# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------x

IN RE:

GENERAL MOTORS LLC IGNITION
SWITCH LITIGATION

*This Document Relates to All Actions*

-----------------------------------------------x

14-MD-2543 (JMF)

**CONSOLIDATED COMPLAINT
CONCERNING ALL GM-BRANDED
VEHICLES THAT WERE ACQUIRED
JULY 11, 2009 OR LATER**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................................................1

II.    JURISDICTION AND VENUE ...............................................................................8

III.    PARTIES ..................................................................................................................8

    A.    Plaintiffs ........................................................................................................8

        1.    Melissa Cave—Alabama ....................................................................9

        2.    Valeria Glenn—Alabama ...................................................................9

        3.    Barbara Hill—Arizona .......................................................................9

        4.    Courtney Williams—Arkansas .........................................................10

        5.    Nettleton Auto Sales, Inc.—Nationwide Dealer and
            Arkansas Class Representative ..........................................................10

        6.    Anna Andrews—California ...............................................................11

        7.    Marc Koppelman—California ...........................................................12

        8.    David Padilla—California .................................................................13

        9.    Daniel Ratzlaff—California ..............................................................13

        10.    Randall Pina—California ..................................................................14

        11.    Nathan Terry—Colorado ..................................................................15

        12.    LaTonia Tucker—Delaware ..............................................................16

        13.    Pajja Jackson—District of Columbia ...............................................16

        14.    Kim Genovese—Florida ...................................................................17

        15.    Rhonda Haskins—Florida .................................................................18

        16.    Joni Ferden-Precht—Florida ............................................................18

        17.    Nykea Fox—Georgia ........................................................................19

        18.    Barry Wilborn—Georgia ..................................................................20

        19.    Patrick Painter—Illinois...................................................................21

20.  Karen Rodman—Indiana ........................................................................21

21.  Alphonso Wright—Indiana...................................................................22

22.  Charles David Loterbour—Iowa.........................................................22

23.  Trina & John Marvin Brutche Jr.—Kansas .......................................23

24.  Phyllis Hartzell—Kansas.....................................................................23

25.  Elizabeth Stewart—Kentucky..............................................................24

26.  Lisa West—Louisiana............................................................................25

27.  Michelangelo De Ieso—Maine .............................................................25

28.  Harry Albert—Maryland.......................................................................25

29.  Bryan Mettee—Maryland......................................................................26

30.  Richard Leger—Massachusetts ...........................................................27

31.  Rafael Lanis—Michigan........................................................................28

32.  Sheree Anderson—Michigan................................................................28

33.  Anna Allhouse—Minnesota..................................................................29

34.  Elizabeth D. Johnson—Mississippi ....................................................29

35.  Linda Wright—Mississippi...................................................................30

36.  Cynthia Hawkins—Missouri ...............................................................30

37.  Ronald Robinson—Missouri ...............................................................31

38.  Patricia Backus—Montana ..................................................................31

39.  Susan Rangel—Nebraska......................................................................32

40.  Sandra Horton—Nevada.......................................................................32

41.  Gene Reagan—New Jersey....................................................................33

42.  Lorraine De Vargas—New Mexico......................................................34

43.  Javier Delacruz—New Mexico.............................................................34

44.  Renate Glyttov—New York ..................................................................35

45.    Nicole Mason—New York ........................................................................36

46.    Steven Sileo—New York ..........................................................................37

47.    Dawn Tefft—New York ............................................................................37

48.    Silas Walton—North Carolina ..................................................................38

49.    Jolene Mulske—North Dakota ..................................................................38

50.    Peggy Robinson—Ohio ............................................................................39

51.    Jerrile Gordon—Oklahoma ......................................................................39

52.    Bruce and Denise Wright—Oklahoma .....................................................39

53.    Jennifer Reeder—Oklahoma ....................................................................40

54.    Deneise Burton—Oklahoma .....................................................................43

55.    Janice Bagley—Pennsylvania ..................................................................43

56.    Janelle Davis—South Dakota ...................................................................44

57.    Louise Tindell—Tennessee ......................................................................44

58.    Michael Graciano—Texas ........................................................................45

59.    Keisha Hunter—Texas ..............................................................................46

60.    Alexis Crockett—Utah ..............................................................................46

61.    Ashlee Hall-Abbott—Virginia .................................................................47

62.    Michael Garcia—Washington ..................................................................47

63.    Tony Hiller—Washington .........................................................................48

64.    Melinda Graley—West Virginia ...............................................................48

65.    Nancy Bellow—Wisconsin .......................................................................49

66.    Henry Redic—Wisconsin .........................................................................49

67.    Scott Schultz—Wisconsin ........................................................................50

68.    Bedford Auto Sales, Inc.—Nationwide Dealer and Ohio
State Class Representative ........................................................................51

B.    Defendant ............................................................................................................52

IV.    FACTUAL ALLEGATIONS ........................................................................53

A.    New GM Falsely Promoted All of Its Vehicles as Safe, Reliable,
and High-Quality ........................................................................53

B.    New GM's Advertising and Marketing Literature Falsely Claimed
that GM Placed Safety and Quality First ....................................65

C.    Contrary to its Barrage of Representations about Safety and
Quality, New GM Concealed and Disregarded Safety Issues as a
Way of Doing Business ................................................................79

D.    New GM's Deceptions Continued In Its Public Discussions of the
Ignition Switch Recalls ...............................................................85

E.    There Are Serious Safety Defects in Millions of GM-Branded
Vehicles Across Many Models and Years and, Until Recently,
New GM Concealed Them from Consumers................................87

F.    The Ignition Switch System Defects...........................................89

1.    New GM learns of the defective ignition switch. ............................92

2.    New GM continues to conceal the ignition switch defect. .............101

3.    New GM receives complaints of power failures in
Defective Ignition Switch Vehicles. ..............................................109

4.    New GM recalls 2.1 million vehicles with defective
ignition
switches...........................................................................................110

5.    New GM recalls over 10 million additional vehicles for
ignition
switch defects in June and July of 2014........................................112

a.    June 19, 2014 Recall—Camaro Recall ..............................113

b.    June 20, 2014 recall—ignition key slot defect..................120

c.    July 2 and 3, 2014 recalls—unintended ignition
rotation defect. ...................................................................133

6.    Yet another ignition switch recall is made on September 4,
2014................................................................................................154

7.    The ignition switch recalls are inadequate and poorly
conducted........................................................................................157

a.    New GM failed to alert drivers of recalled vehicles to the possibility of obtaining a loaner vehicle, and when consumers are aware, they often find that loaner vehicles are not available. .......................................158

b.    The repair is inadequate and/or results in new vehicle defects. ...........................................................161

c.    The recall is untimely.................................................163

d.    The repair of the other ignition switch defects. .................165

G.    Other Safety and Important Defects Affecting Numerous GM-branded Vehicles...........................................................166

1.    Other safety defects affecting the ignition in GM-branded vehicles. .......................................................167

a.    Ignition lock cylinder defect in vehicles also affected by the ignition switch defect that gave rise to the first recall of 2.1 million defective ignition switch vehicles. ....................................................167

b.    Ignition lock cylinder defect affecting over 200,000 additional GM-branded vehicles.....................................171

2.    Defects affecting the occupant safety restraint system in GM-branded vehicles. .............................................172

a.    Safety defects of the airbag systems of GM-branded vehicles. ..............................................................172

(1)    Wiring harness defect. .........................................172

(2)    Driver-side airbag shorting-bar defect. ...................175

(3)    Driver-side airbag inflator defect...........................176

(4)    Roof-rail airbag defect. ........................................177

(5)    Passenger-side airbag defect. ................................179

(6)    Sport seat side-impact airbag defect. .....................180

(7)    Passenger-side airbag inflator defect. ....................180

(8)    Front passenger airbag defect. ..............................182

b.      Safety defects of the seat belt systems in GM-
        branded vehicles..............................................................182

        (1)     Seat belt connector cable defect...............................182

        (2)     Seat belt retractor defect. .......................................184

        (3)     Frontal lap-belt pretensioner defect. ........................185

3.      Safety defects affecting seats in GM-branded vehicles. ...................187

4.      Safety defects affecting the brakes in GM-branded vehicles.......................188

        a.      Brake light defect. ...................................................188

        b.      Brake booster pump defect. ......................................192

        c.      Hydraulic boost assist defect. ...................................193

        d.      Brake rotor defect. ..................................................193

        e.      Reduced brake performance defect.............................194

        f.      Parking brake defect. ...............................................195

5.      Safety defects affecting the steering in GM-branded
        vehicles. ..................................................................195

        a.      Sudden power-steering failure defect. .........................195

        b.      Power steering hose clamp defect................................198

        c.      Power steering control module defect............................198

        d.      Lower control arm ball joint defect. ............................199

        e.      Steering tie-rod defect...............................................200

        f.      Joint fastener torque defect. ......................................200

6.      Safety defects affecting the powertrain in GM-branded
        vehicles. ..................................................................201

        a.      Transmission shift cable defect affecting 1.1 million
                Chevrolet and Pontiac vehicles.................................201

        b.      Transmission shift cable defect affecting
                Cadillac vehicles. ....................................................203

|     |     |                                                                     |     |
|-----|-----|---------------------------------------------------------------------|-----|
|     | c.  | Transmission oil cooler line defect.                                | 204 |
|     | d.  | Transfer case control module software defect.                       | 208 |
|     | e.  | Acceleration-lag defect.                                            | 209 |
|     | f.  | Transmission turbine shaft fracture defect.                         | 210 |
|     | g.  | Automatic transmission shift cable adjuster.                        | 211 |
| 7.  |     | Other serious defects affecting GM-branded vehicles.                | 212 |
|     | a.  | Power management mode software defect.                              | 212 |
|     | b.  | Light control module defect.                                        | 212 |
|     | c.  | Electrical short in driver's door module defect.                    | 213 |
|     | d.  | Front axle shaft defect.                                            | 214 |
|     | e.  | Seat hook weld defect.                                              | 215 |
|     | f.  | Front turn signal bulb defect.                                      | 215 |
|     | g.  | Low-beam headlight defect.                                          | 216 |
|     | h.  | Radio chime defect.                                                | 217 |
|     | i.  | Fuel gauge defect.                                                  | 218 |
|     | j.  | Windshield wiper system defect.                                    | 219 |
|     | k.  | Console bin door latch defect.                                      | 220 |
|     | l.  | Driver door wiring splice defect.                                  | 221 |
|     | m.  | Overloaded feed defect.                                            | 222 |
|     | n.  | Windshield wiper module assembly defect.                           | 223 |
|     | o.  | Engine block heater power cord insulation defect.                  | 224 |
|     | p.  | Rear shock absorber defect.                                        | 224 |
|     | q.  | Electronic stability control defect.                               | 224 |
|     | r.  | Unsecured floor mat defect.                                        | 225 |
|     | s.  | Fuse block defect.                                                 | 226 |

010440-11  725144 V1

| t. | Diesel transfer pump defect. | 227 |
| u. | Rear suspension toe adjuster link defect. | 228 |
| v. | Hood latch defect | 229 |
| w. | Electrical short defect. | 230 |

H.   New GM's Deception Recalls Has Harmed Plaintiffs and the Class ......................231

V.   TOLLING OF THE STATUTES OF LIMITATION ...........................................................242

A.   Discovery Rule Tolling ...........................................................................................242

B.   Fraudulent Concealment Tolling ............................................................................243

C.   Estoppel ...................................................................................................................243

VI.   CHOICE OF LAW ALLEGATIONS .................................................................................244

VII.   CLASS ALLEGATIONS ....................................................................................................245

A.   The Nationwide Class .............................................................................................245

B.   State Law Classes ...................................................................................................252

C.   The Classes and Subclasses Meet Rule 23 Requirements ......................................253

VIII.   CLAIMS FOR RELIEF ......................................................................................................255

A.   Nationwide Class Claims ........................................................................................256

COUNT I  FRAUDULENT CONCEALMENT (BY NATIONWIDE AND
NATIONWIDE DEALER CLASSES) ................................................................................256

COUNT II  UNJUST ENRICHMENT (BY NATIONWIDE AND
NATIONWIDE DEALER CLASSES) ................................................................................258

COUNT III  VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
15 U.S.C. § 2301, *ET SEQ.* ..............................................................................................259

COUNT IV  BREACH OF IMPLIED WARRANTY ...................................................................263

COUNT V  NEGLIGENCE  (ON BEHALF OF THE ARKANSAS,
LOUISIANA, MARYLAND, AND OHIO STATE IGNITION SWITCH
DEFECT SUBCLASSES) ...................................................................................................264

B.   State Class Claims ...................................................................................................266

ALABAMA ........................................................................................................266

COUNT I  VIOLATION OF ALABAMA DECEPTIVE TRADE PRACTICES
ACT (ALA. CODE § 8-19-1, *ET SEQ.*) ...............................................266

COUNT II  FRAUD BY CONCEALMENT ..................................................271

ALASKA ...........................................................................................................273

COUNT I  VIOLATION OF THE ALASKA UNFAIR TRADE  PRACTICES
AND CONSUMER PROTECTION ACT  (ALASKA STAT. ANN.
§ 45.50.471, *ET SEQ.*) .......................................................................273

COUNT II  FRAUD BY CONCEALMENT ..................................................277

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY  (ALASKA STAT. § 45.02.314**)** ....................280

ARIZONA..........................................................................................................281

COUNT I  VIOLATIONS OF THE CONSUMER FRAUD ACT  (ARIZONA
REV. STAT. § 44-1521, *ET SEQ.*)......................................................281

COUNT II  FRAUD BY CONCEALMENT..................................................285

ARKANSAS ......................................................................................................288

COUNT I  VIOLATIONS OF THE DECEPTIVE TRADE PRACTICE ACT
(ARK. CODE ANN. § 4-88-101, *ET SEQ.*) .........................................288

COUNT II  FRAUD BY CONCEALMENT..................................................292

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY ........................................................................294

CALIFORNIA ...................................................................................................296

COUNT I  VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT
(CAL. CIV. CODE § 1750, *ET SEQ.*)..................................................296

COUNT II  VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION
LAW (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*).......................301

COUNT III  FRAUD BY CONCEALMENT .................................................305

COUNT IV  VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY
ACT FOR BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY  (CAL. CIV. CODE §§ 1791.1 & 1792)........................308

COUNT V  NEGLIGENT FAILURE TO RECALL ....................................................310

COLORADO ........................................................................................................312

COUNT I  VIOLATIONS OF THE COLORADO CONSUMER PROTECTION
ACT  (COL. REV. STAT. § 6-1-101, *ET SEQ.*) .................................................312

COUNT II  FRAUD BY CONCEALMENT..............................................................316

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY  (COL. REV. STAT. § 4-2-314)..................................319

CONNECTICUT ..................................................................................................320

COUNT I  VIOLATION OF CONNECTICUT UNLAWFUL TRADE
PRACTICES ACT  (CONN. GEN. STAT. § 42-110A, *ET SEQ.*)......................320

COUNT II  FRAUDULENT CONCEALMENT .........................................................324

DELAWARE ........................................................................................................326

COUNT I  VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT  (6
DEL. CODE § 2513, *ET SEQ.*).....................................................................326

COUNT II  VIOLATION OF THE DELAWARE DECEPTIVE TRADE
PRACTICES ACT (6 DEL. CODE § 2532, *ET SEQ.*).......................................330

COUNT III  FRAUD BY CONCEALMENT ..............................................................334

COUNT IV  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY .................................................................................337

DISTRICT OF COLUMBIA .................................................................................338

COUNT I  VIOLATION OF THE CONSUMER PROTECTION PROCEDURES
ACT  (D.C. CODE § 28-3901, *ET SEQ.*).......................................................338

COUNT II  FRAUD BY CONCEALMENT..............................................................343

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY........................345

FLORIDA ............................................................................................................346

COUNT I  VIOLATION OF FLORIDA'S UNFAIR &  DECEPTIVE TRADE
PRACTICES ACT  (FLA. STAT. § 501.201, *ET SEQ.*)....................................346

COUNT II  FRAUD BY CONCEALMENT..............................................................350

GEORGIA............................................................................................................353

COUNT I  VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT
(GA. CODE ANN. § 10-1-390, *ET SEQ.*)............................................................353

COUNT II  VIOLATION OF GEORGIA'S UNIFORM DECEPTIVE TRADE
PRACTICES ACT  (GA. CODE ANN. § 10-1-370, *ET SEQ.*) ...........................357

COUNT III..................................................................................................................361

HAWAII ....................................................................................................................364

COUNT I  UNFAIR AND DECEPTIVE ACTS IN VIOLATION OF HAWAII
LAW  (HAW. REV. STAT. § 480, *ET SEQ.*) ......................................................364

COUNT II  FRAUD BY CONCEALMENT...............................................................368

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY ............................................................................................371

IDAHO.......................................................................................................................372

COUNT I  VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT
(IDAHO CIV. CODE § 48-601, *ET SEQ.*)..........................................................372

COUNT II  FRAUD BY CONCEALMENT...............................................................376

ILLINOIS...................................................................................................................379

COUNT I  VIOLATION OF ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT  (815 ILCS 505/1, *ET SEQ.*
AND 720 ILCS 295/1A)...........................................................................................379

COUNT II  FRAUD BY CONCEALMENT...............................................................383

INDIANA ...................................................................................................................386

COUNT I  VIOLATION OF THE INDIANA DECEPTIVE CONSUMER
SALES ACT  (IND. CODE § 24-5-0.5-3)................................................................386

COUNT II  FRAUD BY CONCEALMENT...............................................................391

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY.........393

IOWA .........................................................................................................................394

COUNT I  VIOLATIONS OF THE PRIVATE RIGHT OF ACTION  FOR
CONSUMER FRAUDS ACT  (IOWA CODE § 714H.1, *ET SEQ.*) ...................394

COUNT II  FRAUD BY CONCEALMENT...............................................................399

KANSAS.................................................................................................................401

COUNT I  VIOLATIONS OF THE KANSAS CONSUMER PROTECTION
        ACT (KAN. STAT. ANN. § 50-623, *ET SEQ.*) ..................................401

COUNT II  FRAUD BY CONCEALMENT...................................................................406

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY.........................408

KENTUCKY.............................................................................................................410

COUNT I  VIOLATION OF THE KENTUCKY CONSUMER PROTECTION
        ACT (KY. REV. STAT. § 367.110, *ET SEQ.*) ......................................410

COUNT II  FRAUD BY CONCEALMENT...................................................................414

LOUISIANA.............................................................................................................416

COUNT I  VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES
        AND CONSUMER PROTECTION LAW  (LA. REV. STAT. § 51:1401,
        *ET SEQ.*) ...............................................................................................416

COUNT II  FRAUD BY CONCEALMENT...................................................................420

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY/
        WARRANTY AGAINST REDHIBITORY DEFECTS  (LA. CIV. CODE
        ART. 2520, 2524) .....................................................................................423

MAINE ....................................................................................................................425

COUNT I  VIOLATION OF MAINE UNFAIR TRADE PRACTICES ACT
        (ME. REV. STAT. ANN. TIT. 5 § 205-A, *ET SEQ.*)...........................425

COUNT II  FRAUD BY CONCEALMENT...................................................................429

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
        (ME. REV. STAT. ANN. TIT. 11 § 2-314)..........................................431

MARYLAND ............................................................................................................432

COUNT I  VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION
        ACT  (MD. CODE COM. LAW § 13-101, *ET SEQ.*)...........................432

COUNT II  FRAUD BY CONCEALMENT...................................................................436

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
        (MD. CODE COM. LAW § 2-314)........................................................439

MASSACHUSETTS....................................................................................................440

COUNT I  DECEPTIVE ACTS OR PRACTICES PROHIBITED BY
MASSACHUSETTS LAW  (MASS. GEN. LAWS CH. 93A, § 1, *ET
SEQ.*) ..................................................................................................440

COUNT II  FRAUD BY CONCEALMENT ................................................444

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(ALM GL. CH. 106, § 2-314).................................................447

MICHIGAN ...............................................................................................448

COUNT I  VIOLATION OF THE MICHIGAN CONSUMER PROTECTION
ACT   (MICH. COMP. LAWS § 445.903, *ET SEQ.*).........................448

COUNT II  FRAUD BY CONCEALMENT ................................................453

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(MICH. COMP. LAWS § 440.2314)..........................................455

MINNESOTA .............................................................................................457

COUNT I  VIOLATION OF MINNESOTA PREVENTION  OF CONSUMER
FRAUD ACT   (MINN. STAT. § 325F.68, *ET SEQ.*) .........................457

COUNT II  VIOLATION OF MINNESOTA UNIFORM  DECEPTIVE TRADE
PRACTICES ACT  (MINN. STAT. § 325D.43-48, *ET SEQ.*) ..............461

COUNT III  FRAUD BY CONCEALMENT ...............................................465

COUNT IV  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(MINN. STAT. § 336.2-314)....................................................468

MISSISSIPPI .............................................................................................469

COUNT I  VIOLATION OF MISSISSIPPI CONSUMER PROTECTION ACT
(MISS. CODE. ANN. § 75-24-1, *ET SEQ.*) ...................................469

COUNT II  FRAUD BY CONCEALMENT ................................................473

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(MISS. CODE ANN. § 75-2-314).............................................476

MISSOURI .................................................................................................477

COUNT I  VIOLATION OF MISSOURI MERCHANDISING PRACTICES
ACT (MO. REV. STAT. § 407.010, *ET SEQ.*) .................................477

COUNT II  FRAUD BY CONCEALMENT ................................................482

- xiii -

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(MO. REV. STAT. § 400.2-314) ............................................................484

MONTANA ....................................................................................................486

COUNT I  VIOLATION OF MONTANA UNFAIR TRADE PRACTICES AND
CONSUMER PROTECTION ACT OF 1973  (MONT. CODE ANN.
§ 30-14-101, *ET SEQ.*) ..........................................................................486

COUNT II  FRAUD BY CONCEALMENT ..................................................490

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(MONT. CODE § 30-2-314) ....................................................................492

NEBRASKA ...................................................................................................493

COUNT I  VIOLATION OF THE NEBRASKA CONSUMER PROTECTION
ACT (NEB. REV. STAT. § 59-1601, *ET SEQ.*) ....................................493

COUNT II  FRAUD BY CONCEALMENT ..................................................497

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(NEB. REV. STAT. NEB. § 2-314) ........................................................500

NEVADA ........................................................................................................501

COUNT I  VIOLATION OF THE NEVADA DECEPTIVE TRADE
PRACTICES ACT  (NEV. REV. STAT. § 598.0903, *ET SEQ.*) ............501

COUNT II  FRAUD BY CONCEALMENT ..................................................505

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(NEV. REV. STAT. § 104.2314) ............................................................508

NEW HAMPSHIRE ........................................................................................509

COUNT I  VIOLATION OF N.H. CONSUMER PROTECTION ACT  (N.H.
REV. STAT. ANN. § 358-A:1, *ET SEQ.*) ..............................................509

COUNT II  FRAUD BY CONCEALMENT ..................................................513

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (N.H. REV. STAT. ANN. § 382-A:2-314) ..................516

NEW JERSEY .................................................................................................517

COUNT I  VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT  (N.J.
STAT. ANN. § 56:8-1, *ET SEQ.*) ..........................................................517

010440-11 725144 V1

COUNT II  FRAUD BY CONCEALMENT ................................................................521

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(N.J. STAT. ANN. § 12A:2-314) .............................................................524

NEW MEXICO ....................................................................................................525

COUNT I  VIOLATIONS OF THE NEW MEXICO UNFAIR TRADE
PRACTICES ACT (N.M. STAT. ANN. §§ 57-12-1, *ET SEQ.*) ..........................525

COUNT II  FRAUD BY CONCEALMENT ................................................................529

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(N.M. STAT. ANN. § 55-2-314) ............................................................532

NEW YORK .......................................................................................................533

COUNT I  DECEPTIVE ACTS OR PRACTICES  (N.Y. GEN. BUS. LAW § 349
AND 350)..........................................................................................533

COUNT II  FRAUD BY CONCEALMENT ................................................................538

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(N.Y. U.C.C. § 2-314).........................................................................540

COUNT IV  VIOLATION OF NEW YORK'S FALSE ADVERTISING ACT
(N.Y. GEN. BUS. LAW § 350)...............................................................541

NORTH CAROLINA .............................................................................................543

COUNT I  VIOLATION OF NORTH CAROLINA'S UNFAIR  AND
DECEPTIVE ACTS AND PRACTICES ACT  (N.C. GEN. STAT. § 75-
1.1, *ET SEQ.*) ...................................................................................543

COUNT II  FRAUD BY CONCEALMENT ................................................................547

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(N.C. GEN. STAT. § 25-2-314) .............................................................550

NORTH DAKOTA ................................................................................................551

COUNT I  VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD
ACT (N.D. CENT. CODE § 51-15-02) .....................................................551

COUNT II  FRAUD BY CONCEALMENT ................................................................555

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(N.D. CENT. CODE § 41-02-31) ...........................................................558

010440-11 725144 V1

OHIO ..............................................................................................................559

COUNT I  VIOLATION OF OHIO CONSUMER SALES PRACTICES ACT
(OHIO REV. CODE ANN. § 1345.01, *ET SEQ.*) ...............................................559

COUNT II  FRAUD BY CONCEALMENT...................................................................564

COUNT III  IMPLIED WARRANTY IN TORT............................................................567

OKLAHOMA ....................................................................................................568

COUNT I  VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT
(OKLA. STAT. TIT. 15 § 751, *ET SEQ.*)..........................................................568

COUNT II  FRAUD BY CONCEALMENT..................................................................573

COUNT III  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(12A OKLA. STAT. ANN. § 2-314)....................................................................576

OREGON..........................................................................................................577

COUNT I  VIOLATION OF THE OREGON UNLAWFUL TRADE
PRACTICES ACT  (OR. REV. STAT. §§ 646.605, *ET SEQ.*)..............................577

COUNT II  FRAUD BY CONCEALMENT..................................................................581

PENNSYLVANIA.................................................................................................583

COUNT I  VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE
PRACTICES AND CONSUMER PROTECTION LAW  (73 P.S. § 201-1,
*ET SEQ.*) ....................................................................................................583

COUNT II  FRAUD BY CONCEALMENT..................................................................588

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (13 PA. CONS. STAT. ANN. § 2314)..........................................590

RHODE ISLAND .................................................................................................592

COUNT I  VIOLATION OF THE RHODE ISLAND UNFAIR TRADE
PRACTICES AND CONSUMER PROTECTION ACT  (R.I. GEN.
LAWS § 6-13.1, *ET SEQ.*)...............................................................................592

COUNT II  FRAUD BY CONCEALMENT..................................................................596

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (R.I. GEN. LAWS § 6A-2-314) ....................................................599

SOUTH CAROLINA..............................................................................................600

COUNT I  VIOLATIONS OF THE SOUTH CAROLINA UNFAIR TRADE
PRACTICES ACT  (S.C. CODE ANN. § 39-5-10, *ET SEQ.*) .............................................600

COUNT II  VIOLATIONS OF THE SOUTH CAROLINA REGULATION OF
MANUFACTURERS, DISTRIBUTORS, AND DEALERS ACT  (S.C.
CODE ANN. § 56-15-10, *ET SEQ.*) .....................................................................................605

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (S.C. CODE § 36-2-314) ...............................................................606

COUNT IV  FRAUD BY CONCEALMENT ..................................................................................607

SOUTH DAKOTA ............................................................................................................................610

COUNT I  VIOLATION OF THE SOUTH DAKOTA  DECEPTIVE TRADE
PRACTICES AND CONSUMER PROTECTION LAW  (S.D.
CODIFIED LAWS § 37-24-6) ...............................................................................................610

COUNT II  FRAUD BY CONCEALMENT .................................................................................614

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (S.D. CODIFIED LAWS § 57A-2-314) ......................................617

TENNESSEE .....................................................................................................................................618

COUNT I  VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT
(TENN. CODE ANN. § 47-18-101, *ET SEQ.*) ....................................................................618

COUNT II  FRAUD BY CONCEALMENT .................................................................................622

TEXAS...............................................................................................................................................624

COUNT I  VIOLATIONS OF THE TEXAS DECEPTIVE TRADE  PRACTICES
– CONSUMER PROTECTION ACT  (TEX. BUS. & COM. CODE
§§ 17.41, *ET SEQ.*) ...............................................................................................................624

COUNT II  FRAUD BY CONCEALMENT .................................................................................629

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY   (TEX. BUS. & COM. CODE § 2.314) .......................................631

UTAH ................................................................................................................................................633

COUNT I  VIOLATION OF UTAH CONSUMER SALES PRACTICES ACT
(UTAH CODE ANN. § 13-11-1, *ET SEQ.*)..........................................................................633

COUNT II ...........................................................................................................................................637

FRAUD BY CONCEALMENT ......................................................................................................637

COUNT III BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (UTAH CODE ANN. § 70A-2-314) ............................................639

VERMONT.................................................................................................................640

COUNT I VIOLATION OF VERMONT CONSUMER FRAUD ACT (VT.
STAT. ANN. TIT. 9, § 2451 *ET SEQ.*) ................................................................640

COUNT II FRAUD BY CONCEALMENT...................................................................644

VIRGINIA ................................................................................................................647

COUNT I VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT
(VA. CODE ANN. 15 §§ 59.1-196, *ET SEQ.*) ....................................................647

COUNT II FRAUD BY CONCEALMENT...................................................................651

COUNT III BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(VA. CODE ANN. § 8.2-314) ...........................................................................654

WASHINGTON ........................................................................................................655

COUNT I VIOLATION OF THE CONSUMER PROTECTION ACT (REV.
CODE WASH. ANN. §§ 19.86.010, *ET SEQ.*)...................................................655

COUNT II FRAUD BY CONCEALMENT...................................................................658

WEST VIRGINIA .....................................................................................................661

COUNT I VIOLATIONS OF THE CONSUMER CREDIT AND PROTECTION
ACT (W. VA. CODE § 46A-1-101, *ET SEQ.*)....................................................661

COUNT II FRAUD BY CONCEALMENT...................................................................667

COUNT III BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(W. VA. CODE § 46-2-314).............................................................................669

WISCONSIN ...........................................................................................................671

COUNT I VIOLATIONS OF THE WISCONSIN DECEPTIVE TRADE
PRACTICES ACT (WIS. STAT. § 110.18).........................................................671

COUNT II FRAUD BY CONCEALMENT...................................................................675

WYOMING ..............................................................................................................677

COUNT I VIOLATION OF THE WYOMING CONSUMER PROTECTION
ACT (WYO. STAT. §§ 40-12-105 *ET SEQ.*).....................................................677

010440-11 725144 V1

COUNT II  FRAUD BY CONCEALMENT ...................................................................................682

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY  (WYO. STAT. §§ 34.1-2-314) .....................................................684

PRAYER FOR RELIEF ..................................................................................................................685

IX.    JURY TRIAL DEMAND ....................................................................................................686

010440-11  725144 V1

This Consolidated and Amended Complaint ("Complaint") is filed as a civil action in this Court and is intended to serve as the Plaintiffs' Master Class Action Complaint for purposes of discovery, pre-trial motions and rulings (including for choice of law rulings relevant to Rule 23 of the Federal Rules of Civil Procedure, and class certification itself), and trial of certified claims or common questions in these multi-district litigation ("MDL") proceedings. This pleading, consistent with Fed. R. Civ. P. 1's directive to secure the "just, speedy and inexpensive determinations of every action and proceeding," extensively details New GM's unprecedented abrogation of basic standards of safety, truthfulness, and accountability to the detriment of tens-of-millions of consumers and the public at large. This Complaint draws upon an array of sources, including a careful review of the documents produced to date (including tens-of-thousands of pages of unheeded consumer complaints), New GM's own public concessions, and other extensive materials. Notwithstanding the foregoing, certain claims or issues for certain parties may, consistent with 28 U.S.C. § 1407 and the case law thereunder, be matters for determination on remand by transferor courts.

This pleading neither waives nor dismisses any claims for relief against any defendant not included in this pleading that are asserted by any other plaintiffs in actions that have been or will be made part of this MDL proceeding, except by operation of the class notice and (with respect to any Rule 23(b)(3) class) any opt-out provisions on claims or common questions asserted in this Complaint and certified by this Court.

## I.   INTRODUCTION

1.      Rule No. 1:  Manufacturers of any product—from toys to automobiles—must manufacture and sell products that are, above all else, safe to use.  Not only is safety essential to long-term brand value and corporate success, it's also required by law.

010440-11 725144 V1

2.      Rule No. 2:  Manufacturers must also tell the complete truth about the safety of their products.  When a safety defect does occur, manufacturers must initiate some form of recall to address the problem.

3.      New GM violated both of these rules.  It manufactured and sold over 27 million vehicles that were not safe.  New GM also failed to disclose the truth about its ability to manufacture and sell safe and reliable vehicles, and failed to remedy the defects in millions of GM-branded vehicles that were on the road.

4.      New GM led consumers in the United States and worldwide to believe that, after bankruptcy, it was a new company.  For example, in numerous public announcements and public filings, such as in its 2012 Annual Report, New GM repeatedly proclaimed that it was a company committed to innovation, safety, and maintaining a strong brand.  An example from its 2012 Annual Report:



010440-11 725144 V1

5.      New GM was successful in selling its "processes and culture change" and building "the best vehicles in the world" story. Sales of all New GM models went up, and New GM became profitable. As far as the public knew, a new General Motors was born, and the GM brand once again stood strong in the eyes of consumers.

6.      New GM's brand image was an illusion given New GM's egregious failure to disclose, and the affirmative concealment of, ignition switch defects and a plethora of other safety defects in GM-branded vehicles. New GM concealed the existence of the many known safety defects plaguing many models and years of GM-branded vehicles, and New GM valued cost-cutting over safety, while concurrently marketing New GM vehicles as "safe" and "reliable," and claiming that it built the "world's best vehicles." Consequently, New GM enticed Plaintiffs and all GM-branded vehicle purchasers to buy or lease vehicles that have now diminished in value, as the truth about the New GM brand has come out and a stigma has attached to all GM-branded vehicles.

7.      A vehicle made by a reputable manufacturer of safe and reliable vehicles is worth more than an otherwise similar vehicle made by a disreputable manufacturer that is known to devalue safety and to conceal serious defects from consumers and regulators. New GM vehicle Safety Chief, Jeff Boyer, recently highlighted the heightened materiality to consumers of safety: "Nothing is more important than the safety of our customers in the vehicles they drive." Yet New GM failed to live up to this commitment, instead choosing to conceal at least 60 serious defects in over 27 million GM-branded vehicles sold in the United States. And the value of all GM-branded Vehicles has diminished as a result of the widespread publication of those defects and New GM's corporate culture of ignoring and concealing safety defects.

010440-11 725144 V1

8.     The systematic concealment of known defects was deliberate, as New GM followed a consistent pattern of endless "investigation" and delay each time it became aware of a given defect.  Recently revealed documents show that New GM valued cost-cutting over safety, trained its personnel to ***never*** use the word "defect," "stall," or other words suggesting that any GM-branded vehicles are defective, routinely chose the cheapest part supplier without regard to safety, and discouraged employees from acting to address safety issues.

9.     In addition, GM was plagued by what CEO Mary Barra calls "transactional decision making," in which GM employees "color[] inside the lines of their own precise job description without thinking independently or holistically," *i.e.*, without looking at the larger issue of safety.[1]

10.     In light of New GM's systemic devaluation of safety issues, it is not surprising that, from the date of its inception, New GM itself produced a grossly inordinate number of vehicles with serious safety defects.  Until this year, New GM was successful in concealing both its disregard of safety and the myriad defects that resulted from that disregard.

11.     According to the administrator of the National Highway Traffic Safety Administration ("NHTSA"), New GM worked to hide documents from NHTSA and created firewalls to prevent people within New GM from "connecting the dots" with respect to safety issues and defects.  New GM did so to keep information about safety issues and defects secret.

12.     The array of concealed defects is astounding and goes far beyond the ignition switch defects, the belated revelation of which sparked GM's 2014 serial recalls.  The defects affected virtually every safety system in GM-branded vehicles, including but by no means limited to the airbags, seatbelts, brakes, brake lights, electronic stability control, windshield

---

[1] TIME MAGAZINE, October 6, 2014, p. 36.

- 4 -

wipers, sensing and diagnostic modules, and warning chimes. This defect list includes at least the following parts, many of which effect the vehicle's safety: (1) ignition switch, (2) power steering, (3) airbags, (4) brake lights, (5) shift cables, (6) safety belts, (7) ignition lock cylinders, (8) key design, (9) ignition key, (10) transmission oil cooler lines, (11) power management mode software defect, (12) substandard front passenger airbags, (13) light control modules, (14) front axle shafts, (15) brake boosts, (16) low-beam headlights, (17) vacuum line brake boosters, (18) fuel gauges, (19) accelerator, (20) flexible flat cable airbags, (21) windshield wipers, (22) brake rotors, (23) passenger-side airbags, (24) electronic stability control, (25) steering tie-rods, (26) automatic transmission shift cable adjusters, (27) fuse blocks, (28) diesel transfer pumps, (29) radio warning chimes, (30) shorting bars, (31) front passenger airbag end caps, (32) sensing and diagnostic modules ("SDM"), (33) sonic turbine shafts, (34) electrical systems, and (35) the seatbelt tensioning system.

13.    New GM has received reports of crashes, deaths, injuries, and safety concerns expressed by GM's customers that put New GM on notice of the serious safety issues presented by many of these defects. Given the continuity of engineers, corporate counsel, and other key personnel from Old GM to New GM, New GM knew and was fully aware of the now infamous ignition switch defect (and many other serious defects in numerous models of GM-branded vehicles) *from the very date of its inception on July 10, 2009*. New GM was not born innocent, and its public commitment to culture and process change remain entirely hollow.

14.    New GM's claims that the defects were known only to lower level engineers is false. For example, current CEO Mary Barra, while head of product development, was informed in 2011 of a safety defect in the electronic power steering of several models. Despite 4,800

consumer complaints and more than 30,000 warranty repairs, GM waited until 2014 to disclose this defect.

15.     Despite the dangerous nature of many of the defects and their effects on critical safety systems, New GM concealed the existence of the defects, created new defects, and failed to begin to remedy the problems from the date of its inception until this year.

16.     New GM's now highly publicized campaign of deception in connection with the ignition switch defect first revealed in February 2014 sent shockwaves throughout the country and jump-started the ever-burgeoning erosion of consumer confidence in the New GM brand. Unfortunately for all owners of vehicles sold by New GM, the ignition switch defect announced in February 2014 was only one of a seemingly never-ending parade of recalls in 2014—many concerning safety defects that had been long known to New GM.

17.     On May 16, 2014, New GM entered into a Consent Order with NHTSA in which it admitted that it violated the TREAD Act by not disclosing the ignition switch defect that gave rise to the February and March 2014 recalls, and agreed to pay the maximum available civil penalties for its violations.

18.     New GM's CEO, Mary Barra, has admitted in a video message that: "Something went wrong with our process…, and terrible things happened." But that admission is cold comfort for Plaintiffs and the Class, whose vehicles have diminished in value as a result of New GM's deception.

19.     New GM systematically and repeatedly breached its obligations and duties to its customers to make truthful and full disclosures concerning its vehicles—particularly, the safety and reliability of its vehicles and the importance of safety to the Company. New GM's false representations and/or omissions concerning the safety and reliability of its vehicles, and its

concealment of a plethora of known safety defects plaguing its vehicles and its brand, caused

Plaintiffs and the Class to purchase GM-branded vehicles under false pretenses.

20.    Plaintiffs and the Class have been damaged by New GM's conduct,

misrepresentations, concealment, and non-disclosure of the numerous defects plaguing over

27 million GM-branded vehicles.  Now that the truth is emerging, and consumers are aware that

New GM concealed known safety defects in many models and years of its vehicles, and that the

Company de-valued safety and systemically encouraged its employees to conceal serious defects,

the entire New GM brand is greatly tarnished by the revelation that the Company is

untrustworthy and does not stand behind its vehicles.  The value of GM-branded vehicles has

therefore diminished because of New GM's failure to timely disclose and remedy the many

serious defects in GM-branded vehicles after the truth of New GM's safety record and culture of

deceit was exposed.  Examples:  The 2010 and the 2011 Chevrolet Camaro have both seen a

diminished value of $2,000 when compared to the value of comparable vehicles; the 2009

Pontiac Solstice has diminished $2,900 in value; the 2010 Cadillac STS diminished in value by

$1,235 in September 2014; and the 2010 Buick LaCrosse by $649 in that same month.  New

GM's egregious and widely publicized conduct and the never-ending and piecemeal nature of

New GM's recalls has so tarnished GM-branded vehicles that no reasonable consumer would

have paid the price they did when the New GM brand supposedly meant safety and success.

21.    Plaintiffs pursue their claims on behalf of a Class generally and initially defined

as all persons who purchased or leased a GM-branded between July 11, 2009, and July 3, 2014

(the "Affected Vehicles") and who (i) still own or lease an Affected Vehicle, (ii) sold an

Affected Vehicle on or after February 14, 2014, and/or (iii) purchased or leased an Affected

Vehicle that was declared a total loss after an accident on or after February 14, 2014.  Plaintiffs

- 7 -

assert claims for a nationwide class applying Michigan law for claims of fraudulent concealment, unjust enrichment, the implied warranty of merchantability, and the Magnuson-Moss Warranty Act. Plaintiffs also assert claims based upon the laws of all fifty states and the District of Columbia for a class in each jurisdiction for damages, statutory penalties, and declaratory, equitable and injunctive relief against New GM for, among other things, violations of state unfair and deceptive trade practice acts, as more specifically set forth in the claims for relief asserted below.

## II.  JURISDICTION AND VENUE

22.     This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiffs and other Class members are citizens of a different state than Defendant.

23.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over New GM because New GM conducts substantial business in this District, and some of the actions giving rise to the complaint took place in this District.

24.     Venue is proper in this District under 28 U.S.C. § 1391 because New GM, as a corporation, is deemed to reside in any judicial district in which it is subject to personal jurisdiction. Additionally, New GM transacts business within the District, and some of the events establishing the claims arose in this District.

## III.  PARTIES

25.     Pursuant to the Court's instructions that Plaintiffs could file directly in the MDL court and reserve the right to have filed in another district, this Complaint is filed by each new Plaintiff as if they had filed in the district in which they reside.

**A.     Plaintiffs**

010440-11 725144 V1

26.     Unless otherwise indicated, each Plaintiff purchased or leased his or her GM-branded vehicle primarily for personal, family, or household use.

### 1.     Melissa Cave—Alabama

27.     Plaintiff and proposed Nationwide and Alabama State Class Representative Melissa Cave is a resident and citizen of New Hope, Alabama.  Ms. Cave purchased a used 2006 Chevrolet Cobalt on February 15, 2013, at High Country Toyota in Scottsboro, Alabama for approximately $7,000.  Her vehicle was not covered by a warranty.  Ms. Cave drives 23 miles to work and during her drive she has known her Cobalt to shut off more than 50 times in a trip.  On June 21, 2014, Ms. Cave totaled her car after it shut off while she was driving approximately 35-40 miles per hour.  She sustained injuries to her knee, bruising from the seatbelt, and chemical burns to her thumb and hand from the airbag.  Had she known about the problems with her GM-branded vehicle, she would not have purchased the car.

### 2.     Valeria Glenn—Alabama

28.     Plaintiff Valeria Glenn resides in Alabaster, Alabama.  She purchased a used 2006 Pontiac Solstice in February 2013 in Pelham, Alabama for $13,000.  The vehicle has a 100,000 mile warranty.  Ms. Glenn has experienced shut downs and locking of her steering wheel while driving her vehicle.  Ms. Glenn had her ignition switch replaced pursuant to the recall.  Since that time, the air conditioning in her vehicle is no longer working, although it worked fine before the replacement.  Knowing what she now knows about the safety defects in many GM-branded vehicles, and the Solstice in particular, she would not have purchased the vehicle and does not feel safe driving the vehicle.

### 3.     Barbara Hill—Arizona

29.     Plaintiff and proposed Nationwide and Arizona State Class Representative Barbara Hill is a resident and citizen of Mesa, Arizona.  Ms. Hill purchased a used 2007

- 9 -

Chevrolet Cobalt on July 9, 2012, for approximately $12,000 at the Auto Nation in Tempe, Arizona.  Ms. Hill purchased the Cobalt after performing research about vehicles and, based on that research, believing the Cobalt to be a safe and reliable vehicle.  She no longer feels safe driving the vehicle.  Ms. Hill had her ignition switch replaced in May 2014, but she does not trust that the replacement will resolve the vehicle's safety defect.  Had she known about the problems with her GM-branded vehicle, she would he would not have purchased the car.

### 4.    Courtney Williams—Arkansas

30.    Plaintiff and proposed Nationwide and Arkansas State Class Representative Courtney Williams is a resident and citizen of West Memphis, Arkansas.  Mr. Williams purchased a used 2011 Chevrolet Camaro on or about April 15, 2013, at Frank Fletcher Dodge in Sherwood, Arkansas for over $33,585.  Mr. Williams experienced at least one complete shutdown of the Camaro on or about September 17, 2014, after driving over a bump in the road. He has also experienced difficulty in steering his vehicle.  Mr. Williams has not yet had his car repaired under the recall because New GM informed him the parts are not yet available.  Mr. Williams believes he suffered a diminution of value in his vehicle due to the ignition switch defects, the recalls and the surrounding publicity.  He would not have purchased the Camaro, or he would have paid less for it, had he known about these defects.

### 5.    Nettleton Auto Sales, Inc.—Nationwide Dealer and Arkansas Class Representative

31.    Plaintiff and proposed Nationwide and Arkansas State Class Representative Nettleton Auto Sales, Inc. maintains its principal place of business in Jonesboro, Arkansas. Nettleton Auto Sales, Inc. purchased the following GM-branded vehicles with the intention to resale same:

010440-11 725144 V1

- Vehicle #1: used 2009 Chevy HHR on March 27, 2014, in
  Nashville, Tennessee for $10,865, plus $1,268.32 in
  shipping costs;

- Vehicle #2: used 2011 Chevy HHR on February 14, 2014,
  in Jonesboro, Arkansas for $5,850, plus $1,079.49 in
  shipping and repair costs; and

- Vehicle #3: used 2010 Chevy HHR on March 12, 2014, in
  Jonesboro, Arkansas for $6,000, plus $5,028.13 in
  additional shipping and repair costs.

32.     The 2009 HHR is still in the possession of Nettleton Auto Sales, Inc.  The other

two have been sold to Arkansas consumers.  The 2011 HHR is currently covered by a warranty,

while the other two are not.  The 2011 HHR had its ignition switch replaced on June 30, 2014,

and the other two vehicles have not had the repair performed.  Nettleton Auto Sales, Inc.

continues to try and sell the 2009 HHR.  The 2011 HHR was sold to consumers on June 28,

2014, in fair condition for $8,500 with mileage of 126,682.  The 2010 HHR was sold to

consumers on June 4, 2014, in fair condition for $12,900 with 86,960 in mileage.  Nettleton Auto

Sales, Inc. believes the value of its vehicle have been diminished as a result of the defects.  It

would not have purchased these cars if New GM had been honest about the safety defects.

**6.     Anna Andrews—California**

33.     Plaintiff and proposed Nationwide and California State Class Representative

Anna Andrews is a resident and citizen of La Quinta, CA.  She purchased a used 2010 Buick

LaCrosse in Cathedral City, California on August 25, 2011, for $36,686.86.  Ms. Andrews

purchased her LaCrosse, in part, because she wanted a safely designed and manufactured

vehicle.  She further believed that New GM was a reputable manufacturer of safe and reliable

vehicles and that the Company stands behind its vehicles once they are on the road.  Plaintiff did

not learn of the many defects in GM-branded vehicles until shortly before filing this lawsuit.

- 11 -

Had New GM disclosed the many defects in GM-branded vehicles, Plaintiff would either not have purchased her LaCrosse, or would have paid less than she did.

### 7.      Marc Koppelman—California

34.      Plaintiff and proposed Nationwide and California State Class Representative Marc Koppelman is a resident and citizen of Torrance, California.  Mr. Koppelman purchased a certified used 2010 Chevy HHR in 2012 in California for approximately $12,900.00.  The 2010 Chevy HHR was still covered under the original factory warranty, and the dealership provided an additional 1-year warranty as part of the purchase price.  Mr. Koppelman's decision to buy the car was influenced by the perceived safety associated with the car's airbag system and advertising touting the car's reliability.  This was important to Mr. Koppelman because his wife was going to be the principal driver.  In June 2012, about 4 months after he purchased the vehicle, while driving in Maryland on a residential street, the HHR lost power and lost power steering.  Mr. Koppelman managed to pump the brakes and get the car safely off the road.  When he received his recall notice, Mr. Koppelman called his GM dealership and they told him that he should reduce the weight on his keychain.  Mr. Koppelman had to wait for the dealer to receive the new parts so that his HHR would be repaired under the recall.  In August 2014, the recall repair work was completed.  After the GM dealers gave him "the run-around" with regard to getting the new part installed, he and his wife considered selling the vehicle.  In late May or early June 2014, Mr. Koppelman researched his car on Kelley Blue Book and it was valued at approximately $9,200.  He went to his local dealer, Martin Chevrolet in Torrance, California, and they only offered him $6,100 to trade it in.  Mr. Koppelman was shocked at the low number so he declined to sell it.  He then took the vehicle to another GM dealer in Long Beach, California and they quoted him a similar value as the last dealership.  They told him that due to the recalls, the HHR's value had declined, and they were even lowering the retail prices on their

- 12 -

own vehicles for sale.  In mid-July 2014, Mr. Koppelman checked Kelley Blue Book again and

saw that his car value dropped to approximately $8,400.  He remembers comparable HHRs were

selling for $12,000-14,000 retail at the time the recalls were first announced, but now the retail

price has dropped to approximately $10,000.  Mr. Koppelman was a loyal GM-brand owner,

having previously owned Corvettes, Buicks, and Cadillacs, but now he says he will never

purchase a GM-branded vehicle again.  Mr. Koppelman would not have purchased this vehicle

had New GM been honest about the safety defects.

**8.      David Padilla—California**

35.      Plaintiff and proposed Nationwide and California State Class Representative

David Padilla is a resident and citizen of Stockton, California.  Mr. Padilla purchased a new 2010

Chevy Cobalt in April 2010 in Stockton, California for $21,690.27.  The vehicle was under

warranty when he purchased it.  On one occasion, Mr. Padilla was backing out of his garage

when his vehicle inexplicably shut off.  As a result, Mr. Padilla was afraid to drive his vehicle.

Those fears increased once he learned of the ignition switch recall and the risks posed by the

defects.  Mr. Padilla had the ignition switch replaced under the recall repair program.  He

believes the value of his vehicle has been diminished as a result of the defects.  Mr. Padilla

would not have purchased this car if New GM had been honest about the safety defects.

**9.      Daniel Ratzlaff—California**

36.      Plaintiff and proposed Nationwide and California State Class Representative

Daniel Ratzlaff is a resident and citizen of Quartz Hill, California.  Mr. Ratzlaff purchased a used

a 2005 Chevy Equinox in October 2013 in Palmdale, California for $10,000.  The vehicle was

under warranty when he purchased it, and he also purchased an extended warranty which expires

in 2015.  Mr. Ratzlaff chose the Equinox, in part, because he wanted a safely designed and

manufactured vehicle.  He saw advertisements for GM-branded vehicles before he purchased the

010440-11 725144 V1

Equinox and, although he does not recall the specifics of the advertisements, he does recall that safety and quality were consistent themes across the advertisements he saw. These representations about safety and quality influenced Mr. Ratzlaff's decision to purchase the Equinox. Mr. Ratzlaff experienced the ignition switch defect described by the General Motors recall. On several occasions, he remembers all electrical systems turning off, including air bags and dash-signaling monitor information. He would have to consistently turn the ignition switch on and off until the condition resolved, and felt that he was in danger. He did not learn of the ignition switch defects until about March 2014. Had he known about the ignition switch defects, he would not have purchased his Equinox, or would have paid less than he did, and would not have retained the vehicle.

### 10.    Randall Pina—California

37.    Plaintiff Randall Pina resides in Soledad, California. On or about April 25, 2011, Mr. Pina purchased a new 2011 Chevrolet HHR in Fresno, California for $23,270.99. Mr. Pina still owns the 2011 Chevrolet HHR, which is under extended warranty until April 25, 2018. Mr. Pina's vehicle is one of the cars recently identified by New GM as a Defective Vehicle. He believes that he overspent on a lower quality product and acquired a vehicle that posed an undisclosed risk to his health and safety. One of New GM's main selling points has been the efficiency, cost effectiveness, and safety of its vehicles. Plaintiff's purchase was based, in significant part, on these representations and assertions by New GM. New GM failed to disclose that most of its models over the last few years have contained defective ignition switches that pose a serious risk of injury and death to the driver and occupants, as well as other motorists and pedestrians on the road. If New GM had disclosed the nature and extent of its problems, Plaintiff would not have purchased a vehicle from New GM, or would not have purchased that the vehicle for the price paid.

010440-11 725144 V1

11.    **Nathan Terry—Colorado**

38.    Plaintiff and proposed Nationwide and Colorado State Class Representative

Nathan Terry is a resident and citizen of Loveland, Colorado.  Mr. Terry purchased a used 2007

Pontiac G5 GT on January 4, 2011, in Westminster, Colorado for $10,589.49.  He also purchased

a three-year warranty on the vehicle.  Mr. Terry decided to purchase this GM-branded vehicle

after a thorough investigation, including online advertisements and reviews, regarding the brand

and model's safety, reliability, and quality.  Mr. Terry's car inadvertently shut down on him

twice while driving.  In one instance, he was in high traffic on the highway when the vehicle lost

power and he had to force the car over to the shoulder of the road, a task made more difficult by

the fact that his power steering had also shut down.  Mr. Terry learned of the ignition switch

defects in March 2014.  The recall repairs were performed thereafter, after waiting for the parts

to arrive.  In the last month or two, in preparation to sell his car, Mr. Terry checked Kelley Blue

Book against his vehicle, which was in excellent condition with low mileage and fully-equipped,

and it was valued at $7,041.  He then checked thirteen other 2007 Pontiac G5 GT models for sale

at dealerships in his vicinity, and their advertised sale prices ranged from $7,367 to $9,000.

Finally, he checked four models for sale by private owners, with sale prices ranging from $6,800

to $7,840.  Several dozen private buyers contacted Mr. Terry about his vehicle, and three visited

him to test drive it.  All three potential buyers seemed to like the car, but were aware of the

numerous GM recalls, including the ignition switch recalls pertaining to the model.  Even though

he listed his car at the $7,041 Kelley Blue Book price, the average offer for the car was $4,500.

His bargaining value was noticeably impeded, as all potential buyers repeatedly referred to the

recalls in their negotiations.  It was clear to Mr. Terry that the potential buyers knew about these

recalls and used it to their advantage.  As he browsed dealerships at the same time, he also found

the trade-in value was grossly hurt by the recalls.  Again, all dealerships mentioned the safety

- 15 -

and recall issues, and out of six trade-in offers, the highest was $2,634. Because of the negative effects of the recalls on his vehicle value, Mr. Terry was eventually forced to sell the vehicle to CarMax at nearly half his vehicle's Kelley Blue Book value. Mr. Terry would not have purchased this GM-branded vehicle, or any GM-branded vehicle, had he known about its safety defects and New GM's deception. He will never purchase a GM-branded vehicle again.

### 12. LaTonia Tucker—Delaware

39. Plaintiff and proposed Nationwide and Delaware State Class Representative LaTonia Tucker is a resident and citizen of Dover, Delaware. Ms. Tucker purchased a used HHR in Dover, Delaware, in October 2013 for $8,000. She purchased the vehicle with a six month warranty. Ms. Tucker purchased the HHR because she drives long distances on the highway to and from work and wanted a safe vehicle. Ms. Tucker experienced a stall while driving her vehicle on a highway; she was able to stop the car at the side of the road. It took several tries before she was able to restart the vehicle. After this event, she took her car to a mechanic, but the mechanic was unable to determine the cause of the stall. Even after having her ignition switch replaced pursuant to the recall, Ms. Tucker feels unsafe driving her vehicle. The vehicle also now has a noise it did not have before the ignition switch was replaced, but the dealership told her it is unable to find anything wrong with her vehicle. She has grandchildren, and does not feel safe allowing them as passengers in her vehicle. Had she known about the problems with her GM-branded vehicle, she would not have purchased the car.

### 13. Pajja Jackson—District of Columbia

Plaintiff and proposed Nationwide and District of Columbia State Class Representative Pajja Jackson is a resident and citizen of Washington, D.C. Mr. Jackson's grandmother purchased a new 2011 Buick Regal on August 23, 2010, in Mississippi for $31,393.40. The vehicle was covered under the standard manufacturer's warranty when she purchased it. After

- 16 -

his grandmother fell ill last year, Mr. Jackson took possession of the car and assumed its

payments.  Over the course of 2013, he paid the remaining $10,000 owed on the note and had the

car re-titled in his name.  Ever since he began driving the vehicle, Mr. Jackson has experienced

the brakes locking up on him a handful of times.  The worst incident occurred when he was

driving at the airport.  He was driving regularly and touched on his brakes when they seized up

unexpectedly.  He repeatedly pumped the brakes and they eventually unlocked.  Then, this

summer, the car's battery exploded and its acidic vapors infiltrated the car.  Mr. Jackson took the

vehicle into a GM dealership to have the battery issue repaired.  This prompted Mr. Jackson to

investigate the problems with his vehicle and the GM-brand in general.  This investigation led

him to the ignition switch defect, as well as the myriad of other recalls and problems associated

with GM vehicles.  Mr. Jackson also recently researched the value of his vehicle via the Internet

and learned that his car was only selling for approximately $15,000.  Because of his concern for

both the safety of his vehicle and its dropping value, he has considered trying to sell it.  But Mr.

Jackson has refrained from doing so because his vehicle is paid off and he does not wish to incur

a new car payment.  As a father of two sons, ages one and four, Mr. Jackson is worried about the

safety of driving his vehicle with his kids in the car.  He no longer trusts the GM brand.  Had he

known about the safety defects and risks posed by his car and the GM-brand, he would not have

purchased this car, but rather would have chosen another manufacturer.

**14.     Kim Genovese—Florida**

40.     Plaintiff and proposed Nationwide and Florida State Class Representative Kim

Genovese is a resident and citizen of Lake Worth, Florida.  Ms. Genovese purchased a used 2005

Saturn Ion in late 2009 in Boynton Beach, Florida for $5,500.  She also purchased a 90-day

warranty on the vehicle.  She purchased because she believed that it was a reliable and safe

vehicle with a good engine, and because it was a small, fuel efficient vehicle.  Ms. Genovese has

experienced over 20 shutdown incidents with her vehicle. On many of these occasions, her vehicle would stop in the middle of the road and, sometimes, in the middle of an intersection; to restart her vehicle she would have to turn the key from the off position back to the on position. She also experienced issues with the vehicle not starting on multiple occasions. Upon hearing of the recall, Ms. Genovese stopped driving her vehicle and purchased another vehicle that she hopes is safer. On June 5, 2014, Ms. Genovese's Saturn Ion's ignition switch was replaced pursuant to the recall. Her husband still drives the vehicle because she doubts that anyone would purchase the vehicle given the widespread knowledge about the recalls. Knowing what Ms. Genovese now knows about the safety defect of her Saturn Ion, she would not have purchased the vehicle.

### 15. Rhonda Haskins—Florida

41. Plaintiff and proposed Nationwide and Florida State Class Representative Rhonda Haskins is a resident and citizen of Ocala, Florida. Ms. Haskins purchased a used 2007 Chevy Cobalt on November 15, 2013, in Ocala, Florida for $8,473.00. The vehicle was under a 30-day or 1,000 mile warranty when she purchased it. Approximately two or three times, Ms. Haskins' vehicle has shut-off while she was sitting idle in her Cobalt and her knee touched the ignition switch or key area. Ms. Haskins is concerned about her ongoing safety in driving the vehicle and believes its value is now greatly diminished as a result of the ignition switch defects. Ms. Haskins did not learn about the ignition switch defects until March 2014. She would not have purchased this vehicle had she known about the safety defects.

### 16. Joni Ferden-Precht—Florida

Plaintiff and proposed Nationwide and Florida State Class Representative Joni Ferden-Precht is a resident and citizen of Miami Lakes, Florida. Ms. Ferden-Precht purchased a new 2011 Chevy Traverse on May 27, 2011, in Miami Lakes, Florida for $33,262.17. The vehicle

- 18 -

was covered by the manufacturer's standard warranty when she purchased it.  In deciding to buy

this vehicle, Ms. Ferden-Precht consulted Chevy's advertising materials for the Traverse and also

conducted many Internet searches on the vehicle model.  She also saw TV advertisements and

Miami Lakes Auto Mall newspaper advertisements about the Traverse.  These advertisements

and representations mentioned the safety and reliability of the Traverse, which influenced her

decision to purchase the vehicle.  Ms. Ferden-Precht experienced an airbag service light

illuminating intermittently in her vehicle on multiple occasions before having her vehicle

repaired under the airbag recall.  She was concerned for her safety so she stopped driving her

vehicle during these times, and because she did not receive a loaner vehicle, she was forced to

car pool and find alternative means of transportation.  Ms. Ferden-Precht would not have

purchased this vehicle had she known about the safety defects.

### 17.    Nykea Fox—Georgia

42.    Plaintiff and proposed Nationwide and Georgia State Class Representative Nykea

Fox is a resident and citizen of Marietta, Georgia.  Ms. Fox purchased a used 2010 Chevrolet

HHR in December 2012, from Steve Raymond Chevrolet in Smyrna, Georgia for approximately

$17,000.  Her vehicle was covered by a warranty at the time of purchase and she believes it may

still be covered by a warranty.  At the time, Internet searches showed that the vehicle appeared to

have a good reputation for safety and reliability, with few negative comments.  This fact and

New GM's reputation as a quality brand—at the time—influenced her decision to buy the

vehicle.  Ms. Fox believed her vehicle was safe and defect free when she purchased it.

Ms. Fox's vehicle has shut off spontaneously several times in 2013.  On one occasion, it shut off

spontaneously while she was driving near her home.  The vehicle gearshift was in "drive" and

the ignition key was in the "run" position.  On several other occasions at the end of a period of

driving, the vehicle turned off when she attempted to move the vehicle into "park" mode.

010440-11 725144 V1

Ms. Fox also experienced other problems with the ignition. On several occasions in 2013, the key got stuck in the ignition. Plaintiff Fox was ultimately successful in removing the key from the ignition, but it took a great deal of effort each time. Ms. Fox's ignition switch was replaced in the summer of 2014 in connection with the recalls. At the same time, New GM replaced other vehicle parts in connection with a separate power-steering recall. Ms. Fox sent the car in for ignition switch repairs in May of 2014 and received the vehicle back in August of 2014. Had New GM disclosed the defects in its vehicles, Ms. Fox would either not have purchased the vehicle, or would have paid less.

### 18.    Barry Wilborn—Georgia

43.    Plaintiff and proposed Nationwide and Georgia State Class Representative Barry Wilborn is a resident and citizen of Milner, Georgia. He purchased a used 2007 Chevrolet Cobalt in 2013 in Canton, Georgia in a private sale for $4,000. The car was not under warranty at the time of purchase. Within months of purchasing the vehicle, he experienced multiple shut downs while driving. The most recent shut down occurred while driving 60 mph on the highway; he had to veer to the right to avoid hitting another vehicle, went down an embankment and had to have his vehicle towed home. Following the last shut down, he substantially reduced his use of the vehicle because he thought it unsafe. Once he learned of the recall, he stopped driving the vehicle altogether. Mr. Wilborn purchased the vehicle because he believed New GM's representations that the vehicle was safe and reliable, and also based on its mileage rating. Mr. Wilborn's had his ignition switch replaced after his vehicle was at the dealership for over one month. Knowing what he now knows about the safety defects in many GM-branded vehicles, he would not have purchased the vehicle.

### 19.    Patrick Painter—Illinois

44.    Plaintiff and proposed Nationwide and Illinois State Class Representative Patrick Painter is a resident and citizen of Monee, Illinois.  Mr. Painter purchased a new 2010 Chevy Cobalt in April 2011 at a GM dealership in Joliet, Illinois for approximately $21,000.  His car was under warranty at the time he purchased it.  In the summer of 2012, Mr. Painter had the ignition replaced because the vehicle would not turn off and the key could not be removed from the ignition.  He recently received the ignition switch recall notice in the mail, but has not yet had the recall repairs performed.  Mr. Painter believes the value of his vehicle has diminished, and he would either not have purchased the vehicle, or would have paid less for it, had New GM disclosed the defects in its vehicles.

### 20.    Karen Rodman—Indiana

45.    Plaintiff and proposed Nationwide and Indiana State Class Representative Karen Rodman is a resident and citizen of Kendallville, Indiana.  Ms. Rodman purchased a used 2004 Saturn Ion in 2013 in Fort Wayne, Indiana, for $6,000.  The vehicle did not have a warranty. Ms. Rodman purchased the vehicle because she thought it was safe and reliable.  Since purchasing the vehicle, however, she has experienced many stalling incidents.  On one occasion, she was going to the doctor and stopped at a red light.  The car shut down and would not restart, and she had to have the vehicle towed.  Ms. Rodman had the ignition switch replaced pursuant to the recall in or around June 2014.  She continues to have the same stalling problems since the replacement that she had before the ignition switch was replaced.  Ms. Rodman is afraid to drive her vehicle, but it is her only form of transportation; she would like a different vehicle that is safe to drive.  Had she known about the problems with her GM-branded vehicle, she would not have purchased the car.

- 21 -

21.    **Alphonso Wright—Indiana**

46.    Plaintiff and proposed Nationwide and Indiana State Class Representative
Alphonso Wright is a resident and citizen of Fishers, Indiana.  Mr. Wright purchased a used 2005
Chevrolet Cobalt on August 16, 2012, in Indianapolis, Indiana for $9,727.99.  His vehicle was
not covered by a written warranty at the time of purchase.  On two separate occasions, in January
2013 and April 2014, Mr. Wright's vehicle shut down while he was driving over train
tracks.  The steering locked on both occasions as well.  After waiting approximately one month
for the parts to arrive, Mr. Wright's vehicle had the recall repair done on June 5, 2014.  Mr.
Wright was truly frightened by his two inadvertent shut down experiences, and would not have
purchased his car if he had known about the defects in his GM-branded vehicle.

22.    **Charles David Loterbour—Iowa**

47.    Plaintiff and proposed Nationwide and Iowa State Class Representative Charles
David Loterbour is a resident and citizen of Des Moines, Iowa.  He purchased a used 2010 HHR
in October 2011 in Iowa City for $15,274.  He purchased the vehicle with the original
manufacturer's warranty, along with Reliant Repair Protection.  He purchased the HHR over
other vehicles because of New GM representations that it is rated higher for safety and fuel
mileage than many other vehicles.  The dealership also touted the multiple airbag system and the
traction control system in the HHR.  Mr. Loterbour experienced problems with his vehicle
beginning in September 2012, including problems disengaging the ignition key, being unable to
turn the vehicle off without disconnecting the battery, and a loss of power steering.  The
dealership replaced the ignition switch in 2012 in response to these problems.  Since the recall
announcement, the dealership informed Mr. Loterbour that it replaced the ignition switch in 2012
with an "old style" ignition switch, and he would need it replaced under the recall.  Knowing
what he now knows about the safety defects in many GM-branded vehicles, he would not have

- 22 -

Case 1:14-mc-02543-JMF    Document 345    Filed 10/15/14    Page 43 of 132

purchased the vehicle and will never again purchase another GM-branded vehicle.  He would
trade in his vehicle if the opportunity arises, but he doubts that will happen with the current
recalls.

### 23.    Trina & John Marvin Brutche Jr.—Kansas

48.    Plaintiffs and proposed Nationwide and Kansas Class Representatives Trina and
John Marvin Brutche, Jr., husband and wife, are residents and citizens of Goodland, Kansas.
The Brutches purchased a used 2009 Impala LTZ on June 14, 2014, in Grand Junction, Colorado
for $15,471.  They did not purchase any warranty other than the manufacturer's warranty.  John
is a longtime Chevrolet fan, and he has preferred to purchase them because he believes, based on
advertising he has seen over the years, that Chevrolets are excellent quality, reliable family cars.
The Brutches purchased the Impala just two weeks before its recall was announced.  Several
times, John experienced the steering on the Impala becoming tight or heavy.  He continues to
drive the Impala on a daily basis, but he would like to get the recall repairs performed.  He called
about the recall, and New GM directed him to his local dealer to schedule the maintenance.
When John called his local dealer, they acted as if New GM's referral for service did not make
sense.  The dealer reported that the recall parts were not available, so no repair has been
performed yet.  The Brutches would not have purchased their vehicle, or they would have paid
less for it, had they known about these defects.

### 24.    Phyllis Hartzell—Kansas

49.    Plaintiff and proposed Nationwide and Kansas State Class Representative Phyllis
Hartzell is a resident and citizen of Burlingame, Kansas.  Ms. Hartzell purchased a used 2006
Saturn Ion in 2011 in Burlingame, Kansas.  The vehicle had a 30-day dealer warranty.
Ms. Hartzell purchased the vehicle because she thought it was safe and reliable and would be a
good vehicle for transporting her grandchildren.  She no longer feels safe driving the vehicle and

will no longer drive her grandchildren in the car. As of September 2014, Ms. Hartzell is still awaiting replacement of her ignition switch; she contacts her dealership regularly, and they continue to tell her they do not have parts but should have them soon. Had she known about the problems with her GM-branded vehicle, she would not have purchased the car and will never again purchase a GM-branded vehicle.

### 25. Elizabeth Stewart—Kentucky

50.     Plaintiff and proposed Nationwide and Kentucky State Class Representative Elizabeth Stewart is a resident and citizen of Raceland, Kentucky. She purchased a used 2010 Chevrolet Cobalt in February 2012 from a dealer in Paintsville, Kentucky for $14,000. Ms. Stewart's Chevrolet Cobalt was under factory warranty when she purchased it, and she also purchased an extended bumper-to-bumper warranty. The factory warranty and extended warranty have both expired. Around the time of her purchase, Ms. Stewart recalls seeing several commercials in which GM touted the Cobalt's safety and stated that it is the best vehicle in its class. She believed the vehicle was safe and defect free when she purchased it. Just two-and-a-half months after buying the car, in April 2012, Ms. Stewart experienced her first inadvertent shut down. She was driving in Kentucky when the engine suddenly shut off while the key was still turned and the transmission was in "drive." The loss of power made the steering wheel almost impossible to turn. Ms. Stewart managed to get to the side of the road and, thankfully, was not injured. She was also thankful that her children were not in the vehicle at the time, especially given that she purchased it primarily for use as the family car. Ms. Stewart experienced many similar shut downs between the purchase date of February 2012 and July 2014, when the ignition switch was replaced under the recall. Even post-recall "repair," Ms. Stewart has issues with the car indicative of power loss, where the headlights dim and the steering wheel locks up. GM should have disclosed these defects when Ms. Stewart purchased

- 24 -

the vehicle.  Had New GM disclosed the defects in its vehicles, Ms. Stewart would either not have purchased the vehicle, or would have paid less.

### 26.   Lisa West—Louisiana

51.   Plaintiff and proposed Nationwide and Louisiana State Class Representative Lisa West is a resident and citizen of Baton Rouge, Louisiana.  Ms. West purchased a used 2008 Chevrolet Cobalt on August 3, 2010 from All Star Hyundai in Baton Rouge for $9,621.  Her vehicle was covered by a warranty at the time of purchase.  It expired last year.  At the time she purchased it, the GM dealer told her it was a very safe vehicle.  Had New GM disclosed the defects in its vehicles, Ms. West would either not have purchased the vehicle, or would have paid less.

### 27.   Michelangelo De Ieso—Maine

52.   Plaintiff and proposed Nationwide and Maine State Class Representative Michelangelo De Ieso is a resident and citizen of Dover-Foxcroft, Maine.  Mr. De Ieso purchased a used 2008 Pontiac Solstice on June 20, 2013, in Auburn, Massachusetts for $20,250.00.  The vehicle was not under warranty when he purchased it.  Mr. De Ieso did not learn about the ignition switch defects until March 2014.  Mr. De Ieso is concerned about his safety in driving the vehicle and believes its value is now greatly diminished as a result of the ignition switch defects.  As a precaution, Mr. De Ieso has not driven his vehicle since June 2014 and continues to wait to have the recall work performed on his vehicle.  In fact, he purchased another non-GM vehicle to drive in the interim.  In addition, he has tried to sell his Solstice privately but has been unsuccessful.  He would not have purchased this vehicle had he known about the safety defects.

### 28.   Harry Albert—Maryland

53.   Plaintiff and proposed Nationwide and Maryland State Class Representative Harry Albert is a resident and citizen of Montgomery Village, Maryland.  Mr. Albert purchased a

- 25 -

new 2012 Chevrolet Camaro from Ourisman's Rockmont Chevrolet in Rockville, Maryland, in

October 2012 for $34,000.  On at least three occasions, the power in Mr. Albert's Camaro failed

during normal vehicle operation.  During the second of these incidents, on May 13, 2014,

Mr. Albert was operating his vehicle on a roadway at the posted speed when his power failed.

Mr. Albert was nearly rear-ended by the vehicle traveling behind him, but the vehicle swerved

and avoided a collision.  Mr. Albert's knees did not impact the ignition key during this event.  He

was able to restart the Camaro and immediately took it to the Ourisman Rockmont dealership for

testing.  The dealership tested the vehicle, but could find nothing wrong.  Less than one month

later, Mr. Albert's vehicle experienced another power failure when he was turning into a parking

lot.  Again, he was almost rear-ended.  This time, Ourisman Rockmont provided Mr. Albert with

a loaner car while it attempted to determine the source of the problem.  Shortly thereafter, New

GM publicly announced the recall of the Camaro vehicles, but Mr. Albert did not learn of the

ignition switch defect in his vehicle until June 2014.  He took it back to the Ourisman Rockmont

dealership, and they removed the blade from the ignition key fob and put it on a keychain and

returned the vehicle to him.  Mr. Albert was nonetheless so afraid to drive his Camaro that he

traded it in for a used 2013 Chevy Impala in July 2014 in Germantown, Maryland.  He received

$27,000 for his Camaro, and paid $17,999 for the Impala.  At the time of his trade-in, Mr. Albert

did not yet know about the ignition switch recall out on his Impala.  He would not have

purchased the Camaro had he known about the safety defects, and now he is concerned about the

safety of his Impala.

### 29.    Bryan Mettee—Maryland

54.    Plaintiff and proposed Nationwide and Maryland State Class Representative

Bryan Mettee is a resident and citizen of Jarrettsville, Maryland.  Mr. Mettee purchased a used

2006 Chevy Cobalt in 2012 from a dealership in Maryland for $10,000.  He also purchased a

- 26 -

"bumper to bumper" warranty for the lifetime of the car, as well as an extended warranty.
Mr. Mettee has experienced his ignition shutting down at least ten separate times during normal
driving conditions.  The first incident occurred in September 2013 while he was going
approximately 35-40 miles per hour.  He had to use the emergency brake to stop the car.  In all
instances he knows his knee did not bump into the ignition switch or keys when the car shut off.
He visited the dealership no less than three times to attempt to resolve the shutdown issues, but
in all cases the problem resumed after the dealer purported to fix it, and all were out of pocket
repair costs.  It was only after all this hassle that he received the recall notice.  His ignition
switch was repaired shortly after he received the recall notice.  Had New GM disclosed the
defects in its vehicles, Mr. Mettee would either not have purchased the vehicle, or would have
paid less for it.

### 30.    Richard Leger—Massachusetts

55.    Plaintiff and proposed Nationwide and Massachusetts State Class Representative
Richard Leger is a resident and citizen of Franklin, Massachusetts.  Mr. Leger purchased a used
Pontiac G5 in Attleboro, Massachusetts, in 2013 for $8,000.  He purchased the vehicle with a 90-
day warranty.  Mr. Leger purchased the vehicle because he thought it was safe.  Mr. Leger's
vehicle started experiencing stalling in November 2013.  The first time was at a traffic light,
when the car just shut down.  That happened several more times.  He also experienced loss
and/or locking of the power steering.  He does not feel safe driving the car, nor does he feel safe
having his children drive it.  Mr. Leger has attempted to have the ignition switch replaced several
times, but each time he went to the dealership the part was not available.  As of September 2014,
he has not had his ignition switch replaced pursuant to the recall.  Had he known about the
problems with his GM-branded vehicle, he would not have purchased the car.

010440-11 725144 V1

### 31. Rafael Lanis—Michigan

56. Plaintiff and proposed Nationwide and Michigan State Class Representative Rafael Lanis is a resident and citizen of Birmingham, Michigan. Mr. Lanis purchased a used 2006 Chevy Cobalt in July 2011 at auction at Westland Auto Care in Michigan for $2,800. His car was no longer under warranty at the time he purchased it. Mr. Lanis has experienced his ignition shutting down approximately ten separate times after starting his car and then removing his hand from the key. It also shut down once while sitting idle at a traffic light. His ignition switch was repaired approximately one month after he received the recall notice, in April 2014. But his car was affected by further recalls and when he tried to secure a loaner from New GM before repairing his ignition switch, they refused. Mr. Lanis tried to sell his vehicle over the last 4-5 months but has been unsuccessful. He noted that the Kelley Blue Book value of his car has dropped from $4,700 to $4,000 since announcement of the recalls. Had New GM disclosed the defects in its vehicles, Mr. Lanis would either not have purchased the vehicle, or would have paid less for it.

### 32. Sheree Anderson—Michigan

57. Plaintiff and proposed Nationwide and Michigan State Class Representative Sheree Anderson is a resident and citizen of Detroit, Michigan. Ms. Anderson purchased a used 2008 Chevy HHR on November 15, 2011, in Michigan for approximately $16,500. The vehicle had a warranty on it when she purchased it. Ms. Anderson chose the HHR in part because she desired a safe vehicle. Ms. Anderson did not learn about the ignition switch defects until March 2014. Although Ms. Anderson has not experienced her vehicle shutting down while driving, she is concerned for her safety as a result of the ignition switch defects. She must continue to drive her vehicle, however, because it is her main form of transportation, and she must drive it to work every day. Ms. Anderson's HHR received the ignition switch recall repair work on June 10,

- 28 -

2014.  She believes the value of her vehicle is now greatly diminished as a result of the ignition switch defects.  Had she known about the ignition switch defects, she would either not have purchased the HHR or would have paid less for it.

### 33.   Anna Allhouse—Minnesota

58.     Plaintiff and proposed Nationwide and Minnesota State Class Representative Anna Allhouse is a resident and citizen of Clarks Grove, Minnesota.  Ms. Allhouse purchased a used 2007 Chevy HHR in 2012 in Minnesota for approximately $12,000.  Her car was under warranty when she purchased it, and she also purchased an extended warranty and gap insurance from the dealership at the same time.  The car is currently under warranty.  Ms. Allhouse experienced one incident related to the car shutting off on its own. In the winter of 2013, she was backing out of her driveway, and the car suddenly turned off.  She was able to restart the car and was not involved in an accident.  After receiving the recall notice, Ms. Allhouse took her car to the GM dealer.  They told her there was nothing wrong with her ignition.  Ms. Allhouse still owes approximately $9,800 on the vehicle.  Recently, she tried to trade it in for a new vehicle at the same dealership but was told they would only offer $2,000 for the car.  Ms. Allhouse has two small children and wanted a safe, reliable vehicle.  She would never have purchased a GM-branded vehicle if she knew about the defects.

### 34.   Elizabeth D. Johnson—Mississippi

59.     Plaintiff and proposed Nationwide and Mississippi State Class Representative Elizabeth D. Johnson is a resident and citizen of Jackson, Mississippi.  Ms. Johnson purchased a used 2007 Chevrolet Cobalt on March 27, 2012, from Bond Auto Sales, Jackson, Mississippi for $7,200.00.  Ms. Johnson twice had her vehicle shut down and on one occasion was in an accident as a result, her airbags did not deploy.  Her car was totaled and she has lost value as a result.

Ms. Johnson would not have purchased the vehicle, or paid as much, if she had known the vehicle was a safety hazard.

### 35. Linda Wright—Mississippi

60. Plaintiff and proposed Nationwide and Mississippi State Class Representative Linda Wright is a resident and citizen of Greenwood, Mississippi. Ms. Wright purchased a used 2007 Chevrolet Cobalt on July 8, 2013, in Greenwood, Mississippi for $4,300. At the time she purchased her vehicle, it was not covered by a warranty. On two occasions, on November 13, 2013, and May 18, 2014, Ms. Wright experienced her engine shutting down while operating the vehicle under normal driving conditions at 25-40 miles per hour. Each time, she was forced to try and steer the car to the side of the road before restarting the engine. The steering also locked up in both instances. Her vehicle had the ignition switch repair done at a dealership in Greenwood, Mississippi. Had New GM disclosed the defects in its vehicles, Ms. Wright would either not have purchased the vehicle, or would have paid less.

### 36. Cynthia Hawkins—Missouri

61. Plaintiff and proposed Nationwide and Missouri State Class Representative Cynthia Hawkins is a resident and citizen of Pevely, Missouri. Ms. Hawkins purchased a used 2010 Chevy Cobalt on July 23, 2013, in Missouri for approximately $13,000. The car was not under warranty when she purchased it. She believed the car was a good family car and one that a teenager could drive. Ms. Hawkins did not receive a recall notice, but rather heard about it on the news and immediately contacted her GM dealer. The dealer told her the parts were not available. Ms. Hawkins could not drive her vehicle from April 7, 2014, to August 29, 2014, while she awaited the recall repair parts to come in and be installed in her car. Since announcement of the recalls, she believes her car's value has decreased significantly, and it

prevents her from re-selling it for a fair price. Ms. Hawkins would not have purchased this GM-branded vehicle had she known about these defects.

### 37. Ronald Robinson—Missouri

62.     Plaintiff and proposed Nationwide and Missouri State Class Representative Ronald Robinson is a resident and citizen of Bridgeton, Missouri. Mr. Robinson purchased a used 2010 Chevy Impala in June 2010 in Missouri for approximately $16,000. He purchased an extended warranty that expires on March 16, 2015, or at 82,000 miles. Before purchasing, Mr. Robinson viewed email advertising highlighting the quality of the GM product, and this positively impacted his decision to buy the car. Mr. Robinson first heard about the recalls in the summer of 2014. He contacted his local dealer to inquire about his Impala, and they told him his specific make and model was not being recalled. Then just a few months later in August 2014, he received a notice in the mail about his car being recalled for the ignition switch defect. Mr. Robinson's vehicle has still not been repaired, however, because the GM dealership told him the parts are not available—and they do not know when they will become available. He believes his car's value has diminished and he is worried about trying to sell the car now because he does not believe he can get a fair price for it. Mr. Robinson would not have purchased this GM-branded vehicle had he known about these defects, and under no circumstances would he have even considered buying the car for a lesser price.

### 38. Patricia Backus—Montana

63.     Plaintiff and proposed Nationwide and Montana State Class Representative Patricia Backus is a resident and citizen of Bigfork, Montana. Ms. Backus purchased a used 2006 HHR in 2012 in Idaho for $10,900. Ms. Backus purchased a short-term warranty, which she cancelled shortly after purchasing the vehicle. Ms. Backus purchased the HHR because she believed it reliable and safe. Within six months of purchasing the vehicle, she experienced a stall

- 31 -

while approaching a traffic light.  She had three additional shut downs while driving.  During these incidents, she had no control of the steering, and, on at least one of the occasions, her steering locked.  It took Ms. Backus several attempts for her vehicle to turn back on.  She no longer feels safe driving the vehicle even though the ignition switch was replaced, and since learning about the recall she is angry towards New GM for keeping the safety defect a secret.  Ms. Backus had her ignition switch replaced in August 2014.  Since the replacement, the radio in her vehicle turns off.  Had she known about the problems with her GM-branded vehicle, she would not have purchased the car.  She will never purchase another GM-branded vehicle.

### 39. Susan Rangel—Nebraska

64.    Plaintiff and proposed Nationwide and Nebraska Class Representative Susan Rangel is a resident and citizen of North Platte, Nebraska.  She purchased a used 2008 Chevrolet Cobalt in the fall of 2009 at Jerry Remus Chevrolet in North Platte, Nebraska, for $14,000.  At the time of purchase, the vehicle had the original manufacturer's warranty.  Ms. Rangel purchased the vehicle believing it to be safe and reliable.  When she learned about the recall, she requested a rental/loaner vehicle because she did not believe the vehicle was safe to drive, but she was informed by New GM that she would not be given a loaner vehicle.  The dealership replaced the ignition switch in June 2014 pursuant to the recall.  Nevertheless, Ms. Rangel does not believe the vehicle is safe for her family to drive and has attempted to sell the vehicle.  As of September 2014, those efforts have been unsuccessful.  Had she known about the problems with her GM-branded vehicle, she would he would not have purchased the car and will never again purchase another GM-branded vehicle.

### 40. Sandra Horton—Nevada

65.    Plaintiff and proposed Nationwide and Nevada State Class Representative Sandra Horton is a resident and citizen of Las Vegas, Nevada.  Ms. Horton purchased a used 2007

Pontiac Solstice in October 2013 in Nevada for $10,000. Her car was not under warranty at the time of purchase. On several occasions she has experienced issues with her vehicle that are consistent with the ignition switch defects. Her vehicle was repaired under the recall, but only after waiting four months for the parts to arrive. New GM did not provide her with a loaner vehicle during this waiting period. Ms. Horton would not have purchased her GM-branded vehicle had she known about its safety defects.

### 41.    Gene Reagan—New Jersey

66.    Plaintiff and proposed Nationwide and New Jersey State Class Representative Gene Reagan is a resident and citizen of South Amboy, New Jersey. Mr. Reagan purchased a new 2010 HHR in December 2009, at a dealership in Middletown, New Jersey, for approximately $20,000. His vehicle had a standard warranty, but he does not recall its details. Mr. Reagan purchased a GM-branded vehicle because he believed that New GM stood for safety and reliability. Mr. Reagan has experienced several safety problems with his vehicle, including his ignition locking and inability to turn the key to the "on" position, requiring the car to be towed to the dealership. Because of his ignition problems, Mr. Reagan had his ignition replaced approximately three years ago. That did not solve the problems he was experiencing with his vehicle. As of September 2014, Mr. Reagan is still awaiting replacement of his ignition switch pursuant to the recall and feels nervous driving it in its current defective condition. Had he known about the problems with his GM-branded vehicle, and particularly that New GM was building vehicles plagued with defects and not committed to safety and reliability, he would he would not have purchased the car. Mr. Reagan will never purchase another GM-branded vehicle.

010440-11 725144 V1

### 42.  Lorraine De Vargas—New Mexico

67.    Plaintiff and proposed Nationwide and New Mexico State Class Representative Lorraine De Vargas is a resident and citizen of Santa Fe, New Mexico.  Ms. De Vargas purchased a used 2005 Saturn Ion on November 25, 2009, in Santa Fe, New Mexico for $5,000.  There was no warranty on the vehicle when Ms. De Vargas purchased it.  Ms. De Vargas bought her Ion in part because of her desire for a safe vehicle.  Ms. De Vargas was involved in an accident on December 14, 2012.  While Ms. De Vargas was driving her Ion, the vehicle shut down unexpectedly and caused her to collide with a fence at 25-30 miles per hour.  Her airbags failed to deploy.  The vehicle damage has been repaired, and while she is thankful to have survived the accident with no injuries, Ms. De Vargas must continue to drive her Ion to work every day.  She is concerned about the safety of her vehicle, the impact the defects have had on the value of her vehicle, and the costs she has incurred in fixing the vehicle previously.  Ms. De Vargas did not learn of the ignition switch defects until March 2014.  She believes that New GM withheld information about the safety of its vehicles.

### 43.  Javier Delacruz—New Mexico

68.    Plaintiff and proposed Nationwide and Alabama State Class Representative Javier Delacruz is a resident and citizen of Albuquerque, New Mexico.  Mr. Delacruz purchased a new 2009 Chevy Cobalt in September 2009 in Albuquerque, New Mexico for $20,698.  The vehicle was under warranty when he purchased it.  In 2011, Mr. Delacruz could not shut-off his vehicle and the ignition switch was replaced.  Mr. Delacruz fears driving his vehicle due to the ignition switch recall and the risks posed by the defects.  Mr. Delacruz had the ignition switch replaced, again, this year as a result of the recall.  He believes the value of his vehicle has been diminished as a result of the defects.  Mr. Delacruz would not have purchased this car if New GM had been honest about the safety defects.

- 34 -

Case 1:14-mc-02543-JMF   Document 345   Filed 10/10/14   Page 55 of 72

44.     **Renate Glyttov—New York**

69.     Plaintiff and proposed Nationwide and New York State Class Representative

Renate Glyttov is a resident and citizen of New Windsor, New York. Ms. Glyttov purchased a

used 2009 Chevrolet HHR on March 28, 2012 from Barton Birks Chevrolet in Newburgh, New

York for $15,995. Ms. Glyttov's vehicle was covered by a certified pre-owned limited warranty

that expired on March 28, 2013, as well as a standard maintenance plan that was effective from

her purchase date until March 28, 2014. Ms. Glyttov has purchased many GM-branded vehicles,

believing that they were safe and reliable vehicles based on the strength of the brand name.

Operating under the belief that GM was a quality brand and that the vehicle would be safe and

reliable and defect-free, she purchased her HHR. Ms. Glyttov's vehicle regularly shut off

spontaneously on many occasions in 2012 and 2013 while traveling around New Windsor, New

York; Newburgh, New York; Wallkill, New York; and in Pennsylvania when driving onto an off

ramp of I-84. The vehicle would shut off when Ms. Glyttov drove on bumpy roads or hit a

pothole. On each occasion, the vehicle gearshift was in "drive" and the ignition key was in the

"run" position. Ms. Glyttov also experienced other problems with the ignition. On several

occasions in 2012 and 2013, she put the key in the ignition, but the key would not turn and

would then get stuck in the ignition. Eventually the key would move after attempting to turn the

ignition on for several minutes. On May 16, 2012, Ms. Glyttov's ignition lock cylinder was

replaced during a routine oil change. Plaintiff Glyttov experienced numerous shut off events

after this replacement. Ms. Glyttov's ignition switch was replaced in connection with the recalls

initiated in response to the ignition switch defects. First, Ms. Glyttov's ignition key was replaced

on April 16, 2014, and then her ignition switch was replaced on June 11, 2014. Ms. Glyttov

would not have purchased the vehicle had she known of the defects.

- 35 -

Case 1:14-mc-02543-JMF   Document 345   Filed 10/14/14   Page 56 of 72

### 45.    Nicole Mason—New York

70.    Plaintiff and proposed Nationwide and New York State Class Representative
Nicole Mason is a resident and citizen of Rochester, New York.  Ms. Mason purchased a new
2010 Chevrolet Cobalt on May 17, 2010, from Bob Johnson Chevrolet in Rochester, New York
for $22,010.47.  Ms. Mason purchased an extended warranty that covers the vehicle for 72
months or 48,000 miles.  Ms. Mason reviewed advertisements for the Cobalt that ran in her local
newspaper, the *Democrat & Chronicle*, and her decision to buy the vehicle was influenced by
these advertisements.  Ms. Mason believed the Chevrolet Cobalt was a safe and reliable vehicle.
Ms. Mason's vehicle has spontaneously shut off on at least three occasions.  The vehicle first
shut off on September 3, 2010, near Emerson and Glide streets in Rochester, New York when
Ms. Mason's daughter, Jessica Mason, was driving it home from a test to get her drivers' license.
The vehicle shut off a second time on September 16, 2010, in Rochester, New York when Jessica
Mason was traveling on Britton Road.  Most recently, on September 4, 2014, the vehicle shut off
while Ms. Mason was driving it in Myrtle Beach, South Carolina.  On each shutdown occasion,
the vehicle lost power for no apparent reason.  Ms. Mason and her daughter were not driving on
a bumpy road and did not hit the ignition switch with their knees.  On each occasion, the vehicle
gearshift was in "drive" and the ignition key was in the "run" position.  On the September 16,
2010 incident, Jessica Mason was forced to use the emergency break to get the vehicle to stop
and avoid an accident.  The vehicle would not turn back on immediately and had to be towed to
Ms. Mason's home.  Ms. Mason took the vehicle to a GM dealer after the September 16, 2010
incident, but the dealer could not identify a cause for the shut off and made no repairs to the
vehicle.  Ms. Mason's ignition switch was replaced in June 2014 in connection with the recalls
initiated in response to the ignition switch defect.  Had New GM disclosed the defects in its
vehicles, Ms. Mason would either not have purchased the vehicle, or would have paid less.

### 46.    Steven Sileo—New York

71.    Plaintiff and proposed Nationwide and New York State Class Representative Steven Sileo is a resident and citizen of Skillman, New York.  Mr. Sileo purchased a used 2009 Chevy Cobalt in July 2010 in Burlington, New Jersey for $10,000.  The vehicle was under warranty when he purchased it.  Although Mr. Sileo has not experienced any issues with his Cobalt, he fears driving his vehicle after learning of the ignition switch recall and the risks posed by the defects.  Mr. Sileo is still waiting for the recall repair work to be completed on his vehicle. He is eager to sell the vehicle but cannot honestly market it without the ignition switch being replaced.  Also, he believes the value of his vehicle has been diminished as a result of the defects and the stigma with the GM brand.  Mr. Sileo would not have purchased this car if New GM was honest about the safety defects.

### 47.    Dawn Tefft—New York

72.    Plaintiff and proposed Nationwide and New York State Class Representative Dawn Tefft is a resident and citizen of Mt. Upton, New York.  Ms. Tefft purchased a used 2010 Chevy Cobalt on June 21, 2011, in Sidney, New York for $13,695.50.  There was no warranty on the vehicle when Ms. Tefft purchased it.  Ms. Tefft bought her Cobalt in part because of her desire for a safe vehicle.  Ms. Tefft was involved in a serious accident on October 24, 2013, while driving to work.  While Ms. Tefft was driving her Cobalt, the vehicle shut down unexpectedly and caused her to collide head-on with a bridge at 40-45 miles per hour.  The airbags failed to deploy, and the vehicle was totaled as a result of the accident.  Ms. Tefft did not learn about the ignition switch defects until March 2014.  Had she been aware of the ignition switch defects, Ms. Tefft would either not have purchased her Cobalt or would have paid less for it.

- 37 -

Case 1:14-md-02543-JMF  Document 345  Filed 10/14/14  Page 58 of 72

**48.    Silas Walton—North Carolina**

73.    Plaintiff and proposed Nationwide and North Carolina State Class Representative Silas Walton is a resident and citizen of Fayetteville, North Carolina.  Mr. Walton purchased a used 2008 Chevrolet Cobalt in 2010 in Clarksville, Tennessee for between $14,000 and $15,000. The vehicle was under warranty, but he does not recall the warranty terms.  Mr. Walton purchased the vehicle because he thought it was a reliable and safe vehicle.  Mr. Walton often experienced problems with starting the vehicle and turning the key to any position.  On at least one occasion, he experienced a shutdown in his vehicle, which caused the steering wheel to lock. This occurred while he was driving downhill on a highway.  At first, he was unable to control the car, but eventually he was able to maneuver it to the side of the road.  After about ten minutes, he was able to restart the vehicle.  Mr. Walton had the ignition switch replaced in the summer of 2014; however, his key continues to stick in the ignition.  He remains concerned about driving the vehicle.  Had he known about the problems with his GM-branded vehicle, he would not have purchased the car and will never again trust New GM.

**49.    Jolene Mulske—North Dakota**

74.    Plaintiff and proposed Nationwide and North Dakota State Class Representative Jolene Mulske is a resident and citizen of Gladstone, North Dakota.  Ms. Mulske purchased a used 2005 Chevrolet Cobalt in 2010 in Dickinson, North Dakota, for approximately $10,000. Ms. Mulske purchased the vehicle because she wanted a safe and reliable vehicle for her daughter to drive.  Ms. Mulske had the ignition switch replaced in the summer of 2014, but she and her daughter are afraid to drive it now.  Had she known about the problems with her GM-branded vehicle, she would not have purchased the car and will never again purchase a New GM vehicle.

- 38 -

**50.    Peggy Robinson—Ohio**

75.    Plaintiff and proposed Nationwide and Ohio State Class Representative Peggy
Robinson is a resident and citizen of Cincinnati, Ohio.  Ms. Robinson purchased a used 2004
Saturn Ion in 2013 in Cincinnati, Ohio for $4,999.  Ms. Robinson purchased the Ion because she
thought it was safe.  Within six months of purchasing the vehicle, she began experiencing shut
downs while driving.  The shut downs occurred two or three times per week on average.  She no
longer feels safe driving the vehicle, especially because she has children.  Ms. Robinson had her
ignition switch replaced in August 2014, and she has experienced two shut downs since then.
Had she known about the problems with her GM-branded vehicle, she would he would not have
purchased the car.

**51.    Jerrile Gordon—Oklahoma**

76.    Plaintiff and proposed Nationwide and Oklahoma State Class Representative
Jerrile Gordon is a resident and citizen of Del City, Oklahoma.  Mr. Gordon purchased a used
2006 Chevy Cobalt on September 3, 2011, in Oklahoma City, Oklahoma for $14,950.
Mr. Gordon chose the Cobalt, in part, because he wanted a safely designed and manufactured
car.  Mr. Gordon's vehicle has shut down on four separate occasions between December 2011
and July 2012.  In two instances, he was driving on the highway when the shut downs occurred,
and he had to steer his vehicle to the side of the road to restart.  On the other two occasions, his
car shut off while driving over a bump in the road.  Mr. Gordon did not learn of the ignition
switch defects until March 2014.  Had he been aware of the ignition switch defects, Mr. Gordon
would either not have purchased his Cobalt or would have paid less for it than he did.

**52.    Bruce and Denise Wright—Oklahoma**

77.    Plaintiffs and proposed Nationwide and Oklahoma State Class Representatives
Bruce and Denise Wright, husband and wife, are residents and citizens of Enid, Oklahoma.  If

not for this MDL, the Wrights would have filed a class action in the United States District Court for the Western District of Oklahoma.  The Wrights purchased a new 2011 Chevrolet Camaro on March 18, 2011, in Norman, Oklahoma for $31,000.  The vehicle was covered by a standard three year, 36,000 mile warranty.  Prior to buying, they saw television, print, and billboard ads regarding the vehicle's five star rating and safety.  Ms. Wright drove the vehicle daily to and from her and Mr. Wright's places of work.  The Wrights learned of the June 30, 2014 recall affecting their Camaro in July 2014 through the news media, and they called the local GM dealership to confirm the recall and the safety concerns relating to recall.  Afterwards, Ms. Wright was no longer comfortable driving the Camaro, so they proceeded to dispose of the vehicle as quickly as practical.  They traded the car to a local Ford dealership on August 9, 2014. The Wrights believe they suffered a diminution of value in their vehicle due to the ignition switch defects and the surrounding publicity, and that they could have received more for their Camaro but for the defect.  Had New GM disclosed the defects in its vehicles, Plaintiff would either not have purchased the vehicle, or would have paid less.

### 53.    Jennifer Reeder—Oklahoma

78.    Plaintiff and proposed Nationwide and Oklahoma State Class Representative Jennifer Reeder is a resident and citizen of Oklahoma City, Oklahoma.  If not for the MDL, Ms. Reeder would have filed a class action in the Unites States District Court for the Western District of Oklahoma.  Ms. Reeder purchased a used 2012 Chevrolet Impala on August 30, 2013, in Norman, Oklahoma, from David Stanley Chevrolet for $18,595.  Ms. Reeder also purchased an extended warranty for the vehicle from David Stanley Chevrolet at the time of purchase.  On or about July 26, 2014, Ms. Reeder was unable to remove the key from the ignition, and the steering and brakes would not lock.  After 30 minutes of manipulating the key in an effort to remove it from the ignition, she was forced to leave the key in the ignition overnight; her

husband was able to remove the key from the ignition the following day. Ms. Reeder was unaware of any recall notice affecting her Impala until, some time shortly after the key became stuck in the ignition overnight, a neighbor informed her about the recall covering Impalas. Ms. Reeder watched the television concerning the recalls and researched the vehicle recalls online, but she never received a written recall notice in the mail regarding her Impala. Ms. Reeder and her son, both of whom drive the Impala to and from work, would have liked to discontinue driving the Impala until the ignition system was repaired, but they were unable to do so because it would have left her family with a single means of transportation among herself, her husband, and her son due to their other vehicle, a Chevrolet Cobalt, already being totaled in a defect-related crash. The family could not afford to pay for a rental car. Finally, on September 16, 2014, a GM dealership notified her that it was ready to repair the Impala. The repair was performed on September 22, 2014, and the dealership provided her with a loaner or rental vehicle that day while the repairs were performed. At the time the repair was performed, Ms. Reeder reported to the dealership that the Impala's engine light sometimes comes on unexpectedly and, occasionally, the vehicle will not start at all. Replacing the battery has not eliminated the problem. The dealership reported that there were no recalls related to such electrical problems, and they did not do anything to fix it. The electrical problem has recurred since the ignition recall repair. Ms. Reeder believes she has suffered a diminution of value in her vehicle due to the ignition switch defects, recalls, and surrounding publicity.

79.    Ms. Reeder also purchased a used 2010 Chevrolet Cobalt on or about February 5, 2014, in Del City, Oklahoma, from Ricks Auto Sales for $9,595. Ms. Reeder purchased an extended warranty for the Cobalt from Ricks Auto Sales at the same time. Ms. Reeder purchased the vehicle primarily for Anthony Reeder, her son, for his personal, family, and household use.

On May 19, 2014, Anthony Reeder was driving in bumper-to-bumper traffic when the vehicle suddenly shut off, the brakes became ineffective, the steering wheel stopped operating, and he struck the vehicle in front of him, totaling the Cobalt and injuring Anthony.  Ms. Reeder and Mr. Reeder were unaware of any recall on the Cobalt until after the accident when they learned of the recall from a neighbor.  They had never received any recall notice in the mail.  After the accident, Ms. Reeder and her son have been and are currently sharing Ms. Reeder's 2012 Chevrolet Impala, because they cannot afford another car due to the balance remaining on the financing note of the Cobalt.  From sharing the Impala, they have increased the miles accumulated on it so much that they have used up its extended warranty.  A combined total of 45,000 miles were added to the Impala since the crash of the Cobalt, and they had to pay the $2,500 deductible not paid by the insurance company for the totaled Ion.  Ms. Reeder also claims damages for the decreased value of the Impala because of its increased usage in the absence of the Cobalt, the difference in the amount of the cost of gasoline between Mr. Reeder using the Impala and using the better-mileage Cobalt, the value of the extended warranty on the Impala used up by the excess of miles, and the increase in her auto insurance premiums as a result of the accident caused by the Cobalt's defective design being attributed to Mr. Reeder.  The difference between the settlement paid to Ms. Reeder by her insurance company, Geico, on the Cobalt after the wreck and her loan for the vehicle left her with an outstanding balance of more than $1,500.  In valuing the Cobalt, Geico took into account values of vehicles on dates after the July 13, 2014 announcement of the ignition recall on Cobalts and other GM Vehicles received wide publicity. The valuation Geico thus arrived at was lower than it would have been had the defect not been present in the Cobalt and other models.  Geico's valuation explicitly noted the existence of the recalls complained of herein.

### 54.   Deneise Burton—Oklahoma

80.     Plaintiff and proposed Nationwide and Oklahoma State Class Representative Deneise Burton is a resident and citizen of Warr Acres, Oklahoma.  Ms. Burton purchased a used 2007 Saturn Ion on September 8, 2012 in Oklahoma for $11,995.  She also purchased a limited warranty for 24 months or 24,000 miles.  Once, in April 2013, her engine shut off while backing out of her driveway after her knee bumped the ignition switch area, knocking her keys from the ignition.  Her ignition switch was repaired after she received the recall notice.  In two attempts before GM agreed to provide her a loaner vehicle so as not to risk her and her children's lives while using the car and waiting for the repair parts to arrive.  She has tried to sell her vehicle since the recalls were announced, but the value of her vehicle is now too low.  Ms. Burton would not have purchased her vehicle, or she would have paid less for it, had she known about these defects.

### 55.   Janice Bagley—Pennsylvania

81.     Plaintiff and proposed Nationwide and Pennsylvania State Class Representative Janice Bagley is a resident and citizen of Patton, Pennsylvania.  Ms. Bagley purchased a used 2007 Chevrolet Cobalt in 2013 in Carroltown, Pennsylvania, for approximately $6,000. The vehicle had a 30-day warranty at the time of purchase.  Ms. Bagley purchased the Cobalt because she had owned GM-branded vehicles in the past, thought her previous vehicles to be safe and reliable, and believed the Cobalt also would be safe and reliable.  She also thought it would be a safe, reliable vehicle for her 19 year old daughter to drive.  Within the first 30 days of owning the vehicle, she experienced two stalling events; a few weeks later she had a third stalling incident.  Each time she took the vehicle to a mechanic because she was concerned she would be stranded one day.  In February 2014, she was involved in an accident when a deer ran in front of her; she was driving 35 miles per hour yet her airbags did not deploy.  Following the recall, she

- 43 -

made the connection between the frontal collision and airbag failure and the safety recall.

Ms. Bagley had her ignition switch replaced in June or July of 2014.  Had she known about the

problems with her GM-branded vehicle, she would not have purchased the car and will never

again purchase any GM-branded vehicle.

### 56.  Janelle Davis—South Dakota

82.    Plaintiff and proposed Nationwide and South Dakota State Class Representative

Janelle Davis is a resident and citizen of South Sunburst, South Dakota.  Ms. Davis purchased a

used 2006 Chevrolet Cobalt in 2011 in Sioux Falls, South Dakota, for $7,200.  Ms. Davis

purchased the vehicle because she thought it was a reliable and safe vehicle and also because it

has good mileage ratings.  When Ms. Davis learned about the recall, she contacted the dealership

about a loaner vehicle because she has a one year old daughter and did not feel safe driving her

in a vehicle with a safety defect.  She was denied a loaner and/or rental vehicle, even though she

told the dealership about her fear of driving her one year old daughter in an unsafe vehicle,

because she had not experienced shut downs or stalls.  Ms. Davis had her ignition switch

replaced pursuant to the recall in the summer of 2014.  Had she known about the problems with

her GM-branded vehicle, she would not have purchased the car.

### 57.  Louise Tindell—Tennessee

83.    Plaintiff and proposed Nationwide and Tennessee State Class Representative

Louise Tindell is a resident and citizen of Murfeesboro, Tennessee.  Ms. Tindell  purchased a

used 2007 Saturn Ion in 2010 in Murfeesboro, Tennessee, for approximately $10,000.  The

vehicle was under warranty; she believes there were two years remaining on the warranty at the

time she purchased the car.  When Ms. Tindell believed that the Ion was a safe and reliable

vehicle.  Within seven months of purchasing the vehicle, Ms. Tindell's vehicle shut down while

she was driving.  She veered to the right, came to a stop, and waited before turning her car back

- 44 -

on.  On another occasion, her vehicle shut down on her way to church.  These events make her afraid to drive her car, and, since learning about the recall, she is angry towards New GM for keeping the safety defect a secret.  Ms. Tindell had her ignition switch replaced in approximately June 2014.  Since the replacement, she has experienced problems with her seat belts.  She no longer trusts the Ion; she will never feel safe regardless of repairs or replacement parts.  She continues to fear she will experience more shut downs.  Had Ms. Tindell known about the problems with her GM-branded vehicle, she would not have purchased the car.  She now tries to drive as infrequently as possible, and when she does she is fearful.

### 58.   **Michael Graciano—Texas**

84.   Plaintiff and proposed Nationwide and Texas State Class Representative Michael Graciano is a resident and citizen of Arlington, Texas.  On October 17, 2011, Mr. Graciano purchased a used 2007 Chevrolet Cobalt from a dealership in Arlington, Texas, for $22,197.20.  Prior to March 4, 2014, his fiancé and her daughter had experienced the car stalling on numerous occasions with a corresponding loss of power steering.  They had the car looked at by family members experienced in car repair and one independent repair shop, but no one was able to diagnose the problem.  Mr. Graciano received a safety recall notice pertaining to his vehicle in March 2014.  After receiving the notice, Mr. Graciano and his fiancé, fearful for her daughter's safety, instructed her not to drive the car any more.  Mr. Graciano's fiancé called a local Chevrolet dealer in Colorado twice in March 2014 about having the recall repair performed and each time she was told the dealer did not have the necessary parts, and each time the dealer failed to offer a loaner vehicle.  The car was eventually serviced under the recall by AutoNation Chevrolet North in Denver, Colorado, and Mr. Graciano's fiancé's daughter was provided with a rental car as a loaner vehicle.  While Mr. Graciano waited on repair of the Cobalt, his fiancé's daughter moved to Texas to go to college, bringing the rental car with her.  Finally, in

approximately mid-June, the dealer called to say the recall repair had been made, some two months after the car was left with the dealer. Had New GM disclosed the defects in its vehicles, Mr. Graciano would not have purchased the Cobalt.

### 59. Keisha Hunter—Texas

85.    Plaintiff and proposed Nationwide and Texas State Class Representative Keisha Hunter is a resident and citizen of Fort Worth, Texas. Ms. Hunter purchased a used 2006 Chevy Cobalt on March 22, 2013, in Arlington, Texas for $24,965.01. Ms. Hunter chose the Cobalt in part because she wanted a safe vehicle. Ms. Hunter is concerned for her safety and the diminished value of her vehicle as a result of the ignition switch defects. Ms. Hunter did not learn of the ignition switch defects until March 2014. Had she been aware of the of the ignition switch defects, Ms. Hunter would either not have purchased her Cobalt or would have paid less for it than she did.

### 60. Alexis Crockett—Utah

86.    Plaintiff and proposed Nationwide and Utah State Class Representative Alexis Crockett is a resident and citizen of Eagle Mountain, Utah. Ms. Crockett purchased a used 2005 Chevrolet Cobalt in 2013 in Oehi, Utah, for $5,200. The vehicle did not have a warranty. Ms. Crockett experienced problems turning the vehicle on and off on numerous occasions; she also had difficulty removing the key from the ignition. In some weeks, the key would get stuck in the ignition several times. She also has experienced stalling when reversing out of her driveway. Ms. Crockett has not had her ignition switch replaced pursuant to the recall as of September 2014. She regularly calls the dealership and is told that the part is not ready; she has been told by another dealership that her vehicle is not on the recall list. Ms. Crockett is afraid to drive her vehicle, especially when she has to transport her siblings to see her father which requires highway driving. She would like to sell her vehicle but has to pay more than the car is now

- 46 -

worth, so cannot afford to sell it.  Had she known about the problems with her GM-branded

vehicle, she would not have purchased the car.

>   **61.    Ashlee Hall-Abbott—Virginia**

Plaintiff and proposed Nationwide and Virginia State Class Representative Ashlee Hall-

Abbott is a resident and citizen of Hampton, Virginia.  Ms. Hall-Abbott and her husband Brian

Abbott purchased a new 2014 Chevy Silverado in March 2014 at Hampton Chevrolet in

Hampton, Virginia for $38,204.19.  Her vehicle is currently covered by GM's two-year,

100,000-mile warranty and an unlimited lifetime warranty through Hampton Chevrolet.  Ever

since purchasing the truck earlier this year, Ms. Hall-Abbott's vehicle has been repaired under at

least three or four separate recalls, and she just recently received what she believes is the fifth

recall notice in the mail.  She and her husband recently went to the GM dealership to inquire

about trading in the Silverado for a Chevy Tahoe.  The dealership finance manager immediately

declined the offer, however, saying the dealership would be upside down in negative equity if

they accepted.  Had Ms. Hall-Abbott and her husband known about the safety defects and

problems associated with their Silverado, they would have purchased another vehicle.

>   **62.    Michael Garcia—Washington**

87.    Plaintiff and proposed Nationwide and Washington State Class Representative

Michael Garcia is a resident and citizen of Yakima, Washington.  Mr. Garcia purchased a used

2010 Chevy Cobalt in June 2011 in Mt. Vernon, Washington for $16,470.  The vehicle was

under warranty when he purchased it.  Mr. Garcia fears driving his vehicle due to the ignition

switch recall and the risks posed by the defects.  Mr. Garcia had the ignition switch replaced

under the recall repair program.  He believes the value of his vehicle has been diminished as a

result of the defects.  Mr. Garcia would not have purchased this car had New GM been honest

about the safety defects.

- 47 -

### 63. Tony Hiller—Washington

88.     Plaintiff and proposed Nationwide and Washington State Class Representative Tony Hiller is a resident and citizen of Sumner, Washington.  He purchased a used 2009 Chevrolet HHR in March of 2013 in Puyallup, Washington for $10,965.50.  The car was not under warranty at the time of purchase.  After learning of the recall, Mr. Hiller simulated a shutdown incident.  He pulled lightly on his key and the vehicle shut off.  On July 23, 2014, Mr. Hiller's ignition switch was replaced pursuant to the recall.  Mr. Hiller traded in his HHR on August 8, 2014 because he does not believe the vehicle is safe to drive.  He believes he received less in trade in value due to the recall and the safety defects in the vehicle.  Knowing what he now knows about the safety defects in many GM-branded vehicles, he would not have purchased the vehicle.

### 64. Melinda Graley—West Virginia

89.     Plaintiff and proposed Nationwide and West Virginia State Class Representative Melinda Graley is a resident of Alum Creek, West Virginia.  Ms. Graley purchased a used 2003 Saturn Ion in March 2012 in Charleston, West Virginia for $13,000.  The car was not under warranty at the time of purchase.  In February, Ms. Graley's husband was driving the car when it inadvertently shut down, causing him to crash into an embankment.  Ms. Graley also experienced steering lock-up events with her car.  In one instance, it locked up on her while she was driving up a hill in the mountains, causing her car to drift left into the oncoming lane.  She narrowly avoided colliding with a coal truck.  The vehicle was serviced under an ignition switch recall in June 2014.  During those three months her dealership called on multiple instances, insisting she return the loaner vehicle because there was "nothing wrong" with her ignition switch and that her vehicle never failed.  With the assistance of her counsel, Ms. Graley was able to refuse these demands and retain her loaner through June when her car was finally repaired.

010440-11 725144 V1

Ms. Graley attempted to sell her car to a dealership, CNO Motors, in August 2014. They only offered her $1,000 for the car, however, so she decided not to sell it. Had GM disclosed the defects in its vehicles, Ms. Graley would either not have purchased the vehicle, or would have paid less.

### 65.    Nancy Bellow—Wisconsin

90.    Plaintiff and proposed Nationwide and Wisconsin State Class Representative Nancy Bellow is a resident and citizen of Oconto Falls, Wisconsin. She purchased a used 2007 Chevrolet Cobalt in late March or early April 2012 at King Buick in Oconto, Wisconsin for $10,000. The car was not under warranty at the time of purchase. She purchased the vehicle after reading advertisements about the Cobalt on the Internet. Her ignition switch was not repaired under the recall until September 18, 2014, and she was never offered a loaner car during this waiting period. Knowing what she now knows about the safety defects in many GM-branded manufactured vehicles, she would not have purchased the vehicle.

### 66.    Henry Redic—Wisconsin

91.    Plaintiff and proposed Nationwide and Wisconsin State Class Representative Henry Redic is a resident and citizen of Milwaukee, Wisconsin. Mr. Redic purchased a used 2008 Buick Lucerne on September 19, 2011, from Joe Van Horn Chevrolet Inc. in Milwaukee, Wisconsin for $15,876. Mr. Redic's vehicle was covered by a written warranty and is currently covered by two extended warranties: the Advantage Contract # AD40 473150 and the Advantage Wrap Plan. Mr. Redic has owned six Buicks and has long favored this vehicle model. He purchased the vehicle at issue based on his belief that the GM brand was a trusted name and that the Buick was a safe and reliable vehicle. Mr. Redic believed his vehicle was safe and defect free when he purchased it. Mr. Redic's vehicle has spontaneously shut off on six different occasions. The first shut off occurred on July 13, 2013, in Chicago, Illinois. Mr. Redic

was driving over railroad tracks in heavy traffic when his vehicle suddenly shut off. He attempted to pull the vehicle over without causing an accident but was unable to do so and side-swiped a utility pole. The second incident occurred in Milwaukee, Wisconsin on September 1, 2013, when the vehicle shut off after hitting a pothole. The remaining four shut off incidents also occurred in Milwaukee, Wisconsin after hitting potholes, but Mr. Redic does not recall the precise dates of those incidents. Aside from the incident on July 13, 2013, Mr. Redic was able pull the vehicle to the side of the road and allow it to coast until he was able to get it to stop. Mr. Redic would not have purchased the vehicle had he known of the defects.

### 67. Scott Schultz—Wisconsin

92.    Plaintiff and proposed Nationwide and Wisconsin State Representative Scott Schultz is a resident and citizen of Medford, Wisconsin. Mr. Schultz purchased a used 2006 Saturn Ion in 2011 from a Chevy dealership in Wisconsin for $5,000-6,000. The vehicle was not covered by a warranty. Mr. Schultz's vehicle has shut off on him approximately ten times. The worst incident occurred in March or April 2014 when the car shut off and he had to maneuver to avoid an incoming vehicle and ditch. The power steering and brakes were also disabled when the vehicle shut off. Other times the car shut off while driving on gravel roads or railroad tracks. It is possible his knee hit the ignition switch on some occasions, but he does not recall. He only kept two keys on his key fob. His car first shut down about six months after purchasing it, and the most recent time occurred in the spring of 2014. In all instances, it took all his strength to turn the steering wheel and apply the brakes. The ignition switch on his vehicle has not been repaired under the recall because he got tired of waiting for the parts and traded it in around August 2014. Mr. Schultz also tried selling his vehicle in a private sale but no one was interested due to the recall issues on the vehicle. He checked the car's value on Kelley Blue Book and it was $3,700-4,700 for trade in value. When he traded the car in around August 2014, he only got

$3,500 for it.  Mr. Schultz believes the value of his vehicle has been diminished and would not have purchased the car, or would have at least paid less for it, had he known about these defects.

### 68.     Bedford Auto Sales, Inc.—Nationwide Dealer and Ohio State Class Representative

93.     Nationwide Class and Ohio State Class representative Bedford Auto Sales, Inc. maintains its principal place in Bedford, Ohio.  Plaintiff Bedford Auto Sales, Inc. purchased the following vehicles with the intention to resale same:

| YEAR | MAKE | MODEL | VIN # | DATE PURCHASED |
|---|---|---|---|---|
| 2005 | COBALT | CBT | 1G1AK12F657528414 | 2/13/2014 |
| 2005 | COBALT | CBT | 1G1AK52F757653669 | 2/13/2014 |
| 2007 | COBALT | BLT | 1G1AL15F277386297 | 12/16/2013 |
| 2005 | COBALT | BLT | 1G1AZ54F357576386 | 12/12/2013 |
| 2007 | COBALT | BLS | 1G1AK55FX77285373 | 4/7/2014 |
| 2006 | COBALT | BLS | 1G1AK55F967690011 | 12/5/2013 |
| 2007 | COBALT | BLT | 1G1AL55F677243540 | 2/13/2014 |
| 2006 | COBALT | BLT | 1G1AL15FX67834767 | 6/10/2013 |
| 2006 | COBALT | BLT | 1G1AL55F967662819 | 3/15/2014 |
| 2006 | COBALT | BLS | 1G1AK55F567673559 | 10/28/2013 |
| 2007 | COBALT | BLT | 1G1AL55F777398968 | 4/11/2014 |
| 2006 | COBALT | BLS | 1G1AK15F767730210 | 4/7/2014 |
| 2005 | COBALT | BLS | 1G1AL54F757575811 | 3/27/2014 |
| 2005 | COBALT | BLS | 1G1AL52F257540483 | 3/21/2014 |
| 2005 | COBALT | BLS | 1G1AL12FX57605136 | 4/12/2014 |
| 2006 | COBALT | BSS | 1G1AM18B367638417 | 3/28/2014 |
| 2006 | COBALT | BLS | 1G1AK55F567809334 | 3/24/2014 |
| 2005 | COBALT | BLS | 1G1AL14F357618727 | 2/21/2014 |
| 2006 | COBALT | BLS | 1G1AK55F967759635 | 4/14/2014 |
| 2006 | HHR | HHR | 3GNDA23P46S533920 | 9/30/2013 |
| 2003 | SATURN | SI2 | 1G8AJ52F43Z164264 | 3/15/2014 |
| 2003 | SATURN | SI3 | 1G8AL52F83Z104269 | 2/21/2014 |
| 2004 | SATURN | SI1 | 1G8AG52F64Z111307 | 3/24/2014 |
| 2006 | SATURN | SI2 | 1G8AN15F6Z6130753 | 1/28/2014 |
| 2007 | SATURN | SI3 | 1G8AL55F57Z113173 | 4/9/2014 |
| 2007 | SATURN | SI2 | 1G8AJ55F97Z120648 | 2/24/2014 |
| 2007 | SATURN | SI2 | 1G8AJ55F57Z171497 | 1/15/2014 |
| 2007 | SATURN | SI2 | 1G8AJ55F57Z199235 | 3/3/2014 |

- 51 -

94.     At the time the transactions for the purchase of these vehicles were made, Plaintiff

Bedford Auto Sales, Inc. did not know the vehicles were defective.  Plaintiff Bedford Auto Sales,

Inc. relied on GM to produce a safely designed and manufactured vehicle.

95.     Plaintiff Bedford Auto Sales, Inc. continues to pay interest on these vehicles that

sit on the lot.  Plaintiff Bedford Auto has attempted to have the vehicles repaired through Jay

Buick GMC in Bedford, Ohio on four occasions, and was informed the dealership did not have

the parts to perform the repairs.  Plaintiff Bedford Auto Sales, Inc. has been unable to sell these

vehicles, or had to sell the vehicles at a discounted rate, given the safety recall.

96.     As a result of the vehicle defect and subsequent recalls, Plaintiff Bedford Auto

Sales, Inc. has been unable to re-sell these vehicles, or had to sell the vehicles at a discounted

rate, and is incurring considerable expense, financial loss, and economic damage as a result.

**B.      Defendant**

97.     Defendant General Motors LLC ("New GM") is a Delaware limited liability

company with its principal place of business located at 300 Renaissance Center, Detroit,

Michigan, and is a citizen of the States of Delaware and Michigan.  The sole member and owner

of General Motors LLC is General Motors Holding LLC.  General Motors Holdings LLC is a

Delaware limited liability company with its principal place of business in the State of Michigan.

The sole member and owner of General Motors Holdings LLC is General Motors Company,

which is a Delaware Corporation with its principal place of business in the State of Michigan,

and is a citizen of the States of Delaware and Michigan.  New GM was incorporated in 2009 and,

effective on July 10, 2009, acquired substantially all assets and assumed certain liabilities of

General Motors Corporation through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy

Code.

Among the liabilities and obligations expressly assumed by New GM are the following:

010440-11 725144 V1

From and after the Closing, Purchaser [New GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

## IV.    FACTUAL ALLEGATIONS

### A.    New GM Falsely Promoted All of Its Vehicles as Safe, Reliable, and High-Quality

98.    New GM was financially successful in emerging from the Old GM bankruptcy. Sales of all its models went up, and New GM became profitable.  New GM claimed to have turned over a new leaf in the bankruptcy—a new GM was born, and the GM brand once again stood strong in the eyes of consumers—or so the world thought.

99.    In 2010, New GM sold 4.26 million vehicles globally, an average of one every 7.4 seconds.  Joel Ewanick, New GM's global chief marketing officer at the time, described the success of one of its brands in a statement to the press:  "Chevrolet's dedication to compelling designs, quality, durability and great value is a winning formula that resonates with consumers around the world."[2]

100.    New GM repeatedly proclaimed to the world and U.S. consumers that, once it emerged from bankruptcy in 2009, it was a new and improved company committed to innovation, safety, and maintaining a strong brand:

---

[2] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2011/Jan/0117_chev_ global.

010440-11  725144 V1



General Motors Company 2010 Annual Report, cover page.

010440-11  725144 V1

101.    In New GM's 2010 Annual Report, New GM proclaimed its products would

"improve safety and enhance the overall driving experience for our customers:"

> As we regain our financial footing, we expect the number of new product launches to steadily rise over the next several years. And these new products will increasingly embrace advanced technology to reduce fuel consumption and emissions, improve safety and enhance the overall driving experience for our customers.

General Motors Company 2010 Annual Report, pp. 4, 10.

102.    New GM claimed it would create vehicles that would define the industry

standard:

> BUILDING THE NEW GM
> We are moving with increased speed and agility, and implementing change faster than ever before. We are becoming a company with the capability, resources and confidence to play offense, not defense. Instead of creating new vehicles that are just better than their predecessors, we're working to design, build and sell vehicles that define the industry standard.

General Motors Company 2010 Annual Report, p. 5.

103.    In its 2010 Annual Report, New GM told consumers that it built the world's best

vehicles:

> *We truly are building a new GM, from the inside out.  Our vision is clear:  to design, build, and sell the world's best vehicles, and we have a new business model to bring that vision to life.  We have a lower cost structure, a stronger balance sheet, and a dramatically lower risk profile.  We have a new leadership team – a strong mix of executive talent from outside the industry and automotive veterans – and a passionate, rejuvenated workforce.*

010440-11 725144 V1

> *"Our plan is to steadily invest in creating world-class vehicles, which will
> continuously drive our cycle of great design, high quality and higher
> profitability."*

General Motors Company 2010 Annual Report, p. 2.

104.    New GM represented that it was building vehicles with design excellence, quality,

and performance:

> *And across the globe, other GM vehicles are gaining similar acclaim for design
> excellence, quality, and performance, including the Holden Commodore in
> Australia.  Chevrolet Agile in Brazil, Buick LaCrosse in China, and many others.*
>
> *The company's progress is early evidence of a new business model that begins
> and ends with great vehicles.  We are leveraging our global resources and scale
> to maintain stringent cost management while taking advantage of growth and
> revenue opportunities around the world, to ultimately deliver sustainable results
> for all of our shareholders.*

General Motors Company 2010 Annual Report, p. 3.

105.    These themes were repeatedly put forward as the core message about New GM's

Brand:

010440-11 725144 V1

The new General Motors has one clear vision: to design, build and sell the world's best vehicles. Our new business model revolves around this vision, focusing on fewer brands, compelling vehicle design, innovative technology, improved manufacturing productivity and streamlined, more efficient inventory processes. The end result is products that delight customers and generate higher volumes and margins— and ultimately deliver more cash to invest in our future vehicles.

## A New Vision, a New Business Model

Our vision is simple, straightforward and clear: to design, build and sell the world's best vehicles. That doesn't mean just making our vehicles better than the ones they replace. We have set a higher standard for the new GM—and that means building the best.

Our vision comes to life in a continuous cycle that starts, ends and begins again with great vehicle designs. To accelerate the momentum we've already created, we reduced our North American portfolio from eight brands to four: Chevrolet, Buick, Cadillac and GMC. Worldwide, we're aggressively developing and leveraging global vehicle architectures to maximize our talent and resources and achieve optimum economies of scale.

Across our manufacturing operations, we have largely eliminated overcapacity in North America while making progress in Europe, and we're committed to managing inventory with a new level of discipline. By using our manufacturing capacity more efficiently

and maintaining leaner vehicle inventories, we are reducing the need to offer sales incentives on our vehicles. These moves, combined with offering attractive, high-quality vehicles, are driving healthier margins—and at the same time building stronger brands.

Our new business model creates a self-sustaining cycle of reinvestment that drives continuous improvement in vehicle design, manufacturing discipline, brand strength, pricing and margins, because we are now able to make money at the bottom as well as the top of the industry cycles.

We are seeing positive results already. In the United States, for example, improved design, content and quality have resulted in solid gains in segment share, average transaction prices and projected residual values for the Chevrolet Equinox, Buick LaCrosse and Cadillac SRX. This is just the beginning.

General Motors Company 2010 Annual Report, p. 6.

106.    New GM represented that it had a world-class lineup in North America:

# A World-Class Lineup in North America



**Chevrolet Cruze**

Global success is no surprise for the new Chevrolet Cruze, which is sold in more than 60 countries around the world. In addition to a 42 mpg Eco model (sold in North America), Cruze's globally influenced design is complemented by its exceptional quietness, high quality and attention to detail not matched by the competition.

**Buick Regal**

The sport-injected Buick Regal is the brand's latest addition, attracting a whole new demographic for the Buick brand. The newly designed Buick lineup, which saw 52 percent volume growth in 2010 in the United States alone, is appealing to a broader spectrum of buyers.









**Chevrolet Equinox**

The Chevrolet Equinox delivers best-in-segment 32-mpg highway fuel economy in a sleek, roomy new package. With the success of the Equinox and other strong-selling crossovers, GM leads the U.S. industry in total unit sales for the segment.

**Chevrolet Sonic**

Stylish four-door sedan and sporty five-door hatchback versions of the Chevrolet Sonic will be in U.S. showrooms in fall 2011. Currently the only small car built in the United States, it will be sold as the Aveo in other parts of the world.

**Buick LaCrosse**

Buick builds on the brand's momentum in the United States and China with the fuel-efficient LaCrosse. With eAssist technology, the LaCrosse achieves an expected 37 mpg on the highway.

**Buick Verano**

The all-new Buick Verano, which will be available in late 2011, appeals to customers in the United States, Canada and Mexico who want great fuel economy and luxury in a smaller but premium package.

010440-11  725144 V1

Case 1:14-mc-02543-3MF    Document 345    Filed 10/10/14    Page 79 of 712








General Motors Company 2010 Annual Report, pp. 12-13.

107.    New GM boasted of its new "culture":

Case 1:14-md-02543-JMF Document 345 Filed 10/14/14 Page 80 of 112



General Motors Company 2010 Annual Report, p. 16.

108.    In its 2011 Annual Report, New GM proclaimed that it was putting its customers

first:

> Every driver of a GM car, crossover or truck is a driver of our growth. We're putting our vision in motion by putting our customers first—executing our strategy to attract and delight more of them every day, all over the world.

General Motors Company 2011 Annual Report, p. 1.

109.    New GM also announced that it is committed to leadership in vehicle safety:

> **Automotive**
>
> We offer a global vehicle portfolio of cars, crossovers and trucks. We are committed to leadership in vehicle design, quality, reliability, telematics and infotainment and safety, as well as to developing key energy efficiency, energy diversity and advanced propulsion technologies, including electric vehicles with range extending capabilities such as the Chevrolet Volt. Our business is

General Motors Company 2011 Annual Report, p. 11.

110.    In a "Letter to Stockholders" contained in its 2011 Annual Report, New GM noted that its brand had grown in value and that it designed the "World's Best Vehicles":

> *Dear Stockholder:*
>
> *Your company is on the move once again.  While there were highs and lows in 2011, our overall report card shows very solid marks, including record net income attributable to common stockholders of $7.6 billion and EBIT-adjusted income of $8.3 billion.*
>
> •    *GM's overall momentum, including a 13 percent sales increase in the United States, created new jobs and drove investments.  We have announced investments in 29 U.S.  facilities totaling more than $7.1 billion since July 2009, with more than 17,500 jobs created or retained.*

- 61 -

> *Design, Build and Sell the World's Best Vehicles*

> *This pillar is intended to keep the customer at the center of everything we do, and success is pretty easy to define. It means creating vehicles that people desire, value and are proud to own. When we get this right, it transforms our reputation and the company's bottom line.*

General Motors Company 2011 Annual Report, p. 2.

> *Strengthen Brand Value*

> *Clarity of purpose and consistency of execution are the cornerstones of our product strategy, and two brands will drive our global growth. They are Chevrolet, which embodies the qualities of value, reliability, performance, and expressive design; and Cadillac, which creates luxury vehicles that are provocative and powerful. At the same time the Holden, Buick, GMC, Baojun, Opel and Vauxhall brands are being carefully cultivated to satisfy as many customers as possible in select regions.*

> *Each day the cultural change underway at GM becomes more striking. The old internally focused, consensus-driven and overly complicated GM is being reinvented brick by brick, by truly accountable executives who know how to take calculated risks and lead global teams that are committed to building the best vehicles in the world as efficiently as we can.*

> *That's the crux of our plan. The plan is something we can control. We like the results we're starting to see and we're going to stick to it – always.*

General Motors Company 2011 Annual Report, p. 3.

These themes continued in GM's 2012 Annual Report:



General Motors Company 2012 Annual Report, p. 3.

111.    New GM boasted of its "focus on the customer" and its desire to be "great" and produce "quality" vehicles:

> *What is immutable is our focus on the customer, which requires us to go from "good" today to "great" in everything we do, including product design, initial quality, durability, and service after the sale.*

General Motors Company 2012 Annual Report, p. 4.

112.    New GM also indicated it had changed its structure to create more "accountability" which, as shown below, was a blatant falsehood:

> *That work continues, and it has been complemented by changes to our design and engineering organization that have flattened the structure and created more accountability for produce execution, profitability and customer satisfaction.*

General Motors Company 2012 Annual Report, p. 10.

113.   And New GM represented that product quality was a key focus—another blatant falsehood:

> *Product quality and long-term durability are two other areas that demand our unrelenting attention, even though we are doing well on key measures.*

General Motors Company 2012 Annual Report, p. 10.

114.   New GM's 2013 Annual Report stated, "Today's GM is born of the passion of our people to bring our customers the finest cars and trucks we've ever built":



General Motors Company 2013 Annual Report, inside front cover dual page, (unnumbered).

115.   Most importantly given its inaccuracy and the damage wrought in this case, New GM proclaimed, "Nothing is more important than the safety of our customers":

- 64 -

> Nothing is more important than the safety of our customers, so we are also making changes to ensure that something like this does not happen again. One of our first actions was to name a vice president of Global Vehicle Safety to oversee the safety development of GM vehicle systems on a global basis, the confirmation and validation of safety performance, and post-sale safety activities such as recalls. There will be more changes because we are determined to emerge from this crisis stronger and wiser so we can accelerate the momentum we generated throughout 2013.

General Motors Company 2013 Annual Report, p. 4.

**B.    New GM's Advertising and Marketing Literature Falsely Claimed that GM Placed Safety and Quality First**

116.    In May of 2014, New GM sponsored the North American Conference on Elderly Mobility.  Gay Kent, director of New GM global vehicle safety and a presenter at the conference, proclaimed the primacy of safety within New GM's new company culture:  "The safety of all our customers is our utmost concern."[3]

117.    New GM vigorously incorporated this messaging into its public-facing communications.  In advertisements and company literature, New GM consistently promoted all its vehicles as safe and reliable, and presented itself as a responsible manufacturer that stands behind GM-branded vehicles after they are sold.  Examples of New GM's misleading claims of safety and reliability made in public statements, advertisements, and literature provided with its vehicles follow.

118.    An online ad for "GM certified" used vehicles that ran from July 6, 2009, until April 5, 2010, stated that "GM certified means no worries."

---

[3] https://media.gm.com/media/us/en/gm/news.detail./content/Pages/news/us/en/2014/May/0514-cameras.

- 65 -

010440-11  725144 V1

119.    In April 2010, General Motors Company Chairman and CEO Ed Whitacre starred

in a video commercial on behalf of New GM.  In it, Mr. Whitacre acknowledged that not all

Americans wanted to give New GM a second chance, but that New GM wanted to make itself a

company that "all Americans can be proud of again" and "exceed every goal [Americans] set for

[General Motors]."  He stated that New GM was "designing, building, and selling the best cars in

the world."  He continued by saying that New GM has "unmatched lifesaving technology" to

keep customers safe.  He concluded by inviting the viewer to take a look at "the new GM."[4]



120.    A radio ad that ran from New GM's inception until July 16, 2010, stated that "[a]t

GM, building quality cars is the most important thing we can do."

121.    On November 10, 2010, New GM published a video that told consumers that New

GM actually prevents any defects from reaching consumers.  The video, entitled "Andy Danko:

The White Glove Quality Check," explains that there are "quality processes in the plant that

prevent any defects from getting out."  The video also promoted the ideal that, when a customer

buys a New GM vehicle, they "drive it down the road and they never go back to the dealer."[5]

---

[4] https://www.youtube.com/watch?v=jbXpV0aqEM4.

[5] https://www.youtube.com/watch?v=JRFO8UzoNho&list=UUxN-Csvy_9sveql5HJviDjA.

010440-11  725144 V1



122.    In 2010, New GM ran a television advertisement for its Chevrolet brand that implied its vehicles were safe by showing parents bringing their newborn babies home from the hospital, with the tagline "as long as there are babies, there will be Chevys to bring them home."[6]

123.    Another 2010 television ad informed consumers that "Chevrolet's ingenuity and integrity remain strong, exploring new areas of design and power, while continuing to make some of the safest vehicles on earth."

124.    New GM's 2010 brochure for the Chevy Cobalt states, "Chevy Cobalt is savvy when it comes to standard safety" and "you'll see we've thought about safety so you don't have to."  It also states "[w]e're filling our cars and trucks with the kind of thinking, features and craftsmanship you'd expect to pay a lot more for."[7]

---

[6] https://www.youtube.com/watch?v=rb28vTN382g.

[7] https://www.auto-brochures.com/makes/Chevrolet/Cobalt/Chevrolet_US%20Cobalt_2010.pdf.

- 67 -



125.    New GM's 2010 Chevy HHR brochure proclaims, "PLAY IT SAFE" and "It's easier to have fun when you have less to worry about."[8]



---

[8] https://www.auto-brochures.com/makes/Chevrolet/HHR/Chevrolet_US%20HHR_2010.pdf.

126.    New GM's brochure for the 2011 Chevrolet Silverado states, "Silverado – the
most dependable, long-lasting full size pickups on the road."  It goes on to say, "There are three
stages of safety.  Silverado takes every one as seriously as you do."[9]





127.    The brochure for the 2011 Cadillac DTS and STS states, "Passenger safety is a
primary consideration throughout the engineering process," and "[t]he STS and DTS were
carefully designed to provide a host of features to help you from getting into a collision in the
first place."[10]

---

[9] https://www.auto-brochures.com/makes/Chevrolet/Silverado/Chevrolet_US%20Silverado_2011.pdf.

[10] https://www.auto-brochures.com/makes/Cadillac/Cadillac_US%20STS-DTS_2011.pdf.

010440-11  725144 V1



128.    On August 29, 2011, New GM's website advertised:  "Chevrolet provides consumers with fuel-efficient, safe and reliable vehicles that deliver high quality, expressive design, spirited performance and value."[11]

129.    On September 29, 2011, New GM announced on the "News" portion of its website the introduction of front center airbags.  The announcement included a quote from Gay Kent, New GM Executive Director of Vehicle Safety and Crashworthiness, who stated that: "This technology is a further demonstration of New GM's above-and-beyond commitment to provide continuous occupant protection before, during and after a crash."[12]

130.    On December 27, 2011, Gay Kent was quoted in an interview on New GM's website as saying:  "Our safety strategy is about providing continuous protection for our customers before, during and after a crash."[13]

---

[11] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2014/Jul/0731-mpg.

[12] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2011/Sep/0929_airbag.

[13] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2011/Dec/1227_safety.

010440-11  725144 V1

131.    New GM's brochure for the 2012 Chevrolet Impala proclaims:  "A safety
philosophy that RUNS DEEP," and that "if a moderate to severe collision does happen, Impala is
designed to respond quickly":[14]



132.    New GM's brochure for the 2012 Cadillac CTS announces, "At Cadillac, we
believe the best way to survive a collision is to avoid one in the first place," and "Active safety
begins with a responsive engine, powerful brakes, and an agile suspension."[15]

---

[14] https://www.chevrolet.com/content/dam/Chevrolet/northamerica/usa/nscwebsite/en/Home/Help%20Center
/Download%20a%20Brochure/02_PDFs/2012_Impala_eBrochure.pdf.

[15] https://www.auto-brochures.com/makes/Cadillac/CTS/Cadillac_US%20CTS_2012.pdf.



133.    On January 3, 2012, Gay Kent, New GM Executive Director of Vehicle Safety, was quoted on New GM's website as saying:  "From the largest vehicles in our lineup to the smallest, we are putting overall crashworthiness and state-of-the-art safety technologies at the top of the list of must-haves."[16]

134.    An online national ad campaign for New GM in April 2012 stressed "Safety. Utility.  Performance."

135.    On June 5, 2012, New GM posted an article on its website announcing that its Malibu Eco had received top safety ratings from the National Highway Traffic Safety Administration and the Insurance Institute for Highway Safety.  The article includes the following quotes:  "With the Malibu Eco, Chevrolet has earned seven 2012 TOP SAFETY PICK awards," said IIHS President Adrian Lund.  "The IIHS and NHTSA results demonstrate GM's commitment to state-of-the-art crash protection."  And, "We are now seeing the results from our commitment to design the highest-rated vehicles in the world in safety performance," said Gay Kent, New GM Executive Director of Vehicle Safety.  "Earning these top safety ratings

---

[16] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2012/Jan/0103_sonic.

demonstrates the strength of the Malibu's advanced structure, overall crashworthiness and effectiveness of the vehicle's state-of-the-art safety technologies."[17]

136.    On June 5, 2012, New GM posted an article on its website entitled "Chevrolet Backs New Vehicle Lineup with Guarantee," which included the following statement:  "We have transformed the Chevrolet lineup, so there is no better time than now to reach out to new customers with the love it or return it guarantee and very attractive, bottom line pricing," said Chris Perry, Chevrolet global vice president of marketing.  "We think customers who have been driving competitive makes or even older Chevrolets will be very pleased by today's Chevrolet designs, easy-to-use technologies, comprehensive safety and the quality built into all of our cars, trucks and crossovers."[18]

137.    On November 5, 2012, New GM published a video to advertise its "Safety Alert Seat" and other safety sensors.  The video described older safety systems and then added that new systems "can offer drivers even more protection."  A Cadillac Safety Engineer added that "are a variety of crash avoidance sensors that work together to help the driver avoid crashes."  The engineer then discussed all the sensors and the safety alert seat on the Cadillac XTS, leaving the viewer with the impression safety was a top priority at Cadillac.[19]

---

[17] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2012/Jun/0605_malibu safety.

[18] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2012/Jul/0710_ confidence.

[19] https://www.youtube.com/watch?v=CBEvflZMTeM.

Case 1:14-md-02543-JMF Document 345 Filed 10/14/14 Page 94 of 112



138.    New GM's brochure for the 2013 Chevrolet Traverse states, "Traverse provides

peace of mind with an array of innovative safety features," and "[i]t helps protect against the

unexpected."[20]



139.    A national print ad campaign in April 2013 states that, "[w]hen lives are on the

line, you need a dependable vehicle you can rely on.  Chevrolet and GM … for power,

performance and safety."

_____

[20] https://www.auto-brochures.com/makes/Chevrolet/Traverse/Chevrolet_US%20Traverse_2013.pdf.

- 74 -

140.     On November 8, 2013, New GM posted a press release on its website regarding

GMC, referring to it as "one of the industry's healthiest brands":[21]

**About GMC**

GMC has manufactured trucks since 1902, and is one of the industry's healthiest brands. Innovation and engineering excellence is built into all GMC vehicles and the brand is evolving to offer more fuel-efficient trucks and crossovers, including the Terrain small SUV and Acadia crossover. The 2014 Sierra half-ton pickup boasts all-new powertrains and design, and the Sierra Heavy Duty pickups are the most capable and powerful trucks ever built by GMC. Every retail GMC model, including Yukon and Yukon XL full-size SUVs, is now available in Denali luxury trim. Details on all GMC models are available at http://www.gmc.com/, on Twitter at @thisisgmc or at http://www.facebook.com/gmc.

141.     A December 2013 New GM testimonial ad stated that "GM has been able to

deliver a quality product that satisfies my need for dignity and safety."

142.     In 2013, New GM proclaimed on its website, https://www.gm.com, the

company's passion for building and selling the world's best vehicles as "the hallmark of our

customer-driven culture":[22]



---

[21] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2013/Nov/1108-truck-lightweighting.

[22] https://www.gm.com/company/aboutGM/our_company.

- 75 -

Case 1:14-md-02543-JMF    Document 345    Filed 10/14/14    Page 96 of 712

143.    On the same website in 2013, New GM stated:  "At GM, it's about getting
everything right for our customers – from the way we design, engineer and manufacture our
vehicles, all the way through the ownership experience."[23]



144.    On its website, Chevrolet.com, New GM promises that it is "Putting safety ON
TOP," and that "Chevy Makes Safety a Top Priority":[24]



145.    On its website, Buick.com, New GM represents that "Keeping you and your
family safe is a priority":[25]

---

[23] https://www.gm.com/vision/quality_safety/it_begins_with_a_commitment_to_Quality.

[24] https://www.chevrolet.com/culture/article/vehicle-safety-preparation.

[25] https://www.buick.com/top-vehicle-safety-features.



146.   New GM's website currently touts its purported "Commitment to Safety," which is "at the top of the agenda at GM:"[26]

> *Innovation: Quality & Safety; GM's Commitment to Safety; Quality and safety are at the top of the agenda at GM, as we work on technology improvements in crash avoidance and crashworthiness to augment the post-event benefits of OnStar, like advanced automatic crash notification.*

> *Understanding what you want and need from your vehicle helps GM proactively design and test features that help keep you safe and enjoy the drive. Our engineers thoroughly test our vehicles for durability, comfort, and noise minimization before you think about them. The same quality process ensures our safety technology performs when you need it.*

147.   New GM's website further promises "Safety and Quality First: Safety will always be a priority at New GM. We continue to emphasize our safety-first culture in our facilities," and that, "[i]n addition to safety, delivering the highest quality vehicles is a major cornerstone of our promise to our customers":[27]

---

[26] https://www.gm.com/vision/quality_safety/gms_commitment_tosafety.

[27] https://www.gm.com/company/aboutGM/our_company.

> At the new GM, we make a strong commitment to our customers, employees, partners and other important stakeholders. We state proudly our five principles that guide us in everything we do:
>
> - **Safety and Quality First:** Safety will always be a priority at GM. We continue to emphasize our safety-first culture in our facilities, and as we grow our business in new markets. Our safety philosophy is at the heart of the development of each vehicle. In addition to safety, delivering the highest quality vehicles is a major cornerstone of our promise to our customers. That is why our vehicles go through extreme testing procedures in the lab, on the road and in our production facilities prior to being offered to customers. Learn More

148.    New GM's current website states that "leading the way is our seasoned leadership team who set high standards for our company so that we can give you the best cars and trucks. This means that we are committed to delivering vehicles with compelling designs, flawless quality, and reliability, and leading safety, fuel economy and infotainment features…"[28]

149.    In its 2011 10-K SEC filing, New GM stated "We are a leading global automotive company. Our vision is to design, build and sell the world's best vehicles. We seek to distinguish our vehicles through superior design, quality, reliability, telematics (wireless voice and data) and infotainment and safety within their respective segments." General Motors 2011 Form 10-K, p. 50.[29]

150.    New GM made these and similar representations to boost vehicle sales while knowing that millions of GM-branded vehicles, across numerous models and years, were plagued with serious and concealed safety defects. New GM was well aware of the impact vehicle recalls, and their timeliness, have on its brand image. In its 2010 Form 10-K submitted to the United States Securities and Exchange Commission ("SEC"), New GM admitted that "Product recalls can harm our reputation and cause us to lose customers, particularly if those

---

[28] https://www.gm.com/company/aboutGM/our_company.

[29] https://www.sec.gov/Archives/edgar/data/1467858/000119312511051462/d10k.htm.

Case 1:14-mc-02543-JMF   Document 345   Filed 10/10/14   Page 99 of 172

recalls cause consumers to question the safety or reliability of our products. Any costs incurred or lost sales caused by future product recalls could materially adversely affect our business." General Motors 2010 Form 10-K, p. 31.[30] This is precisely why New GM decided to disregard safety issues and conceal them.

## C.   Contrary to its Barrage of Representations about Safety and Quality, New GM Concealed and Disregarded Safety Issues as a Way of Doing Business

151.   Ever since its inception, New GM possessed vastly superior (if not exclusive) knowledge and information to that of consumers about the design and function of GM-branded vehicles and the existence of the defects in those vehicles.

152.   Recently revealed information presents a disturbing picture of New GM's approach to safety issues—both in the design and manufacturing stages, and in discovering and responding to defects in GM-branded vehicles that have already been sold.

153.   New GM made very clear to its personnel that cost-cutting was more important than safety, deprived its personnel of necessary resources for spotting and remedying defects, trained its employees not to reveal known defects, and rebuked those who attempted to "push hard" on safety issues.

154.   In stark contrast to New GM's public mantra that "Nothing is more important than the safety of our customers" and similar statements, a prime "directive" at New GM was "cost is everything."[31] The messages from top leadership at New GM to employees, as well as their actions, were focused on the need to control cost.[32]

---

[30] https://www.sec.gov/Archives/edgar/data/1467858/000119312510078119/d10k.htm#toc85733_4.

[31] Valukas Report at 249.

[32] *Id.* at 250.

Case 1:14-md-02543-JMF    Document 345    Filed 10/14/14    Page 100 of 712

155.    One New GM engineer stated that emphasis on cost control at New GM "permeates the fabric of the whole culture."[33]

156.    According to Mark Reuss (President of GMNA from 2009-2013 before succeeding Mary Barra as Executive Vice President for Global Product Development, Purchasing and Supply Chain in 2014), cost and time-cutting principles known as the "Big 4" at New GM "emphasized timing over quality."[34]

157.    New GM's focus on cost-cutting created major disincentives to personnel who might wish to address safety issues.  For example, those responsible for a vehicle were responsible for its costs, but if they wanted to make a change that incurred cost and affected other vehicles, they also became responsible for the costs incurred in the other vehicles.

158.    As another cost-cutting measure, parts were sourced to the lowest bidder, even if they were not the highest quality parts.[35]

159.    Because of New GM's focus on cost-cutting, New GM engineers did not believe they had extra funds to spend on product improvements.[36]

160.    New GM's focus on cost-cutting also made it harder for New GM personnel to discover safety defects, as in the case of the "TREAD Reporting team."

161.    New GM used its TREAD database (known as "TREAD") to store the data required to be reported quarterly to NHTSA under the TREAD Act.[37]  From the date of its

---

[33] *Id.*

[34] *Id.*

[35] *Id.* at 251.

[36] *Id.*

[37] *Id.* at 306.

- 80 -

inception in 2009, TREAD has been the principal database used by New GM to track incidents related to its vehicles.[38]

162.    From 2003-2007 or 2008, the TREAD Reporting team had eight employees who would conduct monthly searches and prepare scatter graphs to identify spikes in the number of accidents or complaints with respect to various GM-branded vehicles.  The TREAD Reporting team reports went to a review panel and sometimes spawned investigations to determine if any safety defect existed.[39]

163.    In or around 2007-08, Old GM reduced the TREAD Reporting team from eight to three employees, and pared down the monthly data mining process.[40]  In 2010, New GM restored two people to the team, but they did not participate in the TREAD database searches.[41] Moreover, until 2014, the TREAD Reporting team did not have sufficient resources to obtain any of the advanced data mining software programs available in the industry to better identify and understand potential defects.[42]

164.    By starving the TREAD Reporting team of the resources it needed to identify potential safety issues, New GM helped to insure that safety issues would not come to light.

165.    "[T]here was resistance or reluctance to raise issues or concerns in the GM culture."  The culture, atmosphere and supervisor response at New GM "discouraged individuals from raising safety concerns."[43]

---

[38] Id.

[39] Id. at 307.

[40] Id.

[41] Id. at 307-308.

[42] Id. at 208.

[43] Id. at 252.

010440-11  725144 V1

166.    New GM CEO, Mary Barra, experienced instances where New GM engineers were "unwilling to identify issues out of concern that it would delay the launch" of a vehicle.[44]

167.    New GM supervisors warned employees to "never put anything above the company" and "never put the company at risk."[45]

168.    New GM systematically "pushed back" on describing matters as safety issues and, as a result, "GM personnel failed to raise significant issues to key decision-makers."[46]

169.    So, for example, New GM discouraged the use of the word "stall" in Technical Service Bulletins ("TSBs") that it sometimes sent to dealers about issues in GM-branded vehicles.  According to Steve Oakley, who drafted a Technical Service Bulletin in connection with the ignition switch defects, "the term 'stall' is a 'hot' word that GM generally does not use in bulletins because it may raise a concern about vehicle safety, which suggests GM should recall the vehicle, not issue a bulletin."[47]  Other New GM personnel confirmed Oakley on this point, stating that "there was concern about the use of 'stall' in a TSB because such language might draw the attention of NHTSA."[48]

170.    Oakley further noted that "he was reluctant to push hard on safety issues because of his perception that his predecessor had been pushed out of the job for doing just that."[49]

171.    Many New GM employees "did not take notes at all at critical safety meetings because they believed New GM lawyers did not want such notes taken."[50]

---

[44] Id.

[45] Id. at 252-253.

[46] Id. at 253.

[47] Id. at 92.

[48] Id. at 93.

[49] Id.

[50] Id. at 254.

172.    A New GM training document released by NHTSA as an attachment to its
Consent Order sheds further light on the lengths to which New GM went to ensure that known
defects were concealed.  It appears that the defects were concealed pursuant to a company policy
that New GM inherited from Old GM.  The document consists of slides from a 2008 Technical
Learning Symposium for "designing engineers," "company vehicle drivers," and other
employees at Old GM.  On information and belief, the vast majority of employees who
participated in this webinar presentation continued on in their same positions at New GM after
July 10, 2009.

173.    The presentation focused on recalls and the "reasons for recalls."

174.    One major component of the presentation was captioned "Documentation
Guidelines," and focused on what employees should (and should not say) when describing
problems in vehicles.  Employees were instructed to "[w]rite smart," and to "[b]e factual, not
fantastic" in their writing.  In practice, "factual" was a euphemism for avoiding facts and
relevant details.

175.    New GM vehicle drivers were given examples of comments to avoid, including
the following:  "This is a safety and security issue"; "I believe the wheels are too soft and weak
and could cause a serious problem"; and "Dangerous … almost caused accident."

176.    In documents used for reports and presentations, employees were advised to avoid
a long list of words, including:  "bad," "dangerous," "defect," "defective," "failed," "flawed,"
"life-threatening," "problem," "safety," "safety-related," and "serious."

177.    In truly Orwellian fashion, the company advised employees to use the words (1)
"Issue, Condition [or] Matter" instead of "Problem"; (2) "Has Potential Safety Implications"
instead of "Safety"; (3) "Broke and separated 10 mm" instead of "Failed"; (4)

"Above/Below/Exceeds Specification" instead of "Good [or] Bad"; and (5) "Does not perform to design" instead of "Defect/Defective."

178.    As NHTSA's Acting Administrator Friedman noted at the May 16, 2014 press conference announcing the Ignition Switch Defect Consent Order, it was New GM's company policy to avoid using words that might suggest the existence of a safety defect:

> *GM must rethink the corporate philosophy reflected in the documents we reviewed, including training materials that explicitly discouraged employees from using words like 'defect,' 'dangerous,' 'safety related,' and many more essential terms for engineers and investigators to clearly communicate up the chain when they suspect a problem.*

179.    Thus, New GM trained its employees to conceal the existence of known safety defects from consumers and regulators.  Indeed, it is nearly impossible to convey the potential existence of a safety defect without using the words "safety" or "defect" or similarly strong language that was forbidden at New GM.

180.    So institutionalized was the "phenomenon of avoiding responsibility" at New GM that the practice was given a name:  "the 'GM salute,'" which was "a crossing of the arms and pointing outward towards others, indicating that the responsibility belongs to someone else, not me."[51]

181.    CEO Mary Barra described a related phenomenon, "known as the 'GM nod,'" which was "when everyone nods in agreement to a proposed plan of action, but then leaves the room with no intention to follow through, and the nod is an empty gesture."[52]

182.    According to the New GM Report prepared by Anton R. Valukas (known as the "Valukas Report"), part of the failure to properly correct the ignition switch defect was due to

---

[51] GM Report at 255.

[52] *Id*. at 256.

problems with New GM's organizational structure[53] and a corporate culture that did not care

enough about safety.[54]  Other culprits included a lack of open and honest communication with

NHTSA regarding safety issues,[55] and the improper conduct and handling of safety issues by

lawyers within New GM's Legal Staff.[56]  On information and belief, all of these issues

independently and in tandem  helped cause the concealment of, and failure to remedy, the many

defects that have led to the spate of recalls in 2014.

183.    An automobile manufacturer has a duty to promptly disclose and remedy defects.

New GM knowingly concealed information about material safety hazards from the driving

public, its own customers, and the Class, thereby allowing unsuspecting vehicle owners and

lessees to continue unknowingly driving patently unsafe vehicles that posed a mortal danger to

themselves, their passengers and loved ones, other drivers, and pedestrians.

184.    Not only did New GM take far too long in failing to address or remedy the

defects, it deliberately worked to cover-up, hide, omit, fraudulently conceal, and/or suppress

material facts from the Class who relied upon it to the detriment of the Class.

**D.    New GM's Deceptions Continued In Its Public Discussions of the Ignition Switch Recalls**

185.    From the CEO on down, GM has once again embarked on a public relations

campaign to convince consumers and regulators that, ***this time***, New GM has sincerely reformed.

186.    On February 25, 2014, New GM North America President Alan Batey publicly

apologized and again reiterated New GM's purported commitment to safety:  "Ensuring our

---

[53] *Id*. at 259-260.

[54] *Id*. at 260-61.

[55] *Id*. at 263.

[56] *Id*. at 264.

010440-11  725144 V1

customers' safety is our first order of business. We are deeply sorry and we are working to address this issue as quickly as we can."[57]

187. In a press release on March 18, 2014, New GM announced that Jeff Boyer had been named to the newly created position of Vice President, Global Vehicle Safety. In the press release, New GM quoted Mr. Boyer as stating that: "Nothing is more important than the safety of our customers in the vehicles they drive. Today's GM is committed to this, and I'm ready to take on this assignment."[58]

188. On May 13, 2014, New GM published a video to defend its product and maintain that the ignition defect will never occur when only a single key is used. Jeff Boyer addressed viewers and told them New GM's Milford Proving Ground is one of "the largest and most comprehensive testing facilities in the world." He told viewers that if you use a New GM single key that there is no safety risk.[59]



189. As of July 2014, New GM continues to praise its safety testing. It published a video entitled "90 Years of Safety Testing at New GM's Milford Proving Ground." The narrator describes New GM's testing facility as "one of the world's top automotive facilities" where data

---

[57] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2014/Feb/0225-ion.

[58] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2014/mar/0318-boyer.

[59] https://www.youtube.com/watch?v=rXO7F3aUBAY.

is "analyzed for customer safety."  The narrator concludes by saying, "[o]ver the past ninety

years one thing remained unchanged, GM continues to develop and use the most advanced

technologies available to deliver customers the safest vehicles possible."[60]



190.    On July 31, 2014, Jack Jensen, the New GM engineering group manager for the

"Milford Proving Ground" dummy lab, told customers that "[w]e have more sophisticated

dummies, computers to monitor crashes and new facilities to observe different types of potential

hazards.  All those things together give our engineers the ability to design a broad range of

vehicles that safely get our customers where they need to go."[61]

191.    As discussed in this Complaint, these most recent statements from New GM

personnel contrast starkly with New GM's wholly inadequate response to remedy the defects in

its vehicles, including the ignition switch defect.

**E.      There Are Serious Safety Defects in Millions of GM-Branded Vehicles Across
         Many Models and Years and, Until Recently, New GM Concealed Them from
         Consumers**

192.    Over the first nine-months of 2014, New GM announced at least 60 recalls for

more than 60 separate defects affecting over 27 million GM-branded vehicles sold in the United

---

[60] https://www.youtube.com/watch?v=BPQdlJZvZhE&list=UUxN-Csvy_9sveql5HJviDjA.

[61] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2014/Jul/0731-mpg.

010440-11  725144 V1

States from model years 1997-2014. The numbers of recalls and serious safety defects are unprecedented, and can only lead to one conclusion: New GM was concealing the fact that it was incapable of building safe vehicles free from defects. For context, in 2013, the whole auto industry in the United States issued recalls affecting 23 million vehicles, and the record for the whole industry in a given year is 31 million (in 2004). Thus, New GM's recalls just 10 months into this year impacts more vehicles than the ***entire industry's*** recalls did last year and is approaching the ***industry-wide*** record for a single year.

193.    Even more disturbingly, the available evidence shows a common pattern: From its inception in 2009, New GM knew about an ever-growing list of serious safety defects in millions of GM-branded vehicles, but concealed them from consumers and regulators in order to cut costs, boost sales, and avoid the cost and publicity of recalls.

194.    Unsurprisingly in light of New GM's systemic devaluation of safety issues, the evidence also shows that New GM has manufactured and sold a grossly inordinate number of vehicles with serious safety defects.

195.    New GM inherited from Old GM a company that valued cost-cutting over safety, actively discouraged its personnel from taking a "hard line" on safety issues, avoided using "hot" words like "stall" that might attract the attention of NHTSA and suggest that a recall was required, and trained its employees to not use words such as "defect" or "problem" that might flag the existence of a safety issue. New GM did nothing to change these practices.

196.    The Center for Auto Safety recently stated that it has identified 2,004 death and injury reports filed by New GM with federal regulators in connection with vehicles that have

recently been recalled.[62]  Most or all of these deaths and injuries would have been avoided had
New GM complied with its TREAD Act obligations over the past five years.

197.    The many defects concealed and/or created by New GM affect important safety
systems in GM-branded vehicles, including the ignition, power steering, airbags, brake lights,
gearshift systems, and seatbelts.

198.    The available evidence shows a consistent pattern:  New GM learned about a
particular defect and, often only at the prodding of regulatory authorities, "investigated" the
defect and decided upon a "root cause."  New GM then took minimal action—such as issuing a
carefully worded "Technical Service Bulletin" to its dealers, or even recalling a limited number
of the vehicles with the defect.  All the while, the true nature and scope of the defects were kept
under wraps, vehicles affected by the defects remained on the road, New GM continued to create
new defects in new vehicles, and New GM enticed Class members to purchase its vehicles by
touting the safety, quality, and reliability of its vehicles, and presenting itself as a manufacturer
that stands behind its products.

199.    Many of the most significant defects are discussed below.

F.    **The Ignition Switch System Defects**

200.    More than 13 million GM-branded vehicles contain a uniformly designed ignition
switch and cylinder, which is substantially similar for all the vehicles, with the key position of
the lock module located low on the steering column, in close proximity to a driver's knee.  The
ignition switch in these vehicles, the "Defective Ignition Switch Vehicles," is prone to fail during
ordinary and foreseeable driving situations.  New GM initially recalled 2.1 million of these
Defective Ignition Switch Vehicles in February and March of 2014, and it was this initial recall

---

[62] *See Thousands of Accident Reports Filed Involving Recalled GM Cars:  Report*, Irvin Jackson (June 3, 2014).

that set in motion the avalanche of recalls that is described in this Complaint.  In June and July of 2014, New GM recalled an additional 11 million vehicles, ostensibly for distinct safety defects involving the ignition and ignition key.  As set forth below, however, each of these recalls involves a defective ignition switch, and the consequences of product failure in each of the recalled vehicles is substantially similar, if not identical.  Because the defects and the safety consequences are so similar, it is likely (and Plaintiffs hereby allege) that each of the defects involves a defective ignition switch that is placed in an unreasonable position on the steering cylinder and that is capable of disabling the airbag system in normal and foreseeable driving circumstances.

201.     More specifically, the ignition switch can inadvertently move from the "run" to the "accessory" or "off" position at any time during normal and proper operation of the Defective Ignition Switch Vehicles.  The ignition switch is most likely to move when the vehicle is jarred or travels across a bumpy road; if the key chain is heavy; if a driver inadvertently touches the ignition key with his or her knee; or for a host of additional reasons.  When the ignition switch inadvertently moves out of the "run" position, the vehicle suddenly and unexpectedly loses engine power, power steering, and power brakes, and certain safety features are disabled, including the vehicle's airbags.  This leaves occupants vulnerable to crashes, serious injuries, and death.

202.     The ignition switch systems at issue are defective in at least three major respects.  First, the switches are simply weak; because of a faulty "detent plunger," the switch can inadvertently move from the "run" to the "accessory" position.  Second, because the ignition switch is placed low on the steering column, the driver's knee can easily bump the key (or the hanging fob below the key) and cause the switch to inadvertently move from the "run" to the

"accessory" or "off" position. Third, when the ignition switch moves from the "run" to the "accessory" or "off" position, the vehicle's power is disabled. This also immediately disables the airbags. Thus, when power is lost during ordinary operation of the vehicle, a driver is left without the protection of the airbag system even if he or she is traveling at high speeds.

203.    Vehicles with defective ignition switches are therefore unreasonably prone to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the vehicles.

204.    Indeed, New GM itself has acknowledged that the defective ignition switches pose an "increas[ed] risk of injury or fatality" and has linked the ignition switch defect to at least 13 deaths and over 50 crashes. Ken Feinberg, who was hired by New GM to settle wrongful death claims arising from the ignition switch defects, has already linked the defect to 21 deaths, and has over 100 potential wrongful death claims still to review. The Center for Auto Safety studied collisions in just two vehicle makes, and linked the defect to over 300 accidents. There is every reason to believe that as more information is made public, these numbers will continue to grow.

205.    Alarmingly, New GM knew of the deadly ignition switch defects and their dangerous consequences from the date of its creation on July 10, 2009, but concealed its knowledge from consumers and regulators. To this day, New GM continues to conceal material facts regarding the extent and nature of this safety defect, as well as what steps must be taken to remedy the defect.

206.    While New GM has instituted a recall of millions vehicles for defective ignition switches, it knew—*and its own engineering documents reflect*—that the defects transcend the design of the ignition switch and also include the placement of the ignition switch on the steering

- 91 -

column, a lack of adequate protection of the ignition switch from forces of inadvertent driver contact, and the need to redesign the airbag system so that it is not immediately disabled when the ignition switch fails in ordinary and foreseeable driving situations. To fully remedy the problem and render the Defective Ignition Switch Vehicles safe and of economic value to their owners again, New GM must address these additional issues (and perhaps others).

207. Further, and as set forth more fully below, New GM's recall of the Defective Ignition Switch Vehicles has been, to date, incomplete and inadequate, and it underscores New GM's ongoing fraudulent concealment and fraudulent misrepresentation of the nature and extent of the defects. New GM has long known of and understood the ignition switch defects, and its failure to fully remedy the problems associated with this defect underscores the necessity of this class litigation.

### 1. New GM learns of the defective ignition switch.

208. On July 10, 2009, the United States Bankruptcy Court approved the sale of General Motors Corporation, which was converted into General Motors, LLC, or New GM. From its creation, New GM, which retained the vast majority of Old GM's senior level executives and engineers, knew that Old GM had manufactured and sold millions of vehicles afflicted with the ignition switch defects.

209. In setting forth the knowledge of Old GM in connection with the ignition switch and other defects set forth herein, Plaintiffs *do not* seek to hold New GM liable for the actions of Old GM. Instead, the knowledge of Old GM is important and relevant because it is *directly attributable* to New GM. In light of its knowledge of the ignition switch defects, and the myriad other defects, New GM had (and breached) its legal obligations to Plaintiffs and the Class.

210. In part, New GM's knowledge of the ignition switch defects arises from the fact that key personnel with knowledge of the defects were employed by New GM when Old GM

ceased to exist. Moreover, many of these employees held managerial and decision making authority in Old GM, and accepted similar positions with New GM. For example, the design research engineer who was responsible for the rollout of the defective ignition switch in the Saturn Ion was Ray DeGiorgio. Mr. DeGiorgio continued to serve as an engineer at New GM until April 2014, when he was suspended (and ultimately fired) as a result of his involvement in the ignition switch crisis.

211. Mr. DeGiorgio was hardly the only employee who retained his Old GM position with New GM. Other Old GM employees who were retained and given decision making authority in New GM include: current CEO Mary T. Barra; director of product investigations Carmen Benavides; Program Engineering Manager Gary Altman; engineer Jim Federico; vice presidents for product safety John Calabrese and Alicia Boler-Davis; vice president of regulatory affairs Michael Robinson; director of product investigations Gay Kent; general counsel and vice president Michael P. Milliken; and in-house product liability lawyer William Kemp.

212. Indeed, on or around the day of its formation as an entity, New GM acquired notice and full knowledge of the facts set forth below.

213. In 2001, during pre-production testing of the 2003 Saturn Ion, GM engineers learned that the vehicle's ignition switch could unintentionally move from the "run" to the "accessory" or "off" position. GM further learned that where the ignition switch moved from "run" to "accessory" or "off," the vehicle's engine would stall and/or lose power.

214. Delphi Mechatronics ("Delphi"), the manufacturer of many of the defective ignition switches in the Defective Ignition Switch Vehicles, informed Old GM that the ignition switch did not meet Old GM's design specifications. Rather than delay production of the Saturn Ion in order to ensure that the ignition switch met specifications, Old GM's design release

engineer, Ray DeGiorgio, simply lowered the specification requirements and approved use of ignition switches that he knew did not meet Old GM's specifications.

215.    In 2004, Old GM engineers reported that the ignition switch on the Saturn Ion was so weak and the ignition placed so low on the steering column that the driver's knee could easily bump the key and turn off the vehicle.

216.    This defect was sufficiently serious for an Old GM engineer to conclude, in January 2004, that "[t]his is a basic design flaw and should be corrected if we want repeat sales."

217.    A July 1, 2004 report by Siemens VDO Automotive analyzed the relationship between the ignition switch in GM-branded vehicles and the airbag system.  The Siemens report concluded that when a GM-branded vehicle experienced a power failure, the airbag sensors were disabled.  The Siemens report was distributed to at least five Old GM engineers.  The Chevrolet Cobalt was in pre-production at this time.

218.    In 2004, Old GM began manufacturing and selling the 2005 Chevrolet Cobalt. Old GM installed the same ignition switch in the 2005 Cobalt as it did in the Saturn Ion.

219.    During testing of the Cobalt, Old GM engineer Gary Altman observed an incident in which a Cobalt suddenly lost engine power because the ignition switch moved out of the "run" position during vehicle operation.

220.    In late 2004, while testing was ongoing on the Cobalt, Chief Cobalt Engineer Doug Parks asked Mr. Altman to investigate a journalist's complaint that he had turned off a Cobalt vehicle by hitting his knee against the key fob.

221.    Old GM opened an engineering inquiry known as a Problem Resolution Tracking System "Problem Resolution" to evaluate a number of potential solutions to this moving engine stall problem.  At this time, Problem Resolution issues were analyzed by a Current Production

Improvement Team ("Improvement Team"). The Improvement Team that examined the Cobalt issue beginning in late 2004 included a cross-section of business people and engineers, including Altman and Lori Queen, Vehicle Line Executive on the case.

222. Doug Parks, Chief Cobalt Engineer, was also active in Problem Resolution. On March 1, 2005, he attended a meeting whose subject was "vehicle can be keyed off with knee while driving." Parks also attended a June 14, 2005 meeting that included slides discussing a NEW YORK TIMES article that described how the Cobalt's engine could cut out because of the ignition switch problem.

223. In 2005, Parks sent an email with the subject, "Inadvertent Ign turn-off." In the email, Parks wrote, "For service, can we come up with a 'plug' to go into the key that centers the ring through the middle of the key and not the edge/slot? This appears to me to be the only real, quick solution."

224. After considering this and a number of other solutions (including changes to the key position and measures to increase the torque in the ignition switch), the CPIT examining the issue decided to do nothing.

225. Old and New GM engineer Gary Altman recently admitted that engineering managers (including himself and Ray DeGiorgio) knew about ignition switch problems in the Cobalt that could cause these vehicles to stall, and disable power steering and brakes, but launched the vehicle anyway because they believed that the vehicles could be safely coasted off the road after a stall. Mr. Altman insisted that "the [Cobalt] was maneuverable and controllable" with the power steering and power brakes inoperable.

010440-11  725144 V1

226.    On February 28, 2005,  Old GM issued a bulletin to its dealers regarding engine-stalling incidents in 2005 Cobalts and 2005 Pontiac Pursuits (the Canadian version of the Pontiac G5).

227.    In the February 28, 2005 bulletin, Old GM provided the following recommendations and instructions to its dealers—but not to the public in general:

> There is potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effort.  The concern is more likely to occur if the driver is short and has a large heavy key chain.

> In the case this condition was documented, the driver's knee would contact the key chain while the vehicle was turning.  The steering column was adjusted all the way down.  This is more likely to happen to a person that is short as they will have the seat positioned closer to the steering column.

> In cases that fit this profile, question the customer thoroughly to determine if this may be the cause.  The customer should be advised of this potential and to take steps, such as removing unessential items from their key chains, to prevent it.

> Please follow this diagnosis process thoroughly and complete each step.  If the condition exhibited is resolved without completing every step, the remaining steps do not need to be performed.

228.    On June 19, 2005, the NEW YORK TIMES reported that Chevrolet dealers were advising some Cobalt owners to remove items from heavy key rings so that they would not inadvertently move the ignition into the "off" position.  The article's author reported that his wife had bumped the steering column with her knee while driving on the freeway and the engine "just went dead."

229.    The NEW YORK TIMES contacted Old GM and Alan Adler, manager for safety communications, provided the following statement:

> In rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the ignition key to the accessory or off position while the

- 96 -

car is running.  Service advisers are telling customers they can
virtually eliminate the possibility by taking several steps, including
removing nonessential material from their key rings.

230.    Between February 2005 and December 2005, Old GM opened multiple Problem

Resolution inquiries regarding reports of power failure and/or engine shutdown in Defective

Ignition Switch Vehicles.

231.    One of these, opened by quality brand manager Steve Oakley in March 2005, was

prompted by Old GM engineer Jack Weber, who reported turning off a Cobalt with his knee

while driving.  After Oakley opened the PRTS, Gary Altman advised that the inadvertent shut

down was not a safety issue.

232.    As part of Problem Resolution, Oakley asked William Chase, an Old GM

warranty engineer, to estimate the warranty impact of the ignition switch defect in the Cobalt and

Pontiac G5 vehicles.  Chase estimated that for Cobalt and G5 vehicles on the road for 26 months,

12.40 out of every 1,000 vehicles would experience inadvertent power failure while driving.

233.    In September 2005, Old GM received notice that Amber Marie Rose, a 16 year

old resident of Clinton, Maryland, was killed in an accident after her 2005 Chevrolet Cobalt

drove off the road and struck a tree head-on.  During Old GM's investigation, it learned that the

ignition switch in Amber's Cobalt was in the "accessory" or "off" position at the time of the

collision.  Upon information and belief, Old GM subsequently entered into a confidential

settlement agreement with Amber's mother.

234.    In December 2005, Old GM issued Technical Service Bulletin 05-02-35-007.

The Bulletin applied to 2005-2006 Chevrolet Cobalts, 2006 Chevrolet HHRs, 2005-2006 Pontiac

Pursuits, 2006 Pontiac Solstices, and 2003-2006 Saturn Ions.  The Bulletin explained that

"[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key

cylinder torque/effort."

235.    What Old GM failed to say in this Technical Service Bulletin was that it knew

that there had been fatal incidents involving vehicles with the ignition switch defect.  On

November 17, 2005—shortly after Amber's death and immediately before Old GM issued the

December Bulletin—a Cobalt went off the road and hit a tree in Baldwin, Louisiana.  The front

airbags did not deploy in this accident.  Old GM received notice of the accident, opened a file,

and referred to it as the "Colbert" incident.

236.    On February 10, 2006, in Lanexa, Virginia—shortly after Old GM issued the

Technical Service Bulletin—a 2005 Cobalt flew off of the road and hit a light pole.  As with the

Colbert incident (above), the frontal airbags failed to deploy in this incident as well.  The

download of the SDM (the vehicle's "black box") showed the key was in the "accessory/off"

position at the time of the crash.  Old GM received notice of this accident, opened a file, and

referred to it as the "Carroll" incident.

237.    On March 14, 2006, in Frederick, Maryland, a 2005 Cobalt traveled off the road

and struck a utility pole.  The frontal airbags did not deploy in this incident.  The download of

the SDM showed the key was in the "accessory/off" position at the time of the crash.  Old GM

received notice of this accident, opened a file, and referred to it as the "Oakley" incident.

238.    In April 2006, Old GM design engineer Ray DeGiorgio approved a design change

for the Chevrolet Cobalt's ignition switch, as proposed by Delphi.  The changes included a new

detent plunger and spring and were intended to generate greater torque values in the ignition

switch.  These values, though improved, were still consistently below Old GM's design

specifications.  Despite its redesign of the ignition switch, Old GM did not change the part

number for the switch.

010440-11 725144 V1

239.    In congressional testimony in 2014, New GM CEO Mary Barra acknowledged that Old GM should have changed the part number when it redesigned the ignition switch, and that its failure to do so did not meet industry standard behavior.  (Old GM's failure to change the part number constituted an act of concealment of the defect.)

240.    In October 2006, Old GM updated Technical Service Bulletin 05-02-35-007 to include additional model years:  the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, 2007 Cobalt, and 2007 Pontiac Solstice and G5.  These vehicles had the same safety-related defects in the ignition switch systems as the vehicles in the original Bulletin.

241.    On December 29, 2006, in Sellenville, Pennsylvania, a 2005 Cobalt drove off the road and hit a tree.  The frontal airbags failed to deploy in this incident.  Old GM received notice of this incident, opened a file, and referred to it as the "Frei" incident.

242.    On February 6, 2007, in Shaker Township, Pennsylvania, a 2006 Cobalt sailed off the road and struck a truck.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  Old GM received notice of this incident, opened a file, and referred to it as the "White" incident.

243.    On August 6, 2007, in Cross Lanes, West Virginia, a 2006 Cobalt rear-ended a truck.  The frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "McCormick" incident.

244.    On September 25, 2007, in New Orleans, Louisiana, a 2007 Cobalt lost control and struck a guardrail.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "Gathe" incident.

245.    On October 16, 2007, in Lyndhurst, Ohio, a 2005 Cobalt traveled off road and hit a tree.  The frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "Breen" incident.

246.    On April 5, 2008, in Sommerville, Tennessee, a 2006 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  Old GM received notice of this incident, opened a file, and referred to it as the "Freeman" incident.

247.    On May 21, 2008, in Argyle, Wisconsin, a 2007 G5 traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  Old GM received notice of this incident, opened a file, and referred to it as the "Wild" incident.

248.    On May 28, 2008, in Lufkin, Texas, a 2007 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "McDonald" incident.

249.    On September 13, 2008, in Lincoln Township, Michigan, a 2006 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "Harding" incident.

250.    On November 29, 2008, in Rolling Hills Estates, California, a 2008 Cobalt traveled off the road and hit a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "Dunn" incident.

010440-11  725144 V1

251.    On December 6, 2008, in Lake Placid, Florida, a 2007 Cobalt traveled off the road and hit a utility pole.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position. Old GM received notice of this incident, opened a file, and referred to it as the "Grondona" incident.

252.    In February 2009, Old GM opened another Problem Resolution regarding the ignition switches in the Defective Ignition Switch Vehicles.  Old GM engineers decided at this time to change the top of the Chevrolet Cobalt key from a "slot" to a "hole" design, as had originally been suggested in 2005.  The new key design was produced for the 2010 model year. Old GM did not provide these redesigned keys to the owners or lessees of any of the vehicles implicated in prior Technical Service Bulletins, including the 2005-2007 Cobalts.

253.    Just prior to its bankruptcy sale, Old GM met with Continental Automotive Systems US, its airbag supplier for the Cobalt, Ion, and other Defective Ignition Switch Vehicles. Old GM requested that Continental download SDM data from a 2006 Chevrolet Cobalt accident where the airbags failed to deploy.  In a report dated May 11, 2009, Continental analyzed the SDM data and concluded that the SDM ignition state changed from "run" to "off" during the accident.  According to Continental, this, in turn, disabled the airbags.  Old GM did not disclose this finding to NHTSA, despite its knowledge that NHTSA was interested in airbag non-deployment incidents in Chevrolet Cobalt vehicles.

        **2.      New GM continues to conceal the ignition switch defect.**

254.    In March 2010, New GM recalled nearly 1.1 million Cobalt and Pontiac G5 vehicles for faulty power steering issues.  In recalling these vehicles, New GM recognized that loss of power steering, standing alone, was grounds for a safety recall.  Yet, incredibly, New GM claims it did not view the ignition switch defect as a "safety issue," but only a "customer

- 101 -

convenience issue." Despite its knowledge of the ignition switch defect, New GM did not include the ignition switch defect in this recall. Further, although the Saturn Ion used the same steering system as the Cobalt and Pontiac G5 (and had the same ignition switch defect), New GM did not recall any Saturn Ion vehicles at this time.

255. On March 10, 2010, Brooke Melton was driving her 2005 Cobalt on a two-lane highway in Paulding County, Georgia. While she was driving, her key turned from the "run" to the "accessory/off" position causing her engine to shut off. After her engine shut off, she lost control of her Cobalt, which traveled into an oncoming traffic lane, where it collided with an oncoming car. Brooke was killed in the crash. New GM received notice of this incident.

256. On December 31, 2010, in Rutherford County Tennessee, a 2006 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. New GM received notice of this incident, opened a file, and referred to it as the "Chansuthus" incident.

257. On December 31, 2010, in Harlingen, Texas, a 2006 Cobalt traveled off the road and struck a curb. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. New GM received notice of this incident, opened a file, and referred to it as the "Najera" incident.

258. On March 22, 2011, Ryan Jahr, a New GM engineer, downloaded the SDM from Brooke Melton's Cobalt. The information from the SDM download showed that the key in Brooke's Cobalt turned from the "run" to the "accessory/off" position 3-4 seconds before the crash. On June 24, 2011, Brooke Melton's parents, Ken and Beth Melton, filed a lawsuit against New GM.

259.    In August 2011, New GM assigned Engineering Group Manager Brian Stouffer to assist with a Field Performance Evaluation that it had opened to investigate frontal airbag non-deployment incidents in Chevrolet Cobalts and Pontiac G5s.

260.    On December 18, 2011, in Parksville, South Carolina, a 2007 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  New GM received notice of this incident, opened a file, and referred to it as the "Sullivan" incident.

261.    In early 2012, Mr. Stouffer asked Jim Federico, who reported directly to Mary Barra, to oversee the Field Performance Evaluation investigation into frontal airbag non-deployment incidents.  Federico was named the "executive champion" for the investigation to help coordinate resources.

262.    In May 2012, New GM engineers tested the torque on numerous ignition switches of 2005-2009 Chevrolet Cobalt, 2009 Pontiac G5, 2006-2009 HHR, and 2003-2007 Saturn Ion vehicles that were parked in a junkyard.  The results of these tests showed that the torque required to turn the ignition switches from the "run" to the "accessory" or "off" position in most of these vehicles did not meet GM's minimum torque specification requirements.  These results were reported to Mr. Stouffer and other members of the Field Performance Evaluation team.

263.    In September 2012, Stouffer requested assistance from a "Red X Team" as part of the Field Performance Evaluation investigation.  The Red X Team was a group of engineers within New GM assigned to find the root cause of the airbag non-deployments in frontal accidents involving Chevrolet Cobalts and Pontiac G5s.  By that time, however, it was clear that

010440-11  725144 V1

the root cause of the airbag non-deployments in a majority of the frontal accidents was the defective ignition switch and airbag system.

264.    Indeed, Mr. Stouffer acknowledged in his request for assistance that the Chevrolet Cobalt could experience a power failure during an off-road event, or if the driver's knee contacted the key and turned off the ignition.  Mr. Stouffer further acknowledged that such a loss of power could cause the airbags not to deploy.

265.    At this time, New GM did not provide this information to NHTSA or the public.

266.    Acting NHTSA Administrator David Friedman recently stated, "at least by 2012, GM staff was very explicit about an unreasonable risk to safety" from the ignition switches in the Defective Ignition Switch Vehicles.

267.    Mr. Friedman continued:  "GM engineers knew about the defect.  GM lawyers knew about the defect.  But GM did not act to protect Americans from the defect."

268.    There is significant evidence that multiple in-house attorneys also knew of and understood the ignition switch defect.  These attorneys, including Michael Milliken, negotiated settlement agreements with families whose loved ones had been killed and/or injured while operating a Defective Ignition Switch Vehicle.  In spite of this knowledge, New GM's attorneys concealed their knowledge and neglected to question whether the Defective Ignition Switch Vehicles should be recalled.  This quest to keep the ignition switch defect secret delayed its public disclosure and contributed to increased death and injury as a result of the ignition switch defect.

269.    During the Field Performance Evaluation process, New GM determined that, although increasing the detent in the ignition switch would reduce the chance that the key would

- 104 -

inadvertently move from the "run" to the "accessory" or "off" position, it would not be a total solution to the problem.

270. Indeed, the New GM engineers identified several additional ways to actually fix the problem. These ideas included adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the run position, and adding a push button to the lock cylinder to prevent it from slipping out of "run." New GM rejected each of these ideas.

271. The photographs below are of a New GM engineer in the driver's seat of a Cobalt during the investigation of Cobalt engine stalling incidents:



272. These photographs show the dangerous position of the key in the lock module on the steering column, as well as the key with the slot, which allow the key fob to hang too low off the steering column. New GM engineers understood that the key fob can be impacted and pinched between the driver's knee and the steering column, and that this will cause the key to inadvertently turn from the "run" to the "accessory" or "off" position. The photographs show that the New GM engineers understood that increasing the detent in the ignition switch would

- 105 -

not be a total solution to the problem.  They also show why New GM engineers believed that additional changes (such as the shroud) were necessary to fix the defects with the ignition switch.

273.    The New GM engineers clearly understood that increasing the detent in the ignition switch alone was not a solution to the problem.  But New GM concealed—and continues to conceal—from the public the full nature and extent of the defects.

274.    On October 4, 2012, there was a meeting of the Red X Team during which Mr. Federico gave an update of the Cobalt airbag non-deployment investigation.  According to an email from Mr. Stouffer on the same date, the "primary discussion was on what it would take to keep the SDM active if the ignition key was turned to the accessory mode."  Despite this recognition by New GM engineers that the SDM should remain active if the key is turned to the "accessory" or "off" position, New GM took no action to remedy the ignition switch defect or notify customers that the defect existed.

275.    During the October 4, 2012 meeting, Mr. Stouffer and other members of the Red X Team also discussed "revising the ignition switch to increase the effort to turn the key from Run to Accessory."

276.    On October 4, 2012, Mr. Stouffer emailed Ray DeGiorgio and asked him to "develop a high level proposal on what it would take to create a new switch for service with higher efforts."  On October 5, 2012, DeGiorgio responded:

> Brian,
>
> In order to provide you with a HIGH level proposal, I need to understand what my requirements are.  what is the TORQUE that you desire?
>
> Without this information I cannot develop a proposal.

277.    On October 5, Stouffer responded to DeGiorgio's email, stating:

> Ray,

As I said in my original statement, I currently don't know what the torque value needs to be.  Significant work is required to determine the torque.  What is requested is a high level understanding of what it would take to create a new switch.

278.    DeGiorgio replied to Stouffer the following morning:

Brian,

Not knowing what my requirements are I will take a SWAG at the Torque required for a new switch.  Here is my level proposal

**Assumption is 100 N cm Torque.**

•       New switch design = Engineering Cost Estimate approx. $300,000

•       Lead Time = 18 – 24 months from issuance of GM Purchase Order and supplier selection.

Let me know if you have any additional questions.

279.    Stouffer later admitted in a deposition that DeGiorgio's reference to "SWAG" was an acronym for "Silly Wild-Ass Guess."

280.    DeGiorgio's cavalier attitude exemplifies New GM's approach to the safety-related defects that existed in the ignition switch and airbag system in the Defective Ignition Switch Vehicles.  Rather than seriously addressing the safety-related defects, DeGiorgio's emails show he understood the ignition switches were contributing to the crashes and fatalities and he could not care less.

281.    It is also obvious from this email exchange that Stouffer, who was a leader of the Red X Team, had no problem with DeGiorgio's cavalier and condescending response to the request that he evaluate the redesign of the ignition switches.

282.    In December 2012, in Pensacola, Florida, Ebram Handy, a New GM engineer, participated in an inspection of components from Brooke Melton's Cobalt, including the ignition switch.  At that inspection, Handy, along with Mark Hood, a mechanical engineer retained by the

Meltons, conducted testing on the ignition switch from Brooke Melton's vehicle, as well as a replacement ignition switch for the 2005 Cobalt.

283.    At that inspection, Handy observed that the results of the testing showed that the torque performance on the ignition switch from Brooke Melton's Cobalt was well below Old GM's minimum torque performance specifications.  Handy also observed that the torque performance on the replacement ignition switch was significantly higher than the torque performance on the ignition switch in Brooke Melton's Cobalt.

284.    On April 29, 2013, Ray DeGiorgio, the chief design engineer for the ignition switches in these Defective Ignition Switch Vehicles, was deposed.  At his deposition, Mr. DeGiorgio was questioned about his knowledge of differences in the ignition switches in early model-year Cobalts and the switches installed in later model-year Cobalts:

> Q.  And I'll ask the same question.  You were not aware before today that GM had changed the spring – the spring on the ignition switch had been changed from '05 to the replacement switch?
>
> MR. HOLLADAY:  Object to the form.  Lack of predicate and foundation.  You can answer.
>
> THE WITNESS:  I was not aware of a detent plunger switch change.  We certainly did not approve a detent plunger design change.
>
> Q.  Well, suppliers aren't supposed to make changes such as this without GM's approval, correct?
>
> A.  That is correct.
>
> Q.  And you are saying that no one at GM, as far as you know, was aware of this before today?
>
> MR. HOLLADAY:  Object.  Lack of predicate and foundation. You can answer.
>
> THE WITNESS:  I am not aware about this change.

285.    When Mr. DeGiorgio testified, he knew that he personally had authorized the ignition switch design change in 2006, but he stated unequivocally that no such change had occurred.

### 3.    New GM receives complaints of power failures in Defective Ignition Switch Vehicles.

286.    Throughout the entirety of its corporate existence, New GM received numerous and repeated complaints of moving engine stalls and/or power failures.  These complaints are yet more evidence that New GM was fully aware of the ignition switch defect and should have timely announced a recall much sooner than it did.

287.    New GM was aware of these problems year after year and nationwide, as reflected not only by the internal documents reflecting knowledge and cover-up at high levels, but in the thousands of customer complaints, some of which are reflected in the common fact patterns presented by the experiences of the named plaintiffs (as discussed above), but also, and not by way of limitation, by the records of their internal complaint logs and documents.

288.    To demonstrate the pervasiveness and consistency of the problems, and by way of examples, New GM received and reviewed complaints of safety issues from Class members with Defective Ignition Switch Vehicles in Puerto Rico and in the States of Alaska, Arkansas, Connecticut, Delaware, Hawaii, Indiana, Kansas, Massachusetts, Montana, Nebraska, Nevada, New Hampshire, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Virginia, and Vermont.  Documents produced by New GM pursuant to Order No. 12 (Sept. 10, 2014, ECF No. 296) show that New GM was aware of customer complaints of stalling Defective Ignition Switch Vehicles in all of these states and territories.  New GM opened at least 38 complaint files between September 2009 and February 2014.  Further, in December 2010, GM closed at least 40 complaint files—which Old GM had opened before the bankruptcy sale in July 2009—without

- 109 -

disclosing the safety defect to the customers, thus indicating that Old GM's knowledge of these Defective Ignition Switch Vehicles carried over to New GM.

289.    During the years 2010 to the present, GM's Technical Assistance Center received hundreds, if not thousands, of complaints concerning stalling or misperforming vehicles due to ignition issues, including "heavy key chains."

290.    Within the complaint files which GM closed after the bankruptcy sale—those opened both before and after the bankruptcy sale—at least six customers complained they did not feel safe in their vehicles because of the stalling.  Three customers described accidents caused by stalling.  The airbags did not deploy in one of these accidents.

291.    Another customer, who contacted New GM in February 2014, complained that he was aware that people were dying from this defect and that he refused to risk the lives of himself, his wife, and his children.  He was nearly rear-ended when his vehicle stalled at 60 mph.

292.    Finally, a customer contacted New GM in January 2011 complaining that he had read various online forums describing the stalling problem and expressing his outrage that New GM had done nothing to solve the problem.  This customer's car stalled at 65 mph on the Interstate.

**4.    New GM recalls 2.1 million vehicles with defective ignition switches.**

293.    Under continuing pressure to produce high-ranking employees for deposition in the Melton litigation, New GM's Field Performance Review Committee and Executive Field Action Decision Committee ("Decision Committee") finally ordered a recall of *some* vehicles with defective ignition switches on January 31, 2014.

294.    Initially, the Decision Committee ordered a recall of only the Chevrolet Cobalt and Pontiac G5 for model years 2005-2007.

295.     After additional analysis, the Decision Committee expanded the recall on

February 24, 2014 to include the Chevrolet HHR and Pontiac Solstice for model years 2006 and

2007, the Saturn Ion for model years 2003-2007, and the Saturn Sky for model year 2007.

296.     Public criticism in the wake of these recalls was withering.  On March 17, 2014,

Mary Barra issued an internal video, which was broadcast to employees.  In the video, Ms. Barra

admits:

> Scrutiny of the recall has expanded beyond the review by the
> federal regulators at NHTSA, the National Highway Traffic Safety
> Administration.  As of now, two congressional committees have
> announced that they will examine the issue.  And it's been reported
> that the Department of Justice is looking into this matter. . . . These
> are serious developments that shouldn't surprise anyone.  After all,
> something went wrong with our process in this instance and
> terrible things happened.

297.     The public backlash continued and intensified.  Eventually, GM expanded the

ignition switch recall yet again on March 28, 2014.  This expansion covered all model years of

the Chevrolet Cobalt and HHR, the Pontiac G5 and Solstice, and the Saturn Ion and Sky.  The

expanded recall brought the total number of vehicles recalled for defective ignition switches to

2,191,146.

298.     Several high-ranking New GM employees were summoned to testify before

Congress, including Ms. Barra and executive vice president and in-house counsel Michael

Milliken.  Further, in an effort to counter the negative backlash, New GM announced that it had

hired Anton R. Valukas to conduct an internal investigation into the decade-long concealment of

the ignition switch defect.

299.     As individuals came forward who had been injured and/or whose loved ones were

killed in the Defective Ignition Switch Vehicles, the public criticism continued.  Under intense,

continuing pressure, New GM agreed in April 2014 to hire Ken Feinberg to design and

010440-11  725144 V1

Case 1:14-md-02543-JMF    Document 345    Filed 10/14/14    Page 132 of 712

administer a claims program in order to compensate certain victims who were injured or killed in the Defective Ignition Switch Vehicles. Ms. Barra explained to Congress: "[W]e will make the best decisions for our customers, recognizing that we have legal obligations and responsibilities as well as moral obligations. We are committed to our customers, and we are going to work very hard to do the right thing for our customers."

300. New GM's compensation of such individuals, however, was limited to the protocol set forth in the Feinberg Compensation Fund. In the courts, New GM has taken the position that any accident that occurred prior to its bankruptcy is barred by the bankruptcy sale order. In addition, New GM has argued that it has no responsibility whatsoever for the manufacture and sale of any vehicle prior to July 10, 2009. This position is obviously inconsistent with the statements Ms. Barra provided to Congress and the public at large.

**5.    New GM recalls over 10 million additional vehicles for ignition switch defects in June and July of 2014.**

301. By actively concealing the ignition switch defects in the Defective Ignition Switch Vehicles, and by continuing to manufacture and sell millions of such vehicles for years after it acquired knowledge of the defects, New GM engaged in unlawful and fraudulent practices in violation of the law.

302. Following the waves of negative publicity surrounding New GM's recall of the first 2.1 million Defective Ignition Switch Vehicles, New GM was forced to issue a series of additional recalls for more than 10 million additional Defective Ignition Switch Vehicles, as summarized below.

303. Even so, safety regulators received dozens of complaints of moving stalls and/or power failures in the vehicles covered by New GM's June and July 2014 recalls; New GM still did nothing.

304.     NHTSA's website contains more than 100 complaints about vehicle stalls for the
2006-2009 Impalas alone.  In one 2012 complaint, an Impala stalled in the middle of a large
intersection.  The owner took it to a dealer four times but could not get it repaired.  The
complainant stated, "I'm fearful I will be the one causing a fatal pile-up."

305.     New GM admits knowing that ignition switch defects have been linked to at least
three deaths and eight injuries in the vehicle model years covered by its June and July recalls.
The fatal accidents occurred in 2003 and 2004 Chevrolet Impalas in which the airbags failed to
deploy.

### a.     June 19, 2014 Recall—Camaro Recall

306.     On June 19, 2014, New GM recalled 464,712 model year 2010 through 2014
Chevrolet Camaro vehicles in the United States (NHTSA Recall Number 14V-346).

307.     The great majority of the defective Camaros were sold by New GM, though some
indeterminate number of the 117,959 model year 2010 Camaros were manufactured by Old GM,
and some smaller number were sold by Old GM.

308.     According to the recall notice, the driver of an affected Camaro may accidentally
hit the ignition key with his or her knee, unintentionally knocking the key out of the "run"
position and turning off the engine.  If the key is not in the "run" position, the airbags may not
deploy during a collision.  Additionally, when the key is moved out of the "run" position, the
vehicle will experience a loss of engine power, loss of power steering, and loss of power brakes.

309.     Between 2010 and 2014, NHTSA received numerous complaints of power
failures in 2010-2014 Camaros.  These complaints started as early as January 2010, months after
New GM's formation.

310.     One complainant described an incident in which his model year 2010 Camaro lost
all power while he was driving 55-65 mph down a mountain road in heavy traffic.  The

- 113 -

Case 1:14-mc-02543-JMF Document 345 Filed 10/14/14 Page 134 of 712

complainant was able to stop the vehicle by jamming it into a guardrail. He stated that he was

lucky he was not killed. When he notified his dealership, however, they told him there was

nothing wrong with the vehicle.

311.    Another complainant, in May 2010, described several instances in which his

moving Camaro's power failed, including one instance in which he was driving on the highway

at 70 mph. This complainant concluded his report by asking, "Will I have a head[-]on collision

while trying to pass another car?"

312.    Between 2010 and 2014, NHTSA received numerous complaints reporting engine

stalls during normal and regular Camaro operations.

313.    For example, on May 3, 2010, New GM became aware of a complaint filed with

NHTSA involving a 2010 Camaro in which the following was reported:

> WHILE DRIVING TO THE DEALERSHIP IN BROOKDALE,
> MN. ON FREEWAY APPROX 70MPH WHEN CAR
> COMPLETELY GOES DEAD. QUICKLY I PUT IT IN
> NEUTRAL AND TURNED IT BACK ON AND COMPLAINED
> TO DEALER. DRIVING IN ST CLOUD,MN AT INTOWN
> SPEEDS WHEN THE CAR SHUTS DOWN AGAIN. THEN IT
> ALSO SHUT DOWN TWICE ON ME IN BRAINERD, MN AT
> A SPEED OF 50MPH WHILE DRIVING NORMAL. THEN ON
> 3 MAY 2010 I WAS GOING AROUND A CURVE WITH 2
> FRIENDS WHEN IT AGAIN SHUT DOWN AT
> APPROXIMATELY 60 MPH. THIS TIME WHILE ON THE
> CURVE I WENT INTO THE DITCH AND HIT A MAIL BOX.
> THUS CAUSING DAMAGE TO THE RIGHT FRONT OF THE
> CAR. THE CAR WAS TOWED AND IS PRESENTLY AT THE
> DEALERSHIP IN BRAINERD, MN. THIS CAR IS TO
> DANGEROUS TO DRIVE; WILL I HAVE A HEAD[-]ON
> COLLISION WHILE TRYING TO PASS ANOTHER CAR?

314.    On October 20, 2010, New GM became aware of a complaint filed with NHTSA

involving a 2010 Camaro in which the following was reported:

> 2010 CHEVROLET CHEVY CAMARO V6, SUDDEN LOSS OF
> POWER, COMPLETE ELECTRICAL FAILURE, AND ENGINE
> SHUTDOWN WHILE DRIVING 30 MPH IN SUBDIVISION.

> PULLED TO SIDE OF ROAD. TURNED CAR "OFF" AND
> BACK ON. DROVE TO DEALER WHO SAID THEY COULD
> FIND NO PROBLEM AND NOTHING RECORDED IN CAR'S
> COMPUTER. GOOGLED RECALL OF V8 TO SHOW
> DEALER, BUT DEALER SAID THIS WAS UNRELATED.

315.    On March 6, 2012, New GM became aware of a complaint filed with NHTSA

involving a 2010 Camaro in which the following was reported:

> WHILE DRIVING VEHICLE FIRST SHUT OFF AT A RED
> LIGHT FOR NO REASON ON FEB 28 2012 SAME INCIDENT
> ON MARCH 1ST SHUT OFF A RED LIGHT THIRD TIME IT
> WAS WHILE DRIVING 10 MPH MAKING A TURN IN A
> PARKING SPOT. WAS ABLE TO TURN BACK CAR ON
> WITH NO PROBLEMS BUT IT IS OF GREAT CONCERN
> NOW IF THIS SHOULD HAPPEN AT A HIGH SPEED I AM
> SURE CAR CAN CAUSE INJURIES TO OTHERS AS WELL
> AS MYSELF.

316.    On October 9, 2012, New GM became aware of a complaint filed with NHTSA

involving a 2012 Camaro in which the following was reported:

> THE CONTACT OWNS A 2012 CHEVROLET CAMARO. THE
> CONTACT STATED THAT WHILE DRIVING 50 MPH, THE
> VEHICLE STALLED WITHOUT WARNING. THE CONTACT
> WAS ABLE TO RESTART THE VEHICLE. THE
> MANUFACTURER WAS CONTACTED AND HAD THE
> VEHICLE TOWED TO A LOCAL DEALER. THE DEALER
> RESET THE COMPUTER BUT THE REPAIR DID NOT
> REMEDY THE ISSUE. THE CONTACT TOOK THE VEHICLE
> BACK TO THE DEALER WHERE THE DEALER RESET THE
> COMPUTER A SECOND TIME. THE DEALER ALSO DROVE
> THE VEHICLE FOR ONE HUNDRED MILES AND COULD
> NOT DUPLICATE THE STALLING ISSUE. THE VEHICLE
> CONTINUED TO STALL SPORADICALLY. THE FAILURE
> MILEAGE WAS 4,200.

317.    On July 3, 2013, New GM became aware of a complaint filed with NHTSA

involving a 2013 Camaro in which the following was reported:

> THE CONTACT OWNS A 2013 CHEVROLET CAMARO. THE
> CONTACT STATED THAT WHILE DRIVING
> APPROXIMATELY 55 MPH, THE VEHICLE STALLED
> WITHOUT WARNING. THE CONTACT MENTIONED THAT

- 115 -

THE FAILURE WOULD RECUR INTERMITTENTLY. THE
VEHICLE WAS TAKEN TO A DEALER FOR A DIAGNOSTIC
WHERE THE FAILURE WAS UNABLE TO BE REPLICATED.
THE MANUFACTURER WAS NOTIFIED OF THE FAILURE.
THE APPROXIMATE FAILURE MILEAGE WAS 1,460 AND
THE CURRENT MILEAGE WAS 1,800.

318. On August 4, 2013, New GM became aware of a complaint filed with NHTSA

involving a 2010 Camaro in which the following was reported:

I PURCHASED MY 2010 CHEVY CAMARO 2SS, IN
FEBRUARY OF 2012. IT HAD 4,400 MILES ON IT. ABOUT A
MONTH OR TWO, AFTER I BOUGHT IT, IT COMPLETELY
SHUT OFF ON ME, ON A MAJOR HIGHWAY, WHILE
DOING 65 MPH. I THREW IT INTO NEUTRAL AND TURNED
THE KEY AND IT STARTED RIGHT BACK UP. ABOUT A
MONTH AFTER THAT, I WAS DOING ABOUT 20MPH ON A
BACK ROAD AND IT DID THE SAME EXACT THING. JUST
RECENTLY, ABOUT 2 WEEKS AGO, I WAS IN 6TH GEAR,
ON CRUISE DOING 60MPH AND I FELT THE CAR "JERK"
OR BUCK" A LITTLE BIT. FOLLOWED IMMEDIATELY BY
THE CAR DECELERATING. I DOWN-SHIFTED TO 4TH
GEAR AND WAS GIVING IT GAS, BUT STILL WOULDN'T
SPEED UP. IT FELL DOWN TO ABOUT 40MPH, BEFORE
FINALLY CATCHING ITSELF AND SPEEDING BACK UP.
ABOUT A MILE LATER, I GOT OFF MY EXIT AND WAS
COMING DOWN TO THE STOP SIGN,WHEN ALL THE
INDICATOR LIGHTS CAME ON FOR ABOUT 10 SECONDS.
THEY WENT OFF AND I MADE A LEFT HAND TURN AND
WENT ABOUT A MILE UP THE ROAD. AT THAT POINT,
THE CAR COMPLETELY SHUT OFF DOING ABOUT 35MPH.
THERE WAS HEAVY TRAFFIC, SO I PULLED OVER AND
STARTED IT BACK UP. I CALLED THE CHEVY
DEALERSHIP, WHERE I BOUGHT IT FROM, AND THEY
HAD NO OPENINGS FOR A WEEK. SO I TOOK IT LAST
WEEK TO GET IT CHECKED AND THEY FOUND NOTHING
THAT COULD HAVE CAUSED IT, THEY SAY. I AM VERY
UPSET, BUT VERY THANKFUL THAT MY TWO CHILDREN
WERE NOT WITH ME WHEN IT HAPPENED. I AM
CURRENTLY CONTEMPLATING TRADING IT IN, CUZ I AM
WORRIED THAT IF IT HAPPENS AGAIN,AND MY
CHILDREN ARE IN THE CAR, THAT IT MIGHT SHUT OFF
IN VERY CONGESTED BUMPER TO BUMPER TRAFFIC, ON
THE HIGHWAY AT NIGHT, AND A TRACTOR TRAILER IS
BEHIND ME AND I CAN'T GET IT STARTED OR SOMEONE

010440-11 725144 V1

DOESN'T SEE ME CUZ MY LIGHTS WOULD BE OFF. THE
THOUGHT OF THAT COMPLETELY SCARES ME.

319.    On September 28, 2013, New GM became aware of a complaint filed with

NHTSA involving a 2010 Camaro in which the following was reported:

> THE CONTACT OWNS A 2010 CHEVROLET CAMARO. THE
> CONTACT STATED THAT WHILE DRIVING 5 MPH AND
> MAKING A TURN, THE VEHICLE STALLED WITHOUT
> WARNING. THE CONTACT WAS ABLE TO RESTART THE
> VEHICLE BUT THE FAILURE RECURRED. THE VEHICLE
> WAS TAKEN TO A DEALER WHO PERFORMED A
> DIAGNOSTIC AND REPLACED A COMPONENT TO
> CORRECT THE FAILURE. THE CONTACT WAS UNABLE
> TO DETERMINE THE EXACT COMPONENT HOWEVER,
> THE FAILURE RECURRED WITHOUT WARNING. THE
> VEHICLE WAS TAKEN TO DEALER HOWEVER, NO
> FAILURE WAS DETERMINED. THE MANUFACTURER WAS
> MADE AWARE OF THE ISSUE AND AN INCIDENT
> RECORDER WAS INSTALLED ON THE VEHICLE TO
> DETERMINE ANY FUTURE FAILURES. THE FAILURE
> MILEAGE WAS 23,000. THE CURRENT MILEAGE WAS
> 24,000.

320.    On October 2, 2013, New GM became aware of a complaint filed with NHTSA

involving a 2010 Camaro in which the following was reported:

> I REACHED OUT TO [XXX], GM CEO ON MAY 24, 2013
> WITH A STRONG CONCERNS OF POWER FAILURE FOR
> THE 2ND TIME WHILE DRIVING THE VEHICLE; CAUSING
> ME NOT TO HAVE CONTROL WHILE THE VEHICLE WAS
> DRIVEN. THUS IT WAS ALSO NOTED THAT I ORIGINALLY
> REACHED OUT TO GM TO REQUEST A REPLACED
> VEHICLE WHILE MY VEHICLE WAS UNDER WARRANTY
> DUE TO THE VEHICLE LOSING POWER ON A MAJOR
> FREEWAY; WHICH WAS LIFE THREATENING; HOWEVER
> THE RESPONSE BACK FROM GM WAS A DECLINED
> LETTER THAT I RECEIVED ENSURING ME THAT THE
> VEHICLE WAS SAFE TO DRIVE. I TRAVEL MAJOR
> FREEWAYS AS PART OF CAREER SO HAVING A
> RELIABLE VEHICLE IS IMPERATIVE AS FOR I VALUE MY
> LIFE. [XXX], SENIOR VICE PRESIDENT OF GLOBAL
> QUALITY & CUSTOMER EXPERIENCE HAS NOT
> RETURNED MY CALLS AND NOW GM IS ALSO NOT
> HONORING THE WARRANTY TOO. AFTER ASSISTING ME

WITH MY CAR FOR 5 MONTHS .PLEASE NOT MY 2010
CAMARO SS IS PARK AS FOR IT'S NOT SAFE TO DRIVE.
GM OFFER ME A CONTRACT TO SIGN THAT WOULD
GUARANTEE "NO FAULT TO GM ". I COULDN'T NOT DUE
THEM SHOULD MY CAMARO HARM MYSELF OR OTHERS
WHILE DRIVING IT. ADDITIONALLY, I WAS TOLD THAT
GM KNOWS THERE IS A PROBLEM WITH THE CAMARO
BUT CAN'T FIND THE PROBLEM. IT'S HAS BEEN NOTED
THAT THE CORRECTIONS THAT I NEED TO HAVE MADE
IN ORDER TO BE SAFE IN THE GM VEHICLE CANNOT BE
OBTAINED AS FOR MY VEHICLE HAS BEEN KEEP CHEVY
FOR SHOP 5 MONTHS. ….

321. On October 16, 2013, New GM became aware of a complaint filed with NHTSA

concerning a 2013 Camaro, in which the following was reported:

THE CONTACT OWNS A 2013 CHEVROLET CAMARO. THE
CONTACT STATED THAT WHILE MAKING A U-TURN, THE
VEHICLE STALLED WITHOUT WARNING. THE VEHICLE
WAS NOT TAKEN TO A DEALER FOR DIAGNOSIS OF THE
FAILURE. THE MANUFACTURER WAS NOT NOTIFIED OF
THE FAILURE. THE VEHICLE WAS NOT REPAIRED. THE
APPROXIMATE FAILURE AND CURRENT MILEAGE WAS
830.

322. On April 20, 2014, New GM became aware of a complaint filed with NHTSA

concerning a 2014 Camaro, in which the following was reported:

AS I WAS TURNING THE CORNER ON TO WOODWARD
AVENUE MY CAR JUST SHUT DOWN. THE CAR WENT
TOTALLY BLACK AND SHUT DOWN IN THE MIDDLE OF
THE TURN ON THIS VERY BUSY-MAIN THOROUGHFARE.

323. On April 30, 2014, New GM became aware of a complaint filed with NHTSA

concerning a 2014 Camaro, in which the following was reported:

WITHIN TWO WEEKS AFTER PURCHASING MY CAR IT
STALLED TWICE--BOTH WHEN STOPPED AT RED LIGHTS.
I TOOK CAR TO DEALERSHIP AND THEY DID A ROAD
TEST BUT COULD NOT REPLICATE. ON 4/9/2014 I WAS
MAKING A RIGHT HAND TURN AND THE CAR STALLED
IN THE MIDDLE OF THE INTERSECTION. I RESTARTED
THE CAR, DROVE TO MY OFFICE AND THE CAR STALLED
WHEN TURNING INTO THE PARKING GARAGE AND

Case 1:14-mc-02543-JMF  Document 345  Filed 10/14/14  Page 139 of 712

> AGAIN WHEN TURNING INTO THE PARKING SPACE.
> TOOK TO THE DEALERSHIP THE FOLLOWING DAY AND
> THEY KEPT FOR AN EXTENDED TEST DRIVE BUT COULD
> NOT REPLICATE THE PROBLEM. SINCE THERE WERE
> NOT ANY CODES THE CAR WAS RETURNED TO ME.

324.    On May 6, 2014, New GM became aware of a complaint filed with NHTSA

concerning a 2014 Camaro, in which the following was reported:

> DRIVING ON CRUISE CONTROL. KNEE BUMPED KEY,
> ENGINE TURNED OFF AT 60 MPH. POWER STEERING AND
> BRAKES STILL WORKED, BUT ENGINE WAS OFF.

325.    On May 9, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2013 Camaro, in which the following was reported:

> THE CONTACT INDICATED WHILE TRAVELING 60 MPH
> ON A MAJOR HIGHWAY, THE VEHICLE STALLED
> WITHOUT WARNING. THE CONTACT WAS ABLE TO
> MOVE THE VEHICLE OVER TO THE SHOULDER AND
> AFTER SEVERAL ATTEMPTS THE VEHICLE WAS ABLE TO
> RESTART. THE VEHICLE WAS TO BE FURTHER
> INSPECTED, DIAGNOSED AND REPAIRED BY AN
> AUTHORIZED DEALER BUT IT WAS NOT REPAIRED. THE
> CONTACT WAS NOTIFIED OF NHTSA CAMPAIGN ID
> NUMBER: 14V346000 (ELECTRICAL SYSTEM) AFTER
> EXPERIENCING THE FAILURE MULTIPLE TIMES AND
> WAS WAITING FOR PARTS TO GET THE VEHICLE
> REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE
> FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS
> 28,000.

326.    On May 19, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2013 Camaro, in which the following was reported:

> WHILE DRIVING DOWN I 75 IN OCALA FLORIDA CAR
> STALLED IN MIDDLE OF HIGHWAY . I PULLED OVER TO
> SHOULDER AND HAD TO RESTART CAR. I TOOK IT IN TO
> A DEALER AND THEY SAID THEY COULD NOT FIND ANY
> THING WRONG. THEY SAID TAKE THE CAR.

327.    On May 20, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2012 Camaro, in which the following was reported:

010440-11  725144 V1

> WHEN THE IGNITION SWITCH/ KEY IS SLIGHTLY
> BUMPED WITH KNEE, THE CAR SHUTS OFF. THREE
> TIMES NOW. DEALERSHIP NOT RESPONSIVE. TAUGHT
> MY TEEN DRIVERS WHAT TO DO IF THIS HAPPENS AND
> THIS SAVED MY DAUGHTER'S LIFE WHEN IT HAPPENED
> TO HER.

328.    Astoundingly, the *sole* remedy provided by New GM in its recall will be to

"remove the key blade from the original flip key/RKE transmitter assemblies provided with the

vehicle, and provide two new keys and two key rings per key."

329.    The proposed "remedy" is insufficient, because it does not address (i) the poor

placement of the ignition switch such that the keys are vulnerable to being "kneed" by the driver;

(ii) the airbag algorithm that can render the airbags inoperable *even when the vehicles are*

*travelling at a high speed*; and (iii) the possible need for a new switch with higher torque.

330.    Indeed, on July 31, 2014, after the recall was announced, New GM became aware

of a complaint filed with NHTSA involving a 2014 Camaro, in which the following was

reported:

> I WAS TURNING ONTO THE HIGHWAY THAT THE SPEED
> LIMIT IS 65 MPH FROM A SIDE ROAD. I WAITED FOR
> ONCOMING TRAFFIC TO PASS AND THEN PULLED OUT.
> AS I PULLED OUT, TURNING RIGHT, MY CAR HAD A
> SUDDEN LOSS OF POWER. I TRIED TO RESTART AND IT
> WOULD NOT RESTART. I HAD DIFFICULTY PULLING
> OVER TO THE SIDE OF THE ROAD DUE TO THE STEERING
> WHEEL BEING STIFF AND HARD TO HANDLE. AFTER I
> GOT TO THE SIDE OF THE ROAD, I WAS ABLE TO
> RESTART MY CAR. I ***DID NOT BUMP THE IGNITION***
> ***SWITCH WHEN THIS HAPPENED EITHER***.  [Emphasis
> added.]

**b.      June 20, 2014 recall—ignition key slot defect.**

331.    On June 20, 2014, New GM recalled 3,141,731 vehicles in the United States for

ignition switch, or ignition key slot, defects (NHTSA Recall Number 14V- 355).  New GM

announced to NHTSA and the public that the recall concerns an ignition key slot defect.

- 120 -

332.    2,349,095 of the vehicles subject to this recall were made by Old GM.  792,636 vehicles were made and/or sold by New GM.

333.    The following vehicles were included in the June 20, 2014 recall:  2005-2009 Buick Lacrosse, 2006-2014 Chevrolet Impala, 2000-2005 Cadillac Deville, 2004-2011 Cadillac DTS, 2006-2011 Buick Lucerne, 2004-2005 Buick Regal LS and RS, and 2006-2008 Chevrolet Monte Carlo.

334.    The recall notice states, "In the affected vehicles, the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the run position, turning off the engine."

335.    Further, "[i]f the key is not in the run position, the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury.  Additionally, a key knocked out of the run position could cause loss of engine power, power steering, and power braking, increasing the risk of a vehicle crash."

336.    During its existence GM has received hundreds of complaints at its Technical Assistance Center in which the weight of the key chain was identified as a source of the problem.[63]

337.    The vehicles included in this recall were built on the same platform and their defective ignition switches are likely due to weak detent plungers, just like the Cobalt and other Defective Ignition Switch Vehicles recalled in February and March of 2014.

338.    New GM was aware of the ignition switch defect in these vehicles from the date of its inception on July 10, 2009, as it acquired on that date all of the knowledge possessed by Old GM given the continuity in personnel, databases, and operations from Old GM to New GM.

---

[63] *See, e.g.*, GM-MDL-254300011834-35.

In addition, New GM acquired additional information thereafter. The information, all of which was known to New GM, included the following facts:

a.      On August 30, 2005, Ms. Andres sent an email to Old GM employee Jim Zito and copied ten other Old GM employees, including Ray DeGiorgio. Ms. Andres, in her email, stated, "I picked up the vehicle from repair. No repairs were done. . . . The technician said there is nothing they can do to repair it. He said it is just <u>the design of the switch</u>. He said other switches, like on the trucks, have a stronger detent and don't experience this."

b.      Ms. Andres' email continued: "I think this is a serious safety problem, especially if this switch is on multiple programs. I'm thinking big recall. I was driving 45 mph when I hit the pothole and the car shut off and I had a car driving behind me that swerved around me. I don't like to imagine a customer driving with their kids in the back seat, on I-75 and hitting a pothole, in rush-hour traffic. I think you should seriously consider changing this part to a switch with a stronger detent."

c.      Ray DeGiorgio, who reportedly designed the ignition switches installed in the 2006 Chevrolet Impala vehicles, replied to Ms. Andres' email, stating that he had recently driven a 2006 Impala and "did not experience this condition."

339.    On or after July 10, 2009, senior executives and engineers at New GM knew that some of the information relayed to allay Ms. Andres' concerns was inaccurate. For example, Ray DeGiorgio knew that there had been "issues with detents being too light." Instead of relaying those "issues," Mr. DeGiorgio falsely stated that there were no such "issues."

340.    Plaintiffs are informed and believe that New GM has tried to characterize the recall of these 3.14 million vehicles as being different than the recall for the ignition switch defect in the Cobalts and other Defective Ignition Switch Vehicles when in reality and for all

- 122 -

practical purposes it is for exactly the same defect that creates exactly the same safety risks. New GM has attempted to label and describe the ignition key slot defect as being different in order to provide it with cover and an explanation for why it did not recall these 3.14 million vehicles much earlier, and why it is not providing a new ignition switch for the 3.14 million vehicles.

341.    From 2001 to the present, Old GM and New GM received numerous reports from consumers regarding complaints, crashes, injuries, and deaths linked to this safety defect.  The following are examples of just a few of the many reports and complaints regarding the defect.

342.    On January 23, 2001, Old GM became aware of a complaint filed with NHTSA involving a 2000 Cadillac Deville and an incident that occurred on January 23, 2001, in which the following was reported:

> COMPLETE ELECTRICAL SYSTEM AND ENGINE
> SHUTDOWN WHILE DRIVING. HAPPENED THREE
> DIFFERENT TIMES TO DATE. DEALER IS UNABLE TO
> DETERMINE CAUSE OF FAILURE. THIS CONDITION
> DEEMED TO BE EXTREMELY HAZARDOUS BY OWNER.
> NHTSA ID Number: 739850.

343.    On June 12, 2001, Old GM became aware of a complaint filed with NHTSA involving a 2000 Cadillac Deville and an incident that occurred on June 12, 2001, in which the following was reported:

> INTERMITTENTLY AT 60MPH VEHICLE WILL STALL OUT
> AND DIE. MOST TIMES VEHICLE WILL START UP
> IMMEDIATELY AFTER. DEALER HAS REPLACED MAIN
> CONSOLE 3 TIMES, AND ABS BRAKES. BUT, PROBLEM
> HAS NOT BEEN CORRECTED. MANUFACTURER HAS
> BEEN NOTIFIED.*AK  NHTSA ID Number: 890227.

344.    On January 27, 2003, Old GM became aware of a complaint filed with NHTSA involving a 2001 Cadillac Deville and an incident that occurred on January 27, 2003, in which the following was reported:

- 123 -

> WHILE DRIVING AT HIGHWAY SPEED ENGINE SHUT
> DOWN, CAUSING AN ACCIDENT. PLEASE PROVIDE ANY
> ADDITIONAL INFORMATION.*AK  NHTSA ID Number:
> 10004759.

345.    On September 18, 2007, Old GM became aware of a complaint filed with

NHTSA involving a 2006 Chevrolet Impala and an incident that occurred on September 15,

2006, in which it was reported that:

> TL*THE CONTACTS SON OWNS A 2006 CHEVROLET
> IMPALA. WHILE DRIVING APPROXIMATELY 33 MPH AT
> NIGHT, THE CONTACTS SON CRASHED INTO A STALLED
> VEHICLE. HE STRUCK THE VEHICLE ON THE DRIVER
> SIDE DOOR AND NEITHER THE DRIVER NOR THE
> PASSENGER SIDE AIR BAGS DEPLOYED. THE DRIVER
> SUSTAINED MINOR INJURIES TO HIS WRIST. THE
> VEHICLE SUSTAINED MAJOR FRONT END DAMAGE. THE
> DEALER WAS NOTIFIED AND STATED THAT THE CRASH
> HAD TO HAVE BEEN A DIRECT HIT ON THE SENSOR. THE
> CURRENT AND FAILURE MILEAGES WERE 21,600. THE
> CONSUMER STATED THE AIR BAGS DID NOT DEPLOY.
> THE CONSUMER PROVIDED PHOTOS OF THE VEHICLE.
> UPDATED 10/10/07 *TR  NHTSA ID Number: 10203350.

346.    On April 02, 2009, GM became aware of a complaint filed with NHTSA

involving a 2005 Buick LaCrosse and an incident that occurred on April 02, 2009, in which the

following was reported:

> POWER STEERING WENT OUT COMPLETELY, NO
> WARNING JUST OUT. HAD A VERY HARD TIME
> STEERING CAR. LUCKY KNOW ONE WAS HURT. *TR
> NHTSA ID Number: 10263976.

347.    The reports regarding the defect continued to be reported to New GM.  For

example, on February 15, 2010, New GM became aware of a complaint filed with NHTSA

involving a 2008 Buick LaCrosse and an incident that occurred on February 13, 2010, in which a

driver reported:

> WHILE DRIVING AT 55MPH I RAN OVER A ROAD BUMP
> AND MY 2008 BUICK LACROSSE SUPER SHUT

010440-11 725144 V1

OFF(STALLED). I COASTED TO THE BURM, HIT BRAKES
TO A STOP. THE CAR STARTED ON THE FIRST TRY.
CONTINUED MY TRIP WITH NO INCIDENCES. TOOK TO
DEALER AND NO CODES SHOWED IN THEIR COMPUTER.
CALLED GM CUSTOMER ASSISTANCE AND THEY GAVE
ME A CASE NUMBER. NO BULLETINS. SCARY TO DRIVE.
TRAFFIC WAS LIGHT THIS TIME BUT MAY NOT BE THE
NEXT TIME. *TR.  NHTSA ID Number: 10310692.

348.    On April 21, 2010, New GM became aware of a complaint filed with NHTSA

involving a 2006 Buick Lucerne and an incident that occurred on March 22, 2010, in which the

following was reported:

06 BUICK LUCERNE PURCHASED 12-3-09, DIES OUT
COMPLETELY WHILE DRIVING AT VARIOUS SPEEDS.
THE CAR HAS SHUT OFF ON THE HIGHWAY 3 TIMES
WITH A CHILD IN THE CAR. IT HAS OCCURRED A TOTAL
OF 7 TIMES BETWEEN 1-08-10 AND 4-17-10. THE CAR IS
UNDER FACTORY WARRANTY AND HAS BEEN
SERVICED 7 TIMES BY 3 DIFFERENT BUICK
DEALERSHIPS. *TR  NHTSA ID Number: 10326754.

349.    On April 29, 2010, New GM became aware of a complaint filed with NHTSA

involving a 2005 Buick LaCrosse and an incident that occurred on March 21, 2010, in which it

was reported that:

TRAVELING ON INTERSTATE 57 DURING DAYTIME
HOURS. WHILE CRUISING AT 73 MILES PER HOUR IN THE
RIGHT HAND LANE, THE VEHICLE SPUTTERED AND
LOST ALL POWER. I COASTED TO A STOP OFF THE SIDE
OF THE ROAD. I RESTARTED THE VEHICLE AND
EVERYTHING SEEMED OK, SO I CONTINUED ON. A
LITTLE LATER IT SPUTTERED AGAIN AND STARTED
LOSING POWER. THE POWER CAME BACK BEFORE IT
CAME TO A COMPLETE STOP. I CALLED ON STAR FOR A
DIAGNOSTIC CHECK AND THEY TOLD ME I HAD A FUEL
SYSTEM PROBLEM AND THAT IF THE CAR WOULD RUN
TO CONTINUE THAT IT WAS NOT A SAFETY ISSUE. THEY
TOLD ME TO TAKE IT TO A DEALER FOR REPAIRS WHEN
I GOT HOME. I TOOK THE CAR WORDEN-MARTEN
SERVICE CENTER FOR REPAIRS ON MARCH 23RD. TO
REPAIR THE CAR THEY: 1.REPLACED CAT CONVERTER
AND OXYGEN SENSOR 125CGMPP- $750.47 A SECOND

- 125 -

INCIDENT OCCURRED WHILE TRAVELING ON
INTERSTATE 57 DURING DAYTIME HOURS. I WAS
PASSING A SEMI TRACTOR TRAILER WITH THREE CARS
FOLLOWING ME WHILE CRUISING AT 73 MILES PER
HOUR WHEN THE VEHICLE SPUTTERED AND LOST ALL
POWER PUTTING ME IN A VERY DANGEROUS
SITUATION. THE VEHICLE COASTED DOWN TO ABOUT
60 MILES PER HOUR BEFORE IT KICKED BACK IN. I IN
THE MEAN TIME HAD DROPPED BACK BEHIND THE SEMI
WITH THE THREE CARS BEHIND ME AND WHEN I COULD
I PULLED BACK INTO THE RIGHT HAND LANE. THIS WAS
A VERY DANGEROUS SITUATION FOR ME AND MY WIFE.
I CALLED ON STAR FOR A DIAGNOSTIC CHECK AND
THEY TOLD ME THAT EVERYTHING WAS OK. I TOOK
THE CAR WORDEN-MARTEN SERVICE CENTER FOR
REPAIRS AGAIN ON APRIL 19TH TO REPAIR THE CAR
THEY: 1.REPLACED MASS -AIR FLOW UNIT AND SENSOR
$131.39 WHO KNOWS IF IT IS FIXED RIGHT THIS TIME?
THIS WAS A VERY DANGEROUS SITUATION TO BE IN
FOR THE CAR TO FAIL. *TR  NHTSA ID Number: 10328071.

350.    On June 2, 2010, New GM became aware of a complaint filed with NHTSA

involving a 2007 Buick LaCrosse and an incident that occurred on March 1, 2010, in which the

following was reported:

2007 BUICK LACROSSE SEDAN. CONSUMER STATES
MAJOR SAFETY DEFECT. CONSUMER REPORTS WHILE
DRIVING THE ENGINE SHUT DOWN 3 TIMES FOR NO
APPARENT REASON *TGW  NHTSA ID Number: 10334834.

351.    On February 20, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Chevrolet Monte Carlo and an incident that occurred on January 16, 2014, in

which the following was reported:

I WAS DRIVING GOING APPROXIMATELY 45 MPH, I HIT A
POT HOLE AND MY VEHICLE CUT OFF. THIS HAS
HAPPENED THREE TIMES SINCE JANUARY. THE SAME
THING HAPPENED THE SECOND TIME. THE LAST TIME IT
OCCURRED WAS TUESDAY, FEBRUARY 18. THIS TIME I
WAS ON THE EXPRESSWAY TRAVELING
APPROXIMATELY 75 MPH, HIT A BUMP AND IT CUT OFF.
THE CAR STARTS BACK UP WHEN I PUT IT IN NEUTRAL.
*TR  NHTSA ID Number: 10565104.

- 126 -

352.    On March 3, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Chevrolet Impala and an incident that occurred on February 29, 2012, in which

the following was reported:

> I WAS DRIVING MY COMPANY ASSIGNED CAR DOWN A
> STEEP HILL WHEN THE ENGINE STALLED WITHOUT
> WARNING. THIS HAS HAPPENED 5 OTHER TIMES WITH
> THIS VEHICLE. THIS WAS THE FIRST TIME I WAS
> TRAVELING FAST THOUGH. IT'S LIKE THE ENGINE JUST
> TURNS OFF. THE LIGHTS ARE STILL ON BUT I LOSE THE
> POWER STEERING AND BRAKES. IT WAS TERRIFYING
> AND EXTREMELY DANGEROUS. THIS PROBLEM
> HAPPENS COMPLETELY RANDOMLY WITH NO
> WARNING. IT HAS HAPPENED TO OTHERS IN MY
> COMPANY WITH THEIR IMPALAS. I LOOKED ONLINE
> AND FOUND NUMEROUS OTHER INSTANCES OF CHEVY
> IMPALAS OF VARIOUS MODEL YEARS DOING THE SAME
> THING. IT IS CURRENTLY IN THE REPAIR SHOP AND THE
> MECHANIC CAN'T DUPLICATE THE PROBLEM. I TOLD
> THEM ITS RANDOM AND OCCURS ABOUT EVERY 4
> MONTHS OR SO. I AM AFRAID I WILL HAVE TO GET
> BACK IN THIS DEATH TRAP DUE TO MY EMPLOYER
> MAKING ME. PLEASE HELP- I DON'T WANT TO DIE
> BECAUSE CHEVROLET HAS A PROBLEM WITH THEIR
> ELECTRICAL SYSTEMS IN THEIR CARS. *TR  NHTSA ID
> Number: 10567458.

353.    On March 11, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2007 Cadillac DTS and an incident that occurred on January 27, 2013, in which the

following was reported:

> ENGINE STOPPED. ALL POWER EQUIPMENT CEASED TO
> FUNCTION. I WAS ABLE TO GET TO THE SIDE OF THE
> FREEWAY. PUT THE CAR IN NEUTRAL, TURNED THE KEY
> AND THE CAR STARTED AND CONTINUED FOR THE
> DURATION OF THE 200 MILE TRIP. THE SECOND TIME
> APPROXIMATELY THREE WEEKS AGO MY WIFE WAS
> DRIVING IN HEAVY CITY TRAFFIC WHEN THE SAME
> PROBLEM OCCURRED AND SHE LOST THE USE OF ALL
> POWER EQUIPMENT. SHE WAS ABLE TO PUT THE CAR IN
> PARK AND GET IT STARTED AGAIN WITHOUT INCIDENT.
> I CALLED GM COMPLAINT DEPARTMENT. THEY
> INSTRUCTED ME TO TAKE THE CAR TO A DEALERSHIP

010440-11  725144 V1

AND HAVE A DIAGNOSTIC TEST DONE ON IT. THIS WAS
DONE AND NOTHING WAS FOUND TO BE WRONG WITH
THE VEHICLE. I AGAIN CALLED CADILLAC COMPLAINT
DEPARTMENT AND OPENED A CASE. THIS TIME I WAS
TOLD TO TAKE THE CAR BACK TO THE DEALERSHIP
AND ASK THE SERVICE DEPARTMENT TO RECHECK IT. I
INFORMED THEM I HAVE THE DIAGNOSTIC REPORT
SHOWING NOTHING WRONG WAS FOUND. THEY
SUGGESTED I TAKE IT BACK AND HAVE THE SERVICE
PEOPLE DRIVE THE CAR. THIS DIDN'T MAKE ANY SENSE
BECAUSE I DON'T KNOW WHEN AND WHERE THE
PROBLEM WILL OCCUR AGAIN. WHAT WAS I TO DO FOR
A CAR WHILE THE DEALERSHIP HAD MINE? I INQUIRED
OF THE CADILLAC REPRESENTATIVE IF THIS CAR MAY
HAVE THE SAME IGNITION AS THE CARS CURRENTLY
BEING RECALLED BY GM. THEY WERE UNABLE TO
ANSWER THAT QUESTION. THEY FINALLY STATED THE
ONLY REMEDY WAS TO TAKE IT BACK TO THE
DEALERSHIP. IF THIS PROBLEM OCCURS AGAIN
SOMEONE COULD EASILY GET INJURED OR KILLED. I
WOULD APPRECIATE ANY ASSISTANCE YOU CAN GIVE
ME ON HOW TO RESOLVE THIS MATTER.  NHTSA ID
Number: 10568491.

354.    On March 19, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Buick LaCrosse and an incident that occurred on March 15, 2014, in which the

following was reported:

WHILE DRIVING UP A LONG INCLINE ON I-10 VEHICLE
BEHAVED AS IF THE IGNITION HAD BEEN TURNED OFF
AND KEY REMOVED. IE: ENGINE OFF, NO LIGHTS OR
ACCESSORIES, NO WARNING LIGHTS ON DASH. TRAFFIC
WAS HEAVY AND MY WIFE WAS FORTUNATE TO
SAFELY COAST INTO SHOULDER. INCIDENT RECORDED
WITH BUICK, HAVE REFERENCE NUMBER. *TR  NHTSA
ID Number: 10573586.

355.    On June 20, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2008 Buick LaCrosse and an incident that occurred on August 30, 2013, in which the

following was reported:

THE IGNITION CONTROL MODULE (NOT THE IGNITION
SWITCH) FAILED SUDDENLY WHILE DRIVING ON THE

- 128 -

HIGHWAY, CAUSING THE ENGINE TO SHUT OFF
SUDDENLY AND WITHOUT WARNING. THE CAR WAS
TRAVELING DOWNHILL, SO THE INITIAL INDICATION
WAS LOSS OF POWER STEERING. I WAS ABLE TO PULL
ONTO THE SHOULDER AND THEN REALIZED THAT THE
ENGINE HAD DIED AND WOULD NOT RESTART. WHILE
NO CRASH OR INJURY OCCURRED, THE POTENTIAL FOR
A SERIOUS CRASH WAS QUITE HIGH.  NHTSA ID Number:
10604820.

356.     On July 1, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Buick LaCrosse and an incident that occurred on October 25, 2012, in which

the following was reported:

TRAVELING 40 MPH ON A FOUR LANE ABOUT TO PASS A
TRUCK. MOTOR STOPPED, POWER STEERING OUT,
POWER BRAKES OUT, MANAGED TO COAST ACROSS
THREE LANES TO SHOULDER TO PARK. WALKED 1/4
MILES TO STORE CALLED A LOCAL GARAGE. CAR STILL
WOULD NOT START, TOWED TO HIS GARAGE. CHECKED
GAS, FUEL PRESSURE OKAY BUT NO SPARK. MOVED
SOME CONNECTORS AROUND THE STARTING MODULE
AND CAR STARTED. HAVE NOT HAD ANY PROBLEMS
SINCE, HAVE THE FEAR THAT I WILL BE ON A CHICAGO
TOLL ROAD AND IT WILL STOP AGAIN.  NHTSA ID
Number: 10607535.

357.     On July 12, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2009 Chevrolet Impala and an incident that occurred on March 19, 2010, in which

the following was reported:

I HAD JUST TURNED ONTO THIS ROAD, HAD NOT EVEN
GONE A MILE. NO SPEED, NO BLACK MARKS, CAR SHUT
DOWN RAN OFF THE ROAD AND HIT A TREE STUMP.
TOTAL THE CAR. THE STEERING WHEEL WAS BENT
ALMOST IN HALF. I HAVE PICTURES OF THE CAR. I GOT
THIS CAR NEW, SO ALL MILES WE'RE PUT ON IT BY ME. I
BROKE MY HIP, BACK, KNEE, DISLOCATED MY ELBOW,
CRUSHED MY ANKLE AND FOOT. HAD A HEAD INJURY,
A DEFLATED LUNG. I WAS IN THE HOSPITAL FOR TWO
MONTHS AND A NURSING HOME FOR A MONTH. I HAVE
HAD 14 SURGERIES. STILL NOT ABLE TO WORK OR DO A
LOT OF THINGS FOR MY SELF. WITH THE RECALLS

SHOWING THE ISSUES OF THE ENGINE SHUTTING OFF, I
NEED THIS LOOKED INTO.  NHTSA ID Number: 10610093.

358.    On July 24, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2008 Buick LaCrosse and an incident that occurred on July 15, 2014, in which the

following was reported:

> WHILE DRIVING NORTH ON ALTERNATE 69 HIGHWAY
> AT 65 MPH AT 5:00 P.M., MY VEHICLE ABRUPTLY LOSS
> POWER EVEN THOUGH I TRIED TO ACCELERATE. THE
> ENGINE SHUT OFF SUDDENLY AND WITHOUT WARNING.
> VEHICLE SLOWED TO A COMPLETE STOP. I WAS
> DRIVING IN THE MIDDLE LANE AND WAS UNABLE TO
> GET IN THE SHOULDER LANE BECAUSE I HAD NO
> PICKUP (UNABLE TO GIVE GAS TO ACCELERATE) SO MY
> HUSBAND AND I WERE CAUGHT IN FIVE 5:00 TRAFFIC
> WITH CARS WHIPPING AROUND US ON BOTH SIDES AND
> MANY EXCEEDING 65 MPH. I PUT ON MY EMERGENCY
> LIGHTS AND IMMEDIATELY CALLED ON-STAR. I WAS
> UNABLE TO RESTART THE ENGINE. THANK GOD FOR
> ON-STAR BECAUSE FROM THAT POINT ON, I WAS IN
> TERROR WITNESSING CARS COMING UPON US NOT
> SLOWING UNTIL THEY REALIZED I WAS AT A STAND
> STILL WITH LIGHTS FLASHING. THE CARS WOULD
> SWERVE TO KEEP FROM HITTING US. IT TOOK THE
> HIGHWAY PATROL AND POLICE 15 MINUTES TO GET TO
> US BUT DURING THAT TIME, I RELIVED VISIONS OF US
> BEING KILLED ON THE HIGHWAY. I CAN€™T
> DESCRIBE THE HORROR, LOOKING OUT MY REAR VIEW
> MIRROR, WITNESSING OUR DEMISE TIME AFTER TIME.
> THOSE 15 MINUTES SEEMED LIKE AN ETERNITY. WHEN
> THE HIGHWAY PATROL ARRIVED THEY CLOSED LANES
> AND ASSISTED IN PUSHING CAR OUT OF THE HIGHLY
> TRAFFIC LANES. IT TOOK MY HUSBAND AND I BOTH TO
> TURN THE STEERING WHILE IN NEUTRAL. THE CAR WAS
> TOWED TO CONKLIN FANGMAN KC DEALERSHIP AND I
> HAD TO REPLACE IGNITION COIL AND MODULE THAT
> COST ME $933.16. THEY SAID THESE PARTS WERE NOT
> ON THE RECALL LIST, WHICH I HAVE FOUND OUT SINCE
> THEN GM HAS PUT DEALERSHIPS ON NOTICE OF THIS
> PROBLEM. IT HAS SOMETHING TO DO WITH SUPPLYING
> ENOUGH MANUFACTURED PARTS TO TAKE CARE OF
> RECALL. IF I COULD AFFORD TO PURCHASE ANOTHER
> CAR I WOULD BECAUSE I DON€™T FEEL SAFE ANY
> LONGER IN THIS CAR. EMOTIONALLY I AM STILL

010440-11  725144 V1

SUFFERING FROM THE TRAUMA.  NHTSA ID Number:
10604820.

359.    Notwithstanding New GM's recall, the reports and complaints relating to this

defect have continued to pour into New GM.  Such complaints and reports indicate that New

GM's proffered recall "fix" does not work.

360.    For example, on August 2, 2014, New GM became aware of a complaint filed

with NHTSA involving a 2006 Buick LaCrosse and an incident that occurred on July 12, 2014,

in which the following was reported:

> WHILE TRAVELING IN THE FAST LANE ON THE GARDEN
> STATE PARKWAY I HIT A BUMP IN THE ROAD, THE
> AUTO SHUT OFF.WITH A CONCRETE DIVIDER ALONG
> SIDE AND AUTOS APPROACHING AT HIGH SPEED, MY
> WIFE AND DAUGHTER SCREEMING I MANAGED TO GET
> TO THE END OF THE DIVIDER WERE I COULD TURN OFF
> THE AUTO RESTARTED ON 1ST TRY BUT VERY SCARY.
> NHTSA ID Number: 10618391.

361.    On August 18, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2007 Buick LaCrosse and an incident that occurred on August 18, 2014, in which the

following was reported:

> TL* THE CONTACT OWNS A 2007 BUICK LACROSSE. THE
> CONTACT STATED WHILE DRIVING APPROXIMATELY 60
> MPH, SHE HIT A POT HOLE AND THE VEHICLE STALLED.
> THE VEHICLE COASTED TO THE SHOULDER OF THE
> ROAD. THE VEHICLE WAS RESTARTED AND THE
> CONTACT WAS ABLE TO DRIVE THE VEHICLE AS
> NORMAL. THE CONTACT RECEIVED A RECALL NOTICE
> UNDER NHTSA CAMPAIGN NUMBER: 14V355000
> (ELECTRICAL SYSTEM), HOWEVER THE PARTS NEEDED
> FOR THE REPAIRS WAS UNAVAILABLE. THE VEHICLE
> WAS NOT REPAIRED. THE MANUFACTURER WAS NOT
> NOTIFIED OF THE FAILURE. THE APPROXIMATE
> FAILURE MILEAGE WAS 110,000.  NHTSA ID Number:
> 10626067.

362.     On August 20, 2014, New GM became aware of a complaint filed with NHTSA involving a 2007 Chevrolet Impala and an incident that occurred on August 6, 2014, in which it was reported that:

> TL* THE CONTACT OWNS A 2007 CHEVROLET IMPALA. THE CONTACT STATED THAT WHILE DRIVING 25 MPH, THE VEHICLE STALLED WITHOUT WARNING. THE CONTACT RECEIVED A NOTIFICATION FOR RECALL NHTSA CAMPAIGN NUMBER: 14V355000 (ELECTRICAL SYSTEM). THE VEHICLE WAS TAKEN TO AN INDEPENDENT MECHANIC WHERE THE TECHNICIAN ADVISED THE CONTACT TO REMOVE THE KEY FOB AND ANY OTHER OBJECTS. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 79,000. NHTSA ID Number: 10626659.

363.     On August 27, 2014, New GM became aware of the following complaint filed with NHTSA involving a 2008 Chevrolet Impala and an incident that occurred on August 27, 2014, in which it was reported that:

> TL-THE CONTACT OWNS A 2008 CHEVROLET IMPALA. THE CONTACT STATED WHILE DRIVING APPROXIMATELY 50 MPH, THE VEHICLE LOST POWER AND THE STEERING WHEEL SEIZED WITHOUT WARNING. AS A RESULT, THE CONTACT CRASHED INTO A POLE AND THE AIR BAGS FAILED TO DEPLOY. THE CONTACT SUSTAINED A CONCUSSION, SPRAINED NECK, AND WHIPLASH WHICH REQUIRED MEDICAL ATTENTION. THE POLICE WAS NOT FILED. THE VEHICLE WAS TOWED TO A TOWING COMPANY. THE CONTACT RECEIVED NOTIFICATION OF NHTSA CAMPAIGN ID NUMBER: 14V355000 (ELECTRICAL SYSTEM), HOWEVER THE PARTS ARE NOT AVAILABLE TO PERFORM THE REPAIRS. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 70,000. MF. NHTSA ID Number: 10628704.

010440-11  725144 V1

364.    Old GM and later New GM knew that this serious safety defect existed for years yet did nothing to warn the public or even attempt to correct the defect in these vehicles until late June of 2014 when New GM finally made the decision to implement a recall.

365.    The "fix" that New GM plans as part of the recall is to modify the ignition key from a "slotted" key to "hole" key.  This is insufficient and does not adequately address the safety risks posed by the defect.  The ignition key and switch remain prone to inadvertently move from the "run" to the "accessory" position.  Simply changing the key slot or taking other keys and fobs off of key rings is New GM's attempt to make consumers responsible for the safety of GM-branded vehicles and to divert its own responsibility to make GM-branded vehicles safe.  New GM's "fix" does not adequately address the inherent dangers and safety threats posed by the defect in the design.

366.    In addition, New GM is not addressing the other design issues that create safety risks in connection with this defect.  New GM is not altering the algorithm that prevents the airbags from deploying when the ignition leaves the "run" position even when the vehicle is moving at high speed.  And New GM is not altering the placement of the ignition switch in an area where the driver's knees may inadvertently cause the ignition to move out of the "run" position.

### c.    July 2 and 3, 2014 recalls—unintended ignition rotation defect.

367.    On July 2, 2014, New GM recalled 554,328 vehicles in the United States for ignition switch defects (Recall Number 14V-394).  The July 2 recall applied to the 2003-2014 Cadillac CTS and the 2004-2006 Cadillac SRX.

368.    The recall notice explains that the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the "run" position,

turning off the engine.  Further, if the key is not in the "run" position, the airbags may not deploy in the event of a collision, increasing the risk of injury.

369.    On July 3, 2014, New GM recalled 6,729,742 additional vehicles in the United States for ignition switch defects (Recall No. 14V-400).

370.    The following vehicles were included in this recall:  1997-2005 Chevrolet Malibu, 2000-2005 Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005 Pontiac Grand Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999-2004 Oldsmobile Alero.

371.    The recall notice states that the weight on the key and/or road conditions or some other jarring event may cause the ignition switch to move out of the "run" position, turning off the engine.  If the key is not in the "run" position, the airbags may not deploy if the vehicle is involved in a collision, increasing the risk of injury.

372.    In both of these recalls, New GM notified NHTSA and the public that the recall was intended to address a defect involving unintended or "inadvertent key rotation" within the ignition switch of the vehicles.  As with the ignition key defect announced June 20, however, the defects for which these vehicles have been recalled is directly related to the ignition switch defect in the Cobalt and other Defective Ignition Switch Vehicles and involves the same safety risks and dangers.

373.    7,175,896 of the recalled vehicles were manufactured by Old GM.  108,174 of the vehicles were manufactured and sold by New GM.

374.    Once again, the unintended ignition rotation defect is substantially similar to and relates directly to the other ignition switch defects, including the defects that gave rise to the initial recall of 2.1 million Cobalts and other vehicles in February and March of 2014.  Like the

- 134 -

other ignition switch defects, the unintended ignition key rotation defect poses a serious and

dangerous safety risk because it can cause a vehicle to stall while in motion by causing the key in

the ignition to inadvertently move from the "on" or "run" position to "off" or "accessory"

position.  Like the other ignition switch defects, the unintended ignition key rotation defect can

result in a loss of power steering, power braking, and increase the risk of a crash.  And as with

the other ignition switch defects, if a crash occurs, the airbags will not deploy because of the

unintended ignition key rotation defect.

375.    The unintended ignition key rotation defect involves several problems, and they

are identical to the problems in the other Defective Ignition Switch Vehicles:  a weak detent

plunger, the low positioning of the ignition on the steering column, and the algorithm that

renders the airbags inoperable when the vehicle leaves the "run" position.

376.    The 2003-2006 Cadillac CTS and the 2004-2006 Cadillac SRX use the same

Delphi switch and have inadequate torque for the "run"-"accessory" direction of the key rotation.

This was known to Old and New GM, and was the basis for a change that was made to a stronger

detent plunger for the 2007 and later model years of the SRX model.  The 2007 and later CTS

vehicles used a switch manufactured by Dalian Alps.

377.    In 2010, New GM changed the CTS key from a "slot" to a "hole" design to

"reduce an observed nuisance" of the key fob contacting the driver's leg.  But in 2012, a New

GM employee reported two running stalls of a 2012 CTS that had a "hole" key and the stronger

detent plunger switch.  When New GM did testing in 2014 of the "slot" versus "hole" keys, it

confirmed that the weaker detent plunger-equipped switches used in the older CTS and SRX

could inadvertently move from "run" to "accessory" or "off" when the "vehicle goes off road or

experience some other jarring event."

010440-11  725144 V1

378.    Plaintiffs are informed and believe that New GM has tried to characterize the recall of these 7.3 million vehicles as being different than the other ignition switch defects that gave rise to the February recall *even though* these recalls are aimed at addressing the same defects and safety risks as those that gave rise to the other ignition switch defect recalls. New GM has attempted to portray the unintended ignition key rotation defect as being different from the other ignition switch defects in order to deflect attention from the severity and pervasiveness of the ignition switch defect and to try to provide a story and plausible explanation for why it did not recall these 7.3 million vehicles much earlier, and to avoid providing new, stronger ignition switches as a remedy.

379.    Further, New GM acquired knowledge of the defects in these vehicles on July 10, 2009. On that date, it acquired knowledge of the following facts, as well as others not pleaded herein:

a.      In January of 2003, Old GM opened an internal investigation after it received complaints from a Michigan GM dealership that a customer had experienced a power failure while operating his model year 2003 Pontiac Grand Am.

b.      During the investigation, Old GM's Brand Quality Manager for the Grand Am visited the dealership and requested that the affected customer demonstrate the problem. The customer was able to recreate the shutdown event by driving over a speed bump at approximately 30-35 mph.

c.      The customer's key ring was allegedly quite heavy. It contained approximately 50 keys and a set of brass knuckles.

d.      In May 2003, Old GM issued a voicemail to dealerships describing the defective ignition condition experienced by the customer in the Grand Am. Old GM identified

- 136 -

the relevant population of the Affected Vehicles as the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am.

e.  Old GM did not recall these vehicles.  Nor did it provide owners and/or lessees with notice of the defective condition.  Instead, its voicemail directed dealerships to pay attention to the key size and mass of the customer's key ring.

f.  On July 24, 2003, Old GM issued an engineering work order to increase the detent plunger force on the ignition switch for the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am vehicles.  Old GM engineers allegedly increased the detent plunger force and changed the part number of the ignition switch.  The new parts were installed beginning in the model year 2004 Malibu, Alero, and Grand Am vehicles.

g.  Old GM issued a separate engineering work order in March 2004 to increase the detent plunger force on the ignition switch in the Pontiac Grand Prix.  Old GM engineers did not change the part number for the new Pontiac Grand Prix ignition switch.

h.  Then-Old GM design engineer Ray DeGiorgio signed the work order in March 2004 authorizing the part change for the Grand Prix ignition switch.  Ray DeGiorgio maintained his position as design engineer with New GM.

i.  On or around August 25, 2005, Laura Andres, an Old GM design engineer (who remains employed with New GM), sent an email describing ignition switch issues that she experienced while operating a 2006 Chevrolet Impala on the highway.  Ms. Andres' email stated, "While driving home from work on my usual route, I was driving about 45 mph, where the road changes from paved to gravel & then back to paved, some of the gravel had worn away, and the pavement acted as a speed bump when I went over it.  The car shut off.  I took the car in for

010440-11  725144 V1

repairs.  The technician thinks it might be the ignition detent, because in a road test in the parking lot it also shut off."

        j.     Old GM employee Larry S. Dickinson, Jr. forwarded Ms. Andres' email on August 25, 2005 to four Old GM employees.  Mr. Dickinson asked, "Is this a condition we would expect to occur under some impacts?"

        k.     On August 29, 2005, Old GM employee Jim Zito forwarded the messages to Ray DeGiorgio and asked, "Do we have any history with the ignition switch as far as it being sensitive to road bumps?"

        l.     Mr. DeGiorgio responded the same day, stating, "To date there has never been any issues with the detents being too light."

380.    From 2002 to the present, Old GM and New GM received numerous reports from consumers regarding complaints, crashes, injuries, and deaths linked to this safety defect.  The following are just a handful of examples of some of the reports known to Old GM and New GM.

381.    On September 16, 2002, Old GM became aware of a complaint filed with NHTSA regarding a 2002 Oldsmobile Intrigue involving an incident that occurred on March 16, 2002, in which the following was reported:

        WHILE DRIVING AT 30 MPH CONSUMER RAN HEAD ON INTO A STEEL GATE, AND THEN HIT THREE TREES. UPON IMPACT, NONE OF THE AIR BAGS DEPLOYED. CONTACTED DEALER. PLEASE PROVIDE FURTHER INFORMATION. *AK  **NHTSA ID Number:** 8018687.

382.    On November 22, 2002, Old GM became aware of a complaint filed with NHTSA involving a 2003 Cadillac CTS involving an incident that occurred on July 1, 2002, in which it was reported that:

        THE CAR STALLS AT 25 MPH TO 45 MPH, OVER 20 OCCURANCES, DEALER ATTEMPTED 3 REPAIRS. DT NHTSA ID Number: 770030.

010440-11 725144 V1

383.    On January 21, 2003, Old GM became aware of a complaint filed with NHTSA

involving a 2003 Cadillac CTS, in which the following was reported:

> WHILE DRIVING AT ANY SPEED,THE VEHICLE WILL
> SUDDENLY SHUT OFF. THE STEERING WHEEL AND THE
> BRAKE PEDAL BECOMES VERY STIFF. CONSUMER FEELS
> ITS VERY UNSAFE TO DRIVE. PLEASE PROVIDE ANY
> FURTHER INFORMATION.  NHTSA ID Number: 10004288.

384.    On June 30, 2003, Old GM became aware of a complaint filed with NHTSA

regarding a 2001 Oldsmobile Intrigue which involved the following report:

> CONSUMER NOTICED THAT WHILE TRAVELING DOWN
> HILL AT 40-45 MPH BRAKES FAILED, CAUSING
> CONSUMER TO RUN INTO THREES AND A POLE. UPON
> IMPACT, AIR BAGS DID NOT DEPLOY. *AK  NHTSA ID
> Number: 10026252.

385.    On March 11, 2004, Old GM became aware of a complaint filed with NHTSA

involving a 2004 Cadillac CTS involving an incident that occurred on March 11, 2004, in which

the following was reported:

> CONSUMER STATED WHILE DRIVING AT 55-MPH
> VEHICLE STALLED, CAUSING CONSUMER TO PULL OFF
> THE ROAD. DEALER INSPECTED VEHICLE SEVERAL
> TIMES, BUT COULD NOT DUPLICATE OR CORRECT THE
> PROBLEM. *AK  NHTSA ID Number: 10062993.

386.    On March 11, 2004, Old GM became aware of a complaint with NHTSA

regarding a 2003 Oldsmobile Alero incident that occurred on July 26, 2003, in which the

following was reported:

> THE VEHICLE DIES. WHILE CRUISING AT ANY SPEED,
> THE HYDRAULIC BRAKES & STEERING FAILED DUE TO
> THE ENGINE DYING. THERE IS NO SET PATTERN, IT
> MIGHT STALL 6 TIMES IN ONE DAY, THEN TWICE THE
> NEXT DAY. THEN GO 4 DAYS WITH NO OCURRENCE,
> THEN IT WILL STALL ONCE A DAY FOR 3 DAYS. THEN
> GO A WEEK WITH NO OCURRENCE, THEN STALL 4 TIMES
> A DAY FOR 5 DAYS, ETC., ETC. IN EVERY OCURRENCE, IT
> TAKES APPROXIMATELY 10 MINUTES BEFORE IT WILL

010440-11  725144 V1

START BACK UP. AT HIGH SPEEDS, IT IS EXTREMELY
TOO DANGEROUS TO DRIVE. WE'VE TAKEN IT TO THE
DEALER, UNDER EXTENDED WARRANTY, THE
REQUIRED 4 TIMES UNDER THE LEMON LAW PROCESS.
THE DEALER CANNOT ASCERTAIN, NOR FIX THE
PROBLEM. IT HAPPENED TO THE DEALER AT LEAST
ONCE WHEN WE TOOK IT IN. I DOUBT THEY WILL
ADMIT IT, HOWEVER, MY WIFE WAS WITNESS. THE CAR
IS A 2003. EVEN THOUGH I BOUGHT IT IN JULY 2003, IT
WAS CONSIDERED A USED CAR. GM HAS DENIED OUR
CLAIM SINCE THE LEMON LAW DOES NOT APPLY TO
USED CARS. THE CAR HAS BEEN PERMANENTLY
PARKED SINCE NOVEMBER 2003. WE WERE FORCED TO
BUY ANOTHER CAR. THE DEALER WOULD NOT TRADE.
THIS HAS RESULTED IN A BADLUCK SITUATION FOR US.
WE CANNOT AFFORD 2 CAR PAYMENTS / 2 INSURANCE
PREMIUMS, NOR CAN WE AFFORD $300.00 PER HOUR TO
SUE GM. I STOPPED MAKING PAYMENTS IN DECEMBER
2003. I HAVE KEPT THE FINANCE COMPANY ABREAST OF
THE SITUATION. THEY HAVE NOT REPOSSED AS OF YET.
THEY WANT ME TO TRY TO SELL IT. CAN YOU HELP
?*AK  NHTSA ID Number: 10061898.

387.    On July 20, 2004, Old GM became aware of a complaint filed with NHTSA

involving a 2004 Cadillac SRX, involving an incident that occurred on July 9, 2004, in which the

following was reported:

THE CAR DIES AFTER TRAVELING ON HIGHWAY. IT
GOES FROM 65 MPH TO 0. THE BRAKES, STEERING, AND
COMPLETE POWER DIES. YOU HAVE NO CONTROL OVER
THE CAR AT THIS POINT. I HAVE ALMOST BEEN HIT 5
TIMES NOW. ALSO, WHEN THE CARS DOES TURN BACK
ON IT WILL ONLY GO 10 MPH AND SOMETIMES WHEN
YOU TURN IT BACK ON THE RPM'S WILL GO TO THE
MAX. IT SOUNDS LIKE THE CAR IS GOING TO EXPLODE.
THIS CAR IS A DEATH TRAP. *LA  NHTSA ID Number:
10082289.

388.    In August 2004, Old GM became aware of a complaint filed with NHTSA

regarding a 2004 Chevrolet Malibu incident that occurred on June 30, 2004, in which it was

reported that:

010440-11  725144 V1

> WHILE TRAVELING AT ANY SPEED VEHICLE STALLED.
> WITHOUT CONSUMER HAD SEVERAL CLOSE CALLS OF
> BEING REAR ENDED. VEHICLE WAS SERVICED SEVERAL
> TIMES, BUT PROBLEM RECURRED. *AK.  NHTSA ID
> Number:  10089418.

389.    Another report in August of 2004 which Old GM became aware of involved a

2004 Chevrolet Malibu incident that occurred on August 3, 2004, in which it was reported that:

> WHEN DRIVING, THE VEHICLE TO CUT OFF. THE DEALER
> COULD NOT FIND ANY DEFECTS. *JB.  NHTSA ID
> Number: 10087966.

390.    On October 23, 2004, Old GM became aware of a complaint with NHTSA

regarding a 2003 Chevrolet Monte Carlo, in which the following was reported:

> VEHICLE CONTINUOUSLY EXPERIENCED AN
> ELECTRICAL SYSTEM FAILURE. AS A RESULT,
> THERE'WAS AN ELECTRICAL SHUT DOWN WHICH
> RESULTED IN THE ENGINE DYING/ STEERING WHEEL
> LOCKING UP, AND LOSS OF BRAKE POWER.*AK  NHTSA
> ID Number: 10044624.

391.    On April 26, 2005, Old GM became aware of a complaint filed with NHTSA

involving a 2005 Pontiac Grand Prix, pertaining to an incident that occurred on December 29,

2004, in which the following was reported:

> 2005 PONTIAC GRAND PRIX GT SEDAN VIN #[XXX]
> PURCHASED 12/16/2004. INTERMITTENTLY VEHICLE
> STALLS/ LOSS OF POWER IN THE ENGINE. WHILE
> DRIVING THE VEHICLE IT WILL SUDDENLY JUST LOSES
> POWER. YOU CONTINUE TO PRESS THE ACCELERATOR
> PEDAL AND THEN THE ENGINE WILL SUDDENLY TAKE
> BACK OFF AT A GREAT SPEED. THIS HAS HAPPENED
> WHILE DRIVING NORMALLY WITHOUT TRYING TO
> ACCELERATE AND ALSO WHILE TRYING TO
> ACCELERATE. THE CAR HAS LOST POWER WHILE
> TRYING TO MERGE IN TRAFFIC. THE CAR HAS LOST
> POWER WHILE TRYING TO CROSS HIGHWAYS. THE CAR
> HAS LOST POWER WHILE JUST DRIVING DOWN THE
> ROAD. GMC HAS PERFORMED THE FOLLOWING REPAIRS
> WITHOUT FIXING THE PROBLEM. 12/30/2004 [XXX]-
> MODULE, POWERTRAIN CONTROL-ENGINE

REPROGRAMMING. 01/24/2005 [XXX]-
SOLENOID,PRESSURE CONTROL-REPLACED. 02/04/2005
[XXX]-MODULE, PCM/VCM-REPLACED. 02/14/2005 [XXX]-
PEDAL,ACCELERATOR-REPLACED. DEALERSHIP
PURCHASED FROM CAPITAL BUICK-PONTIAC-GMC 225-
293-3500. DEALERSHIP HAS ADVISED THAT THEY DO
NOT KNOW WHAT IS WRONG WITH THE CAR. WE HAVE
BEEN TOLD THAT WE HAVE TO GO DIRECT TO PONTIAC
WITH THE PROBLEM. HAVE BEEN IN CONTACT WITH
PONTIAC SINCE 02/15/05. PONTIAC ADVISED THAT THEY
WERE GOING TO RESEARCH THE PROBLEM AND SEE IF
ANY OTHER GRAND PRI WAS REPORTING LIKE
PROBLEMS. SO FAR THE ONLY ADVICE FROM PONTIAC
IS THEY WANT US TO COME IN AND TAKE ANOTHER
GRAND PRIX OFF THE LOT AND SEE IF WE CAN GET THIS
CAR TO DUPLICATE THE SAME PROBLEM. THIS DID NOT
IMPRESS ME AT ALL. SO AFTER WAITING FOR 2-1/2
MONTHS FOR PONTIAC TO DO SOMETHING TO FIX THE
PROBLEM, I HAVE DECIDED TO REPORT THIS TO NHTSA.
*AK *JS INFORMATION REDACTED PURSUANT TO THE
FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C.
552(B)(6)  NHTSA ID Number: 10118501.

392.    In May 2005, Old GM became aware of a complaint filed with NHTSA regarding

a 2004 Chevrolet Malibu incident that occurred on July 18, 2004, in which it was reported that:

THE CAR CUT OFF WHILE I WAS DRIVING AND IN
HEAVY TRAFFIC MORE THAN ONCE. THERE WAS NO
WARNING THAT THIS WOULD HAPPEN. THE CAR WAS
SERVICED BEFORE FOR THIS PROBLEM BUT IT
CONTINUED TO HAPPEN. I HAVE HAD 3 RECALLS, THE
HORN FUSE HAS BEEN REPLACED TWICE, AND THE
BLINKER IS CURRENTLY OUT. THE STEERING COLLAR
HAS ALSO BEEN REPLACED. THIS CAR WAS SUPPOSED
TO BE A NEW CAR.  NHTSA ID Number: 10123684.

393.    On June 2, 2005, Old GM became aware of a complaint with NHTSA regarding a

2004 Pontiac Grand Am incident that occurred on February 18, 2005, in which the following was

reported:

2004 PONTIAC GRAND PRIX SHUTS DOWN WHILE
DRIVING AND THE POWER STEERING AND BRAKING
ABILITY ARE LOST.*MR *NM.  NHTSA ID
Number: 10124713.

394.    On August 12, 2005, Old GM became aware of a complaint filed with NHTSA

involving a 2003 Cadillac CTS, regarding an incident that occurred on January 3, 2005, in which

it was reported that:

> DT: VEHICLE LOST POWER WHEN THE CONSUMER HIT
> THE BRAKES. THE TRANSMISSION JOLTS AND THEN THE
> ENGINE SHUTS OFF. IT HAS BEEN TO THE DEALER 6
> TIMES SINCE JANUARY. THE DEALER TRIED
> SOMETHING DIFFERENT EVERY TIME SHE TOOK IT IN.
> MANUFACTURER SAID SHE COULD HAVE A NEW
> VEHICLE IF SHE PAID FOR IT. SHE WANTED TO GET RID
> OF THE VEHICLE.*AK THE CHECK ENGINE LIGHT
> ILLUMINATED. *JB  NHTSA ID Number: 10127580.

395.    On August 26, 2005, Old GM became aware of a complaint with NHTSA

regarding a 2004 Pontiac Grand Am incident that occurred on August 26, 2005, in which the

following was reported:

> WHILE DRIVING MY 2004 PONTIAC GRAND AM THE CAR
> FAILED AT 30 MPH. IT COMPLETELY SHUT OFF LEAVING
> ME WITH NO POWER STEERING AND NO WAY TO
> REGAIN CONTROL OF THE CAR UNTIL COMING TO A
> COMPLETE STOP TO RESTART IT. ONCE I HAD STOPPED
> IT DID RESTART WITHOUT INCIDENT. ONE WEEK LATER
> THE CAR FAILED TO START AT ALL NOT EVEN TURNING
> OVER. WHEN THE PROBLEM WAS DIAGNOSED AT THE
> GARAGE IT WAS FOUND TO BE A FAULTY "IGNITION
> CONTROL MODULE" IN THE CAR. AT THIS TIME THE
> PART WAS REPLACED ONLY TO FAIL AGAIN WITHIN 2
> MONTHS TIME AGAIN WHILE I WAS DRIVING THIS TIME
> IN A MUCH MORE HAZARDOUS CONDITION BEING THAT
> I WAS ON THE HIGHWAY AND WAS TRAVELING AT 50
> MPH AND HAD TO TRAVEL ACROSS TWO LANES OF
> TRAFFIC TO EVEN PULL OVER TO TRY TO RESTART IT.
> THE CAR CONTINUED TO START AND SHUT OFF ALL
> THE WAY TO THE SERVICE GARAGE WHERE IT WAS
> AGAIN FOUND TO BE A FAULTY "IGNITION CONTROL
> MODULE". IN ANOTHER TWO WEEKS TIME THE CAR
> FAILED TO START AND WHEN DIAGNOSED THIS TIME IT
> WAS SAID TO HAVE "ELECTRICAL PROBLEMS"
> POSSIBLE THE "POWER CONTROL MODULE". AT THIS
> TIME THE CAR IS STILL UNDRIVEABLE AND UNSAFE
> FOR TRAVEL. *JB  NHTSA ID Number: 10134303.

Case 14-mc-02543-JMF   Document 345   Filed 10/14/14   Page 164 of 712

396.    On September 22, 2005, Old GM became aware of a complaint filed with

NHTSA involving a 2005 Cadillac CTS, concerning an incident that occurred on September 16,

2005, in which the following was reported:

> DT: 2005 CADILLAC CTS – THE CALLER'S VEHICLE WAS
> INVOLVED IN AN ACCIDENT WHILE DRIVING AT 55 MPH.
> UPON IMPACT, AIR BAGS DID NOT DEPLOY. THE
> VEHICLE WENT OFF THE ROAD AND HIT A TREE. THIS
> WAS ON THE DRIVER'S SIDE FRONT. THERE WERE NO
> INDICATOR LIGHTS ON PRIOR TO THE ACCIDENT. THE
> VEHICLE HAS NOT BEEN INSPECTED BY THE
> DEALERSHIP, AND INSURANCE COMPANY TOTALED
> THE VEHICLE. THE CALLER SAW NO REASON FOR THE
> AIR BAGS NOT TO DEPLOY. . TWO INJURED WERE
> INJURED IN THIS CRASH. T A POLICE REPORT WAS
> TAKEN. THERE WAS NO FIRE. *AK  NHTSA ID Number:
> 10137348.

397.    On September 29, 2006, Old GM became aware of a complaint filed with

NHTSA involving a 2004 Cadillac CTS and an incident that occurred on September 29, 2006, in

which the following was reported:

> DT*: THE CONTACT STATED AT VARIOUS SPEEDS
> WITHOUT WARNING, THE VEHICLE LOST POWER AND
> WOULD NOT ACCELERATE ABOVE 20 MPH. ALSO,
> WITHOUT WARNING, THE VEHICLE STALLED ON
> SEVERAL OCCASIONS, AND WOULD NOT RESTART. THE
> VEHICLE WAS TOWED TO THE DEALERSHIP, WHO
> REPLACED THE THROTTLE TWICE AND THE THROTTLE
> BODY ASSEMBLY HARNESS, BUT THE PROBLEM
> PERSISTED. *AK UPDATED 10/25/2006 – *NM  NHTSA ID
> Number: 10169594.

398.    On April 18, 2007, Old GM became aware of a complaint filed with NHTSA

involving a 2004 Cadillac SRX, regarding an incident that occurred on April 13, 2007, in which

it was reported that:

> TL*THE CONTACT OWNS A 2004 CADILLAC SRX. THE
> ENGINE STALLED WITHOUT WARNING AND CAUSED
> ANOTHER VEHICLE TO CRASH INTO THE VEHICLE. THE
> VEHICLE WAS ABLE TO RESTART A FEW MINUTES

AFTER THE CRASH. THE DEALER AND MANUFACTURER
WAS UNABLE TO DIAGNOSE THE FAILURE. THE
MANUFACTURER HAD THE VEHICLE INSPECTED BY A
CADILLAC SPECIALIST WHO WAS UNABLE TO
DIAGNOSE THE FAILURE. THE DEALER UPDATED THE
COMPUTER FOUR TIMES, BUT THE ENGINE CONTINUED
TO STALL. THE CURRENT AND FAILURE MILEAGES
WERE 48,000. NHTSA ID Number: 10188245.

399. On September 20, 2007, Old GM became aware of a complaint filed with

NHTSA involving a 2007 Cadillac CTS, in connection with an incident that occurred on January

1, 2007, in which it was reported that:

TL*THE CONTACT OWNS A 2007 CADILLAC CTS. WHILE
DRIVING 40 MPH, THE VEHICLE SHUT OFF WITHOUT
WARNING. THE FAILURE OCCURRED ON FIVE SEPARATE
OCCASIONS. THE DEALER WAS UNABLE TO DUPLICATE
THE FAILURE. AS OF SEPTEMBER 20, 2007, THE DEALER
HAD NOT REPAIRED THE VEHICLE. THE POWERTRAIN
WAS UNKNOWN. THE FAILURE MILEAGE WAS 2,000 AND
CURRENT MILEAGE WAS 11,998. NHTSA ID Number:
10203516.

400. On September 24, 2007, Old GM became aware of a complaint filed with

NHTSA involving a 2004 Cadillac SRX, regarding an incident that occurred on January 1, 2005,

in which the following was reported:

TL*THE CONTACT OWNS A 2004 CADILLAC SRX. WHILE
DRIVING 5 MPH OR GREATER, THE VEHICLE WOULD
SHUT OFF WITHOUT WARNING. THE DEALER STATED
THAT THE BATTERY CAUSED THE FAILURE AND THEY
REPLACED THE BATTERY. APPROXIMATELY EIGHT
MONTHS LATER, THE FAILURE RECURRED. THE DEALER
STATED THAT THE BATTERY CAUSED THE FAILURE
AND REPLACED IT A SECOND TIME. APPROXIMATELY
THREE MONTHS LATER, THE FAILURE OCCURRED
AGAIN. SHE WAS ABLE TO RESTART THE VEHICLE. THE
DEALER WAS UNABLE TO DUPLICATE THE FAILURE,
HOWEVER, THEY REPLACED THE CRANK SHAFT
SENSOR. THE FAILURE CONTINUES TO PERSIST. AS OF
SEPTEMBER 24, 2007, THE DEALER HAD NOT REPAIRED
THE VEHICLE. THE POWERTRAIN WAS UNKNOWN. THE

- 145 -

FAILURE MILEAGE WAS 8,000 AND CURRENT MILEAGE
WAS 70,580.  NHTSA ID Number: 10203943.

401.    On June 18, 2008, Old GM became aware of a complaint filed with NHTSA

involving a 2006 Cadillac CTS and an incident that occurred on June 17, 2008, in which it was

reported that:

> TL*THE CONTACT OWNS A 2006 CADILLAC CTS. WHILE
> DRIVING 60 MPH AT NIGHT, THE VEHICLE SHUT OFF
> AND LOST TOTAL POWER. WHEN THE FAILURE
> OCCURRED, THE VEHICLE CONTINUED TO ROLL AS IF IT
> WERE IN NEUTRAL. THERE WERE NO WARNING
> INDICATORS PRIOR TO THE FAILURE. THE CONTACT
> FEELS THAT THIS IS A SAFETY HAZARD BECAUSE IT
> COULD HAVE RESULTED IN A SERIOUS CRASH. THE
> VEHICLE WAS TAKEN TO THE DEALER TWICE FOR
> REPAIR FOR THE SAME FAILURE IN FEBURARY OF 2008
> AND JUNE 17, 2008. THE FIRST TIME THE CAUSE OF THE
> FAILURE WAS IDENTIFIED AS A GLITCH WITH THE
> COMPUTER SWITCH THAT CONTROLS THE
> TRANSMISSION. AT THE SECOND VISIT, THE SHOP
> EXPLAINED THAT THEY COULD NOT IDENTIFY THE
> FAILURE. IT WOULD HAVE TO RECUR IN ORDER FOR
> THEM TO DIAGNOSE THE FAILURE PROPERLY. THE
> CURRENT AND FAILURE MILEAGES WERE 43,000.
> NHTSA ID Number: 10231507.

402.    On October 14, 2008, Old GM became aware of a complaint filed with NHTSA

involving a 2008 Cadillac CTS and an incident that occurred on April 5, 2008, in which it was

reported that:

> WHILE DRIVING MY 2008 CTS, WITH NO ADVANCE
> NOTICE, THE ENGINE JUST DIED. IT SEEMED TO RUN
> OUT OF GAS. MY FUEL GAUGE READ BETWEEN 1/2 TO
> 3/4 FULL. THIS HAPPENED 3 DIFFERENT OCCASIONS. ALL
> 3 TIMES I HAD TO HAVE IT TOWED BACK TO THE
> DEALERSHIP THAT I PURCHASED THE CAR FROM. ALL 3
> TIMES I GOT DIFFERENT REASONS IT HAPPENED, FROM
> BAD FUEL PUMP IN GAS TANK, TO SOME TYPE OF BAD
> CONNECTION, ETC. AFTER THIS HAPPENED THE 3RD
> TIME, I DEMANDED A NEW CAR, WHICH I RECEIVED. I
> HAVE HAD NO PROBLEMS WITH THIS CTS, RUNS GREAT.
> *TR  NHTSA ID Number: 10245423.

010440-11 725144 V1

403.    On November 13, 2008, Old GM became aware of a complaint with NHTSA

regarding a 2001 Oldsmobile Intrigue, in which the following was reported:

> L*THE CONTACT OWNS A 2001 OLDSMOBILE INTRIGUE.
> WHILE DRIVING 35 MPH, THE VEHICLE CONTINUOUSLY
> STALLS AND HESITATES. IN ADDITION, THE
> INSTRUMENT PANEL INDICATORS WOULD ILLUMINATE
> AT RANDOM. THE VEHICLE FAILED INSPECTION AND
> THE CRANKSHAFT SENSOR WAS REPLACED, WHICH
> HELPED WITH THE STALLING AND HESITATION;
> HOWEVER, THE CHECK ENGINE INDICATOR WAS STILL
> ILLUMINATED. DAYS AFTER THE CRANKSHAFT SENSOR
> WAS REPLACED, THE VEHICLE FAILED TO START.
> HOWEVER, ALL OF THE INSTRUMENT PANEL
> INDICATORS FLASHED ON AND OFF. AFTER NUMEROUS
> ATTEMPTS TO START THE VEHICLE, HE HAD IT
> JUMPSTARTED. THE VEHICLE WAS THEN ABLE TO
> START. WHILE DRIVING HOME, ALL OF THE LIGHTING
> FLASHED AND THE VEHICLE SUDDENLY SHUT OFF. THE
> VEHICLE LOST ALL ELECTRICAL POWER AND POWER
> STEERING ABILITY. THE CONTACT MANAGED TO PARK
> THE VEHICLE IN A PARKING LOT AND HAD IT TOWED
> THE FOLLOWING DAY TO A REPAIR SHOP. THE VEHICLE
> IS CURRENTLY STILL IN THE SHOP. THE VEHICLE HAS
> BEEN RECALLED IN CANADA AND HE BELIEVES THAT IT
> SHOULD ALSO BE RECALLED IN THE UNITED STATES.
> THE FAILURE MILEAGE WAS UNKNOWN AND THE
> CURRENT MILEAGE WAS 106,000.  NHTSA ID
> Number: 10248694.

404.    On December 10, 2008, Old GM became aware of a complaint filed with NHTSA

regarding a 2004 Oldsmobile Alero and an incident that occurred on December 10, 2008, in

which the following was reported:

> I WAS DRIVING DOWN THE ROAD IN RUSH HOUR GOING
> APPROX. 55 MPH AND MY CAR COMPLETELY SHUT OFF,
> THE GAUGES SHUT DOWN, LOST POWER STEERING. HAD
> TO PULL OFF THE ROAD AS SAFELY AS POSSIBLE,
> PLACE VEHICLE IN PARK AND RESTART CAR. MY CAR
> HAS SHUT DOWN PREVIOUSLY TO THIS INCIDENT AND
> FEEL AS THOUGH IT NEEDS SERIOUS INVESTIGATION. I
> COULD HAVE BEEN ON THE HIGHWAY AND BEEN
> KILLED. THIS ALSO HAS HAPPENED WHEN IN A SPIN

- 147 -

OUT AS WELL THOUGH THIS PARTICULAR INCIDENT
WAS RANDOM. *TR  NHTSA ID Number: 10251280.

405.    On March 31, 2009, Old GM became aware a complaint filed with NHTSA

regarding a 2005 Chevrolet Malibu incident that occurred on May 30, 2008, in which it was

reported that:

> TL*THE CONTACT OWNS A 2005 CHEVROLET MALIBU.
> THE CONTACT STATED THAT THE POWER WINDOWS,
> LOCKS, LINKAGES, AND IGNITION SWITCH
> SPORADICALLY BECOME INOPERATIVE. SHE TOOK THE
> VEHICLE TO THE DEALER AND THEY REPLACED THE
> IGNITION SWITCH AT THE COST OF $495. THE
> MANUFACTURER STATED THAT THEY WOULD NOT
> ASSUME RESPONSIBILITY FOR ANY REPAIRS BECAUSE
> THE VEHICLE EXCEEDED ITS MILEAGE. ALL REMEDIES
> AS OF MARCH 31, 2009 HAVE BEEN INSUFFICIENT IN
> CORRECTING THE FAILURES. THE FAILURE MILEAGE
> WAS 45,000 AND CURRENT MILEAGE WAS 51,000.  NHTSA
> ID Number: 10263716.

406.    The defects did not get any safer and the reports did not stop when Old GM

ceased to exist.  To the contrary, New GM continued receiving the same reports involving the

same defects.  For example, on August 11, 2010, New GM became aware of the following

complaint filed with NHTSA involving a 2005 Cadillac CTS, the incident occurred on May 15,

2010, in which it was reported:

> TL*THE CONTACT OWNS A 2005 CADILLAC CTS. WHILE
> DRIVING 40 MPH, ALL OF THE SAFETY LIGHTS ON THE
> DASHBOARD ILLUMINATED WHEN THE VEHICLE
> STALLED. THE VEHICLE WAS TURNED BACK ON IT
> BEGAN TO FUNCTION NORMALLY. THE FAILURE
> OCCURRED TWICE. THE DEALER WAS CONTACTED AND
> THEY STATED THAT SHE NEEDED TO BRING IT IN TO
> HAVE IT DIAGNOSED AGAIN. THE DEALER PREVIOUSLY
> STATED THAT THEY WERE UNABLE TO DUPLICATE THE
> FAILURE. THE VEHICLE WAS NOT REPAIRED. THE
> FAILURE MILEAGE WAS 4100 AND THE CURRENT
> MILEAGE WAS 58,000.  NHTSA ID Number: 10348743.

407.    On April 16, 2012, New GM became aware of a complaint filed with NHTSA
involving a 2005 Cadillac SRX and an incident that occurred on March 31, 2012, in which the
following was reported:

> TL* THE CONTACT OWNS A 2005 CADILLAC SRX. WHILE
> DRIVING APPROXIMATELY 45 MPH, THE CONTACT
> STATED THAT THE STEERING BECAME DIFFICULT TO
> MANEUVER AND HE LOST CONTROL OF THE VEHICLE.
> THERE WERE NO WARNING LIGHTS ILLUMINATED ON
> THE INSTRUMENT PANEL. THE CONTACT THEN
> CRASHED INTO A HIGHWAY DIVIDER AND INTO
> ANOTHER VEHICLE. THERE WERE NO INJURIES. THE
> VEHICLE WAS TOWED TO AN AUTO CENTER AND THE
> MECHANIC STATED THAT THERE WAS A RECALL
> UNDER NHTSA CAMPAIGN ID NUMBER 06V125000
> (SUSPENSION:REAR), THAT MAY BE RELATED TO THE
> FAILURE. THE MANUFACTURER WAS MADE AWARE OF
> THE FAILURE AND STATED THAT THE VIN WAS NOT
> INCLUDED IN THE RECALL. THE VEHICLE WAS NOT
> REPAIRED. THE APPROXIMATE FAILURE MILEAGE WAS
> 46,000.  NHTSA ID Number: 10455394.

408.    On March 20, 2013, New GM became aware of a complaint filed with NHTSA
regarding a 2003 Chevrolet Impala incident that occurred on March 1, 2013, in which it was
reported that:

> CAR WILL SHUT DOWN WHILE DRIVING AND SECURITY
> LIGHT WILL FLASH. HAS DONE IT NUMEROUS TIMES,
> WORRIED IT WILL CAUSE AN ACCIDENT. THERE ARE
> MULTIPLE CASES OF THIS PROBLEM ON INTERNET. *TR
> NHTSA ID Number: 10503840.

409.    On May 12, 2013, New GM became aware of the following complaint filed with
NHTSA regarding a 2005 Chevrolet Malibu incident that occurred on May 11, 2012, in which
the following was reported:

> I WAS AT A STOP SIGN WENT TO PRESS GAS PEDAL TO
> TURN ONTO ROAD AND THE CAR JUST SHUT OFF NO
> WARNING LIGHTS CAME ON NOR DID IT SHOW ANY
> CODES. GOT OUT OF CAR POPPED TRUNK PULLED
> RELAY FUSE OUT PUT IT BACK IN AND IT CRANKED

UP,THEN ON MY WAY HOME FROM WORK,GOING
ABOUT 25 MPH AND IT JUST SHUT DOWN AGAIN,I
REPEATED PULLING OUT RELAY FUSE AND PUT IT BACK
IN THEN WAITED A MINUTE THEN IT CRANKED AND I
DROVE STRAIGHT HOME. *TR  NHTSA ID
Number: 10458198.

410.    On February 26, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2004 Pontiac Grand Prix, concerning an incident that occurred on May 10, 2005, in

which it was reported that:

TL – THE CONTACT OWNS A 2004 PONTIAC GRAND PRIX.
THE CONTACT STATED THAT WHILE DRIVING AT
VARIOUS SPEEDS AND GOING OVER A BUMP, THE
VEHICLE WOULD STALL WITHOUT WARNING. THE
VEHICLE WAS TAKEN TO THE DEALER. THE
TECHNICIAN WAS UNABLE TO DIAGNOSE THE FAILURE.
THE MANUFACTURER WAS MADE AWARE OF THE
FAILURE. THE VEHICLE WAS NOT REPAIRED. THE VIN
WAS NOT AVAILABLE. THE FAILURE MILEAGE WAS
12,000 AND THE CURRENT MILEAGE WAS 82,000. KMJ
NHTSA ID Number: 10566118.

411.    On March 13, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Pontiac Grand Prix and an incident that occurred on February 27, 2014, in

which a driver reported:

I WAS DRIVING HOME FROM WORK AND WHEN I
TURNED A CORNER, THE ENGINE CUT OUT. I BELIEVE IT
WAS FROM THE KEY FLIPPING TO ACCESSORY. I'VE
HEARD THAT THIS HAS CAUSED CRASHES THAT HAVE
KILLED PEOPLE AND WOULD LIKE THIS FIXED. THIS IS
THE FIRST TIME IT HAPPENED, BUT NOW I'M WORRIED
EVERY TIME I DRIVE IT THAT THIS IS GOING TO HAPPEN
AND I DON'T FEEL SAFE LETTING MY WIFE DRIVE THE
CAR NOW. WHY ARE THE 2006 PONTIAC GRAND PRIX
VEHICLES NOT PART OF THE RECALL FROM GM? *TR
NHTSA ID Number: 10569215.

010440-11  725144 V1

412.    On April 1, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2003 Cadillac CTS and an incident that occurred on January 1, 2008, in which the

following was reported:

>            TL* THE CONTACT OWNS A 2003 CADILLAC CTS. THE
>            CONTACT STATED THAT THE VEHICLE EXHIBITED A
>            RECURRING STALLING FAILURE. THE VEHICLE WAS
>            TAKEN TO THE DEALER NUMEROUS TIMES WHERE
>            SEVERAL UNKNOWN REPAIRS WERE PERFORMED ON
>            THE VEHICLE BUT TO NO AVAIL. THE FAILURE
>            MILEAGE WAS 59,730 AND THE CURRENT MILEAGE WAS
>            79,000. UPDATED 06/30/14 MA UPDATED 07/3/2014 *JS
>            NHTSA ID Number: 10576468.

413.    On April 1, 2014, New GM became aware of a complaint with NHTSA regarding

a 2003 Chevrolet Monte Carlo and an incident that occurred on September 16, 2013, in which

the following was reported:

>            WHILE DRIVING AT ANY SPEED THE IGNITION SYSTEM
>            WOULD RESET LIGHTING UP THE DISPLAY CLUSTER
>            JUST AS IF THE KEY WAS TURNED OFF AND BACK ON.
>            THIS WOULD CAUSE A MOMENTARY SHUTDOWN OF
>            THE ENGINE. THE PROBLEM SEEMED TO BE MORE
>            PREVAILANT WHILE TURNING THE WHEEL FOR A
>            CURVE OR TURN OFF THE ROAD. THE TURN SIGNAL
>            UNIT WAS FIRST SUSPECT SINCE IT SEEMED TO
>            CORRELATE WITH APPLYING THE TURN SIGNAL AND
>            TURNING THE WHEEL. THE CONDITION WORSENED TO
>            THE IGNITION SHUTDOWN FOR LONGER PERIODS
>            SHUTTING DOWN THE ENGINE CAUSING STEERING AND
>            BRAKING TO BE SHUT DOWN AND FINALLY DIFFICULTY
>            STARTING THE CAR. AFTER 2 VISITS TO A GM SERVICE
>            CENTER THE PROBLEM WAS FOUND TO BE A FAULTY
>            IGNITION THAT WAS REPLACED AND THE PROBLEM
>            HAS NOT RECURRED.  NHTSA ID Number: 10576201.

414.    On April 8, 2014, New GM became aware of a complaint with NHTSA regarding

a 2003 Chevrolet Impala and an incident that occurred on August 14, 2011 and the following

was reported:

I HAVE HAD INCIDENTS SEVERAL TIMES OVER THE
YEARS WHERE I WOULD HIT A BUMP IN THE ROAD AND
MY CAR WOULD COMPLETLY SHUT OFF. I HAVE ALSO
HAD SEVERAL INCIDENTS WHERE I WAS TRAVELING
DOWN THE EXPRESSWAY AND MY CAR TURNED OFF ON
ME. I HAD TO SHIFT MY CAR INTO NEUTRAL AND
RESTART IT TO CONTINUE GOING. I WAS FORTUNATE
NOT TO HAVE AN ACCIDENT.  NHTSA ID
Number: 10578158.

415.     On May 14, 2014, New GM became aware of a complaint filed with NHTSA

regarding a 2004 Chevrolet Impala incident that occurred on April 5, 2013 and was reported that:

CHEVY IMPALA 2004 LS- THE VEHICLE IS STOPPING
COMPLETELY WHILE DRIVING OR SITTING AT
INTERSECTION. THERE IS NO WARNING, NO MESSAGE,
IT JUST DIES. THE STEERING GOES WHEN THIS HAPPENS
SO I CANNOT EVEN GET OFF THE ROAD. THEN THERE
ARE TIMES THAT THE CAR WILL NOT START AT ALL
AND I HAVE BEEN STRANDED. EVENTUALLY AFTER
ABOUT 20 MINUTES THE CAR WILL START- I HAVE
ALREADY REPLACED THE STARTER BUT THE PROBLEM
STILL EXISTS. I HAVE HAD THE CAR CHECKED OUT AT 2
DIFFERENT SHOPS (FIRESTONE) AND THEY CANNOT
FIND THE PROBLEM. THERE ARE NO CODES COMING UP.
THEY ARE COMPLETELY PERPLEXED. CHEVY STATES
THEIR MECHANICS ARE BETTER. ALSO THE CLUSTER
PANEL IS GONE AND CHEVY IS AWARE OF THE
PROBLEM BUT THEY ONLY RECALLED CERTAIN
MODELS AND DID NOT INCLUDE THE IMPALAS. I HAVE 2
ESTIMATES REGARDING FIXING THIS PROBLEM BUT
THE QUOTES ARE $500.00. I DO NOT FEEL THAT I
SHOULD HAVE TO PAY FOR THIS WHEN CHEVY KNEW
THEY HAD THIS PROBLEM WITH CLUSTER PANELS AND
OMITTED THE IMPALAS IN THEIR RECALL. SO, TO
RECAP: THE CAR DIES IN TRAFFIC (ALMOST HIT TWICE),
I DO NOT KNOW HOW MUCH GAS I HAVE, HOW FAST I
AM GOING, OR IF THE CAR IS OVERHEATING. IN
DEALING WITH CHEVY I WAS TOLD TO TAKE THE CAR
TO A CHEVY DEALERSHIP. THEY GAVE ME A PLACE
THAT IS 2 1/2 HOURS HOUSE AWAY FROM MY HOME. I
WAS ALSO TOLD THAT I WOULD HAVE THE HONOR OF
PAYING FOR THE DIAGNOSTICS. IN RESEARCHING THIS
PROBLEM, I HAVE PULLED UP SEVERAL COMPLAINTS
FROM OTHER CHEVY IMPALA 2004 OWNERS THAT ARE
EXPERIENCING THE SAME MULTIPLE PROBLEMS. I ALSO

- 152 -

> NOTICED THAT MOST OF THE COMPLAINTS ARE
> STATING THAT THE SAME ISSUES OCCURRED AT
> APPROX. THE SAME MILEAGE AS MINE. I HAVE
> DISCUSSED THIS WITH CHEVY CUSTOMER SERVICE
> AND BASICALLY THAT WAS IGNORED. THIS CAR IS
> HAZARDOUS TO DRIVE AND POTENTIALLY WILL CAUSE
> BODILY HARM. DEALING WITH CHEVY IS POINTLESS.
> ALL THEY CAN THINK OF IS HOW MUCH MONEY THEIR
> DEFECTS WILL BRING IN. *TR  NHTSA ID
> Number: 10512006.

416.    New GM has publicly admitted that it was aware of at least seven (7) crashes,

eight (8) injuries, and three (3) deaths linked to this serious safety defect before deciding to

finally implement a recall.  However, in reality, the number of reports and complaints is much

higher.

417.    Moreover, notwithstanding years of notice and knowledge of the defect, on top of

numerous complaints and reports from consumers, including reports of crashes, injuries, and

deaths, New GM delayed and did not implement a recall involving this defect until July of 2014.

418.    New GM replicated the "knee to key" report in 2012 causing inadvertent key

rotation and a running stall.  New GM recalled all of the CTS and SRX and gave out new keys to

those that did not have "hole" keys, and two key rings so the fob could be kept on one, and the

ignition key on another.  New GM's supposed recall fix does not address the defect or the safety

risks that it poses, including insufficient amount of torque to resist rotation from the "run" to

"accessory" position under reasonably foreseeable conditions, and puts the burden on drivers to

alter their behavior and carry their ignition keys separately from their other keys, and even from

their remote fob.  The real answer must include the replacement of all the switches with ones that

have sufficient torque to resist foreseeable rotational forces.  The consequences of an unwanted

rotation from the "run" to "accessory" position are the same in all these cars:  loss of power

010440-11  725144 V1

Case 1:14-mc-02543-JMF   Document 345   Filed 10/14/14   Page 174 of 712

(stalling), loss of power steering, loss of power brakes after one or two depressions of the brake pedal, and suppression of seat belt pretensioners and airbag deployments.

419.    In addition, New GM is not addressing the other design issues that create safety risks in connection with this defect.  New GM is not altering the algorithm that prevents the airbags from deploying when the ignition leaves the "run" position, even when the vehicle is moving.  And New GM is not altering the placement of the ignition in an area where the driver's knees may inadvertently cause the ignition to move out of the "run" position.  Moreover, notwithstanding years of notice and knowledge of the defect, on top of numerous complaints and reports from consumers, including reports of crashes, injuries, and deaths, New GM delayed and did not implement a recall involving this defect until July of 2014.

### 6.    Yet another ignition switch recall is made on September 4, 2014.

420.    On September 4, 2014, New GM recalled 46,873 MY 2011-2013 Chevrolet Caprice and 2008-2009 Pontiac G8 vehicles for yet another ignition switch defect (NHTSA Recall Number 14-V-510).

421.    New GM explains that, in these Defective Ignition Switch Vehicles, "there is a risk, under certain conditions, that some drivers may bump the ignition key with their knee and unintentionally move the key away from the 'run' position."  New GM admits that, when this happens, "engine power, and power braking will be affected, increasing the risk of a crash." Moreover, "[t]he timing of the key movement out of the 'run' position, relative to the activation of the sending algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes."[64]

---

[64] New GM's Part 573 Safety Recall Report, Sept. 4, 2014.

010440-11  725144 V1

422.    This recall is directly related to the other ignition switch recalls and involves the same safety risks and dangers.  The defect poses a serious and dangerous safety risk because the key in the ignition switch can rotate and consequently cause the ignition to switch from the "on" or "run" position to the "off" or "accessory" position, which causes the loss of engine power, stalling, loss of speed control, loss of power steering, loss of power braking, and increases the risk of a crash.  Moreover, as with the ignition switch torque defect, if a crash occurs, the airbags may not deploy.

423.    According to New GM, in late June 2014, "GM Holden began investigating potential operator knee-to-key interference in Holden-produced vehicles consistent with Safety's learning from" earlier ignition switch recalls, NHTSA recall nos. 14V-346 and 14V-355.[65]

424.    New GM "analyzed vehicle test results, warranty data, TREAD data, NHTSA Vehicle Owner Questionnaires, and other data."[66]  This belated review, concerning vehicles that were sold as long as six years earlier, led to the August 27, 2014 decision to conduct a safety recall.[67]

425.    Once again, a review of NHTSA's website shows that New GM was long on notice of ignition switch issues in the vehicles subject to the September 4 recall.

426.    For example, on February 10, 2010, New GM became aware of an incident involving a 2009 Pontiac G8 that occurred on November 23, 2009, and again on January 26, 2010, in which the following was reported to NHTSA:

> FIRST OCCURRED ON 11/23/2009. ON THE INTERSTATE IT
> LOSES ALL POWER, ENGINE SHUTS DOWN, IGNITION
> STOPS, POWER STEERING STOPS, BRAKES FAIL -
> COMPLETE VEHICLE STOPPAGE AND FULL OPERATING

---

[65] Id.

[66] Id.

[67] Id.

- 155 -

SYSTEMS SHUT DOWN WITHOUT WARNING AT 70 MPH,
TWICE! SECOND OCCURRENCE WAS 1/26/2010.

8.      On May 22, 2013, New GM became aware of an incident involving a 2008

Pontiac G8 that occurred on May 18, 2013, in which the following was reported:

> THE CONTACT OWNS A 2008 PONTIAC G8. THE CONTACT
> STATED THAT WHILE DRIVING 50 MPH, THE VEHICLE
> STALLED WITHOUT WARNING. THE FAILURE RECURRED
> TWICE. THE VEHICLE WAS TOWED TO THE DEALER FOR
> DIAGNOSIS, BUT THE DEALER WAS UNABLE TO
> DUPLICATE THE PROBLEM. THE VEHICLE WAS NOT
> REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED.
> THE APPROXIMATE FAILURE MILEAGE WAS 60,000.

427.    Consistent with its pattern in the June and July recalls, New GM's proposed

remedy is to provide these Defective Ignition Switch Vehicle owners with a "revised key blade

and housing assembly, in which the blade has been indexed by 90 degrees."[68]  Until the remedy

is provided, New GM asserts, "it is very important that drivers adjust their seat and steering

column to allow clearance between their knee and the ignition key."[69]  New GM sent its recall

notice to NHTSA one week later, on September 4, 2014.

428.    New GM's supposed fix does not address the defect or the safety risks that the

defect poses, including the apparent insufficient torque to resist rotation from the "run" to the

"accessory" position under reasonably foreseeable driving conditions, and puts the burden on

drivers to alter their behavior and carry their ignition keys separately from their other keys, and

even from their remote fob.  The real answer must include the replacement of all the switches

with ones that have sufficient torque to resist foreseeable rotational forces.

429.    In addition, New GM is not addressing the other design issues that create safety

risks in connection with this defect.  New GM is not altering the algorithm that prevents the

---

[68] New GM's Part 573 Safety Recall Report, Sept. 4, 2014.

[69] *Id.*

airbags from deploying when the ignition leaves the "run" position, even when the vehicle is moving.  And New GM is not altering the placement of the ignition in an area where the driver's knee may inadvertently cause the ignition to move out of the "run" position.

430.    The September 4 recall is, like the earlier defective ignition switch recalls, too little and too late.

### 7.    The ignition switch recalls are inadequate and poorly conducted.

431.    New GM sent its first recall notices to the owners of vehicles with defective ignition switches in late February and early March of 2014.  New GM's recall letter minimized the risk of the ignition switch defect, indicating that ignition problems would occur only "under certain circumstances."  New GM's recall notification emphasized that the risk of power failure increased if the "key ring is carrying added weight . . . or your vehicle experiences rough road conditions."

432.    To repair the Defective Ignition Switch Vehicles, New GM is replacing the defective ignition switch with a new, presumably improved, ignition switch.  At the time it announced the recall of these Defective Ignition Switch Vehicles, however, New GM did not have replacement switches ready.  New GM CEO Mary Barra told Congress that New GM would start replacing ignition switches beginning in April of 2014.

433.    New GM later revised its timeline, notifying NHTSA that all replacement switches would be ready by October 4, 2014.

434.    New GM's repair of the defective switches has proceeded painfully slowly.  As of August 5, 2014, New GM had repaired only 683,196 of the 2.1 million Defective Ignition Switch Vehicles.

435.    On September 8, 2014, Ms. Barra told CNBC radio that the repair process was

"substantially complete."  Nonetheless, at that time, New GM had repaired only 1 million

vehicles.

436.    Meanwhile, dealerships across the country have struggled to implement New

GM's repair process.  One dealership in Kalamazoo, Michigan, hired a "recall concierge" simply

to deal with the myriad issues raised by the recall repair process.

437.    Although New GM has touted to courts around the country that it is offering to

provide any concerned driver with a temporary loaner vehicle while he or she awaits a

replacement part (for some over five months and counting), GM's recall letter failed to inform

vehicle owners whether temporary loaner vehicles would be made available while they awaited

replacement parts.  The letter also provided no time frame in which repairs would be completed.

438.    To add insult to injury, the New GM recall is fraught with problems for

consumers.  Many consumers are unable to obtain a loaner vehicle despite New GM's promise to

provide them with one pending repair.  When individuals have been fortunate enough to obtain a

loaner, they often experience problems associated with the loaner program.  Even worse, many

consumers continue to experience safety problems with the Defective Ignition Switch Vehicles,

even after the ignition switch has been replaced pursuant to the recall.

> **a.**    **New GM failed to alert drivers of recalled vehicles to the possibility of obtaining a loaner vehicle, and when consumers are aware, they often find that loaner vehicles are not available.**

439.    One common problem consumers have faced and continue to face is the

difficulty, if not impossibility, of obtaining a rental or loaner vehicle while awaiting the

replacement part for their Defective Ignition Switch Vehicle pursuant to the recall.  Yet since it

announced the recall, New GM has represented to the government and courts across the country

that it is offering consumers temporary loaner vehicles, free of charge, while those consumers wait for their Defective Ignition Switch Vehicle to be repaired.

440.    New GM did not make this information easily accessible for consumers.  Shortly after the recall was announced, for example, New GM published a website at gmignitionupdate.com.  The front page of that website does not inform consumers that they are eligible to obtain a temporary replacement vehicle.

441.    Indeed, consumers must click on the Frequently Asked Questions page to learn about New GM's offer.  Even there, the information is not included in a section entitled, "What will GM do?"  Neither is it included in a section entitled, "What should you do if you have an affected vehicle?"

442.    To learn that New GM is offering temporary loaner vehicles, a class member must click on a section under the heading, "Parts Availability & Repair Timing."  A subsection entitled, "Who is eligible for a rental vehicle?" states that "[a]ny affected customer who is concerned about operating their vehicle may request courtesy transportation.  Dealership service management is empowered to place the customer into a rental or loaner vehicle until parts are available to repair the customer's vehicle."

443.    Numerous owners and/or lessees of Defective Ignition Switch Vehicles were unaware that New GM was offering temporary loaner vehicles.  As a result, many class members driving one of the Defective Ignition Switch Vehicles and who are rightfully fearful of continuing to drive their vehicles in light of the now-disclosed safety defect are denied an alternate vehicle pre-repair.  They either are forced to drive their unsafe Defective Ignition Switch Vehicles out of necessity, and fear every time they sit behind the wheel they could be involved in an accident that will injure them or an innocent bystander, or to park their vehicles

while awaiting the replacement part for their vehicles and seek alternative means of transportation.

444.    Upon information and belief, New GM also did not widely distribute its temporary loaner vehicle guarantee to dealerships across the country. Many dealerships do not know and have not been informed about New GM's promise to provide rental/loaner vehicles to owners of vehicles awaiting the ignition switch replacement part.

445.    Further, licensed New GM dealerships aware of the loaner program quickly exhausted their supply of loaner vehicles early into the recall. Numerous dealerships then refused interested consumers. Because New GM's ignition repair website only states that "[d]ealership service management" is empowered to provide a temporary loaner vehicle, many such class members reasonably believed that their sole avenue for relief was foreclosed when their dealership refused.

446.    Even where class members have inquired directly with New GM for provision of a temporary loaner vehicle, numerous Class members have been refused.

447.    Such refusals not only violate New GM's representations but also cause Class members substantial inconvenience and expense, such as:

    a.    Class members who cannot perform their jobs because they are denied a loaner/rental, despite repeated requests to both the dealership and the New GM hotline; and

    b.    Class members who are denied a rental/loaner vehicle because they have only property loss or property damage insurance coverage on their Defective Ignition Switch Vehicle rather than full coverage.

448.    Further, even when a loaner vehicle is provided, consumers experience varied and numerous problems with the program. Among the problems encountered:

a.      Class members incur substantially increased gasoline expenses with their loaner vehicles because the loaner is far less fuel efficient than the Defective Ignition Switch Vehicle;

b.      Class members incur substantially increased monthly insurance premium—up to hundreds more per month—than they pay for their Defective Ignition Switch Vehicle because the loaner vehicle is newer and more expensive; and

c.      Class members are threatened with charges for the loaner vehicle if they do not pick up their Defective Ignition Switch Vehicle immediately when it is repaired.  Class members have experienced these threats even when their Defective Ignition Switch Vehicle sat idle for months at a dealership awaiting repair and the dealership provided no notice that it would repair the vehicle until the repair was complete.

### b.      The repair is inadequate and/or results in new vehicle defects.

449.    Yet another common problem with the recall that plaintiffs are experiencing is the replacement part is not remedying the safety defect.  Numerous class members report repeated stalls and shut downs *after* their vehicles are purportedly repaired pursuant to the recall.  Indeed, the most common complaint is that the vehicle continues to have unintended stalls while driving, the very safety defect the recall is intended to correct.  What is more, dealerships and New GM have been known to accuse vehicle owners who report stalls and shut downs following their ignition switch being replaced of lying.

450.    Yet from its inception, New GM has known that simply replacing the ignition switches on the Defective Ignition Switch Vehicles is not a solution to the potential for the key to inadvertently turn from the "run" to the "accessory/off" position in these vehicles.  The necessary modifications New GM is undertaking with respect to the Defective Ignition Switch

010440-11  725144 V1

Vehicles' ignition switches and keys are insufficient to make the Defective Ignition Switch Vehicles safe or to restore their value.

451.    New GM's recall fails to address the design defect that causes the key fob/chain to hang too low on the steering column.  During testing of the Defective Ignition Switch Vehicles, Old GM and New GM engineers repeatedly observed that the Defective Ignition Switch Vehicle's ignition switch could be moved to the "accessory/off" position when a driver touched the ignition key with his or her knee during ordinary and foreseeable driving conditions. New GM's recall repairs fail to address such occurrences.  New GM's recall is thus inadequate to remedy the defective product.

452.    Further, New GM's recall fails to address the defective airbag system, which disables the airbag immediately when the engine shuts off.  The loss of airbags is a serious safety condition, especially because it can happen when the Defective Ignition Switch Vehicle is traveling at highway speeds.

453.    Following replacement of the ignition switch pursuant to the recall, problems occurring with the Defective Ignition Switch Vehicles include, but are not limited to:  (i) stalls and shut down on roads and highways; (ii) the ignition key does not fully turn to the "off" position and, instead, becomes stuck in the "accessory" position; (iii) the ignition key cannot be removed when the engine is off; (iv) power steering fails; and (v) cars are returned following replacement of the ignition switch with new parts in non-working order that were in working order prior to the "repair," such as airbag light remaining on, horn not working, broken door locking mechanism, and locking steering wheel.

454.    Among the specific problems experienced in connection with the recall are:

a. Accidents in Defective Ignition Switch Vehicles as a result of unintended shut downs or stalls, **after** the ignition switch has been replaced pursuant to the recall;

b. Class members have been threatened with charges for leaving Defective Ignition Switch Vehicles at the dealership once the replacement part is installed pursuant to the recall, even in circumstances where the Defective Ignition Switch Vehicle has been at the dealership for months awaiting the repair and the dealership did not provide timely notice of the repair's completion;

c. Class members have been charged the costs of a replacement battery when their Defective Ignition Switch Vehicle's battery dies on the dealership lot while waiting for months for the ignition switch replacement parts;

d. Class members' Defective Ignition Switch Vehicles, following replacement of the ignition switch pursuant to the recall, often are returned without the ability to turn the ignition key to the "off" position and, instead, the key becomes stuck in the "accessory" position, and/or the driver is unable to remove the key at all; and

e. When Defective Ignition Switch Vehicles are returned after months of storage at the dealership (pursuant to New GM's instruction to the dealerships to store the vehicles while they await repair), new damages have appeared on the vehicle and/or additional mileage has appeared on the odometer.

### c. The recall is untimely.

455. At the time it announced the first ignition switch recalls, New GM acknowledged that it was not prepared to begin replacing defective ignition switches with presumably non-defective switches.

456. New GM informed NHTSA that it would complete 100% of the ignition switch replacements on or before October 4, 2014. New GM has not met that deadline.

- 163 -

457.    The recall is delayed even further because even the replacement ignition switches are sometimes defective. Various news outlets have reported on New GM's delivery of faulty replacement switches.  The DETROIT NEWS reported on July 9, 2014, that New GM notified dealerships that it had delivered 542 ignition switch kits with faulty tabs.  Those switches, some of which were delivered to a dealership in New York, were sent back to New GM.

458.    The recall causes continuing problems to the class members, including:

a.    Class members must wait months for Defective Ignition Switch Vehicles to be repaired and, while the Defective Ignition Switch Vehicle sits on the dealership's lot, the Vehicle's registration expires;

b.    Class members have experienced unintended stalls and power failures in Defective Ignition Switch Vehicles while they await repair of their vehicle and were refused a loaner vehicle in the interim, or did not know loaner vehicles were available;

c.    Class members have been involved in accidents when they experienced an unintended stall in the Defective Ignition Switch Vehicle while waiting for replacement parts and repair; and

d.    Class members who have only their Defective Ignition Switch Vehicle face daily inconveniences and additional expenses to obtain alternate transportation, but refuse to drive their Defective Ignition Switch Vehicle.

459.    These delays have real and significant consequences for members of the Class.  As one illustrative example of the worst, yet entirely foreseeable, outcome of this common problem known to New GM, on September 27, 2014, the NEW YORK TIMES reported that Laura Gass, a 27-year-old owner of a 2006 Saturn Ion, was killed just days after she received her recall notice.  That notice informed her that replacement parts were not yet

- 164 -

available.  The notice also did not inform Ms. Gass that she was eligible to obtain a loaner vehicle should she not wish to drive her defective Saturn.  Ms. Gass needed transportation, and was unaware that New GM was prepared to provide temporary transportation to replace her defective automobile.  As a result, she continued to drive her defective Ion, a turn of events that had disastrous consequences.  On March 18, 2014, the ignition switch in Ms. Gass's Saturn slipped to the "accessory" or "off" position, the power to the vehicle failed, and she was unable to control the vehicle as it collided with a truck on the interstate.  Ms. Gass was killed, but the tragedy should have been prevented.

        **d.**      **The repair of the other ignition switch defects.**

460.    The repair of the vehicles recalled for ignition switch-related problems in June and July 2014—the Camaro recall, the ignition key slot recall, and the unintended key rotation recall—is also proceeding in a problematic fashion.

461.    Owners of these vehicles—more than 10 million—have been notified that their vehicle is defective, but no replacement parts are available.  New GM has not provided a timeline within which it will repair these vehicles.

462.    Further, because New GM claims that the defect afflicting these vehicles is distinct from the ignition switch defect affecting the 2.1 million vehicles in its initial recall of Defective Ignition Switch Vehicles, it has offered owners significantly less safe alternatives.  New GM has not offered loaner vehicles to owners of these ten million vehicles.  It has simply advised them to remove everything from the key chain.

463.    Of course, the recall notice for each of these 10 million vehicles notes the possibility that the vehicle may experience a moving stall and/or power failure by traveling across a bumpy roadway or when a driver's knee inadvertently contacts the ignition key.

464.    What is more, New GM's proposed repair of these vehicles is wholly inadequate. New GM will modify the ignition key for all the affected vehicles so that the key is less susceptible to movement.  New GM's proposed remedy, however, does nothing to prevent one from impacting the ignition key with one's knee during ordinary and foreseeable driving conditions.  It does nothing to ensure that the airbag system is not disabled if and when the ignition switch moves into the "accessory" or "off" position.  And it does not address the fact that many of the affected vehicles contain ignition switches with inadequate "detent plungers."

465.    New GM's proposed repairs are an attempt to rid itself of safety problems on the cheap.  Indeed, New GM is not offering temporary rental vehicles to those affected customers driving the vehicles recalled in June and early July.  Nor will GM reimburse owners for any previous repairs aimed at preventing inadvertent power failure in these subject vehicles.

466.    According to New GM spokesperson Alan Adler, and despite the fact that the June and July recalls are aimed at safety problems that are substantially similar, if not identical, to those present in the February and March ignition switch recalls, the recall of more than 10 million vehicles in June and July was to remedy "key issues," not because the vehicles contain bad ignition switches.

467.    This statement is belied by the facts on the ground.  Many Class members have experienced power failures and engine stalls, and many individuals have been in accidents attributable to such failures.  Court supervision and involvement is required in order to force New GM to provide its customers with a repair that will truly make the Defective Ignition Switch Vehicles safe for ordinary and foreseeable driving conditions.

**G.    Other Safety and Important Defects Affecting Numerous GM-branded Vehicles**

468.    As if the plethora of recalls for ignition switch defects was not enough to taint New GM's brand and put the lie to New GM's repeated statements that it values safety and

- 166 -

reliability above all else, New GM has been forced to issue scores of other recalls this year

involving myriad serious safety defects in a wide range of GM-branded vehicles—many of

which defects were known to New GM for years.

469. Moreover, New GM's ongoing and systemic devaluation of safety issues has

given rise to a host of new Defective Ignition Switch Vehicles created by New GM.

470. Many (but by no means all) of the serious defects revealed in New GM's never-

ending series of recalls are discussed below.

**1. Other safety defects affecting the ignition in GM-branded vehicles.**

    **a. Ignition lock cylinder defect in vehicles also affected by the ignition switch defect that gave rise to the first recall of 2.1 million defective ignition switch vehicles.**

471. On April 9, 2014, New GM recalled 2,191,014 GM-branded vehicles with faulty

ignition lock cylinders.[70] Though the vehicles are the same as those affected by the ignition

switch torque defect,[71] the lock cylinder defect is distinct.

472. In these vehicles, faulty ignition lock cylinders can allow removal of the ignition

key while the engine is not in the "off" position. If the ignition key is removed when the ignition

is not in the "off" position, unintended vehicle motion may occur. That could cause a crash and

injury to the vehicle's occupants or pedestrians. Some of the vehicles with faulty ignition lock

cylinders may fail to conform to Federal Motor Vehicle Safety Standard number 114, "*Theft*

*Prevention and Rollaway Prevention.*"[72]

473. According to New GM's Chronology that it submitted to NHTSA on April 23,

2014, the ignition lock cylinder defect arose out of New GM's notorious recalls for defective

---

[70] New GM Letter to NHTSA dated April 9, 2014.

[71] Namely, MY 2005-2010 Chevrolet Cobalts, 2006-2011 Chevrolet HHRs, 2007-2010 Pontiac G5s, 2003-2007 Saturn Ions, and 2007-2010 Saturn Skys. *See id.*

[72] New GM Notice to NHTSA dated April 9, 2014, at 1.

010440-11 725144 V1

ignition switch systems in the Chevrolet Cobalt, Chevrolet HHR, Pontiac G5, Pontiac Solstice, Saturn ION, and Saturn Sky vehicles.  Those three recalls occurred in February and March of 2014.[73]

474.    In late February or March 2014, New GM personnel participating in the ignition switch recalls observed that the keys could sometimes be removed from the ignition cylinders when the ignition was not in the "off" position.  This led to further investigation.

475.    After investigation, New GM's findings were presented at a Decision Committee meeting on April 3, 2014.  New GM noted several hundred instances of potential key pullout issues in vehicles covered by the previous ignition switch recalls, and specifically listed 139 instances identified from records relating to customer and dealer reports to GM call centers, 479 instances identified from warranty repair data, one legal claim, and six instances identified from NHTSA VOQ information.  New GM investigators also identified 16 roll-away instances associated with the key pullout issue from records relating to customer and dealer reports to GM call centers and legal claims information.

476.    New GM noted that excessive wear to ignition tumblers and keys may be the cause of the key pullout issue.  New GM also considered the possibility that some vehicles may have experienced key pullout issues at the time they were manufactured, based on information that included the following:  (a) a majority of instances of key pullouts that had been identified in the recall population were in early-year Saturn Ion and Chevrolet Cobalt vehicles, and in addition, repair order data indicated vehicles within that population had experienced a repair potentially related to key pullout issues as early as 47 days from the date on which the vehicle was put into service; and (b) an engineering inquiry known within New GM as a Problem

---

[73] *See* Attachment B to New GM's letter to NHTSA dated April 23, 2014 ("Chronology").

Resolution related to key pullout issues was initiated in June 2005, which resulted in an engineering work order to modify the ignition cylinder going forward.

477.    A majority of the key pullout instances identified involved 2003-2004 model year Saturn Ion and 2005 model year Chevrolet Cobalt vehicles.  An April 3 New GM PowerPoint identified 358 instances of key pullouts involving those vehicles.

478.    In addition, with respect to early-year Saturn Ion and Chevrolet Cobalt vehicles, the April 3 PowerPoint materials discussed the number of days that elapsed between the "In Service Date" of those vehicles (the date they first hit the road) and the "Repair Date."  The April 3 PowerPoint stated that, with respect to the 2003 model year Saturn Ion, a vehicle was reported as experiencing a potential key pullout repair as early as 47 days from its "In Service Date;" with respect to the 2004 model year Saturn Ion, a vehicle was reported as experiencing a potential key pullout repair as early as 106 days from its "In Service Date;" with respect to the 2005 model year Chevrolet Cobalt, a vehicle was reported as experiencing a potential key pullout repair as early as 173 days from its "In Service Date;" and with respect to the 2006 model year Chevrolet Cobalt, a vehicle was reported as experiencing a potential key pullout repair as early as 169 days from its "In Service Date."  The length of time between the "In Service Date" and the "Repair Date" suggested that these vehicles were defective at the time of manufacture.

479.    The PowerPoint at the April 3 Decision Committee meeting also discussed a Problem Resolution that was initiated in June 2005 which related to key pullout issues in the Chevrolet Cobalt (PRTS N 183836).  According to PRTS N 183836:  "Tolerance stack up condition permits key to be removed from lock cylinder while driving."  The "Description of Root Cause Investigation Progress and Verification" stated, "[a]s noted a tolerance stack up exists in between the internal components of the cylinder."  According to a "Summary," "A

010440-11 725144 V1

tolerance stack up condition exists between components internal to the cylinder which will allow some keys to be removed."  Problem Resolution identified the following "Solution":  "A change to the sidebar of the ignition cylinder will occur to eliminate the stack-up conditions that exist in the cylinder."

480.    In response to PRTS N 183836, New GM issued an engineering work order to "[c]hange shape of ignition cylinder sidebar top from flat to crowned."

481.    According to the work order:  "Profile and overall height of ignition cylinder sidebar [will be] changed in order to assist in preventing key pullout on certain keycodes.  Profile of sidebar to be domed as opposed to flat and overall height to be increased by 0.23mm."

482.    According to PRTS N 183836, this "solution fix[ed] the problem" going forward. An entry in Problem Resolution  made on March 2, 2007 stated:  "There were no incidents of the key coming out of the ignition cylinder in the run position during a review of thirty vehicles…." A "Summary" in Problem Resolution stated:  "Because there were no incidents of the key coming out of the ignition cylinder in the run position during a review of thirty vehicles[,] this PRTS issue should be closed."  PRTS N 183836 was the only PRTS discussed at the April 3, 2014, Decision Committee meeting, although it is not the only engineering or field report relating to potential key pullout issues.

483.    This data led the Decision Committee to conclude that 2003-2004 model year Saturn Ion vehicles and 2005 and some 2006 model year Chevrolet Cobalt vehicles failed to conform to FMVSS 114.  In addition, the Decision Committee concluded that a defect related to motor vehicle safety existed, and decided to recall all vehicles covered by the first, second, and third ignition switch torque recalls to prevent unintended vehicle motion potentially caused by key pullout issues that could result in a vehicle crash and occupant or pedestrian injuries.  For

- 170 -

vehicles that were built with a defective ignition cylinder that have not previously had the ignition cylinder replaced with a redesigned part, the recall called for dealers to replace the ignition cylinder and provide two new ignition/door keys for each vehicle.

**b.  Ignition lock cylinder defect affecting over 200,000 additional GM-branded vehicles.**

484.  On August 7, 2014, New GM recalled 202,155 MY 2002-2004 Saturn Vue vehicles.[74]  In the affected vehicles, the ignition key can be removed when the vehicle is not in the "off" position.[75]  If this happens, the vehicle can roll away, increasing the risk for a crash and occupant or pedestrian injuries.[76]

485.  Following New GM's April 9, 2014 recall announcement regarding ignition switch defects, New GM reviewed field and warranty data for potential instances of ignition cylinders that permit the operator to remove the ignition key when the key is not in the "off" position in other vehicles outside of those already recalled.[77]  New GM identified 152 reports of vehicle roll away and/or ignition keys being removed when the key is not in the "off" position in the 2002-2004 MY Saturn Vue vehicles.[78]

486.  After reviewing this data with NHTSA on June 17, 2014, July 7, 2014, and July 24, 2014, GM instituted a safety recall on July 31, 2014.[79]

---

[74] *See* August 7, 2014 Letter from New GM to NHTSA.

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.*

- 171 -

2. **Defects affecting the occupant safety restraint system in GM-branded vehicles.**

   a. **Safety defects of the airbag systems of GM-branded vehicles.**

      (1) **Wiring harness defect.**

487.     On March 17, 2014, New GM recalled nearly 1.2 million model year 2008-2013 Buick Enclave, 2009-2013 Chevrolet Traverse, 2008-2013 GMC Acadia, and 2008-2010 Saturn Outlook vehicles for a dangerous defect involving airbags and seatbelt pretensioners.

488.     The affected vehicles were sold with defective wiring harnesses. Increased resistance in the wiring harnesses of driver and passenger seat-mounted, side-impact airbag in the affected vehicles may cause the side impact airbags, front center airbags, and seat belt pretensioners to not deploy in a crash. The vehicles' failure to deploy airbags and pretensioners in a crash increases the risk of injury and death to the drivers and front-seat passengers.

489.     Once again, New GM knew of the dangerous airbag defect long before it took anything approaching the requisite remedial action.

490.     As the wiring harness connectors in the side impact airbags corrode or loosen over time, resistance will increase. The airbag sensing system will interpret this increase in resistance as a fault, which then triggers illumination of the "SERVICE AIR BAG" message on the vehicle's dashboard. This message may be intermittent at first and the airbags and pretensioners will still deploy. But over time, the resistance can build to the point where the SIABs, pretensioners, and front center airbags will not deploy in the event of a collision.[80]

491.     The problem apparently arose when Old GM made the change from using gold-plated terminals to connect its wire harnesses to cheaper tin terminals in 2007.

---

[80] *See* New GM Notice to NHTSA dated March 17, 2014, at 1.

010440-11  725144 V1

492.    In June 2008, Old GM noticed increased warranty claims for airbag service on certain of its vehicles and determined it was due to increased resistance in airbag wiring. After analysis of the tin connectors in September 2008, Old GM determined that corrosion and wear to the connectors was causing the increased resistance in the airbag wiring. It released a technical service bulletin on November 25, 2008, for 2008-2009 Buick Enclave, 2009 Chevy Traverse, 2008-2009 GMC Acadia, and 2008-2009 Saturn Outlook models, instructing dealers to repair the defect by using Nyogel grease, securing the connectors, and adding slack to the line. Old GM also began the transition back to gold-plated terminals in certain vehicles. At that point, Old GM suspended all investigation into the defective airbag wiring and took no further action.[81]

493.    In November 2009, New GM learned of similar reports of increased airbag service messages in 2010 Chevy Malibu and 2010 Pontiac G6 vehicles. After investigation, New GM concluded that corrosion and wear in the same tin connector was the root of the airbag problems in the Malibu and G6 models.[82]

494.    In January 2010, after review of the Malibu and G6 airbag connector issues, New GM concluded that ignoring the service airbag message could increase the resistance such that a side impact airbag might not deploy in a side impact collision. On May 11, 2010, New GM issued a Customer Satisfaction Bulletin for the Malibu and G6 models and instructed dealers to secure both front seat-mounted, side-impact airbag wire harnesses and, if necessary, reroute the wire harness.[83]

495.    From February to May 2010, New GM revisited the data on vehicles with faulty harness wiring issues, and noted another spike in the volume of the airbag service warranty

---

[81] *See* New GM Notification Campaign No. 14V-118 dated March 31, 2014, at 1-2.

[82] *Id.* at 2.

[83] *Id.*

- 173 -

claims.  This led New GM to conclude that the November 2008 bulletin was "not entirely effective in correcting the [wiring defect present in the vehicles]."  On November 23, 2010, New GM issued another Customer Satisfaction Bulletin for certain 2008 Buick Enclave, 2008 Saturn Outlook, and 2008 GMC Acadia models built from October 2007 to March 2008, instructing dealers to secure side impact airbag harnesses and re-route or replace the side impact airbag connectors.[84]

496.    New GM issued a revised Customer Service Bulletin on February 3, 2011, requiring replacement of the front seat-mounted side-impact airbag connectors in the same faulty vehicles mentioned in the November 2010 bulletin.  In July 2011, New GM again replaced its connector, this time with a Tyco-manufactured connector featuring a silver-sealed terminal.[85]

497.    But in 2012, New GM noticed another spike in the volume of warranty claims relating to side impact airbag connectors in vehicles built in the second half of 2011.  After further analysis of the Tyco connectors, it discovered that inadequate crimping of the connector terminal was causing increased system resistance.  In response, New GM issued an internal bulletin for 2011-2012 Buick Enclave, Chevy Traverse, and GMC Acadia vehicles, recommending dealers repair affected vehicles by replacing the original connector with a new sealed connector.[86]

498.    The defect was still uncured, however, because in 2013 New GM again noted an increase in service repairs and buyback activity due to illuminated airbag service lights.  On October 4, 2013, New GM opened an investigation into airbag connector issues in 2011-2013

---

[84] *See id.* at 3.

[85] *See id.*

[86] *See id.* at 4.

Buick Enclave, Chevy Traverse, and GMC Acadia models. The investigation revealed an increase in warranty claims for vehicles built in late 2011 and early 2012.[87]

499.    On February 10, 2014, New GM concluded that corrosion and crimping issues were again the root cause of the airbag problems.[88]

500.    New GM initially planned to issue a less-urgent Customer Satisfaction Program to address the airbag flaw in the 2010-2013 vehicles. But it wasn't until a call with NHTSA on March 14, 2014, that New GM finally issued a full-blown safety recall on the vehicles with the faulty harness wiring—years after it first learned of the defective airbag connectors, after four investigations into the defect, and after issuing at least six service bulletins on the topic. The recall as first approved covered only 912,000 vehicles, but on March 16, 2014, it was increased to cover approximately 1.2 million vehicles.[89]

501.    On March 17, 2014, New GM issued a recall for 1,176,407 vehicles potentially afflicted with the defective airbag system. The recall instructs dealers to remove driver and passenger SIAB connectors and splice and solder the wires together.[90]

**(2)    Driver-side airbag shorting-bar defect.**

502.    On June 5, 2014, New GM issued a safety recall of 38,636 MY 2012 Chevrolet Cruze, 2012 Chevrolet Camaro, 2012 Chevrolet Sonic, and 2012 Buick Verano vehicles with a driver's airbag shorting bar defect.

503.    In the affected vehicles, the driver side frontal airbag has a shorting bar which may intermittently contact the airbag terminals. If the bar and terminals are contacting each other at the time of a crash, the airbag will not deploy, increasing the driver's risk of injury. New

---

[87] See id.

[88] See id. at 5.

[89] See id.

[90] See id.

GM admits awareness of one crash with an injury where the relevant diagnostic trouble code was found at the time the vehicle was repaired. New GM is aware of other crashes involving these vehicles where airbags did not deploy but claims not to know if they were related to this defect.

504.    New GM knew about the driver's airbag shorting bar defect in 2012. In fact, New GM conducted two previous recalls in connection with the shorting bar defect condition involving 7,116 vehicles—one on October 31, 2012, and one on January 24, 2013.[91] Yet it would take New GM nearly two years to finally order a broader recall.

505.    On May 31, 2013, after New GM's two incomplete recalls, NHTSA opened an investigation into reports of allegations of the non-deployment of air bags. New GM responded to this investigation on September 13, 2013.

506.    On November 1, 2013, NHTSA questioned New GM about:  (i) the exclusion of 390 vehicles which met the criteria for the two previous safety recalls; (ii) the 30-day in-service cutoff used for the recall population of one previous recall; and (iii) twelve additional build days which, as of the June 2013 data pull in the investigation, had an elevated warranty rate. In response to NHTSA's concerns, New GM added additional vehicles to the recall.

507.    After announcement of the initial ignition switch torque defect in February and March of 2014, New GM re-examined its records relating to the driver's airbag shorting defect. This review finally prompted New GM to expand the recall population on May 29, 2014—***long after the problem should have been remedied.***

### (3)    Driver-side airbag inflator defect.

508.    On June 25, 2014, New GM recalled 29,019 MY 2013-2014 Chevrolet Cruze vehicles with a driver-side airbag inflator defect.

---

[91] *See* New GM's Letters to NHTSA dated 10/31/2012 and 1/24/2013, respectively.

010440-11  725144 V1

509.     In the affected vehicles, the driver's front airbag inflator may have been manufactured with an incorrect part.  In the event of a crash necessitating deployment of the driver-side airbag, the airbag's inflator may rupture and the airbag may not inflate.  The rupture could cause metal fragments to strike and injure the vehicle's occupants.  Additionally, if the airbag does not inflate, the driver will be at increased risk of injury.[92]

510.     New GM was named in a lawsuit on or about May 1, 2014 involving a 2013 Chevrolet Cruze and an improperly deployed driver-side airbag that caused an injury to the driver.[93]  The lawsuit prompted an inspection of "the case vehicle," the assignment of a New GM Product Investigations engineer, and discussions with NHTSA.[94]

511.     Meanwhile, the airbag supplier, Takata Corporation/TK Holdings Inc., conducted its own analysis.  New GM removed airbags with "build dates near the build date of the case vehicle,"  and sent them to Takata.[95] Subsequently, on June 20, 2014, Takata informed New GM it had "discovered [the] root cause" of the driver-side airbag defect through analysis of one of the airbags sent by New GM.[96]

512.     Shortly thereafter, on June 23, 2014, New GM decided to conduct a safety recall.[97]

### (4)     Roof-rail airbag defect.

513.     On June 18, 2014, New GM recalled 16,932 MY 2011 Cadillac CTS vehicles with a roof-rail airbag defect.

---

[92] *See* New GM's Letter to NHTSA dated June 25, 2014.

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] *Id.*

010440-11  725144 V1

514.     In the affected vehicles, vibrations from the drive shaft may cause the vehicle's roll over sensor to command the roof rail airbags to deploy.  If the roof rail airbags deploy unexpectedly, there is an increased risk of crash and injury to the occupants.[98]

515.     According to New GM, the defect is caused by a loss of grease from the center constant velocity joint; the loss of grease causes vibrations of the propeller shaft that are transferred to the roll over sensor in the vehicle floor above the shaft.  The vibrations can cause the deployment of the roof rail airbags.[99]

516.     On October 28, 2010, a new supplier began shipping propeller shafts for MY 2011 Cadillac CTS vehicles; these propeller shafts used a metal gasket from the constant velocity joint (as opposed to the liquid sealing system used by the previous supplier).[100]  *This new metal gasket design was not validated or approved by New GM.*[101]

517.     On June 27, 2011, a Problem Resolution Tracking System (PRTS) was opened concerning this defect.  The PRTS resulted in the "purge" of the metal gasket design.[102]  Then, on August 1, 2011, New GM issued an Engineering Work Order banning the metal gasket design, and mandating the use of the liquid sealing system.  Yet New GM "closed the investigation without action in October 2012."[103]

518.     Inexplicably, New GM waited until June of 2014 before finally recalling the affected vehicles.

---

[98] *See* June 18, 2014 New GM Letter to NHTSA.

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] *Id.*

- 178 -

### (5)   Passenger-side airbag defect.

519.   On May 16, 2014, GM recalled 1,953 MY 2015 Cadillac Escalade and Escalade ESV vehicles with a passenger-side airbag defect.

520.   The affected vehicles do not conform to Federal Motor Vehicle Safety Standard number 208, "Occupant Crash Protection."  In these vehicles, the airbag module is secured to a chute adhered to the backside of the instrument panel with an insufficiently heated infrared weld. As a result, the front passenger-side airbag will only partially deploy in the event of crash, and this will increase the risk of occupant injury.[104]

521.   On April 28, 2014, during product validation testing of the "Platinum" Escalade (a planned interim 2015 model), the passenger-side front airbag did not properly deploy.[105]  New GM then obtained information from the supplier Johnson Controls Inc. concerning the portion of the Escalade instrument panel through which the frontal airbag deploys.[106]  In particular, New GM requested information on chute weld integrity.[107]

522.   On May 13, 2014, Johnson Controls informed New GM engineering that it had modified its infrared weld process on April 2, 2014 and "corrected" that process on April 29, 2014.  New GM claims that it was unaware of the changes until May 13, 2014.[108]

523.   On May 14, 2014, the Decision Committee decided to conduct a "noncompliance recall."  On May 16, 2014, GM obtained a list of suspected serial numbers from Johnson Controls, which GM then matched to VINs through records obtained from the scanning process

---

[104] *See* May 16, 2014 Letter from New GM to NHTSA.

[105] *See* May 27, 2014 Letter from New GM to NHTSA.

[106] *Id.*

[107] *Id.*

[108] *Id.*

used during instrument panel sub-assembly.[109]  A recall notice was issued on May 16, 2014 for

1,953 vehicles, each of which will have the Johnson Controls part replaced.[110]

524.    Subsequently, GM discovered errors in the scanning process, and decided to

expand the recall population to include any VINs that could have received parts bearing the

suspect Johnson Controls serial numbers.[111]  GM therefore issued a second recall notice on May

27, 2014.  With respect to this second set of 885 vehicles, they will be inspected to see if they

were made with Johnson Controls parts bearing suspect serial numbers.  If they are, the part will

be replaced.[112]

### (6)    Sport seat side-impact airbag defect.

525.    On June 18, 2014, New GM issued a safety recall for 712 MY 2014 Chevrolet

Corvette vehicles with a sport seat side-impact airbag defect.

526.    The affected vehicles do not meet a Technical Working Group Side Airbag Injury

Assessment Reference Value specifications for protecting unbelted, out-of-position young

children from injury.  In a crash necessitating side impact airbag deployment, an unbelted, out-

of-position three-year-old child may be at an increased risk of neck injury.

### (7)    Passenger-side airbag inflator defect.

527.    On June 5, 2014, New GM recalled 61 MY 2013 Chevrolet Spark and 2013 Buick

Encore vehicles with a passenger side airbag inflator defect.

---

[109] *Id.*

[110] *Id.*

[111] *Id.*

[112] *Id.*

010440-11  725144 V1

528. In the affected vehicles, because of an improper weld, the front passenger airbag end cap could separate from the airbag inflator. This can prevent the airbag from deploying properly, and creates an increased risk of injury to the front passenger.[113]

529. New GM was alerted to this issue on July 10, 2013, when a customer brought an affected vehicle into a dealership with "an airbag readiness light 'ON' condition."[114] After replacing the side frontal airbag, the dealer shipped the original airbag to New GM for warranty analysis.

530. In September 2013, New GM "noted" the "weld condition of the end cap." New GM then sent the airbag to the airbag supplier, S&T Motive, who sent it on to the inflator supplier, ARC Automotive Inc., for "root cause" analysis.[115] S&T and ARC did not conclude their analysis until April 2014.[116]

531. Based upon the information provided by S&T and ARC, in May 2014 New GM Engineering linked the defect to inflators produced on December 17, 2012. ARC records show that on that date, an inflator end cap separated during testing, but that ARC nonetheless shipped quarantined inflators to S&T where they were used in passenger side frontal airbags beginning on December 29, 2012.[117]

532. On May 29, 2014—nearly one year after being presented with a faulty airbag—New GM's Safety Field Action Committee finally decided to conduct a safety recall.[118]

---

[113] *See* June 5, 2014 Letter from New GM to NHTSA.

[114] *Id.*

[115] *Id.*

[116] *Id.*

[117] *Id.*

[118] *Id.*

010440-11 725144 V1

### (8)    Front passenger airbag defect.

533.    On March 17, 2014, New GM issued a noncompliance recall of 303,013 MY 2009-2014 GMC Savana vehicles with a passenger-side instrument panel defect.[119]

534.    In the affected vehicles, in certain frontal impact collisions below the airbag deployment threshold, the panel covering the airbag may not sufficiently absorb the impact of the collision.  These vehicles therefore do not meet the requirements of Federal Motor Vehicle Safety Standard number 201, "Occupant Protection in Interior Impact."[120]

535.    The defect apparently arose in early 2009, when the passenger-side airbag housing was changed from steel to plastic.[121]  Inexplicably, New GM did not act to remedy this defect until March of 2014.

### b.    Safety defects of the seat belt systems in GM-branded vehicles.

### (1)    Seat belt connector cable defect.

536.    On May 20, 2014, New GM issued a safety recall for nearly 1.4 million model year 2009-2014 Buick Enclave,  2009-2014 Chevrolet Traverse, 2009-2014 GMC Acadia, and 2009-2010 Saturn Outlook vehicles with a dangerous safety belt defect.

537.    In the affected vehicles, "[t]he flexible steel cable that connects the safety belt to the vehicle at the outside of the front outside of the front outboard seating positions can fatigue and separate over time as a result of occupant movement into the seat.  In a crash, a separated cable could increase the risk of injury to the occupant."[122]

---

[119] *See* March 31, 2014 Letter from New GM to NHTSA.

[120] *Id.*

[121] *Id.*

[122] *See* New GM Notice to NHTSA dated May 19, 2014, at 1.

- 182 -

538.    New GM waited more than two years after learning about this defect before disclosing it or remedying it.[123]  This delay is consistent with New GM's long period of concealment of the other defects as set forth above.

539.    New GM first learned of the seat belt defect no later than February 10, 2012, when a dealer reported that a seat belt buckle separated from the anchor at the attaching cable in a 2010 GMC Acadia.[124]  On March 7, 2012, after notification and analysis of the returned part, the supplier determined the problem was caused by fatigue of the cable.[125]

540.    On April 20, 2012, New GM received another part exhibiting the defect from a dealership.[126]  New GM also did a warranty analysis that turned up three additional occurrences of similar complaints.[127]  But New GM did not order a field review until June 4, 2012.[128]  The review, on June 11, 2012, covered just 68 vehicles, and turned up no cable damage.[129]

541.    New GM received another part exhibiting the defect on August 28, 2013, from GM Canada Product Investigations.[130]  After further testing in October 2013, New GM duplicated the defect condition, determining that, in some seat positions, the sleeve can present the buckle in a manner that can subject the cable to bending during customer entry into the vehicle.[131]  New GM duplicated the condition again in a second vehicle in November 2013.[132]  And then just a month later, on December 18, 2013, New GM received another part exhibiting

---

[123] *See* New GM Notice to NHTSA dated May 30, 2014, at 1-3.

[124] *Id.* at 1.

[125] *Id.* at 2.

[126] *Id.*

[127] *Id.*

[128] *Id.*

[129] *Id.*

[130] *Id.*

[131] *Id.*

[132] *Id.*

- 183 -

the condition from GM Canada Product Investigations.[133]  But still New GM did not issue a
safety recall.

542.    Further testing between February and April 2014 confirmed the defect resulted
from fatigue of the cable.[134]  This was the same root cause New GM identified as early as March
7, 2012.  Finally, on April 14, 2014, these findings were turned over to New GM Product
Investigations and assigned an investigation number.[135]

543.    On May 19, 2014, New GM decided to conduct a recall of the affected
vehicles.[136]

### (2)    Seat belt retractor defect.

544.    On June 11, 2014, New GM recalled 28,789 MY 2004-2011 Saab 9-3 Convertible
vehicles with a seat belt retractor defect.

545.    In the affected vehicles, the driver's side front seat belt retractor may break,
causing the seat belt webbing spooled out by the user not to retract.[137]  In the event of a crash, a
seat belt that has not retracted may not properly restrain the seat occupant, increasing the risk of
injury to the driver.[138]

546.    By September of 2009 New GM was aware of an issue with seat belt retractors in
MY 2004 Saab 9-3 vehicles; at that time, NHTSA informed New GM that it received 5 Vehicle
Owner Questionnaires "alleging that the driver seat belt will no longer retract on 2004 Saab 0-3

---

[133] *Id.*

[134] *Id.*

[135] *Id.*

[136] New GM Notice to NHTSA dated May 19, 2014, at 1.

[137] *See* New GM's June 11, 2013 Letter to NHTSA.

[138] *See id.*

- 184 -

vehicles built after September 30, 2003."[139]  In December 2009-January 2010, New GM

conducted a survey "of customers who had a retractor replaced to determine how many were

due" to a break in the Automatic Tensioning System that causes "webbing spooled out by the

user not to retract."[140]

547.    On February 9, 2010, New GM issued a recall for the driver side retractor, but

only in certain MY 2004 Saab 9-3 sedans—some 14,126 vehicles.[141]  New GM would wait

another four years before attempting to address the full scope of the seatbelt retractor defect in

Saab 9-3 vehicles.

548.    New GM finally opened an investigation into the seat belt retractor defect in other

Saab 9-3 vehicles in February of this year, and that was "in response to NHTSA Vehicle Owner

Questionnaires claiming issues with the driver side front seat belt retractor" in the affected

vehicles.[142]  As a result, New GM eventually recalled 28,789 MY 2004-2011 Saab 9-3

convertible vehicles on June 11, 2014.

**(3)    Frontal lap-belt pretensioner defect.**

549.    On August 7, 2014, New GM recalled 48,059 MY 2013 Cadillac ATS and 2013

Buick Encore vehicles with a defect in the front lap-belt pretensioners.[143]

550.    In the affected vehicles, the driver and passenger lap-belt pretensioner cables may

not lock in a retracted position; that allows the seat belts to extend when pulled upon.[144]  If the

---

[139] See New GM's February 9, 2010 Letter to NHTSA.

[140] Id.

[141] Id.

[142] See New GM's June 11, 2013 Letter to NHTSA.

[143] See August 7, 2014 Letter from New GM to NHTSA.

[144] Id.

010440-11  725144 V1

seat belts do not remain locked in the retracted position, the seat occupant may not be adequately restrained in a crash, increasing the risk of injury.[145]

551.    In July 2012, GM Korea learned that the lap-belt pretensioner cable and seat belt webbing slipped out after being retracted.[146]  Several months later, New GM changed the rivet position on the pretensioner bracket and the design of the pretension mounting bolt.[147]  This change was made after New GM started production on the 2013 MY Buick Encore.[148]

552.    In October 2012, New GM testing on a pre-production 2014 MY Cadillac CTS revealed that the driver side front seat belt anchor pretensioner cables retracted upon deployment to pull in the lap-belt webbing, as intended, but did not lock in that position; that allowed the retracted webbing to return ("pay out") to its original position under loading, which was not intended.[149]

553.    On November 13, 2012, New GM modified the design of the lap-belt pretensioner for the Cadillac CTS, Cadillac ATS, and Cadillac ELR vehicles to include a modified bolt, relocation of a rivet in the cam housing to reposition the locking cam, and a change in torque of the lap-belt pretensioner bolt to seat.[150]  These changes were implemented in the 2014 MY Cadillac CTS and Cadillac ELR, but not in the 2013 MY Cadillac ATS.[151]

554.    Despite making these adjustments to later MY vehicles only, New GM did not launch an investigation into the performance of the lap-belt pretensioners in the 2013 MY Buick

---

[145] Id.

[146] See August 21, 2014 Letter from New GM to NHTSA.

[147] Id.

[148] Id.

[149] Id.

[150] Id.

[151] Id.

- 186 -

Encore and Cadillac ATS until mid-April, 2013.[152]   New GM claims that during this year-long

investigation period it found no issues potentially relating to the pay out of the lap-belt

pretensioners.[153]

555.     Nonetheless, New GM decided to issue a safety recall for the affected vehicles on

July 31, 2014.[154]  It later expanded the recall by 55 additional vehicles, to a total population of

48,114, on August 19, 2014.[155]

**3.     Safety defects affecting seats in GM-branded vehicles.**

556.     On July 22, 2014, New GM issued a safety recall of 414,333 MY 2010-2012

Chevrolet Equinox, MY 2011-2012 Chevrolet Camaro, MY 2010-2012 Cadillac SRX, MY

2010-2012 GMC Terrain, MY 2011-2012 Buick Regal, and MY 2011-2012 Buick LaCrosse

vehicles with a power height adjustable seats defect.[156]

557.     In the affected vehicles, the bolt that secures the height adjuster in the driver and

front passenger seats may become loose or fall out.  If the bolt falls out, the seat will drop

suddenly to the lowest vertical position.  The sudden drop can affect the driver's ability to safely

operate the vehicle, and can increase the risk of injury to the driver and the front-seat passenger

if there is an accident.  New GM admits to knowledge of at least one crash caused by this

defect.[157]

---

[152] *Id.*

[153] *Id.*

[154] *Id.*

[155] *Id.*

[156] *See* July 22, 2014 Letter from New GM to NHTSA.

[157] *Id.*

010440-11  725144 V1

558.    New GM was aware of this defect by July 10, 2013 when the crash occurred, and by July 22, 2013, New GM was aware that the crash was caused when the bolt on the height adjuster fell out.[158]

559.    By September 5, 2013, New GM was aware of 27 cases of loose or missing height adjuster bolts in Camaro vehicles.[159]  Yet New GM waited until July 15, 2014 before it made the decision to conduct a safety recall.

### 4.    Safety defects affecting the brakes in GM-branded vehicles.

#### a.    Brake light defect.

560.    On May 14, 2014, New GM issued a safety recall of approximately 2.4 million model year 2004-2012 Chevrolet Malibu,  2004-2007 Malibu Maxx,  2005-2010 Pontiac G6, and 2007-2010 Saturn Aura vehicles with a dangerous brake light defect.

561.    In the affected vehicles, the brake lamps may fail to illuminate when the brakes are applied or illuminate when the brakes are not engaged; the same defect can disable cruise control, traction control, electronic stability control, and panic brake assist operation, thereby increasing the risk of collisions and injuries.[160]

562.    Once again, New GM knew of the dangerous brake light defect for years before it took anything approaching the requisite remedial action.  In fact, although the brake light defect has caused at least 13 crashes since 2008, New GM did not recall all 2.4 million vehicles with the defect until May 2014.

563.    According to New GM, the brake defect originates in the Body Control Module connection system.  "Increased resistance can develop in the [Body Control Module] connection

---

[158] *Id.*

[159] *Id.*

[160] *See* New GM Notification Campaign No. 14V-252 dated May 28, 2014, at 1.

- 188 -

system and result in voltage fluctuations or intermittency in the Brake Apply Sensor (BAS) circuit that can cause service brakes lamp malfunction."[161]  The result is brake lamps that may illuminate when the brakes are not being applied and may not illuminate when the brakes are being applied.[162]

564.    The same defect can also cause the vehicle to get stuck in cruise control if it is engaged, or cause cruise control to not engage, and may also disable the traction control, electronic stability control, and panic-braking assist features.[163]

565.    New GM now acknowledges that the brake light defect "may increase the risk of a crash."[164]

566.    As early as September 2008, NHTSA opened an investigation for MY 2005-2007 Pontiac G6 vehicles involving allegations that the brake lights may turn on when the driver does not depress the brake pedal and may *not* turn on when the driver *does* depress the brake pedal.[165]

567.    During its investigation of the brake light defect in 2008, Old GM found elevated warranty claims for the brake light defect for MY 2005 and 2006 vehicles built in January 2005, and found "fretting corrosion in the [Body Control Module] C2 connector was the root cause" of the problem.[166]  Old GM and its part supplier Delphi decided that applying dielectric grease to the [Body Control Module] C2 connector would be "an effective countermeasure to the fretting

---

[161] *Id.*

[162] *Id.*

[163] *Id.*

[164] *Id.*

[165] *Id.* at 2.

[166] *Id.*

corrosion."[167]  Beginning in November of 2008, the Company began applying dielectric grease in its vehicle assembly plants.[168]

568.    On December 4, 2008, Old GM issued a Technical Service Bulletin recommending the application of dielectric grease to the Body Control Module C2 connector for the MY 2005-2009 Pontiac G6, 2004-2007 Chevrolet Malibu/Malibu Maxx, 2008 Malibu Classic, and 2007-2009 Saturn Aura vehicles.[169]  One month later, in January 2009, Old GM recalled only a small subset of the vehicles with the brake light defect—8,000 MY 2005-2006 Pontiac G6 vehicles built during the month of January 2005.[170]

569.    Not surprisingly, the brake light problem was far from resolved.

570.    In October 2010, New GM released an updated Technical Service Bulletin regarding "intermittent brake lamp malfunctions," and added MY 2008-2009 Chevrolet Malibu/Malibu Maxx vehicles to the list of vehicles for which it recommended the application of dielectric grease to the Body Control Module C2 connector.[171]

571.    In September of 2011, New GM received an information request from Canadian authorities regarding brake light defect complaints in vehicles that had not yet been recalled. Then, in June 2012, NHTSA provided New GM with additional complaints "that were outside of the build dates for the brake lamp malfunctions on the Pontiac G6" vehicles that had been recalled.[172]

---

[167] *Id.*

[168] *Id* at 3.

[169] *Id.* at 2.

[170] *Id.*

[171] *Id.*

[172] *Id.*

- 190 -

572.    In February of 2013, NHTSA opened a "Recall Query" in the face of 324

complaints "that the brake lights do not operate properly" in Pontiac G6, Malibu, and Aura

vehicles that had not yet been recalled.[173]

573.    In response, New GM asserts that it "investigated these occurrences looking for

root causes that could be additional contributors to the previously identified fretting corrosion,"

but that it continued to believe that "fretting corrosion in the [Body Control Module] C2

connector" was the "root cause" of the brake light defect.[174]

574.    In June of 2013, NHTSA upgraded its "Recall Query" concerning brake light

problems to an "Engineering Analysis."[175]

575.    In August 2013, New GM found an elevated warranty rate for Body Control

module C2 connectors in vehicles built *after* Old GM had begun applying dielectric grease to

Body Control Module C2 connectors at its assembly plants in November of 2008.[176]  In

November of 2013, New GM concluded that "the amount of dielectric grease applied in the

assembly plant starting November 2008 was insufficient…."[177]

576.    Finally, in March of 2014, "[New] GM engineering teams began conducting

analysis and physical testing to measure the effectiveness of potential countermeasures to

address fretting corrosion.  As a result, New GM determined that additional remedies were

needed to address fretting corrosion."[178]

577.    On May 7, 2014, New GM finally decided to conduct a safety recall.

---

[173] *Id.* at 3.

[174] *Id.*

[175] *Id.*

[176] *Id.*

[177] *Id.*

[178] *Id.* at 4.

010440-11  725144 V1

578.     According to New GM, "Dealers are to attach the wiring harness to the [Body Control Module] CM with a spacer, apply dielectric lubricant to both the [Body Control Module] CR and harness connector, and on the BAS and harness connector, and relearn the brake pedal home position."[179]

579.     New GM sat on and concealed its knowledge of the brake light defect for years, and did not even consider available countermeasures (other than the application of grease that had proven ineffective) until March of this year.

**b.      Brake booster pump defect.**

580.     On March 17, 2014, New GM issued a safety recall of 63,903 MY 2013-2014 Cadillac XTS vehicles with a brake booster pump defect.

581.     In the affected vehicles, a cavity plug on the brake boost pump connector may dislodge and allow corrosion of the brake booster pump relay connector.  This can have an adverse impact on the vehicle's brakes and increase the risk of collision.  This same defect can also cause a fire in the vehicle resulting from the electrical shore in the relay connector.

582.     In June of 2013, New GM learned that a fire occurred in a 2013 Cadillac XTS vehicle while it was being transported between car dealerships.  Upon investigation, New GM determined that the fire originated near the brake booster pump relay connector, but could not determine the "root cause" of the fire.

583.     A second vehicle fire in a 2013 Cadillac XTS occurred in September of  2013.  In November 2013, the same team of New GM investigators examined the second vehicle, but, again, could not determine the "root cause" of the fire.

---

[179] *Id.*

010440-11  725144 V1

584.     In December 2013, New GM identified two warranty claims submitted by dealers related to complaints by customers about vibrations in the braking system of their vehicles.  The New GM team investigating the two prior 2013 Cadillac XTS fires inspected these parts and discovered the relay connector in both vehicles had melted.

585.     In January 2014, New GM determined that pressure in the relay connector increased when the brake booster pump vent hose was obstructed or pinched.  Further testing revealed that pressure from an obstructed vent hose could force out the cavity plugs in the relay connector, and in the absence of the plugs, water, and other contaminants can enter and corrode the relay connector, causing a short and leading to a fire or melting.

586.     On March 11, 2014, New GM issued a safety recall for the affected vehicles.

        **c.     Hydraulic boost assist defect.**

587.     On May 13, 2014, New GM recalled 140,067 model year 2014 Chevrolet Malibu vehicles with a hydraulic brake boost assist defect.[180]

588.     In the affected vehicles, the "hydraulic boost assist" may be disabled; when that happens, slowing or stopping the vehicle requires harder brake pedal force, and the vehicle will travel a greater distance before stopping.  Therefore, these vehicles do not comply with Federal Motor Vehicle Safety Standard number 135, "Light Vehicle Brake Systems," and are at increased risk of collision.[181]

        **d.     Brake rotor defect.**

589.     On May 7, 2014, New GM recalled 8,208 MY 2014 Chevrolet Malibu and Buick LaCrosse vehicles with a brake rotor defect.

---

[180] *See* May 13, 2014 Letter from New GM to NHTSA.

[181] *Id.*

- 193 -

590.     In the affected vehicles, New GM may have accidentally installed rear brake rotors on the front brakes.  The rear rotors are thinner than the front rotors, and the use of rear rotors in the front of the vehicle may result in a front brake pad detaching from the caliper.  The detachment of a break pad from the caliper can cause a sudden reduction in braking which lengthens the distance required to stop the vehicle and increases the risk of a crash.

### e.     Reduced brake performance defect.

591.     On July 28, 2014, New GM recalled 1,968 MY 2009-2010 Chevrolet Aveo and 2009 Pontiac G3 vehicles.[182]  Affected vehicles may contain brake fluid which does not protect against corrosion of the valves inside the anti-lock brake system module, affecting the closing motion of the valves.[183] If the anti-lock brake system valve corrodes it may result in longer brake pedal travel or reduced performance, increasing the risk of a vehicle crash.[184]

592.     New GM was aware of this defect as far back as August 2012, when it initiated a customer satisfaction campaign.[185]  The campaign commenced in November 2012, and New GM estimates that, to date, approximately 34% of Chevrolet Aveo and Pontiac G3 vehicles included in the customer satisfaction campaign are not yet repaired.[186]  On July 19, 2014, New GM decided to conduct a safety recall for vehicles that had been included in the customer satisfaction program but had not had the service repair performed.[187]

---

[182] *See* July 28, 2014 Letter from New GM to NHTSA.

[183] *Id.*

[184] *Id.*

[185] *Id.*

[186] *Id.*

[187] *Id.*

010440-11  725144 V1

f.  **Parking brake defect.**

593.    On September 20, 2014, GM recalled more than 221,000 MY 2014-15 Chevrolet Impala and 2013-15 model Cadillac XTS vehicles because of a parking-brake defect.

594.    In the affected vehicles, the brake pads can stay partly engaged, which can lead to "excessive brake heat that may result in a fire," according to documents posted on the NHTSA website.

595.    NHTSA said the fire risk stemmed from the rear brakes generating "significant heat, smoke and sparks."  The agency also warned that drivers of the Affected Vehicles might experience "poor vehicle acceleration, undesired deceleration, excessive brake heat and premature wear to some brake components."

5.    **Safety defects affecting the steering in GM-branded vehicles.**

a.    **Sudden power-steering failure defect.**

596.    Between 2003 and 2010, over 1.3 million GM-branded vehicles in the United States were sold with a safety defect that causes the vehicle's electric power steering ("power steering") to suddenly fail during ordinary driving conditions and revert back to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries.

597.    The affected vehicles are MY 2004-2006 and 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx, 2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2006 and 2008-2009 Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura vehicles.

598.    As with the ignition switch defects and many of the other defects, New GM was aware of the power steering defect long before it took anything approaching full remedial action.

599.     When the power steering fails, a message appears on the vehicle's dashboard, and a chime sounds to inform the driver. Although steering control can be maintained through manual steering, greater driver effort is required, and the risk of an accident is increased.

600.     In 2010, New GM first recalled Chevy Cobalt and Pontiac G5 models for these power steering issues, yet it did *not* recall the many other vehicles that had the very same power steering defect.

601.     Documents released by NHTSA show that New GM waited years to recall nearly 335,000 Saturn Ions for power-steering failure—despite receiving nearly 4,800 consumer complaints and more than 30,000 claims for warranty repairs. That translates to a complaint rate of 14.3 incidents per thousand vehicles and a warranty claim rate of 9.1 percent. By way of comparison, NHTSA has described as "high" a complaint rate of 250 complaints per 100,000 vehicles.[188] Here, the rate translates to 1,430 complaints per 100,000 vehicles.

602.     In response to the consumer complaints, in September 2011, NHTSA opened an investigation into the power-steering defect in Saturn Ions.

603.     NHTSA database records show complaints from Ion owners as early as June 2004, with the first injury reported in May 2007.

604.     NHTSA has linked approximately 12 crashes and two injuries to the power-steering defect in the Ions.

605.     In September 2011, after NHTSA began to make inquiries about the safety of the Saturn Ion, GM acknowledged that it had received almost 3,500 customer reports claiming a sudden loss of power steering in 2004-2007 Ion vehicles.

---

[188] *See* https://www-odi.nhtsa.dot.gov/cars/problems/defect/-results.cfm?action_number=EA06002&Search Type= QuickSearch&summary=true.

010440-11  725144 V1

Case 1:14-mc-02543-JMF   Document 345   Filed 10/14/14   Page 217 of 712

606.    The following month, New GM engineer Terry Woychowski informed current
CEO Mary Barra—then head of product development—that there was a serious power-steering
issue in Saturn Ions, and that it may be the same power steering issue that plagued the Chevy
Cobalt and Pontiac G5.  Ms. Barra was also informed of the ongoing NHTSA investigation.  At
the time, NHTSA reportedly came close to concluding that Saturn Ions should have been
included in New GM's 2010 steering recall of Cobalt and G5 vehicles.

607.    Instead of recalling the Saturn Ion, GM sent dealers a service bulletin in May of
2012 identifying complaints about the steering system in the vehicle.

608.    By the time GM finally recalled the Saturn Ion—four years later, in March
2014—NHTSA had received more than 1,200 complaints about the vehicle's power steering.
Similar complaints resulted in over 30,000 warranty claims with GM.

609.    After announcing the March 31, 2014 recall, Jeff Boyer, New GM's Vice
President of Global Vehicle Safety, acknowledged that New GM recalled some of these same
vehicle models previously for the **same issue**, but that New GM "did not do enough."

610.    According to an analysis by the NEW YORK TIMES published on April 20, 2014,
New GM has "repeatedly used technical service bulletins to dealers and sometimes car owners as
stopgap safety measures instead of ordering a timely recall."

611.    Former NHTSA head Joan Claybrook echoed this conclusion, stating, "There's no
question that service bulletins have been used where recalls should have been."

612.    NHTSA has recently criticized New GM for issuing service bulletins on at least
four additional occasions in which a recall would have been more appropriate and in which New
GM later, in fact, recalled the subject vehicles.

613.     These inappropriate uses of service bulletins prompted Frank Borris, the top

defect investigator for NHTSA, to write to New GM's product investigations director, Carmen

Benavides, in July 2013, complaining that "GM is slow to communicate, slow to act, and, at

times, requires additional effort . . . that we do not feel is necessary with some of [GM's] peers."

614.     Mr. Borris' correspondence was circulated widely among New GM's top

executives.  Upon information and belief, the following employees received a copy:  John

Calabrese and Alicia Boler-Davis, two vice presidents for product safety; Michael Robinson,

vice president of regulatory affairs; engineer Jim Federico; Gay Kent, director of product

investigations who had been involved in safety issues with the Cobalt since 2006; and William

Kemp, an in-house product liability lawyer.

### b.     Power steering hose clamp defect.

615.     On June 18, 2014, New GM issued a safety recall of 57,192 MY 2015 Chevrolet

Silverado 2500/3500 HD and 2015 GMC Sierra 2500/3500 HD vehicles with a power steering

hose clamp defect.

616.     In the affected vehicles, the power steering hose clamp may disconnect from the

power steering pump or gear, causing a loss of power steering fluid.  A loss of power steering

fluid can result in a loss of power steering assist and power brake assist, increasing the risk of a

crash.

### c.     Power steering control module defect.

617.     On July 22, 2014, New GM recalled 57,242 MY 2014 Chevrolet Impala vehicles

with a Power Steering Control Module defect.

618.     Drivers of the affected vehicles may experience reduced or no power steering

assist at start-up or while driving due to a poor electrical ground connection to the Power

Steering Control Module.  If power steering is lost, the vehicle will revert to manual steering

- 198 -

mode. Manual steering requires greater driver effort and increases the risk of accident. New GM acknowledges one crash related to this condition.

619.    On May 17, 2013, New GM received a report of a 2014 Impala losing communication with the Power Steering Control Module. On or about May 24, 2013, New GM determined the root cause was a poor electrical connection at the Power Steering Control Module grounding stud wheelhouse assembly.

620.    But New GM's initial efforts to implement new procedures and fix the issue were unsuccessful. In January 2014, New GM reviewed warranty data and discovered 72 claims related to loss of assist or the Service Power Steering message after implementation of New GM's process improvements.

621.    Then, on February 25, 2014, New GM received notice of a crash involving a 2014 Impala that was built in 2013. The crash occurred when the Impala lost its power steering, and crashed into another vehicle as a result.

622.    In response, New GM monitored field and warranty data related to this defect and, as of June 24, 2014, it identified 253 warranty claims related to loss of power steering assist or Service Power Steering messages.

623.    On July 15, 2014, New GM finally issued a safety recall for the vehicles, having been unsuccessful in its efforts to minimize and conceal the defect.

         **d.      Lower control arm ball joint defect.**

624.    On July 18, 2014, New GM issued a safety recall of 1,919 MY 2014-2015 Chevrolet Spark vehicles with a lower control arm ball joint defect.

625.    The affected vehicles were assembled with a lower control arm bolt not fastened to specification. This can cause the separation of the lower control arm from the steering

knuckle while the vehicle is being driven, and result in the loss of steering control. The loss of

steering control in turn creates a risk of accident.[189]

### e.   Steering tie-rod defect.

626.   On May 13, 2014, New GM issued a safety recall of 477 MY 2014 Chevrolet

Silverado, 2014 GMC Sierra, and 2015 Chevrolet Tahoe vehicles with a steering tie-rod defect.

627.   In the affected vehicles, the tie-rod threaded attachment may not be properly

tightened to the steering gear rack. An improperly tightened tie-rod attachment may allow the

tie-rod to separate from the steering rack and greatly increases the risk of a vehicle crash.[190]

### f.   Joint fastener torque defect.

628.   On June 30, 2014, New GM issued a safety recall of 106 MY 2014 Chevrolet

Camaro, 2014 Chevrolet Impala, 2014 Buick Regal, and 2014 Cadillac XTS vehicles with a joint

fastener torque defect.

629.   In the affected vehicles, joint fasteners were not properly torqued to specification

at the assembly plant. As a result of improper torque, the fasteners may "back out" and cause a

"loss of steering," increasing the risk of a crash.[191]

630.   New GM claims that it was alerted to the problem by a warranty claim filed on

December 23, 2013, at a California dealership for a Chevrolet Impala built at New GM's

Oshawa car assembly plant in Ontario, Canada. Yet the Oshawa plant was not informed of the

issue until March 4, 2014.[192]

631.   Between March 4 and March 14, 2014, the Oshawa plant conducted a "root

cause" investigation and concluded that the problem was caused by an improperly fastened

---

[189] *See* July 18, 2014 Letter from New GM to NHTSA.

[190] *See* May 27, 2014 Letter from New GM to NHTSA.

[191] *See* July 2, 2014 Letter from New GM to NHTSA.

[192] *Id.*

010440-11  725144 V1

"Superhold" joint. Though the Impala was electronically flagged for failing to meet the requisite torque level, the employee in charge of correcting the torque level failed to do so.[193]

632. On or about March 14, 2014, New GM learned of two more warranty claims concerning improperly fastened Superhold joints. Both of the vehicles were approved by the same employee who had approved the corrective action for the joint involved in the December 23, 2013 warranty claim. The two additional vehicles were also flagged for corrective action, but the employee failed to correct the problem.[194]

633. On March 20, 2014, New GM concluded the derelict employee had approved 112 vehicles after they were flagged for corrective action to the Superhold joint.[195]

634. Yet New GM waited until June 25, 2014 before deciding to conduct a safety recall.

**6. Safety defects affecting the powertrain in GM-branded vehicles.**

**a. Transmission shift cable defect affecting 1.1 million Chevrolet and Pontiac vehicles.**

635. On May 19, 2014, New GM issued a safety recall for more than 1.1 million MY 2007-2008 Chevrolet Saturn, 2004-2008 Chevrolet Malibu, 2004-2007 Chevrolet Malibu Maxx, and 2005-2008 Pontiac G6 vehicles with dangerously defective transmission shift cables.

636. In the affected vehicles, the shift cable may fracture at any time, preventing the driver from switching gears or placing the transmission in the "park" position. According to New GM, "[i]f the driver cannot place the vehicle in park, and exits the vehicle without applying the park brake, the vehicle could roll away and a crash could occur without prior warning."[196]

---

[193] *Id.*

[194] *Id.*

[195] *Id.*

[196] *See* New GM letter to NHTSA Re: NHTSA Campaign No. 14V-224 dated May 22, 2014, at 1.

- 201 -

Case 1:14-md-02543-JMF Document 345-5 Filed 10/14/14 Page 222 of 712

637.     Yet again, New GM knew of the shift cable defect long before it issued the recent recall of more than 1.1 million vehicles with the defect.

638.     In May of 2011, NHTSA informed New GM that it had opened an investigation into failed transmission cables in 2007 model year Saturn Aura vehicles.  In response, New GM noted "a cable failure model in which a tear to the conduit jacket could allow moisture to corrode the interior steel wires, resulting in degradation of shift cable performance, and eventually, a possible shift cable failure."[197]

639.     Upon reviewing these findings, New GM's Executive Field Action Committee conducted a "special coverage field action for the 2007-2008 MY Saturn Aura vehicles equipped with 4 speed transmissions and built with Leggett & Platt cables."  New GM apparently chose that cut-off date because, on November 1, 2007, Kongsberg Automotive replaced Leggett & Platt as the cable provider.[198]

640.     New GM did not recall any of the vehicles with the shift cable defect at this time, and limited its "special coverage field action" to the 2007-2008 Aura vehicles even though "the same or similar Leggett & Platt cables were used on … Pontiac G6 and Chevrolet Malibu (MMX380) vehicles."

641.     In March 2012, NHTSA sent New GM an Engineering Assessment request to investigate transmission shift cable failures in 2007-2008 MY Aura, Pontiac G6, and Chevrolet Malibu.[199]

642.     In responding to the Engineering Assessment request, New GM for the first time "noticed elevated warranty rates in vehicles built with Kongsberg shift cables."  Similar to their

---

[197] *Id.* at 2.

[198] *Id.*

[199] *Id.*

- 202 -

predecessor vehicles built with Leggett & Platt shift cables, in the vehicles built with Kongsberg shift cables "the tabs on the transmission shift cable end may fracture and separate without warning, resulting in failure of the transmission shift cable and possible unintended vehicle movement."[200]

643.    On September 13, 2012, the Decision Committee decided to conduct a safety recall.  This initial recall was limited to 2008-2010 MY Saturn Aura, Pontiac G6, and Chevrolet Malibu vehicles with 4-speed transmission built with Kongsberg shifter cables, as well as 2007-2008 MY Saturn Aura and 2005-2007 MY Pontiac G6 vehicles with 4-speed transmissions which may have been serviced with Kongsberg shift cables.[201]

644.    But the shift cable problem was far from resolved.

645.    In March of 2013, NHTSA sent New GM a second Engineering Assessment concerning allegations of failure of the transmission shift cables on all 2007-2008 MY Saturn Aura, Chevrolet Malibu, and Pontiac G6 vehicles.[202]

646.    New GM continued its standard process of "investigation" and delay.  But by May 9, 2014, New GM was forced to concede that "the same cable failure mode found with the Saturn Aura 4-speed transmission" was present in a wide population of vehicles.[203]

647.    Finally, on May 19, 2014, New GM decided to conduct a safety recall of more than 1.1 million vehicles with the shift cable defect.

**b.    Transmission shift cable defect affecting Cadillac vehicles.**

648.    On June 18, 2014, New GM issued a safety recall of 90,750 MY 2013-2014 Cadillac ATS and 2014 Cadillac CTS vehicles with a transmission shift cable defect.

---

[200] *Id.*

[201] *Id.*

[202] *Id.*

[203] *Id.*

010440-11  725144 V1

649.     In the affected vehicles, the transmission shift cable may detach from either the bracket on the transmission shifter or the bracket on the transmission.  If the cable detaches while the vehicle is being driven, the transmission gear selection may not match the indicated gear and the vehicle may move in an unintended or unexpected direction, increasing the risk of a crash.  Furthermore, when the driver goes to stop and park the vehicle, the transmission may not be in "PARK" even though the driver has selected the "PARK" position.  If the vehicle is not in the "PARK" position, there is a risk the vehicle will roll away as the driver and other occupants exit the vehicle or anytime thereafter.  A vehicle rollaway causes a risk of injury to exiting occupants and bystanders.

650.     On March 20, 2014, a New GM dealership contacted an assembly plant about a detached transmission shift cable.  The assembly plant investigated and discovered one additional detached shift cable in the plant.

651.     New GM assigned a product investigation engineer was assigned, and from March 24 to June 2, 2014, New GM examined warranty claims and plant assembly procedures and performed vehicle inspections.  Based on these findings, New GM issued a safety recall on June 11, 2014.

### c.     Transmission oil cooler line defect.

652.     On March 31, 2014, New GM issued a safety recall of 489,936 MY 2014 Chevy Silverado, 2014 GMC Sierra, 2014 GMC Yukon, 2014 GMC Yukon XL, 2015 Chevy Tahoe, and 2015 Chevy Suburban vehicles with a transmission oil cooler line defect.

653.     In the affected vehicles, the transmission oil cooler lines may not be securely seated in the fitting.  This can cause transmission oil to leak from the fitting, where it can contact a hot surface and cause a vehicle fire.

- 204 -

654.    On September 4, 2013, a New GM assembly plant in Silao, Mexico experienced two instances in which a transmission oil cooler line became disconnected from the thermal bypass valve in 2014 pick-up trucks on the K2XX platform during pressure tests.  As a result, New GM required the supplier of the transmission oil cooler lines and thermal bypass valve assembly (collectively the "transmission oil cooler assembly") for these vehicles to issue a Quality Alert for its facility concerning the transmission oil cooler assemblies.  The supplier sorted the over 3,000 TOC assemblies at its facility, performed manual pull checks and visual inspections, and found no defects.

655.    New GM also conducted manual pull checks and visual inspections on the transmission oil cooler assemblies in the two New GM assembly plants responsible for the K2XX platform at the time (Silao, Mexico and Fort Wayne, Indiana), and identified no defects.

656.    On September 19, 2013, the supplier provided New GM with a plan to ensure that the transmission oil cooler lines were properly connected to the thermal bypass valve going forward.  In addition to continuing its individual pull tests to verify that these connections were secure, the supplier planned to add a manual alignment feature to the three machines that it used to connect the transmission oil cooler lines to the thermal bypass valve boxes.  The supplier completed these upgrades on October 28, 2013.

657.    On January 2, 2014, New GM's Product Investigations, Field Performance Assessment, and K2XX program teams received an investigator's report concerning a 2014 Chevrolet Silverado that caught fire during a test drive from a dealer in Gulfport, Mississippi on December 16, 2013.  New GM's on-site investigation of the vehicle revealed that a transmission oil cooler line had disconnected from the thermal bypass valve box.  The build date for this vehicle was October 10, 2013, and the build date for the transmission oil cooler assembly was

- 205 -

September 28, 2013, prior to the supplier's October 28, 2013 completion of its machinery
upgrades.

658.    On January 3, 2014, New GM issued a Quality Alert to its assembly plants for
K2XX vehicles, advising them to manually inspect the transmission oil cooler assemblies from
the supplier to ensure that the transmission oil cooler lines were securely connected.  New GM
also informed the supplier of the Mississippi event.

659.    On January 15, 2014, New GM learned that a 2014 Chevrolet Silverado had
recently caught fire while being driven by a dealer salesperson.  New GM's investigation of the
incident determined that one of the vehicle's transmission oil cooler lines was disconnected from
the thermal bypass valve box.  The vehicle was built on November 12, 2013.

660.    On January 29, after completing its investigation, New GM followed up with its
K2XX assembly plants, and found no additional cases involving disconnected transmission oil
cooler lines after the January 3 Quality Alert.

661.    On January 31, 2014, a team from New GM traveled to the supplier's facility to
work with the supplier on its thermal valve assembly process.  By February 27, 2014, the
supplier added pressure transducers to the machine fixtures used to connect the transmission oil
cooler lines to the thermal bypass valve boxes to directly monitor the delivery of air pressure to
the pull-test apparatus.

662.    On March 23, 2014, a 2015 GMC Yukon caught fire during a test drive from a
dealership in Anaheim, California.  On March 24, 2014, New GM formed a team to investigate
the incident; the team was dispatched to Anaheim that afternoon.  On the morning of March 25,
2014, the New GM team examined the vehicle in Anaheim and determined that the incident was
caused by a transmission oil cooler line that was disconnected from the thermal bypass valve

- 206 -

box.  The assembly plants for K2XX vehicles were placed on hold and instructed to inspect all transmission oil cooler assemblies in stock, as well as those in completed vehicles.  A team from New GM also traveled to the supplier on March 25, 2014, to further evaluate the assembly process.

663.    On March 26, 2014, New GM personnel along with personnel from the supplier examined the transmission oil cooler assembly from the Anaheim vehicle.  The group concluded that a transmission oil cooler line had not been properly connected to the thermal bypass valve box.  The build date for the thermal valve assembly in the Anaheim vehicle was determined to be January 16, 2014, after the supplier's October 28, 2013 machinery upgrades, but before its February 27, 2014 process changes.

664.    On March 27, 2014, the Product Investigator assigned to this matter received a list of warranty claims relating to transmission fluid leaks in K2XX vehicles, which he had requested on March 24.  From that list, he identified five warranty claims, ranging from August 30, 2013, to November 20, 2013, that potentially involved insecure connections of transmission oil cooler lines to the thermal bypass valve box, none of which resulted in a fire.  All five vehicles were built before the supplier completed its machinery upgrades on October 28, 2013.

665.    Also on March 27, 2014, following discussions with New GM, the supplier began using an assurance cap in connecting the transmission oil cooler lines to the thermal bypass valve boxes to ensure that the transmission oil cooler lines are properly secured.

666.    On March 28, 2014, New GM decided to initiate a recall of vehicles built on the K2XX platform so that they can be inspected to ensure that the transmission oil cooler lines are properly secured to the thermal bypass valve box.

010440-11 725144 V1

### d.   Transfer case control module software defect.

667.    On June 26, 2014, New GM issued a safety recall of 392,459 MY 2014-2015

Chevrolet Silverado, 2015 Chevrolet Tahoe, 2015 Chevrolet Suburban, 2014-2015 GMC Sierra,

2015 GMC Yukon, and 2015 GMC Yukon XL vehicles with a transfer case control module

software defect.

668.    In the affected vehicles, the transfer case may electronically switch to neutral

without input from the driver.  If the transfer case switches to neutral while the vehicle is parked

and the parking brake is not in use, the vehicle may roll away and cause injury to bystanders.  If

the transfer case switches to neutral while the vehicle is being driven, the vehicle will lose drive

power, increasing the risk of a crash.

669.    New GM first observed this defect on February 14, 2014, when a 2015 model

year development vehicle, under slight acceleration at approximately 70 mph, shifted into a

partial neutral position without operator input.  When the vehicle shifted into neutral, the driver

lost power, could not shift out of neutral, and was forced to stop driving.  Once the vehicle

stopped, the transfer case was in a complete neutral state and could not be moved out of neutral.

670.    On or about February 17, 2014, New GM contacted Magna International Inc., the

supplier of the transfer case and the Transfer Case Control Module ("TCCM") hardware and

software, to investigate the incident.  Magna took the suspect TCCM for testing.

671.    From mid-February through mid-March, Magna continued to conduct testing.  On

March 18, Magna provided its first report to New GM but at that time, Magna had not fully

identified the root cause.

672.    On March 27, Magna provided an updated report that identified three scenarios

that could cause a transfer case to transfer to neutral.

673.     Between late March and April, New GM engineers continued to meet with Magna to identify additional conditions that would cause the unwanted transfer to neutral.  New GM engineers also analyzed warranty information to identify claims for similar unwanted transfer conditions.

674.     Two warranty claims for unwanted transfers were identified that appeared to match the conditions exhibited on February 14, 2014.  Those warranty claims were submitted on March 3 and March 18, 2014.  On April 23, 2014, a Product Investigation engineer was assigned. A Problem Resolution case was initiated on May 20, 2014.

675.     The issue was presented to Open Investigation Review on June 16, 2014, and on June 18, 2014, New GM  decided to conduct a safety recall.

            **e.       Acceleration-lag defect.**

676.     On April 24, 2014, New GM issued a safety recall of 50,571 MY 2013 Cadillac SRX vehicles with an acceleration-lag defect.

677.     In the affected vehicles, there may be a three to four-second lag in acceleration due to faulty transmission control module programming.  That can increase the risk of a crash.

678.     On October 24, 2013, New GM's transmission calibration group learned of an incident involving hesitation in a company owned vehicle.  New GM obtained the vehicle to investigate and recorded one possible event showing a one second hesitation.

679.     In early December 2013, New GM identified additional reports of hesitation from the New GM company-owned vehicle driver fleet, as well as NHTSA VOQs involving complaints of transmission hesitation in the 2013 SRX vehicles.

680.     In mid-February 2014, the transmission calibration team obtained additional company vehicles and repurchased customer vehicles that were reported to have transmission hesitation in order to install data loggers and attempt to reproduce the defect.  On February 20,

- 209 -

2014, and February 27, 2014, New GM captured two longer hesitation events consistent with customer reports.

681.     In response to the investigation, New GM issued a safety recall for the affected vehicles on April 17, 2014.

### f.     Transmission turbine shaft fracture defect.

682.     On June 11, 2014, New GM recalled 21,567 MY 2012 Chevrolet Sonic vehicles equipped with a 6 Speed Automatic Transmission and a 1.8L Four Cylinder Engine suffering from a turbine shaft fracture defect.

683.     In the affected vehicles, the transmission turbine shaft may fracture.  If the transmission turbine shaft fracture occurs during vehicle operation in first or second gear, the vehicle will not upshift to the third through sixth gears, limiting the vehicle's speed.  If the fracture occurs during operation in third through sixth gear, the vehicle will coast until it slows enough to downshift to first or second gear, increasing the risk of a crash.[204]

684.     The turbine shafts at issue were made by Sundram Fasteners Ltd.[205]  In November 2013, New GM learned of two broken turbine shafts in the affected vehicles when transmissions were returned to New GM's Warranty Parts Center.  New GM sent the shafts to Sundram, but Sundram did not identify any "non-conformities."[206]  But "[s]ubsequent investigation by GM identified a quality issue" with the Sundram turbine shafts.[207]

685.     By late January 2014, 5 or 6 more transmissions "were returned to the WPC for the same concern."  That prompted a warranty search for related claims by New GM's "Quality Reliability Durability (QRD) lead for Gears and Shafts and Validation Engineer for Global Front

---

[204] *See* June 11, 2014 Letter from New GM to NHTSA.

[205] *Id.*

[206] *Id.*

[207] *Id.*

010440-11  725144 V1

Wheel 6 Speed Transmission…." That search revealed "a clear increase in incidents for 2012 Sonic built with 6T30 turbine shaft[s] during late February to June of 2012." [208]

686.    In March of 2014, New GM engineers found that turbine shafts made "in the suspect window were found to have a sharp corner and not a smooth radius in the spline." Testing done in April of 2014 apparently showed a lower life expectancy for "shafts with sharp corners" as opposed to "shafts with smooth radii."[209]

687.    On June 4, 2014, New GM "decided to conduct a safety recall," and New GM did so on June 11, 2014.[210]

g.    **Automatic transmission shift cable adjuster.**

688.    On February 20, 2014, New GM issued a noncompliance recall of 352 MY 2014 Buick Enclave, Buick LaCrosse, Buick Regal, Buick Verano, Chevrolet Cruze, Chevrolet Impala, Chevrolet Malibu, Chevrolet Traverse, and GMC Acadia vehicles with defective automatic transmission shift cable adjusters.[211]

689.    In the affected vehicles, one end of the transmission shift cable adjuster body has four legs that snap over a ball stud on the transmission shift lever. One or more of these legs may have been fractured during installation. If any of the legs are fractured, the transmission shift cable adjuster may disengage from the transmission shift lever. When that happens, the driver may be unable to shift gears, and the indicated gear position may not be accurate. If the adjuster is disengaged when the driver attempts to stop and park the vehicle, the driver may be able to shift the lever to the "PARK" position but the vehicle transmission may not be in the

---

[208] *Id.*

[209] *Id.*

[210] *Id.*

[211] *See* February 20, 2014 Letter from New GM to NHTSA.

"PARK" gear position.  That creates the risk that the vehicle will roll away as the driver and other occupants exit the vehicle, or anytime thereafter.[212]

690.    These vehicles may not conform with Federal Motor Vehicle Safety Standard 102 for Transmission Shift Lever Sequence Starter Interlock and Transmission Braking Effect, or Federal Motor Vehicle Safety Standard 114 for Theft Protection and Rollaway Prevention.

**7.    Other serious defects affecting GM-branded vehicles.**

**a.    Power management mode software defect.**

691.    On January 13, 2014, New GM issued a safety recall of 324,970 MY 2014 Chevy Silverado and GMC Sierra Vehicles with a Power Management Mode software defect.[213]

692.    In the affected vehicles, the exhaust components can overheat, melt nearby plastic parts, and cause an engine fire.  GM acknowledges that the Power Management Mode software defect is responsible for at least six fires in the affected vehicles.[214]

**b.    Light control module defect.**

693.    On May 16, 2014, New GM issued a safety recall of 217,578 model year 2004-2008 Chevrolet Aveo vehicles with a light control module defect.[215]

694.    In the vehicles, heat generated within the daytime running lamp module in the center console in the instrument panel may melt the module and cause a vehicle fire.[216]  New GM first became aware of this issue when two Suzuki Forenza vehicles suffered interior fires in

---

[212] *Id.*

[213] *See* New GM Letter to NHTSA dated January 23, 2014.

[214] *Id.*

[215] *See* May 30, 2014 Letter from New GM to NHTSA.

[216] *Id.*

010440-11  725144 V1

March of 2012; an investigation conducted by GM North America found evidence that the fires emanated from the connection of the wiring at the module.[217]

695.    New GM took no remedial action at this time.

696.    Then in May of 2012, New GM conducted a TREAD data and NHTSA VOQ search for "thermal issues" related.  The search uncovered 13 customer claims and two VOQs "that implied the DRL as the source of the issue."[218]

697.    Finally, on May 16, 2014, New GM decided to conduct a safety recall.

698.    New GM does not provide adequate explanation for why it took more than two years for it to remedy the problem it was aware of by March of 2012.

699.    On May 16, 2014, GM recalled 218,214 MY 2004-2008 Chevrolet Aveo (subcompact) and 2004-2008 Chevrolet Optra (subcompact) vehicles.  In these vehicles, heat generated within the light control module in the center console in the instrument panel may melt the module and cause a vehicle fire.

### c.    Electrical short in driver's door module defect.

700.    On June 30, 2014, New GM issued a safety recall of 181,984 model year 2005-2007 Chevrolet Trailblazer, 2006 Chevrolet Trailblazer EXT, 2005-2007 Buick Rainier, 2005-2007 GMC Envoy, 2006 GMC Envoy XL, 2005-2007 Isuzu Ascender, and 2005-2007 Saab 9-7x vehicles with a defect that can cause an electrical short in the driver's door module.[219]

701.     In the affected vehicles, an electrical short in the driver's door module may occur that can disable the power door lock and window switches and overheat the module.  The overheated module can then cause a fire in the affected vehicles.

---

[217] *Id.*

[218] *Id.*

[219] *See* July 2, 2014 Letter from New GM to NHTSA.

702.    The defect apparently arose from an earlier "repair" provided by New GM for certain vehicles which consisted of applying a "protective coating" to the modules. The "repair" allowed fluids to enter the driver's door module, and a short could result.[220]

703.    New GM finally identified this issue, and issued a safety recall on June 30, 2014.

### d.    Front axle shaft defect.

704.    On March 28, 2014, New GM issued a safety recall of 174,046 model year 2013-2014 Chevrolet Cruze vehicles with dangerous front axle shaft defect.[221]

705.    In the affected vehicles, the right front axle shaft may fracture and separate. If this happens while the vehicle is being driven, the vehicle will lose power and coast to a halt. If a vehicle with a fractured shaft is parked and the parking brake is not applied, the vehicle may move unexpectedly and cause accident and injury.[222]

706.    New GM admits to knowledge of "several dozen" half-shaft fractures through its warranty data.[223]

707.    The several dozen instances could have been prevented. Indeed, in September of 2013, New GM conducted a safety recall of model year 2013-2014 Chevrolet Cruze vehicles, but limited the recall to (i) vehicles built between January 24, 2013-August 1, 2013 and (ii) had manual transmission.[224] New GM did so even though both manual and automatic Cruze vehicles used "half shafts containing tubular bars manufactured by GM's second-tier supplier, Korea Delphi Automotive Systems Corporation."[225]

---

[220] *Id.*

[221] *See* March 28, 2014 Letter from New GM to NHTSA.

[222] *Id.*

[223] "GM recalls 172,000 Chevrolet Cruze Sedans over front axle half-shaft," *Bloomberg*, March 31, 2014.

[224] *See* April 11, 2014 Letter from New GM to NHTSA.

[225] *Id.*

708.     The 2013 recall was inadequate.  By February of 2014, New GM was aware of at least 47 claims of fractured tubular bars in model year 2013-2014 Cruze vehicles with automatic transmission.  New GM also learned that some of the manual Cruze vehicles that were "repaired" in the 2013 recall had *subsequently* suffered fractured half shafts.  Finally, New GM learned of fractured half-shaft in Cruze vehicles that were built *after* the August 1, 2013 build-date cutoff for the 2013 recall.[226]

709.     Finally, on March 26, 2014, New GM issued a safety recall that included (i) broader "build-date" coverage; (ii) both manual and automatic Cruze vehicles, and (iii) some manual Cruze vehicles that had been improperly repaired in the 2013 recall.

### e.    Seat hook weld defect.

710.     On July 22, 2014, New GM recalled 124,007 model year 2014 Chevrolet SS, 2014 Chevrolet Caprice, 2014 Chevrolet Caprice PPC, 2014 Chevrolet Silverado 1500, 2015 Chevrolet Silverado 2500/3500 HD, 2013-2014 Buick Encore, 2013-2014 Cadillac ATS, 2014 Cadillac CTS, 2014 Cadillac ELR, 2014 GMC Sierra 1500, and 2015 GMC Sierra 2500/3500 HD vehicles with a seat hook weld defect.[227]

711.     In the affected vehicles, as the result of an incomplete weld on the seat hook bracket assembly, in a "high load" situation, "the hook may separate from the seat track, increasing the risk of occupant injury in a crash."[228]

### f.    Front turn signal bulb defect.

712.     On July 21, 2014, New GM recalled 120,426 model year 2013 Chevrolet Malibu and 2011-2013 Buick Regal vehicles with a front turn signal bulb defect.

---

[226] *Id.*

[227] *See* July 22, 2014 Letter from New GM to NHTSA.

[228] *Id.*

010440-11  725144 V1

713.    In the affected vehicles, the driver will see a rapidly flashing turn signal arrow in the instrument cluster if both bulbs in one turn signal are burned out; but if only one bulb on either side burns out, there will be no signal to the driver.  The failure to properly warn the driver that a turn signal is inoperable increases the risk of accident.

714.    New GM first learned of the defect on September 6, 2012, when it conducted a read-across review on turn signal bulb outage and discovered that when one of the two front turn signal bulbs on either side burns out, there was no indication to the driver, and that the remaining functioning bulb did not likely meet the photometric requirements for turn signal lamps under Federal Motor Vehicle Safety Standards.  On September 26, 2012, New GM confirmed these vehicles did not comply with federal standards.

715.    However, New GM attempted to categorize this noncompliance as "inconsequential as it relate[s] to motor vehicle safety" by submitting a petition for exemption from the notification and remedy requirements of the Motor Vehicle Safety Act on October 25, 2012.  On July 15, 2014, New GM's petition was denied, and the company was forced to issue a recall.

### g.    Low-beam headlight defect.

716.    On May 14, 2014, New GM issued a safety recall of 103,158 MY 2005-2007 Chevrolet Corvette vehicles with a low-beam headlight defect.

717.    In the affected vehicles, the underhood bussed electrical center housing can expand and cause the headlamp low beam relay control circuit wire to bend.  When the wire is repeatedly bent, it can fracture and cause a loss of low-beam headlamp illumination.  The loss of illumination decreases the driver's visibility and the vehicle's conspicuity to other motorists, increasing the risk of a crash.

010440-11 725144 V1

718.    In May of 2013, prompted by 30 reports from drivers of the affected vehicles, NHTSA opened a preliminary evaluation of allegations of simultaneous loss of both low-beam headlights without warning in the affected vehicles.  The preliminary investigation looked at the low-beam headlights and all associated components, including but not limited to, switches, fuses and fuse box, and wiring and connectors.  New GM did not respond to the preliminary evaluation until June 27, 2013.

719.    On August 23, 2013, NHTSA upgraded the preliminary evaluation to an engineering analysis and expanded the vehicle scope to include MY 2005-2013 Chevrolet Corvette vehicles.  NHTSA provided New GM with Vehicle Owners' Questionnaires related to customer complaints of loss of low-beam headlamps.

720.    On January 14, 2014, New GM responded to the engineering analysis and had ongoing discussions with NHTSA through February 2014 regarding the Corvette vehicle.

721.    But New GM did nothing further until May 1, 2014, when it finally reviewed and analyzed warranty data and other records accumulated since NHTSA's August 2013 data request.  At this time NHTSA also provided New GM additional Vehicle Owners' Questionnaires received since January 2014.  After New GM analyzed the data received by model year for the affected vehicles, it presented its findings to the Field Performance Evaluation Review Committee on May 5, 2014, and on May 7, 2014, New GM decided to conduct a safety recall to remedy the low-beam headlight defect.

#### h.    Radio chime defect.

722.    On June 5, 2014, New GM issued a noncompliance recall of 57,512 MY 2014 Chevrolet Silverado LD, 2015 Chevrolet Silverado HD, 2015 Chevrolet Suburban, 2015 Chevrolet Tahoe, 2014 GMC Sierra LD, and 2015 GMC Sierra HD vehicles with a radio chime defect.

010440-11 725144 V1

723.     In the affected vehicles, the radios may become inoperative; when that happens,

there is no audible chime to notify the driver if the door is opened with the key in the ignition

and no audible seat belt warning indicating that the seat belts are not buckled.  These vehicles

fail to comply with the requirements of FMVSS numbers 114, "Theft Protection and Rollaway

Prevention," and 208, "Occupant Crash Protection."  Without an audible indicator, the driver

may not be aware that the driver's door is open while the key is in the ignition, and that creates a

risk of a vehicle rollaway.  Additionally, there will be no reminder that the driver's or front seat

passenger's seat belt is not buckled, which increases the risk of injury in a crash.

724.     New GM ordered a vehicle stop-shipment on April 28, 2014.  From April 30,

2014, through May 6, 2014, affected base radios were re-flashed with updated software at

assembly plants, and on May 21, 2014, a service bulletin was issued with instructions to update

the software in the affected vehicles.

725.     But New GM's efforts did not comply with the FMVSS, as it learned on May 28,

2014, after consulting its regulatory engineers.  New GM issued a noncompliance recall on May

29, 2014.

### i.     Fuel gauge defect.

726.     On April 29, 2014, New GM issued a safety recall of 51,460 MY 2014 Chevrolet

Traverse, GMC Acadia, and Buick Enclave vehicles with a fuel gauge defect.

727.     In the affected vehicles, the engine control module software may cause inaccurate

fuel gauge readings.  An inaccurate fuel gauge may result in the vehicle unexpectedly running

out of fuel and stalling, and thereby increases the risk of accident.

728.     In July 2013, New GM began producing the 2014 MY Buick Enclave, Chevrolet

Traverse, and GMC Acadia vehicles with a revised software calibration to better predict fuel

- 218 -

levels.  The revised calibration takes into account actions such as refueling events, sloshing of fuel during operation, and consumption rates to better predict fuel level readings.

729.    But in August 2013, New GM received feedback from rental fleet customers regarding errors in gauge readings predominantly at the "full" end of the range.  Many rental customers complained they were charged a fuel surcharge for vehicles that had been refueled but were still reading less than full.  In response, on September 23, 2013, New GM switched back to using the 2013 MY fuel gauge software and calibration in new productions and issued a service bulletin to address the issue in vehicles already out in the market.

730.    On November 19, 2013, New GM was put on notice of a quality concern regarding inaccurate fuel gauge readings and warranty claims indicating "running out of fuel."  It conducted further searches and, as of December 6, 2013, discovered approximately 1,000 complaints of inaccurate fuel gauge readings, with the majority of these reading less than full, and 62 related to running out fuel.

731.    On January 9, 2014, New GM proposed only a customer satisfaction field action. NHTSA took the matter under consideration to provide additional feedback, and returned with information supporting a safety recall in lieu of a customer satisfaction field action.

732.    Hence, New GM finally decided to recall the affected vehicles on April 22, 2014.

    **j.    Windshield wiper system defect.**

733.    On May 14, 2014, New GM recalled 19,225 MY 2014 Cadillac CTS vehicles with a windshield wiper system defect.

734.    In the affected vehicles, a defect leaves the windshield wiper system prone to failure; though the windshield wipers systems are particularly prone to failure after a vehicle jump start occurs while the wipers are on and restricted by snow and ice, "an unstable voltage in

- 219 -

the vehicle can reproduce this condition without an external jump start." Inoperative windshield wipers can decrease the driver's visibility and increase the risk of a crash.[229]

735.    On January 17, 2014, New GM received a warranty claim and an inoperative wiper module from an affected vehicle. The supplier, BOSCH, examined the module and determined that the MOSFET (metal-oxide-semiconductor field-effect transistor) "Trench 4" was damaged. (A "Trench" is a design style of a MOSFET). New GM engineering and BOSCH then investigated possible causes of MOSFET damage from the part manufacturing through the vehicle assembly processes.[230]

736.    On February 26, 2014, BOSCH began using MOSFET Trench 3 instead of Trench 4.

737.    On April 15, 2014, "GM was able to reproduce electrical overstress inputs that could create a damaged MOSFET failure in a vehicle with restricted wipers during a jumpstart. GM tested the MOSFET Trench 3 for electrical overstress and they did not exhibit the same failure." BOSCH then "duplicated the MOSFET [Trench] electrical overstress condition on a bench without a vehicle jumpstart."[231]

738.    On May 7, 2014, New GM decided to conduct a safety recall, and the recall notice was issued on May 14, 2014.

**k.    Console bin door latch defect.**

739.    On August 7, 2014, New GM issued a safety recall of 14,940 MY 2014-2015 Chevrolet Impala vehicles with a console bin door latch defect.[232]

---

[229] *See* May 28, 2014 Letter to NHTSA.

[230] *Id.*

[231] *Id.*

[232] *See* August 7, 2014 Letter from New GM to NHTSA.

740.     In the affected vehicles, the inertia latch on the front console bin compartment

door may not engage in the event of a rear collision and the front console compartment door may

open, increasing the risk of occupant injury.[233]  These vehicles fail to comply with the

requirements of FMVSS No. 201, "Occupant Protection In Interior Impact."[234]

### l.     Driver door wiring splice defect.

741.     On June 11, 2014, New GM recalled 14,765 MY 2014 Buick LaCrosse vehicles

with a driver door wiring splice defect.

742.     In the affected vehicles, a wiring splice in the driver's door may corrode and

break, resulting in the absence of an audible chime to notify the driver if the door is opened

while the key is in the ignition.  Additionally, the Retained Accessory Power module may stay

active for ten minutes allowing the operation of the passenger windows, rear windows, and

sunroof.  As such, these vehicles fail to comply with the requirements of FMVSS numbers 114,

"Theft Protection and Rollaway Prevention," and 118, "Power-Operated Window, Partition, and

Roof Panel Systems."  Without an audible indicator, the driver may not be aware that the driver's

door is open while the key is in the ignition, increasing the risk of a vehicle rollaway.  If the

passenger windows, rear windows, and sunroof can function when the vehicle is turned off and

the driver is not in the vehicle, there is an increased risk of injury if an unsupervised occupant

operates the power closures.

743.     New GM first learned of this defect on August 21, 2013, when a test fleet vehicle

reported an inoperable driver window swift.  New GM added the issue to Problem Resolution.

744.     But New GM did not perform a warranty analysis until nearly eight months later

in April 2014.  The warranty analysis identified additional claims for this condition for harnesses

---

[233] *Id.*

[234] *Id.*

produced July 2013 through September 2013.  On April 21, 2014, the issue was reviewed and a New GM engineer identified "two FMVSS standards, 114 and 118, that may be impacted."

745.    A Product Investigations Engineer was assigned to investigate further.  On May 8, 2014, a review of TREAD data and additional warranty files revealed additional related claims.

746.    New GM finally issued a safety recall on June 4, 2014.

**m.    O**verloaded feed defect.

747.    On July 2, 2014, New GM recalled 9,371 MY 2007-2011 Chevrolet Silverado and 2007-2011 GMC Sierra HD vehicles with an overloaded feed defect.

748.    In the affected vehicles, an overload in the feed may cause the underhood fusible link to melt due to electrical overload, resulting in potential smoke or flames that could damage the electrical center cover and/or the nearby wiring harness conduit.

749.    Sometime prior to January 2012, New GM received reports of four underhood fires resulting from an auxiliary battery fusible link wire melting, opening circuit, and contacting surrounding components.  On January 19, 2012, New GM initiated a Customer Satisfaction Program to close a product investigation into the reported fires.  New GM states a design change had already been implemented into production in June 2011.

750.    More than two years later, on May 5, 2014, the Engineering Analysis department requested that Product Investigations conduct an investigation to confirm the complete population was included in the Customer Satisfaction Program and that the remedy was effective.  From May 20 to May 23, 2014, data was reviewed from a recent pull of New GM reports and warranty.  The investigation revealed that while all identified vehicles reported to have an incident were included in the original investigation and vehicle population, two vehicles involved in the Customer Satisfaction Program experienced incidents, including one fire,

subsequent to the Customer Satisfaction Program.  Both of these vehicles had not had the repair performed.

751.    After review during an Open Investigation Review on June 23, 2014, and on June 25, 2014, New GM issued a safety recall for vehicles not yet repaired under the Customer Satisfaction Program.

**n.    Windshield wiper module assembly defect.**

752.    On June 26, 2014, New GM recalled 4,794 MY 2013-2014 Chevrolet Caprice and 2014 Chevrolet SS vehicles with a windshield wiper module assembly defect.

753.    In the affected vehicles, the motor gear teeth may become stripped and the wipers inoperable.  Inoperable wipers increase the risk of accident in inclement conditions.

754.    After noting an increase in warranty claims, New GM requested that dealers return parts related to wiper motor warranty claims on February 14, 2014.

755.    Nearly three months later, on May 1, 2014, New GM held a meeting with the supplier of the wiper motor and learned that the supplier had used unauthorized grease in the motors built from January 15, 2013 to August 5, 2013.  The supplier changed back to the authorized grease after a July 24, 2013 lot test revealed the gear teeth stripping.  New GM claims that, prior to May 1, 2014, it was unaware of the grease changes or the gear stripping condition.

756.    A root cause investigation between May 7, 2014, and June 3, 2014, conducted by the supplier with New GM Engineering participation, determined the source of the problem was the unauthorized grease and its improper application to the wiper motor gear teeth.

757.    On June 19, 2014, New GM decided to conduct a safety recall.

010440-11  725144 V1

o.      **Engine block heater power cord insulation defect.**

758.    On July 2, 2014, New GM issued a safety recall of 2,990 MY 2013-2014 Chevrolet Cruze, 2012-2014 Chevrolet Sonic, 2013-2014 Buick Encore, and 2013-2014 Buick Verano vehicles with an engine block heater power cord insulation defect.

759.    In the affected vehicles the insulation on the engine block heater cord can be damaged, exposing the wires.  Exposed wires increase the risk of electrical shock and personal injury if the cord is handled while plugged in.

p.      **Rear shock absorber defect.**

760.    On June 27, 2014, New GM issued a safety recall of 1,939 MY 2014 Chevrolet Corvette vehicles with a rear shock absorber defect.

761.    In the affected vehicles, an insufficient weld in the rear shocks can cause the shock absorber tube to separate from the shock absorber bracket.  That separation may cause a sudden change in vehicle handling behavior that can startle drivers and increase the risk of a crash.[235]

q.      **Electronic stability control defect.**

762.    On March 26, 2014, New GM issued a safety recall for 656 MY 2014 Cadillac ELR vehicles with an electronic stability control defect.

763.    In the affected vehicles, the electronic stability control system software may inhibit certain diagnostics and fail to alert the driver that the electronic stability control system is partially or fully disabled.  Therefore, these vehicles fail to conform to FMVSS number 126, "Electronic Stability Control Systems."  A driver who is not alerted to an electronic stability

---

[235] *See* June 26, 2014 Letter from New GM to NHTSA.

010440-11  725144 V1

control system malfunction may continue driving with a disabled system.  That may result in the loss of directional control, greatly increasing the risk of a crash.[236]

**r.       Unsecured floor mat defect.**

764.     On June 18, 2014, New GM issued a safety recall of 184 MY 2014 Chevrolet Silverado LD and 2014 GMC Sierra LD vehicles with an unsecured floor mat defect.

765.     The affected vehicles built with the optional vinyl flooring option and equipped with the optional All-Weather Floor Mats do not have the retention features necessary to properly secure the floor mat on the driver's side.  The driver's floor mat can shift such that it interferes with the accelerator pedal, and thus increases the risk of a crash.[237]

766.     On January 20, 2014, a New GM dealership informed New GM marketing that vehicles in affected class of vehicles have no floor mat retention features.  Accordingly, New GM should not have permitted that combination of options (the vinyl floor and All-Weather Floor Mats).  On January 22, 2014, New GM revised its systems to prevent vehicles being ordered with that combination.[238]

767.     New GM waited another month before cancelling all orders for the vinyl flooring and All-Weather Floor Mats on February 24, 2014.  Then, on February 25, 2014, New GM instructed its Accessory Distribution Centers not to ship All-Weather Floor Mats to vehicles with the vinyl flooring option.[239]  New GM informed dealerships with affected vehicles, and advised them to remove and destroy any floor mats installed in the vehicles.  New GM also issued an

---

[236] *See* March 26, 2014 Letter from New GM to NHTSA.

[237] *See* June 18, 2014 Letter from New GM to NHTSA.

[238] *Id.*

[239] *Id.*

010440-11  725144 V1

Engineering Work Order to restrict orders for All-Weather Floor Mats to vehicles with the carpet floor covering option.[240]

768.    Inexplicably, though New GM presented this issue to the Field Performance Evaluation group on February 25, 2014, it was not until June 11, 2014 that New GM decided to conduct a safety recall.[241]

####    s.    Fuse block defect.

769.    On May 23, 2014, New GM issued a safety recall of 58 MY 2015 Chevrolet Silverado HD and GMC Sierra HD vehicles with a fuse block defect.

770.    In the affected vehicles, the retention clips that attach the fuse block to the vehicle body can become loose allowing the fuse block to move out of position.  When this occurs, exposed conductors in the fuse block may contact the mounting studs or other metallic components, which in turn causes a "short to ground" event.  That can result in an arcing condition, igniting nearby combustible materials and starting an engine fire.[242]

771.    New GM became aware of this issue by January 30, 2014, when the fuse block became disconnected and resulted in the fiber wheel liner catching fire during testing of an affected vehicle at the Flint Assembly Plant.  New GM put a hold on all vehicles with suspect fuse block, and assigned an internal investigator to the issue.[243]

772.    On February 3, 2014, New GM issued a Stop Delivery Order on all of the vehicles with the suspect fuse block and informed NHTSA of the issue.  At the time, New GM

---

[240] *Id.*

[241] *Id.*

[242] *See* May 30, 2014 Letter from New GM to NHTSA.

[243] *Id.*

010440-11  725144 V1

claims, only one of the affected vehicles had been sold; New GM contacted that customer and repaired the sold vehicle.[244]

773.    New GM issued a Service Update Bulletin (SUB 14034) for all unsold vehicles with the defective fuse blocks, and provided its dealership with repair kits in February of 2014.[245]  New GM revised the repair after it discovered a susceptibility to corrosion during a March 2014 durability test—but only used the enhanced kit for the vehicles that had not already been repaired by May of 2014.[246]

774.    On May 7, 2014, New GM found that there were 58 affected vehicles that had not been repaired.  Inexplicably, 20 of the 58 vehicles had been sold—even though New GM had known about the defect prior to the sales.[247]

775.    On May 19, 2014, New GM decided to conduct a safety recall of all 58 affected vehicles.[248]

t.    **Diesel transfer pump defect.**

776.    On April 24, 2014, New GM issued a safety recall of 51 MY 2015 GMC Sierra HD and 2015 Chevrolet Silverado HD vehicles.

777.    In the affected vehicles, the fuel pipe tube nuts on both sides of the diesel fuel transfer pump may not be tightened to the properly torque.  That can result in a diesel fuel leak, which can cause a vehicle fire.[249]

---

[244] *Id.*

[245] *Id.*

[246] *Id.*

[247] *Id.*

[248] *Id.*

[249] *See* April 24, 2014 Letter from New GM to NHTSA.

010440-11  725144 V1

u.    **Rear suspension toe adjuster link defect.**

778.    On September 17, 2014, New GM issued a safety recall for 290,241 MY 2010-
2015 Cadillac SRX and 2011-2012 Saab 9-4x vehicles with a rear suspension toe adjuster link
defect that can cause vehicles to sway or wander on the road.[250]

779.    According to New GM, in the affected vehicles, "the jam nut in the rear
suspension toe adjuster link may not be torqued to the proper specification.  A loose toe adjuster
link can cause the vehicle to sway or wander at highway speed, activate the vehicle's electronic
stability control system, and cause excessive wear to the threads in the link….If the threads in the
link become worn, the link may separate."[251]  If the link separates, that "would create sudden
vehicle instability, increasing the risk of a crash."[252]

780.    Once again, New GM should have picked up on this defect years earlier.  In fact,
in 2011, New GM conducted a safety recall of Cadillac CTS vehicles with a similar rear
suspension toe adjuster link defect.[253]

781.    New GM claims that, ever since 2011, it had been "monitor[ing] warranty data
associated with the suspension systems in Cadillac SRX vehicles, which utilized similar rear
suspension components" to the Cadillac CTS vehicles that were recalled in 2011.[254]  "As of July
2014, [New] GM had received 83 warranty claims, 14 TREAD reports, and two NHTSA VOQs
relating to the rear suspension system on 2010 through 2012 MY Cadillac SRX vehicles."[255]

---

[250] *See* New GM's Sept. 17, 2014 Part 573 Safety Report.

[251] *Id.*

[252] *Id.*

[253] *Id.*

[254] *Id.*

[255] *Id.*

782.    Between July 14 and early September 2014, GM "determined that the rear

suspension adjuster link jam nuts in some 2010-2015 MY Cadillac SRX vehicles may not have

been torqued to the proper specification"[256]—*just as in the case of the Cadillac CTS vehicles*

*that had been recalled several years earlier.*

783.    Finally, on September 10, 2014, New GM decided to conduct a safety recall of

the Cadillac SRX vehicles.

784.    New GM offers no explanation as to why it took so long to finally expand the

recall to cover vehicles sharing the same components and the same defects with vehicles that had

been recalled several years earlier.

**v.      Hood latch defect**

785.    On September 23, 2014, New GM recalled 89,294 MY 2013-2015 Chevrolet

Spark vehicles with a hood latch defect.[257]

786.    According to New GM, the affected vehicles "were manufactured with a

secondary hood latch that may prematurely corrode at the latch pivot causing the striker to get

stuck out of position and preventing the striker from properly engaging the hood latch."[258]  If this

happens, "the vehicle's hood may open unexpectedly," and that will "likely" impair the driver's

vision and increase the risk of a collision.[259]

787.    In November 2013, the secondary hood latch in the affected vehicles "failed a 10-

year component level corrosion test."  By February 2014, New GM determined that "the anti-

---

[256] *Id.*

[257] *See* New GM's September 23, 2014 Part 573 Safety Recall Report.

[258] *Id.*

[259] *Id.*

010440-11  725144 V1

Case 1:14-md-02543-JMF   Document 345   Filed 10/14/14   Page 250 of 712

corrosion coating applied to the secondary hood latch was deficient and did not meet" the company's requirements.[260]

788.    New GM commenced a search for the "root cause" of the defect from March 24 through September 18, 2014.  New GM found that, in the earlier MY Chevrolet Sparks, "all secondary hood latches were coated with an 'ED' coat (electro deposition of zinc phosphate) rather than the required 'MFC-A' coat (e.g., a phosphate and oil based corrosion protection coat)."  As of July 31, 2014, MFC-A coating was used for the Sparks.[261]

789.    New GM's investigation found 10 warranty cases in the U.S. for premature corrosion of the hood latches.[262]

790.    On September 18, 2014, New GM decided to conduct a safety recall.

### w.    Electrical short defect.

791.    On October 2, 2014, New GM announced a recall of 117,652 MY 2013-2014 Chevrolet Tahoe, 2013-2014 Chevrolet Suburban, 2013-2014 GMC Yukon, 2013-2014 GMC Yukon, 2013-2014 Cadillac Escalade, 2013-2014 Cadillac CTS, 2014 Chevrolet Traverse, 2014 GMC Acadia, 2014 Buick Enclave, 2014 Chevrolet Express, 2014 GMC Savana, 2014 Chevrolet Silverado, and 2014 GMC Sierra vehicles with a defect that can cause an electrical short.[263]

792.    In the affected vehicles, due to a defect in the chassis control module, metal slivers can cause an electrical short that results in the vehicle stalling or not starting.[264]  This creates a serious risk of accident.

---

[260] *Id.*

[261] *Id.*

[262] *Id.*

[263] *See "GM recalls 117,651 vehicles for potential electrical short issue,"* Reuters (Oct. 2, 2014).

[264] *Id.*

010440-11  725144 V1

793.    As of this writing, New GM has not yet released further information about this defect or the recall.

**H.    New GM's Deception Recalls Has Harmed Plaintiffs and the Class**

794.    New GM was well aware that vehicle recalls, especially untimely ones, can taint its brand image and the value of GM vehicles.  In its 2010 Form 10-K submitted to the SEC, New GM admitted that "Product recalls can harm our reputation and cause us to lose customers, particularly if those recalls cause consumers to question the safety or reliability of our products.  Any costs incurred or lost sales caused by future product recalls could materially adversely affect our business."[265]

795.    Unfortunately for owners of GM-branded vehicles, New GM was correct.  It is difficult to find a brand whose reputation has taken as great a beating as has the New GM brand starting in February 2014 when the first ignition switch recall occurred.

796.    In fact, the public outcry has been significant in response to the ongoing revelations of the massive number of defects New GM concealed, and the massive number of defective vehicles New GM has sold.  The following are illustrative examples of the almost constant beating the New GM brand has taken ever since the first ignition switch recall was announced on July 13, 2014.

797.    After the announcement the first ignition switch recall the media was highly critical of GM.  For example, a CBS February 27, 2014, news report headlined:

By AIMEE PICCHI   MONEYWATCH   February 27, 2014 1:41 PM

# Did GM wait too long to issue its recall?

---

[265]   General Motors 2010 Form 10-K, p. 31, available at https:llwww.sec.gov/Archives/edgar/data/1467858/0001193125 10078119/dlOk.htm#toc85733 4.

- 231 -

798.   The CBS report had a video link:[266]



**13 deaths now linked to GM faulty ignition switches, recall expanded**

799.   On March 13, 2014 a CNN report was entitled:

## Feds demand answers from GM on recall defect

By Mike M. Ahlers, CNN
updated 7:51 AM EDT, Thu March 13, 2014

800.   On March 16, 2014, Reuters reported as follows:

# Owners of recalled GM cars feel angry, vindicated

(Reuters) – As details emerge about how General Motors Co dealt with faulty ignition switches in some of its models, car owners are increasingly angry after learning that the automaker knowingly allowed them to drive defective vehicles.

Saturn Ion owner Nancy Bowman of Washington, Michigan, said she is outraged that GM allowed her to drive a "death trap." She said her car had so many ignition problems she was afraid to resell it to an innocent buyer.

She bought the 2004 model car new and still drives it after extensive repairs and multiple run-ins with a Saturn dealer she called dismissive.

---

[266] http://www.cbsnews.com/news/did-general-motors-wait-too-long -to-issue-its-recall/.

"Five times the car died right out from under me after hitting a
bump in the road," she wrote in a 2013 posting on a complaint
website, arfc.org, that says it sends information to the National
Highway Traffic Safety Administration (NHTSA).

Every time I brought it in they said it was an isolated incident.
Couldn't find the problem, so they acted like I was an idiot.

801.    On March 24, 2014, the NEW YORK TIMES issued an article entitled:

BUSINESS DAY

### *General Motors Misled Grieving Families on a Lethal Flaw*

By HILARY STOUT, BILL VLASIC, DANIELLE IVORY and REBECCA R. RUIZ   MARCH 24, 2014

802.    It contained a troublesome account of GM's conduct:

It was nearly five years ago that any doubts were laid to rest
among engineers at General Motors about a dangerous and faulty
ignition switch.  At a meeting on May 15, 2009, they learned that
data in the black boxes of Chevrolet Cobalts confirmed a
potentially fatal defect existed in hundreds of thousands of cars.

But in the months and years that followed, as a trove of internal
documents and studies mounted, G.M. told the families of accident
victims and other customers that it did not have enough evidence
of any defect in their cars, interviews, letters and legal documents
show.  Last month, G.M. recalled 1.6 million Cobalts and other
small cars, saying that if the switch was bumped or weighed down
it could shut off the engine's power and disable air bags.

In one case, G.M. threatened to come after the family of an
accident victim for reimbursement of legal fees if the family did
not withdraw its lawsuit.  In another instance, it dismissed a family
with a terse, formulaic letter, saying there was no basis for claims.

*    *    *

Since the engineers' meeting in May 2009, at least 23 fatal crashes
have involved the recalled models, resulting in 26 deaths.  G.M.
reported the accidents to the government under a system called
Early Warning Reporting, which requires automakers to disclose
claims they receive blaming vehicle defects for serious injuries or
deaths.

A New York Times review of 19 of those accidents – where
victims were identified through interviews with survivors, family
members, lawyers and law enforcement officials – found that G.M.

- 233 -

Case 14-mc-02543-JMF   Document 345   Filed 10/14/14   Page 254 of 712

pushed back against families in at least two of the accidents, and reached settlements that required the victims to keep the discussions confidential.

\* \* \*

In other instances, G.M. ignored repeated calls, families said. "We did call G.M.," said Leslie Dueno, whose 18-year-old son, Christopher Hamberg, was killed on June 12, 2009 – not quite a month after the critical May 15 meeting of G.M. engineers about the ignition data – driving his 2007 Cobalt home before dawn in Houston.  He lost control at 45 miles per hour and hit a curb, then a tree, the police report said.  "Nobody ever called me.  They never followed up.  Ever."

Last month's recalls of the Cobalt and five other models encompassed model years 2003 through 2007.  G.M. faces numerous investigations, including one by the Justice Department looking into the company's disclosures in its 2009 bankruptcy filing as well as what it told regulators.

"We are conducting an unsparing, comprehensive review of the circumstances leading to the ignition switch recall," G.M. said in a statement on Monday.  "As part of that review we are examining previous claims and our response to them.  If anything changes as a result of our review, we will promptly bring that to the attention of regulators."

G.M. has said it has evidence of 12 deaths tied to the switch problem, but it has declined to give details other than to say that they all occurred in 2009 or earlier.  It says it has no conclusive evidence of more recent deaths tied to the switch.

\* \* \*

It was unclear how many of the 26 deaths since the 2009 meeting were related to the faulty ignition, but some appeared to fit patterns that reflected the problem, such as an inexplicable loss of control or air bags that did not deploy.  In some cases, the drivers had put themselves at risk, including having high blood-alcohol levels or texting.

Still, by the time Benjamin Hair, 20, crashed into a tree in Charlottesville, Va., on Dec. 13, 2009, while driving a Pontiac G5 home, G.M. had conducted five internal studies about the ignition problem, its records indicate.

…

- 234 -

Consumer complaints and claims came to the company in a variety of ways – through lawsuits, calls, letters and emails, warranty claims, or insurance claims. G.M.'s legal staff was the recipient of lawsuits, insurance information, accident reports and any other litigation-related paperwork. But warranty claims and customer calls were routed through the sales and service division – a vast bureaucracy that occupies most of one tower at G.M.'s headquarters in Detroit. Because the legal staff reports to the chief executive, and the sales department to the head of G.M. North America, it is unclear whether they share information related to a specific car, like the Cobalt.

803. NPR ran a story on March 31, 2014:

## Timeline: A History Of GM's Ignition Switch Defect

By TANYA BASU

March 31, 2014  4:31 PM ET

804. The NPR story raised questions about GM's candor:

NPR looked into the timeline of events that led to the recall. It's long and winding, and it presents many questions about how GM handled the situation: How long did the company know of the problem? Why did the company not inform federal safety officials of the problem sooner? Why weren't recalls done sooner? And did GM continue to manufacture models knowing of the defect?

805. On May 11, 2014, the CHICAGO TRIBUNE ran an article entitled:

*GM ranked worst automaker by U.S. suppliers:  survey*

DETROIT (Reuters) – General Motors Co, already locked in a public relations crisis because of a deadly ignition defect that has triggered the recall of 2.6 million vehicles, has a new perception problem on its hands.

The U.S. company is now considered the worst big automaker to deal with, according to a new survey of top suppliers to the car industry in the United States.

Those so-called "Tier 1" suppliers say GM is now their least favorite big customer, according to the rankings, less popular even than Chrysler, the unit of Fiat Chrysler Automobiles FIA.MI, which since 2008 had consistently earned that dubious distinction.

Suppliers gave GM low marks on all kinds of key measures, including its overall trustworthiness, its communication skills, and its protection of intellectual property.

806.    On May 25, 2014, an article reported on a 2.4 million vehicle recall:

## When Will GM's Recall Mess End?

**General Motors** (NYSE: <u>GM</u>) on Tuesday said it is recalling about 2.4 million additional vehicles in four separate recalls for a variety of problems, including faulty seat belts and gearshift troubles.

This announcement came on the heels of another set of GM recalls, announced last Thursday, covering 2.7 million vehicles. Including the four recalls announced on Tuesday, GM has issued a total of 30 recalls in the U.S. so far in 2014, encompassing about 13.8 million vehicles.

That's a stupendous number.[267]

807.    On May 26, 2014, the NEW YORK TIMES ran an article:

BUSINESS DAY

## *13 Deaths, Untold Heartache, From G.M. Defect*

By REBECCA R. RUIZ, DANIELLE IVORY and HILARY STOUT    MAY 26, 2014

808.    The article once again pointed blame at GM:

BEN WHEELER, Tex. – For most of the last decade, Candice Anderson has carried unspeakable guilt over the death of her boyfriend. He was killed in 2004 in a car accident here, and she was at the wheel. At one point, Ms. Anderson, who had a trace of Xanax in her blood, even faced a manslaughter charge. She was 21.

All these years, Ms. Anderson – now engaged and a mother – has been a devoted visitor to his grave. She tidies it every season, sweeping away leaves and setting down blue daisies with gold glitter for his birthday, miniature lit trees for Christmas, stones with etched sayings for the anniversary of their accident.

"It's torn me up," Ms. Anderson said of the death of Gene Mikale Erickson. "I've always wondered, was it really my fault?"

---

[267] http://www.fool.com/investing/general/2014/05/25/when-will-gms-recall-mess-end.aspx.

010440-11  725144 V1

Case 1:14-mc-02543-JMF    Document 345    Filed 10/14/14    Page 257 of 712

Last week, she learned it was not.

\* \* \*

Inside G.M., the nation's largest automaker, some of the 13 victims appear on charts and graphs with a date and a single word: "fatal."

809.    News of GM's misconduct and of the recalls made the front page of every major newspaper and was the lead story on every major television news program in the country.

810.    The congressional hearings where GM executives were subject to harsh questioning and criticism were widely reported in every type of media.

811.    In June 2014 GM recalled another 8.2 million vehicles and again these recalls received widespread attention in the press.  The stories often included charts and graphs depicting the ever-growing list of vehicles recalled:

## GM to recall 8.2 million more vehicles over ignition-switch defect

*POSTED AT 3:21 PM ON JUNE 30, 2014*

The recall blues continue at GM, as does the scope of their previously hidden ignition-switch defect.  The world's largest automaker <u>added 8.45 million more vehicles to its list</u>, with some models going back to 1997.  This puts GM over the 28-million mark for cars recalled on a global basis in 2014, and over 26 million domestic.[268]

812.    The coverage did not simply die down as often happens.  On July 15, 2014, the NEW YORK TIMES ran an article entitled, "Documents Show General Motors Kept Silent on Fatal Crashes."

813.    By August 2, 2014, the press was reporting that New GM used vehicles were losing value:

---

[268] http://hotair.com/archives/2014/06/30/gm-to-recall-8-2-million-more-vehicles-over-ignition-switch-defect-8-45-million-overall/.

010440-11  725144 V1

THE DALLAS MORNING NEWS

**August 2, 2014 Saturday**
1 Edition

**SECTION:** BRIEFING; Pg. 10

**LENGTH:** 80 words

**HEADLINE:** GM vehicles' resale values are taking a hit as safety recalls mount

**BODY:**

Although General Motors' sales remained solid in the midst of its recent record recalls, some vehicles experienced significant drops in their resale values.

In an analysis of more than 11 million used cars for sale between March and June of this year, iSeeCars.com found that the resale values of the main vehicles in GM's recalls dropped 14 percent from the same period last year.

814.    An August 5, 2014 article also reported that used GM vehicles were suffering loss

in value due to the recalls:[269]



Ignition recall caused resale values to take a hit—some Pontiac, Saturn and Chevy models were most affected.

General Motors Co.  GM -0.41%  has been fortunate to avoid a collapse of new-vehicle sales since the ignition-switch safety crisis blew up in January, engulfing the automaker in litigation, a federal criminal probe and Congressional inquiries.

Used GM vehicles – models affected by the recall – meanwhile have taken a substantial hit in value, according to a study by iSeeCars.com, an online search engine. GM's new-vehicles sales

---

[269] Doron Levin, FORTUNE MAGAZINE, August 5, 2014.

are up 3.5% in the U.S. through July in a market that has risen 5% in terms of unit sales.

(Holders of GM stock have gotten whacked as well since January, the value of shares falling nearly 18%, compared with a S&P 500 Index that has risen 4% during the period.)

The operators of the search engine said they created an algorithm to determine the market value of six GM cars affected by the recall, based on asking prices of used vehicles on dealer lots from March to June 2013, compared to a year later. The change in value also was compared to the dropping value of all used cars in the U.S., which has been occurring for the past few months. The sample size was 11 million cars.

The average price of the recalled GM models dropped 14% from March to June 2014, compared to a year earlier and adjusted for inflation. The drop in value of all similar models was 6.7% during the same period.

Phong Ly, chief executive and co-founder of iSeeCars.com said "recalls are playing a role in motivating sellers to sell their used cars and at a lower price point than they otherwise would." His company provides free information to car shoppers and sells sales leads to dealers.

815.    The crisis that affected the GM Brand was so significant that GM stock has been battered.  A September 22, 2014 report observed:[270]

## GM Falls Deeper Into The Abyss

Sep. 22, 2014 7:55 AM ET | About: General Motors Company (GM)

**Summary**

- GM has been in a rut since the ignition switch recalls.

- More and more, GM is coming off as a perpetually troubled business.

- We continue to avoid General Motors stock.

---

[270] *See* http://seekingalpha.com/article/2511545-gm-falls-deeper-into-the-abyss.

010440-11  725144 V1

> We previously wrote about GM (NYSE:GM) and placed a $31
> price target on it here. Our basic argument was that GM was going
> to have trouble presenting itself into the mainstream as a reputable
> brand to buy after the ignition switch recall.
>
> Late Sunday, it was announced that GM was recalling 222,500
> vehicles due to brake pad malfunction. This number towers over
> the amount of normal recalls that come during the course of
> business. It's also involving vehicles that were made from 2013 to
> 2015, a clear indicator that these vehicles (manufactured by the
> post-bankruptcy GM) should have had a renewed focus of safety
> on them from the beginning.

816.   The impact on the value of GM-brand is also evidenced by the decline in GM's

stock price which hit a 52 week low on October 10, 2014.

817.   New GM's unprecedented concealment of a large number of serious defects, and

its irresponsible approach to safety, quality, and reliability issues, has caused damage to

Plaintiffs and the Class.

818.   A vehicle made by a reputable manufacturer of safe, high quality, and reliable

vehicles who stands behind its vehicles after they are sold is worth more than an otherwise

similar vehicle made by a disreputable manufacturer known for selling defective vehicles and for

concealing and failing to remedy serious defects after the vehicles are sold.

819.   A vehicle purchased or leased under the reasonable assumption that it is safe and

reliable is worth more than a vehicle of questionable safety, quality, and reliability due to the

manufacturer's recent history of concealing serious defects from consumers and regulators.

820.   Purchasers and lessees of GM-branded vehicles after the July 10, 2009 inception

of New GM paid more for the vehicles than they would have had New GM disclosed the many

defects it had a duty to disclose in GM-branded vehicles, and disclosed that GM's culture and

business model was such that it did not produce safe, high quality, and reliable vehicles.

Because New GM concealed the defects and the fact that it was a disreputable brand that valued

cost-cutting over safety, Plaintiffs and the Class did not receive the benefit of their bargain. And

the value of all their vehicles has diminished as the result of New GM's deceptive conduct.

821. On information and belief, an estimate of the diminished value in class vehicles

not subject to the ignition switch recall is illustrated by way of example as follows for a few

Model Year 2013 vehicles:

| GMC | Terrain | September Diminished Value: $1,052 |
|---|---|---|
| GMC | Sierra 1500 | September Diminished Value: $325 |
| Buick | Lacrosse | September Diminished Value: $954 |
| Chevrolet | Suburban | September Diminished Value: $854 |
| Cadillac | CTS | September Diminished Value: $867 |
| Cadillac | XTS | September Diminished Value: $1,722 |

822. Another example is the diminished value of illustrative 2011 models:

| GMC | Terrain | September Diminished Value: $891 |
|---|---|---|
| Buick | Lacrosse | September Diminished Value: $1,017 |

823. GM-branded vehicles not involved in the ignition switch recall experienced

declines in value when the ignition switch recalls occurred due to the impact on the perception of

buyers concerning New GM's promises of safety and reliability. As news of New GM's culture

of deceit grew, so did diminished value. The following estimates are examples:

| | Diminished Value as of 03/2014 | Diminished Value as of 09/2014 |
|---|---|---|
| 2008 Cadillac STS | $249 | $1,243 |
| 2008 GMC Acadia | $730 | $1,011 |
| 2010 GMC Terrain | $403 | $912 |

010440-11 725144 V1

824. GM vehicles subject to the ignition switch recall also have suffered diminished value by way of example:

| | Diminished Value as of 03/2014 | Diminished Value as of 09/2014 |
|---|---|---|
| 2008 Cobalt | $256 | $357 |
| 2008 HHR | $162 | $477 |
| 2009 Sky | $173 | $429 |

825. If New GM had timely disclosed the many defects as required by the TREAD Act, the law of fraudulent concealment, and consumer laws set forth below, Class members' vehicles would be considerably more valuable than they are now and/or Class members would have paid less than they did. Because of New GM's now highly publicized campaign of deception, and its belated, piecemeal and ever-expanding recalls, so much stigma has attached to the New GM brand that no rational consumer would pay what otherwise would have been fair market value for the Affected Vehicles.

## V. TOLLING OF THE STATUTES OF LIMITATION

### A. Discovery Rule Tolling

826. Within the time period of any applicable statutes of limitation, Plaintiffs and the other Class members could not have discovered through the exercise of reasonable diligence that New GM was concealing scores of defects and misrepresenting the Company's true position on safety issues.

827. Plaintiffs and the other Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that New GM did not report information within its knowledge to federal authorities (including NHTSA), its dealerships or consumers, nor would a reasonable and diligent investigation have disclosed that New GM had information in its

- 242 -

possession about the existence and dangerousness of numerous defects and opted to conceal that information until shortly before this action was filed, and nor would such an investigation have disclosed that New GM valued cost-cutting over safety and actively discouraged its personnel from uncovering or raising safety issues.

828.    All applicable statutes of limitation have been tolled by operation of the discovery rule.

**B.    Fraudulent Concealment Tolling**

829.    All applicable statutes of limitation have also been tolled by New GM's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

830.    Instead of disclosing the myriad safety defects and disregard of safety of which it was aware, New GM falsely represented that its vehicles were safe, reliable, and of high quality, and that it was a reputable manufacturer that stood behind GM-branded vehicles after they were sold.

**C.    Estoppel**

831.    New GM was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the Defective Ignition Switch Vehicles.

832.    New GM knowingly, affirmatively, and actively concealed the true nature, quality, and character of the Defective Ignition Switch Vehicles from consumers.

833.    New GM was also under a continuous duty to disclose to Plaintiffs and the Class that scores of other defects plagued GM-branded vehicles, and that it systematically devalued safety.

834.    Based on the foregoing, New GM is estopped from relying on any statutes of limitations in defense of this action.

- 243 -

## VI.    CHOICE OF LAW ALLEGATIONS

835.    Plaintiffs allege that Michigan law applies nationwide to Plaintiffs' claims for

fraudulent concealment, unjust enrichment, breach of the implied warranty of merchantability,

and the Magnuson-Moss Warranty Act based in part on the following allegations.

836.    New GM is headquartered in Detroit, Michigan.

837.    New GM does substantial business in Michigan, with a significant portion of the

proposed Nationwide Class located in Michigan.

838.    On information and belief, Michigan hosts a significant number of New GM's

U.S. operations.

839.    In addition, the conduct that forms the basis for each and every Class members'

claims against New GM emanated from New GM's headquarters in Detroit, Michigan.

840.    New GM personnel responsible for customer communications are located at

GM's Michigan headquarters, and the core decision not to disclose the array of defects to

consumers was made and implemented from there.

841.    The Red X team, an engineering team whose purpose is to find the cause of an

engineering design defect, is located in Detroit, Michigan.

842.    Some or all of the marketing campaigns falsely promoting New GM cars as safe

and reliable were conceived and designed in Michigan.

843.    New GM personnel responsible for managing New GM's customer service

division are located at the New GM Michigan headquarters.  The "Customer Assistance Centers"

directs customers to call the following numbers:  1-800-222-1020 (Chevrolet), 1-800-521-7300

(Buick), 1-800-462-8782 (GMC), 1-800-458-8006 (Cadillac), 1-800-762-2737 (Pontiac), 1-800-

732-5493 (HUMMER), and 1-800-553-6000 (Saturn), which are landlines in Detroit,

Michigan.  Customers are directed to send correspondence to GM Company, P.O. Box 33170,

- 244 -

Detroit, MI 48232-5170. In addition, personnel from New GM in Detroit, Michigan, also communicate via e-mail with customers concerned about the ignition switch and other safety defects.

844. Many of the key Michigan personnel with knowledge of the array of defects remained in their same positions once New GM took over Old GM. For example, the Design Research Engineer who was responsible for the rollout of the defective ignition switch in 2003 was Ray DeGiorgio. Mr. DeGiorgio continued to serve as an engineer at New GM until April 2014.

845. GM's presence is more substantial in Michigan than any other state.

## VII. CLASS ALLEGATIONS

### A. The Nationwide Class

846. Under Rules 23(a), 23(b)(2), and/or 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and a Class initially defined as follows for claims under Michigan law (the "Nationwide Class"):

> All persons in the United States who purchased or leased a GM-branded vehicle between July 11, 2009 and July 3, 2014 (the "Affected Vehicles") and who (i) still own or lease an Affected Vehicle, (ii) sold an Affected Vehicle on or after February 14, 2014, and/or (iii) purchased or leased an Affected Vehicle that was declared a total loss after an accident on or after February 14, 2014.

847. Excluded from the Nationwide Class are New GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliates of New GM, New GM Dealers; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons.

010440-11 725144 V1

848.    The following vehicles, if sold or leased between July 11, 2009 and July 3, 2014, are among the Affected Vehicles for the Nationwide Class (in addition to Old GM vehicles sold as used during that same time period):

| MY 2009 | | | | | | | |
| CHEVROLET | BUICK | GMC | CADILLAC | SATURN | PONTIAC | HUMMER | SAAB |
|---|---|---|---|---|---|---|---|
| Avalanche | Enclave | Acadia | CTS | Aura | G3 | H2 | 9-3 |
| Aveo | LaCrosse | Canyon | CTS-V | Aura Hybrid | G6 | H3 | 9-5 |
| Colorado | Lucerne | Envoy | DTS | Outlook | G8 | | 9-7X |
| Corvette | | Savana Cargo Van | Escalade | VUE | Solstice | | |
| Equinox | | Sierra 1500 | Escalade ESV | VUE Hybrid | Torrent | | |
| Express Cargo Van | | Sierra 2500HD | Escalade EXT | | Vibe | | |
| Express Passenger | | Sierra 3500HD | Escalade Hybrid | | | | |
| Impala | | Yukon | SRX | | | | |
| Malibu | | Yukon XL | STS | | | | |
| Silverado 1500 | | | STS-V | | | | |
| Silverado 1500 Hybrid | | | XLR | | | | |
| Silverado 3500HD | | | XLR-V | | | | |
| Suburban | | | | | | | |
| Tahoe | | | | | | | |
| Tahoe Hybrid | | | | | | | |
| Trailblazer | | | | | | | |
| Traverse | | | | | | | |
| Impala Police | | | | | | | |

| MY 2010 | | | | | | | |
| CHEVROLET | BUICK | GMC | CADILLAC | SATURN | PONTIAC | HUMMER | SAAB |
|---|---|---|---|---|---|---|---|
| Avalanche | Enclave | Acadia | CTS Sedan | Aura | G6 | H2 | 9-3 |
| Aveo | LaCrosse | Canyon | CTS-V | Outlook | Vibe | H3 SUV | 9-5 |
| Camaro | Lucerne | Savana Cargo Van | CTS Wagon | VUE | | H3T | |
| Colorado | | Sierra 1500 | DTS | | | | |
| Corvette | | Sierra 2500HD | Escalade | | | | |
| Equinox | | Sierra 3500HD | Escalade ESV | | | | |
| Express Cargo Van | | Terrain | Escalade EXT | | | | |
| Express Passenger | | Yukon | Escalade Hybrid | | | | |
| Impala | | Yukon XL | SRX | | | | |

- 246 -

| MY 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **CHEVROLET** | **BUICK** | **GMC** | **CADILLAC** | **SATURN** | **PONTIAC** | **HUMMER** | **SAAB** |
| Malibu | | | STS | | | | |
| Malibu Hybrid | | | | | | | |
| Silverado 1500 | | | | | | | |
| Silverado 1500 Hybrid | | | | | | | |
| Silverado 2500HD | | | | | | | |
| Silverado 3500HD | | | | | | | |
| Suburban | | | | | | | |
| Tahoe | | | | | | | |
| Tahoe Hybrid | | | | | | | |
| Traverse | | | | | | | |

| MY 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **CHEVROLET** | **BUICK** | **GMC** | **CADILLAC** | **SATURN** | **PONTIAC** | **HUMMER** | **SAAB** |
| Avalanche | Enclave | Acadia | CTS Coupe | N/A | N/A | N/A | N/A |
| Aveo | LaCrosse | Canyon | CTS Sedan | | | | |
| Camaro | Lucerne | Savana Cargo Van | CTS Wagon | | | | |
| Caprice Police Patrol Vehicle | Regal | Sierra 1500 | CTS-V Coupe | | | | |
| Caprice | | | | | | | |
| Colorado | | Sierra 2500HD | CTS-V Sedan | | | | |
| Corvette | | Sierra 3500HD | CTS-V Wagon | | | | |
| Cruze | | Terrain | DTS | | | | |
| Equinox | | Yukon | Escalade | | | | |
| Express Cargo Van | | Yukon XL | Escalade ESV | | | | |
| Express Passenger | | | Escalade EXT | | | | |
| Impala | | | Escalade Hybrid | | | | |
| Malibu | | | SRX | | | | |
| Silverado 1500 | | | STS | | | | |
| Silverado 1500 Hybrid | | | | | | | |
| Silverado 2500HD | | | | | | | |
| Silverado 3500HD | | | | | | | |
| Suburban | | | | | | | |
| Tahoe | | | | | | | |
| Tahoe Hybrid | | | | | | | |

- 247 -

| MY 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **CHEVROLET** | **BUICK** | **GMC** | **CADILLAC** | **SATURN** | **PONTIAC** | **HUMMER** | **SAAB** |
| Traverse | | | | | | | |
| Volt | | | | | | | |
| Impala Police | | | | | | | |

| MY 2012 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **CHEVROLET** | **BUICK** | **GMC** | **CADILLAC** | **SATURN** | **PONTIAC** | **HUMMER** | **SAAB** |
| Avalanche | Enclave | Acadia | CTS Coupe | N/A | N/A | N/A | N/A |
| Camaro | LaCrosse | Canyon | CTS Sedan | | | | |
| Captiva Sport Fleet | Regal | Savana Cargo Van | CTS Wagon | | | | |
| Caprice | | | | | | | |
| Colorado | Verano | Sierra 1500 | CTS-V Coupe | | | | |
| Corvette | | Sierra 2500HD | CTS-V Sedan | | | | |
| Cruze | | Sierra 3500HD | CTS-V Wagon | | | | |
| Equinox | | Terrain | Escalade | | | | |
| Express Cargo Van | | Yukon | Escalade ESV | | | | |
| Express Passenger | | Yukon XL | Escalade EXT | | | | |
| Impala | | | Escalade Hybrid | | | | |
| Malibu | | | SRX | | | | |
| Silverado 1500 | | | | | | | |
| Silverado 1500 Hybrid | | | | | | | |
| Silverado 2500HD | | | | | | | |
| Silverado 3500HD | | | | | | | |
| Sonic | | | | | | | |
| Suburban | | | | | | | |
| Tahoe | | | | | | | |
| Tahoe Hybrid | | | | | | | |
| Traverse | | | | | | | |
| Volt | | | | | | | |

| MY 2013 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **CHEVROLET** | **BUICK** | **GMC** | **CADILLAC** | **SATURN** | **PONTIAC** | **HUMMER** | **SAAB** |
| Avalanche | Enclave | Acadia | ATS | N/A | N/A | N/A | N/A |
| Camaro | Encore | Savana Cargo Van | CTS Coupe | | | | |
| Captiva Sport Fleet | LaCrosse | Sierra 1500 | CTS Sedan | | | | |

| MY 2013 | | | | | | | |
|---------|-------|-----|----------|--------|---------|--------|------|
| CHEVROLET | BUICK | GMC | CADILLAC | SATURN | PONTIAC | HUMMER | SAAB |
| Caprice | | | | | | | |
| Corvette | Regal | Sierra 2500HD | CTS Wagon | | | | |
| Cruze | Verano | Sierra 3500HD | CTS-V Coupe | | | | |
| Equinox | | Terrain | CTS-V Sedan | | | | |
| Express Cargo Van | | Yukon | CTS-V Wagon | | | | |
| Express Passenger | | Yukon XL | Escalade | | | | |
| Impala | | | Escalade ESV | | | | |
| Malibu | | | Escalade EXT | | | | |
| Silverado 1500 | | | Escalade Hybrid | | | | |
| Silverado 1500 Hybrid | | | SRX | | | | |
| Silverado 2500HD | | | XTS | | | | |
| Silverado 3500HD | | | | | | | |
| Sonic | | | | | | | |
| Spark | | | | | | | |
| Suburban | | | | | | | |
| Tahoe | | | | | | | |
| Tahoe Hybrid | | | | | | | |
| Traverse | | | | | | | |
| Volt | | | | | | | |

| MY 2014 | | | | | | | |
|---------|-------|-----|----------|--------|---------|--------|------|
| CHEVROLET | BUICK | GMC | CADILLAC | SATURN | PONTIAC | HUMMER | SAAB |
| Camaro | Enclave | Acadia | ATS | N/A | N/A | N/A | N/A |
| Captiva Sport Fleet | Encore | Savana Cargo Van | CTS Coupe | | | | |
| Corvette Stingray | LaCrosse | Sierra 1500 | CTS Sedan | | | | |
| Cruze | Regal | Sierra 2500HD | CTS Wagon | | | | |
| Equinox | Verano | Sierra 3500HD | CTS-V Coupe | | | | |
| Express Cargo Van | | Terrain | CTS-V Sedan | | | | |
| Express Passenger | | Yukon | CTS-V Wagon | | | | |
| Impala | | Yukon XL | ELR | | | | |
| Impala Limited | | | Escalade | | | | |
| Malibu | | | Escalade ESV | | | | |
| Silverado 1500 | | | SRX | | | | |

- 249 -

| MY 2014 | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| CHEVROLET | BUICK | GMC | CADILLAC | SATURN | PONTIAC | HUMMER | SAAB |
| Silverado 2500HD | | | XTS | | | | |
| Silverado 3500HD | | | | | | | |
| Sonic | | | | | | | |
| Spark | | | | | | | |
| Spark EV | | | | | | | |
| SS | | | | | | | |
| Suburban | | | | | | | |
| Tahoe | | | | | | | |
| Traverse | | | | | | | |
| Volt | | | | | | | |

| MY 2015 | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| CHEVROLET | BUICK | GMC | CADILLAC | SATURN | PONTIAC | HUMMER | SAAB |
| Camaro | Enclave | Acadia | ATS Coupe | N/A | N/A | N/A | N/A |
| Captiva Sport Fleet | LaCrosse | Savana Cargo Van | ATS Sedan | | | | |
| City Express Cargo Van | Regal | Sierra 2500HD | CTS Sedan | | | | |
| Equinox | | Sierra 3500HD | CTS-V Coupe | | | | |
| Express Cargo Van | | Terrain | ELR | | | | |
| Express Passenger | | Yukon | Escalade | | | | |
| Impala | | Yukon XL | Escalade ESV | | | | |
| Impala Limited | | | SRX | | | | |
| Malibu | | | XTS | | | | |
| Silverado 2500HD | | | | | | | |
| Silverado 3500HD | | | | | | | |
| Spark | | | | | | | |
| Spark EV | | | | | | | |
| Suburban | | | | | | | |
| Tahoe | | | | | | | |
| Traverse | | | | | | | |
| Volt | | | | | | | |

849.    Under Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure,

Plaintiffs New Bedford Auto Sales and Nettleton Auto Sales bring this action on behalf of

- 250 -

themselves and a Dealer Class initially defined as follows for claims under Michigan law (the

"Nationwide Dealer Class"):

> All non-GM car dealerships in the United States that, on or after
> February 14, 2014, have sold or leased an Affected Vehicle or
> retained an Affected Vehicle in their inventory, when such
> Affected Vehicle was purchased by the dealership between July
> 11, 2009 and July 3, 2014.

850.   Under Rules 23(a), (b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure,

Plaintiffs bring this action on behalf of themselves and a Subclass initially defined as follows

(the Nationwide Ignition Switch Defect Subclass):

> All persons in the United States who either (i) own or lease a
> Defective Ignition Switch Vehicle that was sold or leased as a new
> vehicle by New GM between July 11, 2009 and July 3, 2014, (ii)
> sold such a vehicle on or after February 14, 2014, and/or (iii)
> purchased or leased a Defective Ignition Switch Vehicle that was
> declared a total loss after an accident on or after February 14,
> 2014.

851.   The following vehicles are included in the Nationwide Ignition Switch Defect

Subclass if they were sold or leased as a new vehicle between July 11, 2009 and July 3, 2014:

| RECALL | VEHICLES AFFECTED |
|---|---|
| **Ignition Switch Torque Performance:** | · 2009-2010 Chevy Cobalt |
| | · 2009-2011 Chevy HHR |
| | · 2009-2010 Pontiac G5 |
| | · 2009-2010 Pontiac Solstice |
| | · 2009-2010 Saturn Sky |
| | |
| **Ignition Cylinder:** | · 2009-2010 Chevy Cobalt |
| | · 2009-2011 Chevy HHR |
| | · 2009-2010 Pontiac G5 |
| | · 2009-2010 Pontiac Solstice |
| | · 2009-2010 Saturn Sky |
| | |
| **Key FOB/Ignition Switch Placement:** | · 2010-2014 Chevy Camaro |

- 251 -

| RECALL | VEHICLES AFFECTED |
|---|---|
| **Ignition Switch/Weighted Key Ring/Key Hole Replacement:** | · 2009 Buick LaCrosse |
| | · 2009-2011 Buick Lucerne |
| | · 2009-2011 Cadillac DTS |
| | · 2009-2014 Chevy Impala |
| | 2011-2013 Chevy Caprice |
| | 2009 Pontiac G8 |
| | |

## B.   State Law Classes

852.   Plaintiffs allege claims, under the laws of each state and the District of Columbia, for the following Statewide Classes:

> All persons who purchased or leased a GM-branded vehicle between July 11, 2009 and July 3, 2014 (the "Affected Vehicles") and (i) who still own or lease an Affected Vehicle, (ii) who sold an Affected Vehicle on or after February 14, 2014, and/or (iii) purchased or leased an Affected Vehicle that was declared a total loss after an accident on or after February 14, 2014.

853.   Plaintiffs also allege claims, under the laws of each state and the District of Columbia, for the following Statewide Ignition Switch Defect Subclasses:

> All persons who either (i) own or lease a Defective Ignition Switch Vehicle that was sold or leased as a new vehicle by New GM between July 11, 2009 and July 3, 2014, (ii) sold such a vehicle on or after February 14, 2014, and/or (iii) purchased or leased a Defective Ignition Switch Vehicle that was declared a total loss after an accident on or after February 14, 2014.

854.   Excluded from each of the Classes and Subclasses are New GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliates of New GM; New GM Dealers; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons.

010440-11  725144 V1

## C.    The Classes and Subclasses Meet Rule 23 Requirements

855.    Plaintiffs are informed and believe that there are over 10 million Affected

Vehicles nationwide and hundreds-of-thousands of the Affected Vehicles in each state, and over

2 million Defective Ignition Switch Vehicles owned or leased by members of the National

Ignition Switch Defect Subclass.  Individual joinder of all Class members is impracticable.

856.    The Class can be readily identified using registration records, sales records,

production records, and other information kept by New GM or third parties in the usual course of

business and within their control.

857.    Questions of law and fact are common to each of the Classes and Subclasses and

predominate over questions affecting only individual members, including the following:

a.    Whether numerous GM-branded vehicles suffer from serious defects;

b.    Whether New GM was aware of many or all of the defects, and concealed

the defects from regulators, Plaintiffs, and the Class;

c.    Whether New GM misrepresented to Affected Vehicle purchasers that

GM-branded vehicles are safe, reliable, and of high quality;

d.    Whether New GM misrepresented itself as a reputable manufacturer that

values safety and stands behind its vehicles after they are sold;

e.    Whether New GM actively encouraged the concealment of known defects

from regulators and consumers;

f.    Whether New GM engaged in fraudulent concealment;

g.    Whether New GM engaged in unfair, deceptive, unlawful, and/or

fraudulent acts or practices in trade or commerce by failing to disclose that many GM-branded

vehicles had serious defects;

h.    Whether New GM violated various state consumer protection statutes;

- 253 -

i.      Whether the Defective Ignition Switch Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

j.      Whether New GM's unlawful, unfair, fraudulent, and/or deceptive practices harmed Plaintiffs and the members of the Class;

k.      Whether New GM has been unjustly enriched;

l.      Whether Plaintiffs and the members of the Class are entitled to equitable and/or injunctive relief;

m.      What aggregate amounts of statutory penalties, as available under the laws of Michigan and other States, are sufficient to punish and deter New GM and to vindicate statutory and public policy, and how such penalties should most equitably be distributed among Class members; and

n.      Whether any or all applicable limitations periods are tolled by acts of fraudulent concealment.

858.    Plaintiffs' claims are typical of the claims of the Class members, and arise from the same course of conduct by New GM.  The relief Plaintiffs seek is typical of the relief sought for the absent Class members.

859.    Plaintiffs will fairly and adequately represent and protect the interests of all absent Class members.  Plaintiffs are represented by counsel competent and experienced in product liability, consumer protection, and class action litigation.

860.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class members is impracticable.  Because the damages suffered by each individual Class member may be

relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous. Rule 23 provides the Court with authority and flexibility to maximize the benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, utilize the processes of Rule 23(C)(4) and/or (C)(5) certify common questions of fact or law and to designate subclasses.

861. The prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for New GM. The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

862. Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Plaintiffs anticipate providing appropriate notice to be approved by the Court after discovery into the size and nature of the Class.

863. Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class members' claims, it is likely that only a few Class members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class members will continue to incur damages, and Defendant's misconduct will continue without remedy.

## VIII. CLAIMS FOR RELIEF

A.    **Nationwide Class Claims**

## COUNT I

## FRAUDULENT CONCEALMENT
## (BY NATIONWIDE AND NATIONWIDE DEALER CLASSES)

864.    Plaintiffs and the Class incorporate by reference each preceding and following

paragraph as though fully set forth at length herein.

865.    This claim is brought on behalf of the Nationwide and Nationwide Dealer

Classes, under Michigan law or alternatively, under the law of all states because there is no

material difference in the law of fraudulent concealment.

866.    New GM concealed and suppressed material facts concerning the quality of its

vehicles and the GM brand.

867.    New GM concealed and suppressed material facts concerning the culture of

New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of

safety issues, and a shoddy design process.

868.    New GM concealed and suppressed material facts concerning the many serious

defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps

to ensure that its employees did not reveal known safety defects to regulators or consumers.

869.    New GM did so in order to boost confidence in its vehicles and falsely assure

purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands

behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false

representations were material to consumers, both because they concerned the quality and safety

of the Affected Vehicles and because they played a significant role in the value of the vehicles.

870.    New GM had a duty to disclose the many defects in GM-branded vehicles

because they were known and/or accessible only to New GM who had superior knowledge and

- 256 -

access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Nationwide and Nationwide Dealer Classes. These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Nationwide and Nationwide Dealer Classes. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

871. New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Nationwide and Nationwide Dealer Classes.

872. On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Nationwide and Nationwide Dealer Classes and conceal material information regarding defects that exist in GM-branded vehicles.

873. Plaintiffs and the Nationwide Class and Nationwide Dealer Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Nationwide and Nationwide Dealer Classes' actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Nationwide and Nationwide Dealer Classes.

874. Because of the concealment and/or suppression of the facts, Plaintiffs and the Nationwide and Nationwide Dealer Classes sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies. Had they been aware of the many defects that

existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

875.    The value of all Nationwide and Nationwide Dealer Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the New GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

876.    Accordingly, New GM is liable to the Nationwide and Nationwide Dealer Classes for their damages in an amount to be proven at trial.

877.    New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Nationwide and Nationwide Dealer Classes' rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT II

### UNJUST ENRICHMENT
### (BY NATIONWIDE AND NATIONWIDE DEALER CLASSES)

878.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

879.    This claim for unjust enrichment is brought on behalf of the Nationwide Dealer classes under Michigan law.  If Michigan law does not apply, it is brought in the alternative under the laws of the states where Plaintiffs and Class members reside.

010440-11 725144 V1

880.    New GM has received and retained a benefit from the Plaintiffs and inequity has resulted.

881.    New GM was benefitted from selling defective cars for more than they were worth, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

882.    It is inequitable for New GM to retain these benefits.

883.    As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT III

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### 15 U.S.C. § 2301, *et seq.*

884.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

885.    Plaintiffs bring this Count on behalf of members of the Nationwide Ignition Switch Defect Subclass who are residents of the following States:  Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah,  Virginia, West Virginia and Wyoming (the "Class," for the purposes of this Count).

886.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

887.    The Defective Ignition Switch Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

- 259 -

888. Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

889. New GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

890. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

891. New GM provided Plaintiffs and the other Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, New GM warranted that the Defective Ignition Switch Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

892. New GM breached its implied warranties, as described in more detail above, and is therefore liable to Plaintiffs and the Class pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Defective Ignition Switch Vehicles share common design defects in that they are equipped with defective ignition switch systems that can suddenly fail during normal operation, leaving occupants of the Defective Ignition Switch Vehicles vulnerable to crashes, serious injury, and death. New GM has admitted that the Defective Ignition Switch Vehicles are defective in issuing its recalls, but the recalls are woefully insufficient to address each of the defects.

893. In its capacity as a warrantor, New GM had knowledge of the inherent defects in the Defective Ignition Switch Vehicles. Any effort by New GM to limit the implied warranties

- 260 -

Case 1:14-mc-02543-JMF Document 345 Filed 10/14/14 Page 281 of 712

in a manner that would exclude coverage of the Defective Ignition Switch Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Defective Ignition Switch Vehicles is null and void.

894.    Any limitations New GM might seek to impose on its warranties are procedurally unconscionable.  There was unequal bargaining power between New GM and Plaintiffs and the other Class members, as, at the time of purchase and lease, Plaintiffs and the other Class members had no other options for purchasing warranty coverage other than directly from New GM.

895.    Any limitations New GM might seek to impose on its warranties are substantively unconscionable.  New GM knew that the Defective Ignition Switch Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired.  New GM failed to disclose these defects to Plaintiffs and the other Class members.  Thus, New GM's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

896.    Plaintiffs and each of the other Class members have had sufficient direct dealings with either New GM or its agents (dealerships) to establish privity of contract between New GM, on the one hand, and Plaintiffs and each of the other Class members, on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between New GM and its dealers, and specifically, of New GM's implied warranties.  The dealers were not intended to be the ultimate consumers of the Defective Ignition Switch Vehicles and have no rights under the warranty agreements provided with the Defective Ignition Switch Vehicles; the warranty agreements were designed for and intended to benefit consumers.  Finally, privity is also not required because the

- 261 -

Defective Ignition Switch Vehicles are dangerous instrumentalities due to the aforementioned
defects and nonconformities.

897.    Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action
and are not required to give New GM notice and an opportunity to cure until such time as the
Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal
Rules of Civil Procedure.

898.    Plaintiffs and the other Class members would suffer economic hardship if they
returned their Defective Ignition Switch Vehicles but did not receive the return of all payments
made by them.  Because New GM is refusing to acknowledge any revocation of acceptance and
return immediately any payments made, Plaintiffs and the other Class members have not re-
accepted their Defective Ignition Switch Vehicles by retaining them.

899.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the
sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of
interest and costs, computed on the basis of all claims to be determined in this lawsuit.  Plaintiffs,
individually and on behalf of the other Class members, seek all damages permitted by law,
including diminution in value of their vehicles, in an amount to be proven at trial.  In addition,
pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover
a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on
actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs
and the other Class members in connection with the commencement and prosecution of this
action.

900.    Further, Plaintiffs and the Class are also entitled to equitable relief under 15
U.S.C. § 2310(d)(1).  Based on New GM's continuing failures to fix the known dangerous

defects, Plaintiffs seek a declaration that New GM has not adequately implemented its recall commitments and requirements and general commitments to fix its failed processes, and injunctive relief in the form of judicial supervision over the recall process is warranted. Plaintiffs also seek the establishment of the New GM-funded program for Plaintiffs and Class members to recover out of pocket costs incurred in attempting to rectify the Ignition Switch Defects in their vehicles.

## COUNT IV

## BREACH OF IMPLIED WARRANTY

901.   Plaintiffs reallege and incorporate by reference all paragraphs as if full set forth herein.

902.   Plaintiffs bring this Count on behalf of the Nationwide  Ignition Switch Defect Subclass under Michigan law.

903.   New GM was a merchant with respect to motor vehicles within the meaning of MICH. COMP. LAWS § 440.2314(1).

904.   Under MICH. COMP. LAWS § 440.2314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles.

905.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

906.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent

by Plaintiffs and the Nationwide Ignition Switch Defect Subclass before or within a reasonable

amount of time after New GM issued the recall and the allegations of vehicle defects became

public.

907. As a direct and proximate result of New GM's breach of the implied warranty of

merchantability, Plaintiffs and the Nationwide Ignition Switch Defect Subclass have been

damaged in an amount to be proven at trial.

## COUNT V

## NEGLIGENCE

### (On Behalf of the Arkansas, Louisiana, Maryland, and Ohio State Ignition Switch Defect Subclasses)

908. Plaintiffs bring this Count on behalf of members of the Ignition Switch Defect

Subclass who reside in Arkansas, Louisiana, Maryland, and Ohio ("Negligence Subclasses").

909. New GM has designed, manufactured, sold, or otherwise placed in the stream of

commerce Defective Ignition Switch Vehicles, as set forth above.

910. New GM had a duty to design and manufacture a product that would be safe for

its intended and foreseeable uses and users, including the use to which its products were put by

Plaintiffs and the other members of the Negligence Subclasses. New GM breached its duties to

Plaintiffs and the other members of the Negligence Subclasses because they were negligent in

the design, development, manufacture, and testing of the Defective Ignition Switch Vehicles, and

New GM is responsible for this negligence.

911. New GM was negligent in the design, development, manufacture, and testing of

the Defective Ignition Switch Vehicles because they knew, or in the exercise of reasonable care

should have known, that the vehicles equipped with defective ignition systems pose an

unreasonable risk of death or serious bodily injury to Plaintiffs and the other members of the

Negligence Subclasses, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents in which brakes, power steering, and airbags are all rendered inoperable.

912.    Whereupon Plaintiffs, individually and on behalf of the other members of the Negligence Subclasses, respectfully rely upon the **RESTATEMENT (SECOND) OF TORTS** § 395.

913.    New GM further breached its duties to Plaintiffs and the other members of the Negligence Subclasses by supplying directly or through a third person defective vehicles to be used by such foreseeable persons as Plaintiffs and the other members of the Negligence Subclasses when:

a.    Old GM and New GM knew or had reason to know that the vehicles were dangerous or likely to be dangerous for the use for which they were supplied; and

b.    Old GM and New GM failed to exercise reasonable care to inform customers of the dangerous condition or of the facts under which the vehicles are likely to be dangerous.

914.    New GM had a continuing duty to warn and instruct the intended and foreseeable users of its vehicles, including Plaintiffs and the other members of the Negligence Subclasses, of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles. Plaintiffs and the other members of the Negligence Subclasses were entitled to know that the vehicles, in their ordinary operation, were not reasonably safe for their intended and ordinary purposes and uses.

915.    New GM knew or should have known of the defects described herein, New GM breached its duty to Plaintiffs and the other members of the Negligence Subclasses because it

failed to warn and instruct the intended and foreseeable users of its vehicles of the defective condition of the Vehicles and the high degree of risk attendant to using the vehicles.

916.     As a direct and proximate result of New GM's negligence, Plaintiffs and the other members of the Negligence Subclasses suffered damages.

**B.     State Class Claims**

917.     The following state law class claims are asserted in addition to the Nationwide Classes.

**ALABAMA**

**COUNT I**

**VIOLATION OF ALABAMA DECEPTIVE TRADE PRACTICES ACT**

**(ALA. CODE § 8-19-1, *et seq.*)**

918.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

919.     This claim is brought solely on behalf of Nationwide Class members who are Alabama residents (the "Alabama Class").

920.     Plaintiffs and the Alabama Class are "consumers" within the meaning of ALA. CODE § 8-19-3(2).

921.     Plaintiffs, the Alabama Class, and New GM are "persons" within the meaning of ALA. CODE § 8-19-3(5).

922.     The Affected Vehicles are "goods" within the meaning of ALA. CODE § 8-19-3(3).

923.     New GM was and is engaged in "trade or commerce" within the meaning of ALA. CODE § 8-19-3(8).

924.     The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including:  "(5) Representing that goods or services have

sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." ALA. CODE § 8-19-5. By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in deceptive business practices prohibited by the Alabama DTPA, including: representing that Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Affected Vehicles are of a particular standard, quality, and grade when they are not; advertising Affected Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Affected Vehicles has been supplied in accordance with a previous representation when it has not; and engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

925. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

926. From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities. New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

010440-11 725144 V1

927.    New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

928.    According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

929.    By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the Alabama DTPA.

930.    In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

931.    New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

932.    New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Alabama Class.

933. New GM knew or should have known that its conduct violated the Alabama DTPA.

934. As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

935. New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

    a.    Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

    b.    Intentionally concealed the foregoing from Plaintiffs; and/or

    c.    Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

936. Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished. In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

937. New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Alabama Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

- 269 -

938.     Plaintiffs and the Alabama Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

939.     New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

940.     As a direct and proximate result of New GM's violations of the Alabama DTPA, Plaintiffs and the Alabama Class have suffered injury-in-fact and/or actual damage.

941.     Pursuant to ALA. CODE § 8-19-10, Plaintiffs and the Alabama Class seek monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each Plaintiff and each Alabama Class member.

942.     Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the ALA. CODE § 8-19-1, *et seq.*

943.     On October 8, 2014, certain Plaintiffs sent a letter complying with ALA. CODE § 8-19-10(e).  Plaintiffs presently do not claim relief under the Alabama DTPA until and unless New GM fails to remedy its unlawful conduct within the requisite time period, after which Plaintiffs seek all damages and relief to which Plaintiffs and the Alabama Class are entitled.

## COUNT II

## FRAUD BY CONCEALMENT

944.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

945.    In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Alabama residents (the "Alabama Class").

946.    New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

947.    New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

948.    New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

949.    New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

950.    New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Alabama Class.  These omitted and concealed facts were material because

- 271 -

they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the

Alabama Class.  Whether a manufacturer's products are safe and reliable, and whether that

manufacturer stands behind its products, are material concerns to a consumer.

951.    New GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM

money, and it did so at the expense of Plaintiffs and the Alabama Class.

952.    On information and belief, New GM has still not made full and adequate

disclosure and continues to defraud Plaintiffs and the Alabama Class and conceal material

information regarding defects that exist in GM-branded vehicles.

953.    Plaintiffs and the Alabama Class were unaware of these omitted material facts and

would not have acted as they did if they had known of the concealed and/or suppressed facts.

Plaintiffs' and the Class's actions were justified.  New GM was in exclusive control of the

material facts and such facts were not known to the public, Plaintiffs, or the Alabama Class.

954.    Because of the concealment and/or suppression of the facts, Plaintiffs and the

Alabama Class sustained damage because they own vehicles that diminished in value as a result

of New GM's concealment of, and failure to timely disclose, the serious defects in millions of

GM-branded vehicles and the serious safety and quality issues engendered by New GM's

corporate policies.  Had they been aware of the many defects that existed in GM-branded

vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less

for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the

benefit of their bargain as a result of New GM's fraudulent concealment.

955.    The value of all Alabama Class members' vehicles has diminished as a result of

New GM's fraudulent concealment of the many defects and its systemic safety issues which has

greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

956.    Accordingly, New GM is liable to the Alabama Class for their damages in an amount to be proven at trial.

957.    New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Alabama Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## ALASKA

## COUNT I

## VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT

### (ALASKA STAT. ANN. § 45.50.471, *et seq.*)

958.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

959.    This claim is brought only on behalf of Nationwide Class members who are Alaska residents (the "Alaska Class").

960.    The Alaska Unfair Trade Practices And Consumer Protection Act ("Alaska CPA") declares unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including:  "(4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person

- 273 -

does not have;" "(6) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" "(8) advertising goods or services with intent not to sell them as advertised;" or "(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged." ALASKA STAT. ANN. § 45.50.471.

961.    New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles in violation of the Alaska CPA.  New GM also engaged in unlawful trade practices by representing that the Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Affected Vehicles are of a particular standard and quality when they are not; advertising the Affected Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Affected Vehicles.

962.    From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

963.    New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the

- 274 -

existence of more defects in the vehicles it designed and manufactured and the failure to disclose

and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

964.    According to one report from the Center for Auto Safety, some 2,004 deaths and

injuries are connected with recently recalled GM-branded vehicles, and New GM should have

recalled the vehicles years ago.

965.    By failing to disclose and by actively concealing the many defects in GM-branded

vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself

as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold,

New GM engaged in unfair or deceptive business practices in violation of the Alaska CPA.

966.    In the course of GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the many safety issues and serious defects discussed

above.  GM compounded the deception by repeatedly asserting that the Affected Vehicles were

safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued

safety and stood behind its vehicles once they are on the road.

967.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive

reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded

vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of

the Affected Vehicles.

968.    New GM intentionally and knowingly misrepresented material facts regarding the

Affected Vehicles with an intent to mislead Plaintiffs and the Alaska Class.

969.    New GM knew or should have known that its conduct violated the Alaska CPA.

970.    As alleged above, New GM made material statements about the safety and

reliability of the Affected Vehicles that were either false or misleading.

971.    New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

a.    Possessed exclusive knowledge that it valued cost-cutting
over safety, selected parts from the cheapest supplier
regardless of quality, and actively discouraged employees
from finding and flagging known safety defects, and that
this approach would necessarily cause the existence of
more defects in the vehicles it designed and manufactured;

b.    Intentionally concealed the foregoing from Plaintiffs;
and/or

c.    Made incomplete representations about the safety and
reliability of the Affected Vehicles generally, and the
ignition switch in particular, while purposefully
withholding material facts from Plaintiffs that contradicted
these representations.

972.    Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

973.    New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the Alaska Class.  A vehicle

made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable

vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than

promptly remedies them.

974.    Plaintiffs and the Alaska Class suffered ascertainable loss caused by New GM's

misrepresentations and its failure to disclose material information.  Had they been aware of the

many defects that existed in GM-branded vehicles, and the company's callous disregard for

safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or

leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

975.    New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

976.    As a direct and proximate result of New GM's violations of the Alaska CPA, Plaintiffs and the Alaska Class have suffered injury-in-fact and/or actual damage.

977.    Pursuant to ALASKA STAT. ANN. § 45.50. 535(b)(1), Plaintiffs and the Alaska Class seek monetary relief against New GM measured as the greater of (a) three times the actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff and each Alaska Class member.

978.    Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Alaska CPA.

979.    On October 8, 2014, certain Plaintiffs sent a letter complying with ALASKA STAT. ANN. § 45.50. 535(b)(1).  Plaintiffs presently do not claim injunctive relief under the Alaska CPA until and unless New GM fails to remedy its unlawful conduct within the requisite time period, after which Plaintiffs seek all injunctive relief to which Plaintiffs and the Alaska Class are entitled.

## COUNT II

## FRAUD BY CONCEALMENT

980.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 277 -

981.    In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Alaska residents (the "Alaska Class").

982.    New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

983.    New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

984.    New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

985.    New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

986.    New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Alaska Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Alaska Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

- 278 -

987.     New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Alaska Class.

988.     On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Alaska Class and conceal material information regarding defects that exist in GM-branded vehicles.

989.     Plaintiffs and the Alaska Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Alaska Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Alaska Class.

990.     Because of the concealment and/or suppression of the facts, Plaintiffs and the Alaska Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

991.     The value of all Alaska Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the New GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

992.    Accordingly, New GM is liable to the Alaska Class for their damages in an amount to be proven at trial.

993.    New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Alaska Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT III**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**

**(ALASKA STAT. § 45.02.314)**

994.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

995.    In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of Alaska residents who are members of the Ignition Switch Defect Subclass (the "Alaska Ignition Switch Defect Subclass").

996.    New GM was a merchant with respect to motor vehicles within the meaning of ALASKA STAT. § 45.02.104(a).

997.    Under ALASKA STAT. § 45.02.314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles.

998.    These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems

- 280 -

that permit sudden unintended shutdown to occur, with the attendant shut down of power

steering and power brakes and the nondeployment of airbags in the event of a collision.

999.    New GM was provided notice of these issues by numerous complaints filed

against it, internal investigations, and by numerous individual letters and communications sent

by Plaintiffs and the Alaska Ignition Switch Defect Subclass before or within a reasonable

amount of time after New GM issued the recalls and the allegations of vehicle defects became

public.

1000.    As a direct and proximate result of New GM's breach of the implied warranty of

merchantability, Plaintiffs and the Alaska Ignition Switch Defect Subclass have been damaged in

an amount to be proven at trial.

### ARIZONA

### COUNT I

### VIOLATIONS OF THE CONSUMER FRAUD ACT

### (ARIZONA REV. STAT. § 44-1521, *et seq.*)

1001.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

1002.    This claim is brought only on behalf of Class members who are Arizona residents

(the "Arizona Class").

1003.    New GM, Plaintiffs, and the Arizona Class are "persons" within the meaning of

the Arizona Consumer Fraud Act ("Arizona CFA"), ARIZ. REV. STAT. § 44-1521(6).

1004.    The Affected Vehicles are "merchandise" within the meaning of ARIZ. REV. STAT.

§ 44-1521(5).

1005.    The Arizona CFA provides that "[t]he act, use or employment by any person of

any deception, deceptive act or practice, fraud, . . . misrepresentation, or concealment,

- 281 -

suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." ARIZ. REV. STAT. § 44-1522(A).

1006.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

1007.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1008.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

010440-11  725144 V1

1009.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1010.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the Arizona CFA.

1011.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1012.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the New GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1013.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Arizona Class.

1014.   New GM knew or should have known that its conduct violated the Arizona CFA.

1015.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

1016.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

- 283 -

    a.      Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

    b.      Intentionally concealed the foregoing from Plaintiffs; and/or

    c.      Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1017.  Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished. In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

1018.  New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Arizona Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1019.  Plaintiffs and the Arizona Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information. Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

010440-11  725144 V1

1020.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1021.   The recalls and repairs instituted by New GM have not been adequate.

1022.   As a direct and proximate result of New GM's violations of the Arizona CFA, Plaintiffs and the Arizona Class have suffered injury-in-fact and/or actual damage.

1023.   Plaintiffs and the Arizona Class seek monetary relief against New GM in an amount to be determined at trial.  Plaintiffs and the Arizona Class also seek punitive damages because New GM engaged in aggravated and outrageous conduct with an evil mind.

1024.   Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## COUNT II

## FRAUD BY CONCEALMENT

1025.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1026.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Class members who are Arizona residents (the "Arizona Class").

1027.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the New GM brand.

1028.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

- 285 -

Case 1:14-md-02543-JMF   Document 345-1   Filed 10/14/14   Page 306 of 712

1029.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1030.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

1031.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Arizona Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Arizona Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1032.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Arizona Class.

1033.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Arizona Class and conceal material information regarding defects that exist in GM-branded vehicles.

1034.   Plaintiffs and the Arizona Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

010440-11 725144 V1

Plaintiffs' and the Arizona Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Arizona Class.

1035.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Arizona Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

1036.   The value of all Arizona Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the New GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1037.   Accordingly, New GM is liable to the Arizona Class for their damages in an amount to be proven at trial.

1038.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Arizona Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

- 287 -

# ARKANSAS

## COUNT I

### VIOLATIONS OF THE DECEPTIVE TRADE PRACTICE ACT

### (ARK. CODE ANN. § 4-88-101, *et seq.*)

1039.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1040.   This claim is brought only on behalf of Class members who are Arkansas residents (the "Arkansas Class").

1041.   New GM, Plaintiffs, and the Arkansas Class are "persons" within the meaning of Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), ARK. CODE ANN. § 4-88-102(5).

1042.   The Affected Vehicles are "goods" within the meaning of ARK. CODE ANN. § 4-88-102(4).

1043.   The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" ARK. CODE ANN. § 4-88-107(a)(10).  The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods:  "(1) The act, use, or employment by any person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission."  ARK. CODE ANN. § 4-88-108.  New GM violated the Arkansas DTPA and engaged in deceptive and unconscionable trade practices by, among other things, systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles and otherwise engaging in activities with a tendency or capacity to deceive.

1044.   New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

1045.   New GM's actions as set forth above occurred in the conduct of trade or commerce.

1046.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1047.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1048.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1049.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold,

New GM engaged in deceptive and unconscionable business practices in violation of the
Arkansas DTPA.

1050.   In the course of New GM's business, it willfully failed to disclose and actively
concealed the dangerous risk posed by the many safety issues and serious defects discussed
above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles
were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that
valued safety and stood behind its vehicles once they are on the road.

1051.   New GM's unfair or deceptive acts or practices were likely to and did in fact
deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-
branded vehicles, the quality of the New GM brand, the devaluing of safety at New GM, and the
true value of the Affected Vehicles.

1052.   New GM intentionally and knowingly misrepresented material facts regarding the
Affected Vehicles with an intent to mislead Plaintiffs and the Arkansas Class.

1053.   New GM knew or should have known that its conduct violated the Arkansas
DTPA.

1054.   As alleged above, New GM made material statements about the safety and
reliability of the Affected Vehicles that were either false or misleading.

1055.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the
Affected Vehicles and the devaluing of safety at New GM, because New GM:

      a.     Possessed exclusive knowledge that it valued cost-cutting
over safety, selected parts from the cheapest supplier
regardless of quality, and actively discouraged employees
from finding and flagging known safety defects, and that
this approach would necessarily cause the existence of
more defects in the vehicles it designed and manufactured;

      b.     Intentionally concealed the foregoing from Plaintiffs;
and/or

- 290 -

    c.     Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1056.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

1057.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Arkansas Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1058.   Plaintiffs and the Arkansas Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

1059.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1060.   As a direct and proximate result of New GM's violations of the Arkansas DTPA, Plaintiffs and the Arkansas Class have suffered injury-in-fact and/or actual damage.

010440-11 725144 V1

1061.   Plaintiffs and the Arkansas Class seek monetary relief against New GM in an amount to be determined at trial.  Plaintiffs and the Arkansas Class also seek punitive damages because New GM acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice may be inferred.

1062.   Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

**COUNT II**

**FRAUD BY CONCEALMENT**

1063.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1064.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Class members who are Arkansas residents (the "Arkansas Class").

1065.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

1066.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

1067.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1068.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands

- 292 -

behind its vehicles after they are sold and that its vehicles are safe and reliable. The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

1069.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Arkansas Class. These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Arkansas Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1070.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Arkansas Class.

1071.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Arkansas Class and conceal material information regarding defects that exist in GM-branded vehicles.

1072.   Plaintiffs and the Arkansas Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Arkansas Class's actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Arkansas Class.

1073.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Arkansas Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of

GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

1074.   The value of all Arkansas Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1075.   Accordingly, New GM is liable to the Arkansas Class for their damages in an amount to be proven at trial.

1076.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Arkansas Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (ARK. CODE ANN. § 4-2-314)

1077.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1078.   In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only

on behalf of Ignition Switch Defect Subclass members who are Arkansas residents (the "Arkansas Ignition Switch Defect Subclass").

1079.    New GM was a merchant with respect to motor vehicles within the meaning of ARK. CODE ANN. § 4-2-104(1).

1080.    Under ARK. CODE ANN. § 4-2-314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles.

1081.    These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

1082.    New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Arkansas Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1083.    As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs and the Arkansas Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

010440-11 725144 V1

# CALIFORNIA

## COUNT I

## VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT

### (CAL. CIV. CODE § 1750, *et seq.*)

1084.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1085.   This claim is brought only on behalf of Nationwide Class members who are California residents.

1086.   New GM is a "person" under CAL. CIV. CODE § 1761(c).

1087.   Plaintiffs and the California Class are "consumers," as defined by CAL. CIVIL CODE § 1761(d), who purchased or leased one or more Affected Vehicles.

1088.   The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" CAL. CIV. CODE § 1770(a).  New GM has engaged in unfair or deceptive acts or practices that violated CAL. CIV. CODE § 1750, *et seq*., as described above and below, by among other things, representing that Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Affected Vehicles are of a particular standard, quality, and grade when they are not; advertising Affected Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Affected Vehicles has been supplied in accordance with a previous representation when it has not.

1089.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful

trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

1090.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1091.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1092.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1093.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair and deceptive business practices in violation of the CLRA.

1094.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed

- 297 -

above. New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1095. New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1096. New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the California Class.

1097. New GM knew or should have known that its conduct violated the CLRA.

1098. As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

1099. New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

    a.    Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

    b.    Intentionally concealed the foregoing from Plaintiffs; and/or

    c.    Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1100. Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

- 298 -

the value of the Affected Vehicles has greatly diminished. In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

1101. New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the California Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1102. Plaintiffs and the California Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information. Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

1103. New GM's violations present a continuing risk to Plaintiffs as well as to the general public. New GM's unlawful acts and practices complained of herein affect the public interest.

1104. As a direct and proximate result of New GM's violations of the CLRA, Plaintiffs and the California Class have suffered injury-in-fact and/or actual damage.

1105. Under CAL. CIV. CODE § 1780(a), Plaintiffs and the California Class seek monetary relief against New GM measured as the diminution of the value of their vehicles caused by New GM's violations of the CLRA as alleged herein.

010440-11 725144 V1

1106.   Under CAL. CIV. CODE § 1780(b), Plaintiffs seek an additional award against New GM of up to $5,000 for each California Class member who qualifies as a "senior citizen" or "disabled person" under the CLRA.  New GM knew or should have known that its conduct was directed to one or more California Class members who are senior citizens or disabled persons. New GM's conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person. One or more California Class members who are senior citizens or disabled persons are substantially more vulnerable to New GM's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from New GM's conduct.

1107.   Plaintiffs also seek punitive damages against New GM because it carried out reprehensible conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs and the California Class to potential cruel and unjust hardship as a result. New GM intentionally and willfully deceived Plaintiffs on life-or-death matters, and concealed material facts that only New GM knew.  New GM's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages under CAL. CIV. CODE § 3294.

1108.   Plaintiffs further seek an order enjoining New GM's unfair or deceptive acts or practices, restitution, punitive damages, costs of court, attorneys' fees under CAL. CIV. CODE § 1780(e), and any other just and proper relief available under the CLRA.

1109.   Certain Plaintiffs have sent a letter complying with CAL. CIV. CODE § 1780(b).

010440-11  725144 V1

## COUNT II

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

### (CAL. BUS. & PROF. CODE § 17200, *et seq.*)

1110.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1111.  This claim is brought only on behalf of Nationwide Class members who are California residents (the "California Class").

1112.  California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."  New GM has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

1113.  New GM violated the unlawful prong of § 17200 by the following:

a.      violations of the CLRA, CAL. CIV. CODE § 1750, *et seq.*, as set forth in Count I by the acts and practices set forth in this Complaint.

b.      violation of the common-law claim of negligent failure to recall, in that New GM knew or should have known that the Defective Ignition Switch Vehicles, and many other vehicles suffering myriad other defects, were dangerous and/or were likely to be dangerous when used in a reasonably foreseeable manner; New GM became aware of the attendant risks after the Defective Ignition Switch Vehicles and other defective vehicles were sold; continued to gain information further corroborating the ignition switch defects and many other defects; and failed to adequately recall the Defective Ignition Switch Vehicles and many other vehicles in a timely manner, which failure was a substantial factor in causing Plaintiffs and the Class harm, including diminished value and out-of-pocket costs.

c.      violation of the National Traffic and Motor Vehicle Safety Act of 1996, codified at 49 U.S.C. §§ 30101-30170, and its regulations.  Federal Motor Vehicle Safety Standard ("FMVSS") 573 governs a motor vehicle manufacturer's responsibility to notify NHTSA of a motor vehicle defect within five days of determining that the defect is safety

related.  *See* 49 C.F.R. § 573.6.  New GM violated these reporting requirements by failing to report the myriad defects discussed herein within the required time, and failing to timely recall all impacted vehicles.

1114.   New GM also violated the unfair and fraudulent prong of section 17200 by systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, information that was material to a reasonable consumer.

1115.   New GM also violated the unfair prong of section 17200 because the acts and practices set forth in the Complaint, including systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, offend established public policy, and also because the harm New GM caused consumers greatly outweighs any benefits associated with those practices.  New GM's conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiffs and the California Class from making fully informed decisions about whether to lease, purchase and/or retain the Affected Vehicles.

1116.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1117.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

- 302 -

1118.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1119.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unlawful, unfair, or fraudulent business act or practices in violation of the UCL.

1120.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1121.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1122.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the California Class.

1123.   New GM knew or should have known that its conduct violated the UCL.

1124.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

1125.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

   a.   Possessed exclusive knowledge that it valued cost-cutting
        over safety, selected parts from the cheapest supplier
        regardless of quality, and actively discouraged employees
        from finding and flagging known safety defects, and that
        this approach would necessarily cause the existence of
        more defects in the vehicles it designed and manufactured;

   b.   Intentionally concealed the foregoing from Plaintiffs;
        and/or

   c.   Made incomplete representations about the safety and
        reliability of the Affected Vehicles generally, and the
        ignition switch in particular, while purposefully
        withholding material facts from Plaintiffs that contradicted
        these representations.

1126.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

1127.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the California Class.  A vehicle

made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable

vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than

promptly remedies them.

1128.   Plaintiffs and the California Class suffered ascertainable loss caused by

New GM's misrepresentations and its failure to disclose material information.  Had they been

aware of the many defects that existed in GM-branded vehicles, and the company's callous

disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have

purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

1129. New GM's violations present a continuing risk to Plaintiffs as well as to the general public. Its unlawful acts and practices complained of herein affect the public interest.

1130. As a direct and proximate result of New GM's violations of the UCL, Plaintiffs and the California Class have suffered injury-in-fact and/or actual damage.

1131. Plaintiffs request that this Court enter such orders or judgments as may be necessary, including a declaratory judgment that New GM has violated the UCL; an order enjoining New GM from continuing its unfair, unlawful, and/or deceptive practices; an order supervising the recalls; an order and judgment restoring to the California Class members any money lost as the result of New GM's unfair, unlawful, and deceptive trade practices, including restitution and disgorgement of any profits New GM received as a result of its unfair, unlawful, and/or deceptive practices, as provided in CAL. BUS. & PROF. CODE § 17203, CAL CIV. PROC. § 384 and CAL. CIV. CODE § 3345; and for such other relief as may be just and proper.

## COUNT III

## FRAUD BY CONCEALMENT

1132. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1133. In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are California residents (the "California Class").

1134. New GM concealed and suppressed material facts concerning the quality of its vehicles and the New GM brand.

1135.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

1136.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1137.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

1138.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the California Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the California Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1139.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the California Class.

010440-11  725144 V1

1140.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the California Class and conceal material information regarding defects that exist in GM-branded vehicles.

1141.   Plaintiffs and the California Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the California Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the California Class.

1142.   Because of the concealment and/or suppression of the facts, Plaintiffs and the California Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

1143.   The value of all California Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the New GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1144.   Accordingly, New GM is liable to the California Class for their damages in an amount to be proven at trial.

1145.   New GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' and the California Class's rights and well-being

to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an

amount sufficient to deter such conduct in the future, which amount is to be determined

according to proof.

**COUNT IV**

**VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT
FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

**(CAL. CIV. CODE §§ 1791.1 & 1792)**

1146.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

1147.   In the event the Court declines to certify a Nationwide Ignition Switch Defect

Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only

on behalf of California residents who are members of the Ignition Switch Defect Subclass (the

"California Ignition Switch Defect Subclass").

1148.   Plaintiffs and California Ignition Switch Defect Subclass members are "buyers"

within the meaning of CAL. CIV. CODE § 1791(b).

1149.   The Defective Ignition Switch Vehicles are "consumer goods" within the meaning

of CIV. CODE § 1791(a).

1150.   New GM was a "manufacturer" of the Defective Ignition Switch Vehicles within

the meaning of CAL. CIV. CODE § 1791(j).

1151.   New GM impliedly warranted to Plaintiffs and the California Ignition Switch

Defect Subclass that its Defective Ignition Switch Vehicles were "merchantable" within the

meaning of CAL. CIV. CODE §§ 1791.1(a) & 1792; however, the Defective Ignition Switch

- 308 -

Vehicles do not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

1152. CAL. CIV. CODE § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1) Pass without objection in the trade under the contract description.

(2) Are fit for the ordinary purposes for which such goods are used.

(3) Are adequately contained, packaged, and labeled.

(4) Conform to the promises or affirmations of fact made on the container or label.

1153. The Defective Ignition Switch Vehicles would not pass without objection in the automotive trade because of the ignition switch defects that cause the Defective Ignition Switch Vehicles to inadvertently shut down during ordinary driving conditions, leading to an unreasonable likelihood of accident and an unreasonable likelihood that such accidents will cause serious bodily harm or death to vehicle occupants.

1154. Because of the ignition switch defects, the Defective Ignition Switch Vehicles are not safe to drive and thus not fit for ordinary purposes.

1155. The Defective Ignition Switch Vehicles are not adequately labeled because the labeling fails to disclose the ignition switch defects and does not advise Class members to avoid attaching anything to their vehicle key rings. New GM failed to warn about the dangerous safety defects in the Defective Ignition Switch Vehicles.

1156. New GM breached the implied warranty of merchantability by selling Defective Ignition Switch Vehicles containing defects leading to the sudden and unintended shut down of

- 309 -

the vehicles during ordinary driving conditions.  These defects have deprived Plaintiffs and the

California Ignition Switch Defect Subclass of the benefit of their bargain and have caused the

Defective Ignition Switch Vehicles to depreciate in value.

1157.   Notice of breach is not required because Plaintiffs and California Ignition Switch

Defect Subclass members did not purchase their automobiles directly from New GM.

1158.   As a direct and proximate result New GM's breach of its duties under California's

Lemon Law, Plaintiffs and California Ignition Switch Defect Subclass members received goods

whose dangerous condition substantially impairs their value.  Plaintiffs and the California

Ignition Switch Defect Subclass have been damaged by the diminished value of New GM's

products, the product's malfunctioning, and the nonuse of their Defective Ignition Switch

Vehicles.

1159.   Under CAL. CIV. CODE §§ 1791.1(d) & 1794, Plaintiffs and California Ignition

Switch Defect Subclass members are entitled to damages and other legal and equitable relief

including, at their election, the purchase price of their Defective Ignition Switch Vehicles, or the

overpayment or diminution in value of their Defective Ignition Switch Vehicles.

1160.   Under CAL. CIV. CODE § 1794, Plaintiffs and California Ignition Switch Defect

Subclass members are entitled to costs and attorneys' fees.

**COUNT V**

**NEGLIGENT FAILURE TO RECALL**

1161.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

1162.   This claim is brought only on behalf of California residents who are members of

the Ignition Switch Defect Subclass (the "California Ignition Switch Defect Subclass").

1163.   New GM manufactured, distributed, and sold  Defective Ignition Switch Vehicles.

- 310 -

1164.   New GM knew or reasonably should have known that the Defective Ignition Switch Vehicles were dangerous and/or were likely to be dangerous when used in a reasonably foreseeable manner.

1165.   New GM either knew of the ignition switch defects before the vehicles were sold, or became aware of the ignition switch defects and their attendant risks after the vehicles were sold.

1166.   New GM continued to gain information further corroborating the ignition switch defects and their risks from its inception until this year.

1167.   New GM failed to adequately recall the Defective Ignition Switch Vehicles in a timely manner.

1168.   Purchasers of the Defective Ignition Switch Vehicles, including the California Ignition Switch Defect Subclass, were harmed by New GM's failure to adequately recall all the Defective Ignition Switch Vehicles in a timely manner and have suffered damages, including, without limitation, damage to other components of the Defective Ignition Switch Vehicles caused by the Ignition Switch Defects, the diminished value of the Defective Ignition Switch Vehicles, the cost of modification of the defective ignition switch systems, and the costs associated with the loss of use of the Defective Ignition Switch Vehicles.

1169.   New GM's failure to timely and adequately recall the Defective Ignition Switch Vehicles was a substantial factor in causing the purchasers' harm, including that of Plaintiffs and the California Ignition Switch Defect Subclass.

010440-11  725144 V1

# COLORADO

## COUNT I

### VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT

### (COL. REV. STAT. § 6-1-101, *et seq.*)

1170.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1171.   This claim is brought only on behalf of Nationwide Class members who are Colorado residents (the "Colorado Class").

1172.   New GM is a "person" under § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), COL. REV. STAT. § 6-1-101, *et seq*.

1173.   Plaintiffs and Colorado Class members are "consumers" for purposes of COL. REV. STAT § 6-1-113(1)(a) who purchased or leased one or more Affected Vehicles.

1174.   The Colorado CPA prohibits deceptive trade practices in the course of a person's business.  New GM engaged in deceptive trade practices prohibited by the Colorado CPA, including:  (1) knowingly making a false representation as to the characteristics, uses, and benefits of the Affected Vehicles that had the capacity or tendency to deceive Colorado Class members; (2) representing that the Affected Vehicles are of a particular standard, quality, and grade even though New GM knew or should have known they are not; (3) advertising the Affected Vehicles with the intent not to sell them as advertised; and (4) failing to disclose material information concerning the Affected Vehicles that was known to New GM at the time of advertisement or sale with the intent to induce Colorado Class members to purchase, lease or retain the Affected Vehicles.

1175.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise

- 312 -

engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful

trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or

concealment, suppression or omission of any material fact with intent that others rely upon such

concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

1176.   New GM's actions as set forth above occurred in the conduct of trade or

commerce.

1177.   From the date of its inception on July 10, 2009, New GM knew of many serious

defects affecting many models and years of GM-branded vehicles, both because of the

knowledge of Old GM personnel who remained at New GM and continuous reports,

investigations, and notifications from regulatory authorities.  New GM became aware of other

serious defects and systemic safety issues years ago, but concealed all of that information until

recently.

1178.   New GM was also aware that it valued cost-cutting over safety, selected parts

from the cheapest supplier regardless of quality, and actively discouraged employees from

finding and flagging known safety defects, and that this approach would necessarily cause the

existence of more defects in the vehicles it designed and manufactured and the failure to disclose

and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1179.   According to one report from the Center for Auto Safety, some 2,004 deaths and

injuries are connected with recently recalled GM-branded vehicles, and New GM should have

recalled the vehicles years ago.

1180.   By failing to disclose and by actively concealing the many defects in GM-branded

vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself

as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold,

New GM engaged in deceptive business practices in violation of the Colorado CPA.

1181.   In the course of New GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the many safety issues and serious defects discussed

above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles

were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that

valued safety and stood behind its vehicles once they are on the road.

1182.   New GM's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-

branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true

value of the Affected Vehicles.

1183.   New GM intentionally and knowingly misrepresented material facts regarding the

Affected Vehicles with an intent to mislead Plaintiffs and the Colorado Class.

1184.   New GM knew or should have known that its conduct violated the Colorado CPA.

1185.   As alleged above, New GM made material statements about the safety and

reliability of the Affected Vehicles that were either false or misleading.

1186.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

> a.   Possessed exclusive knowledge that it valued cost-cutting
>       over safety, selected parts from the cheapest supplier
>       regardless of quality, and actively discouraged employees
>       from finding and flagging known safety defects, and that
>       this approach would necessarily cause the existence of
>       more defects in the vehicles it designed and manufactured;
>
> b.   Intentionally concealed the foregoing from Plaintiffs;
>       and/or

010440-11 725144 V1

   c.  Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1187. Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished. In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

1188. New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Colorado Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1189. Plaintiffs and the Colorado Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information. Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

1190. Plaintiffs and Colorado Class members risk irreparable injury as a result of New GM's act and omissions in violation of the Colorado CPA, and these violations present a continuing risk to Plaintiffs as well as to the general public. New GM's unlawful acts and practices complained of herein affect the public interest.

010440-11 725144 V1

1191.   As a direct and proximate result of New GM's violations of the Colorado CPA, Plaintiffs and the Colorado Class have suffered injury-in-fact and/or actual damage.

1192.   Pursuant to COLO. REV. STAT. § 6-1-113, Plaintiffs individually and on behalf of the Colorado Class, seek monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each Plaintiff and each Colorado Class member.

1193.   Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Colorado CPA.

## COUNT II

## FRAUD BY CONCEALMENT

1194.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1195.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Colorado residents (the "Colorado Class").

1196.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

1197.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

1198.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

- 316 -

1199.   New GM did so in order to boost confidence in its vehicles and falsely assure

purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands

behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false

representations were material to consumers, both because they concerned the quality and safety

of the Affected Vehicles and because they played a significant role in the value of the vehicles.

1200.   New GM had a duty to disclose the many defects in GM-branded vehicles

because they were known and/or accessible only to New GM who had superior knowledge and

access to the facts, and New GM knew the facts were not known to or reasonably discoverable

by Plaintiffs and the Colorado Class.  These omitted and concealed facts were material because

they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the

Colorado Class.  Whether a manufacturer's products are safe and reliable, and whether that

manufacturer stands behind its products, are material concerns to a consumer.

1201.   New GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM

money, and it did so at the expense of Plaintiffs and the Colorado Class.

1202.   On information and belief, New GM has still not made full and adequate

disclosure and continues to defraud Plaintiffs and the Colorado Class and conceal material

information regarding defects that exist in GM-branded vehicles.

1203.   Plaintiffs and the Colorado Class were unaware of these omitted material facts

and would not have acted as they did if they had known of the concealed and/or suppressed facts.

Plaintiffs' and the Colorado Class's actions were justified.  New GM was in exclusive control of

the material facts and such facts were not known to the public, Plaintiffs, or the Colorado Class.

010440-11  725144 V1

1204.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Colorado Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

1205.   The value of all Colorado Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1206.   Accordingly, New GM is liable to the Colorado Class for their damages in an amount to be proven at trial.

1207.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Colorado Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

010440-11  725144 V1

# COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (COL. REV. STAT. § 4-2-314)

1208.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1209.  In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of Colorado residents who are members of the Ignition Switch Defect Subclass (the "Colorado Ignition Switch Defect Subclass").

1210.  New GM was a merchant with respect to motor vehicles.

1211.  Under COL. REV. STAT. § 4-2-314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles.

1212.  These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

1213.  New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Colorado Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

010440-11 725144 V1

1214.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs and the Colorado Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

## CONNECTICUT

## COUNT I

## VIOLATION OF CONNECTICUT UNLAWFUL TRADE PRACTICES ACT

### (CONN. GEN. STAT. § 42-110A, *et seq.*)

1215.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1216.   This claim is brought only on behalf of Class members who are Connecticut residents (the "Connecticut Class").

1217.   The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  CONN. GEN. STAT. § 42-110b(a).

1218.   New GM is a "person" within the meaning of CONN. GEN. STAT. § 42-110a(3). New GM is in "trade" or "commerce" within the meaning of CONN. GEN. STAT. § 42-110a(4).

1219.   New GM participated in deceptive trade practices that violated the Connecticut UTPA as described herein.  In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

- 320 -

1220.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1221.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1222.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1223.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair and deceptive business practices in violation of the Connecticut UTPA.

1224.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles

- 321 -

were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that

valued safety and stood behind its vehicles once they are on the road.

1225.   New GM's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-

branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true

value of the Affected Vehicles.

1226.   New GM intentionally and knowingly misrepresented material facts regarding the

Affected Vehicles with an intent to mislead Plaintiffs and the Connecticut Class.

1227.   New GM knew or should have known that its conduct violated the Connecticut

UTPA.

1228.   As alleged above, New GM made material statements about the safety and

reliability of the Affected Vehicles that were either false or misleading.

1229.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

> a.   Possessed exclusive knowledge that it valued cost-cutting
> over safety, selected parts from the cheapest supplier
> regardless of quality, and actively discouraged employees
> from finding and flagging known safety defects, and that
> this approach would necessarily cause the existence of
> more defects in the vehicles it designed and manufactured;
>
> b.   Intentionally concealed the foregoing from Plaintiffs;
> and/or
>
> c.   Made incomplete representations about the safety and
> reliability of the Affected Vehicles generally, and the
> ignition switch in particular, while purposefully
> withholding material facts from Plaintiffs that contradicted
> these representations.

1230.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

1231.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Connecticut Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1232.   Plaintiffs and the Connecticut Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

1233.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1234.   As a direct and proximate result of New GM's violations of the Connecticut UTPA, Plaintiffs and the Connecticut Class have suffered injury-in-fact and/or actual damage.

1235.   Plaintiffs and the Class are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to CONN. GEN. STAT. § 42-110g.

010440-11  725144 V1

1236.   New GM acted with a reckless indifference to another's rights or wanton or intentional violation to another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights and safety of others.

## COUNT II

### FRAUDULENT CONCEALMENT

1237.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1238.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Class members who are Connecticut residents (the "Connecticut Class").

1239.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

1240.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

1241.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1242.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

- 324 -

1243.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Connecticut Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Connecticut Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1244.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Connecticut Class.

1245.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Connecticut Class and conceal material information regarding defects that exist in GM-branded vehicles.

1246.   Plaintiffs and the Connecticut Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Connecticut Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Connecticut Class.

1247.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Connecticut Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded

vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

1248.   The value of all Connecticut Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1249.   Accordingly, New GM is liable to the Connecticut Class for their damages in an amount to be proven at trial.

1250.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Connecticut Class's rights and well-being to enrich New GM. New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## DELAWARE

## COUNT I

## VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT

### (6 DEL. CODE § 2513, *et seq.*)

1251.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1252.   This claim is brought only on behalf of Nationwide Class members who are Delaware residents (the "Delaware Class").

1253.   New GM is a "person" within the meaning of 6 DEL. CODE § 2511(7).

- 326 -

1254.   The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby."  6 DEL. CODE § 2513(a).

1255.   New GM participated in deceptive trade practices that violated the Delaware CFA as described herein.  In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

1256.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1257.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the

existence of more defects in the vehicles it designed and manufactured and the failure to disclose

and remedy defects in all GM-branded vehicles. New GM concealed this information as well.

1258. According to one report from the Center for Auto Safety, some 2,004 deaths and

injuries are connected with recently recalled GM-branded vehicles, and New GM should have

recalled the vehicles years ago.

1259. By failing to disclose and by actively concealing the many defects in GM-branded

vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself

as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold,

New GM engaged in deceptive business practices in violation of the Delaware CFA.

1260. In the course of New GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the many safety issues and serious defects discussed

above. New GM compounded the deception by repeatedly asserting that the Affected Vehicles

were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that

valued safety and stood behind its vehicles once they are on the road.

1261. New GM's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-

branded vehicles, the quality of the New GM brand, the devaluing of safety at New GM, and the

true value of the Affected Vehicles.

1262. New GM intentionally and knowingly misrepresented material facts regarding the

Affected Vehicles with an intent to mislead Plaintiffs and the Delaware Class.

1263. New GM knew or should have known that its conduct violated the Delaware

CFA.

1264.  As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

1265.  New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

    a.    Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

    b.    Intentionally concealed the foregoing from Plaintiffs; and/or

    c.    Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1266.  Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

1267.  New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Delaware Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1268.  Plaintiffs and the Delaware Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been

- 329 -

aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

1269.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public. New GM's unlawful acts and practices complained of herein affect the public interest.

1270.   As a direct and proximate result of New GM's violations of the Delaware CFA, Plaintiffs and the Delaware Class have suffered injury-in-fact and/or actual damage.

1271.   Plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of New GM's unlawful conduct. *See*, *e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983). Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

1272.   New GM engaged in gross, oppressive or aggravated conduct justifying the imposition of punitive damages.

## COUNT II

## VIOLATION OF THE DELAWARE DECEPTIVE TRADE PRACTICES ACT

### (6 DEL. CODE § 2532, *et seq.*)

1273.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1274.   This claim is brought only on behalf of Nationwide Class members who are Delaware residents (the "Delaware Class").

1275.   New GM is a "person" within the meaning of 6 DEL. CODE § 2531(5).

1276.   Delaware's Deceptive Trade Practices Act ("Delaware DTPA") prohibits a person from engaging in a "deceptive trade practice," which includes:  "(5) Represent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have"; "(7) Represent[ing] that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; "(9) Advertis[ing] goods or services with intent not to sell them as advertised"; or "(12) Engag[ing] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."

1277.   New GM engaged in deceptive trade practices in violation of the Delaware DTPA by systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles as described above.  New GM also engaged in deceptive trade practices in violation of the Delaware DTPA by representing that the Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Affected Vehicles are of a particular standard and quality when they are not; advertising the Affected Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

1278.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

010440-11  725144 V1

1279.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1280.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1281.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the Delaware DTPA.

1282.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1283.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the New GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1284.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Delaware Class.

- 332 -

Case 1:14-md-02543-JMF   Document 345   Filed 10/14/14   Page 353 of 712

1285.   New GM knew or should have known that its conduct violated the Delaware DTPA.

1286.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

1287.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

    a.   Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

    b.   Intentionally concealed the foregoing from Plaintiffs; and/or

    c.   Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1288.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

1289.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Delaware Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

010440-11  725144 V1

1290.   Plaintiffs and the Delaware Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

1291.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1292.   As a direct and proximate result of New GM's violations of the Delaware DTPA, Plaintiffs and the Delaware Class have suffered injury-in-fact and/or actual damage.

1293.   Plaintiff seeks injunctive relief and, if awarded damages under Delaware common law or Delaware DTPA Act, treble damages pursuant to 6 DEL. CODE § 2533(c).

1294.   New GM engaged in gross, oppressive or aggravated conduct justifying the imposition of punitive damages.

## COUNT III

## FRAUD BY CONCEALMENT

1295.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1296.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Delaware residents (the "Delaware Class").

1297.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

- 334 -

1298.   New GM concealed and suppressed material facts concerning the culture of
New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of
safety issues, and a shoddy design process.

1299.   New GM concealed and suppressed material facts concerning the many serious
defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps
to ensure that its employees did not reveal known safety defects to regulators or consumers.

1300.   New GM did so in order to boost confidence in its vehicles and falsely assure
purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands
behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false
representations were material to consumers, both because they concerned the quality and safety
of the Affected Vehicles and because they played a significant role in the value of the vehicles.

1301.   New GM had a duty to disclose the many defects in GM-branded vehicles
because they were known and/or accessible only to New GM who had superior knowledge and
access to the facts, and New GM knew the facts were not known to or reasonably discoverable
by Plaintiffs and the Delaware Class.  These omitted and concealed facts were material because
they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the
Delaware Class.  Whether a manufacturer's products are safe and reliable, and whether that
manufacturer stands behind its products, are material concerns to a consumer.

1302.   New GM actively concealed and/or suppressed these material facts, in whole or in
part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM
money, and it did so at the expense of Plaintiffs and the Delaware Class.

010440-11  725144 V1

1303.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Delaware Class and conceal material information regarding defects that exist in GM-branded vehicles.

1304.   Plaintiffs and the Delaware Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Delaware Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Delaware Class.

1305.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Delaware Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

1306.   The value of all Delaware Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the New GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1307.   Accordingly, New GM is liable to the Delaware Class for their damages in an amount to be proven at trial.

1308.   New GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' and the Delaware Class's rights and well-being to

enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount

sufficient to deter such conduct in the future, which amount is to be determined according to

proof.

## COUNT IV

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (6 DEL. CODE § 2-314)

1309.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

1310.   In the event the Court declines to certify a Nationwide Ignition Switch Defect

Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only

on behalf of Delaware residents who are members of the Ignition Switch Defect Subclass (the

"Delaware Ignition Switch Defect Subclass").

1311.   New GM was a merchant with respect to motor vehicles within the meaning of 6

DEL. CODE § 2-104(1).

1312.   Under 6 DEL. CODE § 2-314,  a warranty that the Defective Ignition Switch

Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs

purchased their Defective Ignition Switch Vehicles.

1313.   These vehicles, when sold and at all times thereafter, were not merchantable and

are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition

Switch Vehicles are inherently defective in that there are defects in the ignition switch systems

that permit sudden unintended shutdown to occur, with the attendant shut down of power

steering and power brakes and the nondeployment of airbags in the event of a collision.

1314. New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Delaware Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1315. As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs and the Delaware Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

**DISTRICT OF COLUMBIA**

**COUNT I**

**VIOLATION OF THE CONSUMER PROTECTION PROCEDURES ACT**

**(D.C. CODE § 28-3901, *et seq*.)**

1316. Plaintiffs reallege and incorporate by reference all paragraphs as if fully set forth herein.

1317. This claim is brought only on behalf of Nationwide Class members who are District of Columbia residents (the "District of Columbia Class").

1318. New GM is a "person" under the Consumer Protection Procedures Act ("District of Columbia CPPA"), D.C. CODE § 28-3901(a)(1).

1319. Class members are "consumers," as defined by D.C. CODE § 28-3901(1)(2), who purchased or leased one or more Affected Vehicles.

1320. New GM's actions as set forth herein constitute "trade practices" under D.C. CODE § 28-3901.

1321. New GM participated in unfair or deceptive acts or practices that violated the District of Columbia CPPA. By systematically devaluing safety and concealing a plethora of

- 338 -

defects in GM-branded vehicles, New GM engaged in unfair or deceptive practices prohibited by

the District of Columbia CPPA, D.C. CODE § 28-3901, *et seq.*, including: (1) representing that

the Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have;

(2) representing that the Affected Vehicles are of a particular standard, quality, and grade when

they are not; (3) advertising the Affected Vehicles with the intent not to sell them as advertised;

(4) representing that the subject of a transaction involving the Affected Vehicles has been

supplied in accordance with a previous representation when it has not; (5) misrepresenting as to a

material fact which has a tendency to mislead; and (6) failing to state a material fact when such

failure tends to mislead.

1322.   In the course of its business in trade or commerce, New GM systematically

devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein

and otherwise engaged in activities with a tendency or capacity to deceive. New GM also

engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud,

misrepresentations, or concealment, suppression or omission of any material fact with intent that

others rely upon such concealment, suppression or omission, in connection with the sale of the

Affected Vehicles.

1323.   From the date of its inception on July 10, 2009, New GM knew of many serious

defects affecting many models and years of GM-branded vehicles, both because of the

knowledge of Old GM personnel who remained at New GM and continuous reports,

investigations, and notifications from regulatory authorities. New GM became aware of other

serious defects and systemic safety issues years ago, but concealed all of that information until

recently.

010440-11 725144 V1

1324.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1325.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1326.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair and deceptive business practices in violation of the District of Columbia CCPA.

1327.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1328.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1329.   New GM intentionally and knowingly misrepresented material facts regarding the

Affected Vehicles with an intent to mislead Plaintiffs and the District of Columbia Class.

1330.   New GM knew or should have known that its conduct violated the District of

Columbia CPPA.

1331.   As alleged above, New GM made material statements about the safety and

reliability of the Affected Vehicles that were either false or misleading.

1332.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

      a.      Possessed exclusive knowledge that it valued cost-cutting
over safety, selected parts from the cheapest supplier
regardless of quality, and actively discouraged employees
from finding and flagging known safety defects, and that
this approach would necessarily cause the existence of
more defects in the vehicles it designed and manufactured;

      b.      Intentionally concealed the foregoing from Plaintiffs;
and/or

      c.      Made incomplete representations about the safety and
reliability of the Affected Vehicles generally, and the
ignition switch in particular, while purposefully
withholding material facts from Plaintiffs that contradicted
these representations.

1333.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

1334.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the District of Columbia Class.

A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise

comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1335.   Plaintiffs and the District of Columbia Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

1336.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1337.   As a direct and proximate result of New GM's violations of the District of Columbia CPPA, Plaintiffs and the District of Columbia Class have suffered injury-in-fact and/or actual damage.

1338.   Plaintiff and the District of Columbia Class are entitled to recover treble damages or $1,500, whichever is greater, punitive damages, reasonable attorneys' fees, and any other relief the Court deems proper, under D.C. CODE § 28-3901.

1339.   Plaintiffs seek punitive damages against New GM because New GM's conduct evidences malice and/or egregious conduct.  New GM maliciously and egregiously misrepresented the safety and reliability of the Affected Vehicles, deceived Class members on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting deadly flaws in vehicles and repeatedly promised Class

010440-11 725144 V1

members that all vehicles were safe.  New GM's unlawful conduct constitutes malice warranting punitive damages.

## COUNT II

## FRAUD BY CONCEALMENT

1340.   Plaintiffs reallege and incorporate by reference all paragraphs as if fully set forth herein.

1341.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are District of Columbia residents (the "District of Columbia Class").

1342.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

1343.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

1344.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1345.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

1346.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and

access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the District of Columbia Class. These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the District of Columbia Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1347. New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the District of Columbia Class.

1348. On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the District of Columbia Class and conceal material information regarding defects that exist in GM-branded vehicles.

1349. Plaintiffs and the District of Columbia Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the District of Columbia Class's actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the District of Columbia Class.

1350. Because of the concealment and/or suppression of the facts, Plaintiffs and the District of Columbia Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies. Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have

- 344 -

paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

1351.   The value of all District of Columbia Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the New GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1352.   Accordingly, New GM is liable to the District of Columbia Class for their damages in an amount to be proven at trial.

1353.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the District of Columbia Class's rights and well-being to enrich New GM. New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT III**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

**(D.C. CODE § 28:2-314)**

1354.   Plaintiffs reallege and incorporate by reference all paragraphs as if fully set forth herein.

1355.   In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of District of Columbia residents who are members of the Ignition Switch Defect Subclass (the "D.C. Ignition Switch Defect Subclass").

1356.   New GM was a merchant with respect to motor vehicles within the meaning of D.C. CODE § 28:2-104(1).

1357.   Under D.C. CODE § 28:2-314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles.

1358.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

1359.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the D.C. Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recalls and the allegations of vehicle defects became public.

1360.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs and the D.C. Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

## FLORIDA

## COUNT I

## VIOLATION OF FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT

### (FLA. STAT. § 501.201, *et seq.*)

1361.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1362.   This claim is brought only on behalf of Nationwide Class members who are Florida residents (the "Florida Class").

1363.   Plaintiffs are "consumers" within the meaning of Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), FLA. STAT. § 501.203(7).

1364.   New GM engaged in "trade or commerce" within the meaning of FLA. STAT. § 501.203(8).

1365.   FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" FLA. STAT. § 501.204(1).  New GM participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.

1366.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

1367.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

010440-11  725144 V1

1368.   New GM was also aware that it valued cost-cutting over safety, selected parts
from the cheapest supplier regardless of quality, and actively discouraged employees from
finding and flagging known safety defects, and that this approach would necessarily cause the
existence of more defects in the vehicles it designed and manufactured and the failure to disclose
and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1369.   According to one report from the Center for Auto Safety, some 2,004 deaths and
injuries are connected with recently recalled GM-branded vehicles, and New GM should have
recalled the vehicles years ago.

1370.   By failing to disclose and by actively concealing the many defects in GM-branded
vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself
as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold,
New GM engaged in unfair, unconscionable, and deceptive business practices in violation of the
FUDTPA.

1371.   In the course of New GM's business, it willfully failed to disclose and actively
concealed the dangerous risk posed by the many safety issues and serious defects discussed
above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles
were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that
valued safety and stood behind its vehicles once they are on the road.

1372.   New GM's unfair or deceptive acts or practices were likely to and did in fact
deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-
branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true
value of the Affected Vehicles.

010440-11 725144 V1

1373.  New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Florida Class.

1374.  New GM knew or should have known that its conduct violated the FUDTPA.

1375.  As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

1376.  New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

    a.    Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

    b.    Intentionally concealed the foregoing from Plaintiffs; and/or

    c.    Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1377.  Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

1378.  New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Florida Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable

- 349 -

vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1379.   Plaintiffs and the Florida Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

1380.   Plaintiffs and Florida Class members risk irreparable injury as a result of New GM's act and omissions in violation of the FUDTPA, and these violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1381.   As a direct and proximate result of New GM's violations of the FUDTPA, Plaintiffs and the Florida Class have suffered injury-in-fact and/or actual damage.

1382.   Plaintiffs and the Florida Class are entitled to recover their actual damages under FLA. STAT. § 501.211(2) and attorneys' fees under FLA. STAT. § 501.2105(1).

1383.   Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

## COUNT II

## FRAUD BY CONCEALMENT

1384.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1385.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Florida residents (the "Florida Class").

1386.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

1387.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

1388.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1389.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

1390.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Florida Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Florida Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

Case 1:14-mc-02543-JMF  Document 345  Filed 10/14/14  Page 372 of 712

1391.  New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Florida Class.

1392.  On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Florida Class and conceal material information regarding defects that exist in GM-branded vehicles.

1393.  Plaintiffs and the Florida Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Florida Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Florida Class.

1394.  Because of the concealment and/or suppression of the facts, Plaintiffs and the Florida Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

1395.  The value of all Florida Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the New GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1396.   Accordingly, New GM is liable to the Florida Class for their damages in an amount to be proven at trial.

1397.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Florida Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## GEORGIA

## COUNT I

## VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT

### (GA. CODE ANN. § 10-1-390, *et seq.*)

1398.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1399.   This claim is brought only on behalf of Nationwide Class members who are Georgia residents (the "Georgia Class").

1400.   The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, GA. CODE. ANN. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," GA. CODE. ANN. § 10-1-393(b).

- 353 -

Case 1:14-mc-02543-JMF   Document 345   Filed 10/14/14   Page 374 of 712

1401.   By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in unfair or deceptive practices prohibited by the FBPA, including:  (1) representing that the Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Affected Vehicles are of a particular standard, quality, and grade when they are not; and (3) advertising the Affected Vehicles with the intent not to sell them as advertised.  New GM participated in unfair or deceptive acts or practices that violated the Georgia FBPA.

1402.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

1403.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1404.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the

existence of more defects in the vehicles it designed and manufactured and the failure to disclose

and remedy defects in all GM -branded vehicles.  New GM concealed this information as well.

1405.   According to one report from the Center for Auto Safety, some 2,004 deaths and

injuries are connected with recently recalled GM-branded vehicles, and New GM should have

recalled the vehicles years ago.

1406.   By failing to disclose and by actively concealing the many defects in GM-branded

vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself

as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold,

New GM engaged in unfair and deceptive business practices in violation of the Georgia FBPA.

1407.   In the course of New GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the many safety issues and serious defects discussed

above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles

were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that

valued safety and stood behind its vehicles once they are on the road.

1408.   New GM's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-

branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true

value of the Affected Vehicles.

1409.   New GM intentionally and knowingly misrepresented material facts regarding the

Affected Vehicles with an intent to mislead Plaintiffs and the Georgia Class.

1410.   New GM knew or should have known that its conduct violated the Georgia

FBPA.

010440-11  725144 V1

1411.   As alleged above, New GM made material statements about the safety and
reliability of the Affected Vehicles that were either false or misleading.

1412.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the
Affected Vehicles and the devaluing of safety at New GM, because New GM:

a.      Possessed exclusive knowledge that it valued cost-cutting
over safety, selected parts from the cheapest supplier
regardless of quality, and actively discouraged employees
from finding and flagging known safety defects, and that
this approach would necessarily cause the existence of
more defects in the vehicles it designed and manufactured;

b.      Intentionally concealed the foregoing from Plaintiffs;
and/or

c.      Made incomplete representations about the safety and
reliability of the Affected Vehicles generally, and the
ignition switch in particular, while purposefully
withholding material facts from Plaintiffs that contradicted
these representations.

1413.   Because New GM fraudulently concealed the many defects in GM-branded
vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,
the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to
those vehicles by New GM's conduct, they are now worth significantly less than they otherwise
would be.

1414.   New GM's systemic devaluation of safety and its concealment of a plethora of
defects in GM-branded vehicles were material to Plaintiffs and the Georgia Class.  A vehicle
made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable
vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than
promptly remedies them.

1415.   Plaintiffs and the Georgia Class suffered ascertainable loss caused by New GM's
misrepresentations and its failure to disclose material information.  Had they been aware of the

many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

1416.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1417.   As a direct and proximate result of New GM's violations of the Georgia FBPA, Plaintiffs and the Georgia Class have suffered injury-in-fact and/or actual damage.

1418.   Plaintiff and the Georgia Class are entitled to recover damages and exemplary damages (for intentional violations) per GA. CODE. ANN § 10-1-399(a).

1419.   Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per GA. CODE. ANN § 10-1-399.

1420.   On October 8, 2014, certain Plaintiffs sent a letter complying with GA. CODE. ANN § 10-1-399(b).  Plaintiffs presently do not claim relief under the Georgia FBPA until and unless New GM fails to remedy its unlawful conduct within the requisite time period, after which Plaintiffs seek all damages and relief to which Plaintiffs and the Georgia Class are entitled.

## COUNT II

## VIOLATION OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT

### (GA. CODE ANN. § 10-1-370, *et seq.*)

1421.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1422.   This claim is brought only on behalf of Nationwide Class members who are Georgia residents (the "Georgia Class").

1423.   New GM, Plaintiffs, and the Georgia Class are "persons' within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), GA. CODE. ANN § 10-1-371(5).

1424.   The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." GA. CODE. ANN § 10-1-372(a).  By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in deceptive trade practices prohibited by the Georgia UDTPA.

1425.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

1426.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

010440-11  725144 V1

1427.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1428.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1429.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the Georgia UDTPA.

1430.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1431.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1432.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Georgia Class.

010440-11  725144 V1

Case 1:14-mc-02543-JMF    Document 345    Filed 10/14/14    Page 380 of 712

1433.   New GM knew or should have known that its conduct violated the Georgia

UDTPA.

1434.   As alleged above, New GM made material statements about the safety and

reliability of the Affected Vehicles that were either false or misleading.

1435.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

> a.    Possessed exclusive knowledge that it valued cost-cutting
> over safety, selected parts from the cheapest supplier
> regardless of quality, and actively discouraged employees
> from finding and flagging known safety defects, and that
> this approach would necessarily cause the existence of
> more defects in the vehicles it designed and manufactured;
>
> b.    Intentionally concealed the foregoing from Plaintiffs;
> and/or
>
> c.    Made incomplete representations about the safety and
> reliability of the Affected Vehicles generally, and the
> ignition switch in particular, while purposefully
> withholding material facts from Plaintiffs that contradicted
> these representations.

1436.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

1437.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the Georgia Class.  A vehicle

made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable

vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than

promptly remedies them.

010440-11 725144 V1

1438.   Plaintiffs and the Georgia Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

1439.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1440.   As a direct and proximate result of New GM's violations of the Georgia UDTPA, Plaintiffs and the Georgia Class have suffered injury-in-fact and/or actual damage.

1441.   Plaintiffs seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA per GA. CODE. ANN § 10-1-373.

## COUNT III

## FRAUD BY CONCEALMENT

1442.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1443.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Georgia residents (the "Georgia Class").

1444.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

- 361 -

1445.   New GM concealed and suppressed material facts concerning the culture of

New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of

safety issues, and a shoddy design process.

1446.   New GM concealed and suppressed material facts concerning the many serious

defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps

to ensure that its employees did not reveal known safety defects to regulators or consumers.

1447.   New GM did so in order to boost confidence in its vehicles and falsely assure

purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands

behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false

representations were material to consumers, both because they concerned the quality and safety

of the Affected Vehicles and because they played a significant role in the value of the vehicles.

1448.   New GM had a duty to disclose the many defects in GM-branded vehicles

because they were known and/or accessible only to New GM who had superior knowledge and

access to the facts, and New GM knew the facts were not known to or reasonably discoverable

by Plaintiffs and the Georgia Class.  These omitted and concealed facts were material because

they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the

Georgia Class.  Whether a manufacturer's products are safe and reliable, and whether that

manufacturer stands behind its products, are material concerns to a consumer.

1449.   New GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM

money, and it did so at the expense of Plaintiffs and the Georgia Class.

010440-11  725144 V1

1450.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Georgia Class and conceal material information regarding defects that exist in GM-branded vehicles.

1451.   Plaintiffs and the Georgia Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Georgia Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Georgia Class.

1452.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Georgia Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

1453.   The value of all Georgia Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1454.   Accordingly, New GM is liable to the Georgia Class for their damages in an amount to be proven at trial.

010440-11  725144 V1

1455.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Georgia Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## HAWAII

## COUNT I

## UNFAIR AND DECEPTIVE ACTS IN VIOLATION OF HAWAII LAW

### (HAW. REV. STAT. § 480, *et seq.*)

1456.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1457.   This claim is brought only on behalf of Nationwide Class members who are Hawaii residents (the "Hawaii Class").

1458.   New GM is a "person" under HAW. REV. STAT. § 480-1.

1459.   Class members are "consumer[s]" as defined by HAW. REV. STAT. § 480-1, who purchased or leased one or more Affected Vehicles.

1460.   New GM's acts or practices as set forth above occurred in the conduct of trade or commerce.

1461.   The Hawaii Act § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.…"  By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in unfair and deceptive trade practices prohibited by the Hawaii Act.

1462.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise

- 364 -

engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful

trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or

concealment, suppression or omission of any material fact with intent that others rely upon such

concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

1463. From the date of its inception on July 10, 2009, New GM knew of many serious

defects affecting many models and years of GM-branded vehicles, both because of the

knowledge of Old GM personnel who remained at New GM and continuous reports,

investigations, and notifications from regulatory authorities. New GM became aware of other

serious defects and systemic safety issues years ago, but concealed all of that information until

recently.

1464. New GM was also aware that it valued cost-cutting over safety, selected parts

from the cheapest supplier regardless of quality, and actively discouraged employees from

finding and flagging known safety defects, and that this approach would necessarily cause the

existence of more defects in the vehicles it designed and manufactured and the failure to disclose

and remedy defects in all GM-branded vehicles. New GM concealed this information as well.

1465. According to one report from the Center for Auto Safety, some 2,004 deaths and

injuries are connected with recently recalled GM-branded vehicles, and New GM should have

recalled the vehicles years ago.

1466. By failing to disclose and by actively concealing the many defects in GM-branded

vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself

as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold,

New GM engaged in unfair and deceptive business practices in violation of the Hawaii Act.

1467.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1468.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1469.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Hawaii Class.

1470.   New GM knew or should have known that its conduct violated the Hawaii Act.

1471.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

1472.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

a.    Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

b.    Intentionally concealed the foregoing from Plaintiffs; and/or

c.    Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

- 366 -

1473.  Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

1474.  New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Hawaii Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1475.  Plaintiffs and the Hawaii Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

1476.  New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1477.  As a direct and proximate result of New GM's violations of the Hawaii Act, Plaintiffs and the Hawaii Class have suffered injury-in-fact and/or actual damage.

1478.   Pursuant to HAW. REV. STAT. § 480-13, Plaintiffs and the Hawaii Class seek monetary relief against New GM measured as the greater of (a) $1,000 and (b) threefold actual damages in an amount to be determined at trial.

1479.   Under HAW. REV. STAT. § 480-13.5, Plaintiffs seek an additional award against New GM of up to $10,000 for each violation directed at a Hawaiian elder.  New GM knew or should have known that its conduct was directed to one or more Class members who are elders. New GM's conduct caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the elder.  One or more Hawaii Class members who are elders are substantially more vulnerable to New GM's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from New GM's conduct.

## COUNT II

## FRAUD BY CONCEALMENT

1480.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1481.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Hawaii residents (the "Hawaii Class").

1482.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

1483.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

- 368 -

Case 14-mc-02543-JMF    Document 345    Filed 10/14/14    Page 389 of 712

1484.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1485.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

1486.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Hawaii Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Hawaii Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1487.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Hawaii Class.

1488.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Hawaii Class and conceal material information regarding defects that exist in GM-branded vehicles.

1489.   Plaintiffs and the Hawaii Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

Plaintiffs' and the Hawaii Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Hawaii Class.

1490.    Because of the concealment and/or suppression of the facts, Plaintiffs and the Hawaii Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

1491.    The value of all Hawaii Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the New GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1492.    Accordingly, New GM is liable to the Hawaii Class for their damages in an amount to be proven at trial.

1493.    New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Hawaii Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

## (HAW. REV. STAT. § 490:2-314)

1494.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1495.   In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of Hawaii residents who are members of the Ignition Switch Defect Subclass (the "Hawaii Ignition Switch Defect Subclass").

1496.   New GM was a merchant with respect to motor vehicles within the meaning of HAW. REV. STAT. § 490:2-104(1).

1497.   Under HAW. REV. STAT. § 490:2-314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles.

1498.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

1499.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Hawaii Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

010440-11  725144 V1

1500.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs and the Hawaii Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

## IDAHO

## COUNT I

## VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT

(IDAHO CIV. CODE § 48-601, *et seq.*)

1501.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1502.   This claim is brought only on behalf of Class members who are Idaho residents (the "Idaho Class").

1503.   New GM is a "person" under the Idaho Consumer Protection Act ("Idaho CPA"), IDAHO CIV. CODE § 48-602(1).

1504.   New GM's acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under IDAHO CIV. CODE § 48-602(2).

1505.   New GM participated in misleading, false, or deceptive acts that violated the Idaho CPA.  By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in deceptive business practices prohibited by the Idaho CPA, including:  (1) representing that the Affected Vehicles have characteristics, uses, and benefits which they do not have; (2) representing that the Affected Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Affected Vehicles with the intent not to sell them as advertised; (4) engaging in acts or practices which are otherwise misleading, false, or deceptive to the consumer; and (5) engaging in any unconscionable method, act or practice in the conduct of trade or commerce.  *See* IDAHO CIV. CODE § 48-603.

- 372 -

Case 1:14-mc-02543-JMF   Document 345   Filed 10/14/14   Page 393 of 712

1506.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

1507.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1508.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1509.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1510.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself

010440-11 725144 V1

as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the Idaho CPA.

1511.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1512.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1513.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Idaho Class.

1514.   New GM knew or should have known that its conduct violated the Idaho CPA.

1515.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

1516.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

> a.      Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;
>
> b.      Intentionally concealed the foregoing from Plaintiffs; and/or

- 374 -

c.   Made incomplete representations about the safety and
reliability of the Affected Vehicles generally, and the
ignition switch in particular, while purposefully
withholding material facts from Plaintiffs that contradicted
these representations.

1517.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

1518.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the Idaho Class.  A vehicle made

by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle

made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than

promptly remedies them.

1519.   Plaintiffs and the Idaho Class suffered ascertainable loss caused by New GM's

misrepresentations and its failure to disclose material information.  Had they been aware of the

many defects that existed in GM-branded vehicles, and the company's callous disregard for

safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or

leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's

misconduct.

1520.   New GM's violations present a continuing risk to Plaintiffs as well as to the

general public.  New GM's unlawful acts and practices complained of herein affect the public

interest.

1521.   As a direct and proximate result of New GM's violations of the Idaho CPA,

Plaintiffs and the Idaho Class have suffered injury-in-fact and/or actual damage.

- 375 -

1522.   Pursuant to IDAHO CODE § 48-608, Plaintiffs and the Idaho Class seek monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each Plaintiff and each Idaho Class member.

1523.   Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho CPA.

1524.   Plaintiffs and Idaho Class members also seek punitive damages against New GM because New GM's conduct evidences an extreme deviation from reasonable standards. New GM flagrantly, maliciously, and fraudulently misrepresented the safety and reliability of the Affected Vehicles, deceived Class members on life-or-death matters, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in vehicles it repeatedly promised Class members were safe.  New GM's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT II

## FRAUD BY CONCEALMENT

1525.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1526.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Idaho residents (the "Idaho Class").

1527.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

- 376 -

1528.   New GM concealed and suppressed material facts concerning the culture of

New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of

safety issues, and a shoddy design process.

1529.   New GM concealed and suppressed material facts concerning the many serious

defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps

to ensure that its employees did not reveal known safety defects to regulators or consumers.

1530.   New GM did so in order to boost confidence in its vehicles and falsely assure

purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands

behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false

representations were material to consumers, both because they concerned the quality and safety

of the Affected Vehicles and because they played a significant role in the value of the vehicles.

1531.   New GM had a duty to disclose the many defects in GM-branded vehicles

because they were known and/or accessible only to New GM who had superior knowledge and

access to the facts, and New GM knew the facts were not known to or reasonably discoverable

by Plaintiffs and the Idaho Class.  These omitted and concealed facts were material because they

directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Idaho

Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer

stands behind its products, are material concerns to a consumer.

1532.   New GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM

money, and it did so at the expense of Plaintiffs and the Idaho Class.

1533.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Idaho Class and conceal material information regarding defects that exist in GM-branded vehicles.

1534.   Plaintiffs and the Idaho Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Idaho Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Idaho Class.

1535.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Idaho Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

1536.   The value of all Idaho Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the New GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1537.   Accordingly, New GM is liable to the Idaho Class for their damages in an amount to be proven at trial.

010440-11 725144 V1

1538.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Idaho Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**ILLINOIS**

**COUNT I**

**VIOLATION OF ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT**

**(815 ILCS 505/1, *et seq*. and 720 ILCS 295/1A)**

1539.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1540.   This claim is brought only on behalf of Nationwide Class members who are Illinois residents (the "Illinois Class").

1541.   New GM is a "person" as that term is defined in 815 ILCS 505/1(c).

1542.   Plaintiff and the Illinois Class are "consumers" as that term is defined in 815 ILCS 505/1(e).

1543.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby."  815 ILCS 505/2.

- 379 -

Case 1:14-mc-02543-JMF Document 345 Filed 10/14/14 Page 400 of 712

1544.   New GM participated in misleading, false, or deceptive acts that violated the Illinois CFA.  By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in deceptive business practices prohibited by the Illinois CFA.

1545.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

1546.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1547.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

010440-11  725144 V1

1548.  According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1549.  By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair and deceptive business practices in violation of the Illinois CFA.

1550.  In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1551.  New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1552.  New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Illinois Class.

1553.  New GM knew or should have known that its conduct violated the Illinois CFA.

1554.  As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

1555.  New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

    a.      Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

    b.      Intentionally concealed the foregoing from Plaintiffs; and/or

    c.      Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1556.    Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

1557.    New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Illinois Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1558.    Plaintiffs and the Illinois Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

1559.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1560.   As a direct and proximate result of New GM's violations of the Illinois CFA, Plaintiffs and the Illinois Class have suffered injury-in-fact and/or actual damage.

1561.   Pursuant to 815 ILCS 505/10a(a), Plaintiffs and the Illinois Class seek monetary relief against New GM in the amount of actual damages, as well as punitive damages because New GM acted with fraud and/or malice and/or was grossly negligent.

1562.   Plaintiffs also seek an order enjoining New GM's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq*.

## COUNT II

## FRAUD BY CONCEALMENT

1563.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1564.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Illinois residents (the "Illinois Class").

1565.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

1566.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

- 383 -

1567.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1568.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

1569.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Illinois Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Illinois Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1570.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Illinois Class.

1571.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Illinois Class and conceal material information regarding defects that exist in GM-branded vehicles.

1572.   Plaintiffs and the Illinois Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

Plaintiffs' and the Illinois Class's actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Illinois Class.

1573.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Illinois Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies. Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

1574.   The value of all Illinois Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the New GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1575.   Accordingly, New GM is liable to the Illinois Class for their damages in an amount to be proven at trial.

1576.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Illinois Class's rights and well-being to enrich New GM. New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

# INDIANA

## COUNT I

## VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT

### (IND. CODE § 24-5-0.5-3)

1577.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1578.    This claim is brought only on behalf of Nationwide Class members who are Indiana residents (the "Indiana Class").

1579.    New GM is a "person" within the meaning of IND. CODE § 24-5-0.5-2(2) and a "supplier" within the meaning of IND. CODE § 24-5-.05-2(a)(3).

1580.    Plaintiffs' and Indiana Class members' purchases of the Affected Vehicles are "consumer transactions" within the meaning of IND. CODE § 24-5-.05-2(a)(1).

1581.    Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive trade practice," which includes representing:  "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; … (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall

010440-11  725144 V1

state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false."

1582.   New GM participated in misleading, false, or deceptive acts that violated the Indiana DCSA.  By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in deceptive business practices prohibited by the Indiana DCSA.  New GM also engaged in unlawful trade practices by:  (1) representing that the Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Affected Vehicles are of a particular standard and quality when they are not; (3) advertising the Affected Vehicles with the intent not to sell them as advertised; and (4) otherwise engaging in conduct likely to deceive.

1583.   New GM's actions as set forth above occurred in the conduct of trade or commerce.

1584.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

1585.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other

serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1586.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1587.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1588.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the Indiana DCSA.

1589.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1590.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the New GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1591.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Indiana Class.

1592.   New GM knew or should have known that its conduct violated the Indiana DCSA.

1593.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

1594.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

> a.    Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

> b.    Intentionally concealed the foregoing from Plaintiffs; and/or

> c.    Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1595.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

1596.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Indiana Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable

- 389 -

vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1597. Plaintiffs and the Indiana Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information. Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

1598. New GM's violations present a continuing risk to Plaintiffs as well as to the general public. New GM's unlawful acts and practices complained of herein affect the public interest.

1599. As a direct and proximate result of New GM's violations of the Indiana DCSA, Plaintiffs and the Indiana Class have suffered injury-in-fact and/or actual damage.

1600. Pursuant to IND. CODE § 24-5-0.5-4, Plaintiffs and the Indiana Class seek monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff and each Indiana Class member, including treble damages up to $1,000 for New GM's willfully deceptive acts.

1601. Plaintiff also seeks punitive damages based on the outrageousness and recklessness of the New GM's conduct and New GM's high net worth.

1602. On October 8, 2014, certain Plaintiffs sent a letter complying with IND. CODE § 24-5-0.5-5(a). Plaintiffs presently do not claim relief under the Indiana DCSA for "curable" acts until and unless New GM fails to remedy its unlawful conduct within the requisite time

period, after which Plaintiffs seek all damages and relief to which Plaintiffs and the Indiana

Class are entitled. Plaintiffs presently seek full relief for New GM's "incurable" acts.

## COUNT II

## FRAUD BY CONCEALMENT

1603. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

1604. In the event the Court declines to certify a Nationwide Class under Michigan law,

this claim is brought only on behalf of Nationwide Class members who are Indiana residents (the

"Indiana Class").

1605. New GM concealed and suppressed material facts concerning the quality of its

vehicles and the GM brand.

1606. New GM concealed and suppressed material facts concerning the culture of

New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of

safety issues, and a shoddy design process.

1607. New GM concealed and suppressed material facts concerning the many serious

defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps

to ensure that its employees did not reveal known safety defects to regulators or consumers.

1608. New GM did so in order to boost confidence in its vehicles and falsely assure

purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands

behind its vehicles after they are sold and that its vehicles are safe and reliable. The false

representations were material to consumers, both because they concerned the quality and safety

of the Affected Vehicles and because they played a significant role in the value of the vehicles.

1609. New GM had a duty to disclose the many defects in GM-branded vehicles

because they were known and/or accessible only to New GM who had superior knowledge and

access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Indiana Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Indiana Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1610.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Indiana Class.

1611.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Indiana Class and conceal material information regarding defects that exist in GM-branded vehicles.

1612.   Plaintiffs and the Indiana Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Indiana Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Indiana Class.

1613.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Indiana Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

010440-11  725144 V1

Case 1:14-md-02543-JMF   Document 345   Filed 10/14/14   Page 413 of 712

1614.   The value of all Indiana Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1615.   Accordingly, New GM is liable to the Indiana Class for their damages in an amount to be proven at trial.

1616.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Indiana Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (IND. CODE § 26-1-2-314)

1617.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1618.   In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of Indiana residents who are members of the Ignition Switch Defect Subclass (the "Indiana Ignition Switch Defect Subclass").

1619.   New GM was a merchant with respect to motor vehicles within the meaning of IND. CODE § 26-1-2-104(1).

010440-11  725144 V1

1620.   Under IND. CODE § 26-1-2-314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles.

1621.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

1622.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Indiana Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1623.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs and the Indiana Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

## IOWA

### COUNT I

### VIOLATIONS OF THE PRIVATE RIGHT OF ACTION
### FOR CONSUMER FRAUDS ACT

#### (IOWA CODE § 714H.1, *et seq.*)

1624.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

Case 1:14-mc-02543-JMF Document 345 Filed 10/14/14 Page 416 of 712

1625.   This claim is brought only on behalf of Nationwide Class members who are Iowa residents (the "Iowa Class").

1626.   New GM is "person" under IOWA CODE § 714H.2(7).

1627.   Plaintiff and the Iowa Class are "consumers," as defined by IOWA CODE § 714H.2(3), who purchased or leased one or more Affected Vehicles.

1628.   The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise."  IOWA CODE § 714H.3.  New GM participated in misleading, false, or deceptive acts that violated the Iowa CFA.  By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in deceptive business practices prohibited by the Iowa CFA.

1629.   New GM's actions as set forth above occurred in the conduct of trade or commerce.

1630.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

Case 1:14-mc-02543-JMF  Document 345  Filed 10/14/14  Page 416 of 712

1631.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1632.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1633.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1634.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair and deceptive business practices in violation of the Iowa CFA.

1635.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

010440-11 725144 V1

1636.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the New GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1637.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Iowa Class.

1638.   New GM knew or should have known that its conduct violated the Iowa CFA.

1639.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

1640.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

a.   Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

b.   Intentionally concealed the foregoing from Plaintiffs; and/or

c.   Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1641.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

- 397 -

1642.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Iowa Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1643.   Plaintiffs and the Iowa Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

1644.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1645.   As a direct and proximate result of New GM's violations of the Iowa CFA, Plaintiffs and the Iowa Class have suffered injury-in-fact and/or actual damage.

1646.   Pursuant to IOWA CODE § 714H.5, Plaintiffs seek an order enjoining New GM's unfair and/or deceptive acts or practices; actual damages; in addition to an award of actual damages, statutory damages up to three times the amount of actual damages awarded as a result of New GM's willful and wanton disregard for the rights or safety of others; attorneys' fees; and such other equitable relief as the Court deems necessary to protect the public from further violations of the Iowa CFA.

010440-11  725144 V1

## COUNT II

## FRAUD BY CONCEALMENT

1647.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1648.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Iowa residents (the "Iowa Class").

1649.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

1650.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

1651.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1652.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

1653.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Iowa Class.  These omitted and concealed facts were material because they

- 399 -

directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Iowa

Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer

stands behind its products, are material concerns to a consumer.

1654. New GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM

money, and it did so at the expense of Plaintiffs and the Iowa Class.

1655. On information and belief, New GM has still not made full and adequate

disclosure and continues to defraud Plaintiffs and the Iowa Class and conceal material

information regarding defects that exist in GM-branded vehicles.

1656. Plaintiffs and the Iowa Class were unaware of these omitted material facts and

would not have acted as they did if they had known of the concealed and/or suppressed facts.

Plaintiffs' and the Iowa Class's actions were justified. New GM was in exclusive control of the

material facts and such facts were not known to the public, Plaintiffs, or the Iowa Class.

1657. Because of the concealment and/or suppression of the facts, Plaintiffs and the

Iowa Class sustained damage because they own vehicles that diminished in value as a result of

New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-

branded vehicles and the serious safety and quality issues engendered by New GM's corporate

policies. Had they been aware of the many defects that existed in GM-branded vehicles, and the

company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or

would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their

bargain as a result of New GM's fraudulent concealment.

1658. The value of all Iowa Class members' vehicles has diminished as a result of

New GM's fraudulent concealment of the many defects and its systemic safety issues which has

greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1659.  Accordingly, New GM is liable to the Iowa Class for their damages in an amount to be proven at trial.

1660.  New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Iowa Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**KANSAS**

**COUNT I**

**VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT**

**(KAN. STAT. ANN. § 50-623, *et seq*.)**

1661.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1662.  This claim is brought only on behalf of Nationwide Class members who are Kansas residents (the "Kansas Class").

1663.  New GM is a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), KAN. STAT. ANN. § 50-624(l).

1664.  Kansas Class members are "consumers," within the meaning of KAN. STAT. ANN. § 50-624(b), who purchased or leased one or more Affected Vehicles.

1665.  The sale of the Affected Vehicles to the Kansas Class members was a "consumer transaction" within the meaning of KAN. STAT. ANN. § 50-624(c).

1666. The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," KAN. STAT. ANN. § 50-626(a), and that deceptive acts or practices include: (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." KAN. STAT. ANN. § 50-627(a).

1667. New GM participated in misleading, false, or deceptive acts that violated the Kansas CPA. By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in deceptive business practices prohibited by the Kansas CPA. New GM also engaged in unlawful trade practices by: (1) representing that the Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Affected Vehicles are of a particular standard and quality when they are not; (3) advertising the Affected Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

1668.   New GM's actions as set forth above occurred in the conduct of trade or commerce.

1669.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

1670.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1671.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1672.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

- 403 -

1673. By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the Kansas CPA.

1674. In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above. New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1675. New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1676. New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Kansas Class.

1677. New GM knew or should have known that its conduct violated the Kansas CPA.

1678. As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

1679. New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

     a.    Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

- 404 -

      b.       Intentionally concealed the foregoing from Plaintiffs; and/or

      c.       Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1680.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

1681.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Kansas Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1682.   Plaintiffs and the Kansas Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

1683.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

010440-11  725144 V1

1684.   As a direct and proximate result of New GM's violations of the Kansas CPA, Plaintiffs and the Kansas Class have suffered injury-in-fact and/or actual damage.

1685.   Pursuant to KAN. STAT. ANN. § 50-634, Plaintiffs and the Kansas Class seek monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each Plaintiff and each Kansas Class member

1686.   Plaintiff also seeks an order enjoining New GM's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under KAN. STAT. ANN § 50-623 *et seq.*

## COUNT II

## FRAUD BY CONCEALMENT

1687.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1688.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Kansas residents (the "Kansas Class").

1689.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

1690.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

1691.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

- 406 -

Case 1:14-mc-02543-JMF Document 345 Filed 10/14/14 Page 427 of 712

1692. New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable. The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

1693. New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Kansas Class. These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Kansas Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1694. New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Kansas Class.

1695. On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Kansas Class and conceal material information regarding defects that exist in GM-branded vehicles.

1696. Plaintiffs and the Kansas Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Kansas Class's actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Kansas Class.

1697.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Kansas Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

1698.   The value of all Kansas Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the New GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1699.   Accordingly, New GM is liable to the Kansas Class for their damages in an amount to be proven at trial.

1700.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Kansas Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (KAN. STAT. ANN. § 84-2-314)

- 408 -

1701.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1702.   In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of Kansas residents who are members of the Ignition Switch Defect Subclass (the "Kansas Ignition Switch Defect Subclass").

1703.   New GM was a merchant with respect to motor vehicles within the meaning of KAN. STAT. ANN. § 84-2-104(1).

1704.   Under KAN. STAT. ANN. § 84-2-314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles.

1705.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

1706.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Kansas Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

010440-11 725144 V1

1707. As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs and the Kansas Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

**KENTUCKY**

**COUNT I**

**VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT**

**(KY. REV. STAT. § 367.110, *et seq.*)**

1708. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1709. This claim is brought only on behalf of Nationwide Class members who are Kentucky residents (the "Kentucky Class").

1710. New GM, Plaintiffs, and the Kentucky Class are "persons" within the meaning of the KY. REV. STAT. § 367.110(1).

1711. New GM engaged in "trade" or "commerce" within the meaning of KY. REV. STAT. § 367.110(2).

1712. The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce ...." KY. REV. STAT. § 367.170(1). Old GM and New GM both participated in misleading, false, or deceptive acts that violated the Kentucky CPA. By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in deceptive business practices prohibited by the Kentucky CPA.

1713. In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful

Case 1:14-md-02543-JMF   Document 345-5   Filed 10/14/14   Page 431 of 712

trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

1714.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1715.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1716.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1717.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the Kentucky CPA.

1718.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed

- 411 -

Case 1:14-mc-02543-JMF    Document 345    Filed 10/14/14    Page 432 of 712

above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles

were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that

valued safety and stood behind its vehicles once they are on the road.

1719.   New GM's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-

branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true

value of the Affected Vehicles.

1720.   New GM intentionally and knowingly misrepresented material facts regarding the

Affected Vehicles with an intent to mislead Plaintiffs and the Kentucky Class.

1721.   New GM knew or should have known that its conduct violated the Kentucky

CPA.

1722.   New GM made material statements about the safety and reliability of the Affected

Vehicles that were either false or misleading.

1723.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

>   a.    Possessed exclusive knowledge that it valued cost-cutting
>         over safety, selected parts from the cheapest supplier
>         regardless of quality, and actively discouraged employees
>         from finding and flagging known safety defects, and that
>         this approach would necessarily cause the existence of
>         more defects in the vehicles it designed and manufactured;
>
>   b.    Intentionally concealed the foregoing from Plaintiffs;
>         and/or
>
>   c.    Made incomplete representations about the safety and
>         reliability of the Affected Vehicles generally, and the
>         ignition switch in particular, while purposefully
>         withholding material facts from Plaintiffs that contradicted
>         these representations.

010440-11  725144 V1

1724.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

1725.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the Kentucky Class.  A vehicle

made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable

vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than

promptly remedies them.

1726.   Plaintiffs and the Kentucky Class suffered ascertainable loss caused by

New GM's misrepresentations and its failure to disclose material information.  Had they been

aware of the many defects that existed in GM-branded vehicles, and the company's callous

disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have

purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result

of New GM's misconduct.

1727.   New GM's violations present a continuing risk to Plaintiffs as well as to the

general public.  New GM's unlawful acts and practices complained of herein affect the public

interest.

1728.   As a direct and proximate result of New GM's violations of the Kentucky CPA,

Plaintiffs and the Kentucky Class have suffered injury-in-fact and/or actual damage.

1729.   Pursuant to KY. REV. STAT. ANN. § 367.220, Plaintiffs and the Kentucky Class

seek to recover actual damages in an amount to be determined at trial; an order enjoining

New GM's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and

any other just and proper relief available under KY. REV. STAT. ANN. § 367.220.

**COUNT II**

**FRAUD BY CONCEALMENT**

1730.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

1731.   In the event the Court declines to certify a Nationwide Class under Michigan law,

this claim is brought only on behalf of Nationwide Class members who are Kentucky residents

(the "Kentucky Class").

1732.   New GM concealed and suppressed material facts concerning the quality of its

vehicles and the GM brand.

1733.   New GM concealed and suppressed material facts concerning the culture of

New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of

safety issues, and a shoddy design process.

1734.   New GM concealed and suppressed material facts concerning the many serious

defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps

to ensure that its employees did not reveal known safety defects to regulators or consumers.

1735.   New GM did so in order to boost confidence in its vehicles and falsely assure

purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands

behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false

representations were material to consumers, both because they concerned the quality and safety

of the Affected Vehicles and because they played a significant role in the value of the vehicles.

1736.  New GM had a duty to disclose the many defects in GM-branded vehicles

because they were known and/or accessible only to New GM who had superior knowledge and

- 414 -

access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Kentucky Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Kentucky Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1737.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Kentucky Class.

1738.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Kentucky Class and conceal material information regarding defects that exist in GM-branded vehicles.

1739.   Plaintiffs and the Kentucky Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Kentucky Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Kentucky Class.

1740.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Kentucky Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

1741.   The value of all Kentucky Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1742.   Accordingly, New GM is liable to the Kentucky Class for their damages in an amount to be proven at trial.

1743.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Kentucky Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

# LOUISIANA

## COUNT I

### VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

### (LA. REV. STAT. § 51:1401, *et seq.*)

1744.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1745.   This claim is brought only on behalf of Nationwide Class members who are Louisiana residents (the "Louisiana Class").

1746.   New GM, Plaintiffs, and the Louisiana Class are "persons" within the meaning of the LA. REV. STAT. § 51:1402(8).

- 416 -

1747.   Plaintiffs and the Louisiana Class are "consumers" within the meaning of LA. REV. STAT. § 51:1402(1).

1748.   New GM engaged in "trade" or "commerce" within the meaning of LA. REV. STAT. § 51:1402(9).

1749.   The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." LA. REV. STAT. § 51:1405(A).  New GM both participated in misleading, false, or deceptive acts that violated the Louisiana CPL.  By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in deceptive business practices prohibited by the Louisiana CPL.

1750.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

1751.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

- 417 -

1752.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1753.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1754.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the Louisiana CPL.

1755.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1756.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1757.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Louisiana Class.

010440-11 725144 V1

Case 14-MC-02543-JMF    Document 345    Filed 10/14/14    Page 439 of 712

1758.   New GM knew or should have known that its conduct violated the Louisiana CPL.

1759.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

1760.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

      a.      Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

      b.      Intentionally concealed the foregoing from Plaintiffs; and/or

      c.      Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1761.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

1762.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Louisiana Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

010440-11  725144 V1

1763.   Plaintiffs and the Louisiana Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

1764.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1765.   As a direct and proximate result of New GM's violations of the Louisiana CPL, Plaintiffs and the Louisiana Class have suffered injury-in-fact and/or actual damage.

1766.   Pursuant to LA. REV. STAT. § 51:1409, Plaintiffs and the Louisiana Class seek to recover actual damages in an amount to be determined at trial; treble damages for New GM's knowing violations of the Louisiana CPL; an order enjoining New GM's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under LA. REV. STAT. § 51:1409.

## COUNT II

## FRAUD BY CONCEALMENT

1767.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1768.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Louisiana residents (the "Louisiana Class").

1769.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

1770.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

1771.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1772.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

1773.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Louisiana Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Louisiana Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1774.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Louisiana Class.

- 421 -

1775.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Louisiana Class and conceal material information regarding defects that exist in GM-branded vehicles.

1776.   Plaintiffs and the Louisiana Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Louisiana Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Louisiana Class.

1777.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Louisiana Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

1778.   The value of all Louisiana Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1779.   Accordingly, New GM is liable to the Louisiana Class for their damages in an amount to be proven at trial.

010440-11 725144 V1

1780.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Louisiana Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY/ WARRANTY AGAINST REDHIBITORY DEFECTS

### (LA. CIV. CODE ART. 2520, 2524)

1781.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1782.   In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of Louisiana residents who are members of the Ignition Switch Defect Subclass (the "Louisiana Ignition Switch Defect Subclass").

1783.   At the time Plaintiffs and the Louisiana Class acquired their Defective Ignition Switch Vehicles, those vehicles had a redhibitory defect within the meaning of LA. CIV. CODE ART. 2520, in that (a) the defective ignition switches rendered the use of the Defective Ignition Switch Vehicles so inconvenient that Plaintiffs either would not have purchased the Defective Ignition Switch Vehicles had they known of the defect, or, because the defective ignition switches so diminished the usefulness and/or value of the Defective Ignition Switch Vehicles such that it must be presumed that the Plaintiffs would have purchased the Defective Ignition Switch Vehicles, but for a lesser price.

- 423 -

1784.   No notice of the defect is required under LA. CIV. CODE ART. 2520, since New GM had knowledge of a redhibitory defect in the Defective Ignition Switch Vehicles at the time they were sold to Plaintiffs and the Louisiana Ignition Switch Defect Subclass.

1785.   Under LA. CIV. CODE ART. 2524, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition, or fit for ordinary use, was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles.

1786.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

1787.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Louisiana Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1788.   As a direct and proximate result of New GM's sale of vehicles with redhibitory defects, and in violation of the implied warranty that the Defective Ignition Switch Vehicles were fit for ordinary use, Plaintiffs and the Louisiana Class are entitled to either rescission or damages in an amount to be proven at trial.

010440-11  725144 V1

# MAINE

## COUNT I

## VIOLATION OF MAINE UNFAIR TRADE PRACTICES ACT

### (ME. REV. STAT. ANN. TIT. 5 § 205-A, *et seq.*)

1789.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1790.   This claim is brought only on behalf of Nationwide Class members who are Maine residents (the "Maine Class").

1791.   New GM, Plaintiffs, and the Maine Class are "persons" within the meaning of ME. REV. STAT. ANN. TIT. § 206(2).

1792.   New GM is engaged in "trade" or "commerce" within the meaning of ME. REV. STAT. ANN. TIT. § 206(3).

1793.   The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…."  ME. REV. STAT. ANN. TIT. 5 § 207.  In the course of New GM's business, New GM engaged in unfair or deceptive acts or practices by systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles.  New GM participated in misleading, false, or deceptive acts that violated the Maine UTPA.

1794.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

1795.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1796.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1797.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1798.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair and deceptive business practices in violation of the Maine UTPA.

1799.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

- 426 -

1800.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1801.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Maine Class.

1802.   New GM knew or should have known that its conduct violated the Maine UTPA.

1803.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

1804.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

a.   Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

b.   Intentionally concealed the foregoing from Plaintiffs; and/or

c.   Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1805.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

- 427 -

1806.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the Maine Class.  A vehicle made

by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle

made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than

promptly remedies them.

1807.   Plaintiffs and the Maine Class suffered ascertainable loss caused by New GM's

misrepresentations and its failure to disclose material information.  Had they been aware of the

many defects that existed in GM-branded vehicles, and the company's callous disregard for

safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or

leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's

misconduct.

1808.   New GM's violations present a continuing risk to Plaintiffs as well as to the

general public.  New GM's unlawful acts and practices complained of herein affect the public

interest.

1809.   As a direct and proximate result of New GM's violations of the Maine UTPA,

Plaintiffs and the Maine Class have suffered injury-in-fact and/or actual damage.

1810.   Pursuant to ME. REV. STAT. ANN. TIT. 5 § 213, Plaintiffs and the Maine Class seek

an order enjoining New GM's unfair and/or deceptive acts or practices, damages, punitive

damages, and attorneys' fees, costs, and any other just and proper relief available under the

Maine UTPA.

1811.   On October 8, 2014, certain Plaintiffs sent a letter complying with ME. REV.

STAT. ANN. TIT. 5, § 213(1-A).  Plaintiffs presently do not claim relief under the Maine UTPA

until and unless New GM fails to remedy its unlawful conduct within the requisite time period,

after which Plaintiffs seek all damages and relief to which Plaintiffs and the Maine Class are entitled.

**COUNT II**

**FRAUD BY CONCEALMENT**

1812.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1813.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Maine residents (the "Maine Class").

1814.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

1815.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

1816.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1817.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

1818.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and

- 429 -

access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Maine Class. These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Maine Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1819. New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Maine Class.

1820. On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Maine Class and conceal material information regarding defects that exist in GM-branded vehicles.

1821. Plaintiffs and the Maine Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Maine Class's actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Maine Class.

1822. Because of the concealment and/or suppression of the facts, Plaintiffs and the Maine Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies. Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

1823.   The value of all Maine Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1824.   Accordingly, New GM is liable to the Maine Class for their damages in an amount to be proven at trial.

1825.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Maine Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (ME. REV. STAT. ANN. TIT. 11 § 2-314)

1826.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1827.   In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of Maine residents who are members of the Ignition Switch Defect Subclass (the "Maine Ignition Switch Defect Subclass").

1828.   New GM was a merchant with respect to motor vehicles within the meaning of ME. REV. STAT. ANN. TIT. 11 § 2-104(1).

- 431 -

1829.   Under ME. REV. STAT. ANN. TIT. 11 § 2-314, a warranty that the Defective

Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions

when Plaintiffs purchased their Defective Ignition Switch Vehicles.

1830.   These vehicles, when sold and at all times thereafter, were not merchantable and

are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition

Switch Vehicles are inherently defective in that there are defects in the ignition switch systems

that permit sudden unintended shutdown to occur, with the attendant shut down of power

steering and power brakes and the nondeployment of airbags in the event of a collision.

1831.   New GM was provided notice of these issues by numerous complaints filed

against it, internal investigations, and by numerous individual letters and communications sent

by Plaintiffs and the Maine Ignition Switch Defect Subclass before or within a reasonable

amount of time after New GM issued the recall and the allegations of vehicle defects became

public.

1832.   As a direct and proximate result of New GM's breach of the implied warranty of

merchantability,  Plaintiffs and the Maine Ignition Switch Defect Subclass have been damaged in

an amount to be proven at trial.

## MARYLAND

## COUNT I

## VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT

### (MD. CODE COM. LAW § 13-101, *et seq.*)

1833.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

1834.   This claim is brought only on behalf of Nationwide Class members who are

Maryland residents.

010440-11  725144 V1

1835.   New GM, Plaintiffs, and the Maryland Class are "persons" within the meaning of MD. CODE COM. LAW § 13-101(h).

1836.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale of any consumer good.  MD. COM. LAW CODE § 13-303.  New GM participated in misleading, false, or deceptive acts that violated the Maryland CPA.  By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in deceptive business practices prohibited by the Maryland CPA.

1837.   New GM's actions as set forth above occurred in the conduct of trade or commerce.

1838.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

1839.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

Case 1:14-mc-02543-JMF   Document 345   Filed 10/14/14   Page 454 of 712

1840.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1841.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1842.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair and deceptive business practices in violation of the Maryland CPA.

1843.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1844.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the New GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1845.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Maryland Class.

Case 1:14-mc-02543-JMF   Document 345   Filed 10/14/14   Page 455 of 712

1846.   New GM knew or should have known that its conduct violated the Maryland

CPA.

1847.   As alleged above, New GM made material statements about the safety and

reliability of the Affected Vehicles that were either false or misleading.

1848.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

    a.    Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

    b.    Intentionally concealed the foregoing from Plaintiffs; and/or

    c.    Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1849.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

1850.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the Maryland Class.  A vehicle

made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable

vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than

promptly remedies them.

1851.   Plaintiffs and the Maryland Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

1852.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1853.   As a direct and proximate result of New GM's violations of the Maryland CPA, Plaintiffs and the Maryland Class have suffered injury-in-fact and/or actual damage.

1854.   Pursuant to MD. CODE COM. LAW § 13-408, Plaintiffs and the Maryland Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

## COUNT II

## FRAUD BY CONCEALMENT

1855.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1856.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Maryland residents.

1857.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

- 436 -

Case 14-md-02543-JMF   Document 345   Filed 10/14/14   Page 457 of 712

1858.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

1859.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1860.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

1861.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Maryland Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Maryland Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1862.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Maryland Class.

1863.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Maryland Class and conceal material information regarding defects that exist in GM-branded vehicles.

1864.   Plaintiffs and the Maryland Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Maryland Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Maryland Class.

1865.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Maryland Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

1866.   The value of all Maryland Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1867.   Accordingly, New GM is liable to the Maryland Class for their damages in an amount to be proven at trial.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (MD. CODE COM. LAW § 2-314)

1868.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1869.   In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of Maryland residents who are members of the Ignition Switch Defect Subclass (the "Maryland Ignition Switch Defect Subclass").

1870.   New GM was a merchant with respect to motor vehicles within the meaning of MD. COM. LAW § 2-104(1).

1871.   Under MD. COM. LAW § 2-314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles.

1872.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

1873.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Maryland Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

- 439 -

1874.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs and the Maryland Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

## MASSACHUSETTS

## COUNT I

## DECEPTIVE ACTS OR PRACTICES PROHIBITED BY MASSACHUSETTS LAW

### (MASS. GEN. LAWS CH. 93A, § 1, *et seq.*)

1875.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1876.   This claim is brought only on behalf of Nationwide Class members who are Massachusetts residents (the "Massachusetts Class").

1877.   New GM, Plaintiffs, and the Massachusetts Class are "persons" within the meaning of MASS. GEN. LAWS ch. 93A, § 1(a).

1878.   New GM engaged in "trade" or "commerce" within the meaning of MASS. GEN. LAWS ch. 93A, § 1(b).

1879.   Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  MASS. GEN. LAWS ch. 93A, § 2. New GM both participated in misleading, false, or deceptive acts that violated the Massachusetts Act.  By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in deceptive business practices prohibited by the Massachusetts Act.

1880.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or

concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

1881.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1882.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1883.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1884.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair and deceptive business practices in violation of the Massachusetts Act.

1885.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed

above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles

were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that

valued safety and stood behind its vehicles once they are on the road.

1886.   New GM's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-

branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true

value of the Affected Vehicles.

1887.   New GM intentionally and knowingly misrepresented material facts regarding the

Affected Vehicles with an intent to mislead Plaintiffs and the Massachusetts Class.

1888.   New GM knew or should have known that its conduct violated the Massachusetts

Act.

1889.   As alleged above, New GM made material statements about the safety and

reliability of the Affected Vehicles that were either false or misleading.

1890.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

     a.     Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

     b.     Intentionally concealed the foregoing from Plaintiffs; and/or

     c.     Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1891.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

1892.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Massachusetts Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1893.   Plaintiffs and the Massachusetts Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

1894.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1895.   As a direct and proximate result of New GM's violations of the Massachusetts Act, Plaintiffs and the Massachusetts Class have suffered injury-in-fact and/or actual damage.

1896.   Pursuant to MASS. GEN. LAWS ch. 93A, § 9, Plaintiffs and the Massachusetts Class seek monetary relief against New GM measured as the greater of (a) actual damages in an

amount to be determined at trial and (b) statutory damages in the amount of $25 for each

Plaintiff and each Massachusetts Class member. Because New GM's conduct was committed

willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff and each

Massachusetts Class member, up to three times actual damages, but no less than two times actual

damages.

1897.  Plaintiffs also seek an order enjoining New GM's unfair and/or deceptive acts or

practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief

available under the Massachusetts Act.

1898.  On October 8, 2014, certain Plaintiffs sent a letter complying with MASS. GEN.

LAWS ch. 93A, § 9(3).  Plaintiffs presently do not claim relief under the Massachusetts Act until

and unless New GM fails to remedy its unlawful conduct within the requisite time period, after

which Plaintiffs seek all damages and relief to which Plaintiffs and the Massachusetts Class are

entitled.

## COUNT II

## FRAUD BY CONCEALMENT

1899.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

1900.  In the event the Court declines to certify a Nationwide Class under Michigan law,

this claim is brought only on behalf of Nationwide Class members who are Massachusetts

residents (the "Massachusetts Class").

1901.  New GM concealed and suppressed material facts concerning the quality of its

vehicles and the GM brand.

1902.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

1903.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

1904.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

1905.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Massachusetts Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Massachusetts Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1906.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Massachusetts Class.

010440-11  725144 V1

1907.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Massachusetts Class and conceal material information regarding defects that exist in GM-branded vehicles.

1908.   Plaintiffs and the Massachusetts Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Massachusetts Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Massachusetts Class.

1909.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Massachusetts Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

1910.   The value of all Massachusetts Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1911.   Accordingly, New GM is liable to the Massachusetts Class for their damages in an amount to be proven at trial.

010440-11  725144 V1

1912.    New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Massachusetts Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

## (ALM GL. CH. 106, § 2-314)

1913.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1914.    In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of Massachusetts residents who are members of the Ignition Switch Defect Subclass (the "Massachusetts Ignition Switch Defect Subclass").

1915.    New GM was a merchant with respect to motor vehicles within the meaning of ALM GL CH. 106, § 2-104(1).

1916.    Under ALM GL CH. 106, § 2-314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles.

1917.    These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

- 447 -

1918.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Massachusetts Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1919.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs and the Massachusetts Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

## MICHIGAN

## COUNT I

## VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT

### (MICH. COMP. LAWS § 445.903, *et seq.*)

1920.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1921.   This claim is brought only on behalf of Nationwide Class members who are Michigan residents (the "Michigan Class").

1922.   Plaintiffs and the Michigan Class members were "person[s]" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d).

1923.   At all relevant times hereto, New GM was a "person" engaged in "trade or commerce" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d) and (g).

1924.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . . ."  MICH. COMP. LAWS § 445.903(1).  New GM engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including:  "(c) Representing that

- 448 -

goods or services have . . . characteristics . . . that they do not have . . . .;" "(e) Representing that

goods or services are of a particular standard . . . if they are of another;" "(i) Making false or

misleading statements of fact concerning the reasons for, existence of, or amounts of price

reductions;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or

deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb)

Making a representation of fact or statement of fact material to the transaction such that a person

reasonably believes the represented or suggested state of affairs to be other than it actually is;"

and "(cc) Failing to reveal facts that are material to the transaction in light of representations of

fact made in a positive manner." MICH. COMP. LAWS § 445.903(1).  By systematically devaluing

safety and concealing a plethora of defects in GM-branded vehicles, New GM participated in

unfair, deceptive, and unconscionable acts that violated the Michigan CPA.

1925.   In the course of its business, New GM systematically devalued safety and

concealed a plethora of defects in GM-branded vehicles as described herein and otherwise

engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful

trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or

concealment, suppression or omission of any material fact with intent that others rely upon such

concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

1926.   From the date of its inception on July 10, 2009, New GM knew of many serious

defects affecting many models and years of GM-branded vehicles, both because of the

knowledge of Old GM personnel who remained at New GM and continuous reports,

investigations, and notifications from regulatory authorities.  New GM became aware of other

serious defects and systemic safety issues years ago, but concealed all of that information until

recently.

1927.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1928.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1929.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair, unconscionable, and deceptive business practices in violation of the Michigan CPA.

1930.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1931.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

1932.   New GM intentionally and knowingly misrepresented material facts regarding the

Affected Vehicles with an intent to mislead Plaintiffs and the Michigan Class.

1933.   New GM knew or should have known that its conduct violated the Michigan

CPA.

1934.   As alleged above, New GM made material statements about the safety and

reliability of the Affected Vehicles that were either false or misleading.

1935.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

> a.   Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;
>
> b.   Intentionally concealed the foregoing from Plaintiffs; and/or
>
> c.   Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1936.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

1937.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the Michigan Class.  A vehicle

made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable

- 451 -

vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1938.   Plaintiffs and the Michigan Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

1939.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1940.   As a direct and proximate result of New GM's violations of the Michigan CPA, Plaintiffs and the Michigan Class have suffered injury-in-fact and/or actual damage.

1941.   Plaintiffs seek injunctive relief to enjoin New GM from continuing its unfair and deceptive acts; monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiffs and each Michigan Class member; reasonable attorneys' fees; and any other just and proper relief available under MICH. COMP. LAWS § 445.911.

1942.   Plaintiffs also seek punitive damages against New GM because it carried out despicable conduct with willful and conscious disregard of the rights and safety of others. New GM intentionally and willfully misrepresented the safety and reliability of the Affected Vehicles, deceived Plaintiffs and Michigan Class members on life-or-death matters, and concealed material facts that only they knew, all to avoid the expense and public relations

- 452 -

nightmare of correcting a deadly flaw in vehicles it repeatedly promised Plaintiffs and Michigan

Class members were safe.  New GM's unlawful conduct constitutes malice, oppression, and

fraud warranting punitive damages.

## COUNT II

## FRAUD BY CONCEALMENT

1943.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

1944.  In the event the Court declines to certify a Nationwide Class under Michigan law,

this claim is brought only on behalf of Nationwide Class members who are Michigan residents

(the "Michigan Class").

1945.  New GM concealed and suppressed material facts concerning the quality of its

vehicles and the GM brand.

1946.  New GM concealed and suppressed material facts concerning the culture of

New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of

safety issues, and a shoddy design process.

1947.  New GM concealed and suppressed material facts concerning the many serious

defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps

to ensure that its employees did not reveal known safety defects to regulators or consumers.

1948.  New GM did so in order to boost confidence in its vehicles and falsely assure

purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands

behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false

representations were material to consumers, both because they concerned the quality and safety

of the Affected Vehicles and because they played a significant role in the value of the vehicles.

1949.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Michigan Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Michigan Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1950.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Michigan Class.

1951.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Michigan Class and conceal material information regarding defects that exist in GM-branded vehicles.

1952.   Plaintiffs and the Michigan Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Michigan Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Michigan Class.

1953.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Michigan Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less

for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

1954.   The value of all Michigan Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1955.   Accordingly, New GM is liable to the Michigan Class for their damages in an amount to be proven at trial.

1956.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Michigan Class's rights and well-being to enrich New GM. New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (MICH. COMP. LAWS § 440.2314)

1957.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1958.   In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of Michigan residents who are members of the Ignition Switch Defect Subclass (the "Michigan Ignition Switch Defect Subclass").

- 455 -

1959.   New GM was a merchant with respect to motor vehicles within the meaning of MICH. COMP. LAWS § 440.2314(1).

1960.   Under MICH. COMP. LAWS § 440.2314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles.

1961.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

1962.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Michigan Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1963.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs and the Michigan Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

**MINNESOTA**

**COUNT I**

**VIOLATION OF MINNESOTA PREVENTION
OF CONSUMER FRAUD ACT**

**(MINN. STAT. § 325F.68, *et seq*.)**

1964.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1965.   This claim is brought only on behalf of Nationwide Class members who are Minnesota residents (the "Minnesota Class").

1966.   The Affected Vehicles constitute "merchandise" within the meaning of MINN. STAT. § 325F.68(2).

1967.   The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby . . ." MINN. STAT. § 325F.69(1).  New GM participated in misleading, false, or deceptive acts that violated the Minnesota CFA.  By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in deceptive business practices prohibited by the Minnesota CFA.

1968.   New GM's actions as set forth above occurred in the conduct of trade or commerce.

1969.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful

- 457 -

trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

1970.  From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1971.  New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1972.  According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

1973.  By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the Minnesota CFA.

1974.  In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed

- 458 -

above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles

were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that

valued safety and stood behind its vehicles once they are on the road.

1975.  New GM's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-

branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true

value of the Affected Vehicles.

1976.  New GM intentionally and knowingly misrepresented material facts regarding the

Affected Vehicles with an intent to mislead Plaintiffs and the Minnesota Class.

1977.  New GM knew or should have known that its conduct violated the Minnesota

CFA.

1978.  As alleged above, New GM made material statements about the safety and

reliability of the Affected Vehicles that were either false or misleading.

1979.  New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

    a.    Possessed exclusive knowledge that it valued cost-cutting
          over safety, selected parts from the cheapest supplier
          regardless of quality, and actively discouraged employees
          from finding and flagging known safety defects, and that
          this approach would necessarily cause the existence of
          more defects in the vehicles it designed and manufactured;

    b.    Intentionally concealed the foregoing from Plaintiffs;
          and/or

    c.    Made incomplete representations about the safety and
          reliability of the Affected Vehicles generally, and the
          ignition switch in particular, while purposefully
          withholding material facts from Plaintiffs that contradicted
          these representations.

- 459 -

1980.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

1981.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Minnesota Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1982.   Plaintiffs and the Minnesota Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

1983.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1984.   As a direct and proximate result of New GM's violations of the Minnesota CFA, Plaintiffs and the Minnesota Class have suffered injury-in-fact and/or actual damage.

1985.   Pursuant to MINN. STAT. § 8.31(3a), Plaintiffs and the Minnesota Class seek

actual damages, attorneys' fees, and any other just and proper relief available under the

Minnesota CFA.

1986.   Plaintiffs also seek punitive damages under MINN. STAT. § 549.20(1)(a) give the

clear and convincing evidence that New GM's acts show deliberate disregard for the rights or

safety of others.

**COUNT II**

**VIOLATION OF MINNESOTA UNIFORM
DECEPTIVE TRADE PRACTICES ACT**

**(MINN. STAT. § 325D.43-48, *et seq*.)**

1987.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

1988.   This claim is brought only on behalf of Nationwide Class members who are

Minnesota residents (the "Minnesota Class").

1989.   The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits

deceptive trade practices, which occur when a person "(5) represents that goods or services have

sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not

have or that a person has a sponsorship, approval, status, affiliation, or connection that the person

does not have;" "(7) represents that goods or services are of a particular standard, quality, or

grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises

goods or services with intent not to sell them as advertised."  MINN. STAT. § 325D.44.  In the

course of the New GM's business, it systematically devalued safety and concealed a plethora of

defects in GM-branded vehicles and engaged in deceptive practices by representing that Affected

Vehicles have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that

- 461 -

they do not have; representing that Affected Vehicles are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising Affected Vehicles with intent not to sell them as advertised. New GM participated in misleading, false, or deceptive acts that violated the Minnesota DTPA. By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in deceptive business practices prohibited by the Minnesota DTPA.

1990. New GM's actions as set forth above occurred in the conduct of trade or commerce.

1991. In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

1992. From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities. New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

1993. New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the

existence of more defects in the vehicles it designed and manufactured and the failure to disclose

and remedy defects in all GM-branded vehicles. New GM concealed this information as well.

1994. According to one report from the Center for Auto Safety, some 2,004 deaths and

injuries are connected with recently recalled GM-branded vehicles, and New GM should have

recalled the vehicles years ago.

1995. By failing to disclose and by actively concealing the many defects in GM-branded

vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself

as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold,

New GM engaged in deceptive business practices in violation of the Minnesota DTPA.

1996. In the course of New GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the many safety issues and serious defects discussed

above. New GM compounded the deception by repeatedly asserting that the Affected Vehicles

were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that

valued safety and stood behind its vehicles once they are on the road.

1997. New GM's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-

branded vehicles, the quality of the New GM brand, the devaluing of safety at New GM, and the

true value of the Affected Vehicles.

1998. New GM intentionally and knowingly misrepresented material facts regarding the

Affected Vehicles with an intent to mislead Plaintiffs and the Minnesota Class.

1999. New GM knew or should have known that its conduct violated the Minnesota

DTPA.

- 463 -

2000.   As alleged above, New GM made material statements about the safety and

reliability of the Affected Vehicles that were either false or misleading.

2001.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

a.      Possessed exclusive knowledge that it valued cost-cutting
over safety, selected parts from the cheapest supplier
regardless of quality, and actively discouraged employees
from finding and flagging known safety defects, and that
this approach would necessarily cause the existence of
more defects in the vehicles it designed and manufactured;

b.      Intentionally concealed the foregoing from Plaintiffs;
and/or

c.      Made incomplete representations about the safety and
reliability of the Affected Vehicles generally, and the
ignition switch in particular, while purposefully
withholding material facts from Plaintiffs that contradicted
these representations.

2002.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

2003.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the Minnesota Class.  A vehicle

made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable

vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than

promptly remedies them.

2004.   Plaintiffs and the Minnesota Class suffered ascertainable loss caused by

New GM's misrepresentations and its failure to disclose material information.  Had they been

- 464 -

aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

2005.  New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

2006.  As a direct and proximate result of New GM's violations of the Minnesota DTPA, Plaintiffs and the Minnesota Class have suffered injury-in-fact and/or actual damage.

2007.  Pursuant to MINN. STAT. § 8.31(3a) and 325D.45, Plaintiffs and the Minnesota Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

2008.  Plaintiffs also seek punitive damages under MINN. STAT. § 549.20(1)(a) give the clear and convincing evidence that New GM's acts show deliberate disregard for the rights or safety of others.

### COUNT III

### FRAUD BY CONCEALMENT

2009.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2010.  In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Minnesota residents (the "Minnesota Class").

2011.  New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

2012.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

2013.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

2014.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

2015.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Minnesota Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Minnesota Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

2016.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Minnesota Class.

- 466 -

2017.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Minnesota Class and conceal material information regarding defects that exist in GM-branded vehicles.

2018.   Plaintiffs and the Minnesota Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Minnesota Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Minnesota Class.

2019.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Minnesota Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

2020.   The value of all Minnesota Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2021.   Accordingly, New GM is liable to the Minnesota Class for their damages in an amount to be proven at trial.

2022.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Minnesota Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (MINN. STAT. § 336.2-314)

2023.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2024.   In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of Minnesota residents who are members of the Ignition Switch Defect Subclass (the "Minnesota Ignition Switch Defect Subclass").

2025.   New GM was a merchant with respect to motor vehicles within the meaning of MINN. STAT. § 336.2-104(1).

2026.   Under MINN. STAT. § 336.2-314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles.

2027.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

010440-11 725144 V1

2028.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Minnesota Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2029.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs and the Minnesota Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

## MISSISSIPPI

## COUNT I

## VIOLATION OF MISSISSIPPI CONSUMER PROTECTION ACT

## (MISS. CODE. ANN. § 75-24-1, *et seq.*)

2030.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2031.   This claim is brought only on behalf of Nationwide Class members who are Mississippi residents (the "Mississippi Class").

2032.   The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair or deceptive trade practices in or affecting commerce."  MISS. CODE. ANN. § 75-24-5(1).  Unfair or deceptive practices include, but are not limited to, "(e) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;" "(g) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(i) Advertising goods or services with intent not to sell them as advertised."  New GM participated

- 469 -

in deceptive trade practices that violated the Mississippi CPA as described herein, including representing that Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Affected Vehicles are of a particular standard and quality when they are not; and advertising Affected Vehicles with the intent not to sell them as advertised.

2033. In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2034. From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities. New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

2035. New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles. New GM concealed this information as well.

2036.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

2037.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair and deceptive business practices in violation of the Mississippi CPA.

2038.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

2039.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the New GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

2040.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Mississippi Class.

2041.   New GM knew or should have known that its conduct violated the Mississippi CPA.

2042.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

010440-11 725144 V1

2043.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

    a.    Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

    b.    Intentionally concealed the foregoing from Plaintiffs; and/or

    c.    Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2044.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

2045.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the Mississippi Class.  A vehicle

made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable

vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than

promptly remedies them.

2046.   Plaintiffs and the Mississippi Class suffered ascertainable loss caused by

New GM's misrepresentations and its failure to disclose material information.  Had they been

aware of the many defects that existed in GM-branded vehicles, and the company's callous

disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have

- 472 -

purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

2047. New GM's violations present a continuing risk to Plaintiffs as well as to the general public. New GM's unlawful acts and practices complained of herein affect the public interest.

2048. As a direct and proximate result of New GM's violations of the Mississippi CPA, Plaintiffs and the Mississippi Class have suffered injury-in-fact and/or actual damage.

2049. Plaintiffs' actual damages in an amount to be determined at trial any other just and proper relief available under the Mississippi CPA.

## COUNT II

## FRAUD BY CONCEALMENT

2050. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2051. In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Mississippi residents (the "Mississippi Class").

2052. New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

2053. New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

2054. New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

- 473 -

2055.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

2056.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Mississippi Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Mississippi Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

2057.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Mississippi Class.

2058.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Mississippi Class and conceal material information regarding defects that exist in GM-branded vehicles.

2059.   Plaintiffs and the Mississippi Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Mississippi Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Mississippi Class.

2060.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Mississippi Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

2061.   The value of all Mississippi Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2062.   Accordingly, New GM is liable to the Mississippi Class for their damages in an amount to be proven at trial.

2063.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Mississippi Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

## (MISS. CODE ANN. § 75-2-314)

2064.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2065.   In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of Mississippi residents who are members of the Ignition Switch Defect Subclass (the "Mississippi Ignition Switch Defect Subclass").

2066.   New GM was a merchant with respect to motor vehicles within the meaning of MISS. CODE ANN. § 75-2-104(1).

2067.   Under MISS. CODE ANN. § 75-2-314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles.

2068.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

2069.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Mississippi Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

- 476 -

2070.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs and the Mississippi Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

## MISSOURI

## COUNT I

## VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT

### (MO. REV. STAT. § 407.010, *et seq.*)

2071.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2072.   This claim is brought only on behalf of Nationwide Class members who are Missouri residents (the "Missouri Class").

2073.   New GM, Plaintiffs and the Missouri Class are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

2074.   New GM engaged in "trade" or "commerce" in the State of Missouri within the meaning of MO. REV. STAT. § 407.010(7).

2075.   The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise."  MO. REV. STAT. § 407.020.

2076.   In the course of its business, New GM systematically devalued safety and, omitted, suppressed, and concealed a plethora of defects in GM-branded vehicles as described herein.  By failing to disclose these defects or facts about the defects described herein known to it or that were available to New GM upon reasonable inquiry, New GM deprived consumers of

- 477 -

all material facts about the safety and functionality of their vehicle. By failing to release material facts about the defect, New GM curtailed or reduced the ability of consumers to take notice of material facts about their vehicle, and/or it affirmatively operated to hide or keep those facts from consumers. 15 Mo. CODE OF SERV. REG. § 60-9.110. Moreover, New GM has otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, unfair practices, and/or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2077.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities. New GM became aware of other serious defects and systemic safety issues years ago, but suppressed and/or concealed all of that information until recently.

2078.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles. New GM omitted, suppressed, and/or concealed this information as well.

2079.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have

010440-11  725144 V1

recalled the vehicles years ago.  Failure to do so has been part of New GM's method, act, use, and/or practice to hide, keep, curtail, and/or reduce consumers' access to material facts.

2080.   By failing to disclose and by actively concealing, suppressing, or omitting the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair and/or deceptive business practices and concealed, suppressed, and/or omitted material facts from consumers in connection with the purchase of their vehicles—all in violation of the Missouri MPA.

2081.   In the course of New GM's business, it willfully failed to disclose and actively concealed, suppressed, and omitted the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

2082.   New GM's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

2083.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Missouri Class, including without limitation by failing to disclose the defects in light of circumstances under which the omitted facts were necessary in order to correct the assumptions, inferences or representations being made by New GM about the safety or reliability of its vehicles. Consequently, the failure to

- 479 -

disclose such facts amounts to misleading statements pursuant to 15 MO. CODE OF SERV. REG. §
60-9.090.

2084.   Because New GM knew or believed that its statements regarding safety and
reliability of its vehicles were not in accord with the facts and/or had no reasonable basis for
such statements in light of its knowledge of these defects, New GM engaged in fraudulent
misrepresentations pursuant to 15 MO. CODE OF SERV. REG. 60-9.100.

2085.   New GM's conduct as described herein is unethical, oppressive, or unscrupulous
and/or it presented a risk of substantial injury to consumers whose vehicles were prone to fail at
times and under circumstances that could have resulted in death.  Such acts are unfair practices
in violation of 15 MO. CODE OF SERV. REG. 60-8.020.

2086.   New GM knew or should have known that its conduct violated the Missouri
MPA.

2087.   As alleged above, New GM made material statements about the safety and
reliability of the Affected Vehicles that were either false, misleading, and/or half-truths in
violation of the Missouri MPA.

2088.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the
Affected Vehicles and the devaluing of safety at New GM, because New GM:

      a.      Possessed exclusive knowledge that it valued cost-cutting
over safety, selected parts from the cheapest supplier
regardless of quality, and actively discouraged employees
from finding and flagging known safety defects, and that
this approach would necessarily cause the existence of
more defects in the vehicles it designed and manufactured;

      b.      Intentionally concealed the foregoing from Plaintiffs;
and/or

      c.      Made incomplete representations about the safety and
reliability of the Affected Vehicles generally, and the
ignition switch in particular, while purposefully

- 480 -

withholding material facts from Plaintiffs that contradicted these representations.

2089.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, and committed these other unlawful acts in violation of the Missouri MPA, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

2090.   New GM's systemic devaluation of safety and its misleading statements, deception, and/or concealment, suppression, or omission of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Missouri Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

2091.   Plaintiffs and the Missouri Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

2092.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

2093.   As a direct and proximate result of New GM's violations of the Missouri MPA, Plaintiffs and the Missouri Class have suffered injury-in-fact and/or actual damage.

- 481 -

Case 1:14-mc-02543-JMF    Document 345    Filed 10/14/14    Page 502 of 712

2094.   New GM is liable to Plaintiffs and the Missouri Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining New GM's unfair and deceptive practices, and any other just and proper relief under MO. REV. STAT. § 407.025.

## COUNT II

## FRAUD BY CONCEALMENT

2095.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2096.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Missouri residents (the "Missouri Class").

2097.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the New GM brand.

2098.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

2099.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

2100.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

2101.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Missouri Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Missouri Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

2102.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Missouri Class.

2103.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Missouri Class and conceal material information regarding defects that exist in GM-branded vehicles.

2104.   Plaintiffs and the Missouri Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Missouri Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Missouri Class.

2105.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Missouri Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less

- 483 -

for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

2106. The value of all Missouri Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the New GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2107. Accordingly, New GM is liable to the Missouri Class for their damages in an amount to be proven at trial.

2108. New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Missouri Class's rights and well-being to enrich New GM. New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT III**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

**(MO. REV. STAT. § 400.2-314)**

2109. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2110. In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of Missouri residents who are members of the Ignition Switch Defect Subclass (the "Missouri Ignition Switch Defect Subclass").

- 484 -

2111.   New GM was a merchant with respect to motor vehicles within the meaning of Mo. Rev. Stat. § 400.2-314(1).

2112.   Under Mo. Rev. Stat. § 400.2-314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles.

2113.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

2114.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Missouri Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2115.   As a direct and proximate result of New GM's breach of the warranties of merchantability, Plaintiffs and the Missouri Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

010440-11  725144 V1

Case 14-Md-02543-JMF    Document 345    Filed 10/14/14    Page 506 of 712

# MONTANA

## COUNT I

### VIOLATION OF MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT OF 1973

### (MONT. CODE ANN. § 30-14-101, *et seq.*)

2116.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2117.   This claim is brought only on behalf of Nationwide Class members who are Montana residents (the "Montana Class").

2118.   New GM, Plaintiffs and the Montana Class are "persons" within the meaning of MONT. CODE ANN. § 30-14-102(6).

2119.   Montana Class members are "consumer[s]" under MONT. CODE ANN. § 30-14-102(1).

2120.   The sale or lease of the Affected Vehicles to Montana Class members occurred within "trade and commerce" within the meaning of MONT. CODE ANN. § 30-14-102(8), and New GM committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

2121.   The Montana Unfair Trade Practices and Consumer Protection Act ("Montana CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  MONT. CODE ANN. § 30-14-103.  By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in unfair and deceptive acts or practices in violation of the Montana CPA.

2122.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise

- 486 -

engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful

trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or

concealment, suppression or omission of any material fact with intent that others rely upon such

concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2123.   From the date of its inception on July 10, 2009, New GM knew of many serious

defects affecting many models and years of GM-branded vehicles, both because of the

knowledge of Old GM personnel who remained at New GM and continuous reports,

investigations, and notifications from regulatory authorities. New GM became aware of other

serious defects and systemic safety issues years ago, but concealed all of that information until

recently.

2124.   New GM was also aware that it valued cost-cutting over safety, selected parts

from the cheapest supplier regardless of quality, and actively discouraged employees from

finding and flagging known safety defects, and that this approach would necessarily cause the

existence of more defects in the vehicles it designed and manufactured and the failure to disclose

and remedy defects in all GM-branded vehicles. New GM concealed this information as well.

2125.   According to one report from the Center for Auto Safety, some 2,004 deaths and

injuries are connected with recently recalled GM-branded vehicles, and New GM should have

recalled the vehicles years ago.

2126.   By failing to disclose and by actively concealing the many defects in GM-branded

vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself

as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold,

New GM engaged in unfair and deceptive business practices in violation of the Montana CPA.

2127.   In the course of New GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the many safety issues and serious defects discussed

above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles

were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that

valued safety and stood behind its vehicles once they are on the road.

2128.   New GM's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-

branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true

value of the Affected Vehicles.

2129.   New GM intentionally and knowingly misrepresented material facts regarding the

Affected Vehicles with an intent to mislead Plaintiffs and the Montana Class.

2130.   New GM knew or should have known that its conduct violated the Montana CPA.

2131.   As alleged above, New GM made material statements about the safety and

reliability of the Affected Vehicles that were either false or misleading.

2132.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

<blockquote>

a.      Possessed exclusive knowledge that it valued cost-cutting
over safety, selected parts from the cheapest supplier
regardless of quality, and actively discouraged employees
from finding and flagging known safety defects, and that
this approach would necessarily cause the existence of
more defects in the vehicles it designed and manufactured;

b.      Intentionally concealed the foregoing from Plaintiffs;
and/or

c.      Made incomplete representations about the safety and
reliability of the Affected Vehicles generally, and the
ignition switch in particular, while purposefully
withholding material facts from Plaintiffs that contradicted
these representations.

</blockquote>

2133.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

2134.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Montana Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

2135.   Plaintiffs and the Montana Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

2136.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

2137.   As a direct and proximate result of New GM's violations of the Montana CPA, Plaintiffs and the Montana Class have suffered injury-in-fact and/or actual damage.

2138.   Because the New GM's unlawful methods, acts, and practices have caused Montana Class members to suffer an ascertainable loss of money and property, the Montana

Class seeks from New GM actual damages or $500, whichever is greater, discretionary treble damages, reasonable attorneys' fees, an order enjoining New GM's unfair, unlawful, and/or deceptive practices, and any other relief the Court considers necessary or proper, under MONT. CODE ANN. § 30-14-133.

## COUNT II

## FRAUD BY CONCEALMENT

2139.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2140.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Montana residents (the "Montana Class").

2141.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the New GM brand.

2142.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

2143.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

2144.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

- 490 -

2145.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Montana Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Montana Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

2146.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Montana Class.

2147.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Montana Class and conceal material information regarding defects that exist in GM-branded vehicles.

2148.   Plaintiffs and the Montana Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Montana Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Montana Class.

2149.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Montana Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less

for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

2150. The value of all Montana Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2151. Accordingly, New GM is liable to the Montana Class for their damages in an amount to be proven at trial.

2152. New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Montana Class's rights and well-being to enrich New GM. New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT III**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
(MONT. CODE § 30-2-314)

2153. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2154. In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of Montana residents who are members of the Ignition Switch Defect Subclass (the "Montana Ignition Switch Defect Subclass").

010440-11 725144 V1

2155.   New GM was a merchant with respect to motor vehicles under MONT. CODE § 30-2-104(1) .

2156.   Under MONT. CODE § 30-2-314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles.

2157.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

2158.   New GM  was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Montana Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2159.   As a direct and proximate result of New GM's breach of the warranties of merchantability, Plaintiffs and the Montana Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

## NEBRASKA

## COUNT I

## VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT

### (NEB. REV. STAT. § 59-1601, *et seq.*)

2160.   Plaintiff incorporates by reference all preceding and succeeding paragraphs as if set forth fully herein.

010440-11 725144 V1

2161.   This claim is brought only on behalf of Nationwide Class members who are Nebraska residents (the "Nebraska Class").

2162.   New GM, Plaintiffs and Nebraska Class members are "person[s]" under the Nebraska Consumer Protection Act ("Nebraska CPA"), NEB. REV. STAT. § 59-1601(1).

2163.   New GM's actions as set forth herein occurred in the conduct of trade or commerce as defined under NEB. REV. STAT. § 59-1601(2).

2164.   The Nebraska CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." NEB. REV. STAT. § 59-1602.  The conduct New GM as set forth herein constitutes unfair or deceptive acts or practices.

2165.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2166.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

2167.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from

finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles. New GM concealed this information as well.

2168.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

2169.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair and deceptive business practices in violation of the Nebraska CPA.

2170.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above. New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

2171.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

2172.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Nebraska Class.

2173.   New GM knew or should have known that its conduct violated the Nebraska CPA.

010440-11 725144 V1

2174.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

2175.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

> a.    Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

> b.    Intentionally concealed the foregoing from Plaintiffs; and/or

> c.    Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2176.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

2177.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Nebraska Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

2178.   Plaintiffs and the Nebraska Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been

- 496 -

Case 1:14-mc-02543-JMF Document 345 Filed 10/14/14 Page 517 of 712

aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

2179. New GM's violations present a continuing risk to Plaintiffs as well as to the general public. New GM's unlawful acts and practices complained of herein affect the public interest.

2180. As a direct and proximate result of New GM's violations of the Nebraska CPA, Plaintiffs and the Nebraska Class have suffered injury-in-fact and/or actual damage.

2181. Because New GM's conduct caused injury to Class members' property through violations of the Nebraska CPA, the Nebraska Class seeks recovery of actual damages, as well as enhanced damages up to $1,000, an order enjoining New GM's unfair or deceptive acts and practices, costs of Court, reasonable attorneys' fees, and any other just and proper relief available under NEB. REV. STAT. § 59-1609.

## COUNT II

## FRAUD BY CONCEALMENT

2182. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2183. In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Nebraska residents (the "Nebraska Class").

2184. New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

2185.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

2186.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

2187.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

2188.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Nebraska Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Nebraska Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

2189.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Nebraska Class.

010440-11  725144 V1

2190.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Nebraska Class and conceal material information regarding defects that exist in GM-branded vehicles.

2191.   Plaintiffs and the Nebraska Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Nebraska Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Nebraska Class.

2192.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Nebraska Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

2193.   The value of all Nebraska Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2194.   Accordingly, New GM is liable to the Nebraska Class for their damages in an amount to be proven at trial.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (Neb. Rev. Stat. Neb. § 2-314)

2195.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2196.   In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of Nebraska residents who are members of the Ignition Switch Defect Subclass (the "Nebraska Ignition Switch Defect Subclass").

2197.   New GM was a merchant with respect to motor vehicles within the meaning of Neb. Rev. Stat. § 2-104(1).

2198.   A warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles under Neb. Rev. Stat. § 2-314.

2199.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

2200.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Nebraska Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

010440-11  725144 V1

2201.   As a direct and proximate result of New GM's breach of the warranties of

merchantability, Plaintiffs and the Nebraska Ignition Switch Defect Subclass have been damaged

in an amount to be proven at trial.

**NEVADA**

**COUNT I**

**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT**

**(NEV. REV. STAT. § 598.0903, *et seq*.)**

2202.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

2203.   This claim is brought only on behalf of Nationwide Class members who are

Nevada residents (the "Nevada Class").

2204.   The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), NEV. REV. STAT.

§ 598.0903, *et seq.* prohibits deceptive trade practices.  NEV. REV. STAT. § 598.0915 provides

that a person engages in a "deceptive trade practice" if, in the course of business or occupation,

the person:  "5.  Knowingly makes a false representation as to the characteristics, ingredients,

uses, benefits, alterations or quantities of goods or services for sale or lease or a false

representation as to the sponsorship, approval, status, affiliation or connection of a person

therewith"; "7.  Represents that goods or services for sale or lease are of a particular standard,

quality or grade, or that such goods are of a particular style or model, if he or she knows or

should know that they are of another standard, quality, grade, style or model"; "9.  Advertises

goods or services with intent not to sell or lease them as advertised"; or "15.  Knowingly makes

any other false representation in a transaction."

2205.   New GM engaged in deceptive trade practices that violated the Nevada DTPA,

including:  knowingly representing that Affected Vehicles have uses and benefits which they do

- 501 -

not have; representing that Affected Vehicles are of a particular standard, quality, and grade when they are not; advertising Affected Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Affected Vehicles has been supplied in accordance with a previous representation when it has not; and knowingly making other false representations in a transaction.

2206.   New GM's actions as set forth above occurred in the conduct of trade or commerce.

2207.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2208.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

2209.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the

existence of more defects in the vehicles it designed and manufactured and the failure to disclose

and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

2210.   According to one report from the Center for Auto Safety, some 2,004 deaths and

injuries are connected with recently recalled GM-branded vehicles, and New GM should have

recalled the vehicles years ago.

2211.   By failing to disclose and by actively concealing the many defects in GM-branded

vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself

as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold,

New GM engaged in deceptive business practices in violation of the Nevada DTPA.

2212.   In the course of New GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the many safety issues and serious defects discussed

above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles

were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that

valued safety and stood behind its vehicles once they are on the road.

2213.   New GM's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-

branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true

value of the Affected Vehicles.

2214.   New GM intentionally and knowingly misrepresented material facts regarding the

Affected Vehicles with an intent to mislead Plaintiffs and the Nevada Class.

2215.   New GM knew or should have known that its conduct violated the Nevada DTPA.

2216.   As alleged above, New GM made material statements about the safety and

reliability of the Affected Vehicles that were either false or misleading.

Case 1:14-mc-02543-JMF    Document 345    Filed 10/14/14    Page 524 of 712

2217.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

> a.      Possessed exclusive knowledge that it valued cost-cutting
>         over safety, selected parts from the cheapest supplier
>         regardless of quality, and actively discouraged employees
>         from finding and flagging known safety defects, and that
>         this approach would necessarily cause the existence of
>         more defects in the vehicles it designed and manufactured;
>
> b.      Intentionally concealed the foregoing from Plaintiffs;
>         and/or
>
> c.      Made incomplete representations about the safety and
>         reliability of the Affected Vehicles generally, and the
>         ignition switch in particular, while purposefully
>         withholding material facts from Plaintiffs that contradicted
>         these representations.

2218.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

2219.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the Nevada Class.  A vehicle

made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable

vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than

promptly remedies them.

2220.   Plaintiffs and the Nevada Class suffered ascertainable loss caused by New GM's

misrepresentations and its failure to disclose material information.  Had they been aware of the

many defects that existed in GM-branded vehicles, and the company's callous disregard for

safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or

- 504 -

leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

2221.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

2222.   As a direct and proximate result of New GM's violations of the Nevada DTPA, Plaintiffs and the Nevada Class have suffered injury-in-fact and/or actual damage.

2223.   Accordingly, Plaintiffs and the Nevada Class seek their actual damages, punitive damages, an order enjoining New GM's deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada Deceptive Trade Practices Act.  NEV. REV. STAT. § 41.600.

## COUNT II

## FRAUD BY CONCEALMENT

2224.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2225.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Nevada residents (the "Nevada Class").

2226.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

2227.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

2228.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

2229.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

2230.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Nevada Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Nevada Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

2231.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Nevada Class.

2232.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Nevada Class and conceal material information regarding defects that exist in GM-branded vehicles.

2233.   Plaintiffs and the Nevada Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

Plaintiffs' and the Nevada Class's actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Nevada Class.

2234.  Because of the concealment and/or suppression of the facts, Plaintiffs and the Nevada Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies. Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

2235.  The value of all Nevada Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2236.  Accordingly, New GM is liable to the Nevada Class for their damages in an amount to be proven at trial.

2237.  New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Nevada Class's rights and well-being to enrich New GM. New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

# COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (NEV. REV. STAT. § 104.2314)

2238.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2239.   In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of Nevada residents who are members of the Ignition Switch Defect Subclass (the "Nevada Ignition Switch Defect Subclass").

2240.   New GM was a merchant with respect to motor vehicles within the meaning of NEV. REV. STAT. § 104.2104(1).

2241.   A warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles.

2242.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

2243.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Nevada Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

010440-11 725144 V1

2244. As a direct and proximate result of New GM's breach of the warranties of merchantability, Plaintiffs and the Nevada Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

## NEW HAMPSHIRE

## COUNT I

## VIOLATION OF N.H. CONSUMER PROTECTION ACT

## (N.H. REV. STAT. ANN. § 358-A:1, *et seq.*)

2245. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2246. This claim is brought only on behalf of Nationwide Class members who are New Hampshire residents (the "New Hampshire Class").

2247. Plaintiffs, the New Hampshire Class, and New GM are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire CPA"), N.H. REV. STAT. § 358-A:1.

2248. New GM's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. REV. STAT. § 358-A:1.

2249. The New Hampshire CPA prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but … not limited to, the following: . . . (V) Representing that goods or services have … characteristics, … uses, benefits, or quantities that they do not have;" "(VII) Representing that goods or services are of a particular standard, quality, or grade, … if they are of another;" and "(IX) Advertising goods or services with intent not to sell them as advertised." N.H. REV. STAT. § 358-A:2.

2250. New GM participated in unfair or deceptive acts or practices that violated the New Hampshire CPA as described above and below. By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in deceptive

business practices prohibited by the CPA, including representing that Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Affected Vehicles are of a particular standard, quality, and grade when they are not; advertising Affected Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Affected Vehicles has been supplied in accordance with a previous representation when it has not; and engaging in other unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce.

2251.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2252.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

2253.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the

existence of more defects in the vehicles it designed and manufactured and the failure to disclose

and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

2254.   According to one report from the Center for Auto Safety, some 2,004 deaths and

injuries are connected with recently recalled GM-branded vehicles, and New GM should have

recalled the vehicles years ago.

2255.   By failing to disclose and by actively concealing the many defects in GM-branded

vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself

as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold,

New GM engaged in unfair and deceptive business practices in violation of the New Hampshire

CPA.

2256.   In the course of New GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the many safety issues and serious defects discussed

above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles

were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that

valued safety and stood behind its vehicles once they are on the road.

2257.   New GM's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-

branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true

value of the Affected Vehicles.

2258.   New GM intentionally and knowingly misrepresented material facts regarding the

Affected Vehicles with an intent to mislead Plaintiffs and the New Hampshire Class.

2259.   New GM knew or should have known that its conduct violated the New

Hampshire CPA.

2260.  As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

2261.  New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

    a.    Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

    b.    Intentionally concealed the foregoing from Plaintiffs; and/or

    c.    Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2262.  Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

2263.  New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the New Hampshire Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

2264.  Plaintiffs and the New Hampshire Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been

- 512 -

aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

2265. New GM's violations present a continuing risk to Plaintiffs as well as to the general public. New GM's unlawful acts and practices complained of herein affect the public interest.

2266. As a direct and proximate result of New GM's violations of the New Hampshire CPA, Plaintiffs and the New Hampshire Class have suffered injury-in-fact and/or actual damage.

2267. Because New GM's willful conduct caused injury to New Hampshire Class members' property through violations of the New Hampshire CPA, the New Hampshire Class seeks recovery of actual damages or $1,000, whichever is greater, treble damages, costs and reasonable attorneys' fees, an order enjoining New GM's unfair and/or deceptive acts and practices, and any other just and proper relief under N.H. REV. STAT. § 358-A:10.

## COUNT II

## FRAUD BY CONCEALMENT

2268. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2269. In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are New Hampshire residents (the "New Hampshire Class").

2270. New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

2271.   New GM concealed and suppressed material facts concerning the culture of
New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of
safety issues, and a shoddy design process.

2272.   New GM concealed and suppressed material facts concerning the many serious
defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps
to ensure that its employees did not reveal known safety defects to regulators or consumers.

2273.   New GM did so in order to boost confidence in its vehicles and falsely assure
purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands
behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false
representations were material to consumers, both because they concerned the quality and safety
of the Affected Vehicles and because they played a significant role in the value of the vehicles.

2274.   New GM had a duty to disclose the many defects in GM-branded vehicles
because they were known and/or accessible only to New GM who had superior knowledge and
access to the facts, and New GM knew the facts were not known to or reasonably discoverable
by Plaintiffs and the New Hampshire Class.  These omitted and concealed facts were material
because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs
and the New Hampshire Class.  Whether a manufacturer's products are safe and reliable, and
whether that manufacturer stands behind its products, are material concerns to a consumer.

2275.   New GM actively concealed and/or suppressed these material facts, in whole or in
part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM
money, and it did so at the expense of Plaintiffs and the New Hampshire Class.

010440-11 725144 V1

2276.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the New Hampshire Class and conceal material information regarding defects that exist in GM-branded vehicles.

2277.   Plaintiffs and the New Hampshire Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the New Hampshire Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the New Hampshire Class.

2278.   Because of the concealment and/or suppression of the facts, Plaintiffs and the New Hampshire Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

2279.   The value of all New Hampshire Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the New GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2280.   Accordingly, New GM is liable to the New Hampshire Class for their damages in an amount to be proven at trial.

- 515 -

2281. New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the New Hampshire Class's rights and well-being to enrich New GM. New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT III**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**

**(N.H. REV. STAT. ANN. § 382-A:2-314)**

2282. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2283. In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of New Hampshire residents who are members of the Ignition Switch Defect Subclass (the "New Hampshire Ignition Switch Defect Subclass").

2284. New GM was a merchant with respect to motor vehicles within the meaning of N.H. REV. STAT. ANN. § 382-A:2-104(1).

2285. A warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles under N.H. REV. STAT. ANN. § 382-A:2-314.

2286. These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

- 516 -

2287.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the New Hampshire Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2288.   As a direct and proximate result of New GM's breach of the warranties of merchantability, Plaintiffs and the New Hampshire Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

## NEW JERSEY

## COUNT I

## VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT

### (N.J. STAT. ANN. § 56:8-1, *et seq.*)

2289.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2290.   This claim is brought only on behalf of Nationwide Class members who are New Jersey residents (the "New Jersey Class").

2291.   Plaintiffs, the New Jersey Class, and New GM are or were "persons" within the meaning of N.J. STAT. ANN. § 56:8-1(d).

2292.   New GM engaged in "sales" of "merchandise" within the meaning of N.J. STAT. ANN. § 56:8-1(c), (d).

2293.   The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment,

suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…"  N.J. STAT. ANN. § 56:8-2. New GM engaged in unconscionable or deceptive acts or practices that violated the New Jersey CFA as described above and below, and did so with the intent that Class members rely upon their acts, concealment, suppression or omissions.

2294.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2295.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

2296.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

010440-11  725144 V1

2297.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

2298.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the New Jersey CFA.

2299.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

2300.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

2301.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the New Jersey Class.

2302.   New GM knew or should have known that its conduct violated the New Jersey CFA.

2303.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

2304.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

> a.    Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;
>
> b.    Intentionally concealed the foregoing from Plaintiffs; and/or
>
> c.    Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2305.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

2306.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the New Jersey Class.  A vehicle

made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable

vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than

promptly remedies them.

2307.   Plaintiffs and the New Jersey Class suffered ascertainable loss caused by

New GM's misrepresentations and its failure to disclose material information.  Had they been

aware of the many defects that existed in GM-branded vehicles, and the company's callous

disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have

purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

2308. New GM's violations present a continuing risk to Plaintiffs as well as to the general public. New GM's unlawful acts and practices complained of herein affect the public interest.

2309. As a direct and proximate result of New GM's violations of the New Jersey CFA, Plaintiffs and the New Jersey Class have suffered injury-in-fact and/or actual damage.

2310. Plaintiffs and the New Jersey Class are entitled to recover legal and/or equitable relief including an order enjoining New GM's unlawful conduct, treble damages, costs and reasonable attorneys' fees pursuant to N.J. STAT. ANN. § 56:8-19, and any other just and appropriate relief.

**COUNT II**

**FRAUD BY CONCEALMENT**

2311. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2312. In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are New Jersey residents (the "New Jersey Class").

2313. New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

2314. New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

- 521 -

2315.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

2316.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

2317.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the New Jersey Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the New Jersey Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

2318.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the New Jersey Class.

2319.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the New Jersey Class and conceal material information regarding defects that exist in GM-branded vehicles.

2320.   Plaintiffs and the New Jersey Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

- 522 -

Plaintiffs' and the New Jersey Class's actions were justified.  New GM was in exclusive control

of the material facts and such facts were not known to the public, Plaintiffs, or the New Jersey

Class.

2321.   Because of the concealment and/or suppression of the facts, Plaintiffs and the

New Jersey Class sustained damage because they own vehicles that diminished in value as a

result of New GM's concealment of, and failure to timely disclose, the serious defects in millions

of GM-branded vehicles and the serious safety and quality issues engendered by New GM's

corporate policies.  Had they been aware of the many defects that existed in GM-branded

vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less

for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the

benefit of their bargain as a result of New GM's fraudulent concealment.

2322.   The value of all New Jersey Class members' vehicles has diminished as a result of

New GM's fraudulent concealment of the many defects and its systemic safety issues which has

greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of

the Affected Vehicles, let alone pay what otherwise would have been fair market value for the

vehicles.

2323.   Accordingly, New GM is liable to the New Jersey Class for their damages in an

amount to be proven at trial.

2324.   New GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' and the New Jersey Class's rights and well-being

to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an

amount sufficient to deter such conduct in the future, which amount is to be determined

according to proof.

- 523 -

# COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (N.J. STAT. ANN. § 12A:2-314)

2325.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2326.   In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of New Jersey residents who are members of the Ignition Switch Defect Subclass (the "New Jersey Ignition Switch Defect Subclass").

2327.   New GM was a merchant with respect to motor vehicles within the meaning of N.J. STAT. ANN. § 12A:2-104(1).

2328.   A warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles under N.J. STAT. ANN. § 12A:2-104(1).

2329.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

2330.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the New Jersey Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2331.   As a direct and proximate result of New GM's breach of the warranties of merchantability, Plaintiffs and the New Jersey Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

## NEW MEXICO

## COUNT I

## VIOLATIONS OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT

### (N.M. STAT. ANN. §§ 57-12-1, *et seq.*)

2332.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2333.   This claim is brought only on behalf of Nationwide Class members who are New Mexico residents (the "New Mexico Class").

2334.   New GM, Plaintiffs and New Mexico Class members are or were "person[s]" under the New Mexico Unfair Trade Practices Act ("New Mexico UTPA"), N.M. STAT. ANN. § 57-12-2.

2335.   New GM's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. STAT. ANN. § 57-12-2.

2336.   The New Mexico UTPA makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services … by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive."  N.M. STAT. ANN. § 57-12-2(D).  New GM's acts and omissions described herein constitute unfair or deceptive acts or practices under N.M. STAT. ANN. § 57-12-2(D).  In addition, New GM's actions constitute unconscionable actions under N.M. STAT. ANN. § 57-12-2(E), since they took

advantage of the lack of knowledge, ability, experience, and capacity of the New Mexico Class members to a grossly unfair degree.

2337.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2338.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

2339.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

2340.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

2341.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the New Mexico UTPA.

2342.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

2343.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the New GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

2344.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the New Mexico Class.

2345.   New GM knew or should have known that its conduct violated the New Mexico UTPA.

2346.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

2347.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

      a.      Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that

- 527 -

this approach would necessarily cause the existence of
more defects in the vehicles it designed and manufactured;

b.      Intentionally concealed the foregoing from Plaintiffs;
and/or

c.      Made incomplete representations about the safety and
reliability of the Affected Vehicles generally, and the
ignition switch in particular, while purposefully
withholding material facts from Plaintiffs that contradicted
these representations.

2348.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

2349.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the New Mexico Class.  A

vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise

comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects

rather than promptly remedies them.

2350.   Plaintiffs and the New Mexico Class suffered ascertainable loss caused by

New GM's misrepresentations and its failure to disclose material information.  Had they been

aware of the many defects that existed in GM-branded vehicles, and the company's callous

disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have

purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result

of New GM's misconduct.

010440-11  725144 V1

2351.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

2352.   As a direct and proximate result of New GM's violations of the New Mexico UTPA, Plaintiffs and the New Mexico Class have suffered injury-in-fact and/or actual damage.

2353.   New Mexico Class members seek punitive damages against New GM because New GM's conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith. New GM fraudulently and willfully misrepresented the safety and reliability of GM-branded vehicles, deceived New Mexico Class members on life-or-death matters, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of correcting the myriad flaws in the GM-branded vehicles that New GM repeatedly promised New Mexico Class members were safe.  Because New GM's conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith, it warrants punitive damages.

2354.   Because New GM's unconscionable, willful conduct caused actual harm to New Mexico Class members, the New Mexico Class seeks recovery of actual damages or $100, whichever is greater, discretionary treble damages, punitive damages, and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. STAT. ANN. § 57-12-10.

## COUNT II

## FRAUD BY CONCEALMENT

2355.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2356.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are New Mexico residents (the "New Mexico Class").

2357.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

2358.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

2359.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

2360.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

2361.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the New Mexico Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the New Mexico Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

- 530 -

2362.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the New Mexico Class.

2363.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the New Mexico Class and conceal material information regarding defects that exist in GM-branded vehicles.

2364.   Plaintiffs and the New Mexico Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the New Mexico Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the New Mexico Class.

2365.   Because of the concealment and/or suppression of the facts, Plaintiffs and the New Mexico Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

2366.   The value of all New Mexico Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the New GM brand and made any reasonable consumer reluctant to

- 531 -

purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2367.   Accordingly, New GM is liable to the New Mexico Class for their damages in an amount to be proven at trial.

2368.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the New Mexico Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

## (N.M. STAT. ANN. § 55-2-314)

2369.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2370.   In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of New Mexico residents who are members of the Ignition Switch Defect Subclass (the "New Mexico Ignition Switch Defect Subclass").

2371.   New GM was a merchant with respect to motor vehicles within the meaning of N.M. STAT. ANN. § 55-2-104(1).

2372.   A warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles under N.M. STAT. ANN. § 55-2-314.

- 532 -

2373.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

2374.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the New Mexico Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2375.   As a direct and proximate result of New GM's breach of the warranties of merchantability, Plaintiffs and the New Mexico Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

## NEW YORK

## COUNT I

## DECEPTIVE ACTS OR PRACTICES

### (N.Y. GEN. BUS. LAW § 349 and 350)

2376.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2377.   This claim is brought only on behalf of Class members who are New York residents (the "New York Class").

2378.   Plaintiffs and New York Class members are "persons" within the meaning of New York General Business Law ("New York GBL"), N.Y. GEN. BUS. LAW § 349(h).

- 533 -

2379. New GM is a "person," "firm," "corporation," or "association" within the meaning of N.Y. GEN. BUS. LAW § 349.

2380. The New York GBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW § 349. New GM's conduct, as described above and below, constitutes "deceptive acts or practices" within the meaning of the New York GBL. Furthermore, New GM's deceptive acts and practices, which were intended to mislead consumers who were in the process of purchasing and/or leasing the Affected Vehicles, was conduct directed at consumers.

2381. New GM's actions as set forth above occurred in the conduct of trade or commerce.

2382. In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2383. From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities. New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

010440-11 725144 V1

2384.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.   New GM concealed this information as well.

2385.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

2386.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the New York GBL.

2387.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.   New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

2388.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the New GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

2389.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the New York Class.

- 535 -

2390.   New GM knew or should have known that its conduct violated the New York
GBL.

2391.   As alleged above, New GM made material statements about the safety and
reliability of the Affected Vehicles that were either false or misleading.

2392.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the
Affected Vehicles and the devaluing of safety at New GM, because New GM:

    a.    Possessed exclusive knowledge that it valued cost-cutting
over safety, selected parts from the cheapest supplier
regardless of quality, and actively discouraged employees
from finding and flagging known safety defects, and that
this approach would necessarily cause the existence of
more defects in the vehicles it designed and manufactured;

    b.    Intentionally concealed the foregoing from Plaintiffs;
and/or

    c.    Made incomplete representations about the safety and
reliability of the Affected Vehicles generally, and the
ignition switch in particular, while purposefully
withholding material facts from Plaintiffs that contradicted
these representations.

2393.   Because New GM fraudulently concealed the many defects in GM-branded
vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,
the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to
those vehicles by New GM's conduct, they are now worth significantly less than they otherwise
would be.

2394.   New GM's systemic devaluation of safety and its concealment of a plethora of
defects in GM-branded vehicles were material to Plaintiffs and the New York Class.  A vehicle
made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable
vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than
promptly remedies them.

2395.   Plaintiffs and the New York Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

2396.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

2397.   As a direct and proximate result of New GM's violations of the New York GBL, Plaintiffs and the New York Class have suffered injury-in-fact and/or actual damage.

2398.   New York Class members seek punitive damages against New GM because New GM's conduct was egregious.  New GM misrepresented the safety and reliability of millions of GM-branded vehicles, concealed myriad defects in millions of GM-branded vehicles and the systemic safety issues plaguing the company, deceived Class members on life-or-death matters, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of correcting the serious flaw in its culture and in millions of GM-branded vehicles.  New GM's egregious conduct warrants punitive damages.

2399.   Because New GM's willful and knowing conduct caused injury to Class members, the New York Class seeks recovery of actual damages or $50, whichever is greater, discretionary treble damages up to $1,000, punitive damages, reasonable attorneys' fees and costs, an order enjoining New GM's deceptive conduct, and any other just and proper relief available under N.Y. GEN. BUS. LAW § 349.

010440-11  725144 V1

## COUNT II

## FRAUD BY CONCEALMENT

2400.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2401.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Class members who are New York residents (the "New York Class").

2402.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

2403.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

2404.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

2405.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

2406.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the New York Class.  These omitted and concealed facts were material because

Case 1:14-mc-02543-JMF    Document 345    Filed 10/14/14    Page 559 of 712

they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the New York Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

2407.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the New York Class.

2408.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the New York Class and conceal material information regarding defects that exist in GM-branded vehicles.

2409.   Plaintiffs and the New York Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the New York Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the New York Class.

2410.   Because of the concealment and/or suppression of the facts, Plaintiffs and the New York Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

2411.   The value of all New York Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2412.   Accordingly, New GM is liable to the New York Class for their damages in an amount to be proven at trial.

2413.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the New York Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (N.Y. U.C.C. § 2-314)

2414.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2415.   In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of New York residents who are members of the Ignition Switch Defect Subclass (the "New York Ignition Switch Defect Subclass").

2416.   New GM was a merchant with respect to motor vehicles within the meaning of N.Y. U.C.C. § 2-104(1).

- 540 -

2417.   A warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles under N.Y. U.C.C. § 2-314.

2418.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

2419.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the New York Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2420.   As a direct and proximate result of New GM's breach of the warranties of merchantability, Plaintiffs and the New York Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

## COUNT IV

## VIOLATION OF NEW YORK'S FALSE ADVERTISING ACT

### (N.Y. GEN. BUS. LAW § 350)

2421.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2422.   This claim is brought only on behalf of Class members who are New York residents (the "New York Class").

2423.  New GM was and is engaged in the "conduct of business, trade or commerce" within the meaning of N.Y. GEN. BUS. LAW § 350.

2424.  N.Y. GEN. BUS. LAW § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce."  False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …."  N.Y. GEN. BUS. LAW § 350-a.

2425.  New GM caused to be made or disseminated through New York, through advertising, marketing and other publications, statements that were untrue or misleading, and that were known, or which by the exercise of reasonable care should have been known to New GM, to be untrue and misleading to consumers and the New York Class.

2426.  New GM has violated § 350 because the misrepresentations and omissions regarding the defects, and New GM's systemic devaluation of safety, as set forth above, were material and likely to deceive a reasonable consumer.

2427.  New York Class members have suffered an injury, including the loss of money or property, as a result of New GM's false advertising.  In purchasing or leasing their vehicles, New York Plaintiffs and the New York Class relied on the misrepresentations and/or omissions of New GM with respect to the safety and reliability of the Affected Vehicles.  New GM's representations were false and/or misleading because the concealed defects and safety issues seriously undermine the value of the Affected Vehicles.  Had Plaintiffs and the New York Class known this, they would not have purchased or leased their Affected Vehicles and/or paid as much for them.

010440-11  725144 V1

2428.   Pursuant to N.Y. GEN. BUS. LAW § 350 e, the New York Class seeks monetary relief against New GM  measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 each for New York Class member.  Because New GM's conduct was committed willfully and knowingly, New York members are entitled to recover three times actual damages, up to $10,000, for each New York Class member.

2429.   The New York Class also seeks an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under General Business Law §§ 349–350.

## NORTH CAROLINA

## COUNT I

## VIOLATION OF NORTH CAROLINA'S UNFAIR
## AND DECEPTIVE ACTS AND PRACTICES ACT

### (N.C. GEN. STAT. § 75-1.1, *et seq.*)

2430.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2431.   This claim is brought only on behalf of Nationwide Class members who are North Carolina residents (the "North Carolina Class").

2432.   New GM engaged in "commerce" within the meaning of N.C. GEN. STAT. § 75-1.1(b).

2433.   The North Carolina Act broadly prohibits "unfair or deceptive acts or practices in or affecting commerce."  N.C. GEN. STAT. § 75-1.1(a).  As alleged above and below, New GM willfully committed unfair or deceptive acts or practices in violation of the North Carolina Act.

- 543 -

2434.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2435.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

2436.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

2437.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

2438.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold,

- 544 -

New GM engaged in unfair and deceptive business practices in violation of the North Carolina
Act.

2439.   In the course of New GM's business, it willfully failed to disclose and actively
concealed the dangerous risk posed by the many safety issues and serious defects discussed
above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles
were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that
valued safety and stood behind its vehicles once they are on the road.

2440.   New GM's unfair or deceptive acts or practices were likely to and did in fact
deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-
branded vehicles, the quality of the New GM brand, the devaluing of safety at New GM, and the
true value of the Affected Vehicles.

2441.   New GM intentionally and knowingly misrepresented material facts regarding the
Affected Vehicles with an intent to mislead Plaintiffs and the North Carolina Class.

2442.   New GM knew or should have known that its conduct violated the North Carolina
Act.

2443.   As alleged above, New GM made material statements about the safety and
reliability of the Affected Vehicles that were either false or misleading.

2444.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the
Affected Vehicles and the devaluing of safety at New GM, because New GM:

    a.    Possessed exclusive knowledge that it valued cost-cutting
over safety, selected parts from the cheapest supplier
regardless of quality, and actively discouraged employees
from finding and flagging known safety defects, and that
this approach would necessarily cause the existence of
more defects in the vehicles it designed and manufactured;

    b.    Intentionally concealed the foregoing from Plaintiffs;
and/or

- 545 -

    c.       Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2445.  Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

2446.  New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the North Carolina Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

2447.  Plaintiffs and the North Carolina Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

2448.  New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

2449.  As a direct and proximate result of New GM's violations of the North Carolina Act, Plaintiffs and the North Carolina Class have suffered injury-in-fact and/or actual damage.

2450.   North Carolina Class members seek punitive damages against New GM because New GM's conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith. New GM fraudulently and willfully misrepresented the safety and reliability of GM-branded vehicles, deceived North Carolina Class members on life-or-death matters, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of correcting the myriad flaws in the GM-branded vehicles it repeatedly promised Class members were safe.  Because New GM's conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith, it warrants punitive damages.

2451.   Plaintiffs seek an order for treble their actual damages, an order enjoining New GM's unlawful acts, costs of Court, attorney's fees, and any other just and proper relief available under the North Carolina Act, N.C. Gen. Stat. § 75-16.

## COUNT II

## FRAUD BY CONCEALMENT

2452.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2453.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are North Carolina residents (the "North Carolina Class").

2454.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

2455.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

2456.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

2457.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

2458.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the North Carolina Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the North Carolina Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

2459.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the North Carolina Class.

2460.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the North Carolina Class and conceal material information regarding defects that exist in GM-branded vehicles.

2461.   Plaintiffs and the North Carolina Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed

- 548 -

Case 1:14-mc-02543-JMF Document 345 Filed 10/14/14 Page 569 of 712

facts. Plaintiffs' and the North Carolina Class's actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the North Carolina Class.

2462. Because of the concealment and/or suppression of the facts, Plaintiffs and the North Carolina Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies. Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

2463. The value of all North Carolina Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the New GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2464. Accordingly, New GM is liable to the North Carolina Class for their damages in an amount to be proven at trial.

2465. New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the North Carolina Class's rights and well-being to enrich New GM. New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

## (N.C. GEN. STAT. § 25-2-314)

2466.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2467.  In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of North Carolina residents who are members of the Ignition Switch Defect Subclass (the "North Carolina Ignition Switch Defect Subclass").

2468.  New GM was a merchant with respect to motor vehicles within the meaning of N.C. GEN. STAT. § 25-2-104(1).

2469.  A warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles under N.C. GEN. STAT. § 25-2-314.

2470.  These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

2471.  New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the North Carolina Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2472.   As a direct and proximate result of New GM's breach of the warranty of merchantability, Plaintiffs and the North Carolina Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

## NORTH DAKOTA

## COUNT I

## VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT

### (N.D. CENT. CODE § 51-15-02)

2473.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2474.   This claim is brought only on behalf of Nationwide Class members who are North Dakota residents (the "North Dakota Class").

2475.   Plaintiffs, the North Dakota Class members, and New GM are "persons" within the meaning of N.D. CENT. CODE § 51-15-02(4).

2476.   New GM engaged in the "sale" of "merchandise" within the meaning of N.D. CENT. CODE § 51-15-02(3), (5).

2477.   The North Dakota Consumer Fraud Act ("North Dakota CFA") makes unlawful "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise…." N.D. CENT. CODE § 51-15-02. As set forth above and below, New GM committed deceptive acts or practices, with the intent that Class members rely thereon in connection with their purchase or lease of the Affected Vehicles.

2478.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise

engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful

trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or

concealment, suppression or omission of any material fact with intent that others rely upon such

concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2479.   From the date of its inception on July 10, 2009, New GM knew of many serious

defects affecting many models and years of GM-branded vehicles, both because of the

knowledge of Old GM personnel who remained at New GM and continuous reports,

investigations, and notifications from regulatory authorities. New GM became aware of other

serious defects and systemic safety issues years ago, but concealed all of that information until

recently.

2480.   New GM was also aware that it valued cost-cutting over safety, selected parts

from the cheapest supplier regardless of quality, and actively discouraged employees from

finding and flagging known safety defects, and that this approach would necessarily cause the

existence of more defects in the vehicles it designed and manufactured and the failure to disclose

and remedy defects in all GM-branded vehicles. New GM concealed this information as well.

2481.   According to one report from the Center for Auto Safety, some 2,004 deaths and

injuries are connected with recently recalled GM-branded vehicles, and New GM should have

recalled the vehicles years ago.

2482.   By failing to disclose and by actively concealing the many defects in GM-branded

vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself

as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold,

New GM engaged in deceptive business practices in violation of the North Dakota CFA.

2483.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

2484.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the New GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

2485.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the North Dakota Class.

2486.   New GM knew or should have known that its conduct violated the North Dakota CFA.

2487.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

2488.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

> a.   Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;
>
> b.   Intentionally concealed the foregoing from Plaintiffs; and/or
>
> c.   Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully

- 553 -

withholding material facts from Plaintiffs that contradicted
these representations.

2489.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

2490.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the North Dakota Class.  A

vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise

comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects

rather than promptly remedies them.

2491.   Plaintiffs and the North Dakota Class suffered ascertainable loss caused by

New GM's misrepresentations and its failure to disclose material information.  Had they been

aware of the many defects that existed in GM-branded vehicles, and the company's callous

disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have

purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result

of New GM's misconduct.

2492.   New GM's violations present a continuing risk to Plaintiffs as well as to the

general public.  New GM's unlawful acts and practices complained of herein affect the public

interest.

2493.   As a direct and proximate result of New GM's violations of the North Dakota

CFA, Plaintiffs and the North Dakota Class have suffered injury-in-fact and/or actual damage.

2494. North Dakota Class members seek punitive damages against New GM because New GM's conduct was egregious. New GM misrepresented the safety and reliability of millions of GM-branded vehicles, concealed myriad defects in millions of GM-branded vehicles and the systemic safety issues plaguing the company, deceived North Dakota Class members on life-or-death matters, and concealed material facts that only New GM knew, all to avoid the expense and public relations nightmare of correcting the serious flaw in its culture and in millions of GM-branded vehicles. New GM's egregious conduct warrants punitive damages.

2495. Further, New GM knowingly committed the conduct described above, and thus, under N.D. CENT. CODE § 51-15-09, New GM is liable to Plaintiffs and the North Dakota Class for treble damages in amounts to be proven at trial, as well as attorneys' fees, costs, and disbursements. Plaintiffs further seek an order enjoining New GM's unfair and/or deceptive acts or practices, and other just and proper available relief under the North Dakota CFA.

## COUNT II

### FRAUD BY CONCEALMENT

2496. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2497. In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are North Dakota residents (the "North Dakota Class").

2498. New GM concealed and suppressed material facts concerning the quality of its vehicles and the New GM brand.

2499. New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

- 555 -

2500.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

2501.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

2502.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the North Dakota Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the North Dakota Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

2503.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the North Dakota Class.

2504.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the North Dakota Class and conceal material information regarding defects that exist in GM-branded vehicles.

2505.   Plaintiffs and the North Dakota Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed

facts. Plaintiffs' and the North Dakota Class's actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the North Dakota Class.

2506. Because of the concealment and/or suppression of the facts, Plaintiffs and the North Dakota Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies. Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

2507. The value of all North Dakota Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2508. Accordingly, New GM is liable to the North Dakota Class for their damages in an amount to be proven at trial.

2509. New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the North Dakota Class's rights and well-being to enrich New GM. New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (N.D. CENT. CODE § 41-02-31)

2510.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2511.   In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of North Dakota residents who are members of the Ignition Switch Defect Subclass (the "North Dakota Ignition Switch Defect Subclass").

2512.   New GM was a merchant with respect to motor vehicles.

2513.   A warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles.

2514.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

2515.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the North Dakota Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2516.   As a direct and proximate result of New GM's breach of the warranties of merchantability, Plaintiffs and the North Dakota Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

## OHIO

## COUNT I

## VIOLATION OF OHIO CONSUMER SALES PRACTICES ACT

## (OHIO REV. CODE ANN. § 1345.01, *et seq.*)

2517.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2518.   This claim is brought only on behalf of Nationwide Class members who are Ohio residents (the "Ohio Class").

2519.   New GM is a "supplier" as that term is defined in OHIO REV. CODE § 1345.01(C).

2520.   Plaintiffs and the Ohio Class are "consumers" as that term is defined in OHIO REV. CODE § 1345.01(D), and their purchases and leases of the Affected Vehicles are "consumer transactions" within the meaning of OHIO REV. CODE § 1345.01(A).

2521.   The Ohio Consumer Sales Practices Act ("Ohio CSPA"), OHIO REV. CODE § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction.  Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing (i) that goods have characteristics or uses or benefits which they do not have; (ii) that their goods are of a particular quality or grade they are not; and (iii) the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not.  *Id.*  New GM's conduct as alleged above and below constitutes unfair and/or deceptive consumer sales practices in violation of OHIO REV. CODE § 1345.02.

- 559 -

2522.  By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in deceptive business practices prohibited by the Ohio CSPA, including:  representing that Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Affected Vehicles are of a particular standard, quality, and grade when they are not; representing that the subject of a transaction involving Affected Vehicles has been supplied in accordance with a previous representation when it has not; and engaging in other unfair or deceptive acts or practices.

2523.  New GM's actions as set forth above occurred in the conduct of trade or commerce.

2524.  In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2525.  From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

2526.  New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from

finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles. New GM concealed this information as well.

2527.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

2528.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair and deceptive business practices in violation of the Ohio CSPA.

2529.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above. New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

2530.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

2531.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Ohio Class.

2532.   New GM knew or should have known that its conduct violated the Ohio CSPA.

Case 14-MC-02543-JMF    Document 345    Filed 10/14/14    Page 582 of 712

2533.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

2534.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

a.     Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

b.     Intentionally concealed the foregoing from Plaintiffs; and/or

c.     Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2535.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

2536.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Ohio Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

2537.   Plaintiffs and the Ohio Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the

- 562 -

many defects that existed in GM-branded vehicles, and the company's callous disregard for

safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or

leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's

misconduct.

2538.   New GM's violations present a continuing risk to Plaintiffs as well as to the

general public.  New GM's unlawful acts and practices complained of herein affect the public

interest.

2539.   As a direct and proximate result of New GM's violations of the Ohio CSPA,

Plaintiffs and the Ohio Class have suffered injury-in-fact and/or actual damage.

2540.   Ohio Class members seek punitive damages against New GM because New GM's

conduct was egregious.  New GM misrepresented the safety and reliability of millions of GM-

branded vehicles, concealed myriad defects in millions of GM-branded vehicles and the systemic

safety issues plaguing New GM, deceived Class members on life-or-death matters, and

concealed material facts that only New GM knew, all to avoid the expense and public relations

nightmare of correcting the serious flaw in its culture and in millions of GM-branded vehicles.

New GM's egregious conduct warrants punitive damages.

2541.   Plaintiffs and the Ohio Class specifically do not allege herein a claim for violation

of OHIO REV. CODE § 1345.72.

2542.   New GM was on notice pursuant to OHIO REV. CODE § 1345.09(B) that its actions

constituted unfair, deceptive, and unconscionable practices by, for example, *Mason v. Mercedes-

Benz USA, LLC*, 2005 Ohio App. LEXIS 3911, at *33 (S.D. Ohio Aug. 18, 2005), and *Lilly v.

Hewlett-Packard Co.*, 2006 U.S. Dist. LEXIS 22114, at *17-18 (S.D. Ohio Apr. 21, 2006).

Further, New GM's conduct as alleged above constitutes an act or practice previously declared to

- 563 -

be deceptive or unconscionable by rule adopted under division (B)(2) of section 1345.05 and

previously determined by Ohio courts to violate Ohio's Consumer Sales Practices Act and was

committed after the decisions containing these determinations were made available for public

inspection under division (A)(3) of O.R.C. § 1345.05. The applicable rule and Ohio court

opinions include, but are not limited to:  OAC 109:4-3-16; *Mason v. Mercedes-Benz USA, LLC*,

2005 Ohio 4296 (Ohio Ct. App. 2005); *Khouri v. Lewis*, Cuyahoga Common Pleas No. 342098

(2001); *State ex rel. Montgomery v. Canterbury*, Franklin App. No. 98CVH054085 (2000); and

*Fribourg v. Vandemark* (July 26, 1999), Clermont App. No CA99-02-017, unreported (PIF #

10001874).

2543.   As a result of the foregoing wrongful conduct of New GM, Plaintiffs and the Ohio

Class have been damaged in an amount to be proven at trial, and seek all just and proper

remedies, including, but not limited to, actual and statutory damages, an order enjoining

New GM's deceptive and unfair conduct, treble damages, court costs and reasonable attorneys'

fees, pursuant to OHIO REV. CODE § 1345.09, *et seq*.

**COUNT II**

**FRAUD BY CONCEALMENT**

2544.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

2545.   In the event the Court declines to certify a Nationwide Class under Michigan law,

this claim is brought only on behalf of Nationwide Class members who are Ohio residents (the

"Ohio Class").

2546.   New GM concealed and suppressed material facts concerning the quality of its

vehicles and the GM brand.

2547.   New GM concealed and suppressed material facts concerning the culture of
New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of
safety issues, and a shoddy design process.

2548.   New GM concealed and suppressed material facts concerning the many serious
defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps
to ensure that its employees did not reveal known safety defects to regulators or consumers.

2549.   New GM did so in order to boost confidence in its vehicles and falsely assure
purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands
behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false
representations were material to consumers, both because they concerned the quality and safety
of the Affected Vehicles and because they played a significant role in the value of the vehicles.

2550.   New GM had a duty to disclose the many defects in GM-branded vehicles
because they were known and/or accessible only to New GM who had superior knowledge and
access to the facts, and New GM knew the facts were not known to or reasonably discoverable
by Plaintiffs and the Ohio Class.  These omitted and concealed facts were material because they
directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Ohio
Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer
stands behind its products, are material concerns to a consumer.

2551.   New GM actively concealed and/or suppressed these material facts, in whole or in
part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM
money, and it did so at the expense of Plaintiffs and the Ohio Class.

010440-11  725144 V1

2552.   On information and belief, New GM has still not made full and adequate
disclosure and continues to defraud Plaintiffs and the Ohio Class and conceal material
information regarding defects that exist in GM-branded vehicles.

2553.   Plaintiffs and the Ohio Class were unaware of these omitted material facts and
would not have acted as they did if they had known of the concealed and/or suppressed facts.
Plaintiffs' and the Ohio Class's actions were justified.  New GM was in exclusive control of the
material facts and such facts were not known to the public, Plaintiffs, or the Ohio Class.

2554.   Because of the concealment and/or suppression of the facts, Plaintiffs and the
Ohio Class sustained damage because they own vehicles that diminished in value as a result of
New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-
branded vehicles and the serious safety and quality issues engendered by New GM's corporate
policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the
company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or
would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their
bargain as a result of New GM's fraudulent concealment.

2555.   The value of all Ohio Class members' vehicles has diminished as a result of
New GM's fraudulent concealment of the many defects and its systemic safety issues which has
greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of
the Affected Vehicles, let alone pay what otherwise would have been fair market value for the
vehicles.

2556.   Accordingly, New GM is liable to the Ohio Class for their damages in an amount
to be proven at trial.

010440-11  725144 V1

2557.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Ohio Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## IMPLIED WARRANTY IN TORT

2558.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2559.   Plaintiffs bring this claim only on behalf of Ohio residents who are members of the Ignition Switch Defect Subclass (the "Ohio Ignition Switch Defect Subclass").

2560.   The Defective Ignition Switch Vehicles contained a design defect, namely, a faulty ignition system that fails under reasonably foreseeable use, resulting in stalling, loss of brakes, power steering, and airbags, among other safety issues, as detailed herein more fully.

2561.   The design, manufacturing, and/or assembly defects existed at the time the Defective Ignition Switch Vehicles containing the defective ignition systems left the possession or control of New GM.

2562.   Based upon the dangerous product defects, New GM failed to meet the expectations of a reasonable consumer.  The Defective Ignition Switch Vehicles failed their ordinary, intended use because the ignition systems in the vehicles do not function as a reasonable consumer would expect.  Moreover, the defect presents a serious danger to Plaintiffs and the other members of the Ohio Ignition Defect Subclass that cannot be eliminated without significant cost.

- 567 -

Case 1:14-mc-02543-JMF    Document 345    Filed 10/14/14    Page 588 of 712

2563.   The design defects in the vehicles were the direct and proximate cause of economic damages to Plaintiffs, as well as damages incurred or to be incurred by each of the other Ohio Ignition Switch Defect Subclass members.

## OKLAHOMA

## COUNT I

## VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT

### (OKLA. STAT. TIT. 15 § 751, *et seq.*)

2564.   Plaintiffs reallege and incorporate by reference each paragraph as if set forth fully herein.

2565.   This claim is brought only on behalf of Nationwide Class members who are Oklahoma residents (the "Oklahoma Class").

2566.   Plaintiffs and Oklahoma Class members are "persons" under the Oklahoma Consumer Protection Act ("Oklahoma CPA"), OKLA. STAT. TIT. 15 § 752.

2567.   New GM is a "person," "corporation," or "association" within the meaning of OKLA. STAT. TIT. 15 § 15-751(1).

2568.   The sale or lease of the Affected Vehicles to the Oklahoma Class members was a "consumer transaction" within the meaning of OKLA. STAT. TIT. 15 § 752, and New GM's actions as set forth herein occurred in the conduct of trade or commerce.

2569.   The Oklahoma CPA declares unlawful, *inter alia*, the following acts or practices when committed in the course of business:  "mak[ing] a false or misleading representation, knowingly or with reason to know, as to the characteristics …, uses, [or] benefits, of the subject of a consumer transaction," or making a false representation, "knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another or "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer

transaction with intent not to sell it as advertised;" and otherwise committing "an unfair or deceptive trade practice." *See* OKLA. STAT. TIT. 15, § 753.

2570.   By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in unfair and deceptive business practices prohibited by the Oklahoma CPA, including:  representing that Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Affected Vehicles are of a particular standard, quality, and grade when they are not; and advertising Affected Vehicles with the intent not to sell or lease them as advertised; misrepresenting, omitting and engaging in other practices that have deceived or could reasonably be expected to deceive or mislead; and engaging in practices which offend established public policy or are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

2571.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2572.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.   New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

2573.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

2574.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

2575.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive trade practices in violation of the Oklahoma CPA.

2576.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

2577.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

2578.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Oklahoma Class.

010440-11  725144 V1

Case 1:14-mc-02543-JMF Document 345 Filed 10/14/14 Page 591 of 712

2579.   New GM knew or should have known that its conduct violated the Oklahoma

CPA.

2580.   As alleged above, New GM made material statements about the safety and

reliability of the Affected Vehicles that were either false or misleading.

2581.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

    a.    Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

    b.    Intentionally concealed the foregoing from Plaintiffs; and/or

    c.    Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2582.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

2583.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the Oklahoma Class.  A vehicle

made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable

vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than

promptly remedies them.

2584.   Plaintiffs and the Oklahoma Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

2585.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

2586.   As a direct and proximate result of New GM's violations of the Oklahoma CPA, Plaintiffs and the Oklahoma Class have suffered injury-in-fact and/or actual damage.

2587.   Oklahoma Class members seek punitive damages against New GM because New GM's conduct was egregious.  New GM misrepresented the safety and reliability of millions of GM-branded vehicles, concealed myriad defects in millions of GM-branded vehicles and the systemic safety issues plaguing New GM, deceived Oklahoma Class members on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting the serious flaw in its culture and in millions of GM-branded vehicles.  New GM's egregious conduct warrants punitive damages.

2588.   New GM's conduct as alleged herein was unconscionable because (1) New GM, knowingly or with reason to know, took advantage of consumers reasonably unable to protect their interests because of their age, physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor; (2) at the time the consumer transaction was entered into, New GM knew or had reason to know that price grossly exceeded

the price at which similar vehicles were readily obtainable in similar transactions by like

consumers; and (3) New GM knew or had reason to know that the transaction New GM induced

the consumer to enter into was excessively one-sided in favor of New GM.

2589. Because New GM's unconscionable conduct caused injury to Oklahoma Class

members, the Oklahoma Class seeks recovery of actual damages, discretionary penalties up to

$2,000 per violation, and reasonable attorneys' fees, under OKLA. STAT. TIT. 15 § 761.1. The

Oklahoma Class further seeks an order enjoining New GM's unfair and/or deceptive acts or

practices, and any other just and proper relief available under the Oklahoma CPA.

## COUNT II

## FRAUD BY CONCEALMENT

2590. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

2591. In the event the Court declines to certify a Nationwide Class under Michigan law,

this claim is brought only on behalf of Nationwide Class members who are Oklahoma residents

(the "Oklahoma Class").

2592. New GM concealed and suppressed material facts concerning the quality of its

vehicles and the GM brand.

2593. New GM concealed and suppressed material facts concerning the culture of

New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of

safety issues, and a shoddy design process.

2594. New GM concealed and suppressed material facts concerning the many serious

defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps

to ensure that its employees did not reveal known safety defects to regulators or consumers.

2595.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

2596.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Oklahoma Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Oklahoma Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

2597.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Oklahoma Class.

2598.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Oklahoma Class and conceal material information regarding defects that exist in GM-branded vehicles.

2599.   Plaintiffs and the Oklahoma Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Oklahoma Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Oklahoma Class.

2600.   Because of the concealment and/or suppression of the facts, Plaintiffs and the

Oklahoma Class sustained damage because they own vehicles that diminished in value as a result

of New GM's concealment of, and failure to timely disclose, the serious defects in millions of

GM-branded vehicles and the serious safety and quality issues engendered by New GM's

corporate policies.  Had they been aware of the many defects that existed in GM-branded

vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less

for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the

benefit of their bargain as a result of New GM's fraudulent concealment.

2601.   The value of all Oklahoma Class members' vehicles has diminished as a result of

New GM's fraudulent concealment of the many defects and its systemic safety issues which has

greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of

the Affected Vehicles, let alone pay what otherwise would have been fair market value for the

vehicles.

2602.   Accordingly, New GM is liable to the Oklahoma Class for their damages in an

amount to be proven at trial.

2603.   New GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' and the Oklahoma Class's rights and well-being

to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an

amount sufficient to deter such conduct in the future, which amount is to be determined

according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (12A Okla. Stat. Ann. § 2-314)

2604.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2605.   In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of Oklahoma residents who are members of the Ignition Switch Defect Subclass (the "Oklahoma Ignition Switch Defect Subclass").

2606.   New GM was a merchant with respect to motor vehicles.

2607.   A warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Defective Ignition Switch Vehicles.

2608.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

2609.   New GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Oklahoma Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2610.   As a direct and proximate result of New GM's breach of the warranties of merchantability, Plaintiffs and the Oklahoma Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

**OREGON**

**COUNT I**

**VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT**

**(OR. REV. STAT. §§ 646.605, *et seq.*)**

2611.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2612.   This claim is brought only on behalf of Nationwide Class members who are Oregon residents (the "Oregon Class").

2613.   New GM is a person within the meaning of OR. REV. STAT. § 646.605(4).

2614.   The Affected Vehicles at issue are "goods" obtained primarily for personal family or household purposes within the meaning of OR. REV. STAT. § 646.605(6).

2615.   The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits a person from, in the course of the person's business, doing any of the following:  "(e) Represent[ing] that … goods … have … characteristics … uses, benefits, … or qualities that they do not have; (g) Represent[ing] that … goods … are of a particular standard [or] quality … if they are of another; (i) Advertis[ing] … goods or services with intent not to provide them as advertised;" and "(u) engag[ing] in any other unfair or deceptive conduct in trade or commerce."  OR. REV. STAT. § 646.608(1).

2616.   New GM engaged in unlawful trade practices, including representing that Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Affected Vehicles are of a particular standard and quality when they are not;

- 577 -

advertising Affected Vehicles with the intent not to sell them as advertised; and engaging in other unfair or deceptive acts.

2617.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2618.  New GM's actions as set forth above occurred in the conduct of trade or commerce.

2619.  From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

2620.  New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

2621.  According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

2622.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the Oregon UTPA.

2623.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

2624.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

2625.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Oregon Class.

2626.   New GM knew or should have known that its conduct violated the Oregon UTPA.

2627.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

2628.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles, and the devaluing of safety at New GM, because New GM:

> a.      Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

      b.      Intentionally concealed the foregoing from Plaintiffs; and/or

      c.      Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2629.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

2630.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Oregon Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

2631.   Plaintiffs and the Oregon Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

2632.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

010440-11  725144 V1

2633.   As a direct and proximate result of New GM's violations of the Oregon UTPA, Plaintiffs and the Oregon Class have suffered injury-in-fact and/or actual damage.

2634.   Plaintiffs and the Oregon Class are entitled to recover the greater of actual damages or $200 pursuant to OR. REV. STAT. § 646.638(1).  Plaintiffs and the Oregon Class are also entitled to punitive damages because New GM engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

**COUNT II**

**FRAUD BY CONCEALMENT**

2635.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2636.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Oregon residents (the "Oregon Class").

2637.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

2638.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

2639.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

2640.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false

- 581 -

Case 14-mc-02543-JMF   Document 345   Filed 10/14/14   Page 602 of 712

representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

2641.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Oregon Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

2642.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Oregon Class.

2643.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Oregon Class and conceal material information regarding defects that exist in GM-branded vehicles.

2644.   Plaintiffs and the Oregon Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Oregon Class.

2645.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Oregon Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate

010440-11 725144 V1

policies. Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

2646. The value of all Oregon Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2647. Accordingly, New GM is liable to the Oregon Class for their damages in an amount to be proven at trial.

2648. New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Oregon Class's rights and well-being to enrich New GM. New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## PENNSYLVANIA

## COUNT I

## VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

### (73 P.S. § 201-1, *et seq.*)

2649. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

010440-11 725144 V1

2650.   This claim is brought only on behalf of Nationwide Class members who are
Pennsylvania residents (the "Pennsylvania Class").

2651.   Plaintiffs purchased or leased their Affected Vehicles primarily for personal,
family or household purposes within the meaning of 73 P.S. § 201-9.2.

2652.   All of the acts complained of herein were perpetrated by New GM in the course
of trade or commerce within the meaning of 73 P.S. § 201-2(3).

2653.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law
("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including:  (i)
"Representing that goods or services have … characteristics, ….  Benefits or qualities that they
do not have;" (ii) "Representing that goods or services are of a particular standard, quality or
grade … if they are of another;:" (iii) "Advertising goods or services with intent not to sell them
as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a
likelihood of confusion or misunderstanding."  73 P.S. § 201-2(4).

2654.   New GM engaged in unlawful trade practices, including representing that
Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have;
representing that Affected Vehicles are of a particular standard and quality when they are not;
advertising Affected Vehicles with the intent not to sell them as advertised; and engaging in any
other fraudulent or deceptive conduct which creates a likelihood of confusion or of
misunderstanding.

2655.   In the course of its business, New GM systematically devalued safety and
concealed a plethora of defects in GM-branded vehicles as described herein and otherwise
engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful
trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or

- 584 -

concealment, suppression or omission of any material fact with intent that others rely upon such
concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2656.   From the date of its inception on July 10, 2009, New GM knew of many serious
defects affecting many models and years of GM-branded vehicles, both because of the
knowledge of Old GM personnel who remained at New GM and continuous reports,
investigations, and notifications from regulatory authorities.  New GM became aware of other
serious defects and systemic safety issues years ago, but concealed all of that information until
recently.

2657.   New GM was also aware that it valued cost-cutting over safety, selected parts
from the cheapest supplier regardless of quality, and actively discouraged employees from
finding and flagging known safety defects, and that this approach would necessarily cause the
existence of more defects in the vehicles it designed and manufactured and the failure to disclose
and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

2658.   According to one report from the Center for Auto Safety, some 2,004 deaths and
injuries are connected with recently recalled GM-branded vehicles, and New GM should have
recalled the vehicles years ago.

2659.   By failing to disclose and by actively concealing the many defects in GM-branded
vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself
as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold,
New GM engaged in unfair and deceptive business practices in violation of the Pennsylvania
CPL.

2660.   In the course of New GM's business, it willfully failed to disclose and actively
concealed the dangerous risk posed by the many safety issues and serious defects discussed

- 585 -

above. New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

2661. New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

2662. New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Pennsylvania Class.

2663. New GM knew or should have known that its conduct violated the Pennsylvania CPL.

2664. As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

2665. New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

    a.    Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

    b.    Intentionally concealed the foregoing from Plaintiffs; and/or

    c.    Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

- 586 -

2666.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

2667.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Pennsylvania Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

2668.   Plaintiffs and the Pennsylvania Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

2669.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

2670.   As a direct and proximate result of New GM's violations of the Pennsylvania CPL, Plaintiffs and the Pennsylvania Class have suffered injury-in-fact and/or actual damage.

2671.   New GM is liable to Plaintiffs and the Pennsylvania Class for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs.  73 P.S. § 201-9.2(a).

- 587 -

Plaintiffs and the Pennsylvania Class are also entitled to an award of punitive damages given that New GM's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT II

## FRAUD BY CONCEALMENT

2672.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2673.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Pennsylvania residents (the "Pennsylvania Class").

2674.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

2675.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

2676.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

2677.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

2678.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Pennsylvania Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Pennsylvania Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

2679.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Pennsylvania Class.

2680.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Pennsylvania Class and conceal material information regarding defects that exist in GM-branded vehicles.

2681.   Plaintiffs and the Pennsylvania Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Pennsylvania Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Pennsylvania Class.

2682.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Pennsylvania Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded

vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

2683. The value of all Pennsylvania Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2684. Accordingly, New GM is liable to the Pennsylvania Class for their damages in an amount to be proven at trial.

2685. New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Pennsylvania Class's rights and well-being to enrich New GM. New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT III

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (13 PA. CONS. STAT. ANN. § 2314)

2686. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2687. In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of Pennsylvania residents who are members of the Ignition Switch Defect Subclass (the "Pennsylvania Ignition Switch Defect Subclass").

- 590 -

Case 1:14-md-02543-JMF   Document 345   Filed 10/14/14   Page 611 of 712

2688.   New GM is s a merchant with respect to motor vehicles.

2689.   A warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law when New GM sold the Defective Ignition Switch Vehicles to Plaintiffs and the Pennsylvania Ignition Switch Defect Subclass.

2690.   These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended stalling to occur during ordinary driving conditions; when the vehicles stall, the power brakes and power steering become inoperable and the vehicles' airbags will not deploy,

2691.   New GM was provided notice of these issues by numerous complaints filed against it, by its own internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Pennsylvania Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2692.   As a direct and proximate result of New GM's breach of the warranties of merchantability, Plaintiffs and the Pennsylvania Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

# RHODE ISLAND

## COUNT I

### VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES
### AND CONSUMER PROTECTION ACT

### (R.I. GEN. LAWS § 6-13.1, *et seq.*)

2693.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2694.   This claim is brought only on behalf of Nationwide Class members who are Rhode Island residents (the "Rhode Island Class").

2695.   Plaintiffs are persons who purchased or leased one or more Affected Vehicles primarily for personal, family, or household purposes within the meaning of R.I. GEN. LAWS § 6-13.1-5.2(a).

2696.   Rhode Island's Unfair Trade Practices and Consumer Protection Act ("Rhode Island CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including:  "(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have";
"(vii) Representing that goods or services are of a particular standard, quality, or grade …, if they are of another"; "(ix) Advertising goods or services with intent not to sell them as advertised"; "(xii) Engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding"; "(xiii) Engaging in any act or practice that is unfair or deceptive to the consumer"; and "(xiv) Using any other methods, acts or practices which mislead or deceive members of the public in a material respect."  R.I. GEN. LAWS § 6-13.1-1(6).

2697.   New GM engaged in unlawful trade practices, including:  (1) representing that the Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2)

010440-11  725144 V1

representing that the Affected Vehicles are of a particular standard and quality when they are not; (3) advertising the Affected Vehicles with the intent not to sell them as advertised; and (4) otherwise engaging in conduct that is unfair or deceptive and likely to deceive.

2698.   New GM's actions as set forth above occurred in the conduct of trade or commerce.

2699.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2700.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

2701.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

2702.  According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

2703.  By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair and deceptive business practices in violation of the Rhode Island CPA.

2704.  In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

2705.  New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

2706.  New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Rhode Island Class.

2707.  New GM knew or should have known that its conduct violated the Rhode Island CPA.

2708.  As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

2709.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

      a.      Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

      b.      Intentionally concealed the foregoing from Plaintiffs; and/or

      c.      Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2710.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

2711.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the Rhode Island Class.  A

vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise

comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects

rather than promptly remedies them.

2712.   Plaintiffs and the Rhode Island Class suffered ascertainable loss caused by

New GM's misrepresentations and its failure to disclose material information.  Had they been

aware of the many defects that existed in GM-branded vehicles, and the company's callous

disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have

purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

2713.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

2714.   As a direct and proximate result of New GM's violations of the Rhode Island CPA, Plaintiffs and the Rhode Island Class have suffered injury-in-fact and/or actual damage.

2715.   Plaintiffs and the Rhode Island Class are entitled to recover the greater of actual damages or $200 pursuant to R.I. GEN. LAWS § 6-13.1-5.2(a).  Plaintiffs also seek punitive damages in the discretion of the Court because of New GM's egregious disregard of consumer and public safety and its long-running concealment of the serious safety defects and their tragic consequences.

**COUNT II**

**FRAUD BY CONCEALMENT**

2716.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2717.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Rhode Island residents (the "Rhode Island Class").

2718.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

- 596 -

2719.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

2720.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

2721.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

2722.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Rhode Island Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Rhode Island Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

2723.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Rhode Island Class.

010440-11  725144 V1

Case 1:14-md-02543-JMF   Document 345   Filed 10/14/14   Page 618 of 712

2724.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Rhode Island Class and conceal material information regarding defects that exist in GM-branded vehicles.

2725.   Plaintiffs and the Rhode Island Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Rhode Island Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Rhode Island Class.

2726.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Rhode Island Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

2727.   The value of all Rhode Island Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2728.   Accordingly, New GM is liable to the Rhode Island Class for their damages in an amount to be proven at trial.

2729.   New GM's acts were done maliciously, oppressively, deliberately, with intent to
defraud, and in reckless disregard of Plaintiffs' and the Rhode Island Class's rights and well-
being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an
amount sufficient to deter such conduct in the future, which amount is to be determined
according to proof.

### COUNT III

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (R.I. GEN. LAWS § 6A-2-314)

2730.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set
forth herein.

2731.   In the event the Court declines to certify a Nationwide Ignition Switch Defect
Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only
on behalf of Rhode Island residents who are members of the Ignition Switch Defect Subclass
(the "Rhode Island Ignition Switch Defect Subclass").

2732.   New GM was a merchant with respect to motor vehicles.

2733.   A warranty that the Defective Ignition Switch Vehicles were in merchantable
condition was implied by law when Plaintiffs and the Class purchased their Defective Ignition
Switch Vehicles.

2734.   These vehicles, when sold and at all times thereafter, were not in merchantable
condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the
Defective Ignition Switch Vehicles are inherently defective in that there are defects in the
ignition switch systems that permit sudden unintended stalling to occur during ordinary driving
conditions; when the vehicles stall, the power brakes and power steering become inoperable and
the vehicles' airbags will not deploy.

010440-11  725144 V1

2735.   New GM was provided notice of these issues by numerous complaints filed against it, by its own internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Rhode Island Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2736.   As a direct and proximate result of New GM's breach of the warranties of merchantability, Plaintiffs and the Rhode Island Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

## SOUTH CAROLINA

## COUNT I

## VIOLATIONS OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT

### (S.C. CODE ANN. § 39-5-10, *et seq.*)

2737.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2738.   This claim is brought only on behalf of Nationwide Class members who are South Carolina residents (the "South Carolina Class").

2739.   New GM is a "person" under S.C. CODE ANN. § 39-5-10.

2740.   The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." S.C. CODE ANN. § 39-5-20(a).  New GM engaged in unfair and deceptive acts or practices and violated the South Carolina UTPA by systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles.

2741.   New GM's actions as set forth above occurred in the conduct of trade or commerce.

2742.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2743.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

2744.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

2745.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

010440-11  725144 V1

2746. By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair and deceptive business practices in violation of the South Carolina UTPA.

2747. In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above. New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

2748. New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

2749. New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the South Carolina Class.

2750. New GM knew or should have known that its conduct violated the South Carolina UTPA.

2751. As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

2752. New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

a. Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier

- 602 -

regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

b. Intentionally concealed the foregoing from Plaintiff; and/or

c. Made incomplete representations about the safety and reliability of the Affected Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

2753. Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished. In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

2754. New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the South Carolina Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

2755. Plaintiffs and the South Carolina Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information. Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

2756.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

2757.   As a direct and proximate result of New GM's violations of the South Carolina UTPA, Plaintiffs and the South Carolina Class have suffered injury-in-fact and/or actual damage.

2758.   Pursuant to S.C. CODE ANN. § 39-5-140(a), Plaintiffs seek monetary relief against New GM to recover for their economic losses.  Because New GM's actions were willful and knowing, Plaintiffs' damages should be trebled.  *Id.*

2759.   Plaintiffs further allege that New GM's malicious and deliberate conduct warrants an assessment of punitive damages because New GM carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs and the Class to cruel and unjust hardship as a result.  New GM's intentionally and willfully misrepresented the safety and reliability of the Affected Vehicles, deceived Plaintiffs on life-or-death matters, and concealed material facts that only New GM knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in vehicles New GM repeatedly promised Plaintiffs was safe.  New GM's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

2760.   Plaintiffs further seek an order enjoining New GM's unfair or deceptive acts or practices.

## COUNT II

## VIOLATIONS OF THE SOUTH CAROLINA REGULATION OF MANUFACTURERS, DISTRIBUTORS, AND DEALERS ACT

### (S.C. CODE ANN. § 56-15-10, *et seq.*)

2761.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2762.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are South Carolina residents (the "South Carolina Class").

2763.   New GM was a "manufacturer" as set forth in S.C. CODE ANN. § 56-15-10, as it was engaged in the business of manufacturing or assembling new and unused motor vehicles.

2764.   New GM committed unfair or deceptive acts or practices that violated the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Dealers Act"), S.C. CODE ANN. § 56-15-30.

2765.   New GM engaged in actions which were arbitrary, in bad faith, unconscionable, and which caused damage to Plaintiffs, the South Carolina Class, and to the public.

2766.   New GM's bad faith and unconscionable actions include, but are not limited to: (1) representing that Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Affected Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Affected Vehicles with the intent not to sell them as advertised, (4) representing that a transaction involving Affected Vehicles confers or involves rights, remedies, and obligations which it does not, and (5) representing that the subject of a transaction involving Affected Vehicles has been supplied in accordance with a previous representation when it has not.

010440-11 725144 V1

2767.  New GM resorted to and used false and misleading advertisements in connection with its business.  As alleged above, New GM made numerous material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.  Each of these statements contributed to the deceptive context of New GM's unlawful advertising and representations as a whole.

2768.  Pursuant to S.C. CODE ANN. § 56-15-110(2), Plaintiffs bring this action on behalf of themselves and the South Carolina Class, as the action is one of common or general interest to many persons and the parties are too numerous to bring them all before the court.

2769.  Plaintiffs and the  South Carolina Class are entitled to double their actual damages, the cost of the suit, attorney's fees pursuant to S.C. CODE ANN. § 56-15-110.  Plaintiffs also seek injunctive relief under S.C. CODE ANN. § 56-15-110.  Plaintiffs also seek treble damages because New GM acted maliciously.

## COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

## (S.C. CODE § 36-2-314)

2770.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2771.  In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of South Carolina residents who are members of the Ignition Switch Defect Subclass (the "South Carolina Ignition Switch Defect Subclass").

2772.  New GM was a merchant with respect to motor vehicles under S.C. CODE § 36-2-314.

- 606 -

Case 1:14-mc-02543-JMF   Document 345   Filed 10/14/14   Page 627 of 712

2773.   Under S.C. CODE § 36-2-314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law when Plaintiffs and the Class purchased the vehicles.

2774.   These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended stalling to occur during ordinary driving conditions; when the vehicles stall, the power brakes and power steering become inoperable and the vehicles' airbags will not deploy.

2775.   New GM was provided notice of these issues by numerous complaints filed against it, its own internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the South Carolina Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM  issued the recall and the allegations of vehicle defects became public.

2776.   As a direct and proximate result of New GM's breach of the warranty of merchantability,  Plaintiffs and the South Carolina Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

**COUNT IV**

**FRAUD BY CONCEALMENT**

2777.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2778.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are South Carolina residents (the "South Carolina Class").

010440-11  725144 V1

2779.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

2780.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

2781.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

2782.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

2783.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the South Carolina Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the South Carolina Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

2784.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the South Carolina Class.

Case 1:14-md-02543-JMF   Document 345   Filed 10/14/14   Page 629 of 712

2785.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the South Carolina Class and conceal material information regarding defects that exist in GM-branded vehicles.

2786.   Plaintiffs and the South Carolina Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the South Carolina Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the South Carolina Class.

2787.   Because of the concealment and/or suppression of the facts, Plaintiffs and the South Carolina Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

2788.   The value of all South Carolina Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2789.   Accordingly, New GM is liable to the South Carolina Class for their damages in an amount to be proven at trial.

2790.   New GM's acts were done maliciously, oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' and the South Carolina Class's rights and well-

being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an

amount sufficient to deter such conduct in the future, which amount is to be determined

according to proof.

**SOUTH DAKOTA**

**COUNT I**

**VIOLATION OF THE SOUTH DAKOTA
DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW**

**(S.D. CODIFIED LAWS § 37-24-6)**

2791.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

2792.   This claim is brought only on behalf of Nationwide Class members who are South

Dakota residents (the "South Dakota Class").

2793.   The South Dakota Deceptive Trade Practices and Consumer Protection Law

("South Dakota CPL") prohibits deceptive acts or practices, which are defined for relevant

purposes to include "[k]nowingly and intentionally act, use, or employ any deceptive act or

practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or

omit any material fact in connection with the sale or advertisement of any merchandise,

regardless of whether any person has in fact been misled, deceived, or damaged thereby [.]"

S.D. CODIFIED LAWS § 37-24-6(1).  The conduct of New GM as set forth herein constitutes

deceptive acts or practices, fraud, false promises, misrepresentation, concealment, suppression

and omission of material facts in violation of S.D. Codified Laws § 37-24-6 and 37-24-31,

including, but not limited to, New GM's misrepresentations and omissions regarding the safety

- 610 -

and reliability of the Affected Vehicles, and New GM's misrepresentations concerning a host of other defects and safety issues.

2794.   New GM's actions as set forth above occurred in the conduct of trade or commerce.

2795.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2796.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

2797.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

2798.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

2799.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the South Dakota CPL.

2800.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

2801.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the New GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

2802.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the South Dakota Class.

2803.   New GM knew or should have known that its conduct violated the South Dakota CPL.

2804.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

2805.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

> a.   Possessed exclusive knowledge that it valued cost-cutting
> over safety, selected parts from the cheapest supplier
> regardless of quality, and actively discouraged employees
> from finding and flagging known safety defects, and that
> this approach would necessarily cause the existence of
> more defects in the vehicles it designed and manufactured;
>
> b.   Intentionally concealed the foregoing from Plaintiffs;
> and/or
>
> c.   Made incomplete representations about the safety and
> reliability of the Affected Vehicles generally, and the
> ignition switch in particular, while purposefully
> withholding material facts from Plaintiffs that contradicted
> these representations.

2806.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

2807.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the South Dakota Class.  A

vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise

comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects

rather than promptly remedies them.

2808.   Plaintiffs and the South Dakota Class suffered ascertainable loss caused by

New GM's misrepresentations and its failure to disclose material information.  Had they been

aware of the many defects that existed in GM-branded vehicles, and the company's callous

disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have

purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

2809.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

2810.   As a direct and proximate result of New GM's violations of the South Dakota CPL, Plaintiffs and the South Dakota Class have suffered injury-in-fact and/or actual damage.

2811.   Under S.D. CODIFIED LAWS § 37-24-31, Plaintiffs and the South Dakota Class are entitled to a recovery of their actual damages suffered as a result of New GM's acts and practices.

## COUNT II

## FRAUD BY CONCEALMENT

2812.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2813.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are South Dakota residents (the "South Dakota Class").

2814.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

2815.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

2816.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

2817.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

2818.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the South Dakota Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the South Dakota Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

2819.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the South Dakota Class.

2820.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the South Dakota Class and conceal material information regarding defects that exist in GM-branded vehicles.

2821.   Plaintiffs and the South Dakota Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed

- 615 -

facts. Plaintiffs' and the South Dakota Class's actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the South Dakota Class.

2822.   Because of the concealment and/or suppression of the facts, Plaintiffs and the South Dakota Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies. Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

2823.   The value of all South Dakota Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2824.   Accordingly, New GM is liable to the South Dakota Class for their damages in an amount to be proven at trial.

2825.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the South Dakota Class's rights and well-being to enrich New GM. New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

# COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (S.D. CODIFIED LAWS § 57A-2-314)

2826.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2827.   In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of South Dakota residents who are members of the Ignition Switch Defect Subclass (the "South Dakota Ignition Switch Defect Subclass").

2828..  New GM was a merchant with respect to motor vehicles.

2829.   South Dakota law imposed a warranty that the Defective Ignition Switch Vehicles were merchantable when Plaintiffs and the South Dakota Ignition Switch Defect Subclass purchased their Defective Ignition Switch Vehicles.

2830.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

2831.   As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs and the South Dakota Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

010440-11  725144 V1

# TENNESSEE

## COUNT I

## VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT

### (TENN. CODE ANN. § 47-18-101, *et seq.*)

2832.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2833.   This claim is brought only on behalf of Nationwide Class members who are Tennessee residents (the "Tennessee Class").

2834.   Plaintiffs and the Tennessee Class are "natural persons" and "consumers" within the meaning of TENN. CODE ANN. § 47-18-103(2).

2835.   New GM is a "person" within the meaning of TENN. CODE ANN. § 47-18-103(2) (the "Act").

2836.   New GM's conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of TENN. CODE ANN. § 47-18-103(19).

2837.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to:  "Representing that goods or services have … characteristics, [or] … benefits … that they do not have…;" "Representing that goods or services are of a particular standard, quality or grade… if they are of another;" and "Advertising goods or services with intent not to sell them as advertised."  TENN. CODE ANN. § 47-18-104.  New GM violated the Tennessee CPA by engaging in unfair or deceptive acts, including representing that Affected Vehicles have characteristics or benefits that they did not have; representing that Affected Vehicles are of a particular standard, quality, or grade when they are of another; and advertising Affected Vehicles with intent not to sell them as advertised.

2838.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2839.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

2840.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

2841.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

2842.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself

- 619 -

as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold,

New GM engaged in unfair and deceptive business practices in violation of the Tennessee CPA.

2843.   In the course of New GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the many safety issues and serious defects discussed

above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles

were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that

valued safety and stood behind its vehicles once they are on the road.

2844.   New GM's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-

branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true

value of the Affected Vehicles.

2845.   New GM intentionally and knowingly misrepresented material facts regarding the

Affected Vehicles with an intent to mislead Plaintiffs and the Tennessee Class.

2846.   New GM knew or should have known that its conduct violated the Tennessee

CPA.

2847.   As alleged above, New GM made material statements about the safety and

reliability of the Affected Vehicles that were either false or misleading.

2848.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

     a.     Possessed exclusive knowledge that it valued cost-cutting
over safety, selected parts from the cheapest supplier
regardless of quality, and actively discouraged employees
from finding and flagging known safety defects, and that
this approach would necessarily cause the existence of
more defects in the vehicles it designed and manufactured;

     b.     Intentionally concealed the foregoing from Plaintiffs;
and/or

- 620 -

    c.     Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2849.  Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

2850.  New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Tennessee Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

2851.  Plaintiffs and the Tennessee Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

2852.  New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

2853.  As a direct and proximate result of New GM's violations of the Tennessee CPA, Plaintiffs and the Tennessee Class have suffered injury-in-fact and/or actual damage.

010440-11 725144 V1

2854.   Pursuant to TENN. CODE § 47-18-109(a), Plaintiffs and the Tennessee Class seek monetary relief against New GM measured as actual damages in an amount to be determined at trial, treble damages as a result of New GM's willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

## COUNT II

## FRAUD BY CONCEALMENT

2855.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2856.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Tennessee residents (the "Tennessee Class").

2857.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

2858.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

2859.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

2860.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

- 622 -

Case 1:14-mc-02543-JMF   Document 345   Filed 10/14/14   Page 643 of 712

2861.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Tennessee Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Tennessee Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

2862.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Tennessee Class.

2863.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Tennessee Class and conceal material information regarding defects that exist in GM-branded vehicles.

2864.   Plaintiffs and the Tennessee Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Tennessee Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Tennessee Class.

2865.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Tennessee Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded

- 623 -

vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

2866. The value of all Tennessee Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2867. Accordingly, New GM is liable to the Tennessee Class for their damages in an amount to be proven at trial.

2868. New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Tennessee Class's rights and well-being to enrich New GM. New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**TEXAS**

**COUNT I**

**VIOLATIONS OF THE TEXAS DECEPTIVE TRADE
PRACTICES – CONSUMER PROTECTION ACT**

**(TEX. BUS. & COM. CODE §§ 17.41, *et seq.*)**

2869. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2870. This claim is brought only on behalf of Nationwide Class members who are Texas residents (the "Texas Class").

- 624 -

2871.   Plaintiffs and the Texas Class are individuals, partnerships and corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets).  *See* TEX. BUS. & COM. CODE § 17.41.

2872.   The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce," TEX. BUS. & COM. CODE § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE § 17.45(5); TEX. BUS. & COM. CODE § 17.50(a)(3).  New GM has committed false, misleading, unconscionable, and deceptive acts or practices in the conduct of trade or commerce.

2873.   New GM also violated the Texas DTPA by:  (1) representing that the Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Affected Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Affected Vehicles with the intent not to sell them as advertised; and (4) failing to disclose information concerning the Affected Vehicles with the intent to induce consumers to purchase or lease the Affected Vehicles.

2874.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2875.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

2876.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

2877.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

2878.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive and unconscionable business practices in violation of the Texas DTPA.

2879.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles

- 626 -

were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that

valued safety and stood behind its vehicles once they are on the road.

2880.   New GM's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-

branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true

value of the Affected Vehicles.

2881.   New GM intentionally and knowingly misrepresented material facts regarding the

Affected Vehicles with an intent to mislead Plaintiffs and the Texas Class.

2882.   New GM knew or should have known that its conduct violated the Texas DTPA.

2883.   As alleged above, New GM made material statements about the safety and

reliability of the Affected Vehicles that were either false or misleading.

2884.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

> a.      Possessed exclusive knowledge that it valued cost-cutting
>         over safety, selected parts from the cheapest supplier
>         regardless of quality, and actively discouraged employees
>         from finding and flagging known safety defects, and that
>         this approach would necessarily cause the existence of
>         more defects in the vehicles it designed and manufactured;
>
> b.      Intentionally concealed the foregoing from Plaintiffs;
>         and/or
>
> c.      Made incomplete representations about the safety and
>         reliability of the Affected Vehicles generally, and the
>         ignition switch in particular, while purposefully
>         withholding material facts from Plaintiffs that contradicted
>         these representations.

2885.  Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

- 627 -

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

2886.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Texas Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

2887.   Plaintiffs and the Texas Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

2888.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

2889.   As a direct and proximate result of New GM's violations of the Texas DTPA, Plaintiffs and the Texas Class have suffered injury-in-fact and/or actual damage.

2890.   Pursuant to Tex. Bus. & Com. Code § 17.50(a)(1) and (b), Plaintiffs and the Texas Class seek monetary relief against New GM measured as actual damages in an amount to be determined at trial, treble damages for New GM's knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

010440-11 725144 V1

2891.   For those Class members who wish to rescind their purchases, they are entitled under TEX. BUS. & COM. CODE § 17.50(b)(4) to rescission and other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA.

2892.   Plaintiffs and the Class also seek court costs and attorneys' fees under § 17.50(d) of the Texas DTPA.

2893.   On October 8, 2014, certain Plaintiffs sent a letter complying with TEX. BUS. & COM. CODE § 17.505(a).  Plaintiffs presently do not claim relief for damages under the Texas DTPA until and unless New GM fails to remedy its unlawful conduct within the requisite time period, after which Plaintiffs seek all damages and relief to which Plaintiffs and the Texas Class are entitled.

## COUNT II

## FRAUD BY CONCEALMENT

2894.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2895.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

2896.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

2897.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

2898.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands

behind its vehicles after they are sold and that its vehicles are safe and reliable. The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

2899. New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Texas Class. These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Texas Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

2900. New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Texas Class.

2901. On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Texas Class and conceal material information regarding defects that exist in GM-branded vehicles.

2902. Plaintiffs and the Texas Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Texas Class's actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Texas Class.

2903. Because of the concealment and/or suppression of the facts, Plaintiffs and the Texas Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-

branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies. Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

2904. The value of all Texas Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2905. Accordingly, New GM is liable to the Texas Class for their damages in an amount to be proven at trial.

2906. New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Texas Class's rights and well-being to enrich New GM. New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (TEX. BUS. & COM. CODE § 2.314)

2907. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2908. In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only

Case 1:14-mc-02543-JMF  Document 345  Filed 10/14/14  Page 652 of 712

on behalf of Texas residents who are members of the Ignition Switch Defect Subclass (the "Texas Ignition Switch Defect Subclass").

2909.  New GM was a merchant with respect to motor vehicles under TEX. BUS. & COM. CODE § 2.104.

2910.  Under TEX. BUS. & COM. CODE § 2.314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law in the transaction in which Plaintiffs and the Texas Ignition Switch Defect Subclass purchased their Defective Ignition Switch Vehicles.

2911.  New GM impliedly warranted that the vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use – transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.

2912.  These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

2913.  As a direct and proximate result of New GM's breach of the implied warranty of merchantability, Plaintiffs and the Texas Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

010440-11  725144 V1

# UTAH

## COUNT I

## VIOLATION OF UTAH CONSUMER SALES PRACTICES ACT

### (UTAH CODE ANN. § 13-11-1, *et seq.*)

2914.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2915.   This claim is brought only on behalf of Nationwide Class members who are Utah residents (the "Utah Class").

2916.   New GM is a "supplier" under the Utah Consumer Sales Practices Act ("Utah CSPA"), UTAH CODE ANN. § 13-11-3.

2917.   Utah Class members are "persons" under UTAH CODE ANN. § 13-11-3.

2918.   The sale of the Affected Vehicles to the Utah Class members was a "consumer transaction" within the meaning of UTAH CODE ANN. § 13-11-3.

2919.   The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction" under UTAH CODE ANN. § 13-11-4.  Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally:  (a) indicates that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not" or "(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not." UTAH CODE ANN. § 13-11-4.  "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.  UTAH CODE ANN. § 13-11-5.

2920.   New GM committed deceptive acts or practices in the conduct of trade or commerce, by, among other things, engaging in unconscionable acts, representing that the Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; and

representing that the Affected Vehicles are of a particular standard, quality, and grade when they are not

2921.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2922.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

2923.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

2924.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

010440-11  725144 V1

2925.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the Utah CSPA.

2926.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

2927.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the New GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

2928.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Utah Class.

2929.   New GM knew or should have known that its conduct violated the Utah CSPA.

2930.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

2931.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

> a.      Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

- 635 -

      b.        Intentionally concealed the foregoing from Plaintiffs; and/or

      c.        Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2932.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

2933.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Utah Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

2934.   Plaintiffs and the Utah Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

2935.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

010440-11  725144 V1

2936.   As a direct and proximate result of New GM's violations of the Utah CSPA,

Plaintiffs and the Utah Class have suffered injury-in-fact and/or actual damage.

2937.   Pursuant to UTAH CODE ANN. § 13-11-4, Plaintiffs and the Utah Class seek

monetary relief against New GM measured as the greater of (a) actual damages in an amount to

be determined at trial and (b) statutory damages in the amount of $2,000 for each Plaintiff and

each Utah Class member, reasonable attorneys' fees, and any other just and proper relief

available under the Utah CSPA.

## COUNT II

## FRAUD BY CONCEALMENT

2938.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

2939.   In the event the Court declines to certify a Nationwide Class under Michigan law,

this claim is brought only on behalf of Nationwide Class members who are Utah residents (the

"Utah Class").

2940.   New GM concealed and suppressed material facts concerning the quality of its

vehicles and the GM brand.

2941.   New GM concealed and suppressed material facts concerning the culture of

New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of

safety issues, and a shoddy design process.

2942.   New GM concealed and suppressed material facts concerning the many serious

defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps

to ensure that its employees did not reveal known safety defects to regulators or consumers.

2943.   New GM did so in order to boost confidence in its vehicles and falsely assure

purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands

010440-11 725144 V1

behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

2944.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Utah Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Utah Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

2945.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Utah Class.

2946.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Utah Class and conceal material information regarding defects that exist in GM-branded vehicles.

2947.   Plaintiffs and the Utah Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Utah Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Utah Class.

2948.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Utah Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-

- 638 -

branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies. Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

2949.   The value of all Utah Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2950.   Accordingly, New GM is liable to the Utah Class members for their damages in an amount to be proven at trial.

2951.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Utah Class's rights and well-being to enrich New GM. New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (UTAH CODE ANN. § 70A-2-314)

2952.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2953.   In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only

on behalf of Utah residents who are members of the Ignition Switch Defect Subclass (the "Utah Ignition Switch Defect Subclass").

2954.   New GM was at all relevant times a merchant with respect to motor vehicles.

2955.   New GM impliedly warranted that its vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use – transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.

2956.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

2957.   As a direct and proximate result of the New GM's breach of the implied warranty of merchantability,  Plaintiffs and the Utah Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

## VERMONT

## COUNT I

## VIOLATION OF VERMONT CONSUMER FRAUD ACT

### (VT. STAT. ANN. TIT. 9, § 2451 *et seq.*)

2958.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2959.   This claim is brought only on behalf of Nationwide Class members who are Vermont residents (the "Vermont Class").

2960.   New GM is a seller within the meaning of VT. STAT. ANN. TIT. 9, § 2451(a)(c).

2961.   The Vermont Consumer Fraud Act ("Vermont CFA") makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce.…" VT. STAT. ANN. TIT. 9, § 2453(a).  New GM engaged in unfair and deceptive acts or practices in trade or commerce in violation of the Vermont CFA by systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles.

2962.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2963.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

2964.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

- 641 -

2965. According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

2966. By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair and deceptive business practices in violation of the Vermont CFA.

2967. In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above. New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

2968. New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

2969. New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Vermont Class.

2970. New GM knew or should have known that its conduct violated the Vermont CFA.

2971. As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

2972. New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

a.   Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

b.   Intentionally concealed the foregoing from Plaintiffs; and/or

c.   Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2973.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

2974.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Vermont Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

2975.   Plaintiffs and the Vermont Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

010440-11  725144 V1

2976.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

2977.   As a direct and proximate result of New GM's violations of the Vermont CFA, Plaintiffs and the Vermont Class have suffered injury-in-fact and/or actual damage.

2978.   Plaintiffs and the Vermont Class are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]" pursuant to VT. STAT. ANN. TIT. 9, § 2461(b).

## COUNT II

## FRAUD BY CONCEALMENT

2979.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2980.   In the event the Court declines to certify a Nationwide  Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Vermont residents (the "Vermont Class").

2981.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

2982.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

2983.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

2984.   New GM did so in order to boost confidence in its vehicles and falsely assure

purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands

behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false

representations were material to consumers, both because they concerned the quality and safety

of the Affected Vehicles and because they played a significant role in the value of the vehicles.

2985.   New GM had a duty to disclose the many defects in GM-branded vehicles

because they were known and/or accessible only to New GM who had superior knowledge and

access to the facts, and New GM knew the facts were not known to or reasonably discoverable

by Plaintiffs and the Vermont Class.  These omitted and concealed facts were material because

they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the

Vermont Class.  Whether a manufacturer's products are safe and reliable, and whether that

manufacturer stands behind its products, are material concerns to a consumer.

2986.   New GM actively concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM

money, and it did so at the expense of Plaintiffs and the Vermont Class.

2987.   On information and belief, New GM has still not made full and adequate

disclosure and continues to defraud Plaintiffs and the Vermont Class and conceal material

information regarding defects that exist in GM-branded vehicles.

2988.   Plaintiffs and the Vermont Class were unaware of these omitted material facts and

would not have acted as they did if they had known of the concealed and/or suppressed facts.

Plaintiffs' and the Vermont Class's actions were justified.  New GM was in exclusive control of

the material facts and such facts were not known to the public, Plaintiffs, or the Vermont Class.

010440-11  725144 V1

2989.   Because of the concealment and/or suppression of the facts, Plaintiffs and the
Vermont Class sustained damage because they own vehicles that diminished in value as a result
of New GM's concealment of, and failure to timely disclose, the serious defects in millions of
GM-branded vehicles and the serious safety and quality issues engendered by New GM's
corporate policies.  Had they been aware of the many defects that existed in GM-branded
vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less
for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the
benefit of their bargain as a result of New GM's fraudulent concealment.

2990.   The value of all Vermont Class members' vehicles has diminished as a result of
New GM's fraudulent concealment of the many defects and its systemic safety issues which has
greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of
the Affected Vehicles, let alone pay what otherwise would have been fair market value for the
vehicles.

2991.   Accordingly, New GM is liable to the Vermont Class for their damages in an
amount to be proven at trial.

2992.   New GM's acts were done maliciously, oppressively, deliberately, with intent to
defraud, and in reckless disregard of Plaintiffs' and the Vermont Class's rights and well-being to
enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount
sufficient to deter such conduct in the future, which amount is to be determined according to
proof.

## VIRGINIA

## COUNT I

## VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT

## (VA. CODE ANN. 15 §§ 59.1-196, *et seq.*)

2993.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2994.   This claim is brought only on behalf of Nationwide Class members who are Virginia residents (the "Virginia Class").

2995.   New GM is a "supplier" under VA. CODE ANN. § 59.1-198.

2996.   The sale of the Affected Vehicles to the Class members was a "consumer transaction" within the meaning of VA. CODE ANN. § 59.1-198.

2997.   The Virginia Consumer Protection Act ("Virginia CPA") lists prohibited "practices" which include:  "5. Misrepresenting that good or services have certain characteristics;" "6. Misrepresenting that goods or services are of a particular standard, quality, grade style, or model;" "8. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised;" "9.  Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" and "14. Using any other deception, fraud, or misrepresentation in connection with a consumer transaction."  VA. CODE ANN. § 59.1-200.  New GM violated the Virginia CPA by misrepresenting that Affected Vehicles had certain quantities, characteristics, ingredients, uses, or benefits; misrepresenting that Affected Vehicles were of a particular standard, quality, grade, style, or model when they were another; advertising Affected Vehicles with intent not to sell them as advertised; and otherwise "using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

2998.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

2999.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

3000.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

3001.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

3002.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself

- 648 -

as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold,

New GM engaged in deceptive business practices in violation of the Virginia CPA.

3003.  In the course of New GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the many safety issues and serious defects discussed

above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles

were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that

valued safety and stood behind its vehicles once they are on the road.

3004.  New GM's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-

branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true

value of the Affected Vehicles.

3005.  New GM intentionally and knowingly misrepresented material facts regarding the

Affected Vehicles with an intent to mislead Plaintiffs and the Virginia Class.

3006.  New GM knew or should have known that its conduct violated the Virginia CPA.

3007.  As alleged above, New GM made material statements about the safety and

reliability of the Affected Vehicles that were either false or misleading.

3008.  New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

> a.    Possessed exclusive knowledge that it valued cost-cutting
>       over safety, selected parts from the cheapest supplier
>       regardless of quality, and actively discouraged employees
>       from finding and flagging known safety defects, and that
>       this approach would necessarily cause the existence of
>       more defects in the vehicles it designed and manufactured;
>
> b.    Intentionally concealed foregoing from Plaintiffs; and/or
>
> c.    Made incomplete representations about the safety and
>       reliability of the Affected Vehicles generally, and the

- 649 -

ignition switch in particular, while purposefully
withholding material facts from Plaintiffs that contradicted
these representations.

3009.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

3010.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the Virginia Class.  A vehicle

made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable

vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than

promptly remedies them.

3011.   Plaintiffs and the Virginia Class suffered ascertainable loss caused by New GM's

misrepresentations and its failure to disclose material information.  Had they been aware of the

many defects that existed in GM-branded vehicles, and the company's callous disregard for

safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or

leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's

misconduct.

3012.   New GM's violations present a continuing risk to Plaintiffs as well as to the

general public.  New GM's unlawful acts and practices complained of herein affect the public

interest.

3013.   As a direct and proximate result of New GM's violations of the Virginia CPA,

Plaintiffs and the Virginia Class have suffered injury-in-fact and/or actual damage.

3014.   Pursuant to VA. CODE ANN. § 59.1-204, Plaintiffs and the Virginia Class seek monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff and each Virginia Class member.  Because New GM's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff and each Virginia Class member, the greater of (a) three times actual damages or (b) $1,000.

3015.   Plaintiffs also seek an order enjoining New GM's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under General Business Law § 59.1-204, *et seq*.

## COUNT II

## FRAUD BY CONCEALMENT

3016.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3017.   In the event the Court declines to certify a Nationwide  Class under Michigan law, this claims is brought only on behalf of Nationwide Class members who are Virginia residents (the "Virginia Class").

3018.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the New GM brand.

3019.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

3020.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

- 651 -

3021.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

3022.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Virginia Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Virginia Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

3023.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Virginia Class.

3024.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Virginia Class and conceal material information regarding defects that exist in GM-branded vehicles.

3025.   Plaintiffs and the Virginia Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Virginia Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Virginia Class.

3026.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Virginia Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

3027.   The value of all Virginia Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

3028.   Accordingly, New GM is liable to the Virginia Class for their damages in an amount to be proven at trial.

3029.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Virginia Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

- 653 -

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

## (VA. CODE ANN. § 8.2-314)

3030.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3031.  In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of Virginia residents who are members of the Ignition Switch Defect Subclass (the "Virginia Ignition Switch Defect Subclass").

3032.  New GM was at all relevant times a merchant with respect to motor vehicles.

3033.  New GM impliedly warranted that its vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use—transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.

3034.  These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

3035.  As a direct and proximate result of the New GM's breach of the implied warranty of merchantability,  Plaintiffs and the Virginia Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

010440-11  725144 V1

# WASHINGTON

## COUNT I

## VIOLATION OF THE CONSUMER PROTECTION ACT

### (Rev. Code Wash. Ann. §§ 19.86.010, *et seq.*)

3036.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3037.   This claim is brought only on behalf of Nationwide Class members who are Washington residents (the "Washington Class").

3038.   New GM committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of Wash. Rev. Code. Wash. Ann. § 19.96.010.

3039.   The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Wash. Rev. Code. Wash. Ann. § 19.96.010.  New GM engaged in unfair and deceptive acts and practices and violated the Washington CPA by systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles.

3040.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

3041.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports,

- 655 -

investigations, and notifications from regulatory authorities. New GM became aware of other

serious defects and systemic safety issues years ago, but concealed all of that information until

recently.

3042.  New GM was also aware that it valued cost-cutting over safety, selected parts

from the cheapest supplier regardless of quality, and actively discouraged employees from

finding and flagging known safety defects, and that this approach would necessarily cause the

existence of more defects in the vehicles it designed and manufactured and the failure to disclose

and remedy defects in all GM-branded vehicles. New GM concealed this information as well.

3043.  According to one report from the Center for Auto Safety, some 2,004 deaths and

injuries are connected with recently recalled GM-branded vehicles, and New GM should have

recalled the vehicles years ago.

3044.  By failing to disclose and by actively concealing the many defects in GM-branded

vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself

as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold,

New GM engaged in unfair and deceptive business practices in violation of the Washington

CPA.

3045.  In the course of New GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the many safety issues and serious defects discussed

above. New GM compounded the deception by repeatedly asserting that the Affected Vehicles

were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that

valued safety and stood behind its vehicles once they are on the road.

3046.  New GM's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-

010440-11 725144 V1

branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

3047.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Washington Class.

3048.   New GM knew or should have known that its conduct violated the Washington CPA.

3049.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

3050.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

    a.    Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

    b.    Intentionally concealed the foregoing from Plaintiffs; and/or

    c.    Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

3051.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

010440-11  725144 V1

3052.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Washington Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

3053.   Plaintiffs and the Washington Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

3054.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

3055.   As a direct and proximate result of New GM's violations of the Washington Act, Plaintiffs and the Washington Class have suffered injury-in-fact and/or actual damage.

3056.   New GM is liable to Plaintiffs and the Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under REV. CODE. WASH. ANN. § 19.86.090.

## COUNT II

## FRAUD BY CONCEALMENT

3057.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3058.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Washington residents (the "Washington Class").

3059.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

3060.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

3061.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

3062.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

3063.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Washington Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Washington Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

- 659 -

3064.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Washington Class.

3065.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Washington Class and conceal material information regarding defects that exist in GM-branded vehicles.

3066.   Plaintiffs and the Washington Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Washington Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Washington Class.

3067.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Washington Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

3068.   The value of all Washington Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the New GM brand and made any reasonable consumer reluctant to

purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

3069.    Accordingly, New GM is liable to the Washington Class for their damages in an amount to be proven at trial.

3070.    New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Washington Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## WEST VIRGINIA

## COUNT I

## VIOLATIONS OF THE CONSUMER CREDIT AND PROTECTION ACT

### (W. VA. CODE § 46A-1-101, *et seq.*)

3071.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3072.    This claim is brought only on behalf of Nationwide Class members who are West Virginia residents (the "West Virginia Class").

3073.    New GM is a "person" under W.VA. CODE § 46A-1-102(31).

3074.    Plaintiff and the  West Virginia Class are "consumers," as defined by W.VA. CODE §§ and 46A-1-102(12) and 46A-6-102(2), who purchased or leased one or more Affected Vehicles.

3075.    New GM engaged in trade or commerce as defined by W. VA. CODE § 46A-6-102(6).

3076.   The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA")

prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …."

W. VA. CODE § 46A-6-104.  Without limitation, "unfair or deceptive" acts or practices include:

<blockquote>

(I)     Advertising goods or services with intent not to sell
them as advertised;

(K)     Making false or misleading statements of fact
concerning the reasons for, existence of or amounts
of price reductions;

(L)     Engaging in any other conduct which similarly
creates a likelihood of confusion or of
misunderstanding;

(M)     The act, use or employment by any person of any
deception, fraud, false pretense, false promise or
misrepresentation, or the concealment, suppression
or omission of any material fact with intent that
others rely upon such concealment, suppression or
omission, in connection with the sale or
advertisement of any goods or services, whether or
not any person has in fact been misled, deceived or
damaged thereby;

(N)     Advertising, printing, displaying, publishing,
distributing or broadcasting, or causing to be
advertised, printed, displayed, published, distributed
or broadcast in any manner, any statement or
representation with regard to the sale of goods or
the extension of consumer credit including the rates,
terms or conditions for the sale of such goods or the
extension of such credit, which is false, misleading
or deceptive or which omits to state material
information which is necessary to make the
statements therein not false, misleading or
deceptive;

</blockquote>

W. VA. CODE § 46A-6-102(7).

3077.   By systematically devaluing safety and concealing a plethora of defects in GM-

branded vehicles, New GM engaged in deceptive business practices prohibited by the West

Virginia CCPA, including:  (1) representing that the Affected Vehicles have characteristics, uses,

- 662 -

benefits, and qualities which they do not have; (2) representing that the Affected Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Affected Vehicles with the intent not to sell them as advertised; (4) representing that a transaction involving the Affected Vehicles confers or involves rights, remedies, and obligations which it does not; and (5) representing that the subject of a transaction involving the Affected Vehicles has been supplied in accordance with a previous representation when it has not.

3078.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

3079.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

3080.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

010440-11  725144 V1

Case 1:14-mc-02543-JMF    Document 345    Filed 10/14/14    Page 684 of 712

3081.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

3082.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in unfair and deceptive business practices in violation of the West Virginia CCPA.

3083.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

3084.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the New GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

3085.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the West Virginia Class.

3086.   New GM knew or should have known that its conduct violated the West Virginia Act.

3087.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

3088.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

> a.    Possessed exclusive knowledge that it valued cost-cutting
> over safety, selected parts from the cheapest supplier
> regardless of quality, and actively discouraged employees
> from finding and flagging known safety defects, and that
> this approach would necessarily cause the existence of
> more defects in the vehicles it designed and manufactured;
>
> b.    Intentionally concealed the foregoing from Plaintiffs;
> and/or
>
> c.    Made incomplete representations about the safety and
> reliability of the Affected Vehicles generally, and the
> ignition switch in particular, while purposefully
> withholding material facts from Plaintiffs that contradicted
> these representations.

3089.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

3090.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the West Virginia Class.  A

vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise

comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects

rather than promptly remedies them.

3091.   Plaintiffs and the West Virginia Class suffered ascertainable loss caused by

New GM's misrepresentations and its failure to disclose material information.  Had they been

aware of the many defects that existed in GM-branded vehicles, and the company's callous

disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have

- 665 -

purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

3092. New GM's violations present a continuing risk to Plaintiffs as well as to the general public. New GM's unlawful acts and practices complained of herein affect the public interest.

3093. As a direct and proximate result of New GM's violations of the West Virginia CCPA, Plaintiffs and the West Virginia Class have suffered injury-in-fact and/or actual damage.

3094. Pursuant to W. VA. CODE § 46A-1-106, Plaintiffs seek monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $200 per violation of the West Virginia CCPA for each Plaintiff and each member of the West Virginia Class they seek to represent.

3095. Plaintiffs also seek punitive damages against New GM because New GM carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs to cruel and unjust hardship as a result. New GM intentionally and willfully misrepresented the safety and reliability of the Affected Vehicles, deceived Plaintiffs on life-or-death matters, and concealed material facts that only New GM knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the vehicles New GM repeatedly promised Plaintiffs were safe. New GM's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

3096. Plaintiffs further seek an order enjoining New GM's unfair or deceptive acts or practices, restitution, punitive damages, costs of Court, attorney's fees under W. VA. CODE § 46A-5-101, *et seq.*, and any other just and proper relief available under the West Virginia CCPA.

3097.   On October 8, 2014, certain Plaintiffs sent a letter complying with W. VA. CODE § 46A-6-106(b).  Plaintiffs presently do not claim relief under the West Virginia CCPA until and unless New GM fails to remedy its unlawful conduct within the requisite time period, after which Plaintiffs seek all damages and relief to which Plaintiffs and the West Virginia Class are entitled.

## COUNT II

## FRAUD BY CONCEALMENT

3098.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3099.   In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are West Virginia residents (the "West Virginia Class").

3100.   New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

3101.   New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

3102.   New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

3103.   New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

Case 1:14-mc-02543-JMF   Document 345   Filed 10/14/14   Page 688 of 712

3104.   New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the West Virginia Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the West Virginia Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

3105.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the West Virginia Class.

3106.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the West Virginia Class and conceal material information regarding defects that exist in GM-branded vehicles.

3107.   Plaintiffs and the West Virginia Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the West Virginia Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the West Virginia Class.

3108.   Because of the concealment and/or suppression of the facts, Plaintiffs and the West Virginia Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded

vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

3109.   The value of all West Virginia Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

3110.   Accordingly, New GM is liable to the West Virginia Class for their damages in an amount to be proven at trial.

3111.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the West Virginia Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (W. VA. CODE § 46-2-314)

3112.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3113.   In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of West Virginia residents who are members of the Ignition Switch Defect Subclass (the "West Virginia Ignition Switch Defect Subclass").

- 669 -

3114.   New GM was at all relevant times a seller of motor vehicles under W. VA. CODE § 46-2-314, and was also a "merchant" as the term is used in W. VA. CODE § 46A-6-107 and § 46-2-314.

3115.   Under W. VA. CODE § 46-2-314, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied by law when Plaintiffs and the Class purchased their Defective Ignition Switch Vehicles.

3116.   These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

3117.   New GM was provided notice of these issues by numerous complaints filed against it, its own internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the West Virginia Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

3118.   As a direct and proximate result of New GM's breach of the warranty of merchantability,  Plaintiffs and the West Virginia Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

**WISCONSIN**

**COUNT I**

**VIOLATIONS OF THE WISCONSIN
DECEPTIVE TRADE PRACTICES ACT**

**(WIS. STAT. § 110.18)**

3119.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3120.   This claim is brought only on behalf of Nationwide Class members who are Wisconsin residents (the "Wisconsin Class").

3121.   New GM is a "person, firm, corporation or association" within the meaning of WIS. STAT. § 100.18(1).

3122.   Plaintiffs and Wisconsin Class members are members of "the public" within the meaning of WIS. STAT. § 100.18(1).  Plaintiffs and Wisconsin Class members purchased or leased one or more Affected Vehicles.

3123.   The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits a "representation or statement of fact which is untrue, deceptive or misleading."  WIS. STAT. § 100.18(1).  By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles, New GM engaged in unfair and deceptive acts and practices and violated the Wisconsin DTPA.

3124.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or

- 671 -

concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

3125.  From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

3126.  New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

3127.  According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

3128.  By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the Wisconsin DTPA.

3129.  In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles

- 672 -

were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

3130.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

3131.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Wisconsin Class.

3132.   New GM knew or should have known that its conduct violated the Wisconsin DTPA.

3133.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

3134.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

a.     Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

b.     Intentionally concealed the foregoing from Plaintiffs; and/or

c.     Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

3135.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

- 673 -

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

3136.   New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Wisconsin Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

3137.   Plaintiffs and the Wisconsin Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

3138.   New GM' violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

3139.   As a direct and proximate result of New GM's violations of the Wisconsin DTPA, Plaintiffs and the Wisconsin Class have suffered injury-in-fact and/or actual damage.

3140.   Plaintiffs and the Wisconsin Class are entitled to damages and other relief provided for under WIS. STAT. § 110.18(11)(b)(2).  Because New GM's conduct was committed knowingly and/or intentionally, Plaintiffs` and the Wisconsin Class are entitled to treble damages.

010440-11  725144 V1

3141.    Plaintiffs and the Wisconsin Class also seek court costs and attorneys' fees under Wis. Stat. § 110.18(11)(b)(2).

## COUNT II

## FRAUD BY CONCEALMENT

3142.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3143.    In the event the Court declines to certify a Nationwide Class under Michigan law, this claim is brought only on behalf of Nationwide Class members who are Wisconsin residents (the "Wisconsin Class").

3144.    New GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

3145.    New GM concealed and suppressed material facts concerning the culture of New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and a shoddy design process.

3146.    New GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

3147.    New GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

3148.    New GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to New GM who had superior knowledge and

access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Wisconsin Class. These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Wisconsin Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

3149. New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Wisconsin Class.

3150. On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Wisconsin Class and conceal material information regarding defects that exist in GM-branded vehicles.

3151. Plaintiffs and the Wisconsin Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Wisconsin Class's actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Wisconsin Class.

3152. Because of the concealment and/or suppression of the facts, Plaintiffs and the Wisconsin Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies. Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less

for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

3153.   The value of all Wisconsin Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

3154.   Accordingly, New GM is liable to the Wisconsin Class for their damages in an amount to be proven at trial.

3155.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Wisconsin Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**WYOMING**

**COUNT I**

**VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT**

**(WYO. STAT. §§ 40-12-105 *et seq.*)**

3156.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3157.   This claim is brought only on behalf of Nationwide Class members who are Wyoming residents (the "Wyoming Class").

3158.   Plaintiffs, Wyoming Class members, and New GM are "persons" within the meaning of WYO. STAT. § 40-12-102(a)(i).

- 677 -

3159.   The sales of the Affected Vehicles to Plaintiffs and the Wyoming Class were "consumer transactions" within the meaning of WYO. STAT. § 40-12-105.

3160.   Under the Wyoming Consumer Protection Act ("Wyoming CPA"), a person engages in a deceptive trade practice when, in the course of its business and in connection with a consumer transaction it knowingly:  "(iii) Represents that merchandise is of a particular standard, grade, style or model, if it is not"; "(v) Represents that merchandise has been supplied in accordance with a previous representation, if it has not…"; "(viii) Represents that a consumer transaction involves a warranty, a disclaimer of warranties, particular warranty terms, or other rights, remedies or obligations if the representation is false"; "(x) Advertises merchandise with intent not to sell it as advertised"; or  "(xv) Engages in unfair or deceptive acts or practices." WYO. STAT. § 45-12-105.

3161.   By systematically devaluing safety and concealing a plethora of defects in GM-branded vehicles as described above, New GM violated the Wyoming CPA.  New GM engaged in deceptive trade practices, including (among other things) representing that the Affected Vehicles are of a particular standard and grade, which they are not; advertising the Affected Vehicles with the intent not to sell them as advertised; and overall engaging in unfair and deceptive acts or practices.

3162.   In the course of its business, New GM systematically devalued safety and concealed a plethora of defects in GM-branded vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

3163.   From the date of its inception on July 10, 2009, New GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at New GM and continuous reports, investigations, and notifications from regulatory authorities.  New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

3164.   New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

3165.   According to one report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and New GM should have recalled the vehicles years ago.

3166.   By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive business practices in violation of the Wyoming CPA.

3167.   In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  New GM compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

3168.   New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true value of the Affected Vehicles.

3169.   New GM intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and the Wyoming Class.

3170.   New GM knew or should have known that its conduct violated the Wyoming CPA.

3171.   As alleged above, New GM made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

3172.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles and the devaluing of safety at New GM, because New GM:

a.   Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

b.   Intentionally concealed the foregoing from Plaintiffs; and/or

c.   Made incomplete representations about the safety and reliability of the Affected Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

3173.   Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

Case 1:14-mc-02543-JMF Document 345 Filed 10/14/14 Page 701 of 712

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

3174.  New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Plaintiffs and the Wyoming Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

3175.  Plaintiffs and the Wyoming Class suffered ascertainable loss caused by New GM's misrepresentations and its failure to disclose material information.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's misconduct.

3176.  New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

3177.  As a direct and proximate result of New GM's violations of the Wyoming CPA, Plaintiffs and the Wyoming Class have suffered injury-in-fact and/or actual damage.

3178.  Pursuant to WYO. STAT. § 40-12-108(a), Plaintiffs and the Wyoming Class seek monetary relief against New GM measured as actual damages in an amount to be determined at trial, in addition to any other just and proper relief available under the Wyoming CPA.

3179.  On October 8, 2014, certain Plaintiffs sent a letter complying with WYO. STAT. §§ 45-12-109.  Plaintiffs presently do not claim relief under the Wyoming CPA until and unless

New GM fails to remedy its unlawful conduct within the requisite time period, after which

Plaintiffs seek all damages and relief to which Plaintiffs and the Wyoming Class are entitled.

## COUNT II

## FRAUD BY CONCEALMENT

3180.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

3181.   In the event the Court declines to certify a Nationwide Class under Michigan law,

this claim is brought only on behalf of Natiownwide Class members who are Wyoming residents

(the "Wyoming Class").

3182.   New GM concealed and suppressed material facts concerning the quality of its

vehicles and the GM brand.

3183.   New GM concealed and suppressed material facts concerning the culture of

New GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of

safety issues, and a shoddy design process.

3184.   New GM concealed and suppressed material facts concerning the many serious

defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps

to ensure that its employees did not reveal known safety defects to regulators or consumers.

3185.   New GM did so in order to boost confidence in its vehicles and falsely assure

purchasers and lessors of its vehicles that New GM was a reputable manufacturer that stands

behind its vehicles after they are sold and that its vehicles are safe and reliable.  The false

representations were material to consumers, both because they concerned the quality and safety

of the Affected Vehicles and because they played a significant role in the value of the vehicles.

3186.   New GM had a duty to disclose the many defects in GM-branded vehicles

because they were known and/or accessible only to New GM who had superior knowledge and

access to the facts, and New GM knew the facts were not known to or reasonably discoverable by Plaintiffs and the Wyoming Class.  These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and the Wyoming Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

3187.   New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs and the Wyoming Class.

3188.   On information and belief, New GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Wyoming Class and conceal material information regarding defects that exist in GM-branded vehicles.

3189.   Plaintiffs and the Wyoming Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Wyoming Class's actions were justified.  New GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Wyoming Class.

3190.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Wyoming Class sustained damage because they own vehicles that diminished in value as a result of New GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by New GM's corporate policies.  Had they been aware of the many defects that existed in GM-branded vehicles, and the company's callous disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New GM's fraudulent concealment.

3191.   The value of all Wyoming Class members' vehicles has diminished as a result of New GM's fraudulent concealment of the many defects and its systemic safety issues which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

3192.   Accordingly, New GM is liable to the Wyoming Class for their damages in an amount to be proven at trial.

3193.   New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Wyoming Class's rights and well-being to enrich New GM.  New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (WYO. STAT. §§ 34.1-2-314)

3194.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

3195.   In the event the Court declines to certify a Nationwide Ignition Switch Defect Subclass under the Magnuson-Moss Warranty Act or Michigan law, this claim is brought only on behalf of Wyoming residents who are members of the Ignition Switch Defect Subclass (the "Wyoming Ignition Switch Defect Subclass").

3196.   New GM was at all relevant times a merchant with respect to motor vehicles.

- 684 -

3197.   Under Wyoming law, a warranty that the Defective Ignition Switch Vehicles were in merchantable condition was implied when Class members purchased their Defective Ignition Switch Vehicles.

3198.   These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

3199.   New GM was provided notice of these issues by numerous complaints filed against it, its own internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Wyoming Ignition Switch Defect Subclass before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

3200.   As a direct and proximate result of New GM's breach of the warranty of merchantability,  Plaintiffs and the Wyoming Ignition Switch Defect Subclass have been damaged in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf all others similarly situated, respectfully request that this Court enter a judgment against New GM and in favor of Plaintiffs and the Classes and Subclasses, and grant the following relief:

A.      Determine that this action may be maintained as a class action and certify it as such under Rule 23(b)(2) and/or 23(b)(3), or alternatively certify all issues and claims that are

appropriately certified; and designate and appoint Plaintiffs as Class Representatives and Plaintiffs' chosen counsel as Class Counsel;

B.     Declare, adjudge, and decree the conduct of New GM as alleged herein to be unlawful, unfair, and/or deceptive and otherwise in violation of law, enjoin any such future conduct, and issue an injunction under which the Court will monitor New GM's response to problems with the recalls and efforts to improve its safety processes, and will establish by Court decree and administration under Court supervision a program funded by New GM under which claims can be made and paid for Ignition Switch Defect Subclass members' out-of-pocket expenses and costs;

C.     Award Plaintiffs and Class members actual, compensatory damages or, in the alternative, statutory damages, as proven at trial;

D.     Award Plaintiffs and the Class members exemplary damages in such amount as proven;

E.     Award damages and other remedies, including but not limited to statutory penalties, as allowed by the consumer laws of the various states;

F.     Award Plaintiffs and the Class members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest;

G.     Award Plaintiffs and Class members restitution and/or disgorgement of New GM's ill-gotten gains relating to the conduct described in this Complaint; and

H.     Award Plaintiffs and the Class members such other further and different relief as the case may require or as determined to be just, equitable, and proper by this Court.

## IX.     JURY TRIAL DEMAND

Plaintiffs request a trial by jury on the legal claims, as set forth herein.

DATED:  October 14, 2014          HAGENS BERMAN SOBOL SHAPIRO LLP

By: _____*/s/ Steve W. Berman*_____
    Steve W. Berman
*steve@hbsslaw.com*
Sean R. Matt
*sean@hbsslaw.com*
Andrew M. Volk
*andrew@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594

DATED:  October 14, 2014          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By: _____*/s/ Elizabeth J. Cabraser*_____
    Elizabeth J. Cabraser
*ecabraser@lchb.com*
Steven E. Fineman
*sfineman@lchb.com*
Rachel Geman
*rgeman@lchb.com*
Annika K. Martin
*akmartin@lchb.com*
275 Battery St., 29th Floor
San Francisco, CA 94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

*Co-Lead Counsel with Primary Focus on Economic Loss Cases*

DATED:  October 14, 2014          HILLIARD MUÑOZ GONZALES L.L.P.

By: _____*/s/ Robert Hilliard*_____
    Robert Hilliard
*bobh@hmglawfirm.com*
719 S Shoreline Blvd, Suite #500
Corpus Christi, TX 78401
Telephone:  (361) 882-1612
Facsimile:  (361) 882-3015

*Co-Lead Counsel with Primary Focus on Personal Injury Cases*

- 687 -

WEITZ & LUXENBERG, PC
Robin L. Greenwald
James J. Bilsborrow
700 Broadway
New York, NY 10003
Telephone:  (212) 558-5500

*Liaison Counsel*

BOIES, SCHILLER & FLEXNER LLP
David Boies
333 Main Street
Armonk, NY  10504
Telephone:  (914) 749-8200

THE COOPER FIRM
Lance A. Cooper
531 Roselane St., Suite 200
Marietta, GA 30060
Telephone:  (770) 427-5588

OTTERBOURG, STEINDLER, HOUSTON & ROSEN
Melanie Cyganowski
230 Park Avenue
New York, NY 10169-0075
Telephone:  (212) 661-9100

GRANT & EISENHOFER, P.A.
Adam J. Levitt
John Tangren
30 N. LaSalle Street, Suite 1200
Chicago, IL  60602
Telephone:  (312) 214-0000

NAST LAW LLC
Dianne M. Nast
1101 Market St., Suite 2801
Philadelphia, PA 19107
Telephone:  (215) 923-9300

010440-11  725144 V1

PODHURST ORSECK, P.A.
Peter Prieto
City National Bank Building
25 West Flagler Street, Suite 800
Miami, FL 33130
Telephone:  (305) 358-2800

COTCHETT, PITRE & MCCARTHY, LLP
Frank Pitre
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000

MOTLEY RICE LLC
Joseph F. Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone:  (843) 216-9159

ROBINSON CALCAGNIE ROBINSON
  SHAPIRO DAVIS, INC.
Mark P. Robinson, Jr.
19 Corporate Plaza
Newport Beach, CA 92660
Telephone:  (949) 720-1288

SUSMAN GODFREY, L.L.P.
Marc M. Seltzer
1901 Avenue of the Stars, Suite 950
Los Angeles, CA  90067
Telephone:  (310) 789-3102

*Executive Committee*

BARRIOS, KINGSDORF & CASTEIX, LLP
Dawn M. Barrios
701 Poydras St., Suite 3650
New Orleans, LA 70139
Telephone:  (504) 524-3300

*Federal / State Liaison Counsel*

010440-11  725144 V1

BARON & BUDD, PC
Mark Philip Pifko
Roland K. Tellis
15910 Ventura Boulevard
Encino Plaza, Suite 1600
Encino, CA  91436
Telephone:  818-839-2333

BARRETT LAW GROUP, PA
Don Barrett
404 Court Square
Lexington, MS 39095
Telephone:  662-834-2488

BEASLEY, ALLEN, CROW, METHVIN, PORTIS &
MILES, P.C.
W. Daniel "Dee" Miles
Jere L. Beasley
J. Cole Portis
D. Michael Andrews
Benjamin E. Baker
218 Commerce Street
Montgomery, AL  36104
Telephone:  (800) 898-2034

BLOCK & LEVITON, LLP
Joel A. Fleming
155 Federal Street, Suite 1303
Boston, MA 02110
Telephone:  617-398-5600

CARNEY BATES & PULLIAM, PLLC
David Slade
James Allen Carney, Jr.
Joseph Henry Bates, III
Randall Keith Pulliam
11311 Arcade Drive, Suite 200
Little Rock, AR 72212
Telephone:  501-312-8500

010440-11  725144 V1

CLIFFORD LAW OFFICES
Robert A. Clifford
Shannon M. McNulty
Kristofer S. Riddle
120 N. LaSalle, Suite 3100
Chicago, IL 60602
Telephone:  312-899-9090

CUNEO GILBERT & LADUCA LLP
Jonathan W. Cuneo
Pamela Gilbert
507 C Street NE
Washington, DC 20002
Telephone:  202-789-3960

EDWARD L. WHITE, PC
Edward L. White
853 E. 33rd Street
Edmond, OK  73013
Telephone:  405-810-8188

FINKELSTEIN BLANKINSHIP FREI-PEARSON &
GARBER
Douglas Gregory Blankinship
1311 Mamaroneck Avenue, Suite 220
White Plains, NY 10605
Telephone:  914-298-3281

GRAY RITTER & GRAHAM
Don M. Downing
701 Market Street, Suite 800
St. Louis, MO  63101
Telephone:  314-241-5620

HAZZARD LAW, LLC
Brent Hazzard
P.O. Box 24382
Jackson, MS 39225
Telephone:  601-977-5253
mailto:ed@edwhitelaw.com
LACKEY HERSHMAN, LLP
Roger L. Mandel
3102 Oak Lawn Avenue, Suite 777
Dallas, TX  75219
Telephone:  214-560-2238

- 691 -

STUEVE SIEGEL HANSON, LLP
Patrick J. Stueve
Todd E. Hilton
Bradley T. Wilders
460 Nichols Road, Suite 200
Kansas City, MO  64112
Telephone:  816-714-7100

STUEVE SIEGEL HANSON, LLP
Jason S. Hartley
Jason M. Lindner
550 W. C Street, Suite 1750
San Diego, CA 92101
Telephone:  619-400-5822

*Counsel to Certain Plaintiffs*

010440-11  725144 V1

# Exhibit 1

Case 1:14-md-02543-JMF    Document 345    Filed 10/14/14    Page 2 of 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------x

IN RE:                                              14-MD-2543 (JMF)

GENERAL MOTORS LLC IGNITION          DECLARATION OF
SWITCH LITIGATION                    MARC KOPPELMAN RE: VENUE

This Document Relates to All Actions

----------------------------------------------------x

010440-11  725503 V1

I, Marc Koppelman, hereby declare and state as follows:

1.      I have personal knowledge of the facts stated herein and, if necessary, could competently testify thereto.

2.      I am a Plaintiff in the above-entitled action.

3.      Pursuant to Cal. Civ. Code § 1780(d), I make this declaration in support of the Class Action Complaint and the claim therein for relief under Cal. Civ. Code § 1780(a).

4.      This action for relief under Cal. Civ. Code § 1780(a) has been properly commenced in this Court pursuant to the Court's direction that new plaintiffs can file directly in the MDL without first filing in the district in which they reside; hence, I am filing this action as if it had been filed in the Central District of California, in a county that is a proper place for trial of this action because Defendant does business there and throughout the State of California.

5.      The Complaint filed in this matter contains causes of action for violations of the Consumers Legal Remedies Act against General Motors, LLC ("GM"), a Delaware limited liability company doing business nationwide, including California.

6.      I own a 2010 Chevy HHR which I purchased used at a Chevrolet dealership in Glen Burnie, Maryland on March 17, 2012.

7.      I declare under penalty of perjury under the laws of the State of California that the foregoing Declaration is true and correct, and was executed by me in the city of _Torrance_, California, on October _14_, 2014.

By _____
   Marc Koppelman