Hearing Date and Time:  To Be Determined
Objection Deadline:  December 16, 2014
Reply Deadline:  January 16, 2015

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:    (212) 556-2100
Facsimile:    (212) 556-2222
Arthur Steinberg
Scott Davidson

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Richard C. Godfrey, P.C. (admitted *pro hac vice*)
Andrew B. Bloomer, P.C. (admitted *pro hac vice*)

*Attorneys for General Motors LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **MOTORS LIQUIDATION COMPANY,** *et al.,* | : | **Case No.:  09-50026 (REG)** |
| **f/k/a General Motors Corp.,** *et al.* | : | |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

-------------------------------------------------------------x


**OPENING BRIEF BY GENERAL MOTORS LLC ON THRESHOLD ISSUES**
**CONCERNING ITS MOTIONS TO ENFORCE THE SALE ORDER AND INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

FACTS ................................................................................................................. 9

    A. THE SALE NOTICE ........................................................................... 10

    B. THE SALE AGREEMENT .................................................................... 12

    C. VEHICLE OWNERS' OBJECTIONS TO THE 363 SALE AND
       THEIR DISPOSITION BY THE COURT ................................................... 15

    D. SALE DECISION AND SALE ORDER AND INJUNCTION ......................... 18

    E. THE ACTIONS AND CONSOLIDATED COMPLAINTS ............................. 20

    F. OLD GM ADMINISTRATION AND CLAIMS ........................................ 22

ARGUMENT ...................................................................................................... 23

I.   DUE PROCESS THRESHOLD ISSUE: PLAINTIFFS' DUE PROCESS RIGHTS
    WERE NOT VIOLATED ................................................................... 23

    A. PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN
       UNDER FED. R. CIV. P. 60(B)(4) ..................................................... 23

    B. PLAINTIFFS' DUE PROCESS ARGUMENT FAILS BECAUSE
       PLAINTIFFS RECEIVED CONSTITUTIONALLY ADEQUATE
       AND REASONABLE NOTICE OF THE 363 SALE .................................... 26

       1. *Due Process Is A Flexible Standard Based On The Particular Facts
          And Circumstances Of The Case* ................................................... 26

       2. *Under The Circumstances Facing Old GM,
          Plaintiffs Were "Unknown" Creditors* .................................... 27

       3. *Plaintiffs Received Proper Notice Of The 363 Sale* ...................... 33

    C. PLAINTIFFS' DUE PROCESS ARGUMENT FAILS BECAUSE
       PLAINTIFFS CANNOT DEMONSTRATE PREJUDICE ............................. 36

       1. *A Party That Has Suffered No Prejudice Has No Due Process Claim* ...... 36

       2. *Plaintiffs Have Suffered No Prejudice As A Result Of
          Their Receiving Notice Of The Sale Proceedings by Publication* ............ 40

         a. Similarly-Situated Parties Filed Objections To The Sale Motion
           That Encompassed Objections That Plaintiffs Could Have Raised
           Had They Participated In The 363 Sale ....................................... 41

         b. New GM's Agreement To Assume Some Narrow Additional
           Categories Of Liabilities Specifically Confirmed That It
           Would Not Assume Existing Product Claims ............................... 43

         c. At The Sale Hearing, Old GM And New GM Made Clear That
           New GM Would Be Shielded From All Successor Liability Claims ...... 44

d.   The Court Considered And  Overruled The Vehicle Claim Objections .................. 46

e.   Information Relating To The Product Defect  Would Not Have
Altered The Course Of The 363 Sale......................................................................... 49

**II. REMEDIES THRESHOLD ISSUE:  IF A REMEDY IS WARRANTED, THE
PROPER REMEDY IS TO ALLOW PLAINTIFFS TO SEEK TO RECOVER THEIR
PRO RATA DISTRIBUTION FROM THE PROCEEDS OF THE SALE OF OLD
GM'S ASSETS ........................................................................................................................ 50**

A. SETTING ASIDE THE SALE ORDER AND INJUNCTION
FIVE YEARS AFTER THE FACT IS NOT A VIABLE OPTION.................................... 52

B. THE BANKRUPTCY CODE AND RULES DO NOT ALLOW FOR
PARTIAL REVOCATION OF THE SALE ORDER AND INJUNCTION,
AND THE SALE ORDER AND INJUNCTION EXPRESSLY PROHIBITS IT ................................ 53

C. PLAINTIFFS HAVE A VIABLE REMEDY AGAINST  OLD GM'S UNSECURED CREDITOR'S
TRUST ...................................................................................................................... 56

**III. OLD GM CLAIM THRESHOLD ISSUE:  CLAIMS ASSERTED IN THE
CONSOLIDATED COMPLAINTS  ARE RETAINED LIABILITIES OF OLD GM
AND NOT ASSUMED LIABILITIES OF NEW GM ....................................................... 57**

A. THIS COURT'S PRIOR DECISIONS DEMONSTRATE WHY PLAINTIFFS'
CLAIMS ARE RETAINED LIABILITIES AND NOT ASSUMED LIABILITIES............................. 61

B. NEW GM CANNOT BE HELD LIABLE FOR OLD GM'S ALLEGED
CONDUCT, EITHER DIRECTLY OR AS OLD GM'S ALLEGED "SUCCESSOR"........................ 63

C. PLAINTIFFS' WARRANTY ASSERTIONS WITH RESPECT TO
OLD GM VEHICLES AND PARTS DO NOT ENABLE THEM
TO CIRCUMVENT THE COURT'S SALE ORDER AND INJUNCTION ................................. 67

1.   Plaintiffs Have Not Asserted  A Glove Box Warranty Claim...................................... 67

2.   New GM Did Not Assume Any Implied Warranties Or Other
Implied Obligations Under Statutory Or Common Law............................................ 67

3.   Claims Based On The Magnuson-Moss Warranty Act Cannot Be
Asserted Against  New GM With Respect To Old GM Vehicles Or Parts ................. 69

D. ANY CLAIMS BASED ON A DESIGN DEFECT ARE BARRED BY
THE SALE ORDER AND INJUNCTION ................................................................... 69

E. ANY CLAIMS BASED ON "CONTRACT, TORT OR  OTHERWISE" ARE
BARRED BY THE SALE ORDER AND INJUNCTION ............................................... 71

1.   Tort-Based Claims Are Not Assumed Liabilities ....................................................... 71

2.   Claims Premised On Fraud And Consumer Protection Statutes
That Are Based On Old GM Conduct Are Barred.................................................... 72

3.   Plaintiffs' Unjust Enrichment Claims Are Not Credible ........................................... 72

4.   Plaintiffs' Reliance On Restatement (Second) of Torts Is Erroneous......................... 73

F.  THERE IS NO PRIVATE CAUSE OF ACTION BASED ON A
FAILURE TO RECALL AND  ANY SUCH CLAIMS ARE NOT
ASSUMED LIABILITIES UNDER THE SALE AGREEMENT....................................................... 75

**IV. "FRAUD ON THE COURT" LEGAL STANDARD** ....................................................... **76**

**CONCLUSION** ..................................................................................................................... **79**

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................................ 72

*Ayres v. GMC,*
    234 F.3d 514 (11th Cir. 2000) ............................................................... 75

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................................ 72

*Beyond Sys., Inc. v. Kraft Foods, Inc.,*
    972 F.Supp.2d 748, 768 (D. Md. 2013) ................................................. 71

*Burton v. Chrysler Group, LLC (In re Old Carco),*
    492 B.R. 392 (Bankr. S.D.N.Y. 2013) ................................... 30, 48, 65, 66

*Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.),*
    428 B.R. 43 (S.D.N.Y. 2010)............................... 19, 24, 25, 43, 51, 54, 55

*Carlisle v. Deere & Co.,*
    576 F.3d 649 (7th Cir. 2009) ................................................................. 70

*Castillo v. Gen. Motors LLC (In re Motors Liquidation Co.),*
    Adv. Proc. No. 09–00509, 2012 WL 1339496 (Bankr. S.D.N.Y. Apr. 17, 2012),
    *aff'd,* 500 B.R. 333 (S.D.N.Y. 2013),
    *aff'd,* No. 13-4223-BK, 2014 WL 4653066 (2d Cir. Sept. 19, 2014)..................... 42, 61, 68, 69

*Causey v. Sewell Cadillac-Chevrolet, Inc.,*
    394 F.3d 285 (5th Cir. 2004) ................................................................. 70

*Cedar Tide Corp. v. Chandler's Cove Inn, Ltd,*
    859 F.2d 1127 (2d Cir. 1988)................................................................. 52

*Charter Crude Oil Co. v. Petroleos Mexicanos (In re Charter Co.),*
    125 B.R. 650 (M.D. Fla. 1991) .............................................................. 28

*Chemetron Corp. v. Jones,*
    72 F.3d 341 (3d Cir. 1995)............................................................ 28, 29, 32

*Conway v. White Trucks, A Div. of White Motor Corp.,*
    885 F.2d 90 (3d Cir. 1989)..................................................................... 56

*Dickerson v. Bd. of Educ.,*
    32 F.3d 1114 (7th Cir. 1994) ................................................................. 23

*Doktor v. Werner Co.,*
    762 F. Supp. 2d 494 (E.D.N.Y. 2011) ................................................... 53

*Dorking Genetics v. United States,*
    76 F.3d 1261 (2d Cir. 1996)................................................................... 73

*Douglas v. Stamco,*
   363 Fed. App'x 100, 2010 WL 337043 (2d Cir. 2010) .......................................... 53

*Garland Dollar Gen. LLC v. Reeves Dev., LLC,*
   No. 3:09-CV-0707-D, 2010 WL 4259818 (N.D. Tex. Oct. 21, 2010) .................................... 74

*Gleason v. Jandrucko,*
   860 F.2d 556 (2d Cir. 1988)........................................................76, 77, 78

*Gruber v. Victor,*
   No. 95 Civ. 2285 (JSM), 1996 WL 492991 (S.D.N.Y. Aug. 28, 1996) ................................. 71

*Hadges v. Yonkers Racing Corp.,*
   48 F.3d 1320 (2d Cir. 1995)........................................................ 76

*Handy v. Gen. Motors Corp.,*
   518 F.2d 786 (9th Cir. 1975) ...................................................... 75

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.,*
   322 U.S. 238 (1944)............................................................... 77

*Hiller v. Mfrs. Prod. Research Grp. of N. Am., Inc.,*
   59 F.3d 1514 (5th Cir. 1995) ..................................................... 71

*In re Agway, Inc.,*
   313 B.R. 31 (Bankr. N.D.N.Y. 2004) ......................................27, 29, 32, 33

*In re Andrada Fin., LLC,*
   No. AZ-10-1209-JuMkPa, 2011 WL 3300983 (B.A.P. 9th Cir. Apr. 7, 2011) ....................... 78

*In re Best Prods. Co.,*
   140 B.R. 353 (Bankr. S.D.N.Y. 1992) .............................................. 27, 29

*In re BFW Liquidation, LLC,*
   471 B.R. 652 (Bankr. N.D. Ala. 2012) ........................................ 52, 56, 57

*In re Brooks Fashion Stores, Inc.,*
   124 B.R. 436 (Bankr. S.D.N.Y. 1991)............................................... 28

*In re Brooks Fashion Stores, Inc.,*
   No. 92 Civ. 1571 (KTD), 1994 WL 132280 (S.D.N.Y. Apr. 14, 1994) ................................. 29

*In re Caldor, Inc.-NY,*
   240 B.R. 180, 188 (Bankr. S.D.N.Y. 1999).......................................... 36

*In re City Equities Anaheim, Ltd.,*
   22 F.3d 954 (9th Cir. 1994) ...................................................... 37

*In re Chrysler LLC,*
   405 B.R. 84 (Bankr. S.D.N.Y. 2009),
     *aff'd,* (2d Cir. June 5, 2009)................................................ 46

*In re Drexel Burnham Lambert Grp.,*
   995 F.2d 1138, 1144 (2d Cir. 1993)............................................... 28

*In re Edwards,*
   962 F.2d 641 (7th Cir. 1992) ...............................................36, 38, 56

*In re Emoral, Inc.*,
740 F.3d 875 (3d Cir. 2014).................................................................................................. 49

*In re Enron Corp.*,
No. 01-16034 (AJG), 2006 WL 898031 (Bankr. S.D.N.Y. Mar. 29, 2006) ...................... 28, 31

*In re Envirodyne Indus., Inc.*,
206 B.R. 468 (N.D. Ill. 1997) ............................................................................................ 28, 31

*In re Fernwood Markets*,
73 B.R. 616 (Bankr. E.D. Pa. 1987) ....................................................................................... 55

*In re Flanagan*,
415 B.R. 29 (D. Conn. 2009) .................................................................................................. 66

*In re Food Mgmt. Grp., LLC*,
380 B.R. 677 (Bankr. S.D.N.Y. 2008) ............................................................................... 77, 78

*In re Galanis*,
71 B.R. 953 (Bankr. D. Conn. 1987) ...................................................................................... 78

*In re Gen. Dev. Corp.*,
165 B.R. 685, 688 (S.D. Fla. 1994) ........................................................................................ 36

*In re Gen. Motors Corp.*,
407 B.R. 463 (Bankr. S.D.N.Y. 2009)................ 1, 10, 12, 17, 18, 19, 34, 46, 47, 49, 52, 54, 63

*In re Gen. Motors Corp.*,
No. M 47(LAK), 2009 WL 2033079 (S.D.N.Y. July 9, 2009)................................................. 12

*In re Grumman Olson Indus., Inc.*,
467 B.R. 694 (S.D.N.Y. 2012)........................................................................................... 47, 48

*In re Hoti Enters., LP*,
No. 12-CV-5341 (CS), 2012 WL 6720378 (S.D.N.Y. Dec. 27, 2012).................................... 78

*In re Keene Corp.*,
164 B.R. 844 (Bankr. S.D.N.Y. 1994).................................................................................... 49

*In re L.F. Rothschild Holdings, Inc.*,
No. 92 Civ. 1129 (RPP), 1992 WL 200834 (S.D.N.Y. Aug. 3, 1992) .................................... 29

*In re Lehman Bros. Holdings Inc.*,
445 B.R. 143 (Bankr. S.D.N.Y. 2011),
*aff'd in part and rev'd in part on other grounds*, 478 B.R. 570 (S.D.N.Y. 2012),
*aff'd*, 761 F.3d 303 (2d Cir. 2014) ....................................................................................... 24

*In re Levander*,
180 F.3d 1114 (9th Cir. 1999) ............................................................................................... 78

*In re Motors Liquidation Co.*,
462 B.R. 494 (Bankr. S.D.N.Y. 2012)....................................................... 27, 28, 29, 30, 50, 56

*In re Mucci*,
488 BR 186 (Bankr. D. N.M. 2013) ....................................................................................... 78

*In re New Century TRS Holdings, Inc.*,
  No. 07-10416 (BLS), 2014 WL 842637 (Bankr. D. Del. Mar. 4, 2014) ............... 27, 28, 31, 32

*In re Old Carco LLC*,
  423 B.R. 40 (Bankr. S.D.N.Y. 2010),
  *aff'd*, 2010 WL 3566908 (S.D.N.Y. Sept. 14, 2010),
  *aff'd, Mauro Motors Inc. v. Old Carco LLC*, 420 Fed. App'x 89 (2d Cir. 2011).................... 23

*In re Parcel Consultants, Inc.*,
  58 F. App'x 946 (3d Cir. 2003) ........................................................................................... 37

*In re Paris Indus. Corp.*,
  132 B.R. 504 (D. Me. 1991) ......................................................................................... 38, 39

*In re Rosson*,
  545 F.3d 764 (9th Cir. 2008) ............................................................................................ 37

*In re Spiegel, Inc.*,
  354 B.R. 51 (Bankr. S.D.N.Y. 2006) .................................................................................. 32

*In re Ticketplanet.com*,
  313 B.R. 46 (Bankr. S.D.N.Y. 2004) .................................................................................. 77

*In re Trans World Airlines, Inc.*,
  322 F.3d 283 (3d Cir. 2003) .............................................................................................. 55

*In re U.S. Kids, Inc.*,
  178 F.3d 1297, 1999 WL 196509 (6th Cir. 1999) ................................................................. 37

*In re U.S.H. Corp. of N.Y.*,
  223 B.R. 654 (Bankr. S.D.N.Y. 1998) ................................................................................ 29

*In re Union Hosp. Ass'n*,
  226 B.R. 134 (Bankr. S.D.N.Y. 1998) ................................................................................ 29

*In re Vanguard Oil & Serv. Co.*,
  788 B.R. 576, 580 (E.D.N.Y. 1988) ................................................................................... 36

*In re White Motor Credit Corp.*,
  75 B.R. 944 (Bankr. N.D. Ohio 1987) ................................................................................ 51

*In re XO Commc'ns. Inc.*,
  301 B.R. 782 (Bankr. S.D.N.Y. 2003) ................................................................................ 28

*In re YBA Nineteen, LLC*,
  505 B.R. 289 (S.D. Cal. 2014) .......................................................................................... 37

*King v. First American Investigations, Inc.*,
  287 F.3d 91 (2d Cir. 2002)................................................................................................ 78

*Kupferman v. Consol. Research and Mfg. Corp.*,
  459 F.2d 1072 (2d Cir. 1972)....................................................................................... 76, 77

*Lehman Bros., Inc. v. Maselli*,
  No. 93 Civ. 4478 AGS RJW, 1998 WL 531831 (S.D.N.Y. Aug. 24, 1998) .......................... 77

*MacArthur Co. v. Johns-Manville Corp.*,
  837 F.2d 89 (2d Cir. 1988)...................................................................... 56

*Matthews v. United States*,
  150 F. Supp. 2d 406 (E.D.N.Y. 2001) ................................................... 73

*McTigue v. Am. Sav. & Loan Assoc. of Fla.*,
  564 F.2d 677 (5th Cir. 1977) ................................................................. 52

*Molla v. Adamar of New Jersey, Inc.*,
  No. 11-6470 (JBS/KMW), 2014 WL 2114848 (D. N.J. May 21, 2014) ................................. 57

*Morgenstein v. Motors Liquidation Co.*,
  Order, 12 Civ. 01746 (AJN) (S.D.N.Y. Aug. 9, 2012) ............................................ 30

*Mullane v. Central Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950)...................................................................... 26, 28

*Murphy v. DirecTV, Inc.*,
  724 F.3d 1218 (9th Cir. 2013) ................................................................ 70

*Official Comm. of Unsecured Creditors of Lois/USA, Inc. v. Conseco Fin. Servicing Corp.*
  *(In re Lois/USA, Inc.)*, 264 B.R. 69 (Bankr. S.D.N.Y. 2001) ................................... 71

*Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
  430 B.R. 65 (S.D.N.Y. 2010)................................................. 19, 25, 26, 37, 46, 51

*Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*,
  266 B.R. 575 (S.D.N.Y. 2001)......................................... 26, 36, 37, 39, 40

*Perry v. Blum*,
  629 F.3d 1 (1st Cir. 2010)........................................................................ 37

*Proctor & Gamble Co. v. Haugen*,
  222 F.3d 1262 (10th Cir. 2000) ................................................................ 70

*Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*,
  533 F.3d 810 (D.C. Cir. 2008)................................................................ 75

*Rapp v. U.S. Dep't of Treasury, Office of Thrift Supervision*,
  52 F.3d 1510 (10th Cir. 1995) ................................................................ 37

*Rodriguez v. It's Just Lunch, Intern.*,
  300 F.R.D. 125 (S.D.N.Y. 2014) ................................................................ 72

*Schaefer v. IndyMac Mortg. Servs.*,
  731 F.3d 98 (1st Cir. 2013)................................................................ 74

*SEC v. ESM Grp., Inc.*,
  835 F.2d 270 (11th Cir. 1988)
  *cert denied, sub. nom., Peat Marwick Main & Co. v. Tew*, 486 U.S. 1055 (1988) ................. 77

*Secs. Investor Prot. Corp. v. Blinder, Robinson & Co., Inc.*,
  962 F.2d 960 (10th Cir. 1992) ................................................................ 37

*Segal v. Firtash*,
  No. 13–cv–7818 (RJS), 2014 WL 4470426 (S.D.N.Y. Sept. 9, 2014).................................... 71

viii

*Serzysko v. Chase Manhattan Bank*,
  461 F.2d 699 (2d Cir. 1972)..................................................................................... 76

*Simon v. Navon*,
  116 F.3d 1 (1st Cir. 1997)......................................................................................... 78

*St. John's Univ. v. Bolton*,
  757 F. Supp. 2d 144 (E.D.N.Y. 2010) ..................................................................... 71

*State Street Bank & Trust, Co. v. Inversions Errazuriz Limitada*,
  374 F.3d 158 (2d Cir. 2004)..................................................................................... 76

*Syarns v. H.E. Avent*,
  96 B.R. 620 (M.D. La. 1989).................................................................................... 77

*Transaero, Inc. v. La Fuerza Area Boliviana*,
  24 F.3d 457 (2d Cir.), *on reh'g in part sub nom.*
  *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 38 F.3d 648 (2d Cir. 1994) .......... 76

*Trusky v. Gen. Motors LLC (In re Motors Liquidation Co.)*,
  Adv. Proc. No. 09–09803, 2013 WL 620281
  (Bankr. S.D.N.Y. Feb. 19, 2013) ........................................... 60, 62, 63, 67, 68, 70

*United States v. Beggerly*,
  524 U.S. 38 (1998).................................................................................................... 77

*United States v. Int'l Bd. Of Teamsters*,
  247 F.3d 370 (2d Cir. 2001)..................................................................................... 23

*United States v. Int'l Tel. & Tel. Corp.*,
  349 F. Supp. 22 (D. Conn. 1972),
  *aff'd mem. sub. nom.*, *Nader v. United States*, 410 U.S. 919 (1973) ...................... 78

*United States v. Salerno*,
  932 F.2d 117 (2d Cir. 1991)..................................................................................... 54

*Vanderbrook v. Coachmen Indus., Inc.*,
  818 So.2d 906 (La. App. 1 Cir. 2002) ..................................................................... 68

*Weese v. Schukman*,
  98 F.3d 542 (10th Cir. 1996) ................................................................................... 78

*Wilson v. Johns-Manville Sales Corp.*,
  873 F.2d 869 (5th Cir. 1989) ............................................................................ 76, 78

## **Statutes**

15 U.S.C. § 2301, *et seq.*..................................................................................................... 77
Fed. R. Civ. P. 60(b) ......................................................................................................... 25
Fed. R. Civ. P. 60(b)(4)................................................................................................ 42, 45
Fed. R. Civ. P. 60(d) ........................................................................................................... 5
Fed. R. Civ. P. 60(d)(3)................................................................................................ 86, 88
LA. CIV. CODE ART. 2520, *et seq.* ................................................................................... 68

## <u>Other Authorities</u>

Restatement (Second) of Torts § 324A..................................................................................... 73, 74
Restatement (Second) of Torts § 395....................................................................................... 74

## INTRODUCTION

In June 2009, during a period of dramatic financial upheaval, this Court was assigned the

*Old GM*[1] bankruptcy case—one of the largest, most complex Chapter 11 cases in U.S. history.

