# **Exhibit H**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
|  | : |  |
| **MOTORS LIQUIDATION COMPANY**, *et al.*, | : | **09-50026 (REG)** |
| f/k/a General Motors Corp., *et al.* | : |  |
|  | : |  |
| Debtors. | : | **(Jointly Administered)** |
|  | : |  |

---------------------------------------------------------------x

**DISCLOSURE STATEMENT FOR**
**DEBTORS' AMENDED JOINT CHAPTER 11 PLAN**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Attorneys for the Debtors and Debtors in
Possession

Dated: New York, New York
          December 8, 2010

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE
PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL
A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE
BANKRUPTCY COURT.  THE DISCLOSURE STATEMENT IS BEING
SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE
BANKRUPTCY COURT TO DATE.**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................. 1

    A.     Definitions and Exhibits ............................................. 1

        1.     Definitions.................................................. 1

        2.     Exhibits ...................................................... 1

    B.     Notice to Creditors .................................................... 1

        1.     Scope of Plan ............................................. 1

        2.     Purpose of Disclosure Statement ................... 2

    C.     Disclosure Statement Enclosures .............................. 3

        1.     Disclosure Statement Approval Order ........... 3

        2.     Notice of Confirmation Hearing .................... 3

        3.     Ballots ....................................................... 3

    D.     Inquiries .................................................................. 3

    E.     Summary Table of Classification and Treatment of Claims and
        Equity Interests Under the Plan ................................ 4

II.     OVERVIEW OF DEBTORS' OPERATIONS AND CHAPTER 11
    CASES ............................................................................... 8

    A.     Debtors' Prepetition Business Operations ................. 8

    B.     Significant Events Leading to Commencement of Chapter 11
        Cases ..................................................................... 10

    C.     Restructuring of GM ............................................... 16

    D.     Debtors' Prepetition Capital Structure...................... 20

    E.     REALM/ENCORE Debtors...................................... 25

    F.     Chapter 11 Cases..................................................... 26

        1.     Commencement of Chapter 11 Cases ........... 26

        2.     Appointment of Creditors' Committee ........... 26

        3.     Appointment of Asbestos Claimants' Committee and
           Future Claimants' Representative.................. 27

        4.     DIP Financing ............................................ 27

        5.     363 Transaction........................................... 28

        6.     Term Loan Avoidance Action ...................... 31

i

# TABLE OF CONTENTS
## (continued)

|  |  |  |  |
|---|---|---|---|
|  | 7. | Wind-Down Process | 33 |
|  | 8. | Executory Contracts and Unexpired Leases/Dealerships | 33 |
|  | 9. | Claims Process | 34 |
|  | 10. | Reclamation Claims and 503(b)(9) Claims | 36 |
|  | 11. | Nova Scotia Objection | 37 |
|  | 12. | Automatic Stay Issues | 43 |
|  | 13. | Assessment of Environmental Liabilities | 43 |
|  | 14. | Asbestos Liability | 47 |
|  | 15. | De Minimis Asset Sales | 49 |
|  | 16. | Non-De Minimis Asset Sales | 50 |
|  | 17. | Settlement with Remy International, Inc. | 50 |
|  | 18. | Appointment of Fee Examiner | 52 |
|  | 19. | New GM Initial Public Offering and Valuation of New GM | 52 |
| III. | OVERVIEW OF THE PLAN | | 52 |
|  | A. | General | 52 |
|  | B. | Assets for Distribution Under the Plan | 53 |
|  | C. | Description and Summary Table of Classification and Treatment of Claims and Equity Interests Under the Plan | 56 |
|  | D. | Reservation of "Cram Down" Rights | 67 |
|  | E. | Administrative Expenses for the Debtors | 68 |
|  | F. | Provisions Governing Distributions Under the Plan | 68 |
|  | 1. | Distribution Record Date | 68 |
|  | 2. | Payments and Transfers on Effective Date | 69 |
|  | 3. | Repayment of Excess Cash to DIP Lenders | 69 |
|  | 4. | Payment of Cash or Certain Assets to Charitable Organizations | 70 |
|  | 5. | Distributions of Cash | 70 |
|  | 6. | Sale of New GM Warrants About to Expire | 70 |
|  | 7. | Delivery of Distributions and Undeliverable Distributions | 71 |
|  | 8. | Withholding and Reporting Requirements | 72 |

