# **Exhibit I**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: | INDEX NO. 14-MD-2543 (JMF); 14-MC-2543 |
| GENERAL MOTORS LLC IGNITION SWITCH LITIGATION | **CONSOLIDATED CLASS ACTION COMPLAINT AGAINST NEW GM FOR RECALLED VEHICLES MANUFACTURED BY OLD GM AND PURCHASED BEFORE JULY 11, 2009** |
| *This Document Relates to All Actions* | **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................................... 1

JURISDICTION AND VENUE............................................................................. 8

PARTIES ................................................................................................................ 9

    I.      Plaintiffs ....................................................................................................... 9

    II.     Defendant ................................................................................................... 45

FACTUAL ALLEGATIONS............................................................................... 46

    I.      There Are Serious Safety Defects in Millions of Old GM Vehicles that New GM Has Continued to Conceal from Consumers........................................ 46

        A.     The Ignition Switch Defects .......................................................... 48

    II.     Old GM's Fraudulent Conduct with Respect to the 2.19 Million Defective Vehicles Subject to the February/March Recall. .......................................... 49

        A.     Old GM Knew That There Were Failures With The Ignition Switch Design In 2001, And Concealed These Material Facts, Putting The Safety Of The Class At Serious Risk Of Harm.................... 49

        B.     Old GM Approved Production Of Ignition Switches In 2002 Despite Knowing That They Had Failed In Pre-Production Testing And Did Not Meet Old GM's Internal Design Specifications................. 51

        C.     Old GM Received Complaints And Reports On The Stalling Of Vehicles Due To The Defective Ignition Switch Turning Off And Causing Moving Stalls, And Concealed That Material Information From The Class. ................................................................................... 51

        D.     Old GM Engineers Understood The Need To Correct The Ignition Switch Defect In 2004 But Failed To Act To Disclose Or Correct The Defect.................................................................................... 52

        E.     Old GM Closed Its First Internal Investigation With No Action Because Of Cost. ......................................................................... 56

        F.     Complaints Continued And Serious Accidents Came To Old GM's Attention In 2005, While NHTSA Began To Investigate Death Cases Involving Chevy Cobalts. ........................................................ 58

        G.     Old GM Engineers Proposed Design Modifications To The Ignition Switch In 2005 That Were Rejected By Old GM Management On The Basis Of Cost. ...................................................... 62

**TABLE OF CONTENTS**
**(continued)**

**Page**

|   |   |   |   |
|---|---|---|---|
| H. | Rather Than Implementing A Safety Recall And Fixing The Known Defect, Old GM Sent An Inadequate Technical Service Bulletin To GM Dealers In Late 2005, Advising Dealers On Taking Heavy Items Off Key Rings. | | 66 |
| I. | Old GM Knew About And Authorized A Design Change To The Ignition Switch In 2006, But Masked The Existence Of The Change By Keeping The Part Number The Same. | | 68 |
| J. | The Fatalities Resulting From The Defects And Cover-Up Came To Old GM's Attention As Early As 2004. | | 70 |
| K. | Old GM Responded To Growing Evidence Of Fatalities By Updating The Technical Service Bulletin To Dealers About Heavy Key Chains. | | 72 |
| L. | Old GM Knew Of And Tracked Multiple Accidents Involving The Ignition Switch Defect By 2007 And Avoided Scrutiny By Misleading The Class, The Public, And Regulators. | | 73 |
| M. | Old GM Instructed Its Personnel On Judgment Words To Be Avoided. | | 76 |
| N. | By 2009, As Injuries And Deaths Continued To Mount, Old GM Opened Yet Another Internal Investigation, But Continued To Withhold Information From Its Customers And The Class About The Defects. | | 78 |
| O. | The Spreadsheet Of Accidents Involving The Cobalt Ignition Switch Within Old GM Continued To Grow, But Was Never Disclosed. | | 79 |
| III. | Meet The New GM, Same As The Old GM: With Knowledge of the Defects, New GM "Investigates" Further–And Continues To Conceal The Defects. | | 80 |
| IV. | New GM Issues A Recall—Ten Years Too Late. | | 91 |
| V. | New GM's Recall Fails to Correct the Defect. | | 93 |
| VI. | New GM Expands the February/March Recall—and Suspends Two Engineers. | | 95 |
| VII. | The June 2014 Recall For The "Ignition Key Slot" Defect Further Reveals New GM's Fraudulent Concealment of Known Serious Safety Problems. | | 96 |

# TABLE OF CONTENTS
## (continued)

                                                                        **Page**

VIII.   The July 2 and 3, 2014 Recalls Relating to the Unintended Ignition Rotation Defect Further Reveal New GM's Fraudulent Concealment of Known Serious Safety Problems. ................................................. 111

IX.   The September 2014 Ignition Switch Defect Recall Is the Latest Evidence of the Extent of the Defects and New GM's Ongoing Concealment................. 130

X.   Even As They Concealed the Safety Defects From Consumers, Old and New GM Each Presented Their Vehicles As Safe And Reliable, and Presented Itself As An Honest Company With Integrity. .................................. 133

XI.   New GM Promoted All Of Its Vehicles As Safe, Reliable, And High-Quality While It Fraudulently Concealed Numerous Safety Defects ............... 149

     A.   New GM Claimed To Be Turning Over A New Leaf After The Bankruptcy. ........................................................................... 149

     B.   New GM's Advertising And Literature Claimed That GM Placed Safety And Quality First. ........................................................ 159

     C.   New GM Concealed And Disregarded Safety Issues As A Way Of Doing Business. ................................................................... 172

     D.   New GM Admitted Its Failure To Disclose The Defects In Its Vehicle, Attempting To Reassure The Public That It Can Now Be Trusted. ........................................................................... 178

XII.   Other Recently Revealed Information Demonstrates New GM's Widespread Ongoing Pattern Of Concealing Dangerous Defects In GM-Branded Vehicles That Has Caused Diminution in the Value of the Defective Vehicles. .................................................................. 181

     A.   The Ignition Lock Cylinder Defect. ................................................ 182

     B.   There Have Been Extensive Additional Recalls of GM-branded Vehicles With Additional Safety-Related and Other Defects. .............. 186

XIII.   New GM's Misrepresentations That It Made Safe And Reliable Cars, The Ignition Switch Defect, and Other Safety Defects Have Harmed Plaintiffs And The Classes. ................................................................... 229

**TOLLING OF THE STATUTES OF LIMITATION** ....................................... 231

**SUCCESSOR LIABILITY ALLEGATIONS** ............................................ 235

**CHOICE OF LAW ALLEGATIONS** ................................................... 250

**CLASS ACTION ALLEGATIONS** ..................................................... 252

    II.   The Nationwide Class ................................................................ 252

# TABLE OF CONTENTS
## (continued)

Page

III.   The State Classes .......................................................................... 253

**REALLEGATION AND INCORPORATION BY REFERENCE** .................................... 259

**CLAIMS FOR RELIEF** .............................................................................. 259

I.   NATIONWIDE CLASS CLAIMS ......................................................... 259

FIRST CLAIM FOR RELIEF ON BEHALF OF NATIONWIDE
CLASS  VIOLATION OF THE MAGNUSON-MOSS
WARRANTY ACT 15 U.S.C. § 2301 *et. seq.* ........................... 259

SECOND CLAIM FOR RELIEF ON BEHALF OF THE
NATIONWIDE CLASS  BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (MICH. COMP.
LAWS § 440.2314) ......................................................................... 264

THIRD CLAIM FOR RELIEF ON BEHALF OF NATIONWIDE
CLASS  FRAUDULENT CONCEALMENT ............................. 265

FOURTH CLAIM FOR RELIEF ON BEHALF OF
NATIONWIDE CLASS  UNJUST ENRICHMENT ................. 267

II.   STATE CLASS CLAIMS .................................................................... 268

ALABAMA ............................................................................................. 268

FIFTH CLAIM FOR RELIEF VIOLATION OF ALABAMA
DECEPTIVE TRADE PRACTICES ACT (ALA. CODE § 8-
19-1, *et. seq.*) ................................................................................. 268

SIXTH CLAIM FOR RELIEF FRAUD BY CONCEALMENT ......... 273

ALASKA ................................................................................................. 274

SEVENTH CLAIM FOR RELIEF VIOLATION OF THE
ALASKA UNFAIR TRADE PRACTICES AND
CONSUMER PROTECTION ACT (ALASKA STAT. ANN.
§ 45.50.471, *et. seq.*) ................................................................... 274

EIGHTH CLAIM FOR RELIEF BREACH OF THE IMPLIED
WARRANTY OF MERCHANTABILITY (ALASKA STAT.
§ 45.02.314) ................................................................................... 279

NINTH CLAIM FOR RELIEF FRAUD BY CONCEALMENT ......... 280

ARIZONA ............................................................................................... 281

TENTH CLAIM FOR RELIEF VIOLATIONS OF THE
CONSUMER FRAUD ACT (ARIZONA REV. STAT. § 44-
1521, *et. seq.*) ............................................................................... 281

# TABLE OF CONTENTS
## (continued)

Page

ELEVENTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ................................................................... 286

ARKANSAS ............................................................................... 287

TWELFTH CLAIM FOR RELIEF VIOLATIONS OF THE
DECEPTIVE TRADE PRACTICE ACT (ARK. CODE ANN.
§ 4-88-101, *et. seq.*) ................................................ 287

THIRTEENTH CLAIM FOR RELIEF BREACH OF THE
IMPLIED WARRANTY OF MERCHANTABILITY
(**ARK. CODE ANN**. § 4-2-314) ................................... 292

FOURTEENTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ................................................................... 293

CALIFORNIA ............................................................................ 294

FIFTEENTH CLAIM FOR RELIEF VIOLATIONS OF THE
CONSUMER LEGAL REMEDIES ACT (CAL. CIV. CODE
§ 1750, *et. seq.*) ........................................................ 294

SIXTEENTH CLAIM FOR RELIEF VIOLATION OF THE
CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS.
& PROF. CODE § 17200, *et. seq.*) (Asserted on Behalf of the
California Class) ................................................................... 303

SEVENTEENTH CLAIM FOR RELIEF VIOLATION OF SONG-
BEVERLY CONSUMER WARRANTY ACT FOR
BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (CALIFORNIA "LEMON LAW")
(CAL. CIV. CODE §§ 1791.1 & 1792) ....................... 307

EIGHTEENTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ................................................................... 309

NINETEENTH CLAIM FOR RELIEF VIOLATION OF
CALIFORNIA'S FALSE ADVERTISING LAW CAL.
BUS. & PROF. CODE § 17500, ***et. seq.*** (Asserted on Behalf
of the California Class) ................................................ 311

TWENTIETH CLAIM FOR RELIEF NEGLIGENT FAILURE
TO RECALL (Asserted on Behalf of the California Class) ...... 313

COLORADO .............................................................................. 314

1197532.10

**TABLE OF CONTENTS**
(continued)

Page

TWENTY-FIRST CLAIM FOR RELIEF VIOLATIONS OF THE
COLORADO CONSUMER PROTECTION ACT (COL.
REV. STAT. § 6-1-101, *et. seq.*) ................................................... 314

TWENTY-SECOND CLAIM FOR RELIEF BREACH OF THE
IMPLIED WARRANTY OF MERCHANTABILITY
(**COL. REV. STAT.** § 4-2-314) ................................................. 318

TWENTY-THIRD CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ................................................................. 319

CONNECTICUT ............................................................................... 321

TWENTY-FOURTH CLAIM FOR RELIEF VIOLATION OF
CONNECTICUT UNLAWFUL TRADE PRACTICES
ACT (CONN. GEN. STAT. § 42-110a, *et. seq.*) ............................ 321

TWENTY-FIFTH CLAIM FOR RELIEF FRAUDULENT
CONCEALMENT ................................................................. 325

DELAWARE .................................................................................... 326

TWENTY-SIXTH CLAIM FOR RELIEF VIOLATION OF THE
DELAWARE CONSUMER FRAUD ACT (6 DEL. CODE
§ 2513, *et. seq.*) ............................................................... 326

TWENTY-SEVENTH CLAIM FOR RELIEF VIOLATION OF
THE DELAWARE DECEPTIVE TRADE PRACTICES
ACT (6 DEL. CODE § 2532, *et. seq.*) ..................................... 331

TWENTY-EIGHTH CLAIM FOR RELIEF BREACH OF THE
IMPLIED WARRANTY OF MERCHANTABILITY (**6
DEL. CODE** § **2-314**) ................................................. 335

TWENTY-NINTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ................................................................. 336

DISTRICT OF COLUMBIA ............................................................. 338

THIRTIETH CLAIM FOR RELIEF VIOLATION OF THE
CONSUMER PROTECTION PROCEDURES ACT (D.C.
CODE § 28-3901, *et. seq.*) .................................................. 338

THIRTY-FIRST CLAIM FOR RELIEF BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (**D.C. CODE**
§ **28:2-314**) ................................................................. 343

THIRTY-SECOND CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ................................................................. 344

1197532.10

# TABLE OF CONTENTS
## (continued)

**Page**

FLORIDA ....................................................................... 345

    THIRTY-THIRD CLAIM FOR RELIEF VIOLATION OF
    FLORIDA'S UNFAIR & DECEPTIVE TRADE
    PRACTICES ACT (FLA. STAT. § 501.201, *et. seq.*) ................. 345

    THIRTY-FOURTH CLAIM FOR RELIEF FRAUD BY
    CONCEALMENT ................................................... 349

GEORGIA........................................................................ 351

    THIRTY-FIFTH CLAIM FOR RELIEF VIOLATION OF
    GEORGIA'S FAIR BUSINESS PRACTICES ACT (GA.
    CODE ANN. § 10-1-390, *et. seq.*)................................... 351

    THIRTY-SIXTH CLAIM FOR RELIEF VIOLATION OF
    GEORGIA'S UNIFORM DECEPTIVE TRADE
    PRACTICES ACT (GA. CODE ANN. § 10-1-370, *et. seq.*).......... 355

    THIRTY-SEVENTH CLAIM FOR RELIEF FRAUD BY
    CONCEALMENT ................................................... 359

HAWAII ........................................................................ 361

    THIRTY-EIGHTH CLAIM FOR RELIEF UNFAIR AND
    DECEPTIVE ACTS IN VIOLATION OF HAWAII LAW
    (HAW. REV. STAT. § 480, *et. seq.*) ............................... 361

    THIRTY-NINTH CLAIM FOR RELIEF BREACH OF THE
    IMPLIED WARRANTY OF MERCHANTABILITY
    **(HAW. REV. STAT. § 490:2-314)** ............................... 365

    FORTIETH CLAIM FOR RELIEF FRAUD BY
    CONCEALMENT ................................................... 366

IDAHO........................................................................... 368

    FORTY-FIRST CLAIM FOR RELIEF VIOLATION OF THE
    IDAHO CONSUMER PROTECTION ACT (IDAHO CIV.
    CODE § 48-601, *et. seq.*)............................................ 368

    FORTY-SECOND CLAIM FOR RELIEF FRAUD BY
    CONCEALMENT ................................................... 372

ILLINOIS........................................................................ 374

1197532.10

# TABLE OF CONTENTS
## (continued)

Page

FORTY-THIRD CLAIM FOR RELIEF VIOLATION OF
ILLINOIS CONSUMER FRAUD AND DECEPTIVE
BUSINESS PRACTICES ACT (815 ILCS 505/1, *et. seq.*
and 720 ilcs 295/1a) .................................................................. 374

FORTY-FOURTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT .................................................................. 378

INDIANA .................................................................. 380

FORTY-FIFTH CLAIM FOR RELIEF VIOLATION OF THE
INDIANA DECEPTIVE CONSUMER SALES ACT (Ind.
Code § 24-5-0.5-3) .................................................................. 380

FORTY-SIXTH CLAIM FOR RELIEF BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (IND. CODE
§ 26-1-2-314) .................................................................. 385

FORTY-SEVENTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT .................................................................. 386

IOWA .................................................................. 387

FORTY-EIGHTH CLAIM FOR RELIEF VIOLATIONS OF THE
PRIVATE RIGHT OF ACTION FOR CONSUMER
FRAUDS ACT (IOWA CODE § 714h.1, *et. seq.*) ........................ 387

FORTY-NINTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT .................................................................. 392

KANSAS .................................................................. 393

FIFTIETH CLAIM FOR RELIEF VIOLATIONS OF THE
KANSAS CONSUMER PROTECTION ACT (KAN. STAT.
ANN. § 50-623, *et. seq.*) .................................................................. 393

FIFTY-FIRST CLAIM FOR RELIEF BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (KAN. STAT.
ANN. § 84-2-314) .................................................................. 399

FIFTY-SECOND CLAIM FOR RELIEF FRAUD BY
CONCEALMENT .................................................................. 400

KENTUCKY .................................................................. 401

FIFTY-THIRD CLAIM FOR RELIEF VIOLATION OF THE
KENTUCKY CONSUMER PROTECTION ACT (KY.
REV. STAT. § 367.110, *et. seq.*) .................................................. 401

1197532.10

# TABLE OF CONTENTS
## (continued)

**Page**

FIFTY-FOURTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ..................................................................... 405

LOUISIANA ..................................................................................... 407

FIFTY-FIFTH CLAIM FOR RELIEF VIOLATION OF THE
LOUISIANA UNFAIR TRADE PRACTICES AND
CONSUMER PROTECTION LAW (LA. REV. STAT.
§ 51:1401, *et. seq.*) ................................................................. 407

FIFTY-SIXTH CLAIM FOR RELIEF BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (LA. CIV. CODE
ART. 2520, 2524) ..................................................................... 411

FIFTY-SEVENTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ..................................................................... 413

FIFTY-EIGHTH CLAIM FOR RELIEF REDHIBITION **LA. CIV.
CODE ART.** 2520, *et. seq.* and 2545 (On Behalf of the
Louisiana State Class) .............................................................. 414

MAINE ............................................................................................. 415

FIFTY-NINTH CLAIM FOR RELIEF VIOLATION OF MAINE
UNFAIR TRADE PRACTICES ACT (ME. REV. STAT. ANN.
TIT. 5 § 205-a, *et. seq.*) ........................................................... 415

SIXTIETH CLAIM FOR RELIEF BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (ME. REV.
STAT. ANN. TIT. 11 § 2-314) ..................................................... 420

SIXTY-FIRST CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ..................................................................... 421

MARYLAND ..................................................................................... 422

SIXTY-SECOND CLAIM FOR RELIEF VIOLATIONS OF THE
MARYLAND CONSUMER PROTECTION ACT (MD.
CODE COM. LAW § 13-101, *et. seq.*) .......................................... 422

SIXTY-THIRD CLAIM FOR RELIEF BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (MD. CODE
COM. LAW § 2-314) ................................................................. 427

SIXTY-FOURTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ..................................................................... 428

MASSACHUSETTS ........................................................................... 429

# TABLE OF CONTENTS
## (continued)

Page

SIXTY-FIFTH CLAIM FOR RELIEF DECEPTIVE ACTS OR
PRACTICES PROHIBITED BY MASSACHUSETTS
LAW (MASS. GEN. LAWS CH. 93A, § 1, *et. seq.*) ........................ 429

SIXTY-SIXTH CLAIM FOR RELIEF BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (ALM GL. CH.
106, § 2-314) ............................................................................. 434

SIXTY-SEVENTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ..................................................................... 435

MICHIGAN ............................................................................................. 436

SIXTY-EIGHTH CLAIM FOR RELIEF VIOLATION OF THE
MICHIGAN CONSUMER PROTECTION ACT  (MICH.
COMP. LAWS § 445.903, *et. seq.*) .................................................. 436

SIXTY-NINTH CLAIM FOR RELIEF BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (MICH. COMP.
LAWS § 440.2314) ..................................................................... 441

SEVENTIETH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ..................................................................... 442

MINNESOTA .......................................................................................... 444

SEVENTY-FIRST CLAIM FOR RELIEF VIOLATION OF
MINNESOTA PREVENTION  OF CONSUMER FRAUD
ACT  (MINN. STAT. § 325f.68, *et. seq.*) ...................................... 444

SEVENTY-SECOND CLAIM FOR RELIEF VIOLATION OF
MINNESOTA UNIFORM  DECEPTIVE TRADE
PRACTICES ACT (MINN. STAT. § 325d.43-48, *et. seq.*) ........... 448

SEVENTY-THIRD CLAIM FOR RELIEF BREACH OF
IMPLIED WARRANTY OF MERCHANTABILITY
(MINN. STAT. § 336.2-314) ....................................................... 453

SEVENTY-FOURTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT ..................................................................... 454

MISSISSIPPI ........................................................................................... 455

SEVENTY-FIFTH CLAIM FOR RELIEF VIOLATION OF
MISSISSIPPI CONSUMER PROTECTION ACT  (MISS.
CODE. ANN. § 75-24-1, *et. seq.*) ................................................. 455

# TABLE OF CONTENTS
## (continued)

Page

SEVENTY-SIXTH CLAIM FOR RELIEF BREACH OF
IMPLIED WARRANTY OF MERCHANTABILITY
(MISS. CODE ANN. § 75-2-314) .................................................. 459

SEVENTY-SEVENTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT .................................................................... 460

MISSOURI ....................................................................................... 462

SEVENTY-EIGHTH CLAIM FOR RELIEF VIOLATION OF
MISSOURI MERCHANDISING PRACTICES ACT (MO.
REV. STAT. § 407.010, *et. seq.*).................................................. 462

SEVENTY-NINTH CLAIM FOR RELIEF BREACH OF
IMPLIED WARRANTY OF MERCHANTABILITY (MO.
REV. STAT. § 400.2-314)........................................................... 466

EIGHTIETH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT .................................................................... 467

MONTANA ....................................................................................... 469

EIGHTY-FIRST CLAIM FOR RELIEF VIOLATION OF
MONTANA UNFAIR TRADE PRACTICES AND
CONSUMER PROTECTION ACT OF 1973 (MONT. CODE
ANN. § 30-14-101, *et. seq.*) ....................................................... 469

EIGHTY-SECOND CLAIM FOR RELIEF BREACH OF
IMPLIED WARRANTY OF MERCHANTABILITY
(**MONT. CODE** § 30-2-314)....................................................... 473

EIGHTY-THIRD CLAIM FOR RELIEF FRAUD BY
CONCEALMENT .................................................................... 474

NEBRASKA ...................................................................................... 476

EIGHTY-FOURTH CLAIM FOR RELIEF VIOLATION OF THE
NEBRASKA CONSUMER PROTECTION ACT (NEB.
REV. STAT. § 59-1601, *et. seq.*) .................................................. 476

EIGHTY-FIFTH CLAIM FOR RELIEF BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (**NEB. REV.
STAT. NEB.** § 2-314) ................................................................ 480

EIGHTY-SIXTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT .................................................................... 481

NEVADA.......................................................................................... 482

# TABLE OF CONTENTS
## (continued)

Page

EIGHTY-SEVENTH CLAIM FOR RELIEF VIOLATION OF
THE NEVADA DECEPTIVE TRADE PRACTICES ACT
(NEV. REV. STAT. § 598.0903, *Et. seq.*) .................................... 482

EIGHTY-EIGHTH CLAIM FOR RELIEF BREACH OF
IMPLIED WARRANTY OF MERCHANTABILITY
(NEV. REV. STAT. § 104.2314) .................................... 487

EIGHTY-NINTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT .................................... 488

NEW HAMPSHIRE .................................... 489

NINETIETH CLAIM FOR RELIEF VIOLATION OF N.H.
CONSUMER PROTECTION ACT (N.H. REV. STAT.
ANN. § 358-A:1, Et. seq.) .................................... 489

NINETY-FIRST CLAIM FOR RELIEF BREACH OF THE
IMPLIED WARRANTY OF MERCHANTABILITY (N.H.
REV. STAT. ANN. § 382-A:2-314) .................................... 494

NINETY-SECOND CLAIM FOR RELIEF FRAUD BY
CONCEALMENT .................................... 495

NEW JERSEY .................................... 497

NINETY-THIRD CLAIM FOR RELIEF VIOLATION OF NEW
JERSEY CONSUMER FRAUD ACT (N.J. STAT. ANN.
§ 56:8-1, *Et. seq.*) .................................... 497

NINETY-FOURTH CLAIM FOR RELIEF BREACH OF
IMPLIED WARRANTY OF MERCHANTABILITY (N.J.
STAT. ANN. § 12A:2-314) .................................... 501

NINETY-FIFTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT .................................... 502

NEW MEXICO .................................... 504

NINETY-SIXTH CLAIM FOR RELIEF VIOLATIONS OF THE
NEW MEXICO UNFAIR TRADE PRACTICES ACT
(N.M. STAT. ANN. § 57-12-1, *et. seq.*) .................................... 504

NINETY-SEVENTH CLAIM FOR RELIEF BREACH OF
IMPLIED WARRANTY OF MERCHANTABILITY (N.M.
STAT. ANN. § 55-2-314) .................................... 509

NINETY-EIGHTH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT .................................... 510

1197532.10

# TABLE OF CONTENTS
## (continued)

| | Page |
|---|---|
| NEW YORK | 511 |
| NINETY-NINTH CLAIM FOR RELIEF DECEPTIVE ACTS OR PRACTICES (N.Y. GEN. BUS. LAW § 349 AND 350) | 511 |
| ONE HUNDREDTH CLAIM FOR RELIEF BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.Y. U.C.C. § 2-314) | 516 |
| ONE HUNDRED FIRST CLAIM FOR RELIEF FRAUD BY CONCEALMENT | 517 |
| ONE HUNDRED SECOND CLAIM FOR RELIEF VIOLATION OF NEW YORK'S FALSE ADVERTISING ACT (N.Y. GEN. BUS. LAW § 350) (Asserted on Behalf of the New York Class) | 518 |
| NORTH CAROLINA | 520 |
| ONE HUNDRED THIRD CLAIM FOR RELIEF VIOLATION OF NORTH CAROLINA'S UNFAIR AND DECEPTIVE ACTS AND PRACTICES ACT (N.C. GEN. STAT. § 75-1.1 *et. seq.*) | 520 |
| ONE HUNDRED FOURTH CLAIM FOR RELIEF BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.C. GEN. STAT. § 25-2-314) | 524 |
| ONE HUNDRED FIFTH CLAIM FOR RELIEF FRAUD BY CONCEALMENT | 525 |
| NORTH DAKOTA | 526 |
| ONE HUNDRED SIXTH CLAIM FOR RELIEF VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT (N.D. CENT. CODE § 51-15-02) | 526 |
| ONE HUNDRED SEVENTH CLAIM FOR RELIEF BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.D. CENT. CODE § 41-02-31) | 531 |
| ONE HUNDRED EIGHTH CLAIM FOR RELIEF FRAUD BY CONCEALMENT | 532 |
| OHIO | 533 |
| ONE HUNDRED NINTH CLAIM FOR RELIEF VIOLATION OF OHIO CONSUMER SALES PRACTICES ACT (OHIO REV. CODE ANN. § 1345.01, *et. seq.*) | 533 |

1197532.10

# TABLE OF CONTENTS
## (continued)

Page

ONE HUNDRED TENTH CLAIM FOR RELIEF FRAUD BY CONCEALMENT ................................................... 540

ONE HUNDRED ELEVENTH CLAIM FOR RELIEF IMPLIED WARRANTY IN TORT (On Behalf of the Ohio Class)........... 541

OKLAHOMA ................................................... 542

ONE HUNDRED TWELFTH CLAIM FOR RELIEF VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT (OKLA. STAT. TIT. 15 § 751, et. seq.)........ 542

ONE HUNDRED THIRTEENTH CLAIM FOR RELIEF BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (12A OKLA. STAT. ANN. § 2-314) ......... 547

ONE HUNDRED FOURTEENTH CLAIM FOR RELIEF FRAUD BY CONCEALMENT ................................................... 548

OREGON ................................................... 550

ONE HUNDRED FIFTEENTH CLAIM FOR RELIEF VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT (OR. REV. STAT. § 646.605, et. seq.)............ 550

ONE HUNDRED SIXTEENTH CLAIM FOR RELIEF FRAUD BY CONCEALMENT (BASED ON OREGON LAW).................... 554

PENNSYLVANIA ................................................... 556

ONE HUNDRED SEVENTEENTH CLAIM FOR RELIEF VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1, et. seq.) ................................................ 556

ONE HUNDRED EIGHTEENTH CLAIM FOR RELIEF BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (13 PA. CONS. STAT. ANN. § 2314)....... 561

ONE HUNDRED NINETEENTH CLAIM FOR RELIEF FRAUD BY CONCEALMENT ................................................... 562

RHODE ISLAND ................................................... 564

ONE HUNDRED TWENTIETH CLAIM FOR RELIEF VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES  AND CONSUMER PROTECTION ACT (R.I. GEN. LAWS § 6-13.1, et. seq.) ..................................... 564

# TABLE OF CONTENTS
## (continued)

Page

ONE HUNDRED TWENTY-FIRST CLAIM FOR RELIEF
BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (R.I. GEN. LAWS § 6A-2-314) ............. 568

ONE HUNDRED TWENTY-SECOND CLAIM FOR RELIEF
FRAUD BY CONCEALMENT ................................ 569

SOUTH CAROLINA ................................................. 571

ONE HUNDRED TWENTY-THIRD CLAIM FOR RELIEF
VIOLATIONS OF THE SOUTH CAROLINA UNFAIR
TRADE PRACTICES ACT (S.C. CODE ANN. § 39-5-10, et.
seq.) .......................................................... 571

ONE HUNDRED TWENTY-FOURTH CLAIM FOR RELIEF
BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (S.C. CODE § 36-2-314) .................... 576

ONE HUNDRED TWENTY-FIFTH CLAIM FOR RELIEF
VIOLATIONS OF THE SOUTH CAROLINA
REGULATION OF MANUFACTURERS,
DISTRIBUTORS, AND DEALERS ACT (S.C. CODE ANN.
§ 56-15-10, et. seq.) ................................... 577

SOUTH DAKOTA ................................................. 578

ONE HUNDRED TWENTY-SIXTH CLAIM FOR RELIEF
VIOLATION OF THE SOUTH DAKOTA DECEPTIVE
TRADE PRACTICES AND CONSUMER PROTECTION
LAW (S.D. CODIFIED LAWS § 37-24-6) ...................... 578

ONE HUNDRED TWENTY-SEVENTH CLAIM FOR RELIEF
BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (S.D. CODIFIED LAWS § 57a-2-314) .... 583

ONE HUNDRED TWENTY-EIGHTH CLAIM FOR RELIEF
FRAUD BY CONCEALMENT ................................ 583

TENNESSEE ................................................. 585

ONE HUNDRED TWENTY-NINTH CLAIM FOR RELIEF
VIOLATION OF TENNESSEE CONSUMER
PROTECTION ACT (TENN. CODE ANN. § 47-18-101, et.
seq.) .......................................................... 585

ONE HUNDRED THIRTIETH CLAIM FOR RELIEF FRAUD
BY CONCEALMENT ..................................... 590

**TABLE OF CONTENTS**
**(continued)**

                                                                                          **Page**

TEXAS.................................................................................................. 591

    ONE HUNDRED THIRTY-FIRST CLAIM FOR RELIEF
    VIOLATIONS OF THE TEXAS DECEPTIVE TRADE
    PRACTICES — CONSUMER PROTECTION ACT (TEX.
    BUS. & COM. CODE §§ 17.41, *et. seq.*) ........................................ 591

    ONE HUNDRED THIRTY-SECOND CLAIM FOR RELIEF
    BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY  (TEX. BUS. & COM. CODE § 2.314)...... 597

    ONE HUNDRED THIRTY-THIRD CLAIM FOR RELIEF
    FRAUD BY CONCEALMENT ............................................... 598

UTAH ................................................................................................ 599

    ONE HUNDRED THIRTY-FOURTH CLAIM FOR RELIEF
    VIOLATION OF UTAH CONSUMER SALES
    PRACTICES ACT (UTAH CODE ANN. § 13-11-1, *et. seq.*)......... 599

    ONE HUNDRED THIRTY-FIFTH CLAIM FOR RELIEF
    BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY (UTAH CODE ANN. § 70A-2-314) ......... 604

VERMONT............................................................................................ 605

    ONE HUNDRED THIRTY-SIXTH CLAIM FOR RELIEF
    VIOLATION OF VERMONT CONSUMER FRAUD ACT
    (**VT. STAT. ANN. TIT.** 9, § 2451 *et seq.*) ................................... 605

    ONE HUNDRED THIRTY-SEVENTH CLAIM FOR RELIEF
    FRAUD BY CONCEALMENT ............................................... 609

VIRGINIA ......................................................................................... 610

    ONE HUNDRED THIRTY-EIGHTH CLAIM FOR RELIEF
    VIOLATION OF VIRGINIA CONSUMER
    PROTECTION ACT (VA. CODE ANN. 15 §§ 59.1-196, *et.*
    *seq.*).......................................................................................... 610

    ONE HUNDRED THIRTY-NINTH CLAIM FOR RELIEF
    BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (**VA. CODE ANN**. § 8.2-314)................ 615

    ONE HUNDRED FORTIETH CLAIM FOR RELIEF FRAUD BY
    CONCEALMENT .................................................................. 616

WASHINGTON ...................................................................................... 617

1197532.10

# TABLE OF CONTENTS
## (continued)

Page

ONE HUNDRED FORTY-FIRST CLAIM FOR RELIEF
VIOLATION OF THE CONSUMER PROTECTION ACT
(REV. CODE WASH. ANN. §§ 19.86.010, *et. seq.*) ........................ 617

ONE HUNDRED FORTY-SECOND CLAIM FOR RELIEF
FRAUD BY CONCEALMENT ............................................... 622

WEST VIRGINIA ................................................................. 623

ONE HUNDRED FORTY-THIRD CLAIM FOR RELIEF
VIOLATIONS OF THE CONSUMER CREDIT AND
PROTECTION ACT (W. VA. CODE § 46a-1-101, *et. seq.*)......... 623

ONE HUNDRED FORTY-FOURTH CLAIM FOR RELIEF
BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (W. VA. CODE § 46-2-314) .................. 629

ONE HUNDRED FORTY-FIFTH CLAIM FOR RELIEF FRAUD
BY CONCEALMENT .............................................. 630

WISCONSIN .................................................................. 632

ONE HUNDRED FORTY-SIXTH CLAIM FOR RELIEF
VIOLATIONS OF THE WISCONSIN DECEPTIVE
TRADE PRACTICES ACT (**WIS. STAT.** § 110.18)................. 632

ONE HUNDRED FORTY-SEVENTH CLAIM FOR RELIEF
FRAUD BY CONCEALMENT ............................... 636

WYOMING .................................................................... 638

ONE HUNDRED FORTY-EIGHTH CLAIM FOR RELIEF
VIOLATION OF THE WYOMING CONSUMER
PROTECTION ACT (WYO. STAT. § 40-12-105 *et. seq.*)........... 638

ONE HUNDRED FORTY-NINTH CLAIM FOR RELIEF
BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (WYO. STAT. § 34.1-2-314)................. 642

ONE HUNDRED FIFTIETH CLAIM FOR RELIEF FRAUD BY
CONCEALMENT .............................................. 643

ONE HUNDRED FIFTY-FIRST CLAIM FOR RELIEF
NEGLIGENCE (On Behalf of the Arkansas, Louisiana,
Maryland, and Ohio Classes)................................ 645

**PRAYER FOR RELIEF**........................................................ 647

**JURY TRIAL DEMANDED**.................................................. 649

1197532.10

## **INTRODUCTION**

1.       This Consolidated Complaint ("Complaint") is filed as a civil action under the

authority and direction of the Court as set forth in Section III of its August 15, 2014 <u>Order</u>

<u>No. 8</u>. It is intended to serve as the Plaintiffs' Master Class Action Complaint for purposes of

discovery, pre-trial motions and rulings (including for choice of law rulings relevant to Rule

23 of the Federal Rules of Civil Procedure, and class certification itself), and the

determination and trial of certified claims or common questions in these multi-district

litigation ("MDL") proceedings with respect to millions of vehicles recalled by New GM, that

were originally sold by Old GM.

2.       Plaintiffs bring this action for a Nationwide Class of all persons in the United

States who either bought or leased a vehicle with one of the ignition switch related defects, as

defined herein ("Defective Vehicle") prior to the Bankruptcy Sale Order and: (i) still own or

lease the vehicle, or (ii) sold the vehicle on or after February 14, 2014; or (iii) owned or leased

a Defective Vehicle that was declared a total loss after an accident on or after February 14,

2104 and, as set forth in the CLASS ACTION ALLEGATIONS section of this Complaint,

State Classes of such purchasers (collectively, the "Classes").

3.       This case involves New GM's egregious and ongoing failure to disclose and

affirmative concealment of a known safety defect in Old GM-manufactured vehicles. This

Complaint is bought on behalf of the Classes for recovery of damages, statutory penalties, and

injunctive relief/equitable relief against New GM as the sole Defendant. This Complaint

asserts each of the Classes' claims for relief on two distinct and separate bases of liability

against New GM: First, this Complaint asserts each of the claims for relief herein based on

New GM's own wrongful conduct and breaches of its own independent, non-derivative duties

toward the Classes. Second, this Complaint alternatively asserts claims on behalf of the
Classes against New GM for its liability as a successor and mere continuation of Old GM.

4.      This Complaint, consistent with Fed. R. Civ. P. 1's directive to secure the "just,
speedy and inexpensive determinations of every action and proceeding," sets forth those facts
relating to the unprecedented abnegation by New GM of basic standards of safety,
truthfulness, and accountability, to the detriment of millions of consumers and the public at
large, that are capable of determination in this MDL. It draws upon an array of sources,
including but not limited to documents GM recently produced to the National Highway
Traffic Safety Administration ("NHTSA"), the House Energy & Commerce Committee, and
the results of an internal investigation overseen by Anton R. Valukas ("Valukas Report").[1]
These documents include tens of thousands of pages of unheeded consumer complaints.

5.      This Complaint neither waives nor dismisses any claims for relief against any
defendant not included in this pleading that are asserted by any other plaintiffs in actions that
have been or will be made part of this MDL proceeding, except by operation of the class
notice and any opt-out provisions on claims or common questions asserted in this Complaint
and certified by this Court. Certain claims for certain parties may, consistent with 28 U.S.C.
§ 1407 and the caselaw thereunder, be matters for determination on remand by transferor
courts.

6.      An auto manufacturer should never make profits more important than safety
and should never conceal defects that exist in its vehicles from customers or the public. New
GM Vehicle Safety Chief Jeff Boyer acknowledged that: "Nothing is more important than the
safety of our customers in the vehicles they drive."

---

[1] These sources are referred to as "GMNHTSA," "GMHEC," and the "Valukas Report." Other sources are described
herein

1197532.10

Case 1:14-md-02543-JMF    Document 347    Filed 10/14/14    Page 221 of 150

7.      The first priority of a car manufacturer should be to ensure that the vehicles

who bear its brands are safe, and particularly that its vehicles have operable ignition systems,

airbags, power steering, power brakes, seatbelt pretensioners, and other safety features that

can prevent or minimize the threat of death or serious bodily harm to the vehicle's occupants.

8.      The Transportation Recall Enhancement, Accountability and Documentation

Act ("TREAD Act")[2], its accompanying regulations, and state statutory and common law

require prompt disclosure of serious safety defects known to a manufacturer.[3] If it is

determined that the vehicle is defective, the manufacturer may be required to notify vehicle

owners, purchasers, and dealers of the defect, and may be required to remedy the defect.[4]

9.      Millions of vehicles designed, manufactured, and sold by Old GM have a

safety defect such that the vehicle's ignition switch inadvertently moves from the "run"

position to the "accessory" or "off" position during ordinary driving conditions, resulting in a

loss of power, vehicle speed control, and braking, as well as a failure of the vehicle's airbags

to deploy. These vehicles are referred to in this Complaint as "Defective Vehicles."

10.     In February and March of 2014, New GM, which has assumed the liabilities of

Old GM for the conduct at issue in this Complaint, and which has independent and non-

derivative duties of candor and care based upon its own knowledge and conduct, issued its

first set of recalls of various models due to the defective ignition switch. The recalls

encompassed 2.19 million vehicles in the United States and included the following models of

cars manufactured by Old GM: 2005-2009 Cobalts; 2007-2009 Pontiac G5s; 2006-2009

Chevrolet HHRs and Pontiac Solstices; 2005-2006 Pontiac Pursuits; 2003-2007 Saturn Ions;

and 2007-2009 Saturn Skys.

---

[2] 49 U.S.C. §§ 30101-30170.
[3] 49 U.S.C. § 30118(c)(1) & (2).
[4] 49 U.S.C. § 30118(b)(2)(A) & (B).

11.     The ignition switch systems in these vehicles are defective for several reasons, including (a) the ignition switch is too weak to hold the key in place in the "run" position; (b) the low position of the switches in the Defective Vehicles, as exacerbated by the use of a "slotted" key; and (c) they cause the airbags to become inoperable when the ignition switch is in the "accessory" or "off" position. As NHTSA's Acting Administrator testified in recent Congressional hearings, a vehicle's airbags should deploy whenever the car is moving—even if the ignition switch moves out of the "run" position.

12.     On June 23, 2014, New GM notified NHTSA and consumers that it was issuing a second recall for Defective Vehicles (the "June recall"). Here, New GM recalled 3.14 million vehicles. New GM characterized the June recall as relating to the design of the ignition key with a slot (rather than a hole), which allows the key and the key fob to hang lower down in the vehicle where it is vulnerable to being hit by the driver's knee. Despite this delineation, this "key slot defect" is substantially identical to the ignition switch defect that gave rise to the earlier recall and creates the same safety risks and dangers.

13.     According to documents on NHTSA's website, 2,349,095 of the vehicles subject to the June recall were made by Old GM. 792,636 vehicles were made and sold by New GM. The Defective Vehicles made by Old GM with the ignition key slot defect include:

- 2005-2009 Buick Lacrosse

- 2006-2009 Buick Lucerne

- 2004-2005 Buick Regal LS & GS

- 2000-2005 Cadillac Deville

- 2007-2009 Cadillac DTS

- 2006-2009 Chevrolet Impala

- 2006-2007 Chevrolet Monte Carlo

1197532.10

14.     Like the ignition switch defect that is the subject of the February/March recall, the ignition key slot defect poses a serious and dangerous safety risk because the key in the ignition switch can rotate and consequently cause the ignition to switch from the "on" or "run" position to "off" or "accessory" position. This, in turn, may result in a loss of engine power, stalling, loss of speed control, loss of power steering, loss of power braking, and increase the risk of a crash. Moreover, as with the ignition switch defect, because of this defect, if a crash occurs, the airbags are unlikely to deploy.

15.     New GM has tried to characterize the recall of these 3.14 million vehicles as being different than the ignition switch defect in the February/March recall when in reality it is for exactly the same defect, posing the same safety risks. New GM has attempted to distinguish the ignition key slot defect from the ignition switch defect to provide it with cover and an explanation for why it did not recall these 3.14 million vehicles much earlier, and allow New GM to provide a more limited, cheap and ineffective "fix" in the form of a key with hole (as opposed to a slot).

16.     On July 2-3, 2014 New GM announced it was recalling 7.29 million Defective Vehicles due to "unintended key rotation" (the "July recall"). The vehicles with the unintended key rotation defect were built on the same platform and with defective ignition switches, likely due to weak detent plungers just like the other Defective Vehicles. The Old GM vehicles implicated in the July recall are: 2000-2005 Chevrolet Impalas and Monte Carlos; 1997-2005 Chevrolet Malibus; 1999-2004 Oldsmobile Aleros; 1999-2005 Pontiac Grand Ams and 2004-2008 Pontiac Grand Prixs; certain 2003-2009 Cadillac CTSs; and certain 2004-2006 Cadillac SRX vehicles.

1197532.10

17.     As with the vehicles subject to the June recall, New GM has downplayed the severity of the "unintended key rotation" defect, and its recall offers a similarly cheap and ineffective "fix" in the form of new keys. New GM is *not* upgrading the ignition switches in these vehicles, altering the placement of the ignition so that it is not placed low on the steering column and is not correcting the algorithm that immediately disables the airbags as soon as the Defective Vehicle's ignition switch leaves the "run" position.

18.     Collectively these three groups of recalls (as well as a yet another very recent recall first posted on the NHTSA website on September 9, 2014 involving unintended ignition key rotation defects and another nearly 47,000 vehicles, including 2008-2009 Pontiac G8s) all relate to defects in the ignition switch system that New GM could and should have remedied years ago. The vehicles in these recalls are the "Defective Vehicles."

19.     From at least 2005 to the present, both Old GM and New GM received reports of crashes and injuries that put Old GM and New GM on notice of the serious safety issues presented by its ignition switch system. Given the continuity of engineers, general counsel, and other key personnel from Old GM to New GM, to say nothing of the access to Old GM's documents, New GM was aware of the ignition switch defects *from the very date of its inception* pursuant to the July 5, 2009 bankruptcy Sale Order, which became effective on July 11, 2009.

20.     Despite the dangerous, life-threatening nature of the ignition switch defects, including how the defects affect critical safety systems, New GM concealed the existence of the defects and failed to remedy the problem.

21.     The systematic concealment of known defects was deliberate, as both Old and New GM followed a consistent pattern of endless "investigation" and delay each time they

-6-

became aware (or aware yet again) of a given defect. In fact, recently revealed documents

show that both Old and New GM valued cost-cutting over safety, trained their personnel to

*never* use the word "defect," "stall," or other words suggesting that any GM-branded vehicles

are defective, routinely chose the cheapest part supplier without regard to safety, and

discouraged employees from acting to address safety issues.

22.     According to the administrator of NHTSA, Old and New GM worked to hide

documents from the government regulator and to keep people within the Companies from

"connecting the dots" to keep information secret.

23.     New GM's CEO, Mary Barra, has admitted in a video message that:

"Something went wrong with our process in this instance, and terrible things happened." But

that admission, and New GM's attempt to foist the blame on its parts supplier and engineers,

lawyers and others whom it has now terminated, are cold comfort for Plaintiffs and the Class.

24.     As a result of the disclosure of these defects and Old and New GM's

independent roles in concealing their existence, the value of Defective Vehicles has

diminished. For example, a 2007 Saturn Ion sedan is estimated to have diminished in value by

$251 in March 2014 as a direct result of these disclosures of unlawful conduct. A 2007 Saturn

Sky was down $238.

25.     But there is more. In the first eight months of 2014, New GM announced at

least 60 additional recalls, bringing the total number of recalled vehicles up to more than

*27 million*. The unprecedented scope of these recalls has completely belied the Companies'

claims that they made reliable and safe cars. As a result of these further revelations the

Defective Vehicles suffered additional diminished value. For example, the 2007 Saturn Ion

sedan's estimated diminution was $472 in September 2014 and the 2007 Saturn Sky had $686

in diminished value. From its very inception, New GM had the knowledge, the choice, the opportunity, and the responsibility to prevent personal and economic harm by timely and properly recalling the Defective Vehicles and timely and properly correcting the other safety defects. The economic harm to millions of customers that manifested upon the long-delayed recalls and revelation of New GM's ongoing concealment of these defects could have been prevented by timely discharge of its duties. This Complaint seeks the redress now available at law and in equity for New GM's failure to do so.

## JURISDICTION AND VENUE

26.    This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiffs and other Class members are citizens of a different state than Defendant.

27.    This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over New GM because it conducts substantial business in this District, and some of the actions giving rise to the complaint took place in this District.

28.    Venue is proper in this District under 28 U.S.C. § 1391 because New GM, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction. Additionally, New GM transacts business within this District, and some of the events establishing the claims arose in this District. Additionally, New GM requested that the Judicial Panel on Multi-District litigation transfer and centralize the ignition defect class actions filed by Plaintiffs to this District and the Judicial Panel has done so.

29.    Pursuant to this Court's direction that new plaintiffs can file directly in the MDL without first filing in the district in which they reside, new plaintiffs file this action as if it had been filed in the judicial district in which they reside.

1197532.10

## PARTIES

### I.    Plaintiffs

30.    Unless otherwise indicated, all Plaintiffs below purchased their GM-branded vehicles primarily for personal, family, and household use.

31.    Unless otherwise indicated, all Plaintiffs' vehicles described below were manufactured, sold, distributed, advertised, marketed, and warranted by GM.

**Debra Forbes—Alabama**: Plaintiff and proposed Nationwide and Alabama State Class Representative Debra Forbes is a resident and citizen of Geneva, Alabama. Ms. Forbes purchased a new 2007 Chevrolet Cobalt in 2007 in Fort Walton Beach, Florida for $16,000. Her vehicle is covered by a seven-year warranty that expires at the end of 2014. Among other incidents consistent with ignition switch shutdown, Ms. Forbes' steering locked up on three or four occasions, in May or June 2010, fall 2010, and spring 2011, all on normal road conditions and while she was driving approximately 25-30 miles per hour. Each time she had to slam on her brakes and manipulate the ignition switch to unlock the steering. Although the ignition switch on Ms. Forbes's car has been repaired, other repairs are incomplete, pending the arrival of parts. The book value of Ms. Forbes' vehicle is presently only approximately $6,000. She would not have purchased her vehicle if she knew of the problems with the ignition switch.

**Aaron Henderson—Alabama**: Plaintiff and proposed Nationwide and Alabama State Class Representative Aaron Henderson is a resident and citizen of Buhl, Alabama. Mr. Henderson purchased a new 2007 Saturn Ion 3 in September, 2006, in Madison, Wisconsin for approximately $17,500. At the time Mr. Henderson purchased his new Saturn it was under warranty. Mr. Henderson has experienced two accidents in this car—one on December 7, 2012, and the other on February 23, 2014. The airbags failed to deploy in both accidents, and

Case 1:14-md-02543-JMF    Document 347    Filed 10/14/14    Page 28 of 150

Mr. Henderson suffered minor injuries as a result. Mr. Henderson has spent approximately $9,000 to repair his vehicle following these accidents. Mr. Henderson did not learn of the ignition switch defects until March of 2014. In May of 2014, the ignition switch recall repair work was performed on his vehicle. Mr. Henderson would not have purchased the vehicle if he had known of the problems with the ignition switch.

**Marion Smoke—Alabama**: Plaintiff and proposed Nationwide and Alabama State Class Representative Marion Smoke is a resident and citizen of Elmore, Alabama. Ms. Smoke purchased a new 2005 Chevy Cobalt the week of May 5, 2005 in Montgomery, Alabama, for $19,000. At the time Ms. Smoke purchased her new Cobalt, she also purchased the manufacturer's warranty. Ms. Smoke's Cobalt unexpectedly shut off on at least seven separate occasions, all of them while she was driving on highways. She has also had trouble with the steering wheel being hard to turn making it difficult to drive. As a result of the issues with her vehicle and ignition switch recall and associated risks, she fears driving her vehicle despite having the recall work performed on her vehicle in April of 2014. She believes the value of her vehicle has been diminished as a result of the defects. Ms. Smoke feels that the safety of the vehicle was misrepresented, and she would not have purchased this car if GM had been honest about the safety defects.

**Grace Belford—Arizona**: Plaintiff and proposed Nationwide and Arizona State Class Representative Grace Belford is a resident and citizen of Phoenix, Arizona. Ms. Belford purchased a new 2005 Chevrolet Cobalt in October 2005, in Phoenix, Arizona for $18,900. Ms. Belford also purchased the warranty for her Cobalt. On two separate occasions, Ms. Belford's ignition has unexpectedly shut off after her vehicle went over a bump in the road. Ms. Belford did not learn of the ignition switch defects until March of 2014. She immediately

requested a loaner vehicle, but she had no choice despite her concerns to continue to drive the Cobalt to work, as it was her only form of transportation. It took about three months for the recall repair work to be completed on Ms. Belford's vehicle. Ms. Belford had planned to use her Cobalt as a down payment on a new vehicle, but the resale value of her Cobalt was diminished due to the ignition switch defect. Ms. Belford traded in her Cobalt in August of 2014. She was only offered $3,000 for the vehicle - $2,000 less than current Kelley Blue Book value. Ms. Belford would never have purchased the 2005 Chevrolet Cobalt had she known about the defects and GM's indifference with regard to the safety and reliability of its vehicles.

**Camille Burns—Arkansas**: Plaintiff and proposed Nationwide and Arkansas State Class Representative Camille Burns is a resident and citizen of Pine Bluff, Arkansas. Ms. Burns purchased a used 2006 Chevrolet Cobalt on or about November 1, 2006, from Smart Chevrolet in White Hall, Arkansas, for over $16,000. At the time of purchase, the car was still covered under warranty. Ms. Burns recalls reading that GM and Chevrolet-branded vehicles were great cars with reliable parts. Ms. Burns' Cobalt shutdown "too many times to count"— approximately two to three times per week between June 2014 and the time she traded the vehicle in around July 14, 2014. These unexpected shutdowns occurred when Ms. Burns was pulling out into traffic, backing up, or turning her car. Each time she would be forced to restart the car. The last time it shut off suddenly, it almost caused an accident. She also experienced a loss of power steering while backing out of her driveway. Ms. Burns had her car checked by an independent repair shop, but they could not diagnose the problem. Upon calling a GM dealership about the ignition recall, the dealership refused to provide her a loaner car. But when she called GM directly, they advised her that she should get out of the car immediately. Although her Cobalt had been paid off, based on the repeated shutdowns,

GM's advice, and GM's inability to fix it, Ms. Burns felt compelled to trade in the Cobalt for a safer vehicle. On or about July 14, 2014, she traded it to Smart Hyundai and received only $2,500. The new car payment was a financial hardship. Ms. Burns asserts that the Cobalt suffered a diminution of value due to the ignition switch defects, the recalls, and the surrounding publicity. Ms. Burns would not have purchased the Cobalt, or she would have paid less for it, had she known about its defects.

**Patricia Barker—California**: Plaintiff and proposed Nationwide and California Class Representative Patricia Barker is a resident and citizen of Wilmington, California. Ms. Barker purchased a new 2005 Saturn Ion in Torrance, California in March 2005 for approximately $18,000. The car was covered under the standard manufacturer's warranty, and she also purchased an extended warranty. She chose the Saturn, in part, because she wanted a safely-designed and manufactured vehicle. She saw advertisements for Old GM Vehicles before she purchased the Saturn and, although she does not recall the specifics of the advertisements, she does recall that safety and quality were consistent themes across the advertisements she saw. These representations about safety and quality influenced Ms. Barker's decision to purchase the Saturn. She has experienced power steering failure in her car on at least two separate occasions. In both instances she was able to reboot the power steering after restarting the car. Ms. Barker did not learn of the ignition switch defects until about February 2014 when she received an undated recall notice in the mail. She then saw a commercial notifying affected GM drivers that they could receive a loaner car while waiting for backordered recall parts to arrive. When she went to a local GM dealership they gave her a 2014 Chevy Impala. She drove this car for forty-five days until her car was repaired in April 2014. Only after she returned the loaner did she find out that it was under recall for the same ignition issue as her

own vehicle. Ever since the recall repair has been completed on her car she has some difficulty turning the key in her ignition. Ms. Barker would not have purchased this car had she known about the defects in her GM vehicle.

**Michael and Sylvia Benton—California**: Plaintiffs and proposed Nationwide and California State Class Representatives Michael and Sylvia Benton are residents and citizens of Barstow, California. Mr. and Mrs. Benton purchased a used 2005 Chevrolet Cobalt on January 10, 2009, in Barstow, California, for $12,789.76. The Bentons chose the Cobalt, in part, because they wanted a safely designed and manufactured vehicle. They saw advertisements for vehicles before they purchased the Cobalt, and, although they do not recall the specifics of the advertisements, they do recall that safety and quality were consistent themes across the advertisements they saw, which influenced their purchase decision. The vehicle was not covered under warranty when they purchased it. Mr. and Mrs. Benton purchased gap warranty for the Cobalt for a term of 48 months. The Bentons' vehicle has shutdown at least 20 times. Mr. and Mrs. Benton did not learn of the ignition switch defects until March 2014. In April 2014, they took their Cobalt to the dealership in their area to have the recall work performed. They were provided a loaner vehicle. The Bentons still fear driving their vehicle due to the ignition switch recall and the risk posed by the ignition switch defects. They would not have purchased this car, or would have paid less than they did, if GM was honest about the safety defects.

**Melvin Cohen—California**: Plaintiff and proposed Nationwide and California State Class Representative Melvin Cohen is a resident and citizen of California City, California. Mr. Cohen purchased a new 2006 Chevrolet Cobalt on January 13, 2006, from Rally Auto Group in Palmdale, California, for $22,799.80. He does not believe his vehicle was covered by

-13-

written warranties. Mr. Cohen had a general impression that GM was a quality brand and that
the vehicle was safe and reliable. In October of 2008, Mr. Cohen's wife, Karin was driving
the vehicle when it suddenly shut off while making a left turn into a gas station in California
City, California. Ms. Cohen was unable to control the vehicle once it shut off, and it was hit
by another vehicle when it strayed out of its lane. The airbags did not deploy even though the
impact was significant enough to total the vehicle. Mr. Cohen would not have purchased the
vehicle had he known of the defects.

**Esperanza Ramirez—California**: Plaintiff and proposed Nationwide and California
State Class Representative Esperanza Ramirez is a resident and citizen of Los Angeles,
California. Ms. Ramirez purchased new 2007 Saturn Ion on March 13, 2007, at a dealership in
California for $27, 215. Her vehicle was covered by a warranty at the time of purchase. Ms.
Ramirez has experienced several incidents consistent with the ignition defects, and is unable
to drive the car on freeways or for long distances. She had seen commercials about Saturns
featuring families that trusted Saturns. Had she known of the problems with her GM car, she
would not have purchased it.

**Kimberly Brown—California**: Plaintiff and proposed Nationwide and California
State Class Representative Kimberly Brown is a resident and citizen of Palmdale, California.
Ms. Brown purchased a new 2006 Chevrolet HHR on January 7, 2007, at Rally Auto Group in
Palmdale, California, for $30,084. Her car was under a 48-month or 100,000 mile warranty at
the time she purchased it. She and her husband relied on the advertising posted at the GM
dealership where they purchased the vehicle, as well as the GM brand name and its purported
reputation for safety and quality, which were consistent with the representations at the GM
dealership. Between 2007 and 2011, Ms. Brown's vehicle inadvertently shutdown four or five

times a year, and on several other occasions she had to use heavy force to turn the wheel.

Between 2012 and 2014, her vehicle inadvertently shutdown eight or nine times a year, and on

several other occasions she had to use heavy force to turn the wheel. Her vehicle typically

shuts down while going over bumpy roads, speed bumps, or railroad tracks. It will shutdown

while the gear is in drive and the key is in the "on" position. To remedy the problem she puts

the gear into neutral and restarts the car. Although the GM dealership indicated that it fixed

the ignition switch defect during a post-recall repair in May of 2014, Ms. Brown and her

husband have experienced their ignition shutting down at least five times since then. In

September 2014, she returned to the dealer to try to have the ongoing shutdowns remedied,

and she had to pay out of pocket for a loaner vehicle. Ms. Brown would not have paid the

purchase price she paid if she had known GM was manufacturing and selling vehicles plagued

with defects, and was not committed to the safety and reliability of its vehicles.

**Javier Malaga—California**: Plaintiff and proposed Nationwide and California State

Class Representative Javier F. Malaga is a resident and citizen of in Playa Del Rey, California.

On or about August 7, 2013, Mr. Malaga purchased a used 2006 Cobalt LS, which he still

owns, for $15,979.08. When Mr. Malaga purchased the 2006 Cobalt LS, it was not covered by

a written warranty. On two occasions Mr. Malaga was unable to turn on the engine with his

ignition key. Mr. Malaga returned the car to a dealer for repairs on or about February 15, 2008,

and March 25, 2010. One of GM's main selling points has been the efficiency, cost

effectiveness, and safety of its vehicles. Mr. Malaga's purchase was based, in significant part,

on these representations and assertions by GM. If GM had disclosed the nature and extent of

its problems, Mr. Malaga would not have purchased a GM vehicle, or would not have

purchased the vehicle for the price paid.

Case 1:14-md-02543-JMF    Document 347    Filed 10/14/14    Page 844 of 150

**William Rukeyser—California**: Plaintiff and proposed Nationwide and California State Class Representative William Rukeyser is a resident and citizen of Davis, California. After researching vehicles on the GM website, Mr. Rukeyser purchased a new 2008 Chevrolet Cobalt on September 4, 2008, in Lodi, California, for $16,215.54. Mr. Rukeyser purchased the manufacturer's warranty at the same time. Mr. Rukeyser had the ignition switch replaced on August 8, 2014. He was provided a loaner vehicle during the two months it took to complete the recall repair work. Mr. Rukeyser would not have purchased this car if GM had been honest about the safety defects.

**Yvonne Elaine Rodriguez—Colorado**: Plaintiff and proposed Nationwide and Colorado State Class Representative Yvonne Elaine Rodriguez is a resident and citizen of Lakewood, Colorado. She purchased a new 2007 Chevrolet HHR on December 5, 2006, at EMICH Chevrolet in Lakewood, Colorado, for $20,735.87. At the time of purchase, the HHR was covered by Chevrolet's standard warranty. Ms. Rodriguez did not find out about the ignition defect and the safety risk it posed until she received a recall notice in March 2014. After that point, Ms. Rodriguez stopped using her HHR for any long trips or highway driving, for fear of the safety of her family and herself. As soon as she received the recall notice, Ms. Rodriguez attempted to have the recall repair performed on her vehicle, but was informed that the parts were not available. Ms. Rodriguez continued to try to schedule the repair, but because of a lack of parts, she was not able to get her HHR repaired until June 2014. Even after the recall repair, however, Ms. Rodriguez does not feel her HHR is safe, and she and her family continue to avoid long trips and highway driving with the HHR. Ms. Rodriguez would not have purchased her vehicle if she had known that GM cars were plagued by defects and produced by a company that is not committed to safety.

**Dawn Orona—Colorado**: Plaintiff and proposed Nationwide and Colorado State Class Representative Dawn Orona is a resident and citizen of Limon, Colorado. Ms. Orona purchased a new 2005 Chevrolet Cobalt on August 6, 2005, from Century 1 Chevrolet in Broomfield, Colorado, for a total sale price of $35,053.92. She financed a portion of the sales price, paid a portion of the sales price by trading in an older Chevrolet vehicle, and paid the balance of the purchase in cash. Ms. Orona's vehicle was covered by a warranty and the warranty had not expired at the time the vehicle was totaled in an accident. In the years prior to her purchase and around the time of her purchase, Ms. Orona viewed multiple commercials in which GM touted the safety of its vehicles, and she believed she was purchasing a vehicle that was safe and defect-free. Ms. Orona's vehicle spontaneously shut off a number of times within the first several months of purchasing it. Approximately six months after purchasing the 2006 Chevrolet Cobalt, Ms. Orona and her husband experienced a power loss while attempting to complete a turn on a curve. Although her husband applied both feet on the brakes, the car jumped the curb and plowed into a brick wall. The impact of the crash was severe enough to break the front axle, totaling the vehicle, but the air bags never deployed. Ms. Orona would not have purchased the vehicle had she known of the defects.

**Michael Pesce—Connecticut**: Plaintiff and proposed Nationwide and Connecticut State Class Representative Michael Pesce is a resident and citizen of Waterbury, Connecticut. Mr. Pesce purchased a used 2006 Chevrolet Cobalt on May 29, 2008, in Waterbury, Connecticut, for approximately $12,000. When Mr. Pesce bought the car it was still covered under a three-year, 36,000-mile warranty. Mr. Pesce was a repeat GM customer and trusted the GM brand when he decided to purchase his Cobalt. This was Mr. Pesce's fifth time owning a GM vehicle. In August 2011, Mr. Pesce's 18 year-old son was driving the car on a

1197532.10

major highway in Connecticut when the vehicle lost all power. His son was able to pull over and restart the car, but after another few minutes it died again. Mr. Pesce paid to have the vehicle looked over and repaired, but he now believes the problem was related to the ignition switch defects. Mr. Pesce did not learn about the ignition switch defects until March 2014. The recall repair work was not performed until September 2014, more than six months later. While he waited for the repair work, Mr. Pesce only drove the vehicle if there was an emergency because he was afraid to drive the car. Mr. Pesce does not feel this car is worth what he paid for it and will not buy another GM vehicle.

**Lisa Teicher—Connecticut**: Plaintiff and proposed Nationwide and Connecticut State Class Representative Lisa Teicher is a resident and citizen of Manchester, Connecticut. Ms. Teicher purchased a used 2005 Chevrolet Cobalt on January 24, 2008, from Gengras Chevrolet in Hartford, Connecticut, for $7,769.22. Her vehicle was covered by written warranty that has now expired. Ms. Teicher received a direct mailing from Gengras Chevrolet advertising the vehicle she purchased. These and other consistent representations at the dealership left her with the impression that the vehicle was safe and reliable. She believed her vehicle was safe and defect free when she purchased it. Ms. Teicher's vehicle has spontaneously turned off on two occasions. In June 2008, her vehicle locked up and shut off while she was driving on an exit ramp on Route 2 in Connecticut. She was unable to control the vehicle and ended up hitting a barrier on the road. She hit her head on the dash and was injured, but hospitalization was not required. The airbags did not deploy during this collision. In May of 2009, Ms. Teicher's vehicle again shut off while she was driving to work on I-84 in Connecticut just before Exit 64. She was able to bring the vehicle to a stop and re-start the vehicle again. On June 25, 2014, she had her ignition switch replaced by Carter Chevrolet,

located in Manchester, Connecticut, in connection with the recalls GM initiated in response to the ignition switch defects. Ms. Teicher would not have purchased the vehicle had she known of the defects.

**Steven Diana—Florida**: Plaintiff and proposed Nationwide and Florida State Class Representative Steven Diana is a resident and citizen of Sebastian, Florida. Mr. Diana purchased a used 2002 Chevrolet Impala in July 2007 from Champion Motors in Mansfield, Connecticut, for $12,500. Mr. Diana did not purchase an extended warranty and does not believe his vehicle is currently covered by any written warranties. Mr. Diana expressly recalls seeing advertisements on television and in the newspaper about the 2002 Chevrolet Impala, including advertisements touting its safety. He considered and was influenced by the advertisements emphasizing the safety of the vehicle when making his purchase. Mr. Diana believed his vehicle was safe and defect-free when he purchased it. Mr. Diana's vehicle spontaneously shut off in January 2009, July 2012, and August 2012. On each occasion Mr. Diana was driving on or around I-95 near his home in Sebastian, Florida, and the road was bumpy. On each occasion, Mr. Diana had to put the vehicle in neutral to get it to restart. Mr. Diana would not have purchased the vehicle had he known of the defects.

**Maria E. Santiago—Florida**: Plaintiff and proposed Nationwide and Florida State Class Representative Maria Santiago is a resident and citizen of Cutler Bay, Florida. Ms. Santiago purchased a new 2007 Saturn Ion Coupe in late 2006 at a Saturn Dealership at Dadeland South in Miami, Florida, for approximately $20,000. Ms. Santiago also purchased an extended warranty for the vehicle that is still active. Ms. Santiago purchased her Ion because she understood and believed that GM vehicles were durable and reliable. Sometime in 2009, as Ms. Santiago was leaving a friend's house and driving onto an expressway ramp,

-19-

Case 14-mc-02543-JMF   Document 347   Filed 10/14/14   Page 88 of 150

her Ion turned suddenly turned off. Since Ms. Santiago had just entered the expressway ramp and was driving at only 25 miles per hour, she was able to pull her vehicle over to the side of the ramp. She soon noticed the ignition key was in the off position, for no apparent reason. Ms. Santiago was able to restart the car and continue driving. Plaintiff Santiago would not have purchased her Ion had she known of the car's ignition switch defect.

**Turner Clifford—Georgia**: Plaintiff and proposed Nationwide and Georgia State Class Representative Turner Clifford is a resident and citizen of Palmetto, Georgia. He purchased a used 2004 Saturn Ion in September 2005 in Marietta, Georgia, for $15,000. Mr. Clifford purchased a standard three-year warranty on his vehicle. Mr. Clifford experienced safety issues while driving his vehicle, including periodic shut-offs, usually when driving the interstate, and the key falling out of the ignition on occasion while driving. Mr. Clifford stopped driving his vehicle as soon as he learned about the safety recall. In April 2014, he brought his vehicle to the dealership to have his ignition switch replaced, but the repair did not occur until late June/early July. During that time, Mr. Clifford incurred considerable additional fuel costs because the rental vehicle he was given consumed more fuel than his Saturn had. In August 2014, Mr. Clifford traded in his Saturn Ion. He believes he received less in trade in value as a result of the GM recalls, but he no longer wanted to own the Saturn. When he traded in his vehicle, the dealership informed him that it would have to sell the Saturns at wholesale because of the safety recalls. Knowing what he now knows about the safety defects in the Saturn Ion, Mr. Clifford would not have purchased the vehicle.

**Jennifer Gearin—Georgia**: Plaintiff and proposed Nationwide and Georgia State Class Representative Jennifer Gearin is a resident and citizen of Clermont, Georgia. Ms. Gearin purchased a new 2006 Chevrolet Cobalt in 2006 in Gainesville, Georgia, for

$18,499.52. Her Cobalt was covered under the manufacturer's warranty when she purchased it. Ms. Gearin has owned GM products before and she and her family were loyal customers. Ms. Gearin was advised at the dealership that the Cobalt was most dependable car for the lowest price. Although Ms. Gearin has not experienced her vehicle shutting down while driving, she is very afraid for her safety as a result of the ignition switch defects and she must drive a long distance to work on a daily basis. Ms. Gearin did not learn about the ignition switch defects until March 2014. She had the recall repair work completed this summer and was provided a loaner vehicle. She would not have purchased this car if GM had been honest about the safety defects.

**Winifred Mattos—Hawaii**: Plaintiff and proposed Nationwide and Hawaii State Class Representative Winifred Mattos is a resident and citizen of Honolulu, Hawaii. Ms. Mattos purchased a new Pontiac G5 in April 2007 in Culver City, California, for $20,000. She also had a three-year warranty on her vehicle. When she first learned about the recall, Ms. Mattos stopped driving her vehicle on highways or long distances and then decided it was unsafe to drive any distance at all. She requested and obtained a rental vehicle while awaiting replacement of her ignition switch pursuant to the recall. Her vehicle's ignition switch was replaced in April 2014. Ms. Mattos is still concerned about driving her vehicle. She would like to sell it, but she doubts she will be able to sell it and, even if she could, she doubts she would receive what she would have received before the recall. She would need full, pre-recall notice value for her vehicle in order to purchase another vehicle. Knowing what she now knows about the safety defects in many GM-manufactured vehicles, she would not have purchased her vehicle.

**Dennis Walther—Hawaii**: Plaintiff and proposed Nationwide and Hawaii State Class Representative Dennis Walther is a resident and citizen of Honolulu, Hawaii. Mr. Walther purchased a new 2006 Saturn Ion in 2006 in Hawaii for approximately $16,400. His car had a three-year warranty when he purchased it. The vehicle's ignition switch has been replaced under the recall. He bought the car because he trusted GM. If Mr. Walther had known about the Ion's defects, he would never have purchased it. He will never purchase another GM product.

**Donna Harris—Illinois**: Plaintiff and proposed Nationwide and Illinois State Class Representative Donna Harris is a resident and citizen of Herrin, Illinois. Ms. Harris purchased a used 2006 Chevrolet Cobalt in Herrin, Illinois, in 2007 for approximately $13,000. She purchased the vehicle with a standard three-year manufacturer's warranty. Ms. Harris bought the vehicle because her father was a "GM person" and she believed the vehicle was safe and reliable. Safety is the feature Ms. Harris finds most important feature in a vehicle. Ms. Harris started experiencing shutdowns in her Cobalt in 2009. The first time she was backing out of parking lot and the vehicle shutdown; as a result, she collided with a parked truck. In another incident, the vehicle stalled while Ms. Harris was backing out of a hospital parking lot space and she hit a cement barrier. The second shutdown cost Ms. Harris $1,700 in repairs. She also has experienced problems with her vehicle not locking. She has had her ignition switch replaced, but she still experiences problems turning the key in the ignition. Ms. Harris no longer feels safe driving her car, but she has no other means of transportation. Had she known about the problems with her GM vehicle, she would not have purchased the car, and she will never again purchase a GM vehicle.

**Heather Holleman—Indiana**: Plaintiff and proposed Nationwide and Indiana State Class Representative Heather Holleman is a resident and citizen of South Bend, Indiana. Ms. Holleman purchased a new 2007 Pontiac G5 in May 2007 from Don Meadows in South Bend, Indiana, for $17,500. Ms. Holleman has experienced numerous issues with the ignition of her Pontiac G5. The GM dealership where she purchased her vehicle has told her that the parts to fix the vehicle are unavailable, and she should simply "be careful." Ms. Holleman would not have purchased the vehicle had she known of the defects.

**James Dooley—Iowa**: Plaintiff and proposed Nationwide and Iowa State Class Representative James Dooley is a resident and citizen of Waterloo, Iowa. Mr. Dooley purchased a new 2006 Pontiac Solstice from Dan Deery Chevrolet in Cedar Falls, Iowa, in June 2006 for $28,000. Mr. Dooley purchased an extended seven-year warranty on the vehicle. Mr. Dooley did not experience a power failure during normal operation of his vehicle, but he stopped driving his vehicle in March 2014 when he learned about the safety recall because he was afraid for his safety. Because Mr. Dooley was unaware that GM was offering loaner vehicles to individuals afraid to drive their defective vehicles, he did not drive the vehicle again until August 2014 when the ignition switch was replaced. Knowing what he now knows about the safety defects in many GM-manufactured vehicles, he believes GM mislead him about the Solstice's safety and he would not have purchased the vehicle had he known the truth.

**Philip Zivnuska, D.D.S.—Kansas**: Plaintiff and proposed Nationwide and Kansas State Class Representative Philip Zivnuska, D.D.S., is a resident and citizen of Valley Center, Kansas. Mr. Zivnuska purchased a new 2006 Chevrolet Cobalt from Conklin Cars dealership in Newton, Kansas, in 2006 for approximately $25,000. His vehicle was covered by

Chevrolet's standard new car warranty at the time it was purchased. Throughout the course of his ownership of the Cobalt, Dr. Zivnuska and his family members experienced numerous issues consistent with the ignition switch defect, including frequent total power failure and loss of power steering, and an accident. Dr. Zivnuska brought the Cobalt into Conklin Cars dealership multiple times to address the issues, and became so concerned that he eventually filed a complaint with NHTSA in 2007 to document the problems he was experiencing. He never received information from GM following this complaint, although he was lead to understand GM obtained information about his car, which was subsequently totaled in a later accident. Dr. Zivnuska is appalled by the number of people who have also experienced ignition switch issues and is very upset that GM has not been forthcoming to vehicle owners, mechanics, and dealerships. Dr. Zivnuska reviewed internet websites before purchasing his car, particularly because good handling was important to him. Had he known of the problems with his GM car, he would not have purchased it.

**Dawn Talbot—Kentucky**: Plaintiff and proposed Nationwide and Kentucky State Class Representative Dawn Talbot is a resident and citizen of Glasgow, Kentucky. Ms. Talbot purchased a used 2006 Chevrolet Cobalt in May 2009 from Goodman Automotive in Glasgow, Kentucky. Ms. Talbot's vehicle has regularly lost power during driving. She would not have purchased the vehicle had she known of the defects.

**Jennifer Crowder—Louisiana**: Plaintiff and proposed Nationwide and Louisiana State Class Representative Jennifer Crowder is a resident and citizen of Shreveport, Louisiana. She purchased a used 2006 Chevrolet Cobalt in 2008 in Shreveport, Louisiana, for $14,000. Her car was not under warranty at the time of purchase. Ms. Crowder experienced many instances of stalling in her Cobalt. Her vehicle stalled on many occasions while driving to

1197532.10

work. She was late to work so often due to the stalling that she was dismissed from her employment for arriving late to work. On another occasion, Ms. Crowder's vehicle shut off in the middle of the road while she was making a turn. She was fortunately able to start the vehicle on the second try and avoided an accident. Knowing what she now knows about the safety defects in many GM-manufactured vehicles, and the Cobalt in particular, she would not have purchased the vehicle nor even visited the dealership to look at the Cobalt.

**Alysha Peabody—Maine**: Plaintiff and proposed Nationwide and Maine State Class Representative Alysha Peabody is a resident and citizen of Kenduskeag, Maine. Ms. Peabody purchased a used 2005 Chevrolet Cobalt in 2006 in Maine for $14,000. Her car was under warranty at the time of purchase. Although she did not have ignition switch issues before the recall, since having the repair done her vehicle does not always start on the first try. She has tried to sell her car on Craigslist since news of the ignition switch defect went public, but has not received a single inquiry about the vehicle. Ms. Peabody would have never purchased a GM vehicle if she had known about the defects.

**Robert Wyman—Maryland**: Plaintiff and proposed Nationwide and Maryland State Class Representative Robert Wyman is a resident and citizen of Baltimore, Maryland. Mr. Wyman purchased a new 2007 Saturn Sky from the Owings Mills, Maryland, Heritage Group in 2007 for $32,000. His vehicle came with a three-year warranty. Although he has not experienced an inadvertent power failure while driving his vehicle, on multiple occasions Mr. Wyman had difficulty removing and/or inserting his ignition key into the ignition cylinder or starting his vehicle. Mr. Wyman's vehicle had the recall repair done on May 31, 2014. Had he known that the Saturn Sky contained a defective ignition switch, Mr. Wyman would not have

purchased the vehicle because it is a "death car," and he worries what might have happened had he "hit a bump a certain way."

**George Mathis—Maryland**: Plaintiff and proposed Nationwide and Maryland State Class Representative George Mathis is a resident and citizen of Parkville, Maryland. Mr. Mathis purchased a new 2007 Chevrolet Cobalt on April 1, 2007, in York, Pennsylvania, for $12,000. The vehicle was covered under warranty when he purchased it. Mr. Mathis has experienced his ignition shutting down while driving on three separate occasions, with one instance resulting in a minor accident, and the other two nearly resulting in an accident. Mr. Mathis did not learn about the ignition switch defects until March 2014. In August 2014, he took his Cobalt to the dealership in his area to have the recall work performed. Mr. Mathis would not have purchased this car, or would have paid less than he did, if GM had been honest about the safety defects.

**Mary Dias—Massachusetts**: Plaintiff and proposed Nationwide and Massachusetts State Class Representative Mary Dias is a resident and citizen of Taunton, Massachusetts. Ms. Dias purchased a used 2007 Chevrolet HHR on February 28, 2008, in Woonsocket, Rhode Island, for approximately $13,000. The vehicle was under warranty when she purchased it. Because of the ignition switch defects, Ms. Dias is very concerned for her safety every time she drives her vehicle. Ms. Dias did not learn of the ignition switch defects until March 2014. When she inquired about her safety, GM told her that her vehicle had not been recalled and not to worry. On April 11, 2014, after receiving notice that her HHR was in fact recalled, Ms. Diaz took her HHR in for the recall repair work and was provided a loaner vehicle. She would not have purchased this vehicle if she had known of the safety defects.

**Colin Elliott—Massachusetts**: Plaintiff and proposed Nationwide and Massachusetts State Class Representative Colin Elliott is a resident and citizen of Buzzards Bay, Massachusetts. Mr. Elliot purchased a new 2008 Saturn Sky in Hyannis, Massachusetts, in July of 2007 for $23,000. His vehicle was covered by a standard 100,000-mile warranty at the time of purchase. At the time of purchase, Mr. Elliott was choosing between a Saturn Sky and Pontiac Solstice. To avoid defects that he believed plagued early production models, however, Mr. Elliott waited two years before ordering his Saturn in the hopes that any early production defects would be discovered and fixed. Although he has not experienced an inadvertent power failure while operating the vehicle, Mr. Elliott has not driven his Sky since learning of the recall several months ago. He has contacted his dealership to inquire about the timing of repairs, but his dealership has indicated that it does not have parts available. Because he will no longer drive his Sky, Mr. Elliott and his wife have been sharing her Kia since March. This has caused significant inconvenience, as they drive each other to work and are dependent on one another's schedule.

**Diana Cnossen—Michigan**: Plaintiff and proposed Nationwide and Michigan State Class Representative Diana Cnossen is a resident and citizen of Grand Rapids, Michigan. Ms. Cnossen purchased a new 2007 Saturn Ion on November 27, 2006, in Michigan for $18,250. Her vehicle was covered under warranty when she purchased it. She purchased the vehicle because she was attracted to its compact size when she viewed it in the showroom. Ms. Cnossen did not experience a power failure during normal operation of her vehicle, though she often experienced difficulty turning the steering wheel. Ms. Cnossen's ignition switch was replaced under the recall on June 4, 2014. While she awaited a replacement part, Ms. Cnossen continued to use her vehicle because she was not aware that GM had offered to provide loaner

vehicles to those too afraid to continue operating their defective vehicles. Ms. Cnossen did not

learn of the ignition switch defect until it was announced in March of 2014, and she would not

have purchased her Saturn Ion had she known it continued a defective ignition switch. Ms.

Cnossen will "never buy another car from GM."

**David Cleland—Minnesota**: Plaintiff and proposed Nationwide and Minnesota Class

Representative David Cleland is a resident and citizen of Northfield, Minnesota. He purchased

a used 2004 Saturn Ion in 2005 in Northfield, Minnesota, for $10,000. Mr. Cleland's Saturn

Ion was covered under the standard manufacturer's warranty at the time he purchased it. Mr.

Cleland read GM promotional material about the vehicle's safety and reliability, including the

vehicle's airbags, prior to purchasing the vehicle. This spring, after the recall announcement,

Mr. Cleland's children had a frontal collision while driving his vehicle. The airbags did not

deploy, even though they should have under the circumstances of the collision. Knowing what

he now knows about the safety defects in many GM-manufactured vehicles, and particularly

his Saturn Ion, Mr. Cleland would not have paid the amount of money he paid, or even

purchased, the vehicle.

**Frances Howard—Mississippi**: Plaintiff and proposed Nationwide and Mississippi

State Class Representative Frances Howard is a resident and citizen of Jackson, Mississippi.

Ms. Howard leased and then purchased a new 2006 Saturn Ion in April 2006 at a Saturn

dealership in Jackson, Mississippi, for approximately $11,000. The vehicle was covered by a

warranty at the time of purchase. She recalls seeing television ads touting the Saturn brand as

outstanding with dependable vehicles and high-rated customer service. In 2009, Ms.

Howard's key got stuck in the ignition and she could not turn the vehicle off. She drove it to

the dealership and they replaced the ignition switch on September 8, 2009, at Ms. Howard's

expense. One week later the key got stuck in the ignition again. This time the GM dealership told her it was because her car's battery was dead. Their service was unhelpful and contradictory. Ms. Howard's car has also inadvertently shutdown on two occasions. The first time happened approximately four months ago when she accidentally bumped the key while it was in the ignition. The second time, on September 2, 2014, it shut off while she was at a red light. Both times the car restarted after she turned the key off and then on again. Ms. Howard was never contacted about the ignition switch recall, and only found out about it by reading news on the internet. After contacting her GM dealership about the repairs, it took eight weeks for the parts to come in. She also asked for a loaner vehicle, but they declined, telling her there were none available and it would be only two weeks until the parts arrived. Ms. Howard would have never purchased this vehicle if she had known about these defects

**Michelle Washington—Missouri**: Plaintiff and proposed Nationwide and Missouri State Class Representative Michelle Washington is a resident and citizen of Florissant, Missouri. Ms. Washington purchased a new 2008 Chevrolet Impala in July 2007 at a GM dealership in Missouri for approximately $27,000. She also purchased a new 2014 Chevrolet Impala on May 9, 2014, at a GM dealership for approximately $37,000. The 2008 Impala was covered under warranty at the time of sale and she also purchased an extended warranty. The 2014 Impala is currently covered under warranty. In purchasing the 2008 Impala, Ms. Washington was convinced of the safety and reliability of her GM product based upon their warranties and representations. The ignition switch defect manifested in her 2008 Impala on approximately four separate occasions. In one instance the car shutdown on the highway and she had to pull to the side of the road and restart it. Before purchasing her new 2014 Impala, Washington took her 2008 Impala to two different GM dealerships to get an estimated trade-

in value. At the first GM dealership, during their test drive of her 2008 Impala, the vehicle

ignition switch defect manifested and the car shutdown. The dealership informed her that they

would have to dock her money on the trade-in amount being offered because of the problem.

Based upon the vehicle shutting down during the examination, the dealership offered her a

quote of $1,500 for a trade-in amount. Just days later, she took it to another GM dealership

who gave her $2,900 for a trade-in amount. Ms. Washington received the ignition switch

recall notice on her 2008 Impala after she had already traded it in for the 2014 Impala. Her

2014 Impala has not yet been repaired under the recall. Ms. Washington is adamant that had

she known of the defects, she would have never considered the 2008 Impala or, later, the 2014

Impala when she was looking to trade-in her vehicle.

**Patrice Witherspoon—Missouri**: Plaintiff and proposed Nationwide and Missouri

State Class Representative Patrice Witherspoon is a resident and citizen of Lee's Summit,

Missouri. Ms. Witherspoon purchased a new 2006 Saturn Ion in 2005 from a Missouri vehicle

dealer for approximately $16,828. Ms. Witherspoon reviewed GM's webpage and other

internet websites discussing the Saturn Ion prior to her purchases and believed that the vehicle

was safe and reliable based on her review. Ms. Witherspoon believed her vehicle was safe and

defect-free when she purchased it. Ms. Witherspoon's 2006 Saturn Ion spontaneously shut off

on at least five occasions while driving the vehicle. On one such occasion, she was on the

highway, but was able to avoid an accident by pulling over to the shoulder. On another

occasion, her vehicle shut off while on the exit ramp to a highway, but she was fortunately

again able to avoid an accident. On each occasion, the vehicle gearshift was in "drive" or

"reverse" and the ignition key was in the "run" position. Ms. Witherspoon had difficulty

controlling and safely stopping the vehicle on these occasions. The value of Ms.

Case 1:14-mc-02543-JMF    Document 347    Filed 10/14/14    Page 49 of 150

Witherspoon's vehicle is less than she bargained for when she purchased the vehicle and has diminished as a result of the defect.

**Laurie Holzwarth—Montana**: Plaintiff and proposed Nationwide and Minnesota Class Representative Laurie Holzwarth is a resident and citizen of Billings, Montana. Ms. Holzwarth purchased a used 2005 Chevrolet Cobalt in 2008 in Billings, Montana, for approximately $7,000. Her daughter Christine has experienced countless shutdowns in the vehicle. Christine is the primary driver of the vehicle and will not let anyone else drive it, because she is concerned about the number of shutdowns that she has experienced. They have occurred on highways, in the main street of her town, pulling into parking spaces, and everything in between. The worst incident that she can remember was a definite power failure. Ms. Holzwarth witnessed this event. They were driving on the highway in August of 2010 from Billings to Bozeman, where Christine would be attending college. At a point where they had to make a sharp turn, traveling at 75-80 miles per hour, the car just quit. Christine was able to get the car to a stop without hitting the concrete wall, cycle the key, and continue. They drove another 40 miles, and the car shut off twice more on the straightaway, and once more in the town. Christine had experienced both power steering failure and power failure incidences before this, but had not done much highway driving because she mainly drove to and from high school. The ignition switch was supposedly repaired as part of the ignition switch recall on July 29, 2014. But Ms. Holzwarth's daughter is still experiencing power failures in the car. Since the vehicle was repaired, Christine experienced two shutdowns and/or power steering failures on September 3, 2014, and September 8, 2014. Ms. Holzwarth and her daughter would like to get rid of the car, but they are not financially capable of doing so—Christine is working full time to pay off her college loans and needs a vehicle to get to

work. Furthermore, they do not believe that they could sell this vehicle to anyone else in good conscience. Even if they were to say that the car was repaired, they do not believe it is true, and they don't want to put anyone else at risk in the car. Ms. Holzwarth would not have purchased this vehicle if she had known about its serious and dangerous defects.

**Michael Amezquita—New Jersey**: Plaintiff and proposed Nationwide and New Jersey State Class Representative Michael Amezquita is a resident and citizen of Hamilton, New Jersey. Mr. Amezquita purchased a new 2006 Chevrolet Cobalt on June 30, 2006, in East Windsor, New Jersey, for $14,000. At the time he purchased the vehicle it was covered under warranty, but the warranty has since expired. Mr. Amezquita did not learn of the ignition switch defects until March 2014. His car was not repaired under the recall until April 23, 2014. Mr. Amezquita had to demand a loaner vehicle before GM would agree to provide one. He used the loaner vehicle for approximately seven weeks, from March 19, 2014, to April 23, 2014, while he waited for the repair parts to arrive. Mr. Amezquita would not have purchased this vehicle if he had known about these defects.

**Anthony Juraitis—New Jersey**: Plaintiff and proposed Nationwide and New Jersey State Representative Anthony Juraitis is a resident and citizen of Freehold, New Jersey. He purchased a new 2004 Saturn Ion in or around the winter of 2003. Mr. Juraitis purchased the vehicle with a standard warranty. Mr. Juraitis was considering other vehicles as well, but he decided on the Ion in part because he believed the vehicle to be safe and reliable. Mr. Juraitis experienced several shutdowns/stalls while driving his Ion. The first occurred on the highway, when his vehicle "locked" while driving. Other drivers stopped to help him push his vehicle to the side of the road, where after several attempts he was able to restart his vehicle. Mr. Juraitis took the vehicle to the dealership, which replaced the ignition switch and charged Mr. Juraitis

for parts and labor. Following this supposed repair, Mr. Juraitis continued to have stalls and shutdowns with his vehicle; he estimates approximately three dozen times with about eight or ten of them being in very dangerous situations. On July 31, 2014, the ignition switch was replaced again, this time pursuant to the recall. Following this replacement, Mr. Juraitis has continued to experience safety problems with the vehicle, including in early September 2014 when his vehicle shutdown again and he was unable to immediately restart the vehicle. Mr. Juraitis would like to sell or trade in his vehicle, but he does not want another person to experience the dangerous events he has experienced or have a vehicle with an obvious safety defect. Mr. Juraitis believes the vehicle is not worth anything if it means you have to gamble with your life to drive it. Knowing what he now knows about the safety defects in many GM-manufactured vehicles, he would not have purchased the vehicle and will never again purchase a General Motors vehicle.

**Bernadette Romero—New Mexico**: Plaintiff and proposed Nationwide and New Mexico State Class Representative Bernadette Romero is a resident and citizen of Santa Fe, New Mexico. Ms. Romero purchased a new 2007 Chevrolet Cobalt on July 3, 2007, at Casa Chevrolet in Albuquerque, New Mexico, for $14,645. Her car was covered by a warranty at the time of purchase. Her vehicle had the recall repair performed in May 2014, but she went without her vehicle for five weeks while it was repaired. She drove a loaner car during that time. Ms. Romero traded in her Cobalt for $5,500 on June 20, 2014. She would never have bought this vehicle had she known about the ignition switch defects.

**Sandra Levine—New York**: Plaintiff and proposed Nationwide and New York State Class Representative Sandra Levine is a resident and citizen of Babylon, New York. Ms. Levine purchased a used 2005 Chevrolet Cobalt on May 27, 2006, from Babylon Honda in

1197532.10

Babylon, New York, for $16,627.96. Ms. Levine's vehicle was covered by a warranty that

expired 90 days after her purchase. She does not recall any specific advertising that influenced

her decision to buy the vehicle, but she had a general impression that GM was a quality brand

and that the vehicle was safe and reliable. Plaintiff Levine believed her vehicle was safe and

defect-free when she purchased it. Ms. Levine's vehicle spontaneously shut off on two

occasions. Although she does not recall precise dates, the shut-off incidents occurred in 2011

and 2012. The shut-off incidents both took place when she was driving on Deer Park Avenue

in Suffolk County, New York. There was no apparent reason for the shutdown in either case.

The road was not bumpy, and Ms. Levine does not believe her knee hit the ignition switch. In

both instances, Ms. Levine was able to navigate the vehicle to the shoulder of the road. Ms.

Levine's ignition switch was replaced on May 22, 2014, by Chevrolet of Huntington in

connection with the recall GM initiated in response to the ignition switch defects. Ms. Levine

would not have purchased the vehicle had she known of the defects.

**Michael Rooney—New York**: Plaintiff and proposed Nationwide and New York

State Representative Michael Rooney is a resident and citizen of Ronkonkoma, New York.

She purchased a used 2005 Chevrolet Cobalt in November 2006. Ms. Rooney purchased an

extended warranty for the vehicle. She purchased the Cobalt after reading several

advertisements about the Cobalt and other vehicles as well; she believed the Cobalt to be a

safe and reliable vehicle to drive. Further, the dealership confirmed with Ms. Rooney that the

Cobalt was a safe, reliable vehicle. Ms. Rooney experienced several shutdowns in her vehicle

while driving. Upon learning about the safety recall on her vehicle, she stopped driving it. The

dealership later informed her of her right to a loaner vehicle while awaiting replacement of her

ignition switch, and she received a loaner vehicle soon thereafter. Her ignition switch was

1197532.10

replaced in the summer of 2014. Following that replacement, her automatic starter no longer worked in her vehicle, which she had to have repaired. Knowing what she now knows about the safety defects in many GM-manufactured vehicles, she would not have purchased the vehicle.

**William Ross—New York**: Plaintiff and proposed Nationwide and New York State Class Representative William Ross is a resident and citizen of Bellmore, New York. Mr. Ross purchased a new 2005 Chevrolet Cobalt in 2005, in Hicksville, New York, for approximately $25,000. At the time of purchase, his vehicle was under the original manufacturer's warranty, and he did not purchase any additional warranties. Mr. Ross does not recall when the warranty expired or its terms. Mr. Ross recalls at least one incident where the car became hard to steer. He took it to a repair shop thinking added power steering fluid would fix the problem, but the repair shop told him the vehicle did not need power steering fluid. On June 23, 2012, Mr. Ross was driving his Cobalt in Nassau County, New York, at approximately 55 miles per hour when the ignition was inadvertently switched into the accessory position, causing the engine to lose power. The car's power steering, power braking, and airbag systems were disabled. Mr. Ross lost control and the car crashed into a divider lined with rubber pylons. The airbag did not deploy. Mr. Ross suffered cuts and a separation of the muscle from his tendon in his arm. It could not be surgically repaired by the time he was able to go to the VA hospital. This accident cost Mr. Ross $6,279.97 in car repairs. On March 30, 2014, Mr. Ross was again driving his Chevrolet Cobalt in Nassau County, New York, at approximately 55 miles per hour when the ignition again suddenly switched into the accessory position, causing the vehicle to lose power to the engine. Again the power steering, power braking system, and airbags were disabled. Mr. Ross lost control of the car and it hit a divider, knocking the rear

1197532.10

wheels out of alignment. This accident cost Mr. Ross approximately $175 in repairs. In both accidents, the road was not bumpy and Mr. Ross does not recall hitting anything with his knee to cause the key to turn. When Mr. Ross learned of the recalls he called his GM dealership to see if his vehicle was involved in the recall. GM told him it was not. Then in early March 2014, he received a recall notice. When he called about getting the recall repairs done he was told the parts to repair it were not available. Mr. Ross stopped driving the vehicle and, in April 2014, he sold it to a junkyard to scrap for approximately $4,000. He is a retired, disabled veteran. Since selling the Cobalt he now relies on veterans' transportation to go to his medical appointments and walks everywhere else. Mr. Ross would not have bought the car if he had known beforehand about the ignition switch defect.

**Donald Cameron—North Carolina**: Plaintiff and proposed Nationwide and North Carolina State Class Representative Donald Cameron is a resident and citizen of Durham, North Carolina. He purchased a new 2006 Saturn Ion in 2006 in Durham, North Carolina, for $14,000. Mr. Cameron purchased the vehicle with a five-year, 120,000-mile warranty. On several occasions, Mr. Cameron's vehicle shutdown while he was driving. Knowing what he now knows about the safety defects in many GM-manufactured vehicles, and in the Ion specifically, he would not have purchased the vehicle or, at a minimum, would not have been willing to pay the amount of money he paid for the car.

**Leland Tilson—North Carolina**: Plaintiff and proposed Nationwide and North Carolina State Representative Leland Tilson is a resident and citizen of Gastonia, North Carolina. He purchased a new 2009 Chevrolet Cobalt in February 2009. Mr. Tilson has a five-year/100,000-mile warranty on the vehicle. Mr. Tilson experienced at least one shutdown in the vehicle, while driving on a highway at highway speed. It happened when the vehicle went

over a break in the asphalt, and the vehicle shutdown. Mr. Tilson, with an 18-wheeler bearing

down on him, was able to maneuver the vehicle to the side of the road to avoid an accident.

During this power failure, the power steering also failed. Mr. Tilson has had his ignition

replaced twice. The first time was in June 2013, not pursuant to the recall, because he was

unable to shut off his vehicle. The second time was in July 2014 pursuant to the recall.

Knowing what he now knows about the safety defects in many GM-manufactured vehicles, he

would not have purchased a vehicle with a safety defect.

**Jayn Roush—Ohio**: Plaintiff and proposed Nationwide and Ohio State Class

Representative Jayn Roush is a resident and citizen of Worthington, Ohio. Ms. Roush

purchased a used 2005 Saturn Ion on May 5, 2008, from Saturn West in Hilliard, Ohio, for

$14,984.59. Ms. Roush's vehicle was covered by a standard warranty that expired on August

3, 2008. Ms. Roush purchased an extended warranty, but this warranty only covers the

vehicle's powertrain. She recalls advertisements for the Saturn running frequently around the

time of her purchase. She had a general impression that GM was a quality brand and that

Saturn vehicles were safe and reliable. Ms. Roush believed her vehicle was safe and defect-

free when she purchased it. Ms. Roush's vehicle has spontaneously lost power with some

regularity. She recalls a number of discrete incidents. Her vehicle suddenly lost power three

different times on November 25, 2010, when she was driving in and around Columbus, Ohio.

The vehicle also experienced several power-loss incidents driving in and around Columbus,

Ohio, in 2013. She was able to pull over and get the vehicle to the side of the road. The

vehicle most recently shut off on Highway 315 S in Ohio on January 9, 2014. Each of Ms.

Roush's incidents involved a sudden loss of power accompanied by a "TRAC OFF" light. Ms.

Roush had her ignition switch replaced at an out-of-pocket cost of $187.50 on June 11, 2013,

in an attempt to address the power-loss problems the vehicle was experiencing, but the replacement did not fix the problem. Indeed, the car experienced a loss of power again in January of 2014. Ms. Roush attempted to participate in GM's 2014 recall of the vehicle, initiated in response to the ignition switch defects, but her ignition switch was not replaced in connection with this recall because the parts have not been available. Ms. Roush would not have purchased the vehicle had she known of the defects.

**Bonnie Taylor—Ohio**: Plaintiff and proposed Nationwide and Ohio State Class Representative Bonnie Taylor is a resident and citizen of Laura, Ohio. Ms. Taylor purchased a new 2007 Chevrolet Cobalt on December 23, 2006, from Joe Johnson Chevrolet in Troy, Ohio, for $14,417.42. At the time Ms. Taylor purchased her new Cobalt she also purchased a warranty which expired in December 2011. This was Ms. Taylor's fourth time purchasing a vehicle from Joe Johnson Chevrolet and she trusted them to provide her with a safe and reliable vehicle. Ms. Taylor did not learn of the ignition switch defects until March 2014. She scheduled the recall work on her vehicle right away and was provided a loaner vehicle. The repair work was completed on April 21, 2014. Although Ms. Taylor has not experienced the ignition shutdown while driving her Cobalt, she believes the Cobalt has too many serious safety defects for her to ever feel safe driving it again. She also feels that the value of her vehicle is severely diminished as a result of the recall. She would not have purchased this vehicle if she had known of the safety defects.

**Sharon Dorsey—Ohio**: Plaintiff and proposed Nationwide and Ohio State Class Representative Sharon Dorsey is a resident and citizen of Dayton, Ohio. Ms. Dorsey purchased a used 2004 Chevrolet Malibu in June 2007 at Reichard dealership in Dayton, Ohio, for $12,040. At the time of purchase, Plaintiff Dorsey also secured an extended warranty

which expired in 2011. Plaintiff Dorsey has experienced no less than four engine shut-offs while driving her vehicle. In one such instance, her Malibu stalled in the middle of heavy traffic with her five-year-old grandson in the vehicle. Upon returning the vehicle to Reichard on September 10, 2014, she was informed by a GM technician that he had, in fact, been able to duplicate the engine stall event she experienced. Ms. Dorsey's sister was a former GM employee and owned a Chevrolet Impala, which influenced Ms. Dorsey's desire to own a GM vehicle. However, if she had known of the defects plaguing her Chevrolet Malibu prior to purchasing the vehicle, she would not have purchased it. Ms. Dorsey relied upon the GM Malibu brand to be a safe and reliable vehicle. As a result of the vehicle defect and subsequent recalls, Ms. Dorsey has been unable to enjoy the use of her Chevrolet Malibu since June 2014, has been unable to work regularly, and has not been provided a loaner or rental vehicle while repairs are being made on her vehicle despite repeated requests. In addition, Ms. Dorsey continues to incur significant expense, inconvenience, and economic damage as a result.

**Paulette Hand—Oklahoma**: Plaintiff and proposed Nationwide and Oklahoma State Class Representative Paulette Hand is a resident and citizen of Blanchard, Oklahoma. She purchased a new 2006 Chevrolet HHR in 2006 from Frost Chevrolet, a dealership owned by her sister, in Hennessy, Oklahoma, for $24,625. She believed that GM made safe and reliable cars. Ms. Hand experienced multiple events in which her vehicle's steering locked up and the power failed. She would not have purchased or paid as much for the vehicle if she had known the truth about GM's commitment to safety and its concealment of the defects.

**William Bernick—Oregon**: Plaintiff and proposed Nationwide and Oregon State Class Representative William Bernick is a resident and citizen of Grants Pass, Oregon. Mr. Bernick purchased a used 2005 Chevrolet Cobalt on December 29, 2006, from a dealership in

Oregon for $10,750. He also purchased a vehicle service contract, and his warranty is

continuing. During the time he has owned the vehicle, Mr. Bernick has experienced power

outages and difficulties with the ignition, such as keys becoming stuck in the ignition,

inability to shift gears, inability to start the ignition, and transmission default. Mr. Bernick is

very concerned about the ignition defect and is disappointed in the way GM has handled the

recalls. He wants to see GM held accountable for putting lives at risk for so long. Had Mr.

Bernick known of the problems with his GM car, he would not have purchased it.

   **Shawn Doucette—Pennsylvania**: Plaintiff and proposed Nationwide and

Pennsylvania State Class Representative Shawn Doucette is a resident and citizen of Hamburg,

Pennsylvania. Mr. Doucette purchased a new 2007 Chevrolet Cobalt SS in September 2007

from Outten Chevrolet of Hamburg in Hamburg, Pennsylvania, for $28,000. GM should have

disclosed the ignition switch defects when Mr. Doucette purchased the vehicle. Mr. Doucette

has experienced numerous shutdowns and power loss events while driving. He would not

have purchased the vehicle had he known of the defects.

   **Shirley Gilbert—Pennsylvania**: Plaintiff and proposed Nationwide and Pennsylvania

State Class Representative Shirley Gilbert is a resident and citizen of Frackville, Pennsylvania.

She purchased a new 2008 Chevrolet Cobalt in Pennsylvania in June 2008 for $16,000. Her

vehicle was covered by a warranty when she purchased it. The warranty expired in June 2013.

She purchased the car, in part, because the dealership highlighted the safety features, namely

the car's eight airbags. On two or three occasions she has experienced her vehicle shutting

down immediately after it started. She would not have purchased her vehicle, or she would

have paid less for it, had she known about its defects.

**Garrett Mancieri—Rhode Island**: Plaintiff and proposed Nationwide and Rhode Island State Class Representative Garrett Mancieri is a resident and citizen of Woonsocket, Rhode Island. Mr. Mancieri purchased a new 2007 Pontiac G5 on November 24, 2006 in Woonsocket, Rhode Island, for $16,138. Mr. Mancieri received a safety recall notice pertaining to his vehicle in March 2014. He promptly requested that the dealership perform the recall repair, but was told that he would be put on a waiting list because the dealership was waiting on the parts from GM. The dealership did not provide Mr. Mancieri with a loaner car, so he had to continue driving the vehicle. The recall notice received by Mr. Mancieri did not inform him of the right to a loaner vehicle, nor did the GM dealership volunteer such information. His vehicle was not scheduled to be repaired until September 18, 2014. Mr. Mancieri believes he has been damaged by the diminution of value in his vehicle due to the ignition switch defect. Mr. Mancieri also believes he has been damaged in the amount of the reasonable value of the rental car he should have received from March 2014 through the time his vehicle is finally repaired by GM.

**Annette Hopkins—South Carolina**: Plaintiff and proposed Nationwide and South Carolina State Class Representative Annette Hopkins is a resident and citizen of Bishopville, South Carolina. Ms. Hopkins purchased a used 2003 Chevrolet Impala LS on December 31, 2004, at Newsome Automotive in Florence, South Carolina, for $12,749.32. Ms. Hopkins first learned of a recall affecting her vehicle when she received a recall notice in September 2014. Although she has not yet experienced any incidents of sudden power loss with her vehicle, now that she knows about the defects and the recalls, Ms. Belford asserts that she would never have purchased the Chevrolet Impala had she known about the defects and GM's indifference with regard to the safety and reliability of its vehicles.

-41-

**Norma Lee Nelson—South Dakota**: Plaintiff and proposed Nationwide and South Dakota State Class Representative Norma Lee Nelson is a resident and citizen of Huron, South Dakota. Ms. Nelson purchased a used 2007 Chevrolet Cobalt in September 2007 from a dealership in Watertown, South Dakota, for $14,000. Her vehicle came with a standard warranty at the time of purchase that expired in 2010. She has experienced numerous ignition problems with the vehicle, and at times it requires significant force to turn the steering wheel. Ms. Nelson has removed all of the keys from her keychain, but remains nervous about driving the car. Ms. Nelson has had difficulty starting the vehicle on numerous occasions. Had she known that the Cobalt contained a defective ignition switch, Ms. Nelson would not have purchased the vehicle.

**Helen A. Brown—Tennessee**: Plaintiff and proposed Nationwide and Tennessee State Class Representative Helen A. Brown is a resident and citizen of Franklin, Tennessee. She purchased a new 2006 Chevrolet Cobalt from a GM dealer, with an extended warranty, on February 1, 2006, for approximately $10,000. Ms. Brown's vehicle lost power at least three times, twice in 2007 and once in 2014. She does not trust her car and would not have purchased the vehicle or would have paid less if the truth had been disclosed about the quality and safety of GM vehicles.

**Lisa William—Texas**: Plaintiff and proposed Nationwide and Texas State Class Representative Lisa William is a resident and citizen of Amarillo, Texas. Ms. William purchased a new 2007 Saturn Ion in 2007 in Amarillo, Texas, for approximately $16,000. Her vehicle had a standard warranty, which she believes was for five years. Ms. William purchased a Saturn because she had owned one in the past and believed the brand to be one she could trust. She has experienced problems with her airbag light turning on unexpectedly

-42-

Case 1:14-md-02543-JMF    Document 347    Filed 10/14/14    Page 61 of 150

and difficulty turning on her vehicle. These problems have caused her concern and she does not feel safe driving her vehicle. She is a college student and provides rides from time to time for certain students. She is now concerned about having other students or anyone else in her vehicle because of the safety defect. She also frequently drives out of town and is afraid of her vehicle shutting down. Ms. William had her ignition switch replaced on September 23, 2014. She wonders if she can trust the "repair." Had she known about the problems with her GM vehicle, she would not have purchased the car.

**Blair Tomlinson, D.D.S.—Utah**: Plaintiff and proposed Nationwide and Utah State Class Representative Blair Tomlinson, D.D.S., is a resident and citizen of Kaysville, Utah. Dr. Tomlinson purchased a new 2005 Chevrolet Cobalt from Murdock Chevrolet in Bountiful, Utah, in August 2005 for approximately $15,000. Throughout the course of his ownership of the Cobalt, Dr. Tomlinson and his family members have experienced various issues consistent with the ignition switch defect, including unexpected shutdowns. In one particular incident, Dr. Tomlinson's daughter was driving on the highway in Logan, Utah, when she accidentally bumped the ignition switch with her knee and the vehicle lost power. She was able to get the vehicle safely to the side of the road, but was terrified by the incident. After hearing about the recall in the news in March 2014, Dr. Tomlinson attempted to reach GM, but he had great difficulty before eventually being informed he would receive a letter if his car was recalled. He also immediately took his Cobalt to Young Chevrolet in Layton, Utah, to address the issue. However, the dealership informed him they did not have the recall parts available to fix the defect. Mr. Tomlinson continues to be concerned about the defects in his Cobalt and the safety of his family. Had he known of the problems with his GM car, he would not have purchased it or would have paid less.

-43-

**Erinn Salinas—Virginia**: Plaintiff and proposed Nationwide and Virginia State Representative Erinn Salinas is a resident and citizen of Virginia Beach, Virginia. She purchased a new 2008 Chevrolet Cobalt in April 2008. The vehicle was purchased with the standard manufacturer's warranty. Ms. Salinas purchased her vehicle after seeing television advertisements about the vehicle and also about a GM rebate. The salesperson at the dealership also told Ms. Salinas that the Cobalt was a very safe vehicle. Ms. Salinas experienced at least one shutdown while driving the vehicle. She was able to steer the vehicle to the side of the road and then to turn it back on. Once she learned about the safety recall in March or April of 2014, she stopped driving her vehicle because she believed it was not safe to drive. She was not given a rental vehicle to use and had to depend on her sister or father for transportation. On July 18, 2014, the ignition switch was replaced in her vehicle pursuant to the recall. Knowing what she now knows about the safety defects in many GM-manufactured vehicles, she would not have purchased the vehicle.

**Stephanie Renee Carden—West Virginia**: Plaintiff and proposed Nationwide and West Virginia Class Representative Stephanie Renee Carden is a resident and citizen of Huntington, West Virginia. Ms. Carden purchased a new 2004 Saturn Ion 2 on July 22, 2004, at Saturn of Hurricane in Hurricane, West Virginia, for $22,181. Ms. Carden's vehicle came with the standard manufacturer's warranty. Ms. Carden has experienced manifestation of the defect on more than one occasion. She has twice experienced loss of power due to the ignition switch defect. Shortly after the second power-loss incident, Ms. Carden's vehicle had an issue where it would not restart, causing here to have to have the vehicle towed to a service station. If she had known what she now knows about the safety defects in many GM-manufactured vehicles, Ms. Carden would not have purchased the vehicle.

**Les Rouse—Wisconsin**: Plaintiff and proposed Nationwide and Wisconsin Class Representative Les Rouse is a resident and citizen of LaCrosse, Wisconsin. Mr. Rouse purchased a new 2004 Saturn Ion 2 in October 2004 in LaCrosse, Wisconsin, for approximately $16,000. His car was covered under the manufacturer's standard warranty at the time of purchase, and Mr. Rouse also believes he purchased some kind of extended warranty. At the time of purchase, Mr. Rouse and his wife visited the dealer to learn more about the Ion. There, the dealership had Ions on display to demonstrate the safety and reliability of the vehicle. The safety and reliability of the Ion had a large impact on Mr. Rouse's decision to buy the car. Mr. Rouse experienced a loss of electrical power in his vehicle while driving and he is concerned about driving it due to the safety risks it poses. He also believes the value of his car has diminished as a result of the ignition switch defects. Mr. Rouse learned of the ignition switch defects in March 2014, but it took until May 2014 for the parts to arrive and to repair his car under the recall. Mr. Rouse would not have purchased his vehicle had he known about the ignition switch defects in his GM vehicle.

## II.  **Defendant**

Defendant General Motors LLC ("New GM") is a foreign limited liability company formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan. The sole member and owner of General Motors LLC is General Motors Holding LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan. The sole member and owner of General Motors Holdings LLC is General Motors Company. General Motors Company is a Delaware Corporation, which has its principal place of business in the State of Michigan, and is a citizen of the States of Delaware and Michigan. New GM was incorporated in 2009 and, effective on July 10, 2009, acquired substantially all assets and

assumed certain liabilities of General Motors Corporation through a Section 363 sale under

Chapter 11 of the U.S. Bankruptcy Code.

Among the liabilities and obligations expressly assumed by New GM are the

following:

> From and after the Closing, Purchaser [New GM] shall comply
> with the certification, reporting and recall requirements of the
> National Traffic and Motor Vehicle Act, the Transportation Recall
> Enhancement, Accountability and Documentation Act, the Clean
> Air Act, the California Health and Safety Code, and similar laws,
> in each case, to the extent applicable in respect of vehicles and
> vehicle parts manufactured or distributed by [Old GM].

New GM also expressly assumed:

> [A]ll Liabilities arising under express written warranties of [Old
> GM] that are specifically identified as warranties and delivered in
> connection with the sale of new, certified used or pre-owned
> vehicles or new or remanufactured motor vehicle parts and
> equipment (including service parts, accessories, engines and
> transmissions) manufactured or sold by [Old GM] or Purchaser
> prior to or after the Closing and (B) all obligations under Lemon
> Laws

Finally, New GM also expressly assumed "all Liabilities arising out of, relating to, in

respect of, or in connection with the use, ownership or sale of the Purchased Assets after the

closing." Those assets included all contracts of Old GM, including its contracts with dealers

and service centers.

## FACTUAL ALLEGATIONS

**I.** **There Are Serious Safety Defects in Millions of Old GM Vehicles that New GM Has
Continued to Conceal from Consumers.**

97.     So far, in 2014, New GM has announced over 60 recalls affecting over

27 million GM-branded vehicles from model years 1997-2014. These recalls include millions

of vehicles originally made and sold by Old GM. The numbers of recalls and serious safety

defects are unprecedented, and lead to only one conclusion: Old GM and New GM have been

1197532.10

incapable of building safe, defect-free vehicles, and they have systematically refused to remedy (and instead have fraudulently concealed) defects once the vehicles were on the road.

98.    The available evidence shows a common pattern: Old GM knew about an ever-growing list of serious safety defects in millions of its vehicles, but concealed those defects from consumers and regulators in order to cut costs, boost sales, and avoid the cost and publicity of recalls.

99.    The company New GM inherited from Old GM in 2009 valued cost-cutting over safety, actively discouraged its personnel from taking a "hard line" on safety issues, avoided using "hot" words like "stall" that might attract the attention of NHTSA, and trained its employees to avoid the use of words such as "defect" or "problem" that might flag the existence of a safety issue. New GM affirmatively and independently continued and ratified these practices.

100.    The Center for Auto Safety recently stated that it has identified 2,004 death and injury reports filed by New GM with federal regulators in connection with vehicles that have recently been recalled. Most or all of these deaths and injuries would have been avoided had Old GM complied with its TREAD Act obligations instead of concealing the truth.

101.    The many defects concealed by Old GM affected key safety systems in its vehicles, including the ignition, power steering, and airbag systems.

102.    The available evidence shows a consistent pattern: Old GM learned about a particular defect and, often at the prodding of regulatory authorities, "investigated" the defect and decided upon a "root cause." Old GM then took minimal action – such as issuing a carefully worded "Technical Service Bulletin" to its dealers, or even recalling a very small number of the vehicles with the defect. All the while, the true nature and scope of the defects

were kept under wraps, defective vehicles remained on the road, and Old GM enticed Class members to purchase its vehicles by touting their safety, quality, and reliability.

103. After July 11, 2009, New GM would continue this very same pattern of conduct and concealment, for over five more years.

### A.    **The Ignition Switch Defects**

104. The Defective Vehicles all contain substantially similar ignition switch and cylinders, with the key position of the lock module located low on the steering column, in close proximity to a driver's knee. The ignition switch systems on these vehicles are prone to fail during ordinary and foreseeable driving situations.

105. Specifically, the ignition switches can inadvertently move from the "run" to the "accessory" or "off" position at any time during normal and proper operation of the Defective Vehicles. The ignition switch is most likely to move when the vehicle is jarred or travels across a bumpy road; if the key chain is heavy; if a driver inadvertently touches the ignition key with his or her knee; or for a host of additional reasons. When the ignition switch fails, the vehicle suddenly and unexpectedly loses engine power, power steering, and power brakes, and certain safety features are disabled, including the vehicle's airbags. This leaves occupants vulnerable to crashes, serious injuries, and death.

106. The ignition switch systems at issue are defective in at least three major respects. First, the switches are weak; due to a faulty "detent plunger," the switch can inadvertently move from the "run" to the "accessory" position. Second, because the ignition switch is placed low on the steering column, the driver's knee can easily bump the key (or the hanging fob below the key) and cause the switch to inadvertently move from the "run" to the "accessory" or "off" position. Third, when the ignition switch moves from the "run" to the "accessory" or "off" position, the vehicle's power is disabled. This also immediately disables

-48-

the airbags. Thus, when power is lost during ordinary operation of the vehicle, a driver is left

without the protection of the airbag system even if he or she is traveling at high speeds.

107.    Vehicles with defective ignition switches are therefore unreasonably prone to

be involved in accidents, and those accidents are unreasonably likely to result in serious

bodily harm or death to the drivers and passengers of the vehicles.

108.    Indeed, New GM itself has acknowledged that the defective ignition switches

pose an "increas[ed] risk of injury or fatality" and has linked the ignition defect to at least

thirteen deaths and over fifty crashes in the vehicles subject to the February recall alone. Ken

Feinberg, who was hired by New GM to settle wrongful death claims arising from the ignition

switch defects, has already linked the defect to twenty-seven deaths, and has over 1300 death

and injury claims still to review. The Center for Auto Safety studied collisions in just two

vehicle makes, and linked the defect to over 300 accidents. There is every reason to believe

that as more information is made public, these numbers will continue to grow.

109.    Alarmingly, Old GM knew of the deadly ignition switch defects and their

dangerous consequences from at least 2001, but concealed its knowledge from consumers and

regulators. New GM did the same, and, incredibly, it was not until 2014 – more than a decade

later – that the ignition switch recalls were first announced.

## II.    Old GM's Fraudulent Conduct with Respect to the 2.19 Million Defective Vehicles Subject to the February/March Recall.

### A.    Old GM Knew That There Were Failures With The Ignition Switch Design In 2001, And Concealed These Material Facts, Putting The Safety Of The Class At Serious Risk Of Harm.

110.    Old GM knew that the ignition switches to be used in its vehicles were

defective well before the vehicles were ever sold to the public. In the late 1990s and early

2000s, Old GM and one of its suppliers, Eaton Mechatronics, finalized the specifications for

the ignition switch for the Saturn Ion. Eaton Corporation sold its Vehicle Switch/Electronic

Division to Delphi Automotive Systems ("Delphi") on March 31, 2001. Delphi went on to

manufacture the defective ignition switch for Old GM.

111.    In 2001, years *before* the vehicles were ever sold and available to customers,

Old GM privately acknowledged in a pre-production report for the Saturn Ion that there were

serious problems, including engineering test failures, with the ignition switch. During the pre-

production development of the 2003 Saturn Ion, Old GM engineers learned that the ignition

switch could inadvertently move from the "Run" position to the "Accessory" or "Off"

position. In a section of an internal report titled "Root Cause Summary," Old GM engineers

identified two "causes of failure" namely, "[l]ow contact force and low detent plunger force."

The "detent" is part of the ignition switch's inner workings that keeps the switch from rotating

from one setting to another unless the driver turns the key.

112.    The Old GM Design Release Engineer assigned to the ignition switch was Ray

DeGiorgio. DeGiorgio had worked at Old GM since 1991, and spent his career focused on

vehicle switches. During early testing of the ignition switch, DeGiorgio noticed problems with

the prototypes provided by Delphi. In September 2001, DeGiorgio corresponded with

representatives of Koyo, the supplier of the Ion steering column into which Delphi's switch

was installed. In his correspondence, DeGiorgio stated he learned that 10 of 12 prototype

switches from Delphi "[f]ailed to meet engineering requirements," and the "failure is

significant," adding that Old GM "must ensure this new design meets engineering

requirements." This significant failure of the ignition switch design was not corrected by Old

GM; moreover, it was suppressed and concealed by the failure to remedy and disclose.

**B.** **Old GM Approved Production Of Ignition Switches In 2002 Despite Knowing That They Had Failed In Pre-Production Testing And Did Not Meet Old GM's Internal Design Specifications.**

113.    Old GM approved production of the ignition switches despite knowing that they did not meet Old GM's own engineering design specifications.

114.    Validation testing conducted by Delphi in late 2001 and early 2002 revealed that the ignition switch consistently failed to meet the torque values in the internal specification. These tests, conducted on various dates in the fall of 2001, included a test to determine whether the torque required to rotate the switch from Run to Accessory complied with the specification. The January 2002 test report denoted the design failure by stating "Not OK" next to each result.

115.    In February 2002, Delphi, Old GM's ignition switch supplier for the recalled vehicles, asked Old GM to approve production for the ignition switch and submitted a Production Part Approval Process ("PPAP") request. Even though testing of the ignition switch revealed that it did not meet the original specifications set by Old GM and that internal testing showed the switch would fail, Old GM approved it. The defective switch was put into Old GM vehicles unbeknownst to the Class.

**C.** **Old GM Received Complaints And Reports On The Stalling Of Vehicles Due To The Defective Ignition Switch Turning Off And Causing Moving Stalls, And Concealed That Material Information From The Class.**

116.    In 2003, almost immediately after the first Old GM vehicles with the defective ignition switches were sold to the public, GM started receiving complaints regarding loss of power while driving with no Diagnostic Trouble Codes ("DTC") being recorded in 2003 Saturn Ions involving the same ignition switch and steering column. In 2003, an internal report documented an instance in which the service technician observed a stall while driving.

-51-

The service technician noted that the weight of several keys on the key ring had worn out the ignition switch. The ignition switch was replaced and the matter closed.

117. Old GM employees were also having problems with their own model year ("MY") 2003 and 2004 Ions that contained the switch. In a January 9, 2004 report received from Old GM employee, Gerald A. Young, concerning his MY 2003 Saturn Ion, he informed Old GM, "[t]he ignition switch is too low. All other keys and the key fob hit on the driver's right knee. The switch should be raised at least one inch toward the wiper stalk," characterizing it as "a basic design flaw [that] should be corrected if we want repeat sales."

118. In a February 19, 2004 report concerning his MY 2004 Saturn Ion, Old GM employee, Onassis Matthews, stated: "The location of the ignition key was in the general location where my knee would rest (I am 6' 3" tall, not many places to put my knee). On several occasions, I inadvertently turn [sic] the ignition key off with my knee while *driving down the road*. For a tall person, the location of the ignition key should be moved to a place that will not be inadvertently switched to the off position."

119. In an April 15, 2004 report concerning his MY 2004 Saturn Ion, Old GM employee, Raymond P. Smith, reported experiencing an inadvertent shut-off: "I thought that my knee had inadvertently turned the key to the off position."

120. Old GM concealed these and other similar manifestations of the defective ignition switch.

**D.    Old GM Engineers Understood The Need To Correct The Ignition Switch Defect In 2004 But Failed To Act To Disclose Or Correct The Defect.**

121. In 2004, Old GM knew that the ignition switch posed a safety concern that needed to be fixed. For example, in October 2004, Old GM internally documented incidents in which Old GM engineers verified that the ignition switch was turned to the off position as a

-52-

result of being grazed by the driver's knee. The cause of the problem was found to be the "low key cylinder torque/effort."

122.   In 2004, Old GM was finalizing plans to begin production and sale of the Chevrolet Cobalt. The Chevrolet Cobalt was designed using the same ignition switch that was used in the Saturn Ion. As the Chevrolet Cobalt moved into production, it too—like its Saturn Ion predecessor— experienced inadvertent ignition switch shut-offs that resulted in moving stalls. Old GM already knew that when the ignition switch was inadvertently turned to off or accessory—by design—the airbags would not deploy. Instead of implementing a solution to the safety problem, the engineers debated partial solutions, short-term fixes, and cost.

123.   Around the time of the Cobalt launch, more reports surfaced of moving stalls caused by a driver bumping the key fob or chain with his knee. At a 2004 press event associated with the launch of the Cobalt in Santa Barbara, California, a journalist informed Doug Parks, the Cobalt Chief Engineer, that while adjusting his seat in the Cobalt he was test driving, the journalist had inadvertently turned off the car by hitting his knee against the key fob or chain. Old GM's Doug Parks asked Gary Altman, the Program Engineering Manager, to follow up on the complaint by trying to replicate the incident and to determine a fix.

124.   Old GM engineers independently encountered the ignition switch defect in early test drives of the Chevy Cobalt, before it went to market. The Old GM engineers pinpointed the problem of engine shut-off in the Cobalt and were "able to replicate this phenomenon during test drives." Despite this knowledge, Old GM told no one.

125.   According to Old GM, its engineers "believed that low key cylinder torque effort was an issue and considered a number of potential solutions." But after considering the

cost and amount of time it would take to develop a fix, Old GM did not implement a fix, and
the defective vehicles went to market.

126.    As soon as the Chevrolet Cobalt hit the market in late 2004, Old GM
immediately started getting similar complaints about sudden loss of power incidents,
"including instances in which the key moved out of the 'run' position when a driver
inadvertently contacted the key or steering column." Old GM engineers determined that the
low torque in the ignition switch could cause the key to move from the "run" to the "accessory"
or "off" position under ordinary driving conditions with normal key chains because "detent
efforts on ignition switch are too low, allowing [the] key to be cycled to [the] off position
inadvertently." Specifically, in February 2005, GM engineers concluded that "there are two
main reasons that we believe can cause a lower effort in turning the key: a lower torque detent
in the ignition switch … [and a] low position of the lock module [on] the [steering] column."

127.    From the outset, Old GM employees, customers, and members of the
automotive press found repeatedly that they would hit the key fob or keychain with their knee,
and the car would turn off. As noted, Old GM received some of these reports before the
Cobalt's launch, and others afterwards. Despite the many complaints describing the moving
stalls and customers' safety concerns, Old GM covered up the defect and made safety
assurances to the driving public, its customers, and the Class, upon which they reasonably
relied. Old GM received reports from dealers documenting this problem and advised dealers
to tell customers to modify their key chains. For example, in response to a customer complaint
in December 2004, GM internally noted:

RECOMMENDATION/INSTRUCTIONS:

There is potential for the driver to inadvertently turn off the
ignition due to low key ignition cylinder torque/effort. The concern

-54-

> is more likely to occur if the driver is short and has a large heavy
> key chain.
>
> In the cases this condition was documented, the driver's knee
> would contact the key chain while the vehicle was to ruing the
> steering column was adjusted all the way down. This is more likely
> to happen to a person that is short as they will have the seat
> positioned closer to the steering column.
>
> In cases that fit this profile, question the customer thoroughly to
> determine if this may the cause. The customer should be advised of
> this potential and to take steps, such as removing unessential items
> from their key chain, to prevent it.

GM then closed the complaint file and kept this "potential" problem secret.

128.    Old GM's Manager of Product Safety Communications publicly announced
and reassured customers that there was no safety issue with Cobalt moving stalls: "When this
happens, the Cobalt is still controllable. The engine can be restarted after shifting to neutral."

129.    DeGiorgio learned about the Cobalt press event moving stall and was
approached by an Old GM engineer who suggested that DeGiorgio could "beef up" the
ignition switch and increase the torque.

130.    On May 17, 2004, during a NHTSA visit to the GM Milford Proving Grounds,
Old GM gave a presentation titled "Engine Stall & Loss of Assist Demonstration." At a June 3,
2004, meeting with NHTSA, GM represented to NHTSA that in assessing a given stall, it
considered severity, incident rate, and warning to the driver. But drivers had no such warning,
certainly not from Old GM. NHTSA told Old GM that where number of stalls were high, the
factors should be considered, but did not immunize Old GM from a safety recall.

131.    On November 22, 2004, engineers in Old GM's High Performance Vehicle
Operations group wrote DeGiorgio and informed him that their group had repeatedly
experienced a moving stall during a track test of the Cobalt SS (the high-performance version
of the Cobalt) when the driver's knee "slightly graze[d]" the key fob. An Old GM engineer

-55-

forwarded this complaint to DeGiorgio, and explicitly asked DeGiorgio whether there was "a

specification on the force/torque required to keep that switch in the RUN position." He also

asked DeGiorgio: "If so, is the switch meeting that spec? If not, what are the options for

implementing a stronger spring?"

**E.**   **Old GM Closed Its First Internal Investigation With No Action Because Of
Cost.**

132.   Despite the serious safety problem posed by the ignition switch defect, Old

GM took no action to correct the defect and instead covered it up. As set forth above, in the

summer and fall of 2004, as the Chevrolet Cobalt moved into the production stage, engineers

observed a number of moving stalls caused by the ignition switch defect.

133.   On November 19, 2004, Old GM personnel opened an engineering inquiry

known as a Problem Resolution Tracking System (PRTS) to address the complaint that the

Cobalt could be "keyed off with knee while driving." At this time, PRTS issues were analyzed

by a Current Production Improvement Team (CPIT). The CPIT that examined the Cobalt

issue beginning in late 2004 included a cross-section of business people and engineers,

including Parks, Old GM engineer Gary Altman and Lori Queen, Vehicle Line Executive for

the Cobalt.

134.   In early 2005, and as part of the PRTS, Parks sent an email with the subject,

"Inadvertent Ign turn-off." In the email, Parks wrote, "For service, can we come up with a

'plug' to go into the key that centers the ring through the middle of the key and not the

edge/slot? This appears to me to be the only real, quick solution."

135.   After considering this and a number of other solutions (including changes to

the key position and measures to increase the torque in the ignition switch), the CPIT

examining the issue decided to do nothing. Indeed, by March 2005, the GM Cobalt Program

Engineering Manager ("PEM") issued a "directive" to close the 2004 PRTS "with no action."[5]

According to Old GM's internal documents, the design change was refused because of time,

i.e., because the "lead-time for all solutions is too long," and money, i.e., because the "tooling

cost and piece price are too high…".[6]

136.  The 2004 PRTS was closed because "none of the solutions represents an

acceptable business case"—a standard phrase used by GM personnel for closing a PRTS

without action because of cost.[7] In deciding to do nothing to correct the serious safety defect

that existed in its vehicles, Old GM simply shrugged off the issue entirely. What is more, Old

GM downplayed the severity of the safety threat, rating the specter of a moving stall (even at

highway speeds) with a severity level of 3—on a scale of 1 (most severe) to 4 (least severe).

Old GM did not explain what, if any, criteria exist for an "acceptable business case" or

otherwise justify its decision to do nothing. David Trush, the DRE for the ignition cylinder,

explained that to present an "acceptable business case," a solution should solve the issue, be

cost effective, and have an acceptable lead time to implement the change.[8] But one of the very

solutions proposed by Thrush—changing the key from a slot to a hole configuration—would

have cost less than one dollar per vehicle.

137.  Here, as elsewhere in the story of the ignition switch defect, the structure

within Old GM was one in which no one was held responsible and no one took responsibility.[9]

---

[5] GMHEC000001735 (Nov. 19, 2004).
[6] GMHEC000001735.
[7] GMNA PRTS+ Closure Codes (Close w/out Action) (Effective Dec. 2007) [DOC ID GMCB-000000977300].
Valukas Report at 69, n. 271.
[8] Valukas Report at 69.
[9] Valukas Report at 71.

1197532.10

**F.     Complaints Continued And Serious Accidents Came To Old GM's Attention In 2005, While NHTSA Began To Investigate Death Cases Involving Chevy Cobalts.**

138.    After the Cobalt program team closed the November 19, 2004, PRTS with no action taken, additional complaints of Cobalt stalls and inadvertent ignition switch shut-offs continued to come into GM's Brand Quality Group.[10]

139.    In March 2005, Jack Weber, a GM engineer, reported that during "heel-toe downshifting" in a Cobalt SS with a manual transmission (a high-performance Cobalt model), his knee contacted the key fob and key ring, which caused "pulling on the key to move it to the 'Off' position."[11]

140.    In May 2005, a customer demanded that Old GM repurchase his Cobalt. The complaint was that the ignition switch shut off during normal driving conditions with no apparent contact between the driver's knee and the key chain or fob.[12] Old GM Brand Quality Manager Steven Oakley forwarded this information internally at Old GM, stating that the ignition switch "goes to the off position too easily shutting the car off."[13] DeGiorgio was one of the Old GM personnel who received this e-mail chain, which effectively stated that the customer's car, as well as others at the dealership, had ignition switches with insufficient

---

[10] Valukas Report at 75.

[11] E-mail from Jonathan L. Weber, GM, to Rajiv Mehta, GM, et al. (March 9, 2005), at 22 (attached to FPR0793/2005/US) [DOC ID GMHEC000019677]. Valukas Report at 76, n. 303.

[12] E-mail from Steven Oakley, GM, to Arnaud Dessirieix, GM (May 2, 2005) [DOC ID 000077753011; GMNHTSA000337483]. Valukas Report at 76, n. 308.

[13] E-mail from Steven Oakley, GM, to Arnaud Dessirieix, GM (May 2, 2005) [DOC ID 000077753011; GMNHTSA000337483]. Valukas Report at 76, n. 309.

torque and cause the car to shut off while driving.[14] This e-mail specifically included a request to DeGiorgio for an ignition switch "at the high end of the tolerance spec."[15]

    141.    By May 2005, Old GM personnel thus had multiple reports of moving stalls and were receiving buyback requests for Cobalts following complaints that consumers made to dealers.[16]

    142.    The problem of moving stalls and the ignition switch turning off in Old GM vehicles continued throughout 2005, and was described both within Old GM and in the media. In May and June 2005, reviewers from two newspapers, including the New York Times, wrote articles detailing how they or a family member had inadvertently turned a Cobalt off with their knees.[17] On May 26, 2005, a writer for the Sunbury Daily Item in Pennsylvania reviewed the Cobalt and reported that "[u]nplanned engine shutdowns happened four times during a hard-driving test last week. . . . I never encountered anything like this in 37 years of driving and I hope I never do again." In furtherance of covering up a material safety hazard, one of Old GM's in-house vehicle safety lawyers e-mailed a colleague to marshal evidence for the press that the risk of moving stalls was "remote" and "inconsequential." He wrote that he did not want to be criticized for failing to "defend a brand new launch."[18]

---

[14] E-mail from Joseph Joshua, GM, to Joseph Manson, GM, Raymond DeGiorgio, GM, et al. (May 4, 2005) [DOC ID 000077753011; GMNHTSA000337483]. Valukas Report at 77, n. 312.

[15] E-mail from Joseph Joshua, GM, to Steven Oakley, GM, et al. (May 4, 2005) (noting "[w]e have asked the ign switch DRE for a switch at the high end of the tolerance spec") [DOC ID 000077753011; GMNHTSA000337483]. Valukas Report at 76-77, n. 310.

[16] J&B Interview of Steven Oakley, May 23, 2014. Valukas Report at 78, n. 315.

[17] Jeff Sabatini, "Making a Case for Ignitions That Don't Need Keys," *New York Times*, June 19, 2005; *see also* Christopher Jensen, "Salamis, Key Rings and GM's Ongoing Sense of Humor," *Plain Dealer (Cleveland)*, June 26, 2005.

[18] Valukas Report at 86.

143.    In June 2005, a Senior Delphi Project Engineer stated in an "e-mail that the "Cobalt is blowing up in [GM's] face in regards to the car turning off with the driver's knee."[19]

144.    An Old GM customer filed the following complaint about a 2005 Cobalt prone to moving stalls on June 29, 2005:

> Dear Customer Service:
>
> This is a safety/recall issue if ever there was one.… The problem is the ignition turn switch is poorly installed. Even with the slightest touch, the car will shut off while in motion. I don't have to list to you the safety problems that may happen, besides an accident or death, a car turning off while doing a high speed …[20]

145.    In July 2005, a 2005 Chevrolet Cobalt crashed in Maryland, killing the teenage driver, Amber Rose.[21] Calspan Crash Data Research Center was assigned by the NHTSA Special Crash Investigation Program to conduct a Special Crash Investigation (or "SCI"), which found "that the frontal airbag system did not deploy" and the "[Sensing Diagnostic Module (or "SDM")] data indicated that the 'vehicle power mode status' was in 'Accessory.'"[22] The August 15, 2005, SCI report found that the vehicles' SDM data recorded the "vehicle power mode status" of the ignition switch had shifted from "run" to "accessory" just before the crash. NHTSA continued the SCI and Old GM failed to report the crash to

---

[19] Valukas Report at 88.
[20] Customer complaint (June 29, 2005) [DOC ID 000014669078; GMNHTSA000540683]. Valukas Report at 89, n. 379.
[21] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation Case No. CA05-049, Vehicle: 2005 Chevrolet Cobalt (July 2005) (the "2005 SCI Report").
[22] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation Case No. CA05-049, Vehicle: 2005 Chevrolet Cobalt (July 2005) (the "2005 SCI Report").

Case 14-md-02543-JMF Document 547 Filed 10/14/14 Page 79 of 150

NHTSA until the third quarter of 2005.[23] Upon information and belief, Old GM subsequently entered into a confidential settlement agreement with the victim's mother.

146.     Inside Old GM, the defect was raised with the Product Investigations ("PI") unit. The PI unit was charged with solving significant engineering problems, including safety problems; it was the primary unit charged with investigating and resolving potential safety defects.[24] Old GM Product Investigations Manager Doug Wachtel assigned PI employee Elizabeth Kiihr to investigate the Cobalt ignition switch shut-off. Wachtel's team looked at early data from the field and found 14 incidents related to the ignition switch. The PI group also tried to recreate the problem themselves. Doug Wachtel and Gay Kent drove a Cobalt around Old GM's property in Warren, Michigan. Gay Kent had a long and heavy key chain, and was able to knock the ignition from Run to Accessory simply by moving her leg so that her jeans caused friction against the fob.[25] Wachtel also reproduced the stall in the Cobalt test drive by contact with the key chain.[26]

147.     Notwithstanding the media reporting, the customer complaints, and its replication of moving stalls in the field, the PI team did not recommend a safety recall on vehicles with the ignition switch defect.[27] Old GM knew that a defect existed in its vehicles, but did nothing to disclose the truth or warn consumers or the Class, nor did Old GM correct the defect in vehicles that it had already sold, or in vehicles it continued to manufacture, sell, warrant, and represent as safe.

---

[23] Letter from Christina Morgan, Chief, Early Warning Division, Office of Defects Investigation to Gay P. Kent, Director, General Motors Corp. (Mar. 1, 2006) and Letter to Christina Morgan from Gay P. Kent, Director, Product Investigations (Apr. 6, 2006), (GMHEC 00198137-198210); (GMHEC00197893).
[24] Valukas Report at 86.
[25] TREAD Search Results (June 28, 2005) [DOC ID 000005586004; DOC ID 000005586005; DOC ID 000005586006]. Valukas Report at 86-87, n. 367.
[26] Valukas Report at 87.
[27] Valukas Report at 87.

**G.**   **Old GM Engineers Proposed Design Modifications To The Ignition Switch In 2005 That Were Rejected By Old GM Management On The Basis Of Cost.**

148.    Old GM's knowledge of the serious safety problem grew, but still there was no disclosure. In February 2005, as part of the 2004 PRTS that avoided the word "stall," Old GM engineers met to analyze how to address the ignition switch defect.[28] Indeed, between February 2005 and December 2005, Old GM opened multiple PRTS inquiries regarding reports of power failure and/or engine shutdown in the affected vehicles.

149.    Old GM engineers internally recognized that there was a need to do something in order to address the ignition switch defect. For example, Old GM engineers were directed to investigate a possible key slot change as "containment" of the defect, including development cost and time estimates.[29]

150.    In May 2005, PRTS N182276 (the "2005 PRTS") was opened by Old GM to analyze the ignition switch in the 2005 Chevrolet Cobalt following continued customer complaints that the "vehicle ignition will turn off while driving."[30] Old GM acknowledged in the 2005 PRTS that it had previously been faced with the same issue in the 2004 PRTS and "[d]ue to the level of buyback  activity that is developing in the field, Brand Quality requests that the issue be reopened."[31] In other words, customers were asking Old GM to take back the defective cars while Old GM said nothing to customers or the Class about the safety risks. Old GM continued to market and warrant the vehicles as safe. The 2005 PRTS proposed that Old

---

[28] GMHEC000001733 (Nov. 19, 2004).
[29] GMHEC000001734 (Nov. 19, 2004).
[30] 2005 PRTS, originated May 17, 2005, GMHEC000001742-54.
[31] GMHEC000001743.

GM re-design the key head from a "slotted" to a "hole" configuration. After initially

approving the proposed fix, Old GM reversed course and again declined to implement it.[32].

151.    As part of one of the myriad PRTS inquiries opened in 2005, Quality Brand

Manager Steve Oakley asked William Chase, an Old GM warranty engineer, to estimate the

warranty impact of the ignition switch defect in Cobalt vehicles. Chase estimated that for

Cobalt and G5 vehicles on the road for 26 months, 12.40 out of every 1,000 vehicles would

experience inadvertent power failure while driving. Still, Old GM did nothing.

152.    At a June 7, 2005, Vehicle And Process Integration Review ("VAPIR")

meeting at Old GM, the Cobalt VAPIR team discussed potential solutions to the inadvertent

shut-off issue. Around this same time, DeGiorgio was asked to propose a change to the

ignition switch that would double the torque required to turn the switch.[33] DeGiorgio

identified two possibilities. First, he proposed using a switch under development for the

Saturn Vue and the Chevrolet Equinox (the "GMT 191"). Because the GMT 191 switch was

superior to the current ignition switch both electrically and mechanically, DeGiorgio referred

to it as the "gold standard of ignition switches."[34] Second, DeGiorgio proposed redesigning

the ignition switch already in Delta platform vehicles. Part of DeGiorgio's redesign plan

included adding a second detent plunger.[35]

153.    At the VAPIR meeting on June 14, 2005, additional proposed fixes were

presented – categorized as either "short-term" or "long-term" solutions. The short- term

solution was to use a smaller key ring and to change the key going forward with a new key

---

[32] February 24, 2014 GM Submission to NHTSA – Chronology Re: Recall of 2005-2007 Chevrolet Cobalt and 2007
Pontiac G5 Vehicles (or "February GM Chronology"), at 1; March 11, 2014 GM Submission to NHTSA –
Chronology Re: Recall of 2006-2007 Chevrolet HHR and Pontiac Solstice, 2003-2007 Saturn Ion, and 2007 Saturn
Sky Vehicles (or "March GM Chronology") at 1; April Chronology at 2.
[33] J&B Interview of Raymond DeGiorgio, May 7-8, 2014. Valukas Report at 79.
[34] J&B Interview of Raymond DeGiorgio, May 7-8, 2014. Valukas Report at 79.
[35] J&B Interview of Raymond DeGiorgio, May 7-8, 2014. Valukas Report at 79.

head design that used a hole instead of a slot—the same idea that David Thrush had proposed
during the November 2004 PRTS inquiry.[36] The "long-term" solutions included DeGiorgio's
idea of replacing the ignition switch with the GMT 191, or gold standard switch, which would
double the torque needed to shut off the ignition. The implementation of the new switch was
targeted for MY 2007 or MY 2008 vehicles, at a cost of just $1.00/vehicle, plus tooling costs
which were not known at that time.[37]

154.    The presentation for this VAPIR meeting also included discussion of press
coverage that described the very defect in this case that the Old GM engineers were
addressing earlier in 2005: inadvertent shut-off of the ignition switch and moving stalls. The
presentation included GM's official public relations statement regarding the issue reassuring
the public and the Class that the vehicle was "still controllable."[38]

155.    Also on June 14, 2005, similar complaints surfaced of "inadvertent ignition
shut-offs" in the Solstice, which used the same defective ignition switch as the Cobalt and the
Ion. A GM engineer emailed DeGiorgio and other Old GM personnel involved in evaluating
short-term and long-term fixes for the ignition switch, informing them that Solstice testing
showed the "ignition inadvertently turns off when hit." The engineer noted that the complaint
was "very similar to the ones on the Cobalt [sic]" and suggested that the same "preventative
measures" under discussion for the Cobalt should be taken for the Solstice.[39]

---

[36] X001 Ignition Cylinder Effort … Next Actions VAPIR Presentation (June 14, 2005), at 1 [DOC ID 000011020041; GMNHTSA000218772]. Valukas Report at 80, n. 331.
[37] X001 Ignition Cylinder Effort … Next Actions VAPIR Presentation (June 14, 2005), at 1 [DOC ID 000011020041; GMNHTSA000218772]. Valukas Report at 80-81, n. 333.
[38] X001 Ignition Cylinder Effort … Next Actions VAPIR Presentation (June 14, 2005), at 1 [DOC ID 000011020041; GMNHTSA000218772]. Valukas Report at 80-81, n. 334.
[39] E-mail from Devin Newell, GM, to Raymond DeGiorgio, GM, et al. (June 14, 2005) [DOC ID 000001748037; GMNHTSA000218756]. Valukas Report at 81, n. 336.

156.    On June 17, 2005, Old GM engineer Al Manzor conducted testing on the ignition switch, and the proposed GMT 191 ignition switch, at Old GM's Milford Proving Ground[40] to evaluate how the switches performed in the Cobalt using a key with a slotted key head versus a key head with a hole.[41]

157.    Manzor's testing demonstrated that the rotational torque required to move the key out of Run was 10 N-cm, below the Specification of 15 to 25 N-cm. However, neither Manzor, nor anyone else interviewed, compared the test results to the actual specification.[42]

158.    Later in June 2005, the VAPIR approved a fix for existing customers – a plug that could be inserted into keys when customers came to the dealer reporting problems – and a change to the key for production in the future (a change that was not implemented). On July 12, 2005, Old GM also issued another Preliminary Information to dealers, this time explaining (only for the 2005 Cobalt and 2005 Pontiac Pursuit) that a fix was available (the key insert). The key change (and the insert) did not, however, address the core problem of inadequate torque performance in the ignition switch or the low placement of the ignition switch on the steering cylinder; indeed, the engineers still regarded the key head design change as only a temporary solution – or, as one Old GM engineer described it, a "band-aid."[43]

---

[40] The Milford Proving Ground is a GM engineering facility designed for vehicle research, development, and testing in Milford, Michigan. It has extensive test tracks for vehicle testing under a range of road conditions. Valukas Report at 81, n. 337.

[41] X001 Ignition Cylinder Effort … Next Actions" (June 19, 2005) [DOC ID 000012140574; GMNHTSA000218793]; J&B Interview of Alberto Manzor, May 1, 2014; e mail from Gay Kent, GM, to Deb Nowak-Vanderhoef, GM, et al.(June 14, 2005) [DOC ID S006878_000038279]. Valukas Report at 81, n. 338.

[42] J&B Interview of Doug parks, May 1-2, 2014; J&B Interview of Alberto Manzor, May 1, 2014. Valukas Report at 82, n. 341.

[43] Valukas Report at 82-83.

159.    Manzor said he discussed his safety concerns about the Cobalt, including the potential for airbag non-deployment, with Parks, Altman, and a safety engineer, Naveen Ramachandrappa Nagapola.[44]

160.    Ignoring the ignition defect did not make the problem or reported incidents go away.

**H.    Rather Than Implementing A Safety Recall And Fixing The Known Defect, Old GM Sent An Inadequate Technical Service Bulletin To GM Dealers In Late 2005, Advising Dealers On Taking Heavy Items Off Key Rings.**

161.    Throughout 2005, various committees within Old GM considered proposed fixes, but rejected them as too costly. In December of 2005, rather than issuing a safety recall on the ignition switch defects, Old GM sent a Technical Service Bulletin ("TSB") 05-02-35-007 to GM dealers, titled "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and No DTCs" for the Chevy Cobalt and HHR, Saturn Ion, and Pontiac Solstice vehicles.[45] The TSB explained that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder/torque."

162.    When Old GM issued this TSB, the prior Preliminary Information provided to its dealers on July 12, 2005 (which had accurately used the word "stall"), was removed from the dealer database as obsolete. This TSB also did not accurately describe the danger posed by the ignition switch defect and went only to Old GM dealers, not to the public or the Class.[46] There was no mention in the TSB of the possibility of airbag non-deployment, engine stalls, loss of power steering or power brakes.

---

[44] J&B Interview of Alberto Manzor, May 1, 2014. Valukas Report at 83, n. 347.
[45] TSB 05-02-35-007, "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and No DTCs," (Oct. 2006), at GMHEC000329773.
[46] March 2014 GM chronology; GMHEC000329773.

163.    As evidence of the international and fraudulent concealment by Old GM, multiple Old GM employees confirmed that Old GM intentionally avoided using the word "stall" in the TSB to dealers.[47]

164.    Old GM Quality Brand Manager, Steve Oakley, who drafted the December 2005 TSB, stated the term "stall" is a "hot" word that Old GM did not use in TSBs because *it may raise a concern about vehicle safety, which "suggests Old GM should recall the vehicle, not issue a bulletin."*[48] In addition, Old GM personnel stated that "there was concern about the use of 'stall' in a TSB because such language might draw the attention of NHTSA."[49] The December 2005 TSB was intentionally misleading and incomplete. Rather than spend the money on a part with sufficient torque or recall the defective vehicles, Old GM came up with a self-described band-aid.

165.    Rather than disclose the true nature of the defects and correct them, pursuant to the December 2005 TSB, Old GM, through its dealers, instead gave some customers who brought in their vehicle complaining about stalling "an insert for the key ring so that it goes from a 'slot' design to a hole design" to prevent the key rings from moving up and down in the slot. "[T]he previous key ring" was "replaced with a smaller" one; this change was intended to keep the keys from hanging as low as they had in the past.[50] Old GM created over 10,000 key plug inserts as the defect's cheaper fix.[51] According to GM's records, Old GM dealers provided key inserts to only 474 customers who brought their vehicles into dealers for service.[52] But the band-aid failed because Old GM abandoned the key redesign effort.[53]

---

[47] Valukas Report at 91-93; (citing GMHEC000329773).
[48] Valukas Report at 92, n. 390, emphasis added.
[49] Valukas Report at 93, n. 392.
[50] Valukas Report at 1-2; March GM Chronology at 2; April GM Chronology at 2.
[51] Valukas Report at 93-94.
[52] February GM Chronology at 2.

-67-

Furthermore, while Old GM made the key insert available to consumers of previously

purchased vehicles, it did not, at the same time, change the key for cars that were rolling off

the assembly line and those yet to be produced. Thus, even the "band-aid" that Old GM

engineers proposed was not implemented for new cars.[54]

166.    Still there was no recall and Old GM continued to receive complaints of

fatalities and injuries that put it squarely on notice of the defect. Rather than issue the

necessary safety recall, inside Old GM, the cover-up continued.

### I.    Old GM Knew About And Authorized A Design Change To The Ignition Switch In 2006, But Masked The Existence Of The Change By Keeping The Part Number The Same.

167.    Old GM covertly authorized a design change for the defective ignition switch

in 2006.

168.    In late 2005 and early 2006, DeGiorgio discussed with Delphi a proposal to put

a stronger spring and plunger into the ignition switch.[55] An internal Delphi document

indicates that this switch design—with a longer detent spring-plunger—was the same as the

longer detent spring-plunger design originally drafted by Delphi in 2001.[56] In other words,

this option was available when the ignition switch was first designed[57]

169.    In April 2006, DeGiorgio authorized Delphi to implement changes to fix the

ignition switch defect.[58] The design change "was implemented to increase torque performance

---

*Footnote continued from previous page*

[53] Valukas Report at 94.

[54] Valukas Report at 94.

[55] E-mail from Arturo Alcala, Delphi to Raymond DeGiorgio, GM, John B. Coniff, Delphi, et al. (Jan. 6, 2006) [DOC ID 000051786002; GMNHTSA000257777]. Valukas Report at 97, n. 401.

[56] Drawing 741-76307-T [DOC ID GMHEC000003206]; 2001 Long Detent Spring Drawing, Drawing 741-79378 (2001) [Ex. A.3.a(2) 2001 Long Detent Spring Drawing]; 2001 Short Detent Spring Drawing, Drawing 741-75259 (2001) [Ex. A.3.a (1) 2001 Short Detent Spring Drawing]; e-mail from Antero Cuervo, Delphi, to Lyle Miller, Delphi (Oct. 29, 2013) [DOC ID 000004253527; GMNHTSA000223906]. Valukas Report at 97, n. 402.

[57] Valukas Report at 97.

[58] General Motors Commodity Validation Sign-Off (April 26, 2006, GMHEC000003201).

-68-

in the switch."[59] On April 26, 2006, DeGiorgio approved an ignition switch with a longer detent plunger by signing what is called a Form 3660, giving Delphi permission to begin manufacturing the longer parts for the switch.[60] The Form 3660 stated, "[n]ew detent plunger (Catera spring/plunger) was implemented to increase torque force in switch."[61] Each Form 3660 has to link back to a master work order, and this one did as well. But the work order to which it was linked was only for the electrical improvements to the ignition switch; the work order did not mention the change to the spring and plunger.[62] Old GM fraudulently concealed and acted to suppress and cover up this material fact.

170.    Delphi documents suggest that the new ignition switch went into production sometime after June 26, 2006.[63] Although the design of the ignition switch changed, *the part number remained the same*.[64]

171.    Meanwhile, consumers, NHTSA, the driving public, and the Class were not told of this change, because Old GM "*concealed the fact*" of the design change and "*failed to disclose this critical information*," with devastating consequences.[65]

172.    In congressional testimony in 2014, GM CEO Mary Barra acknowledged that GM should have changed the part number when it redesigned the ignition switch, and that its failure to do so did not meet industry standard behavior. Former New GM engineers term GM's failure to change the part number a "cardinal sin" and "an extraordinary violation of internal processes."

---

[59] General Motors Commodity Validation Sign-Off (April 26, 2006, GMHEC000003201).
[60] General Motors Commodity Validation Sign Off (April 26, 2006) GMHEC000003201.
[61] Form 3660 (April 26, 2006), at 3 [DOC ID 000004253529; GMNHTSA000223924]. Valukas Report at 98, n. 406.
[62] EWO 302726 (Feb. 19, 2004) [DOC ID 000000000080; GMNHTSA000220667]. Valukas Report at 98, n. 407.
[63] Valukas Report at 99.
[64] Valukas Report at 100 (emphasis added).
[65] Valukas Report at 34 (emphasis added).

**J.**   **The Fatalities Resulting From The Defects And Cover-Up Came To Old GM's Attention As Early As 2004.**

173.   Customer complaints and reports of injuries and fatalities continued.

174.   GM's legal department received notice of the first Ion airbag non-deployment claim in January 2004 in a 2004 Saturn Ion. The first Cobalt crash came to Old GM's attention in September 2005.[66]

175.   On November 17, 2005—immediately before Old GM issued the December Bulletin—a Cobalt went off the road and hit a tree in Baldwin, Louisiana. The front airbags did not deploy in this accident. Old GM received notice of the accident, opened a file, and referred to it as the "Colbert" incident.

176.   In January 2006, a 2005 Chevy Cobalt, driven by an unsuspecting Old GM customer struck several trees and its driver died en route to the hospital.[67] The vehicle's power mode status was in "accessory" at the time of the crash and the airbag did not deploy when it should have.[68]

177.   On February 10, 2006, in Lanexa, Virginia – shortly after Old GM issued the TSB – a 2005 Cobalt flew off of the road and hit a light pole. As with the Colbert incident (above), the frontal airbags failed to deploy in this incident. The download of the SDM (the vehicle's "black box") showed the key was in the "accessory/off" position at the time of the crash. Old GM received notice of this accident, opened a file, and referred to it as the "Carroll" incident.

---

[66] Valukas Report at 103, n. 419.
[67] Calspan Corporation, Calspan On-Site Air Bag Non-Deployment Investigation, Case No. CA05-049, Dec. 12, 2006 [DOC ID GMCB-000000073786; GMHEC100026303]; GM, Activity Notes form, File No. 501661, Jan. 31, 2006 [DOC ID 000001660023; GMNHTSA000200717]. Valukas Report at 110, n. 453.
[68] Crash Data Retrieval System, [redacted] SDM Data, Sept. 14, 2005 [DOC ID 000001660011; GMNHTSA000200688]. Valukas Report at 110, n. 454.

178.    On March 14, 2006, in Frederick, Maryland, a 2005 Cobalt traveled off the road and struck a utility pole. The frontal airbags did not deploy in this incident. The download of the SDM showed the key was in the "accessory/off" position at the time of the crash. Old GM received notice of this incident, opened a file, and referred to it as the "Oakley" incident.

179.    In September 2006, GM became aware of an incident in which a 2004 Saturn Ion left the road and struck a utility pole head on. The airbag did not deploy and the driver was wearing her seatbelt, but was pronounced dead at the scene. Old GM identified this crash as one in which the airbag should have deployed, and the airbag likely would have saved her life.[69] Old GM engineers agreed that "1) the airbags … should have deployed; 2) the SDM did not record the crash event, for unknown reasons;… and 4) it is reasonably likely that deployment of the driver airbag would have prevented [] death in this accident."[70] Still, Old GM admitted nothing and represented its cars were non-defective and safe.

180.    On October 24, 2006, a crash occurred in which a 2005 Cobalt left the road and struck a telephone box and two trees. There were fatalities and severe injuries and the airbag did not deploy. Alan Adler e-mailed Dwayne Davidson, Senior Manager for TREAD Reporting at Old GM, and others, copying Gay Kent, Jaclyn Palmer, Brian Everest, and Doug Wachtel, with the subject line "2005 Cobalt Air Bags—Fatal Crash; Alleged Non-Deployment."[71]

181.    In October 2006, a 2005 Chevy Cobalt was involved in a crash in Wisconsin which resulted in the deaths of the front right and rear right passengers. NHTSA assigned Indiana University Transportation Research Center to investigate the crash. The vehicle was

---

[69] Valukas Report at 112, n. 463, 464.
[70] Valukas Report at 113, n. 474.
[71] Valukas Report at 113-114.

inspected on November 6, 2006.[72] Old GM reported the crash later in 2006 in its EWR

filing.[73] NHTSA requested additional information from GM in May of 2007, and GM

responded a month later.[74]

182.   In 2007, two analyses of the fatalities in the Wisconsin Cobalt crash, one by

Wisconsin State Trooper Keith Young and another by Indiana University researchers, both

independently concluded that the movement of the ignition switch from "run" into "accessory"

caused the 2006 accident, the airbag non-deployment and the tragic deaths. Officer Young

was able to reach this accurate conclusion by examining GM's own engineering documents.

183.   Internal Old GM documents show that the company has received at least 248

reports of air bag non-deployment in 2005 MY vehicles.[75] Internal documents also showed

that Old GM received at least 134 reports of air bag non-deployment in 2006 MY vehicles.[76]

## K.   Old GM Responded To Growing Evidence Of Fatalities By Updating The Technical Service Bulletin To Dealers About Heavy Key Chains.

184.   In October 2006, Old GM updated the prior December 2005 Service Bulletin

to include additional make and MY vehicles, namely: the 2007 Saturn Ion and Sky, 2007

Chevrolet HHR, and 2007 Pontiac Solstice and G5.[77] As it had previously done, in its

statement to dealers, Old GM avoided acknowledging the ignition switch defect and this time

blamed the problem on height and weight of its customers, short people and heavy key rings,

stating:

---

[72] Indiana Univ. Transp. Research Ctr., On-site Air Bag Non-deployment Investigation Case No. IN06-033, Vehicle: 2005 Chevrolet Cobalt (Oct. 2006) (hereinafter the "2006 SCI Report").
[73] Letter from Christina Morgan, Chief, Early Warning Division, Office of Defects Investigation, to Gay P. Kent, Director, General Motors Corp. (May 7, 2007); Letter to Christina Morgan from Gay P. Kent, Director, Product Investigations (June 7, 2007) (GMHEC00198410-198414).
[74] GMHEC00197898.
[75] GM Internal Summary Points on Airbag Non-Deployment for Cobalt, G5 and Pursuit (Aug. 2013).
[76] GM Internal Summary Points on Airbag Non-Deployment for Cobalt, G5 and Pursuit (Aug. 2013).
[77] (Service Bulletin 05-02-35-007, "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and No DTCs," (Oct. 2006 revised), at GMHEC000000002).

There is potential for the driver to inadvertently turn off the
ignition due to low ignition key cylinder torque/effort. The concern
is more likely to occur if the driver is short and has a large and/or
heavy key chain. In these cases, this condition was documented
and the driver's knee would contact the key chain while the vehicle
was turning and the steering column was adjusted all the way
down. This is more likely to happen to a person who is short, as
they will have the seat positioned closer to the steering column. In
cases that fit this profile, question the customer thoroughly to
determine if this may be the cause. The customer should be
advised of this potential and should take steps to prevent it—such
as removing unessential items from their key chain.[78]

185.    Despite the TSB to dealers, millions of the defective vehicles remained on the

road endangering the lives and livelihoods of the Class and the public.

**L.      Old GM Knew Of And Tracked Multiple Accidents Involving The Ignition
Switch Defect By 2007 And Avoided Scrutiny By Misleading The Class, The
Public, And Regulators.**

186.    Old GM knew that people were being killed and seriously injured because of

the ignition switch defect in its vehicles and the resulting loss of power and airbag non-

deployment.

187.    In March 2007, Old GM met with NHTSA and discussed the July 29, 2005,

fatal crash involving Amber Rose.[79] At this meeting, Old GM was told by NHTSA the airbags

in the Cobalt did not deploy, causing the Ms. Rose's death, and that data retrieved from the

crashed vehicle's diagnostic system indicated that the ignition was in the "accessory" position.

This was no surprise to Old GM; it had been secretly tracking ignition switch related accidents

since well before this time. By the end of 2007, Old GM identified ten (10) other accidents,

including four (4) where the ignition switch had moved into the "accessory" position.[80]

---

[78] GMHEC000143093; GM Technical Service Bulletin, "Information on Inadvertent Turning Off of Key Cylinder,
Loss of Electrical System and no DTCs," (Oct. 25, 2006), at GMHEC000138614.
[79] GM Feb. 24, 2014, Letter to NHTSA, GM February Chronology.
[80] GM Feb. 24, 2014, Letter to NHTSA, GM February chronology.

188.    Thus, by the end of 2007, Old GM knew of at least 10 frontal collisions in
which the airbag did not deploy.[81] Old GM actually knew of but kept secret many other
similar fatal accidents involving the ignition switch defects.

189.    For the next two years, Old GM continued to receive complaints and continued
to investigate frontal crashes in which the airbags did not deploy in Defective Vehicles, but
did not disclose the crucial safety information to the Class of unsuspecting drivers of Old GM
vehicles.

190.    In April 2007, having continued its investigation into the July 2005 Maryland
Cobalt crash, NHTSA received a 2006 SCI report stating that the "crash is of special interest
because the vehicle was equipped with … dual stage air bags that did not deploy."[82] The SCI
Report concluded that the air bags did not deploy "as a result of the impact with the clump of
trees, possibly due to the yielding nature of the tree impact or power loss due to the movement
of the ignition switch just prior to impact."[83] The Electronic Data Recorder ("EDR") for the
vehicle indicated that the ignition switch was in "Accessory" mode at the time of impact.[84]
The SCI Report also found that the investigation demonstrated that contact with the ignition
switch could result in "engine shutdown and loss of power."[85]

191.    In August 2007, Old GM met with its airbag supplier, Continental, to review
SDM data from a 2005 Chevrolet Cobalt crash where the airbags failed to deploy.[86]

---

[81] Letter from M. Carmen Benavides, Dir., Prod. Investigations & Safety Regulations, GM, to Nancy Lewis, Assoc.
Adm'r for Enforcements, NHTSA, Attach. B-573.6(c)(6) at 2 (February 24, 2014), *available at*
http://democrats.energycommerce.house.gov/sites/default/files/ documents/Letter-Benavides-Lewis-2014-02-24.pdf
(or "Benavides Letter").
[82] 2006 NTHSA SCI Report.
[83] 2006 NTHSA SCI Report at ii.
[84] 2006 NTHSA SCI Report at 7.
[85] 2006 NTHSA SCI Report at 7.
[86] Continental Automotive Sys. US, Inc., Field Event Analysis Report, GMHEC00003143-3153, GM Mar. 11, 2014
Letter to NHTSA, GM March chronology at 2.

-74-

192.    The next month, in September of 2007, the Chief of the Defects Assessment

Division ("DAD") within NHTSA's Office of Defects Investigation ("ODI") proposed an

investigation of "frontal airbag non-deployment in the 2003-2006 Chevrolet Cobalt/Saturn Ion"

vehicles.[87] The Chief of DAD within ODI noted that the "issue was prompted by a pattern of

reported non-deployments in VOQ [Vehicle Owner Questionnaire] complaints that was first

observed in early 2005."[88] The email stated that NHTSA had "discussed the matter with GM,"

but that Old GM had assured NHTSA that "they see no specific problem pattern."[89] NHTSA's

Greg Magno stated:

> Notwithstanding GM's indications that they see no specific
> problem, DAD perceives a pattern of non-deployment in these
> vehicles that does not exist in their peers and that their
> circumstances are such that, in our engineering judgment, merited
> a deployment, and that such a deployment would have reduced
> injury levels or saved lives.[90]

193.    In November 2007, NHTSA's ODI considered a proposal to investigate the

non-deployment of airbags in 2003-2006 model/year Chevy Cobalt and Saturn Ion vehicles.[91]

The review was prompted by twenty-nine (29) complaints, four (4) fatal crashes, and fourteen

(14) field reports that NHTSA knew about.[92] Again, Old GM not only failed to act, it worked

to thwart the agency's efforts, in furtherance of its fraud and concealment to the detriment of

the Class.

194.    As part of the cover-up, Old GM tried to avoid full regulatory investigation and

disclosure by claiming that it was unaware of any problem in its vehicles. Furthermore, Old

GM knew that the airbag system in the Defective Vehicles would be disabled when the

---

[87] E-mail from Chief of DAD, ODI, to NHTSA staff (Sept. 5, 2007), NHTSA-HEC-004491.
[88] E-mail from Chief of DAD, ODI, to NHTSA staff (Sept. 5, 2007), NHTSA-HEC-004491.
[89] E-mail from Chief of DAD, ODI, to NHTSA staff (Sept. 5, 2007), NHTSA-HEC-004491.
[90] E-mail from Chief of DAD, ODI, to NHTSA staff (Sept. 5, 2007), NHTSA-HEC-004491.
[91] DAD Panel (Nov. 17, 2007), at NHTSA-HECC-004462-4483.
[92] DAD Panel (Nov. 17, 2007), at NHTSA-HECC-004462-4483.

ignition switch to a vehicle moved from the "run" to the "accessory" position. The airbag

system, in other words, was disabled when the vehicle lost power. Old GM knew, however,

that NHTSA believed that in most, if not all, vehicles, the airbag systems were operable for

several seconds following a power loss. Although Old GM knew that NHTSA was mistaken,

it did not correct NHTSA's mistaken belief.

**M.    Old GM Instructed Its Personnel On Judgment Words To Be Avoided.**

195.    In a 2008 internal presentation at Old GM, it instructed its employees to avoid

using the following judgment words:[93]

| | | |
|---|---|---|
| Always | detonate | maniacal |
| Annihilate | disemboweling | mutilating |
| Apocalyptic | enfeebling | Never |
| Asphyxiating | Evil | potentially-disfiguring |
| Bad | evicscerated [sic] | power [sic] keg |
| Band-Aid | explode | Problem |
| big time | Failed | Safety |
| brakes like an "X" car | Flawed | safety related |
| Cataclysmic | genocide | Serious |
| Catastrophic | Ghastly | spontaneous combustion |
| Challenger | grenadelike | startling |
| Chaotic | Grisly | suffocating |
| Cobain | gruesome | Suicidal |
| Condemns | Hindenburg | terrifying |
| Corvair-like | Hobbling | Titanic |
| Crippling | Horrific | tomblike |
| Critical | impaling | unstable |
| Dangerous | Inferno | widow-maker rolling sarcophagus (tomb or coffin) |
| Deathtrap | Kevorkianesque | Words or phrases with biblical connotation |
| Debilitating | lacerating | |
| Decapitating | life-threatening | |
| Defect | maiming | |
| Defective | mangling | |

---

[93] NHTSA Consent Order at Exhibit B, 2008 Q1 Interior Technical Learning Symposium.

1197532.10

196.    Instead of using their common sense judgment, Old GM employees were advised in Orwellian fashion to use specific words to avoid disclosure of the material safety risks, and in so doing furthered the cover-up and fraud through intentional word substitutions such as:

- "Issue, Condition [or] Matter" instead of "**Problem**"

- "Has Potential Safety Implications" instead of "**Safety**"

- "Does not perform to design" instead of "**Defect/Defective**"[94]

197.    Old GM knew its defective vehicles were killing and maiming its customers, while instructing its employees to avoid the words "defect" or "safety." Instead of publicly admitting the dangerous safety defects in its vehicles, Old GM repeatedly blamed accidents on driver error.

198.    From 2001 until July 10, 2009, Old GM was repeatedly put on notice of the defect internally and received reports of deaths and injuries in Chevy Cobalts and other GM vehicles involving airbag failures and/or steering, yet acted at every turn to fraudulently conceal the danger from the Class. Examples include, but are not limited to:

- 2005: 26 Cobalt Death and Injury Incidents, including 1 death citing "airbag" as the component involved.

- 2006: 69 Cobalt Death and Injury Incidents, including 2 deaths citing "airbag" as the component involved and 4 deaths listing the component involved as "unknown."

- 2007: 87 Cobalt Death and Injury Incidents, including 3 deaths citing "airbag" as the component involved.

- 2008: 106 Cobalt Death and Injury Incidents, including 1 death citing "airbag" as the component involved and 2 deaths listing the component involved as "unknown."[95]

---

[94] NHTSA Consent Order at Exhibit B (emphasis added).

### N.    By 2009, As Injuries And Deaths Continued To Mount, Old GM Opened Yet Another Internal Investigation, But Continued To Withhold Information From Its Customers And The Class About The Defects.

199.    In February 2009, Old GM initiated yet another internal investigation of the ignition switch defect which resulted in a redesign of the ignition key for the 2010 model/year Cobalt.[96] However, Old GM took no remedial action in response to the investigation and continued to conceal the facts. Consequently, deaths, injuries, and incidents continued to occur related to the ignition switch defect. As one Old GM employee put it when the ignition defect was raised again internally at Old GM:

> "Gentleman! This issue has been around since man first lumbered out of sea and stood on two feet. In fact, I think Darwin wrote the first PRTS on this and included as an attachment as part of his Theory of Evolution."[97]

200.    Some within Old GM were not mincing words. Yet Old GM chose to conceal the truth from the Class, and the death and injury toll mounted.

201.    Again, in April 2009, a 2005 Chevy Cobalt was involved in a crash in Pennsylvania which resulted in the deaths of the driver and front passenger.[98] The crash was investigated by NHTSA.[99] The 2009 SCI Report noted that data from the Cobalt's SDM indicated that the ignition switch was in "accessory" mode at the time of the crash.[100] Still, Old GM refused to issue a recall or notify the Class of the danger.

---

*Footnote continued from previous page*
[95] NHTSA Cobalt Chronology prepared by the Center for Auto Safety, February 27, 2014.
[96] GM Feb. 24, 2014 Letter To NHSTA, GM Feb. chronology at 2; Valukas Report at 132-133; GM PRTS Complete Report (1078137)—GMNHTSA000018925.
[97] Memo, Joseph R. Manson, Feb. 18, 2009, GMHEC000282093.
[98] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation SCI Case No.: CA09022, Vehicle: 2005 Chevrolet Cobalt (Apr. 2009) (the "2009 SCI Report").
[99] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation SCI Case No.: CA09022, Vehicle: 2005 Chevrolet Cobalt (Apr. 2009) (the "2009 SCI Report").
[100] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation SCI Case No.: CA09022, Vehicle: 2005 Chevrolet Cobalt (Apr. 2009) (the "2009 SCI Report"). SDM Data Report, attached to 2009 SCI Report.

1197532.10

O.    **The Spreadsheet Of Accidents Involving The Cobalt Ignition Switch Within Old GM Continued To Grow, But Was Never Disclosed.**

202.    Beginning in 2007, Old GM Field Performance Assessment engineer, John Sprague, maintained a spreadsheet of accidents involving Cobalt non-airbag deployments, along with the vehicle power mode status. To gather the data for the spreadsheet, Sprague sent SDMs from crash vehicles to Continental (the SDM manufacturer) so that it could access information that Old GM could not.[101] After receiving the data from Continental, Sprague collected information regarding the Cobalt crashes and power mode status, added it to the spreadsheet, and discovered that, in fact, the power mode status was recorded as "off" or "accessory" in many accidents..[102]

203.    Sprague continued to maintain his spreadsheet until July 10, 2009 (and beyond). In doing so, Sprague noticed a pattern—the problem of non-deployment of airbags did not appear as frequently in MY 2008 and later Cobalts. That led him to question whether there had been some change in the Cobalt from MY 2007 to MY 2008.[103]

204.    Sprague brought his spreadsheet on the ignition switches and vehicles losing power while driving to a meeting with DeGiorgio in 2009 and the two of them reviewed it together.[104] Still no action was taken. Instead, there were more non-productive meetings.

205.    In May 2009, Old GM again met with its SDM supplier, Continental, and asked for data in connection with another crash involving a 2006 Chevy Cobalt where the airbags failed to deploy.[105] In a report dated May 11, 2009, Continental analyzed the SDM data and concluded that the SDM ignition state changed from "run" to "off" during the

---

[101] Valukas Report at 134.
[102] J&B Interview of John Sprague, May 27, 2014. Valukas Report at 135, n. 596.
[103] Valukas Report at 137.
[104] Valukas Report at 138, n. 616.
[105] Continental Automotive Sys. US, Inc., Field Event Analysis Report GMHEC00003129-3142.

accident. According to Continental, this, in turn, disabled the airbags. Old GM did not

disclose this finding to NHTSA, despite its knowledge that NHTSA was interested in non-

deployment incidents in Chevrolet Cobalt vehicles. Yet again, in the face of mounting death

tolls, Old GM did not correct the ignition switch defect, take the vehicles off the road, or warn

its consumers or the Class. Sprague's secret spreadsheet of accidents simply grew.

206. The next month, in June 2009, Old GM filed a Chapter 11 petition. The

bankruptcy sale to New GM became effective on July 10, 2009.

207. At that point, New GM assumed Old GM's obligation to report any known,

dangerous defects in GM vehicles, including the Defective Vehicles.

## III. Meet The New GM, Same As The Old GM: With Knowledge of the Defects, New GM "Investigates" Further-And Continues To Conceal The Defects.

208. In 2009, Old GM declared bankruptcy, and, weeks later, it emerged from

bankruptcy as New GM. Both before and after GM's bankruptcy, the ignition switches in the

Defective Vehicles continued to fail and GM, in both its incarnations, continued to conceal

the truth.

209. On March 10, 2010, many months after the birth of New GM, Brooke Melton

was driving her 2005 Cobalt on a two-lane highway in Paulding County, Georgia. While she

was driving, her key turned from the "run" to the "accessory/off" position causing her engine

to shut off. After her engine shut off, she lost control of her Cobalt, which traveled into an

oncoming traffic lane, where it collided with an oncoming car. Brooke was killed in the crash.

210. On March 22, 2011, Ryan Jahr, a GM engineer, downloaded the SDM from

Brooke's Cobalt. The information from the SDM download showed that the key in Brooke's

Cobalt turned from the "run" to the "accessory/off" position 3-4 seconds before the crash. On

June 24, 2011, Brooke Melton's parents, Ken and Beth Melton, filed a lawsuit against GM.

211.    On December 31, 2010, in Rutherford County Tennessee, a 2006 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. New GM received notice of this incident, opened a file, and referred to it as the "Chansuthus" incident.

212.    On December 31, 2010, in Harlingen, Texas, another 2006 Cobalt traveled off the road and struck a curb. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. New GM received notice of this incident, opened a file, and referred to it as the "Najera" incident.

213.    These incidents are not limited to vehicles of model year 2007 and before. According to New GM's own investigation, there have been over 250 crashes involving 2008-2010 Chevrolet Cobalts in which the airbags failed to deploy.

214.    In 2010, New GM began a formal investigation of the frontal airbag non-deployment incidents in Chevrolet Cobalts and Pontiac G5s. New GM subsequently elevated the investigation to a Field Performance Evaluation ("FPE").

215.    In August 2011, New GM assigned Engineering Group Manager, Brian Stouffer as the Field Performance Assessment Engineer ("FPAE") to assist with the FPE investigation.

216.    On December 18, 2011, in Parksville, South Carolina, a 2007 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. GM received notice of this incident, opened a file, and referred to it as the "Sullivan" incident.

1197532.10

Case 14-mc-02543-JMF    Document 34    Filed 10/14/14    Page 500 of 150

217.    In spring 2012, Stouffer asked Jim Federico, a high level executive and chief engineer at Old and New GM who recently retired, to oversee the FPE investigation. Federico was the "executive champion" for the investigation to help coordinate resources for the FPE investigation.

218.    In May 2012, New GM engineers tested the torque on the ignition switches for 2005-2009 Cobalt, 2007, 2009 Pontiac G5, 2006-2009 HHR, and 2003-2007 Ion vehicles in a junkyard. The results of these tests showed that the torque required to turn the ignition switches in most of these vehicles from the "run" to the "accessory/off" position did not meet Old GM's minimum torque specification requirements, including the 2008-2009 vehicles. These results were reported to Stouffer and other members of the FPE.

219.    Indeed, airbag non-deployment incidents are not limited to vehicles of model year 2007 and before. According to New GM's own investigation, there have been over 250 crashes involving 2008-2010 Chevrolet Cobalts in which the airbags failed to deploy.

220.    In September 2012, Stouffer requested assistance from a "Red X Team" as part of the FPE investigation. The Red X Team was a group of engineers within GM assigned to find the root cause of the airbag non-deployments in frontal accidents involving Chevrolet Cobalts and Pontiac G5s. By that time, however, it was clear that the root cause of the airbag non-deployments in a majority of the frontal accidents was the defective ignition switch system. The Red X Team became involved in the investigation shortly after Mr. Stouffer's request.

221.    During the field-performance-evaluation process, New GM determined that, although increasing the detent in the ignition switch would reduce the chance that the key

1197532.10

Case 14-mc-02543-JMF    Document 347    Filed 10/14/14    Page 104 of 150

would inadvertently move from the "run" to the "accessory/off" position, it would not be a total solution to the problem.

222.    Indeed, the New GM engineers identified several additional ways to actually fix the problem. These ideas included adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the run position, and adding a push button to the lock cylinder to prevent it from slipping out of run. New GM rejected each of these ideas.

223.    The photographs below are of a New GM engineer in the driver's seat of a Cobalt during the investigation of Cobalt engine stalling incidents:



224.    These photographs show the dangerous condition of the position of the key in the lock module on the steering column, as well as the key with the slot, which allow the key fob to hang too low off of the steering column. New GM engineers understood that the key fob may be impacted and pinched between the driver's knee and the steering column which causes the key to be inadvertently turned from the run to accessory/off position. The photographs show why the New GM engineers understood that increasing the detent in the ignition switch would not be a total solution to the problem. It also shows why GM engineers

Case 14-MC-2543-JMF   Document 347   Filed 10/14/14   Page 102 of 150

believe that the additional changes to the ignition switch system (such as the shroud) were necessary to fix the defects.

225.     The New GM engineers clearly understood that increasing the detent in the ignition switch alone was not a solution to the ignition switch problem but New GM concealed—and continues to conceal—from the public, the nature and extent of the defects.

226.     By 2012, Federico, Stouffer, and the remaining members of the Red X Team knew that the Key System in the Ion, the Cobalt, and the G5 vehicles had safety-related defects that would cause the key to move from the "run" to the "accessory/off" position while driving these vehicles. They also knew that when this happened the airbags would no longer work in frontal crashes.

227.     On October 4, 2012, there was a meeting of the Red X Team during which Federico gave an update of the Cobalt airbag non-deploy investigation. According to an email from Stouffer on the same date, the "primary discussion was on what it would take to keep the SDM active if the ignition key was turned to the accessory mode." Despite this recognition by New GM engineers that the SDM should remain active if the key is turned to the accessory/off mode, New GM has done nothing to remedy this safety defect and has fraudulently concealed, and continue to fraudulently conceal it, from the public.

228.     During the October 4, 2012 meeting, Stouffer, and the other members of the Red X Team also discussed "revising the ignition switch to increase the effort to turn the key from Run to Accessory."

229.     On October 4, 2012, at 9:07 p.m., Stouffer emailed DeGiorgio and asked him to "develop a high level proposal on what it would take to create a new switch for service with higher efforts."

230.    On October 5, 2012, at 7:39 a.m., DeGiorgio responded:

Brian,

In order to provide you with a HIGH level proposal, I need to understand what my

requirements are. what is the TORQUE value that you desire?

Without this information I cannot develop a proposal.

231.    At 9:05 a.m. on that same day, Stouffer in responding to DeGiorgio's email,

stated:

Ray,

As I said in my original statement, I currently don't know what the torque value needs

to be. Significant work is required to determine the torque. What is requested is a high

level understanding of what it would take to create a new switch.

232.    DeGiorgio responded back to Stouffer at 9:33 a.m. that same morning:

Brian,

Not knowing what my requirements are I will take a SWAG at the Torque required for

a new switch. Here is my high level proposal:

Assumption is 100 N cm Torque.

•    New switch design = Engineering Cost Estimate approx. $300,000

•    Lead Time = 18-24 months from issuance of GM Purchase Order and supplier

selection.

Let me know if you have any additional questions.

233.    Stouffer admitted during his deposition that DeGiorgio's reference to SWAG

was an acronym for Silly Wild-Ass Guess.

-85-

234.    DeGiorgio's cavalier attitude exemplifies the decade-long approach to the safety-related defects that existed in the ignition switch systems in Defective Vehicles. Rather than seriously addressing the safety defects, DeGiorgio's emails show he understood the ignition switches were contributing to the crashes and fatalities and he could not care less.

235.    It is also obvious from this email exchange that Stouffer, who was a leader of the Red X Team, had no problem with DeGiorgio's cavalier and condescending response to the request that he evaluate the redesign of the ignition switches.

236.    Federico, Stouffer, and the other members of the Red X Team also understood that these safety-related defects had caused or contributed to numerous accidents and multiple fatalities. Despite this knowledge, New GM chose to conceal this information from the public, including the Class.

237.    In December 2012, in Pensacola, Florida, Ebram Handy, a New GM engineer, participated in an inspection of components from Brooke Melton's Cobalt, including the ignition switch. At that inspection, Handy, along with Mark Hood, a mechanical engineer retained by the Meltons, conducted testing on the ignition switch from Brooke Melton's vehicle, as well as a replacement ignition switch for the 2005 Cobalt.

238.    At that inspection, Handy observed that the results of the testing showed that the torque performance on the ignition switch from Brooke Melton's Cobalt was well below Old GM's minimum torque performance specifications. Handy also observed that the torque performance on the replacement ignition switch was higher than the torque performance on the ignition switch in Brooke Melton's Cobalt.

239.    In January 2013, Handy, in preparation for his Rule 30(b)(6) deposition in the Melton case, spoke with several people who were engineers at both Old and New GM,

including DeGiorgio and Stouffer. At that time, Handy knew that, based on the testing he had observed, the original ignition switch in the 2005 Cobalt failed to meet Old GM's minimum torque performance specifications and that Old GM had redesigned the ignition switches that were being sold as replacement switches. Both Old and N that an ignition switch that did not meet its minimum torque performance requirements was a safety defect.

240.    Old and New GM engineers integrally involved with this situation have admitted that Old GM never should have sold the Defective Vehicles with ignition switches that did not meet the Company's minimum torque performance requirements.

241.    In 2013, Ray DeGiorgio, the chief design engineer for the ignition switches in millions of the Defective Vehicles was deposed. At his deposition, DeGiorgio was shown photographs of the differences between the ignition switch in Brooke Melton's Cobalt and the ignition switch in the 2008 Cobalt or replacement ignition switch. After looking at the photographs of the different ignition switches, DeGiorgio testified as follows:

Q. The one on the right, Exhibit 13 is an '05 or an '06, and the one on the left, Exhibit 14, is either an '08 or replacement. Do you see the difference?

A. Yes.

Q. Have you noticed that before today, Mr. DeGiorgio?

A. No sir.

Q. Were you aware of this before today, Mr. DeGiorgio?

        MR. HOLLADAY: Object to the form. You can answer.

THE WITNESS: No sir.

Q. It appears to be pretty clear that the plunger and the cap is taller on Exhibit 14 compared to Exhibit 13, isn't it?

A. That's correct.

Q. How is a taller cap going to affect the rotational resistance?

A. It's hard to determine from these pictures exactly if it is a taller cap or is it recessed inside the housing or not. It's hard for me to assess, really, what I'm looking at.

Q. You've taken apart a number of switches and you're telling the jury you've never noticed the difference in the plunger between the '05 and '06 versus the new resistor or switch?

MR. HOLLADAY: Object to the form.

THE WITNESS: I did not notice, no.

(DeGiorgio Deposition, pp. 149-150.)

242.     DeGiorgio was then further questioned about his knowledge of any differences in the ignition switches:

Q. And I'll ask the same question. You were not aware before today that GM had changed the spring—the spring on the ignition switch had been changed from '05 to the replacement switch?

MR. HOLLADAY: Object to the form. Lack of predicate and foundation. You can answer.

THE WITNESS: I was not aware of a detent plunger switch change. We certainly did not approve a detent plunger design change.

Q. Well, suppliers aren't supposed to make changes such as this without GM's approval, correct?

A. That is correct.

-88-

Q. And you are saying that no one at GM, as far as you know, was aware of this before today?

MR. HOLLADAY: Object. Lack of predicate and foundation. You can answer.

THE WITNESS: I am not aware about this change.

(DeGiorgio Deposition, pp. 151-152.)

243.    DeGiorgio clearly testified that he had absolutely no knowledge of any change in the ignition switch in 2005-2010 Cobalts.

244.    DeGiorgio also provided the following testimony about the ignition switch supplier, Delphi:

Q. And there weren't any changes made—or were there changes made to the switch between '05 and 2010 that would have affected the torque values to move the key from the various positions in the cylinder?

A. There was one change made to the resistor in '08, but that should not have affected the torque or the displacement of the switch.

I can restate this way: There was an electrical change made in '08, but not a mechanical change—at least there were no official changes, mechanical changes, made to the switch that I know of.

Q. When you say no official, could there be unofficial changes made?

A. I'm not saying that there was, I'm just saying if there was something changed at the supplier side, we were not aware of it and we did not approve it, okay?

(DeGiorgio Deposition, pp. 57-58.)

Q. Did you ask Mary Fitz or anyone from Delphi whether there, in fact, had been any changes made to the ignition switch?

-89-

A. Yes, yes I did. And they came back, said there's been no changes made to the

switch since the introduction to production.

Q. Who told you that?

A. Mary Fitz.

Q. Where is she located?

A. She's located in, I want to say, Delphi headquarters here in Michigan.

(DeGiorgio Deposition, pp. 117-118.)

245.    DeGiorgio clearly testified that he had spoken with Delphi employees and that

they confirmed there were no changes made to the ignition switch in 2005-2010 Cobalts.

246.    DeGiorgio signed his errata sheet on May 23, 2013. In the signed errata sheet,

DeGiorgio did not change any testimony referenced in this Complaint.

247.    On June 12, 2013, Gary Altman, the Cobalt program engineering manager,

testified as follows during his deposition in Melton v. GM:

Q. And the vehicle never should have been sold if it didn't meet GM's minimum

torque specific—performance requirements, should it?

MR. FRANKLIN: Object to form.

THE WITNESS: That's correct.

Q. And the reason is because that could be dangerous under certain situations, because

the key can move from run to accessory?

MR. FRANKLIN: Object to form.

THE WITNESS: Yes.

(Gary Altman Dep., pp. 23-24)

-90-

248.     Altman's admission simply demonstrates that N that the Defective Vehicles were dangerous but chose to do nothing about it.

**IV.   New GM Issues A Recall—Ten Years Too Late.**

249.     On February 7, 2014, New GM informed NHTSA that it was conducting Recall No. 14V-047 for certain 2005-2007 model year Chevrolet Cobalts and 2007 model year Pontiac G5 vehicles.

250.     In its February 7, 2014, letter to NHTSA, New GM represented that as replacement ignition switches became available, New GM would replace the ignition switches on the Defective Vehicles with ignition switches with greater torque to prevent the unintended movement from the "run" to "accessory" position..

251.     On February 19, 2014, a request for timeliness query was sent to NHTSA in connection with Recall No. 14V-047 ("timeliness query"). The timeliness query pointed out that New GM had failed to recall all of the vehicles with the defective ignition switches.

252.     The February 19, 2014 timeliness query also asked NHTSA to investigate New GM's failure to fulfill its legal obligation to report the safety defects in the Defective Vehicles to NHTSA within five days of discovering the defect.

253.     On February 24, 2014, New GM sent a letter informing NHTSA it was expanding the recall to include 2006-2007 model year (MY) Chevrolet HHR and Pontiac Solstice, 2003-2007 MY Saturn Ion, and 2007 MY Saturn Sky vehicles.

254.     New GM included an Attachment to the February 24, 2014, letter. In the Attachment New GM, *for the first time,* admitted that Old GM had authorized a change in the ignition switch in 2006. Specifically, New GM stated:

> On April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch proposed by the supplier, Delphi Mechatronics.

The approved changes included, among other things, the use of a new detent plunger and spring that increased torque force in the ignition switch. This change to the ignition switch was not reflected in a corresponding change in the part number for the ignition switch. GM believes that the supplier began providing the re-designed ignition switch to GM at some point during the 2007 model year.

255. New GM then produced documents in response to Congressional requests leading up to hearings on April 1 and 2, 2014. Among the documents produced by New GM is a document titled, "GENERAL MOTORS COMMODITY VALIDATION SIGN-OFF," dated April 26, 2006. According to this document, Delphi had met all of the sign-off requirements in order to provide a new ignition switch for certain Old GM vehicles. New GM has acknowledged that the ignition switch in the Cobalt was included in this design change.

256. The design change included a new detent plunger "to increase torque force in the switch." DeGiorgio's signature is on this page as the Old GM authorized engineer who signed off on this change to the ignition switch.

257. This Commodity Validation Sign-Off shows that DeGiorgio repeatedly perjured himself during his deposition on April 29, 2013. DeGiorgio perjured himself in order to fraudulently conceal evidence from the Meltons that Old GM had signed off on the change in the ignition switch so that the Meltons, and ultimately a jury, would never know that Old GM had changed the switches in 2007 and later model year Cobalts and concealed these changes from Brooke Melton.

258. DeGiorgio perjured himself when he signed the errata sheet confirming that all the testimony was true and accurate.

Case 14-PC-02543-JMF   Document 347   Filed 10/14/14   Page 114 of 150

259.     On March 17, 2014, Mary T. Barra, General Motors' chief executive issued an

internal video, which was broadcast to employees.[106] In the video, Ms. Barra admits:

> Scrutiny of the recall has expanded beyond the review by the
> federal regulators at NHTSA, the National Highway Traffic Safety
> Administration. As of now, two congressional committees have
> announced that they will examine the issue. And it's been reported
> that the Department of Justice is looking into this matter.… *These
> are serious developments that shouldn't surprise anyone.* After all,
> *something went wrong with our process in this instance and
> terrible things happened.…* The bottom line is, *we will be better
> because of this tragic situation*, if we seize the opportunity.… I ask
> everyone to stay focused on making today's GM the best it can be.

260.     On March 28, 2014, New GM again expanded the first ignition switch recall to

cover all model years of the Chevrolet Cobalt and HHR, the Pontiac G5 and Solstice and the

Saturn Ion and Sky in the United States. This third expansion of the ignition switch recall

covered an additional 824,000 vehicles in the U.S., bringing the number of recalled vehicles

to 2,191,146.

**V.     New GM's Recall Fails to Correct the Defect.**

261.     Not only was New GM's recall ten years too late, it is completely insufficient

to correct the safety-related defects in the Defective Vehicles.

262.     The supposed fix implemented by New GM as part of the recall—replacing the

ignition switch—is insufficient and does not adequately address the safety risks posed by the

defect. The ignition key and switch remains prone to inadvertently move from "run" to

"accessory." Replacing the ignition switch does not address the problem posed by the low

position of the ignition on the steering cylinder. Even with New GM's alleged "fix," drivers of

ordinary height can hit the ignition key with their knees during ordinary driving situations.

---

[106] *See* http://media.gm.com/media/us/en/gm/news.detail.html./content/ Pages/news/us/en/2014/mar/0317-
video.html. (last visited March 21, 2014) (emphasis added).

Such an impact may cause the ignition to move from the "run" to the "accessory" or "off" position while the vehicle is in operation, causing the vehicle to stall, the power brakes and power steeling to fail, and the airbags not to deploy in a collision.

263.     Since at least the November 2004 PRTS inquiry, first Old and then New GM has known that simply replacing the ignition switches on the Defective Vehicles is not a solution to the potential for the key to inadvertently turn from the "run" to the "accessory/off" position in these vehicles.

264.     New GM's recall fails to address the design defect that causes the key fob/chain to hang too low on the steering column.

265.     Thus, even when the ignition switches are replaced, this defective condition will still exist in the Defective Vehicles and there continues to be the potential for a driver to contact the key chain and inadvertently turn the key from the "run" to the "accessory/off" position.

266.     The recall is additionally insufficient because New GM is not replacing all of the keys in the Defective Vehicles with the redesigned key with a hole instead of a slot. Yet New GM's engineers have determined that the redesigned key would reduce the chance that the key could be inadvertently turned from the "run" to the "accessory/off" position.

267.     The recall also fails to address the design defects in the Defective Vehicles which disables the airbag immediately upon the engine shutting off.

268.     Although New GM began installing DeGiorgio's redesigned ignition switch in MY 2008 Defective Vehicles, later model year Defective Vehicles continue to experience non-deployment collision events. Undermining New GM's position is its own investigation

into the non-deployment events in Cobalts that identifies over 250 non-deploy crashes involving 2008-2010 Cobalts.

269.    New GM's engineers understood that increasing the detent in the ignition switch alone was not a solution to the problem, but New GM concealed—and continues to conceal from the public, including the Class, the nature and extent of the defects, which the current recall will not cure.

## VI.    New GM Expands the February/March Recall—and Suspends Two Engineers.

270.    On Wednesday, April 9, 2014, New GM issued a new recall of all the vehicles covered by the February/March ignition switch recall.

271.    New GM's stated purpose for the new recall is to replace "lock cylinder" into which the key is inserted, because the current lock cylinders allow the key to be pulled out while the car is still running.

272.    According to New GM, the defective lock cylinder could lead to "a possible roll-away, crash and occupant or pedestrian injuries."

273.    The next day, April 10, 2014, New GM announced that it was suspending Ray DeGiorgio, the lead design engineer for the Cobalt and Ion ignition switch, and Gary Altman, GM's program-engineering manager for the Cobalt, for their respective roles in GM's safety failure. (The two have since been terminated in the wake of the Valukas Report.)

274.    The April 10 announcement came after Ms. Barra, New GM's chief executive, was briefed on the results of former United States Attorney Anton R. Valukas internal investigation of the company, which was conducted in response to growing concerns regarding the safety of the Defective Vehicles.

275.    Additionally, New GM also announced a new program entitled "Speak Up for Safety," which is intended to encourage New GM employees to report potential customer

-95-

safety issues. According to Ms. Barra, this program is being adopted because New "GM must embrace a culture where safety and quality come first." Unfortunately, these actions are too little, too late.

**VII.** **The June 2014 Recall For The "Ignition Key Slot" Defect Further Reveals New GM's Fraudulent Concealment of Known Serious Safety Problems.**

276.     New GM sent further shockwaves through the automotive world when it announced, on June 23, 2014, that it was recalling 3,141,731 vehicles in the United States for ignition switch, or so-called "ignition key slot" defects (NHTSA Recall Number 14V- 355).

277.     According to information on NHTSA's website, 2,349,095 of the vehicles subject to this recall were made by Old GM. 792,636 vehicles were made and/or sold by New GM.

278.     The following Old GM vehicles were included in the June 23, 2014 recall: 2005-2009 Buick Lacrosse, 2006-2009 Chevrolet Impala, 2000-2005 Cadillac Deville, 2004-2009 Cadillac DTS, 2006-2011 Buick Lucerne, 2004-2005 Buick Regal LS and RS, and 2006-20009 Chevrolet Monte Carlo.

279.     The recall notice states, "In the affected vehicles, the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the run position, turning off the engine."

280.     Further, "[i]f the key is not in the run position, the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury. Additionally, a key knocked out of the run position could cause loss of engine power, power steering, and power braking, increasing the risk of a vehicle crash."

281. The vehicles included in this recall were built on the same platform and their defective ignition switches are likely due to weak detent plungers, just like the other Defective Vehicles recalled in February and March of 2014.

282. Old GM was long-aware of the ignition switch defect in these vehicles, and New GM was aware of the ignition switch defect in these vehicles from the date of its inception on July 11, 2009, as it acquired on that date all of the knowledge possessed by Old GM given the continuity in personnel, databases and operations from Old GM to New GM. In addition, New GM acquired additional information thereafter. The information, all of which was known to New GM, included the following facts:

i. In January of 2003, Old GM opened an internal investigation after it received complaints from a Michigan GM dealership that a customer had experienced a power failure while operating his model year 2003 Pontiac Grand Am.

ii. During the investigation, Old GM's Brand Quality Manager for the Grand Am visited the dealership and requested that the affected customer demonstrate the problem. The customer was able to recreate the shutdown event by driving over a speed bump at approximately 30-35 mph.

iii. The customer's key ring was allegedly quite heavy. It contained approximately 50 keys and a set of brass knuckles.

iv. In May 2003, Old GM issued a voicemail to dealerships describing the defective ignition condition experienced by the customer in the Grand Am. Old GM identified the relevant population of affected vehicles as the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am.

1197532.10

Case 14-MC-02543-JMF    Document 347    Filed 10/14/14    Page 216 of 150

      v.      Old GM did not recall these vehicles. Nor did it provide owners and/or lessees with notice of the defective condition. Instead, its voicemail directed dealerships to pay attention to the key size and mass of the customer's key ring.

      vi.      On July 24, 2003, Old GM issued an engineering work order to increase the detent plunger force on the ignition switch for the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am vehicles. Old GM engineers allegedly increased the detent plunger force and changed the part number of the ignition switch. The new parts were installed beginning in the model year 2004 Malibu, Alero, and Grand Am vehicles.

      vii.      Old GM issued a separate engineering work order in March 2004 to increase the detent plunger force on the ignition switch in the Pontiac Grand Prix. Old GM engineers did not change the part number for the new Pontiac Grand Prix ignition switch.

      viii.      Then-Old GM design engineer Ray DeGiorgio signed the work order in March 2004 authorizing the part change for the Grand Prix ignition switch. DeGiorgio maintained his position as design engineer with New GM.

      ix.      On or around August 25, 2005, Laura Andres, an Old GM design engineer (who remains employed with New GM), sent an email describing ignition switch issues that she experienced while operating a 2006 Chevrolet Impala on the highway. Ms. Andres' email stated, "While driving home from work on my usual route, I was driving about 45 mph, where the road changes from paved to gravel & then back to paved, some of the gravel had worn away, and the pavement acted as a speed bump when I went over it. The car shut off. I took the car in for repairs. The technician thinks it might be the ignition detent, because in a road test in the parking lot it also shut off."

Case 14-MC-02543-JMF    Document 374    Filed 10/14/14    Page 217 of 150

x.      Old GM employee Larry S. Dickinson, Jr. forwarded Ms. Andres'
email on August 25, 2005 to four Old GM employees. Mr. Dickinson asked, "Is this a condition
we would expect to occur under some impacts?"

xi.      On August 29, 2005, Old GM employee Jim Zito forwarded the
messages to Ray DeGiorgio and asked, "Do we have any history with the ignition switch and far
as it being sensitive to road bumps?"

xii.      Mr. DeGiorgio responded the same day, stating, "To date there has
never been any issues with the detents being too light."

xiii.      On August 30, 2005, Ms. Andres sent an email to Old GM
employee Jim Zito and copied ten other Old GM employees, including Ray DeGiorgio.
Ms. Andres, in her email, stated, "I picked up the vehicle from repair. No repairs were done. . . .
The technician said there is nothing they can do to repair it. He said it is just the design of the
switch. He said other switches, like on the trucks, have a stronger detent and don't experience
this."

xiv.      Ms. Andres' email continued: "I think this is a serious safety
problem, especially if this switch is on multiple programs. I'm thinking big recall. I was driving
45 mph when I hit the pothole and the car shut off and I had a car driving behind me that
swerved around me. I don't like to imagine a customer driving with their kids in the back seat, on
I-75 and hitting a pothole, in rush-hour traffic. I think you should seriously consider changing
this part to a switch with a stronger detent."

xv.      Ray DeGiorgio, who reportedly designed the ignition switches
installed in the 2006 Chevrolet Impala vehicles, replied to Ms. Andres' email, stating that he had
recently driven a 2006 Impala and "did not experience this condition."

283.    On or after July 11, 2009, senior executives and engineers at N that some of the information relayed to allay Ms. Andres' concerns was inaccurate. For example, Ray DeGiorgio knew that there had been "issues with detents being too light." Instead of relaying those "issues," Mr. DeGiorgio falsely stated that there were no such "issues."

284.    New GM has tried to characterize the recall of these 3.14 million vehicles as being different than the recall for the ignition switch defect in the Cobalts and other Defective Ignition Switch Vehicles when in reality and for all practical purposes it is for exactly the same defect that creates exactly the same safety risks. New GM has attempted to label and describe the ignition key slot defect as being different in order to provide it with cover and an explanation for why it did not recall these 3.14 million vehicles much earlier, and why it is not providing a new ignition switch and other remedies for the 3.14 million vehicles.

285.    From 2001 to the present, Old GM and New GM received numerous reports from consumers regarding complaints, crashes, injuries and deaths linked to this safety defect. The following are examples of just a few of the many reports and complaints regarding the defect:

286.    For example, on January 23, 2001, Old GM became aware of a complaint filed with NHTSA involving a 2000 Cadillac Deville and an incident that occurred on January 23, 2001, in which the following was reported:

> "COMPLETE ELECTRICAL SYSTEM AND ENGINE SHUTDOWN WHILE DRIVING. HAPPENED THREE DIFFERENT TIMES TO DATE. DEALER IS UNABLE TO DETERMINE CAUSE OF FAILURE. THIS CONDITION DEEMED TO BE EXTREMELY HAZARDOUS BY OWNER."
> NHTSA ID Number: 739850

287.     On June 12, 2001, Old GM became aware of a complaint filed with NHTSA involving a 2000 Cadillac Deville and an incident that occurred on June 12, 2001, in which the following was reported:

> "INTEERMITTENTLY AT 60MPH VEHICLE WILL STALL OUT AND DIE. MOST TIMES VEHICLE WILL START UP IMMEDIATELY AFTER. DEALER HAS REPLACED MAIN CONSOLE 3 TIMES, AND ABS BRAKES. BUT, PROBLEM HAS NOT BEEN CORRECTED. MANUFACTURER HAS BEEN NOTIFIED.*AK" NHTSA ID Number: 890227

288.     On January 27, 2003, Old GM became aware of a complaint filed with NHTSA involving a 2001 Cadillac Deville and an incident that occurred on January 27, 2003, in which the following was reported:

> "WHILE DRIVING AT HIGHWAY SPEED ENGINE SHUTDOWN, CAUSING AN ACCIDENT. PLEASE PROVIDE ANY ADDITIONAL INFORMATION.*AK" NHTSA ID Number: 10004759

289.     On September 18, 2007, Old GM became aware of a complaint filed with NHTSA involving a 2006 Chevrolet Impala and an incident that occurred on September 15, 2006, in which it was reported that:

> "TL*THE CONTACTS SON OWNS A 2006 CHEVROLET IMPALA. WHILE DRIVING APPROXIMATELY 33 MPH AT NIGHT, THE CONTACTS SON CRASHED INTO A STALLED VEHICLE. HE STRUCK THE VEHICLE ON THE DRIVER SIDE DOOR AND NEITHER THE DRIVER NOR THE PASSENGER SIDE AIR BAGS DEPLOYED. THE DRIVER SUSTAINED MINOR INJURIES TO HIS WRIST. THE VEHICLE SUSTAINED MAJOR FRONT END DAMAGE. THE DEALER WAS NOTIFIED AND STATED THAT THE CRASH HAD TO HAVE BEEN A DIRECT HIT ON THE SENSOR. THE CURRENT AND FAILURE MILEAGES WERE 21,600. THE CONSUMER STATED THE AIR BAGS DID NOT DEPLOY. THE CONSUMER PROVIDED PHOTOS OF THE VEHICLE. UPDATED 10/10/07 *TR" NHTSA ID Number: 10203350

290.    On April 02, 2009, GM became aware of a complaint filed with NHTSA involving a 2005 Buick LaCrosse and an incident that occurred on April 02, 2009, in which the following was reported:

> "POWER STEERING WENT OUT COMPLETELY, NO
> WARNING JUST OUT. HAD A VERY HARD TIME
> STEERING CAR. LUCKY KNOW ONE WAS HURT. *TR"
> NHTSA ID Number: 10263976

291.    The reports regarding the defect continued to be reported to New GM. For example, on February 15, 2010, New GM became aware of a complaint filed with NHTSA involving a 2008 Buick LaCrosse and an incident that occurred on February 13, 2010, in which a driver reported:

> "WHILE DRIVING AT 55MPH I RAN OVER A ROAD BUMP
> AND MY 2008 BUICK LACROSSE SUPER SHUT
> OFF(STALLED). I COASTED TO THE BURM, HIT BRAKES
> TO A STOP. THE CAR STARTED ON THE FIRST TRY.
> CONTINUED MY TRIP WITH NO INCIDENCES. TOOK TO
> DEALER AND NO CODES SHOWED IN THEIR COMPUTER.
> CALLED GM CUSTOMER ASSISTANCE AND THEY GAVE
> ME A CASE NUMBER. NO BULLETINS. SCARY TO DRIVE.
> TRAFFIC WAS LIGHT THIS TIME BUT MAY NOT BE THE
> NEXT TIME. *TR." NHTSA ID Number: 10310692

292.    On April 21, 2010, New GM became aware of a complaint filed with NHTSA involving a 2006 Buick Lucerne and an incident that occurred on March 22, 2010, in which the following was reported:

> "06 BUICK LUCERNE PURCHASED 12-3-09, DIES OUT
> COMPLETELY WHILE DRIVING AT VARIOUS SPEEDS.
> THE CAR HAS SHUT OFF ON THE HIGHWAY 3 TIMES
> WITH A CHILD IN THE CAR. IT HAS OCCURRED A TOTAL
> OF 7 TIMES BETWEEN1-08-10 AND 4-17-10. THE CAR IS
> UNDER FACTORY WARRANTY AND HAS BEEN
> SERVICED 7 TIMES BY 3 DIFFERENT BUICK
> DEALERSHIPS. *TR" NHTSA ID Number: 10326754

1197532.10

Case 14-MC-02543-JMF   Document 347   Filed 11/05/14   Page 91 of 150

293.    On April 29, 2010, New GM became aware of a complaint filed with NHTSA

involving a 2005 Buick LaCrosse and an incident that occurred on March 21, 2010, in which

it was reported that:

> "TRAVELING ON INTERSTATE 57 DURING DAYTIME
> HOURS. WHILE CRUISING AT 73 MILES PER HOUR IN THE
> RIGHT HAND LANE, THE VEHICLE SPUTTERED AND
> LOST ALL POWER. I COASTED TO A STOP OFF THE SIDE
> OF THE ROAD. I RESTARTED THE VEHICLE AND
> EVERYTHING SEEMED OK, SO I CONTINUED ON. A
> LITTLE LATER IT SPUTTERED AGAIN AND STARTED
> LOSING POWER. THE POWER CAME BACK BEFORE IT
> CAME TO A COMPLETE STOP. I CALLED ON STAR FOR A
> DIAGNOSTIC CHECK AND THEY TOLD ME I HAD A FUEL
> SYSTEM PROBLEM AND THAT IF THE CAR WOULD RUN
> TO CONTINUE THAT IT WAS NOT A SAFETY ISSUE. THEY
> TOLD ME TO TAKE IT TO A DEALER FOR REPAIRS WHEN
> I GOT HOME. I TOOK THE CAR WORDEN-MARTEN
> SERVICE CENTER FOR REPAIRS ON MARCH 23RD. TO
> REPAIR THE CAR THEY: 1.REPLACED CAT CONVERTER
> AND OXYGEN SENSOR 125CGMPP- $750.47 A SECOND
> INCIDENT OCCURRED WHILE TRAVELING ON
> INTERSTATE 57 DURING DAYTIME HOURS. I WAS
> PASSING A SEMI TRACTOR TRAILER WITH THREE CARS
> FOLLOWING ME WHILE CRUISING AT 73 MILES PER
> HOUR WHEN THE VEHICLE SPUTTERED AND LOST ALL
> POWER PUTTING ME IN A VERY DANGEROUS
> SITUATION. THE VEHICLE COASTED DOWN TO ABOUT
> 60 MILES PER HOUR BEFORE IT KICKED BACK IN. I IN
> THE MEAN TIME HAD DROPPED BACK BEHIND THE SEMI
> WITH THE THREE CARS BEHIND ME AND WHEN I COULD
> I PULLED BACK INTO THE RIGHT HAND LANE. THIS WAS
> A VERY DANGEROUS SITUATION FOR ME AND MY WIFE.
> I CALLED ON STAR FOR A DIAGNOSTIC CHECK AND
> THEY TOLD ME THAT EVERYTHING WAS OK. I TOOK
> THE CAR WORDEN-MARTEN SERVICE CENTER FOR
> REPAIRS AGAIN ON APRIL 19TH TO REPAIR THE CAR
> THEY: 1.REPLACED MASS -AIR FLOW UNIT AND SENSOR
> $ 131.39 WHO KNOWS IF IT IS FIXED RIGHT THIS TIME?
> THIS WAS A VERY DANGEROUS SITUATION TO BE IN
> FOR THE CAR TO FAIL. *TR" NHTSA ID Number: 10328071

294.    On June 2, 2010, New GM became aware of a complaint filed with NHTSA involving a 2007 Buick LaCrosse and an incident that occurred on March 1, 2010, in which the following was reported:

> "2007 BUICK LACROSSE SEDAN. CONSUMER STATES
> MAJOR SAFETY DEFECT. CONSUMER REPORTS WHILE
> DRIVING THE ENGINE SHUTDOWN 3 TIMES FOR NO
> APPARENT REASON *TGW" NHTSA ID Number: 10334834

295.    On February 20, 2014, New GM became aware of a complaint filed with NHTSA involving a 2006 Chevrolet Monte Carlo and an incident that occurred on January 16, 2014, in which the following was reported:

> "I WAS DRIVING GOING APPROXIMATELY 45 MPH, I HIT
> A POT HOLE AND MY VEHICLE CUT OFF. THIS HAS
> HAPPENED THREE TIMES SINCE JANUARY. THE SAME
> THING HAPPENED THE SECOND TIME. THE LAST TIME IT
> OCCURRED WAS TUESDAY, FEBRUARY 18. THIS TIME I
> WAS ON THE EXPRESSWAY TRAVELING
> APPROXIMATELY 75 MPH, HIT A BUMP AND IT CUT OFF.
> THE CAR STARTS BACK UP WHEN I PUT IT IN NEUTRAL.
> *TR" NHTSA ID Number: 10565104

296.    On March 3, 2014, New GM became aware of a complaint filed with NHTSA involving a 2006 Chevrolet Impala and an incident that occurred on February, 29, 2012, in which the following was reported:

> "I WAS DRIVING MY COMPANY ASSIGNED CAR DOWN A
> STEEP HILL WHEN THE ENGINE STALLED WITHOUT
> WARNING. THIS HAS HAPPENED 5 OTHER TIMES WITH
> THIS VEHICLE. THIS WAS THE FIRST TIME I WAS
> TRAVELING FAST THOUGH. IT'S LIKE THE ENGINE JUST
> TURNS OFF. THE LIGHTS ARE STILL ON BUT I LOSE THE
> POWER STEERING AND BRAKES. IT WAS TERRIFYING
> AND EXTREMELY DANGEROUS. THIS PROBLEM
> HAPPENS COMPLETELY RANDOMLY WITH NO
> WARNING. IT HAS HAPPENED TO OTHERS IN MY
> COMPANY WITH THEIR IMPALAS. I LOOKED ONLINE
> AND FOUND NUMEROUS OTHER INSTANCES OF CHEVY
> IMPALAS OF VARIOUS MODEL YEARS DOING THE SAME
> THING. IT IS CURRENTLY IN THE REPAIR SHOP AND THE

1197532.10

Case 14-MC-02543-JMF    Document 1574    Filed 10/11/14    Page 823 of 150

MECHANIC CAN'T DUPLICATE THE PROBLEM. I TOLD
THEM ITS RANDOM AND OCCURS ABOUT EVERY 4
MONTHS OR SO. I AM AFRAID I WILL HAVE TO GET
BACK IN THIS DEATH TRAP DUE TO MY EMPLOYER
MAKING ME. PLEASE HELP- I DON'T WANT TO DIE
BECAUSE CHEVROLET HAS A PROBLEM WITH THEIR
ELECTRICAL SYSTEMS IN THEIR CARS. *TR" NHTSA ID
Number: 10567458

297.    On March 11, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2007 Cadillac DTS and an incident that occurred on January 27, 2013, in which

the following was reported:

"ENGINE STOPPED. ALL POWER EQUIPMENT CEASED TO
FUNCTION. I WAS ABLE TO GET TO THE SIDE OF THE
FREEWAY. PUT THE CAR IN NEUTRAL, TURNED THE KEY
AND THE CAR STARTED AND CONTINUED FOR THE
DURATION OF THE 200 MILE TRIP. THE SECOND TIME
APPROXIMATELY THREE WEEKS AGO MY WIFE WAS
DRIVING IN HEAVY CITY TRAFFIC WHEN THE SAME
PROBLEM OCCURRED AND SHE LOST THE USE OF ALL
POWER EQUIPMENT. SHE WAS ABLE TO PUT THE CAR IN
PARK AND GET IT STARTED AGAIN WITHOUT INCIDENT.
I CALLED GM COMPLAINT DEPARTMENT. THEY
INSTRUCTED ME TO TAKE THE CAR TO A DEALERSHIP
AND HAVE A DIAGNOSTIC TEST DONE ON IT. THIS WAS
DONE AND NOTHING WAS FOUND TO BE WRONG WITH
THE VEHICLE. I AGAIN CALLED CADILLAC COMPLAINT
DEPARTMENT AND OPENED A CASE. THIS TIME I WAS
TOLD TO TAKE THE CAR BACK TO THE DEALERSHIP
AND ASK THE SERVICE DEPARTMENT TO RECHECK IT. I
INFORMED THEM I HAVE THE DIAGNOSTIC REPORT
SHOWING NOTHING WRONG WAS FOUND. THEY
SUGGESTED I TAKE IT BACK AND HAVE THE SERVICE
PEOPLE DRIVE THE CAR. THIS DIDN'T MAKE ANY SENSE
BECAUSE I DON'T KNOW WHEN AND WHERE THE
PROBLEM WILL OCCUR AGAIN. WHAT WAS I TO DO FOR
A CAR WHILE THE DEALERSHIP HAD MINE? I INQUIRED
OF THE CADILLAC REPRESENTATIVE IF THIS CAR MAY
HAVE THE SAME IGNITION AS THE CARS CURRENTLY
BEING RECALLED BY GM. THEY WERE UNABLE TO
ANSWER THAT QUESTION. THEY FINALLY STATED THE
ONLY REMEDY WAS TO TAKE IT BACK TO THE
DEALERSHIP. IF THIS PROBLEM OCCURS AGAIN
SOMEONE COULD EASILY GET INJURED OR KILLED. I

Case 14-MC-2543-JMF   Document 347   Filed 11/05/14   Page 924 of 150

WOULD APPRECIATE ANY ASSISTANCE YOU CAN GIVE
ME ON HOW TO RESOLVE THIS MATTER." NHTSA
Number: 10568491

298.    On March 19, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Buick LaCrosse and an incident that occurred on March 15, 2014, in which

the following was reported:

> "WHILE DRIVING UP A LONG INCLINE ON I-10 VEHICLE
> BEHAVED AS IF THE IGNITION HAD BEEN TURNED OFF
> AND KEY REMOVED. IE: ENGINE OFF, NO LIGHTS OR
> ACCESSORIES, NO WARNING LIGHTS ON DASH. TRAFFIC
> WAS HEAVY AND MY WIFE WAS FORTUNATE TO
> SAFELY COAST INTO SHOULDER. INCIDENT RECORDED
> WITH BUICK, HAVE REFERENCE NUMBER. *TR" NHTSA
> ID Number: 10573586

299.    On June 20, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2008 Buick LaCrosse and an incident that occurred on August 30, 2013, in which

the following was reported:

> "THE IGNITION CONTROL MODULE (NOT THE IGNITION
> SWITCH) FAILED SUDDENLY WHILE DRIVING ON THE
> HIGHWAY, CAUSING THE ENGINE TO SHUT OFF
> SUDDENLY AND WITHOUT WARNING. THE CAR WAS
> TRAVELING DOWNHILL, SO THE INITIAL INDICATION
> WAS LOSS OF POWER STEERING. I WAS ABLE TO PULL
> ONTO THE SHOULDER AND THEN REALIZED THAT THE
> ENGINE HAD DIED AND WOULD NOT RESTART. WHILE
> NO CRASH OR INJURY OCCURRED, THE POTENTIAL FOR
> A SERIOUS CRASH WAS QUITE HIGH." NHTSA ID Number:
> 10604820

300.    On July 1, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Buick LaCrosse and an incident that occurred on October 25, 2012, in which

the following was reported:

> "TRAVELING 40 MPH ON A FOUR LANE ABOUT TO PASS
> A TRUCK. MOTOR STOPPED, POWER STEERING OUT,
> POWER BRAKES OUT, MANAGED TO COAST ACROSS
> THREE LANES TO SHOULDER TO PARK. WALKED 1/4

MILES TO STORE CALLED A LOCAL GARAGE. CAR STILL
WOULD NOT START, TOWED TO HIS GARAGE. CHECKED
GAS, FUEL PRESSURE OKAY BUT NO SPARK. MOVED
SOME CONNECTORS AROUND THE STARTING MODULE
AND CAR STARTED. HAVE NOT HAD ANY PROBLEMS
SINCE, HAVE THE FEAR THAT I WILL BE ON A CHICAGO
TOLL ROAD AND IT WILL STOP AGAIN." NHTSA ID
Number: 10607535

301.    On July 12, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2009 Chevrolet Impala and an incident that occurred on March 19, 2010, in which

the following was reported:

"I HAD JUST TURNED ONTO THIS ROAD, HAD NOT EVEN
GONE A MILE. NO SPEED, NO BLACK MARKS, CAR
SHUTDOWN RAN OFF THE ROAD AND HIT A TREE
STUMP. TOTAL THE CAR. THE STEERING WHEEL WAS
BENT ALMOST IN HALF. I HAVE PICTURES OF THE CAR. I
GOT THIS CAR NEW, SO ALL MILES WE'RE PUT ON IT BY
ME. I BROKE MY HIP, BACK, KNEE, DISLOCATED MY
ELBOW, CRUSHED MY ANKLE AND FOOT. HAD A HEAD
INJURY, A DEFLATED LUNG. I WAS IN THE HOSPITAL
FOR TWO MONTHS AND A NURSING HOME FOR A
MONTH. I HAVE HAD 14 SURGERIES. STILL NOT ABLE TO
WORK OR DO A LOT OF THINGS FOR MY SELF. WITH THE
RECALLS SHOWING THE ISSUES OF THE ENGINE
SHUTTING OFF, I NEED THIS LOOKED INTO." NHTSA ID
Number: 10610093

302.    On July 24, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2008 Buick LaCrosse and an incident that occurred on July 15, 2014, in which the

following was reported:

"WHILE DRIVING NORTH ON ALTERNATE 69 HIGHWAY
AT 65 MPH AT 5:00 P.M., MY VEHICLE ABRUPTLY LOSS
POWER EVEN THOUGH I TRIED TO ACCELERATE. THE
ENGINE SHUT OFF SUDDENLY AND WITHOUT WARNING.
VEHICLE SLOWED TO A COMPLETE STOP. I WAS
DRIVING IN THE MIDDLE LANE AND WAS UNABLE TO
GET IN THE SHOULDER LANE BECAUSE I HAD NO
PICKUP (UNABLE TO GIVE GAS TO ACCELERATE) SO MY
HUSBAND AND I WERE CAUGHT IN FIVE 5:00 TRAFFIC
WITH CARS WHIPPING AROUND US ON BOTH SIDES AND

MANY EXCEEDING 65 MPH. I PUT ON MY EMERGENCY
LIGHTS AND IMMEDIATELY CALLED ON-STAR. I WAS
UNABLE TO RESTART THE ENGINE. THANK GOD FOR
ON-STAR BECAUSE FROM THAT POINT ON, I WAS IN
TERROR WITNESSING CARS COMING UPON US NOT
SLOWING UNTIL THEY REALIZED I WAS AT A STAND
STILL WITH LIGHTS FLASHING. THE CARS WOULD
SWERVE TO KEEP FROM HITTING US. IT TOOK THE
HIGHWAY PATROL AND POLICE 15 MINUTES TO GET TO
US BUT DURING THAT TIME, I RELIVED VISIONS OF US
BEING KILLED ON THE HIGHWAY. I CAN€™T
DESCRIBE THE HORROR, LOOKING OUT MY REAR VIEW
MIRROR, WITNESSING OUR DEMISE TIME AFTER TIME.
THOSE 15 MINUTES SEEMED LIKE AN ETERNITY. WHEN
THE HIGHWAY PATROL ARRIVED THEY CLOSED LANES
AND ASSISTED IN PUSHING CAR OUT OF THE HIGHLY
TRAFFIC LANES. IT TOOK MY HUSBAND AND I BOTH TO
TURN THE STEERING WHILE IN NEUTRAL. THE CAR WAS
TOWED TO CONKLIN FANGMAN KC DEALERSHIP AND I
HAD TO REPLACE IGNITION COIL AND MODULE THAT
COST ME $933.16. THEY SAID THESE PARTS WERE NOT
ON THE RECALL LIST, WHICH I HAVE FOUND OUT SINCE
THEN GM HAS PUT DEALERSHIPS ON NOTICE OF THIS
PROBLEM. IT HAS SOMETHING TO DO WITH SUPPLYING
ENOUGH MANUFACTURED PARTS TO TAKE CARE OF
RECALL. IF I COULD AFFORD TO PURCHASE ANOTHER
CAR I WOULD BECAUSE I DON€™T FEEL SAFE ANY
LONGER IN THIS CAR. EMOTIONALLY I AM STILL
SUFFERING FROM THE TRAUMA." NHTSA ID Number:
10604820

303.     Notwithstanding New GM's recall, the reports and complaints relating to this

defect have continued to pour into New GM. Such complaints and reports indicate that New

GM's proffered recall "fix" does not work.

304.     For example, on August 2, 2014, New GM became aware of a complaint filed

with NHTSA involving a 2006 Buick LaCrosse and an incident that occurred on July 12, 2014,

in which the following was reported:

"WHILE TRAVELING IN THE FAST LANE ON THE
GARDEN STATE PARKWAY I HIT A BUMP IN THE ROAD,
THE AUTO SHUT OFF.WITH A CONCRETE DIVIDER
ALONG SIDE AND AUTOS APPROACHING AT HIGH

SPEED, MY WIFE AND DAUGHTER SCREEMING I
MANAGED TO GET TO THE END OF THE DIVIDER WERE I
COULD TURN OFF THE AUTO RESTARTED ON 1ST TRY
BUT VERY SCARY." NHTSA ID Number: 10618391

305.    On August 18, 2014, New GM became aware of a complaint filed with

NHTSA involving a 2007 Buick LaCrosse and an incident that occurred on August 18, 2014,

in which the following was reported:

"TL* THE CONTACT OWNS A 2007 BUICK LACROSSE. THE
CONTACT STATED WHILE DRIVING APPROXIMATELY 60
MPH, SHE HIT A POT HOLE AND THE VEHICLE STALLED.
THE VEHICLE COASTED TO THE SHOULDER OF THE
ROAD. THE VEHICLE WAS RESTARTED AND THE
CONTACT WAS ABLE TO DRIVE THE VEHICLE AS
NORMAL. THE CONTACT RECEIVED A RECALL NOTICE
UNDER NHTSA CAMPAIGN NUMBER: 14V355000
(ELECTRICAL SYSTEM), HOWEVER THE PARTS NEEDED
FOR THE REPAIRS WAS UNAVAILABLE. THE VEHICLE
WAS NOT REPAIRED. THE MANUFACTURER WAS NOT
NOTIFIED OF THE FAILURE. THE APPROXIMATE
FAILURE MILEAGE WAS 110,000." NHTSA ID Number:
10626067

306.    On August 20, 2014, New GM became aware of complaint filed with NHTSA

involving a 2007 Chevrolet Impala and an incident that occurred on August 6, 2014, in which

it was reported that:

"TL* THE CONTACT OWNS A 2007 CHEVROLET IMPALA.
THE CONTACT STATED THAT WHILE DRIVING 25 MPH,
THE VEHICLE STALLED WITHOUT WARNING. THE
CONTACT RECEIVED A NOTIFICATION FOR RECALL
NHTSA CAMPAIGN NUMBER: 14V355000 (ELECTRICAL
SYSTEM). THE VEHICLE WAS TAKEN TO AN
INDEPENDENT MECHANIC WHERE THE TECHNICIAN
ADVISED THE CONTACT TO REMOVE THE KEY FOB AND
ANY OTHER OBJECTS. THE VEHICLE WAS NOT
REPAIRED. THE MANUFACTURER WAS MADE AWARE OF
THE FAILURE. THE FAILURE MILEAGE WAS 79,000."
NHTSA ID Number: 10626659

Case 14-md-02543-JMF    Document 347    Filed 10/14/14    Page 130 of 150

307.    On August 27, 2014, New GM became aware of the following complaint filed

with NHTSA involving a 2008 Chevrolet Impala and an incident that occurred on August 27,

2014, in which it was reported that:

> "TL-THE CONTACT OWNS A 2008 CHEVROLET IMPALA.
> THE CONTACT STATED WHILE DRIVING
> APPROXIMATELY 50 MPH, THE VEHICLE LOST POWER
> AND THE STEERING WHEEL SEIZED WITHOUT
> WARNING. AS A RESULT, THE CONTACT CRASHED INTO
> A POLE AND THE AIR BAGS FAILED TO DEPLOY. THE
> CONTACT SUSTAINED A CONCUSSION, SPRAINED NECK,
> AND WHIPLASH WHICH REQUIRED MEDICAL
> ATTENTION. THE POLICE WAS NOT FILED. THE VEHICLE
> WAS TOWED TO A TOWING COMPANY. THE CONTACT
> RECEIVED NOTIFICATION OF NHTSA CAMPAIGN ID
> NUMBER: 14V355000 (ELECTRICAL SYSTEM), HOWEVER
> THE PARTS ARE NOT AVAILABLE TO PERFORM THE
> REPAIRS. THE VEHICLE WAS NOT REPAIRED. THE
> MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE.
> THE APPROXIMATE FAILURE MILEAGE WAS 70,000. MF."
> NHTSA ID Number: 10628704.

308.    Old GM and later N that this serious safety defect existed for years yet did

nothing to warn the public or even attempt to correct the defect in these vehicles until late

June of 2014 when New GM finally made the decision to implement a recall.

309.    The "fix" that New GM plans as part of the recall is to modify the ignition key

from a "slotted" key to "hole" key." This is insufficient and does not adequately address the

safety risks posed by the defect. The ignition key and switch remain prone to inadvertently

move from the "run" to the "accessory" position. Simply changing the key slot or taking other

keys and fobs off of key rings is New GM's attempt to make consumers responsible for the

safety of GM-branded vehicles and to divert its own responsibility to make GM-branded

vehicles safe. New GM's "fix" does not adequately address the inherent dangers and safety

threats posed by the defect in the design. In addition, New GM is not addressing the other

design issues that create safety risks in connection with this defect. New GM is not altering

Case 14-PM-02543-JMF    Document 347    Filed 10/14/14    Page 229 of 150

the algorithm that prevents the airbags from deploying when the ignition leaves the "run" position even when the vehicle is moving at high speed. And New GM is not altering the placement of the ignition switch in an area where the driver's knees may inadvertently cause the ignition to move out of the "run" position.

310.    Further, as of the date of this filing, New GM has not even begun to implement this "fix," leaving owners and lessees in these vehicles exposed to the serious safety risks posed by moving stalls and the accompanying effects on powering steering, power brakes, and the vehicle's airbags.

## VIII.    The July 2 and 3, 2014 Recalls Relating to the Unintended Ignition Rotation Defect Further Reveal New GM's Fraudulent Concealment of Known Serious Safety Problems.

311.    On July 2, 2014, New GM recalled 554,328 vehicles in the United States for ignition switch defects (Recall Number 14V-394). The July 2 recall applied to the 2003-2014 Cadillac CTS and the 2004-2006 Cadillac SRX.

312.    The recall notice explains that the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the "run" position, turning off the engine. Further, if the key is not the in the "run" position, the airbags may not deploy in the event of a collision, increasing the risk of injury.

313.    On July 3, 2014, New GM recalled 6,729,742 additional vehicles in the United States for ignition switch defects (Recall No. 14V-400).

314.    The following Old GM vehicles were included in this recall: 1997-2005 Chevrolet Malibu, 2000-2005 Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005 Pontiac Grand Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999-2004 Oldsmobile Alero.

-111-

315.    The recall notice states that the weight on the key and/or road conditions or some other jarring event may cause the ignition switch to move out of the "run" position, turning off the engine. If the key is not in the "run" position, the airbags may not deploy if the vehicle is involved in a collision, increasing the risk of injury.

316.    In both of these recalls, New GM notified NHTSA and the public that the recall was intended to address a defect involving unintended or "inadvertent key rotation" within the ignition switch of the vehicles. As with the ignition key defect announced June 20, however, the defects for which these vehicles have been recalled is directly related to the ignition switch defect in the Cobalt and other Defective Ignition Switch Vehicles and involves the same safety risks and dangers.

317.    Based on information on NHTSA's website, 175,896 of the recalled vehicles were manufactured by Old GM. 108,174 of the vehicles were manufactured and sold by New GM.

318.    Once again, the unintended ignition rotation defect is substantially similar to and relates directly to the other ignition switch defects, including the defects that gave rise to the initial recall of 2.1 million Cobalt and other vehicles in February and March of 2014. Like the other ignition switch defects, the unintended ignition key rotation defect poses a serious and dangerous safety risk because it can cause a vehicle to stall while in motion by causing the key in the ignition to inadvertently move from the "on" or "run" position to "off" or "accessory position." Like the other ignition switch defects, the unintended ignition key rotation defect can result in a loss of power steering, power braking and increase the risk of a crash. And as with the other ignition switch defects, if a crash occurs, the airbags will not deploy because of the unintended ignition key rotation defect.

-112-

319.    The unintended ignition key rotation defect involves several problems, and they are identical to the problems in the other Defective Vehicles: a weak detent plunger, the low positioning of the ignition on the steering column, and the algorithm that renders the airbags inoperable when the vehicle leaves the "run" position.

320.    The 2003-2006 Cadillac CTS and the 2004-2006 Cadillac SRX use the same Delphi switch and have inadequate torque for the "run"-"accessory" direction of the key rotation. This was known to Old and New GM, and was the basis for a change that was made to a stronger detent plunger for the 2007 and later model years of the SRX model. The 2007 and later CTS vehicles used a switch manufactured by Dalian Alps.

321.    In 2010, New GM changed the CTS key from a "slot" to a "hole" design to "reduce an observed nuisance" of the key fob contacting the driver's leg. But in 2012, a New GM employee reported two running stalls of a 2012 CTS that had a "hole" key and the stronger detent plunger switch. When New GM did testing in 2014 of the "slot" versus "hole" keys, it confirmed that the weaker detent plunger-equipped switches used in the older CTS and SRX could inadvertently move from "run" to "accessory" or "off" when the "vehicle goes off road or experience some other jarring event."

322.    GM has tried to characterize the recall of these 7.3 million vehicles as being different than the other ignition switch defects *even though* these recalls are aimed at addressing the same defects and safety risks as those that that gave rise to the other ignition switch defect recalls. New GM has attempted to portray the unintended ignition key rotation defect as being different from the ignition switch defect in order to deflect attention from the severity and pervasiveness of the ignition switch defect and to try to provide a story and

plausible explanation for why it did not recall these 7.3 million vehicles much earlier, and to avoid providing new, stronger ignition switches as a remedy.

323.    From 2002 to the present, Old GM and New GM received numerous reports from consumers regarding complaints, crashes, injuries and deaths linked to this safety defect. The following are just a handful of examples of some of the reports known to Old GM and New GM:

324.    On September 16, 2002, Old GM became aware of a complaint filed with NHTSA regarding a 2002 Oldsmobile Intrigue involving an incident that occurred on March 16, 2002, in which the following was reported:

> "WHILE DRIVING AT 30 MPH CONSUMER RAN HEAD ON INTO A STEEL GATE, AND THEN HIT THREE TREES. UPON IMPACT, NONE OF THE AIR BAGS DEPLOYED. CONTACTED DEALER. PLEASE PROVIDE FURTHER INFORMATION. *AK" **NHTSA ID Number:** 8018687.

325.    On November 22, 2002, Old GM became aware of complaint filed with NHTSA involving a 2003 Cadillac CTS involving an incident that occurred on July 1, 2002, in which it was reported that:

> "THE CAR STALLS AT 25 MPH TO 45 MPH, OVER 20 OCCURANCES, DEALER ATTEMPTED 3 REPAIRS. DT" NHTSA ID Number: 770030.

326.    On January 21, 2003, Old GM became aware of a complaint filed with NHTSA involving a 2003 Cadillac CTS, in which the following was reported:

> "WHILE DRIVING AT ANY SPEED,THE VEHICLE WILL SUDDENLY SHUT OFF. THE STEERING WHEEL AND THE BRAKE PEDAL BECOMES VERY STIFF. CONSUMER FEELS ITS VERY UNSAFE TO DRIVE. PLEASE PROVIDE ANY FURTHER INFORMATION." NHTSA ID Number: 10004288.

327.    On June 30, 2003, Old GM became aware of a complaint with NHTSA regarding a 2001 Oldsmobile Intrigue which involved the following report:

1197532.10

"CONSUMER NOTICED THAT WHILE TRAVELING DOWN
HILL AT 40-45 MPH BRAKES FAILED, CAUSING
CONSUMER TO RUN INTO THREES AND A POLE. UPON
IMPACT, AIR BAGS DID NOT DEPLOY. *AK" **NHTSA ID
Number:** 10026252.

328.    On March 11, 2004, Old GM became aware of a complaint filed with NHTSA

involving a 2004 Cadillac CTS involving an incident occurred on March 11, 2004, in which

the following was reported:

"CONSUMER STATED WHILE DRIVING AT 55-MPH
VEHICLE STALLED, CAUSING CONSUMER TO PULL OFF
THE ROAD. DEALER INSPECTED VEHICLE SEVERAL
TIMES, BUT COULD NOT DUPLICATE OR CORRECT THE
PROBLEM. *AK" NHTSA ID Number: 10062993.

329.    On March 11, 2004, Old GM became aware of a complaint with NHTSA

regarding a 2003 Oldsmobile Alero incident that occurred on July 26, 2003, in which the

following was reported:

"THE VEHICLE DIES. WHILE CRUISING AT ANY SPEED,
THE HYDRAULIC BRAKES & STEERING FAILED DUE TO
THE ENGINE DYING. THERE IS NO SET PATTERN, IT
MIGHT STALL 6 TIMES IN ONE DAY, THEN TWICE THE
NEXT DAY. THEN GO 4 DAYS WITH NO OCURRENCE,
THEN IT WILL STALL ONCE A DAY FOR 3 DAYS. THEN
GO A WEEK WITH NO OCURRENCE, THEN STALL 4 TIMES
A DAY FOR 5 DAYS, ETC., ETC. IN EVERY OCURRENCE, IT
TAKES APPROXIMATELY 10 MINUTES BEFORE IT WILL
START BACK UP. AT HIGH SPEEDS, IT IS EXTREMELY
TOO DANGEROUS TO DRIVE. WE'VE TAKEN IT TO THE
DEALER, UNDER EXTENDED WARRANTY, THE
REQUIRED 4 TIMES UNDER THE LEMON LAW PROCESS.
THE DEALER CANNOT ASCERTAIN, NOR FIX THE
PROBLEM. IT HAPPENED TO THE DEALER AT LEAST
ONCE WHEN WE TOOK IT IN. I DOUBT THEY WILL
ADMIT IT, HOWEVER, MY WIFE WAS WITNESS. THE CAR
IS A 2003. EVEN THOUGH I BOUGHT IT IN JULY 2003, IT
WAS CONSIDERED A USED CAR. GM HAS DENIED OUR
CLAIM SINCE THE LEMON LAW DOES NOT APPLY TO
USED CARS. THE CAR HAS BEEN PERMANENTLY
PARKED SINCE NOVEMBER 2003. WE WERE FORCED TO
BUY ANOTHER CAR. THE DEALER WOULD NOT TRADE.

THIS HAS RESULTED IN A BADLUCK SITUATION FOR US.
WE CANNOT AFFORD 2 CAR PAYMENTS / 2 INSURANCE
PREMIUMS, NOR CAN WE AFFORD $300.00 PER HOUR TO
SUE GM. I STOPPED MAKING PAYMENTS IN DECEMBER
2003. I HAVE KEPT THE FINANCE COMPANY ABREAST OF
THE SITUATION. THEY HAVE NOT REPOSSED AS OF YET.
THEY WANT ME TO TRY TO SELL IT. CAN YOU HELP
?*AK" **NHTSA ID Number:** 10061898.

330.    On July 20, 2004, Old GM became aware of a complaint filed with NHTSA

involving a 2004 Cadillac SRX, involving an incident that occurred on July 9, 2004, in which

the following was reported:

"THE CAR DIES AFTER TRAVELING ON HIGHWAY. IT
GOES FROM 65 MPH TO 0. THE BRAKES, STEERING, AND
COMPLETE POWER DIES. YOU HAVE NO CONTROL OVER
THE CAR AT THIS POINT. I HAVE ALMOST BEEN HIT 5
TIMES NOW. ALSO, WHEN THE CARS DOES TURN BACK
ON IT WILL ONLY GO 10 MPH AND SOMETIMES WHEN
YOU TURN IT BACK ON THE RPM'S WILL GO TO THE
MAX. IT SOUNDS LIKE THE CAR IS GOING TO EXPLODE.
THIS CAR IS A DEATH TRAP. *LA" NHTSA ID Number:
10082289.

331.    In August 2004, Old GM became aware of a complaint filed with NHTSA

regarding a 2004 Chevrolet Malibu incident that occurred on June 30, 2004, in which it was

reported that:

"WHILE TRAVELING AT ANY SPEED VEHICLE STALLED.
WITHOUT CONSUMER HAD SEVERAL CLOSE CALLS OF
BEING REAR ENDED. VEHICLE WAS SERVICED SEVERAL
TIMES, BUT PROBLEM RECURRED. *AK." **NHTSA ID
Number:** 10089418.

332.    Another report in August of 2004 which Old GM became aware of involved a

2004 Chevrolet Malibu incident that occurred on August 3, 2004, in which it was reported

that:

"WHEN DRIVING, THE VEHICLE TO CUT OFF. THE
DEALER COULD NOT FIND ANY DEFECTS. *JB." **NHTSA
ID Number:** 10087966.

-116-

Case 14-MC-02543-JMF    Document 34    Filed 10/14/15    Page 236 of 150

333.    On October 23, 2004, Old GM became aware of a complaint with NHTSA

regarding a 2003 Chevrolet Monte Carlo, in which the following was reported:

> "VEHICLE CONTINUOUSLY EXPERIENCED AN
> ELECTRICAL SYSTEM FAILURE. AS A RESULT,
> THERE'WAS AN ELECTRICAL SHUTDOWN WHICH
> RESULTED IN THE ENGINE DYING/ STEERING WHEEL
> LOCKING UP, AND LOSS OF BRAKE POWER.*AK" **NHTSA
> ID Number:** 10044624.

334.    On April 26, 2005, Old GM became aware of a complaint filed with NHTSA

involving a 2005 Pontiac Grand Prix, pertaining to an incident that occurred on December 29,

2004, in which the following was reported:

> "2005 PONTIAC GRAND PRIX GT SEDAN VIN #[XXX]
> PURCHASED 12/16/2004. INTERMITTENTLY VEHICLE
> STALLS/ LOSS OF POWER IN THE ENGINE. WHILE
> DRIVING THE VEHICLE IT WILL SUDDENLY JUST LOSES
> POWER. YOU CONTINUE TO PRESS THE ACCELERATOR
> PEDAL AND THEN THE ENGINE WILL SUDDENLY TAKE
> BACK OFF AT A GREAT SPEED. THIS HAS HAPPENED
> WHILE DRIVING NORMALLY WITHOUT TRYING TO
> ACCELERATE AND ALSO WHILE TRYING TO
> ACCELERATE. THE CAR HAS LOST POWER WHILE
> TRYING TO MERGE IN TRAFFIC. THE CAR HAS LOST
> POWER WHILE TRYING TO CROSS HIGHWAYS. THE CAR
> HAS LOST POWER WHILE JUST DRIVING DOWN THE
> ROAD. GMC HAS PERFORMED THE FOLLOWING REPAIRS
> WITHOUT FIXING THE PROBLEM. 12/30/2004 [XXX]-
> MODULE, POWERTRAIN CONTROL-ENGINE
> REPROGRAMMING. 01/24/2005 [XXX]-
> SOLENOID,PRESSURE CONTROL-REPLACED. 02/04/2005
> [XXX]-MODULE, PCM/VCM-REPLACED. 02/14/2005 [XXX]-
> PEDAL,ACCELERATOR-REPLACED. DEALERSHIP
> PURCHASED FROM CAPITAL BUICK-PONTIAC-GMC 225-
> 293-3500. DEALERSHIP HAS ADVISED THAT THEY DO
> NOT KNOW WHAT IS WRONG WITH THE CAR. WE HAVE
> BEEN TOLD THAT WE HAVE TO GO DIRECT TO PONTIAC
> WITH THE PROBLEM. HAVE BEEN IN CONTACT WITH
> PONTIAC SINCE 02/15/05. PONTIAC ADVISED THAT THEY
> WERE GOING TO RESEARCH THE PROBLEM AND SEE IF
> ANY OTHER GRAND PRI WAS REPORTING LIKE
> PROBLEMS. SO FAR THE ONLY ADVICE FROM PONTIAC
> IS THEY WANT US TO COME IN AND TAKE ANOTHER

GRAND PRIX OFF THE LOT AND SEE IF WE CAN GET THIS
CAR TO DUPLICATE THE SAME PROBLEM. THIS DID NOT
IMPRESS ME AT ALL. SO AFTER WAITING FOR 2-1/2
MONTHS FOR PONTIAC TO DO SOMETHING TO FIX THE
PROBLEM, I HAVE DECIDED TO REPORT THIS TO NHTSA.
*AK *JS INFORMATION REDACTED PURSUANT TO THE
FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C.
552(B)(6)" NHTSA ID Number: 10118501.

335.    In May 2005, Old GM became aware of a complaint filed with NHTSA

regarding a 2004 Chevrolet Malibu incident that occurred on July 18, 2004, in which it was

reported that:

"THE CAR CUT OFF WHILE I WAS DRIVING AND IN
HEAVY TRAFFIC MORE THAN ONCE. THERE WAS NO
WARNING THAT THIS WOULD HAPPEN. THE CAR WAS
SERVICED BEFORE FOR THIS PROBLEM BUT IT
CONTINUED TO HAPPEN. I HAVE HAD 3 RECALLS, THE
HORN FUSE HAS BEEN REPLACED TWICE, AND THE
BLINKER IS CURRENTLY OUT. THE STEERING COLLAR
HAS ALSO BEEN REPLACED. THIS CAR WAS SUPPOSED
TO BE A NEW CAR." **NHTSA ID Number:** 10123684.

336.    On June 2, 2005, Old GM became aware of a complaint with NHTSA

regarding a 2004 Pontiac Grand Am incident that occurred on February 18, 2005, in which the

following was reported:

"2004 PONTIAC GRAND PRIX SHUTS DOWN WHILE
DRIVING AND THE POWER STEERING AND BRAKING
ABILITY ARE LOST.*MR *NM." **NHTSA ID
Number:** 10124713.

337.    On August 12, 2005, Old GM became aware of a complaint filed with NHTSA

involving a 2003 Cadillac CTS, regarding an incident that occurred on January 3, 2005, in

which it was reported that:

"DT: VEHICLE LOST POWER WHEN THE CONSUMER HIT
THE BRAKES. THE TRANSMISSION JOLTS AND THEN THE
ENGINE SHUTS OFF. IT HAS BEEN TO THE DEALER 6
TIMES SINCE JANUARY. THE DEALER TRIED
SOMETHING DIFFERENT EVERY TIME SHE TOOK IT IN.

> MANUFACTURER SAID SHE COULD HAVE A NEW
> VEHICLE IF SHE PAID FOR IT. SHE WANTED TO GET RID
> OF THE VEHICLE.*AK THE CHECK ENGINE LIGHT
> ILLUMINATED. *JB" NHTSA ID Number: 10127580.

338.    On August 26, 2005, Old GM became aware of a complaint with NHTSA

regarding a 2004 Pontiac Grand Am incident that occurred on August 26, 2005, in which the

following was reported:

> "WHILE DRIVING MY 2004 PONTIAC GRAND AM THE CAR
> FAILED AT 30 MPH. IT COMPLETELY SHUT OFF LEAVING
> ME WITH NO POWER STEERING AND NO WAY TO
> REGAIN CONTROL OF THE CAR UNTIL COMING TO A
> COMPLETE STOP TO RESTART IT. ONCE I HAD STOPPED
> IT DID RESTART WITHOUT INCIDENT. ONE WEEK LATER
> THE CAR FAILED TO START AT ALL NOT EVEN TURNING
> OVER. WHEN THE PROBLEM WAS DIAGNOSED AT THE
> GARAGE IT WAS FOUND TO BE A FAULTY "IGNITION
> CONTROL MODULE" IN THE CAR. AT THIS TIME THE
> PART WAS REPLACED ONLY TO FAIL AGAIN WITHIN 2
> MONTHS TIME AGAIN WHILE I WAS DRIVING THIS TIME
> IN A MUCH MORE HAZARDOUS CONDITION BEING THAT
> I WAS ON THE HIGHWAY AND WAS TRAVELING AT 50
> MPH AND HAD TO TRAVEL ACROSS TWO LANES OF
> TRAFFIC TO EVEN PULL OVER TO TRY TO RESTART IT.
> THE CAR CONTINUED TO START AND SHUT OFF ALL
> THE WAY TO THE SERVICE GARAGE WHERE IT WAS
> AGAIN FOUND TO BE A FAULTY "IGNITION CONTROL
> MODULE". IN ANOTHER TWO WEEKS TIME THE CAR
> FAILED TO START AND WHEN DIAGNOSED THIS TIME IT
> WAS SAID TO HAVE "ELECTRICAL PROBLEMS"
> POSSIBLE THE "POWER CONTROL MODULE". AT THIS
> TIME THE CAR IS STILL UNDRIVEABLE AND UNSAFE
> FOR TRAVEL. *JB" **NHTSA ID Number:** 10134303.

339.    On September 22, 2005, Old GM became aware of a complaint filed with

NHTSA involving a 2005 Cadillac CTS, concerning an incident that occurred on September

16, 2005, in which the following was reported:

> "DT: 2005 CADILLAC CTS – THE CALLER'S VEHICLE WAS
> INVOLVED IN AN ACCIDENT WHILE DRIVING AT 55 MPH.
> UPON IMPACT, AIR BAGS DID NOT DEPLOY. THE
> VEHICLE WENT OFF THE ROAD AND HIT A TREE. THIS

-119-

Case 14-MC-2543-JMF    Document 347    Filed 10/14/14    Page 536 of 150

WAS ON THE DRIVER'S SIDE FRONT. THERE WERE NO
INDICATOR LIGHTS ON PRIOR TO THE ACCIDENT. THE
VEHICLE HAS NOT BEEN INSPECTED BY THE
DEALERSHIP, AND INSURANCE COMPANY TOTALED
THE VEHICLE. THE CALLER SAW NO REASON FOR THE
AIR BAGS NOT TO DEPLOY. . TWO INJURED WERE
INJURED IN THIS CRASH. T A POLICE REPORT WAS
TAKEN. THERE WAS NO FIRE. *AK" NHTSA ID Number:
10137348.

340.    On September 29, 2006, Old GM became aware of a complaint filed with

NHTSA involving a 2004 Cadillac CTS and an incident that occurred on September 29, 2006,

in which the following was reported:

"DT*: THE CONTACT STATED AT VARIOUS SPEEDS
WITHOUT WARNING, THE VEHICLE LOST POWER AND
WOULD NOT ACCELERATE ABOVE 20 MPH. ALSO,
WITHOUT WARNING, THE VEHICLE STALLED ON
SEVERAL OCCASIONS, AND WOULD NOT RESTART. THE
VEHICLE WAS TOWED TO THE DEALERSHIP, WHO
REPLACED THE THROTTLE TWICE AND THE THROTTLE
BODY ASSEMBLY HARNESS, BUT THE PROBLEM
PERSISTED. *AK UPDATED 10/25/2006 – *NM" NHTSA ID
Number: 10169594.

341.    On April 18, 2007, Old GM became aware of a complaint filed with NHTSA

involving a 2004 Cadillac SRX, regarding an incident that occurred on April 13, 2007, in

which it was reported that:

"TL*THE CONTACT OWNS A 2004 CADILLAC SRX. THE
ENGINE STALLED WITHOUT WARNING AND CAUSED
ANOTHER VEHICLE TO CRASH INTO THE VEHICLE. THE
VEHICLE WAS ABLE TO RESTART A FEW MINUTES
AFTER THE CRASH. THE DEALER AND MANUFACTURER
WAS UNABLE TO DIAGNOSE THE FAILURE. THE
MANUFACTURER HAD THE VEHICLE INSPECTED BY A
CADILLAC SPECIALIST WHO WAS UNABLE TO
DIAGNOSE THE FAILURE. THE DEALER UPDATED THE
COMPUTER FOUR TIMES, BUT THE ENGINE CONTINUED
TO STALL. THE CURRENT AND FAILURE MILEAGES
WERE 48,000." NHTSA ID Number: 10188245.

342.    On September 20, 2007, Old GM became aware of a complaint filed with

NHSTA involving a 2007 Cadillac CTS, in connection with an incident that occurred on

January 1, 2007, and the following was reported:

> "TL*THE CONTACT OWNS A 2007 CADILLAC CTS. WHILE
> DRIVING 40 MPH, THE VEHICLE SHUT OFF WITHOUT
> WARNING. THE FAILURE OCCURRED ON FIVE SEPARATE
> OCCASIONS. THE DEALER WAS UNABLE TO DUPLICATE
> THE FAILURE. AS OF SEPTEMBER 20, 2007, THE DEALER
> HAD NOT REPAIRED THE VEHICLE. THE POWERTRAIN
> WAS UNKNOWN. THE FAILURE MILEAGE WAS 2,000 AND
> CURRENT MILEAGE WAS 11,998." NHTSA ID Number:
> 10203516.

343.    On September 24, 2007, Old GM became aware of a complaint filed with

NHTSA involving a 2004 Cadillac SRX, regarding an incident that occurred on January 1,

2005, in which the following was reported:

> "TL*THE CONTACT OWNS A 2004 CADILLAC SRX. WHILE
> DRIVING 5 MPH OR GREATER, THE VEHICLE WOULD
> SHUT OFF WITHOUT WARNING. THE DEALER STATED
> THAT THE BATTERY CAUSED THE FAILURE AND THEY
> REPLACED THE BATTERY. APPROXIMATELY EIGHT
> MONTHS LATER, THE FAILURE RECURRED. THE DEALER
> STATED THAT THE BATTERY CAUSED THE FAILURE
> AND REPLACED IT A SECOND TIME. APPROXIMATELY
> THREE MONTHS LATER, THE FAILURE OCCURRED
> AGAIN. SHE WAS ABLE TO RESTART THE VEHICLE. THE
> DEALER WAS UNABLE TO DUPLICATE THE FAILURE,
> HOWEVER, THEY REPLACED THE CRANK SHAFT
> SENSOR. THE FAILURE CONTINUES TO PERSIST. AS OF
> SEPTEMBER 24, 2007, THE DEALER HAD NOT REPAIRED
> THE VEHICLE. THE POWERTRAIN WAS UNKNOWN. THE
> FAILURE MILEAGE WAS 8,000 AND CURRENT MILEAGE
> WAS 70,580." NHTSA ID Number: 10203943.

344.    On June 18, 2008, Old GM became aware of a complaint filed with NHTSA

involving a 2006 Cadillac CTS and an incident that occurred on June 17, 2008, in which it

was reported that:

"TL*THE CONTACT OWNS A 2006 CADILLAC CTS. WHILE
DRIVING 60 MPH AT NIGHT, THE VEHICLE SHUT OFF
AND LOST TOTAL POWER. WHEN THE FAILURE
OCCURRED, THE VEHICLE CONTINUED TO ROLL AS IF IT
WERE IN NEUTRAL. THERE WERE NO WARNING
INDICATORS PRIOR TO THE FAILURE. THE CONTACT
FEELS THAT THIS IS A SAFETY HAZARD BECAUSE IT
COULD HAVE RESULTED IN A SERIOUS CRASH. THE
VEHICLE WAS TAKEN TO THE DEALER TWICE FOR
REPAIR FOR THE SAME FAILURE IN FEBURARY OF 2008
AND JUNE 17, 2008. THE FIRST TIME THE CAUSE OF THE
FAILURE WAS IDENTIFIED AS A GLITCH WITH THE
COMPUTER SWITCH THAT CONTROLS THE
TRANSMISSION. AT THE SECOND VISIT, THE SHOP
EXPLAINED THAT THEY COULD NOT IDENTIFY THE
FAILURE. IT WOULD HAVE TO RECUR IN ORDER FOR
THEM TO DIAGNOSE THE FAILURE PROPERLY. THE
CURRENT AND FAILURE MILEAGES WERE 43,000."
NHTSA ID Number: 10231507.

345.    On October 14, 2008, Old GM became aware of a complaint filed with

NHTSA involving a 2008 Cadillac CTS and an incident that occurred on April 5, 2008, in

which it was reported that:

"WHILE DRIVING MY 2008 CTS, WITH NO ADVANCE
NOTICE, THE ENGINE JUST DIED. IT SEEMED TO RUN
OUT OF GAS. MY FUEL GAUGE READ BETWEEN 1/2 TO
3/4 FULL. THIS HAPPENED 3 DIFFERENT OCCASIONS. ALL
3 TIMES I HAD TO HAVE IT TOWED BACK TO THE
DEALERSHIP THAT I PURCHASED THE CAR FROM. ALL 3
TIMES I GOT DIFFERENT REASONS IT HAPPENED, FROM
BAD FUEL PUMP IN GAS TANK, TO SOME TYPE OF BAD
CONNECTION, ETC. AFTER THIS HAPPENED THE 3RD
TIME, I DEMANDED A NEW CAR, WHICH I RECEIVED. I
HAVE HAD NO PROBLEMS WITH THIS CTS, RUNS GREAT.
*TR" NHTSA ID Number: 10245423.

346.    On November 13, 2008, Old GM became aware of a complaint with NHTSA

regarding a 2001 Oldsmobile Intrigue, in which the following was reported:

"L*THE CONTACT OWNS A 2001 OLDSMOBILE INTRIGUE.
WHILE DRIVING 35 MPH, THE VEHICLE CONTINUOUSLY
STALLS AND HESITATES. IN ADDITION, THE
INSTRUMENT PANEL INDICATORS WOULD ILLUMINATE

Case 14-MC-02543-JMF   Document 347   Filed 10/14/14   Page 541 of 150

> AT RANDOM. THE VEHICLE FAILED INSPECTION AND
> THE CRANKSHAFT SENSOR WAS REPLACED, WHICH
> HELPED WITH THE STALLING AND HESITATION;
> HOWEVER, THE CHECK ENGINE INDICATOR WAS STILL
> ILLUMINATED. DAYS AFTER THE CRANKSHAFT SENSOR
> WAS REPLACED, THE VEHICLE FAILED TO START.
> HOWEVER, ALL OF THE INSTRUMENT PANEL
> INDICATORS FLASHED ON AND OFF. AFTER NUMEROUS
> ATTEMPTS TO START THE VEHICLE, HE HAD IT
> JUMPSTARTED. THE VEHICLE WAS THEN ABLE TO
> START. WHILE DRIVING HOME, ALL OF THE LIGHTING
> FLASHED AND THE VEHICLE SUDDENLY SHUT OFF. THE
> VEHICLE LOST ALL ELECTRICAL POWER AND POWER
> STEERING ABILITY. THE CONTACT MANAGED TO PARK
> THE VEHICLE IN A PARKING LOT AND HAD IT TOWED
> THE FOLLOWING DAY TO A REPAIR SHOP. THE VEHICLE
> IS CURRENTLY STILL IN THE SHOP. THE VEHICLE HAS
> BEEN RECALLED IN CANADA AND HE BELIEVES THAT IT
> SHOULD ALSO BE RECALLED IN THE UNITED STATES.
> THE FAILURE MILEAGE WAS UNKNOWN AND THE
> CURRENT MILEAGE WAS 106,000." **NHTSA ID
> Number:** 10248694.

347.    On December 10, 2008, Old GM became aware of a complaint filed with

NHTSA regarding a 2004 Oldsmobile Alero and an incident that occurred on December 10,

2008, in which the following was reported:

> "I WAS DRIVING DOWN THE ROAD IN RUSH HOUR
> GOING APPROX. 55 MPH AND MY CAR COMPLETELY
> SHUT OFF, THE GAUGES SHUTDOWN, LOST POWER
> STEERING. HAD TO PULL OFF THE ROAD AS SAFELY AS
> POSSIBLE, PLACE VEHICLE IN PARK AND RESTART CAR.
> MY CAR HAS SHUTDOWN PREVIOUSLY TO THIS
> INCIDENT AND FEEL AS THOUGH IT NEEDS SERIOUS
> INVESTIGATION. I COULD HAVE BEEN ON THE
> HIGHWAY AND BEEN KILLED. THIS ALSO HAS
> HAPPENED WHEN IN A SPIN OUT AS WELL THOUGH THIS
> PARTICULAR INCIDENT WAS RANDOM. *TR" **NHTSA ID
> Number:** 10251280.

348.    On March 31, 2009, Old GM became aware a complaint filed with NHTSA

regarding a 2005 Chevrolet Malibu incident that occurred on May 30, 2008, in which it was

reported that:

Case 14-MC-2543-JMF   Document 1-9   Filed 11/05/14   Page 342 of 150

"TL*THE CONTACT OWNS A 2005 CHEVROLET MALIBU.
THE CONTACT STATED THAT THE POWER WINDOWS,
LOCKS, LINKAGES, AND IGNITION SWITCH
SPORADICALLY BECOME INOPERATIVE. SHE TOOK THE
VEHICLE TO THE DEALER AND THEY REPLACED THE
IGNITION SWITCH AT THE COST OF $495. THE
MANUFACTURER STATED THAT THEY WOULD NOT
ASSUME RESPONSIBILITY FOR ANY REPAIRS BECAUSE
THE VEHICLE EXCEEDED ITS MILEAGE. ALL REMEDIES
AS OF MARCH 31, 2009 HAVE BEEN INSUFFICIENT IN
CORRECTING THE FAILURES. THE FAILURE MILEAGE
WAS 45,000 AND CURRENT MILEAGE WAS 51,000."
**NHTSA ID Number:** 10263716.

349.    The defects did not get any safer and the reports did not stop when Old GM

ceased to exist. To the contrary, New GM continued receiving the same reports involving the

same defects. For example, on August 11, 2010, New GM became aware of the following

complaint filed with NHTSA involving a 2005 Cadillac CTS, the incident occurred on May

15, 2010, in which it was reported:

"TL*THE CONTACT OWNS A 2005 CADILLAC CTS. WHILE
DRIVING 40 MPH, ALL OF THE SAFETY LIGHTS ON THE
DASHBOARD ILLUMINATED WHEN THE VEHICLE
STALLED. THE VEHICLE WAS TURNED BACK ON IT
BEGAN TO FUNCTION NORMALLY. THE FAILURE
OCCURRED TWICE. THE DEALER WAS CONTACTED AND
THEY STATED THAT SHE NEEDED TO BRING IT IN TO
HAVE IT DIAGNOSED AGAIN. THE DEALER PREVIOUSLY
STATED THAT THEY WERE UNABLE TO DUPLICATE THE
FAILURE. THE VEHICLE WAS NOT REPAIRED. THE
FAILURE MILEAGE WAS 4100 AND THE CURRENT
MILEAGE WAS 58,000." NHTSA ID Number: 10348743.

350.    On April 16, 2012, New GM became aware of as complaint filed with NHTSA

involving a 2005 Cadillac SRX and an incident that occurred on March 31, 2012, in which the

following was reported:

"TL* THE CONTACT OWNS A 2005 CADILLAC SRX. WHILE
DRIVING APPROXIMATELY 45 MPH, THE CONTACT
STATED THAT THE STEERING BECAME DIFFICULT TO
MANEUVER AND HE LOST CONTROL OF THE VEHICLE.

-124-

THERE WERE NO WARNING LIGHTS ILLUMINATED ON
THE INSTRUMENT PANEL. THE CONTACT THEN
CRASHED INTO A HIGHWAY DIVIDER AND INTO
ANOTHER VEHICLE. THERE WERE NO INJURIES. THE
VEHICLE WAS TOWED TO AN AUTO CENTER AND THE
MECHANIC STATED THAT THERE WAS A RECALL
UNDER NHTSA CAMPAIGN ID NUMBER 06V125000
(SUSPENSION:REAR), THAT MAY BE RELATED TO THE
FAILURE. THE MANUFACTURER WAS MADE AWARE OF
THE FAILURE AND STATED THAT THE VIN WAS NOT
INCLUDED IN THE RECALL. THE VEHICLE WAS NOT
REPAIRED. THE APPROXIMATE FAILURE MILEAGE WAS
46,000." NHTSA ID Number: 10455394.

351.    On March 20, 2013, New GM became aware of a complaint filed with NHTSA

regarding a 2003 Chevrolet Impala incident that occurred on March 1, 2013, in which it was

reported that:

"CAR WILL SHUTDOWN WHILE DRIVING AND SECURITY
LIGHT WILL FLASH. HAS DONE IT NUMEROUS TIMES,
WORRIED IT WILL CAUSE AN ACCIDENT. THERE ARE
MULTIPLE CASES OF THIS PROBLEM ON INTERNET. *TR"
**NHTSA ID Number:** 10503840.

352.    On May 12, 2013, New GM became aware of the following complaint filed

with NHTSA regarding a 2005 Chevrolet Malibu incident that occurred on May 11, 2012, in

which the following was reported:

"I WAS AT A STOP SIGN WENT TO PRESS GAS PEDAL TO
TURN ONTO ROAD AND THE CAR JUST SHUT OFF NO
WARNING LIGHTS CAME ON NOR DID IT SHOW ANY
CODES. GOT OUT OF CAR POPPED TRUNK PULLED
RELAY FUSE OUT PUT IT BACK IN AND IT CRANKED
UP,THEN ON MY WAY HOME FROM WORK,GOING
ABOUT 25 MPH AND IT JUST SHUTDOWN AGAIN,I
REPEATED PULLING OUT RELAY FUSE AND PUT IT BACK
IN THEN WAITED A MINUTE THEN IT CRANKED AND I
DROVE STRAIGHT HOME. *TR" **NHTSA ID
Number:** 10458198.

353. On February 26, 2014, New GM became aware of a complaint filed with

NHTSA involving a 2004 Pontiac Grand Prix, concerning an incident that occurred on May

10, 2005, in which it was reported that:

> "TL – THE CONTACT OWNS A 2004 PONTIAC GRAND
> PRIX. THE CONTACT STATED THAT WHILE DRIVING AT
> VARIOUS SPEEDS AND GOING OVER A BUMP, THE
> VEHICLE WOULD STALL WITHOUT WARNING. THE
> VEHICLE WAS TAKEN TO THE DEALER. THE
> TECHNICIAN WAS UNABLE TO DIAGNOSE THE FAILURE.
> THE MANUFACTURER WAS MADE AWARE OF THE
> FAILURE. THE VEHICLE WAS NOT REPAIRED. THE VIN
> WAS NOT AVAILABLE. THE FAILURE MILEAGE WAS
> 12,000 AND THE CURRENT MILEAGE WAS 82,000. KMJ"
> NHTSA ID Number: 10566118.

354. On March 13, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Pontiac Grand Prix and an incident that occurred on February 27, 2014, in

which a driver reported:

> "I WAS DRIVING HOME FROM WORK AND WHEN I
> TURNED A CORNER, THE ENGINE CUT OUT. I BELIEVE IT
> WAS FROM THE KEY FLIPPING TO ACCESSORY. I'VE
> HEARD THAT THIS HAS CAUSED CRASHES THAT HAVE
> KILLED PEOPLE AND WOULD LIKE THIS FIXED. THIS IS
> THE FIRST TIME IT HAPPENED, BUT NOW I'M WORRIED
> EVERY TIME I DRIVE IT THAT THIS IS GOING TO HAPPEN
> AND I DON'T FEEL SAFE LETTING MY WIFE DRIVE THE
> CAR NOW. WHY ARE THE 2006 PONTIAC GRAND PRIX
> VEHICLES NOT PART OF THE RECALL FROM GM? *TR"
> NHTSA ID Number: 10569215.

355. On April 1, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2003 Cadillac CTS and an incident that occurred on January 1, 2008, in which the

following was reported:

> "TL* THE CONTACT OWNS A 2003 CADILLAC CTS. THE
> CONTACT STATED THAT THE VEHICLE EXHIBITED A
> RECURRING STALLING FAILURE. THE VEHICLE WAS
> TAKEN TO THE DEALER NUMEROUS TIMES WHERE
> SEVERAL UNKNOWN REPAIRS WERE PERFORMED ON

THE VEHICLE BUT TO NO AVAIL. THE FAILURE
MILEAGE WAS 59,730 AND THE CURRENT MILEAGE WAS
79,000. UPDATED 06/30/14 MA UPDATED 07/3/2014 *JS"
NHTSA ID Number: 10576468.

356.    On April 1, 2014, New GM became aware of a complaint with NHTSA

regarding a 2003 Chevrolet Monte Carlo and an incident that occurred on September 16, 2013,

in which the following was reported:

> "WHILE DRIVING AT ANY SPEED THE IGNITION SYSTEM
> WOULD RESET LIGHTING UP THE DISPLAY CLUSTER
> JUST AS IF THE KEY WAS TURNED OFF AND BACK ON.
> THIS WOULD CAUSE A MOMENTARY SHUTDOWN OF
> THE ENGINE. THE PROBLEM SEEMED TO BE MORE
> PREVAILANT WHILE TURNING THE WHEEL FOR A
> CURVE OR TURN OFF THE ROAD. THE TURN SIGNAL
> UNIT WAS FIRST SUSPECT SINCE IT SEEMED TO
> CORRELATE WITH APPLYING THE TURN SIGNAL AND
> TURNING THE WHEEL. THE CONDITION WORSENED TO
> THE IGNITION SHUTDOWN FOR LONGER PERIODS
> SHUTTING DOWN THE ENGINE CAUSING STEERING AND
> BRAKING TO BE SHUTDOWN AND FINALLY DIFFICULTY
> STARTING THE CAR. AFTER 2 VISITS TO A GM SERVICE
> CENTER THE PROBLEM WAS FOUND TO BE A FAULTY
> IGNITION THAT WAS REPLACED AND THE PROBLEM
> HAS NOT RECURRED." **NHTSA ID Number:** 10576201.

357.    On April 8, 2014, New GM became aware of a complaint with NHTSA

regarding a 2003 Chevrolet Impala and an incident that occurred on August 14, 2011 and the

following was reported:

> "I HAVE HAD INCIDENTS SEVERAL TIMES OVER THE
> YEARS WHERE I WOULD HIT A BUMP IN THE ROAD AND
> MY CAR WOULD COMPLETLY SHUT OFF. I HAVE ALSO
> HAD SEVERAL INCIDENTS WHERE I WAS TRAVELING
> DOWN THE EXPRESSWAY AND MY CAR TURNED OFF ON
> ME. I HAD TO SHIFT MY CAR INTO NEUTRAL AND
> RESTART IT TO CONTINUE GOING. I WAS FORTUNATE
> NOT TO HAVE AN ACCIDENT." **NHTSA ID
> Number:** 10578158.

1197532.10

Case 14-MC-2543-JMF    Document 547    Filed 10/14/14    Page 946 of 150

358.    On May 14, 2014, New GM became aware of a complaint filed with NHTSA

regarding a 2004 Chevrolet Impala incident that occurred on April 5, 2013 and reported that:

> "CHEVY IMPALA 2004 LS- THE VEHICLE IS STOPPING
> COMPLETELY WHILE DRIVING OR SITTING AT
> INTERSECTION. THERE IS NO WARNING, NO MESSAGE,
> IT JUST DIES. THE STEERING GOES WHEN THIS HAPPENS
> SO I CANNOT EVEN GET OFF THE ROAD. THEN THERE
> ARE TIMES THAT THE CAR WILL NOT START AT ALL
> AND I HAVE BEEN STRANDED. EVENTUALLY AFTER
> ABOUT 20 MINUTES THE CAR WILL START- I HAVE
> ALREADY REPLACED THE STARTER BUT THE PROBLEM
> STILL EXISTS. I HAVE HAD THE CAR CHECKED OUT AT 2
> DIFFERENT SHOPS (FIRESTONE) AND THEY CANNOT
> FIND THE PROBLEM. THERE ARE NO CODES COMING UP.
> THEY ARE COMPLETELY PERPLEXED. CHEVY STATES
> THEIR MECHANICS ARE BETTER. ALSO THE CLUSTER
> PANEL IS GONE AND CHEVY IS AWARE OF THE
> PROBLEM BUT THEY ONLY RECALLED CERTAIN
> MODELS AND DID NOT INCLUDE THE IMPALAS. I HAVE 2
> ESTIMATES REGARDING FIXING THIS PROBLEM BUT
> THE QUOTES ARE $500.00. I DO NOT FEEL THAT I
> SHOULD HAVE TO PAY FOR THIS WHEN CHEVY KNEW
> THEY HAD THIS PROBLEM WITH CLUSTER PANELS AND
> OMITTED THE IMPALAS IN THEIR RECALL. SO, TO
> RECAP: THE CAR DIES IN TRAFFIC (ALMOST HIT TWICE),
> I DO NOT KNOW HOW MUCH GAS I HAVE, HOW FAST I
> AM GOING, OR IF THE CAR IS OVERHEATING. IN
> DEALING WITH CHEVY I WAS TOLD TO TAKE THE CAR
> TO A CHEVY DEALERSHIP. THEY GAVE ME A PLACE
> THAT IS 2 1/2 HOURS HOUSE AWAY FROM MY HOME. I
> WAS ALSO TOLD THAT I WOULD HAVE THE HONOR OF
> PAYING FOR THE DIAGNOSTICS. IN RESEARCHING THIS
> PROBLEM, I HAVE PULLED UP SEVERAL COMPLAINTS
> FROM OTHER CHEVY IMPALA 2004 OWNERS THAT ARE
> EXPERIENCING THE SAME MULTIPLE PROBLEMS. I ALSO
> NOTICED THAT MOST OF THE COMPLAINTS ARE
> STATING THAT THE SAME ISSUES OCCURRED AT
> APPROX. THE SAME MILEAGE AS MINE. I HAVE
> DISCUSSED THIS WITH CHEVY CUSTOMER SERVICE
> AND BASICALLY THAT WAS IGNORED. THIS CAR IS
> HAZARDOUS TO DRIVE AND POTENTIALLY WILL CAUSE
> BODILY HARM. DEALING WITH CHEVY IS POINTLESS.
> ALL THEY CAN THINK OF IS HOW MUCH MONEY THEIR

DEFECTS WILL BRING IN. *TR" **NHTSA ID Number:** 10512006.

359.   New GM has publicly admitted that it was aware of at least seven (7) crashes, eight (8) injuries, and three (3) deaths linked to this serious safety defect before deciding to finally implement a recall. However, in reality, the number of reports and complaints is much higher.

360.   Moreover, notwithstanding years of notice and knowledge of the defect, on top of numerous complaints and reports from consumers, including reports of crashes, injuries and deaths, New GM delayed and did not implement a recall involving this defect until July of 2014.

361.   New GM's supposed recall fix does not address the defect or the safety risks that it poses, including insufficient amount of torque to resist rotation from the "run" the "accessory" position under reasonably foreseeable conditions, and puts the burden on drivers to alter their behavior and carry their ignition keys separately from their other keys, and even from their remote fob. The real answer must include the replacement of all the switches with ones that have sufficient torque to resist foreseeable rotational forces. The consequences of an unwanted rotation from the "run" to "accessory" position has the same results in all these cars: loss of power (stalling), loss of power steering, loss of power brakes after one or two depressions of the brake pedal, and suppression of seat belt pretensioners and airbag deployments.

362.   In addition, New GM is not addressing the other design issues that create safety risks in connection with this defect. New GM is not altering the algorithm that prevents the airbags from deploying when the ignition leaves the "run" position, even when the vehicle is moving. And New GM is not altering the placement of the ignition in an area where the

1197532.10

Case 14-MD-02543-JMF   Document 347   Entered 10/11/14   Page 248 of 150

driver's knees may inadvertently cause the ignition to move out of the "run" position

Moreover, notwithstanding years of notice and knowledge of the defect, on top of numerous

complaints and reports from consumers, including reports of crashes, injuries and deaths, New

GM delayed and did not implement a recall involving this defect until July of 2014.

363.     Further, New GM has not begun implementing its "fix" for these affected

vehicles. Thus, owners and lessees continue to operate their vehicles, at risk of the serious

safety defects posed if and when the ignition switch in a Defective Vehicle fails during normal

and ordinary vehicle operation.

## IX.     The September 2014 Ignition Switch Defect Recall Is the Latest Evidence of the Extent of the Defects and New GM's Ongoing Concealment.

364.     On September 4, 2014, New GM recalled 46,873 MY 2011-2013 Chevrolet

Caprice and 2008-2009 Pontiac G8 vehicles for yet another ignition switch defect (NHTSA

Recall Number 14-V-510).

365.     New GM explains that, in these Defective Ignition Switch Vehicles, "there is a

risk, under certain conditions, that some drivers may bump the ignition key with their knee

and unintentionally move the key away from the 'run' position." New GM admits that, when

this happens, "engine power, and power barking will be affected, increasing the risk of a

crash." Moreover, "[t]he timing of the key movement out of the 'run' position, relative to the

activation of the sending algorithm of the crash event, may result in the airbags not deploying,

increasing the potential for occupant injury in certain kinds of crashes."

366.     This recall is directly related to the other ignition switch recalls and involves

the same safety risks and dangers. The defect poses a serious and dangerous safety risk

because the key in the ignition switch can rotate and consequently cause a the ignition to

switch from the "on" or "run" position to the "off" or "accessory" position, which causes the

Case 14-MC-2543-JMF    Document 347    Filed 11/05/14    Page 249 of 150

loss of engine power, stalling, loss of speed control, loss of power steering, loss of power

braking, and increases the risk of a crash. Moreover, as with the ignition switch torque defect,

if a crash occurs, the airbags may not deploy.

367.    According to New GM, in late June 2014, "GM Holden began investigating

potential operator knee-to-key interference in Holden-produced vehicles consistent with

Safety's learning from" earlier ignition switch recalls, NHTSA recalls no. 14V-346 and 14V-

355.[107]

368.    New GM "analyzed vehicle test results, warranty data, TREAD data, NHTSA

Vehicle Owner Questionnaires, and other data."[108] This belated review, concerning vehicles

that were sold as long as six years earlier, led to the August 27, 2014 decision to conduct a

safety recall.[109]

369.    Once again, a review of NHTSA's website shows that New GM was long on

notice of ignition switch issues in the vehicles subject to the September 4 recall.

370.    For example, on February 10, 2010, New GM became aware of an incident

involving a 2009 Pontiac G8 that occurred on November 23, 2009, and again on January 26,

2010, in which the following was reported to NHTSA:

> FIRST OCCURRED ON 11/23/2009. ON THE INTERSTATE IT LOSES ALL
> POWER, ENGINE SHUTS DOWN, IGNITION STOPS, POWER STEERING
> STOPS, BRAKES FAIL - COMPLETE VEHICLE STOPPAGE AND FULL
> OPERATING SYSTEMS SHUTDOWN WITHOUT WARNING AT 70 MPH,
> TWICE! SECOND OCCURRENCE WAS 1/26/2010.

371.    On May 22, 2013, New GM became aware of an incident involving a 2008

Pontiac G8 that occurred on May 18, 2013, in which the following was reported:

---

[107] *Id.*
[108] *Id.*
[109] *Id.*

Case 14-MC-02543-JMF    Document 347    Filed 11/05/14    Page 950 of 150

> THE CONTACT OWNS A 2008 PONTIAC G8. THE CONTACT STATED THAT
> WHILE DRIVING 50 MPH, THE VEHICLE STALLED WITHOUT WARNING.
> THE FAILURE RECURRED TWICE. THE VEHICLE WAS TOWED TO THE
> DEALER FOR DIAGNOSIS, BUT THE DEALER WAS UNABLE TO DUPLICATE
> THE PROBLEM. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER
> WAS NOT NOTIFIED. THE APPROXIMATE FAILURE MILEAGE WAS 60,000.

372.     Consistent with its pattern in the June and July recalls, New GM's proposed remedy is to provide these Defective Ignition Switch Vehicle owners with a "revised key blade and housing assembly, in which the blade has been indexed by 90 degrees."[110] Until the remedy is provided, New GM asserts, "it is very important that drivers adjust their seat and steering column to allow clearance between their knee and the ignition key."[111] New GM sent its recall notice to NHTSA one week later, on September 4, 2014.

373.     New GM's supposed fix does not address the defect or the safety risks that the defect poses, including the apparent insufficient torque to resist rotation from the "run" to the "accessory" position under reasonably foreseeable driving conditions, and puts the burden on drivers to alter their behavior and carry their ignition keys separately from their other keys, and even from their remote fob. The real answer must include the replacement of all the switches with ones that have sufficient torque to resist foreseeable rotational forces.

374.     In addition, New GM is not addressing the other design issues that create safety risks in connection with this defect. New GM is not altering the algorithm that prevents the airbags from deploying when the ignition leaves the "run" position, even when the vehicle is moving. And New GM is not altering the placement of the ignition in an area where the driver's knees may inadvertently cause the ignition to move out of the "run" position.

---

[110] New GM's Part 573 Safety Recall Report, Sept. 4, 2014.
[111] *Id.*

1197532.10

375.    The September 4 recall is, like the earlier defective ignition switch recalls, too little and too late.

## X.    Even As They Concealed the Safety Defects From Consumers, Old and New GM Each Presented Their Vehicles As Safe And Reliable, and Presented Itself As An Honest Company With Integrity.

376.    Throughout its history, Old GM regularly used print media, press releases, and television and video media to represent its vehicles as safe, reliable, quality products that provide great value to purchasers, and retain their value over time better than other manufacturers' vehicles. Old GM also used these media to present itself as an honest, above-board, values-oriented company with integrity. In truth, however, Old GM was concealing serious safety hazards and endangering its own customers.

377.    A 1988 Old GM commercial stated:

"GM meets your challenge. With outstanding quality and great value… That's leadership, that's GM."[112]

378.    In 1989, an Old GM commercial represented:

"Fact: GM cars have held their resale value better than any other U.S. make."[113]



---

[112] https://www.youtube.com/watch?v=h19lFAwGDwU.
[113] https://www.youtube.com/watch?v=Bg8CAt5ZhdI.

1197532.10

379.    A 1990 Old GM Pontiac commercial stated:

"GM is putting quality on the road."[114]



380.    A 1998 General Motors Commercial proclaimed that Old GM cars were

reliable and safe:

> "We are fans and nothing keeps us from the game. We need cars
> and trucks as reliable as we are. Season after season. And when the
> game is over, we need to know that what got us there will also get
> us safely home. Delivering cars and trucks that fans count on is
> what makes us General Motors."[115]

381.    Old GM explained that the 2003 Saturn ION had "surprising levels of safety"

in the car's Product Information: "Bringing a new charge into the small-car segment, the 2003

Saturn ION sets itself apart from competitors with innovative features, unique personalization

opportunities and surprising levels of safety, sophistication and fun."[116]

382.    On July 1, 2003, Old GM issued a press release explaining that the 2004

Impala "offers a comprehensive safety package, solid body structure, room for five passengers,

---

[114] https://www.youtube.com/watch?v=_hR7-7eKufQ.
[115] https://www.youtube.com/watch?v=Dt12Gti12iA.
[116] https://archives.media.gm.com/division/2003_prodinfo/03_saturn/03_Ion/index.html.

plenty of cargo space, a surprising number of amenities for the price, and a track record of outstanding quality, reliability and durability."[117]

383.    In a July 1, 2003 press release Old GM stated that "[e]nhanced handling and acceleration are always paramount for Pontiac enthusiasts, and these, plus added safety and comfort measures, make the 2004 Pontiac lineup one of the most exciting in the division's history."[118]

384.    On July 1, 2003, Old GM issued a press release about the 2004 Chevrolet Monte Carlo that explained that "[a]ttention to safety and security is also key to Monte Carlo's success."[119]

385.    On July 1, 2003, Old GM issued a press release about the 2004 Pontiac Grand Prix that explained that "[s]afety is always a high priority for Grand Prix."[120]

386.    In its Product Information for the 2003 Chevrolet Malibu, Old GM explained that "since 1997, the new Malibu has offered buyers excellent performance, safety and comfort in a trim, stylish package. For 2003, Chevrolet Malibu remains a smart buy for those who want a well-equipped midsize sedan at an attractive price.… Designed for individuals or families with high expectations of quality, reliability, safety, driving pleasure, and affordability, the Malibu appeals to domestic and import owners."[121]

387.    On July 1, 2003, Old GM issued a press release about the 2004 Saturn Ion explaining that, "[t]he ION sedan and quad coupe are designed to carry on the Saturn tradition of being at the top of the class when it comes to safety and security. The world-class structural design provides the foundation for this focus on safety. The steel spaceframe's front and rear

---

[117] https://archives.media.gm.com/division/2004_prodinfo/chevrolet/cars/impala/index.html.
[118] https://archives.media.gm.com/division/2004_prodinfo/pontiac/pdf/04_Pontiac_Overview.pdf.
[119] https://archives.media.gm.com/division/2004_prodinfo/chevrolet/cars/monte_carlo/ index.html.
[120] https://archives.media.gm.com/division/2004_prodinfo/pontiac/grand_prix/index.html.
[121] https://archives.media.gm.com/division/2003_prodinfo/03_chevrolet/03_malibu/ index.html.

crush zones help absorb the energy of a crash while protecting the integrity of the safety cage."[122]

388.     On October 4, 2003, Old GM's website stated that "[m]otor vehicle safety is important to GM and to our customers. It is at the top of mind in many of the thousands of decisions that are made every day in engineering and manufacturing today's cars, trucks, and SUVs/ Motor vehicle safety is a significant public health concern in the U.S., and GM is proud to partner with government agencies, emergency responders and health care workers in addressing that challenge."[123]

---

[122] https://archives.media.gm.com/division/2004_prodinfo/saturn/ion/index.html.
[123] http://web.archive.org/web/20031004014908/http://www.gm.com/automotive/vehicle
_shopping/suv_facts/100_safety/index.html.

1197532.10



389.    In 2004, Old GM's marketing campaign incorporated a new phrase "Only GM,"
which highlighted safety features such as electronic stability control. Old GM stated: "We
want to bring this kind of safety, security and peace-of-mind to all of our customers because
it's the right thing to do, and because only Old GM can do it."

1197532.10

**Only GM**

For example, we recently launched a new corporate advertising campaign under the theme, "Only GM." It's part of an effort to use the GM brand more aggressively and with more purpose, to show that we're leading the industry in ways that only GM can.

The "Only GM" campaign began by highlighting our plans to equip all our cars and trucks sold to retail customers in the United States and Canada with OnStar and StabiliTrak, GM's electronic stability control system. We want to bring this kind of safety, security and peace-of-mind to all of our customers because it's the right thing to do, and because only GM can do it. We also want potential customers to know that GM offers them great value, and that buying GM matters. (For more details, go to *onlygm.com*.)

(Old GM's 2004 Annual Report, p. 6.)

    390.    And in the same Report, under the banner "Peace of mind," Old GM

represented that "Only GM can offer its customers the assurance that someone is looking out

for them and their families when they're on the road," and that: "This commitment to safety

makes GM the only automobile manufacturer able to offer a full range of cars, tricks an SUVs

that provide safety protection before, during and after vehicle collisions."



(Old GM's 2004 Annual Report, p. 22.)

-138-

1197532.10

391.    On May 10, 2004, Old GM's website announced that its "aim is to improve motor vehicle safety for customers, passengers, and other motorists. Our customers expect and demand vehicles that help them to avoid crashes and reduce the risk of injury in case of a crash. We strive to exceed these expectations and to protect customers and their families while they are on the road." The website continued, "GM is committed to continuously improving the crashworthiness and crash avoidance of its vehicles, and we support many programs aimed at encouraging safer motor vehicle use…"[124]

392.    On June 4, 2004, Old GM's website stated that "[v]ehicle safety is paramount at GM, and we constantly strive to make our cars and trucks safe. We also continue our support for groups such as the National SAFE KIDS Campaign, and a number of programs aimed at encouraging safer motor vehicle use."[125]

393.    Old GM's June 4, 2004, website published a message from its CEO, Rick Wagoner, on corporate responsibility. Mr. Wagoner wrote, "[a]t a time when current events remind us of the critical importance of corporate responsibility and the value of sustainable development, we at General Motors are fortunate to have inherited a legacy of doing business the right way. It's a great asset. And, it's a huge obligation … one we take very seriously. What we call "winning with integrity" is not an optional or occasional behavior at GM. Integrity is one of our core values, and a way of doing business that helps us realize our company's full potential….In short, "winning with integrity" is much more than a one-time exercise at GM. It's how we work every day. It's a philosophy that transcends borders,

---

[124] http://web.archive.org/web/20040510221647/http://www.gm.com/company/
gmability/safety/?section=Company&layer=GMAbility2&action=open&page=1.
[125] http://web.archive.org/web/20040604055658/http://www.gm.com/company/
gmability/sustainability/reports/03/safety.html.

language, and culture, and something we promote by creating an environment within our company that supports, and demands, proper business conduct."[126]

394.    In its 2005 Annual Report Old GM stated: "We are driving quality and productivity even further." "Lasting quality—That is why restoring confidence in quality is just as important as design in rebuilding our brands…. We are focused on providing our customers with the best quality experience over the lifetime of GM ownership."



395.    The 2005 GMC Yukon, Tahoe, and Cadillac Escalade were touted as "distinctly designed packages that lead the segment in performance, safety, efficiency and capability."[127]

396.    On September 9, 2005, Old GM's website described its safety technology as "Helping You Avoid a Crash" and "Giving the driver information never possible before":[128]

---

[126] http://web.archive.org/web/20040604055939/http://www.gm.com/company/gmability /sustainability/reports/03/wagoner_message.html.
[127] GM's 2005 Annual Report, p. 23.

1197532.10



397.    At the same time Old GM announced what it called the next big step in safety:[129]

> "No matter what vehicle you drive, your safety is vital. GM is looking out for you—you deserve that peace of mind on the road. Which is why at GM, we've taken the next big step in our commitment to provide more customers with more safety and security."



*Footnote continued from previous page*

[128] http://web.archive.org/web/20050909184042/http://www.gm.com/company/gmability/safety/avoid_crash/index.html.

[129] http://web.archive.org/web/20050909225925/http://www.gm.com/company/onlygm/.

1197532.10

Case 1:14-mc-02543-JMF   Document 347-1   Filed 10/05/14   Page 10 of 45

398.    In a July 12, 2006 press release regarding Old GM's 2007 model year lineup, Old GM stated, "[f]rom an all-new family of full-size pickup trucks and SUVs to carlike crossovers to small cars and a near-complete revitalization of the Saturn portfolio, General Motors is introducing several new or significantly redesigned vehicles for the 2007 model year—stylish products that leverage GM's global resources to deliver value, brand-distinctive design character, safety, fuel efficiency, relevant technologies and quality to the North American market."[130]

399.    In an August 1, 2006 press statement for the 2007 Cadillac Lucerne, Old GM represented that the "Lucerne's body structure is engineered to provide maximum occupant protection and minimum intrusion under a wide range of impact conditions."[131]

400.    In an August 1, 2006 press statement for the 2007 Cadillac DTS, Old GM represented: "[d]esigned and engineered with occupant safety and protection in mind, the DTS reinforces Cadillac's long-standing reputation for safe occupant environments in premium vehicles."[132]

401.    Old GM's website on August 9, 2006, stated:[133]

**MAKING VEHICLES SAFER**

"GM strives to make each new model safer than the one it replaces. Vehicle-based safety strategies generally fall into three categories:

BEFORE: Collision avoidance—technologies designed to help the driver avoid potential crashes (sometimes called 'active safety' technologies),

---

[130] https://archives.media.gm.com/us/gm/en/product_services/vehicles/2007/07%20 corporate%20oview.html.
[131] https://archives.media.gm.com/us/buick/en/product_services/r_cars/r_c_lucerne/07 index.html.
[132] https://archives.media.gm.com/us/cadillac/en/product_services/r_cars/r_c_DTS/07 index.html.
[133] http://web.archive.org/web/20060809103405/http://www.gm.com/company/gmability/ sustainability/reports/05/400_products/7_seventy/471.html.

DURING: Crashworthiness—designs and technologies that help mitigate the injury potential of a crash (sometimes called 'passive safety'), and

AFTER: Post-crash—systems that can help alert emergency rescue to a crash and help provide information to aid rescue specialists.

…

GM vehicles are designed to help protect occupants in the 'first' collision, which acts to deform the vehicle structure and change the velocity of the vehicle's center of mass. Also, GM vehicles are designed to help reduce injury risk for occupants in the 'second' collision, which is between the vehicle interior as it responds to the forces imposed by object that collides with the vehicle, and the occupants."

402.    Old GM's website on September 6, 2006, stated:[134]

"Helping drivers avoid crashes and making vehicles safer is a priority for GM.

…

Motor vehicle safety involves not only the design of the vehicle, but the manner in which it is driven, and the driving environment as well. GM is committed to researching and implementing programs and technologies that enhance the safety of vehicles. GM wants to assist drivers to operate their vehicles to avoid hazards, and to help protect occupants in the event of a vehicle crash. GM also focuses on the circumstances that occur after a crash.

GM's vehicle safety priorities are guided by analysis of the real-world experience that customers have with motor vehicles."

403.    Old GM stated on its website in October 29, 2006 it is a leader in automotive safety and that its safety leadership extends as far back as the birth of Old GM:[135]

---

[134] http://web.archive.org/web/20060906083227/http://www.gm.com/company/gmability /sustainability/reports/05/400_products/7_seventy/470.html.
[135] http://web.archive.org/web/20061029080834/http://www.gm.com/company/gmability/ safety/safety_firsts/index.html.

1197532.10

Case 1:14-mc-02543-JMF    Document 347-1    Filed 10/24/14    Page 12 of 49



404.    In a video published on January 2, 2007, Old GM's Vice Chairman of Product Development, Bob Lutz, stated "Saturn has always been a great brand" and that it "has predominately been known for customer service, fair dealers, honest dealers and having happy buyers."[136]

405.    On Old GM's website on January 6, 2007, Bob Lange, Executive Director, Structure and Safety Integration, stated "[o]ur aim is to improve motor vehicle safety for customers, passengers and other motorists. Our customers expect and demand vehicles that help them to avoid crashes and reduce the risk of injury in case of a crash. We strive to exceed these expectations and to protect customers and their families while they are on the road." Further, that "GM is committed to continuously improving the crashworthiness and crash avoidance of its vehicles…"[137]

406.    In its 2007 Annual Report, Old GM stated:

> In 2007, we continued to implement major improvements to our
> U.S. sales and marketing strategy. Over the past two years, we've

---

[136] https://www.youtube.com/watch?v=Kd1Kg0BBdto&list=UUxN-Csvy_9sveql5HJviDjA.

[137] http://web.archive.org/web/20070106044410/http://www.gm.com/company/gmability /safety/.

> re-focused our marketing efforts to emphasize the strength and
> value of our products and brands…
>
> We also continued to make progress in our long-term effort to
> improve quality…
>
> We've also witnessed, since 2005, an 89 percent reduction in
> vehicle recall campaigns involving safety and non-compliance.

(Old GM's 2007 Annual Report, p. 7.)

407.    Moreover, Old GM represented that it "actively studies trends of claims" to

take action to improve vehicle quality:



(Old GM 2007 Annual Report, p. 74.)

408.    In an August 1, 2007 press release, Mark LaNeve, GM North America Vice

President, Vehicle Sales, Service and Marketing introduced Old GM's 2008 line up, stating

"Old GM's transformation is being driven by high-quality cars and trucks that look great,

drive great, are fuel-efficient and provide genuine value to our customers." Further, "[n]o

other automaker provides such a diverse lineup of cars and trucks that meets the needs of

customers that range from college studies to contactors. And our five-year, 100,000-mile

powertrain warranty—the most comprehensive in the industry—adds even more value to the

bottom line, demonstrating that we are putting our money where our mouth is on vehicle

quality."[138]

409.    On August 1, 2007, Old GM represented that "[t]he Cobalt enters the 2008

model year on the heels of a successful '07 model year, which introduced several significant

---

[138] https://archives.media.gm.com/us/gm/en/product_services/vehicles/2008/08gmna_ overview.html.

1197532.10

enhancements, including more powerful Ecotec engines. For '08, the Cobalt builds on that

powerful foundation with a streamlined model lineup and more standard safety and

convenience equipment...Cobalt's enhanced safety features include:

> StabiliTrack electronic stability control system standard on 2LT
> and Sport
>
> Traction control standard on all models equipped with an
> automatic transmission and optional ABS
>
> Tire pressure monitoring system standard on all models
>
> Headcurtain side impact air bags standard on all models
>
> OnStar standard on 2LT and Sport; available on 1LT"[139]

410.  On August 1, 2007 Old GM represented that "[t]he 2008 Impala reinforces the

brand's value story with new features and revisions that add to its safety and efficiency,

including the addition of standard StabiliTrack electronic stability control on 2LT, LTZ and

SS models..."[140]

411.  In an August 1, 2007 press statement for the 2008 Buick LaCrosse, Old GM

represented that the "LaCrosse is built with a strong 'safety cage' structure and a full-

perimeter aluminum engine cradle that directs impact energy away from passengers. Anti-lock

brakes and side curtain airbags are standard on all models."[141]

412.  In an August 1, 2007 press statement for the 2008 Buick Lucerne, GM

represented that the "Lucerne's body structure is designed to provide maximum occupant

protection and minimum intrusion under a wide range of impact conditions. Active safety and

handling features offered on Lucerne include a four-channel anti-lock braking system and

traction control; an auto-level rear suspension that automatically adjusts the vehicle height for

---

[139] https://archives.media.gm.com/us/chevrolet/en/product_services/r_cars/08%20 chevrolet%20car%20oview.html.
[140] https://archives.media.gm.com/us/chevrolet/en/product_services/r_cars/08%20 chevrolet%20car%20oview.html.
[141] https://archives.media.gm.com/us/buick/en/product_services/r_cars/r_c_lacrosse/ 08index.html.

heavy loads; and four-channel StabiliTrack electronic stability control with brake assist, which senses emergency braking situations and boosts power as needed."[142]

413.    In mid to late 2007, Old GM represented that "[t]he 2008 CTS is designed to enhance Cadillac's reputation for providing safe occupant environments in luxury vehicles. Details include:

> Dual-stage driver's front air bag
>
> Segment-first dual-depth front passenger air bag
>
> River and front passenger side seat-mounted pelvic/thorax side air bags
>
> Roof-rail side curtain air bags, covers front and rear seating rows
>
> Front safety belt pretensioners
>
> Tire pressure monitoring system
>
> Body structure with strategically place high-strength steels"[143]

414.    In an August 1, 2007, press statement for the 2008 Cadillac DTS, Old GM stated, "Designed and engineered with occupant safety and protection in mind, the DTS reinforces Cadillac's long-standing reputation for safe occupant environments in premium vehicles. The DTS is equipped with a host of safety and security features, beginning with its body frame integral (BFI) construction, strategically engineered crumple zones in front and rear; and comprehensive use of high-strength steel. The vehicle's crashworthiness is enhanced with structural foam and nylon structural inserts strategically placed in areas of the vehicle's structure."[144]

415.    In an August 1, 2007, press statement for the 2008 Pontiac Grand Prix, Old GM represented that the "Grand Prix's convenience and safety features are perfect for drivers

---

[142] https://archives.media.gm.com/us/buick/en/product_services/r_cars/r_c_lucerne/ 08index.html.
[143] https://archives.media.gm.com/us/cadillac/en/product_services/r_cars/r_c_CTS/08 index.html.
[144] https://archives.media.gm.com/us/cadillac/en/product_services/r_cars/r_c_DTS/ 08index.html.

Case 1:14-mc-02583-JMF Document 347-1 Filed 10/06/14 Page 16 of 49

who enjoy the precise handling characteristics of a sporty, family-friendly package. The 2008 Grand Prix remains a driver's car inside and out. The active and passive safety features on the Grand Prix include standard four-wheel disc brakes, traction control and daytime running lamps."[145]

416.    Old GM's website on January 15, 2008, stated "GM incorporates a total safety philosophy into each of its designs to help protect you in a collision—and keep one from occurring in the first place."[146]

417.    In February 2008, Old GM aired a Chevy Malibu commercial during The Grammy's which stated the Chevy Malibu was "built to last" "because safety should last a lifetime." The commercial used images of a child being raised to adulthood, in order to convey protection and safety.[147]

418.    On its website in March of 2008, Old GM stated it was delivering the best cars and trucks in its 100-year history, and that it was "Obsessed with Quality." The website also spoke of "Continuous Safety," and represented that "GM incorporates a total safety philosophy into each of its designs to help protect you in a collision—and keep one from occurring in the first place":[148/149/150]

---

[145] https://archives.media.gm.com/us/pontiac/en/product_services/r_cars/r_c_grandprix/ index.html.
[146] http://web.archive.org/web/20080115004426/http://www.gm.com/explore/safety/.
[147] https://www.youtube.com/watch?v=EgNQ2tns0Gs.
[148] http://web.archive.org/web/20080303182635/http://www.gm.com/corporate/.
[149] http://web.archive.org/web/20080305021951/http://www.gm.com/explore/.
[150] http://web.archive.org/web/20080311045525/http://www.gm.com/explore/safety.

09-50026-mg14-mc-12983-13 JMF Filed 11/05/14 Entered 11/05/14 17:16:14 Exhibit I
Case 14-mc-02583-JMF Document 347-1 Filed 11/14/14 Page 14 of 49
Pg 168 of 673



## XI. New GM Promoted All Of Its Vehicles As Safe, Reliable, And High-Quality While It Fraudulently Concealed Numerous Safety Defects

### A. New GM Claimed To Be Turning Over A New Leaf After The Bankruptcy.

419. New GM was financially successful in emerging from the Old GM bankruptcy. Sales of all its models went up and New GM became profitable. A new GM was born and the GM brand once again stood strong in the eyes of consumers – or so the world thought.

420. In 2010, New GM sold 4.26 million vehicles globally, an average of one every 7.4 seconds. Joel Ewanick, New GM's global chief marketing officer at the time, described this success in a statement to the press, "Chevrolet's dedication to compelling designs, quality, durability and great value is a winning formula that resonates with consumers around the world."[151]

421. New GM led the world and U.S. consumers to believe that, once it emerged from bankruptcy in 2009, it was a new and improved company. New GM repeatedly

---

[151] https://media.gm.com/media/us/en/gm/news.detail../content/Pages/news/us/en/2011/Jan/0117_chev_ global.

proclaimed that it was a company committed to innovation, safety, and maintaining a strong

brand:



1197532.10

General Motors Company 2010 Annual Report, cover page.

      422.    In New GM's 2010 Annual Report, New GM proclaimed its products would

"improve safety and enhance the overall driving experience for our customers." (*See* New GM

2010 Annual Report, p. 10.)

> As we regain our financial footing, we expect the number of new product launches to steadily rise over the next several years. And these new products will increasingly embrace advanced technology to reduce fuel consumption and emissions, improve safety and enhance the overall driving experience for our customers.

General Motors Company 2010 Annual Report, p. 4.

      423.    New GM claimed the New GM would create vehicles that would define the

industry stand.

> **BUILDING THE NEW GM**
> We are moving with increased speed and agility, and implementing change faster than ever before. We are becoming a company with the capability, resources and confidence to play offense, not defense. Instead of creating new vehicles that are just better than their predecessors, we're working to design, build and sell vehicles that define the industry standard.

General Motors Company 2010 Annual Report, p. 5.

      424.    In its 2010 Annual Report New GM told consumers that it built the world's

best vehicles:

> *We truly are building a new GM, from the inside out. Our vision is*
> *clear: to design, build, and sell the world's best vehicles, and we*

-151-

Case 14-mc-02543-JMF    Document 347-1    Filed 11/26/14    Page 20 of 49

> *have a new business model to bring that vision to life. We have a*
> *lower cost structure, a stronger balance sheet, and a dramatically*
> *lower risk profile. We have a new leadership team – a strong mix*
> *of executive talent from outside the industry and automotive*
> *veterans – and a passionate, rejuvenated workforce.*
>
> *"Our plan is to steadily invest in creating world-class vehicles,*
> *which will continuously drive our cycle of great design, high*
> *quality and higher profitability."*

General Motors Company 2010 Annual Report, p. 2.

425.    New GM represented that it was building vehicles with design excellence,

quality, and performance:

> *And across the globe, other GM vehicles are gaining similar*
> *acclaim for design excellence, quality, and performance, including*
> *the Holden Commodore in Australia. Chevrolet Agile in Brazil,*
> *Buick LaCrosse in China, and many others.*
>
> *The company's progress is early evidence of a new business model*
> *that begins and ends with great vehicles. We are leveraging our*
> *global resources and scale to maintain stringent cost management*
> *while taking advantage of growth and revenue opportunities*
> *around the world, to ultimately deliver sustainable results for all of*
> *our shareholders.*

General Motors Company 2010 Annual Report, p. 3.

426.    These themes were repeatedly put forward as the core message about New

GM's Brand:

1197532.10

The new General Motors has one clear vision: to design, build and sell the world's best vehicles. Our new business model revolves around this vision, focusing on fewer brands, compelling vehicle design, innovative technology, improved manufacturing productivity and streamlined, more efficient inventory processes. The end result is products that delight customers and generate higher volumes and margins—and ultimately deliver more cash to invest in our future vehicles.

# A New Vision,
## a New Business Model

Our vision is simple, straightforward and clear: to design, build and sell the world's best vehicles. That doesn't mean just making our vehicles better than the ones they replace. We have set a higher standard for the new GM—and that means building the best.

Our vision comes to life in a continuous cycle that starts, ends and begins again with great vehicle designs. To accelerate the momentum we've already created, we reduced our North American portfolio from eight brands to four: Chevrolet, Buick, Cadillac and GMC. Worldwide, we're aggressively developing and leveraging global vehicle architectures to maximize our talent and resources and achieve optimum economies of scale.

Across our manufacturing operations, we have largely eliminated overcapacity in North America while making progress in Europe, and we're committed to managing inventory with a new level of discipline. By using our manufacturing capacity more efficiently and maintaining leaner vehicle inventories, we are reducing the need to offer sales incentives on our vehicles. These moves, combined with offering attractive, high-quality vehicles, are driving healthier margins—and at the same time building stronger brands.

Our new business model creates a self-sustaining cycle of reinvestment that drives continuous improvement in vehicle design, manufacturing discipline, brand strength, pricing and margins, because we are now able to make money at the bottom as well as the top of the industry cycles.

We are seeing positive results already. In the United States, for example, improved design, content and quality have resulted in solid gains in segment share, average transaction prices and projected residual values for the Chevrolet Equinox, Buick LaCrosse and Cadillac SRX. This is just the beginning.

General Motors Company 2010 Annual Report, p. 6.

1197532.10

427.    New GM boasted of its new "culture":



General Motors Company 2010 Annual Report, p. 16.

428.    In its 2011 Annual Report, New GM proclaimed that it was putting its

customers first:

1197532.10

General Motors Company 2011 Annual Report, p. 1.

429.    Further, New GM stated that it is committed to leadership in vehicle safety:



General Motors Company 2011 Annual Report, p. 11.

430.    In its 2011 Annual Report, in a "Letter to Stockholders," New GM noted that

its brand had grown in value and that it designed the "World's Best Vehicles":

> *Dear Stockholder:*
>
> *Your company is on the move once again. While there were highs
> and lows in 2011, our overall report card shows very solid marks,
> including record net income attributable to common stockholders
> of $7.6 billion and EBIT-adjusted income of $8.3 billion.*
>
> • *GM's overall momentum, including a 13 percent sales
> increase in the United States, created new jobs and drove
> investments. We have announced investments in 29 U.S.
> facilities totaling more than $7.1 billion since July 2009,
> with more than 17,500 jobs created or retained.*
>
> *Design, Build and Sell the World's Best Vehicles*

> *This pillar is intended to keep the customer at the center of everything we do, and success is pretty easy to define. It means creating vehicles that people desire, value and are proud to own. When we get this right, it transforms our reputation and the company's bottom line.*

General Motors Company 2011 Annual Report, p. 2.

> *Strengthen Brand Value*

> *Clarity of purpose and consistency of execution are the cornerstones of our product strategy, and two brands will drive our global growth. They are Chevrolet, which embodies the qualities of value, reliability, performance, and expressive design; and Cadillac, which creates luxury vehicles that are provocative and powerful. At the same time the Holden, Buick, GMC, Baojun, Opel and Vauxhall brands are being carefully cultivated to satisfy as many customers as possible in select regions.*

> *Each day the cultural change underway at GM becomes more striking. The old internally focused, consensus-driven and overly complicated GM is being reinvented brick by brick, by truly accountable executives who know how to take calculated risks and lead global teams that are committed to building the best vehicles in the world as efficiently as we can.*

> *That's the crux of our plan. The plan is something we can control. We like the results we're starting to see and we're going to stick to it – always.*

General Motors Company 2011 Annual Report, p. 3.

These themes continued in New GM's 2012 Annual Report:



General Motors Company 2012 Annual Report, p. 3.

> 431.    New GM told the world the following about its brand:

> > *What is immutable is our focus on the customer, which requires us to go from "good" today to "great" in everything we do, including product design, initial quality, durability, and service after the sale.*

General Motors Company 2012 Annual Report, p. 4.

> 432.    New GM also indicated it had changed its structure to create more

"accountability" which, as shown below, was a blatant falsehood:

> > *That work continues, and it has been complemented by changes to our design and engineering organization that have flattened the*

> *structure and created more accountability for produce execution,*
> *profitability and customer satisfaction.*

General Motors Company 2012 Annual Report, p. 10.

433.    And New GM represented that product quality was a key focus – another

blatant falsehood:

> *Product quality and long-term durability are two other areas that*
> *demand our unrelenting attention, even though we are doing well*
> *on key measures.*

General Motors Company 2012 Annual Report, p. 10.

434.    New GM's 2013 Annual Report stated "Today's GM is born of the passion of

our people to bring our customers the finest cars and trucks we've ever built":



General Motors Company 2013 Annual Report, inside front cover dual page, (unnumbered).

435.    In addition, New GM represented: "Nothing is more important than the safety

of our customers":

1197532.10

> Nothing is more important than the safety of our customers, so we are also making changes to ensure that something like this does not happen again. One of our first actions was to name a vice president of Global Vehicle Safety to oversee the safety development of GM vehicle systems on a global basis, the confirmation and validation of safety performance, and post-sale safety activities such as recalls. There will be more changes because we are determined to emerge from this crisis stronger and wiser so we can accelerate the momentum we generated through-out 2013.

General Motors Company 2013 Annual Report, p. 4.

**B.    New GM's Advertising And Literature Claimed That GM Placed Safety And Quality First.**

436.    In May of 2014, New GM sponsored the North American Conference on Elderly Mobility. Gay Kent, director, New GM global vehicle safety, and a presenter at the conference stated: "The safety of all our customers is our utmost concern.[152]

437.    In advertisements and company literature, New GM consistently promoted all its vehicles as safe and reliable, and presented itself as a responsible manufacturer that stands behind GM-branded vehicles after they are sold. New GM has made, and continues to make, misleading safety and reliability claims in public statements, advertisements, and literature provided with its vehicles. For example:

438.    An online ad for "GM certified" used vehicles that ran from July 6, 2009, until April 5, 2010, stated that "GM certified means no worries."

439.    In April 2010, General Motors Company Chairman and CEO, Ed Whitacre, starred in a commercial video advertisement on behalf of New GM. In it, Mr. Whitacre acknowledged that not all Americans wanted to give New GM a second chance, but that New

---

[152] https://media.gm.com/media/us/en/gm/news.detail./content/Pages/news/us/en/2014/May/0514-cameras.

GM wanted to make itself a company that "all Americans can be proud of again" and "exceed every goal [Americans] set for [General Motors]." He stated that New GM was "designing, building, and selling the best cars in the world." He continued by saying New GM has "unmatched lifesaving technology" to keep customers safe. He concluded by inviting the viewer to take a look at "the new GM."[153]



440.    A radio ad that ran from New GM's inception until July 16, 2010 stated that "[a]t GM, building quality cars is the most important thing we can do."

441.    On November 10, 2010, General Motors published a video that told consumers that New GM prevents any defects from reaching consumers. The video, entitled "Andy Danko: The White Glove Quality Check," wherein it is stated that there are "quality processes in the plant that prevent any defects from getting out." The video also stated that the goal when a customer buys a New GM vehicle is that they "drive it down the road and they never go back to the dealer."[154]

---

[153] https://www.youtube.com/watch?v=jbXpV0aqEM4.
[154] https://www.youtube.com/watch?v=JRFO8UzoNho&list=UUxN-Csvy_9sveql5HJviDjA.



442. In 2010 New GM ran a television advertisement for its Chevrolet brand that implied its vehicles were safe by showing parents bringing their newborn babies home from the hospital, with the tagline "as long as there are babies, there will be Chevys to bring them home."[155]

443. Another 2010 television ad informed consumers that "Chevrolet's ingenuity and integrity remain strong, exploring new areas of design and power, while continuing to make some of the safest vehicles on earth."

444. New GM's 2010 brochure for the Chevy Cobalt states "Chevy Cobalt is savvy when it comes to standard safety" and "you'll see we've thought about safety so you don't have to." It also states "[w]e're filling our cars and trucks with the kind of thinking, features and craftsmanship you'd expect to pay a lot more for."[156]

---

[155] https://www.youtube.com/watch?v=rb28vTN382g.
[156] https://www.auto-brochures.com/makes/Chevrolet/Cobalt/Chevrolet_US%20Cobalt_2010.pdf.

1197532.10



445. New GM's 2010 Chevy HHR brochure proclaims "PLAY IT SAFE" and "It's easier to have fun when you have less to worry about."[157]



---

[157] https://www.auto-brochures.com/makes/Chevrolet/HHR/Chevrolet_US%20HHR_2010.pdf.

1197532.10

446.    New GM's brochure for the 2011 Chevrolet Silverado states "Silverado – the most dependable, long-lasting full size pickups on the road." It goes on to state "[t]here are three stages of safety. Silverado takes every one as seriously as you do."[158]



447.    The brochure for the 2011 Cadillac DTS and STS states "Passenger safety is a primary consideration throughout the engineering process." It continues by stating "[t]he STS and DTS were carefully designed to provide a host of features to help you from getting into a collision in the first place."[159]

---

[158] https://www.auto-brochures.com/makes/Chevrolet/Silverado/Chevrolet_US%20Silverado_2011.pdf.
[159] https://www.auto-brochures.com/makes/Cadillac/Cadillac_US%20STS-DTS_2011.pdf.

1197532.10



448. On August 29, 2011, New GM stated on its website that: "Chevrolet provides consumers with fuel-efficient, safe and reliable vehicles that deliver high quality, expressive design, spirited performance and value."[160]

449. On September 29, 2011, New GM announced on the "News" portion of its website the introduction of front center airbags. The announcement included a quote from Gay Kent, New GM executive director of Vehicle Safety and Crashworthiness, who stated that: "This technology is a further demonstration of New GM's above-and-beyond commitment to provide continuous occupant protection before, during and after a crash."[161]

450. On December 27, 2011, Gay Kent, Executive Director of Vehicle Safety, was quoted in an interview on New GM's website as saying: "Our safety strategy is about providing continuous protection for our customers before, during and after a crash."[162]

451. New GM's brochure for the 2012 Chevrolet Impala proclaims: "[a] safety philosophy that RUNS DEEP," and that "if a moderate to severe collision does happen, Impala is designed to respond quickly":[163]

---

[160] https://media.gm.com/media/us/en/gm/news.detail../content/Pages/news/us/en/2014/Jul/0731-mpg.
[161] https://media.gm.com/media/us/en/gm/news.detail../content/Pages/news/us/en/2011/Sep/0929_airbag.
[162] https://media.gm.com/media/us/en/gm/news.detail../content/Pages/news/us/en/2011/Dec/1227_safety.

1197532.10



452.    New GM's brochure for the 2012 Cadillac CTS states "At Cadillac, we believe the best way to survive a collision is to avoid one in the first place." It goes on to say "Active safety begins with a responsive engine, powerful brakes, and an agile suspension."[164]



---

*Footnote continued from previous page*
[163] https://www.chevrolet.com/content/dam/Chevrolet/northamerica/usa/nscwebsite/en/Home/Help%20Center/Download%20a%20Brochure/02_PDFs/2012_Impala_eBrochure.pdf.
[164] https://www.auto-brochures.com/makes/Cadillac/CTS/Cadillac_US%20CTS_2012.pdf.

1197532.10

453.    On January 3, 2012, Gay Kent, New GM Executive Director of Vehicle Safety, was quoted on New GM's website as saying: "From the largest vehicles in our lineup to the smallest, we are putting overall crashworthiness and state-of-the-art safety technologies at the top of the list of must-haves."[165]

454.    An online national ad campaign for New GM in April 2012 stressed "Safety. Utility. Performance."

455.    On June 5, 2012, New GM posted an article on its website announcing that its Malibu Eco had received top safety ratings from the National Highway Traffic Safety Administration and the Insurance Institute for Highway Safety. The article includes the following quotes: "With the Malibu Eco, Chevrolet has earned seven 2012 TOP SAFETY PICK awards," said IIHS President Adrian Lund. "The IIHS and NHTSA results demonstrate GM's commitment to state-of-the-art crash protection." And "We are now seeing the results from our commitment to design the highest-rated vehicles in the world in safety performance," said Gay Kent, New GM executive director of Vehicle Safety. "Earning these top safety ratings demonstrates the strength of the Malibu's advanced structure, overall crashworthiness and effectiveness of the vehicle's state-of-the-art safety technologies."[166]

456.    On June 5, 2012, New GM posted an article on its website entitled "Chevrolet Backs New Vehicle Lineup with Guarantee," which included the following statement: "We have transformed the Chevrolet lineup, so there is no better time than now to reach out to new customers with the love it or return it guarantee and very attractive, bottom line pricing," said Chris Perry, Chevrolet global vice president of marketing. "We think customers who have been driving competitive makes or even older Chevrolets will be very pleased by today's

---

[165] https://media.gm.com/media/us/en/gm/news.detail../content/Pages/news/us/en/2012/Jan/0103_sonic.
[166] https://media.gm.com/media/us/en/gm/news.detail../content/Pages/news/us/en/2012/Jun/0605_malibu safety.

Chevrolet designs, easy-to-use technologies, comprehensive safety and the quality built into all of our cars, trucks and crossovers."[167]

457. On November 5, 2012, New GM published a video to advertise its "Safety Alert Seat" and other safety sensors. The video described older effective safety systems and then added that new systems "can offer drivers even more protection." Then, a Cadillac Safety Engineer stated there "are a variety of crash avoidance sensors that work together to help the driver avoid crashes." Finally, the engineer then discussed all the sensors and the safety alert seat on the Cadillac XTS, leaving the viewer with the impression safety was a top priority at Cadillac.[168]



458. New GM's brochure for the 2013 Chevrolet Traverse states "Traverse provides peace of mind with an array of innovative safety features" and "[i]t helps protect against the unexpected."[169]

---

[167] https://media.gm.com/media/us/en/gm/news.detail../content/Pages/news/us/en/2012/Jul/0710_ confidence.
[168] https://www.youtube.com/watch?v=CBEvflZMTeM.
[169] https://www.auto-brochures.com/makes/Chevrolet/Traverse/Chevrolet_US%20Traverse_2013.pdf.



459. A national print ad campaign in April 2013 states that "[w]hen lives are on the line, you need a dependable vehicle you can rely on. Chevrolet and GM … for power, performance and safety."

460. On November 8, 2013, New GM posted a press release on its website regarding GMC, referring to it as "one of the industry's healthiest brands":[170]

**About GMC**

GMC has manufactured trucks since 1902, and is one of the industry's healthiest brands. Innovation and engineering excellence is built into all GMC vehicles and the brand is evolving to offer more fuel-efficient trucks and crossovers, including the Terrain small SUV and Acadia crossover. The 2014 Sierra half-ton pickup boasts all-new powertrains and design, and the Sierra Heavy Duty pickups are the most capable and powerful trucks ever built by GMC. Every retail GMC model, including Yukon and Yukon XL full-size SUVs, is now available in Denali luxury trim. Details on all GMC models are available at http://www.gmc.com/, on Twitter at @thisisgmc or at http://www.facebook.com/gmc.

461. A December 2013 New GM testimonial ad stated that "GM has been able to deliver a quality product that satisfies my need for dignity and safety."

---

[170] https://media.gm.com/media/us/en/gm/news.detail../content/Pages/news/us/en/2013/Nov/1108-truck-lightweighting.

1197532.10

Case 14-mc-02543-JMF   Document 347-1   Filed 10/14/14   Page 57 of 49

462.     In 2013, New GM proclaimed on its website, https://www.gm.com, the company's passion for building and selling the world's best vehicles as "the hallmark of our customer-driven culture":[171]

463.     On the same website in 2013, New GM stated: "At GM, it's about getting everything right for our customers – from the way we design, engineer and manufacture our vehicles, all the way through the ownership experience."[172]

464.     On its website, Chevrolet.com, New GM promises that it is "Putting safety ON TOP," and that "Chevy Makes Safety a Top Priority":[173]



465.     On its website, Buick.com, New GM represents that "Keeping you and your family safe is a priority":[174]

---

[171] https://www.gm.com/company/aboutGM/our_company.
[172] https://www.gm.com/vision/quality_safety/it_begins_with_a_commitment_to_Quality.
[173] https://www.chevrolet.com/culture/article/vehicle-safety-preparation.
[174] https://www.buick.com/top-vehicle-safety-features.

1197532.10



466.    New GM's website currently states:[175]

> *Innovation: Quality & Safety; GM's Commitment to Safety;
> Quality and safety are at the top of the agenda at GM, as we work
> on technology improvements in crash avoidance and
> crashworthiness to augment the post-event benefits of OnStar, like
> advanced automatic crash notification.*
>
> *Understanding what you want and need from your vehicle helps
> GM proactively design and test features that help keep you safe
> and enjoy the drive. Our engineers thoroughly test our vehicles for
> durability, comfort, and noise minimization before you think about
> them. The same quality process ensures our safety technology
> performs when you need it.*

467.    New GM's website further promises: Safety and Quality First: Safety will

always be a priority at New GM. We continue to emphasize our safety-first culture in our

facilities," and that, "[i]n addition to safety, delivering the highest quality vehicles is a major

cornerstone of our promise to our customers":[176]

---

[175] https://www.gm.com/vision/quality_safety/gms_commitment_tosafety.
[176] https://www.gm.com/company/aboutGM/our_company.

-170-

> At the new GM, we make a strong commitment to our customers, employees, partners and other important stakeholders. We state proudly our five principles that guide us in everything we do:
>
> • **Safety and Quality First:** Safety will always be a priority at GM. We continue to emphasize our safety-first culture in our facilities, and as we grow our business in new markets. Our safety philosophy is at the heart of the development of each vehicle. In addition to safety, delivering the highest quality vehicles is a major cornerstone of our promise to our customers. That is why our vehicles go through extreme testing procedures in the lab, on the road and in our production facilities prior to being offered to customers. Learn More

468. New GM's current website states that "leading the way is our seasoned leadership team who set high standards for our company so that we can give you the best cars and trucks. This means that we are committed to delivering vehicles with compelling designs, flawless quality, and reliability, and leading safety, fuel economy and infotainment features… Safety and Quality First: Safety will always be a priority at New GM. We continue to emphasize our safety-first culture in our facilities, and as we grow our business in new markets. Our safety philosophy is at the heart of the development of each vehicle. In addition to safety, delivering the highest quality vehicles is a major cornerstone of our promise to our customers. That is why our vehicles go through extreme testing procedures in the lab, on the road and in our production facilities prior to being offered to customers."[177]

469. New GM is highly aware of the impact vehicle recalls, and their timeliness, have on its brand image. In its 2010 Form 10-K submitted to the United States Securities and Exchange Commission ("SEC"), New GM admitted that "Product recalls can harm our reputation and cause us to lose customers, particularly if those recalls cause consumers to question the safety or reliability of our products. Any costs incurred or lost sales caused by

---

[177] https://www.gm.com/company/aboutGM/our_company.

future product recalls could materially adversely affect our business. Conversely, not issuing a
recall or not issuing a recall on a timely basis can harm our reputation and cause us to lose
customers…" General Motors 2010 Form 10-K, p. 31.[178]

470.    In its 2011 10-K SEC filing, New GM stated "We are a leading global
automotive company. Our vision is to design, build and sell the world's best vehicles. We
seek to distinguish our vehicles through superior design, quality, reliability, telematics
(wireless voice and data) and infotainment and safety within their respective segments."
General Motors 2011 Form 10-K, p. 50.[179]

471.    New GM's relentlessly repeated and reinforced product quality and safety
representations were not mere harmless "puffery." New GM made these and similar
representations to boost vehicle sales while knowing the starkly contrasting truth that millions
of GM-branded vehicles, across numerous models and years, were plagued with serious and
concealed safety defects that were putting its customers, their passengers, and all those who
shared the road with its Defective Vehicles at constant risk of crashes, injury and death.

C.    **New GM Concealed And Disregarded Safety Issues As A Way Of Doing
Business.**

472.    Ever since its inception, New GM possessed vastly superior knowledge and
information to that of consumers – if not exclusive information – about the design and
function of GM-branded vehicles and the existence of the defects in those vehicles.

473.    Recently revealed information presents a disturbing picture of New GM's
approach to safety issues – both in the design and manufacture stages, and in discovering and
responding to defects in GM-branded vehicles that have already been sold.

---

[178] https://www.sec.gov/Archives/edgar/data/1467858/000119312510078119/d10k.htm#toc85733_4.
[179] https://www.sec.gov/Archives/edgar/data/1467858/000119312511051462/d10k.htm.

Case 1:14-mc-02543-JMF Document 347-1 Filed 10/06/14 Page 41 of 49

474.     New GM made very clear to its personnel that cost-cutting was more important than safety, deprived its personnel of necessary resources for spotting and remedying defects, trained its employees not to reveal known defects, and rebuked those who attempted to "push hard" on safety issues.

475.     One "directive" at New GM was "cost is everything."[180] The messages from top leadership at New GM to employees, as well as their actions, were focused on the need to control cost.[181]

476.     One New GM engineer stated that emphasis on cost control at New GM "permeates the fabric of the whole culture."[182]

477.     According to Mark Reuss (President of GMNA from 2009-2013 before succeeding Mary Barra as Executive Vice President for Global Product Development, Purchasing and Supply Chain in 2014), cost and time-cutting principles known as the "Big 4" at New GM "emphasized timing over quality."[183]

478.     New GM's focus on cost-cutting created major disincentives to personnel who might wish to address safety issues. For example, those responsible for a vehicle were responsible for its costs, but if they wanted to make a change that incurred cost and affected other vehicles, they also became responsible for the costs incurred in the other vehicles.

479.     As another cost-cutting measure, parts were sourced to the lowest bidder, even if they were not the highest quality parts.[184]

480.     Because of New GM's focus on cost-cutting, New GM Engineers did not believe they had extra funds to spend on product improvements.[185]

---

[180] Valukas Report at 249.
[181] Id. at 250.
[182] Id.
[183] Id.
[184] Id. at 251.

481.    New GM's focus on cost-cutting also made it harder for New GM personnel to discover safety defects, as in the case of the "TREAD Reporting team."

482.    New GM used its TREAD database (known as "TREAD") to store the data required to be reported quarterly to NHTSA under the TREAD Act.[186] From the date of its inception in 2009, TREAD has been the principal database used by New GM to track incidents related to its vehicles.[187]

483.    From 2003-2007 or 2008, the TREAD Reporting team had eight employees, who would conduct monthly searches and prepare scatter graphs to identify spikes in the number of accidents or complaints with respect to various GM-branded vehicles. The TREAD Reporting team reports went to a review panel and sometimes spawned investigations to determine if any safety defect existed.[188]

484.    In or around 2007-08, Old GM cut its TREAD Reporting team from eight to three employees, and the monthly data mining process pared down.[189] In 2010, New GM restored two people to the team, but they did not participate in the TREAD database searches.[190] Moreover, until 2014, the TREAD Reporting team did not have sufficient resources to obtain any of the advanced data mining software programs available in the industry to better identify and understand potential defects.[191]

485.    By starving the TREAD Reporting team of the resources it needed to identify potential safety issues, New GM helped to insure that safety issues would not come to light.

---

*Footnote continued from previous page*
[185] *Id.*
[186] *Id.* at 306.
[187] *Id.*
[188] *Id.* at 307.
[189] *Id.*
[190] *Id.* at 307-308.
[191] *Id.* at 208.

1197532.10

Case 1:14-mc-02543-JMF Document 347-1 Filed 10/24/14 Page 43 of 49

486. "[T]here was resistance or reluctance to raise issues or concerns in the GM culture." The culture, atmosphere and supervisor response at New GM "discouraged individuals from raising safety concerns."[192]

487. New GM CEO, Mary Barra, experienced instances where New GM engineers were "unwilling to identify issues out of concern that it would delay the launch" of a vehicle.[193]

488. New GM supervisors warned employees to "never put anything above the company" and "never put the company at risk."[194]

489. New GM "pushed back" on describing matters as safety issues and, as a result, "GM personnel failed to raise significant issues to key decision-makers."[195]

490. So, for example, and as set forth above, New GM discouraged the use of the word "stall" in Technical Service Bulletins ("TSBs") it sometimes sent to dealers because the word "stall" was a "hot" word that may raise concerns at NHTSA.[196]

491. Direct of Brand Quality Steven Oakley, who drafted TSBs, noted that "he was reluctant to push hard on safety issues because of his perception that his predecessor had been pushed out of the job for doing just that."[197]

492. Many New GM employees "did not take notes at all at critical safety meetings because they believed New GM lawyers did not want such notes taken."[198]

493. A New GM training document released by NHTSA as an attachment to its Consent Order sheds further light on the lengths to which New GM went to ensure that known

---

[192] *Id*. at 252.
[193] *Id*.
[194] *Id*. at 252-253.
[195] *Id*. at 253.
[196] *Id*. at 92.
[197] *Id*.
[198] *Id*. at 254.

defects were concealed. It appears that the defects were concealed pursuant to a company policy New GM inherited from Old GM.

494.   The document consists of slides from a 2008 Technical Learning Symposium for "designing engineers," "company vehicle drivers," and other employees at Old GM. On information and belief, the vast majority of employees who participated in this webinar presentation continued on in their same positions at New GM after July 10, 2009.

495.   The presentation focused on recalls, and the "reasons for recalls."

496.   One major component of the presentation was captioned "Documentation Guidelines," and focused on what employees should (and should not say) when describing problems in vehicles.

497.   Employees were instructed to "[w]rite smart," and to "[b]e factual, not fantastic" in their writing.

498.   Company vehicle drivers were given examples of comments to avoid, including the following: "This is a safety and security issue"; "I believe the wheels are too soft and weak and could cause a serious problem"; and "Dangerous … almost caused accident."

499.   In documents used for reports and presentations, employees were advised to avoid a long list of words, including: "bad," "dangerous," "defect," "defective," "failed," "flawed," "life-threatening," "problem," "safety," "safety-related," and "serious."

500.   As NHTSA's Acting Administrator Friedman noted at the May 16, 2014, press conference announcing the Consent Order concerning the ignition switch defect, it was New GM's company policy to avoid using words that might suggest the existence of a safety defect:

1197532.10

> *GM must rethink the corporate philosophy reflected in the
> documents we reviewed, including training materials that explicitly
> discouraged employees from using words like 'defect,'
> 'dangerous,' 'safety related,' and many more essential terms for
> engineers and investigators to clearly communicate up the chain
> when they suspect a problem.'*

501. New GM appears to have trained its employees to conceal the existence of
known safety defects from consumers and regulators. Indeed, it is nearly impossible to convey
the potential existence of a safety defect without using the words "safety" or "defect" or
similarly strong language that was verboten at New GM.

502. So institutionalized at New GM was the "phenomenon of avoiding
responsibility" that the practice was given a name: "the 'GM salute,'" which was "a crossing
of the arms and pointing outward towards others, indicating that the responsibility belongs to
someone else, not me."[199]

503. CEO Mary Barra described a related New GM phenomenon, "known as the
'GM nod,'" which was "when everyone nods in agreement to a proposed plan of action, but
then leaves the room with no intention to follow through, and the nod is an empty gesture."[200]

504. According to the New GM Report prepared by Anton R. Valukas, part of the
failure to properly correct the ignition switch defect was due to problems with New GM's
organizational structure.[201] Part of the failure to properly correct the ignition switch defect
was due to a corporate culture that did not care enough about safety.[202] Part of the failure to
properly correct the ignition switch defect was due to a lack of open and honest
communication with NHTSA regarding safety issues.[203] Part of the failure to properly correct

---

[199] GM Report at 255.
[200] *Id*. at 256.
[201] *Id*. at 259-260.
[202] *Id*. at 260-61.
[203] *Id*. at 263.

1197532.10

Case 1:14-mc-02543-JMF    Document 347-1    Filed 10/06/14    Page 46 of 49

the ignition switch defect was due to improper conduct and handling of safety issues by lawyers within New GM's Legal Staff.[204] On information and belief, all of these issues also helped cause the concealment of and failure to remedy the many defects that have led to the spate of recalls in the first half of 2014.

505.    An automobile manufacturer has a duty to promptly disclose and remedy defects. New GM knowingly concealed information about material safety hazards from the driving public, its own customers, and the Class, thereby allowing unsuspecting vehicle owners and lessees to continue unknowingly driving patently unsafe vehicles which posed a mortal danger to themselves, their passengers and loved ones, other drivers, and pedestrians.

506.    Not only did New GM take far too long in failing to address or remedy the defects, it deliberately worked to cover-up, hide, omit, fraudulently conceal and/or suppress material facts from the Class who relied upon it to the detriment of the Class.

### D.    New GM Admitted Its Failure To Disclose The Defects In Its Vehicle, Attempting To Reassure The Public That It Can Now Be Trusted.

507.    Consistent with its CEO's contrition, GM has once again embarked on a public campaign to convince the public that, this time, it has sincerely reformed.

508.    On February 25, 2014, New GM North America President, Alan Batey, publically stated: "Ensuring our customers' safety is our first order of business. We are deeply sorry and we are working to address this issue as quickly as we can."[205]

509.    In a press release on March 18, 2014 New GM announced that Jeff Boyer had been named to the newly created position of Vice President, Global Vehicle Safety. In the press release New GM quoted Mr. Boyer as stating that: "Nothing is more important than the

---

[204] Id. at 264.
[205] https://media.gm.com/media/us/en/gm/news.detail../content/Pages/news/us/en/2014/Feb/0225-ion.

safety of our customers in the vehicles they drive. Today's GM is committed to this, and I'm ready to take on this assignment."[206]

510.    On May 13, 2014, New GM published a video to defend its product and maintain that the ignition defect will never occur when only a single key is used. Jeff Boyer, New GM Vice President of Global Vehicle Safety, addressed viewers and told them New GM's Milford Proving Ground is "the largest and most comprehensive testing facilities in the world." He told viewers that if you use a New GM single key that there is no safety risk.[207]



511.    As of July 2014, New GM continues to praise its safety testing. It published a video entitled "90 Years of Safety Testing at New GM's Milford Proving Ground." The narrator describes New GM's testing facility as "one of the world's top automotive facilities" where data is "analyzed for customer safety." The narrator concludes by saying, "[o]ver the past ninety years one thing remained unchanged, GM continues to develop and use the most advanced technologies available to deliver customers the safest vehicles possible."[208]

---

[206] https://media.gm.com/media/us/en/gm/news.detail../content/Pages/news/us/en/2014/mar/0318-boyer.
[207] https://www.youtube.com/watch?v=rXO7F3aUBAY.
[208] https://www.youtube.com/watch?v=BPQdlJZvZhE&list=UUxN-Csvy_9sveql5HJviDjA.

-179-

Case 14-mc-02543-JMF    Document 347-1    Filed 10/14/14    Page 48 of 49



512.    On July 31, 2014, Jack Jensen, the New GM engineering group manager for

the "Milford Proving Ground" dummy lab, told customers that "[w]e have more sophisticated

dummies, computers to monitor crashes and new facilities to observe different types of

potential hazards. All those things together give our engineers the ability to design a broad

range of vehicles that safely get our customers where they need to go."[209]

513.    As discussed in this Complaint, these most recent statements from New GM

contrast starkly with New GM's wholly inadequate response to remedy the defects in its

vehicles, such as the ignition switch defect.

---

[209] https://media.gm.com/media/us/en/gm/news.detail../content/Pages/news/us/en/2014/Jul/0731-mpg.



## XII.  Other Recently Revealed Information Demonstrates New GM's Widespread Ongoing Pattern Of Concealing Dangerous Defects In GM-Branded Vehicles That Has Caused Diminution in the Value of the Defective Vehicles.

514.  Other recently-revealed information suggests that Old and New GM's egregious mishandling of the ignition switch defects is part of a pattern of concealing dangerous known defects in Old and New GM vehicles.

515.  That pattern of conduct, together with the ever-expanding and piecemeal nature of the recall, calls into further question whether New GM is to be trusted when it claims that simply replacing the ignition switch (in some Defective Vehicles) and providing new keys for others, will fully resolve the myriad of issues faced by Defective Vehicle owners as a result of the ignition switch defects.

516.  The defects identified in the myriad recalls of 2014 affect virtually every safety system in GM-branded vehicles, including but by no means limited to the airbags, power

1197532.10

steering, power brakes, and seat belts, as discussed below, and are discussed here to illustrate the extent of Old and New GM's pattern of faulty processes and concealment of known defects to the detriment of consumers and public safety.

### A.      The Ignition Lock Cylinder Defect.

517.      As discussed briefly in previous sections, on April 9, 2014, New GM recalled 2,191,014 GM-branded vehicles with faulty ignition lock cylinders.[210] Though the vehicles are the same as those affected by the ignition switch torque defect,[211] the lock cylinder defect is distinct.

518.      In these vehicles, faulty ignition lock cylinders can allow removal of the ignition key while the engine is not in the "off" position. If the ignition key is removed when the ignition is not in the "off" position, unintended vehicle motion may occur. That could cause a crash and injury to the vehicle's occupants or pedestrians. Some of the vehicles with faulty ignition lock cylinders may fail to conform to Federal Motor Vehicle Safety Standard number 114, "*Theft Prevention and Rollaway Prevention*."[212]

519.      According to New GM's Chronology that it submitted to NHTSA on April 23, 2014, the ignition lock cylinder defect arose out of New GM's notorious recalls for defective ignition switch systems in the Chevrolet Cobalt, Chevrolet HHR, Pontiac G5, Pontiac Solstice, Saturn ION, and Saturn Sky vehicles. Those three recalls occurred in February and March of 2014.[213]

---

[210] New GM Letter to NHTSA dated April 9, 2014.
[211] Namely, MY 2005-2010 Chevrolet Cobalts, 2006-2011 Chevrolet HHRs, 2007-2010 Pontiac G5s, 2003-2007 Saturn Ions, and 2007-2010 Saturn Skys. *See id.*
[212] New GM Notice to NHTSA dated April 9, 2014, at 1.
[213] *See* Attachment B to New GM's letter to NJTSA dated April 23, 2014 ("Chronology").

1197532.10

520.    In late February or March 2014, New GM personnel participating in the ignition switch recalls observed that the keys could sometimes be removed from the ignition cylinders when the ignition was not in the "off" position. This led to further investigation.

521.    After investigation, New GM's findings were presented at an EFADC meeting on April 3, 2014. New GM noted several hundred instances of potential key pullout issues in vehicles covered by the previous ignition switch recalls, and specifically listed 139 instances identified from records relating to customer and dealer reports to GM call centers, 479 instances identified from warranty repair data, one legal claim, and six instances identified from NHTSA VOQ information. New GM investigators also identified 16 roll-away instances associated with the key pullout issue from records relating to customer and dealer reports to GM call centers and legal claims information.

522.    New GM noted that excessive wear to ignition tumblers and keys may be the cause of the key pullout issue. New GM also considered the possibility that some vehicles may have experienced key pullout issues at the time they were manufactured, based on information that included the following: (a) a majority of instances of key pullouts that had been identified in the recall population were in early-year Saturn Ion and Chevrolet Cobalt vehicles, and in addition, repair order data indicated vehicles within that population had experienced a repair potentially related to key pullout issues as early as 47 days from the date on which the vehicle was put into service; and (b) an engineering inquiry known within New GM as a Problem Resolution Tracking System inquiry ("PRTS") related to key pullout issues was initiated in June 2005, which resulted in an engineering work order to modify the ignition cylinder going forward.

523.    A majority of the key pullout instances identified involved 2003-2004 model year Saturn Ion and 2005 model year Chevrolet Cobalt vehicles. An April 3 New GM PowerPoint identified 358 instances of key pullouts involving those vehicles.

524.    In addition, with respect to early-year Saturn Ion and Chevrolet Cobalt vehicles, the April 3 PowerPoint materials discussed the number of days that elapsed between the "In Service Date" of those vehicles (the date they first hit the road) and the "Repair Date." The April 3 PowerPoint stated that, with respect to the 2003 model year Saturn Ion, a vehicle was reported as experiencing a potential key pullout repair as early as 47 days from its "In Service Date;" with respect to the 2004 model year Saturn Ion, a vehicle was reported as experiencing a potential key pullout repair as early as 106 days from its "In Service Date;" with respect to the 2005 model year Chevrolet Cobalt, a vehicle was reported as experiencing a potential key pullout repair as early as 173 days from its "In Service Date;" and with respect to the 2006 model year Chevrolet Cobalt, a vehicle was reported as experiencing a potential key pullout repair as early as 169 days from its "In Service Date." The length of time between the "In Service Date" and the "Repair Date" suggested that these vehicles were defective at the time of manufacture.

525.    The PowerPoint at the April 3 EFADC meeting also discussed a PRTS that was initiated in June 2005 which related to key pullout issues in the Chevrolet Cobalt (PRTS N 183836). According to PRTS N 183836: "Tolerance stack up condition permits key to be removed from lock cylinder while driving." The "Description of Root Cause Investigation Progress and Verification" stated, "[a]s noted a tolerance stack up exists in between the internal components of the cylinder." According to a "Summary," "A tolerance stack up condition exists between components internal to the cylinder which will allow some keys to

-184-

be removed." The PRTS identified the following "Solution": "A change to the sidebar of the ignition cylinder will occur to eliminate the stack-up conditions that exist in the cylinder."

526.   In response to PRTS N 183836, New GM issued an engineering work order to ·"[c]hange shape of ignition cylinder sidebar top from flat to crowned."

527.   According to the work order: "Profile and overall height of ignition cylinder sidebar [will be] changed in order to assist in preventing key pullout on certain keycodes. Profile of sidebar to be domed as opposed to flat and overall height to be increased by 0.23mm."

528.   According to PRTS N 183836, this "solution fix[ed] the problem" going forward. An entry in the PRTS made on March 2, 2007 stated: "There were no incidents of the key coming out of the ignition cylinder in the run position during a review of thirty vehicles…." A "Summary" in the PRTS stated: "Because there were no incidents of the key coming out of the ignition cylinder in the run position during a review of thirty vehicles[,] this PRTS issue should be closed." PRTS N 183836 was the only PRTS discussed at the April 3, 2014, EFADC meeting, although it is not the only engineering or field report relating to potential key pullout issues.

529.   This data led the EFADC to conclude that 2003-2004 model year Saturn Ion vehicles and 2005 and some 2006 model year Chevrolet Cobalt vehicles failed to conform to FMVSS 114. In addition, the EFADC concluded that a defect related to motor vehicle safety existed, and decided to recall all vehicles covered by the first, second, and third ignition switch torque recalls to prevent unintended vehicle motion potentially caused by key pullout issues that could result in a vehicle crash and occupant or pedestrian injuries. For vehicles that were built with a defective ignition cylinder that have not previously had the ignition cylinder

-185-

replaced with a redesigned part, the recall called for dealers to replace the ignition cylinder and provide two new ignition/door keys for each vehicle.

**B.**     **There Have Been Extensive Additional Recalls of GM-branded Vehicles With Additional Safety-Related and Other Defects.**

530.     **Sudden Power-Steering Failure Defect:** Between 2003 and 2010, over 1.3 million GM-branded vehicles in the United States were sold with a safety defect that causes the vehicle's electric power steering ("EPS") to suddenly fail during ordinary driving conditions and revert back to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries.

531.     The affected vehicles are MY 2004-2006 and 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx, 2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2006 and 2008-2009 Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura vehicles.

532.     As with the ignition switch defects and many of the other defects, New GM was aware of the power steering defect long before it took anything approaching full remedial action.

533.     When the power steering fails, a message appears on the vehicle's dashboard, and a chime sounds to inform the driver. Although steering control can be maintained through manual steering, greater driver effort is required, and the risk of an accident is increased.

534.     In 2010, New GM first recalled Chevy Cobalt and Pontiac G5 models for these power steering issues, yet it did *not* recall the many other vehicles that had the very same power steering defect.

535.     Documents released by NHTSA show that New GM waited years to recall nearly 335,000 Saturn Ions for power-steering failure – despite receiving nearly 4,800

Case 1:14-mc-02543-JMF Document 347-2 Filed 10/24/14 Page 6 of 473

consumer complaints and more than 30,000 claims for warranty repairs. That translates to a complaint rate of 14.3 incidents per thousand vehicles and a warranty claim rate of 9.1 percent. By way of comparison, NHTSA has described as "high" a complaint rate of 250 complaints per 100,000 vehicles.[214] Here, the rate translates to 1,430 complaints per 100,000 vehicles.

536.     In response to the consumer complaints, in September 2011, NHTSA opened an investigation into the power-steering defect in Saturn Ions.

537.     NHTSA database records show complaints from Ion owners as early as June 2004, with the first injury reported in May 2007.

538.     NHTSA has linked approximately 12 crashes and two injuries to the power-steering defect in the Ions.

539.     In September 2011, after NHTSA began to make inquiries about the safety of the Saturn Ion, GM acknowledged that it had received almost 3,500 customer reports claiming a sudden loss of power steering in 2004-2007 Ion vehicles.

540.     The following month, New GM engineer Terry Woychowski informed current CEO Mary Barra – then head of product development –that there was a serious power-steering issue in Saturn Ions, and that it may be the same power steering issue that plagued the Chevy Cobalt and Pontiac G5. Ms. Barra was also informed of the ongoing NHTSA investigation. At the time, NHTSA reportedly came close to concluding that Saturn Ions should have been included in New GM's 2010 steering recall of Cobalt and G5 vehicles.

541.     Instead of recalling the Saturn Ion, GM sent dealers a service bulletin in May of 2012 identifying complaints about the steering system in the vehicle.

---

[214] *See* http://www-odi.nhtsa.dot.gov/cars/problems/defect/-results.cfm?action_number=EA06002&SearchType= QuickSearch&summary=true.

1197532.10

542.    By the time GM finally recalled the Saturn Ion – four years later, in March 2014 - NHTSA had received more than 1200 complaints about the vehicle's power steering. Similar complaints resulted in over 30,000 warranty claims with GM.

543.    After announcing the March 31, 2014 recall, Jeff Boyer, New GM's Vice President of Global Vehicle Safety, acknowledged that New GM recalled some of these same vehicle models previously for the *same issue*, but that New GM "did not do enough."

544.    According to an analysis by the New York Times published on April 20, 2014, New GM has "repeatedly used technical service bulletins to dealers and sometimes car owners as stopgap safety measures instead of ordering a timely recall."

545.    Former NHTSA head Joan Claybrook echoed this conclusion, stating, "There's no question that service bulletins have been used where recalls should have been."

546.    NHTSA has recently criticized New GM for issuing service bulletins on at least four additional occasions in which a recall would have been more appropriate and in which New GM later, in fact, recalled the subject vehicles.

547.    These inappropriate uses of service bulletins prompted Frank Borris, the top defect investigator for NHTSA, to write to New GM's product investigations director, Carmen Benavides, in July 2013, complaining that "GM is slow to communicate, slow to act, and, at times, requires additional effort . . . that we do not feel is necessary with some of [GM's] peers."

548.    Mr. Borris' correspondence was circulated widely among New GM's top executives. Upon information and belief, the following employees received a copy: John Calabrese and Alicia Boler-Davis, two vice presidents for product safety; Michael Robinson, vice president of regulatory affairs; Jim Federico; Gay Kent, director of product investigations

who had been involved in safety issues with the Cobalt since 2006; and William Kemp, an in-house product liability lawyer.

549.   **Ignition Lock Cylinder Defect:** On August 7, 2014, New GM recalled 202,155 MY 2002-2004 Saturn Vue vehicles.[215] In the affected vehicles, the ignition key can be removed when the vehicle is not in the "off" position.[216] If this happens, the vehicle can roll away, increasing the risk for a crash and occupant or pedestrian injuries.[217]

550.   Following New GM's April 9, 2014 recall announcement regarding ignition switch defects, New GM reviewed field and warranty data for potential instances of ignition cylinders that permit the operator to remove the ignition key when the key is not in the "off" position in other vehicles outside of those already recalled.[218] New GM identified 152 reports of vehicle roll away and/or ignition keys being removed when the key is not in the "off" position in the 2002-2004 MY Saturn Vue vehicles.[219]

551.   After reviewing this data with NHTSA on June 17, 2014, July 7, 2014, and July 24, 2014, GM instituted a safety recall on July 31, 2014.[220]

552.   **Safety Defects of the Airbag Systems – Wiring Harness Defect:** On March 17, 2014, New GM recalled nearly 1.2 million vehicles for a dangerous defect involving airbags and seatbelt pretensioners that caused them to fail to deploy, increasing the risk of injury and death to the drivers and front-seat passengers.

553.   Once again, N of the dangerous airbag defect long before it took anything approaching the requisite remedial action. Indeed, the problem apparently arose when Old

---

[215] *See* August 7, 2014 Letter from New GM to NHTSA.
[216] *Id.*
[217] *Id.*
[218] *Id.*
[219] *Id.*
[220] *Id.*

GM made the change from using gold-plated terminals to connect its wire harnesses to cheaper tin terminals in 2007.

554.    In June 2008, Old GM noticed increased warranty claims for airbag service on certain of its vehicles and determined it was due to increased resistance in airbag wiring. After analysis of the tin connectors in September 2008, Old GM determined that corrosion and wear to the connectors was causing the increased resistance in the airbag wiring. It released a technical service bulletin on November 25, 2008, for 2008-2009 Buick Enclaves, 2009 Chevy Traverse, 2008-2009 GMC Acadia, and 2008-2009 Saturn Outlook models, instructing dealers to repair the defect by using Nyogel grease, securing the connectors, and adding slack to the line. Old GM also began the transition back to gold-plated terminals in certain vehicles. At that point, Old GM suspended all investigation into the defective airbag wiring and took no further action.[221]

555.    In November 2009, New GM learned of similar reports of increased airbag service messages in 2010 Chevy Malibu and 2010 Pontiac G6 vehicles. After investigation, New GM concluded that corrosion and wear in the same tin connector was the root of the airbag problems in the Malibu and G6 models.[222]

556.    In January 2010, after review of the Malibu and G6 airbag connector issues, New GM concluded that ignoring the service airbag message could increase the resistance such that an SIAB might not deploy in a side impact collision. On May 11, 2010, New GM issued a Customer Satisfaction Bulletin for the Malibu and G6 models and instructed dealers

---

[221] *See* New GM Notification Campaign No. 14V-118 dated March 31, 2014, at 1-2.
[222] *Id.* at 2.

to secure both front seat-mounted, side-impact airbag wire harnesses and, if necessary, reroute the wire harness.[223]

557.    From February to May 2010, New GM revisited the data on vehicles with faulty harness wiring issues, and noted another spike in the volume of the airbag service warranty claims. This led New GM to conclude that the November 2008 bulletin was "not entirely effective in correcting the [wiring defect present in the vehicles]." On November 23, 2010, New GM issued another Customer Satisfaction Bulletin for certain 2008 Buick Enclave, 2008 Saturn Outlook, and 2008 GMC Acadia models built from October 2007 to March 2008, instructing dealers to secure SIAB harnesses and re-route or replace the SIAB connectors.[224]

558.    New GM issued a revised Customer Service Bulletin on February 3, 2011, requiring replacement of the front seat-mounted side-impact airbag connectors in the same faulty vehicles mentioned in the November 2010 bulletin. In July 2011, New GM again replaced its connector, this time with a Tyco-manufactured connector featuring a silver-sealed terminal.[225]

559.    But in 2012, New GM noticed another spike in the volume of warranty claims relating to SIAB connectors in vehicles built in the second half of 2011. After further analysis of the Tyco connectors, it discovered that inadequate crimping of the connector terminal was causing increased system resistance. In response, New GM issued an internal bulletin for 2011-2012 Buick Enclave, Chevy Traverse, and GMC Acadia vehicles, recommending dealers repair affected vehicles by replacing the original connector with a new sealed connector.[226]

---

[223] *Id.*
[224] *See id.* at 3.
[225] *See id.*
[226] *See id.* at 4.

Case 1:14-md-02543-JMF    Document 534-2    Filed 10/14/14    Page 11 of 473

560.    The defect was still uncured, however, because in 2013 New GM again noted an increase in service repairs and buyback activity due to illuminated airbag service lights. On October 4, 2013, New GM opened an investigation into airbag connector issues in 2011-2013 Buick Enclave, Chevy Traverse, and GMC Acadia models. The investigation revealed an increase in warranty claims for vehicles built in late 2011 and early 2012.[227]

561.    On February 10, 2014, New GM concluded that corrosion and crimping issues were again the root cause of the airbag problems.[228]

562.    New GM initially planned to issue a less-urgent Customer Satisfaction Program to address the airbag flaw in the 2010-2013 vehicles. But it wasn't until a call with NHTSA on March 14, 2014, that New GM finally issued a full-blown safety recall on the vehicles with the faulty harness wiring – years after it first learned of the defective airbag connectors, after four investigations into the defect, and after issuing at least six service bulletins on the topic. The recall as first approved covered only 912,000 vehicles, but on March 16, 2014, it was increased to cover approximately 1.2 million vehicles.[229]

563.    **Safety Defects of the Airbag Systems – Driver-side Airbag Shorting Bar Defect:** On June 5, 2014, New GM issued a safety recall of 38,636 vehicles with a driver's airbag shorting bar defect.

564.    In the affected vehicles, the driver side frontal airbag has a shorting bar which may intermittently contact the airbag terminals. If the bar and terminals are contacting each other at the time of a crash, the airbag will not deploy, increasing the driver's risk of injury. New GM admits awareness of one crash with an injury where the relevant diagnostic trouble code was found at the time the vehicle was repaired. New GM is aware of other crashes

---

[227] *See id.*
[228] *See id.* at 5.
[229] *See id.*

involving these vehicles where airbags did not deploy but claims not to know if they were related to this defect.

565.    N about the driver's airbag shorting bar defect in 2012. In fact, New GM conducted two previous recalls in connection with shorting bar defect condition involving 7,116 vehicles – one on October 31, 2012, and one on January 24, 2013.[230] Yet it would take New GM nearly two years to finally order a broader recall.

566.    On May 31, 2013, after New GM's two incomplete recalls, NHTSA opened an investigation into reports of allegations of the non-deployment of air bags. New GM responded to this investigation on September 13, 2013.

567.    On November 1, 2013, NHTSA questioned New GM about: (1) the exclusion of 390 vehicles which met the criteria for the two previous safety recalls; (2) the 30-day in-service cutoff used for the recall population of one previous recall; and (3) twelve additional build days which, as of the June 2013 data pull in the investigation, had an elevated warranty rate. In response to NHTSA's concerns, New GM added additional vehicles to the recall.

568.    After announcement the initial ignition switch torque defect in February and March of 2014, New GM re-examined its records relating to the driver's airbag shorting defect. This review finally prompted New GM to expand the recall population on May 29, 2014 – *long after the problem should have been remedied.*

569.    **Safety Defects of the Airbag Systems – Driver-Side Airbag Inflator Defect:** On June 25, 2014, New GM recalled 29,019 vehicles with a driver-side airbag inflator defect.

570.    In the affected vehicles, the driver's front airbag inflator may have been manufactured with an incorrect part. In the event of a crash necessitating deployment of the

---

[230] *See* New GM's Letters to NHTSA date 10/31/2012 and 1/24/2013, respectively.

driver-side airbag, the airbag's inflator may rupture and the airbag may not inflate. The

rupture could cause metal fragments to strike and injure the vehicle's occupants. Additionally,

if the airbag does not inflate, the driver will be at increased risk of injury.[231]

571.    New GM was named in a lawsuit on or about May 1, 2014 involving a 2013

Chevrolet Cruze and an improperly deployed driver-side airbag that caused an injury to the

driver.[232] The lawsuit prompted an inspection of "the case vehicle," the assignment of a New

GM Product Investigations engineer, and discussions with NHTSA.[233]

572.    Meanwhile, the airbag supplier, Takata Corporation/TK Holdings Inc.,

conducted its own analysis. New GM removed airbags with "build dates near the build date of

the case vehicle," and sent them to Takata.[234] Subsequently, on June 20, 2014, Takata

informed New GM it had "discovered [the] root cause" of the driver-side airbag defect

through analysis of one of the airbags sent by New GM.[235]

573.    Shortly thereafter, on June 23, 2014, New GM decided to conduct a safety

recall.[236]

574.    **Safety Defects of the Airbag Systems – Roof Rail Airbag Defect:** On

June 18, 2014, New GM recalled 16,932 MY 2011 Cadillac CTS vehicles with a roof rail

airbag defect.

575.    In the affected vehicles, vibrations from the drive shaft may cause the vehicle's

roll over sensor to command the roof rail airbags to deploy. If the roof rail airbags deploy

unexpectedly, there is an increased risk of crash and injury to the occupants.[237]

---

[231] *See* New GM's Letter to NHTSA dated June 25, 2014.
[232] *Id.*
[233] *Id.*
[234] *Id.*
[235] *Id.*
[236] *Id.*

1197532.10

576.    According to New GM, the defect is caused by a loss of grease from the center constant velocity (CV) joint; the loss of grease causes vibrations of the propeller shaft that are transferred to the roll over sensor in the vehicle floor above the shat. The vibrations can cause the deployment of the roof rail airbags.[238]

577.    On October 28, 2010, a new supplier began shipping propeller shafts for MY 2011 Cadillac CTS vehicles; these propeller shafts used a metal gasket from the CV joint (as opposed to the liquid sealing system used by the previous supplier.).[239] *This new metal gasket design was not validated or approved by New GM.*[240]

578.    On June 27, 2011, a Problem Resolution Tracking System (PRTS) was opened concerning this defect. The PRTS resulted in the "purge" of the metal gasket design.[241] Then, on August 1, 2011, New GM issued an Engineering Work Order banning the metal gasket design, and mandating the use of the liquid sealing system. Yet New GM "closed the investigation without action in October 2012."[242]

579.    Inexplicably, New GM waited until June of 2014 before finally recalling the affected vehicles.

580.    **Safety Defects of the Airbag Systems – Passenger-Side Airbag Defect:** On May 16, 2014, GM recalled 1,953 MY 2015 Cadillac Escalade and Escalade ESV vehicles with a passenger-side airbag defect.

581.    The affected vehicles do not conform to Federal Motor Vehicle Safety Standard number 208, "Occupant Crash Protection." In these vehicles, the airbag module is

---

*Footnote continued from previous page*
[237] *See* June 18, 2014 New GM Letter to NHTSA.
[238] *Id.*
[239] *Id.*
[240] *Id.*
[241] *Id.*
[242] *Id.*

secured to a chute adhered to the backside of the instrument panel with an insufficiently heated infrared weld. As a result, the front passenger-side airbag will only partially deploy in the event of crash, and this will increase the risk of occupant injury.[243]

582.     On April 28, 2014, during product validation testing of the "Platinum" Escalade (a planned interim 2015 model), the passenger-side front airbag did not properly deploy.[244] New GM then obtained information from the supplier Johnson Controls Inc. (JCI) concerning the portion of the Escalade instrument panel through which the frontal airbag deploys.[245] In particular, New GM requested information on chute weld integrity.[246]

583.     On May 13, 2014, JCI informed New GM engineering that it had modified its infrared weld process on April 2, 2014 and "corrected" that process on April 29, 2014. New GM claims that it was unaware of the changes until May 13, 2014.[247]

584.     On May 14, 2014, the Executive Field Action Decision Committee decided to conduct a "noncompliance recall." On May 16, 2014, GM obtained a list of suspected serial numbers from JCI, which GM then matched to VINs through a records obtained from the scanning process used during instrument panel sub-assembly.[248] A recall notice was issued on May 16, 2014 for 1,953 vehicles, each of which will have the JCI part replaced.[249]

585.     Subsequently, GM discovered errors in the scanning process, and decided to expand the recall population to include any VINs that could have received parts bearing the suspect JCI serial numbers.[250] GM therefore issued a second recall notice on May 27, 2014.

---

[243] *See* May 16, 2014 Letter from New GM to NHTSA.
[244] *See* May 27, 2014 Letter from New GM to NHTSA.
[245] *Id.*
[246] *Id.*
[247] *Id.*
[248] *Id.*
[249] *Id.*
[250] *Id.*

With respect to this second set of 885 vehicles, they will be inspected to see if they were made with JCI parts bearing suspect serial numbers. If they are, the part will be replaced.[251]

586.    **Safety Defects of the Airbag Systems – Sport Seat Side-Impact Airbag Defect:** On June 18, 2014, New GM issued a safety recall for 712 MY 2014 Chevrolet Corvette vehicles with sport seat side-impact airbag defect.

587.    The affected vehicles do not meet a Technical Working Group Side Airbag Injury Assessment Reference Value (IARV) specifications for protecting unbelted, out-of-position young children from injury. In a crash necessitating side impact airbag deployment, an unbelted, out-of-position three year old child may be at an increased risk of neck injury.

588.    **Safety Defects of the Airbag Systems – Passenger-side Airbag Inflator Defect:** On June 5, 2014, New GM recalled 61 MY 2013 Chevrolet Spark and 2013 Buick Encore vehicles with a passenger side airbag inflator defect.

589.    In the affected vehicles, because of an improper weld, the front passenger airbag end cap could separate from the airbag inflator. This can prevent the airbag from deploying properly, and creates an increased risk of injury to the front passenger.[252]

590.    New GM was alerted to this issue on July 10, 2013, when a customer brought an affected vehicle into a dealership with "an airbag readiness light 'ON' condition."[253] After replacing the side frontal airbag, the dealer shipped the original airbag to New GM for warranty analysis.

591.    In September 2013, New GM "noted" the "weld condition of the end cap." New GM then sent the airbag to the airbag supplier, S&T Motive, who sent it on to the

---

[251] *Id.*
[252] *See* June 5, 2014 Letter from New GM to NHTSA.
[253] *Id.*

inflator supplier, ARC Automotive Inc., for "root cause" analysis.[254] S&T and ARC did not conclude their analysis until April 2014.[255]

592.     Based upon the information provided by S&T and ARC, in May 2014 New GM Engineering linked the defect to inflators produced on December 17, 2012. ARC records show that on that date, an inflator end cap separated during testing, but that ARC nonetheless shipped quarantined inflators to S&T where they were used in passenger side frontal airbags beginning on December 29, 2012.[256]

593.     On May 29, 2014 – nearly one year after being presented with a faulty airbag – New GM's Safety Field Action Committee finally decided to conduct a safety recall.[257]

594.     **Safety Defects of the Airbag Systems – Front Passenger Airbag Defect:** On March 17, 2014, New GM issued a noncompliance recall of 303,013 MY 2009-2014 GMC Savana vehicles with a passenger-side instrument panel defect.[258]

595.     In the affected vehicles, in certain frontal impact collisions below the airbag deployment threshold, the panel covering the airbag may not sufficiently absorb the impact of the collision. These vehicles therefore do not meet the requirements of Federal Motor Vehicle Safety Standard number 201, "Occupant Protection in Interior Impact."[259]

596.     The defect apparently arose in early 2009, when the passenger-side airbag housing was changed from steel to plastic.[260] Inexplicably, New GM did not act to remedy this defect until March of 2014.

---

[254] *Id.*
[255] *Id.*
[256] *Id.*
[257] *Id.*
[258] *See* March 31, 2014 Letter from New GM to NHTSA.
[259] *Id.*
[260] *Id.*

597.   **Safety Defects of the Seat Belt Systems – Seat Belt Connector Cable**

**Defect:** On May 20, 2014, New GM issued a safety recall for nearly 1.4 million vehicles with a dangerous safety belt defect.

598.   In the affected vehicles, "[t]he flexible steel cable that connects the safety belt to the vehicle at the outside of the front outside of the front outboard seating positions can fatigue and separate over time as a result of occupant movement into the seat. In a crash, a separated cable could increase the risk of injury to the occupant."[261]

599.   New GM waited more than two years after learning about this defect before disclosing it or remedying it.[262] This delay is consistent with New GM's long period of concealment of the other defects as set forth above.

600.   New GM first learned of the seat belt defect no later than February 10, 2012, when a dealer reported that a seat belt buckle separated from the anchor at the attaching cable in a 2010 GMC Acadia.[263] On March 7, 2012, after notification and analysis of the returned part, the supplier determined the problem was caused by fatigue of the cable.[264]

601.   On April 20, 2012, New GM received another part exhibiting the defect from a dealership.[265] New GM also did a warranty analysis that turned up three additional occurrences of similar complaints.[266] But New GM did not order a field review until June 4, 2012.[267] The review, on June 11, 2012, covered just 68 vehicles, and turned up no cable damage.[268]

---

[261] *See* New GM Notice to NHTSA dated May 19, 2014, at 1.
[262] *See* New GM Notice to NHTSA dated May 30, 2014, at 1-3.
[263] *Id.* at 1.
[264] *Id.* at 2.
[265] *Id.*
[266] *Id.*
[267] *Id.*
[268] *Id.*

1197532.10

602.    New GM received another part exhibiting the defect on August 28, 2013, from GM Canada Product Investigations.[269] After further testing in October 2013, New GM duplicated the defect condition, determining that, in some seat positions, the sleeve can present the buckle in a manner that can subject the cable to bending during customer entry into the vehicle.[270] New GM duplicated the condition again in a second vehicle in November, 2013.[271] And then just a month later, on December 18, 2013, New GM received another part exhibiting the condition from GM Canada Product Investigations.[272] But still New GM did not issue a safety recall.

603.    Further testing between February and April 2014, confirmed the defect resulted from fatigue of the cable.[273] This was the same root cause New GM identified as early as March 7, 2012. Finally, on April 14, 2014, these findings were turned over to New GM Product Investigations and assigned an investigation number.[274]

604.    On May 19, 2014, New GM's Executive Field Action Decision Committee decided to conduct a recall of the affected vehicles.[275]

605.    **Safety Defects of the Seat Belt Systems – Seat Belt Retractor Defect:** On June 11, 2014, New GM recalled 28,789 MY 2004-2011 Saab 9-3 Convertible vehicles with a seatbelt retractor defect.

606.    In the affected vehicles, the driver's side front seat belt retractor may break, causing the seat belt webbing spooled out by the user not to retract.[276] In the event of a crash,

---

[269] *Id.*
[270] *Id.*
[271] *Id.*
[272] *Id.*
[273] *Id.*
[274] *Id.*
[275] New GM Notice to NHTSA dated May 19, 2014, at 1.
[276] *See* New GM's June 11, 2013 Letter to NHTSA.

-200-

Case 1:14-md-02543-JMF Document 544-2 Filed 10/14/14 Page 20 of 73

a seat belt that has not retracted may not properly restrain the seat occupant, increasing the risk of injury to the driver.[277]

607.    By September of 2009 New GM was aware of an issue with seatbelt retractors in MY 2004 Saab 9-3 vehicles; at that time, NHTSA informed New GM that it received 5 Vehicle Owner Questionnaires "alleging that the driver seat belt will no longer retract on 2004 Saab 0-3 vehicles built after September 30, 2003."[278] In December 2009-January 2010, New GM conducted a survey "of customers who had a retractor replaced to determine how many were due" to a break in the Automatic Tensioning System that causes "webbing spooled out by the user not to retract."[279]

608.    On February 9, 2010, New GM issued a recall for the driver side retractor, but only in certain MY 2004 Saab 9-3 sedans – some 14,126 vehicles.[280] New GM would wait another 4 years before attempting to address the full scope of the seatbelt retractor defect in Saab 9-3 vehicles.

609.    New GM finally opened an investigation into the seatbelt retractor defect in other Saab 9-3 vehicles in February of this year, and that was "in response to NHTSA Vehicle Owner Questionnaires claiming issues with the driver side front seat belt retractor" in the affected vehicles.[281] As a result, New GM eventually recalled 28,789 MY 2004-2011 Saab 9-3 convertible vehicles on June 11, 2014.

---

[277] *See* New GM's June 11, 2013 Letter to NHTSA.
[278] *See* New GM's February 9, 2010 Letter to NHTSA.
[279] *Id.*
[280] *Id.*
[281] *See* New GM's June 11, 2013 Letter to NHTSA.

1197532.10

610.   **Safety Defects of the Seat Belt Systems – Frontal Lap-Belt Pretensioner
Defect:** On August 7, 2014, New GM recalled 48,059 MY 2013 Cadillac ATS and 2013
Buick Encore vehicles with a defect in the front lap-belt pretensioners.[282]

611.   In the affected vehicles, the driver and passenger lap-belt pretensioner cables
may not lock in a retracted position; that allows the seat belts to extend when pulled upon.[283]
If the seat belts do not remain locked in the retracted position, the seat occupant may not be
adequately restrained in a crash, increasing the risk of injury.[284]

612.   In July 2012, GM Korea learned that the lap-belt pretensioner cable and seat
belt webbing slipped out after being retracted.[285] Several months later, New GM changed the
rivet position on the pretensioner bracket and the design of the pretension mounting bolt.[286]
This change was made after New GM started production on the 2013 MY Buick Encore.[287]

613.   In October 2012, New GM testing on a pre-production 2014 MY Cadillac CTS
revealed that the driver side front seat belt anchor pretensioner cables retracted upon
deployment to pull in the lap-belt webbing, as intended, but did not lock in that position; that
allowed the retracted webbing to return ("pay out") to its original position under loading,
which was not intended.[288]

614.   On November 13, 2012, New GM modified the design of the lap-belt
pretensioner for the Cadillac CTS, Cadillac ATS, and Cadillac ELR vehicles to include a
modified bolt, relocation of a rivet in the cam housing to reposition the locking cam, and a

---

[282] *See* August 7, 2014 Letter from New GM to NHTSA.
[283] *Id.*
[284] *Id.*
[285] *See* August 21, 2014 Letter from New GM to NHTSA.
[286] *Id.*
[287] *Id.*
[288] *Id.*

change in torque of the lap-belt pretensioner bolt to seat.[289] These changes were implemented in the 2014 MY Cadillac CTS and Cadillac ELR, but not in the 2013 MY Cadillac ATS.[290]

615.    Despite making these adjustments to later MY vehicles only, New GM did not launch an investigation into the performance of the lap-belt pretensioners in the 2013 MY Buick Encore and Cadillac ATS until mid-April, 2013.[291] New GM claims that during this year-long investigation period it found no issues potentially relating to the pay out of the lap-belt pretensioners.[292]

616.    Nonetheless, New GM decided to issue a safety recall for the affected vehicles on July 31, 2014.[293] It later expanded the recall by 55 additional vehicles, to a total population of 48,114, on August 19, 2014.[294]

617.    **Safety Defects of the Seat:** On July 22, 2014, New GM issued a safety recall of 414,333 vehicles with a power height adjustable seats defect.[295]

618.    In the affected vehicles, the bolt that secures the height adjuster in the driver and front passenger seats may become loose or fall out. If the bolt falls out, the seat will drop suddenly to the lowest vertical position. The sudden drop can affect the driver's ability to safely operate the vehicle, and can increase the risk of injury to the driver and the front-seat passenger if there is an accident. New GM admits to knowledge of at least one crash caused by this defect.[296]

---

[289] *Id.*
[290] *Id.*
[291] *Id.*
[292] *Id.*
[293] *Id.*
[294] *Id.*
[295] *See* July 22, 2014 Letter from New GM to NHTSA.
[296] *Id.*

619.    New GM was aware of this defect by July 10, 2013 when the crash occurred, and by July 22, 2013, New GM was aware that the crash was caused when the bolt on the height adjuster fell out.[297]

620.    By September 5, 2013, New GM was aware of 27 cases of loose or missing height adjuster bolts in Camaro vehicles.[298] Yet New GM waited until July 15 before its Safety Field Decision Authority made the decision to conduct a safety recall.

621.    **Safety Defects Affecting the Brakes in GM-branded Vehicles – Brake Light Defect:** On May 14, 2014, New GM issued a safety recall of approximately 2.4 million vehicles with a dangerous brake light defect.

622.    In the affected vehicles, the brake lamps may fail to illuminate when the brakes are applied or illuminate when the brakes are not engaged; the same defect can disable cruise control, traction control, electronic stability control, and panic brake assist operation, thereby increasing the risk of collisions and injuries.[299]

623.    Once again, N of the dangerous brake light defect for years before it took anything approaching the requisite remedial action. In fact, although the brake light defect has caused at least 13 crashes since 2008, New GM did not recall all 2.4 million vehicles with the defect until May 2014.

624.    According to New GM, the brake defect originates in the Body Control Module (BCM) connection system. "Increased resistance can develop in the [BCM] connection system and result in voltage fluctuations or intermittency in the Brake Apply Sensor (BAS) circuit that can cause service brakes lamp malfunction."[300] The result is brake

---

[297] *Id.*
[298] *Id.*
[299] *See* New GM Notification Campaign No. 14V-252 dated May 28, 2014, at 1.
[300] *Id.*

1197532.10

lamps that may illuminate when the brakes are not being applied and may not illuminate when the brakes are being applied. [301]

625.    The same defect can also cause the vehicle to get stuck in cruise control if it is engaged, or cause cruise control to not engage, and may also disable the traction control, electronic stability control, and panic-braking assist features.[302]

626.    New GM now acknowledges that the brake light defect "may increase the risk of a crash."[303]

627.    As early as September 2008, NHTSA opened an investigation for MY 2005-2007 Pontiac G6 vehicles involving allegations that the brake lights may turn on when the driver does not depress the brake pedal and may **not** turn on when the driver **does** depress the brake pedal.[304]

628.    During its investigation of the brake light defect in 2008, Old GM found elevated warranty claims for the brake light defect for MY 2005 and 2006 vehicles built in January 2005, and found "fretting corrosion in the BCM C2 connector was the root cause" of the problem.[305] Old GM and its part supplier Delphi decided that applying dielectric grease to the BCM C2 connector would be "an effective countermeasure to the fretting corrosion."[306] Beginning in November of 2008, the Company began applying dielectric grease in its vehicle assembly plants.[307]

629.    On December 4, 2008, Old GM issued a TSB recommending the application of dielectric grease to the BCM C2 connector for the MY 2005-2009, Pontiac G6, 2004-2007

---

[301] *Id.*
[302] *Id.*
[303] *Id.*
[304] *Id.* at 2.
[305] *Id.*
[306] *Id.*
[307] *Id* at 3.

Case 1:14-md-02543-JMF Document 847-2 Filed 10/14/14 Page 25 of 473

Chevrolet Malibu/Malibu Maxx, 2008 Malibu Classic, and 2007-2009 Saturn Aura vehicles.[308] One month later, in January 2009, Old GM recalled only a small subset of the vehicles with the brake light defect – 8,000 MY 2005-2006 Pontiac G6 vehicles built during the month of January, 2005.[309]

630. Not surprisingly, the brake light problem was far from resolved.

631. In October 2010, New GM released an updated TSB regarding "intermittent brake lamp malfunctions," and added MY 2008-2009 Chevrolet Malibu/Malibu Maxx vehicles to the list of vehicles for which it recommended the application of dielectric grease to the BCM C2 connector.[310]

632. In September of 2011, New GM received an information request from Canadian authorities regarding brake light defect complaints in vehicles that had not yet been recalled. Then, in June 2012, NHTSA provided New GM with additional complaints "that were outside of the build dates for the brake lamp malfunctions on the Pontiac G6" vehicles that had been recalled.[311]

633. In February of 2013, NHTSA opened a "Recall Query" in the face of 324 complaints "that the brake lights do not operate properly" in Pontiac G6, Malibu, and Aura vehicles that had not yet been recalled.[312]

634. In response, New GM asserts that it "investigated these occurrences looking for root causes that could be additional contributors to the previously identified fretting

---

[308] *Id.* at 2.
[309] *Id.*
[310] *Id.*
[311] *Id.*
[312] *Id.* at 3.

corrosion," but that it continued to believe that "fretting corrosion in the BCM C2 connector" was the "root cause" of the brake light defect.[313]

635.    In June of 2013, NHTSA upgraded its "Recall Query" concerning brake light problems to an "Engineering Analysis."[314]

636.    In August 2013, New GM found an elevated warranty rate for BCM C2 connectors in vehicles built *after* Old GM had begun applying dielectric grease to BCM C2 connectors at its assembly plants in November of 2008.[315] In November of 2013, New GM concluded that "the amount of dielectric grease applied in the assembly plant starting November 2008 was insufficient…."[316]

637.    Finally, in March of 2014, "[New] GM engineering teams began conducting analysis and physical testing to measure the effectiveness of potential countermeasures to address fretting corrosion. As a result, New GM determined that additional remedies were needed to address fretting corrosion."[317]

638.    On May 7, 2014, New GM's Executive Field Action Decision Committee finally decided to conduct a safety recall.

639.    According to New GM, "Dealers are to attach the wiring harness to the BCM with a spacer, apply dielectric lubricant to both the BCM CR and harness connector, and on the BAS and harness connector, and relearn the brake pedal home position."[318]

---

[313] *Id.*
[314] *Id.*
[315] *Id.*
[316] *Id.*
[317] *Id.* at 4.
[318] *Id.*

640.    New GM sat on and concealed its knowledge of the brake light defect for years, and did not even consider available countermeasures (other than the application of grease that had proven ineffective) until March of this year.

641.    **Safety Defects Affecting the Brakes in GM-branded Vehicles – Brake Booster Pump Defect:** On March 17, 2014, New GM issued a safety recall of 63,903 MY 2013-2014 Cadillac XTS vehicles with a brake booster pump defect.

642.    In the affected vehicles, a cavity plug on the brake boost pump connector may dislodge and allow corrosion of the brake booster pump relay connector. This can have an adverse impact on the vehicle's brakes and increase the risk of collision. This same defect can also cause a fire in the vehicle resulting from the electrical shore in the relay connector.

643.    In June of 2013, New GM learned that a fire occurred in a 2013 Cadillac XTS vehicle while it was being transported between car dealerships. Upon investigation, New GM determined that the fire originated near the brake booster pump relay connector, but could not determine the "root cause" of the fire.

644.    A second vehicle fire in a 2013 Cadillac XTS occurred in September of 2013. In November 2013, the same team of New GM investigators examined the second vehicle, but, again, could not determine the "root cause" of the fire.

645.    In December 2013, New GM identified two warranty claims submitted by dealers related to complaints by customers about vibrations in the braking system of their vehicles. The New GM team investigating the two prior 2013 Cadillac XTS fires inspected these parts and discovered the relay connector in both vehicles had melted.

646.    In January 2014, New GM determined that pressure in the relay connector increased when the brake booster pump vent hose was obstructed or pinched. Further testing

revealed that pressure from an obstructed vent hose could force out the cavity plugs in the relay connector, and in the absence of the plugs, water, and other contaminants can enter and corrode the relay connector, causing a short and leading to a fire or melting.

647.    On March 11, 2014, New GM issued a safety recall for the affected vehicles.

648.    **Safety Defects Affecting the Brakes in GM-branded Vehicles – Hydraulic Boost Assist Defect:** On May 13, 2014, New GM recalled 140,067 model year 2014 Chevrolet Malibu vehicles with a hydraulic brake boost assist defect.[319]

649.    In the affected vehicles, the "hydraulic boost assist" may be disabled; when that happens, slowing or stopping the vehicle requires harder brake pedal force, and the vehicle will travel a greater distance before stopping. Therefore, these vehicles do not comply with Federal Motor Vehicle Safety Standard number 135, "Light Vehicle Brake Systems," and are at increased risk of collision.[320]

650.    **Safety Defects Affecting the Brakes in GM-branded Vehicles – Brake Rotor Defect:** On May 7, 2014, New GM recalled 8,208 MY 2014 Chevrolet Malibu and Buick LaCrosse vehicles with a brake rotor defect.

651.    In the affected vehicles, New GM may have accidentally installed rear brake rotors on the front brakes. The rear rotors are thinner than the front rotors, and the use of rear rotors in the front of the vehicle may result in a front brake pad detaching from the caliper. The detachment of a break pad from the caliper can cause a sudden reduction in braking which lengthens the distance required to stop the vehicle and increases the risk of a crash.

652.    **Safety Defects Affecting the Brakes in GM-branded Vehicles – Reduced Brake Performance Defect:** On July 28, 2014, New GM recalled 1,968 MY 2009-2010

---

[319] *See* May 13, 2014 Letter from New GM to NHTSA.
[320] *Id.*

1197532.10

Chevrolet Aveo and 2009 Pontiac G3 vehicles.[321] Affected vehicles may contain brake fluid which does not protect against corrosion of the valves inside the anti-lock brake system ("ABS") module, affecting the closing motion of the valves.[322] If the ABS valve corrodes it may result in longer brake pedal travel or reduced performance, increasing the risk of a vehicle crash.[323]

653.    New GM was aware of this defect as far back as August 2012, when it initiated a customer satisfaction campaign.[324] The campaign commenced in November 2012, and New GM estimates that, to date, approximately 34% of Chevrolet Aveo and Pontiac G3 vehicles included in the customer satisfaction campaign are not yet repaired.[325] On July 19, 2014, New GM decided to conduct a safety recall for vehicles that had been included in the customer satisfaction program but had not had the service repair performed.[326]

654.    **Safety Defects Affecting the Brakes in GM-branded Vehicles – Parking Brake Defect:** On September 20, 2014, GM recalled more than 221,000 MY 2014-15 Chevrolet Impalas and 2013-15 model Cadillac XTS vehicles because of a parking-brake defect.

655.    In the affected vehicles, the brake pads can stay partly engaged, which can lead to "excessive brake heat that may result in a fire," according to documents posted on the NHTSA website.

656.    NHTSA said the fire risk stemmed from the rear brakes generating "significant heat, smoke and sparks." The agency also warned that drivers of affected vehicles might

---

[321] *See* July 28, 2014 Letter from New GM to NHTSA.
[322] *Id.*
[323] *Id.*
[324] *Id.*
[325] *Id.*
[326] *Id.*

experience "poor vehicle acceleration, undesired deceleration, excessive brake heat and premature wear to some brake components."

657.   **Safety Defects Affecting the Steering in GM-branded Vehicles – Sudden Power-Steering Failure Defect:** Between 2003 and 2010, over 1.3 million GM-branded vehicles in the United States were sold with a safety defect that causes the vehicle's electric power steering ("EPS") to suddenly fail during ordinary driving conditions and revert back to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries.

658.   The affected vehicles are MY 2004-2006 and 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx, 2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2006 and 2008-2009 Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura vehicles.

659.   As with the ignition switch defects and many of the other defects, New GM was aware of the power steering defect long before it took anything approaching full remedial action.

660.   When the power steering fails, a message appears on the vehicle's dashboard, and a chime sounds to inform the driver. Although steering control can be maintained through manual steering, greater driver effort is required, and the risk of an accident is increased.

661.   In 2010, New GM first recalled Chevy Cobalt and Pontiac G5 models for these power steering issues, yet it did *not* recall the many other vehicles that had the very same power steering defect.

662.   Documents released by NHTSA show that New GM waited years to recall nearly 335,000 Saturn Ions for power-steering failure – despite receiving nearly 4,800

-211-

consumer complaints and more than 30,000 claims for warranty repairs. That translates to a complaint rate of 14.3 incidents per thousand vehicles and a warranty claim rate of 9.1 percent. By way of comparison, NHTSA has described as "high" a complaint rate of 250 complaints per 100,000 vehicles.[327] Here, the rate translates to 1,430 complaints per 100,000 vehicles.

663.    In response to the consumer complaints, in September 2011, NHTSA opened an investigation into the power-steering defect in Saturn Ions.

664.    NHTSA database records show complaints from Ion owners as early as June 2004, with the first injury reported in May 2007.

665.    NHTSA has linked approximately 12 crashes and two injuries to the power-steering defect in the Ions.

666.    In September 2011, after NHTSA began to make inquiries about the safety of the Saturn Ion, GM acknowledged that it had received almost 3,500 customer reports claiming a sudden loss of power steering in 2004-2007 Ion vehicles.

667.    The following month, New GM engineer Terry Woychowski informed current CEO Mary Barra – then head of product development –that there was a serious power-steering issue in Saturn Ions, and that it may be the same power steering issue that plagued the Chevy Cobalt and Pontiac G5. Ms. Barra was also informed of the ongoing NHTSA investigation. At the time, NHTSA reportedly came close to concluding that Saturn Ions should have been included in New GM's 2010 steering recall of Cobalt and G5 vehicles.

668.    Instead of recalling the Saturn Ion, GM sent dealers a service bulletin in May of 2012 identifying complaints about the steering system in the vehicle.

---

[327] *See* https://www-odi.nhtsa.dot.gov/cars/problems/defect/-results.cfm?action_number=EA06002&Search Type= QuickSearch&summary=true.

1197532.10

669.    By the time GM finally recalled the Saturn Ion – four years later, in March

2014 - NHTSA had received more than 1,200 complaints about the vehicle's power steering.

Similar complaints resulted in over 30,000 warranty claims with GM.

670.    After announcing the March 31, 2014 recall, Jeff Boyer, New GM's Vice

President of Global Vehicle Safety, acknowledged that New GM recalled some of these same

vehicle models previously for the *same issue*, but that New GM "did not do enough."

671.    According to an analysis by the New York Times published on April 20, 2014,

New GM has "repeatedly used technical service bulletins to dealers and sometimes car owners

as stopgap safety measures instead of ordering a timely recall."

672.    Former NHTSA head Joan Claybrook echoed this conclusion, stating, "There's

no question that service bulletins have been used where recalls should have been."

673.    NHTSA has recently criticized New GM for issuing service bulletins on at

least four additional occasions in which a recall would have been more appropriate and in

which New GM later, in fact, recalled the subject vehicles.

674.    These inappropriate uses of service bulletins prompted Frank Borris, the top

defect investigator for NHTSA, to write to New GM's product investigations director,

Carmen Benavides, in July 2013, complaining that "GM is slow to communicate, slow to act,

and, at times, requires additional effort . . . that we do not feel is necessary with some of

[GM's] peers."

675.    Mr. Borris' correspondence was circulated widely among New GM's top

executives. Upon information and belief, the following employees received a copy: John

Calabrese and Alicia Boler-Davis, two vice presidents for product safety; Michael Robinson,

-213-

vice president of regulatory affairs; Jim Federico; Gay Kent, director of product investigations, and William Kemp, an in-house product liability lawyer.

676.    **Safety Defects Affecting the Steering in GM-branded Vehicles – Power-Steering Hose Clamp Defect:** On June 18, 2014, New GM issued a safety recall of 57,192 MY 2015 Chevrolet Silverado 2500/3500 HD and 2015 GMC Sierra 2500/3500 HD vehicles with a power steering hose clamp defect.

677.    In the affected vehicles, the power steering hose clamp may disconnect from the power steering pump or gear, causing a loss of power steering fluid. A loss of power steering fluid can result in a loss of power steering assist and power brake assist, increasing the risk of a crash.

678.    **Safety Defects Affecting the Steering in GM-branded Vehicles – Power-Steering Control Module Defect:** On July 22, 2014, New GM recalled 57,242 MY 2014 Chevrolet Impala vehicles with a Power Steering Control Module defect.

679.    Drivers of the affected vehicles may experience reduced or no power steering assist at start-up or while driving due to a poor electrical ground connection to the Power Steering Control Module. If power steering is lost, the vehicle will revert to manual steering mode. Manual steering requires greater driver effort and increases the risk of accident. New GM acknowledges one crash related to this condition.

680.    On May 17, 2013, New GM received a report of a 2014 Impala losing communication with the Power Steering Control Module ("PSCM"). On or about May 24, 2013, New GM determined the root cause was a poor electrical connection at the PSCM grounding stud wheelhouse assembly.

681.    But New GM's initial efforts to implement new procedures and fix the issue were unsuccessful. In January 2014, New GM reviewed warranty data and discovered 72 claims related to loss of assist or the Service Power Steering message after implementation of New GM's process improvements.

682.    Then, on February 25, 2014, New GM received notice of a crash involving a 2014 Impala that was built in 2013. The crash occurred when the Impala lost its power steering, and crashed into another vehicle as a result.

683.    In response, New GM monitored field and warranty data related to this defect and, as of June 24, 2014, it identified 253 warranty claims related to loss of power steering assist or Service Power Steering messages.

684.    On July 15, 2014, New GM finally issued a safety recall for the vehicles, having been unsuccessful in its efforts to minimize and conceal the defect.

685.    **Safety Defects Affecting the Steering in GM-branded Vehicles – Lower Control Arm Ball Joint Defect:** On July 18, 2014, New GM issued a safety recall of 1,919 MY 2014-2015 Chevrolet Spark vehicles with a lower control arm ball joint defect.

686.    The affected vehicles were assembled with a lower control arm bolt not fastened to specification. This can cause the separation of the lower control arm from the steering knuckle while the vehicle is being driven, and result in the loss of steering control. The loss of steering control in turn creates a risk of accident.[328]

687.    **Safety Defects Affecting the Steering in GM-branded Vehicles – Steering Tie-Rod Defect:** On May 13, 2014, New GM issued a safety recall of 477 MY 2014

---

[328] *See* July 18, 2014 Letter from New GM to NHTSA.

-215-

Chevrolet Silverado, 2014 GMC Sierra and 2015 Chevrolet Tahoe vehicles with a steering tie-rod defect.

688.     In the affected vehicles, the tie-rod threaded attachment may not be properly tightened to the steering gear rack. An improperly tightened tie-rod attachment may allow the tie-rod to separate from the steering rack and greatly increases the risk of a vehicle crash.[329]

689.     **Safety Defects Affecting the Steering in GM-branded Vehicles – Joint Fastener Torque Defect:** On June 30, 2014, New GM issued a safety recall of 106 MY 2014 Chevrolet Camaro, 2014 Chevrolet Impala, 2014 Buick Regal and 2014 Cadillac XTS vehicles with a joint fastener torque defect.

690.     In the affected vehicles, joint fasteners were not properly torqued to specification at the assembly plant. As a result of improper torque, the fasteners may "back out" and cause a "loss of steering," increasing the risk of a crash.[330]

691.     New GM claims that it was alerted to the problem by a warranty claim filed on December 23, 2013, at a California dealership for a Chevrolet Impala built at New GM's Oshawa car assembly plant in Ontario, Canada. Yet the Oshawa plant was not informed of the issue until March 4, 2014.[331]

692.     Between March 4 and March 14, 2014, the Oshawa plant conducted a "root cause" investigation and concluded that the problem was caused by an improperly fastened "Superhold" joint. Though the Impala was electronically flagged for failing to meet the requisite torque level, the employee in charge of correcting the torque level failed to do so.[332]

---

[329] *See* May 27, 2014 Letter from New GM to NHTSA.
[330] *See* July 2, 2014 Letter from New GM to NHTSA.
[331] *Id.*
[332] *Id.*

693.    On or about March 14, 2014, New GM Oshawa learned of two more warranty claims concerning improperly fastened Superhold joints. Both of the vehicles were approved by the same employee who had approved the corrective action for the joint involved in the December 23, 2013 warranty claim. The two additional vehicles were also flagged for corrective action, but the employee failed to correct the problem.[333]

694.    On March 20, 2014, New GM Oshawa concluded the derelict employee had approved 112 vehicles after they were flagged for corrective action to the Superhold joint.[334]

695.    Yet New GM waited until June 25, 2014 before deciding to conduct a safety recall.

696.    **Safety Defects Affecting the Powertrain in Chevrolet and Pontiac Vehicles – Transmission Shift Cable Defect:** On May 19, 2014, New GM issued a safety recall for more than 1.1 million Chevrolet and Pontiac vehicles with dangerously defective transmission shift cables.

697.    In the affected vehicles, the shift cable may fracture at any time, preventing the driver from switching gears or placing the transmission in the "park" position. According to New GM, "[i]f the driver cannot place the vehicle in park, and exits the vehicle without applying the park brake, the vehicle could roll away and a crash could occur without prior warning."[335]

698.    Yet again, N of the shift cable defect long before it issued the recent recall of more than 1.1 million vehicles with the defect.

699.    In May of 2011, NHTSA informed New GM that it had opened an investigation into failed transmission cables in 2007 model year Saturn Aura vehicles. In

---

[333] *Id.*
[334] *Id.*
[335] *See* New GM letter to NHTSA Re: NHTSA Campaign No. 14V-224 dated May 22, 2014, at 1.

1197532.10

response, New GM noted "a cable failure model in which a tear to the conduit jacket could allow moisture to corrode the interior steel wires, resulting in degradation of shift cable performance, and eventually, a possible shift cable failure."[336]

700.    Upon reviewing these findings, New GM's Executive Field Action Committee conducted a "special coverage field action for the 2007-2008 MY Saturn Aura vehicles equipped with 4 speed transmissions and built with Leggett & Platt cables." New GM apparently chose that cut-off date because, on November 1, 2007, Kongsberg Automotive replaced Leggett & Platt as the cable provider. [337]

701.    New GM did not recall any of the vehicles with the shift cable defect at this time, and limited its "special coverage field action" to the 2007-2008 Aura vehicles even though "the same or similar Leggett & Platt cables were used on … Pontiac G6 and Chevrolet Malibu (MMX380) vehicles."

702.    In March 2012, NHTSA sent New GM an Engineering Assessment request to investigate transmission shift cable failures in 2007-2008 MY Aura, Pontiac G6, and Chevrolet Malibu.[338]

703.    In responding to the Engineering Assessment request, New GM for the first time "noticed elevated warranty rates in vehicles built with Kongsberg shift cables." Similar to their predecessor vehicles built with Leggett & Platt shift cables, in the vehicles built with Kongsberg shift cables "the tabs on the transmission shift cable end may fracture and separate without warning, resulting in failure of the transmission shift cable and possible unintended vehicle movement."[339]

---

[336] *Id.* at 2.
[337] *Id.*
[338] *Id.*
[339] *Id.*

1197532.10

704.    On September 13, 2012, the Executive Field Action Decision Committee decided to conduct a safety recall. This initial recall was limited to 2008-2010 MY Saturn Aura, Pontiac G6, and Chevrolet Malibu vehicles with 4-speed transmission built with Kongsberg shifter cables, as well as 2007-2008 MY Saturn Aura and 2005-2007 MY Pontiac G6 vehicles with 4-speed transmissions which may have been serviced with Kongsberg shift cables.[340]

705.    But the shift cable problem was far from resolved.

706.    In March of 2013, NHTSA sent New GM a second Engineering Assessment concerning allegations of failure of the transmission shift cables on all 2007-2008 MY Saturn Aura, Chevrolet Malibu, and Pontiac G6 vehicles.[341]

707.    New GM continued its standard process of "investigation" and delay. But by May 9, 2014, New GM was forced to concede that "the same cable failure mode found with the Saturn Aura 4-speed transmission" was present in a wide population of vehicles.[342]

708.    Finally, on May 19, 2014, New GM's Executive Field Action Decision Committee decided to conduct a safety recall of more than 1.1 million vehicles with the shift cable defect.

709.    **Safety Defects Affecting the Powertrain in Cadillac Vehicles – Transmission Shift Cable Defect:** On June 18, 2014, New GM issued a safety recall of 90,750 MY 2013-2014 Cadillac ATS and 2014 Cadillac CTS vehicles with a transmission shift cable defect.

710.    In the affected vehicles, the transmission shift cable may detach from either the bracket on the transmission shifter or the bracket on the transmission. If the cable detaches

---

[340] *Id.*
[341] *Id.*
[342] *Id.*

1197532.10

while the vehicle is being driven, the transmission gear selection may not match the indicated

gear and the vehicle may move in an unintended or unexpected direction, increasing the risk

of a crash. Furthermore, when the driver goes to stop and park the vehicle, the transmission

may not be in "PARK" even though the driver has selected the "PARK" position. If the

vehicle is not in the "PARK" position, there is a risk the vehicle will roll away as the driver

and other occupants exit the vehicle or anytime thereafter. A vehicle rollaway causes a risk of

injury to exiting occupants and bystanders.

711.    On March 20, 2014, a New GM dealership contacted an assembly plant about a

detached transmission shift cable. The assembly plant investigated and discovered one

additional detached shift cable in the plant.

712.    New GM assigned a product investigation engineer was assigned, and from

March 24 to June 2, 2014, New GM examined warranty claims and plant assembly procedures

and performed vehicle inspections. Based on these findings, New GM issued a safety recall on

June 11, 2014.

713.    **Safety Defects Affecting the Transmission in GM-branded Vehicles –**

**Transmission Oil Cooler Defect:** On March 31, 2014, New GM issued a safety recall of

489,936 vehicles with a transmission oil cooler line defect.

714.    In the affected vehicles, the transmission oil cooler lines may not be securely

seated in the fitting. This can cause transmission oil to leak from the fitting, where it can

contact a hot surface and cause a vehicle fire.

715.    On September 4, 2013, a New GM assembly plant in Silao, Mexico

experienced two instances in which a transmission oil cooler ("TOC") line became

disconnected from the thermal bypass valve in 2014 pick-up trucks on the K2XX platform

1197532.10

during pressure tests. As a result, New GM required the supplier of the TOC lines and thermal

bypass valve assembly (collectively the "TOC assembly") for these vehicles to issue a Quality

Alert for its facility concerning the TOC assemblies. The supplier sorted the over 3,000 TOC

assemblies at its facility, performed manual pull checks and visual inspections, and found no

defects.

716.    New GM also conducted manual pull checks and visual inspections on the

TOC assemblies in the two New GM assembly plants responsible for the K2XX platform at

the time (Silao, Mexico and Fort Wayne, Indiana), and identified no defects.

717.    On September 19, 2013, the supplier provided New GM with a plan to ensure

that the TOC lines were properly connected to the thermal bypass valve going forward. In

addition to continuing its individual pull tests to verify that these connections were secure, the

supplier planned to add a manual alignment feature to the three machines that it used to

connect the TOC lines to the thermal bypass valve boxes. The supplier completed these

upgrades on October 28, 2013.

718.    On January 2, 2014, New GM's Product Investigations, Field Performance

Assessment, and K2XX program teams received an investigator's report concerning a 2014

Chevrolet Silverado that caught fire during a test drive from a dealer in Gulfport, Mississippi

on December 16, 2013. New GM's on-site investigation of the vehicle revealed that a TOC

line had disconnected from the thermal bypass valve box. The build date for this vehicle was

October 10, 2013, and the build date for the TOC assembly was September 28, 2013, prior to

the supplier's October 28, 2013 completion of its machinery upgrades.

719.    On January 3, 2014, New GM issued a Quality Alert to its assembly plants for

K2XX vehicles, advising them to manually inspect the TOC assemblies from the supplier to

ensure that the TOC lines were securely connected. New GM also informed the supplier of the Mississippi event.

720.    On January 15, 2014, New GM learned that a 2014 Chevrolet Silverado had recently caught fire while being driven by a dealer salesperson. New GM's investigation of the incident determined that one of the vehicle's TOC lines was disconnected from the thermal bypass valve box. The vehicle was built on November 12, 2013.

721.    On January 29, after completing its investigation, New GM followed up with its K2XX assembly plants, and found no additional cases involving disconnected TOC lines after the January 3 Quality Alert.

722.    On January 31, 2014, a team from New GM traveled to the supplier's facility to work with the supplier on its thermal valve assembly process. By February 27, 2014, the supplier added pressure transducers to the machine fixtures used to connect the TOC lines to the thermal bypass valve boxes to directly monitor the delivery of air pressure to the pull-test apparatus.

723.    On March 23, 2014, a 2015 GMC Yukon caught fire during a test drive from a dealership in Anaheim, California. On March 24, 2014, New GM formed a team to investigate the incident; the team was dispatched to Anaheim that afternoon. On the morning of March 25, 2014, the New GM team examined the vehicle in Anaheim and determined that the incident was caused by a TOC line that was disconnected from the thermal bypass valve box. The assembly plants for K2XX vehicles were placed on hold and instructed to inspect all TOC assemblies in stock, as well as those in completed vehicles. A team from New GM also traveled to the supplier on March 25, 2014, to further evaluate the assembly process.

1197532.10

724.    On March 26, 2014, New GM personnel along with personnel from the supplier examined the TOC assembly from the Anaheim vehicle. The group concluded that a TOC line had not been properly connected to the thermal bypass valve box. The build date for the thermal valve assembly in the Anaheim vehicle was determined to be January 16, 2014, after the supplier's October 28, 2013 machinery upgrades, but before its February 27, 2014 process changes.

725.    On March 27, 2014, the Product Investigator assigned to this matter received a list of warranty claims relating to transmission fluid leaks in K2XX vehicles, which he had requested on March 24. From that list, he identified five warranty claims, ranging from August 30, 2013, to November 20, 2013, that potentially involved insecure connections of TOC lines to the thermal bypass valve box, none of which resulted in a fire. All five vehicles were built before the supplier completed its machinery upgrades on October 28, 2013.

726.    Also on March 27, 2014, following discussions with New GM, the supplier began using an assurance cap in connecting the TOC lines to the thermal bypass valve boxes to ensure that the TOC lines are properly secured.

727.    On March 28, 2014, New GM decided to initiate a recall of vehicles built on the K2XX platform so that they can be inspected to ensure that the TOC lines are properly secured to the thermal bypass valve box.

728.    **Safety Defects Affecting the Transmission in GM-branded Vehicles – Transfer Case Control Module Software Defect:** On June 26, 2014, New GM issued a safety recall of 392,459 vehicles with a transfer case control module software defect.

729.    In the affected vehicles, the transfer case may electronically switch to neutral without input from the driver. If the transfer case switches to neutral while the vehicle is

parked and the parking brake is not in use, the vehicle may roll away and cause injury to bystanders. If the transfer case switches to neutral while the vehicle is being driven, the vehicle will lose drive power, increasing the risk of a crash.

730.    New GM first observed this defect on February 14, 2014, when a 2015 model year development vehicle, under slight acceleration at approximately 70 mph, shifted into a partial neutral position without operator input. When the vehicle shifted into neutral, the driver lost power, could not shift out of neutral, and was forced to stop driving. Once the vehicle stopped, the transfer case was in a complete neutral state and could not be moved out of neutral.

731.    On or about February 17, 2014, New GM contacted Magna International Inc., the supplier of the transfer case and the Transfer Case Control Module ("TCCM") hardware and software, to investigate the incident. Magna took the suspect TCCM for testing.

732.    From mid-February through mid-March, Magna continued to conduct testing. On March 18, Magna provided its first report to New GM but at that time, Magna had not fully identified the root cause.

733.    On March 27, Magna provided an updated report that identified three scenarios that could cause a transfer case to transfer to neutral.

734.    Between late March and April, New GM engineers continued to meet with Magna to identify additional conditions that would cause the unwanted transfer to neutral. New GM engineers also analyzed warranty information to identify claims for similar unwanted transfer conditions.

735.    Two warranty claims for unwanted transfers were identified that appeared to match the conditions exhibited on February 14, 2014. Those warranty claims were submitted

on March 3 and March 18, 2014. On April 23, 2014, a Product Investigation engineer was assigned. A Problem Resolution Tracking System (PRTS) case was initiated on May 20, 2014.

736.    The issue was presented to Open Investigation Review (OIR) on June 16, 2014, and on June 18, 2014, the Safety and Field Action Decision Authority (SFADA) decided to conduct a safety recall.

737.    **Safety Defects Affecting the Transmission in GM-branded Vehicles – Acceleration-Lag Defect:** On April 24, 2014, New GM issued a safety recall of 50,571 MY 2013 Cadillac SRX vehicles with an acceleration-lag defect.

738.    In the affected vehicles, there may be a three to four-second lag in acceleration due to faulty transmission control module programming. That can increase the risk of a crash.

739.    On October 24, 2013, New GM's transmission calibration group learned of an incident involving hesitation in a company owned vehicle. New GM obtained the vehicle to investigate and recorded one possible event showing a one second hesitation.

740.    In early December 2013, New GM identified additional reports of hesitation from the New GM company-owned vehicle driver fleet, as well as NHTSA VOQs involving complaints of transmission hesitation in the 2013 SRX vehicles.

741.    In mid-February 2014, the transmission calibration team obtained additional company vehicles and repurchased customer vehicles that were reported to have transmission hesitation in order to install data loggers and attempt to reproduce the defect. On February 20, 2014, and February 27, 2014, New GM captured two longer hesitation events consistent with customer reports.

742.    In response to the investigation, New GM issued a safety recall for the affected vehicles on April 17, 2014.

Case 1:14-md-02543-JMF Document 5847-2 Filed 01/14/14 Page 45 of 473

743. **Safety Defects Affecting the Transmission in GM-branded Vehicles –
Transmission Turbine Shaft Fracture Defect:** On June 11, 2014, New GM recalled 21,567
MY 2012 Chevrolet Sonic vehicles equipped with a 6 Speed Automatic Transmission and a
1.8L Four Cylinder Engine suffering from a turbine shaft fracture defect.

744. In the affected vehicles, the transmission turbine shaft may fracture. If the
transmission turbine shaft fracture occurs during vehicle operation in first or second gear, the
vehicle will not upshift to the third through sixth gears, limiting the vehicle's speed. If the
fracture occurs during operation in third through sixth gear, the vehicle will coast until it
slows enough to downshift to first or second gear, increasing the risk of a crash.[343]

745. The turbine shafts at issue were made by Sundram Fasteners Ltd. ("SFL").[344]
In November 2013, New GM learned of two broken turbine shafts in the affected vehicles
when transmissions were returned to New GM's Warranty Parts Center (WPC). New GM sent
the shafts to SFL, but SFL did not identify any "non-conformities."[345] But "[s]ubsequent
investigation by GM identified a quality issue" with the SFL turbine shafts.[346]

746. By late January 2014, 5 or 6 more transmissions "were returned to the WPC for
the same concern." That prompted a warranty search for related claims by New GM's
"Quality Reliability Durability (QRD) lead for Gears and Shafts and Validation Engineer for
Global Front Wheel 6 Speed Transmission…." That search revealed "a clear increase in
incidents for 2012 Sonic built with 6T30 turbine shaft[s] during late February to June of 2012."[347]

---

[343] *See* June 11, 2014 Letter from New GM to NHTSA.
[344] *Id.*
[345] *Id.*
[346] *Id.*
[347] *Id.*

747.    In March of 2014, New GM engineers found that turbine shafts made "in the suspect window were found to have a sharp corner and not a smooth radius in the spline." Testing done in April of 2014 apparently showed a lower life expectancy for "shafts with sharp corners" as opposed to "shafts with smooth radii."[348]

748.    On June 4, 2014 "the Safety Field Action Decision Authority (SFADA) decided to conduct a safety recall," and New GM did so on June 11, 2014.[349]

749.    **Safety Defects Affecting the Transmission in GM-branded Vehicles – Automatic Transmission Shaft Cable Adjuster Defect:** On February 20, 2014, New GM issued a noncompliance recall of 352 vehicles with defective automatic transmission shift cable adjusters.[350]

750.    In the affected vehicles, one end of the transmission shift cable adjuster body has four legs that snap over a ball stud on the transmission shift lever. One or more of these legs may have been fractured during installation. If any of the legs are fractured, the transmission shift cable adjuster may disengage from the transmission shift lever. When that happens, the driver may be unable to shift gears, and the indicated gear position may not be accurate. If the adjuster is disengaged when the driver attempts to stop and park the vehicle, the driver may be able to shift the lever to the "PARK" position but the vehicle transmission may not be in the "PARK" gear position. That creates the risk that the vehicle will roll away as the driver and other occupants exit the vehicle, or anytime thereafter.[351]

---

[348] *Id.*
[349] *Id.*
[350] *See* February 20, 2014 Letter from New GM to NHTSA.
[351] *Id.*

-227-

751.    These vehicles may not conform with Federal Motor Vehicle Safety Standard 102 for Transmission Shift Lever Sequence Starter Interlock and Transmission Braking Effect, or Federal Motor Vehicle Safety Standard 114 for Theft Protection and Rollaway Prevention.

752.    **Other Serious Defects Affecting GM-branded Vehicles:** The above-described Safety Defects are not random or coincidental. They are not mere glitches. They are symptoms of an ailing culture at New GM—one that transfers ongoing risk of harm, as well as inconvenience and cost, to New GM's customers. The below list of other serious defects and recalls further illustrates and underscores that New GM has in no way prioritized making safe, defect free cars. There have been no fewer than 20 additional safety and other recalls of GM-Branded vehicles in 2014 alone. The defects are:

- Power management mode software defect
- Light control module defect
- Electrical short in driver's door module defect
- Front axle shaft defect
- Seat hook weld defect
- Front turn signal bulb defect
- Low-beam headlight defect
- Radio chime defect
- Fuel gauge defect
- Windshield wiper system defect
- Console bin door latch defect
- Driver door wiring splice defect
- Overloaded feed defect
- Windshield wiper module assembly defect

- Engine block heater power cord insulation defect

- Rear shock absorber defect

- Electronic stability control defect

- Unsecured floor mat defect

- Fuse block defect

- Diesel transfer pump defect

**XIII.** **New GM's Misrepresentations That It Made Safe And Reliable Cars, The Ignition Switch Defect, and Other Safety Defects Have Harmed Plaintiffs And The Classes.**

753. The ignition switch defect and the other safety defects have caused damage to Plaintiffs and the Class.

754. A vehicle purchased, leased, or retained with a serious safety defect is worth less than the equivalent vehicle leased, purchased, or retained without the defect.

755. A vehicle purchased, leased, or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic accident because of the ignition switch defects.

756. Purchasers and lessees of Defective Vehicles prior to the July 11, 2009, inception of New GM paid more for the Defective Vehicles, through a higher purchase price or higher lease payments, than they would have had Old GM disclosed the ignition switch defects. Plaintiffs and those Class members who purchased new or used Defective Vehicles overpaid for their Defective Vehicles as the result of Old GM's conduct, for which New GM is responsible. Because Old and New GM concealed the Ignition Switch Defect and the Other Safety Defects, these Plaintiffs did not receive the benefit of the bargain. In addition, the value of all Defective Vehicles has diminished as the result of Old and New GM's deceptive conduct.

-229-

757.    Plaintiffs and *millions* of Class members are stuck with vehicles that are now worth less than they would have been but for Old and New GM's failure to disclose and remedy the Ignition Switch Defect and the Other Safety Defects, and the remaining Class members overpaid at the time of purchase or lease, only to then sell at diminished value on or after February 14, 2014.

758.    In addition, Plaintiffs and Class members are subject to a recall that *does not* fully cure the safety defects. Even if they receive a replacement switch with a stronger detent plunger, their vehicles will *not* be safe from the unreasonable risk of sudden unintended shutdown, with the attendant loss of power steering and other critical safety systems, including an operable airbag. That is because New GM has *not* pledged to address either the placement of the ignition switch in the Defective Vehicles *or* the fact that the airbags in the Defective Vehicles become inoperable as soon as the ignition switch turns to the "accessory" or "off" position in all of the Defective Vehicles, and refuses to even provide a stronger ignition switch for the millions of vehicles subject to the June and July ignition switch recalls.

759.    If Old or New GM had timely disclosed the ignition switch defects as required by the TREAD Act, the law of fraudulent concealment, and the other State laws set forth below, all Class members' vehicles would now be safe to drive, and would have retained considerably more of their value. Because of the Companies' now highly-publicized campaign of deception, and New GM's belated, piecemeal and ever-expanding recalls, so much stigma has attached to the Defective Vehicles that no rational consumer would now purchase a Defective Vehicle—let alone pay what otherwise would have been fair market value for the vehicle.

1197532.10

760.    The fact that vehicles owned by the Plaintiffs and Class are worth less than vehicles that are perceived as safe is demonstrated by the decline in value the Defective Vehicles have experienced since the revelation of Old and New GM's misconduct.

761.    In essence Plaintiffs and Class members suffered harm from the revelation of two facts (i) Old and New GM's concealment of switch defects, and (2) New GM's widespread inability to produce safe cars as evidenced by the massive recalls in 2014.

762.    For example, the following 2007 model year vehicles suffered estimated diminished value in March 2014 following the February ignition switch recall:

| | |
|---|---|
| Saturn Ion | $251 |
| Pontiac Solstice | $790 |
| Saturn Sky | $238 |

763.    As the truth was revealed that GM cars were not safe and reliable as evidenced by the unprecedented number of recalls and vehicles recalled, Defective Vehicles suffered additional diminished value by way of illustration:

| | |
|---|---|
| 2007 Pontiac G5 | September 2014 Diminished Value $459 |
| 2007 Saturn Ion Sedan | September 2014 Diminished Value $472 |
| 2007 Saturn Sky | September 2014 Diminished Value $686 |

## TOLLING OF THE STATUTES OF LIMITATION

764.    All applicable statutes of limitation have been tolled by Old and New GM's knowing, ongoing and active fraudulent concealment and denial of the facts alleged herein. Plaintiffs and Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Old and New GM did not report information

-231-

within their knowledge to federal authorities (including NHTSA), their dealerships. Nor

consumers, nor would a reasonable and diligent investigation have disclosed that Old or New

GM had information in their possession about the existence and dangerousness of the defects,

or that each opted to conceal that information until shortly before this action was filed.

765.    All applicable statutes of limitation also have been tolled by operation of the

discovery rule. Specifically, Plaintiffs and the other Class members could not have discovered,

through the exercise of reasonable diligence, that their Defective Vehicles were defective

within the time period of any applicable statutes of limitation.

766.    Instead of disclosing the myriad safety defects and disregard of safety of which

it was aware, New GM falsely represented that its vehicles were safe, reliable, and of high

quality, and that it was a reputable manufacturer that stood behind GM-branded vehicles after

they were sold.

767.    New GM has been, since its inception, under a continuous duty to disclose to

Plaintiffs and the other Class members the true character, quality, and nature of the Defective

Vehicles. Instead, New GM has consistently, knowingly, affirmatively, and actively concealed

the true nature, quality, and character of the Defective Vehicles from consumers.

768.    Based on the foregoing, New GM is estopped from relying on any statutes of

limitations in defense of this action as to claims for which the doctrine of estoppel is

recognized.

769.    Overall, regardless of whether it was New GM or Old GM that manufactured

or sold a particular Defective Vehicle to a particular Class member, New GM is responsible

for *its own* actions with respect to *all* the Defective Vehicles, and the resulting harm to Class

members that occurred as the result of GM's acts and omissions. Simply put, GM was aware

of serious safety defects, and it also knew that Defective Vehicle owners were unaware of the defect, and it chose both to conceal these defects, and to forgo or delay any action to correct them. Under these circumstances, New GM had the clear duty to disclose and not conceal the ignition switch defects to Plaintiffs and the Class—regardless of when they acquired their Defective Vehicles.

770.    New GM's obligations stem from several different sources, including, but not limited to: (i) the obligations it explicitly assumed under the TREAD Act to promptly report any safety defect to Defective Vehicle owners and to NHTSA so that appropriate remedial action could occur; (ii) the duty it had under the law of fraudulent concealment, as pleaded below; (iii) the duty it had under the State consumer protection and other laws, as pleaded below; and (iv) the general legal principle embodied in § 324A of the RESTATEMENT (SECOND) OF TORTS, ("Liability To Third Person For Negligent Performance Of Undertaking").

771.    In acquiring Old GM, New GM expressly assumed the obligations to make all required disclosures under the TREAD Act with respect to all the Defective Vehicles.

772.    Under the TREAD Act, if it is determined that vehicle has a safety defect, the manufacturer must promptly notify vehicle owners, purchasers and dealers of the defect, and may be ordered to remedy the defect. 49 U.S.C. § 30118(b)(2)(A) & (B).

773.    Under the TREAD Act, manufacturers must also file a report with NHTSA within five working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist." 49 C.F.R. § 573.6(a) & (b). At a minimum, the report to NHTSA must include: the manufacturer's name; the identification of the vehicles or equipment

1197532.10

containing the defect, including the make, line, model year and years of manufacturing; a description of the basis for determining the recall population; how those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and a description of the defect. 49 C.F.R. § 276.6(b), (c)(1), (c)(2), & (c)(5).

774.    The manufacturer must also promptly inform NHTSA regarding: the total number of vehicles or equipment potentially containing the defect; the percentage of vehicles estimated to contain the defect; a chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with its dates of receipt; and a description of the plan to remedy the defect. 49 C.F.R. § 276.6(b) & (c).

775.    It cannot be disputed that New GM assumed a duty to all Defective Vehicle owners under the TREAD Act, and that it violated this duty.

776.    Under § 324A of the RESTATEMENT, an entity that undertakes to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability for harm to the third person resulting from the failure to exercise reasonable care to protect the undertaking if the "failure to establish reasonable care increases the risk of such harm…" While this doctrine of negligent undertaking grew up in the context of physical harm, it also applies to economic loss, such as that suffered by Plaintiffs and the Class.

777.    RESTATEMENT § 324A applies to an undertaking which is purely gratuitous, and it applies with even greater force here, where New GM is receiving substantial remuneration for its undertaking in relation to its dealerships' service centers. New GM provides parts for the Defective Vehicles as they are serviced at its dealerships, and receives

substantial revenue from dealerships relating to the servicing of Defective Vehicles. It also

receives an additional benefit in that many of the people who own these vehicles will

eventually sell or trade in their old vehicles for new ones. Consumers using New GM service

centers and buying New GM replacement parts necessarily rely upon New GM to advise its

dealerships of defects, notify its dealerships of safety related issues, provide its dealerships

with accurate and up to date information and enable them to remedy defects. New GM's

failure to carry out these obligations has increased the risk of harm to owners of Defective

Vehicles, who regularly have their vehicles inspected and serviced at New GM dealerships

and rely upon representations that the vehicles are safe and free of defects.

778.    New GM's dealerships pass along GM replacement parts, and they also rely on

New GM's expertise regarding how the vehicles should be maintained, and what conditions

are necessary for the dealer to conclude that the vehicles are in proper working order at the

time they are inspected, serviced and released back to the owner. The dealerships rely on New

GM's assurances of safety, that New GM will tell them about safety related problems that

come to New GM's attention, and that New GM will pass along knowledge of defects and

how to address them. Dealers servicing the Defective Vehicles rely on New GM's

representations that the vehicles and their component parts and safety features will function

correctly if certain conditions are met when the vehicles are inspected and serviced, as do the

consumers who go to a New GM dealership for repairs. New GM's breach of its obligations to

its dealerships has resulted in harm to Plaintiffs and the Class.

## SUCCESSOR LIABILITY ALLEGATIONS

779.    General Motors Corporation was founded on September 16, 1908, in Flint,

Michigan, and was incorporated on October 13, 1916, in Delaware. On June 1, 2009, General

Motors Corporation ("Old GM") filed a Chapter 11 bankruptcy petition in the United States

Bankruptcy Court for the Southern District of New York.[352] On July 5, 2009, that court

approved the sale of substantially all of the assets of Old GM to an entity known as General

Motors LLC ("New GM").[353] Old GM sold all of its assets to New GM in a transaction

finalized on July 10, 2009.[354] In that sale, all Old GM brands, inventory, physical assets,

management, personnel, vehicles and general business operations were transferred to New

GM. New GM acquired the contracts, books, and records of Old GM. New GM acquired all

goodwill and intellectual property of Old GM. At no time was the business enterprise of the

General Motors Company interrupted, and the New GM brand was continued as the same

brand as Old GM.[355] New GM is the mere continuation or reincarnation of the same business

enterprise as Old GM.

  780. New GM acquired all or substantially all of the manufacturing assets of Old

GM, and undertook the identical manufacturing operation as Old GM. New GM continued the

manufacture, marketing sale and warranty of the Old GM brands, including the Chevrolet

Cobalt, the Chevrolet HHR, the Buick Allure, the Buick LaCrosse, the Buick Lucerne, the

Cadillac Deville, the Cadillac DTS, the Cadillac CTS, the Cadillac SRX, the Chevrolet Impala,

the Chevrolet Camaro, the Chevrolet Malibu, and the Chevrolet Monte Carlo.

  781. Saturn Corporation was established on January 7, 1985 as a subsidiary of Old

GM. The Saturn Sky was first manufactured in 2006 for the 2007 model year ("MY"), and the

Pontiac Solstice was first manufactured in 2005 for the 2006 MY. Old GM manufactured both

of these vehicles at its Wilmington, DE plant, and New GM continued to manufacture, market

and sell these vehicles post-bankruptcy. After attempting to sell the Saturn brand to Penske,

---

[352] Valukas Report at 1, FN 1 and Valukas Report at 131.
[353] *Id.*
[354] Valukas Report at 131-132.
[355] Valukas Report at 132, FN 577.

New GM announced on September 30, 2009, that it was going to wind down the Saturn brand by October 2010.[356]

782.    Adam Opel AG was founded on January 21, 1862 as a sewing machine manufacturer and produced its first automobiles in 1899. Opel, based in Russelsheim, Hesse, Germany, became a subsidiary of Old GM in 1931. The Opel/Vauxhall GT was introduced as a production model in late 1968. Production of the Opel/Vauxhall GT was shutdown in 1973 only to return 34 years later as a 2007 MY vehicle for GM. The Daewoo G2X was a rebadged version of the Opel GT available in September 2007. Old GM manufactured these vehicles from 2007 until July 28, 2009 at its Wilmington, DE plant, and New GM continued to manufacture, market and sell these Old GM vehicles post-bankruptcy. New GM announced on July 21, 2014, that Opel Group, a new entity created by Adam Opel AG and New GM, would manage and maintain full responsibility for New GM's European business, including Cadillac, Chevrolet, and the Opel/Vauxhall brands.[357]

783.    Old GM began production of the Chevrolet Cobalt at its Lordstown Assembly plant in Lordstown, OH, in 2004 for the 2005 MY. New GM continued to manufacture, market and sell the Cobalt, an Old GM vehicle, post-bankruptcy until New GM discontinued the brand in 2010.[358]

---

[356] Valukas Report at 19; http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/ 2009/Jun/0601_PlantClosures.html; http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aioTrH.Mfo0o.
[357] http://en.wikipedia.org/wiki/Opel_GT; http://en.wikipedia.org/wiki/Saturn_Sky; http://www.detroitnews.com/ article/20140721/AUTO0103/307210084.
[358] Valukas Report at 18; http://www.cleveland.com/business/index.ssf/2010/06/gm_taking_some _unusual_risks_i.html.

784.    The Chevrolet HHR was manufactured at Old GM's Ramos Arizpe, Mexico

plant for the 2006 MY. New GM continued to manufacture, market and sell the Chevrolet

HHR post-bankruptcy.[359]

785.    Old GM introduced the Pontiac G5/Pursuit in Canada for the 2005 MY and in

the U.S. for the 2007 MY. New GM continued to manufacture, market and sell the Pontiac

G5/Pursuit post-bankruptcy.[360]

786.    Old GM began manufacturing the Buick LaCrosse (U.S.) (or Buick Allure in

Canada) in September 2004 for the 2005 MY.[361] The last vehicle of the first-generation Buick

LaCrosse was manufactured on December 23, 2008, at GM's Oshawa, Ontario plant. The

second-generation Buick LaCrosse was unveiled at the North American International Auto

Show in Detroit, Michigan in January 2009. New GM continues to manufacture, market and

sell the LaCrosse to this day.[362]

787.    Old GM began production of the Buick Lucerne in 2005 for the 2006 MY.[363]

New GM continued production of the Buick Lucerne model vehicle until 2011.[364]

788.    Old GM began manufacturing the Cadillac DTS in 2005 for the 2006 MY. In

the bankruptcy, New GM acquired the Cadillac brand and continued to manufacture, market

and sell the Cadillac DTS until 2011.[365]

---

[359] Valukas Report at 18; http://www.prlog.org/11024409-chevrolet-discontinues-the-hhr.html;
http://www.autofieldguide.com/articles/lookingthe-chevy-hhr.
[360] http://www.answers.com/topic/pontiac-g5.
[361] *Ward's Automotive Yearbook 2005*. Ward's Communications, Inc. 2005. p. 115.
[362] http://www.autoblog.com/2009/01/08/detroit-preview-2010-buick-lacrosse-breaks-cover/.
[363] http://www.edmunds.com/buick/lucerne/.
[364] http://www.just-auto.com/news/gm-axes-cadillac-dts-and-buick-lucerne_id111499.aspx.
[365] http://www.edmunds.com/cadillac/dts/.

789.    The first-generation Cadillac SRX was manufactured and sold by Old GM between 2004 and 2009. New GM debuted the second-generation Cadillac SRX in 2010 and continues to manufacture, market and sell these vehicles to this day.[366]

790.    Old GM began production of the Cadillac CTS in 2002 for the 2003 MY. Old GM redesigned portions of the Cadillac CTS in 2008, and New GM recently completed another redesign of this model in 2014.[367] New GM continues to manufacture, market and sell the Cadillac CTS.

791.    The Chevrolet Impala has been manufactured, marketed and sold by Old GM since 1958. Old GM manufactured, marketed and sold the eighth-generation Impala from 2000-2005; followed by the ninth-generation Impala from 2006-2009. New GM continued to manufacture, market and sell the ninth-generation Chevrolet Impala between 2009 and 2013. New GM performed a redesign in 2013 for the 2014 MY, and continues to manufacture, market and sell the Chevrolet Impala.[368]

792.    Old GM began manufacturing and selling the Chevrolet Malibu in 1963 for the 1964 MY. Four generations of Malibu were manufactured, marketed and sold by Old GM between 1964 and 1983, when the Malibu was discontinued. Old GM brought back the Malibu make in 1996 for the 1997 MY. With MY 2004, Old GM redesigned the Malibu, manufacturing, marketing and selling the second-generation Malibu until 2008. The third-generation Chevrolet Malibu was manufactured, marketed and sold by Old GM from 2008 to 2009. New GM continued to manufacture, market and sell the third-generation Chevrolet

---

[366] http://www.edmunds.com/cadillac/srx/.
[367] http://www.edmunds.com/cadillac/cts/.
[368] http://www.edmunds.com/chevrolet/impala/.

Malibu from July 10, 2009 through 2012. New GM continues to manufacture, market and sell

the current version of the Malibu as redesigned for MY 2013.[369]

793.    Old GM manufactured, marketed and sold the Chevrolet Camaro model from

its inception in the late 1960s until 2002, when the model was discontinued. The Chevrolet

Camaro returned to the New GM lineup in 2009 for the 2010 MY, and continues to be

manufactured, marketed and sold by New GM to this day.[370]

794.    New GM enjoyed the benefits of the Old GM brands in continuing these

brands and product lines. As the specific examples below demonstrate, New GM knowingly

and intentionally undertook ongoing duties to the purchasers of Old GM vehicles to ensure the

safety, function, and value of these vehicles. New GM cannot in law, equity or fairness

absolve itself of liability for the Old GM vehicle defects that New GM fraudulently acted to

conceal and keep on the road.

795.    New GM honored the vehicle warranties and customer programs of Old GM

on Old GM vehicles. On June 1, 2009, days before it was to file for bankruptcy protection,

Old GM posted on its Internet website (www.gm.com) a "Customer FAQ on GM's Chapter

11 Filing," which remained accessible on New GM's website (www.gm.com) post-

bankruptcy.[371] Among other things, New GM promised its customers and the Class:

> There will be no interruptions in GM's ability to take care of our
> customers and honor customer programs, warranties and provide
> replacement parts. In fact, GM has asked the Court for specific
> orders authorizing GM to honor customer warranties and programs
> as it always has. You should have total confidence that:

---

[369] http://wot.motortrend.com/a-quick-history-of-the-chevy-malibu-125595.html; http://www.edmunds.com/
chevrolet/malibu/.
[370] http://www.edmunds.com/chevrolet/camaro/.
[371] http://web.archive.org/web/20090606083403/http://www.gmreinvention.com/index.php/site/
progress_reports/0601_Viability_CustomerFAQ/#; http://web.archive.org/web/20100107122701/;
http://www.gmreinvention.com/index.php/site/progress_reports/.

- Our products are safe and sound;

- We will honor your existing warranty;

- Customer promotions and incentives will continue without interruption;

- You do not need to do anything differently regarding your warranty[372]

796.    New GM continued:

> Will New GM honor customer warranty claims?

> Yes. GM will succeed and win by taking care of our customers every day. New GM will assume the obligations to support the express warranties issued by GM to its customers.[373]

797.    With respect to Old GM's loyalty program—GM Card Earnings:

> What happens to my GM Card Earnings?

> Your GM Card Earnings will continue to be honored in accordance with the Program Rules. You can keep using your Card at more than 18 million outlets where MasterCard is accepted to accumulate Earnings and redeem them toward eligible, new GM vehicles.[374]

798.    Under the bankruptcy sale agreement, New GM also expressly assumed certain liabilities of Old GM, including certain statutory requirements:

> From and after the Closing, Purchaser [New GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.

799.    In the sale agreement, New GM expressly set forth that it:

---

[372] *Id.*
[373] *Id.*
[374] *Id.*

> shall be responsible for the administration, management and
> payment of all Liabilities arising under (i) express written
> warranties of Sellers [Old GM] that are specifically identified as
> warranties and delivered in connection with the sale of new,
> certified used or pre-owned vehicles or new or remanufactured
> motor vehicle parts and equipment (including service parts,
> accessories, engines and transmissions) manufactured or sold by
> Sellers or Purchaser prior to or after the Closing and (ii) Lemon
> Laws.

800.    New GM kept the same principle place of business and centers of operation as

Old GM. Old GM purchased the Renaissance Center in Detroit, Michigan on May 16, 1996

for use as its global headquarters. New GM still maintains its public presence and residence at

300 Renaissance Center in Detroit, Michigan.[375]

801.    In addition, Old GM established the General Motors Proving Grounds in

Milford, Michigan in 1924; the Milford Proving Grounds property is still owned and used by

New GM. The Milford Proving Grounds is a testing facility where the ignition switch was

tested.

802.    New GM kept the same employees as Old GM; retaining over 65,000 of Old

GM's employees. This included some of Old GM's Board of Directors, top management and

key players involved in the ignition switch defect, *inter alia*:

- Terry J. Woychowski was with Old GM since 1978,
  serving in various engineering positions including Global
  Vehicle Chief Engineer.[376] He held the position of Vice
  President of Global Quality and Vehicle Launch for New
  GM until retiring in June 2012.[377]

- Michael J. Robinson joined Old GM in 1984, and moved
  up to become North American General Counsel in 2008.[378]
  He continued to serve in New GM's legal department,

---

[375] *See* GM Annual Reports
[376] http://www.dbusiness.com/January-February-2011/General-Motors-Co/?cparticle=5&siarticle=4#.
VBsxQE1OXcs.
[377] Valukas Report at 171.
[378] http://green.autoblog.com/2009/09/04/general-motors-announces-mike-robinson-as-new-environment-vp/.

becoming New GM's Vice President of Environment,
Energy and Safety Policy in September 2009, holding that
position until he was fired in 2014.[379]

- John R. Buttermore began his career at GM as an engineer
in 1978.[380] He served Old GM as Vice President of
Powertrain and Manufacturing Operations, and has served
as New GM's Vice President of Manufacturing since
September 2009.[381]

- Current New GM Chief Executive Officer, Mary T. Barra,
began her career at Old GM in 1980 as a student at General
Motors Institute.[382] She served in a number of engineering
and management positions throughout Old GM and New
GM prior to becoming New GM's Executive Vice
President, Global Product Development, Purchasing and
Supply Chain in 2013.[383] She assumed her current role with
New GM on January 15, 2014.[384]

- Mark L. Reuss began his career with Old GM as an
engineering intern in 1983.[385] Having held numerous
management positions in engineering for GM, he served as
President of GM North America from 2009-2013.[386] He
currently serves New GM as Executive Vice President,
Global Product Development, Purchasing and Supply
Chain, having assumed the role from Barra.[387]

- Gary Altman served as Old GM's Program Engineering
Manager for the Chevrolet Cobalt in 2004 and continued to
serve New GM as a manager until he was fired in 2014.[388]

- Raymond DeGiorgio served Old GM as the Design Release
Engineer for the ignition switch used in the Saturn Ion and
Chevrolet Cobalt vehicles in 2003/2004.[389] He continued to

---

[379] *Id*; http://fortune.com/2014/06/06/report-names-top-gm-workers-fired-over-gm-safety-probe/.
[380] http://investing.businessweek.com/research/stocks/people/person.asp?personId=2971371&ticker=GM&previousCapId=61206100&previousTitle=GENERAL%20MOTORS%20CO.
[381] *Id*.
[382] http://www.gm.com/company/aboutGM/board_of_directors0/mary_barra.html.
[383] *Id*.
[384] *Id*.
[385] http://www.gm.com/company/corporate-officers/mark-reuss.
[386] *Id*.
[387] *Id*.
[388] Valukas Report at 58; http://www.newsweek.com/gm-fired-15-over-defect-killed-least-13-253685.
[389] Valukas Report at 37-38.

be employed by New GM in an engineering role until he was fired in 2014.[390]

- Lawrence Buonomo served as an attorney in Old GM's legal department from 1994-2009, and served as New GM's Executive Director of Litigation from 2009-2012.[391] New GM named him Practice Area Manager and Global Legal Process Leader - Litigation in 2012, a position in which he served until he was fired in 2014.[392]

- William J. Kemp served as a top product safety attorney for Old GM during 2003-2013.[393] He continued to serve in New GM's legal department until his termination in 2014.[394]

- Michael Millikin, formerly Old GM's Coordinator of Global Legal Services, was renamed Old GM's Associate General Counsel in June 2005, a position he continued to hold until he assumed his current role as New GM's Vice President and General Counsel in July 2009.[395] Millikin remains in place as General Counsel for New GM.

- Thomas G. Stephens began his career at Old GM as an engineer in 1969.[396] Moving up the corporate ladder, he was made Group Vice President, Global Powertrain and Global Quality in 2006, and served as Vice Chairman, Global Product Development for Old GM and New GM from April 2009 through June 2011.[397] He continued to serve New GM as Vice Chairman & Global Chief Technology Officer until April 2012.[398]

- Timothy E. Lee began his career at Old GM as a student at General Motors Institute in 1969.[399] He moved into top management in 2002 when he assumed the role of Vice President of Manufacturing for GM Europe and in 2006 as

---

[390] http://www.newsweek.com/gm-fired-15-over-defect-killed-least-13-253685.
[391] http://www.linkedin.com/pub/lawrence-larry-buonomo/5/978/499
[392] *Id.; See also* http://online.wsj.com/articles/gm-dismissals-include-lawyers-lawrence-buonomo-bill-kemp-1402003050
[393] Valukas Report at 85-86, 104, 147-148, 150, 153, 164-165, 171, 178, 183 and 196.
[394] *Id;* http://online.wsj.com/articles/gm-dismissals-include-lawyers-lawrence-buonomo-bill-kemp-1402003050
[395] http://www.gm.com/company/aboutGM/GM_Corporate_Officers/michael_p_millikin.html
[396] http://investing.businessweek.com/research/stocks/people/person.asp?personId=9663636&ticker=GM
[397] *Id; See also* GM Annual Reports.
[398] http://investing.businessweek.com/research/stocks/people/person.asp?personId=9663636&ticker=GM
[399] http://investing.businessweek.com/research/stocks/people/person.asp?personId=25315960&ticker=GM

1197532.10

Vice President of Manufacturing for GM North America.[400]
He took over as President of International Operations for
New GM in December 2009, and also served New GM as
its Executive Vice President of Global Manufacturing from
2012 through 2014.[401]

- Chester N. Watson has served as General Auditor for Old
  GM and New GM from 2003 through 2010.[402]

- Victoria McInnis began her career at GM Canada in 1995
  and served New GM as Chief Tax Officer through 2012.[403]

- Frederick A. Henderson served as Old GM's Vice
  Chairman of the Board of Directors and Chief Financial
  Officer from 2005 until he was elected Chairman and Chief
  Financial Officer in June of 2009, leading new GM through
  bankruptcy.[404]

- Erroll B. Davis, Jr. served on Old GM's Board of Directors
  starting in 2007 and, according to New GM's 2013 Annual
  Report, still serves on the Board of Directors to this day.[405]

- Phillip A. Laskawy served on Old GM's Board of Directors
  beginning in 2003 and continued to serve on New GM's
  Board of Directors until 2013.[406]

- Kathryn V. Marinello served on Old GM's Board of
  Directors starting in 2007 and, according to New GM's
  2013 Annual Report, still serves on the Board of Directors
  to this day.[407]

803.    In addition to in-house counsel that remained with New GM post-bankruptcy,

Old GM and New GM retained the same outside lawyers and law firms.

---

[400] *Id.; See also* GM Annual Reports.
[401] http://investing.businessweek.com/research/stocks/people/person.asp?personId=25315960&ticker=GM.
[402] http://www.dbusiness.com/January-February-2011/General-Motors-Co/?cparticle=5&siarticle=4#.
VBrd9U1OXcs; *See also* GM Annual Reports.
[403] *Id.*
[404] *See* GM Annual Reports.
[405] *Id.*
[406] *Id.*
[407] *Id.*

1197532.10

804.    New GM retained ownership and control over nearly all of Old GM's manufacturing plants; closing only fourteen.[408] New GM also assumed ownership and responsibility for over 3,600 of Old GM's U.S. dealerships.[409]

805.    New GM kept the same logos and brand marketing as Old GM. Old GM unveiled its "Mark of Excellence" logo in 1966.



806.    The words "Mark of Excellence" were removed in the late 1970's, but what remained of the logo is still in use today.



807.    On August 24, 2009, New GM announced the removal of its logo from all of its vehicles starting with the 2010 MY; however, New GM continues to use this logo to this day on its websites and marketing materials.

---

[408] http://money.cnn.com/2009/07/10/news/companies/new_gm/.
[409] Id.

1197532.10

808.    New GM has also maintained the logos and branding for Chevrolet and
Cadillac, after acquiring these brand assets post-bankruptcy. The Chevrolet bowtie was
introduced in late 1913 containing the "Chevrolet" name within the bowtie. Old GM
continued to use the bowtie logo after it purchased Chevrolet in 1918.



809.    Around 2000, the Chevrolet name was removed from the logo, and, despite
slight design variations to the bowtie, the logo and brand remain the same today as used by
New GM.



810.    The iconic Cadillac crest was first unveiled in 1906. Though there have been
slight varying designs of the crest, the Cadillac logo consisting of a silver, gold, red and blue
crest surrounded by a wreath has remained conceptually the same since 1982.

1197532.10



811.    In January of 2014, New GM announced it was removing the Cadillac wreath

from the logo and widening the crest for a more streamlined appearance.



812.    New GM's operations have consistently demonstrated a continuity of Old GM

as an extension of its predecessor corporations' business and product lines. New GM

expressly and impliedly assumed the warranty obligations and liabilities of Old GM. New GM

has consistently and continuously held itself out to the public and the Class as the continuation

of Old GM. New GM is a mere continuation or reincarnation of the same business of Old GM.

New GM had—and continues to have—an ongoing duty to warn the Class of the defects that

it knew existed in Old GM vehicles. New GM entered into the bankruptcy having fraudulently

concealed material facts on the defects in Old GM and New GM vehicles to the reliance and

detriment of the Class, and is responsible for the conduct and fraudulent concealment by Old

GM as it relates to the Defective Vehicles. New GM and Old GM were, and New GM remains, under a continuing duty to disclose to the Class the true character, quality, and nature of the Defective Vehicles; that this defect is based on dangerous, inadequate, and defective design and substandard materials; and that the defects will require repair, pose a severe safety concern, and diminishes the value of the Defective Vehicles.

813.    New GM undertook the same manufacturing operation as Old GM. New GM continued the product lines of Old GM. The totality of the transaction between the predecessor and successor corporations demonstrates a basic continuity of the predecessor corporation's business. Indeed, the purpose of the bankruptcy transaction funded by taxpayer dollars was to save and continue the Old GM brand, the Old GM name, the Old GM product line, and to ensure the continuation or reincarnation of the same business enterprise as New GM. The fraudulent concealment of material facts begun under Old GM was continued, carried on, and furthered by New GM and its agents. New GM did not report material safety information within its knowledge to the Class, nor would a reasonable and diligent public investigation have disclosed to the Class that New GM had information in its possession about the existence and dangerousness of the Old GM defects that it failed to disclosed and instead acted to fraudulently conceal. The cover-up and omissions of Old GM are the responsibility of New GM. The transfer of Old GM assets to New GM was done fraudulently and in an attempt to escape liability for gross misconduct and to destroy the remedies of the Class as against New GM.

814.    New GM continued the business of General Motors as evidenced by the continuity of management, personnel, physical location, assets, and general business operations of Old GM.

815.    Old GM ceased its ordinary business operations and was dissolved by terms of the bankruptcy. New GM expressly and impliedly assumed the obligations of Old GM to manufacture non-defective vehicles and by warranting to the Class and the public that the GM brand would remain in operation as a continuation of the same company. At all relevant times, New GM held itself out to the Class, and to the world, as the effective continuation of Old GM. With respect to each of the Claims for Relief asserted herein, the Classes thus assert two distinct, severable, and independent bases of New GM liability: (1) GM's own knowledge, deceptive, negligent, and violative conduct, its breach of its own duty, and resulting harm; and (2) New GM's successor liability.

## CHOICE OF LAW ALLEGATIONS

816.    New GM is headquartered in Detroit, Michigan, the "center of gravity" of this case.

817.    As did Old GM, New GM does substantial business in Michigan. Nearly half of New GM's United States manufacturing plants are in Michigan, as are a third of its assembly plants. Upon information and belief, there are approximately 20,000 New GM employees in Michigan alone.

818.    In addition, the conduct that forms the basis for each and every Class members' claims against New GM emanated from Old and New GM's headquarters in Detroit, Michigan.

819.    On information and belief, Old and New GM personnel responsible for customer communications are and were located at the Michigan headquarters, and the core decision not to disclose the ignition switch and safety defects to consumers was made and implemented from there.

820.    On information and belief, throughout the Class Period, Old and New GM, in concert with their Michigan-based advertising agencies, failed to disclose the existence of the ignition switch and other safety defects.

821.    On information and belief, the Red X team, an engineering team whose purpose is to find the cause of an engineering design defect, is and was located in Detroit, Michigan.

822.    On information and belief, marketing campaigns falsely promoting Old and New GM cars as safe and reliable were conceived and designed in Michigan.

823.    On information and belief, Old and New GM personnel responsible for managing the customer service division are and were located at the Michigan headquarters. The "Customer Assistance Centers" directs customers to call the following numbers: 1-800-222-1020 (Chevrolet), 1-800-521-7300 (Buick), 1-800-462-8782 (GMC), 1-800-458-8006 (Cadillac), 1-800-762-2737 (Pontiac), 1-800-732-5493 (HUMMER), and 1-800-553-6000 (Saturn), which are landlines in Detroit, Michigan. Customers are directed to send correspondence to GM Company, P.O. Box 33170, Detroit, MI 48232-5170. In addition, personnel from GM in Detroit, Michigan, also communicate via e-mail with customers concerned about the ignition switch and safety defects.

824.    On information and belief, Old and New GM personnel responsible for communicating with dealers regarding known problems with Defective Vehicles are and were also located at the Michigan headquarters.

825.    On information and belief, Old and New GM personnel responsible for managing the distribution of replacement parts to dealerships are and were located at the Michigan headquarters. The decision not to change the part number and the service stock

-251-

1197532.10

(replacement parts they had in inventory) of older, weaker switches was made and
implemented from Old GM's Michigan headquarters.

826.    On information and belief, New GM's presence is more substantial in
Michigan than any other state, and the same was true of Old GM.

## CLASS ACTION ALLEGATIONS

827.    As alleged throughout this Complaint, the Classes' claims all derive directly
from a single course of conduct by New GM, from its inception onward. This case is about the
responsibility of New GM, at law and in equity, for its knowledge, its conduct, and its
products. New GM has engaged in uniform and standardized conduct toward the Classes. It
did not differentiate, in its degree of care or candor, its actions or inactions, OR in the content
of its statements or omissions, among individual Class members. The objective facts on these
subjects are the same for all Class members. Within each Claim For Relief asserted by the
respective Classes, the same legal standards govern. Additionally, many states share the same
legal standards and elements of proof, facilitating the certification of multistate classes for
some or all claims.

## II.    The Nationwide Class

828.    Accordingly, under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal
Rules of Civil Procedure, Plaintiffs bring this action and seek to certify and maintain it as a
class action on behalf of themselves and a Nationwide Class initially defined as follows:

> All persons in the United States who entered into a lease or bought,
> prior to July 11, 2009, and who (i) own or lease, or (ii) who sold
> after February 14, 2014, or (iii) who had declared a total loss after
> an accident occurring after February 14, 2014, one or more of the
> following GM vehicles: 2003-2007 Saturn Ion; 2005-2009
> Chevrolet Cobalt; 2007-2009 Pontiac G5; 2006-2009 Chevrolet
> HHR; 2006-2009 Pontiac Solstice; 2007-2009 Saturn Sky; 2004-
> 2005 Buick Regal LS & GS; 2005-2009 Buick Lacrosse; 2006-
> 2009 Buick Lucerne; 2000-2005 Cadillac Deville; 2004-2009

Cadillac DTS; 2006-2009 Chevrolet Impala; 2000-2008 Chevrolet
Monte Carlo; 2003-2009 Cadillac CTS; 2004-2006 Cadillac SRX;
1997-2005 Chevrolet Malibu; 2000-2005 Pontiac Grand Am;
2004-2008 Pontiac Grand Prix; 1998-2002 Oldsmobile Intrigue;
1999-2004 Oldsmobile Alero; or 2008-2009 Pontiac G8
("Defective Vehicles").[410]

## III.    The State Classes

829.    Plaintiffs allege statewide class action claims on behalf of classes for each of

the 50 states, the District of Columbia and Puerto Rico ("State Classes"). Each of these State

Classes is initially defined as follows:

> All persons in the State of _____ (e.g., Alabama) who entered
> into a lease or bought, prior to July 11, 2009, and who (i) own or
> lease, or (ii) who sold after February 14, 2014, or (iii) who had
> declared a total loss after an accident occurring after February 14,
> 2014, one or more of the following GM vehicles: 2003-2007
> Saturn Ion; 2005-2009 Chevrolet Cobalt; 2007-2009 Pontiac G5;
> 2006-2009 Chevrolet HHR; 2006-2009 Pontiac Solstice; 2007-
> 2009 Saturn Sky; 2004-2005 Buick Regal LS & GS; 2005-2009
> Buick Lacrosse; 2006-2009 Buick Lucerne; 2000-2005 Cadillac
> Deville; 2004-2009 Cadillac DTS; 2006-2009 Chevrolet Impala;
> 2000-2008 Chevrolet Monte Carlo; 2003-2009 Cadillac CTS;
> 2004-2006 Cadillac SRX; 1997-2005 Chevrolet Malibu; 2000-
> 2005 Pontiac Grand Am; 2004-2008 Pontiac Grand Prix; 1998-
> 2002 Oldsmobile Intrigue; 1999-2004 Oldsmobile Alero; or 2008-
> 2009 Pontiac G8 ("Defective Vehicles").

830.    The Nationwide Class and the State Classes and their members are sometimes

referred to herein as the "Class" or "Classes."

831.    Excluded from each Class are Old GM and New GM, their employees, co-

conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly

owned subsidiaries or affiliates of Old GM; Class Counsel and their employees; and the

---

[410] To the extent warranted, the list of Defective Vehicles for the purpose of the Nationwide and State Class
Definitions, will be supplemented to include other GM vehicles that have the defective ignition switches, which
inadvertently turn off the engine and vehicle electrical systems during ordinary driving conditions, and related
defects.

judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons.

832.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). Plaintiffs are informed and believe that there are millions of Defective Vehicles nationwide, and thousands of Defective Vehicles in each of the States. Individual joinder of all Class members is impracticable.

833.    Each of the Classes is ascertainable because its members can be readily identified using registration records, sales records, production records, and other information kept by New GM or third parties in the usual course of business and within their control. Plaintiffs anticipate providing appropriate notice to each certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

834.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because questions of law and fact that have common answers that are the same for each of the respective Classes predominate over questions affecting only individual Class members. These include, without limitation, the following:

a.    Do the Defective Vehicles suffer from ignition switch defects?

b.    Did Old GM and/or New GM fraudulently conceal these defects?

c.    Did Old GM and/or New GM's conduct toll any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppel?

d.    Did Old GM and/or New GM misrepresent that the Defective Vehicles were safe?

-254-

e.     Did Old GM and/or New GM engage in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Defective Vehicles were designed, manufactured, and sold with defective ignition switches?

f.     Was Old GM and/or New GM's conduct, as alleged herein, likely to mislead a reasonable consumer?

g.     Were Old GM and/or New GM's statements, concealments and omissions regarding the Defective Vehicles material, in that a reasonable consumer could consider them important in purchasing, selling, maintaining, or operating such vehicles?

h.     Did Old GM and/or New GM violate each of the States' consumer protection statutes, and if so, what remedies are available under those statutes?

i.     Were the Defective Vehicles unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability?

j.     Is New GM liable to the Class for damages and/or penalties, as a result of its own knowledge, conduct, action, or inaction?

k.     Is New GM liable to the Class for damages and/or penalties under privileges of successor liability

l.     Are Plaintiffs and the Class entitled to a declaratory judgment stating that the ignition switches in the Defective Vehicles are defective and/or not merchantable?

m.     Did Old GM and/or New GM's unlawful, unfair, and/or deceptive practices harm Plaintiffs and the Class?

n.     Has New GM been unjustly enriched by its conduct?

o.     Are Plaintiffs and the Class entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction?

Case 1:14-mc-02543-JMF    Document 847-2    Filed 10/14/14    Page 15 of 473

p. Should New GM be declared responsible for notifying all Class members of the defects and ensuring that all GM vehicles with the Ignition Switch Defect are promptly recalled and repaired?

q. What aggregate amounts of statutory penalties, as available under the laws of Michigan and other States, are sufficient to punish and deter New GM and to vindicate statutory and public policy?

r. How should such penalties be most equitably distributed among Class members?

835. This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of the Class members, and arise from the same course of conduct by New GM. The relief Plaintiffs seek is typical of the relief sought for the absent Class members.

836. This action satisfies the requirements of Fed. R. Civ. P. 23(a)(4) because Plaintiffs will fairly and adequately represent and protect the interests of all absent Class members. Plaintiffs are represented by counsel who are competent and experienced in product liability, consumer protection, and class action litigation.

837. This action satisfies the requirements of Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by the individual Class members on the claims asserted herein would create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for New GM; and because adjudication with respect to individual Class members would, as a practical matter, be dispositive of the interests of other Class members, or impair substantially or impede their ability to protect their interests.

1197532.10

Case 114-mc-02543-JMF    Document 65-4-2    Filed 10/14/14    Page 16 of 473

838.    Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy.

839.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendant New GM has acted and refused to act on grounds generally applicable to each Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

840.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and of fact regarding New GM's conduct and responsibility predominate over any questions affecting only individual Class members.

841.    Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

842.    The claims in this Complaint have been centralized in this forum as MDL

proceedings pursuant to 28 U.S.C. § 1407. Essentially all related litigation already begun by

GM customers asserting ignition switch-related class claims is now consolidated in this forum.

The ongoing concentration of such claims in this forum, at least through the class certification

determination and the trial of bellwether class claims, is superior, under Fed. R. Civ.

P. 23(b)(3)(B) and (C), to the premature dispersion of these claims or individualized treatment

of these claims.

843.    The conduct of this action as a class action presents far fewer management

difficulties, far better conserves judicial resources and the parties' resources, and far more

effectively protects the rights of each Class member than would piecemeal litigation.

Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies

of individualized litigation, the challenges of managing this action as a class action are

substantially outweighed by the benefits to the legitimate interests of the parties, the court,

and the public of class treatment in this court, making class adjudication superior to other

alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

844.    Plaintiffs are not aware of any obstacles likely to be encountered in the

management of this action that would preclude its maintenance as a class action. Rule 23

provides the Court with authority and flexibility to maximize the efficiencies and benefits of

the class mechanism and reduce management challenges. The Court may, on motion of

Plaintiffs or on its own determination, certify nationwide, statewide and/or multistate classes

for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify

any particular claims, issues, or common questions of fact or law for classwide adjudication;

certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

845.    The Classes expressly disclaim any recovery, in this action, for physical injury resulting from the ignition switch defects without waiving or dismissing such claims. Plaintiffs are informed and believe that crashes implicating the Defective Vehicles are continuing to occur because of New GM's delays and inaction regarding the commencement and completion of recalls. The increased risk of injury from the ignition switch defects serves as an independent justification for the relief sought by Plaintiffs and the Class.

## REALLEGATION AND INCORPORATION BY REFERENCE

846.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs and allegations of this Complaint, including the Introduction, all Factual Allegations, Tolling Allegations, Successor Liability Allegations, Choice of Law Allegations, and Class Action Allegations, as though fully set forth in each of the following Claims for Relief asserted on behalf of the Nationwide Class and the Statewide Classes.

## CLAIMS FOR RELIEF

I.    **NATIONWIDE CLASS CLAIMS**

### FIRST CLAIM FOR RELIEF
### ON BEHALF OF NATIONWIDE CLASS

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### 15 U.S.C. § 2301 *et. seq.*

847.    Plaintiffs bring this Count on behalf of members of the Nationwide Class who are residents of the following States: Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma,

Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, West

Virginia and Wyoming.

848.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by

virtue of 28 U.S.C. § 1332 (a)-(d).

849.    The Defective Vehicles are "consumer products" within the meaning of the

Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

850.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss

Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled

under applicable state law to enforce against the warrantor the obligations of its express and

implied warranties.

851.    Old GM was a "supplier" and "warrantor" within the meaning of the

Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

852.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is

damaged by the failure of a warrantor to comply with a written or implied warranty.

853.    Old and New GM provided Plaintiffs and the other Class members with an

implied warranty of merchantability in connection with the purchase or lease of their vehicles

that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15

U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Old and New GM

warranted that the Defective Vehicles were fit for their ordinary purpose as safe passenger

motor vehicles, would pass without objection in the trade as designed, manufactured, and

marketed, and were adequately contained, packaged, and labeled. Mich. Comp. Laws

§ 440.2314(2)(a), (c), and (e); U.C.C. § 2-314.

Case 1:14-md-02543-JMF    Document 584-2    Filed 10/14/14    Page 30 of 473

854.    Old and New GM breached these implied warranties, as described in more detail above, and are therefore liable to Plaintiffs and the Class pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Defective Vehicles share common design defects in that they are equipped with defective Key Systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death. New GM has admitted that the Defective Vehicles are defective in issuing its recalls, but the recalls are woefully insufficient to address each of the defects.

855.    In its capacity as a warrantor, as Old and New GM had knowledge of the inherent defects in the Defective Vehicles, any efforts to limit the implied warranties in a manner that would exclude coverage of the Defective Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Defective Vehicles is null and void.

856.    The limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between Old GM and Plaintiffs and the other Class members, as, at the time of purchase and lease, Plaintiffs and the other Class members had no other options for purchasing warranty coverage other than directly from Old GM.

857.    The limitations on the warranties are substantively unconscionable. Old and N that the Defective Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. Old and New GM failed to disclose these defects to Plaintiffs and the other Class members. Thus, New GM's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

858.    Plaintiffs and each of the other Class members have had sufficient direct dealings with either Old or New GM or its agents (dealerships) to establish privity of contract. Nonetheless, privity is not required here because Plaintiffs and each of the other Class

members are intended third-party beneficiaries of contracts between Old and New GM and its

dealers, and specifically, of the implied warranties. The dealers were not intended to be the

ultimate consumers of the Defective Vehicles and have no rights under the warranty

agreements provided with the Defective Vehicles; the warranty agreements were designed for

and intended to benefit consumers. Finally, privity is also not required because the Defective

Vehicles are dangerous instrumentalities due to the aforementioned defects and

nonconformities.

859.    Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action

and are not required to give New GM notice and an opportunity to cure until such time as the

Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal

Rules of Civil Procedure.

860.    Furthermore, affording either Old or New GM an opportunity to cure its breach

of written warranties would be unnecessary and futile here. At the time of sale or lease of each

Defective Vehicle, Old GM knew, should have known, or was reckless in not knowing of its

misrepresentations concerning the Defective Vehicles' inability to perform as warranted, but

nonetheless failed to rectify the situation and/or disclose the defective design. Under the

circumstances, the remedies available under any informal settlement procedure would be

inadequate and any requirement that Plaintiffs resort to an informal dispute resolution

procedure and/or afford Old GM a reasonable opportunity to cure its breach of warranties is

excused and thereby deemed satisfied.

861.    Plaintiffs and the other Class members would suffer economic hardship if they

returned their Defective Vehicles but did not receive the return of all payments made by them.

Because New GM is refusing to acknowledge any revocation of acceptance and return

immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Defective Vehicles by retaining them.

862.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class members in connection with the commencement and prosecution of this action.

863.    Further, Plaintiffs and the Class are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1). Based on New GM's continuing failures to fix the known dangerous defects, Plaintiffs seek a declaration that New GM has not adequately implemented its recall commitments and requirements and general commitments to fix its failed processes, and injunctive relief in the form of judicial supervision over the recall process is warranted. Plaintiffs also seek the establishment of the New GM-funded program for Plaintiffs and Class members to recover out of pocket costs incurred, as discussed in Paragraphs __ above.

864.    Plaintiffs also request, as a form of equitable monetary relief, re-payment of the out-of-pocket expenses and costs they have incurred in attempting to rectify the Ignition Switch Defects in their vehicles. Such expenses and losses will continue as Plaintiffs and Class members must take time off from work, pay for rental cars or other transportation

arrangements, child care, and the myriad expenses involved in going through the recall process.

865.    The right of Class members to recover these expenses as an equitable matter to put them in the place they would have been but for Old and New GM's conduct presents common questions of law. Equity and fairness requires the establishment by Court decree and administration under Court supervision of a program funded by New GM, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

**SECOND CLAIM FOR RELIEF
ON BEHALF OF THE NATIONWIDE CLASS**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(MICH. COMP. LAWS § 440.2314)**

866.    This claim is brought on behalf of the Nationwide Class for breach of implied warranty under Michigan law.

867.    Old GM and New GM were merchants with respect to motor vehicles within the meaning of MICH. COMP. LAWS § 440.2314(1).

868.    Under MICH. COMP. LAWS § 440.2314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Michigan Class members purchased their Defective Vehicles.

869.    These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shutdown of power steering and power brakes and the non-deployment of airbags in the event of a collision.

870.    Old GM and New GM were provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and

-264-

communications sent by the Michigan Class before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

871.    As a direct and proximate result of Old GM and New GM's breach of the implied warranty of merchantability, the Michigan Class has been damaged in an amount to be proven at trial. New GM also has successor liability for Old GM's breach.

872.    The Michigan Class also seeks available equitable and/or injunctive relief. Based on New GM's continuing failures to fix the known dangerous defects, the Michigan Class seeks a declaration that New GM has not adequately implemented its recall commitments and requirements and general commitments to fix its failed processes, and injunctive relief in the form of judicial supervision over the recall process is warranted. The Michigan Class also seeks the establishment of a New GM-funded program for Plaintiffs and Class members to recover out of pocket costs incurred.

**THIRD CLAIM FOR RELIEF**
**ON BEHALF OF NATIONWIDE CLASS**

**FRAUDULENT CONCEALMENT**

873.    This claim is brought on behalf of the Nationwide Class under Michigan law, or, alternatively, under the laws of the all states, as there is no material difference in the law of fraudulent concealment as applied to the claims and questions in this case.

874.    Old and New GM each concealed and suppressed material facts concerning the Defective Vehicles.

875.    As described above, Old GM and New GM each made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

876.    The Companies each knew these representations were false when made.

1197532.10

877.    The vehicles purchased or leased by Plaintiffs were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

878.    The Companies each had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because Plaintiffs relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

879.    The aforementioned concealment was material, because if it had been disclosed Plaintiffs would not have bought, leased or retained their vehicles.

880.    The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies each knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies each intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

881.    Plaintiffs relied on the Companies' reputation-along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurances that their vehicles were safe and reliable and other similar false statements-in purchasing, leasing or retaining the Defective Vehicles.

1197532.10

882.    However, Old and New GM each concealed and suppressed material facts

concerning the culture of Old and New GM-a culture that emphasized cost-cutting, avoidance

of dealing with safety issues and a shoddy design process.

883.    Further, Old and then New GM each had a duty to disclose the true facts about

the Defective Vehicles because they were known and/or accessible only to Old and then New

GM who had superior knowledge and access to the facts, and the facts were not known to or

reasonably discoverable by Plaintiff and the Classes. As stated above, these omitted and

concealed facts were material because they directly impact the safety, reliability and value of

the Defective Vehicles. Whether a manufacturer's products are safe and reliable, and whether

that manufacturer stands behind its products, is of material concern to a reasonable consumer.

**FOURTH CLAIM FOR RELIEF**
**ON BEHALF OF NATIONWIDE CLASS**

**UNJUST ENRICHMENT**

880.    This claim for unjust enrichment is brought on behalf of the Nationwide Class

under Michigan law, or alternatively, under the laws of all states as there is no material

difference in the law of unjust enrichment as it applies to the claims and questions in this case.

881.    New GM has received and retained a benefit from the Plaintiffs and the

Nationwide Class, and inequity has resulted.

882.    New GM benefitted from acquiring the assets and goodwill of Old GM, and

avoiding and delaying the effort and expenditures involved in recalling and repairing the

Defective Vehicles; while Plaintiffs, who originally overpaid for their Old GM cars, have

been forced to pay additional out-of-pocket costs and incur additional expense and losses in

connection with the belated recalls.

883.    It is inequitable for New GM to retain the benefits of its misconduct.

1197532.10

884.    As a result of New GM's conduct, the amount of New GM's unjust enrichment should be disgorged, in an amount according to proof.

## II.    STATE CLASS CLAIMS

### ALABAMA

### FIFTH CLAIM FOR RELIEF

### VIOLATION OF ALABAMA DECEPTIVE TRADE PRACTICES ACT
(ALA. CODE § 8-19-1, *et. seq.*)

885.    The Class Members who are Alabama residents (the "Alabama Class") are "consumers" within the meaning of ALA. CODE §8-19-3(2).

886.    The Alabama Class, Old GM, and New GM are "persons" within the meaning of ALA. CODE §8-19-3(5).

887.    The Defective Vehicles are "goods" within the meaning of ALA. CODE §8-19-3(3).

888.    The Companies were engaged in "trade or commerce" within the meaning of ALA. CODE §8-19-3(8).

889.    The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." ALA. CODE § 8-19-5. By failing to disclose and actively concealing the dangerous risk of ignition switch movement, engine shutdown, and airbag disabling in Defective Vehicles, New GM engaged in deceptive business practices prohibited

Case 1:14-mc-02543-JM Document 584-2 Filed 10/14/14 Page 33 of 473

by the Alabama DTPA, including: representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Defective Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Defective Vehicles has been supplied in accordance with a previous representation when it has not; and engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

890.     In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Alabama DTPA, and also has successor liability for the violations of Old GM.

891.     As alleged above, both Companies knew of the ignition switch defects, while the Alabama Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

892.     The Companies knew or should have known that their conduct violated the Alabama DTPA.

893.     As alleged above, the Companies made material statements about the safety
and reliability of Defective Vehicles that were either false or misleading.

894.     Old GM engaged in a deceptive trade practice when it failed to disclose
material information concerning the Defective Vehicles which it knew at the time of the sale.
Old GM deliberately withheld the information about the vehicles' propensity to inadvertently
shut down in order to ensure that consumers would purchase its vehicles and to induce the
consumer to enter into a transaction.

895.     From its inception in 2009, New GM has known of the ignition switch defects
that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits
and to avoid remediation costs and a public relations nightmare, New GM concealed the
defects and their tragic consequences and allowed unsuspecting new and used car purchasers
to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to
continue driving highly dangerous vehicles.

896.     The Companies each owed the Alabama Class a duty to disclose the defective
nature of Defective Vehicles, including the dangerous risk of ignition switch movement,
engine shutdown, and disabled safety airbags, because they:

a.     Possessed exclusive knowledge of the defects rendering Defective
Vehicles inherently more dangerous and unreliable than similar vehicles;

b.     Intentionally concealed the hazardous situation with Defective Vehicles
through their deceptive marketing campaign and recall program that they designed to hide the
life-threatening problems from the Alabama Class; and/or

-270-

     c.     Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Alabama Class that contradicted these representations.

897.    The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Alabama Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

898.    The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Alabama Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Alabama Class.

899.    The propensity of the Defective Vehicles to inadvertently shut down during ordinary operation was material to the Alabama Class. Had the Alabama Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

900.    All members of the Alabama Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Alabama Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Alabama Class own vehicles that are not safe.

901.    The Alabama Class have been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

902.    The Alabama Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the Alabama DTPA, and these violations present a continuing risk to the Alabama Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

903.    The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

904.    As a direct and proximate result of the Companies' violations of the Alabama DTPA, the Alabama Class have suffered injury-in-fact and/or actual damage.

905.    Pursuant to ALA. CODE § 8-19-10, the Alabama Class seeks monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each Alabama Class Member.

906.    The Alabama Class also seeks an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the ALA. CODE §8-19-1, *et. seq.*

1197532.10

907.    Alabama Plaintiffs have complied with the notice requirement set forth in Alabama Code § 8-19-10 by virtue of the notice previously provided in the context of the underlying action styled *Forbes, et al. v. GM*, 2:14-cv-02018-GP (E.D. Pa.) and other underlying actions, as well as additional notice in the form of a demand letter sent on October 12, 2014.

## SIXTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

908.    In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought only on behalf of the Alabama Class.

909.    As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

910.    The Companies knew these representations were false when made.

911.    The vehicles purchased or leased by the Alabama Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

912.    The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the Alabama Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

913.    The aforementioned concealment was material, because if it had been disclosed the Alabama Class would not have bought, leased or retained their vehicles.

914. The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

915. The Alabama Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

916. As a result of their reliance, the Alabama Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

917. The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Alabama Class. The Alabama Class is therefore entitled to an award of punitive damages.

## ALASKA

## SEVENTH CLAIM FOR RELIEF

## VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT
### (ALASKA STAT. ANN. § 45.50.471, *et. seq.*)

918. This claim is brought on behalf of Class members who are Alaska residents (the "Alaska Class").

919. The Alaska Unfair Trade Practices And Consumer Protection Act ("Alaska CPA") declares unfair methods of competition and unfair or deceptive acts or practices in the

-274-

Case 1:14-md-02543-JMF    Document 584-2    Filed 10/14/14    Page 34 of 73

conduct of trade or commerce unlawful, including: "(4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(6) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" "(8) advertising goods or services with intent not to sell them as advertised;" or "(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged." ALASKA STAT. ANN. § 45.50.471.

920.    In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein. Old GM and New GM also engaged in unlawful trade practices by representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; advertising the Defective Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Alaska CPA, and also has successor liability for the violations of Old GM.

921.    As alleged above, both Companies knew of the ignition switch defects, while the Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

922.    The Companies knew or should have known that their conduct violated the Alaska CPA.

923.    As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

924.    Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shut down in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

925.    From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

926.    The Companies each owed the Alaska Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.    Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

1197532.10

      b.     Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Alaska Class; and/or

      c.     Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Alaska Class that contradicted these representations.

      927.     The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Alaska Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

      928.     The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Alaska Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Alaska Class.

      929.     The propensity of the Defective Vehicles to inadvertently shut down during ordinary operation was material to the Alaska Class. Had the Alaska Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

      930.     All members of the Alaska Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Alaska Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the

Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Alaska Class own vehicles that are not safe.

931.    The Alaska Class has been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

932.    The Alaska Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the Alaska CPA, and these violations present a continuing risk to the Alaska Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

933.    The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

934.    As a direct and proximate result of the Companies' violations of the Alaska CPA, the Alaska Class has suffered injury-in-fact and/or actual damage.

935.    Pursuant to ALASKA STAT. ANN. § 45.50. 535(b)(1), the Alaska Class seek monetary relief against New GM measured as the greater of (a) three times the actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Alaska Class member.

1197532.10

936.    Plaintiffs also seek an order enjoining New GM's unfair, unlawful, and/or
deceptive practices, attorneys' fees, and any other just and proper relief available under the
Alaska CPA.

937.    On October 12, 2014, Plaintiffs sent a notice letter complying with Alaska Stat.
§ 45.50.535. Plaintiffs presently do not claim the damages relief asserted in this Complaint
under the Alaska CPA until and unless New GM fails to remedy its unlawful conduct towards
the class within the requisite time period, after which Plaintiffs seek all damages and relief to
which Plaintiffs and the Alaska Class are entitled

### EIGHTH CLAIM FOR RELIEF

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
#### (ALASKA STAT. § 45.02.314)

938.    In the event the Court declines to certify a nationwide Class under Michigan
law, this claim is brought only on behalf of the Alaska Class members.

939.    Old GM was a merchant with respect to motor vehicles within the meaning of
ALASKA STAT. § 45.02.104(a).

940.    Under ALASKA STAT. § 45.02.314, a warranty that the Defective Vehicles were
in merchantable condition was implied by law in the transactions when the Alaska Class
purchased their Defective Vehicles.

941.    These vehicles, when sold and at all times thereafter, were not merchantable
and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective
Vehicles are inherently defective in that there are defects in the ignition switch systems that
permit sudden unintended shutdown to occur, with the attendant shut down of power steering
and power brakes and the nondeployment of airbags in the event of a collision.

942.    Old GM and New GM were provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and communications sent by the Alaska Class before or within a reasonable amount of time after GM issued the recall and the allegations of vehicle defects became public.

943.    As a direct and proximate result of Old GM and New GM's breach of the implied warranty of merchantability, the Alaska Class has been damaged in an amount to be proven at trial. New GM also has successor liability for Old GM's breach.

## NINTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

944.    In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought only on behalf of the Alaska Class members.

945.    As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

946.    The Companies knew these representations were false when made.

947.    The vehicles purchased or leased by the Alaska Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

948.    The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the Alaska Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

949.    The aforementioned concealment was material, because if it had been disclosed the Alaska Class would not have bought, leased or retained their vehicles.

950.    The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

951.    The Alaska Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

952.    As a result of their reliance, the Alaska Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

953.    The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Alaska Class. The Alaska Class are therefore entitled to an award of punitive damages.

## ARIZONA

## TENTH CLAIM FOR RELIEF

## VIOLATIONS OF THE CONSUMER FRAUD ACT
### (ARIZONA REV. STAT. § 44-1521, *et. seq.*)

954.    This claim is brought on behalf of Class members who are Arizona residents (the "Arizona Class").

955. The Companies, and the Arizona Class, are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

956. The Defective Vehicles are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

957. The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud,. . . misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

958. In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Arizona CFA, and also has successor liability for the violations of Old GM.

959. As alleged above, both Companies knew of the ignition switch defects, while the Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

960.    The Companies knew or should have known that their conduct violated the Arizona CFA.

961.    As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

962.    Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shut down in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

963.    From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

964.    The Companies each owed the Arizona Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

    a.    Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

    b.    Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Arizona Class; and/or

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Arizona Class that contradicted these representations.

965.    The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Arizona Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

966.    The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Arizona Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Arizona Class.

967.    The propensity of the Defective Vehicles to inadvertently shut down during ordinary operation was material to the Arizona Class. Had the Arizona Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

968.    All members of the Arizona Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Arizona Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Arizona Class own vehicles that are not safe.

1197532.10

969.     The Arizona Class have been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

970.     The Arizona Class members risk irreparable injury as a result of the Companies' act and omissions in violation of the Arizona CFA, and these violations present a continuing risk to the Arizona Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

971.     The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

972.     As a direct and proximate result of the Companies' violations of the Arizona CFA, the Arizona Class has suffered injury-in-fact and/or actual damage.

973.     The Arizona Class seeks monetary relief against New GM in an amount to be determined at trial. The Arizona Class also seeks punitive damages because the Companies engaged in aggravated and outrageous conduct with an evil mind.

974.     The Arizona Class also seeks an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

1197532.10

## ELEVENTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

975.    In the event the Court declines to certify a nationwide Class under Michigan

law, this claim is brought only on behalf of the Arizona Class.

976.    As described above, Old GM and New GM made material omissions and

affirmative misrepresentations regarding the Defective Vehicles.

977.    The Companies knew these representations were false when made.

978.    The vehicles purchased or leased by the Arizona Class were, in fact, defective,

unsafe and unreliable, because the vehicles were subject to sudden unintended shut down,

with the attendant loss of power steering, power brakes, and the non-deployment of airbags in

the event of a collision.

979.    The Companies had a duty to disclose that these vehicles were defective,

unsafe and unreliable in that the vehicles were subject to sudden unintended shut down, with

the attendant loss of power steering, power brakes, and the non-deployment of airbags in the

event of a collision, because the Arizona Class relied on the Companies' representations that

the vehicles they were purchasing and retaining were safe and free from defects.

980.    The aforementioned concealment was material, because if it had been disclosed

the Arizona Class would not have bought, leased or retained their vehicles.

981.    The aforementioned representations were also material because they were facts

that would typically be relied on by a person purchasing, leasing or retaining a new or used

motor vehicle. The Companies knew or recklessly disregarded that their representations were

false because they knew that people had died as the result of the vehicles' defective ignition

switch systems. The Companies intentionally made the false statements in order to sell

vehicles and avoid the expense and public relations nightmare of a recall.

982.    The Arizona Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

983.    As a result of their reliance, the Arizona Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

984.    The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Arizona Class. The Arizona Class are therefore entitled to an award of punitive damages.

## ARKANSAS

## TWELFTH CLAIM FOR RELIEF

## VIOLATIONS OF THE DECEPTIVE TRADE PRACTICE ACT
### (ARK. CODE ANN. § 4-88-101, *et. seq.*)

985.    This claim is brought on behalf of Class members who are Arkansas residents (the "Arkansas Class").

986.    The Companies, and the Arkansas Class, are "persons" within the meaning of Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), ARK. CODE ANN. § 4-88-102(5).

987.    The Class Vehicles are "goods" within the meaning of ARK. CODE ANN. § 4-88-102(4).

988.    The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices," which include but are not limited to a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" ARK. CODE ANN. § 4-88-107(a)(10). The Arkansas DTPA also prohibits the following when

-287-

utilized in connection with the sale or advertisement of any goods: "(1) The act, use, or

employment by any person of any deception, fraud, or false pretense; or (2) The concealment,

suppression, or omission of any material fact with intent that others rely upon the concealment,

suppression, or omission." ARK. CODE ANN. § 4-88-108. The Companies violated the

Arkansas DTPA and engaged in deceptive and unconscionable trade practices by failing to

disclose and actively concealing the dangerous ignition switch defects in the Defective

Vehicles.

989.    The Companies' actions as set forth above occurred in the conduct of trade or

commerce.

990.    In the course of their business, both Old GM and New GM willfully failed to

disclose and actively concealed the dangerous ignition switch defects in the Defective

Vehicles as described herein and otherwise engaged in activities with a tendency or capacity

to deceive. Old GM and New GM also engaged in unlawful trade practices by employing

deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression

or omission of any material fact with intent that others rely upon such concealment,

suppression or omission, in connection with the sale of Defective Vehicles. New GM is

directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or

commerce in violation of the Arkansas DTPA, and also has successor liability for the

violations of Old GM.

991.    As alleged above, both Companies knew of the ignition switch defects, while

the Class was deceived by the Companies' omission into believing the Defective Vehicles

were safe, and the information could not have reasonably been known by the consumer.

992.    The Companies knew or should have known that their conduct violated the Arkansas DTPA.

993.    As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

994.    Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shut down in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

995.    From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

996.    The Companies each owed the Arkansas Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.    Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.    Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Arkansas Class; and/or

1197532.10

c.    Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Arkansas Class that contradicted these representations.

997.    The Defective Vehicles posed and/or posed an unreasonable risk of death or serious bodily injury to the Arkansas Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

998.    The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Arkansas Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Arkansas Class.

999.    The propensity of the Defective Vehicles to inadvertently shut down during ordinary operation was material to the Arkansas Class. Had the Arkansas Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1000.    The Arkansas Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Arkansas Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Arkansas Class own vehicles that are not safe.

1001.   The Arkansas Class has been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1002.   The Arkansas Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the Arkansas DTPA, and these violations present a continuing risk to the Arkansas Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

1003.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

1004.   As a direct and proximate result of the Companies' violations of the Arkansas DTPA, the Arkansas Class have suffered injury-in-fact and/or actual damage.

1005.   The Arkansas Class seeks monetary relief against New GM in an amount to be determined at trial. The Arkansas Class also seeks punitive damages because the Companies acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice may be inferred.

1006.   The Arkansas Class also seeks an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

1197532.10

## THIRTEENTH CLAIM FOR RELIEF

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (ARK. CODE ANN. § 4-2-314)

1007.   In the event the Court declines to certify a nationwide Class under Michigan

law, this claim is brought only on behalf of the Arkansas Class.

1008.   Old GM was a merchant with respect to motor vehicles within the meaning of

ARK. CODE ANN. § 4-2-104(1).

1009.   Under ARK. CODE ANN. § 4-2-314, a warranty that the Defective Vehicles were

in merchantable condition was implied by law in the transactions when the Arkansas Class

purchased their Defective Vehicles.

1010.   These vehicles, when sold and at all times thereafter, were not merchantable

and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective

Vehicles are inherently defective in that there are defects in the ignition switch systems that

permit sudden unintended shutdown to occur, with the attendant shut down of power steering

and power brakes and the nondeployment of airbags in the event of a collision.

1011.   Old GM and New GM were provided notice of these issues by numerous

complaints filed against them, internal investigations, and by numerous individual letters and

communications sent by the Arkansas Class before or within a reasonable amount of time

after New GM issued the recall and the allegations of vehicle defects became public.

1012.   As a direct and proximate result of Old GM and New GM's breach of the

implied warranty of merchantability, the Arkansas Class have been damaged in an amount to

be proven at trial. New GM also has successor liability for Old GM's breach.

Case 1:14-md-02543-JMF    Document 547-2    Filed 10/14/14    Page 114 of 213

## FOURTEENTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

1013.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought only on behalf of Class members who are Arkansas residents.

1014.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

1015.   The Companies knew these representations were false when made.

1016.   The vehicles purchased or leased by the Arkansas Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1017.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the Arkansas Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1018.   The aforementioned concealment was material, because if it had been disclosed the Arkansas Class would not have bought, leased or retained their vehicles.

1019.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

1020.   The Arkansas Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

1021.   As a result of their reliance, the Arkansas Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1022.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Arkansas Class. The Arkansas Class are therefore entitled to an award of punitive damages.

## CALIFORNIA

## FIFTEENTH CLAIM FOR RELIEF

## VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT
### (CAL. CIV. CODE § 1750, *et. seq.*)

1023.   This claim is brought on behalf of Class members who are California residents (the "California Class").

1024.   New GM is a "person" under CAL. CIV. CODE § 1761(c).

1025.   The California Class are "consumers," as defined by CAL. CIVIL CODE § 1761(d), who purchased or leased one or more Defective Vehicles.

1026.   The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" CAL. CIV. CODE § 1770(a). Old GM and New GM have engaged in unfair or deceptive acts or practices that violated CAL. CIV. CODE § 1750, *et. seq.*, as described above and below, by among other things, representing that

1197532.10

Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a particular standard, quality, and grade when they are not; advertising Defective Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Defective Vehicles has been supplied in accordance with a previous representation when it has not.

1027. In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the CLRA, and also has successor liability for the violations of Old GM.

1028. As alleged above, both Companies knew of the ignition switch defects, while the California Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

1029. The Companies knew or should have known that their conduct violated the CLRA.

1030. As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

1031.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shut down in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1032.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

1033.   The Companies each owed the California Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the California Class; and/or

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the California Class that contradicted these representations.

1034.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the California Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

1035.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the California Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the California Class.

1036.   New GM has also violated the CLRA by violating the TREAD Act, 49 U.S.C. §§ 30101, *et. seq.*, and its accompanying regulations. Under the TREAD Act and its regulations, if a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must disclose the defect. 49 U.S.C. § 30118(c)(1) & (2).

1037.   In acquiring Old GM, New GM expressly assumed the obligations to make all required disclosures under the TREAD Act with respect to all Defective Vehicles. New GM also has successor liability for the deceptive and unfair acts and omissions of Old GM.

1038.   Under the TREAD Act, if it is determined that the vehicle is defective, the manufacturer must promptly notify vehicle owners, purchasers and dealers of the defect and remedy the defect. 49 U.S.C. § 30118(b)(2)(A) & (B).

1039.   Under the TREAD Act, manufacturers must also file a report with NHTSA within five working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist." 49 C.F.R. § 573.6(a) & (b). At a minimum, the report to NHTSA

must include: the manufacturer's name; the identification of the vehicles or equipment containing the defect, including the make, line, model year and years of manufacturing; a description of the basis for determining the recall population; how those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and a description of the defect. 49 C.F.R. § 276.6(b), (c)(1), (c)(2), & (c)(5).

1040.   The manufacturer must also promptly inform NHTSA regarding: the total number of vehicles or equipment potentially containing the defect; the percentage of vehicles estimated to contain the defect; a chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with its dates of receipt; and a description of the plan to remedy the defect. 49 C.F.R. § 276.6(b) & (c).

1041.   The TREAD Act provides that any manufacturer who violates 49 U.S.C. § 30166 must pay a civil penalty to the U.S. Government. The current penalty "is $7,000 per violation per day," and the maximum penalty "for a related series of daily violations is $17,350,000." 49 C.F.R. § 578.6(c).

1042.   From at least 2001, Old GM had knowledge of the ignition switch defect, but hid the problem for the remainder of its existence until 2009.

1043.   From the date of its inception on July 5, 2009, New GM knew of the ignition switch problem both because of the knowledge of Old GM personnel who remained at New GM and continuous reports and internal investigation right up until the present.

1044.   New GM admits the defect in the ignition switch has been linked to at least 13 accident-related fatalities. But other sources have reported that hundreds of deaths and serious injuries are linked to the faulty ignition switches.

1045.   Despite being aware of the ignition switch defects ever since its creation on
July 5, 2009, New GM waited until February 7, 2014, before finally sending a letter to
NHTSA confessing its knowledge of the ignition switch defects which could cause the
vehicles to lose power, and in turn cause the airbags not to deploy. New GM initially
identified two vehicle models, along with the corresponding model years, affected by the
defect—the 2005-2007 Chevrolet Cobalt and the 2007 Pontiac G5. On February 25, 2014,
New GM amended its letter to include four additional vehicles, the 2006-2007 Chevrolet
HHR, 2006-2007 Pontiac Solstice, 2003-2007 Saturn Ion, and the 2007 Saturn Sky. In late
March 2014, New GM added later model-year Ions and Cobalts (through 2010), HHRs
through 2011, and Skys through 2010.

1046.   By failing to disclose and by actively concealing the ignition switch defect, and
by selling vehicles while violating the TREAD Act and through its other conduct as alleged
herein, Old GM and New GM both engaged in deceptive business practices prohibited by the
CLRA, Cal. Civ. Code § 1750, *et. seq.*

1047.   Both Old GM and New GM failed for many years to inform NHTSA about
known defects in the Defective Vehicles' ignition system. Consequently, the public, including
the California Class, received no notice of the ignition switch defects, that the defect could
disable multiple electrical functions including power steering and power brakes, or that the
defect could cause the airbags not to deploy in an accident.

1048.   Old GM and then New GM knew that the ignition switch had a defect that
could cause a vehicle's engine to lose power without warning, and that when the engine lost
power there was a risk that electrical functions would fail and that the airbags would not

deploy. Yet Old GM and New GM failed to inform NHTSA or warn the California Class or the public about these inherent dangers despite having a duty to do so.

1049.   New GM owed the California Class a duty to comply with the TREAD Act and disclose the defective nature of the Defective Vehicles, including the ignition switch defect and accompanying loss of power and failure of the airbags to deploy, because New GM:

a.    Possessed exclusive knowledge of the ignition switch defects rendering the Defective Vehicles inherently more dangerous and unreliable than otherwise similar vehicles; and

b.    Intentionally concealed the hazardous situation with the Defective Vehicles by failing to comply with the TREAD Act, which required the disclosure of the ignition switch defects.

1050.   Defective Vehicles equipped with the faulty ignition switch posed and/or pose an unreasonable risk of death or serious bodily injury to the California Class, passengers, other motorists, and pedestrians, because they are susceptible to sudden loss of power resulting in the loss of power steering and power brakes and failure of the airbags to deploy.

1051.   Old GM and New GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including the California Class, about the true safety and reliability of the Defective Vehicles.

1052.   The propensity of the Defective Vehicles to inadvertently shut down during ordinary operation was material to the California Class. Had the California Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1053.   All members of the California Class suffered ascertainable loss caused by the

Companies' failure to disclose material information. The California Class overpaid for their

vehicles and did not receive the benefit of their bargain. As the result of the concealment and

failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls,

the value of their Defective Vehicles has diminished now that the safety issues in the

Defective Vehicles, and the many other serious safety issues and myriad defects in the

Companies' vehicles have come to light, and the California Class own vehicles that are not

safe.

1054.   The California Class has been proximately and directly damaged by Old GM

and New GM's misrepresentations, concealment, and non-disclosure of the ignition switch

defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly

diminished because of the Companies' failure to timely disclose and remedy the serious

defects. New GM's egregious and widely-publicized conduct and the never-ending and

piecemeal nature of New GM's recalls, and the many other serious defects in New GM

vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would

purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1055.   The California Class Members risk irreparable injury as a result of the

Companies' act and omissions in violation of the CLRA, and these violations present a

continuing risk to the California Class as well as to the general public. The Companies'

unlawful acts and practices complained of herein affect the public interest.

1056.   The recalls and repairs instituted by New GM have not been adequate. The

recall is not an effective remedy and is not offered for all Defective Vehicles. Moreover,

notwithstanding its obligations under the TREAD Act and the CLRA, New GM has not yet

disclosed that the low placement of the ignition column and the fact that the airbags shut off

as soon as the key hits the "accessory" or "off" position are also defects. This failure to

disclose continues to pose a grave risk to the California Class.

1057.   As a direct and proximate result of the Companies' violations of the CLRA,

and the California Class have suffered injury-in-fact and/or actual damage.

1058.   Under CAL. CIV. CODE § 1780(a), the California Class seeks monetary relief

against New GM measured as the diminution of the value of their vehicles caused by Old

GM's and New GM's violations of the CLRA as alleged herein.

1059.   Under CAL. CIV. CODE § 1780(b), the California Class seeks an additional

award against New GM of up to $5,000 for each California Class member who qualifies as a

"senior citizen" or "disabled person" under the CLRA. Old GM and New GM knew or should

have known that their conduct was directed to one or more Class members who are senior

citizens or disabled persons. Old GM's and New GM's conduct caused one or more of these

senior citizens or disabled persons to suffer a substantial loss of property set aside for

retirement or for personal or family care and maintenance, or assets essential to the health or

welfare of the senior citizen or disabled person. One or more California Class members who

are senior citizens or disabled persons are substantially more vulnerable to Old GM's and

New GM's conduct because of age, poor health or infirmity, impaired understanding,

restricted mobility, or disability, and each of them suffered substantial physical, emotional, or

economic damage resulting from Old GM's and New GM's conduct.

1060.   The California Class also seeks punitive damages against New GM because it

carried out reprehensible conduct with willful and conscious disregard of the rights and safety

of others, subjecting the Class to potential cruel and unjust hardship as a result. First Old GM

and then New GM intentionally and willfully concealed and failed to inform NHTSA of the

unsafe and unreliable Defective Vehicles, deceived the California Class on life-or-death

matters, and concealed material facts that only they knew, all to avoid the expense and public

relations problem of correcting a deadly flaw in the Defective Vehicles. New GM's unlawful

conduct constitutes malice, oppression, and fraud warranting punitive damages under CAL.

CIV. CODE § 3294.

1061.   The California Class further seeks an order enjoining New GM's unfair or

deceptive acts or practices, restitution, punitive damages, costs of court, attorneys' fees under

CAL. CIV. CODE § 1780(e), and any other just and proper relief available under the CLRA.

1062.   California Plaintiffs have complied with the notice requirement set forth in

CAL. CIV. CODE § 1780(b) by virtue of the notice previously provided in the context of the

underlying action styled *Ramirez, et al. v. GM*, 2:14-cv-02344-JVS-AN (C.D. Cal.), and other

underlying actions, as well as additional notice in the form of a demand letter sent on

October 12, 2014.

## SIXTEENTH CLAIM FOR RELIEF

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200, *et. seq.*)
### (Asserted on Behalf of the California Class)

1063.   This Claim for Relief is brought by the California Class.

1064.   California Business and Professions Code § 17200 prohibits acts of "unfair

competition," including any "unlawful, unfair or fraudulent business act or practice" and

"unfair, deceptive, untrue or misleading advertising. . . ." The Companies engaged in conduct

that violated each of this statute's three prongs.

1065.   The Companies committed an unlawful business act or practice in violation of

§ 17200 by their violations of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et.*

*seq.*, as set forth above, by the acts and practices set forth in this Complaint.

1066.   New GM has also violated the unlawful prong because it has engaged in

violations of National Traffic and Motor Vehicle Safety Act of 1996, codified at 49 U.S.C.

§ 30101, *et. seq.*, and its regulations.

1067.   Federal Motor Vehicle Safety Standard ("FMVSS") 573 governs a motor

vehicle manufacturer's responsibility to notify the NHTSA of a motor vehicle defect within

five days of determining that a defect in a vehicle has been determined to be safety-related.

*See* 49 C.F.R. § 573.6.

1068.   Defendant violated the reporting requirements of FMVSS 573 requirement by

failing to report the Ignition Switch Defect or any of the other Defects within five days of

determining the defect existed, and failing to recall all affected vehicles.

1069.   Defendant violated the common-law claim of negligent failure to recall, in that

New GM knew or should have known that the Defective Vehicles were dangerous and/or

were likely to be dangerous when used in a reasonably foreseeable manner; New GM became

aware of the attendant risks after the Defective Vehicles were sold; New GM continued to

gain information further corroborating the Ignition Switch Defects; and New GM failed to

adequately recall the Defective Vehicles in a timely manner, which failure was a substantial

factor in causing the California Class harm, including diminished value and out-of-pocket

costs.

1070.   Defendant committed unfair business acts and practices in violation of § 17200

when it concealed the existence and nature of the Ignition Switch Defect and the other Defects

and represented that the Class Vehicles were reliable and safe when, in fact, they are not. The Ignition Switch Defect and the other Defects present safety hazards for occupants of the Class Vehicles.

1071.    New GM also violated the unfairness prong of § 17200 by failing to properly administer the numerous recalls of Defendant's vehicles for the Initiation Switch Defect and the other Defects. As alleged above, the recalls have proceeded unreasonably slowly in light of the safety-related nature of the Defects, and have been plagued with shortages of replacement parts as well as a paucity of loaner vehicles available for Class Members whose Vehicles are in the process of being repaired. Even worse, many consumers continue to experience safety problems with the Defective Vehicles, even after the defective parts have been replaced pursuant to the recalls.

1072.    Defendant violated the fraudulent prong of § 17200 because the misrepresentations and omissions regarding the safety and reliability of their vehicles as set forth in this Complaint were likely to deceive a reasonable consumer, and the information would be material to a reasonable consumer.

1073.    Defendant committed fraudulent business acts and practices in violation of § 17200 when they concealed the existence and nature of the Ignition Switch Defect and the other Defects, while representing in their marketing, advertising, and other broadly disseminated representations that the Class Vehicles were reliable and safe when, in fact, they are not. Defendant's representations and active concealment of the Defect are likely to mislead the public with regard to the true defective nature of the Class Vehicles.

1074.    Defendant has violated the unfair prong of § 17200 because the acts and practices set forth in the Complaint, including the manufacture and sale of vehicles with the

Ignition Switch Defect that unintentionally shifts from the "run" position to the "accessory" or "off" position causing loss of electrical power and turning off the engine, and Defendant's failure to adequately investigate, disclose and remedy, offend established public policy, and because the harm they cause to consumers greatly outweighs any benefits associated with those practices. Defendant's conduct has also impaired competition within the automotive vehicles market and has prevented the California Class from making fully informed decisions about whether to purchase or lease Class Vehicles and/or the price to be paid to purchase or lease Class Vehicles.

1075.   The California Class has suffered injuries in fact, including the loss of money or property, as a result of Defendant's unfair, unlawful, and/or deceptive practices. As set forth in the allegations concerning each California Class member, in purchasing or leasing their vehicles, the California Class relied on the misrepresentations and/or omissions of Defendant with respect of the safety and reliability of the vehicles. Defendant's representations turned out not to be true. Had the California Class known this they would not have purchased or leased their Class Vehicles and/or paid as much for them.

1076.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's businesses. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

1077.   As a direct and proximate result of Defendant's unfair and deceptive practices, the California Class Members have suffered and will continue to suffer actual damages.

1078.   The California Class requests that this Court enter such orders or judgments as may be necessary to enjoin New GM from continuing its unfair, unlawful, and/or deceptive

practices, as provided in Cal. Bus. & Prof. Code § 17203; and for such other relief set forth

below.

1079.   The California Class also requests equitable and injunctive relief in the form of

Court supervision of New GM's numerous recalls of the various Class Vehicles, to ensure that

all affected vehicles are recalled and that the recalls properly and adequately cure the Ignition

Switch Defect and the other Defects.

## SEVENTEENTH CLAIM FOR RELIEF

### VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT
### FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (CALIFORNIA "LEMON LAW")
### (CAL. CIV. CODE §§ 1791.1 & 1792)

1080.   In the event the Court declines to certify a nationwide Class under Michigan

law, this claim is brought solely on behalf of the California Class.

1081.   The California Class members who purchased or leased the Defective Vehicles

in California are "buyers" within the meaning of CAL. CIV. CODE § 1791(b).

1082.   The Defective Vehicles are "consumer goods" within the meaning of CIV.

CODE § 1791(a).

1083.   Old GM was a "manufacturer" of the Defective Vehicles within the meaning of

CAL. CIV. CODE § 1791(j), and, in purchasing Old GM, New GM expressly assumed liability

and responsibility for "payment of all [Old GM's] Liabilities arising under…Lemon Laws,"

including California's Lemon Law, the Song-Beverly Act.

1084.   Old GM and New GM impliedly warranted to the California Class that its

Defective Vehicles were "merchantable" within the meaning of CAL. CIV. CODE §§ 1791.1(a)

& 1792; however, the Defective Vehicles do not have the quality that a buyer would

reasonably expect, and were therefore not merchantable.

1085.   Cal. Civ. Code § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)    Pass without objection in the trade under the contract description.

(2)    Are fit for the ordinary purposes for which such goods are used.

(3)    Are adequately contained, packaged, and labeled.

(4)    Conform to the promises or affirmations of fact made on the container or label.

1086.   The Defective Vehicles would not pass without objection in the automotive trade because of the ignition switch defects that cause the Defective Vehicles to inadvertently shut down during ordinary driving conditions, leading to an unreasonable likelihood of accident and an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1087.   Because of the ignition switch defects, the Defective Vehicles are not safe to drive and thus not fit for ordinary purposes.

1088.   The Defective Vehicles are not adequately labeled because the labeling fails to disclose the ignition switch defects and does not advise Class members to avoid attaching anything to their vehicle key rings. Old GM and New GM failed to warn about the dangerous safety defects in the Defective Vehicles.

1089.   Old GM and New GM breached the implied warranty of merchantability by manufacturing and selling Defective Vehicles containing defects leading to the sudden and unintended shut down of the vehicles during ordinary driving conditions. These defects have

-308-

deprived the California Class of the benefit of their bargain and have caused the Defective

Vehicles to depreciate in value.

1090.   Notice of breach is not required because the California Class members did not

purchase their automobiles directly from New GM.

1091.   As a direct and proximate result of Old GM and New GM's breach of their

duties under California's Lemon Law (for which New GM expressly assumed liability), the

California Class members received goods whose dangerous condition substantially impairs

their value to the California Class members. The California Class has been damaged by the

diminished value of the vehicles, the products' malfunctioning, and the non-use of their

Defective Vehicles.

1092.   Under CAL. CIV. CODE §§ 1791.1(d) & 1794, the California Class members are

entitled to damages and other legal and equitable relief including, at their election, the

purchase price of their Defective Vehicles, or the overpayment or diminution in value of their

Defective Vehicles.

1093.   Under CAL. CIV. CODE § 1794, the California Class members are entitled to

costs and attorneys' fees.

## EIGHTEENTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

1094.   In the event the Court declines to certify a nationwide Class under Michigan

law, this claim is brought only on behalf of the California Class.

1095.   As described above, Old GM and New GM made material omissions and

affirmative misrepresentations regarding the Defective Vehicles.

1096.   The Companies knew these representations were false when made.

1097.   The vehicles purchased or leased by the California Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1098.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the California Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1099.   The aforementioned concealment was material, because if it had been disclosed the California Class would not have bought, leased or retained their vehicles.

1100.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

1101.   The California Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

1102.   As a result of their reliance, the California Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1103.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the California Class. The California Class are therefore entitled to an award of punitive damages.

## NINETEENTH CLAIM FOR RELIEF

### VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW
**CAL. BUS. & PROF. CODE § 17500, *et. seq.***
**(Asserted on Behalf of the California Class)**

1104.   This Claim for Relief is brought by the California Class.

1105.   California Business and Professions Code § 17500 states: "It is unlawful for any… corporation… with intent directly or indirectly to dispose of real or personal property… to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated… from this state before the public in any state, in any newspaper or other publication, or any advertising device,… or in any other manner or means whatever, including over the Internet, any statement… which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading...."

1106.   Defendant caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to the Defendant, to be untrue and misleading to consumers and the California Class.

-311-

1107.   Defendant violated section 17500 because the misrepresentations and omissions regarding the safety and reliability of their vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

1108.   The California Class Members have suffered injuries in fact, including the loss of money or property, as a result of Defendant' unfair, unlawful, and/or deceptive practices. In purchasing or leasing their vehicles, the California Class Members relied on the misrepresentations and/or omissions of Defendant with respect to the safety and reliability of their vehicles. Defendant' representations turned out not to be true. Had the California Class Members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.

1109.   Accordingly, the California Class Members overpaid for their Class Vehicles and did not receive the benefit of their bargain. One way to measure this overpayment, or lost benefit of the bargain, at the moment of purchase is by the value consumers place on the vehicles now that the truth has been exposed. Both trade-in prices and auction prices for Class Vehicles have declined as a result of Defendant' misconduct. This decline in value measures the overpayment, or lost benefit of the bargain, at the time of the California Class Members' purchases.

1110.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant' businesses. Defendant' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

1111.   The California Class requests that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing their unfair, unlawful, and/or deceptive practices, and for such other relief set forth below.

## TWENTIETH CLAIM FOR RELIEF

### NEGLIGENT FAILURE TO RECALL
### (Asserted on Behalf of the California Class)

1112.   This claim is brought on behalf of the California Class.

1113.   New GM knew or reasonably should have known that the Defective Vehicles were dangerous and/or were likely to be dangerous when used in a reasonably foreseeable manner.

1114.   New GM either knew of the ignition switch-related defects in the Defective Vehicles before the vehicles were sold, or became aware of them and their attendant risks after the vehicles was sold.

1115.   New GM continued to gain information further corroborating the ignition switch-related defects and their risks from its inception until this year.

1116.   New GM failed to adequately recall the Defective Vehicles in a timely manner.

1117.   Purchasers of the Defective Vehicles, including the California Class, were harmed by New GM's failure to adequately recall all the Defective Vehicles in a timely manner and have suffered damages, including, without limitation, damage to other components of the Defective Vehicles caused by the ignition switch-related defects, the diminished value of the Defective Vehicles, the cost of modification of the defective ignition switch systems, and the costs associated with the loss of use of the Defective Vehicles.

1118.   New GM's failure to timely and adequately recall the Defective Vehicles was a substantial factor in causing the purchasers' harm, including that of the California Class.

# COLORADO

## TWENTY-FIRST CLAIM FOR RELIEF

## VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT
### (COL. REV. STAT. § 6-1-101, *et. seq.*)

1119.   This claim is brought on behalf of Class members who are Colorado residents (the "Colorado Class").

1120.   Old GM and New GM are "persons" under § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), COL. REV. STAT. § 6-1-101, *et. seq.*

1121.   The Colorado Class members are "consumers" for purposes of COL. REV. STAT § 6-1-113(1)(a) who purchased or leased one or more Defective Vehicles.

1122.   The Colorado CPA prohibits deceptive trade practices in the course of a person's business. Old GM and New GM engaged in deceptive trade practices prohibited by the Colorado CPA, including: (1) knowingly making a false representation as to the characteristics, uses, and benefits of the Defective Vehicles that had the capacity or tendency to deceive Class members; (2) representing that the Defective Vehicles are of a particular standard, quality, and grade even though both Companies knew or should have known they are not; (3) advertising the Defective Vehicles with the intent not to sell them as advertised; and (4) failing to disclose material information concerning the Defective Vehicles that was known to Old GM and New GM at the time of advertisement or sale with the intent to induce Class members to purchase, lease or retain the Defective Vehicles.

1123.   The Companies' actions as set forth above occurred in the conduct of trade or commerce.

1124.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective

Vehicles as described herein and otherwise engaged in activities with a tendency or capacity

to deceive. Old GM and New GM also engaged in unlawful trade practices by employing

deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression

or omission of any material fact with intent that others rely upon such concealment,

suppression or omission, in connection with the sale of Defective Vehicles. New GM is

directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or

commerce in violation of the Colorado CPA, and also has successor liability for the violations

of Old GM.

1125.   As alleged above, both Companies knew of the ignition switch defects, while

the Class was deceived by the Companies' omission into believing the Defective Vehicles

were safe, and the information could not have reasonably been known by the consumer.

1126.   The Companies knew or should have known that their conduct violated the

Colorado CPA.

1127.   As alleged above, the Companies made material statements about the safety

and reliability of Defective Vehicles that were either false or misleading.

1128.   Old GM engaged in a deceptive trade practice when it failed to disclose

material information concerning the Defective Vehicles which it knew at the time of the sale.

Old GM deliberately withheld the information about the vehicles' propensity to inadvertently

shut down in order to ensure that consumers would purchase its vehicles and to induce the

consumer to enter into a transaction.

1129.   From its inception in 2009, New GM has known of the ignition switch defects

that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits

and to avoid remediation costs and a public relations nightmare, New GM concealed the

-315-

defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

1130.   The Companies each owed the Colorado Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.   Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.   Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Colorado Class; and/or

c.   Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Colorado Class that contradicted these representations.

1131.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Colorado Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

1132.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Colorado Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Colorado Class.

1133.   The propensity of the Defective Vehicles to inadvertently shut down during ordinary operation was material to the Colorado Class. Had the Colorado Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1134.   All members of the Colorado Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Colorado Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Colorado Class own vehicles that are not safe.

1135.   The Colorado Class have been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1136.   The Colorado Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the Colorado CPA, and these violations present

-317-

a continuing risk to the Colorado Class as well as to the general public. The Companies'

unlawful acts and practices complained of herein affect the public interest.

1137.    The recalls and repairs instituted by New GM have not been adequate. The

recall is not an effective remedy and is not offered for all Defective Vehicles.

1138.    As a direct and proximate result of the Companies' violations of the Colorado

CPA, the Colorado Class have suffered injury-in-fact and/or actual damage.

1139.    Pursuant to COLO. REV. STAT. § 6-1-113, the Colorado Class seeks monetary

relief against New GM measured as the greater of (a) actual damages in an amount to be

determined at trial and discretionary trebling of such damages, or (b) statutory damages in the

amount of $500 for each Colorado Class Member.

1140.    The Colorado Class also seeks an order enjoining New GM's unfair, unlawful,

and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper

relief available under the Colorado CPA.

## TWENTY-SECOND CLAIM FOR RELIEF

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (COL. REV. STAT. § 4-2-314)

1141.    In the event the Court declines to certify a nationwide Class under Michigan

law, this claim is brought solely on behalf of Class members who are Colorado residents.

1142.    Old and New GM were merchants with respect to motor vehicles within the

meaning of COL. REV. STAT. § 4-2-314.

1143.    Under COL. REV. STAT. § 4-2-314, a warranty that the Defective Vehicles were

in merchantable condition was implied by law in the transactions when the Colorado Class

purchased their Defective Vehicles.

1144.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

1145.   Old GM and New GM were provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and communications sent by the Colorado Class before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1146.   As a direct and proximate result of Old GM and New GM's breach of the implied warranty of merchantability, the Colorado Class has been damaged in an amount to be proven at trial. New GM has successor liability for Old GM's breach.

## TWENTY-THIRD CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

1147.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought solely on behalf of the Colorado Class.

1148.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

1149.   The Companies knew these representations were false when made.

1150.   The vehicles purchased or leased by the Colorado Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1197532.10

1151.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the Colorado Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1152.   The aforementioned concealment was material, because if it had been disclosed the Colorado Class would not have bought, leased or retained their vehicles.

1153.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

1154.   The Colorado Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

1155.   As a result of their reliance, the Colorado Class have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1156.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Colorado Class. The Colorado Class are therefore entitled to an award of punitive damages.

1197532.10

# CONNECTICUT

## TWENTY-FOURTH CLAIM FOR RELIEF

## VIOLATION OF CONNECTICUT UNLAWFUL TRADE PRACTICES ACT
### (CONN. GEN. STAT. § 42-110a, *et. seq.*)

1157.   This claim is brought on behalf of Class members who are Connecticut residents (the "Connecticut Class").

1158.   The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." CONN. GEN. STAT. § 42-110b(a).

1159.   Old GM was, and New GM is, a "person" within the meaning of CONN. GEN. STAT. § 42-110a(3). Both Companies were engaged in in "trade" or "commerce" within the meaning of CONN. GEN. STAT. § 42-110a(4).

1160.   Old GM and New GM participated in deceptive trade practices that violated the Connecticut UTPA as described herein. In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Connecticut UTPA, and also has successor liability for the violations of Old GM.

1161.   As alleged above, both Companies knew of the ignition switch defects, while the Connecticut Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

1162.   The Companies knew or should have known that their conduct violated the Connecticut UTPA.

1163.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

1164.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shut down in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1165.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

1166.   The Companies each owed the Connecticut Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

1197532.10

a.  Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.  Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Connecticut Class; and/or

c.  Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Connecticut Class that contradicted these representations.

1167.  The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Connecticut Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

1168.  The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Connecticut Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Connecticut Class.

1169.  The propensity of the Defective Vehicles to inadvertently shut down during ordinary operation was material to the Connecticut Class. Had the Connecticut Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1170.  All members of the Connecticut Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Connecticut Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and

-323-

failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Connecticut Class own vehicles that are not safe.

1171.   The Connecticut Class has been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1172.   The Connecticut Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the Connecticut UTPA, and these violations present a continuing risk to the Connecticut Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

1173.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

1174.   As a direct and proximate result of the Companies' violations of the Connecticut UTPA, the Connecticut Class has suffered injury-in-fact and/or actual damage.

1175.   The Connecticut Class is entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to CONN. GEN. STAT. § 42-110g.

1176.  New GM and Old GM acted with a reckless indifference to another's rights or wanton or intentional violation to another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights and safety of others.

1177.  Pursuant to CONN. GEN. STAT. § 42-110g(c), the Connecticut Class will mail a copy of the complaint to Connecticut's Attorney General.

## TWENTY-FIFTH CLAIM FOR RELIEF

## FRAUDULENT CONCEALMENT

1178.  In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought solely on behalf of the Connecticut Class.

1179.  As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

1180.  The Companies knew these representations were false when made.

1181.  The vehicles purchased or leased by the Connecticut Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1182.  The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the Connecticut Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1183.  The aforementioned concealment was material, because if it had been disclosed the Connecticut Class would not have bought, leased or retained their vehicles.

1184.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

1185.   The Connecticut Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

1186.   As a result of their reliance, the Connecticut Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1187.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Connecticut Class. The Connecticut Class is therefore entitled to an award of punitive damages.

**DELAWARE**

**TWENTY-SIXTH CLAIM FOR RELIEF**

**VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT**
**(6 DEL. CODE § 2513, *et. seq.*)**

1188.   This claim is brought on behalf of Class members who are Delaware residents (the "Delaware Class").

1189.   New GM and Old GM are both "persons" within the meaning of 6 DEL. CODE § 2511(7).

1190.   The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby." 6 DEL. CODE § 2513(a).

1191.   Old GM and New GM participated in deceptive trade practices that violated the Delaware CFA as described herein. In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Delaware CFA, and also has successor liability for the violations of Old GM.

1192.   As alleged above, both Companies knew of the ignition switch defects, while the Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

1193.   The Companies knew or should have known that their conduct violated the Delaware CFA.

1194.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

1195.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shut down in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1196.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

1197.   The Companies each owed the Delaware Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

   a.   Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

   b.   Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Delaware Class; and/or

c.    Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Delaware Class that contradicted these representations.

1198.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Delaware Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

1199.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Delaware Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Delaware Class.

1200.   The propensity of the Defective Vehicles to inadvertently shut down during ordinary operation was material to the Delaware Class. Had the Delaware Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1201.   All members of the Delaware Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Delaware Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Delaware Class own vehicles that are not safe.

1202.   The Delaware Class have been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1203.   The Delaware Class Members risks irreparable injury as a result of the Companies' act and omissions in violation of the Delaware CFA, and these violations present a continuing risk to the Delaware Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

1204.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

1205.   As a direct and proximate result of the Companies' violations of the Delaware CFA, the Delaware Class have suffered injury-in-fact and/or actual damage.

1206.   The Delaware Class seeks damages under the Delaware CFA for injury resulting from the direct and natural consequences of the Companies' unlawful conduct. *See*, *e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983). The Delaware Class also seeks an order enjoining New GM's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

1207.   New GM and Old GM engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

**TWENTY-SEVENTH CLAIM FOR RELIEF**

**VIOLATION OF THE DELAWARE DECEPTIVE TRADE PRACTICES ACT**
**(6 DEL. CODE § 2532, *et. seq.*)**

1208.   Old GM and New GM are "persons" within the meaning of 6 DEL. CODE § 2531(5).

1209.   Delaware's Deceptive Trade Practices Act ("Delaware DTPA") prohibits a person from engaging in a "deceptive trade practice," which includes: "(5) Represent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have"; "(7) Represent[ing] that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; "(9) Advertis[ing] goods or services with intent not to sell them as advertised"; or "(12) Engag[ing] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." 6 DEL. CODE § 2532.

1210.   Old GM and New GM engaged in deceptive trade practices in violation of the Delaware DTPA by willfully failing to disclose and actively concealing the dangerous risk of ignition switch defects in the Defective Vehicles as described above. The Companies also engaged in deceptive trade practices in violation of the Delaware DTPA by representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; advertising the Defective Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

1211.   The Companies' actions as set forth above occurred in the conduct of trade or commerce.

1212.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Delaware DTPA, and also has successor liability for the violations of Old GM.

1213.   As alleged above, both Companies knew of the ignition switch defects, while the Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

1214.   The Companies knew or should have known that their conduct violated the Delaware DTPA.

1215.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

1216.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently

1197532.10

shut down in order to ensure that consumers would purchase its vehicles and to induce the

consumer to enter into a transaction.

1217. From its inception in 2009, New GM has known of the ignition switch defects

that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits

and to avoid remediation costs and a public relations nightmare, New GM concealed the

defects and their tragic consequences and allowed unsuspecting new and used car purchasers

to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to

continue driving highly dangerous vehicles.

1218. The Companies each owed the Delaware Class a duty to disclose the defective

nature of Defective Vehicles, including the dangerous risk of ignition switch movement,

engine shutdown, and disabled safety airbags, because they:

      a.      Possessed exclusive knowledge of the defects rendering Defective

Vehicles inherently more dangerous and unreliable than similar vehicles;

      b.      Intentionally concealed the hazardous situation with Defective Vehicles

through their deceptive marketing campaign and recall program that they designed to hide the

life-threatening problems from the Delaware Class; and/or

      c.      Made incomplete representations about the safety and reliability of

Defective Vehicles generally, and the ignition switch in particular, while purposefully

withholding material facts from the Delaware Class that contradicted these representations.

1219. The Defective Vehicles posed and/or pose an unreasonable risk of death or

serious bodily injury to the Delaware Class, passengers, other motorists, pedestrians, and the

public at large, because they are susceptible to incidents of sudden and unintended engine

shutdown.

1220.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Delaware Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Delaware Class.

1221.   The propensity of the Defective Vehicles to inadvertently shut down during ordinary operation was material to the Delaware Class. Had the Delaware Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1222.   All members of the Delaware Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Delaware Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Delaware Class own vehicles that are not safe.

1223.   The Delaware Class has been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that

no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1224.   The Delaware Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the Delaware DTPA, and these violations present a continuing risk to the Delaware Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

1225.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

1226.   As a direct and proximate result of the Companies' violations of the Delaware DTPA, the Delaware Class have suffered injury-in-fact and/or actual damage.

1227.   The Delaware Class seeks injunctive relief and, if awarded damages under Delaware common law or Delaware Consumer Fraud Act, treble damages pursuant to 6 DEL. CODE § 2533(c).

1228.   The Delaware Class also seeks punitive damages based on the outrageousness and recklessness of the Companies' conduct and the high net worth of New GM.

## TWENTY-EIGHTH CLAIM FOR RELIEF

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (6 DEL. CODE § 2-314)

1229.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought solely on behalf of the Delaware Class.

1230.   Old GM and New GM were merchants with respect to motor vehicles within the meaning of 6 DEL. CODE § 2-104(1).

1231.   Under 6 DEL. CODE § 2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when the Delaware Class purchased their Defective Vehicles.

1232.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

1233.   Old GM and New GM were provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and communications sent by the Delaware Class before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1234.   As a direct and proximate result of Old GM and New GM's breach of the implied warranty of merchantability, the Delaware Class have been damaged in an amount to be proven at trial. New GM has successor liability for Old GM's breach.

## TWENTY-NINTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

1235.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought solely on behalf of Class members who are Delaware residents.

1236.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

1237.   The Companies knew these representations were false when made.

1238.   The vehicles purchased or leased by the Delaware Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shut down,

1197532.10

with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1239.    The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the Delaware Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1240.    The aforementioned concealment was material, because if it had been disclosed the Delaware Class would not have bought, leased or retained their vehicles.

1241.    The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

1242.    The Delaware Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

1243.    As a result of their reliance, the Delaware Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1244.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Delaware Class. The Delaware Class is therefore entitled to an award of punitive damages.

## DISTRICT OF COLUMBIA

## THIRTIETH CLAIM FOR RELIEF

## VIOLATION OF THE CONSUMER PROTECTION PROCEDURES ACT
### (D.C. CODE § 28-3901, *et. seq.*)

1245.   This claim is brought on behalf of Class members who are District of Columbia residents (the "District of Columbia Class").

1246.   Old GM and New GM are "persons" under the Consumer Protection Procedures Act ("District of Columbia CPPA"), D.C. CODE § 28-3901(a)(1).

1247.   Class members are "consumers," as defined by D.C. CODE § 28-3901(1)(2), who purchased or leased one or more Defective Vehicles.

1248.   Old GM's and New GM's actions as set forth herein constitute "trade practices" under D.C. CODE § 28-3901.

1249.   Both Old GM and New GM participated in unfair or deceptive acts or practices that violated the District of Columbia CPPA. By failing to disclose and actively concealing the ignition switch defect in the Defective Vehicles, Old GM and New GM engaged in unfair or deceptive practices prohibited by the District of Columbia CPPA, D.C. CODE § 28-3901, *et. seq.*, including: (1) representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Defective Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Defective Vehicles with the intent not to sell them as advertised; (4) representing that the subject of a transaction involving the Defective Vehicles has been supplied in accordance with a previous

1197532.10

representation when it has not; (5) misrepresenting as to a material fact which has a tendency to mislead; and (6) failing to state a material fact when such failure tends to mislead.

1250.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the District of Columbia CPPA, and also has successor liability for the violations of Old GM.

1251.   As alleged above, both Companies knew of the ignition switch defects, while the Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

1252.   The Companies knew or should have known that their conduct violated the District of Columbia CPPA.

1253.   As alleged above, each of the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

1254.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently

shut down in order to ensure that consumers would purchase its vehicles and to induce the

consumer to enter into a transaction.

1255.   From its inception in 2009, New GM has known of the ignition switch defects

that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits

and to avoid remediation costs and a public relations nightmare, New GM concealed the

defects and their tragic consequences and allowed unsuspecting new and used car purchasers

to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to

continue driving highly dangerous vehicles.

1256.   The Companies each owed the District of Columbia Class an independent duty

to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition

switch movement, engine shutdown, and disabled safety airbags, because they:

a.       Possessed exclusive knowledge of the defects rendering Defective

Vehicles inherently more dangerous and unreliable than similar vehicles;

b.       Intentionally concealed the hazardous situation with Defective Vehicles

through their deceptive marketing campaign and recall program that they designed to hide the

life-threatening problems from the District of Columbia Class; and/or

c.       Made incomplete representations about the safety and reliability of

Defective Vehicles generally, and the ignition switch in particular, while purposefully

withholding material facts from the District of Columbia Class that contradicted these

representations.

1257.   The Defective Vehicles posed and/or pose an unreasonable risk of death or

serious bodily injury to the District of Columbia Class, passengers, other motorists,

pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

1258.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the District of Columbia Class, about the true safety and reliability of Defective Vehicles. The Companies each intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the District of Columbia Class.

1259.   The propensity of the Defective Vehicles to inadvertently shut down during ordinary operation was material to the District of Columbia Class. Had the District of Columbia Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1260.   All members of the District of Columbia Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The District of Columbia Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the District of Columbia Class own vehicles that are not safe.

1261.   The District of Columbia Class has been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's

egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1262.   The District of Columbia Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the District of Columbia CPPA, and these violations present a continuing risk to the District of Columbia Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

1263.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

1264.   As a direct and proximate result of the Companies' violations of the District of Columbia CPPA, the District of Columbia Class has suffered injury-in-fact and/or actual damage.

1265.   The District of Columbia Class is entitled to recover from New GM treble damages or $1,500, whichever is greater, punitive damages, reasonable attorneys' fees, and any other relief the Court deems proper, under D.C. CODE § 28-3901.

1266.   The District of Columbia Class seeks punitive damages against New GM because both Old GM's and New GM's conduct evidences malice and/or egregious conduct. Old GM and New GM maliciously and egregiously misrepresented the safety and reliability of the Defective Vehicles, deceived Class members on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Defective Vehicles it repeatedly promised Class members were

safe. Old GM's and New GM's unlawful conduct constitutes malice warranting punitive damages.

## THIRTY-FIRST CLAIM FOR RELIEF

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (D.C. CODE § 28:2-314)

1267.   In the event that the Court declines to certify a nationwide class under Michigan law, this claim is brought solely on behalf of Class members who are District of Columbia residents.

1268.   Old GM and New GM were merchants with respect to motor vehicles within the meaning of D.C. CODE § 28:2-104(1).

1269.   Under D.C. CODE § 28:2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when the District of Columbia Class purchased their Defective Vehicles.

1270.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision.

1271.   Old GM and New GM were provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and communications sent by the District of Columbia Class before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1197532.10

1272.   As a direct and proximate result of Old GM's breach of the implied warranty

of merchantability, the District of Columbia Class has been damaged in an amount to be

proven at trial. New GM has successor liability for Old GM's breach.

### THIRTY-SECOND CLAIM FOR RELIEF

### FRAUD BY CONCEALMENT

1273.   In the event that the Court declines to certify a nationwide class under

Michigan law, this claim is brought solely on behalf of the District of Columbia Class.

1274.   As described above, Old GM and New GM made material omissions and

affirmative misrepresentations regarding the Defective Vehicles.

1275.   The Companies knew these representations were false when made.

1276.   The vehicles purchased or leased by the District of Columbia Class were, in

fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended

shut down, with the attendant loss of power steering, power brakes, and the non-deployment

of airbags in the event of a collision.

1277.   The Companies had a duty to disclose that these vehicles were defective,

unsafe and unreliable in that the vehicles were subject to sudden unintended shut down, with

the attendant loss of power steering, power brakes, and the non-deployment of airbags in the

event of a collision, because the District of Columbia Class relied on the Companies'

representations that the vehicles they were purchasing and retaining were safe and free from

defects.

1278.   The aforementioned concealment was material, because if it had been disclosed

the District of Columbia Class would not have bought, leased or retained their vehicles.

1279.   The aforementioned representations were also material because they were facts

that would typically be relied on by a person purchasing, leasing or retaining a new or used

motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

1280.   The District of Columbia Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

1281.   As a result of their reliance, the District of Columbia Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1282.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the District of Columbia Class. The District of Columbia Class are therefore entitled to an award of punitive damages.

**FLORIDA**

**THIRTY-THIRD CLAIM FOR RELIEF**

**VIOLATION OF FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT**
**(FLA. STAT. § 501.201, et. seq.)**

1283.   This claim is brought solely on behalf of Class members who are Florida residents (the "Florida Class").

1284.   The Florida Class are "consumers" within the meaning of Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), FLA. STAT. § 501.203(7).

1285.   The Companies engaged in "trade or commerce" within the meaning of FLA. STAT. § 501.203(8).

1286.   FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.…" FLA. STAT. § 501.204(1). Old GM and New GM participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.

1287.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defect in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the FUDTPA, and also has successor liability for the violations of Old GM.

1288.   As alleged above, both Companies knew of the ignition switch defects, while the Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

1289.   The Companies knew or should have known that their conduct violated the FUDTPA.

1290.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

1291.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1292.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

1293.   The Companies each owed the Florida Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Florida Class; and/or

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Florida Class that contradicted these representations.

1294.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Florida Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

1295.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Florida Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Florida Class.

1296.   The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the Florida Class. Had the Florida Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1297.   All members of the Florida Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Florida Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Florida Class own vehicles that are not safe.

1298.   The Florida Class have been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-

-348-

publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1299.   The Florida Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the FUDTPA, and these violations present a continuing risk to the Florida Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

1300.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

1301.   As a direct and proximate result of the Companies' violations of the FUDTPA, the Florida Class has suffered injury-in-fact and/or actual damage.

1302.   The Florida Class are entitled to recover their actual damages under FLA. STAT. § 501.211(2) and attorneys' fees under FLA. STAT. § 501.2105(1).

1303.   The Florida Class also seeks an order enjoining New GM's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

## THIRTY-FOURTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

1304.   In the event that the Court declines to certify a nationwide Class under Michigan law, this claim is brought solely on behalf of the Florida Class.

1305.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

1306.   The Companies knew these representations were false when made.

-349-

Case 1:14-md-02543-JMF    Document 544-2    Filed 10/14/14    Page 169 of 473

1307.   The vehicles purchased or leased by the Florida Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1308.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the Florida Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1309.   The aforementioned concealment was material, because if it had been disclosed the Florida Class would not have bought, leased or retained their vehicles.

1310.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

1311.   The Florida Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

1312.   As a result of their reliance, the Florida Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1313.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Florida Class. the Florida Class are therefore entitled to an award of punitive damages.

## GEORGIA

## THIRTY-FIFTH CLAIM FOR RELIEF

## VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT
### (GA. CODE ANN. § 10-1-390, *et. seq.*)

1314.   This claim is brought solely on behalf of Class members who are Georgia residents (the "Georgia Class").

1315.   The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, GA. CODE. ANN. § 10-1-393(a), including but not limited to "(5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "(7) [r]epresenting that goods or services are of a particular standard, quality, or grade… if they are of another," and "(9) [a]dvertising goods or services with intent not to sell them as advertised," GA. CODE. ANN. § 10-1-393.

1316.   By failing to disclose and actively concealing the ignition switch defects in the Defective Vehicles, Old GM and New GM engaged in unfair or deceptive practices prohibited by the FBPA, including: (1) representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Defective Vehicles are

-351-

of a particular standard, quality, and grade when they are not; and (3) advertising the

Defective Vehicles with the intent not to sell them as advertised. Both Old GM and New GM

participated in unfair or deceptive acts or practices that violated the Georgia FBPA.

1317.   In the course of their business, both Old GM and New GM willfully failed to

disclose and actively concealed the dangerous ignition switch defect in the Defective Vehicles

as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

Old GM and New GM also engaged in unlawful trade practices by employing deception,

deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or

omission of any material fact with intent that others rely upon such concealment, suppression

or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for

engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in

violation of the Georgia FBPA, and also has successor liability for the violations of Old GM.

1318.   As alleged above, both Companies knew of the ignition switch defects, while

the Georgia Class was deceived by the Companies' omission into believing the Defective

Vehicles were safe, and the information could not have reasonably been known by the

consumer.

1319.   The Companies knew or should have known that their conduct violated the

Georgia FBPA.

1320.   As alleged above, the Companies made material statements about the safety

and reliability of Defective Vehicles that were either false or misleading.

1321.   Old GM engaged in a deceptive trade practice when it failed to disclose

material information concerning the Defective Vehicles which it knew at the time of the sale.

Old GM deliberately withheld the information about the vehicles' propensity to inadvertently

shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1322.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

1323.   The Companies each owed the Georgia Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Georgia Class; and/or

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Georgia Class that contradicted these representations.

1324.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Georgia Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

1325. The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Georgia Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Georgia Class.

1326. The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the Georgia Class. Had the Georgia Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1327. All members of the Georgia Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Georgia Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Georgia Class own vehicles that are not safe.

1328. The Georgia Class has been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1329.   The Georgia Class Members risks irreparable injury as a result of the

Companies' act and omissions in violation of the Georgia FBPA, and these violations present

a continuing risk to the Georgia Class as well as to the general public. The Companies'

unlawful acts and practices complained of herein affect the public interest.

1330.   The recalls and repairs instituted by New GM have not been adequate. The

recall is not an effective remedy and is not offered for all Defective Vehicles.

1331.   As a direct and proximate result of the Companies' violations of the Georgia

FBPA, the Georgia Class has suffered injury-in-fact and/or actual damage.

1332.   The Georgia Class is entitled to recover damages and exemplary damages (for

intentional violations) per GA. CODE. ANN § 10-1-399(a).

1333.   The Georgia Class also seeks an order enjoining New GM's unfair, unlawful,

and/or deceptive practices, attorneys' fees, and any other just and proper relief available under

the Georgia FBPA per GA. CODE. ANN § 10-1-399.

1334.   Georgia Plaintiffs have complied with the notice requirement set forth in GA.

CODE. ANN § 10-1-399(b) by virtue of the notice previously provided in the context of the

underlying action styled *Dinco, et al. v GM*, 2:14-cv-03638-JVS-AN (C.D. Cal.), and other

underlying actions, as well as additional notice in the form of a demand letter sent on

October 12, 2014.

## THIRTY-SIXTH CLAIM FOR RELIEF

## VIOLATION OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (GA. CODE ANN. § 10-1-370, *et. seq.*)

1335.   The Companies and the Georgia Class are "persons' within the meaning of

Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), GA. CODE. ANN § 10-

1-371(5).

1336.   The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." GA. CODE. ANN § 10-1-372(a). By failing to disclose and actively concealing the ignition switch defects in the Defective Vehicles, Old GM and New GM engaged in deceptive trade practices prohibited by the Georgia UDTPA.

1337.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defect in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Georgia UDTPA, and also has successor liability for the violations of Old GM.

1338.   As alleged above, both Companies knew of the ignition switch defects, while the Georgia Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

1339.   The Companies knew or should have known that their conduct violated the Georgia UDTPA.

1340.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

-356-

1341.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1342.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

1343.   The Companies each owed the Georgia Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Georgia Class; and/or

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Georgia Class that contradicted these representations.

1344.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to Plaintiffs, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

1345.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Georgia Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Georgia Class.

1346.   The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the Georgia Class. Had the Georgia Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1347.   All members of the Georgia Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Georgia Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Georgia Class own vehicles that are not safe.

1348.   The Georgia Class has been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the

many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1349.   The Georgia Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the Georgia UDTPA, and these violations present a continuing risk to the Georgia Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

1350.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

1351.   As a direct and proximate result of the Companies' violations of the Georgia UDTPA, and the Georgia Class have suffered injury-in-fact and/or actual damage.

1352.   Plaintiffs seek an order enjoining New GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA per GA. CODE. ANN § 10-1-373.

## THIRTY-SEVENTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

1353.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought solely on behalf of the Georgia Class.

1354.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

1355.   The Companies knew these representations were false when made.

1356.   The vehicles purchased or leased by the Georgia Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with

the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1357.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the Georgia Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1358.   The aforementioned concealment was material, because if it had been disclosed the Georgia Class would not have bought, leased or retained their vehicles.

1359.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

1360.   The Georgia Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

1361.   As a result of their reliance, the Georgia Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1197532.10

1362.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Georgia Class. The Georgia Class is therefore entitled to an award of punitive damages.

## HAWAII

## THIRTY-EIGHTH CLAIM FOR RELIEF

## UNFAIR AND DECEPTIVE ACTS IN VIOLATION OF HAWAII LAW
### (HAW. REV. STAT. § 480, *et. seq.*)

1365.   This claim is brought on behalf of Class members who are Hawaii residents (the "Hawaii Class").

1366.   Old GM and New GM are "persons" under HAW. REV. STAT. § 480-1.

1367.   Class members are "consumer[s]" as defined by HAW. REV. STAT. § 480-1, who purchased or leased one or more Defective Vehicles.

1368.   Old GM and New GM's acts or practices as set forth above occurred in the conduct of trade or commerce.

1369.   The Hawaii Act § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.…" By failing to disclose and actively concealing the ignition switch defects in the Defective Vehicles, Old GM and New GM engaged in unfair and deceptive trade practices prohibited by the Hawaii Act.

1370.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defect in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or

omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Hawaii Act, and also has successor liability for the violations of Old GM.

1371.   As alleged above, both Companies knew of the ignition switch defects, while the Hawaii Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

1372.   The Companies knew or should have known that their conduct violated the Hawaii Act.

1373.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

1374.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1375.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

1197532.10

1376.   The Companies each owed the Hawaii Class a duty to disclose the defective

nature of Defective Vehicles, including the dangerous risk of ignition switch movement,

engine shutdown, and disabled safety airbags, because they:

        a.     Possessed exclusive knowledge of the defects rendering Defective

Vehicles inherently more dangerous and unreliable than similar vehicles;

        b.     Intentionally concealed the hazardous situation with Defective Vehicles

through their deceptive marketing campaign and recall program that they designed to hide the

life-threatening problems from the Hawaii Class; and/or

        c.     Made incomplete representations about the safety and reliability of

Defective Vehicles generally, and the ignition switch in particular, while purposefully

withholding material facts from the Hawaii Class that contradicted these representations.

1377.   The Defective Vehicles posed and/or pose an unreasonable risk of death or

serious bodily injury to the Hawaii Class, passengers, other motorists, pedestrians, and the

public at large, because they are susceptible to incidents of sudden and unintended engine

shutdown.

1378.   The Companies' unfair or deceptive acts or practices were likely to deceive

reasonable consumers, including the Hawaii Class, about the true safety and reliability of

Defective Vehicles. The Companies intentionally and knowingly misrepresented material

facts regarding the Defective Vehicles with an intent to mislead the Hawaii Class.

1379.   The propensity of the Defective Vehicles to inadvertently shutdown during

ordinary operation was material to the Hawaii Class. Had the Hawaii Class known that their

vehicles had these serious safety defects, they would either not have purchased their Defective

Vehicles, or would have paid less for them than they did.

1380.   All members of the Hawaii Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Hawaii Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Hawaii Class own vehicles that are not safe.

1381.   The Hawaii Class has been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1382.   The Hawaii Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the Hawaii Act, and these violations present a continuing risk to the Hawaii Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

1383.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

1384.   As a direct and proximate result of the Companies' violations of the Hawaii Act, the Hawaii Class has suffered injury-in-fact and/or actual damage.

1385.   Pursuant to HAW. REV. STAT. § 480-13, the Hawaii Class seeks monetary relief against New GM measured as the greater of (a) $1,000 and (b) threefold actual damages in an amount to be determined at trial.

1386.   Under HAW. REV. STAT. § 480-13.5, the Hawaii Class seeks an additional award against New GM of up to $10,000 for each violation directed at a Hawaiian elder. Old GM and N or should have known that their conduct was directed to one or more Class members who are elders. Old GM and New GM's conduct caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the elder. One or more Hawaii Class members who are elders are substantially more vulnerable to Old GM and New GM's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from Old GM and New GM's conduct.

## THIRTY-NINTH CLAIM FOR RELIEF

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (HAW. REV. STAT. § 490:2-314)

1387.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of Class members who are Hawaii residents.

1388.   Old GM and New GM were merchants with respect to motor vehicles within the meaning of HAW. REV. STAT. § 490:2-104(1).

1389.   Under HAW. REV. STAT. § 490:2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when the Hawaii Class purchased their Defective Vehicles.

1390.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shutdown of power steering and power brakes and the non-deployment of airbags in the event of a collision.

1391.   Old GM and New GM were provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and communications sent by the Hawaii Class before or within a reasonable amount of time after GM issued the recall and the allegations of vehicle defects became public.

1392.   As a direct and proximate result of Old GM and New GM's breach of the implied warranty of merchantability, the Hawaii Class has been damaged in an amount to be proven at trial. New GM also has successor liability for Old GM's breach.

## FORTIETH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

1393.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought solely on behalf of the Hawaii Class.

1394.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

1395.   The Companies knew these representations were false when made.

1396.   The vehicles purchased or leased by the Hawaii Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1397.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the Hawaii Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1398.   The aforementioned concealment was material, because if it had been disclosed the Hawaii Class would not have bought, leased or retained their vehicles.

1399.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

1400.   The Hawaii Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

1401.   As a result of their reliance, the Hawaii Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1402.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Hawaii Class. The Hawaii Class are therefore entitled to an award of punitive damages.

## IDAHO

## FORTY-FIRST CLAIM FOR RELIEF

## VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT
### (IDAHO CIV. CODE § 48-601, *et. seq.*)

1403.   This claim is brought on behalf of Class members who are Idaho residents (the "Idaho Class").

1404.   Old GM and New GM are "persons" under the Idaho Consumer Protection Act ("Idaho CPA"), IDAHO CIV. CODE § 48-602(1).

1405.   Old GM and New GM's acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under IDAHO CIV. CODE § 48-602(2).

1406.   Old GM and New GM both participated in misleading, false, or deceptive acts that violated the Idaho CPA. By failing to disclose and actively concealing the dangerous ignition switch defects in the Defective Vehicles, both Old GM and New GM engaged in deceptive business practices prohibited by the Idaho CPA, including: (1) representing that the Defective Vehicles have characteristics, uses, and benefits which they do not have; (2) representing that the Defective Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Defective Vehicles with the intent not to sell them as advertised; (4) engaging in acts or practices which are otherwise misleading, false, or deceptive to the consumer; and (5) engaging in any unconscionable method, act or practice in the conduct of trade or commerce. *See* IDAHO CIV. CODE § 48-603.

1407.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing

deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Idaho CPA, and also has successor liability for the violations of Old GM.

1408.   As alleged above, both Companies knew of the ignition switch defects, while the Idaho Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

1409.   The Companies knew or should have known that their conduct violated the Idaho CPA.

1410.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

1411.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1412.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers

-369-

to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to

continue driving highly dangerous vehicles.

1413.   The Companies each owed the Idaho Class a duty to disclose the defective

nature of Defective Vehicles, including the dangerous risk of ignition switch movement,

engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective

Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles

through their deceptive marketing campaign and recall program that they designed to hide the

life-threatening problems from the Idaho Class; and/or

c.      Made incomplete representations about the safety and reliability of

Defective Vehicles generally, and the ignition switch in particular, while purposefully

withholding material facts from the Idaho Class that contradicted these representations.

1414.   The Defective Vehicles posed and/or pose an unreasonable risk of death or

serious bodily injury to the Idaho Class, passengers, other motorists, pedestrians, and the

public at large, because they are susceptible to incidents of sudden and unintended engine

shutdown.

1415.   The Companies' unfair or deceptive acts or practices were likely to deceive

reasonable consumers, including the Idaho Class, about the true safety and reliability of

Defective Vehicles. The Companies intentionally and knowingly misrepresented material

facts regarding the Defective Vehicles with an intent to mislead the Idaho Class.

1416.   The propensity of the Defective Vehicles to inadvertently shutdown during

ordinary operation was material to the Idaho Class. Had the Idaho Class known that their

vehicles had these serious safety defects, they would either not have purchased their Defective

Vehicles, or would have paid less for them than they did.

1417. All members of the Idaho Class suffered ascertainable loss caused by the

Companies' failure to disclose material information. The Idaho Class overpaid for their

vehicles and did not receive the benefit of their bargain. As the result of the concealment and

failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls,

the value of their Defective Vehicles has diminished now that the safety issues in the

Defective Vehicles, and the many other serious safety issues and myriad defects in the

Companies' vehicles have come to light, and the Idaho Class own vehicles that are not safe.

1418. The Idaho Class has been damaged by New GM's misrepresentations,

concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as

they are now holding vehicles whose value has greatly diminished because of New GM's

failure to timely disclose and remedy the serious defects. New GM's egregious and widely-

publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the

many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that

no reasonable consumer would purchase them—let alone pay what would otherwise be fair

market value for the vehicles.

1419. The Idaho Class Members risk irreparable injury as a result of the Companies'

act and omissions in violation of the Idaho CPA, and these violations present a continuing risk

to the Idaho Class as well as to the general public. The Companies' unlawful acts and

practices complained of herein affect the public interest.

1420. The recalls and repairs instituted by New GM have not been adequate. The

recall is not an effective remedy and is not offered for all Defective Vehicles.

1197532.10

1421.   As a direct and proximate result of the Companies' violations of the Idaho

CPA, the Idaho Class has suffered injury-in-fact and/or actual damage.

1422.   Pursuant to IDAHO CODE § 48-608, the Idaho Class seeks monetary relief

against New GM measured as the greater of (a) actual damages in an amount to be determined

at trial and (b) statutory damages in the amount of $1,000 for each Idaho Class Member.

1423.   The Idaho Class also seeks an order enjoining New GM's unfair, unlawful,

and/or deceptive practices, attorneys' fees, and any other just and proper relief available under

the Idaho CPA.

1424.   The Idaho Class members also seek punitive damages against New GM

because both Old GM and New GM's conduct evidences an extreme deviation from

reasonable standards. Old GM and New GM flagrantly, maliciously, and fraudulently

misrepresented the safety and reliability of the Defective Vehicles, deceived Class members

on life-or-death matters, and concealed material facts that only they knew, all to avoid the

expense and public relations nightmare of correcting a deadly flaw in the Defective Vehicles

they repeatedly promised Class members were safe. Old GM and New GM's unlawful

conduct constitutes malice, oppression, and fraud warranting punitive damages.

## FORTY-SECOND CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

1425.   In the event the Court declines to certify a nationwide Class under Michigan

law, this claim is brought solely on behalf of the Idaho Class.

1426.   As described above, Old GM and New GM made material omissions and

affirmative misrepresentations regarding the Defective Vehicles.

1427.   The Companies knew these representations were false when made.

1428.   The vehicles purchased or leased by the Idaho Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1429.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the Idaho Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1430.   The aforementioned concealment was material, because if it had been disclosed the Idaho Class would not have bought, leased or retained their vehicles.

1431.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

1432.   The Idaho Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

1433.   As a result of their reliance, the Idaho Class has been injured in an amount to
be proven at trial, including, but not limited to, their lost benefit of the bargain and
overpayment at the time of purchase and/or the diminished value of their vehicles.

1434.   The Companies' conduct was knowing, intentional, with malice, demonstrated
a complete lack of care, and was in reckless disregard for the rights of the Idaho Class. The
Idaho Class is therefore entitled to an award of punitive damages.

## ILLINOIS

## FORTY-THIRD CLAIM FOR RELIEF

### VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1, *et. seq.* and 720 ilcs 295/1a)

1435.   This claim is brought on behalf of Class members who are Illinois residents
(the "Illinois Class").

1436.   Old GM and New GM are "persons" as that term is defined in 815 ILCS
505/1(c).

1437.   The Illinois Class are "consumers" as that term is defined in 815 ILCS 505/1(e).

1438.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois
CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or
employment of any deception, fraud, false pretense, false promise, misrepresentation or the
concealment, suppression or omission of any material fact, with intent that others rely upon
the concealment, suppression or omission of such material fact… in the conduct of trade or
commerce… whether any person has in fact been misled, deceived or damaged thereby." 815
ILCS 505/2.

1439.   Old GM and New GM both participated in misleading, false, or deceptive acts
that violated the Illinois CFA. By failing to disclose and actively concealing the dangerous

-374-

ignition switch defects in the Defective Vehicles, both Old GM and New GM engaged in

deceptive business practices prohibited by the Illinois CFA.

1440.   In the course of their business, both Old GM and New GM willfully failed to

disclose and actively concealed the dangerous ignition switch defects in the Defective

Vehicles as described herein and otherwise engaged in activities with a tendency or capacity

to deceive. Old GM and New GM also engaged in unlawful trade practices by employing

deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression

or omission of any material fact with intent that others rely upon such concealment,

suppression or omission, in connection with the sale of Defective Vehicles. New GM is

directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or

commerce in violation of the Illinois CFA, and also has successor liability for the violations of

Old GM.

1441.   As alleged above, both Companies knew of the ignition switch defects, while

the Illinois Class was deceived by the Companies' omission into believing the Defective

Vehicles were safe, and the information could not have reasonably been known by the

consumer.

1442.   The Companies knew or should have known that their conduct violated the

Illinois CFA.

1443.   As alleged above, the Companies made material statements about the safety

and reliability of Defective Vehicles that were either false or misleading.

1444.   Old GM engaged in a deceptive trade practice when it failed to disclose

material information concerning the Defective Vehicles which it knew at the time of the sale.

Old GM deliberately withheld the information about the vehicles' propensity to inadvertently

-375-

shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1445.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

1446.   The Companies each owed the Illinois Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

      a.      Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

      b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Illinois Class; and/or

      c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Illinois Class that contradicted these representations.

1447.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Illinois Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

1448.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Illinois Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Illinois Class.

1449.   The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the Illinois Class. Had the Illinois Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1450.   All members of the Illinois Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Illinois Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Illinois Class own vehicles that are not safe.

1451.   The Illinois Class has been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1197532.10

1452.   The Illinois Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the Illinois CFA, and these violations present a continuing risk to the Illinois Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

1453.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

1454.   As a direct and proximate result of the Companies' violations of the Illinois CFA, the Illinois Class has suffered injury-in-fact and/or actual damage.

1455.   Pursuant to 815 ILCS 505/10a(a), the Illinois Class seeks monetary relief against New GM in the amount of actual damages, as well as punitive damages because New GM acted with fraud and/or malice and/or was grossly negligent.

1456.   The Illinois Class also seeks an order enjoining New GM's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS. § 505/1 *et. seq.*

## FORTY-FOURTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

1457.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought solely on behalf of the Illinois Class.

1458.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

1459.   The Companies knew these representations were false when made.

1460.   The vehicles purchased or leased by the Illinois Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with

-378-

the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1461.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the Illinois Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1462.   The aforementioned concealment was material, because if it had been disclosed the Illinois Class would not have bought, leased or retained their vehicles.

1463.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

1464.   The Illinois Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

1465.   As a result of their reliance, the Illinois Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1466. The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Illinois Class. The Illinois Class is therefore entitled to an award of punitive damages.

**INDIANA**

**FORTY-FIFTH CLAIM FOR RELIEF**

**VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT
(Ind. Code § 24-5-0.5-3)**

1467. This claim is brought on behalf of Class members who are Indiana residents (the "Indiana Class").

1468. Old GM and New GM are "persons" within the meaning of IND. CODE § 24-5-0.5-2(2) and "suppliers" within the meaning of IND. CODE § 24-5-0.5-2(a)(3).

1469. The Indiana Class Members' purchases of the Defective Vehicles are "consumer transactions" within the meaning of IND. CODE § 24-5-0.5-2(a)(1).

1470. Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive trade practice," which includes representing: "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not;… (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have;… (c) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both

-380-

1197532.10

of the supplier who places such a representation thereon or therein, or who authored such

materials, and such suppliers who shall state orally or in writing that such representation is

true if such other supplier shall know or have reason to know that such representation was

false." IND. CODE § 24-5-0.5-3.

1471.   Old GM and New GM both participated in misleading, false, or deceptive acts

that violated the Indiana DCSA. By failing to disclose and actively concealing the dangerous

ignition switch defects in the Defective Vehicles, both Old GM and New GM engaged in

deceptive business practices prohibited by the Indiana DCSA. The Companies also engaged in

unlawful trade practices by: (1) representing that the Defective Vehicles have characteristics,

uses, benefits, and qualities which they do not have; (2) representing that the Defective

Vehicles are of a particular standard and quality when they are not; (3) advertising the

Defective Vehicles with the intent not to sell them as advertised; and (4) otherwise engaging

in conduct likely to deceive.

1472.   The Companies' actions as set forth above occurred in the conduct of trade or

commerce.

1473.   In the course of their business, both Old GM and New GM willfully failed to

disclose and actively concealed the dangerous ignition switch defect in the Defective Vehicles

as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

Old GM and New GM also engaged in unlawful trade practices by employing deception,

deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or

omission of any material fact with intent that others rely upon such concealment, suppression

or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for

engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Indiana DCSA, and also has successor liability for the violations of Old GM.

1474.   As alleged above, both Companies knew of the ignition switch defects, while the Indiana was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

1475.   The Companies knew or should have known that their conduct violated the Indiana DCSA.

1476.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

1477.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1478.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

1479.   The Companies each owed the Indiana Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a. Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b. Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Indiana Class; and/or

c. Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Indiana Class that contradicted these representations.

1480. The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Indiana Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

1481. The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Indiana Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Indiana Class.

1482. The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the Indiana Class. Had the Indiana Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1483. All members of the Indiana Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Indiana Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and

-383-

failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Indiana Class own vehicles that are not safe.

1484.   The Indiana Class has been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1485.   The Indiana Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the Indiana DCSA, and these violations present a continuing risk to the Indiana Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

1486.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

1487.   As a direct and proximate result of the Companies' violations of the Indiana DCSA, the Indiana Class has suffered injury-in-fact and/or actual damage.

1488.   Pursuant to IND. CODE § 24-5-0.5-4, the Indiana Class seeks monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined

at trial and (b) statutory damages in the amount of $500 for each Indiana Class Member, including treble damages up to $1,000 for New GM's willfully deceptive acts.

1489.   The Indiana Class also seeks punitive damages based on the outrageousness and recklessness of the Companies' conduct and New GM's high net worth.

1490.   Indiana Plaintiffs have complied with the notice requirement set forth in Indiana Code § 24-5-0.5-5(a) by virtue of the notice previously provided in the context of the underlying action styled *Saclo, et al. v. GM*, 8:14-cv-00604-JVS-AN (C.D. Cal.), and other underlying actions, as well as additional notice in the form of a demand letter sent on October 12, 2014.

<h3 style="text-align:center">FORTY-SIXTH CLAIM FOR RELIEF</h3>

<h3 style="text-align:center">BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY<br>(IND. CODE § 26-1-2-314)</h3>

1491.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of the Indiana Class.

1492.   Old GM and New GM were merchants with respect to motor vehicles within the meaning of IND. CODE. § 26-1-2-104(1).

1493.   Under IND. CODE. § 26-1-2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when the Indiana Class purchased their Defective Vehicles.

1494.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shutdown of power steering and power brakes and the non-deployment of airbags in the event of a collision.

1495.   Old GM and New GM were provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and communications sent by the Indiana Class before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1496.   As a direct and proximate result of Old GM and New GM's breach of the implied warranty of merchantability, the Indiana Class has been damaged in an amount to be proven at trial. New GM has successor liability for Old GM's breach.

## FORTY-SEVENTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

1497.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of Class members who are Indiana residents.

1498.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

1499.   The Companies knew these representations were false when made.

1500.   The vehicles purchased or leased by the Indiana Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1501.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the Indiana Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1502.   The aforementioned concealment was material, because if it had been disclosed the Indiana Class would not have bought, leased or retained their vehicles.

1503.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

1504.   The Indiana Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

1505.   As a result of their reliance, the Indiana Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1506.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Indiana Class. The Indiana Class is therefore entitled to an award of punitive damages.

## IOWA

### FORTY-EIGHTH CLAIM FOR RELIEF

### VIOLATIONS OF THE PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT (IOWA CODE § 714h.1, *et. seq.*)

1507.   This claim is brought on behalf of Class members who are Iowa residents (the "Iowa Class").

1508.   Old GM and New GM are "persons" under IOWA CODE § 714H.2(7).

1509.   The Iowa Class are "consumers," as defined by IOWA CODE § 714H.2(3), who purchased or leased one or more Defective Vehicles.

1510.   The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise…." IOWA CODE § 714H.3. Old GM and New GM both participated in misleading, false, or deceptive acts that violated the Iowa CFA. By failing to disclose and actively concealing the dangerous ignition switch defects in the Defective Vehicles, both Old GM and New GM engaged in deceptive business practices prohibited by the Iowa CFA.

1511.   The Companies' actions as set forth above occurred in the conduct of trade or commerce.

1512.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or

-388-

commerce in violation of the Iowa CFA, and also has successor liability for the violations of Old GM.

1513.   As alleged above, both Companies knew of the ignition switch defects, while the Iowa Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

1514.   The Companies knew or should have known that their conduct violated the Iowa CFA.

1515.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

1516.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1517.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

1197532.10

1518.   The Companies each owed the Iowa Class a duty to disclose the defective

nature of Defective Vehicles, including the dangerous risk of ignition switch movement,

engine shutdown, and disabled safety airbags, because they:

        a.      Possessed exclusive knowledge of the defects rendering Defective

Vehicles inherently more dangerous and unreliable than similar vehicles;

        b.      Intentionally concealed the hazardous situation with Defective Vehicles

through their deceptive marketing campaign and recall program that they designed to hide the

life-threatening problems from the Iowa Class; and/or

        c.      Made incomplete representations about the safety and reliability of

Defective Vehicles generally, and the ignition switch in particular, while purposefully

withholding material facts from the Iowa Class that contradicted these representations.

1519.   The Defective Vehicles posed and/or pose an unreasonable risk of death or

serious bodily injury to the Iowa Class, passengers, other motorists, pedestrians, and the

public at large, because they are susceptible to incidents of sudden and unintended engine

shutdown.

1520.   The Companies' unfair or deceptive acts or practices were likely to deceive

reasonable consumers, including the Iowa Class, about the true safety and reliability of

Defective Vehicles. The Companies intentionally and knowingly misrepresented material

facts regarding the Defective Vehicles with an intent to mislead the Iowa Class.

1521.   The propensity of the Defective Vehicles to inadvertently shutdown during

ordinary operation was material to the Iowa Class. Had the Iowa Class known that their

vehicles had these serious safety defects, they would either not have purchased their Defective

Vehicles, or would have paid less for them than they did.

1522.   All members of the Iowa Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Iowa Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Iowa Class own vehicles that are not safe.

1523.   The Iowa Class has been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1524.   The Iowa Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the Iowa CFA, and these violations present a continuing risk to the Iowa Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

1525.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

1526.   As a direct and proximate result of the Companies' violations of the Iowa CFA, the Iowa Class has suffered injury-in-fact and/or actual damage.

1527.   Pursuant to IOWA CODE § 714H.5, the Iowa Class seeks an order enjoining New GM's unfair and/or deceptive acts or practices; actual damages; in addition to an award of actual damages, statutory damages up to three times the amount of actual damages awarded as a result of New GM's willful and wanton disregard for the rights or safety of others; attorneys' fees; and such other equitable relief as the Court deems necessary to protect the public from further violations of the Iowa CFA.

## FORTY-NINTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

1528.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of the Iowa Class.

1529.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

1530.   The Companies knew these representations were false when made.

1531.   The vehicles purchased or leased by the Iowa Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1532.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the Iowa Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1533.   The aforementioned concealment was material, because if it had been disclosed the Iowa Class would not have bought, leased or retained their vehicles.

1534.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

1535.   The Iowa Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

1536.   As a result of their reliance, the Iowa Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1537.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Iowa Class. The Iowa Class is entitled to an award of punitive damages.

## KANSAS

## FIFTIETH CLAIM FOR RELIEF

## VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT
### (KAN. STAT. ANN. § 50-623, *et. seq.*)

1538.   This claim is brought on behalf of Class members who are Kansas residents (the "Kansas Class").

1539.   Old GM and New GM are "supplier[s]" under the Kansas Consumer Protection Act ("Kansas CPA"), KAN. STAT. ANN. § 50-624(1).

1540.   Class members are "consumers," within the meaning of KAN. STAT. ANN. § 50-624(b), who purchased or leased one or more Defective Vehicles.

1541.   The sale of the Defective Vehicles to the Class members was a "consumer transaction" within the meaning of KAN. STAT. ANN. § 50-624(c).

1542.   The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," KAN. STAT. ANN. § 50-626(a), and that deceptive acts or practices include: (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." KAN. STAT. ANN. § 50-627(a).

1543.   Old GM and New GM both participated in misleading, false, or deceptive acts that violated the Kansas CPA. By failing to disclose and actively concealing the dangerous ignition switch defect in the Defective Vehicles, both Old GM and New GM engaged in deceptive business practices prohibited by the Kansas CPA. The Companies also engaged in unlawful trade practices by: (1) representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Defective Vehicles are of a particular standard and quality when they are not; (3) advertising the

1197532.10

Defective Vehicles with the intent not to sell them as advertised; (4) willfully using, in any

oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a

material fact; (5) willfully failing to state a material fact, or the willfully concealing,

suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act

or practice in connection with a consumer transaction.

1544.   The Companies' actions as set forth above occurred in the conduct of trade or

commerce.

1545.   In the course of their business, both Old GM and New GM willfully failed to

disclose and actively concealed the dangerous ignition switch defects in the Defective

Vehicles as described herein and otherwise engaged in activities with a tendency or capacity

to deceive. Old GM and New GM also engaged in unlawful trade practices by employing

deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression

or omission of any material fact with intent that others rely upon such concealment,

suppression or omission, in connection with the sale of Defective Vehicles. New GM is

directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or

commerce in violation of the Kansas CPA, and also has successor liability for the violations

of Old GM.

1546.   As alleged above, both Companies knew of the ignition switch defects, while

the Kansas Class was deceived by the Companies' omission into believing the Defective

Vehicles were safe, and the information could not have reasonably been known by the

consumer.

1547.   The Companies knew or should have known that their conduct violated the

Kansas CPA.

1548.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

1549.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1550.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

1551.   The Companies each owed the Kansas Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

   a.      Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

   b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Kansas Class; and/or

    c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Kansas Class that contradicted these representations.

1552.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Kansas Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

1553.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Kansas Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Kansas Class.

1554.   The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the Kansas Class. Had the Kansas Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1555.   All members of the Kansas Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Kansas Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Kansas Class own vehicles that are not safe.

1556.   The Kansas Class has been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1557.   The Kansas Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the Kansas CPA, and these violations present a continuing risk to the Kansas Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

1558.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

1559.   As a direct and proximate result of the Companies' violations of the Kansas CPA, the Kansas Class has suffered injury-in-fact and/or actual damage.

1560.   Pursuant to KAN. STAT. ANN. § 50-634, the Kansas Class seeks monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each Kansas Class Member.

1561.   The Kansas Class also seeks an order enjoining New GM's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under KAN. STAT. ANN § 50-623 *et. seq*.

-398-

## FIFTY-FIRST CLAIM FOR RELIEF

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (KAN. STAT. ANN. § 84-2-314)

1562.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of the Kansas Class.

1563.   Old GM and New GM were merchants with respect to motor vehicles within the meaning of KAN. STAT. ANN. § 84-2-104(1).

1564.   Under KAN. STAT. ANN. § 84-2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when the Kansas Class purchased their Defective Vehicles.

1565.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shutdown of power steering and power brakes and the non-deployment of airbags in the event of a collision.

1566.   Old GM and New GM were provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and communications sent by the Kansas Class before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1567.   As a direct and proximate result of Old GM and New GM's breach of the implied warranty of merchantability, the Kansas Class has been damaged in an amount to be proven at trial. New GM also has successor liability for Old GM's breach.

## FIFTY-SECOND CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

1568.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of the Kansas Class.

1569.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

1570.   The Companies knew these representations were false when made.

1571.   The vehicles purchased or leased by the Kansas Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1572.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the Kansas Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1573.   The aforementioned concealment was material, because if it had been disclosed the Kansas Class would not have bought, leased or retained their vehicles.

1574.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

-400-

1197532.10

1575.   The Kansas Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

1576.   As a result of their reliance, the Kansas Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1577.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Kansas Class. The Kansas Class is therefore entitled to an award of punitive damages.

## KENTUCKY

## FIFTY-THIRD CLAIM FOR RELIEF

### VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT
(KY. REV. STAT. § 367.110, *et. seq.*)

1578.   This claim is brought on behalf of Class members who are Kentucky residents (the "Kentucky Class").

1579.   The Companies and the Kentucky Class are "persons" within the meaning of the KY. REV. STAT. § 367.110(1).

1580.   The Companies engaged in "trade" or "commerce" within the meaning of KY. REV. STAT. § 367.110(2).

1581.   The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce…." KY. REV. STAT. § 367.170(1). Old GM and New GM both participated in misleading, false, or deceptive acts that violated the Kentucky CPA. By failing to disclose and

1197532.10

actively concealing the dangerous ignition switch defect in the Defective Vehicles, both Old

GM and New GM engaged in deceptive business practices prohibited by the Kentucky CPA.

1582.    The Companies' actions as set forth above occurred in the conduct of trade or

commerce.

1583.    In the course of their business, both Old GM and New GM willfully failed to

disclose and actively concealed the dangerous ignition switch defects in the Defective

Vehicles as described herein and otherwise engaged in activities with a tendency or capacity

to deceive. Old GM and New GM also engaged in unlawful trade practices by employing

deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression

or omission of any material fact with intent that others rely upon such concealment,

suppression or omission, in connection with the sale of Defective Vehicles. New GM is

directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or

commerce in violation of the Kentucky CPA, and also has successor liability for the violations

of Old GM.

1584.    As alleged above, both Companies knew of the ignition switch defects, while

the Kentucky Class was deceived by the Companies' omission into believing the Defective

Vehicles were safe, and the information could not have reasonably been known by the

consumer.

1585.    The Companies knew or should have known that their conduct violated the

Kentucky CPA.

1586.    As alleged above, the Companies made material statements about the safety

and reliability of Defective Vehicles that were either false or misleading.

1587.   Old GM engaged in a deceptive trade practice when it failed to disclose

material information concerning the Defective Vehicles which it knew at the time of the sale.

Old GM deliberately withheld the information about the vehicles' propensity to inadvertently

shutdown in order to ensure that consumers would purchase its vehicles and to induce the

consumer to enter into a transaction.

1588.   From its inception in 2009, New GM has known of the ignition switch defects

that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits

and to avoid remediation costs and a public relations nightmare, New GM concealed the

defects and their tragic consequences and allowed unsuspecting new and used car purchasers

to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to

continue driving highly dangerous vehicles.

1589.   The Companies each owed the Kentucky Class a duty to disclose the defective

nature of Defective Vehicles, including the dangerous risk of ignition switch movement,

engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective

Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles

through their deceptive marketing campaign and recall program that they designed to hide the

life-threatening problems from the Kentucky Class; and/or

c.      Made incomplete representations about the safety and reliability of

Defective Vehicles generally, and the ignition switch in particular, while purposefully

withholding material facts from the Kentucky Class that contradicted these representations.

1590.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Kentucky Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

1591.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Kentucky Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Kentucky Class.

1592.   The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the Kentucky Class. Had the Kentucky Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1593.   All members of the Kentucky Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Kentucky Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Kentucky Class own vehicles that are not safe.

1594.   The Kentucky Class has been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's

-404-

failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1595.   The Kentucky Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the Kentucky CPA, and these violations present a continuing risk to the Kentucky Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

1596.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

1597.   As a direct and proximate result of the Companies' violations of the Kentucky CPA, the Kentucky Class has suffered injury-in-fact and/or actual damage.

1598.   Pursuant to KY. REV. STAT. ANN. § 367.220, the Kentucky Class seeks to recover actual damages in an amount to be determined at trial; an order enjoining New GM's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under KY. REV. STAT. ANN. § 367.220.

## FIFTY-FOURTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

1599.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of Class members who are Kentucky residents.

1600.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

1601.   The Companies knew these representations were false when made.

Case 1:14-md-02543-JMF    Document 547-2    Filed 01/10/14    Page 225 of 473

1602.   The vehicles purchased or leased by the Kentucky Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1603.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the Kentucky Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1604.   The aforementioned concealment was material, because if it had been disclosed the Kentucky Class would not have bought, leased or retained their vehicles.

1605.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

1606.   The Kentucky Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

1197532.10

1607.   As a result of their reliance, the Kentucky Class has been injured in an amount
to be proven at trial, including, but not limited to, their lost benefit of the bargain and
overpayment at the time of purchase and/or the diminished value of their vehicles.

1608.   The Companies' conduct was knowing, intentional, with malice, demonstrated
a complete lack of care, and was in reckless disregard for the rights of the Kentucky Class.
The Kentucky Class is entitled to an award of punitive damages.

## LOUISIANA

## FIFTY-FIFTH CLAIM FOR RELIEF

## VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (LA. REV. STAT. § 51:1401, *et. seq.*)

1609.   This claim is brought on behalf of Class members who are Louisiana residents
(the "Louisiana Class").

1610.   The Companies and the Louisiana Class are "persons" within the meaning of
the LA. REV. STAT. § 51:1402(8).

1611.   The Louisiana Class members are "consumers" within the meaning of the LA.
REV. STAT. § 51:1402(1).

1612.   The Companies engaged in "trade" or "commerce" within the meaning of LA.
REV. STAT. § 51:1402(9).

1613.   The Louisiana Unfair Trade Practices and Consumer Protection Law
("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or
commerce…" LA. REV. STAT. § 51:1405(A). Old GM and New GM both participated in
misleading, false, or deceptive acts that violated the Louisiana CPL. By failing to disclose and
actively concealing the dangerous ignition switch defect in the Defective Vehicles, both Old
GM and New GM engaged in deceptive business practices prohibited by the Louisiana CPL.

-407-

1614.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Louisiana CPL, and also has successor liability for the violations of Old GM.

1615.   As alleged above, both Companies knew of the ignition switch defects, while the Louisiana Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

1616.   The Companies knew or should have known that their conduct violated the Louisiana CPL.

1617.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

1618.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1197532.10

1619.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

1620.   The Companies each owed the Louisiana Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Louisiana Class; and/or

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Louisiana Class that contradicted these representations.

1621.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Louisiana Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

1622.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Louisiana Class, about the true safety and reliability of

-409-

Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Louisiana Class.

1623.   The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the Louisiana Class. Had the Louisiana Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1624.   All members of the Louisiana Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Louisiana Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Louisiana Class own vehicles that are not safe.

1625.   The Louisiana Class has been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1197532.10

1626.   The Louisiana Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the Louisiana CPL, and these violations present a continuing risk to the Louisiana Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

1627.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

1628.   As a direct and proximate result of the Companies' violations of the Louisiana CPL, the Louisiana Class have suffered injury-in-fact and/or actual damage.

1629.   Pursuant to LA. REV. STAT. § 51:1409, the Louisiana Class seeks to recover actual damages in an amount to be determined at trial; treble damages for New GM's knowing violations of the Louisiana CPL; an order enjoining New GM's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under LA. REV. STAT. § 51:1409.

1630.   Pursuant to LA. REV. STAT. § 51:1409(B), the Louisiana Class will mail a copy of this complaint to Louisiana's Attorney General

## FIFTY-SIXTH CLAIM FOR RELIEF

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (LA. CIV. CODE ART. 2520, 2524)

1631.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of the Louisiana Class.

1632.   At the time the Louisiana Class acquired their Defective Vehicles, those vehicles had a redhibitory defect within the meaning of LA. CIV. CODE ART. 2520, in that (a) the defective ignition switches rendered the use of the Defective Vehicles so inconvenient that the Louisiana Class either would not have purchased the Defective Vehicles had they

-411-

known of the defect, or, because the defective ignition switches so diminished the usefulness and/or value of the Defective Vehicles such that it must be presumed that the Louisiana Class would have purchased the Defective Vehicles, but for a lesser price.

1633.   No notice of the defect is required under LA. CIV. CODE ART. 2520, since Old GM had knowledge of a redhibitory defect in the Defective Vehicles at the time they were sold to the Louisiana Class.

1634.   Under LA. CIV. CODE ART. 2524, a warranty that the Defective Vehicles were in merchantable condition, or fit for ordinary use, was implied by law in the transactions when the Louisiana Class purchased their Defective Vehicles.

1635.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shutdown of power steering and power brakes and the non-deployment of airbags in the event of a collision.

1636.   Old GM and New GM were provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and communications sent by the Louisiana Class before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1637.   As a direct and proximate result of Old GM's sale of vehicles with redhibitory defects, and in violation of the implied warranty that the Defective Vehicles were fit for ordinary use, the Louisiana Class is entitled to either rescission or damages from New GM in an amount to be proven at trial.

1638.   New GM also has successor liability for Old GM's breach.

## FIFTY-SEVENTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

1639.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of the Louisiana Class.

1640.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

1641.   The Companies knew these representations were false when made.

1642.   The vehicles purchased or leased by the Louisiana Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1643.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the Louisiana Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1644.   The aforementioned concealment was material, because if it had been disclosed the Louisiana Class would not have bought, leased or retained their vehicles.

1645.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

-413-

1646.  The Louisiana Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

1647.  As a result of their reliance, the Louisiana Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1648.  The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Louisiana Class. The Louisiana Class is entitled to an award of punitive damages.

## FIFTY-EIGHTH CLAIM FOR RELIEF

### REDHIBITION
### LA. CIV. CODE ART. 2520, *et. seq.* and 2545
### (On Behalf of the Louisiana State Class)

1649.  Under Louisiana law, the seller and manufacturer warrants the buyer against redhibitory defects or vices in the thing sold. LA. CIV. CODE ART. 2520. A defect is redhibitory under two circumstances. First, a defect is redhibitory when it renders the thing useless, or renders its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. *Id.* The existence of such a defect gives a buyer the right to obtain rescission of the sale. *Id.* Second, a defect is redhibitory when it diminishes the usefulness or the value of the thing so that it must be presumed that a buyer would still have bought it, but for a lesser price. *Id.* The existence of such a defect entitles the buyer to a reduction in the price. *Id.*

1650.  Old GM and New GM defectively designed, manufactured, sold, or otherwise placed in the stream of commerce Vehicles that are defective.

-414-

1651.   Old GM and New GM have known of the defects and the safety hazards that result from the defects, as alleged herein, and have failed to adequately address those safety concerns.

1652.   New GM is responsible for damages caused by the failure of its products to conform to well-defined standards. In particular, the Defective Vehicles contain vices or defects which have rendered them useless or their use so inconvenient and unsafe that reasonable buyers would not have purchased them had they known of the defects, or at the least, would not have paid as much for the Vehicles as they did. The Louisiana Class members are entitled to obtain either rescission or a reduction in the purchase/lease price of the Vehicles from New GM.

1653.   Further, under Louisiana law, Old GM and New GM are deemed to know that the Vehicles contained redhibitory defects pursuant to LA. CIV. CODE ART. 2545. New GM is liable for the bad faith sale of defective products with knowledge of the defects and thus is liable to the Louisiana Class for the price of the Vehicles, with interest from the purchase or lease date, as well as reasonable expenses occasioned by the sale or lease of the Vehicles, as well as attorneys' fees.

1654.   Due to the defects and redhibitory vices in the Vehicles sold or leased to the Louisiana Class, they have suffered damages under Louisiana law.

## MAINE

## FIFTY-NINTH CLAIM FOR RELIEF

## VIOLATION OF MAINE UNFAIR TRADE PRACTICES ACT
### (ME. REV. STAT. ANN. TIT. 5 § 205-a, *et. seq.*)

1655.   This claim is brought on behalf of Class members who are Maine residents (the "Maine Class").

Case 1:14-md-02543-JMF    Document 547-2    Filed 11/11/14    Page 235 of 473

1656.   The Companies, and the Maine Class are, "persons" within the meaning of ME. REV. STAT. ANN. TIT. 5 § 206(2).

1657.   The Companies are engaged in "trade" or "commerce" within the meaning of ME. REV. STAT. ANN. TIT. § 206(3).

1658.   The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…." ME. REV. STAT. ANN. TIT. 5 § 207. In the course of the Companies' business, they each willfully failed to disclose and actively concealed the dangerous risk caused by the ignition switch defects in the Defective Vehicles. Accordingly, the Companies engaged in unfair or deceptive acts or practices. Old GM and New GM both participated in misleading, false, or deceptive acts that violated the Maine UTPA. By failing to disclose and actively concealing the dangerous ignition switch defect in the Defective Vehicles, both Old GM and New GM engaged in deceptive business practices prohibited by the Maine UTPA.

1659.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Maine UTPA, and also has successor liability for the violations of Old GM.

1660.   As alleged above, both Companies knew of the ignition switch defects, while the Maine Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

1661.   The Companies knew or should have known that their conduct violated the Maine UTPA.

1662.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

1663.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1664.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

1665.   The Companies each owed the Maine Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Maine Class; and/or

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Maine Class that contradicted these representations.

1666.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Maine Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

1667.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Maine Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Maine Class.

1668.   The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the Maine Class. Had the Maine Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1669.   All members of the Maine Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Maine Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and

-418-

failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Maine Class own vehicles that are not safe.

1670.    The Maine Class have been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1671.    The Maine Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the Maine UTPA, and these violations present a continuing risk to the Maine Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

1672.    The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

1673.    As a direct and proximate result of the Companies' violations of the Maine UTPA, the Maine Class has suffered injury-in-fact and/or actual damage.

1674.    Pursuant to ME. REV. STAT. ANN. TIT. 5 § 213, the Maine Class seeks an order enjoining Defendant's unfair and/or deceptive acts or practices, damages, punitive damages,

1197532.10

and attorneys' fees, costs, and any other just and proper relief available under the Maine
UTPA.

1675.   On October 12, 2014, Plaintiffs sent a notice letter complying with ME. REV.
STAT. ANN. TIT. 5, § 213(1-A). Plaintiffs presently do not claim the damages relief asserted in
this Complaint under the Maine UTPA until and unless New GM fails to remedy its unlawful
conduct towards the Class within the requisite time period, after which Plaintiffs seek all
damages and relief to which Plaintiffs and the Maine Class are entitled.

1676.   Pursuant to ME. REV. STAT. ANN. TIT. 5 § 213(3), Plaintiffs will mail a copy of
this complaint to Maine's Attorney General.

## SIXTIETH CLAIM FOR RELIEF

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (ME. REV. STAT. ANN. TIT. 11 § 2-314)

1677.   In the event the Court declines to certify a nationwide Class under Michigan
law, this claim is brought on behalf of Class members who are Maine residents.

1678.   Old GM and New GM were merchants with respect to motor vehicles within
the meaning of ME. REV. STAT. ANN. TIT. 11 § 2-104(1).

1679.   Under ME. REV. STAT. ANN. TIT. 11 § 2-314, a warranty that the Defective
Vehicles were in merchantable condition was implied by law in the transactions when the
Maine Class purchased their Defective Vehicles.

1680.   These vehicles, when sold and at all times thereafter, were not merchantable
and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective
Vehicles are inherently defective in that there are defects in the ignition switch systems that
permit sudden unintended shutdown to occur, with the attendant shutdown of power steering
and power brakes and the non-deployment of airbags in the event of a collision.

-420-

1681.   Old GM and New GM were provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and communications sent by the Maine Class before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1682.   As a direct and proximate result of Old GM and New GM's breach of the implied warranty of merchantability, the Maine Class has been damaged in an amount to be proven at trial. New GM also has successor liability for Old GM's breach.

### SIXTY-FIRST CLAIM FOR RELIEF

### FRAUD BY CONCEALMENT

1683.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of Class members who are Maine residents.

1684.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

1685.   The Companies knew these representations were false when made.

1686.   The vehicles purchased or leased by the Maine Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1687.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the Maine Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1688.   The aforementioned concealment was material, because if it had been disclosed the Maine Class would not have bought, leased or retained their vehicles.

1689.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

1690.   The Maine Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

1691.   As a result of their reliance, the Maine Class been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1692.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Maine Class, who are therefore entitled to an award of punitive damages.

## MARYLAND

## SIXTY-SECOND CLAIM FOR RELIEF

## VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT
### (MD. CODE COM. LAW § 13-101, *et. seq.*)

1693.   This claim is brought on behalf of Class members who are Maryland residents (the "Maryland Class").

Case 1:14-md-02543-JMF    Document 574-2    Filed 01/10/14    Page 242 of 473

1694.   The Companies and the Maryland Class are "persons" within the meaning of MD. CODE COM. LAW § 13-101(h).

1695.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale of any consumer good. MD. COM. LAW CODE § 13-303. Old GM and New GM both participated in misleading, false, or deceptive acts that violated the Maryland CPA. By failing to disclose and actively concealing the dangerous ignition switch defect in the Defective Vehicles, both Old GM and New GM engaged in deceptive business practices prohibited by the Maryland CPA.

1696.   The Companies' actions as set forth above occurred in the conduct of trade or commerce.

1697.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Maryland CPA, and also has successor liability for the violations of Old GM.

1698.   As alleged above, both Companies knew of the ignition switch defects, while the Maryland Class was deceived by the Companies' omission into believing the Defective

Vehicles were safe, and the information could not have reasonably been known by the consumer.

1699.   The Companies knew or should have known that their conduct violated the Maryland CPA.

1700.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

1701.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1702.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

1703.   The Companies each owed the Maryland Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.     Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

-424-

b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Maryland Class; and/or

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Maryland Class that contradicted these representations.

1704.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Maryland Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

1705.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Maryland Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Maryland Class.

1706.   The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the Maryland Class. Had the Maryland Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1707.   The Maryland Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Maryland Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective

Vehicles, and the many other serious safety issues and myriad defects in the Companies'
vehicles have come to light, and the Maryland Class own vehicles that are not safe.

1708.   The Maryland Class have been damaged by New GM's misrepresentations,
concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as
they are now holding vehicles whose value has greatly diminished because of New GM's
failure to timely disclose and remedy the serious defects. New GM's egregious and widely-
publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the
many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that
no reasonable consumer would purchase them—let alone pay what would otherwise be fair
market value for the vehicles.

1709.   The Maryland Class Members risk irreparable injury as a result of the
Companies' act and omissions in violation of the Maryland CPA, and these violations present
a continuing risk to them as well as to the general public. The Companies' unlawful acts and
practices complained of herein affect the public interest.

1710.   The recalls and repairs instituted by New GM have not been adequate. The
recall is not an effective remedy and is not offered for all Defective Vehicles.

1711.   As a direct and proximate result of the Companies' violations of the Maryland
CPA, the Maryland Class has suffered injury-in-fact and/or actual damage.

1712.   Pursuant to MD. CODE COM. LAW § 13-408, the Maryland Class seek actual
damages, attorneys' fees, and any other just and proper relief available under the Maryland
CPA.

## SIXTY-THIRD CLAIM FOR RELIEF

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MD. CODE COM. LAW § 2-314)

1713.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of Class members who are Maryland residents.

1714.   Old GM and New GM were merchants with respect to motor vehicles within the meaning of MD. COM. LAW § 2-104(1).

1715.   Under MD. COM. LAW § 2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when the Maryland Class purchased their Defective Vehicles.

1716.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shutdown of power steering and power brakes and the non-deployment of airbags in the event of a collision.

1717.   Old GM and New GM were provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and communications sent by the Maryland Class before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1718.   As a direct and proximate result of Old GM and New GM's breach of the implied warranty of merchantability, the Maryland Class has been damaged in an amount to be proven at trial. New GM also has successor liability for Old GM's breach.

## SIXTY-FOURTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

1719.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of Class members who are Maryland residents.

1720.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

1721.   The Companies knew these representations were false when made.

1722.   The vehicles purchased or leased were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1723.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the Maryland Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1724.   The aforementioned concealment was material, because if it had been disclosed the Maryland Class would not have bought, leased or retained their vehicles.

1725.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

1197532.10

1726.   The Maryland Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

1727.   As a result of their reliance, the Maryland Class been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1728.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Maryland Class, who are therefore entitled to an award of punitive damages.

## MASSACHUSETTS

## SIXTY-FIFTH CLAIM FOR RELIEF

## DECEPTIVE ACTS OR PRACTICES PROHIBITED BY MASSACHUSETTS LAW
### (MASS. GEN. LAWS CH. 93A, § 1, *et. seq.*)

1729.   This claim is brought on behalf of Class members who are Massachusetts residents (the "Massachusetts Class or "The MA Class"").

1730.   The Companies and the Massachusetts Class are "persons" within the meaning of MASS. GEN. LAWS ch. 93A, § 1(a).

1731.   The Companies engaged in "trade" or "commerce" within the meaning of MASS. GEN. LAWS ch. 93A, § 1(b).

1732.   Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." MASS. GEN. LAWS ch. 93A, § 2. Old GM and New GM both participated in misleading, false, or deceptive acts that violated the Massachusetts Act. By failing to disclose and actively concealing the dangerous ignition

switch defect in the Defective Vehicles, both Old GM and New GM engaged in deceptive
business practices prohibited by the Massachusetts Act.

1733.   In the course of their business, both Old GM and New GM willfully failed to
disclose and actively concealed the dangerous ignition switch defects in the Defective
Vehicles as described herein and otherwise engaged in activities with a tendency or capacity
to deceive. Old GM and New GM also engaged in unlawful trade practices by employing
deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression
or omission of any material fact with intent that others rely upon such concealment,
suppression or omission, in connection with the sale of Defective Vehicles. New GM is
directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or
commerce in violation of the Massachusetts Act, and also has successor liability for the
violations of Old GM.

1734.   As alleged above, both Companies knew of the ignition switch defects, while
the Massachusetts Class was deceived by the Companies' omission into believing the
Defective Vehicles were safe, and the information could not have reasonably been known by
the consumer.

1735.   The Companies knew or should have known that their conduct violated the
Massachusetts Act.

1736.   As alleged above, the Companies made material statements about the safety
and reliability of Defective Vehicles that were either false or misleading.

1737.   Old GM engaged in a deceptive trade practice when it failed to disclose
material information concerning the Defective Vehicles which it knew at the time of the sale.
Old GM deliberately withheld the information about the vehicles' propensity to inadvertently

-430-

shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1738.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

1739.   The Companies each owed the MA Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the MA Class; and/or

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the MA Class that contradicted these representations.

1740.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the MA Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

1741.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the MA Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Massachusetts Class.

1742.   The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the Massachusetts Class. Had the Massachusetts Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1743.   The Massachusetts Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Massachusetts Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Massachusetts Class owns vehicles that are not safe.

1744.   The Massachusetts Class Members have been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1197532.10

1745.   Massachusetts Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the Massachusetts Act, and these violations present a continuing risk to the MA Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

1746.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

1747.   As a direct and proximate result of the Companies' violations of the Massachusetts Act, the Massachusetts Class have suffered injury-in-fact and/or actual damage.

1748.   Pursuant to MASS. GEN. LAWS ch. 93A, § 9, the Massachusetts Class seeks monetary relief against New GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Massachusetts Class Member. Because Defendant's conduct was committed willfully and knowingly, up to three times actual damages, but no less than two times actual damages, is warranted as a recovery for each Massachusetts Class Member.

1749.   The Massachusetts Class also seeks an order enjoining New GM's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

1750.   Massachusetts Plaintiffs have complied with the notice requirement set forth in MASS. GEN. LAWS ch. 93A, § 9(3) by virtue of the notice previously provided in the context of the underlying action styled *Dinco, et al. v GM*, 2:14-cv-03638-JVS-AN (C.D. Cal.), and other underlying actions, as well as additional notice in the form of a demand letter sent on October 12, 2014.

## SIXTY-SIXTH CLAIM FOR RELIEF

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (ALM GL. CH. 106, § 2-314)

1751.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of Class members who are Massachusetts residents.

1752.   Old GM and New GM were merchants with respect to motor vehicles within the meaning of ALM GL CH. 106, § 2-104(1).

1753.   Under ALM GL CH. 106, § 2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the Defective Vehicle transactions.

1754.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shutdown of power steering and power brakes and the non-deployment of airbags in the event of a collision.

1755.   Old GM and New GM were provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and communications sent by the Massachusetts Class before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1756.   As a direct and proximate result of Old GM and New GM's breach of the implied warranty of merchantability, the Massachusetts Class has been damaged in an amount to be proven at trial. New GM also has successor liability for Old GM's breach.

## SIXTY-SEVENTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

1757.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of Class members who are Massachusetts residents.

1758.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

1759.   The Companies knew these representations were false when made.

1760.   The vehicles purchased or leased by the MA Class, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1761.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the MA Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1762.   The aforementioned concealment was material, because if it had been disclosed the MA Class would not have bought, leased or retained their vehicles.

1763.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

1197532.10

1764.   The MA Class relied on the Companies' reputation—along with their failure to
disclose the ignition switch system problems and the Companies' affirmative assurance that
its vehicles were safe and reliable and other similar false statements—in purchasing, leasing
or retaining the Defective Vehicles.

1765.   As a result of their reliance, MA Class Members have been injured in an
amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and
overpayment at the time of purchase and/or the diminished value of their vehicles.

1766.   The Companies' conduct was knowing, intentional, with malice, demonstrated
a complete lack of care, and was in reckless disregard for the rights of the Massachusetts
Class, who are therefore entitled to an award of punitive damages.

## MICHIGAN

## SIXTY-EIGHTH CLAIM FOR RELIEF

### VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
(MICH. COMP. LAWS § 445.903, *et. seq.*)

1767.   This claim is brought under Michigan law on behalf of the Michigan Class for
equitable injunctive relief , actual damages, and statutory penalties.

1768.   Michigan Class Members were "person[s]" within the meaning of the MICH.
COMP. LAWS § 445.902(1)(d).

1769.   At all relevant times hereto, the Companies were "persons" engaged in "trade
or commerce" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d) and (g).

1770.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair,
unconscionable, or deceptive methods, acts, or practices in the conduct of trade or
commerce…." MICH. COMP. LAWS § 445.903(1). Old GM and New GM engaged in unfair,
unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA,

-436-

including: "(c) Representing that goods or services have… characteristics… that they do not have….;" "(e) Representing that goods or services are of a particular standard… if they are of another;" "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." MICH. COMP. LAWS § 445.903(1). By failing to disclose and actively concealing the dangerous ignition switch defect in the Defective Vehicles, Old GM and New GM both participated in unfair, deceptive, and unconscionable acts that violated the Michigan CPA.

1771. In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defect in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Michigan CPA, and also has successor liability for the violations of Old GM.

1772. As alleged above, both Companies knew of the ignition switch defects, and the Michigan Class was deceived by the Companies' omissions into believing the Defective

1197532.10

Vehicles were safe. The true information could not have reasonably been known by the consumer.

1773.    The Companies knew or should have known that their conduct violated the Michigan CPA.

1774.    As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

1775.    Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1776.    From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

1777.    The Companies each owed the Michigan Class an independent duty, based on their respective knowledge, to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they each:

a.    Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

1197532.10

b.    Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from Plaintiffs; and/or

c.    Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1778.   The Defective Vehicles posed and/or continue to pose an unreasonable risk of death or serious bodily injury to the Michigan Class passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

1779.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Michigan Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Michigan Class.

1780.   The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the Michigan Class. Had the Michigan Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1781.   The Michigan Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Michigan Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective

Vehicles, and the many other serious safety issues and myriad defects in the Companies'
vehicles have come to light, and the Michigan Class owns vehicles that are not safe.

1782.    The Michigan Class has been damaged by New GM's misrepresentations,
concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as
they are now holding vehicles whose value has greatly diminished because of New GM's
failure to timely disclose and remedy the serious defects. New GM's egregious and widely-
publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the
many other serious defects in GM vehicles, have so tarnished the Defective Vehicles that no
reasonable consumer would purchase them—let alone pay what would otherwise be fair
market value for the vehicles.

1783.    Michigan Class Members were—and continue to be—at risk of irreparable
injury as a result of the respective Companies' acts and omissions in violation of the Michigan
CPA, and these violations present a continuing risk to the Michigan Class as well as to the
general public. The Companies' unlawful acts and practices complained of herein affect the
public interest.

1784.    The recalls and repairs instituted by New GM have not been adequate. The
recall is not an effective remedy and is not offered for all Defective Vehicles.

1785.    As a direct and proximate result of the Companies' violations of the Michigan
CPA, the Michigan Class has suffered injury-in-fact and/or actual damage.

1786.    The Michigan Class seeks injunctive relief to enjoin New GM from continuing
its unfair and deceptive acts; monetary relief against New GM measured as the greater of
(a) actual damages in an amount to be determined at trial and (b) statutory damages in the
amount of $250 for each Michigan Class Member; reasonable attorneys' fees; declaratory

relief in the nature of a judicial determination of whether each Company's conduct violated

the Michigan Statute, the just total amount of penalties to be assessed against each thereunder,

and the formula and procedure for fair and equitable allocation of statutory penalties among

the Michigan Class; and any other just and proper relief available under MICH. COMP. LAWS

§ 445.911.

1787.   The Michigan Class also seeks punitive damages against New GM because it

carried out despicable conduct with willful and conscious disregard of the rights and safety of

others. New GM intentionally and willfully misrepresented the safety and reliability of

Defective Vehicles, deceived Michigan Class Members on life-or-death matters, and

concealed material facts that only it knew, all to avoid the expense and public relations

nightmare of correcting a deadly flaw in the Defective Vehicles it repeatedly promised

Michigan Class Members were safe. New GM's unlawful conduct constitutes malice,

oppression, and fraud warranting punitive damages.

## SIXTY-NINTH CLAIM FOR RELIEF

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MICH. COMP. LAWS § 440.2314)

1788.   This claim is brought on behalf of Michigan residents (the "Michigan Class").

1789.   Old GM and New GM were merchants with respect to motor vehicles within

the meaning of MICH. COMP. LAWS § 440.2314(1).

1790.   Under MICH. COMP. LAWS § 440.2314, a warranty that the Defective Vehicles

were in merchantable condition was implied by law in the transactions when Michigan Class

members purchased their Defective Vehicles.

1791.   These vehicles, when sold and at all times thereafter, were not merchantable

and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective

-441-

Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shutdown of power steering and power brakes and the non-deployment of airbags in the event of a collision.

1792.   Old GM and New GM were provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and communications sent by the Michigan Class before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1793.   As a direct and proximate result of Old GM and New GM's breach of the implied warranty of merchantability, the Michigan Class has been damaged in an amount to be proven at trial. New GM also has successor liability for Old GM's breach.

1794.   The Michigan Class also seeks available equitable and/or injunctive relief. Based on New GM's continuing failures to fix the known dangerous defects, the Michigan Class seeks a declaration that New GM has not adequately implemented its recall commitments and requirements and general commitments to fix its failed processes, and injunctive relief in the form of judicial supervision over the recall process is warranted. The Michigan Class also seeks the establishment of a New GM-funded program for Plaintiffs and Class members to recover out of pocket costs incurred.

### SEVENTIETH CLAIM FOR RELIEF

### FRAUD BY CONCEALMENT

1795.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of Class members who are Michigan residents.

1796.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

1797.   The Companies knew these representations were false when made.

1798.   The vehicles purchased or leased by the Michigan Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1799.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the Michigan Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1800.   The aforementioned concealment was material, because if it had been disclosed the Michigan Class would not have bought, leased or retained their vehicles.

1801.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

1802.   The Michigan Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

1803.   As a result of their reliance, the Michigan Class Members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1804.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Michigan Class, who are therefore entitled to an award of punitive damages.

## MINNESOTA

### SEVENTY-FIRST CLAIM FOR RELIEF

### VIOLATION OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT (MINN. STAT. § 325f.68, *et. seq.*)

1805.   This claim is brought on behalf of Class members who are Minnesota residents (the "Minnesota Class").

1806.   The Defective Vehicles constitute "merchandise" within the meaning of MINN. STAT. § 325F.68(2).

1807.   The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby…" MINN. STAT. § 325F.69(1). Old GM and New GM both participated in misleading, false, or deceptive acts that violated the Minnesota CFA. By failing to disclose and actively concealing the dangerous ignition switch defects in the Defective Vehicles, both Old GM and New GM engaged in deceptive business practices prohibited by the Minnesota CFA.

1808.   The Companies' actions as set forth above occurred in the conduct of trade or commerce.

1809.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Minnesota CFA, and also has successor liability for the violations of Old GM.

1810.   As alleged above, both Companies knew of the ignition switch defects, while the Minnesota Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

1811.   The Companies knew or should have known that their conduct violated the Minnesota CFA.

1812.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

1813.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently

-445-

shutdown in order to ensure that consumers would purchase its vehicles and to induce the

consumer to enter into a transaction.

1814.   From its inception in 2009, New GM has known of the ignition switch defects

that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits

and to avoid remediation costs and a public relations nightmare, New GM concealed the

defects and their tragic consequences and allowed unsuspecting new and used car purchasers

to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to

continue driving highly dangerous vehicles.

1815.   The Companies each owed the Minnesota Class a duty to disclose the defective

nature of Defective Vehicles, including the dangerous risk of ignition switch movement,

engine shutdown, and disabled safety airbags, because they:

a.       Possessed exclusive knowledge of the defects rendering Defective

Vehicles inherently more dangerous and unreliable than similar vehicles;

b.       Intentionally concealed the hazardous situation with Defective Vehicles

through their deceptive marketing campaign and recall program that they designed to hide the

life-threatening problems from the Minnesota Class; and/or

c.       Made incomplete representations about the safety and reliability of

Defective Vehicles generally, and the ignition switch in particular, while purposefully

withholding material facts from the Minnesota Class that contradicted these representations.

1816.   The Defective Vehicles posed and/or pose an unreasonable risk of death or

serious bodily injury to the Minnesota Class, passengers, other motorists, pedestrians, and the

public at large, because they are susceptible to incidents of sudden and unintended engine

shutdown.

1817.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Minnesota Class.

1818.   The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the Minnesota Class. Had the Minnesota Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1819.   The Minnesota Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Minnesota Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Minnesota Class owns vehicles that are not safe.

1820.   The Minnesota Class Members have been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1821.   Minnesota Class Members risk irreparable injury as a result of the Companies'

act and omissions in violation of the Minnesota CFA, and these violations present a

continuing risk to them as well as to the general public. The Companies' unlawful acts and

practices complained of herein affect the public interest.

1822.   The recalls and repairs instituted by New GM have not been adequate. The

recall is not an effective remedy and is not offered for all Defective Vehicles.

1823.   As a direct and proximate result of the Companies' violations of the Minnesota

CFA, the Minnesota Class has suffered injury-in-fact and/or actual damage.

1824.   Pursuant to MINN. STAT. § 8.31(3a), the Minnesota Class seeks actual damages,

attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

1825.   The Minnesota Class also seeks punitive damages under MINN. STAT.

§ 549.20(1)(a) give the clear and convincing evidence that New GM's acts show deliberate

disregard for the rights or safety of others.

### SEVENTY-SECOND CLAIM FOR RELIEF

### VIOLATION OF MINNESOTA UNIFORM
### DECEPTIVE TRADE PRACTICES ACT
#### (MINN. STAT. § 325d.43-48, *et. seq.*)

1826.   This claim is brought on behalf of Class members who are Minnesota residents.

1827.   The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits

deceptive trade practices, which occur when a person "(5) represents that goods or services

have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they

do not have or that a person has a sponsorship, approval, status, affiliation, or connection that

the person does not have;" "(7) represents that goods or services are of a particular standard,

quality, or grade, or that goods are of a particular style or model, if they are of another;" and

"(9) advertises goods or services with intent not to sell them as advertised." MINN. STAT.

1197532.10

§ 325D.44. In the course of the Companies' business, they each willfully failed to disclose and actively concealed the dangerous risk caused by the ignition switch defects in the Defective Vehicles and engaged in deceptive practices by representing that Defective Vehicles have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; representing that Defective Vehicles are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising Defective Vehicles with intent not to sell them as advertised. Old GM and New GM both participated in misleading, false, or deceptive acts that violated the Minnesota DTPA. By failing to disclose and actively concealing the dangerous ignition switch defects in the Defective Vehicles, both Old GM and New GM engaged in deceptive business practices prohibited by the Minnesota DTPA.

1828.   The Companies' actions as set forth above occurred in the conduct of trade or commerce.

1829.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Minnesota DTPA, and also has successor liability for the violations of Old GM.

1197532.10

1830.   As alleged above, both Companies knew of the ignition switch defects, while the Minnesota Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

1831.   The Companies knew or should have known that their conduct violated the Minnesota DTPA.

1832.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

1833.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1834.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

1835.   The Companies each owed the Minnesota Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.    Possessed exclusive knowledge of the defects rendering Defective
Vehicles inherently more dangerous and unreliable than similar vehicles;

b.    Intentionally concealed the hazardous situation with Defective Vehicles
through their deceptive marketing campaign and recall program that they designed to hide the
life-threatening problems; and/or

c.    Made incomplete representations about the safety and reliability of
Defective Vehicles generally, and the ignition switch in particular, while purposefully
withholding material facts from the Minnesota that contradicted these representations.

1836.   The Defective Vehicles posed and/or pose an unreasonable risk of death or
serious bodily injury to the Minnesota Class passengers, other motorists, pedestrians, and the
public at large, because they are susceptible to incidents of sudden and unintended engine
shutdown.

1837.   The Companies' unfair or deceptive acts or practices were likely to deceive
reasonable consumers about the true safety and reliability of Defective Vehicles. The
Companies intentionally and knowingly misrepresented material facts regarding the Defective
Vehicles with an intent to mislead the Minnesota Class.

1838.   The propensity of the Defective Vehicles to inadvertently shutdown during
ordinary operation was material to the Minnesota Class. Had the Minnesota Class Members
known that their vehicles had these serious safety defects, they would either not have
purchased their Defective Vehicles, or would have paid less for them than they did.

1839.   The Minnesota Class suffered ascertainable loss caused by the Companies'
failure to disclose material information. The Minnesota Class Members overpaid for their
vehicles and did not receive the benefit of their bargain. As the result of the concealment and

failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Minnesota Class owns vehicles that are not safe.

1840.   The Minnesota Class Members have been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1841.   The Minnesota Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the Minnesota DTPA, and these violations present a continuing risk to the Minnesota Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

1842.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

1843.   As a direct and proximate result of the Companies' violations of the Minnesota DTPA, the Minnesota Class has suffered injury-in-fact and/or actual damages.

1844.  Pursuant to MINN. STAT. § 8.31(3a) and 325D.45, the Minnesota Class seeks

actual damages, attorneys' fees, and any other just and proper relief available under the

Minnesota DTPA.

1845.  The Minnesota Class also seeks punitive damages under MINN. STAT.

§ 549.20(1)(a) give the clear and convincing evidence that New GM's acts show deliberate

disregard for the rights or safety of others.

### SEVENTY-THIRD CLAIM FOR RELIEF

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MINN. STAT. § 336.2-314)

1846.  In the event the Court declines to certify a nationwide Class under Michigan

law, this claim is brought on behalf of Class members who are Minnesota residents.

1847.  Old GM and New GM were merchants with respect to motor vehicles within

the meaning of MINN. STAT. § 336.2-104(1).

1848.  Under MINN. STAT. § 336.2-314, a warranty that the Defective Vehicles were

in merchantable condition was implied by law in the transactions when the Minnesota Class

purchased their Defective Vehicles.

1849.  These vehicles, when sold and at all times thereafter, were not merchantable

and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective

Vehicles are inherently defective in that there are defects in the ignition switch systems that

permit sudden unintended shutdown to occur, with the attendant shutdown of power steering

and power brakes and the non-deployment of airbags in the event of a collision.

1850.  Old GM and New GM were provided notice of these issues by numerous

complaints filed against them, internal investigations, and by numerous individual letters and

communications sent by the Minnesota Class before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1851.   As a direct and proximate result of Old GM and New GM's breach of the implied warranty of merchantability, the Minnesota Class has been damaged in an amount to be proven at trial. New GM also has successor liability for Old GM's breach.

<b><u>SEVENTY-FOURTH CLAIM FOR RELIEF</u></b>

<b><u>FRAUD BY CONCEALMENT</u></b>

1852.   This claim is brought on behalf of Class members who are Minnesota residents.

1853.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

1854.   The Companies knew these representations were false when made.

1855.   The vehicles purchased or leased by the Minnesota Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1856.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the Minnesota Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1857.   The aforementioned concealment was material, because if it had been disclosed the Minnesota Class Members would not have bought, leased or retained their vehicles.

1858.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used

-454-

motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

1859.  The Minnesota Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

1860.  As a result of their reliance, they have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1861.  The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Minnesota Class, who are therefore entitled to an award of punitive damages.

## MISSISSIPPI

## SEVENTY-FIFTH CLAIM FOR RELIEF

## VIOLATION OF MISSISSIPPI CONSUMER PROTECTION ACT
### (MISS. CODE. ANN. § 75-24-1, et. seq.)

1862.  This claim is brought solely on behalf of Class members who are Mississippi residents (the "Mississippi Class").

1863.  The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair or deceptive trade practices in or affecting commerce…." MISS. CODE. ANN. § 75-24-5(1). Unfair or deceptive practices include, but are not limited to, "(e) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or

-455-

quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;" "(g) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(i) Advertising goods or services with intent not to sell them as advertised." Old GM and New GM participated in deceptive trade practices that violated the Mississippi CPA as described herein, including representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a particular standard and quality when they are not; and advertising Defective Vehicles with the intent not to sell them as advertised.

1864.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defect in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Mississippi CPA, and also has successor liability for the violations of Old GM.

1865.   As alleged above, both Companies knew of the ignition switch defects, while the Mississippi Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

1866.   The Companies knew or should have known that their conduct violated the Mississippi CPA.

1867.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

1868.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1869.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

1870.   The Companies each owed the Mississippi Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Mississippi Class; and/or

-457-

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts that contradicted these representations.

1871.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Mississippi Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

1872.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Mississippi, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Mississippi Class.

1873.   The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the Mississippi Class. Had the Mississippi Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1874.   All members of the Mississippi Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Mississippi Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Mississippi Class owns vehicles that are not safe.

1875.   The Mississippi Class Members have been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1876.   The Mississippi Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the Mississippi CPA, and these violations present a continuing risk to the Mississippi Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

1877.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

1878.   As a direct and proximate result of the Companies' violations of the Mississippi CPA, the Mississippi Class has suffered injury-in-fact and/or actual damage.

1879.   The actual damages of the Mississippi Class will be determined at trial, and the Mississippi Class seeks these damages as well as any other just and proper relief available under the Mississippi CPA.

## SEVENTY-SIXTH CLAIM FOR RELIEF

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MISS. CODE ANN. § 75-2-314)

1880.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is solely on behalf of Class members who are Mississippi residents.

1881.   Old GM and New GM were merchants with respect to motor vehicles within the meaning of MISS. CODE ANN. § 75-2-104(1).

1882.   Under MISS. CODE ANN. § 75-2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when the Mississippi Class purchased their Defective Vehicles.

1883.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shutdown of power steering and power brakes and the non-deployment of airbags in the event of a collision.

1884.   Old GM and New GM were provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and communications sent by the Mississippi Class before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1885.   As a direct and proximate result of Old GM and New GM's breach of the implied warranty of merchantability, the Mississippi Class has been damaged in an amount to be proven at trial. New GM also has successor liability for Old GM's breach.

## SEVENTY-SEVENTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

1886.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of Class members who are Mississippi residents.

1887.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

1888.   The Companies knew these representations were false when made.

1889.   The vehicles purchased or leased by the Mississippi Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1890.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because the Mississippi Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1891.   The aforementioned concealment was material, because if it had been disclosed the Mississippi Class would not have bought, leased or retained their vehicles.

1892.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

1893.   The Mississippi Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

1894.   As a result of their reliance, the Mississippi Class Members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1895.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Mississippi Class, who are therefore entitled to an award of punitive damages.

## MISSOURI

## SEVENTY-EIGHTH CLAIM FOR RELIEF

## VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT
### (MO. REV. STAT. § 407.010, *et. seq.*)

1896.   Plaintiffs bring this claim on behalf of Class members who are Missouri residents (the "Missouri Class") .

1897.   New GM, Old GM, and the Missouri Class are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

1898.   Old GM and New GM engaged in "trade" or "commerce" within the meaning of MO. REV. STAT. § 407.010(7).

1899.   The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise…." MO. REV. STAT. § 407.020.

1900.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity

to deceive. Old GM and New GM also engaged in unlawful trade practices by employing

deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression,

or omission of any material fact with intent that others rely upon such concealment,

suppression, or omission, in connection with the sale of Defective Vehicles. New GM is

directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or

commerce in violation of the Missouri MPA, and also has successor liability for the violations

of Old GM.

1901.   As alleged above, both Companies knew of the ignition switch defects, while

the Missouri Class was deceived by the Companies' omission into believing the Defective

Vehicles were safe, and the information could not have reasonably been known by the

consumer.

1902.   The Companies knew or should have known that their conduct violated the

Missouri MPA.

1903.   As alleged above, the Companies made material statements about the safety

and reliability of Defective Vehicles that were either false or misleading.

1904.   Old GM engaged in a deceptive trade practice when it failed to disclose

material information concerning the Defective Vehicles which it knew at the time of the sale.

Old GM deliberately withheld the information about the vehicles' propensity to inadvertently

shutdown in order to ensure that consumers would purchase its vehicles and to induce the

consumer to enter into a transaction.

1905.   From its inception in 2009, New GM has known of the ignition switch defects

that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits

and to avoid remediation costs and a public relations nightmare, New GM concealed the

defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

1906.  The Companies each owed the Missouri Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Missouri Class; and/or

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Missouri Class that contradicted these representations.

1907.  The Defective Vehicles pose an unreasonable risk of death or serious bodily injury to the Missouri Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

1908.  The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Missouri Class.

1909.  The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the Missouri Class. Had the Missouri Class known that

their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1910.   All members of the Missouri Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Missouri Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Missouri Class owns vehicles that are not safe.

1911.   The Missouri Class Members have been damaged by Old GM and New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of Old GM and New GM's failure to timely disclose and remedy the serious defects. Old GM and New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in Old GM and New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1912.   The Missouri Class Members risk irreparable injury as a result of the Companies' acts and omissions in violation of the Missouri MPA, and these violations present a continuing risk to them as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

-465-

1913.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

1914.   As a direct and proximate result of the Companies' violations of the Missouri MPA, the Missouri Class has suffered injury-in-fact and/or actual damage.

1915.   New GM is liable to the Missouri Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining New GM's unfair and deceptive practices, and any other just and proper relief under MO. REV. STAT. § 407.025.

1916.   Pursuant to MO. REV. STAT. § 407.010, Plaintiffs will serve the Missouri Attorney General with a copy of this complaint as Plaintiffs seek injunctive relief.

1917.   Both companies conduct as described herein is unethical, oppressive, or unscrupulous and/or it presented a risk of substantial injury to consumers whose vehicles were prone to fail at times and under circumstances that could have resulted in death. Such acts are unfair practices in violation of 15 Mo. Code Reg. 60-8.020.

## SEVENTY-NINTH CLAIM FOR RELIEF

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MO. REV. STAT. § 400.2-314)

1918.   In the event the Court declines to certify a nationwide Class under

1919.   Michigan law, Plaintiffs bring this claim on behalf the Missouri Class.

1920.   Old GM and New GM were merchants with respect to motor vehicles.

1921.   Under MO. REV. STAT. § 400.2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when the Missouri Class purchased their Defective Vehicles.

1197532.10

Case 1:14-md-02543-JMF    Document 547-2    Filed 10/14/14    Page 236 of 473

1922.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shutdown of power steering and power brakes and the non-deployment of airbags in the event of a collision.

1923.   Old GM and New GM were provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and communications sent by Missouri Class members before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1924.   As a direct and proximate result of Old GM and New GM's breach of the warranties of merchantability, the Missouri Class has been damaged in an amount to be proven at trial. New GM has successor liability for Old GM's breach.

## EIGHTIETH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

1925.   In the event the Court declines to certify a nationwide Class under Michigan law, Plaintiffs bring this claim on behalf the Missouri Class.

1926.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

1927.   The Companies knew these representations were false when made.

1928.   The vehicles purchased or leased by the Missouri Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1929.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision because the Missouri Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1930.   The aforementioned concealment was material because if it had been disclosed the Missouri Class would not have bought, leased or retained their vehicles. When Missouri Class members bought a Defective Vehicle for personal, family, or household purposes, they reasonably expected the vehicle would not change ignition position unless the driver turned the key.

1931.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing, leasing, or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

1932.   Missouri Class members relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

1933.   As a result of their reliance, the Missouri Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1197532.10

1934.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Missouri Class. Missouri Class members are therefore entitled to an award of punitive damages.

## MONTANA

## EIGHTY-FIRST CLAIM FOR RELIEF

## VIOLATION OF MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT OF 1973
### (MONT. CODE ANN. § 30-14-101, et. seq.)

1935.   This claim is brought on behalf of Class members who are Montana residents (the "Montana Class").

1936.   Old GM, New GM, and the Montana Class are "person[s]" within the meaning of MONT. CODE ANN. § 30-14-102(6).

1937.   Montana Class members are "consumer[s]" under MONT. CODE ANN. § 30-14-102(1).

1938.   The sale or lease of the Defective Vehicles to Montana Class members occurred within "trade and commerce" within the meaning of MONT. CODE ANN. § 30-14-102(8), and the Companies committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

1939.   The Montana Unfair Trade Practices and Consumer Protection Act ("Montana CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." MONT. CODE ANN. § 30-14-103. By failing to disclose and actively concealing the dangerous ignition switch defects in the Defective Vehicles, both Old GM and New GM engaged in unfair and deceptive acts or practices in violation of the Montana CPA.

-469-

1940.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Montana CPA, and also has successor liability for the violations of Old GM.

1941.   As alleged above, both Companies knew of the ignition switch defects, while the Montana Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

1942.   The Companies knew or should have known that their conduct violated the Montana CPA.

1943.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

1944.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1945.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

1946.   The Companies each owed the Montana Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Montana Class; and/or

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Montana Class that contradicted these representations.

1947.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Montana Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

1948.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Montana Class, about the true safety and reliability of

-471-

Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Montana Class.

1949.   The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the Montana Class. When Montana Class members bought their Defective Vehicles, they reasonably expected the vehicle would not change ignition position unless the driver turned the key. Had Montana Class members known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1950.   All members of the Montana Class suffered ascertainable loss caused by the Companies' failure to disclose material information. Montana Class members overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and Montana Class members own vehicles that are not safe.

1951.   The Montana Class has been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of Old GM and New GM's failure to timely disclose and remedy the serious defects. Old GM and New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in Old GM and New GM vehicles, have so

1197532.10

tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

1952.   Montana Class members risk irreparable injury as a result of the Companies' acts and omissions in violation of the Montana CPA, and these violations present a continuing risk to the Montana Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

1953.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

1954.   As a direct and proximate result of the Companies' violations of the Montana CPA, the Montana Class has suffered injury-in-fact and/or actual damage.

1955.   Because the Companies' unlawful methods, acts, and practices have caused Montana Class members to suffer an ascertainable loss of money and property, the Montana Class seeks from New GM actual damages or $500, whichever is greater, discretionary treble damages, reasonable attorneys' fees, an order enjoining New GM's unfair, unlawful and/or deceptive practices, and any other relief the Court considers necessary or proper, under MONT. CODE ANN. § 30-14-133.

## EIGHTY-SECOND CLAIM FOR RELIEF

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MONT. CODE § 30-2-314)

1956.   In the event the Court declines to certify a nationwide Class, Plaintiffs bring this claim on behalf of the Montana Class.

1957.   Old GM and New GM were merchants with respect to motor vehicles under MONT. CODE § 30-2-104.

1958.   Under MONT. CODE § 30-2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Montana Class members purchased their Defective Vehicles.

1959.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shutdown of power steering and power brakes and the non-deployment of airbags in the event of a collision. .

1960.   Old GM and New GM were provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and communications sent by Montana Class members before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1961.   As a direct and proximate result of Old GM and New GM's breach of the warranties of merchantability, the Montana Class has been damaged in an amount to be proven at trial. New GM has successor liability for Old GM's breach.

## EIGHTY-THIRD CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

1962.   In the event the Court declines to certify a nationwide Class under Michigan law, Plaintiffs bring this claim on behalf of the Montana Class.

1963.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

1964.   The Companies knew these representations were false when made.

1965.   The vehicles purchased or leased by the Montana Class were, in fact, defective, unsafe, and unreliable, because the vehicles were subject to sudden unintended shutdown,

-474-

with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

1966.    The Companies had a duty to disclose that these vehicles were defective, unsafe, and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision because the Montana Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

1967.    The aforementioned concealment was material because if it had been disclosed the Montana Class would not have bought, leased, or retained their vehicles.

1968.    The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing, leasing, or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

1969.    The Montana Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing, or retaining the Defective Vehicles.

1970.    As a result of their reliance, Montana Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1971.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Montana Class. Montana Class members are therefore entitled to an award of punitive damages.

## NEBRASKA

## EIGHTY-FOURTH CLAIM FOR RELIEF

## VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT
### (NEB. REV. STAT. § 59-1601, *et. seq.*)

1972.   This claim is brought on behalf of Class members who are Nebraska residents (the "Nebraska Class").

1973.   Old GM, New GM, and Nebraska Class members are "person[s]" under the Nebraska Consumer Protection Act ("Nebraska CPA"), NEB. REV. STAT. § 59-1601(1).

1974.   The Companies' actions as set forth herein occurred in the conduct of trade or commerce as defined under NEB. REV. STAT. § 59-1601(2).

1975.   The Nebraska CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." NEB. REV. STAT. § 59-1602. The conduct of Old GM and New GM as set forth herein constitutes unfair or deceptive acts or practices.

1976.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or

-476-

commerce in violation of the Nebraska CPA, and also has successor liability for the violations of Old GM.

1977.   As alleged above, both Companies knew of the ignition switch defects, while the Nebraska Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

1978.   The Companies knew or should have known that their conduct violated the Nebraska CPA.

1979.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

1980.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1981.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

1982.   The Companies each owed the Nebraska Class a duty to disclose the defective

nature of Defective Vehicles, including the dangerous risk of ignition switch movement,

engine shutdown, and disabled safety airbags, because they:

        a.      Possessed exclusive knowledge of the defects rendering Defective

Vehicles inherently more dangerous and unreliable than similar vehicles;

        b.      Intentionally concealed the hazardous situation with Defective Vehicles

through their deceptive marketing campaign and recall program that they designed to hide the

life-threatening problems from the Nebraska Class; and/or

        c.      Made incomplete representations about the safety and reliability of

Defective Vehicles generally, and the ignition switch in particular, while purposefully

withholding material facts from the Nebraska Class that contradicted these representations.

1983.   The Defective Vehicles posed and/or pose an unreasonable risk of death or

serious bodily injury to the Nebraska Class, passengers, other motorists, pedestrians, and the

public at large, because they are susceptible to incidents of sudden and unintended engine

shutdown.

1984.   The Companies' unfair or deceptive acts or practices were likely to deceive

reasonable consumers, including the Nebraska Class, about the true safety and reliability of

Defective Vehicles. The Companies intentionally and knowingly misrepresented material

facts regarding the Defective Vehicles with an intent to mislead the Nebraska Class.

1985.   The propensity of the Defective Vehicles to inadvertently shutdown during

ordinary operation was material to the Nebraska Class. When the Nebraska Class members

bought a Defective Vehicles, they reasonably expected the vehicle would not change ignition

position unless the driver turned the key. Had the Nebraska Class known that their vehicles

had these serious safety defects, they would either not have purchased their Defective

Vehicles, or would have paid less for them than they did.

1986.   All members of the Nebraska Class suffered ascertainable loss caused by the

Companies' failure to disclose material information. Nebraska Class members overpaid for

their vehicles and did not receive the benefit of their bargain. As the result of the concealment

and failure to remedy the serious safety defect, and the piecemeal and serial nature of the

recalls, the value of their Defective Vehicles has diminished now that the safety issues in the

Defective Vehicles, and the many other serious safety issues and myriad defects in the

Companies' vehicles have come to light, and Nebraska Class members own vehicles that are

not safe.

1987.   The Nebraska Class has been damaged by Old GM and New GM's

misrepresentations, concealment, and non-disclosure of the ignition switch defects in the

Defective Vehicles, as they are now holding vehicles whose value has greatly diminished

because of Old GM and New GM's failure to timely disclose and remedy the serious defects.

Old GM and New GM's egregious and widely-publicized conduct and the never-ending and

piecemeal nature of New GM's recalls, and the many other serious defects in Old GM and

New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer

would purchase them—let alone pay what would otherwise be fair market value for the

vehicles.

1988.   Nebraska Class Members risk irreparable injury as a result of the Companies'

acts and omissions in violation of the MPA, and these violations present a continuing risk to

the Nebraska Class as well as to the general public. The Companies' unlawful acts and

practices complained of herein affect the public interest.

1989.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

1990.   As a direct and proximate result of the Companies' violations of the Nebraska CPA, the Nebraska Class has suffered injury-in-fact and/or actual damage.

1991.   Because the Companies' conduct caused injury to Class members' property through violations of the Nebraska CPA, the Nebraska Class seeks recovery of actual damages, as well as enhanced damages up to $1,000, an order enjoining New GM's unfair or deceptive acts and practices, costs of Court, reasonable attorneys' fees, and any other just and proper relief available under NEB. REV. STAT. § 59-1609.

## EIGHTY-FIFTH CLAIM FOR RELIEF

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (NEB. REV. STAT. NEB. § 2-314)

1992.   In the event the Court declines to certify a nationwide Class, Plaintiffs bring this claim on behalf of the Nebraska Class.

1993.   Old GM and New GM were merchants with respect to motor vehicles.

1994.   A warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when Nebraska Class members purchased their Defective Vehicles.

1995.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shutdown of power steering and power brakes and the non-deployment of airbags in the event of a collision.

1996.   Old GM and New GM were provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and communications sent by Nebraska Class members before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1997.   As a direct and proximate result of Old GM and New GM's breach of the warranties of merchantability, the Nebraska Class has been damaged in an amount to be proven at trial. New GM has successor liability for Old GM's breach.

## EIGHTY-SIXTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

1998.   In the event the Court declines to certify a nationwide Class under Michigan law, Plaintiffs bring this claim on behalf of the Nebraska Class.

1999.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

2000.   The Companies knew these representations were false when made.

2001.   The vehicles purchased or leased by the Nebraska Class were, in fact, defective, unsafe, and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

2002.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision because the Nebraska Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

2003.   The aforementioned concealment was material because if it had been disclosed the Nebraska Class would not have bought, leased, or retained their vehicles.

2004.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing, leasing, or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

2005.   The Nebraska Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

2006.   As a result of their reliance, the Nebraska Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

2007.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Nebraska Class. Nebraska Class members are therefore entitled to an award of punitive damages.

## NEVADA

## EIGHTY-SEVENTH CLAIM FOR RELIEF

## VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT
### (NEV. REV. STAT. § 598.0903, *Et. seq.*)

2008.   This claim is brought on behalf of Class members who are Nevada residents (the "Nevada Class").

2009.   The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), NEV. REV. STAT. § 598.0903, *et. seq.* prohibits deceptive trade practices. NEV. REV. STAT. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "(5) Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "(7) Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "(9) Advertises goods or services with intent not to sell or lease them as advertised"; or "(15) Knowingly makes any other false representation in a transaction."

2010.   Old GM and New GM both engaged in deceptive trade practices that violated the Nevada DTPA, including: knowingly representing that Defective Vehicles have uses and benefits which they do not have; representing that Defective Vehicles are of a particular standard, quality, and grade when they are not; advertising Defective Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Defective Vehicles has been supplied in accordance with a previous representation when it has not; and knowingly making other false representations in a transaction.

2011.   The Companies' actions as set forth above occurred in the conduct of trade or commerce.

2012.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity

to deceive. Old GM and New GM also engaged in unlawful trade practices by employing

deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression

or omission of any material fact with intent that others rely upon such concealment,

suppression or omission, in connection with the sale of Defective Vehicles. New GM is

directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or

commerce in violation of the Nevada DTPA, and also has successor liability for the violations

of Old GM.

2013.   As alleged above, both Companies knew of the ignition switch defects, while

the Nevada Class was deceived by the Companies' omission into believing the Defective

Vehicles were safe, and the information could not have reasonably been known by the

consumer.

2014.   The Companies knew or should have known that their conduct violated the

Nevada DTPA.

2015.   As alleged above, the Companies made material statements about the safety

and reliability of Defective Vehicles that were either false or misleading.

2016.   Old GM engaged in a deceptive trade practice when it failed to disclose

material information concerning the Defective Vehicles which it knew at the time of the sale.

Old GM deliberately withheld the information about the vehicles' propensity to inadvertently

shutdown in order to ensure that consumers would purchase its vehicles and to induce the

consumer to enter into a transaction.

2017.   From its inception in 2009, New GM has known of the ignition switch defects

that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits

and to avoid remediation costs and a public relations nightmare, New GM concealed the

defects and their tragic consequences and allowed unsuspecting new and used car purchasers

to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to

continue driving highly dangerous vehicles.

2018.  The Companies each owed the Nevada Class a duty to disclose the defective

nature of Defective Vehicles, including the dangerous risk of ignition switch movement,

engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective

Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles

through their deceptive marketing campaign and recall program that they designed to hide the

life-threatening problems from the Nevada Class; and/or

c.      Made incomplete representations about the safety and reliability of

Defective Vehicles generally, and the ignition switch in particular, while purposefully

withholding material facts from the Nevada Class that contradicted these representations.

2019.  The Defective Vehicles posed and/or pose an unreasonable risk of death or

serious bodily injury to the Nevada Class, passengers, other motorists, pedestrians, and the

public at large, because they are susceptible to incidents of sudden and unintended engine

shutdown.

2020.  The Companies' unfair or deceptive acts or practices were likely to deceive

reasonable consumers, including the Nevada Class, about the true safety and reliability of

Defective Vehicles. The Companies intentionally and knowingly misrepresented material

facts regarding the Defective Vehicles with an intent to mislead the Nevada Class.

2021.   The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the Nevada Class. Had the Nevada Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

2022.   All members of the Nevada Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Nevada Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Nevada Class members own vehicles that are not safe.

2023.   The Nevada Class has been damaged by Old GM and New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of Old GM and New GM's failure to timely disclose and remedy the serious defects. Old GM and New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in Old GM and New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

2024.   Nevada Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the Nevada DTPA, and these violations present a continuing risk

-486-

to the Nevada Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

2025.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

2026.   As a direct and proximate result of the Companies' violations of the Nevada DTPA, the Nevada Class has suffered injury-in-fact and/or actual damage.

2027.   Accordingly, the Nevada Class seeks their actual damages, punitive damages, an order enjoining New GM's deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada Deceptive Trade Practices Act. NEV. REV. STAT. § 41.600.

## EIGHTY-EIGHTH CLAIM FOR RELIEF

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (NEV. REV. STAT. § 104.2314)

2028.   In the event the Court declines to certify a nationwide Class, Plaintiffs bring this claim on behalf of the Nevada Class.

2029.   Old GM and New GM were merchants with respect to motor vehicles.

2030.   A warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when the Nevada Class purchased their Defective Vehicles.

2031.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shutdown of power steering and power brakes and the non-deployment of airbags in the event of a collision.

2032.   Old GM and New GM were provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and communications sent by the Nevada Class before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2033.   As a direct and proximate result of Old GM and New GM's breach of the warranties of merchantability, the Nevada Class has been damaged in an amount to be proven at trial. New GM has successor liability for Old GM's breach.

## EIGHTY-NINTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

2034.   In the event the Court declines to certify a nationwide Class, Plaintiffs bring this claim solely on behalf of Class members who are Nevada residents.

2035.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

2036.   The Companies knew these representations were false when made.

2037.   The vehicles purchased or leased by the Nevada Class were, in fact, defective, unsafe, and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

2038.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision because the Nevada Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

2039.   The aforementioned concealment was material because if it had been disclosed the Nevada Class would not have bought, leased, or retained their vehicles.

2040.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing, leasing, or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

2041.   The Nevada Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing, or retaining the Defective Vehicles.

2042.   As a result of their reliance, the Nevada Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

2043.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Nevada Class. Nevada Class members are therefore entitled to an award of punitive damages.

## NEW HAMPSHIRE

## NINETIETH CLAIM FOR RELIEF

## VIOLATION OF N.H. CONSUMER PROTECTION ACT
### (N.H. REV. STAT. ANN. § 358-A:1, Et. seq.)

2062.   This claim is brought on behalf of Class members who are New Hampshire residents (the "New Hampshire Class").

2063.   The New Hampshire Class, Old GM and New GM are or were "person[s]" under the New Hampshire Consumer Protection Act ("New Hampshire CPA"), N.H. REV. STAT. ANN. § 358-A:1.

2064.   The Companies' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. REV. STAT. ANN. § 358-A:1.

2065.   The New Hampshire CPA prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but… not limited to, the following:…(V) Representing that goods or services have… characteristics,… uses, benefits, or quantities that they do not have;" "(VII) Representing that goods or services are of a particular standard, quality, or grade,… if they are of another;" and "(IX) Advertising goods or services with intent not to sell them as advertised." N.H. REV. STAT. ANN. § 358-A:2.

2066.   The Companies both participated in unfair or deceptive acts or practices that violated the New Hampshire CPA as described above and below. By failing to disclose and actively concealing the dangerous risk of ignition switch movement, engine shutdown, and airbag disabling in Defective Vehicles, the Companies engaged in deceptive business practices prohibited by the CPA, including representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a particular standard, quality, and grade when they are not; advertising Defective Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Defective Vehicles has been supplied in accordance with a previous representation when it has not; and engaging in other unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce.

2067.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the New Hampshire CPA, and also has successor liability for the violations of Old GM.

2068.   As alleged above, both Companies knew of the ignition switch defects, while the New Hampshire Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

2069.   The Companies knew or should have known that their conduct violated the New Hampshire CPA.

2070.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

2071.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

2072.  From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

2073.  The Companies each owed the New Hampshire Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the New Hampshire Class; and/or

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the New Hampshire Class that contradicted these representations.

2074.  The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the New Hampshire Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

2075.  The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the New Hampshire Class about the true safety and

-492-

reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the New Hampshire Class.

2076.    The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the New Hampshire Class. Had the New Hampshire Class Members known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

2077.    All members of the New Hampshire Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The New Hampshire Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the New Hampshire Class owns vehicles that are not safe.

2078.    The New Hampshire Class Members have been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

2079.   New Hampshire Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the New Hampshire CPA, and these violations present a continuing risk to them as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

2080.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

2081.   As a direct and proximate result of the Companies' violations of the New Hampshire CPA, the New Hampshire Class has suffered injury-in-fact and/or actual damage.

2082.   Because the Companies' willful conduct caused injury to New Hampshire Class members' property through violations of the New Hampshire CPA, the New Hampshire Class seeks recovery of actual damages or $1,000, whichever is greater, treble damages, costs and reasonable attorneys' fees, an order enjoining New GM's unfair and/or deceptive acts and practices, and any other just and proper relief under N.H. REV. STAT. § 358-A:10.

## NINETY-FIRST CLAIM FOR RELIEF

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (N.H. REV. STAT. ANN. § 382-A:2-314)

2083.   In the event the Court declines to certify a nationwide Class, this claim is brought on behalf of Class members who are New Hampshire residents.

2084.   Old GM and New GM were merchants with respect to motor vehicles.

2085.   A warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when the New Hampshire Class Members purchased their Defective Vehicles.

2086.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective

Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shutdown of power steering and power brakes and the non-deployment of airbags in the event of a collision.

2087.   Old GM and New GM were provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by the New Hampshire Class before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2088.   As a direct and proximate result of Old GM's breach of the warranties of merchantability, the New Hampshire Class has been damaged in an amount to be proven at trial. New GM also has successor liability for Old GM's breach

## NINETY-SECOND CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

2089.   In the event the Court declines to certify a nationwide Class, this claim is brought on behalf of Class members who are New Hampshire residents.

2090.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

2091.   The Companies knew these representations were false when made.

2092.   The vehicles purchased or leased by the New Hampshire Class was, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

2093.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the

event of a collision because the New Hampshire Class relied on the Companies'
representations that the vehicles they were purchasing and retaining were safe and free from
defects.

2094.   The aforementioned concealment was material because if it had been disclosed
the New Hampshire Class would not have bought, leased or retained their vehicles.

2095.   The aforementioned representations were material because they were facts that
would typically be relied on by a person purchasing, leasing or retaining a new or used motor
vehicle. The Companies knew or recklessly disregarded that their representations were false
because they knew that people had died as the result of the vehicles' defective ignition switch
systems. The Companies intentionally made the false statements in order to sell vehicles and
avoid the expense and public relations nightmare of a recall.

2096.   The New Hampshire Class relied on the Companies' reputation—along with
their failure to disclose the ignition switch system problems and the Companies' affirmative
assurance that its vehicles were safe and reliable and other similar false statements—in
purchasing, leasing or retaining the Defective Vehicles.

2097.   As a result of their reliance, the New Hampshire Class Members have been
injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the
bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

2098.   The Companies' conduct was knowing, intentional, with malice, demonstrated
a complete lack of care, and was in reckless disregard for the rights of the New Hampshire
Class, who are therefore entitled to an award of punitive damages.

# NEW JERSEY

## NINETY-THIRD CLAIM FOR RELIEF

## VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT
### (N.J. Stat. Ann. § 56:8-1, *Et. seq.*)

2099.   This claim is on behalf of Class members who are New Jersey residents (the "New Jersey Class").

2100.   The New Jersey Class, New GM and Old GM are or were "person[s]" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

2101.   Old GM and New GM engaged in the "sale" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

2102.   The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2. The Companies engaged in unconscionable or deceptive acts or practices that violated the New Jersey CFA as described above and below, and did so with the intent that Class members rely upon their acts, concealment, suppression or omissions.

2103.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing

deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the New Jersey CFA, and also has successor liability for the violations of Old GM.

2104.   As alleged above, both Companies knew of the ignition switch defects, while the New Jersey Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

2105.   The Companies knew or should have known that their conduct violated the New Jersey CFA.

2106.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

2107.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

2108.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers

to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

2109.   The Companies each owed the New Jersey Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the New Jersey Class; and/or

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the New Jersey Class that contradicted these representations.

2110.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the New Jersey Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

2111.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the New Jersey Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the New Jersey Class.

2112.   The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the New Jersey Class. Had the New Jersey Class known

-499-

that their vehicles had these serious safety defects, they would either not have purchased their

Defective Vehicles, or would have paid less for them than they did.

2113.   All members of the New Jersey Class suffered ascertainable loss caused by the

Companies' failure to disclose material information. The New Jersey Class overpaid for their

vehicles and did not receive the benefit of their bargain. As the result of the concealment and

failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls,

the value of their Defective Vehicles has diminished now that the safety issues in the

Defective Vehicles, and the many other serious safety issues and myriad defects in the

Companies' vehicles have come to light, and the New Jersey Class owns vehicles that are not

safe.

2114.   The New Jersey Class Members have been damaged by the Companies'

misrepresentations, concealment, and non-disclosure of the ignition switch defects in the

Defective Vehicles, as they are now holding vehicles whose value has greatly diminished

because of New GM's failure to timely disclose and remedy the serious defects. New GM's

egregious and widely-publicized conduct and the never-ending and piecemeal nature of New

GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the

Defective Vehicles that no reasonable consumer would purchase the them—let alone pay what

would otherwise be fair market value for the vehicles.

2115.   New Jersey Class Members risk irreparable injury as a result of the Companies'

act and omissions in violation of the New Jersey CFA, and these violations present a

continuing risk to them as well as to the general public. The Companies' unlawful acts and

practices complained of herein affect the public interest.

2116.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

2117.   As a direct and proximate result of the Companies' violations of the New Jersey CFA, the New Jersey Class has suffered injury-in-fact and/or actual damage.

2118.   The New Jersey Class is entitled to recover legal and/or equitable relief including an order enjoining New GM's unlawful conduct, treble damages, costs and reasonable attorneys' fees pursuant to N.J. STAT. ANN. § 56:8-19, and any other just and appropriate relief.

2119.   Pursuant to N.J. STAT. ANN. § 56:8-20, the New Jersey Class will mail a copy of the complaint to New Jersey's Attorney General within ten (10) days of filing it with the Court.

## NINETY-FOURTH CLAIM FOR RELIEF

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (N.J. STAT. ANN. § 12A:2-314)

2120.   In the event the Court declines to certify a nationwide Class, this claim is brought on behalf of Class members who are New Jersey residents.

2121.   Old GM and New GM were merchants with respect to motor vehicles.

2122.   A warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when the New Jersey Class purchased their Defective Vehicles.

2123.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that

-501-

permit sudden unintended shutdown to occur, with the attendant shutdown of power steering and power brakes and the non-deployment of airbags in the event of a collision.

2124.   Old GM and New GM were provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by the New Jersey Class before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2125.   As a direct and proximate result of Old GM and New GM's breach of the warranties of merchantability, the New Jersey Class has been damaged in an amount to be proven at trial. New GM also has successor liability for Old GM's breach.

<u>**NINETY-FIFTH CLAIM FOR RELIEF**</u>

<u>**FRAUD BY CONCEALMENT**</u>

2126.   In the event the Court declines to certify a nationwide Class, this claim is on behalf of Class members who are New Jersey residents.

2127.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

2128.   The Companies knew these representations were false when made.

2129.   The vehicles purchased or leased by the New Jersey Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

2130.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the

event of a collision because the New Jersey Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

2131.   The aforementioned concealment was material because if it had been disclosed the New Jersey Class would not have bought, leased or retained their vehicles.

2132.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

2133.   The New Jersey Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements – in purchasing, leasing or retaining the Defective Vehicles.

2134.   As a result of their reliance, the New Jersey Class Members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

2135.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the New Jersey Class, who are therefore entitled to an award of punitive damages.

## NEW MEXICO

## NINETY-SIXTH CLAIM FOR RELIEF

## VIOLATIONS OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT
### (N.M. STAT. ANN. § 57-12-1, *et. seq.*)

2136.   This claim is on behalf of Class members who are New Mexico residents (the "New Mexico Class").

2137.   Old GM, New GM, and the New Mexico Class members are or were "person[s]" under the New Mexico Unfair Trade Practices Act ("New Mexico UTPA"), N.M. STAT. ANN. § 57-12-2.

2138.   The Companies' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. STAT. ANN. § 57-12-2.

2139.   The New Mexico UTPA makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services… by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "(14) failing to state a material fact if doing so deceives or tends to deceive." N.M. STAT. ANN. § 57-12-2(D)(14). The Companies' acts and omissions described herein constitute unfair or deceptive acts or practices under N.M. STAT. ANN. § 57-12-2(D). In addition, the Companies' actions constitute unconscionable actions under N.M. STAT. ANN. § 57-12-2(E), since they took advantage of the lack of knowledge, ability, experience, and capacity of the New Mexico Class members to a grossly unfair degree.

2140.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity

to deceive. Old GM and New GM also engaged in unlawful trade practices by employing

deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression

or omission of any material fact with intent that others rely upon such concealment,

suppression or omission, in connection with the sale of Defective Vehicles. New GM is

directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or

commerce in violation of the New Mexico UTPA, and also has successor liability for the

violations of Old GM.

2141.   As alleged above, both Companies knew of the ignition switch defects, while

the New Mexico Class was deceived by the Companies' omission into believing the Defective

Vehicles were safe, and the information could not have reasonably been known by the

consumer.

2142.   The Companies knew or should have known that their conduct violated the

New Mexico UTPA.

2143.   As alleged above, the Companies made material statements about the safety

and reliability of Defective Vehicles that were either false or misleading.

2144.   Old GM engaged in a deceptive trade practice when it failed to disclose

material information concerning the Defective Vehicles which it knew at the time of the sale.

Old GM deliberately withheld the information about the vehicles' propensity to inadvertently

shutdown in order to ensure that consumers would purchase its vehicles and to induce the

consumer to enter into a transaction.

2145.   From its inception in 2009, New GM has known of the ignition switch defects

that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits

and to avoid remediation costs and a public relations nightmare, New GM concealed the

defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

2146.   The Companies each owed the New Mexico Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.    Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.    Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the New Mexico Class; and/or

c.    Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the New Mexico Class that contradicted these representations.

2147.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the New Mexico Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

2148.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the New Mexico Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the New Mexico Class.

2149.   The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the New Mexico Class. Had the New Mexico Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

2150.   All members of the New Mexico Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The New Mexico Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the New Mexico Class owns vehicles that are not safe.

2151.   The New Mexico Class has been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

2152.   The New Mexico Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the New Mexico UTPA, and these violations

present a continuing risk to them as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

2153.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

2154.   As a direct and proximate result of the Companies' violations of the New Mexico UTPA, and the New Mexico Class has suffered injury-in-fact and/or actual damage.

2155.   New Mexico Class members seek punitive damages against New GM because the Companies' conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith. The Companies fraudulently and willfully misrepresented the safety and reliability of New GM-branded vehicles, deceived New Mexico Class members on life-or-death matters, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of correcting the myriad flaws in the New GM-branded vehicles the Companies repeatedly promised New Mexico Class members were safe. Because the Companies' conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith, it warrants punitive damages.

2156.   Because the Companies' unconscionable, willful conduct caused actual harm to Class members, the Class seeks recovery of actual damages or $100, whichever is greater, discretionary treble damages or $300 (whichever is greater), punitive damages, and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. STAT. ANN. § 57-12-10.

Case 1:14-md-02543-JMF    Document 547-2    Filed 11/14/14    Page 328 of 473

## NINETY-SEVENTH CLAIM FOR RELIEF

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.M. STAT. ANN. § 55-2-314)

2157.   In the event the Court declines to certify a nationwide Class, this claim is brought on behalf of Class members who are New Mexico residents.

2158.   Old GM and New GM were a merchants with respect to motor vehicles.

2159.   A warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when the New Mexico Class purchased their Defective Vehicles.

2160.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shutdown of power steering and power brakes and the non-deployment of airbags in the event of a collision. .

2161.   Old GM and New GM were provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by the New Mexico Class before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2162.   As a direct and proximate result of Old GM and New GM's breach of the warranties of merchantability, the New Mexico Class has been damaged in an amount to be proven at trial. New GM also has successor liability for Old GM's breach.

## NINETY-EIGHTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

2163.   In the event the Court declines to certify a nationwide Class, this claim is on behalf of Class members who are New Mexico residents.

2164.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

2165.   The Companies knew these representations were false when made.

2166.   The vehicles purchased or leased by the New Mexico Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

2167.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision because the New Mexico Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

2168.   The aforementioned concealment was material because if it had been disclosed they would not have bought, leased or retained their vehicles.

2169.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

2170.   The New Mexico Class relied on the Companies' reputation – along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements – in purchasing, leasing or retaining the Defective Vehicles.

2171.   As a result of their reliance, the New Mexico Class Members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

2172.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the New Mexico Class, who are therefore entitled to an award of punitive damages.

## NEW YORK

## NINETY-NINTH CLAIM FOR RELIEF

### DECEPTIVE ACTS OR PRACTICES
#### (N.Y. GEN. BUS. LAW § 349 AND 350)

2173.   This claim is on behalf of Class members residing in New York (the "New York Class").

2174.   The New York Class members are "person[s]" within the meaning of New York General Business Law ("New York GBL"), N.Y. GEN. BUS. LAW § 349(h).

2175.   New GM is, and Old GM was, a "person," "firm," "corporation," or "association" within the meaning of N.Y. GEN. BUS. LAW § 349(b).

2176.   The New York GBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW § 349. The Companies' conduct, as described above and below, constitutes "deceptive acts or practices" within the meaning of the New York GBL. Furthermore, the Companies' deceptive acts and practices,

which were intended to mislead consumers who were in the process of purchasing and/or leasing the Defective Vehicles, was conduct directed at consumers.

2177.   The Companies' actions as set forth above occurred in the conduct of trade or commerce.

2178.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the New York GBL, and also has successor liability for the violations of Old GM.

2179.   As alleged above, both Companies knew of the ignition switch defects, while the New York Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

2180.   The Companies knew or should have known that their conduct violated the New York GBL.

2181.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

1197532.10

2182.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

2183.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

2184.   The Companies each owed the New York Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.       Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.       Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the New York Class s; and/or

c.       Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the New York Class that contradicted these representations.

2185.   The Defective Vehicles posed and /or pose an unreasonable risk of death or

serious bodily injury to the New York Class, passengers, other motorists, pedestrians, and the

public at large, because they are susceptible to incidents of sudden and unintended engine

shutdown.

2186.   The Companies' unfair or deceptive acts or practices were likely to deceive

reasonable consumers, including the New York Class, about the true safety and reliability of

Defective Vehicles. The Companies intentionally and knowingly misrepresented material

facts regarding the Defective Vehicles with an intent to mislead the New York Class.

2187.   The propensity of the Defective Vehicles to inadvertently shutdown during

ordinary operation was material to the New York Class. Had the New York Class known that

their vehicles had these serious safety defects, they would either not have purchased their

Defective Vehicles, or would have paid less for them than they did.

2188.   All members of the New York Class suffered ascertainable loss caused by the

Companies' failure to disclose material information. The New York Class overpaid for their

vehicles and did not receive the benefit of their bargain. As the result of the concealment and

failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls,

the value of their Defective Vehicles has diminished now that the safety issues in the

Defective Vehicles, and the many other serious safety issues and myriad defects in the

Companies' vehicles have come to light, and the New York Class owns vehicles that are not

safe.

2189.   The New York Class members have been damaged by New GM's

misrepresentations, concealment, and non-disclosure of the ignition switch defects in the

Defective Vehicles, as they are now holding vehicles whose value has greatly diminished

1197532.10

because of New GM's failure to timely disclose and remedy the serious defects. New GM's

egregious and widely-publicized conduct and the never-ending and piecemeal nature of New

GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the

Defective Vehicles that no reasonable consumer would purchase them—let alone pay what

would otherwise be fair market value for the vehicles.

2190.    The New York Class Members risk irreparable injury as a result of the

Companies' act and omissions in violation of the New York GBL, and these violations present

a continuing risk to the New York Class as well as to the general public. The Companies'

unlawful acts and practices complained of herein affect the public interest.

2191.    The recalls and repairs instituted by New GM have not been adequate. The

recall is not an effective remedy and is not offered for all Defective Vehicles.

2192.    As a direct and proximate result of the Companies' violations of the New York

GBL, the New York Class has suffered injury-in-fact and/or actual damage.

2193.    New York Class members seek punitive damages against New GM because the

Companies' conduct was egregious. The Companies misrepresented the safety and reliability

of millions of New GM-branded vehicles, concealed myriad defects in millions of New GM-

branded vehicles and the systemic safety issues plaguing the Company, deceived Class

members on life-or-death matters, and concealed material facts that only they knew, all to

avoid the expense and public relations nightmare of correcting the serious flaw in its culture

and in millions of New GM-branded vehicles. The Companies' egregious conduct warrants

punitive damages.

2194.    Because the Companies' willful and knowing conduct caused injury to Class

members, the New York Class seeks recovery of actual damages or $50, whichever is greater,

discretionary treble damages up to $1,000, punitive damages, reasonable attorneys' fees and costs, an order enjoining New GM's deceptive conduct, and any other just and proper relief available under N.Y. GEN. BUS. LAW § 349.

## ONE HUNDREDTH CLAIM FOR RELIEF

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (N.Y. U.C.C. § 2-314)

2195.   In the event the Court declines to certify a nationwide Class, this claim is brought on behalf of Class members who are New York residents.

2196.   Old GM and New GM are merchants with respect to motor vehicles.

2197.   A warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when the New York Class purchased their Defective Vehicles.

2198.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shutdown of power steering and power brakes and the non-deployment of airbags in the event of a collision. .

2199.   Old GM and New GM were provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by the New York Class before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2200.   As a direct and proximate result of Old GM and New GM's breach of the warranties of merchantability, the New York Class has been damaged in an amount to be proven at trial. New GM also has successor liability for Old GM's breach.

## ONE HUNDRED FIRST CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

2201.   In the event the Court declines to certify a nationwide Class, this claim is brought solely on behalf of Class members who are New York residents.

2202.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

2203.   The Companies knew these representations were false when made.

2204.   The vehicles purchased or leased by the New York Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

2205.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision because the New York Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

2206.   The aforementioned concealment was material because if it had been disclosed the New York Class would not have bought, leased or retained their vehicles.

2207.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

2208.   The New York Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

2209.   As a result of their reliance, the New York Class have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

2210.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the New York Class, who are therefore entitled to an award of punitive damages.

## ONE HUNDRED SECOND CLAIM FOR RELIEF

### VIOLATION OF NEW YORK'S FALSE ADVERTISING ACT
#### (N.Y. GEN. BUS. LAW § 350)
**(Asserted on Behalf of the New York Class)**

2211.   This claim is brought on behalf of the New York Class.

2212.   Old GM and New GM have been are New GM is engaged in the "conduct of… business, trade or commerce" within the meaning of N.Y. GEN. BUS. LAW § 350.

2213.   NEW YORK GEN. BUS. LAW § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising includes "advertising, including labeling, of a commodity… if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of… representations [made] with respect to the commodity.…" N.Y. GEN. BUS. LAW § 350-a.

2214.   Old GM and New GM caused to be made or disseminated through New York, through advertising, marketing and other publications, statements that were untrue or

misleading, and that were known, or which by the exercise of reasonable care should have

been known to them, to be untrue and misleading to consumers and New York Class.

2215.   Old GM and New GM have violated § 350 because the misrepresentations and

omissions regarding the Defects, as set forth above, were material and likely to deceive a

reasonable consumer.

2216.   The New York Class has suffered an injury, including the loss of money or

property, as a result of New GM's false advertising. In purchasing or leasing their vehicles,

the New York Class relied on the misrepresentation and/or omissions relating to the safety

and reliability of the Defective Vehicles. Those representations were false and/or misleading

because the Defects may cause the engine to shutdown, disabling power steering, power

brakes, and disabling deployment of safety airbags. Had the New York Class known this, they

would not have purchased or leased their Defective Vehicles and/or paid as much for them.

2217.   Pursuant to N.Y. GEN. BUS. LAW § 350-e, the New York Class seeks

monetary relief against New GM measured as the greater of (a) actual damages in an amount

to be determined at trial and (b) statutory damages in the amount of $500 each for each New

York Class Member. Because the conduct was committed willfully and knowingly, the New

York Class is entitled to recover three times actual damages, up to $10,000, for each New

York Class Member.

2218.   The New York Class also seeks an order enjoining the unfair, unlawful, and/or

deceptive practices, attorneys' fees, and any other just and proper relief available under N.Y.

GEN. BUS. LAW §§ 349–350.

# NORTH CAROLINA

## ONE HUNDRED THIRD CLAIM FOR RELIEF

### VIOLATION OF NORTH CAROLINA'S UNFAIR AND DECEPTIVE ACTS AND PRACTICES ACT
(N.C. GEN. STAT. § 75-1.1 *et. seq.*)

2219.   This claim is on behalf of Class members who are North Carolina residents (the "North Carolina Class").

2220.   New GM and Old GM engaged in "commerce" within the meaning of N.C. GEN. STAT. § 75-1.1(b).

2221.   The North Carolina Act broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. GEN. STAT. § 75-1.1(a). As alleged above and below, the Companies willfully committed unfair or deceptive acts or practices in violation of the North Carolina Act.

2222.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the North Carolina Act, and also has successor liability for the violations of Old GM.

2223.   As alleged above, both Companies knew of the ignition switch defects, while the North Carolina Class was deceived by the Companies' omission into believing the

Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

2224.    The Companies knew or should have known that their conduct violated the North Carolina Act.

2225.    As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

2226.    Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

2227.    From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

2228.    The Companies each owed the North Carolina Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

        a.    Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.     Intentionally concealed the hazardous situation with Defective Vehicles

through their deceptive marketing campaign and recall program that they designed to hide the

life-threatening problems from the North Carolina Class; and/or

c.     Made incomplete representations about the safety and reliability of

Defective Vehicles generally, and the ignition switch in particular, while purposefully

withholding material facts from the North Carolina Class that contradicted these representations.

2229.   The Defective Vehicles posed and/or pose an unreasonable risk of death or

serious bodily injury to the North Carolina Class, passengers, other motorists, pedestrians, and

the public at large, because they are susceptible to incidents of sudden and unintended engine

shutdown.

2230.   The Companies' unfair or deceptive acts or practices were likely to deceive

reasonable consumers, including the North Carolina Class, about the true safety and reliability

of Defective Vehicles. The Companies intentionally and knowingly misrepresented material

facts regarding the Defective Vehicles with an intent to mislead the North Carolina Class.

2231.   The propensity of the Defective Vehicles to inadvertently shutdown during

ordinary operation was material to the North Carolina Class. Had the North Carolina Class

known that their vehicles had these serious safety defects, they would either not have

purchased their Defective Vehicles, or would have paid less for them than they did.

2232.   The North Carolina Class suffered ascertainable loss caused by the Companies'

failure to disclose material information. The North Carolina Class overpaid for their vehicles

and did not receive the benefit of their bargain. As the result of the concealment and failure to

remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value

of their Defective Vehicles has diminished now that the safety issues in the Defective

Vehicles, and the many other serious safety issues and myriad defects in the Companies'
vehicles have come to light, and the North Carolina Class own vehicles that are not safe.

2233.   The North Carolina Class members have been damaged by New GM's
misrepresentations, concealment, and non-disclosure of the ignition switch defects in the
Defective Vehicles, as they are now holding vehicles whose value has greatly diminished
because of New GM's failure to timely disclose and remedy the serious defects. New GM's
egregious and widely-publicized conduct and the never-ending and piecemeal nature of New
GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the
Defective Vehicles that no reasonable consumer would purchase them—let alone pay what
would otherwise be fair market value for the vehicles.

2234.   North Carolina Class members risk irreparable injury as a result of the
Companies' act and omissions in violation of the North Carolina Act, and these violations
present a continuing risk to them as well as to the general public. The Companies' unlawful
acts and practices complained of herein affect the public interest.

2235.   The recalls and repairs instituted by New GM have not been adequate. The
recall is not an effective remedy and is not offered for all Defective Vehicles.

2236.   As a direct and proximate result of the Companies' violations of the North
Carolina Act, the North Carolina Class has suffered injury-in-fact and/or actual damage.

2237.   North Carolina Class members seek punitive damages against New GM
because the Companies' conduct was malicious, willful, reckless, wanton, fraudulent and in
bad faith. The Companies fraudulently and willfully misrepresented the safety and reliability
of the Defective Vehicles, deceived North Carolina Class members on life-or-death matters,
and concealed material facts that only they knew, all to avoid the expense and public relations

1197532.10

nightmare of correcting the myriad flaws in the Defective Vehicles it repeatedly promised

Class members were safe. Because the Companies' conduct was malicious, willful, reckless,

wanton, fraudulent and in bad faith, it warrants punitive damages.

2238.   Plaintiffs seek an order for treble their actual damages, an order enjoining New

GM's unlawful acts, costs of Court, attorney's fees, and any other just and proper relief

available under N.C. GEN. STAT. § 75-16.

## ONE HUNDRED FOURTH CLAIM FOR RELIEF

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.C. GEN. STAT. § 25-2-314)

2239.   In the event the Court declines to certify a nationwide Class, this claim is on

behalf of Class members who are North Carolina residents.

2240.   Old GM and New GM were merchants with respect to motor vehicles.

2241.   A warranty that the Defective Vehicles were in merchantable condition was

implied by law in the transactions when the North Carolina Class purchased their Defective

Vehicles.

2242.   These vehicles, when sold and at all times thereafter, were not merchantable

and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective

Vehicles are inherently defective in that there are defects in the ignition switch systems that

permit sudden unintended shutdown to occur, with the attendant shutdown of power steering

and power brakes and the non-deployment of airbags in the event of a collision.

2243.   Old GM and New GM were provided notice of these issues by numerous

complaints filed against it, internal investigations, and by numerous individual letters and

communications sent by the North Carolina Class before or within a reasonable amount of

time after New GM issued the recall and the allegations of vehicle defects became public.

2244.   As a direct and proximate result of Old GM and New GM's breach of the warranties of merchantability, the North Carolina Class have been damaged in an amount to be proven at trial. New GM also has successor liability for Old GM's breach.

## ONE HUNDRED FIFTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

2245.   In the event the Court declines to certify a nationwide Class, this claim is on behalf of Class members who are North Carolina residents.

2246.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

2247.   The Companies knew these representations were false when made.

2248.   The vehicles purchased or leased by the North Carolina Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

2249.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision because the North Carolina Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

2250.   The aforementioned concealment was material because if it had been disclosed they would not have bought, leased or retained their vehicles.

2251.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false

-525-

because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

2252.    The North Carolina Class relied on the Companies' reputation – along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements – in purchasing, leasing or retaining the Defective Vehicles.

2253.    As a result of their reliance, the North Carolina Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

2254.    The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the North Carolina Class, who are therefore entitled to an award of punitive damages.

**NORTH DAKOTA**

**ONE HUNDRED SIXTH CLAIM FOR RELIEF**

**VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT**
**(N.D. CENT. CODE § 51-15-02)**

2255.    This claim is on behalf of Class members who are North Dakota residents (the "North Dakota Class").

2256.    The North Dakota Class members, Old GM and New GM are or were "persons" within the meaning of N.D. CENT. CODE § 51-15-02.

2257.    The Companies engaged in the "sale" of "merchandise" within the meaning of N.D. CENT. CODE § 51-15-02.

2258.   The North Dakota Consumer Fraud Act ("North Dakota CFA") makes unlawful "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise…." N.D. CENT. CODE § 51-15-02. As set forth above and below, the Companies committed deceptive acts or practices, with the intent that Class members rely thereon in connection with their purchase or lease of the Defective Vehicles.

2259.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the North Dakota CFA, and also has successor liability for the violations of Old GM.

2260.   As alleged above, both Companies knew of the ignition switch defects, while the North Dakota Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

2261.   The Companies knew or should have known that their conduct violated the North Dakota CFA.

2262.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

2263.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

2264.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

2265.   The Companies each owed the North Dakota Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the North Dakota Class; and/or

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the North Dakota Class that contradicted these representations.

2266.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the North Dakota Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

2267.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the North Dakota Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the North Dakota Class.

2268.   The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the North Dakota Class. Had the North Dakota Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

2269.   The North Dakota Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The North Dakota Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the North Dakota Class owns vehicles that are not safe.

2270.   The North Dakota Class members have been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

2271.   North Dakota Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the North Dakota CFA, and these violations present a continuing risk to the North Dakota Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

2272.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

2273.   As a direct and proximate result of the Companies' violations of the North Dakota CFA, the North Dakota Class has suffered injury-in-fact and/or actual damage.

2274.   North Dakota Class members seek punitive damages against New GM because the Companies' conduct was egregious. The Companies misrepresented the safety and reliability of millions of Defective Vehicles, concealed myriad defects in millions of Defective Vehicles and the systemic safety issues plaguing the Company, deceived North Dakota Class members on life-or-death matters, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of correcting the serious flaw in

its culture and in millions of New GM-branded vehicles. The Companies' egregious conduct

warrants punitive damages.

2275.   Further, the Companies knowingly committed the conduct described above,

and thus, under N.D. CENT. CODE § 51-15-09, New GM is liable to the North Dakota Class for

treble damages in amounts to be proven at trial, as well as attorneys' fees, costs, and

disbursements. The North Dakota Class further seeks an order enjoining New GM's unfair

and/or deceptive acts or practices, and other just and proper available relief under the North

Dakota CFA.

## ONE HUNDRED SEVENTH CLAIM FOR RELIEF

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.D. CENT. CODE § 41-02-31)

2276.   In the event the Court declines to certify a nationwide Class, this claim is on

behalf of Class members who are North Dakota residents.

2277.   Old GM and New GM were merchants with respect to motor vehicles.

2278.   A warranty that the Defective Vehicles were in merchantable condition was

implied by law in the transactions when the North Dakota Class members purchased their

Defective Vehicles.

2279.   These vehicles, when sold and at all times thereafter, were not merchantable

and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective

Vehicles are inherently defective in that there are defects in the ignition switch systems that

permit sudden unintended shutdown to occur, with the attendant shutdown of power steering

and power brakes and the non-deployment of airbags in the event of a collision.

2280.   Old GM and New GM were provided notice of these issues by numerous

complaints filed against it, internal investigations, and by numerous individual letters and

communications sent by the North Dakota Class before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2281.   As a direct and proximate result of Old GM's breach of the warranties of merchantability, the North Dakota Class has been damaged in an amount to be proven at trial. New GM also has successor liability for Old GM's breach.

## ONE HUNDRED EIGHTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

2282.   In the event the Court declines to certify a nationwide Class, this claim is on behalf of Class members who are North Dakota residents.

2283.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

2284.   The Companies knew these representations were false when made.

2285.   The Defective Vehicles were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

2286.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision because the North Dakota Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

2287.   The aforementioned concealment was material because if it had been disclosed they would not have bought, leased or retained their vehicles.

2288.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor

vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

2289.   The North Dakota Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

2290.   As a result of their reliance, the North Dakota Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

2291.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the North Dakota Class, who are therefore entitled to an award of punitive damages.

## OHIO

## ONE HUNDRED NINTH CLAIM FOR RELIEF

### VIOLATION OF OHIO CONSUMER SALES PRACTICES ACT
(OHIO REV. CODE ANN. § 1345.01, et. seq.)

2292.   This claim is on behalf of Class members who are Ohio residents (the "Ohio Class").

2293.   New GM is and Old GM was a "supplier" as that term is defined in OHIO REV. CODE § 1345.01(C).

2294.   The Ohio Class members are "consumer[s]" as that term is defined in OHIO
REV. CODE § 1345.01(D), and their purchases and leases of the Defective Vehicles are
"consumer transaction[s]" within the meaning of OHIO REV. CODE § 1345.01(A).

2295.   The Ohio Consumer Sales Practices Act ("Ohio CSPA"), OHIO REV. CODE
§ 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a
consumer transaction. Specifically, and without limitation of the broad prohibition, the Act
prohibits suppliers from representing (i) that goods have characteristics or uses or benefits
which they do not have; (ii) that their goods are of a particular quality or grade they are not;
and (iii) the subject of a consumer transaction has been supplied in accordance with a previous
representation, if it has not. *Id.* The conduct of the Companies as alleged above and below
constitutes unfair and/or deceptive consumer sales practices in violation of OHIO REV. CODE
ANN. § 1345.02.

2296.   By failing to disclose and actively concealing the dangerous risk of ignition
switch movement, engine shutdown, and airbag disabling in Defective Vehicles, the
Companies engaged in deceptive business practices prohibited by the Ohio CSPA, including:
representing that Defective Vehicles have characteristics, uses, benefits, and qualities which
they do not have; representing that Defective Vehicles are of a particular standard, quality,
and grade when they are not; representing that the subject of a transaction involving Defective
Vehicles has been supplied in accordance with a previous representation when it has not; and
engaging in other unfair or deceptive acts or practices.

2297.   The Companies' actions as set forth above occurred in the conduct of trade or
commerce.

2298.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Ohio CSPA, and also has successor liability for the violations of Old GM.

2299.   As alleged above, both Companies knew of the ignition switch defects, while the Ohio Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

2300.   The Companies knew or should have known that their conduct violated the Ohio CSPA Act.

2301.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

2302.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

-535-

2303.  From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

2304.  The Companies each owed the Ohio Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Ohio Class; and/or

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Ohio Class that contradicted these representations.

2305.  The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Ohio Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

2306.  The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Ohio Class, about the true safety and reliability of

-536-

Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Ohio Class.

2307.    The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the Ohio Class. Had the Ohio Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

2308.    The Ohio Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Ohio Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Ohio Class owns vehicles that are not safe.

2309.    The Ohio Class members have been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

2310.    Ohio Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the Ohio CSPA, and these violations present a continuing risk to

the Ohio Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

2311.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

2312.   As a direct and proximate result of the Companies' violations of the Ohio CSPA, the Ohio Class has suffered injury-in-fact and/or actual damage.

2313.   Ohio Class members seek punitive damages against New GM because the Companies' conduct was egregious. The Companies misrepresented the safety and reliability of millions of Defective Vehicles, concealed myriad defects in millions of Defective Vehicles and the systemic safety issues plaguing the Companies, deceived Class members on life-or-death matters, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of correcting the serious flaw in its culture and in millions of New GM-branded vehicles. The Companies' egregious conduct warrants punitive damages.

2314.   The Ohio Class specifically does not allege herein a claim for violation of OHIO REV. CODE § 1345.72.

2315.   The Companies were on notice pursuant to OHIO REV. CODE ANN. § 1345.09(B) that their actions constituted unfair, deceptive, and unconscionable practices by, for example, *Mason v. Mercedes-Benz USA, LLC*, No. 85031, 2005 Ohio App. LEXIS 3911, at *33 (S.D. Ohio Aug. 18, 2005), and *Lilly v. Hewlett-Packard Co.*, No. 1:05-CV-465 , 2006 U.S. Dist. LEXIS 22114, at *17-18 (S.D. Ohio Apr. 21, 2006). Further, the Companies' conduct as alleged above constitutes an act or practice previously declared to be deceptive or unconscionable by rule adopted under division (B)(2) of section 1345.05 and previously determined by Ohio courts to violate Ohio's Consumer Sales Practices Act and was

committed after the decisions containing these determinations were made available for public

inspection under division (A)(3) of O.R.C. § 1345.05. The applicable rule and Ohio court

opinions include, but are not limited to: OAC 109:4-3-16; *Mason v. Mercedes-Benz USA, LLC*,

OPIF # 10002382*, 2005 Ohio 4296 (Ohio Ct. App. 2005); *Khouri v. Lewis*, OPIF # 10001995,

Cuyahoga Common Pleas No. 342098 (2001); *State ex rel. Montgomery v. Canterbury*,

Franklin App. No. 98CVH054085 (2000); *Fribourg v. Vandemark* (July 26, 1999), Clermont

App. No CA99-02-017, unreported (PIF # 10001874); *State ex rel. Betty D. Montgomery v.*

*Ford Motor Co.*, OPIF #10002123; *State ex rel. Betty D. Montgomery v.*

*Bridgestone/Firestone, Inc.*, OPIF #10002025; *Bellinger v. Hewlett-Packard Co.*, OPIF

#10002077, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002);

*Borror v. MarineMax of Ohio*, OPIF #10002388, No. OT-06-010, 2007 Ohio App. LEXIS

525 (Ohio Ct. App. Feb. 9, 2007); *State ex rel. Jim Petro v. Craftmatic Organization, Inc.*,

OPIF #10002347; *Mark J. Cranford, et al v. Joseph Airport Ford, Inc.*, OPIF #10001586;

State ex rel. *William J. Brown v. Harold Lyons, et al.*, OPIF #10000304; *Brinkman v. Mazda*

*Motor of America, Inc.*, OPIF #10001427; *Mosley v. Performance Mitsubishi aka*

*Automanage*, OPIF #10001326; *Walls v. Harry Williams dba Butch's Auto Sales*, OPIF

#10001524; and, *Brown v. Spears*, OPIF #10000403.

2316.   As a result of the foregoing wrongful conduct of New GM, the Ohio Class has

been damaged in an amount to be proven at trial, and seek all just and proper remedies,

including, but not limited to, actual and statutory damages, an order enjoining New GM's

deceptive and unfair conduct, treble damages, court costs and reasonable attorneys' fees,

pursuant to OHIO REV. CODE § 1345.09, *et. seq.*

## ONE HUNDRED TENTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

2317.   In the event the Court declines to certify a nationwide Class, this claim is on behalf of Class members who are Ohio residents.

2318.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

2319.   The Companies knew these representations were false when made.

2320.   The vehicles purchased or leased by the Ohio Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

2321.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision because the Ohio Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

2322.   The aforementioned concealment was material because if it had been disclosed the Ohio Class would not have bought, leased or retained their vehicles.

2323.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

2324.   The Ohio Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

2325.   As a result of their reliance, the Ohio Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

2326.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Ohio Class, who are therefore entitled to an award of punitive damages.

### ONE HUNDRED ELEVENTH CLAIM FOR RELIEF

### IMPLIED WARRANTY IN TORT
### (On Behalf of the Ohio Class)

2327.   This claim is on behalf of the Ohio Class.

2328.   The Vehicles contained a design defect, namely, a faulty ignition system that fails under reasonably foreseeable use, resulting in loss of brakes, power steering, and airbags, among others, as detailed herein more fully.

2329.   The design, manufacturing, and/or assembly defects existed at the time these Vehicles containing the defective ignition systems left the possession or control of Old GM.

2330.   Based upon the dangerous product defects, Old GM and then New GM failed to meet the expectations of a reasonable consumer. The Vehicles failed their ordinary, intended use because the ignition systems in the Vehicles do not function as a reasonable consumer would expect. Moreover, it presents a serious danger to the Ohio Class that cannot be eliminated without significant cost.

2331.   The design defects in the Vehicles were the direct and proximate cause of economic damages to the Ohio Class.

## OKLAHOMA

## ONE HUNDRED TWELFTH CLAIM FOR RELIEF

## VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT
### (OKLA. STAT. TIT. 15 § 751, *et. seq.*)

2332.   This claim is on behalf of Class members who are Oklahoma residents (the "Oklahoma Class").

2333.   Oklahoma Class members are "persons" under the Oklahoma Consumer Protection Act ("Oklahoma CPA"), OKLA. STAT. TIT. 15 § 752.

2334.   Old GM was, and New GM is a "person," "corporation," or "association" within the meaning of OKLA. STAT. TIT. 15 § 15-751(1).

2335.   The sale or lease of the Defective Vehicles to the Oklahoma Class members was a "consumer transaction" within the meaning of OKLA. STAT. TIT. 15 § 752, and the Companies' actions as set forth herein occurred in the conduct of trade or commerce.

2336.   The Oklahoma CPA declares unlawful, *inter* alia, the following acts or practices when committed in the course of business: "mak[ing] a false or misleading representation, knowingly or with reason to know, as to the characteristics…, uses, [or] benefits, of the subject of a consumer transaction," or making a false representation, "knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another or "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;" and otherwise committing "an unfair or deceptive trade practice." *See* OKLA. STAT. TIT. 15, § 753.

2337.   By failing to disclose and actively concealing the dangerous risk of ignition switch movement, engine shutdown, and airbag disabling in Defective Vehicles, the Companies engaged in unfair and deceptive business practices prohibited by the Oklahoma CPA, including: representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a particular standard, quality, and grade when they are not; and advertising Defective Vehicles with the intent not to sell or lease them as advertised; misrepresenting, omitting and engaging in other practices that have deceived or could reasonably be expected to deceive or mislead; and engaging in practices which offend established public policy or are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

2338.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Oklahoma CPA, and also has successor liability for the violations of Old GM.

2339.   As alleged above, both Companies knew of the ignition switch defects, while the Oklahoma Class was deceived by the Companies' omission into believing the Defective

Vehicles were safe, and the information could not have reasonably been known by the consumer.

2340.   The Companies knew or should have known that their conduct violated the Oklahoma CPA.

2341.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

2342.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

2343.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

2344.   The Companies each owed the Oklahoma Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

-544-

b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Oklahoma Class; and/or

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Oklahoma Class that contradicted these representations.

2345.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Oklahoma Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

2346.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Oklahoma Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Oklahoma Class.

2347.   The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the Oklahoma Class. Had the Oklahoma Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

2348.   The Oklahoma Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Oklahoma Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective

Vehicles, and the many other serious safety issues and myriad defects in the Companies'

vehicles have come to light, and the Oklahoma Class own vehicles that are not safe.

2349.   The Oklahoma Class have been damaged by New GM's misrepresentations,

concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as

they are now holding vehicles whose value has greatly diminished because of New GM's

failure to timely disclose and remedy the serious defects. New GM's egregious and widely-

publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the

many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that

no reasonable consumer would purchase them—let alone pay what would otherwise be fair

market value for the vehicles.

2350.   Oklahoma Class Members risk irreparable injury as a result of the Companies'

act and omissions in violation of the Oklahoma CPA, and these violations present a

continuing risk to them as well as to the general public. The Companies' unlawful acts and

practices complained of herein affect the public interest.

2351.   The recalls and repairs instituted by New GM have not been adequate. The

recall is not an effective remedy and is not offered for all Defective Vehicles.

2352.   As a direct and proximate result of the Companies' violations of the Oklahoma

CPA, the Oklahoma Class has suffered injury-in-fact and/or actual damage.

2353.   Oklahoma Class members seek punitive damages against New GM because the

Companies' conduct was egregious. The Companies misrepresented the safety and reliability

of millions of Defective Vehicles, concealed myriad defects in millions of Defective Vehicles

and the systemic safety issues plaguing the Companies, deceived Oklahoma Class members

on life-or-death matters, and concealed material facts that only it knew, all to avoid the

expense and public relations nightmare of correcting the serious flaw in its culture and in millions of New GM-branded vehicles. The Companies' egregious conduct warrants punitive damages.

2354.   The Companies' conduct as alleged herein was unconscionable since (1) the Companies, knowingly or with reason to know, took advantage of consumers reasonably unable to protect their interests because of their age, physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor; (2) at the time the consumer transaction was entered into, Old GM knew or had reason to know that price grossly exceeded the price at which similar vehicles were readily obtainable in similar transactions by like consumers; and (3) Old GM knew or had reason to know that the transaction Old GM induced the consumer to enter into was excessively one-sided in favor of Old GM.

2355.   Because the Companies' unconscionable conduct caused injury to Oklahoma Class members, the Oklahoma Class seeks recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees, under OKLA. STAT. TIT. 15 § 761.1. The Oklahoma Class further seeks an order enjoining New GM's unfair and/or deceptive acts or practices, and any other just and proper relief available under the Oklahoma CPA.

## ONE HUNDRED THIRTEENTH CLAIM FOR RELIEF

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (12A OKLA. STAT. ANN. § 2-314)

2356.   In the event the Court declines to certify a nationwide Class, this claim is on behalf of Class members who are Oklahoma residents.

2357.   Old GM and New GM were merchants with respect to motor vehicles.

1197532.10

2358.  A warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions when the Oklahoma Class purchased their Defective Vehicles.

2359.  These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shutdown of power steering and power brakes and the non-deployment of airbags in the event of a collision. .

2360.  Old GM and New GM were provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by the Oklahoma Class before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2361.  As a direct and proximate result of Old GM and New GM's breach of the warranties of merchantability, the Oklahoma Class have been damaged in an amount to be proven at trial. New GM also has successor liability for Old GM's breach.

## ONE HUNDRED FOURTEENTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

2362.  In the event the Court declines to certify a nationwide Class, this claim is on behalf of Class members who are Oklahoma residents.

2363.  As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

2364.  The Companies knew these representations were false when made.

2365.  The vehicles purchased or leased by the Oklahoma Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended

1197532.10

shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

2366.  The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision because the Oklahoma Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

2367.  The aforementioned concealment was material because if it had been disclosed the Oklahoma Class would not have bought, leased or retained their vehicles.

2368.  The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

2369.  The Oklahoma Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

2370.  As a result of their reliance, the Oklahoma Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

2371.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Oklahoma Class, who are therefore entitled to an award of punitive damages.

## OREGON

## ONE HUNDRED FIFTEENTH CLAIM FOR RELIEF

## VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT
### (OR. REV. STAT. § 646.605, *et. seq.*)

2372.   This claim is brought on behalf of Class members who are Oregon residents (the "Oregon Class")

2373.   Old GM was, and New GM is, a person within the meaning of OR. REV. STAT. § 646.605(4).

2374.   The Defective Vehicles at issue are "goods" obtained primarily for personal family or household purposes within the meaning of OR. REV. STAT. § 646.605(6).

2375.   The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits a person from, in the course of the person's business, doing any of the following: "(e) Represent[ing] that… goods… have… characteristics… uses, benefits,… or qualities that [they] do not have; (g) Represent[ing] that… goods… are of a particular standard [or] quality… if they are of another; (i) Advertis[ing]… goods or services with intent not to provide [them] as advertised;" and "(u) engag[ing] in any other unfair or deceptive conduct in trade or commerce." OR. REV. STAT. § 646.608(1).

2376.   The Companies engaged in unlawful trade practices, including representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a particular standard and quality when they

are not; advertising Defective Vehicles with the intent not to sell them as advertised; and engaging in other unfair or deceptive acts.

2377.   The Companies' actions as set forth above occurred in the conduct of trade or commerce.

2378.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Oregon UTPA, and also has successor liability for the violations of Old GM.

2379.   As alleged above, both Companies knew of the ignition switch defects, while the Oregon Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

2380.   The Companies knew or should have known that their conduct violated the Oregon UTPA.

2381.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

2382.   Old GM engaged in a deceptive trade practice when it failed to disclose

material information concerning the Defective Vehicles which it knew at the time of the sale.

Old GM deliberately withheld the information about the vehicles' propensity to inadvertently

shutdown in order to ensure that consumers would purchase its vehicles and to induce the

consumer to enter into a transaction.

2383.   From its inception in 2009, New GM has known of the ignition switch defects

that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits

and to avoid remediation costs and a public relations nightmare, New GM concealed the

defects and their tragic consequences and allowed unsuspecting new and used car purchasers

to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to

continue driving highly dangerous vehicles.

2384.   The Companies each owed the Oregon Class a duty to disclose the defective

nature of Defective Vehicles, including the dangerous risk of ignition switch movement,

engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective

Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles

through their deceptive marketing campaign and recall program that they designed to hide the

life-threatening problems from the Oregon Class; and/or

c.      Made incomplete representations about the safety and reliability of

Defective Vehicles generally, and the ignition switch in particular, while purposefully

withholding material facts from the Oregon Class that contradicted these representations.

-552-

2385.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Oregon Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

2386.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Oregon Class.

2387.   The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the Oregon Class. Had the Oregon Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

2388.   The Oregon Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Oregon Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Oregon Class own vehicles that are not safe.

2389.   The Oregon Class members have been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's

egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, has so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

2390. Oregon Class members risk irreparable injury as a result of the Companies' acts and omissions in violation of the Oregon UTPA, and these violations present a continuing risk to the Oregon Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

2391. The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

2392. As a direct and proximate result of the Companies' violations of the Oregon UTPA, the Oregon Class has suffered injury-in-fact and/or actual damage.

2393. The Oregon Class is entitled to recover the greater of actual damages or $200 pursuant to OR. REV. STAT. § 646.638(1). The Oregon Class is also entitled to punitive damages because the Companies engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

2394. Pursuant to OR. REV. STAT. § 646.638(2), Plaintiffs will mail a copy of the complaint to Oregon's attorney general.

## ONE HUNDRED SIXTEENTH CLAIM FOR RELIEF

### FRAUD BY CONCEALMENT
#### (BASED ON OREGON LAW)

2395. In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of Class members who are Oregon residents.

2396.   As set forth above, Old GM concealed and/or suppressed material facts concerning the safety of its vehicles.

2397.   Old GM had a duty to disclose these safety issues because it consistently marketed its vehicles as safe and proclaimed that safety was one of Old GM's highest corporate priorities. Once Old GM made representations to the public about safety, it was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

2398.   In addition, Old New GM had a duty to disclose these omitted material facts because they were known and/or accessible only to Old GM who had superior knowledge and access to the facts, and Old GM knew they were not known to or reasonably discoverable by Plaintiffs and the Class. These omitted facts were material because they directly impact the safety of the Defective Vehicles. Whether or not a vehicle inadvertently shuts down, and whether a vehicle's power steering, power brakes and airbags become inoperable during ordinary driving conditions, are material safety concerns. Old GM possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

2399.   Old GM actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce the Oregon Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

2400.   New GM still has not made full and adequate disclosure and continues to defraud the Oregon Class.

2401.   The Oregon Class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The Oregon Class' actions were justified. Old GM and New GM were in exclusive control of the material facts and such facts were not known to the public or the Oregon Class.

2402.   As a result of the concealment and/or suppression of the facts, the Oregon Class sustained damage. For those Oregon Class members who elect to affirm the sale, these damages, include the difference between the actual value of that which the Oregon Class paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits. Those who want to rescind their purchases are entitled to restitution and consequential damages.

2403.   The Companies' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the Oregon Class' rights and well-being to enrich the Companies. The Companies' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## PENNSYLVANIA

## ONE HUNDRED SEVENTEENTH CLAIM FOR RELIEF

### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (73 P.S. § 201-1, *et. seq.*)

2404.   This claim is brought on behalf of Class members who are Pennsylvania residents (the "Pennsylvania Class")

2405.   The Class purchased or leased their Defective Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

2406. All of the acts complained of herein were perpetrated by the Companies in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

2407. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have… characteristics,…. Benefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade…if they are of another;:" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

2408. The Companies engaged in unlawful trade practices, including representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a particular standard and quality when they are not; advertising Defective Vehicles with the intent not to sell them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

2409. In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or

commerce in violation of the Pennsylvania CPL, and also has successor liability for the violations of Old GM.

2410.  As alleged above, both Companies knew of the ignition switch defects, while the Pennsylvania Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

2411.  The Companies knew or should have known that their conduct violated the Pennsylvania CPL.

2412.  As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

2413.  Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

2414.  From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. New GM also knew of a serious safety issues and a myriad of serious defects in a host of New GM vehicles. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

2415. The Companies each owed the Pennsylvania Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

      a.    Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

      b.    Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Pennsylvania Class; and/or

      c.    Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Pennsylvania Class that contradicted these representations.

2416. The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Pennsylvania Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

2417. The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Pennsylvania Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Pennsylvania Class.

2418. The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the Pennsylvania Class. Had the Pennsylvania Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

2419.   The Pennsylvania Class suffered ascertainable loss caused by the Companies'
failure to disclose material information. The Pennsylvania Class overpaid for their vehicles
and did not receive the benefit of their bargain. As the result of the concealment and failure to
remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value
of their Defective Vehicles has diminished now that the safety issues in the Defective
Vehicles, and the many other serious safety issues and myriad defects in the Companies'
vehicles have come to light, and the Pennsylvania Class owns vehicles that are not safe.

2420.   The Pennsylvania Class has been damaged by New GM's misrepresentations,
concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as
they are now holding vehicles whose value has greatly diminished because of New GM's
failure to timely disclose and remedy the serious defects. New GM's egregious and widely-
publicized conduct and the never-ending and piecemeal nature of New GM's recalls has so
tarnished the Defective Vehicles that no reasonable consumer would purchase them—let
alone pay what would otherwise be fair market value for the vehicles.

2421.   Pennsylvania Class members risk irreparable injury as a result of the
Companies' act and omissions in violation of the Pennsylvania Act, and these violations
present a continuing risk to them as well as to the general public. The Companies' unlawful
acts and practices complained of herein affect the public interest.

2422.   The recalls and repairs instituted by New GM have not been adequate. The
recall is not an effective remedy and is not offered for all Defective Vehicles.

2423.   As a direct and proximate result of the Companies' violations of the
Pennsylvania CPL, the Pennsylvania Class have suffered injury-in-fact and/or actual damage.

2424.   New GM is liable to the Pennsylvania Class for treble their actual damages or $100, whichever is greater, and attorneys' fees, costs. 73 P.S. § 201-9.2(a). The Pennsylvania Class are also entitled to an award of punitive damages given that the Companies' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## ONE HUNDRED EIGHTEENTH CLAIM FOR RELIEF

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (13 PA. CONS. STAT. ANN. § 2314)

2425.   This claim is brought solely on behalf of Class members who are Pennsylvania residents.

2426.   Old GM was and New GM is a merchant with respect to motor vehicles.

2427.   A warranty that the Defective Vehicles were in merchantable condition was implied by law when Old GM sold the Defective Vehicles to Plaintiffs and the Class.

2428.   These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended stalling to occur during ordinary driving conditions; when the vehicles stall, the power brakes and power steering become inoperable and the vehicles' airbags will not deploy,

2429.   Old GM and New GM were provided notice of these issues by numerous complaints filed against it, by its own internal investigations, and by numerous individual letters and communications sent by the Pennsylvania Class before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

1197532.10

2430.   As a direct and proximate result of Old GM and New GM's breach of the warranties of merchantability, the Pennsylvania Class has been damaged in an amount to be proven at trial.

## ONE HUNDRED NINETEENTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

2431.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of Class members who are Pennsylvania residents.

2432.   As set forth above, both Old GM and New GM concealed and/or suppressed material facts concerning the safety of the Defective Vehicles.

2433.   Both Companies had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety was one of the Companies' highest corporate priorities. Once the Companies made representations to the public about safety, they were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

2434.   In addition, the Companies had a duty to disclose these omitted material facts because they were known and/or accessible only to the Companies who had superior knowledge and access to the facts, and the Companies new they were not known to or reasonably discoverable by the Pennsylvania Class. These omitted facts were material because they directly impact the safety of the Defective Vehicles. Whether or not a vehicle inadvertently shuts down, and whether a vehicle's power steering, power brakes and airbags become inoperable during ordinary driving conditions, are material safety concerns. The

Companies possessed exclusive knowledge of the defects rendering Defective Vehicles

inherently more dangerous and unreliable than similar vehicles.

2435.   The Companies actively concealed and/or suppressed these material facts with

the intent to induce the Pennsylvania Class to purchase Defective Vehicles at a higher price

for the vehicles, which did not match the vehicles' true value. The Companies also concealed

and withheld the information in order to prevent a public relations nightmare and harm to the

Companies' profits that would result from disclosure.

2436.   New GM still has not made full and adequate disclosure and continues to

defraud the Pennsylvania Class.

2437.   The Pennsylvania Class was unaware of these omitted material facts and would

not have acted as they did if they had known of the concealed and/or suppressed facts. The

Pennsylvania Class' actions were justified. The Companies were in exclusive control of the

material facts and such facts were not known to the public or the Pennsylvania Class.

2438.   As a result of the concealment and/or suppression of the facts, the

Pennsylvania Class sustained damage. For those who elect to affirm the sale, these damages

include the difference between the actual value of that which the Class member paid and the

actual value of that which she received, together with additional damages arising from the

sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use

and enjoyment of the property, and/or lost profits. Those who want to rescind the purchase are

entitled to restitution and consequential damages.

2439.   The Companies' acts were done maliciously, oppressively, deliberately, with

intent to defraud, and in reckless disregard of the Pennsylvania Class' rights and well-being to

enrich the Companies. The Companies' conduct warrants an assessment of punitive damages

in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## RHODE ISLAND

## ONE HUNDRED TWENTIETH CLAIM FOR RELIEF

## VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT
### (R.I. GEN. LAWS § 6-13.1, *et. seq.*)

2440.   This claim is brought solely on behalf of Class members who are Rhode Island residents (the "Rhode Island Class").

2441.   The Rhode Island Class members purchased or leased one or more Defective Vehicles primarily for personal, family, or household purposes within the meaning of R.I. GEN. LAWS § 6-13.1-5.2(a).

2442.   Rhode Island's Unfair Trade Practices and Consumer Protection Act ("Rhode Island CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including: "(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "(vii) Representing that goods or services are of a particular standard, quality, or grade…, if they are of another"; "(ix) Advertising goods or services with intent not to sell them as advertised"; "(xii) Engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding"; "(xiii) Engaging in any act or practice that is unfair or deceptive to the consumer"; and "(xiv) Using any other methods, acts or practices which mislead or deceive members of the public in a material respect." R.I. GEN. LAWS § 6-13.1-1(6).

2443.   The Companies engaged in unlawful trade practices, including: (1) representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Defective Vehicles are of a particular

standard and quality when they are not; (3) advertising the Defective Vehicles with the intent not to sell them as advertised; and (4) otherwise engaging in conduct that is unfair or deceptive and likely to deceive.

2444. The Companies' actions as set forth above occurred in the conduct of trade or commerce.

2445. In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Rhode Island CPA, and also has successor liability for the violations of Old GM.

2446. As alleged above, both Companies knew of the ignition switch defects, while the Rhode Island Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

2447. The Companies knew or should have known that their conduct violated the Rhode Island CPA.

2448. As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

2449.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shutdown in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

2450.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

2451.   The Companies each owed the Rhode Island Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

      a.     Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

      b.     Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Rhode Island Class; and/or

      c.     Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Rhode Island Class that contradicted these representations.

2452.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Rhode Island Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

2453.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Rhode Island Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Rhode Island Class.

2454.   The propensity of the Defective Vehicles to inadvertently shutdown during ordinary operation was material to the Rhode Island Class. Had they known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

2455.   The Rhode Island Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Rhode Island Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Rhode Island Class owns vehicles that are not safe.

2456.   The Rhode Island Class have been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-

publicized conduct and the never-ending and piecemeal nature of New GM's recalls has so

tarnished the Defective Vehicles that no reasonable consumer would purchase them—let

alone pay what would otherwise be fair market value for the vehicles.

2457.   The Rhode Island Class members risk irreparable injury as a result of the

Companies' act and omissions in violation of the Rhode Island CPA, and these violations

present a continuing risk to them as well as to the general public. The Companies' unlawful

acts and practices complained of herein affect the public interest.

2458.   The recalls and repairs instituted by New GM have not been adequate. The

recall is not an effective remedy and is not offered for all Defective Vehicles.

2459.   As a direct and proximate result of the Companies' violations of the Rhode

Island CPA, the Rhode Island Class have suffered injury-in-fact and/or actual damage.

2460.   The Rhode Island Class are entitled to recover the greater of actual damages or

$200 pursuant to R.I. GEN. LAWS § 6-13.1-5.2(a). The Rhode Island Class also seeks punitive

damages in the discretion of the Court because of the Companies' egregious disregard of

consumer and public safety and its long-running concealment of the serious safety defects and

their tragic consequences.

## ONE HUNDRED TWENTY-FIRST CLAIM FOR RELIEF

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (R.I. GEN. LAWS § 6A-2-314)

2461.   In the event the Court declines to certify a nationwide Class under Michigan

law, this claim is brought on behalf of Class members who are Rhode Island residents.

2462.   Old GM and New GM were merchants with respect to motor vehicles.

2463.   A warranty that the Defective Vehicles were in merchantable condition was

implied by law when the Rhode Island Class purchased their Defective Vehicles.

1197532.10

2464.   These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended stalling to occur during ordinary driving conditions; when the vehicles stall, the power brakes and power steering become inoperable and the vehicles' airbags will not deploy,

2465.   Old GM was provided notice of these issues by numerous complaints filed against it, by its own internal investigations, and by numerous individual letters and communications sent by the Rhode Island Class before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2466.   As a direct and proximate result of Old GM's breach of the warranties of merchantability, the Rhode Island Class has been damaged in an amount to be proven at trial.

## ONE HUNDRED TWENTY-SECOND CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

2467.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of Class members who are Rhode Island residents.

2468.   As set forth above, Both Old GM and New GM concealed and/or suppressed material facts concerning the safety of the Defective Vehicles.

2469.   The Companies had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety was one of the Companies' highest corporate priorities. Once the Companies made representations to the public about safety, they were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify

-569-

those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

2470.   In addition, the Companies had a duty to disclose these omitted material facts because they were known and/or accessible only to the Companies who had superior knowledge and access to the facts, and the Companies knew they were not known to or reasonably discoverable by the Rhode Island Class. These omitted facts were material because they directly impact the safety of the Defective Vehicles. Whether or not a vehicle inadvertently shuts down, and whether a vehicle's power steering, power brakes and airbags become inoperable during ordinary driving conditions, are material safety concerns. The Companies possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

2471.   The Companies actively concealed and/or suppressed these material facts with the intent to induce the Rhode Island Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value. The Companies also concealed and withheld the information in order to prevent a public relations nightmare and harm to the Companies' profits that would result from disclosure.

2472.   The Rhode Island Class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The Rhode Island Class' actions were justified. The Companies were in exclusive control of the material facts and such facts were not known to the public or the Rhode Island Class.

2473.   As a result of the concealment and/or suppression of the facts, the Rhode Island Class sustained damage. For those who elect to affirm the sale, these damages include

-570-

the difference between the actual value of that which the Rhode Island Class member paid and the actual value of what she received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits. Those who want to rescind the purchase are entitled to restitution and consequential damages.

2474.   The Companies' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the Rhode Island Class' rights and well-being to enrich New GM. New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## SOUTH CAROLINA

### ONE HUNDRED TWENTY-THIRD CLAIM FOR RELIEF

#### VIOLATIONS OF THE SOUTH CAROLINA
UNFAIR TRADE PRACTICES ACT
(S.C. CODE ANN. § 39-5-10, *et. seq.*)

2475.   This claim is brought on behalf of Class members who are South Carolina residents (the "South Carolina Class").

2476.   Old GM was, and New GM is, a "person" under S.C. CODE ANN. § 39-5-10.

2477.   The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce…." S.C. CODE § 39-5-20(a). The Companies engaged in unfair and deceptive acts or practices and violated the South Carolina UTPA by failing to disclose and actively concealing the dangerous risk caused by the ignition switch defects in the Defective Vehicles.

2478.   The Companies' actions as set forth above occurred in the conduct of trade or commerce.

2479.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the South Carolina UTPA, and also has successor liability for the violations of Old GM.

2480.   As alleged above, both Companies knew of the ignition switch defects, while the South Carolina Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

2481.   The Companies knew or should have known that their conduct violated the South Carolina UTPA.

2482.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

2483.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shut down in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

2484.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

2485.   The Companies each owed the South Carolina Class a duty to disclose the defective nature of the Defective Vehicles, including the dangerous risks posed by the defective ignition switches, because the Companies:

a.      Possessed exclusive knowledge of the defects rendering the Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with the Defective Vehicles in order to hide the life-threatening problems from Plaintiff; and/or

c.      Made incomplete representations about the safety and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

2486.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the South Carolina Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

2487.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the South Carolina Class, about the true safety and reliability

of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the South Carolina Class.

2488.   The propensity of the Defective Vehicles to inadvertently shut down during ordinary operation was material to the South Carolina Class. Had the South Carolina Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

2489.   All members of the South Carolina Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The South Carolina Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the South Carolina Class own vehicles that are not safe.

2490.   The South Carolina Class have been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls has so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

2491.   South Carolina Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the South Carolina UTPA, and these violations

present a continuing risk to the South Carolina Class as well as to the general public. The

Companies' unlawful acts and practices complained of herein affect the public interest.

2492.    The recalls and repairs instituted by New GM have not been adequate. The

recall is not an effective remedy and is not offered for all Defective Vehicles.

2493.    As a direct and proximate result of the Companies' violations of the South

Carolina UTPA, the South Carolina Class members have suffered injury-in-fact and/or actual

damage.

2494.    Pursuant to S.C. CODE ANN. § 39-5-140(a), the South Carolina Class seeks

monetary relief against New GM to recover for their economic losses. Because the Companies'

actions were willful and knowing, the South Carolina Class members' damages should be

trebled. *Id.*

2495.    The South Carolina Class further alleges that the Companies' malicious and

deliberate conduct warrants an assessment of punitive damages because the Companies

carried out despicable conduct with willful and conscious disregard of the rights and safety of

others, subjecting the South Carolina Class to cruel and unjust hardship as a result. The

Companies intentionally and willfully misrepresented the safety and reliability of the

Defective Vehicles, deceived the South Carolina Class on life-or-death matters, and concealed

material facts that only they knew, all to avoid the expense and public relations nightmare of

correcting a deadly flaw in the Defective Vehicles they repeatedly promised the South

Carolina Class was safe. New GM's unlawful conduct constitutes malice, oppression, and

fraud warranting punitive damages.

2496.    The South Carolina Class further seeks an order enjoining New GM's unfair or

deceptive acts or practices.

1197532.10

## ONE HUNDRED TWENTY-FOURTH CLAIM FOR RELIEF

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (S.C. CODE § 36-2-314)

2497.   In the event the Court declines to certify a nationwide Class under Michigan

law, this claim is brought on behalf of the South Carolina Class.

2498.   Old GM and New GM are merchants with respect to motor vehicles under S.C.

CODE § 36-2-314.

2499.   Under S.C. CODE § 36-2-314, a warranty that the Defective Vehicles were in

merchantable condition was implied by law when the South Carolina Class purchased the

vehicles.

2500.   These vehicles, when sold and at all times thereafter, were not in merchantable

condition and are not fit for the ordinary purpose for which cars are used. Specifically, the

Defective Vehicles are inherently defective in that there are defects in the ignition switch

systems that permit sudden unintended stalling to occur during ordinary driving conditions;

when the vehicles stall, the power brakes and power steering become inoperable and the

vehicles' airbags will not deploy,

2501.   Old GM and New GM were provided notice of these issues by numerous

complaints filed against them, their own internal investigations, and by numerous individual

letters and communications sent by the South Carolina Class members before or within a

reasonable amount of time after New GM issued the recall and the allegations of vehicle

defects became public.

2502.   As a direct and proximate result of Old GM and New GM's breach of the

warranty of merchantability, Plaintiffs and the Class have been damaged in an amount to be

proven at trial.

1197532.10

<u>**ONE HUNDRED TWENTY-FIFTH CLAIM FOR RELIEF**</u>

<u>**VIOLATIONS OF THE SOUTH CAROLINA REGULATION OF MANUFACTURERS,
DISTRIBUTORS, AND DEALERS ACT**
**(S.C. CODE ANN. § 56-15-10, *et. seq.*)**</u>

2503.   This claim is brought solely on behalf of the South Carolina Class.

2504.   Old GM and New GM were "manufacturer[s]" as set forth in S.C. CODE ANN.
§ 56-15-10, as they were engaged in the business of manufacturing or assembling new and
unused motor vehicles.

2505.   Old GM and New GM participated in unfair or deceptive acts or practices that
violated the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act
("Dealers Act"), S.C. CODE ANN. § 56-15-30.

2506.   Old GM and New GM engaged in actions which were arbitrary, in bad faith,
unconscionable, and which caused damage to Plaintiffs, the Class, and to the public.

2507.   Old GM and New GM's bad faith and unconscionable actions include, but are
not limited to: (1) representing that Defective Vehicles have characteristics, uses, benefits, and
qualities which they do not have, (2) representing that Defective Vehicles are of a particular
standard, quality, and grade when they are not, (3) advertising Defective Vehicles with the
intent not to sell them as advertised, (4) representing that a transaction involving Defective
Vehicles confers or involves rights, remedies, and obligations which it does not, and
(5) representing that the subject of a transaction involving Defective Vehicles has been
supplied in accordance with a previous representation when it has not.

2508.   Old GM and New GM resorted to and used false and misleading
advertisements in connection with its business. As alleged above, Old GM and New GM
made numerous material statements about the safety and reliability of Defective Vehicles that

were either false or misleading. Each of these statements contributed to the deceptive context of Old GM and New GM's unlawful advertising and representations as a whole.

2509. Pursuant to S.C. CODE ANN. § 56-15-110(2), members of the South Carolina Class bring this action on behalf of themselves as the action is one of common or general interest to many persons and the parties are too numerous to bring them all before the court.

2510. The South Carolina Class members are entitled to double the actual damages, the cost of the suit, attorney's fees pursuant to S.C. CODE ANN. § 56-15-110. The South Carolina Class also seeks injunctive relief under S.C. CODE ANN. § 56-15-110. The South Carolina Class also seeks treble damages because Old GM and New GM acted maliciously.

## SOUTH DAKOTA

## ONE HUNDRED TWENTY-SIXTH CLAIM FOR RELIEF

### VIOLATION OF THE SOUTH DAKOTA
### DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW
#### (S.D. CODIFIED LAWS § 37-24-6)

2511. This claim is brought on behalf of Class members who are South Dakota residents (the "South Dakota Class").

2512. The South Dakota Deceptive Trade Practices and Consumer Protection Law ("South Dakota CPL") prohibits deceptive acts or practices, which are defined for relevant purposes to include "[k]nowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby [.]" S.D. CODIFIED LAWS § 37-24-6(1). The conduct of Old GM and New GM as set forth herein constitutes deceptive acts or practices, fraud, false promises, misrepresentation, concealment, suppression, and omission of material facts in violation of S.D. Codified Laws § 37-24-6 and 37-24-31,

including, but not limited to, Old GM and New GM's manufacture and sale of vehicles with an ignition switch defect which the Old GM and New GM failed to adequately investigate, disclose, and remedy, the Companies' misrepresentations and omissions regarding the safety and reliability of the Defective Vehicles, and the Companies' misrepresentations concerning a host of other defects and safety issues.

2513.   The Companies' actions as set forth above occurred in the conduct of trade or commerce.

2514.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the South Dakota CPL, and also has successor liability for the violations of Old GM.

2515.   As alleged above, both Companies knew of the ignition switch defects, while the South Dakota Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

2516.   The Companies knew or should have known that their conduct violated the South Dakota CPL.

2517.  As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

2518.  Old GM and New GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM and New GM deliberately withheld the information about the vehicles' propensity to inadvertently shut down in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

2519.  From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

2520.  The Companies each owed the South Dakota Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.  Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.  Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the South Dakota Class; and/or

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the South Dakota Class that contradicted these representations.

2521.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the South Dakota Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

2522.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the South Dakota Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the South Dakota Class.

2523.   The propensity of the Defective Vehicles to inadvertently shut down during ordinary operation was material to the South Dakota Class. Had the South Dakota Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

2524.   All members of the South Dakota Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The South Dakota Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the South Dakota Class own vehicles that are not safe.

2525.   The South Dakota Class members have been damaged by Old GM and New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of Old GM and New GM's failure to timely disclose and remedy the serious defects. Old GM and New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in Old GM and New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

2526.   South Dakota Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the South Dakota CPL, and these violations present a continuing risk to the South Dakota Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

2527.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

2528.   As a direct and proximate result of the Companies' violations of the South Dakota CPL, the South Dakota Class members have suffered injury-in-fact and/or actual damage.

2529.   Under S.D. CODIFIED LAWS § 37-24-31, the South Dakota Class is entitled to a recovery of their actual damages suffered as a result of New GM's acts and practices, including the acts and practices of Old GM for which New GM has successor liability.

**ONE HUNDRED TWENTY-SEVENTH CLAIM FOR RELIEF**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(S.D. CODIFIED LAWS § 57a-2-314)**

2530.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of the South Dakota Class.

2531.   Old GM and New GM were merchants with respect to motor vehicles.

2532.   South Dakota law imposed a warranty that the Defective Vehicles were merchantable when the South Dakota Class purchased their Defective Vehicles.

2533.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the non-deployment of airbags in the event of a collision.

2534.   As a direct and proximate result of Old GM and New GM's breach of the implied warranty of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

**ONE HUNDRED TWENTY-EIGHTH CLAIM FOR RELIEF**

**FRAUD BY CONCEALMENT**

2535.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of the South Dakota Class.

2536.   As set forth above, both Old GM and New GM concealed and/or suppressed material facts concerning the safety of the Defective Vehicles.

2537.   The Companies had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety was one of the

Companies' highest corporate priorities. Once the Companies made representations to the public about safety, they were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

2538.   In addition, the Companies had a duty to disclose these omitted material facts because they were known and/or accessible only to the Companies who had superior knowledge and access to the facts, and the Companies knew they were not known to or reasonably discoverable by the South Dakota Class. These omitted facts were material because they directly impact the safety of the Defective Vehicles. Whether or not a vehicle inadvertently shuts down, and whether a vehicle's power steering, power brakes and airbags become inoperable during ordinary driving conditions, are material safety concerns. The Companies possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

2539.   The Companies actively concealed and/or suppressed these material facts with the intent to induce the South Dakota Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value. The Companies also concealed and withheld the information in order to prevent a public relations nightmare and harm to the Companies' profits that would result from disclosure.

2540.   The South Dakota Class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The South Dakota Class' actions were justified. The Companies were in exclusive

control of the material facts and such facts were not known to the public or the South Dakota

Class.

2541.    As a result of the concealment and/or suppression of the facts, the South

Dakota Class sustained damage. For those the South Dakota Class members who elect to

affirm the sale, these damages include the difference between the actual value of that which

members of the South Dakota Class paid and the actual value of that which they received,

together with additional damages arising from the sales transaction, amounts expended in

reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or

lost profits. For those members of the South Dakota Class who want to rescind the purchase,

then those South Dakota Class members are entitled to restitution and consequential damages.

2542.    The Companies' acts were done maliciously, oppressively, deliberately, with

intent to defraud, and in reckless disregard of the South Dakota Class's rights and well-being

to enrich Old GM and New GM. Old GM and New GM's conduct warrants an assessment of

punitive damages in an amount sufficient to deter such conduct in the future, which amount is

to be determined according to proof.

## TENNESSEE

## ONE HUNDRED TWENTY-NINTH CLAIM FOR RELIEF

## VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT
### (TENN. CODE ANN. § 47-18-101, *et. seq.*)

2543.    This claim is brought on behalf of Class members who are Tennessee residents

(the "Tennessee Class").

2544.    Tennessee Class members are "natural person[s]" and "consumer[s]" within

the meaning of TENN. CODE ANN. § 47-18-103(2).

2545.   Old GM was, and New GM is, a "person" within the meaning of TENN. CODE ANN. § 47-18-103(2) (the "Act").

2546.   All of the Companies' conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of TENN. CODE ANN. § 47-18-103(19).

2547.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to: "(5) Representing that goods or services have… characteristics, [or]… benefits… that they do not have…;" "(7) Representing that goods or services are of a particular standard, quality or grade… if they are of another;" and "Advertising goods or services with intent not to sell them as advertised." TENN. CODE ANN. § 47-18-104. The Companies violated the Tennessee CPA by engaging in unfair or deceptive acts, including representing that Defective Vehicles have characteristics or benefits that they did not have; representing that Defective Vehicles are of a particular standard, quality, or grade when they are of another; and advertising Defective Vehicles with intent not to sell them as advertised.

2548.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or

commerce in violation of the Tennessee CPA, and also has successor liability for the violations of Old GM.

2549.   As alleged above, both Companies knew of the ignition switch defects, while the Tennessee Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

2550.   The Companies knew or should have known that their conduct violated the Tennessee CPA.

2551.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

2552.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shut down in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

2553.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

-587-

2554.   The Companies each owed Tennessee Class members a duty to disclose the
defective nature of Defective Vehicles, including the dangerous risk of ignition switch
movement, engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective
Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles
through their deceptive marketing campaign and recall program that they designed to hide the
life-threatening problems from the Tennessee Class; and/or

c.      Made incomplete representations about the safety and reliability of
Defective Vehicles generally, and the ignition switch in particular, while purposefully
withholding material facts from the Tennessee Class that contradicted these representations.

2555.   The Defective Vehicles posed and/or pose an unreasonable risk of death or
serious bodily injury to the Tennessee Class, passengers, other motorists, pedestrians, and the
public at large, because they are susceptible to incidents of sudden and unintended engine
shutdown.

2556.   The Companies' unfair or deceptive acts or practices were likely to deceive
reasonable consumers, including the Tennessee Class, about the true safety and reliability of
Defective Vehicles. The Companies intentionally and knowingly misrepresented material
facts regarding the Defective Vehicles with an intent to mislead the Tennessee Class.

2557.   The propensity of the Defective Vehicles to inadvertently shut down during
ordinary operation was material to the Tennessee Class. Had the Tennessee Class members
known that their vehicles had these serious safety defects, they would either not have
purchased their Defective Vehicles, or would have paid less for them than they did.

2558.   All members of the Tennessee Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Tennessee Class members overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and the Tennessee Class members own vehicles that are not safe.

2559.   Tennessee Class members have been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of Old GM and New GM's failure to timely disclose and remedy the serious defects. Old GM and New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in Old GM and New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

2560.   Plaintiffs and Tennessee Class members risk irreparable injury as a result of the Companies' act and omissions in violation of the Tennessee CPA, and these violations present a continuing risk to the Tennessee Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

2561.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

1197532.10

2562.   As a direct and proximate result of the Companies' violations of the Tennessee CPA, the Tennessee Class members have suffered injury-in-fact and/or actual damage.

2563.   Pursuant to TENN. CODE § 47-18-109(a), the Tennessee Class seeks monetary relief against New GM measured as actual damages in an amount to be determined at trial, treble damages as a result of the Companies' willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

<u>**ONE HUNDRED THIRTIETH CLAIM FOR RELIEF**</u>

<u>**FRAUD BY CONCEALMENT**</u>

2564.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of the Tennessee Class.

2565.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

2566.   The Companies knew these representations were false when made.

2567.   The vehicles purchased or leased by the Tennessee Class were, in fact, defective, unsafe, and unreliable, because the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

2568.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision because the Tennessee Class members relied on the Companies' representations that the vehicles they purchased and retained were safe and free from defects.

2569.   The aforementioned concealment was material because if it had been disclosed the Tennessee Class members would not have bought, leased or retained the vehicles.

2570.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

2571.   The Tennessee Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

2572.   As a result of their reliance, Tennessee Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

2573.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Tennessee Class. The Tennessee Class members are therefore entitled to an award of punitive damages.

## TEXAS

## ONE HUNDRED THIRTY-FIRST CLAIM FOR RELIEF

### VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES — CONSUMER PROTECTION ACT
**(TEX. BUS. & COM. CODE §§ 17.41, *et. seq.*)**

2574.   This claim is brought on behalf of Class members who are Texas residents (the "Texas Class").

2575.   Members of the Texas Class are individuals, partnerships, and corporations

with assets of less than $25 million (or are controlled by corporations or entities with less than

$25 million in assets). *See* TEX. BUS. & COM. CODE § 17.41,

2576.   The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas

DTPA") prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any

trade or commerce," TEX. BUS. & COM. CODE § 17.46(a), and an "unconscionable action or

course of action," which means "an act or practice which, to a consumer's detriment, takes

advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a

grossly unfair degree." TEX. BUS. & COM. CODE § 17.45(5); TEX. BUS. & COM. CODE

§ 17.50(a)(3). The Companies have committed false, misleading, unconscionable and

deceptive acts or practices in the conduct of trade or commerce.

2577.   The Companies also violated the Texas DTPA by (1) representing that the

Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have;

(2) representing that the Defective Vehicles are of a particular standard, quality, and grade

when they are not; (3) advertising the Defective Vehicles with the intent not to sell them as

advertised; and (4) failing to disclose information concerning the Defective Vehicles with the

intent to induce consumers to purchase or lease the Defective Vehicles.

2578.   In the course of their business, both Old GM and New GM willfully failed to

disclose and actively concealed the dangerous ignition switch defects in the Defective

Vehicles as described herein and otherwise engaged in activities with a tendency or capacity

to deceive. Old GM and New GM also engaged in unlawful trade practices by employing

deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression,

or omission of any material fact with intent that others rely upon such concealment,

1197532.10

suppression, or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Texas DTPA, and also has successor liability for the violations of Old GM.

2579.  As alleged above, both Companies knew of the ignition switch defects, while the Texas Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

2580.  The Companies knew or should have known that their conduct violated the Texas DTPA.

2581.  As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

2582.  Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shut down in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

2583.  From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

2584.    The Companies each owed Texas Class members a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.    Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.    Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Texas Class; and/or

c.    Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Texas Class that contradicted these representations.

2585.    The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Texas Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

2586.    The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Texas Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Texas Class.

2587.    The propensity of the Defective Vehicles to inadvertently shut down during ordinary operation was material to the Texas Class. Had Texas Class members known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

2588.   All members of the Texas Class suffered ascertainable loss caused by the

Companies' failure to disclose material information. Texas Class members overpaid for their

vehicles and did not receive the benefit of their bargain. As the result of the concealment and

failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls,

the value of their Defective Vehicles has diminished now that the safety issues in the

Defective Vehicles, and the many other serious safety issues and myriad defects in the

Companies' vehicles have come to light, and Texas Class members own vehicles that are not

safe.

2589.   Texas Class members have been damaged by Old GM and New GM's

misrepresentations, concealment, and non-disclosure of the ignition switch defects in the

Defective Vehicles, as they are now holding vehicles whose value has greatly diminished

because of Old GM and New GM's failure to timely disclose and remedy the serious defects.

Old GM and New GM's egregious and widely-publicized conduct and the never-ending and

piecemeal nature of New GM's recalls, and the many other serious defects in Old GM and

New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer

would purchase them—let alone pay what would otherwise be fair market value for the

vehicles.

2590.   Texas Class members risk irreparable injury as a result of the Companies' act

and omissions in violation of the Texas DTPA, and these violations present a continuing risk

to the Texas Class as well as to the general public. The Companies' unlawful acts and

practices complained of herein affect the public interest.

2591.   The recalls and repairs instituted by New GM have not been adequate. The

recall is not an effective remedy and is not offered for all Defective Vehicles.

2592.   As a direct and proximate result of the Companies' violations of the Texas
DTPA, Texas Class members have suffered injury-in-fact and/or actual damage.

2593.   Pursuant to TEX. BUS. & COM. CODE § 17.50(a)(1) and (b), the Texas Class
seeks monetary relief against New GM measured as actual damages in an amount to be
determined at trial, treble damages for the Companies' knowing violations of the Texas DTPA,
and any other just and proper relief available under the Texas DTPA.

2594.   For those Texas Class members who wish to rescind their purchases, they are
entitled under TEX. BUS. & COM. CODE § 17.50(b)(4) to rescission and other relief necessary
to restore any money or property that was acquired from them based on violations of the
Texas DTPA.

2595.   The Texas Class also seeks court costs and attorneys' fees under § 17.50(d) of
the Texas DTPA.

2596.   Texas Plaintiffs have complied with the notice requirement set forth in TEX.
BUS. & COM. CODE § 17.505(a) by virtue of the notice previously provided in the context of
the underlying action styled *Ramirez, et al. v. GM*, 2:14-cv-02344-JVS-AN (C.D. Cal.), and
other underlying actions, as well as additional notice in the form of a demand letter sent on
October 12, 2014.

2597.   Upon filing this Complaint and as required by TEX. BUS. & COM. CODE
§ 17.501, Plaintiffs will provide the consumer protection division of the Attorney General's
office a copy of the demand letter and a copy of the complaint.

## ONE HUNDRED THIRTY-SECOND CLAIM FOR RELIEF

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (TEX. BUS. & COM. CODE § 2.314)

2598.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of the Texas Class.

2599.   Old GM and New GM were merchants with respect to motor vehicles under TEX. BUS. & COM. CODE § 2.104.

2600.   Under TEX. BUS. & COM. CODE § 2.314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions in which Texas Class members purchased their Defective Vehicles.

2601.   Old GM and New GM impliedly warranted that the vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use—transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.

2602.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the non-deployment of airbags in the event of a collision.

2603.   As a direct and proximate result of Old GM and New GM's breach of the implied warranty of merchantability, Texas Class members have been damaged in an amount to be proven at trial.

## ONE HUNDRED THIRTY-THIRD CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

2604.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of the Texas Class.

2605.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

2606.   The Companies knew these representations were false when made.

2607.   The vehicles purchased or leased by the Texas Class were, in fact, defective, unsafe, and unreliable, because the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

2608.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision because Texas Class members relied on the Companies' representations that the vehicles they were purchasing were safe.

2609.   The aforementioned concealment was material because if it had been disclosed Texas Class members would not have bought, leased, or retained their vehicles, or would have paid less for the vehicles.

2610.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing, leasing, or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch

systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

2611.   Texas Class members relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

2612.   As a result of their reliance, Texas Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

2613.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Texas Class. Texas Class members are therefore entitled to an award of punitive damages.

## UTAH

## ONE HUNDRED THIRTY-FOURTH CLAIM FOR RELIEF

### VIOLATION OF UTAH CONSUMER SALES PRACTICES ACT
(UTAH CODE ANN. § 13-11-1, et. seq.)

2614.   This claim is brought on behalf of Class members who are Utah residents (the "Utah Class").

2615.   Old GM was and New GM is a "supplier" under the Utah Consumer Sales Practices Act ("Utah CSPA"), UTAH CODE ANN. § 13-11-3.

2616.   Utah Class members are "persons" under UTAH CODE ANN. § 13-11-3.

2617.   The sale of the Defective Vehicles to the Utah Class members was a "consumer transaction" within the meaning of UTAH CODE ANN. § 13-11-3.

2618.   The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction" under UTAH CODE ANN. § 13-11-4. Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally: (a) indicates that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not" or "(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not." UTAH CODE ANN. § 13-11-4. "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA. UTAH CODE ANN. § 13-11-5.

2619.   The Companies committed deceptive acts or practices in the conduct of trade or commerce, by, among other things, engaging in unconscionable acts, representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; and representing that the Defective Vehicles are of a particular standard, quality, and grade when they are not

2620.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or

-600-

commerce in violation of the Utah CSPA, and also has successor liability for the violations of Old GM.

2621.   As alleged above, both Companies knew of the ignition switch defects, while the Utah Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

2622.   The Companies knew or should have known that their conduct violated the Utah CSPA.

2623.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

2624.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shut down in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

2625.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

2626.   The Companies each owed Utah Class members a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

      a.      Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

      b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Utah Class; and/or

      c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Utah Class that contradicted these representations.

2627.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Utah Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

2628.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Utah Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Utah Class.

2629.   The propensity of the Defective Vehicles to inadvertently shut down during ordinary operation was material to Utah Class members. Had the Utah Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

1197532.10

2630.  All members of the Utah Class suffered ascertainable loss caused by the Companies' failure to disclose material information. Utah Class members overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and Utah Class members own vehicles that are not safe.

2631.  Utah Class members have been damaged by Old GM and New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of Old GM and New GM's failure to timely disclose and remedy the serious defects. Old GM and New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in Old GM and New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

2632.  Utah Class members risk irreparable injury as a result of the Companies' act and omissions in violation of the Utah CSPA, and these violations present a continuing risk to Utah Class members as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

2633.  The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

2634.   As a direct and proximate result of the Companies' violations of the Utah

CSPA, Utah Class members have suffered injury-in-fact and/or actual damage.

2635.   Pursuant to UTAH CODE ANN. § 13-11-4, the Utah Class seek monetary relief

against New GM measured as the greater of (a) actual damages in an amount to be determined

at trial and (b) statutory damages in the amount of $2,000 for each Utah Class member,

reasonable attorneys' fees, and any other just and proper relief available under the Utah CSPA.

### ONE HUNDRED THIRTY-FIFTH CLAIM FOR RELIEF

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
#### (UTAH CODE ANN. § 70A-2-314)

2636.   In the event the Court declines to certify a nationwide Class under Michigan

law, this claim is brought on behalf of the Utah Class.

2637.   Old GM and New GM were at all relevant times merchants with respect to

motor vehicles.

2638.   Old GM and New GM impliedly warranted that its vehicles were of good and

merchantable quality and fit, and safe for their ordinary intended use—transporting the driver

and passengers in reasonable safety during normal operation, and without unduly endangering

them or members of the public.

2639.   These vehicles, when sold and at all times thereafter, were not merchantable

and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective

Vehicles are inherently defective in that there are defects in the ignition switch systems that

permit sudden unintended shutdown to occur, with the attendant shut down of power steering

and power brakes and the non-deployment of airbags in the event of a collision.

2640.   As a direct and proximate result of the Companies' breach of the implied warranty of merchantability, Utah Class members have been damaged in an amount to be proven at trial.

**VERMONT**

**ONE HUNDRED THIRTY-SIXTH CLAIM FOR RELIEF**

**VIOLATION OF VERMONT CONSUMER FRAUD ACT**
**(VT. STAT. ANN. TIT. 9, § 2451 *et. seq.*)**

2641.   This claim is brought on behalf of Class members who are Vermont residents (the "Vermont Class").

2642.   Old GM was, and New GM is, a seller within the meaning of VT. STAT. ANN. TIT. 9, § 2451(a)(c).

2643.   The Vermont Consumer Fraud Act ("Vermont CFA") makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce...." VT. STAT. ANN. TIT. 9, § 2453(a). The Companies engaged in unfair and deceptive acts or practices in trade or commerce in violation of the Vermont CFA by failing to disclose and actively concealing the ignition switch defects in the Defective Vehicles.

2644.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or

commerce in violation of the Vermont CFA, and also has successor liability for the violations
of Old GM.

2645.   As alleged above, both Companies knew of the ignition switch defects, while
the Vermont Class was deceived by the Companies' omission into believing the Defective
Vehicles were safe, and the information could not have reasonably been known by the
consumer.

2646.   The Companies knew or should have known that their conduct violated the
Vermont CFA.

2647.   As alleged above, the Companies made material statements about the safety
and reliability of Defective Vehicles that were either false or misleading.

2648.   Old GM engaged in a deceptive trade practice when it failed to disclose
material information concerning the Defective Vehicles which it knew at the time of the sale.
Old GM deliberately withheld the information about the vehicles' propensity to inadvertently
shut down in order to ensure that consumers would purchase its vehicles and to induce the
consumer to enter into a transaction.

2649.   From its inception in 2009, New GM has known of the ignition switch defects
that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits
and to avoid remediation costs and a public relations nightmare, New GM concealed the
defects and their tragic consequences and allowed unsuspecting new and used car purchasers
to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to
continue driving highly dangerous vehicles.

2650.   The Companies each owed Plaintiffs a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Vermont Class; and/or

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Vermont Class that contradicted these representations.

2651.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Vermont Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

2652.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Vermont Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Vermont Class.

2653.   The propensity of the Defective Vehicles to inadvertently shut down during ordinary operation was material to Vermont Class members. Had Vermont Class members known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

2654.   All members of the Vermont Class suffered ascertainable loss caused by the Companies' failure to disclose material information. Vermont Class members overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and Vermont Class members own vehicles that are not safe.

2655.   Vermont Class members have been damaged by Old GM and New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of Old GM and New GM's failure to timely disclose and remedy the serious defects. Old GM and New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in Old GM and New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

2656.   Vermont Class members risk irreparable injury as a result of the Companies' act and omissions in violation of the Vermont CFA, and these violations present a continuing risk to the Vermont Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

2657.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

2658.   As a direct and proximate result of the Companies' violations of the Vermont CFA, Vermont Class members have suffered injury-in-fact and/or actual damage.

2659.   Vermont Class members are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]" pursuant to VT. STAT. ANN. TIT. 9, § 2461(b).

## ONE HUNDRED THIRTY-SEVENTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

2660.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of the Vermont Class.

2661.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

2662.   The Companies knew these representations were false when made.

2663.   The vehicles purchased or leased by Vermont Class members were, in fact, defective, unsafe, and unreliable, because the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

2664.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision because Vermont Class members relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

2665.   The aforementioned concealment was material because if it had been disclosed Vermont Class members would not have bought, leased, or retained their vehicles.

2666.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing, leasing, or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

2667.   Vermont Class members relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

2668.   As a result of their reliance, Vermont Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

2669.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Vermont Class. Vermont Class members are therefore entitled to an award of punitive damages.

## **VIRGINIA**

## **ONE HUNDRED THIRTY-EIGHTH CLAIM FOR RELIEF**

### **VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT**
**(VA. CODE ANN. 15 §§ 59.1-196, *et. seq.*)**

2670.   This claim is brought solely on behalf of Class members who are Virginia residents (the "Virginia Class").

2671.   Old GM was and New GM are "supplier[s]" under VA. CODE ANN. § 59.1-198.

2672.   The sale of the Defective Vehicles to Virginia Class members was a "consumer transaction" within the meaning of VA. CODE ANN. § 59.1-198.

2673.   The Virginia Consumer Protection Act ("Virginia CPA") lists prohibited "practices" which include: "5. Misrepresenting that good or services have certain characteristics;" "6. Misrepresenting that goods or services are of a particular standard, quality, grade style, or model;" "8. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised;" "9. Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" and "14. Using any other deception, fraud, or misrepresentation in connection with a consumer transaction." VA. CODE ANN. § 59.1-200. The Companies violated the Virginia CPA by misrepresenting the Defective Vehicles had certain quantities, characteristics, ingredients, uses, or benefits; misrepresenting that Defective Vehicles were of a particular standard, quality, grade, style, or model when they were another; advertising Defective Vehicles with intent not to sell them as advertised; and otherwise "using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

2674.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment,

-611-

suppression, or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Virginia CPA, and also has successor liability for the violations of Old GM.

2675.   As alleged above, both Companies knew of the ignition switch defects, while the Virginia Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

2676.   The Companies knew or should have known that their conduct violated the Virginia CPA.

2677.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

2678.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shut down in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

2679.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

2680.   The Companies each owed Virginia Class members a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Virginia Class; and/or

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Virginia Class that contradicted these representations.

2681.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Virginia Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

2682.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Virginia Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Virginia Class.

2683.   The propensity of the Defective Vehicles to inadvertently shut down during ordinary operation was material to Virginia Class members. Had Virginia Class members known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

2684.   All members of the Virginia Class suffered ascertainable loss caused by the Companies' failure to disclose material information. Virginia Class members overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and Virginia Class members own vehicles that are not safe.

2685.   Virginia Class members have been damaged by New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of New GM's failure to timely disclose and remedy the serious defects. New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

2686.   Virginia Class members risk irreparable injury as a result of the Companies' act and omissions in violation of the Virginia CPA, and these violations present a continuing risk to the Virginia Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

2687.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

2688.   As a direct and proximate result of the Companies' violations of the Virginia

CPA, Virginia Class members have suffered injury-in-fact and/or actual damage.

2689.   Pursuant to VA. CODE ANN. § 59.1-204, Virginia Class members seek

monetary relief against New GM measured as the greater of (a) actual damages in an amount

to be determined at trial and (b) statutory damages in the amount of $500 for each Virginia

Class Member. Because the Companies' conduct was committed willfully and knowingly, the

Virginia Classis entitled to recover, for each Virginia Class Member, the greater of (a) three

times actual damages or (b) $1,000.

2690.   Plaintiffs also seek an order enjoining New GM's unfair and/or deceptive acts

or practices, punitive damages, and attorneys' fees, and any other just and proper relief

available under General Business Law § 59.1-204, *et. seq.*

## ONE HUNDRED THIRTY-NINTH CLAIM FOR RELIEF

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (VA. CODE ANN. § 8.2-314)

2691.   In the event the Court declines to certify a nationwide Class under Michigan

law, this claim is brought on behalf of the Virginia Class.

2692.   Old GM and New GM were at all relevant times merchants with respect to

motor vehicles.

2693.   Old GM and New GM impliedly warranted that their vehicles were of good

and merchantable quality and fit, and safe for their ordinary intended use—transporting the

driver and passengers in reasonable safety during normal operation, and without unduly

endangering them or members of the public.

2694.   These vehicles, when sold and at all times thereafter, were not merchantable

and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective

Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the non-deployment of airbags in the event of a collision.

2695.  As a direct and proximate result of the Companies' breach of the implied warranty of merchantability, the Virginia Class has been damaged in an amount to be proven at trial.

**ONE HUNDRED FORTIETH CLAIM FOR RELIEF**

**FRAUD BY CONCEALMENT**

2696.  In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of the Virginia Class.

2697.  As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

2698.  The Companies knew these representations were false when made.

2699.  The vehicles purchased or leased by Virginia Class members were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

2700.  The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision because Virginia Class members relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

2701.  The aforementioned concealment was material because if it had been disclosed Virginia Class members would not have bought, leased, or retained their vehicles.

2702.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

2703.   Virginia Class members relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

2704.   As a result of their reliance, the Virginia Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

2705.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Virginia Class. Virginia Class members are therefore entitled to an award of punitive damages.

## WASHINGTON

## ONE HUNDRED FORTY-FIRST CLAIM FOR RELIEF

## VIOLATION OF THE CONSUMER PROTECTION ACT
### (REV. CODE WASH. ANN. §§ 19.86.010, *et. seq.*)

2706.   This claim is brought on behalf of Class members who are Washington residents (the "Washington Class").

2707.   The Companies committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of WASH. REV. CODE. WASH. ANN. §§ 19.96.010.

2708.   The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." WASH. REV. CODE. WASH. ANN. §§ 19.96.010. The Companies engaged in unfair and deceptive acts and practices and violated the Washington CPA by failing to disclose and actively concealing the ignition switch defects in the Defective Vehicles.

2709.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Washington CPA, and also has successor liability for the violations of Old GM.

2710.   As alleged above, both Companies knew of the ignition switch defects, while the Washington Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

2711.   The Companies knew or should have known that their conduct violated the Washington CPA.

2712.  As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

2713.  Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shut down in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

2714.  From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

2715.  The Companies each owed Washington Class members a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.     Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.     Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from Washington Class members; and/or

c.     Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully

-619-

withholding material facts from Washington Class members that contradicted these representations.

2716.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Washington Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

2717.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Washington Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Washington Class.

2718.   The propensity of the Defective Vehicles to inadvertently shut down during ordinary operation was material to Washington Class members. Had the Washington Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

2719.   All members of the Washington Class suffered ascertainable loss caused by the Companies' failure to disclose material information. Washington Class members overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and Washington Class members own vehicles that are not safe.

2720.   Washington Class members have been damaged by Old GM and New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of Old GM and New GM's failure to timely disclose and remedy the serious defects. Old GM and New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in Old GM and New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

2721.   Washington Class members risk irreparable injury as a result of the Companies' act and omissions in violation of the Washington CPA, and these violations present a continuing risk to the Washington Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

2722.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

2723.   As a direct and proximate result of the Companies' violations of the Washington Act, Washington Class members have suffered injury-in-fact and/or actual damage.

2724.   New GM is liable to the Washington Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under REV. CODE. WASH. ANN. § 19.86.090.

2725.   Pursuant to WASH. REV. CODE. WASH. ANN. § 19.86.095, Plaintiffs will serve

the Washington Attorney General with a copy of this complaint as Plaintiffs seek injunctive

relief.

## ONE HUNDRED FORTY-SECOND CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

2726.   In the event the Court declines to certify a nationwide Class under Michigan

law, this claim is brought on behalf of the Washington Class.

2727.   As described above, Old GM and New GM made material omissions and

affirmative misrepresentations regarding the Defective Vehicles.

2728.   The Companies knew these representations were false when made.

2729.   The vehicles purchased or leased by Washington Class members were, in fact,

defective, unsafe, and unreliable, because the vehicles were subject to sudden unintended shut

down, with the attendant loss of power steering, power brakes, and the non-deployment of

airbags in the event of a collision.

2730.   The Companies had a duty to disclose that these vehicles were defective,

unsafe and unreliable in that the vehicles were subject to sudden unintended shut down, with

the attendant loss of power steering, power brakes, and the non-deployment of airbags in the

event of a collision because Washington Class members relied on the Companies'

representations that the vehicles they were purchasing and retaining were safe and free from

defects.

2731.   The aforementioned concealment was material because if it had been disclosed

the Washington Class would not have bought, leased, or retained their vehicles.

2732.   The aforementioned representations were material because they were facts that

would typically be relied on by a person purchasing, leasing, or retaining a new or used motor

vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

2733.   Washington Class members relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

2734.   As a result of their reliance, the Washington Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

## WEST VIRGINIA

## ONE HUNDRED FORTY-THIRD CLAIM FOR RELIEF

## VIOLATIONS OF THE CONSUMER CREDIT AND PROTECTION ACT
### (W. VA. CODE § 46a-1-101, *et. seq.*)

2735.   This claim is brought on behalf of Class members who are West Virginia residents (the "West Virginia Class").

2736.   Old GM was, and New GM is, a "person" under W.VA. CODE § 46A-1-102(31).

2737.   West Virginia Class members are "consumers," as defined by W.VA. CODE §§ and 46A-1-102(12) and 46A-6-102(2), who purchased or leased one or more Defective Vehicles.

2738.   The Companies engaged in trade or commerce as defined by W. VA. CODE § 46A-6-102(6).

2739.   The West Virginia Consumer Credit and Protection Act ("West Virginia

CCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or

commerce.…" W. VA. CODE § 46A-6-104. Without limitation, "unfair or deceptive" acts or

practices include:

> (I) Advertising goods or services with intent not to sell them as advertised;
>
> (K) Making false or misleading statements of fact concerning the reasons for, existence of or amounts of price reductions;
>
> (L) Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding;
>
> (M) The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby;
>
> (N) Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised, printed, displayed, published, distributed or broadcast in any manner, any statement or representation with regard to the sale of goods or the extension of consumer credit including the rates, terms or conditions for the sale of such goods or the extension of such credit, which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive;

W. VA. CODE § 46A-6-102(7).

2740.   By failing to disclose and actively concealing the dangerous risks posed by the

defective ignition switches in the Defective Vehicles, the Companies engaged in deceptive

business practices prohibited by the West Virginia CCPA, including: (1) representing that the

Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have;

(2) representing that the Defective Vehicles are of a particular standard, quality, and grade

-624-

when they are not; (3) advertising the Defective Vehicles with the intent not to sell them as advertised; (4) representing that a transaction involving the Defective Vehicles confers or involves rights, remedies, and obligations which it does not; and (5) representing that the subject of a transaction involving the Defective Vehicles has been supplied in accordance with a previous representation when it has not.

2741.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the West Virginia CCPA, and also has successor liability for the violations of Old GM.

2742.   As alleged above, both Companies knew of the ignition switch defects, while the West Virginia Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

2743.   The Companies knew or should have known that their conduct violated the West Virginia Act.

2744.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

-625-

2745.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shut down in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

2746.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

2747.   The Companies each owed the West Virginia Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the West Virginia Class; and/or

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the West Virginia Class that contradicted these representations.

1197532.10

2748.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the West Virginia Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

2749.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the West Virginia Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the West Virginia Class.

2750.   The propensity of the Defective Vehicles to inadvertently shut down during ordinary operation was material to the West Virginia Class. Had West Virginia Class members known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

2751.   All members of the West Virginia Class suffered ascertainable loss caused by the Companies' failure to disclose material information. West Virginia Class members overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and West Virginia Class members own vehicles that are not safe.

2752.   West Virginia Class members have been damaged by Old GM and New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished

because of Old GM and New GM's failure to timely disclose and remedy the serious defects.
Old GM and New GM's egregious and widely-publicized conduct and the never-ending and
piecemeal nature of New GM's recalls, and the many other serious defects in Old GM and
New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer
would purchase them—let alone pay what would otherwise be fair market value for the
vehicles.

2753.   West Virginia Class members risk irreparable injury as a result of the
Companies' act and omissions in violation of the West Virginia CCPA, and these violations
present a continuing risk to the West Virginia Class as well as to the general public. The
Companies' unlawful acts and practices complained of herein affect the public interest.

2754.   The recalls and repairs instituted by New GM have not been adequate. The
recall is not an effective remedy and is not offered for all Defective Vehicles.

2755.   As a direct and proximate result of the Companies' violations of the West
Virginia CCPA, West Virginia Class members have suffered injury-in-fact and/or actual
damage.

2756.   Pursuant to W. VA. CODE § 46A-1-106, the West Virginia Class seeks
monetary relief against New GM measured as the greater of (a) actual damages in an amount
to be determined at trial and (b) statutory damages in the amount of $200 per violation of the
West Virginia CCPA for each West Virginia Class member.

2757.   The West Virginia Class also seeks punitive damages against New GM
because the Companies carried out despicable conduct with willful and conscious disregard of
the rights and safety of others, subjecting the West Virginia Class to cruel and unjust hardship
as a result. The Companies intentionally and willfully misrepresented the safety and reliability

of the Defective Vehicles, deceived the West Virginia Class on life-or-death matters, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Defective Vehicles it repeatedly promised the West Virginia Class was safe. The Companies' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

2758.   The West Virginia Class believes that the recalls and repairs instituted by New GM have not been adequate, and that some or all of the Defective Vehicles will remain defective even after New GM's "remedy" is implemented.

2759.   The West Virginia Class further seeks an order enjoining New GM's unfair or deceptive acts or practices, restitution, punitive damages, costs of Court, attorney's fees under W. VA. CODE § 46A-5-101, *et. seq.*, and any other just and proper relief available under the West Virginia CCPA.

2760.   West Virginia Plaintiffs have complied with the notice requirement set forth in W. VA. CODE § 46A-6-106(b ) by virtue of the notice previously provided in the context of the underlying action styled *Ramirez, et al. v. GM*, 2:14-cv-02344-JVS-AN (C.D. Cal.), and other underlying actions, as well as additional notice in the form of a demand letter sent on October 12, 2014.

## ONE HUNDRED FORTY-FOURTH CLAIM FOR RELIEF

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (W. VA. CODE § 46-2-314)

2761.   In the event the Court declines to certify a nationwide Class, Plaintiffs bring this claim on behalf of the West Virginia Class.

2762.   Old GM and New GM were at all relevant times sellers of motor vehicles
under W. Va. Code § 46-2-314, and were also "merchant[s]" as the term is used in W. Va.
Code § 46A-6-107 and § 46-2-314.

2763.   Under W. Va. Code § 46-2-314, a warranty that the Defective Vehicles were
in merchantable condition was implied by law when West Virginia Class members purchased
their Defective Vehicles.

2764.   These vehicles, when sold and at all times thereafter, were not in merchantable
condition and are not fit for the ordinary purpose for which cars are used. Specifically, the
Defective Vehicles are inherently defective in that there are defects in the ignition switch
systems that permit sudden unintended shutdown to occur, with the attendant shut down of
power steering and power brakes and the non-deployment of airbags in the event of a collision.

2765.   Old GM and New GM were provided notice of these issues by numerous
complaints filed against them, their own internal investigations, and by numerous individual
letters and communications sent by West Virginia Class members before or within a
reasonable amount of time after New GM issued the recall and the allegations of vehicle
defects became public.

2766.   As a direct and proximate result of Old GM and New GM's breach of the
warranty of merchantability, the West Virginia Class been damaged in an amount to be
proven at trial.

## ONE HUNDRED FORTY-FIFTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

2767.   In the event the Court declines to certify a nationwide Class under Michigan
law, this claim is brought on behalf of the West Virginia Class.

2768.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

2769.   The Companies knew these representations were false when made.

2770.   The vehicles purchased or leased by West Virginia Class members were, in fact, defective, unsafe, and unreliable, because the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

2771.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision because West Virginia Class members relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

2772.   The aforementioned concealment was material because if it had been disclosed West Virginia Class members would not have bought, leased or retained their vehicles.

2773.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

2774.   The West Virginia Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative

assurance that its vehicles were safe and reliable and other similar false statements—in

purchasing, leasing, or retaining the Defective Vehicles.

2775.   As a result of their reliance, the West Virginia Class has been injured in an

amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and

overpayment at the time of purchase and/or the diminished value of their vehicles.

2776.   The Companies' conduct was knowing, intentional, with malice, demonstrated

a complete lack of care, and was in reckless disregard for the rights of the West Virginia Class.

West Virginia Class members are therefore entitled to an award of punitive damages.

**WISCONSIN**

**ONE HUNDRED FORTY-SIXTH CLAIM FOR RELIEF**

**VIOLATIONS OF THE WISCONSIN
DECEPTIVE TRADE PRACTICES ACT
(WIS. STAT. § 110.18)**

2777.   This claim is brought on behalf of Class members who are Wisconsin residents

(the "Wisconsin Class").

2778.   The Companies are a "person, firm, corporation or association" within the

meaning of WIS. STAT. § 100.18(1).

2779.   The Wisconsin Class members are members of "the public" within the

meaning of WIS. STAT. § 100.18(1). Wisconsin Class members purchased or leased one or

more Class Vehicles.

2780.   The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits a

"representation or statement of fact which is untrue, deceptive or misleading." WIS. STAT.

§ 100.18(1). The Companies engaged in unfair and deceptive acts and practices and violated

the Wisconsin DTPA by making misrepresentations and failing to disclose and actively

concealing the ignition switch defects in the Defective Vehicles.

2781.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Wisconsin DTPA, and also has successor liability for the violations of Old GM.

2782.   As alleged above, both Companies knew of the ignition switch defects, while the Wisconsin Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

2783.   The Companies knew or should have known that their conduct violated the Wisconsin DTPA.

2784.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

2785.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently shut down in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

-633-

2786. From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

2787. The Companies each owed Wisconsin Class members a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

a. Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b. Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Wisconsin Class; and/or

c. Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Wisconsin Class that contradicted these representations.

2788. The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Wisconsin Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

2789. The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Wisconsin Class, about the true safety and reliability of

-634-

Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Wisconsin Class.

2790.   The propensity of the Defective Vehicles to inadvertently shut down during ordinary operation was material to the Wisconsin Class. Had the Wisconsin Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

2791.   All members of the Wisconsin Class suffered ascertainable loss caused by the Companies' failure to disclose material information. Wisconsin Class members overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and Wisconsin Class members own vehicles that are not safe.

2792.   The Wisconsin Class has been damaged by Old GM and New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of Old GM and New GM's failure to timely disclose and remedy the serious defects. Old GM and New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in Old GM and New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

2793.   Wisconsin Class members risk irreparable injury as a result of the Companies'
act and omissions in violation of the Wisconsin DTPA, and these violations present a
continuing risk to the Wisconsin Class as well as to the general public. The Companies'
unlawful acts and practices complained of herein affect the public interest.

2794.   The recalls and repairs instituted by New GM have not been adequate. The
recall is not an effective remedy and is not offered for all Defective Vehicles.

2795.   As a direct and proximate result of the Companies' violations of the Wisconsin
DTPA, Wisconsin Class members have suffered injury-in-fact and/or actual damage.

2796.   The Wisconsin Class is entitled to damages and other relief provided for under
WIS. STAT. § 110.18(11)(b)(2). Because the Companies' conduct was committed knowingly
and/or intentionally, the Wisconsin Class is entitled to treble damages.

2797.   The Wisconsin Class also seeks court costs and attorneys' fees under WIS.
STAT. § 110.18(11)(b)(2).

## ONE HUNDRED FORTY-SEVENTH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

2798.   In the event the Court declines to certify a nationwide Class, this claim is
brought on behalf of the Wisconsin Class.

2799.   As described above, Old GM and New GM made material omissions and
affirmative misrepresentations regarding the Defective Vehicles.

2800.   The Companies knew these representations were false when made.

2801.   The vehicles purchased or leased by the Wisconsin Class were, in fact,
defective, unsafe, and unreliable, because the vehicles were subject to sudden unintended shut
down, with the attendant loss of power steering, power brakes, and the non-deployment of
airbags in the event of a collision.

2802.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision because the Wisconsin Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

2803.   The aforementioned concealment was material because if it had been disclosed Wisconsin Class members would not have bought, leased, or retained their vehicles.

2804.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing, leasing, or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

2805.   The Wisconsin Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing, or retaining the Defective Vehicles.

2806.   As a result of their reliance, the Wisconsin Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

2807.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Wisconsin Class. Wisconsin Class members are therefore entitled to an award of punitive damages.

1197532.10

# WYOMING

## ONE HUNDRED FORTY-EIGHTH CLAIM FOR RELIEF

## VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT
### (WYO. STAT. § 40-12-105 *et. seq.*)

2808.    This claim is brought on behalf of Class members who are Wyoming residents
(the "Wyoming Class").

2809.    The Wyoming Class members, Old GM, and New GM are "persons" within
the meaning of WYO. STAT. § 40-12-102(a)(i).

2810.    The sales of the Defective Vehicles to the Wyoming Class were "consumer
transaction[s]" within the meaning of WYO. STAT. § 40-12-105.

2811.    Under the Wyoming Consumer Protection Act ("Wyoming CPA"), a person
engages in a deceptive trade practice when, in the course of its business and in connection
with a consumer transaction it knowingly: "(iii) Represents that merchandise is of a particular
standard, grade, style or model, if it is not"; "(v) Represents that merchandise has been
supplied in accordance with a previous representation, if it has not…"; "(viii) Represents that
a consumer transaction involves a warranty, a disclaimer of warranties, particular warranty
terms, or other rights, remedies or obligations if the representation is false"; "(x) Advertises
merchandise with intent not to sell it as advertised"; or "(xv) Engages in unfair or deceptive
acts or practices." WYO. STAT. § 45-12-105.

2812.    The Companies willfully failed to disclose and actively concealed the ignition
switch defects in the Defective Vehicles as described above in violation of the Wyoming CPA.
The Companies engaged in deceptive trade practices, including (among other things)
representing that the Defective Vehicles are of a particular standard and grade, which they are

1197532.10

not; advertising the Defective Vehicles with the intent not to sell them as advertised; and overall engaging in unfair and deceptive acts or practices.

2813.   In the course of their business, both Old GM and New GM willfully failed to disclose and actively concealed the dangerous ignition switch defects in the Defective Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Old GM and New GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles. New GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Wyoming CPA, and also has successor liability for the violations of Old GM.

2814.   As alleged above, both Companies knew of the ignition switch defects, while the Wyoming Class was deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

2815.   The Companies knew or should have known that their conduct violated the Wyoming CPA.

2816.   As alleged above, the Companies made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

2817.   Old GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which it knew at the time of the sale. Old GM deliberately withheld the information about the vehicles' propensity to inadvertently

-639-

shut down in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

2818.   From its inception in 2009, New GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, New GM concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

2819.   The Companies each owed the Wyoming Class a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags, because they:

   a.   Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

   b.   Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Wyoming Class; and/or

   c.   Made incomplete representations about the safety and reliability of Defective Vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the Wyoming Class that contradicted these representations.

2820.   The Defective Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Wyoming Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden and unintended engine shutdown.

2821.   The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Wyoming Class, about the true safety and reliability of Defective Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead the Wyoming Class.

2822.   The propensity of the Defective Vehicles to inadvertently shut down during ordinary operation was material to the Wyoming Class. Had the Wyoming Class known that their vehicles had these serious safety defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

2823.   All members of the Wyoming Class suffered ascertainable loss caused by the Companies' failure to disclose material information. Wyoming Class members overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished now that the safety issues in the Defective Vehicles, and the many other serious safety issues and myriad defects in the Companies' vehicles have come to light, and Wyoming Class members own vehicles that are not safe.

2824.   The Wyoming Class has been damaged by Old GM and New GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding vehicles whose value has greatly diminished because of Old GM and New GM's failure to timely disclose and remedy the serious defects. Old GM and New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls, and the many other serious defects in Old GM and New GM vehicles, have so tarnished the Defective Vehicles that no reasonable consumer

would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

2825.   Wyoming Class members risk irreparable injury as a result of the Companies' act and omissions in violation of the Wyoming CPA, and these violations present a continuing risk to the Wyoming Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest

2826.   The recalls and repairs instituted by New GM have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles.

2827.   As a direct and proximate result of the Companies' violations of the Wyoming CPA, Wyoming Class members have suffered injury-in-fact and/or actual damage.

2828.   Pursuant to WYO. STAT. § 40-12-108(a), the Wyoming Class seeks monetary relief against New GM measured as actual damages in an amount to be determined at trial, in addition to any other just and proper relief available under the Wyoming CPA.

2829.   On October 12, 2014, Plaintiffs sent a notice letter complying with WYO. STAT. § 45-12-109. Plaintiffs presently do not claim the damages relief asserted in this Complaint under the Wyoming CPA until and unless New GM fails to remedy its unlawful conduct towards the class within the requisite time period, after which Plaintiffs seek all damages and relief to which Plaintiffs and the Wyoming Class are entitled.

## ONE HUNDRED FORTY-NINTH CLAIM FOR RELIEF

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (WYO. STAT. § 34.1-2-314)

2830.   In the event the Court declines to certify a nationwide Class, Plaintiffs brings this claim on behalf of the Wyoming Class.

2831.   Old GM and New GM were at all relevant times merchants with respect to motor vehicles.

2832.   Under Wyoming law, a warranty that the Defective Vehicles were in merchantable condition was implied when Wyoming Class members purchased their Defective Vehicles.

2833.   These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down of power steering and power brakes and the non-deployment of airbags in the event of a collision.

2834.   Old GM and New GM were provided notice of these issues by numerous complaints filed against them, their own internal investigations, and by numerous individual letters and communications sent by Wyoming Class members before or within a reasonable amount of time after New GM issued the recall and the allegations of vehicle defects became public.

2835.   As a direct and proximate result of Old GM and New GM's breach of the warranty of merchantability, the Wyoming Class has been damaged in an amount to be proven at trial.

## ONE HUNDRED FIFTIETH CLAIM FOR RELIEF

## FRAUD BY CONCEALMENT

2836.   In the event the Court declines to certify a nationwide Class under Michigan law, this claim is brought on behalf of the Wyoming Class.

2837.   As described above, Old GM and New GM made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

2838.   The Companies knew these representations were false when made.

2839.   The vehicles purchased or leased by the Wyoming Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

2840.   The Companies had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shut down, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision because the Wyoming Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

2841.   The aforementioned concealment was material because if it had been disclosed the Wyoming Class would not have bought, leased, or retained their vehicles.

2842.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing, leasing, or retaining a new or used motor vehicle. The Companies knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. The Companies intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

2843.   The Wyoming Class relied on the Companies' reputation—along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing, or retaining the Defective Vehicles.

2844.   As a result of their reliance, Wyoming Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

2845.   The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Wyoming Class. Wyoming Class members are therefore entitled to an award of punitive damages.

### ONE HUNDRED FIFTY-FIRST CLAIM FOR RELIEF

### NEGLIGENCE
### (On Behalf of the Arkansas, Louisiana, Maryland, and Ohio Classes)

2846.   Plaintiffs Camille Burns, Jennifer Crowder, Robert Wyman, George Mathis, Jayn Roush, Bonnie Taylor, and Sharon Dorsey ("Plaintiffs," for purposes of this Count) bring this Count on behalf of the Arkansas, Louisiana, Maryland, and Ohio State Classes ("Negligence Classes").

2847.   Old GM and New GM have designed, manufactured, sold, or otherwise placed in the stream of commerce Vehicles with defects, as set forth above.

2848.   Od GM and New GM had a duty to design and manufacture a product that would be safe for its intended and foreseeable uses and users, including the use to which its products were put by Plaintiffs and the other members of the Negligence Classes. Old GM and New GM breached their duties to Plaintiffs and the other members of the Negligence Classes because they were negligent in the design, development, manufacture, and testing of the Vehicles, and New GM is responsible for this negligence.

2849.   Old GM and New GM were negligent in the design, development, manufacture, and testing of the Vehicles because they knew, or in the exercise of reasonable care should have known, that the Vehicles equipped with defective ignition systems pose an unreasonable

risk of death or serious bodily injury to Plaintiffs and the other members of the Negligence Classes, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents in which brakes, power steering, and airbags are all rendered inoperable.

2850.   Whereupon Plaintiffs, individually and on behalf of the other members of the Negligence Classes, respectfully rely upon the Restatement (Second) of Torts § 395.

2851.   Old GM and New GM further breached their duties to Plaintiffs and the other members of the Negligence Classes by supplying directly or through a third person defective Vehicles to be used by such foreseeable persons as Plaintiffs and the other members of the Negligence Classes when:

    a.      Old GM and New GM knew or had reason to know that the Vehicles were dangerous or likely to be dangerous for the use for which they were supplied; and

    b.      Old GM and New GM failed to exercise reasonable care to inform customers of the dangerous condition or of the facts under which the Vehicles are likely to be dangerous.

2852.   Old GM and New GM had a continuing duty to warn and instruct the intended and foreseeable users of its Vehicles, including Plaintiffs and the other members of the Negligence Classes, of the defective condition of the Vehicles and the high degree of risk attendant to using the Vehicles. Plaintiffs and the other members of the Negligence Classes were entitled to know that the Vehicles, in their ordinary operation, were not reasonably safe for their intended and ordinary purposes and uses.

2853.   At all times at which Old GM and New GM knew or should have known of the defects described herein, Old GM and New GM breached its duty to Plaintiffs and the other

1197532.10

members of the Negligence Classes because it failed to warn and instruct the intended and foreseeable users of its Vehicles of the defective condition of the Vehicles and the high degree of risk attendant to using the Vehicles.

2854.   As a direct and proximate result of Old GM and New GM's negligence, Plaintiffs and the other members of the Negligence Classes suffered damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes as defined herein, respectfully request that this Court enter a judgment against New GM and in favor of Plaintiffs and the Classes, and grant the following relief:

A.    Determine that this action may be maintained and certified as a class action on a nationwide, statewide, and/or multistate basis under Rule 23(b)(1), 23(b)(2) and/or 23(b)(3); or alternatively, certify all questions, issues and claims that are appropriately certified under 23(c)(4); and that it designate and appoint Plaintiffs as Class Representatives, and appoint Class Counsel under Rule 23(g).

B.    Declare, adjudge, and decree the conduct of New GM, as alleged herein, to be unlawful, unfair, and/or deceptive; enjoin any such future conduct; and issue an injunction under which the Court will, *inter alia*: (1) monitor New GM's response to problems with its recalls, defects in its replacement parts, and efforts to improve its safety processes, and (2) establish by Court decree and administrator, under Court supervision, a program funded by New GM, under which claims can be made and paid for Class members' recall-related out-of-pocket expenses and costs;

C.    Award Plaintiffs and Class members their actual, compensatory and/or statutory damages, according to proof;

-647-

1197532.10

D.      Award Plaintiffs and the Class members punitive and exemplary damages in an amount sufficient to punish New GM for its misconduct and deter the repetition of such conduct by New GM or others;

E.      Award Plaintiffs and Class members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest;

F.      Award Plaintiffs and Class members restitution and/or disgorgement of New GM's ill-gotten gains for the conduct described in this Complaint; and

G.      Award Plaintiffs and Class members such other, further and different relief as the case may require; or as determined to be just, equitable, and proper by this Court.

1197532.10

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs request a trial by jury on all claims so triable.

Dated: October 14, 2014

HAGENS BERMAN SOBOL SHAPIRO LLP

LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP

By:   */s/ Steve W. Berman*
       Steve W. Berman

By:   */s/ Elizabeth J. Cabraser*
       Elizabeth J. Cabraser

Steve W. Berman
steve@ hbsslaw.com
Sean R. Matt
sean@hbsslaw.com
Andrew M. Volk
andrew@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594

Elizabeth J. Cabraser
ecabraser@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
275 Battery St., 29th Floor
San Francisco, CA 94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

and

Steven E. Fineman (SF 8481)
sfineman@lchb.com
Rachel Geman (RG 0998)
rgeman@lchb.com
Annika K. Martin (AM 2972)
akmartin@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

*Plaintiffs' Co-Lead Counsel with Primary Focus on Economic Loss Cases*

1197532.10

HILLIARD MUÑOZ GONZALES L.L.P.

By:    */s/ Robert Hilliard*
        Robert Hilliard

Robert Hilliard
719 S Shoreline Blvd, Suite #500
Corpus Christi, TX  78401
Telephone:   (361) 882-1612
Facsimile:   (361) 882-3015

*Plaintiffs' Co-Lead Counsel with Primary
Focus on Personal Injury Cases*

WEITZ & LUXENBERG, PC
Robin L. Greenwald
James Bilsborrow
700 Broadway
New York, NY  10003
Telephone:   (212) 558-5500
Facsimile:   (212) 344-5461

*Plaintiffs' Liaison Counsel*

BOIES, SCHILLER & FLEXNER LLP
David Boies
333 Main Street
Armonk, NY  10504
Telephone:   (914) 749-8200

THE COOPER FIRM
Lance A. Cooper
531 Roselane St., Suite 200
Marietta, GA 30060
Telephone:   (770) 427-5588

OTTERBOURG, STEINDLER, HOUSTON &
   ROSEN
Melanie Cyganowski
230 Park Avenue
New York, NY 10169-0075
Telephone:   (212) 661-9100

GRANT & EISENHOFER, P.A.
Adam J. Levitt
30 N. LaSalle Street, Suite 1200
Chicago, IL  60602
Telephone:    (312) 214-0000

NAST LAW LLC
Dianne M. Nast
1101 Market St., Suite 2801
Philadelphia, PA 19107
Telephone:    (215) 923-9300

PODHURST ORSECK, P.A.
Peter Prieto
City National Bank Building
25 West Flagler Street, Suite 800
Miami, FL 33130
Telephone:    (305) 358-2800

COTCHETT, PITRE & MCCARTHY, LLP
Frank Pitre
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:    (650) 697-6000

MOTLEY RICE LLC
Joseph F. Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone:     (843) 216-9159

ROBINSON CALCAGNIE ROBINSON
  SHAPIRO DAVIS, INC.
Mark P. Robinson, Jr.
19 Corporate Plaza
Newport Beach, CA 92660
Telephone:    (949) 720-1288

SUSMAN GODFREY, L.L.P.
Marc M. Seltzer
1901 Avenue of the Stars, Suite 950
Los Angeles, CA  90067
Telephone:    (310) 789-3102

*Plaintiffs' Executive Committee*

1197532.10

BARRIOS, KINGSDORF & CASTEIX, LLP
Dawn M. Barrios
701 Poydras St., Suite 3650
New Orleans, LA 70139
Telephone:    (504) 524-3300

*Federal / State Liaison Counsel*

Jonathan Shub
jshub@seegerweiss.com
SEEGER WEISS LLP
1515 Market Street
Philadelphia, PA 19002
Telephone:    (215) 564-2300
Facsimile:    (215) 851-8029

Mark P. Pifko
MPifko@baronbudd.com
Roland K. Tellis
RTellis@baronbudd.com
BARON AND BUDD PC
15910 Ventura Boulevard Suite 1600
Encino, CA 91436
Telephone:    (818) 839-2333
Facsimile:    (818) 986-9698

W. Daniel ("Dee") Miles, III
dee.miles@beasleyallen.com
Archie I. Grubb, II
archie.grubb@beasleyallen.com
BEASLEY ALLEN CROW METHVIN
PORTIS & MILES PC
218 Commerce Street
PO Box 4160
Montgomery, AL 36104
Telephone:    (334) 269-2343
Facsimile:    (334) 954-7555

Norman E. Siegel
siegel@stuevesiegel.com
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Telephone:    (816) 714-7112
Facsimile:    (816) 714-7101

Michael A. Caddell
mac@caddellchapman.com
Cory S. Fein
csf@caddellchapman.com
CADDELL & CHAPMAN
1331 Lamar Street, Suite 1070
Houston, TX 77010
Telephone:    (713) 751-0400
Facsimile:    (713) 751-0906

Robert Ahdoot
rahdoot@ahdootwolfson.com
Tina Wolfson
twolfson@ahdootwolfson.com
Bradley K. King
bking@ahdootwolfson.com
AHDOOT AND WOLFSON, P.C.
1016 Palm Avenue
West Hollywood, CA 90069
Telephone:    (310)-474-9111
Facsimile:    (310)-474-8585

Jonathan W. Cuneo
jonc@cuneolaw.com
CUNEO GILBERT & LADUCA, LLP
8120 Woodmont Avenue, Suite 810
Bethesda, MD 20814
Telephone:    (202) 789-3960
Facsimile:    (202) 789-1813

Roger L. Mandel
rlm@lhlaw.net
LACKEY HERSHMAN LLP
3102 Oak Lawn Avenue Suite 777
Dallas, TX 75219
Telephone:    (214)-560-2201

Gregory M. Travalio
gtravalio@isaacwiles.com
ISAAC WILES BURKHOLDER AND
TEETOR
Two Miranova Place, Suite 700
Columbus, OH 43215
Telephone:    (614) 221-2121
Facsimile:    (614) 365-9516

1197532.10

Benjamin L. Bailey
bbailey@baileyglasser.com
Eric B. Snyder
esnyder@baileyglasser.com
BAILEY & GLASSER, LLP
209 Capitol Street
Charleston, WV 25301
Telephone:    (304) 345-6555
Facsimile:    (304) 342-1110

Edward L. White
ed@edwhitelaw.com
EDWARD L. WHITE, P.C.
825 E. 33rd St.
Edmond, OK 73013
Telephone:    (405) 810-8188
Facsimile:    (405) 608-0971

*Counsel to Certain Plaintiffs*

1197532.10