# Exhibit Q

Barry E. Bressler (*admitted pro hac vice*)
Richard A. Barkasy (*admitted pro hac vice*)
Benjamin P. Deutsch (BD-5435)
SCHNADER HARRISON SEGAL & LEWIS LLP
140 Broadway, Suite 3100
New York, NY 10005-1101
Phone: (212) 973-8000
Fax: (212) 972-8798
*Attorneys for the Ad Hoc*
*Committee of Consumer Victims of General Motors*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                           :

In re:                                 :       Chapter 11
                                           :

GENERAL MOTORS CORP., *et al.*,      :       Case No. 09-50026 (REG)
                                           :

                     Debtors.     :       (Jointly Administered)
-------------------------------------------------------------------X

---

**OBJECTION OF AD HOC COMMITTEE OF CONSUMER VICTIMS OF GENERAL
MOTORS TO THE DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§105, 363(b), (f),
(k), and (m), AND 365 AND FED R. BANKR. P. 2002, 6004, AND 6006, TO (I) APPROVE
(A) THE SALE PURSUANT TO THE MASTER SALE AND PURCHASE AGREEMENT
WITH VEHICLE ACQUISITION HOLDINGS LLC, A U.S. TREASURY-SPONSORED
PURCHASER, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND
OTHER INTERESTS; (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) OTHER RELIEF;
AND (II) SCHEDULE SALE APPROVAL HEARING**

---

The Ad Hoc Committee of Consumer Victims of General Motors (the "Ad Hoc

Consumer Committee"), by and through its undersigned counsel, hereby objects to the  Debtors'

Motion Pursuant to 11 U.S.C. §§105, 363(b), (f), (k), and (m), and 365 and Fed R. Bankr. P.

2002, 6004, and 6006, to (I) Approve (A) the Sale Pursuant to the Master Sale and Purchase

Agreement With Vehicle Acquisition Holdings LLC, a U.S. Treasury-Sponsored Purchaser, Free and Clear Of Liens, Claims, Encumbrances, and Other Interests; (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Other Relief; and (II) Schedule Sale Approval Hearing (the "Sale Motion"). In support thereof, the Ad Hoc Consumer Committee respectfully represents as follows:

## BACKGROUND

1.    On June 1, 2009 (the "Petition Date"), General Motors Corp. and certain of its affiliates ("GM" or the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

2.    GM is one of the "Big Three" U.S. automakers. Each year it sells millions of vehicles to American consumers, some of whom unfortunately suffer injuries, sometimes catastrophic, as a result of manufacturing defects and other legally culpable conduct on the part of the Debtors.

3.    The Ad Hoc Consumer Committee was formed to advance the mutual interests of its members and others similarly situated with regard to the financial reorganization of GM.

4.    The Ad Hoc Consumer Committee has more than 300 members who each have product liability tort claims involving personal injuries (including derivative claims and wrongful death actions) against GM. The members of the Ad Hoc Consumer Committee are individuals who reside throughout the country, many of whom who have suffered devastating injuries as a result of flaws in GM vehicles.

5.    Upon information and belief, GM is self-insured against personal injury claims based upon products liability up to $35 million per occurrence. As a result, it is unlikely that insurance proceeds will be available to satisfy almost any of the tort claims.

6.      The Debtors are seeking approval of a Master Sale and Purchase Agreement (the "Purchase Agreement") between GM and certain of its affiliates and a U.S. Treasury-sponsored entity, Vehicle Acquisition Holdings LLC ("New GM"). The Purchase Agreement contemplates the sale of substantially all of GM's core operating assets to New GM.

7.      The majority owner of New GM will be the U.S. Treasury.

8.      Under the Purchase Agreement, New GM has agreed to assume certain liabilities, including liabilities for warranties provided for vehicles sold before the closing. (Purchase Agreement § 2.3(a)(vii)).

9.      However, New GM has not agreed to assume the obligation for "Products Liabilities arising out of products delivered to a consumer, lessee or other purchaser of products prior to the Closing." (Purchase Agreement § 2.3(b)(ix)).

10.     The proposed sale order provides that "the Purchased Assets shall be transferred to the Purchaser…free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability." (Proposed Sale Order ¶ 7).

11.     The proposed order further provides that all persons and entities "are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its successors or assigns, its property, or the Purchased Assets, such persons' or entities liens, claims, encumbrances, and other interests, including rights or claims based upon successor or transferee liability." (Proposed Sale Order ¶ 8).

