# <u>Exhibit T</u>

Objection deadline (extended):  June 24, 2009 at 12 p.m.
Hearing date:  June 30, 2009 at 9:45 a.m.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-3275
Facsimile: (212) 715-8000
Thomas Moers Mayer
Kenneth H. Eckstein
Jeffrey S. Trachtman

*Proposed Counsel for the Official Committee
of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
  :  
In re:   :   Chapter 11
  :  
GENERAL MOTORS CORP., et al.,   :   Case No. 09-50026 (REG)
  :  
           Debtors.   :   Jointly Administered
  :  
------------------------------------------------------------- X

**LIMITED OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363(b), (f), (k),
AND (m), AND 365 AND FED. R. BANKR. P. 2002, 6004, AND 6006, TO (I) APPROVE
(A) THE SALE PURSUANT TO THE MASTER SALE AND PURCHASE AGREEMENT
WITH VEHICLE ACQUISITION HOLDINGS LLC, A U.S. TREASURY-SPONSORED
PURCHASER, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES,
AND OTHER INTERESTS; (B) THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND
(C) OTHER RELIEF; AND (II) SCHEDULE SALE APPROVAL HEARING**

# Table of Contents

**Page**

Table of Authorities ..........................................................................................................ii

Preliminary Statement......................................................................................................2

Background .......................................................................................................................4

    A. General Background .................................................................................................4

    B. The Proposed Sale...................................................................................................5

        1. Purchased and Retained Assets.......................................................................5

        2. Assumed and Retained Liabilities ..................................................................6

        3. Consideration ..................................................................................................7

        4. Ownership of New GM ...................................................................................8

    C. The Proposed Sale Order .........................................................................................8

    D. Old GM's Tort Liability...........................................................................................9

Argument .......................................................................................................................10

I.     SECTION 363(f) DOES NOT AUTHORIZE THE SALE OF ASSETS
        FREE AND CLEAR OF SUCCESSOR LIABILITY CLAIMS ...........................10

II.    SECTION 105(a) DOES NOT AUTHORIZE THE SALE OF ASSETS
        FREE AND CLEAR OF SUCCESSOR LIABILITY CLAIMS ...........................16

III.   EVEN IF ASSETS COULD BE SOLD FREE AND CLEAR OF
        *EXISTING* CLAIMS THEY CANNOT BE SOLD FREE AND
        CLEAR OF *FUTURE* CLAIMS.......................................................................19

IV.   THE DEBTORS MUST DEMONSTRATE THAT THE PROPOSED
        SALE MAKES ADEQUATE PROVISION FOR THE PAYMENT
        OF COSTS OF ADMINISTERING THE ESTATE .........................................22

Conclusion .....................................................................................................................25

KL3 2724625.6

## Table of Authorities

### CASES

*In re All-American of Ashburn, Inc.*, 56 B.R. 186 (Bankr. N.D. Ga.), *aff'd*, 805 F.2d 1515
   (11th Cir. 1986) ....................................................................................................14, 19

*Car-Tec, Inc. v. Venture Indus., Inc. (In re Autostyle Plastics, Inc.)*, 227 B.R. 797 (Bankr.
   W.D. Mich. 1998)..............................................................................................................19

*Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159 (7th Cir. 1994)................................15, 17, 19, 21

*Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension
   Fund v. Tasemkin, Inc.*, 59 F.3d 48 (7th Cir. 1995)........................................................15, 16

*In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. May 31, 2009)...............................................13

*In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004)...............................................22

*DiGuilio v. Goss Int'l Corp.*, No. 1-07-1584, 2009 WL. 1175089 (Ill. App. Ct. Apr. 30,
   2009) ..................................................................................................................................20

*Fairchild Aircraft Corp. v. Cambell (In re Fairchild Aircraft Corp.)*, 184 B.R. 910
   (Bankr. W.D. Tex. 1995), *vacated on other grounds*, 220 B.R. 909 (Bankr. W.D.
   Tex. 1998)...........................................................................................11, 12, 13, 20, 21

*Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746 (5th Cir. 1995) ..............................................16

*Florida Department of Revenue v. Piccadilly Cafeterias, Inc.*, 128 S. Ct. 2326 (2008) ...............18

*Forde v. Kee-Lox Manufacturing Co.*, 437 F. Supp. 631 (W.D.N.Y. 1977), *aff'd on
   different grounds*, 584 F.2d 4 (2d Cir. 1978).........................................................................15

*Gross v. Trustees of Columbia University*, 816 N.Y.S.2d 695, 2006 WL. 825040 (Sup.
   Ct. Kings Co. Mar. 30, 2006) ..............................................................................................20

*In re Gulf Coast Oil Corp.*, 404 B.R. 407 (Bankr. S.D. Tex. 2009)........................................23, 24

*Johns-Manville Corp. v. Chubb Indemnity Insurance Co. (In re Johns-Manville Corp.)*,
   517 F.3d 52 (2d Cir. 2008), *reversed on other grounds*, —S.Ct.—, 2009 WL
   1685625 (June 18, 2009) ...............................................................................................16, 18

*Kattula v. Republic Bank (In re LWD, Inc.)*, No. 5:08-cv-121, 2009 U.S. Dist. LEXIS
   17852 (W.D. Ky. Feb. 12, 2009) .........................................................................................11

*Lefever v. K.P. Hovnanian Enters. Inc.*, 734 A.2d 290 (N.J. Sup. Ct. 1999) ...............................20

- ii -

*Michigan Employment Sec. Comm. v. Wolverine Radio Co. (In re Wolverine Radio Co.)*,
930 F.2d 1132 (6th Cir. 1991) ........................................................................11

*Mooney Aircraft Corp. v. Foster (In re Mooney Aircraft, Inc.)*, 730 F.2d 367 (5th Cir.
1984) ..............................................................................................................19, 21

*Myers v. United States*, 297 B.R. 774 (S.D. Cal. 2003) ...........................................13, 19

*Ninth Ave Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716 (N.D. Ind. 1996) ......15, 16, 20

*P.K.R. Convalescent Ctrs., Inc. v. Virginia Dept. of Med. Assistance Serv. (In re P.K.R.
Convalescent Ctrs., Inc.)*, 189 B.R. 90 (Bankr. E.D. Va. 1995) ......................14, 19

*Powerex Corp. v. Reliant Energy Servs., Inc.*, 127 S. Ct. 2411 (2007) ........................13

*In re Pudgie's Dev. of N.Y.*, 223 B.R. 421 (Bankr. S.D.N.Y. 1998) ...............................24

*R.C.M. Executive Gallery Corp. v. Rols Capital Co.*, 901 F. Supp. 630
(S.D.N.Y. 1995) ...........................................................................................11, 15, 16, 21

*Renkiewicz v. Allied Prods. Corp.*, 492 N.W.2d 820 (Mich. Ct. App. 1992) ................20

*Rivera v. Anderson United Co.*, 727 N.Y.S.2d 447 (N.Y. App. Div. 2001) ...................20

*Ross v. DESA Holdings Corp.*, No. 05C-05-013, 2008 WL. 4899226 (Del. Super. Ct.
Sept. 30, 2008) ...............................................................................................20

*Russello v. United States*, 464 U.S. 16 (1983) ...........................................................12

*Schwinn Cycling & Fitness Inc. v. Benonis (In re Schwinn Bicycle Co.)*, 210 B.R. 747
(Bankr. N.D. Ill. 1997), *aff'd*, 217 B.R. 790 (N.D Ill. 1997) ......................11, 19, 21

*Simmons v. Mark Lift Indus., Inc.*, 622 S.E.2d 213 (S.C. 2005) ................................20

*In re Trans World Airlines, Inc.*, 322 F.3d 283 (3d Cir. 2003) ..............................13, 19

*UMWA 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal
Co.)*, 99 F.3d 573 (4th Cir. 1996) ...................................................................14

*Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re The White Motor Credit
Corp.)*, 75 B.R. 944 (Bankr. N.D. Oh. 1987) ..............................................11, 16, 20

*Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Industries, Inc.)*, 43 F.3d
714 (1st Cir. 1994) ...........................................................................................21

KL3 2724625.6

*Wilkerson v. C.O. Porter Machinery Co.*, 567 A.2d 598 (N.J. Super. Ct. 1989) ..........................20

*Yadkin Valley Bank & Trust Co. v. McGee (In re Hutchinson)*, 5 F.3d 750 (4th Cir. 1993).........11

