# Exhibit V

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-50026

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


GENERAL MOTORS CORPORATION, et al.,


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            July 2, 2009

            9:02 AM




B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

2

1

2      HEARING re Motion of the Debtors for Entry of Order Pursuant to

3      11 U.S.C. § 363(b) Authorizing and Approving Settlement

4      Agreements with Certain Unions

5

6      HEARING re Debtors' Motion Pursuant to Bankruptcy Code §§

7      105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002,

8      4001 and 6004 to Amend DIP Credit Facility

9

10     HEARING re Continuation of GM 363 Sale Hearing

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25     Transcribed by:  Lisa Bar-Leib

3

A P P E A R A N C E S :

WEIL, GOTSHAL & MANGES LLP

    Attorneys for Debtor General Motors Corporation

    767 Fifth Avenue

    New York, NY 10153


BY:  HARVEY R. MILLER, ESQ.

    STEPHEN KAROTKIN, ESQ.

    JOSEPH H. SMOLINSKY, ESQ.

    JOHN A. NEUWIRTH, ESQ.

    IRWIN WARREN, ESQ.


HONIGMAN MILLER SCHWARTZ & COHN

    Special Counsel for General Motors Corporation

    2290 First National Building

    660 Woodward Avenue

    Detroit, MI 48226


BY:  ROBERT B. WEISS, ESQ.

    SETH A. DRUCKER, ESQ. (TELEPHONICALLY)

4

1

2    JENNER & BLOCK LLP

3         Special Counsel for Debtors and Debtors-in-Possession

4         919 Third Avenue

5         37th Floor

6         New York, NY 10022

7

8    BY:  PATRICK J. TROSTLE, ESQ.

9

10   JENNER & BLOCK LLP

11        Special Counsel for Debtors and Debtors-in-Possession

12        330 North Wabash Avenue

13        Chicago, IL 60611

14

15   BY:  DANIEL R. MURRAY, ESQ.

16

17   KRAMER LEVIN NAFTALIS & FRANKEL LLP

18        Attorneys for Official Committee of Unsecured Creditors

19        1177 Avenue of the Americas

20        New York, NY 10036

21

22   BY:  KENNETH ECKSTEIN, ESQ.

23        ADAM ROSOFF, ESQ.

24        THOMAS MOERS MAYER, ESQ.

25        ROBERT T. SCHMIDT, ESQ.

5

1

2    UNITED STATES DEPARTMENT OF JUSTICE

3         Office of the United States Trustee

4         33 Whitehall Street

5         21st Floor

6         New York, NY 10004

7

8    BY:  TRACY HOPE DAVIS, ESQ.

9         BRIAN MASUMOTO, ESQ.

10

11   U.S. DEPARTMENT OF JUSTICE

12        United States Attorney's Office

13        Southern District of New York

14        86 Chambers Street

15        New York, NY 10007

16

17   BY:  MATTHEW L. SCHWARTZ, AUSA

18        DAVID S. JONES, AUSA

19

20

21

22

23

24

25

6

1

2    ARENT FOX LLP

3         Attorneys for The Timken Company, Superior Industries

4          International, Inc., Discovery Communications, LLC,

5          Harman Becker Automotive Systems and its affiliated

6          companies, Toyota Boshoku America, Inc., and JJF

7          Management Services, Inc.

8         1675 Broadway

9         New York, NY 10019

10

11    BY:   JAMES M. SULLIVAN, ESQ.

12

13    ATTORNEY GENERAL OF TEXAS

14         Counsel to State of Texas On Behalf of Texas Department of

15          Transportation

16         P.O. Box 12548

17         Austin, TX 78711

18

19    BY:   J. CASEY ROY, ASSISTANT ATTORNEY GENERAL

20

21

22

23

24

25

7

1

2    BINGHAM MCCUTCHEN LLP

3        Attorneys for Wells Fargo Bank, as Indenture Trustee

4        399 Park Avenue

5        New York, NY 10022

6

7    BY:  ERIN H. MAUTNER, ESQ.

8

9    CADWALADER, WICKERSHAM & TAFT LLP

10       Attorneys for U.S. Treasury Auto Task Force

11       One World Financial Center

12       New York, NY 10281

13

14   BY:  JOHN RAPISARDI, ESQ.

15

16   CADWALADER, WICKERSHAM & TAFT LLP

17       Attorneys for U.S. Treasury Auto Task Force

18       1201 F Street, N.W.

19       Washington, DC 20004

20

21   BY:  PETER M. FRIEDMAN, ESQ.

22       JILL KAYLOR, ESQ. (TELEPHONICALLY)

23

24

25

8

1

2    CAPLIN & DRYSDALE, CHARTERED

3        Attorneys for Mark Buttita

4        375 Park Avenue

5        35th Floor

6        New York, NY 10152

7

8    BY:  RITA C. TOBIN, ESQ.

9

10   CAPLIN & DRYSDALE, CHARTERED

11       Attorneys for Mark Buttita

12       One Thomas Circle N.W.

13       Suite 1100

14       Washington, DC 20005

15

16   BY:  RONALD E. REINSEL, ESQ.

17

18

19

20

21

22

23

24

25

9

1

2    CLEARY GOTTLIEB STEEN & HAMILTON LLP

3        Attorneys for The International Union, United Automobile

4         Aerospace and Agricultural Implement Workers of America,

5         AFL-CIO

6        One Liberty Plaza

7        New York, NY 10006

8

9    BY:  AVRAM E. LUFT, ESQ.

10       JAMES BROMLEY, ESQ.

11

12   CLIFFORD CHANCE US LLP

13       Attorneys for ABN AMRO BANK N.V., RBS Citizens N.A., Royal

14        Bank of Scotland plc

15       31 West 52nd Street

16       New York, NY 10019

17

18   BY:  ANDREW BROZMAN, ESQ.

19

20   COHEN, WEISS AND SIMON LLP

21       Attorneys for United Auto Workers

22       330 West 42nd Street

23       New York, NY 10036

24

25   BY:  BABETTE CECCOTTI, ESQ.

10

 1

 2    THE COLEMAN LAW FIRM

 3         Attorneys for Product Liability Claimants:  Callan

 4          Campbell, Kevin Junso, et al.; Edwin Agosto, Kevin

 5          Chadwick, et al., and Joseph Berlingieri

 6         77 West Wacker Drive

 7         Suite 4800

 8         Chicago, IL 60601

 9

10    BY:  STEVE JAKUBOWSKI, ESQ.

11

12    CONNOLLY BOVE LODGE & HUTZ LLP

13         Attorneys for Connecticut General

14         The Nemours Building

15         1007 North Orange Street

16         Wilmington, DE 19899

17

18    BY:  JEFFREY C. WISLER, ESQ.

19

20

21

22

23

24

25

11

1

2    COVINGTON & BURLING LLP

3         Attorneys for Union Pacific Railroad Company

4         The New York Times Building

5         620 Eighth Avenue

6         New York, NY 10018

7

8    BY:  MARTIN E. BEELER, ESQ.

9

10   DLA PIPER US LLP

11        Attorneys for Hewlett-Packard Company and all of its

12         Affiliates, Domestic and International, Including but not

13         Limited to Electronic Data Systems Corporation, and HP

14         Company and Hewlett-Packard Financial Services Company

15        550 South Hope Street

16        Suite 2300

17        Los Angeles, CA 90071

18

19   BY:  KAROL K. DENNISTON, ESQ.

20

21

22

23

24

25

12

1

2    DICKINSON WRIGHT PLLC

3        Attorneys for Multimatic Inc.

4        301 East Liberty

5        Suite 500

6        Ann Arbor, MI 48104

7

8    BY:  TRENT B. COLLIER, ESQ.

9

10   DRINKER BIDDLE & REATH LLP

11       Attorneys for Cross-Complainant/Defendant, Manufacturers

12        and Trust Company and Wells Fargo Bank Northwest

13       1500 K Street, N.W.

14       Washington, DC 20005

15

16   BY:  STEPHANIE WICKOUSKI, ESQ.

17

18   FORMAN HOLT ELIADES & RAVIN LLC

19       Attorneys for Rose Cole, Guardian of Timothy L. Montis, a

20        Disabled Adult

21       80 Route 4 East

22       Paramus, NJ 07652

23

24   BY:  KIMBERLY J. SALOMON, ESQ.

25

13

1

2    GIBSON, DUNN & CRUTCHER LLP

3         Attorneys for Wilmington Trust Co., as Indenture Trustee

4         200 Park Avenue

5         New York, NY 10166

6

7    BY:  MATTHEW J. WILLIAMS, ESQ.

8         DAVID M. FELDMAN, ESQ.

9

10   GORLICK, KRAVITZ & LISTHAUS, P.C.

11        Attorneys for International Union of Operating Engineers

12         Local 18S, 101S and 832S, United Steelworkers, IUE- CWA

13        17 State Street

14        4th Floor

15        New York, NY 10004

16

17   BY:  BARBARA S. MEHLSACK, ESQ.

18

19   HISCOCK & BARCLAYS

20        Attorneys for The Schaeffer Group

21        One Park Place

22        300 South State Street

23        Syracuse, NY 13202

24

25   BY:  SUSAN R. KATZOFF, ESQ.

14

1

2    KELLEY DRYE & WARREN LLP

3        Attorneys for Law Debenture Trust Company of New York, as

4         Successor Indenture Trustee

5        101 Park Avenue

6        New York, NY 10178

7

8    BY:  JENNIFER A. CHRISTIAN, ESQ.

9         ROBERT L. LEHANE, ESQ.

10

11   KENNEDY JENNIK AND MURRAY, PC

12       Attorneys for IUE-CWA

13       113 University Place

14       Floor 7

15       New York, NY 10003

16

17   BY:  THOMAS M. KENNEDY, ESQ.

18        JOHN HOFFMAN, ESQ.

19

20   KIRKLAND & ELLIS LLP

21       Citigroup Center

22       153 East 53rd Street

23       New York, NY 10022

24

25   BY:  MARC A. LEWINSTEIN, ESQ.

15

1

2      KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP

3            Attorneys for Manufactures Traders & Trust

4            260 South Broad Street

5            Philadelphia, PA 19102

6

7      BY:  BRIAN CROWLEY, ESQ.

8

9      LATHAM & WATKINS LLP

10           Attorneys for GE Capital Corp.

11           Sears Tower

12           Suite 5800

13           233 South Wacker Drive

14           Chicago, IL 60606

15

16     BY:  DOUGLAS BACON, ESQ.

17

18     LAW OFFICES OF OLIVER ADDISON PARKER

19           Attorney Pro Se

20           4900 North Ocean Blvd.

21           Suite 421

22           Lauderdale By the Sea, FL 33308

23

24     BY:  OLIVER A. PARKER, ESQ.

25

16

```
 1
 2    MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
 3         Attorneys for Henry Case Class Plaintiffs
 4         1350 Broadway
 5         Suite 501
 6         New York, NY 10018
 7
 8    BY:  EDWARD J. LOBELLO, ESQ.
 9         HANAN KOLKO, ESQ.
10
11    N.W. BERNSTEIN & ASSOCIATES, LLC
12         Attorneys for Environmental Conservation and Chemical
13         Corporation Site Trust Fund
14         800 Westchester Avenue
15         Suite N319
16         Rye Brook, NY 10573
17
18    BY:  NORMAN W. BERNSTEIN, ESQ.
19
20    NATIONAL ASSOCIATION OF ATTORNEYS GENERAL
21         2030 M Street, NW
22         8th Floor
23         Washington, DC 20036
24
25    BY:  KAREN CORDRY, ESQ.
```

17

1

2    PUBLIC CITIZEN LITIGATION GROUP

3         Attorneys for Product Liability Claimants:  Center for

4          Auto Safety, Consumer Action, Consumers for Auto

5          Reliability and Safety, National Association of Consumer

6          Advocates, and Public Citizen

7         1600 20th Street NW

8         Washington, DC 20009

9

10   BY:  ADINA H. ROSENBAUM, ESQ.

11        ALLISON M. ZIEVE, ESQ.

12

13   ORRICK, HERRINGTON & SUTCLIFFE LLP

14        Attorneys for GM Unofficial Dealer Committee

15        Columbia Center

16        1152 15th Street, NW

17        Washington, DC 20005

18

19   BY:  RICHARD H. WYRON, ESQ.

20        ROGER FRANKEL, ESQ.

21

22

23

24

25

18

1

2    ORRICK, HERRINGTON & SUTCLIFFE LLP

3         Attorneys for Finmeccenica S.p.A. and Ansaldo Ricercke

4          S.p.A.; Ad Hoc Dealer Committee

5         666 Fifth Avenue

6         New York, NY 10103

7

8    BY:   ROBERT M. ISACKSON, ESQ.

9          ALYSSA D. ENGLUND, ESQ.

10

11   PATTON BOGGS LLP

12        Attorneys for Unofficial Committee of Family Bondholders

13        1185 Avenue of the Americas

14        30th Floor

15        New York, NY 10036

16

17   BY:   MICHAEL P. RICHMAN, ESQ.

18

19   PATTON BOGGS LLP

20        Attorneys for Unofficial Committee of Family Bondholders

21        2550 M Street, NW

22        Washington, DC 20037

23

24   BY:   MARK A. SALZBERG, ESQ.

25

19

1

2    PATTON BOGGS LLP

3         Attorneys for Unofficial Committee of Family Bondholders

4         2001 Ross Avenue

5         Suite 3000

6         Dallas, TX 75201

7

8    BY:  JAMES CHADWICK, ESQ.

9         (TELEPHONICALLY)

10

11   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

12        Attorneys for Ad Hoc Bondholders Group

13        1285 Avenue of the Americas

14        New York, NY 10019

15

16   BY:  ANDREW N. ROSENBERG, ESQ.

17        JONATHAN KOEVARY, ESQ. (TELEPHONICALLY)

18

19   PENSION BENEFIT GUARANTY CORPORATION

20        United States Government Agency

21        1200 K Street NW

22        Washington, DC 20005

23

24   BY:  MICHAEL A. MARICCO, ESQ.

25        ANDREA WONG, Assistant Chief Counsel

20

1

2    ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.

3         Attorneys for Greater New York Automobile Dealers

4          Association

5         1345 Avenue of the Americas

6         New York, NY 10105

7

8    BY:  RUSSELL P. MCRORY, ESQ.

9

10   ROBINSON WATERS & O'DORISIO, PC

11        Attorneys for Environmental Testing Corporation

12        1099 18th Street

13        Suite 2600

14        Denver, CO 80202

15

16   BY:  ANTHONY L. LEFFERT, ESQ.

17

18   SCHNADER HARRISON SEGAL & LEWIS LLP

19        Attorneys for Ad Hoc Committee Consumer Victims

20        1600 Market Street

21        Suite 3600

22        Philadelphia, PA 19103

23

24   BY:  BARRY E. BRESSLER, ESQ.

25

21

1

2     SCHNADER HARRISON SEGAL & LEWIS LLP

3          Attorneys for Ad Hoc Committee Consumer Victims

4          824 North Market Street

5          Suite 1001

6          Wilmington, DE 19801

7

8     BY:  RICHARD A. BARKASY, ESQ.

9

10    STATE OF MICHIGAN

11         Office of the State Attorney General

12         G. Mennen Williams Building

13         525 West Ottawa Street

14         6th Floor

15         Lansing, MI 48909

16

17    BY:  CELESTE R. GILL, Assistant Attorney General

18

19    STATE OF NEW YORK

20         Office of the Attorney General

21         The Capitol

22         Albany, NY 12224

23

24    BY:  MAUREEN F. LEARY, Assistant Attorney General

25

22

1

2    STATE OF NEW YORK

3        Office of the Attorney General

4        120 Broadway

5        New York, NY 10271

6

7    BY:  KATHERINE KENNEDY, Special Deputy Attorney General

8

9    STEMBERG FEINSTEIN DOYLE & PAYNE, LLC

10        Attorneys for Class Representatives in Henry Case

11        1007 Mt. Royal Blvd.

12        Pittsburgh, PA 15223

13

14    BY:  WILLIAM T. PAYNE, ESQ.

15

16    STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

17        Attorneys for Ad Hoc Committee of Unsecured Creditors

18        2323 Bryan Street

19        Suite 2200

20        Dallas, TX 75201

21

22    BY:  SANDER L. ESSERMAN, ESQ.)

23

24

25

23

1

2    VEDDER PRICE P.C.

3        Attorneys for Export Development Canada

4        1633 Broadway

5        47th Floor

6        New York, NY 10019

7

8    BY:  MICHAEL L. SCHEIN, ESQ.

9

10   WILMER CURLER PICKERING HALE AND DORR LLP

11       Attorneys for Pension Benefit Guaranty Corporation

12       399 Park Avenue

13       New York, NY 10022

14

15   BY:  PHILIP D. ANKER, ESQ.

16

17   WINDELS MARK LANE & MITTENDORF, LLP

18       Attorneys for Lloyd Good; Plastic Omanna et al.;

19        Progressive Stamping Company; Morgan Adhesives Co. d/b/a

20        MACTAC; Western Flyer Express

21       156 West 56th Street

22       New York, NY 10019

23

24   BY:  LESLIE S. BARR, ESQ.

25

24

```
 1
 2    TELEPHONIC APPEARANCES:
 3    ALLARD & FISH, P.C.
 4         Attorneys for Creditor Severstal North America, Inc.
 5         535 Griswold
 6         Suite 2600
 7         Detroit, MI 48226
 8
 9    BY:  DEBORAH L. FISH, ESQ.
10         (TELEPHONICALLY)
11
12    ARNALL GOLDEN & GREGORY LLP
13         Attorneys for Verizon Communications
14         171 17TH Street NW
15         Suite 1200
16         Atlanta, GA 30363
17
18    BY:  DARRYL S. LADDIN, ESQ.
19         FRANK N. WHITE, ESQ.
20         (TELEPHONICALLY)
21
22
23
24
25
```

25

1

2    ATTORNEY GENERAL'S OFFICE, STATE OF CALIFORNIA

3         Attorneys for State of California

4         California Dept. of Justice

5         P.O. Box 744255

6         Sacramento, CA 94244

7

8    BY:  MARGARITA PACFILLA, ESQ.

9         (TELEPHONICALLY)

10

11   ATTORNEY GENERAL'S OFFICE, STATE OF ILLINOIS

12        Attorneys for State of Illinois

13        100 West Randolph Street

14        Chicago, IL 60601

15

16   BY:  JAMES NEWBOLD, ESQ.

17        (TELEPHONICALLY)

18

19

20

21

22

23

24

25

26

1

2    ATTORNEY GENERAL'S OFFICE, STATE OF MICHIGAN

3         State of Michigan Department of Treasury

4         G. Mennen Williams Building

5         7th Floor

6         525 West Ottawa Street

7         Lansing, MI 48909

8

9    BY:   JULIUS O. CURTING, ESQ.

10         (TELEPHONICALLY)

11

12   ATTORNEY GENERAL'S OFFICE, STATE OF NEW JERSEY

13         Attorneys for State of New Jersey Department of

14          Environmental Protection Agency

15         Richard J. Hughes Justice Complex

16         8th Floor, West Wing

17         25 Market Street

18         Trenton, NJ 08625

19

20   BY:   RACHEL LEHR, ESQ.

21         (TELEPHONICALLY)

22

23

24

25

27

1

2    ATTORNEY GENERAL'S OFFICE, STATE OF TENNESSEE

3         Attorneys for Tennessee Department of Revenue

4         Office of the Attorney General

5         P.O. Box 20207

6         Nashville, TN 37202

7

8    BY:   MARVIN CLEMENTS, ESQ.

9          (TELEPHONICALLY)

10

11   ATTORNEY GENERAL'S OFFICE, STATE OF TEXAS

12        Attorneys for Texas Department of Transportation Motor

13         Vehicle Division

14        300 West 15th Street

15        Austin, TX 78701

16

17   BY:   HAL F. MORRIS, ESQ.

18         RON DEL VENTO, ESQ.

19         (TELEPHONICALLY)

20

21

22

23

24

25

28

1

2    DAVIS POLK & WARDWELL

3        Attorneys for Interested Party Ford Motor Company

4        450 Lexington Avenue

5        New York, NY 10017

6

7    BY:   BRIAN M. RESNICK, ESQ.

8        (TELEPHONICALLY)

9

10   DLA PIPER LLP U.S.

11       Attorneys for Creditor Hewlett Packard

12       550 South Hope Street

13       Suite 2300

14       Los Angeles, CA 90071

15

16   BY:   KAROL K. DENNISTON, ESQ.

17       (TELEPHONICALLY)

18

19

20

21

22

23

24

25

29

1

2    FOLEY & LARDNER LLP

3         Attorneys for Toyota Motor Corp.

4         One Detroit Center

5         500 Woodward Avenue

6         Suite 2700

7         Detroit, MI 48226

8

9    BY:   KATHERINE R. CALANESE, ESQ.

10        JOHN A. SIMON, ESQ.

11        (TELEPHONICALLY)

12

13   FOLEY & LARDNER LLP

14        Attorneys for Toyota Motor Corp.

15        407 West Broadway

16        Suite 2100

17        San Diego, CA 92101

18

19   BY:   MATTHEW J. RIOPELLE, ESQ.

20        (TELEPHONICALLY)

21

22

23

24

25

30

1

2     FREEBORN & PETERS LLP

3          Attorneys for Trico Products & PGW LLC

4          311 South Wacker Drive

5          Suite 3000

6          Chicago, IL 620606

7

8     BY:  THOMAS R. FAWKES, ESQ.

9          (TELEPHONICALLY)

10

11    FROST BROWN TODD LLC

12         Lexington Financial Center

13         250 West Main

14         Suite 2800

15         Lexington, KY 40507

16

17    BY:  ROBERT V. SARTIN, ESQ.

18         (TELEPHONICALLY)

19

20

21

22

23

24

25

31

1

2      FULBRIGHT & JAWORSKI L.L.P

3           Attorneys for Bell Atlantic

4           2200 Ross Avenue

5           Suite 2800

6           Dallas, TX 75201

7

8      BY:  ELIZABETH N. BOYDSTON, ESQ.

9           (TELEPHONICALLY)

10

11

12     GOULSTON & STORRS P.C.

13          Attorneys for Creditor 767 Fifth Partners, LLC

14          400 Atlantic Avenue

15          Boston, MA 02110

16

17     BY:  DOUGLAS B. ROSNER, ESQ.

18          (TELEPHONICALLY)

19

20

21

22

23

24

25

32

1

2    HANGLEY ARONCHICK SEGAL & PUDLIN

3        Attorneys for NCR Corporation

4        One Logan Square

5        18th & Cherry Streets

6        27th Floor

7        Philadelphia, PA 19103

8

9    BY:   MATTHEW A. HAMERMESH, ESQ.

10       (TELEPHONICALLY)

11

12   KEMP KLEIN LAW FIRM

13       Attorneys for Custom Automotive Services, Inc.

14       201 West Big Beaver Road

15       Suite 600

16       Troy, MI 48084

17

18   BY:   GLORIA M. CHON, ESQ.

19       (TELEPHONICALLY)

20

21

22

23

24

25

33

```
1
2    MASTROMARCO FIRM
3         Attorneys for Gerald Haynor, Interested Party
4         1024 North Michigan Avenue
5         Saginaw, MI 48602
6
7    BY:  VICTOR MASTROMARCO, ESQ.
8         (TELEPHONICALLY)
9
10   MCDONALD HOPKINS CO., LPA
11        Attorneys for Swegalok Company
12        39533 Woodward Avenue
13        Bloomfield Hills, MI 48304
14
15   BY:  JAYSON B. RUFF, ESQ.
16        (TELEPHONICALLY)
17
18   MCNAMEE, LOCHNER, TITUS & WILLIAMS, PC
19        Attorneys for The Saint Regis Mohawk Tribe
20        677 Broadway
21        Albany, NY 12201
22
23   BY:  JACOB F. LAMME, ESQ.
24        (TELEPHONICALLY)
25
```

34

1

2     MILLER, CANFIELD, PADOCK AND STONE, P.L.C.

3          Attorneys for Creditor Ford Motor Company

4          150 West Jefferson

5          Suite 2500

6          Detroit, MI 48226

7

8     BY:  MARC N. SWANSON, ESQ.

9          (TELEPHONICALLY)

10

11    MORRIS JAMES LLP

12         Attorneys for Monster Worldwide

13         500 Delaware Avenue

14         Suite 1500

15         Wilmington, DE 19801

16

17    BY:  CARL N. KUNZ, III, ESQ.

18         (TELEPHONICALLY)

19

20

21

22

23

24

25

35

1

2    OFFICE OF SANTA CLARA COUNTY COUNSEL

3          Attorneys for County of Santa Clara Tax Collector

4          70 West Hedding Street

5          9th Floor, East Wing

6          San Jose, CA 95110

7

8    BY:   NEYSA A. FIGOR, ESQ.

9          (TELEPHONICALLY)

10

11   OHIO ATTORNEY GENERAL'S OFFICE

12          Attorneys for State of Ohio

13          State Office Tower

14          30 East Broad Street

15          17th Floor

16          Columbus, OH 43215

17

18   BY:   LUCAS C. WARD, ESQ.

19          (TELEPHONICALLY)

20

21

22

23

24

25

36

```
 1

 2     PEPPER HAMILTON LLP

 3          Attorneys for Creditor SKF USA Inc.

 4          400 Berwyn Park

 5          899 Cassatt Road

 6          Berwyn, PA 19312

 7

 8     BY:  HENRY J. JAFFE, ESQ.

 9          (TELEPHONICALLY)

10

11     PERDUE, BRANDON, FIELDER, COLLINS & MOTT LLP

12          Attorneys for Arlington ISD et al.

13          4025 South Woodland Park Boulevard

14          Suite 300

15          Arlington, TX 76013

16

17     BY:  ELIZABETH BANDA, ESQ.

18          (TELEPHONICALLY)

19

20

21

22

23

24

25
```

37

1

2     ROTH & DEMPSEY P.C.

3          Attorneys for Burton Taft

4          436 Jefferson Avenue

5          Scranton, PA 18510

6

7     BY:   MICHAEL G. GALLACHER, ESQ.

8          (TELEPHONICALLY)

9

10    SCHIFF HARDIN LLP

11         Attorneys for Columbia Gas of Ohio; Columbia Gas of

12         Virginia

13         233 South Wacker Drive

14         Suite 6600

15         Chicago, IL 60606

16

17    BY:   JASON TORF, ESQ.

18         (TELEPHONICALLY)

19

20

21

22

23

24

25

38

1

2      SINGER & LEVICK, P.C.

3           Attorneys for ACS Affiliated Computers Services, Inc.

4           16200 Addison Road

5           Suite 140

6           Addison, TX 75001

7

8      BY:  LARRY A. LEVICK, ESQ.

9           (TELEPHONICALLY)

10

11     WOLFSON BOLTON PLLC

12          Attorneys for Guardian Industries

13          3150 Livernois

14          Suite 275

15          Troy, MI 48084

16

17     BY:  SCOTT A. WOLFSON, ESQ.

18          (TELEPHONICALLY)

19

20

21

22

23

24

25

39

1                    P R O C E E D I N G S

2            THE COURT:  Good morning, folks.

3            MR. MILLER:  Good morning.

4            THE COURT:  Have seats, everybody.  Come on up,

5    please.

6            MR. WEISS:  Good morning, Your Honor.  Robert Weiss

7    of Honigman Miller Schwartz & Cohen, special counsel for

8    General Motors Corporation.

9            THE COURT:  Right, Mr. Weiss.

10           MR. WEISS:  When we ended last evening, I indicated

11   that we had arrived upon a stipulation order resolving

12   objection to sale motion with regard to GECC and some equipment

13   leases that are critical to the sale of the company should it

14   proceed based upon this Court's order.

15           I'm pleased to advise the Court that we have come to

16   a final resolution in the form of a stipulation and order

17   resolving objection to sale motion.  We have consulted with

18   counsel for the creditors' committee whose input is

19   incorporated within the final terms of the stipulation.

20           Your Honor, just very briefly, if I may, the subject

21   of the leases are very substantial equipment for both

22   manufacturing and assembly that's included in a number of

23   different General Motors facilities.  The stipulation is only

24   effective if the Court approves the sale and the sale closes.

25   In that period of time, the debtor has not yet elected whether

40

1    it will assume or reject these leases.  This stipulation

2    permits the use of this equipment post closing in the period

3    before a decision is made as to whether to assume and assign or

4    reject these leases.  All rights and interests of the parties

5    are protected and we believe that this is a stipulation that is

6    very much in the interest of both constituents.  I would ask

7    that the Court approve it.

8            THE COURT:  Okay, Mr. Weiss.  Anybody else want to

9    comment?  Mr. Schmidt, creditors' committee?

10           MR. SCHMIDT:  Good morning, Your Honor.  Robert

11   Schmidt, Kramer Levin, on behalf of the committee.  Your Honor,

12   Mr. Weiss presented the stip to me a little while ago.  He's

13   represented that one of my colleagues has signed off on it.  I

14   have no reason to not believe that but I just want to take a

15   quick look at it and we'll advise the Court at a break.

16           THE COURT:  I'm going to be tied up for the next hour

17   or two --

18           MR. SCHMIDT:  I suspect we'll have plenty of time to

19   read it.

20           THE COURT:  Fair enough.  Mr. Weiss, would it be

21   helpful more than just that?  Would it be necessary -- would

22   you like an order entered on that today assuming the creditors'

23   committee is so (indiscernible)?

24           MR. WEISS:  Yes, we would, Your Honor.  And I can

25   represent to the Court that, as Mr. Bacon can attest to, we had

41

1    a number of different conversations with Adam Rogoff.  And he

2    has, in fact, signed off on the stipulation in the form in

3    which we're going to present it.

4          MR. BACON:  And by email as well.

5          THE COURT:  Sure.  The practical problem that a lot

6    of parties are having in this case is that this is a

7    complicated case.  You can't do it with one lawyer.  And people

8    have to kind of have enough time to talk to each other when

9    they're so busy on other things.

10         MR. WEISS:  Sure.

11         THE COURT:  So that's fine.  Mr. Schmidt, could I

12   simply ask you if either you or Mr. Rogoff or somebody

13   communicate with my chambers perhaps by lunchtime just to give

14   me comfort that you guys are okay with it?

15         MR. SCHMIDT:  Absolutely, Your Honor.

16         THE COURT:  Thank you.  Thank you.

17         MR. WEISS:  Your Honor, shall I --

18         THE COURT:  Yes, Mr. Weiss?

19         MR. WEISS:  Would you like me to present to the Court

20   a copy of the stip and order at this time?

21         THE COURT:  Well, actually, giving it to me is not

22   going to be that helpful right now.  So, yeah, you can give it

23   to me but I won't really be able to look at it until next

24   recess at the earliest or maybe after we're done today.

25         MR. WEISS:  May I approach the bench?

42

1          THE COURT:  Oh, sure.  Sure.  Thank you.

2          MR. WEISS:  So just so I understand, assuming that

3     the creditors' committee confirms that the form of the order is

4     satisfactory to them, we need to appear before the Court again

5     on this matter?

6          THE COURT:  I wouldn't think you need to.

7          MR. WEISS:  Okay.  Thank you, Your Honor.

8          MR. SCHMIDT:  Thank you, Your Honor.

9          THE COURT:  Thank you.  Do we have other housekeeping

10    matters before -- yes?

11         MR. WARREN:  Good morning, Your Honor.  Irwin Warren,

12    Weil Gotshal & Manges, for the debtors.  Two housekeeping

13    matters.  On the record yesterday, I believe it was, there was

14    discussion about provisions of the loan security agreement

15    between the Treasury and the debtors, in particular with

16    respect to the question of what collateral did or did not have

17    liens.  Going to Mr. Parker's question, we advised the Court we

18    would provide a letter with the relevant sections.  And if I

19    may hand that up to Your Honor, we have done that.  We've

20    provided it to Mr. Parker and to all other counsel for the

21    objectors.  The particularly important provision is the

22    exclusion of collateral which is in here and the definition of

23    excluded collateral basically says it's any property to the

24    extent that the grant of a lien on it would give rise to a lien

25    under any other document.  So it's sort of elegant in its

43

1    simplicity of addressing the question of whether a lien has

2    been granted.  If it would grant a lien and it would have done

3    what Mr. Parker says, the government doesn't have it.

4            If I may hand up that letter?

5            THE COURT:  Yes, Mr. Warren.  Thank you.

6            MR. WARREN:  The second housekeeping matter, Your

7    Honor, is Mr. Bressler had indicated that rather than putting a

8    witness on for certain of the questioning, he would designate

9    certain testimony from the depositions and Your Honor had said

10   we should counter designate by this morning.  The IUE also

11   chose to designate not just with respect to Mr. Henderson but

12   with respect to Mr. Raleigh.  We have put together our counter

13   designations.  Those will be filed but Your Honor had asked

14   that marked copies of the transcripts be provided color-coded

15   to indicate who are the objectors.

16           THE COURT:  I say color coded.  I simply meant so

17   that I could tell whose is what.

18           MR. WARREN:  We figured the easiest --

19           THE COURT:  Black and white, that's equally

20   satisfactory.

21           MR. WARREN:  We thought color might work.  We have

22   taken the liberty of taking all of the objectors designations

23   and put them in yellow.  Ours are in pink.  And if I may hand

24   those up to Your Honor, these are the Henderson and Raleigh

25   transcripts.  Hopefully, this will be of assistance.

44

1          THE COURT:  Okay.  And I assume all of your opponents

2     also have.

3          MR. WARREN:  Yes.  They all have been provided copies

4     and they'll have the designations which are filed.  Thank you,

5     Your Honor.

6          THE COURT:  Thank you, Mr. Warren.

7          MR. JONES:  Sorry, Your Honor.  Very quickly.  David

8     Jones.

9          THE COURT:  Mr. Jones?

10          MR. JONES:  Let me note that on the Wilson

11     designations, we're in the process of doing the same thing.  We

12     don't have it in hand yet.  The designations are filed and

13     we'll provide it as soon as possible.

14          THE COURT:  Okay.

15          MR. LEHANE:  Good morning, Your Honor.  Robert

16     LeHane, Kelly Drye & Warren, on behalf of the debtors' landlord

17     and its Roanoke, Texas distribution facility.

