# **Exhibit W**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-50026

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


GENERAL MOTORS CORPORATION, et al.,


      Debtors.


- - - - - - - - - - - - - - - - - - - - -x


        United States Bankruptcy Court

        One Bowling Green

        New York, New York


        June 30, 2009

        10:07 AM



B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

2

1

2   HEARING re Debtors Motion Pursuant to 11 U.S.C. §§ 105, 363(b),

3   (f), (k), and (m), and 365 and Fed. R. Bankr. P. 2002, 6004,

4   and 6006, to (i)Approve (a)the Sale Pursuant to the Master Sale

5   and Purchase Agreement with Vehicle Acquisition Holdings LLC, a

6   U.S. Treasury-Sponsored Purchaser, Free and Clear of Liens,

7   Claims, Encumbrances, and Other Interests; (b)the Assumption

8   and Assignment of Certain Executory Contracts and Unexpired

9   Leases; and (c)Other Relief; and (ii)Schedule Sale Approval

10  Hearing

11

12  HEARING re Notice of Settlement of an Order Denying Motion of

13  the Unofficial Committee of Family & Dissident GM Bondholders

14  for an Order Directing the United States Trustee to Appoint an

15  Official Committee of Family & Dissident Bondholders

16

17  HEARING re Debtors' First Omnibus Motion to Reject Certain

18  Unexpired Leases of Nonresidential Real Property

19

20  HEARING re Motion of Debtors for Entry of Order Pursuant to 11

21  U.S.C. §§ 105(a) and 366 (i)Approving Debtors Proposed Form of

22  Adequate Assurance of Payment; (ii) Establishing Procedures for

23  Resolving Objections by Utility Companies; and (iii)Prohibiting

24  Utilities from Altering, Refusing, or Discontinuing Service

25

3

1

2    HEARING re Motion of Debtors for Entry of Order Pursuant to 11

3    U.S.C. §§ 105(a), 327, 328 and 330 for Authorization to Employ

4    Professionals Utilized in the Ordinary Course of Business

5

6    HEARING re Application of the Official Committee of Unsecured

7    Creditors of General Motors Corporation, et al. for an Order

8    Authorizing and Approving the Employment and Retention of

9    Kramer Levin Naftalis & Frankel LLP as Counsel, Nunc Pro Tunc,

10    to June 3, 2009

11

12    HEARING re Debtors' Second Omnibus Motion to Reject Certain

13    Unexpired Leases of Nonresidential Real Property

14

15    HEARING re Greater New York Automobile Dealers Association's

16    (i)Motion for Consideration of Amicus Curiae Statement; and

17    (ii)Amicus Curiae Statement Regarding Debtor's Motion to

18    Approve Sale Pursuant to Master Sale and Purchase Agreement

19    with Vehicle Acquisition Holdings LLC

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

4

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4        Attorneys for Debtor General Motors Corporation

5        767 Fifth Avenue

6        New York, NY 10153

7

8    BY:  HARVEY R. MILLER, ESQ.

9        STEPHEN KAROTKIN, ESQ.

10        JOSEPH H. SMOLINSKY, ESQ.

11        JOHN A. NEUWIRTH, ESQ.

12

13    JENNER & BLOCK LLP

14        Proposed Special Counsel for GM

15        919 Third Avenue

16        37th Floor

17        New York, NY 10022

18

19    BY:  PATRICK J. TROSTLE, ESQ.

20

21

22

23

24

25

5

1

2    JENNER & BLOCK LLP

3         Proposed Special Counsel for GM

4         330 North Wabash Avenue

5         Chicago, IL 60611

6

7    BY:   DANIEL MURRAY, ESQ.

8         (TELEPHONICALLY)

9

10   KRAMER LEVIN NAFTALIS & FRANKEL LLP

11        Attorneys for Official Committee of Unsecured Creditors

12        1177 Avenue of the Americas

13        New York, NY 10036

14

15   BY:   KENNETH ECKSTEIN, ESQ.

16        ADAM ROSOFF, ESQ.

17        THOMAS MOERS MAYER, ESQ.

18        ROBERT T. SCHMIDT, ESQ.

19

20

21

22

23

24

25

6

1

2    UNITED STATES DEPARTMENT OF JUSTICE

3          Office of the United States Trustee

4          33 Whitehall Street

5          21st Floor

6          New York, NY 10004

7

8    BY:  TRACY HOPE DAVIS, AUST

9          LINDA A. RIFFKIN, AUST

10

11   UNITED STATES DEPARTMENT OF JUSTICE

12         U.S. Attorney's Office

13         86 Chambers Street

14         New York, NY 10007

15

16   BY:  MATTHEW L. SCHWARTZ, AUSA

17         DAVID S. JONES, AUSA

18

19   ARENT FOX LLP

20         Attorneys for The Timken Company, Superior Industries

21          Inc., and Harman Becker Automotive Systems, Inc.

22         1675 Broadway

23         New York, NY 10019

24

25   BY:  JAMES M. SULLIVAN, ESQ.

7

1

2    ATTORNEY GENERAL OF TEXAS

3         Counsel to State of Texas On Behalf of Texas Department of

4         Transportation

5         P.O. Box 12548

6         Austin, TX 78711

7

8    BY:  J. CASEY ROY, ASSISTANT ATTORNEY GENERAL

9

10   CADWALADER, WICKERSHAM & TAFT LLP

11        Attorneys for U.S. Treasury Auto Task Force

12        One World Financial Center

13        New York, NY 10281

14

15   BY:  JOHN RAPISARDI, ESQ.

16

17   CADWALADER, WICKERSHAM & TAFT LLP

18        Attorneys for U.S. Treasury Auto Task Force

19        1201 F Street, N.W.

20        Washington, DC 20004

21

22   BY:  PETER M. FRIEDMAN, ESQ.

23

24

25

8

1

2    CAPLIN & DRYSDALE, CHARTERED

3         Attorneys for Mark Buttita

4         375 Park Avenue

5         35th Floor

6         New York, NY 10152

7

8    BY:  RITA C. TOBIN, ESQ.

9

10   CAPLIN & DRYSDALE, CHARTERED

11        Attorneys for Mark Buttita

12        One Thomas Circle N.W.

13        Suite 1100

14        Washington, DC 20005

15

16   BY:  RONALD E. REINSEL, ESQ.

17

18

19

20

21

22

23

24

25

9

1

2    CLEARY GOTTLIEB STEEN & HAMILTON LLP

3         Attorneys for The International Union, United Automobile

4          Aerospace and Agricultural Implement Workers of America,

5          AFL-CIO

6         One Liberty Plaza

7         New York, NY 10006

8

9    BY:  AVRAM E. LUFT, ESQ.

10        JAMES BROMLEY, ESQ.

11

12   CLIFFORD CHANCE US LLP

13        Attorneys for ABN AMRO BANK N.V., RBS Citizens N.A., Royal

14         Bank of Scotland plc

15        31 West 52nd Street

16        New York, NY 10019

17

18   BY:  ANDREW BROZMAN, ESQ.

19

20   COHEN, WEISS AND SIMON LLP

21        Attorneys for United Auto Workers

22        330 West 42nd Street

23        New York, NY 10036

24

25   BY:  BABETTE CECCOTTI, ESQ.

10

1

2    COLEMAN LAW FIRM

3         Attorneys for Product Liability Claimants:  Callan

4          Campbell, Kevin Junso, et al.; Edwin Agosto, Kevin

5          Chadwick, et al., and Joseph Berlingieri

6         77 West Wacker Drive

7         Suite 4800

8         Chicago, IL 60601

9

10   BY:  STEVE JAKUBOWSKI, ESQ.

11

12   DLA PIPER US LLP

13        Attorneys for Hewlett-Packard Company and all of its

14         Affiliates, Domestic and International, Including but not

15         Limited to Electronic Data Systems Corporation, and HP

16         Company and Hewlett-Packard Financial Services Company

17        550 South Hope Street

18        Suite 2300

19        Los Angeles, CA 90071

20

21   BY:  KAROL K. DENNISTON, ESQ.

22

23

24

25

11

```
1
2    FORMAN HOLT ELIADES & RAVIN LLC
3         Attorneys for Rose Cole, Guardian of Timothy L. Montis, a
4          Disabled Adult
5         80 Route 4 East
6         Paramus, NJ 07652
7
8    BY:  KIMBERLY J. SALOMON, ESQ.
9
10   GIBSON, DUNN & CRUTCHER LLP
11        Attorneys for Wilmington Trust Co., as Indenture Trustee
12        200 Park Avenue
13        New York, NY 10166
14
15   BY:  MATTHEW J. WILLIAMS, ESQ.
16        DAVID M. FELDMAN, ESQ.
17
18   GORLICK, KRAVITZ & LISTHAUS, P.C.
19        Attorneys for International Union of Operating Engineers
20         Local 18S, 101S and 832S, United Steelworkers, IUE- CWA
21        17 State Street
22        4th Floor
23        New York, NY 10004
24
25   BY:  BARBARA S. MEHLSACK, ESQ.
```

```
                                                             12
 1

 2    HISCOCK & BARCLAYS

 3         Attorneys for The Schaeffer Group

 4         One Park Place

 5         300 South State Street

 6         Syracuse, NY 13202

 7

 8    BY:  SUSAN R. KATZOFF, ESQ.

 9

10    KELLEY DRYE & WARREN LLP

11         Attorneys for Law Debenture Trust Company of New York, as

12          Successor Indenture Trustee

13         101 Park Avenue

14         New York, NY 10178

15

16    BY:  JENNIFER A. CHRISTIAN, ESQ.

17

18    KENNEDY JENNIK AND MURRAY, PC

19         Attorneys for IUE-CWA

20         113 University Place

21         Floor 7

22         New York, NY 10003

23

24    BY:  THOMAS KENNEDY, ESQ.

25         JOHN HOFFMAN, ESQ.
```

13

1

2    LAW OFFICES OF OLIVER ADDISON PARKER

3         Attorney Pro Se

4         4900 North Ocean Blvd.

5         Suite 421

6         Lauderdale By the Sea, FL 33308

7

8    BY:  OLIVER A. PARKER, ESQ.

9

10   MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

11        Attorneys for Henry Case Class Plaintiffs

12        1350 Broadway

13        Suite 501

14        New York, NY 10018

15

16   BY:  EDWARD J. LOBELLO, ESQ.

17        HANAN KOLKO, ESQ.

18

19

20

21

22

23

24

25

14

1

2    N.W. BERNSTEIN & ASSOCIATES, LLC

3         Attorneys for Environmental Conservation and Chemical

4         Corporation Site Trust Fund

5         800 Westchester Avenue

6         Suite N319

7         Rye Brook, NY 10573

8

9    BY:  NORMAN W. BERNSTEIN, ESQ.

10

11   NATIONAL ASSOCIATION OF ATTORNEYS GENERAL

12        2030 M Street, NW

13        8th Floor

14        Washington, DC 20036

15

16   BY:  KAREN CORDRY, ESQ.

17

18

19

20

21

22

23

24

25

15

1

2    PUBLIC CITIZEN LITIGATION GROUP

3          Attorneys for Product Liability Claimants:  Center for

4           Auto Safety, Consumer Action, Consumers for Auto

5           Reliability and Safety, National Association of Consumer

6           Advocates, and Public Citizen

7          1600 20th Street NW

8          Washington, DC 20009

9

10   BY:  ADINA H. ROSENBAUM, ESQ.

11         ALLISON M. ZIEVE, ESQ.

12

13   ORRICK, HERRINGTON & SUTCLIFFE LLP

14         Attorneys for GM Unofficial Dealer Committee

15         Columbia Center

16         1152 15th Street, NW

17         Washington, DC 20005

18

19   BY:  RICHARD H. WYRON, ESQ.

20         ROGER FRANKEL, ESQ.

21

22

23

24

25

16

```
 1

 2    ORRICK, HERRINGTON & SUTCLIFFE LLP

 3         Attorneys for Finmeccenica S.p.A. and Ansaldo Ricercke

 4          S.p.A.; Ad Hoc Dealer Committee

 5         666 Fifth Avenue

 6         New York, NY 10103

 7

 8    BY:  ROBERT M. ISACKSON, ESQ.

 9         ALYSSA D. ENGLUND, ESQ.

10

11    PATTON BOGGS LLP

12         Attorneys for Unofficial Committee of Family and Dissident

13          Bondholders

14         1185 Avenue of the Americas

15         30th Floor

16         New York, NY 10036

17

18    BY:  MICHAEL P. RICHMAN, ESQ.

19

20

21

22

23

24

25
```

17

1

2    PATTON BOGGS LLP

3         Attorneys for Unofficial Committee of Family and Dissident

4          Bondholders

5         2550 M Street, NW

6         Washington, DC 20037

7

8    BY:  MARK A. SALZBERG, ESQ.

9

10   PATTON BOGGS LLP

11        Attorneys for Unofficial Committee of Family Bondholders

12        2001 Ross Avenue

13        Suite 3000

14        Dallas, TX 75201

15

16   BY:  JAMES CHADWICK, ESQ.

17        (TELEPHONICALLY)

18

19   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

20        Attorneys for Ad Hoc Bondholders Group

21        1285 Avenue of the Americas

22        New York, NY 10019

23

24   BY:  ANDREW N. ROSENBERG, ESQ.

25        JONATHAN KOEVARY, ESQ. (TELEPHONICALLY)

18

1

2    PENSION BENEFIT GUARANTY CORPORATION

3         United States Government Agency

4         1200 K Street NW

5         Washington, DC 20005

6

7    BY:  MICHAEL A. MARICCO, ESQ.

8         ANDREA WONG, Assistant Chief Counsel

9

10   ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.

11        Attorneys for Greater New York Automobile Dealers

12         Association

13        1345 Avenue of the Americas

14        New York, NY 10105

15

16   BY:  RUSSELL P. MCRORY, ESQ.

17

18   ROBINSON WATERS & O'DORISIO, PC

19        Attorneys for Environmental Testing Corporation

20        1099 18th Street

21        Suite 2600

22        Denver, CO 80202

23

24   BY:  ANTHONY L. LEFFERT, ESQ.

25

19

1

2    SCHNADER HARRISON SEGAL & LEWIS LLP

3         Attorneys for Ad Hoc Committee of Consumer Victims

4         1600 Market Street

5         Suite 3600

6         Philadelphia, PA 19103

7

8    BY:  BARRY E. BRESSLER, ESQ.

9

10   SCHNADER HARRISON SEGAL & LEWIS LLP

11        Attorneys for Ad Hoc Committee of Consumer Victims

12        824 North Market Street

13        Suite 1001

14        Wilmington, DE 19801

15

16   BY:  RICHARD A. BARKASY, ESQ.

17

18   STATE OF MICHIGAN

19        Office of the State Attorney General

20        G. Mennen Williams Building

21        525 West Ottawa Street

22        6th Floor

23        Lansing, MI 48909

24

25   BY:  CELESTE R. GILL, Assistant Attorney General

20

1

2    STATE OF NEW YORK

3         Office of the Attorney General

4         The Capitol

5         Albany, NY 12224

6

7    BY:  MAUREEN F. LEARY, Assistant Attorney General

8

9    STATE OF NEW YORK

10        Office of the Attorney General

11        120 Broadway

12        New York, NY 10271

13

14   BY:  KATHERINE KENNEDY, Special Deputy Attorney General

15

16   STEMBERG FEINSTEIN DOYLE & PAYNE, LLC

17        Attorneys for Class Representatives in Henry Case

18        1007 Mt. Royal Blvd.

19        Pittsburgh, PA 15223

20

21   BY:  WILLIAM T. PAYNE, ESQ.

22

23

24

25

21

1

2    STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

3         Attorneys for Ad Hoc Committee of Unsecured Creditors

4         2323 Bryan Street

5         Suite 2200

6         Dallas, TX 75201

7

8    BY:  SANDER L. ESSERMAN, ESQ.)

9

10   VEDDER PRICE P.C.

11        Attorneys for Export Development Canada

12        1633 Broadway

13        47th Floor

14        New York, NY 10019

15

16   BY:  MICHAEL L. SCHEIN, ESQ.

17

18   WILMER CURLER PICKERING HALE AND DORR LLP

19        Attorneys for Pension Benefit Guaranty Corporation

20        399 Park Avenue

21        New York, NY 10022

22

23   BY:  PHILIP D. ANKER, ESQ.

24

25

22

1

2      WINDELS MARK LANE & MITTENDORF, LLP

3           Attorneys for Lloyd Good; Plastic Omanna et al.;

4            Progressive Stamping Company; Morgan Adhesives Co. d/b/a

5            MACTAC; Western Flyer Express

6           156 West 56th Street

7           New York, NY 10019

8

9      BY:  LESLIE S. BARR, ESQ.

10

11     TELEPHONIC APPEARANCES:

12     ALLARD & FISH, P.C.

13           Attorneys for Creditor Severstal North America, Inc.

14           535 Griswold

15           Suite 2600

16           Detroit, MI 48226

17

18     BY:  DEBORAH L. FISH, ESQ.

19           (TELEPHONICALLY)

20

21

22

23

24

25

23

1

2    ARNALL GOLDEN & GREGORY LLP

3          Attorneys for Verizon Communications

4          171 17TH Street NW

5          Suite 1200

6          Atlanta, GA 30363

7

8    BY:  DARRYL S. LADDIN, ESQ.

9          FRANK N. WHITE, ESQ.

10         (TELEPHONICALLY)

11

12   ATTORNEY GENERAL'S OFFICE, STATE OF CALIFORNIA

13         Attorneys for State of California

14         California Dept. of Justice

15         P.O. Box 744255

16         Sacramento, CA 94244

17

18   BY:  MARGARITA PACFILLA, ESQ.

19         (TELEPHONICALLY)

20

21

22

23

24

25

24

```
1

2    ATTORNEY GENERAL'S OFFICE, STATE OF ILLINOIS

3         Attorneys for State of Illinois

4         100 West Randolph Street

5         Chicago, IL 60601

6

7    BY:   JAMES NEWBOLD, ESQ.

8         (TELEPHONICALLY)

9

10   ATTORNEY GENERAL'S OFFICE, STATE OF MICHIGAN

11        State of Michigan Department of Treasury

12        G. Mennen Williams Building

13        7th Floor

14        525 West Ottawa Street

15        Lansing, MI 48909

16

17   BY:   JULIUS O. CURTING, ESQ.

18        (TELEPHONICALLY)

19

20

21

22

23

24

25
```

25

```
 1

 2     ATTORNEY GENERAL'S OFFICE, STATE OF NEW JERSEY

 3          Attorneys for State of New Jersey Department of

 4           Environmental Protection Agency

 5          Richard J. Hughes Justice Complex

 6          8th Floor, West Wing

 7          25 Market Street

 8          Trenton, NJ 08625

 9

10     BY:  RACHEL LEHR, ESQ.

11          (TELEPHONICALLY)

12

13     ATTORNEY GENERAL'S OFFICE, STATE OF TENNESSEE

14          Attorneys for Tennessee Department of Revenue

15          Office of the Attorney General

16          P.O. Box 20207

17          Nashville, TN 37202

18

19     BY:  MARVIN CLEMENTS, ESQ.

20          (TELEPHONICALLY)

21

22

23

24

25
```

26

1

2    ATTORNEY GENERAL'S OFFICE, STATE OF TEXAS

3         Attorneys for Texas Department of Transportation Motor

4          Vehicle Division

5         300 West 15th Street

6         Austin, TX 78701

7

8    BY:  HAL F. MORRIS, ESQ.

9         RON DEL VENTO, ESQ.

10        (TELEPHONICALLY)

11

12   DAVIS POLK & WARDWELL

13        Attorneys for Interested Party Ford Motor Company

14        450 Lexington Avenue

15        New York, NY 10017

16

17   BY:  BRIAN M. RESNICK, ESQ.

18        (TELEPHONICALLY)

19

20

21

22

23

24

25

27

1

2    DLA PIPER LLP U.S.

3          Attorneys for Creditor Hewlett Packard

4          550 South Hope Street

5          Suite 2300

6          Los Angeles, CA 90071

7

8    BY:   KAROL K. DENNISTON, ESQ.

9          (TELEPHONICALLY)

10

11   DRINKER BIDDLE & REATH LLP

12         Attorneys for Cross-Complainant/Defendant, Manufacturers

13          and Trust Company and Wells Fargo Bank Northwest

14         1500 K Street, N.W.

15         Washington, DC 20005

16

17   BY:   KRISTIN K. GOING, ESQ.

18         STEPHANIE WICKOUSKI, ESQ.

19         (TELEPHONICALLY)

20

21

22

23

24

25

28

1

2    FOLEY & LARDNER LLP

3         Attorneys for Toyota Motor Corp.

4         One Detroit Center

5         500 Woodward Avenue

6         Suite 2700

7         Detroit, MI 48226

8

9    BY:   KATHERINE R. CALANESE, ESQ.

10        JOHN A. SIMON, ESQ.

11

12   FOLEY & LARDNER LLP

13        Attorneys for Toyota Motor Corp.

14        407 West Broadway

15        Suite 2100

16        San Diego, CA 92101

17

18   BY:   MATTHEW J. RIOPELLE, ESQ.

19        (TELEPHONICALLY)

20

21

22

23

24

25

29

```
1

2    FREEBORN & PETERS LLP

3         Attorneys for Trico Products & PGW LLC

4         311 South Wacker Drive

5         Suite 3000

6         Chicago, IL 620606

7

8    BY:  THOMAS R. FAWKES, ESQ.

9         (TELEPHONICALLY)

10

11   FROST BROWN TODD LLC

12        Lexington Financial Center

13        250 West Main

14        Suite 2800

15        Lexington, KY 40507

16

17   BY:  ROBERT V. SARTIN, ESQ.

18        (TELEPHONICALLY)

19

20

21

22

23

24

25
```

30

1

2      FULBRIGHT & JAWORSKI L.L.P

3            Attorneys for Bell Atlantic

4            2200 Ross Avenue

5            Suite 2800

6            Dallas, TX 75201

7

8      BY:  ELIZABETH N. BOYDSTON, ESQ.

9            (TELEPHONICALLY)

10

11     GOULSTON & STORRS P.C.

12            Attorneys for Creditor 767 Fifth Partners, LLC

13            400 Atlantic Avenue

14            Boston, MA 02110

15

16     BY:  DOUGLAS B. ROSNER, ESQ.

17            (TELEPHONICALLY)

18

19

20

21

22

23

24

25

31

1

2      HANGLEY ARONCHICK SEGAL & PUDLIN

3           Attorneys for NCR Corporation

4           One Logan Square

5           18th & Cherry Streets

6           27th Floor

7           Philadelphia, PA 19103

8

9      BY:   MATTHEW A. HAMERMESH, ESQ.

10          (TELEPHONICALLY)

11

12     HONIGMAN MILLER SCHWARTZ & COHN

13          2290 First National Building

14          660 Woodward Avenue

15          Detroit, MI 48226

16

17     BY:   SETH A. DRUCKER, ESQ.

18          JOSEPH R. SGROI, ESQ.

19          (TELEPHONICALLY)

20

21

22

23

24

25

32

1

2    KEMP KLEIN LAW FIRM

3        Attorneys for Custom Automotive Services, Inc.

4        201 West Big Beaver Road

5        Suite 600

6        Troy, MI 48084

7

8    BY:  GLORIA M. CHON, ESQ.

9        (TELEPHONICALLY)

10

11   MASTROMARCO FIRM

12       Attorneys for Gerald Haynor, Interested Party

13       1024 North Michigan Avenue

14       Saginaw, MI 48602

15

16   BY:  VICTOR MASTROMARCO, ESQ.

17       (TELEPHONICALLY)

18

19   MCDONALD HOPKINS CO., LPA

20       Attorneys for Swegalok Company

21       39533 Woodward Avenue

22       Bloomfield Hills, MI 48304

23

24   BY:  JAYSON B. RUFF, ESQ.

25       (TELEPHONICALLY)

33

1

2     MCNAMEE, LOCHNER, TITUS & WILLIAMS, PC

3          Attorneys for The Saint Regis Mohawk Tribe

4          677 Broadway

5          Albany, NY 12201

6

7     BY:  JACOB F. LAMME, ESQ.

8          (TELEPHONICALLY)

9

10    MILLER, CANFIELD, PADOCK AND STONE, P.L.C.

11         Attorneys for Creditor Ford Motor Company

12         150 West Jefferson

13         Suite 2500

14         Detroit, MI 48226

15

16    BY:  MARC N. SWANSON, ESQ.

17         (TELEPHONICALLY)

18

19

20

21

22

23

24

25

34

1

2    MORRIS JAMES LLP

3         Attorneys for Monster Worldwide

4         500 Delaware Avenue

5         Suite 1500

6         Wilmington, DE 19801

7

8    BY:   CARL N. KUNZ, III, ESQ.

9          (TELEPHONICALLY)

10

11   OFFICE OF SANTA CLARA COUNTY COUNSEL

12        Attorneys for County of Santa Clara Tax Collector

13        70 West Hedding Street

14        9th Floor, East Wing

15        San Jose, CA 95110

16

17   BY:   NEYSA A. FIGOR, ESQ.

18         (TELEPHONICALLY)

19

20

21

22

23

24

25

35

1

2    OHIO ATTORNEY GENERAL'S OFFICE

3         Attorneys for State of Ohio

4         State Office Tower

5         30 East Broad Street

6         17th Floor

7         Columbus, OH 43215

8

9    BY:   LUCAS C. WARD, ESQ.

10        (TELEPHONICALLY)

11

12   PEPPER HAMILTON LLP

13        Attorneys for Creditor SKF USA Inc.

14        400 Berwyn Park

15        899 Cassatt Road

16        Berwyn, PA 19312

17

18   BY:   HENRY J. JAFFE, ESQ.

19        (TELEPHONICALLY)

20

21

22

23

24

25

36

1

2      PERDUE, BRANDON, FIELDER, COLLINS & MOTT LLP

3           Attorneys for Arlington ISD et al.

4           4025 South Woodland Park Boulevard

5           Suite 300

6           Arlington, TX 76013

7

8      BY:   ELIZABETH BANDA, ESQ.

9            (TELEPHONICALLY)

10

11     ROTH & DEMPSEY P.C.

12          Attorneys for Burton Taft

13          436 Jefferson Avenue

14          Scranton, PA 18510

15

16     BY:   MICHAEL G. GALLACHER, ESQ.

17           (TELEPHONICALLY)

18

19

20

21

22

23

24

25

37

1

2    SCHIFF HARDIN LLP

3         Attorneys for Columbia Gas of Ohio; Columbia Gas of

4         Virginia

5         233 South Wacker Drive

6         Suite 6600

7         Chicago, IL 60606

8

9    BY:   JASON TORF, ESQ.

10        (TELEPHONICALLY)

11

12   SINGER & LEVICK, P.C.

13        Attorneys for ACS Affiliated Computers Services, Inc.

14        16200 Addison Road

15        Suite 140

16        Addison, TX 75001

17

18   BY:   LARRY A. LEVICK, ESQ.

19        (TELEPHONICALLY)

20

21

22

23

24

25

38

1

2   WOLFSON BOLTON PLLC

3        Attorneys for Guardian Industries

4        3150 Livernois

5        Suite 275

6        Troy, MI 48084

7

8   BY:   SCOTT A. WOLFSON, ESQ.

9        (TELEPHONICALLY)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

39

```
 1              P R O C E E D I N G S

 2              THE COURT:  Good morning.  Have seats, everybody.

 3    Before we begin, I want to make some apologies to you.  It

 4    wasn't practical to move to another courthouse with a bigger

 5    courtroom and better air conditioning.  I'm told that our

 6    amplification system is overloaded, is overheated.  I'll try to

 7    keep my voice up until we can get the amplification system

 8    fixed.

 9              As far as the temperature goes, you all have

10    permission, if you need it, to take off your suits -- your suit

11    coats.  You can take off your ties, for that matter.  Anything

12    you want to do to help make yourself more comfortable under

13    these circumstances is fine with me.

14              ALL:  We can't hear you, Your Honor.

15              THE COURT:  Can you hear me now?

16              ALL:  A little better.

17              THE COURT:  Well, I don't mind raising my voice a

18    little but I'm kind of screaming now.  Can you hear me in the

19    back at all?

20              ALL:  No, Your Honor.

21              THE COURT:  All right.  Then we're going to have to

22    take a recess until we can get this straightened up.

23         (Recess from 10:09 a.m. until 10:59 a.m.)

24              THE COURT:  All right, folks.  Have seats, please.

25    I'm sorry.  I don't know how many courts are typically capable
```

40

1    of handling a case with the needs of this one that would jog

2    with a 100 year old building.  Let's get to work.

3         With so many people appearing about so many things,

4    we're going to have to establish some orderly procedures.  So

5    here's what we're going to do.  If anybody sees the need to do

6    the lease rejection motion, he can do it.  He can have about

7    five minutes or less.  If counsel really wants to be heard on

8    that, he's going to have to address my decision in Ames

9    Department Stores.  Is he here -- she here?  Okay.  Back then I

10   ruled -- it's a written decision; I assume you have a copy --

11   that compliance with broom-clean and cleanup obligations can't

12   be an impediment to exercising the rights to reject under 365.

13   And that would seemingly be dispositive of this motion.  But if

14   there's something that you want to say to show me that I got it

15   wrong back when I decided Ames Department Stores,  I'll give

16   you that opportunity.

17        Turning to the main issues, folks, from everything

18   I've read, I understand the issues.  And I don't want openings.

19   They're not necessary.  With everyone who has filed papers, if

20   we had openings, we'd be here forever.  We will, of course,

21   have appropriate opportunity for summation and argument at the

22   end of the evidentiary phase of the hearing, subject to the

23   requirements for coordination and limits to avoid duplication

24   that I'll discuss.

25        I do, however, want to hear from you, Mr. Miller, or

41

1    your designee as to how issues have been narrowed or eliminated

2    since I got all of those briefs.  And if you can speak to that

3    after my preliminary remarks, that would be helpful.

4         I am also going to want, at some point, and I'll take

5    your recommendations as to the best time, for objectors on

6    successor liability issues, which are the main issues in this

7    case, and of the debtor, to give me one-page submissions as to

8    their understanding as to which of the successor liability

9    issues remain and which have been eliminated.  I want to know

10   the extent to which modifications in the purchase agreement or

11   otherwise have made successor liability issues go away and

12   which of them still remain matters of concern to parties.

13        Okay.  Then we're going to get the evidentiary record

14   buttoned up.  I'm going to take evidentiary objections first

15   from anybody who wants to raise them.  We're then going to take

16   the cross and, of course, any applicable redirect and the like

17   from the movant witnesses.  If there's any adverse direct of

18   any of those witnesses, and I sense from your pretrial

19   submissions that there may be, it's my view subject to parties'

20   rights to be heard that we should deal with it then so I won't

21   have to make witnesses bounce up and down and to go through

22   this stuff more than once.  Then, likewise, we'll have cross of

23   any objector witnesses, rebuttal witnesses, if any, then

24   summation and argument.  More about that in a minute.

25        I didn't receive any designations of deposition

1    testimony or, if I did, I don't know about it.  Normally, I get

2    them a few days before.  But I understand how hard you folks

3    have been working and it's possible that you folks were working

4    right through the weekend or even yesterday to do depositions.

5    Subject to your rights to be heard, my thought is that if

6    anybody wants to designate any deposition testimony, he or she

7    should do it by noon tomorrow with twenty-four hours for the

8    debtors to submit any Rule 32 counterdesignations.  If anybody

9    thinks that's not a workable course here, I'll hear discussion

10   on that.

11          Oral argument.  I can't blame anybody, especially

12   since you were obligated to put in your objections at the same

13   time.  But the objecting briefs make many similar points over

14   and over again.  As we've done in all of my other huge cases

15   where there were many, many parties who would be aligned in

16   interest in making the same points, we have to have some

17   coordination.  After first hearing from the debtors and the

18   debtors' allies and their advocates for the motion, which are

19   to be likewise coordinated to avoid duplication, with the

20   debtors speaking first unless the debtor has a different view,

21   I'll first take oral argument from one representative each of

22   the following objector or limited objector groups:  first, the

23   creditors' committee to the extent it's an objector; next, the

24   dissenting bondholders.  Mr. Richman, you or your folks; Center

25   for Auto Safety or another representative for tort claimants;

43

1  asbestos litigants; AGs; dealers; non-agreeing unions; nonunion

2  retirees.

3           If issues are still outstanding and argument is

4  really necessary, I'll take brief, very brief argument, from

5  lienholders, taxing authorities and the County of Wayne.

6           I won't take oral argument from shareholders,

7  workers' comp objectors or any objectors other than the County

8  of Wayne expressing concerns as to decisions as to whether or

9  not to close down particular plants.

10          Other parties in the classes I've described are to

11  coordinate with their group advocate and won't separately be

12  heard except on issues that weren't addressed at all to come

13  back and be -- or whether there's a conflict of interest

14  between the various objectors.  Remember, folks, I have the

15  briefs.

16          If the U.S. trustee or the indenture trustees wish to

17  be heard, they can be heard any time they choose.  And as I

18  said, the U.S. government, PBGC, the UAW and other supporting

19  unions -- supporting bondholders and others supporting the

20  motion should coordinate with the debtors.  But if they have

21  points to make after the debtors have been heard then we're

22  going to give them that opportunity.

23          Cross-examination.  Cross-examination is going to be

24  heard in the same coordinated fashion that I discussed with

25  respect to argument with the objector representatives that I

44

1  noted being heard first.  So, by way of example, we would start

2  with the creditors' committee, then Mr. Richman and move on

3  from there.

4       After that, others feeling the need to cross will

5  have that chance but subject to other parties' rights to raise

6  asked and answered objections and my inherent power to control

7  my courtroom and avoid duplicative questioning.  Actually, that

8  principle will be applicable throughout.  I hope that we won't

9  have the need to raise a lot of asked and answered objections

10  but if I have to rule on them, I will.

11       Next:  briefs.  Folks, I understand people worked

12  hard on their briefs.  But there was much too much in the way

13  of failures to comply with the requirements of the case

14  management order whose purpose is to help me understand briefs

15  when -- if you put them all together, they're almost two feet

16  high; failures to highlight defined terms so I've got to go

17  back and make sure that you're talking about the things that I

18  think you're talking about; and especially failures to give me

19  tables of authorities and tables of contents make it much, much

20  harder for me to do my job and for me to help you all.  You

21  know, I won't embarrass any particular constituency in the

22  courtroom but when I get a sixty-one page brief without a table

23  of authorities or a table of contents, how am I supposed to

24  compare your discussion of TWA with the debtors or on Fairchild

25  Aviation or of White Motor?

45

```
1        So, it's tough on me when you do that, folks, and --
2   now I don't have a page limit on briefs and I feel like no good
3   deed goes unpunished.  So the people who failed to comply with
4   the requirements for tables of authorities and tables of
5   contents have now until noon tomorrow to give it to me.  You
6   don't have to give me new briefs.  I'm not going to strike your
7   briefs.  I'm not going to make you comply with the other
8   respects in which you were deficient.  But you're going to give
9   me those tables of authorities because when this is done, I'm
10  going to be going back to put your discussion of the TWAs and
11  the other cases that are relevant to this against the debtors.
12  And we're going to see who's right and who's wrong.  But I
13  can't do that unless you help me out, folks.
14       All right.  Fair enough.  On the listing of the
15  issues that remain or are resolved on the successor liability
16  issues, there should be lists or bullet points, one page
17  hopefully per constituency and they're not to include federal
18  argument.  I just need to know what's open and what isn't.
19       Okay.  With that said, I think it's time to hear from
20  you, Mr. Miller.
21       MR. MILLER:  Good morning, Your Honor.  Harvey
22  Miller, Weil Gotshal & Manges, on behalf of the debtors.  In
23  response to your question, Your Honor, as to what has been
24  changed since June 1, as Your Honor noted, the weekend and
25  yesterday were really devoted to depositions.  They went on
```

46

1    through Saturday, Sunday and Monday.  So there was little

2    opportunity, Your Honor, to try and reach conclusions as to

3    open issues.  There are two areas in which there has been

4    progress.  On the product liability side, Your Honor, in

5    respect of product liability claims arising from expressed

6    warranties in connection with accidents from products,

7    anything -- any accident that occurs after the closing date,

8    Your Honor, irrespective of when the vehicle was manufactured

9    and sold, will be assumed by the purchaser, now New General

10   Motors Corporation.  Product liability claims that may arise

11   subsequent to the commencement of the Chapter 11 case and up

12   through the closing to the extent they're triggered by an

13   accident, those, Your Honor, should be administrative expense

14   claims.  So there is a major concession on the part of the

15   purchaser, Your Honor, with respect to that type of claims.

16        There hasn't been any progress, Your Honor, in

17   respect of the asbestos claimants as to future asbestos

18   claimants and existing asbestos claimants so that those claims,

19   under the proposal, Your Honor, would remain with Old GM.

20        Other tort claims, other than what I've already

21   explained, Your Honor, would remain with Old GM.  In connection

22   with what we refer to, Your Honor, as the splinter unions and

23   the contention made by the splinter unions led by the IUE that

24   the treatment which may be afforded to those claimants,

25   retirees, those will be claims against the old company.  There

47

1    are no active employees of IUE or these other splinter unions

2    that will be working for the new company.  And the purchaser

3    has exhibited no desire to assume any of those liabilities,

4    Your Honor.

5          There has been an amended and restated master sales

6    and purchase agreement which was filed on Friday, Your Honor.

7    It is also on the website.  It makes a number of changes, not

8    many substantive changes at all, Your Honor.  And we have

9    copies here for anybody who's interested in it.

10         That, essentially, Your Honor, is where we stand

11   today.  The motion is as it was filed with these exceptions.

12   And what we would propose to do, Your Honor -- one exception,

13   Your Honor.  There has been some issue raised in connection

14   with the loan and security agreement with the United States

15   government that was entered into on December 31, 2008.  And we

16   would like to offer that -- that was not, I think, on our

17   original exhibit list.  And we would like to offer that into

18   evidence as part of the debtors' direct case.  With the

19   schedules that are attached to that loan and security

20   agreement.

21         MR. SCHWARTZ:  It's on the exhibit list.

22         THE COURT:  Oh, it's on the exhibit list, Your Honor,

23   but the schedules weren't there.  And these are the schedules

24   that are attached to it.

25         THE COURT:  So the basic agreement is but the

48

1    schedules to it aren't?

2            MR. MILLER:  Yes.

3            THE COURT:  Okay.  Any objection?  Hearing none,

4    that's admitted.

5    (Loan and security agreement between GM and U.S. government

6    dated 12/31/08, was hereby received into evidence as of this

7    date.)

8            MR. MILLER:  And we would offer as the debtors'

9    direct case, Your Honor, the declarations or affidavits of Mr.

10   Henderson, the first day affidavit and the supplement to that;

11   the declaration of Mr. Repko; and the declaration or affidavit

12   of Mr. Worth and Mr. Koch.  And in the amended evidence and

13   witness list which was submitted to the Court, we had listed,

14   Your Honor, Exhibits 1 through 16 in support of those

15   declarations and affidavits.  And to anybody that doesn't have

16   a copy, Your Honor, we have additional binders with all of

17   these documents.

18           THE COURT:  All right.  Fair enough.  Any evidentiary

19   objections?  Mr. Richman?

20           MR. RICHMAN:  Your Honor --

21           THE COURT:  I think you need to come to one

22   microphone or another, Mr. Richman.

23           MR. RICHMAN:  There are two -- and we're trying also,

24   Your Honor -- Michael Richman for the -- Patton Brogs for the

25   family and dissenting GM bondholders -- to try to narrow the

49

1    issues and the focus to be as constructive as possible.  And

2    the issues that are the most important to us that are what we

3    believe to be the fulcrum of the hearings are the Lionel

4    factors of the debtors' business judgment; related to that, the

5    expressed need for urgency; and tied into that, the effect

6    which the bankruptcy case has on the value of the enterprise.

7    And I say that to create focus and not to waive any of the

8    other factors or issues.  And I also don't want to argue

9    extensively; I'm mindful that the time is limited.  But as to

10   those issues, we believe that witness credibility is very, very

11   important.  And that Your Honor should see and hear the

12   witnesses on those issues that we should be able to see and

13   hear them and be able to cross-examine what the witnesses

14   actually say as distinct from what the declarations have been

15   written to say.

16        So, to the limited extent of any of the declarations

17   providing evidence on those issues, we object and we would

18   request that there be live direct examination.  Thank you, Your

19   Honor.

20        THE COURT:  All right.  Mr. Miller?

21        MR. MILLER:  Your Honor, I've read --

22        THE COURT:  My message to you -- I was going to

23   surprise you.  It sounds to me I'm too loud.  And, folks,

24   including me, and I'll comply, please move back from the

25   microphones for the benefit of the people in the other rooms.

50

 1          MR. MILLER:  Your Honor --

 2          THE COURT:  Go ahead, Mr. Miller.

 3          MR. MILLER:  I have read Your Honor's case management

 4    order very carefully.  And Your Honor's order really states --

 5    too loud?

 6          THE COURT:  As much as I'd like to avoid excessive

 7    sound to the others, I think it's more important that people in

 8    the courtroom and me hear what you have to say and that you

 9    guys hear what I have to say.  So, this close, Mr. Miller,

10    speak so people in the back can hear.

11          MR. MILLER:  I'm saying, Your Honor, that I read your

12    case management order carefully and your case management order

13    clearly enunciates that direct cases can be put into a

14    declaration and affidavits.  Mr. Henderson, Mr. Worth, Mr. Koch

15    are all in the courtroom and can be cross-examined as to

16    everything that is set forth in the affidavits and

17    declarations, Your Honor.  If we're going to move this process

18    forward, that's the way to do it.

19          THE COURT:  Okay.

20          MR. MILLER:  I must add one other thing, Your Honor.

21    I neglected to say there has been considerable advances made

22    with respect to the tax claims by governmental entities.  And

23    we believe that that will be resolved before the end of this

24    hearing, Your Honor.

25          THE COURT:  Okay.  Thank you.  Mr. Richman --

51

1          MR. MILLER:  If I may, Your Honor, add one more thing

2     about the F&D dissidents bondholders committee.  As Your Honor

3     may recall, there was a motion made by the F&M dissident

4     bondholders committee for the appointment of an additional

5     bondholders committee.  And at the time of argument, the U.S.

6     trustee raised the issue as to the completeness of the Rule

7     2019 statement on behalf of the bondholders.  And counsel said

8     that there was no problem, they would file that 2019 statement

9     subsequent to the hearing.

10         There was an indication or a suggestion during the

11    hearing, Your Honor, that the three members of the F&M

12    dissident bondholders committee were almost par-bias of GM

13    bonds.  Subsequent to the hearing, Your Honor, an amended 2019

14    statement was filed.  And in that 2019 statement for these

15    three members, one member who was actually buying bonds on June

16    1, 2009, the date of the filing of this petition, the cost of

17    that bondholder per hundred dollars of value was two dollars.

18    The other bond -- none of these bondholders, Your Honor, paid

19    more than twenty dollars per hundred dollars of -- per thousand

20    dollars of value of these bonds.  These are three bondholders,

21    Your Honor, who claim to represent family and dissident

22    bondholders.  But there are only three members.  And every one

23    of those three members, Your Honor, bought their bonds

24    substantially below par and one significantly, significantly

25    below par.  So I would question, Your Honor, their motivation

52

1    and their standing in connection with this proceeding.

2          THE COURT:  All right.  I'm not going to make Mr.

3    Richman respond on the issue of standing because the amount

4    that these guys paid for their investments to make them

5    bondholders still doesn't go to their rights under 1109 to

6    appear and be heard in the case.

7          Practically everybody in this room knows that we get

8    distressed debt investors all the time in this courthouse and

9    other districts as well taking very active roles in these cases

10   having bought their bonds or other investments at very

11   distressed prices.  So I'm overruling your objection to deny

12   him standing.  And I'll allow you or anyone else, subject to

13   relevance considerations, to amplify on the points you made as

14   we go forward.

15         I looked at his amended 2019 and I find it to be in

16   compliance with what 2019 requires.  So I don't need to deal

17   with the issues of what I or any other judge would do if a 2019

18   failed to comply or if constituency failed to file a 2019 at

19   all or gave a grossly insufficient one.

20         The underlying objection on the direct testimony

21   affidavit is overruled.  And I don't need to spend a lot of

22   time on the reason.  As Mr. Miller appropriately pointed out,

23   my case management order provides for it.  And it's the only

24   ways guys like me can function in complex cases with a lot of

25   numeric and statistical information, a lot of historic facts.

53

1    This is, of course, without your right, Mr. Richman, to pool on

2    the credibility issues as much as you choose to on cross.

3            Although the objection was only focused at the

4    movants' witnesses, the same applies to anybody else who gave

5    their direct testimony affidavits or declarations going

6    forward.

7            I sense that there may be a relevance objection to

8    some of this splinter union affidavits.  I'll deal with that.

9    But that isn't an objection on whether the affidavits are

10   admissible at all.  The question is the relevance of what they

11   say.  All right.  Are there -- yes, sir?

12           MR. JAKUBOWSKI:  Yes, Your Honor.

13           THE COURT:  Would you identify yourself for the

14   record, please?

15           MR. JAKUBOWSKI:  May I approach the podium?

16           THE COURT:  Of course.  But do me a favor.  I

17   intentionally didn't want everybody making a lot of appearances

18   on the record.  But when you first speak, folks, please

19   identify yourself.

20           MR. JAKUBOWSKI:  Thank you, Your Honor.  My name is

21   Steve Jakubowski.  I'm here from Chicago and I very much

22   appreciate your permitting me to appear in this case.  I

23   represent product liability claimants and I'm also joint

24   counsel with the Center for Auto Safety --

25           THE COURT:  Yes.  I saw your submission, Mr.

54

1    Jakubowski.

2           MR. JAKUBOWSKI:  -- and a number of consumer

3    organizations.

4           The evidentiary issue that I'd like to bring to the

5    Court's attention is the question of the exhibits and the

6    documents that we would like to have -- to use for purposes of

7    cross-examination of witnesses.  Every one of the documents --

8    I have five particular documents that we've designated last

9    night as exhibits that we would like to be able to present to

10   Your Honor to deal with the limited issues of successor

11   liability in the TWA case.  And all of those are privileged --

12   or excuse me.  All of those are highly confidential documents

13   that are subject to an agreement among the parties between

14   myself and the debtor and myself and Treasury regarding the

15   ability to disclose them in court.

16          The debtors have raised an objection to relevance but

17   the relevance objection came before my particular exhibits were

18   designated.  So what I would like to do is ask whether or

19   not -- is to try to come up with some procedure as to how to be

20   sure that the exhibits that I would like to present to the

21   witnesses on cross-examination are appropriately held

22   confidential but enough to be able to give you the information

23   you need to be able to rule properly.

24          THE COURT:  I need some help from you, Mr.

25   Jakubowski.  Without disclosing the confidential portion, can

55

1    you tell me the nature of the confidentiality concern?

2            MR. JAKUBOWSKI:  Sure.  Well, I'm not sure.  It's

3    their concern and we haven't really discussed --

4            THE COURT:  Oh, is the debtor concerned --

5            MR. JAKUBOWSKI:  It's the debtor's concern.

6            THE COURT:  -- that you got the document subject to a

7    confidentiality --

8            MR. JAKUBOWSKI:  Correct, Your Honor.

9            THE COURT:  Well, maybe I should give them a chance

10    to be heard and give you a chance to respond if you need to.

11            MR. JAKUBOWSKI:  Thank you, Your Honor.

12            THE COURT:  The presumption, folks, is that in a

13    hearing in a case of this type that's of fairly considerable

14    public importance, I really do not want to have to close the

15    courtroom or to deprive the public of access to this if there's

16    any possible way to be avoided.

17            Let's see if we can flesh this out.  Another

18    possibility, Mr. Jakubowski, is that since, under my

19    guidelines, I would be giving the creditors' committee and Mr.

20    Richman the first opportunities to cross, is it helpful for me

21    to suggest that you have a caucus with the movants in the next

22    recess to see if you can work something out with them on giving

23    you what you need to do or the ability to do what you need to

24    do without impairing any commercial confidentiality concerns?

25            MR. JAKUBOWSKI:  I would be happy to do that.

56

1          THE COURT:  Mr. Miller, can I get your views, please?

2          MR. MILLER:  I beg your pardon, Your Honor?

3          THE COURT:  Can I get your views, please?

4          MR. MILLER:  I -- Your Honor, this amended and

5     restated witness list from Mr. Jakubowski came in at 2 a.m.

6     this morning.  I think Your Honor's suggestion is the

7     appropriate suggestion.  I think we need some time to talk with

8     Mr. Jakubowski and see if there is some way that we can

9     alleviate this problem.

10          THE COURT:  Fair enough.  Then let's get on with the

11    cross.  And, Mr. Jakubowski, if you would drop down a couple

12    notches in the questioning order, that won't be a big deal and

13    that way you guys can hopefully resolve it at this juncture.

14          MR. MILLER:  And, Your Honor, I take it that what I

15    described before is now moved into evidence?

16          THE COURT:  Yes.  It is so moved and admitted.

17    (Declarations/affidavits of Mr. Henderson, Mr. Repko, Mr. Worth

18    and Mr. Koch were hereby received into evidence as of this

19    date.)

20          MR. MILLER:  Thank you, Your Honor.

21          THE COURT:  And you had a writing for me with that

22    stuff in the other courtroom.  But if you want to just give me

23    an extra one now, that might be helpful.

24          MR. MILLER:  May I approach, Your Honor?

25          THE COURT:  Yes.  Thank you.

57

1          MR BRESSLER:  Your Honor, may I be heard before the

2     Court?

3          THE COURT:  Yes.

4          MR. MILLER:  Excuse me just one moment.  This is the

5     amended and restated master exhibit list.

6          THE COURT:  Okay.  Good morning.

7          MR. BRESSLER:  Good morning, Your Honor.  Barry

8     Bressler from Schnader Harrison.  We're the ad hoc committee of

9     consumer victims.

10         THE COURT:  Pause, Mr. Bressler.  Now, unless I read

11    the briefs incorrectly, you have similar concerns to Mr.

12    Jakubowski, don't you?

13         MR. BRESSLER:  I wanted clarify where we do not.  We

14    represent 300 tort claimants not his five.  We do have a

15    similar concern as to 363.  But we have raised two other

16    objections on which we have deposed the witnesses:  one is the

17    sub rosa plan objection and the other is a bad faith objection

18    not raised by the --

19         THE COURT:  Purchaser bad faith?

20         MR. BRESSLER:  Yes.  And as to those, since Mr.

21    Jakubowski did not have those objections, I would like to be

22    heard for the consumers.

23         THE COURT:  This is kind of what I was talking about,

24    that overlap, folks, 'cause Mr. Richman made very similar

25    points.  I'm not going to rule in advance but this is exactly

58

1    the kind of thing where we need to avoid duplication.  And

2    whether you agree with Mr. Richman or disagree with Mr.

3    Richman, nobody can suggest that he wasn't a capable advocate

4    for the views that he advanced.

5           So I'm going to hear from Mr. Richman.  And then when

6    it's tort claimants' turn, I'm going to hear from Mr.

7    Jakubowski or the Center for Auto Safety, which, I gather, is

8    his ally on this, first.  And then subject to what I ruled

9    before, if Mr. Richman failed to make a point that you think he

10   should have made or could have made, not made it badly but if

11   he left out -- I don't think there's going to be a distinction

12   because if he makes it, he's going to make it competently, I

13   think you can assume, this willingness without prejudice to

14   your rights to come up and say we could ask something else.

15          MR. BRESSLER:  Thank you, Your Honor.  We do not

16   intend to duplicate.

17          THE COURT:  Okay.  Anything else?  All right.  Mr.

18   Richman, do you have a preference as to who you cross-examine

19   first?

20          MR. RICHMAN:  Your Honor, Mr. Henderson.  And my

21   partner, Mark Salzberg, is going to be my designee for this

22   purpose.

23          THE COURT:  Okay.  Mr. Salzberg was it?

24          MR. RICHMAN:  Yes.

25          THE COURT:  Thank you.  Is Mr. Hen -- yes.  Mr.

59

1    Henderson, could you come up to the witness box, please, and

2    remain standing to be sworn by the operator.

3         (Witness duly sworn)

4              THE COURT:  Have a seat, please, Mr. Henderson.

5    Normally, I tell people to keep their voices up.  In this

6    situation, I don't know whether to do that or tell you the

7    opposite.  Why don't you try talking the way you feel like

8    talking and if the people can't hear then raise your hands and

9    hopefully it won't be too loud for the other people.

10             THE WITNESS:  Thank you, Your Honor.

11             THE COURT:  Mr. Salzberg, proceed.

12             MR. SALZBERG:  Thank you, Your Honor.

13   CROSS-EXAMINATION

14   BY MR. SALZBERG:

15   Q.   Good morning.  Can you please state your name for the

16   record?

17   A.   My name is Frederick Henderson.

18   Q.   And, Mr. Henderson, what is your present position?

19   A.   I'm the president and chief executive officer of General

20   Motors.

21   Q.   And you became the president and CEO of General Motors on

22   what date?

23   A.   April 1st of this year.

24   Q.   And prior to that, you were the chief operating officer,

25   is that correct?

60

1    A.   That's correct, sir.

2    Q.   Okay.  The U.S. Treasury extended certain loans to General

3    Motors and certain of its affiliates on December 31, 2008, is

4    that correct?

5    A.   That's correct.

6    Q.   And there were some loans extended in the months

7    subsequent up until the petition date on June 1, 2009.

8    A.   Also correct.

9    Q.   Do you know what the amount of those loans were that were

10   extended on December 31, 2008?

11   A.   Four billion dollars.

12   Q.   And at the time the four billion dollars was extended on

13   December 31, 2008, was GM adequately capitalized?

14   A.   No.

15   Q.   Okay.  Was it able to pay its debts as they become due --

16   as they came due, excuse me.

17   A.   Without that loan, no.

18   Q.   Okay.  And at that time, were the assets of GM in excess

19   of its liabilities?

20   A.   Could you repeat the question, sir?

21   Q.   Sure.  At the time that the initial four billion dollars

22   was extended on December 31, 2008, were GM's assets in excess

23   of its liabilities?

24   A.   No.

25   Q.   Okay.  And there were subsequent advances made in January,

61

1    February, March, April, May of 2009, correct?

2    A.    That's correct.

3    Q.    And is it fair to say that in each one of those instances,

4    when those subsequent loans were extended, GM was not

5    adequately capitalized?

6    A.    That would be my opinion, yes.

7    Q.    Okay.  And GM was not able to pay its debts as it came

8    due.

9    A.    Without those draws, correct.

10   Q.    Okay.  And its liabilities exceeded its assets, is that

11   correct?

12   A.    Also correct.

13   Q.    Okay.  When GM first received the initial four billion

14   dollars, how did GM intend to pay that four billion dollars

15   back to the U.S. Treasury?

16   A.    At the time, we were planning to develop -- we had plans

17   to develop a viability plan which would restructure our

18   business, restructure our business preferably outside of a

19   bankruptcy court.  And one key objective of that restructuring

20   would be to repay the loans to the Treasury.

21   Q.    So it was a question.  GM was not sure it could pay the

22   loans back in its restructured business, is that correct?

23   A.    That's correct.

24   Q.    And would the same be true at each time that the

25   subsequent pre-petition loans were extended that GM was only

62

1    able to pay back those loans if it restructured its business?

2    A.    Yes.

3    Q.    And did that restructuring include converting the debt

4    into equity?

5    A.    Not initially.  That was not initially the view, sir.

6    Q.    And when did that become the plan?

7    A.    In the second quarter of this year when we launched the

8    bond exchange, one element of that was to equitize at least

9    half of the loans that were provided by the Treasury prior to

10   June 1st.

11   Q.    Okay.  So sometime in April or May of 2009, GM came to the

12   conclusion that it could only pay back its loans to the U.S.

13   Treasury or loans from the Treasury by at least partially

14   equitizing those loans, is that correct?

15   A.    When we launched the bond exchange, we felt that in order

16   for us to proceed, and for the bondholders to consider their

17   opinions that we needed to identify that as one of the

18   conditions to the bond exchange.  We felt it was important for

19   that to happen in order for us to have an adequate

20   capitalization.

21   Q.    But just so I'm clear and so the record is clear, was it

22   GM's belief that the only way it could satisfy -- it could pay

23   back, at that point, the approximately seventeen billion

24   dollars in pre-petition loans was that if some of those loans

25   were converted to equity?

63

1    A.    That was our judgment, yes.

2    Q.    Okay.  So would it be fair to say that since December 31,

3    2008, the United States Treasury had some sort of lev -- some

4    type of leverage over General Motors?

5    A.    Correct.

6            MR. MILLER:  Objection to the form of the question,

7    Your Honor.

8            THE COURT:  Overruled.

9    Q.    And when GM received the four billion dollar installment

10   December of '08, was there any other source of funding for GM?

11   Any other source of loans?

12   A.    No.

13   Q.    And since that time, from December of '08 until the

14   petition date of June of '09, was there any other source of

15   funding for GM?

16   A.    For our U.S. operations, no.

17   Q.    Okay.  And under the loan agreement that was entered into

18   between the debtor and the trustee -- I'm sorry, U.S. Treasury,

19   excuse me -- was the U.S. Treasury able to call the loans if a

20   viability plan was not proposed by GM which was sufficient in

21   its view?

22   A.    Yes.

23   Q.    So at any time from December of '08 through June 2009 when

24   the bankruptcy was filed, U.S. Treasury could have said these

25   loans are payable now, immediately due because GM has not

64

1   proposed a viability plan which we find acceptable?

2   A.   Yes.

3   Q.   Now your predecessor CEO was Richard Wagoner, is that

4   correct?

5   A.   Yes.

6   Q.   And he resigned sometime around April 1st, I guess, 2009,

7   is that correct?

8   A.   Correct.

9   Q.   What were the circumstances surrounding --

10           MR. RICHMAN:   Well, let me rephrase that.   Excuse me.

11   Q.   How did Mr. Wagoner come to resign as CEO of GM?

12   A.   We were asked to come to Washington and review with the

13   automotive task force their preliminary results of our

14   viability plan that was submitted on February 17th.   That was a

15   Friday.   I believe it was March 27th but it was the Friday of

16   that week.   Whether -- I'm not sure if it was exactly the 27th.

17       At that meeting, the head of the automotive task force,

18   Steve Rattner, asked to see Rick Wagoner in advance in a one on

19   one meeting.   And at that meeting, he asked Rick to step down.

20   Q.   So Mr. Rattner asked the CEO of GM to step down?

21   A.   I was not at the meeting but Mr. Wagoner indicated to me

22   that he was asked to step down as both chairman and CEO.

23   Q.   Do you know under what authority Mr. Rattner, on behalf of

24   the auto task force, asked Mr. Wagoner to step down as CEO?

25   A.   No.

1   Q.   Did he have -- did the U.S. Treasury have contractual

2   authority to essentially terminate the CEO of GM?

3   A.   Not that I'm aware of.

4   Q.   Are you familiar with papers filed by the U.S. Treasury in

5   support of the sale motion?

6   A.   Umm --

7   Q.   Have you seen them?

8   A.   No.

9   Q.   Okay.  There's reference -- I will represent to you that

10  there's reference, and Mr. Miller will correct me if I'm wrong,

11  to the U.S. Treasury acting as a "prudent lender" in the

12  statement.  Are you familiar with that phrase or are you aware

13  that they use that language?

14  A.   Yes.

15  Q.   Okay.  Do you know of any other instances where a lender

16  has acted as a prudent lender where it actually instructed its

17  borrower to terminate its CEO?

18  A.   I'm not aware of any.

19  Q.   Do you know of any other instances where lenders have

20  instructed borrowers to terminate their CEO or undertake --

21          MR. MILLER:  Objection, Your Honor.  This assumes

22  facts that are not in the record.  Mr. Henderson testified that

23  Mr. Rattner asked Mr. Wagoner to step down.

24          UNIDENTIFIED SPEAKER:  We can't hear.

25          MR. MILLER:  Sorry.  Mr. Henderson testified, Your

66

1   Honor, that as far as he knows, Mr. Rattner asked Mr. Wagoner

2   to step down.  He did not terminate him.  That was a decision

3   that had to be made by the board of directors of GM.  And if

4   counsel has the document, he should show it to the witness who

5   said he never saw the document.

6          THE COURT:  All right.  I'm going to sustain the

7   objection on form without prejudice to rephrase.

8          MR. SALZBERG:  Thank you, Your Honor.

9   BY MR. SALZBERG:

10  Q.   Mr. Henderson, you were a member of the GM board of

11  directors, is that correct?

12  A.   I am now, yes.

13  Q.   Okay.  Were you a member prior to April 1 of 2009?

14  A.   No.

15  Q.   Okay.  Were you -- did you -- well, as a nonmember, did

16  you attend the board of directors meetings where Mr. Wagoner's

17  resignation was discussed?

18  A.   Yes.

19  Q.   Okay.  How did the board -- I'm sorry.  Did the board ask

20  Mr. Wagoner to resign as CEO at that meeting on or about March

21  27th, 2009?

22  A.   There was a telephonic meeting of the board that had been

23  regularly scheduled for noon that day, on the Friday.  At that

24  meeting, Mr. Wagoner indicated to the board what was asked of

25  him and a discussion ensued.  And, no, the board did not ask

67

1   for his resignation at that meeting.

2   Q.    So how did Mr. Wagoner end up resigning?

3   A.    Mr. Wagoner resigned, I believe, on Sunday, that weekend,

4   after a number of board calls.

5   Q.    Would you agree with me that Mr. Wagoner resigned at the

6   suggestion of the U.S. Treasury?

7   A.    Yes.

8   Q.    And would you agree with me that Mr. Wagoner resigned at

9   the suggestion of the head of the U.S. auto task force?

10  A.    Yes.

11  Q.    And would you also agree with me that Mr. Wagoner resigned

12  at the suggestion of the only lender that GM had at that time?

13  A.    Yes.

14  Q.    Okay.  Now, the debtor has not filed a plan of

15  reorganization as we stand here today, is that correct?

16  A.    That's correct.

17  Q.    There were discussions prior to the filing of the petition

18  regarding --

19          MR. SALZBERG:  Strike that.  Let me rephrase that.

20  Q.    Prior to the bankruptcy being filed, there were

21  discussions between GM and the U.S. Treasury regarding filing a

22  plan of reorganization to accomplish this asset sale, is that

23  correct?

24  A.    Could you rephrase the question, please?  I'm sorry.

25  Q.    Sure.  Were there discussions prior to the petition date

68

1    between the debtor and the U.S. Treasury regarding different

2    processes for accomplishing the asset sale?

3    A.   Yes.

4    Q.   And one of those processes that was discussed was filing a

5    plan, a pre-packaged plan of reorganization, is that correct?

6    A.   Correct.

7    Q.   And was one of the processes discussed filing a pre-

8    negotiated plan of reorganization?

9    A.   Yes.

10   Q.   Okay.

11        MR. SALZBERG:  Excuse me.  Your Honor, if I may?

12        THE COURT:  Yes.

13        MR. SALZBERG:  Your Honor, Mr. Miller and I just have

14   to talk about the confidentiality issue that was raised by

15   counsel 'cause we do have some exhibits.

16   (Pause)

17        MR. SALZBERG:  I apologize, Your Honor.  We're just

18   dealing with procedural --

19        THE COURT:  Oh, I understand.  Go on.

20   (Pause)

21        MR. MILLER:  No objection, Your Honor.

22        MR. SALZBERG:  Your Honor, this is a mea culpa.  Over

23   the last few days, we've been attending depositions and the one

24   thing I forgot were exhibit stickers.  And so I apologize.  But

25   may I approach -- Your Honor, may I hand mark --

69

1          THE COURT:  Do it the old-fashioned way.  Take a pen

2   and then you can mark it as an exhibit.

3          MR. SALZBERG:  Thank you, Your Honor.

4          THE COURT:  Just tell me how you've marked and, for

5   the record, a general description of your document without

6   prejudice to the witness' ability to identify it --

7          UNIDENTIFIED SPEAKER:  Your Honor, I have sticker.

8          MR. SALZBERG:  Thank you, Your Honor.  Your Honor,

9   for the record, I'm going to mark this document Bondholder

10  Exhibit number 1.

11         THE COURT:  Sure.

12         MR. SALZBERG:  And if I may approach the witness and

13  Your Honor?

14         THE COURT:  Yes, you may.

15         THE WITNESS:  Thank you.

16  (Bondholder's Exhibit 1, proposed pre-packaged plan of

17  reorganization, was hereby marked for identification as of this

18  date.)

19  **Q.   Do you recognize this document, sir?**

20  **A.   I recognize parts of this document but not the document in**

21  **its entirety.**

22  **Q.   Okay.  Thank you.  If you would, please turn to page 4**

23  **which is entitled "Plan B Options".**

24  **A.   Yes, sir.**

25  **Q.   Okay.  Do you recognize this page of the document?**

70

1    A.    No.

2    Q.    I'm sorry?

3    A.    No.

4    Q.    Okay.  Let's get to it this way.  You see there are

5    three -- three boxes that one is noted "90-day Cramdown, 4/1";

6    the second is "60-day pre-pack, 5/31"; and the third is the

7    "363 Sale, 5/15", do you see that?

8    A.    Yes, I do.

9    Q.    Okay.  Were there discussions prior to the filing of the

10   petition between the debtor --

11          MR. SALZBERG:  Well, I'm sorry.  Let me rephrase.

12   Q.    Did the debtor contemplate filing a plan of reorganization

13   on or about April 1, 2009?

14   A.    No.  Not April 1st.

15   Q.    Okay.  But there were discussions prior to the filing

16   about filing a plan on the petition date, is that correct?

17   A.    Yes.

18   Q.    And there were discussions -- the debtor considered using

19   the plan confirmation process in order to effectuate the sale

20   of the assets, is that correct?

21   A.    There was a discussion regarding a plan of reorganization

22   pursuant to a pre-packaged bankruptcy.  And also a discussion

23   of a 363.

24   Q.    Okay.  But I just want to be clear that one of the

25   issues -- one of the processes discussed was filing a plan of

71

1   reorganization on the first day, is that right?

2   A.   That's correct.

3           MR. SALZBERG:  Your Honor, I'm going to show the

4   witness what's been marked as Bondholder Exhibit number 2.  And

5   if I may approach?

6           THE COURT:  Yes, sir.

7           MR. SALZBERG:  Two copies.  There you go.

8           THE WITNESS:  Thank you.

9           MR. SALZBERG:  You're welcome.

10          MR. MILLER:  Let me have a copy, please.

11          MR. SALZBERG:  Yes.  Your Honor, if I may, I'd like

12  to move Exhibit -- Bondholder Exhibit 1 into evidence.

13          THE COURT:  Any objection?

14          MR. MILLER:  No objection.

15          THE COURT:  Bondholder Exhibit 1 is admitted.

16  (Bondholder's Exhibit 1, proposed pre-packaged plan of

17  reorganization, was hereby received into evidence as of this

18  date.)

19          MR. SALZBERG:  For the record, Bondholder Exhibit 2

20  is a document bearing Bates stamps GMPR92336 through 92360 and

21  it bears on the first page "Cadwalader Use of Section 363 to

22  Expedite Restructuring of Distressed OEMs".

23  Q.   Sir, Cadwalader, the law firm, represents the U.S. trustee

24  in this case -- the U.S. Treasury in this case, is that

25  correct?

72

1    A.   Yes.

2    Q.   So during the planning of this bankruptcy, you had

3    discussions -- you, being GM, had discussions with Cadwalader,

4    is that right --

5    A.   Yes.

6    Q.   -- in conjunction with your counsel, is that correct?

7    A.   Yes.

8    Q.   Okay.  If you would turn to page 3 of this document --

9    first of all, have you ever seen this document before?

10   A.   Yes.

11   Q.   Okay.  When did you see it?

12   A.   Sunday.

13   Q.   At your deposition?

14   A.   Yes.

15   Q.   Prior to that had you seen it?

16   A.   I'd seen parts of it but not in its entirety.

17   Q.   Okay.  Page 3 of the document -- did you see this page 3

18   prior to your deposition on Sunday?

19   A.   No.

20   Q.   Okay.  You see there are two columns, one is entitled

21   "Section 363" and the other is entitled "Plan"?

22   A.   Yes.

23   Q.   Okay.  And if you read under Section 363, there's some

24   bullet points there.  Do you see the bullet points?

25   A.   Yes, I do.

73

1    Q.    Okay.  Was one of the reasons why the debtor chose to file

2    a sale motion as opposed to file a plan because the consent of

3    creditors and shareholders would not be required under a 363

4    sale whereas they would be required in a plan?

5    A.    Could you rephrase the question, please?

6    Q.    Sure.  Was one of the reasons why the debtor chose to file

7    a sale motion as opposed to filing a plan on the petition date

8    because the Section 363 sale could be done without obtaining

9    the consents of creditors and shareholders?

10    A.    No.

11    Q.    That had nothing to do with it?

12    A.    The discussion with respect to the Treasury was what

13    structure they were prepared to do in terms of both financing

14    the company as well as, in this case, the view was that they

15    were prepared to proceed using a 363 process.  The discussion,

16    for example, of shareholder votes was not a critical factor

17    that we discussed during the deliberations and then how

18    creditors were being affected were basically depending upon

19    what path was chosen.

20    Q.    But it's correct that one of the issues pointed out by

21    Cadwalader in support of the 363 sale was that consent of

22    shareholders and creditors would not be required, is that

23    correct?

24    A.    Yes, that's correct.

25          MR. MILLER:  Objection, Your Honor.  Mr. Henderson

74

1    testified that he never saw that page.

2              UNIDENTIFIED SPEAKER:  Can't hear.

3              THE COURT:  I'm going to sustain the objection on the

4    ground that what the document says is the best evidence of what

5    it says and I'm not going to ask a witness who's only seen

6    parts of the document before to characterize it --

7              MR. SALZBERG:  Okay.

8              THE COURT:  -- without prejudice to your rights to

9    argue in summation and to bring parts of the document to my

10   attention.

11             MR. SALZBERG:  Thank you, Your Honor.

12   Q.    Without looking at the document and without referring to

13   the document, were there discussions between the debtor and the

14   U.S. Treasury leading up to the petition date that a 363 sale

15   would be better strategically because the standards for the

16   sale would be lower than that required under a plan of

17   reorganization?  By U.S. trustee, I meant U.S. Treasury.  I

18   don't know why I keep making that mistake.

19   A.    Yes.  The -- we did have significant discussion regarding

20   the benefits and the risks of 363 and a plan through -- over

21   many months.  So, I'm just trying to make sure I understand

22   your exact question.

23   Q.    Well, was one of the benefits you discussed, benefits of

24   the 363 sale, was it that the standards for the sale would be

25   lower than that required under a plan confirmation?

75

1    A.    Well, I understood the standards were different, for

2    certain.

3    Q.    Okay.  And was one of the reasons why the debtor opted for

4    the 363 sale because it would provide less of an opportunity,

5    less of an opportunity, for creditors to object?

6    A.    I don't recall that discussion.

7    Q.    Okay.  Would it be fair to say that one of the reasons --

8    well, there were strategic reasons why the debtor chose to

9    effectuate the sale of the assets through 363 as opposed

10   through a plan, is that correct?

11   A.    That's correct.

12   Q.    Okay.  Are you aware of any document filed in this

13   proceeding which identifies the recovery for unsecured

14   creditors as compared to the UAW retirees?

15   A.    I've seen the document in that regard so it must be a

16   part.

17   Q.    Okay.  And it's your testimony, just so I'm clear, that

18   there is a document in this file which would identify the level

19   of recovery that the unsecured creditors would get dollar wise,

20   the dollar value of recovery, as compared to UAW retirees.

21   A.    Yes.

22   Q.    Okay.  Do you know what the dollar value in comparison is

23   in the recoveries?

24   A.    It depends on the value of the equity.

25   Q.    Okay.  Well, is it correct to say that the unsecureds,

76

1    which primarily --

2         MR. SALZBERG:  Let me back up.

3    Q.   Is it correct that the unsecured creditor class consists

4    primarily of the bondholders?

5    A.   That's correct.

6    Q.   Okay.  Do you know the percentage of the claims, the

7    bondholder claims, which make up the unsecured creditor class?

8    A.    I don't know.  I just know that the unsecured bondholders

9    at twenty-seven billion dollars would be the largest component

10   of the unsecured creditor class.

11   Q.   Okay.  I believe that the Form 8K filed by GM in late May

12   said the bondholder claim would be primarily the -- primarily

13   all the unsecured creditors.

14   A.   That's correct.

15   Q.   Okay.  And the UAW retirees will get what out of this deal

16   as proposed?

17   A.   The UAW --

18        MR. MILLER:  Objection, Your Honor.  If counsel would

19   lay a foundation -- get from whom?

20        UNIDENTIFIED SPEAKER:  Your Honor, we can't hear.

21        THE COURT:  Mr. Miller, there is a microphone on your

22   desk but I don't know if bringing it closer to you is going to

23   help --

24        MR. MILLER:  I don't think it's on, Your Honor.

25        MR. SALZBERG:  I'll refer --

77

1          THE COURT:  People in the background, do you hear Mr.

2     Miller's tapping on that microphone?

3          UNIDENTIFIED SPEAKER:  No.

4          THE COURT:  All right.  Then, Mr. Miller, you're

5     going to just have to come up to the main lectern microphone.

6          MR. MILLER:  Your Honor, counsel keeps referring to

7     what the UAW employees or retirees are getting as a result of

8     the Section 363 sale.  He fails to identify from whom and how.

9     He's making an assumption that -- a predicate that is not in

10    the record.

11         THE COURT:  Well, I don't think there's a predicate

12    that's not in the record but I think there's an ambiguity.  So

13    why don't we sustain it on form and you just clarify the

14    question.  You can ask it again sharpening the question.

15         MR. SALZBERG:  Yes, Your Honor.  And, by the way, I

16    would ask that Bondholder Exhibit 2 be moved into evidence.

17         MR. SCHWARTZ:  Objection.

18         THE COURT:  Any objections?  Please, Mr. Schwartz?

19         MR. SCHWARTZ:  I just want to be clear for what

20    purpose it's being --

21         THE COURT:  Mr. Schwartz, you're going to have to

22    come up to the mic, too.  Unfortunately, we're talking into

23    three corded ones here.

24         MR. SCHWARTZ:  Matthew Schwartz for the United

25    States.  I just want to be clear for what purpose the exhibit

78

1    is being offered.  Probably I ought to have made the same

2    objection to the first exhibit.  If it's being offered for the

3    truth of the content, it's hearsay.  And if it's being offered

4    for anything else, Mr. Henderson testified he hadn't seen the

5    entire document before.

6              THE COURT:  Okay.  I'll take a response.

7              MR. SALZBERG:  Your Honor, I believe that document

8    number 2 is a business record maintained by -- it's either the

9    U.S. trustee -- U.S. Treasury, excuse me, or the debtor.  It

10   was produced by GM, actually, in response to a document

11   request.  It was -- from its contents, it was drafted by its

12   counsel sometime immediately prior to or during the lead up to

13   the bankruptcy filing.

14             THE COURT:  Well, I don't think it's a business

15   record.  But it may qualify as an admission depending on who

16   its author was and the purpose for which it was put forward.

17   It also raises issues of double hearsay.  My inclination,

18   folks, is for you to -- well, it's more than that.  If I

19   mention it, it's my ruling.  Lay a foundation.  Find out who

20   the author of the document is.  If the author of the document

21   is GM, they're your opponent and I'll admit it as an admission.

22   If the author of the document is the auto task force or

23   Treasury, they're a party in interest with a different

24   perspective but I have problems with taking it as an admission

25   at least without a case that says that a party -- a multi-party

1    1109 case -- Chapter 11 case is, by reason of 1109, a party

2    opponent with the Federal Rules of Evidence.

3         Alternatively, if you want to offer it for a lesser

4    purpose, not for the truth of the matter asserted but for the

5    fact that somebody said something, then at least standing

6    there, you wouldn't have any hearsay issues at all.  So I'm --

7    Mr. Schwartz kind of hit the nail on the head when he talked

8    about the purpose.  It may be admissible for all purposes but

9    it may be admissible only for certain ones.

10        MR. SALZBERG:  Your Honor, in response, I believe

11   that Mr. Wilson, who will be proffered by the U.S. Treasury,

12   will be able to identify the document.  Cadwalader acted as

13   U.S. Treasury's outside counsel in this matter.  But I think

14   just for purposes of right now, what the document is being --

15   what we're seeing to introduce the document for is to show not

16   necessarily that 363 is better than a plan for the reasons

17   stated here but that there were discussions between the debtor

18   and the U.S. trustee (sic) at the U.S. Treasury, and their

19   outside counsel concerning these very issues.

20        THE COURT:  All right.  Well, if your only purpose is

21   to show that it was discussed, I would think that that isn't

22   for the truth of the matter asserted.  Mr. Schwartz, am I

23   missing something?

24        MR. SCHWARTZ:  I think you're exactly right.  And for

25   that purpose, it's appropriate to mark it Bondholder's 2 for

80

1   identification, so it can be used as a talking point, but not

2   to move it into evidence.

3            THE COURT:  All right.  Here's my ruling.

4            MR. SALZBERG:  Your Honor, if I may?  I'm sorry.

5            THE COURT:  Yes.

6            MR. SALZBERG:  And the other issue is that Treasury

7   did file an opposition to our, the bondholders' opposition to

8   the sale motion.  So they are taking an affirmative stand

9   against our position.

10           THE COURT:  I understand that.  And that's why I had

11  the uncertainty as to what the case law would say about whether

12  many parties in an 11 are considered party opponents for the

13  purpose of what's an admission.  And, of course, I'm talking

14  the old style long before there were Federal Rules of Evidence.

15           Here's what we're doing, folks.  Here's what I'm

16  ruling.  I'm taking it, for all purposes relevant to whether

17  something was stated.  I'm not yet taking it for the truth of

18  the matter asserted, by way of example, whether 363 is better

19  than plans, or the plans are better than 363.  That's

20  especially a matter of concern when you have subjective views

21  being expressed in the document as to which people in this room

22  elsewhere have differences in view.

23           It's without prejudice to anybody showing me a case

24  that if somebody who disagrees with you in a multiparty

25  alleging or anything they say is an admission.  I've been at

81

1    this for almost forty years.  I don't think I've seen a case on

2    it.  But you guys have done a lot more homework in preparation

3    for this hearing than I have.  So I'll keep an open mind on

4    that second level issue.

5         I mean, a classic example of that is the creditors'

6    committee.  The creditors' committee has said stuff.  Some

7    people agree with the creditors' committee on some issues and

8    not on others.  I'm not of a mind, subject to seeing some case,

9    to say that anything the creditors' committee generates is an

10   admission of all of the unsecured creditors in this case,

11   because its agent, the creditors' committee, said something.

12   That's a pretty complicated area, and I'm not going to decide

13   that on the fly now.  So it's admitted for the purpose of

14   anything that's in it having been expressed as a view.  Beyond

15   that, the objection is sustained without prejudice to

16   reconsideration.  Go ahead.

17   (Bondholders' Exhibit 2, document entitled "Cadwalader Use of

18   Section 363 to Expedite Restructuring of Distressed OEMs", was

19   hereby received into evidence for a limited purpose as of this

20   date.)

21        MR. SALZBERG:  Thank you, Your Honor.  I'd like to

22   mark this document -- mark it as Bondholders' Exhibit 3.  And

23   if I may approach, Your Honor?

24        THE COURT:  Yes, sir.

25   (Bondholders' Exhibit 3, GM/UAW/UST VEBA discussions dated May

82

1   18, 2009, was hereby marked for identification as of this

2   date.)

3       (Pause)

4           MR. SALZBERG:  For the record, Bondholders' Exhibit 3

5   is Bates stamped Treasury IUE CWA 2609 through 2626.  And the

6   first page bears the title "GM/UAW/UST VEBA Discussions Dated

7   May 18, 2009."

8   BY MR. SALZBERG:

9   Q.   Sir, do you recognize this document?

10  A.   Yes.

11  Q.   What is this document?

12  A.   It's a document that reviews the nature of the VEBA

13  obligation, restructuring terms, pro forma analysis of the

14  capital structure, and the benefits of the restructure.

15  Q.   Was it prepared for you?

16  A.   (No response)

17  Q.   Let me rephrase that.  Who prepared the document?

18  A.   I think General Motors prepared this document.

19  Q.   Okay.  And did you see it on or about May 18, 2009?

20  A.   Yes.

21          MR. SALZBERG:  I would ask that Bondholder Exhibit 3

22  be moved into evidence.

23          THE COURT:  Any objection?

24          MR. MILLER:  No objection.

25          THE COURT:  Admitted without objection.

83

1    (Bondholders' Exhibit 3, GM/UAW/UST VEBA discussions dated May

2    18, 2009, was hereby received into evidence as of this date.)

3    Q.   Sir, if you would turn to page 12 of this document?  Just

4    tell me when you get there.  What is page -- page 12 bears the

5    title "Illustrative Valuation"?

6    A.   Yes.

7    Q.   What does page 12 --

8             THE COURT:  Forgive me, Mr. Salzberg, what page were

9    you referring to?

10            MR. SALZBERG:  I'm sorry.  Page 12.

11            THE COURT:  Thank you.

12   Q.   What is this page of this document purporting to show?

13   A.   It's purporting to arrive at a pro forma common equity

14   value.

15   Q.   The second -- the bottom half of this page bears the title

16   "Recovery Analysis".  Do you see that?

17   A.   Yes, I do.

18   Q.   And we were talking a moment before regarding the recovery

19   to be achieved by the unsecured bondholders and UAW retirees.

20   Do you recall that conversation?

21   A.   Yes.

22   Q.   If you look at the line item that says New VEBA -- and

23   VEBA, just to clarify for the Court, what does VEBA stand for?

24   A.   It's the Voluntary Employee Benefit Association.  But in

25   this case it is intended to be the vehicle with which post

84

1    retirement healthcare plans were paid for UAW members.

2    Q.    Simply for the UAW retirees, correct?

3    A.    Yes.

4    Q.    And if you look at the last column, for line item New

5    VEBA, it shows a 65.6 percent recovery rate.  Do you see that?

6    A.    Yes, I do.

7    Q.    And then for bondholders, who you said consist of

8    primarily or they make up primarily all of the unsecured

9    claimants, this is a nine percent recovery rate.  Do you see

10   that?

11   A.    Yes.

12   Q.    Now, these numbers were calculated using a proposal to the

13   UAW which is not the proposal that's not on the table today,

14   correct?

15   A.    That's correct.

16   Q.    There is a UAW retiree settlement agreement which has been

17   made part of the sale motion which has different recoveries for

18   the UAW retirees than the one shown here, correct?

19   A.    Correct.

20   Q.    And those are actually higher recoveries, correct?

21   A.    Depends on the equity value.

22   Q.    Under the UAW retiree settlement, the retirees are going

23   to receive seventeen and a half percent of the common stock of

24   New GM, correct?

25   A.    Correct.

85

1    Q.    A 2.5 billion dollar note, correct?

2    A.    That's correct.

3    Q.    6.9 billion dollars in preferred stock?

4    A.    6.5.

5    Q.    6.5, excuse me.  And warrants to acquire an additional 2.5

6    percent of the common stock of New GM, correct?

7    A.    At a 75 billion equity value, yes.

8    Q.    And that stands -- well, let's compare that to what the

9    bondholders/unsecureds will recover out of this bankruptcy.

10   What is that?

11   A.    The bondholders/unsecureds would --

12          MR. MILLER:  Objection, Your Honor.  Counsel used the

13   phrase "out of this bankruptcy"?

14          MR. SALZBERG:  I'll rephrase.

15          MR. MILLER:  The UAW is getting --

16          THE COURT:  All right.  Once he said he would

17   rephrase, you don't have to continue.  Go ahead, Mr. Salzberg.

18   Q.    What is the recovery for the unsecured creditors?

19   A.    The unsecured creditors would receive ten percent of the

20   equity of the New General Motors and two different sets of

21   warrants, each at seven and a half percent, so fifteen percent

22   warrants.  The first is a seven-year warrant, struck at a

23   fifteen billion equity value, and the second, I believe, is a

24   ten-year warrant stuck at a thirty billion equity value.

25   Q.    And the UAW retiree claim, how much is that?

86

1    A.    We've estimated the liability that was owed to the UAW at

2    approximately twenty billion dollars, actually twenty-one

3    billion dollars.

4    Q.    Okay.  And the unsecured -- well the bondholders' claim is

5    twenty-seven billion dollars?

6    A.    That's correct.

7    Q.    Now, there were references in the sale motion that the

8    U.S. Treasury has said that it will not fund the DIP --

9    continue to fund the DIP if the sale order is not entered by

10   July 10th.  Do you recall that?

11   A.    Yes.

12   Q.    Now, if the U.S. Treasury does not fund on July 10th and

13   the sale order is not entered by that date, what options are

14   there for GM at that point?

15   A.    Well, if they don't continue, we would liquidate.

16   Q.    And has a calculation been done by GM as to what the U.S.

17   Treasury will recover in a liquidation?

18   A.    We have done liquidation value, the focus of which is to

19   determine what the recovery is of the unsecured creditors.  I

20   don't recall what the recovery of the U.S. Treasury would be.

21   Q.    It won't be a hundred percent recovery, would it?

22   A.    No.

23   Q.    Do you think -- do you have any understanding of what the

24   range would be a projected recovery?

25   A.    I'm sorry, I don't.

87

1    Q.    Let's talk about the performance of GM right now.  Were

2    there targets set for sales of vehicles in June of 2009?

3    A.    Yes.

4    Q.    And how is the company performing as compared to those

5    targets?

6    A.    We're performing in line, if not slightly better than the

7    targets, in terms of retail.

8    Q.    So the company is doing better than expected?

9    A.    The company's certainly better than the forecast coming

10   into the month, again, with respect to retail.  We're off on

11   fleet sales, because fleet customers have actually pulled back

12   their orders associated with the bankruptcy because they didn't

13   know their status in the bankruptcy.

14   Q.    But with respect to other sales other than fleet, you're

15   doing better?

16   A.    Yes.

17            MR. SALZBERG:  Your Honor, may I have a moment to

18   confer?

19            THE COURT:  Yes, sir.

20       (Pause)

21   Q.    Now, in the sale motion that was filed by the debtor,

22   there are assertions that the sale has to take place by July

23   10th, correct?

24   A.    Yes.

25   Q.    How was that date arrived at by the debtors?

88

1    A.    That date was arrived at by the purchaser, actually, as a

2    key date that they felt that was important to them.

3    Q.    Do you have an understanding as to why that date was

4    important to them?

5    A.    Because they, like we, are concerned about the business

6    status of the company in a bankruptcy process.

7    Q.    But again, we discussed that the business of the debtor is

8    actually doing better than expected, correct?

9    A.    The business is doing better for a number of reasons, one

10   of which is the expectation that this will move quickly and

11   that the company, in the 363 process, would be successful.

12   Q.    Just a few more questions.  There are references in the

13   documents that were produced over the weekend to a sixty to

14   ninety-day sale after the petition date.  Is that correct?

15   A.    Yes.

16   Q.    And so that would mean that the sale would be closing

17   outward of ninety days out, which would be August 31 of 2009.

18   Is that correct?

19   A.    We said no later than that, yes.

20   Q.    So actually, the debtor had contemplated with -- I'm --

21         MR. SALZBERG:  Let me rephrase that.

22   Q.    Was the August 31 date chosen in conjunction with or in

23   communication with the U.S. Treasury?

24   A.    Yes.

25   Q.    So there were discussions between the debtor and the U.S.

89

1    Treasury about a sale actually closing as late as August 31,

2    2009?

3    A.   The actual closing, yes.

4    Q.   Yes, okay.  Were there any discussions prepetition as to

5    whether it was feasible to file a plan on the petition date of

6    June 1 and get to plan confirmation within ninety days?

7    A.   I don't recall those discussions.

8    Q.   And you would agree with me that the plan confirmation

9    process would afford additional opportunities for creditors and

10   other stakeholders to raise objections and be involved in the

11   process.  Is that correct?

12           MR. MILLER:  Objection.  It calls for a legal

13   conclusion.

14           THE COURT:  Sustained on legal conclusion, but I'll

15   permit his layman's understanding.

16   A.   Could you repeat the question, please?

17   Q.   Sure.  I think.  You would agree with me that a plan

18   confirmation process would provide additional opportunities for

19   creditors and other stakeholders to be involved and to assert

20   objections to the proposed disposition of the GM assets?

21   A.   That was my understanding of how it would work, yes.

22   Q.   And in fact, in the plan confirmation process, creditors

23   would know how other stakeholders and creditors are being

24   treated, correct?

25   A.   That's my understanding, yes.

90

1    Q.   And there would likely be disclosure in the disclosure

2    statement showing expected recoveries for the creditors and

3    other stakeholders?

4    A.   Yes, that's my understanding.

5            MR. MILLER:  Objection.  Same objection.

6            THE COURT:  I'm taking it only as his layman's

7    understanding, and it's subject to what the law thinks that he

8    is.

9            MR. SALZBERG:  I have no further questions, Your

10   Honor.  Thank you.

11           THE COURT:  Okay.  Before I provide for redirect, I'm

12   inclined to have all of the cross proceed.  Who is next along

13   the lines that I outlined previously?

14           MR. RICHMAN:  Your Honor, auto safety group, Your

15   Honor.  Auto safety group.

16           THE COURT:  Thank you, Mr. Richman.  Auto safety wish

17   to -- does auto safety want to yield to Mr. Jakubowski?

18           MR. JAKUBOWSKI:  I am here with my co-counsel, Adina

19   Rosenbaum, for Public Citizen.  We would like to yield in order

20   to have the ability to speak to Mr. Miller --

21           THE COURT:  Certainly.  Certainly.  Okay.  How about

22   asbestos litigants?  Is that Mr. Esserman or somebody

23   different?  I see Mr. Esserman in the back there.  You can keep

24   it off, if you want, Mr. Esserman.

25           MR. ESSERMAN:  Thank you, Your Honor.

91

1    CROSS-EXAMINATION

2    BY MR. ESSERMAN:

3    Q.   Mr. Henderson, my name is Sandy Esserman.  I represent the

4    ad hoc committee of asbestos claimants in this case.  You're

5    aware that there are asbestos claims against General Motors,

6    are you not?

7    A.   Yes.

8    Q.   And General Motors has done an estimate of its liability

9    that they put to 10K, that shows a ten-year estimate, present

10   valued at about 650 million dollars.  Are you generally

11   familiar with that statement?

12   A.   Yes.

13   Q.   And from what does this liability arise?

14   A.   It's my understanding -- I'm not an expert.  But it's my

15   understanding that it principally arises as a result of

16   asbestos that was used in brake linings.

17   Q.   Did General Motors --

18          THE COURT:  Pause, please.  Did you say brake

19   linings?

20          THE WITNESS:  Yes.

21          THE COURT:  Okay.

22   Q.   And would the exposure to these claimants occur when the

23   brakes were cleaned or changed or brake jobs were done on the

24   cars?

25   A.   I don't know for certain, sir.  I'm sorry.

92

1    Q.    Does General Motors still put asbestos in their brakes?

2    A.    I do not believe so.

3    Q.    Do you know when they stopped putting asbestos in their

4    brakes?

5    A.    I do not know.

6    Q.    Are you aware of the treatment of asbestos claims in the

7    sale agreement that you've entered into with the Treasury?

8    A.    Yes.

9    Q.    And what is that treatment?

10   A.    The assumption of liability is not contemplated by the New

11   General Motors.

12   Q.    And that liability -- is that liability for current

13   claims, for claims on file now?

14   A.    It's my understanding it's on -- it's with respect to any

15   claims that are outstanding today.

16   Q.    What happens if -- are you familiar with the disease

17   mesothelioma?

18   A.    Not -- no, sir.

19   Q.    Asbestos related cancer?

20   A.    I'm familiar with that, yes.

21   Q.    Okay.  If a claimant who was working on General Motors'

22   brakes develops asbestos related cancer five years from now, is

23   it your understanding that New General Motors will be liable

24   for that, if there's anything found to be liable for, for that

25   claim?

93

1    A.    Sir, I'm not an expert in this area, so I couldn't give

2    you an opinion.

3    Q.    What's your intention as a layman, as a representative of

4    General Motors?  Is it to take care of that claimant is it to

5    send him to the bankruptcy court with a proof of claim?

6    A.    In the case of the purchaser of the company is not

7    planning to assume the obligations associated with asbestos

8    liabilities, it would be my expectation that it would not an

9    obligation of the New General Motors.

10   Q.    Calling an asbestos claim that will arise post sale a

11   future claim, would it be a correct statement of fact that all

12   future claims would not be assumed by the new purchaser,

13   relating to asbestos claims?

14            MR. SCHWARTZ:  Objection, Your Honor.  I think as to

15   this entire line of questioning, the actual sale and purchase

16   agreement is the best evidence of the terms of the deal.  I

17   know a lot of objectors are going to have questions about what

18   stays and what goes.

19            THE COURT:  I think, the Court's view is that's

20   right.  So Mr. Esserman, help me understand why his layman's

21   understanding is better than what the plan says?

22            MR. ESSERMAN:  Well --

23            THE COURT:  Unless it's the predicate for some

24   further questioning that --

25            MR. ESSERMAN:  -- that's exactly what it is.

94

```
1              THE COURT:  Can I make a suggestion?

2              MR. ESSERMAN:  Yes, sir.

3              THE COURT:  Perhaps not evidentiary perfect.  Why

4    don't you ask a question premised on your understanding of what

5    the 363 sale contemplates, hopefully articulated in a

6    nonargumentative way, so Mr. Schwartz would agree with you.

7    And then, if the question is reasonable in its assumptions, you

8    can ask questions concerning his businessman's understandings

9    or knowledge that are premised upon that undisputed fact.

10             MR. ESSERMAN:  That's fine, Your Honor.

11             THE COURT:  Thank you.

12   BY MR. ESSERMAN:

13   Q.   Mr. Henderson, it's my understanding that the New GM will

14   not be assuming any liability for future asbestos claims.  Is

15   that --

16   A.   That's my understanding as well, yes.

17   Q.   But that's not true with regard to all tort claims.  Is

18   that correct?

19   A.   That's correct.

20   Q.   And what tort claims is GM -- what is your understanding

21   of tort claims that GM is assuming in the future?

22   A.   In terms of product liabilities, sir?

23   Q.   Yes.

24   A.   The assumption of liability would include, for any vehicle

25   sold post-June 1st, number one.  Number two, for any accidents
```

95

1    incurred post closing, irrespective of when they were sold.

2    And then finally, we have indemnification obligations with

3    respect to our dealers.

4    Q.    And was this a recent decision that was made with regard

5    to product liability claims?

6    A.    The recent change was the agreement to assume obligation

7    for accidents post-closing.

8    Q.    And when was that change made?

9    A.    Late last week.

10    Q.    But there's no change as regards to asbestos claims.  Is

11    that correct?

12    A.    That's correct.

13    Q.    If New GM were to assume the asbestos claims, the

14    liability from the asbestos claims, is it your understanding

15    that that would not have an effect on the viability of the new

16    entity?

17                MR. SCHWARTZ:  Objection.  Relevance?

18                THE COURT:  Pause.  I'm going to overrule the

19    objection but require a predicate as to whether he has an

20    understanding, first.  If he has an understanding, you can ask

21    him.

22    Q.    Do you have an understanding of whether or not assumption

23    of asbestos claims would have an effect on the viability of New

24    General Motors?

25    A.    My business judgment would suggest that it would not

96

1    impair our viability.

2              THE COURT:  I couldn't hear the answer.

3              THE WITNESS:  Excuse me.  I'm sorry, Your Honor.  In

4    my judgment, it would not impair our viability.

5    Q.   GM would still be a viable com -- just so I understand

6    what you said, GM would still be a viable company if, in fact,

7    the purchaser would assume the asbestos claims?

8    A.   Yes.

9    Q.   Whose decision was it not to assume the asbestos claims?

10   A.   The purchaser, in their judgment, felt it was not

11   appropriate that they should be responsible for the asbestos

12   claims.

13   Q.   Was that the United States Treasury?

14   A.   Yes.  They're the purchaser.

15   Q.   In that negotiation with the United States Treasury, did

16   you participate?

17   A.   I participated in a number of negotiations with the U.S.

18   Treasury.

19   Q.   For New General Motors --

20   A.   Yes.

21   Q.   -- for the purchase?  Were you aware of whether or not

22   there was anyone at the bargaining table to create new General

23   Motors that was advocating on behalf of tort claimants or

24   asbestos claimants?

25   A.   We outlined for the U.S. Treasury, as the purchaser, a

97

1    range of obligations that we felt were sensitive that we wanted

2    to discuss with them, including, number one, quantifying them;

3    number two, explaining them; and number three, outlining a

4    range of options that might be considered.

5    Q.    So if you considered a claim sensitive, then it was

6    something that you advocated for with the Treasury to assume?

7    A.    It's something that we felt warranted the discussion, yes.

8    Q.    Did you discuss asbestos claims?

9    A.    Yes.

10   Q.    With the United States Treasury?

11   A.    Yes.

12   Q.    And what decision was made?

13   A.    The conclusion was that the asbestos claims would not

14   carry forward to the New GM.

15   Q.    And did you agree with that conclusion?

16   A.    Yes.

17   Q.    Well, you're referring to the purchaser as New GM, but

18   isn't New GM the same as Old GM, without some of the

19   liabilities?

20   A.    Well, the assets of General Motors are being purchased in

21   forming New GM, and so, pursuant to a 363 transaction.  That's

22   how I understand it.

23   Q.    But New GM -- there's going to be no difference between

24   New GM and Old GM, except for shedding liabilities.  Isn't that

25   correct?

98

1    A.    No, that's not correct.

2    Q.    Well, tell us what the differences are, in your opinion?

3    A.    Our business will be fundamentally restructured in terms

4    of the operating -- the operations of the business and the

5    capital structure of the business will be significantly changed

6    and improved.

7    Q.    So the capital structure might be changed, but the

8    products you sell are the same, aren't they?

9    A.    Yes.

10   Q.    You're not moving offices, are you?

11   A.    No.

12   Q.    Your management isn't changing after the sale, is it?

13   A.    It could well change, but we haven't announced those

14   changes yet.

15   Q.    Your employees are the same?

16   A.    Yes.

17   Q.    And your name's the same?

18   A.    We'll changes some names, but the operating business will

19   still be General Motors.

20           MR. ESSERMAN:  I'm almost done, Your Honor.

21           THE COURT:  Okay.

22           MR. ESSERMAN:  There may be one other asbestos

23   claimant that may have some follow-up questions.  Thank you.  I

24   was just informed, he does not.

25           THE COURT:  All right.  Very good.  I want to pause

99

1    here for a second and ask you folks to comment.  We lost an

2    hour -- more than an hour because of the overload.  But now

3    we're proceeding.  It's now 12:20, though, and I don't know if

4    you folks want to give up your lunches entirely or to give up a

5    chance to take even breaks.  So this is a possible breaking

6    point for either a break or a lunch hour.  I'd like to get your

7    views on it.  I would like to keep this hearing moving forward,

8    and I would like to get Mr. Henderson off the stand as quickly

9    as circumstances permit, consistent with your opportunity for

10   folks to do their jobs.  Mr. Miller, can I get your thoughts

11   first?

12           MR. MILLER:  Your Honor, Harvey Miller.  The debtor

13   joins with Your Honor.  We are perfectly prepared to waive

14   lunch and to proceed.

15           THE COURT:  All right.  I don't know if we're

16   prepared to waive lunch all the way up to dinner time.

17           MR. MILLER:  We are prepared to waive dinner too,

18   Your Honor.

19           THE COURT:  Well, okay.  That's why judges decide

20   things.  Do other parties want to weigh in on this?  I don't

21   see any voices here.  Here's what I want to do, folks.  I just

22   want to give folks a chance to go to the bathroom or get a

23   drink.  And then while we're on a roll, I don't want to take

24   our long lunch recess now.  So let's take -- I would say five

25   minutes if I thought that people could get back from the

100

1    bathroom that quickly.  Let's take ten, but with the

2    understanding that we mean it.  In that ten minute gap, Mr.

3    Miller, I'd like you to talk to Mr. Jakubowski, about seeing if

4    you can button up any understandings vis-a-vis what documents

5    he can use and what he can't.  And then -- folks, when I'm

6    speaking, please give me the courtesy of not even rising or

7    yammering.

8         MR. JAKUBOWSKI:  Your Honor, I have one issue.

9         THE COURT:  All right.  Just a minute, please.  But I

10   still can't let you interrupt me.  Mr. Jakubowski.  Then we're

11   going to resume.  Mr. Henderson, while you're in recesses and

12   while you're under cross, or for that matter, before you're

13   questioned on redirect, I'm going to ask you not to talk to

14   anyone other than maybe whether you want a tuna fish sandwich

15   for lunch.

16        THE WITNESS:  Thank you, Your Honor.

17        THE COURT:  Okay.  Mr. Jakubowski, I'll hear you now.

18        MR. JAKUBOWSKI:  Your Honor, I have just one

19   technical issue.  I ordered my documents from Chicago by FedEx.

20   I hear they didn't get there until 10:30.  I'm going to ask Ms.

21   Rosenbaum if she will go over to the hotel and get the

22   documents so that we could continue through.  In the meantime,

23   I will talk to Mr. Miller about the documents being admitted

24   into evidence.  And so hopefully, I will be able to accommodate

25   the schedule, but I do have a technical issue in terms of just

101

1   getting the box which is about half a mile away to the court.

2        THE COURT:  Why don't I just not prejudge those

3   things now and see if we can skin the cat by giving anybody

4   else who wants to question a chance to get ahead of you, and --

5   was it Ms. Rosenbaum?  Rosenberg?  I'm sorry.  I saw the name

6   on   the --

7        MR. JAKUBOWSKI:  Adina Rosenbaum, Your Honor.

8        THE COURT:  Okay.  All right.  Ten minute recess.

9   (Recess from 12:25 p.m. to 12:38 p.m.)

10       THE COURT:  Have seats everybody.  Can we resume?

11  (Pause)

12       THE COURT:  Okay.  Mr. Henderson, you're still under

13  oath.  Next questioner, please.

14       MR. CORDRY:  Good afternoon, Your Honor.  I was going

15  to say good morning but we've managed to make afternoon.  Karen

16  Cordry, bankruptcy counsel for the National Association of

17  Attorneys General and I'm appearing here on behalf of the

18  various Attorney Generals that have filed objections in this

19  case.

20       THE COURT:  Sure, Ms. Cordry, go ahead.

21       MR. CORDRY:  Thank you.  Just a couple of questions.

22  CROSS-EXAMINATION

23  BY MS. CORDRY:

24  **Q.   In discussions about the specific language in the order,**

25  **quite a few provisions in the order of the asset purchase**

102

1    agreement dealing with successor liability.  Who drafted that

2    language as between GM and the purchaser?

3    A.    I don't know, ma'am.

4    Q.    Did GM have a hand in drafting that language?

5    A.    General Motors would but who specifically I don't know,

6    within our staff.

7    Q.    I'm not really looking for a person as opposed to sides.

8    Was General Motors, then, involved in drafting that language?

9    A.    Yes, General Motors would have been involved.

10   Q.    And was Treasury involved in drafting that?

11   A.    I believe so.   Yes.

12   Q.    Okay.  Was it primarily Treasury?  Primarily GM?  Was it a

13   collaborative process?  How was that language reached?

14   A.    I have no idea.

15   Q.    Okay.  Who would have been the parties involved in

16   deciding those issues from GM?

17   A.    I believe it would have been the U.S. Treasury as the

18   purchaser, General Motors as the debtor, our counsel; counsel

19   to the Treasury would have been involved.

20   Q.    Okay.  And your counsel would be Weil Gotshal, is that

21   true?

22   A.    Yes, ma'am.

23   Q.    Okay.  And Treasury's counsel Cadwalader?

24   A.    Yes, ma'am.

25   Q.    Okay.  Do you know if these are primarily issues that were

103

1    being decided on a lawyer to lawyer basis, on a business

2    judgment to business judgment kind of process?

3    A.   I think a combination, ma'am.

4    Q.   Okay.  Were you present at any of those discussions about

5    that language?

6    A.   No.

7    Q.   Okay.  So specifically would you also have any idea about

8    who decided provisions in the order that provide that the

9    purchaser would not be treated as the successor for any

10   purpose?

11   A.   I don't know for certain who would have done that but my

12   presumption is it would be the U.S. Treasury as the purchaser.

13   Q.   Okay.  And the same question with respect to the language

14   in a number of places there that tries to describe what -- let

15   me back up.  There's a description of a claim in the master

16   purchase agreement that uses language, including things like

17   defenses and rights to recoupment and investigations and so

18   forth, do you know who drafted that language?

19   A.   No, ma'am.

20   Q.   Okay.  Do you know between General Motors versus

21   Treasury --

22   A.   I don't know.

23   Q.   -- where that came from?  And has there been any

24   discussions that you've been involved in since the case was

25   filed about changing the scope of that -- the language in the

104

1    original purchase agreement or the order with respect to

2    successor liability?

3    A.    The only discussion that I've been involved in, subsequent

4    to June 1st, had to do with the changes last week with respect

5    to product liability.

6    Q.    Okay.

7    A.    That's the only area.

8    Q.    Okay.  And apart from the substance we will cover claim X

9    versus claim Y, are you aware if there have been any

10   discussions going on about the more global language, I will

11   say, the language actually in the order that says that we will

12   sell free and clear of various things, those kind of

13   provisions?

14   A.    I have not been involved in those discussions.

15   Q.    And that would -- would it be the lawyers involved in

16   that?

17   A.    Yes.

18   Q.    And would there be anyone else at GM that the lawyers

19   would have been speaking to about those kind of issues if it

20   wasn't you?

21   A.    Yes.

22   Q.    Okay.  And who would that be?

23   A.    I would think it would be our subject matter experts

24   depending upon the area.

25   Q.    Okay.  So again, I'm really looking at a more global

105

1    level.  There's specific inclusions and exclusions in the

2    purchase agreement.  But in the order there's some very broad

3    language about things are being sold free and clear, we're not

4    a successor, those kind of provisions and that's what I'm

5    really trying to get at.  Who would have been making the

6    decisions as to whether or not to consider any changes in that

7    language?

8    A.    I believe the purchaser would.

9    Q.    Okay.  As opposed to GM?

10   A.    A purchaser, this is directly relevant to them.

11   Q.    Okay.  Nothing further.

12   A.    Thank you

13          THE COURT:  Okay.  Next please.  Mr. Eckstein?

14   CROSS-EXAMINATION

15   BY MR. ECKSTEIN:

16   Q.    Mr. Henderson, good afternoon.  I'm Kenneth Eckstein from

17   Kramer Levin representing the creditors' committee, if I may

18   ask you a few questions?

19   A.    Certainly.

20   Q.    Mr. Henderson, I'm assuming as the CEO of General Motors

21   that you are generally familiar with the principal documents

22   that comprise the sale of substantially all of the assets from

23   Old GM to New GM, am I correct?

24   A.    Correct.

25   Q.    And do those documents include the master purchase and

106

1    sale agreement?

2    A.    Yes.

3    Q.    And the master lease agreement?

4    A.    Yes.

5    Q.    And a transition services agreement?

6    A.    Yes.

7    Q.    And am I correct that each of those agreements are

8    agreements between Old GM and New GM?

9    A.    I believe so.  Yes.

10    Q.    Okay.  Can you tell me who negotiated -- on behalf of Old

11    GM who negotiated the master purchase and sale agreement?

12    A.    It would have been the management team as well as our

13    counsel.

14    Q.    And were you involved in the negotiation of that

15    agreement, sir?

16    A.    In some areas, yes.

17    Q.    And did there come -- and is the same true for the master

18    lease agreement and the transition services agreement?

19    A.    Yes, but I would not have been involved in either of those

20    two.

21    Q.    And who at the company had principal responsibility for

22    the transition services agreement?

23    A.    It would depend on the area, sir, I don't know.  I mean, I

24    think it would be multiple people.

25    Q.    All right.  Sitting here today do you know some of the

107

1    individuals in senior management who would have been

2    responsible for the transition services agreement?

3    A.    Certainly, for example in the area of accounting it would

4    have been the chief financial officer and our chief accounting

5    officer in terms of provision of accounting services.  There's

6    a whole series of issues that have to do with transition.

7    Q.    And would you know who, among senior management, would

8    have been responsible for the master lease agreement

9    negotiations?

10   A.    No.

11   Q.    Now did there come a point in time when the board of OldCo

12   or current GM approved the principal documents for the sale of

13   substantially all the assets from OldCo to NewCo?

14   A.    Yes.

15   Q.    And about when did that board meeting take place?

16   A.    The board meeting took place -- the final board meeting

17   took place on May 29th and 30th in New York, which was a Friday

18   and a Saturday.

19   Q.    And has the board met since May 29th to consider any

20   amendments to the principal agreements?

21   A.    Yes.

22   Q.    And when did those meetings take place?

23   A.    I believe last week.

24   Q.    Has there been only one meeting or more than one meeting

25   since May 29th?

108

1    A.    We have regular briefings for our board.  I know there's

2    at least one where it was an official meeting, which is where

3    the amendments were considered.  As to whether or not there

4    were any other official meetings, I don't remember.  We have

5    regular briefings with our board, so there was at least one.

6    Q.    So the board approved the basic agreements on or about May

7    29th, am I correct?

8    A.    May 30th, actually.  Yes.

9    Q.    May 30th.  And you're a member of the board?

10   A.    Yes.

11   Q.    What's your position on the board?

12   A.    I'm a director.

13   Q.    And who's the chairman of the board?

14   A.    The interim chairman of the board is Kent Kresa.

15   Q.    Thank you.

16              THE COURT:  That name again, please?

17              THE WITNESS:  Kent Kresa.

18              THE COURT:  K-R-E-S-S-A?

19              THE WITNESS:  K-R-E-S-A.

20   Q.    And am I correct that you participated in the May 30th

21   board meeting to approve the principal documents associated

22   with the transaction?

23   A.    That's correct.

24   Q.    And the meeting that took place last week, do you recall

25   the date of that meeting, sir?

109

1    A.    It's normally Friday.  And so I believe Friday but I'm not

2    certain.  We have regular briefings for our board.

3    Q.    I understand.  Middle of June?

4    A.    Yes.

5    Q.    And did you participate in the middle of June board

6    meeting to approve the amended agreements?

7    A.    Yes.

8    Q.    And are there board meetings scheduled to approve any

9    further amendments that are being negotiated or have been

10    negotiated in the last few days?

11    A.    No.

12    Q.    And so I'm correct that the board of Old GM approved the

13    principal transaction documents on or about May 30th and then

14    approved the amended documents at the meeting held in the

15    middle of June, is that correct?

16    A.    That's correct.

17    Q.    Now can you tell me, sir, how many members of the board

18    are there today?

19    A.    I believe there are either twelve or thirteen today.

20    Q.    Now can you tell me, what is the current contemplation

21    with respect to the board composition for NewCo?  How many of

22    the twelve or thirteen current board members are expected to

23    become the members of the NewCo board?

24    A.    Five members of -- five independent board members from the

25    old General Motors will move to the New General Motors board

110

1    and myself, so six.

2    Q.    So essentially six of the twelve or six of the thirteen

3    are going to move and become members of the NewCo board?

4    A.    That's correct.

5    Q.    And presently are any members of the current board

6    expected to become members of the OldCo board once the

7    transaction closes?

8    A.    No.

9    Q.    So at present do you know who will comprise the members of

10   the OldCo board?

11   A.    The chief restructuring officer of what will be the Old

12   General Motors, Albert Koch is -- has been going through a

13   recruitment process with respect to selection of board members

14   for the OldCo board.

15   Q.    And am I correct, sir, that you are intended to be the CEO

16   of NewCo, is that correct?

17   A.    That's correct.

18   Q.    And so therefore as CEO of NewCo am I correct that you

19   will essentially be in charge of enforcing the principal

20   documents that comprise this transaction as between NewCo and

21   OldCo?

22   A.    That's correct.

23   Q.    You had testified in your direct, sir, that unsecured

24   creditors of OldCo are expected to receive ten percent of the

25   equity of NewCo, is that correct?

111

1    A.    Plus warrants, yes.

2    Q.    And in addition they're going to receive warrants from

3    NewCo as well, that's for an additional fifteen percent, am I

4    correct?

5    A.    Yes.

6    Q.    In addition to the stock that's been allocated to

7    unsecured creditors, are there funds that have been set aside

8    in OldCo to wind down the OldCo estate?

9    A.    Yes.

10   Q.    And how much has been set aside?

11   A.    Approximately 950 million dollars.

12   Q.    And am I correct that those funds are intended to fund the

13   administrative and priority obligations of OldCo?

14   A.    And wind down costs, yes.

15   Q.    And wind down costs.  And in your view are those claims

16   intended to be adequate to fund the administrative and priority

17   obligations of OldCo?

18   A.    When we sized -- when we developed an estimate of what the

19   cost would be, we developed it with the intention that it would

20   be sufficient to cover those costs.

21   Q.    And do you have any reason to believe today that those

22   aren't sufficient?

23   A.    I believe updated estimates have recently been done with

24   respect to possible cost of environmental which might result in

25   additional amounts beyond the 950 million dollars.

112

1    Q.   Do you have any sense, sitting here today, what additional

2    funds might be necessary?

3    A.   I am advised that the most recent estimate could be

4    between 1.1 and 1.2 billion dollars.  But again, this is an

5    area where the precise number is difficult to determine

6    sometimes.

7    Q.   But am I correct that the intention of the transaction was

8    that there would be funds in the estate sufficient to fund the

9    wind down of the estate so that the monies that were allocated

10   for unsecured creditors who had the stock and warrants

11   allocated for unsecured creditors would be distributed to

12   unsecured creditors?

13   A.   Certainly when we sized the 950 million dollars we

14   intended to cover the total cost.  Our current estimate is it

15   may be short to a certain degree and certainly the other assets

16   are there but certainly what we would hope is that the amount

17   that was allocated would be sufficient.

18   Q.   Thank you, sir.

19   A.   Thank you.

20        THE COURT:  Mr. Frankel?

21        MR. FRANKEL:  Good afternoon, Your Honor.  It's Roger

22   Frankel from Orrick Herrington.

23        THE COURT:  Mr. Frankel?

24        MR. FRANKEL:  Frankel.  Your Honor, we represent the

25   unofficial creditors' committee that was appointed by the

113

1    National Dealer Counsel.  I actually don't have any questions

2    of Mr. Henderson but the dealer community was on your list and

3    I wanted the Court to know we were in the courtroom all the way

4    in the back so it's a little bit hard to get up here and I may

5    have questions of some of the other witnesses.

6            THE COURT:  Thank you, Mr. Frankel.  Next?

7        (Pause)

8            MR. KENNEDY:  Good morning, Your Honor.  Thomas

9    Kennedy for the objecting unions IUE-CWA, the steel workers and

10   the operating engineers.  We have prepared, Your Honor, a set

11   of exhibits that we will be referring to many of them in the

12   cross examination of Mr. Henderson.  They consist of the

13   deposition, extract from them, that were done on Saturday,

14   Sunday and Monday and the exhibits that were identified in

15   those depositions.

16           We've pointed out to Mr. Miller and given him copies

17   and I would ask that I provide you with a book of those

18   exhibits and the witness as well.

19           THE COURT:  I couldn't hear your question.

20           MR. KENNEDY:  Yes, I'd just like permission to

21   provide you with a book of our exhibits.

22           THE COURT:  Oh, all right.

23           MR. KENNEDY:  And the deposition extracts.

24           THE COURT:  You can give me the book and then

25   separately focus on the one you have and you want to introduce.

114

1          MR. KENNEDY:  Thank you.

2      (Pause)

3  CROSS-EXAMINATION

4  BY MR. KENNEDY:

5  Q.    Good afternoon, Mr. Henderson.  Would you agree with me

6  that as of April 30, 2009 the IUE-CWA represented more than

7  25,000 GM retirees?

8  A.    Yes.

9  Q.    And the steel workers represented another 4,000 GM

10 retirees?

11 A.    Yes.

12 Q.    And the operating engineers approximately forty, correct?

13 A.    Yes.

14 Q.    And the December 31, 2008 post retirement health and life

15 obligation that GM owed to the IUE and other non-UAW unions as

16 of that date was 3.724 billion dollars?

17 A.    Correct.

18 Q.    And ninety percent or more of that 3.724 billion dollars

19 was owed to IUE-CWA members?

20 A.    That's my understanding, yes.

21 Q.    In April of 2009 GM had decided that it wanted to arrange

22 a consensual restructuring without resort to the bankruptcy

23 court, is that correct?

24 A.    That's correct.

25 Q.    And GM had determined that it needed the consent of three

115

1    key constituencies to attempt consensual organization, do you

2    agree with that?

3    A.    Yes.

4    Q.    And those three were the bondholders, the UAW and the U.S.

5    Trustee acting as a secured lender?

6    A.    Correct.

7    Q.    And I take it that GM launched a bond exchange in late

8    April that would have required at least ninety percent of the

9    bondholders to agree to exchange their bonds for slightly above

10   ten percent of General Motors, is that also correct?

11   A.    Yes, sir.

12   Q.    And the UAW was asked -- the UAW VEBA was asked to accept

13   at least one half of its obligations from GM in equity in

14   General Motors?

15   A.    It was a condition to the bond exchange, yes.

16   Q.    And was a further condition to the bond exchange that the

17   treasury would agree that one half of the pre-June 1 borrowings

18   would be taken in the form of equity in General Motors?

19   A.    At least one half, yes.

20   Q.    And if the bond exchange and its preconditions had been

21   satisfied, General Motors, as far as you understand it, would

22   not have commenced the bankruptcy proceeding, correct?

23   A.    Had we been successful, our view is we would have likely

24   not proceeded with the bankruptcy proceeding.

25   Q.    Now during the time that the bond exchange was being

116

1    proposed in April of 2009, were you having discussions with the

2    GM leadership group about the advantages and disadvantages of a

3    prepackaged bankruptcy for GM as opposed to a Section

4    transaction?

5    A.    In April, sir?

6    Q.    Yes.

7    A.    Yes.

8    Q.    You examined, in that period of time, the advantages of a

9    possible 363 asset sale, possible cram down and a traditional

10   Chapter 11 process, correct?

11   A.    Correct.

12   Q.    And you examined the advantages and disadvantages of each?

13   A.    Yes.

14   Q.    Had General Motors made a determination of which of those

15   three alternative bankruptcy processes if the bond exchange

16   failed you would undertake as of April 15, 2009?

17   A.    No.

18   Q.    Did General Motors prepare a detailed contingency plan

19   that described the advantages and disadvantages of a 363 filing

20   on or around April 15th?

21   A.    We did that type of analysis through April and May.  I

22   don't know, on or about April 15 but I think it would -- I

23   think, yes, we were in mid-April and we were doing that kind of

24   analysis.

25   Q.    All right.  Well, let me direct your attention to Exhibit

117

1   3, to the exhibit we have marked for your deposition which

2   would be Exhibit 10, which is entitled contingency plan update.

3   A.   Exhibit 10?

4   Q.   No, Exhibit 3.

5   A.   Okay.  I'm sorry.

6   Q.   Let me just be clear about the structure.  The exhibits

7   attached to your deposition are, for the purposes of that book,

8   called Exhibit 10.  The Exhibit 3 to your deposition is the one

9   I'm directing your attention to right now, okay.  And you've

10  seen that --

11          THE COURT:  Help me too, Mr. Kennedy.

12          MR. KENNEDY:  Sure.

13          THE COURT:  Is the document you're talking about one

14  that says IUE APBO on the top?

15          MR. KENNEDY:  No, Your Honor.  The first thing to do

16  would be look for the inner tab which says 10 Henderson

17  Transcript.

18      (Pause)

19          THE WITNESS:  Oh, 10 Henderson Transcript.  I'm

20  sorry.

21          MR. KENNEDY:  Yes.

22          THE WITNESS:  I was also on the IUE.

23          THE COURT:  Well, maybe Mr. Henderson's with you, but

24  I'm not.

25          MR. KENNEDY:  I understand that, Your Honor.

118

1          THE COURT:  Are we talking about this huge notebook

2    you gave me, Mr. Kennedy?

3          MR. KENNEDY:  Yes.

4          THE COURT:  Okay.  And if I open up to tab 10, should

5    I see what you're talking about?

6          MR. KENNEDY:  No, Your Honor.  The first forty-seven

7    tabs, I'm sorry.  I think this is the source of the confusion,

8    are actually part of Exhibit 9, the Rawley (ph.) transcript.

9          THE COURT:  Oh, I see.  Then I find a tab that says

10   Henderson transcript.

11         MR. KENNEDY:  Yes.

12         THE COURT:  And then I go to another tab 3.

13         MR. KENNEDY: Yes, you do.

14         THE COURT:  Contingency plan update?

15         MR. KENNEDY:  Yes.

16         THE COURT:  Okay.  I'm with you now.  Okay.

17   BY MR. KENNEDY:

18   **Q.    Now hopefully with us all literally on the same page, do**

19   **you recognize this as a contingency plan that General Motors**

20   **had prepared on or about April 15, 2009?**

21   **A.    Yes.**

22   **Q.    And for purposes of analyzing the impact of a Section 363**

23   **plan as opposed to a cram down, isn't it a fact that General**

24   **Motors concluded that the UAW collective bargaining contract,**

25   **your obligations with respect to it would not be affected**

119

1    whether you took a 363 approach or a cram down approach.  Do

2    you have a recollection as to that, sir?

3    A.    No, because one element of our Treasury funding a facility

4    was that we needed to renegotiate our collective bargaining

5    agreement with the UAW to become competitive and at the same

6    time we needed to equitize at least half of our VEBA

7    obligations.  Whether it was outside of bankruptcy or inside of

8    bankruptcy, that was a requirement of our loan agreement.

9    Q.    Could you do me a favor then and take a look at page 17 of

10   that contingency plan update that we've identified as Exhibit 3

11   at your deposition?

12   A.    Certainly.

13        (Pause)

14   Q.    You'll note under the title Pension OPEB and Employee

15   Obligations there's a statement that UAW CBA will drive hourly

16   life EDB legal and other benefit obligations - assume that

17   similar result reached for both filing scenarios.

18   A.    Yes.

19   Q.    Do you see that, sir?  Does that refresh your

20   recollection?

21             THE COURT:  Pause please, Mr. Kennedy.  What serial

22   number page was that?

23             MR. KENNEDY:  It's page 17, Your Honor.  The Bates

24   number of that page is 327319.  It's page 17 of the contingency

25   plan.

120

1          THE COURT:  I don't see the page number but it says

2     US Liability Analysis at the top?

3          MR. KENNEDY:  Yes, the page number is on the lower

4     right-hand corner, white against black, sir.

5          THE COURT:  Oh, okay.  Go ahead.

6     Q.   So does that portion of the page I just reminded you of or

7     I should say directed your attention to, Mr. Henderson, does

8     that refresh your recollection as to whether the UAW-CBA issues

9     were regarded to be the same under both filing scenarios?

10    A.   We needed the change under both, yes.

11    Q.   All right.  And isn't it also true that General Motors had

12    concluded that IUE and other splinter group obligations may be

13    more addressable in a 363 proceeding?

14    A.   Yes.

15    Q.   And you see that as the next bullet under the one I had

16    just read you, correct?

17    A.   I do.

18    Q.   And when you -- General Motors concluded that the

19    obligations for the IUE and other splinter unions could be more

20    addressable in a 363 situation, what did you mean?

21    A.   Well, in the event of a 363 transaction, it was not

22    expected that the new General Motors would need to have a

23    contract with the IUE because there were no active employees.

24    And so therefore it wouldn't necessarily be the case that the

25    new company should assume nor enter into a contract with the

121

1    IUE or the other splinter unions.

2    Q.    So I take it then it was General Motors' view that under a

3    363 proceeding it would be easier to eliminate the obligations

4    for the employee post retirement health and life care that we

5    talked about at the beginning of our conversation.

6    A.    Well, our conclusion was at that point that decision

7    hadn't been taken.  But if the new company did not need to have

8    a contract, it did not have to assume those liabilities

9    Q.    In fact, I gather you understood in a section 363

10   transaction a purchaser can cherry pick the liabilities that it

11   assumes?

12   A.    That was in one of the earlier exhibits, yes.

13   Q.    And that was your assumption and General Motors assumption

14   in planning the 363 process, correct?

15   A.    Well the purchaser, as I understand a 363 process, it's an

16   asset sale and the purchaser could then decide what obligations

17   need to be assumed as part of the asset purchase that are

18   necessary for purposes of running the business.

19        So it's my understanding that the selection of those

20   liabilities is the purchaser's discretion and they can decide

21   which liabilities they choose to assume and which they don't.

22   Q.    I'm not asking you for a legal conclusion but as a

23   businessman did you understand that the Bankruptcy Code imposed

24   any obligations on the purchaser in a 363 transaction to assume

25   certain liabilities of the seller?

122

1          MR. MILLER:  Your Honor, he just answered that

2     question.

3          THE COURT:  Sustained.

4     Q.   In the April and May timeframe of 2009, did you understand

5     that if the prepackaged bankruptcy option had been chosen

6     General Motors would need to negotiate contracts with its other

7     unions, non-UAW unions, including principally the IUE-CWA?

8     A.   Yes.

9     Q.   I take it it's because in a prepackaged bankruptcy

10    proceeding the existing General Motors would have continued to

11    perform and would therefore have continued its obligations to

12    its other unions?

13    A.   That was my understanding, yes.

14    Q.   Did General Motors prepare, from time to time, contingency

15    planning documents that identified which obligations would be

16    assumed by the New GM?

17    A.   Yes.

18    Q.   And do you know if there was a document that was prepared

19    on May 7th that concluded that a potential 363 offered

20    demonstrated financial advantages over a cram down?

21    A.   A liability reduction.

22         MR. MILLER:  Your Honor, excuse me.  If there is a

23    such a document why didn't counsel show it to the witness?

24         MR. KENNEDY:  I'm happy to.

25    Q.   Would you turn to page --

123

1          THE COURT:  All right.  Objection sustained.  Go

2    ahead.

3    Q.    Would you turn to document 6?

4    A.    In my deposition?

5    Q.    In your deposition, yes.

6          (Pause)

7    Q.    Specifically page 2, the first line.

8    A.    Yes.

9    Q.    And you would agree with me that at the point in time this

10   documented was generated, on May 7th, General Motors had

11   concluded that the 363 process had demonstrated financial and

12   execution advantages over cram down?

13   A.    Yes.

14   Q.    And I gather, from the following line, that General Motors

15   had concluded that a 363 process allowed incremental liability

16   extinguishment of approximately six to seven billion?

17   A.    Yes.

18   Q.    Were the retiree health and life obligations owed to the

19   non-UAW unions part of the six or seven billion that could be

20   incrementally extinguished as part of the 363 process, as you

21   understood it?

22   A.    I believe so.  Yes.

23   Q.    And I take it, if you turn to page 8 of that document,

24   there's a listing of GM liabilities to New GM, and I'm

25   referring to page 8 of document 6 in the Henderson exhibit

124

1    portion of the book.  Do you see that listing of liabilities,

2    sir?

3    A.    I do.

4    Q.    And am I correct that the fourth of fifth item down

5    indicates that the GM liabilities to the new GM were expected

6    to include a substantial impairment to splinter group health

7    and life benefits, is that correct?

8    A.    It was the assumption and yes it was identified that we

9    would have expected that.

10   Q.    And again, that was an assumption in the context of the

11   363 sale, correct?

12   A.    That's correct.

13   Q.    Now are you aware that as part of this contingency

14   planning 363 analysis on May 7, 2009 a pro forma analysis of

15   the financial implications of a cram down versus a 363 scenario

16   was created?

17   A.    Yes.

18   Q.    And I direct your attention to Page 11 of the document

19   we've identified as Item 6.  I'm sorry; would you make that

20   page 10.

21        (Pause)

22   Q.    Are you with me?

23   A.    Yes.

24   Q.    Okay.  The third item on page 10, entitled GM Consolidated

25   Liabilities Analysis - Detail, under number 3, Pension OPEB

125

1    there's a line that says "Other hourly health and life," do you

2    see that, sir?

3    A.    Yes, I do.

4    Q.    That repeats that 3,724,000,000 figure that we used

5    earlier in our discussion?

6    A.    Correct.

7    Q.    Do you see that?  And under your cram down scenario, how

8    much of that liability is presumed to go to the NewCo?

9    A.    This assumed it would go in its entirety.

10   Q.    So all 3.724 billion would go to NewCo under the cram down

11   scenario?

12   A.    In this analysis that was the case, yes.

13   Q.    Yes.  And the 363 scenario indicated that 1.4 billion of

14   the non-UAW OPEB would remain with OldCo and 2.3 billion would

15   go to NewCo, is that correct?

16   A.    This analysis indicated that, yes.

17   Q.    And do you know where these numbers were drawn from?

18   A.    No, I do not know.

19   Q.    Do you know who was responsible for preparing the May 7th

20   contingency planning analysis?

21   A.    I believe it would have been put together by Joseph DeMore

22   (ph.).

23   Q.    And he's one of your executives?

24   A.    Yes.

25   Q.    And I assume he was incorporating information he was

126

1   receiving from the U.S. Treasury as part of the liabilities the

2   Treasury was willing to assume?

3   A.   As of this date, May 7th, we wouldn't have had definition

4   around that yet on this particular liability.  So we were

5   estimating what it might be.

6   Q.   Well at some point, in terms of the non-UAW retiree

7   obligations, did you get direction from Treasury to provide an

8   outcome for the non-UAW unions that was similar to what was

9   being given to the UAW members?

10  A.   No.

11  Q.   You never got -- General Motors never got such a

12  direction?

13  A.   Is it similar to the UAW members?

14  Q.   Yes.

15  A.   No.

16  Q.   Okay.  At any point was there a discussion with Treasury

17  and General Motors about NewCo accepting some portion of the

18  liabilities that were owed to non-UAW union members for retiree

19  health and life?

20  A.   Yes.

21  Q.   And what was that discussion, sir, and can you tell us

22  when it first occurred?

23  A.   It was later in May and it was done in connection with a

24  total number of liabilities.  We had highlighted this through

25  the month of May but in late May the Treasury asked us to look

127

1    at a total of liabilities which were approximately 7.9 billion

2    dollars, which included the other hourly health and life and

3    indicated at the time that the target reduction of that

4    liability should be approximately two-thirds or alternatively

5    that one third of those liabilities, which in their judgment as

6    a purchaser may not be necessary to run the business going

7    forward and they were prepared to assume.  And so they asked

8    they asked the management to consider a two-thirds reduction in

9    this total 7.9 billion liability.

10   Q.   Okay.  We'll go into that conversation.  Prior to that

11   conversation, which we'll call the 7.9 billion dollar

12   conversation, had you had any direction or had General Motors

13   had any direction as to NewCo assuming some responsibility for

14   non-UAW retiree health and life?

15   A.   Discussion, no definition.

16   Q.   Okay.  And you mean by that you've had discussions with

17   Treasury but you didn't get a definitive direction from them?

18   A.   As the purchaser, that's correct.

19   Q.   Has General Motors concluded that if the 363 process goes

20   through it is probable that the Old GM will go through a

21   Section 1114 proceeding to cancel retiree health benefits to

22   non-UAW members?

23   A.   That decision would either be taken by Mr. Koch as well as

24   the board of directors of the Old General Motors.  I can't

25   presuppose what they would do.  My expectation is they would

128

1    likely do that.

2    Q.   In fact, you regard it as probable that they will go

3    through an 1114 process once the 363 goes through, if it goes

4    through, to cancel the non-UAW OPEB, correct?

5    A.   Again, it's their decision not mine.  But my opinion is

6    they will likely do that.

7    Q.   Now Old GM, at this point in the planning process if the

8    363 sale goes through, is going to last for how long?

9    A.   I don't know, sir.

10   Q.   Is there a target date as to when it will wind up its

11   affairs?

12   A.   I don't -- I have not seen a specific target date.

13   Q.   I assume Mr. Koch's job, as the new CEO, is to wind up the

14   affairs of old GM, correct?

15   A.   Yes.

16   Q.   And have you had any discussions with him about how long

17   that's going to take?

18   A.   Typically it's about several years but there's no

19   certainty as to what the date would be.

20   Q.   Would it be fair to say you expect it to be completed

21   before three years are out?

22   A.   Again, I can't say for certain but I think that's a

23   reasonable expectation, yes.

24   Q.   And the assets of Old GM, if the 363 sale goes through,

25   will consist of the 950 million dedicated for wind up

129

1    activities and the ten percent of New GM plus the warrants for

2    an addition fifteen percent, correct?

3    A.    That's correct.

4    Q.    Where in that process would there be any money to fund the

5    3.724 billion dollars that Old GM owes to non-UAW retirees?

6    A.    The 950 million would clearly not be sufficient to fund

7    us.

8    Q.    So what is your anticipation as to how these retirees,

9    many of whom worked thirty years for General Motors, are going

10   to be able to continue their lifetime healthcare if the 363

11   plan goes through?

12   A.    This was one of the reasons why we, in discussions with

13   the Treasury, suggested we needed to bring forward at least a

14   portion of the liabilities to provide coverage for IUE members.

15   Q.    Because you knew that as structured -- as left in Old GM

16   they will not be able to maintain their health benefits,

17   correct?

18   A.    We were concerned about that.  Yes.

19   Q.    Did you at some point conclude that the issue of retiree

20   health and life insurance for non-UAW members was politically

21   sensitive?

22   A.    Yes.

23   Q.    And you informed the Treasury that the retiree obligations

24   to the non-UAW members were politically sensitive, correct?

25   A.    Amongst other liabilities, yes.

130

1    Q.    Who is Steve Rattner (ph.)?

2    A.    Steve Rattner is in Automotive Task Force.

3    Q.    In fact, is he essentially the head of it for purposes of

4    these discussions?

5    A.    In effect, yes.

6    Q.    Did there come a point in time in May 2009 when you had

7    detailed discussions with Mr. Rattner about the splinter

8    unions?

9    A.    Yes.

10   Q.    And you mentioned earlier that Mr. Rattner and you

11   discussed a grouping of liabilities that in total composed 7.9

12   billion?

13   A.    That's correct.

14   Q.    And am I right that the four elements of that -- of those

15   liabilities consisted of salaried life and health, number one.

16   Number two, executive life and health; number three, executive

17   pension and number four non-UAW union healthcare and life

18   insurance?

19   A.    That's correct.

20   Q.    What was the largest single element of the 7.9?

21   A.    The 3.7 billion

22   Q.    That was owed to the IUE and other non-UAW?

23   A.    Yeah, the non-UAW health and life.

24   Q.    I think you've already identified Mr. Ken Kresa as the

25   acting chairman of the board, correct?

131

1   A.   That's correct.

2   Q.   Did you ask some GM executives to get together some

3   information about splinter union obligations so he could

4   present the information to Steve Rattner?

5   A.   Yes.

6   Q.   And did you -- did Mr. Kresa advise Mr. Rattner that

7   General Motors was targeting to negotiate reduced OPEB

8   liabilities with its splinter unions?

9   A.   It was the recommendation of General Motors and Mr. Kresa

10  that we assume a part of the liability.  And, however, at the

11  same time it would have been a reduction, yes.

12  Q.   I'd like to direct your attention to Exhibit 7 in the

13  portion of the book that relates to your testimony.

14  A.   Yes.

15  Q.   And you recognize that as an e-mail from Mr. Kresa to

16  Gregory Lowe?

17  A.   I do.

18  Q.   And Mr. Lowe is an executive of some sort with General

19  Motors, I suppose?

20  A.   He is.

21  Q.   Okay.  And the second page of this e-mail represents the

22  information concerning splinter unions that you had asked Mr.

23  Lowe to get together for Mr. Kresa?

24  A.   That's correct.

25  Q.   Okay.  I'd like to direct your attention to the second

132

1    sentence of the second paragraph which reads, "The initial

2    direction with the UST was to provide similar funding as used

3    for (on a pro rata basis) as with the UAW."  Had you seen that

4    before today?

5    A.    Yes.

6    Q.    Okay.  And are you able to conclude from that that at some

7    point General Motors had received a direction from UST to

8    provide similar funding for the non-UAW unions as was used with

9    the UAW?

10   A.    I don't remember when we would have gotten that direction.

11   We were, again, exchanging ideas as to what a possible

12   treatment might be.

13   Q.    Well what are Mr. Lowe's duties?

14   A.    Mr. Lowe is responsible for executive compensation.

15   Q.    And you asked him to get together information for Mr.

16   Kresa to discuss with Mr. Rattner, correct?

17   A.    That's correct.

18   Q.    And do you assume he accurately compiled information as to

19   what the splinter union discussions had been prior to this e-

20   mail on May 27, 2009?

21   A.    Yes.

22   Q.    Is it possible that there was a direction from UST to

23   provide similar funding for the non-UAW unions --

24              MR. MILLER:  Objection.  That's not what it says,

25   Your Honor.  Object to the form.

1          THE COURT:  Okay.  Why don't you rephrase.

2          MR. KENNEDY:  Sure.

3   **Q.    In terms of the normal operations of you as CEO and in**

4   **terms of your role with or in the discussions that were going**

5   **on between Treasury and General Motors, is it likely that you**

6   **would not have been aware of a direction from the Treasury to**

7   **provide similar funding for the non-UAW health and retiree**

8   **obligations?**

9          MR. MILLER:  Objection, Your Honor.  That's not what

10  the exhibit says.  It says the initial direction with the UST.

11  It means the initial direction made by Mr. Kresa and GM.

12         MR. KENNEDY:  I disagree with that.

13         THE COURT:  All right.

14         MR. KENNEDY:  Mr. Miller can testify if he wants --

15         THE COURT:  Folks, we're not the English parliament

16  here.  We don't talk to each other.  I am going to sustain the

17  objection but not for the reason that you said, Mr. Miller.

18  Mr. Kennedy, you can read him the language and probe his

19  understanding of what the language means, to the extent he has

20  an understanding.  He seems, as I understand it, to have been

21  copied on this but not to have been the author.  So you can ask

22  it that way, don't assume that he was the author.  You can read

23  the language exactly the way it reads and find out what he

24  knows about it and ask him to tell you what he knows about it.

25         Go ahead.

134

1      MR. KENNEDY:   Thank you, Your Honor.

2    Q.   Just to be clear, Mr. Henderson, the second page of the

3    document we've been referring to was created by Mr. Lowe at

4    your direction, correct?

5    A.   The second page of the document was actually created by

6    Tom Krosky (ph.) for Greg Lowe, yes.

7    Q.   Okay.  But it was ultimately at your direction?

8    A.   Yes.

9    Q.   And you were copied on the e-mail which included page 2?

10   A.   Yes.

11   Q.   And when the e-mail arrived did you read it?

12   A.   Yes.

13   Q.   And did you advise either Mr. Lowe or Mr. Krosky that they

14   were in error in how they had summarized what the discussions

15   between UST and General Motors had been at the time of the e-

16   mail?

17   A.   No, because the second sentence there, which was my

18   understanding at the time, was once the Treasury understood

19   that there were very few active workers that a much lower level

20   of funding was going to be required.

21   Q.   Okay.  So would it be fair to say that there came a point

22   in time when the Treasury decided, or I should say learned,

23   that there were very few active members that were included in

24   the non-UAW union?

25   A.   Yes.

135

1   Q.   Do you know when that was and how they learned it?

2   A.   It would have been likely early mid-May and we would have

3   supplied the information to them.

4   Q.   And prior to that point, was the Treasury position --

5   prior to the point they learned how many actives were involved,

6   prior to that point was it the treasury position that General

7   Motors, the New General Motors, should provide the same level

8   of funding for the non-UAW unions that the UAW had gotten?

9   A.   We had, Mr. Kennedy, reviewed various alternatives and I

10  didn't have, at any point, until later in May what I considered

11  firm direction from the Treasury as to what they wanted to do.

12  We looked at multiple scenarios but we had not yet engaged in

13  something which I would consider to be direction to us.

14  Q.   I take it at least one of the scenarios you did discuss

15  with Treasury was the idea of funding the non-UAW retiree

16  health and life at the same level as the UAW had received?

17  A.   Yes.

18  Q.   It is true, as we stand here today, that the IUE-CWA has

19  very few active members, correct?

20  A.   Yes.

21  Q.   If we went back in time a year to June of 2008, the

22  General Motors Moraine plant was still operating, correct?

23  A.   Yes.

24  Q.   It might have had 1,500 members?

25  A.   That's a reasonable estimate.

136

1    Q.   Okay.  And General Motors closed that plan on December 23,

2    2008, correct?

3    A.   Yes.

4    Q.  So am I right that General Motors is using the fact that

5    it closed the last IUE plant to then decide that it didn't have

6    to provide continuing healthcare to the 25,000 IUE retirees?

7           MR. MILLER:  Your Honor, I object to the question,

8    grounds of relevance.

9           UNIDENTIFIED ATTORNEY:  Can't hear.

10           MR. MILLER:  I object to the question on the grounds

11    of relevance.

12           THE COURT:  Overruled.  You may answer, Mr.

13    Henderson.

14    A.   We closed the plant because sales of the vehicles built in

15    that plant were no longer sustainable.

16    Q.   And the IUE asked you to put additional product in that

17    plant, correct/

18    A.   They did.

19    Q.   And there has been product assigned since that plant was

20    closed, isn't that correct?

21    A.   Yes.

22    Q.   And that some of those products could have been put in to

23    the Moraine facility, isn't that also correct?

24    A.   Could have, yes.

25    Q.   And if product has been put in the put in the Moraine

137

1    plant, then is it your understanding that the IUE-CWA members

2    would have been given the same OPEB treatment that the UAW

3    members were given as a result of this bankruptcy?

4    A.    I don't know but we would have had active employees and we

5    would have had to negotiate an agreement.

6    Q.    Now at some point in late May, you understood that GM was

7    prepared to offer a retiree health and life plan to the non-UAW

8    unions that would cost eighty percent less then the amount

9    being paid by the Old GM, correct?

10   A.    The liability would be eighty percent less, yes.

11   Q.    So that would be -- in essence we'll call it a twenty

12   percent offer to the non-UAW unions?

13   A.    Yes.

14   Q.    And did you receive any information from your labor

15   relations executives on whether a twenty percent plan was

16   likely to be accepted by the non-UAW unions?

17   A.    Yes.

18   Q.    And what is it they advised you?

19   A.    They advised that this would likely -- very likely not be

20   acceptable.

21   Q.    The ultimate offer that was made to the non-UAW unions for

22   the retiree health and welfare, according to the company's

23   figures, represents a thirteen percent recovery, correct?

24   A.    Versus the book value, yes.

25   Q.    And if your labor relations advisors had indicated to you

138

1    that the unions were unlikely to accept a twenty percent offer,

2    what made you think that a thirteen percent offer would in some

3    way be acceptable to the IUE-CWA, the USW or the IUOE?

4    A.    We offered, as we put together the package our conclusion

5    was we would offer the retirees, the IUE and the steel workers

6    retirees the same packages we have for our salaried employees

7    for healthcare.  That was the conclusion and that's what we

8    felt we should move forward with.

9    Q.    Now you had earlier identified, and I'm sorry I'm

10   backtracked a little bit, about the 7.9 billion discussion you

11   had with Mr. Rattner that various executive programs were

12   included in that 7.9 billion, correct?

13   A.    Correct.

14   Q.    And is it true that on May 11, 2009 you personally sent

15   Mr. Rattner an e-mail that included several presentations in

16   effect advocating Treasury to continue the executive SERP (ph.)

17   and life insurance?

18   A.    We made -- early May we made a number of presentations,

19   including myself to Steve, Steve Rattner, talking about what

20   alternatives might be for treatment of the SERP and other

21   liabilities.

22   Q.    Well, would you look at Exhibit 8 --

23   A.    Sure.

24   Q.    -- in the portion of the book that deals with your

25   deposition?

139

1   A.   Yes, sir.

2   Q.   That's an e-mail you sent to Steve Rattner on May 11,

3   2009, correct?

4   A.   Yes.

5   Q.   And attached to it is a document entitled sales rationale

6   for considering salaried retiree treatment?

7   A.   That's correct.

8   Q.   And the third and fourth pages refer to executive

9   compensation issues?

10   A.   That's correct.

11   Q.   Now isn't it fair to say, Mr. Henderson, that in both of

12   these attached documents you advocate for existing General

13   Motors executive programs to be continued and absorbed in the

14   New GM?

15   A.   Yes.

16   Q.   Did you ever send a similar e-mail to Mr. Rattner

17   advocating that the IUE, USW or operating engineer retiree

18   health and life insurance be continued by the New GM?

19   A.   Well, we recommended that the pensions be brought forward

20   for the IUE and the steel workers along with the UAW.  And with

21   respect to the obligation for health and life, as I said, we

22   identified what the size of the liability was and what the

23   options would be.

24   Q.   But in the give and take of actual negotiations, I assume

25   Mr. Rattner --

140

1          MR. KENNEDY:  Let me withdraw that.

2     Q.   I assume you expected Mr. Rattner would regard it as

3     significant that you sent him a personal e-mail urging the

4     continuation of certain programs; wouldn't you agree with me on

5     that?

6     A.   Yes.

7     Q.   And did you ever send a similar personal appeal to Mr.

8     Rattner urging that the IUE or other union, non-UAW union, OPEB

9     be continued by the New GM?

10    A.   I certainly was involved in discussions with Steve Rattner

11    regarding bringing forward at least a portion of the liability

12    to the new company so that some benefits could be provided,

13    yes.

14    Q.   Okay.  Now the portion that would be brought forward to

15    the new company was directly --

16         MR. KENNEDY:  Let me withdraw that.

17    Q.   When you talk about bringing forward a portion of the

18    liabilities owed to the IUE and the steel workers and the

19    operating engineers, you're referring to permitting certain of

20    the IUE and other union non-UAW union members to participate in

21    the salaried post-retirement plan, correct?

22    A.   For healthcare, yes.

23    Q.   For healthcare.  Now did you at some point describe to

24    U.S. Treasury what the terms of the salaried plan were that

25    would be extended to the IUE and other union representatives?

141

1    A.    Yes.

2    Q.    In fact, if you look at Exhibit 13 to your deposition at

3    page 5, does that contain the detail on what the actual plan

4    would be if they were put in the pre-Medicare plan?

5    A.    Yes.

6    Q.    Is that the plan that was ultimately offered to the IUE or

7    the steel workers or the operating engineers, do you know?

8    A.    I don't believe so.

9    Q.    In fact the plan that's described on the page 5 of Exhibit

10   13 is significantly better from the point of view of the

11   participants, meaning cost the participants a lot less then the

12   plan that was ultimately offered to the IUE-CWA and steel

13   worker an operating engineer members, correct?

14   A.    The final -- we did make final changes in order to achieve

15   it, a two-thirds reduction of the liability.

16   Q.    And the basic assumption that you had in talking with the

17   Treasury representatives in late May, is that the IUE, steel

18   worker and operating engineer members would be offered the same

19   plan as salaried retirees, correct?

20   A.    Yes.

21   Q.    The plan for salaried retirees was cut off at age 65,

22   correct?

23   A.    That's right.  Medicare.

24   Q.    So it was a pre-Medicare plan?

25   A.    That's correct.

142

1    Q.   As things stand here today, the plan that General Motors

2    offers to the IUE, steel workers and operating engineers is a

3    retirement to death plan, correct?

4    A.   Yes.

5    Q.   There is no cutoff at age 65?

6    A.   That's correct.

7    Q.   So the plan you were offering to the unions I represent

8    included a cutoff at age 65 of all benefits and a limited

9    benefit pre-65?

10   A.   Similar to our salaried retirees, yes.

11   Q.   Okay.  But isn't it a fact that your salaried retirees, as

12   of January 1, 2009, were provided a 300 dollar a month pension

13   increase so they could purchase a Medigap plan to cover them

14   post 65?

15   A.   We did increase the benefit by 300 dollars a month at the

16   time we made these final -- at the time we made these changes,

17   yes.

18   Q.   And isn't it a fact that the purpose of the change was to

19   permit the salaried retirees to purchase insurance to replace

20   the insurance that was taken away from them on January 1, 2009?

21   A.   Yeah, given the status of our salaried pension plan at

22   that point, we were able to do that and we did that, yes.

23   Q.   Okay.  The offer that was made to the IUE-CWA, the steel

24   workers and the operating engineers did not include a similar

25   300 dollar a month pension increase for retirees whose health

143

1    insurance, GM health insurance would be taken away as a result

2    of your offer, correct?

3    A.   Correct.

4    Q.   Did you explain to Treasury at any point that although you

5    were purporting to offer a parallel plan, in fact it was

6    different in that the post 65s, under the salaried plan, had an

7    extra 300 month and under the plan you were proposing to the

8    unions I represent there wouldn't be the 300 dollars a month?

9    A.   I believe we did.

10   Q.   So did Mr. Wilson know that?

11   A.   I don't know for certain.

12   Q.   Now I'd like to direct your attention to Exhibit 14.  It's

13   a chart entitled salary and splinter union benefit obligations;

14   do you see that, sir?

15   A.   Yes.

16   Q.   I'm referring to the second page of Exhibit 14.  And the

17   total obligations is identified as 7.883 billion?

18   A.   It's the 7.9 billion I referred to before.

19   Q.   Okay.  And if we wanted to isolate the individual

20   components of the liability, we would simply look under the

21   word total in the first column under either retiree basic life

22   or salaried retiree healthcare and so forth?

23   A.   Correct.

24   Q.   At the time this chart was created, it appears to have

25   presented a sixty-two percent reduction in these six

144

1    categories, correct?

2    A.    Correct.

3    Q.    And was that approved by the board of General Motors?

4    A.    It was approved to submit to the Treasury by the

5    compensation committee of the board of General Motors.

6    Q.    And in assembling this, who is it that decided which

7    components would be cut the most, when you were looking at the

8    sixty-two percent proposal that you were going to give to

9    Treasury?

10    A.    The management was responsible.

11    Q.    And is it fair to say that the executive non-qualified

12    pension plan, the SERP, under the initial proposal was cut by

13    only thirty-two percent?

14    A.    In total, yes.

15    Q.    And would you agree with me that in many bankruptcy

16    proceeding an unfunded, unqualified SERP goes to zero?

17             MR. MILLER:  I object to the question.

18             THE COURT:  Overruled.

19    Q.    Now in the 363 proceeding that's being contemplated, New

20    GM is going to absorb 787 million of the existing liabilities

21    under the SERP, is that correct?

22    A.    Yes.

23    Q.    And is it also true that more than two-thirds of that 787

24    million is payable to executives that have already retired?

25    A.    I believe so.  Yes.

145

1    Q.    So your analysis of the IUE-CWA and steel worker and

2    operating engineer liability in which it needn't be carried

3    forward to the New GM because there were no active employees,

4    why would you, on the other hand, permit recovery of two-thirds

5    of that 787 million by New GM even though these are retired

6    executives who will perform no further work for either Old GM

7    or New GM?

8    A.    First of all, it was the decision of the purchaser in this

9    case but in our judgment the pension plans for both the

10   salaried and the hourly employees were unaffected and being

11   carried forward in their entirety to the New General Motors.

12   And so therefore carrying forward a portion of the executive

13   non-qualified plan would be appropriate.  But in this case, it

14   had a thirty-two percent reduction.

15   Q.    Would you agree with me that for individuals whose --

16   individual executives whose combined income, between the

17   salaried retirement plan and the SERP plan was less than

18   100,000 dollars a year in retirement only received a ten

19   percent decrease?

20   A.    A ten percent decrease in their SERP.

21   Q.    In their SERP.

22   A.    Yes.

23   Q.    Okay.  So if someone had a 4,000 a month salaried retiree

24   program benefit and a 4,000 a month SERP benefit, meaning 8,000

25   a month, they received a cut of 400 dollars in their benefit?

146

1    A.    That would be accurate, yes.

2    Q.    And are you under the impression that there's some basic

3    fairness between taking executives and cutting them by 400

4    dollars and at the same time eliminating entirely the health

5    insurance that had been promised to IUE-CWA members for years?

6    Is there a fairness to that?

7    A.    Our view was the fairness valuation of the pension was

8    bringing forward the pension in its entirety for all hourly and

9    salaried employees was an important consideration and then

10   having all executives salaried and the IUE and the other unions

11   on the same healthcare plan was the appropriate treatment.

12   Q.    Now, at some point, when General Motors suggested that the

13   group of liabilities identified on the first page of Exhibit 14

14   was cut by only sixty-two percent, is it accurate that the

15   Treasury came back to you and said we said two-thirds, we meant

16   it, bring it up to sixty-seven percent?

17   A.    Correct.

18   Q.    And does this tell us where that additional five percent

19   was found within all of these categories?

20   A.    Yes.

21   Q.    It was found from the salaried retiree healthcare and the

22   non-UAW union healthcare, correct?

23   A.    Correct.

24   Q.    And the effect of that ultimate change was to reduce the

25   value of the offer to the non-UAW unions to only thirteen

147

1    percent of what the book value of the obligation showed?

2    A.    Correct.

3    Q.    And that 400 million dollars in extra reductions was

4    achieved by making it, the health plan, less lucrative for

5    participants and cheaper for GM, is that fair to say?

6    A.    Correct.

7    Q.    In fact, the health plan that was offered to the members

8    of the IUE-CWA and the other unions, is one in which the

9    company's obligations are capped and fixed, is that true?

10   A.    Correct.

11   Q.    And the cap is about 4,000 dollars a year for a single and

12   8,000 for family?

13   A.    I believe that's true, yes.

14   Q.    And those caps are based on 2006 medical figures?

15   A.    Yes.

16   Q.    But are you aware that the mechanic for accomplishing the

17   extra 400 million dollar reduction in what we've identified as

18   Exhibit 14, page 2 was to lower those caps for years beginning

19   2010?

20   A.    No, I was not aware of the mechanic.

21   Q.     What did you think the mechanic was for squeezing 400

22   dollars more out of the union retirees and the salary?

23   A.    There were changes in vision and dental.  And I was aware

24   that further changes needed to be made in order to implement

25   that direction.

148

1    Q.    And if I told you those changes were to reduce the outyear

2    cap so as we go on this plan becomes more and more expensive

3    for union members, would you believe me?

4    A.    Oh, yes, I would.

5    Q.    Are you aware that when the plan that was presented to the

6    IUE-CWA on June 5th of this year, was presented -- it was done

7    a take it or leave it basis?

8    A.    I think it was presented -- I don't know on what basis it

9    was presented, I wasn't at the meeting.

10   Q.    Was the first offer what the company described as its

11   last, best and final offer?

12   A.    I think it was described as what we were able to provide

13   as part of the negotiation with the purchaser.

14   Q.    If you had taken -- and when I say you, I mean General

15   Motors, the extra 400 million that was used to get to sixty-

16   seven percent from the SERP program, could the benefit plan

17   that was offered to the IUE-CWA and other unions have been

18   better from the point of view of the individual participants?

19   A.    Yes.

20           MR. KENNEDY:  I have no further questions, Judge.

21           THE COURT:  Okay.  I would like to keep going till 2

22   or 2:30, but I don't think we should do away with the lunch

23   hour entirely.

24           MR. KENNEDY:  Your Honor, my associate reminds me

25   that I should offer these documents into evidence.

149

1          THE COURT:  All right.  Are there evidentiary

2     objections?  All right, hearing none, I'll admit it.

3          MR. KENNEDY:  Thank you, Your Honor.

4          THE COURT:  Yes, ma'am?

5          MS. KATZOFF:  Your Honor, my name is Sue Katzoff and

6     I represent the Schaeffer Group.  And I believe I have a couple

7     of questions which have not --

8          THE COURT:  You represent who?

9          MR. KATZOFF:  The Schaeffer Group which filed an

10    objection to the motion.  And I believe I have a couple of

11    questions which are not duplicative of anything we've heard yet

12    today.

13         THE COURT:  First I need your name, then I need to

14    understand the Schaeffer Group in the context of the various

15    categories that I said I will be taking.

16         MS. KATZOFF:  Okay, Your Honor.  My name is Sue

17    Katzoff.

18         THE COURT:  K-E --

19         MS. KATZOFF:  K-A-T-Z-O-F-F.

20         THE COURT:  Okay, Ms. Katzoff.

21         MS. KATZOFF:  And I represent the Schaeffer Group

22    which is part of a tort litigation not covered by the other

23    tort claimants.  But we have sued GM as a third party for

24    common law contribution and indemnification.

25         THE COURT:  All right.  Now, I don't think the

150

1    principal advocate for your class has been heard yet, if I'm

2    not mistaken.

3              MS. KATZOFF:  I don't know that I have a class

4    beyond --

5              THE COURT:  Are they tort litigants?

6              MS. KATZOFF:  We, personally, are not.  We are being

7    sued by a former employee.  And we have in turn sued GM for

8    common law contribution and indemnification.

9              THE COURT:  All right.  You know, all my question is

10   trying to find out where you are could possibly take longer

11   than your questions.  So just go ahead.

12             MS. KATZOFF:  Thank you, Your Honor.

13             THE COURT:  But I do want everybody in the room to

14   understand that this is the kind of thing I'm trying to avoid

15   by an orderly procedure.  Go ahead, Ms. Katzoff.

16             MS. KATZOFF:  Thank you.

17   CROSS-EXAMINATION

18   BY MS. KATZOFF:

19   Q.   Good afternoon.

20   A.   Good afternoon.

21   Q.   I just have a couple of questions for you.  I assume, and

22   correct me if I'm wrong, that you're aware that your attorneys

23   on behalf of GM filed on or about June 26th the first update to

24   the seller's disclosure schedules which formulated a part of

25   the sale motion?

151

1    A.    Yes.

2    Q.    And as pat of that they identified for the first time on

3    Schedule 2.2(a)(7), which had not previously been filed, what

4    personal property was going to be included, and, therefore, you

5    could determine what could be excluded from the sale motion?

6    A.    I'm not aware of that, no.

7    Q.    Okay.  So you're not aware that one of the things listed

8    on the schedule is the GMPT Messina plant, specifically the

9    metallurgy and sand lab as being part of the sale motion?

10   A.    Well, I know we needed to deal with all of our facilities.

11   Perhaps, I could see the document?

12         MS. KATZOFF:  Your Honor, I only have what I printed

13   off of the website.  May I approach the witness and show him

14   the exhibit?

15         THE COURT:  Have you shown it to your opponents?

16         (Pause)

17         MS. KATZOFF:  May I approach the witness, Your Honor.

18         THE WITNESS:  Okay.  Thank you.

19         MS. KATZOFF:  You're welcome.

20   Q.    The document as submitted lists the personalty that is to

21   be included in the sale transaction, which the particular

22   personalty is located on an excluded real property site.  So

23   the real property is not being transferred as part of a sale

24   motion, but the particular identified personalty is, according

25   to the schedule.

152

1    A.    Okay.

2    Q.    So my question to you is can you tell me what is included

3    in the highlighted item located at the Messina plant?

4    A.    No.

5    Q.    Is there someone at the company that can identify with

6    particularity what's included in that personalty?

7    A.    Yes.

8    Q.    And who would that be?

9    A.    It would be the head of the core train, basically engines

10    and transmission, power train engineering because it's a lab.

11    Q.    And who is that person?

12    A.    It could be Dan Hancock.

13    Q.    And where is he located?

14    A.    Detroit.

15    Q.    Detroit.

16    A.    Actually, Pontiac, Michigan in this case.

17    Q.    So you, then, can't tell me whether or not particular cast

18    line or furnaces are included in the personalty that is subject

19    to the sale motion?

20    A.    I'm sorry, ma'am, I cannot.

21           MR. MILLER:  The exhibit says metallurgy and sand lab

22    complete.  That's what's being transferred.

23           MS. KATZOFF:  Yes, Your Honor.  But I don't know

24    what's included in that.  And that's what I was asking the

25    witness.

153

1          THE COURT:  I think the witness told you he doesn't

2     know, and he can't give you any assistance in that regard, Ms.

3     Katzoff.

4          MS. KATZOFF:  Right.  I was just responding to the

5     objection.  I know what the exhibit says, I don't know what is

6     included, that's all I was asking.

7          THE COURT:  Any further questions?

8     Q.   You had indicated that the Old GM would have 950 million

9     dollars dedicated to the wind-down process.  Does the Old GM

10    currently continue funding its workers' comp insurance?

11    A.   It's my understanding that with the exception of four

12    states workers' compensation moves to the new company.  There

13    is still an open issue with respect to the State of Michigan on

14    certain conditions regarding that.  But other than that

15    workers' comp, there are four states that wouldn't happen, that

16    would not move forward, the rest of them come to the New GM

17    with this one issue in Michigan that I know is still open.

18    Q.   And do you know with respect to New York State whether the

19    workers' comp will move to the new company?

20    A.   I believe New York State it does move to the new company.

21    Q.   And the Old GM currently is self-insured with respect to

22    its workers' comp?

23    A.   I believe so, yes.

24    Q.   And do you know if the New GM would also be self-insured?

25    A.   In general that would be our preference, yes.

154

1    Q.   And I have one last question.  With respect to any books

2    and records relative to anything that's going to be part of the

3    sale motion, are the books and records going to be transferred

4    as well?

5    A.   I believe so, yes.

6    Q.   And if something is excluded from the sale motion, can I

7    assume, then, that books and records will remain with the Old

8    GM?

9    A.   I believe books and records are included in transition

10   services agreements, but they're certainly available for the

11   Old General Motors.

12   Q.   Okay.

13        MS. KATZOFF:  Thank you.  I have nothing further.

14        THE COURT:  All right.  Before we take the next

15   questioner, I'm going to speak very softly and I'm going to try

16   to keep my cool.  We have hundreds of lawyers listening to

17   these proceedings in three courtrooms, all of whom are

18   presumably billing their clients.  And I would think that

19   everybody in these three rooms shares the objective putting

20   more money into the pockets of creditors and minimizing the

21   legal fees associated with serving their needs.  And keeping

22   this hearing focusing on the important stuff.  It was for this

23   reason, folks, that I directed an orderly procedure by which

24   questioning would proceed.  And I have a fear that people have

25   forgotten why we're here, what we're trying to accomplish.

155

1    And, though, I sometimes issue my rulings without saying I

2    rule, folks, when I say something I mean it.

3            Now, I'm not going to deny anybody due process.  But

4    I expect questioning more focused on the important issues that

5    we need to decide, and by the people that I've authorized to

6    speak, as the people whom I reviewed of the briefs suggested to

7    me, have the greatest attention to the issues that I need to

8    decide here.  Okay.

9            Mr. Jakubowski, are you now ready to proceed?

10           MR. JAKUBOWSKI:  I am ready, Your Honor.  Thank you.

11           THE COURT:  Come on up, please.

12   CROSS EXAMINATION

13   BY MR. JAKUBOWSKI:

14   Q.   Good afternoon, Mr. Henderson.

15   A.   Good afternoon, Mr. Jakubowski.

16   Q.   You remember me.  Mr. Jakubowski, I represent five tort

17   claimants, personal injury claimants, and I also am here as co-

18   counsel with a number of consumer organizations, including the

19   Center for our Safety and Public Citizen.

20   A.   Yes, sir.

21   Q.   Do you have this big binder right there?

22   A.   Okay.

23   Q.   I'd like to turn to your deposition.  And, in

24   particular -- excuse me for just one second.

25           (Pause)

156

1          MR. JAKUBOWSKI:  We were talking about skinning the

2    cat earlier, Your Honor.  The Federal Express that I ordered

3    somehow has not arrived even in my hotel.  And Ms. Rosenbaum

4    checked the hotel and it had not arrived yet.

5          I think in the -- because it's important to move this

6    along, I think I can go through the matters with Mr. Henderson

7    on the basis of the fact that he's already seen the documents,

8    we've had a discussion about it.  And I think I can do it

9    through testimony.  And I don't believe I'm going to need the

10   three other short exhibits that I was intending on introducing

11   into evidence.

12         THE COURT:  You can try subject to the attorney's

13   rights to be heard.

14         MR. JAKUBOWSKI:  Okay.  Let's try that, Your Honor.

15   Q.   Mr. Henderson, do you recall that there is an item on your

16   balance sheet as of 12/31/08 that identifies what the product

17   liability claims are that have been accrued for the company,

18   correct?

19   A.   Correct.

20   Q.   And that number we went through was 916 million as of

21   12/31/2008, right?

22   A.   Yes.

23   Q.   And you explained that that number relates only to product

24   liability claims, correct?

25   A.   Claims and claims costs.

157

1              THE COURT:  Pause, please, Mr. Jakubowski.  By claims

2       cost you mean the cost of processing the claims --

3              THE WITNESS:  And defense costs.

4              THE COURT:  I beg your pardon?

5              THE WITNESS:  And defense costs, Your Honor.

6              THE COURT:  Okay, continue.

7       Q.   And, in fact, there's two major components of the lost

8       reserve of 916 million, correct?

9       A.   Correct.

10      Q.   And you didn't pick that number out of thin air, did you?

11      A.   No.

12      Q.   And neither did anyone at GM, correct?

13      A.   No.

14      Q.   And, in fact, what they did is they hired Aon Global Risk

15      Consulting, right?

16      A.   Yes, that's correct.

17      Q.   And they hired Aon Global Risk Consulting in order to do

18      an analysis of what those lost reserves should be for the year-

19      ended 2008, correct?

20      A.   Yes.

21      Q.   And the methodology was rigorous, right?

22      A.   Yes.

23      Q.   And you enabled them -- when I say you, I mean GM.  GM

24      gave the full access to the litigation records, correct?

25      A.   They were retained for purposes of providing expert

158

1   information for our financial statements.  So I believe we

2   would have provided them any and all access necessary in order

3   for them to do that job.

4   Q.   Okay, thank you.  And the purpose of the report as you

5   understand it, was to provide assistance to GM in establishing

6   a reasonable estimate of retained loss and defense costs and

7   containment expense, right?

8   A.   Correct.

9   Q.   And you believe they did that, correct?

10  A.   Yes.

11  Q.   And you believe they did a satisfactory job, correct?

12  A.   No reason to believe otherwise.

13  Q.   And, in fact, you put that number in your balance sheet?

14  A.   Yes.

15  Q.   And, again, let's go through the two components.  The

16  first component is the loss component, right?

17           MR. MILLER:  Excuse me, Your Honor.  I object.  I

18  don't understand the relevance of this.  If Mr. Jakubowski

19  wants a mitigating offer of proof, maybe we'll stipulate to it.

20  But, otherwise, as to the issues that affect this motion before

21  Your Honor, I don't see the relevance of this.

22           THE COURT:  The relevance, Mr. Jakubowski?

23           MR. JAKUBOWSKI:  Well, I think it's pretty clear,

24  Your Honor.  The issues here are what are the liability claims

25  that are being left behind, and what are the liability claims

1    that are being assumed.

2              THE COURT:  No, I understand your clients' position,

3    and I'm happy about them, but have more difficulty

4    understanding how the exact number of them -- dollars to the

5    legal issue I have to decide.

6              MR. JAKUBOWSKI:  Well, the legal issue you have to

7    decide is whether or not there are releases of non-debtors with

8    respect to claims, correct?  In particular, whether the

9    purchaser is going to be released from claims asserted by non-

10   debtor third parties, under a theories of successor liability.

11   And so the question is what is the magnitude of that?  And the

12   reason that's important is because later on I will establish

13   through the board meeting that there was as determination made

14   as to how a liability should be segregated pre -- for the

15   liabilities that would be assumed by NewCo and the liabilities

16   that would be left at OldCo.  And there was a decision that was

17   made through a process that took about a month, and that

18   decision was made at the board meeting on May 29th, correct,

19   Mr. Henderson?

20             THE WITNESS:  Yes.

21             THE COURT:  Wait, you don't do that.

22             MR. JAKUBOWSKI:  I'm sorry, Your Honor, I apologize.

23   But I'd just rather confirm that -- I'm sorry.  Okay, I

24   apologize.

25             THE COURT:  Go on.

160

1      MR. JAKUBOWSKI:  So at that board meeting on May

2  29th/May 30th, the decision was made as to what liabilities

3  should be assumed, and what liabilities should be left.  The

4  PowerPoint presentation, I believe the testimony is that at

5  that meeting a determination was made as to what that number

6  should be.  And there was an additional determination made that

7  there would be no purchase price adjustment afterwards, period.

8  There would be no purchase price adjustment afterwards.

9      Now, afterwards, after the case was filed, you know

10  that there have been changes to the deal.  There have been

11  changes to the deal in two ways.  The first way is that future

12  claims are being assumed.  The future claims is part of this

13  916 million dollars.  The question is how much of the 916

14  million dollars is it and I believe that is established by the

15  report.

16      Now, the question is, is there a purchase price

17  adjustment as a result of that?  And the answer is no, there is

18  no purchase price adjustment because of that.  And so --

19      THE COURT:  I'm trying to be patient.  Which I was

20  looking for the answers of which was legally relevant to the

21  argument vis-a-vis these claims and as articulated by the

22  creditors' committee and certain other parties in this hearing.

23      MR. JAKUBOWSKI:  I will tell you how it is.  TWA in a

24  number of cases suggest that it may be relevant for purposes of

25  determining successor liability whether there is a purchase

161

1   price adjustment as a result of liabilities that would be

2   assumed or not assumed as part of the transaction.  It is my

3   contention through the evidence that if the remaining successor

4   liability claims with respect to product liabilities were

5   assumed by the buyer, that, in fact, there would be no purchase

6   price adjustment.  And so if they'd done it voluntarily there

7   could be nor purchase price adjustment.  If it's done

8   involuntarily through you, I believe there could be no purchase

9   price adjustment.  And, therefore, I think it's relevant to the

10  analysis, the policy analysis in TWA as to whether the

11  assumption of the liabilities would have an affect on the

12  purchase which may have a related to affect on the estate.

13          THE COURT:  Now, I'm not going to rule on the merits

14  of your ultimate argument.  Creating pauses suggest my

15  uncertainty in that regard.  I'm going to let you make your

16  record subject to you asking the questions in a quickly and --

17  you articulated the reasons by which you were asking them.

18          MR. JAKUBOWSKI:  Okay.

19          THE COURT:  Without prejudice to Mr. Miller's rights.

20          MR. JAKUBOWSKI:  Understood.

21          THE COURT:  The last objection is overruled.

22  BY MR. JAKUBOWSKI:

23  Q.  Now, the ultimate loss as determined as of 12/30/08 was

24  916 million, correct?

25  A.   Correct.

162

1    Q.   Now, that's broken into two pieces, correct?  One is cases

2    that exist, right?

3    A.   Yes.

4    Q.   And the other are cases that have not been reported yet?

5    A.   That's correct.

6    Q.   And those are called the incurred but not reported cases,

7    correct?

8    A.   Correct.

9    Q.   And if they're not reported, the likelihood, they haven't

10   been incurred yet.  In other words, they're future claims,

11   right?

12   A.   I think incurred but not reported suggest they have been

13   incurred but not reported.

14   Q.   Well, but isn't it the case that you said that for every

15   vehicle year as to which there's a reserve that it includes all

16   the expected future losses with respect to their vehicle year?

17   A.   That's correct.

18   Q.   And, therefore, there are a number of claims in that

19   reserve that, in fact, had not even been incurred yet, have not

20   existed?

21   A.   The accident hasn't happened yet, yes.

22   Q.   Okay.  And so you break into these two categories of cases

23   that exist, cases that don't exist.  Now, in the report do you

24   recall that for the cases that have been filed and exist the

25   reserve was 414 million dollars, approximately?  I guess it

163

1     would be in your deposition, but I can --

2     A.   Let's go to the page of the deposition so I can refresh my

3     recollection?

4     Q.   Okay, sure.

5     A.   I think you were after Mr. Bressler.  There you are Mr.

6     Jakubowski, page 184.

7     Q.   Thank you.

8          THE COURT:  I don't think I have it.  I'm going to

9     let you proceed without giving it to me, but if it makes a

10    difference I'm going to need to see it.

11         MR. JAKUBOWSKI:  Okay, Your Honor.

12         THE COURT:  If it refreshes Mr. Henderson's

13    recollection I don't' need to see it.

14         MR. JAKUBOWSKI:  Well, what I can do, Your Honor, is

15    simply approach the witness, show him the report and he can

16    confirm that it's in the report.  Again, I apologize, the

17    Federal Express simply did not come today, and there's nothing

18    I can do.

19         MR. MILLER:  Your Honor, please, I'm going to renew

20    my objection as to relevance.  As I understand Mr. Jakubowski's

21    argument is that the amount is so small Your Honor can order

22    the treasury to assume that liability.  The way the deal is

23    structured, Your Honor, if they're dissatisfied with sale

24    order, they don't have to close.  But what he's doing is making

25    a legal argument.  He can make an order of proof, and then we

164

1   can move on, Your Honor.  This is hardly relevant to the

2   issues.

3          THE COURT:  Is there going to be a credibility

4   dispute or any other factual dispute, or as is offer of proof,

5   or you're going to accept it as a given.

6          MR. MILLER: I'll accept it, Your Honor.

7          MR. JAKUBOWSKI:  Okay.  That would be fine, Your

8   Honor.  I'd be happy to go through it.

9          THE COURT:  If you will accept it as a given, is

10  there anybody who is aligned with Mr. Miller who disagrees with

11  Mr. Miller's undertaking?

12         All right, no response.  Mr. Jakubowski, make your

13  offer of proof.

14         MR. JAKUBOWSKI:  Okay.

15         THE COURT:  And if Mr. Miller accepts it as being

16  part of the record, we'll move on.

17         MR. JAKUBOWSKI:  Thank you.  The evidence through Mr.

18  Henderson and through this exhibit would show that the 916

19  million dollars in losses are broken in between 414 million

20  dollars of existing claims, and 502 million dollars of claims

21  to be incurred.

22         Of that amount, in fact, that's further broken down,

23  because that's an aggregate amount that represents loss and

24  expense -- litigation expense.  And on page 32 of the report

25  they break down the loss reserve, the actual claims for

165

1    liability at 388 million gross.  The gross reserve of 916

2    million, 388 million, 793,000 represent cases that exist, and

3    376,403 represent, effectively, future claims that are to be

4    incurred.

5            So that I believe is the -- and the remainder of 151

6    million reflects fees associated with the two buckets of case -

7    - existing cases and future claims.  And that's broken down

8    twenty-five million dollars in legal fees for existing claims,

9    and 125 million of existing fees for future claims.  And that

10   takes you up to the aggregate bucket of 414 million for

11   existing claims, 502 million for future claims.  That's all

12   that I have to say with respect to this exhibit, Your Honor.

13           THE COURT:  All right.  Mr. Miller, are you okay with

14   that as being incorporated his assumption that I can proceed

15   with in any decision?

16           MR. MILLER:  Yes, Your Honor.

17           THE COURT:  All right.  Does that --

18           MR. JAKUBOWSKI:  It does, Your Honor.  Thank you very

19   much.  I just had really a few more questions.

20           THE COURT:  Oh, of course.

21           MR. JAKUBOWSKI:  Let me finish up.

22           THE COURT:  Yes, by all means.

23   BY MR. JAKUBOWSKI:

24   Q.   **Now, with respect to the liabilities that would be**

25   **segregated as of the filing, in terms of what goes to the**

166

1    purchaser and what stays with Old GM, there were certain

2    politically -- what you called politically sensitive assets,

3    and politically sensitive liabilities, right?

4    A.    Correct.

5    Q.    And what did it mean to categorize an asset or liability

6    as politically sensitive?

7    A.    We attempted to identify for the purchaser those assets

8    and liabilities that might normally just simply be left behind

9    in the Old General Motors.  And we also identified assets,

10   actually, that were in that category.  But certainly

11   liabilities.  And we wanted to highlight for the purchaser what

12   those liabilities were, how much they were, and what a range of

13   possible treatments might be for each of those obligations.

14   Q.    And one of those liabilities was product liability claims,

15   correct?

16   A.    Correct.

17   Q.    And from the company's perspective, what is the customer

18   relationship issue associated with product liability claims?

19   A.    OH, as we look at product liability claims, the reputation

20   of the company, whether it's via a warranty coverage, or for

21   recall, or in this case, product liability is an important

22   consideration for the company.

23   Q.    And so from the company's perspective -- particularly,

24   from a reputational perspective, you considered it important in

25   your capacity as CEO of the company to assume -- to have all of

167

1   the product liability claims covered, correct?

2   A.   We showed all the information to the purchaser.  We shared

3   with them what our views were on the reputational related

4   elements of this particular decision.  And discussed with them

5   and negotiated with them how product liability might be

6   treated, yes.

7   Q.   And, originally, the decision was made by the treasury,

8   correct, that none of those liability claims would be assumed?

9   A.   The original decision was any vehicle sold post-June 1st,

10  that the new company would assume liability for those.  New

11  company also continues to have indemnification responsibility

12  with respect to our dealers.  Subsequent to that, late last

13  week, agreement was reached that we would modify that to ensure

14  that any accident which occur post-closing would also be

15  assumed by the new company.

16  Q.   Okay.  But in terms of the 916 million dollars that was on

17  the balance sheet at 12/31/08, all of those liabilities under

18  the original dealers of June 1 were rejected and were supposed

19  to be left with OldCo, correct?

20  A.   Can you repeat the question, please?

21  Q.   As of the filing date, and as reflected in the existing

22  purchase agreement -- excuse me, the purchase agreement that

23  was filed as of June 1, all of the product liability claims

24  that arose from cars that had been sold prior to the petition

25  date, would not be assumed by the seller?

168

1          THE COURT:  Mr. Jakubowski, does that go to you

2      establish -- or at least, stuck in part of your proffer that a

3      chunk of the 917 million was for the defense costs and

4      processing costs.  And that -- and this may or may not be in

5      the same bucket, but a chunk of that is for existing claims and

6      a chunk of it was for possible claims in the future.

7          MR. JAKUBOWSKI:  True, Your Honor.  And my point is

8      that as of the first iteration of the document in June 1, none

9      of those future claims, put aside the legal, none of those

10     future claims that arose out of cars sold before the petition

11     date were going to be picked out.  One of the changes made by

12     treasury was, in fact, to pick up those future claims that

13     were -- that happened after the closing date.

14         THE COURT:  Why don't you ask a new question that is

15     more sharply consistent with what you established before.

16         MR. JAKUBOWSKI:  Okay.

17     Q.    So, there was -- after June 1 there was a change in the

18     bucket with respect to product liability?

19     A.    Correct.

20     Q.    And that change was to effectively pick up the

21     approximately 376 million dollars worth of estimated future

22     claims that would be incurred after the closing?

23     A.    I don't know if the number was 376 million, but certainly

24     the conclusion was any subsequent -- any claim arising from an

25     accident subsequent to the closing would be assumed by the new

169

1    company.

2    Q.    And had the closing date been, for example, as of

3    12/31/08, that, in fact, the 376 million dollars of future

4    claims would have, under the deal as it exists right now, been

5    assumed by the purchaser, correct?

6    A.    That's a fair estimate.

7    Q.    But prior to that change the 376 million would not have

8    been assumed, correct?

9    A.    Yeah, that's correct.

10   Q.    Okay.  Now, with respect to that change it's your

11   understanding that there's no change in the purchase price as a

12   result of the buyer picking up this effectively 376 million

13   dollar bucket, correct?

14   A.    The consideration provided to Old General Motors in terms

15   of shares warrants was unchanged as a result of this move.

16   Q.    Did any consideration change that was being paid by the

17   purchaser in the transaction as a result of this change?

18   A.    Not to the best of my knowledge.

19   Q.    Okay.  So now we're dealing effectively with the 388

20   million dollars worth of what we'll call preexisting

21   liabilities, okay.  Now, those liabilities are not being

22   assumed by the purchaser, correct?

23   A.    So there would be vehicles sold prior to June 1st, and

24   vehicles where the accidents incurred prior to June 1st.

25   That's correct.

170

1    Q.    Yes, that's correct.  Vehicles that where the accidents

2    were incurred, the cases exist, as of the petition date?

3    A.    Correct.

4    Q.    And that is -- let's assuming the closing date was

5    12/31/08 that number would be approximately 388 million

6    dollars, correct?

7    A.    Yes.

8    Q.    Now, you said earlier there was another amendment that

9    effectively picks up or indemnifies a third party for some of

10   those claims, right?

11   A.    Well, I don't think it was an amendment -- our agreement

12   with our dealers provides indemnification for our dealers.

13   Q.    So if the dealers are sued by some of these preexisting

14   claimants under state laws or whatever state law exists to

15   pay -- that would hold the dealer responsible for the product

16   liability claim, I take it it's now going to be the obligation

17   of the purchaser to indemnify the dealer for their loss?

18   A.    That's correct.

19   Q.    And have you undertaken any kind of analysis as to what

20   that number is?

21   A.    I have not seen that analysis, no.

22   Q.    No.  How many -- let me ask it this way.  On a ballpark

23   range, how many cars in the past three years, four years, are

24   sold through dealers and versus any other manner?

25   A.    All of our cars, other than direct fleet sales --

171

1    actually, even fleet sales are sold through dealers.

2    Q.    So, effectively, what you're saying is that for product

3    liability claims that were incurred in the past three years, to

4    the extent that all of them were to go against -- have the

5    right to go against the dealer, and would be successful against

6    the dealer, the purchaser would be required to indemnify that

7    dealer, correct?

8    A.    Based upon all of those assumptions, yes.

9              MR. JAKUBOWSKI:  Now, I guess I would like to make

10   one additional proffer with respect to this report, Your Honor.

11   And we will get it and I would like you to at least have it in

12   your hand.

13             THE COURT:  You know, what I'd like you to do, Mr.

14   Jakubowski, I want you to take a second to concur with -- to

15   consult with Mr. Miller and see if he concurs with what you

16   would like to do.

17        (Pause)

18   Q.    Now, let me ask this, Mr. Henderson --

19             MR. JAKUBOWSKI:  I won't make that proffer, Your

20   Honor.

21   Q.    Let me ask you this.  I take it that at the time that the

22   purchaser signed off on the concept of indemnifying the

23   dealers, correct?

24   A.    Yes.

25   Q.    And they did not demand a change in the purchase prices as

172

1    a result of that, correct?

2    A.    It's part of our dealer contract, they understood that,

3    yes.

4    Q.    So there's going to be no increase to the purchase price

5    as a result of this indemnity to the dealer?

6              MR. MILLER:  Objection, Your Honor.  That calls for a

7    legal conclusion.

8              THE COURT:  Sustained.

9              MR. JAKUBOWSKI:  I'll stick with the last answer that

10   we have, Your Honor.  I think that last answer is fine.

11   Q.    Now, I take it, Mr. Henderson, that none of the changes

12   that were made with respect to the assumption by the purchaser

13   of future claims and of indemnities for the dealers is in any

14   way going to affect the viability of New GM, correct?

15   A.    Not in my opinion, no.  I agree with you.

16   Q.    Now, I want to be clear on one additional point, because

17   we're required to make submissions to the Court.  With respect

18   to claims that arise in this -- excuse me, that happen.  With

19   accidents that happen between June 1 and June 30, let's assume

20   the purchase closing was today, that those claims are not being

21   assumed by the purchaser, they're being left in the estate but

22   they're going to be deemed an administrative claim, correct?

23             MR. KAROTKIN:  Your Honor, that's a legal conclusion.

24             THE COURT:  I have to sustain the objection insofar

25   as it asks for a legal conclusion.  If you're asking for this

173

1    man's understanding as a predicate for the next question, I'll

2    permit it.  What he says is not going to bind either the debtor

3    or the creditors' committee or any other party in interest,

4    vis-a-vis whether it's an allowed admin claim or not.

5    Q.   Let me ask it this way to try to put it in a businessman's

6    perspective.  If there's a accident -- if an accident occurred

7    on June 15th with respect to a car that was sold before June

8    1st, is it your understanding that in the event that a loss is

9    determined that needs to get paid, that that liability will be

10   paid by the purchaser?

11   A.   Cars sold prior to June 1st?

12   Q.   And the accident happened on June 15th.  What's your --

13   who do you understand is responsible?

14   A.   I don't know the answer to that question.

15   Q.   Okay.  But your understanding, though, is that one way or

16   the other they're going to get paid?

17   A.   I just don't know the answer to the question, I'm sorry.

18   Q.   That's fine.

19        THE COURT:  Mr. Jakubowski, so I understand the

20   question you asked.  Pre-filing date manufacture, post-filing

21   date injury, that's the scenario for which you asked the

22   question.  And Mr. Henderson told you he doesn't know.

23        MR. JAKUBOWSKI:  Correct, pre-closing -- the accident

24   was pre-closing.

25   Q.   So the sale was pre-filed, the accident was post-petition,

174

1    pre-closing, who pays, the estate as an admin -- who pays, the

2    state or the purchaser?

3    A.    Mr. Jakubowski, there's been some discussion about this.

4    I just don't understand exactly how it works, so I can't answer

5    your question in the detail that you'd like.

6    Q.    So were you here when counsel represented on the record

7    what the change in the deal was with respect to that?

8    A.    I focused on accidents post-closing that would be covered.

9    I know there's some discussion, but it was my understanding it

10   was vehicles sold post, but I must say I'm not an expert in

11   this area.

12   Q.    Okay.  I take it, though, that with respect to the

13   negotiations that you've testified at length here, it was your

14   understanding that it was really up to the purchaser.  At then

15   end of the day it was up to the purchaser to decide which

16   liabilities would be assumed, and which liabilities would be

17   left behind, right?

18   A.    Correct.

19   Q.    And you would make some recommendations, but at the end of

20   the day that wasn't your call, right?

21   A.    We made recommendations, we negotiated, but the purchaser

22   made those decisions.

23   Q.    And is it your understanding that -- isn't it your

24   understanding that the relative priorities among the various

25   claimants that are being assumed, was completely irrelevant to

175

1      the purchaser?

2              MR. MILLER:  Objection, Your Honor, I don't know

3      what's being questioned.

4              THE COURT:  Sustained.

5              MR. JAKUBOWSKI:  Okay.  I'll ask that of Mr. Wilson,

6      Your Honor, I don't think I need to incur that anymore.  If you

7      don't mind, give me one more minute here, Your Honor.

8          (Pause)

9              MR. JAKUBOWSKI:  One further question.

10     Q.   You discussed with the purchaser the concept of assuming

11     the pre-petition for product liability, correct?

12     A.   It was one of the options, yes.

13             MR. MILLER:  Your Honor, the questions been asked

14     and --

15             THE COURT:  Well, that question has been asked and

16     answered.  But if you're using that as the predicate for the

17     next question, it's common for litigators to just ask it to set

18     the table for the next question.  Go ahead.

19     Q.   And isn't it true that after the filing you made no

20     additional attempt to try to get the purchaser to assume these

21     pre-petition claims?

22     A.   Well, there's been discussions with the purchaser with

23     regard to product liability after the filing, pretty

24     significant amount of discussions during the month of June.  So

25     it wouldn't be true that we had no discussions.

176

1    Q.    But I thought your testimony was that the purchaser made

2    it very clear that they had no interest in taking

3    responsibility for pre-petition claims, correct?

4    A.    Yes, correct.  Pre-petition accident.

5    Q.    Pre-petition accidents, pre-petition claims?

6    A.    Yes.

7    Q.    And, therefore, you didn't even see a need in June to even

8    talk to them about that issue because they were so dead-set

9    against it, correct?

10   A.    Well, we had ongoing discussions through the month of June

11   on product liability, but their conclusion was clear.

12   Q.    But those discussions were focused on future claims,

13   correct?

14            MR. MILLER:  Your Honor, the witness answered the

15   question, he said there were discussions.

16            THE COURT:  Sustained.

17            MR. JAKUBOWSKI:  Okay.  Your Honor, I have no further

18   questions.  I thank you for your indulgence.

19            THE COURT:  All right.  Before the next questioner I

20   want to ask you a question -- a few questions under 614.

21   Remind you, of course, that you have a right to object to my

22   questions.

23            Mr. Henderson, I don't know how much you drilled down

24   in the framework of management, do you have any knowledge for

25   relief that isn't speculation as to who often GM gets sued in

177

1    products liability actions when it is sued and the dealer that

2    sold the car isn't also sued?

3              THE WITNESS:  No, Your Honor, I don't know the answer

4    to that question.

5              THE COURT:  Okay, no further questions.  Does the

6    Center for Auto Safety have any questions at this point?

7              UNIDENTIFIED ATTORNEY:  No, we do not.

8              THE COURT:  It's now 2:20, I think it's now time for

9    a lunch break.  And I want thing to keep moving forward.  And I

10   would make it less than an hour except that I don't think you

11   can get down in the elevators quickly enough and get back up

12   quickly enough, so we're going to make it an hour.

13             For anybody who wants to question after the lunch

14   break I'd like them to register with my law clerk to tell me

15   who they are, who they represent and what they propose to

16   question about.  We're in recess for one hour.

17        (Recess from 2:22 p.m. until 3:23 p.m.)

18             THE COURT:  Have seats, everybody.  Ad hoc torts

19   committee.  Mr. Bressler?

20             MR. BRESSLER:  Yes.  Thank you, Your Honor.  Good

21   afternoon.  After a review of what's been said already and

22   having reviewed Mr. Henderson's deposition, for which she was

23   more than forthcoming, we're going to designate deposition

24   sections and not ask any live questions.

25             THE COURT:  Very well.  What I would like you to do,

178

1    Mr. Bressler, is give your designations to the debtor and the

2    debtor is going to have twenty-four hours to counter-designate.

3    And then I would like you or them, it doesn't matter to me, to

4    give me the parts that's been designated, your designations in

5    one color, theirs in another, all returned with markings so

6    I'll know whose is who.  And I'll read it.

7            MR. BRESSLER:  Thank you, Your Honor.

8            THE COURT:  I would like to have it available as soon

9    as is practical for the debtors.  But the debtors can take the

10   full twenty-four hours after they get it from you if they need

11   that.  Oh, U.S. government wants the same opportunity?

12           MR. JONES:  Yes, Your Honor.  David Jones from the

13   U.S. attorneys' office.  Please, we would appreciate that.

14           THE COURT:  Of course.  Anybody else feel like they

15   want counter-designation rights?  All right.  Mr. Jones and Mr.

16   Miller or their designees will get it.  And they'll have a

17   chance to assign a designee.

18           MR. BRESSLER:  Thank you, Your Honor.

19           MR. JONES:  Does Mr. Bressler know, Your Honor, when

20   we will get them?

21           MR. BRESSLER:  His Honor said by noon tomorrow.

22   We'll try to get them over first thing in the morning actually.

23           MR. JONES:  Thank you.

24           THE COURT:  Okay.  All right.  Next.  Oliver Addison

25   Parker?

179

1          MR. PARKER:  Just one minute, Your Honor.

2          THE COURT:  Okay.  For the four people who registered

3    to question with my law clerk before the lunch break, I'm going

4    to take Mr. Parker first and then I'll expect everybody, of

5    course, to be nonrepetitive.  And let's proceed.

6          MR. PARKER:  Thank you, Your Honor.  I'm Oliver

7    Addison Parker.  I'm an attorney in Ft. Lauderdale, Florida and

8    I'm, I suspect, the largest uninstitutional bondholder of

9    General Motors.  I own five million dollars.

10          THE COURT:  Pause, please, Mr. Parker.  Just ask your

11    questions.

12          MR. PARKER:  Okay.  Sure.  Thank you.

13    CROSS-EXAMINATION

14    BY MR. PARKER:

15    **Q.   Mr. Henderson, first thing I'd like to ask you, Mr.**

16    **Henderson, is in December of 2008, GM's liabilities were**

17    **approximately 190 billion dollars and their assets were about**

18    **82 billion dollars, something in that ballpark?**

19          MR. MILLER:  Excuse me, Your Honor.  Could he

20    establish a foundation?  Is he talking about --

21          MR. PARKER:  I'm trying to establish a foundation for

22    something.

23          MR. MILLER:  If he wants to --

24          THE COURT:  Don't communicate with each other.

25    You're saying you want a foundation for the question he just

180

1   asked?

2          MR. MILLER:  He's asking about assets and

3   liabilities.  Is he talking about for accounting purposes or

4   what?

5          THE COURT:  Fine.  Sustained as to form.  You can

6   rephrase, Mr. Parker.

7          MR. PARKER:  Okay.

8          THE COURT:  Talk about whether you're talking book

9   value, appraised value or whatever you want.

10          MR. PARKER:  All right.

11   Q.   In the fourth quarter in 2008, General Motors released a

12   profit and loss statement, correct?

13   A.   Correct.

14   Q.   Okay.  And under that profit and loss statement, they

15   showed what they had, roughly 190 billion dollars in

16   liabilities and something like eighty-two billion dollars in

17   assets, is that correct?

18   A.   I believe so.

19   Q.   And so, under that profit and loss statement, shareholder

20   equity in December of 2008 was negative, is that correct?

21   A.   Correct.

22   Q.   In 2008, the market value -- I mean, the share price of

23   General Motors stock was somewhere around four or five dollars

24   a share, is that correct?

25   A.   Certainly, toward the end of the year, yes.

181

1    Q.    And there were roughly 600 million, 650 million shares

2    outstanding?

3    A.    Correct.

4    Q.    So the market value of the shares was somewhere between

5    two and a half and three billion dollars?  Maybe three and a

6    half billion dollars?

7    A.    Reasonable estimate.

8    Q.    Okay.  Now, in December 1st of -- sorry.  In December 31st

9    of 2008, General Motors signed a loan agreement with the United

10   States Treasury, is that correct?

11   A.    Correct.

12   Q.    And under the terms of the loan agreement, you were

13   supposed to get 13.4 billion dollars, that's billion with a B,

14   with a first installment on December 31st of four billion.  Is

15   that correct?

16   A.    Yes.

17   Q.    Now, is it safe to say that four billion dollars is more

18   than twenty percent of shareholder equity whether you use book

19   value, which was negative, or market value which was between

20   two and a half and three and a half billion dollars?

21   A.    Yes.

22   Q.    Okay.  The mortgages -- the money that you borrowed from

23   the Treasury and the mortgages that you gave the Treasury, the

24   mortgages, the liens, the -- whatever else you want to --

25   security interest, were the loans for property that you bought?

182

1    Were the liens on security for the property that you bought?

2    A.   No.

3    Q.   Were the loans on property -- sorry.  Were the security

4    interests, the mortgages, on property that you already owned?

5    By you, I mean General Motors.

6    A.   General Motors?  Yes.

7    Q.   Now, had General Motors entered into any sort of a

8    contract with United States that required General Motors to

9    enter into a pledge or security agreement to secure partial

10   progress, advance or other payments pursuant to contractor

11   statute?

12   A.   No.

13   Q.   Okay.  So this isn't a case where the government needed

14   tanks to be built or needed whatever to be built and in order

15   to make sure that you could do the job that required some sort

16   of a mortgage or pledge in order to secure performance, is that

17   correct?

18   A.   Correct.

19   Q.   This was just a straight out we need to borrow money,

20   we're pledging assets we already have to get it?

21   A.   Correct.

22   Q.   Okay.  The mortgage agreement that you entered into

23   with -- by you, I mean, General Motors -- that General Motors

24   entered into with the United States Treasury, what did it

25   encumber?

183

1    A.    It encumbered a series of assets, intellectual property,

2    nonmanufacturing real estate, selected stocks in foreign

3    subsidiaries, small amount of inventory.

4    Q.    Credited its mortgage real estate, is that correct?

5    A.    Nonmanufacturing related real estate.

6    Q.    Okay.  Did it mortgage General Motors equity or shares in

7    any manufacturing subsidiaries?

8    A.    Domestic manufacturing subsidiaries?

9    Q.    Yes.

10   A.    No.

11   Q.    I see.

12         MR. PARKER:  Just a second to find it.

13   Q.    All right.  Have you -- has General Motors introduced the

14   loan and security agreement by and between the borrower listed

15   on Appendix A and borrower, the United States Department of the

16   Treasury?

17         MR. SCHWARTZ:  Yes.

18         MR. PARKER:  Have you entered these in as an exhibit?

19         MR. SCHWARTZ:  Yes.

20         MR. PARKER:  Could I ask what exhibit number it is?

21         MR. SCHWARTZ:  6.

22         MR. PARKER:  Okay.  So that's --

23         MR. SCHWARTZ:  Exhibit 6.

24         MR. PARKER:  -- GM6?

25         MR. SCHWARTZ:  Yeah.

184

1    BY MR. PARKER:

2    Q.   All right.  Do you have a copy of GM6?

3    A.   I have no idea, Mr. Parker, if it's in that book.

4    Q.   All right.

5            MR. PARKER:  Could I have a copy of GM6 to show

6    the --

7            MR. MILLER:  May I, Your Honor?

8            MR. PARKER:  Thank you.  May I approach the witness,

9    Your Honor?

10           THE COURT:  Yes.

11   Q.   Would you please go to -- there's two paginations on this.

12   There's a pagination that says 29.  There's another pagination

13   that says 35 of 111.  The 35 of 111 is the top right-hand

14   corner.

15   A.   Yes, sir.

16   Q.   Okay.  Are you looking at Section 4, Collateral Security,

17   4.01, Collateral Security Interest?

18   A.   Yes, sir.

19   Q.   Okay.  Does subparagraph (a) read:  "Subject to any

20   amendments, restatements, supplements or other modifications in

21   Section --

22           MR. MILLER:  Your Honor, the document speaks for

23   itself.  He doesn't have to read it into the record.

24           THE COURT:  Of course the document does.  If you want

25   to call his attention, however, to a particular portion of it

185

1    and then ask him a question, you can do that.  But don't ask

2    him to simply read the document itself.

3            MR. PARKER:  No.  I'm reading it in order to get

4    someplace, Your Honor.

5            THE COURT:  All right.  I'll overrule that objection

6    but it would be helpful to me, Mr. Parker, if you got to the

7    point a little more quickly.

8            MR. PARKER:  Well, I'm trying to, Your Honor.

9    Q.   If you'll go down, one, two, three, four -- four lines,

10   does it say that "GM is giving a lien on and security interest

11   in all of its right, title and interest in and to all personal

12   property and real estate wherever located and without

13   limitation the following whether now or here ever existed on

14   where they're located"?

15   A.   That's what that provision says, Mr. Parker, but it does

16   go on to the next page to provide exceptions to that.

17   Q.   Okay.  If you would please tell me where the exceptions

18   are.

19   A.   The definitions are on page 30 of excluded collateral.

20   Q.   All right.  What paragraph is that in?

21   A.   Top of page 30.

22   Q.   30 --

23   A.   Top of page 36 of 111.

24   Q.   36 of 111.

25   A.   Where it says "And the borrower is not pledging or

186

1    granting a security interest in" --

2    Q.    What line is that in that paragraph?

3    A.    In the third line, sir.

4    Q.    Okay.  Go ahead.

5    A.    It says "The borrower is not pledging or granting a

6    security interest in any properties except that such property

7    constitutes excluded collateral."

8    Q.    Okay.  Now, was there a list of assets that were included

9    anywhere?

10    A.    Sir, my understanding is what's outlined in the document.

11    Q.    Wasn't there a --

12         MR. PARKER:  Bear with me a second.

13    Q.    Wasn't there an appendix with a list of schedules to the

14    document?

15    A.    Sir, I didn't -- I wasn't involved in negotiating this

16    document.  There could very well be appendices but I wouldn't

17    have necessarily reviewed them.

18    Q.    Okay.  So when I asked you on Saturday, I believe it was,

19    in your deposition --

20    A.    Sunday.

21    Q.    Was it Sunday?

22    A.    It was, sir.

23    Q.    Okay.  Sunday.  You're right.  When I asked you Sunday in

24    your deposition, I believe you indicated that the excluded

25    properties dealt with foreign properties and not with domestic

187

1    manufacturing?

2          MR. MILLER:  Excuse me, Your Honor.  If Mr. Parker

3    has a deposition, would he show it to him?

4          THE COURT:  That's the way we do it.  Sustained.

5    Show him the deposition transcript and ask him if he was asked

6    this question and he gave that answer.

7          MR. PARKER:  Very well, Your Honor.  Since I don't

8    have the deposition, I can't do that.  However, let me at

9    least -- 'cause I may be able to get it from other witnesses

10   later.  Let me at least go over a couple of things.  Have you

11   placed into evidence the 1995 indenture.

12         MR. MILLER:  Yes.

13         THE COURT:  What evidence number is it?

14         MR. SCHWARTZ:  10.

15         MR. PARKER:  Okay.  Do you recognize these as being

16   copies of 10 so I can let him look at them?  It's what you have

17   provided me, right?

18      (Pause)

19         MR. SCHWARTZ:  He's got it up there.

20         MR. PARKER:  Oh, okay.

21   Q.   Do you have Exhibit number 10 in that book?

22         MR. SCHWARTZ:  That's the wrong book.

23         MR. PARKER:  That's the wrong book?

24         MR. SCHWARTZ:  It's not in that book.

25         MR. PARKER:  Which book is it?

188

1          MR. SCHWARTZ:  The one he was looking at before.

2          THE WITNESS:  This book?  Oh, okay, yeah.

3     Q.   Exhibit number 10.

4     A.   Yes, sir, I do.

5     Q.   Could you go to Section 1408?

6     A.   Of this Exhibit 10?  1408, okay.

7     Q.   Yes.

8     A.   Give me just a moment, sir.  1408 --

9          THE COURT:  1408?

10    A.   -- says New York Contract.

11    Q.   Right, right.  The indenture is governed by New York law,

12    correct?

13    A.   Yes.

14    Q.   Okay.  Would you go to Section 406, please?

15         MR. PARKER:  This is a horrible copy.

16    A.   Yes, sir.

17         MR. SCHWARTZ:  Wait a minute, please.

18    A.   Limitations on Liens section.

19    Q.   Limitation on Liens.  It basically says, does it not, that

20    GM will not give --

21         MR. MILLER:  Your Honor, same objection.  The

22    document speaks --

23         THE COURT:  Sustained.

24    Q.   Under 406, could General Motors give a lien on its

25    manufacturing facilities?  Domestic.  Domestic manufacturing

189

1    **facilities.**

2            MR. MILLER:  Objection.  Calls for a legal

3    conclusion.

4            THE COURT:  Sustained.

5    **Q.   From your business judgment, could GM give a --**

6            MR. MILLER:  Excuse me, Your Honor.  It's not a

7    question of business judgment.

8            MR. PARKER:  Okay.

9            THE COURT:  Sustained.  Mr. Parker, I normally cut a

10   lot of slack for pro se litigants.  I don't get that many pro

11   se litigants who are lawyers.  I think under those

12   circumstances I have to give you kind of a hybrid kind of

13   courtesy.

14           MR. PARKER:  Right.

15           THE COURT:  What I would suggest is if there is

16   exception of the document of undisputed content that you want

17   to rely on --

18           MR. PARKER:  Yes, sir.

19           THE COURT:  -- read him the sentence that you have in

20   mind.  Then ask him if he has a business understanding as to

21   what that means.  This businessman's understanding isn't

22   binding on the company or any of the other parties in the case

23   as -- with respect to what it says it's a judgment of law that

24   I would make after hearing appropriate argument when necessary.

25           MR. PARKER:  Right.  Okay.

190

1              THE COURT:  But if and to the extent relevant you

2      want to ask him his businessman's understanding on the

3      provisions in the agreement, I'll let you do it notwithstanding

4      that the fact that the legal conclusions trumps his

5      businessman's understanding.

6              MR. PARKER:  All right.

7      BY MR. PARKER:

8      Q.   Section 406 provides that "For the benefit of the

9      securities, the corporation will not nor will it permit any

10     manufacturing subsidiary to issue or assume any debt secured by

11     a mortgage upon any principal domestic manufacturing property

12     or corporation of any manufacturing subsidiary upon any shares

13     of stock or indebtedness of any manufacturing subsidiary

14     whether such principal domestic manufacturing shares of stock,

15     indebtedness, et cetera, together with that of the corporation"

16     -- basically -- well, it's very long.  Have you read it?

17     A.   I just read it here.

18     Q.   Okay.  When General Motors entered into its agreement with

19     the United States Treasury, were they aware of the limitation

20     on liens provision of this document?

21     A.   Yes, sir.

22     Q.   Okay.  Was the Treasury Department aware of the

23     limitations on lien provision of this document?

24     A.   Sir, I wasn't involved in the negotiation of the document

25     in December of '08, but it's my understanding they were aware.

191

1    Q.   Okay.  Is an empty building a manufacturing plant or

2    facility?

3    A.   If it's an empty manufacturing plant, yes, sir.

4    Q.   Okay.  So what does a manufacturing plant or facility mean

5    to you, sir?

6    A.   It's a facility that's intended to manufacture vehicles,

7    power trains, stampings, the various parts of our business.

8    Q.   Would it include machinery?

9    A.   Generally, yes.

10   Q.   Okay.  Did -- under the loan agreement, did you grant a

11   lien on all of your machinery?  The loan agreement with the

12   United States Treasury, did GM grant a security agreement on

13   all of its domestic machinery.

14         MR. MILLER:  I assume, Your Honor, he's just asking

15   for Mr. Henderson's understanding.

16         MR. PARKER:  Yes.

17         THE COURT:  With the clarification, the objection

18   becomes moot.

19   A.   Could you repeat the question, sir?

20   Q.   Sure.  Under your understanding of GM's loan agreement

21   with the Treasury, did the Treasury have a security interest on

22   the manufacturing equipment in domestic manufacturing plants?

23   A.   I don't believe so.

24   Q.   Okay.  Did it -- did you give a security interest on the

25   shares of stock of any subsidiaries of GM, domestic

192

1    subsidiaries?

2    A.   No domestic manufacturing subsidiary to the best of my

3    knowledge.

4    Q.   What are the domestic manufacturing subsidiaries of

5    General Motors?

6    A.   Generally, our manufacturing operations are included in

7    the corporation.  I think if we have a domestic manufacturing

8    subsidiary, it might be Saturn.  But I don't think -- we

9    generally don't have substantial domestic manufacturing

10   subsidiaries.  The parent -- the corporation owns the U.S.

11   manufacturing plants.

12   Q.   Is Saturn a separate plant -- I mean, a separate

13   corporation?

14   A.   I believe so, yes.

15   Q.   And did you grant a lien on Saturn's shares?

16   A.   I don't know.

17           MR. PARKER:  May I ask a question of counsel?  The

18   exhibit -- no, no.  The exhibit that you provided with the

19   appendices, on the two appendices to the agreement that listed

20   the properties that are included and the ones that were

21   excluded, they were blank.  Do you have a copy?

22           MR. MILLER:  I don't know what he's talking about.

23           MR. SCHWARTZ:  I don't know what you're talking

24   about.

25           MR. PARKER:  Okay.  What I'm talking about is the --

193

1        (Pause)

2             MR. PARKER:  You might notice it.  It's a schedule --

3    that's out of order.  This is the first page.  It's a schedule

4    of appendices to the loan agreement.

5             MR. SCHWARTZ:  Which one?

6             MR. PARKER:  The one between Treasury and GM.  And

7    when you get to the final two schedules, they're blank.

8    They're the schedules for assets that are liened and assets

9    that are excluded.  Toward the end.  Actually, if I may -- I'll

10   show you since it's this area.  Schedule 6.29 and 6.30.  As you

11   can see, they're blank with a statement that it's privileged

12   information.  Is it attached to what you gave the Court?

13        (Pause)

14             MR. PARKER:  It was page -- on this, it's page

15   GMPR3959 and GMPR3961 -- 3960.  There's a big skip.  Here's

16   3958.  While they're looking, I'll move on.

17             THE COURT:  Thank you.

18   BY MR. PARKER:

19   Q.   Would you go to Section -- Schedule 6.28 of the document?

20   A.   Which document, sir?

21   Q.   The -- it's called -- it's schedules of, I guess, Exhibit

22   10.

23   A.   6.28.

24   Q.   Yes.

25   A.   Section 6.28, did you say?

194

1   Q.   Yes.

2   A.   All right.  So it's earlier in the document.

3   Q.   No.  It's Schedule 6.28 not section.

4   A.   Okay.

5   Q.   I'm sorry.  Schedule 6.28.

6   A.   What's the name of the schedule, sir?

7   Q.   Assets Subject to Senior Lien.

8   A.   Maybe you can show it to me.  I can't find it here.

9   Q.   Well, this is the copy they gave me.

10   A.   So, let me find it.  Mr. Parker, which page so that I can

11 get on the same page as you are.

12   Q.   Does yours have the stamps on them?

13   A.   No.  Unfortunately, I don't have a GMPR on this page.

14   Q.   'Cause it's 3955.  The schedules aren't otherwise aren't

15 numbered.  The only numbers on these schedules are the GMPR

16 stamps.

17   A.   Perhaps there's -- would you like me to work from yours?

18   Q.   Yeah.  If you take a look at the first one, the first

19 asset, I believe it's -- there's a one 1,400,000,000 lien in

20 favor of a bank, is that correct?

21   A.   Yeah.  This was a 1.4 billion dollar machinery and

22 equipment term loan that was issued in 2006.

23   Q.   On Saturn, correct?

24   A.   That was Saturn as guarantor so it was basically, the

25 parent -- the corporation as well as Saturn Corporation.

195

1    Q.    Right.  And did it also guaranty -- pledge sixty-five

2    percent of Saturn's stock?

3    A.    This is the --

4    Q.    It's in that same page.

5    A.    This is the 2006 transaction?

6    Q.    Yes.

7            THE COURT:  Forgive me.  Mr. Parker, I'm trying very,

8    very hard to be --

9            MR. PARKER:  I know.

10            THE COURT:  -- very, very patient.  The costs to the

11    creditors in this case with examination is enormous.  I can no

12    longer permit you to ask your opponents to find stuff for you.

13            MR. PARKER:  Okay.

14            THE COURT:  And I can no longer ask the witness to

15    find things or to construe documents that are already in the

16    record.  If you want to make legal arguments based upon what

17    the documents say, of course you may do that.  But you're going

18    to have to help me understand why this examination can't

19    proceed more quickly and why you should be putting the witness

20    through a memory test on what the company's documents say.

21            MR. PARKER:  All right, Your Honor.  It's my position

22    that the -- it's -- I'm sorry.  I've got the wrong page.  If I

23    may?  It's my position the bondholders are actually secured

24    creditors, Your Honor.

25            THE COURT:  Fair enough.  But if the documents are in

196

1    evidence, why can't you make you argument based on what the

2    documents say?

3              MR. PARKER:  All right.  I'd like to introduce a

4    document that is not in evidence, if I may.  It's a document I

5    received in discovery from General Motors.  I'm going to ask

6    the witness if he can identify it.

7              MR. MILLER:  Your Honor, this is a document filed

8    June 27, 20003.

9              MR. PARKER:  Yes, it is.

10             MR. MILLER:  I don't know where Mr. Henderson was on

11   June 27th, 2003.

12             THE COURT:  I guess he can tell us when Mr. Parker

13   tries to lay the foundation for the submission.

14             MR. PARKER:  All right.  I'd like to label this

15   Parker Exhibit 1 for identification.  4424D5.

16             THE COURT:  All right.  Parker Exhibit 1 for id.

17   (Parker's Exhibit 1, GM Perspecta Supplement 2, was hereby

18   marked for identification as of this date.)

19   BY MR. PARKER:

20   Q.   Could you take a look at that document, sir?  Okay?  Now,

21   do you recognize it?

22   A.   No.

23   Q.   Did General Motors issue a set of Series C subordinated

24   bonds?

25   A.   Mr. Parker, at that time I was president of GM Asia

197

1    Pacific.  I had nothing to do --

2    Q.   Okay.

3    A.   But I do believe we did issue bonds, the specifics of

4    which I wasn't involved in at the time.

5    Q.   All right.  Who could identify it?

6    A.   Well, this is a General Motors document.  I mean, it's --

7    but I just --

8    Q.   Well, but do you recognize it as a General Motors

9    document?

10   A.   Yes, sir.  It looks like it's a Perspecta Supplement.

11   Q.   It's a Perspecta Supplement with a attached Perspectus

12   that it's a Perspecta Supplement 2.

13   A.   Yes, sir.

14   Q.   All right.  So all I'm asking is can you identify it as a

15   Perspecta Supplement from General Motors.

16   A.   I believe it is, yes.

17        MR. PARKER:  All right.  Your Honor, I'd like to

18   introduce --

19        THE COURT:  Any objection?

20        MR. MILLER:  No, Your Honor.

21        THE COURT:  All right.  It's admitted.

22        MR. PARKER:  Okay.

23   (Parker's Exhibit 1, GM Perspecta Supplement 2, was hereby

24   received into evidence as of this date.)

25        MR. PARKER:  When I argue on it, may I refer to

198

1    sections of it, Your Honor?

2            THE COURT:  Can't think of any reason why not.

3            MR. MILLER:  What are we marking this as, please?

4            MR. PARKER:  Parker's Exhibit 1 in a --

5    Q.    Do you still have that other document?

6    A.    I do, sir.

7    Q.    On the second page of the document, is there -- does it

8    indicate -- and the document, I believe, is the exhibits -- the

9    atta -- the schedules to Exhibit 10, General Motors Exhibit 10.

10   A.    I'm reading.  This is the second page of the document you

11   gave me.

12   Q.    Yeah.  Well, the second -- yes.

13   A.    Yes.

14   Q.    I believe it's Schedule 6 -- I mean, about 628.

15   A.    6.28, that's what it says.

16   Q.    It's page 2 of Schedule 6.28, correct?

17   A.    Yes.

18   Q.    Does it indicate a loan?  Not to the government.

19           MR. MILLER:  Objection, Your Honor.

20           THE COURT:  Sustained.

21           MR. PARKER:  Your Honor, the predicate is under the

22   term --

23           THE COURT:  Forgive me, Mr. Parker, but I believe

24   I've ruled.  You can ask your next question.

25           MR. PARKER:  Okay.

199

1  Q.   Under the terms of that, is there an indebted creditor

2  whose security is sixty-five percent of Saturn?

3  A.   The sixty-five percent of the stock is Controlodora

4  General Motors S.A. de Sivi which is General Motors de Mexico.

5  Q.   Okay.  I misread it then.  Thank you.

6  A.   You're welcome.

7  Q.   So what's encumbered -- well, under the sales agreement

8  that General Motors is asking the -- the master sale purchase

9  agreement that the debtor is asking the Court to approve, your

10 manufacturing facilities were being sold to the new GM, is that

11 correct?

12 A.   That's correct, sir.

13 Q.   Is it true that in your negotiations with General

14 Motors -- sorry -- in General Motor's negotiations with the

15 Treasury Department regarding the master sale and purchase

16 agreement that you strongly advocated the senior executive --

17 retaining the senior executive retirement plan?

18 A.   I testified to that before, yes.

19 Q.   Okay.  Did you also strongly advocate negotiating a better

20 deal for bondholders?

21 A.   Yes.

22 Q.   What were your efforts in that regard?

23 A.   Two things.  I had two areas I would call.  One, when we

24 launched the bond exchange, the Treasury indicated to us that

25 they would not be supportive of offering the bondholders any

200

1    more than ten percent of the company.  We, therefore, selected

2    ten percent.  We went to the maximum because we felt it was the

3    right thing to do. And the second thing is, when the bond

4    exchange failed and the Treasury approached us with regard to

5    providing an updated proposal to the bondholders, this is

6    subsequent to the bond exchange failing, we reacted quickly.

7    That subsequent offer included both ten percent of the new

8    company substantially de-levered from what was in the bond

9    exchange plus the two different sets of warrants of seven and a

10   half percent each.  And we immediately moved to issue an 8K,

11   provided a disclosure, so that the advisor to the informal bond

12   committee could go out and contact bondholders.

13   Q.   Okay.  In April of 2008, did an ad hoc bond committee come

14   to GM to try to negotiate a different settlement offer?

15   A.   I believe it was April 2009, yes.

16   Q.   Yeah.  2009, yes, sir.  Did that happen?

17   A.   We were approached and we suggested that -- since we

18   were -- I don't remember exactly what date but we suggested

19   that the committee approach the Treasury.

20   Q.   All right.  Did you tell the committee that you weren't

21   authorized to negotiate?

22   A.   Because at that point, I believe -- I'm not certain but I

23   believe our bond exchange was in the market.  And so, we were

24   not authorized to negotiate.

25   Q.   Okay.  At any time, did you -- at any time subsequent to

201

1    that that you urged the Treasury to negotiate with the

2    bondholders and give them more favorable treatment than the ten

3    percent off?

4    A.   In late May.

5    Q.   Prior to that.

6    A.   Prior to that?  While the bond exchange was outstanding?

7    We were quite careful that we would not -- we could not -- we

8    could not bargain at that point.

9    Q.   Is it true that you originally approached the government

10   for a loan in late September -- by you, I mean GM -- in late

11   September, early October of 2008?

12   A.   I believe that's correct.

13   Q.   Is it true that the Treasury Department said that they

14   would not grant you a loan under TARP at that time?

15   A.   I believe that's also correct.

16   Q.   Did they recommend that you go to Congress to ask for a

17   loan to get congressional authorization for a loan?

18   A.   At some point, yes.

19   Q.   Was Treasury's stated reason that they couldn't give you a

20   loan was that TARP could not authorize -- they were not

21   authorized to lend money under TARP?

22        MR. SCHWARTZ:  Objection, relevance.

23        THE COURT:  Well, if your point, Mr. Schwartz, is

24   with the enabling legislation is what's relevant to Mr.

25   Henderson's understanding of it basically -- is that basically

202

1    your relevance point, Mr. Schwartz?

2         MR. SCHWARTZ:  That's one of several actually.  I

3    mean, in addition, the authority of Treasury to lend money

4    under TARP is not relevant.  The bills that were not passed by

5    Congress are not relevant.

6         THE COURT:  I need to hear your response on the

7    evidentiary issue, Mr. Parker.

8         MR. PARKER:  Yes, sir.  I believe the fact that

9    Treasury originally took the position that they were not

10   authorized to act -- that TARP did not authorize them to extend

11   loans, that they recommended that they go to Congress, that

12   Congress declined to authorize them to lend loans to General

13   Motors, and that subsequently Treasury changed its mind is

14   relevant.

15        THE COURT:  Well --

16        MR. PARKER:  I'm simply trying to establish the

17   facts.

18        MR. SCHWARTZ:  If I might, I appreciate --

19        THE COURT:  Yeah.  Go ahead, Mr. Schwartz.

20        MR. SCHWARTZ:  I appreciate the argument but this

21   transaction doesn't involve any TARP money.  The proper time to

22   make this objection would have been last week in connection

23   with the DIP which this Court approved with a specific binding

24   that the funds were appropriately expended under EESA and TARP.

25        THE COURT:  Yeah, I understand that.  Of course, the

203

1   more fundamental issue is whatever the authority of the

2   government to do what it did is, this witness' understanding of

3   the governmental authority is irrelevant.  I'm sustaining the

4   objection.

5          MR. PARKER:  Your Honor, I was simply trying to get

6   the factual --

7          THE COURT:  Mr. Parker --

8          MR. PARKER:  -- predicate of what happened.

9          THE COURT:  You're a lawyer.  You know that when a

10   judge rules --

11          MR. PARKER:  Yes, sir.

12          THE COURT:  -- you go on.

13          MR. PARKER:  I'll go on.

14   BY MR. PARKER:

15   Q.   Mr. Henderson, I believe you testified that there's

16   approximately -- there's 950 million dollars that -- I'm

17   unclear whether General Motors is leaving that behind or

18   whether it's new DIP financing.  Whichever way, the 950 million

19   dollars that Old GM is going to have after the transaction

20   might not be enough to pay all the administrative expenses, is

21   that correct?

22   A.   Correct.

23   Q.   Under the master sale and purchase agreement, if it is

24   insufficient to pay -- the 950 million is insufficient to pay

25   the -- all the administrative expenses, is New GM under an

204

1   obligation to get further money?

2   A.   No.

3   Q.   Okay.  Is -- how much money does General Motors have on

4   hand at the moment?

5   A.   We expect in the U.S. to have at the end -- well, excuse

6   me.  At the end of last week, we had a little over twelve

7   billion dollars.  We have very large secured -- the line of

8   credit as well as the term loans are due and payable this week.

9   So we expect substantial outflows this week.

10  Q.   Okay.  When you close the transaction, assuming that the

11  Court approves the transaction, will there be a net transfer of

12  cash from Old GM to New GM?

13  A.   Yes.

14  Q.   About how much?

15  A.   I don't know.

16  Q.   Do you have any idea?

17  A.   Not today, no.

18  Q.   Okay.  Did Treasury require GM to negotiate with the UAW?

19  A.   Yes.

20  Q.   As a condition of the sale?

21  A.   It was part of our loan agreement, number one.  And number

22  two, it was part of a condition -- as a condition of the sale,

23  yes.

24  Q.   Okay.  Under 363 sale and purchase, is it your

25  understanding -- do you have an understanding as to whether or

205

1   not a purchaser is required to assume a collective bargaining

2   agreement?

3   A.    I believe so, yes.

4   Q.    Okay.  So is General Motors going to assume all of the

5   collective bargaining agreements that presently exist?

6   A.    No.  The new General Motors will not.

7   Q.    New General Motors will not?  Does the new General Motors

8   have the right to decide which collective bargaining agreements

9   it will --

10          THE COURT:  Sustained.

11          MR. PARKER:  Okay.

12  Q.    Is management to receive any stock or stock options?  Is

13  the management of the new GM to receive any stock or stock

14  options?

15  A.    First of all, with respect to stock options, I think

16  they're prohibited on -- as I understand, under current

17  legislation, at least for the top twenty-five.  And with

18  respect to stock, it is expected that that would be the case.

19  But at this point, no decisions have been made with respect to

20  the amount of stock that might be granted to the management.

21  Q.    But it's expected management will be given some stock?

22  A.    Yes.

23  Q.    You said that one of the differences between the old GM

24  and the new GM is that management may be different in the new

25  GM, is that correct?

206

1   A.   Yes, sir.

2   Q.   Okay.  Do we know who the new CEO is going to be?

3   A.   I believe it will be me.

4   Q.   The senior management team, is it going from the old GM to

5   the new GM?

6   A.   Yes.

7   Q.   Okay.  Did -- under Section 4.05 of the 1995 indenture

8   agreement, the management is required to give a statement of

9   officers that the corporation is not in default of the loans

10  within the first four months of each year.  In 2009, did

11  management give a statement of officers that General Motors is

12  not in default under the terms of the bonds?

13  A.   First four months in 2009?

14  Q.   Yes.

15  A.   I don't know the answer to that question.

16  Q.   Okay.  Is it true that the bonds that were issued in 2003

17  were under the 1995 indenture agreement with Citibank?

18       MR. MILLER:  Your Honor, same objection.  The

19  document --

20       THE COURT:  Sustained.

21  Q.   Is there a limitation on liens provision in the loan and

22  security agreement?

23       MR. MILLER:  Same objection, Your Honor.

24       THE COURT:  Sustained.  I'm not, Mr. Parker, going to

25  turn this into a memory case on what documents contain.  If the

207

1  documents are otherwise admissible then you can tell me what

2  they say in oral argument.  It's not fair to Mr. Henderson and

3  it's especially not fair to the creditors of this estate.

4  Q.  Who determined the ten percent number for the

5  bondholders -- well, for the unsecured creditors?

6           MR. MILLER:  Your Honor, the guidelines for this

7  hearing was that we should not be duplicating questions that

8  have been already prepondered.

9           THE COURT:  Sustained.

10          MR. PARKER:  Okay.

11  Q.  In May of 2009, was General Motors the top seller of

12  automobiles in the United States?

13  A.  Yes.

14  Q.  So far, in June of 2009, is General Motors the top seller

15  of automobiles in the United States?

16  A.  Yes.

17  Q.  Did Evercore do an analysis of New GM equity?

18  A.  Yes.

19  Q.  What was their analysis?

20  A.  They did an analysis of what the possible equity value for

21  the company might be.

22  Q.  Okay.  Could you give us what the result was if you know

23  it?

24  A.  They had a range of potential equity values on a steady

25  state basis, if you will, of approximately thirty-eight to

208

1    forty-eight billion dollars.

2    Q.    Thirty-eight to forty-eight?

3    A.    Yes, sir.

4    Q.    Okay.

5          MR. PARKER:  No more questions, Your Honor.

6          THE COURT:  Very well.  All right.  Who was next on

7    our list?

8          MR. BERNSTEIN:  I believe I was.

9          MR. PARKER:  By the way, Your Honor -- Your Honor,

10   would I be given an opportunity later to take a look at Exhibit

11   10 in evidence?

12         THE COURT:  Now that the document's in evidence, it's

13   a public document.  Your point is that you didn't bring a copy

14   so you need somebody else to give it to you?

15         MR. PARKER:  No.  I'm saying that my copy -- my point

16   is that I don't have a -- if I've got a copy of it, it's

17   apparently incomplete.  And I just wanted to compare it with

18   the copy that's in evidence.

19         THE COURT:  Anybody object to giving Mr. Parker

20   another look at Exhibit 10?

21         MR. SCHWARTZ:  No, Your Honor.

22         THE COURT:  No?  I see a lot of negative nods.  Work

23   it out, Mr. Parker.  Of course you may.

24         MR. PARKER:  All right.  Thank you.

25         MR. BERNSTEIN:  Good afternoon, Your Honor.  My name

209

1    is Norman Bernstein.  I'm also one of the trustees, the

2    Environmental Conservation Chemical Corporation Site Trust

3    Fund.

4    CROSS-EXAMINATION

5    BY MR. BERNSTEIN:

6    Q.   Mr. Henderson, I want to quickly summarize what I

7    understood you testified to this morning as a preface to asking

8    you a related -- a different question.  Is it correct that from

9    the latter part of December 2008 through the end of May 2009

10   General Motors could only pay its bills in the ordinary course

11   as they came due by borrowing money from the Treasury?

12   A.   That's correct.

13   Q.   Is the reciprocal also true that by borrowing money from

14   the Treasury, it could pay its bills in the ordinary course?

15   A.   Correct.

16   Q.   In May 2009, did General Motors pay all of its bills as

17   they came due in the ordinary course given the fact that it

18   could?

19   A.   I believe so, yes.

20        MR. BERNSTEIN:  Your Honor, I'd like to make a brief

21   offer of proof based on the documents we've already submitted

22   with our papers that on or about September 10, 1991, Judge

23   Nolan of the United States District Court of the Southern

24   District of New York entered a consent decree for the cleanup

25   of a superfund site called Environmental Conservation Chemical

210

1    Corporation Site and that General Motors was a signatory to

2    that consent decree as well as the United States, the state of

3    Indiana and a significant number of other companies; second,

4    that the EnviroChem Superfund Site is on EPA's national

5    priority list of some of the worst, or at least most serious,

6    superfund sites in the United States; third, that pursuant to

7    the terms of that consent, a trust was created to obtain money

8    from certain defendants, including General Motors, to fund the

9    cleanup of that site and that, pursuant to the Court's order,

10   General Motors was obligated to make payments to the trustees;

11   that on April 20th of 2009, General Motor received an

12   assessment from the trustees of the Environmental Conservation

13   Chemical Corporation Site Trust Fund of one-half million

14   dollars in total of which General Motors' share was 62,591

15   dollars.

16           It was not just simply a party to the consent decree,

17   it was the largest company in terms of percentage interest.

18   And that on or about May 20th, the trustees of EnviroChem Site

19   Trust Fund were informed by General Motors that it would not

20   honor any consent decree and that it would not pay the payment

21   due in the consent decree even though it was a payment due in

22   the ordinary course and, as we've established today, it, in

23   fact, could do so.

24           THE COURT:  All right.  Putting aside the slightly

25   argumentative last sentence, does the debtor prepared to

211

1    stipulate to that, Mr. Miller?

2         MR. MILLER:  Your Honor, I don't have any knowledge

3    of the facts concerning this.

4         THE COURT:  All right.

5         MR. MILLER:  Although, I'd be happy to look into it,

6    Your Honor.

7         MR. BERNSTEIN:  May I add, Your Honor, that all those

8    facts are set forth in our papers which were duly filed with

9    this Court under docket number 1865.

10         THE COURT:  Yeah.  I saw them there as part of my

11   preparation, Mr. Bernstein.

12         MR. BERNSTEIN:  Thank you.

13         THE COURT:  Some of this stuff that you said I can

14   take judicial notice of, like court decrees and the like.  The

15   fact that the debtor didn't pay it is probably something that

16   you can stipulate to.  Somehow I suspect that if the debtor had

17   paid it, you wouldn't be here.

18         MR. BERNSTEIN:  Yes, sir.

19         THE COURT:  Let's do it this way because I think what

20   we're really talking about is whether your objection is well

21   grounded in law or not but it isn't particularly a factual

22   dispute.  I sense without prejudice to giving the estate a

23   chance to hear that -- to be heard on that.  So what I would

24   like to suggest is that you propose the stipulation in oral

25   terms with your offer of proof and the debtors will get back to

212

1    you after they've had a chance to sleep on it and to caucus on

2    it.  And if we need to find out a mechanism to find the core of

3    facts which are deemed to have been satisfactorily evidenced as

4    issues of fact, we'll figure out a way to do it without

5    prejudice to your position and any opponent's position on the

6    underlying solution.

7            MR. BERNSTEIN:  That's fine, Your Honor.  May I ask

8    the witness one additional question?

9            THE COURT:  Sure.  Go ahead.

10    BY MR. BERNSTEIN:

11    Q.   If, in fact, General Motors made a conscious decision not

12    to carry out its obligations under a federal court consent

13    decree in May of 2009, who would have had the authority at

14    General Motors to make such a decision?

15    A.   I honestly don't know, sir.

16    Q.   Were you a party to any discussions concerning the payment

17    for environmental liabilities?

18    A.   This is the first time I've heard this discussion.  So --

19    Q.   Well, you previously testified that there were some

20    politically -- I think you said sensitive issues.  Were

21    environmental liabilities one of the politically sensitive

22    issues?

23    A.   We discussed environmental liabilities in general.

24    Q.   And with whom did you have that discussion?

25    A.   It would be with the Treasury.

213

1    Q.    And did the Treasury take any position as to General

2    Motors payment of its environmental liabilities?

3    A.    I wasn't involved in those discussions so I couldn't say

4    what the purchaser's and Treasury's position was.

5    Q.    Could you say who was involved for General Motors on those

6    discussions relating to environmental issues, sir?

7    A.    I'm sorry.  I don't know who it would have been.

8    Q.    Is it fair to assume that General Motors had a team that

9    was doing the negotiating with the Treasury?

10    A.    Yes.

11    Q.    Who were members of the team?

12    A.    That would include -- depends on the facts but it could

13    include Mr. Jordan Barken (ph.); could include our counsel; it

14    could include our labor team to the extent it was labor

15    related; it could include compensation specialists to the

16    extent it was compensation related; it could include me

17    depending upon the subject matter; it could include the chief

18    financial officer; it could include our general counsel; could

19    include our head of manufacturing; could have included a lot --

20    we have a lot of people involved with the purchaser.

21    Q.    Was there someone who had primary responsibility for

22    environmental issues?

23         MR. MILLER:  Your Honor, please, he's talking about

24    67,000 dollars.  It's costing this estate more right now on his

25    questioning of the 67,000 dollars.

214

1          MR. BERNSTEIN:  If you'd pay your bill, I wouldn't be

2     here, sir.

3          MR. MILLER:  We didn't pay the bill and that may be a

4     fact.

5          THE COURT:  I'm going to sustain the objection simply

6     on the Court's hearing power.  Mr. Bernstein, I think we've

7     laid the factual predicate that you need to get your objection

8     heard if it's well founded in law.  I think that this is not a

9     good use of our time to be going beyond what you already

10    accomplished.

11         MR. BERNSTEIN:  All right, Your Honor.  Thank you,

12    Your Honor.

13         THE COURT:  Thank you.  Anybody else?  Come on up,

14    please?

15         MR. REINSEL:  Good afternoon, Your Honor.  Ron

16    Reinsel from Caplin & Drysdale.  I represent Mr. Mark Buttita

17    (ph.).

18         THE COURT:  Sure.  Your last name again, please?

19         MR. REINSEL:  Reinsel, R-E-I-N-S-E-L.  Mr. Buttita is

20    a personal representative of Mr. Sal Buttita --

21         THE COURT:  Right.  I know that.

22         MR. REINSEL:  -- a deceased asbestos claimant.

23    CROSS-EXAMINATION

24    BY MR. REINSEL:

25    **Q.   Mr. Henderson, I want to follow up on just a few questions**

215

1    that Mr. Esserman asked you.  I don't want to be redundant but

2    I'll just kind of take you back to that testimony if I could.

3    A.    Certainly, sir.

4    Q.    Mr. Esserman questioned you about and you said that you

5    were familiar with a report referenced in GM's March '09 10K

6    that provided an estimate of GM's asbestos liability.  Do you

7    recall that?

8    A.    Yes, sir.

9    Q.    And that that was about approximately a 650 million dollar

10   liability over a ten year period, is that right?

11   A.    That's correct.

12   Q.    And, in effect, most of that 650 is for future claims, is

13   that right?

14   A.    I believe so, yes.

15   Q.    And those are future claims of folks who have not yet

16   become and don't know if they have a claim yet.

17   A.    So this is a -- I understand this is a very complex area.

18   I simply know that the liabilities intended to provide a longer

19   term perspective.  And as to when a particular liability is

20   triggered, I'm not an expert in that field.

21   Q.    But generally, illnesses haven't manifested themselves

22   yet.

23   A.    Over a ten year period?  Again, I'm not an expert in this

24   area.

25   Q.    Would you agree, sir, that if people who have not yet

216

1    manifested their illness wouldn't know they have a claim yet?

2            MR. MILLER:  That's speculation, Your Honor.

3            THE COURT:  I'll allow it.

4    A.   I think it's a fair assumption.

5    Q.   Mr. Henderson, as a part of GM filing its present

6    bankruptcy proceeding and the sale, it gave broad notice of

7    these proceedings.

8    A.   Yes, sir.

9    Q.   The objective being to let people know that if they have a

10   claim, those claims and their rights could be effective, is

11   that right?

12   A.   Yes, sir.

13   Q.   You would agree that if someone doesn't know they have a

14   claim yet, that notice wouldn't do them any good?

15           MR. MILLER:  Again, Your Honor, same objection.

16           THE COURT:  Overruled.

17   A.   I would agree with you.

18   Q.   'Cause they wouldn't get notice.

19           THE COURT:  You made your point once, Mr. Reinsel.

20   You don't need to do it again.

21           MR. REINSEL:  Second point -- second set of questions

22   and I'm done, Your Honor.

23   Q.   Mr. Henderson, as we understand if the sale is approved,

24   goes forward as it's presently proposed with the exclusion of

25   asbestos -- future asbestos liabilities, New GM, either because

217

1    those claims are not being assumed or they're otherwise being

2    protected, New GM's being protected from people asserting

3    those, a future claimant will not have recourse against New GM,

4    is that right?

5    A.    That's my understanding, yes.

6    Q.    And if I recall your earlier testimony, if the sale goes

7    through, Old GM will then liquidate, is that right?

8    A.    Yes.

9    Q.    If asbestos claim -- and you say that that liquidation

10   period, you estimated, would be done within three years?

11   A.    I said I didn't know for certain but it was a fair

12   assumption that it could be done within three years.  I just

13   don't know.

14   Q.    Relatively expeditiously.

15   A.    I think that would be the objective, yes.

16   Q.    And, say, then that if an asbestos or any of the other

17   excluded future injuries arise after that liquidation is

18   concluded, it would have no recourse against Old GM, is that

19   right?

20            MR. MILLER:  Your Honor, again it calls for a

21   conclusion.

22            THE COURT:  Yes.  That calls for a conclusion as well

23   and I'm going to sustain that objection.

24            MR. REINSEL:  All right.  Thank you, Your Honor.

25            THE COURT:  And I don't think his businessman's

218

1    understanding would help us much in that regard.

2          MR. REINSEL:  That's fine, Your Honor.  Thank you

3    very much.

4          THE COURT:  Okay.  All right.  I think we've now

5    heard everybody who told us that they wanted to follow up with

6    a committee representatives and the main ones.  I think it's

7    time for your allies and the debtor to question.  Do you need

8    or would you like a short recess before we begin, Mr. Miller,

9    or would you like --

10         MR. MILLER:  Could we have five minutes, Your Honor?

11         THE COURT:  Beg your pardon?

12         MR. MILLER:  Five minutes.

13         THE COURT:  You've got it.  All right.  We're in a

14   five minute recess.

15       (Recess from 4:31 p.m. until 4:41 p.m.)

16         THE COURT:  Can we settle down, please?  Mr. Miller,

17   as soon as it quiets down, you can begin.  Mr. Henderson,

18   you're still under oath.

19         MR. MILLER:  Harvey Miller for the debtors.

20   REDIRECT EXAMINATION

21   BY MR. MILLER:

22   Q.  Mr. Henderson, during your cross-examination, you referred

23   to sales during the month of June.  How did those sales compare

24   with sales last year for the same period?

25   A.  We expect to be down in total of approximately thirty

1    percent and then retail down at least twenty percent from the

2    prior year.

3    Q.    And in the prior year, did GM make money in the month of

4    June?

5    A.    I do not believe so, no.

6    Q.    And did GM make money in 2009 in the month of June?

7    A.    We do not expect to make money in June of 2009.

8    Q.    Do you have an opinion as to why GM beat the downside

9    projections for the month of June 2009.

10    A.    I do.

11    Q.    What is that opinion?

12    A.    Three reasons, I believe.  Perhaps four but we'll go

13    through one at a time.  First, our marketing has been focused

14    on loyal GM customers.  We have a GM credit card, for example,

15    that has historically been used by loyal GM customers.  We went

16    out to those customers this month to offer them a set of

17    incentives which made it attractive for a loyal GM customer to

18    consider a GM vehicle in this particular month sold.  Our

19    marketing was very, very focused on the loyal GM customer as

20    opposed to the conquest GM customer who we would like to have

21    consider our product.

22          Number two, the offers we've had have been attractive for

23    that loyal GM customer.  So the value is there for the

24    customer.

25          Number three, we have some fantastic cars and trucks with

220

1    a great offer on the table.  And so, we have marketed them to

2    the best of our ability.

3         And number four, I believe that there's a confidence

4    certainly that a customer can purchase a GM vehicle --

5    certainly the loyal GM customers are looking at it and saying

6    you can purchase a GM vehicle, be assured that it could be

7    serviced.  You can receive parts.  The government has, in fact,

8    actually stood behind our warranty even though we don't believe

9    the government will have to ever make good on that guaranty

10   because we will be there for the customer.

11        And the expectation that the bankruptcy process, having

12   seen what's happened with Chrysler, would go quickly with

13   General Motors as well.

14   Q.   And do you believe that the Chrysler case had anything to

15   do with the sales?

16   A.   As I said in my comments, I think it's the last point, the

17   fact that Chrysler did -- 363 transaction with Chrysler did go

18   relatively quickly, provided some buyers certainly some

19   assurance that, in fact, this can be done relatively quickly.

20   Q.   And do you have a category of potential customers under

21   the title of, say, "Conquest"?

22   A.   Yes.

23   Q.   What does it mean?

24   A.   Conquest would typically mean where we are -- where a

25   customer might either be loyal to a Toyota or a Nissan or some

221

1    other brand or, in fact, perhaps would consider us but wasn't

2    coming out of a GM vehicle.  So they hadn't been a loyal GM

3    customer.  So therefore, it could be someone who's been very

4    satisfied with some other brand and we would be -- this is the

5    toughest marketing challenge, if you will.  Or, customers who

6    are coming out of a GM product would consider our product but

7    also looking at a full range of other products at the same

8    time.

9    Q.   And how did GM fare in the conquest category during

10    these --

11    A.   Our conquest matrix which have been -- I think it's one of

12    our biggest challenges -- certainly, in the last several months

13    and certainly in the month of June in the last wave of research

14    we saw which show the consideration for customers thinking

15    about General Motors has fallen which is of significant concern

16    to us.

17    Q.   And fallen for what reasons, if you know?

18    A.   Well, the rapid falloff actually took place in the last

19    wave of research which was in the middle of June.  So we think

20    at least, in part, it had to do with our filing.

21    Q.   Now, Mr. Henderson, turning to the UAW settlement, do you

22    know what the source of the consideration that would be

23    provided to the UAW retirees and beneficiaries is?

24    A.   I think the source is the purchaser.

25    Q.   And as part of that settlement, the claim that the UAW may

222

1    have the VEBA and under the collective bargaining agreement,

2    against Old GM, if this sale is approved, that claim will be

3    waived, will it not?

4    A.    It'll be released, yes, that's my understanding.

5    Q.    And is OldCo providing any of the consideration that is

6    going to the UAW as part of the UAW settlement?

7    A.    OldCo, sir?

8    Q.    Yes.

9    A.    I believe not.

10   Q.    Did GM manufacture any asbestos products?

11   A.    No.

12   Q.    What is the source of the asbestos claims against GM?

13   A.    To the best of my knowledge, the largest single factor

14   were asbestos used in brake linings.

15   Q.    And those brake linings were furnished by a supplier?

16   A.    Yes.

17   Q.    And have you ever heard of the expression orphan-share?

18   A.    No.

19            THE COURT:  I didn't hear that expression.

20            MR. MILLER:  Orphan-share, Your Honor.

21            THE COURT:  Often-share?

22            MR. MILLER:  An orphan.  This is the share in an

23   asbestos settlement where one or more of the companies has gone

24   into bankruptcy, and whoever remains picks up that orphan

25   share.

223

1           THE COURT:  I've sat in many asbestos cases and I

2    still didn't hear that.  Often?

3           MR. MILLER:  Orphan.

4           THE COURT:  Oh, orphan.  It must be your New York

5    accent.

6           MR. MILLER:  It's probably the New York accent.

7           THE COURT:  Orphan-share, yes I have -- okay.

8    Q.   Mr. Henderson, turning to the cross-examination by Mr.

9    Kennedy.  Mr. Kennedy referred to the 300 dollars per month

10   that was added to the retirees' pension plan payments?

11   A.   Yes, from the salaried retiree plan, yes.

12   Q.   And that 300 dollars per month is payable out of what?

13   A.   It's paid from the salaried pension fund.

14   Q.   And at the time that the decision was made to increase the

15   pension payments, what was the status of the fund?

16   A.   It was overfunded at the time.

17   Q.   And had there been a previous increase in the pension

18   benefits prior to the 300 dollars?

19   A.   For salaried employees?

20   Q.   Yes.

21   A.   No.

22   Q.   For how long?

23   A.   For many years.

24   Q.   In connection -- if you would, Mr. Henderson, would you

25   look at the binder that Mr. Kennedy was using?

224

1    A.    Which one?  First hearing or 9 to 12?

2    Q.    Nine to twelve.  And if you would look under the exhibits

3    relating to your deposition?  So that would be under 10.  And

4    if we could go to page 3, GM assets to New GM?

5    A.    Page 3 of the deposition?

6    Q.    Under -- yes.  Not of the deposition.  I'm sorry.

7          MR. MILLER:  Might I approach, Your Honor, just to

8    show him?

9          THE COURT:  And after you help him, you can help me.

10         THE WITNESS:  Oh, tab 3.

11    (Pause)

12    Q.    If you look under tab 6 --

13    A.    Tab 6 behind my deposition?

14    Q.    Yes.

15         THE COURT:  The contingency plan 363 now?

16         MR. MILLER:  On page 3.

17         THE WITNESS:  I have it now.  Thank you.

18    Q.    If you would look, Mr. Henderson, at page 3, GM assets to

19    New GM, the third bullet point says, "Core Assets Retained."

20    Do you know what was meant by the phrase "core assets"?

21    A.    These would be assets that we generally consider to be

22    necessary and important to run the business going forward.

23    Q.    And was that a subject matter in which the U.S. Treasury

24    was involved?

25    A.    Yes.

225

1   Q.   And essential in what sense?

2   A.   We had iden -- it was management's view that we needed to

3   identify those assets which needed to be part of the New

4   General Motors to run the business.  And we wanted to be able

5   to show those and outline them for the purchaser.

6   Q.   And that was in connection with making New GM a viable

7   entity?

8   A.   Yes.

9   Q.   And if GM was a highly viable entity, what would be the

10  effect on the capital stock of the New GM?

11  A.   It provides the best chance to maximize value.

12  Q.   And as more liabilities were imposed upon New GM, what

13  wouldn't be the effect of that?

14  A.   It would reduce value.

15  Q.   How many active employees do the splinter unions -- and by

16  the splinter unions, I mean the IUE and the other unions which

17  Mr. Kennedy referred to --

18  A.   Actually working today?

19  Q.   Actually working today?

20  A.   I think about 150.

21  Q.   And how many active employees does the UAW have?

22  A.   Approximately 60,000.

23  Q.   60,000?  Would New GM be able to operate its plants

24  without the UAW employees?

25  A.   No.

226

1   Q.   Do you know what the cost of the IUE retiree benefits are

2   on a monthly basis?

3   A.   The total cost that we're paying today is approximately 26

4   million dollars a month.

5   Q.   And on an annual basis that would be --

6   A.   That's not IUE.  That's IUE plus all the splinter unions,

7   yes.

8   Q.   And on an annual basis --

9         THE COURT:  Mr. Henderson, as to all the unions, you

10   meant all of the splinter unions --

11         THE WITNESS:  Yes, sir.

12         THE COURT:  -- but not the UAW?

13         THE WITNESS:  Correct, sir.  Yes, sir.

14   Q.   So that --

15         THE COURT:  What was the figure? I'm sorry.

16         THE WITNESS:  Twenty-six million dollars a month.

17         THE COURT:  Thank you.

18   Q.   So on an annual basis, that would be more than 300 million

19   dollars a year?

20   A.   That's correct.

21   Q.   Now, if you would turn please to -- let me ask you this.

22   The salaried retirees of GM, what will happen to their retiree

23   benefits if the 360(b) transaction is approved?

24   A.   The salaried retiree healthcare benefits?

25   Q.   Yes.

227

1    A.    They would be modified in accordance with the schedule to

2    achieve the sixty-seven percent reduction in the liability, and

3    they would continue on that basis.

4    Q.    And those benefits would generally encompass what?

5    A.    We provide a certain level of coverage that's capped prior

6    to age sixty-five.  And then once someone -- once a retiree

7    reaches Medicare, they go to Medicare, and the company is no

8    longer responsible.

9    Q.    And the New GM will assume those responsibilities?

10   A.    Correct.

11   Q.    And as to pension for salaried employees and for hourly

12   employees, are those being assumed by New GM?

13   A.    In their entirety, yes, both plans.

14   Q.    Now, Mr. Kennedy referred to -- if I can find it -- if you

15   would turn, Mr. Henderson, I think it's Tab 14, entitled

16   "Salaried and Splinter Union Benefit Obligations Guideline

17   Objectives."

18   A.    Yes, sir.

19   Q.    And this is the chart which referred to the original

20   proposal of sixty-two percent?

21   A.    Correct.

22   Q.    And the changes made?

23   A.    Correct.

24   Q.    Now, looking at the line SOBP-Executive Life, what

25   happened to those benefits?

228

1    A.    These were benefits provided to executives for life

2    insurance, and they are eliminated in their entirety.

3    Q.    And going above that, Mr. Henderson to "Salaried Retiree

4    Health Care and Executive Nonqualified Pension (DB)", what

5    actually had been taken with those benefits prior to the date

6    of this document?

7    A.    Well, the salaried healthcare plan had been changed

8    several times in the last several years.  The first thing that

9    was done with the salaried -- and by the way, salaried

10   healthcare includes all executives.  So there's no difference

11   in plan between -- on healthcare between an executive and a

12   salaried employee -- or retiree, excuse me.  We capped the

13   company's contributions.  I believe that was during 2006.  And

14   then effective 1/1/09 was when we -- when we drop after a

15   retiree reaches Medicare.

16   Q.    So that over the years prior to the date of this document,

17   salaried employees have been subjected to a number of cuts?

18   A.    Yes.

19   Q.    And during that period of time, were members of the

20   splinter unions subjected to similar cuts?

21   A.    In 2006, subsequent to the negotiation in 2005 of

22   healthcare changes with the UAW, we did negotiate with the IUE

23   and made modifications which, in the end, lowered the company's

24   costs associated with healthcare in a way that was analogous to

25   what the UAW did in 2005.

229

1   Q.   And that was the subject of collective bargaining?

2   A.   Yes.

3   Q.   And as to the salaried employees, GM had a unilateral

4   right to reduce?

5   A.   Correct.

6   Q.   Mr. Henderson, did General Motors commence these Chapter

7   11 cases as part of a conspiracy to deprive the splinter unions

8   of retiree health and medical benefits?

9   A.   No.

10  Q.   Now, in the cross-examination by Mr. Jakubowski, he spent

11  some time about whether the purchase price was subject to

12  modification.  And he talked about the assumption of

13  liabilities by the Treasury.  Isn't it a fact that assuming

14  liabilities increases the purchase price?

15  A.   That's true.

16  Q.   And puts more liabilities on NewCo?

17  A.   Correct.

18  Q.   And in terms of the provision in the MPA or the master

19  sales and purchase agreement, it prohibits, without approval,

20  adjustments downward in the purchase price, rather than

21  upwards?

22  A.   I don't know.

23  Q.   And in connection with the indemnity of dealers as to

24  product liability of clients, I believe you said that GM

25  generally indemnifies all of its dealers?

230

1    A.    Correct.

2    Q.    And post closing of a 363 transaction, would that mean

3    that in connection with product liability claims that are

4    sustained, the New GM would have to indemnify the dealers

5    concerning those claims?

6    A.    Correct.

7    Q.    And GM is going -- New GM will retain a good portion of

8    the dealer network?

9    A.    Yes.

10            MR. MILLER:   Just one moment, Your Honor.

11   Q.    Mr. Henderson, in the deliberations of the auto directors

12   and management as to, let me call it, choice of debtor relief,

13   consideration was given to a traditional Chapter 11?

14   A.    Yes.

15   Q.    And in connection with that consideration, was there any

16   consideration given to the financing of such a Chapter 11 case?

17   A.    Yes.

18   Q.    And what conclusion was reached?

19   A.    The conclusion was reached, we outlined this actually in a

20   report that we submitted on February 17th, a viability plan,

21   that a traditional Chapter 11 process, one, would involve very

22   substantial amounts of financing, even beyond that which is

23   being identified here, potentially; and two, it would take a

24   reasonably long period of time.  And the only source of

25   financing was the U.S. Treasury.

231

1    Q.    And to the best of your knowledge, that was a

2    consideration that the United State Trustee gave in reaching

3    its conclusions?

4    A.    The U.S. Treasury?

5    Q.    Yes.

6    A.    I believe so, yes.

7    Q.    And that additional -- the financing that has been

8    approved by the Court in connection with these Chapter 11 cases

9    is 33.3 billion dollars.  You're aware of that?

10   A.    That's the debtor-in-possession financing, yes.

11   Q.    And the indebtedness to the U.S. Treasury pre-June 1

12   commencement date is 19.4 billion dollars?

13   A.    Correct.

14   Q.    And if the --

15         MR. MILLER:  I'll withdraw that.

16   Q.    Do you have any opinion, Mr. Henderson, that absent a UAW

17   retiree settlement, what action the UAW would take in

18   connection with their continued Chapter 11 for a different

19   transaction for the disposition of these assets?

20   A.    Well, certainly one of the requirements of our loan and

21   service agreement and of the U.S. Treasury was that we needed

22   to negotiate a new collective bargaining agreement or changes

23   to the collective bargaining agreement which would allow us to

24   be fully competitive and equatize at least half of the VEBA

25   obligation we had.  Otherwise it was our judgment that the

232

1    treasury would not proceed.

2    Q.    And would you characterize the negotiations with the

3    Treasury as arm's-length, strenuous negotiations.

4    A.    They were very strenuous negotiations.

5    Q.    And were they conducted in good faith?

6    A.    Yes.

7          MR. RICHMAN:  Your Honor, that calls for a legal

8    conclusion.

9          THE COURT:  If you mean by 363(m) standards, or

10   rather good faith as used under the applicable standard for 363

11   sales, it's sustained on legal conclusion.  If you want, you

12   can rephrase and get a businessman's understanding, as long as

13   it doesn't equate to what Mr. Richman is driving at.

14   Q.    Mr. Henderson, during the course of your career, you've

15   been engaged in a lot of negotiations?

16   A.    Yes.

17   Q.    And the negotiations with the Treasury, from your

18   perspective, were they good faith negotiations?

19          MR. RICHMAN:  Same objection, Your Honor.

20          THE COURT:  Sustained.

21   Q.    How would you describe those negotiations, Mr. Henderson?

22   A.    I would describe them as professional, tough, just given

23   the situation we were all in.  I have, in my career, not seen a

24   more dedicated group of people in the automotive task force

25   working around the clock with us working around the clock to

233

1    try to find solutions.  They were tough on us where they needed

2    to be.  We did -- we tried to problem solve to find solutions.

3    And there were a number of cases where we were at loggerheads

4    and we tried to find solutions, and in other cases, as the

5    purchaser, their views were of paramount importance.  And given

6    their position as a secured lender, they had a significant

7    amount of leverage in the negotiations.

8    Q.    During a hearing in this Court last week, the attorney for

9    the creditors' committee referred to the U.S. Treasury as an

10   800 pound elephant.  Would you agree with that?

11   A.    Well, it's a mixed metaphor, actually.  But they were very

12   powerful, yes.

13            MR. MILLER:  That's all, Your Honor.  Thank you.

14            THE COURT:  Anybody supporting the motion want to

15   redirect before I give an opportunity for recross?

16            MR. JONES:  No, thank you, Your Honor.

17            THE COURT:  Anybody else?  Okay.  I will now take a

18   recross, same order as originally, limited to the scope of

19   redirect.

20            MR. RICHMAN:  Good afternoon, again, Your Honor.

21   Michael Richman for the family and dissident GM bondholders.

22   RECROSS-EXAMINATION

23   BY MR. RICHMAN:

24   Q.    Good afternoon, Mr. Henderson.

25   A.    Good afternoon.

234

1    Q.    I'm going to just ask a few questions related to some

2    questions that Mr. Miller just asked.  Mr. Miller was asking

3    why you thought that GM's business was doing so well in June

4    compared to prior months, and particularly after the bankruptcy

5    was filed.  And you gave four reasons, the first three of which

6    were changes in the business model and other innovations in

7    dealing with customers.  Remember that testimony?

8    A.    Yes, I do.

9    Q.    Then you spoke to -- and I don't know if I remember your

10   words correctly, but you said you also felt that customers have

11   confidence now that a vehicle can be serviced and that the

12   company would stand by the warranties, and an expectation that

13   the bankruptcy process will go quickly.  Isn't it a fact that

14   the government announced that it was standing behind the

15   warranties well before the bankruptcy case was filed?

16   A.    Oh, it did.  Sure.

17   Q.    So the confidence that customers would have in warranties

18   and servicing related to steps the government took that were

19   completely independent of the bankruptcy filing.  Isn't that

20   correct?

21   A.    It was -- they announced it before the bankruptcy filing,

22   and it's been something we've continuously communicated through

23   the process.

24   Q.    Right.  Now, do you have your declaration in front of you?

25   I think it's Debtors' Exhibit 15.

235

1    A.    I do not have it in front of me.

2              MR. RICHMAN:  Do we have an exhibit binder with that?

3              THE WITNESS:  Is it in here?

4    Q.    It's in one of them.  Do you have two?

5    A.    I've got two.  I don't think it's in the IUE.  It must be

6    in the other one.

7    Q.    In the other one.

8    A.    What tab is it in?

9    Q.    It's toward the back.  It is Debtors' Exhibit 15.

10   A.    Here it is.  Thank you.

11   Q.    Thank you.  I want to direct your attention to paragraph

12   84 where you discuss the risks to GM of a prolonged Chapter 11

13   process.

14   A.    Yes, sir.

15   Q.    Is that what you meant when Mr. Miller asked your opinion

16   of a traditional Chapter 11 bankruptcy?

17   A.    Yes.

18   Q.    A prolonged process, in your words?

19   A.    Yes.

20   Q.    And isn't it a fact that when the case was filed, these

21   bankruptcy cases were filed on June 1, that you made several

22   public statements to the effect that GM expected to emerge from

23   bankruptcy in sixty to ninety days?

24   A.    No later than sixty to ninety days, yes.

25   Q.    Yes.  And then the White House made similar statements,

236

1    didn't they?

2    A.    Yes.

3    Q.    You also say in paragraph 84 that "Information compiled by

4    or at the direction of the company confirms that the mere

5    threat of a bankruptcy filing has depressed GM's sales, and

6    that in an extended period of a bankruptcy case, the sales

7    reductions and customer defections can be expected to be even

8    more significant."  Do you see that statement?

9    A.    Yes.

10    Q.    That hasn't happened yet, has it?

11    A.    Based upon June sales, it has not happened yet.

12    Q.    And when you told Mr. Miller that it was your opinion that

13    customers had an -- expectations -- that one reason you were

14    doing well in June was because customers had an expectation

15    that the bankruptcy process would go quickly, was that based on

16    any information compiled by or at the direction of the company?

17    A.    That's pure judgment, sir.

18    Q.    Your personal pure conjecture?

19    A.    And -- well, dealers, talking -- basically we get

20    anecdotal information from dealers as to what they believe.

21    But there's no -- we don't have hard research which would

22    suggest that.

23    Q.    And were you to file a Chapter 11 plan that could create

24    New GM in sixty to ninety days, don't you believe that

25    customers would continue to be assured and will continue to

237

1    purchase vehicles as they have during the month of June?

2    A.   Well, in this case, the U.S. Treasury as purchaser

3    indicated that we needed to move forward with the 363

4    transaction.  And that's how we've proceeded.

5    Q.   Because Treasury directed you to do it that way?

6    A.   They were providing the financing for the transaction.

7    Q.   Right.  And Treasury has indicated that its financing will

8    go through July 10, but has not, so far as I can tell from

9    anything I've seen in the record, said anywhere that at July

10   10, they will never agree to any extensions or further

11   financing, have they?

12   A.   I just know that July 10, sir.

13   Q.   Is their deadline?

14   A.   Yes.

15   Q.   And that they've made -- today, they haven't made any

16   commitments beyond that?

17   A.   I have not heard any such commitments.

18   Q.   Briefly, just on the collective bargaining agreement Mr.

19   Miller asked you about with respect to the UAW.  Isn't it a

20   fact that the collective bargaining agreement as modified

21   through the negotiations that Treasury asked you to engage in

22   has already become effective?

23   A.   The operating measures are -- I think at this point, are

24   by and large, in effect.

25   Q.   They are in effect.  So the union is already operating in

238

1    connection with the amended collective bargaining agreement?

2    A.    The -- I believe some parts of it are.  For example, the

3    changes in the jobs bank -- or excuse me, doing away with the

4    jobs bank, launching the attrition plan.  I'm not sure if all

5    of the provisions are in place today.  I'm just not sure.  And

6    I know that the VEBA has not yet, certainly, changed.

7    Q.    If the Court expressed a preference to proceed under an

8    accelerated Chapter 11 plan, to create a New GM in sixty to

9    ninety days, do you have any reason to believe that the union

10   is going to breach its collective bargaining agreement or

11   otherwise cease working because the judge expressed a

12   preference that a sale not take place within the time frame

13   being requested?

14   A.    I can't speak for the UAW.

15   Q.    Okay.

16              MR. RICHMAN:  I have nothing further, Your Honor.

17              THE COURT:  Okay.  Any re-redirect?

18              MR. MILLER:  No, Your Honor.

19              THE COURT:  Okay.  Oh.

20              MR. JAKUBOWSKI:  Your Honor, I have some questions.

21              THE COURT:  Oh, I'm sorry.

22   RECROSS-EXAMINATION

23   BY MR. JAKUBOWSKI:

24   Q.    Mr. Henderson, Mr. Miller asked you on direct, redirect,

25   whether or not the purchase price to the seller increases to

239

1    the extent that it assumes various liabilities, right?  And you

2    recall saying the answer to that is yes?

3    A.    Yes.

4    Q.    But from the estate's perspective, there's no diminution,

5    is there, as a result of that increase, is there?

6    A.    Well, the purchaser would be paying more, and so

7    therefore, if a liability that was otherwise with the old

8    company was going to go with the new company, the old company

9    would be better off.

10   Q.    Okay.  So the estate would actually be enhanced as a

11   result of that increase -- the resulted increase in purchase

12   price to the purchaser?

13   A.    That's correct.

14   Q.    Okay.  Now, I would like to ask you about the dealer

15   indemnity that Mr. Miller brought up on redirect.

16           MR. JAKUBOWSKI:  And let me go to the next exhibit,

17   is it Exhibit 4, Mr. Henderson?  Does anyone know?

18   Q.    How many exhibits do you have in front of you right now?

19           MR. JAKUBOWSKI:  Does anyone know --

20   A.    Incalculable.

21   Q.    So we will do the product liability claimant advocates

22   PLCA Exhibit 1.

23           MR. JAKUBOWSKI:  And if I may approach the witness,

24   and I'll give you a copy, Your Honor.  And I will give a copy

25   to --

240

1    THE COURT:  I assume your opponent received a copy?

2    MR. JAKUBOWSKI:  Yes, Your Honor.

3    THE WITNESS:  Thank you, sir.

4    Q.   Do you recognize this document, PLCA-1?

5    A.   Yes.

6    Q.   And could you just tell the Court generally what this

7    document is?

8    A.   It's providing an update on the 363 sale as of June 5th.

9    Q.   And this is a format that the company, GM, has used to

10   provide periodic updates to its executives and to Treasury,

11   correct?

12   A.   And to our board of directors, yes.

13   Q.   And this is an update that was prepared after the filing

14   of the bankruptcy, correct?

15   A.   Correct.

16   Q.   And in that, you have a -- on PowerPoint page 4 of that,

17   you have identified what you call a liability reduction

18   tracking sheet, right?

19   A.   Correct.

20   Q.   And what was the purpose of that?

21   A.   To provide an update on where we stand on each of these

22   individual liabilities.

23   Q.   And these were liabilities that would either be assumed by

24   NewCo or not be assumed by NewCo, correct?

25   A.   Correct.

241

1    Q.    And you broke them into various categories, buckets -- for

2    example, your general debt; your pension; your OPB litigation;

3    tax related; and operational liabilities.  Correct?

4    A.    Correct.

5    Q.    And these were forecasted based on your 12/31/08 numbers,

6    correct?

7            MR. JAKUBOWSKI:  Strike that question.  I'm sorry.  I

8    apologize.

9    Q.    It also includes off-balance liabilities that you were

10   tracking, correct?

11   A.    Yes.

12   Q.    Now, would you please turn to page 13 -- PowerPoint page

13   13 of the document?  Excuse me.  Please start with page 12.

14   And the summary on page 4 is broken down at the back of the

15   document at pages 12, 13 and 14, correct?

16   A.    Yes.

17   Q.    And as far as you can tell, do you believe that this

18   reflected an accurate analysis on June 5th of the initial

19   forecast of liability reduction and the current forecast as of

20   that date?

21   A.    As of June 5th?

22   Q.    Yes.

23   A.    No reason to believe otherwise.

24   Q.    So if you look at the section called "Litigation", number

25   6 on page 13, you see it references product liability claims,

242

1   correct?

2   A.   Yes.

3   Q.   And the 934 million dollar initial forecast was based on

4   the first quarter 10Q as of March 31, 2009, correct?

5   A.   I believe that's true.

6   Q.   And your current forecast as of June 5th says that that

7   projected liability reduction is actually going to go down by

8   400 million dollars, correct?

9   A.   Correct.

10   Q.   And you said the reason -- isn't it the case that the

11   reason it went down was because of the dealer indemnity

12   agreements that you had struck just after the filing of the

13   petition?

14   A.   Our dealer agreements customarily include indemnification

15   for dealers.  And so it is true that we would have updated our

16   estimate, and it's purely an estimate of what that might be.

17   Q.   But your estimate at the time was about 400 million dollar

18   assumption of liabilities by the purchaser, correct?

19   A.   Through the indemnification, yes, that would be a fair

20   assumption.

21   Q.   Okay.  Now, Mr. Miller talked to you a bit about product

22   liability case.  And are you aware, as a businessman, of the

23   approximate number of states in which dealers are required by

24   law to pay for product liability claims with respect to

25   vehicles they sell?

243

1    A.    No, I'm not.

2    Q.    You have no sense of that?

3    A.    No, sir.

4         MR. JAKUBOWSKI:  Your Honor, I have no further

5    questions.  I guess I do have one question for you, if I may.

6    And that is whether or not you have any interest in seeing a

7    supplemental memorandum on the issue of the responsibility of

8    dealers in various states for indemnity obligations?

9         THE COURT:  No.

10        MR. JAKUBOWSKI:  Okay.

11        THE COURT:  I don't think that's relevant to legal

12   issues that are before me.

13        MR. JAKUBOWSKI:  Okay.  I have no further questions,

14   Your Honor.  Thank you.

15        THE COURT:  Fine.  Mr. Esserman?

16        MR. ESSERMAN:  Yes.

17   RECROSS-EXAMINATION

18   BY MR. ESSERMAN:

19   Q.    Mr. Henderson, my name is Sandy Esserman.  I represent the

20   ad hoc asbestos committee, and I have a few follow-up questions

21   that were raised by Mr. Miller's direct.  And then I think

22   you're just about done for the day.  Mr. Henderson, you talked

23   about several factors that you thought might be part of the

24   reason why GM sales were looking pretty good.  You talked about

25   your marketing your GM credit card.  Do you recall that

244

1    testimony just now?

2    A.   What I said was our sales were going to be down twenty to

3    thirty percent.  So they were better than we had expected.

4    They're still terrible.  And the point is, is that the

5    marketing around the GM card has been a factor, yes.

6    Q.   And that GM credit card that you're talking about, that's

7    used in connection with the purchase of a GM automobile?

8    A.   Yes.  There's credits that a customer would have that they

9    could use in connection with the purchase of a GM automobile.

10   Q.   And those credit cards are good for Old GM as well as New

11   GM?

12   A.   These are cards actually issued by a bank that's had an

13   affinity program with us for many years.

14   Q.   And have those cards been used to purchase Old GM cars,

15   cars made by this debtor?

16        MR. MILLER:  Can you fix a period in time, please?

17   Q.   Any time prior to today?

18   A.   Yes, certainly.

19   Q.   And will those credit cards also be honored post-sale by

20   General Motors?

21   A.   The -- what the customer has are credits that they can

22   use, akin -- I mean these are credits that they build up by

23   using the card over time.  And we very much welcome when

24   customers wish to use them.  As a form of incentive, it's

25   actually a fairly attractive way to maintain loyalty with

245

1    traditionally loyal GM customers.

2    Q.   Can we just cut through to all of that -- those credit

3    cards were good to purchase cars from Old GM, they're going to

4    be good to purchase cars from New GM?

5    A.   That's not true.  The credit cards don't purchase the

6    cars.  The credits --

7    Q.   The credits, okay.  The credits.

8    A.   -- on the credit card can be used to purchase a GM

9    vehicle.

10   Q.   Both from Old or New GM, correct?

11   A.   Well the Old GM won't be selling -- the New GM will be

12   selling GM vehicles.

13   Q.   Old GM's selling cars today, aren't they?

14   A.   Yes.  Yes, sorry.

15   Q.   So, and there is no New GM yet, correct?

16   A.   Correct.

17   Q.   So all cars being sold by GM are being sold by Old GM.  Is

18   that right?

19   A.   That's correct.

20   Q.   And these credits can be used to purchase cars from either

21   Old GM or New GM.  Is that right?

22   A.   New GM doesn't exist today.

23   Q.   When New GM does exist?

24   A.   That's correct.

25   Q.   And you talked about your marketing loyalty of your

246

1    customers.  Those would be the customers that you hope will

2    continue from the Old GM to the New GM.  Is that correct?

3    A.    Well, loyal -- traditionally, a loyal GM customer would

4    have been someone who would have bought over the course of

5    years a number of GM vehicles and has a proclivity and

6    inclination to continue to buy a GM vehicle.  That's what we

7    refer to when we talk about a more traditionally loyal GM

8    customer.

9    Q.    And you want that customer to view this as a seamless

10    transaction, don't you?

11    A.    Yes.

12    Q.    Something that he won't notice that when he goes in to buy

13    his Cadillac, that there's any difference from what he

14    purchased last year.  Is that correct?

15    A.    Correct.

16    Q.    And the same answer would be for your excellent GM

17    service, your parts, and your standing behind the warranty.

18    You want that to be a seamless transaction to New GM, do you

19    not?

20    A.    That's correct.

21    Q.    Let's talk a little bit about the UAW settlement that Mr.

22    Miller discussed with you.

23    A.    I believe Mr. Miller stated and you agreed that OldCo is

24    providing no consideration to the UAW, that their stock that

25    they're going to receive as part of this transaction isn't

247

1    going to be paid by NewCo.  Is that right?

2    A.    The stock they received, they received from the Treasury.

3    And so that's part of their -- that's part of the deal in the

4    new company.

5    Q.    And that OldCo is providing no consideration of the UAW,

6    is that --

7    A.    I'm not aware of any consideration of OldCo providing to

8    the UAW.

9    Q.    Okay.  But isn't it a fact, under the sale agreement,

10   OldCo is giving the UAW a release?

11   A.    I think the UAW gives OldCo a release.

12   Q.    OldCo doesn't give the UAW a release?

13   A.    Perhaps they do.  I don't know.

14   Q.    It would be in a document if, in fact, it's the case?

15   A.    I'm aware of the UAW and the VEBA giving OldCo the

16   release, so that they no longer have a claim for post-

17   retirement healthcare benefits against the Old General Motors.

18   Q.    Are you aware of any releases being given by OldCo as part

19   of this transaction to sell to New GM?

20   A.    I'm sorry, sir, I'm not aware.

21   Q.    That's fine.  Part of Mr. Miller's recross was talking

22   about --

23            MR. MILLER:  Redirect.

24            MR. ESSERMAN:  Oh, sorry, redirect.  Thank you, Mr.

25   Miller.

248

1    Q.   -- I won't get into this orphan share, I frankly couldn't

2    understand it either -- but this asbestos brakes is what he

3    asked you about.  Do you recall that line of questioning?

4    A.   I do, sir.

5    Q.   And Mr. Miller said that the asbestos brakes were

6    furnished by suppliers to GM.  Is that --

7    A.   It is. The brake linings, yes.

8    Q.   -- okay.  And one of those suppliers was Delphi, isn't it?

9    A.   I'm not -- I don't know if Delphi was ever in brake

10   linings.  They may have been.  I just am not aware.  They were

11   brakes, but they were not -- I'm not sure if they were in brake

12   linings.

13   Q.   Do you know where GM purchased their brake linings from,

14   then?

15   A.   Multiple suppliers.

16   Q.   Could Delphi have been one of them?

17   A.   They could have been, but I don't know.

18   Q.   Okay.  Finally, Mr. Miller talked about the tough

19   negotiations as part of the sale transaction.  You're aware of

20   that?

21   A.   Yes.

22   Q.   And a couple final questions I have for you.  As part of

23   these tough negotiations, would it be a correct statement of

24   fact that no one from GM carried the banner or represented at

25   the table the asbestos claimants?

249

1    A.    I think we outlined for the Treasury the level -- the

2    nature of the asbestos liability, the issues surrounding it,

3    and the purchaser, or the Treasury, in this case, concluded

4    that it was not appropriate to bring forward.

5    Q.    My question -- and listen to my question carefully,

6    because I understand your answer, but I don't think that was

7    quite what I was asking.  Did anyone at GM advocate for the

8    interests of asbestos claimants in negotiating with the U.S.

9    Treasury Department?

10    A.    Beyond simply highlighting it, no.

11    Q.    And did anyone at the Treasury Department advocate for the

12    interests of the asbestos claimants?

13    A.    I don't know.

14    Q.    Do you recall giving your deposition few days ago?

15    A.    Um-hmm.

16    Q.    I'd like you to read a statement and see if you agree with

17    this statement that I represent you gave --

18    A.    Yes, sir.

19    Q.    -- at your deposition.  It was at page 415 -- 414, line

20    25.  And see if this is a correct statement.

21            THE COURT:  Mr. Esserman, what I normally like to do

22    is, does he have a copy in front of him,  I'd like if he'd be

23    able to read along with you.

24            MR. ESSERMAN:  Okay.

25            UNIDENTIFIED ATTORNEY:  There's one in our book, Your

250

1   Honor.

2           THE WITNESS:  I'll grab it.  Hold on.

3   Q.   Page 414, starting at line 25.

4   A.   Yes, sir.

5   Q.   Okay.  "Question:  In negotiating with the U.S. Treasury

6   Department, did anyone at GM advocate for the interests of the

7   asbestos claimants?

8   "A.   The purchaser didn't.  In looking at this, had no reason

9   to assume these liabilities for a number of reasons, and

10  concluded it wasn't necessary for the New General Motors to

11  operate going forward."

12          And that's the end of the answer.  Is that the correct

13  answer?

14  A.   That's what I said.

15          MR. ESSERMAN:  Okay.  Thank you, Your Honor.  Thank

16  you.

17          THE COURT:  Are you done, Mr. Esserman?

18          MR. ESSERMAN:  Yes.

19          THE COURT:  All right.

20          MR. JAKUBOWSKI:  Your Honor, while we're changing the

21  guard, I inadvertently forgot to move for admission of PLCA-1

22  into evidence.  And I would like to do that, with your

23  indulgence?

24          THE COURT:  Objections?

25          MR. MILLER:  No objection.

251

1          THE COURT:  No objection.  It's admitted.

2     (Exhibit PLCA-1, debtors' update on 363 sale as of 6/5, was

3     hereby received into evidence as of this date.)

4          THE COURT:  All right.  Now back giving the debtors

5     any final opportunity.

6          MR. KENNEDY:  Well, Your Honor, I had a question or

7     two on recross.

8          THE COURT:  Oh, I'm sorry, Mr. Kennedy.  Come on up,

9     please.

10    RECROSS-EXAMINATION

11    BY MR. KENNEDY:

12    Q.   Mr. Henderson, could I direct you to Exhibit 14 in the

13    section of Exhibit 10 that's related to your deposition in the

14    exhibit, sir?  It's that chart, "Salaried and Splinter Union

15    Benefit Obligations" that I think you've addressed once or

16    twice, and I believe you looked at again with Mr. Miller.

17    A.   Yes, sir.  Okay.

18    Q.   Now, would you agree with me that since the Sprague

19    decision in the eighties, it's been clear that General Motors'

20    salaried employees were subject to having their retiree basic

21    life insurance canceled at any point by the company,

22    unilaterally?

23    A.   Changed, modified or canceled, yes.

24    Q.   Okay.  And the same is true with respect to the salaried

25    retiree healthcare plan, correct?

252

1   A.   We did change -- we did freeze it and implement a new

2   plan.

3   Q.   And the executive nonqualified pension was subject to

4   being canceled, certainly, in this bankruptcy proceeding,

5   correct?

6   A.   Yes.

7   Q.   And the SLBP executive life was subject to cancelation by

8   General Motors, correct?

9   A.   Correct.

10  Q.   And that leaves the splinter unions life insurance

11  healthcare.  Would you agree with me that the IUE, CWA and the

12  other unions that are covered by that group, have always taken

13  the position that their members' entitlement to these benefits

14  is vested and uncancelable by the company?

15  A.   That has been their position.

16  Q.   And General Motors has taken the position that you could,

17  in fact, change them, correct?

18  A.   Yes.

19  Q.   And in resolving those to positions, isn't it also true

20  that in October of 2008, GM and the IUE agreed to fund a VEBA

21  for IUE retirees in the amount from General Motors of 2.455

22  billion dollars?

23          MR. MILLER:  If Your Honor pleases, that goes way

24  beyond redirect.

25          THE COURT:  Sustained.

253

1          MR. KENNEDY:  I have no other questions, Your Honor.

2     Thank you.

3          THE COURT:  Okay.  Are there any other objectors who

4     I forgot.  I seemed to have done that a couple of times.  Now,

5     one more time, Mr. Miller, anything further?

6          MR. MILLER:  No, Your Honor.

7          THE COURT:  All right.  Mr. Henderson, you're

8     excused.  You can step down and remain in the courtroom.

9          THE WITNESS:  Thank you, Your Honor.

10         THE COURT:  Thank you.  Okay.  It's 5:30.  My energy

11    level is okay.  I'd like to keep going at least for another

12    couple of hours, if you people feel up to it also.  What I

13    think I would like to do is determine now, who will be the next

14    witness, take five minutes, and resume with the next witness,

15    cross examination and the similar -- Mr. Richman, were you the

16    leadoff man, you or your partner?

17         MR. RICHMAN:  Yes, Your Honor.

18         THE COURT:  Who would you like to take next?

19         MR. RICHMAN:  Mr. Worth.

20         THE COURT:  Mr. Worth?

21         MR. RICHMAN:  Yes.

22         THE COURT:  Okay.  Five minutes, and we'll continue

23    with Mr. Worth.

24         (Recess from 5:30 p.m. until 5:45 p.m.)

25         THE COURT:  Take your seats, please.  Before we begin

254

1    with Mr. Worth, I'd like to be in a position where we can help

2    everybody to plan their evening and tomorrow.  So I would like

3    to take a moment for a nonbinding estimates, how long we expect

4    to be with this witness, then to ascertain whether the person

5    who's number 3 in the lineup would be needed tonight or I could

6    tell him he could leave.  I'm not going to put a sock in

7    anybody's mouth or cut him off, but I'd like to get a sense

8    from you, Mr. Richman, as to how long you think this would be.

9    How many folks, besides you, want to question Mr. Worth, and

10   then answer my questions for the next couple of minutes?

11            MR. RICHMAN:  Thank you, Your Honor.  We've had some

12   discussions among counsel during the break, also, to see

13   whether there was any common ground.  I don't have a great many

14   number of questions for Mr. Worth or for Mr. Koch.  I don't

15   think either of them will take very long.

16            THE COURT:  That's the order of the two folks you

17   want to take?

18            MR. RICHMAN:  Yes.

19            THE COURT:  You want to take Mr. Worth first and then

20   Mr. Koch?

21            MR. RICHMAN:  And then Mr. Koch.  I can't speak for

22   other parties in the courtroom and it may well be with my

23   questions being limited that that could well expand the needs

24   of other parties.  But it certainly seems to us that once you

25   get to Mr. Wilson, you're going to be engaged in another

255

1    exercise that may be comparable in time to what we had with Mr.

2    Henderson.  And I think for everyone's benefit, at a minimum

3    that would be a good time for a break to start fresh with Mr.

4    Wilson in the morning, rather than to try to begin that this

5    evening.

6              THE COURT:  I hear you.  Then, what I would like to

7    do is now ask the other folks whether a scenario that takes Mr.

8    Worth and Mr. Koch tonight and starts with Mr. Wilson in the

9    morning makes sense.

10             MR. RICHMAN:  Just so I can clarify, Your Honor, I

11   didn't mention Mr. Repko.  We do not have any plans to question

12   him, but other parties may.  And he's the forth of the debtors'

13   four witnesses who will be before we got to Mr. Wilson.  So

14   just for clarity of record, other parties may want to comment

15   on that.

16             THE COURT:  Fair enough.  Why don't we invite other

17   people to weigh in?

18             MR. MILLER:  As far as the debtors are concerned,

19   Your Honor, we would agree with Mr. Richman to take Mr. Worth

20   and Mr. Koch tonight and start fresh with Mr. Wilson tomorrow

21   morning, hopefully early, Your Honor.

22             THE COURT:  All right.  Mr. Jakubowski, you rise to

23   be heard?

24             MR. JAKUBOWSKI:  Thank you, Your Honor.  We have no

25   questions for any of the other debtors' witnesses that are

256

1    proposed.  And the only other questioning we'll have is of Mr.

2    Wilson.

3            THE COURT:  Okay.  Anybody -- Mr. Kennedy?

4            MR. KENNEDY:  We have ten minutes or so for Mr.

5    Repko, none for the other witnesses until we get to Mr. Wilson.

6            THE COURT:  Okay.  Mr. Eckstein.

7            MR. ECKSTEIN:  We may have a few questions for Mr.

8    Koch.

9            THE COURT:  Yeah, I thought you might.  Okay.  Then

10   let's assume that we're going to definitely start with Mr.

11   Wilson in the morning.  I guess the question is, is it too

12   ambitious or should be give Mr. Repko a break and tell him he

13   could go home tonight?  Everybody's shrugging their shoulders.

14   As far as tomorrow goes --

15           MR. RICHMAN:  Did you mean Mr. Repko or Mr. Worth?

16           MR. KENNEDY:  I meant Repko.

17           THE COURT:  All right.  As far as tomorrow goes, I

18   have an 8:00 relief from stay motion which was perceived by

19   somebody to be important.  So I'll hear it at 8:00.  And then

20   what I was going to ask you people is if you wanted to start at

21   9 instead of 9:45.  And if you want I'll start and finish that

22   relief from stay motion if that helps.  I don't know if it will

23   or not.  I would have thought that a relief from stay motion

24   wouldn't take a long time, but I would have thought that it

25   wouldn't be arguable.  Mr. Richman, I want to get your

257

1    perspective.

2         MR. RICHMAN:  Well, I think some of it relates to

3    getting into the courthouse and the courtroom.  This morning

4    people weren't allowed in until about beginning at 8:30 and it

5    took a very long time for the line to clear.

6         And related to that, will we have this courtroom

7    tomorrow and we'll be able somehow to reserve these seats so we

8    don't have the kind of chaos we had this morning.

9         THE COURT:  Well, those are legitimate questions.  I

10   think that if I tell the marshals that I want you guys let in,

11   they'll listen to me.  And I'll do that.

12        As far as -- yes, we've got clearance to use this

13   courtroom.  And I know you guys all have your places and things

14   like that, but what I would like to do is have the people who

15   have their existing places and more prominent roles in the

16   case, having the spots at cancel table.  And those of you who

17   are in the audience you're welcome to come back as far as I'm

18   concerned.  I do need to have the comfort that the people who

19   have participated so far know that they can get into this

20   courtroom and that they won't have to fight for places to be

21   heard, or to hear what I have to say.

22        So, Mr. Richman, the answer is sure.  I'll also let

23   you leave your stuff here as long as you understand that I

24   can't guarantee its security.  But as far as having permission

25   to leave your stuff in the courtroom, that's fine.

258

1        So the one open issue is what time we're going to

2   start the main event tomorrow.  And I'm afraid, Mr. Richman,

3   even if I give the marshals the authority to let people in

4   early we're still going to have logistic issues.  So I'm going

5   to start the main event a 9:00.

6        With that, let's bring up Mr. Worth.  Okay.  Mr.

7   Worth is here.

8        MR. RICHMAN:  Thank you, Your Honor.

9   CROSS-EXAMINATION

10  BY MR. RICHMAN:

11  Q.   Good afternoon, Mr. Koch -- I'm sorry, Mr. Worth.  Just so

12  we have clarity of the record, Mr. Worth, could you for the

13  record describe what your and Evercore's assignment was in this

14  case, when it began and where it stands right now.

15  A.   We have been advisors to General Motors since about June

16  of 2008.

17  Q.   Could you use the mic?  I think people are having

18  difficulty hearing in the back.

19  A.   Absolutely.  Is that better?

20  Q.   Yes.

21  A.   We've been financial advisors to General Motors since

22  about June of 2008, on a variety of matters, as this case has

23  progressed.

24  Q.   Now, are you -- next to Mr. Repko, are you the senior

25  person responsible for the engagement?

259

1      A.    Yes.

2      Q.    And were you responsible for the preparation of the

3      fairness opinion?

4      A.    Yes.

5      Q.    That fairness opinion I note is attached to your

6      declaration which is in evidence as Debtors' Exhibit 3, is

7      that -- did I get that right?  Is it 3?  Exhibit 3.  So are you

8      able to testify about the contents of the fairness opinion?  Do

9      you have specific knowledge from your oversight and preparation

10     of it to be able to speak to its contents?

11     A.    Yes.

12     Q.    Do you have it in front of you, there should be a binder

13     of debtors' exhibits?  It would be tab 3, Exhibit 3.  And just

14     for the record it's called "Fairness Opinion Letter" which is

15     Exhibit A to your declaration.  And that's a letter dated May

16     31, 2009 on the letterhead of Evercore Group LLC, and addressed

17     to the board of directors of General Motors Corporation?

18     A.    Yes, sir.

19     Q.    I'd like to refer you to page 3 of that letter.

20     A.    Yes.

21     Q.    The paragraph at the bottom of the page indicates "that in

22     preparing the fairness opinion Evercore" -- and I'm just

23     reading from the letter to ask you to confirm this "relied on

24     management in Evercore's conclusion that GM's range of options

25     have narrowed to a choice between (1)the 363 sale, or (2)a

260

1    bankruptcy liquidation as described in the liquidation

2    analysis," that's a correct statement?

3    A.    Yes.

4    Q.    So would I be correct in saying you were directed not to

5    consider a fair valuation of New GM under any other scenario?

6    A.    Can you repeat the question?

7    Q.    Did you perform any fairness valuation of New GM if New GM

8    was created, for example, as a spin-off under a Chapter 11

9    plan?

10   A.    No.

11   Q.    Or any other scenario other than the two indicated in the

12   letter, which is the 363 sale or a liquidation?

13   A.    No, we did not.

14   Q.    In your experience would there be any reason to believe

15   that if New GM was created in a Chapter 11 plan with the same

16   business objectives, that the valuation would be different than

17   it would be in a Section 363 sale?

18         MR. MILLER:  Objection, Your Honor.  You have to

19   establish foundation.  Who does the financing?  How the case is

20   going to proceed without financing.  He's talking apples and

21   oranges, Your Honor.

22         THE COURT:  I'm going to sustain it.  But if you lay

23   out a few more parameters in a way of background facts, and if

24   you want to get his opinion on that opinion.

25         MR. RICHMAN:  Thank you, Your Honor.

261

1    Q.    Mr. Worth, how many Chapter 11 plan valuations have you

2    been involved in, in your career, ballpark?

3    A.    Very few.

4    Q.    Very few?

5    A.    Yes.

6    Q.    Approximately how many?

7    A.    Where I've testified?

8    Q.    No, where you have as a professional provided a fairness

9    opinion, or supervised a fairness opinion?

10            MR. MILLER:  In a Chapter 11 context?

11            MR. RICHMAN:  Yes.

12    Q.    I'm asking specifically about the valuation of a company

13    being created under a Chapter 11 plan?

14    A.    Fairness opinions, none.

15    Q.    Did you take into account or did person working under your

16    supervision in preparing the fairness opinion, take into

17    account General Motors' net operating losses?

18    A.    Which General Motors; OldCo or NewCo?

19    Q.    OldCo.

20    A.    Not other than in the capital structure of NewCo.  The

21    only company we valued was NewCo.

22    Q.    How are NOLs valued in NewCo?  Where would I find that?

23    Is that actually in the letter or in any of the documents that

24    were produced?

25    A.    Yes.  It's implicit in the valuation of NewCo.  There are

262

1   deferred tax attributes at current General Motors that carry

2   over into NewCo, those are part of the valuation.

3   Q.   Could I trouble you to just show me where I would find

4   that in your fairness letter or in the exhibits?

5   A.   In the valuation methodology description, it's probably

6   the best place.  Exhibit G, where we describe the various

7   methodologies we use to value OldCo -- sorry, NewCo.  Give me a

8   second and I'll find a reference.  I apologize, I don't see a

9   page number.  The third page of Exhibit G.

10            THE COURT:  What exhibit?

11            THE WITNESS:  Exhibit G.

12            THE COURT:  G, golf?

13            THE WITNESS:  G, golf.  The third page last

14   paragraph.

15   A.   There's a description of how we valued the deferred tax

16   attributes, deferred tax assets of General Motors.

17   Q.   But this doesn't contain any particular amounts, does it?

18   A.   No, simply methodology.

19   Q.   Is there a place where I would find the amount of the

20   NOLs?

21   A.   It is more implicit in the core enterprise value than it

22   is explicit on the amount in any page.  So -- let me refer you

23   back to the appendix.  Give me one second.  In Exhibit F to the

24   affidavit.

25   Q.   I appreciate your help with this.

263

1   A.   Page 22 of Exhibit F.  There's a line there that says

2   "core enterprise value."

3   Q.   This is in the -- it looks like a PowerPoint presentation?

4   A.   Correct.  There's a line three lines down that says "core

5   enterprise value," the value of the tax assets is imbedded in

6   core enterprise value.

7   Q.   But it's not broken out as a separate number anywhere?

8   A.   No, sir.

9   Q.   So we can't see what the -- do you know what the existing

10   NOLs are that are in the Old General Motors?

11   A.   I recall the value of those tax attributes was somewhere

12   in the ten to twelve billion dollar range?

13   Q.   Ten to twelve billion, did you say?

14   A.   Correct.

15   Q.   And do you have any understanding of how they are able to

16   get to New GM?

17   A.   I'm not a tax lawyers, but I have a lay understanding of

18   the process that they're going to use, called the G re-org, to

19   preserve those tax attributes.

20          THE COURT:  G re-org, did you say?

21          THE WITNESS:  Yes, sir.

22   A.   To preserve those tax attributes.

23   Q.   But that hasn't been done -- that's not in the current

24   structure?

25   A.   It is assumed to have been accomplished as part of this

264

1    transaction.  So those tax assets would be preserved if a G re-

2    org is approved.

3    Q.    Can you explain for us what a G re-org is, in your

4    understanding?

5    A.    Not being a tax attorney, probably not adequately.

6    Q.    I'm not either.

7    A.    It would have the net impact of preserving the value of

8    the NOLs currently at General Motors, and being transferred

9    from OldCo to NewCo.

10   Q.    So am I correct in understanding that if this G re-org is

11   not done then the value of the NOLs will not transfer to New

12   GM?

13   A.    Not in totality, no.  Some but not all would be available

14   to NewCo.

15         MR. RICHMAN:  Excuse me one second, Your Honor.

16   Q.    Just last question.  When I was reading from page 3 of the

17   letter before there was a reference to the two options; the 363

18   sale and the liquidation analysis.  Was the liquidation

19   analysis that was referred to in the fairness opinion, the one

20   that was prepared by AlixPartners and Mr. Koch?

21   A.    Yes, sir.

22   Q.    Thank you.

23         MR. RICHMAN:  I have no further questions, Your

24   Honor.

25         THE COURT:  Okay, thank you.  Mr. Kennedy?

265

1          MR. KENNEDY:  Your Honor, I was in error before, I do

2     have some questions of Mr. Worth, not of Mr. Repko, I

3     apologize.

4          THE COURT:  All right.  You want to come up?

5          MR. KENNEDY:  Well, I'm typically not the second

6     person, so I don't know if there are other people who want to

7     go first.

8          THE COURT:  I think Mr. Eckstein focused on Mr. Koch.

9     Do you have any of Mr. Worth, sir?

10          MR. ECKSTEIN:  I do have a few questions for Mr.

11     Worth.

12          THE COURT:  Whichever.

13     CROSS-EXAMINATION

14     BY MR. KENNEDY:

15     Q.   Mr. Worth, I'd like to direct you to Exhibit F to your

16     declaration, which is Exhibit 3 in the exhibits marked by the

17     debtor.  That consists of a project main presentation to the

18     board of directors.  Can you go to that, sir?  Do you have in

19     front of you?

20     A.   I have it right in front of me.

21     Q.   Would you describe what the Exhibit F is?

22     A.   It is a presentation that we delivered to the board of

23     General Motors on May --

24     Q.   It's dated if it would help, the first page.

25     A.   May 31st.

266

1    Q.    And is that date the date it was presented?

2    A.    Yes.

3    Q.    And is that the same date that the board of General Motors

4    made the decision to proceed with the bankruptcy petition?

5    A.    Yes, sir.

6    Q.    I'd like to address your attention to page 5, if I could.

7    A.    Yes.

8              MR. KENNEDY:  Do you have it, Your Honor?

9              THE COURT:  Not yet.  If you'll bear with me.  You

10   said Exhibit F, page 5?

11             MR. KENNEDY:  Yes, sir.  To Exhibit 3.  And this is

12   not my book.  This one isn't my fault.

13             THE COURT:  No.  I understand.  Bear with me.

14             MR. KENNEDY:  You had it right there, sir.  I think

15   that could be it, I don't know.

16             THE COURT:  You're right.  Okay.  Go ahead.

17             MR. KENNEDY:  Move to page 5 of that.

18             THE COURT:  Overview of transaction in

19   (indiscernible) process?

20             MR. KENNEDY:  Yes, sir.

21   Q.    What is this page intended to depict, Mr. Worth?

22   A.    It is a simplified version of the capitalization of the

23   company at the end of the transaction.

24   Q.    So at the end of the 363 transaction, this is essentially

25   what the company is going to look like, correct?

267

1          MR. MILLER:  As of that date?

2    Q.   As of that date, yes?

3    A.   Correct.

4    Q.   And I take it that you identified a few of the important

5    elements of the capitalization on this page, would you agree

6    with me on that?

7    A.   Yes.

8    Q.   And I noticed that you called out pension and OPEB

9    obligations, why were they among all the potential obligations

10   of this company?  Why were they called out for special mention

11   on page 5?

12   A.   Part of the success of NewCo and the profile of NewCo

13   depended on the restructuring of some of those obligations.

14   Principally OPEB obligations and Canadian pension obligations.

15   Q.   Okay.  So that they -- first the pension and OPEB

16   obligations referred to is the obligation for NewCo to pay 900

17   million in cash and 700 million in note to a Canadian

18   healthcare trust structure, is that correct?

19   A.   Correct.

20   Q.   And the second one was prefunding of an assumed Canadian

21   pension with 3.6 billion in cash, is that also correct?

22   A.   Correct.

23   Q.   But the third one is actually a reduction of liability,

24   it's not a recognition of liability on the new company,

25   correct?

268

1    A.    Can you rephrase the question?

2    Q.    Sure.  Is the third one item mentioned here a reduction in

3    liability as opposed to a statement of cash or equity that

4    would have to be paid out?

5    A.    It is a statement of an assumption, which at the time we

6    gave this presentation was still undefined that there would be

7    a reduction in the cash flow requirements for the non-UAW OPEB

8    obligations.  And that that would then have an impact on the

9    profile of NewCo.

10    Q.    Okay.  So that the non-UAW OPEB obligations which you've

11    been sitting here you may now at least recognize refers to IUE,

12    Steelworkers, IUOE and other unions, that was identified as

13    significant enough to be included on this page, correct?

14    A.    Correct.

15    Q.    And how much of a reduction in OPEB obligation for non-UAW

16    unions were you assuming at the point you were preparing this

17    document?

18    A.    I believe at the time we did this analysis we had

19    assumed --

20    Q.    While you think about it, let me remind you if it does.

21    And I believe the total of the non-UAW OPEB obligation is 3.725

22    billion?

23    A.    Correct.

24    Q.    Does that help refresh your recollection as to how much

25    you might have been referring to as a reduction?

269

1    A.    Let me answer the question this way.  At the time that we

2    were developing the models -- I'm sorry, rephrase that.  At the

3    time that the NewCo models were being developed and we did the

4    valuation of NewCo there was an assumption made around non-UAW

5    OPEB.  And at this very moment, I can't remember exactly what

6    that assumption was.  But there was an assumption that they

7    would be reduced.

8    Q.    In fact, would it be fair to say that the assumption of

9    the reduction would be in billions of dollars or it would not

10   have been identified separately on this page?

11   A.    That's fair.

12   Q.    And that that was one of the factors that the board

13   considered in determining whether to go through the new company

14   transition, or transaction, rather?

15   A.    That's fair.

16   Q.    All right.  I'd like to address your attention to page 15.

17   I take it from this page and from other information that the

18   credit bid Treasury is making to accomplish the 363 transaction

19   is in the amount of 48.7 billion dollars?

20   A.    That's correct.

21   Q.    And it's also true that as of the filing, June 1, Treasury

22   had made 19.4 billion in pre-petition loans to General Motors,

23   correct?

24   A.    Correct.

25   Q.    Are the 19.4 billion in pre-petition loans included in the

270

1    48.7 billion dollar credit bid which is referred to on page 15

2    of Exhibit F and elsewhere in these documents?

3    A.    Yes.

4    Q.    I also gathered from the document, and if you need to I'm

5    referring to page 16, that the NewCo equity value is assumed to

6    be between thirty-eight billion and forty-eight billion?

7    A.    Yes, sir.

8    Q.    And if you look at the combination of holdings that the

9    U.S. Treasury has -- is expected to have as a result of the 363

10   transaction of 72.5 percent equity, and 2.5 billion in

11   preferred, what amount of the thirty-eight to forty-eight

12   billion would you understand Treasury to own?

13   A.    The U.S. Treasury?

14   Q.    Yes.

15   A.    A loan?

16   Q.    Uh-huh.

17   A.    I believe the percentage is sixty percentish of the

18   equity.

19   Q.    So if we were looking at the equity range, thirty-eight to

20   forty-eight billion, we would understand the treasury owned

21   about sixty percent of that, or a little more, maybe?

22   A.    Of the common shares outstanding at close, correct.

23   Q.    And when you say at close, you mean at the expected close?

24   A.    Correct.

25   Q.    And how much of that sixty percent in effect of equity or

271

1    value that the U.S. Treasury would have is represented by the

2    portion of the credit bid reflecting the 19.4 billion pre-

3    petition loans?

4    A.    Point of clarification?

5    Q.    Sure.

6    A.    The U.S. Treasury and Industry Canada are both part of the

7    DIP loan.

8    Q.    Okay.

9    A.    So the equity that results from the credit bid --

10    Q.    You might want to speak up, I hear somebody saying they

11    can't hear.

12    A.    Sorry.  The equity that results from the credit bid is,

13    both to the U.S. Treasury and Canada EDC.

14    Q.    So that sixty percent figure is representative of both

15    U.S. Treasury and Canada.

16    A.    Sixty is just the UST.

17    Q.    I see.

18    A.    The Canada equity ultimately in the transaction comes from

19    the credit bid and from the other amounts that the Canadian

20    government is lending into the overall transaction.  So it's --

21    you need a calculator to give you the answer that you just

22    asked, which is the portion of the credit bid that is

23    specifically related to the UST, which results in a sixty

24    percent ownership.

25    Q.    Okay.  Is it at least clear as we sit here today that some

272

1    of the equity ownership the treasury is obtaining is as a

2    result of their pre-June 1 loans to General Motors?

3    A.    Yes.

4         MR. KENNEDY:  All right.  I have no other questions,

5    Your Honor.

6         THE COURT:  Okay.  Mr. Eckstein.

7    CROSS-EXAMINATION

8    BY MR. ECKSTEIN:

9    Q.    Mr. Worth, good evening.  My name is Kenneth Eckstein, I

10   represent the official creditors' committee.  I have a few

11   questions, if I may.

12   A.    Good evening.

13   Q.    Mr. Worth, can you just clarify for me on whose behalf did

14   Evercore provide a fairness opinion in connection with this

15   transaction?

16   A.    We provided an opinion to the board of directors of

17   General Motors.

18   Q.    So, essentially, OldCo, the selling company, is that

19   correct?

20   A.    Yes.

21   Q.    And do I understand correctly that in connection with

22   providing the opinion, you advised the board of directors?

23   A.    We provided the opinion to the board of directors.  We've

24   been an advisor to the company and to the board of directors

25   during the course of our assignment.

273

1    Q.    Did Evercore participate in the negotiations of the

2    transaction as well as providing a famous opinion to the board

3    of directors?

4    A.    In portions.

5    Q.    Which portions of the negotiations were you involved with,

6    or was the form of Evercore involved with?

7    A.    There were multiple areas that we were witnesses of and

8    provided advice to the company.  It was probably a half dozen

9    different areas.  We were not front and center in those

10   negotiations, though.

11   Q.    Did you participate in the negotiations between

12   representatives of the bondholders and U.S. Treasury regarding

13   the allocation of equity to OldCo?

14   A.    During it's final iteration, no.

15   Q.    Did you participate in the negotiations with UAW?

16   A.    No.

17   Q.    I assume that the opinion that Evercore provided was the

18   written opinion that is attached to your declaration, is that

19   correct?

20   A.    Correct.

21   Q.    And that's dated May 29, 2009, am I correct?

22   A.    I believe it's dated May 31st.

23   Q.    May 31 or May 29?

24   A.    May 31st.

25   Q.    May 31st, right.  And was there a meeting with the board

274

1    of directors at which you presented your opinion and

2    recommendations?

3    A.    There was.

4    Q.    Was that one meeting or several meetings?

5    A.    There was a meeting on Saturday, the 30th, I believe, in

6    which we went through our presentation.  We subsequently

7    delivered our opinion on a telephonic meeting on the 31st.

8    Q.    Were there any subsequent meetings in which you dated your

9    recommendations to the board?

10    A.    Yes.

11    Q.    When did those take place?

12    A.    This past Friday we were asked whether the changes to the

13    MSPA as they had occurred as distinct from the MSPA that we had

14    May 31st the day of our opinion, whether had we known those

15    changes at the time that we had delivered our opinion, would it

16    have changed the substance of our opinion.  And we met with our

17    creditors' committee, we obtained the opinion committee on the

18    substance of the changes and we advised the board during that

19    telephonic board meeting that the substance of our opinion

20    would not have changed had we known all of those facts at the

21    time we had presented them with our opinion.  We did not update

22    our opinion in writing.

23    Q.    Which changes to the MSPA were you considering in

24    connection with your supplemental advice?

25    A.    There were a few, about sixteen different small changes.

275

1    Some of them were mechanics in the MSPA.  One specific was

2    around the warrants and the capitalization table, which, at the

3    time we delivered our opinion, we did not have the exact number

4    of warrants that were being issued, nor did we have a cap

5    table.  We also -- another change was the product liability and

6    the assumption of product liability.

7    Q.    Was this the change that reflected the agreement by NewCo

8    to assume product liability that arises subsequent to the

9    closing of the transaction?

10    A.    Yes.  And there were a handful of other changes to the

11    MSPA, all non-major substantive money issues.

12    Q.    Were there any other changes that you could recall that,

13    in your view, materially affected the amount of liability that

14    was being left with OldCo or was not being assumed by NewCo?

15    A.    Could you repeat the question?

16    Q.    Were there any other modifications that in your view were

17    material that involved an assumption of additional liability by

18    OldCo or releasing NewCo of liabilities that it had previously

19    agreed to assume?

20    A.    There were none that were material to our opinion.

21    Q.    Were there any modifications made in connection with

22    workers' compensation liability?

23    A.    I don't recall specifically.  But, again, none that I

24    recall that would have affected our opinion.

25    Q.    And as you said, this was not done in writing, this was

276

1    done orally, am I correct?

2    A.    Yes.

3    Q.    Okay.  Can you tell me what you understand the value of

4    the equity that is being left with NewCo to be under this

5    transaction?

6    A.    Can you repeat that, you mean OldCo?

7    Q.    What is the value of the equity being left with OldCo?

8    A.    Again, clarification, the equity and the warrants?

9    Q.    First the equity?

10   A.    Our estimate of the value of NewCo was the range between

11   thirty-eight and forty-eight billion dollars for 100 percent of

12   the common equity of NewCo.  So straight ten percent of that

13   would be 3.8 to 4.8 billion dollars.

14   Q.    3.8 to 4.8 billion dollars was ten percent?

15   A.    Correct.

16   Q.    And did you ascribe a value to the seven-year warrant for

17   seven and a half percent of the equity?

18   A.    We did.

19   Q.    And approximately how much value did you ascribe to the

20   warrant?

21   A.    The value -- I'm going to refer you back to page 14 of

22   that same Exhibit F that we've been talking about.  The value

23   ascribed in this presentation was 2.1 to 2.9 billion dollars

24   for that warrant -- the seven-year warrant.  At the time that

25   we did this valuation, we did not have the exact number of

277

1    warrants, nor the cap table, that affects the valuation

2    slightly of both the warrants and the way that we would do the

3    valuation.  The net impact, though, internal of all of that new

4    information was not significant on the bottom line range that

5    you have here of 7.4 to 9.4 million dollars.  So that is the

6    value of the entire package; ten percent of the equity plus the

7    fifteen percent warrants.

8    Q.   So based upon the amended opinion that you provided last

9    week, the value ranges have not changed in your opinion?

10   A.   Not substantively, no.

11   Q.   And just so I understand the value that you ascribed to

12   the ten-year warrant, what is referred to as warrant B, is that

13   one and a half to 2.1 billion dollars?

14   A.   That's correct.

15   Q.   And so am I correct that the value that -- of the

16   equity -- the straight equity and the warrants that are being

17   left with OldCo in your view is between 7.4 and 9.8 billion

18   dollars?

19            MR. MILLER:  He just testified to that, Your Honor.

20            THE COURT:  I'm going to sustain.  But just to try to

21   get to the next question, you can move on.  I think you got it

22   enough that I wrote it in my notes, Mr. Eckstein.

23            MR. ECKSTEIN:  Thank you, your Honor, that's fine.

24   Q.   In connection with your opinions did you make any

25   evaluation of the liabilities that were being retained by

278

1   OldCo?

2   A.   Yes.  In estimating the value of those assumed

3   liabilities, we took the book value of those liabilities.  But

4   for pension where in all of our valuation methodology, we

5   estimated the value of pensions to be the present value of

6   future contributions.

7   Q.   Can you tell me what liability level you were assuming was

8   being retained by OldCo in connection with this transaction?

9   A.   If you look at page 15 of that same exhibit the total

10   numbers 48.4 billion dollars.

11         THE COURT:  Mr. Worth, would you mind standing a

12   little closer to the microphone, please?

13         THE WITNESS:  Certainly, sorry.

14   A.   So the total on page 15 is 48.4 billion dollars.

15   Q.   These are the liabilities that are being retained by

16   OldCo, or the liabilities that are being assumed by NewCo?

17   A.   Forgive me, those are the liabilities that are being

18   assumed by NewCo.

19   Q.   I had asked you the question, did you make any assumptions

20   as to the aggregate amount of liabilities being retained by

21   OldCo?

22   A.   No.

23   Q.   So for purposes of your fairness opinion, you simply

24   looked at the value of the -- let's called it the asset side

25   rather than the liability side of the transaction, at least as

279

1    it impacted OldCo, am I correct?

2    A.   Yes, sir.

3    Q.   Did you express any opinion as to the fairness of the

4    transaction on the OldCo creditors in connection with your

5    opinion?

6    A.   No.

7         MR. ECKSTEIN:  Your Honor, that's all I have.  Thank

8    you.

9         THE COURT:  Okay.  Any other objectors want to

10   question?  No.  Okay, redirect, Mr. Miller?

11        MR. MILLER:  No, Your Honor.

12        THE COURT:  All right.  Mr. Worth, you're excused,

13   thank you.

14        MR. PARKER:  No.  I do, sir.  I raised my hand.

15        THE COURT:  Come on up.

16        MR. PARKER:  I don't have many questions.

17   CROSS-EXAMINATION

18   BY MR. PARKER:

19   Q.   Mr. Worth, I believe you stated that the value of the net

20   operating losses is ten to twelve billion dollars, is that

21   correct?

22   A.   Yes, sir.

23   Q.   Is that their market value to acquiring a corporation?

24   A.   No.

25   Q.   Okay.

280

1    A.    That is the value implicit in the value of NewCo.  So it

2    is the value of those tax assets to a fully operational NewCo.

3    Q.    Okay.  So on page 22 of your report you have the MPV at

4    37.3 to 53.9, is that correct?  Page -- I think it was 22.

5    A.    22.

6              THE COURT:  22 of the exhibit, the one that said to

7    NewCo DCF?

8              MR. PARKER:  Yes, sir.

9    A.    Can you repeat the question?

10    Q.    Maybe I misheard your testimony that's why I'm asking.

11    But you said the MPV is between 37.3 and 53.9?

12    A.    That is the MPV of the base case, value of the equity in a

13    base case, just in a cash flow analysis.

14    Q.    Okay.  So that has nothing to do with the net operating

15    losses?

16    A.    Included in that value it is an estimate of the value of

17    the net operating losses to NewCo.

18    Q.    Okay.  Was there anywhere on this page where you had the

19    value of the net operating losses?

20    A.    No.  It's implicit in the core enterprise value.

21    Q.    Okay.  I'm curious how you came up with a ten to twelve

22    billion dollar figure for the net operating losses?

23    A.    We valued the business as a full taxpayer.

24    Q.    Uh-huh.

25    A.    And a discounted cash flow analysis.  And separately we

281

1    valued the usage of the NOLs based on the projected taxable

2    earnings of the U.S. company, and of all the companies around

3    the world.

4    Q.   Do you know what the net operating losses of Old GM are

5    right now?

6    A.   The face value of them escapes me right now.

7    Q.   Has old GM had operating losses of about eighty-eight

8    billion dollars over the last five years, does that sound about

9    right?

10   A.   I don't know.

11   Q.   You're being offered as an expert witness, right?

12   A.   Yes, sir.

13   Q.   Okay.  Assuming for a moment that the net operating losses

14   for the last five years were somewhere in the eight billion

15   dollar range, what would be their value to a company?

16            THE COURT:  Sustained, under what circumstances?  In

17   a liquidation as a going concern?

18   Q.   Well, first off, what would be their worth to the company

19   in tax savings?

20   A.   Which one?

21   Q.   The company who has them.  Suppose GM started to make

22   profits again, what would that be in tax savings to them, what

23   would it represent?

24   A.   The value of those --

25            THE COURT:  Wait just a minute, an attorney rises to

282

1    be heard.  You've got to pause.  Mr. Miller, go ahead.

2             MR. MILLER:  Your Honor, please, I object.  It's pure

3    speculation, there's no foundation laid.

4             THE COURT:  I'm going to sustain.  Mr. Parker, if you

5    want to ask about this you'd better give a lot more facts.

6             MR. PARKER:  Okay.

7    Q.   Do that operating losses have a market value to someone

8    who could purchase them to use them to offset income?

9    A.   In isolation?

10   Q.   Yeah.

11   A.   If one can structure a purchase in such a way that the

12   acquirer can take advantage of them?

13   Q.   Yes.

14   A.   Yes, they can have value.

15   Q.   What kind of value can they have?

16   A.   The value --

17            MR. MILLER:  Excuse me.  Again, Your Honor.

18            MR. PARKER:  I'm asking for market value.

19            THE COURT:  Well, I'm going to overrule the

20   objection.  It's a big question and it deserves a big answer.

21   You can give an answer commensurate with the question that was

22   asked.

23   A.   The value of the net operating losses depends on their

24   ability to shield taxes in the future.

25   Q.   Okay.  Do you know what the corporate tax rate is?

283

1    A.    I would assume thirty-five percent.

2    Q.    So thirty-five percent of eighty billion would be

3    something like twenty-eight billion?  That's the amount that --

4              MR. MILLER:  Your Honor, that's the --

5              THE COURT:  Sustained.

6    Q.    Okay.  On page 15 of your -- I think it's your Exhibit F,

7    the one that says Analysis of Proposed Transaction Summary

8    Purchase Price Analysis.

9    A.    Yes, sir.

10   Q.    Okay.  I notice that in analyzing the -- I take it this is

11   an order to analyze the fair price, the fair purchase price, is

12   that correct, of the assets that Old GM is giving to New GM?

13   A.    Sorry, can you rephrase the question?

14   Q.    What was the purpose of the analysis of proposed

15   transaction summary purchase price analysis?

16   A.    To compare the purchase price as defined in the MSBA to

17   the liquidation analysis performed by AlixPartners.

18   Q.    Okay.  You took the credit bid of 48.7 billion, added

19   assumed liabilities of 48.4, added the 7.4 to 9.8 that's

20   allegedly being given to OldCo and sub-rated out 13.4 billion

21   in cash, is that correct?

22   A.    Correct.

23   Q.    And you came up with ninety-one to ninety-three billion?

24   A.    Correct.

25   Q.    The thing I'm curious about here is, a 48.4 billion that

284

1    you've got, does that include the 20.5 billion that's going to

2    the UAW VEBA is giving up a claim of 20.5 billion against old

3    UAW -- sorry, against Old GM when the transaction has been

4    completed, I believe that was testified to by Mr. -- the new

5    CEO of GM.

6    A.    Mr. Henderson.

7    Q.    Yeah.  So does that include the twenty -- it says 48.4

8    billion in assumed liabilities, does that include the

9    liabilities owed to the UAW VEBA?

10    A.    No.

11    Q.    Okay.  One of the things in there it says is employee

12    obligations, so what does that mean?

13    A.    Can you flip to page 25?

14    Q.    Sure.

15    A.    It'll break it down for you, what was included in that

16    obligation.  The employee obligations you're referring to are

17    payroll and pensions.

18    Q.    Okay.  The government's credit bid is for roughly forty-

19    nine billion, is that correct?

20    A.    That's correct.

21    Q.    Okay.  Other than 400 million that's owed by GM Canada to

22    the Canadian government, is the Canadian government presently a

23    creditor of GM?

24    A.    Yes.

25    Q.    How much are they owed?

285

1   A.   In the DIP facility of 33.3 --

2   Q.   Uh-huh.

3   A.   -- the total amount of Canadian participation in the 33.3

4   should be about 3.2 of the --

5   Q.   Okay.  So if I recall the documents correctly Canada is

6   supposed to be contributing roughly nine billion dollars

7   between debt forgiveness and new money, is that correct?

8   A.   Could you rephrase the question?

9   Q.   Okay.  Canada's contribution to the New GM roughly equals

10  about nine billion dollars, is that correct?

11  A.   I think about nine and a half.

12  Q.   Nine and a half.  And that includes debt forgiveness for

13  new money, correct?

14  A.   I don't understand the distinction debt forgiveness and

15  new money.

16  Q.   Well, right now it's contributing 3.2 million toward the

17  33.3 million, correct of financing?

18  A.   Correct.

19  Q.   Okay.  It's -- where's the other six million?

20  A.   That would be lent directly to GMCL, GM's Canadian

21  operation.

22  Q.   Post the transaction?

23  A.   Some pre, some post.

24  Q.   Okay.  Then it sounds like the forty-nine billion dollar

25  credit bid that the government's making includes 3.2 billion

286

1    that goes to Canada, is that correct?

2    A.    Correct.

3    Q.    So the government's contribution -- the government's share

4    of the credit bid is roughly forty-six billion?

5    A.    That sounds fair.

6    Q.    19.4 billion of which is pre-bankruptcy debt and the

7    remainder is post-bankruptcy debt, right?

8    A.    Correct.

9    Q.    So you were earlier asked -- you admitted that some of the

10   60.8 percent of equity that the government is getting from New

11   GM or retaining with New GM is due to pre-bankruptcy debt, the

12   19.4 billion.  It would sound like it wouldn't be that hard to

13   do a calculation, would it?

14          MR. MILLER:  Your Honor, please.  This is --

15   Mr. Eckstein did this.  This has been on the record and he

16   keeps repeating the same stuff.

17          THE COURT:  Sustained.  Mr. Parker, I'm not going to

18   cut you off but you've got to be more focused on new stuff.

19      (Pause)

20   Q.    I'm also confused by one other thing, is the value of New

21   GM, the stock value, between thirty-eight and forty billion or

22   is it between thirty-eight and forty-eight billion?  I'm not

23   sure which one I heard.

24   A.    We chose a reference rate of thirty-eight to forty-eight.

25   Q.    Thirty-eight to forty-eight?  Okay.

287

1          MR. PARKER:  No further questions, Your Honor.

2          THE COURT:  Are we now ready for any redirect?

3          MR. MILLER:  Just one question, Your Honor.

4          THE COURT:  Go ahead, Mr. Miller.  Come on up.

5    REDIRECT EXAMINATION

6    BY MR. MILLER:

7    Q.    Mr. Worth, how long have you been in the investment

8    banking business?

9    A.    Over twenty years.

10   Q.    And during the course of your career have you participated

11   and formulated fairness opinions outside the Chapter 11

12   context?

13   A.    Many.

14   Q.    How many?

15   A.    Over thirty.

16   Q.    Thank you.

17          THE COURT:  Any recross?  All right.  None.  Mr.

18   Worth, you're excused.  Folks, I'd like to go right into Mr.

19   Koch now unless people need a break.  Mr. Richman?

20          MR. RICHMAN:  That's fine.  I do want to revise one

21   statement I made earlier.  Bbased on Mr. Worth's testimony I

22   would like some limited question of Mr. Repko.

23          THE COURT:  All right.

24          MR. RICHMAN:  And that can be tomorrow.

25          THE COURT:  Okay.  Do we still have consensus that we

288

1    want to ask Mr. Koch to come up now?

2             MR. MILLER:  Yes.  I'm on the fence on that, Your

3    Honor.  If everybody wants to proceed we can proceed.

4             THE COURT:  I think Mr. Koch is on the fence because

5    you're on the fence.

6             MR. RICHMAN:  He's at the gate, Your Honor.

7             THE COURT:  Come on up, please, Mr. Koch.  Mr. Worth,

8    you want to give him your spot, please?

9        (Pause)

10            THE COURT:  Mr. Koch, after you get in there, you

11   want to remain standing for a moment?

12       (Witness duly sworn)

13            THE COURT:  Okay.  Thank you.  Have a seat please,

14   Mr. Koch.  I think on balance you need to keep the microphone

15   close to you.

16   CROSS-EXAMINATION

17   BY MR. RICHMAN:

18   Q.   Good evening, Mr. Koch.

19   A.   Good evening.

20   Q.   Could you please describe your affiliation at present and

21   your assignment for General Motors, when it began, what it

22   consists of?

23   A.   I'm a managing director and vice chairman with

24   AlixPartners.  And beginning in December we began serving as

25   advisors to General Motors, primarily focused on contingency

289

1    planning in the event that an out-of-court solution was not

2    possible.  We were working with the company to prepare for a

3    possible bankruptcy filing and that's been the substance of

4    what we've been working on.

5    Q.    And your declaration, I want to ask you if you have it in

6    front of you, it's Debtor's Exhibit 5 in the binder.

7          (Pause)

8    A.    I have it.

9    Q.    That includes within it a liquidation analysis, doesn't

10   it?

11   A.    It does.

12   Q.    Could you explain who asked you to prepare that and what

13   the purpose of it was?

14   A.    We were asked by the company's counsel, Weil Gotshal, to

15   prepare that.  And it is for the purpose of demonstrating that

16   the -- what the creditors will receive under a proposed

17   transaction with the U.S. Treasury is at least as great as what

18   creditors would receive in a liquidation.

19   Q.    When were you asked to prepare that?

20   A.    I'm going to guess that it was early in May, perhaps a

21   little earlier.

22   Q.    Were you asked to prepare a liquidation analysis in

23   connection with the proposed Chapter 11 plan?

24   A.    The liquidation analysis would have been the same in a

25   Chapter 11 regardless of how it was to be used in a chapter

290

1    proceeding.

2    Q.   Were you surprised that nobody objected to the proposed

3    transaction on the basis of perhaps a belief they would receive

4    more in liquidation value?

5            MR. MILLER:  Objection, Your Honor, whether Mr. Koch

6    was surprised or not is not relevant to what's going on in

7    today's courtroom.

8            THE COURT:  Mr. Richman, help me on this one.

9            MR. RICHMAN:  Your Honor, I'll move on.

10           THE COURT:  Okay.  Objection sustained.

11   Q.   Did you hear my discussion earlier with Mr. Worth about

12   NOLs?

13   A.   I did.

14   Q.   Do you have understanding of NOLs in your experience?

15   A.   I have some.  I'm not a tax attorney but I have some

16   understanding.

17   Q.   You have been in the business a long time, I know.

18   A.   I have.

19   Q.   About how many years have you been doing financial

20   advisory work?

21   A.   A long time.

22   Q.   Ballpark.

23   A.   More than forty years.

24   Q.   More than forty years, congratulations.

25   A.   Thank you.

291

1    Q.    Approximately how many Chapter 11 cases have you been

2    involved with, probably hundreds?

3    A.    Certainly dozens.

4    Q.    In forty years I bet it's more than that.

5    A.    Well, I haven't been doing restructuring work for all of

6    that forty years.

7    Q.    Do you have an understanding from your experience of how a

8    company can keep NOLs or transfer NOLs to a purchaser?

9    A.    It is a -- it is relatively difficult to structure a

10   transaction where NOLs will survive.  And the specifics of how

11   to do that are really beyond my expertise.  In a Chapter 11,

12   which is a reorganization where there's a change of control,

13   there are typically limitations that are placed on the use of

14   NOLs.  I know that there was some legislation that

15   benefitted -- will benefit the OEMs, General Motors in the use

16   of NOLs going forward.  But I'm not familiar -- I'm not

17   conversant with the details.

18   Q.    You said before that this liquidation analysis would be

19   the same analysis that would be applied for a conventional

20   Chapter 11 plan, is that correct?

21   A.    Yes.

22   Q.    So if the debtors had filed a Chapter 11 plan on June 1st

23   and tried to get confirmation on an accelerated basis, the same

24   liquidation analysis would have been used for that exercise,

25   correct?

292

1    A.    I believe that's correct.

2              MR. RICHMAN:  Excuse me one second, Your Honor.

3              THE COURT:  Sure.

4         (Pause)

5    Q.    And just to be clear, when I asked you if the liquidation

6    analysis would be the same, this liquidation analysis would be

7    used to show that creditors under a Chapter 11 plan would

8    receive more than the value shown in the liquidation analysis,

9    correct?

10   A.    Presumably that would be the case, yes.

11   Q.    Okay.

12   A.    The liquidation analysis would show what it shows.

13   Q.    For a liquidation of the company?

14   A.    Correct.

15   Q.    Thank you.

16             MR. RICHMAN:  That's all for now, Your Honor.

17             THE COURT:  Okay.  Mr. Eckstein, did you want to

18   question too?

19             MR. ECKSTEIN:  Yes.

20   CROSS-EXAMINATION

21   BY MR. ECKSTEIN:

22   Q.    Mr. Koch, good evening.

23   A.    Good evening.

24   Q.    My understanding is that currently you are the chief

25   restructuring officer for General Motors, is that correct?

293

1    A.    That is correct.

2    Q.    And am I correct that once the proposed transaction

3    closes, that you are anticipated to become the CEO of what's

4    referred to as OldCo, am I correct?

5    A.    That is correct.

6    Q.    And what do you understand your responsibilities as CEO of

7    OldCo would be?

8    A.    Well, it would be to oversee the wind down of OldCo, the

9    settlement of claims and the distribution of the stock that --

10   of NewCo that is held by OldCo.

11   Q.    And do you anticipate that OldCo will be retaining any of

12   the employees of current General Motors?

13   A.    The current plan is for all employees of General Motors to

14   move to NewCo.

15   Q.    So the employees of OldCo will essentially be yourself and

16   other AlixPartners individuals, is that correct?

17   A.    A number of AlixPartners individuals as well as other

18   people, perhaps, that we -- perhaps retirees of General Motors

19   that have a particular expertise that, you know, we may retain

20   as consultants or as contractors.

21   Q.    So am I correct that an important part of implementing the

22   wind down of OldCo will be the implementation of a transition

23   of services agreement between OldCo and NewCo, am I correct?

24   A.    It is an element.  It's an important element, yes.

25   Q.    Do you recall hearing Mr. Henderson testify that the

294

1    transition services agreement was one of the key transactional

2    documents being negotiated in connection with the transaction?

3    A.    Yes.

4    Q.    And are you responsible at the company -- principally

5    responsible for negotiating the transition of services

6    agreement?

7    A.    I and my colleagues have, on behalf of OldCo, have taken a

8    lead role in negotiating those, yes.

9    Q.    And I assume you would agree that it's important to OldCo

10    to make sure that we have as much cooperation as possible from

11    NewCo once the transaction closes, am I correct?

12    A.    That is correct.

13    Q.    Now I'm assuming one of the areas where cooperation is

14    going to be needed is going to be to maintain access to the

15    legal staff at NewCo in terms of assisting OldCo in winding

16    down the assets and the liabilities, am I correct?

17    A.    Certainly we need access to legal records.  I believe the

18    decision has been made that GM legal will not be providing

19    services to OldCo going forward.

20    Q.    Who made the decision that GM legal will not be providing

21    services to OldCo, Mr. Koch?

22    A.    I believe GM legal.

23    Q.    And sitting here today, do you know how you're going to

24    get the legal advice necessary to deal with all of the

25    remaining contracts and claims that are being left with OldCo?

295

1    A.    Yeah.  I believe we will primarily work with debtors'

2    counsel.  Weil Gotshal will remain our counsel going forward.

3    So we'll primarily rely on them.  To the extent necessary,

4    we'll retain other law firms and if necessary we'll hire

5    attorneys internally.

6    Q.    Did you participate in the negotiation of that provision,

7    Mr. Koch?

8    A.    I would say yes.

9    Q.    In your opinion, is this the relationship that you think

10   is most advantageous to OldCo going forward with respect to the

11   provision of legal services?

12          MR. MILLER:  Objection, Your Honor.  I don't know.

13   This line of testimony doesn't relate to the issues which are

14   before the Court.

15          THE COURT:  Overruled.

16   A.    I believe it's a satisfactory result.

17   Q.    Would it be fair for me to assume that it would be

18   preferable to OldCo if it had ongoing access to the in-house

19   General Motors legal staff, isn't that correct?

20   A.    I believe that I've answered that it's a satisfactory

21   arrangement.

22   Q.    In connection with the -- am I correct that part of the

23   transaction that's being considered by the Court is an

24   arrangement whereby OldCo will be leasing various plants to

25   NewCo post the closing of the transaction?

296

1    A.    That is correct.

2    Q.    Approximately how many plants do you expect will be left

3    with OldCo and leased to NewCo?

4    A.    I'm going to say there might be -- I don't have a number

5    on the top of my head, you know.  I would say in the range of

6    ten plants, perhaps, that have varying shutdown dates that have

7    been identified that NewCo will lease from OldCo until the date

8    that they're taken out of service.

9    Q.    And do you know how the determination was made to leave

10   certain plants with OldCo rather than have them go to NewCo?

11   A.    I believe that was based upon the company's production

12   plans going forward and in an assessment of the vehicles that

13   are being produced and a whole range of business factors that

14   led them to that conclusion.

15   Q.    And so there are ten plants, thereabout, that are being

16   left with OldCo and is there going to be a lease agreement

17   that's being entered into between OldCo and NewCo in connection

18   with these plants?

19   A.    Yes, there is.

20   Q.    And does this lease agreement essentially provide for

21   NewCo to assume the ongoing responsibilities in connection with

22   these plants while the plants are being used by NewCo in its

23   business?

24   A.    Yes, they're constructed as triple-net leases plus one

25   dollar a foot rental income for OldCo.

297

1    Q.   So it's fair for me to assume that the business intention

2    is for OldCo not to have ongoing liabilities arising out of

3    these plants while these plants are being utilized by NewCo, is

4    that correct?

5    A.   Let me phrase it this way, to the extent that liabilities

6    are created between the date of the sale and the date that GM

7    exits, NewCo would be responsible for those matters.  To the

8    extent there are existing environmental issues, they would be

9    dealt with by OldCo.

10   Q.   So let me understanding, you're saying if an environmental

11   liability exists today, that liability is being left with

12   OldCo?

13   A.   Yes, sir.

14   Q.   But if an environmental liability arises post closing

15   while the plant is being operated by NewCo, that would be a

16   liability of NewCo, is that what you're saying?

17   A.   That is correct.

18   Q.   And at this point in time are you aware of any

19   environmental liabilities that exist with respect to the plants

20   that are being retained by OldCo?

21   A.   Yes, we are.

22   Q.   And have those been included in any estimates of the wind

23   down liabilities that are expected to be the responsibility of

24   OldCo?

25   A.   Yes, they have.

298

1    Q.    And do you have any estimate as to what those amounts are?

2    A.    We estimate presently approximately 530 million dollars.

3    Q.    And have those liabilities been included in the 950

4    million dollars that is being left with OldCo in order to

5    satisfy the wind down responsibilities?

6    A.    We're having ongoing discussions with General Motors as

7    well as with the U.S. Treasury as to what the wind down budget

8    needs to be.  And so we're working with draft -- with a draft

9    budget.  And to the extent that either new liabilities or we

10   learn of liabilities that are going to be left in OldCo that

11   either we were unaware of or that we thought -- did not realize

12   were to be settled in cash, then we needed to increase the

13   budget for that.

14        Similarly, as we have learned more from environmental

15   consultants that we retained, we've adjusted the estimated cost

16   to reflect what we've learned from our environmental

17   consultants.

18   Q.    Other than the environmental liabilities that you just

19   addressed, are there any other categories of liabilities

20   associated with the plants that will be leased to NewCo that

21   are not being assumed by NewCo under the master lease

22   agreement?

23   A.    May I ask you to repeat that, please?

24   Q.    Other than the environmental liabilities that you just

25   referred to, are you aware of any other category of liability

299

1    that is not being assumed by NewCo in connection with these

2    plants that are being leased to NewCo post closing?

3    A.    Yes.  Plant decommissioning cost and holding cost of the

4    property after GM exists, after NewCo exits, property taxes,

5    insurance, security, those costs will remain with OldCo.

6    Q.   And are these costs -- have they been included in the wind

7    down budget that you've prepared in connection with what it

8    will cost to wind down OldCo?

9    A.   We have.

10   Q.   And you believe that there are sufficient reserves to deal

11   with the costs you've just described?

12   A.   We do.

13   Q.   Are you familiar with the categories of liabilities,

14   prepetition liabilities, that are being retained by OldCo?

15   A.   I believe I'm generally familiar, yes.

16   Q.   Sitting here today, do you have an estimate of what those

17   liabilities will aggregate?

18   A.   No.

19   Q.   Have you prepared any analyses that would set forth what

20   those liabilities would aggregate?

21   A.   No.

22   Q.   Is it fair for me to assume that this is an exercise that

23   will need to be undertaken post closing?

24   A.   Yes, sir.

25   Q.   Do you have any sense of how long that exercise is likely

300

1    to take?

2    A.    We think that it will probably be first quarter 2010 to

3    second quarter 2010 before we'll be in a position to file a

4    liquidating plan at the earliest.  And we'll need to set a bar

5    date so I think it'll probably be early in 2010 that we'll be

6    in a position to estimate liabilities.

7    Q.    Mr. Koch, in your capacity as CRO and your future capacity

8    as the CEO of OldCo, is it your expectation that the -- that

9    OldCo will have sufficient assets to satisfy the administrative

10   and priority obligations being incurred by General Motors?

11   A.    To the extent that claims such as cure claims are not

12   assumed by NewCo, we have had ongoing discussions with the

13   Treasury.  They have more diligence work to do on the budget

14   but it has been reaffirmed that it is their intention to leave

15   behind adequate assets to satisfy the liabilities.  And so I

16   have comfort that the answer to your question is yes.

17   Q.    Thank you, sir.

18           MR. ECKSTEIN:  No further questions.

19           THE COURT:  Before you come up, Mr. Kennedy, just

20   give me a second, please.

21       (Pause)

22           THE COURT:  Okay.  Mr. Kennedy, whenever you're

23   ready.

24       (Pause)

25   CROSS-EXAMINATION

301

1    BY MR. KENNEDY:

2    Q.    Good evening, Mr. Koch.  My name is Tom Kennedy.  I'm

3    acting on behalf of the IUE-CWA, the steel workers and the

4    operating engineers in this proceeding.  I just have a couple

5    of questions.

6        How long do you expect the wind up of General Motors to

7    take if the 363 sale transaction is approved?

8    A.    I think the heavy lifting we'll move as quickly as we can.

9    I think the heavy lifting will be finished in two to three

10   years.  And there undoubtedly will be some aspects that may

11   drag on a couple of years longer than that.

12   Q.    Are you aware that Old GM has a book value obligation of

13   3.7 billion dollars to its non UAW unions for post retirement

14   life and health?

15   A.    Yes, sir.

16   Q.    And you indicated a moment ago that Treasury has committed

17   to provide enough money to Old GM to satisfy its wind down

18   obligations, is that correct?

19   A.    That's correct.

20   Q.    Is any part of that 950 million dollar wind down budget,

21   or whatever it ends up being, intended to satisfy the claims of

22   non-UAW union retirees for their health and welfare?

23   A.    There is a portion that is anticipated.  We do anticipate

24   a contract rejection procedure.  And so there is a portion that

25   is estimated that will be an administrative expense prior to

302

1    the consummation of that contract rejection action.

2    Q.    Are you familiar with the phrase Section 1113 of the

3    Bankruptcy Code?

4    A.    Yes, sir.

5    Q.    And is that what you refer to when you used the words

6    contract rejection a moment ago?

7    A.    Yes, sir.

8    Q.    Are you also familiar with the term Section 1114 of the

9    Bankruptcy Code?

10    A.    Yes, sir.

11    Q.    And you're aware that that's a section that deals with

12    post retirement health obligations?

13    A.    Yes, sir.

14    Q.    And is it your anticipation, as we sit here today, that if

15    the 363 sale's process is approved, Old GM will begin a Section

16    1114 process to cancel the health and welfare owed to non-UAW

17    union members?

18    A.    Yes, sir.

19    Q.    And when would you anticipate doing that?

20    A.    Next week.

21            MR. KENNEDY:  All right.  I have no other questions,

22    Your Honor.

23            THE COURT:  Okay.  Thank you, Mr. Kennedy.

24    CROSS-EXAMINATION

25    BY MR. BRESSLER:

303

1    Q.    Good evening, Mr. Koch.  My name is Barry Bressler, I

2    represent the Ad Hoc Committee of Consumer Victims, product

3    liability tort claimants and I just have a couple of questions.

4         Have you contemplated a procedure yet for liquidating the

5    existing product liability tort claims?

6    A.    Not in detail but we have contemplated that we would look

7    to put in place a mediation process.

8    Q.    And has the cost of handling that procedure been included

9    in the wind down budget?

10   A.    Yes, sir.

11   Q.    Are you contemplating a binding mediation process or

12   mediation process with some sort of appeals?

13   A.    We have not gotten that far.

14              MR. BRESSLER:  Thank you, sir.

15              THE COURT:  Okay.  Mr. Esserman?

16              MR. ESSERMAN:  Just a few questions, Your Honor.

17              THE COURT:  Okay.

18   CROSS-EXAMINATION

19   BY MR. ESSERMAN:

20   Q.    Good evening, Mr. Koch.  My name is Sandy Esserman.  I'm

21   counsel to the Ad Hoc Asbestos Committee.  I just have a few

22   questions for you on your testimony.  As it stands now, the

23   wind down budget is set at 950 million, is that correct?

24   A.    That number has been referred to, that would not be the

25   amount that we're currently anticipating.

304

1    Q.    And what amount are you anticipating?

2    A.    We currently believe that wind down will be something

3    slightly in excess of 1.25 billion dollars.

4         THE COURT:  Pause, please, Mr. Esserman.  Did you say

5    1.25 billion, Mr. Koch?

6         THE WITNESS:  Yes, Your Honor.

7    Q.    Has the United States Treasury committed to leave 1.25

8    billion dollars behind in this estate to liquidate it?

9    A.    What the treasury has committed to us is that they will

10   meet with us, we'll work through -- they need to do some more

11   diligence on the wind down budget.  But it is their stated

12   intention to leave us with sufficient cash to satisfy the costs

13   estimated in the wind down budget that is ultimately agreed to.

14   Q.    Well, what happens if the Treasury Department disagrees

15   with you on how much it's going to wind down this estate and

16   this Court has approved a sale?

17   A.    I expect that we will have reached agreement with the U.S.

18   Treasury before that occurs.

19   Q.    Well, this Court may rule tomorrow or the next day, are

20   you anticipating an agreement between tonight as we sit here

21   today and tomorrow morning such that that agreement will be in

22   writing and circulated to the creditors?

23   A.    I don't know that it would be in writing but it will be

24   documented.

25   Q.    You mean not in writing, I always thought documented was

305

1    in writing.

2    A.    Sir, you asking me to speculate as to how long it's going

3    to take to generate a legal agreement.  What I'm telling you is

4    that I'm relying on what the Treasury folks have said.  They've

5    been very straightforward to work with so far, I anticipate

6    they will continue to be straightforward to work with.  And I

7    believe that we will have, in ample time, what is needed to

8    document the agreement.

9    Q.    You know, Mr. Koch, you're right it is speculation.

10   Because as you sit here today you don't know whether the

11   treasury department will agree to a budget that will adequately

12   fund a wind down of this estate, do you?  You're hopeful.  I

13   understand that.

14   A.    Well --

15   Q.    But you don't know that, do you?

16   A.    Well, I know it -- I believe I do know it because

17   yesterday my partner and I talked with one of the treasury

18   people who reaffirmed that that is the intention of the

19   Treasury to do that.

20   Q.    But you have nothing in writing from the U.S. Treasury on

21   this subject, do you?

22   A.    I do not today, no.

23   Q.    Okay.  And yet you're here asking the Court to approve a

24   sale which may leave inadequate funds for a wind down budget if

25   you and the Treasury don't agree, isn't that what you're asking

306

1   this Court to do?

2   A.   Sir, I'm not asking the Court to approve a sale.

3   Q.   You're not?  Okay.  You're not asking the Court to approve

4   the sale?  Okay.  Would you like this Court to deny the sale?

5   A.   No.

6   Q.   Okay.  As it sits today, if there are no further

7   agreements with the United States Treasury, what is the amount

8   of money that the United States Treasury has allowed as a wind

9   down budget of this estate?

10  A.   I believe the number is 950 million.

11  Q.   And it's your view that that number is inadequate?

12       MR. SCHWARTZ:  I'm sorry; I think documents were

13  filed last night that say at least 950 million dollars.

14       MR. ESSERMAN:  I don't know what they filed last

15  night but --

16       THE COURT:  Well --

17       MR. ESSERMAN:  My point simply, Your Honor --

18       THE COURT:  No, Mr. Esserman.

19       MR. ESSERMAN:  I apologize.

20       THE COURT:  Thank you.  On the one hand I can

21  understand why you might not know what something that was filed

22  last night says.  But on the other hand, once you've been told

23  that there's a document out there that may be inconsistent with

24  the premise of your question, I'm not going to permit you to

25  ask a question premised upon a fact that's in doubt until it's

307

1    clarified.  And frankly, if a lawyer, any lawyer on any side of

2    this case makes a representation to me, until he or she has

3    shown to me that that lawyer's own reliability is unreliable, I

4    think a representation from a lawyer in this courtroom is good

5    enough for me.

6         Now there's a problem with a premise so you can ask a

7    question that doesn't have that premise.  Or if you think it's

8    so important, I'll give you the opportunity to ask more

9    questions of Mr. Koch tomorrow after you can see if Mr.

10   Schwartz is lying to you and lying to me when that

11   representation was made.

12        MR. ESSERMAN:  Your Honor, I would have no further

13   questions and, frankly, would withdraw every question I asked

14   if Mr. Schwartz would stand up and say we're committed to fund

15   the estate for a wind up budget of --

16        THE COURT:  No.  We're not going to make let's make a

17   deal here.  What we will do is you're entitled to test Mr.

18   Schwartz' credibility in making a representation to me, if you

19   want to.

20        MR. ESSERMAN:  Okay.  Your Honor, it's -- there's

21   nothing nefarious here.  I'm just concerned, from the estate's

22   standpoint, that there's enough money being left behind.  And I

23   get concerned --

24        THE COURT:  Mr. Esserman, you made that point to me

25   between five and ten minutes ago.  I understood it when Mr.

308

1    Eckstein made it.

2         MR. ESSERMAN:  Okay.

3         THE COURT:  I understood it when you made the first

4    five or ten questions of your further examination and I

5    understand when you asked the question, in words or in

6    substance, there isn't anything in writing yet and Mr. Koch

7    pretty much agreed with you.  Not pretty much, totally agreed

8    with you.  You made your point at that point in time.

9         MR. ESSERMAN:  I'm done and I apologize to the Court.

10        THE COURT:  All right.  Thank you.  Thank you.  Other

11   objectors?  Okay, Mr. Parker, you're up, please.

12        (Pause)

13   CROSS-EXAMINATION

14   BY MR. PARKER:

15   Q.   Mr. Koch.  Hi.  I'm Oliver Parker.  I've got a couple of

16   questions for you.  The -- your liquidation value that you did,

17   as part of the liquidation value, did you make a calculation of

18   what the net operating losses might be worth to an acquiring

19   company in a liquidation?

20   A.   Sir, in a Chapter 7 liquidation, net operating losses

21   would have zero value.

22   Q.   Okay.  In a Chapter 7 liquidation, a -- the corporate

23   shell could not be sold independently of the assets?

24   A.   The -- I believe, sir, that the rules surrounding

25   survivability of net operating losses would really preclude

309

1   that from occurring.

2   Q.   Okay.  You're going to be the chief restructuring officer

3   of the new -- I'm sorry, of the old company, correct?  Sorry,

4   the new CEO?

5   A.   Yes, sir.

6   Q.   When -- are there any other liabilities that are going to

7   be administrative expenses besides the environmental liability

8   and, of course, the cost of administration and the cost of the

9   mediation process that you're talking about?

10          MR. MILLER:  In Mr. Parker's question, he said the

11  cost of administration.  That includes everything that relates

12  to the administration.  So I don't know what he's talking

13  about.

14          THE COURT:  Sustained as to form.  But you can

15  rephrase, Mr. Parker.

16          MR. PARKER:  Okay.

17  Q.   Besides the cost of actually hiring some people like

18  yourself and others to wind up OldCo, you indicated that there

19  were some other costs of administration; there was

20  environmental costs of -- I think you said something like 530

21  million dollars; there were costs of mediation for the tort

22  claimants to try to settle with them.  Are there any other

23  costs, administrative or priority costs, that you anticipate?

24  A.   Well, there will be some priority tax claims.  We don't

25  have an estimate of their amount, but all of the expenses that

310

1    we incur, whether it be wind-down costs or holding costs for

2    plants that are being decommissioned, all of those would be, in

3    my view, costs of administration that are included in as

4    administrative expenses.

5    Q.   Are those plants going to have any value?

6    A.   Well, we hope so, but they're going to be -- they're going

7    to be very difficult to -- they're going to be very difficult

8    to either sell or dispose of.  Many, if not most, have some

9    form of environmental contamination that will need to be dealt

10   with.  So we'll have a very difficult time.  We'll do the best

11   that we can.

12   Q.   Do you know, is the Treasury Department willing to amend

13   the contract with General Motors to provide that if the costs

14   of administration exceed their estimate that there will be a --

15   that they will bring additional money to the table?

16           MR. SCHWARTZ:  Objection.

17           THE COURT:  Asked and answered?

18           MR. SCHWARTZ:  Asked and answered.

19           THE COURT:  Sustained.

20   Q.   Okay.  The 950 million, or whatever it turns out to be,

21   the money that's given to wind down the estate to pay the cost

22   of administration, will that have a lien or claim on the ten

23   percent stock and fifteen percent warrants that are supposed to

24   be distributed?

25   A.   I believe that as -- that it will not have a lien on

311

1    the -- it will not have a lien on the stock, but the -- it will

2    be a nonrecourse loan to the Treasury.  So the stock of New GM

3    will be held free and clear in OldCo until we're in a position

4    to make a distribution to the creditors.

5    Q.    And the U.S. Treasury will not be one of the creditors

6    that gets a distribution?

7    A.    That is my understanding, sir, unless --

8         MR. SCHWARTZ:  Objection.  To clarify, that's on

9    account of the LSA and the DIP.

10        THE COURT:  All right, time out here, because I

11   think, in essence, you were trying to correct Mr. Parker.  I

12   don't have the ability to make an evidentiary ruling on whether

13   this question is objectionable or not.  I think what we need to

14   do is I have to temporarily sustain that objection.  You have

15   to lay a foundation, Mr. Parker.  And that's the way we would

16   have to do it by the book, by conditional use of evidence.

17   Maybe if you want to take eight seconds to talk to Mr. Schwartz

18   about how you can ask the question so he won't object to it,

19   that would save us a lot of time, more time than going by the

20   book.

21        (Pause)

22   Q.    What I'm trying to find out is, is the government going to

23   be getting some of the ten percent stock and fifteen percent

24   warrants that's going to Old Company because of the 950 million

25   dollars?

312

1    A.    No, sir.

2    Q.    Okay, so Treasury isn't looking for reimbursement from the

3    stock and the warrants for the 950, or whatever it is?

4              MR. MILLER:  Answered, Your Honor.

5              THE COURT:  Sustained.

6              MR. PARKER:  Okay.

7    Q.    How much does it cost to decommission a plant?

8    A.    It varies by plant, but I believe it's probably on the

9    order of five or six million dollars to drain the fluids and

10   basically do the above-ground environmental that will make the

11   plant safe.

12   Q.    And how many plants are we decommissioning?

13   A.    Well, there's a total, I believe, of about sixty-nine

14   million dollars in the budget.  So that probably sounds like

15   about a dozen.

16   Q.    Okay.  The -- I realize that the cost of the 513 and 514

17   procedures, from your testimony, is going to be an

18   administrative cost, but whatever the --

19             THE COURT:  What?  What sections do those include,

20   did you say?

21             MR. PARKER:  1113 and 1114.

22             THE COURT:  Oh, okay.

23             MR. MILLER:  I'm sorry.

24   Q.    But once it's determined whatever the outstanding claim is

25   of the non-UAW unions, that's not an administrative cost, is

313

1   it?

2   A.   No, sir.

3   Q.   And while the cost of mediation is an administrative cost,

4   that is, a cost of mediation for the tort claimants, their

5   underlying claims would not be administrative costs, correct?

6   A.   That is correct.

7   Q.   Do you have any idea what you expect the total claims to

8   range, the nonadministrative claims to range?

9        MR. MILLER:  Objection, Your Honor.  Asked and

10   answered.

11        THE COURT:  It's in exhibits we have in the record,

12   Mr. Parker.

13        MR. PARKER:  Yeah, but I don't think he's testified

14   to it, Your Honor.

15        THE COURT:  If you think that his knowledge trumps

16   what's in the exhibits and is relevant for that purpose, you

17   may answer.  Go ahead, Mr. Koch.  If you have an understanding,

18   I'll let you answer.

19   A.   I did answer earlier that we do not have an estimate of

20   total claims at this time.

21   Q.   Any ballpark?

22   A.   No, sir.

23   Q.   Okay.

24        MR. PARKER:  Is it possible for us to get a copy of

25   the document that was filed yesterday, Your Honor -- I mean,

314

1    this morning, Your Honor?

2           THE COURT:  Forgive me, Mr. Parker.  I've cut you an

3    awful lot of slack about coming to the Court unprepared, and I

4    don't think it's fair to ask the other parties, or the Court,

5    to fetch for you.

6           MR. PARKER:  No, Your Honor --

7           THE COURT:  Make your presentation.  Are you talking

8    about seeing a document that's in evidence?

9           MR. PARKER:  No, sir, I'm talking about seeing a

10   document that the government represents was filed this morning.

11   None of us has seen it.

12          THE COURT:  Mr. Schwartz, is it on the electronic

13   filing system?

14          MR. SCHWARTZ:  Yes, it's, to be clear, not a document

15   that the government filed.  It's a motion the debtors filed.

16   But as to timing, actually, this has been on the docket for

17   some time.  In the final DIP order that Your Honor signed on

18   the 25th of this month, it provides for a wind-down facility,

19   quote, "in an amount not less than 950 million dollars".

20          THE COURT:  All right.  You want to let Mr. Parker

21   look over your shoulder so he can see what you were reading

22   from?

23          MR. PARKER:  Your Honor, I'm a little confused

24   because I understood when the previous person asked -- was

25   asking questions, he wanted to know whether or not there was

1    anything in writing that said the government would give 1.25

2    billion for the --

3            THE COURT:  No, he asked two separate questions, Mr.

4    Parker.

5            MR. PARKER:  And he was then informed that something

6    was filed this morning with that regard.  That's what I thought

7    I heard.

8            THE COURT:  No.  What I heard -- I guess what I hear

9    probably counts as much as anything -- I heard that management,

10    Mr. Koch, believed that it'd probably take in the ballpark of

11    about 1.2 billion to cover the administrative costs.  And I

12    heard Mr. Schwartz say -- and I also heard Mr. Koch say, and

13    this is a paraphrase, that he understood the government would

14    do that which was necessary.  The exact words were the exact

15    words, and if there's a difference between my memory, the exact

16    words trump what my memory is.

17            Now, apart from that, I think Mr. Schwartz

18    represented that a document had been filed in court that said -

19    - and, Mr. Schwartz, you can read it again now because I don't

20    think my memory should trump the words you've read.  But I

21    think we have those three separate things that were transmitted

22    to me.  Now, if anybody thinks that's wrong, I won't be so pig-

23    headed as to insist that my memory is correct.  And I certainly

24    want to hear the exact words Mr. Schwartz read once again, even

25    though I know it's repetitious.

316

1          MR. SCHWARTZ:  I think that you captured exactly what

2     I said, which was a response, I think, to the suggestion in Mr.

3     Esserman's questioning that it was precisely a 950 million

4     dollar budget.  And I rose to say that there was a document

5     filed which says it turns out to be the final DIP order, that

6     there is a wind-down facility, quote, "in an amount not less

7     than 950 million dollars".

8          THE COURT:  All right.

9          MR. PARKER:  But, Your Honor, not less than does not

10    necessarily mean they're going to go more than.

11         THE COURT:  I understand that.

12         MR. PARKER:  And I thought the line of questioning

13    was that how do we know that there'll be sufficient funds?  And

14    I had thought that we were being told that the government is --

15    Treasury is representing that there will be sufficient funds,

16    that they won't --

17         THE COURT:  Well, we haven't heard that from the

18    Treasury yet.

19         MR. PARKER:  Okay.

20         THE COURT:  I think Mr. Koch has told you his

21    understanding, which is, frankly, all you can get out of Mr.

22    Koch.

23         MR. PARKER:  Thank you, Your Honor.

24         THE COURT:  Okay.

25         MR. PARKER:  I have no further questions.

317

1          THE COURT:  Okay.  All right, any other objectors up

2    for Mr. Koch?  Redirect, Mr. Miller?

3    REDIRECT EXAMINATION

4    BY MR. MILLER:

5    Q.    Mr. Koch, you heard Mr. Worth's testimony as to the value

6    of the equity and warrants that will be the property of the

7    estate of OldCo?

8    A.    I did.

9    Q.    And do you recall what that value was?

10   A.    3.9 to 4.9 billion dollars.

11   Q.    Did you take into account the value of the warrants?

12          MR. RICHMAN:  Objection, Your Honor.  The question

13   went to Mr. Worth's testimony and what Mr. Koch recalls.  So --

14          THE COURT:  Sustained.

15          Why don't you rephrase, please, Mr. Miller?

16          MR. MILLER:  If I may, Your Honor, may I show the

17   witness -- I think it's Exhibit 3, Mr. Worth's --

18          THE COURT:  Yes, you may.

19          MR. MILLER:  -- declaration.

20   Q.    I draw your attention to page 14.  Do you see the value

21   that Mr. Worth beforehand put down, the equity value and the

22   common stock going to OldCo?

23   A.    I do.

24   Q.    And that value's how much?

25   A.    7.4 billion to 9.8 billion dollars.

318

1    Q.   So that the estate -- if that value is correct, the estate

2    of OldCo will have over 7 billion dollars of value, not

3    counting the 950 million dollars?

4    A.   That is correct.

5    Q.   At least the 950 million dollars, is that correct?

6    A.   Yes, sir.

7    Q.   In your opinion, is there any possibility of the

8    administrator -- the estate of OldCo being administratively

9    insolvent?

10   A.   No, sir.

11            MR. MILLER:  Thank you.

12            THE COURT:  All right.  Any recross?

13            MR. RICHMAN:  One second, Your Honor.

14            THE COURT:  Sure.

15       (Pause)

16            MR. RICHMAN:  Just a few, Your Honor.

17   RECROSS-EXAMINATION

18   BY MR. RICHMAN:

19   Q.   Mr. Koch, are you familiar with the widely reported

20   agreement of GM's bondholders with Treasury that was reported

21   just prior to the bankruptcy filing as to what consideration

22   they would be receiving from NewCo?

23   A.   I know only what I read in the newspaper.

24   Q.   Was that ten percent of the equity of NewCo and warrants

25   to acquire another fifteen percent were going to be what

319

1    bondholders, indeed what all unsecured creditors, could expect

2    to receive from NewCo in these Chapter 11 cases?

3            MR. MILLER:  Objection, Your Honor.  If Mr. Richman

4    has such a document, if he could show it to the witness.  All

5    Mr. Koch said is what he read in the newspaper.

6    Q.   Do you have knowledge that there is an agreement that has

7    been reported that unsecured creditors will receive ten percent

8    of the equity of NewCo and warrants to acquire another fifteen

9    percent?

10           MR. MILLER:  That assumes facts that are not in the

11   record, Your Honor, and goes beyond redirect.

12           MR. RICHMAN:  I believe it is in the record in a

13   number documents, including briefs.

14           THE COURT:  I think it does not exceed redirect, and

15   I'm going to overrule the objection with the understanding that

16   if you -- that you don't have to accept his premises if you

17   don't want to, Mr. Koch.  You can answer the question as best

18   you can.

19   A.   I have only a very general understanding.  So to make a --

20   some -- to give you a specific answer as to what my

21   understanding of the specific deal that's been reached, I don't

22   know the specific deal that's been reached.

23   Q.   Well, if there was a specific deal reached of the type I

24   just described that would provide ten percent of the equity of

25   NewCo and warrants to acquire another fifteen percent for the

320

1    benefit of all unsecured creditors, would I be correct that

2    your testimony in response to Mr. Miller's last question is

3    that unsecured creditors could not, under any reasonable

4    scenario, expect to receive those distributions?

5    A.   It is possible that we would need to sell some of the new

6    stock.  It is -- we would -- if we had 950 million dollars to

7    work with, we'll do our very best to wind down the estate at

8    minimum cost.  Any excess monies will be returned to the

9    Treasury.  I think it would be unlikely that we would get it

10   done for 950; I wouldn't rule it out entirely.  And so if we

11   were unable to get it done for 950, then it is possible we

12   would need to sell some of the stock.

13   Q.   So I would be correct in saying, then, that the -- any

14   distribution that has been set aside for unsecured creditors

15   would likely have to be invaded and diminished in order to

16   handle wind-down and other administrative costs that are not

17   being covered by Treasury --

18   A.   It is --

19   Q.   -- correct?

20   A.   That is possible.

21            MR. RICHMAN:  Thank you.

22            THE COURT:  Okay.  Mr. Eckstein?

23   RECROSS-EXAMINATION

24   BY MR. ECKSTEIN:

25   Q.   Mr. Koch, let me just clarify a couple of items that I

321

1    believe were the subject of your testimony.  Did I understand

2    you to testify that in your view this estate will have

3    sufficient assets outside of the stock that is being retained

4    by OldCo, the stock and the warrants; that this estate will

5    have sufficient liquid assets, either the 950 or some

6    additional amount of cash being provided by Treasury, to

7    satisfy the wind-down obligations of this estate?

8              MR. MILLER:  Objection, Your Honor.

9              THE COURT:  Sustained.  And here's the problem,

10   folks.  I understand the point that both of you folks are

11   making.  Mr. Miller, you made the point that there's aggregate

12   assets so that there's no way that I or another judge could

13   find the case administratively insolvent.  Mr. Eckstein is

14   making quite a different point, which is that a good chunk,

15   let's call it between 7.4 and 9.8 billion bucks' worth of

16   stock, is going to be illiquid until it's converted to cash and

17   before it's registered with the SEC without an 1145 exemption.

18   It's going to be hard to unload.  In the meantime, the estate's

19   going to be short on liquidity.

20             I understand the points that you're trying to make,

21   Mr. Epstein, but you got to ask questions that are focused on

22   liquidity as contrasted to administrative insolvency in the

23   technical sense, unless you're trying to show me something

24   different.

25             MR. ECKSTEIN:  Your Honor, and I'll save it for --

322

1    the argument I'll save for later in the hearing, but I am

2    making a somewhat different point, and that is that -- and I

3    understood Mr. Koch to testify that he expects that the amount

4    of cash that is being left in the estate by the United States

5    Treasury will be sufficient to satisfy the wind-down

6    obligations separate and apart from the stock and the warrants.

7    And it was that issue that I was going to, which subsumes the

8    liquidity issue, Your Honor.  But --

9         THE COURT:  Okay, but then if you've got further

10   nuances, I'm not keeping up with you on that.  So if you have

11   further questions that you want to develop, go ahead and do it;

12   just make them a little clearer in terms of whether you're

13   talking about assets, liquidity or something possibly --

14        MR. ECKSTEIN:  I will do so, Your Honor.  Thank you.

15        THE COURT:  Okay.  Thanks.

16   BY MR. ECKSTEIN:

17   Q.   Mr. Koch, are you familiar with negotiations that took

18   place, prior to the commencement of this case, between

19   representatives of an ad hoc committee for bondholders and the

20   United States Treasury regarding the amount of equity and

21   warrants that will be left for the benefit of unsecured

22   creditors of this estate?

23   A.   I have secondhand knowledge of those discussions.

24   Q.   And what did -- what was your understanding as to what was

25   agreed to, to be left for unsecured creditors of this estate?

323

1          MR. MILLER:  Objection, Your Honor.  It's hearsay.

2          THE COURT:  It is hearsay.  So unless it's not for

3  the truth of the matter asserted, I have to sustain Mr.

4  Miller's objection.

5          MR. ECKSTEIN:  Just a few more questions, if I may.

6          THE COURT:  Sure.  Of course.

7  **Q.   Mr. Koch, did you ever see a term sheet that summarized**

8  **the understanding reached between the bondholders and the U.S.**

9  **Treasury?**

10         MR. MILLER:  Object to the question, Your Honor.  It

11  assumes there was an agreement between the bondholders and

12  somebody.  I don't know who he's talking about.

13         THE COURT:  Sustained as to form for lack of

14  foundation.  But if you can lay the foundation, Mr. Eckstein,

15  you can try.

16  **Q.   Mr. Koch, are you familiar with a term sheet that**

17  **reflected any discussions that took place between U.S. Treasury**

18  **and an ad hoc committee of bondholders?**

19  **A.   I don't recall if I ever saw a term sheet or not.**

20         MR. ECKSTEIN:  Your Honor, may I approach the witness

21  for a moment?

22         THE COURT:  Sure.  You can go ahead and see it now.

23  But before you ask the question --

24         MR. ECKSTEIN:  I will, Your Honor.

25         THE COURT:  -- give Mr. Miller a copy, and anybody

324

1   else who needs to see it.

2       (Pause)

3   **Q.   Mr. Koch, have you ever seen this term sheet?**

4   **A.   No, sir.**

5   **Q.   So you're not familiar with it?**

6   **A.   That is correct.**

7   **Q.   Okay.**

8           MR. ECKSTEIN:  Thank you, You Honor.  I'll save the

9   question.

10          THE COURT:  Okay.  Any other objectors for Mr. Koch?

11  All right, Mr. Miller, anything further?

12          MR. MILLER:  No, sir.

13          THE COURT:  All right, Mr. Koch, you're excused.

14  Thank you.

15          THE WITNESS:  Thank you.

16          THE COURT:  Okay, folks, it's now twenty-five to 8.

17  I'd like to get a sense as to how long Mr. Repko's expected to

18  be.  If he's more than a very modest period of time, I inclined

19  to go tomorrow.

20          MR. RICHMAN:  Your Honor?

21          THE COURT:  Mr. Richman?

22          MR. RICHMAN:  With your permission, I would prefer

23  that we do that tomorrow.  I think it would be more efficient.

24  I don't know who else has questions.  There's -- I think we can

25  benefit from a break as well.

325

1          MR. MILLER:  Your Honor, can we get some idea as to

2    what Mr. Richman -- how many -- what time he expects --

3          THE COURT:  You can get an idea, but I'll tell you

4    that I'm not going to bind him to his representation.  Mr.

5    Richman, do you have a sense as to how long you're going to be?

6          MR. RICHMAN:  I'm thinking in the nature of thirty to

7    forty-five minutes.  It may be less.

8          THE COURT:  Okay.  Are there other folks who think

9    they may -- other objectors who think they want to question Mr.

10   Repko too?  All right, Mr. Parker raised his hand.  I will

11   start -- we'll do Mr. Repko tomorrow.  But, Mr. Richman, who do

12   you want to take first so that people can plan?

13         MR. RICHMAN:  Mr. Repko.

14         THE COURT:  All right.  Fair enough.  Okay then,

15   folks --

16         MR. MILLER:  Your Honor, if I might interrupt.

17         THE COURT:  Yes, Mr. Miller?

18         MR. MILLER:  There are some other matters on the

19   calendar which I think we could clear up very quickly.

20         THE COURT:  All right.  Any objection to that?

21         UNIDENTIFIED SPEAKER:  Couldn't hear.  What?

22         MR. MILLER:  There are other matters on the -- that

23   were set on the calendar for today which we could clear up very

24   quickly, including some uncontested matters.

25         THE COURT:  Okay.  Yeah, I think you have to tell

1    people what you have in mind so that -- because if I ask if

2    they object without them knowing, it makes it a little hard for

3    them to respond.

4            MR. MILLER:  I tried, Your Honor.  Mr. Smolinsky will

5    handle that, Your Honor.

6            THE COURT:  Okay.

7            MR. SMOLINSKY:  Good evening, Your Honor.  Joe

8    Smolinsky from Weil, Gotshal & Manges, for the debtors.  On the

9    calendar today we have a lease rejection motion that Your Honor

10   alluded to earlier.  We're rejecting thirty-nine leases and six

11   subleases.  The rejection is effective today.  There was one

12   objection, Your Honor, Environmental Testing Corporation, which

13   was a lease, a thirty-eight year lease.  It expires on its

14   terms December 2009.  ETC had objected to the sale based on 105

15   of the Bankruptcy Code; Your Honor had made a comment about

16   that earlier.  And in speaking with counsel for ETC, they were

17   willing to rest on their papers and have Your Honor decide as

18   to whether or not Your Honor would defer to the business

19   judgment of the company in rejecting that lease.

20           THE COURT:  All right.  Charlie, do you have my file

21   on that?

22           MR. SMOLINSKY:  Your Honor, we did file a reply

23   yesterday.  I'm not sure if Your Honor has it.

24           THE COURT:  All right.  I'm granting the motion vis-

25   a-vis the nonobjectors, and I'm also granting it vis-a-vis the

327

1    objector, in reliance, in part, on my 2004 decision in Ames

2    Department Stores, 306 B.R. 43.  In that case we had a very

3    similar situation in which a debtor wanted to reject the lease

4    and leave his mess behind.  And the landlord contended that the

5    debtor couldn't reject the lease until it left the leased

6    premises in the condition that they were supposed to have been

7    left in under the lease.

8         And I ruled that the very purpose of the rejection

9    aimed to relieve the estate of burdensome obligations.  The

10   failures to meet lease obligations could not themselves be

11   impediments to the ability of a debtor to enforce those rights

12   or to apply its rights to reject for the benefit of the

13   creditors of the estate.

14        And I stated at page 51, "The Court necessarily must

15   reject the landlord's implicit contention that the debtor's

16   statutory right to reject can be qualified by requirements not

17   in the Bankruptcy Code itself and especially by an implied

18   requirement in compliance with lease covenants that are

19   burdensome to the debtor, that they form part of the rationale

20   for rejection in the first place."  I'm not going to read the

21   totality of that language, but I think it's directly on point

22   here.

23        I fully recognize that any rejection can be a

24   hardship to the lease counterparty, but there are a lot of

25   people suffering in this case and I simply can't help everybody

328

1    who appears before me.

2            I refer everybody to the Ames decision in greater

3    length for a more extensive discussion of that.  But the motion

4    is granted even vis-a-vis the objector.

5            And, Mr. Smolinsky, I would appreciate it if you or

6    your designee would provide a copy of this portion of the

7    transcript to your counterparty and, with that, then settle an

8    order granting relief vis-a-vis that entity as well as the

9    remainder, the ruling being nunc pro tunc to the time of the

10   filing of the motion.

11           MR. SMOLINSKY:  Thank you, Your Honor.  Actually, the

12   effective date of the rejection is today.

13           THE COURT:  Oh, okay.  That's less controversial.

14           MR. SMOLINSKY:  Thank you, Your Honor.

15           THE COURT:  Okay.

16           MR. SMOLINSKY:  To clean up the docket, Your Honor,

17   there were two utility objections that were carried over from

18   the 25th.  We have now resolved those objections and we can

19   mark those matters off calendar.

20           THE COURT:  Okay.

21           MR. SMOLINSKY:  We can notify chambers.  Your Honor,

22   the last matter is an ordinary-course professional motion.  It

23   seeks to allow us to use streamlined procedures for the

24   engagement of ordinary-course professionals, which are limited

25   to lawyers and limited to those that bill less than 150,000

329

1    dollars a month with a two million dollar overall cap for each

2    professional.  The motion also contains a 20,000 dollar a month

3    cap on de minimis professionals which don't need to go through

4    the procedures of filing declarations and affidavits with the

5    Court.

6          We've been in discussions -- we've had discussions

7    with the U.S. trustee, with the creditors' committee; they have

8    no objection.  Your Honor, the U.S. trustee had asked us to

9    make a representation on the record with respect to the de

10   minimis professionals, that those professionals will not be

11   engaged in activities related to the debtors' core

12   restructuring activities.  And while we don't necessarily

13   object to the general premise of that representation, we do

14   have certain concerns about misrepresenting the facts.  So if I

15   could just spend a minute to explain how the company engages

16   professionals.  We have approximately 70 ordinary-course

17   professionals, which is between the 20,000 and 150,000.  We

18   have hundreds of professionals that would fall below the 20,000

19   dollars.  These professionals are engaged -- these lawyers are

20   engaged by the hundred-plus in-house lawyers that work for

21   General Motors.  So it's hard to coordinate the efforts of

22   understanding what every de minimis professional is doing at

23   every moment.

24         These de minimis professionals are engaged in

25   providing legal opinions in the ordinary course, assisting on

330

1    international aspects of transactions, lemon law litigation,

2    product liability litigation, environmental litigation, labor

3    law, franchise law issues.

4          So these professionals are not engaged, are not hired

5    for the bankruptcy, but the concern is that they may do certain

6    aspects that relate indirectly to the bankruptcy efforts, such

7    as getting legal opinions in connection with mortgages, and the

8    like.  So we can make the representation that these de minimis

9    professionals are not engaged specifically but have long-

10   standing relationships with the company for the aspects of the

11   work that they're going to be engaged in.

12         THE COURT:  Okay.  Mr. Masumoto, Ms. Davis, are you

13   okay with what he had to say?  Just come to the microphone, if

14   you would.

15         MR. MASUMOTO:  Yes, Your Honor.  The representations

16   made satisfy the requirements that we set -- agreed to with

17   counsel.

18         THE COURT:  Okay.  Okay, Mr. Eckstein, do you guys

19   want to be heard now?

20         MR. ECKSTEIN:  Your Honor, we're satisfied with the

21   relief being sought.

22         THE COURT:  Okay.  Thank you.

23         MR. SMOLINSKY:  Yes, Your Honor, with respect to the

24   rejection of leases, there are two leases that are going to be

25   handled by co-counsel because of conflict issues.

331

1          THE COURT:  Sure.  Come on up, please.

2          MR. MURRAY:  Your Honor, Dan Murray for Jenner &

3    Block, special counsel for the debtor.  Your Honor, this is the

4    second -- this is the debtor's second omnibus motion to reject

5    certain unexpired leases of nonresidential real property.  It's

6    on the agenda for today.  Your Honor, the landlord has no

7    objections to the entry of an order that's been slightly

8    modified by us, a draft order, to make a correction on an

9    address.  And it's not objected to by the landlord, Your Honor.

10   We would submit --

11         THE COURT:  Okay.  Is the order that I've already

12   received in the form that the landlords have had a chance to

13   see it?

14         MR. MURRAY:  They have seen the revised version, Your

15   Honor, and I have it with me to give it to your clerk at the

16   conclusion of the hearing.

17         THE COURT:  Okay.  Do that as soon as we're done, Mr.

18   Murray.

19         MR. MURRAY:  I will, Your Honor.  Thank you.

20         THE COURT:  It's approved.

21         MR. MURRAY:  Thank you, Your Honor.

22         THE COURT:  Okay.  Anything else?  Mr. Miller?

23         MR. MILLER:  Yes, Your Honor.  Mr. Eckstein's --

24         THE COURT:  Sure.  Come on up, please, Mr. Eckstein.

25         MR. ECKSTEIN:  Thank you, Mr. Miller.  Thank you,

1    Your Honor.  Your Honor, item number 3 on the agenda in the

2    uncontested section is the application of the official

3    committee to retain my firm, Kramer Levin, as counsel for the

4    official committee.  I am told by my partner, Mr. Schmidt, that

5    this application has been discussed extensively with the United

6    States trustee.  And I believe all of the issues have been

7    resolved to the satisfaction of the United States Trustee, and

8    there are no objections that have been filed.  So we would

9    respectfully ask --

10              THE COURT:  Okay.  Yeah, why don't you just stand in

11   place for a second?  Mr. Masumoto, can you join Mr. Eckstein at

12   the lectern, please?

13              MR. MASUMOTO:  Yes, Your Honor.  That's correct.  We

14   have no further objections to the retention.

15              THE COURT:  Okay.

16              MR. MASUMOTO:  Your Honor, if I may, just as a

17   housekeeping matter, with respect to the ordinary-course

18   professionals, I just did want to indicate that it was also an

19   agreement with our office that the debtors would modify the

20   language of the order to indicate that if they intended to seek

21   a raising of the limit of the ordinary-course professional cap,

22   that they would apply to the Court.

23              THE COURT:  Okay.  Let me just try to stay organized

24   here.  I want to give Mr. Eckstein a chance to sit down and to

25   give his partner some comfort.  Mr. Eckstein, you're motion's

333

1    granted.

2              MR. ECKSTEIN:  Thank you, Your Honor.

3              THE COURT:  Now, Mr. Smolinsky, if you can come on up

4    and just confirm that you're okay with what Mr. Masumoto's

5    saying.

6              MR. ECKSTEIN:  Your Honor --

7              MR. SMOLINSKY:  Yes, Your Honor.

8              MR. ECKSTEIN:  Sorry.  We'll submit an order.

9              THE COURT:  Sure.

10             MR. SMOLINSKY:  Yes, Your Honor.  We will comply with

11   that and we'll add language to the order.  And we'll get in

12   touch with Brian to make sure that he's okay with the language.

13             And I also stand because I -- while I don't want to

14   prejudge the outcome, I don't believe Your Honor has approved

15   the motion yet.

16             THE COURT:  I haven't approved which motion?

17             MR. SMOLINSKY:  The ordinary-course professional.

18             THE COURT:  This is why we need to take a recess

19   tonight.  Yes, your ordinary-course professionals motion is

20   granted.

21             MR. SMOLINSKY:  Thank you, Your Honor.

22             MR. MILLER:  Thank you, Your Honor.

23             THE COURT:  Okay, Mr. Miller.

24             MR. MILLER:  Your Honor, there is one other matter on

25   the calendar, Greater New York Automobile Dealers Association's

334

1    motion for consideration of amicus curiae statement, an amicus

2    curiae statement regarding the 363 transaction.

3            THE COURT:  Can you think of any reason why I should

4    tell them they can't file a brief?

5            MR. MILLER:  No, sir.

6            THE COURT:  It's granted.

7            MR. MILLER:  Thank you, Your Honor.

8            THE COURT:  Okay.  All right.  We're adjourned until

9    tomorrow, 8:00 for the relief from stay motion.  I assume that

10   that will be lightly attended, one lawyer, or whatever, on

11   behalf of the estate, or whatever it takes, should be here at

12   8:00 for the movant.  And he or she should tell security, if

13   there's a problem in getting in early, that that person's

14   needed for an 8:00 hearing.  I'll tell the marshals to let

15   people in starting at 7:30, unless we need to get things --

16   people going through security even earlier than that.  And I'll

17   expect the rest of you folks at 9.  Those folks who have staked

18   out positions at the counsel table or, for that matter, in this

19   courtroom, should tell the marshals, if you have a problem,

20   that I said you can have your seats back.  Okay, we're

21   adjourned until tomorrow.

22           ALL:  Thank you, Your Honor.

23       (Whereupon these proceedings were concluded at 7:51 p.m.)

24

25

VERITEXT REPORTING COMPANY

335

1                              I N D E X

2

3                          T E S T I M O N Y

4    WITNESS                EXAM BY              PAGE      LINE

5    Frederick Henderson    Mr. Salzberg          59        13

6    Frederick Henderson    Mr. Esserman          91         1

7    Frederick Henderson    Ms. Cordry           101        22

8    Frederick Henderson    Mr. Eckstein         105        14

9    Frederick Henderson    Mr. Kennedy          114         3

10   Frederick Henderson    Ms. Katzoff          150        18

11   Frederick Henderson    Mr. Jakubowski       155        13

12   Frederick Henderson    Mr. Parker           179        14

13   Frederick Henderson    Mr. Bernstein        209         5

14   Frederick Henderson    Mr. Reinsel          215         1

15   Frederick Henderson    Mr. Miller           218        21

16   Frederick Henderson    Mr. Richman          233        23

17   Frederick Henderson    Mr. Jakubowski       238        23

18   Frederick Henderson    Mr. Esserman         243        18

19   Frederick Henderson    Mr. Kennedy          251        11

20   Stephen Worth          Mr. Richman          258        10

21   Stephen Worth          Mr. Kennedy          265        14

22   Stephen Worth          Mr. Eckstein         272         8

23   Stephen Worth          Mr. Parker           279        18

24   Stephen Worth          Mr. Miller           287         6

25                       I N D E X, cont'd

336

1

2                          T E S T I M O N Y

3    WITNESS                 EXAM BY              PAGE    LINE

4    Albert Koch            Mr. Richman          288     17

5    Albert Koch            Mr. Eckstein         292     21

6    Albert Koch            Mr. Kennedy          301      1

7    Albert Koch            Mr. Bressler         303      1

8    Albert Koch            Mr. Esserman         303     19

9    Albert Koch            Mr. Parker           308     14

10   Albert Koch            Mr. Miller           317      4

11   Albert Koch            Mr. Richman          318     18

12   Albert Koch            Mr. Eckstein         321      1

13

14                          E X H I B I T S

15   NO.         DESCRIPTION                     ID.     EVID.

16   Parker-1    Loan and security agreement              48

17               between GM and US government

18               dated 12/31/08

19   Debtors     Declaration of Mr. Henderson             56

20               Declaration of Mr. Repko                 56

21               Declaration of Mr. Worth                 56

22               Declaration of Mr. Koch                  56

23

24

25

337

1                          I N D E X, cont'd

2

3                        E X H I B I T S

4   NO.              DESCRIPTION                    ID.      EVID.

5   Bondholders-1    Proposed pre-packaged plan of   69       71

6                    reorganization

7   Bondholders-2    Document entitled "Cadwalader            81

8                      Use of Section 363 to Expedite

9                      Restructuring of Distressed OEMs"

10  Bondholders-3    GM/UAW/UST VEBA discussions     81       83

11                   dated May 18, 2009

12  Parker-1         GM Perspecta Supplement 2      196      197

13  PLCA-1           Debtors' update on 363 sale as of        251

14                     6/5

15

16                        R U L I N G S

17  DESCRIPTION                                    PAGE     LINE

18  Debtors' first omnibus motion to reject certain  328       5

19  unexpired leases of nonresidential real

20  property granted

21  Debtors' second omnibus motion to reject certain  331      21

22  unexpired leases of nonresidential real

23  property granted

24

25                      I N D E X, cont'd

VERITEXT REPORTING COMPANY

338

```
 1

 2                          R U L I N G S

 3   DESCRIPTION                                  PAGE    LINE

 4   Application of creditors' committee of       333      2

 5   to retain Kramer Levin Naftalis & Frankel LLP

 6   as counsel, nunc pro tunc, to 6/3/09 granted

 7   Debtors' motion for authorization to employ  333     21

 8   professionals utilized in the ordinary course

 9   of business granted

10   Greater New York Automobile Dealers          334      7

11   Association's motion for consideration of amicus

12   curiae statement regarding debtor's motion to

13   approve sale pursuant to master sale and

14   purchase agreement with Vehicle Acquisition

15   Holdings LLC granted

16

17

18

19

20

21

22

23

24

25
```

339

1                     C E R T I F I C A T I O N

2

3     I, Lisa Bar-Leib, certify that the foregoing transcript is a

4     true and accurate record of the proceedings.

5     Lisa Bar-Leib                Digitally signed by Lisa Bar-Leib
                                   DN: cn=Lisa Bar-Leib, c=US
                                   Reason: I am the author of this
6     _____      document
                                   Date: 2009.07.08 13:03:32 -04'00'

7     LISA BAR-LEIB

8     AAERT Certified Electronic Transcriber (CET**D-486)

9

10    Also transcribed by:  Penina Wolicki

11                          Pnina Eilberg

12                          Esther Accardi

13                          Clara Rubin

14

15    Veritext LLC

16    200 Old Country Road

17    Suite 580

18    Mineola, NY 11501

19

20    Date:  July 7, 2009

21

22

23

24

25