Hearing Date and Time:  To Be Determined
Response Deadline:  December 16, 2014
Reply Deadline:  January 16, 2015

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002
Daniel H. Golden
Deborah J. Newman
Jamison A. Diehl
Naomi Moss

*Attorneys for the Participating Unitholders*

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone:  (212) 351-4000
Facsimile:  (212) 351-6391
Matthew J. Williams
Lisa H. Rubin
Keith Martorana

*Attorneys for Wilmington Trust Company, as
Trustee for and Administrator of the Motors
Liquidation Company GUC Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------x
**In re**                                              :        **Chapter 11**
                                                       :
**MOTORS LIQUIDATION COMPANY,** *et al.,*    :        **Case No.:  09-50026 (REG)**
       **f/k/a General Motors Corp.,** *et al.*        :
                                                       :
                        **Debtors.**                   :        **(Jointly Administered)**
---------------------------------------------------------------x

**THE PARTICIPATING UNITHOLDERS' AND GUC TRUST
ADMINISTRATOR'S OPENING MEMORANDUM OF LAW
RESPECTING THE EQUITABLE MOOTNESS THRESHOLD ISSUE**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

STATEMENT OF FACTS ........................................................................................................5

    A.    General Motors Corporation Files for Bankruptcy Protection and the Court Sets a Bar Date for Claims to be Filed Against the Debtors ...................................5

    B.    The Debtors Propose the Plan, Which Establishes The GUC Trust for the Benefit of Creditors Holding Allowed or Disputed Claims as of the Effective Date .................................................................................................6

    C.    The GUC Trust Distributes Approximately 89% of the New GM Securities..........9

    D.    The GUC Trust Units Trade Based On Estimates Of GUC Trust Assets That Will Be Distributed to Unitholders ...................................................................12

    E.    New GM Recalls Millions of Vehicles, and Actions Alleging Billions of Dollars in Damages are Filed Against New GM ....................................................13

    F.    New GM Attempts to Inject the GUC Trust Into these Proceedings ....................16

ARGUMENT .........................................................................................................................19

I.    Where, as Here, A Plan of Liquidation has been Substantially Consummated, There Is a Presumption of Equitable Mootness ................................................................19

II.    Plaintiffs' Claims, if Asserted Against the GUC Trust, are Equitably Moot ....................21

    A.    The First *Chateaugay* Factor Cannot be Satisfied .................................................21

        1.    Even if Plaintiffs' Claims Could be Satisfied by the GUC Trust, Allowing Such Claims Would Result in Manifest Inequity ......................22

        2.    The Assets Remaining in the GUC Trust Make It Impossible for Plaintiffs to Obtain Effective Relief from the GUC  Trust ........................26

    B.    Allowing Plaintiffs to Assert their Claims Against the GUC Trust Would Unravel Intricate Transactions and Create an Unmanageable, Uncontrollable Situation for the Court .............................................................28

    C.    Numerous Third Parties Would Be Adversely Affected By the Relief Sought by Plaintiffs and Would Have Neither Notice nor Opportunity to Participate in the Proceedings .................................................................................30

    D.    Plaintiffs have not Diligently Pursued Remedies that Could Potentially Have Minimized the Inequities that Would Result from Allowing their Claims to Proceed Against the GUC Trust ...........................................................31

CONCLUSION ......................................................................................................................33

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abel v. Shugrue* (*In re Ionosphere Clubs, Inc.*),
    184 B.R. 648 (S.D.N.Y. 1995).........................................................................20, 27

*Alsohaibi v. Arcapita Bank B.S.C.(C)* (*In re Arcapita Bank B.S.C.(C)*)),
    Nos. 13 Civ. 5755 (SAS), 13 Civ. 5756 (SAS), 2014 WL 46552 (S.D.N.Y. Jan. 6,
    2014) ...............................................................................................................3, 19, 20, 30

*Bartel v. Bar Harbor Airways, Inc*.,
    196 B.R. 268 (S.D.N.Y 1996.......................................................................20, 27

*Beeman v. BGI Creditors' Liquidating Trust* (*In re BGI, Inc.*),
    Nos. 12 Civ 7714 (ALC), 12 Civ 7715 (ALC), 13 Civ 0080 (ALC), 2013 U.S. Dist.
    LEXIS 77740 (S.D.N.Y. Jan. 22, 2014) ................................................24, 25, 31

*Beeman v. BGI Creditors' Liquidating Trust* (*In re BGI, Inc.*),
    Nos. 13-2226-bk, 13-2288-bk, 13-2300-bk, 2014 WL 5462477 (2d Cir. Oct. 29,
    2014) ...............................................................3, 19, 20, 21, 24, 25, 30, 31

*Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
    428 B.R. 43 (S.D.N.Y. 2010).........................................................................20, 32

*Church of Scientology v. United States*,
    506 U.S. 9 (1992).............................................................................................19

*Compania Internacional Financiera S.A. v. Calpine Corp. (In re Calpine Corp.)*,
    390 B.R. 508 (S.D.N.Y. 2008), *aff'd*, 354 Fed. Appx. 479 (2d Cir. 2009)
    ..........................................................................................19, 20, 21, 24, 27, 29

*Credit Alliance Corp. v. Dunning-Ray Ins. Agency, Inc.* (*In re Blumer*),
    66 B.R. 109 (B.A.P. 9th Cir. 1986), *aff'd*, 826 F.2d 1069 (9th Cir. 1987).............................27

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network,
    Inc.)*,
    416 F.3d 136 (2d Cir. 2005)..........................................................................19, 21

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*,
    10 F.3d 944 (2d Cir. 1993) ...............................................3, 4, 20, 21, 28, 29, 31

*In re MF Global Holdings Ltd.*,
    No. 13 Civ 3432, 2014 WL 231130. (S.D.N.Y. Jan. 22, 2014)...............................20

*In re Thomson McKinnon Secs.*,
    133 B.R. 39 (Bankr. S.D.N.Y. 1991), *aff'd*, 141 B.R. 31 (S.D.N.Y. 1992) ........................4, 25

*Kenton Cnty. Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*,
    374 B.R. 516 (S.D.N.Y. 2007) ........................................................................................20, 27

*Morgenstein v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
    462 B.R. 492 (Bankr. S.D.N.Y. 2012) ..................................4, 8, 12, 20, 23, 24, 26, 27, 28, 29

*O'Connor v. Pan Am Corp. (In re Pan Am Corp.)*,
    No. 98CIV7838RDCLE, 2000 WL 254010 (S.D.N.Y. Mar. 7, 2000) .................20, 26, 30, 31

*Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. Official*
    *Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.)*,
    988 F.2d 322 (2d Cir. 1993) ......................................................................................4, 19, 27

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JP Morgan Chase*
    *Bank, N.A (In re Motors Liquidation Co.)*,
    486 B.R. 596 (Bankr. S.D.N.Y. 2013) ........................................................................................9

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JP Morgan Chase*
    *Bank, N.A.(In re Motors Liquidation Co.)*,
    755 F.3d 78 (2d Cir. 2014) ........................................................................................................9

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase*
    *Bank, N.A.*,
    No. 325, 2014, __ A.3d __ , 2014 WL 5305937 (Del. Oct. 17, 2014) ...................................10

*Parker v. Motor Liquidation Co. (In re Motors Liquidation Co.)*,
    430 B.R. 65 (S.D.N.Y. 2010) ................................................................................3, 20, 30, 31

*Salsberg v. Trico Marine Servs., Inc. (In re Trico Marine Servs. )*,
    343 B.R. 68 (S.D.N.Y. 2006) ...................................................................................................28

*Trone v. Robert Farms, Inc. (In re Roberts Farm, Inc.)*,
    652 F.2d 793 (9th Cir. 1981) ............................................................................................28, 29

*Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*,
    326 B.R. 497 (S.D.N.Y. 2005) ...........................................................................................21, 24

*U.S. Dept. of Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation*
    *Co. (In re Motors Liquidation Co.)*,
    475 B.R. 347 (S.D.N.Y. 2012) ................................................................................................10

## STATUTES

11 U.S.C.
    § 101 *et seq.* ......................................................................................................................19, 29
    § 1144........................................................................................................................................26

Pursuant to this Court's Supplemental Scheduling Order dated July 11, 2014 (ECF No. 12770), and the Court's Endorsed Order (ECF No. 12869) (together, the "**Scheduling Order**"), certain unaffiliated holders (the "**Participating Unitholders**") of beneficial units of the Motors Liquidation Company GUC Trust (the "**GUC Trust**") and Wilmington Trust Company, the trustee and trust administrator of the GUC Trust (the "**GUC Trust Administrator**"),[1] hereby submit this memorandum of law respecting the following Threshold Issue (the "**Equitable Mootness Threshold Issue**"):

> whether, if any or all of the claims asserted in connection with the Recalls are or could be claims against the Old GM Bankruptcy estate (and/or the GUC Trust), such claims or the actions asserting such claims must be disallowed/dismissed on grounds of equitable mootness.

Scheduling Order at 3.

## **PRELIMINARY STATEMENT**[2]

1.      The Court need look no further than the procedural posture in which the Equitable Mootness Threshold Issue arises to determine that any claims Plaintiffs may assert against the GUC Trust are equitably moot.  The reason is simple: where, as here, a chapter 11 plan has been substantially consummated, parties must act diligently to minimize any inequity that would result from the relief they are seeking, including by seeking a stay and providing notice of the requested relief to affected parties.  Here, however, the parties who are seeking relief—the Plaintiffs in various putative class actions filed against New GM in connection with its seemingly endless series of recalls—*are not seeking any relief from the GUC Trust*.  Instead,

---

[1]    Notwithstanding anything to the contrary set forth herein, the GUC Trust Administrator takes no position with respect to any of the factual assertions or arguments set forth herein or in the accompanying Declaration of Deborah J. Newman (the "**Newman Decl.**") regarding the historical trading levels of GUC Trust Units and any related secondary market activity.

