Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 09-50026(REG)

4    (Jointly Administered)

5    - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7    MOTORS LIQUIDATION COMPANY, ET AL.,

8        f/k/a General Motors Corp., et al.,

9                  Debtors.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - x

11   ADV. PROC. NO.: 14-01929 (REG)

12   STEVEN GROMAN, ROBIN DELUCO,

13   ELIZABETH Y. GRUMET, ABC FLOORING, INC.,

14   MARCUS SULLIVAN, KATELYN SAXSON, AMY C.

15   CLINTON, AND ALLISON C. CLINTON, on behalf

16   of themselves, and all others similarly situated,

17                  Plaintiffs,

18   v

19   GENERAL MOTORS, LLC,

20                  Defendant.

21   - - - - - - - - - - - - - - - - - - - - - - - - - - x

22                  U.S. Bankruptcy Court

23                  One Bowling Green

24                  New York, New York

25

Page 2

1                        July 2, 2014

2                        9:46 AM

3

4    B E F O R E :

5    HON ROBERT E. GERBER

6    U.S. BANKRUPTCY JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    "No Stay Pleadings" filed in connection with Scheduling

2    Order Regarding (I) Motion of General Motors, LLC Pursuant

3    to 11 U.S.C. Section 105 and 363 to Enforce the Court's July

4    5, 2009 Sale Order and Injunction, and (II) Objection Filed

5    by Certain Plaintiffs in Respect Thereto, and (III)

6    Adversary Proceeding No. 14-01929 (ECF 12697)

7

8    Motion of General Motors, LLC to Establish Stay Procedures

9    for Newly-Filed Ignition Switch Actions, filed by General

10   Motors, LLC (ECF 12725)

11

12   In re Motors Liquidation Company, et al., Case No. 09-50026

13   (REG): Motion of General Motors, LLC Pursuant to 11 U.S.C.

14   Section 105 and 363 to Enforce Sale Order and Injunction

15   ("Motion to Enforce"), filed by General Motors, LLC (ECF

16   12620, 12621)

17

18   Motion for Leave to Pursue Claims Against General Motors,

19   LLC and, Alternatively, to File a Post-Bar-Date Proof of

20   Claim in the Motors Liquidation Company Bankruptcy, filed by

21   Roger Dean Gillispie ("Gillispie Motion") (ECF 12727)

22

23

24

25   Transcribed by:  Sherri L. Breach

1  A P P E A R A N C E S :

2  KING & SPALDING, LLP

3       Attorneys for General Motors, LLC

4       1185 Avenue of the Americas

5       New York, New York 10036

6

7  BY:  ARTHUR J. STEINBERG, ESQ.

8       SCOTT DAVIDSON, ESQ.

9

10  KIRKLAND & ELLIS, LLP

11       Attorneys for General Motors, LLC

12       300 North LaSalle

13       Chicago, Illinois 60654

14

15  BY:  RICHARD C. GODFRY, ESQ.

16

17  CAPLIN & DRYSDALE, CHARTERED

18       Attorneys for Certain Plaintiffs

19       600 Lexington Avenue, 21st Floor

20       New York, New York 10022

21

22  BY:  ELIHU INSELBUNCH, ESQ.

23       ANDREW J. SACKETT, ESQ.

24

25

```
 1   GOODWIN PROCTER, LLP

 2        Attorneys for South Texas Plaintiffs

 3        The New York Times Building

 4        620 Eighth Avenue

 5        New York, New York 10018

 6

 7   BY:  WILLIAM P. WEINTRAUB, ESQ.

 8

 9   FOREMAN LAW, PLLC

10        Attorneys for Ponce & Hurst Class Action Plaintiffs

11        1745 Broadway, 17th Floor

12        New York, New York 10019

13

14   BY:  MICHAEL FOREMAN, ESQ.

15

16   BROWN RUDNICK

17        Attorneys for Certain Plaintiffs

18        Seven Times Square

19        New York, New York 10036

20

21   BY:  HOWARD S. STEEL, ESQ.

22        EDWARD WEISFELNER, ESQ.

23        DAVID MOLTON, ESQ.

24

25
```

Page 6

```
 1   OTTTERBOURG, P.C.

 2         Liaison Counsel for Plaintiff's Counsel

 3         230 Park Avenue

 4         New York, New York 10169

 5

 6   BY:  MELANIE L. CYGANOWSKI, ESQ.

 7

 8   GOLENBOCK. EISEMAN, ASSOR, BELL & PESKOE, LLP

 9         Attorneys for Groman Plaintiffs

10         437 Madison Avenue

11         New York, New York 10022

12

13   BY:  JONATHAN L. FLAXER, ESQ.

14         S. PRESTON RICARDO, ESQ.

15

16   GIBSON, DUNN & CRUTCHER, LLP

17         Attorneys for Wilmington Trust Company as

18         GUC Trust Administrator

19         200 Park Avenue

20         New York, New York 10166

21

22   BY:  LISA H. RUBIN, ESQ.

23         ADAM OFFENHARTZ, ESQ.

24         KEITH R. MARTORANA, ESQ.

25
```

1   AKIN, GUMP, STRAUSS, HAUER & FELD, LLP

2        Attorneys for GUC Trust Unit Trust Holders

3        One Bryant Park

4        New York, New York 10036

5

6   BY:  DANIEL H. GOLDEN, ESQ.

7        DEBORAH NEWMAN, ESQ.

8

9   TALOS LAW

10        Attorneys for Lawrence & Celestine Elliott

11        705 4th Street NorthWest, Suite 403

12        Washington, D.C. 20001

13

14   BY:  DANIEL HORNAL, ESQ.

15

16   STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

17        Attorneys for Barron & Budd & Grant

18        2323 Bryan Street, Suite 2200

19        Dallas, Texas 75201

20

21   BY:  SANDER L. ESSERMAN, ESQ.

22

23

24

25

Page 8

1   BLOCK & LEVITON, LLP

2        Attorneys for Phaneuf Plaintiffs

3        155 Federal Street, Suite 400

4        Boston, Massachusetts 02110

5

6   BY:  JEFFREY C. BLOCK, ESQ.

7

8   FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP

9        Attorneys for Phaneuf Plaintiffs

10        1279 Route 300

11        Newburgh, New York 12551

12

13   BY:  TODD GARBER, ESQ.

14

15   LOWENSTEIN SANDLER, LLP

16        Attorneys for Darby & Jones Plaintiffs

17        65 Livingston Avenue

18        Roseland, New Jersey 07068

19

20   BY:  MICHAEL S. ETKIN, ESQ.

21

22

23

24

25

Page 9

1                    P R O C E E D I N G S

2              THE COURT:  Good morning.  Have seats, please.

3              All right.  We're here on a continued conference

4    and motion return date in Motors Liquidation, General

5    Motors.

6              As I understand it -- and I want to thank you for

7    the agenda letter.  Now you know why we require agenda

8    letters in this Court.  We have five matters on the table,

9    four of which are contested.

10             Here's what we're going to do.  I'm going to grant

11   the uncontested motion; that being the one for what I'll

12   call tag-along matters, and then I'm going to take

13   discussion on the most important, or at least effecting the

14   most people matter, the scheduling order.  And then I'll

15   hear the Phaneuf no-stay motion, the Elliott's issue, and at

16   the end -- and people can leave if they're not interested in

17   that -- the Gillispie malicious prosecution claim issue.

18             I know a lot of you.  I certainly know Mr.

19   Steinberg, Mr. Weisfelner, Mr. Inselbuch, Mr. Esserman and

20   Mr. Flaxer.  But even if I know you, I'm going to need you

21   to identify yourselves as you come up so that we get a good

22   recording and transcript.

23             Unless somebody needs to say anything, the tag-

24   along stay motion is granted and, accordingly, when we get

25   to the Elliott matter, which will be later in the morning,

Page 10

1    I'll want to hear discussion as to the extent to which I

2    should consider the Elliotts along with the other 87 actions

3    on the one hand or whether I should hear it as a tag-along

4    matter on the other, and subject to the mechanisms that I'm

5    approving today vis-à-vis that motion.

6           On the main show make your points as you see fit,

7    but before you're done I would like you to address the

8    following questions and concerns that I have as a result of

9    reading your papers.  I've read them all, including the

10   redlines of the counter-orders as you prepared them, for

11   which I'm grateful.  The blacklines made it much easier for

12   me to see the differences in your perspective.

13          But there's some underlying conceptual matters

14   highlighted by Mr. Flaxer's letter and by the GUC trust

15   letter which I would particularly like you to address.   And

16   it seems to me there are two conceptual matters where I need

17   your help.

18          The first is that I'm sympathetic to points that

19   were made by Wilmington Trust that the threshold issues, if

20   I were to limit them to a single one, would be unduly

21   narrow.  I will understand the desire to consider the fraud

22   on the court claim separately, or at least the additional

23   management issues that are associated with the consideration

24   of that issue.

25          But I am interested in your views as to the best

Page 11

1   time to decide that and the extent to which that issue would

2   or could be expected to go away on the one hand or would be

3   lingering on the other.  And I would like your help on what

4   you perceive to be the management issues associated with

5   dealing with a claim of that character.

6           I also wonder whether or not just the first or

7   even the second, as might be read from the GUC trust and

8   perhaps the Groman issue -- letters which suggest the second

9   being what I'll call the remedies issue, whether the last

10  one dealing with the extent to which any of these claims, if

11  they're not assertable against new GM or might still be

12  assertable against old GM, should also be considered to be

13  threshold issues because the thing I would like you guys to

14  focus on is in that last connection if, as Mr. Steinberg is

15  likely to argue, plaintiffs can't go against new GM, whether

16  that means they can't go against anybody, which strikes me

17  as counter-intuitive subject to your rights to be heard.

18          I think, folks -- I certainly want to hear your

19  views.  But, ultimately, I will decide, of course, what the

20  threshold issues are, whether the threshold issues should

21  include not just number one being the due process issue, but

22  number two or (b), I guess, the remedies issue and (d) the

23  issue as to whether it can be asserted against anybody else.

24          Subject to your rights to be heard, it seems to me

25  that the bigger issue in determining what are threshold

Page 12

1    issues is not whether you write an additional section in

2    your brief, but whether you have the need to address it by

3    discovery.  And if you think that instinct is wrong, I would

4    certainly hear that view. But my tentative is to ask you

5    folks to brief as much as you can without the need for

6    material discovery or any discovery and to defer only those

7    matters that require discovery to a later time, if we can

8    accomplish that.

9            Obviously, I need the ability to do my job and I'm

10   disinclined to look at the issues with blinders.

11           The second point that I understood Wilmington

12   Trust and/or the Groman plaintiffs to have addressed in

13   their competing orders and their associated letters is when

14   and how we should deal with any discovery.  And my views are

15   less crystallized in that regard and I want your input in

16   that respect.

17           It seems to me that in a way I'm faced with a

18   gamble because it may well be that we can't deal with this

19   stuff, or at least the entirety of this stuff, without

20   discovery.  But the discovery has such great potential for

21   slowing things down that I want your input on that, and when

22   and how I should determine the need for additional

23   discovery.

24           I expressly disclaim any knowledge, belief or

25   expectation as to what that discovery would show, and I

1   assume each of you has your own view of the world in that

2   regard.

3          So with that I'll hear from you.  First from you,

4   Mr. Steinberg, and before you deal with the deeper stuff I

5   would appreciate an update from you and then perhaps you

6   yielding temporarily to Mr. Weisfelner, Mr. Inselbuch or Mr.

7   Esserman for them to supplement or correct anything you

8   might stay vis-à-vis what you've accomplished since we were

9   here last on what I think was May 2nd, so I can get a lay of

10  the land in terms of where we are.

11         Obviously, folks, I want to get this right.  But I

12  also have an obligation to the system and to Judge Furman to

13  keep this train moving on schedule and to try to reach an

14  expeditious resolution here.  And our challenge is going to

15  be finding the sweet spot where we accomplish both goals.

16         So, Mr. Steinberg, may I hear from you first,

17  please?

18         MR. STEINBURG:   Good morning, Your Honor.  Arthur

19  Steinberg from King & Spalding, and I'm here with my

20  colleagues, Scott Davidson from King & Spalding and Richard

21  Godfrey from Kirkland & Ellis.

22         Your Honor, with regard to what has been

23  accomplished since the May 2 hearing, we actually did a

24  pretty good job getting voluntary stay stipulations signed

25  and we had the cooperation of the designated counsel in the

1   context of doing that.  So if there were 88 ignition switch

2   actions that had been identified, 87 have signed voluntary

3   stay stipulations.  Phaneuf being the only one who had filed

4   a no-stay stipulation.

5           THE COURT:  Mr. Steinberg, I'm going to sound like

6   a broker record, but I would appreciate you pulling the

7   microphone closer to you and speaking a little louder,

8   please.

9           MR. STEINBURG:  Okay.  I apologize for that.

10          THE COURT:  Now you sound pretty good.

11          MR. STEINBURG:  Okay. I'm usually loud enough and

12   I --

13          THE COURT:  Yeah.  I know that, but we have a full

14   courtroom and the sound system isn't what it used to be.  So

15   try to find that sweet spot again between being loud enough

16   for me to hear you without screaming at me.

17          MR. STEINBURG:  I certainly will try not to scream

18   at you, Your Honor.

19          With regard to the other major activity that was

20   done, we went through the exercise of trying to agree as to

21   factual stipulations that would be the given record for

22   purposes of resolving the threshold issues.  And the

23   exercise proved to be a little more difficult than

24   envisioned, at least envisioned by myself.

25          And we gave a little more time for a plaintiff's

Page 15

1   group to gather together their questions.  And this would be

2   my own perspective of what occurred, and I share it with you

3   and I know that counsel will follow me and if I say

4   something that they think should be modulated, they

5   certainly will do that.

6           But when you're dealing with a large group and

7   you're just trying to accumulate the types of factual

8   stipulations that you want people to agree to, sometimes you

9   function with the lowest common denominator, which means if

10  someone wants to raise it, we'll throw it in.  And the end

11  result was, with regard to factual stipulations, we got 112

12  pages from the designated counsel with 713 requests plus

13  subparts.  We got 47 pages from the GUC trust with 166

14  requests.  We got only 4 pages from the Groman plaintiffs,

15  but after we had our first meet and confer they wanted to

16  add another 60.

17          THE COURT:  6-0 or 16?

18          MR. STEINBURG:  6-0.

19          THE COURT:  Uh-huh.

20          MR. STEINBURG:  So -- and then we responded to

21  what we thought would be the right way to go.  And what you

22  have as the byproduct of that exercise is the difference is

23  in what we had proposed in conjunction with the designated

24  counsel and what the GUC trust has proposed and, separately,

25  what the Groman plaintiffs have proposed.

Page 16

1          There's a desire on everybody's part to get the

2    train moving, right?  We were stuck in neutral.  We have an

3    MDL.  There's a report that's due on August 11th.  The

4    voluntary stay stipulations have a September 1 date before

5    someone can petition Your Honor to modulate the voluntary

6    stay that they had agreed to.

7          And so the question was, after having gone through

8    this exercise, what do we think that we can accomplish

9    without much controversy and move the matter along in a

10   significant way.  And I think going through the exercise we

11   realized that we probably can get to the procedural due

12   process issue without discovery.  We -- it was certainly our

13   position that you didn't need discovery.  I think the

14   designated counsel came along with that provision and,

15   basically, they wanted to set it up which is that if we

16   can't agree with something at the end of the day, we'll

17   brief the issues before Your Honor and we'll do it fairly

18   quickly.

19         And after Your Honor gets it presented and it

20   turns out like in a summary judgment motion there was a

21   material fact in dispute, at that point in time you would be

22   able to tailor the discovery so that we can complete the

23   issue.

24         And that was the reason why you see us identifying

25   the procedural due process issue and not contemplating

Page 17

1    discovery.  Frankly, it almost is six of one, half a dozen

2    of another because we still have to do the factual

3    stipulations with whatever threshold issues emerges from

4    today, but certainly procedural due process.  And we gave

5    ourselves our deadlines to do so.

6              And if it turns out that even though we thought we

7    would be successful, we turned out to be less than

8    successful and what we have outlining to you today doesn't

9    really make as much sense as we think it does right now, we

10   scheduled a status conference for August 5th to come back to

11   Your Honor after we had undergone that factual stipulation

12   exercise to see if we got it wrong.  And then we would

13   modulate the briefing schedule if we had to, but the

14   intention was to tell everybody and to commit ourselves not

15   to do that, to go forward on a briefing schedule and at

16   least be able to accomplish that issue.

17             So why didn't we tackle the other threshold issues

18   that are outline in the May 2nd order?  On the remedy

19   section, I think the answer to us is clear.  If you can

20   agree to do the remedy section without any discovery, I

21   don't think anybody is -- has a problem with briefing that

22   issue and including that as a threshold issue.

23             I -- to some extent there was a thought process

24   that everything flows from the procedural due process issue,

25   so that if it turns out that new GM -- a position was

Page 18

1    validated and that there was no violation of procedural due

2    process, the issue of the remedy, which assumes that there

3    was a violation, would not have to be addressed.

4              Similarly, fraud on the court is the same way

5    because as we go through our discussions the factual

6    predicate for which they want to argue fraud on the court is

7    the same allegations that are in the procedural due process.

