# Exhibit A

**THOMAS C. HORNE**
**Attorney General**
Firm State Bar No. 14000
BRAD K. KEOGH (SBA #010321)
DANA R. VOGEL (SBA # 030748)
Assistant Attorneys General
Office of the Attorney General
1275 West Washington Street
Phoenix, Arizona 85007
Telephone:  (602) 542-3702
Facsimile:  (602) 542-4377

[Additional Counsel on Signature Page]

*Attorneys for Plaintiff*
*State of Arizona*

## THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, *ex rel*. THOMAS C. HORNE, Attorney General, | Case No. |
| Plaintiff, | **COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF** |
| vs. | |
| GENERAL MOTORS LLC, | (Non-classified Civil; Consumer Fraud) |
| Defendant. | |

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...............................................................................................1

II.    PARTIES, JURISDICTION AND VENUE ......................................................5

    A.    Plaintiff ..................................................................................................5

    B.    Defendant ...............................................................................................5

III.   FACTUAL ALLEGATIONS ............................................................................6

    A.    New GM Falsely Promoted All of Its Vehicles as Safe, Reliable, and
       High-Quality. ...........................................................................................6

    B.    New GM's Advertising and Marketing Literature Falsely Claimed that
       GM Placed Safety and Quality First. ....................................................10

    C.    Contrary to its Barrage of Representations about Safety and Quality, New
       GM Concealed and Disregarded Safety Issues as a Way of Doing
       Business. ................................................................................................19

    D.    There Are Serious Safety Defects in Millions of GM-Branded Vehicles
       across Many Models and Years and, Until Recently, New GM Concealed
       Them from Consumers. ..........................................................................25

    E.    The Ignition Switch System Defects....................................................27

         1.    New GM knew of the ignition switch defects from the date of its
            inception................................................................................................30

         2.    New GM continues to conceal the ignition switch defects........................39

         3.    New GM recalls 2.1 million vehicles with defective ignition switches. ...46

         4.    New GM recalls over 10 million additional vehicles for ignition switch
            defects in June and July of 2014................................................................47

         5.    June 19, 2014 Recall—Camaro Recall. .................................................48

            a.    June 20, 2014 recall—ignition key slot defect...............................55

         6.    July 2 and 3, 2014 recalls—unintended ignition rotation defect. ..............64

         7.    Yet another ignition switch recall is made on September 4, 2014............81

    F.    Other Safety and Important Defects Affecting Numerous GM-branded
       Vehicles.................................................................................................83

1.      Other safety defects affecting the ignition in GM-branded vehicles. ........83

        a.      Ignition lock cylinder defect in vehicles also affected by the
                ignition switch defect that gave rise to the first recall of 2.1
                million defective ignition switch vehicles. ....................................83

        b.      Ignition lock cylinder defect affecting over 200,000
                additional GM-branded vehicles....................................................84

2.      Defects affecting the occupant safety restraint system in GM-branded
        vehicles. ..................................................................................................85

        a.      Safety defects of the airbag systems of GM-branded vehicles. ......85

                (1)     Wiring harness defect. .......................................................85

                (2)     Driver-side airbag shorting-bar defect. ..............................85

                (3)     Driver-side airbag inflator defect.......................................86

                (4)     Roof-rail airbag defect. ......................................................86

                (5)     Passenger-side airbag defect...............................................87

                (6)     Sport seat side-impact airbag defect. .................................87

                (7)     Passenger-side airbag inflator defect. ................................87

                (8)     Front passenger airbag defect. ...........................................88

        b.      Safety defects of the seat belt systems in GM-branded
                vehicles. ...........................................................................................88

                (1)     Seat belt connector cable defect.........................................88

                (2)     Seat belt retractor defect. ...................................................89

                (3)     Frontal lap-belt pretensioner defect. ..................................89

3.      Safety defects affecting seats in GM-branded vehicles. ...........................90

4.      Safety defects affecting the brakes in GM-branded vehicles....................91

        a.      Brake light defect..........................................................................91

        b.      Brake booster pump defect. ...........................................................91

        c.      Hydraulic boost assist defect. .......................................................92

d.      Brake rotor defect. .......................................................92

e.      Reduced brake performance defect...............................92

f.      Parking brake defect. ...................................................93

5.      Safety defects affecting the steering in GM-branded vehicles. ................93

a.      Sudden power-steering failure defect. ...........................93

b.      Power steering hose clamp defect...................................94

c.      Power steering control module defect...........................94

d.      Lower control arm ball joint defect. ..............................94

e.      Steering tie-rod defect...................................................95

f.      Joint fastener torque defect. ..........................................95

6.      Safety defects affecting the powertrain in GM-branded vehicles..............95

a.      Transmission shift cable defect affecting 1.1 million
        Chevrolet and Pontiac vehicles.....................................95

b.      Transmission shift cable defect affecting Cadillac vehicles. .........96

c.      Transmission oil cooler line defect. ...............................96

d.      Transfer case control module software defect. ...............97

e.      Acceleration-lag defect. .................................................97

f.      Transmission turbine shaft fracture defect.....................97

g.      Automatic transmission shift cable adjuster. .................98

7.      Other serious defects affecting GM-branded vehicles..............................98

a.      Power management mode software defect. .....................98

b.      Light control module defect...........................................99

c.      Electrical short in driver's door module defect..............99

d.      Front axle shaft defect..................................................100

e.      Seat hook weld defect. .................................................100

f.      Front turn signal bulb defect.......................................101

- iii -

g.    Low-beam headlight defect.........................................................101

h.    Radio chime defect. ...................................................................101

i.    Fuel gauge defect. ......................................................................102

j.    Windshield wiper system defect. ...............................................102

k.    Console bin door latch defect. ...................................................103

l.    Driver door wiring splice defect. ...............................................103

m.    Overloaded feed defect. .............................................................104

n.    Windshield wiper module assembly defect. ...............................104

o.    Engine block heater power cord insulation defect......................104

p.    Rear shock absorber defect. .......................................................105

q.    Electronic stability control defect. .............................................105

r.    Unsecured floor mat defect........................................................105

s.    Fuse block defect. ......................................................................106

t.    Diesel transfer pump defect. ......................................................106

u.    Rear suspension toe adjuster link defect....................................106

v.    Hood latch defect .......................................................................107

w.    Electrical short defect. ...............................................................108

G.    New GM's Deception In Connection With the Recalls Has Harmed
Arizona Consumers Who Own or Lease GM-Branded Vehicles. .......................108

IV.    CLAIM FOR RELIEF .................................................................................120

ARIZONA CONSUMER FRAUD ACT (A.R.S. § 44-1521, *ET SEQ*.) ...................................120

PRAYER FOR RELIEF ...........................................................................................124

010440-13 732514 V1

For its Complaint against Defendant General Motors LLC ("New GM"), Plaintiff State of Arizona (the "State") *ex rel.* Thomas C. Horne, the Attorney General, alleges as follows:

## I.    INTRODUCTION

1.     This action is brought pursuant to the Arizona Consumer Fraud Act (A.R.S. § 44-1521, *et seq.*) to obtain injunctive relief to permanently enjoin and prevent the unlawful acts and practices alleged in this Complaint, and to obtain other relief, including disgorgement, civil penalties, costs of investigation and attorneys' fees.

2.     This Complaint arises from New GM's egregious violation of two fundamental rules all manufacturers must follow if they do business in the State of Arizona.

3.     Rule No. 1:  Manufacturers of any product—from toys to automobiles—must make and sell products that are, above all else, safe to use.  Safety is not only essential to long-term brand value, it is also required by law.

4.     Rule No. 2:  Manufacturers must also tell the complete truth about the safety of their products.  When a safety defect does occur, manufacturers must promptly initiate some form of recall to address the problem.

5.     New GM violated both of these rules.  It manufactured and sold millions of vehicles that were not safe, including hundreds of thousands in Arizona, and it failed to remedy serious defects in millions of older GM-branded vehicles.[1]  As New GM has belatedly disclosed in scores of recalls in 2014, safety defects affected over 27 million GM-branded vehicles on the road in the United States.  These vehicles were not recalled until 2014, but the vast majority of them should have been recalled years earlier.

---

[1] The term "GM-branded vehicles" refers to vehicles manufactured and sold by both New GM, and its predecessor, "Old GM."

010440-13  732514 V1

6.      New GM led consumers in Arizona and across the country to believe that, after bankruptcy, it was a new company.  For example, in numerous public announcements and public filings,  New GM repeatedly proclaimed that it was a company committed to innovation, safety, and maintaining a strong brand.

7.      New GM was successful in selling its story that it had changed its "processes and culture " and was building "the best vehicles in the world."   Sales of all New GM models went up, including in Arizona, and New GM became profitable.  As far as the public knew, a new General Motors was born, and the GM brand once again stood strong in the eyes of consumers.

8.      New GM's brand image was an illusion given the company's egregious failure to disclose, and its affirmative concealment of, ignition switch defects and a plethora of other safety defects in GM-branded vehicles.

9.      New GM concealed the existence of many known safety defects plaguing many models and years of GM-branded vehicles, and hid the fact that New GM valued cost-cutting over safety.

10.     At the same time,  New GM marketed its vehicles as "safe" and "reliable," and claimed that it built the "world's best vehicles."  Consequently, New GM intentionally enticed Arizona consumers to buy or lease new or used GM-branded vehicles that have now diminished in value as the truth about the New GM brand has come out and a stigma has attached to all GM-branded vehicles.

11.     A vehicle made by a reputable manufacturer of safe and reliable vehicles is worth more than an otherwise similar vehicle made by a disreputable manufacturer that is known to devalue safety and to conceal serious defects from consumers and regulators.

12.     New GM vehicle Safety Chief, Jeff Boyer, recently highlighted the heightened materiality to consumers of safety:  "Nothing is more important than the safety of our customers

- 2 -

in the vehicles they drive." Yet New GM failed to live up to this commitment, instead choosing to conceal at least 60 serious defects in over 27 million GM-branded vehicles sold in the United States.

13.     The systematic concealment of known defects was deliberate, as New GM followed a consistent pattern of endless "investigation" and delay each time it became aware of a given defect.

14.     Recently revealed documents show that New GM valued cost-cutting over safety, trained its personnel to ***never*** use the word "defect," "stall," or other words suggesting that any GM-branded vehicles are defective, routinely chose the cheapest part supplier without regard to safety, and discouraged employees from acting to address safety issues.

15.     In addition, New GM was plagued by what CEO Mary Barra calls "transactional decision making," in which New GM employees "color[] inside the lines of their own precise job description without thinking independently or holistically," *i.e.*, without looking at the larger issue of safety.[2]

16.     In light of New GM's systemic devaluation of safety issues, it is not surprising that, from the date of its inception, New GM itself produced a grossly inordinate number of vehicles with serious safety defects. Until this year, New GM was successful in concealing both its disregard of safety and the myriad defects that resulted from that disregard.

17.     According to the administrator of the National Highway Traffic Safety Administration ("NHTSA"), New GM worked to hide documents from NHTSA and created firewalls to prevent people within New GM from "connecting the dots" with respect to safety issues and defects. New GM did so to keep information about safety issues and defects secret.

---

[2] TIME MAGAZINE, October 6, 2014, p. 36.

18.     The array of concealed defects is astounding and goes far beyond the ignition switch defects, the belated revelation of which sparked GM's 2014 serial recalls.  The defects affected virtually every safety system in GM-branded vehicles, including but by no means limited to the airbags, seatbelts, brakes, brake lights, electronic stability control, windshield wipers, sensing and diagnostic modules, and warning chimes.

19.     Given the continuity of engineers, corporate counsel, and other key personnel from Old GM to New GM, New GM knew and was fully aware of the now infamous ignition switch defects (and many other serious defects in numerous models of GM-branded vehicles) *from the very date of its inception on July 11, 2009*.  New GM was not born innocent.

20.     New GM's claims that the defects were known only to lower level engineers are false.  For example, current CEO Mary Barra, while head of product development, was informed in 2011 of a safety defect in the electronic power steering of several models.  Despite 4,800 consumer complaints and more than 30,000 warranty repairs, GM waited until 2014 to disclose this defect.

21.     On May 16, 2014, New GM entered into a Consent Order with NHTSA in which it admitted that it violated the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act") by not disclosing the ignition switch defect that gave rise to the February and March 2014 recalls, and agreed to pay the maximum available civil penalties for its violations.

22.     New GM's false representations and/or omissions concerning the safety and reliability of its vehicles, and its concealment of a plethora of known safety defects plaguing its vehicles and its brand, caused Arizona residents to purchase GM-branded vehicles under false pretenses.

23.     New GM's false representations and omissions harmed Arizona consumers because the emergence of the truth about New GM's abysmal safety record and culture of deceit, and its failure to promptly remedy known defects, has greatly diminished the value of GM-branded vehicles sold after the inception of New GM.  For example:  the 2010 and 2011 Chevrolet Camaro have both suffered a diminished value of $2,000 when compared to the value of comparable vehicles; the 2009 Pontiac Solstice has diminished $2,900 in value; the 2010 Cadillac STS had diminished in value by $1,235 in September 2014; and the 2010 Buick LaCrosse had diminished by $649 in that same month.  New GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of New GM's recalls has so tarnished GM-branded vehicles that no reasonable consumer would pay the price they would have paid if the brand continued to mean safety and success.

24.     These same false representations, omissions and acts of concealment violated the Arizona Consumer Fraud Act, A.R.S. § 44-1521, *et seq.*  As a result, the State seeks injunctive relief preventing further violations of the Act, civil penalties, disgorgement of any profits, gain, gross receipts, or other benefit obtained by means of such unlawful practices, and the costs of litigation including attorneys' fees.

## II.     PARTIES, JURISDICTION AND VENUE

### A.     Plaintiff

25.     Plaintiff is the State of Arizona, *ex rel.* Thomas C. Horne, the Attorney General of Arizona (the "State").

### B.     Defendant

26.     Defendant General Motors LLC ("New GM") is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen of the States of Delaware and Michigan.

- 5 -

27.     The sole member and owner of General Motors LLC is General Motors Holding LLC.  General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan.

28.     The sole member and owner of General Motors Holdings LLC is General Motors Company, which is a Delaware Corporation with its principal place of business in the State of Michigan, and is a citizen of the States of Delaware and Michigan.

29.     New GM was incorporated in 2009 and, effective on July 11, 2009, acquired substantially all assets and assumed certain liabilities of General Motors Corporation ("Old GM") through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

30.     This Court has jurisdiction to enter appropriate orders both prior to and following a determination of liability pursuant to the Arizona Consumer Fraud Act (A.R.S. § 44-1521, *et seq.*).

31.     Venue is proper in Maricopa County pursuant to A.R.S. § 12-401.

### III.     FACTUAL ALLEGATIONS

**A.     New GM Falsely Promoted All of Its Vehicles as Safe, Reliable, and High-Quality.**

32.     New GM was financially successful in emerging from the Old GM bankruptcy. Sales of all its models went up, and New GM became profitable.  New GM claimed to have turned over a new leaf in the bankruptcy—a new GM was born, and the GM brand once again stood strong—or so consumers thought.

33.     In 2010, New GM sold 4.26 million vehicles globally, an average of one every 7.4 seconds.  Joel Ewanick, New GM's global chief marketing officer at the time, described the success of one of its brands in a statement to the press:  "Chevrolet's dedication to compelling

designs, quality, durability and great value is a winning formula that resonates with consumers around the world."[3]

34.    New GM repeatedly proclaimed to the world and U.S. consumers that, once it emerged from bankruptcy in 2009, it was a new and improved company committed to innovation, safety, and maintaining a strong brand.

35.    In New GM's 2010 Annual Report, New GM proclaimed its products would "improve safety and enhance the overall driving experience for our customers."

36.    In that same Annual Report, New GM claimed it would create vehicles that would "define the industry standard."

37.    In its 2010 Annual Report, New GM told consumers that it built "the world's best vehicles."

38.    New GM  repeatedly put forward these themes—safety first, "design excellence, quality and performance," and building "word class vehicles—as the core message about New GM's Brand.

39.    New GM repeatedly boasted of its new "culture":

---

[3]

https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2011/Jan/0117_chev_ global.



General Motors Company 2010 Annual Report, p. 16.

40.    In its 2011 Annual Report, New GM announced its commitment to leadership in vehicle safety:

*Automotive*

We offer a global vehicle portfolio of cars, crossovers and trucks. We are committed to leadership in vehicle design, quality, reliability, telematics and infotainment and safety, as well as to developing key energy efficiency, energy diversity and advanced propulsion technologies, including electric vehicles with range extending capabilities such as the Chevrolet Volt. Our business is

General Motors Company 2011 Annual Report, p. 11.

41.    In a "Letter to Stockholders" contained in its 2011 Annual Report, New GM boasted that it was "creating vehicles that people desire, value and are proud to own, noted that its brand had grown in value and again proclaimed that it designed the "World's Best Vehicles."

42.    These themes continued in New GM's 2012 Annual Report:



General Motors Company 2012 Annual Report, p. 3.

010440-13  732514 V1

43.    New GM touted its "focus on the customer" and its plan to be "great" and produce "quality" vehicles:

> *What is immutable is our focus on the customer, which requires us to go from "good" today to "great" in everything we do, including product design, initial quality, durability, and service after the sale.*

General Motors Company 2012 Annual Report, p. 4.

44.    New GM also indicated it had changed its structure to create more "accountability" which, as shown below, was a blatant falsehood:

> *That work continues, and it has been complemented by changes to our design and engineering organization that have flattened the structure and created more accountability for produce execution, profitability and customer satisfaction.*

General Motors Company 2012 Annual Report, p. 10.

45.    And New GM represented that product quality was a key focus—another blatant falsehood:

> *Product quality and long-term durability are two other areas that demand our unrelenting attention, even though we are doing well on key measures.*

General Motors Company 2012 Annual Report, p. 10.

46.    New GM's 2013 Annual Report falsely  proclaimed, "Nothing is more important than the safety of our customers." General Motors Company 2013 Annual Report, p. 4.

**B.    New GM's Advertising and Marketing Literature Falsely Claimed that GM Placed Safety and Quality First.**

47.    In May of 2014, New GM sponsored the North American Conference on Elderly Mobility.  Gay Kent, director of New GM global vehicle safety and a presenter at the conference, proclaimed the primacy of safety within New GM's new company culture:  "The safety of all our customers is our utmost concern."[4]

---

[4]
https://media.gm.com/media/us/en/gm/news.detail./content/Pages/news/us/en/2014/May/0514-cameras.

010440-13  732514 V1

48.     New GM vigorously incorporated this messaging into its public-facing communications.  In advertisements and company literature, New GM consistently promoted all its vehicles as safe and reliable, and presented itself as a responsible manufacturer that stands behind GM-branded vehicles after they are sold.  Examples of New GM's misleading claims of safety and reliability made in public statements, advertisements, and literature provided with its vehicles follow.

49.     An online ad for "GM certified" used vehicles that ran from at least July 11, 2009, until April 5, 2010, stated that "GM certified means no worries."

50.     In April 2010, General Motors Company Chairman and CEO Ed Whitacre starred in a video commercial on behalf of New GM.  In it, Mr. Whitacre acknowledged that not all Americans wanted to give New GM a second chance, but that New GM wanted to make itself a company that "all Americans can be proud of again" and "exceed every goal [Americans] set for [General Motors]."  He stated that New GM was "designing, building, and selling the best cars in the world."  He continued by saying that New GM has "unmatched lifesaving technology" to keep customers safe.  He concluded by inviting the viewer to take a look at "the new GM."[5]

51.     A radio ad that ran from New GM's inception until July 16, 2010, stated that "[a]t GM, building quality cars is the most important thing we can do."

52.     On November 10, 2010, New GM published a video that told consumers that New GM actually prevents any defects from reaching consumers.  The video, entitled "Andy Danko: The White Glove Quality Check," explains that there are "quality processes in the plant that prevent any defects from getting out."  The video also promoted the ideal that, when a customer buys a New GM vehicle, they "drive it down the road and they never go back to the dealer."[6]

---

[5] https://www.youtube.com/watch?v=jbXpV0aqEM4.

[6] https://www.youtube.com/watch?v=JRFO8UzoNho&list=UUxN-Csvy_9sveql5HJviDjA.

- 11 -

53.    In 2010, New GM ran a television advertisement for its Chevrolet brand that implied its vehicles were safe by showing parents bringing their newborn babies home from the hospital, with the tagline "as long as there are babies, there will be Chevys to bring them home."[7]

54.    Another 2010 television ad informed consumers that "Chevrolet's ingenuity and integrity remain strong, exploring new areas of design and power, while continuing to make some of the safest vehicles on earth."

55.    New GM's 2010 brochure for the Chevy Cobalt states, "Chevy Cobalt is savvy when it comes to standard safety" and "you'll see we've thought about safety so you don't have to."  It also states "[w]e're filling our cars and trucks with the kind of thinking, features and craftsmanship you'd expect to pay a lot more for."[8]



---

7 https://www.youtube.com/watch?v=rb28vTN382g.

8 https://www.auto-brochures.com/makes/Chevrolet/Cobalt/Chevrolet_US%20Cobalt_2010.pdf.

56.    New GM's 2010 Chevy HHR brochure proclaims, "PLAY IT SAFE" and "It's easier to have fun when you have less to worry about."[9]

57.    New GM's brochure for the 2011 Chevrolet Silverado states, "Silverado – the most dependable, long-lasting full size pickups on the road."  It goes on to say, "There are three stages of safety.  Silverado takes every one as seriously as you do."[10]

58.    The brochure for the 2011 Cadillac DTS and STS states, "Passenger safety is a primary consideration throughout the engineering process," and "[t]he STS and DTS were carefully designed to provide a host of features to help you from getting into a collision in the first place."[11]

59.    On August 29, 2011, New GM's website advertised:  "Chevrolet provides consumers with fuel-efficient, safe and reliable vehicles that deliver high quality, expressive design, spirited performance and value."[12]

60.    On September 29, 2011, New GM announced on the "News" portion of its website the introduction of front center airbags.  The announcement included a quote from Gay Kent, New GM Executive Director of Vehicle Safety and Crashworthiness, who stated that: "This technology is a further demonstration of New GM's above-and-beyond commitment to provide continuous occupant protection before, during and after a crash."[13]

---

[9] https://www.auto-brochures.com/makes/Chevrolet/HHR/Chevrolet_US%20HHR_2010.pdf.

[10] https://www.auto-brochures.com/makes/Chevrolet/Silverado/Chevrolet_US%20Silverado_2011.pdf.

[11] https://www.auto-brochures.com/makes/Cadillac/Cadillac_US%20STS-DTS_2011.pdf.

[12] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2014/Jul/0731-mpg.

[13] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2011/Sep/0929_airbag.

61.     On December 27, 2011, Gay Kent was quoted in an interview on New GM's website as saying:  "Our safety strategy is about providing continuous protection for our customers before, during and after a crash."[14]

62.     New GM's brochure for the 2012 Chevrolet Impala proclaims:  "A safety philosophy that RUNS DEEP," and that "if a moderate to severe collision does happen, Impala is designed to respond quickly."[15]

63.     New GM's brochure for the 2012 Cadillac CTS, captioned "A Holistic Approach to Safety,"  announces, "At Cadillac, we believe the best way to survive a collision is to avoid one in the first place," and "Active safety begins with a responsive engine, powerful brakes, and an agile suspension."[16]

64.     On January 3, 2012, Gay Kent, New GM Executive Director of Vehicle Safety, was quoted on New GM's website as saying:  "From the largest vehicles in our lineup to the smallest, we are putting overall crashworthiness and state-of-the-art safety technologies at the top of the list of must-haves."[17]

65.     An online national ad campaign for New GM in April 2012 stressed "Safety. Utility.  Performance."

66.     On June 5, 2012, New GM posted an article on its website announcing that its Malibu Eco had received top safety ratings from the National Highway Traffic Safety

---

[14] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2011/Dec/1227_safety.

[15] https://www.chevrolet.com/content/dam/Chevrolet/northamerica/usa/nscwebsite/en/Home/Help%20Center /Download%20a%20Brochure/02_PDFs/2012_Impala_eBrochure.pdf.

[16] https://www.auto-brochures.com/makes/Cadillac/CTS/Cadillac_US%20CTS_2012.pdf.

[17] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2012/Jan/0103_sonic.

Administration and the Insurance Institute for Highway Safety.  The article includes the

following quotes:  "With the Malibu Eco, Chevrolet has earned seven 2012 TOP SAFETY PICK

awards," said IIHS President Adrian Lund.  "The IIHS and NHTSA results demonstrate GM's

commitment to state-of-the-art crash protection."  And, "We are now seeing the results from our

commitment to design the highest-rated vehicles in the world in safety performance," said Gay

Kent, New GM Executive Director of Vehicle Safety.  "Earning these top safety ratings

demonstrates the strength of the Malibu's advanced structure, overall crashworthiness and

effectiveness of the vehicle's state-of-the-art safety technologies."[18]

67.     On June 5, 2012, New GM posted an article on its website entitled "Chevrolet

Backs New Vehicle Lineup with Guarantee," which included the following statement:  "We have

transformed the Chevrolet lineup, so there is no better time than now to reach out to new

customers with the love it or return it guarantee and very attractive, bottom line pricing," said

Chris Perry, Chevrolet global vice president of marketing.  "We think customers who have been

driving competitive makes or even older Chevrolets will be very pleased by today's Chevrolet

designs, easy-to-use technologies, comprehensive safety and the quality built into all of our cars,

trucks and crossovers."[19]

68.     On November 5, 2012, New GM published a video to advertise its "Safety Alert

Seat" and other safety sensors.  The video described older safety systems and then added that

new systems "can offer drivers even more protection."  A "Cadillac Safety Engineer" added that

there "are a variety of crash avoidance sensors that work together to help the driver avoid

---

[18] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en
/2012/Jun/0605_malibu safety.

[19] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en
/2012/Jul/0710_ confidence.

crashes." The engineer then discussed all the sensors and the safety alert seat on the Cadillac XTS, leaving the viewer with the impression safety was a top priority at Cadillac.[20]

69.    New GM's brochure for the 2013 Chevrolet Traverse states, "Traverse provides peace of mind with an array of innovative safety features," and "[i]t helps protect against the unexpected."[21]



70.    A national print ad campaign in April 2013 states that, "[w]hen lives are on the line, you need a dependable vehicle you can rely on. Chevrolet and GM … for power, performance and safety."

71.    A December 2013 New GM testimonial ad stated that "GM has been able to deliver a quality product that satisfies my need for dignity and safety."

---

[20] https://www.youtube.com/watch?v=CBEvflZMTeM.

[21] https://www.auto-brochures.com/makes/Chevrolet/Traverse/Chevrolet_US% 20Traverse_2013.pdf.

