William P. Weintraub
Eamonn O'Hagan
Gregory W. Fox
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel.: 212.813.8800
Fax:  212.355.3333

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Motors Liquidation Company, *et al.*<br>        f/k/a General Motors Corp., *et al.*<br><br>                Debtors. | Chapter 11<br><br>Case No. 09-50026 (REG)<br><br>(Jointly Administered) |

**RESPONSIVE BRIEF OF DESIGNATED COUNSEL FOR PRE-CLOSING**
**ACCIDENT PLAINTIFFS ON THRESHOLD ISSUES CONCERNING**
**NEW GM'S MOTIONS TO ENFORCE THE SALE ORDER AND INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

PRELIMINARY STATEMENT AND FACTUAL BACKGROUND ......................................... 3

ARGUMENT ..................................................................................................................... 11

I.     DUE PROCESS THESHOLD ISSUE:  THE PLAINTIFFS' DUE PROCESS
      RIGHTS WERE VIOLATED IN CONNECTION WITH THE 363 SALE
      REGARDLESS OF WHETHER THEY WERE INVOLVED IN A
      PRE-CLOSING ACCIDENT ........................................................................................... 11

A.    The Plaintiffs Were Known Creditors Entitled To Actual Notice
      Reasonably Calculated To Allow Them To Object To The 363 Sale And
      Protect Their Litigation Rights ..................................................................................... 13

      1.    If A Debtor's Books And Records Suggest That A Party Might
           Reasonably Bring A Particular Claim, That Party Is A Known
           Creditor Entitled To Actual Notice ........................................................... 14

      2.    The Record Demonstrates That The Plaintiffs' Ignition Switch
           Defect Related Claims Were Reasonably Ascertainable From
           Old GM's Books And Records ................................................................... 16

      3.    Old GM Employees' Knowledge Of The Ignition Switch Defect
           Was Imputable To Old GM ....................................................................... 20

      4.    Owners Of Cars With Claims Arising From The Ignition Switch
           Defect Were Reasonably Identifiable By GM Through The Same
           Process By Which It Eventually Recalled Those Vehicles ................................. 22

      5.    New GM Relies On Inapposite Cases To Support Its Argument That
           the Plaintiffs Were Unknown Claimants ................................................... 23

B.    Notice Of The 363 Sale Was Constitutionally Insufficient Because It Failed
      To Apprise Plaintiffs – Including Pre-Closing Accident Plaintiffs – Of The
      Defect From Which Their Claims Arise ..................................................................... 26

      1.    Old GM's Failure To Disclose To Potential Claimants Facts Necessary
           For Them To Realize They Had Claims Deprives Them of Due Process ........... 27

      2.    Old GM Has Made No Showing That Any Pre-Closing Accident
           Plaintiffs Were Aware Of The Ignition Switch Defect ........................................ 32

C.    Due Process Violations Prejudiced Plaintiffs By Depriving Them Of The
      Opportunity To Advocate That New GM Be Forced To Assume Their Claims .............. 35

II.     REMEDIES THESHOLD ISSUE:  THE PROPER REMEDY FOR A DUE
        PROCESS VIOLATION IS TO PERMIT PLAINTIFFS TO PURSUE ALL
        RIGHTS OTHERWISE  AVAILABLE ABSENT THE INJUNCTIVE
        PROVISIONS OF THE SALE ORDER AND INJUNCTION......................................... 38

A.      Second Circuit's Decision In *Manville IV* Dictates Appropriate Remedy ....................... 38

B.      Authority Cited By New GM Is Inapposite ...................................................................... 41

C.      Potential Availability Of Remedies Against Old GM's Estate Is Immaterial .................. 46

III.    CONCLUSION.................................................................................................................. 49

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arch Wireless, Inc. v. Nationwide Paging, Inc. (In re Arch Wireless, Inc.)*,
    534 F.3d 76 (1st Cir. 2008) ........................................................................14, 15, 16

*Arista Records LLC v. Usenet.com, Inc.*,
    633 F. Supp. 2d 124 (S.D.N.Y. 2009) ..................................................................20, 21

*Bondi v. Bank of Am. Corp. (In re Parmalat Secs. Litig.)*,
    383 F. Supp. 2d 587 (S.D.N.Y. 2005) ........................................................................20

*Brunswick Hosp. Ctr., Inc. v. New York Dep't of Health (In re Brunswick Hosp. Ctr.)*,
    No. 892-80487-20, 1997 Bankr. LEXIS 2184 (Bankr. E.D.N.Y. Sept. 12, 1997) .................16

*Burton v. Chrysler Grp., LLC (In re Old Carco LLC)*,
    492 B.R. 392 (Bankr. S.D.N.Y. 2013) ........................................................................24

*Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
    528 B.R. 43 (S.D.N.Y. 2010) ........................................................................45

*Cedar Tile Corp. v. Chandler's Cove Inn, Ltd.*,
    859 F.2d 1127 (2d Cir. 1988) ........................................................................43

*Chemetron Corp. v. Jones*,
    72 F.3d 341 (3d Cir. 1995) ........................................................................22

*City of New York v. New York, New Haven & Hartford R.R. Co.*,
    344 U.S. 293 (1953) ........................................................................3, 13, 39

*Conway v. White Trucks, A Div. of White Motor Corp.*,
    885 F.2d 90 (3d Cir. 1989) ........................................................................47

*Doktor v. Werner Co.*,
    762 F.2d 494 (E.D.N.Y. 2011) ........................................................................44

*Douglas v. Stamco*,
    363 Fed. App'x 100 (2d Cir. 2010) ........................................................................44

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
    11-CV-564 (JG), 2014 U.S. Dist. LEXIS 130154 (E.D.N.Y. Sept. 16, 2014) .................33

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
    871 F. Supp. 2d 143 (E.D.N.Y. 2012), *rev'd on other grounds*,
    747 F.3d 145 (2d Cir. 2014) ........................................................................28, 32, 33, 34

*Gabauer v. Chemtura Corp. (In re Chemtura Corp.)*,
    505 B.R. 427 (S.D.N.Y. 2014)............................................................27, 29, 30, 31

*In re Arch Wireless, Inc.*,
    332 B.R. 241 (Bankr. D. Mass. 2005), *aff'd*, 534 F.3d 76 (1st Cir. 2008) ......................15, 16

*In re BFW Liquidation, LLC*,
    471 B.R. 652 (Bankr. N.D. Ala. 2012) ............................................................44, 48

*In re Chemtura Corp.*,
    Case No. 09-11233 (REG)......................................................................................31

*In re Drexel Burnham Lambert Grp., Inc.*,
    151 B.R. 674 (Bankr. S.D.N.Y. 1993) ............................................................14, 15

*In re Edwards*,
    962 F.2d 641 (7th Cir. 1992) ....................................................................................47

*In re Fernwood Markets*,
    73 B.R. 616 (Bankr. E.D. Pa. 1987) ........................................................................45

*In re Johns-Manville Corp.*,
    759 F.3d 206 (2d Cir. 2014)................................................................42, 43, 45

*In re New Century TRS Holdings, Inc.*,
    No. 07-10416 (BLS), 2014 WL 842637 (Bankr. D. Del. Mar. 4, 2014) ..........................25, 26

*In re Savage Indus., Inc.*,
    43 F.3d 714 (1st Cir. 1994).........................................................................................41

*In re Thomson McKinnon Secs. Inc.*,
    130 B.R. 717 (Bankr. S.D.N.Y. 1991) ............................................................14, 15

*In re Trans World Airlines, Inc.*,
    322 F.3d 283 (3d Cir. 2003).......................................................................................46

*Koam Produce, Inc. v. DiMare Homestead, Inc.*,
    213 F. Supp. 2d 314 (S.D.N.Y. 2002), *aff'd*, 329 F.3d 123 (2d Cir. 2003) ..........................20

*Koepp v. Holland*,
    No. 13-4097, 2014 U.S. App. LEXIS 22108 (2d Cir. Nov. 21, 2014) ....................................41

*Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*,
    879 F. Supp. 2d 243 (E.D.N.Y. 2012) ....................................................................21

*MacArthur Co. v. Johns-Manville Corp.*,
    837 F.2d 89 (2d Cir. 1988).......................................................................................40

*Mennonite Bd. of Missions v. Adams*,
  462 U.S. 791 (1983)........................................................................................13, 14, 39

*Molla v. Admar of New Jersey, Inc.*,
  No. 11-6470, 2014 WL 2114848 (D.N.J. May 21, 2014).......................................................47

*Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus., Inc.)*,
  467 B.R. 694 (S.D.N.Y. 2012)..................................................................................41, 45, 48

*Morgenstein v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
  462 B.R. 494 (Bankr. S.D.N.Y. 2012)........................................................................23

*Mullane v. Cent. Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950)........................................................................................ *passim*

*Picard v. Cohmad Secs. Corp. (In re Bernard L. Madoff Inv. Secs. LLC)*,
  454 B.R. 317 (Bankr. S.D.N.Y. 2011)........................................................................20

*Schwinn Cycling & Fitness v. Benonis*,
  217 B.R. 790 (N.D. Ill. 1997) ................................................................................41

*Solow Bldg. Co., LLC v. ATC Assocs. Inc.*,
  175 F. Supp.2d 465 (E.D.N.Y. 2001) .......................................................................14, 16

*Tillman v. Camelot Music, Inc.*,
  408 F.3d 1300 (10th Cir. 2005) ...............................................................................28

*Travelers Cas. & Sur. Co. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*,
  600 F.3d 135 (2d Cir. 2010)..................................................................................... *passim*

*Tulsa Prof'l Collection Servs., Inc. v. Pope*,
  483 U.S. 478 (1988)...............................................................................................14

*United States v. Koppers Co.*,
  652 F.2d 290 (2d Cir. 1981)....................................................................................20

*Waterman S.S. Corp. v. Aguiar (In re Waterman S.S. Corp.)*,
  141 B.R. 552 (Bankr. S.D.N.Y. 1992)........................................................................27

*Zurich Am. Ins. Co. v. Tessler (In re J.A. Jones, Inc.)*,
  492 F.3d 242 (4th Cir. 2007) ..................................................................................14

STATUTES

11 U.S.C. § 363(f).................................................................................................................44, 46

11 U.S.C. § 363(m)..............................................................................................................44, 45

11 U.S.C. § 1144.......................................................................................................................44

49 U.S.C. § 30117(b)................................................................................................................22

49 U.S.C. § 30118(c)................................................................................................................22

OTHER AUTHORITIES

Anton R. Valukas, *Report to Board of Directors of General Motors Company Regarding
    Ignition Switch Recalls*, *available at* http://www.nhtsa.gov/staticfiles/nvs/Valukas-
    report-on-gm-redacted.pdf ............................................................................................. *passim*

Rachel Abrams, *11 Years Later, Woman's Death Is Tied to G.M. Ignition Defect*, NY
    TIMES, Nov. 10, 2014, *available at* http://www.nytimes.com/2014/11/11/business/11-
    years-later-death-is-tied-to-gm-defect.html?_r=0....................................................................34

Rebecca R. Ruiz, *Woman Cleared in Death Tied to G.M.'s Faulty Ignition Switch*, NY
    TIMES, Nov. 24, 2014, *available at* http://www.nytimes.com/2014/11/25/business/
    woman-cleared-in-death-caused-by-gms-faulty-ignition-switch.html?_r=0 ..........................34

FED. R. CIV. P. 9(b) ..................................................................................................................23

U.S. Const. amend. V...........................................................................................................11, 48

Designated Counsel for the plaintiffs in Pre-Closing Accident Lawsuits (the "Pre-Closing Accident Plaintiffs") submits this Responsive Brief to the Opening Brief by General Motors LLC on Threshold Issues Concerning its Motions to Enforce the Sale Order and Injunction (the "New GM Opening Brief") and represents as follows:

## INTRODUCTION

On August 1, 2014, General Motors LLC ("New GM") filed its *Motion of General Motors LLC Pursuant to 11 U.S.C. Sections 105 and 363 to Enforce this Court's July 9, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits* [Dkt. No. 12807] (the "Motion to Enforce Sale Order re: Pre-Closing Accident Lawsuits").

Subsequently, on September 15, 2014, this Court entered its *Scheduling Order Regarding Motion of General Motors LLC Pursuant to 11 U.S.C. Sections 105 and 363 to Enforce this Court's July 9, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits* [Dkt. No. 12897] (the "Scheduling Order re: Pre-Closing Accident Lawsuits").

Pursuant to the Scheduling Order re: Pre-Closing Accident Lawsuits, this Court ordered, *inter alia*, that Designated Counsel for the Pre-Closing Accident Plaintiffs should (i) absent further order of the Court, adhere to the briefing schedule set forth in the Court's *Supplemental Scheduling Order Regarding (I) Motion of General Motors LLC Pursuant to 11 U.S.C. Sections 105 and 363 to Enforce this Court's July 9, 2009 Sale Order and Injunction, (II) Objection Filed by Certain Plaintiffs in Respect Thereto, and (III) Adversary Proceeding No. 14-01929*, entered on July 11, 2014 [Dkt. No. 12770] (as amended, the "Scheduling Order re: Original Motion to Enforce Sale Order"); and (ii) coordinate its efforts with other Designated Counsel for the plaintiffs asserting claims against New GM for economic damages (the "Economic Damages Plaintiffs" and, together with the Pre-Closing Accident Plaintiffs, the "Plaintiffs") "to the extent reasonably practicable to avoid repetition and duplicative arguments" with respect to the Four

ACTIVE/80648509.1

Threshold Issues and the Fraud on the Court Standard Briefing as described in the Scheduling

Order re: Original Motion to Enforce Sale Order.

