# <u>Exhibit A</u>

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 09-11233 (REG)

4    - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6

7    CHEMTURA CORPORATION

8

9              Debtors.

10

11   - - - - - - - - - - - - - - - - - - - -x

12

13                        United States Bankruptcy Court

14                        One Bowling Green

15                        New York, New York  10004

16

17                        January 31, 2013

18                        9:53 AM

19

20   B E F O R E:

21   HON. ROBERT E. GERBER

22   U.S. BANKRUPTCY JUDGE

23

24

25   ECRO:  EMMANUEL

Page 2

1    HEARING re:  Doc #5769 Motion to Approve/Reorganized Debtors

2    Motion for an Order Enforcing the Discharge Injunction Under

3    the Debtors Chapter 11 Plan of Reorganization

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Theresa Pullan

Page 3

```
 1   A P P E A R A N C E S :

 2   DEBEVOISE & PLIMPTON LLP

 3          Attorneys for Chemtura

 4          919 Third Avenue

 5          New York, NY  10022

 6

 7   BY:   M. NATASHA LABOVITZ, ESQ.

 8

 9

10   KIRKLAND & ELLIS

11          Attorneys for Chemtura

12          601 Lexington Avenue

13          New York, NY  10022

14

15   BY:   CRAIG A. BRUENS, ESQ.

16

17

18   TELEPHONIC APPEARANCES:

19   For Claimant, Firmenich

20

21   RITA C. TOBIN, ESQ., Caplin & Drysdale

22   KENNETH B. MCCLAIN, ESQ., Humphrey, Farrington, McClain

23

24

25
```

09-15-2026-mg Doc 13021-1 Filed 12/16/14 Entered 12/16/14 18:59:58 Exhibit A
09-21238-mg Doc 13023-1ed 02/04/16 Entered 12/16/14 18:59:58 Main Document
Pg 4 of 43

Page 4

```
 1                P R O C E E D I N G S

 2           THE COURT:  We have a busy day today.  We have major

 3     matters in both Chemtura and Bearing Point.  I want to get

 4     appearances on Chemtura, and then I have some preliminary

 5     remarks.

 6           I know that our friends from Missouri had some

 7     challenges in getting these issues heard -- I do need quiet on

 8     the phone please.  But certainly I'll hear the same arguments

 9     over the phone that I would have heard in person.  First, for

10     the Chemtura estate.

11           MS. LABOVITZ:  Your Honor, Natasha Labovitz from

12     Debevoise & Plimpton representing Chemtura.

13           THE COURT:  Okay, Ms. Labovitz.  Thank you.  Anybody

14     in the courtroom on behalf of the litigants, the Fermenich

15     litigants?  No.  Okay.  On the phone?

16           MR. MCCLAIN:  On behalf of the Fermenich litigants,

17     Your Honor, Kenneth McClain.

18           THE COURT:  Okay, Mr. McClain.

19           MS. TOBIN:  Yes, and as local counsel for the

20     Fermenich litigants, Your Honor, Rita Tobin.  I'm actually

21     downstairs and I will be off Courtcall and in the courtroom in

22     about five m minutes.  I had traffic problems getting in.

23           THE COURT:  Ms. Tobin, are you going to be the

24     principal arguer for your side?

25           MS. TOBIN:  No, no, no, Mr. McClain is, but I am
```

                                                              Page 5

1    going to be in the courtroom.

2              THE COURT:  Okay.  Do you want us to wait until you

3    can get upstairs?

4              MS. TOBIN:  I can get up -- I'm right downstairs, so

5    I should be upstairs shortly.  Yes, that would be great.

6              THE COURT:  All right.  We'll stand by.

7              MS. TOBIN:  Okay.

8    (Pause)

9              THE COURT:  Mr. McClain, you're hearing quiet on the

10   courtroom side of the phone because we're waiting for Ms.

11   Tobin.

12             MR. MCCLAIN:  And thank you, Your Honor.  Yes, I

13   understood that.  And you're not hearing any noise from my end,

14   are you?

15             THE COURT:  I can't tell where it came from, but I,

16   but after I made the comments, the noise stopped which I guess

17   was a good sign.

18             MS. TOBIN:  Your Honor, I apologize.  I came from

19   West Chester, and they had some problems up there this morning.

20             THE COURT:  Okay.  Ms. Tobin is now here.  All right.

21   Ms. Labovitz, Mr. McClain, make your arguments as you see fit,

22   but keep them relatively brief because I've read the papers.

23   Mr. McClain, when it's your turn to argue, I need you to focus

24   on the U.S. Supreme Court of Mullane, decision in Mullane,

25   which to my surprise you didn't cite much less substantively

Page 6

```
 1    address.  And with it the decisions in Best Products,

 2    Chateaugay and Placid Oil.

 3              You know, we have the U.S. Supreme Court decision

 4    that's talked about what's necessary here, and in particularly

 5    notice that's reasonably calculated to reach its recipient.

 6    And which, unless I read it wrong, and I think I'm pretty good

 7    at reading cases at this point in my career, the subjective

 8    understanding of the claimant is not relevant.  The -- whether

 9    or not the claimant read the notice in the newspaper or other

10    means of providing published notice is not relevant, and I have

11    some difficulty seeing how or why you made the arguments you

12    did while failing to address the Supreme Court decision that's

13    directly on point.

14              And, you know, I read your brief, I read your table

15    of authorities which is why my case management order require

16    tables of authorities to find your discussion of Best Products,

17    Chateaugay and Placid Oil -- couldn't find anything.  So I need

18    help from you on that.

19              On the class action points, your opponent says at

20    least seemingly correctly that this isn't a class action, so

21    why do we have all this discussion about class actions, and I

22    have some difficulty seeing why your opponent isn't right on

23    that as well.  And while I recognize that the inclusion of

24    these folks or the failure to include them in the earlier

25    settlement is a second string to their bow, and it may be
```

09-15 09:26 ... g-in ... Doc 13021-1 ... Filed 12/16/14 ... Entered 12/16/14 13:59:58 ... Exhibit A
09-21-23 ... g-in ... Doc 13023-jed ... U.S. Bankruptcy Court ... Georgia Corporation ... Page Main Document
Pg 8 of 43

Page 7

1    depending on when they, you know, contacted your firm might not

2    be regarded within that group of additional people who are

3    covered by the earlier settlement as having been deemed to have

4    been retained by your firm back when the settlement was entered

5    into.  I don't see how that goes to their more fundamental

6    point, and I need help on that.

7            Ms. Labovitz, I do not recall you actually asking me

8    for discovery style relief to get a more fulsome disclosure

9    beyond those redacted retention agreements with respect to when

10   the folks here, I think there are nine of them, first contacted

11   Humphrey, the Humphrey Firm.  But you help me understand

12   whether you want to pursue your second ground for relief or

13   whether you're content to rely on the Mullane issues and the

14   like.  We'll go in the traditional order.  Ms. Labovitz, I'll

15   hear from you first.