Old GM's bankruptcy not only directly jeopardized hundreds of thousands of jobs at Old GM,

but also threatened many inter-related companies and jobs that depended on Old GM's business.

President Barack Obama emphasized the importance of Old GM's business and a healthy

automotive industry to our national interest.  Ultimately, the United States and Canadian

Governments ("**Governments**") decided that Old GM's business had to be saved.  They formed

a new entity, which became New GM, that acquired substantially all of Old GM's assets

pursuant to the 363 Sale.  The milestone event in the Old GM bankruptcy was this Court's Sale

Order and Injunction (**Appendix, Exh. "E"**), which approved the 363 Sale to New GM.

In its Sale Decision, this Court outlined the multiple compelling reasons that supported

the approval of the 363 Sale.  In short, Old GM's core assets needed to be sold immediately,

New GM was the only viable entity willing to purchase those assets based on "national interests"

concerns, and the failure to consummate the 363 Sale would have been disastrous for the

---

[1]     Capitalized terms not defined herein shall have the meanings ascribed to them in the *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction* on April 21, 2014 [Dkt. No. 12620] ("**Motion to Enforce**") (**Appendix, Exh. "A"**).  Unless otherwise indicated, the term "**Plaintiffs**" means the plaintiffs in the Ignition Switch Actions, as well as the plaintiffs that are subject to (i) the *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions)* [Dkt. No. 12808] ("**Non-Ignition Switch Actions**") (**Appendix, Exh. "B"**), and (ii) the *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits* [Dkt. No. 12807] (**Appendix, Exh. "C"**) ("**Pre-Closing Accident Cases**" and along with the Ignition Switch Actions and the Non-Ignition Switch Actions, collectively, the "**Actions**").  The term "**363 Sale**" means the transaction pursuant to which New GM acquired substantially all of the assets of Old GM.  The term "**Sale Decision**" means the Court's July 5, 2009 *Decision on Debtors' Motion for Approval of (1) Sale of Assets to Vehicle Acquisition Holdings LLC; (2) Assumption and Assignment of Related Executory Contracts; and (3) Entry into UAW Retiree Settlement Agreement* [Dkt. No. 2967] (as modified by the Court's Errata Order [*see* Dkt. No. 2985]) (published at 407 B.R. 463 (Bankr. S.D.N.Y. 2009)).  The term "**Sale Agreement**" means the *Amended and Restated Master Sale and Purchase Agreement*, dated June 26, 2009 (as amended) (**Appendix, Exh. "D"**), approved by the Court's Sale Decision, and Sale Order and Injunction.

creditors of Old GM and the public at large. Certain creditors of Old GM, who would not be paid in full under the 363 Sale, contested the 363 Sale in an attempt to increase the amounts they would be paid on their claims. But the U.S. Treasury drew a line in the sand: New GM would assume only those liabilities that the U.S. Treasury decided were commercially necessary for New GM's success. In particular, U.S. Treasury did not agree that New GM would assume successor liability claims, pre-petition accident claims, economic loss claims relating to Old GM vehicles and parts, and various claims predicated on Old GM's conduct.

Now, more than five years after the entry of the Sale Order and Injunction, well after the full implementation of the 363 Sale, Plaintiffs resurrect the same failed arguments as the creditors before them made in seeking payments from New GM for Old GM's liabilities. Specifically, Plaintiffs seek to hold New GM liable for a variety of Retained Liabilities, which is a violation of the Sale Order and Injunction.

Plaintiffs essentially concede that the Sale Order and Injunction would bar many of their claims. Nevertheless, they allege, without merit, that the Sale Order and Injunction should not be binding on them because Old GM deprived them of "proper" notice of the Sale Hearing. Plaintiffs further allege that, if they had received such notice from *Old GM*, they would have objected to the 363 Sale and changed the outcome of the Sale Hearing with respect to their claims. Plaintiffs have not, however, disclosed any new arguments that other objectors to the Sale Motion (as defined below) did not make. Nor have Plaintiffs explained how these unarticulated, new arguments would have changed the 363 Sale outcome. Presumably, Plaintiffs will not contend that their arguments would have resulted in the denial of the Sale Motion back in 2009 because, in that case, as this Court has already found, Old GM would have liquidated and unsecured creditors (including Plaintiffs) would have received nothing on their claims. Such

a result would have been far worse for Plaintiffs in the Ignition Switch Actions and Non-Ignition Switch Actions because there would have been no entity to pay for any applicable glove box warranty repairs on their vehicles, or the recall repairs that are now being done at no cost to vehicle owners.

Plaintiffs' opaque hypothesis—that they somehow could have coerced New GM to assume their alleged pre-petition "economic loss" claims—ignores the following material undisputed facts, which inexorably lead to a contrary result.  At the Sale Hearing, New GM refused to assume the claims of pre-closing accident claimants (including those subject to the Pre-Closing Accident Cases).  There is no basis to assume that New GM would have paid economic loss claims for Old GM vehicles (*e.g.*, the loss in value of their vehicles) when it did not pay for the pre-closing injuries and property damage purportedly caused by the same Old GM vehicles.  In addition, New GM refused to pay for any warranty claims, other than the glove box warranty and Lemon Law claims.  There is likewise no basis to assume that New GM would have paid economic loss claims based on breaches of the same warranties that New GM refused to assume.  New GM also refused to assume unconsummated class action settlements (such as *Castillo*, *Dexcool* and *Soders*[2]) relating to alleged defects in Old GM vehicles.  There is also no basis to assume that New GM would have paid Plaintiffs' unliquidated, contingent warranty claims and not pay the fixed, liquidated claims set forth in the class action settlements.  The purchaser testified that it would not have gone through with the 363 Sale if it were forced to assume such claims.  Yet, somehow, Plaintiffs in the Ignition Switch Actions and the Non-Ignition Switch Actions contend, without explanation, that they had the missing "silver bullet"— the secret leverage point that would have forced a different result for them.

---

[2]     *See* Dkt. No. 6622 (Order dated August 10, 2010 approving resolution of *Soders*-related claims) (**Appendix, Exh. "F"**); Dkt. No. 10172 (Order dated May 3, 2011 approving resolution of *Dexcool* claims) (**Appendix, Exh. "G"**).  The *Castillo* decision was recently affirmed by the Second Circuit and is discussed *infra*.

Importantly, the fact that Plaintiffs did not participate in the Sale Hearing did not preclude them, like other purported unsecured creditors, from asserting claims against Old GM seeking their allocable share of the 363 Sale proceeds.  Old GM's bankruptcy schedules were filed after the 363 Sale was consummated, the unsecured claims bar order was entered after the 363 Sale was consummated, and the Old GM plan of liquidation was consummated years after the 363 Sale was consummated.  Each of these events—relating to the determination of Plaintiffs' claims against Old GM—(a) obviously are not related to the 363 Sale since they all occurred **after** the 363 Sale, and (b) relate to the conduct of Old GM only (not New GM).  Thus, any grievance that Plaintiffs may have about the bankruptcy process relating to their claims should be brought against Old GM (and its successor, the GUC Trust).  Plaintiffs have no legitimate grievance against the 363 Sale and the amounts paid by New GM thereunder, which had the salutary effect of creating a fund for the unsecured creditors of Old GM.

Plaintiffs also argue, without any basis in fact, that there was a "fraud on the court" by **Old GM** in connection with the entry of the Sale Order and Injunction.  Old GM was insolvent by tens of billions of dollars at the time of the Sale Hearing.  Yet, Plaintiffs speculate, without any foundation, that Old GM and their restructuring professionals intentionally hid these particular product defect claims because they were somehow outcome-determinative of the issues that the Court needed to decide in approving the 363 Sale.  Of course, the opposite is true: the more insolvent Old GM was, the more compelling the basis for the 363 Sale.  And, at the time of the 363 Sale, while no one knew the quantum of economic loss claims that would actually be filed against Old GM,[3] the Sale Agreement always contemplated that there could be

---

[3]  Plaintiffs' "fraud on the court" theory (which is based on the notion that their claims represented the tipping point for the approval of the 363 Sale) should be measured against the undisputed fact that, after the 363 Sale, there were ultimately 70,000 proofs of claim filed against Old GM; ***29,000 of which were unliquidated***.  The

economic loss claims for Old GM vehicles and that such claims would be Retained Liabilities. In other words, while the magnitude of economic loss claims was unknown, the Sale Agreement was clear as to who bore the liability for such claims—it remained with Old GM, the party that always had the liability.  Finally, the "fraud on the court" theory is inconsistent with the Sale Agreement, which was structured to provide for an upward adjustment of the purchase price in the event that allowed unsecured claims (driven by economic loss claims, or otherwise) ultimately exceeded $35 billion.  In any event, this concocted hypothesis would not constitute "fraud on the court" within the legal standard of Rule 60(d) of the Federal Rules of Civil Procedure ("**Fed. R. Civ. P.**").

In addition to pre-closing wrongful death and personal injury claims both inside and outside Multi-District Litigation ("**MDL**") 2543 (*In re: General Motors LLC Ignition Switch Litigation* (S.D.N.Y.)), this brief discusses the applicability of the Motions to Enforce to the approximately 130 Ignition Switch and Non-Ignition Switch "economic loss" actions that have been consolidated in the MDL, along with other economic loss actions which have not been transferred to the MDL that relate to vehicles and parts manufactured by Old GM.  On October 14, 2014, Lead Plaintiffs in MDL 2543 filed two consolidated complaints against New GM, one on behalf of Plaintiffs who are asserting economic damages for vehicles purchased prior to the closing of the 363 Sale ("**Pre-Sale Consolidated Complaint**"), and the other on behalf of Plaintiffs who are asserting economic damages for vehicles purchased after the closing of the 363 Sale ("**Post-Sale Consolidated Complaint**," and with the Pre-Sale Consolidated Complaint, the "**Consolidated Complaints**").[4]

---

aggregate amount of such claims totaled approximately ***$270 billion***.  *See* Disclosure Statement, p. 33. Relevant excerpts of the Disclosure Statement are contained in the Appendix as **Exhibit "H."**

[4]    Copies of the Consolidated Complaints are contained in the Appendix being filed simultaneously herewith as **Exhibits "I"** and **"J."**

Assuming Plaintiffs subject to the Pre-Sale Consolidated Complaint lose the Due Process Threshold Issue, that Complaint should be dismissed in its entirety because the claims alleged therein are unequivocally barred by the Sale Order and Injunction.  So too if Plaintiffs in the Pre-Closing Accident Cases lose the Due Process Threshold Issue; those complaints should also be dismissed in their entirety, as the claims alleged therein are unequivocally barred by the Sale Order and Injunction.

This brief, therefore, will primarily focus on whether the Post-Sale Consolidated Complaint asserts Retained Liabilities of Old GM against New GM in violation of the Sale Order and Injunction.[5]  The Post-Sale Consolidated Complaint repeats most of the allegations and the same causes of action set forth in the Pre-Sale Consolidated Complaint, including claims purportedly on behalf of a nationwide class of Plaintiffs based on (i) the Magnuson Moss Warranty Act; (ii) a breach of the implied warranty of merchantability; (iii) fraudulent concealment; and (iv) unjust enrichment.  Both Consolidated Complaints also include putative "sub-classes" for each state and the District of Columbia, which assert various state law claims based on consumer protection statutes (as well as for fraud, breach of implied warranty of merchantability, and negligence).

In actuality, the title of the Post-Sale Consolidated Complaint is misleading to the extent it suggests that all of the economic loss claims alleged therein are based on vehicles sold by New GM post-363 Sale.  They are not.  The majority of Named Plaintiffs are asserting economic loss claims for ***Old GM vehicles*** that were resold by dealers or third parties (but not New GM) after the 363 Sale.  Additionally, the economic loss claims in the Post-Sale Consolidated Complaint

---

[5]    This brief discusses the applicability of the Motions to Enforce to all economic loss and Pre-Closing Accident Cases as a whole (whether an individual Action was included in the original Motions to Enforce or in a supplemental schedule filed with the Bankruptcy Court).  The arguments are generally the same; where there are differences, they are noted in the relevant sections.

are for *all* GM-branded vehicles sold (or resold) after the 363 Sale—not just the vehicles that are subject to the various recalls instituted this year.  In other words, Plaintiffs' economic loss claims include used Old GM vehicles that were resold after the 363 Sale but have never been the subject of any recalls.  Economic loss claims related to Old GM vehicles and parts are not Assumed Liabilities and, therefore, by definition, are Retained Liabilities of Old GM.

In *Point I* below, New GM will show that Plaintiffs' due process argument is meritless[6] because Plaintiffs (a) received proper publication notice of the 363 Sale as "unknown" creditors, (b) were generally aware of the 363 Sale in June/July 2009 and took no action in respect of the 363 Sale, (c) are now making the same arguments that were rejected by the Court in connection with the Sale Hearing, and (d) would not have changed the outcome of the Sale Hearing even if they made their objections at that time.

In *Point II* below, New GM addresses the Remedies Threshold Issue and demonstrates that, if Plaintiffs have a due process grievance against any entity (they do not), it is not against New GM, but is instead against the party required to give notice, Old GM (and its successor, the GUC Trust).  In all circumstances, Plaintiffs should not be put in a better position than they could have achieved had they actually participated in the Sale Hearing.  As this Court found in the Sale Decision, New GM purchased Old GM's core assets in good faith.  New GM had no involvement with either the final decision as to who would receive notice of the 363 Sale, or the scope of Old GM's pre-sale disclosures relating to product defects.  In other words, even if Plaintiffs' contentions were correct (they are not), these matters involve Old GM's conduct, and

---

[6]    Plaintiffs in the Pre-Closing Accident Cases presumably cannot make this due process argument because they clearly *knew* they had a claim against Old GM prior to the closing of the 363 Sale, and either (i) received direct mail notice of the Sale Motion because their litigation was pending, (ii) received Publication Notice of the Sale Motion because no claim had yet been asserted, or (iii) had settled with Old GM (and been paid) before the Petition Date, and therefore were not creditors of Old GM at the time of the 363 Sale.

any remedy should be against Old GM, and the proceeds it received from the 363 Sale (now held
by the GUC Trust).

In ***Point III*** below, which deals with the Old GM Claim Threshold Issue, New GM will
show that except for Assumed Liabilities, New GM has no liability for vehicles or parts
manufactured and/or sold by Old GM, regardless of when those vehicles were acquired by
Plaintiffs (*e.g.*, in a third-party used vehicle sale after the 363 Sale).  Assumed Liabilities is a
contractually-defined term consisting of only three categories of liabilities relating to vehicle
owners:  (a) post-363 Sale accidents or incidents involving Old GM vehicles causing personal
injury, loss of life, or property damage; (b) repairs or the replacement of parts provided for under
the "glove box warranty"—a specific written warranty, of limited duration, that only covers
repairs and replacement of parts (and not monetary damages); and (c) Lemon Law claims (as
defined in the Sale Agreement), essentially tied to the failure to honor the glove box warranty.
All other liabilities relating to vehicles and parts manufactured by Old GM are "Retained
Liabilities" of Old GM.  The economic loss claims in the Consolidated Complaints as they relate
to Old GM vehicles and parts, and the Pre-Closing Accident Cases, do not fall within any of the
three expressly defined categories of Assumed Liabilities.  Such claims are therefore Retained
Liabilities of Old GM.  New GM did not acquire any new liabilities relating to Old GM vehicle
owners after the 363 Sale.  The allocation of responsibility for such liabilities was determined in
the Sale Agreement.  The claims "artfully" pled in the Post-Sale Consolidated Complaint relating
to Old GM vehicles, parts and conduct are successor liability claims that are barred by the Sale
Order and Injunction.

Finally, in ***Point IV*** below, New GM explains that, as a matter of law, fraud on the Court
under Fed. R. Civ. P. 60(d) requires egregious conduct, which is qualitatively different than

8

fraud upon another litigant under Fed. R. Civ. P. 60(b).  Fraud on the Court under Fed. R. Civ. P. 60(d)(3) is limited to only that species of fraud that defiles the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner.  In other words, the fraud must be directed at the judicial process itself, not just at other litigants.  As a matter of law, a party's alleged failure to disclose pertinent facts relating to a controversy does not, without more, constitute "fraud on the court."[7]

## FACTS

In late 2008, "[a]t the time that the U.S. Treasury first extended credit to [Old] GM, there was absolutely no other source of financing available.  No party other than Treasury conveyed its willingness to loan funds to [Old] GM and thereby enable it to continue operating."  New GM Agreed-Upon Stipulations of Facts ("**New GM SOF**") (**Appendix, Exh. "K"**), ¶ 4.  In March 2009, the U.S. Government gave Old GM sixty days to submit a viable restructuring plan or Old GM would be forced to liquidate.  *Id.* ¶ 1.  It thereafter became evident that Old GM would not be able to achieve an out-of-court restructuring.  *Id.* ¶ 3.  The only viable option was to sell Old GM's assets through the 363 Sale to a newly-formed company sponsored by the Governments, which ultimately became New GM.  *Id.* ¶ 2.

On June 1, 2009 ("**Petition Date**"), Old GM and three of its direct and indirect subsidiaries (collectively, the "**Debtors**") commenced cases under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York ("**Bankruptcy Court**" or "**Court**").  *Id.* ¶ 2.  On that same day, Old GM filed a motion ("**Sale Motion**") (**Appendix, Exh. "L"**) seeking approval of the original version of the Sale Agreement, pursuant to which substantially all of Old GM's assets were to be sold to New GM.  *See In re Gen. Motors Corp.*,

---

[7]    This brief only addresses the legal standard regarding the "fraud on the court" issue.  Substantive arguments demonstrating why there was no "fraud on the court" are not Threshold Issues.

407 B.R. 463, 473 (Bankr. S.D.N.Y. 2009).  Old GM (*not* New GM) was the proponent of the

Sale Motion and had the burden of seeking its approval and complying with all due process

requirements.  *See generally* Sale Motion.

### A.   The Sale Notice

In the Sale Motion, Old GM requested, and the Court authorized, the service of direct

mail notice of the Sale Motion and the relief requested therein on the categories of individuals

and entities listed on Exhibit "4" annexed to New GM's Agreed-Upon Stipulations of Fact.  New

GM SOF, ¶ 19.  Old GM's noticing agent, the Garden City Group ("**GCG**"), provided direct

mail notice of the 363 Sale in accordance with the Court's directive to over 4 million persons and

entities at a cost of approximately $3 million.  *See* Declaration of Scott Davidson ("**Davidson**

**Declaration**") (**Appendix, Exh. "1"**), ¶ 5.  New GM did not decide which parties would receive

direct mail notice of the Sale Motion or how notice would be provided.  New GM SOF, ¶ 17.

That decision was made by Old GM, which sought and obtained approval of the notice

procedures from the Court.  Old GM represented to New GM under the Sale Agreement that it

would follow the sale procedures approved by the Court (*see* Sale Motion, ¶¶ 49-57), and it did.

Old GM also stated in the Sale Motion (¶¶ 46 and 55) that it was not practicable to

provide direct mail notice to contingent creditors, and that publication notice should be sufficient

under the circumstances.  At that time, approximately 70 million Old GM vehicles were in use in

the United States.  *See* Declaration of Michael Yakima ("**Yakima Declaration**") (**Appendix,**

**Exh. "2"**), ¶ 5.

Old GM considered vehicle owners who were not involved in actual litigation with Old

GM at the time of the 363 Sale to be unknown, contingent creditors.  That was consistent with

Old GM's books and records, which did not reflect the names of Old GM vehicle owners as

being creditors of Old GM (unless there was a fixed monetary obligation owed to them).  *See*

10

Declaration of Herb Kiefer ("**Kiefer Declaration**") (**Appendix, Exh. "3"**), ¶ 3.  Old GM was not required to provide direct mail notice to unknown creditors, which included holders of contingent warranty claims.  *See* Sale Procedures Order (**Appendix, Exh. "M"**), ¶ E; Sale Order and Injunction, ¶ E.  This Court previously ruled in the *Robley* matter (discussed *infra*) that Old GM did not have to mail notices of the 363 Sale to Old GM vehicle owners who had not yet sued Old GM, and that publication notice of the 363 Sale in the form approved by the Court was sufficient for due process purposes.  Hr'g Tr. (**Appendix, Exh. "N"**) 59:19-61:13, June 1, 2010.

On or before June 11, 2009, pursuant to the Court's directive, Old GM published extensive notice of the Sale Motion in (a) the global edition of *The Wall Street Journal*, (b) the national edition of *The New York Times*, (c) the global edition of *The Financial Times*, (d) the national edition of *USA Today*, (e) *The Detroit Free Press/Detroit News*, (f) *Le Journal de Montreal*, (g) *The Montreal Gazette*, (h) *The Globe and Mail*, and (i) *The National Post*, and (j) on the website of GCG (the "**Publication Notice**").  New GM SOF, ¶¶ 22-23.

In the Sale Procedures Order, the Bankruptcy Court approved the form and content of the direct mail notice and the Publication Notice.  Sale Procedures Order, ¶ 9.  The 363 Sale notices did not discuss or identify the liabilities or the potential liabilities of Old GM.  The Sale Procedures Order (¶ 12) provided that the failure to timely object to the Sale Motion would bar "the assertion, at the Sale Hearing or *thereafter*, of any objection to the Motion, to the consummation and *performance of the 363 Transaction* contemplated by the MPA . . . ." (emphasis added).  The Sale Procedures Order was never appealed.  New GM SOF, ¶ 24.

In addition to direct mail and Publication Notice, there was a tremendous amount of media coverage of the Old GM bankruptcy and the contemplated sale to New GM.[8]  The U.S. Government's financing and the purchase of Old GM's business was a controversial subject that

---

[8]    *See* Declaration of Andrew Bloomer ("**Bloomer Declaration**"), contained in the Appendix as **Exhibit "4"**.

was widely discussed in the media.  Indeed, there was never an issue as to whether the public

would become aware of Old GM's bankruptcy filing and the 363 Sale—that was a given.  In

fact, because of this wide public awareness, there was concern that consumer confidence would

be eroded if Old GM lingered in bankruptcy (*see Gen. Motors Corp.*, 407 B.R. at 492);

widespread notice of the 363 Sale was therefore provided so the public would know of the

contemplated prompt "bankruptcy exit" for Old GM's business.  Any notion that the public at

large (especially an Old GM vehicle owner or his/her attorney) was caught unaware of Old GM's

bankruptcy filing and the sale of its business to the Governments-sponsored entity is not

credible.  The District Court aptly summarized this point: "[n]o sentient American is unaware of

the travails of the automobile industry in general and of General Motors Corporation . . . in

particular."  *In re Gen. Motors Corp.*, No. M 47(LAK), 2009 WL 2033079, at *1 (S.D.N.Y. July

9, 2009).