# TABLE OF CONTENTS
## (continued)

Page

| | | | |
|---|---|---|---|
| | 9. | Time Bar to Cash Payments | 72 |
| | 10. | Minimum Distributions and Fractional Shares | 72 |
| | 11. | Setoffs | 73 |
| | 12. | Transactions on Business Days | 73 |
| | 13. | Allocation of Plan Distributions Between Principal and Interest | 73 |
| | 14. | Surrender of Existing Publicly-Traded Securities | 73 |
| | 15. | Class Proofs of Claim | 74 |
| | 16. | Continued Evaluation of Distribution Mechanics | 74 |
| G. | | Means for Implementation and Execution of the Plan | 74 |
| | 1. | Substantive Consolidation | 74 |
| | 2. | The GUC Trust | 75 |
| | | a. Execution of GUC Trust Agreement | 75 |
| | | b. Purpose of GUC Trust | 76 |
| | | c. GUC Trust Assets | 76 |
| | | d. Governance of GUC Trust | 76 |
| | | e. GUC Trust Administrator and GUC Trust Monitor | 76 |
| | | f. Role of GUC Trust Administrator | 76 |
| | | g. Role of GUC Trust Monitor | 77 |
| | | h. Transferability of GUC Trust Interests | 77 |
| | | i. Cash | 77 |
| | | j. Costs and Expenses of GUC Trust Administrator | 77 |
| | | k. Compensation of GUC Trust Administrator | 78 |
| | | l. Distribution of GUC Trust Assets | 78 |
| | | m. Retention of Professionals by GUC Trust Administrator and GUC Trust Monitor | 78 |
| | | n. U.S. Federal Income Tax Treatment of GUC Trust | 78 |
| | | o. Dissolution | 79 |
| | | p. Indemnification of GUC Trust Administrator and GUC Trust Monitor | 79 |

# TABLE OF CONTENTS
## (continued)

Page

|   |   |   |   |
|---|---|---|---|
| q. | Closing of Chapter 11 Cases | 79 |
| 3. | The Asbestos Trust | 80 |
| a. | Execution of Asbestos Trust Agreement | 80 |
| b. | Purpose of Asbestos Trust | 80 |
| c. | Assumption of Certain Liabilities by Asbestos Trust | 80 |
| d. | Asbestos Trust Assets | 80 |
| e. | Governance of Asbestos Trust | 81 |
| f. | The Asbestos Trust Administrator(s) | 81 |
| g. | Role of Asbestos Trust Administrator(s) | 81 |
| h. | Nontransferability of Asbestos Trust Interests | 81 |
| i. | Cash | 81 |
| j. | Costs and Expenses of Asbestos Trust Administrator(s) | 81 |
| k. | Allowance of Asbestos Personal Injury Claims | 81 |
| l. | Distribution of Asbestos Trust Assets | 81 |
| m. | Retention of Professionals by Asbestos Trust Administrator(s) | 82 |
| n. | U.S. Federal Income Tax Treatment of Asbestos Trust | 82 |
| o. | Dissolution | 82 |
| p. | Indemnification of Asbestos Trust Administrator(s) | 82 |
| 4. | The Environmental Response Trust | 83 |
| a. | Environmental Response Trust Agreement and Environmental Response Trust Consent Decree and Settlement Agreement | 83 |
| b. | Purpose of Environmental Response Trust | 83 |
| c. | Environmental Response Trust Assets | 84 |
| d. | Governance of Environmental Response Trust | 84 |
| e. | Role of Environmental Response Trust Administrative Trustee | 84 |