12.     Thus, if the sale is approved and the proposed sale order is entered, all successor liability claims against New GM, which will continue to sell the same vehicles that have been sold by the Debtors, are intended to be wiped out.

3

13.     On April 27, 2009, in an effort to avoid bankruptcy, GM launched a public

exchange offer for approximately $27 Billion of its unsecured bonds (the "Exchange Offer").

(Frederick A. Henderson Declaration (Doc. 21) ("Henderson Decl.") ¶ 71).  The U.S. Treasury's

consent to the Exchange Offer was conditioned upon, among other things, the conversion to

equity of at least 50% of GM's obligations to the U.S. Treasury.  (Henderson Decl. ¶ 72).  The

Exchange Offer expired on May 26, 2009 without achieving the threshold of acceptances

required by the U.S. Treasury.  (Henderson Decl. ¶ 73).  If the Exchange Offer acceptable to the

U.S. Treasury had been successful and GM had not filed bankruptcy, the tort claims would not

have been extinguished.

## OBJECTION

### A.     The "Sale" is an Illegal *Sub Rosa* Plan.

14.     "It is well established that section 363(b) is not to be utilized as a means of

avoiding Chapter 11's plan confirmation procedures."  *In re Westport Stevens, Inc.*, 333 B.R. 30,

59 (Bankr. S.D. N.Y. 2005).

15.     Section 363 "does not authorize a debtor and the bankruptcy court to 'short circuit

the requirements of a reorganization plan by establishing the terms of the plan *sub rosa* in

connection' with a proposed transaction."  *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226

(5th Cir. 1986), *quoting In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983).

16.     The provisions of § 363 "do not allow a debtor to gut the bankruptcy estate before

reorganization or to change the fundamental nature of the estate's assets in such a way that limits

a future reorganization plan."  *In re Babcock & Wilcox Co.*, 250 F.3d 955, 960 (5th Cir. 2001).  A

transaction should not be approved under § 363 if it "improperly and indirectly lock[s] the estate

into any particular plan mode prematurely, and without the protection afforded by the procedures

4

surrounding a disclosure statement and confirmation hearing, in a plan of reorganization." *In re Public Service Co.*, 90 B.R. 575, 581 (Bankr. D. N.H. 1988).

17.     The proposed transaction is not really a sale of assets.  It is the reorganization of GM through a debt-for-equity exchange. There is no independent "buyer." The U.S. Treasury is obtaining its controlling equity interest in New GM by way of a credit bid.

18.     There will be little difference between GM and New GM, except that the company will now be owned by its creditors.  The New GM will be led by GM's current management and will continue to manufacture and sell Chevrolet, Cadillac, Buick and GMC brand vehicles.  New GM will use the same offices, manufacturing facilities, suppliers and many of the same dealers to build and sell its products as GM has used and the workforce will remain unchanged.

19.     GM's and the U.S. Treasury's decision to circumvent seeking approval of GM's reorganization through a confirmed plan will deprive tort claimants of critical procedural and substantive safeguards that are not available to them under § 363(f). *See In re Golf, L.L.C.*, 322 B.R. 874, 877 (Bankr. D. Neb. 2004) (noting that "§ 363(b) and (f) control asset sales prior to plan approval and require less notice and opportunity for hearing than § 1123(a)(5)(D) and § 1141(c), which govern sales made pursuant to a plan").

20.     Among the rights being denied tort claimants by GM's and the U.S. Treasury's attempted evasion of the plan process mandated by Congress are those afforded under § 1122 (classification of claims), § 1125 (disclosure and solicitation), §§ 1126 and 1129(a)(7) (voting and acceptance) and § 1129(b)(2) (a plan may not be confirmed over objection of dissenting class unless the proponent establishes that it is "fair and equitable" and "does not discriminate unfairly").

21.    In the recent case of *In re Gulf Coast Oil Corp.*, 2009 Bankr. LEXIS 313 (Bankr.

S.D. Tex. 2009), the debtors sought approval of a sale of substantially all of their assets to their

sole secured lender free and clear of successor liability claims by way of a credit bid.  The court

denied the debtors' motion for reasons that are equally applicable here:

> In this case, the essence of the proposed transaction is a
> foreclosure supplemented materially by a release, by assignment of
> executory contracts (but only contracts chosen by the secured
> lender), by a federal court order eliminating any successor liability,
> and by preservation of the going concern.  Congress provided a
> process by which these benefits could be obtained.  That scheme
> requires bargaining, voting, and a determination by the Court that
> Bankruptcy Code § 1129 requirements are met.  The Court sees no
> authority to provide the benefits of the Congressional scheme in
> this case without compliance with Congressional requirements.