## STATUTES

11 U.S.C. § 1141(c) ...........................................................................................................12

11 U.S.C. § 363(e) .............................................................................................................13

11 U.S.C. § 363(f)............................................................................................3, 10, 11, 12, 13, 14

11 U.S.C. § 506(c) ............................................................................................................24

11 U.S.C. § 524(g) ...........................................................................................................22

11 U.S.C. § 1129(a) ..........................................................................................................24

28 U.S.C. § 1334(b) ..........................................................................................................17

## OTHER MATERIALS

George W. Kuney, *Misinterpreting Bankruptcy Code Section 363(f) and Undermining the Chapter 11 Process,* 76 Am. Bankr. L.J. 235 (2002) .......................................................13

KL3 2724625.6

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-3275
Facsimile: (212) 715-8000
Thomas Moers Mayer
Kenneth H. Eckstein
Jeffrey S. Trachtman

*Proposed Counsel for the Official Committee*
*of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X
                          :

In re:                                :        Chapter 11
                          :

GENERAL MOTORS CORP., et al.,      :        Case No. 09-50026 (REG)
                          :

              Debtors.       :        Jointly Administered
                          :

-------------------------------------------------------------- X

**LIMITED OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363(b), (f), (k),
AND (m), AND 365 AND FED. R. BANKR. P. 2002, 6004, AND 6006, TO (I) APPROVE
(A) THE SALE PURSUANT TO THE MASTER SALE AND PURCHASE AGREEMENT
WITH VEHICLE ACQUISITION HOLDINGS LLC, A U.S. TREASURY-SPONSORED
PURCHASER, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES,
AND OTHER INTERESTS; (B) THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND
(C) OTHER RELIEF; AND (II) SCHEDULE SALE APPROVAL HEARING**

The Official Committee of Unsecured Creditors (the "**Committee**") of the above-
captioned debtors and debtors-in-possession (the "**Debtors**"), by and through its undersigned
counsel, hereby submits this limited objection (the "**Objection**") to the Debtors' motion seeking,
among other forms of relief, authority to sell substantially all of their assets free and clear of
liens, claims, encumbrances, and other interests.  In support of the Objection, the Committee
represents as follows:

## PRELIMINARY STATEMENT

1.      The Committee, in its capacity as a fiduciary for a broad cross-section of General Motors Corp. ("**GM**") creditors, including workers, suppliers, dealers, tort creditors, and other unsecured creditors of the Debtors' estates, generally supports the proposed asset sale and objects only on limited, but important, grounds as described below.  The Committee believes that the proposed sale order can and should be amended to address its concerns and permit the sale to go forward on the schedule currently contemplated by the Debtors.

2.      The Committee recognizes that the proposed sale transaction is not perfect.  Indeed, it will leave impaired numerous parties within the Committee's constituency.  However, the Committee is satisfied that no viable alternative exists to prevent the far worse harm that would flow from the liquidation of GM.

3.      The simple fact is that there are no other viable bids – indeed no serious expressions of interest – to purchase GM's assets and no other feasible way for GM to restructure its business to remain viable.  The current transaction is the only option on the table.  The Court is thus faced with a clear choice:  to approve the proposed sale transaction, preserve the going-concern value of the Debtors' businesses, and maximize substantial value for stakeholders (despite the pain that this course will inflict on numerous innocent parties), or reject the transaction and precipitate the dismantling and liquidation of GM to the detriment of all involved.  Preventing this harm serves the core purposes of the Bankruptcy Code and constitutes a strong business justification under Section 363 of the Code to sell the debtors' assets outside of a plan process.

4.      Nevertheless, the Committee is compelled to object to the proposed sale in its current form on two specific grounds:

- 2 -

5.      First, the Committee objects because the proposed order approving the sale purports to cut off all state law successor liability for the new entity purchasing GM's assets. Current and future claimants alleging claims based on injuries caused by product defects, breach of implied warranties, asbestos exposure, and, in certain cases, denial of post employment benefits would thus be limited to recourse against the limited assets being left behind in the old company.

6.      The Committee believes that the attempt to cut off liability represents, at minimum, a poor business and policy judgment, because it undercuts the otherwise clear message that the new company is assuming the mantel of the old GM for purposes of customer service and will otherwise stand behind GM products.  But the purported liability cut-off is also *illegal* for two reasons:  (1) Section 363(f) of the Bankruptcy Code authorizes the sale of assets free and clear of *interests* in a debtor's property, not *claims* arising out of existing or potential causes of action that remain unliquidated and not reduced to liens; and (2) in any event, the attempt to cut off liability for *future* claims is ineffective and a violation of due process that would likely not even be honored by state courts.  The terms of the sale should therefore be revised to leave creditors holding successor liability claims to their state law rights against the new company, and such liabilities should be expressly assumed by the new company.

7.      Second, the sale transaction cannot be approved unless the Debtors make an adequate showing at the upcoming sale hearing that the assets left behind in the old company will be sufficient to pay all administrative expenses of and priority claims against the estates. The proposed transaction provides for the distribution of stock in the new company to the Debtors' unsecured creditors.  Such a distribution can take place only under a confirmed chapter 11 plan, which, in turn, requires that all priority and administrative claims be paid in full.  The

- 3 -

Debtors' unsecured creditors should not bear the costs associated with the wind down of the Debtors' bankruptcy cases.  The purchaser of GM's assets is receiving substantial benefits under the Bankruptcy Code to effectuate the sale and support the viability of the continuing enterprise.  It may not reap those benefits without assuring this Court and constituents of the old company that sufficient assets have been left behind to cover the costs of that bankruptcy process.  Thus, it is incumbent upon the Debtors and the government to ensure that the "wind down budget" is sufficient to allow a plan to be confirmed and implemented without impairing the limited recovery promised to unsecured creditors.[1]

## BACKGROUND

### A.    General Background

8.      On June 1, 2009 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.      On June 3, 2009, the U.S. Trustee appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code.  The Committee is comprised of 15 members who represent the interests of all unsecured creditors.  The Committee members include: two indenture trustees – Wilmington Trust Company and Law Debenture

---

[1]      In addition to these objections, the Committee objects to any attempt by the Debtors to transfer collateral of secured lenders to the new company without the new company either assuming the liability associated with such collateral or paying the claims of such lenders.

The Committee understands that prior to the filing of this Objection, certain modifications were agreed upon or made to the sale transaction documents that resolve a number of the Committee's concerns and will be incorporated into the final sale transaction documents.  Accordingly, Exhibit A to this Objection outlines the issues and objections for which no modifications have yet been made, or for which no agreements have been reached at this time.  Notwithstanding the foregoing, the Committee reserves the right to raise additional issues and objections should the final sale documents or sale order fail to incorporate such agreements or modifications.

- 4 -

Trust Company of New York; two suppliers – Denso International America, Inc. and Inteva

Products, LLC; one trade service creditor – Interpublic Group; three automotive dealers – Serra

Chevrolet of Birmingham, Inc., Paddock Chevrolet and Saturn of Hempstead, Inc.; three

collective bargaining representatives – the Industrial Division of Communications Workers of

America, AFL-CIO, the International Union, United Automobile, Aerospace and Agricultural

Implement Workers of America ("**UAW**"), and the United Steelworkers; three tort claimants –

Kevin Schoenl, Genoveva Bermudez, and Mark Buttita; and the Pension Benefit Guaranty

Corporation.

**B.      The Proposed Sale**

10.      On the Petition Date, the Debtors filed a motion (the "**Sale Motion**") to

approve the sale (the "**Sale**") of substantially all of their assets to Vehicle Acquisition Holdings

LLC ("**New GM**" or "**Purchaser**"), an entity established for the purpose of acquiring such

assets.  The terms of the Sale are set forth in the Master Sale and Purchase Agreement (the

"**MPA**"), dated as of June 1, 2009, by and among GM Corporation ("**Old GM**"), Saturn LLC,

Saturn Distribution Corporation and Chevrolet-Saturn of Harlem, Inc., as sellers, and New GM,

as purchaser.[2]

**1.      Purchased and Retained Assets**

11.      Pursuant to the Sale, New GM is to acquire all properties, assets, and

rights of Old GM, with the exception of certain excluded assets (respectively, the "**Purchased

Assets**" and the "**Excluded Assets**").