18          THE COURT:  Good morning, Mr. LeHane.

19          MR. LEHANE:  Your Honor, we filed a limited objection

20     that raised three issues:  cure, adequate assurance and the

21     debtors' ability to remain in the premises prior to a

22     designation of the lease.  The parties have, we believe,

23     arrived at a business decision, a business settlement.  There's

24     a lease amendment that has yet to be executed.  But the

25     settlement involves the debtor confirming for the record, one

45

1     of the issues raised in the adequate assurance objection.  Your

2     Honor, the debtors agreed to assume the lease and assume the

3     lease at closing and that in connection with the assumption of

4     the lease, the debtor agrees that it will assume all of the

5     obligations to indemnify the landlord whether or not those

6     relate to incidents that may have occurred pre-closing or pre-

7     petition.  The debtors also agreed to pay all tax obligations

8     under the lease.  Specifically, in Texas, the real estate taxes

9     are billed at the end of the year and they may relate to

10    periods pre-petition and pre-closing and the debtors agreed

11    that it would confirm for the record that it has agreed to

12    assume all of those obligations.  If debtors' counsel would

13    simply confirm that for the record, we can --

14         THE COURT:  Okay.  Anybody have any problems with

15    what Mr. LeHane said.  Mr. Smolinsky?

16         MR. SMOLINSKY:  Good morning, Your Honor.  Joe

17    Smolinsky, Weil Gotshal & Manges for the debtors.  Your Honor,

18    we have a number of contract resolutions, of cure disputes,

19    that are on the calendar today.  We were hoping to do it in a

20    streamline fashion, so as not to cause a stampede, one at a

21    time.  We are in the process of working out with LBA the terms

22    of a modified lease amendment.  I think the statements that

23    were made are accurate to the extent that there's an unknown

24    indemnity event that occurs prior to closing that that -- to

25    the extent it's covered any indemnity agreement under the

46

1    lease, the purchaser is assuming that liability.

2           I didn't want to upset the flow of this hearing

3    today.  And to the extent that we want to deal with these

4    issues now or deal with them later, we can.

5           THE COURT:  You know, you're reading my mind, Mr.

6    Smolinsky.  And, frankly, I didn't know what Mr. LeHane was

7    coming up to say.  That's fine, Mr. LeHane.  I think you've got

8    it done, though.  But, folks, what we have here now, which is

9    what appears to be a line of people who want to get up on

10   relatively minor matters, important to you all, of course, but

11   smaller in the scheme of things, it raises the risk of really

12   spiraling out of control and undercutting, if not undoing,

13   everything I've been trying to accomplish in the last couple of

14   days in terms of triaging these matters and dealing with the

15   most important issues first.

16          Unless there are any other things of major

17   importance, such as modifying any of the arguments that I've

18   already heard, I'm going to ask all of the people who are on

19   line to speak to sit down until I can hear from Mr. Richman and

20   Mr. Parker and reply by the movants.  And then rest assured

21   that before I leave today, we will have dealt with everybody.

22   Okay, folks.

23          MR. SMOLINSKY:  And, Your Honor, I think I could

24   later present a streamlined approach to the cure objections so

25   that we can make sure we cover everybody's concerns in the

47

1    fastest possible way.

2           THE COURT:  Sure.  Thank you, Mr. Smolinsky.

3           MR. SMOLINSKY:  Thank you.

4           THE COURT:  All right.  Mr. Richman, I think you're

5    up.

6           MR. RICHMAN:  Good morning, Your Honor.  Your Honor,

7    Michael Richman, Patton Boggs, for the unofficial committee of

8    family and dissident GM bondholders.  Your Honor, our principal

9    argument, which I'm going to focus on this morning, is that the

10   debtors have not satisfied their burdens to demonstrate the

11   right to use Section 363 to effectuate a sale of substantially

12   all their assets in the first month of the case.

13          After the briefing and the evidence, a related and

14   central question that seems to be unique to this case is where

15   the government seeks to rescue a failing company through a

16   corporate restructuring under Chapter 11 of the Bankruptcy Code

17   may have circumvent the Code's various creditors' rights and

18   protections by labeling its restructuring a sale and then

19   conditioning its rescue on a quick sale to itself.

20          We understand the argument that but for the

21   government's rescue effort, we and many other stakeholders

22   would have nothing.  And so, we should be grateful for

23   receiving anything.  But that is not the way that bondholders

24   and other creditors and stakeholders look at what is being

25   proposed.  Instead they ask why is a financial rescue under

48

1   Chapter 11 not according equal and ratable treatment to

2   different groups of claimants whose claims are legally similar.

3   They do not understand how our legal system can permit the

4   government to resort to Chapter 11 and yet choose to favor some

5   constituencies over others.

6        The government's answer is that it is purchasing the

7   best assets under Section 363.  So it has the right to take

8   what it wants, leave what it doesn't want and make special

9   deals by allocating its equity in order to take care of the

10  constituencies that it needs to operate the new company.  The

11  new company doesn't need the old company's bondholders.  It

12  doesn't need or want a lot of other things.  Provisions of

13  Chapter 11 that might require a restructuring to recognize that

14  the value of New GM belongs to all of Old GM and its estates to

15  be allocated in a more equal and ratable way are simply

16  inconvenient.

17       The debtors argue that this Court has the power to

18  authorize this transaction if it finds that there is an

19  articulated business justification.  The business judgment must

20  be reasonable and the purchaser must have good faith.  This

21  derives from Lionel and its progeny.

22       But, Your Honor, I submit that assumes a genuine

23  sale.  That assumes independence between a purchaser and a

24  seller.  That assumes that a debtor has a real choice other

25  than to bend to the will of its lender and its purchaser

49

1    whereas here, the record shows an utter dominance of the

2    debtors including the fact that the principal negotiators for

3    the debtors are also to be the principal managers of the new GM

4    negotiating with the owner of New GM, the protestations of

5    arm's length negotiations and good faith are simply irrelevant.

6    The absence of real choice and the dominance of the government

7    creates an environment unique in this case in which those

8    factors that are required for a 363 sale cannot credibly exist.

9         Indeed, the testimony was that the sale price was not

10   so much negotiated as derived on the basis of asset values, but

11   was rather derived on the basis of the minimum amounts needed

12   to settle the claims of the favored constituencies.  That this

13   later turned out to be supported by a fairness opinion is

14   irrelevant to the fact that it wasn't negotiated as any real

15   sale of assets would be.  Your Honor asked yesterday why there

16   was a fairness opinion at all if there were no other bidders.

17   It's clear from the response that the fairness opinion and the

18   liquidation analysis was window dressing for the board, and

19   maybe for the Court.

20        In this case, no one came to the company offering to

21   buy any assets.  The government came to GM with financial

22   rescue, not to buy assets.  The government then came up with a

23   restructuring plan with union and bondholder settlements.  But

24   it concluded that implementing it through a Chapter 11 plan

25   would give rise to potential rights and uncertainties and the

50

1    possibility of longer time than if it could be implemented as a

2    sale.  So they made a conscious strategic decision to label

3    their restructuring a sale and a conscious strategic decision

4    to bypass and circumvent the Chapter 11 plan process.

5         The evidence shows that Treasury's lawyers presented

6    to Treasury alternative means of restructuring the company

7    including through a Chapter 11 plan and that 363 was chosen for

8    strategic purposes.

9         THE COURT:  Pause, please, Mr. Richman. You've been

10   around the block a few times.  To what extent either in this

11   court or Delaware or anywhere else in the country have you ever

12   seen a Chapter 11 case?  Put aside a large one like this, even

13   medium size one, even cases in the fifty million dollar,

14   hundred million dollar range -- that has ever gone from filing

15   to confirmation within a period of ninety days.

16        MR. RICHMAN:  Well, Your Honor, what we mention in

17   the briefs is pre-packs and pre-negotiated plans certainly have

18   been confirmed very rapidly.  And this restructuring plan was

19   fundamentally a pre-negotiated plan.  There were agreements in

20   place with the union, important agreements in place with some

21   of the senior bondholders.  This could have been filed as a

22   pre-negotiated plan and put on an accelerated time frame.

23        Not only that, Your Honor, if the business objective

24   here, both on the --

25        THE COURT:  Pause.  Forgive me.  Can you give me any

51

1    more specificity than that?  Ninety days is a very short time.

2    A pre-negotiated plan, by definition, is, aside from the fact

3    that you haven't solicited your votes from the disclosure yet,

4    I get so-called pre-negotiated plans all the time where there

5    have been pre-negotiated secured debt or with major elements of

6    the unsecured creditor community.  But when they've been filed

7    that way, I can't count the number of times, even in my pre-

8    packs, where one issue or another comes up and -- I'm trying to

9    think of any specific example to any you know which have been

10   able to meet that time frame.  We have testimony, as I

11   understand it, from Mr. Wilson that he had gone to -- and I'll

12   have to look at the record for the number -- any number of

13   people experienced in Chapter 11.  And the view was unanimous,

14   subject to me checking the record, that it would be suicidal to

15   expect it to be completed in that period of time.

16          MR. RICHMAN:  There were two alternatives.  Well,

17   first, let me respond to that, Your Honor.  I have complete

18   confidence that, with the resources available here, that (a)a

19   pre-negotiated plan with the agreements that are in place and

20   sought to be approved with the sale could have been filed on

21   June 1st; and that Your Honor, upon cause shown, would have

22   accelerated the timetable and all of the objections and issues

23   and creditors' rights issues and many of the things that we're

24   hearing today in a truncated way could still be determined by

25   Your Honor, could still be determined on a fast track.  Just

52

1   consider the extraordinary manner in which these hearings have

2   been held in the last couple of days, discovery over the

3   weekend, shortened times for everything.  The same thing could

4   be done in an accelerated plan if the same arguments were being

5   made but creditors' rights would be accorded to that.

6        I can't tell you standing here right now of a

7   specific case where I know that that was done.  Honestly, I

8   haven't had time to look for that.  We did cite cases where the

9   record showed confirmation within so many days of filing all of

10  which were within thirty, sixty, ninety days, some of which

11  were a couple of days.  Most of those were pre-packs; some were

12  pre-nego -- I believe some were pre-negotiated plans.  I'd have

13  to check and we could submit something afterwards, if Your

14  Honor wishes.

15       But the other thing that I think is a useful response

16  to Your Honor, if the goal here that everybody says they want

17  is to create spinoff New GM, and it has to be done quickly

18  because that'll get it out of the bankruptcy environment and

19  allow public to understand that there's a new GM in place, that

20  could have been done without allocating the equity.  The

21  company could have spun off the assets into a New GM.  It could

22  do so today.  It could do so under 363.  But it could retain

23  the equity so that all the equity -- all the interest holders

24  in this case would still have a stake in it and that equity

25  allocation could then be done later pursuant to a plan so that

53

1   full creditors' rights are protected.  And that would achieve

2   all of the objectives that the government and the debtors claim

3   that they have to achieve.  It would be outside the bankruptcy

4   environment but instead of the government holding the equity

5   and determining how it gets allocated, the debtors would hold

6   the equity until a plan could determine how it should be

7   allocated.

8         Your Honor, the evidence shows that Treasury's

9   lawyers presented various alternative means of effectuating the

10  restructuring including through a plan and that 363 was a

11  deliberate strategic choice.  It was only at that time, after

12  they decided to effectuate the restructuring through 363, that

13  the format of a sale was devised with a shell company and the

14  sale format was plugged in to fit the strategy.  Once Treasury

15  mandated a restructuring using a 363 sale strategy, the script

16  was written in order to make that work.  The company and its

17  advisors analyzed only two options:  the sale or a liquidation.

18  They conspicuously failed to analyze or to present to the board

19  the possibility of spinning off GM's best assets to a new GM,

20  as I just indicated, or in an accelerated plan process.

21        The evidence shows that the government decided to use

22  363 not for any goal that a real purchaser would have but as a

23  restructuring tool.  The government doesn't want to buy, own or

24  operate a car company.  That's been said many, many times on

25  the public record.  But if the Court allows this restructuring

54

1    under 363 then the government can take control more easily,

2    quickly and without providing value or distributions of a type

3    or amount that conceivably otherwise would be required in a

4    Chapter 11 plan.

5            It's a good strategy.  We understand why they did it.

6    They have nothing to lose.  They told the public, as did the

7    White House, that they hope to emerge from Chapter 11 in sixty

8    to ninety days.  So if this Court decides that in the unusual

9    circumstances of this case including very distinguishing factor

10   from Chrysler, the absence of any independent third party

11   purchaser whose commercial needs are driving the deadlines, if

12   this Court decides that there is insufficient support under

13   Lionel and Chrysler to restructure under 363, the government

14   and the debtors can easily spin this as a temporary setback but

15   still well within their initial time frames.  This case tests

16   the very meaning of Lionel and its limits.

17           These were the very concerns that the Second Circuit

18   had in articulating the Lionel guidelines, a balancing of

19   tensions between the need to preserve a business and the need

20   to protect creditors' rights.  Lionel gave us six nonexclusive

21   factors for evaluating the propriety of 363 sales to dispose of

22   substantially all of the debtors' assets.  But just before

23   reciting those factors, the Second Circuit cited to the Supreme

24   Court opinion in Committee for Independent Stockholders of TMT

25   Trailer against Anderson for the proposition that, and I quote,

55

1    "The need for expedition is not a justification for abandoning

2    proper standards."  The president of the United States made a

3    similar statement in his inaugural address which we quoted in

4    our brief.  In essence, we should not compromise our principles

5    for the sake of expediency.

6         Then the Second Circuit had to say, in words that

7    apply fully to the situation we face today, and I quote, "A

8    bankruptcy judge must not blindly follow the hue and cry of the

9    most vocal special interest groups; rather, he should consider

10   all salient factors pertaining to the proceeding and,

11   accordingly, act to further the diverse interests of the

12   debtor, creditors and equity holders alike."

13        As the case law has subsequently developed and as

14   reflected in these hearings and the arguments, the criteria

15   considered most important are a sound business judgment and the

16   question whether the assets in question are declining in value.

17   The need to preserve value, particularly where there is

18   evidence of deterioration, is often argued and cited to support

19   unusual speed, particularly when the sale is sought so early in

20   the case as it is here.

21        The only evidence before the Court demonstrates that

22   since filing Chapter 11, GM's assets are not wasting.  They are

23   not deteriorating; they are not melting.  Chapter 11 has

24   apparently, so far, stabilized the company and sales have

25   increased over the pre-bankruptcy period.  Therefore, the

56

1    asserted need to effectuate a new GM very quickly or at least

2    by July 10, is not supported by evidence of declining value.

3    Indeed, it's clear from the testimony of both Mr. Henderson and

4    Mr. Wilson that the debtors' and the government's first day

5    fears about the negative effects that Chapter 11 would have on

6    GM were greatly exaggerated and unsupported at least over the

7    first thirty days.  And we presume over the first sixty to

8    ninety days that they predicted that the case would last and

9    inform the public that the case would last.  What we see in the

10   evidence is that because the parties attempted at all cost to

11   justify the need for a fast track sale, there were a number of

12   conclusory statements and predictions of dire consequences that

13   turned out not to be true.

14          Mr. Henderson's first day affidavit in evidence as

15   Debtors' Exhibit 15 states at paragraph 82 that "The value of

16   and consumer confidence in the GM brand and its products and

17   support systems are fragile and will be subject to significant

18   value erosion unless they are expeditiously transferred to New

19   GM and its operations start fee from the stigma of bankruptcy.

20   Any delay will result in irretrievable revenue perishability

21   and loss of market share to the detriment of all economic

22   interest.  It will exacerbate and entrench consumer resistance

23   to General Motors products."  Mr. Wilson said that his concerns

24   about timing were informed by articles from commentators who

25   predicted GM could not survive Chapter 11.

57

1        But as we have seen from the evidence, these first

2   day predictions turned out not to be true.  It is evidence and

3   not prophecy on which this Court should rely.

4        Though GM's overall financial performance was in

5   decline over a long period of time and clearly it is today on a

6   year-over-year basis below what it was a year ago, it enjoyed

7   improved performance in the first month of bankruptcy over the

8   month of May.  Some of this may be attributable, as Mr.

9   Henderson testified, to the government backstopping of

10  warranties which occurred earlier and independently of any

11  bankruptcy filing.  Some of it may also be attributable to

12  business strategies that Mr. Henderson and his team pursued

13  more recently.  So the assets are not wasting or spoiling or

14  deteriorating.

15       Now, echoing his first day fears when he testified,

16  Mr. Henderson said that he thought one reason why the business

17  was doing better than expected in June was customer expectation

18  that the bankruptcy process would go quickly but he later

19  conceded that that was pure conjecture.  Indeed, it became

20  clear from Mr. Henderson's testimony, as well as Mr. Wilson's,

21  that the fears of business decline that they said motivated

22  their desire for a fast track 363 as distinct from any

23  alternative were based on worries over a prolonged case --

24  "prolonged" was a word in the testimony -- one where the

25  company "languished" in Chapter 11.  Mr. Wilson said Treasury

58

1    was concerned about a "traditional" Chapter 11 process.

2         Mr. Miller spent argument time warning of dire

3    consequences as well, not in the record of evidence but in Mr.

4    Miller's opinion, and concluded with the point that a Delphi-

5    like case would be bad for the business.  That's not really

6    debatable but it's not the point.

7         The debtors argue that this transaction is the only

8    alternative to a liquidation but is it fair to say that there

9    is no viable alternative to a sale where you deliberately limit

10   your alternatives?  I understand an aversion to a traditional

11   plan process.  But here, where there was already the equivalent

12   of a pre-negotiated plan, an accelerated plan process could

13   have been and could yet be attempted.  But no advisors were

14   asked to consider that or value it or present it as an option

15   to the board.  Mr. Repko agreed that the value of a new GM

16   under a plan could be comparable to the value under the 363

17   transaction.

18        Now, Mr. Miller said that our suggestion of a Chapter

19   11 process that could be concluded within ninety days was

20   magical.  Yet, as I indicated before, and I'd be prepared to

21   supplement the record with some further research, we know that

22   many cases with pre-packs and pre-negotiated plans have been

23   completed in that time frame without magic.  And there is no

24   doubt that the debtors and the government have the resources to

25   do that here, to at least try that here.  Perhaps the magic

59

1    that he was referring was making creditor objections disappear.

2    And if that's what he meant, then I agree that you couldn't do

3    that in a plan process.  But this Court could have easily dealt

4    with as easily such issues in an accelerated plan time frame as

5    the Court demonstrated it could do with these hearings

6    especially in an extraordinary case like this.  If there was

7    any magic here, it was the debtors and the government taking a

8    magic wand to a restructuring and saying poof, now you're a

9    sale.  And with that, creditors' rights and plan protections

10   disappeared.

11          Since the evidence does not establish that the

12   business is deteriorating, the debtors' business judgment, if

13   it actually has any judgment of that sort in a case like this,

14   is narrowed to its asserted belief that the business

15   opportunity, if what the government is offering could even be

16   characterized as a business opportunity, is limited and

17   perishable.  The government's offer of financing will expire on

18   July 10.  If the debtors do not comply with the government's

19   dictates, liquidation will inevitably follow.  The important

20   question is whether this Court has any power to disbelieve

21   that.  From the debtors' perspective, we completely understand

22   the argument that they have to try this.  They have to advocate

23   it and believe it.  It's not business judgment, though, because

24   there's no real choice involved.  It's inconceivable that any

25   company would choose to liquidate in the face of such a

60

1    government offer.  Simply inconceivable.  And we're not

2    criticizing the fact that the debtors have chosen this course.

3    And we're not criticizing the fact that they sensibly decided

4    not to liquidate.  We're objecting to the form of the

5    transaction.

6          Even though the debtor had no choice, this Court

7    does.  This Court can look through the form to the substance,

8    through the evidence to the truth and through the magic in

9    order to stand for the Chapter 11 process.

10         Now yesterday, Your Honor commented about our

11   familiar experiences with overbearing lenders.  I believe the

12   comment was that lenders frequently overreach.  In many such

13   situations the debtor, in dire need of financing, is in no

14   position to negotiate effectively.  As here, the debtor is

15   given no real choice.  Where the debtors' will is overborne,

16   the Court can and does step in.  We see that all the time with

17   DIP financing and purchase -- 363 purchase provisions.

18   Desperate debtors agree to things demanded of them because they

19   have to.  But the Courts will not hesitate to push back and

20   tell the lenders, sorry, I'm not approving those provisions.

21         THE COURT:  I've done this a few times, Mr. Richman.

22   When you say we don't hesitate, I think that understates it a

23   little.  Every time a judge rules on a DIP, he's rolling the

24   dice that he's going to crater the whole case if he messes

25   around with economic terms.  If you give them extra time to do

61

1    investigations so they can bring their avoidance actions, we

2    make individualized adjustments as to whether 506(c) labors are

3    appropriate or handing over the proceeds of avoidance actions

4    are appropriate.  But I cannot think of a single time in the

5    nine years I've been on the bench or the nearly four years I've

6    been doing this where I've ever told -- seen a judge tell a

7    lender that he has to agree to different deal terms.

8            MR. RICHMAN:  I wasn't suggesting that, Your -- I

9    actually agree with Your Honor up to that point in the sense I

10   wasn't suggesting that you tell what the deal should be.  But

11   Courts do and Your Honor has pushed back on provisions that

12   Your Honor was being told we're absolutely required by the

13   purchaser with the DIP lender.  And Your Honor has said and

14   other judges have said, I want to prove those even though there

15   was the threat, difficult threat to deal with that the party

16   would walk away because the Court stands for the law and the

17   parties understand that they have to follow those dictates if

18   they want to do a transaction under Chapter 11.  My only point,

19   which I think Your Honor was agreeing with, is that it's not

20   uncommon.  When the debtor doesn't have the ability or leverage

21   or the independence of will to be able to fight back over

22   onerous provisions or even a mandated sale, the Court still has

23   the power and authority to do so.

24           Bankruptcy courts call the bluffs of billing lenders

25   and purchasers all the time.  And that brings me to footnote 15

62

1    of Judge Gonzales' opinion in Chrysler  In Chrysler, as here,

2    the main argument was that the debtor had no viable options but

3    a sale or a liquidation.  Now, in that footnote, the Court

4    commented on a third option raised by dissenting creditors.

5    And I quote:  "Based upon the U.S. government's substantial

6    interest in preserving the automobile industry, jobs and

7    retiree benefits, the intimation is that the government was

8    bluffing when it indicated that it would walk away from

9    exploring other options if the Fiat did not close quickly."

10   The proposed third option is that the debtors could have

11   refused to accede to the government's terms in the hope that

12   the government would capitulate and agree to consider other

13   alternatives.  The Court concludes that gambling on the

14   possibility that the government was bluffing and listing the

15   potential for a lesser recovery in a resulting liquidation

16   would have been a breach of the debtor's fiduciary duty.

17         Judge Gonzales did not, however, say that he or any

18   other judge would be without power to call such a bluff.  We

19   are not challenging the debtors' choice which was a non-choice

20   to proceed with the strategy.  But we do say that in the

21   circumstances of this case, the Court has the power and

22   authority to push back.  Many people say that Chrysler is the

23   blueprint for GM and that the cases are the same.  They are

24   not.  And they are completely distinguishable in the most

25   fundamental of ways.  The deadline pressures in Chrysler were

63

1    in the main driven by the commercial needs of an independent

2    purchaser.  The business opportunity was legitimate, commercial

3    and limited.  By contrast, there is no real purchaser in this

4    case.  The government is not setting any deadlines with

5    reference to commercial exigencies of the automotive

6    marketplace; it has no experience running a car company.  The

7    deadlines were set to support the strategy of a 363

8    restructuring.

9            If you go to a Broadway musical, you expect an

10   orchestra.  For a 363 fast track sale, you need a drop dead

11   date.  It's part of the scenery; part of the show.

12           As distinct from the dissenters in Chrysler, we are

13   not suggesting that the debtor should have refused to attempt

14   the 363 transaction.  We don't see how they could have.  They

15   had no choice.  As the evidence has showed, and as other

16   parties have argued, the principal decision makers and senior

17   management were not acting with any independence.  They were

18   across the table from their new employer.  They were arguing

19   with their new owner.

20           But this Court can push back.  This Court can call

21   the bluff in the overriding interest of upholding the Chapter

22   11 process.  Consider:  the government has repeatedly said it

23   will not allow GM to fail.  It has said it is committed to

24   creating New GM.  It has already invested 19.4 billion dollars

25   pre-petition and perhaps as much as thirty three billion

64

1    dollars including DIP lending.  It told the public it was on a

2    sixty to ninety day track.  Like any powerful lender or

3    purchaser, it says, my way or the highway.

4         Mr. Wilson said that if the sale order was not

5    approved, Treasury would cut its losses.  Now, I submit that

6    Mr. Wilson's credibility was open to question on some points.

7    His demeanor was markedly different from the other witnesses.

8    He's smart enough to know what findings the Court needs to make

9    to approve the transaction and I believe and I submit that he

10   answered some questions in ways designed to serve the end.  For

11   example, he said that his understanding of the term

12   "languishing" meant anything more than thirty to forty days.

13   Most of his testimony was carefully couched in terms of present

14   intentions and beliefs.

15         But while the drop dead threat is out there, there is

16   nothing that binds the government to abandoning GM and the

17   government can and will react to a decision here, a decision of

18   law by this court, in a manner that is both politically and

19   economically sensible.  Their agreement on funding

20   administrative expenses was limited to 950 million dollars.

21   But we heard Mr. Koch testify that he had a feeling or a belief

22   that they would step up and do something more.  It wasn't in

23   writing but there may be a number of unwritten understandings

24   here as part of the strategy of how the parties are going

25   forward.  And the clear impression from the sixty to ninety day

65

1    pronouncements from both GM and the White House is that while

2    Treasury may not be obligated to fund beyond July 10, they will

3    step up and do so if they have to.  They have to threaten to

4    cut off financing.

5         THE COURT:  Pause, please.  Can you repeat that?  And

6    say a little slower.  And if you had a particular reference to

7    something, I ask you to repeat that as well.

8         MR. RICHMAN:  Yes, Your Honor.  I said the clear

9    impression from the sixty to ninety day pronouncements, which

10   we quoted in our brief from the outset of the case, is that

11   while Treasury may not be obligated to fund beyond July 10,

12   they will step up if they have to.  And to expand on that, it's

13   inconceivable to me that the White House press secretary or

14   GM's CEO would be telling the public sixty to ninety days if

15   they didn't have some assurance of financing beyond July 10th.

16        THE COURT:  Okay.  You preceded the words about clear

17   impression.  It's an inference you want me to draw --

18        MR. RICHMAN:  Yes.

19        THE COURT:  -- or, in fact, is it something somebody

20   said?

21        MR. RICHMAN:  That's correct, Your Honor.

22        THE COURT:  Okay.  Continue.

23        MR. RICHMAN:  The government has to threaten to cut

24   off the financing in order to limit the debtors' options and

25   perhaps those of this Court as well.  But I don't think and I

1    don't believe this Court should believe that the government is

2    now going to abandon GM if this Court merely says that the use

3    of 363 is not legally supportable in this case.  Do it another

4    way.  It's not credible to think that the White House will say

5    tomorrow, we've now decided to let GM fail because we don't

6    want to follow the law.  We didn't get our way in court on an

7    attempted fast track sale so we're going to give up --

8    sacrifice three-quarters of our investment and flush GM away

9    and the thousands of jobs with it and the dealer network and

10   the dependent suppliers and so on and so on.  All the same

11   considerations that the debtors have argued are important

12   reasons to approve the transaction are at least equally

13   important reasons why the government will obey the law if Your

14   Honor determines that the law is that 363 can't be used on a

15   fast track under these circumstances.

16        Now, there was a related power or leverage threat

17   that seemed to come through in the hearings, something like an

18   additional drop dead threat that might be added, pressure for

19   approval of the transaction.  And that was the suggestion that

20   the UAW agreements to modify their collective bargaining

21   agreement were in some way conditioned upon and could be

22   rescinded or undone by a failure to approve the sale order by

23   July 10.  And I thought that's what Mr. Curson said in his

24   testimony.

25        Your Honor, we checked the documents that were

67

1    submitted in evidence in the records and we could not find

2    anything in writing in the evidentiary record which conditions

3    the collective bargaining agreements in any way.  And both Mr.

4    Henderson and Wilson testified that those amendments were

5    already in effect and that the amended bargaining agreement is

6    now governing.

7         In particular, we looked at the amendments that the

8    UAW filed.  We just didn't see anything which provided that if

9    the sale order wasn't approved by July 10 that those amendments

10   would be rescinded.

11        Now, the agreement to fund the VEBA, which we ask

12   questions --

13        THE COURT:  Pause, please.  Can you slice and dice

14   that piece of information?  If I heard you right just a second

15   ago, you said by July 10.  Would you mean to include or exclude

16   by that whether you had a view as to whether the union would

17   continue to perform this day to day stuff if it didn't get its

18   VEBA funding, new VEBA funding, one way or another or if you're

19   back to square one?

20        MR. RICHMAN:  I do have a view of that, Your Honor.

21   My view on that is that the collective bargaining agreement is

22   a binding contract.  And it's in effect and it's operative now

23   regardless of what happens to the VEBA at least as I read the

24   record and the evidence.  The VEBA deal, I think, is a separate

25   deal.  And I understand if it is, at least again as I

68

1    understand the record, it makes sense to me because one could

2    argue that the overall settlement in terms of the amendments to

3    the collective bargaining agreement are an asset of the estate

4    and that the VEBA deal is part of a consideration that should

5    actually go to the estate.  But if you keep them legally

6    separate such that the VEBA is not inextricably intertwined

7    then maybe you create a better argument that the VEBA is like

8    the equivalent of giving stock to somebody by the purchaser and

9    isn't really consideration for the modification and then the

10   assumption and assignment of the collective bargaining

11   agreement.

12           THE COURT:  Help me on that a little more, because I

13   thought the duty to the UAW's VEBA was in the ballpark of

14   twenty billion bucks and it was a liability rather than an

15   asset.

16           MR. RICHMAN:  Your Honor, all I can say is we didn't

17   find any linkage that would cause that to fail in any way.  And

18   in any event --

19           THE COURT:  Your basic point is that, if you read the

20   documents, you're questioning whether Mr. Curson's right in his

21   view that he's got a package deal here.

22           MR. RICHMAN:  Exactly.  It goes to the question of

23   whether there's some further dire consequence that Your Honor

24   should consider would result if Your Honor did not approve this

25   transaction by July 10.  And I submit that it's not a dire

69

1   consequence because of the lack of linkage.  And if there's a

2   separate agreement on the VEBA, that separate agreement, I

3   don't know that it's conditioned on a July 10 approval, but

4   presumably that would still be in play for a plan process.

5            THE COURT:  Go on, please.

6            MR. RICHMAN:  As we've seen from the hearings, there

7   are many other questions and issues that a plan process could

8   better address:  Why is the government getting full credit for

9   prepetition loans that could be challenged as equity?  Doesn't

10  that call for more cash to be put into any deal, whether under

11  363 or a plan?  Other counsel have raised serious questions

12  about the bypassing of rights under Section 1114 of the Code

13  and of attempts to shed successor liability.  And we've also

14  raised other arguments in our brief, to which we continue to

15  adhere, including that the transaction should also be rejected

16  as a sub rosa plan.

17           THE COURT:  Okay.  Pause, please.  On the

18  recharacterization point, are you contending that not only the

19  pre-petition secured debt ballpark or nineteen billion bucks --

20  I'd have to check, or maybe it's thirteen billion, I'd have to

21  check the exact figure on that -- should be recharacterized?

22  Are you also contending that the thirty-three billion bucks of

23  U.S. and Canadian DIP financing also has to be recharacterized?

24           MR. RICHMAN:  Only the pre-petition debt, Your Honor.

25  I think that in a case that wasn't moving at quite this

70

1   lightning speed where parties had a real opportunity to

2   negotiate allocations and distributions, that there would be

3   greater focus on the priority of that pre-petition loan as

4   compared to other creditors.  I partic --

5            THE COURT:  But stick with me for a second.  Suppose

6   the U.S. government had only bid thirty-three -- credit bid

7   thirty-three billion instead of fifty-nine billion.  I'm not

8   aware of there being any bids in the wings that could have

9   trumped a credit bid if it was low as thirty-three billion --

10  as low as.

11           MR. RICHMAN:  And we know, we know, as a fact that --

12           THE COURT:  -- as thirty-three billion as well.

13           MR. RICHMAN:  We know as a fact that there weren't.

14  I think that the way I would answer that is if the debtors have

15  produced a fairness opinion that indicates that the fair value

16  for the company is 90 billion dollars or 70 billion dollars,

17  and then you back out 19.4 billion dollars, it suggests that

18  the consideration is short by 19.4 billion dollars and that

19  there either has to be a reallocation of the equity or the

20  infusion of additional funds in order to meet the fair price.

21           But I agree with Your Honor that had this gone

22  differently as a real transaction might have gone -- remember,

23  this wasn't negotiated as a sale of assets.  This was a

24  determination of how much money it would take to reach

25  settlement agreements with the favored constituencies, and

71

1    everything else was backed into that.  And then, so, a price

2    was derived on the back end.

3            We also argued, Your Honor, that the transaction

4    should be rejected as a sub rosa plan.  I'm not going to spend

5    a lot of time on that.  The debtors' answer to that is that it

6    doesn't predetermine a plan because, the way this transaction

7    is designed, the 10 percent of stock and the warrants to

8    acquire another 15 percent and, I guess, the 950 million

9    dollars for administrative expenses is being left behind to be

10   distributed in the normal course.

11           But, Your Honor, if you engage in a transaction which

12   removes from the plan matrix an important class of creditors

13   and give them favored treatment outside of the plan process,

14   that's as much predetermining the plan as leaving them in the

15   plan process.  You are still predetermining and creating the

16   construct of a plan but you're doing it through extra plan

17   provisions.  So I don't think -- just because this doesn't

18   dictate distributions to every class doesn't mean that somehow

19   it's not a sub rosa plan.

20           I want to be clear about an important point, and it's

21   another distinction from the Chrysler case, particularly in

22   respect of parties who stand in the position of bondholders, as

23   our clients do.  We've never argued, and we don't contend, that

24   GM should liquidate.  We support the creation of a New GM.  We

25   think it's a fine idea and we defer to the collective judgment

72

1      of the professional advisors on that issue.