[2]    Capitalized terms not defined in the Preliminary Statement shall have the meaning ascribed to them the first time they appear in the remainder of this memorandum.  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Scheduling Order.

Plaintiffs have taken a "wait and see" approach, choosing first to pursue New GM and its deep pockets, and to look to the GUC Trust only if those pockets turn up empty for them.  By contrast, New GM, the actual target of Plaintiffs' efforts, has pointed *its* finger at the GUC Trust, arguing that if Plaintiffs are to have any recovery, it must come from the GUC Trust's assets, notwithstanding that, under the terms of the Plan, those assets have already been allocated to specific parties.

2.        New GM's attempt to foist Plaintiffs' claims onto the GUC Trust—and any efforts by Plaintiffs to impose liability on the GUC Trust that may ultimately occur—cannot succeed as a matter of law.  Nearly five years have passed since the Bar Date; it has been more than three years since Old GM's Plan went effective; and all parties concede that the Plan has been substantially consummated.  Moreover, the Plan and Confirmation Order are clear:  the only parties that may receive GUC Trust assets (other than those to whom the GUC Trust is liable for its costs and expenses) are those that held Allowed Claims or Disputed Claims (to the extent allowed) ***as of the Effective Date***; those that are or may be subject to disgorgement pursuant to an avoidance action brought on behalf of the Debtors' creditors (to the extent that such disgorgement actually occurs); or those that hold publicly-traded units issued by the GUC Trust (collectively, the "**GUC Trust Beneficiaries**").  There can be no dispute that Plaintiffs do not fall within this universe.  Accordingly, fashioning relief for Plaintiffs out of the GUC Trust's assets would not only expose the GUC Trust to claims of a potentially enormous magnitude (and a potentially infinite period during which such claims could be asserted), it would also require a significant, and highly prejudicial, modification of the substantially-consummated Plan.

3.    Under the well-established law of this Circuit, however, claims for relief that require a modification of a substantially-consummated plan are presumed to be equitably moot unless *all five* of the following factors (the "***Chateaugay* Factors**") are shown:

(a)    The court can still order some effective relief;

(b)    Such relief will not affect the re-emergence of the debtor as a revitalized corporate entity;

(c)    Such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court;

(d)    The parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings; and

(e)    The [movant] pursue[d] with diligence all available remedies to obtain a stay of execution of the objectionable order . . . if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from.

*Parker v. Motor Liquidation Co. (In re Motors Liquidation Co.)*, 430 B.R. 65, 80 (S.D.N.Y. 2010) (citing *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 952-53 (2d Cir. 1993) ("***Chateaugay II***").

4.    ***None*** of these factors are present here.[3]  More than 89% percent of the GUC Trust's assets have already been distributed to GUC Trust Beneficiaries, and case law is clear that those distributions cannot be recovered.  Under the terms of the Plan and Confirmation Order, the GUC Trust assets that remain must be preserved for the GUC Trust Beneficiaries, or to fund the GUC Trust's current and projected costs.  Diverting those assets to Plaintiffs now would be manifestly unjust and prejudicial to creditors who filed timely proofs of claim in the

---

[3]    The second *Chateaugay* Factor does not apply here, given that the Debtors have liquidated rather than reorganized.  *See, e.g., Beeman v. BGI Creditors' Liquidating Trust (In re BGI, Inc.)*, Nos. 13-2226-bk, 13-2288-bk, 13-2300-bk, 2014 WL 5462477, at *6, fn. 15 (2d Cir. Oct. 29, 2014) ("***BGI III***"); *Alsohaibi v. Arcapita Bank B.S.C.(C) (In re Arcapita Bank B.S.C.(C))*, Nos. 13 Civ. 5755 (SAS), 13 Civ. 5756 (SAS), 2014 WL 46552, at *8 (S.D.N.Y. Jan. 6, 2014).

3

Debtors' bankruptcy cases, and the multitude of investors who have purchased or held GUC

Trust units in reliance on the Plan, and the publicly-disclosed, finite amounts of claims that could

recover against those assets.

5.     Additionally, as this Court has previously held, the Plan cannot be partially

modified to allow for a class proof of claim to be asserted against the GUC Trust following the

Effective Date. *Morgenstein v. Motors Liquidation Co.* (*In re Motors Liquidation Co.*), 462 B.R.

492, 505 (Bankr. S.D.N.Y. 2012) ("***Morgenstein***").  Rather, such a modification would require

total revocation of the Plan.  Such revocation is impermissible under the Bankruptcy Code,

however, and would undoubtedly "knock the props out from under the authorization for every

transaction that has taken place" under the Plan and "create an unmanageable, uncontrollable

situation for the Bankruptcy Court."  *See Chateaugay II*, 10 F.3d at 952-53.

6.     Further, given New GM's refusal to confirm that there are no additional recalls

forthcoming, the multitude and size of the litigations that have been filed in connection with the

existing recalls, and the prolonged nature of class action litigation, permitting Plaintiffs to file

claims against the GUC Trust would likely preclude the GUC Trust from making any additional

distributions for the foreseeable future, and potentially require that the trust continue in

perpetuity.  Such an outcome would be directly contrary to the policies underlying bankruptcy

proceedings, "where the ability to achieve finality is essential to the fashioning of effective

remedies."  *Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. Official*

*Comm. of Unsecured Creditors of LTV Steel Co.* (*In re Chateaugay Corp.*), 988 F.2d 322, 325

(2d Cir. 1993) ("***Chateaugay I***").  The importance of finality is especially pertinent here, given

that "the need for expeditious administration of assets is paramount" in liquidation cases.  *In re*

4

*Thomson McKinnon Secs.*, 133 B.R. 39, 41 (Bankr. S.D.N.Y. 1991), *aff'd*, 141 B.R. 31 (S.D.N.Y. 1992).

7.      Finally, no notice, let alone the personal notice that is required to overcome the presumption of equitable mootness, has been given to the many parties that would be adversely affected if Plaintiffs were permitted to assert claims against the GUC Trust.  Nor have Plaintiffs (or New GM) acted with diligence to judicially stay any portions of the Plan.  Having chosen this strategy, Plaintiffs are now unquestionably barred from asserting their claims against the GUC Trust.

## STATEMENT OF FACTS

**A.      General Motors Corporation Files for Bankruptcy Protection and the Court Sets a Bar Date for Claims to be Filed Against the Debtors**

8.      On June 1, 2009, General Motors Corporation, n/k/a Motors Liquidation Company ("**Old GM**" and, together with three of its debtor subsidiaries, the "**Debtors**") commenced bankruptcy proceedings in this Court.  Stipulated Facts ¶ 1.[4]  On June 26, 2009, the Debtors entered into the Amended and Restated Master Sale and Purchase Agreement (as amended, the "**Sale Agreement**"), pursuant to which the Debtors agreed to sell substantially all of their assets to an acquisition vehicle that later became General Motors LLC ("**New GM**").  *Id.* at ¶ 2.  Pursuant to an order dated July 5, 2009 (the "**Sale Order**"), the Court approved the sale (the "**363 Sale**") under Section 363 of the Bankruptcy Code.  *Id.*  The 363 Sale was consummated on July 10, 2009.  *Id.*

9.      The out-of-pocket consideration provided by New GM to the Debtors in the 363 Sale comprised (i) 10% of the post-closing outstanding shares of New GM (the "**New GM**

---

[4]      Unless otherwise noted, citations to "Stipulated Facts" refer to the *Agreed Upon Stipulations of Fact Regarding the Equitable Mootness Threshold Issue that are attached as Exhibit D to the Agreed and Disputed Stipulations of Fact Pursuant to the Court's Supplemental Scheduling Order, Dated July 11, 2014* (ECF No. 12826).

**Common Stock**"); and (ii) two series of warrants, each to purchase 7.5% of the post-closing

outstanding shares of New GM, with an exercise price based on a $15 billion equity valuation

and a $30 billion equity valuation, respectively (collectively, the "**New GM Warrants**").  *Id.* at

¶ 3.  The New GM Common Stock and both series of New GM Warrants (collectively, the "**New

GM Securities**") are currently listed on the New York Stock Exchange.  *Id.* at ¶ 4.

10.     On September 16, 2009, the Bankruptcy Court entered an order (the "**Bar Date

Order**") establishing November 30, 2009 as the deadline for proofs of claim to be filed against

any of the Debtors (the "**Bar Date**"), and approved the form and manner of notice of the Bar

Date.  *See id.* at ¶ 6-7.

11.     On February 8, 2012, the Court entered an order deeming as disallowed any

claims filed after such date.  *See Order Approving Motion Pursuant to Bankruptcy Rule 3003

and Section 105(a) of the Bankruptcy Code for an Order Disallowing Certain Late Filed Claims*

(ECF No. 11394).

> **B.     The Debtors Propose the Plan, Which Establishes the GUC Trust for
> the Benefit of Creditors Holding Allowed or Disputed Claims as of the
> Effective Date**

12.     On March 18, 2011, the Debtors filed their Second Amended Joint Chapter 11

Plan with the Court (the "**Plan**").  *Id.* at ¶ 8.  The Plan provided for the establishment of the GUC

Trust pursuant to the GUC Trust Agreement on or before the date on which the Plan became

effective, which was March 31, 2011 (the "**Effective Date**").  *Id.* at ¶ 13.