8    And there was a recognition that if new GM's position was

9    correct on procedural due process, the remedy section and

10   the fraud on the court section probably drops out.

11             And so the thought was we have one issue that's

12   fairly clear.  The other two issues may go away, but if not,

13   they may very well engage and require discovery, sufficient

14   discovery that will slow down the process, that the judgment

15   was made that we should do what we can do without discovery.

16   If it turns out that we could do more going through the

17   factual stipulations, I think everybody will want to do

18   more.  And this is where you are the byproduct of what

19   happened.

20             Having gone through a number of meet and confers

21   and having confronted with the large number of requests that

22   we had and, frankly, our response which was that so much of

23   that you're asking for is not relevant and their response

24   is, well, you're not going to decide relevance.  The judge

25   is going to decide relevance.

```
 1              We then had sort of narrowed it down to what we
 2    thought we could do in due process, but we ran out of time
 3    in getting it precisely right, and there was a concern, I'm
 4    guessing on the plaintiff's part, that they didn't want to
 5    rush this aspect.  They wanted to make sure that they got it
 6    right.  They were really ready to start again, but it wasn't
 7    starting from square one.  We had accomplished enough to
 8    know that within this time frame we were fairly comfortable
 9    that we could complete the role.
10              But if -- Your Honor, if you'll notice -- and I
11    apologize that -- I was debating writing a speaking piece as
12    to why you have these two stipulations, and I figure that my
13    speaking piece would invite a whole bunch of other speaking
14    pieces and I might as well do it better here.
15              If you notice the remedy section and how we dealt
16    with the discrimination issue which was the letter (d).
17    They have taken that issue off the table; that they have
18    agreed that they are not going to press claims based on the
19    discrimination issue, discrimination issue being defined as
20    that if new GM decides that it's going to pay prepetition
21    accident victims which would otherwise retain liabilities,
22    that that didn't create a new obligation for new GM.  It
23    would be allowed to do that.
24              They've agreed that that is off the table.  But if
25    you notice that there's a caveat and that was -- that was
```

Page 20

1    based on trying to accommodate the concerns raised by one of

2    the identified parties that said the fact that you may be

3    voluntarily paying what was otherwise a retained liability

4    pursuant to the Feinberg protocol that was announced on

5    Monday of this week should be relevant towards the remedy

6    section.  As to there's a procedural due process issue,

7    someone believed as part of that group it's relevant to the

8    remedy section.

9            I didn't believe it was relevant to the remedy

10   section, but I sit on this side of the table and I'm not the

11   judge.  So at some point in time the back and forth ended

12   and I had to let them say whatever it is that they want to

13   say as to why it's relevant, and I reserved the right to say

14   why it wasn't relevant if anybody decided that they actually

15   wanted to brief that issue as part of the 1(b) remedies for

16   a violation of procedural due process.

17           But subsumed in that issue, which is that new GM

18   voluntarily is agreeing to pay a prepetition accident

19   victim, that is a post-sale conduct issue.  And the concern

20   was is that someone had decided that procedural due process

21   has a whole bunch of equitable concepts.  And because of

22   that, they could raise a whole bunch of events that took

23   place after the sale which should be relevant for your

24   determination of what the appropriate remedy would be.

25           If that was true -- and I don't think it should be

```
 1    true, but I'm not here to try to advocate the position.  If

 2    that was true, then we have a whole bunch more factual

 3    stipulations that could get messed up and into the process

 4    and maybe potential discovery issues as well, too.  And the

 5    though process after, I think, we heard it and the

 6    designated counsel heard it, was let's not try to bite that

 7    off.  Let's not try to do it.  We already had a failed

 8    exercise.  Face reality.  We're not going to be able to

 9    accomplish that.

10          What you get is the difference between what we

11    proposed and what the others have proposed, is that we've

12    decided that we can't do something and we want to accomplish

13    what we think we can do.  There actually was a proposal,

14    Your Honor, made by designated counsel which we supported,

15    which was if we all agree that we could do something without

16    discovery we'll add it to the threshold issue.  But if

17    there's --

18          THE COURT:  Pause, please, Mr. Steinberg, because

19    that was what I almost interrupted you to ask about.

20          You acknowledged -- I think probably everybody in

21    the room would acknowledge that, ultimately, the materiality

22    call is mine, the relevance call is mine vis-à-vis any

23    particular fact.  But it seems to me that if parties can

24    agree upon it, it's no harm, no foul, and then you can

25    reserve your respective rights to argue whether any
```

Page 22

1   particular fact is relevant or not down the road.

2          The corollary of that would seem to be agree on as

3   much as you can and sooner or later it will be useful, or it

4   -- if worse comes to worse you'll have agreed on something

5   that doesn't matter.

6          Do I sense a consensus on that?

7          MR. STEINBURG:  Yes.

8          THE COURT:  Okay.

9          MR. STEINBURG:  The issue is, is that while we can

10  agree to that, it may not stop with just an agreement as to

11  whether this fact occurred.  There may be an issue as to

12  whether there's discovery that's needed to evolve more

13  facts.  And I think that was the underlying issue between

14  the designated counsel and the Groman plaintiff with regard

15  to fraud on the court.

16         There was a recognition that you probably needed

17  to take discovery because fraud on the court has the

18  potential of a mens rea element, and there was a -- there

19  was a concern that I don't want to do this halfway.  If I'm

20  going to brief this issue, I want to get everything out and

21  if I get everything out, I'm in a much longer discovery

22  plan.

23         And recognizing that it all derives from the

24  procedural due process issue, recognizing that the MDL has a

25  report and hearing on August 11th and the September 1 stay

Page 23

1    stipulation would otherwise allow people to make further

2    applications.  The goal was to do something concrete,

3    significant, material to move this forward.  And the

4    question was how much more can we do to move forward.

5              To be candid, Your Honor, I could live with the

6    other stipulations as well, too, right?  I mean, all that

7    the other stipulations say is that we may want to -- going

8    through this exercise we may want to take discovery.  And we

9    may want to be able to add threshold issues on.  I could

10   have the same discussion with you now -- as I'm having now

11   on August 5th and I could respond and say, no, because it's

12   going to slow down the briefing schedule, but I will have

13   had the benefit of the meet and confer and the back and

14   forth on the factual stipulations.

15             I could say nothing about it, but I've set up a

16   status conference and I can't prevent someone from writing

17   letters to you asking to add something to a status

18   conference.

19             We are literally fighting about a concern that may

20   or may not occur.  That's the only difference that happens

21   here.  Threshold issues may be added and someone will

22   consider adding it if there is no discovery or there's

23   limited discovery.  Designated counsel believes that that's

24   a fool hearty's errand.  We had to pick a horse, right?  We

25   had three people going in different directions here.  We had

Page 24

1  to pick the horse where the issue of procedural due process

2  mattered the most.  The designated counsel represents the

3  super majority of the plaintiffs.  They know what they think

4  they can accomplish better than I know what I think they can

5  accomplish.

6          If that's what they're telling me as to what makes

7  the most sense under the circumstances, and I need to come

8  to Your Honor with something because I had committed to

9  actually do more than what we're doing now, that's what we

10  chose. That is the thought process that new GM had and that

11  was what was behind the stipulation at least from our

12  perspective.

13          I think this is probably a good point where I

14  concede the platform to the remaining designated counsel who

15  can speak on the issue.

16          THE COURT:  Okay.  Is that going to be you, Mr.

17  Inselbuch?

18          MR. INSELBUCH:  Yes.

19          THE COURT:  Come on up, please.

20          MR. INSELBUCH:  Good morning, Your Honor.  Elihu

21  Inselbuch from Caplin & Drysdale with Mr. Weisfelner and Mr.

22  Esserman, designated counsel.

23          First, as a preliminary matter, Your Honor has

24  noted that Judge Furman has been designated by the

25  (indiscernible) panel.  He has appointed temporary lead

Page 25

1    counsel.  They are with us today and I would like to

2    introduce them to the Court.  Mark Robinson, Steven Berman

3    and Elizabeth Cabraizer (ph).

4              UNIDENTIFIED:  Good morning, Your Honor.

5              UNIDENTIFIED:  Good morning, Your Honor.

6              THE COURT:  Folks.

7              UNIDENTIFIED:  Good morning.

8              MR. INSELBUCH:  Now turning to the issues Your

9    Honor has raised and Mr. Steinberg's points, I think it's

10   important for the Court to understand that there was a C-

11   change in the facts on the table between the time we were

12   here last time and even between the time we presented our

13   first set of stipulations and today.

14              On -- our stips were due on May the 28th, and as

15   Mr. Steinberg has reasonably described, we presented an

16   enormous number of stipulations anticipating that there

17   would be a need for some considerable discovery on all of

18   these issues.  The best we could, the stipulations were

19   derived from documents that the -- that GM had provided to

20   the United States Congress, testimony that General Motors

21   personnel had produced in various pieces of litigation.

22              But what happened was on June the 5th General

23   Motors delivered a report prepared on their behalf by Mr.

24   Valukas to the National Highway Transport Safety

25   Administration.  They immediately put it on their website.

Page 26

1    The report was delivered to the congress and in their

2    testimony of their chief -- the chief executive of General

3    Motors I promised that we would conduct a comprehensive and

4    transparent investigation into the causes of the ignition

5    switch problem.  I promised we would share the findings of

6    the report with congress, our regulators, NHTSA and the

7    Courts.

8           That report in hundreds of pages detailed many of

9    the facts that -- if not all of the facts that we believe

10   will be relevant to any consideration of threshold issue

11   (a), the due process issue.

12          Having seen that report, which we saw very soon

13   after or about the time we had the -- just before we had the

14   meet and confer on the first set of stipulations, it

15   occurred to us that there -- it would be much more

16   profitable to try and go forward in the absence of discovery

17   using that report, the facts propounded in that report as

18   our basis for a record.

19          We discussed that at that meet and confer and

20   while there's no agreement about whether or not the report

21   itself would be admissible into evidence, I think there is

22   agreement with General Motors that to the extent that that

23   report describes facts that occurred during the periods in

24   question, that we may produce -- present those facts by way

25   of stipulation and they will consider those.

1      So for that reason, we were of the view that we

2  could go forward quickly to an -- to frame the issues before

3  Your Honor without discovery on that limited subject.  That

4  limited subject, of course, is the threshold for everything

5  else that may be before the Court here.

6      If this Court were to decide that issue against

7  us, presumably we wouldn't have to reach the remedy issues.

8  And if the Court were to decide that there were -- had not

9  been a denial of due process, it's extreme -- we would view

10  it as extremely unlikely that the Court would then find that

11  there had been fraud on the Court.  There might still be an

12  issue before Your Honor under (e) of whether or not there

13  would be any remedy available to the claimants, but that

14  would be a much more limited and presumably an issue that

15  would be based on briefing alone.

16      Yes, sir.

17      THE COURT:  Pause, please, Mr. Inselbuch, because

18  the converse isn't necessarily true.  Let me just make up

19  facts and state once now and if I need to repeat it at the

20  end I'll state it again.  I have no basis for knowing them.

21  I'm just talking about strictly hypothetical facts.

22      Suppose it were the case that those who might file

23  claims associated with ignition switches didn't get notice

24  back in June and July 2009 or before the bar date of their

25  potential claims.  And, by the way, I don't make any

1    distinction now or conclusion now as to which date matters.

2            You might argue, you and your colleagues might

3    argue that that by itself constitutes a due process

4    violation.  Mr. Steinberg would -- or might disagree, and

5    then that issue would be teed up for a determination.

6            But it's also possible that not only didn't they

7    get due process if that -- or notice, which you would argue

8    is a failure to provide due process, that when Fritz

9    Henderson (ph), the CEO back at the time was testifying

10    before me he knew about the ignition switch problem and was

11    intending to keep that from me.  The latter, if it were so,

12    might constitute or be argued to constitute a fraud on the

13    Court and an offense beyond the mere failure to give notice.

14            I assume that your guys would want to reserve all

15    of their rights at both levels and I assume that Mr.

16    Steinberg would want to reserve his rights to resist at both

17    levels.  But it seems to me that the failure to provide due

18    process and fraud on the Court are not necessarily

19    congruent.  Is that the way you see it as well?

20            MR. INSELBUCH:  Yes.  But one is -- but the due

21    process issue we believe now is available to us on facts

22    that we believe can be stipulated or proven to the Court

23    without discovery.

24            As you hypothesize, to get the proof that the

25    chairman of the company knowingly mislead the Court would

Page 29

1     require at the very least discovery and probably discovery

2     at the highest levels of General Motors.

3               Bear in mind that General Motors is a large public

4     company now facing a grand jury investigation, many state

5     prosecutorial investigations, a congressional investigation

6     and an SEC investigation.  And the idea that we could go

7     forward and just assume that we would have easily -- easy

8     access to discovery in that context is also, I think,

9     perhaps not realistic.  So that the idea that we could now

10    call Mary Barra (ph) to testify in our case here without

11    objection by General Motors I think -- I'm not asking Mr.

12    Steinberg to comment on that, but I think it's ill-advised

13    to think that we could have an easy path to discovery in the

14    short term.  That's why -- among the reasons why we focused

15    on the due process issue.

16              The remedies issue, I was interested to hear Mr.

17    Steinberg discuss the remedies issue.  Our problem with the

18    remedies issue is not what we would argue with the Court.

19    We would argue to the Court that if you find that there has

20    been a violation of due process, the simple answer to their

21    motion, which is to enforce their sale order and include an

22    injunction, would be just to deny that motion and the

23    parties would be free to proceed to seek their remedies in

24    the state courts, you know, on successor liability claims or

25    whatever they might be.

1          We doubt very much that General Motors will

2     concede that that's the remedy that would be dictated here.

3     They would want to argue, and we're not sure what they would

4     want to argue, excuse me, that for some reason or another

5     that shouldn't follow; that some view should be taken to the

6     remedies that would otherwise be available, how that might

7     go, arguments about whether that would implicate claims

8     against the GUC trust or not.  We don't know where that's

9     going to jump, and it -- and, thus, we wouldn't know how now

10    to try and prepare a stipulated record or even a discovery

11    record to identify what those facts might be.

12          We thought in the context of what is a complex set

13    of situations that if we could move one ball forward and --

14    an important ball forward and get it resolved, that would be

15    the best course to take.

16          I might say that we have been reasonably

17    successful, but not as successful as we might have been in

18    keeping the rest of the constituency advised as things

19    develop.  It's difficult for us, but we are making an effort

20    to do that with Judge Cyganowski and others.

21          Now --

22          THE COURT:  Mr. Inselbuch, sooner or later I'm

23    going to be an ex-judge, too, but everything in this Court

24    has to refer to her as Ms. Cyganowski.

25          MR. INSELBUCH:  I beg your pardon. I didn't hear

1    that.

2              THE COURT:  I'm going -- the rules going to apply

3    to me when I'm an ex-judge also.  But in this courtroom

4    you've got to refer to her as Ms. Cyganowski.

5              MR. INSELBUCH:  Yes, Your Honor.  I stand

6    corrected.

7              THE COURT:  We have rules applicable in the

8    Federal Courts that apply --

9              MR. INSELBUCH:  I stand --

10             THE COURT:  -- to current judges and ex-judges

11   alike.

12             MR. INSELBUCH:  I stand corrected, Your Honor.

13             Your Honor commented in your opening statements

14   that you would lean toward moving forward in a context where

15   there would be a lack -- there would not be a need for

16   discovery.  We believe that, too.  Our instructions from our

17   clients are, after all, to see whether we can resolve the

18   bankruptcy court issues as quickly as possible.  We don't

19   see how that can be done with discovery.  We don't see any

20   point in kicking forward to August 8th a further argument

21   that maybe we could take some discovery.  We don't think

22   discovery -- that there's any limited amount of discovery or

23   limited amount of time within which discovery has been --

24   would be available.

25             Moreover, no one has suggested to us what that

1    discovery might look like, what issues the other parties

2    might -- think they might take by way of discovery.  We

3    don't know what they are.  As I've said before, we don't

4    even know what the issues might be on the remedies side.

5           So with that, Your Honor, unless my colleagues --

6    I would pass the baton.

7           THE COURT:  I think I would -- well, the baton to

8    Mr. Weisfelner or the baton to Ms. Rubin or Mr. Flaxer.

9           MR. WEISFELNER:  I just wanted to add a couple of

10   --

11          THE COURT:  All right.  Come on up to the main

12   mic, please.

13          MR. WEISFELNER:  Three points, and as quickly as I

14   possibly can.

15          Mr. Inselbuch made reference to a game changer in

16   the context of the issuance of the Valukas report and I

17   agree wholeheartedly.  That report is chock full of

18   information that in the process of coming up with

19   stipulations for Your Honor to try any issue, but in

20   particular due process issue is critical.

21          Add to that record the fact that just before the

22   issuance of the Valukas report, as Your Honor may or may not

23   be aware, General Motors entered into a consent order with

24   NHTSA, you know the one pursuant to which they paid their

25   maximum fine --

1            THE COURT:  I think I can get what that acronym --

2    is that the Highway Safety Board or whatever it's called.