010440-13 732514 V1

72.     In 2013, New GM proclaimed on its website, https://www.gm.com, that the company's passion for building and selling the world's best vehicles is "the hallmark of our customer-driven culture."[22]

73.     On the same website in 2013, New GM stated:  "At GM, it's about getting everything right for our customers – from the way we design, engineer and manufacture our vehicles, all the way through the ownership experience."[23]

74.     On its website, Chevrolet.com, New GM promises that it is "Putting safety ON TOP," and that "Chevy Makes Safety a Top Priority":[24]



75.     On its website, Buick.com, New GM represents that "Keeping you and your family safe is a priority."[25]

76.     New GM's website currently touts its purported "Commitment to Safety," which is "at the top of the agenda at GM:"[26]

---

[22] https://www.gm.com/company/aboutGM/our_company.

[23] https://www.gm.com/vision/quality_safety/it_begins_with_a_commitment_to_Quality.

[24] https://www.chevrolet.com/culture/article/vehicle-safety-preparation.

[25] https://www.buick.com/top-vehicle-safety-features.

[26] https://www.gm.com/vision/quality_safety/gms_commitment_tosafety.

- 17 -

> *Innovation:  Quality & Safety; GM's Commitment to Safety; Quality and safety are at the top of the agenda at GM, as we work on technology improvements in crash avoidance and crashworthiness to augment the post-event benefits of OnStar, like advanced automatic crash notification.*

> *Understanding what you want and need from your vehicle helps GM proactively design and test features that help keep you safe and enjoy the drive.  Our engineers thoroughly test our vehicles for durability, comfort, and noise minimization before you think about them.  The same quality process ensures our safety technology performs when you need it.*

77.    New GM's website further promises "Safety and Quality First:  Safety will always be a priority at New GM.  We continue to emphasize our safety-first culture in our facilities," and that, "[i]n addition to safety, delivering the highest quality vehicles is a major cornerstone of our promise to our customers."[27]

78.    New GM's website currently states that "leading the way is our seasoned leadership team who set high standards for our company so that we can give you the best cars and trucks.  This means that we are committed to delivering vehicles with compelling designs, flawless quality, and reliability, and leading safety, fuel economy and infotainment features…"[28]

79.    New GM made these and similar representations to boost vehicle sales while knowing that millions of GM-branded vehicles, across numerous models and years, were plagued with serious and concealed safety defects.

80.    New GM was well aware of the impact vehicle recalls, and their timeliness, have on its brand image.  In its 2010 Form 10-K submitted to the United States Securities and Exchange Commission ("SEC"), New GM admitted that "Product recalls can harm our reputation and cause us to lose customers, particularly if those recalls cause consumers to question the safety or reliability of our products.  Any costs incurred or lost sales caused by future product recalls could materially adversely affect our business."  General Motors 2010

---

[27] https://www.gm.com/company/aboutGM/our_company.

[28] https://www.gm.com/company/aboutGM/our_company.

010440-13  732514 V1

Form 10-K, p. 31.[29]  This is precisely why New GM chose to conceal safety issues rather than remedy them.

**C.      Contrary to its Barrage of Representations about Safety and Quality, New GM Concealed and Disregarded Safety Issues as a Way of Doing Business.**

81.     Ever since its inception, New GM possessed vastly superior (if not exclusive) knowledge and information to that of consumers about the design and function of GM-branded vehicles and the existence of the defects in those vehicles.

82.     Recently revealed information presents a disturbing picture of New GM's approach to safety issues—both in the design and manufacturing stages, and in discovering and responding to defects in GM-branded vehicles that have already been sold.

83.     New GM made very clear to its personnel that cost-cutting was more important than safety, deprived its personnel of necessary resources for spotting and remedying defects, trained its employees not to reveal known defects, and rebuked those who attempted to "push hard" on safety issues.

84.     In stark contrast to New GM's public mantra that "Nothing is more important than the safety of our customers" and similar statements, a prime "directive" at New GM was "cost is everything."[30]  The messages from top leadership at New GM to employees, as well as their actions, were focused on the need to control cost.[31]

85.     One New GM engineer stated that emphasis on cost control at New GM "permeates the fabric of the whole culture."[32]

---

[29] https://www.sec.gov/Archives/edgar/data/1467858/000119312510078119/d10k.htm#toc85733_4.

[30] Valukas Report at 249.

[31] *Id*. at 250.

[32] *Id*.

86.    According to Mark Reuss (President of GMNA from 2009-2013 before succeeding Mary Barra as Executive Vice President for Global Product Development, Purchasing and Supply Chain in 2014), cost and time-cutting principles known as the "Big 4" at New GM "emphasized timing over quality."[33]

87.    New GM's focus on cost-cutting created major disincentives to personnel who might wish to address safety issues.  For example, those responsible for a vehicle were responsible for its costs, but if they wanted to make a change that incurred cost and affected other vehicles, they also became responsible for the costs incurred in the other vehicles.

88.    As another cost-cutting measure, parts were sourced to the lowest bidder, even if they were not the highest quality parts.[34]

89.    Because of New GM's focus on cost-cutting, New GM engineers did not believe they had extra funds to spend on product improvements.[35]

90.    New GM's focus on cost-cutting also made it harder for New GM personnel to discover safety defects, as in the case of the "TREAD Reporting team."

91.    New GM used its TREAD database (known as "TREAD") to store the data required to be reported quarterly to NHTSA under the TREAD Act.[36]  From the date of New GM's inception in 2009, TREAD has been the principal database used by New GM to track incidents related to its vehicles.[37]

92.    From 2003-2007 or 2008, the TREAD Reporting team had eight employees who would conduct monthly searches and prepare scatter graphs to identify spikes in the number of

---

[33] *Id.*

[34] *Id.* at 251.

[35] *Id.*

[36] *Id.* at 306.

[37] *Id.*

accidents or complaints with respect to various GM-branded vehicles.  The TREAD Reporting

team reports went to a review panel and sometimes spawned investigations to determine if any

safety defect existed.[38]

93.    In or around 2007-08, Old GM reduced the TREAD Reporting team from eight to

three employees, and pared down the monthly data mining process.[39]  In 2010, New GM restored

two people to the team, but they did not participate in the TREAD database searches.[40]

Moreover, until 2014, the TREAD Reporting team did not have sufficient resources to obtain any

of the advanced data mining software programs available in the industry to better identify and

understand potential defects.[41]

94.    By starving the TREAD Reporting team of the resources it needed to identify

potential safety issues, New GM helped to ensure that safety issues would not come to light.

95.    "[T]here was resistance or reluctance to raise issues or concerns in the GM

culture."  The culture, atmosphere and supervisor response at New GM "discouraged individuals

from raising safety concerns."[42]

96.    New GM CEO, Mary Barra, experienced instances where New GM engineers

were "unwilling to identify issues out of concern that it would delay the launch" of a vehicle.[43]

97.    New GM supervisors warned employees to "never put anything above the

company" and "never put the company at risk."[44]

---

[38] *Id*. at 307.

[39] *Id*.

[40] *Id*. at 307-308.

[41] *Id*. at 208.

[42] *Id*. at 252.

[43] *Id*.

[44] *Id*. at 252-253.

98.    New GM systematically "pushed back" on describing matters as safety issues and, as a result, "GM personnel failed to raise significant issues to key decision-makers."[45]

99.    So, for example, New GM discouraged the use of the word "stall" in Technical Service Bulletins ("TSBs") that it sometimes sent to dealers about issues in GM-branded vehicles.  According to Steve Oakley, who drafted a Technical Service Bulletin in connection with the ignition switch defects, "the term 'stall' is a 'hot' word that GM generally does not use in bulletins because it may raise a concern about vehicle safety, which suggests GM should recall the vehicle, not issue a bulletin."[46]  Other New GM personnel confirmed Oakley on this point, stating that "there was concern about the use of 'stall' in a TSB because such language might draw the attention of NHTSA."[47]

100.    Oakley further noted that "he was reluctant to push hard on safety issues because of his perception that his predecessor had been pushed out of the job for doing just that."[48]

101.    Many New GM employees "did not take notes at all at critical safety meetings because they believed GM lawyers did not want such notes taken."[49]

102.    A New GM training document released by NHTSA as an attachment to its Consent Order sheds further light on the lengths to which New GM went to ensure that known defects were concealed.  It appears that the defects were concealed pursuant to a company policy that New GM inherited from Old GM.  The document consists of slides from a 2008 Technical Learning Symposium for "designing engineers," "company vehicle drivers," and other employees at Old GM.  On information and belief, the vast majority of employees who

---

[45] *Id*. at 253.

[46] *Id*. at 92.

[47] *Id*. at 93.

[48] *Id*.

[49] *Id*. at 254.

participated in this webinar presentation continued on in their same positions at New GM after July 10, 2009.

103.     The presentation focused on recalls and the "reasons for recalls."

104.     One major component of the presentation was captioned "Documentation Guidelines," and focused on what employees should (and should not say) when describing problems in vehicles.  Employees were instructed to "[w]rite smart," and to "[b]e factual, not fantastic" in their writing.  In practice, "factual" was a euphemism for avoiding facts and relevant details.

105.     New GM vehicle drivers were given examples of comments to avoid, including the following:  "This is a safety and security issue"; "I believe the wheels are too soft and weak and could cause a serious problem"; and "Dangerous … almost caused accident."

106.     In documents used for reports and presentations, employees were advised to avoid a long list of words, including:  "bad," "dangerous," "defect," "defective," "failed," "flawed," "life-threatening," "problem," "safety," "safety-related," and "serious."

107.     In truly Orwellian fashion, the company advised employees to use the words (1) "Issue, Condition [or] Matter" instead of "Problem"; (2) "Has Potential Safety Implications" instead of "Safety"; (3) "Broke and separated 10 mm" instead of "Failed"; (4) "Above/Below/Exceeds Specification" instead of "Good [or] Bad"; and (5) "Does not perform to design" instead of "Defect/Defective."

108.     As NHTSA's Acting Administrator Friedman noted at the May 16, 2014 press conference announcing the Consent Order in connection with the February and March recall for the ignition switch defect, it was New GM's company policy to avoid using words that might suggest the existence of a safety defect:

*GM must rethink the corporate philosophy reflected in the documents we reviewed, including training materials that explicitly discouraged employees from using words like 'defect,' 'dangerous,' 'safety related,' and many more essential terms for engineers and investigators to clearly communicate up the chain when they suspect a problem.*

109.    Thus, New GM trained its employees to conceal the existence of known safety defects from consumers and regulators.  Indeed, it is nearly impossible to convey the potential existence of a safety defect without using the words "safety" or "defect" or similarly strong language that was forbidden at New GM.

110.    So institutionalized was the "phenomenon of avoiding responsibility" at New GM that the practice was given a name:  "the 'GM salute,'" which was "a crossing of the arms and pointing outward towards others, indicating that the responsibility belongs to someone else, not me."[50]

111.    CEO Mary Barra described a related phenomenon, "known as the 'GM nod,'" which was "when everyone nods in agreement to a proposed plan of action, but then leaves the room with no intention to follow through, and the nod is an empty gesture."[51]

112.    According to the New GM Report prepared by Anton R. Valukas (the "Valukas Report"), part of the failure to properly correct the ignition switch defect was due to problems with New GM's organizational structure[52] and a corporate culture that did not care enough about safety.[53]  Other culprits included a lack of open and honest communication with NHTSA regarding safety issues,[54] and the improper conduct and handling of safety issues by lawyers

---

[50] Valukas Report at 255.

[51] *Id*. at 256.

[52] *Id*. at 259-260.

[53] *Id*. at 260-61.

[54] *Id*. at 263.

within New GM's Legal Staff.[55]  On information and belief, all of these issues independently and in tandem helped cause the concealment of, and failure to remedy, the many defects that have led to the spate of recalls in 2014.

113.    An automobile manufacturer has a duty to promptly disclose and remedy defects. New GM knowingly concealed information about material safety hazards from the driving public, and its own customers, including those in Arizona.    As a result, hundreds of thousands of unsuspecting vehicle owners and lessees in Arizona continued driving patently unsafe vehicles that posed a mortal danger to themselves, their passengers and loved ones, other drivers, and pedestrians.

114.    Not only did New GM take far too long in failing to address or remedy the defects, it deliberately worked to cover-up, hide, omit, fraudulently conceal, and/or suppress material facts from consumers who purchased GM-branded vehicles.

**D.    There Are Serious Safety Defects in Millions of GM-Branded Vehicles across Many Models and Years and, Until Recently, New GM Concealed Them from Consumers.**

115.    Over the first ten months of 2014, New GM announced at least 60 recalls for more than 60 separate defects affecting over 27 million GM-branded vehicles sold in the United States from model years 1997-2014.  The numbers of recalls and serious safety defects are unprecedented, and can only lead to one conclusion:  New GM was concealing the fact that it was incapable of building safe vehicles free from defects.

116.    For context, in 2013, the whole auto industry in the United States issued recalls affecting 23 million vehicles, and the record for the whole industry in a given year is 31 million (in 2004).  Thus, New GM's recalls just 10 months into this year impacts more vehicles than the

---

[55] *Id*. at 264.

*entire industry's* recalls did last year and is approaching the ***industry-wide*** record for a single year.

117.    The available evidence shows that, from its inception in 2009, New GM knew about an ever-growing list of serious safety defects in millions of GM-branded vehicles, but concealed them from consumers and regulators in order to cut costs, boost sales, and avoid the negative publicity of recalls.

118.    Unsurprisingly in light of New GM's systemic devaluation of safety issues, the evidence also shows that New GM has manufactured and sold a grossly inordinate number of vehicles with serious safety defects.

119.    New GM inherited from Old GM a company that valued cost-cutting over safety, actively discouraged its personnel from taking a "hard line" on safety issues, avoided using "hot" words like "stall" that might attract the attention of NHTSA and suggest that a recall was required, and trained its employees to not use words such as "defect" or "problem" that might flag the existence of a safety issue.  New GM did nothing to change these practices.

120.    The Center for Auto Safety recently stated that it has identified 2,004 death and injury reports filed by New GM with federal regulators in connection with vehicles that have recently been recalled.[56]  Many of these deaths and injuries would have been avoided had New GM complied with its TREAD Act obligations over the past five years.

121.    The many defects concealed and/or created by New GM affect important safety systems in GM-branded vehicles, including the ignition, power steering, airbags, brake lights, gearshift systems, and seatbelts.

---

[56] *See Thousands of Accident Reports Filed Involving Recalled GM Cars:  Report*, Irvin Jackson (June 3, 2014).

010440-13  732514 V1

122.    The available evidence shows a consistent pattern:  New GM learned about a particular defect and, often only at the prodding of regulatory authorities, "investigated" the defect and decided upon a "root cause."  New GM then took minimal action—such as issuing a carefully worded "Technical Service Bulletin" to its dealers, or even recalling a limited number of the vehicles with the defect.  All the while, the true nature and scope of the defects were kept under wraps, vehicles affected by the defects remained on the road, New GM continued to create new defects in new vehicles, and New GM enticed consumers to purchase its vehicles by touting the safety, quality, and reliability of its vehicles, and presenting itself as a manufacturer that stands behind its products.

123.    Many of the defects are discussed below.

**E.      The Ignition Switch System Defects.**

124.    More than 13 million GM-branded vehicles were made and sold with an ignition switch and cylinder with the key position of the lock module located low on the steering column, in close proximity to a driver's knee.  The ignition switch in these vehicles, the "Defective Ignition Switch Vehicles," is prone to fail during ordinary and foreseeable driving situations.

125.    When the ignition switches fail, the vehicles stall, the power steering and power brakes fail, and the airbags will not deploy in the event of a collision.

126.     New GM initially recalled 2.1 million of these Defective Ignition Switch Vehicles in February and March of 2014, and it was this initial recall that set in motion the avalanche of recalls that is described in this Complaint.

127.     In June and July of 2014, New GM recalled an additional 11 million vehicles, ostensibly for distinct safety defects involving the ignition and ignition key.  As set forth below, however, each of these recalls involves a defective ignition switch, and the consequences of product failure in each of the recalled vehicles are substantially similar, if not identical.

- 27 -

128.    More specifically, in each of the Defective Ignition Switch Vehicles, the ignition switch can inadvertently move from the "run" to the "accessory" or "off" position at any time during normal and proper operation of the Defective Ignition Switch Vehicles.  The ignition switch can move when the vehicle is jarred or travels across a bumpy road; if the key chain is heavy; if a driver inadvertently touches the ignition key with his or her knee; or for a host of additional reasons.  When the ignition switch inadvertently moves out of the "run" position, the vehicle suddenly and unexpectedly loses engine power, power steering, and power brakes, and certain safety features are disabled, including the vehicle's airbags.  This leaves occupants vulnerable to crashes, serious injuries, and death.

129.    The ignition switch systems at issue are defective in at least three major respects.  First, the switches are simply weak; because of a faulty "detent plunger," the switch can inadvertently move from the "run" to the "accessory" position.  Second, because the ignition switch is placed low on the steering column, the driver's knee can easily bump the key (or the hanging fob below the key) and cause the switch to inadvertently move from the "run" to the "accessory" or "off" position.  Third, when the ignition switch moves from the "run" to the "accessory" or "off" position, the vehicle's power is disabled.  This also immediately disables the airbags.  Thus, when power is lost during ordinary operation of the vehicle, a driver is left without the protection of the airbag system even if he or she is traveling at high speeds.

130.    Vehicles with defective ignition switches are therefore unreasonably prone to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the vehicles.

131.    Indeed, New GM itself has acknowledged that the defective ignition switches pose an "increas[ed] risk of injury or fatality" and has linked the ignition switch defect to at least 13 deaths and over 50 crashes.  Ken Feinberg, who was hired by New GM to settle wrongful

death claims arising from the ignition switch defects that led to the February and March 2014

recall, has already linked the defect to 30 deaths, and has many more wrongful death claims still

to review.  The Center for Auto Safety studied collisions in just two vehicle makes, and linked

the defect to over 300 accidents.  There is every reason to believe that as more information is

made public, these numbers will continue to grow.

132.    Alarmingly, New GM knew of the deadly ignition switch defects and their

dangerous consequences from the date of its inception on July 11, 2009, but concealed its

knowledge from consumers and regulators.  To this day, New GM continues to conceal material

facts regarding the extent and nature of this safety defect, as well as what steps must be taken to

remedy the defect.

133.    While New GM has instituted a recall of millions vehicles for defective ignition

switches, it knew—*and its own engineering documents reflect*—that the defects transcend the

design of the ignition switch and also include the placement of the ignition switch on the steering

column, a lack of adequate protection of the ignition switch from forces of inadvertent driver

contact, and the need to redesign the airbag system so that it is not immediately disabled when

the ignition switch fails in ordinary and foreseeable driving situations.  To fully remedy the

problem and render the Defective Ignition Switch Vehicles safe and of economic value to their

owners again, New GM must address these additional issues (and perhaps others).

134.    Further, and as set forth more fully below, New GM's recall of the Defective

Ignition Switch Vehicles has been, to date, incomplete and inadequate, and it underscores New

GM's ongoing fraudulent concealment and fraudulent misrepresentation of the nature and extent

of the defects.  New GM has long known of and understood the ignition switch defects, and its

failure to fully remedy the problems associated with this defect underscores the necessity of this

law enforcement action.

1.      **New GM knew of the ignition switch defects from the date of its inception.**

135.    Effective July 11, 2009, a United States Bankruptcy Court approved the sale of General Motors Corporation, which was converted into General Motors, LLC, or New GM. From its creation, New GM, which retained the vast majority of Old GM's senior level executives and engineers, knew that Old GM had manufactured and sold millions of vehicles afflicted with the ignition switch defects.

136.    The knowledge of Old GM is important and relevant because it is ***directly attributable*** to New GM.  In light of its knowledge of the ignition switch defects, and the myriad of other defects, New GM violated the Arizona Consumer Fraud Act, and harmed Arizona consumers in the process.

137.    In part, New GM's knowledge of the ignition switch defects arises from the fact that key personnel with knowledge of the defects were employed by New GM when Old GM ceased to exist.  Moreover, many of these employees held managerial and decision making authority in Old GM, and accepted similar positions with New GM.  For example, the design research engineer who was responsible for the rollout of the defective ignition switch in the Saturn Ion was Ray DeGiorgio.  Mr. DeGiorgio continued to serve as an engineer at New GM until April 2014, when he was suspended (and ultimately fired) as a result of his involvement in the ignition switch crisis.

138.    Mr. DeGiorgio was hardly the only employee who retained his Old GM position with New GM.  Other Old GM employees who were retained and given decision making authority in New GM include:  current CEO Mary T. Barra; director of product investigations Carmen Benavides; Program Engineering Manager Gary Altman; engineer Jim Federico; vice presidents for product safety John Calabrese and Alicia Boler-Davis; vice president of regulatory

affairs Michael Robinson; director of product investigations Gay Kent; general counsel and vice president Michael P. Milliken; and in-house product liability lawyer William Kemp.

139.    Indeed, on or around the day of its formation as an entity, New GM acquired notice and full knowledge of the facts set forth below.

140.    In 2001, during pre-production testing of the 2003 Saturn Ion, Old GM engineers learned that the vehicle's ignition switch could unintentionally move from the "run" to the "accessory" or "off" position.  Old GM further learned that where the ignition switch moved from "run" to "accessory" or "off," the vehicle's engine would stall and/or lose power.

141.    Delphi Mechatronics ("Delphi"), the manufacturer of many of the defective ignition switches in the Defective Ignition Switch Vehicles, informed Old GM that the ignition switch did not meet Old GM's design specifications.  Rather than delay production of the Saturn Ion in order to ensure that the ignition switch met specifications, Old GM's design release engineer, Ray DeGiorgio, simply lowered the specification requirements and approved use of ignition switches that he knew did not meet Old GM's specifications.

142.    In 2004, Old GM engineers reported that the ignition switch on the Saturn Ion was so weak and the ignition placed so low on the steering column that the driver's knee could easily bump the key and turn off the vehicle.

143.    This defect was sufficiently serious for an Old GM engineer to conclude, in January 2004, that "[t]his is a basic design flaw and should be corrected if we want repeat sales."

144.    A July 1, 2004 report by Siemens VDO Automotive analyzed the relationship between the ignition switch in GM-branded vehicles and the airbag system.  The Siemens report concluded that when a GM-branded vehicle experienced a power failure, the airbag sensors were disabled.  The Siemens report was distributed to at least five Old GM engineers.  The Chevrolet Cobalt was in pre-production at this time.

145.   In 2004, Old GM began manufacturing and selling the 2005 Chevrolet Cobalt. Old GM installed the same ignition switch in the 2005 Cobalt as it did in the Saturn Ion.

146.   During testing of the Cobalt, Old GM engineer Gary Altman observed an incident in which a Cobalt suddenly lost engine power because the ignition switch moved out of the "run" position during vehicle operation.

147.   In late 2004, while testing was ongoing on the Cobalt, Chief Cobalt Engineer Doug Parks asked Mr. Altman to investigate a journalist's complaint that he had turned off a Cobalt vehicle by hitting his knee against the key fob.

148.   Old GM opened an engineering inquiry known as a Problem Resolution Tracking System ("Problem Resolution") to evaluate a number of potential solutions to this moving engine stall problem.  At this time, Problem Resolution issues were analyzed by a Current Production Improvement Team ("Improvement Team").  The Improvement Team that examined the Cobalt issue beginning in late 2004 included a cross-section of business people and engineers, including Altman and Lori Queen, Vehicle Line Executive on the case.

149.   Doug Parks, Chief Cobalt Engineer, was also active in Problem Resolution.  On March 1, 2005, he attended a meeting whose subject was "vehicle can be keyed off with knee while driving."  Parks also attended a June 14, 2005 meeting that included slides discussing a NEW YORK TIMES article that described how the Cobalt's engine could cut out because of the ignition switch problem.

150.   In 2005, Parks sent an email with the subject, "Inadvertent Ign turn-off."  In the email, Parks wrote, "For service, can we come up with a 'plug' to go into the key that centers the ring through the middle of the key and not the edge/slot?  This appears to me to be the only real, quick solution."

010440-13 732514 V1

151.    After considering this and a number of other solutions (including changes to the key position and measures to increase the torque in the ignition switch), the CPIT examining the issue decided to do nothing.

152.    Old and New GM engineer Gary Altman recently admitted that engineering managers (including himself and Ray DeGiorgio) knew about ignition switch problems in the Cobalt that could cause these vehicles to stall, and disable power steering and brakes, but launched the vehicle anyway because they believed that the vehicles could be safely coasted off the road after a stall.  Mr. Altman insisted that "the [Cobalt] was maneuverable and controllable" with the power steering and power brakes inoperable.

153.    On February 28, 2005, Old GM issued a bulletin to its dealers regarding engine-stalling incidents in 2005 Cobalts and 2005 Pontiac Pursuits (the Canadian version of the Pontiac G5).

154.    In the February 28, 2005 bulletin, Old GM provided the following recommendations and instructions to its dealers—but not to the public in general:

> There is potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effort.  The concern is more likely to occur if the driver is short and has a large heavy key chain.
>
> In the case this condition was documented, the driver's knee would contact the key chain while the vehicle was turning.  The steering column was adjusted all the way down.  This is more likely to happen to a person that is short as they will have the seat positioned closer to the steering column.
>
> In cases that fit this profile, question the customer thoroughly to determine if this may be the cause.  The customer should be advised of this potential and to take steps, such as removing unessential items from their key chains, to prevent it.
>
> Please follow this diagnosis process thoroughly and complete each step.  If the condition exhibited is resolved without completing every step, the remaining steps do not need to be performed.

- 33 -

155.    On June 19, 2005, the NEW YORK TIMES reported that Chevrolet dealers were advising some Cobalt owners to remove items from heavy key rings so that they would not inadvertently move the ignition into the "off" position.  The article's author reported that his wife had bumped the steering column with her knee while driving on the freeway and the engine "just went dead."

156.    The NEW YORK TIMES contacted Old GM and Alan Adler, manager for safety communications, who provided the following statement:

> In rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the ignition key to the accessory or off position while the car is running.  Service advisers are telling customers they can virtually eliminate the possibility by taking several steps, including removing nonessential material from their key rings.

157.    Between February 2005 and December 2005, Old GM opened multiple Problem Resolution inquiries regarding reports of power failure and/or engine shutdown in Defective Ignition Switch Vehicles.

158.    One of these, opened by quality brand manager Steve Oakley in March 2005, was prompted by Old GM engineer Jack Weber, who reported turning off a Cobalt with his knee while driving.  After Oakley opened the PRTS, Gary Altman advised that the inadvertent shut down was not a safety issue.

159.    As part of the Problem Resolution, Oakley asked William Chase, an Old GM warranty engineer, to estimate the warranty impact of the ignition switch defect in the Cobalt and Pontiac G5 vehicles.  Chase estimated that for Cobalt and G5 vehicles on the road for 26 months, 12.40 out of every 1,000 vehicles would experience inadvertent power failure while driving.

160.    In September 2005, Old GM received notice that Amber Marie Rose, a 16 year-old resident of Clinton, Maryland, was killed in an accident after her 2005 Chevrolet Cobalt drove off the road and struck a tree head-on.  During Old GM's investigation, it learned that the

- 34 -

ignition switch in Amber's Cobalt was in the "accessory" or "off" position at the time of the collision. Upon information and belief, Old GM subsequently entered into a confidential settlement agreement with Amber's mother.