In keeping with the Court's requests, Designated Counsel for the Pre-Closing Accident

Plaintiffs hereby adopts and incorporates by reference the following arguments made by

Designated Counsel for the Economic Damages Plaintiffs in their responsive briefs: (i) the Old

GM Claim Threshold Issue, (ii) the Equitable Mootness Threshold Issue, and (iii) the Fraud on

the Court Standard Briefing. Also in keeping with the Court's requests, rather than setting forth

a lengthy and duplicative Statement of Facts, Designated Counsel for Pre-Closing Accident

Plaintiffs hereby adopts and incorporates by reference the statement of facts set forth in the

responsive briefs filed by Designated Counsel for the Economic Damages Plaintiffs.

In addition, Designated Counsel for the Pre-Closing Accident Plaintiffs hereby adopts

and incorporates by reference: (i) the *Agreed and Disputed Stipulations of Fact Pursuant to the*

*Court's Supplemental Scheduling Order, Dated July 11, 2014*, filed on August 8, 2104, [Dkt.

No. 12826] and Exhibits A-D attached thereto (the "Stipulated Facts")[1]; (ii) the Proposed

Additional Agreed and Disputed Stipulations of Fact filed with the Court on November 5, 2104,

as Exhibit A to Designated Counsel's *Notice of Submission of Proposed Additional Agreed and*

*Disputed Stipulations of Fact in Connection with Court's Scheduling Order Regarding Motion of*

*General Motors LLC Pursuant to 11 U.S.C. Sections 105 and 363 to Enforce this Court's July 9,*

*2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits* [Dkt. No.

12977] (the "Additional Pre-Closing Accident Stipulated Facts")[2]; and (iii) all declarations and

exhibits attached thereto filed by the Economic Damages Plaintiffs in support of their responsive

briefs.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Stipulated Facts.
[2] Goodwin Procter LLP has been engaged to act as Designated Counsel only with respect to claims relating to the Ignition Switch, not other defects.

## PRELIMINARY STATEMENT AND FACTUAL BACKGROUND

General Motors Corporation ("Old GM") sold defective automobiles to unsuspecting customers. The defect was embedded in the DNA of every one of the millions of vehicles that used the Ignition Switch. The defective Ignition Switch was used for years in Saturn Ions, Chevrolet Cobalts, Pontiac G5s, Chevrolet HHRs, and other vehicles. Referred to internally as "the switch from hell," there were early electrical problems with the switch, high failure rates during testing, and the torque required to supply the resistance necessary to prevent the switch from inadvertently slipping from the "run" position to "auxiliary" or "off" was inadequate and below specification even before mass production began.[3] Because problems were noted almost immediately, the gallows humor within Old GM was that the problem had been around "since man first lumbered out of the sea and stood on two feet." Stipulated Facts, Exh. B ¶ 14(B)(vi).

However, the defect was deadly serious. The defect made all of the Subject Vehicles prone to spontaneous unexpected moving stalls on rough roads, or if the key was inadvertently jostled or bumped by the driver, or if the key ring had too many keys or too much weight on it. Although unexpected stalling is immediately recognizable as a safety hazard to any sentient person, Old GM treated the possibility of an unexpected moving stall as an issue of "customer convenience." V.R. at 2, 33. As one car reviewer for the *Cleveland Plain Dealer* put it in 2005, that characterization was "a knee slapper." V.R. at 85. According to the Valukas Report, although Old GM employees knew better and categorized the moving stalls as a safety issue, they were either intimidated into acquiescence or ignored. *See* Stipulated Facts, Exh. B ¶ 14(R)(i), (S)(i); V.R. at 83, 93.

---

[3] *See generally*, Anton R. Valukas, *Report to Board of Directors of General Motors Company Regarding Ignition Switch Recalls*, dated May 29, 2014 (the "Valukas Report" or "V.R."). A copy of the Valukas Report is available in redacted form at http://www.nhtsa.gov/staticfiles/nvs/Valukas-report-on-gm-redacted.pdf. *See also* Stipulated Facts, Exh. B ¶¶ 1-3.

Significantly, the electrical system of the Subject Vehicles was designed so that if the engine was shut off by the Ignition Switch moving from the "run" position to "auxiliary" or "off," not only would power be lost for the steering and brakes, but the airbags would be disengaged and would not deploy upon a crash. Stipulated Facts, Exh. B ¶ 1.

Knowledge of problems with the Ignition Switch was widespread within Old GM:

- Raymond DeGiorgio (Design Release Engineer for the Ignition Switch) knew about it.

- Steven Oakley (Brand Quality Manager) knew about it.

- William Kemp (Senior In-House Attorney) knew about it.

- Gay Kent (Director of Product Investigations) knew about it.

- Elizabeth Kiihr (Product Investigations Engineer) knew about it.

- Alberto Manzor (Engineer) knew about it.

- Gary Altman (Program Engineering Manager) knew about it.

- Dwayne Davidson (Manager for TREAD Reporting) knew about it.

- Jaclyn Palmer (In-House Product Liability Attorney) knew about it.

- Elizabeth Zatina (In-House Attorney) knew about it.

- Doug Parks (Chief Engineer for Cobalt) knew about it.

- William Chase (Warranty Engineer) knew about it.

- Douglas Wachtel (Manager, Products Investigation Unit) knew about it.

- David Trush (Design Engineer for Ignition Cylinder/Key for Cobalt) knew about it.

- John Dolan (Electrical Engineer) knew about it.

- Brian Everest (Field Performance Assessment Supervisor, Engineer) knew about it.

- John Hendler (Vehicle Systems Engineer for Electrical Systems) knew about it.

- Joseph Joshua (employee) knew about it.

- Joseph Manson (Engineer) knew about it.

4

- Onassis Matthews (employee) knew about it.

- Lori Queen (Vehicle Line Executive, Chair November 2004 PRTS) knew about it.

- John Sprague (Performance Assessment Airbag Engineer) knew about it.

- Lisa Stacey (Field Performance Assessment Engineer) knew about it

- Brian Stouffer (Products Investigation Engineer) knew about it.

*See* Stipulated Facts, Exh. B ¶ 14.

Millions of vehicles using the defective Ignition Switch were in circulation among unsuspecting owners and, by extension, the rest of the driving and pedestrian public during the seven year period between the Ignition Switch's earliest commercial use in 2002 and the Petition Date in 2009. During that seven year period, Old GM initiated no fewer than six investigative reports with respect to moving stalls resulting from the defective Ignition Switch, including three "Problem Resolution Tracking System" ("PRTS") inquiries (November 2004, May 2005, and February 2009). V.R. at 63. These internal probes followed as result of (i) customer complaints, (ii) the observations of Old GM's own employees that had either witnessed or experienced stalling in Subject Vehicles, (iii) negative press reports, (iv) inquiries from the National Highway Traffic Safety Administration ("NHTSA") about the high rate of airbag non-deployments in Cobalts and Ions, and (v) accidents involving Subject Vehicles. As a result of these investigations, in March of 2009, the key for the Ignition Switch was redesigned from a slot to a hole. Stipulated Facts, Exh. B ¶ 14(F)(ii); V.R. at 131. This belated and far from adequate change was acknowledged internally at Old GM to be a "band-aid" that fell short of the needed changes to the Ignition Switch. Stipulated Facts, Exh. B ¶ 14(R)(ii). In fact, the key modification had been recommended four years earlier in May of 2005, but was inexplicably delayed while accidents and deaths continued to occur. Stipulated Facts, Exh. B ¶ 14(T)(ii); V.R. at 78, 80, 88. Everyone within Old GM involved with the three PRTS investigations and

everyone within Old GM that read the multiple reports, received the multiple emails, or attended the multiple meetings, knew about the problems with the Ignition Switch that were being investigated.

During this same seven year period, Old GM issued at least two Technical Service Bulletins to all of its dealers warning of the possibility of an unexpected moving stall in identified vehicles using the Ignition Switch – a switch that was common to vehicles designed using the Delta and Kappa platforms such as the Cobalt, the Ion, and several Pontiac vehicles. Stipulated Facts, Exh. B ¶¶ 10, 11, 14(R)(ii). Perforce, everyone within Old GM that authorized the issuance of the Technical Service Bulletins and everyone within Old GM that saw those bulletins, had knowledge of the faulty Ignition Switch. Shamefully, neither Technical Service Bulletin actually used the word "stall" because "stall" was considered to be a hot button word that would alert the NHTSA to a safety issue and a possible recall. V.R. 8, 92.[4] This ultimately meant that drivers were not adequately warned of the hazard and only those who complained to a dealer would learn of the "band aid" recommendation that a plug could be inserted into the key to reconfigure it from a slot to a circular hole. V.R. at 93.

Likewise, beginning in 2005, the Product Investigations group within Old GM initiated the first of several investigations into the Ignition Switch problem to try to diagnose and correct the stalling problem. V.R. at 74, 86, 102. Everyone within Old GM involved with these multiple investigations and everyone within Old GM that read the Field Performance Reports that were issued in connection with these investigations, received the emails, or attended the meetings, knew about the problems with the Ignition Switch.

---

[4] This willful obfuscation by Old GM belies any claim that it did not perceive the Ignition Switch defect as a safety issue.

As reports of accidents mounted, people outside Old GM realized what people inside Old GM were denying: An unexpected moving stall is a safety issue.

- In May 2005, a reviewer for the *Sunbury Daily Item* described four unplanned engine shutdowns during a hard driving test and concluded the review with "I never encountered anything like this in 37 years of driving and I hope I never do again."  V.R. at 84.

- In June 2005, a customer wrote to Old GM's Customer Service and called the moving stall issue in his 2005 Cobalt "a safety/recall issue if ever there was one." V.R. at 89.

- In February 2006, a Better Business Bureau arbitrator mandated that GM repurchase a Cobalt from a customer because "unexplained stalling of a vehicle in traffic certainly constitutes a serious safety hazard."  V.R. at 89 n.378.

- In April 2007, a Wisconsin State Trooper published an Accident Reconstruction Report that identified the connection between the loss of power and the non-deployment of airbags.  Stipulated Facts, Exh. B ¶ 14(H)(i).  This was something that should have been evident to the Old GM engineers that designed the electrical system of the Subject Vehicles and to the trouble-shooting engineers that were assigned to the Preliminary Investigations and the PRTS investigations.

Of course, Old GM was aware of and possessed all of these materials, but it resolutely refused to classify the unexpected stalling and concomitant loss of power to the power steering and brakes as anything more than an inconvenience.  In response to Old GM's contention that the moving stalls were not a safety issue, the *Cleveland Plain Dealer* quipped, "[s]o, if you're whisking along at 65 mph or trying to pull across an intersection and the engine stops, [you restart the engine after shifting into neutral.]  Only a gutless ninny would worry about such a problem.  Real men are not afraid of temporary reductions of forward momentum."[5]  V.R. at 85.

As is evident from the reporter's sarcasm, moving stalls do not only occur in the daytime on deserted suburban streets.  Notwithstanding the proven connection between the unexpected

---

[5] Indeed, the press had it right.  When Old GM senior in-house attorney Bill Kemp wanted to "shut up" the Cleveland Plain Dealer with a video demonstration that would show the remoteness of the stalling risk, another Old GM in-house attorney (Elizabeth Zatina) told Kemp that she was "not optimistic we can come up with something compelling."  V.R. at 86.

moving stalls and the failure of the airbags to deploy, airbag non-deployment did not cause the

crashes that killed and injured the Pre-Closing Accident Plaintiffs.  While the failure of the

airbags to deploy may have exacerbated the injuries, the failure of the airbags to deploy was not

the cause of the crashes at issue.  Those crashes would have occurred regardless of whether the

airbags were disengaged.

To date, the Pre-Closing Accident Plaintiffs have been denied the opportunity to

demonstrate that their crashes, injuries and deaths were attributable to the Ignition Switch defect.

This is because until the parade of recalls began in February 2014, the defect in the Ignition

Switch was undisclosed, or worse, deliberately hidden.  Everything laid out above, which is but a

fraction of the already available information, was culled from the Stipulated Facts or the Valukas

Report.  For almost a decade preceding the sale of Old GM to New GM (the "363 Sale"),

engineers, supervisors, lawyers, and others within Old GM consciously nibbled around the edges

of the problem of the Ignition Switch defect.  V.R. at 256.  They gave each other what the

Valukas Report unflatteringly describes as the "GM nod" and "GM salute" while the buck was

being passed back and forth by employees that were reluctant to raise safety issues for fear of

retaliation.  V.R. at 255.  Information about crashes involving Subject Vehicles was

accumulated, compiled and logged onto spreadsheets by such Old GM employees as John

Sprague, Brian Everest, and Dwayne Davidson, but that wealth of data remained buried within

Old GM, and stayed buried within New GM until the dam finally burst.  Stipulated Facts, Exh. B

¶ 14(H), (K), (X).

Old GM unquestionably had knowledge of the Ignition Switch defect.[6]  Yet, at the time

that Old GM filed its motion for authority to sell its assets to New GM free and clear of

---

[6] Should the Court have any doubt about Old GM's knowledge, then the Pre-Closing Accident Plaintiffs respectfully
request the opportunity to take discovery on the question of knowledge.  This critically important, fact-intensive

successor liability claims, it did not disclose the existence of the Ignition Switch defect or any of

the relevant data it possessed.  In particular, Old GM did not disclose the existence of the

Ignition Switch defect in the Sale Motion or in the Sale Notice mailed to Pre-Closing Accident

Plaintiffs that had already sued Old GM.  Nor did Old GM disclose the existence of the Ignition

Switch defect in the Publication Notice published in newspapers of general circulation.  Old GM

did not even describe the Ignition Switch defect and the claims that would be affected by the free

and clear aspect of the sale when it asked the Court in the Sale Motion to approve the form and

method of notice as "sufficient under the circumstances."  New GM Opening Brief at 10.  In

every instance, the notice that was given was generic and lacked any hint or mention of the

known Ignition Switch defect.  As a result of the insufficient notice that was given, persons

injured or the relatives of persons killed were unaware that the Subject Vehicles contained an

intrinsic safety defect that could have both caused and amplified the consequences of their

accidents.