16           MS. LABOVITZ:  Thank you, Your Honor.  For the

17   record, this is Natasha Labovitz from Debevoise and Plimpton

18   representing Chemtura.

19           Your Honor, particularly in light of the Court's busy

20   calendar today, I'm going to try to be very brief in my initial

21   remarks.  I would request the opportunity to respond to any

22   points that Mr. McClain makes.

23           THE COURT:  Sure.  And if you say anything in reply,

24   I'll give Mr. McClain a comparable opportunity to sur-reply,

25   but in each case the second round has to be limited to new

Page 8

1 stuff that was raised here and not to address things that could

2 have been said the first time.

3          MS. LABOVITZ:  I understand, Your Honor.  What I'd

4 like to do is cover what I think are the three main points that

5 are before the Court today, and in doing that, I will answer

6 the question about whether we're asking for discovery style

7 relief or whether we think this could be decided on the

8 pleadings.

9          Your Honor, there are some tangents in the pleadings,

10 but I think this really comes down to three big points, the

11 first two of which are related, and the third of which is

12 separate.

13          The related points are, as you characterize them, the

14 Mullane factors, although I have looked at them as the Mullane

15 and Waterman factors.  The questions are -- was the bar date

16 noticing scheme reasonably calculated to provide notice to

17 unknown creditors?  I think it's undisputed that these

18 Fermenich plaintiffs were unknown creditors.

19          THE COURT:  Ms. Labovitz, don't necessarily raise

20 your voice, but come a little closer to the microphone.

21          MS. LABOVITZ:  Of course, Your Honor.  So the first

22 question that I think arises under the bar date noticing and

23 discharge portion of our argument is whether the bar date

24 noticing scheme was reasonably calculated to provide notice to

25 unknown creditors.  And as I said, I think that it's undisputed

1    that he Fermenich claimants were unknown creditors from the

2    perspective of Chemtura during the chapter 11 case.

3         The second question that is related to this is

4    whether these plaintiffs' claims fall within the scope of the

5    definition of claim such that they're susceptible to discharge.

6    In other words, the Debtors have recognized throughout these

7    chapter 11 cases that there is a category of potential future

8    claim that is so remote, so I don't even want to say

9    contingent, it's so incipient that it simply cannot be

10   characterized as a claim and discharged under a plan of

11   reorganization.  The classic example of those kinds of claims

12   is a manufacturing defect that does not come into contact with

13   a party and cause injury until after the chapter 11 case is

14   concluded.  So, for example, a manufacturing defect in an

15   airplane that causes a plane crash after the confirmation of a

16   chapter 11 plan cannot give rise to a claim that would be

17   discharged in bankruptcy I think under applicable precedent.

18   Because the exposure, the injury that causes the harm has not

19   occurred until after the case.  We've always conceded that

20   point.

21        I think that in this case and throughout the chapter

22   11 cases, we view diacetyl claims as being different, because

23   in all such instances, almost based on the very nature of

24   diacetyl and how it was used in the food industry.  Every

25   claimant that may have a diacetyl claim came into contact with

1   diacetyl and therefore was exposed and incurred injury within

2   the meaning of the Bankruptcy Code many years before Chemtura

3   filed for chapter 11 because the food industry ceased using

4   nonorganic diacetyl before the chapter 11 case.  So all

5   instances of exposure should have occurred before the chapter

6   11 case.

7          So looking at those two points, Your Honor, the

8   Debtors' position is that the bar date noticing scheme was

9   comprehensive, the company took great pains to provide not only

10  constructive notice, but in all instances possible, actual

11  notice to unknown claimants.  We think our bar date noticing

12  scheme was good, and we think that's evidenced by the fact that

13  we started the case with 50 diacetyl claims that were known to

14  the company, we ended with 375 including five new claimants

15  from the very Fermenich facility that is at issue here.  From

16  our perspective our bar date noticing scheme was not only

17  reasonably calculated to provide notice, it worked, it did

18  provide notice to the extent possible.  And from our

19  perspective that is the conduct that was required under

20  Mullane.  You can't be held to the standard to provide actual

21  notice to every possible unknown creditor.

22          I addressed the point of whether the plaintiffs'

23  claims fall within the scope of the Bankruptcy Code definition

24  of claim.  We think in this case they clearly do.

25          From our perspective we think that's the end of the

1  story, we think that the Court could rule today based on the

2  pleadings, on the adequacy of the notice and the scope of the

3  discharge, and that there's no need to get to the third

4  argument that we've raised, but as a backup we've raised it.

5          And the third argument is the one that you

6  identified, Your Honor, as the independent question of whether

7  the claims fall within the scope of Chemtura as diacetyl

8  settlement with the Humphrey Farrington firm.  As is clearly

9  covered in the pleadings, that settlement was intended to cover

10 not only all of the claimants that Chemtura knew about at the

11 time of the chapter 11 case, but just as added protection,

12 anyone else that Mr. McClain or his law firm knew about at that

13 time.  We don't know whether or not these nine claimants fall

14 within the scope of that settlement or not, that's information

15 that Mr. McClain has and we don't have.  To the extent that

16 Your Honor either you thought that there was reason -- I'm

17 going to back up on that.  To the extent that, Your Honor, you

18 don't believe you can rule on the law on the Mullane and

19 Waterman question, then we would think there is an open factual

20 question both as to whether these are claims that are

21 dischargeable and as to whether these claimants were known to

22 Mr. McClain at the time of the settlement.

23          THE COURT:  Ms. Labovitz, I can see a scenario under

24 which a potential claimant might have consulted the Humphrey

25 Farrington firm with a phone call or a meeting with a view to

```
 1    representation with a level of finality sufficient to allow the

 2    attorney-client privilege to attach, but might have delayed in

 3    having signed one of the retention agreements that was provided

 4    to me in redacted form.  Did you have any discussions with the

 5    Humphrey Farrington firm about some method of getting the

 6    information that might be relevant to your last point without

 7    impinging on their attorney client privilege such as getting

 8    the dates of first contact, the dates of any communications or

 9    anything of that sort?

10            MS. LABOVITZ:  Your Honor, we had a letter exchange

11    with the Humphrey Farrington firm in which Chemtura asked for

12    information of that kind.  We haven't had follow-up discussions

13    about that.  I do think that there may be ways to get at that

14    information, but again, Your Honor, respectfully we think this

15    can be discharged as a matter of law without having to get to

16    that point.  If we do have to get to that point, I'm sure we

17    could explore ways of getting the information we need.

18            THE COURT:  Okay.  Anything else before I give Mr.

19    McClain a chance to be heard?

20            MS. LABOVITZ:  No, thank you, Your Honor.

21            THE COURT:  Okay.  Thank you.  Mr. McClain?

22            MR. MCCLAIN:  Your Honor, you, in your initial

23    questions you talked about Mullane and adequacy of notice

24    issues, and I will address those points.  We put that

25    information in our brief simply to illustrate the point that
```