### B.    The Sale Agreement

Old GM sold its core assets in the 363 Sale.  The claims related thereto are expressly

allocated in the Sale Agreement.  Under the Sale Agreement, claims arising from or based on

Old GM vehicles, parts, or conduct fall within one of two categories: either they are an Assumed

Liability that went to New GM, or a Retained Liability that stayed with Old GM.  It is a binary

choice; there is no third option for claims relating to Old GM vehicles, parts, or conduct,

including for Old GM vehicles that were resold in a used vehicle transaction after the 363 Sale.

New GM's liability for an Old GM vehicle or part was limited to only the three categories of

contractually-defined Assumed Liabilities:    (a) post-sale accidents or incidents involving

personal injury, loss of life, or property damage; (b) repairs or the replacement of parts provided

for under the "glove box warranty"; and (c) Lemon Law claims.  Every claim based on an Old

GM vehicle, part or conduct that was not specifically listed as an Assumed Liability is, by definition, a Retained Liability of Old GM. *See* Sale Agreement, § 2.3(b).

These classifications on their face do not depend on whether an Old GM vehicle sold before the 363 Sale was later re-sold after the 363 Sale by someone other than New GM (*i.e.*, a dealer or a third party). Stated otherwise, the resale of an Old GM vehicle did not, and could not, transform a Retained Liability into an Assumed Liability.

By way of illustration, according to the Post-Sale Consolidated Complaint, Named Plaintiff Barry Wilborn, after the 363 Sale, bought a 2007 used Chevrolet Cobalt in a private sale for $4,000, with no warranty. Post-Sale Consolidated Complaint, ¶ 43. Whatever economic loss claim is associated with that Old GM vehicle is a Retained Liability, no matter when, or how many times, that vehicle was sold by a dealer or a third party. By way of further example, the same result would apply to Named Plaintiff Rafael Lewis who, after the 363 Sale, purportedly bought a 2006 Chevrolet Cobalt at auction for $2,800, with no warranty. *Id.* ¶ 56; *see also id.* ¶ 29 (Named Plaintiff Barbara Hill who bought a 2007 Chevy Cobalt, after the 363 Sale, from Auto Nation (a Nissan dealer)); *id.* ¶ 51 (Named Plaintiff Lisa West who bought a 2008 Chevy Cobalt, after the 363 Sale, from All Star Hyundai).

Moreover, the fact that some Old GM employees, who were investigating alleged product defects while at Old GM, became Transferred Employees (as defined in the Sale Agreement) after the closing of the 363 Sale did not expand the scope of liabilities assumed by New GM with respect to Old GM vehicles or parts. The Sale Agreement expressly contemplated that Old GM employees would be hired by New GM. *See* Sale Agreement, § 6.17(a). Thus, the explicit allocation of liabilities for Old GM vehicles, parts, and conduct as set forth in the Sale

Agreement was not affected by the hiring of employees (as contemplated by the same Agreement).

Further, the Sale Order and Injunction is equally clear that, except for Assumed Liabilities (not applicable here), New GM is *not liable* for any claims arising in any way in connection with any *acts, or failures to act* of Old GM, whether *known or unknown*, contingent or otherwise, whether arising before *or after* Old GM's bankruptcy, including claims arising under doctrines of successor or transferee liabilities. Sale Order and Injunction, ¶ AA. Thus, it is not Old GM's conduct (*i.e.*, the purported knowledge of Old GM's employees) that determines whether New GM assumed liabilities relating to Old GM vehicles. It is the express terms of the Sale Agreement and the Sale Order and Injunction that sets forth the Assumed Liabilities of New GM. Plaintiffs' attempt to shift the argument to the purported knowledge of Old GM employees when they were hired by New GM is simply another way of making a "successor liability" claim, which is proscribed by the Sale Order and Injunction.

In addition, Plaintiffs' attempt to make New GM's covenant to comply with the recall requirement of the National Traffic and Motor Vehicle Safety Act the equivalent of an Assumed Liability is contrary to the express terms of the Sale Agreement and the Sale Order and Injunction. Assumed Liabilities are set forth in Section 2.3(a) of the Sale Agreement. The recall covenant is in Section 6.15 of the Sale Agreement. The Sale Order and Injunction (¶ 7) is clear that New GM acquired the Purchased Assets free and clear of all claims. The only exception is the contractually defined "Assumed Liabilities"—that term does not include alleged breaches of the recall covenant. And, the alleged failure to comply with the recall covenant is not a back door opportunity to transform that Retained Liability into an Assumed Liability. New GM's separate covenant to comply with certain federal statutes does not modify the explicit Assumed

14

Liability construct in the Sale Agreement.  Especially since, as shown *infra*, such federal statutes do not provide for a private right of action.

### C.    Vehicle Owners' Objections To The 363 Sale And Their Disposition By The Court

The Sale Motion engendered a number of objections by entities speaking on behalf of vehicle owners.    Consumer organizations representing vehicle owners, plaintiffs' lawyers representing vehicle owners, States' Attorneys General representing their public constituencies including vehicle owners, and the Creditors' Committee representing all unsecured creditors, including vehicle owners, each objected to the 363 Sale.[9]

The Center for Auto Safety[10] (and other consumer advocacy groups) filed an objection to the Sale Motion arguing that the Court should make clear that the sale process "does not release the claims of consumers who will be injured *or suffer losses* as a result of defects in GM Vehicles."  Consumer Advocacy Memo of Law, at 24 (emphasis added).

The States' Attorneys General filed an objection to the Sale Motion arguing that New GM should assume consumer claims, including implied warranty claims, additional express warranties, and statutory warranties.  *See* First AG Objection, Second AG Objection.  They noted their concern that the Retained Liability provision taken as a whole "divests consumers of legal

---

[9]    *See* Limited Objection and Memorandum of Law of Personal Injury Claimants, Center for Auto Safety, *et al*. [Dkt. Nos. 2176 ("**Consumer Advocacy Limited Objection**") (**Appendix, Exh. "O"**) & 2177 ("**Consumer Advocacy Memo of Law**") (**Appendix, Exh. "P"**)]; Objection of Ad Hoc Committee of Consumer Victims [Dkt. No. 1997] ("**Consumer Victims Objection**") (**Appendix, Exh. "Q"**); States Attorneys General Objections [Dkt. Nos. 1926 ("**First AG Objection**") (**Appendix, Exh. "R"**) & 2043 ("**Second AG Objection**") (**Appendix, Exh. "S"**)]; and Limited Objection of Official Committee of Unsecured Creditors [Dkt. No. 2362 ("**Creditors Comm. Objection**") (**Appendix, Exh. "T"**)].

[10]   The Center for Auto Safety is a non-profit consumer advocacy organization for vehicle owners.  The other consumer advocacy groups were (i) Consumer Action, (ii) Consumers for Auto Reliability and Safety, which is dedicated to preventing, among other things, economic losses by vehicle owners (*see* Consumer Advocacy Limited Objection, ¶ 5), (iii) National Association of Consumer Advocates, which represents consumers "in the ongoing struggle to curb unfair or abusive business practices . . ." (*id.*), and (iv) Public Citizens, which "has a long history of advocacy on matters related to auto safety" (*id.*) (collectively, the "**Consumer Advocacy Groups**").  The Consumer Advocacy Groups worked to protect consumers who would be affected by Old GM's bankruptcy case.  *See* New GM SOF, ¶¶ 36-37.

rights, without regard to state laws, that may, when a claim is eventually made, be read to hold otherwise." First AG Objection, at 4.

The Ad Hoc Committee of Consumer Victims[11] filed an objection to the 363 Sale arguing that if the pre-petition bond exchange offer had been successful, all consumer claims would have been assumed, and that the 363 Sale should achieve the same result. *See* Consumer Victims Objection, ¶ 34. They also argued that since New GM's viability did not rest on rejecting consumer claims, New GM should assume such claims. *Id.* ¶ 35. In addition, they contended that assuming the glove box warranty, but not prepetition accident claims, made little sense. *Id.* ¶ 37. Each of these objectors, along with the Creditors Committee, raised the issue that New GM should be liable for successor liability claims.

The three-day Sale Hearing took place from June 30 through July 2, 2009. New GM SOF, ¶ 48. Counsel for the Consumer Advocacy Groups, the Ad Hoc Committee of Consumer Victims, the States' Attorneys General, and the Creditors Committee all appeared at the Sale Hearing. *Id.* ¶ 39. The Personal Injury Claimants[12] and the Consumer Advocacy Groups argued, *inter alia*, that New GM should assume broader warranty-related claims, and that New GM should not be shielded from successor liability claims. *Id.* ¶ 44. U.S. Treasury Representatives declined to make further changes to the Sale Agreement with respect to Assumed Liabilities and Retained Liabilities. *Id.* ¶ 47. Auto Task Force member and U.S. Treasury official Harry Wilson testified that "[o]ur thinking [as] a commercial buyer of the assets that will constitute [New GM] was to assess what [l]iabilities were commercially necessary for the success of [New GM]." *Id.* ¶ 6.

---

[11] The Ad Hoc Committee of Consumer Victims asserted that they represented more than 300 members who each had product liability claims involving personal injuries against Old GM. *See* New GM SOF, ¶ 38.
[12] The Personal Injury Claimants are defined in New GM SOF, ¶ 32 n.8.

Old GM's counsel argued at the Sale Hearing that it was unnecessary to decide how to deal with vehicle owner claims against Old GM as part of the 363 Sale. Old GM would have sale proceeds and could deal with that issue as part of its liquidating plan. Hr'g Tr. (**Appendix, Exh. "U"**) 262:14-25, July 1, 2009. Counsel for Wilmington Trust[13] echoed that sentiment at the Sale Hearing, stating that the 363 Sale created a pie, and that the creditors could fight about how that pie should be allocated after the 363 Sale closed. Hr'g Tr. (**Appendix, Exh. "V"**) 109:15-24, July 2, 2009. In the Sale Decision, the Court endorsed this theme: "GM's assets simply are being sold, with the consideration to be hereafter distributed to stakeholders, consistent with their statutory priorities under a subsequent plan." *Gen. Motors*, 407 B.R. at 474. The Court also stated that the Sale Agreement did not seek to restructure the rights of creditors; it merely brought in value that creditors would share in a plan. *Id.* at 495-96.

Counsel for Old GM also emphasized at the Sale Hearing that Old GM and New GM were separate, distinct entities. It was clear that Old GM and New GM had different ownership, and engaged in "intense arms' length negotiations" that culminated in the 363 Sale. *Id.* at 494. This separation was further illustrated by the fact that Old GM made requests for provisions in the Sale Agreement that were rejected by the U.S. Treasury. Hr'g Tr. 151:20-152:3, July 2, 2009. In fact, the vehicle owner objectors tried to show at the Sale Hearing that Old GM recommended that New GM assume certain vehicle owner claims as being commercially necessary, but New GM had a differing view, which prevailed. Hr'g Tr. (**Appendix, Exh. "W"**) 174:12-22, June 30, 2009. The Sale Order and Injunction expressly held that neither New GM nor U.S. Treasury was an "insider" of any of the Debtors. *See* Sale Order and Injunction, ¶ S.

---

[13]    Wilmington Trust was at that time, the indenture trustee for Old GM bonds with a face value of approximately $24 billion and the chairman of the Creditors Committee. It is now the GUC Trust Administrator.

### D.    Sale Decision and Sale Order and Injunction

On July 5, 2009, the Court issued the Sale Decision and Sale Order and Injunction,

approving the Sale Agreement.  The Court overruled all of the remaining objections.  It held that

the 363 Sale was the only viable alternative.  *See Gen. Motors*, 407 B.R. at 485.  It found that if

Old GM had liquidated its assets, unsecured creditors would have received nothing from the Old

GM bankruptcy estate.  New GM SOF, ¶ 50.  As of March 31, 2009, Old GM had consolidated

reported global assets and liabilities of approximately $82,290,000,000 and $172,810,000,000,

respectively.  *Id.* ¶ 51.  The Court found that, as of the Petition Date, if Old GM had liquidated

its assets, its liquidation asset value would have been less than 10% of $82 billion.  *Id.* ¶ 52.  The

Court further found that the consideration transferred by New GM to Old GM under the Sale

Agreement was estimated to be worth not less than $45 billion, plus the value of equity interests

in New GM.  *Id.* ¶ 53.[14]

In the Sale Decision, the Court held that Old GM had the legal basis under section 363(f)

of the Bankruptcy Code to sell its assets "free and clear" of successor liability claims.  *Gen.

Motors*, 407 B.R. at 505-06.  Importantly, the Court also found that the purchaser would ***not***

have consummated the Sale Agreement without this protection.  *See* Sale Order and Injunction, ¶

DD.  The Sale Decision also provided that New GM had the ability, in its sole discretion, to

"pick and choose" which Old GM liabilities it would assume.  The Court found "it was the intent

and structure of the 363 Sale, as agreed on by the [U.S. Treasury] and Old GM, that the New GM

would start business with as few legacy liabilities as possible, and that presumptively, liabilities

would be left behind and not assumed."  New GM SOF, ¶ 5.  The Court recognized that New

---

[14]    The Sale Decision specifically noted that: "Only the U.S. and Canadian Governmental authorities were prepared
to invest in GM—and then not so much by reason of the economic merit of the purchase, but rather to address
the underlying societal interests in preserving jobs and the North American auto industry, the thousands of
suppliers to that industry, and the health of the communities, in the U.S. and Canada, in which GM operates."
*Gen. Motors*, 407 B.R. at 480.

GM was not assuming, among other things, (a) product liability claims from accidents or incidents before the sale, (b) liabilities to third parties for claims based upon contract, tort or other basis, or (c) liabilities related to any implied warranty or implied obligation under statutory or common law. *Gen. Motors*, 407 B.R. at 482. The Court understood the circumstances of the tort claimants and that they would not be able to collect from New GM, but found that the law in this Circuit clearly supported that result. *See id.* at 505. In addition, the Court found that New GM (essentially the Governments) was a "good faith purchaser" and was entitled to the protections of section 363(m) of the Bankruptcy Code. *Id.* at 494; Sale Order and Injunction, ¶ R. On July 10, 2009, New GM consummated the 363 Sale. New GM SOF, ¶ 56.

The Personal Injury Claimants and a bondholder separately appealed the Sale Order and Injunction. *See Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 428 B.R. 43 (S.D.N.Y. 2010) (Buchwald, J.); *Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 430 B.R. 65 (S.D.N.Y. 2010) (Sweet, J.). The Sale Order and Injunction was upheld on appeal by at least two different District Court judges. *See id.* Millions of transactions have since been entered into by New GM, and others, based on the rights and provisions contained in the Sale Agreement and the Sale Order and Injunction. One of the appeals of the Sale Order and Injunction was dismissed by the Second Circuit more than three years ago on the grounds that it was equitably moot. New GM SOF, ¶ 64.

Old GM filed a certificate of dissolution on or about December 15, 2011, and, pursuant to an Assignment and Assumption Agreement dated December 15, 2011, Old GM assigned to the GUC Trust certain assets and agreements and the GUC Trust assumed certain obligations of Old GM. *Id.* ¶ 65. As of June 30, 2014, the GUC Trust held, in the aggregate, approximately $1.1 billion in assets that remained from the proceeds of the 363 Sale. *See Motors Liquidation*

19

*Company GUC Trust Quarterly GUC Trust Report as of June 30, 2014*, dated August 13, 2014 [Dkt. No. 12838] (**Appendix, Exh, "X"**), at 11. On October 24, 2014, the GUC Trust filed a quarterly report with the Court indicating, among other things, that it anticipated making an additional distribution to GUC Trust beneficiaries of securities with an estimated value of $225 million on or about November 12, 2014, notwithstanding that the Four Threshold Issues have yet to be decided by the Court. *See Motors Liquidation Company GUC Trust Quarterly Section 6.2(c) Report and Budget Variance Report as of September 20, 2014* [Dkt. No. 12963] ("**GUC Trust Section 6.2(c) Report**") (**Appendix, Exh. "Y"**), at notes 1, 2.

The GUC Trust is the successor to the Old GM estate. *See* Disclosure Statement, at 93; Old GM's Second Amended Chapter 11 Plan, § 1.115 (relevant excerpts are contain in the **Appendix, Exh. "Z"**); GUC Trust Form 10-K for the period ending March 31, 2014 (relevant excerpts are contained in the **Appendix, Exh. "AA"**), at 2; Amended and Restated GUC Trust Agreement, dated as of June 11, 2012 (relevant excerpts are contained in the **Appendix, Exh. "BB"**), at § 6.5. The GUC Trust is subject to the positions previously taken by its predecessor(s).

## E.    The Actions and Consolidated Complaints

All of the Actions include, in whole or part, vehicles and/or parts designed and manufactured by Old GM. *See* New GM SOF, ¶ 66; Consolidated Complaints; Pre-Closing Accident Motion to Enforce. At the time of the 363 Sale, the Named Plaintiffs in the Ignition Switch Actions and Non-Ignition Switch Actions (i) had not sued Old GM on account of the purported defect in their vehicle (*id.* ¶¶ 11-12), and (ii) were not listed as creditors in the books and records of Old GM as a result of their vehicle ownership. *See* Kiefer Declaration, ¶ 3.

On June 9, 2014, the Judicial Panel on Multidistrict Litigation established MDL 2543 and designated the United States District Court for the Southern District of New York as the MDL

court, assigning the Honorable Jesse M. Furman to conduct coordinated or consolidated proceedings for the actions assigned to the MDL.  More than 130 cases are pending in MDL 2543.  Many involve economic loss claims based on vehicles with allegedly defective parts, and some involve claims for personal injuries.

At an August 11, 2014 initial case conference, the District Court discussed the filing by Lead Counsel of a consolidated master complaint for all economic loss actions.  On October 14, 2014, Lead Counsel filed two Consolidated Complaints.  The Pre-Sale Consolidated Complaint is based on a successor liability theory and concerns Plaintiffs who purchased a vehicle with a purported Old GM defective part prior to the closing of the 363 Sale and are asserting an economic loss claim against New GM.

The Post-Sale Consolidated Complaint concerns Plaintiffs who assert economic loss claims against New GM and purchased vehicles after the closing of the 363 Sale.  The putative classes defined in the Consolidated Complaints encompass all Old GM and New GM vehicles sold during a defined time period (not just vehicles that have been recalled).  Notwithstanding its label, a substantial majority of Plaintiffs named in the *Post-Sale Consolidated Complaint* seek economic loss damages for vehicles *manufactured by Old GM*.  *See* Post-Sale Consolidated Complaint, § III.A.  In other words, those Named Plaintiffs allege that they bought a used Old GM vehicle from a third party—not from New GM.  In such circumstance, for those Named Plaintiffs, the purported basis of New GM's liability is the same flawed theory of successor liability that is used for the Pre-Sale Consolidated Complaint.

The Post-Sale Consolidated Complaint violates the Sale Order and Injunction to the extent it seeks to recover various Retained Liabilities from New GM.  For example, it contains causes of action predicated on an alleged design defect in an Old GM vehicle (*see* ¶ 910); it

seeks rescission against New GM for amounts paid to Old GM (*see* ¶ 898); and it refers to an implied warranty when the Old GM vehicle was purchased (*see* ¶ 904).  Such claims as they relate to Old GM vehicles are subject to the Motions to Enforce, whether they are stated in the Pre-Sale Consolidated Complaint or the Post-Sale Consolidated Complaint.

F.    **Old GM Administration and Claims**

As of the time of the 363 Sale, Old GM retained AP Services, LLC ("**APS**") to provide interim management and restructuring services.  Old GM also retained Weil Gotshal & Manges ("**WGM**") as its counsel to handle, among other things, the 363 Sale.  Both APS and WGM advised Old GM in connection with the Sale Motion and the Sale Hearing.

As of the time of the 363 Sale, Old GM had not filed its schedules of assets and liabilities with the Court, there was no deadline or bar date for general unsecured creditors to file claims, and no disclosure statement or plan of reorganization had been filed.[15]

At some point *after* the 363 Sale was consummated, the $270 billion of claims filed against Old GM were substantially reduced.  As of this date, there have been approximately $31 billion of general unsecured claims allowed, and there are less than $2 billion of disputed general unsecured claims pending against Old GM.  *See* GUC Trust Section 6.2(c) Report.  Plaintiffs have not filed proofs of claims against the *Old GM* bankruptcy estate.  Nor have they filed a motion for authority to file a late proof of claim against the *Old GM* bankruptcy estate.

---

[15]    The Debtors' initial bankruptcy schedules were filed with the Court on September 15, 2009.  *See* Dkt. Nos. 4060 *et seq.*  The Order establishing the bar date for filing proofs of claims was entered on September 16, 2009. *See* Dkt. No. 4079.  The Debtors' Second Amended Chapter 11 Plan was confirmed on March 29, 2011.  *See* Dkt. No. 9941.

**ARGUMENT**

I.    **DUE PROCESS THRESHOLD ISSUE:**
      **PLAINTIFFS' DUE PROCESS RIGHTS WERE NOT VIOLATED**

Plaintiffs seek to void the Sale Order and Injunction as to them by contending that they should have received direct mail notice of the 363 Sale. Significantly, Plaintiffs, as a putative class, have ***not*** affirmatively argued that the class, as a whole, was ***unaware*** of Old GM's bankruptcy filing and the pendency of the 363 Sale. The failure to establish that essential fact ends the "due process" argument for their putative class. Furthermore, they concede that they received publication notice.[16] As shown below, such notice satisfied constitutional due process requirements.

A party seeking relief under Fed. R. Civ. P. 60(b)(4) for lack of due process carries an extremely heavy burden, particularly when dealing with an asset sale order under section 363 of the Bankruptcy Code. Voiding a sale order against a good faith purchaser like New GM, more than five years after the transaction was consummated, requires rare and extraordinary proof; Plaintiffs do not come close to satisfying that demanding standard.