# TABLE OF CONTENTS
## (continued)

|  |  |  | Page |
|---|---|---|---|
|  | f. | Nontransferability of Environmental Response Trust Interests | 85 |
|  | g. | Cash | 85 |
|  | h. | Indemnification of Environmental Response Trust Administrative Trustee | 85 |
|  | i. | U.S. Federal Income Tax Treatment of Environmental Response Trust | 85 |
| 5. |  | The Avoidance Action Trust | 86 |
|  | a. | Execution of Avoidance Action Trust Agreement | 86 |
|  | b. | Purpose of Avoidance Action Trust | 86 |
|  | c. | Avoidance Action Trust Assets | 86 |
|  | d. | Governance of Avoidance Action Trust | 87 |
|  | e. | Avoidance Action Trust Administrator and Avoidance Action Trust Monitor | 87 |
|  | f. | Role of Avoidance Action Trust Administrator | 87 |
|  | g. | Role of Avoidance Action Trust Monitor | 87 |
|  | h. | Nontransferability of Avoidance Action Trust Interests | 88 |
|  | i. | Cash | 88 |
|  | j. | Distribution of Avoidance Action Trust Assets | 88 |
|  | k. | Costs and Expenses of Avoidance Action Trust | 88 |
|  | l. | Compensation of Avoidance Action Trust Administrator | 89 |
|  | m. | Retention of Professionals by Avoidance Action Trust Administrator and Avoidance Action Trust Monitor | 89 |
|  | n. | U.S. Federal Income Tax Treatment of Avoidance Action Trust | 89 |
|  | o. | Dissolution | 92 |
|  | p. | Indemnification of Avoidance Action Trust Administrator and Avoidance Action Trust Monitor | 92 |
| 6. |  | Securities Law Matters | 93 |

# TABLE OF CONTENTS
## (continued)

7.     Cancellation of Existing Securities and Agreements .................. 94

8.     Equity Interests in MLC Subsidiaries Held by the Debtors ........ 95

9.     Administration of Taxes .............................................................. 95

10.    Dissolution of the Debtors .......................................................... 95

11.    Determination of Tax Filings and Taxes .................................... 96

12.    Books and Records ..................................................................... 97

13.    Corporate Action ........................................................................ 98

14.    Effectuating Documents and Further Transactions ..................... 98

15.    Continued Applicability of Final Order Approving Dip
       Credit Agreement ....................................................................... 99

H.    Procedures for Resolving and Treating Disputed Claims ....................... 99

1.     Objections to Claims and Resolution of Disputed Claims .......... 99

2.     No Distribution Pending Allowance ......................................... 100

3.     Estimation ................................................................................. 101

4.     Allowance of Disputed Claims ................................................. 101

5.     Dividends .................................................................................. 101

I.    Treatment of Executory Contracts and Unexpired Leases ................... 101

1.     Executory Contracts and Unexpired Leases ............................. 101

2.     Approval of Rejection of Executory Contracts and
       Unexpired Leases ...................................................................... 101

3.     Claims Relating to Executory Contracts and Unexpired
       Leases Rejected Pursuant to the Plan ........................................ 102

J.    Releases Granted Pursuant to the Plan .................................................. 102

1.     Limited Releases ....................................................................... 102

2.     Exculpation ............................................................................... 103

K.    Conditions Precedent to Effectiveness of Plan ..................................... 104

1.     Condition Precedent to Confirmation of Plan ........................... 104

2.     Conditions Precedent to Effective Date .................................... 104

3.     Satisfaction and Waiver of Conditions ..................................... 104

4.     Effect of Nonoccurrence of Conditions to Consummation ........ 105

# TABLE OF CONTENTS
## (continued)

**Page**

L.     Effects of Confirmation of Plan ............................................................ 105

     1.     Vesting of Assets ........................................................................ 105

     2.     Release of Assets from Bankruptcy Court Jurisdiction ............. 106

     3.     Binding Effect ............................................................................ 106

     4.     Term of Injunction or Stays ...................................................... 106

     5.     Term Loan Avoidance Action; Offsets ..................................... 106

     6.     Injunction ................................................................................... 106

     7.     Injunction Against Interference with Plan ................................ 106

     8.     Special Provisions for Governmental Units.............................. 107

M.     Retention of Jurisdiction by Bankruptcy Court ..................................... 107

N.     Dissolution of Committees .................................................................... 109

O.     Exemption from Transfer Taxes ........................................................... 110

IV.     ALTERNATIVES TO THE PLAN ................................................................. 110

A.     Liquidation Under Chapter 7 of the Bankruptcy Code ......................... 111

B.     Alternative Chapter 11 Plan.................................................................. 111

C.     Certain Risk Factors.............................................................................. 111

V.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN ............................................................................................................ 111

A.     Consequences to the Debtors ................................................................ 113

     1.     Treatment of Asbestos Trust ...................................................... 114

     2.     Treatment of GUC Trust ............................................................ 115

     3.     Treatment of Avoidance Action Trust ....................................... 115

     4.     Treatment of Environmental Response Trust ............................ 116

B.     Consequences to Holders of General Unsecured Claims ..................... 117

     1.     Reorganization Treatment........................................................... 118

     2.     Fully Taxable Exchange ............................................................. 119

     3.     Character of Gain or Loss .......................................................... 120

     4.     Distribution with Respect to Accrued but Unpaid Interest........ 121

     5.     Ownership and Disposition of New GM Stock ......................... 122

        a.     Dividends ................................................................... 122