Id. at * 51.

22.    The U.S. Treasury is misusing the § 363 sale process to, among other things,

attempt to effectuate a cram down of unsecured creditors for which it could not obtain approval

in a plan of reorganization under § 1129.

23.    The United Auto Workers Union ("UAW")  is identified by the Debtors on their

Consolidated List of 50 Largest Unsecured Claims as an unsecured creditor, with a claim of

$20.56 Billion.  The claim represents the estimated net present value of GM's obligation to make

contributions to the UAW Voluntary Employee Beneficiary Association ("VEBA") Trust.

(Henderson Decl. ¶31 and n.3).

24.    Under the proposed "sale" transaction, the UAW VEBA Trust will exchange its

unsecured claim for 17% of the common equity in new GM, a note from New GM in the amount

of $2.5 Billion, cumulative preferred stock of New GM in the amount of $6.5 Billion and

warrants to purchase 2.5% of GM's equity.  (Sale Motion ¶26).  This is disparate and far better

treatment than is being afforded to GM's other unsecured creditors.

25.    In order to confirm a plan of reorganization over a class of unsecured creditors that has rejected the plan, the proponent must establish that the plan does not discriminate unfairly. 11 U.S.C. § 1129(b)(1).

26.    "In general, the Bankruptcy Code is premised on the rule of equality of treatment. Creditors with claims of equal rank are entitled to equal distribution." *In re Sentry Operating Co. of Texas, Inc.*, 264 B.R. 850, 863 (Bankr. S.D. Tex 2001); *See also In re Granada Wines, Inc.*, 748 F.2d 42, 47 (1st Cir. 1984) (finding insufficient basis for distinguishing a pension fund claim from other general unsecured claims); *In re Arn Ltd. Ltd. Partnership*, 140 B.R. 5, 14 (Bankr. D.C. 1992) ("both trade claims and tort claims enjoy equal standing against the debtor's assets").

27.    The preferential treatment of the UAW VEBA Trust violates the basic principle of equality that underlies the Bankruptcy Code and would not be allowed under a plan of reorganization.

28.    The U.S. Treasury should not be permitted to manipulate the Bankruptcy Code to use § 363 to deprive tort claimants of their rights by making an end run around the plan of reorganization process protections.

**B.    New GM's Refusal to Assume Responsibility for Tort Claims is Not in Good Faith.**

29.    "When a bankruptcy court authorizes a sale of assets pursuant to §363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser." *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986). Indeed, a finding of good faith is a "crucial element" of a sale motion. *In re Summit Global Logistics, Inc.*, 2008 Bankr. LEXIS 896 at * 34 (Bankr. D. N.J. 2008).

30.    The requirement of a finding of good faith "ensures that section 363(b)(1) will not be employed to circumvent the creditor protections of Chapter 11, and, as such, it mirrors the requirement of section 1129 that the bankruptcy court independently scrutinize the debtor's reorganization plan and make a finding that it 'has been proposed in good faith and not by means forbidden by law.'" *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d at 150.

31.    Courts apply "traditional equitable principles to define the term 'good faith." *In re Condere Corp.*, 228 B.R. 615, 631 (Bankr. S.D. Miss. 1998); *See also In re Exaeris, Inc.*, 380 B.R. 741 (Bankr. D. Del. 2008) (denying motion to approve sale where purchaser was an insider of the debtor, provided the debtor with post-petition financing, sought a release and insisted upon an expedited sale process).

32.    "When a pre-confirmation §363(b) sale is of all, or substantially all, of the Debtor's property, and is proposed during the beginning stages of the case, the sale transaction should be 'closely scrutinized, and the proponent bears a heightened burden of proving the elements necessary for authorization.'" *In re Medical Software Solutions*, 286 B.R. 431, 444 (Bankr. D. Utah 2002), *quoting In re Channel One Communications, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990).

33.    Under the circumstances of this case, New GM's refusal to assume successor liability for pre-closing products liability claims, or to otherwise provide for them by, e.g. purchasing post-occurrence insurance covering such claims, is not in good faith.