12.      The Purchased Assets include, without limitation: (i) all of Old GM's

cash, receivables, intercompany obligations, real property, machinery, equipment, inventory,

---

[2]      A copy of the MPA is attached as Exhibit A to the Sale Motion.  [Dkt. No. 92, Ex. A.]

intellectual property, permits, rights to tax refunds, claims, books and records, goodwill and intangible property other than the Excluded Assets, *see generally* MPA § 2.2(a); (ii) the equity and corporate documents of all entities in which Old GM has an equity interest, with the exception of certain excluded entities, *id.* § 2.2(a)(v); and (iii) benefit plans, including certain plans relating to non-union employees and all employee benefit plans covered by the collective bargaining agreement with the UAW, *id.* §§ 2.2(a)(xvi), 6.17(e).[3]

13.     The Excluded Assets chiefly consist of:  (i) $950 million in cash or cash equivalents, (ii) equity interests in certain Saturn and other entities, (iii) certain real and personal property, (iv) bankruptcy avoidance actions, (v) certain employee benefit plans, and (vi) restricted cash and receivables that exclusively relate to an Excluded Asset or Retained Liability. *See generally* MPA § 2.2(b).

### 2.     <u>Assumed and Retained Liabilities</u>

14.     Old GM will retain all liabilities except those defined in the MPA as "**<u>Assumed Liabilities</u>**."  *See generally* MPA § 2.3(b); *see also id.* § 2.3(b)(xi).

15.     The Assumed Liabilities include: (i) product liability claims arising out of products delivered at or after the Sale transaction closes (the "**<u>Closing</u>**"), MPA § 2.3(a)(ix); (ii) the warranty and recall obligations of both Old GM and New GM, *id.* §§ 2.3(a)(vii), 6.15(a), (b); and (iii) all employment-related obligations and liabilities under any assumed employee benefit plan relating to employees that are or were covered by the UAW collective bargaining agreement, *id.* § 2.3(a)(xiii).

16.     The liabilities being retained by Old GM include: (i) product liability claims arising out of products delivered prior to the Closing, MPA § 2.3(b)(ix); (ii) all liabilities

---

[3]     While the MPA itemizes these various types of assets being sold, the Purchased Assets broadly include *any* asset that is not an Excluded Asset.  MPA § 2.2(a).

KL3 2724625.6

for claims arising out of exposure to asbestos, *id.* § 2.3(b)(x); (iii) all liabilities to third parties for

claims based upon "[c]ontract, tort or any other basis," *id.* § 2.3(b)(xi); (iv) all liabilities related

to any implied warranty or other implied obligation arising under statutory or common law, *id.* §

2.3(b)(xvi); and (v) all employment-related obligations not otherwise assumed, including, among

other obligations, those arising out of the employment, potential employment, or termination of

any individual (other than an employee covered by the UAW collective bargaining agreement)

prior to or at the Closing, *id.* § 2.3(b)(vii).

### 3.    Consideration

17.    Old GM is to receive consideration estimated to be worth approximately

$45 billion, plus the value of certain equity interests in New GM.

18.    The bulk of the consideration will come in the form of a credit bid by the

United States Treasury ("**Treasury**") and Export Development Canada ("**EDC**").  Treasury and

EDC will credit bid the majority of the indebtedness outstanding under certain prepetition credit

facilities and the DIP facilities.

19.    In addition to the consideration provided in the credit bid, New GM is also

assuming approximately $6.7 billion of indebtedness under the DIP facilities, plus an additional

$950 million to be loaned by Treasury under a new DIP facility (the "**Wind Down Facility**").

20.    The consideration will also consist of: (i) the surrender of a warrant issued

by Old GM to Treasury in connection with the prepetition credit facilities; (ii) 10% of the post-

closing outstanding shares of New GM, plus an additional 2% if the estimated amount of allowed

prepetition general unsecured claims against Old GM exceeds $35 billion; (iii) two warrants,

each to purchase 7.5% of the post-closing outstanding shares of New GM, with an exercise price

based on a $15 billion equity valuation and a $30 billion equity valuation, respectively; and

(iv) the assumption of certain liabilities.

4.    **Ownership of New GM**

21.    Under the terms of the Sale, New GM will be owned by four entities.

22.    Treasury will own 60.8% of New GM's common stock on an undiluted basis.  It also will own $2.1 billion of New GM Series A preferred stock.

23.    EDC will own 11.7% of New GM's common stock on an undiluted basis. It also will own $400 million of New GM Series A Preferred Stock.

24.    The New Employees' Beneficiary Association Trust ("**New VEBA**") will own 17.5% of New GM's common stock on an undiluted basis.  It also will own $6.5 billion of New GM's Series A Preferred Stock, and a 6-year warrant to acquire 2.5% of New GM's common stock, with an exercise price based on $75 billion total equity value.

25.    Finally, if a chapter 11 plan is implemented as contemplated under the structure of the Sale transaction, Old GM will own 10.0% of New GM's common stock on an undiluted basis.  In addition, as stated above, if the allowed prepetition general unsecured claims against Old GM exceed $35 billion, Old GM will be issued an additional 10 million shares amounting to approximately 2.0% of New GM's common stock.  Old GM will also own the two warrants mentioned above.

C.    **The Proposed Sale Order**

26.    In their memorandum of law in support of the Sale Motion (the "**Memorandum in Support**")[4], the Debtors request that the Court authorize the Sale free and clear of all "liens, claims, encumbrances and other interests," including, specifically, "all successor liability claims."  Memorandum in Support at 21-22.

---

[4]    Dkt. No. 105.

27.     To effectuate this result, the Debtors have submitted a proposed order to the Court (the "**Proposed Sale Order**")[5] that contains several provisions directed at cutting off successor liability.

28.     First, the Proposed Sale Order contains an explicit finding – and an order to similar effect – that the Debtors "may sell the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied."  Proposed Sale Order ¶¶ V, 7.

29.     In addition the Proposed Sale Order would enjoin all persons (including "litigation claimants") holding "liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability" from asserting such liens, claims, encumbrances and other interests against New GM or the Purchased Assets.  Proposed Sale Order ¶ 8.

30.     Finally, the Proposed Sale Order provides that New GM:

> shall not be deemed . . . to: (i) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with respect to any obligations arising under the Purchase Agreements from and after the Closing); (ii) have, de facto or otherwise, merged with or into the Debtors; or (iii) be a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors.

Proposed Sale Order ¶ 27

### D.     Old GM's Tort Liability

31.     In the absence of discovery, the Committee is not in a position to make representations concerning the nature and scope of Old GM's historical and future tort liability.

---

[5]     Dkt. No. 92, Ex. B.

KL3 2724625.6

32.    Old GM's most recent quarterly report notes present valued contingent liabilities of $934 million for product liability, $627 million for asbestos liability, $307 million for other litigation liability, and $294 million for environmental liability. *See* Form 10-Q for Period Ended March 31, 2009, at 30-32.

## ARGUMENT

33.    The Committee believes that the Sale Order should be approved within the time frame proposed by the Debtors, but only after being amended to address the issues discussed below, as well as other concerns described in Exhibit A to the Objection.[6]

## I.

### Section 363(f) Does Not Authorize the Sale of Assets Free and Clear of Successor Liability Claims

34.    Pursuant to section 363(f) of the Bankruptcy Code, a debtor is authorized to sell property "free and clear of any *interest* in such property of an entity other than the estate" if any one of five conditions is met.  11 U.S.C. § 363(f) (emphasis added).[7]

---

[6]    Among the concerns detailed in Exhibit A is the creditworthiness of the proposed tenant under the Master Lease Agreement that covers 10 facilities being leased by Old GM.  As contemplated, the proposed tenant under the lease will be a newly formed special purpose entity with assets consisting only of its leasehold interest under the Master Lease and certain personal property and fixtures located at the properties covered by the lease.  Even with these nominal assets, the tenant is not required to post any security deposit or otherwise satisfy any financial criteria.  Not only is Old GM relying on the tenant to pay rent and carrying costs with respect to these 10 facilities, the tenant has the right to self-insure casualty and other risks in lieu of obtaining an insurance policy as is customarily required under real estate leases.