2              And we appreciate that GM would already be liquidated

3      if the government had not come in late last year to provide

4      financing that no one else could provide.  We wouldn't be here

5      discussing this today if the government wasn't committed to

6      saving GM.  But that does not earn the government an exemption

7      from the law.  Our gratitude to the government rescue does not

8      include sacrificing our legal principles.  Perhaps the

9      government could nationalize GM, and we would all be left with

10     nothing, but they chose Chapter 11.  And once you choose

11     Chapter 11, you should comply with all of Chapter 11.  The

12     government should not be permitted to cherry-pick which

13     provisions of Chapter 11 it will use and which it will not use.

14             Right now, the value of New GM rightfully belongs to

15     the estates and all of its creditors.  New companies are spun

16     off through Chapter 11 reorganizations all the time.  In that

17     normal process, all of the major constituencies participate in

18     negotiations concerning overall value and allocations of that

19     value.  The final results are accompanied by full disclosure.

20     Parties-in-interest have protection against oppressive results

21     through Section 1129.  These negotiations would determine how

22     much equity in New GM the Old GM should award to the government

23     or the union or to other parties.  That's the essence of the

24     Congressionally-mandated corporate reorganization process of

25     Chapter 11.

1          By taking what would otherwise be a deliberative

2     reorganization involving all major parties on an accelerated

3     basis and calling it a sale that must be completed by June 10

4     to avoid dire consequences, the debtors and the other favored

5     parties in the allocation of values are engaged in a fiction,

6     in a pretext, in a subterfuge to avoid a plan process in which

7     the allocations of value might be determined differently.

8          We get their arguments.  If you accept that this

9     transaction is a legitimate sale, then of course the purchaser

10    can choose to divide up the ownership any way it likes.  And

11    therefore, of course, its arrangement with the UAW and the

12    Canadian and Ontario governments, parties who are providing

13    unique present and future value to the new business, is its

14    prerogative.  But if it's not a legitimate sale, or if the

15    other tests of 363 are not met, then these important allocation

16    decisions would not be the purchaser's to make.

17         If this Court does not have the freedom to push back,

18    if any distressed company can be diverted into Section 363 in

19    order to avoid plan confirmation requirements by overbearing

20    lenders or purchasers setting arbitrary deadlines or, more

21    importantly for the facts of this case, by an overbearing

22    government, then the Court does not truly have discretion.

23         We have seen before in our history how in times of

24    stress and extraordinary circumstances government asserts

25    itself on more grand and powerful scales than before.  In

74

1    substance, this appears to be an historic first attempt at a

2    Chapter 11 nationalization.  GM has no ability to resist that

3    power.  In our system of government, it is the judicial system

4    which is the primary check on that power.  This Court can and

5    should draw the line and hold that this transaction goes too

6    far.  Doing so is consistent with Lionel and with Chrysler.

7    Such a holding which recognizes the important distinctions

8    between this and every case that has gone before sends a

9    powerful message that even in the bankruptcy courts of the

10   nation's commercial capitol there are limits and that due

11   process and creditors' rights are important values not to be

12   sacrificed in the interest of expediency.  Thank you, Your

13   Honor.

14          THE COURT:  Thank you.  Thank you, Mr. Richman.

15          All right, Mr. Parker, I'll hear from you.  Mr.

16   Parker, on anything that Mr. Richman addressed, I'll ask you to

17   limit yourself to anything where you think Mr. Richman failed

18   to do an adequate job.

19          MR. PARKER:  Okay, Your Honor.  If I may, may I begin

20   by asking the Court to -- for time reasons, and because I think

21   certain things have been adequately argued already, I'm not

22   going to argue some points that I've raised in my objections,

23   but I'd like to preserve those points.

24          THE COURT:  Of course.  Anything anybody said in a

25   brief or in a pleading is deemed to have been asserted.  I

75

1    mean, the purpose of oral argument, in my court, is not to

2    repeat or to have to say again what you said in your papers.

3    It's to give me orally anything which helps me better

4    understand the papers or answer things where you're plugging

5    the holes.

6              MR. PARKER:  Okay.  So I'm not waiving anything, any

7    points --

8              THE COURT:  Right.

9              MR. PARKER:  -- by not mentioning it.

10             THE COURT:  That's what I said.

11             MR. PARKER:  I know, I'm just clarifying for myself.

12   I'd also like to also incorporate by reference the arguments of

13   Mr. Kennedy and of --

14             THE COURT:  To the extent you need to, it's done.

15             MR. PARKER:  Okay, and also my immediate predecessor

16   up here.

17             THE COURT:  Same.

18             UNIDENTIFIED SPEAKER:  Mr. Richman.

19             MR. PARKER:  Mr. Richman, right.

20             Thank you, Your Honor.  Your Honor, basically I want

21   to address four points, if I may, four points that I don't

22   think have been addressed.  One I wish to address very, very

23   briefly, and I'll begin it with apologizing to the Court for my

24   less-than-stellar performance on Tuesday.  But I think that

25   less-than-stellar performance is at least partly the result

76

1    of -- I object to the process, and I've objected in my

2    objections, to the process chosen by the debtor.  This is not a

3    criticism of the Court or of yourself; this is a criticism of

4    the process they chose.

5         I don't believe that there has been adequate time to

6    prepare a response to their motion.  For example, and after

7    making the example I'll move onto another point, for example,

8    they criticize, or in their oral argument to the Court they

9    have emphasized, that they're the only ones who've provided any

10   valuation scenarios for General Motors.  Well, of course, they

11   had several months to prepare those valuation scenarios.  We've

12   had less than thirty days.  The time frame -- I mean, I filed

13   my objection on June 19th, so I've basically had eleven days.

14   In eleven days you can't find an expert, have an expert get

15   access to the records and create a valuation report.  I don't

16   think it can be done.  So I'm objecting on those grounds.

17        But I'll move on.  One of the things I'm objecting

18   to, and I believe I'm the only one who's objecting on this, is

19   the limitation-on-liens argument.  The -- I rest upon two

20   documents -- well, three documents:  first, the 1995 indenture,

21   which I believe is Debtors' Exhibit 10 in evidence, if my notes

22   are correct.  Section 1408 provides that it's governed by New

23   York and is to be interpreted by New York law.  Section 406

24   contains a limitation-on-liens provision, which I think the

25   Court can read; I don't think the Court needs me to repeat it.

77

1      In addition, there's Parker's Exhibit 1 in evidence,

2   which I believe is my only exhibit, which is a prospectus

3   supplement dated June 26, 2003 for six and a quarter Series C

4   convertible debentures due in 2033, with an attached prospectus

5   dated June 19th, 2003.  If you look at page 23 of the June 19th

6   prospectus, the one that's attached to the supplement, you'll

7   find that the identical limitation-on-liens provision is found

8   in that prospectus and that it applies to my bonds.  The

9   prospectus also states that my bonds are issued under the 1995

10   indenture.

11      Now, the third document that I'm relying upon is -- I

12   believe it's Debtors' Exhibit 6.  Again, back there it's

13   difficult to keep track of which exhibit is which, but it's the

14   loan and security agreement dated December 31st, 2008.  And if

15   you'll give me one second to get the agreement.  Here we go.

16   If you go to page 35 of Exhibit 6, which -- and I'm using the

17   numbers on the top right-hand corner --

18      THE COURT:  Go on.

19      MR. PARKER:  Do yours have the same pagination?

20   Otherwise, I'll use the pagination from the original document.

21      THE COURT:  Why don't you speak to it, because it'll

22   take me a little bit of time to find it.  But --

23      MR. PARKER:  Sure, if I may.

24      THE COURT:  -- I'll assume, unless somebody

25   disagrees, that you're accurately reading to me.  And I'm

78

1    familiar with the issue.  What I want you to focus on is

2    excluded assets within the meaning of the December 31st, 2008

3    agreement.

4         MR. PARKER:  Yes, sir, I know, I'm getting there.

5    Paragraph -- or I should say section 4.01(a) creates a lien on

6    all real and personal property wherever located, except where

7    excluded.  Okay, section -- subsection - sub-subsection (a)(6)

8    provides a lien on all personalty; it gives a nonexclusive

9    definition of personalty, including equipment and instruments.

10        Section 4.02 provides that General Motors is to

11   provide UCC filings in order to perfect the government's liens

12   on all equipment.  And there's a schedule of all the properties

13   where equipment is located that UCC liens are to be filed for;

14   that's section .402 (sic) on page 36.  And, again, I'm using

15   the pagination 36 of 111 in the top right-hand corner.

16        Section 6.09 has excluded collateral, and it refers

17   one to schedule 6.29.  It states that section 6.29 is a

18   complete and accurate list -- by the way, that's 6.29, I'm

19   sorry, not 6.09.  Section 6.29, which is on page 51 of 111,

20   states that, on excluded collateral, "See, set forth on

21   Schedule 6.29, is a complete and accurate list of all excluded

22   collateral of each property."  When you go to schedule 6.29,

23   you get a blank page.  It says "Schedule 6.29, Blank".  So

24   apparently there is no excluded property.

25        It then goes on --

79

1          THE COURT:  Mr. Parker, are you going to eventually

2     get to subsection v --

3          MR. PARKER:  Yes, yes.

4          THE COURT:  -- romanette v, one of the definitions of

5     excluded collateral?

6          MR. PARKER:  Yes, sir, but -- okay.  I am eventually.

7     My point about what I -- to summarize, I was going through the

8     documents to show you -- I realize that there is a subsection v

9     on -- bear with me a second -- section 4.01, subsection v,

10    defines excluded -- has a definition of excluded property but

11    says "any property, including any debt or equity interest, any

12    manufacturing plant or facility which is located within the

13    continental United States, to the extent that the grant of a

14    security interest therein to secure the obligations will result

15    in a lien or an obligation to grant a lien in such property to

16    secure other obligation".  I understand that that's there.

17    What I'm trying to show the Court is that even though that's

18    there they still went and filed liens on property.  And I don't

19    think you can file liens on property and get an excuse for it

20    by saying oh, well, I filed someplace else a statement that if

21    I did it I didn't mean it.

22         The documents show that -- I might add, if you go to

23    section 6.30, Mortgaged Real Estate, that's actually the only

24    section that I've been able to find where they have language

25    that says we do not have a lien on mortgaged real estate if the

80

1    lien would give rise to a lien in favor of a person as set

2    forth in schedule 30 hereto.  By the way, schedule 30 hereto is

3    also blank.

4         It seems to me that they have, whether they were

5    allowed to or not, and whether they've excused themselves from

6    doing it or not, filed liens on two classes of property that I

7    would like to bring to the Court's attention.  The first class

8    of property is listed in schedule 6.25, which is the UCC

9    filings.  They have filed the UCC filing -- lien on the

10   following -- on the manufacturing and equipment of the

11   following localities:  the Doraville Assembly Center, the

12   Janesville Assembly Center, the Moraine Assembly Center, the

13   Massena Castings, Pittsburg Metal Stamping, Grand Rapids Metal

14   Stamping, Spring Hill Manufacturing Campus, Wilson Run (ph.)

15   PDC, Latsina (ph.) PDC, Pontiac North Pitt 17, Pontiac North

16   PC, Yps -- I can't even pronounce it -- Ypsilanti Vehicle

17   Center, Beavertown PDC, Grand Blanc Metal Center, Former Cherry

18   Town Assembly, Former Validation Center, Former Lansing Plants

19   1, 2, 3, and 6.

20        Finally, Your Honor, under schedules 1.1 and 1.2,

21   they've made it clear that among the assets that have been

22   liened are Saturn.  Saturn is -- at least according to the

23   testimony of Mr. Fritz Henderson, Saturn is the only

24   manufacturing -- American manufacturing subsidiary of General

25   Motors.  They've liened that.  And indeed, because they liened

81

1    that, I believe that Saturn is a -- has an accompanying

2    bankruptcy proceeding that's consolidated with this one.

3           Now, I realize they say they gave themselves an

4    escape clause and if we lien something and we shouldn't have it

5    as liened.  But in point of fact, they did lien it.  And the

6    escape clause shows that they knew that they had obligations

7    not to lien it.  And when they liened it, when they liened

8    these facilities and when they liened Saturn, under the terms

9    of the bond indenture, the 1995 bond indenture, the bondholders

10   acquired liens equal and ratable to that of the government.

11          THE COURT:  Mr. Parker, do you think that if Mr.

12   Schwartz had come in to me and said I got a lien on that stuff

13   and any other party-in-interest in the case showed me romanette

14   v he wouldn't have been left out of court?

15          MR. PARKER:  I don't know, Your Honor.  I do know

16   that they attempted to perfect a lien on these assets even

17   though they were prohibited from doing so.  And, Your Honor, if

18   nothing else, I believe that that goes toward the issue of bad

19   faith.  I believe -- which, by the way, gets us to the next

20   issue that I wish to discuss.

21          THE COURT:  Good time to do it.

22          MR. PARKER:  Pardon?

23          THE COURT:  Go ahead, please.

24          MR. PARKER:  Give me a second to get there.

25          In order to approve a 363 sale, the government must

82

1    allege and prove good faith.  In looking at good faith, the

2    Court, I believe, needs to take a look at the totality of the

3    circumstances concerning not only the sale but of the events

4    leading up to the sale under the arrangement between the lender

5    and the debtor.  Even if they did not succeed in acquiring

6    liens on the properties -- on that long list of manufacturing

7    equipment that I listed -- and on Saturn, the only -- to the

8    best of my knowledge, and according to Mr. Henderson's

9    testimony, the only manufacturing subsidiary of GM, they

10   attempted to acquire liens.  They made UCC filing statements.

11   Schedule 6.25 shows the places where they scheduled and what

12   they -- the places where they liened the equipment and what

13   they liened.  Doing so, attempting to do so, Your Honor, is an

14   attempt to violate the covenants of our indentures.

15          In addition, the further evidence of bad faith is

16   found in the fact that their 363 sale procedure is tantamount

17   to a distribution plan which discriminates in favor of certain

18   favored creditors against others, as has been previously argued

19   by others.  Also, their 363 plan, as argued by Mr. Kennedy, is

20   designed to avoid a Section 114 hearing and the effects of the

21   114 hearing.

22          THE COURT:  114?

23          MR. PARKER:  1114, I'm sorry.  1114.  Further, Your

24   Honor, as ably argued by --

25          UNIDENTIFIED SPEAKER:  Mr. Richman.

83

1          MR. PARKER:  Mr. Richman, sorry.  You can obviously

2    tell there's not been much coordination between us.  As ably

3    argued by Mr. Richman, there is no real purchaser.  There is no

4    real -- there's been -- there's no real purchaser, there's been

5    no real negotiation.  This is basically the government selling

6    GM to itself.

7          Furthermore, Your Honor, and I guess this gets me to

8    my next point, I've argued in my objection that the government

9    is not authorized to purchase General Motors under EESA, that

10   is, the Emergency Economic Stabilization Act, or under TARP,

11   the Trouble Assets Recovery Program.  The -- as Mr. Wilson

12   testified, the loans that were given to General Motors were

13   given from TARP funds.  I have argued -- and I'm not going to

14   repeat the arguments here, I'm going to rest upon the argument

15   in the objection -- I have argued that the government is not

16   authorized, was not authorized to make those loans under TARP.

17   Making loans that it is not authorized to make is also evidence

18   of bad faith.

19         I realize that there is some question of whether I

20   have standing to raise this issue, and I'd like to address that

21   very briefly.  I do not believe that I have standing to

22   challenge the use of TARP money for the DIP lending, for the

23   DIP loans.  I believe you entered an order authorizing DIP

24   financing back on June 25th.  I had no standing to object

25   because I was not harmed by that action.  Because I did not

84

1    have standing to object, I didn't object.  However, I am harmed

2    by the government's proposed sale procedure, and because I am

3    harmed -- if they are going to use a credit bid of roughly

4    forty-nine billion dollars of TARP money to purchase GM.  So

5    they are using TARP money to make a purchase.

6         If my argument, as set out in the objection, is

7    correct, they are not authorized to use TARP money.  They may

8    use TARP money to buy a bank; they may use it to buy all sorts

9    of financial institutions.  But whatever else General Motors

10   may be, it is not a financial institution.  The use of money to

11   do something that they are not authorized to do is evidence of

12   bad faith.

13        Finally, Your Honor -- further, Your Honor, on bad

14   faith, I have argued in my brief that there are Constitutional

15   probl -- that there are Fifth Amendment taking problems with

16   the proposed proceeding.  I'm not going to repeat those

17   arguments here.  But, again, those concerns are evidence of bad

18   faith.

19        Which gets me to my final point.  I'm trying to go as

20   quickly as possible; I'm trying not to use too much time.  My

21   final point, Your Honor, if I can find it -- oh, yes.  I need

22   to refer to one more exhibit, if I may.  Here we go.  My final

23   complaint, Your Honor -- and by the way, I -- my final

24   complaint refers to the scheme of distribution, the

25   distribution of the sale proceeds of this 363 proceeding.  Now,

85

1    I want to make clear, I'm not objecting to the sale price.  As

2    I understand it -- and I'm referring now to the declaration of

3    Stephen Worth, Debtors' Exhibit 3, Exhibit F, page 15.  I don't

4    know what exhibit number Stephen Worth -- I don't know what

5    exhibit number it is, but his declaration is in evidence -- he

6    testified -- Exhibit F, page 15.  It is an analysis of the

7    proposed transaction.  It shows that the United States Treasury

8    is paying 104.5 billion dollars.  By the way, I'm using the

9    lower numbers in these calculations.  There's a difference; he

10   gives a range of -- it's usually only two to three billion

11   dollars different; I'm using the lower number.  You can redo

12   the calculations with the larger number if you prefer.

13           He gives a bid of 104.5 billion dollars.  That's

14   what, according to him, the Treasury is paying for General

15   Motors.  I think that's a fair price for General Motors; I'm

16   not quibbling over that.  According to him, the way that the

17   government is paying it is they're making a credit bid of 48.7

18   billion dollars of secured lending.  Now, I don't think he

19   quite explained to you how that number comes about, so I'd like

20   to explain it to the Court, if I may.  The total secured

21   indebtedness, excluding my argument about bonds, the total

22   secured indebtedness is approximately fifty-six billion

23   dollars.  The way you get that number is you take the 19.4, you

24   take the 33.3 and you add on the 6 billions that are owed to

25   previously secured lenders.  You add all those numbers up; you

1    come into approximately fifty-six billion dollars.

2         The government is taking back a loan, a secured loan,

3    from General Motors, the New General Motors, of approximately

4    seven billion dollars.  They're also taking back two billion

5    dollars in preferred stock.  If you take those two numbers out,

6    you come up with the 48.7 billion dollars that is listed here

7    on page 15 of Exhibit F of Stephen Worth's declaration.

8         Now, I fully recognize that secured lenders should be

9    paid first.  So out of the 104 billion dollars they should get

10   their 48 billion.  The problem is that when you look at the

11   sheet you realize that he -- that the other way, the other

12   consideration given, is that -- and if you look at the second

13   column -- the government is assuming and paying in full, or

14   agreeing to pay in full, 48.4 million (sic) dollars of

15   unsecured debt, which, by the way, according to the testimony

16   of everybody who's been up here, does not include the debt of

17   the UAW VEBA.

18        Now, personally, I find that testimony to be -- I

19   question the testimony.  It seems to me that if the UAW VEBA is

20   getting 20.5 million dollars and is releasing its claim of

21   20. -- did I say million?  I meant billion -- 20.5 billion

22   dollars and releasing its claim of 20.5 billion dollars in the

23   estate, that seems to me to be a payment.

24        For the purpose of this argument at the moment

25   though, I'm not going there.  I've argued that in my objection;

87

1    I   will -- obviously have argued that here.  I agree with that

2    argument.  But I'm arguing something slightly different.  If

3    you take -- since the 20.5 billion is gone, according to this

4    sheet the total indebtedness for General Motors, that is, I

5    guess, real indebtedness, not just pro forma indebtedness, is

6    roughly 104.5 billion dollars, excluding the -- no, that's not

7    right, it's 48 and 48 makes 96; 97 plus 35 makes -- roughly 132

8    billion; I may be off by a billion or two because I did a fast

9    calculation in my head.  The real debt in General Motors is 132

10   billion, excluding the 20.5 billion that's owed to the VEBA.

11   The government's getting 48.7 billion to pay off secured

12   lenders.  That leaves 83.4 billion dollars in unsecured debt

13   that needs to be taken care of.  48.4 billion is being paid 100

14   percent on the dollar; 35 billion, including the 28 billion in

15   bonds -- and by the way, they keep saying it's 27, but when you

16   do the math with interest to June 1st or May 31st, take your

17   pick, 2009, it actually comes to 28 billion.  The 28 billion

18   dollar debt is getting 7.4 billion dollars; roughly 20 cents on

19   the dollar.

20        So under the sale procedure, some unsecured

21   creditors, favored unsecured creditors, and we're not talking

22   about the VEBA now, are getting a hundred cents on the dollar

23   while others are getting twenty cents on the dollar.  My

24   objection is let's take the purchase price but let's treat all

25   the unsecured creditors equally and ratably.  And if you do

88

1       that, they would all get sixty-six cents on the dollar.

2               Furthermore, Your Honor -- so, Your Honor, that, I

3       believe, is my final point.  The government is not only showing

4       favoritism with regard to the VEBA; they're showing favoritism

5       with regard to other unsecured claims.  In a Chapter 1129

6       proceeding, those unsecured claims would be treated like all

7       other unsecured claims.  And this, by the way, gets back to

8       good faith.  In order for the government to be showing good

9       faith, they must be treating all unsecured creditors fairly.

10              Now, allegedly they have a good business reason for

11      treating the VEBA differently.  I don't buy it; you may.  I'm

12      not arguing that for this second.  I don't agree with it.  I've

13      argued otherwise in my objection.  But putting that to one

14      side, they still have an obligation to treat all the remaining

15      creditors fairly, and they're not doing so.  They're picking

16      winners and losers.  And they've given no business

17      justification for these other winners that they've picked.

18              And for these reasons, Your Honor, I would urge you

19      to reject the sale.  And I will make clear, I want General

20      Motors to reorganize.  It is not in my interest or any

21      bondholder's interest to see General Motors liquidated,

22      although we have not had time to make a liquidation analysis.

23      All we want is an opportunity to negotiate in good faith with

24      the government to come up with a plan that is fair, fair to all

25      unsecured creditors.

89

1          With that, thank you very much, Your Honor, and I

2     want to thank you for your indulgence over the past three days.

3          THE COURT:  Very well.  Thank you.

4          All right, Mr. Bernstein?

5          MR. BERNSTEIN:  I'll try to be brief, Your Honor.

6          THE COURT:  Yes, I understand the issues.  The main

7     thing I want to hear from you on is whether there's recall

8     authority supporting the idea that the consent decree

9     obligation is something other than a monetary obligation.

10          MR. BERNSTEIN:  Yes, Your Honor.  First thing that

11     supports it is that -- may I approach the bench, Your Honor?

12          THE COURT:  Yes, sir.

13          MR. BERNSTEIN:  Nolan entered a joint stipulation,

14     modified the consent decree and then entered the pack of them

15     as a final judgment of the United States District Court for the

16     Southern District of Indiana.

17     PENINA 1:24:32

18          THE COURT:  Is this new evidence, or is this --

19          MR. BERNSTEIN:  I believe you can take judicial

20     notice of this.  We found this last night in response to Your

21     Honor's question, and you'll see the second as the final

22     judgment, Your Honor.  It was entered by Judge Nolan under

23     54(b).

24          THE COURT:  All right.  Pause, please, Mr. Bernstein.

25     Mr. Miller, do you object to me considering this?

90

1          MR. MILLER:  No, Your Honor.

2          THE COURT:  Okay.

3          UNIDENTIFIED ATTORNEY:  I'm sorry, Your Honor, we

4  don't have a copy of the judgment --

5          MR. BERNSTEIN:  I can give you -- I have extra copies

6  for you, I'd be glad to provide them.  Here's the stipulation

7  and order, and let's see if I have copies -- and here's an

8  extra copy of the final judgment.

9          The second point, Your Honor, the legal context is

10  set by the Supreme Court of the United States.  One of the

11  leading cases is Rufo v. Inmates of Suffolk County Jail.  The

12  citation is 502 U.S. 367.  And the relevant citation is at page

13  378:  "There's no suggestion in these cases that a consent

14  decree is not subject to Rule 60(b)."  I have Rule 60(b) as a

15  rule for modifying judgments.

16          THE COURT:  Right.  And --

17          MR. BERNSTEIN:  Right.  "A consent decree, no doubt

18  embodies an agreement of the parties, and thus in some respects

19  is contractual in nature.  But it is an agreement the parties

20  desire and expect will be reflected in and be enforceable as a

21  judicial decree that is subject to the rules generally

22  applicable to other judgments and decrees."

23          The case counsel cited was one of these cases

24  involving an interpretation of the language of a consent order

25  or a consent decree, and yes, to that narrow context, the

91

1    courts look to contractual reasons, because the judgment

2    reflects an agreement of the parties.  But in terms of

3    enforcement, a leading case in the Second Circuit is Badgley v.

4    Santa Croce -- I'll spell out the name, because I'm making a

5    hash of pronouncing it, I think.  It's B-A-D-G-L-E-Y v.

6    S-A-N-T-A  C-R-O-C-E.  And in that case, the Second Circuit

7    reversed a decision of the district court denying the

8    enforcement of contempt proceedings in a civil consent decree

9    context.

10           "The respect due to the federal judgment is not

11   lessened because the judgment was entered by consent.  The

12   plaintiff's suit alleged denial of their Constitutional rights.

13   When the defendants chose to consent to a judgment rather than

14   have a district court adjudicate the merits of the plaintiff's

15   claims, the result was a fully enforceable, federal judgment,

16   that overrides any conflicting state laws or state order.

17   The --"

18           THE COURT:  I hear you, Mr. Bernstein.  But where I

19   need help from both sides --

20           MR. BERNSTEIN:  Yes, sir.

21           THE COURT:  -- is whether when a federal court

22   proceeding gives rise to a judgment, consent or otherwise, that

23   creates a monetary obligation --

24           MR. BERNSTEIN:  Yes, sir.

25           THE COURT:  -- where the monetary obligation is a

92

1    discharge of a debt?

2         MR. BERNSTEIN:  I misunderstood the question that you

3    raised yesterday.  I thought you were raising the question

4    whether this was a mere contract or whether it was --

5         THE COURT:  That was, for better or for worse,

6    another way of saying the same thing.  And if I didn't say it

7    as well as I should have, I owe everybody in the room an

8    apology.  But as I understand the issue, a consent decree

9    issued by a federal court required the debtor to pay money.

10         MR. BERNSTEIN:  That is correct, Your Honor.

11         THE COURT:  And the question that I need help in is,

12    is this like a lot of the other -- the debtors' other

13    contractual debts which, at least, seemingly fall within the

14    unsecured creditor community, or whether there's something

15    special about a monetary obligation that's been created by a

16    federal court decree that makes me analyze it in a different

17    way?

18         MR. BERNSTEIN:  I would answer it this way, Your

19    Honor.  This is a judgment, and the deliberate refusal by

20    General Motors to honor that judgment was inequitable conduct,

21    indeed conduct potentially punishable by civil contempt.  And

22    therefore the Court has good grounds to modify on an equitable

23    basis, the sale agreement to provide for the small adjustment

24    we requested.  And of course, Mr. Wilson yesterday testified it

25    was unlikely that the transaction -- the financing would be

93

1     affected by that.

2              THE COURT:  Okay.

3              MR. BERNSTEIN:  Thank you.

4              THE COURT:  Thank you very much.  All right.  Yes?

5              MS. WICKOUSKI:  Your Honor, I'm Stephanie Wickouski -

6     -

7              THE COURT:  Well, I need you to come to a microphone,

8     please.  I take it you're coming up because you wanted to argue

9     on any of the issues we have before us.

10             MS. WICKOUSKI:  Um --

11             THE COURT:  And that your predecessors haven't done

12    it adequately.

13             MS. WICKOUSKI:  -- yes, Your Honor.  And my name is

14    Stephanie Wickouski.  I'm here on behalf of two of the

15    indenture trustees on certain leverage lease transactions,

16    manufactures and Traders' Trust Company and Wells Fargo Bank

17    Northwest.  We filed objections to the sale, but through, I

18    think, innocent inadvertence on the part of debtors' counsel,

19    they were not addressed in the omnibus objection by oversight.

20             This came to our attention on the eve of the hearing,

21    and we've had subsequent discussions that I think have

22    partially resolved and expect to resolve over the next week,

23    our objections.  So I wanted to indicate what has been

24    discussed.  I'm also here with counsel --

25             THE COURT:  Tell me, Ms. Wickouski, I'm wondering how

94

1    much this is consistent with what I said before.  If you have a

2    deal, and you're telling me that you're working it out, this

3    isn't the time that I wanted to deal with matters of that

4    character.  And I don't want to be a jerk or a martinet, but I

5    am trying very hard in a case with 850 objections, to deal with

6    them in a way so that I can triage the matters before m.

7            MS. WICKOUSKI:  I understand, Your Honor.  And I

8    apologize.  It was my misunderstanding that the indenture

9    trustees were not being heard at this time.

10           THE COURT:  Well, if you're saying you've got a lien

11   and that your lien has to be addressed, and you've either got

12   to get satisfaction of the lien or a carry-through on the lien,

13   or something like that, that doesn't strike me as rising to the

14   level of controversy as a lot of the other matters that I have.

15           Now, if I'm understating your legal concerns, and you

16   want to argue a legal point, I'm not going to but a sock in

17   your mouth.  But if you're telling me that you and the debtor

18   are having a dialogue that lenders and debtors have all the

19   time to address issues of this character, I applaud that, and I

20   simply say, if you want to confirm your understanding at the

21   end, when I deal with other similar confirmations, I'd be happy

22   to hear that.

23           MS. WICKOUSKI:  Yes, Your Honor.  And my apologies.

24   I misunderstood in terms of the course for proceedings, and I -

25   -

95

1          THE COURT:  I understand that I don't always speak

2     with perfect clarity.  And no offense intended.  But certainly

3     I want to deal with it, Ms. Wickouski.

4          MS. WICKOUSKI:  Understood, Your Honor.  Thank you.

5          THE COURT:  Thank you.  Okay.  Do I have any other

6     substantive objections that are actually being argued that I

7     haven't heard yet?  Mr. Schulman?  Mr. Mayer?

8          MR. MAYER:  Yes, Your Honor.  If I may.  Well, this -

9     -

10         THE COURT:  Oh, another asbestos objection.

11         MR. REINSEL:  Your Honor, Ron Reinsel on behalf of

12    Mark Buttita.  I will try not to rehash anything Mr. Esserman

13    said or anything the very eloquent Mr. Jakubowski said.  I want

14    to make just a couple of points and a clarification.

15         We have objected on a number of grounds, including

16    sub rosa plan, and the extent to which the requested sale

17    extends pat the bounds of 363, specifically to claims, and most

18    importantly to future claims; that they are not interests in

19    property, and a certainly that future claim that has not come

20    into existence, has not arisen, goes so far beyond the pale of

21    an "interest in property" even if that is permitted.  But I

22    want to concentrate on just a couple of points that distinguish

23    this case both from Chrysler and TWA, and also the White Motor

24    case that the debtors have relied on.

25         Contrary to Chrysler, Judge, and contrary to TWA,

1   this isn't a sale of assets that will meld assets into an

2   existing business.  It is, instead, a standalone, complete

3   continuation of the exact same business enterprise.  It is the

4   same products; it is the same employees; it's the same

5   management; it's the same marketing; it's the same logos.  And

6   to accomplish what the debtor and Treasury has indicated they

7   want is "a seamless transition in the eyes of consumers."  In

8   other words, New GM is just the same Old GM.

9          Yet, they want to escape the strictures of potential

10  continuation of liability as a successor of existing GM.  They

11  look -- in the order that they're going to present to you,

12  while we haven't seen any final order yet, but we've seen what

13  they're looking for.  And that is complete, but not just an

14  approval of a sale, but protection from specific factual

15  findings that may lead subsequent state courts to find that

16  there is continuation of liability under relevant state law;

17  despite the fact that many of those findings fly specifically

18  in the face of the evidence that we heard here, that could well

19  lead a state court to find such continuing liability.

20         Secondly, Judge, as you noted yesterday also in that

21  order, they're looking for an injunction.  And you asked if

22  that injunction didn't kind of sound like a duck -- like the

23  injunction under 524(g).  Well, Your Honor, it not only sounds

24  like a duck, it quacks like a duck, it walks like a duck, it

25  flies like a duck, and leaves feathers behind it like a duck.

1    It is completely the injunction as to future asbestos liability

2    that was provided for in Section 524(g).

3         Now, aside from the discriminatory treatment that's

4    provided here, they're trying to get protections under the code

5    without complying with the code's requirements.  Now, Mr.

6    Miller pointed out that this is not an asbestos case.  This is

7    not an asbestos-driven case, and that they're not seeking

8    relief under -- they're not including Section 524 treatment

9    here.  All of that is absolutely true.  The point is, however,

10   they're trying to get equivalent relief without complying with

11   the statutory requirements.  And that goes both to the ability

12   to even give the relief, as well as the effective notice and

13   due process requirements that are required in order to get that

14   relief.

15        Let's distinguish some of those cases -- the other

16   cases.  White Motors, it acknowledges, found that 363 did not

17   provide a basis to sell assets free and clear of claims.  And

18   it went on to find that in order to do that, however -- this is

19   certainly beyond the express statutory language -- the statue

20   says "free and clear of interest in that property."

21        Now, whether or not claims become interest in

22   property, cited in other cases.  But it found that 363 didn't

23   provide that basis.  We had to look to Section 105 of the code,

24   the Court's general equitable powers to make things happen --

25             THE COURT:  Yes, I know.  We went through that with

1    Mr. Jakubowski.

2         MR. REINSEL:  All right.  But here's where I wanted

3    to get with that, Judge.  White Motors was decided in 1987.  In

4    1994 Congress enacted Section 524(g).  Section 524(g) provides

5    a comprehensive design by Congress for dealing with asbestos

6    claims specifically, both present, and more importantly, future

7    claims; looking at the unique situation that that kind of

8    injury entails, particularly that it's an insidious product, it

9    went into commerce, and it has a very long latency period, such

10   that from exposure to actually manifesting a disease, finding

11   out that you have a claim, is a matter of decades.  Ten,

12   twenty, thirty, forty years.  Such that those folks who will

13   develop disease, who will become claimants, are not presently

14   claimants.  In fact, the nature of their potential future

15   illness is specifically excluded from the definition of a claim

16   under the Bankruptcy Code.  And in fact, under 524(g) it's

17   referred to a demand.