13.     Pursuant to the GUC Trust Agreement, a form of which is attached as an exhibit

to and incorporated by reference into the Plan, the GUC Trust Beneficiaries are expressly limited

to (i) the holders of allowed general unsecured claims against the Debtors that existed *as of the

Effective Date*, (ii) the holders of claims asserted against the Debtors that were disputed *as of the

Effective Date* ("**Disputed Claims**") and subsequently allowed (collectively with claims that

6

were allowed as of the Effective Date, "**Allowed Claims**"), (iii) the holders of potential general

unsecured claims (the "**JPM Claims**") that may arise in connection with the JPM Action (as

defined below), and (iv) the holders of units of beneficial interest (each, a "**GUC Trust Unit**") in

the GUC Trust. *Id.* at ¶ 29; *see also* Plan § 12.14.

14.    Under the Plan and GUC Trust Agreement, the GUC Trust is responsible for,

among other things, making distributions to the holders of Allowed Claims, resolving and

satisfying (to the extent allowed) Disputed Claims that were outstanding as of the Effective Date,

and distributing any excess assets of the GUC Trust to the holders of GUC Trust Units (the

"**Unitholders**"). *Id.* at ¶¶ 28, 33. In order to enable the GUC Trust to make distributions to

creditors, the Plan provided that Old GM would transfer the New GM Securities to the GUC

Trust, and that prior to such transfer, the GUC Trust could direct Old GM to make such

distributions. *See* Plan § 5.2(a); Stipulated Facts ¶ 34, n. 3.

15.    As of June 30, 2014, in accordance with the Plan, for each $1,000 in amount of

Allowed Claims, the holders of such claims are entitled to receive (i) approximately 4.19 shares

of New GM Common Stock, (ii) approximately 3.81 warrants of each series of New GM

Warrant, and (iii) one GUC Trust Unit. *See* Form 10-Q Quarterly Report for General Motors

Liquidation Company GUC Trust for the Quarter Ended June 30, 2014, filed August 12, 2014

(the "**June 30 Form 10-Q**") at 17. Any assets remaining in the GUC Trust that are not required

to fund Allowed Claims (or potential Allowed Claims), JPM Claims, or projected liquidation and

administrative costs (including potential income taxes) of the GUC Trust (collectively, the "**GUC**

**Trust Liabilities**"), are to be distributed to the Unitholders. Stipulated Facts ¶ 33; *see also* GUC

Trust Agreement §§ 5.4-5.5. Accordingly, under the Plan and GUC Trust Agreement, if Disputed

Claims are disallowed, or the GUC Trust's estimates of costs and liabilities prove to be

overstated, the excess New GM Securities that have been reserved on account of those costs and liabilities are to be distributed to the Unitholders.  *Id.*; *see also* Form 8-K Current Report for Motors Liquidation Company GUC Trust, filed April 21, 2011 (the "**April 2011 Form 8-K**") at 4-5.

16.    On March 29, 2011, the Court entered an order confirming the Plan (the "**Confirmation Order**").  Stipulated Facts ¶ 15.  The Confirmation Order authorizes the "creation and implementation of the GUC Trust . . . in accordance with [its] terms, the Plan [and] the GUC Trust Agreement . . .," and further authorizes the "GUC Trust Administrator . . .  to accomplish the purposes of the GUC Trust . . . as set forth in the GUC Trust Agreement." Confirmation Order at ¶ 30.  Additionally, the Confirmation Order "authorize[s] and approve[s]," the GUC Trust Agreement, and provides that, as of the Effective Date, all of the GUC Trust Assets "shall be free and clear of all Claims and Encumbrances, except as provided in the Plan . . . and this Confirmation Order," and that "from and after the Effective Date . . . the GUC Trust Administrator may dispose of the GUC Trust Assets free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan and the GUC Trust Agreement. . ." *Id.* at ¶¶ 6, 17.  Moreover, the Confirmation Order provides that the GUC Trust shall not be required to establish reserves for claims that have been disallowed or expunged by the Court unless the Court has expressly directed the GUC Trust to establish such a reserve.  *Id*. at 42.

17.    The Plan provided that it would be deemed substantially consummated as of the Effective Date.  Stipulated Facts at ¶ 17.  The Identified Parties have stipulated, and this Court has found, that the Plan has been substantially consummated.  *Id.* at ¶ 18; s*ee also Morgenstein*, 462 B.R. at 501 n. 36 ("[T]he Plan already has been substantially consummated").

###### C.    The GUC Trust Distributes Approximately 89% of the New GM Securities

18.    The GUC Trust Agreement sets forth provisions governing the GUC Trust's

ability to distribute the New GM Securities (or the proceeds thereof, including any dividends)

(collectively, the "**GUC Trust Assets**") and GUC Trust Units to GUC Trust Beneficiaries.  GUC

Trust Agreement §§ 5.3-5.4.  These provisions are designed to ensure that the Unitholders

receive, as promptly as practicable, any GUC Trust Assets that are not necessary to fund the

GUC Trust Liabilities, but also that the GUC Trust retains sufficient assets to fund those

liabilities.  *See id.*

19.    The only remaining avoidance action that could give rise to claims against the

GUC Trust is *Official Committee of Unsecured Creditors of Motors Liquidation Co. v. JP*

*Morgan Chase Bank, N.A. et al.*, Adv. Pro. No 09-00504 (Bankr. S.D.N.Y. July 31, 2009) (the

"**JPM Action**").  In the JPM Action, the Official Committee of Unsecured Creditors appointed in

the Debtors' bankruptcy proceedings (which has since been replaced as plaintiff by a trust

established under the Plan (the "**Avoidance Action Trust**")) sought to recover approximately

$1.5 billion in payments made by Old GM to JPMorgan Chase Bank, N.A. on behalf of a

consortium of purportedly secured prepetition lenders (the "**JPM Defendants**").  Stipulated

Facts ¶ 22.  If the Avoidance Action Trust ultimately prevails in the JPM Action and the JPM

Defendants are required to disgorge the amounts they received from Old GM (or a portion

thereof), the JPM Defendants will be able to assert claims against the GUC Trust in an amount

equal to the amount of the disgorged funds (which, in the aggregate, could be up to $1.5 billion,

exclusive of prejudgment interest).[5]  *Id.* at ¶ 26.  Neither the GUC Trust nor the Unitholders (in

---

[5]    On March 1, 2013, the Bankruptcy Court rendered a decision in favor of the JPM Defendants in the JPM
Action.  *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JP Morgan Chase Bank, N.A* (*In
re Motors Liquidation Co.*), 486 B.R. 596 (Bankr. S.D.N.Y. 2013).  That decision was appealed directly to the

their capacity as Unitholders) would benefit from any such disgorged funds, however, as the

funds would be paid to the Avoidance Action Trust beneficiaries, which are the holders of

Allowed Claims as of the Effective Date.[6]  June 30 Form 10-Q at 20.

20.    As of the Effective Date, the total aggregate amount of general unsecured claims,

both allowed and disputed, asserted against the Debtors was approximately $39.426 billion.

Stipulated Facts ¶ 21; *see also* April 2011 Form 8-K at 4.  These claims consisted of

approximately:  (a) $29.771 billion in Allowed Claims; (b) $8.154 billion in Disputed Claims;

and (c) $1.5 billion in potential JPM Claims.  Stipulated Facts ¶ 21.

21.    On April 21, 2011 and May 26, 2011, initial distributions were made to holders of

Allowed Claims as of the Effective Date.  *Id.* at ¶ 34.  These distributions consisted of more than

75% of the New GM Securities, and 29,770,826 GUC Trust Units.  *Id.*; *see* April 2011 Form 8-K

at 2.  The only New GM Securities that were not distributed were those that could be necessary

to fund GUC Trust Liabilities.  Stipulated Facts ¶ 35.

22.    From the Effective Date through September 30, 2014, the GUC Trust resolved

approximately $8.075 billion in Disputed Claims.  *See* Motors Liquidation Company GUC Trust

Report for the Quarter Ended September 30, 2014 at 4 (ECF No. 12963) (the "**September 30**

---

Second Circuit.  On June 17, 2014, the Second Circuit issued an opinion certifying to the Delaware Supreme
Court the question of whether "[u]nder UCC Article 9, as adopted into Delaware law by Del. Code Ann. Tit. 6,
art. 9, for a UCC-3 termination statement to effectively extinguish the perfected nature of a UCC-1 financing
statement, is it enough that the secured lender review and knowingly approve for filing a UCC-3 purporting to
extinguish the perfected security interest, or must the secured lender intend to terminate the particular security
interest that is listed on the UCC-3?"  *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JP
Morgan Chase Bank, N.A.* (*In re Motors Liquidation Co.*), 755 F.3d 78, 86 (2d Cir. 2014).  On October 17,
2014, the Delaware Supreme Court held that a secured lender's review and knowing approval for filing of a
UCC-3 purporting to extinguish its perfected security interest is sufficient to effectively extinguish the perfected
nature of a UCC-1 financing statement.  *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v.
JPMorgan Chase Bank, N.A.*, No. 325, 2014, __ A.3d __ , 2014 WL 5305937, (Del. Oct. 17, 2014) (*certified
question answered, en Banc*).

[6]    The debtor-in-possession lenders to the Debtors have asserted that they can satisfy their superpriority claim with
proceeds from the JPM Action.  *U.S. Dept. of Treasury v. Official Comm. Of Unsecured Creditors of Motors
Liquidation Co.* (*In re Motors Liquidation Co.*), 475 B.R. 347, 355 (S.D.N.Y. 2012).  This issue has not yet
been resolved.