3            MR. WEISFELNER:  Correct.

4            And in the context of that consent order there are

5    many iterations of the facts as they developed, a chronology

6    of events that occurred.  But understand that pursuant to

7    that consent order you have an acknowledgment by GM that the

8    ignition switch defect constituted a safety issue and should

9    have required a recall.  So we think that's important as

10   well.

11           Again, it was put on the table in the midst of our

12   stipulation and meet and confer process.

13           The other factor that came to light during the

14   meet and confer and stipulation process was the

15   congressional testimony that was given both by Ms. Barr (ph)

16   and by Mr. Valukas.  And remember that testimony takes two

17   forms, as I'm sure Your Honor knows:  One is the prepared

18   statements that go into the record and the other is the

19   questions and answers.

20           And we believe that there was a lot of material

21   relevant portions of the bare testimony in particular that

22   bear, if one looks at the penology of threshold issues, with

23   particular reference to the due process question.

24           THE COURT:  I hear you, Mr. Weisfelner, but I have

25   more difficulty understanding what you're telling me now

Page 34

1   that adds in any material respect to what Mr. Inselbuch

2   already told me.

3            MR. WEISFELNER:  Just --

4            THE COURT:  I -- hear me out, please.

5            MR. WEISFELNER:  Yes, sir.

6            THE COURT:  I'm assuming that you and your

7   colleagues and the tort lawyers who are behind you are going

8   to take whatever facts you can and whatever resources you

9   can to maximize the extent to which you develop a factual

10  record that supports what you want to show, and that's fine.

11  But I don't see today's hearing as arguing -- as the place

12  to argue the merits of things that you may eventually argue

13  to Judge Furman or to a jury or juries.  And what I am

14  focusing on today is case management issues.

15           How does what you're saying change what Mr.

16  Inselbuch already told me?

17           MR. WEISFELNER:  Your Honor, it wasn't intended to

18  change or get beyond the focus on case management.  I

19  thought Your Honor wanted to address of all of the threshold

20  issues and in particular as between 1(a) and 1(b), should

21  we, could we move forward just on 1(a) to the exclusion of

22  1(b) or for that matter any other of the listed threshold

23  issues.

24           And what I thought I was emphasizing was the point

25  that Mr. Inselbuch made very well and that was that having

Page 35

1    gone through the process of meeting and conferring over

2    proposed stipulations which were voluminous and came from

3    every different angle, and to which GM was unable to

4    stipulate, having gotten this material it became clear to GM

5    on the one hand and the designated counsel on the other hand

6    that the right way to proceed from the perspective of

7    advancing the process and the MDL proceedings was to do what

8    we could do effectively and efficiently without unnecessary,

9    if any discovery, and that is focus on 1(a).

10           Your Honor, the only other two points I wanted to

11   make, not that they weren't covered, but I want to

12   underscore them, is why do 1(a) to the exclusion of 1(b) for

13   now.  And the other factor I think, as Your Honor will

14   agree, is that the bankruptcy process favors compromise

15   wherever parties can get there.

16           In our considered judgment, one of the other

17   benefits of doing 1(a) first and then, if necessary, moving

18   to 1(b) is we believe a finding that we think is going to

19   result from a focus on 1(a) will put the parties not only in

20   a better position to brief anything else Your Honor wants us

21   to brief or that the parties think have to be briefed, but

22   may very well put us in a better position to reach a

23   resolution without judicial interference.

24           The last point I wanted to make, and it's a

25   correction to a question that you posed to Mr. Steinberg and

Page 36

1    I thought I misheard him or he may have misinterpreted what

2    Your Honor was asking.

3            One of the things that the designated counsel on

4    the one hand and GM on the other hand offered to Mr. Flaxer

5    on behalf of the Groman plaintiffs and Ms. Rubin on behalf

6    of Wilmington Trust, when we understood what the differences

7    were between our respective orders was, look, let's finish

8    up this stipulation process.  Let's focus both on 1(a) and

9    1(b) with regard to the stipulation and meet and confer

10   process.  We believe that we're going to suffer and run into

11   the same brick wall on 1(b) that we did before and we're not

12   going to have a sufficient enough record to move forward on

13   1(b) at the present time.

14           But if we're wrong and we collectively come to the

15   consensus that we've gotten far enough despite our views

16   that we may not get there, and we, in fact, overcome the

17   1(b) problem with regard to agreed upon stipulations or, for

18   that matter, narrow enough discovery that it makes sense to

19   slow down the train and brief both topics at the same time

20   or seek some limited discovery, then if we all agree then

21   we'll come into court and tell Your Honor we've all agreed

22   to expand the brief to include 1(a) and 1(b).

23           That offer did not meet consensus which I thought

24   was where there was a disconnect between you and Mr.

25   Steinberg.  We had proposed it, together with GM.  It was

Page 37

 1    rejected by Ms. Rubin and Mr. Flaxer on behalf of their

 2    respective clients.  So I just wanted the record to be clear

 3    on that point.

 4                THE COURT:  Okay.  Thank you.

 5                Mr. Flaxer, next, then Ms. Rubin, and then Mr.

 6    Golden.  Is he here?

 7                MR. GOLDEN:  Yes, Your Honor.

 8                THE COURT:  Oh, I'm sorry.  If you need to add

 9    anything to what Ms. Rubin says.

10                MR. FLAXER:  Good morning, Your Honor.  Jonathan

11    Flaxer of Golenbock, Eiseman, Assor, Bell & Peskoe on behalf

12    of the Groman plaintiffs.

13                I would start by observing that the differences

14    between the positions in these proposed orders are narrow.

15    And what we're really talking about is after we complete the

16    stipulation process which has been difficult, but we're

17    still working at it, but not nearly as easy as maybe some

18    had hoped it would be, there would be an opportunity for

19    parties with the knowledge of what we learned in the process

20    of trying to arrive at stipulations to ask the Court to

21    consider whether or not we should at that point expand the

22    issue -- the threshold issues from 1(a) to include 1(b) and

23    in our view to also consider -- only consider -- in

24    including 1(c) the fraud on the Court issue as well.

25                THE COURT:    For those who don't have the old

Page 38

1    order in front of me (sic), 1(b) is procedural due -- 1(a)

2    is procedural due process; 1(b) is what we can call remedy;

3    1(c) is fraud on the court; 1(d) now being off the table;

4    and 1(e) is whether any of these claims are claims against

5    the old GM estate or the GUC trust subject to their rights

6    to argue that it's too late to make such claims, if I

7    understand these issues.

8              MR. FLAXER:  Correct, Your Honor.

9              THE COURT:  All right.  Then continue, please.

10             MR. FLAXER:  I'm going to try to provide at least

11   our perspective on sort of where these issues breakout

12   without advocating or being argumentative to the best I can.

13             The 1(a) issue (indiscernible) revolves around

14   juris prudence that we're all in the bankruptcy world very

15   familiar with this notion of whether a creditor at the time

16   -- at the relevant time is a known -- I'll put that in air

17   quotes -- a known creditor.

18             Our view is that the law is not such that we need

19   to prove that very senior executives at the company knew at

20   the time.  I would say on the other hand, though, that if to

21   take Your Honor's example that, you know, Fritz Henderson,

22   in fact, knew and concealed it from the Court, putting aside

23   whether or not that would establish fraud on the Court, I

24   think it would clearly end any dispute over whether or not

25   there had been a due process violation.

1          So what we're struggling with is even with the

2     benefit of the Valukas report and, as we all know, there are

3     more items coming out seemingly every day in the press from

4     various government investigations and other events, we --

5     it's not so clear and I'm not sure the stipulation, you

6     know, process is going to produce facts -- stipulated facts

7     about senior level knowledge.

8          And, again, I'm very open to continuing the

9     process and we'll work at it and work at it hard, but it may

10    be a decision point when we're back here in August whether

11    or not on the plaintiffs' side and on the GUC trust and

12    Wilmington side we're comfortable that there's enough of a

13    record to give Your Honor what we think should be a full

14    enough record, and that some limited discovery may be

15    necessary to test out how senior the knowledge goes without

16    conceding whether or not we're required to show it.

17         With respect to the remedy and the due -- and the

18    fraud on the Court issue, again, from the perspective of the

19    Groman plaintiffs we see them as somewhat similar in terms

20    of the record that Your Honor, we think, ought to have to

21    decide those issues which is that we think it does expand

22    the inquiry in two ways, two basic ways.

23         One is that it implicates -- how shall I say --

24    well, to use Mr. Steinberg's term, mens rea.  You know, how

25    bad was this.  I'll just leave it at that.

1           We think it expands in another way which is now

2    you -- there really is a need, we think, to get into new

3    GM's conduct, what -- how new GM reacted to treated this

4    ignition switch defect issue.

5           So we think when it comes time to consider the

6    remedy and time to consider maybe fraud on the Court that

7    you have two issues that, in a way, go together.  So that is

8    why the only area where we have any difference with the GUC

9    trust and Wilmington is whether or not we should leave open

10   for consideration adding in fraud on the Court at a later

11   time, again, subject to everybody else's comment and subject

12   to the Court's ultimate, you know, decision.

13          Other than that we completely agree with

14   everything that Ms. Rubin put in her letter and thought that

15   it was very eloquently stated.

16          THE COURT:  Maybe I should have heard from Ms.

17   Rubin first.

18      (Laughter)

19          MR. FLAXER:  I just would like -- and I have a few

20   more observations that I think are germane to the issues

21   that the Court asked us address us at the beginning.

22          The -- again, we remain hopeful that the

23   stipulation process will work, but one issue that's emerged

24   in my mind is that these are not the type of facts that

25   easily lend themselves to the stipulation process.  This

Page 41

1    isn't stipulating, for example, to a long series of

2    transactional documents.  This is very subtle, multi-layered

3    facts about not only who knew what when, but how much they

4    knew, what inferences they should have drawn from what they

5    knew, who else at the company knew that with the silos, if

6    you will -- to use a term that's come up and I'm not

7    conceding it, but I'll use it for convenience -- how much

8    cross-communication was there among the silos.  A series of

9    committees considered these issues; who was on those

10   committees.  We don't have, for example, the full membership

11   of each of the various -- I think there were at least five

12   committees within GM that considered these issues.

13           Again, I'm just trying to layout for the Court (a)

14   what some of the difficulties are and (b) where it may be

15   possible, if necessary, to have fairly limited discovery to

16   try to nail down some of the factual issues that may not be

17   able to come through in the stipulation process.

18           Let me try to cut through as much as I can here.

19           I mean, I'll just observe that what we're

20   balancing here is, you know -- well, let me state it a

21   little differently.

22           We all want to expedite this process.  Everybody

23   agrees on that.  Our concern is if discovery is going to

24   ultimately be necessary, the way to expedite matters is to

25   start the discovery sooner rather than later and don't keep

1    delaying it only to start the longest piece at a later time

2    rather than a sooner time.

3            And with that I think I'm prepared to do maybe

4    what I should have done the first time, which is to cede to

5    Ms. Rubin.

6            THE COURT:  Well, certainly, I want to hear from

7    Ms. Rubin.

8            MR. FLAXER:  Thank you, Your Honor.

9            THE COURT:  Come on up, please.

10           MS. RUBIN:  Good morning, Your Honor.  I'm Lisa

11   Rubin of Gibson, Dunn & Crutcher and I have with me my

12   colleagues, Keith Martorana, who you know, and my colleague,

13   Adam Offenhartz as well.

14           Your Honor, you've heard from everyone this

15   morning that there is a need for speed and the GUC trust and

16   the unit holders, we are all for that.  The question before

17   Your Honor is how to achieve the efficiency that everyone in

18   this courtroom desires.

19           As an initial matter, I want to just preface for

20   Your Honor we see the 1(a) issue differently than it was

21   originally conceived in the May 16th scheduling order.  In

22   all of the orders presented to Your Honor yesterday, that

23   issue is slightly reworded and I want to explain to Your

24   Honor why.

25           You'll see that the 1(a) --

Page 43

1          THE COURT:  Would it help, Ms. Rubin, if I pulled

2    out your counter-order or Mr. Flaxer's, or should I just

3    listen to you?

4          MS. RUBIN:  Or Mr. Steinberg's because it has the

5    same formulation.  I just want to make sure that we focus

6    the Court on this because it's an important issue to the GUC

7    trust and the unit holders, and I want to make sure that the

8    Court appreciates it.

9          What is defined as the due process violation

10   threshold issue, Your Honor, and our counter order and also

11   I believe in the one that Mr. Davidson submitted to the

12   Court yesterday is whether plaintiffs' procedural due

13   process rights were violated in connection with the sale

14   motion and the sale order and injunction or, alternatively,

15   whether plaintiffs' procedural due process rights would be

16   violated if the sale order and injunction is enforced

17   against them.

18          And the reason, Your Honor, that we have pressed

19   for that formulation is because there are two very different

20   versions of events unfolding here.  You have designated

21   counsel and the Groman plaintiffs on one hand advancing a

22   version of events in which old GM fraudulently and knowingly

23   concealed from the public and from this Court what happened

24   with the ignition switch and why it was defective.

25          And on the other hand you have new GM, through the

Page 44

1    Valukas report, saying this is just a sad confluence of

2    events through which people in GM operating in silos failed

3    to connect the dots.  And that's why we want to formulate

4    the issue this way for Your Honor because whether the

5    violation was knowing and these people could have been

6    identified and should have been given actual notice at the

7    time or whether, conversely, there was a failure to

8    appreciate the connection between the ignition switch defect

9    and the safety concerns that have now come to light, there

10   still may be a due process violation if Your Honor were to

11   enforce the sale order and injunction against these

12   plaintiffs.

13           So with that as a preface, Your Honor, I would

14   like to turn to some of your questions, if I might.

15           THE COURT:  Yes.  But I would like ask you to

16   pause for a second, Ms. Rubin --

17           MS. RUBIN:  Sure.

18           THE COURT:  -- before you get onto them.

19           Would the corollary of what you're saying,

20   therefore, be that to the extent that the matter is close I

21   should provide for a broader ability on the part of the

22   various parties to address issues that they think are

23   important to them?

24           MS. RUBIN:  Yes.  I believe so, Your Honor.

25           THE COURT:  All right.  Continue, then.

1          MS. RUBIN:  Okay.

2          Your Honor, with respect to the schedule, as

3    everyone that has come up to the podium this morning has

4    told Your Honor, the process to date has been contested.

5    While I appreciate that all of the parties are operating in

6    good faith -- we had an in person meet and confer session,

7    Your Honor, for example, that lasted nearly an entire day.

8    And I take to heart Mr. Steinberg's concession that the

9    parties are not going to dispute relevance or materiality of

10   the facts anymore, which has been a significant impediment

11   to our reaching agreement.  We will try, Your Honor, with

12   all of the other parties to reach agreement on a set of

13   stipulated facts.  But based on the process to date, we're

14   not particularly hopeful that we're going to get there,

15   notwithstanding Mr. Weisfelner and Mr. Steinberg's

16   representations to Your Honor.

17          So all we want to do is the following, Your Honor.

18   We want two reservations before this August 5th status

19   conference.  We want to be able to tell Your Honor that we

20   believe it is not in the interest of efficiency to separate

21   the violation from the remedy, and we want to ask Your Honor

22   -- want to reserve for ourselves the right to ask Your Honor

23   for discovery.

24          Now when I say that, I don't have any particular

25   discovery in mind that the GUC trust or the unit holders

1    want at this juncture.  All we're saying is based on the

2    process to date and based on the conversations that I've

3    seen unfolding between some of the other parties, it's hard

4    for me to anticipate that we're going to come back before

5    you in August with a set of stipulated facts that allows the

6    parties even to brief the isolated issue of the due process

7    violation alone.

8           If in the event the parties believe they need

9    discovery on the violation question, it makes no sense to us

10   to decouple that from the remedy.  In our view we don't

11   necessarily think that there's a lot of discovery that's

12   needed on 1(b), and the parties who have appeared at the

13   podium this morning already haven't conceptualized for you

14   what discovery would be needed on 1(b) alone.

15          Instead, what they've said to you is we should

16   brief, and then after that briefing if Your Honor feels that

17   there's discovery that's germane to the issues before you

18   that haven't been addressed by whatever fact stipulations

19   we've been able to reach, then and only then should

20   discovery occur.  It's hard for us to understand how that

21   serves the twin values of efficiency and judicial economy,

22   as well as respect for the parties' resources and

23   conservation of those resources.

24          In fact, Your Honor, the discovery provision that

25   appears in the order we submitted to you yesterday, that

Page 47

1    language came from a version initially circulated to all

2    parties by GM and designated counsel.  Why they took that

3    out of the order they submitted to Your Honor I have no

4    idea.  But it seems to us to make perfect sense to try and

5    agree on a stipulation of facts, and then if we can't, to

6    come back before Your Honor and explain why discovery is

7    needed.  The discovery that would be needed on violation

8    seems to us to also be relevant to the question of remedy

9    and to serve everybody's interest in speed.

10            Your Honor asked some questions about some of the

11    other issues and I would like to address those.

12            With respect to the fraud on the Court issue,

13    while I appreciate Mr. Flaxer's points, to us, as you've

14    noted already, it's not congruent.  And it likely would

15    require discovery and discovery separate from any discovery

16    that's implicated on the 1(a) and 1(b) issues.  My

17    understanding of the law of this circuit is that a fraud on

18    the Court claim requires some proof that an officer of the

19    court and not a witness or someone else involved in the

20    proceedings has defrauded the court knowingly with the mens

21    rea that Mr. Steinberg noted.  You noted the Mr. Henderson

22    example.