161.   In December 2005, Old GM issued Technical Service Bulletin 05-02-35-007. The Bulletin applied to 2005-2006 Chevrolet Cobalts, 2006 Chevrolet HHRs, 2005-2006 Pontiac Pursuits, 2006 Pontiac Solstices, and 2003-2006 Saturn Ions. The Bulletin explained that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort."

162.   By the time it issued this Technical Services Bulletin, Old GM knew that there had been fatal incidents involving vehicles with the ignition switch defect. On November 17, 2005—shortly after Amber's death and immediately before Old GM issued the December Bulletin—a Cobalt went off the road and hit a tree in Baldwin, Louisiana. The front airbags did not deploy in this accident. Old GM received notice of the accident, opened a file, and referred to it as the "Colbert" incident.

163.   On February 10, 2006, in Lanexa, Virginia—shortly after Old GM issued the Technical Service Bulletin—a 2005 Cobalt flew off of the road and hit a light pole. As with the Colbert incident (above), the frontal airbags failed to deploy in this incident as well. The download of the SDM (the vehicle's "black box") showed the key was in the "accessory/off" position at the time of the crash. Old GM received notice of this accident, opened a file, and referred to it as the "Carroll" incident.

164.   On March 14, 2006, in Frederick, Maryland, a 2005 Cobalt traveled off the road and struck a utility pole. The frontal airbags did not deploy in this incident. The download of the SDM showed the key was in the "accessory/off" position at the time of the crash. Old GM received notice of this accident, opened a file, and referred to it as the "Oakley" incident.

165.    In April 2006, Old GM design engineer Ray DeGiorgio approved a design change for the Chevrolet Cobalt's ignition switch, as proposed by Delphi.  The changes included a new detent plunger and spring and were intended to generate greater torque values in the ignition switch.  These values, though improved, were still consistently below Old GM's design specifications.  Despite its redesign of the ignition switch, Old GM did not change the part number for the switch.

166.    In congressional testimony in 2014, New GM CEO Mary Barra acknowledged that Old GM should have changed the part number when it redesigned the ignition switch, and that its failure to do so did not meet industry standard behavior.  In October 2006, Old GM updated Technical Service Bulletin 05-02-35-007 to include additional model years:  the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, 2007 Cobalt, and 2007 Pontiac Solstice and G5. These vehicles had the same safety-related defects in the ignition switch systems as the vehicles in the original Bulletin.

167.    On December 29, 2006, in Sellenville, Pennsylvania, a 2005 Cobalt drove off the road and hit a tree.  The frontal airbags failed to deploy in this incident.  Old GM received notice of this incident, opened a file, and referred to it as the "Frei" incident.

168.    On February 6, 2007, in Shaker Township, Pennsylvania, a 2006 Cobalt sailed off the road and struck a truck.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  Old GM received notice of this incident, opened a file, and referred to it as the "White" incident.

169.    On August 6, 2007, in Cross Lanes, West Virginia, a 2006 Cobalt rear-ended a truck.  The frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "McCormick" incident.

170.    On September 25, 2007, in New Orleans, Louisiana, a 2007 Cobalt lost control and struck a guardrail.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "Gathe" incident.

171.    On October 16, 2007, in Lyndhurst, Ohio, a 2005 Cobalt traveled off road and hit a tree.  The frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "Breen" incident.

172.    On April 5, 2008, in Sommerville, Tennessee, a 2006 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  Old GM received notice of this incident, opened a file, and referred to it as the "Freeman" incident.

173.    On May 21, 2008, in Argyle, Wisconsin, a 2007 G5 traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  Old GM received notice of this incident, opened a file, and referred to it as the "Wild" incident.

174.    On May 28, 2008, in Lufkin, Texas, a 2007 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "McDonald" incident.

175.    On September 13, 2008, in Lincoln Township, Michigan, a 2006 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "Harding" incident.

176.    On November 29, 2008, in Rolling Hills Estates, California, a 2008 Cobalt traveled off the road and hit a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "Dunn" incident.

177.    On December 6, 2008, in Lake Placid, Florida, a 2007 Cobalt traveled off the road and hit a utility pole.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position. Old GM received notice of this incident, opened a file, and referred to it as the "Grondona" incident.

178.    In February 2009, Old GM opened another Problem Resolution regarding the ignition switches in the Defective Ignition Switch Vehicles.  Old GM engineers decided at this time to change the top of the Chevrolet Cobalt key from a "slot" to a "hole" design, as had originally been suggested in 2005.  The new key design was produced for the 2010 model year. Old GM did not provide these redesigned keys to the owners or lessees of any of the vehicles implicated in prior Technical Service Bulletins, including the 2005-2007 Cobalts.

179.    Just prior to its bankruptcy sale, Old GM met with Continental Automotive Systems US, its airbag supplier for the Cobalt, Ion, and other Defective Ignition Switch Vehicles. Old GM requested that Continental download SDM data from a 2006 Chevrolet Cobalt accident where the airbags failed to deploy.  In a report dated May 11, 2009, Continental analyzed the SDM data and concluded that the SDM ignition state changed from "run" to "off" during the accident.  According to Continental, this, in turn, disabled the airbags.  Old GM did not disclose this finding to NHTSA, despite its knowledge that NHTSA was interested in airbag non-deployment incidents in Chevrolet Cobalt vehicles.

**2.    New GM continues to conceal the ignition switch defects.**

180.    In March 2010, New GM recalled nearly 1.1 million Cobalt and Pontiac G5 vehicles for faulty power steering issues.  In recalling these vehicles, New GM recognized that loss of power steering, standing alone, was grounds for a safety recall.  Yet, incredibly, New GM claims it did not view the ignition switch defect as a "safety issue," but only a "customer convenience issue."  Despite its knowledge of the ignition switch defect, New GM did not include the ignition switch defect in this recall.  Further, although the Saturn Ion used the same steering system as the Cobalt and Pontiac G5 (and had the same ignition switch defect), New GM did not recall any Saturn Ion vehicles at this time.

181.    On March 10, 2010, Brooke Melton was driving her 2005 Cobalt on a two-lane highway in Paulding County, Georgia.  While she was driving, her key turned from the "run" to the "accessory/off" position causing her engine to shut off.  After her engine shut off, she lost control of her Cobalt, which traveled into an oncoming traffic lane, where it collided with an oncoming car.  Brooke was killed in the crash.  New GM received notice of this incident.

182.    On December 31, 2010, in Rutherford County Tennessee, a 2006 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  New GM received notice of this incident, opened a file, and referred to it as the "Chansuthus" incident.

183.    On December 31, 2010, in Harlingen, Texas, a 2006 Cobalt traveled off the road and struck a curb.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  New GM received notice of this incident, opened a file, and referred to it as the "Najera" incident.

184.    On March 22, 2011, Ryan Jahr, a New GM engineer, downloaded the SDM from Brooke Melton's Cobalt.  The information from the SDM download showed that the key in Brooke's Cobalt turned from the "run" to the "accessory/off" position 3-4 seconds before the crash.  On June 24, 2011, Brooke Melton's parents, Ken and Beth Melton, filed a lawsuit against New GM.

185.    In August 2011, New GM assigned Engineering Group Manager Brian Stouffer to assist with a Field Performance Evaluation that it had opened to investigate frontal airbag non-deployment incidents in Chevrolet Cobalts and Pontiac G5s.

186.    On December 18, 2011, in Parksville, South Carolina, a 2007 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  New GM received notice of this incident, opened a file, and referred to it as the "Sullivan" incident.

187.    In early 2012, Mr. Stouffer asked Jim Federico, who reported directly to Mary Barra, to oversee the Field Performance Evaluation investigation into frontal airbag non-deployment incidents.  Federico was named the "executive champion" for the investigation to help coordinate resources.

188.    In May 2012, New GM engineers tested the torque on numerous ignition switches of 2005-2009 Chevrolet Cobalt, 2009 Pontiac G5, 2006-2009 HHR, and 2003-2007 Saturn Ion vehicles that were parked in a junkyard.  The results of these tests showed that the torque required to turn the ignition switches from the "run" to the "accessory" or "off" position in most of these vehicles did not meet GM's minimum torque specification requirements.  These results were reported to Mr. Stouffer and other members of the Field Performance Evaluation team.

189.    In September 2012, Stouffer requested assistance from a "Red X Team" as part of the Field Performance Evaluation investigation.  The Red X Team was a group of engineers within New GM assigned to find the root cause of the airbag non-deployments in frontal accidents involving Chevrolet Cobalts and Pontiac G5s.  By that time, however, it was clear that the root cause of the airbag non-deployments in a majority of the frontal accidents was the defective ignition switch and airbag system.

190.    Indeed, Mr. Stouffer acknowledged in his request for assistance that the Chevrolet Cobalt could experience a power failure during an off-road event, or if the driver's knee contacted the key and turned off the ignition.  Mr. Stouffer further acknowledged that such a loss of power could cause the airbags not to deploy.

191.    At this time, New GM did not provide this information to NHTSA or the public.

192.    Acting NHTSA Administrator David Friedman recently stated, "At least by 2012, GM staff was very explicit about an unreasonable risk to safety" from the ignition switches in the Defective Ignition Switch Vehicles.

193.    Mr. Friedman continued:  "GM engineers knew about the defect.  GM lawyers knew about the defect.  But GM did not act to protect Americans from the defect."

194.    There is significant evidence that multiple in-house attorneys also knew of and understood the ignition switch defect.  These attorneys, including Michael Milliken, negotiated settlement agreements with families whose loved ones had been killed and/or injured while operating a Defective Ignition Switch Vehicle.  In spite of this knowledge, New GM's attorneys concealed their knowledge and neglected to question whether the Defective Ignition Switch Vehicles should be recalled.  This quest to keep the ignition switch defect secret delayed its public disclosure and contributed to increased death and injury as a result of the ignition switch defect.

- 41 -

195.    During the Field Performance Evaluation process, New GM determined that, although increasing the detent in the ignition switch would reduce the chance that the key would inadvertently move from the "run" to the "accessory" or "off" position, it would not be a total solution to the problem.

196.    Indeed, the New GM engineers identified several additional ways to actually fix the problem.  These ideas included adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the run position, and adding a push button to the lock cylinder to prevent it from slipping out of "run."  New GM rejected each of these ideas.

197.    The photographs below are of a New GM engineer in the driver's seat of a Cobalt during the investigation of Cobalt engine stalling incidents:



198.    These photographs show the dangerous position of the key in the lock module on the steering column, as well as the key with the slot, which allow the key fob to hang too low off the steering column.  New GM engineers understood that the key fob can be impacted and pinched between the driver's knee and the steering column, and that this will cause the key to inadvertently turn from the "run" to the "accessory" or "off" position.  The photographs show

- 42 -

that the New GM engineers understood that increasing the detent in the ignition switch would not be a total solution to the problem. They also show why New GM engineers believed that additional changes (such as the shroud) were necessary to fix the defects with the ignition switch.

199.    The New GM engineers clearly understood that increasing the detent in the ignition switch alone was not a solution to the problem. But New GM concealed—and continues to conceal—from the public the full nature and extent of the defects.

200.    On October 4, 2012, there was a meeting of the Red X Team during which Mr. Federico gave an update of the Cobalt airbag non-deployment investigation. According to an email from Mr. Stouffer on the same date, the "primary discussion was on what it would take to keep the SDM active if the ignition key was turned to the accessory mode." Despite this recognition by New GM engineers that the SDM should remain active if the key is turned to the "accessory" or "off" position, New GM took no action to remedy the ignition switch defect or notify customers that the defect existed.

201.    During the October 4, 2012 meeting, Mr. Stouffer and other members of the Red X Team also discussed "revising the ignition switch to increase the effort to turn the key from Run to Accessory."

202.    On October 4, 2012, Mr. Stouffer emailed Ray DeGiorgio and asked him to "develop a high level proposal on what it would take to create a new switch for service with higher efforts." On October 5, 2012, DeGiorgio responded:

> Brian,
>
> In order to provide you with a HIGH level proposal, I need to understand what my requirements are. what is the TORQUE that you desire?
>
> Without this information I cannot develop a proposal.

203.    On October 5, Stouffer responded to DeGiorgio's email, stating:

Ray,

As I said in my original statement, I currently don't know what the torque value needs to be. Significant work is required to determine the torque. What is requested is a high level understanding of what it would take to create a new switch.

204.    DeGiorgio replied to Stouffer the following morning:

Brian,

Not knowing what my requirements are I will take a SWAG at the Torque required for a new switch. Here is my level proposal

**Assumption is 100 N cm Torque.**

•    New switch design = Engineering Cost Estimate approx. $300,000

•    Lead Time = 18 – 24 months from issuance of GM Purchase Order and supplier selection.

Let me know if you have any additional questions.

205.    Stouffer later admitted in a deposition that DeGiorgio's reference to "SWAG" was an acronym for "Silly Wild-Ass Guess."

206.    DeGiorgio's cavalier attitude exemplifies New GM's approach to the safety-related defects that existed in the ignition switch and airbag system in the Defective Ignition Switch Vehicles. Rather than seriously addressing the safety-related defects, DeGiorgio's emails show he understood the ignition switches were contributing to the crashes and fatalities and he could not care less.

207.    It is also obvious from this email exchange that Stouffer, who was a leader of the Red X Team, had no problem with DeGiorgio's cavalier and condescending response to the request that he evaluate the redesign of the ignition switches.

208.    In December 2012, in Pensacola, Florida, Ebram Handy, a New GM engineer, participated in an inspection of components from Brooke Melton's Cobalt, including the ignition

- 44 -

switch.  At that inspection, Handy, along with Mark Hood, a mechanical engineer retained by the

Meltons, conducted testing on the ignition switch from Brooke Melton's vehicle, as well as a

replacement ignition switch for the 2005 Cobalt.

209.    At that inspection, Handy observed that the results of the testing showed that the

torque performance on the ignition switch from Brooke Melton's Cobalt was well below Old

GM's minimum torque performance specifications.  Handy also observed that the torque

performance on the replacement ignition switch was significantly higher than the torque

performance on the ignition switch in Brooke Melton's Cobalt.

210.    On April 29, 2013, Ray DeGiorgio, the chief design engineer for the ignition

switches in these Defective Ignition Switch Vehicles, was deposed.  At his deposition,

Mr. DeGiorgio was questioned about his knowledge of differences in the ignition switches in

early model-year Cobalts and the switches installed in later model-year Cobalts:

> Q.  And I'll ask the same question.  You were not aware before
> today that GM had changed the spring – the spring on the ignition
> switch had been changed from '05 to the replacement switch?
>
> MR. HOLLADAY:  Object to the form.  Lack of predicate and
> foundation.  You can answer.
>
> THE WITNESS:  I was not aware of a detent plunger switch
> change.  We certainly did not approve a detent plunger design
> change.
>
> Q.  Well, suppliers aren't supposed to make changes such as this
> without GM's approval, correct?
>
> A.  That is correct.
>
> Q.  And you are saying that no one at GM, as far as you know, was
> aware of this before today?
>
> MR. HOLLADAY:  Object.  Lack of predicate and foundation.
> You can answer.
>
> THE WITNESS:  I am not aware about this change.

211.    When Mr. DeGiorgio testified, he knew that he personally had authorized the ignition switch design change in 2006, but he stated unequivocally that no such change had occurred.

**3.    New GM recalls 2.1 million vehicles with defective ignition switches.**

212.    Under continuing pressure to produce high-ranking employees for deposition in the Melton litigation, New GM's Field Performance Review Committee and Executive Field Action Decision Committee ("Decision Committee") finally decided to order a recall of *some* vehicles with defective ignition switches on January 31, 2014.

213.    Initially, the Decision Committee ordered a recall of only the Chevrolet Cobalt and Pontiac G5 for model years 2005-2007.

214.    After additional analysis, the Decision Committee expanded the recall on February 24, 2014 to include the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion for model years 2003-2007, and the Saturn Sky for model year 2007.

215.    Public criticism in the wake of these recalls was withering.  On March 17, 2014, Mary Barra issued an internal video, which was broadcast to employees.  In the video, Ms. Barra admits:

> Scrutiny of the recall has expanded beyond the review by the federal regulators at NHTSA, the National Highway Traffic Safety Administration.  As of now, two congressional committees have announced that they will examine the issue.  And it's been reported that the Department of Justice is looking into this matter. . . . These are serious developments that shouldn't surprise anyone.  After all, something went wrong with our process in this instance and terrible things happened.

216.    The public backlash continued and intensified.  Eventually, GM expanded the ignition switch recall yet again on March 28, 2014.  This expansion covered all model years of the Chevrolet Cobalt and HHR, the Pontiac G5 and Solstice, and the Saturn Ion and Sky.  The

expanded recall brought the total number of vehicles recalled for defective ignition switches to 2,191,146.

217.    Several high-ranking New GM employees were summoned to testify before Congress, including Ms. Barra and executive vice president and in-house counsel Michael Milliken.  Further, in an effort to counter the negative backlash, New GM announced that it had hired Anton R. Valukas to conduct an internal investigation into the decade-long concealment of the ignition switch defect.

218.    As individuals came forward who had been injured and/or whose loved ones were killed in the Defective Ignition Switch Vehicles, the public criticism continued.  Under intense, continuing pressure, New GM agreed in April 2014 to hire Ken Feinberg to design and administer a claims program in order to compensate certain victims who were injured or killed in the Defective Ignition Switch Vehicles.  Ms. Barra explained to Congress:  "[W]e will make the best decisions for our customers, recognizing that we have legal obligations and responsibilities as well as moral obligations.  We are committed to our customers, and we are going to work very hard to do the right thing for our customers."

219.    New GM's compensation of such individuals, however, was limited to the protocol set forth in the Feinberg Compensation Fund.  In the courts, New GM has taken the position that any accident that occurred prior to the Old GM bankruptcy is barred by the bankruptcy Sale Order.

**4.    New GM recalls over 10 million additional vehicles for ignition switch defects in June and July of 2014.**

220.    Following the waves of negative publicity surrounding New GM's recall of the first 2.1 million Defective Ignition Switch Vehicles, New GM was forced to issue a series of additional recalls for more than 10 million additional Defective Ignition Switch Vehicles, as summarized below.

221.    While New GM and safety regulators received dozens of complaints of moving stalls and/or power failures in the vehicles covered by New GM's June and July 2014 recalls, New GM did nothing to remedy the situation.

222.    NHTSA's website contains more than 100 complaints about vehicle stalls for the 2006-2009 Impalas alone.  In one 2012 complaint, an Impala stalled in the middle of a large intersection.  The owner took it to a dealer four times but could not get it repaired.  The complainant stated, "I'm fearful I will be the one causing a fatal pile-up."

223.    New GM admits knowing that ignition switch defects have been linked to at least three deaths and eight injuries in the vehicle model years covered by its June and July recalls. The fatal accidents occurred in 2003 and 2004 Chevrolet Impalas in which the airbags failed to deploy.

**5.      June 19, 2014 Recall—Camaro Recall.**

224.    On June 19, 2014, New GM recalled 464,712 model year 2010 through 2014 Chevrolet Camaro vehicles in the United States (NHTSA Recall Number 14V-346).

225.    The great majority of the defective Camaros were sold or leased by New GM, though some indeterminate number of the 117,959 model year 2010 Camaros were manufactured by Old GM, and some smaller number were sold by Old GM.

226.    According to the recall notice, the driver of an affected Camaro may accidentally hit the ignition key with his or her knee, unintentionally knocking the key out of the "run" position and turning off the engine.  If the key is not in the "run" position, the airbags may not deploy during a collision.  Additionally, when the key is moved out of the "run" position, the vehicle will experience a loss of engine power, loss of power steering, and loss of power brakes.

227.   Between 2010 and 2014, NHTSA received numerous complaints of power

failures in 2010-2014 Camaros.  These complaints started as early as January 2010, months after

New GM's formation.

228.   For example, on May 3, 2010, New GM became aware of a complaint filed with

NHTSA involving a 2010 Camaro in which the following was reported:

> WHILE DRIVING TO THE DEALERSHIP IN BROOKDALE,
> MN. ON FREEWAY APPROX 70MPH WHEN CAR
> COMPLETELY GOES DEAD. QUICKLY I PUT IT IN
> NEUTRAL AND TURNED IT BACK ON AND COMPLAINED
> TO DEALER. DRIVING IN ST CLOUD, MN AT INTOWN
> SPEEDS WHEN THE CAR SHUTS DOWN AGAIN. THEN IT
> ALSO SHUT DOWN TWICE ON ME IN BRAINERD, MN AT
> A SPEED OF 50MPH WHILE DRIVING NORMAL. THEN ON
> 3 MAY 2010 I WAS GOING AROUND A CURVE WITH 2
> FRIENDS WHEN IT AGAIN SHUT DOWN AT
> APPROXIMATELY 60 MPH. THIS TIME WHILE ON THE
> CURVE I WENT INTO THE DITCH AND HIT A MAIL BOX.
> THUS CAUSING DAMAGE TO THE RIGHT FRONT OF THE
> CAR. THE CAR WAS TOWED AND IS PRESENTLY AT THE
> DEALERSHIP IN BRAINERD, MN. THIS CAR IS TO
> DANGEROUS TO DRIVE; WILL I HAVE A HEAD[-]ON
> COLLISION WHILE TRYING TO PASS ANOTHER CAR?

229.   On October 20, 2010, New GM became aware of a complaint filed with NHTSA

involving a 2010 Camaro in which the following was reported:

> 2010 CHEVROLET CHEVY CAMARO V6, SUDDEN LOSS OF
> POWER, COMPLETE ELECTRICAL FAILURE, AND ENGINE
> SHUTDOWN WHILE DRIVING 30 MPH IN SUBDIVISION.
> PULLED TO SIDE OF ROAD. TURNED CAR "OFF" AND
> BACK ON. DROVE TO DEALER WHO SAID THEY COULD
> FIND NO PROBLEM AND NOTHING RECORDED IN CAR'S
> COMPUTER. GOOGLED RECALL OF V8 TO SHOW
> DEALER, BUT DEALER SAID THIS WAS UNRELATED.

230.   On March 6, 2012, New GM became aware of a complaint filed with NHTSA

involving a 2010 Camaro in which the following was reported:

> WHILE DRIVING VEHICLE FIRST SHUT OFF AT A RED
> LIGHT FOR NO REASON ON FEB 28 2012 SAME INCIDENT
> ON MARCH 1ST SHUT OFF A RED LIGHT THIRD TIME IT

- 49 -

WAS WHILE DRIVING 10 MPH MAKING A TURN IN A
PARKING SPOT. WAS ABLE TO TURN BACK CAR ON
WITH NO PROBLEMS BUT IT IS OF GREAT CONCERN
NOW IF THIS SHOULD HAPPEN AT A HIGH SPEED I AM
SURE CAR CAN CAUSE INJURIES TO OTHERS AS WELL
AS MYSELF.

231.    On October 9, 2012, New GM became aware of a complaint filed with NHTSA

involving a 2012 Camaro in which the following was reported:

THE CONTACT OWNS A 2012 CHEVROLET CAMARO. THE
CONTACT STATED THAT WHILE DRIVING 50 MPH, THE
VEHICLE STALLED WITHOUT WARNING. THE CONTACT
WAS ABLE TO RESTART THE VEHICLE. THE
MANUFACTURER WAS CONTACTED AND HAD THE
VEHICLE TOWED TO A LOCAL DEALER. THE DEALER
RESET THE COMPUTER BUT THE REPAIR DID NOT
REMEDY THE ISSUE. THE CONTACT TOOK THE VEHICLE
BACK TO THE DEALER WHERE THE DEALER RESET THE
COMPUTER A SECOND TIME. THE DEALER ALSO DROVE
THE VEHICLE FOR ONE HUNDRED MILES AND COULD
NOT DUPLICATE THE STALLING ISSUE. THE VEHICLE
CONTINUED TO STALL SPORADICALLY. THE FAILURE
MILEAGE WAS 4,200.

232.    On July 3, 2013, New GM became aware of a complaint filed with NHTSA

involving a 2013 Camaro in which the following was reported:

THE CONTACT OWNS A 2013 CHEVROLET CAMARO. THE
CONTACT STATED THAT WHILE DRIVING
APPROXIMATELY 55 MPH, THE VEHICLE STALLED
WITHOUT WARNING. THE CONTACT MENTIONED THAT
THE FAILURE WOULD RECUR INTERMITTENTLY. THE
VEHICLE WAS TAKEN TO A DEALER FOR A DIAGNOSTIC
WHERE THE FAILURE WAS UNABLE TO BE REPLICATED.
THE MANUFACTURER WAS NOTIFIED OF THE FAILURE.
THE APPROXIMATE FAILURE MILEAGE WAS 1,460 AND
THE CURRENT MILEAGE WAS 1,800.

233.    On August 4, 2013, New GM became aware of a complaint filed with NHTSA

involving a 2010 Camaro in which the following was reported:

I PURCHASED MY 2010 CHEVY CAMARO 2SS, IN
FEBRUARY OF 2012. IT HAD 4,400 MILES ON IT. ABOUT A
MONTH OR TWO, AFTER I BOUGHT IT, IT COMPLETELY

- 50 -

SHUT OFF ON ME, ON A MAJOR HIGHWAY, WHILE
DOING 65 MPH. I THREW IT INTO NEUTRAL AND TURNED
THE KEY AND IT STARTED RIGHT BACK UP. ABOUT A
MONTH AFTER THAT, I WAS DOING ABOUT 20MPH ON A
BACK ROAD AND IT DID THE SAME EXACT THING. JUST
RECENTLY, ABOUT 2 WEEKS AGO, I WAS IN 6TH GEAR,
ON CRUISE DOING 60MPH AND I FELT THE CAR "JERK"
OR BUCK" A LITTLE BIT. FOLLOWED IMMEDIATELY BY
THE CAR DECELERATING. I DOWN-SHIFTED TO 4TH
GEAR AND WAS GIVING IT GAS, BUT STILL WOULDN'T
SPEED UP. IT FELL DOWN TO ABOUT 40MPH, BEFORE
FINALLY CATCHING ITSELF AND SPEEDING BACK UP.
ABOUT A MILE LATER, I GOT OFF MY EXIT AND WAS
COMING DOWN TO THE STOP SIGN,WHEN ALL THE
INDICATOR LIGHTS CAME ON FOR ABOUT 10 SECONDS.
THEY WENT OFF AND I MADE A LEFT HAND TURN AND
WENT ABOUT A MILE UP THE ROAD. AT THAT POINT,
THE CAR COMPLETELY SHUT OFF DOING ABOUT 35MPH.
THERE WAS HEAVY TRAFFIC, SO I PULLED OVER AND
STARTED IT BACK UP. I CALLED THE CHEVY
DEALERSHIP, WHERE I BOUGHT IT FROM, AND THEY
HAD NO OPENINGS FOR A WEEK. SO I TOOK IT LAST
WEEK TO GET IT CHECKED AND THEY FOUND NOTHING
THAT COULD HAVE CAUSED IT, THEY SAY. I AM VERY
UPSET, BUT VERY THANKFUL THAT MY TWO CHILDREN
WERE NOT WITH ME WHEN IT HAPPENED. I AM
CURRENTLY CONTEMPLATING TRADING IT IN, CUZ I AM
WORRIED THAT IF IT HAPPENS AGAIN, AND MY
CHILDREN ARE IN THE CAR, THAT IT MIGHT SHUT OFF
IN VERY CONGESTED BUMPER TO BUMPER TRAFFIC, ON
THE HIGHWAY AT NIGHT, AND A TRACTOR TRAILER IS
BEHIND ME AND I CAN'T GET IT STARTED OR SOMEONE
DOESN'T SEE ME CUZ MY LIGHTS WOULD BE OFF. THE
THOUGHT OF THAT COMPLETELY SCARES ME.