        Had the Pre-Closing Accident Plaintiffs been notified of the existence of the Ignition

Switch defect, those persons (or their surviving relatives) would have been alerted to the actual

(rather than abstract) consequence of the free and clear aspect of the pending sale upon their

claims.  Lacking this crucial information, the Pre-Closing Accident Plaintiffs were denied due

process because the Pre-Closing Accident Plaintiffs were deprived of the opportunity to file

meaningful objections to the free and clear aspect of the proposed sale.[7]  The factual predicates

of that objection are obvious:

---

question cannot be decided against the Pre-Closing Accident Plaintiffs on a stunted record that has been limited to a
stipulated set of facts culled from a report commissioned by New GM.
[7] Every Pre-Closing Accident Plaintiff was a known creditor of Old GM at the time of the sale entitled to notice
because (unbeknownst to these victims) every owner of a Subject Vehicle already had a claim against Old GM for
the repair of the faulty Ignition Switch regardless of whether an accident had occurred.  Constitutionally sufficient
notice to the owners of Subject Vehicles describing the existence and nature of the defect would have gone to the

- Information about a known safety defect is withheld from the public for many years;

- Although the vehicle owners are identifiable by Old GM due to federally mandated record-keeping requirements, or reachable through targeted press releases, no warnings are given and no repairs or recalls are made;

- The "symptoms" of the defect (moving stalls, loss of power to the steering and brakes, and disengagement of the airbags) are elements of many of the accidents that occurred in the Subject Vehicles;

- After several years of non-disclosure and failures to remedy or warn, Old GM (with full knowledge of the lack of disclosure) readies to sell itself to itself in a taxpayer-funded, expedited sale that will leave these inconvenient claims behind and shield itself from successor liability from the moment it transforms itself to "New GM"; and

- The sale is to be accomplished on a highly expedited basis without ever telling the victims – or this Court – about the existence of the defect.

The Pre-Closing Accident Plaintiffs do not have to demonstrate they would have been successful in opposing the successor liability shield in the Sale Order and Injunction. What would have happened if proper disclosure had been made is speculative and unknowable. But what is not speculative is that the Pre-Closing Accident Plaintiffs were prevented from making arguments against the free and clear aspect of the sale using the information that was withheld from them – information that was known to Old GM and that should have been disclosed. The Pre-Closing Accident Plaintiffs can never go back in time and make the arguments that they could have made but for the lack of proper notice. The context, tension, and fluidity of July 2009 cannot be recreated, hypothetically or otherwise. Old GM's failure to provide meaningful content in the Sale Notice meant that the Pre-Closing Accident Plaintiffs were unable to fully comprehend the effect of the successor liability shield on claims that are based on the decade-long failure by Old GM to publicly announce and correct a defect that resulted in grievous bodily

---

Pre-Closing Accident Plaintiffs as a subset of the group of all owners of Subject Vehicles, irrespective of whether Old GM knew of the accident. Upon receipt of the notice, those claimants would have been able to act accordingly.

injury and loss of life. The absence of full comprehension in turn impacted the ability of those most immediately affected by the free and clear aspect of the sale (the Pre-Closing Accident Plaintiffs) to knowledgeably assert their best arguments against the extraordinary relief that was being requested by Old GM. The firestorm reaction of the American public, federal and state governments, and the press to New GM's 2014 revelation gives every indication that a similar or greater maelstrom would have occurred in July 2009 had Old GM made proper disclosure before the 363 Sale.

As a result of the disclosure failures, the free and clear aspect of the sale was approved based upon faulty premises and a deficient record that was manipulated by Old GM to its own advantage in anticipation of its reincarnation as New GM. The violation of due process that resulted from the insufficient disclosure of the Ignition Switch defect can (and should) be remedied by insulating the Pre-Closing Accident Plaintiffs from the free and clear aspects and injunctive provisions of the Sale Order and Injunction and permitting their claims to be asserted against New GM under theories of successor liability.

## **ARGUMENT**

## I.    **DUE PROCESS THESHOLD ISSUE:  THE PLAINTIFFS' DUE PROCESS RIGHTS WERE VIOLATED IN CONNECTION WITH THE 363 SALE REGARDLESS OF WHETHER THEY WERE INVOLVED IN A PRE-CLOSING ACCIDENT**

New GM argues in its opening brief that the Plaintiffs were "unknown" claimants at the time of the 363 Sale and, thus, were only entitled to publication notice of the 363 Sale to satisfy the Fifth Amendment's due process requirement.[8]  In taking this position, New GM ignores reams of evidence demonstrating that – for years prior to the commencement of Old GM's chapter 11 case – at least dozens of Old GM employees were aware of the Ignition Switch defect

---

[8] "No person shall … be deprived of … property, without due process of law."  U.S. Const. amend. V.

present in the Subject Vehicles.[9]  In fact, certain of these employees held senior positions within

the company's legal, engineering, and Products Investigation departments.  As the Court is

aware, this defect causes the Ignition Switch to unexpectedly move out of the "run" position and

into the "accessory" or "off" positions while the vehicle is in motion (possibly at highway

speed), disabling the vehicle's electrical system, power steering, power breaks, and airbag

deployment system.

When New GM finally disclosed the existence of this deadly safety defect in February

2014 and the public learned that General Motors (both "Old" and "New") was aware of this

defect for over a decade, there was an immediate and explosive reaction.  As New GM belatedly

began its series of 2014 recalls affecting millions of vehicles, an avalanche of media coverage,

litigation, congressional hearings, and federal criminal investigations ensued.  Although the

Plaintiffs do not possess a time machine, there is no reason to believe that a response of similar

force would not have occurred had Old GM made these same disclosures prior to the 363 Sale.

Because the Ignition Switch defect and its hazardous implications were known to Old

GM for years prior to the 363 Sale and because owners of the Subject Vehicles were reasonably

identifiable through the same federally-regulated means by which GM conducts recalls, Supreme

Court precedent required Old GM to provide these known creditors actual notice of the 363 Sale

proceedings.  On this record, generic publication notice alone does not suffice for due process

purposes.  Moreover, Old GM had to provide sufficient detail about the Ignition Switch defect to

apprise these known creditors of the existence of their claims and afford them a reasonable and

---

[9] *See* Stipulated Facts at Exh. B ¶¶ 6-22.  Nowhere in the New GM Opening Brief is there mention of the
voluminous Valukas Report prepared at the request of New GM's board of directors, which describes Mr. Valukas's
conclusions as to why GM (both "Old" and "New") took so long to recall the Subject Vehicles in the face of the
substantial knowledge of the defect within the organization "from the outset" of the Ignition Switch being installed
in GM vehicles.  V.R. at 5.  The Plaintiffs are confident that there is a great deal more to learn than what was
revealed in the Valukas Report about the level and timing of knowledge of this safety defect within the ranks of GM.

meaningful opportunity to object to the free and clear nature of the 363 Sale that purported to shield the taxpayer-funded purchaser from liability to them.

Instead, the Plaintiffs – including those who were involved in an accident prior to the 363 Sale – were kept in the dark about GM's longstanding knowledge of this defect and, thus, were deprived of the ability effectively participate in the proceedings culminating in the 363 Sale. This was a violation of the Plaintiffs' due process rights for which New GM should not be rewarded.

A. **The Plaintiffs Were Known Creditors Entitled To Actual Notice Reasonably Calculated To Allow Them To Object To The 363 Sale And Protect Their Litigation Rights**

When a bankruptcy debtor seeks relief against third parties, due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).[10] The method of notice necessary to satisfy due process depends on whether a creditor is "known" or "unknown" at the time the notice is to be given. While unknown creditors are merely entitled to constructive publication notice of the proceedings, known creditors must receive _actual_ notice. *See Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 800 (1983). This is true regardless of how widely-publicized the bankruptcy case is or whether the known creditor is actually aware of the bankruptcy proceedings. *See City of New York v. New York, New Haven & Hartford R.R. Co.*, 344 U.S. 293, 297 (1953) ("[E]ven creditors who have knowledge of a reorganization have a right to assume that the statutory 'reasonable notice' will be given them before their claims are forever barred.");

---

[10] The *Mullane* due process standard established by the Supreme Court implicates both the method and the content of the required notice. Section I.A of this brief addresses the method of notice required to satisfy due process while Section I.B addresses the required content. In this case, both were constitutionally deficient such that all Plaintiffs were denied due process in connection with the 363 Sale.

*Arch Wireless, Inc. v. Nationwide Paging, Inc. (In re Arch Wireless, Inc.)*, 534 F.3d 76, 83 (1st

Cir. 2008) (same).

      **1.**      ***If A Debtor's Books And Records Suggest That A Party***
                         ***Might Reasonably Bring A Particular Claim, That Party***
                         ***Is A Known Creditor Entitled To Actual Notice***

A known creditor is one whose identity is "reasonably ascertainable" by the debtor.

*Mennonite Bd. of Missions*, 462 U.S. at 800 ("Notice by mail or other means as certain to ensure

actual notice is a minimum constitutional precondition to a proceeding which will adversely

affect the liberty or property interests of <u>any</u> party, whether unlettered or well versed in

commercial practice, if its name and address are reasonably ascertainable."); *Tulsa Prof'l*

*Collection Servs., Inc. v. Pope*, 483 U.S. 478, 489-90 (1988) (executor required to provide actual

notice by mail of probate proceedings to creditors whose identities were "reasonably

ascertainable").  To identify its known creditors, a debtor must undertake a diligent examination

of its books and records.  *In re Drexel Burnham Lambert Grp., Inc.*, 151 B.R. 674, 681 (Bankr.

S.D.N.Y. 1993); *Solow Bldg. Co., LLC v. ATC Assocs. Inc.*, 175 F. Supp.2d 465, 471-72

(E.D.N.Y. 2001); *In re Thomson McKinnon Secs. Inc.*, 130 B.R. 717, 720 (Bankr. S.D.N.Y.

1991).  *See also Zurich Am. Ins. Co. v. Tessler (In re J.A. Jones, Inc.)*, 492 F.3d 242, 252 (4th

Cir. 2007) (for purposes of determining if a creditor is a known creditor, "settled and sensible

authority provides that [a creditor providing notice to the debtor of its claim] is not necessary and

that the debtor must make its own determination based on a reasonably diligent effort in

reviewing its own records.").

New GM asserts that the Plaintiffs' claims would not have been identified through a

diligent examination of Old GM's books and records.  Specifically, New GM argues that

Plaintiffs who had not yet asserted claims against Old GM at the time of the 363 Sale would not

have been "listed as creditors in Old GM's books and records" and were, thus, unknown

creditors.  *See* New GM Opening Brief at 27-28.  New GM's contention that known creditors are

only those whose names appear on some "list of creditors" is incorrect, contrary to case law, and

unconstitutionally narrow.

Courts within and without this circuit have recognized that "books and records" is much

broader than the debtor's accounting ledger or its list of pending litigations.  Indeed, "[d]irect

knowledge based on a demand for payment is not … required for a claim to be considered

'known.'  A known claim arises from facts that would alert the reasonable debtor to the

possibility that a claim might reasonably be filed against it."  *Drexel Burnham*, 151 B.R. at 681

(rejecting argument that guaranty creditor was unknown because debtor's accounting principles

prevented it from listing its guaranty obligations as liabilities on financial reports).  Thus, if the

debtor has in its possession "some specific information that reasonably suggests both the claim

for which the debtor may be liable and the entity to whom he would be liable," that creditor is a

known creditor entitled to actual notice of the proceedings.  *In re Arch Wireless, Inc.*, 332 B.R.

241, 255 (Bankr. D. Mass. 2005), *aff'd*, 534 F.3d 76 (1st Cir. 2008) (quoting *La. Dep't of Envtl.

Quality v. Crystal Oil Co.*, 158 F.3d 291, 297 (5th Cir. 1998)).  *See also Thomson McKinnon*,

130 B.R. at 720 ("If the debtor knows, or should know, of its potential liability to a specific

creditor, that creditor is a known creditor entitled to actual notice.") (emphasis added)).

*Arch Wireless* is instructive in this regard.  In that case, the debtor argued that one of its

customers was an unknown creditor not entitled to actual notice of the bankruptcy because the

debtor's list of payables did not reflect a debt owing to that customer but instead a reflected a

receivable. *Arch Wireless*, 332 B.R. at 255.  The bankruptcy court found this argument "wholly

unpersuasive" because there were written communications from that customer in the debtor's

records asserting that the debtor had overcharged the customer and was potentially liable for

15

damages resulting from the debtor's delivery of faulty product. *Id.* The fact that the debtor

disputed the allegations in these letters and that the customer was generally aware of the

bankruptcy were irrelevant to the fact that this customer was a known creditor deprived of due

process by not receiving actual notice. *Id.* The First Circuit affirmed this result, finding no fault

in the bankruptcy court's conclusion that this customer was known creditor. *Arch Wireless*, 534

F.3d at 82. *See also Solow Bldg.*, 175 F. Supp.2d at 472 (letters from plaintiff in debtor's

possession regarding problems with debtor's asbestos abatement work rendered plaintiff a

known creditor entitled to actual notice even though plaintiff had not yet sued debtor); *Brunswick*

*Hosp. Ctr., Inc. v. New York Dep't of Health (In re Brunswick Hosp. Ctr.)*, No. 892-80487-20,

1997 Bankr. LEXIS 2184, *13-*14 (Bankr. E.D.N.Y. Sept. 12, 1997) (prepetition

correspondence from state to debtor regarding allocation of previously-awarded subsidy

payments supported court's conclusion that state was a known creditor).