1    these people in fact were unaware.  Whether or not that has any

2    impact on the noticing scheme was not the focus of why we

3    pointed that out.  We had long discussions as the Court will

4    recall about the noticing scheme and the difficulties of it

5    before the notice was approved by the Court in which we talked

6    about important issues that impinge on the second point that I

7    really want to focus on, which is a point that this Court

8    previously made in the context of the GM bankruptcy, where you

9    pointed out, Judge, in that case in the opinion at 407 Br. 463

10   (2009) that the notice given on this motion was not fully

11   effective since without knowledge of an ailment that had not

12   yet manifested itself, any recipient would be in no position to

13   file a present claim.  That's really the focus of our issue and

14   complaint here.

15          And I just want to back up to a point that we made at

16   the time that the bar date was set and the noticing scheme was

17   discussed.  This is a new disease process.  In 2002, the New

18   England Journal of Medicine published the first article about

19   diacetyl and its ability to cause disease.  So the issues

20   involved in regard to the medical community, workers and

21   lawyers becoming aware of this disease process is really

22   relatively speaking asbestos and these other things that have

23   consumed the courts in the opinions that we cited to in the

24   arguments that have been previously made are quite different in

25   that it is a new disease process.  But the Waterman Steamship

09-15026-mg   Doc 13021-1   Filed 12/16/14   Entered 12/16/14 13:59:58   Main Document
Pg 14 of 43

1    case that the Court asked us to address in regard to the

2    Mullane scheme has some important language that we did discuss

3    in our brief.  The defendants pointed to this any detectible

4    signs language that the Court I'm sure is aware of without

5    reference to able to perceive the significance and implications

6    language contained in the opinion which you clearly were aware

7    of when recognizing the complexity of this issue in a latent

8    disease situation such as was existed in the General Motors

9    case.  In fact, Judge, on this issue, in the Chemtura

10   bankruptcy itself in a related but separate situation, on

11   September 8th of 2010 --

12           THE COURT:  Pause please Mr. McClain.  GM didn't

13   involve latent diseases, it involved people who were hurt in

14   car wrecks.  When your car goes off the road and gets into a

15   crash, that's not so latent.  I mean you know about it.  And

16   what had bothered me was the scenario under which GM made cars

17   before the sale and they didn't crash until years later.  That

18   is not a situation where somebody was injured much earlier but

19   had not brought the lawsuit until a later time.  When you have

20   a car wreck, which is what I talked about in GM, that's in

21   Macy's window, everybody knows when they're in a car wreck from

22   the instant that the car wreck takes place.

23           MR. MCCLAIN:  Judge, I'm talking about your opinion

24   regarding the asbestos claim within the GM bankruptcy, and

25   those people who had not yet had manifested asbestos claims who

1    were trying to assert them after the Debtor's asset sale.  And

2    it's at 407 Br. 463, the 2009 opinion.

3              THE COURT:  All right.  Go on.

4              MR. MCCLAIN:  So that's one point, Judge, that caught

5    my attention that it's similar to our problem which is that if

6    someone doesn't know they have a disease or they don't have a

7    disease yet, no noticing scheme will be effective as to them

8    nor should it bar under due process Mullane and its progeny a

9    claim that arises later.  Particularly in this instance where

10   there was no futures representative and no futures were

11   anticipated, and in fact repeatedly this defendant claimed that

12   no futures were intended to be covered by the settlement.  In

13   our view, these are futures.  If they had filed a claim, Judge,

14   I think we had some indication from you in regard to a similar

15   chemical exposure against Chemtura in this very bankruptcy

16   where you ruled, and the transcript that I have dated September

17   8th of 2010 where a Mr. Cogut (phonetic) came before the Court

18   claiming that he had been exposed to chemicals at the Naugatuck

19   Treatment Company plant owned by the Debtor.  And in that very

20   case, the proceeding, you struck that claim because he offered

21   no evidence or allegations of any specific injury to himself or

22   his family.  In essence, his claim was that his exposure may

23   cause injuries, that it becomes apparent now by which I mean or

24   I assume he means shortly in the future or in the future which

25   I understand to be more in the future.  That's insufficient to

1    stay the claim much less for 20, or 10 or 20 million dollars.

2    As a conclusion of law, I rule that while I wouldn't demand all

3    of the claimant's evidentiary support at the proof of claim

4    stage, the law requires that there be some showing of a an

5    entitlement to relief of a legally cognizable injury.

6         Our point on these nine individuals is that there is

7    no evidence since they had a legally cognizable injury as of

8    the bar date and the settlement effective date.  If they had,

9    they would have been included in the settlement, but they were

10   not even our clients at that point in time because there was no

11   evidence that they were sick.  That's the nature of why we

12   believe that these claims are viable and not barred.  And

13   that's the focus of our argument in this case, Judge, and the

14   rest of the arguments are within the pleadings.  So unless the

15   Court has questions, that's all I have.

16        THE COURT:  Yeah, I do have one follow-up question.

17   Were you saying by your last point that's why they weren't

18   included in the settlement, that there were people who had

19   consulted you before the date that they signed their retention

20   agreement but they weren't included in the settlement because

21   they didn't have legally cognizable injuries?

22        MR. MCCLAIN:  Judge, I would have to look to see to

23   be sure about that.  But in general, if they didn't have

24   legally cognizable injuries, we didn't file proofs of claims

25   for them because of the principal that you announced and we

09-11233-reg   Doc 5482-1   Filed 09/04/14   Chemtura Corporation   Page Main Document

1    understood even before you announced it, that I think it's

2    actually automatic what you announced on September 8th of 2010

3    that if you have no legally cognizable claim you don't have a

4    bankruptcy claim either.

5                THE COURT:  Um-hum.  Continue please.

6                MR. MCCLAIN:  So it was our intention not to file

7    claims that were not legally cognizable, and I don't think that

8    we knowingly did that.  So I would have to look to be certain

9    about that, but I think we tried to file all the claims that we

10   had in our office that potentially involved Chemtura before the

11   effective date and the bar date.  And in fact we included some

12   that we discovered along the way that were not filed, but we

13   included them within the settlement with Chemtura even

14   afterwards to be sure that we were being comprehensive and

15   acting in good faith with them.  But we don't think that it's

16   possible to bar people who we subsequently came to represent

17   with a settlement that was, that had occurred before the

18   representation and say constitutionally at least or even

19   contractually, you know, you didn't get any money, you didn't

20   sign this agreement, but you're barred because the McClain firm

21   represented some other people that we settled with.  That

22   doesn't seem to be fair and it's not certainly something that

23   I've seen the Court previously address or sanction.

24                So we think that these are futures claims as properly

25   understood and were not included within the settlement and

09-21532-reg   Doc 13021-1   Filed 02/04/15   Chemtura Corporation   Page 18 of 43   Main Document

1    should not be barred from pursuing their claim against Chemtura

2    in State Court since Chemtura did not want a future settlement.