A.    **Plaintiffs Have Failed to Meet Their Burden Under Fed. R. Civ. P. 60(b)(4)**

Relief under Fed. R. Civ. P. 60(b) may only be granted in the "most exceptional of circumstances" and cannot "impose undue hardship on other parties." *In re Old Carco LLC*, 423 B.R. 40, 45 (Bankr. S.D.N.Y. 2010), *aff'd*, 2010 WL 3566908 (S.D.N.Y. Sept. 14, 2010), *aff'd*, *Mauro Motors Inc. v. Old Carco LLC*, 420 Fed. App'x 89 (2d Cir. 2011); *see also United States v. Int'l Bd. Of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001) (relief under Fed. R. Civ. P. 60(b) is "not favored and is properly granted only upon a showing of exceptional circumstances."); *Dickerson v. Bd. of Educ.*, 32 F.3d 1114, 1116 (7th Cir. 1994). Furthermore, courts in this

---

[16]    Pre-closing accident claimants who had active lawsuits as of the Petition Date received direct mail notice of the Sale Motion.

Circuit (and elsewhere) have broadly interpreted section 363(m) of the Bankruptcy Code to protect purchasers from attacks on the finality of bankruptcy sales.

In that context, a party challenging a 363 sale order (a challenge that would otherwise be statutorily moot pursuant to section 363(m) of the Bankruptcy Code) not only bears the burden of showing "exceptional circumstances" under Fed. R. Civ. P. 60(b)(4), but has the additional and higher burden of showing that its challenge overcomes the well-established legislative policy of protecting good faith purchasers of a debtor's assets.  As stated by Judge Peck in *Lehman*:

> This tension relating to finality naturally exists to some extent in every motion under Rule 60(b) but the Court views final Sale Order and Injunctions as falling within a select category of court orders that may be worthy of greater protection from being upset by later motion practice.  Sale Order and Injunctions ordinarily should not be disturbed or subjected to challenges under Rule 60(b) unless there are truly special circumstances that warrant judicial intervention and the granting of relief from the binding effect of such orders.

*In re Lehman Bros. Holdings Inc.*, 445 B.R. 143, 149-50 (Bankr. S.D.N.Y. 2011), *aff'd in part and rev'd in part on other grounds*, 478 B.R. 570 (S.D.N.Y. 2012), *aff'd*, 761 F.3d 303 (2d Cir. 2014).   In *Lehman*, significant information was omitted from the record of the sale hearing—facts that the Court "in a more perfect hearing" would have liked to have known.  *Id.* at 150.   However, "[d]espite what in retrospect appears to be a glaring problem of flawed disclosure," the movants failed to carry their burden in establishing a right to relief from the sale order under Fed. R. Civ. P. 60(b).  *Id.* at 150.  Here, there was no flawed disclosure as to the assets sold, and *Lehman's* conclusion that relief under Fed. R. Civ. P. 60(b) is not available is therefore even more compelling for this proceeding.

Also, the law of this case is that the Sale Order and Injunction should not be overturned because any challenge thereto would be equitably moot.  *See Campbell*, 428 B.R. at 60-64 (finding it clear that "this Court cannot fashion effective relief without rewriting and unraveling

the integrated terms of this extensively negotiated transaction—which would be beyond our power . . ."); *Parker*, 430 B.R. at 80-83 ("[T]he 363 Transaction, as noted, has been consummated, with all of the attendant consequences of transferring and transforming a multibillion dollar enterprise, including its relationship to third parties, governmental entities, suppliers, customers and the communities in which it does business. The doctrine of equitable mootness thus applies."). In the words of the District Court, it is now too late for the Court to order effective relief from the Sale Order and Injunction. Millions of transactions have been undertaken based on the 363 Sale. To modify the Sale Order and Injunction now would "knock the props out" of the foundation upon which these transactions were based. *See Parker*, 430 B.R. at 82; *Campbell*, 428 B.R. at 63 n.31. This rationale is equally compelling in the Fed. R. Civ. P. 60 context, as it is in the appeal context.

Further, the law of this case is that the Sale Order and Injunction cannot be partially revoked. This form of relief is expressly prohibited by the Sale Order and Injunction, which provides that all of its terms are non-severable and mutually dependent on each other. *See* Sale Order and Injunction, ¶ 69. This "partial revocation" argument was also expressly rejected by the District Courts in ruling on the appeals of the Sale Order and Injunction. *See Campbell*, 428 B.R. at 52 ("the very nature of the requested relief, to the extent it could even be granted, would result in an inequitable rewriting of the Sale Order and Injunction"); *see also id*. at 61 ("As a threshold matter, the requested remedy (characterized as 'elective surgery' on the Sale Order and Injunction to 'carve out' its offending provisions) is beyond the power of this Court to grant . . . [and the] Bankruptcy Court could not have modified the Sale Order and Injunction without the parties' consent or written waiver"); *Parker*, 430 B.R. at 81-82.

**B.** **Plaintiffs' Due Process Argument Fails Because Plaintiffs Received Constitutionally Adequate And Reasonable Notice Of The 363 Sale**

**1.** **Due Process Is A Flexible Standard Based On The Particular Facts And Circumstances Of The Case**

Due process is a flexible standard requiring notice "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Parker*, 430 B.R. at 97 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). That flexibility is important in bankruptcy matters. For example, in *Caldor*, the court evaluated the reasonableness and adequacy of debtor's method of notice in light of the dire financial circumstances facing the debtor, the debtor's emergency application to the court, and the "formidable task of providing notice to approximately 35,000 entities" in a compressed time frame. *Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 583 & n.5 (S.D.N.Y. 2001).

Here, the reasonableness of the method of notice approved by the Court and provided by Old GM to Plaintiffs must be evaluated in the context of the extreme circumstances facing Old GM at the time of the 363 Sale. *See In re Drexel Burnham Lambert Grp.*, 995 F.2d 1138, 1144 (2d Cir. 1993) ("No rigid constitutionally mandated standard governs the contents of notice in a case like the one before us. The Due Process Clause requires the best notice practical under the circumstances." (*citing Mullane*, 336 U.S. at 314)). Further, "the Supreme Court has warned against interpreting this notice requirement so inflexibly as to make it an 'impractical or impossible obstacle.'" *Id.* Importantly, in affirming the Sale Order and Injunction on appeal, the District Court properly recognized that this flexible standard applied with "due regard for the practicalities and peculiarities" of the Old GM bankruptcy. *Parker*, 430 B.R. at 97-98. In the Sale Procedures Order, the Court outlined how notice was to be given and to whom. The record is clear that GCG, on behalf of Old GM, provided notice of the 363 Sale in accordance with the

Sale Procedures Order.  Essentially, Plaintiffs are arguing that the Court erred in setting forth

how, and to whom, Old GM was required to provide notice.  It is far too late to make that

argument now.

### 2. Under The Circumstances Facing Old GM, Plaintiffs Were "Unknown" Creditors

The 363 Sale involved an expedited, complex sale of assets in connection with an

extremely complicated chapter 11 case.   Well-established law provides that, in such

circumstances, a debtor can rely on its books and records to identify its "known" creditors for

sale notice purposes.  In *In re Motors Liquidation Co*., 462 B.R. 494 (Bankr. S.D.N.Y. 2012)

("***Morgenstein***"), the Court held that since un-asserted, potential contingent product liability

claims arising from allegedly undisclosed defects in Old GM's products were not in Old GM's

books and records, the holders of such contingent product liability claims were not "known"

creditors.  *Id*. at 508 & n.68; s*ee also In re New Century TRS Holdings, Inc.*, No. 07-10416

(BLS), 2014 WL 842637, at *3-6 (Bankr. D. Del. Mar. 4, 2014); *In re Agway, Inc.*, 313 B.R. 31

(Bankr. N.D.N.Y. 2004) (holding that the plaintiff's claims were not "known" claims on

Agway's books and records even though Agway held significant information regarding the

possibility of the claim being brought against it); *In re Best Prods. Co*., 140 B.R. 353, 358

(Bankr. S.D.N.Y. 1992) (debtor not required to search beyond its own books and records to

ascertain the identity of unknown creditors).

Here, at the time of the 363 Sale, Old GM's books and records did not identify Plaintiffs

in the Ignition Switch Actions or the Non-Ignition Switch Actions as creditors of Old GM as a

result of owning an Old GM vehicle.  *See* Kiefer Declaration, ¶ 3.  Old GM recognized that, with

respect to vehicles it manufactured, some number of unknown vehicle owners might eventually

assert claims against it.  That is why Old GM established warranty and litigation reserves for

financial reporting.  Hr'g Tr. 161:23-21, June 30, 2009.  But for un-asserted claims (such as Plaintiffs' claims in the Ignition Switch Actions and the Non-Ignition Switch Actions at the time of the 363 Sale), specific vehicle owners were not listed as creditors in Old GM's books and records.  These owners were considered to have, at best, contingent claims.  They were "unknown" creditors.

Plaintiffs point to the fact that a certain limited number of Old GM personnel were aware that there were some reported incidents prior to the 363 Sale where the ignition switch in an Old GM vehicle had turned from the run to the accessory or off position and that there were internal inquiries as to what had occurred.  However, the mere possibility of purported claims based on engineering issues being investigated by Old GM prior to the 363 Sale does not make such purported claims "known" to Old GM as of the Petition Date.  *See Morgenstein*, 462 B.R. at 508, nn.55, 67, 68; *see also In re Enron Corp.*, No. 01-16034 (AJG), 2006 WL 898031, at *4-5 (Bankr. S.D.N.Y. Mar. 29, 2006); *In re Envirodyne Indus., Inc.*, 206 B.R. 468, 473-75 (N.D. Ill. 1997); *New Century*, 2014 WL 842637, at *3-6.

Well-established law provides that, as part of the review of its books and records, a debtor's reasonable diligence does not require "impracticable and extended searches . . . in the name of due process." *In re XO Commc'ns. Inc.*, 301 B.R. 782, 793-94 (Bankr. S.D.N.Y. 2003) (citing *Mullane*, 339 U.S. at 317).  A debtor does not have a "duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it." *Id*. at 793 (quoting *In re Brooks Fashion Stores, Inc*., 124 B.R. 436, 445 (Bankr. S.D.N.Y. 1991) (quoting *Charter Crude Oil Co. v. Petroleos Mexicanos* (*In re Charter Co*.), 125 B.R. 650, 654 (M.D. Fla. 1991))).  A vast open-ended investigation is not required.  *XO Commc'ns.*, 301 B.R. at 793; *Chemetron Corp. v. Jones*, 72 F.3d 341, 347 (3d Cir. 1995)).  For due process in the bankruptcy

context, requiring debtors to undertake extensive investigations would "completely vitiate the important goal of prompt and effectual administration and settlement of debtors' estates." *In re U.S.H. Corp. of N.Y.*, 223 B.R. 654, 659 (Bankr. S.D.N.Y. 1998) (internal quotations omitted); *Chemetron*, 72 F.3d at 348. As to contingent litigation claims, such as those held by Plaintiffs, "a debtor is not charged with the knowledge of the existence of a contingent claim absent a claimant's express statement of its intent to lodge a future claim against the debtor." *Agway,* 313 B.R. at 39 (citing *In re Brooks Fashion Stores, Inc*., No. 92 Civ. 1571 (KTD), 1994 WL 132280 (S.D.N.Y. Apr. 14, 1994); *In re L.F. Rothschild Holdings, Inc*., No. 92 Civ. 1129 (RPP), 1992 WL 200834 (S.D.N.Y. Aug. 3, 1992); *In re Best Prods. Co*., 140 B.R. 353 (Bankr. S.D.N.Y. 1992)); *In re Union Hosp. Ass'n*, 226 B.R. 134, 139 (Bankr. S.D.N.Y. 1998). Plaintiffs did not express any intent to bring a claim against Old GM until years after the consummation of the 363 Sale.

The Court's decision in *Morgenstein* is directly on point. There, this Court held that the plaintiffs were "unknown" creditors and could not use lack of actual notice to vacate the confirmation order. In *Morgenstein*, the plaintiffs alleged that, to obtain the Court's approval of Old GM's bankruptcy plan, Old GM concealed from the plaintiffs and the Court design defects in 2007 and 2008 Chevy Impalas that were allegedly known to Old GM prior to the formulation of its liquidation plan. 462 B.R. at 505-08. The *Morgenstein* plaintiffs estimated that the defect, allegedly concealed by Old GM, impacted 400,000 vehicles and caused approximately $180 million in damages. *Id.* at 496 n.2. They argued that the plan confirmation order should not apply to them because they did not receive actual notice, asserting that:

> In [Old GM's] schedules and disclosure statement . . ., the Debtors falsely omitted disclosure of its obligations to an entire class [sic] Impala Owners/Lessees (hereinafter "Impala Owners") [sic] Debtors knew of this class of creditors ("Known Creditors"). Known Creditors knew nothing of Debtors' obligation to

address their claims because the design defect in their respective vehicles was a latent defect of which GM gave no notice.

*Id*. at 497 n.6.

This Court rejected the *Morgenstein* plaintiffs' argument that they were "known" creditors.  462 B.R. at 508 & nn. 55, 67, 68.   The Court's decision in *Morgenstein* was upheld on appeal.  *See Morgenstein v. Motors Liquidation Co.*, Order, 12 Civ. 01746 (AJN) (S.D.N.Y. Aug. 9, 2012) [Dkt. No. 21] (**Appendix, Exh. "CC"**).[17]

Plaintiffs' arguments also are similar to the arguments rejected in *Burton v. Chrysler Group, LLC* (*In re Old Carco*), 492 B.R. 392 (Bankr. S.D.N.Y. 2013) ("**_Burton_**").   In that case, the plaintiffs alleged their pre-petition vehicles suffered from a design flaw known as a "fuel spit back" problem.   *Id*. at 394.   The plaintiffs asserted a due process violation saying they did not know of the defect at the time of the sale because they were not given notice and the defect did not manifest itself until after the sale.[18]   Judge Bernstein rejected the plaintiffs' due process argument and held that New Chrysler was entitled to the protection in the sale order from economic loss claims for pre-petition vehicles.   *See id*. at 402-03.   The court ruled that even though Old Carco had actual knowledge relating to the defect in related vehicles prior to the sale and did not provide the plaintiffs with actual notice of the defect, that knowledge was insufficient to make the Old Carco plaintiffs "known" creditors.   *Id*.   As the *Old Carco* court found, "[a]nyone who owns a car contemplates that it will need to be repaired . . ."; such claims are contingent claims.  *Id*. at 403.  The *Old Carco* court's rationale is equally applicable here.

---

[17]   The arguments raised by plaintiffs in *Morgenstein* have even less merit here.   The *Morgenstein* plaintiffs asserted they were denied adequate notice of the proposed plan, where issues regarding the debtor's liabilities are specifically addressed and decided.  In contrast, in the 363 Sale context, issues relating to specific liabilities **_not_** being assumed by the purchaser are not germane to whether the sale should be approved.  The focus, in the 363 Sale context, is whether the sale process ultimately achieved the best price for the debtor's assets under the circumstances.  Liabilities of the debtor that are retained by the debtor under the 363 Sale typically are sorted out after the 363 Sale is consummated, when there is a pool of assets to divide up among the creditors.

[18]   *See* Burton Plaintiffs' Opposition to Motion to Dismiss (**Appendix, Exh. "DD"**), dated March 21, 2012, ¶ 66.

30

Likewise, *In re Enron* established that even an ongoing formal investigation does not transform a contingent creditor into a known creditor.  2006 WL 898031 (Bankr. S.D.N.Y. Mar. 29, 2006).   In *Enron*, the State of Montana sought to file a late claim arguing that it was a "known" creditor deprived of due process because after bankruptcy, but before the bar date, the Federal Energy Regulatory Commission ("**FERC**") had started an administrative investigation into Enron's alleged power manipulation in the western United States, with the FERC ultimately concluding several years later that Enron had engaged in improper conduct.  *Id*. at *1-2.  After noting the flexible legal standards for due process and the legal distinction between "known" versus "unknown" creditors in the bankruptcy context, Judge Gonzalez rejected the State of Montana's argument holding that, even though at the time of the bar date the FERC was conducting an investigation, that fact was not sufficient to trigger a known creditor status for the State of Montana.  *Id.* at *4-5.    The *Enron* court also held that there was no indication that an investigation by the debtors of their books and records at that time would have demonstrated that the State of Montana held a claim.  *Id.*; *see also Envirodyne Indus.*, 206 B.R. at 473-75 (holding that plaintiff alleging to be a victim of debtor's antitrust violations was an "unknown" creditor, notwithstanding debtor's receipt of a subpoena, prior to the confirmation of the debtor's reorganization plan, from the United States Justice Department investigating allegations that debtor had violated antitrust laws).

Similarly, in *New Century*, Judge Carey denied a late claim seeking damages for alleged fraudulent mortgage loan practices. 2014 WL 842637.   There, an examiner conducted an investigation and produced a report identifying some mortgage loan issues facing the debtor.  *Id.* at *5.  The court held that simply because a report highlighted issues with certain lending

practices did not mean that the movant asserting some of those same practices was a "known" creditor. *Id.* at *6.

Moreover, the pendency of certain product liability lawsuits does not make parties with similar but unfiled claims "known" creditors. The *New Century* court held that the existence of litigation against the debtor by certain customers did not make every customer in the same category a "known" creditor at the time of the bankruptcy. *Id.* at *5. Instead, the court held that this type of unfiled, unasserted litigation claim was "either conjectural or future or, although [it] could be discovered upon investigation, [such claim did] not in due course of business come to the knowledge [of the debtor.]" *Id.* (citing *Chemtron*, 72 F.3d at 346). As in *New Century*, in *In re Spiegel, Inc.*, 354 B.R. 51, 56-57 (Bankr. S.D.N.Y. 2006), the plaintiffs alleged they were "known" creditors because the debtor knew about litigation by a different party with claims similar to plaintiffs prior to confirmation. However, the plaintiffs themselves did not assert their litigation claims against the debtor until after the debtor's reorganization plan had been approved. Judge Lifland rejected the argument that simply having a litigation claim similar to another parties' pending litigation claim makes one a "known" creditor. He held that a debtor is "not required to employ a crystal ball . . . when one complaint is filed to determine whether any other similar claims exist." *Id.* (citing *Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478 (1988)).

Also, in *Agway*, an employer knew about an employee's litigation against various entities in connection with an on-the-job injury. 313 B.R. at 36, 39. The employer filed for bankruptcy and did not provide actual notice to all the defendants in the employee's pending personal injury action, notwithstanding the foreseeable claims that defendants held against it for indemnity and contribution. *Id.* at 38-39. The court held that the defendants in the employee's personal injury

action, who had not expressed an intent to lodge a claim against the employer prior to the bar date, held contingent claims that were therefore "unknown" to the employer for the purposes of notice. *Id.* at 39. The court ruled that a debtor's knowledge of some litigation claims does not make a person who might potentially assert similar claims a "known" creditor.

Here, as of June 2009, although there were some issues raised relating to certain Old GM vehicles, none of the Plaintiffs in the Ignition Switch Actions or Non-Ignition Switch Actions had commenced any litigation against Old GM, and none were listed as creditors on Old GM's books and records. *See* Kiefer Declaration, ¶ 3. The authorities cited above apply a consistent standard that leads to the inescapable conclusion that Plaintiffs were "unknown" creditors for purposes of notice of the Sale Hearing.

### 3.      Plaintiffs Received Proper Notice Of The 363 Sale

At the time of the 363 Sale, Old GM's restructuring professionals (APS and WGM) provided guidance to Old GM as to the categories of individuals and entities that should receive direct mail notice of the 363 Sale. According to the GCG cost structure used for the direct mail notice of the Sale Motion, providing direct mail notice to the owners of the 70 million Old GM vehicles on the road in the United States would have cost Old GM approximately $43 million, or *14 times* the cost actually incurred by Old GM for direct mail notice of the 363 Sale. *See* Davidson Declaration, ¶ 7.

Importantly, there was extensive news coverage of the pending 363 Sale to the U.S. Government. *See* Bloomer Declaration (discussing the over 1,250 written news stories concerning the Old GM bankruptcy and the 363 Sale in the weeks between the Petition Date and the Sale Hearing). Through these news stories and other extensive media coverage, the general public and Old GM's customers were undoubtedly aware of the contemplated 363 Sale.

Under these facts and circumstances, publication notice for vehicle owners who might potentially bring a claim related to their vehicles was proper.  The notice informed the public of the proposed sale, including that the assets would be sold free and clear of claims.  It also stated where additional information with respect to the Sale Motion could be obtained.  Sending out more detailed and widespread direct mail notice would not have made any difference to the outcome of the 363 Sale.  Instead, it would have cost Old GM millions of dollars, and taken more time to complete, thereby causing delay and further deterioration to the value of the Debtors' assets.  The flexibility of due process does not require such a wasteful notice procedure.

Old GM requested and obtained approval from the Court to provide notice by publication for, *inter alia*, contingent claims.  Specifically, in the Sale Motion, Old GM asserted:

> ***The notice to be provided via the Publication Notice is reasonably calculated to provide all parties in interest (including parties with contingent claims)*** with the necessary information concerning the 363 Transaction, the Sale Hearing, and the Sale Order, ***including the requested finding as to successor liability***, because providing notice to these parties by mail is not practicable.

Sale Motion, ¶ 46 (emphasis added).

Old GM also requested and obtained approval from the Court for a shortened notice period, citing to the extensive media coverage already provided:

> the fact that it ***has been widely known*** that the Company's assets and businesses have been available for sale and that the Debtors' precarious financial and operational condition have been ***widely reported in the media on a daily basis for the past few months***, due process is not hindered as a result of the proposed shortening of the applicable notice periods.

*Id.* (emphasis added).

This Court ruled in its Sale Decision that adequate notice by publication was given in connection with the 363 Sale.  *Gen. Motors*, 407 B.R. at 494 ("Notice was extensively given, and it complied with all applicable rules").  The Court further found:

34

> With respect to parties who may have claims against the Debtors, but whose identities are not reasonably ascertainable by the Debtors (including, but not limited to, ***potential contingent warranty claims against the Debtors***), the Publication Notice was sufficient and reasonably calculated under the circumstances to reach such parties.

Sale Order and Injunction, ¶ E (emphasis added).  Thus, the Court ruled that owners of vehicles manufactured by Old GM with "contingent claims," including "potential contingent warranty claims," received adequate notice through publication.  This holding is directly applicable to Plaintiffs' claims and remains correct today.