# TABLE OF CONTENTS
## (continued)

Page

| | | | |
|---|---|---|---|
| | b. | Sale, Redemption, or Repurpose | 123 |
| 6. | | Ownership, Disposition, and Exercise of New GM Warrants | 123 |
| 7. | | Tax Treatment of Avoidance Action Trust and Beneficiaries of Avoidance Action Trust | 123 |
| | a. | Classification of Avoidance Action Trust | 123 |
| | b. | General Tax Reporting by Avoidance Action Trust and Beneficiaries of Avoidance Action Trust | 124 |
| | c. | Tax Reporting for Avoidance Action Trust Assets Allocable to Disputed Claims | 126 |

C.   Consequences to Holders of Asbestos Personal Injury Claims ............ 127

D.   Information Reporting and Withholding ................................................ 128

E.   Consequences to Non-U.S. Holders of Notes ....................................... 128

    1.   Distributions Under the Plan .................................................... 129

        a.   Accrued Interest .............................................................. 130

        b.   Treaty Benefits ................................................................ 130

        c.   Foreign Government Exemption ..................................... 130

    2.   Ownership and Disposition of New GM Securities ................... 131

        a.   Dividends ......................................................................... 131

        b.   Sale, Redemption, or Repurchase .................................. 131

        c.   Information Reporting and Backup Withholding .......... 132

VI.   VOTING PROCEDURES AND REQUIREMENTS ....................................... 133

  A.   Ballots and Voting Deadline ................................................................. 133

  B.   Holders of Claims Entitled to Vote ....................................................... 134

  C.   Votes Required for Acceptance by a Class ............................................ 134

  D.   Voting Procedures ................................................................................. 135

    1.   Holders of Claims in Classes 3 and 5 ........................................ 135

    2.   Withdrawal of Ballot or Master Ballot ...................................... 135

VII.   CONFIRMATION OF THE PLAN ................................................................ 135

  A.   Acceptance of the Plan .......................................................................... 135

**TABLE OF CONTENTS**
**(continued)**

|   | B. | Confirmation of the Plan If a Class Does Not Accept the Plan/No Unfair Discrimination/Fair and Equitable Test | 136 |
|---|----|-----|-----|
|   | C. | Best Interests Test | 137 |
|   | D. | Feasibility | 138 |
|   | E. | Classification of Claims and Equity Interests Under the Plan | 139 |
|   | F. | Confirmation Hearing | 139 |
| VIII. | | CONCLUSION | 141 |

I.    **INTRODUCTION**

This is the disclosure statement (the "**Disclosure Statement**") of Motors Liquidation Company (f/k/a General Motors Corporation) ("**MLC**"); MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.); MLCS, LLC (f/k/a Saturn, LLC); MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation); Remediation and Liability Management Company, Inc. ("**REALM**"); and Environmental Corporate Remediation Company, Inc. ("**ENCORE**," and collectively with MLC, MLC of Harlem, Inc., MLCS, LLC, MLCS Distribution Corporation, and REALM, the "**Debtors**"), in the above-captioned chapter 11 cases pending before the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), filed in connection with the Debtors' Amended Chapter 11 Plan, dated December 7, 2010 (the "**Plan**"), a copy of which is annexed to this Disclosure Statement as **Exhibit "A**."

A.    **Definitions and Exhibits**

1.    Definitions.  Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan.

2.    Exhibits.  The exhibit to this Disclosure Statement are incorporated as if fully set forth herein and are a part of this Disclosure Statement.