34.    Until at least May 27, the U.S. Treasury was prepared to proceed with the restructuring of GM outside of bankruptcy. Under the out-of-court restructuring, at least 50% of GM's indebtedness to the U.S. Treasury and the UAW VEBA Trust would have been converted to equity. However, there would have been no Bankruptcy Court order approving a § 363 sale

transaction free and clear of products liability claims.  Consumers grievously injured by defects in GM vehicles would have been permitted to maintain claims against the restructured GM entity owned by the U.S. Treasury and the UAW VEBA Trust.

35.     New GM's viability is not dependent on New GM avoiding its liability for tort claims.  If it was, GM and the U.S. Treasury would not have consented to an out-of-court reorganization under which tort claims would have survived.

36.     It is clear that having determined that a bankruptcy was necessary to deal with bondholders who did not consent to the Exchange Offer, the U.S. Treasury seized on the opportunity to try to sweeten the deal for itself and the New GM by attempting to extinguish tort claims of taxpayers through a § 363 sale transaction.

37.     New GM has agreed to assume the warranty obligations for vehicles sold pre-closing, but has refused to assume products liability claims arising from vehicles delivered to consumers before the closing.  Thus, a consumer purchasing a GM vehicle before the closing will be able to have a defect in his vehicle repaired, but if the same flaw causes the consumer grievous personal injury, he will not be permitted to look to New GM for his medical expenses and other compensation.  This is incongruous and unfair to tort claimants.

38.     To make matters worse, knowing that it is seeking an order which would eliminate tort claims, GM has continued to advertise and sell GM vehicles without advising unwitting consumers that it is seeking to bar future claims for injuries arising from defects in vehicles sold before the closing.  Such conduct is unconscionable, if not illegal.

39.     New GM's failure to take on responsibility for tort claims will also harm others who are also already suffering from GM's financial collapse.  If the sale is approved, GM's

dealers and component part suppliers will likely be exposed to such products liability and personal injury claims in greater numbers.

40.     Further, as soon as consumers comprehend that New GM has avoided responsibility for tort claims, their confidence will be shaken and the value of used GM vehicles will drop perhaps dramatically, damaging millions of consumers.

41.     The proposed sale would leave consumers injured by GM products – including quadriplegics, paraplegics, burn victims, the families of those killed and others, including those who have not yet suffered injuries – with little recompense. This condition of the sale has been dictated by the U.S. Treasury using the clout of its taxpayer dollars – the same dollars that the victims themselves have paid in taxes to a government that is supposed to protect them. Moreover, as demonstrated above, stripping of tort claim liabilities is unnecessary and would have no effect on the future viability of the New GM. As such, there is no legitimate reason to deprive thousands of injured consumers of their ability to obtain redress. The contemplated transaction on these terms is nothing less than shameful.

42.     Since the purchaser has not acted in good faith, the "sale" should not be approved.

**C.     The Debtors Are Not Permitted to Transfer Their Assets to New GM Free and Clear of Tort Claims.**

43.     Section 363(f) of the Bankruptcy Code authorizes the debtor-in-possession, under certain specific circumstances, to sell property "free and clear of any interest in such property."

44.     The term "any interest in such property" in Section 363(f) does not include *in personam* claims:

> Section 363(f) does not authorize sales free and clear of *any interest*, but rather of *any interest in such property*. These three additional words define the real breadth of *any interests*. The sorts of interests impacted by a sale "free and clear" are *in rem* interests which have attached to the property. Section 363(f) is not intended

10

> to extinguish *in personam* liabilities. Were we to allow "any
> interests" to sweep up *in personam* claims as well, we would
> render the words "in such property" a nullity. No one can
> seriously argue that that *in personam* claims have, of themselves,
> an *interest in such property.*

*In re Fairchild Aircraft Corp.*, 184 B.R. 910, 917-18 (Bankr. W.D. Tex. 1995), *vacated on*

*other grounds*, 220 B.R. 909 (Bankr. W.D. Tex. 1998).

45.     As the court in *Fairchild Aircraft* explained, unsecured creditors do not have an

interest in any specific property of the debtor:

> The closest analogy outside bankruptcy to the position of
> unsecured creditors in bankruptcy is that of the judgment creditor
> who has yet to abstract or execute its judgment. Such a creditor
> has an enforceable judgment that will support remedies such as
> levies, garnishment, or attachment, but until such steps are actually
> taken, the judgment creditor has no actual interest in any particular
> property of its debtor. If the judgment creditor never takes the
> additional steps necessary to convert its claims from one against
> the debtor personally, *in personam,* to one against the debtor's
> property, *in rem*, the creditor cannot be said to have any interest in
> the debtor's property. Bankruptcy gives an unsecured creditor, via
> the proof of claim process, the functional equivalent of a judgment
> against the debtor's estate - - but does not give the creditor an
> interest in any particular property of the debtor.