[7]    Specifically, a "free and clear" sale is authorized if:

    (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

    (2)    such entity consents;

    (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (4)    such interest is in bona fide dispute; or

35.     The term "interest" is not defined in the Bankruptcy Code.  Courts are
divided as to whether the term, as used in section 363(f), encompasses unliquidated claims
subject to successor liability.  However, the better view – which is supported by both the text and
policies of the Bankruptcy Code – is that unsecured claims arising out of existing or potential
causes of action are not "interests" for purposes of section 363(f).  Numerous courts have so
held.  *See, e.g., R.C.M. Executive Gallery Corp. v. Rols Capital Co.,* 901 F. Supp. 630, 637
(S.D.N.Y. 1995); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re The White
Motor Credit Corp.),* 75 B.R. 944, 948 (Bankr. N.D. Oh. 1987); *see also, e.g., Yadkin Valley
Bank & Trust Co. v. McGee (In re Hutchinson),* 5 F.3d 750, 756 n.4 (4th Cir. 1993); *Michigan
Employment Sec. Comm. v. Wolverine Radio Co. (In re Wolverine Radio Co.),* 930 F.2d 1132,
1147 n.23 (6th Cir. 1991); *Kattula v. Republic Bank (In re LWD, Inc.),* No. 5:08-cv-121, 2009
US Dist. LEXIS 17852, at *12 (W.D. Ky. Feb. 12, 2009); *Schwinn Cycling & Fitness Inc. v.
Benonis (In re Schwinn Bicycle Co.),* 210 B.R. 747, 761 (Bankr. N.D. Ill. 1997), *aff'd*, 217 B.R.
790 (N.D Ill. 1997); *Fairchild Aircraft Corp. v. Cambell (In re Fairchild Aircraft Corp.),* 184
B.R. 910, 917-18 (Bankr. W.D. Tex. 1995), *vacated on other grounds*, 220 B.R. 909 (Bankr.
W.D. Tex. 1998).

36.     As an initial matter, section 363(f) does not refer to just any "interest."
Rather, it refers to an "interest *in . . . property*."  It could perhaps be said that a litigation
claimant holds an "interest" in property of the estate in the colloquial sense of the term.  But,
having not yet reduced its claim to judgment and obtained a lien, it cannot be said to have an
interest *in property*.

---

(5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money
satisfaction of such interest.

11 U.S.C. § 363(f).

KL3 2724625.6

37.     Thus, while section 363(f) may be used to extinguish *in rem* liabilities,

there is no basis in the text of the statute for extinguishing *in personam* liabilities:

> Section 363(f) does not authorize sales free and clear of *any interest*, but rather of *any interest in such property*.  These three additional words define the real breadth of *any interests*.  The sorts of interests impacted by a sale "free and clear" are *in rem* interests which have attached to the property.  Section 363(f) is not intended to extinguish *in personam* liabilities.  Were we to allow "any interests" to sweep up *in personam* claims as well, we would render the words "in such property" a nullity.  No one can seriously argue that *in personam* claims have, of themselves, an *interest in such property*.

*Fairchild Aircraft*, 184 B.R. at 917-18.

38.     The use of the term "interest" in other sections of the Bankruptcy Code

also supports a narrow reading of the term.

39.     For example, Section 1141(c) provides that property "dealt with" by a plan

of reorganization – *e.g.*, property sold pursuant to a plan – "is free and clear of all *claims and

interests* of creditors, equity security holders, and of general partners in the debtor."  11 U.S.C. §

1141(c) (emphasis added).  The presence of the word "claims" in section 1141(c) indicates that

"claims" and "interests" are not synonymous.  Thus, under recognized canons of statutory

construction, the absence of the word "claims" from section 363(f) suggests that Congress did

not intend for that section to be used to extinguish unliquidated claims.[8]  Instead, such claims are

to be dealt with only through the more rigorous (and protective) processes governing plans of

---

[8]     *See, e.g., Russello v. United States,* 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute, but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

reorganization.  *See* George W. Kuney, *Misinterpreting Bankruptcy Code Section 363(f) and Undermining the Chapter 11 Process,* 76 Am. Bankr. L.J. 235, 238-42 (2002).[9]

40.    The use of the phrase "interest in property" in section 363(<u>e</u>) of the Bankruptcy Code also strongly suggests that "interest in . . . property" as used in section 363(<u>f</u>) cannot be so broad as to encompass general unsecured claims arising out of existing or potential causes of action.

41.    Under section 363(e), the bankruptcy court may condition the use, sale, or lease of property in which an entity has an "interest" on the provision of adequate protection of such interest.  But surely this does not mean that holders of unliquidated claims are entitled to adequate protection.  Such a reading would "render[] the distinctions drawn in the Code [between secured and unsecured creditors] a nullity."  *Fairchild Aircraft*, 184 B.R. at 918.  It is well recognized that "identical words and phrases within the same statute should normally be given the same meaning."  *Powerex Corp. v. Reliant Energy Servs., Inc.,* 127 S. Ct. 2411, 2417 (2007).  Thus, if the "interest in property" referred to in section 363(e) cannot be read to include unliquidated claims, the same must then be true of the "interest in . . . property" referred to in section 363(f).

42.    Notwithstanding the language of the statute, some courts have held that section 363(f) does permit the sale of assets free and clear of unliquidated claims.  *See, e.g., In re Trans World Airlines, Inc.,* 322 F.3d 283, 288-89 (3d Cir. 2003); *In re Chrysler LLC,* 405 B.R. 84, 111 (Bankr. S.D.N.Y. May 31, 2009); *Myers v. United States,* 297 B.R. 774, 781-82 (S.D.

---

[9]    It has been argued that the term "claims" in section 1141(c) corresponds to that section's reference to "creditors" and "interests" corresponds to the section's reference to "equity security holders" and "general partners."  This, it is said, explains the use of two terms in section 1141(c), where one sufficed in section 363(f).  But this argument works equally well in reverse.  If the point is to show that "interests" in section 363(f) is broad and all-encompassing, then it follows that it was unnecessary to use the term "claims" in section 1141(c).

Cal. 2003); *P.K.R. Convalescent Ctrs., Inc. v. Virginia Dept. of Med. Assistance Serv. (In re P.K.R. Convalescent Ctrs., Inc.)*, 189 B.R. 90, 94 (Bankr. E.D. Va. 1995); *In re All-American of Ashburn, Inc.,* 56 B.R. 186, 190 (Bankr. N.D. Ga.), *aff'd*, 805 F.2d 1515 (11th Cir. 1986). These courts tend to rely on one or more of three rationales, none of which is persuasive.

43.    First, some courts hold that to the extent "it was the assets of the debtor which gave rise to the claims," the claims are interests in property. *Trans World Airlines,* 322 F.3d at 289-90. However, as discussed above, such a broad reading of interests in property is not supported by the text of the Bankruptcy Code. Section 363(e), in particular, requires that the interest truly be anchored in the property.

44.    Second, these courts reason that "interest" must mean something more than "lien" because section 363(f) contains a specific subsection – section 363(f)(3) – dealing with liens. *See, e.g., Trans World Airlines,* 322 F.3d at 290.

45.    This argument, too, is flawed. That "interest" is something more than "lien" does not mean that it is something as much as "unliquidated claim." The Fourth Circuit has recognized this very point. In *UMWA 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.),* 99 F.3d 573 (4th Cir. 1996), the court rejected the argument that Congress intended to limit the scope of section 363(f) to *in rem* interests only. *Id.* at 582. Nonetheless, the court endorsed its earlier observation that "courts have recognized that general, unsecured claims do not constitute 'interests' within the meaning of § 363(f)." *Id.* at 581-82 (citing *Yadkin Valley Bank & Trust,* 5 F.3d at 756 n.4). The Fourth Circuit further held that the lower court had "applied an unduly broad interpretation of [section 363(f)] when it stated that one has an interest in a debtor's property simply when one has a right to demand money from the debtor." *Id.* at 581.

- 14 -

46.     Finally, some courts have held that a broad reading of "interest" is necessary to further the policies of the Bankruptcy Code.  The pre-Bankruptcy Code case of *Forde v. Kee-Lox Manufacturing Co.,* 437 F. Supp. 631, 633-34 (W.D.N.Y. 1977), *aff'd on different grounds,* 584 F.2d 4 (2d Cir. 1978), is typically cited for this proposition.  There, the court argued that: (i) it would frustrate the priority scheme of the Bankruptcy Code to permit successor liability claimants "to assert their claims against purchasers of the bankrupt's assets, while relegating lienholders to the proceeds of the sale"; and (ii) to hold that sales could not be free and clear of successor liability claims would chill sales and impair a debtor's ability to realize value for its assets.  *Id.* at 633-34.