18        The problem of recognizing of how to give adequate

19   due process to those future potential claimants, those demand

20   holders, and how to give adequate notice, because you can't

21   give them notice -- in fact, we asked Mr. Henderson -- one of

22   the few questions I asked here, was, you gave broad notice of

23   these proceedings in order to give everyone notice of their

24   rights were at issue and could be affected.  But he recognized

25   that GM has 650 million dollars-worth of projected asbestos

99

1    liability going out over a period of at least ten years, and

2    that many of those claimants, many of those potential

3    claimants, don't presently have a disease, don't know they have

4    a claim, and that whatever publication notice was given to

5    them, wouldn't have reached them and would have done them no

6    good whatsoever.

7          In Chrysler, they kind of gave that notice issue

8    fairly short shrift.  There's one -- they deal with it in about

9    two sentences on page 111 of that decision, simply holding that

10   "With respect to potential future tort claimants, their

11   objections are overruled, as those issues have been discussed.

12   Notice of the proposed sale was published in newspapers in very

13   wide circulation, and the Supreme Court has held that

14   publication of notice in such newspapers provide sufficient

15   notice to claimants 'whose interests or whereabouts could not

16   be with due diligence, ascertained'", citing to the Supreme

17   Court's decision in Mullane v. Central Hanover Bank.

18         Mullane was a trust fund case.  You either held funds

19   in a trust or you didn't.  This --- we're not presented here

20   with a question of we can't ascertain the location of folks; we

21   can't, with reasonable due diligence send them a specific

22   notice, such that the publication even becomes sufficient.

23   We're dealing with individual whose claim doesn't yet exist,

24   who don't know that they have rights that may be affected, and

25   won't know that for years.  That's why Congress, in Section

100

1    524(g), provided mechanisms to provide due process to those

2    folks, by the creation of a specific representative in the

3    court.

4         Last week you were asked to appoint someone -- a

5    futures representative to look out after the interests of those

6    future folks.  You declined.  You said we may look at that

7    later.  But the point is, there is no one here looking out for

8    their interests today.  They didn't get notice of this

9    proceeding.  You can't give effective notice of this

10   proceeding.  And no one is representing them here.  I want to

11   be clear, I am representing a single current asbestos claimant.

12   Mr. Esserman was representing single current asbestos

13   claimants.  We're not advocating -- other than saying they're

14   not here, Judge, we're not here in a position where we can

15   reasonably represent their interests in this case.

16        But let me be clear about the impact of 524(g) here.

17   As we said, this is not an asbestos-driven case.  There is no

18   requirement that the debtor use 524(g) here.  However, the

19   point is, if they don't -- if they don't employ the processes

20   that Congress designed in that section of the code to provide

21   adequate notice, adequate due process to claimants, then you

22   don't get the protections that that section provides.  You

23   don't get the injunction that they're looking for, at least as

24   to asbestos claimants.  You don't get the removal of future

25   successor liability as to those asbestos claimants.  It's a

1    question -- it's up to the debtor, and in this case, and the

2    buyer, to decide if they want to include those sorts of

3    relevant protections.  If they don't -- protections for the

4    claimants and future claimants.  However, if they don't the

5    point is, they take their chances, and you, Judge, can't give

6    them the same protections as that specific statute would under

7    the Court's general 105 equitable powers.  That's all, Your

8    Honor.  Thank you very much.

9           THE COURT:  Thank you.  Mr. Mayer?

10          MR. MAYER:  Thank you, Your Honor.

11      (Pause)

12          MR. MAYER:  Excuse me, Your Honor.  I need thirty

13   seconds to decide -- to figure how much of what we talked about

14   last night can be put on the public record at this moment.  Is

15   it possible to take a five --

16          THE COURT:  How much time to you need?

17          MR. MAYER:  -- take a short recess, perhaps?

18          THE COURT:  Actually, since we've been going so long,

19   let's take a ten-minute recess.

20          MR. MAYER:  Okay.  Thank you, Your Honor.

21          THE COURT:  See you back in ten minutes, folks.

22      (Recess from 10:47 a.m. until 11:10 a.m.)

23          MR. MAYER:  Thank you, Your Honor.  And good morning.

24   Again, Thomas Moers Mayer for Kramer Levin Naftalis & Frankel,

25   counsel to the official committee of unsecured creditors.

102

1          First, a housekeeping item.  I'm pleased to report

2    that we can't confirm that we are fine on the GE matter; I

3    think that may be a typo.  My partner at Waldorf was actually

4    with his wife at a medical facility and was able to get to us

5    and tell us he had this --

6          THE COURT:  That's fine.

7          MR. MAYER:  The committee is prepared to withdraw its

8    limited objection to the sale motion subject to the following:

9          First, individual committee members have forcefully

10   advocated certain of the arguments advanced in the committee's

11   limited objection, and the committee's withdrawal of its

12   limited objection is without prejudice to any position taken by

13   those individual committee members on their own behalf.

14          Second, the committee's withdrawal of its limited

15   objection is subject to the completion of the wind-down budget

16   and the sale order to the committee's satisfaction.  And in

17   that connection, Your Honor, I'm pleased to report that in

18   literally the last sixteen hours, in a meeting that went until

19   I think 2 in the morning and resumed at 7, and it was handled

20   primarily for the committee by FTI's Conner and Anna Phillips

21   and two partners from my firm who are not here today, Amy Caton

22   and Bob Schmidt.  Actually, Bob is here, I apologize.

23          We were able to close the substantive gap on the

24   wind-down budget.  My understanding, which I would ask the

25   government to confirm is that the total amount of the facility

103

1    being provided to cover wind-down expenses has been upsized

2    such that the government is going to make available financing

3    in the amount of 1.175 billion dollars, Your Honor.

4             In addition, there is an agreement that asset

5    proceeds which have previously been dedicated to the repayment

6    of the government's facility will be available to fund

7    additional expenses if needed.

8             The government has agreed that asset sale proceeds

9    that were previously dedicated to the repayment of the

10   government's wind-down facility will now be available for the

11   payment of wind down expenses if needed.

12            MR. JONES:  Also correct, Your Honor.  And I should

13   make clear that the funding facility is on a non-recourse

14   basis, as has been the case throughout these discussions.

15            MR. MAYER:  The details are still being fine tuned,

16   but those are the highlights.  We also had useful discussions

17   with AlixPartners on its administration of the wind-down,

18   again, details will be forthcoming.  But we believe we have an

19   agreement in principal on certain elements on that that are

20   important to us and will be disclosed at a later time when Alix

21   is prepared to come forward with its application.

22            With respect to corporate governance, there are two

23   time periods.  There's a period between now and confirmation

24   and -- strike that.  Consummation.  And there's a period

25   between consummation and final distribution.  And to be precise

104

1    we talked in this proceeding, Your Honor, about a sale

2    consummation, that's not what I mean here.  I mean, there's a

3    period between the sale and the consummation of a Chapter 11

4    plan.  And then there's a period after consummation of a

5    Chapter 11 plan.  And we have agreements in principle for the

6    most part on both periods.  One is ready for publication.

7         During the period from the sale until consummation of

8    a plan of reorganization, it is our understanding that the

9    board of directors of this debtor will be composed of one

10   designee from Alix, one designee from the creditors' committee.

11   And there's a third individual who the parties have agreed on,

12   but I'm not entirely sure he has agreed on it, so perhaps I

13   should keep his name confidential for the moment.  But we have

14   an agreement on a person that would be acceptable to both of

15   us.  And actually is quite a good pick.

16        And, again, the permanent board -- the board for the

17   post-consummation, GM -- Old GM will be in a plan of

18   reorganization and disclosure statement, itself, but we have

19   the outlines of an agreement on that as well.

20        Based on those agreements and one or two other

21   things, there was an issue that came up yesterday, about

22   workers' compensation claims in connection with the State of

23   Michigan.  Our understanding is that the order or relevant

24   documents will be changed so as to have New GM bear

25   responsibility for Michigan Workers' Comp claims.  Old GM will

105

1    not bear responsibility for Michigan workers' comp claims.

2    Does that need to be amplified.

3            MR. JONES:  No amplification needed, Your Honor.

4    That description is correct so far.

5            THE COURT:  Am I right in assuming Michigan has the

6    most workers and potentially the most workers' comp?

7            MR. MAYER:  Mr. Henderson is nodding yes.

8            Finally, the committee reserves its rights with

9    respect to the master sale and purchase agreement and related

10   documents.  As indicated by the narrative as to how late we

11   went last night, these things are still being machine, as is

12   not uncommon.  And we intend to continue to work with Treasury

13   and the debtors.  They fully involved us last night, we

14   appreciate that.  We look forward to working with them to reach

15   a consensual resolution on these documents and we expect that

16   we will reach some if for some unforeseen reason there's an

17   issue of such moment that compels us to come back to the Court

18   we will let Your Honor know.  But this is in the nature of

19   negotiating documents that we expect to reach an agreement on

20   and one that does not affect what I have said previously.

21           And if the Court has any questions, I'm happy to

22   answer them.

23           THE COURT:  Just a couple.  If I heard you right the

24   creditors' committee is withdrawing it's limited objection and

25   it is no longer taking the position one way or the other on the

106

1    tort and asbestos issues that at one time the creditors'

2    committee as a whole were taking.  As of now you're just

3    leaving that to the individual advocates on both sides.

4         MR. MAYER:  That's correct, Your Honor.

5         THE COURT:  I sense that you folks are working very

6    hard to further narrow issues.  But this is an ongoing process.

7    Is it possible for you, in consultation with other parties, to

8    figure out a mechanism to keep me informed over the next

9    several days, even though it's a holiday weekend, so that I can

10   keep my arms around where you are in that.  Obviously, I don't

11   want to be ex parte.  You have to figure out a mechanic to

12   notify me.  Not on what's going on but when issues are buttoned

13   up, just like you reported to me now.

14        MR. MAYER:  Yes, Your Honor.  I think together with

15   the debtors and Treasury we can definitely do that.

16        THE COURT:  Okay.  Anything else at this point, Mr.

17   Mayer?

18        MR. MAYER:  Well, we are withdrawing our objection so

19   we are no longer opposed to this transaction going forward.

20        THE COURT:  Okay.

21        MR. MAYER:  Thank you.

22        THE COURT:  Thank you very much.

23        MR. MAYER:  I don't want to leave any confusions.

24   The committee's papers were originally not in opposition to the

25   transaction going forward.  The committee remains in support of

107

1    the transaction going forward.  The particular objections that

2    we had to features of the order, those are withdrawn, and so

3    you can view the papers that we have filed the withdrawal of

4    those objections as being in support of the transaction.

5              THE COURT:  Okay.

6              MR. MAYER:  Have I neglected to -- about members in

7    the audience, people we negotiated with, if I misstated or

8    omitted anything.  Thank you, Your Honor.

9              THE COURT:  Thank you.  Forgive me, which indentured

10   trustee do you represent, Mr. Feldman.

11             MR. FELDMAN:  I represent  Wilmington Trust Company,

12   the indentured trustee under the 1995 indenture and 1990

13   indentures, with bondholdings in the aggregate of more than

14   twenty-three billion.  So we are the principal indentured

15   trustee in the case, with it's clear to say the largest

16   unsecured creditor constituency that will remain with Old GM in

17   this case.

18             Wilmington Trust Company also serves as the chairman

19   of the creditors committee.  I will note there's been much said

20   about the equities of this case and the various parties

21   involved in the case, and about the importance of employees,

22   the importance of customers, the importance of dealers, the

23   importance of tort victims.

24             GM is an interesting case.  Typically, when I stand

25   up here on behalf of bondholders, I'm standing up on behalf of

1    major financial institutions.  GM bondholding are widely

2    distributed among thousands of mainstream Americans as well as

3    those financial institutions.  So it was with -- in

4    consideration of our entire constituency.  Some subset of our

5    constituency is represented by separate counsel.  Paul Weiss

6    represents as stated in their 2019, approximate twenty percent

7    of the bondholding class.  Mr. Richman according to his 2019

8    represents three bondholders -- I think three bondholders

9    aggregating, about two million of the twenty-eight billion

10   bondholders.  And Mr. Parker has indicated that he is in his

11   individual capacity a bondholder.

12          We stand up here and we filed our papers on behalf of

13   those without a voice in the case.  Wilmington Trust as an

14   indentured trustee believes it's his job to preserve and

15   protect the claims of the bondholder community that it

16   represents.  And it is with that fiduciary duty in mind that we

17   carefully considered the transaction that was presented.

18   Wilmington Trust was not part of the team negotiating the

19   transaction.  We came to this party and we got a chair at the

20   table, frankly, after the deal had been cut.  And we were

21   presented with a binary choice, which is to support the sale or

22   to seek to object to the sale.  And effectively as has been

23   dictated earlier, to potentially role the dice and hope upon an

24   objection to the sale that a debtor recovery for bondholders

25   was forthcoming.  We took that obligation and that concern very

109

1    seriously.  We had extensive discussions with the debtors'

2    advisors, with the committee's advisors, with the committee

3    members themselves, and with the ad hoc bondholder advisors.

4    And when I say the ad hoc bondholders I'm talking about Paul

5    Weiss and Houlihan.  We reviewed the papers of substantially

6    all the parties in this case, with particular attention to the

7    papers filed on behalf of bondholders which are within our

8    constituency.  And based on all of that information available

9    to us, we were of the view, and as our joinder indicates, that

10   based on all the facts available we felt that under the current

11   facts and circumstances that the sale appeared to be in the

12   best interest of the bondholders.

13           We did, however, have some particular concerns with

14   the transaction, not seeking to, frankly, to derail the sale

15   from going forward.   But to ensure as Mr. Miller indicated in

16   his comments, that the sale creates a pie and it creates a

17   universe of people who are going to fight over that pie.  We

18   understood that was the game when this case filed.  What's

19   going to happen post-closing was there was going to be a

20   numerator and that is stock and warrants that the bondholders

21   and the other unsecured creditors are going to have discussion

22   and potential litigations over, how big the denominator was.

23   What we were fundamentally concerned with at the outset, was

24   that the size of the pie was set.  We have heard today that the

25   wind-down budget issue, we had heard on the eve of this

1    hearing, that the wind-down budget was insufficient.  And we

2    were concerned if the wind-down budget was insufficient that it

3    would eat into the stock and the warrants that had been set

4    aside as testified by various witnesses, was designed to be set

5    aside for unsecured creditors.  We were concerned that that

6    wind-down budget would gain access to that stock and warrants.

7    And we've been told based on the representations today in Court

8    that that wind-down budget has been increased by 225 million

9    dollars.  Plus the proceeds of any asset sales.  And we are

10   comforted by that fact.

11        We reserve our rights to review the definitive

12   documentation in connection with that issue, and we will work

13   alongside the committee, as we have throughout this process to

14   streamline the process.

15        But with that in mind, Your Honor, and in closing --

16   and I think that Mr. Richman on behalf of his three individual

17   creditors and Mr. Parker on behalf of himself, they have the

18   ability to make informed decisions by themselves as to whether

19   or not they would like to roll the dice and potentially seek

20   alternative outcome.  Unfortunately, we as -- fortunately

21   unfortunately, as a fiduciary for all these bondholders, our

22   job is to preserve and protect the value that is available to

23   bondholders under the deal.  What we don't see and

24   notwithstanding Mr. Richman's very eloquent presentation, what

25   I haven't seen yet is a clear articulation of what happens if

111

1    this sale doesn't go forward, and, in fact, we got to planned

2    process.  I think on behalf of Wilmington Trust I would say

3    it's not at all clear to me that on behalf of all the

4    bondholders that we represent that a plan process and the delay

5    attended to that plan process, would be designed to enhance the

6    recovery.  Or would, in fact, enhance the recovery to

7    bondholders under this case.  Frankly, it made the delay.  And

8    the other issues that may be attended to a plan process could

9    very well diminish the recovery to bondholders.  It's a risk on

10   behalf of our twenty-three plus billion dollars worth of

11   constituents we're not willing to take.  And with that, Your

12   Honor, we withdraw our joinder subject to the reservations I've

13   indicated.

14          THE COURT:  Thank you.  Ms. Christian, you're the

15   other indentured trustee?

16          MS. CHRISTIAN:  Yes, Your Honor.

17          THE COURT:  Come on up, please.  Is Law Debenture

18   Trust your client?

19          MS. CHRISTIAN:  That's correct, Your Honor.  Jennifer

20   Christian of Kelley Drye & Warren for Law Debenture Trust

21   Company of New York as proposed successor indentured trustee

22   for the holders of eight series of GM's bonds.

23          Your Honor, Law Debenture fully confers with the

24   committee and with Wilmington Trust, and is prepared to

25   withdraw its joinder to the committee's limited objection

112

1    subject to the conditions that have been outlined and with eh

2    full reservation of our rights.  Thank you.

3                THE COURT:  Okay.  We up to --

4                MR. FRANKEL:  Good morning, Your Honor.  It's Roger

5    Frankel from Orrick Hamilton.  I represent the GM National

6    Dealer Counsel and the committee that is formed.  We also

7    represent Paddock Chevrolet that's a member of the official

8    committee.

9                I wanted just to state for the record we had filed a

10   limited objection, reservation of rights.  We had been working

11   with the debtors and have been satisfied since we filed that

12   and even before we filed that that certain concerns that we had

13   have now been resolved.

14               This committee is comprised of dealers that were

15   elected by the entire dealer body as well as three members of

16   the National Automobile Dealers Association.  The National

17   Automobile Dealers Association is also an ex officio member of

18   the committee.  And we think it's important for the dealer

19   voice to be heard here and we are supportive that his

20   transaction move forward and move forward as quickly as

21   possible.

22               The one thing that I would add, Your Honor, I just

23   heard yesterday for the first time, the recommendation of the

24   privacy ombudsman, briefly looked at the report this morning,

25   and I would hope that GM would incorporate and Treasury would

1   incorporate the recommendations of the privacy ombudsman in the

2   sale order.  Thank you, Your Honor.

3            THE COURT:  Okay, thank you.

4            MS. TAYLOR:  Good morning, Judge.  I'm Susan Taylor,

5   I'm an assistant attorney general for the State of New York and

6   I represent the interest of the Department of Environmental

7   Conservation here today.

8            We filed an objection separate and apart from that as

9   to which Ms. Cordry has been speaking.  And I am here to tell

10  the Court that we are not in the same category as many of the

11  objectors.  Mr. Miller very nicely articulated the difference

12  between the State of New York and many of the objectors here.

13  We are not here about money.  We are here because we are

14  concerned that there appears to be an attempt in the proposed

15  order to impair the police and regulatory powers of the State

16  of New York.  And we are here to ask you not to let that

17  happen.

18           The department has an interest in being able to

19  enforce the state's environmental laws in order to protect the

20  public health and safety.  That interest is not an interest in

21  property within the meaning of Section 363.  And it cannot be

22  extinguished or impaired through the means of a 363 sale.  The

23  whole statutory scheme and many cases make clear that

24  regulatory and police powers do not give way to the important

25  interest protected by bankruptcy law.  To the extent that there

114

1    are provisions in the order that are still overly broad, and

2    one of those is still, in for instance, paragraph T, although I

3    confess that I have not this morning seen what may be an order

4    that has changed.  But to the extent that there is still

5    language in there that appears to extinguish or impair the

6    right of the state, to enforce its regulatory and police order,

7    we ask the Court not to let that happen.

8         In the State of New York two sites are not being

9    transferred, are not going with New GM.  One of them is Messina

10   GM, which is a national priorities list superfund cite in the

11   northern part of the state.  It is adjacent to tribal land.  It

12   has serious contamination and has in place consent and

13   administrative orders of the Department of Environmental

14   Conservation.  It came to our attention only on Friday that

15   there appears to be another site that has contamination that

16   may also be excluded.  It's a little unclear from the schedule,

17   we've been unable to get clarification as to whether that site

18   is, in fact, not being transferred.  And we are very concerned

19   about the department's abilities to continue to protect the

20   health and safety of the people of New York through consent

21   orders, administrative orders, and the ability to impose

22   injunctive relief, with respect to those and other sites.

23        If you would like to argue that the state's interests

24   are not interest in them I would be happy to do that.  I think

25   that is clear.  But to the extent that the Court?

115

1          THE COURT:  You have a brief on file, don't you?

2          MS. TAYLOR:  We do have a brief on file and I would

3    refer to the cases cited in the brief on that.  If you

4    disagree, however, we would ask you to condition a sale

5    pursuant to 363(e) in order to protect the state's ability to

6    enforce its police and regulatory powers.  And we have language

7    that we have circulated to GM and its counsel over the past few

8    days that we would like to see added to the order.  I would be

9    happy to submit that to the Court anytime today if you would

10   like that.

11         Essentially, it would provide "that nothing in the

12   order would release, nullify, enjoin, or otherwise affect the

13   police and regulatory authority of any governmental unit or its

14   ability to enforce."  And, of course, being lawyers it goes on,

15   but that is its essence.

16         THE COURT:  If it's consensual by all means.  If I

17   have differing proposal on that, I need to get yours in writing

18   and the debtors' perspective and argument.  The debtors'

19   perspective as to the language they think makes the most sense

20   in writing if it's different than what I have now.  And if

21   you're not in consensus obviously you need to get argument on

22   both.

23         MS. TAYLOR:  Happy to do that, Judge.  At this point

24   I cannot represent that it is consensual.  If you don't have

25   any questions, I will rest on our papers.

116

```
 1              THE COURT:  Thank you.

 2              MS. TAYLOR:  Thank you.

 3              THE COURT:  Okay.  Mr. Roy, you're coming up.

 4              MR. ROY:  I'm coming up in thirty seconds, Your

 5    Honor.

 6              THE COURT:  Okay.

 7         (Pause)

 8              MR. ROY:  Your Honor, for the record, Casey Roy from

 9    the Texas Attorney General's Office on behalf of the State of

10    Texas.

11              We filed a limited standalone objection.  We've

12    reached an agreement with the debtors, subject to entry of that

13    agreement on the record, we will be prepared to withdraw.

14              THE COURT:  Okay.

15              MR. ROY:  Thank you, Your Honor.

16              THE COURT:  Thank you.

17              MR. MOTIF:  I'm not an attorney.  I'm coming to

18    you --

19              THE COURT:  Just a minute.  Is there -- I announced

20    earlier in the hearing that I wasn't going to hear oral

21    argument on all the objections.  Come up, tell me your status

22    so I can make a judgment as to whether you should be resting on

23    your papers.

24              MR. MOTIF:  My name is Normaji, last name is Motif.

25              We bought GM's bonds, 400,000 paying the same amount.
```

117

1    And I --

2              THE COURT:  Sir, you're a bondholder?

3              MR. MOTIF:  Yes, sir.  Unsecured.

4              THE COURT:  Unsecured bondholder.  Do you have any

5    points that weren't made by either Mr. Richman, Mr. Parker or

6    the two indentured trustee?

7              MR. MOTIF:  That's correct.

8              THE COURT:  And you filed a written objection.

9              MR. MOTIF:  I did, but I want to make this.

10             In the master purchase and sales agreement they never

11   really splintered the phrase going concern.  As a grave concern

12   this needs to be sorted fast enough so that the value doesn't

13   go down.  I'm not sure whether they're talking about the legal

14   term of grave concern or the accounting term of grave concern.

15   No matter whether we go on the legal term or the accounting

16   term, that phrase cannot be used.  GM operations like the

17   (indiscernible) cooperation which I read the (indiscernible)

18   very frequently they use of the word grave concern.  They took

19   operations and cooperated in Delaware.  And Delaware's

20   (indiscernible) law with regard to the cooperation applies.

21   Even if this case is filed in New York State I would like the

22   Court to take analyze that usage of the going concern as a

23   property of (indiscernible).  I can understand that it's an

24   operating concern, they will be borrowing money and running the

25   business.  But definitely it is not a grave concern whether it

118

1    is a legal usage or accounting usage.

2         The (indiscernible) cooperation -- I mean, the GM

3    cooperation whether you want to use the title GAAP.  GAAP means

4    the general acts of accounting principals, or you want to use

5    the fair market values of some of the methodology that you use.

6    The corporation became insolvent three year ago.  And since

7    then especially with the loan agreement signed by the Treasury

8    it seems that even though they have created documents stating

9    that this is the loan agreement, actually nobody, if

10   especially, if the government is going to be approving

11   commercial businessman would never lend money.  So the

12   expectation was a situation created and not a reality.  And you

13   have seen what Mr. Henderson and Mr. Wilson and others saying

14   that if the loan never came through then GM could not have

15   functioned, like what happened in the case of Chrysler.

16        Now, there are rules in the corporation's law of

17   Delaware saying that at a particular stage if the money was

18   lent not as a businessman but for other reasons, and especially

19   if control of the corporation has been taken over indefinitely,

20   then that entity should be treated as insiders.  And so,

21   therefore, the loans must be subordinated to the equity and to

22   the unsecured bondholders.  Because it would not be treated as

23   a loan as a creditor, but would be treated as insider, and so

24   therefore it is a capital contribution.

25        The important reason for that is if that is the

1    capital contribution and not a law then --

2         THE COURT:  The recharacterization subordination

3    points were made in many briefs, I understood them.

4         MR. MOTIF:  I'm ready to come to the other important

5    point.

6         If the Court determines that it is a capital

7    contribution and not a loan per se, then the participation

8    fails because in the proposals out of 19.4 billion dollars that

9    was the pre-petition advances made, two million dollars worth

10   of (indiscernible) being taken by the New GM with approximately

11   about eight billion dollars of (indiscernible) and so that

12   leaves about nine million dollars as the big money so there

13   will be a shortage in the bid amount, even if you include the

14   DIP money less the other things.  I believe that this money was

15   given here, that the total purchase price of the total value

16   was between fifty and sixty billion dollars.  If that is the

17   case then it is my submission that the Treasury bring down that

18   nine million dollars and give it to the Old GM as part of the

19   purchase price.  Plus also the eight billion dollars for eight

20   million dollars of the note, plus two billion dollars that also

21   must come for a total of 19.4 billion dollars, must come to the

22   Old GM.

23        Now, the other argument is that --

24        THE COURT:  Are you getting near the end, sir?

25        MR. MOTIF:  Yes, give me five minutes.

120

1          THE COURT:  Five more minutes.

2          MR. MOTIF:  Yes.  Because this is a very crucial case

3     and I need to explain that clearly.  May I proceed?

4          THE COURT:  Yes.

5          MR. MOTIF:  Now, I raised an issue that as an

6     unsecured bondholder there is a breach of contract by GM when

7     they --

8          THE COURT:  GM has breached its contract to everyone

9     of its twenty-eight --

10         MR. MOTIF:  I know, I know.  But I'm coming to the

11    final points, Your Honor.  There were secured bondholders and

12    there were unsecured bondholders, you've got two categories

13    before September 31 of 2008.  I do not know that the secured

14    bondholders are fully secured or partially secured.  And I have

15    no idea as to what properties are fully secured, or partially

16    secured by the secured bondholders.  Now, when they borrowed

17    13.4 billion dollars from the Treasury they put a first lien on

18    the property, which is not covered by the secured bondholders.

19    And with regard to the secured bondholders property they put a

20    second lien.  The document indenture of 1995 is clear that the

21    moment a lien is put then the unsecured bondholders must be

22    repeated on par with the --

23         THE COURT:  Is that the exact point Mr. Parker made?

24         MR. MOTIF:  No, I'm going to go further, Your Honor.

25    He made one point, but he did not elaborate more.

1          Accurately, he admitted in his brief that they

2     realized this lien problem.  So if you read the brief he

3     acknowledges my brief --

4          THE COURT:  I did read his brief.

5          MR. MOTIF:  Pardon?

6          THE COURT:  I did read his brief.

7          MR. MOTIF:  Yeah.  And he acknowledges that he got

8     the idea from me.

9          THE COURT:  Okay.

10         MR. MOTIF:  Here is the question.  I read the

11    Chrysler opinion by Judge Gonzalez.  He said with regard to the

12    unsecured creditors the takings clause -- and I think he said

13    might apply because they don't have a lien.  But if this Court

14    were to decide that the fact that a lien was put on that and

15    that automatically triggered the other problem which is that

16    the unsecured bondholders also has liens on par with the

17    treasury, both with regard to the first lien that decided with

18    regard to the other property, and the second lien that decided

19    on the secured bondholders' property.  Then we have a right to

20    argue that the takings clause under the Fifth Amendment do

21    apply.

22         So with that, Your Honor, thank you very much.

23         THE COURT:  Thank you.  Now, putting aside deals on

24    the record and so forth, which we can deal with later, is there

25    any other substantive argument of a non-duplicative nature to

1    be heard?  Sir?

2          MR. CHEEMA:  Your Honor, good afternoon.  Bik Cheema,

3    Baker Hostetler on behalf of the Bureau of Ohio Workers'

4    Compensation.

5          THE COURT:  Ohio Workers' Comp.

6          MR. CHEEMA:  Yes.  It's OBWC.  We filed a limited

7    motion, we don't oppose the sale.  The limited motion was the

8    OBWC reads the sale motion as indicating that New GM intends to

9    assume all the debtors' Ohio workers' compensation obligations.

10          In the last few hours we've reached an agreement on

11    some clarifying language with the U.S. Treasury, and we wish to

12    just offer that clarifying language for the record.  It will

13    literally take thirty seconds.

14          THE COURT:  Thirty seconds, it will take longer for

15    me to tell you to sit down and comply with what I said before.

16    So go ahead.

17          MR. CHEEMA:  "Pursuant to the master sale and

18    purchase agreement, New GM is assuming all of Old GM's

19    liabilities and obligations, under the workers' compensation

20    laws, rules and regulations of the State of Ohio.  OBWC reads

21    the provision to include the assumption by New GM of Old GM's

22    obligation to provide and to continue to provide security for

23    the payment and performance of all obligations under the

24    workers' compensation laws, rules and regulations of the State

25    of Ohio owed by Old GM.  New GM will be required to apply for

123

1    status as a self-insuring employer in the State of Ohio.  If it

2    seeks such status and nothing in the Court's order approving a

3    sale shall exclude New GM from satisfying all requirements and

4    conditions, including any requirement to provide security of

5    the OBWC to grant self-insuring employer status under

6    applicable Ohio law, rules and regulations."

7              THE COURT:  Okay.

8              MR. CHEEMA:  Thank you, Your Honor.

9              THE COURT:  All right.  Mr. Miller, are you ready

10   for -- sir, is this an objection, further argument, non-

11   repetitive argument?

12             MR. KANSA:  This is a non-repetitive very brief

13   argument, Your Honor.

14             THE COURT:  All right, come on up.

15             MR. KANSA:  Good morning, Your Honor.  Kenneth Kansa,

16   Sidley Austin on behalf of the TPC Lender Group.

17             The TPC Lender Group is a consortium of nine

18   commercial lenders with first priority liens on two of the

19   debtors' facilities, one in White Marsh, Maryland and the

20   second in Memphis, Tennessee.

21             Your Honor, we filed a limited objection to the sale

22   transaction.  We are in the process of working on language that

23   we hope will resolve that objection, but we haven't dotted the

24   I's and crossed the T's yet.  The only point I would raise in

25   addition to our papers, Your Honor, is in rebuttal to some of

124

1    the points that the debtors have made in their reply about our

2    limited objection, which really seeks to characterize this as a

3    garden variety secured creditor 363(f)(3) issue; where on the

4    one hand you have is it the value of the collateral, on the

5    other hand, is it the face amount of the lien.  We think in

6    this context, Your Honor, that misses the point.  There is only

7    one value on the table here today.  That is the amount of the

8    lender's allowed secured proof of claim on file at 90.7 million

9    dollars.  The debtors have stated that they will settle for a

10   purchase price in excess of the value of all liens on the

11   property, that's their obligation under 363(f)(3), and that's

12   the subsection they rely on to sell the facilities.  Our point

13   is simply in response, no purchase price has been specified, no

14   value has been allocated.  The only value that is out there is

15   the value of the claim in our secured proof of claim.  And the

16   only value out there is --

17           THE COURT:  You're saying that if you say that your

18   collateral is worth a certain amount it's binding on the world?

19           MR. KANSA:  I'm not saying it's binding on the world,

20   Your Honor.  I'm saying if they are going to rely here today on

21   363(f)(3), saying that they are selling in excess -- for our

22   purchase price, in excess of the value of our liens, that is

23   what the value of the liens is.  Today there is no other

24   competing value out there.  There's nothing in the record.

25           THE COURT:  You'll agree that sometimes there is a

125

1   difference between the amount that people claim in their proofs

2   of claim as secured claims, and the value of their collateral.

3   And that the actual value of the secured claim is measured by

4   the value of the collateral and the remainder is unsecured, I

5   assume.

6          MR. KANSA:  No disagreement, Your Honor.

7          THE COURT:  Okay.  So basically the issue to the

8   extent there is an issue, is that you're claiming an amount

9   which the debtor and other parties in the case, probably every

10  single other party in the case, might have a difference in

11  perception from you and might say that your secured claim is

12  measured by the value of your collateral.  But the remainder of

13  your claim is unsecured.

14         MR. KANSA:  That's true, Your Honor.  But the point

15  is there is no -- no one has articulated their belief as to the

16  other value here today.

17         THE COURT:  I understand your argument.

18         MR. KANSA:  Thank you, Your Honor.

19         THE COURT:  All right.  Are we now ready for Mr.

20  Miller?  No, one more.

21         MR. WISLER:  Good morning, Your Honor.  Jeffrey

22  Wisler on behalf of Connecticut General Life Insurance Company.

23         Your Honor, I have a non-resolved, non-cure executory

24  contract objection.  Would you like to hear that now, Your

25  Honor.

126

1          THE COURT:  If it's an objection I think I would.

2          MR. WISLER:  Understood.  Your Honor, Connecticut

3    General Life Insurance, also known as CIGNA provides a range of

4    healthcare administrative services to GM and administers GM's

5    self-insured employee healthcare benefits plan for thousands of

6    its employees.

7          CIGNA's objection isn't just critical to CIGNA, it's

8    critical to GM, New GM and it's employees because we want to

9    make sure that the debtors attempt to assume and assign the

10   arrangement it has with CIGNA gets the job done and assures

11   that the employees of New GM will have the benefits that they

12   currently have now with Old GM.  So while we do have a cure

13   objection I understand that will be deferred.