**GUC Trust Report**").  Only approximately $2.081 billion of these claims became Allowed

Claims.  *Id.*  As of September 30, 2014, the total amount of Allowed Claims was approximately

$31.854 billion, and the total amount of Disputed Claims was approximately $79.5 million.  *Id*.

23.    Between May 2011 and September 30, 2014, the GUC Trust made distributions of

8,283,667 shares of New GM Common Stock and 7,530,631 of each series of New GM Warrants

on account of resolved Disputed Claims.  *See* September 30 GUC Trust Report.  In addition, the

GUC Trust made distributions to Unitholders in July 2011, October 2011 and December 2013,[7]

in the aggregate amount of 12,139,889 shares of New GM Common Stock and 11,036,258 of

each series of New GM Warrants.  *Id*.  As of September 30, 2014, the GUC Trust had distributed,

in the aggregate, more than 89% of the New GM Securities, and 31,853,702 GUC Trust Units.

*See* June 30 Form 10-Q at 28; *see also* September 30 GUC Trust Report.

24.    The only GUC Trust Assets remaining in the GUC Trust as of September 30, 2014

were those that could be necessary to fund GUC Trust Liabilities, and approximately

$225,052,529 in New GM Securities that, as disclosed in a GUC Trust report dated October 24,

2014, are scheduled to be distributed to Unitholders on November 12, 2014.  *See* September 30

GUC Trust Report at 8.  In the aggregate, these remaining assets consist of 15,247,286 shares of

New GM Stock, 13,860,926 of each series of New GM Warrants, and approximately $13.8

million of dividend cash, and have a value of approximately $945 million.[8]  *Id*.

---

[7]    The distribution made in December 2013 was on account of the settlement of a $2.67 billion Disputed Claim.
*See* Stipulated Facts ¶¶ 39-40.

[8]    Unless otherwise stated herein, values of New GM Securities are calculated using the closing prices of New
GM Common Stock and New GM Warrants according to Bloomberg Finance, L.P. as of October 24, 2014.  *See*
Stipulated Facts ¶ 54.

**D.      The GUC Trust Units Trade Based On Estimates Of GUC
Trust Assets That Will Be Distributed To Unitholders**

25.      The GUC Trust Units are freely tradable.  Stipulated Facts ¶ 51.  As reported by

Bloomberg Finance L.P., as of October 21, 2014, approximately 100 million GUC Trust Units

had been bought and sold since June 14, 2012, and the aggregate value of those GUC Trust Units

(based on daily closing prices) totaled approximately $2.1 billion.

26.      As this Court has previously surmised, the GUC Trust Units have "been bought

and sold based on estimates of Plan recoveries premised on the claims mix."  *Morgenstein*, 462

B.R. at 509.  Beginning on April 28, 2011, and continuing on a quarterly basis thereafter, the

GUC Trust has filed reports with the SEC and the Court that reflect, among other things, the total

amount of Allowed and Disputed Claims, including the amount of Disputed Claims that it has

resolved, and the amount of such claims that have become Allowed Claims.  Stipulated Facts

¶¶ 49-52.  These reports allow Unitholders to estimate the amount of GUC Trust Assets that may

be available for distribution, since more Disputed Claims that are resolved in favor of the GUC

Trust result in more assets becoming available for distribution to Unitholders.  Unitholders may

also review information relating to the remaining Disputed Claims on the Bankruptcy Court's

public docket.  Additionally, the GUC Trust reports provide information respecting the JPM

Action and projected costs, which Unitholders may review in forming a view as to whether the

GUC Trust Assets reserved on account of these contingent liabilities and projected costs may

ultimately become available for distribution to Unitholders.  *See, e.g., Motors Liquidation

Company GUC Trust Quarterly GUC Trust Reports as of June 30,* 2014, filed August 13, 2014

(ECF No. 12838).

27.      The GUC Trust Units are also tracked by various investment analysts that publish

reports containing recommendations to buy or sell, and valuations of, the GUC Trust Units.  *See,*

12

*e.g., CRT Capital Group, Research Update,* dated October 22, 2013.[9]  When explaining these

recommendations and valuations, the analysts often focus on the number of Disputed Claims that

have been resolved (and the manner in which they have been resolved), and the likelihood that

the New GM Securities that have been set aside in connection with the JPM Action and potential

costs will be released for distribution to Unitholders.  *Id.*  For example, in October 2013,

investment analyst CRT Capital ("**CRT**") raised its valuation of the GUC Trust Units "to reflect

downward revisions to [its] estimates for both claims . . . and the expected costs of the

liquidation . . ."  *Id.* at 3.  Similarly, in November 2013, CRT further raised its valuation of the

GUC Trust Units, based on its view that the GUC Trust would have lower-than-expected tax

liabilities and wind-down costs.  *See CRT Capital Group Research Update*, dated November 11,

2013 at 2.[10]

### E. New GM Recalls Millions of Vehicles, and Actions Alleging Billions of Dollars in Damages are Filed Against New GM

28.    Beginning in February 2014, New GM conducted a series of recalls relating to

ignition switch and other defects in vehicles manufactured by both Old and New GM (the

"**Recalls**").  Stipulated Facts ¶ 56.  In total, the Recalls relate to more than 14.5 million vehicles

manufactured by Old GM.[11]  To date, New GM has refused to confirm that there will be not be

any more recalls.  *See* Transcripts of Today Show Interview, June 26, 2014.[12]

---

[9]    A true and correct copy of this document is attached as **Exhibit A** to the Newman Decl.

[10]    A true and correct copy of this document is attached as **Exhibit B** to the Newman Decl.

[11]    This number was calculated by identifying the GM-branded vehicles that were recalled by New GM that are the subject of the claims asserted by Plaintiffs (as that term is defined herein), and then identifying through New GM's recall notices to the National Highway Traffic Safety Administration ("**NHTSA**") how many of those vehicles were manufactured by Old GM.  New GM's recall notices to NHTSA provide a breakdown of the exact number of vehicles recalled by model year.  True and correct copies of the relevant recall notices are included as **Exhibits C-Y** to the Newman Decl.

[12]    True and correct copies of these transcripts are attached as **Exhibits Z-AA** to the Newman Decl.

29.    Since the Recalls were first announced in February 2014, more than 100 actions

have been filed against New GM relating to the Recalls.  *See* Form 10-Q Quarterly Report for

General Motors Company for the Quarter Ended September 30, 2014, filed on October 23, 2014

at 105 ("**New GM September 30 Form 10-Q"**).  The majority of these actions have been

transferred for pretrial consolidation to MDL 2543, *In re: General Motors LLC Ignition Switch*

*Litigation* (the "**MDL Proceeding**"), which is currently pending before the Hon. Jesse M.

Furman in the Southern District of New York.  *In re: General Motors LLC Ignition Switch*

*Litigation, Transfer Order* (ECF No. 54).

30.    On October 14, 2014, lead counsel appointed in the MDL Proceeding filed two

consolidated complaints against New GM, seeking economic losses allegedly arising in

connection with the Recalls.  New GM September 30 Form 10-Q at 105.  The first complaint,

*Consolidated Class Action Complaint Against New GM for Recalled Vehicles Manufactured By*

*Old GM and Purchased Before July 11, 2009* (the "**Consolidated Pre-Sale Complaint**")

(S.D.N.Y., MDL No. 2543, ECF No. 347), seeks to pursue federal and state law claims on behalf

of a class of all persons in the United States who either bought or leased a vehicle with an

ignition switch defect prior to the 363 Sale and still own the vehicle or sold it on or after

February 14, 2014. [13]  Consolidated Pre-Sale Complaint ¶ 2.  The second complaint,

*Consolidated Complaint Concerning all GM-Branded Vehicles That Were Acquired July 11, 2009*

*or Later* (the "**Consolidated Post-Sale Complaint**," and, together with the Consolidated Pre-

Sale Complaint, the "**Consolidated Complaints**") (S.D.N.Y., MDL No. 2543, ECF No. 345)

seeks to allege federal and state class claims on behalf of a class of all persons who purchased or

---

[13]    On November 4, 2014, lead counsel appointed in the MDL Proceeding filed a "notice of errata" with respect to
the Consolidated Pre-Sale Complaint that expanded the number of Old GM vehicles subject to the Plaintiffs'
claims.  *See Notice of Errata and Correction to the Consolidated Class Action Complaint Against New GM for*
*Recalled Vehicles Manufactured by Old GM and Purchased Before July 11, 2009*, S.D.N.Y., MDL No. 2543,
(ECF No. 379).

leased a GM-branded vehicle (including vehicles manufactured prior to or on July 10, 2009)

between July 11, 2009, and July 3, 2014 (the "**Post–Sale Affected Vehicles**") and (i) still own or

lease a Post-Sale Affected Vehicle, (ii) sold a Post-Sale Affected Vehicle on or after February 14,

2014, and/or (iii) purchased or leased a Post-Sale Affected Vehicle that was declared a total loss

after an accident on or after February 14, 2014.  Consolidated Post-Sale Complaint ¶ 21.  Neither

Old GM nor the GUC Trust is named as a defendant in the Consolidated Complaints.