23            And that that fraud is against the Court alone and

24    not the general public or one's litigation adversaries.  It

25    would inherently expand the inquiry to brief the 1(c) issue

Page 48

1   at that time and it's hard for me to see how that doesn't

2   necessitate some discovery.

3          Your Honor also asked the parties to address why

4   we couldn't brief 1(e) now.  Your Honor, there are a couple

5   of reasons why we don't believe that that makes sense.

6          For one, I believe all the parties are in

7   agreement that the due process issue and along with it the

8   remedy will likely dispose of some of the issues before Your

9   Honor.

10          But even putting that aside, there are nearly 90

11   ignition switch complaints that are before the MDL.  It

12   makes no sense to litigate whether those claims articulate

13   assumed liabilities under the master sale and purchase

14   agreement, or retain liabilities under the master sale and

15   purchase agreement without giving the plaintiffs a full and

16   fair opportunity to amend and consolidate that complaint.

17   It's senseless and a waste of resources to try and litigate

18   that issue on some 90 odd complaints now consolidated before

19   the MDL.

20          The bigger issue --

21          THE COURT:  Pause, please, Ms. Rubin.

22          MS. RUBIN:  Sure.

23          THE COURT:  Because we have parallel proceedings

24   in the District Court on the one hand and in this Court on

25   the other.  And I think you would understand and respect

1  that each Court's instinct at least would be to try to

2  minimize the extent to which it steps on the toes on the

3  other and, also, to try to make things as easy as it could

4  for the other.

5          I would have thought that the ability to amend

6  complaints might be more appropriately decided by Judge

7  Furman if there are complaints in actions before him which

8  parties might want to do or not do or ask or not ask, where

9  he might say okay or not okay in the context of an

10  understanding of what needs to be proven and what may be

11  proven as a matter of federal bankruptcy law.

12          MS. RUBIN:   I understand, Your Honor.

13          THE COURT:  That would suggest that I try to do as

14  much as I can to help him, but that I not take away his

15  ability to make judgments that might turn on the outcome of

16  matters that I've decided.

17          MS. RUBIN:  I understand, Your Honor, and

18  certainly I don't mean to speak for or purport to speak for

19  plaintiffs and what judgments they have about what would be

20  appropriate in that proceeding or in this proceeding.  All I

21  am saying, Your Honor, is that it would seem to us that

22  before we litigate which claims are properly against the GUC

23  trust versus new GM.  It would seem to me to be

24  administratively difficult to do that in the current

25  composition of these actions.  There are some 90 odd

Page 50

1    complaints.

2              Let me get to the more important point, Your

3    Honor, if I may.

4              As Your Honor noted at the May 2nd hearing,

5    whether or not these claims are or are not against new GM

6    versus the GUC trust, that would not resolve the issue of

7    whether the plaintiffs have excusable neglect under the

8    Pioneer standard and, conversely, whether those claims are

9    equitably moot.  Both of those determinations, Your Honor,

10   as you well appreciate, are inherently fact dependent.

11             So it's hard for us to see how litigating 1(e)

12   makes sense now for a variety of reasons.  We simply see it

13   differently.

14             Your Honor, the last thing I want to address is

15   Mr. Weisfelner's point about the veto and the offer that he

16   made to all parties.  We appreciate the offer that Mr.

17   Weisfelner made to try and narrow the issues between the

18   parties and to ensure that if we went forward on 1(b) it

19   would only be based on a unanimous decision of all parties.

20             But we can't agree to that now without seeing how

21   the fact stipulation process unfolds, without seeing whether

22   the parties actually need discovery to even resolve the

23   narrow issue, and Mr. Weisfelner and Mr. Steinberg have told

24   you could proceed expediently.

25             We don't understand why there's such resistance,

 1    Your Honor, to letting us put in papers before you at the

 2    end of July as contemplated in the draft order we submitted

 3    yesterday.  All parties are in agreement that we should come

 4    back before you on August 5th for a status hearing.  To set

 5    in motion now a process to brief whether or not there needs

 6    to be additional threshold issues considered and whether or

 7    not there needs to be discovery simply seems to us to be a

 8    matter of convenience and expediency for the Court.

 9              And with that, Your Honor, I would be happy to

10    address any questions.

11              THE COURT:  No.  You kind of covered them as we

12    went along.  Thank you, Ms. Rubin.

13              MS. RUBIN:  You're very welcome.

14              THE COURT:  Mr. Golden, do you have any need to

15    supplement anything Ms. Rubin said?

16              MR. GOLDEN:  No.  No, I don't.

17              THE COURT:  Okay.  Is there any need by anybody --

18    oh, Mr. Inselbuch, I assume you want to reply, but --

19              MR. INSELBUCH:  Yes.

20              THE COURT:  -- I don't know if Mr. Steinberg wants

21    to --

22              MR. STEINBURG:  Yeah, I do.

23              THE COURT:  -- also.

24              MR. STEINBURG:  I do briefly.

25              Your Honor, I think you have a sort of a microcosm

Page 52

1    of why our meet and confers take a day when we're

2    essentially fighting over whether we should take an issue

3    off the table or preserve it, to be able to take it off the

4    table or not take it off the table a month from now where

5    the major exercise being whether we're going to go through

6    factual stipulations.

7            I just want to say two things, and I know this is

8    a procedural hearing.

9            New GM could brief the 1(e) issue, the -- whether

10   it's a retained liability or an assumed liability.  They

11   could do that now.  The problem is, is that while we say we

12   could do it now without discovery, others say it's a much

13   more complicated issue.  Maybe the complexity is something

14   that I don't see.  Maybe I have tunnel vision.  But it just

15   seemed to us that if everybody wanted to take it off the

16   table for now, then I didn't want to fight that momentum.

17           The other thing, I just want to say that as the

18   focus is on whether there was a procedural due process

19   violation, I just think it needs to be made clear that we

20   have a very strong view about that issue that old GM and new

21   GM, as the purchaser, are different people with different

22   responsibilities, et cetera.  And the whole part of the

23   discussion today has been GM with regard to the procedural

24   due process.  And I wanted to just make sure that at least

25   at one point in the record I stood up and said that new GM

Page 53

1    is a separate entity who bought, with government finance

2    money as a good faith purchaser and that we view the issues

3    differently, including the remedies as to what should be

4    applicable to that type of entity.

5              Thank you.

6              THE COURT:  Thank you.

7              Mr. Inselbuch.

8              MR. INSELBUCH:  Listening to Ms. Rubin and Mr.

9    Flaxer I'm not sure they really understand what our reason

10   is for going ahead with 1(a) alone.

11             We are no more or less sanguine now that we will

12   have agreed stipulations that will take care of all of the

13   facts.  What we believe today, however, is that we will be

14   able to present a record to you irrespective of whether GM

15   stipulates to it that you will accept as factual basis and

16   sufficient factual basis to go ahead and decide issue 1(a).

17   That record will not be sufficient to satisfy 1(b) under any

18   circumstances, particularly as I've said, we don't know yet

19   what the issues will be under 1(b).

20             We heard Ms. Rubin describe that a particularly

21   fact sensitive question of whether or not new GM or the GUC

22   trust should on the one hand or the other hand be responsive

23   if Your Honor were to decide there was a need to respond.

24   As -- we agree that would be a very fact sensitive question.

25   We don't know what the facts that would be relevant to that

Page 54

1       -- those issues might be until they are framed.

2              Mr. Flaxer described the confluence between (b)

3       and (c) by saying, well, what new GM knew at various levels

4       like its chairman, what level they might have known at, what

5       old GM -- I'm sorry -- what old GM knew at its various

6       levels with its chairmen, what new GM might have known.  All

7       of those are fact sensitive questions that are involved in

8       both (b) and (c).

9              We agree that may be true.  That's why we do not

10      believe there is any possibility of going forward on a

11      record without discovery except on (a).  We think it's

12      eminently practical to do that and that's why we suggest

13      that's where we go and not distract ourselves with trying to

14      come up with other approaches that we can do -- deal with

15      later after there's been a decision on 1(a).

16              THE COURT:  All right.  Thanks.

17              Has everybody had a chance to speak their peace on

18      the scheduling matters?

19              All right.  Evidently, yes.

20              We're going to take a ten-minute recess or to put

21      it more exactly, I would like you all back in ten minutes

22      after which I'm going to give you an interim ruling on the

23      matters that we've addressed so far.  And then we'll talk

24      about the implementation of that ruling and then we'll get

25      onto the other issues.

1        We're in recess until -- let's make it until ten

2    after eleven on the clock.

3        (Recess taken at 10:57 a.m.; resumed at 11:21 a.m.)

4        THE CLERK:  All rise.

5        THE COURT:  Have seats, please.

6        THE COURT:  Ladies and gentlemen, though I don't

7    agree with anyone who's spoken in full, my views after

8    hearing your respective positions are closer to those

9    articulated by Mr. Flaxer and Ms. Rubin and I'm ruling that

10   the issues to be briefed as threshold issues should be

11   broadened without prejudice to parties' rights to argue on

12   August 5th or at a later time that issues can't be justly

13   resolved without one kind or another of discovery.

14       All agree, or at least all have heard or who

15   have spoken on the subject agree, on the need to find that

16   sweet spot between fairness and getting to the right result

17   and achieving efficiency and speed.  And I am of the view

18   that a variant of what each of you have recommended in terms

19   of the way to achieve that is the best way to achieve those

20   somewhat conflicting goals.

21       I'm ruling that you're to brief as threshold

22   issues Issue 1(a) which has been colloquially referred to as

23   the due process issue, 1(b) which has been colloquially

24   referred to as the remedies issue and E, whether any or all

25   claims asserted in the additions which actions or claims

Page 56

1    against the Old GM bankruptcy estate and/or the GUC trust.

2    So the latter without now addressing and while maintaining

3    reservations of rights with respect to issues such as

4    Pioneer (ph) Alliance, timeliness and equitable willingness

5    (ph).

6              I'm going to come back to the former issue, 1-C,

7    on the fraud on the court threshold issue momentarily

8    because, as you'll hear at that time, I wonder if there's a

9    way you can make progress on that as well.  All of that is

10   without prejudice to your respect rights to argue with

11   respect to any of them that the consideration of such an

12   issue is, in whole or in part, premature or that you need

13   discovery of some kind to address it.  No reservation of

14   rights may be more significant in connection with issues B

15   and D than it is with the 1(a) issue where you figure to

16   have consensus, that you could make a lot of progress on

17   that right now.

18             But the bases for the exercise of my discretion in

19   that regard, to the extent they weren't telegraphed in the

20   back and forth I had, each of you will follow.  When it was

21   his turn to speak, Mr. Inselbuch then explained how the

22   terrain with respect to the litigation of these issues had

23   evolved.  It at least seemingly is the case that it's easier

24   to agree on facts now after the issuance of the Valukas

25   report and that that report provides a basis either by

Page 57

1    intentions that it's an admission, a matter as to which I

2    make no finding today, or, based upon the fact that if he

3    found those facts, others could as well.

4           When Mr. Weisfelner spoke, the ones he made didn't

5    change that or materially add to that except by underscoring

6    that there may be even greater basis for more materials to

7    use for reaching agreements, stipulated facts.  Those

8    opportunities presented by the matter, the Valukas report

9    that Mr. Insulbuch discussed and anything else that might be

10   of similar value that Mr. Weisfelner discussed provide

11   opportunities that are too good to ignore and provide a

12   reasonable move even if it's not an expectation that

13   stipulated facts are going to be both achievable and provide

14   an opportunity for avoiding the discovery that all agree or

15   should agree would materially drag down this process.  Those

16   matters, collectively, coupled with the progress you made on

17   stipulated facts so far give me some optimism that I can

18   give you lien forbearance (ph) based upon facts as to which

19   you have been able to reach the necessary stipulations.

20          I think that doing as much as we can on stipulated

21   facts is hugely important because, as I indicated, deferring

22   these matters to rate discovery would materially,

23   dramatically, seriously keep adding adverts.  I think it's

24   all really bad, slowed things down before me and, as a

25   corollary, before Judge Fuhrman.  So we're going to do as

Page 58

1    much as we can to keep things moving forward as quickly as

2    possible consistent with getting the result that's just.

3            And it's also so because it's possible -- I'm not

4    signing it now but it's at least possible -- that for

5    reasons that Mr. Flaxer and Ms. Rubin discussed, the 1(a),

6    1(b) and 1(e) issues may be hard to separate.  With that

7    said, if any of you think that they can and should be

8    separated, you're free to do that in your briefs and, as I

9    said, if you think something requires discovery, you're free

10   to make that point to me, definitely.

11           Coming back to the fraud on the court issue, I

12   wonder -- I'm not ruling today but I'm raising as an issue

13   for you ultimately to meet and confer, whether getting as

14   much done as possible to meet my needs and needs of, I

15   suspect, Judge Fuhrman might have as well, suggest that if

16   we can make any progress on the fraud on the court issue, we

17   should at least try and I want you to meet and confer after

18   today's hearing on whether it would be possible to brief

19   this legal standards applicable to fraud on the court.  Then

20   to be matched up against any facts that might later be

21   developed if and when determining that becomes necessary.

22           There's reference onto that relatively briefly in

23   her remarks today.  I don't know if everybody's going to go

24   and agree with her view of the legal standards but I think

25   that if a fraud on the court ultimately needs to be

Page 59

1    determined, determining the legal issues that provide to any

2    such determination or the legal principles that apply to any

3    such determination might make her strong too and merely

4    determining or briefing the legal principles would, by

5    itself, not necessarily require discovery but, of course,

6    whenever you're talking about next questions of fact and law

7    and you're measuring facts against the underlying law,

8    sometimes they're hard to separate and I express no view as

9    to whether the being confirmed is yet to be successful but I

10   want you guys to think about it and at least try any such

11   agreement or ruling by me on the legal standards.  I don't

12   expect you to agree on the legal standards.  I expect you to

13   agree or agree to disagree on whether it would be useful to

14   also brief the legal standards, would have the potential of

15   shaping any discovery that might thereafter be necessary --

16   not saying it would be -- and it's at least possible that

17   there could be unintended consequences of premature briefing

18   on the subject.  I want you guys to think about it, talk to

19   each other and see if it would be productive.  The

20   underlying goal, once more, is and I want to keep things

21   moving forward as efficiently and quickly as I can

22   consistent with the adjustments.

23            UNIDENTIFIED MALE SPEAKER:  Okay.

24            THE COURT:  I do, however, want you to report to

25   me on whether you have a consensus on that at the earliest

1    practical opportunity and if there's something to argue

2    about, I wonder if we could deal with it as well on moment

3    to moment.

4              I've already discussed discovery in substantial

5    part.  I don't want to decide too much on further discovery

6    now without determining how much progress we can make

7    without it.  Mr. Inselbuch's remarks gave me some comfort

8    that we do have the ability to make a lot of progress

9    without discovery and I don't want to let that opportunity

10   slip beyond my fingers.  So for the reasons last stated, I'm

11   affirming the general shape above the order that was

12   initially presented as modified by thoughts advanced by Mr.

13   Flaxer and Ms. Rubin that I've endorsed in the ruling today.

14             To the extent nothing required a black line

15   change, it's approved.  I want the three principal parties

16   who -- or constituencies who spoke coupled with any of the

17   other -- what's the word that Barkley used to describe the

18   family, not the designated counsel, the certain counsel or

19   --

20             UNIDENTIFIED MALE SPEAKER:  Not the parties, the

21   parties --

22             UNIDENTIFIED MALE SPEAKER:  Counsel for the

23   identified parties.

24             THE COURT:  Counsel for the identified parties to

25   see if you can consensually agree upon weaving into one

1    point of the order or another.  It looked to me like from

2    the document managing members and then oh, it all started

3    with the same document that you just marked it up to see if

4    you can give me a jointly-submitted revised order that

5    embodies the portions of Flaxer/Rubin positions that I

6    endorsed and, of course, consistent with the greater detail

7    that I gave you in the ruling just now and if anybody wants

8    any and all reservations of rights that I said you can have

9    and I don't want you to have to work over the Fourth of July

10   weekend but if you can get it to me sometime relatively

11   early next week, I would appreciate that.

12          Anything else on this before we move on to the

13   next issue?  I see both Mr. Steinberg and Weisfelner rising.

14   First you, Mr. Steinberg, then Mr. Weisfelner.

15          MR. STEINBERG:  Your Honor, just from a

16   housekeeping viewpoint, we'll prepare the draft of Your

17   Honor's ruling circulated to the parties.  I'm pretty sure

18   we'll get a consensus on it and we'll red line it off the

19   draft that we submitted if that's okay so at least you can

20   see where the basis of comparison is.

21          I understand, Your Honor, about not changing the

22   parts that we had agreed to.  I had not, obviously, spoken

23   to the other counsel yet but we had envisioned a different

24   type of briefing so we had a briefing schedule that's set up

25   if there would be a modest tweaking to reflect the fact that

Page 62

1    we'll be briefing more issues and if we could all agree that

2    that's a fair amount of tweaking, I would hope that Your

3    Honor would consider that when we present --

4            THE COURT:  That's agreeable in concept.  You

5    know, I'm giving you authority to make those changes now.