234.    On September 28, 2013, New GM became aware of a complaint filed with

NHTSA involving a 2010 Camaro in which the following was reported:

THE CONTACT OWNS A 2010 CHEVROLET CAMARO. THE
CONTACT STATED THAT WHILE DRIVING 5 MPH AND
MAKING A TURN, THE VEHICLE STALLED WITHOUT
WARNING. THE CONTACT WAS ABLE TO RESTART THE
VEHICLE BUT THE FAILURE RECURRED. THE VEHICLE
WAS TAKEN TO A DEALER WHO PERFORMED A
DIAGNOSTIC AND REPLACED A COMPONENT TO
CORRECT THE FAILURE. THE CONTACT WAS UNABLE
TO DETERMINE THE EXACT COMPONENT HOWEVER,

- 51 -

THE FAILURE RECURRED WITHOUT WARNING. THE
VEHICLE WAS TAKEN TO DEALER HOWEVER, NO
FAILURE WAS DETERMINED. THE MANUFACTURER WAS
MADE AWARE OF THE ISSUE AND AN INCIDENT
RECORDER WAS INSTALLED ON THE VEHICLE TO
DETERMINE ANY FUTURE FAILURES. THE FAILURE
MILEAGE WAS 23,000. THE CURRENT MILEAGE WAS
24,000.

235.    On October 2, 2013, New GM became aware of a complaint filed with NHTSA

involving a 2010 Camaro in which the following was reported:

I REACHED OUT TO [XXX], GM CEO ON MAY 24, 2013
WITH A STRONG CONCERNS OF POWER FAILURE FOR
THE 2ND TIME WHILE DRIVING THE VEHICLE; CAUSING
ME NOT TO HAVE CONTROL WHILE THE VEHICLE WAS
DRIVEN. THUS IT WAS ALSO NOTED THAT I ORIGINALLY
REACHED OUT TO GM TO REQUEST A REPLACED
VEHICLE WHILE MY VEHICLE WAS UNDER WARRANTY
DUE TO THE VEHICLE LOSING POWER ON A MAJOR
FREEWAY; WHICH WAS LIFE THREATENING; HOWEVER
THE RESPONSE BACK FROM GM WAS A DECLINED
LETTER THAT I RECEIVED ENSURING ME THAT THE
VEHICLE WAS SAFE TO DRIVE. I TRAVEL MAJOR
FREEWAYS AS PART OF CAREER SO HAVING A
RELIABLE VEHICLE IS IMPERATIVE AS FOR I VALUE MY
LIFE. [XXX], SENIOR VICE PRESIDENT OF GLOBAL
QUALITY & CUSTOMER EXPERIENCE HAS NOT
RETURNED MY CALLS AND NOW GM IS ALSO NOT
HONORING THE WARRANTY TOO. AFTER ASSISTING ME
WITH MY CAR FOR 5 MONTHS .PLEASE NOT MY 2010
CAMARO SS IS PARK AS FOR IT'S NOT SAFE TO DRIVE.
GM OFFER ME A CONTRACT TO SIGN THAT WOULD
GUARANTEE "NO FAULT TO GM ". I COULDN'T NOT DUE
THEM SHOULD MY CAMARO HARM MYSELF OR OTHERS
WHILE DRIVING IT. ADDITIONALLY, I WAS TOLD THAT
GM KNOWS THERE IS A PROBLEM WITH THE CAMARO
BUT CAN'T FIND THE PROBLEM. IT'S HAS BEEN NOTED
THAT THE CORRECTIONS THAT I NEED TO HAVE MADE
IN ORDER TO BE SAFE IN THE GM VEHICLE CANNOT BE
OBTAINED AS FOR MY VEHICLE HAS BEEN KEEP CHEVY
FOR SHOP 5 MONTHS.

236.    On October 16, 2013, New GM became aware of a complaint filed with NHTSA

concerning a 2013 Camaro, in which the following was reported:

- 52 -

> THE CONTACT OWNS A 2013 CHEVROLET CAMARO. THE
> CONTACT STATED THAT WHILE MAKING A U-TURN, THE
> VEHICLE STALLED WITHOUT WARNING. THE VEHICLE
> WAS NOT TAKEN TO A DEALER FOR DIAGNOSIS OF THE
> FAILURE. THE MANUFACTURER WAS NOT NOTIFIED OF
> THE FAILURE. THE VEHICLE WAS NOT REPAIRED. THE
> APPROXIMATE FAILURE AND CURRENT MILEAGE WAS
> 830.

237.    On April 20, 2014, New GM became aware of a complaint filed with NHTSA

concerning a 2014 Camaro, in which the following was reported:

> AS I WAS TURNING THE CORNER ON TO WOODWARD
> AVENUE MY CAR JUST SHUT DOWN. THE CAR WENT
> TOTALLY BLACK AND SHUT DOWN IN THE MIDDLE OF
> THE TURN ON THIS VERY BUSY-MAIN THOROUGHFARE.

238.    On April 30, 2014, New GM became aware of a complaint filed with NHTSA

concerning a 2014 Camaro, in which the following was reported:

> WITHIN TWO WEEKS AFTER PURCHASING MY CAR IT
> STALLED TWICE--BOTH WHEN STOPPED AT RED LIGHTS.
> I TOOK CAR TO DEALERSHIP AND THEY DID A ROAD
> TEST BUT COULD NOT REPLICATE. ON 4/9/2014 I WAS
> MAKING A RIGHT HAND TURN AND THE CAR STALLED
> IN THE MIDDLE OF THE INTERSECTION. I RESTARTED
> THE CAR, DROVE TO MY OFFICE AND THE CAR STALLED
> WHEN TURNING INTO THE PARKING GARAGE AND
> AGAIN WHEN TURNING INTO THE PARKING SPACE.
> TOOK TO THE DEALERSHIP THE FOLLOWING DAY AND
> THEY KEPT FOR AN EXTENDED TEST DRIVE BUT COULD
> NOT REPLICATE THE PROBLEM. SINCE THERE WERE
> NOT ANY CODES THE CAR WAS RETURNED TO ME.

239.    On May 6, 2014, New GM became aware of a complaint filed with NHTSA

concerning a 2014 Camaro, in which the following was reported:

> DRIVING ON CRUISE CONTROL. KNEE BUMPED KEY,
> ENGINE TURNED OFF AT 60 MPH. POWER STEERING AND
> BRAKES STILL WORKED, BUT ENGINE WAS OFF.

240.    On May 9, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2013 Camaro, in which the following was reported:

THE CONTACT INDICATED WHILE TRAVELING 60 MPH
ON A MAJOR HIGHWAY, THE VEHICLE STALLED
WITHOUT WARNING. THE CONTACT WAS ABLE TO
MOVE THE VEHICLE OVER TO THE SHOULDER AND
AFTER SEVERAL ATTEMPTS THE VEHICLE WAS ABLE TO
RESTART. THE VEHICLE WAS TO BE FURTHER
INSPECTED, DIAGNOSED AND REPAIRED BY AN
AUTHORIZED DEALER BUT IT WAS NOT REPAIRED. THE
CONTACT WAS NOTIFIED OF NHTSA CAMPAIGN ID
NUMBER: 14V346000 (ELECTRICAL SYSTEM) AFTER
EXPERIENCING THE FAILURE MULTIPLE TIMES AND
WAS WAITING FOR PARTS TO GET THE VEHICLE
REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE
FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS
28,000.

241.    On May 19, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2013 Camaro, in which the following was reported:

WHILE DRIVING DOWN I 75 IN OCALA FLORIDA CAR
STALLED IN MIDDLE OF HIGHWAY . I PULLED OVER TO
SHOULDER AND HAD TO RESTART CAR. I TOOK IT IN TO
A DEALER AND THEY SAID THEY COULD NOT FIND ANY
THING WRONG. THEY SAID TAKE THE CAR.

242.    On May 20, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2012 Camaro, in which the following was reported:

WHEN THE IGNITION SWITCH/ KEY IS SLIGHTLY
BUMPED WITH KNEE, THE CAR SHUTS OFF. THREE
TIMES NOW. DEALERSHIP NOT RESPONSIVE. TAUGHT
MY TEEN DRIVERS WHAT TO DO IF THIS HAPPENS AND
THIS SAVED MY DAUGHTER'S LIFE WHEN IT HAPPENED
TO HER.

243.    Astoundingly, the *sole* remedy provided by New GM in its recall will be to

"remove the key blade from the original flip key/RKE transmitter assemblies provided with the

vehicle, and provide two new keys and two key rings per key."

244.    The proposed "remedy" is insufficient, because it does not address (i) the poor

placement of the ignition switch such that the keys are vulnerable to being "kneed" by the driver;

(ii) the airbag algorithm that can render the airbags inoperable *even when the vehicles are travelling at a high speed*; and (iii) the possible need for a new switch with higher torque.

245.    Indeed, on July 31, 2014, after the recall was announced, New GM became aware of a complaint filed with NHTSA involving a 2014 Camaro, in which the following was reported:

> I WAS TURNING ONTO THE HIGHWAY THAT THE SPEED LIMIT IS 65 MPH FROM A SIDE ROAD. I WAITED FOR ONCOMING TRAFFIC TO PASS AND THEN PULLED OUT. AS I PULLED OUT, TURNING RIGHT, MY CAR HAD A SUDDEN LOSS OF POWER. I TRIED TO RESTART AND IT WOULD NOT RESTART. I HAD DIFFICULTY PULLING OVER TO THE SIDE OF THE ROAD DUE TO THE STEERING WHEEL BEING STIFF AND HARD TO HANDLE. AFTER I GOT TO THE SIDE OF THE ROAD, I WAS ABLE TO RESTART MY CAR. I *DID NOT BUMP THE IGNITION SWITCH WHEN THIS HAPPENED EITHER*.  [Emphasis added.]

   **a.    June 20, 2014 recall—ignition key slot defect.**

246.    On June 20, 2014, New GM recalled 3,141,731 vehicles in the United States for ignition switch, or ignition key slot, defects (NHTSA Recall Number 14V- 355).  New GM announced to NHTSA and the public that the recall concerns an ignition key slot defect.

247.    2,349,095 of the vehicles subject to this recall were made by Old GM.  792,636 vehicles were made and/or sold by New GM.

248.    The following vehicles were included in the June 20, 2014 recall:  2005-2009 Buick Lacrosse, 2006-2014 Chevrolet Impala, 2000-2005 Cadillac Deville, 2004-2011 Cadillac DTS, 2006-2011 Buick Lucerne, 2004-2005 Buick Regal LS and RS, and 2006-2008 Chevrolet Monte Carlo.

249.    The recall notice states, "In the affected vehicles, the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the run position, turning off the engine."

- 55 -

250.    Further, "[i]f the key is not in the run position, the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury. Additionally, a key knocked out of the run position could cause loss of engine power, power steering, and power braking, increasing the risk of a vehicle crash."

251.    New GM has received hundreds of complaints at its Technical Assistance Center in which the weight of the key chain was identified as a source of the problem.[57]

252.    The vehicles included in this recall were built on the same platform and their defective ignition switches are likely due to weak detent plungers, just like the Cobalt and other Defective Ignition Switch Vehicles recalled in February and March of 2014.

253.    New GM was aware of the ignition switch defect in these vehicles from the date of its inception on July 10, 2009, as it acquired on that date all of the knowledge possessed by Old GM given the continuity in personnel, databases, and operations from Old GM to New GM. In addition, New GM acquired additional information thereafter. The information, all of which was known to New GM, included the following facts:

a.    On August 30, 2005, Old GM employee Laura Andres sent an email to Jim Zito and copied ten other Old GM employees, including Ray DeGiorgio. Ms. Andres, in her email, stated, "I picked up the vehicle from repair. No repairs were done. . . . The technician said there is nothing they can do to repair it. He said it is just the design of the switch. He said other switches, like on the trucks, have a stronger detent and don't experience this." (emphasis in original).

b.    Ms. Andres' email continued: "I think this is a serious safety problem, especially if this switch is on multiple programs. I'm thinking big recall. I was driving 45 mph when I hit the pothole and the car shut off and I had a car driving behind me that swerved around

_____

[57] *See, e.g.*, GM-MDL-254300011834-35.

me.  I don't like to imagine a customer driving with their kids in the back seat, on I-75 and hitting a pothole, in rush-hour traffic.  I think you should seriously consider changing this part to a switch with a stronger detent."

       c.     Ray DeGiorgio, who reportedly designed the ignition switches installed in the 2006 Chevrolet Impala vehicles, replied to Ms. Andres' email, stating that he had recently driven a 2006 Impala and "did not experience this condition."

254.    On or after July 10, 2009, senior executives and engineers at New GM knew that some of the information relayed to allay Ms. Andres' concerns was inaccurate.  For example, Ray DeGiorgio knew that there had been "issues with detents being too light."  Instead of relaying those "issues," Mr. DeGiorgio falsely stated that there were no such "issues."

255.    New GM has tried to characterize the recall of these 3.14 million vehicles as being different than the recall for the ignition switch defect in the Cobalts and other Defective Ignition Switch Vehicles when in reality and for all practical purposes it is for exactly the same defect that creates exactly the same safety risks.  New GM has attempted to label and describe the ignition key slot defect as being different in order to provide it with cover and an explanation for why it did not recall these 3.14 million vehicles much earlier, and why it is not providing a new ignition switch for the 3.14 million vehicles.

256.    From 2001 to the present, Old GM and New GM received numerous reports from consumers regarding complaints, crashes, injuries, and deaths linked to this safety defect.  The following are examples of just a few of the many reports and complaints regarding the defect.

257.    On January 23, 2001, Old GM became aware of a complaint filed with NHTSA involving a 2000 Cadillac Deville and an incident that occurred on January 23, 2001, in which the following was reported:

> COMPLETE ELECTRICAL SYSTEM AND ENGINE
> SHUTDOWN WHILE DRIVING. HAPPENED THREE
> DIFFERENT TIMES TO DATE. DEALER IS UNABLE TO
> DETERMINE CAUSE OF FAILURE. THIS CONDITION
> DEEMED TO BE EXTREMELY HAZARDOUS BY OWNER.
> NHTSA ID Number: 739850.

258.    On June 12, 2001, Old GM became aware of a complaint filed with NHTSA

involving a 2000 Cadillac Deville and an incident that occurred on June 12, 2001, in which the

following was reported:

> INTERMITTENTLY AT 60MPH VEHICLE WILL STALL OUT
> AND DIE. MOST TIMES VEHICLE WILL START UP
> IMMEDIATELY AFTER. DEALER HAS REPLACED MAIN
> CONSOLE 3 TIMES, AND ABS BRAKES. BUT, PROBLEM
> HAS NOT BEEN CORRECTED. MANUFACTURER HAS
> BEEN NOTIFIED.*AK  NHTSA ID Number: 890227.

259.    On January 27, 2003, Old GM became aware of a complaint filed with NHTSA

involving a 2001 Cadillac Deville and an incident that occurred on January 27, 2003, in which

the following was reported:

> WHILE DRIVING AT HIGHWAY SPEED ENGINE SHUT
> DOWN, CAUSING AN ACCIDENT. PLEASE PROVIDE ANY
> ADDITIONAL INFORMATION.*AK  NHTSA ID Number:
> 10004759.

260.    The reports regarding the defect continued to be reported to New GM.  For

example, on February 15, 2010, New GM became aware of a complaint filed with NHTSA

involving a 2008 Buick LaCrosse and an incident that occurred on February 13, 2010, in which a

driver reported:

> WHILE DRIVING AT 55MPH I RAN OVER A ROAD BUMP
> AND MY 2008 BUICK LACROSSE SUPER SHUT
> OFF(STALLED). I COASTED TO THE BURM, HIT BRAKES
> TO A STOP. THE CAR STARTED ON THE FIRST TRY.
> CONTINUED MY TRIP WITH NO INCIDENCES. TOOK TO
> DEALER AND NO CODES SHOWED IN THEIR COMPUTER.
> CALLED GM CUSTOMER ASSISTANCE AND THEY GAVE
> ME A CASE NUMBER. NO BULLETINS. SCARY TO DRIVE.

> TRAFFIC WAS LIGHT THIS TIME BUT MAY NOT BE THE
> NEXT TIME. *TR. NHTSA ID Number: 10310692.

261.    On April 21, 2010, New GM became aware of a complaint filed with NHTSA

involving a 2006 Buick Lucerne and an incident that occurred on March 22, 2010, in which the

following was reported:

> 06 BUICK LUCERNE PURCHASED 12-3-09, DIES OUT
> COMPLETELY WHILE DRIVING AT VARIOUS SPEEDS.
> THE CAR HAS SHUT OFF ON THE HIGHWAY 3 TIMES
> WITH A CHILD IN THE CAR. IT HAS OCCURRED A TOTAL
> OF 7 TIMES BETWEEN 1-08-10 AND 4-17-10. THE CAR IS
> UNDER FACTORY WARRANTY AND HAS BEEN
> SERVICED 7 TIMES BY 3 DIFFERENT BUICK
> DEALERSHIPS. *TR  NHTSA ID Number: 10326754.

262.    On June 2, 2010, New GM became aware of a complaint filed with NHTSA

involving a 2007 Buick LaCrosse and an incident that occurred on March 1, 2010, in which the

following was reported:

> 2007 BUICK LACROSSE SEDAN. CONSUMER STATES
> MAJOR SAFETY DEFECT. CONSUMER REPORTS WHILE
> DRIVING THE ENGINE SHUT DOWN 3 TIMES FOR NO
> APPARENT REASON *TGW  NHTSA ID Number: 10334834.

263.    On February 20, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Chevrolet Monte Carlo and an incident that occurred on January 16, 2014, in

which the following was reported:

> I WAS DRIVING GOING APPROXIMATELY 45 MPH, I HIT A
> POT HOLE AND MY VEHICLE CUT OFF. THIS HAS
> HAPPENED THREE TIMES SINCE JANUARY. THE SAME
> THING HAPPENED THE SECOND TIME. THE LAST TIME IT
> OCCURRED WAS TUESDAY, FEBRUARY 18. THIS TIME I
> WAS ON THE EXPRESSWAY TRAVELING
> APPROXIMATELY 75 MPH, HIT A BUMP AND IT CUT OFF.
> THE CAR STARTS BACK UP WHEN I PUT IT IN NEUTRAL.
> *TR  NHTSA ID Number: 10565104.

- 59 -

264.    On March 3, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Chevrolet Impala and an incident that occurred on February 29, 2012, in which

the following was reported:

> I WAS DRIVING MY COMPANY ASSIGNED CAR DOWN A
> STEEP HILL WHEN THE ENGINE STALLED WITHOUT
> WARNING. THIS HAS HAPPENED 5 OTHER TIMES WITH
> THIS VEHICLE. THIS WAS THE FIRST TIME I WAS
> TRAVELING FAST THOUGH. IT'S LIKE THE ENGINE JUST
> TURNS OFF. THE LIGHTS ARE STILL ON BUT I LOSE THE
> POWER STEERING AND BRAKES. IT WAS TERRIFYING
> AND EXTREMELY DANGEROUS. THIS PROBLEM
> HAPPENS COMPLETELY RANDOMLY WITH NO
> WARNING. IT HAS HAPPENED TO OTHERS IN MY
> COMPANY WITH THEIR IMPALAS. I LOOKED ONLINE
> AND FOUND NUMEROUS OTHER INSTANCES OF CHEVY
> IMPALAS OF VARIOUS MODEL YEARS DOING THE SAME
> THING. IT IS CURRENTLY IN THE REPAIR SHOP AND THE
> MECHANIC CAN'T DUPLICATE THE PROBLEM. I TOLD
> THEM ITS RANDOM AND OCCURS ABOUT EVERY 4
> MONTHS OR SO. I AM AFRAID I WILL HAVE TO GET
> BACK IN THIS DEATH TRAP DUE TO MY EMPLOYER
> MAKING ME. PLEASE HELP- I DON'T WANT TO DIE
> BECAUSE CHEVROLET HAS A PROBLEM WITH THEIR
> ELECTRICAL SYSTEMS IN THEIR CARS. *TR  NHTSA ID
> Number: 10567458.

265.    On March 11, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2007 Cadillac DTS and an incident that occurred on January 27, 2013, in which the

following was reported:

> ENGINE STOPPED. ALL POWER EQUIPMENT CEASED TO
> FUNCTION. I WAS ABLE TO GET TO THE SIDE OF THE
> FREEWAY. PUT THE CAR IN NEUTRAL, TURNED THE KEY
> AND THE CAR STARTED AND CONTINUED FOR THE
> DURATION OF THE 200 MILE TRIP. THE SECOND TIME
> APPROXIMATELY THREE WEEKS AGO MY WIFE WAS
> DRIVING IN HEAVY CITY TRAFFIC WHEN THE SAME
> PROBLEM OCCURRED AND SHE LOST THE USE OF ALL
> POWER EQUIPMENT. SHE WAS ABLE TO PUT THE CAR IN
> PARK AND GET IT STARTED AGAIN WITHOUT INCIDENT.
> I CALLED GM COMPLAINT DEPARTMENT. THEY
> INSTRUCTED ME TO TAKE THE CAR TO A DEALERSHIP
> AND HAVE A DIAGNOSTIC TEST DONE ON IT. THIS WAS

DONE AND NOTHING WAS FOUND TO BE WRONG WITH
THE VEHICLE. I AGAIN CALLED CADILLAC COMPLAINT
DEPARTMENT AND OPENED A CASE. THIS TIME I WAS
TOLD TO TAKE THE CAR BACK TO THE DEALERSHIP
AND ASK THE SERVICE DEPARTMENT TO RECHECK IT. I
INFORMED THEM I HAVE THE DIAGNOSTIC REPORT
SHOWING NOTHING WRONG WAS FOUND. THEY
SUGGESTED I TAKE IT BACK AND HAVE THE SERVICE
PEOPLE DRIVE THE CAR. THIS DIDN'T MAKE ANY SENSE
BECAUSE I DON'T KNOW WHEN AND WHERE THE
PROBLEM WILL OCCUR AGAIN. WHAT WAS I TO DO FOR
A CAR WHILE THE DEALERSHIP HAD MINE? I INQUIRED
OF THE CADILLAC REPRESENTATIVE IF THIS CAR MAY
HAVE THE SAME IGNITION AS THE CARS CURRENTLY
BEING RECALLED BY GM. THEY WERE UNABLE TO
ANSWER THAT QUESTION. THEY FINALLY STATED THE
ONLY REMEDY WAS TO TAKE IT BACK TO THE
DEALERSHIP. IF THIS PROBLEM OCCURS AGAIN
SOMEONE COULD EASILY GET INJURED OR KILLED. I
WOULD APPRECIATE ANY ASSISTANCE YOU CAN GIVE
ME ON HOW TO RESOLVE THIS MATTER.  NHTSA ID
Number: 10568491.

266.    On March 19, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Buick LaCrosse and an incident that occurred on March 15, 2014, in which the

following was reported:

WHILE DRIVING UP A LONG INCLINE ON I-10 VEHICLE
BEHAVED AS IF THE IGNITION HAD BEEN TURNED OFF
AND KEY REMOVED. IE: ENGINE OFF, NO LIGHTS OR
ACCESSORIES, NO WARNING LIGHTS ON DASH. TRAFFIC
WAS HEAVY AND MY WIFE WAS FORTUNATE TO
SAFELY COAST INTO SHOULDER. INCIDENT RECORDED
WITH BUICK, HAVE REFERENCE NUMBER. *TR  NHTSA
ID Number: 10573586.

267.    On July 12, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2009 Chevrolet Impala and an incident that occurred on March 19, 2010, in which

the following was reported:

I HAD JUST TURNED ONTO THIS ROAD, HAD NOT EVEN
GONE A MILE. NO SPEED, NO BLACK MARKS, CAR SHUT
DOWN RAN OFF THE ROAD AND HIT A TREE STUMP.
TOTAL THE CAR. THE STEERING WHEEL WAS BENT

> ALMOST IN HALF. I HAVE PICTURES OF THE CAR. I GOT
> THIS CAR NEW, SO ALL MILES WE'RE PUT ON IT BY ME. I
> BROKE MY HIP, BACK, KNEE, DISLOCATED MY ELBOW,
> CRUSHED MY ANKLE AND FOOT. HAD A HEAD INJURY,
> A DEFLATED LUNG. I WAS IN THE HOSPITAL FOR TWO
> MONTHS AND A NURSING HOME FOR A MONTH. I HAVE
> HAD 14 SURGERIES. STILL NOT ABLE TO WORK OR DO A
> LOT OF THINGS FOR MY SELF. WITH THE RECALLS
> SHOWING THE ISSUES OF THE ENGINE SHUTTING OFF, I
> NEED THIS LOOKED INTO.  NHTSA ID Number: 10610093.

268.    Since New GM's recall announcement, the reports and complaints relating to this

defect have continued to pour into New GM268.

269.    For example, on August 2, 2014, New GM became aware of a complaint filed

with NHTSA involving a 2006 Buick LaCrosse and an incident that occurred on July 12, 2014,

in which the following was reported:

> WHILE TRAVELING IN THE FAST LANE ON THE GARDEN
> STATE PARKWAY I HIT A BUMP IN THE ROAD, THE
> AUTO SHUT OFF.WITH A CONCRETE DIVIDER ALONG
> SIDE AND AUTOS APPROACHING AT HIGH SPEED, MY
> WIFE AND DAUGHTER SCREEMING I MANAGED TO GET
> TO THE END OF THE DIVIDER WERE I COULD TURN OFF
> THE AUTO RESTARTED ON 1ST TRY BUT VERY SCARY.
> NHTSA ID Number: 10618391.

270.    On August 18, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2007 Buick LaCrosse and an incident that occurred on August 18, 2014, in which the

following was reported:

> TL* THE CONTACT OWNS A 2007 BUICK LACROSSE. THE
> CONTACT STATED WHILE DRIVING APPROXIMATELY 60
> MPH, SHE HIT A POT HOLE AND THE VEHICLE STALLED.
> THE VEHICLE COASTED TO THE SHOULDER OF THE
> ROAD. THE VEHICLE WAS RESTARTED AND THE
> CONTACT WAS ABLE TO DRIVE THE VEHICLE AS
> NORMAL. THE CONTACT RECEIVED A RECALL NOTICE
> UNDER NHTSA CAMPAIGN NUMBER: 14V355000
> (ELECTRICAL SYSTEM), HOWEVER THE PARTS NEEDED
> FOR THE REPAIRS WAS UNAVAILABLE. THE VEHICLE
> WAS NOT REPAIRED. THE MANUFACTURER WAS NOT
> NOTIFIED OF THE FAILURE. THE APPROXIMATE

- 62 -

FAILURE MILEAGE WAS 110,000.  NHTSA ID Number: 10626067.