As shown below, the record here similarly reflects ample documentation of knowledge of

this longstanding defect within Old GM's internal records to render all Plaintiffs known creditors

regardless of whether Old GM categorized them as such on the schedule of creditors they

utilized for purposes of bankruptcy notices.

> **2.** ***The Record Demonstrates That The Plaintiffs' Ignition Switch Defect
> Related Claims Were Reasonably Ascertainable From Old GM's Books
> And Records***

The Plaintiffs have not had access to discovery and instead must rely on New GM's own

internal investigation conducted by Mr. Valukas and those facts to which New GM is willing to

stipulate. Nevertheless, the factual record before the Court still establishes that, for years prior to

the 363 Sale, Old GM's internal books and records were littered with documents evidencing

pervasive corporate knowledge that all owners of the Subject Vehicles had claims for the

dangerous Ignition Switch defect that had been evident since the day these vehicles first rolled

off of the assembly line.  *See, e.g.*, Stipulated Facts, Exh. B ¶ 14(B)(vi) (Old GM engineer wrote

in an email that the defect in the Ignition Switch dated back to the time that "man first lumbered

out of [the] sea and stood on two feet.").

Old GM's internal knowledge of the Ignition Switch defect pre-dates the commencement

of mass production of the Subject Vehicles.  Indeed, one of the lead engineers involved in the

development of the defective Ignition Switch was aware since at least 2003 that the torque

problems with these switches were causing the Subject Vehicles to inadvertently stall while

moving.  *See, e.g.*, Stipulated Facts, Exh. B ¶ 14(I) (describing knowledge and activities of

Raymond DiGiorigio in relation to issues involving the ignition switch).  Moreover, several Old

GM employees have admitted that, prior to Old GM's bankruptcy, they viewed stalls resulting

from the Ignition Switch defect as a safety issue.  *See, e.g.*, Stipulated Facts, Exh. B ¶ 14(R)(i)

(assertions by one of the engineers investigating the Cobalt Ignition Switch in the spring of 2005

that he believed at the time that the Ignition Switch defect should be classified as a safety issue

and communicated his safety concerns, including airbag non-deployment, to numerous co-

workers and his superiors), ¶ 14(S)(i) (assertion by brand quality manager that he was aware of

the Ignition Switch issues in March 2005 and was concerned that it presented a safety issue but

that he was reluctant to pursue his concerns because of his perception that he would lose his job

for doing so).  That these employees now admit to having had safety concerns about the Ignition

Switch in the Subject Vehicles is not surprising; logic and common sense belie any argument

that a loss of a rapidly-moving vehicle's electrical power, power steering, power brakes, and

airbags is anything but a dangerous safety hazard.

Old GM's knowledge of the Ignition Switch defect was also demonstrated through the

Technical Service Bulletins ("TSBs") Old GM sent to its dealers regarding the problems with the

Ignition Switch. *See* Stipulated Facts, Exh. B ¶ 10 (describing TSB issued in December 2005 with the subject reference "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and No [Diagnostic Trouble Codes] for [certain Subject Vehicles]."), ¶ 11 (describing update of December 2005 TSB published in October 2006 to cover additional vehicle models and model years), and ¶ 14(AA)(ii) (describing unpublished draft of TSB from spring of 2007 that included in its title the word "stalls," which word was added with approval from Old GM's Senior Manager – Internal Investigation, Product Investigation). The TSBs prepared for dissemination to GM dealers are concrete evidence of a <u>corporate decision</u> to make a formal <u>authorized communication</u> to third parties (the dealers) acknowledging existence of the defect.

The record also demonstrates that numerous senior members of Old GM's legal, engineering, warranty, products investigations, and communications staff were well aware of serious and fatal accidents involving Subject Vehicles experiencing losses of power and airbag non-deployments. *See, e.g.*, Stipulated Facts, Exh. B ¶ 14(A) (Alan Adler, manager for safety communications), (C) (Kathy Anderson, Field Performance Assessment Engineer), (D) (Douglas Brown, In-House Counsel), (E) (Eric Budrius, engineer in Product Investigations unit), (L) (Michael Gruskin, in-house counsel, former head of GM's product litigation team), (N) (William Hohnstadt, sensing performance engineer), (O) (William Kemp, Counsel for Engineering Organization), (P) (Gay Kent, Director of Product Investigations), (S) (Steven Oakley, brand quality manager), (T) (Jaclyn Palmer, in-house product liability attorney); (U) (Manuel Peace, Field Performance Assessment Engineer), (W) (Keith Schultz, Manager of Internal Investigations), (X) (John Sprague, Field Performance Assessment Engineer), (Y) (Lisa Stacey, Field Performance Assessment Engineer), (Z) (David Trush, design engineer for ignition

18

cylinder and key for 2005 Cobalt), and (AA) (Douglas Wachtel, manager in Product

Investigations unit).

    In addition to institutional knowledge, people outside of GM had provided written

notification to Old GM regarding problems with the Ignition Switch and its deadly implications.

As noted above:

- In May 2005, a reviewer for the *Sunbury Daily Item* described four unplanned engine shutdowns during a hard driving test and concluded the review with "I never encountered anything like this in 37 years of driving and I hope I never do again." V.R. at 84.

- In June 2005, a customer wrote to Old GM's Customer Service and called the moving stall issue in his 2005 Cobalt "a safety/recall issue if ever there was one." V.R. at 89.

- In February 2006, a Better Business Bureau arbitrator mandated that GM repurchase a Cobalt from a customer because "unexplained stalling of a vehicle in traffic certainly constitutes a serious safety hazard." V.R. at 89 n.378.

- In April 2007, Old GM was provided with a copy of report by a Wisconsin state trooper regarding a fatal crash of a 2005 Cobalt that correctly concluded that "it appears likely that the vehicle's key turned to Accessory as a result of the low key cylinder torque/effort" and connected this to "the failure of the airbags to deploy." *See* Stipulated Facts, Exh. B ¶¶ 14(H)(i) (Old GM's Senior Manager for TREAD Reporting stating that he obtained a copy of this report in 2007 from someone within the Old GM legal department). *See also* Stipulated Facts, Exh. B ¶ 14(CC), (DD).

    For years prior to the 363 Sale, Old GM knew the Subject Vehicles were defective and all

in need of repair. Because of the widespread corporate knowledge of this dangerous safety

defect, Old GM reasonably should have expected that – if they knew about the defect – all

owners of Subject Vehicles could file claims against the company. This is true regardless of

whether (i) the owner was involved in a Pre-Closing Accident, (ii) a lawsuit had been

commenced against Old GM as of the 363 Sale, or (iii) Old GM was otherwise aware of the

accident.  All owners of Subject Vehicles were known creditors entitled to actual notice of the
363 Sale.

### 3.    *Old GM Employees' Knowledge Of The Ignition Switch Defect Was Imputable To Old GM*

New GM attempts to dodge the conclusion that the Plaintiffs were known creditors by
stating that only "a certain limited number of Old GM personnel" were aware of problems with
the ignition switches turning from the "run" position to "accessory" or "off" while in motion.
*See* New GM Opening Brief at 28.  In addition to this statement being contrary to the evidentiary
record before the Court, it also misleading because it ignores the tenet of agency law that the
knowledge of a corporation's employees acting within the scope of their employment is imputed
to the company.  Because Old GM personnel were aware of the Ignition Switch defect for years
and the problems it caused, Old GM as a corporation had the same knowledge and was obligated
to notify Subject Vehicle owners that their rights were going to be impacted by the 363 Sale.

Because corporations can only act through their employees and agents, "[k]nowledge and
actions of a corporation's employees and agents are generally imputed to the corporation where
the acts are performed within the scope of their authority."  *Arista Records LLC v. Usenet.com,
Inc.*, 633 F. Supp. 2d 124, 152 n.18 (S.D.N.Y. 2009) (quoting *UCAR Int'l, Inc. v. Union Carbide
Corp.*, No. 00 CV 1338 (GBD), 2004 U.S. Dist. LEXIS 914, 2004 WL 137073, at *3 (S.D.N.Y.
Jan. 26, 2004)).  *See also Bondi v. Bank of Am. Corp. (In re Parmalat Secs. Litig.)*, 383 F. Supp.
2d 587, 597 (S.D.N.Y. 2005); *Koam Produce, Inc. v. DiMare Homestead, Inc.*, 213 F. Supp. 2d
314, 325-26 (S.D.N.Y. 2002), *aff'd*, 329 F.3d 123 (2d Cir. 2003); *Picard v. Cohmad Secs. Corp.
(In re Bernard L. Madoff Inv. Secs. LLC)*, 454 B.R. 317, 336 n.14 (Bankr. S.D.N.Y. 2011).  To
have his or her knowledge or actions imputed to the employer corporation, an employee need not
be high ranking.  *United States v. Koppers Co.*, 652 F.2d 290, 298 (2d Cir. 1981) (rejecting

argument that imputation to a corporate employer is only permissible in the case of "high

managerial agents."); *Arista Records*, 633 F. Supp. 2d at 152, n.18 ("[E]mployee or agent need

not be high-ranking for knowledge and actions to be imputed to corporation if employee was

acting within the scope of his responsibilities"; knowledge and actions of marketing department

employees imputed to the corporation because they were acting within the scope of their

employment when creating promotional materials encouraging copyright infringement).

Additionally, a corporation's large size or complex internal structure does not immunize

it from imputation of its employees' knowledge. As one court recently recognized:

> An organization's large size does not in itself defeat imputation,
> nor does the fact that an organization has structured itself internally
> into separate departments or divisions. Organizations are treated
> as possessing the collective knowledge of their employees and
> other agents, when that knowledge is material to the agents' duties,
> however the organization may have configured itself or its internal
> practices for transmission of information.

*Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*, 879 F. Supp. 2d 243, 271 (E.D.N.Y. 2012) (quoting

RESTATEMENT (THIRD) OF AGENCY § 5.03 (2006)).

Many people within Old GM (several of whom were in positions of authority) learned of

the Ignition Switch defect and its implications through the ordinary course of their employment

years prior to the 363 Sale. Indeed, many Old GM staffers (most of whom became New GM

staffers) were specifically tasked with (i) investigating problems with the Ignition Switch

installed in the Subject Vehicles, (ii) drafting the TSBs warning GM dealers of the problem,

(iii) performing the PRTS inquiries aimed at resolving the problem, and (iv) handling (as in-

house attorneys) litigation claims relating to accidents involving Subject Vehicles. Old GM

knew that all owners of the Subject Vehicles were driving defective and dangerous cars and,

thus, were "known" creditors. New GM cannot credibly contend that, despite widespread

knowledge within Old GM of the defect, the Plaintiffs were unknown creditors only entitled to

21

generic publication notice because a handful of directors or senior officers allegedly did not

personally know of the defect in this Ignition Switch.  If accepted, such an argument would

violate not only basic tenets of agency law but also public policy because it would encourage

financially-troubled companies to keep their senior management in the dark about likely

litigation claims in hopes of riding through bankruptcy unchallenged, with the company (or the

purchaser of its assets) emerging on the other side with a permanent injunction against such

claims.

>    **4.**    ***Owners Of Cars With Claims Arising From The Ignition Switch Defect Were Reasonably Identifiable By GM Through The Same Process By Which It Eventually Recalled Those Vehicles***

In addition to Old GM having longstanding corporate knowledge that owners of Subject

Vehicles had claims arising from the undisclosed Ignition Switch defect, the names and

addresses of such known claimants were readily identifiable.  Specifically, since the 1966

enactment of the Motor Vehicle Safety Act, automobile manufacturers have been required to

maintain records of the name and address of all purchasers of their vehicles.  *See* 49 U.S.C. §

30117(b).  The purpose of this requirement is to facilitate recall notifications to drivers when a

manufacturer learns that a vehicle has a safety-related defect or does not comply with applicable

safety standards.  *See* 49 U.S.C. § 30118(c).  Indeed, once New GM belatedly determined to

recall the Subject Vehicles in 2014, it presumably utilized its records of purchases of Subject

Vehicles (many of which it inherited from Old GM) to issue its recall notifications.  Thus, the

Plaintiffs' identities were "reasonably ascertainable," rendering them "known" creditors under

the Supreme Court precedent described above.[11]

---

[11] *Compare Chemetron Corp. v. Jones*, 72 F.3d 341 (3d Cir. 1995) (case New GM relies upon in which debtor was sued post-bankruptcy for alleged injuries suffered by plaintiffs who lived in or visited the neighborhood in which the debtor owned a manufacturing facility and landfill over 20 years earlier; because debtor had no conceivable means of identifying itinerant people exposed to toxins such a long time ago, plaintiffs were unknown creditors).

5.    *New GM Relies On Inapposite Cases To Support Its Argument That the Plaintiffs Were Unknown Claimants*

In support of its argument that no due process violation occurred here, New GM's brief cites a litany of cases that have no application here.  For example, New GM relies heavily on this Court's decision in *Morgenstein v. Motors Liquidation Co., (In re Motors Liquidation Co.)*, 462 B.R. 494 (Bankr. S.D.N.Y. 2012) to establish that Plaintiffs were not known creditors of Old GM.  New GM Opening Brief at 27-30.  In actuality, *Morgenstein* provides a stark factual contrast to the present dispute.  In that case, unscheduled creditors alleged that Old GM's knowledge of an undisclosed design defect gave rise to a fraud on the court, warranting a partial revocation the confirmation order entered in these proceedings.  *Morgenstein*, 462 B.R. at 505 ("Here the substance of the claim of fraud is that Old GM knew that the design defect was in all of Old GM's 2007 and 2008 Impalas . . . and that Old GM intended to defraud the Court by failing to disclose that deficiency and make allowance for the resulting liability . . .").  In concluding that the heightened pleading standard for fraud under Rule 9(b) had not been met[12], the Court observed that "the allegations that Old GM knew of the design defect . . . generally are conclusory statements, supported by no evidentiary facts" and that "this is in substance a claim that Old GM should have known that the alleged design defect was more widespread."  *Id.* at 505-06 (first emphasis added); *see also id.* at 506 ("No facts are set forth establishing that Old GM actually knew the defect was more widespread."  (emphasis added)).  Here, by contrast, knowledge within Old GM of the undisclosed Ignition Switch defect is a stipulated fact.  Moreover, as noted above, the investigative report commission by New GM itself is replete with examples demonstrating longstanding knowledge within Old GM of the undisclosed defect.  Thus, the Court's dismissal of the fraud on the court claim in *Morgenstein* based on the absence

---

[12] As noted by the Court, Rule 9(b) requires plaintiffs "to allege facts that give rise to a strong inference of fraudulent intent."  *Id.* at 505 (citation and internal quotation marks omitted).

of any evidence that Old GM had knowledge of the alleged defect in no way advances New

GM's argument that Plaintiffs were not known creditors.