3    We proposed that at the beginning and they did not want a

4    futures rep, and they said that futures were not included

5    within the claims that we were currently settling.  And that

6    would be my understanding of what these are.

7            THE COURT:  Okay.  Anything else?  Mr. McClain,

8    anything else?

9            MR. MCCLAIN:  No, Your Honor, that's all I have.

10            THE COURT:  Okay.  Ms. Labovitz, reply?

11            MS. LABOVITZ:  Thank you, Your Honor.  I'd like to

12    start by once again drawing a distinction between the two

13    distinct arguments that Chemtura is making because I think Mr.

14    McClain continues to collapse them on each other.  Chemtura's

15    point is first that the nine Fermenich claimants have claims

16    that are barred and discharged under the bar date in Chemtura's

17    plan of reorganization.  That has nothing to do with the

18    settlement with the Humphrey Farrington firm.  That settlement

19    was embodied in one part of the plan, but it's not even the

20    entire settlement that covers all diacetyl claimants.  As the

21    Court may recall and Mr. McClain doubtless does, there were

22    other diacetyl claimants that were not represented by Mr.

23    McClain's firm, they are still barred by the plan of

24    reorganization and covered by that plan.

25            So there are two distinct points here.  One is the

```
 1    bar date and the discharge; the other is the contractual

 2    settlement with the McClain firm.

 3              On the bar date and discharge point, I understand the

 4    points that Mr. McClain is raising, and the on a human level

 5    difficulty of wrestling with the idea that the Bankruptcy Code

 6    can and must act to bar claims of creditors who as a factual

 7    matter do not know or have the factual information to file a

 8    proof of claim.  Your Honor, I acknowledge that's a tough

 9    concept.  It's a concept, however, that courts have wrestled

10    with and dealt with long before we stand in the Court today.

11    The A.H. Robins court at the circuit level, not in this

12    circuit, but a seminal case on this issue.

13              THE COURT:  Fourth Circuit if I recall?

14              MS. LABOVITZ:  I'm going to have to look it up now,

15    Your Honor.  You got it for me?

16              THE COURT:  I am pretty sure of that.

17              MS. LABOVITZ:  It -- what's that?

18              THE COURT:  I'm pretty sure it was the Fourth Circuit

19    Court of Appeals.

20              MS. LABOVITZ:  I think it is the Fourth Circuit, Your

21    Honor.  In any event, it's cited in our pleadings and in our

22    table of authorities.  Your Honor, the A.H. Robins court says

23    what matters is that when the acts constituting a tort or an

24    injury occurred prepetition there was a claim.  And it doesn't

25    matter whether the plaintiff knew about the bar date and filed
```

Page 20

 1   the proof of claim.  It's difficult, but it's the law.  Mr.

 2   McClain says that he understood before anything was said in the

 3   Chemtura case that a claim doesn't need to be ripe in order for

 4   a proof of claim to be required by the bar date.  But again,

 5   Your Honor, that's just not the law even in this district.

 6   Judge Bernstein said in Quigley and Judge Lifland said in

 7   Chateaugay that when an actual chemical exposure occurs

 8   prepetition, the resulting injuries are prepetition claims and

 9   a proof of claim is required.  And in the Quigley case, Judge

10   Bernstein expressly addressed the question of whether a claim

11   needs to be ripe as a matter of law to allow a complaint to be

12   filed.  And Judge Bernstein said it doesn't matter if under

13   state law you would file a complaint at the point of a bar

14   date, you should submit a proof of claim anyway.

15           Judge Bernstein's theory in Quigley would suggest

16   that Mr. Cogut, who is the claimant from September 2010 who Mr.

17   McClain referenced, Mr. Cogut did exactly the right thing by

18   filing a proof of claim that said I've been exposed to

19   chemicals, I don't know if I have a claim or not.  And applying

20   the Bankruptcy Code, exactly the right thing happened, which is

21   we said you may have a claim for chemical exposure, but you

22   can't articulate a claim in this bankruptcy case for 10 or 20

23   million dollars when you have no injuries to point to.  That's

24   the way the law works.  In some situations -- and I'm going to

25   come to how I think the courts have addressed this challenge --

Page 21

1   in some situations, especially in the asbestos cases where we

2   know there is a large class of claims that has a long latency

3   period, we know that there is some X-factor of tort obligations

4   out there that is going, that it's incipient it's going to

5   ultimately be an obligation of the debtor, we've said it's not

6   sufficient for us just to rely on the bar date noticing scheme

7   that is a standard noticing scheme or even an enhanced noticing

8   scheme like the one we used in Chemtura.  So for those long

9   latency cases where you know there's going to be a category of

10  claims out there, the asbestos trust, the 524G contract has

11  arisen as the way to deal with those cases.  But that doesn't

12  mean you have to go through that process or impose it, that

13  kind of a future claims trust in every case.  And the case law

14  that I can point to that helps us understand why that is, is

15  the District Court Opinion in Waterman.

16          In Waterman you may recall Judge Conrad originally

17  looked at the bar date noticing scheme and said it's a good

18  enough noticing scheme, it's adequate, yes there were future

19  claimants but it's a good enough noticing scheme, they

20  published their notice, you know, in a major newspaper just the

21  way you're supposed to, that's enough.  And when Judge Conrad's

22  decision in Waterman went up on appeal, the District Court said

23  you can't quite do it that way.  The adequacy of your noticing

24  scheme has to be tailored to reflect the kinds of claims that

25  you know you're going to have.  And the District Court in

09-15026-reg    Doc 13023-1    Filed 12/08/14    Chemtura Corporation    Page 23    Main Document
Pg 22 of 43

Page 22

1    Waterman said you knew you had this future class of asbestos

2    claimants and you needed to have an enhanced noticing scheme

3    that reflected the scope of claims that you knew you were going

4    to have.  It needed to be appropriately tailored to the

5    circumstances.  And so the District Court referred that

6    question back down to Judge Conrad and asked Judge Conrad to

7    pass on the question of whether the noticing scheme the debtor

8    had used in that case was reasonably tailored to the kinds of

9    tort claims that they had.  And in that case Judge Conrad found

10   that the noticing scheme wasn't reasonably tailored.