A year after the Sale Hearing, this Court confronted a due process argument substantially similar to the one made by Plaintiffs here.  In that case, a pre-363 Sale accident claimant (Shane Robley), who commenced a lawsuit against New GM post-363 Sale, complained that he only received publication notice of the Sale Motion, instead of direct mail notice.  There, the Court ruled that publication notice satisfied due process for the vehicle owner:

> It's agreed by all concerned that Mr. Robley didn't get mailed a personal notice of the 363 hearing that resulted in the sale order, very possibly because as of that time, Mr. Robley had not sued either Old GM or New GM yet.  It's also agreed that Old GM and New GM did not give personal notice of the 363 hearing to all of the individuals who had ever purchased a GM vehicle, and instead, supplemented its personal notice to a much smaller universe of people by notice by publication.  ***It's also undisputed that I expressly approved the notice that had been given in advance of the 363 hearing including the notice by publication, which I found to be reasonable under the circumstances***.  Mr. Robley relies on the First Circuit's decision in *Western Auto Supply Company v. Savage Arms, Inc.*, 43 F.3d 714 (1st Cir, 1994), in which the First Circuit Court of Appeals, speaking through Judge Conrad Cyr, a highly respected former bankruptcy judge, agreed with the district judge that the bankruptcy court had erred when the bankruptcy court enjoined prosecution of product line liability actions brought against the purchaser of the debtor's business for lack of notice. But the critically important distinction between this case and the *Savage Arms* case is that here, and not there, notice was also given by publication.  We all agree that due process requires the best notice practical, but we look to the best notice that's available under the circumstances.  Here, under the facts presented in June of 2009, ***GM didn't have the luxury of waiting to send out notice by mail to hundreds of thousands of GM car owners, and instead gave notice by publication, which I approved***.  In *Savage Arms*, the debtor "[concededly] made

no attempt to provide notice by publication" (43 F.3d at 721) and the notice that was given was never determined, "appropriate in the particular circumstances" (*Id.* at 722). In other words, the First Circuit found it significant that the debtors in *Savage Arms* didn't do the very thing that was done here. *As I've indicated, I've already determined that notice was appropriate in the particular circumstances, and provided for that in an order that entered on July 5th, 2009 that remains valid today. Moreover, it's obvious that the notice was, indeed, appropriate and did what it was supposed to do because it permitted Mr. Jakubowski, in particular, to make effectively and well the very arguments that Mr. Robley's counsel would, himself, have to make either now or back then and which I then considered and rejected.*

Hr'g Tr. 59:20-61:13, June 1, 2010 (emphasis added).

In the Sale Procedures Order, the Court also expressly approved the **content** of the direct mail notice and the Publication Notice. *See* Sale Procedures Order, ¶ 9. The fact that the 363 Sale notice did not identify or describe the liabilities owed by Old GM that were not being assumed by New GM was known at the time to the Creditors Committee, the States' Attorneys General, the Consumer Advocacy Groups, the plaintiffs' bar representing vehicle owners, and others. No one ever challenged the content of the notice or to whom the direct mail notice would be sent. It is far too late in the day to do so now. Accordingly, the method of notice approved by this Court in the Sale Procedure Order satisfied due process then and now.

C.    **Plaintiffs' Due Process Argument Fails
      Because Plaintiffs Cannot Demonstrate Prejudice**

1.    **A Party That Has Suffered No Prejudice Has No Due Process Claim**

Critically, for a party to establish that it has been deprived of due process, it must show that (i) proper notice was not given, **and** (ii) it suffered **prejudice** as a result of the method of notice used. *See, e.g., In re Edwards*, 962 F.2d 641, 644-45 (7th Cir. 1992); *Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575 (S.D.N.Y. 2001); *In re Vanguard Oil & Serv. Co.*, 88 B.R. 576, 580 (E.D.N.Y. 1988); *In re Caldor, Inc.-NY*, 240 B.R. 180, 188 (Bankr. S.D.N.Y. 1999); *In re Gen. Dev. Corp.* 165 B.R. 685, 688 (S.D. Fla. 1994) ("A creditor's due process

36

rights are not violated where the creditor has suffered no prejudice."); *see also Perry v. Blum*, 629 F.3d 1, 17 (1st Cir. 2010); *In re Parcel Consultants*, Inc., 58 F. App'x 946, 950-51 (3d Cir. 2003) ("Proof of prejudice is a necessary element of a due process claim"); *Parker*, 430 B.R. at 97-98 (finding that shortened notice period did not violate unsecured creditor's due process rights because, among other reasons, creditor "was in no way prejudiced by the expedited schedule which was necessitated by the unique and compelling circumstances of the Debtors' chapter 11 cases and the national interest.").

The burden is on the moving party to demonstrate that it was prejudiced by an alleged notice deficiency. *See Pearl-Phil*, 266 B.R. at 583 ("[E]ven if notice was inadequate, the objecting party must demonstrate prejudice as a result thereof."); *Rapp v. U.S. Dep't of Treasury, Office of Thrift Supervision*, 52 F.3d 1510, 1520 (10th Cir. 1995); *In re YBA Nineteen, LLC*, 505 B.R. 289, 300 (S.D. Cal. 2014). As a matter of law, a party cannot prove prejudice when it could not have done anything that would have made a material difference to the outcome of the proceeding, or improved its position in the proceedings had another method of notice been used. *See In re City Equities Anaheim, Ltd.*, 22 F.3d 954, 959 (9th Cir. 1994) (rejecting due process claim for lack of prejudice); *Secs. Investor Prot. Corp. v. Blinder, Robinson & Co., Inc.*, 962 F.2d 960, 967 (10th Cir. 1992); *In re YBA Nineteen, LLC*, 505 B.R. at 300 (denying debtor's appeal of conversion of bankruptcy case to Chapter 7 case on the grounds that "even if the Bankruptcy Court failed to provide Debtor with sufficient notice and opportunity to be heard, Debtor has failed to show that it was prejudiced by any defective process afforded it"); *In re U.S. Kids, Inc.*, 178 F.3d 1297, 1999 WL 196509, at *5 (6th Cir. 1999); *see also In re Rosson*, 545 F.3d 764, 777 (9th Cir. 2008) ("Because there is no reason to think that, given appropriate notice and a hearing, Rosson would have said anything that could have made a difference, Rosson was

37

not prejudiced by any procedural deficiency."). Thus, federal courts have routinely and uniformly held that where a movant has not proven prejudice there can be no violation of due process.

In *In re Edwards*, a known secured creditor with an undisputed claim sought relief from a 363 sale order under Fed. R. Civ. P. 60(b)(4), arguing that the lack of actual notice deprived him of due process and therefore the sale order was void. 962 F.2d at 644. In affirming the lower court decision, the Seventh Circuit weighed the lack of prejudice, the strong policies of finality of bankruptcy sales embodied in section 363(m), and the bedrock principle that a bona fide purchaser at a bankruptcy sale gets good title to the assets purchased. *Id.* at 645. The court enforced the sale order and held that it was not void even as to a known, undisputed secured creditor that was not provided actual notice that his own collateral was being sold. The *Edwards* court relied, in part, on the fact that there was no dispute about the sales process or the sales price. *Id.* Also, it reasoned that had the secured creditor been notified, appeared and objected at the sale hearing, nothing would have changed; the same sale to the same buyer at the same price would have been approved. The court stated that "[t]he law balances the competing interests [of a purchaser against a lienholder who did not receive notice], but weights the balance heavily in favor of the bona fide purchaser." *Id.* at 643.

In *In re Paris Indus. Corp.*, 132 B.R. 504 (D. Me. 1991), the court reached the same conclusion. The debtor there sold its assets in bankruptcy "free and clear" of product liability claims. *Id.* at 506-08. A person injured after the sale by a product manufactured by the debtor prior to the sale brought suit in state court against several defendants, including the purchaser of the debtor's assets. *Id.* The purchaser's co-defendants in the state court action sought contribution from the purchaser. *Id.* In response, the purchaser filed an action in bankruptcy

court seeking injunctive relief enforcing the "free and clear" language in the sale order.  The

bankruptcy court granted the purchaser's request and the co-defendants appealed on due process

grounds, arguing that the sale order could not be enforced against them because they had not

been provided actual notice of the sale.  *Id*. at 509-10.  The district court rejected that argument.

It distinguished the purpose of notice in the context of claims discharge from the purpose of

notice in the context of a sale of a debtor's assets.  In the latter case, the purpose:

> is to insure that the sales price is fair and that the funds flowing into the bankrupt
> estate for distribution among creditors or for other purposes are the most that
> could be realized from the assets sold. …[appellants were] in no way prejudiced
> by the lack of notice and their inability to appear and argue their position on the
> sale. They have made no showing that, if they had been notified and had
> appeared, they could have made any arguments to dissuade the bankruptcy court
> from issuing its order that the assets be sold free and clear of all claims.

*Id*.  The court found no prejudice by the sale because all the sale did was take a group of assets

and convert them into cash.  *Id*.  The fact that the cash was subsequently distributed to creditors

in accordance with bankruptcy law and appellants were subsequently left without recovery on

their claim did not mean that they were prejudiced by the sale.  *Id.*

Also on point is *Pearl-Phil GMT*, 266 B.R. 575.  Pearl entered into an agreement with a

chapter 11 debtor-in-possession to produce merchandise according to the debtor's specifications.

*Id*. at 578.  After the agreement had been entered into, the debtor filed an emergency application

to wind-down its business in chapter 11 and, because it was administratively insolvent, to

bifurcate administrative expense claims into pre-wind-down claims (which would be paid *pro*

*rata*) and post-wind-down claims (which would be paid in full).  *Id*. at 578-79.  The debtor did

not provide notice to Pearl of the emergency hearing on the wind-down application.  *Id*.  The

bankruptcy court held that Pearl, as the holder of a pre-wind down claim, should be paid on a

*pro-rata* basis.  *Id.*  On appeal, the district court held that even if the debtor provided inadequate

notice, Pearl was not deprived of due process because it was unable to establish any prejudice as a consequence of the method of notice provided. *Id.* In particular, Pearl was unable to provide any testimony or evidence that would have impacted the bankruptcy court's holding that Pearl should be paid on a pro-rata basis. *Id*. at 583-85.

### 2.    Plaintiffs Have Suffered No Prejudice As A Result Of Their Receiving Notice Of The Sale Proceedings by Publication

Plaintiffs have not alleged, nor can they prove in light of the undisputed facts and record of the Sale Hearing, any tangible prejudice as a consequence of having received Publication Notice. Thus, they have not been deprived of due process and their request for extraordinary relief under Fed. R. Civ. P. 60(b)(4) should be denied.

The Sale Agreement and Sale Order and Injunction would not have been altered had Old GM provided each Plaintiff in the Ignition Switch Actions and Non-Ignition Switch Actions with direct mail notice (i) of the 363 Sale, (ii) identifying the precise nature of the purported defect, and (iii) that the 363 Sale would prevent them from asserting their claims against the purchaser. Pre-petition accident claimants who had filed litigation claims against Old GM as of the Petition Date received direct mail notice of the 363 Sale. However, over their objection, New GM did not assume those pending pre-petition accident claims. This is precisely the reason that the Plaintiffs' claims in the Pre-Closing Accident Cases are barred. There is no credible argument that economic loss claimants such as Plaintiffs in Ignition Switch Actions or Non-Ignition Switch Actions would have done any better than pre-petition accident claimants. The same 363 Sale process would have taken place, the same overall consideration paid, and the same purchaser and Sale Agreement would have been presented and approved. In short, Plaintiffs cannot meet their burden of establishing that the result would have changed if they had been given direct mail notice of the 363 Sale.

**a.  Similarly-Situated Parties Filed Objections To The Sale
Motion That Encompassed Objections That Plaintiffs
Could Have Raised Had They Participated In The 363 Sale**

The Sale Motion engendered objections from a coalition of parties representing Old GM

vehicle owners, including the Consumer Advocacy Groups and Personal Injury Claimants, the

Ad Hoc Committee of Consumer Victims, and States' Attorneys General.  The asserted grounds

for these objections included lack of due process and that New GM was not required to assume

*all* vehicle owner liabilities ("**Vehicle Claim Objections**").  The Consumer Advocacy Groups

and the Personal Injury Claimants objected to the 363 Sale as follows:

- "GM's attempt to enjoin successor liability claims against the Purchaser must be denied because it violates applicable law, notice, and due process requirements." Consumer Advocacy Limited Objection, ¶ 18;
- "[D]ue process principles do not allow GM to eliminate rights of future claimants, who have not and could not have received meaningful notice that their rights in a future suit are being lost, and thus have no opportunity to seek to preserve those rights." Consumer Advocacy Memo of Law, at 19;
- "People who have not yet suffered injury or *loss* because of GM's behavior cannot have an 'interest in' GM's property because the injuries that would lead them to have such an interest have not yet even occurred."  *Id.* at 20 (emphasis added);
- "[T]he future causes of actions [sic] of people who have not yet suffered a *loss* or injury due to the defect in their vehicles would not be covered" under the definition of "claim."  *Id.* at 20 (emphasis added); and
- "This Court should avoid the difficult constitutional questions that would arise from clearing the Purchaser of liability for claims that do not yet exist, and make clear that the sale does not release the claims of consumers who will be injured *or suffer losses* in the future as a result of defects in GM vehicles." *Id.* at 23-24 (emphasis supplied).

The Ad Hoc Committee of Consumer Victims objected to the 363 Sale as follows:

- "To make matters worse, knowing that it is seeking an order which would eliminate tort claims, GM has continued to advertise and sell GM vehicles without advising unwitting consumers that it is seeking to bar future claims for injuries arising from defects in vehicles sold before the closing. Such conduct is unconscionable, if not illegal." Consumer Victims Objection, ¶ 38; and
- "Further, as soon as consumers comprehend that New GM has avoided responsibility for tort claims, their confidence will be shaken and the value of

41

used GM vehicles will drop perhaps dramatically, damaging millions of consumers." *Id.* ¶ 40.

The States' Attorneys General stated the following objections:

- "[C]ertain rights are too inchoate or unknown to rise to the level of a claim at the time of the bankruptcy case and courts have not allowed such claims to be discharged by debtors in a plan." Second AG Objection, at 21.[19]

The Creditors Committee stated, in their limited objection to the 363 Sale, as follows:

- "As relevant to this Objection, successor liability claims falls into two broad categories. The first are claims for which a right to payment, contingent or otherwise, already exists ('existing claims'). The second are 'claims' for which a right to payment has yet to arise because no liability-generating conduct or incident has yet occurred ('future claims')."  Creditors Comm. Objection, ¶ 58;
- "[S]everal courts have concluded – mistakenly, in the Committee's view – that bankruptcy courts can authorize sales free and clear of existing successor liability claims."  *Id.* ¶ 59; and
- "The Committee objects because the proposed order approving the sale purports to cut off all state law successor liability for the new entity purchasing GM's assets. Current and future claimants alleging claims based on injuries caused by product defects, breach of implied warranties …would thus be limited to recourse against the limited assets being left behind in the old company." *Id.* at ¶ 5.

Notably, these groups expressly argued that it would violate due process to shield New GM from successor liability claims arising from defects in vehicles manufactured by Old GM. They argued that innocent vehicle owners had not been given actual notice or the opportunity to be heard regarding claims that were not known to them at the time of the Sale Hearing.  *See e.g.,* Creditors Comm. Objection, ¶ 6 ("the attempt to cut off liability for *future* claims is ineffective and a violation of due process that would likely not even be honored by state courts" (emphasis in original)); Consumer Advocacy Limited Objection, ¶ 18 ("GM's attempt to enjoin successor

---

[19]    As noted in the Court's *Castillo* decision, numerous State Attorneys General also objected, seeking to expand the definition of New GM's Assumed Liabilities to include implied warranty claims. *Castillo v. Gen. Motors LLC (In re Motors Liquidation Co.),* Adv. Proc. No. 09–00509, 2012 WL 1339496, at *5 (Bankr. S.D.N.Y. Apr. 17, 2012), *aff'd,* 500 B.R. 333 (S.D.N.Y. 2013), *aff'd,* No. 13-4223-BK, 2014 WL 4653066 (2d Cir. Sept. 19, 2014).  They were not successful.

liability claims against the Purchaser must be denied because it violates applicable law, notice, and due process requirements"). Those arguments were properly rejected by the Court, and therefore, Plaintiffs cannot show they were prejudiced by not allegedly having had the opportunity to make the very same objections.

### b. New GM's Agreement To Assume Some Narrow Additional Categories Of Liabilities Specifically Confirmed That It Would Not Assume Existing Product Claims

In response to certain objections, New GM agreed to assume responsibility for (a) post-sale accidents and distinct incidents involving Old GM vehicles causing personal injury, loss of life or property damage, and (b) Lemon Law claims.[20] At the same time, New GM refused any further modifications with respect to other vehicle owner liabilities. New GM's refusal to assume a substantial portion of Old GM's liabilities was fundamental to the 363 Sale (*see* Sale Order and Injunction, ¶ DD) and was widely disclosed by Old GM to all interested parties. *See generally* Sale Motion**.** Like any other section 363 purchaser, New GM agreed to assume some, but not all of the Debtors' liabilities. On appeal, the District Court noted that even though New GM agreed to assume certain additional liabilities:

> [T]he transfer of the Purchased Assets was to remain free and clear of any Existing Products Claims.
>
> The agreement between the Debtors and the Purchaser, as embodied in the [Sale Agreement] and the Sale Order and Injunction itself, made clear that the Purchaser would not pursue the 363 Transaction unless the assets were sold free and clear of those liabilities the Purchaser had not agreed to assume**,** ***including the Existing Products Claims***…

*Campbell*, 428 B.R. at 47-8 (emphasis added). Thus, it was an essential condition of the purchase that New GM not be saddled with claims such as those Plaintiffs are now asserting.

---

[20] Liabilities relating to the glove box warranty (as limited by the Sale Agreement and Sale Order and Injunction) were always considered Assumed Liabilities.

Plaintiffs cannot show that, had they received direct mail notice of the 363 Sale, the result would have been different.

### c.  At The Sale Hearing, Old GM And New GM Made Clear That New GM Would Be Shielded From All Successor Liability Claims

At the Sale Hearing, the vehicle claim objectors persisted in their objections to the 363 Sale.  They continued to challenge the provision that protected New GM from successor liability claims, which included the type of economic loss claims that Plaintiffs are now asserting.  While some issues had been resolved prior to the Sale Hearing, the vehicle claim objectors did not withdraw their due process objections.  At the outset of the Sale Hearing the Court stated:

> I am also going to want, at some point, and I'll take your recommendations as to the best time, for objectors on successor liability issues, which are the main issues in this case, and of the debtor, to give me one-page submissions as to their understanding as to which of the successor liability issues remain and which have been eliminated.

Hr'g Tr. 41:4-41:12, June 30, 2009.

Early in the first day of the Sale Hearing, Old GM's counsel made clear that the types of claims now being asserted by Plaintiffs would remain with Old GM:

> There are two areas in which there has been progress. On the product liability side, Your Honor, in respect of product liability claims arising from expressed warranties in connection with accidents from products, anything—any accident that occurs after the closing date, Your Honor, irrespective of when the vehicle was manufactured and sold, will be assumed by the purchaser, now New General Motors Corporation. . . . So there is a major concession on the part of the purchaser, Your Honor, with respect to that type of claims. . . . ***Other tort claims, other than what I've already explained, Your Honor, would remain with Old GM.***

*Id*. at 46:4-46:19 (emphasis added).

On the second day of the sale hearing, Harry Wilson (Auto Task Force member and U.S. Treasury official) testified that the U.S. Treasury made a business judgment that New GM would not assume responsibility for products liability claims arising out of accidents that occurred

44

before the bankruptcy. *See* Hr'g Tr. 102:25-103:9, July 1, 2009. Mr. Wilson further testified that New GM agreed to accept only those liabilities that Treasury deemed "commercially necessary for the success" of the company. *Id.* at 104:13. New GM's position was that no other liabilities should be part of the transaction. *Id.* at 104:14-15. Mr. Wilson made clear that New GM does "not have any intention to move forward if the Sale Order and Injunction, with regard to successor liability, is not entered as described in here." *Id*. at 150:2-4. Later at the hearing, counsel for Old GM explained that a "363 sale enables the establishment of the value of the assets and leads to a determination of what the pie will be and ultimately, in subsequent proceedings, who will share in that pie." *Id.* at 238:22-25.

All of the foregoing exchanges occurred after Old GM advised the Court that New GM had agreed to accept liabilities related to post-363 Sale accidents or incidents involving Old GM vehicles causing personal injury, loss of life, or property damage. The above-quoted exchanges therefore did not relate to the issue of such "future" claims, which were resolved by agreement. They related to the very types of successor liability claims Plaintiffs are now asserting. Simply put, the vehicle claim objections that were not resolved by agreement, including the outstanding due process objections, were fully considered and properly rejected by the Court. As this Court previously noted in rejecting the same due process argument, "these provisions [free and clear of successor liability] in the sale order were not slipped in the order with stealth, but were hotly contested before me." Hr'g Tr. 56:12-14, June 1, 2010.

The objections to the Sale Motion and arguments made at the Sale Hearing encompass any objections that Plaintiffs could have asserted. There is no reason to believe that Plaintiffs' economic loss claims would have received special treatment. There is nothing unique about

Plaintiffs' economic loss claims that would have resulted in them being "Assumed Liabilities."

Thus, Plaintiffs cannot demonstrate prejudice and their due process objection fails.

### d.  The Court Considered And Overruled The Vehicle Claim Objections

In approving the 363 Sale and overruling the Vehicle Claim Objections, the Court held

that Old GM's assets could pass to New GM "free and clear" of successor liability claims.  *Gen.*

*Motors*, 407 B.R. at 499-506.[21]  And, the Court determined that there was no due process

violation.  These rulings were affirmed on appeal.  *Parker*, 430 B.R. at 65.  The Court's ruling

expressly encompassed both "present claims and unknown future claims."  *Gen. Motors*, 407

B.R. at 505 & nn. 105-06 (citing *In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009), *aff'd*,

(2d Cir. June 5, 2009)).

In approving a similar Section 363 sale shielding the buyer from successor liability

claims, in *In re Chrysler LLC*, Judge Gonzalez rejected the same type of due process objections

relating to unknown product defects that Plaintiffs are making herein:

> Additionally, objections in this category touching upon notice and due process
> issues, particularly with respect to potential future tort claimants, are overruled as
> to those issues because, as discussed elsewhere in this Opinion, notice of the
> proposed sale was published in newspapers with very wide circulation. The
> Supreme Court has held that publication of notice in such newspapers provides
> sufficient notice to claimants "whose interests or whereabouts could not with due
> diligence be ascertained." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S.
> 306, 317, 70 S. Ct. 652, 94 L. Ed. 865 (1950). Accordingly, as demonstrated by
> the objections themselves, the interests of tort claimants, including potential
> future tort claimants, have been presented to the Court, and the objections raised
> by or on behalf of such claimants are overruled.