B.    **Notice to Creditors**

1.    Scope of Plan.  Summarily, the Plan provides for (i) the distribution on the Effective Date of Cash to the holders of Allowed Administrative Expenses, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims in an amount equal to the Allowed amount of such Administrative Expenses and priority Claims, (ii) the distribution on the Effective Date to the holders of Allowed Secured Claims (if any), at the option of the Debtors, of either (a) Cash in an amount equal to one hundred percent (100%) of the unpaid amount of such Allowed Secured Claim, (b) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Claim, net of the costs of disposition of such Collateral, (c) the Collateral securing such Allowed Secured Claim, (d) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Secured Claim is entitled, or (e) such other distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code, (iii) the distribution no earlier than the Distribution Record Date to the holders of Allowed General Unsecured Claims of their Pro Rata Share of (a) the New GM Securities or the proceeds thereof, if any, (b) the GUC Trust Units, and (c) to the extent it is determined that the holders of Allowed General Unsecured Claims are entitled to any proceeds of the Term Loan Avoidance Action, any proceeds of the Term Loan Avoidance Action, all in accordance with the terms of the GUC Trust, the GUC Trust Agreement, the Avoidance Action Trust, and the Avoidance Action Trust Agreement, as applicable, (iv) the satisfaction and treatment on the Effective Date of the holders of Allowed Property Environmental Claims in accordance with the terms of the Environmental Response Trust Agreement and the Environmental Response Trust

counsel to GM filed a UCC-3 terminating the UCC-1, which covered most of the
personal property securing the term loan.  The position of JPMCB, as a lender and the
administrative agent under the Prepetition Term Loan Agreement, is that the UCC-3 was
filed without authority and, therefore, the filing has no force or effect.  The Creditors'
Committee's position is that since JPMCB authorized the filing made by GM's counsel,
the filing is effective.  JPMCB and the Creditors' Committee entered into a stipulated
scheduling order governing discovery and briefing, dated October 6, 2009, as modified
on January 20, 2009, pursuant to which the parties agreed that JPMCB would accept
service of the complaint commencing the Term Loan Avoidance Action and the
Creditors' Committee would have thirty days after the date of entry of the Bankruptcy
Court's decision on any dispositive motion to serve the summons and complaint on the
remaining lenders.  In accordance with the modified scheduling order, on July 1, 2010,
JPMCB filed a motion for summary judgment and the Creditors' Committee filed a
motion for partial summary judgment.  On August 5, 2010, the Creditors' Committee
filed a memorandum of law in opposition to JPMCB's motion for summary judgment,
and JPMCB filed a memorandum of law in opposition to the Creditors' Committee's
motion for partial summary judgment.  On August 26, 2010, the Creditors' Committee
filed a reply memorandum of law in further support of its motion for partial summary
judgment and JPMCB filed a reply memorandum of law in further support of its motion
for summary judgment.  A hearing to consider the summary judgment motion took place
on December 3, 2010.  At the conclusion of the hearing, the Bankruptcy Court requested
further briefing and reserved decision.

Because the Plan currently leaves open whether holders of Allowed
General Unsecured Claims or the DIP Lenders are entitled to the proceeds of any
recovery on the Term Loan Avoidance Action, on October 4, 2010, the Creditors'
Committee filed a Motion to Enforce (A) the Final DIP Order, (B) the Wind-Down
Order, and (C) the Amended DIP Facility (the "**Creditors' Committee's Motion to
Enforce the DIP**") (ECF No. 7226), seeking a determination that the DIP Lenders have
no interest in the Term Loan Avoidance Action and that the interests in the Avoidance
Action Trust should be distributed exclusively to holders of Allowed General Unsecured
Claims.  The U.S. Treasury filed an objection to the Creditors' Committee's Motion to
Enforce the DIP, which was joined by EDC.  (ECF Nos. 7338, 7498)  The Asbestos
Claimants' Committee and the Future Claimants' Representative each filed a joinder in
support of the Creditors' Committee's Motion to Enforce the DIP (ECF Nos. 7441,
7387).  At the hearing held on October 21, 2010, the Bankruptcy Court denied the
Creditors' Committee's Motion to Enforce the DIP, without prejudice, on procedural
grounds as being premature.

The Creditors' Committee has stated that it will discontinue the Term
Loan Avoidance Action if the DIP Lenders are deemed to own the proceeds of the Term
Loan Avoidance Action (as such a result would only decrease recoveries to holders of
Allowed General Unsecured Claims).  It is not certain whether any other party could
proceed with litigating the Term Loan Avoidance Action.  For a discussion of the risks to
holders of Allowed General Unsecured Claims receiving any recovery from the Term
Loan Avoidance Action, see Section III.C, below.