*Id.* at 919, n.6.

46.     Section 363(f) does not permit sales free and clear of including tort claims

because such claimants have no specific interest in any particular property of the debtor. *See In*

*re Wolverine Radio Co.*, 930 F.2d 1132, 1147, n.23 (6th Cir. 1991); *Kattula v. Republic Bank (In*

*re LWD, Inc.),* 2009 U.S.Dist. LEXIS 17852 (W.D. Ky. 2009)

47.     As a result, Section 363(f) "in no way protects the buyer from current or future

product liability; it only protects the purchased assets from lien claims against those assets." *In*

*re Schwinn Bicycle Co.,* 210 B.R. 747, 761 (Bankr. N.D. Ill. 1997), *aff'd* 217 B.R. 790 (N.D. Ill.

1997).

48.     In *In re Trans World Airlines, Inc.*, 322 F.3d 283 (3d. Cir. 2003) (*"TWA"*), the Third Circuit determined that assets of a bankrupt airline could be transferred free and clear of employment discrimination claims under Section 363(f).  The bankruptcy court followed *TWA* in entering an order allowing a sale to Fiat free and clear of tort claims in *In re Chrysler LLC*, 2009 Bankr. LEXIS 1323 at *73-74 (Bankr. S.D. N.Y. 2009), which order was affirmed by the Second Circuit.

49.     This Court should decline to follow *TWA* because its holding expands the term "interest" as used in Section 363(f) far beyond its plain meaning.

50.     While the Code does not define the term "interest," § 101(5) of the Code defines "claim" as "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  Tort claims fall squarely and indisputably within this definition of "claim."

51.     Section 1141(c) permits property "dealt with" by a plan of reorganization to vest "free and clear of all claims and interests."

52.     The term "claim" is *excluded* from § 363(f) and *included* in § 1141(c).

53.      "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 24 (1983) (internal quotation marks and alteration omitted). In accordance with this rule, the Second Circuit has held that the use of the word "practicable" in one section of a statute and its omission in another part is "significant." *Riverkeeper, Inc. v. U.S. Envtl. Prot. Agency*, 475 F.3d 83, 102 (2d Cir. 2007); *see also Sompo Japan Ins. Co. of Am. v. Union Pac. R.R. Co.,*

456 F.3d 54, 71 (2d Cir. 2006) ("Therefore, that Congress, in enacting § 1307, omitted language similar to the language in § 1312 is persuasive evidence that Congress did not wish for period of responsibility clauses to have the force of statute with the capability to supersede federal law."); *cf. In re Beker Indus. Corp.*, 63 B.R. 474, 475 (Bankr. S.D. N.Y. 1986) (interpreting "value" as set forth in § 363(f)(3) of the Code *in pari materia* with "value" as used in § 506(a) of the Code).

54.    This well-established canon of statutory construction shows that Congress's omission of "claim" in § 363(f) was intentional and that § 363(f) therefore applies only to "interests" -- not claims.

55.    Moreover, this interpretation of the relevant statutory provisions makes perfect sense. Congress drafted § 1141(c) to be more expansive than § 363(f) because the former provides unsecured creditors with procedural and substantive safeguards that are not available to them under § 363(f).

56.    The reasoning of the *TWA* court is flawed because it ignores the distinction between § 363(f) and § 1141(c). The court provided no grounds for ignoring this basic tenet of statutory construction, nor did it provide a compelling policy rationale for its interpretation of § 363(f).

57.    Other courts that have reached decisions similar to that of *TWA* rely on two policy reasons to explain why claims should be extinguished by bankruptcy. These reasons are summarized by *Forde v. Kee-Lox Manufacturing Co., Inc.*, 437 F. Supp. 631, 633-34 (W.D. N.Y. 1977): (1) it is necessary to transfer title free and clear of claims to ensure that purchasers will "pay a fair price for the property"; and (2) it would frustrate the scheme of the Bankruptcy Code to permit claimants to "assert their claims against purchasers of the bankrupt's assets, while relegating lienholders to the proceeds of the sale."