47.     These policy arguments are tenuous and have been rejected by several courts.  Collateral litigation in a non-bankruptcy forum against non-debtors (where such non-debtors have no third-party rights against the debtor) has no impact on the bankruptcy estate or priorities of distribution.  *See, e.g., Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension Fund v. Tasemkin, Inc.,* 59 F.3d 48, 51 (7th Cir. 1995) ("[O]nce a bankruptcy proceeding is completed and its books closed, the bankrupt has ceased to exist and the priorities by which its creditors have been ordered lose their force."); *accord R.C.M. Executive Gallery,* 901 F. Supp. at 637-38 ; *Ninth Ave Remedial Group v. Allis-Chalmers Corp.,* 195 B.R. 716, 731 (N.D. Ind. 1996).

48.     Moreover, the prospect of successor liability would not "chill" a bankruptcy sale or impair a debtor's ability to realize value for its assets.  Under a rule of "no sales free and clear of successor liability," section 363 sales would still go forward.  (And, indeed, they do.)  Such sales could be expected to realize the true value of the sold assets: that is, their value in light of the risk of successor liability.  *Cf. Zerand-Bernal Group, Inc. v. Cox,* 23

- 15 -

F.3d 159, 163 (7th Cir. 1994) (rejecting argument that bankruptcy court can enjoin successor

liability claims to maximize sale price).

49.     Finally, to the extent that purchasers of a bankrupt's assets are the

intended beneficiaries of "free and clear" orders, "there is no reason to accord the purchasers of

formally bankrupt entities some special measure of insulation from liability that is unavailable to

ailing but not yet defunct entities." *Chicago Truck,* 59 F.3d at 50; *accord R.C.M. Executive,* 901

F. Supp. at 637; *Ninth Ave. Remedial,* 195 B.R. at 731.

## II.

### Section 105(a) Does Not Authorize the Sale of Assets
### Free and Clear of Successor Liability Claims

50.     Section 105(a) cannot be used to "bridge the gap" between section 363(f)

and 1141(c) and authorize the sale of assets free and clear of successor liability claims outside of

a plan of reorganization.  One older case held that section 105(a) provided authority for such a

sale.  *See White Motor Credit,* 75 B.R. at 948-49.  However, more recent authority regarding the

scope of bankruptcy court jurisdiction suggests that *White Motor Credit* was wrongly decided.

51.     A debtor that has sold its assets at a section 363 sale is indifferent to the

outcome of a subsequent successor liability suit brought against the purchaser.  The debtor's

estate stands neither to be augmented nor diminished.  As a result, the bankruptcy court lacks

jurisdiction to enjoin such a suit.  *See Johns-Manville Corp. v. Chubb Indemnity Insurance Co.*

*(In re Johns-Manville Corp.),* 517 F.3d 52, 66 (2d Cir. 2008) (holding that "a bankruptcy court

only has jurisdiction to enjoin third-party non-debtor claims that directly affect the *res* of the

bankruptcy estate"), *reversed on other grounds,* —S.Ct.—, 2009 WL 1685625 (June 18, 2009);

*Feld v. Zale Corp. (In re Zale Corp.),* 62 F.3d 746, 753 (5th Cir. 1995) (observing that "courts

- 16 -

have held that a third-party action does not create 'related to' jurisdiction when the asset in
question is not property of the estate and the dispute has no effect on the estate").

52.     The Seventh Circuit's opinion in *Zerand-Bernal* is on point.  In *Zerand-
Bernal*, the plaintiff had purchased the assets of a chapter 11 debtor in bankruptcy.  The sale
order approved the sale "free and clear of any liens, claims or encumbrances" and reserved in the
bankruptcy court the jurisdiction "to enjoin . . . any products liabilities claims arising prior to the
Closing or relating to sales made by Debtor prior to the Closing."  23 F.3d at 161.  Several years
after the sale, the defendant commenced a product liability suit against the purchaser on a
successor liability theory, alleging injury from a product manufactured by the debtor.  The
purchaser then brought an adversary proceeding in the bankruptcy court seeking to reopen the
bankruptcy case and enjoin the product liability suit.  The bankruptcy court dismissed the
adversary proceeding for lack of jurisdiction.  *Id.* at 161.

53.     On appeal, the Seventh Circuit affirmed the dismissal.  The Seventh
Circuit held that the bankruptcy court lacked "related to" jurisdiction under 28 U.S.C. § 1334(b)
because "the suit cannot possibly affect the amount of property available for distribution to [the
debtor's] creditors; all of [the debtor's] property has already been distributed to them."  *Id.* at
162.  Similarly, the court held that there was no "arising under" jurisdiction because the
bankruptcy was "over and done with" and "[t]he main dispute is one between a purchaser at the
bankruptcy sale and a person who had nothing to do with the bankruptcy over a point of state
law."  *Id.*

54.     Of significance, the Seventh Circuit was not swayed by the policy
argument that its decision might ultimately lead to depressed sale prices in bankruptcy.  The
court acknowledged the validity of the assertion, but rejected it as a justification for enjoining

- 17 -

successor liability claims.  *See id.* at 163 ("All this is true, but proves too much.  It implies, what

no one believes, that by virtue of the arising-under jurisdiction a bankruptcy court enjoys a

blanket power to enjoin all future lawsuits against a buyer at a bankruptcy sale in order to

maximize the sale price."); *see also Johns-Manville,* 517 F.3d at 66 ("It was inappropriate for the

bankruptcy court to enjoin claims brought against a third-party non-debtor solely on the basis of

that third-party's financial contribution to a debtor's estate.").

55.     Even if a bankruptcy court had jurisdiction to enjoin successor liability

claims, it would be improper to do so.  The Bankruptcy Code contemplates that certain ends can

be achieved only through a plan of reorganization, not through a section 363 sale.  Supreme

Court precedent counsels that the distinctions between the two should not be ignored.  In *Florida*

*Department of Revenue v. Piccadilly Cafeterias, Inc.,* 128 S. Ct. 2326 (2008), the Supreme Court

held that sales pursuant to section 363 were subject to state stamp taxes notwithstanding that

identical sales pursuant to a plan of reorganization were exempt under section 1146(a) of the

Bankruptcy Code.  *Id.* at 2339.

56.     The debtor in *Piccadilly* argued that Congress could not have "intended

the anomaly that a transfer essential to a plan that occurs two minutes before confirmation may

be taxed, but the same transfer occurring two seconds after may not."  *Id.* at 2338.  Additionally,

the debtor argued that "interpreting § 1146(a) to apply solely to postconfirmation transfers would

undermine Chapter 11's twin objectives of 'preserving going concerns and maximizing property

available to satisfy creditors.'"  *Id.* (citation omitted).  The Court was unimpressed by these

arguments, noting that "it is not for us to substitute our view of . . . policy for the legislation

which has been passed by Congress."  *Id.* at 2339 (citation omitted).

57.     The same is true in the case of section 363(f).  Congress could have

drafted that section to permit sales free and clear of "claims and interests."  But instead,

Congress drafted the section more narrowly, and reserved the broader language for section

1141(c).  The court should not use its equitable powers under section 105(a) to override this

distinction.

### III.

### Even if Assets Could be Sold Free and Clear of *Existing* Claims They Cannot be Sold Free and Clear of *Future* Claims

58.     As relevant to this Objection, successor liability claims falls into two

broad categories.  The first are claims for which a right to payment, contingent or otherwise,

already exists ("existing claims").  The second are "claims" for which a right to payment has yet

to arise because no liability-generating conduct or incident has yet occurred ("future claims").