14         Today's objection is more fundamental.  And that is

15   that the debtor has not given CIGNA or this Court what is

16   necessary for this Court to approve the assumption and

17   assignment of agreement.  And there's three fundamental

18   problems, Your Honor.  First is, the debtor in its contract

19   notices identified what appeared to be eight separate contracts

20   relating to CIGNA, but with no detail that we can comprehend.

21   It simply has vendor numbers, contract numbers, row numbers, I

22   don't know what those are.  CIGNA has looked at these, they're

23   sophisticated business people, they don't know what these are.

24   And we haven't received any clarification on what they are.

25   Except that GM intends to assume and assign all of the CIGNA

127

1    contracts.  Well that's meaningless also because we need to

2    know what they are, we need to make sure what we think is all

3    and what they think is all, is the same thing.  Because, in

4    fact, CIGNA's position is that there is one overriding

5    contract, it's an administrative services contract.  And under

6    that are addendums, and riders, and amendments that encompass

7    all of what CIGNA does for GM and its employee benefit plan.

8          So to warrant this Court's approval of the assumption

9    and assignment of that agreement, the debtor needs to formally

10   and unequivocally identify that contract and say to the Court

11   and to CIGNA, this is the contract we intend to assume and

12   assign.

13         THE COURT:  Pause please, Mr. Wisler.  What extent

14   did you or any of your guys pick up the phone and have a

15   dialogue with the debtor to kind of exchange information and

16   get answers to each of those concerns?

17         MR. WISLER:  Both sides have done that, Your Honor,

18   it is not yet resolved.

19         THE COURT:  And help me understand the problem,

20   because this stuff is done all the time.  I didn't hear you

21   accusing the debtor of cherry picking or trying to split apart

22   the master agreement, am I right that that's not your concern?

23         MR. WISLER:  Given the debtors' statement that it

24   wasn't to assume all of our contracts, I will assume that is

25   not the case.

1        THE COURT:  All right.  Forgive me, but I know a

2    little bit about this area, and I still can't understand the

3    problem.

4        MR. WISLER:  Well, Your Honor, if a debtor comes to

5    the Court and does not identify the contract it wishes to

6    assume and assign, I don't think the Court can permit that

7    assumption and assignment.

8        THE COURT:  Assuming arguendo that you're right, I

9    mean after you had the dialogue with them you're saying they

10   didn't tell you what contracts they wanted to assume and

11   assign?

12       MR. WISLER:  Not to any specificity that anyone could

13   use to identify these agreements.

14       The fundamental problem, being number one, that we

15   think there's one agreement and they think there's more than

16   one.

17       THE COURT:  But if the agreement with all of them

18   what difference does that make?

19       MR. WISLER:  If two parties don't agree what all

20   means or, more specifically, if one party believes there's one

21   and one party believes there's multiple agreements, I don't

22   think there's a meeting of the minds, Your Honor.  And I'm

23   certainly not standing up here saying this is not a resolvable

24   problem.  Today's the day for the sale hearing, today's the day

25   we have to present our objection.  We've attempted to come to a

129

1    resolution, we may actually be close to a resolution.  But

2    because we're not at a resolution I need to present this

3    objection to the Court.

4             THE COURT:  Okay.  Make your remaining points.

5             MR. WISLER:  Understood, Your Honor.

6             THE COURT:  And then I'll hear your adversary.

7             MR. WISLER:  Secondly, Your Honor, there are two bank

8    accounts that make this plan work for GM and its employees.

9    And these bank accounts have authorization approvals between GM

10   and CIGNA.  And there has been no confirmation and no reference

11   to it in the APA or the form of order and the motion that those

12   authorizations will continue.  If they do not continue the

13   self-insured plan that CIGNA administers will not work because

14   there will be no money passing from one account to another to

15   pay employee benefit claims, employee healthcare claims.

16            So, again, until that is unequivocally and formally

17   confirmed we don't think any contracts, any of this particular

18   contract that CIGNA has with GM can be assumed and assigned.

19            And, third, Your Honor, and very importantly, nowhere

20   in the APA or the proposed form of order, or the motion, is

21   there confirmation that New GM will be responsible for

22   claims -- healthcare claims -- employee healthcare claims that

23   were incurred prior to closing but will not be processed and

24   paid until after closing.  That's very important because as

25   claims come through a system they come through at different

130

1    times.  If someone goes to the doctor last week, the doctor may

2    take some time to submit the claim to the insurance company,

3    the insurance company has to process it.  If it's approve it's

4    then paid.  That takes time.  There is no way to draw a bright

5    line on a closing date and say hey, these claims are not going

6    to be paid, these claims aren't.  It's not a cure issue, it's a

7    question of is New GM going to take responsibility for paying

8    those claims that were incurred prior to closing.

9          My understanding with the discussions with the debtor

10   is yes, they are.  But, again, that ahs not been --

11         THE COURT:  I've encountered this issue over the

12   years.  Whether you have to slice and dice whether a claim is a

13   pre-petition claim or post-petition claim.  But I've never

14   encountered it with the context of the assume and assign,

15   because it envisions a smooth transition.  Has your dialogue

16   led you to believe that there's some difference in perception

17   on this one?

18         MR. WISLER:  No, Your Honor, that's what I was just

19   saying.  My dialogue with the debtor indicates that this --

20   that it is New GM's intent to just continue to pay claims in

21   the ordinary course of business regardless of when they were

22   incurred.  But, again, that has not been formalized, it has not

23   been unequivocally stated.  Today's the day I have to present

24   this objection.  If it's not formalized or unequivocally

25   stated, we have a problem is we go into closing and we don't

131

1    know the answer to that question.  So our simple request for

2    relief is, Your Honor, do not approve assumption and assignment

3    of the CIGNA agreement until the debtor formally and

4    unequivocally clarifies those three points.

5             THE COURT:  Thank you, Mr. Wisler.

6             MR. WISLER:  Thank you, Your Honor.

7             THE COURT:  Mr. Smolinsky, you're rising.  Is this

8    just to respond to what Mr. Wisler said?

9             MR. SMOLINSKY:  Yes, it is.

10            THE COURT:  Sure, come on up.

11            MR. SMOLINSKY:  Your Honor, again, Joe Smolinsky from

12   Weil Gotshal.

13            I'm not sure if Mr. Wisler is in communication with

14   his client.  We are aware of the CIGNA situation.  Seth Drucker

15   of Honigman Miller has been working with Janice Heulig, who is

16   the head of HR at GM.  I've received no fewer than a dozen e-

17   mails over the last forty-eight hours specifically with respect

18   to CIGNA.  We are assuming the CIGNA contracts.  We have

19   provided them with the -- with a lot of information.  In fact,

20   Jay Manor, an employee of GM who is on vacation this week, came

21   back to the office to put together the documents that CIGNA has

22   requested.  There are bank accounts that need to be moved, the

23   company is in the process of moving those bank accounts.

24            As I understand it, CIGNA has requested execution of

25   a variety of documents.  Consent agreements and other documents

132

1    which other of our suppliers, such as Medco who provide a

2    similar service, has not requested.  I haven't reviewed those

3    document yet to the extent that they are not problematic we

4    will provide them with the assurances they need.  But to the

5    extent that CIGNA does stand in our way of closing and

6    transferring the employee benefits we will be back in front of

7    you, Your Honor.

8             THE COURT:  All right, thank you.  Okay.  Can I now

9    get to debtor reply.

10            MR. MILLER:  I hate to disappoint you, Your Honor,

11   but the U.S. Attorney has asked to go first.

12            THE COURT:  Sure, Mr. Jones.

13            MR. JONES:  Thank you, Your Honor.  We thought it

14   appropriate to let GM have the last word, and so we'll have a

15   short summation first.

16            First, Mr. Schwartz is going to address,

17   particularly, Your Honor's consent decree question, and then

18   I'll have remarks on additional issues.

19            THE COURT:  Sure.  Mr. Schwartz.

20            MS. CORDRY:  Your Honor?

21            THE COURT:  Ms. Cordry?

22            MS. CORDRY:  Yes, sir.  Karen Cordry from National

23   Association of Attorneys Generals.

24            We've been working with the debtors late into the

25   night and this morning, and all this time.  I think we're at

133

1    close to an agreement.  But the discussion we've been having

2    with them when we had the terms in the order we would be able

3    to say we have a resolution that I am still in the process of

4    getting all the attorneys general to sign on to that.  If it

5    didn't then we would be in position to weave our objections on

6    the record, if the order is not done.  I didn't realize I was

7    momentarily distracted, we got it in of everybody else there.

8         I think we are very close to having that.  I guess I

9    would just like to reserve my right to state where that whole

10   position is.  I don't want to necessarily hold up all this.

11   And I don't think anything I would say with that would

12   necessarily require them to have any different rebuttal than

13   they would have.

14        THE COURT:  What's your recommendation, Ms. Cordry,

15   do I let Mr. Schwartz or Mr. Miller speak?  Maybe you'll have

16   the answer again.  Otherwise, I assume that on issues that

17   haven't been resolved to your satisfaction I have your papers.

18   But I also sense that you're so close to the go line that

19   you're saying it might help me to do my job if you have some

20   news to report to me.

21        MS. CORDRY:  Yes.  I think in the same way that you

22   were saying that other people were trying to work towards

23   reporting, I hope I'm going to be in that position as soon as I

24   hear back their last couple of words or two on that page.

25        THE COURT:  Let's agree that as of this point the

134

1    train hasn't left the station.  If you need to be heard after

2    everybody else is done, I'll give you that chance, subject to

3    anybody else's rights to express a different view if you need

4    to.

5            MS. CORDRY:  Okay.  And when I do that I would

6    certainly keep in mind Your Honor has heard a great deal on a

7    great many topics that we had in our papers.

8            THE COURT:  Yes.  I've also heard capable arguments.

9            MS. CORDRY:  Exactly, every capable arguments, far

10   beyond what I was probably planning on doing.  So anything that

11   I would say would be specifically on very short points and

12   other issues that people definitely have no raised to this

13   point.  So thank you, Your Honor.

14           THE COURT:  Okay.

15           MR. MILLER:  Your Honor, there will be one other

16   speaker.  I understand that the UAW would also like to speak.

17           THE COURT:  Is this a good time, or would the UAW be

18   speaking after the U.S. and the debtor?

19           MR. MILLER:  After the Treasury, Your Honor.

20           MR. SCHWARTZ:  Why don't I make my remarks which will

21   take about a minute, and then Mr. Jones and Mr. Bromley can

22   discuss their order.

23           I just wanted to address -- Matthew Schwartz for the

24   United States, the questions Your Honor asked about

25   environmental consent decrees because, of course, we're here

135

1    representing the United States, including the Environmental

2    Protection Agency.

3        Your Honor asked two specific questions, I'd like to

4    quickly provide answers and then suggest why it is you don't

5    have to answer those questions yourself today on this motion.

6        First, I heard the Court ask yesterday whether an

7    environmental consent decrees is a contract -- an executory

8    contract that can be rejected by a debtor in bankruptcy.  As

9    Mr. Bernstein said, a consent decree has features of contract

10   and features of order.  But I think the law is relative clear

11   that they are not executory contracts that can be rejected.  I

12   would point you to Judge Coudle's (ph.) opinion in New York v.

13   Mirant.  That's at 300 B.R. 174 at page 181.

14       The further question that Your Honor asked today, I

15   think the important question, is whether a consent decrees is,

16   therefore, enforceable against the debtor.  And as Your Honor

17   said that turns on whether the consent decree creates a

18   monetary or injunctive obligation.  Whether it embodies a claim

19   within the meaning of the Bankruptcy Code that's Chateaugay in

20   the Second Circuit, Trouweko in the Third Circuit.  That is a

21   remarkably fact-intensive inquiry.  And the fact --

22       THE COURT:  Depends on what the decree actually says.

23       MR. SCHWARTZ:  That's right.  And I've only skimmed

24   the consent decree that Mr. Bernstein was speaking to, but I'll

25   make the general comment that simply because the obligations of

136

1    the debtor under a consent decree are to pay money does not

2    necessarily mean that it is a claim within the meaning of the

3    Bankruptcy Code.  I think that's enough for today's purposes.

4    Because ultimately the objection that Mr. Bernstein raised is

5    not an objection to the sale.  His consent decree is either

6    enforceable against GM or it isn't.  So that obligation will

7    either be treated as an unsecured claim, or it will be

8    enforceable and so they will have to pay in full.  But either

9    way, the claim is against OldCo.  The claim is not against

10   NewCo.  There's no basis, as Mr. Bernstein suggests, to go into

11   the MSPA and rewrite excluded liabilities to add his consent

12   decree.  That's the only issue on today's record.  And so Mr.

13   Bernstein's objection should be denied and we can take up the

14   more substantive issues on a --

15           THE COURT:  To be denied without prejudice to his

16   raising it in a different context against OldCo.

17           MR. SCHWARTZ:  Against OldCo, correct.

18           THE COURT:  Okay.

19           MR. SCHWARTZ:  Against NewCo it's just essentially

20   the successor liability issue.

21           THE COURT:  Okay.  All right, Mr. Jones?

22           MR. JONES:  Thank you, Your Honor.

23           Your Honor, the government simply is not sacrificing

24   principles for expediency as it has been accused of doing.  Far

25   from it.  We are using established law to purchase assets full

137

1    stop.  Specifically, the government sponsored purchasing entity

2    is purchasing the pieces necessary to operate the strongest

3    possible New GM.  This is a liquidating estate, there's no

4    dispute about that.  There is no alternative and no scenario in

5    which this bankruptcy proceeding ends in anything other than

6    some form of liquidation.  And as in any liquidation

7    proceeding, the goal is to maximize recoveries and

8    distributions to the estate and its creditors.

9         So what is before the Court today is simply an asset

10   sale.  It's not a plan.  What is before the Court does not

11   dictate anything about the treatment of any creditor going

12   forward in the bankruptcy proceedings which will remain in

13   place.  The evidence is clear that this sale achieves far and

14   away the highest possible recovery for the assets being sold.

15   And as is salient for legal purposes, vastly in excess of their

16   liquidation value which is the only legally relevant or

17   possible alternative scenario.

18        The evidence also shows that the opportunity to

19   achieve value through the sale is fleeting.  And that the

20   achievable value of this -- of any portion of General Motors is

21   fragile and soon will be lost if not seized now.

22        There will be a plan as this case progresses.  Again,

23   the case will go forward and there are mechanisms to ensure the

24   estate will remain administratively solvent and funded through

25   an orderly wind-down process.  And the Court's well established

138

1    procedures under the Bankruptcy Code will provide the framework

2    for determining the respect of recoveries for all parties-in-

3    interest

4        Your Honor, the evidence is unambiguous and

5    unrebutted that the government has no intention of funding this

6    deal if an order is not in place by July 10th.  Mr. Richman

7    speculates that the government doesn't really mean it, and that

8    the government will fund beyond that date if Your Honor just

9    calls our supposed bluff.  But, Your Honor, speculation does

10   not trump evidence.  There is no evidence of bad faith and

11   there is no evidence undermining what the government has

12   plainly stated in Court during these proceedings.

13       To the contrary, Mr. Wilson was extraordinary

14   forthright and he explained compellingly and without hesitation

15   what steps the government has taken in regards to General

16   Motors so far.  And the reasons for those actions.  And its

17   plans for its future actions with regard to New GM.

18       Your Honor, the gamble that Mr. Richman asks the

19   Court to take would be extraordinarily risky and contrary to

20   the best interest of the estate.  In fact, he concedes that the

21   risk he asks the Court to take today would, in fact, breach the

22   fiduciary duty if undertaken by GM itself. It is clear that the

23   Court cannot require a lender to lend.  It is clear that the

24   Court cannot compel a buyer to buy.

25       This transaction is certain.  It is here today.  It

139

1    is extraordinarily favorable, and it is the only one insight.

2    The purchase fully complies with all applicable law, including

3    Section 363 of the Code.  The Second Circuit just recently in

4    Chrysler heard these issues squarely, and intensively argued to

5    it in an appeal from Judge Gonzalez's decision which also fully

6    considered the very arguments here today.  And of course Judge

7    Gonzalez explicitly adopted and followed TWA, the Third

8    Circuit's decision in TWA and has, in turn, been affirmed by

9    the Second Circuit for the reasons Judge Gonzalez stated.  That

10   TWA order, just as the Chrysler order, expressly affirmed a

11   sale free and clear of claims, both known and unknown, and it

12   further enjoined claims in the future being brought against the

13   purchaser of the assets.

14         Your Honor, the -- I know Your Honor's made reference

15   to reading the transcript of arguments before the Second

16   Circuit, and I will not undertake here a detailed exegesis of

17   the interlocking provisions of the Bankruptcy Code.  But I will

18   note that Fiat's counsel did an extraordinarily abled job of

19   doing just that in arguing before the Second Circuit.  So, for

20   my purposes today, Your Honor, I'll limit myself to saying the

21   case law is very clear and establishes that exactly what is

22   happening here today is permissible and entirely authorized by

23   Section 363.

24         So -- and, Your Honor, in addition to being law, case

25   law that, at a minimum under principles of stare decisis,

1    supports the relief sought today, the ruling was correct on its

2    own terms, as shown in ours and GM's papers, and that ruling

3    simply controls here.

4            Your Honor, I won't elaborate, although -- and go

5    into --

6            THE COURT:  That ruling being Chrysler, you're

7    saying?

8            MR. JONES:  I'm sorry?

9            THE COURT:  That ruling being Chrysler?

10           MR. JONES:  Correct, Your Honor.  And through

11   Chrysler, because it expressly adopted TWA, TWA's analysis as

12   well.

13           THE COURT:  Um-hum.

14           MR. JONES:  Your Honor, I'm not going to go into

15   detail on objections.  I expect that Weil will address those

16   very ably, more than ably.  I want to take a moment to thank

17   the extraordinary assistance provided throughout these

18   proceedings by the Cadwalader who is not authorized to

19   represent the government in court but has done a fantastic job

20   of supporting us in our endeavors and in serving the government

21   as a whole.  And, Your Honor, in closing, let me simply urge

22   the Court that for the reasons stated and supported by the

23   evidence presented to the Court over these three days, the

24   Court should grant the 363 sale motion.  Thank you.

25           THE COURT:  Thank you.

141

1          Sure, Mr. Schein, come on up.

2          MR. SCHEIN:  Yes, Your Honor.  So that Mr. Miller can

3     have his final comment, I'm not adding any further comments as

4     to Export Development Canada's position.  First of all, for the

5     record, Michael Schein, Vedder Price, on behalf of Export

6     Development Canada for the governments of Ontario and Canada.

7          I just want to clarify one legal point that was

8     raised yesterday by Mr., I believe, Jakubowski with respect to

9     an argument that he said was that if the DIP lenders exercise

10    their rights under the loan agreement come the July 10th

11    milestone, not defer their fund, he made a statement that that

12    would be an implied breach of covenant of fair dealing and good

13    faith and that maybe that would give rise to a contract claim

14    by the committee.

15         I'd just like to give the Court a cite that expressly

16    rejects that argument so the Court's aware that if that right

17    is exercised.  Specifically, Your Honor, it is Mirax Chemical

18    Products Corp. v. First Interstate Commercial Corp., and Eighth

19    Circuit Court of Appeals Case, 950 F.2d 566.  And just one

20    statement.  The Court said that that duty, which was the duty

21    of good faith and fair dealing, however, cannot be breached by

22    actions that are specifically authorized in an agreement.

23    That's just the one clarification, Your Honor.  Thank you.

24         THE COURT:  Thank you.

25         Mr. Bromley?

142

1          MR. BROMLEY:  Thank you, Your Honor.  James Bromley

2     of Cleary Gottlieb on behalf of the UAW.  Just want to make one

3     particular point before I ceded to Mr. Miller, which is, to

4     address Mr. Richman's issue as opposed -- as it relates to the

5     linkage between the collective bargaining agreement and the

6     VEBA.  Mr. Richman made a fair amount of hay out of a lack of

7     linkage, as he said, in the documents and in the evidence.  But

8     I think it's important to look at the evidence.  What we have

9     here is testimony from Mr. Henderson that if there was no VEBA

10    there would be no collective bargaining agreement, and with no

11    collective bargaining agreement there would be no workforce.

12          We have testimony from Mr. Wilson, again, saying if

13    there was no VEBA there would be no collective bargaining

14    agreement and, again, without a 1collective bargaining

15    agreement, no workforce.

16          Mr. Curson's declaration said exactly the same thing.

17    The exhibits to Mr. Curson's declaration, the ratification

18    summary at Exhibit 1 -- Exhibit A, I'm sorry, at page 1 and

19    page 11 made it crystal clear that when the UAW membership was

20    voting, they were voting on both the VEBA and the collective

21    bargaining agreement.  And as Mr. Curson said unequivocally, it

22    was a single vote, up or down, for both.

23          Exhibit B to Mr. Curson's declaration is the white

24    book, the white book which contains the amendments to the

25    collective bargaining agreement.  It makes absolutely clear

143

1    that the VEBA and the modifications are part of the collective

2    bargaining agreement that appears at page i, which says that

3    the ratification is on the terms of the ratification, that

4    single vote up or down.

5         And the addendum relating to the changes to the VEBA

6    appears at page 169 of that white book, and it is indeed part

7    and parcel of the amendments to the collective bargaining

8    agreement.

9         And this shouldn't come as any surprise to the

10   objectors.  It's not new.  Indeed, of all the information

11   that's been provided to the Court, this is probably the least

12   new because there is a full paragraph in the Chrysler opinion

13   going directly to this point where Judge Gonzalez found that

14   there is unequivocal evidence presented in the Chrysler trial

15   by Mr. Curson as the witness that there was direct linkage,

16   there was clear and unequivocal value being presented to the

17   new company and that the value of the VEBA was receiving was

18   not being received by the old company but indeed by the new

19   company.

20        In addition, the UAW is an express third-party

21   beneficiary of the master sale and purchase agreement.  That

22   agreement requires that the collective bargaining agreement be

23   assumed and assigned.  It requires that the VEBA be entered

24   into by the new company.  These are unwaivable conditions to

25   closing.

144

1          In addition, Section 7.4(h) of the DIP says that

2    unless by July 10 the agreement, the master service sale and

3    purchase agreement, is approved, that there'll be an event of

4    default under the DIP.  That includes all of the related

5    documents, and the UAW retiree settlement agreement in Schedule

6    1.1(e) to the DIP is one of those agreements.

7          So, Your Honor, I think that the record is replete

8    with evidence of linkage between the UAW's collective

9    bargaining agreement and the VEBA.  And there shouldn't be any

10   doubt or any concern that a showing's been made on that front.

11   And it's very important to keep in mind that that showing is

12   being made by the UAW on behalf of the 475,000 individuals who

13   have either worked or depended on those who've worked for

14   General Motors, as well as the 61,000 active employees.  There

15   are over half a million individuals who are dependent on this

16   transaction closing, and closing quickly.  And I think we need

17   to look through the shorthand that is being used as timing.  If

18   a little more time is given, everything will be fine, nothing

19   will change.  But that's shorthand for if there's a little more

20   time, I can get a little more, maybe a lot more.  And it would

21   fundamentally change all of the carefully constructed

22   arrangements that have been put in place and, indeed, would go

23   directly to the problem that both Treasury and General Motors

24   have pointed out, which is the damage that would be done to

25   this business in connection with a long-term contested Chapter

145

1    11 proceeding.

2         So for those reasons, Your Honor, the UAW strongly

3    urges that the Court approve the sale transaction.

4         THE COURT:  Okay.

5         MR. BROMLEY:  Thank you.

6         THE COURT:  Thank you.

7         Mr. Miller?

8         MR. MILLER:  Good afternoon, Your Honor.  Harvey

9    Miller on behalf of the debtors.  First, Your Honor, one

10   overarching comment.  I was brought up in the school that

11   closing arguments should be confined by the record that was

12   made before the Court.  As I sat here and listened to the

13   closing arguments, Your Honor, many of the closing arguments

14   made no reference to evidence which is in the record in these

15   cases.  Rather, we heard opinions as to what could have

16   happened and not references to evidence that's in the record.

17   So I just make that as an overarching comment.

18        I want to note that none of the objectors has

19   suggested to the Court that it wants to see a liquidation of

20   the assets of GM.  Rather, each of the objectors reiterates

21   that it should not be affected by the 363 transaction and,

22   therefore, it will receive more consideration than what

23   otherwise will be recoverable from the Old GM pursuant to the

24   plan of liquidation which will follow the consummation of the

25   363 transaction.

1          Every objector recognizes that a liquidation will

2     result in no recovery to general unsecured creditors.   So what

3     has happened?  By objecting to the 363 transaction, the

4     objectors are exercising what they perceive to be their

5     leverage.  Certain of the objectors are asking the Court to

6     conditionally allow the 363 transaction by laying down terms

7     and conditions that the purchaser would have to comply with or

8     walk.

9          To paraphrase the words of Mr. Jakubowski, Your

10    Honor, they want you to enter the negotiations and bargain with

11    the purchaser.  Indeed, Mr. Jakubowski suggested that the

12    debtors and the purchasers should have come to you as soon as

13    they knew you were assigned to the case to negotiate the terms

14    and conditions of the sale before finalizing the master

15    purchase agreement.  I suggest that the role that Mr.

16    Jakubowski has tailored for you is inconsistent with your role

17    and your responsibilities as a judge.

18         The essence of what the objectors want, as pointed

19    out by my predecessors, is that you should gamble the

20    preservation of the value of the GM assets, the hundreds of

21    thousands of jobs involved, the welfare of the communities they

22    rely upon in an ongoing automotive industry as well as incur

23    the risk of the probability of systemic failure in the hope

24    that the undisputed testimony of the Treasury's representative

25    is a lie and that the Treasury will not exercise its rights to

147

1    cease financing the debtors.

2         This is an awesome gamble.  It ignores the interests

3    of all other economic stakeholders, including the over 60,000

4    UAW active employees as well as the approximate 500,000

5    retirees and dependents represented by the UAW, as well as the

6    bondholders who have supported the 363 transaction, the

7    suppliers and their industry and the states and communities who

8    will be severely prejudiced if the gamble is lost.

9    Essentially, the objectors ask Your Honor to play Russian

10   Roulette.

11        Now, Mr. Richman referred to footnote 15 in Judge

12   Gonzalez's decision, and he read to you a portion of it, but he

13   did not read the last sentence.  He read the sentence, "The

14   Court concludes that gambling on the possibility that the

15   government was bluffing and risking the potential for a lesser

16   recovery in a resulting liquidation would have been a breach of

17   the debtor's fiduciary duty."  The next sentence is the key

18   sentence, Your Honor:  "This was simply not a viable option."

19        So what Judge Gonzalez held and used as a material

20   point in his decision, he could not take that option of the

21   financing disappearing and risking and bluffed -- that the U.S.

22   Treasury was bluffing.

23        In effect, the objectors are saying if I can't get my

24   pound of flesh, then let GM go down in flames and everybody

25   lose and the devil take the hindmost.  It is not a rational

**148**

1      avenue for the Court to go down in the face of the record in

2      these proceedings.  Liquidation or the risk of liquidation is

3      too great a danger to imperil the many beneficiaries of the 363

4      transaction.  A transaction, Your Honor, that squarely complies

5      with the applicable principles of law, no objector questions

6      the business rationale articulated by GM in support of the

7      sale.  No evidence was presented to Your Honor, through

8      testimony or otherwise, that the business rationale to

9      reconstitute these assets and make them the foundation of a

10     viable automotive manufacturing company -- there is no contrary

11     evidence in the record.  Rather, the complaint is that the pie

12     is not big enough to satisfy the particular needs of each

13     objector and, therefore, the 363 transaction cannot be

14     approved.  That is not a legally sustainable objection.

15             Mr. Bressler, representing the tort victims, or some

16     tort victims who have actual claims has argued that this

17     clients are entitled to extra indulgence.  He cites no legal

18     proposition or authority for that proposition -- I'm sorry, no

19     legal authority for that proposition.  Of course everybody

20     empathizes with his clients, but as stated, bankruptcy is a

21     zero-sum game.  And if GM is liquidated, his clients will

22     receive no recovery.

23             He described the purchase as an extraordinary

24     transaction because the government is not the usual purchaser.

25     But as Mr. Jones has pointed out, Your Honor, the United States

1    Treasury, in the perspective of this case, is a creditor; it is

2    a secured creditor.  It can stand in the position of any

3    secured creditor that appears in the bankruptcy proceeding.

4         From that conclusion, he jumps to another and more

5    far-fetched contention that the purchase is a result of a

6    conspiracy among the Treasury, General Motors, and I guess the

7    UAW, to deprive his clients of their right to trace the assets

8    to New GM.  He argues that New GM must assume the potential

9    liabilities due to his clients because there was no independent

10   purchaser of the GM assets.  Yet, the record is devoid of any

11   evidence to establish the facts that would support a finding

12   and conclusion of the existence of a conspiracy directed at all

13   product liability claimants.  It's just not in the record, Your

14   Honor.

15        So Mr. Bressler argues that there are no similar

16   situations where a pre-petition lender has been the purchaser

17   and the DIP financer and pre-petition creditor.  I suggest that

18   Mr. Bressler is on weak ground.  The concept of loan-to-own has

19   permeated bankruptcy practice throughout this decade.  An

20   example is In re Radner Holdings Corporation, 353 B.R. 820, a

21   bankruptcy case in Delaware before Judge Walsh.  In that case,

22   Tennenbaum Capital Partners was a substantial investor.  It

23   continued to finance the debtor as its fortunes declined and

24   acquired more and more collateral security in substantially of

25   the debtor's property.  When the debtor's revolving lenders

150

1    threatened to cut off funding, the company commenced a Chapter

2    11 case.

3            TCP, Tennenbaum, agreed to purchase the assets under

4    Section 363 and credit bid its 128.8 million dollar pre-

5    petition date claims.  That was challenged, Your Honor, as not

6    an independent purchaser, was challenged in the context of

7    recharacterization and equitable subordination.

8            In another case, Your Honor, of that -- and I didn't

9    have a chance, Your Honor, to do a great deal of research, but

10   another case is In re Medical Software Solutions, 286 B.R. 431,

11   a bankruptcy case out of the district of Utah.

12           THE COURT:  Before you go on to the second one, the

13   Software Solutions, you told me the contention rendered.  Judge

14   Walsh rejected the contention and he said that the lender did

15   in fact have the ability to --

16           MR. MILLER:  Yes, Your Honor.

17           THE COURT:  -- take it over?

18           MR. MILLER:  And he approved the 363 sale, and in a

19   long opinion, Your Honor.

20           THE COURT:  With the same types of protection on 363?

21           MR. MILLER:  Yes, Your Honor.

22           THE COURT:  Um-hum.

23           MR. MILLER:  In the Medical Software case, Judge

24   Thurman held that there was a sound business reason that

25   existed for the sale of the Chapter 11 debtors outside the

151

1    ordinary course of business and outside of the plan based

2    chiefly upon the lack of funds for continued operations and the

3    narrowing window for the sale of assets before they

4    significantly declined in value.

5              THE COURT:  The Judge Thurman, is that Bill Thurman

6    out in Utah?

7              MR. MILLER:  Yes, sir.  A corporate insider that had

8    provided both pre- and post-petition financing for the

9    operation of the debtor's business had a valid security

10   interest in the assets being sold and could credit bid its

11   secured claim.  An insider qualified as a good-faith purchaser,

12   and the Court approved the sale as being for a fair and

13   reasonable price and supported by sound business reasons.

14             There are -- I'm sure, Your Honor, with additional

15   time, we can find many more cases that follow in the concept of

16   loan-to-own.

17             So, turning to the concept that this was not an

18   independent transaction, the record demonstrates, Your Honor,

19   that there were strenuous arms'-length negotiations.  There

20   were differences of opinion.  There were requests made by GM;

21   they were either rejected by Treasury or they were negotiated.

22   And one example, Your Honor, is that GM tried to, in respect of

23   the seven-plus billion dollars of retiree benefits, it tried to

24   keep the cut down to sixty-two percent, but the Treasury came

25   back and said no, it's got to be sixty-six and two-thirds.

1    There was a negotiation over that, and that's just one little

2    item, Your Honor, of what was negotiated during the course of

3    this somewhat complex proceeding.

4          In terms of independence, Your Honor, a great deal of

5    moment is given to the fact that Mr. Henderson will be the CEO

6    of New GM.  Other executives will be employees of New GM.  And

7    because of that, this is a tainted transaction.  But as Your

8    Honor knows, there are many cases in the bankruptcy court where

9    an acquirer of a business will take that business with its

10   employees.  And when you think of this behemoth that is Old GM,

11   a purchaser would not be in its right frame of mind if it did

12   not take the employees who know the business, at least

13   initially, to allow the stabilization of the business while

14   other events may unfold.  The testimony is clear, Your Honor,

15   Mr. Henderson doesn't have an employment contract, he has no

16   employment contract with the purchaser, and none of the other

17   executives have employments contracts.

18         And in terms of independence, Your Honor, what's

19   happened to the stockholders of Old GM?  They're being wiped

20   out, Your Honor, because of the financial condition of the

21   estate.  New GM will have new stockholders.  In addition, New

22   GM, Your Honor, will have an independent board of directors.

23   Five independent directors from Old GM, people of great repute

24   and great business experience, are moving over to New GM.

25   Mr. Henderson is moving over to New GM.  But there will be

1   seven other directors.  And Mr. Edward Whittaker, the former

2   CEO of AT&T, has already been designated to be the chairman of

3   the board of directors.

4        That board of directors, Your Honor, will decide the

5   role in the future -- I mean the future role that Mr. Henderson

6   and other executives and other employees of Old GM will occupy

7   in the operation of New GM.  There has been full disclosure,

8   Your Honor, in this record of what the relationships are

9   between the parties and which, I submit to Your Honor, clearly

10  established the independence of the parties.