31.     The Consolidated Complaints seek several categories of economic damages that

allegedly arose as a result of the Recalls, including damages based on:  (i) amounts that the

purported members of the classes allegedly overpaid for their vehicles; (ii) the amount by which

the vehicles allegedly "diminished in value as a result of New GM's concealment of, and failure

to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety

and quality issues engendered by New GM's corporate policies"; (iii) alleged violations of

various state statutes; and (iv) alleged punitive and exemplary damages, restitution and

disgorgement, attorneys' fees, costs and pre- and post-judgment interest.  *See, e.g.,* Consolidated

Pre-Sale Complaint ¶ 3; Consolidated Post-Sale Complaint ¶ 2554.  While the Consolidated

Complaints do not enumerate the damages sought therein, given their broad allegations, the

number of Old GM vehicles subject to the Recalls to which they relate, and the examples of

damages that they provide for illustrative purposes, it appears that the damages alleged in the

Consolidated Complaints for diminution in value alone could exceed $7 billion.[14]

---

[14]     Specifically, the Consolidated Pre-Sale Complaint concerns vehicles with ignition switch-related defects that
were subject to the Recalls announced by New GM in February, March, June, July, and September
2014.  Consolidated Pre-Sale Complaint ¶¶ 10-18.  According to New GM, approximately 11.6 million of these
vehicles were manufactured by Old GM.  *See* Newman Decl., **Exhibits C-J**.  The Post-Sale Consolidated
Complaint also asserts claims concerning these vehicles, as well as vehicles subject to other Recalls.  *See*
Consolidated Post-Sale Complaint ¶¶ 487-88, 533, 596-98, 560-61, 716-17, 693-94, 635-36, 536-37, 544-45,
700-01, 747-48, 591.  According to New GM, more than 3 million of the vehicles subject to these additional
Recalls were manufactured by Old GM.  *See* Newman Decl., **Exhibits K-Y**.  Thus, it appears that the claims
asserted in the Consolidated Complaints relate to approximately 14.7 million vehicles (the "**Affected Vehicles**")

### F.    New GM Attempts to Inject the GUC Trust Into These Proceedings

32.    In April and August 2014 New GM filed three motions (the "**Motions to Enforce**") seeking an order from this Court declaring that New GM has no liability or responsibility for the claims at issue in the Consolidated Complaints and the other complaints that have been filed against New GM in connection with the Recalls regarding Old GM vehicles (collectively with the Consolidated Complaints, the "**Complaints**"), and that those claims are barred by the 363 Sale Order and related injunction.[15]  By letter to the Court dated April 30, 2014, New GM requested that the schedule governing its first Motion to Enforce "incorporate a process to address issues related to potential claims against the bankruptcy estate relating to Plaintiffs' allegations."  *See New GM's Proposed Conference Agenda Regarding its Motion to Enforce* (ECF No. 12673).  At a status conference respecting New GM's first Motion to Enforce held on May 2, 2014 (the "**Status Conference**"), counsel for New GM stated:

> The tentative that you had about the GUC Trust, late-filed claims, excusable neglect, we actually think that this is an issue that should be dealt with.  It is not our issue, but to the extent that they've raised or some of them have raised a

---

that were manufactured by Old GM.  *See id.*, **Exhibits C-Y.**  Even when using the most conservative assumptions—for example, valuing the lowest-priced, base model without any added options for each model year of the Affected Vehicles—applying the average percentage of the alleged reductions in value cited as examples in the Consolidated Complaints to the value of the Affected Vehicles as of October 2014 (as per the Kelley Bluebook) results in alleged damages of approximately $7.4 billion.  Further, Bloomberg News has estimated that the potential statutory damages for claims relating to 2.2 million Old GM vehicles subject to New GM's initial Recalls (which constitute only a small portion of the 14.7 million Old GM vehicles at issue in the Consolidated Complaints) is $2 billion, based on its evaluation of price data and locations, and its analysis of potential recoveries under state statutes.  *See id.*, **Exhibit EE.**  Needless to say, however, the Participating Unitholders and the GUC Trust Administrator do not concede (and in fact dispute) that the plaintiffs (the "**Plaintiffs**") in the Consolidated Complaints or other complaints in the putative class actions filed against New GM that are subject to the Motions to Enforce (as defined below) are entitled to these or any other damages.

[15]    On April 21, 2014, New GM filed the *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction* (ECF No. 12959).  On August 1, 2014 New GM filed the *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits* (ECF No. 12807) and the *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions)* (ECF No. 12808).  In addition, on April 21, 2014, certain Plaintiffs commenced an adversary proceeding seeking an order declaring that the Sale Order cannot be used by New GM to absolve it of any liability from Plaintiffs' claims.  *See Groman v. General Motors LLC*, Adv. Pro No. 14-01929 REG) (Bankr. S.D.N.Y. 2014) (ECF No. 1).  Old GM was not named as a defendant in the adversary proceeding.

procedural due process issue relating to the bar order, which was after the sale order had taken place and they're saying that they don't have a remedy – an effective remedy against Old GM, well there is a GUC Trust, there are a number of – there's a number of values still left in the GUC Trust . . .  but we were urging that they shouldn't just assume that there was nothing there when there is potentially something there and they should be able to and should be almost in fact required to at least explore that as an alternative to try to get a recovery. . .

Transcript of Hearing, *In re Motors Liquidation Co.*, May 2, 2014 (the "**May 2 Transcript**"),

31:1-18.[16]

33.      Designated Counsel (as that term is defined in the Scheduling Order) opposed

New GM's request by letter dated May 1, 2014, asserting that the question of Plaintiffs' claims

against Old GM could be "addressed at future court conferences, if necessary."  *See Response to

New GM's Proposed Conference Agenda* (ECF No. 12677).  Designated Counsel elaborated on

this position at the Status Conference, explaining:

it seems to me that before we ever get near that thorny issue, [the assertion of claims against the GUC Trust], where lots of people are going to be impacted, and it may not be practical, if we resolve the threshold issue of whether, because of lack of due process the injunction ought not to apply, then we never get into this issue.

May 2 Transcript at 74:15-20.

34.      Designated Counsel further expounded on their strategy with respect to Old GM

and the GUC Trust at a subsequent hearing before the Court, stating expressly that they intend to

seek to pursue claims against New GM only, and will seek to pursue claims against the GUC

Trust only if their efforts with respect to New GM are unsuccessful:

I'll be perfectly frank in terms of what our motivations are. I want to be able -- we want to collectively be able to write a brief to you that says, Your Honor, due

---

[16]      A true and correct copy of the relevant excerpts of the May 2 Transcript is attached to the Newman Decl. as **Exhibit BB.**  In addition, at a status conference held on July 2, 2014, counsel for New GM described New GM's position as follows "…because the obligation is Old GM who committed the procedural due process violation, and we're the good faith purchaser for value and that we're entitled to the protections that the courts have affirmed. That would be our position."  Transcript of Hearing, *Motors Liquidation Co.*, 09-50026 (REG), July 2, 2014, 68:8-13.  A true and correct copy of the relevant excerpts of this transcript is attached to the Newman Decl. as **Exhibit CC**.

process was violated in this context and the only proper remedy for a violation of due process is that the sale order, or more particularly the sale order injunction, can't be imposed against the people whose due process rights were violated. Period, end of a very long story, everything else is in front of Judge Furman. What I don't want to have to brief simultaneously is if I'm wrong and due process—due process wasn't violated or the appropriate remedy for a violation of due process is not that the sale order injunction doesn't get applied to me but now somehow the only recourse I have is against Old GM.

Transcript of Hearing, *In re Motors Liquidation Co.*, 09-50026 (REG), August 18, 2014 at 58:7-21.[17]

35.    At the Status Conference, the Court determined that the Identified Parties would address "the possibility that the claims now being asserted may be claims against Old GM or the GUC Trust." *See* May 2 Transcript at 96:5-7. The Identified Parties subsequently agreed that they would also address the Equitable Mootness Threshold Issue, which addresses the question of whether, "if any or all of the claims asserted in connection with the Recalls are or could be claims against the Old GM Bankruptcy estate (and/or the GUC Trust), such claims or the actions asserting such claims must be disallowed/dismissed on grounds of equitable mootness." Scheduling Order at 3.

---

[17]    A true and correct copy of the relevant excerpts from this transcript is attached to the Neman Decl. as **Exhibit DD.** On November 4, 2014—eleven days after the GUC Trust disclosed that it would be making a distribution to Unitholders on or about November 12, 2014—Designated Counsel sent a letter to the GUC Trust asserting that certain Plaintiffs are "known potential contingent beneficiaries of the GUC Trust," and that the GUC Trust "should not make any further distributions unless and until it demonstrates that adequate reserves have been established with respect to Plaintiffs' potential claims against Old GM and/or the GUC Trust that could be in the multiple billions of dollars." The GUC Trust Administrator responded by letter on November 5, 2014, advising Designated Counsel that, pursuant to the Confirmation Order, and absent further order from the Court, the GUC Trust Administrator is not required to establish reserves for claims filed after the Bar Date. The GUC Trust Administrator stated further that it is required to make distributions in accordance with the GUC Trust Agreement, that any delay in completing the scheduled distribution could result in material harm to the beneficiaries of the GUC Trust, and that it intends on making the scheduled distribution in accordance with its prior disclosure. As of the filing of this memorandum, neither Designated Counsel nor counsel for any other Plaintiffs had taken any steps to seek from the Court a stay of GUC Trust distributions or any other portions of the Plan.

# ARGUMENT[18]

36.     Notwithstanding New GM's efforts, the doctrine of equitable mootness precludes Plaintiffs' claims from being diverted from New GM to the GUC Trust.  Tens of millions of transactions, involving billions of dollars, have taken place in reliance on the terms of the Plan and Confirmation Order.  Modifying these terms now would result in manifest inequity to hundreds (and potentially thousands or millions) of parties who are not involved in these proceedings, and is impermissible both under the doctrine of equitable mootness and the Bankruptcy Code.  *See* 11 U.S.C. § 101 *et seq.*  This is especially so, given that Plaintiffs themselves have not even sought any such modification, or sought a stay from the Court in order to mitigate the prejudice that innocent third parties would suffer if such hypothetical relief was granted.