6    If I think anything's out of the realm of reasonableness,

7    I'll let you know but I'm giving you and the other parties

8    flexibility now.

9            MR. STEINBERG:  And since I've gone through this

10   experience before with Your Honor, it would seem to me so

11   that we meet your expectations as well, we'd like to -- I'd

12   like to be able to consider page limitations for the briefs

13   with my other counsel if they want to consider it but then

14   Your Honor will understand the type of briefing that we

15   expect to give to you and if Your Honor thinks that that is

16   killing too many trees or something like that, you'll be

17   able to modulate how we should write a brief but I think we

18   probably need page limitations or suggestions or we may need

19   to modify your rules on this.

20           THE COURT:  Given the importance of the issues,

21   I'm going to cut you some slack on this but we properly

22   sensed that about halfway through my judicial term, I had

23   started to impose page limits because things were getting

24   out of hand.  One thing you can do -- and I think my task

25   here is a little easier because practically all of you are

1    real litigators and not just bankruptcy lawyers, you can

2    save a lot of paper by writing the briefs like litigators

3    do, like that, because lawyers do, especially when you're

4    talking about a lot of the wordiness that bankers and

5    bankruptcy lawyers make when they're describing legal

6    documents and addressing your relevant facts.

7             MR. STEINBERG:  The only other thing, Your Honor,

8    is that -- well, the only other thing, Your Honor, that I

9    have and then I'll yield the platform, you had talked about

10   reporting to Your Honor on the after the meet and confer as

11   to whether we think it'd be appropriate to brief the legal

12   standard on fraud on the court and if we would be able to

13   take up the issue if there's not a full consensus on it at

14   the August 5th status conference.  Would it be helpful -- it

15   would be helpful probably to us in order to see what kind of

16   consensus we can get if you tell us when you would like to

17   get that report.  If we gave it to you two weeks before the

18   August 5th status conference, would that be sufficient time

19   to -- that will give us -- we will have met and conferred a

20   few times on the factual stipulations and we will have

21   fairly well baked in whether we could do something or not.

22            THE COURT:  I want to get others' views on whether

23   they concur with that proposal and I guess my dream scenario

24   would be if, as you guys sometimes can do, you can give me a

25   joint letter saying you've agreed on this or we don't agree

1    on this, our consensus is on this, we couldn't reach

2    consensus on that so that I -- minimizing the extent of the

3    papers that need to be done on it.  If you think after

4    you've talked it requires more extensive discussion on that,

5    I would be inclined to have a note in mine but I don't want

6    to sign off on this issue, thus, until I've heard them.

7              MR. STEINBERG:  Right.  Your Honor, just so it's

8    clear, we're amenable to whatever date there are.  I just

9    understand that when we did the last scheduling order, we

10   were supposed to deliver things to Your Honor on July 1 and

11   Your Honor was getting papers and we appreciate it very much

12   at 5:00, 6:00, 7:00 o'clock this even -- yesterday evening

13   and sometimes we can do better if we had a deadline so that

14   Your Honor could have papers in a more orderly fashion.  So

15   that's the only reason why I suggested it.

16             THE COURT:  Well, that -- I well understand how

17   hard you guys are trying on this.  I'm not criticizing

18   anybody for what happened yesterday but, yeah, if you can,

19   that would be helpful.

20             MR. STEINBERG:  Okay.

21             THE COURT:  Mr. Edward Weisfelner.

22             MR. WEISFELNER:  Your Honor, with great

23   trepidation, I rise to ask Your Honor for a 15-minute

24   adjournment.  I have a limited number of questions and

25   requests for clarification with regard to your order.  I

Page 65

1    don't feel like eating my shoe and since I have the lead MBL

2    counsel sitting right here in court and my other co-counsel,

3    I'd like 10 or 15 minutes to make sure that the points of

4    clarification I seek are ones that are shared across the

5    board with the MBL lead counsel and the other designated

6    counsel.

7              THE COURT:  If there are matters of clarification

8    that's contrasted to re-arguing anything, I've decided you

9    can have that 15 minutes so we'll reconvene and we'll --

10             MR. WEISFELNER:  And, Your Honor, may we use the

11   conference room?

12             THE COURT:  That will be --

13             (Asides.)

14             THE CLERK:  No.

15             THE COURT:  Well, why not?

16             MR. WEISFELNER:  Well, I'll use any conference

17   room.

18             THE COURT:  Yeah, you can use my conference room

19   after I and my (indiscernible) and if you'd come in through

20   the back door, you can come in?

21             MR. WEISFELNER:  Thank you, Judge.

22             THE COURT:  We're in recess.

23             THE CLERK:  All rise.

24        (Recess taken at 11:44 a.m.; proceedings resume at

25   12:07 p.m.)

```
1              THE CLERK:  All rise.

2              THE COURT:  Have a seat, please.

3              Mr. Inselbuch, you're rising.

4              MR. INSELBUCH:  Yes, sir.  One point, briefly.  We

5    understand your ruling, Your Honor.

6              With respect to 1(b), as I indicated to you

7    earlier, we are at a loss to know how to go forward to

8    produce factual stipulations or a record on 1(b), because

9    what we have, by way of a record here, is a motion by New GM

10   simply to stay these lawsuits.  Could we have a direction

11   from you that New GM tell us, within the next week or two,

12   if they were to lose on 1(a), what they would be arguing the

13   remedy would be under 1(b) so that we could understand what

14   factual basis, if anything, in addition would be necessary

15   to go forward without discovery?

16             THE COURT:  What is the hole (sic), Mr. Inselbuch?

17   I got the impression from the colloquy that I heard

18   beforehand that the array of facts as to which agreement was

19   solicited was so enormous that the real issue was the extent

20   to which they might turn out to be irrelevant rather than

21   even more facts for which you would want stipulations?

22             MR. INSELBUCH:  I don't think that's correct,

23   Your Honor.  The debate on the early set of stipulations was

24   much improved by the delivery of the Deluco report.  What we

25   are focusing on here is we had the same issue without the
```

Page 67

1    Deluco report.  We can't know, as we sit here today, what

2    issues, what factual matters we might need to respond to an

3    argument if we don't know what it would be about what New

4    General Motors might say the relief ought to be if they lose

5    and Your Honor holds that there was a violation of due

6    process.  And we think that, if we're to try and move

7    forward on this in some reasonable way, we need to have that

8    to scope out what we need to do.

9            THE COURT:  Let me hear from you, Mr. Steinberg.

10           MR. STEINBERG:  Your Honor, the 1(a) issue, the

11   procedural due process issue, is their defense to my motion

12   to enforce.  They then will have to tell Your Honor what the

13   remedy they should be asking for in light of having won the

14   first issue, if we have to deal with that.  I'm struggling

15   to try to figure out what it is that they expect me to say

16   when it's their defense that they now have to postulate the

17   remedy.

18           The real practical answer is is that we have set

19   up an opening delivery of factual stipulations by either

20   Monday or whatever date that we agree on should be relaxed

21   because of the additional issues.  We then have two weeks to

22   then try to figure out how to get a bundle of factual

23   stipulations.

24           We will have delivered what we thought should be

25   done on the 1(b) issue on the day that we're exchanging

Page 68

1   factual stipulations, and we'll have 12 or 15 days to try to

2   figure it out.  I'm not exactly sure why they think they

3   need to impose other requirements on their affirmative

4   defense.

5           THE COURT:  Is your position, in substance, likely

6   to be that, whether or not you win on a 1(a) issue, you

7   still don't have to pay?

8           MR. STEINBERG:  That's correct, because the

9   obligation is Old GM who committed the procedural due

10  process violation, and we're the good faith purchaser for

11  value and that we're entitled to the protections that the

12  courts have affirmed.  That would be our position.  I think

13  I've said it to them.

14          THE COURT:  Without ruling on the merits of the

15  position, I can't say that what you just told me came as a

16  surprise to me.

17          MR. STEINBERG:  Right, and it doesn't come as a

18  surprise to them.  I've said it every chance I have.

19          THE COURT:  Mr. Inselbuch, I don't see the need to

20  be as significant as you do.  If any further clarification

21  of what Mr. Steinberg just told me is practical, give it to

22  Mr. Steinberg.  To the extent that you've pretty much said

23  it all, then work with that, Mr. Inselbuch.

24          MR. INSELBUCH:  Yes, I think we have their

25  statement.  We don't need a ruling from Your Honor.  Thank

Page 69

1    you.

2              THE COURT:  Okay.

3              Now, Mr. Weisfelner, did your issues drop out, or

4    do you still need stuff from me?

5              MR. WEISFELNER:  Our issues did, in fact, drop

6    out, but I appreciate the opportunity.

7              THE COURT:  Okay.  Good.

8              All right.  Then am I correct -- directing this

9    question at those who weighed in in the first phase of

10   today's hearing -- that we're done with that and I can turn

11   to Phaneuf?  If I'm mispronouncing the name, I apologize.

12             MR. WEISFELNER:  Your Honor, I think you can so

13   long as Your Honor's prepared to dismiss those of us that

14   have other places to go and don't need to sit through the

15   balance of Your Honor's (indiscernible - 1:39:01).

16             THE COURT:  Yeah, sure.

17             I asked my law clerks to inquire of you all as to

18   whether you have a preference, now that it's about quarter

19   after 12:00, to go straight through.  My tentative is to go

20   straight through, but, if anybody has a different view, I'll

21   hear it.

22             MR. STEINBERG:  No, I have a very strong personal

23   view to go straight through.  I have an obligation to meet a

24   family member who's going through some testing in the

25   afternoon.  So, if I can in any way be able to try to

 1    accommodate, I'd like to.

 2            THE COURT:  So you'd like to keep going, too?

 3            MR. STEINBERG:  I would, yes, Your Honor.

 4            THE COURT:  Okay.

 5            Let's go -- Ms. Rubin?

 6            MS. RUBIN:  Your Honor, I --

 7            THE COURT:  Pull a mike close to you so I can hear

 8    you, please.

 9            MS. RUBIN:  Oh, I'm sorry, Your Honor.  I would

10    just ask that, pursuant to Mr. Weisfelner's request, the

11    briefing schedule for the Gillispie matter concerns the GUC

12    Trust as well.  I believe that we have a resolution of that

13    and can report to Your Honor in short order.  If we could

14    turn to that, that would allow Mr. Weisfelner's request that

15    the rest of us be dismissed as well.

16            THE COURT:  Let's do it this way, folks.  Anybody

17    who wants to leave right now who doesn't care about the

18    Phaneuf, Elliott, or Gillispie is free to do that.

19            Then I'm going to put your matter up next,

20    Ms. Rubin, and I sense that you're basically giving me a

21    report on what your deal is, assuming I'm okay with the

22    deal.

23            MS. RUBIN:  Yes, Your Honor.

24            THE COURT:  Good.  Okay.

25        (Pause)

Page 71

1            MR. STEINBERG:  Your Honor, if I could just say

2      quickly about Gillispie so that I think Ms. Rubin would like

3      to then depart as well.  We have spoken with counsel for

4      Mr. Gillispie.  We agreed on a briefing schedule.

5            THE COURT:  By the way, is he here in the

6      courtroom or on the phone?

7            Evidently, not.

8            MS. RUBIN:  It's my understanding that Mr. Owens

9      intended to be on the phone.

10            Mr. Owens, are you on the phone?

11            THE COURT:  Mr. Owens?

12            Is that Mr. Gillispie's counsel?

13            Are you on the phone?

14            I sense not, but, if you're reporting on something

15      where he might sign a stip. or consent order, why don't you

16      go ahead, you and Ms. Rubin, please?

17            MR. STEINBERG:  Your Honor, we agreed, both the

18      GUC Trust and New GM, to respond to his motion on

19      August 18th.  He would file a reply on September 18th, and

20      then, the Court would schedule an oral argument, to the

21      extent the Court figured that oral argument was necessary.

22      We're prepared to put this into a stipulation so it is of

23      record, but those were the dates that have been --

24      August 19th instead of August 18th.  So it's August 19th,

25      September 18th, and we'll put that into a briefing schedule.

Page 72

1          THE COURT:  Do you have a desire to be heard

2     beyond that, Ms. Rubin?

3          MS. RUBIN:  No, Your Honor.

4          THE COURT:  Okay.

5          Then, that's fine, but especially since that

6     attorney isn't here, put it in the form of a stip. or a

7     consent order, and I'll so order it once I know that he's on

8     the same page as the two of you guys.

9          MR. STEINBERG:  All right.  Thank you, Your Honor.

10          MS. RUBIN:  Thank you, Your Honor.

11          THE COURT:  Okay.  And you can take off, if you

12     care to, Ms. Rubin.

13          Can I hear from counsel for Phaneuf now?  Would

14     you come up, please?

15          And let me get appearances.  Because, while I know

16     some of the old timers in this court, I don't know

17     everybody.

18          MR. BLOCK:  Good afternoon, Your Honor.  Jeffrey

19     Block, with the Block & Leviton firm, for the plaintiff

20     Phaneuf, and you were pronouncing it correctly, yes.

21          THE COURT:  Okay.

22          MR. GARBER:  Todd Garber, from Finkelstein,

23     Blankinship, Frie-Pearson & Garber, for Phaneuf.

24          THE COURT:  Okay.

25          MR. FLEMING:  Joel Fleming, also of the Block &

Page 73

1    Leviton firm, for --

2              THE COURT:  Okay.

3              Am I going to hear mainly from you, Mr. Block?

4              MR. BLOCK:  Yes, Your Honor.

5              THE COURT:  Okay.

6              Have a seat, though, please.

7              And, of course, I know Mr. Steinberg.

8              Make your arguments as you see fit, but I would

9    like both sides to be brief, because I have read the papers,

10   and I don't think the issues here are as difficult or

11   complicated as those that we heard before.

12             The issue, it seems to me, Mr. Block, is that, on

13   this lay of the land, there is a basis for considering your

14   client or clients any differently than those in the other 87

15   actions that are before me.  On page 12 of his answering

16   brief, in particular.  Mr. Steinberg contends that at least

17   one of the vehicles -- or page 11 and 12 -- in question is a

18   2006 Chevy, which, as its name would suggest, was a vehicle

19   manufactured by Old GM, and, if New GM did something bad, a

20   matter which I don't decide, it at least seemingly walks,

21   talks, and quacks, like a lot of the stuff that was done

22   that was bad, took place before the July 2009 sale.

23             There is also an issue in this and other cases

24   before me as to whether if New GM or if Old GM or any GM did

25   something bad, it related to an ignition switch that was

Page 74

1    installed in a vehicle and that it's at least arguable that

2    liability for constructing or designing of bits which would

3    be associated with the designer/manufacturer of that switch,

4    both matters which, if true, are established would suggest

5    that the 363 sale order applies in the first instance to any

6    liabilities that are asserted.  Apart from that, I have some

7    difficulty seeing the prejudice to your client if I were to

8    reach preliminary injunction analysis doctrine as to how you

9    would be harmed in any material respect, if at all, when

10   you're treated like everybody else, and at least most judges

11   are not of a mind to manage litigation for the benefit of 1

12   out of 88 constituencies.

13            I sense from your papers, both your original

14   motion and your letter, that you're relying on the fact that

15   one or more of your plaintiffs might have acquired their

16   vehicles after the sale order, but I need to know the extent

17   to which either any of the assumptions I made before might

18   be matters as to which you're disclaiming a basis for

19   liability or whether we have a situation which I may have to

20   deal with later, because I'm confident that there are at

21   least 1 of the other 87 litigants who have the same

22   situation where they're hanging their head on both pre and

23   post-sale liability, but Mr. Steinberg may contend -- I'm

24   not reading his mind.  I haven't spoken to him, but he may

25   contend that the fact that part of the liability is premised

1      on prepetition or presale acts -- affects the analysis.

2              So I need help from you as to why I should treat

3      your case different than any of the others.  As you can

4      sense from what I said, my tentative, subject to your right

5      to be heard, is to treat you like the other 87.  So come on

6      up, please.

7              MR. BLOCK:  Thank you, Your Honor, and I

8      appreciate your comments, and obviously, I'll try and be as

9      brief as possible.

10             First, all of our clients, not just one, but all

11     of them purchased their vehicles post-bankruptcy.  So none

12     of our purchasers are pre-bankruptcy purchasers, and we

13     think that's what makes our claims different than the other

14     87, and my understanding is the other 87 have both pre and

15     post.  So they're a common nature.

16             So our view is that, when you have people who

17     bought post, as we put in our papers, we view ourselves as

18     what are the future claims.  So none of our clients had any

19     claim against Old GM at the time of the bankruptcy, and, to

20     us, we view the case exactly, even stronger, but exactly

21     like the Grumman Olson case that we cited in our papers, and

22     that was a case before Judge Bernstein, and that was a truck

23     component that was manufactured.

24             The manufacturer of the truck component filed for

25     bankruptcy.  Another company, Morgan, purchased all the

Page 76

1    assets through a 363(f) sale.  After the bankruptcy, a

2    plaintiff was injured and brought a product liability suit

3    against Morgan.  Morgan said your claims were released as

4    part of the sale, as part of the bankruptcy.  Can't bring a

5    claim.