271.    On August 20, 2014, New GM became aware of a complaint filed with NHTSA involving a 2007 Chevrolet Impala and an incident that occurred on August 6, 2014, in which it was reported that:

> TL* THE CONTACT OWNS A 2007 CHEVROLET IMPALA. THE CONTACT STATED THAT WHILE DRIVING 25 MPH, THE VEHICLE STALLED WITHOUT WARNING. THE CONTACT RECEIVED A NOTIFICATION FOR RECALL NHTSA CAMPAIGN NUMBER: 14V355000 (ELECTRICAL SYSTEM). THE VEHICLE WAS TAKEN TO AN INDEPENDENT MECHANIC WHERE THE TECHNICIAN ADVISED THE CONTACT TO REMOVE THE KEY FOB AND ANY OTHER OBJECTS. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 79,000. NHTSA ID Number: 10626659.

272.    On August 27, 2014, New GM became aware of the following complaint filed with NHTSA involving a 2008 Chevrolet Impala and an incident that occurred on August 27, 2014, in which it was reported that:

> TL-THE CONTACT OWNS A 2008 CHEVROLET IMPALA. THE CONTACT STATED WHILE DRIVING APPROXIMATELY 50 MPH, THE VEHICLE LOST POWER AND THE STEERING WHEEL SEIZED WITHOUT WARNING. AS A RESULT, THE CONTACT CRASHED INTO A POLE AND THE AIR BAGS FAILED TO DEPLOY. THE CONTACT SUSTAINED A CONCUSION, SPRAINED NECK, AND WHIPLASH WHICH REQUIRED MEDICAL ATTENTION. THE POLICE WAS NOT FILED. THE VEHICLE WAS TOWED TO A TOWING COMPANY. THE CONTACT RECEIVED NOTIFICATION OF NHTSA CAMPAIGN ID NUMBER: 14V355000 (ELECTRICAL SYSTEM), HOWEVER THE PARTS ARE NOT AVAILABLE TO PERFORM THE REPAIRS. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 70,000. MF. NHTSA ID Number: 10628704.

273.    New GM knew that this serious safety defect existed for years yet did nothing to warn the public or even attempt to correct the defect in these vehicles until late June of 2014 when New GM finally made the decision to implement a recall.

274.    The "fix" that New GM plans as part of the recall is to modify the ignition key from a "slotted" key to "hole" key.  This is insufficient and does not adequately address the safety risks posed by the defect.  The ignition key and switch remain prone to inadvertently move from the "run" to the "accessory" position.

275.    Simply changing the key slot or taking other keys and fobs off of key rings is New GM's attempt to make consumers responsible for the safety of GM-branded vehicles and to divert its own responsibility to make GM-branded vehicles safe.  New GM's "fix" does not adequately address the inherent dangers and safety threats posed by the defect in the design.

276.    In addition, New GM is not addressing the other design issues that create safety risks in connection with this defect.  New GM is not altering the algorithm that prevents the airbags from deploying when the ignition leaves the "run" position even when the vehicle is moving at high speed.  And New GM is not altering the placement of the ignition switch in an area where the driver's knees may inadvertently cause the ignition to move out of the "run" position.

**6.    July 2 and 3, 2014 recalls—unintended ignition rotation defect.**

277.    On July 2, 2014, New GM recalled 554,328 vehicles in the United States for ignition switch defects (Recall Number 14V-394).  The July 2 recall applied to the 2003-2014 Cadillac CTS and the 2004-2006 Cadillac SRX.

278.    The recall notice explains that the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the "run" position,

- 64 -

turning off the engine.  Further, if the key is not in the "run" position, the airbags may not deploy in the event of a collision, increasing the risk of injury.

279.    On July 3, 2014, New GM recalled 6,729,742 additional vehicles in the United States for ignition switch defects (Recall No. 14V-400).

280.    The following vehicles were included in this recall:  1997-2005 Chevrolet Malibu, 2000-2005 Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005 Pontiac Grand Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999-2004 Oldsmobile Alero.

281.    The recall notice states that the weight on the key and/or road conditions or some other jarring event may cause the ignition switch to move out of the "run" position, turning off the engine.  If the key is not in the "run" position, the airbags may not deploy if the vehicle is involved in a collision, increasing the risk of injury.

282.    In both of these recalls, New GM notified NHTSA and the public that the recall was intended to address a defect involving unintended or "inadvertent key rotation" within the ignition switch of the vehicles.  Old GM manufactured 7,175,896 of the recalled vehicles. New GM manufactured and sold 108,174 of the vehicles.

283.    Once again, the unintended ignition rotation defect is substantially similar to and relates directly to the other ignition switch defects, including the defects that gave rise to the initial recall of 2.1 million Cobalts and other vehicles in February and March of 2014.  Like the other ignition switch defects, the unintended ignition key rotation defect poses a serious and dangerous safety risk because it can cause a vehicle to stall while in motion by causing the key in the ignition to inadvertently move from the "on" or "run" position to "off" or "accessory" position.  Like the other ignition switch defects, the unintended ignition key rotation defect can result in a loss of power steering, power braking, and increase the risk of a crash.  And as with

- 65 -

the other ignition switch defects, if a crash occurs, the airbags will not deploy because of the unintended ignition key rotation defect.

284.    The unintended ignition key rotation defect involves several problems, and they are identical to the problems in the other Defective Ignition Switch Vehicles:  a weak detent plunger, the low positioning of the ignition on the steering column, and the algorithm that renders the airbags inoperable when the vehicle leaves the "run" position.

285.    The 2003-2006 Cadillac CTS and the 2004-2006 Cadillac SRX use the same Delphi switch and have inadequate torque for the "run"-"accessory" direction of the key rotation. This was known to Old and New GM, and was the basis for a change that was made to a stronger detent plunger for the 2007 and later model years of the SRX model.  The 2007 and later CTS vehicles used a switch manufactured by Dalian Alps.

286.    In 2010, New GM changed the CTS key from a "slot" to a "hole" design to "reduce an observed nuisance" of the key fob contacting the driver's leg.  But in 2012, a New GM employee reported two running stalls of a 2012 CTS that had a "hole" key and the stronger detent plunger switch.  When New GM did testing in 2014 of the "slot" versus "hole" keys, it confirmed that the weaker detent plunger-equipped switches used in the older CTS and SRX could inadvertently move from "run" to "accessory" or "off" when the "vehicle goes off road or experience some other jarring event."

287.    New GM has tried to characterize the recall of these 7.3 million vehicles as being different than the ignition switch defects in the Cobalt and other vehicles that gave rise to the February and March 2014  recalls **even though** these recalls are aimed at addressing the same defects and safety risks as those that gave rise to the other ignition switch defect recalls. New GM has attempted to portray the unintended ignition key rotation defect as being different from the other ignition switch defects in order to deflect attention from the severity and

pervasiveness of the ignition switch defect and to try to provide a story and plausible explanation for why it did not recall these 7.3 million vehicles much earlier, and to avoid providing new, stronger ignition switches as a remedy.

288.    Further, New GM acquired knowledge of the defects in these vehicles on the date of its inception on July 11, 2009.  On that date, it acquired knowledge of the following facts:

a.    In January of 2003, Old GM opened an internal investigation after it received complaints from a Michigan GM dealership that a customer had experienced a moving stall and power failure while operating his model year 2003 Pontiac Grand Am.

b.    During the investigation, Old GM's Brand Quality Manager for the Grand Am visited the dealership and requested that the affected customer demonstrate the problem.  The customer was able to recreate the shutdown event by driving over a speed bump at approximately 30-35 mph.

c.    The customer's key ring was allegedly quite heavy.  It contained approximately 50 keys and a set of brass knuckles.

d.    In May 2003, Old GM issued a voicemail to dealerships describing the defective ignition switch condition experienced by the customer in the Grand Am.  Old GM identified the vehicles affected by this condition as the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am.

e.    Old GM did not recall these vehicles.  Nor did it provide owners and/or lessees with notice of the defective condition.  Instead, its voicemail directed dealerships to pay attention to the key size and mass of the customer's key ring.

f.    On July 24, 2003, Old GM issued an engineering work order to increase the detent plunger force on the ignition switch for the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am vehicles.  Old GM engineers allegedly increased the detent

plunger force and changed the part number of the ignition switch.  The new parts were installed

beginning in the model year 2004 Malibu, Alero, and Grand Am vehicles.

g.      Old GM issued a separate engineering work order in March 2004 to

increase the detent plunger force on the ignition switch in the Pontiac Grand Prix.  Old GM

engineers did not change the part number for the new Pontiac Grand Prix ignition switch.

h.      Then-Old GM design engineer Ray DeGiorgio signed the work order in

March 2004 authorizing the part change for the Grand Prix ignition switch.  Ray DeGiorgio

maintained his position as design engineer with New GM.

i.      On or around August 25, 2005, Laura Andres, an Old GM design engineer

(who remains employed with New GM), sent an email describing ignition switch issues that she

experienced while operating a 2006 Chevrolet Impala on the highway.  Ms. Andres' email stated,

"While driving home from work on my usual route, I was driving about 45 mph, where the road

changes from paved to gravel & then back to paved, some of the gravel had worn away, and the

pavement acted as a speed bump when I went over it.  The car shut off.  I took the car in for

repairs.  The technician thinks it might be the ignition detent, because in a road test in the

parking lot it also shut off."

j.      Old GM employee Larry S. Dickinson, Jr. forwarded Ms. Andres' email

on August 25, 2005 to four Old GM employees.  Mr. Dickinson asked, "Is this a condition we

would expect to occur under some impacts?"

k.      On August 29, 2005, Old GM employee Jim Zito forwarded the messages

to Ray DeGiorgio and asked, "Do we have any history with the ignition switch as far as it being

sensitive to road bumps?"

l.      Mr. DeGiorgio responded the same day, stating, "To date there has never

been any issues with the detents being too light."

010440-13 732514 V1

289.    From 2002 to the present, Old GM and New GM received numerous reports from

consumers regarding complaints, crashes, injuries, and deaths linked to this safety defect.  The

following are just a handful of examples of some of the reports known to Old GM and New GM.

290.    On November 22, 2002, Old GM became aware of a complaint filed with NHTSA

involving a 2003 Cadillac CTS involving an incident that occurred on July 1, 2002, in which it

was reported that:

> THE CAR STALLS AT 25 MPH TO 45 MPH, OVER 20
> OCCURANCES, DEALER ATTEMPTED 3 REPAIRS. DT
> NHTSA ID Number: 770030.

291.    On January 21, 2003, Old GM became aware of a complaint filed with NHTSA

involving a 2003 Cadillac CTS, in which the following was reported:

> WHILE DRIVING AT ANY SPEED, THE VEHICLE WILL
> SUDDENLY SHUT OFF. THE STEERING WHEEL AND THE
> BRAKE PEDAL BECOMES VERY STIFF. CONSUMER FEELS
> ITS VERY UNSAFE TO DRIVE. PLEASE PROVIDE ANY
> FURTHER INFORMATION.  NHTSA ID Number: 10004288.

292.    On June 30, 2003, Old GM became aware of a complaint filed with NHTSA

regarding a 2001 Oldsmobile Intrigue which involved the following report:

> CONSUMER NOTICED THAT WHILE TRAVELING DOWN
> HILL AT 40-45 MPH BRAKES FAILED, CAUSING
> CONSUMER TO RUN INTO THREES AND A POLE. UPON
> IMPACT, AIR BAGS DID NOT DEPLOY. *AK  NHTSA ID
> Number: 10026252.

293.    On March 11, 2004, Old GM became aware of a complaint filed with NHTSA

involving a 2004 Cadillac CTS involving an incident that occurred on March 11, 2004, in which

the following was reported:

> CONSUMER STATED WHILE DRIVING AT 55-MPH
> VEHICLE STALLED, CAUSING CONSUMER TO PULL OFF
> THE ROAD. DEALER INSPECTED VEHICLE SEVERAL
> TIMES, BUT COULD NOT DUPLICATE OR CORRECT THE
> PROBLEM. *AK  NHTSA ID Number: 10062993.

294.    On March 11, 2004, Old GM became aware of a complaint with NHTSA

regarding a 2003 Oldsmobile Alero incident that occurred on July 26, 2003, in which the

following was reported:

> THE VEHICLE DIES. WHILE CRUISING AT ANY SPEED,
> THE HYDRAULIC BRAKES & STEERING FAILED DUE TO
> THE ENGINE DYING. THERE IS NO SET PATTERN, IT
> MIGHT STALL 6 TIMES IN ONE DAY, THEN TWICE THE
> NEXT DAY. THEN GO 4 DAYS WITH NO OCURRENCE,
> THEN IT WILL STALL ONCE A DAY FOR 3 DAYS. THEN
> GO A WEEK WITH NO OCURRENCE, THEN STALL 4 TIMES
> A DAY FOR 5 DAYS, ETC., ETC. IN EVERY OCURRENCE, IT
> TAKES APPROXIMATELY 10 MINUTES BEFORE IT WILL
> START BACK UP. AT HIGH SPEEDS, IT IS EXTREMELY
> TOO DANGEROUS TO DRIVE. WE'VE TAKEN IT TO THE
> DEALER, UNDER EXTENDED WARRANTY, THE
> REQUIRED 4 TIMES UNDER THE LEMON LAW PROCESS.
> THE DEALER CANNOT ASCERTAIN, NOR FIX THE
> PROBLEM. IT HAPPENED TO THE DEALER AT LEAST
> ONCE WHEN WE TOOK IT IN. I DOUBT THEY WILL
> ADMIT IT, HOWEVER, MY WIFE WAS WITNESS. THE CAR
> IS A 2003. EVEN THOUGH I BOUGHT IT IN JULY 2003, IT
> WAS CONSIDERED A USED CAR. GM HAS DENIED OUR
> CLAIM SINCE THE LEMON LAW DOES NOT APPLY TO
> USED CARS. THE CAR HAS BEEN PERMANENTLY
> PARKED SINCE NOVEMBER 2003. WE WERE FORCED TO
> BUY ANOTHER CAR. THE DEALER WOULD NOT TRADE.
> THIS HAS RESULTED IN A BADLUCK SITUATION FOR US.
> WE CANNOT AFFORD 2 CAR PAYMENTS / 2 INSURANCE
> PREMIUMS, NOR CAN WE AFFORD $300.00 PER HOUR TO
> SUE GM. I STOPPED MAKING PAYMENTS IN DECEMBER
> 2003. I HAVE KEPT THE FINANCE COMPANY ABREAST OF
> THE SITUATION. THEY HAVE NOT REPOSSED AS OF YET.
> THEY WANT ME TO TRY TO SELL IT. CAN YOU HELP
> ?*AK  NHTSA ID Number: 10061898.

295.    On July 20, 2004, Old GM became aware of a complaint filed with NHTSA

involving a 2004 Cadillac SRX, involving an incident that occurred on July 9, 2004, in which the

following was reported:

> THE CAR DIES AFTER TRAVELING ON HIGHWAY. IT
> GOES FROM 65 MPH TO 0. THE BRAKES, STEERING, AND
> COMPLETE POWER DIES. YOU HAVE NO CONTROL OVER
> THE CAR AT THIS POINT. I HAVE ALMOST BEEN HIT 5

TIMES NOW. ALSO, WHEN THE CARS DOES TURN BACK
ON IT WILL ONLY GO 10 MPH AND SOMETIMES WHEN
YOU TURN IT BACK ON THE RPM'S WILL GO TO THE
MAX. IT SOUNDS LIKE THE CAR IS GOING TO EXPLODE.
THIS CAR IS A DEATH TRAP. *LA  NHTSA ID Number:
10082289.

296.    In August 2004, Old GM became aware of a complaint filed with NHTSA

regarding a 2004 Chevrolet Malibu incident that occurred on June 30, 2004, in which it was

reported that:

WHILE TRAVELING AT ANY SPEED VEHICLE STALLED.
WITHOUT CONSUMER HAD SEVERAL CLOSE CALLS OF
BEING REAR ENDED. VEHICLE WAS SERVICED SEVERAL
TIMES, BUT PROBLEM RECURRED. *AK.  NHTSA ID
Number:  10089418.

297.    Another report in August of 2004 which Old GM became aware of involved a

2004 Chevrolet Malibu incident that occurred on August 3, 2004, in which it was reported that:

WHEN DRIVING, THE VEHICLE TO CUT OFF. THE DEALER
COULD NOT FIND ANY DEFECTS. *JB.  NHTSA ID
Number: 10087966.

298.    On October 23, 2004, Old GM became aware of a complaint with NHTSA

regarding a 2003 Chevrolet Monte Carlo, in which the following was reported:

VEHICLE CONTINUOUSLY EXPERIENCED AN
ELECTRICAL SYSTEM FAILURE. AS A RESULT,
THERE'WAS AN ELECTRICAL SHUT DOWN WHICH
RESULTED IN THE ENGINE DYING/ STEERING WHEEL
LOCKING UP, AND LOSS OF BRAKE POWER.*AK  NHTSA
ID Number: 10044624.

299.    On April 26, 2005, Old GM became aware of a complaint filed with NHTSA

involving a 2005 Pontiac Grand Prix, pertaining to an incident that occurred on December 29,

2004, in which the following was reported:

2005 PONTIAC GRAND PRIX GT SEDAN VIN #[XXX]
PURCHASED 12/16/2004. INTERMITTENTLY VEHICLE
STALLS/ LOSS OF POWER IN THE ENGINE. WHILE
DRIVING THE VEHICLE IT WILL SUDDENLY JUST LOSES

POWER. YOU CONTINUE TO PRESS THE ACCELERATOR
PEDAL AND THEN THE ENGINE WILL SUDDENLY TAKE
BACK OFF AT A GREAT SPEED. THIS HAS HAPPENED
WHILE DRIVING NORMALLY WITHOUT TRYING TO
ACCELERATE AND ALSO WHILE TRYING TO
ACCELERATE. THE CAR HAS LOST POWER WHILE
TRYING TO MERGE IN TRAFFIC. THE CAR HAS LOST
POWER WHILE TRYING TO CROSS HIGHWAYS. THE CAR
HAS LOST POWER WHILE JUST DRIVING DOWN THE
ROAD. GMC HAS PERFORMED THE FOLLOWING REPAIRS
WITHOUT FIXING THE PROBLEM. 12/30/2004 [XXX]-
MODULE, POWERTRAIN CONTROL-ENGINE
REPROGRAMMING. 01/24/2005 [XXX]-SOLENOID,
PRESSURE CONTROL-REPLACED. 02/04/2005 [XXX]-
MODULE, PCM/VCM-REPLACED. 02/14/2005 [XXX]-PEDAL,
ACCELERATOR-REPLACED. DEALERSHIP PURCHASED
FROM CAPITAL BUICK-PONTIAC-GMC 225-293-3500.
DEALERSHIP HAS ADVISED THAT THEY DO NOT KNOW
WHAT IS WRONG WITH THE CAR. WE HAVE BEEN TOLD
THAT WE HAVE TO GO DIRECT TO PONTIAC WITH THE
PROBLEM. HAVE BEEN IN CONTACT WITH PONTIAC
SINCE 02/15/05. PONTIAC ADVISED THAT THEY WERE
GOING TO RESEARCH THE PROBLEM AND SEE IF ANY
OTHER GRAND PRI WAS REPORTING LIKE PROBLEMS.
SO FAR THE ONLY ADVICE FROM PONTIAC IS THEY
WANT US TO COME IN AND TAKE ANOTHER GRAND
PRIX OFF THE LOT AND SEE IF WE CAN GET THIS CAR
TO DUPLICATE THE SAME PROBLEM. THIS DID NOT
IMPRESS ME AT ALL. SO AFTER WAITING FOR 2-1/2
MONTHS FOR PONTIAC TO DO SOMETHING TO FIX THE
PROBLEM, I HAVE DECIDED TO REPORT THIS TO NHTSA.
*AK *JS INFORMATION REDACTED PURSUANT TO THE
FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C.
552(B)(6)  NHTSA ID Number: 10118501.

300.    In May 2005, Old GM became aware of a complaint filed with NHTSA regarding

a 2004 Chevrolet Malibu incident that occurred on July 18, 2004, in which it was reported that:

THE CAR CUT OFF WHILE I WAS DRIVING AND IN
HEAVY TRAFFIC MORE THAN ONCE. THERE WAS NO
WARNING THAT THIS WOULD HAPPEN. THE CAR WAS
SERVICED BEFORE FOR THIS PROBLEM BUT IT
CONTINUED TO HAPPEN. I HAVE HAD 3 RECALLS, THE
HORN FUSE HAS BEEN REPLACED TWICE, AND THE
BLINKER IS CURRENTLY OUT. THE STEERING COLLAR
HAS ALSO BEEN REPLACED. THIS CAR WAS SUPPOSED
TO BE A NEW CAR.  NHTSA ID Number: 10123684.

- 72 -

301.    On June 2, 2005, Old GM became aware of a complaint with NHTSA regarding a

2004 Pontiac Grand Am incident that occurred on February 18, 2005, in which the following was

reported:

> 2004 PONTIAC GRAND PRIX SHUTS DOWN WHILE
> DRIVING AND THE POWER STEERING AND BRAKING
> ABILITY ARE LOST.*MR *NM.  NHTSA ID
> Number: 10124713.

302.    On August 12, 2005, Old GM became aware of a complaint filed with NHTSA

involving a 2003 Cadillac CTS, regarding an incident that occurred on January 3, 2005, in which

it was reported that:

> DT: VEHICLE LOST POWER WHEN THE CONSUMER HIT
> THE BRAKES. THE TRANSMISSION JOLTS AND THEN THE
> ENGINE SHUTS OFF. IT HAS BEEN TO THE DEALER 6
> TIMES SINCE JANUARY. THE DEALER TRIED
> SOMETHING DIFFERENT EVERY TIME SHE TOOK IT IN.
> MANUFACTURER SAID SHE COULD HAVE A NEW
> VEHICLE IF SHE PAID FOR IT. SHE WANTED TO GET RID
> OF THE VEHICLE.*AK THE CHECK ENGINE LIGHT
> ILLUMINATED. *JB  NHTSA ID Number: 10127580.

303.    On August 26, 2005, Old GM became aware of a complaint with NHTSA

regarding a 2004 Pontiac Grand Am incident that occurred on August 26, 2005, in which the

following was reported:

> WHILE DRIVING MY 2004 PONTIAC GRAND AM THE CAR
> FAILED AT 30 MPH. IT COMPLETELY SHUT OFF LEAVING
> ME WITH NO POWER STEERING AND NO WAY TO
> REGAIN CONTROL OF THE CAR UNTIL COMING TO A
> COMPLETE STOP TO RESTART IT. ONCE I HAD STOPPED
> IT DID RESTART WITHOUT INCIDENT. ONE WEEK LATER
> THE CAR FAILED TO START AT ALL NOT EVEN TURNING
> OVER. WHEN THE PROBLEM WAS DIAGNOSED AT THE
> GARAGE IT WAS FOUND TO BE A FAULTY "IGNITION
> CONTROL MODULE" IN THE CAR. AT THIS TIME THE
> PART WAS REPLACED ONLY TO FAIL AGAIN WITHIN 2
> MONTHS TIME AGAIN WHILE I WAS DRIVING THIS TIME
> IN A MUCH MORE HAZARDOUS CONDITION BEING THAT
> I WAS ON THE HIGHWAY AND WAS TRAVELING AT 50
> MPH AND HAD TO TRAVEL ACROSS TWO LANES OF

- 73 -

TRAFFIC TO EVEN PULL OVER TO TRY TO RESTART IT.
THE CAR CONTINUED TO START AND SHUT OFF ALL
THE WAY TO THE SERVICE GARAGE WHERE IT WAS
AGAIN FOUND TO BE A FAULTY "IGNITION CONTROL
MODULE". IN ANOTHER TWO WEEKS TIME THE CAR
FAILED TO START AND WHEN DIAGNOSED THIS TIME IT
WAS SAID TO HAVE "ELECTRICAL PROBLEMS"
POSSIBLE THE "POWER CONTROL MODULE". AT THIS
TIME THE CAR IS STILL UNDRIVEABLE AND UNSAFE
FOR TRAVEL. *JB  NHTSA ID Number: 10134303.

304.    On April 18, 2007, Old GM became aware of a complaint filed with NHTSA

involving a 2004 Cadillac SRX, regarding an incident that occurred on April 13, 2007, in which

it was reported that:

TL*THE CONTACT OWNS A 2004 CADILLAC SRX. THE
ENGINE STALLED WITHOUT WARNING AND CAUSED
ANOTHER VEHICLE TO CRASH INTO THE VEHICLE. THE
VEHICLE WAS ABLE TO RESTART A FEW MINUTES
AFTER THE CRASH. THE DEALER AND MANUFACTURER
WAS UNABLE TO DIAGNOSE THE FAILURE. THE
MANUFACTURER HAD THE VEHICLE INSPECTED BY A
CADILLAC SPECIALIST WHO WAS UNABLE TO
DIAGNOSE THE FAILURE. THE DEALER UPDATED THE
COMPUTER FOUR TIMES, BUT THE ENGINE CONTINUED
TO STALL. THE CURRENT AND FAILURE MILEAGES
WERE 48,000.  NHTSA ID Number: 10188245.

305.    On September 20, 2007, Old GM became aware of a complaint filed with

NHTSA involving a 2007 Cadillac CTS, in connection with an incident that occurred on

January 1, 2007, in which it was reported that:

TL*THE CONTACT OWNS A 2007 CADILLAC CTS. WHILE
DRIVING 40 MPH, THE VEHICLE SHUT OFF WITHOUT
WARNING. THE FAILURE OCCURRED ON FIVE SEPARATE
OCCASIONS. THE DEALER WAS UNABLE TO DUPLICATE
THE FAILURE. AS OF SEPTEMBER 20, 2007, THE DEALER
HAD NOT REPAIRED THE VEHICLE. THE POWERTRAIN
WAS UNKNOWN. THE FAILURE MILEAGE WAS 2,000 AND
CURRENT MILEAGE WAS 11,998.  NHTSA ID Number:
10203516.