New GM's reliance on Judge Bernstein's decision in *Chrysler* is similarly misplaced.

New GM Opening Brief at 30, 48, 56, 66 (citing *Burton v. Chrysler Grp., LLC, (In re Old Carco

LLC)*, 492 B.R. 392 (Bankr. S.D.N.Y. 2013)).  In that case, post-sale purchasers of vehicles

manufactured pre-sale by the debtors sued the bankruptcy purchaser for damages relating to the

defect in their vehicles.  Because the successor liability shield was assumed to be in effect and

was not challenged, Judge Bernstein analyzed the issue as a matter of contract interpretation:

whether the asserted claims were assumed by the bankruptcy purchaser under the terms of the

sale agreement.  Judge Bernstein held that post-sale claims against the purchaser were not

assumed liabilities and noted that, even though the plaintiffs had purchased their vehicles <u>after</u>

the bankruptcy sale had closed, the debtor had issued recall notices for type of defect at issue

<u>before</u> the bankruptcy sale.  Thus, the plaintiffs in that case should have anticipated future

repairs.  *Id.* at 403 ("Anyone who owns a car contemplates that it will need to be repaired,

particularly when, as here, Old Carco had already issued at least two and possibly three recall

notices for the 'fuel spit back' problem for certain Durango and other Old Carco vehicles before

the original purchasers bought their vehicles from Old Carco").[13]  Significantly, the court did not

address or determine whether the plaintiffs were known creditors or whether notice of sale was

constitutionally adequate.  In stark contrast to *Chrysler*, the Pre-Closing Accident Plaintiffs'

claims arose <u>prior</u> to the 363 Sale and those claims arose from a defect that Old GM had known

---

[13] That car owners can expect to make repairs on their cars – especially for defective components that the
manufacturer had already recalled in similar vehicles – has no bearing on whether individuals such as the Plaintiffs
should reasonably "expect" that when they buy their cars that they will instantly have claims against the
manufacturer arising from safety defects the manufacturer incorporated into the vehicle for years but failed to
disclose to the public notwithstanding widespread corporate knowledge of the defect and the dangers it posed.

to exist in the Subject Vehicles for years before bankruptcy but was not revealed to the public until February 2014, when New GM began its recalls.

New GM also relies on *In re New Century TRS Holdings, Inc.* to support its argument that Plaintiffs were not known creditors. New GM Opening Brief at 27-28, 31-32 (citing *In re New Century TRS Holdings, Inc.*, No. 07-10416 (BLS), 2014 WL 842637 (Bankr. D. Del. Mar. 4, 2014)). In that case, a creditor argued that her late proof of claim – based on Truth-in-Lending Act violations she first discovered years after plan confirmation – should be deemed timely because she was a known creditor who did not receive actual notice of the claims bar date. *New Century*, 2014 WL 842637 at *3. In rejecting this argument, the bankruptcy court concluded that the claimant was an unknown creditor because: (i) the creditor did not put the debtors on notice of her claims until after the bar date; (ii) her status as a customer of the debtors, without more, did not make her a creditor (whether known or unknown); and (iii) because the circumstances of each loan were different, the existence of similar claims by other customers did not put the debtors on notice of her particular claims. *Id.* at *3-*5. According to the bankruptcy court, the creditor's argument that the debtors "should have known that <u>all borrowers</u>, including herself were known potential claimants" lacked merit because the debtors did not have a "duty to search out each conceivable or possible creditor and urge the person or entity to make a claim against it." *Id.* at *5 (citation and internal quotation marks omitted). Indeed, nothing in the record before the court even suggested that this particular creditor's claims could have been discovered upon investigation by the debtor. *Id.* at *6. Here by contrast, Plaintiffs are not suggesting that they are known creditors simply because they were customers of Old GM or because they have claims that are similar to those previously asserted by other customers. Rather, Plaintiffs were known creditors because they were owners of a limited universe of cars manufactured by Old

GM that had been <u>specifically identified as defective</u> by Old GM.  Unlike the situation in *New Century*, where the circumstances giving rise to the claim would be unique to each borrower, the Ignition Switch was identically manufactured and identically defective in <u>every</u> Subject Vehicle (and Old GM knew it).  Thus, New GM's reliance *New Century* is completely misplaced.[14]

### B.    <u>Notice Of The 363 Sale Was Constitutionally Insufficient Because It Failed To Apprise Plaintiffs – Including Pre-Closing Accident Plaintiffs – Of The Defect From Which Their Claims Arise</u>

The notice that Old GM provided with respect to the 363 Sale was constitutionally deficient regardless of whether the Plaintiffs are considered to be known or unknown creditors and regardless of whether the notice was mailed directly to the Plaintiff or published in the newspaper.  Simply put, even if Old GM had actually delivered a copy of the 363 Sale notice to each and every Plaintiff prior to the sale, those Plaintiffs' due process rights were still violated because the notice did not apprise Plaintiffs of the existence of the Ignition Switch defect in the Subject Vehicles.  Because Plaintiffs – including those Pre-Closing Accident Plaintiffs who had commenced litigation against Old GM prior to the 363 Sale and may have received actual written notice of the 363 Sale – were kept unaware that their vehicles were defective, they had no ability to make an informed objection to the proposed free and clear nature of the 363 Sale.  This denial of information deprived all such owners (including those whose vehicles had already crashed) of the due process the U.S. Constitution guarantees them before they can be deprived of their rights

---

[14] For the same reasons, the following cases upon which New GM relies are readily distinguishable.  New GM Opening Brief at 27-31 (citing *In re Envirodyne Indus., Inc.*, 206 B.R. 468 (Bankr. N.D. Ill. 1997) (concluding that claimants asserting antitrust claims were unknown creditors where there was" <u>totally insufficient proof that [the debtor] knew or should have known</u> that [claimant] held a clam for anti-trust violations on its part" and pointing out that "Plaintiffs seem to be arguing that the debtor should have chased down <u>every person who ever bought</u> plastic cutlery over a three year period to personally notify such person that it <u>might</u> have an antitrust claim against the debtor.") (emphasis added); *In re Enron Corp.*, No. 01-16034 (ALG), 2006 WL 898031 (Bankr. S.D.N.Y. March 20, 2006) (holding that state asserting late claim based on debtor's alleged manipulation of "western power markets" was not a known creditor simply because federal agency was generally <u>investigating</u> price manipulation in those markets and where any investigation by the debtors of their records would <u>not</u> have indicated that state held a claim); *In re Agway, Inc.*, 313 B.R. 31 (Bankr. N.D.N.Y. 2004) (holding that claimant asserting contribution claim was not a known creditor because claim was "uncertain and speculative" from the debtor's perspective)).

under state law to sue a successor company for damages they suffered as a result of this undisclosed safety defect.

### 1. *Old GM's Failure To Disclose To Potential Claimants Facts Necessary For Them To Realize They Had Claims Deprives Them of Due Process*

When a debtor can reasonably ascertain the existence of a creditor's claim and identity but the creditor himself is unaware of the claim, due process requires the debtor to take measures reasonably calculated to apprise that creditor of the facts necessary for him to protect his rights and property interests from being extinguished through the bankruptcy.  Courts within this circuit have recognized that due process should "require that a debtor notify a creditor of his claim when the creditor is unlikely to know about the claim otherwise" because "[a] creditor who is notified of the bankruptcy, but not of his claim, is in the same position as a creditor who has notice of his claim, but not of the bankruptcy."  *Waterman S.S. Corp. v. Aguiar (In re Waterman S.S. Corp.)*, 141 B.R. 552, 559 (Bankr. S.D.N.Y. 1992) (quoting *Acevedo v. Van Dorn Plastic Machinery Co.*, 68 Bankr. 495, 499 (Bankr. E.D.N.Y. 1986)); *Gabauer v. Chemtura Corp. (In re Chemtura Corp.)*, 505 B.R. 427, 429-30 (S.D.N.Y. 2014) (same).  *See also*, *Travelers Cas. & Sur. Co. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 600 F.3d 135, 157 (2d Cir. 2010) ("*Manville IV*") (finding due process violation where a party provided with publication notice of a major settlement between the debtor and its primary insurer would have had to have been "prescient" about the debtor's relationship with its insurer and of future bankruptcy court interpretations of its orders to adequately comprehend that the proposed settlement purported to bar third party claims against the insurer that were not derivative of claims against the debtor).

Thus, a debtor that has actively withheld necessary facts upon which a claim is to be based cannot benefit from serving (either by publication or by mail) a generic notice to known creditors that does not inform them of the facts necessary for them to learn that their claims exist.

27

See, e.g., *Tillman v. Camelot Music, Inc.*, 408 F.3d 1300, 1308 (10th Cir. 2005) (debtor took out

life insurance policies on employees but concealed existence of policies from employees and

their families; post-emergence, widow of deceased employee sued to recover life insurance

proceeds paid to debtor pre-petition; Tenth Circuit held that, because debtor concealed existence

of policies underlying claim, claimant was denied due process as a result of only receiving

generic publication notice of the existence of the bankruptcy case and, thus, her claims were not

discharged in bankruptcy); *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 871 F. Supp.

2d 143, 155-56 (E.D.N.Y. 2012) ("*DPWN Holdings I*"), *rev'd on other grounds*, 747 F.3d 145

(2d Cir. 2014) ("*DPWN Holdings II*") ("The due process rights of an unknowing victim of a

debtor's secret unlawful conduct are not protected by the victim's receipt of notice of the

debtor's bankruptcy proceedings.  Absent any practicable means of identifying what claim he

might have, such a victim is no more able to become a claimant in the bankruptcy proceeding

than if he had not received notice at all.").

The Supreme Court in *Mullane* recognized that that notice cannot be a "mere gesture."

*Mullane*, 339 U.S. at 315.  Rather, the party giving notice must attempt to provide affected

parties with "notice and opportunity for hearing <u>appropriate to the nature of the case</u>." (emphasis

added.)  *Id.* at 313.  Thus, *Mullane* teaches that appropriate notice is not just a matter of

execution; it is also a matter of content.  The right to be heard "has little reality or worth unless

one is informed that the matter is pending and can choose for himself whether to appear, default,

acquiesce or contest."  *Id.* at 314.  For the claimant to be able to make a meaningful decision

whether to object, he or she must be told what is at stake.  That is especially true where, as in

*Mullane*, the party charged with giving the notice is the party that is benefitted by the absence of

objections to the relief sought.  *Id.* at 316 ("But it is [the trust beneficiaries'] caretaker who in the

accounting becomes their adversary.  Their trustee is released from giving notice of jeopardy, and no one else is expected to do so.").

As known creditors of Old GM, all owners of vehicles containing the Ignition Switch defect – including those whose cars had already crashed – were entitled to constitutionally sufficient notice of the proposed sale to New GM rather than the generic notice that was published by Old GM in several newspapers or that, in some instances, was mailed to plaintiffs in pending lawsuits, which did not mention the defective Ignition Switch or list the Subject Vehicles.  The notice that Old GM should have given should have identified the Ignition Switch defect and advised the owners of the Subject Vehicles that the vehicles they were riding in, or that had already crashed, contained an embedded defect that could trigger an unexpected moving stall that would not only shut off power to the engine but also disable the power steering and brakes and disengage the airbags.  Because Old GM kept this information hidden from owners of these vehicles, they lacked the information needed to understand that they had viable claims against Old GM and its proposed successor corporation and to mount a knowledgeable, forceful, and fact-based opposition to the free and clear nature of the 363 Sale to the taxpayer-funded acquisition entity that became New GM.  Denying owners of these defective vehicles this crucial information denied them due process and Old GM's provision of publication or mailed notice of the 363 Sale was ineffective vis-à-vis these known creditors.

The deficiency in Old GM's notice is illustrated by comparing it to the situation this Court faced in the Chemtura case.  In that case, the debtor ("Chemtura") had manufactured diacetyl, a flavoring ingredient used in food products that is now known to be a carcinogen.  As of Chemtura's 2009 bankruptcy filing, the company had ceased production and sale of diacetyl and was already a defendant in personal injury lawsuits brought by approximately fifty plaintiffs.