11            But you can take that construct, that legal construct

12   now and look at Judge Lifland's opinion in Chateaugay where

13   Judge Lifland said there were asbestos claims, they didn't

14   establish an asbestos trust, but they used enough of a good

15   noticing scheme that it's okay, because in that case, this is

16   important, Judge Lifland was saying Chateaugay is not primarily

17   an asbestos case, there, you know, this is not the construct or

18   the rationale for this case, and, therefore, Judge Lifland said

19   they didn't need to go through the whole process of

20   establishing an asbestos trust.

21            And, Your Honor, I think that's the line of cases

22   that points the way through this Chemtura challenge.  In

23   Chemtura, as you know and as Mr. McClain knows, the noticing

24   scheme was not your garden variety bar date noticing scheme, it

25   was comprehensive, it was expensive, it took a long time to put

09-15026-mg    Doc 13021-1    Filed 12/16/14    Entered 12/16/14 13:59:58    Exhibit A
Chemtura Corporation    Pg 24 of 44

Page 23

```
 1    in place.  We had more than one hearing before Your Honor to

 2    discuss whether it was adequate, the company ended up providing

 3    additional notice even over and above the enhanced scheme it

 4    was already proposing with the direct input of Mr. McClain and

 5    his fellow representatives of diacetyl claimants.  It was

 6    comprehensive.  And from our perspective it was reasonably

 7    tailored to with the class of plaintiffs that we knew that we

 8    had, particularly in light of the fact that diacetyl is a low

 9    latency kind of chemical exposure, it's not like asbestos.

10    People do know that they have injuries.  Mr. McClain's point is

11    that they may not be immediately diagnosed with a diacetyl

12    related injury that could be the basis for filing a complaint,

13    I think that's Mr. McClain's point.  But again I would come

14    back to the Quigley case and the Holmes case coming out of the

15    Eastern District and say that's just not the legal standard.

16    The legal standard is whether there was exposure, whether the

17    bar date noticing scheme was adequately tailored under Waterman

18    to the kind of tort plaintiffs that we had.  And ultimately I

19    think the proof that it was is that Chemtura's knowledge of its

20    diacetyl claimants increased by approximately 325.  And since

21    the chapter 11 case we have only these nine plaintiffs who came

22    up.  It's not that there was a huge class of claims that we

23    didn't reach.

24            Your Honor, unless you have any questions, I think

25    that's all I have.
```

09-21523-reg    Doc 33821-1    Filed 09/04/14    Entered 09/04/14 13:56:36    Main Document

General Motors Corporation

Page 24

```
 1              THE COURT:  No, thank you.  Okay.  Mr. McClain, sur-
 2     reply limited to new stuff you heard from Ms. Labovitz this
 3     last time.
 4              MR. MCCLAIN:  Yes, I fundamentally disagree with the
 5     factual matter that these are not long latency diseases and
 6     that people know that they're sick from diacetyl, and that
 7     these people were sick before 2009.  I just don't think that
 8     there's any evidence of that, and I disagree with it
 9     fundamentally.
10              I have a number of clients, including these who do
11     have long latencies and have no symptoms that are diagnosable
12     before they are diagnosed.  And in fact, in this case I would
13     dispute the fact that they had a diagnosable disease by 2009.
14     And I think that this falls right within the opinions that I
15     previously pointed the Court to which say that it's not
16     constitutional to bar people who do not have demonstrable
17     disease before the bar date, it's just not, it does not give
18     them due process in this circumstance.  And so, Judge, I would
19     ask the Court for these nine individuals not to, not to say
20     that they are barred, they didn't have disease beforehand and
21     they didn't know.  That's all.
22              THE COURT:  Okay.  Thank you.  All right.  Everybody
23     sit in place for a minute.  Mr. McClain, you're going to hear a
24     little quiet.
25              MR. MCCLAIN:  That's fine.
```

09-11233-scc    Doc 600-23    Filed 02/06/14    Entered 02/06/14 15:11:06    Main Document
Pg 25 of 43

Page 25

1    (Pause)

2            THE COURT:  All right.  Ladies and gentlemen, in this

3    contested matter in the chapter 11 cases of Chemtura and its

4    affiliates the reorganized Debtors seek entry of an order

5    pursuant to Sections 105(a), 524 and 1141 of the Code, and

6    Bankruptcy Rule 3020(d) enforcing the discharge injunction as

7    to the Firmenich claimants and their counsel, Humphrey

8    Farrington and McClain, and seek orders first finding that the

9    claims asserted in the diacetyl lawsuits now pending in State

10    Court arose before the Chemtura petition date and were thus

11    discharged pursuant to the plan of reorganization; second,

12    directing the Firmenich claimants and their counsel to dismiss

13    the Chemtura defendants from the diacetyl lawsuits; and third,

14    declaring that the Firmenich claimants and their counsel are

15    barred from attempting to seek monetary damages or other relief

16    with respect to any of their diacetyl related claims.

17            The reorganized Debtors' motions in each of their

18    three prongs are granted.  I find that the claims asserted by

19    the Fermenich claimants in the pending State Court diacetyl

20    lawsuits are claims within the meaning of Federal Bankruptcy

21    Law that arose before the petition date and that are thus

22    subject to discharge under Chemtura's plan of reorganization; I

23    find that they're enjoined from seeking any form of relief from

24    the Chemtura defendants with respect to their diacetyl related

25    claims, and I will direct the claimants to dismiss the Chemtura

1    defendants from the pending diacetyl lawsuit as quickly as that

2    reasonably may be accomplished.

3           My findings of fact and conclusions of law underlying

4    this decision follow.

5           Turning first to my findings of fact.  I won't lay

6    out every fact in this matter, but instead will address only

7    those relevant to this decision.  On March 18, 2009, Chemtura's

8    domestic operations filed petition for relief under chapter 11.

9    From 1982 to 2005, Chemtura Canada manufactured and sold

10   diacetyl, a butter flavoring ingredient that was widely used in

11   the food industry prior to 2005 to certain customers in the

12   U.S.  And Chemtura acted as Chemtura Canada's intermediary

13   purchasing the diacetyl from Chemtura Canada and then selling

14   it to customers in the U.S.