405 B.R. at 111.

In Old GM's bankruptcy case, the Court noted Judge Gonzalez's rejection of similar due

process objections in Chrysler, and came to the same conclusion:

---

[21]    The Court noted that with respect to asbestos claims, it was precluding successor liability claims to the fullest
extent it was permitted to do so.  *Gen. Motors*, 407 B.R. at 507.

In Chrysler, Judge Gonzalez expressly considered and rejected the efforts to impose successor liability. And more importantly, the Second Circuit, after hearing extensive argument on this issue along with others, affirmed Judge Gonzalez's Chrysler order for substantially the reasons Judge Gonzalez set forth in his Chrysler decision.

…

One of the matters argued at length before the Circuit on the appeal was successor liability, both with respect to present claims and unknown future claims. They were hardly trivial elements of the appeal, and were a subject of questioning by members of the panel. If the Circuit did not agree with Judge Gonzalez's conclusions on successor liability, after so much argument on that exact issue, it would not have affirmed. Thus the Court has, at the least, a judgment by the Second Circuit that 363(f) may appropriately be invoked to sell free and clear of successor liability claims. The claims sought to be preserved here are identical to those in Chrysler. And Chrysler is not distinguishable in any legally cognizable respect. On this issue, it is not just that the Court feels that it should follow Chrysler. It must follow Chrysler. The Second Circuit's Chrysler affirmance, even if reduced solely to affirmance of the judgment, is controlling authority.

…

***This Court fully understands the circumstances of tort victims, and the fact that if they prevail in litigation and cannot look to New GM as an additional source of recovery, they may recover only modest amounts on any allowed claims***—if, as is possible, they do not have other defendants who can also pay. But the law in this Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction.

407 B.R. at 504-05 (emphasis added). This holding applies to Plaintiffs' claims. This Court already considered and overruled any objection that Plaintiffs could have raised to the Sale Motion. Plaintiffs simply cannot prove prejudice.

Plaintiffs' claims are readily distinguishable from the "future" claim involved in *In re Grumman Olson Indus., Inc.*, 467 B.R. 694 (S.D.N.Y. 2012). The *Grumman* case involved a personal injury claim brought against the manufacturer of a product part incorporated into a Federal Express delivery truck by a plaintiff that had ***no*** pre-petition relationship with the debtor, did not suffer her accident and injury until after the section 363 sale, and had no reason to believe that the debtor's 363 sale might impact her rights. In contrast, Plaintiffs (or their predecessors-in-interest) had a pre-petition relationship with Old GM, the defect that is the

subject of their claims existed pre-petition, and regardless of whether they knew of the specific

defect, Plaintiffs had reason to know that Old GM's bankruptcy might impact their economic

interests in their vehicles.  Plaintiffs' due process argument is predicated on the mistaken notion

that they were known creditors.  They were unknown creditors.  But, significantly, known

creditors are, by definition, not "future creditors."   In sharp contrast to Plaintiffs, in *Grumman*,

the plaintiff did not argue that the plaintiff should have received notice of the 363 sale.

Accordingly, *Grumman* is easily distinguishable and does not control here.   Indeed, Judge

Bernstein noted that the *Grumman* case was inapposite to the *Old GM* case and could never arise

therein since *Grumman* involved a post-sale accident which was an Assumed Liability by New

GM.  *Id.* at 255.

In *Burton*, Judge Bernstein held that the holding in *Grumman* did not apply to claims,

like the ones at issue in this case, brought by plaintiffs seeking economic losses arising from pre-

petition defects in their vehicles.  As stated by Judge Bernstein:

> *Grumman Olson* is distinguishable. The plaintiffs or their predecessors (the
> previous owners of the vehicles) had a pre-petition relationship with Old Carco,
> and the design flaws that they now point to existed pre-petition. At a minimum,
> they held contingent claims because "the occurrence of the contingency or future
> event that would trigger liability was 'within the actual or presumed
> contemplation of the parties at the time the original relationship between the
> parties was created.'"

*Burton*, 492 B.R. at 403 (citation omitted).

Furthermore, according to the Third Circuit, successor liability claims are claims of the

bankruptcy estate and not individual claims, and therefore a bankruptcy trustee could

compromise a successor liability claim, and it would be binding on all creditors.  *See In re*

*Emoral, Inc.*, 740 F.3d 875, 882 (3d Cir. 2014).[22]  So too, here, the barring of successor liability claims in the Sale Agreement is binding on all creditors.  In sum, the Court was fully justified in approving the 363 Sale free and clear of successor liability claims, and the Plaintiffs cannot show prejudice.

### e.  Information Relating To The Product Defect Would Not Have Altered The Course Of The 363 Sale

Had Old GM disclosed the information in June 2009 that Plaintiffs contend it should have disclosed, such information would not have made any difference in the Court's approval of the 363 Sale.  The Court acknowledged that contingent claims were hard to estimate.  *See Gen. Motors*, 407 B.R. at 483.  The generalized discussion at the Sale Hearing relating to contingent claims was not to quantify the amount of contingent claims.  Rather, it was an argument made by the objectors that the contingent claims were sufficiently small that New GM should consider assuming them.  Hr'g Tr. 157:15-165:19, June 30, 2009.

In the end, it did not really matter at the Sale Hearing what the financial magnitude of Retained Liabilities was because the Sale Agreement was the only thing that separated Old GM from a disastrous liquidation.  What is more, there was protection to Old GM for the magnitude of Retained Liabilities.  The Sale Agreement provided for an upward adjustment to the purchase price if allowed claims exceeded $35 billion.  In all cases, the Sale Agreement specifically contemplated that claims would be determined ***after*** the 363 Sale without any effect on the closing.  The reasons the Court extensively discussed in approving the 363 Sale still apply, regardless of whether Old GM would have disclosed an additional class of potential product claims.

---

[22]  The Third Circuit relied on *In re Keene Corp.*, 164 B.R. 844, 849 (Bankr. S.D.N.Y. 1994), finding that "state law causes of action for successor liability, just as for alter ego and veil-piercing causes of action, are properly characterized as property of the bankruptcy estate." *Id.* at 880.

As discussed above, Plaintiffs' argument is the same argument rejected in *Morgenstein*. There, the Court held, as a matter of law, a preplan disclosure by Old GM of a specific vehicle defect impacting hundreds of thousands of vehicles would not have impacted any action by the Court in confirming the Debtors' plan. *Morgenstein,* 462 B.R at 506-07.    The Court reasoned that:

> We here had a plan of liquidation; Old GM would not survive. It would simply be taking whatever assets it had and distributing them, *pari passu,* to its creditors. **If Old GM had known of, and disclosed, the design defect that is alleged, it would have (or at least could have) put up for confirmation the exact same liquidation plan, and the plan would have been just as feasible. If a class claim had been disclosed and ultimately allowed** (or reserved for), individual creditors' *pari passu* shares of the available pot would have been less, of course (and that no doubt would have been of concern to them), but **neither the Plan, nor any judicial action by this Court, would be any different**.

*Id.* (emphasis added).

Here, the 363 Sale would have been approved on the exact same basis.  The bottom line is that, without the approval of the 363 Sale, there would have been nothing for unsecured creditors.  Plaintiffs cannot show prejudice from the Court's approval of the 363 Sale, or from any alleged due process violation they now assert.

## II.    REMEDIES THRESHOLD ISSUE:
IF A REMEDY IS WARRANTED, THE PROPER REMEDY IS TO ALLOW PLAINTIFFS TO SEEK TO RECOVER THEIR PRO RATA DISTRIBUTION FROM THE PROCEEDS OF THE SALE OF OLD GM'S ASSETS

Assuming, *arguendo*, that (i) Plaintiffs can prove they were deprived of due process by **Old GM** as a result of the type of notice **Old GM** provided in connection with the 363 Sale, and (ii) the approval of the Sale Order and Injunction would have changed as a result of the allegedly defective notice, the proper remedy would be to allow Plaintiffs to seek to recover their *pro rata* distribution from the proceeds of that sale.  As of June 30, 2014, the GUC Trust held, in the

aggregate, $1.1 billion in assets that remain from the proceeds of the 363 Sale.[23]  That is where Plaintiffs should look for a remedy.  Were this Court to find a due process violation (which New GM believes it should not), it could only have been Old GM—and certainly not New GM—that arguably committed that due process violation.  The Old GM estate should bear the consequences of such action.

Furthermore, partially setting aside the Sale Order and Injunction as it applies to Plaintiffs is not a viable remedy for inadequate notice.  As discussed above, this Court approved the inclusion of an integration clause in the Sale Order and Injunction that expressly prohibits the partial, selective enforcement of portions of the Sale Agreement.  *See* Sale Order and Injunction, ¶ 69; *see also Campbell*, 428 B.R. at 52, 61; *Parker*, 430 B.R. at 81-82. Importantly, rewriting the Sale Order and Injunction to strip New GM of its bargained-for and Court-approved protections undermines two integral bankruptcy policy objectives:  the finality of judgments and protecting good faith purchasers.[24]  As the Court in *In re White Motor Credit Corp.*, 75 B.R. 944, 950-51 (Bankr. N.D. Ohio 1987), noted in discussing the public policy objectives for imposing a successor liability bar on product liability claimants:

> The effects of successor liability in the context of a corporate reorganization preclude its imposition. The successor liability specter would chill and deleteriously affect sales of corporate assets, forcing debtors to accept less on sales to compensate for this potential liability. This negative effect on sales would only benefit product liability claimants, thereby subverting specific statutory priorities established by the Bankruptcy Code. This result precludes successor liability imposition.

There is no compelling reason for the Court to jettison these fundamental principles.

---

[23]    As noted, the GUC Trust recently announced that it was going to reduce its holdings by making a distribution to its holders this month **in excess of $225 million,** notwithstanding that the Threshold Issues have not yet been decided by the Court.

[24]    *See Lehman*, 445 B.R. at 149-50.

A.  **Setting Aside The Sale Order And Injunction**
    **Five Years After The Fact Is Not A Viable Option**

Courts have held that Fed. R. Civ. P. 60(b)(4) may provide a remedy to set aside a sale in

its entirety in the extreme circumstance where no notice is provided.  *See Cedar Tide Corp. v.*

*Chandler's Cove Inn, Ltd*, 859 F.2d 1127 (2d Cir. 1988) (bankruptcy court did not err in voiding

debtor's post-petition transfer of substantially all of its assets without any notice and a hearing as

required by section 363(b)); *McTigue v. Am. Sav. & Loan Assoc. of Fla.*, 564 F.2d 677, 679 (5th

Cir. 1977).  This drastic remedy exists to correct complete failures to comply with section 363

and the notice requirements of Bankruptcy Rule 2002.

Notably, in this case, extensive notice was provided to parties in interest.  As highlighted,

over four million direct mail notices were sent, Publication Notice was provided in nine major

periodicals, and there was broad and widespread media coverage of the 363 Sale.  Several

hundred objections were filed on account of such expansive notice.  This Court held extensive

hearings over multiple days, and the Court carefully considered the objectors' arguments and the

trial evidence.  *See generally* Sale Hearing transcripts (6/30/09, 7/1/09 and 7/2/09).  This Court,

based on an extensive factual record, determined that the consideration that New GM offered

was fair and provided the creditors with a much more favorable return than liquidation.  *See Gen.*

*Motors*, 407 B.R. at 494.  The Court's findings were upheld on appeal.

New GM is unaware of any legal authority endorsing the proposition that, in a

bankruptcy case involving a large number of claimants where comprehensive notice and hearings

took place, a sale order could be partially voided because one group of claimants allegedly did

not receive proper notice of the sale.  *See In re BFW Liquidation, LLC*, 471 B.R. 652 (Bankr.

N.D. Ala. 2012).  In fact, allowing a partial revocation of the sale order years after its entry

would run contrary to the well-established public policy objectives of protecting asset purchases

in bankruptcy so that a debtor can maximize the sale value of its assets for the benefit of its creditors. *See, e.g., Douglas v. Stamco*, 363 Fed. App'x 100, 2010 WL 337043, at *2 (2d Cir. 2010) (warning against allowing torts claims against a purchaser who acquired a debtor's assets "free and clear" of such claims, explaining that allowing such claims would run counter to a core aim of the Bankruptcy Code, which is to maximize potential recovery by creditors, and holding that allowing such claims is particularly inappropriate where the "free and clear" nature of the sale was a crucial inducement to the sale). Allowing unknown, contingent creditors to assert claims against a purchaser of a debtor's assets could chill bidding and result in the debtor receiving far less for its assets than if such creditors were only permitted to proceed against the entity that allegedly wronged them—*i.e.*, the debtor. *See Doktor v. Werner Co.*, 762 F. Supp. 2d 494, 498-500 (E.D.N.Y. 2011).

To the extent Plaintiffs can prove that they are entitled to any relief, the appropriate remedy is to permit them to seek allowance of an unsecured claim against the Old GM bankruptcy estate, placing them in the same position they would have been in had they participated in the Sale Hearing—and no better position.

**B.      The Bankruptcy Code And Rules Do Not Allow For
Partial Revocation Of The Sale Order And Injunction,
And The Sale Order And Injunction Expressly Prohibits It**

The Sale Order and Injunction (¶ 6) provides that it is binding on, among others, all "known and unknown creditors of . . . any Debtor." Plaintiffs ask that the Sale Order and Injunction be partially revoked so that it is not binding on them. There is no authority supporting such a remedy based on the facts of this case. This lack of legal authority is not surprising given that the plain language of section 363(m) of the Bankruptcy Code does not permit the modification of a sale order on appeal except under extremely limited circumstances, which are

not present here.  To foster the finality of bankruptcy sales and encourage parties to bid for assets

sold in bankruptcy, section 363(m) provides that:

> The reversal or modification on appeal of an authorization under subsection (b) or
> (c) of this section of a sale or lease of property does not affect the validity of a
> sale or lease under such authorization to an entity that purchased or leased such
> property in good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were stayed pending
> appeal.

Here, the Court already ruled that New GM is a good faith purchaser, and entitled to

section 363(m) protection.  *Gen. Motors*, 407 B.R. at 494.  Importantly, while certain parties

appealed the Sale Order and Injunction, it was never stayed pending appeal.  The 363 Sale was

fully consummated and implemented years ago, and any argument seeking to undo it now would

be equitably moot.  *See, e.g., United States v. Salerno*, 932 F.2d 117, 123 (2d Cir. 1991) (holding

that it is beyond the power of the court to rewrite the terms of sale where the consummation of

the sale was not stayed).  Therefore, the terms of the 363 Sale may not be modified as to New

GM, who is a good faith purchaser.  *See Campbell*, 428 B.R. at 60-64.

In *Campbell*, the District Court rejected the plaintiff accident claimants' argument that

the Sale Order and Injunction could be enforced against everyone except them.  *Id.*  Judge

Buchwald refused to "rewrite," "unravel," or "carve out" any provisions from the "integrated

terms of this extensively negotiated transaction."  *Id.* at 60-61.  She ruled:

> As the Bankruptcy Court found, and as discussed above, the various terms of the
> Sale Order and Injunction providing for the free and clear sale of the Purchased
> Assets were of critical significance to the 363 Transaction. *See, e.g.*, Sale Order
> and Injunction ¶ DD.  Following the renegotiation of the agreements between
> Debtors and the Purchaser providing that the Purchaser would assume the Future
> Products Claims, the newly-expanded Assumed Liabilities still did not include the
> Existing Products Claims. *See, e.g.*, Appellants Br. 7–8.  Moreover, the parties
> anticipated and contracted against the sort of interlinear relief Appellants request
> here. *See id*. App. B(MPA) Art. VII § 7.1. In other words, the Bankruptcy Court
> could not have modified the Sale Order and Injunction without the parties'
> consent or written waiver. Cf. Sale Op., 407 B.R. at 517 ("This Court has found

that the Purchaser is entitled to a free and clear order. The Court cannot create exceptions to that by reason of this Court's notions of equity."). This Court likewise lacks the power to rewrite the Sale Order and Injunction.

*Id.* at 61-62. The result of a challenge to the Sale Order and Injunction using Fed. R. Civ. P. 60, as contrasted to an appeal, should be no different; the same reasoning applies.

In *In re Fernwood Markets*, the court provided additional reasons why the partial revocation of a sale order is improper:

> First, we believe that either the sale is totally void or voidable, or it is valid. We do not believe that it can be valid, or "reaffirmed," as to one lienholder and not to another. Secondly, we believe that allowing Shrager to retain its lien—or, more practically, pursue a claim against the TICP—while requiring other lienholders, who may be senior to Shrager, to resort to the sale proceeds just because of the fortuitous circumstance that Shrager failed to get proper notice of the sale would be to provide Shrager with an unjustified and unjustifiable windfall.

73 B.R. 616, 621 (Bankr. E.D. Pa. 1987). The same is true here. Plaintiffs' suggestion that the Sale Order and Injunction can be valid and binding against all of Old GM's creditors, but not against them, would result in an unjustified windfall.[25]

Plaintiffs' request that the Court selectively rewrite portions of the Sale Order and Injunction also ignores the language of the Sale Order and Injunction, which provides that the numerous terms of the final sale cannot be selectively enforced. This Court approved the "Integrated Transaction" and "Conditions to Closing" provisions of the Sale Agreement, in which the purchaser expressly conditioned its purchase on the enforceability of the entirety of the Sale Agreement. *See* Sale Agreement, §§ 5.8, 7.1. Moreover, Plaintiffs' request to rewrite the Sale Order and Injunction is effectively the same as the request made in *Morgenstein* to rewrite

---

[25] *See, e.g., In re Trans World Airlines, Inc.*, 322 F.3d 283, 291-93 (3d Cir. 2003) (holding that allowing the claimants to seek a recovery from the successor entity while creditors which were accorded higher priority by the Bankruptcy Code obtained their recovery from the limited assets of the bankruptcy estate would "subvert the specific priorities which define Congressional policy for bankruptcy distribution to creditors").

the confirmation order, which this Court previously rejected. *See Morgenstein*, 462 B.R. at 500-05.  The Court should similarly reject Plaintiffs' claims.

C.      **Plaintiffs Have A Viable Remedy Against**
        **Old GM's Unsecured Creditor's Trust**

When a debtor's assets are disposed of free and clear of third-party interests, the third party's remedy should be against the proceeds of the disposition. *See MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988); *In re Edwards*, 962 F.2d 641, 643-45 (7th Cir. 1992); *Conway v. White Trucks, A Div. of White Motor Corp.*, 885 F.2d 90, 96-97 (3d Cir. 1989). A decision by Judge Cohen in *In re BFW Liquidation, LLC*, 471 B.R. 652 (Bankr. N.D. Ala. 2012), is instructive.  Shortly after filing for bankruptcy, the debtor sold leases following an extensive marketing and auction process.  A comprehensive notice to a substantial numbers of creditors was sent.  Following various court hearings, the court approved the asset sale under section 363.  *Id.* at 658.  Well after the sale closed, the plaintiff filed suit against the good faith purchaser seeking to hold the purchaser liable for the debtor's alleged bad actions, and to set aside the sale on the grounds that she did not receive notice of it.  *Id.* at 669.

The court distinguished the case from the ones where no notice was given and there was a dispute as to the propriety of the sale process or the consideration paid.  *Id.* at 673.  The court held that there was no basis to object to the sale and that plaintiff's interests had been protected by the creditors' committee and other parties.  *Id.*  In short, the court held plaintiff was not prejudiced by her lack of notice.  The court also noted that the plaintiff was in the same position as many other creditors that did not receive direct notice of the sale based on the court's order limiting and specifying notice.  Lastly, the *BFW* court held that there was simply no practical basis to set aside the sale order.  "More importantly, from a practical perspective, it would simply be impossible to undo the sale, reassemble all of the things sold and since resold, and

reimburse the buyer's purchase price money and other outlays at this late date." *Id.* Instead, the proper remedy was to permit the plaintiff to seek a claim against the debtor. In no event did the plaintiff have any remedy against the good faith purchaser. *Id.* at 669-74; *see also Molla v. Adamar of New Jersey, Inc.*, No. 11-6470 (JBS/KMW), 2014 WL 2114848, at *4 (D. N.J. May 21, 2014) (holding that if plaintiff did not receive adequate notice of the bankruptcy proceeding that is relevant to whether its claims will be discharged, but is not a basis to impose liability on a purchaser who acquired assets "free and clear" of such claims).

In sum, the Court should reject Plaintiffs' argument that they be allowed to pursue successor liability claims against New GM as a remedy for Old GM allegedly providing defective notice. This directly conflicts with controlling precedent protecting good faith purchasers who acquire a debtor's assets "free and clear" of claims. If there were a due process violation (which is not the case), then any remedy would be against Old GM's successor, the GUC Trust, which holds the proceeds of sale.

III. **OLD GM CLAIM THRESHOLD ISSUE:**
    **CLAIMS ASSERTED IN THE CONSOLIDATED COMPLAINTS**
    **ARE RETAINED LIABILITIES OF OLD GM AND NOT ASSUMED**
    **LIABILITIES OF NEW GM**

This section of the brief addresses (a) claims based on accidents that occurred prior to the closing of the 363 Sale, and (b) claims asserted in the Post-Sale Consolidated Complaint.[26] As noted, assuming the due process argument is resolved against Plaintiffs, it is anticipated that Plaintiffs will dismiss the Pre-Sale Consolidated Complaint.[27]

---

[26] The Motions to Enforce also concern any other cases that assert economic loss claims based on Old GM vehicles and parts that are referenced in the schedules (and supplemental schedules) to the Motions to Enforce but, to date, have not been consolidated in MDL 2543. These include: *Watson, Bloom, Alers* and *Frank*.

[27] It is New GM's understanding that, based on the directives of the MDL Court, the 692-page Post-Sale Consolidated Complaint subsumes and replaces all of the economic loss complaints filed in the individual actions that have been transferred to the MDL. Stated otherwise, if a cause of action is not contained in the Post-Sale Consolidated Complaint, it is not being asserted against New GM by the Plaintiffs in the MDL regardless of whether such economic loss claim was previously contained in an individual complaint. For that

Most of the claims in the Post-Sale Consolidated Complaint implicate the Ignition Switch Motion to Enforce and the Monetary Relief Action Motion to Enforce. The Post-Sale Consolidated Complaint alleges, among other things:

(i)    economic loss claims relating to Old GM vehicles and parts sold after the 363 Sale by dealers and third-parties (but not New GM). These claims are barred by the Sale Order and Injunction since the only liabilities assumed by New GM with respect to Old GM vehicles and parts were Assumed Liabilities—these claims are not Assumed Liabilities.