   7. <u>Wind-Down Process</u>.  After the commencement of the Chapter 11
Cases and the consummation of the 363 Transaction, the Debtors began the process of an
orderly liquidation and wind-down of the Debtors' remaining assets and properties.  In
connection therewith, the Debtors retained a number of professionals to assist in the
administration of their estates, including the professionals at AP Services, who have
taken the lead in compiling information related to the Debtors' remaining assets and
administering the Debtors' estates, local and foreign counsel, as well as accounting
professionals and environmental consultants.  The wind-down activities have included,
among other things, analyzing the physical assets of the Debtors; analyzing the assets and
obligations of MLC's numerous remaining subsidiaries to determine the most appropriate
means of liquidating each subsidiary; filing motions to reject hundreds of executory
contracts and unexpired leases; establishing global procedures for asset sales; establishing
bar dates for the filing of claims; analyzing the over 70,000 proofs of claim that have
been filed in an aggregate amount of approximately $270 billion, of which over 29,000
were unliquidated, approximately 28,500 are asbestos-related, and 470 are
environmental-related; and negotiating settlements with certain equipment lessors
resulting in modifications to lease agreements and the assumption and assignment to New
GM of such modified leases, which reduced or eliminated hundreds of millions of dollars
in rejection damage claims.  Certain of these activities are described more fully below.

   8. <u>Executory Contracts and Unexpired Leases/Dealerships</u>.  As of the
Commencement Date, the Debtors were parties to over 700,000 executory contracts and
unexpired leases of nonresidential real property and personal property.

   In connection with the 363 Transaction and the continued operation of
New GM's businesses, the Debtors participated in an assumption and assignment process
that was critical to the continuation of the GM enterprise and wind-down of the Debtors'
remaining operations.  Under this procedure, the Debtors maintained a database of
executory contracts and unexpired leases of nonresidential real property that were
designated by New GM to be assumed by the Debtors and assigned to New GM (each an
"**Assumable Executory Contract**").  New GM, at its option, could elect to designate a
contract as an Assumable Executory Contract until October 22, 2010, the expiration of
the extended contract designation period, which period was agreed to between the
Debtors and New GM.  In connection with this process, New GM has assumed
approximately 672,900 executory contracts and unexpired leases of the Debtors and is
responsible for paying all cure amounts in connection therewith, as required by the
MSPA.

   The Debtors have evaluated those contracts not designated as Assumable
Executory Contracts to determine their appropriate disposition in the context of the
Debtors' wind-down efforts.  The Debtors have sought to reject certain contracts and
leases that are not required for the Debtors' continuing operations and which were not
assumed and assigned to New GM.  Specifically, the Debtors have filed twelve omnibus
motions as well as other motions to reject approximately 1,100 executory contracts and
unexpired leases of nonresidential real property.

Finally, the Debtors had approximately 6,000 dealerships in their network as of the Commencement Date. The Debtors implemented a comprehensive dealer rationalization program, which included entering into thousands of participation and wind-down agreements enabling successful dealerships to continue with New GM while providing underperforming dealerships with significant economic support to wind down their businesses. The Debtors also filed a motion to reject approximately eighty dealership agreements and negotiated voluntary termination agreements with several others.

9.   <u>Claims Process</u>.  By order dated September 16, 2009 (the "**Initial Debtors' Bar Date Order**"), the Bankruptcy Court established November 30, 2009 as the deadline for each person or entity, including governmental units, to file a proof of Claim against the Initial Debtors in the Chapter 11 Cases (the "**Initial Debtors' Bar Date**").  By order dated December 18, 2009 (the "**Property Bar Date Order**"), the Bankruptcy Court established February 10, 2010 as the deadline for entities residing adjacent to or in the proximity of certain Initial Debtors' properties to file a proof of Claim with respect to their person or real property arising from being located adjacent to or in the proximity of such properties (the "**Property Bar Date**").  By order dated December 2, 2009 (the "**REALM/ENCORE Bar Date Order**," and together with the Initial Debtors' Bar Date Order and the Property Bar Date Order, the "**Bar Date Orders**"), the Bankruptcy Court established February 1, 2010 as the deadline for each person or entity to file a proof of Claim against REALM and ENCORE and April 16, 2010 as the deadline for governmental units to file a proof of Claim against REALM and ENCORE (the "**REALM/ENCORE Bar Dates**," and together with the Initial Debtors' Bar Date and the Property Bar Date, the "**Bar Dates**").  Notice of the Bar Dates was given as required.  The time within which to file claims against the Debtors has expired. To date, over 70,000 proofs of claim have been filed against the Debtors.