13

58.  However, those policy rationales -- which, in any event, should not be permitted to supersede the plain language of the statute -- have been discredited.  The first argument pertains equally to all financially troubled companies, and "there is no reason to accord the purchasers of formally bankrupt entities some special measure of insulation that is unavailable to ailing but not yet defunct entities." *Chicago Truck Drivers v. Tasemkin, Inc.*, 59 F.3d 48, 50 (7th Cir. 1995).  Further, as the Seventh Circuit explained, this issue should be of no concern to courts: "purchasers can demand a lower price to account for pending liabilities of which they are aware, and under federal successorship principles they will not be held responsible for liabilities of which they had no notice." *Id.* at 50-51; *see also R.C.M. Executive Gallery Corp.*, 901 F. Supp. 630, 637-38 (S.D. N.Y. 1995) (adopting reasoning from *Chicago Truck Drivers*).

59.  The second rationale is no more compelling.  A lawsuit that proceeds after a bankruptcy is completed "'cannot possibly affect the amount of property available for distribution to [the] creditors; all of [the debtor's] property has already been distributed." *Chicago Truck Drivers*, 59 F.3d at 51 (quoting *Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159, 162 (7th Cir. 1994)).  Thus, permitting a tort claimant to proceed against a successor will not disrupt the scheme provided by the Bankruptcy Code.

60.  Accordingly, the Court should decline to follow *TWA* and should instead adhere to the plain language of § 363(f), which applies only to "interests" and does not extinguish "claims" such as the ones that the members of the Ad Hoc Consumer Committee possess here.[1]

---

[1]  Even if Section 363(f) authorized a sale of assets free and clear of existing unsecured tort claims, a sale free and clear may not include future claims. *See Ninth Ave. Remedial Group v. Allis-Chalmers*, 195 B.R. 716, 732-33 (N.D. Ind. 1996). Thus, to the extent that the Court considers granting the Debtors' request that the sale be approved free and clear
*...Continued*

61.     The Ad Hoc Consumer Committee reserves the right to join in any other objection filed to the Sale Motion and to supplement this objection at the hearing on the Sale Motion.

## RESERVATION OF RIGHTS

62.     By filing this limited objection, the members of the Ad Hoc Consumer Committee do not waive, and specifically reserve, their rights to proceed against New GM under applicable state law. *See e.g. Lefever v. K.P. Hovnanian Enterprises, Inc.,* 160 N.J. 307 (1999) (bankruptcy sale order did not preclude application of product-line successor liability); *Gross v. Trustees of Columbia Univ.*, 816 N.Y.S. 2d 695 (2006) (successor liability imposed against purchaser of assets free and clear of claims in bankruptcy proceeding); *Simmons v. Mark Lift Industries, Inc.*, 366 S.C. 308, 313 (2005) ("a plaintiff may maintain a state-based product liability claim under a successor liability theory against a successor corporation which purchased the predecessor's assets in a voluntary sale approved by the federal bankruptcy court").

## CONCLUSION

WHEREFORE, the Ad Hoc Consumer Committee respectfully requests that the Court enter an Order denying the Sale Motion to the extent that the proposed sale order authorizes the transfer of assets to New GM free and clear of tort claims and granting such further relief as the Court deems just and equitable.

---

*Continued from previous page*
of tort claims (which it should not), the sale order should be modified to clarify that future claims are not precluded.

## MEMORANDUM OF LAW

The Ad Hoc Consumer Committee submits that the points and authorities set forth above

satisfy the requirements of Local Bankruptcy Rule for the Southern District of New York 9013-

1(b).

SCHNADER HARRISON SEGAL
& LEWIS LLP

Dated:  June 19, 2009                    By:  /s/ Benjamin P. Deutsch
                                              Benjamin P. Deutsch (BD-5435)
                                                  bdeutsch@schnader.com
                                              140 Broadway, Suite 3100
                                              New York, NY 10005-1101
                                              Phone:  (212) 973-8000
                                              Fax:  (212) 972-8798

                                              - and -

                                              Barry E. Bressler, Esquire
                                                  (admitted pro hac vice)
                                                  bbressler@schnader.com
                                              Richard A. Barkasy, Esquire
                                                  (admitted pro hac vice)
                                                  rbarkasy@schnader.com
                                              1600 Market Street, Suite 3600
                                              Philadelphia, PA 19103-7286
                                              Phone: (215) 751-2000
                                              Fax:  (215) 751-2205

                                              *Attorneys for the Ad Hoc Committee of
                                              Consumer Victims of General Motors*

16