59.     As discussed above (at ¶ 42), several courts have concluded – mistakenly,

in the Committee's view – that bankruptcy courts can authorize sales free and clear of existing

successor liability claims.[10]  The same cannot be said of future claims.  Courts have

overwhelmingly rejected the idea that assets can be sold free and clear of future claims.  *See, e.g.*

*Zerand-Bernal,* 23 F.3d at 163;  *Mooney Aircraft Corp. v. Foster (In re Mooney Aircraft, Inc.),*

730 F.2d 367, 375 (5th Cir. 1984);  *Car-Tec, Inc. v. Venture Indus., Inc. (In re Autostyle Plastics,*

*Inc.),* 227 B.R. 797, 800 (Bankr. W.D. Mich. 1998); *Schwinn Bicycle,* 210 B.R. at 760-61; *Ninth*

---

[10]     *See, e.g., Trans World Airlines,* 322 F.3d at 286 (addressing sale order that extinguished existing
claims based on Travel Voucher Program and discrimination charges already pending before EEOC);
*Myers,* 297 B.R. at 777 (addressing lawsuit arising out of pre-petition exposure); *P.K.R. Convalescent
Centers,* 189 B.R. at 92 (addressing existing contingent claim); *All American of Ashburn,* 56 B.R. at 189
(distinguishing between existing claims and claims arising after sale, and addressing product liability
claim that arose prior to sale).

*Avenue Remedial,* 195 B.R. at 731-32; *Fairchild Aircraft,* 184 B.R. at 921; *White Motor Credit,* 75 B.R. at 948-49. [11]

      60.    The reasoning of these cases is compelling.  First, to the extent that a bankruptcy court must rely on its equitable power to cleanse assets of successor liability claims, this power does not extend to claims arising post-bankruptcy, because such claims are not "claims" for purposes of bankruptcy.  *See, e.g., White Motor Credit,* 75 B.R. at 948-49 (bankruptcy court's "equitable power to sell free and clear must be interpreted consistent with its power to discharge claims under a plan of reorganization"); *Ninth Avenue Remedial,* 195 B.R. at 731-32 (noting that if claim could have been a claim in bankruptcy, "the bankruptcy court had the equitable power to discharge the claim against the assets purchaser," but "[i]f the claim arose after the consummation of the bankruptcy proceedings, the bankruptcy court did not have the

---

[11]    This trend extends to state courts.  State courts generally accord no deference to bankruptcy court free and clear orders where the successor liability claim at issue in the collateral state court proceeding arises out of an accident occurring subsequent to the bankruptcy sale.  *See, e.g., Simmons v. Mark Lift Indus., Inc.,* 622 S.E. 2d 213, 215 (S.C. 2005) (where accident occurred years after sale, court held that "a plaintiff may maintain a state law-based product liability claim under a successor liability theory against a successor corporation which purchased the predecessor's assets in a voluntary sale approved by the federal bankruptcy court provided one of the [usual exceptions to the rule against successor liability] applies"); *Renkiewicz v. Allied Prods. Corp.,* 492 N.W. 2d 820, 821 (Mich. Ct. App. 1992) (free and clear sale did not extinguish product liability claim against purchaser that arose out of accident that occurred subsequent to sale); *Wilkerson v. C.O. Porter Machinery Co.,* 567 A.2d 598, 599-601 (N.J. Super. Ct. 1989) (where injury occurred subsequent to sale, court held that "[t]he mere fact that the bankruptcy order approves a sale purporting to transfer assets free and clear of various claims, even including contingent products liability claims, should not be determinative."); *cf. Gross v. Trustees of Columbia University,* 816 N.Y.S.2d 695, 2006 WL 825040, at *4-5 (Sup. Ct. Kings Co. Mar. 30, 2006) (although accident occurred prior to sale, product liability claim was not bankruptcy "claim" because it had not yet been filed; accordingly, it was "future claim" that was not barred by free and clear sale); *Lefever v. K.P. Hovnanian Enters. Inc.,* 734 A.2d 290, 298 (N.J. Sup. Ct. 1999) (although accident occurred prior to sale, successor liability claim was not barred because the bankruptcy proceedings had not "dealt with" the claim, that is, the plaintiff "was not a creditor of the bankrupt" and had filed no claim in the bankruptcy proceedings); *see also Ross v. DESA Holdings Corp.,* No. 05C-05-013, 2008 WL 4899226 (Del. Super. Ct. Sept. 30, 2008) (rejecting imposition of successor liability for post-sale accident, but doing so not because of the bankruptcy court "free and clear" order but rather because none of the recognized exceptions to the rule against successor liability applied); *DiGuilio v. Goss Int'l Corp.,* No. 1-07-1584, 2009 WL 1175089, at *6-8 (Ill. App. Ct. Apr. 30, 2009) (same); *Rivera v. Anderson United Co.,* 727 N.Y.S. 2d 447, 448-49 (N.Y. App. Div. 2001) (same).

- 20 -

power to discharge that claim"); *Fairchild Aircraft,* 184 B.R. at 921 ("[I]t is only if the claims . .

. can properly be said to have been the subject of the bankruptcy process that we can maintain

that the bankruptcy court had any authority to issue orders affecting their rights."); *Mooney*

*Aircraft,* 730 F.2d at 375 ("no claim to be divested" because the claims "did not arise until more

than five years after the sale and more than a year after the bankruptcy estate was closed").

61.     Second, due process prevents the sale of assets free and clear of future

claims.  As the District Court for the Southern District of New York noted in *R.C.M. Executive*

*Gallery,* "the case for successor liability is . . . strong[]" where plaintiffs "allege that they had no

notice of the prior bankruptcy proceedings and therefore never pursued a claim in bankruptcy."

901 F. Supp. at 638; *accord Schwinn Bicycle,* 210 B.R. at 760-61 ("Allowing provisions of the

Sale Order to bind these [future claimants], even if that Order was intended to do so, would

violate the Fifth Amendment because of fairness and due process concerns and would also

violate bankruptcy notice requirements."); *Zerand-Bernal,* 23 F.3d at 163 (rejecting notion that

bankruptcy court "could allow the parties to bankruptcy sales to extinguish the rights of third

parties, here future tort claimants, without notice to them or (as notice might well be infeasible)

any consideration of their interests"); *see also, e.g., Mooney Aircraft,* 730 F.2d at 375 ("We

recognize that a sale free and clear is ineffective to divest the claim of a creditor who did not

receive notice, and that, were it necessary to reach this question, this lack of notice might well

require us to find that the bankruptcy court's prior judgment was ineffective as to the [future

claims at issue]") (internal citations omitted); *Western Auto Supply Co. v. Savage Arms, Inc. (In*

*re Savage Industries, Inc.),* 43 F.3d 714, 722 (1st Cir. 1994) ("[I]t cannot seriously be questioned

that the central 'notice and hearing' requirement prescribed by the Bankruptcy Code would be

eviscerated were we to presume, as [defendant] belatedly suggests, that an entire class of future

- 21 -

products liability claimants was beyond the purview of 'such notice . . . and such opportunity for

a hearing as [was] appropriate in the particular circumstances.'") (citing 11 U.S.C. § 102(1)(A)).

62.    There are additional considerations that make it particularly inappropriate

to attempt to use a Section 363 sale to cut off liability for future asbestos claims.  Asbestos

claims are unique in that the Bankruptcy Code contains a provision governing the terms under

which such future claims – or "demands," as they are referred to in the Bankruptcy Code – may

be discharged.  *See* 11 U.S.C. § 524(g).  The existence of the provision implies that it should be

the exclusive means of discharging future asbestos claims, and courts have so held.  *See, e.g., In

re Combustion Engineering, Inc.,* 391 F.3d 190, 237 n.50 (3d Cir. 2004) ("§ 105(a) cannot be

used to achieve a result not contemplated by the more specific provisions of § 524(g), which is

the means Congress prescribed for channeling the asbestos liability of a non-debtor").

63.    A free and clear sale such as that contemplated in these cases does not

constitute a "discharge."  Yet, in purporting to bar future asbestos claims against New GM, the

sale would achieve a similar result.  Thus, to the extent that bankruptcy courts have the equitable

power to authorize sales free and clear of future claims – and the Committee believes that they

do not – this power is impliedly circumscribed by the existence of section 524(g).

## IV.

### The Debtors Must Demonstrate That the Proposed Sale Makes
### Adequate Provision for the Payment of Costs of Administering the Estate

64.    The proposed transaction is termed a "sale," but it more closely resembles

a foreclosure.  By virtue of the Credit Bid, the Government Entities, as secured creditors, are

taking title to property in lieu of being repaid.  A similar result could have been achieved by the

initiation of foreclosure proceedings under state law – with one critical distinction.  Under state

- 22 -

law, the Government Entities would have been unable to avail themselves of the numerous

benefits of the Bankruptcy Code.