11       Mr. Bressler also complains that the UAW VEBA is just

12  too good a deal to be approved.  He ignores the fact that it is

13  the purchaser who made the deal with the VEBA in its interest

14  of getting employees to operate the business and enhance the

15  recoveries and the general unsecured creditors who will receive

16  equity securities as part of this transaction.  One objective

17  of this transaction, Your Honor, is to enhance the value of the

18  equity securities.  And that enhancement obviously requires the

19  employment of the UAW and the other employees.  There would be

20  no business without that.  And as Mr. Curson testified, Your

21  Honor, and notwithstanding Mr. Richman's statements, the record

22  is clear there is only one witness -- and he testified, and

23  he's a union officer -- that the ratification of a modified

24  collective bargaining agreement and the VEBA was one

25  ratification.  And if the VEBA is not approved, all of the

154

1    modifications to the collective bargaining agreement are

2    rescinded and we're back to where we were before with work

3    conditions, wage rates, et cetera, which are not tenable in an

4    automotive industry that is in such severe crisis as this

5    automotive industry.

6    The argument, Your Honor, that another potential 900

7    million dollars of liabilities, irrespective of the asbestos

8    liabilities, assuming the asbestos liabilities, and another 300

9    million-plus dollars of liabilities in connection with retiree

10   benefits, is insignificant.  And, therefore, the purchaser

11   should be required to assume those liabilities.

12   The objective of the purchase, as I said, Your Honor,

13   is to acquire the assets and assume only those liabilities that

14   will contribute to the success of the purchaser.  You take 900

15   million, 300 million, another 600 million, and pretty soon

16   you're in the area where Senator Dirksen said you're talking

17   about real money.

18   The purchaser has drawn the line as to what it is

19   willing to pay for the assets in the context of its credit bid

20   and its assumption of liabilities and the voluntary contractual

21   obligations that it has made to the UAW VEBA.

22   Now, Your Honor, turning to Mr. Jakubowski,

23   Mr. Jakubowski made an impassioned argument.  Essentially he

24   told the Court that it should forget about being in the Second

25   Circuit and it should ignore the Court's stated principle of

155

1    consistency in the decisions of the bankruptcy court in this

2    district.  Mr. Jakubowski speaks of Judge Posner in the Seventh

3    Circuit as if he is immortal and infallible.  I have great

4    respect for Judge Posner and for his colleague Judge

5    Easterbrook, but neither is infallible and particularly

6    conversant with bankruptcy in Chapter 11.  I once debated Judge

7    Easterbrook at a University of Pennsylvania Business and Law

8    Forum.  He argued that persons in businesses should be allowed

9    to contractually waive the benefit of the right to seek

10   bankruptcy protection.  He posited the argument on the basis

11   that the contracting parties had equal bargaining leverage and

12   could freely negotiate that provision.  I asked Judge

13   Easterbrook if he had ever studied a credit card agreement and

14   tried to change the terms of that printed agreement or borrowed

15   money from a financial institution while in financial distress.

16   He replied in the negative and then said he would have to

17   rethink his position.

18         As for Judge Posner, Mr. Jakubowski never named a

19   particular case that he was talking about yesterday and stating

20   that it was in conflict with TWA.  Let us not forget, Your

21   Honor, that the Seventh Circuit is the circuit that is the

22   Chicago school of finance, and it is the circuit that is the

23   least receptive to business reorganizations.  A circuit, Your

24   Honor, that is so unreceptive that it does not endorse the

25   critical vendor situation that is so important in most

1    reorganizations.  But --

2         THE COURT:  Or NOL protection.

3         MR. MILLER:  Or NO -- exactly, Your Honor.  But be

4    that as it may, Mr. Jakubowski argued that the jurisdiction of

5    this Court is extremely limited and unless you are able to find

6    specific words in the Code you are acting beyond your power.

7    He invites you to teach a lesson to the Second Circuit and tell

8    the judges of that court that they don't really understand

9    statutory construction.  Yet, his idol Judge Posner, in a case

10   called FutureSources LLC v. Reuters Limited at 312 F.2d 281,

11   283, a 2002 case, Judge Posner criticized a district court for

12   relying on an unreported opinion from another circuit and for

13   one of the parties to rely upon it in his argument.  Judge

14   Posner said that while, and I'm quoting, "The reasoning of a

15   district judge is of course is entitled to respect, the

16   decision of a district judge cannot be controlling precedent.

17   The law's coherence could not be maintained if district courts

18   were deemed to make law for their circuit, let alone for the

19   nation, since district courts do not have circuitwide or

20   nationwide jurisdiction."  Notwithstanding those piercing words

21   of Judge Posner, Mr. Jakubowski wants you to take on the Second

22   Circuit judges and, in effect, suggests to them that they

23   really ought to act a lot more like Judge Posner.  I don't

24   believe that Your Honor has a death wish.

25        Last week in the argument on the effect of the

1   Sprague Sixth Circuit decision, Your Honor unequivocally stated

2   that Sprague was never binding on you -- was not binding on you

3   and that your obligation is to follow the directions of the

4   Second Circuit and to maintain consistency of bankruptcy court

5   decisions in this district in the absence of clear error.  And

6   as Your Honor stated yesterday, you don't view Judge Gonzalez's

7   decision as clear error.  And right now, Your Honor, the law of

8   this circuit is the decision of the Second Circuit affirming

9   the Chrysler decision on the basis of the reasoning that Judge

10  Gonzalez used in his opinion.  That's the law in this circuit

11  which I believe Your Honor is required to follow.

12           Mr. Jakubowski alluded to stare -- I'm sorry, Your

13  Honor, alluded to stare decisis and the peril of the Court to

14  fill in gaps in the statute.  Mr. Jakubowski argued that 363(f)

15  subject to the plain meaning rule and must be construed

16  narrowly based upon a whole host of Supreme Court decisions

17  that he cited generally involving Chapter 7 or Chapter 13

18  cases.  Bankruptcy courts deal with business reorganizations as

19  situations which require flexibility and the exercise of

20  reasonable judgment by a bankruptcy court.  Courts need to fit

21  the requirements of the case in achieving the objectives and

22  policies of the Code.  A perfect example of the kind of role

23  that must be played by bankruptcy courts is demonstrated with

24  the situation that arose as a result of the Supreme Court's

25  decision in Hartford Accident and Underwriters v. Union

158

1    Planter's Bank at 530 U.S. 1, a 2000 case.  As Your Honor

2    undoubtedly knows, the case involved the construction of

3    Section 506(c) of the Bankruptcy Code and whether the Hartford

4    Accident and Underwriters could present a case for

5    administrative expenses under 506(c) when the language of the

6    statute read that only a trustee could do that.

7            And the Supreme Court, in applying what essentially,

8    I think, was Judge Scalia, the plain meaning rule, said the

9    statute says the trustee can only do that, therefore Hartford

10   could not step into the shoes of the trustee, could not qualify

11   under 506(c), and that's what the statute says and that's what

12   courts have to pay attention to.  So -- and they cite the Ron

13   Pair case and some of the cases that were cited by

14   Mr. Jakubowski.

15           So what followed after Hartford?  In 2003, a case

16   came to the Third Circuit, Cybergenics case at 130 F.3d 545, a

17   2003 case.  This was an en banc --

18           THE COURT:  You're talking about Cybergenics before

19   or after the first en banc?

20           MR. MILLER:  I'm talking about the en banc decision,

21   Your Honor.  The issue in Cybergenics involved Section 544(b)

22   of the Bankruptcy Code and that's the section, part of the

23   avoidance powers where a trustee may prosecute actions based

24   upon nonbankruptcy law to recover preferences, fraudulent

25   transfers, et cetera.

159

1          The language of the statute is almost precisely the

2    same as Section 506(c) of the Bankruptcy Code.  And when the

3    case was heard before the Third Circuit on appeal from the

4    bankruptcy court and the district court, a three-judge court in

5    the Third Circuit reversed the lower courts on the basis of the

6    Hartford Accident case, a pure case of statutory construction

7    as far as the three-judge court was concerned.  That decision

8    was withdrawn as a result of the granting of a motion that the

9    case be heard en banc.

10          When it was heard en banc, the issue of the

11    creditors' committee prosecuting avoidance actions under

12    Section 544(b) was upheld by a majority of the en banc court.

13    The Third Circuit decision, the en banc decision, reflects a

14    court recognizing the needs of the case and the necessity of

15    making the statute work.  And, if I might find -- let me just

16    get that decision.

17          THE COURT:  You're talking the second Cybergenics

18    decision, the en banc one that --

19          MR. MILLER:  Yes, I am.  As Your Honor does with

20    great frequency, first you look at the statute.  And they

21    looked at the statue.  And -- can you hear me?  How's that.

22          First the Court noted that statutory construction is

23    a holistic endeavor, citing the Timbers case.  And then, Your

24    Honor, in reviewing what had occurred, the Third Circuit noted

25    that the fact that the language does not authorize derivative

160

1  action in the first instance, should be recognized.  But that

2  there was a missing link.  And where there was a missing link

3  the Court said we believe that the missing link is supplied by

4  bankruptcy court's equitable powers "to craft flexible remedies

5  in situations where the Code's causes of action failed to

6  receive their intended purpose."

7      The Third Circuit went on to say, Your Honor, "that

8  the Supreme Court has long recognized that bankruptcy courts

9  are equitable tribunals that apply equitable principals in the

10  administration of bankruptcy proceedings."  And it noted, Your

11  Honor, that the Court in the 105(a) has the power to issue any

12  orders, process or judgment that is necessary or appropriate to

13  carry out the provisions of this title.  No provisions of this

14  title providing for the raising of an issue by a party-in-

15  interest shall be construed to preclude the Court from sua

16  sponte taking any action or making any determination necessary

17  or appropriate to enforce or implement court orders or rules,

18  or to prevent an abuse of process.

19      So what that -- those decisions say, Your Honor, is

20  where there is a statutory provision that doesn't comport with

21  a holistic interpretation of the Bankruptcy Code, and the

22  objectors and policies of the Bankruptcy Code, the bankruptcy

23  courts have the equitable power to construe that statute to

24  accomplish those objectives and purposes of the Bankruptcy

25  Code.

161

1          And in connection with Section 363(f), Your Honor,

2     Mr. Jakubowski says you can't give it effect.  It cannot -- it

3     just doesn't cover claims.  Claims are not included in the

4     statutory language and, therefore, this Court is without power

5     to issue an order that provides free and clear of all liens,

6     claims and encumbrances.

7          Now, if you think about Mr. Jakubowski's argument,

8     Your Honor, what he is basically saying that every single

9     unsecured claim carries over, that 363(f) is totally

10    inapplicable, that it doesn't work.  That, Your Honor, is not a

11    principal statutory construction.  Courts are under the duty, I

12    believe, Your Honor, to give effect to the words of a statute,

13    and to harmonize a statue so that it is effective.  And for

14    many, many years, Your Honor, courts have issued 363(f)

15    protections in connection with the 363(b) transaction.  And the

16    law in this Circuit, based upon Judge Gonzalez' order, is that

17    this Court -- the bankruptcy court has the authority to issue a

18    free and clear order as requested by the debtors in this

19    action, which is almost identical to the order that was entered

20    in the Chrysler case.

21         The scope of the power of the bankruptcy court under

22    Section 363 Your Honor once referred to in the Magnesium

23    Corporation of America case.  And you said in that case on June

24    13, 2002 "I believe Judge Walsh got it exactly right in TWA.  I

25    am not going to burden this already very lengthy decision by

162

1    telling you all of the reasons I believe Judge Walsh is right.

2    But I have rarely seen on my time on the bench a decision that

3    was as closely relevant and directly on point" -- and this was

4    in connection with a 363(b) sale, "and as well thought out as

5    his decision.  At the risk of appearing less than thorough I am

6    going to adopt his analysis by reference."

7         THE COURT:  That is the same TWA but before it was

8    affirmed all the way up to the Third Circuit?

9         MR. MILLER:  That's correct, Your Honor.  Your Honor

10   also referred to the Leckie Smokeless Coal Company case at 99

11   F.3d 573.  Your Honor said that Leckie -- that you interpreted

12   the Fourth Circuit as saying "That Congress did not expressly

13   indicate that the language of 363(f) was intended to limit the

14   scope of its application to in rem interest."

15        If Mr. Jakubowski's argument was taken and adopted by

16   Your Honor it would mean, Your Honor, that 363(b) is out of the

17   statute, and there can never be any sales of assets if they're

18   always going to be subject to the claims, the unsecured claims,

19   of the debtor.  Even outside of selling substantially all of

20   the assets every single sale under Section 363(b) would be

21   impaired by the fact that the purchaser is assuming or is going

22   to be responsible for claims that may drift or migrate with the

23   assets that are being sold.  That, Your Honor, cannot be the

24   law.  Common sense says that you cannot effect that kind of a

25   ruling in the face of what has transpired in bankruptcy courts

163

1    through thirty years since the adoption of the 1978 code.  And,

2    again, Your Honor, as I said before, the law in this circuit is

3    clearly Chrysler.

4           Now, Mr. Jakubowski also, like a true plaintiff's

5    lawyer, immediately jumped up and said if the government

6    doesn't go through with this acquisition or finance this

7    acquisition it will be a clear breach of contract.  And he

8    turns to the creditors' committee and says I hope you're

9    drafting a complaint against the government.

10          Counsel referred to a case right on point and in

11   Willis on Contracts under the title Express Conditions "assume

12   liabilities and express conditions in a contract, where there

13   are express conditions in a contract, where there are milestone

14   that have to be accomplished, such as there are in this

15   financing, if there is no order of approval on September 10 and

16   there is no wavier on the part of the U.S. Treasury, the U.S.

17   Treasury has the absolute right to terminate.  And that does

18   not give rise to a breach of contract.  And it is not subject

19   to a commercially unreasonable actions."

20          In connection, Your Honor, to the arguments that Mr.

21   Jakubowski made that the treasury is not -- if it wants to act

22   like a commercial bank it should be treated like a commercial

23   bank.  I would submit to Your Honor that the commercial bank

24   analogy is inappropriate.  We are not just talking about a

25   JPMorgan or a Citibank, we are involved with a federal

1   department that is attempting to salvage an industry and all it

2   represents, as well as protect the taxpayers' money.  The

3   Treasury hired an extremely abled cadre of experienced persons

4   to discharge this function.  They have made -- the Treasury has

5   made a decision that a prompt approval of the 363 transaction

6   is a condition precedent.  If there is no sale order there's no

7   more financing.  And, Your Honor, there is no evidence to the

8   contrary in respect of that.

9          Mr. Richman raises for the first time the credibility

10  of Mr. Wilson.  Mr. Wilson testified yesterday candidly and at

11  length.  And there is nothing in his testimony which would

12  establish that he was lying, falsifying any respect whatsoever.

13  And counsel for the treasury has reiterated the position that

14  Mr. Wilson testified, and there's nothing else in the record,

15  Your Honor.

16         The Court must accept that undisputed evidence and

17  take it into account the consequences of non-approval.  So in

18  connection with Mr. Jakubowski's argument, both the statutory

19  construction, I would submit to Your Honor that this Court has

20  ample power under its equitable powers to construe a statute so

21  that it may implement and further the interests of bankruptcy

22  reorganization and bankruptcy law under the bankruptcy code.

23         And in the context of stare decisis, again, Your

24  Honor, the Chrysler case is the decisional authority in this

25  circuit.  And, certainly, the TWA case is very persuasive, both

1    on bankruptcy court level and on the Court of Appeals level.

2            So then, Your Honor, I turn to Mr. Esserman.  And in

3    connection with that I will also deal with all the asbestos

4    claimants.  The argument is made, Your Honor, that somehow

5    OldCo should comply with 524(g).  524(g), by it's very

6    language, refers to the confirmation of a plan of

7    reorganization that would discharge asbestos claimants.  There

8    is not going to be any discharge here, Your Honor.  OldCo is in

9    liquidation, there will be no discharge of liabilities.

10   524(g), by its very terms, could not be complied with because

11   fifty percent of the equity of the so-called surviving

12   corporation is not available.  So 524(g) is not a player in

13   this scenario, Your Honor.  And Judge Gonzalez, again, Your

14   Honor, specifically held that 524(g) did not apply to the

15   Chrysler 363 transaction.  There is no discharge and there is

16   no channeling order requested.  What we have said to Your Honor

17   in the course of these proceedings, this will be an issue that

18   Old GM, OldCo, will have to deal with.  That the creditors'

19   committee will have to deal with in structuring a plan of

20   liquidation for OldCo.  How existing asbestos claimants are

21   going to be treated to the extent they have allowed claims, and

22   potential future claimants may be treated is an appropriate

23   subject for OldCo.  And it would not be different from some

24   other cases where, in the situation of a liquidation, a

25   specific fund is created to deal with future claimants.  But

166

1    that's an issue to be determined, Your Honor, after the sale is

2    consummated.

3           THE COURT:  Mr. Miller, there's no channeling order,

4    but there is an injunction requested.  And the two lawyers who

5    were raising asbestos issues pointed out that if you did give

6    personal notice and applied it to every state in the United

7    States you wouldn't be able to do much with it because they

8    wouldn't know that they've contracted asbestos.

9           Now, I have an interesting twist here.  Both of those

10   folks represent existing asbestos claimants who analytically in

11   the Jakubowski situation.  But I also believe that this issue

12   was raised that hasn't been discussed in the Second Circuit

13   argument in the (indiscernible) appeal.  To what extent would

14   it be proper or improper in Your view if words were added to

15   any approval order that said to the fullest extent

16   constitutional principal?

17          MR. MILLER:  Just speaking for myself, Your Honor,

18   without consultation for client, I don't have problem with that

19   language.  But I would, again, note, Your Honor, that Judge

20   Gonzalez dealt with the issue of notice and I do not recall the

21   colloquy between Judge Sack and Mr. Esserman, and I'm not sure

22   that colloquy related to injunctions or the ability to sue.

23   All I'm saying, Your Honor, there is going to be an estate.

24   And estate which we believe will have significant value.

25          Part of the claimants who will have rights against

1    the property of that estate will be asbestos claimants, current

2    and future.  And that estate, as part of its plan of

3    liquidation can provide a mechanic to deal with future

4    claimants.  That's not unheard of, Your Honor, the creation of

5    a fund or putting aside assets, so when the disease manifests

6    itself and there is an actual claim there will be a source of

7    recovery.  That can be done within that context.  And there is

8    no discharge in connection with that, Your Honor.

9            And besides, Your Honor, I think it was Mr. Koch

10   testified it will be three or five years, the asbestos

11   situation has been going on now, Your Honor, for I think pretty

12   close to thirty-five years.  GM has not been using brake

13   linings with asbestos for a long time.  If and when these

14   claims manifest and whether they're allowable or not, Your

15   Honor, is another issue that has to be dealt with.  But as far

16   as 363(f) is concerned, as Judge Gonzalez held, and the

17   specific provision in the order is I would construe it as a

18   very broad provision.  And you have to assume, Your Honor, that

19   in the appeal in Chrysler it was considered as Your Honor may

20   have noted in the colloquy, there was a discussion of it.

21           THE COURT:  Oh, there was definitely a discussion of

22   it.

23           MR. MILLER:  And also, Your Honor, I think we have to

24   refer to the per curiam decision of the Supreme Court in

25   connection with the application for a stay.  While the Supreme

1    Court said that it wasn't ruling on the merits, it did say that

2    the applicant, the Indiana Pension Funds, had failed to

3    demonstrate:  1) a reasonable probability that four justices

4    would consider an issue sufficiently meritorious to grant

5    certiorari, or to no probable jurisdiction.  Now, in reaching

6    that conclusion they had to evaluate what was decided by Judge

7    Gonzalez.  2) a fair prospect that a majority of the Court will

8    conclude that the decision below was erroneous; and 3) a

9    likelihood that an irreparable harm would result from the

10   denial of the stay.  So while it's not a ruling on the merits,

11   Your Honor, it does say something about the Supreme Court's

12   view of Judge Gonzalez's decision.

13          So coming back, Your Honor, into the context of stare

14   decisis, again, this is the law in the Second Circuit, and this

15   is the law that should be followed in connection with this

16   transaction that is so important to so many people.

17          Now, Your Honor, turning to Mr. Kennedy who made,

18   likewise, a very impassioned and emotional argument, and

19   likewise, I and everybody here, Your Honor, empathizes with his

20   clients and wished that there was a way to assuage his emotion

21   as well as his client's.  But alas, I can't do it, Your Honor.

22   He took issue, Your Honor, with a statement I made in

23   connection with my initial closing argument referring to his

24   papers as construing that there was a conspiracy, a conspiracy

25   among GM and the Treasury to deprive the splinter union

1    retirees of their benefits.

2           There is nothing in this record, Your Honor, that

3    would support a determination of a conspiracy and all of the

4    elements that would constitute a conspiracy.  Indeed, the

5    record goes the other way, Your Honor.  Mr. Henderson testified

6    that up until the very end of May, there was the hope of GM

7    that the bond exchange offer would be successful.  And if the

8    bond exchange offer would have been successful, there would

9    have been no impact on the retirees.

10          And further, Your Honor, in Mr. Rory's deposition,

11   which has been designated to Your Honor, at page 44 -- I'm

12   sorry, page 43, Your Honor, he refers to an exhibit which is

13   really Exhibit 9, which is in the record.  And he was directed

14   his attention to the first page of that exhibit.  And there's a

15   line in this exhibit, and the title of this exhibit, Your

16   Honor, is History of OPEB Defeasement - IUE.  And in the middle

17   of the third bullet point, it says, "2006, IUE resisted

18   mitigation VEBA concept - reluctant to bargain retiree VEBA for

19   large population from legacy operations (e.g. Frigidaire) not

20   represented by active members - relatively small active

21   population to generate wage and COLA deferrals."

22          So what does that demonstrate, Your Honor?  That in

23   2006, GM was in actual negotiations with the IUE about creating

24   a VEBA, a VEBA that would have provided the health and medical

25   benefits, and yet the union resisted that.  That VEBA could

170

1    have been set up in 2006, Your Honor, and it would have been

2    active.

3            In addition, Your Honor, Mr. Kennedy is an excellent

4    lawyer, and he knew how to play the strings on numbers.  He

5    talked about the 26,000 retirees of the splinter unions who

6    will be deprived of retiree benefits.  And actually, as he

7    spoke, Your Honor, he went on to say that approximately 20,000

8    of those retirees are already post-sixty-five, so they're on

9    Medicare.  And under the proposed retiree benefits that had

10   been offered, all benefits cease from the VEBA or General

11   Motors at the point that you go on Medicare.  So basically,

12   Your Honor, we're talking about 6,000 retirees, who right now,

13   are getting their retiree benefits.

14           Unfortunately, as OldCo goes into liquidation,

15   there's no way that you can sustain paying 26 million dollars a

16   month for retiree and medical benefits.  The exhibit -- I

17   forget the number, Your Honor -- of the statement made by Mr.

18   Henderson, clearly demonstrates that there was an effort to try

19   and find a way, a means, to assist the splinter union retirees

20   and the maintenance of benefits for those retirees.  There's

21   nothing else in the record, Your Honor, except that what

22   happened at the end of May when a decision was made that there

23   had to be a transaction, there had to be something to

24   regenerate and maintain the going concern value of these

25   assets, and that the 363 transaction was the best way to do

1    that, that this sale was finalized.

2         That doesn't give rise, Your Honor, to a conspiracy

3    to deprive these retirees of their benefits.  As Mr. Wilson

4    testified, Your Honor, the guiding principle of the Treasury

5    was to acquire the assets and assume the liabilities which were

6    necessary and incidental to the creation of a commercial

7    success; a commercial success, Your Honor, which would inure to

8    the benefit of OldCo and the creditors of OldCo.

9         This morning Your Honor heard of a potential

10   compromise with the State of Michigan on Workman's

11   Compensation, where NewCo or New GM has agreed to pick up the

12   Workman's Compensation obligations.  Now, why was that done?

13   That was done because if GM -- New GM did not do that, the

14   State of Michigan was not going to allow New GM to be a self

15   insurer, which would have cost New GM an enormous amount of

16   money; and which would come out of its cash flow.  By assuming

17   that liability, it is now going to be allowed to be a self

18   insurer.

19        Essentially, Mr. Kennedy, in his impassioned plea, is

20   arguing something which is novel.  He is basically saying, Your

21   Honor, that Sections 1113 and 1114 are effectively in the same

22   status as liens on the land.  They run with the assets.  That

23   you cannot transfer assets of a unionized business without

24   dealing with obligations under 1113 and 1114.  There is no

25   legal authority that supports that proposition, Your Honor.

172

1   There is no requirement that before you transfer assets, you

2   must reject the collective bargaining agreement, if that's the

3   condition.  There is no requirement in connection with a 363

4   sale that you must comply with 1114.  OldCo --

5           THE COURT:  Can I assume that there will be

6   compliance by OldCo with 1114?

7           MR. MILLER:  Until such time as Your Honor may rule

8   on an 1114 motion.  Yes, sir.  Right now, today, all of the IUE

9   retirees are still receiving the full benefits under that

10  program.  That's what's costing -- and I'm including all the

11  splinter unions, Your Honor -- that's what's costing

12  approximately twenty-five- to twenty-six million dollars a

13  month.

14          Now, as OldCo goes into its liquidation phase,

15  obviously that is not a sustainable benefit in a liquidation

16  scenario, nor is it a sustainable benefit in the context of New

17  GM, Your Honor.  Are we going to inflict upon New GM some of

18  the problems that contributed mightily to the demise of Old GM.

19  The concept of having job banks of thousands of employees who

20  sit around and don't do anything except paychecks with no

21  benefit to the ongoing operations, work rules, et cetera, and

22  conditions under collective bargaining agreements.  What has

23  happened here, Your Honor, is the Treasury, a government

24  sponsored purchaser, who has had to make an agreement with the

25  UAW because otherwise there would be no employees.  And it's

173

1    unfortunate that the IUE has basically no active employees.

2    Not necessary to the operation of the plants that are being

3    acquired by the purchaser.  And there has to be a line of

4    commercial reasonableness in terms of what New GM is going to

5    assume in connection with a sale.

6         Mr. Kennedy also criticized me because I used the

7    word jealousy in respect of the discussions or descriptions

8    that have been made in connection of the UAW recoveries through

9    the purchaser.  I withdraw the word jealousy.  Nonetheless,

10   through half this case I have heard repeated over, and over

11   again, that the UAW is getting too much and that it's just

12   unfair.  Well, it's the economic circumstances, Your Honor,

13   that resulted in the UAW situation.  The proposal by Mr.

14   Jakubowski that Your Honor an order of conditional approval

15   just doesn't work, it's not acceptable to the purchaser.  It

16   doesn't benefit the New GM and it doesn't benefit the Old GM.

17   Because the conditional approval will have a terrible negative

18   effect on consumers.  Everything that this company has been

19   fighting for the last thirty days to make it clear to the

20   consumer that it's not going to be entangled in a bankruptcy

21   case, that these assets which will form a foundation of a new

22   OEM will be there free of the entanglements of bankruptcy will

23   dissipate.

24        And Mr. Richman, again, raised the issue in his

25   closing argument well, GM is really doing well in Chapter 11,

174

1    look at the month of June.  It was only thirty-three percent

2    below June of 2008.  And as Mr. Henderson testified lead sales

3    were down by an even greater margin.  And if Your Honor

4    happened to read this morning's New York Times it shows the

5    relative figures between Chrysler, Ford and GM.  And what you

6    have to surmise out of that or infer out of those discussions,

7    Your Honor, that Ford's market share is rising.  And where is

8    that market share coming from.  As we sit here today -- stand

9    here today, GM's market share is our owee.  And the longer it's

10   in this process the more that will happen.

11          And Mr. Henderson testified that GM will not make

12   money in 2009, which means that somebody has to finance these

13   operations going forward.  And not one objector has brought

14   forth a financier.  Not one objector has brought forth an

15   alterative -- a viable alternative other than, Your Honor, you

16   should deny this application, we'll play poker or Russian

17   roulette with the government.  And if the government walks,

18   well, we'll just have a Chapter 11 case and see what happens.

19          Well, what does that mean, Your Honor?  Without

20   financing it would be the obligation of Old GM to close every

21   factory, to terminate every employee except those that are

22   needed to preserve and protect the properties.  The results

23   will be catastrophic, Your Honor, and irreversible.  So we're

24   be brought back again, Your Honor, to the bluff game.

25          But there's nothing in the record that says that the

175

1    Treasury is bluffing.  And I take the representation of counsel

2    for the United States that that representation is made on

3    information furnished to him by his client, the U.S. Treasury.

4    But again we hear the argument, Your Honor, that this was all

5    a -- this is not a true sale, and part of that also relates

6    back to this infamous document, Bondholders' Exhibit 2 from the

7    Cadwalader firm, about the use of Section 363.  I would venture

8    to say, Your Honor, if anybody goes to a CLE program on

9    bankruptcy, they will get this slide show without the names.  I

10   don't want to demean Cadwalader, Your Honor, but I think that

11   this is in general circulation.

12          Now, looking at that exhibit, Your Honor, and looking

13   at the record as to what GM did, if the board of directors of

14   GM did not consider the various alternatives, that board of

15   directors might have been remiss in its duties.  It had an

16   obligation to consider all alternatives and to rely upon the

17   advice of its professionals and advisors.  That's what the

18   board of directors did, and that's what the exhibits establish.

19   Clearly, there were presentations to the board as to what

20   bankruptcy provides for, what happens in a bankruptcy.

21   Otherwise, the board of directors could not be discharging its

22   fiduciary obligations.

23          I just want to see where I am in this, Your Honor.

24          Now, if I might, Your Honor, I would turn to Mr.

25   Richman's comments.  Last evening, Your Honor, Mr. Richman

1    asked for more time to prepare his closing arguments so that he

2    could address the evidence in the record.  I listened carefully

3    to Mr. Richman's argument.  There were no references to the

4    record other than his claim that Mr. Wilson is not credible.

5    During the course of these proceedings, he put on no evidence,

6    no witnesses, no declaration of fact, no expert witness.  In

7    fact, he didn't do very much other than work off what was in

8    the record.

9        All of the others' evidence shows good-faith

10   bargaining, good-faith business judgment.  And he concedes that

11   it's in the best interest of all parties that the GM assets be

12   sold.  His cross-examination of Mr. Wilson certainly did not

13   shake Mr. Wilson's credibility.  What he's doing, Your Honor,

14   he's asking you to take his opinion and speculate on the future

15   and not refer to the evidence that has been sworn to in these

16   cases -- in these proceedings.  And basically he says, Your

17   Honor, oh, Chapter 11 is an easy process, given a few days

18   parties can agree on various things and in ninety days we can

19   be out of Chapter 11.  I would just say, Your Honor, just

20   taking these three days of hearings as an example of what

21   happens in a Chapter 11, the concept that you could file a

22   Chapter 11 plan, and he doesn't even describe the Chapter 11

23   plan that you would file on the first day, but any Chapter 11

24   plan that you file that had open ends to it would involve the

25   appointment of creditors' committees, disclosure statements,

177

1    arguments over valuation.  The concept that a case of the size

2    and complexity of GM would move through some accelerated basis

3    so that you can have a confirmation in ninety days, I think,

4    Your Honor, is not credible.  It just doesn't happen.

5            I refer to the Delphi case.  The Delphi case was

6    supposed to move on a fast track.  That track seems to have

7    disappeared.  And in July -- later this month, I should say,

8    Your Honor, Delphi will either have a resolicited plan of

9    reorganization or will have a 363 sale with substantially less

10   recoveries for the creditors and basically no recoveries for

11   the unsecured creditors.

12           The problem with long term bankruptcies -- and I

13   don't mean long term to be years, Your Honor -- is that things

14   happen in bankruptcy cases.  People come into the court with

15   all kinds of motions, applications, and various moves to get

16   leverage.  We spent three days on this proceeding.  Think of

17   the days that would be spent in valuation discussions; the

18   possibility of the appointment of an examiner; fights between

19   ad hoc committees and independent committees.  And all during

20   this process,   Mr. Richman never refers to who's going to

21   finance it.  Where's the money going to come from while

22   everybody's having fun in the courtroom.

23           Mr. Jones says don't look at the Treasury.  We've got

24   to protect the taxpayer's money and we're not going to put good

25   dollars after bad dollars.  And while this is happening, Your

178

1    Honor, the consumer is scratching his or her head and saying is

2    there going to be a GM that's going to produce good vehicles,

3    reliable vehicles that I know I can service?  What are the

4    dealers going to say, Your Honor, when this process goes on

5    with no plan other than "We're going to stiff the Treasury and

6    we're going to make the Treasury put in more money."  That is

7    an awful gamble to play in this case when you're dealing

8    with -- and I sympathize with Mr. Kennedy and his 26,000

9    retirees, but we're talking about the UAWs with almost 600,000

10   retirees and active employees, 235,000 GM employees worldwide.

11            Yesterday, I think, Your Honor, Lear, a supplier to

12   GM, commenced bankruptcy, Chapter 11 cases.  In the past month

13   I think there have been three or four suppliers.  If this case

14   doesn't come out the way it has been programmed, with a 363

15   transaction, there will be chaos in the supplier industry.

16   Systemic danger is all over the horizon, Your Honor.

17            So what do we get down to, Your Honor?  We get down

18   to a situation in which there is no palatable alternative.  No

19   financier has shown up, and I think it is very significant,

20   Your Honor, that notwithstanding all the notoriety about GM

21   pre-Chapter 11 and post-Chapter 11, nobody -- no hedge fund, no

22   private equity fund, no foreign investor has come along and

23   said gee, I really would like to take a look at GM and maybe I

24   would like to buy it or parts of it.  Not one party has been

25   interested.  Not one party has been willing to sign a

179

1     confidentiality agreement to get into the data room and look at

2     it for the purposes of considering a bid.  There hasn't been

3     one expression of interest.

4            So we have a situation, Your Honor, where the only

5     offer at all for these assets is the government-sponsored

6     purchaser, the only entity that will be able to get financing

7     and make these assets into a valuable original equipment

8     manufacture.  The only other option is to commence the

9     liquidation process because this company cannot survive without

10    financing, and there is no financing.  And when that becomes

11    public knowledge, that's the end of its ability to really sell

12    cars.  Then you are in the liquidation and no consumer, unless

13    he gets a terrific discount and takes his chances or her

14    chances, will buy a GM vehicle.

15           There has to be a cutoff and a creation of certainty

16    as to the future of these GM assets.  And the fact, Your Honor,

17    as I alluded to before, that GM management is moving over,

18    doesn't make it a nonsale.  It's a sale.  There's a real

19    purchase price that's being paid here.  There is an independent

20    company that is buying these assets and will be an independent

21    company going forward, and hopefully in a very short period of

22    time, a publicly owned company for the benefit not only of

23    shareholders of this company but the whole automotive industry.