## I.     Where, as Here, A Plan of Liquidation has Been Substantially Consummated, There Is a Presumption of Equitable Mootness

37.     While the Constitution requires the dismissal of cases as moot whenever effective relief cannot be fashioned, the related, prudential doctrine of equitable mootness requires dismissal where relief can be fashioned, but implementation of such relief would be inequitable.  *See Church of Scientology v. United States*, 506 U.S. 9, 12 (1992) (quotations omitted); *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 143 (2d Cir. 2005).  The doctrine of equitable mootness reflects the "pragmatic principle" that "with the passage of time after a judgment in equity and implementation of that judgment, effective relief . . . becomes impractical, imprudent, and therefore inequitable."  *Id*. at 144 (quotations and citations omitted); *see also In re Arcapita Bank B.S.C.(C)*, 2014 WL 46552, at

---

[18]     With the exception of the argument asserted in Section II.D. below, the arguments asserted herein apply equally to the claims asserted in the *Motion for Leave to Pursue Claims Against General Motors LLC, and, Alternatively, to File a Post-Bar-Date Proof of Claim in the Motors Liquidation Company Bankruptcy* (ECF No. 12727) filed by Roger Dean Gillispie.

*5. This principle is "especially pertinent" in bankruptcy proceedings, "where the ability to achieve finality is essential to the fashioning of effective remedies." *Chateaugay I*, 988 F.2d at 325; *see also Compania Internacional Financiera S.A. (In re Calpine Corp.)*, 390 B.R. 508, 517 (S.D.N.Y. 2008), *aff'd*, 354 Fed. Appx., 479 (2d Cir. 2009).

38.    While "the doctrine of equitable mootness is perhaps most often associated with orders confirming reorganization plans, [] it [] also applies to orders confirming chapter 11 liquidation plans." *In re Arcapita Bank B.S.C(c)*, 2014 WL 46552 at *5; *see also BGI III*, 2014 WL 5462477 at *3; *O'Connor v. Pan Am Corp.* (*In re Pan Am Corp.*), No. 98CIV7838RDCLE, 2000 WL 254010, at *4 (S.D.N.Y. Mar. 7, 2000); *In re MF Global Holdings Ltd.*, No. 13 Civ 3432, 2014 WL 231130. at *2 (S.D.N.Y. Jan. 22, 2014); *Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 184 B.R. 648 (S.D.N.Y. 1995); *Bartel v. Bar Harbor Airways, Inc.*, 196 B.R. 268, 272-73 (S.D.N.Y. 1996); *Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 428 B.R. 43, 60 (S.D.N.Y. 2010).  Further, "the doctrine is not limited to appeals from confirmation orders, and has been applied in a variety of contexts, including . . . injunctive relief, leave to file untimely proofs of claim, class certification, property rights, asset sales, and payment of prepetition wages." *In re Arcapita Bank B.S.C(c)*, 2014 WL 46552 at *5.

39.    Equitable mootness generally comes into play in two situations, both of which are implicated here: "when an unstayed order has resulted in a comprehensive change in circumstances, and when a reorganization [or liquidation] is substantially consummated." *Kenton Cnty. Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, 374 B.R. 516, 522 (S.D.N.Y. 2007) (internal quotation marks omitted).  In either situation, there is a presumption of equitable mootness, which may be overcome only upon a showing of ***all*** of the *Chateaugay* Factors.  *Parker v. Motors Liquidation Co.*, 430 B.R. at 80 (citing *Chateaugay II*, 10

F.3d at 952-53).

40.    Here, the parties have stipulated, and the Court has previously found, that the Plan

has been substantially consummated.  Stipulated Facts ¶ 18; *Morgenstein*, 462 B.R. at 501 n. 36

("[T]he Plan already has been substantially consummated").  As demonstrated below, the "heavy

burden" necessary to overcome the presumption of equitable mootness cannot be satisfied.[19]

## II.    Plaintiffs' Claims, if Asserted Against the GUC Trust, are Equitably Moot

41.    As noted above, ***all*** of the *Chateaugay* Factors must be satisfied in order to

overcome the presumption that Plaintiffs' claims, if asserted against the GUC Trust, are barred

by the doctrine of equitable mootness.  *See, e.g., BGI III*, 2014 WL 5462477 at *5.  ***None*** of

these factors, let alone all of them*, is present here.

### A.    The First *Chateaugay* Factor Cannot be Satisfied

42.    The first factor that must be established in order to overcome the presumption of

equitable mootness is that the Court can fashion effective relief.  *See Chateaugay II*, 10 F.3d at

952-53.  Additionally, ***even if*** effective relief could conceivably be fashioned, the Court must

consider whether "implementation of that relief would be inequitable."  *Upstream Energy Servs.*

*v. Enron Corp.* (*In re Enron Corp.*), 326 B.R. 497, 502 (S.D.N.Y. 2005) (internal quotations and

citations omitted); *see also In re Metromedia*, 416 F.3d at 145 ("[T]he question is not solely

whether we *can* provide relief . . .  but also whether we *should* provide such relief in light of

fairness concerns.") (emphasis in original) (citation omitted); *In re Calpine*, 390 B.R. at 518-520.

43.    Here, it would be both inequitable and impossible for the Court to fashion relief

for Plaintiffs out of the GUC Trust Assets (in the event that Plaintiffs actually sought such relief).

---

[19]    As described in Section II.A.2, Plaintiffs' claims are also constitutionally moot, given that the Court could not
fashion effective relief for Plaintiffs if their claims were asserted against the GUC Trust.  *See In re Calpine
Corp.*, 390 B.R. at 517 ("Article III of the Constitution requires that there be an actual case or controversy for
which the court may grant effective relief.").

1.      **Even if Plaintiffs' Claims Could be Satisfied by the GUC Trust, Allowing Such Claims Would Result in Manifest Inequity**

44.     Even assuming, *arguendo*, that the assets remaining in the GUC Trust could be diverted from their contractual purposes for Plaintiffs' benefit (which, as discussed below, they cannot), allowing such claims to be asserted against the GUC Trust would result in manifest inequity to the holders of Allowed Claims, JPM Claims, and Unitholders that voted in favor of the Plan, or purchased GUC Trust Units, based on their understanding of the creditor pool and related Plan recoveries.  Granting such relief would also significantly undermine the principles of finality that lie at the heart of the equitable mootness doctrine, and are central to all bankruptcy proceedings.

45.     First, the GUC Trust Assets that have been set aside to fund GUC Trust Liabilities cannot be accessed for Plaintiffs' claims without causing significant injustice.  The Disclosure Statement (as defined in the Stipulated Facts), including the proposed Plan and the proposed GUC Trust Agreement which were exhibits thereto, was provided to the holders of Allowed and Disputed Claims so that they could make an informed decision as to whether to vote for or against the Plan.  The Disclosure Statement described the impact of the Bar Date and the Effective Date, and the scope of claims that could potentially be allowed to recover against the Debtors' estates.  Adding billions of dollars in additional potential claims would be manifestly unjust to the holders of Disputed and pending Allowed Claims and the JPM Defendants—none of whom have received any recoveries from the GUC Trust, and all of whom were expressly designated as GUC Trust Beneficiaries under the Plan.  To delay or reduce their recoveries now (potentially drastically), simply because it has taken longer to resolve their claims, would be highly inequitable, and inconsistent with the absolute priority rule, which requires that all creditors of the same class receive the same treatment.

46.    Second, in purchasing and/or holding their GUC Trust Units, existing Unitholders have relied on the GUC Trust Agreement, Plan, Confirmation Order, and GUC Trust quarterly reports, which provide that the GUC Trust Beneficiaries consist of a finite universe of claimants. Expanding that universe to include Plaintiffs (who are apparently alleging more than $7 billion in damages) now would be highly prejudicial to these Unitholders, who would undoubtedly have behaved differently if they had known that these documents could not be relied upon.

47.    Indeed, this Court has recognized that high volumes of trading can render additional claims against the GUC Trust equitably moot.  In *Morgenstein*, certain creditors sought, after the Bar Date and Effective Date, to file and recover on a class proof of claim in an estimated amount of $180 million, "whose assertion . . . would [have been] barred under the" Plan and Confirmation Order.  *Morgenstein*, 462 B.R. at 496-497.  In denying the relief sought on other grounds, the Court acknowledged that even though the creditors were not seeking to recoup distributions that had already been made, permitting them to proceed even against the assets remaining in the GUC Trust raised "fairness concerns," and "***mootness concerns may very well still exist***."  *Id.* at 509.  The Court continued:

> (the Court suspects but is not yet in a position to find that) hundreds of thousands (or more) of shares and warrants, with a value of many millions (or more) of dollars traded since the Plan became effective, having been bought and sold based on estimates of Plan recoveries premised on the claims mix at the time the Plan was confirmed . . .

> It is very possible that—even if those who already received stock and warrants under the Plan weren't required to give back what they already received—all of the trading that took place after entry of the Confirmation Order (in what probably was in reliance on the Plan and Confirmation Order as then entered, and the related Disclosure Statement as then approved) by itself would support a finding of equitable mootness.

*Id.*

23

48.     While the Court ultimately concluded that it did not have sufficient information before it to make a final determination respecting equitable mootness, the record now before the Court—two-and-a-half years later—shows that approximately 100 million GUC Trust Units, with an aggregate trading value of $2.1 billion (based on daily closing prices), have been bought and sold since June 14, 2012.  *See* Schedule of GUC Trust Unit Trading Information.[20]  As the Court correctly surmised, and as the analyst reports respecting the GUC Trust Units demonstrate, the GUC Trust Units have "been bought and sold based on estimates of Plan recoveries premised on the claims mix" (*See Morgenstein*, 462 B.R. at 509), and, in particular, based on estimates of the aggregate amounts of remaining Disputed Claims and GUC Trust costs and liabilities.