6            Judge Bernstein ruled no, because a constitutional

7    due process issue.  If he didn't have a claim at the time of

8    the bankruptcy, the claim cannot be released, and, also as

9    part of the bankruptcy code, which is since you did not have

10   a claim at the time of the bankruptcy, again, it cannot be

11   released, and that decision was affirmed by the district

12   court.

13           We know that we haven't found a case in which any

14   Court, a bankruptcy Court, has ruled that a future claimant

15   -- their claims can be released through a bankruptcy, and I

16   know this is a question that the Second Circuit did not

17   address in the Chrysler case.  So it is an open question,

18   but that's why we view ourselves in a different situation

19   than the others, because all of our purchasers were post-

20   bankruptcy.  So we don't think that there are any claims

21   that they have against New GM that can be released, because,

22   like I said, they never got notice of the bankruptcy, and

23   they could not have because they were not claimants at the

24   time.

25           So that's why we think our case and our claim is

1    different from all the other 87, which is why and the only

2    reason why we did not agree to the sett. (sic).  I also

3    think, Your Honor, that in his order from, I think it was,

4    last week, Judge Furman in talking about the organization of

5    the cases, notes that there are issues in the bankruptcy

6    court, and I think a read of his order is he is looking for

7    guidance from Your Honor as far as what is going to happen

8    with the claim.

9            We think it would be beneficial to the district

10   court if we're right, and, if I assume I'm right, that folks

11   who purchased after bankruptcy who never got notice of the

12   bankruptcy, could not have gotten notice because they didn't

13   have a GM car, therefore, didn't have a claim -- they're

14   future claimants.  Their claims could not be released.  I

15   think that would be helpful to the district court in

16   organizing the cases and determining how the cases go

17   forward.

18           If I am wrong and future claims can be released

19   through the bankruptcy, then I think obviously that point to

20   be made to Judge Furman doesn't need to be made, but that's

21   our view, and that's why we think we're different.  And

22   there are two groups of folks that we have here.

23           We have people who purchased their cars, new cars,

24   from New GM after the bankruptcy.  We have a second group of

25   people who purchased used cars after the bankruptcy.

1              THE COURT:  Purchased used cars after the

2     bankruptcy but that were manufactured before the bankruptcy?

3              MR. BLOCK:  Yes, Your Honor, yes.

4              THE COURT:  And I take it that there are more

5     variants even than those that you mentioned such as those

6     that might have parts in them that were made before the

7     bankruptcy but were either old cars, on the one hand, or new

8     cars, on the other.  There's a whole bunch of different

9     combinations and permeations, I take it, that's self-

10    evidence to all of us?

11             MR. BLOCK:  Absolutely, Your Honor, but we also

12    think, if you go back to the Grumman Olson case, what

13    Judge Bernstein found where there was no dispute that the

14    part issued or the product at issue was manufactured,

15    designed and manufactured by the bankrupt entity, and the

16    bankrupt entity was -- all the assets were purchased in the

17    sale by the new company.  Judge Bernstein still ruled it

18    doesn't matter.

19             That claim cannot be released, because you were

20    not a claimant at the time of the bankruptcy.  So that was

21    completely irrelevant to his decision and completely

22    irrelevant to the district court when the district court

23    affirmed.

24             THE COURT:  Do you agree that there may or may not

25    be an overlap between what you said and the fact that,

1    whether or not it's a claim that could have been asserted in

2    the bankruptcy, there is an analytically distinct issue,

3    possibly with the same conclusion, possibly with a different

4    conclusion, as to whether New GM assumed any particular

5    claim?

6              MR. BLOCK:  Well, you could go through an analysis

7    as far as whether or not New GM assumed the claim, but I

8    think the way we're also looking at this is I don't even

9    think you need to reach that level of analysis, because I

10   think, again, the Grumman Olson case turns on the simple

11   question that because you did not have a claim at the time

12   of the bankruptcy, you could not have gotten notice of the

13   bankruptcy, and therefore, any claim that you have could not

14   have been released.  So you are the future claimant, and

15   future claims cannot be released through --

16             THE COURT:  I understand that argument, Mr. Block.

17             MR. BLOCK:  Okay.

18             THE COURT:  The question is when and how that

19   argument should appropriately be determined.  I take it you

20   were sitting through the very lengthy proceedings that

21   preceded your argument?

22             MR. BLOCK:  I was, Your Honor.

23             THE COURT:  And you heard the lawyers.  I think we

24   call them the designated counsel, who were speaking for

25   ignition switch action plaintiffs.  I take it you shared my

Page 80

1    view that they're pretty good lawyers?

2            MR. BLOCK:  They're excellent lawyers, Your Honor.

3            THE COURT:  And one of the things that might

4    inform the exercise of my discretion, if I were to consider

5    it merely a matter of discretion, is whether they might be

6    thinking of some of the very same arguments you're making,

7    and they may be making the same arguments you're making,

8    albeit better or worse than you're making them.

9            MR. BLOCK:  I would venture to guess they may make

10   them better than I'm making them.  Hopefully, I'm as equal

11   to them.

12           THE COURT:  Well, you've already proven that

13   you're a capable lawyer, but the underlying point, of

14   course, is a different one.

15           MR. BLOCK:  Well, --

16           THE COURT:  Which is whether I should be deciding

17   issues of the character that you are raising before I give

18   all of the other 87 lawyers a chance to do their thing

19   because I haven't spoken to them any more than I've spoken

20   to Mr. Steinberg, and I'm thinking merely in terms of that

21   which is foreseeable, but I think it's foreseeable that

22   they're going to be making an argument that has some

23   similarities, at least, to the one you're making.

24           MR. BLOCK:  Well, I think they -- I would suspect

25   they will, Your Honor.  What I would just say in response to

Page 81

1   that is obviously, we are responding to Your Honor's

2   May 16th order that we received opposing the stay, and those

3   are the reasons why we, for our case, oppose the sett.

4   (sic), and procedurally, that's how we got here and the

5   timing of how we got here.

6           Number two, I don't know why nobody, in my view,

7   nobody has raised what I think is a very straightforward

8   threshold question as far as whether folks who bought after

9   the bankruptcy who I'm calling the future claimants should

10  be part of the determination as to whether the release

11  applies to them or the injunction applies to them because

12  our view is we think the case law is very clear that it

13  doesn't.  I think if Your Honor were to agree with me and

14  were to issue that ruling, I think it would be highly

15  beneficial to the designated counsel.  I think it would also

16  be very helpful to Judge Furman as he decides how the cases

17  should be organized and moved forward, and obviously, that's

18  going to be up to Judge Furman to decide.

19          THE COURT:  Okay.  Anything further?

20          MR. BLOCK:  No, unless you have anything else,

21  nothing else.

22          THE COURT:  No, you kind of helped me as you went

23  along.

24          MR. BLOCK:  Okay.  Thank you, Your Honor.

25          THE COURT:  Thank you.

1          Mr. Steinberg?

2          MR. STEINBERG:  Yes, Your Honor.  I think your

3     questioning put your finger on a lot of the issues.  One is

4     counsel admitted that, as part of the 87 litigation, there

5     are clearly people who have asserted that they bought a car

6     post-sale that was a prepetition car, and therefore, --

7          THE COURT:  Pause, please, so I keep up with you.

8     This one of the permeations is a post-sale by but a presale

9     manufacture?

10          MR. STEINBERG:  That's correct.  So, of the 87

11     actions, probably 83 are class actions.  Many of them define

12     the class that includes the 2010 Chevy Cobalt, which, by

13     definition, was after the sale, but understand this as New

14     GM's position, and I'm trying to be very careful not to make

15     substantive arguments, but I think I need to illustrate --

16          THE COURT:  That's especially important in light

17     of all the people who have already left the courtroom today.

18          MR. STEINBERG:  That's correct, Your Honor.  New

19     GM's position -- and it's stated this many, many times

20     publicly as well, too -- is that New GM has never

21     manufactured a defective ignition switch.  The reason why

22     that the defective ignition switch had stopped being

23     manufacturing prior to the sale.

24          The reason why the 2010 Chevy Cobalt was recalled

25     was that there was a concern that a car with a good ignition

1    switch may have been repaired with an old GM defective part

2    by a dealer or someone else, and, to be on the safe side,

3    they recalled a million cars when they have always said that

4    the likelihood that any of them actually had this repair is

5    very small, but they didn't know which were the cars that

6    potentially had it.  So they withdrew them all.  So our view

7    is that every post-sale vehicle has an old GM part and

8    implicates the sale order.

9              The second thing is, as a practical matter as you

10   sort of struggle as to why they are different or not, the

11   Phaneuf litigation is part of the MDL, and yesterday you got

12   a letter from counsel suggesting that Judge Furman's letter

13   indicated -- and I'll use the --

14             THE COURT:  By that, did you mean his --

15             MR. STEINBERG:  His July 1 --

16             THE COURT:  -- his order of June 24?

17             MR. STEINBERG:  Yes, Judge Furman's letter of

18   June 24th, which was attached to our submission yesterday.

19   But counsel, Todd Garber, submitted a letter on behalf of

20   Phaneuf, and, in the third paragraph, it said, "The district

21   court's June 24th, 2014 order, attached to GM's letter as

22   Exhibit B, made clear that the district court contemplates

23   the possibility of separate litigation tracks for pre and

24   post-bankruptcy purchasers."  The fact of the matter is is

25   that there's nothing in Judge Furman's order that actually

1    says anything remotely close to that.

2              THE COURT:  Your position, I take it, is that the

3    order speaks for itself?

4              MR. STEINBERG:  That's correct.

5              THE COURT:  And that I can and should simply read

6    it?

7              MR. STEINBERG:  That's correct, Your Honor.  I

8    know that I couldn't find it, and, when I asked counsel

9    before, he pointed to a provision that he was relying on,

10   but that provision, in no way, says anything about presale

11   versus post-sale.  So, if I'm correct, then they're in the

12   MDL.  They're going to move at the pace that the MDL moves.

13   They're not going to move separately, even if Your Honor

14   said they could move separately.

15             All that would happen would be that process here

16   would be discombobulated and the process before Judge Furman

17   would get further confused because, in every voluntary stay

18   stipulation that was agreed to, there was an agreement that

19   New GM made that, if someone was allowed to get out ahead,

20   everybody would have the right to come to Your Honor and say

21   I want to go at that same pace.  So, to let the pimple on

22   the tail wag the dog here where 1 out of the 88 says I

23   should be able to move forward in what, at the end of the

24   day, is an MDL, it could potentially upset the other 87, and

25   whatever we decided earlier today about threshold issues and

1    an orderly way of presenting these issues will very well go

2    by the boards.

3            Other thing is is that, when you read their papers

4    and when you actually listen to their argument -- and

5    Your Honor was right about this, the Grumman Olson case is

6    the procedural due process case that every designated

7    counsel is going to argue.  We have a response to it.  If

8    the counsel couldn't find cases that support our position,

9    they'll see that in our threshold brief, but there was

10   actually a case out of Chrysler that supports our position

11   and distinguishes Grumman Olson.

12           I say that, Your Honor, not to try to argue

13   Grumman Olson before you, only to illustrate that the people

14   who walked out of this courtroom are going to argue the

15   effect of Grumman Olson.  Half of that argument, half of

16   their papers is a procedural due process argument.

17           The other half of their argument is the (1)(e)

18   issue that we talked about before.  Was this a liability

19   that was assumed by New GM?  They take the position that

20   clearly it's not.  We're going to take the position clearly

21   that they didn't -- I'm sorry.  They're going to take the

22   position that we assume this liability.  We're going to take

23   the position that we clearly did not.

24           Interpretation of the asset purchase agreement,

25   the MSPA -- it's all going to be for Your Honor's review,

Page 86

1     but those are the threshold issues.

2              THE COURT:  And either you or your opponents or

3     both are going to address decisions like my Castillo

4     decision?

5              MR. STEINBERG:  Yes.

6              THE COURT:  Where I dealt with somewhat similar

7     issues?

8              MR. STEINBERG:  That's correct.  The other thing

9     that Your Honor was correct also in pointing out to our

10    brief where we reviewed the complaint, we reviewed the

11    allegations.  It's clear that what they're alleging is Old

12    GM's conduct as it relates to the potential liability for

13    what they -- for the vehicles they bought -- successor

14    liability, because that word is actually in their complaint

15    a couple of different occasions -- Old GM vehicles and Old

16    GM parts, and that, by definition, implicates the sale order

17    and injunction.

18              And, once the sale order and injunction is

19    implicated, they never should have brought their action, but

20    they now have brought their action.  It's up to Your Honor,

21    as the person who had exclusive jurisdiction, to determine

22    how these claims are to be resolved.

23              This morning's hearing was how these claims are

24    going to be resolved, by bifurcating and dealing with the

25    threshold issues.  They are not anywhere different than

Page 87

1    anybody else.

2           I have, Your Honor, reasons to say why I believe

3    that substantively they're wrong, but I'm going to adhere to

4    the admonition that you gave me already, which I had tried

5    to check myself, which is I'm not going to try to argue the

6    substance as to why this was a retained liability versus an

7    assumed liability.  Only that ignition switch was mentioned.

8           If you look at the plaintiff Lisa Phaneuf, she has

9    got a 2006 Chevy Cobalt.  It was bought from a non-GM

10   dealer, and they're alleging liability to us under the

11   rubric of language that includes successor liability, and we

12   think that implicates the sale order.  They could disagree.

13          I know that people are not going to agree to

14   everything that I say, but that's the process.  The process

15   is I'm going to have an ability to argue that.  Someone

16   else, including them, will argue all of these issues,

17   procedural due process, whether it's an assumed liability,

18   retained liability, and we're going to have that issue

19   resolved by Your Honor, and we're prepared to take that

20   issue on.

21          It would be a mistake if Your Honor allows them to

22   take this on a different track when so many of the other

23   plaintiffs have the same claim and have defined their class

24   to include post-sale classes, and especially because they

25   want to be able to make the arguments.  And subsumed in what

Page 88

1   we were talking about before was these arguments.  Subsumed

2   in the exchange of factual stipulations are some of the

3   things that are recited in the complaint.

4           they will have their time.  They will have their

5   day in court.  We will have the opportunity to defend it.

6   But to allow them to go forward when they're similarly

7   situated to everyone else, especially when they're part of

8   an MDL where they can't move it in any different way, would

9   be a mistake for what we're trying to accomplish here.

10          THE COURT:  All right.  Thank you, Mr. Steinberg.

11          Mr. Block, I'll take a reply.

12          MR. BLOCK:  Thank you, Your Honor.  Just a couple

13  of brief points.

14          First of all, I know Mr. Steinberg is talking

15  about retained versus assumed liability, who manufactured

16  the parts.  Our view is -- and we think, under the Grumman

17  Olson case, it's clear -- none of that matters.  The

18  question is did folks who purchased cars after the

19  bankruptcy -- can their claims be released when they are

20  future claimants.  We think the law is clear the answer is

21  no.  So we don't think that really matters.

22          Second, as far as allowing us --

23          THE COURT:  Pause, please, Mr. Block.

24          MR. BLOCK:  Yes.

25          THE COURT:  And I must confess that I read your

Page 89

1    brief and your letter, and maybe I should have picked it up.

2    But do you have a punitive damages claim in addition to a

3    compensatory damage claim?

4              MR. BLOCK:  I don't believe we do, Your Honor.

5              THE COURT:  Okay.  Continue.  Thank you.

6              MR. BLOCK:  Okay.  Second, as far as the argument

7    of us getting out ahead of everybody else, I don't really

8    think that that is a valid argument.

9              MR. STEINBERG:  May I just show him where he has

10   punitive damages?

11             MR. BLOCK:  We do?  Okay.  Then we do have

12   punitive damages.

13             THE COURT:  Okay.

14             MR. BLOCK:  He remembers my complaint better than

15   I do.

16             As far as getting out ahead, Your Honor, I think

17   our view is that, right now, there are two stays in place.

18   There is a bankruptcy court stay, which we don't think

19   applies to our claims, and there's a district court stay

20   pending the organization.

21             If Your Honor agrees with me, we are still stayed

22   by Judge Furman, and Judge Furman will decide whether, in

23   essence, we get out ahead or we don't, and he's going to

24   organize the cases, and we just think it would be beneficial

25   for him in terms of organization, in terms of scheduling as

Page 90

1    to whether or not our view is the correct view.  And, if

2    it's not the correct view, then it doesn't matter.

3            Third, just very briefly, as far as the letter,

4    Your Honor, I'm sure you're going to read Judge Furman's

5    decision.  We clearly were not trying to mischaracterize

6    what he said.  Our just view of the letter was he notes that

7    there could be certain claims that are now pending that can

8    go forward or that cannot go forward, depending on how

9    Your Honor rules, and that's the only point we were trying

10   to make, that this would be beneficial for him.

11           THE COURT:  Okay.

12           MR. BLOCK:  Unless Your Honor has anything

13   further, I'm done.