306. On September 24, 2007, Old GM became aware of a complaint filed with

NHTSA involving a 2004 Cadillac SRX, regarding an incident that occurred on January 1, 2005,

in which the following was reported:

> TL*THE CONTACT OWNS A 2004 CADILLAC SRX. WHILE
> DRIVING 5 MPH OR GREATER, THE VEHICLE WOULD
> SHUT OFF WITHOUT WARNING. THE DEALER STATED
> THAT THE BATTERY CAUSED THE FAILURE AND THEY
> REPLACED THE BATTERY. APPROXIMATELY EIGHT
> MONTHS LATER, THE FAILURE RECURRED. THE DEALER
> STATED THAT THE BATTERY CAUSED THE FAILURE
> AND REPLACED IT A SECOND TIME. APPROXIMATELY
> THREE MONTHS LATER, THE FAILURE OCCURRED
> AGAIN. SHE WAS ABLE TO RESTART THE VEHICLE. THE
> DEALER WAS UNABLE TO DUPLICATE THE FAILURE,
> HOWEVER, THEY REPLACED THE CRANK SHAFT
> SENSOR. THE FAILURE CONTINUES TO PERSIST. AS OF
> SEPTEMBER 24, 2007, THE DEALER HAD NOT REPAIRED
> THE VEHICLE. THE POWERTRAIN WAS UNKNOWN. THE
> FAILURE MILEAGE WAS 8,000 AND CURRENT MILEAGE
> WAS 70,580.  NHTSA ID Number: 10203943.

307. On June 18, 2008, Old GM became aware of a complaint filed with NHTSA

involving a 2006 Cadillac CTS and an incident that occurred on June 17, 2008, in which it was

reported that:

> TL*THE CONTACT OWNS A 2006 CADILLAC CTS. WHILE
> DRIVING 60 MPH AT NIGHT, THE VEHICLE SHUT OFF
> AND LOST TOTAL POWER. WHEN THE FAILURE
> OCCURRED, THE VEHICLE CONTINUED TO ROLL AS IF IT
> WERE IN NEUTRAL. THERE WERE NO WARNING
> INDICATORS PRIOR TO THE FAILURE. THE CONTACT
> FEELS THAT THIS IS A SAFETY HAZARD BECAUSE IT
> COULD HAVE RESULTED IN A SERIOUS CRASH. THE
> VEHICLE WAS TAKEN TO THE DEALER TWICE FOR
> REPAIR FOR THE SAME FAILURE IN FEBURARY OF 2008
> AND JUNE 17, 2008. THE FIRST TIME THE CAUSE OF THE
> FAILURE WAS IDENTIFIED AS A GLITCH WITH THE
> COMPUTER SWITCH THAT CONTROLS THE
> TRANSMISSION. AT THE SECOND VISIT, THE SHOP
> EXPLAINED THAT THEY COULD NOT IDENTIFY THE
> FAILURE. IT WOULD HAVE TO RECUR IN ORDER FOR
> THEM TO DIAGNOSE THE FAILURE PROPERLY. THE

CURRENT AND FAILURE MILEAGES WERE 43,000.
NHTSA ID Number: 10231507.

308.    On November 13, 2008, Old GM became aware of a complaint with NHTSA

regarding a 2001 Oldsmobile Intrigue, in which the following was reported:

> L*THE CONTACT OWNS A 2001 OLDSMOBILE INTRIGUE.
> WHILE DRIVING 35 MPH, THE VEHICLE CONTINUOUSLY
> STALLS AND HESITATES. IN ADDITION, THE
> INSTRUMENT PANEL INDICATORS WOULD ILLUMINATE
> AT RANDOM. THE VEHICLE FAILED INSPECTION AND
> THE CRANKSHAFT SENSOR WAS REPLACED, WHICH
> HELPED WITH THE STALLING AND HESITATION;
> HOWEVER, THE CHECK ENGINE INDICATOR WAS STILL
> ILLUMINATED. DAYS AFTER THE CRANKSHAFT SENSOR
> WAS REPLACED, THE VEHICLE FAILED TO START.
> HOWEVER, ALL OF THE INSTRUMENT PANEL
> INDICATORS FLASHED ON AND OFF. AFTER NUMEROUS
> ATTEMPTS TO START THE VEHICLE, HE HAD IT
> JUMPSTARTED. THE VEHICLE WAS THEN ABLE TO
> START. WHILE DRIVING HOME, ALL OF THE LIGHTING
> FLASHED AND THE VEHICLE SUDDENLY SHUT OFF. THE
> VEHICLE LOST ALL ELECTRICAL POWER AND POWER
> STEERING ABILITY. THE CONTACT MANAGED TO PARK
> THE VEHICLE IN A PARKING LOT AND HAD IT TOWED
> THE FOLLOWING DAY TO A REPAIR SHOP. THE VEHICLE
> IS CURRENTLY STILL IN THE SHOP. THE VEHICLE HAS
> BEEN RECALLED IN CANADA AND HE BELIEVES THAT IT
> SHOULD ALSO BE RECALLED IN THE UNITED STATES.
> THE FAILURE MILEAGE WAS UNKNOWN AND THE
> CURRENT MILEAGE WAS 106,000.  NHTSA ID
> Number: 10248694.

309.    On December 10, 2008, Old GM became aware of a complaint filed with NHTSA

regarding a 2004 Oldsmobile Alero and an incident that occurred on December 10, 2008, in

which the following was reported:

> I WAS DRIVING DOWN THE ROAD IN RUSH HOUR GOING
> APPROX. 55 MPH AND MY CAR COMPLETELY SHUT OFF,
> THE GAUGES SHUT DOWN, LOST POWER STEERING. HAD
> TO PULL OFF THE ROAD AS SAFELY AS POSSIBLE,
> PLACE VEHICLE IN PARK AND RESTART CAR. MY CAR
> HAS SHUT DOWN PREVIOUSLY TO THIS INCIDENT AND
> FEEL AS THOUGH IT NEEDS SERIOUS INVESTIGATION. I
> COULD HAVE BEEN ON THE HIGHWAY AND BEEN

> KILLED. THIS ALSO HAS HAPPENED WHEN IN A SPIN
> OUT AS WELL THOUGH THIS PARTICULAR INCIDENT
> WAS RANDOM. *TR  NHTSA ID Number: 10251280.

310.    On March 31, 2009, Old GM became aware a complaint filed with NHTSA

regarding a 2005 Chevrolet Malibu incident that occurred on May 30, 2008, in which it was

reported that:

> TL*THE CONTACT OWNS A 2005 CHEVROLET MALIBU.
> THE CONTACT STATED THAT THE POWER WINDOWS,
> LOCKS, LINKAGES, AND IGNITION SWITCH
> SPORADICALLY BECOME INOPERATIVE. SHE TOOK THE
> VEHICLE TO THE DEALER AND THEY REPLACED THE
> IGNITION SWITCH AT THE COST OF $495. THE
> MANUFACTURER STATED THAT THEY WOULD NOT
> ASSUME RESPONSIBILITY FOR ANY REPAIRS BECAUSE
> THE VEHICLE EXCEEDED ITS MILEAGE. ALL REMEDIES
> AS OF MARCH 31, 2009 HAVE BEEN INSUFFICIENT IN
> CORRECTING THE FAILURES. THE FAILURE MILEAGE
> WAS 45,000 AND CURRENT MILEAGE WAS 51,000.  NHTSA
> ID Number: 10263716.

311.    The defects did not get fixed and the reports did not stop when Old GM ceased to

exist.  To the contrary, New GM continued receiving the same reports involving the same

defects.  For example, on August 11, 2010, New GM became aware of the following complaint

filed with NHTSA involving a 2005 Cadillac CTS, the incident occurred on May 15, 2010, in

which it was reported:

> TL*THE CONTACT OWNS A 2005 CADILLAC CTS. WHILE
> DRIVING 40 MPH, ALL OF THE SAFETY LIGHTS ON THE
> DASHBOARD ILLUMINATED WHEN THE VEHICLE
> STALLED. THE VEHICLE WAS TURNED BACK ON IT
> BEGAN TO FUNCTION NORMALLY. THE FAILURE
> OCCURRED TWICE. THE DEALER WAS CONTACTED AND
> THEY STATED THAT SHE NEEDED TO BRING IT IN TO
> HAVE IT DIAGNOSED AGAIN. THE DEALER PREVIOUSLY
> STATED THAT THEY WERE UNABLE TO DUPLICATE THE
> FAILURE. THE VEHICLE WAS NOT REPAIRED. THE
> FAILURE MILEAGE WAS 4100 AND THE CURRENT
> MILEAGE WAS 58,000.  NHTSA ID Number: 10348743.

312.    On March 20, 2013, New GM became aware of a complaint filed with NHTSA

regarding a 2003 Chevrolet Impala incident that occurred on March 1, 2013, in which it was

reported that:

> CAR WILL SHUT DOWN WHILE DRIVING AND SECURITY
> LIGHT WILL FLASH. HAS DONE IT NUMEROUS TIMES,
> WORRIED IT WILL CAUSE AN ACCIDENT. THERE ARE
> MULTIPLE CASES OF THIS PROBLEM ON INTERNET. *TR
> NHTSA ID Number: 10503840.

313.    On February 26, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2004 Pontiac Grand Prix, concerning an incident that occurred on May 10, 2005, in

which it was reported that:

> TL – THE CONTACT OWNS A 2004 PONTIAC GRAND PRIX.
> THE CONTACT STATED THAT WHILE DRIVING AT
> VARIOUS SPEEDS AND GOING OVER A BUMP, THE
> VEHICLE WOULD STALL WITHOUT WARNING. THE
> VEHICLE WAS TAKEN TO THE DEALER. THE
> TECHNICIAN WAS UNABLE TO DIAGNOSE THE FAILURE.
> THE MANUFACTURER WAS MADE AWARE OF THE
> FAILURE. THE VEHICLE WAS NOT REPAIRED. THE VIN
> WAS NOT AVAILABLE. THE FAILURE MILEAGE WAS
> 12,000 AND THE CURRENT MILEAGE WAS 82,000. KMJ
> NHTSA ID Number: 10566118.

314.    On March 13, 2014, New GM became aware of a complaint filed with NHTSA

involving a 2006 Pontiac Grand Prix and an incident that occurred on February 27, 2014, in

which a driver reported:

> I WAS DRIVING HOME FROM WORK AND WHEN I
> TURNED A CORNER, THE ENGINE CUT OUT. I BELIEVE IT
> WAS FROM THE KEY FLIPPING TO ACCESSORY. I'VE
> HEARD THAT THIS HAS CAUSED CRASHES THAT HAVE
> KILLED PEOPLE AND WOULD LIKE THIS FIXED. THIS IS
> THE FIRST TIME IT HAPPENED, BUT NOW I'M WORRIED
> EVERY TIME I DRIVE IT THAT THIS IS GOING TO HAPPEN
> AND I DON'T FEEL SAFE LETTING MY WIFE DRIVE THE
> CAR NOW. WHY ARE THE 2006 PONTIAC GRAND PRIX
> VEHICLES NOT PART OF THE RECALL FROM GM? *TR
> NHTSA ID Number: 10569215.

315.    On April 1, 2014, New GM became aware of a complaint filed with NHTSA involving a 2003 Cadillac CTS and an incident that occurred on January 1, 2008, in which the following was reported:

> TL* THE CONTACT OWNS A 2003 CADILLAC CTS. THE CONTACT STATED THAT THE VEHICLE EXHIBITED A RECURRING STALLING FAILURE. THE VEHICLE WAS TAKEN TO THE DEALER NUMEROUS TIMES WHERE SEVERAL UNKNOWN REPAIRS WERE PERFORMED ON THE VEHICLE BUT TO NO AVAIL. THE FAILURE MILEAGE WAS 59,730 AND THE CURRENT MILEAGE WAS 79,000. UPDATED 06/30/14 MA UPDATED 07/3/2014 *JS NHTSA ID Number: 10576468.

316.    On April 1, 2014, New GM became aware of a complaint with NHTSA regarding a 2003 Chevrolet Monte Carlo and an incident that occurred on September 16, 2013, in which the following was reported:

> WHILE DRIVING AT ANY SPEED THE IGNITION SYSTEM WOULD RESET LIGHTING UP THE DISPLAY CLUSTER JUST AS IF THE KEY WAS TURNED OFF AND BACK ON. THIS WOULD CAUSE A MOMENTARY SHUTDOWN OF THE ENGINE. THE PROBLEM SEEMED TO BE MORE PREVAILANT WHILE TURNING THE WHEEL FOR A CURVE OR TURN OFF THE ROAD. THE TURN SIGNAL UNIT WAS FIRST SUSPECT SINCE IT SEEMED TO CORRELATE WITH APPLYING THE TURN SIGNAL AND TURNING THE WHEEL. THE CONDITION WORSENED TO THE IGNITION SHUTDOWN FOR LONGER PERIODS SHUTTING DOWN THE ENGINE CAUSING STEERING AND BRAKING TO BE SHUT DOWN AND FINALLY DIFFICULTY STARTING THE CAR. AFTER 2 VISITS TO A GM SERVICE CENTER THE PROBLEM WAS FOUND TO BE A FAULTY IGNITION THAT WAS REPLACED AND THE PROBLEM HAS NOT RECURRED.  NHTSA ID Number: 10576201.

317.    On April 8, 2014, New GM became aware of a complaint with NHTSA regarding a 2003 Chevrolet Impala and an incident that occurred on August 14, 2011 and the following was reported:

> I HAVE HAD INCIDENTS SEVERAL TIMES OVER THE YEARS WHERE I WOULD HIT A BUMP IN THE ROAD AND

- 79 -

> MY CAR WOULD COMPLETLY SHUT OFF. I HAVE ALSO
> HAD SEVERAL INCIDENTS WHERE I WAS TRAVELING
> DOWN THE EXPRESSWAY AND MY CAR TURNED OFF ON
> ME. I HAD TO SHIFT MY CAR INTO NEUTRAL AND
> RESTART IT TO CONTINUE GOING. I WAS FORTUNATE
> NOT TO HAVE AN ACCIDENT.  NHTSA ID
> Number: 10578158.

318.    New GM has publicly admitted that it was aware of at least seven crashes, eight

injuries, and three deaths linked to this serious safety defect before it finally decided to recall

these dangerously defective vehicles.  However, in reality, the number of reports and complaints

is much higher.

319.    Notwithstanding years of notice and knowledge of the defect, New GM delayed

and did not implement a recall involving this defect until July of 2014.

320.    New GM's supposed recall fix does not address the defect or the safety risks that

it poses, including insufficient amount of torque to resist rotation from the "run" to "accessory"

position under reasonably foreseeable conditions, and puts the burden on drivers to alter their

behavior and carry their ignition keys separately from their other keys, and even from their

remote fob.  The real answer must include the replacement of all the switches with ones that have

sufficient torque to resist foreseeable rotational forces.

321.    In addition, New GM is not addressing the other design issues that create safety

risks in connection with this defect.  New GM is not altering the algorithm that prevents the

airbags from deploying when the ignition leaves the "run" position, even when the vehicle is

moving.  And New GM is not altering the placement of the ignition in an area where the driver's

knees may inadvertently cause the ignition to move out of the "run" position.

010440-13  732514 V1

**7.    Yet another ignition switch recall is made on September 4, 2014.**

322.    On September 4, 2014, New GM recalled 46,873 MY 2011-2013 Chevrolet Caprice and 2008-2009 Pontiac G8 vehicles for yet another ignition switch defect (NHTSA Recall Number 14-V-510).

323.    New GM explains that, in these Defective Ignition Switch Vehicles, "there is a risk, under certain conditions, that some drivers may bump the ignition key with their knee and unintentionally move the key away from the 'run' position." New GM admits that, when this happens, "engine power, and power braking will be affected, increasing the risk of a crash." Moreover, "[t]he timing of the key movement out of the 'run' position, relative to the activation of the sending algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes."[58]

324.    This recall is directly related to the other ignition switch recalls and involves the same safety risks and dangers. The defect poses a serious and dangerous safety risk because the key in the ignition switch can rotate and consequently cause the ignition to switch from the "on" or "run" position to the "off" or "accessory" position, which causes the loss of engine power, stalling, loss of speed control, loss of power steering, loss of power braking, and increases the risk of a crash. Moreover, as with the ignition switch torque defect, if a crash occurs, the airbags may not deploy.

325.    Consistent with its pattern in the June and July recalls, New GM's proposed remedy is to provide these Defective Ignition Switch Vehicle owners with a "revised key blade and housing assembly, in which the blade has been indexed by 90 degrees."[59] Until the remedy is provided, New GM asserts, "it is very important that drivers adjust their seat and steering

---

[58] New GM's Part 573 Safety Recall Report, Sept. 4, 2014.

column to allow clearance between their knee and the ignition key."[60]  New GM sent its recall

notice to NHTSA one week later, on September 4, 2014.

326.    New GM's supposed fix does not address the defect or the safety risks that the

defect poses, including the apparent insufficient torque to resist rotation from the "run" to the

"accessory" position under reasonably foreseeable driving conditions, and puts the burden on

drivers to alter their behavior and carry their ignition keys separately from their other keys, and

even from their remote fob.  The real answer must include the replacement of all the switches

with ones that have sufficient torque to resist foreseeable rotational forces.

327.    New GM is not addressing the other design issues that create safety risks in

connection with this defect.  New GM is not altering the algorithm that prevents the airbags from

deploying when the ignition leaves the "run" position, even when the vehicle is moving.  And

New GM is not altering the placement of the ignition in an area where the driver's knee may

inadvertently cause the ignition to move out of the "run" position.

328.    The September 4th recall is, like the earlier defective ignition switch recalls, too

little and too late.

329.    Recently discovered evidence reveals that, on December 18, 2013, New GM sent

an "urgent" order to its parts supplier Delphi for 500,000 ignition switches (part number

10392423).  The order was highly unusual because Delphi had shipped only 11,445 ignition

switches to GM the prior year, and GM was asking Delphi to start shipments immediately.  By

sending this emergency order, New GM implicitly admitted that its ignition switches on the

relevant vehicles being driven by Arizona consumers and other consumers throughout the

country were defective and constituted  a safety-related concern that these vehicles were

---

[59] New GM's Part 573 Safety Recall Report, Sept. 4, 2014.

[60] *Id.*

dangerously unsafe and unreliable. New GM, however, intentionally concealed from Arizona

consumers and NHTSA both its knowledge of this dangerous defect and its emergency order for

half-a-million replacement parts, deliberately not alerting NHTSA for another two months,

despite New GM's legal obligation to do so within five days of determining that a defect is

safety-related (*see* 49 C.F.R. § 573.6).

**F.    Other Safety and Important Defects Affecting Numerous GM-branded Vehicles.**

330.    As if the many recalls for ignition switch defects was not enough to taint New

GM's brand and put the lie to New GM's repeated statements that it values safety and reliability

above all else, New GM has been forced to issue scores of other recalls this year involving

myriad serious safety defects in a wide range of GM-branded vehicles—many of which defects

were known to New GM for years.

331.    Moreover, New GM's ongoing and systemic devaluation of safety issues has

given rise to a host of new Defective Ignition Switch Vehicles created by New GM.

332.    Many (but by no means all) of the serious defects revealed in New GM's never-

ending series of recalls are discussed below.

**1.    Other safety defects affecting the ignition in GM-branded vehicles.**

**a.    Ignition lock cylinder defect in vehicles also affected by the ignition
switch defect that gave rise to the first recall of 2.1 million defective
ignition switch vehicles.**

333.    On April 9, 2014, New GM recalled 2,191,014 GM-branded vehicles with faulty

ignition lock cylinders.[61]  Though the vehicles are the same as those affected by the ignition

switch torque defect,[62] the lock cylinder defect is distinct.

---

[61] New GM Letter to NHTSA dated April 9, 2014.

[62] Namely, MY 2005-2010 Chevrolet Cobalts, 2006-2011 Chevrolet HHRs, 2007-2010
Pontiac G5s, 2003-2007 Saturn Ions, and 2007-2010 Saturn Skys.  *See id.*

334.    In these vehicles, faulty ignition lock cylinders can allow removal of the ignition key while the engine is not in the "off" position.  If the ignition key is removed when the ignition is not in the "off" position, unintended vehicle motion may occur.  That could cause a crash and injury to the vehicle's occupants or pedestrians.  Some of the vehicles with faulty ignition lock cylinders may fail to conform to Federal Motor Vehicle Safety Standard number 114, "*Theft Prevention and Rollaway Prevention.*"[63]

335.    The available evidence is that New GM was aware of this "key pullout defect" from the date of its inception on July 11, 2009.

> **b.    Ignition lock cylinder defect affecting over 200,000 additional GM-branded vehicles.**

336.    On August 7, 2014, New GM recalled 202,155 MY 2002-2004 Saturn Vue vehicles.[64]  In the affected vehicles, the ignition key can be removed when the vehicle is not in the "off" position.[65]  If this happens, the vehicle can roll away, increasing the risk for a crash and occupant or pedestrian injuries.[66]

337.    Following New GM's April 9, 2014 recall announcement regarding ignition switch defects, New GM reviewed field and warranty data for potential instances of ignition cylinders that permit the operator to remove the ignition key when the key is not in the "off" position in other vehicles outside of those already recalled.[67]  New GM identified 152 reports of

---

[63] New GM Notice to NHTSA dated April 9, 2014, at 1.

[64] *See* August 7, 2014 Letter from New GM to NHTSA.

[65] *Id.*

[66] *Id.*

[67] *Id.*

vehicle roll away and/or ignition keys being removed when the key is not in the "off" position in the 2002-2004 MY Saturn Vue vehicles.[68]

### 2. Defects affecting the occupant safety restraint system in GM-branded vehicles.

#### a. Safety defects of the airbag systems of GM-branded vehicles.

##### (1) Wiring harness defect.

338.    On March 17, 2014, New GM recalled nearly 1.2 million vehicles, including the model year 2008-2013 Buick Enclave, 2009-2013 Chevrolet Traverse, 2008-2013 GMC Acadia, and 2008-2010 Saturn Outlook, for a dangerous defect involving airbags and seatbelt pretensioners.

339.    The affected vehicles were sold with defective wiring harnesses.  Increased resistance in the wiring harnesses of driver and passenger seat-mounted, side-impact airbag in the affected vehicles may cause the side impact airbags, front center airbags, and seat belt pretensioners to not deploy in a crash.  The vehicles' failure to deploy airbags and pretensioners in a crash increases the risk of injury and death to the drivers and front-seat passengers.

340.    Once again, the available evidence shows that New GM knew of the dangerous airbag defect long before it took anything approaching the requisite remedial action.

##### (2) Driver-side airbag shorting-bar defect.

341.    On June 5, 2014, New GM issued a safety recall of 38,636 MY 2012 Chevrolet Cruze, 2012 Chevrolet Camaro, 2012 Chevrolet Sonic, and 2012 Buick Verano vehicles with a driver's airbag shorting bar defect.

342.    In the affected vehicles, the driver side frontal airbag has a shorting bar which may intermittently contact the airbag terminals.  If the bar and terminals are contacting each other at the time of a crash, the airbag will not deploy, increasing the driver's risk of injury.  New

---

[68] *Id.*

- 85 -

GM admits awareness of one crash with an injury where the relevant diagnostic trouble code was found at the time the vehicle was repaired.  New GM is aware of other crashes involving these vehicles where airbags did not deploy but claims not to know if they were related to this defect.

343.    New GM knew about the driver's airbag shorting bar defect in 2012.  In fact, New GM conducted two previous recalls in connection with the shorting bar defect condition involving 7,116 vehicles—one on October 31, 2012, and one on January 24, 2013.[69]  Yet it would take New GM nearly two years to finally order a broader recall.

### (3)    Driver-side airbag inflator defect.

344.    On June 25, 2014, New GM recalled 29,019 MY 2013-2014 Chevrolet Cruze vehicles with a driver-side airbag inflator defect.

345.    In the affected vehicles, the driver's front airbag inflator may have been manufactured with an incorrect part.  In the event of a crash necessitating deployment of the driver-side airbag, the airbag's inflator may rupture and the airbag may not inflate.  The rupture could cause metal fragments to strike and injure the vehicle's occupants.  Additionally, if the airbag does not inflate, the driver will be at increased risk of injury.[70]

### (4)    Roof-rail airbag defect.

346.    On June 18, 2014, New GM recalled 16,932 MY 2011 Cadillac CTS vehicles with a roof-rail airbag defect.

347.    In the affected vehicles, vibrations from the drive shaft may cause the vehicle's roll over sensor to command the roof rail airbags to deploy.  If the roof rail airbags deploy unexpectedly, there is an increased risk of crash and injury to the occupants.[71]

---

[69] *See* New GM's Letters to NHTSA dated October 31, 2012 and January 24, 2013, respectively.

[70] *See* New GM's Letter to NHTSA dated June 25, 2014.

[71] *See* June 18, 2014 New GM Letter to NHTSA.

010440-13 732514 V1

348.    Yet again, the available evidence shows that New GM was aware of this defect for years before finally taking steps to remedy it in June of 2014.

### (5)    Passenger-side airbag defect.

349.    On May 16, 2014, GM recalled 1,953 MY 2015 Cadillac Escalade and Escalade ESV vehicles with a passenger-side airbag defect.

350.    The affected vehicles do not conform to Federal Motor Vehicle Safety Standard number 208, "Occupant Crash Protection."  In these vehicles, the airbag module is secured to a chute adhered to the backside of the instrument panel with an insufficiently heated infrared weld. As a result, the front passenger-side airbag will only partially deploy in the event of crash, and this will increase the risk of occupant injury.[72]

### (6)    Sport seat side-impact airbag defect.

351.    On June 18, 2014, New GM issued a safety recall for 712 MY 2014 Chevrolet Corvette vehicles with a sport seat side-impact airbag defect.

352.    The affected vehicles do not meet a Technical Working Group Side Airbag Injury Assessment Reference Value specifications for protecting unbelted, out-of-position young children from injury.  In a crash necessitating side impact airbag deployment, an unbelted, out-of-position three-year-old child may be at an increased risk of neck injury.

### (7)    Passenger-side airbag inflator defect.

353.    On June 5, 2014, New GM recalled 61 MY 2013 Chevrolet Spark and 2013 Buick Encore vehicles with a passenger side airbag inflator defect.

---

[72] *See* May 16, 2014 Letter from New GM to NHTSA.

354.    In the affected vehicles, because of an improper weld, the front passenger airbag end cap could separate from the airbag inflator.  This can prevent the airbag from deploying properly, and creates an increased risk of injury to the front passenger.[73]

**(8)    Front passenger airbag defect.**

355.    On March 17, 2014, New GM issued a noncompliance recall of 303,013 MY 2009-2014 GMC Savana vehicles with a passenger-side instrument panel defect.[74]

356.    In the affected vehicles, in certain frontal impact collisions below the airbag deployment threshold, the panel covering the airbag may not sufficiently absorb the impact of the collision.  These vehicles therefore do not meet the requirements of Federal Motor Vehicle Safety Standard number 201, "Occupant Protection in Interior Impact."[75]

357.    The defect apparently arose in early 2009, when the passenger-side airbag housing was changed from steel to plastic.[76]  Inexplicably, New GM did not act to remedy this defect until March of 2014.

**b.    Safety defects of the seat belt systems in GM-branded vehicles.**

**(1)    Seat belt connector cable defect.**

358.    On May 20, 2014, New GM issued a safety recall for nearly 1.4 million model year 2009-2014 Buick Enclave,  2009-2014 Chevrolet Traverse, 2009-2014 GMC Acadia, and 2009-2010 Saturn Outlook vehicles with a dangerous safety belt defect.

359.    In the affected vehicles, "[t]he flexible steel cable that connects the safety belt to the vehicle at the outside of the front outside of the front outboard seating positions can fatigue

---

[73] *See* June 5, 2014 Letter from New GM to NHTSA.