29

*See Chemtura*, 505 B.R. at 430.  Unlike Old GM, which as noted above was required by federal

law to maintain the names and addresses of all purchasers of its vehicles, Chemtura did not have

a list of all potential claimants who may have been exposed to diacetyl it had manufactured and

sold (*i.e.*, they were unknown).  Nevertheless, to ensure that the maximum number of potential

claimants were aware of the bankruptcy and its impact on their tort claims, this Court approved a

procedure for noticing potential diacetyl claimants of the bankruptcy case.  To that end, the bar

date in that case informed potential claimants of crucial facts necessary for them to determine if

they had a claim against Chemtura for diacetyl exposure and how such claims could be impacted

in the bankruptcy.  Specifically, the approved notice explicitly told the reader:  (i) that Chemtura

sold diacetyl to food flavoring companies throughout the United States from 1998 to 2005,

(ii) that diacetyl was used in butter flavorings, (iii) that direct or indirect exposure to diacetyl

may cause injuries that become apparent now or in the future for which damages may be

available under various legal theories, and (iv) that failure to file a proof of claim for claims

arising from diacetyl exposure by the applicable bar date will result in those claims being forever

barred.  *Id*. at 429.  In addition, the notice was "site-specific" in that it specifically referenced the

flavoring companies that did business with Chemtura and was published in the local newspapers

in the towns where such companies were located.  *Id.*  As a result of this noticing process,

approximately 325 more plaintiffs filed diacetyl-related proofs of claim prior to the bar date.  *See*

Chemtura Tr. 9/13/2013, 29:1-9.

Post-confirmation, certain individuals filed lawsuits in state court against Chemtura

seeking damages for diacetyl exposure.  Chemtura moved before this Court to enjoin these

lawsuits as discharged under Chemtura's confirmed chapter 11 plan.  This Court granted the

debtor's motion, finding that the specific, informative, and geographically targeted notices

afforded diacetyl claimants with due process such that their claims were properly discharged. On appeal, Judge Furman of the district court for the Southern District of New York affirmed, agreeing with this Court that the notice provided was "reasonably calculated, under all the circumstances, to apprise [the post-bankruptcy claimants] of the pendency of the action and afford them an opportunity to present their objections." *Chemtura*, 505 B.R. at 431 (quoting *Mullane*, 339 U.S. at 314).

The *Chemtura* decision highlights perfectly the failures of due process in this case. On one hand, Chemtura utilized an informative and targeted publication notice to alert its <u>unknown</u> creditors of the potential existence of their claims and what to do to protect such claims from being extinguished. This Court and the district court correctly found that such notice passed constitutional muster under applicable Supreme Court precedent. On the other hand, Old GM <u>knew</u> of the Ignition Switch defect for years <u>and knew</u> the identities and addresses of those who could file claims for the defect. Unlike Chemtura, however, Old GM kept such information from these known claimants and the Court and, instead, prepared a notice of the 363 Sale that failed to inform owners of defective vehicles that they had viable damage claims and that any assertion of claims for this defect against Old GM's successor would be enjoined under the free and clear provisions of the 363 Sale. Under these circumstances, such generic notice failed the *Mullane* "reasonably calculated" notice test, resulting in a denial of all Plaintiffs' due process rights.[15]

---

[15] The Pre-Closing Accident Plaintiffs expect that New GM will point to colloquy in *Chemtura* between this Court and plaintiffs' counsel in which the Court said that "when your car goes off the road and gets into a crash, that's not so latent. I mean you know about it . . . . When you have a car wreck, which is what I talked about in GM, that's in Macy's window, everybody knows when they're in a car wreck the instant that the car wreck takes place." *In re Chemtura Corp.*, Case No. 09-11233 (REG), Hrg. Tr. 14:12-22, Jan. 31, 2013 (attached as <u>Exhibit A</u>). First, the Court made this statement in January of 2013, which was over a year before New GM first publicly disclosed the existence of the Ignition Switch defect and its knowledge thereof. Second, Pre-Closing Accident Plaintiffs acknowledge that their injuries were not latent and that they knew at the time their cars crashed that they had been injured. What they did not know is that their injuries were caused by a defect that was, in essence, manufactured directly into their vehicles <u>and</u> that Old GM knew about for years but failed to disclose. This can be compared to a former employee of a food flavoring plant who suffered from lung cancer at the time Chemtura filed for bankruptcy.

### 2.    *Old GM Has Made No Showing That Any Pre-Closing Accident Plaintiffs Were Aware Of The Ignition Switch Defect*

While the Pre-Closing Accident Plaintiffs did experience car crashes prior to the 363 Sale closing, Old GM has presented no evidence upon which this Court can base a finding that this subset of Plaintiffs were aware of the Ignition Switch defect that may have caused their accidents.  Accordingly, there is no basis for New GM to argue that Pre-Closing Accident Plaintiffs were on notice of their defect-related claims and should have objected to the free and clear nature of the 363 Sale on the basis of the undisclosed defect (or otherwise) if they wanted to preserve the ability to seek redress from New GM.

The *DPWN Holdings* case is particularly instructive with respect to the Pre-Closing Accident Plaintiffs.  In that case, United Air Lines ("United") allegedly participated in illegal price-fixing activity prior to filing for bankruptcy that resulted in overcharges to its customers, including DPWN Holdings (USA), Inc. ("DHL").  Although, as a trade creditor, DHL received actual notice of United's bankruptcy filing and the bar date, United never provided DHL specific information regarding potential antitrust violations.  Following United's emergence from bankruptcy, DHL sued for antitrust violations and United moved to dismiss on the grounds that DHL's claims were discharged in bankruptcy.  The district court (assuming for purposes of the motion to dismiss that DHL could not have discovered its antitrust claims until after the bankruptcy) rejected United's motion to dismiss, finding that "where a debtor is aware of certain claims against it due to information uniquely within its purview, due process requires that it notify claimants of the character of those claims prior to any discharge."  *DPWN Holdings I*, 871

---

Such a claimant would have been reasonably alerted by Chemtura's specific notice that the physical injury from which he suffered may have been caused by Chemtura's diacetyl-containing product.  That notice was calculated to apprise him of his claim and what he needed to do to protect it.  On the other hand, the generic notice Old GM provided gave Pre-Closing Accident Plaintiffs no clue as to why their car may have crashed and, thus no reason to object to New GM being shielded from liability to them.

F. Supp. 2d at 159 (emphasis added).  On appeal, the Second Circuit did not upset this holding, however, it found that because there were several allegations in DHL's complaint of public, pre-petition activity by United that could have alerted DHL to the existence of its antitrust claims prior to the bankruptcy, it remanded the case to the district court to determine what aspects of United's alleged price-fixing conduct were known by DHL or reasonably ascertainable prior to plan confirmation.  *DPWN Holdings II*, 747 F.3d at 152-53.  On remand, the district court again rejected a motion to dismiss by United and has ordered that the parties undergo document and deposition discovery so that the court may resolve the question of "what DHL know and when" on a full evidentiary record.  *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 11-CV-564 (JG), 2014 U.S. Dist. LEXIS 130154, *6 (E.D.N.Y. Sept. 16, 2014) ("*DPWN Holdings III*").

Just as in *DPWN Holdings I*, Pre-Closing Accident Plaintiffs who may have received actual notice of the impending 363 Sale, were nonetheless denied due process because that notice failed to apprise them of vital information necessary for them to understand the consequences to them of the free and clear aspect of the 363 Sale.  In particular, these victims were unaware that they had substantial grounds to oppose the successor liability shield requested by New GM as part of the 363 Sale.  They were also unaware that they had a credible causal connection between the existence of a known but undisclosed defect in their vehicle and their accident that would enhance their ability to succeed in recovering damages from Old GM's successor if successor liability protection was not granted.

Moreover, as in *DPWN Holdings*, it is impossible on the record as it exists today for the Court to determine that any of the Pre-Closing Accident Plaintiffs knew or should have known of the undisclosed Ignition Switch defect present in their vehicles at the time of their accidents.

Indeed, with respect to incidents involving Subject Vehicles owned by Pre-Closing Accident

Plaintiffs, the following matters have yet to be determined and are not undisputed:

1) the facts and circumstances of the incidents, including matters of causation or fault;

2) the substance of any direct or indirect communications between Old GM and any of

   the Pre-Closing Accident Plaintiffs with respect to the incidents; and

3) the veracity, responsiveness, or candor of any discovery responses or deposition

   testimony given in connection with any litigation between any of the Pre-Closing

   Accident Plaintiffs and Old GM pending prior to July 10, 2009 concerning such

   incidents.

*See* Additional Pre-Closing Accident Stipulated Facts, at Exh. A.[16]  Because Old GM did not

disclose the critical fact that all Subject Vehicles contained a dangerous defect that was known to

Old GM since the early 2000's, the Pre-Closing Accident Plaintiffs were denied due process

along with the rest of the Plaintiffs.  Any suggestion by New GM that the Pre-Closing Accident

Plaintiffs who actually received notice of the 363 Sale knew or reasonably should have known of

the Ignition Switch defect lacks any evidentiary support.  Moreover, as the *DPWN Holdings*

---

[16] As has been recently reported, crash victims are just now learning that their Pre-Closing Accidents were caused by the Ignition Switch defect.  Indeed, relations of Ms. Jean Averill, who was killed in a 2003 single car accident involving a Saturn Ion, were reportedly told by GM that it was denying an insurance claim because her airbag did not deploy when her car unexpectedly swerved off the road and hit a tree.  *See* Rachel Abrams, *11 Years Later, Woman's Death Is Tied to G.M. Ignition Defect*, NY TIMES, Nov. 10, 2014, *available at* http://www.nytimes.com/2014/11/11/business/11-years-later-death-is-tied-to-gm-defect.html?_r=0.  Old GM also failed to inform Ms. Candice Anderson that Old GM had determined in 2007 that the accident she suffered in 2004 in a Saturn Ion that caused the death of her boyfriend and serious injuries to her was linked to the Ignition Switch defect.  Rebecca R. Ruiz, *Woman Cleared in Death Tied to G.M.'s Faulty Ignition Switch*, NY TIMES, Nov. 24, 2014, *available at* http://www.nytimes.com/2014/11/25/business/ woman-cleared-in-death-caused-by-gms-faulty-ignition-switch.html?_r=0.  Rather than inform Ms. Anderson of the safety defect that caused this fatal accident, Old GM remained silent as Ms. Anderson pled guilty to criminally negligent homicide in 2007.  *Id.*  Thus, despite Old GM's knowledge of this deadly defect and its links to accidents such as these, communications and actions by Old GM appear to have dissuaded victims and their family members from previously pursuing claims against Old GM or its successor, New GM.  If Old GM misled Pre-Closing Accident Plaintiffs through misinformation or disclosure failures about the nature of their claims (*i.e.*, that they were caused by a known defect), how could such Plaintiffs have been afforded due process by receiving a generic notice that Old GM was being Sold to New GM in a free and clear sale?

cases instruct, any determination of a creditor's knowledge of the facts underlying its claim can

only be made after discovery and a ruling by a court of competent jurisdiction.

### C.  Due Process Violations Prejudiced Plaintiffs By Depriving Them Of The Opportunity To Advocate That New GM Be Forced To Assume Their Claims

New GM attempts to evade the consequences of its predecessor's failure to afford due

process to known creditors with claims arising from the Ignition Switch defect by arguing that

these creditors suffered no prejudice as a result of not being notified of the Ignition Switch defect

prior to the 363 Sale.  Specifically, New GM argues that because certain personal injury

claimants, state attorneys general, and consumer advocates were unsuccessful in opposing the

363 Sale and forcing New GM to assume all liabilities for claims arising from vehicles

manufactured by Old GM, that the Plaintiffs' participation in the process would have been

unavailing.[17]  In essence, New GM argues that the outcome of the 363 Sale would have been no

different (or that Old GM would have certainly been liquidated) had the Court, owners of GM

vehicles, the federal government, state attorneys general, and consumer advocacy groups

government actors known that <u>millions</u> of GM vehicles were dangerously defective and that Old

GM knew about it for years.  These arguments are pure self-serving speculation on the part of

New GM and cannot be the basis to justify the due process violations that occurred here.

Without question, the Pre-Closing Accident Plaintiffs suffered prejudice when they were

denied constitutionally sufficient notice of the 363 Sale and its impact on their undisclosed

claims arising from the Ignition Switch defect.  As a result of Old GM failing to disclose this

defect, all Plaintiffs, including Pre-Closing Accident Plaintiffs, were denied the ability to attempt

to affect the outcome of the 363 Sale hearing by making an informed objection to the free and

---

[17] Indeed, *Mullane* holds that each claimant's right to be heard is unique to it and a due process violation cannot be cured by proxy -- that is, by another claimant's receipt of notice and opportunity to be heard.  *See Mullane*, 339 U.S. at 314 ("[The] right to be heard has little reality or worth unless one is informed that the matter is pending <u>and can choose for himself </u>whether to appear or default, acquiesce or contest.") (emphasis added).

clear aspect of that sale. The arguments made by others against the successor liability shield were made without facts and, thus, were abstract legal and policy arguments about contingent future claims or the limits of the bankruptcy court's jurisdiction. Put simply, the Pre-Closing Accident Plaintiffs were not prejudiced by being denied the opportunity to lose in real time. Rather, the prejudice Pre-Closing Accident Plaintiffs suffered was that they were deprived of a meaningful day in court to argue the true state of affairs with the knowledge that they were injured by defective vehicles and that they had viable claims. This due process violation cannot be fixed by assuming that arguments that were never made would have been overruled. Indeed, the denial of a meaningful opportunity to be heard is itself the prejudice, regardless of whether the result would have been different.[18]

Any suggestion by New GM that the Court would have ruled no differently even if it had the Valukas Report in hand on July 9, 2009, is unknowable speculation. No court can truly predict what it would have done if it had known that Old GM had known about this dangerous defect for years.[19] Moreover, no court can predict what the reactions of the other parties in the

---

[18] Plaintiffs dispute that a finding of "prejudice" is a prerequisite for this Court to find a denial of due process. Prejudice is not an element of due process. Rather, the cases that find no denial of due process usually do so based upon the claimant's eventual opportunity to be heard before relief was entered against it. Thus, the cases cited on pages 36 through 40 of the New GM Opening Brief generally set a "no harm, no foul" rule if the violation is cured, as opposed to an affirmative requirement for the injured party to show prejudice as a condition to obtaining relief.