15          In 2001, food industry workers began alleging that

16   exposure to diacetyl caused respiratory illnesses, and product

17   liability actions were filed alleging that diacetyl was

18   defectively designed or manufactured.  As of the petition date,

19   Chemtura and Chemtura Canada faced approximately 15 filed

20   diacetyl lawsuits involving approximately fifty (50)

21   plaintiffs.  In the summer of 2009, the Debtors developed a bar

22   date noticing program involving a combination of general and

23   importantly site specific notices.  The site specific notices

24   were designed to provide notice to potential tort plaintiffs in

25   known geographical locations.  Putting it in another way, the

09-10138-mg    Doc 13021-1    Filed 12/16/14    Entered 12/16/14 13:59:58    Exhibit A
Pg 28 of 43

Page 27

```
 1    locations were known, but the people who might have claims in

 2    those locations were not.  On August 4, 2009, the Debtors filed

 3    a motion before me seeking my approval of their bar date

 4    noticing program.  The diacetyl claimants who were then

 5    represented by Humphrey Farrington filed a limited objection

 6    arguing in part that the noticing program for unknown creditors

 7    was not reasonably calculated to inform potential diacetyl

 8    claimants of the need to file a proof of claim.

 9              The Debtors argued that the site specific diacetyl

10    notices which Humphrey Farrington had overlooked in its

11    objection were more than adequate to satisfy due process

12    requirements.  In addition, the Debtors pointed out that other

13    diacetyl claimants had previously argued that it was unlikely

14    that there would be future claims because of a stated short

15    latency period for manifestation of injuries from diacetyl

16    exposure.  Though I note for the avoidance of doubt that this

17    was other diacetyl claimants and not the Humphrey Farrington

18    firm, and Mr. McClain has stated as recently in oral argument

19    today that he differs with that statement.

20              After hearing argument from both sides, I approve the

21    Debtors' bar date noticing program noting at that time that it

22    was important to me that the Debtors had done or proposed more

23    than a generalized national publication, which is why I

24    welcomed the Debtors' proposal to provide site specific notice.

25    I was then not called upon to decide and I do not decide today
```

1    whether notice the way it's often done in large bankruptcy

2    cases by notice in publications like the New York Times and

3    Wall Street Journal would, without the supplemental noticing

4    undertaken by the Debtor, be enough to pass constitutional

5    muster or not.

6         On August 21, 2009, an order approving the bar date

7    noticing program was entered, and October 31, 2009, two months

8    later was established as the bar date for filing proofs of

9    claim.

10        At the request of the Humphrey Farrington firm, the

11   Debtors added 83 additional manufacturing site locations for

12   site specific notice, including of particular significance

13   here, the Fermenich facility.  The notices informed potential

14   claimants that they might have a claim under various legal

15   theories if they were exposed to diacetyl and such exposure

16   "directly or indirectly caused injury that becomes apparent

17   either now or in the future."  The notices specifically

18   informed potential claimants that they needed to file a proof

19   of claim by the bar date in order to preserve any claim

20   alleging diacetyl related injury.  And in addition, and what I

21   thought then and still do think, is the salutary practice,

22   although I don't make any finding as to whether it's

23   constitutionally required.  There was even language in Spanish

24   to lead the reader to help if he or she was a Spanish speaking

25   recipient.

1          After the notice was given and by the time the bar

2     date passed, the Debtors received 373 non-duplicative proofs of

3     claim related to diacetyl, markedly more than the 50 that were

4     on the table at the time that the chapter 11 case was filed.

5     Of note, five of the 373 were filed by Humphrey Farrington on

6     behalf of individuals who worked at the Fermenich facility.

7     However, none of the claimants pursuing the State Court action

8     to which the reorganized Debtors now object filed a proof of

9     claim.

10          After the bar date passed, Humphrey Farrington and

11    the Debtors reached a settlement which I approved on September

12    1st, 2010 resolving the 347 diacetyl claims filed by Humphrey

13    Farringdon and all claims by anyone represented by Humphrey

14    Farrington as of the effective date of the settlement in

15    exchange for $50 million to be divided by Humphrey Farrington

16    among its clients.  The settlement became effective on November

17    11, 2010.  This Court entered an order confirming the chapter

18    11 plan of Chemtura Corporation on November 3rd, 2010 with a

19    plan effective date of November 10, 2010.  The confirmation

20    order contained language which I'll explore more fully below

21    implementing discharge and injunctive provisions that were set

22    forth in the plan.

23          On September 12th, 2011 the Fermenich claimants who

24    were nine individuals represented by the Humphrey Farrington

25    firm, filed diacetyl related lawsuits in the Superior Court in

09-15002-mg    Doc 13021-1    Filed 12/16/14    Entered 12/16/14 13:50:58    Main Document
Chemtura Corporation
Pg 31 of 44

Page 30

1   Middlesex County, New Jersey against, among others, Chemtura

2   and Chemtura Canada.   For reasons that are not fully clear to

3   me, they didn't serve the reorganized Debtors for a period of

4   nine months after they filed the lawsuits until July 9, 2012.

5   When the reorganized Debtors learned of the lawsuits in March

6   of 2012, they then reached out to counsel for the Firmenich

7   claimants to demand that the reorganized Debtors be dismissed

8   from the diacetyl lawsuits contending that the lawsuits

9   violated the discharge injunction entered by this Court.  When

10  the parties were unable to come to a consensual resolution, the

11  reorganized Debtors filed this motion.

12          Turning now to my conclusions of law.  Under Section

13  1141(d)(1) of the Code, confirmation of a plan of

14  reorganization provides a discharge to a debtor that

15  extinguishes and debts claims against the debtor that arose

16  prior to the confirmation.  Section 1141(d)(1) provides in

17  relevant part, and I'm quoting.

18      "Except as otherwise provided in this subsection in the

19  plan, or in the order confirming the plan, the confirmation of

20  a plan:

21          (a) discharges the debtor from any debt that arose

22  before the date of such confirmation ... whether or not

23              (i) a proof of claim based on such debt is filed

24  or deemed filed under Section 501 of this title...

25          In line with that section of the Code, my order

09-21533-reg Doc 3023-1 Filed 05/06/14 Entered Liquidating Corporation 456 Page 60 of Main Document
Pg 32 of 443

Page 31

```
 1    confirming the debtors' plan of reorganization stated at

 2    paragraph 141 in relevant part and I'm quoting.  "Pursuant to

 3    Section 1141(d) of the Bankruptcy Code and except as otherwise

 4    specifically provided in the plan, the distributions, rights,

 5    and treatment that are provided in the plan shall be in full

 6    and final satisfaction, settlement, release and discharge,

 7    effective as of the effective date of all claims interest and

 8    causes of action of any nature whatsoever including any

 9    interest accrued on claims or interest from and after the

10    petition date whether known or unknown for periods, this order

11    shall be a judicial determination of the discharge of all

12    claims and interest subject to the effective date occurring

13    except as otherwise expressly provided in the plan."

14            Then Section 524(a)(2) of the Code provides that the

15    discharge afforded to a debtor "operates as an injunction

16    against the commencement or continuation of an action, the

17    employment process, or an act, to collect, recover, or offset

18    such debt...."

19            And then the confirmation order contains language

20    mirroring that of Section 524(a)(2) or implementing that.  It

21    states in part, again I'm quoting.  "All entities who have

22    held, hold or may hold claims or interest ... that have been

23    discharged pursuant to Section 11.7 [of the plan] or are

24    subject to exculpation pursuant to Section 11.6 [of the plan]

25    ... are permanently enjoined, from and after the effective
```

1    date, from taking any of the following actions:  (a) commencing

2    or continuing in any manner any action or other proceeding of

3    any kind on account of or in connection with or with respect to

4    any such claims or interest ... (d) commencing or continuing in

5    any manner in the action or other proceeding of any kind on

6    account of or in connection with or with respect to any such

7    claims or interest ... discharge pursuant to the plan."