(ii)   the alleged loss of value to New GM-sold vehicles based on the recall of 27 million vehicles (*see* Post-Sale Consolidated Complaint, ¶ 3), a substantial number of which were manufactured by Old GM between 1997 and 2009 (*see id.* ¶ 192). A damage calculation against New GM predicated on Old GM vehicles and parts, which does not relate to Assumed Liabilities, is barred by the Sale Order and Injunction. That type of damage calculation is predicated on a successor liability theory which is barred by the Sale Order and Injunction.

(iii)  remedies, such as punitive damages, based, in large part, on the conduct of Old GM. The Post-Sale Consolidated Complaint incorporates by reference all of the paragraphs which deal with Old GM events that took place before the 363 Sale. Essentially, Plaintiffs are basing their damage demand, in large part, on Old GM's conduct, which is prohibited by the Sale Order and Injunction.

The Sale Order and Injunction expressly provides that, except for contractually defined "Assumed Liabilities," New GM shall have no liability for claims arising from or based upon vehicles or parts manufactured by Old GM:

*Except for the Assumed Liabilities* expressly set forth in the [Sale Agreement], none of the Purchaser … shall have any liability for any claim that … *relates to the production of vehicles prior to the Closing Date*, or otherwise is ascertainable against the Debtors or is related to the Purchased Assets prior to the Closing Date.

Sale Order and Injunction, ¶ 46 (emphasis added).

---

reason, New GM is not briefing, among other things, causes of action based on RICO and Lemon Laws since the Post-Sale Consolidated Complaint (as compared to some isolated individual economic loss complaints) does not contain such causes of action. In the event this understanding is further clarified by the MDL Court, or the Consolidated Complaints are further amended to add additional causes of action, New GM reserves the right to supplement this brief to address such additional claims.

The Sale Order and Injunction also provides that except as expressly permitted under the Sale Agreement or the Sale Order and Injunction, all persons and entities, including litigation claimants (such as Plaintiffs), holding claims against Old GM, contingent or otherwise, arising under, out of, in connection with, or in any way *relating to Old GM and the operation of its business prior to 363 Sale*, are barred from asserting such claims against New GM. *Id.* ¶ 8.

In addition, the Sale Order and Injunction states that, except for Assumed Liabilities, all claims arising in connection with Old GM's actions or omissions (*i.e.*, Old GM's conduct) may not be asserted against New GM. *See id.* ¶ AA. Based on, among other things, these provisions of the Sale Order and Injunction, with respect to Old GM vehicles or parts, whether they were sold by Old GM before the 363 Sale, or a dealer or third party (not New GM) after the 363 Sale, all economic loss claims arising therefrom are obligations of Old GM (and not New GM).

Under the Sale Agreement, New GM assumed only three expressly defined categories of liabilities for vehicles and parts manufactured by Old GM: (a) post-sale accidents involving Old GM vehicles causing personal injury, loss of life or property damage; (b) repairs or the replacement of parts provided for under the "glove box warranty"; and (c) Lemon Law violations as defined in the Sale Agreement. All other liabilities relating to vehicles and parts sold by Old GM are, by definition, "Retained Liabilities" of Old GM. *See* Sale Agreement § 2.3(b).

Neither the Post-Sale Consolidated Complaint (as it relates to Old GM vehicles, parts or conduct) nor the Pre-Closing Accident Cases fall within any of these three categories of Assumed Liabilities: (i) post-363 Sale accidents; (ii) the already expired glove box warranty for Old GM vehicles (*see* New GM SOF, ¶ 67); or (iii) violations of Lemon Laws (as defined in the Sale Agreement). Therefore, Plaintiffs' claims relating to Old GM vehicles sold after the 363

Sale by dealers or third parties are not Assumed Liabilities; to the contrary, they are liabilities retained by Old GM.

Retained Liabilities for Old GM vehicles and parts include:

i. Liabilities "arising out of, relating to or in connection with any (A) implied warranty or other implied obligation arising under statutory or common law without the necessity of an express warranty or (B) allegation, statement or writing by or attributable to Sellers." Sale Agreement § 2.3(b)(xvi); *see also* Sale Agreement, ¶ 6.15(a). This would include liabilities based on implied warranty of merchantability, redhibition, and state consumer protection statutes.

ii. All liabilities of Old GM based upon contract, tort or any other basis. Sale Agreement, § 2.3(b)(xi). This covers claims based on negligence, state consumer protection statutes, concealment and fraud.

iii. All liabilities relating to vehicles and parts sold by Old GM with a design defect.[28]

iv. All Product Liabilities (as defined in the Sale Agreement) arising from any accidents, incidents or other occurrences that happened prior to the closing of the 363 Sale. Sale Agreement, § 2.3(b)(ix). This covers claims alleged in the Pre-Closing Accident Cases.[29]

v. All Liabilities based on the conduct of Old GM, including any allegation, statement or writing attributable to Old GM. This covers fraudulent concealment type claims and any punitive damage remedy predicated on Old GM's conduct. *See* Sale Order and Injunction, ¶¶ AA, 56.

vi. All claims based on the doctrine of "successor liability." *See, e.g.* Sale Order and Injunction, ¶ 46.

In the Post-Sale Consolidated Complaint, with respect to such Old GM vehicles and parts, Plaintiffs are essentially seeking to hold New GM liable as a successor to Old GM. That is expressly barred by the Sale Order and Injunction. *See* Sale Order and Injunction, ¶ 47.

---

[28]   *See* Sale Order and Injunction, ¶ AA; *see also Trusky v. Gen. Motors LLC (In re Motors Liquidation Co.)*, Adv. Proc. No. 09–09803, 2013 WL 620281, at *2 (Bankr. S.D.N.Y. Feb. 19, 2013).

[29]   *See Decision on New GM's Motion to Enforce Section 363 Order with Respect to Product Liability Claim of Estate of Beverly Deutsch*, dated Jan. 5, 2011 [Dkt. No. 8383](**Appendix, Exh. "EE"**), at 3 ("Thus, those Product Liability Claims that arose from 'accidents or incidents' occurring before July 10, 2009 would not be assumed by New GM . . . .").

A.    **This Court's Prior Decisions Demonstrate Why Plaintiffs'
      Claims Are Retained Liabilities And Not Assumed Liabilities**

This Court, on previous occasions, addressed similar issues to those raised in the Motions

to Enforce, and held that New GM did not assume the types of liabilities that Plaintiffs now

assert against New GM.  As the Court found in *Castillo*, "it was the intent and structure of the

363 Sale, as agreed on by the Auto Task Force and Old GM, that New GM would start business

with as few legacy liabilities as possible, and that presumptively, liabilities would be left behind

and not assumed."  2012 WL 1339496 at *3.  In addition, "by the end of the 363 Sale hearing it

was clear not only to Old GM and Treasury, but also to the Court and to the public, that the goal

of the 363 Sale was to pass on to Old GM's purchaser—what thereafter became New GM—only

those liabilities that were commercially necessary to the success of New GM." *Id.* at *4.  While

certain objectors at the 363 Sale hearing argued that New GM should assume additional

liabilities based on Old GM vehicles, the U.S. Treasury refused to do more than what was

included in the Sale Agreement.  As found by the Court, the States' Attorneys General "urged in

argument before the Court that New GM take on liabilities broader than those that would be

undertaken under the Sale Agreement as initially proposed—including implied warranties,

additional express warranties, statutory warranties, and obligations under Lemon Laws." *Id.* at

*5.  In fact, the States' Attorneys General wanted New GM to take on "everything" related to

Old GM vehicles. *Id.* at *5.[30]

Plaintiffs in the Post-Sale Consolidated Complaint seek to recover for liabilities that

were never assumed by New GM, and are clearly barred by the Sale Order and Injunction.

*Trusky* is on point.  There, New GM sought to enforce the Sale Order and Injunction against a

purported class of plaintiffs who asserted that New GM assumed liabilities related to an alleged

---

[30]    The Court in *Castillo* ultimately found that New GM had not assumed the liabilities at issue (*i.e.*, a prepetition
class action settlement relating to an alleged defect in Old GM vehicles).

defect in vehicles (2007 and 2008 Chevrolet Impalas) manufactured by Old GM. Similar to claims raised in the Ignition Switch Actions and the Non-Ignition Switch Actions, the claims alleged in *Trusky* were based on (i) breaches of express and implied warranties, (ii) a design defect, and (iii) Old GM conduct. The plaintiffs sought damages based on economic loss, as well as injunctive relief. This Court found that such claims were barred by the Sale Order and Injunction:

> (1)  To the extent that the Trusky Plaintiffs are pursuing a claim for design defects in the spindle rods or other components of the 2007 and 2008 Impalas, they may not do so; claims for design defects may not be asserted against New GM, as New GM did not assume liabilities of that character;

> (2)  New GM is not liable for Old GM's conduct or alleged breaches of warranty;

> (3)  New GM's warranty obligations are limited to honoring the specific terms of the glove box warranty as to vehicles presented for repair to New GM dealers within the mileage and duration limitations of the glove box warranty…;

> (4)  New GM is not liable for monetary damages or other economic loss under the terms of the glove box warranty.

*Trusky*, 2013 WL 620281, at \*2.

The *Trusky* decision demonstrates that New GM did not assume liabilities associated with Old GM vehicles sold by a dealer or third party after the 363 Sale that are based on (i) a design defect, (ii) express warranty theories, other than the performance obligations under the glove box warranty (which expired[31]), (iii) implied warranty claims, which include the implied warranty of merchantability, or (iv) Old GM's conduct including Old GM's failure to disclose.

---

[31]  As part of the recall process, New GM is essentially providing the repair remedy that would otherwise have been performed under the glove box warranty prior to its expiration.

**B.      New GM Cannot Be Held Liable For Old GM's Alleged
Conduct, Either Directly Or As Old GM's Alleged "Successor"**

Plaintiffs in the Ignition Switch Actions and the Non-Ignition Switch Actions do not

dispute that (a) certain vehicles and/or parts at issue were manufactured by Old GM prior to the

Sale Order and Injunction, and (b) the purported economic loss claims being asserted against

New GM are not Assumed Liabilities under the Sale Agreement.  Plaintiffs try to paint such

claims as post-363 Sale obligations that New GM independently incurred.  In reality, they are

successor liability claims that are prohibited by the Sale Order and Injunction.

As provided in the Sale Order and Injunction, New GM is not a successor to Old GM;

New GM assumed no liabilities in connection with successor or transferee liability.  The Court

has already ruled:  "[T]he law in this Circuit and District is clear; the Court will permit GM's

assets to pass to the purchaser free and clear of successor liability claims, and in that connection,

will issue the requested findings and associated injunction."  *Gen. Motors*, 407 B.R. at 506.  The

Sale Order and Injunction specifically found:

> ***The Purchaser shall not be deemed***, as a result of any action taken in connection
> with the [Sale Agreement] or any of the transactions or documents ancillary
> thereto or contemplated thereby or in connection with the acquisition of the
> Purchased Assets, ***to: (i) be a legal successor***, or otherwise be deemed a successor
> to the Debtors (other than with respect to any obligations arising under the
> Purchased Assets from and after the Closing); ***(ii) have, de facto or otherwise,***
> ***merged with or into the Debtors; or (iii) be a mere continuation or substantial***
> ***continuation of the Debtors or the enterprise of the Debtors***.  Without limiting
> the foregoing, the Purchaser [New GM] shall not have any successor, transferee,
> derivative, or vicarious liabilities of any kind or character for any claims,
> including, but not limited to, under any theory of successor or transferee liability,
> de facto merger or continuity, environmental, labor and employment, and
> products or antitrust liability, whether known or unknown as of the Closing, now
> existing or hereafter arising, asserted, or unasserted, fixed or contingent,
> liquidated or unliquidated.

Sale Order and Injunction, ¶ 46 (emphasis added); *see also id.* ¶¶ AA, BB, DD, 6, 7, 8, 10 and

47; Sale Agreement, § 9.19; *see also Trusky*, 2013 WL 620281, at *8 ("The Sale Order, by which

I approved the Sale Agreement, further ensures that New GM would acquire the assets free and

clear of successor liability.").

In addressing a motion seeking to enforce the Sale Order and Injunction against a

plaintiff's suit against New GM a year after the Petition Date, the Court specifically recalled that

the successor liability issue had been extensively briefed and argued in connection with the Sale

Hearing:

> The sale order makes clear that New GM was purchasing the assets free and clear
> of all liens, claims, encumbrances, and other interests including any rights or
> claims based on any theory of successor transferee, derivative or vicarious
> liability, or de facto merger or continuity of any kind or character. ***These
> provisions in the sale order were not slipped into the order with stealth but were
> hotly contested before me. One lawyer, in particular, Steve Jakubowski, litigated
> them vigorously and at length both before me and on appeal.*** I dealt with the
> successor liability issue extensively in my written decision and the appeal by Mr.
> Jakubowski from that decision was dismissed by the district court where my
> decision was also affirmed

Hr'g Tr. 56:7-20, June 1, 2010 (emphasis added).  The Court went on to find as follows:

> I've already ruled on the arguments dealing with the underlying propriety of a
> free and clear order cutting off product liabilities claims as set forth in my
> opinion published at 407 B.R. 463. Until or unless some higher court reverses my
> determination—and neither of the district courts who've ruled on that
> determination have yet done so (*see* 2010 W.L. 1524763 and 2010 W.L. 1730802)
> —they're res judicata, or at least res judicata subject to any limitations on the res
> judicata doctrine requiring a final order. And of course, they're stare decisis. I
> found these arguments to be unpersuasive last summer, and considering the great
> deal with which my previous opinion dealt with those exact issues, I am not of a
> mind, nor do I think I could or should, come to a different view on those identical
> issues today.

*Id.*, 61:14-62:2.  Plaintiffs' successor liability allegations relating to Old GM vehicles and parts

are the type of claims barred by the Sale Order and Injunction.  *Res judicata* and *stare decisis*

principles on this issue are controlling.

Plaintiffs have not expressly alleged successor liability in the Post-Sale Consolidated

Complaint.  Nevertheless, many of their claims against New GM fail because they are successor

liability claims, transparently cast in a different way.  In a case directly on point, the bankruptcy court in *Burton* reviewed whether New Chrysler assumed Old Chrysler's duty to warn its customers as to a "fuel spit back" defect. 492 B.R. at 405   While a recall was not initiated, New Chrysler did issue Technical Services Bulletins ("**TSBs**") to its dealers alerting them to the defect in certain models. *Id.* at 406.  A class action was commenced by customers who owned vehicles subject to the defect.  In finding that the sale order in *Old Carco* barred the customers' claims, the bankruptcy court first found that plaintiffs had not properly asserted a "duty to warn" case.  Typically, "duty to warn" cases involve a plaintiff who sustained a *personal injury* because someone failed to warn him about a dangerous product, and the failure to warn proximately caused his subsequent injury.  *Burton*, 492 B.R. at 405.  The plaintiffs in *Old Carco* (like Plaintiffs in the Ignition Switch Actions and the Non-Ignition Switch Actions) did not allege subsequent personal injuries, and thus, in an economic loss case, there was no common-law duty to warn.  *Id.*

Judge Bernstein properly analyzed the *Old Carco* case as one (like the Ignition Switch Actions and the Non-Ignition Switch Actions) where the plaintiffs alleged that they purchased a defective vehicle manufactured by Old Carco that requires more servicing and is worth less money.  The Court found that New Chrysler's conduct did not proximately cause economic loss to the plaintiffs.  Any loss occurred when the vehicle was sold by Old Carco.  The alleged failure to disclose "is a typical successor liability case dressed up to look like something else, and is prohibited by the plain language of the bankruptcy court's Order."  *Burton*, 492 B.R. at 405 (internal citations omitted).

Here, Plaintiffs in the Ignition Switch Actions and the Non-Ignition Switch Actions are contending that, upon purchasing the assets from Old GM, New GM also acquired (and

instantaneously became liable for breaching) a brand new duty to warn Plaintiffs about alleged defects in certain Old GM vehicles.  However, as found in the *Old Carco* case, this theory is nothing more than a "dressed up" successor liability claim, and is barred by the Sale Order and Injunction.  *Id.* at 406.  In other words, if an Old GM vehicle is implicated, and the claim is not an Assumed Liability, New GM has no obligation to the vehicle owner.  It is not more complicated than that.

The fact that Old GM vehicles may have been sold after the closing of the 363 Sale on the secondary market by used car dealers or other individuals, or that New GM may have sold New GM vehicles that were later unknowingly repaired by a third party (but not New GM) with a defective ignition switch acquired from Old GM, does not change the analysis.  The operative facts for the successor liability analysis are the same: ***Old GM*** manufactured a vehicle with a defective part (or sold the defective part itself).  Claims based on the facts alleged in the Actions are not Assumed Liabilities of New GM.

Moreover, a Plaintiff who purchased a used Old GM vehicle after the 363 Sale should not have any greater rights than the original owner of that vehicle.  Generally speaking, a purchaser or assignee receives no greater rights than the seller or assignor had at the time of sale.  *See In re Flanagan*, 415 B.R. 29, 42 (D. Conn. 2009) ("In acquiring the estate's rights and interests . . . Titan acquired no more and no less than whatever rights and interests to MJCC and its properties the estate possessed at the time of the assignment.").  In other words, an owner of an Old GM vehicle should not be able to "end-run" the applicability of the Sale Order and Injunction by merely selling that vehicle after the closing of the 363 Sale.  Simply put, if the Sale Order and Injunction would have applied to the original owner who purchased the vehicle prior to the 363 Sale, it equally applies to the current owner who purchased the vehicle after the 363 Sale.

66

**C.    Plaintiffs' Warranty Assertions With Respect To
Old GM Vehicles And Parts Do Not Enable Them
To Circumvent The Court's Sale Order And Injunction**

### 1.    Plaintiffs Have Not Asserted
A Glove Box Warranty Claim

The glove box warranty is for a limited duration and has expired for all of the vehicles

that are the subject of the Motions to Enforce.  In any event, the glove box warranty covers only

repairs and replacement parts; the economic losses asserted by Plaintiffs in the Ignition Switch

Actions and the Non-Ignition Switch Actions are for monetary damages and expressly barred by

the glove box warranty.  *See Trusky*, 2013 WL 620281, at *8.  This bar pertains to all incidental

or consequential damages, such as lost wages or vehicle rental expenses.  *See id.* (quoting glove

box warranty).  "New GM undertook a performance, and not a monetary, obligation," meaning

that the remedy for alleged breaches would entail specific performance, not monetary damages.

*Id.* at *2.

### 2.    New GM Did Not Assume Any Implied Warranties Or
Other Implied Obligations Under Statutory Or Common Law

The Sale Agreement and the Sale Order and Injunction provide that implied warranty and

other implied obligation claims are Retained Liabilities for which New GM is not responsible.

Specifically, the Sale Agreement stated that Retained Liabilities of Old GM include liabilities

"arising out of, related to or in connection with any (A) *implied warranty* or other *implied*

*obligation arising under statutory or common law* without the necessity of an express warranty

or (B) allegation, statement or writing by or attributable to [Old GM]." Sale Agreement,

§ 2.3(b)(xvi) (emphasis added).  The Sale Agreement further provides that "for avoidance of

doubt," New GM "shall not assume Liabilities arising under the law of implied warranty or other

analogous provisions of state Law, other than Lemon Laws, that provide customer remedies in

addition to or different from those specified in Sellers' express warranties."  *Id.* § 6.15(b).

67

The Sale Order and Injunction reiterated the point by providing that New GM "is not assuming responsibility for Liabilities contended to arise by virtue of other alleged warranties, ***including implied warranties*** and statements in materials such as, without limitation, individual customer communications, owner's manuals, advertisements, and other promotional materials, catalogs and point of purchase materials." Sale Order and Injunction, ¶ 56 (emphasis added); *see also Castillo*, 2012 WL 1339496, at *7 (paragraph 56 of the Sale Order and Injunction, "emphasized, once again, that New GM would be assuming only express warranties that were delivered upon the sale of vehicles—and as having been intended to exclude other kinds of warranty-related claims").

Based on the foregoing, it is beyond dispute that New GM did not assume any liabilities for Old GM vehicles or parts predicated on alleged breaches of either (1) express warranties allegedly contained in materials outside the four corners of the glove box warranty, (2) implied warranties, including the implied warranty of merchantability[32] and redhibition[33] (each of which is expressly pled in the Consolidated Complaints), or (3) implied obligations under state statutes, including consumer protection statutes (also expressly pled in the Consolidated Complaints).

---

[32] While Plaintiffs in the California Class assert that their claim based on the "Song-Beverly Consumer Warranty Act for Breach of Implied Warranty of Merchantability" is a lemon law claim (*see* Post-Sale Consolidated Complaint, ¶ 1158), this claim does not fit within the definition of "Lemon Laws" in the Sale Agreement. Lemon Laws is defined as "a state statute requiring a vehicle manufacturer to provide a consumer remedy when such manufacturer is unable to conform a vehicle to the express written warranty after a reasonable number of attempts, as defined in the applicable statute." Sale Agreement, p. 11. Plaintiffs in this count make absolutely no assertion that New GM failed to conform the vehicle "after a reasonable number of attempts." *See* Post-Sale Consolidated Complaint, ¶¶ 1146-1160. The Song-Beverly statute is merely another state statute that concerns the implied warranty of merchantability. Claims based on such implied warranties are barred by the Sale Order and Injunction.

[33] Both Consolidated Complaints contain claims based on Louisiana's "redhibition" statute, LA. CIV. CODE ART. 2520, *et seq.* The name of the statute is "***warranty*** against redhibitory defects" and provides that "[t]he seller ***warrants*** the buyer against redhibitory defects . . . ." *Id.* (emphasis added). As Louisiana's redhibition statute is an "implied obligation arising under statutory . . . law," any claims based on it are barred by the Sale Agreement and Sale Order and Injunction. *See* Sale Agreement, §§ 2.3(b)(xvi), 6.15(b); Sale Order and Injunction, ¶ 56. In addition, as New GM did not assume liabilities based on design defects in Old GM vehicles, claims based on redhibition defects would similarly be barred. *See Trusky*, 2013 WL 620281, at *2; *Vanderbrook v. Coachmen Indus., Inc.*, 818 So.2d 906, 912 (La. App. 1 Cir. 2002) (a necessary element of a redhibition claim is that "the defect existed at the time of sale, and was not apparent . . .").

Plaintiffs' claims against New GM with respect to Old GM vehicles and parts based on these legal theories are barred by the Sale Order and Injunction.