On October 6, 2009, the Bankruptcy Court entered an order (the "**Omnibus Claims Objection and Settlement Procedures Order**") authorizing the Debtors to file omnibus objections to claims (the "**Omnibus Claims Objections**") and settle claims in accordance with certain procedures (the "**Claim Settlement Procedures**").  Pursuant to the Omnibus Claims Objection and Settlement Procedures Order, the Debtors are authorized to file Omnibus Claims Objections to Claims seeking the reduction, reclassification, and/or disallowance of Claims on grounds in addition to those set forth in Bankruptcy Rule 3007(d).

To date, the Debtors have filed 110 Omnibus Claims Objections with respect to 22,590 Claims. The Debtors' actions have resulted in the expungement of over $48 billion of Claims against the Debtors' estates and the reclassification of over 568 Claims that improperly asserted either secured, administrative, and/or priority Claims to date.

Pursuant to the Claim Settlement Procedures, the Debtors are authorized to settle any and all Claims asserted against them (i) without the approval of the Bankruptcy Court or any other party in interest whenever the aggregate amount allowed for an individual claim (the "**Settlement Amount**") is (x) less than or equal to $1 million

retained on account of Disputed Claims in the Avoidance Action Trust Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims or (ii) to the extent such Disputed Claims subsequently have been resolved, deducted from any amounts otherwise distributable by the Avoidance Action Trust Administrator as a result of the resolution of such Disputed Claims.

(d)    The Avoidance Action Trust Administrator may request an expedited determination of taxes of the Avoidance Action Trust, including the Avoidance Action Trust Claims Reserve, under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Avoidance Action Trust for all taxable periods through the dissolution of the Avoidance Action Trust.

o.    <u>Dissolution</u>.  The Avoidance Action Trust Administrator and the Avoidance Action Trust shall be discharged or dissolved, as applicable, at such time as (i) all of the Avoidance Action Trust Assets have been distributed pursuant to the Plan and the Avoidance Action Trust Agreement, (ii) the Avoidance Action Trust Administrator determines, in its sole discretion, that the administration of the Avoidance Action Trust Assets is not likely to yield sufficient additional Avoidance Action Trust Assets to justify further pursuit, and (iii) all distributions required to be made by the Avoidance Action Trust Administrator under the Plan and the Avoidance Action Trust Agreement have been made, but in no event shall the Avoidance Action Trust be dissolved later than three (3) years from the Effective Date unless the Bankruptcy Court, upon motion within the six (6) month period prior to the third (3rd) anniversary (or at least six (6) months prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Avoidance Action Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Avoidance Action Trust Assets.  If at any time the Avoidance Action Trust Administrator determines, in reliance upon such professionals as the Avoidance Action Trust Administrator may retain, that the expense of administering the Avoidance Action Trust so as to make a final distribution to the beneficiaries of the Avoidance Action Trust is likely to exceed the value of the Avoidance Action Trust Assets remaining in the Avoidance Action Trust, the Avoidance Action Trust Administrator may apply to the Bankruptcy Court for authority to (a) reserve any amounts necessary to dissolve the Avoidance Action Trust, (b) transfer the balance to the DIP Lenders and/or the GUC Trust as determined either by (I) mutual agreement between the U.S. Treasury and the Creditors' Committee or (II) Final Order, or donate any balance to a charitable organization described in section 501(c)(3) of the Tax Code and exempt from U.S. federal income tax under section 501(a) of the Tax Code that is unrelated to the Debtors, the Avoidance Action Trust, and any insider of the Avoidance Action Trust Administrator, and (c) dissolve the Avoidance Action Trust.

p.    <u>Indemnification of Avoidance Action Trust Administrator and Avoidance Action Trust Monitor</u>.  The Avoidance Action Trust Administrator and

the Avoidance Action Trust Monitor (and their agents and professionals) shall not be liable for actions taken or omitted in its or their capacity as, or on behalf of, the Avoidance Action Trust Administrator, the Avoidance Action Trust Monitor, or the Avoidance Action Trust, except those acts found by Final Order to be arising out of its or their own willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or *ultra vires* acts, and each shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of its or their actions or inactions in its or their capacity as, or on behalf of, the Avoidance Action Trust Administrator, the Avoidance Action Trust Monitor, or the Avoidance Action Trust, except for any actions or inactions found by Final Order to be involving willful misconduct, gross negligence, bad faith, self-dealing, or *ultra vires* acts.  Any indemnification claim of the Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor (and the other parties entitled to indemnification under this subsection) shall be satisfied first from the Avoidance Action Trust Administrative Cash and then from the Avoidance Action Trust Assets.  The Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor shall be entitled to rely, in good faith, on the advice of their retained professionals.