65.    Chief among the benefits of bankruptcy are the ability to assume and

reject executory contracts and to purchase assets free and clear of certain interests.  The

Government Entities propose to take full advantage of both of these benefits, and more.  Having

chosen to use the bankruptcy forum to obtain title to Old GM's assets, the Government Entities

should be required to "pay the freight," that is, make provision for the payment of the costs of

administering the bankruptcy cases.

66.    A recent case, *In re Gulf Coast Oil Corp.,* 404 B.R. 407 (Bankr. S.D. Tex.

2009), illustrates the principle.  In *Gulf Coast,* the debtor proposed to sell substantially all of its

assets to its secured lender in partial satisfaction of its claim (i.e., a credit bid).  The debtors'

financial advisors objected to the sale on the ground that the proposed transaction would not pay

all administrative expenses of the estate.  *Id.* at 414.

67.    The bankruptcy court sustained the objection.  The court emphasized that

"bankruptcy is, at its essence, a collective remedy intended to benefit all creditors, not just the

secured lender."  *Id.* at 426.  In the court's view, the essence of the transaction was "a foreclosure

supplemented materially by a release, by assignment of executory contracts (but only the

contracts chosen by the secured lender), by a federal court order eliminating any successor

liability, and by preservation of the going concern."  *Id.* at 428.  In short, "[t]he only effect of the

bankruptcy process would be to transfer the debtors' assets to its secured creditor with benefits

that the creditor could not achieve through foreclosure."  *Id.*  The court was unwilling to

countenance this result, particularly where the expenses of the bankruptcy proceeding would not

be paid.  *See id.* at 427 (noting that "it would be especially difficult to understand why the

- 23 -

purchaser should get the benefit of extraordinary bankruptcy powers and remedies for which it did not pay").

68.     The principle that a secured creditor must pay for the benefits it realizes in bankruptcy is not a novel one.  Indeed, section 506(c) of the Bankruptcy Code expressly contemplates this result.  That section provides that "[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim."  11 U.S.C. § 506(c).  Thus, for example, in *In re Pudgie's Dev. of N.Y.,* 223 B.R. 421 (Bankr. S.D.N.Y. 1998), the court awarded fees to the debtors' counsel notwithstanding that the payment of such fees would reduce the amount of the sale proceeds available to pay the claims of the secured DIP lenders.  *Id.* at 424-25.  The court found that the fees were justified under section 506(c) on the grounds that without the efforts of counsel, "it appears likely that the sale would not have occurred, the Debtors' business operations would have ceased, the case would have been converted to Chapter 7 and the paltry physical assets would have been sold for nominal values undoubtedly equating to a small fraction of the [sale proceeds]."  *Id.* at 424.

69.     Unlike in *Gulf Coast,* the Committee does not suggest that the court should disallow the Sale.  However, prior to approving the Sale, the court should require the Debtors to present evidence that the Sale will not leave the Debtors' estates administratively insolvent.  The distribution of stock to unsecured creditors of Old GM that is contemplated by the Sale transaction is to be accomplished under a future chapter 11 plan.  A plan cannot be confirmed absent the payment of priority and administrative claims.  *See* 11 U.S.C. § 1129(a)(9)(A).  Accordingly, in order to ensure that unsecured creditors will receive the limited recovery promised to them under the terms of the Sale, the Debtors should be required to

- 24 -

demonstrate (1) that Treasury will forego enforcement of Old GM's liability for the $950 million

in DIP proceeds constituting the Wind Down Facility to the extent necessary to fund the

expenses of the Estates, and (2) that the Wind Down Facility will, in turn, be sufficient to pay all

anticipated administrative and priority claims, such that other assets left with Old GM, including

stock of New GM, will be available for distribution to other unsecured creditors.

## CONCLUSION

70.     For the foregoing reasons, the Committee respectfully requests that the

Court approve the Sale Order only if it is amended to eliminate the purported cut-off of successor

liability and provide for the assumption of such claims by New GM, and only upon an adequate

demonstration that the proposed sale makes provision for the payment of all administrative and

priority claims.

Dated:   June 24, 2009
         New York, New York

                                        KRAMER LEVIN NAFTALIS & FRANKEL LLP


                                        By: /s/ Thomas Moers Mayer
                                        Thomas Moers Mayer
                                        Kenneth H. Eckstein
                                        Jeffrey S. Trachtman
                                        1177 Avenue of the Americas
                                        New York, New York 10036
                                        Telephone: (212) 715-3275
                                        Facsimile: (212) 715-8000

                                        *Proposed Counsel for the Official Committee
                                        of Unsecured Creditors*

# Exhibit A

| ISSUE | OBJECTION |
|---|---|
| *Master Sale and Purchase Agreement ("MPA") Issues:* | |
| **Assumption of Dealer Agreements by New GM should be absolute** | Section 6.6(a) permits New GM to request that Old GM consent to the removal of the Deferred Termination Agreement and Participation Agreement from the list of Assumable Executory Contracts. Under the terms of the MPA, Old GM cannot unreasonably withhold its consent to any such request. The language permitting New GM to make these requests should be removed and the requirement that New GM assume all Deferred Termination Agreements and Participation Agreements should be absolute.<br><br>Old GM's counsel has agreed to remove any language that creates ambiguity with respect to the assignment to New GM of Dealer Agreements. This agreement needs to be reflected in a revised MPA. |
| **The Sale Order should not provide for preemption of state law** | Paragraph 39 of the proposed Sale Order provides that no law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the 363 Transaction, the MPA, the Motion, and the Sale Order.<br><br>The Sale Order should not provide that state laws are preempted generally and any such statements must be limited to "legal truisms" (e.g., section 365 controls the assignment of Assumable Executory Contracts) but not otherwise seek to characterize the effects of any such assignment under non-bankruptcy law. |
| **There should be greater transparency with respect to the assumption and rejection of Assumable Executory Contracts** | Section 6.6 provides New GM with the right to add or remove any Executory Contract from the definition of Purchased Contracts until 30 days after the Closing Date. Consequently, it will not be possible to determine the universe of rejected Executory Contracts until at least 30 days after the Closing Date.<br><br>New GM has agreed to publicly disclose, as soon as is practicable, those Executory Contracts with respect to which it has made the pre-Closing determination to assume or not to assume. This covenant should be reflected in the MPA. |
| **It should be clear that Old GM does not bear any liability for tax liabilities of Subsidiaries that are sold to New GM** | There is language in a number of sections in the MPA that creates ambiguity as to whether Old GM would have liability for tax liabilities of Subsidiaries that are sold to New GM.<br><br>It has been indicated that it was not intended that Old GM should bear such liability (though this intent needs to be confirmed). The MPA needs to be revised to reflect this position. |
| **Old GM should have greater rights with respect to tax matters relating to taxes for which Old GM is liable** | Section 6.16 provides New GM with significant control over tax issues affecting Old GM.<br><br>Old GM should have greater rights with respect to tax matters (including tax returns and audits or other proceedings) that could materially affect taxes payable by Old GM, including control over any election under IRC Section 108(b)(5) (which relates to order of attribute reduction resulting from cancellation of indebtedness). |
| **New GM should assume Product Liabilities with respect to claims arising post-Closing** | Section 2.3(a)(ix) provides that New GM will assume Product Liabilities arising out of products delivered after the Closing. |