24           Mr. Richman said that the White House will not allow

25    GM to fail.  I haven't heard anything come out of the White

180

1    House recently about these cases, but I recall President

2    Obama's speech that either Chrysler finds itself a purchaser by

3    May 1 or April 30 or there will be no further financing.  And

4    if GM doesn't come up with a viable plan by June 1st, that's

5    the end.  And I believe the President meant it.  And clearly,

6    the Chrysler people believe that he meant it, even though it

7    must have given Fiat some bargaining leverage.  There is

8    nothing on the record -- I keep repeating this Your Honor --

9    that there will ever be additional financing.

10          I believe all of the objectors agree that if Your

11   Honor found that this is a legitimate sale, then the

12   transaction should be approved.  Delaying the transaction so

13   that various parties can try to exercise leverage by being ad

14   hoc committees in a Chapter 11 or attempting to be additional

15   committees only means further delay in the conservation of a

16   plan, a delay that cannot be borne by this company.

17          Mr. Richman's closing argument, Your Honor, as I

18   said, had nothing to do with the record that was made before

19   Your Honor in the past two days.  It was his ipse dixit as to

20   what he thinks could happen in a Chapter 11 case.  With no

21   expert testifying, there's no other person offering any support

22   for that position.  He offers nothing in the way of a

23   purchaser.  He offers nothing in the way of a financier.

24          I believe, Your Honor, Mr. Richman's closing argument

25   was just his opinion and his advice to you that you should take

1    up the purported bluff of the U.S. Treasury and that's an

2    awesome responsibility that he wants to impose on your

3    shoulders.

4            With respect to, Your Honor, to Mr. Parker, we have

5    submitted, Your Honor, and I'm not going to speak further on

6    it, the statements and the arguments made by Mr. Parker with

7    respect to the equal and ratable clauses in the indentures, are

8    just not accurate.  Mr. Parker has not established and he's not

9    produced any certifications or a record of any lien filings

10    with respect to the excluded assets, and the agreements are

11    quite clear that if there were no liens granted to the federal

12    government, the U.S. Treasure in connection with the security

13    agreement of 12/31/08 that was subject to those indentures.

14            THE COURT:  Let me go back to the Secured Financing

15    101.  UCC-1 perfects the security interests but the security

16    interest has to -- it's separately granted, am I correct?

17            MR. MILLER:  That's correct, Your Honor.

18            THE COURT:  And romanette v says that (indiscernible)

19    will be granting the security interest?

20            MR. MILLER:  I'm sorry, sir?

21            THE COURT:  And romanette v says, in its excluded

22    assets -- or excluded liens provision, that there isn't a grant

23    of security?

24            MR. MILLER:  That's correct, Your Honor.

25            THE COURT:  Okay.

1          MR. MILLER:  And Mr. Henderson testified at length,

2     Your Honor, that there were no liens granted in violation of

3     the indentures.

4          Bad faith.  Mr. Parker says that the purchaser has

5     not acted in good faith.  Yet the record is to the contrary.

6     The record establishes the extent and nature of the

7     negotiations, how they were conducted, and that they were

8     consistent with the standards of good faith under the cases.

9          The TARP argument.  Again, Your Honor, that argument

10    was raised in Chrysler, and Judge Gonzalez ruled on that.  It

11    involved the DDSA and TARP, and that argument was not

12    successful and was continually raised by the Indiana pension

13    plans that you can't use TARP money for these purposes.  And in

14    this circuit, Your Honor, at least, that is not an argument

15    that can stand.

16         Mr. Parker also complains about the scheme of

17    distribution.  And again, the basis of his argument on the

18    scheme of distribution is the UAW is just getting too much,

19    while the record is replete with the rationalization and

20    reasons why the UAW ended up in that position.  There are

21    sometimes, Your Honor, when union membership is a good thing.

22    Sometimes not.  But these active employees are critical to this

23    transaction.  If we did not have these employees, there would

24    not be a 363 transaction.  And more importantly, Your Honor,

25    the consideration that is being given to the UAW VEBA is coming

183

1     from the purchaser and not from OldCo.

2            And if this deal is not approved and this transaction

3     doesn't go forward, and Mr. Curson's testimony demonstrates,

4     the UAW claims, the VEBA claims will be reasserted in the OldCo

5     case so that you will be adding on an additional twenty plus

6     billion dollars of liabilities which will substantially dilute

7     the position of the bondholders and other creditors.

8            I am not going to deal with Mr. Bernstein's argument,

9     Your Honor, as to the consent decree and the effect of that.

10    That's an issue that can be determined in the future.  My

11    colleague, Mr. Karotkin, said I should refer to the case of In

12    re Rochnunis (ph.) and say pay the 62,000 dollars.  I'm not

13    going to do that.

14           As I understand it, Your Honor, the indenture

15    trustees are no longer objecting.  Mr. Reinsel, I think his

16    name is, made the same arguments as Mr. Esserman in respect of

17    asbestos claimants, and I think I've dealt with that.

18           So Your Honor, we get down to the basic issue.  And

19    in connection with --

20           THE COURT:  Before you wrap up, do you want to

21    comment in any way on Ms. Taylor's point that I should have

22    language in the approved order that says, in substance -- I

23    don't know if she's saying just that nothing in this order

24    affects the government's ability to use its police power or if

25    she's looking for more than that.  And I don't know if what she

184

1    says has controversial implications that I'm not sensitive

2    enough to.

3            MR. MILLER:  I would just note, Your Honor, that the

4    proposed sale order in paragraph 55 states, "Nothing contained

5    in this order shall in any way:  1) diminish the obligation of

6    the purchasers to comply with environmental laws or 2) diminish

7    the obligations of the debtors to comply with environmental

8    laws consistent with their rights and obligations as debtors-

9    in-possession under the Bankruptcy Code."  I would submit to

10   Your Honor that is fairly broad language that imposes on the

11   purchaser and the debtors as debtors-in-possession.  And there

12   is no intent to circumvent or evade the environmental laws.  To

13   the extent that New GM is acquiring plants that may have

14   environmental problems, they will be responsible for that.  To

15   the extent --

16           THE COURT:  Kind of like in Magcorp.

17           MR. MILLER:  I'm sorry?

18           THE COURT:  Kind of like in Magnesium Corporation of

19   America.

20           MR. MILLER:  That's correct, Your Honor.  And to the

21   extent that OldCo retains plants that haven't -- I mean, the

22   whole controversy, Your Honor, about the wind-down budget only

23   related to environmental claims.  As the analysis of the

24   environmental claims and the potential exposure there went up,

25   the committee, justifiably, said we need more in the wind-down

185

1    budget to cover environmental claims.  So there is no intent --

2    and I would submit to Your Honor the language is sufficiently

3    broad, and if the New York State Attorney General has a problem

4    with it, we'd be happy to work that language out with her.

5              THE COURT:  Okay.  Continue.

6              MR. MILLER:  So Your Honor, we come down to the final

7    aspect, I hope, of this proceeding.  The record, Your Honor, I

8    believe is abundantly clear.  The business justification has

9    been articulated.  Mr. Richman referred to the Lionel case and

10   the various factors in the Lionel case.  And in the Lionel

11   case, as Your Honor may recall, the sale was disapproved.  It

12   was disapproved and reversed by the Second Circuit because it

13   was being done at the insistence of the creditors' committee

14   who wanted a cash distribution as part of a subsequent plan of

15   reorganization.  And the issue was their electronics, the

16   common stock of that partially owned subsidiary.  But in the

17   Lionel case, Your Honor, there was no danger of diminution in

18   value.  Dale Electronics was an independent company listed on

19   the New York Stock Exchange.  The value of that stock was not

20   diminishing.  And as it turns out, three years later or two

21   years later it was at the same value.

22             We have a different case, Your Honor.  And as pointed

23   out by the Second Circuit in Lionel, the most important factor

24   is the potential diminution in the value of the assets.  This

25   record establishes that if this transaction is not approved,

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

186

1    the value of the GM assets will deteriorate and may deteriorate

2    at a much more rapid pace than either you or I or Mr. Richman

3    understands.  The fact that GM did better than its downside

4    projections in the month of June doesn't establish anything

5    when the month of June was thirty-three percent below the same

6    period in 2008, and a decline of forty-three percent in fleet

7    sales.  And then we have Mr. Henderson's testimony, even going

8    forward GM will lose money in 2009.  If we don't start -- if

9    the purchaser doesn't start using these assets as part of a new

10   GM, a new, leaner, more competitive, more efficient GM, the

11   downward cycle will be irreversible.

12          So we fit right within Lionel and its progeny.  We

13   have -- I will have to call it, Your Honor -- I don't want to

14   call it a melting ice cube because I got criticized for that

15   once before -- a wasting asset.  These are assets that will

16   deteriorate in value.  And that deterioration will be felt by

17   all of the stakeholders, including the stakeholders that oppose

18   this transaction.

19          The bottom line, Your Honor, is that there is no

20   viable alternative.  And that's the kind of situation that

21   Section 363 was enacted for, to deal with a situation where

22   there had to be a relatively quick sale of assets.  And

23   fortunately, we've had thirty days to see if there's anybody

24   else in the market for these assets.  What we have done, Your

25   Honor, is establish the value of these assets.  We've also

187

1    established that nobody's interested in buying them other than

2    this purchaser.

3              And the fact that it's the government, Your Honor,

4    doesn't detract that it is a purchaser.  It's voluntarily doing

5    this, Your Honor.  One, to protect the taxpayer's monies in the

6    hope that it will recover a portion of the taxpayer's monies.

7    And two, to try and salvage an industry.  But there are limits

8    to that, Your Honor, and the government has clearly said what

9    the limits are.

10             So we are in a situation where we can do this

11   transaction, we can create a new GM.  Yes, we're going to use

12   the same name, but we're only going to have four brands, Your

13   Honor.  We're going to have Cadillac, Chevrolet, Buick, and

14   GMC.  A leaner, more competitive GM that will benefit the

15   domestic industry, that will provide more value to the economic

16   stakeholders than any other alternative that has been

17   proffered, and no alternative, unfortunately, Your Honor, has

18   been proffered to date.

19             So on behalf of the debtors, Your Honor, we submit

20   that this case fits squarely within the four corners of 363(b).

21   There has been an articulated business reason for this sale.

22   It is reasonable business judgment.  The board of directors of

23   GM discharged their fiduciary obligations in considering the

24   alternatives and going forward with this Section 363 sale.  And

25   the purchaser, the government-sponsored entity, has acted in

188

1    good faith in negotiating this transaction, as demonstrated by

2    the negotiations that have gone on to this very hour.  There

3    has been no bad faith as Mr. Parker alleges.

4         To allow these assets to go through a process of

5    liquidation would be horrific, Your Honor, a situation that

6    Your Honor should not allow.  And Your Honor should approve

7    this transaction.  Thank you.

8         THE COURT:  All right.  Thank you.  All right.

9    Ladies and gentlemen, this hearing is now closed.  We're going

10   to take a lunch break for an hour, and then if you have any

11   deals to announce to me or any housekeeping matters, I'll hear

12   them an hour from now.  However, there will be no further

13   argument on today.  If it turns out that there are no

14   additional deals to announce or understandings to confirm, it

15   will be very short an hour from now.  The purpose of this,

16   among other things, is to give you a chance to talk to folks to

17   ascertain whether or not you need or want to put anything on

18   the record.  And there may be other people similarly situated.

19   I also will need to talk to at least one person of medium or

20   higher level seniority from each constituency to discuss

21   getting the transcript and exhibits to make sure that I have a

22   full set and the like.  This matter is taken under submission

23   and at this point we're in recess.  Thank you.

24        (Recess from 1:42 p.m. until 2:54 p.m.)

25        THE COURT:  Okay, folks, I need to get to work.  And

189

1    we said that we would set aside some time for you folks to put

2    deals on the record and deal with housekeeping matters, and I

3    have one or two of my own.

4            Mr. Karotkin or Ms. Cordry, who would like to take

5    the lead on taking care of some of those things?

6            MR. KAROTKIN:  Your Honor, I believe we have reached

7    an understanding with Ms. Cordry as to the proposed terms and

8    provisions of a proposed order to address the concerns she has

9    raised.

10           THE COURT:  Okay.

11           MR. KAROTKIN:  Is that correct?

12           MS. CORDRY:  Yes.

13           MR. KAROTKIN:  Okay.  And the one -- so I think that

14   addresses those issues.  If I might, Your Honor, the Attorney

15   General from the State of Texas would like to leave to catch a

16   plane.

17           THE COURT:  Sure.

18           MR. KAROTKIN:  So I --

19           THE COURT:  Would you like to say something before

20   you have to go?

21           MR. KAROTKIN:  He had asked me if I would read into

22   the record --

23           THE COURT:  Oh, okay.

24           MR. KAROTKIN:  -- three paragraphs which would

25   address his concerns as well.

190

1          THE COURT:  All right.

2          MR. KAROTKIN:  These would be three paragraphs that

3     would be inserted into the proposed order:

4          "Entry by GM into the Participation Agreements with

5     Accepting Dealers is hereby approved, and that the offer by GM

6     and entry into the Participation Agreements was appropriate and

7     not the product of coercion.  The Court makes no finding as to

8     whether any specific provision of any participation agreement

9     governing the obligations of Purchaser and its Dealers is

10    enforceable under applicable provisions of state law.  Any

11    disputes that may arise under the Participation Agreements

12    shall be adjudicated on a case-by-case basis in an appropriate

13    forum other than this court."

14         THE COURT:  Mr. Roy, did he get it right?

15         MR. ROY:  He got the first paragraph right, Your

16    Honor.

17         THE COURT:  Still didn't express your last

18    implication there?

19         MR. KAROTKIN:  This is very stressful for me, Your

20    Honor.

21         THE COURT:  Okay.

22         MR. KAROTKIN:  The next paragraph would be, "Nothing

23    contained in the preceding two paragraphs shall impact the

24    authority of any state to regulate Purchaser subsequent to the

25    closing."

1        And the final paragraph is as follows:  "This Court

2    retains exclusive jurisdiction to enforce and implement the

3    terms and provisions of this order, the MPA, all amendments

4    thereto, any waivers and consents thereunder, and each of the

5    agreements executed in connection therewith, including the

6    Deferred Termination Agreements in all respects, including but

7    not limited to retaining jurisdiction to:  (a) compel delivery

8    of the Purchased Assets to the Purchaser; (b) compel delivery

9    of the Purchase Price or performance of other obligations owed

10    by or to the Debtors; (c) resolve any disputes arising under or

11    related to the MPA, except as otherwise provided therein; (d)

12    interpret, implement and enforce the provisions of this order;

13    (e) protect the Purchaser against any of the retained

14    liabilities or the assertion of any lien, claim, encumbrance or

15    other interest of any kind or nature whatsoever against the

16    Purchased Assets; and (f) resolve any disputes with respect to

17    or concerning the Deferred Termination Agreements.

18        "The Court does not retain jurisdiction to hear

19    disputes arising in connection with the application of the

20    Participation Agreements, which disputes shall be adjudicated

21    as necessary under applicable state or federal law in any other

22    court or administrative agency of competent jurisdiction."

23        THE COURT:  Okay, I'll try to -- again, Mr. Roy, did

24    he get it right this time?

25        MR. ROY:  He got it all right this time, Your Honor.

192

1          THE COURT:  Okay.  Fair enough.

2          MR. KAROTKIN:  I believe, with that, this gentleman

3    is prepared to withdraw the --

4          MR. ROY:  Yeah, Your Honor, with the agreement that

5    that language is going to be in the order that the debtors

6    submit as a proposed sale order, and with the understanding

7    that there's no objection from any other party, including

8    Treasury, the State of Texas is prepared to withdraw its

9    objection.

10         THE COURT:  Okay, Mr. Schwartz?

11         MR. SCHWARTZ:  That's correct, there's no objection.

12   We had a small tweak to add the federal government's ability to

13   continue to regulate the purchaser.  I'm not sure if these

14   folks have signed off on it.

15         THE COURT:  In other words, you're proposing that

16   there be an even more regulatory environment than what Mr. Roy

17   was asking for?

18         MR. SCHWARTZ:  Exactly right.

19         MR. ROY:  So I'm getting more than I asked for.

20         THE COURT:  It sounds to me like you wouldn't care if

21   they got that, Mr. Roy.

22         MR. ROY:  No, not at all.  This -- I believe that

23   this protects the state's ability to enforce its regulatory

24   scheme.

25         THE COURT:  Okay.  Well, fair enough.  I assume that

193

1    takes care of your needs and concerns then, Mr. Roy?

2            MR. ROY:  It does, Your Honor.

3            THE COURT:  Have a good flight.

4            MR. ROY:  Thank you so much.

5            THE COURT:  Thank you.

6            MR. ROY:  It's been a privilege.

7            THE COURT:  Thank you.

8            Ms. Cordry?

9            MS. CORDY:  Having come here and sat here through the

10   last couple of days, I did want to indicate for the record the

11   basis on which the states were finding a resolution of their

12   objection.  And I will be very brief, but I do want to, sort

13   of, lay out what is in here and what the basis was for pulling

14   what we had filed.

15           Certainly this is an extraordinary case; I think

16   everyone agrees on that.  On the other hand, in some ways it's

17   also like every other Chapter 11 case in that it has to follow

18   the Bankruptcy Code.  The Supreme Court has told us that the

19   uniformity clause sets aside bankruptcy from every other

20   portion of Congress's powers.  So it's for those reasons that

21   the states initially analyzed this case under their view of

22   what the Bankruptcy Code says without a special exception for

23   the mega auto bankruptcy problems.

24           We had a number of problems with the order with

25   respect to clarity in a number of respects, with taxes,

194

1    environmental law, other provisions.  We had concerns with the

2    substance of the terms in terms of what was being assumed, what

3    was not being assumed.  The treatment of these dealer

4    agreements was a major issue for the states, and I'll get to

5    that in just a moment, and then some of the terms of the order

6    in terms of the way it was phrased about successor liability,

7    which was some of the questions I asked yesterday.

8         We have worked very hard since the beginning of the

9    case with debtors' counsel initially, with Treasury counsel,

10   almost everybody in this room at some point or another, it

11   feels like.  And I think a great number of improvements have

12   been made in this agreement over that time period.  The first

13   was the assumption of the future product liability claims.

14   Obviously, we -- you know, in a perfect world, we would not be

15   distinguishing between those two categories, but certainly

16   that's better than none of them.  And it certainly goes a ways

17   to addressing issues that were raised by the state Attorney

18   Generals.  And by the way, I am speaking strictly on behalf of

19   the forty-five-Attorney-General-objection that's there.

20        With respect to the dealers, you heard yesterday, one

21   set of dealers talked to you about the process of being

22   required to sign on to those.  And there was a statement that

23   while 99.6 percent of the people signed it, so it must have

24   been a great deal.  I -- as a matter of reality, I think most

25   things that you get 99.6 percent of people signing on are

195

1    probably not the greatest deal in the world; they're just

2    better than something really awful.  But we're leaving aside

3    that concern.

4        There was a second concern that the ongoing terms of

5    those agreements that we were being asked to sign had

6    provisions that could be substantively unlawful under state

7    law.  And we do not understand that anything that is said with

8    respect to rejection can carry over to the notion of saying

9    that if you assume a contract you can thereby assume some terms

10    that violate state law on a going-forward basis, any more than

11    if someone could make you sign a contract that said I'll take

12    less than the minimum wage and then assume that contract and

13    make you take less than the minimum wage.

14        So that was a concern on the dealer agreements.  And

15    what you just heard read into the record dealt with that by

16    leaving us free to -- and the jurisdictional piece as well,

17    taking the jurisdiction to enforce ongoing agreements between

18    nondebtor parties, post-closing, that could not affect the

19    estate in trying to leave them in this bankruptcy court's

20    jurisdiction.

21        THE COURT:  Let me interrupt you --

22        MS. CORDY:  Sure.

23        THE COURT:  -- for a second, Ms. Cordry.  When Mr.

24    Roy was standing up next to Mr. Karotkin, they were talking

25    about the things in the context of resolving Mr. Roy's

196

1    objections.  That was -- he was standing there and you weren't,

2    but that was part of a dialogue to which you were also a part.

3         MS. CORDY:  Right.  Yes, and that is part of the

4    overall package that is here.  He spoke to it simply because he

5    had the separate objection on it.  But, yes, that is one of the

6    pieces that went into this overall deal here.

7         So we were very concerned about that treatment of

8    assumed contracts, and that agreement works on that part.  We

9    also wanted to be sure that lemon laws were covered under the

10   notion of warranty claims, but they did not specifically refer

11   to state lemon laws, and that coverage is being picked up.

12        Privacy, we had no idea what they were going to do

13   with privacy.  We've read the consumer privacy ombudsman's

14   report.  We couldn't talk to them directly, but we did try to

15   give some input.  And what I've seen from his report appears to

16   be constructive and useful.  And there is some language in the

17   agreement right now that was drafted without seeing his report.

18   It's pretty much consistent with what the report recommends,

19   perhaps not completely consistent.  That's, I think, up to Your

20   Honor to decide with the debtor what they'll require for that.

21   We had signed off on the other language before we saw what the

22   consumer privacy ombudsman said.

23        On taxes, we clarified that the taxes in the first-

24   day order are all being assumed by the purchaser.  We clarified

25   a number of other pieces of language; some of them are in with

**197**

1    the environmental piece.

2              THE COURT:  Time out, Ms. Cordry.

3              MS. CORDY:  Yes.

4              THE COURT:  I thought I authorized taxes to be paid

5    under the first-day order.

6              MS. CORDY:  Yes.

7              THE COURT:  Your point being that, to the extent they

8    haven't been paid, they'll be assumed?

9              MS. CORDY:  Well, that the -- the assumption was

10   clarified, which was somewhat unclear in the order, that the

11   provision for assumption of taxes is congruent with the kind of

12   taxes that were covered by the first-day order so that if they

13   are the kind of taxes that were being picked up under the

14   first-day order, they will be the kind of taxes that will be

15   assumed, either that there -- there may be some that have just

16   not been paid yet or a dispute or an audit, an ongoing

17   assessment, any of those kind --

18             THE COURT:  One way or another, they'll get paid --

19             MS. CORDY:  Right.

20             THE COURT:  -- at some point in time?

21             MS. CORDY:  Right, and that so they're going to be

22   assumed.  And similarly with the environmental liabilities, we

23   clarified that the New GM intends to be fully liable for

24   environmental liabilities of its transferred facility.

25             So all of these were matters that were very important

198

1    to us.

2        The other piece we talked about, obviously, was the

3    successor liability.  And the basic construct we dealt with was

4    this notion that I raised yesterday of what is -- assuming you

5    can sell free and clear of liability on a claim or on

6    something, what is the scope of that?  And we came to an

7    agreement that we would limit it to a bankruptcy claim, a 1015

8    claim.  So the language on that is all in the agreement.

9        On the TWA issue, I can only say our view remains as

10   to what it is of the proper construction of law.  But we also

11   recognize that there's been a little water under the dam and a

12   lot of people have structured deals based on what they believe

13   the law to be, and certainly this case is an example of that.

14       So for all those reasons, after exhaustive, literally

15   of course, negotiations, we have reached agreement with the

16   debtor, with Treasury on the terms of the order that I have

17   recom -- well, when we say "we", mostly me.  I've recommended

18   to the AGs; I have talked to the staff, counsel, contacts, the

19   ones I could gather last night at 10:00.  We have sent it

20   around.  We have made the request to all the Attorneys General

21   to sign off on this, which they started getting that request at

22   about 9:30 this morning.  As of now, I've been told there are

23   forty-five -- the final total, I believe, was forty-five

24   Attorney Generals on the brief.  At this point I've been told,

25   I think, that the last count of approvals so far is twenty-

199

1    seven.  I'm reasonably optimistic that we will continue to get

2    the rest of them signed on over the course of the day or so.

3         At this point, my view would be I believe that we

4    have an agreement.  I don't believe we're going to have dissent

5    that would overturn the agreement, but the last position, I

6    understood, with the debtors and Treasury, was simply that if

7    for any reason we -- if the other fifteen AGs come back and say

8    no, no, over our dead bodies, that we would just say the deal's

9    off, the order goes back to what you were doing before you had

10   the agreement without us, and we'd just stand on our

11   objections.  But as of now, we think this agreement is going to

12   hold and we think it is a preferable agreement for the Attorney

13   Generals.  We also think it's preferable for all the other

14   parties as well in not having the Attorney Generals seek to

15   overturn this transaction.

16        THE COURT:  All right, thank you.

17        Mr. Karotkin?

18        MR. KAROTKIN:  Thank you, Your Honor.  With respect

19   to Ms. Cordry's colloquy and commentary, I don't know if that

20   was meant to be interpreting what the order said or

21   embellishing what the order said.  As far as we are concerned,

22   the agreement we have reached is in the order.  And we are not

23   necessarily agreeing that how she described it or how she

24   interpreted it is accurate or inaccurate.  It is what it is.

25        THE COURT:  If I approved the motion and entered the

200

1    order in the form as modified, the order would say whatever it

2    says?

3            MR. KAROTKIN:  Correct.

4            THE COURT:  Okay.

5            MR. KAROTKIN:  For example, to the extent she was

6    referring to how environmental laws are being treated under the

7    order, they are being treated as they are being treated.

8            THE COURT:  You're saying the order has them in

9    support of sales.

10           MR. KAROTKIN:  Exactly, sir.

11           THE COURT:  And that what she's saying isn't like a

12   presidential signing statement or --

13           MS. CORDY:  I would stipulate to that, Your Honor.

14   If I get to be president, then I'll determine what kind of

15   authority I have at this point.  But --

16           THE COURT:  Okay.

17           MS. CORDY:  -- I was simply attempting to deal with

18   the fact that we did deal with issues regarding environmental

19   laws and made some improvements in that area that I think

20   are --

21           THE COURT:  Okay.

22           MS. CORDY:  -- hopeful and satisfactory to my

23   clients.  Thank you.

24           THE COURT:  All right.  Fair enough.

25           MR. KAROTKIN:  Thank you, sir.

201

1          THE COURT:  To what extent do we have other things

2     that people want to note on the record?

3          Mr. Smolinsky, I see a few people coming up.  You

4     want to, kind of, help coordinate that, if you can?

5          MR. SMOLINSKY:  Sure, Your Honor.  Let me at least

6     try.  Your Honor, there are approximately 600 objections

7     related to what I would call contract issues, and they continue

8     to come in.  So I thought, to try to head off everyone coming

9     up and making reservation of rights, that I would describe to

10    Your Honor the process that we're undergoing and perhaps that

11    satisfies everyone's concerns, and we could make -- shorten the

12    time here.

13          Your Honor, in connection with the sale, the

14    purchaser has identified over 700,000 contracts for probable

15    assumption and assignment.  We've done everything in our power

16    to manage the process focused on three goals:  First, to have

17    the ability to update the reconciliation process as new

18    invoices come in from the pre-petition and post-petition

19    period; two, allow the purchaser to continue its due diligence

20    with respect to the contracts; and, finally, to try to not bog

21    down this Court's docket with multiple objections.

22          The company, together with AlixPartners, developed a

23    fully trackable system to allow counterparties to see online

24    their contracts which are scheduled for assumption, as well as

25    backup on how cure amounts are derived.

202

1        You've heard a little bit about the call center.  The

2   call centers set up in Warren, Michigan have been fielding

3   calls, have been proactively reaching out to all parties who

4   have filed objections, and have also handled over 6,600 calls

5   from other parties that are making inquiries as to their

6   supplier agreements.

7        Your Honor, when we filed our initial reply last

8   Friday, we attached to it a schedule of those parties that

9   filed objections with respect to contract disputes.  And on

10  Monday when we filed our supplemental brief, we attached a new

11  Schedule J, which had three schedules in it, creatively named

12  J-1, J-2 and J-3.

13       I just want to walk Your Honor through these

14  schedules.  And let me just update that, Monday night after we

15  had made further progress on the contracts, we filed a

16  supplemental schedule and I think we made some significant

17  progress.  And if Your Honor would allow, I'd like to hand up a

18  copy.

19       THE COURT:  Sure.

20       MR. SMOLINSKY:  I have taken the liberty of

21  highlighting for you the few changes that have been made since

22  then.  Your Honor, if you turn to Schedule J-1, which is about

23  six pages long, that is a schedule of withdrawn objections.

24  Now, just to make clear for the record, that doesn't mean that

25  each and every counterparty on the schedule has agreed that

203

1    there are no reconciliation issues.  Either they've been

2    withdrawn because the reconciliation issues have been resolved,

3    or they signed trade agreements which elected into the

4    alternative dispute resolution to the extent a reasonable

5    resolution can't be obtained simply by talking to the call

6    center and working out their differences.  And we've had

7    significant progress there.

8            The only changes I just want to note for the record,

9    on page 1, Cellco Partnership d/b/a Verizon Wireless is going

10   to be moved to J-2; the same for Fiat on page 2.  On page 3,

11   Hitachi Cable Indiana, Inc. and Hitachi, Limited will be moved

12   to J-2.  Isuzu Motors will be moved to J-2; LMC Phase II to

13   phase (sic) 2.  On page 4, Progressive Stamping Company, Inc.

14   moved to J-2.  On page 5, Interpublic Group of Companies Inc.

15   to page 2 -- to J-2, as well as Toyota Motor Sales U.S.A.  And

16   on the last page, the two Verizon contracts will be moved to

17   J-2.

18           Other than that, Your Honor, we believe that the

19   remaining objections can be marked off calendar.

20           We have provided, in consultation with the creditors'

21   committee, to include in the order that if a contract was

22   withdrawn and then there's still a basis for coming back to the

23   Court, that both parties can do so on no less than fifteen

24   days' notice in case there are any further mistakes or

25   omissions.  What we'll propose at the end is to file a final

1   schedule and then to provide Your Honor's chambers with a list

2   by docket number rather than alphabetically so that the matters

3   could be marked off calendar.

4        Your Honor, Schedule J-2 is a schedule of objections

5   that have been limited to cure disputes, and they are subject

6   to adjournment.  And we have included in the order a request

7   for a hearing date around the third week of July for Your Honor

8   to carry these objections while we continue to try to resolve

9   them and get them off the Court's docket.

10        We have been having open dialogues with each of these

11   parties; we have delivered documents to them.  We have worked

12   with them on finalizing a list of contracts and cure amounts.

13   And we've dealt with a number of them in stipulations, which

14   I'll get to in a moment.

15        So the only changes to Schedule 2 is on page 2.

16   Behr-Hella Thermocontrol has filed a withdrawal, and that could

17   be moved to J-1, along with, on page 3, the Hewlett Packard

18   three objections can be moved to J-1 as well.

19        Your Honor, Schedule J-3 is a schedule which has

20   gotten shorter and shorter, which deals with objections that we

21   have not been able to resolve, some of which we have been now

22   able to resolve, and I just want to walk through a few of them

23   and then we can give the other parties an opportunity to speak

24   today if they still have ongoing objections.  To the extent

25   that they don't, I would suggest that we move them to J-2 and

205

1    adjourn them along with the others as a holding date while we

2    continue to reach out for them.

3           So if you turn to --

4           THE COURT:  I sense the way you did it, Mr.

5    Smolinsky, that these deal with something different than cure

6    amounts?

7           MR. SMOLINSKY:  It's unclear, Your Honor.  We've

8    looked at all of these objections and we believe that most of

9    them, even though they may raise adequate protection --

10   adequate assurance issues, they -- I believe they're all

11   quintessentially cure objections, with the exceptions of the

12   ones that I'm going to walk through.

13          THE COURT:  Okay.

14          MR. SMOLINSKY:  The first one that I'd like to speak

15   about is Hertz Corporation.  Your Honor will recall that Mr.

16   Henderson testified that some of the fleet customers are not

17   purchasing vehicles from General Motors because they have

18   issues, internal issues.  Hertz is a prime example.  They have

19   securitizations.  And if their contracts are not assumed by a

20   certain date, then they have to provide additional collateral

21   into their securitizations, which is an anti-competitive issue

22   for them.

23          So we have entered into discussions with Hertz.  We

24   have agreed to assume their contract now with the understanding

25   that they have no objection to the assignment of that contract

1    to New GM upon the sale closing.  They acknowledge in the

2    stipulation they're not aware of any cure amounts that are

3    outstanding, and we do not believe that there are any either.

4    We've discussed this with U.S. Treasury, we've discussed this

5    with the committee, and they have no objection.

6              THE COURT:  Okay.  Continue, please.

7              MR. SMOLINSKY:  Okay.  Your Honor, the next contract,

8    Kolbenschmidt Pierburg AG, that could now be moved to J-2.  LBA

9    Realty Fund -- I think you heard from counsel to LBA this

10   morning.

11             THE COURT:  Mr. LeHane?

12             MR. SMOLINSKY:  That's correct, Your Honor.  And,

13   again, I could put it on the record, but I think you heard the

14   agreement that we intend to assume at closing, to the extent

15   that we finish our amendment discussions, or modification

16   discussions, and the indemnities will follow through with

17   respect to any claims that arise or become known after the

18   closing.

19             Pratt & Miller Engineering & Fabrication can be moved

20   to J-1.  They withdrew their objection.

21             Royal Bank of Scotland, these contracts -- there are

22   four contracts that relate to the Lordstown plant.  Subject to

23   closing, GM has agreed to assume those contracts and we agreed

24   to work cooperatively with RBS to make sure that we deal with

25   any transfer documents that are necessary and any third-party

207

1    consents.

2         Last one, Trafasee (ph.) Marketplaces Inc., that

3    could be moved to J-2 as well.

4         So, Your Honor, we did our best in these schedules to

5    reflect the desire and intention of the parties.  We're also

6    working with the committee to add language to the order to make

7    it clear as to what the cure resolution process is and to

8    preserve everyone's rights while we work it out.

9         We're not currently intending to bar any reasonable

10   late objections.  We understand the process was quick.

11   We're -- ultimately our goal is to try to reconcile all the

12   claims to the satisfaction of all parties.  Of course, if

13   there's an unreasonable delay, then we'll bring it to Your

14   Honor.

15        We intend to send notice; we propose in our order

16   within two business days of the entry of the order.  We would

17   send out notice to each of the parties in here notifying them

18   of the adjourn date for their objection or, if their objection

19   has been withdrawn, notifying them as to why it was withdrawn

20   and giving them the opportunity to come back and explain if

21   there was an error.