49.     If Plaintiffs are permitted to file claims against the GUC Trust, however, the pool of Allowed Claims will be increased by an amount that cannot be estimated with any reasonable certainty (but which Plaintiffs appear to believe is in excess of $7 billion), and additional distributions to Unitholders, to the extent any are made, could be delayed pending both the resolution of Plaintiffs' claims, and a determination that no additional claims are forthcoming.

50.     Such a bait and switch—where innocent parties have made irrevocable decisions based on the terms of a confirmed plan that are then sought to be modified—is exactly the type of injustice that equitable mootness is designed to prevent.  *See, e.g., In re Calpine*, 390 B.R. at 520 (finding that appellant had failed to satisfy the first *Chateaugay* Factor based, in part, on the court's view that "modifying the TEV in a consummated plan of reorganization that so many parties have relied upon in making at least some potentially irrevocable decisions would be inequitable."); *In re Enron,* 326 B.R. at 504 (holding that it would be "manifestly inequitable" to

---

[20]   A true and correct copy of this document is attached to the Newman Decl. as **Exhibit FF**.

modify even a single provision of a substantially consummated plan "that so many parties have relied upon in making various, potentially irrevocable, decisions.").

51.     The recent decisions in *In re BGI* are instructive.  Appellants there argued that the bankruptcy court erred by denying them leave to assert late priority claims and refusing to certify a class of creditors holding unused gift cards issued by the debtor, Borders Bookstores, following confirmation of the debtor's plan of liquidation.  *See Beeman v. BGI Creditors' Liquidating Trust (In re BGI, Inc.),* Nos. 12 Civ 7714 (ALC), 12 Civ 7715 (ALC), 13 Civ 0080 (ALC), 2013 U.S. Dist. LEXIS 77740 at *2 (S.D.N.Y. Jan. 22, 2014) ("***BGI II***"); *see also BGI III*, 2014 WL 5462477 at *2.  The BGI liquidating trust had already distributed more than $80 million, and there was an additional approximately $61 million remaining for distribution.  *BGI II*, 2013 U.S. Dist. LEXIS 77740 at *16.  In holding that appellants' appeals were equitably moot, the district court reiterated the bankruptcy court's holding that allowing appellants to file late claims "would result in massive prejudice to the estate because the distributions to general unsecured creditors who filed timely proofs of claim would be severely impacted."  *Id.* at 25; *see also BGI III*, 2014 WL 5462477 at *6 (referring to this reasoning as "persuasive[e]").

52.     Here, as in *In re BGI,* if Plaintiffs are permitted to file claims against the GUC Trust, the pool of Allowed Claims (to the extent Plaintiffs' claims are allowed) will be massively increased, and additional distributions to Unitholders may be eviscerated.  Indeed, given that 89% of the GUC Trust's assets have been distributed, it is highly likely that the remaining assets would be entirely wiped out by Plaintiffs' claims (if such claims were allowed) and, in any event, such claims could take years to resolve.  Such a result would "have a disastrous effect" on innocent creditors who filed timely proofs of claim and the Unitholders.

53.     Additionally, given New GM's refusal to confirm that there will not be additional

recalls, and the multitude of class action lawsuits that have been filed in connection with the

existing Recalls, no one can say with certainty how many claims like Plaintiffs' will ultimately

be asserted (if asserted at all), or how long it will take to resolve such claims.  Courts recognize,

however, that "[t]he costs and delay associated with class actions are not compatible with

liquidation cases where the need for expeditious administration of assets is paramount," and that

"creditors who are not involved in the class litigation should not have to wait for payment of

their distributive liquidated share while the class action grinds on."  *In re Thomson McKinnon*

*Securities*, 133 B.R. at 41.  This is especially true here, where the GUC Trust was established

more than three years ago, and the vast majority of potential claims against it have been resolved.

There can be no question that permitting Plaintiffs to file claims against the GUC Trust now will

prolong its existence for many years, which will inure to the detriment of the Unitholders and

holders of yet-to-be-paid Allowed Claims, even if Plaintiffs' claims are ultimately disallowed.

### 2.     The Assets Remaining in the GUC Trust Make It Impossible for Plaintiffs to Obtain Effective Relief from the GUC  Trust

54.     The first *Chateaugay* Factor also cannot be satisfied for the additional reason that

the assets remaining in the GUC Trust make it impossible to grant Plaintiffs effective relief from

the GUC Trust (assuming, for purposes of the Equitable Mootness Threshold Issue only, that

Plaintiffs' claims were allowed).   These remaining assets have been set aside to fund the GUC

Trust Liabilities or the distribution to Unitholders scheduled for November 12, 2014.  The terms

of the Plan providing for such funding are binding contractual commitments, and cannot be

altered in order to fashion relief for Plaintiffs without revoking the entirety of the Plan and

Confirmation Order.  *See Morgenstein*, 462 B.R. at 504 ("A confirmed plan takes on the

attributes of a contract . . . modification of a contract only in part, without revoking it in whole,

raises grave risks of upsetting the expectations of those who provided the necessary assents.");

*see also In re Pan Am Corp.*, 2000 WL 254010, at *4 (questioning whether any relief could be

fashioned where assets in a liquidating trust were to be paid to another entity under a distribution

order).

55.    Revocation of the Confirmation Order, however, is impermissible under the

Bankruptcy Code, which provides for such revocation only in limited circumstances that are not

present here. *See* 11 U.S.C. § 1144.  Accordingly, the only way that effective relief for Plaintiffs

could be fashioned from the GUC Trust is if the distributions the GUC Trust and Debtors have

already made could be recouped.  Such recoupment, however, is simply not possible.  The GUC

Trust and Debtors have distributed more than 100 million each of the publicly-traded shares of

New GM Common Stock and two series of publicly-traded New GM Warrants, and more than 31

million GUC Trust Units, and the vast majority of those distributions (approximately 80%) were

made more than three years ago.  Many, if not most, of these distributed securities, which are

actively traded, have no doubt been bought and sold several times over.[21]  Identifying the chain

of ownership of these securities would not only be highly expensive and impracticable (and

potentially impossible), it would also require that a myriad of financial transactions be unwound.

Indeed, the Court has already observed that the equitable mootness argument is a "slam dunk"

for any relief that requires disgorgement of the New GM Securities that have been distributed

under the Plan. *Morgenstein*, 462 B.R. at 508.[22]

---

[21]    According to Bloomberg Finance L.P., approximately 9 billion shares of New GM Common Stock were traded
between June 2012 and October 24, 2014.

[22]    Numerous other courts are in accord, repeatedly ruling that equitable mootness applies where, as here, the relief
in question would require recoupment of plan distributions that have already been made. *See, e.g., Bartel*, 196
B.R. at 273 (appeal of confirmation order dismissed as equitably moot because "assets ha[d] been liquidated,
millions of dollars in distributions ha[d] already been made, and these assets and distributions [could not] be
recouped"); *In re Ionosphere Clubs*, 184 B.R. at 652 ("tens of thousands of creditors have received millions of
dollars in distributions under the Plan.  These assets and distributions cannot be recouped."); *Chateaugay* I, 988
F.2d at 326 (equitable mootness applied where the recoupment of funds, "in addition to being impracticable,

56.    Quite simply, Plaintiffs cannot be afforded effective relief from the assets
remaining in the GUC Trust, and recoupment of the distributions that have already been made is
not possible.  Plaintiffs' claims, if asserted against the GUC Trust, are thus equitably moot.

**B.    Allowing Plaintiffs to File their Claims Against the GUC Trust Would
Unravel Intricate Transactions and Create an Unmanageable,
Uncontrollable Situation for the Court**

57.    Additionally, allowing Plaintiffs to file their claims against the GUC Trust now
would "unravel intricate transactions so as to 'knock the props out from under the authorization
for every transaction that has taken place' and 'create an unmanageable, uncontrollable situation
for the Bankruptcy Court." *Chateaugay II,* 10 F.3d at 953 (quoting *Trone v. Robert Farms, Inc.*
(*In re Roberts Farm, Inc.*), 652 F.2d 793, 797 (9th Cir. 1981).  Regardless of whether Plaintiffs
ultimately (if ever) seek to recoup GUC Trust distributions, or lay claim to the GUC Trust's
remaining assets, permitting Plaintiffs to file claims against the GUC Trust now would require
revocation of the entire Plan.  *See Morgenstein*, 462 B.R. at 504.

58.    As the court in *In re Trico Marine Services, Inc.* observed, "[i]f stock is issued
under a plan to creditors in satisfaction of their debts, restoration of the status quo requires the
reinstatement of the debts and the cancellation of the stock."  *Salsberg v. Trico Marine Servs.,
Inc.* (*In re Trico Marine Servs.* ), 343 B.R. 68, 71 (S.D.N.Y. 2006).  Recoupment of prior
distributions, therefore, would plainly strike a death knell for the Plan.

---

would impose an unfair hardship on faultless beneficiaries who [were] not parties to [the] appeal."); *In re Delta
Airlines*, 374 B.R. at 524 (appeal dismissed as equitably moot where distributions "have already been made and
the securities distributed have likely been traded to parties who are not before the Court and those distributions
cannot reasonably be undone . . . "); *In re Calpine Corp.*, 390 B.R. at 520 ("The disgorgement of approximately
48.5 million Warrants, at least four million of which have already been traded, would be infeasible and
inequitable to investors who subsequently purchased the Warrants in good faith); *see also Credit Alliance Corp.
v. Dunning-Ray Ins. Agency, Inc. (In re Blumer)*, 66 B.R. 109, 113 (B.A.P. 9th Cir. 1986), *aff'd*, 826 F.2d 1069
(9th Cir. 1987) ("effective relief is impossible if funds have been disbursed to persons who are not parties to the
appeal").