14           THE COURT:  No, thank you.

15           MR. BLOCK:  Thank you, Your Honor.

16           THE COURT:  Sit in place for a second, gentlemen.

17   I don't need to take a recess.

18       (Pause)

19           THE COURT:  Mr. Block and Mr. Garber, I'm ruling

20   that the stay should remain in place, subject to the usual

21   right to ask that I revisit the issue after September 1st

22   that all of the other tort litigants have and that your

23   claims will be treated the same as the other 87, and I'm

24   going to summarize the reasons for that orally.

25           What I would like you to do -- and I'm not going

Page 91

1   to put a gun to your head to give you a deadline to do it,

2   but I would appreciate an answer as soon as practical, and

3   you should advise my chambers with a copy of your

4   communication to Mr. Steinberg and all of the parties who I

5   heard from today as to whether you would like to take an

6   appeal.  If you do, I will write an opinion on it, but, in

7   the nature of the way that I have to triage my matters, I've

8   found that, very often, when I summarize a ruling orally,

9   that it's sufficient, except for an appellate record, and

10  then, I'll decide whether I need to write to assist an

11  appellate Court.

12          I am ruling more specifically that the sale order

13  now applies, though it's possible, without prejudging any

14  issues, that, after I hear from the other 87 litigants, I

15  might ultimately rule that it does not apply to some kinds

16  of claims and that, even if the sale order didn't apply,

17  that New GM would be entitled to a preliminary injunction

18  temporarily staying the Phaneuf plaintiffs' action from

19  going forward, pending a determination by me on the other 87

20  litigants' claims under the standards articulated by the

21  circuit in Jackson Dairy (sic) and its progeny (sic).

22          My findings of fact, conclusions of law, and bases

23  for the exercise of my discretion will be summarized now and

24  more fully set forth if you decide you want to take an

25  appeal.  All of the facts with respect to the Phaneuf

Page 92

1    plaintiffs' claims have not been fleshed out, and I make

2    findings today for the purpose of this analysis based solely

3    on undisputed ones.  It is said to me -- and I have heard

4    not dispute -- that Ms. Phaneuf, Lisa Phaneuf, purchased a

5    2006 Chevy, which was a vehicle manufactured by Old GM.

6           Page 1, excuse me, of your complaint, alleges that

7    the ignition switch action is brought against New GM,

8    successor and interest to Old GM.  On page 12 of the

9    opposing brief, New GM points to 6 matters alleged in your

10   complaint, speaking of events that took place in February

11   2005, April 2005, June 2005, March 2005, April 2006, and in

12   2003.  Each of those circumstances is, to state the obvious,

13   an event that took place before the formation of New GM.

14          Those allegations, if proven, might have relevance

15   to a punitive damage claim, which we've now agreed has been

16   asserted here, but they do not describe events taken place

17   by New GM.  I do not make any finding as to the extent, if

18   any, to which New GM assumed such liabilities, but I do find

19   them sufficient for me to form a view that they raise at

20   least serious issues as to whether there is material

21   reliance on matters that took place before the sale order.

22          Putting it another way, the applicability of the

23   sale order has been established in the first instance, at

24   least for the purposes of your clients' claims.  For the

25   avoidance of doubt, I make no finding as to the extent to

Page 93

1    which these allegations or any others would be probative or

2    relevant in any of the other 87 litigations.

3            That is not to say, of course, that what the sale

4    order says now will be the end of the inquiry, either in

5    your case or in the case of the other 87 actions, but what

6    the matters that I discussed before show is that the sale

7    order applies in the first instance.  By reason of the due

8    process contentions the other litigants want to make or

9    otherwise, the sale order may turn out to self-destruct, a

10   matter as to which I make no finding today, but, for now,

11   it's in place, at least vis-à-vis your clients.

12       (Pause)

13           THE COURT:  Then I am required to consider or

14   should consider, not so much as a matter of law, but as a

15   matter of my discretion, whether I should make an exception

16   for your clients, notwithstanding the prima facie

17   applicability of the sale order, on the one hand, or whether

18   I should treat them with those who are or who are likely to

19   be similarly situated, on the other.  I think that making an

20   exception for your clients would be monumentally bad case

21   management, from my perspective.

22           You heard for a period of about three hours a back

23   and forth as to what makes the most sense, case management-

24   wise, for some very complicated issues, which it would be

25   manifestly inappropriate for me to make findings on, pro or

Page 94

1    con, for or against any party.  To step out of that template

2    and make early findings without giving them the opportunity

3    to be heard and where the issues are of the complexity that

4    people argued in good faith from many different approaches

5    would be extraordinarily ill-advised.  To the contrary,

6    every principal of case management that judges are taught

7    causes them to, on the one hand, try to deal with issues

8    where all concerned have the ability to be heard and also to

9    prevent one client or one group of litigants to get ahead of

10   the rest in a way that has the potential for prejudicing the

11   remainder.

12          Just as Mr. Steinberg tried to avoid making

13   statements in this proceeding after so many of the other

14   affected lawyers left, the same principles that underlie

15   that decision, which if he hadn't done it voluntarily, I

16   would have asked him to do, underscores that one client

17   shouldn't be -- or litigant group -- shouldn't be making

18   arguments ahead of everybody else.  And that's so, in this

19   court, even without considering whether Judge Furman might

20   have the same view as to those matters that I do or not.

21          Finally, I determine that, even if my earlier

22   order hadn't been entered, it would be appropriate to enter

23   a preliminary injunction, limited in duration until I've

24   ruled, preventing the piecemeal litigation of the Phaneuf

25   plaintiffs' claims now ahead of all of the other lawsuits

1   that are similarly situated.  While I don't have a complete

2   record, it's foreseeable, if not obvious, that at least a

3   subset of the 87 other litigants are going to present the

4   same issues, and that's the exact reason why the MDL action

5   came into being where the cases before Judge Furman were

6   determined by the MDL panel to be sent to a single judge for

7   pretrial matters and explains how they originally came to be

8   before Judge Furman.

9           When issues raise overlapping -- excuse me.  When

10  actions raise overlapping issues, even if they're not wholly

11  congruent, coordinated disposition is essential, and I don't

12  rule out the possibility -- in fact, I assume it to be true

13  -- that the facts you present, Mr. Block and Mr. Garber, may

14  not appear in every one of those 88 cases, but the chances

15  that they're not going to be present in at least some of

16  them are remote.  While I well-understand the desire of

17  litigants both to get their cases moving as quickly as

18  possible and -- though I don't know if it's your desire here

19  -- to put yourself in a desirable a position ahead of others

20  -- might occasion your desire to get this relief, they are

21  insufficient to trump the normal case management concerns

22  that I and most other judges would have.

23          With respect to the applicability of the sale

24  order, I find, for reasons I articulated before, that New GM

25  has raised serious issues going to the merits.  I don't need

Page 96

1    to, nor do I, find that New GM has a likelihood of success

2    on anything else.  In fact, I don't want to make such a

3    finding, because it would prejudice the litigants in the

4    other 87.

5              But, as we know, under the standards of Jackson

6    Dairy and its progeny, the standards for a preliminary

7    injunction in the Second Circuit require irreparable injury

8    and a likelihood of success or, once irreparable injury has

9    been established, serious issues going to the merits and a

10   tipping of the equities or the hardships decidedly in favor

11   of the party that's seeking the injunction.

12             Here, the irreparable injury, in terms of the case

13   management concerns and the prejudice to the litigants in

14   the other 87 actions, has been plainly established, and,

15   because, as is apparent from Judge Furman's order of

16   June 16th, including, among other things, that he's trying

17   to put his cases in an orderly way, just as I am, and that

18   he provided in his paragraph 16 on page 14 of his order,

19   that he would be doing a stop, look, and listen to await --

20   or at least to consider -- any rulings by the bankruptcy

21   court or any higher court exercising appellate authority

22   over the bankruptcy court.  The chances of him wanting to

23   proceed in a piecemeal manner with respect to only one

24   litigant and to exempt that litigant from other matters that

25   he prescribed in his order have not yet been shown to me, if

1    they ever will be.

2           So, for all of these reasons -- and, no offense.

3    I'm not doing anything to you, other than saying that you're

4    going to be treated like everybody else.  The Phaneuf action

5    will not be proceeding ahead of the other 87.  I'm so

6    ordering the record, but I am expressly giving you an

7    extension of the time to appeal for my oral order until I

8    enter a written one.

9           I am going to ask you, as I indicated early on, to

10   think about whether you want to take an appeal, because I

11   don't want a clock to start running against you on the

12   appellate time instantly.  I want to give you the

13   opportunity to think about it, and, though I don't know if

14   anything I say comes as much of a surprise to anybody, if

15   you do take an appeal, I may wish to confirm and amplify

16   upon some of the points I made.

17          Lastly, vis-à-vis Grumman Olson, I've read and I

18   think I understand Grumman Olson, but I want to minimize the

19   extent of the findings that I make with respect to it now.

20   For now, I want to limit it to say that, with lawyers of the

21   quality who argued before me this morning, it is

22   inconceivable to me that they won't be raising Grumman Olson

23   as well and that Mr. Steinberg will wish to be heard with

24   respect to Grumman Olson as well and that fairness to the

25   entire plaintiff community requires that I not deal with

Page 98

1    Grumman Olson issues piecemeal.  Just as you wanted to argue

2    it, I think it's at least foreseeable, if not certain, that

3    they will as well and that I don't want to make any rulings

4    based on Grumman Olson without giving them a fair

5    opportunity to be heard with respect to it also.

6              So, not by way or reargument, do we have any

7    questions or matters that I need to clarify?

8              MR. BLOCK:  Not from us, Your Honor.

9              THE COURT:  Okay.

10             Mr. Steinberg:

11             MR. STEINBERG:  No, we're good.

12             THE COURT:  Thank you.

13             Then, Mr. Block, you and Mr. Garber are free to go

14   or stay, as you prefer.  I think I have one other matter,

15   which is the Elliott plaintiffs.  I'm going to deal with

16   them now.

17             So come on up, please, folks.

18             MR. STEINBERG:  Thank you, Your Honor.

19             THE COURT:  And I can make a guess as to who you

20   are, but maybe I can get a formal appearance.

21             MR. HORNAL:  Daniel Hornal, representing the

22   Elliott plaintiffs.

23             THE COURT:  Right.  I had suspected as much.

24   Thank you, Mr. Hornal.

25             And, Mr. Steinberg, again, I assume?

Page 99

1          MR. STEINBERG:  That's correct.

2          THE COURT:  Gentlemen, I have a tentative here,

3    and I want to share it with both of you.

4          My tentative -- and this gores your ox a little

5    more than Mr. Hornal's, Mr. Steinberg -- is that I well-

6    understand that the Elliott plaintiffs, when they weren't

7    represented by counsel, entered into a stay stip. under

8    which they were part of the other 87, but historically, I've

9    had a sensitivity to the needs and concerns of pro se

10   litigants and the fact that they sometimes screw up.

11         Frankly, in this case, I think that, although they

12   may have screwed up by voluntarily entering into this stip.

13   without the benefit of legal counsel, it's giving away ice

14   in winter because of the Phaneuf ruling that I've just

15   issued, but my tentative, subject to your rights to be

16   heard, is to relieve them of the stip. temporarily to treat

17   your case, Mr. Hornal, as a tag-along action of the type

18   which I approved in the very first uncontested motion today

19   and to give you the opportunity, if you can, to show that

20   your action is any different than the other 87, including

21   now Phaneuf and to consider my ruling that I just issued in

22   Phaneuf to be stare decisis, that is a precedent, vis-a-vis

23   your effort to get them special treatment but not res

24   judicata or collateral estoppel.

25         I do want you to think about whether you want

Page 100

1   special treatment after the ruling that I just dictated,

2   because frankly, I think that you'd have to throw a hail

3   Mary -- throw and complete a hail Mary, Joe Montana style,

4   if you're old enough to remember him -- to succeed when the

5   able counsel for the Phaneuf plaintiffs failed.  But that's

6   the way I see it, gentlemen.

7           Frankly, if your clients hadn't been pro se at the

8   time, I would hold them to the stip., but, under the

9   circumstances, that's the way I see it, and I'll give each

10   of you an opportunity to be heard in opposition to my

11   tentative.  Either way, I assume that, by the time you're

12   done, each of you will be heard.

13           Come on up, please, Mr. Hornal.

14           MR. HORNAL:  Thank you, Your Honor.  Just to

15   clarify, so our client -- we have submitted a request to

16   amend the complaint with the district court.

17           We are fine with this procedures going forward,

18   and I appreciate the opportunity to develop our no-stay

19   arguments formally, but we want to make sure that the no-

20   stay arguments will be not due until after the district

21   court accepts the amended complaint, because it's going to

22   be very difficult to try to argue based on the pro se.

23           THE COURT:  I see that as an issue that would be

24   decided by Judge Furman rather than me.  And I say, Judge

25   Furman, by the way, and not the D.C. Court because I cannot

1    for the life of me see what the D.C. Court can properly be

2    doing in a situation like this.

3              But, again, that may be a Judge Furman issue and

4    not mine.  So, if what you're asking is, would I permit, my

5    approval wouldn't necessarily be the only approval

6    necessary.  Would I permit you to amend the complaint and

7    then ask Judge Furman for permission, I -- my tentative is

8    to say that from perspective, that's okay but I want to hear

9    Mr. Steinberg's view so I (indiscernible).

10             MR. HORNAL:  I'm a bit confused.  I -- perhaps I

11   can clarify with some of the procedural things that have

12   happened so far which is --

13             THE COURT:  Put that mic close to you, please,

14   Mr. Hornal.

15             MR. HORNAL:  Oh, of course.

16             My -- I believe that prior to us being retained as

17   counsel, a motion was made to add the Elliotts to the MDL

18   and the MDL panel rejected it.  That's why it's currently

19   and still in the D.C. District Court.

20             THE COURT:  Did it state the reasons for the

21   rejection?

22             MR. HORNAL:  It simply said it is not appropriate.

23   I don't believe it issued a lengthy opinion.  Since that --

24             THE COURT:  And you're theorizing that it might be

25   because the way the Elliott plaintiffs had originally

1    drafted it, it was so unintelligible that it might not have

2    reflected the commonality of issues that would be a normal

3    requirement for sending a case on an MDL basis somewhere

4    else?

5              MR. HORNAL:  I certain wouldn't characterize my

6    clients' complaint as unintelligible but it certainly was

7    difficult for some people to understand and it's very

8    possible that the -- I can't -- I should speculate on the

9    MDL Court's reasoning.  I only know that they sent it back.

10             Since that time, we have made a motion to amend

11   our complaint.  There is a motion to dismiss pending from

12   the defendants.  The -- and I believe just last night the

13   -- GM has moved to pull us back into the MDL based on the

14   amended complaint even though the amended complaint hasn't

15   been accepted.

16             Basically, all I'm asking, Your Honor, and since,

17   at this point, procedurally the amendments in front of

18   Judge Jackson in D.C., whether or not she will accept the

19   amendment, it seems the most sensible thing to do would be

20   for us to file our no stay papers soon after Judge Jackson's

21   accepts the amendment to the complaint, assuming she does,

22   which I -- we believe she will.

23             THE COURT:  If you got leave to file the amended

24   complaint, would you then be filing no stay papers or would

25   you be satisfied with the treatment that the Phaneuf

1   plaintiffs got?

2           MR. HORNAL:  Your Honor, our legal theories are

3   considerably different from the Phaneufs and the other 87

4   plaintiffs and I believe we would be filing a no stay.

5           THE COURT:  You think you thought of something

6   that 87 other lawyers didn't?

7           MR. HORNAL:  I'm quite confident we did, Your

8   Honor.

9           THE COURT:  Okay.  Mr. Steinberg, your

10  perspective, please.

11          MR. HORNAL:  Thank you, Your Honor.

12          MR. STEINBERG:  Your Honor, to some extent, this

13  case is an easier case for you to stay than the Phaneuf

14  case.  The Elliott car is a 2006 Chevrolet Cobalt and a 2006

15  Trail Blazer.  So they're both --

16          THE COURT:  But they have two cars.

17          MR. STEINBERG:  They have two cars.

18          THE COURT:  Both of which were manufactured prior

19  to 2009?

20          MR. STEINBERG:  That's correct.  So he may have a

21  theory but it's -- the predicate is an old GM car and the

22  issue is whether, under the MSPA, new GM assumed whatever

23  his theory is.

24          The second thing is to clarify, I've been told by

25  my colleague, and it's in our papers, that the clerk of the

Page 104

1   JP MAL (ph) did not accept the Elliott pro se action to be

2   part of the MDL because it was a pro se action.  That's our

3   belief.  It was a pro se action and the clerk didn't really

4   understand and therefore didn't tag it.

5          We filed out motion and they will have 21 days to

6   oppose it, if they want, but we think, clearly, when you

7   review the amended complaint, it's ignitions -- I can find

8   the word ignition switch on almost every page of a 53 page

9   complaint.

10          The third thing is, we should actually be clear as

11  to what is going on here.  This is not a situation where

12  they're just amending a complaint to make it clearer from a

13  pro se viewpoint.  And this wasn't excusable neglect.

14          When counsel came onboard, he had conversations

15  with my co-counsel at Kirkland and Ellis and they filed the

16  request to amend the complaint anyway, instead of coming to

17  Your Honor.  As they say, they probably should have gone and

18  dealt with this as a no stay pleading or move to vacate the

19  stay stipulation.