[74] *See* March 31, 2014 Letter from New GM to NHTSA.

[75] *Id.*

[76] *Id.*

and separate over time as a result of occupant movement into the seat.  In a crash, a separated cable could increase the risk of injury to the occupant."[77]

360.    New GM waited more than two years after learning about this defect before disclosing it or remedying it.[78]

### (2)    Seat belt retractor defect.

361.    On June 11, 2014, New GM recalled 28,789 MY 2004-2011 Saab 9-3 Convertible vehicles with a seat belt retractor defect.

362.    In the affected vehicles, the driver's side front seat belt retractor may break, causing the seat belt webbing spooled out by the user not to retract.[79]  In the event of a crash, a seat belt that has not retracted may not properly restrain the seat occupant, increasing the risk of injury to the driver.[80]

363.    By September of 2009 New GM was aware of an issue with seat belt retractors in MY 2004 Saab 9-3 vehicles, but waited until June of 2014 before taking steps to fully resolve the issue in all affected vehicles.

### (3)    Frontal lap-belt pretensioner defect.

364.    On August 7, 2014, New GM recalled 48,059 MY 2013 Cadillac ATS and 2013 Buick Encore vehicles with a defect in the front lap-belt pretensioners.[81]

365.    In the affected vehicles, the driver and passenger lap-belt pretensioner cables may not lock in a retracted position; that allows the seat belts to extend when pulled upon.[82]  If the

---

[77] *See* New GM Notice to NHTSA dated May 19, 2014, at 1.

[78] *See* New GM Notice to NHTSA dated May 30, 2014, at 1-3.

[79] *See* New GM's June 11, 2013 Letter to NHTSA.

[80] *See id.*

[81] *See* August 7, 2014 Letter from New GM to NHTSA.

[82] *Id.*

seat belts do not remain locked in the retracted position, the seat occupant may not be adequately restrained in a crash, increasing the risk of injury.[83]

### 3.    Safety defects affecting seats in GM-branded vehicles.

366.    On July 22, 2014, New GM issued a safety recall of 414,333 MY 2010-2012 Chevrolet Equinox, MY 2011-2012 Chevrolet Camaro, MY 2010-2012 Cadillac SRX, MY 2010-2012 GMC Terrain, MY 2011-2012 Buick Regal, and MY 2011-2012 Buick LaCrosse vehicles with a power height adjustable seats defect.[84]

367.    In the affected vehicles, the bolt that secures the height adjuster in the driver and front passenger seats may become loose or fall out.  If the bolt falls out, the seat will drop suddenly to the lowest vertical position.  The sudden drop can affect the driver's ability to safely operate the vehicle, and can increase the risk of injury to the driver and the front-seat passenger if there is an accident.  New GM admits to knowledge of at least one crash caused by this defect.[85]

368.    New GM was aware of this defect by July 10, 2013 when the crash occurred, and by July 22, 2013, New GM was aware that the crash was caused when the bolt on the height adjuster fell out.[86]

369.    Yet New GM waited another year before issuing a safety recall.

---

[83] *Id.*

[84] *See* July 22, 2014 Letter from New GM to NHTSA.

[85] *Id.*

[86] *Id.*

4.      **Safety defects affecting the brakes in GM-branded vehicles.**

a.      **Brake light defect.**

370.    On May 14, 2014, New GM issued a safety recall of approximately 2.4 million

model year 2004-2012 Chevrolet Malibu,  2004-2007 Malibu Maxx,  2005-2010 Pontiac G6, and

2007-2010 Saturn Aura vehicles with a dangerous brake light defect.

371.    In the affected vehicles, the brake lamps may fail to illuminate when the brakes

are applied or illuminate when the brakes are not engaged; the same defect can disable cruise

control, traction control, electronic stability control, and panic brake assist operation, thereby

increasing the risk of collisions and injuries.[87]

372.    Once again, New GM knew of the dangerous brake light defect for years before it

took anything approaching the requisite remedial action.  In fact, although the brake light defect

has caused at least 13 crashes since 2008, New GM did not recall all 2.4 million vehicles with

the defect until May 2014.

b.      **Brake booster pump defect.**

373.    On March 17, 2014, New GM issued a safety recall of 63,903 MY 2013-2014

Cadillac XTS vehicles with a brake booster pump defect.

374.    In the affected vehicles, a cavity plug on the brake boost pump connector may

dislodge and allow corrosion of the brake booster pump relay connector.  This can have an

adverse impact on the vehicle's brakes and increase the risk of collision.  This same defect can

also cause a fire in the vehicle resulting from the electrical shore in the relay connector.

---

[87] *See* New GM Notification Campaign No. 14V-252 dated May 28, 2014, at 1.

c.      **Hydraulic boost assist defect.**

375.      On May 13, 2014, New GM recalled 140,067 model year 2014 Chevrolet Malibu vehicles with a hydraulic brake boost assist defect.[88]

376.      In the affected vehicles, the "hydraulic boost assist" may be disabled; when that happens, slowing or stopping the vehicle requires harder brake pedal force, and the vehicle will travel a greater distance before stopping.  Therefore, these vehicles do not comply with Federal Motor Vehicle Safety Standard number 135, "Light Vehicle Brake Systems," and are at increased risk of collision.[89]

d.      **Brake rotor defect.**

377.      On May 7, 2014, New GM recalled 8,208 MY 2014 Chevrolet Malibu and Buick LaCrosse vehicles with a brake rotor defect.

378.      In the affected vehicles, New GM may have accidentally installed rear brake rotors on the front brakes.  The rear rotors are thinner than the front rotors, and the use of rear rotors in the front of the vehicle may result in a front brake pad detaching from the caliper.  The detachment of a break pad from the caliper can cause a sudden reduction in braking which lengthens the distance required to stop the vehicle and increases the risk of a crash.

e.      **Reduced brake performance defect.**

379.      On July 28, 2014, New GM recalled 1,968 MY 2009-2010 Chevrolet Aveo and 2009 Pontiac G3 vehicles.[90]  Affected vehicles may contain brake fluid which does not protect against corrosion of the valves inside the anti-lock brake system module, affecting the closing

---

[88] *See* May 13, 2014 Letter from New GM to NHTSA.

[89] *Id.*

[90] *See* July 28, 2014 Letter from New GM to NHTSA.

motion of the valves.[91] If the anti-lock brake system valve corrodes it may result in longer brake pedal travel or reduced performance, increasing the risk of a vehicle crash.[92]

380.    New GM was aware of this defect as far back as August 2012, but waited two years before issuing a recall.[93]

### f.    Parking brake defect.

381.    On September 20, 2014, GM recalled more than 221,000 MY 2014-15 Chevrolet Impala and 2013-15 model Cadillac XTS vehicles because of a parking-brake defect.

382.    In the affected vehicles, the brake pads can stay partly engaged, which can lead to "excessive brake heat that may result in a fire," according to documents posted on the NHTSA website.

### 5.    Safety defects affecting the steering in GM-branded vehicles.

### a.    Sudden power-steering failure defect.

383.    Between 2003 and 2010, over 1.3 million GM-branded vehicles in the United States were sold with a safety defect that causes the vehicle's electric power steering ("power steering") to suddenly fail during ordinary driving conditions and revert back to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries.

384.    The affected vehicles are MY 2004-2006 and 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx, 2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2006 and 2008-2009 Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura vehicles.

---

[91] *Id.*

[92] *Id.*

[93] *Id.*

010440-13 732514 V1

385.    As with the ignition switch defects and many of the other defects, New GM was aware of the power steering defect long before it took anything approaching full remedial action.

### b.    Power steering hose clamp defect.

386.    On June 18, 2014, New GM issued a safety recall of 57,192 MY 2015 Chevrolet Silverado 2500/3500 HD and 2015 GMC Sierra 2500/3500 HD vehicles with a power steering hose clamp defect.

387.    In the affected vehicles, the power steering hose clamp may disconnect from the power steering pump or gear, causing a loss of power steering fluid.  A loss of power steering fluid can result in a loss of power steering assist and power brake assist, increasing the risk of a crash.

### c.    Power steering control module defect.

388.    On July 22, 2014, New GM recalled 57,242 MY 2014 Chevrolet Impala vehicles with a Power Steering Control Module defect.

389.    Drivers of the affected vehicles may experience reduced or no power steering assist at start-up or while driving due to a poor electrical ground connection to the Power Steering Control Module.  If power steering is lost, the vehicle will revert to manual steering mode.  Manual steering requires greater driver effort and increases the risk of accident. New GM acknowledges one crash related to this condition.

### d.    Lower control arm ball joint defect.

390.    On July 18, 2014, New GM issued a safety recall of 1,919 MY 2014-2015 Chevrolet Spark vehicles with a lower control arm ball joint defect.

391.    The affected vehicles were assembled with a lower control arm bolt not fastened to specification.  This can cause the separation of the lower control arm from the steering

knuckle while the vehicle is being driven, and result in the loss of steering control.  The loss of

steering control in turn creates a risk of accident.[94]

### e.    Steering tie-rod defect.

392.    On May 13, 2014, New GM issued a safety recall of 477 MY 2014 Chevrolet

Silverado, 2014 GMC Sierra, and 2015 Chevrolet Tahoe vehicles with a steering tie-rod defect.

393.    In the affected vehicles, the tie-rod threaded attachment may not be properly

tightened to the steering gear rack.  An improperly tightened tie-rod attachment may allow the

tie-rod to separate from the steering rack and greatly increases the risk of a vehicle crash.[95]

### f.    Joint fastener torque defect.

394.    On June 30, 2014, New GM issued a safety recall of 106 MY 2014 Chevrolet

Camaro, 2014 Chevrolet Impala, 2014 Buick Regal, and 2014 Cadillac XTS vehicles with a joint

fastener torque defect.

395.    In the affected vehicles, joint fasteners were not properly torqued to specification

at the assembly plant.  As a result of improper torque, the fasteners may "back out" and cause a

"loss of steering," increasing the risk of a crash.[96]

### 6.    Safety defects affecting the powertrain in GM-branded vehicles.

### a.    Transmission shift cable defect affecting 1.1 million Chevrolet and Pontiac vehicles.

396.    On May 19, 2014, New GM issued a safety recall for more than 1.1 million MY

2007-2008 Chevrolet Saturn, 2004-2008 Chevrolet Malibu, 2004-2007 Chevrolet Malibu Maxx,

and 2005-2008 Pontiac G6 vehicles with dangerously defective transmission shift cables.

---

[94] *See* July 18, 2014 Letter from New GM to NHTSA.

[95] *See* May 27, 2014 Letter from New GM to NHTSA.

[96] *See* July 2, 2014 Letter from New GM to NHTSA.

397.    In the affected vehicles, the shift cable may fracture at any time, preventing the driver from switching gears or placing the transmission in the "park" position.  According to New GM, "[i]f the driver cannot place the vehicle in park, and exits the vehicle without applying the park brake, the vehicle could roll away and a crash could occur without prior warning."[97]

398.    Yet again, New GM knew of the shift cable defect long before it issued the recent recall of more than 1.1 million vehicles with the defect.

### b.    Transmission shift cable defect affecting Cadillac vehicles.

399.    On June 18, 2014, New GM issued a safety recall of 90,750 MY 2013-2014 Cadillac ATS and 2014 Cadillac CTS vehicles with a transmission shift cable defect.

400.    In the affected vehicles, the transmission shift cable may detach from either the bracket on the transmission shifter or the bracket on the transmission.  If the cable detaches while the vehicle is being driven, the transmission gear selection may not match the indicated gear and the vehicle may move in an unintended or unexpected direction, increasing the risk of a crash. Furthermore, when the driver goes to stop and park the vehicle, the transmission may not be in "PARK" even though the driver has selected the "PARK" position.  If the vehicle is not in the "PARK" position, there is a risk the vehicle will roll away as the driver and other occupants exit the vehicle or anytime thereafter.  A vehicle rollaway causes a risk of injury to exiting occupants and bystanders.

### c.    Transmission oil cooler line defect.

401.    On March 31, 2014, New GM issued a safety recall of 489,936 MY 2014 Chevy Silverado, 2014 GMC Sierra, 2014 GMC Yukon, 2014 GMC Yukon XL, 2015 Chevy Tahoe, and 2015 Chevy Suburban vehicles with a transmission oil cooler line defect.

---

[97] *See* New GM letter to NHTSA Re: NHTSA Campaign No. 14V-224 dated May 22, 2014, at 1.

402.    In the affected vehicles, the transmission oil cooler lines may not be securely seated in the fitting.  This can cause transmission oil to leak from the fitting, where it can contact a hot surface and cause a vehicle fire.

### d.    Transfer case control module software defect.

403.    On June 26, 2014, New GM issued a safety recall of 392,459 MY 2014-2015 Chevrolet Silverado, 2015 Chevrolet Tahoe, 2015 Chevrolet Suburban, 2014-2015 GMC Sierra, 2015 GMC Yukon, and 2015 GMC Yukon XL vehicles with a transfer case control module software defect.

404.    In the affected vehicles, the transfer case may electronically switch to neutral without input from the driver.  If the transfer case switches to neutral while the vehicle is parked and the parking brake is not in use, the vehicle may roll away and cause injury to bystanders.  If the transfer case switches to neutral while the vehicle is being driven, the vehicle will lose drive power, increasing the risk of a crash.

### e.    Acceleration-lag defect.

405.    On April 24, 2014, New GM issued a safety recall of 50,571 MY 2013 Cadillac SRX vehicles with an acceleration-lag defect.

406.    In the affected vehicles, there may be a three to four-second lag in acceleration due to faulty transmission control module programming.  That can increase the risk of a crash.

### f.    Transmission turbine shaft fracture defect.

407.    On June 11, 2014, New GM recalled 21,567 MY 2012 Chevrolet Sonic vehicles equipped with a 6 Speed Automatic Transmission and a 1.8L Four Cylinder Engine suffering from a turbine shaft fracture defect.

408.    In the affected vehicles, the transmission turbine shaft may fracture.  If the transmission turbine shaft fracture occurs during vehicle operation in first or second gear, the

- 97 -

vehicle will not upshift to the third through sixth gears, limiting the vehicle's speed.  If the fracture occurs during operation in third through sixth gear, the vehicle will coast until it slows enough to downshift to first or second gear, increasing the risk of a crash.[98]

### g. Automatic transmission shift cable adjuster.

409.    On February 20, 2014, New GM issued a noncompliance recall of 352 MY 2014 Buick Enclave, Buick LaCrosse, Buick Regal, Buick Verano, Chevrolet Cruze, Chevrolet Impala, Chevrolet Malibu, Chevrolet Traverse, and GMC Acadia vehicles with defective automatic transmission shift cable adjusters.[99]

410.    In the affected vehicles, one end of the transmission shift cable adjuster body has four legs that snap over a ball stud on the transmission shift lever.  One or more of these legs may have been fractured during installation.  If any of the legs are fractured, the transmission shift cable adjuster may disengage from the transmission shift lever.  When that happens, the driver may be unable to shift gears, and the indicated gear position may not be accurate.  If the adjuster is disengaged when the driver attempts to stop and park the vehicle, the driver may be able to shift the lever to the "PARK" position but the vehicle transmission may not be in the "PARK" gear position.  That creates the risk that the vehicle will roll away as the driver and other occupants exit the vehicle, or anytime thereafter.[100]

### 7. Other serious defects affecting GM-branded vehicles.

### a. Power management mode software defect.

411.    On January 13, 2014, New GM issued a safety recall of 324,970 MY 2014 Chevy Silverado and GMC Sierra Vehicles with a Power Management Mode software defect.[101]

---

[98] *See* June 11, 2014 Letter from New GM to NHTSA.

[99] *See* February 20, 2014 Letter from New GM to NHTSA.

[100] *Id.*

[101] *See* New GM Letter to NHTSA dated January 23, 2014.

412.    In the affected vehicles, the exhaust components can overheat, melt nearby plastic parts, and cause an engine fire.  GM acknowledges that the Power Management Mode software defect is responsible for at least six fires in the affected vehicles.[102]

### b.    Light control module defect.

413.    On May 16, 2014, New GM issued a safety recall of 217,578 model year 2004-2008 Chevrolet Aveo vehicles with a light control module defect.[103]

414.    In the vehicles, heat generated within the daytime running lamp module in the center console in the instrument panel may melt the module and cause a vehicle fire.[104] New GM first became aware of this issue when two Suzuki Forenza vehicles suffered interior fires in March of 2012.  An investigation conducted by GM North America found evidence that the fires emanated from the connection of the wiring at the module.[105]

415.    New GM took no remedial action at this time, but waited until May of 2014 to issue a safety recall.

### c.    Electrical short in driver's door module defect.

416.    On June 30, 2014, New GM issued a safety recall of 181,984 model year 2005-2007 Chevrolet Trailblazer, 2006 Chevrolet Trailblazer EXT, 2005-2007 Buick Rainier, 2005-2007 GMC Envoy, 2006 GMC Envoy XL, 2005-2007 Isuzu Ascender, and 2005-2007 Saab 9-7x vehicles with a defect that can cause an electrical short in the driver's door module.[106]

---

[102] *Id.*

[103] *See* May 30, 2014 Letter from New GM to NHTSA.

[104] *Id.*

[105] *Id.*

[106] *See* July 2, 2014 Letter from New GM to NHTSA.

- 99 -

417.    In the affected vehicles, an electrical short in the driver's door module may occur that can disable the power door lock and window switches and overheat the module.  The overheated module can then cause a fire in the affected vehicles.

### d.    Front axle shaft defect.

418.    On March 28, 2014, New GM issued a safety recall of 174,046 model year 2013-2014 Chevrolet Cruze vehicles with dangerous front axle shaft defect.[107]

419.    In the affected vehicles, the right front axle shaft may fracture and separate.  If this happens while the vehicle is being driven, the vehicle will lose power and coast to a halt.  If a vehicle with a fractured shaft is parked and the parking brake is not applied, the vehicle may move unexpectedly and cause accident and injury.[108]

420.    New GM admits to knowledge of "several dozen" half-shaft fractures through its warranty data.[109]  These incidents should have been prevented, since New GM was aware of the problem by September of 2013.

### e.    Seat hook weld defect.

421.    On July 22, 2014, New GM recalled 124,007 model year 2014 Chevrolet SS, 2014 Chevrolet Caprice, 2014 Chevrolet Caprice PPC, 2014 Chevrolet Silverado 1500, 2015 Chevrolet Silverado 2500/3500 HD, 2013-2014 Buick Encore, 2013-2014 Cadillac ATS, 2014 Cadillac CTS, 2014 Cadillac ELR, 2014 GMC Sierra 1500, and 2015 GMC Sierra 2500/3500 HD vehicles with a seat hook weld defect.[110]

---

[107] *See* March 28, 2014 Letter from New GM to NHTSA.

[108] *Id.*

[109] "GM recalls 172,000 Chevrolet Cruze Sedans over front axle half-shaft," *Bloomberg*, March 31, 2014.

[110] *See* July 22, 2014 Letter from New GM to NHTSA.

422.    In the affected vehicles, as the result of an incomplete weld on the seat hook bracket assembly, in a "high load" situation, "the hook may separate from the seat track, increasing the risk of occupant injury in a crash."[111]

**f.    Front turn signal bulb defect.**

423.    On July 21, 2014, New GM recalled 120,426 model year 2013 Chevrolet Malibu and 2011-2013 Buick Regal vehicles with a front turn signal bulb defect.

424.    In the affected vehicles, the driver will see a rapidly flashing turn signal arrow in the instrument cluster if both bulbs in one turn signal are burned out; but if only one bulb on either side burns out, there will be no signal to the driver.  The failure to properly warn the driver that a turn signal is inoperable increases the risk of accident.

425.    New GM first learned of the defect on September 6, 2012, but did not issue a recall until July of 2014.

**g.    Low-beam headlight defect.**

426.    On May 14, 2014, New GM issued a safety recall of 103,158 MY 2005-2007 Chevrolet Corvette vehicles with a low-beam headlight defect.

427.    In the affected vehicles, the underhood bussed electrical center housing can expand and cause the headlamp low beam relay control circuit wire to bend.  When the wire is repeatedly bent, it can fracture and cause a loss of low-beam headlamp illumination.  The loss of illumination decreases the driver's visibility and the vehicle's conspicuity to other motorists, increasing the risk of a crash.

**h.    Radio chime defect.**

428.    On June 5, 2014, New GM issued a noncompliance recall of 57,512 MY 2014 Chevrolet Silverado LD, 2015 Chevrolet Silverado HD, 2015 Chevrolet Suburban, 2015

---

[111] *Id.*

Chevrolet Tahoe, 2014 GMC Sierra LD, and 2015 GMC Sierra HD vehicles with a radio chime defect.

429.    In the affected vehicles, the radios may become inoperative; when that happens, there is no audible chime to notify the driver if the door is opened with the key in the ignition and no audible seat belt warning indicating that the seat belts are not buckled.  These vehicles fail to comply with the requirements of FMVSS numbers 114, "Theft Protection and Rollaway Prevention," and 208, "Occupant Crash Protection."  Without an audible indicator, the driver may not be aware that the driver's door is open while the key is in the ignition, and that creates a risk of a vehicle rollaway.  Additionally, there will be no reminder that the driver's or front seat passenger's seat belt is not buckled, which increases the risk of injury in a crash.

### i.    Fuel gauge defect.

430.    On April 29, 2014, New GM issued a safety recall of 51,460 MY 2014 Chevrolet Traverse, GMC Acadia, and Buick Enclave vehicles with a fuel gauge defect.

431.    In the affected vehicles, the engine control module software may cause inaccurate fuel gauge readings.  An inaccurate fuel gauge may result in the vehicle unexpectedly running out of fuel and stalling, and thereby increases the risk of accident.

### j.    Windshield wiper system defect.

432.    On May 14, 2014, New GM recalled 19,225 MY 2014 Cadillac CTS vehicles with a windshield wiper system defect.

433.    In the affected vehicles, a defect leaves the windshield wiper system prone to failure; though the windshield wipers systems are particularly prone to failure after a vehicle jump start occurs while the wipers are on and restricted by snow and ice, "an unstable voltage in

- 102 -

the vehicle can reproduce this condition without an external jump start." Inoperative windshield wipers can decrease the driver's visibility and increase the risk of a crash.[112]

### k.    Console bin door latch defect.

434.    On August 7, 2014, New GM issued a safety recall of 14,940 MY 2014-2015 Chevrolet Impala vehicles with a console bin door latch defect.[113]

435.    In the affected vehicles, the inertia latch on the front console bin compartment door may not engage in the event of a rear collision and the front console compartment door may open, increasing the risk of occupant injury.[114] These vehicles fail to comply with the requirements of FMVSS No. 201, "Occupant Protection in Interior Impact."[115]

### l.    Driver door wiring splice defect.

436.    On June 11, 2014, New GM recalled 14,765 MY 2014 Buick LaCrosse vehicles with a driver door wiring splice defect.

437.    In the affected vehicles, a wiring splice in the driver's door may corrode and break, resulting in the absence of an audible chime to notify the driver if the door is opened while the key is in the ignition. Additionally, the Retained Accessory Power module may stay active for ten minutes allowing the operation of the passenger windows, rear windows, and sunroof. As such, these vehicles fail to comply with the requirements of FMVSS numbers 114, "Theft Protection and Rollaway Prevention," and 118, "Power-Operated Window, Partition, and Roof Panel Systems." Without an audible indicator, the driver may not be aware that the driver's door is open while the key is in the ignition, increasing the risk of a vehicle rollaway. If the passenger windows, rear windows, and sunroof can function when the vehicle is turned off and

---

[112] *See* May 28, 2014 Letter to NHTSA.

[113] *See* August 7, 2014 Letter from New GM to NHTSA.

[114] *Id.*

[115] *Id.*

the driver is not in the vehicle, there is an increased risk of injury if an unsupervised occupant operates the power closures.

### m.    Overloaded feed defect.

438.    On July 2, 2014, New GM recalled 9,371 MY 2007-2011 Chevrolet Silverado and 2007-2011 GMC Sierra HD vehicles with an overloaded feed defect.

439.    In the affected vehicles, an overload in the feed may cause the underhood fusible link to melt due to electrical overload, resulting in potential smoke or flames that could damage the electrical center cover and/or the nearby wiring harness conduit.

440.    New GM was aware of this defect for at least two years before taking action to remedy it through a recall.

### n.    Windshield wiper module assembly defect.

441.    On June 26, 2014, New GM recalled 4,794 MY 2013-2014 Chevrolet Caprice and 2014 Chevrolet SS vehicles with a windshield wiper module assembly defect.

442.    In the affected vehicles, the motor gear teeth may become stripped and the wipers inoperable.  Inoperable wipers increase the risk of accident in inclement conditions.

### o.    Engine block heater power cord insulation defect.

443.    On July 2, 2014, New GM issued a safety recall of 2,990 MY 2013-2014 Chevrolet Cruze, 2012-2014 Chevrolet Sonic, 2013-2014 Buick Encore, and 2013-2014 Buick Verano vehicles with an engine block heater power cord insulation defect.

444.    In the affected vehicles the insulation on the engine block heater cord can be damaged, exposing the wires.  Exposed wires increase the risk of electrical shock and personal injury if the cord is handled while plugged in.

010440-13 732514 V1

p.      **Rear shock absorber defect.**

445.    On June 27, 2014, New GM issued a safety recall of 1,939 MY 2014 Chevrolet

Corvette vehicles with a rear shock absorber defect.

446.    In the affected vehicles, an insufficient weld in the rear shocks can cause the

shock absorber tube to separate from the shock absorber bracket.  That separation may cause a

sudden change in vehicle handling behavior that can startle drivers and increase the risk of a

crash.[116]

q.      **Electronic stability control defect.**

447.    On March 26, 2014, New GM issued a safety recall for 656 MY 2014 Cadillac

ELR vehicles with an electronic stability control defect.

448.    In the affected vehicles, the electronic stability control system software may

inhibit certain diagnostics and fail to alert the driver that the electronic stability control system is

partially or fully disabled.  Therefore, these vehicles fail to conform to FMVSS number 126,

"Electronic Stability Control Systems."  A driver who is not alerted to an electronic stability

control system malfunction may continue driving with a disabled system.  That may result in the

loss of directional control, greatly increasing the risk of a crash.[117]

r.      **Unsecured floor mat defect.**

449.    On June 18, 2014, New GM issued a safety recall of 184 MY 2014 Chevrolet

Silverado LD and 2014 GMC Sierra LD vehicles with an unsecured floor mat defect.

450.    The affected vehicles built with the optional vinyl flooring option and equipped

with the optional All-Weather Floor Mats do not have the retention features necessary to

---

[116] *See* June 26, 2014 Letter from New GM to NHTSA.

[117] *See* March 26, 2014 Letter from New GM to NHTSA.

properly secure the floor mat on the driver's side.  The driver's floor mat can shift such that it interferes with the accelerator pedal, and thus increases the risk of a crash.[118]

### s.      Fuse block defect.

451.      On May 23, 2014, New GM issued a safety recall of 58 MY 2015 Chevrolet Silverado HD and GMC Sierra HD vehicles with a fuse block defect.