[19] In support of its position that due process was satisfied because this Court approved the content and delivery mechanisms for the 363 Sale notice, New GM relies on statements this Court made when it barred a claimant (Shane Robley) from prosecuting a post-363 Sale lawsuit against New GM for injuries he suffered when his GM vehicle rolled over. *See* New GM Opening Brief at 35; Hr'g Tr. 25:21-26:4, June 1, 2010 . Reliance on these statements, however, is misplaced because such statements were made years before New GM disclosed the existence of the Ignition Switch defect. Under the circumstances known to the Court at the time – not having been told that millions of Subject Vehicles were known by Old GM to be hazardously defective – it is unsurprising that the Court approved a generic notice of the 363 Sale and permitted that notice to be served by publication pursuant to *Mullane*. That said, it is unknowable whether this Court would have approved the same notice and delivery mechanism had Old GM told the Court of the Ignition Switch defect before seeking approval of that notice. Indeed, when ruling against Mr. Robley this Court made clear that the result may have been different had there been evidence that Old GM had known of Mr. Robley's injuries and chose to use publication notice rather than a more effective method. Hr'g Tr. 28:2-9, June 10, 2010 ("If GM knew back then that your client had already been injured and chose to use the publication route rather than a way that would get to him more directly, that kind of factual circumstance would have troubled me."). Unlike Mr. Robley, here there is ample evidence before the Court that Old GM knew at the time it sought approval of the 363 Sale notice that all Subject Vehicles were defective and that the owners of such

case would have been in July of 2009 if the entire landscape of the case had undergone a seismic

shift in the wake of the disclosures that were made in the Valukas Report.  The same firestorm

that erupted in 2014 likely would have erupted in 2009.  Would the Department of the Treasury

still have insisted on purchasing the assets free and clear of the claims of Plaintiffs, including

Pre-Closing Accident Plaintiffs?  Would Congress have sat still in the face of political pressure

from angry constituents?  Would the Executive Branch have supported using taxpayer money for

a bailout that shielded New GM from the claims of the Pre-Closing Accident Plaintiffs?  No one

knows the answer to any of those questions and, as a result of the due process failures described

above, Pre-Closing Accident Plaintiffs were forever barred from learning the answers.

For these reasons, the denial of due process prejudiced the Pre-Closing Accident

Plaintiffs.  But even though there are no do-overs and the sale is beyond revocation, as explained

in the following section, binding precedent does provide a remedy:  the free and clear aspects of

the Sale Order and Injunction are inoperative as to those persons that were denied the notice they

were entitled to receive.

---

vehicles had potential successor liability claims that were to be extinguished through the 363 Sale.  Under these
circumstances, the notice given was unconstitutionally deficient and deprived all Plaintiffs of due process.

II. **REMEDIES THESHOLD ISSUE:  THE PROPER REMEDY FOR A DUE PROCESS VIOLATION IS TO PERMIT PLAINTIFFS TO PURSUE ALL RIGHTS OTHERWISE  AVAILABLE ABSENT THE INJUNCTIVE PROVISIONS OF THE SALE ORDER AND INJUNCTION**

For the reasons discussed above, Plaintiffs were denied procedural due process in connection with the Sale Motion and the Sale Order and Injunction.  The proper remedy for such a due process violation is clear: the Plaintiffs cannot be bound by the Sale Order and Injunction to the extent it purported to enjoin the assertion of claims against New GM.  As discussed below, this result is dictated by governing precedent of the Second Circuit Court of Appeals.  Thus, the Plaintiffs must be permitted to pursue any and all available remedies for their injuries, including successor liability claims against New GM.  As explained further below, this remedy does <u>not</u> have the effect of "setting aside" or "rewriting" the Sale Order and Injunction, notwithstanding New GM's attempt to characterize it as such.  Rather, this remedy simply gives effect to the constitutional directive that absent due process, Plaintiffs could not have been deprived of their right to sue New GM.

A. **Second Circuit's Decision In *Manville IV* Dictates Appropriate Remedy**

In *Manville IV*, the Second Circuit specifically addressed the appropriate remedy for a due process violation resulting from a debtor's failure to give adequate notice in connection with a bankruptcy court order enjoining claims against non-debtors.  *Manville IV*, 600 F.3d at 138.  In that case, the bankruptcy court entered orders in 1986 (as well as a "clarifying order" in 2004) that enjoined claims against certain settling insurers, including Travelers Indemnity Company ("<u>Travelers</u>").  *Id.* at 141-42.  The injunction of claims was part of a settlement through which Travelers agreed to contribute hundreds of millions of dollars to the debtor's estate.  Years after entry of the 1986 orders, Chubb Indemnity Insurance Co. ("<u>Chubb</u>"), one of the parties purportedly subject to the injunction, argued that it could not be bound by the 1986 orders for

two independent reasons.  First, Chubb argued that the bankruptcy court lacked subject matter

jurisdiction to enjoin its claims against Travelers.  *Id.* at 148.  Second, Chubb argued that "it

could not, as a matter of due process, be bound to the 1986 Orders' terms" because "it was not

given constitutionally sufficient notice of the 1986 Orders."  *Id.* at 137, 142.  Chubb's due

process argument was the focus of the Second Circuit's decision in *Manville IV*.  *Id.* at 149

("With respect to due process . . . . the issue is therefore <u>whether Chubb may be bound at all by

the 1986 Orders</u>, whatever their meaning." (emphasis added)).

According to the Second Circuit, Chubb was "correct" that it did not receive

constitutionally sufficient notice of the 1986 orders and that as a remedy, "<u>due process absolves

it from following them, whatever their scope</u>."  *Id*. at 137 (emphasis added, internal quotation

marks omitted).  In other words, because Chubb's due process rights were violated, it was "<u>not

bound</u> by the terms of the 1986 Orders."  *Id.* at 158 (emphasis added).  As a result, Chubb was

free to pursue its claims against Travelers notwithstanding the 1986 orders' purported injunction

of those claims.[20]  Based on the foregoing, the Court need look further than *Manville IV* to

answer the Remedies Threshold Issue.[21]

---

[20] In its opening brief, New GM argues that because it was <u>Old GM's</u> obligation to provide adequate notice of the Sale Order and Injunction, any due process violation would have been committed by Old GM.  New GM Opening Brief at 51.  As such, New GM argues, it would be inappropriate to permit Plaintiffs to assert claims against <u>New GM</u> as a remedy for Old GM's due process violation.  *Id.*  Again, this argument is completely belied by the Second Circuit's holding in *Manville IV*, where Chubb was allowed to proceed against <u>Travelers</u> notwithstanding the fact that the <u>debtor</u> had failed in its obligation to provide constitutionally sufficient notice of the 1986 orders.  Indeed, there is nothing in the Constitution that ties a litigant's right to adequate notice to fault or motive – either sufficient notice was given or it was not.

[21] The remedy imposed by the Second Circuit in *Manville IV* was anything but novel.  U.S. Supreme Court precedent has long established that parties cannot be bound by the purported extinguishment of rights by courts or other government actors absent constitutionally sufficient notice.  *See, e.g.*, *Mennonite Bd. of Missions*, 462 U.S. at 798-99 (holding that mortgagee could not be bound by tax sale of property where mortgagee was not provided constitutionally sufficient notice); *New York, New Haven & Hartford R.R. Co.*, 344 U.S. at 296 (holding that lien creditor could not be enjoined from enforcing liens on railroad's assets following reorganization because creditor was not provided with constitutionally sufficient notice of claims bar date); *Mullane*, 339 U.S. at 320 (holding that party could not be bound by judicial settlement of trust because notice was constitutionally deficient).

Tellingly, New GM failed to even cite *Manville IV* in its opening brief and instead opted

to discuss inapposite and out-of-circuit authority.  Any attempt by New GM to argue that

*Manville IV* is somehow distinguishable because it addressed injunctions contained in

confirmation and settlement orders (rather an order approving a sale) would not withstand

scrutiny.  Indeed, New GM's <u>own brief</u> contends that the Second Circuit's earlier analysis of the

<u>very same *Johns-Manville* orders and injunctions</u> should inform the Remedies Threshold Issue in

this case.  New GM Opening Brief at 56 (citing *MacArthur Co. v. Johns-Manville Corp.*, 837

F.2d 89, 94 (2d Cir. 1988)).  Moreover, the Second Circuit's *Johns-Manville* decision on which

New GM relies explained that the bankruptcy court's order approving the settlement was

actually akin to a section 363 sale order:

> The Bankruptcy Court, having jurisdiction over the property of the
> Bankrupt, and having jurisdiction to order the sale of the
> Bankrupt's property . . . had jurisdiction to enjoin a lien-holder
> from attempting to assert his lien against property in the hands of a
> purchaser who has acquired from the Bankruptcy Court a title free
> and clear of liens and encumbrances . . . . Admittedly, the
> insurance settlement and accompanying injunction in this case are
> not <u>precisely</u> the same as a <u>traditional sale</u> of real property free and
> clear of liens followed by a channeling of the liens to the proceeds
> of the sale . . . . Here, the property of the estate at issue (insurance
> policies) was not technically 'sold'; rather, Manville liquidated its
> interest via a voluntary settlement . . . . <u>Nevertheless, the
> underlying principle of preserving the debtor's estate for the
> creditors and funneling claims to one proceeding</u> in the bankruptcy
> court <u>remains the same</u>.

*MacArthur*, 837 F.2d at 93-94 (emphasis added).

In any event, even if the 1986 orders in *Manville IV* were not analogous to a sale order,

the Second Circuit's due process remedy analysis would still apply with full force here.  In both

instances, claims against non-debtors were purportedly enjoined through an insufficiently

noticed bankruptcy court order.  There is no principled basis to argue that the appropriate remedy

for the <u>same</u> constitutional violation should change based on whether an injunction is contained

in an order approving a sale as opposed to an order approving a settlement or confirming a plan. To that end, courts within the Second Circuit apply *Manville IV*'s due process remedy in the <u>precise context</u> of improperly noticed sale orders.  *Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus., Inc.)*, 467 B.R. 694, 709 (S.D.N.Y. 2012) ("Here, the court is not addressing whether [claimants] will ultimately be able to sustain their successor liability claim, the question is whether the Sale Order prevents them from even bring the suit in the first place. In light of the due process problems that would result from such an interpretation, the Court holds that the Sale Order cannot be enforced in this manner.").  *See also Koepp v. Holland*, No. 13-4097, 2014 U.S. App. LEXIS 22108, *5-*6 (2d Cir. Nov. 21, 2014) (citing *Manville IV* and *Grumman* and ruling that a bankruptcy court could not extinguish property interests of parties who did not receive notice of the bankruptcy proceedings); *In re Savage Indus., Inc.*, 43 F.3d 714, 721-22 (1st Cir. 1994) (holding that plaintiffs' successor liability claims against asset purchaser could not be enjoined, notwithstanding "fee and clear" nature of the sale because plaintiffs were denied adequate notice in connection with sale); *Schwinn Cycling & Fitness v. Benonis*, 217 B.R. 790, 797 (N.D. Ill. 1997) (refusing to enjoin successor liability claims against asset purchaser where plaintiffs did not receive constitutionally sufficient notice in connection with the sale).

### B.     <u>Authority Cited By New GM Is Inapposite</u>

In addressing the Remedies Threshold Issue, New GM erroneously conflates two distinct concepts: (i) the "rewriting" or "setting aside" of a final bankruptcy court order and (ii) the determination that certain parties are not bound by its terms because they were denied due process.  The Plaintiffs are only pursuing the latter remedy and are not seeking to rewrite or set aside the Sale Order and Injunction.  In confusing these concepts, New GM cites case law that is simply inapposite.  *See* New GM Opening Brief at 52-56.  As the Second Circuit has recently

explained, excepting parties from the injunctive terms of a bankruptcy court's final order based

on a lack of due process does <u>not</u> have the effect of rewriting or revoking that order.  *In re Johns-*

*Manville Corp*., 759 F.3d 206, 215 (2d Cir. 2014) ("*Manville V*").

   This very issue arose in *Manville V*, where Travelers attempted to evade its settlement

obligations to the debtor's estate based on the Second Circuit's ruling in *Manville IV* that Chubb

was not bound by the injunctive provisions of the bankruptcy court's 1986 and 2004 orders.

According to Travelers, the *Manville IV* decision had the effect of preventing the occurrence of

two conditions precedent to its payment obligations under the settlement agreement.  *Id.* at 213.

The first condition precedent was that the bankruptcy court's 2004 clarifying order contain

injunctive provisions of a specific breadth.  *Id.* at 214.  The second referenced condition

precedent was that the 2004 clarifying order become a "final order."  *Id.*

   With respect to the "breadth" condition precedent, Travelers argued that although the

bankruptcy court's order contained the injunctive language required by the settlement agreement,

the *Manville IV* holding had the effect of rewriting the order's injunctive provisions.  *Id.* at 215.

In rejecting this argument, the Second Circuit pointed out the injunctive language in the

bankruptcy court's order had been affirmed on appeal to the United States Supreme Court "and

has not been altered since."  *Id.*  According to the Second Circuit,

> The fact that Chubb may collaterally attack the applicability of the
> Clarifying Order to actions it might bring – because it never
> received constitutionally sufficient notice – does not alter our
> conclusion.  The error in Travelers' reading of the Clarifying Order
> stems from its <u>conflation of two separate issues: (i) a party's ability</u>
> <u>to collaterally attack an order for lack of constitutional notice; and</u>
> <u>(ii) the integrity of that order and the breadth of the claims it bars</u>.

*Id.* (emphasis added).