8            Section 11.6 of the plan "Discharge of Claims and

9    Termination of Interest," and Section 11.7 "Injunction,"

10   contain virtually identical language to that in the

11   confirmation order.

12           As a result of Sections 1141(d)(1) and 524(a)(2) of

13   the Code and the related provisions in the plan and

14   confirmation order, the reorganized Debtors argue that the

15   Fermenich claimants are barred from asserting their claims

16   against the reorganized Debtors in the State Court diacetyl

17   lawsuits.  I agree.

18           The first and most vigorously argued issue before me

19   is whether these are claims at all, that is prepetition claims.

20   At Section 1141(d)(1) only discharges claims that arose prior

21   to the confirmation, it is necessary to first determine when

22   the claimants' claims arose.

23           Section 1015(a) defines "claim" broadly to include "a

24   right to payment whether or not such right is reduced to

25   judgment, liquidated, unliquidated, fixed, contingent, matured,

1   unmatured, disputed, undisputed, legal, equitable, secured, or

2   unsecured...."  As the Ninth Circuit noted, this definition is

3   "designed to ensure that 'all legal obligations of the debtor

4   no matter how remote or contingent, will be able to be dealt

5   with in the bankruptcy case.'"  California Department of Health

6   Services vs. Jensen (In re Jensen) 995 F.2d 925, 929 (9th Cir.

7   1993).  I've left out its citations.

8          Importantly -- and this is why I have the problems

9   with the arguments that are the principal arguments upon which

10  the Fermenich claimants rely including those that I heard from

11  Mr. McClain this morning -- Judges in this Court have

12  consistently held that claims for injuries resulting from

13  preparation exposure to products alleged to cause tort injuries

14  are prepetition claims.  The claim arises at the time of

15  exposure regardless of when the injury manifests or when the

16  claimant receives a formal diagnosis.  See In re Chateaugay

17  Corp, 2009 Westlaw 367490 at *6 (Bankr. S.D.N.Y. 2009) (Lifland

18  J.)  In re Quigley Company Inc., 383 Br. 19, 27 (Bankr.

19  S.D.N.Y. 2008) (Bernstein J) both holding that if a plaintiff

20  was exposed to asbestos before the petition date, he or she

21  held a prepetition claim.

22          I must conclude that the claimants' hold prepetition

23  claims because any exposure of the claimants to diacetyl that

24  was manufactured or sold by the Debtors occurred prepetition.

25  Each of the nine claimants alleges that he or she was exposed

Page 34

1    to diacetyl during the course of employment at the Fermenich

2    facility during various time periods starting from 1984 to 2000

3    and continuing to 2011.  The Debtors ceased manufacturing

4    and/or selling diacetyl in 2005, four years prior to filing a

5    chapter 11 petition in this Court.  The claimants' claims as to

6    injuries arising from alleged exposure to diacetyl that was

7    manufactured or sold by the Debtors arose at the time of

8    exposure, which under these facts would be 2005 at the latest.

9    Thus, these are prepetition claims.

10            The rule that claims are discharged under those

11   circumstances is, however, subject to an important

12   qualification, one that's required under the U.S. Constitution.

13   That's a requirement of due process.  Though I was surprised

14   and disappointed to see that the Fermenich claimants failed to

15   mention the key case in this area, which is a Supreme Court

16   decision, notwithstanding the language of Section 1141 the

17   discharge of claims without notice violates the due process

18   clause of the United States Constitution.  As the Supreme Court

19   held in Mullane vs. Central Hanover Bank and Trust Company, 339

20   U.S. 306, 314 (1950), "an elementary and fundamental

21   requirement of due process in any proceeding which is to be

22   accorded finality is noticed reasonably calculated, under all

23   the circumstances, to apprise interested parties of the

24   pendency of the action and afford them an opportunity to

25   present their objections.  The notice must be of such nature as

1   reasonably to convey the required information."

2          The Supreme Court in Mullane went on to note that

3   actual notice is not required in all circumstances to satisfy

4   due process.  Rather "in the case of persons missing or

5   unknown, employment of an indirect and even a probably futile

6   means of notification is all that ... [is required]."  339 U.S.

7   at 317.  See also Dippipo (phonetic) vs. Kmart Corp., 335 Br.

8   290, 296 (S.D.N.Y. 2005) (Connor J)  "It is well settled that

9   when a creditor is 'unknown' to the debtor, publication notice

10  of the claims' bar date is adequate constructive notice

11  sufficient to satisfy due process requirements...."  An

12  "unknown" creditor is one whose interests "are either

13  conjectural or future or although they could be discovered upon

14  investigation, do not in due course of business come to

15  knowledge [of the debtor]."  Mullane 339 U.S. at 317.

16          Courts have routinely held that publication notice is

17  sufficient to satisfy due process standards for unknown

18  creditors.  See for example, In re Chateaugay Corp., 2009 WL

19  367490, at *5.  That's not, however, to say that any means of

20  publication notice is sufficient.  The publication notice must

21  be reasonably calculated to reach interested creditors.  See

22  Waterman Steamship Corp. vs. Aguilar, (In re Waterman Steamship

23  corporation), 157 Br. 2290 (S.D.N.Y. 1993).  That's why

24  Bankruptcy Judges like me look at the proposed form of notice

25  and we make a judgment as to whether we think that under all

1  the circumstances it will skin the cat that is whether it's

2  reasonably calculated to achieve the notice that the

3  Constitution and traditional concepts of fairness require.

4  That's why, for example, we had the supplemental noticing

5  scheme here, partly because the Debtors anticipated the need

6  and partly because I wanted to be comfortable that it would do

7  a better job of providing that kind of notice, the notice the

8  way it's very often proposed in large chapter 11 cases.

9        Here I find that the claimants fall squarely within

10  the definition of unknown creditors because although their

11  interests likely were not conjectural or future at the time of

12  notice, their interests were not discoverable by the debtors in

13  the ordinary course of the Debtors' business.  As unknown

14  creditors, actual notice was not required to satisfy due

15  process.  Rather, the Debtors only needed to provide

16  publication notice reasonably calculated to reach the claimants

17  as dictated by Waterman and Mullane.