> **3.    Claims Based On The Magnuson-Moss
> Warranty Act Cannot Be Asserted Against
> New GM With Respect To Old GM Vehicles Or Parts**

In the Consolidated Complaints, Plaintiffs also attempt to assert claims against New GM based on the Magnuson Moss Warranty Act.  *See* 15 U.S.C. § 2301, *et seq*.  That statute creates a federal private cause of action for a warrantor's failure to comply with the terms of a written warranty, but the only express warranty claim assumed by New GM was under the now expired, limited glove box warranty.  All other express warranty claims with respect to Old GM vehicles and parts, including claims based on the Magnuson Moss Warranty Act, are Retained Liabilities.

The statute also allows a suit for breach of an implied warranty, but as previously noted (*see* Part III.C.2, *supra*), New GM did not assume liabilities "arising out of, related to or in connection with any [ ] implied warranty . . .," and therefore any implied warranty claim based on the Magnuson Moss Warranty Act are Retained Liabilities.  *See* Sale Agreement, § 2.3(b)(xvi); Sale Order and Injunction, ¶ 56; *see also Castillo*, 2012 WL 1339496, at *7.

**D.    Any Claims Based On A Design Defect
Are Barred By The Sale Order And Injunction**

Many of the claims set forth in the Consolidated Complaints are predicated on an alleged design defect in vehicles and/or parts manufactured and/or sold by Old GM.  *See*, *e.g.*, Post-Sale Consolidated Complaint, ¶ 2560 ("The Defective Ignition Switch Vehicles contained a design defect, namely, a faulty ignition system that fails under reasonably foreseeable use, resulting in stalling, loss of brakes, power steering, and airbags, among other safety issues, as detailed herein more fully."); ¶ 2563 ("The design defects in the vehicles were the direct and proximate cause of economic damages to Plaintiffs, as well as damages incurred or to be incurred by each of the

other Ohio Ignition Switch Defect Subclass members.).  However, as expressly found in *Trusky*,

New GM did not assume any liabilities based on an alleged design defect in Old GM vehicles.

*See Trusky*, 2013 WL 620281, at \*2.

The Sale Order and Injunction also applies to claims relating to New GM vehicles to the

extent those vehicles are alleged to contain a defective part manufactured by Old GM.  Indeed,

subsequent to the New GM sale, in a limited number of cases, an original, defective ignition

switch—one sold by Old GM prior to the closing of the 363 sale—may have been unknowingly

installed by a dealer or other third party (but not New GM) when the vehicle was repaired.

While New GM believes that the number of affected vehicles was small, New GM initiated a

full-scale recall to ensure there would be no issue.  Obviously, no design defect claim of any

kind will lie for any Plaintiff who owned a New GM vehicle that was prophylactically repaired

under the recall because his/her vehicle never contained a defective part.

The repairs performed by dealers or other third parties in which a defective ignition

switch was installed are not attributable to New GM.  Those dealers and other third parties are

not agents of New GM.  *See Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 290 (5th

Cir. 2004) (holding that General Motors "has no agency relationship with [GM dealership] and

cannot be held liable for any improper acts that occurred at the [GM] dealership"); *Murphy v.

DirecTV, Inc.*, 724 F.3d 1218, 1232 (9th Cir. 2013) ("Generally, retailers are not considered the

agents of the manufacturers whose products they sell."); *Carlisle v. Deere & Co.*, 576 F.3d 649,

656 (7th Cir. 2009) ("As a general rule, a dealer is not an agent for manufacturers of the products

it sells."); *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1278 (10th Cir. 2000) (holding that

distributors of manufacturer's products were not agents of the manufacturer).

E.    **Any Claims Based On "Contract, Tort Or**
      **Otherwise" Are Barred By The Sale Order And Injunction**

1.    **Tort-Based Claims Are Not Assumed Liabilities**

As noted, one of the express categories of Retained Liabilities is "all Liabilities to third

parties for Claims based upon Contract, tort or any other basis."  Sale Agreement, § 2.3(b)(xi).

Claims for common-law fraud, fraudulent concealment, fraudulent misrepresentation, tortious

interference with contract, violations of consumer protection statutes, unjust enrichment, and

similar theories, are all claims that sound in tort and are barred by the Sale Order and Injunction.

*See e.g., Gruber v. Victor*, No. 95 Civ. 2285 (JSM), 1996 WL 492991, at *17 (S.D.N.Y. Aug. 28,

1996) ("The tort of fraudulent concealment similarly requires a relationship between the parties

creating a duty to disclose."); *St. John's Univ. v. Bolton,* 757 F. Supp. 2d 144, 174 (E.D.N.Y.

2010) ("The Complaint includes a tort claim . . . for fraudulent concealment . . . ."); *Official*

*Comm. of Unsecured Creditors of Lois/USA, Inc. v. Conseco Fin. Servicing Corp. (In re*

*Lois/USA, Inc.)*, 264 B.R. 69, 98 (Bankr. S.D.N.Y. 2001) ("At the other extreme are claims (# 4,

Fraudulent Misrepresentation; # 5, Fraud; and # 6, Negligent Misrepresentation) which are

plainly in the nature of tort."); *Beyond Sys., Inc. v. Kraft Foods, Inc.*, 972 F.Supp.2d 748, 768 (D.

Md. 2013) ("'[V]iolations of the Consumer Protection Act, are 'in the nature of a tort.'  Indeed,

both statutes regulate[ ] false and deceptive trade practices . . . the same principles that when

faced with questions of individual liability for torts apply here.' [citation omitted].  California

law is equally clear that statutory violations may be deemed as being in the nature of torts.");

*Hiller v. Mfrs. Prod. Research Grp. of N. Am., Inc.*, 59 F.3d 1514, 1537 (5th Cir. 1995) (claims

based on Texas Deceptive Trade Practices and Consumer Protection Act "sound in tort"); *Segal*

*v. Firtash,* No. 13–cv–7818 (RJS), 2014 WL 4470426, at *7 (S.D.N.Y. Sept. 9, 2014) (stating

that an unjust enrichment claim sounded in tort); *Rodriguez v. It's Just Lunch, Intern.*, 300

F.R.D. 125, 135 (S.D.N.Y. 2014) ("Plaintiffs' fraud and unjust enrichment claims sound in tort

pursuant to New York law."). These types of claims are not Assumed Liabilities under the Sale

Agreement. Accordingly, any such claims in the Consolidated Complaints based on Old GM

vehicles, parts and/or conduct are barred by the Sale Order and Injunction.

### 2. Claims Premised On Fraud And Consumer Protection Statutes That Are Based On Old GM Conduct Are Barred

Moreover, any claims for fraud or fraudulent concealment, as well as claims based on

consumer protection statutes, arise from Old GM's duties and emanate from Old GM's conduct

at the time of Old GM's sale of the vehicle. The Consolidated Complaints are littered with

allegations of Old GM concealing information or fraudulently inducing Plaintiffs to purchase

vehicles. New GM did not exist at that time and, by definition, had absolutely no involvement in

such sales. As a matter of law, New GM could not have concealed any information or

fraudulently induced purchases of vehicles sold by Old GM. Moreover, New GM did not inherit

from Old GM any common-law or statutory duty to disclose information about a product defect

to current owners or future purchasers of used vehicles made and/or sold by Old GM. That

would be another form of a successor liability claim, which New GM did not assume.

### 3. Plaintiffs' Unjust Enrichment Claims Are Not Credible

The United States Supreme Court has held that a complaint must allege "enough facts to

state a claim to relief that is plausible on its face" (*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570

(2007)), so that the court can "draw the reasonable inference that the defendant is liable for the

misconduct alleged" (*Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). Here, Plaintiffs' unjust

enrichment claims with respect to Old GM vehicles sold by dealers and third parties after the 363

Sale are simply not plausible. There is no explanation for the theory and it seems like a

carryover from the Pre-Sale Consolidated Complaint. Plaintiffs allege without any support that

"New GM was benefitted from selling defective cars for more than they were worth, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs."  Post-Sale Consolidated Complaint, ¶ 881.  Significantly, however, approximately 65% of the Named Plaintiffs in the Post-Sale Consolidated Complaint—and likely substantially more—own pre-363 Sale vehicles which were originally sold by Old GM and purchased used on the secondary market.[34]  As a threshold matter, New GM receives no benefit or other consideration when an Old GM vehicle is sold on the secondary market.  In fact, there is nothing but downside for New GM under these circumstances as conclusively shown by the fact that New GM is bearing all of the costs of recalling Old GM vehicles.  Moreover, New GM did not directly sell an Old GM vehicle and receive anything of value from any Plaintiff who purchased an Old GM vehicle.  Plaintiffs' unjust enrichment claims are just another form of successor liability that is barred.

### 4. Plaintiffs' Reliance On Restatement (Second) of Torts Is Erroneous

Plaintiffs also allege that New GM is liable under the doctrine of negligent undertaking, citing *Restatement (Second) of Torts* § 324A.  *See* Post-Sale Consolidated Complaint, ¶ 912; Pre-Sale Consolidated Complaint ¶¶ 776-78, 2850.  As a threshold matter, this Restatement section concerns "Good Samaritan liability."  *Dorking Genetics v. United States*, 76 F.3d 1261, 1267 (2d Cir. 1996).  Plaintiffs do not allege that New GM undertook any Good Samaritan duties, which is fatal to any claim based on Section 324A.  *See Matthews v. United States*, 150 F. Supp. 2d 406, 413-14 (E.D.N.Y. 2001).

---

[34]   Of the 68 Named Plaintiffs in the Post-Sale Consolidated Complaint, (i) 44 (approximately 65%) own vehicles that are Model Year 2009 or earlier (and thus were likely manufactured by Old GM); (ii) 13 own vehicles that are Model Year 2010 (some or all of which may have been manufactured by Old GM); (iii) 2 do not provide information on the Model Year of the vehicle identified; and (iv) 9 (approximately 13%) own vehicles that are Model Year 2011 or later.  *See* Post-Sale Consolidated Complaint, ¶¶ 27-93.  Without vehicle identification numbers, it is impossible for New GM to ascertain whether a particular 2009 and 2010 vehicle was manufactured by Old GM or New GM.

Moreover, as the *Restatement* makes clear, a defendant can only be liable under Section 324A "**for physical harm** resulting from his failure to exercise reasonable care to protect his undertaking." *Restatement (Second) of Torts* § 324A (emphasis added); *see also Garland Dollar Gen. LLC v. Reeves Dev., LLC*, No. 3:09-CV-0707-D, 2010 WL 4259818, at *4 (N.D. Tex. Oct. 21, 2010) ("[T]he Restatement (Second) of Torts § 324A only recognizes negligence liability to a third person when physical harm results."). Plaintiffs in the Ignition Switch Actions and Non-Ignition Switch Actions, however, do not allege any accident-based injuries—they merely allege economic losses. Courts overwhelmingly hold that Section 324A does ***not*** permit recovery for purely economic losses. *See Schaefer v. IndyMac Mortg. Servs.*, 731 F.3d 98, 104 (1st Cir. 2013) ("[C]ourts in a large number of jurisdictions have read the references to 'physical harm' in § 323 and § 324A of the Restatement as affirmatively precluding recovery for economic losses in such cases."). Because Plaintiffs here are suing for economic losses—not personal injuries—New GM cannot be liable under a theory of negligent undertaking.

Additionally, a subset of Plaintiffs who reside in four states—Arkansas, Louisiana, Maryland, and Ohio—rely upon *Restatement (Second) of Torts* § 395 to bring negligence-based claims. *See* Pre-Sale Consolidated Complaint, ¶¶ 2850-2854; Post-Sale Consolidated Complaint, ¶¶ 912-916. Yet, the plain language of Section 395 makes clear that it only applies to ***manufacturers***. *See Restatement (Second) of Torts* § 395 (imposing liability upon "[a] ***manufacturer*** who fails to exercise reasonable care *in the manufacture* of a chattel . . . ." (emphasis added)). New GM had no involvement in the manufacturing of Old GM vehicles and, thus, cannot be liable under Section 395 of the *Restatement*.

74

**F.**     **There Is No Private Cause of Action Based On A Failure To Recall And Any Such Claims Are Not Assumed Liabilities Under The Sale Agreement**

The Consolidated Complaints appear to be based, at least in part, on the assertion that New GM should have issued the Subject Vehicle recall sooner. Decisively, as a matter of law, individual consumers do not have standing to seek damages for alleged violations of a car manufacturer's reporting and recall-related obligations to NHTSA. Indeed, the Ninth Circuit has held that "Congress did not intend to create private rights of action in favor of individual purchasers of motor vehicles when it adopted the comprehensive system of regulation to be administered by NHTSA." *Handy v. Gen. Motors Corp.*, 518 F.2d 786, 788 (9th Cir. 1975) (*per curiam*); *see also Ayres v. GMC*, 234 F.3d 514, 522 (11th Cir. 2000) (stating that the Safety Act confers no private right of action).

In an attempt to end-run around this obvious problem, Plaintiffs assert that New GM, pursuant to the Sale Order and Injunction and Sale Agreement, agreed to comply with certain laws and to conduct appropriate recalls with respect to Old GM vehicles. Specifically, Section 6.15(a) of the Sale Agreement provides as follows:

> From and after the Closing, Purchaser shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.[35]

There is a corresponding provision in the Sale Order and Injunction (¶ 17). Notably, however, the recall obligation is not contained in the Assumed Liability section of the Sale Agreement. The Sale Agreement and the Sale Order and Injunction are explicit that the only exception to the

---

[35]    The Transportation Recall Enhancement, Accountability and Documentation Act ("**TREAD Act**") amended the Safety Act and became incorporated therein. *See Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 811 (D.C. Cir. 2008). Thus, if the Safety Act confers no private right of action, the same is true of the TREAD Act. The Sale Agreement's inclusion of language concerning the Clean Air Act and the California Health and Safety Code refers to emissions-related recall and reporting obligations which are not at issue in the Ignition Switch Actions or the Non-Ignition Switch Actions.

"free and clear" of claims language relates to Assumed Liabilities (which is a contractually-defined term that does not include the recall covenant). Accordingly, New GM's covenant to comply with the federal recall statute is not an Assumed Liability under the Sale Agreement.

In sum, New GM's recall covenant is not a "back-door" assumption by New GM of what otherwise are Retained Liabilities under the Sale Agreement.

## IV.    "FRAUD ON THE COURT" LEGAL STANDARD

Fed. R. Civ. P. 60(d)(3) provides, in relevant part, that a court can "set aside a judgment for fraud on the court." While Fed. R. Civ. P. 60(b) motions are closely scrutinized and rarely granted, relief under Fed. R. Civ. P. 60(d)(3)[36] is even ***more limited*** and "is reserved for only the most egregious misconduct, and requires a showing of an unconscionable plan or scheme which is designed to improperly influence the court in its decision." *Wilson v. Johns-Manville Sales Corp.*, 873 F.2d 869, 872 (5th Cir. 1989); *State Street Bank & Trust, Co. v. Inversions Errazuriz Limitada*, 374 F.3d 158, 176 (2d Cir. 2004).

A "fraud on the court" under Fed. R. Civ. P. 60(d)(3) relates to:

> only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication.

*Kupferman v. Consol. Research and Mfg. Corp.*, 459 F.2d 1072, 1078 (2d Cir. 1972) (quotation marks omitted); *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1325 (2d Cir. 1995); *Transaero, Inc. v. La Fuerza Area Boliviana*, 24 F.3d 457, 460 (2d Cir.) *on reh'g in part sub nom. Transaero, Inc. v. La Fuerza Aerea Boliviana*, 38 F.3d 648 (2d Cir. 1994); *Gleason v. Jandrucko*, 860 F.2d 556, 558 (2d Cir. 1988); *Serzysko v. Chase Manhattan Bank*, 461 F.2d 699, 702 (2d Cir. 1972).

---

[36] Plaintiffs cannot use Fed. R. Civ. P. 60(b)(3) "fraud" because the limitation period long ago expired and there is no equitable tolling. *Campaniello Imps., Ltd. v. Saporiti Italia S.p.A*, 117 F.3d 655 (2d Cir. 1997).

Fraud on the court under Fed. R. Civ. P. 60(d)(3) involves **intentional conduct** that "seriously affects the integrity of the normal process of adjudication." *Gleason*, 860 F.2d at 559; *Lehman Bros., Inc. v. Maselli*, No. 93 Civ. 4478 AGS RJW, 1998 WL 531831, at *6 (S.D.N.Y. Aug. 24, 1998) (quoting *United States v. Beggerly*, 524 U.S. 38, 47 (1998)); *see also SEC v. ESM Grp., Inc.,* 835 F.2d 270 (11th Cir. 1988) (holding that fraud on the court is the type of fraud which prevents or impedes the proper functioning of the judicial process, and it must threaten public injury, as distinguished from injury to a particular litigant), *cert denied, sub. nom., Peat Marwick Main & Co. v. Tew*, 486 U.S. 1055 (1988). It encompasses conduct that prevents the court from fulfilling its duty of impartially deciding cases. *In re Ticketplanet.com*, 313 B.R. 46, 64 (Bankr. S.D.N.Y. 2004).

Unlike fraud that can be remedied under Fed. R. Civ. P. 60(b)(3), to obtain relief under Fed. R. Civ. P. 60(d)(3), the movant must allege a fraud perpetrated by an officer of the court and it must be directed at the judicial process itself, not just to other litigants. *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245-46 (1944) (fraud directed to other litigants does not constitute a fraud on the court); *Kupferman*, 459 F.2d at 1078; *Syarns v. H.E. Avent,* 96 B.R. 620 (M.D. La. 1989); *see also In re Food Mgmt. Grp., LLC*, 380 B.R. 677, 714-15 (Bankr. S.D.N.Y. 2008) ("Successfully alleging fraud on the court requires (1) a misrepresentation to the court by the defendant; (2) a description of the impact the misrepresentation had on proceedings before the court; (3) a lack of an opportunity to discover the misrepresentation and either bring it to the court's attention or bring an appropriate corrective proceeding; and (4) the benefit the defendant derived from the misrepresentation."). Typical examples of "fraud on the court" include bribery of a judge or members of a jury, or fabrication of evidence by a party in which an attorney, as an officer of the court, is involved. *Weese v. Schukman*, 98 F.3d 542, 552-53 (10th

Cir. 1996); *United States v. Int'l Tel. & Tel. Corp.*, 349 F. Supp. 22, 29 (D. Conn. 1972), *aff'd*

*mem. sub. nom.*, *Nader v. United States*, 410 U.S. 919 (1973).

The failure to disclose pertinent facts relating to a controversy before the court, or even

perjury regarding such facts, whether to an adverse party or to the court, does not without more

constitute "fraud upon the court" and does not merit relief under Fed. R. Civ. P. 60(d)(3).  *E.g.,*

*Gleason*, 860 F.2d at 559-60; *In re Hoti Enters., LP*, No. 12-CV-5341 (CS), 2012 WL 6720378,

at * 3-4 (S.D.N.Y. Dec. 27, 2012).  Instead, such conduct would only be covered by Fed. R. Civ.

P. 60(b)(3). *Id.*

In  *Hoti Enterprises*, the district court affirmed the bankruptcy court's denial of

reconsideration of a cash collateral order based on alleged fraud by a lender in its representation

that it had a secured claim.  It held that "neither perjury nor non-disclosure by itself amounts to

anything more than fraud involving injury to a single litigant" covered by Fed. R. Civ. P.

60(b)(3), and therefore, is not the type of egregious misconduct necessary for relief under Fed. R.

Civ. P. 60(d).  *Hoti Enters.*, 2012 WL 6720378, at *3-4.[37]

The burden of proof in establishing fraud upon the court is on the movant.  The threshold

for the burden is "clear and convincing" evidence.  *King v. First American Investigations, Inc.,*

287 F.3d 91 (2d Cir. 2002).  Further, fraud on the court requires the moving party to establish

that the other party (here, Old GM) benefited, or could have benefited, from the alleged fraud.

*See In re Food Mgmt. Grp. LLC,* 380 B.R. at 714-15.

---

[37]  Courts from other jurisdictions have reached the same conclusion.  *In re Tevis*, BAP No. EC-13-1211 KiKuJu,
2014 WL 345207 (B.A.P. 9th Cir. Jan. 30, 2014) ("Mere nondisclosure of evidence is typically not enough to
constitute fraud on the court, and 'perjury by a party or witness, by itself, is not normally fraud on the court.");
*In re Andrada Fin., LLC*, No. AZ-10-1209-JuMkPa, 2011 WL 3300983, at *7 (B.A.P. 9th Cir. Apr. 7, 2011); *In
re Levander*, 180 F.3d 1114, 1119 (9th Cir. 1999); *Simon v. Navon*, 116 F.3d 1, 6 (1st Cir. 1997); *Wilson v.
Johns-Manville Sales Corp.*, 873 F.2d 869, 872 (5th Cir. 1989); *In re Mucci*, 488 BR 186, 193-94 & n.8 (Bankr.
D. N.M. 2013); *In re Galanis*, 71 B.R. 953, 960 (Bankr. D. Conn. 1987) ("It is well established that the failure
to disclose allegedly pertinent facts relating to a controversy before the court, whether to an adverse party or to
the court, does not constitute "fraud upon the court" for purposes of setting aside a judgment . . . .").

In reality, the factual predicate for Plaintiffs' fraud on the court theory (a purposeful failure to disclose an alleged product defect that was not being assumed by the purchaser as part of a 363 Sale) is nothing more than a re-casted formulation of the due process argument. And, since that argument fails, so does the more limited and rarely granted "fraud on the court" argument.

In the Sale Order and Injunction, the Court found that neither Old GM nor New GM entered into the Sale Agreement or consummated the 363 Sale "for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors." Sale Order and Injunction, ¶ M.

## CONCLUSION

Plaintiffs cannot satisfy their burden of showing that they were denied due process in connection with the 363 Sale. Even assuming that Plaintiffs could establish that they were entitled to direct mail notice of the 363 Sale, they cannot carry their burden of demonstrating prejudice—showing that the outcome of the 363 Sale would have been different. And, even if there were a due process violation in connection with the 363 Sale, the proper remedy would be to penalize the actor that committed that violation—Old GM—and not New GM who this Court found to be a good faith purchaser. Plaintiffs similarly cannot meet their burden of showing how the legal standard for fraud on the Court is satisfied based on the factual predicate alleged against Old GM. In the end, it is patently evident that Plaintiffs have improperly asserted Retained Liabilities against New GM in the Consolidated Complaints. They have violated the Sale Order and Injunction, and the Motions to Enforce should be granted to prevent their improper conduct from continuing.

Dated: New York, New York
       November 5, 2014

Respectfully submitted,


_/s/ Arthur Steinberg_____
Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222

Richard C. Godfrey, P.C. (admitted *pro hac vice*)
Andrew B. Bloomer, P.C. (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Attorneys for General Motors LLC*