      6.    <u>Securities Law Matters</u>.  In reliance upon section 1145(a) of the Bankruptcy Code, the offer and/or issuance of the New GM Securities (but, for the avoidance of doubt, not the sale by the GUC Trust Administrator of New GM Warrants pursuant to Section 5.2(e) of the Plan) by either MLC or the GUC Trust, as a successor of MLC under the Plan, is exempt from registration under the Securities Act and any equivalent securities law provisions under state law.  The exemption from Securities Act registration provided by section 1145(a) of the Bankruptcy Code (as well as any equivalent securities law provisions under state law) also is available for the offer and/or issuance by the GUC Trust of (i) beneficial interests in the GUC Trust and (ii) New GM Securities in exchange for such beneficial interests as outstanding Disputed General Unsecured Claims are resolved in accordance with the Plan.  The offer and/or issuance of beneficial interests by any of the following successors of the Debtors – the Asbestos Trust, the Environmental Response Trust, and the Avoidance Action Trust – is exempt from Securities Act registration (along with any equivalent securities law provisions under state law) in reliance upon section 1145(a) of the Bankruptcy Code.

      Notwithstanding the foregoing, the exemption from registration that is provided by section 1145(a) of the Bankruptcy Code will not apply if the holder of the applicable securities is an "underwriter," as that term is defined in section 1145(b) of the Bankruptcy Code.  Section 1145(b) of the Bankruptcy Code defines an "underwriter" for the purposes of the Securities Act as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim other than in ordinary trading transactions, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (d) is a "Control Person" of the issuer of the securities as defined in Section 2(a)(11) of the Securities Act.

For persons deemed to be "underwriters" who receive New GM Securities or beneficial interests in the GUC Trust, the Asbestos Trust, the Environmental Response Trust, or the Avoidance Action Trust pursuant to the Plan, including control person underwriters (collectively, the "**Restricted Holders**"), resales of New GM Securities, or beneficial interests in the applicable trust will not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Restricted Holders, however, may be able, at a future time, and under certain conditions described below, to sell New GM Securities or beneficial interests in the applicable trust without registration pursuant to the resale provisions of Rule 144 or other applicable exemptions under the Securities Act.

Under certain circumstances, holders of New GM Securities or beneficial interests in the GUC Trust, the Asbestos Trust, the Environmental Response Trust, or the Avoidance Action Trust deemed to be "underwriters" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available, and in compliance with applicable state and foreign securities laws.  Generally, Rule 144 of the Securities Act provides that persons who hold securities received in a transaction not involving a public offering or who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met.  These conditions vary depending on whether the seller is a holder of restricted securities or a control person of the issuer and whether the security to be sold is an equity security or a debt security.  The conditions include required holding periods in certain cases, the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold in certain cases, the requirement in certain cases that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker," and that, in certain cases, notice of the resale be filed with the Securities and Exchange Commission.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF NEW GM SECURITIES OR BENEFICIAL INTERESTS IN THE GUC TRUST, THE ASBESTOS TRUST, THE ENVIRONMENTAL RESPONSE TRUST, OR THE AVOIDANCE ACTION TRUST MAY BE AN UNDERWRITER, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN NEW GM SECURITIES OR BENEFICIAL INTERESTS TO BE DISTRIBUTED PURSUANT TO THE PLAN.  ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF NEW GM SECURITIES OR BENEFICIAL INTERESTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES OR BENEFICIAL INTERESTS.

7.      Cancellation of Existing Securities and Agreements.  Except for purposes of evidencing a right to distributions under the Plan or otherwise provided under the Plan or as set forth in Sections 2.4 or 10.1 of the Plan, on the Effective Date all the agreements and other documents evidencing the Claims or rights of any holder of a Claim against the Debtors, including all Indentures and Fiscal and Paying Agency Agreements and bonds, debentures, and notes issued thereunder evidencing such Claims, all Note Claims, all Eurobond Claims, all Nova Scotia Guarantee Claims, and any options or