| ISSUE | OBJECTION |
|---|---|
| | New GM has agreed to assume all Product Liabilities for claims arising after the Closing, regardless of whether the products were delivered prior to or after the Closing.  This agreement should be reflected in the MPA.<br><br>The MPA needs to clarify the treatment of product liability claims arising post-petition and pre-Closing. |
| **New GM should assume implied warranties** | Section 2.3(a)(vii) provides that New GM will assume express warranties with respect to vehicles and parts.<br><br>New GM has additionally agreed to assume all implied warranties with respect to vehicles and parts.  This agreement should be reflected in the MPA. |
| **Old GM should retain Product Liability insurance policies** | Pursuant to Section 2.2(a)(xvii), New GM will acquire insurance policies of Old GM which relate to product liability claims, while Old GM will retain certain product liabilities under Section 2.3(b)(ix).  Old GM should retain the insurance policies which provide coverage for these claims. |
| **No Representations or Warranties should survive Closing** | Section 9.1(b) provides that a number of the representations and warranties survive until the third anniversary of the Closing.<br><br>New GM has agreed that no representations or warranties should survive the Closing.  This agreement needs to be reflected in a revised MPA. |
| **Adjustment Shares should be excluded from collateral securing the Wind Down Facility** | Section 6.9(b) does not exclude the Adjustment Shares from the assets of Old GM which will secure the Wind Down Facility.<br><br>New GM has agreed that the Adjustment Shares will be so excluded.  This agreement needs to be reflected in a revised MPA. |
| **Definition of "UST Credit Facilities" should be clarified** | The definition of "UST Credit Facilities" should capture any amendments thereto.  This is an important issue since New GM is credit bidding the debt under the UST Credit Facilities as defined in the MPA.<br><br>Old GM's counsel has agreed to make this clarification.  This clarification needs to be reflected in a revised MPA. |
| **It should be clarified that New GM is assuming all liabilities with respect to Assumed Plans that constitute Purchased Assets** | Section 2.2(a)(xvi) provides for the acquisition by New GM of all Assumed Plans to the extent described in Section 6.17(e).  Section 2.3(a)(xiii), however, provides only for the assumption of Liabilities under the Assumed Plans to the extent that such Liabilities relate to an Employee covered by the UAW Collective Bargaining Agreement.  The assumption of liabilities under Assumed Plans should be consistent with the acquisition of the Assumed Plans and with Section 6.17(e). |
| *Form of Registration Rights Agreement ("RRA") Issues:* | |
| **Share and Warrant Consideration should be registered under the Securities Exchange Act of 1934 (the "1934 Act"), and be listed on a national exchange, prior to specific dates** | The RRA does not require that New GM become a reporting company under the 1934 Act or that New GM's shares of common stock and warrants be listed for trading on the NYSE or Nasdaq prior to specific dates.<br><br>New GM is considering dates by which such commitments may be made.  Once the date is determined it should be reflected in a revised RRA. |

KL2 2610453.6

| ISSUE | OBJECTION |
|---|---|
| **Old GM should be granted "most favored nation" status, along with the other stockholders of New GM** | Section 2.12(b) provides that if New GM grants to any party registration rights which are more favorable than those provided in the RRA, New GM will grant those same rights to UST Holdco, Canada and the VEBA. Old GM should also receive the benefits of this provision.<br><br>New GM agreed that this provision would be changed to be uniform for UST Holdco, Canada, the VEBA and Old GM. This agreement needs to be reflected in a revised RRA. |
| **Old GM should not be required to indemnify New GM to a greater degree than New GM's other stockholders** | Section 2.9.2 requires Old GM to indemnify New GM for Losses arising out of material misstatements or omissions made in a registration statement or prospectus in reliance on information provided by Old GM. No other stockholder which is a party to the RRA is required to provide such indemnification.<br><br>New GM has agreed to exempt Old GM from the indemnification obligation on the same basis as the other holders of Registrable Securities. This agreement needs to be reflected in a revised RRA. |
| *Form of Transition Services Agreement ("TSA") Issues:* | |
| **The $15MM cap on liability and limited remedies unduly restrict Old GM's recourse if New GM breaches**<br>**[§§ 5.3, 5.4 & 6.1]** | The amount of the cap should be increased, and its application limited by carving out gross negligence and intentional breach. Otherwise, the cap may enable New GM to shed all of its obligations under the TSA (thereby depriving Old GM of services essential to the liquidation) by paying $15MM. In addition, each party should have the express remedy of specific performance. |
| **New GM's ability to terminate the TSA in its entirety needs to be very limited**<br>**[§ 4.3]** | Continued provision of New GM's services are critical to Old GM's ability to move forward towards liquidation. Accordingly, and given the adequacy of other remedies, New GM's ability to call a default and terminate the TSA in its entirety should be extremely narrow -- limited only to an Old GM payment default that continues for 30 days after notice. New GM should pursue specific performance and damages for other breaches. |
| **Old GM needs to assure the sufficiency and quality of services received**<br>**[§§ 2.5, 2.8, 2.10, & Sch. A, A-2 & B]** | If Old GM reasonably requires, within a year of Closing, additional services which New GM has historically provided or is reasonably able to provide, New GM should be obligated to provide them, on a commercially reasonable ("fully loaded" cost plus 5%) basis, regardless of whether the parties are able to agree on price and specifications. New GM should also provide (i) legal services of the type previously provided in house (subject to conflict of interest or ethical bars) and (ii) all facility idling services. In addition, New GM should, consistent with its own business, expressly seek to afford Old GM with the benefits of qualified personnel and institutional knowledge. |
| **A traditional overall objective performance standard should apply to all services**<br>**[§ 2.1]** | All services, including those performed by New GM for its own account, should be subject to a performance standard specifying reasonable and ordinary care, skill and diligence, in a manner consistent with historic practice, including with respect to nature, quality and timeliness. |
| **Old GM should not be required to perform additional services**<br>**[§ 2.5]** | Old GM will have no post-Closing employees. New GM should not have any ability to require Old GM to perform services not specified in the TSA. |

3

| ISSUE | OBJECTION |
|---|---|
| **New GM needs to be responsible for the performance of its third party providers** **[§ 2.4]** | If consent from a third party provider cannot be obtained, New GM should provide a substantially equivalent service. In addition, New GM should be responsible for its third party providers' adherence to the performance standard and any other breaches, and obtain Old GM's reasonable approval of new providers. |
| **New GM needs to be responsible for environmental conditions it causes** **[Sch. B]** | New GM should be liable for the cost of remediating any contamination caused by it, and any resulting consequences. In addition, Old GM should not be obligated to provide or guarantee financial assurance required under any environmental laws. |
| **New GM needs to be responsible for the absence of landlord consents** **[Sch. C]** | No landlord consents have been obtained for New GM's use and occupancy of the leased properties covered by the TSA. New GM should be responsible for any resulting liability. |
| **Old GM needs traditional arms-length real estate protections** **[Sch. C]** | The TSA should provide Old GM with traditional real estate protections including (i) the right to recover possession following a New GM default; (ii) at least six months' prior notice before vacating; (iii) the ability to directly enforce overleases; and (iv) the acknowledgement by New GM that it is taking facilities "as is" (with no implied obligation of Old GM to make repairs or provide services) and is liable for all related taxes and the repair of damages caused by it. |
| **Old GM must be assured access to appropriate New GM personnel and information** **[§ 7.18]** | The parties should expressly agree to reasonably cooperate with each other, including by providing the other access to books and records, and employees. |
| **Coordination/dispute resolution should be enhanced** **[§ 2.14]** | Each party should appoint a liaison to coordinate activities and facilitate prompt dispute resolution. |
| **The terms of the TSA applicable to SPO Jacksonville and SPO Boston must be clarified** **[Schedule C]** | The TSA is unclear regarding New GM's use and occupancy of certain properties (including SPO Jacksonville and SPO Boston), including whether the leases will be assumed or rejected. |
| *Form of Master Lease Agreement ("MLA") Issues:* | |
| **Old GM is entitled to a creditworthy Tenant under the MLA** **[cover page]** | The Tenant under the MLA is a new shell entity, with no obligation to post any security deposit or maintain third party insurance. Instead, New GM should itself be the Tenant, or provide a full guaranty. |
| **Old GM is entitled to traditional arms-length real estate provisions** **[§§ 6, 8, 9 & 13.2]** | Tenant should be obligated for all customary "triple net lease" responsibilities, including all taxes imposed on the real estate, fixtures and personal property, and repairs other than major structural repairs, as well as obtaining waivers of subrogation, and observing customary subletting and assignment restrictions. |
| **Short notice periods unduly disadvantage Old GM** **[§§ 3 & 23]** | Tenant may at any time, on 45 days' notice (30 in certain cases), remove one or more facilities from the MLA. Such short notice periods will disadvantage Old GM in selling or re-letting the facilities. Six months' notice should be |

4

| ISSUE | OBJECTION |
|---|---|
|  | required. |
| **Old GM is entitled to true holdover rent** [§ 16] | Tenant should be required to pay holdover rent at a customary premium to market rent, and operating costs during any holdover period. |
| **Tenant needs to be responsible for environmental conditions it causes** [§ 18] | While Old GM generally retains environmental liabilities, Tenant should be responsible for (and not released from) the cost of remediating any contamination caused by it, and any resulting consequences. |
| **Michigan law should not govern out-of-state properties** [§ 21.8] | Michigan law governs the MLA, even where facilities are in other states. This unusual provision may operate to limit Old GM's rights and remedies. Governing law should be the law of the state in which a property is located. |

5