22        Turning to stipulations -- and many of these

23   stipulations, I don't believe, require the signature of Your

24   Honor; we're simply to going to file them -- we have received

25   the stipulation from approximately 115 suppliers who have

208

1   agreed to withdraw their objection and to appear on Schedule

2   J-1 and defer into the alternative dispute resolution process

3   so that we don't have to deal with them further in the

4   bankruptcy process.

5        We have some additional stipulations, one with

6   International Automotive Components Group, one with Dell and

7   one with Timken that likewise withdraw their objection, but

8   they have not agreed to the ADR process.  They have agreed to

9   work with us to try to reconcile, and if they can't reconcile

10  then we would use the procedure that I explained before that on

11  fifteen days' notice we can come back to Your Honor and

12  litigate the objection.

13       Your Honor, like Hertz, Avis is another fleet

14  customer.  They're having a similar issue, but they don't have

15  the same timing issues that Hertz has.  So they've entered into

16  a stipulation, again, acknowledging that they're not aware of

17  any cure amounts under the agreements.  But we have agreed to

18  assume and assign those contracts upon the closing.  So, unlike

19  Hertz, which happens immediately, the Avis will happen upon the

20  sale.  Again, we shared that stipulation with the committee and

21  the Treasury and they have no problem.

22       Cigna, Your Honor, I think, we talked about earlier.

23  We continue to work with Cigna to try to get their comfort

24  level up on the assignment of those employee benefit-related

25  contracts.  And, again, we wouldn't expect to be back before

209

1    Your Honor unless there's a problem in assigning those

2    contracts.

3         Equipment lessors.  I just want to put on the record

4    that Manufacturers and Traders Company, as well as Wells Fargo

5    Bank, have equipment leases with the company.  They've filed

6    objections.  There are additional indentured trustees related

7    to those that have objections.  And we've agreed to put on the

8    record that all those contracts are still in the undetermined

9    bucket, meaning that they haven't been noticed out for

10   assumption and assignment.  Everyone reserves their rights.  We

11   reserve the right to assume and assign those contracts.  They

12   reserve the right to object.  And we're going to work with them

13   over the next week to enter into an adequate protection

14   stipulation with respect to the use of that equipment as we go

15   through the transition of closing the sale.  So we'll be back

16   before Your Honor on that.

17        Your Honor, I think that's the end.  Of course,

18   people may want to make statements, and I'm happy to come back

19   and explain any clarifications that are necessary.

20        THE COURT:  Okay.

21        People can now come on up, and those who I sent back

22   can now come up again.

23        Go ahead.

24        MR. BACON:  Good afternoon, Your Honor.  Doug Bacon

25   with Latham & Watkins for GE Capital.  We spoke at the end of

1    yesterday's hearing and this morning and tendered a proposed

2    stipulation and order that has been underway for about the last

3    five days, about twenty hours a day.  And Mr. Weiss, who had to

4    depart but left his colleague here and his special counsel to

5    the debtor, we have been successful in getting the creditors'

6    committee's support, or lack of objection.

7            Mr. Mayer -- this is the stipulation that Mr. Mayer

8    confirmed that indeed they're fine with and Treasury's counsel

9    is not opposed to.  And we -- this bears the signature of the

10   debtors' special counsel and me as counsel for GE.  Mr. Weiss

11   explained it to some degree earlier.  We can certainly go into

12   more detail.  There's a great deal of money involved and

13   hundreds of millions of dollars' worth of equipment, which is

14   why both sides have put a lot of energy into this.

15           We tendered this earlier today, Your Honor.  And

16   since then, the only change that has been made is to change the

17   name of the purchaser.  And I'm hoping Your Honor, under the

18   circumstances, will just indulge us in interlineation.

19           THE COURT:  I would if it weren't for the fact that

20   it has to be electronically entered.  I guess it can be

21   scanned.  Otherwise, if I could ask somebody to -- do you have

22   a floppy disk with the underlying document?

23           MR. BACON:  I can arrange to have that down here this

24   afternoon, Your Honor.

25           THE COURT:  Can you have it e-mailed to my chambers?

211

1          MR. BACON:  Easily, Your Honor.

2          THE COURT:  Okay.  My law clerk can help you as to

3    how to do that.  And I'm glad -- it's just as well that a new

4    one's coming, Mr. Bacon, because I think you did hand me up

5    something, or did you?

6          UNIDENTIFIED SPEAKER:  Yes.

7          MR. BACON:  We did.

8          THE COURT:  I don't know if you saw how much paper

9    was on this thing just --

10         MR. BACON:  I understand, Judge.

11         THE COURT:  So e-mail it when it's finalized to the

12   Gerber chambers.  Charlie will give you the exact e-mail

13   address.  And on the transmission for the e-mail, note that

14   this is the one that Gerber said that he would enter today.

15   And we'll take care of it today.

16         MR. BACON:  Thank you, Judge.  Thank you very much.

17   May I approach Charlie?

18         THE COURT:  Yes.

19         MR. BACON:  Thank you.

20         THE COURT:  Who's on deck?

21         MR. DUETCHE:  I think I am, Your Honor.

22         THE COURT:  Sure.  Come on up, please.

23         MR. DEUTSCHE:  Good afternoon, Your Honor.  Benjamin

24   Deutsche, Schnader Harrison Segal & Lewis on behalf of New

25   United Motor Manufacturing Corp., commonly referred to as

212

1    NUMMI.  NUMMI is a joint venture between Toyota and GM.  We

2    had -- we received a notice to assume and assign.  Based on the

3    notice and based on the Web site, we simply can't tell what

4    contracts GM is talking about.  We're trying to work it out.  I

5    believe -- I thought -- I spoke to Mr. Smolinsky earlier.  I

6    thought we were going to have a stipulation, basically push

7    this over, give the parties a chance to figure out which

8    contracts they're talking about and then mark this down for

9    something later in July.

10           THE COURT:  I think Mr. Smolinsky's being pulled in

11   more than one direction at the same time.

12           MR. SMOLINSKY:  Your Honor, I believe we've been

13   having communications with Foley & Lardner, who are

14   representing Toyota in this matter.  And we've agreed that

15   we're going to work together to resolve all these contracts.

16           MR. DEUTSCHE:  Yeah -- I represent NUMMI and,

17   obviously, my clients instructed us to get resolution.  I don't

18   represent Toyota --

19           THE COURT:  Who does Foley represent?

20           MR. DEUTSCHE:  I believe the Toyota part of NUMMI.

21           THE COURT:  And who are the agreements with?

22           MR. DEUTSCHE:  I believe with NUMMI.  But, yeah, I'm

23   sure they're contracts --

24           MR. SMOLINSKY:  We'd be happy to involve them in the

25   discussions.

213

1          THE COURT:  Yeah, why don't you just turn it into a

2     three-way conversation so nobody's toes get stepped on.

3          MR. SMOLINSKY:  Certainly makes sense, Your Honor.

4          THE COURT:  Okay.

5          MR. DEUTSCHE:  Thank you, Your Honor.

6          THE COURT:  All right.

7          MR. QUIGLEY:  Good afternoon, Your Honor.  Sean

8     Quigley from Lowenstein Sandler on behalf of Group 1 Automotive

9     Inc., a company owning approximately seven dealerships in

10    Texas.  Your Honor, we filed a limited cure objection.

11    Subsequently, however, we recently learned from the debtors

12    that the Group 1 dealers were sent either participation

13    agreements or wind-down agreements.  Certainly, we don't object

14    to the sale, Your Honor, but --

15         THE COURT:  Some have one type and some got the

16    other?

17         MR. QUIGLEY:  Correct, Judge.  Certainly, we don't

18    object to the sale, but to the extent there are any cure

19    amounts or other payments due under these agreements, we simply

20    want to reserve our rights.

21         THE COURT:  Okay.

22         Would it help, folks, if I said that, unless there's

23    some reason why I shouldn't, Mr. Smolinsky or Mr. Schwartz,

24    that everybody who wants a reservation of rights on this stuff

25    can have it?  Or is it more complicated than that?

214

1        Got an affirmative nod from the government.

2        Mr. Smolinsky, that's okay with you too?

3        MR. SMOLINSKY:  We have no problem, Your Honor.

4        THE COURT:  Okay, good.  So anybody who wants to just

5   take a reservation of rights doesn't have to, unless they want

6   to.  You certainly have one, Mr. Quigley.

7        MR. QUIGLEY:  Thank you, Judge.

8        THE COURT:  Mr. Sullivan?

9        MR. SULLIVAN:  Thank you, Your Honor.  James Sullivan

10  of Arent Fox, counsel for the Timken Company and Superior

11  Industries International Inc.  Two things, Your Honor.  First,

12  I had some communications with counsel for the debtor.  We were

13  able to get the debtor to agree to some language added to the

14  sale order, and that's the reason why I didn't come up and

15  actually argue anything.  Assuming that the language of the

16  sale order remains as has been represented to us, we would not

17  be pursuing any objection.  I just wanted to reserve our right

18  to perhaps send -- or comment on the form of order that is

19  finally submitted to Your Honor.

20       THE COURT:  That's a big problem, Mr. Sullivan.  You

21  better get your comments in on the form of the order before the

22  proposed form of order is sent to me, because I can't have

23  hundreds of parties waiting for somebody to comment on the form

24  of the order.

25       MR. SULLIVAN:  Your Honor, as far as I know, I think

1   the changes have already been included, although I've not been

2   able -- counsel for the debtor has not been willing to

3   circulate the current form of order to all the parties.

4          THE COURT:  I would agree upon the language, Mr.

5   Sullivan, but I think I made my position on that clear.

6          MR. SULLIVAN:  Okay, I'll discuss it with counsel for

7   GM.

8          THE COURT:  Okay.

9          MR. SULLIVAN:  The second thing, I just wanted to

10  correct something.  I think Mr. Smolinsky made a comment on the

11  record about the Timken Company, about the ADR procedure.  I

12  don't believe that they've opted out of that procedure.  I

13  believe that they are in fact -- agreed to that procedure.  So

14  I don't think that needs any further comment.

15         MR. SMOLINSKY:  Your Honor, I think I said that the 3

16  parties that have not agreed to the ADR are subject to separate

17  stipulations from the 120 that did.

18         THE COURT:  Okay.  All right.  Thank you.

19         Next.

20         MR. BEELER:  Good afternoon.  Martin Beeler of

21  Covington & Burling, on behalf of Union Pacific.

22         THE COURT:  Okay, Mr. Beeler.

23         MR. BEELER:  Union Pacific provides rail

24  transportation services to the debtors under various executory

25  contracts.  We filed a limited objection to the sale, noncure

216

1    or adequate assurance-related limited objection, for the

2    avoidance of doubt, simply seeking language in the sale order

3    clarifying the setoff and recoupment rights of nondebtor

4    executory contract parties for nonassumed and assigned

5    contracts, similar to language that was included in the

6    Chrysler order for the same purpose.

7           And our understanding of the MPA is that receivables

8    related to those nonassigned contracts would stay with the

9    debtors and, consequently, setoff and recoupment rights would

10   be unimpaired.  In discussion with debtors' counsel and in

11   reviewing the MPA provisions with debtors' counsel, we are

12   confirmed in that understanding and prepared to withdraw the

13   objection.

14          THE COURT:  Okay.  Pause, please, Mr. Beeler.

15          Mr. Smolinsky?

16          MR. SMOLINSKY:  Your Honor, I just wanted to be clear

17   on this.  I reviewed the language in the Chrysler order.

18   Frankly, I really didn't understand it but -- on this point,

19   but what the MPA says, and I'm only paraphrasing, is that

20   receivables related to excluded assets, assets which aren't

21   going to NewCo, are excluded assets themselves.  And so I asked

22   counsel to simply rely on that language.  I didn't want to

23   paraphrase it in the order or change the subject matter of the

24   contract by adding language to the order.

25          But I think that he has reviewed the contract and is

217

1    now comfortable that the contract protects his client's rights.

2        THE COURT:  All right.

3        Anything further, Mr. Beeler?

4        MR. BEELER:  No, that's fair enough.

5        THE COURT:  Okay, good.

6        MR. BEELER:  Thank you.

7        THE COURT:  Mr. Brozman?

8        MR. BROZMAN:  Thank you, Your Honor, and good

9    afternoon.  Andrew Brozman, Clifford Chance, for the Royal Bank

10   of Scotland, ABN AMRO and RBS Citizens.  Your Honor, the

11   agreement that I think we've arrived at with the debtors

12   involves a structured lease transaction for the supply of

13   energy to the Lordstown, Ohio plant.  The record should note

14   the exact contracts that the debtors have agreed to assume and

15   assign, since the Web sites did not correctly list them and I'd

16   like to be clear on that.  There is a lease dated July 17, 2003

17   between ICX Corporation, which is an affiliate of RBS Citizens,

18   as assignee of Kensington Capital Corp. and General Motors.

19   There is a tripartite agreement of the same date among

20   Lordstown Energy LLC, ICX, again as assignee of Kensington, and

21   General Motors, together with the two sets of schedules

22   pertinent thereto.

23       We have agreed to the assumption and the assignment.

24   There is no dispute, to my knowledge, raised by the debtor with

25   respect to cure amounts, if any.  And the debtors, since this

218

1    is a structured lease transaction, have agreed with us to grant

2    us further assurances in the filing of safe harbor documents in

3    connection with the transfer of the assets.

4              And I think that accurately states our agreement, and

5    I appreciate Your Honor's time.

6              THE COURT:  Okay.

7              Mr. Smolinsky, do you need to be heard on what Mr.

8    Brozman just said?

9              MR. SMOLINSKY:  I agree, Your Honor.

10             THE COURT:  Okay.  Fair enough.

11             Who's next?  Ms. Taylor?

12             MS. TAYLOR:  Yes.  Judge, I just wanted to report

13   back -- Susan Taylor from the Attorney General's Office -- that

14   we accept Your Honor's offer for a reservation of rights.  And

15   I want it to be clear that New York's objection had two parts:

16   the part we discussed this morning, and it appears that

17   acceptable language may be being inserted in the final order.

18   But I don't currently have authority from my client to withdraw

19   our objection to that portion.

20             And in addition, in our papers we submitted we have a

21   successor liability -- part of our argument turns on successor

22   liability.  That part we didn't argue because it has been very

23   competently argued.  And I just wanted to be clear that we are

24   not withdrawing the objection as to that portion either and it

25   is now before the Court.

219

```
1              THE COURT:  Okay.

2              MS. TAYLOR:  Thank you very much.

3              THE COURT:  Thank you.

4              Did I take care of everybody?

5              Mr. Bromley?

6              MR. BROMLEY:  Your Honor, James Bromley of Cleary

7    Gottlieb on behalf of the UAW.  This is not with respect to an

8    objection by any stretch; this is just a cleanup from earlier.

9    I had not realized that when we were submitting our

10   designations with respect to depositions that we also needed to

11   submit marked copies separately to the Court.  So I just have

12   them here.  We submitted them online before noon, but we have

13   the marked ones here, so I'd like to just hand them up.

14             THE COURT:  That's not a problem.  You can give them

15   to Charlie.

16             MR. BROMLEY:  Thank you very much.

17             THE COURT:  I appreciate that.

18             Okay, to what extent do we have anything else, folks?

19   All right, I think -- I thought we were done but I see some

20   folks have now come back into the courtroom.

21             MR. SMOLINSKY:  Your Honor, just -- I'm not sure I

22   said it, so I wanted to make clear on the record.  There have

23   been a number of objections that have been filed since we filed

24   our last reply.  We would propose to just carry those along

25   with all the others until the holding date, July --
```

220

1          THE COURT:  These are executory contract objections?

2          MR. SMOLINSKY:  Cure objections, sorry.

3          THE COURT:  Cure?  Okay.

4          MR. SMOLINSKY:  Thank you.

5          MR. KANZA:  Good afternoon, Your Honor.  Ken Kansa of

6    Sidley Austin on behalf of the TPC lender group.  We have

7    agreed language for the order with the debtors and the

8    purchaser that resolves the TPC lenders' objections.  And so on

9    reliance on that language, we withdraw the objection.

10         THE COURT:  Okay.

11         Anybody else?

12         Going once.  All right, I see no response.

13         MR. SMOLINSKY:  Your Honor, we've been working on a

14   term sheet for a resolution of the Michigan workers'

15   compensation issues.  I think everyone is agreed in principle.

16   We just revised the term sheet over at Kinko's.  And we would

17   just need everyone to sign off, but we think that everyone is

18   in agreement on the terms.

19         MS. PRZEKOP-SHAW:  Good afternoon, Your Honor.  My

20   name is Susan Przekop-Shaw.  I'm an assistant attorney general

21   for the state of Michigan.

22         THE COURT:  Forgive me again.  You're last name,

23   please?

24         MS. PRZEKOP-SHAW:  Przekop-Shaw.

25         THE COURT:  Okay.

221

1          MS. PRZEKOP-SHAW:  It's spelled P as in Peter, R-Z-E-

2     K-O-P, hyphen, S-H-A-W.  On behalf of -- I'm here on behalf of

3     the Attorney General of Michigan, Mike Cox, who represents the

4     Michigan Workers' Compensation Agency and the Funds

5     Administration.  And we were compelled to file an objection in

6     this matter to resolve the issue of New -- NGMCO's ongoing

7     workers' compensation obligations in Michigan.  And as promised

8     by NGMCO's counsel yesterday, negotiations were held between

9     the State of Michigan and, in fact, they were pursued by the

10    Treasury in regards to resolving this workers' compensation

11    issue.  And these discussions culminated in the terms that were

12    necessary for the Michigan Workers' Compensation Agency

13    director to grant NGMCO self-insured status as an employer in

14    Michigan when it begins its operations.

15          What's left is that there's -- as Mr. Smolinsky

16    indicated, that there's ongoing steps being taken to

17    incorporate those terms into a binding agreement that the

18    appropriate parties, after they are identified, can sign on

19    behalf of NGMCO.

20          The representation was made today that such an

21    agreement will be finalized and signed at the end of today.

22    And on that basis, we feel that that addresses a major concern

23    for Michigan, who really wants to have a seamless transition

24    for GMCO to come into there.

25          There were several other legal issues that were

222

1    presented based upon the proposed order that was filed.

2    Paragraph 52 on the new one that Ms. Cordry worked with on

3    behalf -- with counsel to culminate in has a paragraph that

4    discusses NGMCO's assumption of these workers' compensation

5    obligations.  And we have been advised by Old GM's counsel that

6    they will appropriately amend the master sale and purchase

7    order to reflect that provision.

8           And we also observed that proposed order paragraph

9    41, which was dealing with preventing a state to essentially

10   implement its statutory and regulatory system, that this

11   provision will not apply if there's a stipulation on the record

12   that it will not apply to the circumstances.  And here, the

13   Michigan Workers' Compensation Agency --

14          THE COURT:  Time out.  What do you mean by that, that

15   if there's an individual stip it'll trump the moot stip?

16          MS. PRZEKOP-SHAW:  From my understanding of paragraph

17   41, as provided, that effective upon the closing and except as

18   may be otherwise provided by stipulation filed with or

19   announced to the Court with respect to a specific matter, that

20   that provision would -- and the following terms would not

21   apply.  And in regards to that provision, Michigan Workers'

22   Compensation Agency and the Funds Administration, in order to

23   operate its regulatory scheme and enforce the self-insured

24   process in Michigan, will need to have that stipulation made on

25   the record, and I understand counsel are prepared to do so

223

1    today.

2           MR. SMOLINSKY:  Your Honor, I think the agreement,

3    with respect to paragraph 41, and just to make sure that we're

4    all clear, is that the stipulation that we're entering into

5    allows the Workers' Compensation Board to do their business, to

6    actually take the permit, the application that's proposed to

7    them, to make sure they have all the documents available and to

8    grant their license and then to regulate New GM going forward.

9    And so the agreement that we reached is that that paragraph

10   will not interfere with the Workers' Compensation Board

11   exercising their regulatory duties.

12          Is that accurate?

13          MS. PRZEKOP-SHAW:  In regard -- yes.

14          In that regards, to its ongoing regulatory

15   obligations to meet the Workers' Compensation Agency's -- the

16   acts requirements and the rules that apply to that.

17          THE COURT:  Mr. Jones, you heading up?

18          MR. JONES:  Yep.  Yes, Your Honor.  Thank you, Your

19   Honor.  I just need to note, the Treasury fully agrees to the

20   agreement as -- with the agreement as described.  I just do

21   need to note for everyone that the signatory we need for the

22   actual stipulation may not be available today, although we're

23   trying to get that person.  Failing that, we expect the person

24   to sign tomorrow.

25          THE COURT:  Okay.

224

1          MR. JONES:  Thank you.

2          THE COURT:  All right -- I'm sorry, go ahead.

3          MS. PRZEKOP-SHAW:  No, thank you.

4          THE COURT:  Thank you.

5          Mr. Schmidt?

6          MR. SCHMIDT:  Yes, Your Honor.  And I apologize, one

7    point harking back to the TPC matter that you heard a few

8    minutes ago.  I just received a note from one of my colleagues

9    that we hadn't seen that language in the order yet, and we'd

10   just like to take a few minutes to look at it.

11         THE COURT:  Okay.  Can somebody get the creditors'

12   committee the language they need to satisfy themselves?

13         MR. SCHMIDT:  Thank you, Your Honor.

14         THE COURT:  Sure.

15         All right, what else do we have, folks?

16         Mr. Karotkin?

17         MR. KAROTKIN:  Your Honor, I think, as to the sale

18   motion, there is nothing else, unless I'm mistaken.

19         THE COURT:  I have one or two things.  I'm not going

20   to prejudge the motion.  But I gather you have been, and may

21   even now still be, doing a lot of work on the order that you

22   would want me to enter, if I approved it, which, among other

23   things, requires you to implement a lot of understandings that

24   you have been working on even up to this minute.  Am I correct

25   in assuming that there is going to be a revised proposed order

225

1    that's going to be sent to my chambers sometime when you've

2    been able to embody all of your deals, Mr. --

3              MR. KAROTKIN:  Yes, sir.

4              THE COURT:  Do you have some sense as to how long

5    it's going to take you to -- believe me, you don't have to

6    worry about it not getting here in time if it's going to take

7    more than twenty-four hours, but -- or even more, but what's

8    your sense as to how long it's going to take you to embody all

9    of your stuff so that something comes to me?

10             MR. KAROTKIN:  I think, actually, we've made a lot of

11   progress.  It's our intention to go back tonight, revise it,

12   circulate it to the parties this evening and hopefully get

13   their comments tomorrow morning, and hopefully get it to you

14   either sometime tomorrow night or Saturday, if that's fine with

15   you.

16             THE COURT:  Yeah, that'll be fine.

17             Now, to what extent do parties have transcripts --

18   paper transcripts of the last three days?

19             MR. KAROTKIN:  Excuse me, sir.

20        (Pause)

21             MR. KAROTKIN:  We only have June 30 in the afternoon.

22   There was the problem in the morning with the microphones.  We

23   don't have the other two days, but we're arranging to get those

24   as soon as possible.

25             THE COURT:  Those have been ordered?

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

226

1          MR. KAROTKIN:  Yes.

2          Have they been ordered?

3          Yes.

4          THE COURT:  On expedited --

5          MR. KAROTKIN:  Yes, sir.

6          THE COURT:  -- request?  Okay.  As soon as you or any

7    of your colleagues -- by that I mean the Treasury, creditors'

8    committee, other parties-in-interest, anybody gets them, I

9    would like to have them e-mailed to the chambers e-mail

10   address.

11         MR. KAROTKIN:  Yes, sir.

12         THE COURT:  All right.  I think that takes care of

13   the housekeeping matters I had, Mr. Karotkin.  Do you have

14   other stuff?

15         MR. KAROTKIN:  There are two other items on the

16   calendar for this afternoon.

17         THE COURT:  Go ahead.

18         MR. KAROTKIN:  I believe the first item, Your Honor,

19   relates to a motion by the debtors seeking authority and

20   approval of certain settlement with four different unions.

21   This was noticed on shortened time pursuant to an order of your

22   court.

23         This motion, Your Honor, involves a settlement with

24   four of what, over the last few days, you've come to know as

25   the splinter unions.  They --

227

1          THE COURT:  These are both non-UAW and --

2          MR. KAROTKIN:  Non-I --

3          THE COURT:  -- nonobjecting unions, or at least for

4   not presently objecting unions, not the IUE steelworkers, and I

5   forgot the third.

6          MR. KAROTKIN:  Correct.  That's correct.  They

7   encompass about 1,050 retirees and 150 active employees.  There

8   are four different settlement agreements annexed to the motion,

9   each of which is substantially identical.  And they basically

10  provide, Your Honor, that the unions, as the 1114

11  representative of the covered groups, as defined in the

12  settlement agreements, have agreed to the retiree -- the

13  modified retiree benefits that, again, you heard about over the

14  last few days, of the same nature that were offered to salaried

15  employees and the same that were offered to the objecting

16  parties as well.

17         But these four unions have agreed to that.  Two of

18  the unions have -- that have the active employees have also --

19  the debtor has also agreed to modify collective bargaining

20  agreements with those two unions.  And all of this is

21  conditioned on approval and consummation of the sale.

22         And, again, like the UAW, in connection with each of

23  these agreements, they've agreed to waive their claims for the

24  retiree health and life benefits as against the debtor company.

25         THE COURT:  Okay.

228

1           Any desire from the creditors' committee to be heard

2      on this?

3           All right.

4           MR. KAROTKIN:  Now, if I --

5           THE COURT:  Normally -- I think the deadline for

6      objections has passed, but considering the short notice, is

7      there anybody who wants to be heard in the way of objection to

8      that settlement?

9           Record will reflect no response.

10          MR. KAROTKIN:  If I could interrupt for one second?

11          THE COURT:  Yes.

12          MR. KAROTKIN:  I'm sorry.  If Your Honor's inclined

13     to grant the relief in the motion, I would suggest that -- we

14     don't have a proposed form of order with us.  It was -- the

15     form that we had was incorrect in a few respects, and we

16     haven't had time to change it.  My suggestion is if we could

17     send it down to chambers over the next day or so.

18          THE COURT:  I'm going to approve the motion, and your

19     mechanics are okay with me, Mr. Karotkin.  When you do that, I

20     want your -- either your letter transmittal or your e-mail

21     message accompanying any attached proposed order to be able to

22     give me a representation of counsel for all of the objected

23     unions and the creditors' committee and the U.S. government are

24     satisfied with the form of the order as consistent with

25     reflecting the deal as everybody understands it to be.

229

1           MR. KAROTKIN:  Very well, sir.

2           THE COURT:  Okay.  Thank you.

3           What else do we have?

4           MR. KAROTKIN:  The other item on the calendar is the

5    approval of the wind-down facility.  Now, I think that, based

6    on the current state of play and all the negotiations that,

7    again, you heard about earlier today with respect to that

8    facility, I think the current state we're in right now is that

9    the document is still in somewhat of a state of flux, although

10   there is an agreement in principle as to the terms and

11   provisions of the wind-down facility.  Of course, the amount of

12   the wind-down facility, as Your Honor heard this morning, would

13   be 1.175 billion dollars.

14           I think all of the substantive terms have been agreed

15   to.  The document has not yet been finalized.  We do have a

16   proposed order that we will be in a position to submit later

17   today or early tomorrow, which, as I understand it -- the terms

18   of which have been substantially agreed to by both the debtors,

19   the U.S. Treasury, the creditors' committee and the Paul Weiss

20   firm representing the ad hoc committee of bondholders.

21           I don't -- there was some suggestion, Your Honor,

22   that if we could take a short recess, perhaps we might even

23   have a form of document down here.  But --

24           THE COURT:  That's not necessarily a problem, but

25   before we get that far, I want to give Treasury and especially

230

1    the creditors' committee a chance to be heard if either of them

2    wants to be.

3            Ms. Caton?

4            MS. CATON:  Good afternoon, Your Honor.  Amy Caton

5    from Kramer Levin Naftalis & Frankel, on behalf of the

6    creditors' committee.  The wind-down credit facility has been

7    a -- the product of a lot of negotiation by the creditors'

8    committee.  This is a very important document to us because

9    it's going to govern how these estates run after the sale

10   closes.

11           I believe we are satisfied largely with the

12   resolution on the credit facility and the loan that Treasury is

13   making.  And there are a few nits that we still had to the

14   credit agreement, but I think those will be worked out.

15           The one substantive comment that we have to the form

16   of order that we're still trying to work out is corporate

17   governance and how Old GM will be governed after the sale

18   closes and the board leaves.  I believe we have a proposal

19   right now on the table, which is that two -- there will be a

20   five-member board, two members of which will be proposed by the

21   creditors' committee, nominated by the creditors' committee,

22   and basically go through the same board approval.

23           THE COURT:  Time out, Ms. Caton.

24           MS. CATON:  Yes.

25           THE COURT:  Is this an evolution since what I heard

1    this morning on that?  I thought I heard of a three-person

2    board, and now it sounds like it's up to five.

3                MS. CATON:  Yes.  Yes, Your Honor, it is.

4                MR. ECKSTEIN:  There has been developments --

5                THE COURT:  Evolution.

6                MR. ECKSTEIN:  There has been evolution.  A lot of

7    parties have been put into this issue, and we have been trying

8    to deal with changes as they've been evolving.

9                THE COURT:  I understand.  Okay.

10                MS. CATON:  I apologize.  I forgot about the

11    representations that were made this morning.

12                THE COURT:  No, that's fine.  I am really trying to

13    pay attention to what people tell me.

14                MS. CATON:  That's good.  That proves -- that

15    definitely shows you're paying attention.

16                THE COURT:  Is this like the guy who gets credit for

17    having given another litigant an idea, or --

18                MS. CATON:  Your Honor, I believe that the proposal

19    on the table is acceptable to the creditors' committee and

20    Weil, but we still need -- and the debtors, but we still need

21    Treasury's acceptance of that, and that's what we're waiting

22    on.

23                With that, I believe that we'll be prepared to have

24    the order entered.  And if Your Honor has any questions about

25    the credit facility, we or Weil or anyone is happy to answer

232

1   them.

2          THE COURT:  Well, I understand it in general terms.

3   I'm sure I don't have the detailed understanding that the

4   parties do, but certainly the concepts are fine with me.

5          Okay, anything else from your perspective, Ms. Caton?

6          MS. CATON:  No, Your Honor.

7          THE COURT:  Okay, Mr. Schwartz or Mr. Jones, either

8   of you want to comment?

9          MR. SCHWARTZ:  Not particularly.  I think that was an

10   accurate description in that we were comfortable with what was

11   announced this morning.  There have since been some proposals

12   that we're working through, as well as the form of the order.

13          THE COURT:  All right.

14          Mr. Karotkin, I'm not going anywhere this afternoon,

15   but I'm not sure, from what I heard, whether you're going to

16   have an order that's ready for me anytime that quickly.

17          MR. KAROTKIN:  You read my mind.  It's kind of like

18   what you say.  I suggest, Your Honor, since everyone pretty

19   much has agreed on the substance, that rather than sticking

20   around, we'd just submit an order to Your Honor after we've

21   circulated it.

22          THE COURT:  That's agreeable.  And the drill is going

23   to be the same.  When I get it sent to me, I need a

24   representation from whoever's sending it to me that it's been

25   run past the people who are the principal ones who need to be

233

1    heard on it; I think that's Treasury and creditors' committee

2    and the estate and Canada.

3            UNIDENTIFIED SPEAKER:  Yes, Your Honor.

4            THE COURT:  Right.

5            Okay.  Mr. Schein, are your folks putting money in

6    this deal too?

7            MR. SCHEIN:  Your Honor, Canada is not actually

8    funding this.  But since it does change the rights of the

9    existing DIP facility, it's conditioned upon certain provisions

10   allowing the closing to happen.  That's why we are concerned.

11           THE COURT:  Sure.

12           Okay.  Mr. Rosenberg?

13           MR. ROSENBERG:  Good afternoon, Your Honor.  Andrew

14   Rosenberg, Paul, Weiss, Rifkind, Wharton & Garrison, on behalf

15   of the ad hoc bondholders.  I did -- actually, I think I was

16   the second person or so to speak the first day.  I didn't

17   intend to be just the last person to speak on the last day, but

18   I guess that's the way -- I just wanted to mention that when

19   Your Honor was mentioning who needed to be served or passed by

20   in terms of the documents, the Paul Weiss firm obviously has

21   also been involved in looking at the sale order and the DIP

22   order and the credit agreement.  We just want to make sure also

23   that we're staying in the loop and are going to see all drafts

24   of those documents.

25           THE COURT:  By all means.

234

1          Okay, Mr. Karotkin, I'm going to look to you to focus

2     more than I focused on who needs to look at the paper you send

3     me.

4          MR. KAROTKIN:  Yes, sir.

5          THE COURT:  And if you can give me a representation

6     both that you've gotten the okays and that you've consulted

7     everybody who has expressed the interest or need to be

8     consulted, that'll be good enough for me.

9          MR. SMOLINSKY:  Thank you, sir.

10          THE COURT:  Okay.

11          And to what extent do we have anything else?

12          All right, I think we're done.

13          And you can get me your proposed orders by e-mail.

14     I'm going to ask Mr. Pollack, Charlie, to hang around in case

15     anybody needs details of e-mail addresses and things of that

16     sort.

17          We're adjourned.  Thank you.

18          MR. SMOLINSKY:  Thank you, sir.

19       (Proceedings concluded at 3:57 PM)

20

21

22

23

24

25

235

1                           I N D E X

2

3                         R U L I N G S

4    DESCRIPTION                                PAGE        LINE

5    Motion to authorize/Motion of the debtors   162         15

6    for entry of order authorizing and

7    approving settlement agreements with

8    certain unions, approved

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

236

1

2                    C E R T I F I C A T I O N

3

4        I, Lisa Bar-Leib, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6

7        _____

8        LISA BAR-LEIB

9        AAERT Certified Electronic Transcriber (CET**D-486)

10

11       Also transcribed by:     Clara Rubin (CET**D-491)

12                                Penina Wolicki

13                                Esther Accardi (CET**D-485)

14

15       Veritext LLC

16       200 Old Country Road

17       Suite 580

18       Mineola, NY 11501

19

20       Date:  July 6, 2009

21

22

23

24

25