59.     But even granting Plaintiffs the more limited relief of permitting them to recover

from the GUC Trust's remaining assets would "knock the props out" from under the Plan and the

transactions that have taken place in reliance on its terms.  As noted above, such relief would

require modifications to the GUC Trust Agreement, Plan, and Confirmation Order to expand the

GUC Trust Beneficiaries beyond that provided for thereunder; materially alter the potential

claims described in the Plan and Disclosure Statement and the claims and liability mix disclosed

in the GUC Trust's quarterly reports; and significantly delay (and potentially eviscerate

completely) additional distributions to Unitholders, who have purchased or held GUC Trust

Units in reliance on the Plan and Confirmation Order and the disclosures in the quarterly reports.

As this Court observed in *Morgenstein*, modifying the Plan to permit the late filing of a class

proof of claim seeking even $180 million (a fraction of the amount Plaintiffs are apparently

seeking here) "***raises grave risks of upsetting the expectations of those who provided the***

***necessary assents***," and is not permitted under the Bankruptcy Code.  462 B.R. at 504 (emphasis

added).  Nor is there any basis, under the Bankruptcy Code, or any other applicable law, for

revoking the Plan in its entirety.  *See* 11 U.S.C. § 101 *et seq.*

60.     Moreover, revocation of the Plan would clearly "create an unmanageable,

uncontrollable situation for the Bankruptcy Court." *Chateaugay II,* 10 F.3d at 953 (quoting *In re*

*Roberts Farm, Inc.*, 652 F.2d at 797).  The hundreds of millions of securities that have been

distributed under the Plan would need to be cancelled, distributed cash recovered, a new plan

formulated, and votes solicited.  Essentially, the years of work that this Court and interested

parties spent formulating and confirming the Plan will have been for naught.  This *Chateaugay*

Factor thus also mandates a finding of equitable mootness.

**C.      Numerous Third Parties Would Be Adversely Affected By the Relief
Sought by Plaintiffs and Would Have Neither Notice nor Opportunity
to Participate in the Proceedings**

61.      The fourth *Chateaugay* Factor, which requires a showing that the third parties

affected by the relief sought have had notice of and an opportunity to participate in the

proceedings, also cannot be shown.  *See Chateaugay II*, 10 F.3d at 952-53.  This *Chateaugay*

Factor requires individual notice, and cannot be satisfied by an "assertion . . . that [affected

parties] may have constructive or actual notice."  *See, e.g., In re Calpine*, 390 B.R. at 522 ("An

assertion by Appellants that purchasers of New Calpine Common Stock may have constructive

or actual notice is not sufficient to satisfy their burden of establishing that such purchasers had

notice of the Appeals and an opportunity to participate in the proceedings.").

62.      Here, as detailed above, affording relief to the Plaintiffs from the GUC Trust's

remaining assets—in the event that the Plaintiffs actually sought such relief—would affect the

current holders of Disputed Claims, the defendants in the JPM Action, the holders of Allowed

Claims who have not yet received a distribution, and third-party Unitholders that have purchased

or held GUC Trust Units based on the publicly disclosed amounts of potential GUC Trust

Liabilities.  Numerous additional parties will be affected if Plaintiffs are seeking to recoup prior

distributions, as more than one hundred million of each of the New GM shares and both series of

New GM Warrants, with values of many billions of dollars, have been distributed (and likely

traded).

63.      Neither Plaintiffs nor New GM, however, has done anything to provide notice that

Plaintiffs are seeking a recovery from the GUC Trust, and there is no evidence that any such

notice has been provided or received.  To the contrary, Plaintiffs have stated explicitly that at this

point, they are ***not*** seeking such relief.  *See* May 2 Transcript at 74:15-20.  Accordingly, this

*Chateaugay* Factor cannot be satisfied.  *See, e.g., In re Arcapita Bank B.S.C(c)*, 2014 WL 46552

30

at *7 ("Appellant does not contend that the numerous third parties who have participated in and

relied on the transactions completed pursuant to the Plan have been notified.  Accordingly,

Appellant fails to satisfy the fourth *Chateaugay* factor"); *In re Pan Am*, 2000 WL 254010 at *4

(the fact that the appellant "did not notify any of the holders of administrative claims of her

intent to challenge the distribution order" weighed in favor of a finding of equitable mootness);

*BGI III*, 2014 WL 5462477 at * 6.

> **D.      Plaintiffs have not Diligently Pursued Remedies that Could
> Potentially Have Minimized the Inequities that Would Result from
> Allowing their Claims to be Filed Against the GUC Trust**

64.     Finally, Plaintiffs have not "pursued with diligence all available remedies to

obtain a stay of execution of the objectionable order," and "the failure to do so creates a situation

rendering it inequitable to reverse the orders . . ."  *Parker v. Motors Liquidation Co.*, 430 B.R. at

80 (quoting *Chateaugay II*, 10 F.3d at 952-53).  While Plaintiffs may be able to credibly argue

that they could not have sought a stay of the Confirmation Order because they were not aware

that they had claims against the Debtors, there is no excuse as to why, if they wish to assert

claims against the GUC Trust now, they have not taken any steps to assert those claims (or to put

all holders of Allowed and Disputed Claims, JPM Defendants, and Unitholders on notice of their

intention to do so), or to obtain from this Court a stay of additional GUC Trust distributions.

Plaintiffs' failure to take these actions further exacerbates the inequity of permitting them to

recover against the GUC Trust, as more than 25 million GUC Trust Units and almost 3 billion of

New GM Common Stock have traded since the first of their Complaints was filed.  *See, e.g., In

re Pan Am*, 2000 WL 254010 at *4 (finding that appellant failed to satisfy the fifth *Chateaugay*

Factor where she "never sought a stay of execution of the distribution order" and "did not notify

any of the holders of administrative claims of her intent to challenge the distribution order.").

31

65.    *BGI II* is again instructive.  The district court there held that the appellants "did

not pursue their claims with all diligence," noting that the "[a]ppellants' counsel began reviewing

the case in early December and was retained by the end of December," but that the appellants

"did not appear at the confirmation hearing or file any objections to the Plan," and "did not seek

reconsideration of or appeal the confirmation order or seek a stay of the Effective Date."  2013

U.S. Dist. LEXIS 77740 at *32-33.  The court concluded that "[t]he fact that no stay of

distributions was sought by Appellants until almost a year after they entered the bankruptcy

litigation and the Plan was confirmed indicates the lack of diligence with which Appellants

moved."  *Id.* at *33 (emphasis added).  The Second Circuit affirmed on this basis.  *BGI III*, 2014

WL 5462477 at *6.

66.    The circumstances here are similar.  Plaintiffs began filing their actions as early as

February 2014.  Yet, prior to the entry of the Scheduling Order, and with only one exception,

Plaintiffs did not take any steps to assert claims against the GUC Trust (or preserve their ability

to do so), and have taken no steps at all to seek a stay from the Court preventing the GUC Trust

from making further distributions, or to put all affected third parties on notice of their intention to

assert claims over the GUC Trust Assets.[23]  Plaintiffs have been frank in explaining why—they

prefer to pursue claims against New GM first, and resort to the GUC Trust only if necessary.

Whatever Plaintiffs' motivation, however, the law is clear.  They cannot have it both ways.  Their

failure to diligently pursue claims against the GUC Trust precludes them from doing so now.  *See

Campbell v. Motors Liquidation Co.*, 428 B.R. at 63, n.30 (holding that "Appellants' deliberate

failure to 'pursue with diligence all available remedies to obtain a stay of execution of the

objectionable order' has indeed ''created a situation rendering it inequitable to reverse the orders

---

[23]    The only Complaint in which the GUC Trust has been named as a defendant is *Phillips, et al. v. General Motors Corporation, et al.*, Civil Action No. 3:14-cv-00192, which has been consolidated with the MDL Proceedings.

appealed from,'" and "emphasiz[ing] that the Second Circuit has made it clear that an appellant

is obligated to protect its litigation position by seeking a stay . . .") (citations omitted).

## **CONCLUSION**

For the foregoing reasons, the Participating Unitholders and Wilmington Trust Company,

as trustee for and trust administrator of the GUC Trust, respectfully request that the Court issue

an Order providing that, if any or all of the claims asserted in connection with the Recalls are or

could be claims against the Old GM Bankruptcy estate (and/or the GUC Trust), such claims or

the actions asserting such claims must be disallowed/dismissed on grounds of equitable

mootness.

Dated: New York, New York
        November 5, 2014

AKIN GUMP STRAUSS HAUER & FELD LLP

By:      */s/ Daniel H. Golden*
        Daniel H. Golden
        Deborah J. Newman
        Jamison A. Diehl
        Naomi Moss
        One Bryant Park
        New York, NY 10036
        (212) 872-1000 (Telephone)
        (212) 872-1002 (Facsimile)

        *Attorneys for the Participating Unitholders*


GIBSON, DUNN & CRUTCHER LLP

By:      */s/ Matthew J. Williams*
        Matthew J. Williams
        Lisa H. Rubin
        Keith Martorana
        200 Park Avenue
        New York, NY 10166-0193
        (212) 351-4000 (Telephone)
        (212) 351-6391 (Facsimile)

        *Attorneys for Wilmington Trust Company,*
        *as Trustee for and Administrator of the*
        *Motors Liquidation Company GUC Trust*