20          That complaint that they filed was not a

21  clarification of what the Elliotts did.  It was a request to

22  turn that into a class action.  The Elliotts didn't file a

23  class action.  Counsel decided that he wanted to do that.

24  Counsel is advertising the ability to sue GM on his email

25  and he writes on his website, if you're registered on one of

Page 105

1    the following GM cars in the District of Columbia, or if you

2    commute to work to the District of Columbia, you may be

3    entitled up to fifteen hundred, even if GM fixes your car.

4            Then they cite to the GM recall lawsuit and they

5    refer to the fact that, due to the ignition switch defect,

6    GM has recalled, and then it lists the car that were

7    recalled and then it says, the defect causes the ignition

8    switch to move into the accessory position shutting down the

9    engine, power steering, and power brakes and sometime

10   causing problems to lose control of their cars.  The same

11   allegation that everyone in the 87 plaintiffs says.

12           The ignition switch can be moved to the accessory

13   or off position from anything from a bump in the road to a

14   heavy keychain.  This has caused many deaths, serious

15   injuries; so often these bumps occur immediately before a

16   major accident, and upon impact the airbag does not deploy.

17           GM has already acknowledged that you were aware of

18   the defect for a decade but didn't tell the public until

19   recently.  Even if you have not been injured, you may be

20   entitled to up to fifteen hundred dollars.  To evaluate your

21   claim, contact, essentially us.

22           So this wasn't excusable neglect to amend the

23   complaint.  This was purposeful.  This was turning this into

24   a class action and this is a fee opportunity for them.  They

25   may have a theory but, believe me, it's no different than

Page 106

1    any other theory that has been asserted by any of the 87

2    plaintiffs.  It actually is the same 1(e) issue that we had

3    before, which is if they want to claim that the new GM is

4    responsible for something that happened relating to a 2006

5    vehicle, even if it doesn't involve an ignition switch, it's

6    -- if it's the compressor or something else like that, which

7    is also in their complaint.

8            So maybe the MDL takes it or maybe it doesn't.

9    But it implicates the MSPA.  It's implicates your sale order

10   injunction.  It's a pre-petition vehicle and old GM's view

11   and I say it, I say it with the same caveat I had before,

12   the MSPA listed three categories for which we assume

13   everything else we didn't assume.  This doesn't fall into

14   any of the three categories.

15           I won't argue anything more than that other than

16   that I'm happy for them to treat this as a no stay pleading.

17   I'm happy to make the same arguments that I did in the

18   Phaneuf action.  I actually think they should be withdrawing

19   their class action complaint.  If they actually want to re-

20   file an Elliott complaint that is specific only to the

21   Elliotts and not new parties and clarifies what a pro se

22   plaintiff would do, I probably would consent to do that as

23   well, too, so that there's a clear pleading onboard.

24           But I'm not consenting for them to go forward,

25   make this a class action, come ahead of everybody, and

Page 107

1    assert causes of action that everybody else and the 87

2    plaintiffs were prepared to do.  I'm not prepared to concede

3    that.

4          THE COURT:  All right.  Mr. Hornal.  Before you're

5    done, I want you to know whether you admit or deny what

6    Mr. Steinberg argued viz-a-viz now seeking to represent

7    people beyond the Elliotts and whether this is not beyond

8    protecting the interests of the pro se plaintiffs.

9          MR. HORNAL:  Your Honor, we are soliciting clients

10   for other cases.  Those cases have nothing to do with the

11   Elliotts.  The Elliotts filed pro se.  We had no contact

12   with them when they filed pro se.  We -- as I mention in the

13   papers that were filed with this Court, we were retained in

14   mid-June by them.  We did contact them after we saw that

15   they had filed pro se because we figured they needed help.

16   But that's the -- I was actually sort of boggled that that

17   would even -- that our law firm's actions outside of, you

18   know, in soliciting clients in accordance with D.C. law

19   would have anything to do with the Elliotts' claim.

20          I don't want to spend too much time on the merits

21   of whether or not we should have a no stay.  I simply -- I

22   feel the need to respond simply because there was such an

23   extensive presentation by GM.

24          THE COURT:  Well, you may need to do a little,

25   Mr. Hornal, because doctrine in the Southern District of New

1    York, and the Second Circuit, says that to be relieved of a

2    default, and that's in substance what you're asking me to

3    give you relief from, because you're asking for relief from

4    a stip that your client signed, requires both excusable

5    neglect and the showing of the meritorious claim or defense.

6        I well understand the point that we don't like to

7    beat up on pro se's and that might provide the basis for the

8    excusable neglect prong.  But the meritorious defense or

9    claim part would, at least seemingly, require, unless you

10   can show me some case law authority to the contrary, that

11   you have some plausible argument for being excused from the

12   sale order or for contending that it doesn't apply.

13       MR. HORNAL:  Absolutely, Your Honor.

14       I'm sorry.  I was looking through the complaint

15   right now to find the specific quotations trying to help

16   with that.

17       THE COURT:  I mean, if we are talking about

18   vehicles that were manufactured in about 2006, I am

19   scratching my head to see how you're going to do that.

20       MR. HORNAL:  Your Honor, our primary claim is

21   based on the Consumer Protection Procedures Act which is a

22   District of Columbia law.

23       THE COURT:  Is that what?

24       MR. HORNAL:  The Consumer Protections Procedures

25   Act.  It is a District of Columbia law.

1          All of our claims is -- are -- very explicitly

2     disclaim any liability based on successor liability or

3     anything based on the purchase.  Rather, we're only looking

4     to hold GM liable for its own actions and

5     misrepresentations, the new GM, since its inception.  We do

6     intend to introduce evidence about what happened in old GM.

7     We only -- to prevail in our legal theories, we only need to

8     show that new GM knew about the problem and failed to

9     disclose it.  That's the basis for our claim.

10          In our complaint, we specifically say, plaintiffs

11     are not making any claim against the old GM whatsoever and

12     plaintiffs are not making any claim against the new GM based

13     on having purchased its assets from old GM or having

14     continued the business or succeeded old GM.  Plaintiffs

15     disavow any claim based on the design or sale of vehicles by

16     old GM or based on any retained liability of the old GM.

17          Plaintiffs seek relief from new GM solely for

18     claims that have arisen since October 19th, 2009, and solely

19     based on actions and omissions of the new GM.

20          So I don't -- once again I would appreciate an

21     opportunity to develop this more fully on papers but that's

22     a -- an idea, basically the idea of what we're trying to do

23     and the basis of our claim, which is, in our opinion, quite

24     clearly, quite different from the claim you've -- or the

25     notes that you argued on earlier today, or that you ruled on

Page 110

1    earlier today, excuse me.

2              As to the procedure going forward, you know, our

3    client did enter into this stipulation.  Our client didn't

4    know what it meant.  The stipulation specifically says it

5    was a --  negotiated between counsel for both sides, which

6    he  wasn't represented by counsel.  And, furthermore,

7    Judge Jackson rejected the stipulation.  So I actually -- I

8    argue we're not in default in any way. We file -- my client

9    agreed to file a stipulation.  It was filed and it was

10   rejected.

11             My client doesn't have the option of simply

12   stopping to litigate the claims particularly when GM has a

13   pending motion to dismiss.  So we had to deal with that when

14   we came into the case and it was clear from talking to our

15   client what the proper form of relief was and the proper

16   complaint would be and that's what we have asked the

17   District Court to accept as an amendment.

18             We do not intend to do any sort of any end run

19   around the procedures here.  We do not intend to, you know,

20   try to engage in early discovery or something like that.

21   Rather, we simply want an opportunity to, based on the

22   complaint, assuming it is accepted for filing, to file a no

23   stay pleading and have our -- be heard.

24             THE COURT:  Mr. Steinberg.

25             MR. STEINBERG:   Your Honor, we attached his

1    amended complaint to our letter of July 1 and if you look at

2    paragraph 37, 38, 39 -- I'm sorry, start with paragraph 40.

3    It's the paragraph that starts with: class action

4    allegations.

5            So I know counsel really didn't answer your

6    question when you had asked him, but he filed a class action

7    complaint and the original action brought by the Elliotts

8    was on behalf of the two individuals.

9            Paragraph 41 of his amended complaint lists the

10    cars that are implicated as to the defined affected vehicles

11    and you can see you have Chevrolets, Pontiacs, Saturn,

12    Buicks -- all -- Cadillacs, all involving pre-petition

13    vehicles and some post-petition vehicles.  But mostly pre-

14    petition vehicles.  That's his affected class.

15            Our argument is that this class action can't go

16    forward.  This will end up being in the MDL.  We're

17    confident that that will be the case.  But it all is because

18    he took an action with knowledge of the sale order

19    injunction and we believe for the reasons that you gave on

20    the Phaneuf action that the sale order injunction was

21    implicated, he was required to come here and that was the

22    practice that he should have followed and he didn't do that.

23    And Justice Jackson rejected the stipulation and said file a

24    motion instead, that's our practice.  And we prepared the

25    motion for him to deal with it.

1           First of all, the stay stipulation applies whether

2      it's filed with a Court or not.  So, the pro se client was

3      actually bound by it just as a technical matter.

4           The second thing is the stay stipulation requires

5      them to do those acts that are necessary to implement the

6      stay stipulation which meant that they were required to

7      consent to the motion.  We prepared the motion.  We gave

8      them the motion.  He refused to comment on the motion.

9      Instead filed the complaint before Justice Jackson and is

10     now soliciting clients to try to sue new GM with respect to

11     pre-petition vehicles.

12          That's what's happening here.  I agree with Your

13     Honor insofar that if the tentative said he wants to file a

14     no stay stipulation in view of the Phaneuf ruling.  Fine.

15     Let him do it.  Let him articulate what his theory is and

16     we'll respond.  But don't, in effect, take advantage of the

17     fact that you violated the sale order and injunction, give

18     something and then say, that's why I want to announce the

19     truce.  He should be required to withdraw that action and I

20     said before, if he wants to clarify an individual action on

21     behalf of the Elliotts, let him do that.  I think we would

22     consent if this was an individual action on behalf of the

23     Elliotts.  It will say ignition switch on almost every page.

24          That's what this complaint says as well, too.

25          THE COURT:  All right.

1          MR. HORNAL:  Your Honor, if I may, I --

2          THE COURT:  No.  I've heard plenty, Mr. Hornal.  I

3    don't know if I gave you two or three opportunities to be

4    heard but every argument must come to an end.

5          MR. HORNAL:  We did consent on the motion I just

6    wanted to say.

7          THE COURT:  Forgive me, Mr. Hornal.

8          MR. HORNAL:  I apologize.

9          THE COURT:  I don't get cranky about a lot of

10   things but I really get cranky about getting interrupted.

11         MR. HORNAL:  I apologize, Your Honor.

12         THE COURT:  When I have the fuller, factual

13   exposition that I got by reason of oral argument, I see that

14   my tentative was only partly correct and I'm going to amend

15   it.

16         The rationale for my tentative was driven by my

17   normal desire to avoid penalizing pro se plaintiffs for

18   inartful pleading and to allow them to keep alive claims

19   that, while they might have dubious merit, at least against

20   new GM, under principles similar, if not identical to those

21   in the Phaneuf ruling, might warrant giving them a day in

22   Court.  But it was that alone and for that reason I'm going

23   to allow the Elliotts' complaint to be considered as a tag-

24   along action for the purpose of protecting those two pro se

25   individuals only but no more than that.  And, therefore, for

1    the avoidance of doubt, when we settle an order to this

2    effect, which I'm going to ask Mr. Steinberg to draft, it

3    may provide, as Mr. Steinberg argued that the two Elliott

4    plaintiffs get the benefit of the ability to make the

5    further arguments that consideration as a tag-along action

6    would allow them to make.  But no more than that.

7             So we're going to give the Elliotts, themselves,

8    relief from the stipulation that they entered into, but

9    nobody else.  Therefore, if you want to proceed for their

10   benefit as a non-class action, as what in substance is an

11   individual action, you can do that, Mr. Hornal.

12            But when a Judge, like me, excuses somebody from

13   the legal consequences of what he's done, there is no basis

14   in law or logic for then opening up the doors to anything

15   more than that which is necessary to protect the pro se

16   plaintiff.

17            Mr. Steinberg, you're to settle an order in

18   accordance with that.  You may include such matter as you

19   regard appropriate so long as it's not inconsistent with

20   anything I've said.

21            MR. STEINBERG:  your Honor, I wanted to make sure,

22   if I can include that counsel be directed with the

23   withdrawal his class complaint that he seeks to amend and

24   that if he wants to amend it, to limit it only to the

25   individuals and thereupon he will be stayed until his no

Page 115

1   stay action will be ruled upon.

2              THE COURT:  Yes, you may.  That's implicit in what

3   I said, but if you want to make it explicit, you may.

4              MR. STEINBERG:  Thank you, Judge.

5              THE COURT:  All right.  There be no further

6   matters with respect to Motors Liquidation.  I'm on the

7   bench for a long time.  We adjourned.

8      (Chorus of thank you.)

9              THE COURT:  Wait.   Is somebody on the phone who

10  has some other matter?

11             MR. KANOVITZ:  Yes, hi.  This is Mike Kanovitz.  I

12  represent plaintiff Gillispie.

13             THE COURT:  You're not very audible but I sense

14  that you're counsel for Mr. Gillispie?

15             MR. KANOVITZ:  That's correct, Judge.

16             THE COURT:  Were you able to hear when I called

17  your matter earlier this morning?

18             MR. KANOVITZ:  No.  What I heard was you would

19  take us up at the end of the day.  I've been sitting on the

20  phone.

21             THE COURT:  Okay.

22             MR. KANOVITZ:  I apologize if I somehow missed

23  that.

24             THE COURT:  All right.  Well, no apology is

25  necessary or at least I'm going to excuse you from not being

Page 116

1   around earlier.

2          Basically, what was said with respect to your

3   matter was that an agreement had been reached for a briefing

4   schedule to address your client's concerns, which was to be

5   papered in a stipulation or consent order to which you would

6   be a signatory along with the others.  And, assuming that

7   the schedule for addressing those matters as in the written

8   stip, which I gather reflects an agreement with you, is

9   satisfactory, I'm going to so order the stip or enter the

10  consent order.

11         MR. KANOVITZ:  (Inaudible), Judge.  That all

12  sounds correct.  We've reached an agreement on schedule by

13  emails back and forth and I know that will get reduced to

14  stip.

15         THE COURT:  Okay.  Are you on a landline because

16  I'm having a lot of trouble hearing you?

17         MR. KANOVITZ:  Yeah.  I actually am on a landline.

18  I've been in my basement this morning listening -- I don't

19  know how it is that I missed the call but, yeah, I got off a

20  couple times when you said we were taking a break but --

21  anyway.  Yes, I am on a landline.

22         THE COURT:  Okay.  Well, that disposition should

23  cause you no prejudice.  When you get the stip, look at it,

24  make sure it fairly reflects your deal and when you counter-

25  sign it, along with the other parties, I'll so order it.

1          MR. KANOVITZ:  Will do.  Thank you very much,

2    Judge.

3          THE COURT:  Okay.  Anybody else now?  All right.

4    Then we're adjourned.

5        (Chorus of thank you.)

6        (Whereupon the proceedings were adjourned at 2:59 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2

3                        RULINGS

4                                          Page      Line

5   "No Stay Pleadings" filed in connection with

6   Scheduling Order Regarding (I) Motion of

7   General Motors, LLC Pursuant to 11 U.S.C.

8   Section 105 and 363 to Enforce the Court's

9   July 5, 2009 Sale Order and Injunction, and

10  (II) Objection Filed by Certain Plaintiffs

11  in Respect Thereto, and (III) Adversary

12  Proceeding No. 14-01929 (ECF 12697)          55        21

13

14  Motion of General Motors, LLC to Establish

15  Stay Procedures for Newly-Filed Ignition

16  Switch Actions, filed by General Motors,

17  LLC (ECF 12725)                              9         23

18

19  In re Motors Liquidation Company, et al.,

20  Case No. 09-50026 (REG): Motion of General

21  Motors, LLC Pursuant to 11 U.S.C. Section 105

22  and 363 to Enforce Sale Order and Injunction

23  ("Motion to Enforce"), filed by General Motors,

24  LLC (ECF 12620, 12621)                       91        12

25

Page 119

1                          I N D E X

2

3                          RULINGS

4                                        Page      Line

5    Motion for Leave to Pursue Claims Against

6    General Motors, LLC and, Alternatively, to

7    File a Post-Bar-Date Proof of Claim in the

8    Motors Liquidation Company Bankruptcy, filed

9    by Roger Dean Gillispie ("Gillispie Motion")

10   (ECF 12727)                         116       2

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 120

```
 1              C E R T I F I C A T I O N

 2

 3    I, Sherri L. Breach, CERT*D-397, Nicole Yawn and Penny Shaw

 4    certified that the foregoing transcript is a true and

 5    accurate record of the proceedings.

 6

 7

 8    Sherri L. Breach

 9    AAERT Certified Electronic Reporter & Transcriber

10    CERT*D-397

11

12

13    Nicole Yawn

14

15

16    Penny Shaw

17

18

19    Veritext

20    330 Old Country Road

21    Suite 300

22    Mineola, NY 11501

23

24    Date: July 3, 2014

25
```