452.      In the affected vehicles, the retention clips that attach the fuse block to the vehicle body can become loose allowing the fuse block to move out of position.  When this occurs, exposed conductors in the fuse block may contact the mounting studs or other metallic components, which in turn causes a "short to ground" event.  That can result in an arcing condition, igniting nearby combustible materials and starting an engine fire.[119]

### t.      Diesel transfer pump defect.

453.      On April 24, 2014, New GM issued a safety recall of 51 MY 2015 GMC Sierra HD and 2015 Chevrolet Silverado HD vehicles.

454.      In the affected vehicles, the fuel pipe tube nuts on both sides of the diesel fuel transfer pump may not be tightened to the properly torque.  That can result in a diesel fuel leak, which can cause a vehicle fire.[120]

### u.      Rear suspension toe adjuster link defect.

455.      On September 17, 2014, New GM issued a safety recall for 290,241 MY 2010-2015 Cadillac SRX and 2011-2012 Saab 9-4x vehicles with a rear suspension toe adjuster link defect that can cause vehicles to sway or wander on the road.[121]

---

[118] *See* June 18, 2014 Letter from New GM to NHTSA.

[119] *See* May 30, 2014 Letter from New GM to NHTSA.

[120] *See* April 24, 2014 Letter from New GM to NHTSA.

[121] *See* New GM's Sept. 17, 2014 Part 573 Safety Report.

- 106 -

456.    According to New GM, in the affected vehicles, "the jam nut in the rear suspension toe adjuster link may not be torqued to the proper specification.  A loose toe adjuster link can cause the vehicle to sway or wander at highway speed, activate the vehicle's electronic stability control system, and cause excessive wear to the threads in the link….If the threads in the link become worn, the link may separate."[122]  If the link separates, that "would create sudden vehicle instability, increasing the risk of a crash."[123]

457.    Once again, New GM should have picked up on this defect years earlier.  In fact, in 2011, New GM conducted a safety recall of Cadillac CTS vehicles with a similar rear suspension toe adjuster link defect.[124]

### v.    Hood latch defect

458.    On September 23, 2014, New GM recalled 89,294 MY 2013-2015 Chevrolet Spark vehicles with a hood latch defect.[125]

459.    According to New GM, the affected vehicles "were manufactured with a secondary hood latch that may prematurely corrode at the latch pivot causing the striker to get stuck out of position and preventing the striker from properly engaging the hood latch."[126]  If this happens, "the vehicle's hood may open unexpectedly," and that will "likely" impair the driver's vision and increase the risk of a collision.[127]

---

[122] *Id.*

[123] *Id.*

[124] *Id.*

[125] *See* New GM's September 23, 2014 Part 573 Safety Recall Report.

[126] *Id.*

[127] *Id.*

### w.    Electrical short defect.

460.    On October 2, 2014, New GM announced a recall of 117,652 MY 2013-2014 Chevrolet Tahoe, 2013-2014 Chevrolet Suburban, 2013-2014 GMC Yukon, 2013-2014 GMC Yukon, 2013-2014 Cadillac Escalade, 2013-2014 Cadillac CTS, 2014 Chevrolet Traverse, 2014 GMC Acadia, 2014 Buick Enclave, 2014 Chevrolet Express, 2014 GMC Savana, 2014 Chevrolet Silverado, and 2014 GMC Sierra vehicles with a defect that can cause an electrical short.[128]

461.    In the affected vehicles, due to a defect in the chassis control module, metal slivers can cause an electrical short that results in the vehicle stalling or not starting.[129]  This creates a serious risk of accident.

### G.    New GM's Deception In Connection With the Recalls Has Harmed Arizona Consumers Who Own or Lease GM-Branded Vehicles.

462.    New GM was well aware that vehicle recalls, especially untimely ones, can taint its brand image and the value of its vehicles.  In its 2010 Form 10-K submitted to the SEC, New GM admitted that "Product recalls can harm our reputation and cause us to lose customers, particularly if those recalls cause consumers to question the safety or reliability of our products. Any costs incurred or lost sales caused by future product recalls could materially adversely affect our business."[130]

463.    Unfortunately for owners of GM-branded vehicles, New GM was correct.  It is difficult to find a brand whose reputation has taken as great a beating as has the New GM brand starting in February 2014 when the first ignition switch recall occurred.

---

[128] *See "GM recalls 117,651 vehicles for potential electrical short issue*," Reuters (Oct. 2, 2014).

[129] *Id.*

[130] General Motors 2010 Form 10-K, p. 31, available at https:llwww.sec.gov/Archives/ edgar/data/1467858/0001193125 10078119/dlOk.htm#toc85733 4.

464.    In fact, the public outcry has been significant in response to the ongoing revelations of the massive number of defects New GM concealed, and the massive number of defective vehicles New GM has sold.  The following are illustrative examples of the almost constant beating the New GM brand has taken ever since the first ignition switch recall was announced on July 13, 2014.

465.    After the announcement the first ignition switch recall the media was highly critical of New GM.  For example, a CBS February 27, 2014, news report headlined:

By AIMEE PICCHI / MONEYWATCH / February 27, 2014, 1:42 PM

## Did GM wait too long to issue its recall?

466.    The CBS report had a video link:[131]



*Play* **VIDEO**

**13 deaths now linked to GM faulty ignition switches, recall expanded**

467.    On March 13, 2014 a CNN report was entitled:

## Feds demand answers from GM on recall defect

By **Mike M. Ahlers, CNN**
updated 7:51 AM EDT, Thu March 13, 2014

---

[131] http://www.cbsnews.com/news/did-general-motors-wait-too-long -to-issue-its-recall/.

468.    On March 16, 2014, Reuters reported as follows:

# Owners of recalled GM cars feel angry, vindicated

(Reuters) – As details emerge about how General Motors Co dealt with faulty ignition switches in some of its models, car owners are increasingly angry after learning that the automaker knowingly allowed them to drive defective vehicles.

Saturn Ion owner Nancy Bowman of Washington, Michigan, said she is outraged that GM allowed her to drive a "death trap."  She said her car had so many ignition problems she was afraid to resell it to an innocent buyer.

She bought the 2004 model car new and still drives it after extensive repairs and multiple run-ins with a Saturn dealer she called dismissive.

"Five times the car died right out from under me after hitting a bump in the road," she wrote in a 2013 posting on a complaint website, arfc.org, that says it sends information to the National Highway Traffic Safety Administration (NHTSA).

Every time I brought it in they said it was an isolated incident. Couldn't find the problem, so they acted like I was an idiot.

469.    On March 24, 2014, the NEW YORK TIMES issued an article entitled:

BUSINESS DAY

## General Motors Misled Grieving Families on a Lethal Flaw

By HILARY STOUT, BILL VLASIC, DANIELLE IVORY and REBECCA R. RUIZ    MARCH 24, 2014

470.    It contained a troublesome account of New GM's conduct:

It was nearly five years ago that any doubts were laid to rest among engineers at General Motors about a dangerous and faulty ignition switch.  At a meeting on May 15, 2009, they learned that data in the black boxes of Chevrolet Cobalts confirmed a potentially fatal defect existed in hundreds of thousands of cars.

But in the months and years that followed, as a trove of internal documents and studies mounted, G.M. told the families of accident victims and other customers that it did not have enough evidence of any defect in their cars, interviews, letters and legal documents show.  Last month, G.M. recalled 1.6 million Cobalts and other

- 110 -

small cars, saying that if the switch was bumped or weighed down it could shut off the engine's power and disable air bags.

In one case, G.M. threatened to come after the family of an accident victim for reimbursement of legal fees if the family did not withdraw its lawsuit.  In another instance, it dismissed a family with a terse, formulaic letter, saying there was no basis for claims.

\* \* \*

Since the engineers' meeting in May 2009, at least 23 fatal crashes have involved the recalled models, resulting in 26 deaths.  G.M. reported the accidents to the government under a system called Early Warning Reporting, which requires automakers to disclose claims they receive blaming vehicle defects for serious injuries or deaths.

A New York Times review of 19 of those accidents – where victims were identified through interviews with survivors, family members, lawyers and law enforcement officials – found that G.M. pushed back against families in at least two of the accidents, and reached settlements that required the victims to keep the discussions confidential.

\* \* \*

In other instances, G.M. ignored repeated calls, families said. "We did call G.M.," said Leslie Dueno, whose 18-year-old son, Christopher Hamberg, was killed on June 12, 2009 – not quite a month after the critical May 15 meeting of G.M. engineers about the ignition data – driving his 2007 Cobalt home before dawn in Houston.  He lost control at 45 miles per hour and hit a curb, then a tree, the police report said.  "Nobody ever called me.  They never followed up.  Ever."

Last month's recalls of the Cobalt and five other models encompassed model years 2003 through 2007.  G.M. faces numerous investigations, including one by the Justice Department looking into the company's disclosures in its 2009 bankruptcy filing as well as what it told regulators.

"We are conducting an unsparing, comprehensive review of the circumstances leading to the ignition switch recall," G.M. said in a statement on Monday.  "As part of that review we are examining previous claims and our response to them.  If anything changes as a result of our review, we will promptly bring that to the attention of regulators."

G.M. has said it has evidence of 12 deaths tied to the switch problem, but it has declined to give details other than to say that they all occurred in 2009 or earlier.  It says it has no conclusive evidence of more recent deaths tied to the switch.

* * *

It was unclear how many of the 26 deaths since the 2009 meeting were related to the faulty ignition, but some appeared to fit patterns that reflected the problem, such as an inexplicable loss of control or air bags that did not deploy.  In some cases, the drivers had put themselves at risk, including having high blood-alcohol levels or texting.

Still, by the time Benjamin Hair, 20, crashed into a tree in Charlottesville, Va., on Dec. 13, 2009, while driving a Pontiac G5 home, G.M. had conducted five internal studies about the ignition problem, its records indicate.

…

Consumer complaints and claims came to the company in a variety of ways – through lawsuits, calls, letters and emails, warranty claims, or insurance claims.  G.M.'s legal staff was the recipient of lawsuits, insurance information, accident reports and any other litigation-related paperwork.  But warranty claims and customer calls were routed through the sales and service division – a vast bureaucracy that occupies most of one tower at G.M.'s headquarters in Detroit.  Because the legal staff reports to the chief executive, and the sales department to the head of G.M. North America, it is unclear whether they share information related to a specific car, like the Cobalt.

471.    NPR ran a story on March 31, 2014:

news > business

# Timeline: A History Of GM's Ignition Switch Defect

by TANYA BASU

March 31, 2014   4:33 PM ET

472.    The NPR story raised questions about New GM's candor:

NPR looked into the timeline of events that led to the recall.  It's long and winding, and it presents many questions about how GM handled the situation:  How long did the company know of the problem?  Why did the company not inform federal safety officials of the problem sooner?  Why weren't recalls done sooner?  And did GM continue to manufacture models knowing of the defect?

- 112 -

473.    On May 11, 2014, the CHICAGO TRIBUNE ran an article entitled:

*GM ranked worst automaker by U.S. suppliers:  survey*

DETROIT (Reuters) – General Motors Co, already locked in a public relations crisis because of a deadly ignition defect that has triggered the recall of 2.6 million vehicles, has a new perception problem on its hands.

The U.S. company is now considered the worst big automaker to deal with, according to a new survey of top suppliers to the car industry in the United States.

Those so-called "Tier 1" suppliers say GM is now their least favorite big customer, according to the rankings, less popular even than Chrysler, the unit of Fiat Chrysler Automobiles FIA.MI, which since 2008 had consistently earned that dubious distinction.

Suppliers gave GM low marks on all kinds of key measures, including its overall trustworthiness, its communication skills, and its protection of intellectual property.

474.    On May 25, 2014, an article reported on a 2.4 million vehicle recall:

## When Will GM's Recall Mess End?

**General Motors** (NYSE: <u>GM</u>) on Tuesday said it is recalling about 2.4 million additional vehicles in four separate recalls for a variety of problems, including faulty seat belts and gearshift troubles.

This announcement came on the heels of another set of GM recalls, announced last Thursday, covering 2.7 million vehicles.  Including the four recalls announced on Tuesday, GM has issued a total of 30 recalls in the U.S. so far in 2014, encompassing about 13.8 million vehicles.

That's a stupendous number.[132]

475.    On May 26, 2014, the NEW YORK TIMES ran an article:

BUSINESS DAY

## *13 Deaths, Untold Heartache, From G.M. Defect*

By REBECCA R. RUIZ, DANIELLE IVORY and HILARY STOUT    MAY 26, 2014

---

[132] http://www.fool.com/investing/general/2014/05/25/when-will-gms-recall-mess-end.aspx.

476.    The article once again pointed blame at GM:

BEN WHEELER, Tex. – For most of the last decade, Candice
Anderson has carried unspeakable guilt over the death of her
boyfriend.  He was killed in 2004 in a car accident here, and she
was at the wheel.  At one point, Ms. Anderson, who had a trace
of Xanax in her blood, even faced a manslaughter charge.  She
was 21.

All these years, Ms. Anderson – now engaged and a mother – has
been a devoted visitor to his grave.  She tidies it every season,
sweeping away leaves and setting down blue daisies with gold
glitter for his birthday, miniature lit trees for Christmas, stones
with etched sayings for the anniversary of their accident.

"It's torn me up," Ms. Anderson said of the death of Gene Mikale
Erickson.  "I've always wondered, was it really my fault?"

Last week, she learned it was not.

* * *

Inside G.M., the nation's largest automaker, some of the 13 victims
appear on charts and graphs with a date and a single word:  "fatal."

477.    News of New GM's misconduct and of the recalls made the front page of every

major newspaper and was the lead story on every major television news program in the country.

478.    The congressional hearings where New GM executives were subject to harsh

questioning and criticism were widely reported in every type of media.

479.    In June 2014 New GM recalled another 8.2 million vehicles and again these

recalls received widespread attention in the press.  The stories often included charts and graphs

depicting the ever-growing list of vehicles recalled:

## GM to recall 8.2 million more vehicles over ignition-switch defect

*POSTED AT 3:21 PM ON JUNE 30, 2014*

The recall blues continue at GM, as does the scope of their
previously hidden ignition-switch defect.  The world's largest
automaker added 8.45 million more vehicles to its list, with some

models going back to 1997.  This puts GM over the 28-million mark for cars recalled on a global basis in 2014, and over 26 million domestic.[133]

480.    The coverage did not simply die down as often happens.  On July 15, 2014, the

NEW YORK TIMES ran an article entitled, "Documents Show General Motors Kept Silent on Fatal

Crashes."

481.    By August 2, 2014, the press was reporting that used GM-branded vehicles were

losing value:

THE DALLAS MORNING NEWS

**August 2, 2014 Saturday**
1 Edition

**SECTION:**  BRIEFING; Pg. 10

**LENGTH:**  80 words

**HEADLINE:**  GM vehicles' resale values are taking a hit as safety recalls mount

**BODY:**

Although General Motors' sales remained solid in the midst of its recent record recalls, some vehicles experienced significant drops in their resale values.

In an analysis of more than 11 million used cars for sale between March and June of this year, iSeeCars.com found that the resale values of the main vehicles in GM's recalls dropped 14 percent from the same period last year.

482.    An August 5, 2014 article also reported that used GM-branded vehicles were

suffering loss in value due to the recalls:[134]

---

[133] http://hotair.com/archives/2014/06/30/gm-to-recall-8-2-million-more-vehicles-over-ignition-switch-defect-8-45-million-overall/.

[134] Doron Levin, FORTUNE MAGAZINE, August 5, 2014.

AUTOS   GM

# Used GM cars affected by recall getting hurt in the marketplace

by Doron Levin    @FortuneMagazine    AUGUST 5, 2014, 2:25 PM EDT

Ignition recall caused resale values to take a hit—some Pontiac, Saturn and Chevy models were most affected.

General Motors Co.  GM -0.41%  has been fortunate to avoid a collapse of new-vehicle sales since the ignition-switch safety crisis blew up in January, engulfing the automaker in litigation, a federal criminal probe and Congressional inquiries.

Used GM vehicles – models affected by the recall – meanwhile have taken a substantial hit in value, according to a study by iSeeCars.com, an online search engine. GM's new-vehicles sales are up 3.5% in the U.S. through July in a market that has risen 5% in terms of unit sales.

(Holders of GM stock have gotten whacked as well since January, the value of shares falling nearly 18%, compared with a S&P 500 Index that has risen 4% during the period.)

The operators of the search engine said they created an algorithm to determine the market value of six GM cars affected by the recall, based on asking prices of used vehicles on dealer lots from March to June 2013, compared to a year later. The change in value also was compared to the dropping value of all used cars in the U.S., which has been occurring for the past few months. The sample size was 11 million cars.

The average price of the recalled GM models dropped 14% from March to June 2014, compared to a year earlier and adjusted for inflation. The drop in value of all similar models was 6.7% during the same period.

Phong Ly, chief executive and co-founder of iSeeCars.com said "recalls are playing a role in motivating sellers to sell their used cars and at a lower price point than they otherwise would." His company provides free information to car shoppers and sells sales leads to dealers.

483.    The crisis that affected the GM Brand was so significant that New GM stock has

been battered.  A September 22, 2014 report observed:[135]

## GM Falls Deeper Into The Abyss

Sep. 22, 2014 7:55 AM ET  |  About: General Motors Company (GM)

**Summary**

- GM has been in a rut since the ignition switch recalls.

- More and more, GM is coming off as a perpetually troubled
  business.

- We continue to avoid General Motors stock.

We previously wrote about GM (NYSE:GM) and placed a $31
price target on it here. Our basic argument was that GM was going
to have trouble presenting itself into the mainstream as a reputable
brand to buy after the ignition switch recall.

Late Sunday, it was announced that GM was recalling 222,500
vehicles due to brake pad malfunction. This number towers over
the amount of normal recalls that come during the course of
business. It's also involving vehicles that were made from 2013 to
2015, a clear indicator that these vehicles (manufactured by the
post-bankruptcy GM) should have had a renewed focus of safety
on them from the beginning.

484.    New GM's stock price hit a 52-week low on October 10, 2014.

485.    New GM's unprecedented concealment of a large number of serious defects, and

its dangerously irresponsible approach to safety, quality, and reliability issues, has caused

damage to Arizona consumers who own or lease GM-branded vehicles acquired on or after

July 11, 2009.

486.    A vehicle made by a reputable manufacturer of safe, high quality, and reliable

vehicles who stands behind its vehicles after they are sold is worth more than an otherwise

---

[135] *See* http://seekingalpha.com/article/2511545-gm-falls-deeper-into-the-abyss.

similar vehicle made by a disreputable manufacturer known for selling defective vehicles and for concealing and failing to remedy serious defects after the vehicles are sold.

487.   A vehicle purchased or leased under the reasonable assumption that it is safe and reliable is worth more than a vehicle of questionable safety, quality, and reliability due to the manufacturer's recent history of concealing serious defects from consumers and regulators.

488.   Purchasers and lessees of GM-branded vehicles on or after the July 11, 2009, inception of New GM paid more for the vehicles than they would have had New GM disclosed the many defects it had a duty to disclose in GM-branded vehicles, and disclosed that the company's culture and business model was such that it did not produce safe, high quality, and reliable vehicles.  Because New GM concealed the defects and the fact that it was a disreputable brand that valued cost-cutting over safety, Arizona consumers did not receive the benefit of their bargain.  And the value of all their vehicles has diminished as the result of New GM's deceptive conduct.

489.   On information and belief, an estimate of the diminished value in GM-branded vehicles not subject to the ignition switch recall is illustrated by way of example as follows for a few Model Year 2013 vehicles:

| | | |
|---|---|---|
| GMC | Terrain | September Diminished Value:  $1,052 |
| GMC | Sierra 1500 | September Diminished Value:  $325 |
| Buick | Lacrosse | September Diminished Value:  $954 |
| Chevrolet | Suburban | September Diminished Value:  $854 |
| Cadillac | CTS | September Diminished Value:  $867 |
| Cadillac | XTS | September Diminished Value:  $1,722 |

010440-13 732514 V1

490.    Another example is the diminished value of illustrative 2011 models:

| GMC | Terrain | September Diminished Value:  $891 |
|---|---|---|
| Buick | Lacrosse | September Diminished Value:  $1,017 |

491.    GM-branded vehicles not involved in the ignition switch recall experienced declines in value when the ignition switch recalls occurred due to the impact on the perception of buyers concerning New GM's promises of safety and reliability.  As news of New GM's culture of deceit grew, so did diminished value.  The following estimates are examples:

| | Diminished Value as of 03/2014 | Diminished Value as of 09/2014 |
|---|---|---|
| 2008 Cadillac STS | $249 | $1,243 |
| 2008 GMC Acadia | $730 | $1,011 |
| 2010 GMC Terrain | $403 | $912 |

492.    GM-branded vehicles subject to the ignition switch recall also have suffered diminished value by way of example:

| | Diminished Value as of 03/2014 | Diminished Value as of 09/2014 |
|---|---|---|
| 2008 Cobalt | $256 | $357 |
| 2008 HHR | $162 | $477 |
| 2009 Sky | $173 | $429 |

493.    If New GM had timely disclosed the many defects as required by the TREAD Act, and the Arizona Consumer Fraud Act as detailed below, Arizona consumers' GM-branded vehicles would be considerably more valuable than they are now and/or Arizona consumers would have paid less than they did.  Because of New GM's now highly publicized campaign of deception, and its belated, piecemeal and ever-expanding recalls, so much stigma has attached to

- 119 -

the New GM brand that no rational consumer would pay what otherwise would have been fair

market value for their GM-branded vehicles purchased on or after July 11, 2009.

### IV.    CLAIM FOR RELIEF

### ARIZONA CONSUMER FRAUD ACT (A.R.S. § 44-1521, *et seq.*)

494.    The State  realleges and incorporates by reference all paragraphs as though fully

set forth herein.

495.    New GM is a "person" within the meaning of  A.R.S. § 44-1521(6).

496.    GM-branded vehicles sold or leased on or after July 11, 2009  are "merchandise"

within the meaning of A.R.S.§ 44-1521(5).

497.    The Arizona Consumer Fraud Act  provides that "[t]he act, use or employment by

any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false

promise, misrepresentation, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the

sale or advertisement of any merchandise whether or not any person has in fact been misled,

deceived or damaged thereby, is declared to be an unlawful practice."  A.R.S.  § 44-1522(A).

498.    In the course of its business, New GM systematically devalued safety and

concealed a plethora of defects in GM-branded vehicles as described herein and otherwise

engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful

practices by employing deception, deceptive or unfair acts or practices, fraud, false pretenses,

false promises, misrepresentations, or concealment, suppression or omission of material facts

with intent that others rely upon such concealment, suppression or omission, in connection with

the sale and lease of GM-branded vehicles on or after July 11, 2009.

499.    From the date of its inception on July 11, 2009, New GM knew of many serious

defects affecting many models and years of GM-branded vehicles, both because of the

knowledge of Old GM personnel who remained at New GM, and continuous reports, investigations, and notifications from regulatory authorities. New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

500.    New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to promptly disclose and remedy defects in all GM-branded vehicles. New GM concealed this information as well.

501.    By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive and unlawful business practices in violation of the Arizona Consumer Fraud Act.

502.    In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above. New GM compounded the deception by repeatedly asserting that its vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

503.    New GM's unlawful, unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Arizona consumers, about the true safety and reliability of GM-branded vehicles, the quality of the New GM brand, the devaluing of safety at New GM, and the true value of GM-branded vehicles sold or leased on or after July 11, 2009.

- 121 -

504.    New GM intentionally and knowingly misrepresented material facts regarding GM-branded vehicles with an intent to mislead Arizona consumers.

505.    New GM knew or should have known that its conduct was of the nature prohibited by and violative of the Arizona Consumer Fraud Act.

506.    As alleged above, New GM made material statements about the safety and reliability of GM-branded vehicles that were either false or misleading.

507.    New GM owed purchasers of New GM vehicles a duty to disclose the true safety and reliability of GM-branded vehicles and the devaluing of safety at New GM, because New GM:

a.    Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

b.    Intentionally concealed the foregoing from the public, including Arizona residents; and/or

c.    Made incomplete representations about the safety and reliability of GM-branded vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the public, including Arizona residents, that contradicted these representations.

508.    Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of GM-branded vehicles sold on or after July 11, 2009, has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

509.    New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Arizona residents.  A vehicle made by a

- 122 -

reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

510.    New GM's violations present a continuing risk to owners of GM-branded vehicles, as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

511.    While engaging in the unlawful acts and practices alleged in this Complaint, New GM was at all times acting willfully as defined by A.R.S. § 44-1531.

010440-13  732514 V1

## PRAYER FOR RELIEF

WHEREFORE, the State respectfully requests the Court to enter Judgment against New GM as follows:

A.      Enter an injunction against New GM permanently prohibiting it, and all others acting directly or indirectly on its behalf, from continuing and engaging in the unlawful acts and practices as alleged in this Complaint and from doing any acts in furtherance of such unlawful acts and practices, pursuant to A.R.S. § 44-1528(A)(1);

B.      Order  New GM to disgorge any profits, gains, gross receipts, or other benefit obtained by means of any unlawful act or practice as alleged in this Complaint, pursuant to A.R.S. § 44-1528(A)(3);

C.      Order New GM to pay to the State a civil penalty of not more than $10,000 for each willful violation of the Consumer Fraud Act, pursuant to A.R.S. § 44-1531;

D.      Order New GM to pay the State its costs of investigation and prosecution of this matter, including its reasonable attorneys' fees,  pursuant to A.R.S. § 44-1534; and

E.      Award the State such further relief the Court deems just and proper under the circumstances.

- 124 -

DATED:  November 19, 2014

THOMAS C. HORNE
ATTORNEY GENERAL

By:
    Brad K. Keogh
    Dana R. Vogel
    Office of Attorney General
    1275 West Washington Street
    Phoenix, Arizona 85007
    Brad.Keogh@azag.gov
    Dana.Vogel@azag.gov
    Telephone:  (602) 542-3702
    Facsimile:  (602) 542-4377

HAGENS BERMAN SOBOL SHAPIRO LLP

By:
    Robert B. Carey
    Leonard Aragon
    Rachel E. Freeeman
    11 West Jefferson Street, Ste. 1000
    Phoenix, AZ  85003
    Telephone: (602) 840-5900
    Facsimile: (602) 840-3012
    rob@hbsslaw.com
    leonard@hbsslaw.com
    rachelf@hbsslaw.com
    Telephone: (602) 840-5900
    Facsimile: (602) 840-3012

    and

    Steve W. Berman *(Pro Hac Vice)*
    Sean R. Matt *(Pro Hac Vice)*
    Andrew M. Volk *(Pro Hac Vice)*
    1918 Eighth Avenue, Suite 3300
    Seattle, Washington  98101
    steve@hbsslaw.com
    sean@hbsslaw.com
    andrew@hbsslaw.com
    Telephone:  206) 623-7292
    Facsimile:  (206) 623-0594

    Attorneys for Plaintiff
    State of Arizona