   With respect to the "finality" condition precedent, Travelers similarly argued that the

decision in *Manville IV* prevented the bankruptcy court's order from becoming "final."  *Id.* at

42

217-18.  In dismissing this argument, the Second Circuit pointed out that Travelers was again

conflating two separate concepts in that Chubb's due process argument "had no bearing" on

whether the bankruptcy court's order became final.  *Id.* at 218.  In other words,

> [*Manville IV*] did not alter any aspect of the Clarifying Order . . . .
> The fact that Chubb is not bound by the 1986 Orders does not,
> therefore, render the 1986 Orders any less 'final.'" . . . It would
> defy logic to hold that the Clarifying Order, as an extension of the
> 1986 Orders, is not 'final' simply because Chubb did not receive
> constitutionally adequate notice of the 1986 proceedings.  If the
> 1986 Orders are final despite the inapplicability of the orders to
> Chubb, it follows that the Clarifying Order is just as final.

*Id.*

Just as Travelers did in *Manville V*, New GM incorrectly conflates a <u>revocation</u> or

<u>rewriting</u> of the Sale Order and Injunction with a determination that <u>certain</u> parties are simply <u>not</u>

<u>bound</u> by its terms.[22]  As explained in *Manville V*, a determination that Plaintiffs are not

enjoined from asserting claims against New GM will neither modify the substantive terms of the

Sale Order and Injunction nor alter its finality.  New GM's argument is therefore based on the

false premise that such a remedy would effect a "rewriting" or "revocation" of the Sale Order

and Injunction that somehow undermines its finality.  As instructed by *Manville IV*, a

determination that Plaintiffs are not enjoined from asserting claims against New GM is the

appropriate remedy recognized by the Second Circuit.  As held in *Manville V*, such a remedy will

neither rewrite nor revoke the Sale Order and Injunction, which will remain a final order, as

entered by the Court in 2009.

Rather than acknowledging the Second Circuit's governing rulings in *Manville IV* and

*Manville V*, New GM instead cites case law that has no application in this context.  *See, e.g.*,

New GM Opening Brief at 52-56 (citing *Cedar Tile Corp. v. Chandler's Cove Inn, Ltd.*, 859 F.2d

---

[22] Similar to its failure to address *Manville IV*, New GM's opening brief also fails to even acknowledge the Second
Circuit's decision in *Manville V*.

1127 (2d Cir. 1988) for the proposition that a sale of substantially all of a debtor's assets can be

unwound in its entirety if there was no notice or a hearing as required by Bankruptcy Code

§ 363(b); *In re BFW Liquidation, LLC*, 471 B.R. 652 (Bankr. N.D. Ala. 2012) (holding that

transaction to sell substantially all of the debtor's assets could not be unwound in its entirety in

case where no due process violation had occurred); *Douglas v. Stamco*, 363 Fed. App'x 100 (2d

Cir. 2010) (affirming district court's dismissal of claims against purchaser of debtor's assets

where (i) plaintiff failed to even plead successor liability; (ii) sale order provided that transaction

was "free and clear" under Bankruptcy Code § 363(f); (iii) no lack of notice or due process

violation was alleged with respect to the sale order and (iv) plaintiffs sought no relief from sale

order); *Doktor v. Werner Co.*, 762 F.2d 494, 498-500 (E.D.N.Y. 2011) (dismissing claims

against purchaser of debtor's assets where (i) plaintiff failed to establish a basis for successor

liability; (ii) sale was "free and clear" of successor liability; (iii) no lack of notice or due process

violation was alleged and (iv) plaintiff did not seek relief from sale order); *Morgenstein*, 462

B.R. at 500-05 (holding that plan confirmation order could not be partially revoked under

Bankruptcy Code § 1144 and that plaintiff had utterly failed to adequately plead its fraud claim)).

Among the inapposite cases cited by New GM are those addressing Bankruptcy Code

section 363(m), which provides that in the event of "reversal or modification on appeal" of an

un-stayed sale order, "the validity of a sale" to a good faith purchaser will not be affected. *Id.* at

54-56 (emphasis added). New GM also relies on cases for the proposition that a sale order

cannot be "partially revoked" because the order can only be completely valid or completely void.

*Id.* None of these cases support New GM's position. First, Bankruptcy Code section 363(m) has

no application to this dispute because it does not involve an appeal of the Sale Order and

Injunction but rather, a constitutional challenge to its application to certain individuals after the

44

order became final.  The section 363(m) cases cited by New GM do not even purport to address

the appropriate remedy in this context.[23]  New GM Opening Brief at 54-56 (citing *United States*

*v. Salerno*, 932 F.2d 117 (2d Cir. 1991); *Campbell v. Motors Liquidation Co. (In re Motors*

*Liquidation Co.)*, 528 B.R. 43 (S.D.N.Y. 2010)).

Second, notwithstanding, an out-of-circuit case opining that an asset sale cannot be

partially <u>revoked</u>, *see* New GM Opening Brief at 55 (citing *In re Fernwood Markets*, 73 B.R.

616 (Bankr. E.D. Pa. 1987)), governing precedent of the Second Circuit provides that (i) parties

are simply <u>not bound</u> by the injunctive provisions of a bankruptcy court order to the extent they

were not given constitutionally sufficient notice and (ii) such a remedy does <u>not</u> have the effect

of even partially revoking or rewriting the bankruptcy court's order.  *Manville V*, 759 F.3d at 218

("The Clarifying Order, as a restatement of the of the 1986 Orders' injunction, <u>precludes</u>

<u>claimants . .  . from further prosecution of those claims against Travelers</u> . . . The fact that Chubb

may collaterally attack the <u>applicability</u> to the Clarifying Order to actions it might bring –

because it never received constitutionally sufficient notice – <u>does not alter our conclusion</u>."

(emphasis added)); *see also Grumman*, 467 B.R. at 711 ("The Court holds only that, under the

circumstances presented in this case, <u>to enforce</u> the sale Order to enjoin [claimants'] state law

suit would deny them due process . . ." (emphasis added)).  Thus, New GM's argument lacks

merit because Plaintiffs are not seeking a partial revocation of the sale order nor are they seeking

to affect New GM's title to the purchased assets.

---

[23] New GM argues that section 363(m) should shield both appeals of un-stayed sale orders <u>and</u> post-closing due process challenges because, in its view, "the same reasoning applies." *Id.* at 55.  This is simply wishful thinking untethered to law.  The terms of section 363(m) speak for themselves: they apply to appeals.  Furthermore, applying section 363(m) in such a manner would permit the calculated disregard of parties' due process rights without any practical consequence.  New GM also misapprehends the scope of section 363(m), even where it does apply.  As noted above, section 363(m) protects only the "validity" of a sale of assets to a good faith purchaser if the sale order is reversed.  11 U.S.C. § 363(m).  Section 363(m) does not insulate <u>all</u> aspects of an un-stayed sale order from appellate challenge.  Indeed, the special protections of section 363(m) would be unnecessary if certain aspects of a sale order were not subject to reversal or modification on appeal.

New GM's argument that the remedy sought by Plaintiffs "would result in an unjustified windfall" is equally misguided.[24]  New GM Opening Brief at 55.  The Plaintiffs did not choose to have their due process rights violated.  The present litigation is before the Court only because Old GM denied Plaintiffs constitutionally sufficient notice in connection with the Sale Order and Injunction.  As explained above, the existence of the undisclosed defect in the Subject Vehicles was known to Old GM for <u>years</u> prior to its bankruptcy proceedings.  The decision of whether to provide Plaintiffs with adequate information of the Ignition Switch defect was uniquely in the control of Old GM personnel.  This failure to provide constitutionally sufficient notice has consequences.  The consequence here is that Plaintiffs cannot be bound to the injunctive terms of the Sale Order and Injunction.  A different result would only incentivize companies to withhold information until after a "free and clear" sale has been accomplished as both Old GM and New GM did here.[25]

### C.    Potential Availability Of Remedies Against Old GM's Estate Is Immaterial

To support its argument that no remedy can be had against it, New GM suggests that Plaintiffs have a "viable remedy" against Old GM's estate.  New GM Opening Brief at 56.  As an initial matter, New GM incorrectly frames the Remedies Threshold Issue as requiring this Court to specifically choose between allowing <u>either</u> a remedy against Old GM's estate <u>or</u> against New GM.  As explained above, the proper remedy for the due process violation is simply

---

[24] In support of this argument, New GM cites the Third Circuit's decision in *In re Trans World Airlines, Inc.*, 322 F.3d 283, 291-93 (3d Cir. 2003) ("*TWA*").  That decision lends no support to New GM's position because it addressed only whether successor liability claims are "interests" subject to the "free and clear" language of Bankruptcy Code § 363(f).  Thus, *TWA* has no bearing on the appropriate remedy for a due process violation in connection with a sale that was purportedly "free and clear" of successor liability claims.

[25] Thus, contrary to New GM's argument, the truly inequitable result would be to permit Old GM personnel to cross over to the other side of the room, start calling themselves "New GM" and then blame "Old GM" personnel for the deficiency in notice.  Essentially, New GM is blaming itself.  Old GM personnel knew they would be New GM employees the moment the Sale was approved.  Thus, Old GM had every incentive to leave the liability for the Subject Vehicles behind so that its new incarnation would not be saddled with the obligations to account to these victims.

for the Court to rule that the Plaintiffs are not bound by the injunctive provisions of the Sale

Order and Injunction, thereby freeing Plaintiffs to pursue any and all available remedies,

including successor liability claims against New GM.  The Court need go no further.  Such a

remedy does not require the Court to determine whether "viable" remedies also exist against Old

GM's estate.

To the extent New GM argues that the <u>exclusive</u> remedy for the due process violation is a

claim against Old GM's estate, it is mistaken.  In support of its position, New GM primarily

relies on cases <u>where no due process violation was found</u> or that are otherwise readily

distinguishable.  New GM Opening Brief at 56-57 (citing in *In re Edwards*, 962 F.2d 641, 643-

45 (7th Cir. 1992) (holding that <u>entire sale transaction</u> (including transfer of title) could not be

completely <u>unwound</u> based on deficient notice to lien holder where lien holder failed to monitor

the case for two years, took no action for months after learning of notice deficiency complained

of, did not dispute the adequacy of the sale price, and the lien holder's share of the sale proceeds

was still available to pay it); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir.

1988) (addressing bankruptcy court order approving settlement that enjoined claims against

settling insurers and holding: (i) injunction was not "unfair" because objector retained claim

against debtor's estate and (ii) objector's <u>due process rights were not violated</u> because objector

was provided with adequate notice of the settlement order and injunction and specifically

objected); *Conway v. White Trucks, A Div. of White Motor Corp.*, 885 F.2d 90, 96 (3d Cir. 1989)

(affirming dismissal of successor liability claims where plaintiff "did not attempt to assert his

inadequate notice argument" in bankruptcy court or district court); *Molla v. Admar of New

Jersey, Inc.*, No. 11-6470 (JBS/KMW), 2014 WL 2114848, at *3, *5 (D.N.J. May 21, 2014)

(granting defendant's motion to dismiss successor liability claim, in case where <u>no due process</u>

violation was found and defendant acquired assets "free and clear of all claims and interests."); *BFW Liquidation*, 471 B.R. 652 (holding that "free and clear" sale of substantially all of the debtor's assets barred claims against purchaser and that plaintiff could assert its claims against the debtor where no due process violation had occurred)).

Even if the out-of-circuit cases relied by New GM could somehow support its argument that Plaintiffs' remedy is limited to asserting a claim against Old GM's estate – which they do not – that argument would remain at odds with governing Second Circuit precedent holding that a party cannot be bound by the injunctive terms of a bankruptcy court order for which insufficient notice was provided. *Manville IV*, 600 F.3d at 153 ("[T]he primary current contention is the argument of Chubb . . . that 'it was not given constitutionally sufficient notice of the 1986 Orders, so that due process absolves it from following them, whatever their scope.' In our view, Chubb is correct."); *Grumman*, 467 B.R. at 711.  More fundamentally, New GM's proposed remedy would not provide redress for the due process violation actually at issue.  As New GM is no doubt aware, the operative language of the Due Process Clause provides that "[n]o person shall . . . deprived of . . . property, without due process of law."  U.S. Const. amend. V.  Here, the property Plaintiffs were deprived of through the Sale Order and Injunction is their right to assert claims against New GM.[26]  By suggesting the assertion of a claim against Old GM's estate, New GM proposes a remedy that is disconnected from the constitutional injury.  This incongruity further highlights the incorrectness of New GM's argument and the soundness of the Second Circuit's conclusion in *Manville IV*.

---

[26] Stated differently, Plaintiffs are not asserting a due process challenge to a bar date order or a discharge injunction issued in favor of a debtor.  Rather, the due process violation occurred through an order that curtailed their rights vis-à-vis a non-debtor (New GM).

Based on the foregoing, the appropriate remedy for the due process violation at issue is for this Court to determine that Plaintiffs are not bound by the injunctive provisions of the Sale Order and Injunction.

## III.    CONCLUSION

For the reasons set forth above, the Pre-Closing Accident Plaintiffs respectfully request that the Court deny New GM's Motion to Enforce Sale Order re: Pre-Closing Accident Lawsuits and grant such other and further relief as it deems just and proper.

Dated: December 16, 2014                    Respectfully submitted,

/s/ *William P. Weintraub*
William P. Weintraub
Eamonn O'Hagan
Gregory W. Fox
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel.: 212.813.8800
Fax:  212.355.3333
wweintraub@goodwinprocter.com
eohagan@goodwinprocter.com
gfox@goodwinprocter.com

## CERTIFICATE OF SERVICE

I, William P. Weintraub, hereby certify that a copy of the foregoing *RESPONSIVE BRIEF OF DESIGNATED COUNSEL FOR PRE-CLOSING ACCIDENT PLAINTIFFS ON THRESHOLD ISSUES CONCERNING NEW GM'S MOTIONS TO ENFORCE THE SALE ORDER AND INJUNCTION*, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 16, 2014.

/s/ *William P. Weintraub*
William P. Weintraub