18        I find that the Debtors' extensive bar date noticing

19  process including specific diacetyl related notices and local

20  publications and postings at various sites, including the

21  Fermenich facility, were sufficient to satisfy due process.  As

22  the reorganized Debtors point out in their motion, following

23  that unusually thorough noticing procedure, five individuals

24  employed at the Fermenich facility filed proofs of claim

25  asserting injuries allegedly caused by exposure to diacetyl at

1    that facility.  This lends further support to the finding that

2    notice of the bar date for individuals who worked at the

3    Fermenich facility was sufficient to satisfy the due process

4    standards articulated under Mullane and Waterman.

5           The claimants make three main objections which I'll

6    deal with now although one of them was largely addressed

7    already.  They argued that they could not have been provided

8    with notice reasonably calculated to advise them of their

9    future ability to assert a claim because it wasn't until after

10   the bar date that they received the diagnosis from a doctor

11   telling them that they had injuries caused by diacetyl.  The

12   reorganized Debtors respond persuasively that many hundreds of

13   personal injury claimants, including diacetyl claimants, filed

14   proofs of claim based on asserted physical injury without the

15   formality of a doctor's diagnosis, and that these claimants

16   should be held to the same standard.  In fact, other

17   individuals who worked at the Fermenich facility and who were

18   represented by Humphrey Farrington did exactly that.

19          Next, the Fermenich claimants argue that they were

20   denied due process because they didn't receive sufficient

21   notice.  They argue that none of the Fermenich claimants ever

22   subscribed to, received or read the Home News Tribune, a

23   newspaper in which supplemental notice was published, nor were

24   they otherwise aware of the bar date or plan of reorganization.

25   But again that runs contrary to what Mullane, which they failed

1 to address, requires. The standard doesn't turn on whether

2 they actually read the notice, rather the question is whether

3 the notice scheme was reasonably calculated to reach unknown

4 creditors which as I noted previously I find to be the case

5 here.

6 Further, the Fermenich claimants argue that they

7 can't constitutionally be bound by the discharge injunction

8 because they were denied due processes, there was no future

9 claims representative appointed to represent their interest. A

10 future claims representative was not required here. They

11 correctly rely upon Manful (phonetic) 603 F.3d, 135 (2010) in

12 which the Second Circuit held that Chubb (phonetic) wasn't

13 adequately represented by the asbestos claimants in the

14 proceedings that led the court to approve a nondebtor release

15 of other liability insurers including Travelers, and thus that

16 Chubbs' claims against Travelers for contribution and indemnity

17 were not enjoined. But as the reorganized Debtors point out

18 here Manful isn't on point -- it's a third party release case,

19 not a discharge case, and it involves the Bankruptcy Court's

20 exercise of in persona authority in relation to third party

21 claims against a nondebtor rather than in rem authority dealing

22 with the claims that are asserted against the debtor itself and

23 the debtor's property itself. The motion here invokes this

24 court's in rem jurisdiction.

25 The applicable authority here as the reorganized

1   Debtors correctly assert is the bundle of cases such as

2   Chateaugay in which a debtor's discharge against unknown tort

3   claimants was enforced based upon publication notice of the

4   debtor's bar date.

5          Finally, the parties argue an issue that ultimately

6   is not relevant, whether they were parties to the earlier

7   Humphrey Farrington settlement or not.  By reason of what I've

8   held previously I don't need to deal with that issue.  To be

9   sure, I must conclude that when they sign their retainer

10  agreements, which is the only evidence I have in the record,

11  and where these agreements are heavily redacted, is not

12  necessarily determinative without knowledge of the extent to

13  which any of the nine folks who are the subject of the motion

14  were represented by Humphrey Farrington or could be found to

15  have done so before they signed those particular pieces of

16  papers.  But in light of the other conclusions that follow, I

17  don't need to address what is effectively another string to the

18  reorganized Debtors.

19         I'm well aware of the fact as argued by Mr. McClain

20  today that when somebody has suffered an injury but doesn't yet

21  know it, there are fairness issues associated with requiring an

22  individual of that circumstance to file a claim even though as

23  the record reflects here, many claimants did exactly that.  But

24  nevertheless, as cases like Chateaugay, Quigley, Holmes versus

25  ALPA 745, F.Supp 2d, 176, 196(E.D.N.Y. 2000), Placid Oil,

1    claims of this character arise at times earlier than the

2    plaintiff may be in a position to sue.  I don't write on a

3    clean slate and indeed it could be persuasively argued if

4    Judges could act upon their notions of policy rather than on

5    precedent and case law.  It would be difficult for the

6    bankruptcy system to effectively function if the law were any

7    different.  But as I've stated many times in writing the

8    interest of predictability that is so important to the

9    commercial community require me to follow the decisions of my

10   colleague Bankruptcy Judges in this district, except at least

11   in cases of manifest error and certainly the decisions by Chief

12   Judges Lifland and Bernstein are hardly of that character.

13   Consistent with their rulings, there were claims here that were

14   capable of being subject to publication notice, it was good,

15   indeed better than average publication notice, the Humphrey

16   Farrington firm had further opportunities to make even greater

17   suggestions and I effectively incorporated anything that I felt

18   was practical to achieve the best notice we could, and the

19   notice did its job.

20          Accordingly, the Fermenich claimants' claims were

21   discharged and they can't proceed with their pending lawsuit.

22          Ms. Labovitz, you are to settle an order in

23   accordance with the preceding ruling.

24          MS. LABOVITZ:  Yes, Your Honor.

25          THE COURT:  All right.  We're going to take a five

1    minute recess, maybe ten, enough for me to get my voice back

2    and then we'll continue with the next matter on the calendar.

3    We're in recess.

4              MS. LABOVITZ:   Thank you, Your Honor.

5    (Proceedings concluded at 11:14 AM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                           I N D E X

 2

 3                           RULINGS

 4    DESCRIPTION                                      PAGE

 5    HEARING re Doc #5769 Motion to Approve/

 6    Reorganized Debtors Motion for an Order

 7    Enforcing the Discharge Injunction Under

 8    the Debtors Chapter 11 Plan of Reorganization        25

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

CERTIFICATION

2

3          I, Theresa Pullan, certify that the foregoing is a

4    correct transcript from the official electronic sound recording

5    of the proceedings in the above-entitled matter.

6

7

     AAERT Certified Electronic Transcriber CET**00650

8

     Theresa Pullan

9

10

     February 3, 2013

11

12

13

14

15

16

17

18

19

20

21

     Veritext

22

     200 Old Country Road

23

     Suite 580

24

     Mineola, NY 11501

25