**Hearing Date and Time: To Be Determined**
**Opposition Deadline: December 16, 2014**
**Reply Deadline: January 16, 2015**

Edward S. Weisfelner
David J. Molton
May Orenstein
Howard S. Steel
Rebecca L. Fordon (*pro hac vice* pending)
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036
Telephone: 212-209-4800
Email: eweisfelner@brownrudnick.com
Email: dmolton@brownrudnick.com
Email: morenstein@brownrudnick.com
Email: hsteel@brownrudnick.com
Email: rfordon@brownrudnick.com

Sander L. Esserman
STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA, A PROFESSIONAL
CORPORATION
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Telephone: 214-969-4900
Email: esserman@sbep-law.com

*Designated Counsel for Certain Plaintiffs*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, et al., | : | Case No.: 09-50026 (REG) |
| f/k/a General Motors Corp., et al., | : | |
| | : | |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------------X

**DESIGNATED COUNSEL'S OPPOSITION TO**
**NEW GM'S MOTIONS FOR ENFORCEMENT OF SALE ORDER AND INJUNCTION**

TABLE OF CONTENTS

PRELIMINARY STATEMENT..................................................................................1

NEW GM'S MOTIONS ...........................................................................................6

FACTUAL BACKGROUND .....................................................................................8

    A.  The Defective Ignition Switch Was Engineered By Old GM In 2001................................8

    B.  Old GM Initiates Internal Investigations Of The ISD.....................................................10

    C.  Old GM Notifies Its Dealers Of The ISD. .........................................................11

    D.  Old GM Re-Engineers The Ignition Switch Without Fixing The ISD. ............................12

    E.  Old GM Learns Of Multiple Fatal Or Serious Accidents Evidencing A Safety Defect Involving Ignition Switches. .........................................................12

    F.  Knowledge Of The ISD Was Widespread Within Old GM. ...............................................13

    G.  The February 2009 "Band-Aid" Change To The Cobalt Key. ...........................................16

    H.  The 2009 Report By An Old GM Supplier Confirms Existence Of The ISD....................17

    I.  Old GM's Bankruptcy Proceedings. .........................................................17

    J.  Post-Sale, New GM Continues The Business Of Old GM And Issues Recalls.................19

    K.  Old GM Had A Culture Of Downplaying Safety Related Problems, Which Has Persisted In New GM.........................................................23

    L.  Plaintiffs' Economic Loss Claims.........................................................25

ARGUMENT ..............................................................................................................26

I.  Due Process Threshold Issue. ..............................................................................26

    A.  Due Process Requires Notice And Opportunity To Be Heard. ...........................................26

        1.  Due Process Requires Direct Notice To Creditors Whose Identities Are Reasonably Ascertainable. .........................................................27

        2.  Due Process Requires Notice To Contain Sufficient Information To Inform Creditors Of Their Interests. .........................................................31

3.   The Due Process Requirements Of Adequate Notice And Opportunity To Be
Heard Apply With Equal Force To Section 363 Sale Orders. ....................................32

4.   A Failure Of Due Process Cannot Be Cured By Speculation About What
Could Have Occurred Absent The Violation. ...............................................36

B.  The Pre-Sale Plaintiffs Were Reasonably Ascertainable Claimants At The Time Of
The 363 Sale. ......................................................................39

1.   Old GM Knew Of The ISD And That It Was A Safety Defect. ...................39

2.   Agency Principles Confirm Old GM's Actual Knowledge.........................47

3.   Old GM Had Standard Procedures For Effecting Recalls That Made The
Identities And Mailing Addresses Of Pre-Sale Class Members Reasonably
Ascertainable.................................................................49

C.  GM Did Not Apprise Plaintiffs That Their Interests Could Be Affected By The
Sale Order...........................................................................52

D.  No Notice Could Be Sufficient To The  Post-Sale Claimants As Unknown
Creditors...........................................................................55

E.  In Addition To Being Legally Unsupportable, New GM's Inevitability Argument
Is Factually Unfounded..............................................................58

II.  Remedies Threshold Issue. .................................................................61

A.  This Court Should Deny The Motions To Enforce The Sale Order, As They
Purport To Deprive Plaintiffs of Property Without Due Process. ......................61

B.  No Rule Or Standard Prohibits This Court's Denial Of The Motions. ...........................64

C.  Principles Of Bankruptcy Policy Do Not Warrant A Different Result.............................67

III. Old GM Claim Threshold Issue: The Consolidated Complaints Assert Claims That Are
Based On New GM's Post-Sale Conduct And Not Subject To The Sale Order.....................69

A.  The Bankruptcy Court Lacked Jurisdiction To Enjoin Future Claims Against New
GM Arising Out Of Post-Sale Violations Of New GM's Independent Legal
Duties. .............................................................................70

B.  This Court's Prior Decisions Do Not Shield New GM From Liability For Its Own
Conduct.............................................................................71

C.  Plaintiffs Assert Direct Claims Based On New GM's Conduct.......................72

D.  Plaintiffs Correctly Assert Consumer-Based Claims Arising Out Of New GM's
Failure To Comply With The Safety Act And Plaintiffs' Resulting Harm........................76

IV. Fraud on the Court Standard. ...............................................................................................78

CONCLUSION ...........................................................................................................................81

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Acevedo v. Van Dorn Plastic Mach. Co.,
 68 B.R. 495 (Bankr. E.D.N.Y. 1986)...........................................................32, 54

Ahcom, Ltd. v. Smeding,
 623 F.3d 1248 (9th Cir. 2010) ...............................................................36

Albert v. Alex. Brown Mgmt. Servs., Inc.,
 No. 762-N, 2005 Del. Ch. LEXIS 133 (Del. Ch. Aug. 26, 2005)..........................49

Allard v. Arthur Andersen & Co. (USA),
 924 F. Supp. 488 (S.D.N.Y. 1996) ...............................................................48

Andrada Fin., LLC v. Humara Grp., Inc. (In re Andrada Fin., LLC),
 No. 10-00289, 2011 WL 3300983 (B.A.P. 9th Cir. Apr. 7, 2011) .......................79

Apex Oil Co. v. Vanguard Oil & Serv. Co. (In re Vanguard Oil & Serv. Co., Inc.),
 88 B.R. 576 (E.D.N.Y. 1988) ...............................................................38

Arch Wireless v. Nationwide Paging, Inc. (In re Arch Wireless),
 534 F.3d 76 (1st Cir. 2008)...............................................................61

Austin v. BFW Liquidation, LLC (In re BFW Liquidation, LLC),
 471 B.R. 652 (Bankr. N.D. Ala. 2012) ...........................................................65, 66

Back v. LTV Corp. (In re Chateaugay Corp.),
 213 B.R. 633 (S.D.N.Y. 1997)...............................................................65

Barry v. L.F. Rothschild & Co. (In re L.F. Rothschild Holdings, Inc.),
 No. 92 Civ. 1129, 1992 WL 200834 (S.D.N.Y. Aug. 3, 1992) ...........................30

Beeman v. BGI Creditors' Liquidating Trust (In re BGI, Inc.),
 772 F.3d 102 (2d Cir. 2014)...............................................................51

Brooks Fashion Stores, Inc. v. Michigan Emp't Sec. Comm'n (In re Brooks Fashion
 Stores, Inc.), 124 B.R. 436 (Bankr. S.D.N.Y. 1991) .......................................46

Brunswick Hosp. Ctr., Inc. v. New York Dep't of Health (In re Brunswick Hosp. Ctr.,
 Inc.),
 Nos. 892-80487-20, 894-8283-346, 1997 WL 836684
 (Bankr. E.D.N.Y. Sept. 12, 1997)...............................................................31

Burton v. Chrysler Group, LLC (In re Old Carco LLC),
 492 B.R. 392 (Bankr. S.D.N.Y. 2013)...........................................45, 46, 57, 76

California v. Gen. Motors LLC,
    No. 14-2543, 2014 WL 6655796 (S.D.N.Y. Nov. 24, 2014)..................................................77

Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.),
    428 B.R. 43 (S.D.N.Y. 2010) ....................................................................................36, 68, 69

Cameron v. Terrell & Garrett, Inc.,
    618 S.W.2d 535 (Tex. 1981)...........................................................................................74

Castillo v. General Motors LLC (In re Motors Liquidation Co.),
    Adv. Proc. No. 09-00509 (REG), 2012 WL 1339496
    (Bankr. S.D.N.Y. Apr. 17, 2012) ..................................................................................71, 72

Cedar Tide Corp. v. Chandler's Cove Inn, Ltd. (In re Cedar Tide Corp.),
    859 F.2d 1127 (2d Cir. 1988), cert. denied, 490 U.S. 1035 (1989) ........................................66

Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,
    973 P.2d 527 (Cal. 1999) ...............................................................................................77

Cent. Vt. Pub. Corp. v. Herbert,
    341 F.3d 186 (2d Cir. 2003).............................................................................................64

Charter Crude Oil Co. v. Petroleos Mexicanos (In re Charter Co.),
    125 B.R. 650 (M.D. Fla. 1991) .......................................................................................47

Chateaugay Corp. v. LTV Corp. (In re Chateaugay Corp.),
    944 F.2d 997 (2d Cir. 1991)............................................................................................56

Chemetron Corp. v. Jones,
    72 F.3d 341 (3d Cir. 1995), cert. denied sub nom.
    Jones v. Chemetron Corp., 517 U.S. 1137 (1996) .................................................................47

Citicorp Mortg., Inc. v. Brooks (In re Ex-Cel Concrete Co.),
    178 B.R. 198 (B.A.P. 9th Cir. 1995)......................................................32, 34, 35, 64, 67

City Equities Anaheim, Ltd. v. Lincoln Plaza Dev. Co.
    (In re City Equities Anaheim, Ltd.), 22 F.3d 954 (9th Cir. 1994) ..........................................38

City of New York v. N.Y., New Haven & Hartford R.R. Co.,
    344 U.S. 293 (1953), motion to modify denied, 345 U.S. 901 (1953) ....................................31

Compak Cos., LLC v. Johnson,
    415 B.R. 334 (N.D. Ill. 2009) .....................................................................................34, 65

Consol. Coal Co. v. Borda,
    171 F.3d 175 (4th Cir. 1999) ..........................................................................................37

Cont'l Cas. Co. v. Gen. Dev. Corp. (In re Gen. Dev. Corp.),
    165 B.R. 685 (S.D. Fla. 1994) ................................................................38

Conway v. White Trucks, A Div. of White Motor Corp.,
    885 F.2d 90 (3d Cir. 1989)....................................................................67

Copeman Labs. Co. v. Gen. Motors Corp.,
    36 F. Supp. 755 (E.D. Mich. 1941)........................................................49

Covey v. Town of Somers,
    351 U.S. 141 (1956)......................................................................31, 53

Doktor v. Werner Co.,
    762 F. Supp. 2d 494 (E.D.N.Y. 2011) ....................................................68

Doolittle v. Cnty. of Santa Cruz (In re Metzger),
    346 B.R. 806 (Bankr. N.D. Cal. 2006) ..................................................33

Douglas v. Stamco,
    363 F. App'x 100 (2d Cir. 2010) .....................................................67, 68

DPWN Holdings (USA), Inc. v. United Air Lines, Inc.,
    747 F.3d 145, 150 (2d Cir. 2014)....................................................46, 61

Esposito v. New York,
    No. 07-11612, 2012 WL 5499882 (S.D.N.Y. Nov. 13, 2012)...........78, 79

Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.),
    73 B.R. 616 (Bankr. E.D. Pa. 1987) ......................................................65

Estate of Pope,
    808 P.2d 640 (Okla. 1990)....................................................................28

First Ala. Bank of Montgomery, N.A. v. First State Ins. Co.,
    899 F.2d 1045 (11th Cir. 1990) ............................................................48

Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV,
    209 F.3d 252 (3d Cir. 2000)........................................................28, 32, 54

Fuentes v. Shevin,
    407 U.S. 67 (1972), reh'g denied, 409 U.S. 902 (1972)........................36

Furst v. Einstein Moomjy,
    860 A.2d 435 (N.J. 2004).....................................................................74

Gabauer v. Chemtura Corp. (In re Chemtura Corp.),
    505 B.R. 427 (S.D.N.Y. 2014)..............................................................54

Gazes v. DelPrete (In re Clinton St. Food Corp.),
        254 B.R. 523 (Bankr. S.D.N.Y. 2000) ...................................................................78, 79, 80

Gleason v. Jandrucko,
        860 F.2d 556 (2d Cir. 1988) .................................................................................................79

Global Commercial Fin., L.L.C. v. Old Kent Bank (In re U.S. Kids, Inc.),
        No. 97-1939, 1999 WL 196509 (6th Cir. Mar. 25, 1999) .......................................................37

Grace v. Bank Leumi Trust Co. of N.Y.,
        443 F.3d 180 (2d Cir. 2006) .................................................................................................64

Grant v. U.S. Home Corp. (In re U.S.H. Corp. of N.Y.),
        223 B.R. 654 (Bankr. S.D.N.Y. 1998) ...................................................................................47

Grubin v. Rattet (In re Food Mgmt. Grp., LLC),
        380 B.R. 677 (Bankr. S.D.N.Y. 2008) .............................................................................78, 79

Hadges v. Yonkers Racing Corp.,
        48 F.3d 1320 (2d Cir. 1995) .................................................................................................78

Hamdi v. Rumsfeld,
        542 U.S. 507 (2004) .............................................................................................................26

Hoti Enters., L.P. v. GECMC 2007 C-1 Burnett St., LLC (In re Hoti Enters., L.P.),
        No. 12-cv-5341, 2012 WL 6720378 (S.D.N.Y. Dec. 27, 2012) ..............................................79

In re Agway, Inc.,
        313 B.R. 31 (Bankr. N.D.N.Y. 2004) ........................................................................30, 44, 45

In re Arch Wireless,
        332 B.R. 241 (Bankr. D. Mass. 2005), aff'd, 534 F.3d 76 (1st Cir. 2008) .......................29, 31

In re BGI, Inc.,
        476 B.R. 812 (Bankr. S.D.N.Y. 2012), aff'd, 772 F.3d 102 (2d Cir. 2014) ...........................51

In re Caldor, Inc., N.Y.,
        240 B.R. 180 (Bankr. S.D.N.Y. 1999), aff'd sub nom.
        Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp., 266 B.R. 575 (S.D.N.Y. 2001) ...............37, 38

In re Chrysler LLC,
        405 B.R. 84 (Bankr. S.D.N.Y. 2009), cert. granted, judgment vacated sub nom.
        Indiana State Police Pension Trust v. Chrysler LLC, 558 U.S. 1087 (2009) .........................37

In re Drexel Burnham Lambert Grp. Inc.,
        151 B.R. 674 (Bankr. S.D.N.Y. 1993),
        aff'd, 157 B.R. 532 (S.D.N.Y. 1993) .................................................................29, 30, 31, 46

In re Edwards,
    962 F.2d 641 (7th Cir. 1992) .........................................................................34, 35, 38, 65, 66

In re Emoral, Inc.,
    740 F.3d 875 (3d Cir. 2014), cert. denied sub nom.
    Diacetyl Plaintiffs v. Aaroma Holdings, LLC, 135 S. Ct. 436 (2014)....................................36

In re Enron Corp.,
    No. 01-16034, 2006 WL 898031 (Bankr. S.D.N.Y. Mar. 29, 2006) ......................................43

In re Envirodyne Indus., Inc.,
    206 B.R. 468 (Bankr. N.D. Ill. 1997), aff'd, 214 B.R. 338 (N.D. Ill. 1997) ..........................43

In re Fairchild Aircraft Corp.,
    184 B.R. 910 (Bankr. W.D. Tex. 1995), vacated on other grounds,
    220 B.R. 909 (Bankr. W.D. Tex. 1998).................................................................................60

In re Feldman,
    261 B.R. 568 (Bankr. E.D.N.Y. 2001)...................................................................................30

In re Flanagan,
    415 B.R. 29 (D. Conn. 2009) ..........................................................................................57, 58

In re Freedom Indus.,
    Case No. 14-20017 (Bankr. S.D.W. Va. Jan. 17, 2014) ........................................................55

In re Gen. Motors Corp.,
    407 B.R. 463 (Bankr. S.D.N.Y. 2009), aff'd sub nom. Campbell v. Motors
    Liquidation Co. (In re Motors Liquidation Co.), 428 B.R. 43 (S.D.N.Y. 2010),
    and aff'd sub nom. Parker v. Motors Liquidation Co. (In re Motors Liquidations
    Co.), 430 B.R. 65 (S.D.N.Y. 2010).......................................................................................36

In re Gucci,
    126 F.3d 380 (2d Cir. 1997)..................................................................................................59

In re Interstate Cigar Co.,
    150 B.R. 305 (Bankr. E.D.N.Y. 1993)...................................................................................30

In re New Century TRS Holdings, Inc.,
    No. 07-10416, 2014 WL 842637 (Bankr. D. Del. Mar. 4, 2014),
    appeal pending No. 14-822 (D. Del. June 25, 2014) .......................................................46, 51

In re Old Carco LLC,
    423 B.R. 40 (Bankr. S.D.N.Y. 2010)..........................................................................78, 79, 80

In re Polycel Liquidation, Inc.,
    No. 00–62780, 2006 WL 4452982 (Bankr. D.N.J. Apr. 18, 2006),
    aff'd, No. 06-2183, 2007 WL 77336 (D.N.J. Jan. 8, 2007).........................................33, 34, 69

In re R.H. Macy & Co.,
    283 B.R. 140 (S.D.N.Y. 2002) ........................................................................45

In re Spiegel, Inc.,
    354 B.R. 51 (Bankr. S.D.N.Y. 2006), aff'd, 269 F. App'x 56 (2d Cir. 2008) ........................43

In re Tex. E. Transmission Corp. PCB Contamination Ins. Coverage Litig.,
    870 F. Supp. 1293 (E.D. Pa. 1992), aff'd, 15 F.3d 1249 (3d Cir. 1994) ................................48

In re Thomson McKinnon Secs. Inc.,
    130 B.R. 717 (Bankr. S.D.N.Y. 1991) ....................................................................44

In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices,
    and Prods. Liab. Litig., 754 F. Supp. 2d. 1145 (C.D. Calif. 2010) .........................................77

In re Union Hosp. Ass'n of the Bronx,
    226 B.R. 134 (Bankr. S.D.N.Y. 1998) ....................................................................44

In re XO Commc'ns, Inc.,
    301 B.R. 782 (Bankr. S.D.N.Y. 2003), aff'd, No. 04 Civ. 01489LAK,
    2004 WL 2414815 (S.D.N.Y. June 14, 2004) ...........................................................46

Inkel v. Pride Chevrolet-Pontiac,
    945 A.2d 855 (Vt. 2008) ....................................................................................74

IRS v. Moberg Trucking, Inc. (In re Moberg Trucking, Inc.),
    112 B.R. 362 (B.A.P. 9th Cir. 1990) .......................................................................69

Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.),
    517 F.3d 52 (2d Cir. 2008) .............................................................................70, 71

Johnson v. Holder,
    564 F.3d 95 (2d Cir. 2009), cert. denied, 560 U.S. 919 (2010) ......................................68

Kellogg Brown & Root Servs., Inc. v. United States,
    728 F.3d 1348 (Fed. Cir. 2013), cert. denied, 135 S. Ct. 167 (2014) ...................................49

Kirschner v. KPMG LLP,
    938 N.E.2d 941 (N.Y. 2010) ...............................................................................48

Koepp v. Holland,
    No. 13-4097, 2014 U.S. App. LEXIS 22108 (2d Cir. Nov. 21, 2014) ............................26, 62

Krietzburg v. Mucci (In re Mucci),
    488 BR 186 (Bankr. D.N.M. 2013) ........................................................................79

Kupferman v. Consol. Research & Mfg. Corp.,
    459 F.2d 1072, 1078 (2d Cir. 1972) .......................................................................78

Lane Hollow Coal Co. v. Dir., Office of Workers' Comp. Programs,
    137 F.3d 799 (4th Cir. 1998) ...............................................36

Leber-Krebs, Inc. v. Capitol Records,
    779 F.2d 895, 899 (2d Cir. 1985).........................................78

Levander v. Prober (In re Levander),
    180 F.3d 1114 (9th Cir. 1999) ..............................................78

Link v. Wabash R.R. Co.,
    370 U.S. 626 (1962), reh'g denied, 371 U.S. 873 (1962).......................48

Lousiana Dep't of Envtl. Quality v. Crystal Oil Co. (In re Crystal Oil Co.),
    158 F.3d 291 (5th Cir. 1998) ...........................................28, 39

MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.),
    837 F.2d 89 (2d Cir. 1988), cert. denied, 488 U.S. 868 (1988) ..............66

Mazzeo v. United States (In re Mazzeo),
    131 F.3d 295, 303 (2d Cir. 1997).........................................45

McTigue v. Am. Sav. & Loan Ass'n of Fla. (In re First Baptist Church),
    564 F.2d 677 (5th Cir. 1977) ...............................................66

Mennonite Bd. of Missions v. Adams,
    462 U.S. 791 (1983)......................................................27

Metal Founds. Acquisition, LLC v. Reinert (In re Reinert),
    467 B.R. 830 (Bankr. W.D. Pa. 2012) ...................................33, 64

Meza v. Gen. Battery Corp.,
    908 F.2d 1262 (5th Cir. 1990) ..............................................60

Molamphy v. Town of S. Pines,
    No. 02-00720, 2004 WL 419789 (M.D.N.C. Mar. 3, 2004)....................60

Molla v. Adamar of N.J., Inc.,
    No. 11-6470, 2014 WL 2114848 (D.N.J. May 21, 2014)......................66

Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus., Inc.),
    467 B.R. 694 (S.D.N.Y. 2012)......................................33, 56, 57, 62, 63

Morgenstein v. Motors Liquidation Co. (In re Motors Liquidation Co.),
    462 B.R. 494 (Bankr. S.D.N.Y. 2012) ....................................47

Mullane v. Cent. Hanover Bank & Trust Co.,
    339 U.S. 306 (1950).........................26, 27, 28, 29, 33, 35, 43, 44, 50, 66

Nat'l Pipe & Plastics, Inc. v. N.P.P. Liquidation Co.
(In re Nat'l Pipe & Plastics, Inc.), No. A-99-12,
2000 Bankr. LEXIS 1329 (Bankr. D. Del. Sept. 25, 2000) ..............................................28, 33

Nat'l Union Fire Ins. Co. v. Lomax Johnson Ins. Agency, Inc.,
496 So.2d 737, 739 (Ala. 1986) ...........................................................................................48

Nelson v. Adams USA, Inc.,
529 U.S. 460 (2000)...............................................................................................................60

New Concept Hous., Inc. v. Poindexter (In re New Concept Hous., Inc.),
951 F.2d 932 (8th Cir. 1991) ................................................................................................37

New York Marine & Gen. Ins. Co. v. Tradeline L.L.C.,
266 F.3d 112 (2d Cir. 2001)..................................................................................................48

Newman ex rel. Green v. Gen. Motors Corp.,
228 F. App'x 245 (3d Cir. 2007) ..........................................................................................23

Ninth Ave. v. Remedial Grp.,
195 B.R. 716 (N.D. Ind. 1996) .............................................................................................34

Oan Servs., Inc. v. Official Comm. of Unsecured Creditors of Nat'l Telecomms., Inc.
(In re Parcel Consultants, Inc.), 58 F. App'x 946 (3d Cir. 2003) ........................................37

Paris Mfg. Corp. v. Ace Hardware Corp. (In re Paris Indus. Corp.),
132 B.R. 504 (D. Me. 1991) ...............................................................................34, 35, 36, 38

Park Ave. Radiologists v. Melnick (In re Park Ave. Radiologists, P.C.),
450 B.R. 461 (Bankr. S.D.N.Y. 2011)..............................................................................75, 76

Parker v. Motors Liquidation Co. (In re Motors Liquidations Co.),
430 B.R. 65 (S.D.N.Y. 2010)...........................................................................36, 38, 68

Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp.,
266 B.R. 575 (S.D.N.Y. 2001)..............................................................................38, 39

Penthouse Media Grp. v. Guccione (In re Gen. Media, Inc.),
335 B.R. 66 (Bankr. S.D.N.Y. 2005) ....................................................................................76

Perry v. Blum,
629 F.3d 1 (1st Cir. 2010)......................................................................................................37

Pfizer Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co., Inc.),
676 F.3d 45 (2d Cir. 2012), cert. denied, 133 S. Ct. 2849 (2013) ........................................71

Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC),
    721 F.3d 54 (2d Cir. 2013), cert. denied sub nom. Picard v. HSBC Bank Plc,
    134 S.Ct. 2895 (2014) ...................................................................................................36

Rapp v. U.S. Dep't of Treasury, Office of Thrift Supervision,
    52 F.3d 1510 (10th Cir. 1995) ..............................................................................37, 38

Ray v. Norseworthy,
    90 U.S. 128 (1874).........................................................................................................35

Richards v. Jefferson Co.,
    517 U.S. 793 (1996).......................................................................................................61

Rosson v. Fitzgerald (In re Rosson),
    545 F.3d 764 (9th Cir. 2008) .......................................................................................37

Ruiz v. Comm'r of Dep't of Transp. of City of New York,
    679 F. Supp. 341 (S.D.N.Y. 1988) .............................................................................60

Schroeder v. City of New York,
    371 U.S. 208 (1962)...............................................................................................31, 53

Schwinn Cycling & Fitness Inc. v. Benonis,
    217 B.R. 790 (N.D. Ill. 1997) .....................................................................................64

State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.,
    694 N.W.2d 518 (Iowa 2005) .....................................................................................74

Tese-Milner v. TPAC, LLC (In re Ticketplanet.com),
    313 B.R. 46 (Bankr. S.D.N.Y. 2004) .........................................................................79

Tillman v. Camelot Music, Inc.,
    408 F.3d 1300 (10th Cir. 2005) .................................................................................55

Travelers Cas. & Sur. Co. v. Chubb Indem. Ins. Co.
    (In re Johns-Manville Corp.), 600 F.3d 135 (2d Cir. 2010),
    cert. denied, 131 S. Ct. 644 (2010) .........................................32, 53, 61, 62, 63, 69, 71

Tri-Cran, Inc. v. Fallon (In re Tri-Cran, Inc.),
    98 B.R. 609 (Bankr. D. Mass. 1989) ...................................................................69, 79

Trusky v. General Motors LLC (In re Motors Liquidation Co.),
    Adv. Pro. No. 12–09803, 2013 WL 620281
    (Bankr. S.D.N.Y. Feb. 19, 2013) .........................................................................71, 72, 75

Tulsa Prof'l Collection Servs., Inc. v. Pope,
    485 U.S. 478 (1988)......................................................................................................28

United States v. Gen. Motors Corp.,
    574 F. Supp. 1047 (D.D.C. 1983) ..................................................................40

Upjohn Co. v. New Hampshire Ins. Co.,
    476 N.W.2d 392 (Mich. 1991), reh'g denied, 503 N.W.2d 442 (Mich. 1991) ........................49

Valley Forge Towers S. Condo. v. Ron-Ike Foam Insulators, Inc.,
    574 A.2d 641 (Pa. Super. Ct. 1990), aff'd, 605 A.2d 798 (Pa. 1992)................................73, 74

Veal v. Geraci,
    23 F.3d 722 (2d Cir. 1994)................................................................................48

Volvo White Truck Corp. v. Chambersburg Beverage
    (In re White Motor Credit Corp.), 75 B.R. 944 (Bankr. N.D. Ohio 1987) ...........................68

Waterman S.S. Corp. v. Aguiar (In re Waterman S.S. Corp.),
    157 B.R. 220 (S.D.N.Y. 1993)...........................................................................61

Waterman Steamship Corp. v. Aguiar (In re Waterman S.S. Corp.),
    141 B.R. 552 (Bankr. S.D.N.Y. 1992), aff'd in part, vacated
    and remanded, 157 B.R. 220 (S.D.N.Y. 1993) .......................................................53

Western Auto Supply Co. v. Savage Arms, Inc.
    (In re Savage Industries, Inc.), 43 F.3d 714 (1st Cir. 1994) ...................32, 33, 34, 36, 53, 63

White v. Chance Indus., Inc. (In re Chance Indus., Inc.),
    367 B.R. 689 (Bankr. D. Kan. 2006) ...................................................................37

Woods v. Maytag Co.,
    807 F. Supp. 2d 112 (E.D.N.Y. 2011) ................................................................49

YBA Nineteen, LLC v. IndyMac Venture, LLC (In re YBA Nineteen, LLC),
    505 B.R. 289 (S.D. Cal. 2014) ..........................................................................38

Zerand-Bernal Grp., Inc. v. Cox,
    23 F.3d 159 (7th Cir. 1994) .........................................................................65, 71

STATUTES

49 U.S.C. ch. 301 ...............................................................................................18

49 U.S.C. § 30102(a)(8)......................................................................................40

49 U.S.C. § 30118(c) ..........................................................................................41

49 U.S.C. § 30165(a)(1).......................................................................................41

49 U.S.C. § 30166(m)(3) ....................................................................................40

Cal. Bus. & Prof. Code § 17200 ...................................................................77

Fed. R. Bankr. P. 7056 ...............................................................................7

REGULATIONS

49 C.F.R. § 573.6(b) .................................................................................41

49 C.F.R. § 573.6(c) .................................................................................41

49 C.F.R. § 576.5 .....................................................................................40

49 C.F.R. § 576.6 .....................................................................................40

49 C.F.R. § 577.5(a) .................................................................................41

49 C.F.R. § 577.5(h) .................................................................................50

49 C.F.R. § 577.7(a) .............................................................................41, 50

49 C.F.R. § 577.7(a)(2)(i) ..........................................................................50

49 C.F.R. § 577.7(a)(2)(iv) .........................................................................50

49 C.F.R. § 579.21 ...................................................................................40

OTHER AUTHORITIES

*Consent Order*, In re TQ14-001 NHTSA Recall No. 14V-047,
    (U.S. Dep't of Transp. May 16, 2014), available at http://www.nhtsa.gov/staticfiles/
    communications/pdf/May-16-2014-TQ14-001-Consent-Order.pdf ...............................20, 24

*Final Judgment*, Castillo v. Gen. Motors Corp.,
    No. 07-2142 (E.D. Cal. Apr. 16, 2009), ECF Nos. 48, 74 ......................................44

*Final Judgment*, Zwicker v. Gen. Motors Corp.,
    No. 07-0291 (W.D. Wash. Nov. 7, 2008), ECF Nos. 31, 31-2 ...................................44

*Opinion*, Newman v. Gen. Motors Corp.,
    No. 02-135 (D.N.J. Mar. 24, 2005)..........................................................23

*Order Pursuant to Fed. R. Bankr. P. 9019 and Fed. R. Civ. P. Rule 23 Approving
    Agreement Resolving Proof of Claim No. 51095 and Implementing Modified Dex-
    Cool Class Settlement*, In re Motors Liquidation Co., No. 09-50026 (Bankr. S.D.N.Y.
    May 4, 2011), ECF Nos. 9905, 10172 ........................................................43, 44

Restatement (Third) of Agency § 5.03 ...........................................................48, 49

Designated Counsel,[1] for and on behalf of certain Plaintiffs, file this brief in opposition

(the "**Opposition**") to New GM's Motions[2] and in response to the *Opening Brief By General*

*Motors LLC On Threshold Issues Concerning Its Motions To Enforce The Sale Order And*

*Injunction*, dated November 5, 2014 [ECF No. 12981] (the "**New GM Brief**" or "**Br.**") and

respectfully represent as follows:[3]

## PRELIMINARY STATEMENT

New GM first perpetrated and was then forced to publicly acknowledge a deliberate,

systematic, and callous cover-up of dangerous defects.  That admitted cover-up has resulted in

numerous deaths and scores of serious bodily injuries, allowed innocent persons to be accused of

and given criminal or moral responsibility for accidents that were the fault of GM,[4] and caused

---

[1]    Lead Counsel appointed in the General Motors LLC Ignition Switch Litigation Multidistrict Litigation in the United States District Court for the Southern District of New York, Judge Furman presiding, Case No. 14-MD-2543 (JMF) (the "**MDL Proceeding**"), have retained the undersigned Designated Counsel, pursuant to Lead Counsel's authority under *Order No. 13 (Organization of Plaintiffs' Counsel, Protocols for Common Benefit Work and Expenses)*, dated September 16, 2014 [MDL Proceeding ECF No. 304], to brief the Threshold Issues with respect to plaintiffs who have asserted actions consolidated for pre-trial purposes in the MDL Proceeding ("**Plaintiffs**").  *See also Scheduling Order Regarding (I) Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction, (II) Objection Filed by Certain Plaintiffs in Respect Thereto, and (III) Adversary Proceeding No. 14-01929*, dated May 16, 2014 [ECF No. 12697] (in which certain Plaintiffs designated Designated Counsel to appear for Plaintiffs' regarding New GM's Motions); *Supplemental Scheduling Order Regarding (I) Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction, (II) Objection Filed by Certain Plaintiffs in Respect Thereto, and (III) Adversary Proceeding No. 14-01929*, dated July 11, 2014 [ECF No. 12770] (the "**Supplemental Scheduling Order**") (ordering Designated Counsel to, *inter alia*, file and serve a response to the New GM Brief).

[2]    "New GM's Motions" are (i) *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction*, dated April 21, 2014 [ECF No. 12620]; (ii) *Motion of General Motors LLC Pursuant to 11 U.S.C §§ 105 and 363 to Enforce this Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits*, dated August 1, 2014 [ECF No. 12807]; and (iii) *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions)*, dated August 1, 2014 [ECF No. 12808].  *See Appendix of Exhibits for Opening Brief by General Motors LLC on Threshold Issues Concerning Its Motions to Enforce the Sale Order and Injunction*, **Exhibits A, B, and C**, dated November 5, 2014 [ECF No. 12982] (the "**New GM Appendix**").

[3]    Capitalized terms not otherwise defined in this Opposition shall have the meanings ascribed to them in the New GM Brief or the *Agreed and Disputed Stipulations of Fact Pursuant to the Court's Supplemental Scheduling Order, Dated July 11, 2014*, dated August 8, 2014 [ECF No. 12826].  *See* New GM Appendix, **Exhibit K**.

[4]    For example, in 2004, a woman inexplicably lost control of the Saturn Ion she was driving and crashed, killing her boyfriend who was a passenger.  The woman was convicted of criminally negligent homicide in 2007.  Although

dramatic economic loss to millions of victims. Despite New GM's purported commitment to transparency and accountability, it now argues that a Sale Order,[5] entered five years before New GM initiated the long-overdue ignition switch defect recalls, provides New GM with total immunity from liability, for its own actions and for the actions of Old GM.

New GM's arguments ignore the constitutionally protected due process rights of the Plaintiffs and are a dangerous invitation to abuse the bankruptcy process whenever a company knows of serious liabilities but chooses not to disclose them and seeks, instead, to transfer its valuable assets to a "new" company while attempting to leave its undisclosed liabilities behind.

New GM's motions must be denied as to all categories of claimants: (a) those who bought or leased Old GM manufactured cars before the entry of the Sale Order (the "**Pre-Sale Class**"); (b) those who bought or leased Old GM manufactured cars after the entry of the Sale Order; and (c) those who bought or leased New GM manufactured cars (categories (b) and (c) together, the "**Post-Sale Class**").

As to the Pre-Sale Class members, New GM argues they were "unknown creditors" entitled only to constructive notice by publication. New GM is wrong. The Pre-Sale Class's damage claims and its members' identities were both readily ascertainable, as was the means to provide them with direct and meaningful notice. The existence of an ignition switch defect that caused loss of power and disablement of power steering, brakes and airbags in several model years of GM vehicles (the "**Ignition Switch Defect**" or "**ISD**") was known to a broad range of

---

Old GM knew the crash was the result of a power failure, Old GM never came forward, and New GM only admitted that the ignition switch defect caused the accident this year. See Rebecca R. Ruiz, Woman Cleared in Death Linked to G.M.'s Faulty Ignition Switch, N.Y. Times, Nov. 24, 2014, http://www.nytimes.com/2014/11/25/business/ woman-cleared-in-death-caused-by-gms-faulty-ignition-switch.html, attached as **Exhibit A** to the Affidavit of Edward S. Weisfelner (the "**Weisfelner Decl.**"), filed in connection herewith.

[5]    A copy of the Sale Order is attached as **Exhibit E** to the New GM Appendix.

Old GM engineers, warranty claims managers, supply chain officials, test-track drivers, product quality managers, and counsel. Old GM continued to install the same or similarly faulty and unsafe ignition switches into multiple models of cars even as, year in and year out, reports of unexplained stalls and resulting accidents continued to pour into Old GM, and lawsuits resulting therefrom were settled with authorization from the highest corporate levels.

Purchasers of vehicles with undisclosed latent safety defects have claims against the manufacturer of such vehicles, for, *inter alia*, economic losses, a fact well known to Old GM.

The identities of the members of the Pre-Sale Class were reasonably ascertainable to Old GM because, as required by federal law, Old GM had systems in place to track product safety issues and the means to identify and communicate directly with owners and lessees of manufactured cars, even after multiple ownership changes.

As known creditors with cognizable claims whose contact information was readily (and reasonably) ascertainable, the members of the Pre-Sale Class were entitled to actual, direct and meaningful notice of the proceeding. It was not given. Because the right to bring a claim against New GM as a state law successor to Old GM is "property" cognizable under the Fifth Amendment, and because the members of the Pre-Sale Class were not provided with adequate notice of the hearing, the Sale Order is not enforceable against its members.

New GM argues that, even if the Pre-Sale Class was denied adequate notice and an opportunity to be heard, such deprivation is not, in and of itself, a denial of due process. According to New GM, the Pre-Sale Class must also show "prejudice." Thus, New GM argues that if the Plaintiffs cannot demonstrate that constitutionally required notice would have altered the outcome of the Sale Hearing, the Pre-Sale Class members can have sustained no prejudice and therefore have not shown a due process violation.

New GM's "lack of prejudice" argument flies in the face of decades of due process jurisprudence. Because the Due Process Clause protects, *inter alia*, the right to be heard, not the right to win, an order issued without providing for adequate notice and the right to be heard is unenforceable as against the party deprived of that right. Moreover, there is no way to determine, some five years later, what the outcome would have been had the bombshell of Old GM's concealment of this massive safety defect been made known to the Court, the Treasury, Congress, the public, the press and the various objectors. That is precisely why the case law is so clear that if there was a denial of due process, the resulting order cannot be enforced against the parties so deprived. The law simply does not permit Monday-morning quarterbacking in connection with a game that the Plaintiffs were precluded from playing in real time.

In any case, New GM's self-serving speculation regarding possible outcomes had the ISD been disclosed and notice to the Pre-Sale Class been given are not even plausible. Treasury has testified that the line it drew on which obligations New GM would assume was based on a determination of what liabilities were "commercially necessary" for the success of New GM. In that regard, had the Court and governmental authorities known that Old GM had knowingly placed millions of cars on the road with a life-threatening safety defect (and that New GM intended to continue to allow such cars to remain on the road with those known defects), it is not reasonable to assume (as New GM does) that such a revelation could only have resulted in a disastrous liquidation and the end of GM as a functioning company. Instead, it is likely that such an outcome would have still been avoided (for numerous reasons, political, national economic and otherwise, that were still significant, compelling and extant), and that the entry of the Sale Order would have been conditioned on New GM's assumption of all related liabilities so as to

4

ensure the commercial success of the purchasing entity. Indeed, that was the rationale behind the last-minute amendment to the deal that saw New GM take on liabilities for post-sale accidents.

Addressing the issue of remedies, New GM then argues that even if there was a denial of due process, the fault lies with Old GM and the only remedy is to have the Pre-Sale Class target the GUC Trust. This argument, again, ignores that it is New GM that is seeking a remedy here— the enforcement of the Sale Order. Notwithstanding the potential legal availability to Plaintiffs of relief on other claims against other parties, the violation of the due process rights of the Pre-Sale Class prevents, as a matter of law, New GM from enforcing the Sale Order against its members. Furthermore, New GM's finger-pointing is particularly inapposite (and disappointing) given that members of Old GM management who were complicit in the due process violations at issue (as well as the underlying misconduct) continued on as the leadership of New GM. In that role, the former Old GM management then perpetuated—for years—the same obdurate pattern of violation of law and disregard for the rights of others as they had begun as management of Old GM.

New GM's Motions to enforce the Sale Order against the Post-Sale Class must likewise be denied based on fundamental due process considerations. The identity of the members of this class could not be predicted at the time of the Sale Hearing, nor did their claims then exist. As "future claimants" they could not have been (and were not) afforded notice or an opportunity to be heard. Moreover, even though Old GM knew that millions of dangerously defective cars were on the roads and in the stream of commerce, it did nothing that would have enabled future claimants from avoiding either physical or economic injury. Under well-established law, the Sale Order is ineffective to bar their claims against New GM either as successor to Old GM or on any other footing.

Finally, it must be emphasized that each and every one of the direct claims asserted against New GM targets New GM's own actions and failures in causing cognizable injuries. New GM is not absolved from liability because it was perpetuating the safety flaws embedded in cars designed by Old GM. New GM and New GM alone is responsible for continuing to manufacture defective motor vehicles after the Sale, for failing to timely recall the dangerous vehicles that it and it alone put on the roads, and for further delaying those recalls even after it started ordering replacement parts to remedy the ISD. It was New GM that fired some fifteen New GM employees (including in-house counsel) and entered into a Consent Order with the National Highway Traffic Safety Administration ("**NHTSA**"), in which it admitted that it (and not just "Old GM") violated federal law by not disclosing the ISD, and agreed to pay the maximum available civil penalty for its violations. And it was New GM's conduct that generated a firestorm of negative publicity surrounding the safety and reliability of the GM brand, thus causing a dramatic drop in the value of GM cars still on the road. While New GM would like to construe the Sale Order as a "get out of jail free" card that shields it from its own acts and failures, that cannot be the proper construction of the subject order.

## NEW GM'S MOTIONS

Through its Motions, New GM seeks to enjoin, *inter alia*, the prosecution of all claims by owners or lessees of ISD-affected vehicles ("**Defective Vehicles**").[6] Plaintiffs oppose the Motions as to claims they have asserted in the MDL Proceeding,[7] including those claims alleged

---

[6] Through its motions New GM also seeks to enjoin prosecution of economic loss claims involving vehicles and parts sold by Old GM and containing a defect other than the ISD. This Opposition does not address these claims for the reasons discussed *infra* at note 9.

[7] As of the date of this Opposition, approximately 132 actions have been consolidated for pre-trial purposes in the MDL Proceeding, a number which may still increase. See Transfer Order, In re Gen. Motors Ignition Switch Litig., MDL No. 2543, Doc. No. 266 (J.P.M.L. June 12, 2014) ("**Transfer Order**"), attached hereto as **Exhibit 1**. Each individual action asserts claims on behalf of classes or individuals for "economic damages . . . stemming from an

6

in the two amended consolidated class action complaints (the "**Consolidated Complaints**," attached as **Exhibits I and J** to the New GM Appendix):

      i.      **The "Pre-Sale Action"**: Asserting claims on behalf of the Pre-Sale Class against New GM as successor to Old GM and based on New GM's own wrongful conduct and breaches of its own independent, non-derivative duties;

      ii.     **The "Post-Sale Action"**: Asserting claims on behalf of the Post-Sale Class against New GM for New GM's own wrongful conduct and breaches of its own independent, non-derivative duties.[8]

    In connection with the Motions, the Court issued an Order directing Plaintiffs, New GM and the GUC Trust to initially address certain Threshold Issues. See Supplemental Scheduling Order at 2.[9] The Court ordered that there be no discovery at present with respect to the Threshold Issues, and no discovery has been conducted in this forum. Id. at 4. Plaintiffs, New GM, and the GUC Trust agreed that in addressing these Threshold Issues, they may rely upon the agreed factual stipulations filed with the court and any factual materials that would be considered by the Court pursuant to Federal Rule of Bankruptcy Procedure 7056.[10] Id. at 4-5.

---

alleged defect in certain General Motors vehicles that causes the vehicle's ignition switch to move unintentionally from the 'run' position to the 'accessory' or 'off' position, resulting in a loss of power, vehicle speed control, and braking, as well as a failure of the vehicle's airbags to deploy." Transfer Order at 1-2.

[8]  The New GM Motions also seek to enjoin two actions brought by States' Attorney Generals: California v. Gen. Motors LLC, No. 8:14-cv-01238 (Super. Ct. Cal. June 27, 2014), and Arizona, ex rel. Horne v. Gen. Motors LLC, No. CV2014-014090 (Super. Ct. Ariz. Nov. 19, 2014). However, these actions seek civil penalties that are based solely on the Post-Sale conduct of New GM and as such are outside of the scope of the Sale Order.

[9]  The Supplemental Scheduling Order does not order briefing for claims not related to ISD defects. As a result, the stipulations of fact that constitute the record for the Threshold Issues do not address those claims and the factual record with respect to them has not been adequately developed in this Court. It may well be most efficient for due process issues related to non-ISD claims to be addressed in the MDL Proceeding, upon reference withdrawal, together with other motions directed to the Consolidated Complaints, after this Court determines the Threshold Issues based upon the stipulated record developed for the ISD. But, in any event, the Sale Order should not apply to claims in the Post-Sale Complaint because (i) they are based exclusively on New GM's own conduct and are outside the scope of the Sale Order, see infra Section III; (ii) certain of the claims involve vehicles manufactured or sold by New GM, and are outside the scope of the Sale Order, see infra Section III, and (iii) the Sale Order barred them without due process, see infra Section I.D.

[10]  If this Court determines, based on a lack of discovery, that contested factual issues remain, Plaintiffs suggest that those factual issues may be most efficiently resolved in the MDL Proceeding where discovery has been proceeding and ongoing under Judge Furman's supervision.

## FACTUAL BACKGROUND

**A.      The Defective Ignition Switch Was Engineered By Old GM In 2001.**

Beginning in or before 2001, several models of vehicles designed, manufactured, and

sold by Old GM through June 10, 2009, had a safety defect that, without the driver so intending,

caused the vehicle's ignition switch to move from the "Run" position to the "Accessory" or

"Off" position during ordinary driving conditions.  No less than 13 million vehicles containing

the ISD have now been recalled.[11]  An ignition switch with this defect (an "**Ignition Switch**") is

more likely to move position during a collision, on bumpy roads, if the key chain is heavy, or if

the driver's knee inadvertently touches the ignition key.   *See Certain Plaintiffs, Through*

*Designated Counsel, And The* <u>*Groman*</u> *Plaintiffs' Agreed-Upon Stipulations Of Fact In*

*Connection With The Four Threshold Issues Identified In This Court's July 11, 2014*

*Supplemental Scheduling Order*, ¶ 10(A), dated August 8, 2014, [ECF No. 12826-2] ("**DC**

**Stipulated Facts**").  While in the "Accessory" or "Off" position, the vehicle will lose power and

the driver will be unable to control the vehicle's speed and braking functions.  Additionally, in

the event of a collision, the vehicle's airbags will not deploy.  The inadvertent movement of the

Ignition Switch is due to one or more design and engineering defects which allow the ignition

key to move too easily while the vehicle is being operated.  *See* Anton R. Valukas, Report to

Board of Directors of General Motors Company Regarding Ignition Switch Recalls, dated May

29, 2014, at 29-30, attached to the Weisfelner Decl. as **Exhibit B** ("**Valukas Report**" or

"**V.R.**").   As New GM has acknowledged, the ISD results in "increas[ed] risk of injury or

fatality."  DC Stipulated Facts ¶ 3.

---

[11]   <u>See</u> GM 2014 Year-to-Date North American Recalls Including Exports, <u>available at</u> http://media.gm.com/
content/dam/Media/images/US/Release_Images/2014/05-2014/recalls/Recalls-Running-Total.jpg (last accessed Dec.
15, 2014), attached hereto as **Exhibit 2**.

Old GM first identified the ISD fourteen years ago in late 2001 or early 2002, during validation testing of the 2003 model year Saturn Ion, then still in pre-production. See, e.g., V.R. at 45, 54. Old GM's design release engineer for the Ignition Switch, Raymond DeGiorgio, reported it consistently missed the final torque specifications provided to the part's supplier, Delphi Automotive Systems ("**Delphi**"). DC Stipulated Facts ¶¶ 14(I); V.R. at 37, 44-45.

Notwithstanding that the Ignition Switch did not meet Old GM's safety specifications, Old GM manufactured vehicles containing the Ignition Switch and released them into the public starting in the fall of 2002. See V.R. at 54. Immediately thereafter, Old GM began receiving reports from customers that their vehicles would stall while driving.

On October 3, 2003, Old GM opened the first of many internal investigations into the moving stall safety issue. Id. Old GM employees readily replicated the issue upon driving the subject vehicles and concluded that the inadvertent engine shut-offs resulted from a driver's knee grazing the key fob. See DC Stipulated Facts ¶¶ 7-8 (describing statement of Old GM employee Raymond P. Smith); V.R. at 57 n.219 (describing January 9, 2004 report from an engineer in Old GM's High Performance Vehicle Operations Group that a driver in a track test of the Chevrolet Cobalt SS repeatedly experienced a moving stall when his knee slightly grazed the key fob).

On July 4, 2004, a vehicle occupant died after her 2004 Saturn Ion (which contained the ISD) left the road and struck a utility pole head on. The airbag did not deploy. See DC Stipulated Facts ¶ 14(C)(i). Old GM was aware of this incident.

In August 2004, the 2005 Chevrolet Cobalt went into production and contained the ISD. V.R. at 57. Around the time of the Cobalt's launch, reports surfaced of moving stalls caused by drivers bumping the key fob or chain with their knees. Old GM was aware of these reports. See V.R. at 59-63; DC Stipulated Facts ¶ 14(B)(i).

9

### B. Old GM Initiates Internal Investigations Of The ISD.

On November 19, 2004, Old GM initiated a Problem Resolution Tracking System ("**PRTS**") to address the inadvertent shut-off issue.  See V.R. at 63.  Beginning a troubling pattern, the November 2004 PRTS was closed by Old GM with no action.  Nevertheless, Old GM continued to receive reports of moving stalls associated with the defective Ignition Switches. See V.R. at 75-78; DC Stipulated Facts ¶ 14(S)(ii) (May 2005 customer demand that Old GM repurchase the customer's Cobalt because the Ignition Switch shut off during normal driving).

On May 17, 2005, a second PRTS was opened, as complaints of moving stalls continued to roll in.  See V.R. at 78, 84.  Testing done as part of the May 2005 PRTS confirmed that the force required to dislodge the Ignition Switch from "Run" was far below Old GM's manufacturing specifications.  See DC Stipulated Facts ¶ 14(R)(i).

Mr. DeGiorgio, Ignition Switch lead design engineer, asked Delphi for data for a fix to the Ignition Switch, leading a Delphi engineer to comment, "Cobalt is blowing up in their face in regards to turning the car off with the driver's knee."[12]

Instead of a true fix, Old GM proposed other "solutions:" a plug to insert in keys and a change to the key for future production.  But dealers only offered the plug to customers who complained of problems associated with the ISD.  And the key change, described by one Old GM engineer as a "band-aid," was not even implemented then.  DC Stipulated Facts ¶ 14(R)(ii).

On June 29, 2005, Old GM received a customer complained to Old GM about a 2005 Cobalt:

Dear Customer Service:

*This is a safety/recall issue if ever there was one* . . . .  The problem is the ignition turn switch is poorly installed.  Even with the slightest touch, the car will shut off

---

[12]  See **Exhibit 27** to the Declaration of Steven W. Berman, filed in connection herewith ("**Berman Decl.**").

10

> while in motion.  I don't have to list to you the safety problems that may happen,
> besides an accident or death, a car turning off while doing a high speed . . . .

V.R. at 89 (emphasis added).

On July 29, 2005, a 2005 Chevrolet Cobalt crashed, killing the occupant.  The airbags did

not deploy.  DC Stipulated Facts ¶ 14(C)(i).  Old GM was aware of this incident.

### C.    Old GM Notifies Its Dealers Of The ISD.

In December 2005, Old GM issued Service Bulletin 05-02-35-007 (the "**December 2005**

**Service Bulletin**") to its dealers with respect to the 2005-2006 Chevrolet Cobalt, 2006 Chevrolet

HHR, 2003-2006 Saturn Ion, and 2006 Pontiac Solstice.  Bearing the subject reference,

"Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and No

[Diagnostic Trouble Codes]," it described circumstances likely to increase the chance of an

inadvertent shut-off ("if the driver is short and has a large and/or heavy key chain") and gave

dealers talking points for customers who brought vehicles in for regular service (customers

"should be advised of this potential and should take steps to prevent it—such as removing

unessential items from their key chain").  Id. ¶¶ 10, 10(A).  Old GM did not issue any public

statements related to the December 2005 Service Bulletin, nor did it use the word "stall" in the

bulletin. Id. ¶¶ 10(C), 10(D).

In October 2006, Old GM updated the December 2005 Service Bulletin (as updated, the

"**October 2006 Service Bulletin**") to include additional vehicle models and model years—

namely, the 2007 Saturn Ion, the 2007 Saturn Sky, the 2007 Chevrolet HHR, the 2007 Pontiac

Solstice, and the 2007 Pontiac G5.  Id. ¶ 11.  The October 2006 Service Bulletin acknowledged

that "[t]here [was] potential for the driver to inadvertently turn off the ignition due to low

ignition key cylinder torque/effort."  The October 2006 Service Bulletin again advised dealers to

tell their customers to remove unessential items from their key chains.  Id. ¶ 11(A).  There was again no public statement or use of the word "stall."  Id. ¶ 11(B).

### D.    Old GM Re-Engineers The Ignition Switch Without Fixing The ISD.

In April 2006, Raymond DeGiorgio, the Old GM Design Release Engineer who had provided Delphi with the final specifications for the Ignition Switch and observed in 2001-2002 that it was not meeting those specifications, approved a change in its design intended to solve the problem of low rotational torque.  The changed design did not fix the ISD.  The change was implemented without changing the defective Ignition Switch's part number in an apparent effort to hide the evidence of the ISD.  V.R. at 98-101.

### E.    Old GM Learns Of Multiple Fatal Or Serious
###        Accidents Evidencing A Safety Defect Involving Ignition Switches.

Even as Old GM continued to fail to address or even disclose the ISD, it knew people were dying and being seriously injured in crashes involving Defective Vehicles, as indicated in the following non-exclusive examples:

- On October 24, 2006, two passengers died and a passenger was severely injured when a 2005 Chevrolet Cobalt left the road, struck a telephone box, and its airbags did not deploy.  V.R. at 113-14.  Old GM learned of the crash on November 15, 2006 through a reporter's inquiry.  Id. at 114.

- In October 2006, a Collision Analysis & Reconstruction Report (the "**Wisconsin Report**") written by a Wisconsin State Patrol Trooper regarding a 2005 Chevrolet Cobalt stated that *it appeared likely that the vehicle's key turned to the Accessory position as a result of the low key cylinder torque/effort, and connected this to the failure of the airbags to deploy*.  See V.R. at 116-17.  The Wisconsin Report was in the possession of Old GM; Dwayne Davidson, Old GM's Senior Manager for TREAD Reporting, stated that he obtained the Wisconsin Report from "*someone at Old GM Legal*" in 2007.  DC Stipulated Facts ¶ 14(H)(i) (emphasis added).

- On December 29, 2006, the driver of a 2005 Chevrolet Cobalt suffered severe injuries when the vehicle drove off the road, hit an embankment and a large tree, and the airbag failed to deploy.  Upon review of this incident, neither Old GM nor its outside counsel had an explanation for the non-deployment.  See V.R. at 130.

12

- In May 2007, Old GM received from its outside counsel, Hartline, Dacus, Berger & Dryer, LLP, an evaluation of a November 15, 2004 airbag non-deployment crash. See id. at 124. According to the evaluation, the impact of the crash was so severe that "*the airbag non-deployment 'must be' attributable to power loss.*" Id. at 125 (emphasis added). Manuel Peace, the Old GM Field Performance Assessment engineer assigned to the case, also believed that the most likely explanation for the airbag non-deployment was a "power loss." Id.

- In September 2007, Old GM's "Roundtable Committee," responsible for approving settlements between Old GM and third parties between $100,000 and $1.5 million, reviewed a crash that severely injured the driver of a 2005 Saturn Ion that ran into the rear of a tractor trailer on June 26, 2005.[13] *The presentation made at the Roundtable indicated a probable power loss during the crash.* See DC Stipulated Facts ¶ 14(L).

- In late 2008 or early 2009, Old GM Field Performance Assessment engineers learned about a September 13, 2008 Cobalt crash in Stevensville, Michigan, which resulted in two deaths. V.R. at 132.

**F.    Knowledge Of The ISD Was Widespread Within Old GM.**[14]

Among many others, the following Old GM employees learned of the ISD in the course

of their employment by Old GM:

- Raymond DeGiorgio, the lead design engineer for the Ignition Switch in the 2003 Saturn Ion and 2005 Chevrolet Cobalt and for the replacement ignition switches in 2006, came to be intimately familiar with the ISD through his involvement with Old GM's investigation starting in 2005, see DC Stipulated Facts ¶ 14(I). In 2006, he approved a change in the Ignition Switch that increased the torque required to turn the key. Despite this change to the Ignition Switch, Old GM did not change the Ignition Switch's part number, see id. ¶¶ 14(I)(v); 22;

- Gary Altman, the program engineering manager responsible for the design and development of the 2005 Chevrolet Cobalt, attended a press event for the launch of the Cobalt in the summer or fall of 2004. V.R. at 59-60. At the press event, a journalist informed the Cobalt's chief engineer, Doug Parks, that the journalist had inadvertently turned off his Cobalt by hitting his knee against the key fob or chain while driving. Id. at 60. Parks asked Altman to investigate the complaint

---

[13] Michael Gruskin, an attorney in Old GM's general counsel's office, was involved in the Roundtable Committee's review of Chevrolet Cobalt and Saturn Ion crash cases involving the Ignition Switch beginning in January 2006. See DC Stipulated Facts ¶ 14(L).

[14] After the parties completed their factual stipulations as directed by the Supplemental Scheduling Order, additional discovery produced by New GM in the MDL Proceeding has revealed that Old GM was aware of dozens of additional complaints and accidents concerning the ISD in addition to those collected infra. See Berman Decl., filed in connection herewith.

13

by trying to replicate the incident and determine a fix.  Id.[15]  After the press event, Altman and another GM engineer test drove a Cobalt at the Milford Proving Grounds and replicated the incident described by the journalist and, on November 19, 2004, a PRTS was opened for it.  Id. at 63.  The engineers responsible for the PRTS developed a number of potential solutions, including moving the location of the Ignition Switch to a higher mount on the steering column.  Id. at 65-67.  However, on March 9, 2005, the PRTS was closed with "no action" at the "directive" of Altman (then the Cobalt program engineering manager), V.R. at 68;

- Steven Oakley, a Chevrolet Cobalt brand quality manager responsible for monitoring warranty claims, became aware of the ISD in March 2005 and submitted a PRTS report, see DC Stipulated Facts ¶ 14(S);

- William Chase, a warranty engineer responsible for reducing warranty costs for the Chevrolet Cobalt and Pontiac G5, provided an estimate of how many Chevrolet Cobalts would experience inadvertent shut-offs due to the ISD, see id. ¶ 14(F);

- Michael Gruskin, an attorney in Old GM's general counsel office who sat on a committee charged with authorizing settlements and spotting trends indicative of safety issues, was involved in the committee's review, beginning in January 2006, of Chevrolet Cobalt and Saturn Ion crash cases involving the ISD, see id. ¶ 14(L); V.R. at 110;

- William J. Kemp, counsel for Global Engineering Organization, sat on Old GM's Settlement Review Committee and participated for years in Old GM's review of the ISD.  See DC Stipulated Facts ¶ 14(O).  He worked closely with the Old GM engineering group and had extensive experience with safety-related liability.  Id.  In 2005, Kemp suggested sending a columnist a videotape demonstrating the remoteness of the risk of inadvertently moving the ignition to the "accessory" position, see id.; V.R. at 85-86;

- Dwayne Davidson, senior manager for TREAD Reporting, conducted a search of Old GM's TREAD database after receiving an email in November 2006 from Alan Adler, a manager for safety communications, concerning a fatal October 2006 crash involving a 2005 Cobalt.  See DC Stipulated Facts ¶ 14(H).  Davidson's search revealed *no fewer than 700 records of field reports and complaints* involving vehicles containing the ISD, see id.;

---

[15]  Although there is no indication that the journalist reported his complaint publicly, it is likely that members of Old GM's senior management were made aware of it given the high profile of the launch event.  See V.R. at 59-60.  Moreover, it appears that approximately three other Old GM executives, in addition to Mr. Altman, were present at the press event, including: Lori Queen, a Vehicle Line Executive; Jim Queen, the Vice President for Global Engineering; and Robert Lutz, the Vice President for Global Product Development.  Id. at 60 n.231.

14

- Jack Weber, an Old GM engineer, in 2005 reported that he had turned off a Chevrolet Cobalt SS with his knee while "heel-toe downshifting," see id. ¶ 14(B)(iv);

- Eric Buddrius, an Old GM engineer, was scheduled to present a May 4, 2007 Investigation Status Review Presentation Planning Worksheet on an issue described as "Cobalt/Ion Airbag (NHTSA discussion item)," see id. ¶ 14(E)(i);

- Viktor Hakim, an Old GM employee, who as of June 11, 2013 had been with Old GM and then New GM for more than forty-three years, testified that there was a summary Excel spreadsheet from the Old GM Company Vehicle Evaluation Program containing comments from drivers of Ion vehicles, including a January 9, 2004 statement from one driver of a Saturn Ion that the Ignition Switch was positioned too low on the steering column, that the keys hit his knee while driving, that the Ignition Switch should be raised on the steering column at least one inch, that this was a basic design flaw, and that it should be corrected if Old GM wanted repeat sales, see id. ¶ 14(M);

- Gay Kent, Old GM's Director of Product Investigations, and Douglas Wachtel, an Old GM Product Investigations Manager, obtained a Cobalt in or around 2005 and drove around Old GM's property in Warren, Michigan, during which they were able to knock the Ignition Switch from the "Run" to "Accessory" position simply by contacting the key chain, see id. ¶ 14(P);

- Elizabeth Kiihr, an engineer with Old GM's Products Investigations Unit, created a file in 2005 that contained:  (i) customer complaints; (ii) a copy of a February 2005 "Preliminary Information" report on engine stalls in the Cobalt; (iii) several TREAD data reports regarding the Cobalt; (iv) PowerPoint presentations, including presentations from an Investigation Status Review meeting in 2005 and a Vehicle and Progress Integration Review meeting in 2005; (v) a cost estimate for changing the design of the ignition key; and (vi) a copy of a Product Investigation Bulletin titled "Engine Stalls, Loss of Electrical Systems, and No DTCs," see id. ¶ 14(Q)(ii);

- Alberto Manzor, an Old GM engineer involved in the investigation of the Cobalt Ignition Switch, stated that, in or around the spring of 2005, he had said that the Cobalt Ignition Switch was incorrectly categorized as a moderate issue and should have been categorized as a safety issue, see id. ¶ 14(R)(i);

- Laura Andres, an Old GM employee, sent an email on August 30, 2005 to Jim Zito, copying ten other Old GM employees, including Ray DeGiorgio.  See E-mail from Laura Andres, General Motors, to Jim Zito, General Motors (Aug. 30, 2005, 3:39 p.m.) (GMHEC000442219), attached to the Weisfelner Decl. as **Exhibit C**.  In her email, Ms. Andres stated:  "I picked up the vehicle from repair. No repairs were done. . . .  The technician said there is nothing they can do to repair it.  He said it is just the design of the switch.  He said other switches, like on the trucks, have a stronger detent and don't experience this."  Id. (emphasis in original).  Ms. Andres' email continued: "*I think this is a serious safety problem,*

15

*especially if this switch is on multiple programs. I'm thinking big recall*. I was driving 45 mph when I hit the pothole and the car shut off and I had a car driving behind me that swerved around me. I don't like to imagine a customer driving with their kids in the back seat, on I-75 and hitting a pothole, in rush-hour traffic. I think you should seriously consider changing this part to a switch with a stronger detent," see id. (emphasis added);

- Doug Parks, Old GM's Vehicle Chief Engineer for the Chevrolet Cobalt, sent an e-mail in late 2004 to various Old GM personnel regarding "GMX 001: Inadvertent Ign turn-off," writing, "for service, can we come up with a 'plug' to go into the key that centers the ring through the middle of the key and not the edge/slot? This appears to me to be the only real, quick solution," see DC Stipulated Facts ¶ 14(T)(ii);

- Douglas Wachtel, a manager in Old GM's Product Investigations Unit, approved a revised service bulletin in April 2007, which was never published, warning drivers that the inadvertent turning off of key cylinders could cause vehicles to stall, see id. ¶ 14(AA)(ii)-(iv); and

- Joseph Manson, an Old GM engineer, emailed colleagues in February 2009 and stated that issues with the Ignition Switch inadvertently turning off while driving "ha[d] been around since man first lumbered out of [the] sea and stood on two feet," see id. ¶ 14(B)(vi).[16]

### G.    The February 2009 "Band-Aid" Change To The Cobalt Key.

In February 2009, Old GM responded to "a high number of warranty claims" against "the Cobalt key cylinder design" by changing the key's design for future model year Cobalts. V.R. 132-33. Although a design change was previously discussed in 2006, the change was not completed at that time "because of problems with the original supplier of the key and [a] backlog of other part changes to the Cobalt that [David] Trush [an Old GM engineer] believed *were more important*." Id. at 133 (emphasis added). By June 2009, GM finally attempted a fix, changing the "slot" at the top of the key head to a "hole," which had been previously suggested in 2005. Id. Even though Trush said he believed, in 2005 and 2009, that the effort was merely "a 'band-aid,' because the complete solution was to change the Ignition Switch," Trush ultimately chose

---

[16]    Each of Altman, Buddrius, Chase, Davidson, DeGiorgio, Gruskin, Hakim, Kemp, Kent, Kiihr, Manzor, Oakley, Parks, and Wachtel, among others, became an employee of New GM. See DC Stipulated Facts ¶¶ 14(B)(vii); (E)(v); (H)(ii); (I)(vii); (L)(i); (M)(i); (O)(iii); (P)(ii); (Q)(iii); (R)(iii); (S)(iv); (T)(iii); (AA)(vii).

to "support[] the decision because it would reduce his warranty numbers, even if it did not entirely solve the problem" reflected in the related PRTS inquiry.  Id.

### H.    The 2009 Report By An Old GM Supplier Confirms Existence Of The ISD.

On May 15, 2009, Continental, the manufacturer of the Sensing Diagnostic Module for the Chevrolet Cobalt, held a meeting (the "**May 2009 Continental Meeting**") to present and discuss its findings and its report on a September 13, 2008 accident involving a 2006 Chevrolet Cobalt (the "**Continental Report**").  See DC Stipulated Facts ¶ 14(E)(ii).  A number of Old GM employees attended that meeting.  See id. ¶ 14(E)(iii).[17]

The Continental Report disclosed that the Sensing Diagnostic Module had not deployed the airbag because certain algorithms were disabled at the start of the event, and identified two possible causes for the disabled algorithms, either: (a) the vehicle experienced "loss of battery;" or (b) the Sensing Diagnostic Module received a power mode status of "Off" from the Body Control Module.  Id. ¶ 14(E)(iv).

The May 2009 Continental Meeting confirmed a safety issue that had been well known to Old GM  for years—that the airbags were not being properly deployed because the power mode status was in the "Off" or "Accessory" position in the Defective Vehicles.  See V.R. at 134-35; DC Stipulated Facts ¶ 14(X)(i).

### I.    Old GM's Bankruptcy Proceedings.

On June 1, 2009 (the "**Petition Date**"), Old GM and certain of its affiliates (collectively, the "**Debtors**") commenced its cases in this Court.  That same day, Old GM asked the Court to

---

[17]  Attendees of the May 2009 Continental Meeting included: James Churchwell, Old GM engineer; Eric Buddrius, Old GM Product Investigations Unit engineer; John Dolan, Old GM electrical engineer; William Hohnstadt, Old GM sensing performance engineer; John Sprague, Old GM Field Performance Assessment engineer; Lisa Stacey, Old GM Field Performance Assessment engineer; Brian Everest, Old GM Field Performance Assessment Supervisor; and Jaclyn C. Palmer, Old GM product liability attorney.  See DC Stipulated Facts ¶¶ 14(E), (E)(iii), (G), (J), (K), (N), (T), (U)(i), (X), (Y).

approve a sale of substantially all of its assets to NGMCO, Inc. (subsequently renamed General Motors, LLC, a/k/a "**New GM**") in a government-sponsored transaction under Bankruptcy Code Section 363 (the "**363 Sale**"). Under the Amended and Restated Master Sale and Purchase Agreement, dated June 26, 2009 [ECF No. 2968-2] (the "**MSPA**"), New GM expressly undertook to "comply with the certification, reporting and recall requirements" of the Safety Act and other federal regulations for cars and car parts "manufactured or distributed by [Old GM]," MSPA § 6.15(a),[18] thereby requiring it to recall any vehicles or vehicle parts manufactured by Old GM that had safety-related defects, such as the ISD. See, e.g., 49 U.S.C. ch. 301.

Old GM also sought the Court's approval of the form and manner of the notice to be given in connection with the Sale Motion. See Sale Motion, Exs. C to G (forms for Sale Procedures Order and notices to creditors).[19] Pursuant to the Sale Procedures Order, Old GM purported to provide direct mail notice of the Sale Motion to "all parties who are known to have asserted any lien, claim, encumbrance, or interest in or on the Purchased Assets," and "all other known creditors." See Sale Procedures Order ¶¶ 9(a)(xiii), 9(b)(i).[20] At no time prior to the 363 Sale did Old GM disclose the existence of the ISD to owners or lessees of Defective Vehicles. It is undisputed that owners or lessees of vehicles known to contain the ISD did not receive mailed notice. See New GM's Agreed-Upon Factual Stipulations, and Disputed Factual Stipulations, ¶¶ 19-20, dated August 8, 2014 [ECF No. 12826-1] ("**New GM Stipulated Facts**").

The Sale Procedures Order also required publication notice in various national and local newspapers and on the website of the Debtors' claims and noticing agent, The Garden City

---

[18] A copy of the MSPA is attached as **Exhibit D** to the New GM Appendix.

[19] A copy of the Sale Motion is attached as **Exhibit L** to the New GM Appendix.

[20] A copy of the Sale Procedures Order is attached as **Exhibit M** to the New GM Appendix.

Group, Inc. (the "**Publication Notice**").  See Sale Procedures Order ¶ 9(e).  The Publication

Notice did not disclose the ISD, or that persons owning or leasing a car with the ISD may have a

claim against Old GM that could be barred under the proposed Sale Order if not asserted.  See

New GM Stipulated Facts ¶ 25.[21]

The hearing on the Sale Motion commenced on June 30, 2009 and continued through

July 2, 2009.  Old GM did not disclose the ISD in connection with the Sale Hearing and no

objection to the 363 Sale was made by any person representing the named Plaintiffs or based on

claims arising from the ISD, which still had not been disclosed publicly despite Old GM's

knowledge thereof.  See New GM Stipulated Facts ¶¶ 32, 61.

On July 5, 2009, the Court entered the Sale Order.  See Sale Order at 50.  On July 10,

2009, the Debtors consummated the 363 Sale.  See New GM Stipulated Facts ¶ 56.  By the 363

Sale, New GM purchased substantially all of Old GM's assets, including, *inter alia*, vehicle

inventory, intellectual property and licenses, books and records related to all purchased assets,

and all goodwill in connection with the purchased assets.  See MSPA § 2.2(a).

**J.      Post-Sale, New GM Continues The Business Of Old GM And Issues Recalls.**

The vast majority of Old GM employees, including many that were aware of the ISD

(and many who attended the May 2009 Continental Meeting), were "**Transferred Employees**"

(as such term is defined in the MSPA)—meaning they went to bed as Old GM employees and

woke up the next day as New GM employees.  See MSPA § 6.17(a).  New GM also assumed

---

[21]  Over the course of the bankruptcy cases, Old GM also failed to provide direct notice to the Plaintiffs on account of the ISD of: (i) the bar date to file proofs of claim (notwithstanding that the order establishing the bar date required service of notice thereof on "all parties known to the Debtors as having potential Claims against any of the Debtors' estates"), see Bar Date Order at 6; (ii) the hearing on approval of the Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan (the "**Disclosure Statement**") (notwithstanding that the motion seeking approval of the Disclosure Statement indicated that the Debtors would serve notice thereof on "any . . . known holders of Claims against . . . the Debtors"), see ECF No. 6854, ¶ 26 ; or (iii) the hearing on confirmation of the Debtors' Joint Chapter 11 Plan (the "**Plan**") (notwithstanding that the order approving form of notice of the confirmation hearing required service thereof on "any . . . known holders of Claims against . . . the Debtors"), see ECF 8043, ¶ 32(f).

ownership of substantially all of Old GM's books and records, including those reflecting knowledge of the ISD.  See MSPA § 7.2(c)(xxiv).

Notwithstanding the personal knowledge of the Transferred Employees, the independent documentation of the existence of the ISD, and New GM's assumption of Old GM's duties under the Safety Act to recall defective vehicles, New GM did not issue any recalls of GM-Branded Vehicles affected by the ISD until February 2014.

New GM now admits that it (*i.e.*, New GM as opposed to Old GM) violated the Safety Act by failing to timely provide notice of the ISD to NHTSA and has agreed to pay the maximum civil penalty of thirty-five million dollars ($35,000,000) for its violation.  See Consent Order, In re TQ14-001 NHTSA Recall No. 14V-047, ¶¶ 10-11 (U.S. Dep't of Transp. May 16, 2014) (the "**Consent Order**"), attached to the Weisfelner Decl. as **Exhibit D**.  As of the date of this Opposition, a total of 42 death claims and 58 injury claims relating to the ISD have been approved by New GM's victim compensation program.[22]  As New GM Chief Executive Officer Mary Barra ("**Barra**") conceded on March 17, 2014, "something went wrong with our process in this instance and terrible things happened."  See Mary Barra, Update On Recalls - Message to GM Employees, at 00:00:34 to 00:00:39 (Mar. 17, 2014), available at http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/mar/0317 -video.html.

Since February 2014, New GM has issued five recalls for vehicles with defective Ignition Switches (collectively, the "**Ignition Switch Recalls**"), affecting more than 13 million Defective Vehicles across various models of cars manufactured by Old and New GM.  See GM 2014 Year-

---

[22] Upon information and belief, the victim compensation program will be accepting claims for compensation for deaths and injuries caused by the ISD until January 31, 2014.  Thus, the figures representing death and personal injury claims are likely to increase following the date of this Opposition.

to-Date N. Am. Recalls, Ex. 2.  The first Ignition Switch Recalls in February and March 2014

impacted 2005-2010 Cobalts; 2007-2010 Pontiac G5s; 2006-2011 Chevrolet HHRs; 2006-2010

Pontiac Solstices; 2003-2007 Saturn Ions; and 2007-2010 Saturn Skys.[23]

On June 19, 2014, New GM notified NHTSA that it was issuing a second recall for

Defective Vehicles for 464,712 model year 2010-2014 Chevrolet Camaros afflicted with a safety

defect that can cause the Ignition Switch to inadvertently move from the "Run" to the

"Accessory" position.[24]  The great majority of the defective Camaros were sold by New GM,

though some percentage were made and sold by Old GM.[25]

On June 20, 2014, New GM notified NHTSA that it was issuing a third recall for

3,141,731 Defective Vehicles afflicted with a safety defect related to an ignition key slot.[26]  Of

the Defective Vehicles subject to the third recall, approximately 2.4 million were made by Old

GM and 700,000 were made and sold by New GM.[27]  On July 2-3, 2014, New GM announced it

---

[23]  See Letter from M. Carmen Benavides, Director, Product Investigations and Safety Regulations, General Motors LLC ("**Benavides**"), to Nancy Lewis, Associate Administrator for Enforcement, NHTSA ("**Lewis**") (Feb. 7, 2014); see also  Letter from Benavides to Lewis (Feb. 24, 2014); Letter from Benavides to Lewis (Feb. 25, 2014); Letter from Benavides to Lewis (Mar. 11, 2014); Letter from Benavides to Lewis (Mar. 28, 2014); Letter from Benavides to Lewis (Apr. 11, 2014), attached to the Weisfelner Decl. as **Exhibit E**.

[24]  See Letter from Brian Latouf, Director, Field Product Investigations & Evaluations, General Motors LLC ("**Latouf**") to Lewis (June 19, 2014); see also Letter from Jim Moloney, General Director, Customer and Relationship Services, General Motors LLC ("**Moloney**") to General Motors Customers, regarding Recall No. 14294 (Aug. 2014) (New GM subsequently notified customers of the defect and product recall in August), attached to the Weisfelner Decl. as **Exhibit F**.

[25]  117,959 of the Chevrolet Camaros recalled on June 19, 2014 were manufactured between December 3, 2008 and June 3, 2010.  See Ex. F.  It is probable that certain of these vehicles were sold by Old GM prior to the July 5, 2009 entry of the Sale Order.

[26]  See Letter from Latouf to Lewis (June 20, 2014); see also Letter from Latouf to Lewis (July 2, 2014); Letter from Moloney to General Motors Customers, regarding Recall No. 14299 (Aug. 2014) (New GM subsequently notified customers of the defect and product recall in August), attached to the Weisfelner Decl. as **Exhibit G**.

[27]  The Defective Vehicles made by Old GM with the ignition key slot defect include:  2005-2009 Buick Lacrosse; 2006-2009 Buick Lucerne; 2000-2005 Cadillac Deville; 2007-2009 Cadillac DTS; 2006-2009 Chevrolet Impala; and 2006-2007 Chevrolet Monte Carlo.  See Ex. G (the numbers of vehicles made by Old and New GM respectively are approximate given that there is no indication what percentage of MY 2009 and 2010 vehicles may have been made by either Old or New GM).

21

was recalling 7,284,070 Defective Vehicles due to a safety defect related to "unintended key rotation."[28]   The vehicles with the unintended key rotation defect were built with defective Ignition Switches just like the other Defective Vehicles.[29]

On September 4, 2014, New GM announced it was recalling 46,873 Defective Vehicles due to a safety defect related to unintended ignition key rotations.[30]   The Defective Vehicles include vehicles made by both Old GM and New GM.

Shortly after Barra's admission of wrongdoing and the publication of the Valukas Report, Barra announced that at least fifteen New GM employees (including executives, engineers and at least six in-house lawyers responsible for, *inter alia*, safety issues) had been fired for misconduct, failure to respond properly to evidence of the ISD, incompetence and in some cases, because "they simply didn't do enough, they didn't take responsibility, they didn't act with a sense of urgency" given their knowledge of the ISD.[31]   However, New GM has refused to identify the employees by name. See id.

---

[28]   See Letter from Latouf to Lewis (July 2, 2014); see also Letter from Latouf to Lewis (July 16, 2014);  Letter from Latouf to Lewis (Aug. 6, 2014); Letter from Latouf to Lewis (July 3, 2014); Letter from Latouf to Lewis (July 16, 2014); Dealer Notice Letter from General Motors Customer Care & Aftersales, General Motors LLC, to All General Motors Dealers (July 17, 2014), attached to the Weisfelner Decl. as **Exhibit H**.

[29]   The Old GM Defective Vehicles implicated in the July 2-3, 2014 Recall are:  2000-2005 Chevrolet Impalas and Monte Carlos; 1997-2005 Chevrolet Malibus; 1999-2004 Oldsmobile Aleros; 1998-2002 Oldsmobile Intrigues; 1999-2005 Pontiac Grand Ams and 2004-2008 Pontiac Grand Prixs; certain 2003-2009 Cadillac CTSs; and certain 2004-2006 Cadillac SRX vehicles.

[30]   See Letter from General Motors, Customer Care & Aftersales, General Motors LLC, to All General Motors Dealers (Sept. 4, 2014); Letter from Jennifer Timian, Chief, Recall Management Division, NHTSA, to Latouf (Oct. 3, 2014), attached to the Weisfelner Decl. as **Exhibit I.**

[31]   See Mary Barra, Chief Executive Officer, General Motors Company, General Motors Ignition Switch Update and Press Conference, at 00:10:50 to 00:11:35 (June 5, 2014), available at http://media.gm.com/businessupdate.html.

### K.    Old GM Had A Culture Of Downplaying Safety Related Problems, Which Has Persisted In New GM.

Notwithstanding that the law required Old GM to diligently track and immediately report safety defects, a "not me" culture festered at Old GM that encouraged just the opposite and caused management and employees to downplay serious safety issues and avoid accountability.[32] V.R. at 255-56.  The culture manifested in such mainstays as the "GM salute," signaled by "a crossing of arms and pointing outwards towards others, indicating that the responsibility belongs to someone else, not me," and the "GM nod," a phenomenon in which, as Barra put it, "everyone nods in agreement to a proposed plan of action, but then leaves the [conference] room with no intention to follow through, and the nod is an empty gesture." Id. at 256.

The culture is also apparent in Old GM's training and reporting practices.  For example, in formal training, employees learned to write safety reports sanitized of any reference to a safety issue, and were *specifically instructed* to avoid the words problem, safety, or defect when writing about safety issues, and instead to hedge their statements by substituting "safety" with "has potential safety implications," and "defect" with "does not perform to design." Id. at 253-54. Senior attorneys and engineers at Old GM failed to elevate and "raise significant safety issues to key decision-makers" out of fear of pushback or retaliation.  Id. at 253.  Supervisors at Old GM routinely sought to downplay safety issues and discouraged employees from raising safety

---

[32]    The culture of nondisclosure was not limited to out-of-court settings.  In 2007, the Third Circuit affirmed a district court's conclusion that Old GM had intentionally withheld relevant evidence in a product design defect case concerning the "T-top roof" for GM's 1986 Chevrolet IROC Camaro.  See Newman ex rel. Green v. Gen. Motors Corp., 228 F. App'x 245, 245 (3d Cir. 2007).  Magistrate Judge Patty Schwartz below found sufficient allegations to support a finding that GM had "*made a calculated decision to withhold [evidence] or delay its disclosure, thereby allowing the plaintiff and the state court to labor under a misapprehension as to the true state of affairs.  The record show[ed] a pattern of troubling discovery conduct.*" Opinion at 81, Newman v. Gen. Motors Corp., No. 02-135 (D.N.J. Mar. 24, 2005) (ECF No. 60), attached hereto as **Exhibit 3**.  The Third Circuit affirmed.  Newman ex rel. Green, 228 F. App'x at 246 (finding "no error in the findings of fact or legal conclusions drawn by Judge Schwartz and . . . no need to expand upon her fine opinion").

concerns, and communicated this message by warning employees to "never put anything above the company" and "never put the company at risk." Id. at 252-53.

The "extraordinary cost-cutting" of the 2000s exacerbated the culture, sending "messages from top leadership at GM—both to employees and to the outside world" that the need to control costs ruled supreme over safety. V.R. at 250. For example, teams were themselves now directly responsible for any added costs incurred as a result of part changes. Id. "[I]f the Cobalt team wanted an ignition switch replaced, the other vehicle lines that used the ignition switch would request that the cost for their new switches be paid for by the Cobalt team because the Cobalt team requested the change."[33] Id.

New GM continued this culture of conscious avoidance following the 363 Sale. As a company-wide survey conducted in 2013 revealed, "GM's [employees'] rate of reporting misconduct they observed was below the benchmark rate developed by the Compliance and Ethics Leadership Council based on responses and experiences of [other] participating companies." Id. at 252. Moreover, the lack of "coordination between groups with interrelated responsibilities" at New GM allowed the corporate culture that did not dedicate enough resources to safety concerns to continue for more than five years before the Ignition Switch Recall was announced. Id. at 259-60. The Valukas Report went so far as to recommend that New GM "explicitly communicate to employees that they should not be reluctant to classify issues as safety issues or potential safety issues" to combat the preexisting culture at the company. V.R. at 260 (citing Consent Order ¶ 20).

---

[33] In this same vein, Old GM cut personnel from its TREAD Reporting team, which was dedicated to mining "the TREAD data and prepar[ing] scatter graphs . . . in an effort to identify any spikes in the number of accidents or complaints." V.R. at 307. Although the team typically operated with eight employees from 2003 until roughly 2008, Old GM eliminated five employees in or around 2007 or 2008, leaving just three employees, and also "pared down" its data mining process. Id. Old GM thus chose to save costs by starving the TREAD Reporting team of resources, rather than prioritizing safety concerns.

The legacy of the culture endured with New GM intentionally delaying disclosure of the ISD for nearly two months even after placing an "urgent" order for 500,000 replacement parts,[34] followed by its total failure to plan, even after disclosure, for timely manufacture and shipment of the necessary parts.[35]   New GM then took up to an ***additional two months*** after the February announcement of the ISD to notify the first 778,562 owners of defective cars of the safety issue.[36]

### L.    Plaintiffs' Economic Loss Claims.

The Consolidated Complaints allege damages in the form of the diminution of value of the Defective Vehicles resulting from the ISD and Old and New GM's respective roles in first concealing the existence of the ISD and then disclosing its existence in the context of a firestorm of negative publicity.   The diminution of value is not based solely on the mechanical and design defect now known to impair the Defective Vehicles.   As alleged in the Consolidated Complaints, a vehicle made by a disreputable manufacturer that is known to devalue safety and to conceal serious safety defects from consumers and regulators is worth less than an otherwise similar vehicle made by a reputable manufacturer of safe and reliable vehicles; the unprecedented scope of these recalls and related disclosures have damaged the value of the GM brand and undermined assertions regarding the safety and reliability of GM-Branded Vehicles.

The Consolidated Complaints allege two main theories: first, that both Old GM and New GM are guilty of egregious misconduct that has harmed millions of consumers; and second, New

---

[34]   See Email from Sarah Missentzis, Top 100 Project Manager, General Motors Company, to Lisa Augustine, DPSS COP Specialist, Delphi Automotive PLC (dated Dec. 18, 2013, 3:16 p.m.) (DLPH_MDL_0004241 R), available at http://www.detroitnews.com/story/business/autos/general-motors/2014/11/10/gm-ignition-switch-recall/18791811/, attached to the Weisfelner Decl. as **Exhibit J.**

[35]   See Email from Christine Witt, Senior Coordinator - Parts Alerts, General Motors Company, to Susan Dowling, DPSS, Delphi Automotive PLC (dated February 13, 2014, 3:28 p.m.) (DLPH_MDL_0004349 R), available at http://www.detroitnews.com/story/business/autos/general-motors/2014/11/10/gm-ignition-switch-recall/18791811/, attached to the Weisfelner Decl. as **Exhibit K**.

[36]   Id.

GM's recall of over 27 million vehicles in just nine months—13 million of which relate to the ISD—has permanently destroyed any favorable or competitive perception of GM-Branded Vehicles and thus irreparably diminished the fair market and resale value of such vehicles.[37]

## ARGUMENT

### I.    Due Process Threshold Issue.

#### A.    Due Process Requires Notice And Opportunity To Be Heard.

The core elements of Fifth Amendment due process are well known: "'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'"  Hamdi v. Rumsfeld, 542 U.S. 507, 533 (2004) (internal citation omitted).  To satisfy the demands of due process, all persons must be afforded notice "reasonably calculated, under all the circumstances" to apprise them of the pendency of any proceeding that may result in their being deprived of any property and "afford them an opportunity to present their objections."  Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).  As the Second Circuit has held, due process principles are fully applicable to proceedings in bankruptcy and "[b]ankruptcy courts cannot extinguish the interests of parties who lacked notice of or did not participate in the proceedings."  See Koepp v. Holland, No. 13-4097, 2014 U.S. App. LEXIS 22108, *5 (2d Cir. Nov. 21, 2014) (discussed infra Section II.A).  As explained below, Plaintiffs and members of the Pre- and Post-Sale Classes were deprived of due process in connection with the Sale Hearing.

---

[37]  As New GM acknowledges, Old GM had previously settled similar claims arising out of mass defects in its vehicles.  See Br. at 3 n.2; see also infra Section I.B.1.

1.    **Due Process Requires Direct Notice To
Creditors Whose Identities Are Reasonably Ascertainable.**

Mullane is the seminal Supreme Court case establishing due process requirements for

creditors in a bankruptcy proceeding.    In Mullane, the Court held that statutory notice by

publication of a proposed judicial settlement of a trust failed to satisfy the constitutional

requirements of due process with respect to the trust's known beneficiaries.  Id. at 315.  Despite

the large number of beneficiaries, the Court found that because the trustee, with due diligence,

could ascertain their names and addresses, they were entitled to mail notice of the settlement.  Id.

at 318-19.   That the trustee had mailed notices to these ascertainable beneficiaries in the past

was, to the Court, "persuasive" as to his ability to mail notice in the case at hand.  Id. at 319.

Notwithstanding the practical concerns of providing direct notice to the very large

number of beneficiaries involved in Mullane, the Court identified only three categories of

"unknown" creditors for whom publication notice could suffice.   See id. at 317.   The first

category was that of beneficiaries whose "interests . . . could not with due diligence be

ascertained."  Mullane, 339 U.S. at 317.  The second category of "unknowns" was beneficiaries

whose "whereabouts" were unknown and not reasonably ascertainable.  Id.  The third category

was claimants whose interests, at the time of the proceeding, were either "conjectural or

future."[38]  Id.  Thus, as the Supreme Court has further elaborated, if both the existence of a claim

and the identity of the persons with such claim are "reasonably ascertainable" by the debtor

through reasonable diligence, the creditor is entitled to direct notice.   See Mennonite Bd. of

Missions v. Adams, 462 U.S. 791, 800 (1983) ("Notice by mail or other means as certain to

ensure actual notice is a minimum constitutional precondition to a proceeding which will

---

[38]  As to future claims based on conduct that had not caused an identifiable harm to an identifiable plaintiff at the time of the order, the affected claimants could not possibly receive sufficient notice to satisfy due process, and their claims generally may not be discharged or extinguished by such an order.  See infra Section I.D.

27

adversely affect the liberty or property interests . . . if [the party's] name and address are
reasonably ascertainable."); Lousiana Dep't of Envtl. Quality v. Crystal Oil Co. (In re Crystal Oil
Co.), 158 F.3d 291, 297 (5th Cir. 1998) (noting, in *dicta* that, a claim is reasonably ascertainable
where the debtor has in its possession information that "reasonably suggests both the claim for
which the debtor may be liable and the entity to whom he would be liable"); see also Tulsa Prof'l
Collection Servs., Inc. v. Pope, 485 U.S. 478, 490 (1988) (holding that if a claimant's identity
was known or reasonably ascertainable, termination of its claim without actual notice violated
due process and remanding for further findings regarding whether creditor was known).[39]

Mullane's analysis of the due process rights owed to trust beneficiaries applies equally to
bankruptcy proceedings that propose to bar or extinguish a creditor's claim or interest. These
proceedings include the establishment of a bar date, an auction or sale of the debtor's assets that
transfers those assets "free and clear" of the creditors' interests, the release of claims against
third parties, including a release pursuant to settlement with the debtor, and the discharge of
claims upon plan confirmation. See, e.g., Nat'l Pipe & Plastics, Inc. v. N.P.P. Liquidation Co.
(In re Nat'l Pipe & Plastics, Inc.), No. A-99-12, 2000 Bankr. LEXIS 1329, at *32 (Bankr. D.
Del. Sept. 25, 2000) (known creditor is entitled to direct notice and an opportunity to contest the
findings of a sale order pursuant to section 363; thus "cannot be held bound by" a sale order if
notice is deficient); Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV, 209 F.3d 252, 265 (3d
Cir. 2000) (concluding that, under the circumstances, constitutionally mandated due process
required that notice of auction of the debtor's assets apprise claimant that contract defenses
against the debtor would be waived) (citing Mullane, 339 U.S. at 314-15).

---

[39]    On remand from the Supreme Court, the state court, in Estate of Pope, 808 P.2d 640 (Okla. 1990), found that the
creditor's due process rights had been violated because it had been "a known health care provider during the
decedent's last illness" and thus qualified as "a likely or ascertainable creditor" that should have received "actual
notice of the statutory period for submission of claims." Id. at 647.

Following <u>Mullane</u> and its progeny, courts addressing the adequacy of notice in bankruptcy proceedings first assess whether both the creditor's claim and the identity of the creditor were "known" (*i.e.*, reasonably ascertainable) or whether, in the alternative, the creditor falls within one of the three categories of "unknowns," *i.e.*, interest unknown, whereabouts unknown, or claims, albeit foreseeable, that are non-existent as of the time because they would arise only in the future. <u>See</u> <u>In re Drexel Burnham Lambert Grp. Inc.</u>, 151 B.R. 674, 680 (Bankr. S.D.N.Y. 1993) ("For purposes of determining constitutionally acceptable notice . . . bankruptcy law divides creditors into two groups: known and unknown."), <u>aff'd</u>, 157 B.R. 532 (S.D.N.Y. 1993). If a creditor is "known" to the debtor, process will be found to be inadequate unless actual, direct notice of the proceeding has been given. <u>See, e.g.</u>, <u>id.</u> at 680 ("According to well-established case law, due process requires that a debtor's known creditors be afforded actual notice . . . .").

When determining whether a claim is "reasonably ascertainable" to the debtor, courts will consider whether such a claim could be discovered with reasonable diligence by resort to information in the debtor's possession, including its books and records. <u>Id.</u> at 680. An adequate review of a debtor's "books and records" must also include "a reasonable search for contingent or unmatured claims" that would not, under generally accepted accounting practices, necessarily or even ordinarily appear on such accounting records. <u>Id.</u> at 681-82. "Reasonable diligence in ferreting out known creditors . . . [varies] in different contexts and may depend on the nature of the property interest held by the debtor." <u>Id.</u> at 680; <u>see also</u> <u>In re Arch Wireless</u>, 332 B.R. 241, 254 (Bankr. D. Mass. 2005) (noting that "[w]hether a creditor's claim was reasonably ascertainable must be determined by the circumstances of the case"), <u>aff'd</u>, 534 F.3d 76 (1st Cir. 2008). "What is reasonable depends on the particular facts of each case," but requires a debtor

29

"to undertake more than a cursory review of its records and files to ascertain its known creditors." Drexel Burnham, 151 B.R. at 681.

The inquiry is not limited to accounting records, but includes operating records, public records, and the systems and procedures of the debtor. See, e.g., id. at 681-82 (considering contract guaranty between debtor and creditor); In re Interstate Cigar Co., 150 B.R. 305, 310 (Bankr. E.D.N.Y. 1993) (creditor's claim arising out of pension plan fund should have been known where Debtor knew that pension plan was underfunded prior to bankruptcy *and* the debtor's actions prior to filing indicated its "recogni[tion] that a liability to the [creditor] existed"); In re Feldman, 261 B.R. 568, 577 (Bankr. E.D.N.Y. 2001) (in context of claim by judgment-creditor, considering, *inter alia*, a publicly filed "Assignment of Judgment" at the county clerk's office; reasoning that debtor was "sufficiently sophisticated" to have searched the public record to ascertain its proper creditors). New GM is simply wrong when it argues that the inquiry into whether the Pre-Sale Class's claims were known to Old GM should begin and end with whether such claims appeared on the accounting ledgers of Old GM. See Br. at 27-28; Kiefer Decl. ¶ 3 (claiming that Old GM's books and records did not identify Plaintiffs as creditors because Plaintiffs were not included on Old GM's ledgers and supplying declaration of accounting officer to such effect).[40] Indeed, in Drexel Burnham, the Bankruptcy Court gave short shrift to and dismissed similar technical, accounting-based arguments, stating that they "lie on the floor like pennies not worth picking up." Id. at 681. As the Court said there, financial records are just one kind of record considered when determining whether a creditor's claim was

---

[40] In re Agway, Inc., 313 B.R. 31, 38-39 (Bankr. N.D.N.Y. 2004), relied on by New GM, only further refutes New GM's argument by including a notice of lien issued in connection with a lawsuit in the "books and records" analysis. Br. at 27. The same is true for Barry v. L.F. Rothschild & Co. (In re L.F. Rothschild Holdings, Inc.), No. 92 Civ. 1129, 1992 WL 200834, at *4 (S.D.N.Y. Aug. 3, 1992), where the court relied on memoranda and letters exchanged between the debtor and claimant, and affidavits submitted to the court, to determine whether the claimant was "known" to the debtor. See Br. at 29.

"reasonably ascertainable." See id. at 681-82; see also Arch Wireless, 332 B.R. at 255 (finding debtor's assertion that creditor was "unknown" was "wholly unpersuasive" where debtor "relie[d] solely on the fact that its books, at all relevant times, showed [only] a balance owed on [the creditor's] accounts").

Moreover, direct notice cannot be dispensed with merely because known creditors supposedly were aware of the pendency of bankruptcy proceedings.[41] Creditors with knowledge of bankruptcy proceedings generally "have a right to assume that the statutory 'reasonable notice' will be given them" before an order is entered in those proceedings that will bar their claims. See, e.g., City of New York v. N.Y., New Haven & Hartford R.R. Co., 344 U.S. 293, 297 (1953) (the fact that the city of New York was aware of the debtor's reorganization did not excuse debtor's failure to provide any notice to it other than by publication), motion to modify denied, 345 U.S. 901 (1953); Brunswick Hosp. Ctr., Inc. v. New York Dep't of Health (In re Brunswick Hosp. Ctr., Inc.), Nos. 892-80487-20, 894-8283-346, 1997 WL 836684, at *5 (Bankr. E.D.N.Y. Sept. 12, 1997) (finding due process violation for failure to provide direct notice of bar date, even where known creditor had actual knowledge of bankruptcy filing).

### 2. Due Process Requires Notice To Contain Sufficient Information To Inform Creditors Of Their Interests.

To be constitutionally adequate, notice must contain sufficient information to alert the party to the interest that is potentially affected. No form of notice, published or otherwise, can pass constitutional muster *if the persons to whom the notice is directed have no knowledge, or ability to understand, that they hold rights that are about to be taken away.* See Schroeder v. City of New York, 371 U.S. 208, 211-13 (1962); Covey v. Town of Somers, 351 U.S. 141, 145-

---

[41] Although New GM baldly asserts Plaintiffs' awareness here, it supplies no proof in support of its argument that, even given the notoriety of the bankruptcy proceedings, Plaintiffs were aware that their interests would be affected by the Sale Order. See, e.g., Br. at 12, 33.

47 (1956).  In Travelers Cas. & Sur. Co. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.),

600 F.3d 135, 143, 158 (2d Cir. 2010), cert. denied, 131 S. Ct. 644 (2010) ("**Manville IV**"), the

Second Circuit applied this principle to a final order of the bankruptcy court that released

asbestos-related claims against the debtor and the debtor's insurance carriers.  Thereafter, when a

non-settling insurer sought indemnity and contribution from a settling insurer, the Second Circuit

held that the non-settling insurer was not bound by the order releasing claims because it could

not have anticipated at the time the notice was given that the order would be interpreted to cover

rights to contribution and indemnity arising from direct liability of insurers to persons harmed by

asbestos-related activities. Id. at 145, 157; see also Folger Adam Sec., Inc., 209 F.3d at 265 (even

where creditor received notice of Section 363 sale motion, notice was constitutionally

insufficient where it failed to describe the interests that would be affected by the free and clear

sale); Acevedo v. Van Dorn Plastic Mach. Co., 68 B.R. 495, 499 (Bankr. E.D.N.Y. 1986) ("A

creditor who is notified of the bankruptcy but not of his claim is in the same position as a

creditor who has notice of his claim, but not of the bankruptcy.").

> **3.      The Due Process Requirements Of
> Adequate Notice And Opportunity To Be
> Heard Apply With Equal Force To Section 363 Sale Orders.**

Due process applies with equal force to claims and interests extinguished without notice

by Section 363 sale orders and related injunctions, despite the bankruptcy policy interests in

finality and protection of good faith purchasers.  For example, in Citicorp Mortg., Inc. v. Brooks

(In re Ex-Cel Concrete Co.), 178 B.R. 198, 205 (B.A.P. 9th Cir. 1995), the Bankruptcy Appellate

Panel of the Ninth Circuit concluded that "the lack of any notice" to a lienholder whose lien the

sale purported to extinguish "constituted constitutional lack of due process."  In Western Auto

Supply Co. v. Savage Arms, Inc. (In re Savage Industries, Inc.), 43 F.3d 714, 721-22 (1st Cir.

1994), the First Circuit held that a Section 363 sale order purporting to bar a claimant's successor

liability claims against a purchaser of estate assets violated that claimant's due process rights, where the claimant was not provided with notice of the sale—even though the claims of such persons were unknown, future claims at the time of the sale order.  And in In re Polycel Liquidation, Inc., No. 00–62780, 2006 WL 4452982, at *9, *11 (Bankr. D.N.J. Apr. 18, 2006), aff'd, No. 06-2183, 2007 WL 77336 (D.N.J. Jan. 8, 2007), where a creditor did not receive proper notice of a Section 363 sale, even where it learned of the proceedings prior to the execution of the sale, the bankruptcy court found the creditor's knowledge insufficient to satisfy due process requirements and held that the interests of finality, while important, could not "trump constitutionally mandated due process requirements for notice and an opportunity to be heard." Id. (finding persuasive "ample authority" for the principle that "'sales within the scope of § 363(b)(1), of which no proper notice was provided, may be set aside'") (internal citation omitted); see also Nat'l Pipe & Plastics, 2000 Bankr. LEXIS 1329 at *25-26, *32 (applying Mullane in a Section 363 sale context and finding due process violation where sale order purported to bind known creditor to its finding that purchaser was not a successor-in-interest to the debtor in liquidation, but creditor had not received adequate notice of sale); Metal Founds. Acquisition, LLC v. Reinert (In re Reinert), 467 B.R. 830, 831-32 (Bankr. W.D. Pa. 2012) (applying Mullane in Section 363 sale context and finding due process violation where sale order purported to bind entity with interest in property sold, but entity did not receive adequate notice); Doolittle v. Cnty. of Santa Cruz (In re Metzger), 346 B.R. 806, 819 (Bankr. N.D. Cal. 2006) (finding sale order void to extent it affected rights of known lienholder that did not receive due process); Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus., Inc.), 467 B.R. 694, 706-07 (S.D.N.Y. 2012) ("**Grumman**") (applying Mullane in Section 363 sale context and

finding due process violation where sale order purported to bar successor liability claims, even where claimants were unknown, future claimants).

No doubt recognizing that due process was not afforded here, New GM points to two decisions that purport to hold that a Section 363(f) order provides a due process exception and can bar claims regardless of whether notice was given to a claimant.  See In re Edwards, 962 F.2d 641, 645 (7th Cir. 1992) (holding that, when the debtor fails to notify lienholders of a Section 363(f) sale, the order is effective anyway due to the "policy of finality"); Paris Mfg. Corp. v. Ace Hardware Corp. (In re Paris Indus. Corp.), 132 B.R. 504, 509-10 (D. Me. 1991) (holding that due process permits the sale of assets free and clear of future claims against a purchaser).  Because these decisions incorrectly disregard due process rights in reliance on the need for finality and the desirability of maximizing the value of the estate, Edwards and Paris were wrongly decided.  These cases cannot pass muster under Supreme Court precedent, and they have been rejected.[42]  This Court should do likewise.[43]

---

[42] See, e.g., In re Ex-Cel Concrete Co., 178 B.R. at 205 ("disagree[ing] with Edwards to the extent that it allows considerations, such as the exigent needs of the bankruptcy system or the innocence or good faith of third parties involved in bankruptcy sales, to justify departures from due process standards in adjudicating property rights."); In re Polycel Liquidation, Inc., 2006 WL 4452982, at *10 ("This court is inclined to disagree with the reasoning of the Seventh Circuit [in Edwards], and instead follows the more persuasive line of cases that recognize the importance of affording parties their due process rights over the interest of finality in bankruptcy sales."); Compak Cos., LLC v. Johnson, 415 B.R. 334, 342 (N.D. Ill. 2009) (holding that patent licensors' interests could not be extinguished by a sale order without due process, notwithstanding Edwards, given that the lienholder in Edwards had suffered only a trivial loss of interest).

The First Circuit itself has rejected the district court's reasoning in Paris.  In re Savage Industries, Inc., the First Circuit reversed a bankruptcy court that had improperly granted a purchaser's request to enjoin a state law successor liability suit pursuant to a Section 363 sale order, where the claimant had received no notice.  43 F.3d at 721-22. The bankruptcy court had cited Paris for the principle that "successor liability actions might 'chill' all-asset sales under chapter 11 by prompting potential purchasers to hedge their bids against unquantifiable future product liability costs."  Id. at 719.  In reversing, the First Circuit refused to credit that concern, reasoning that it was "largely illusory" and "entirely of the parties' own making," brought on by the sale of the debtor's assets "without regard to basic Bankruptcy Code notice requirements."  Id. at 722; see also Ninth Ave. v. Remedial Grp., 195 B.R. 716, 732 (N.D. Ind. 1996) (noting court's decision in Paris before concluding that "a sale free and clear does not include future claims that did not arise until after the bankruptcy proceedings concluded").

[43] To the extent the deciding courts considered equitable factors in deciding those cases, it is also significant that those cases did not involve a multi-year-long cover-up of a product defect, by both the seller and the purchaser as is

34

Contrary to the overriding weight Edwards and Paris placed upon the finality of Section 363 sale orders and related injunctions, such orders are no different than any other final order in their finality.  It is the very potential of orders—whether under Section 363 or otherwise—to finally adjudicate interests in property that call into play the requirements of due process.  See Mullane, 339 U.S. at 314 ("An elementary and fundamental requirement of due process in any proceeding *which is to be accorded finality* is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.") (emphasis added).  Accordingly, as the Ninth Circuit's Bankruptcy Appellate Panel observed in critiquing Edwards, notice and an opportunity to be heard cannot be dispensed with, and collateral attack made unavailable, *because of* the need for finality.  See In re Ex-Cel Concrete Co., 178 B.R. at 205.  The Ex-Cel court went on to quote Ray v. Norseworthy, 90 U.S. 128 (1874)—cited but given only lip service by the Edwards court—in which the Supreme Court refused to grant a good faith purchaser of property absolute title where a secured creditor had not been notified of the sale, reasoning that "[n]otice in some form must be given in all cases, else the judgment, order, or decree will not conclude the party whose rights of property would otherwise be divested by the proceeding."  Id. ("'No man is to be condemned without the opportunity [to make] a defence, or to have his property taken from him by a judicial sentence without the privilege of showing, if he can, that the pretext for doing it is unfounded.'" (quoting Ray, 90 U.S. at 136)).  Nor can the mere utility of the power to eliminate

---

present here.  For Old GM and New GM to conceal the ISD until the Sale Order became final and then turn around and say that its finality should protect them cannot be what the Seventh Circuit intended in announcing a "strict rule."  See Edwards, 962 F.2d at 745-46 (where debtor had attempted notice, but used the wrong address, and where claimant had filed proof of claim and then ceased to pay attention to case, court had no "cause . . . to question the benefits of having a strict rule in favor of the bona fide purchaser").

liabilities as a means to maximize the value of an estate for creditors justify overriding due process concerns, as the <u>Paris</u> court proposes.  <u>See</u> <u>In re Paris Indus. Corp.</u>, 132 B.R. at 509 n.11.

4.    **A Failure Of Due Process Cannot Be Cured By Speculation About What Could Have Occurred Absent The Violation.**

Contrary to New GM's arguments, once a claimant has shown that it has been deprived of an interest or claim without constitutionally adequate notice and opportunity to be heard, a due process violation has been established.[44]    The claimant is not obligated to demonstrate a "reasonable likelihood that the result of this claim would have been different absent the violation." <u>Lane Hollow Coal Co. v. Dir., Office of Workers' Comp. Programs</u>, 137 F.3d 799, 807 (4th Cir. 1998).  As the Supreme Court has explained, "[t]o one who protests against the taking of his property without due process of law, it is no answer to say that in his particular case due process of law would have led to the same result because he had no adequate defense upon the merit." <u>Fuentes v. Shevin</u>, 407 U.S. 67, 87 (1972) (citation omitted), <u>reh'g denied</u>, 409 U.S. 902 (1972).  Thus, courts reject as "improper speculation" and "hindsight rationalization[]"

---

[44]  New GM does not seriously dispute that Plaintiffs' successor liability claims are property interests.  Nor could it, as this was the precise reason this Court found it could give New GM the successor liability bar on which it now relies.  <u>See</u> <u>In re Gen. Motors Corp.</u>, 407 B.R. 463,  503-04 (Bankr. S.D.N.Y. 2009) (concluding successor liability claim is "interest in property" that may be barred pursuant to Section 363(f) if other requirements are satisfied), <u>aff'd sub nom.</u> <u>Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.)</u>, 428 B.R. 43 (S.D.N.Y. 2010), and <u>aff'd sub nom.</u> <u>Parker v. Motors Liquidation Co. (In re Motors Liquidations Co.)</u>, 430 B.R. 65 (S.D.N.Y. 2010).  Instead, New GM says that any successor liability claims were property of Old GM's estate as of the Sale Order and could be released without Plaintiffs' participation.  Br. at 48-49.  New GM selectively cites the Third Circuit's decision in <u>In re Emoral, Inc.</u>, 740 F.3d 875 (3d Cir. 2014), <u>cert. denied sub nom.</u> <u>Diacetyl Plaintiffs v. Aaroma Holdings, LLC</u>, 135 S. Ct. 436 (2014), ignoring that other circuits around the country, including the Second Circuit, have rejected similar arguments.  <u>See</u> <u>Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC)</u>, 721 F.3d 54, 70 (2d Cir. 2013) (analyzing whether the underlying creditor claims were personal to the creditor or general to the corporation to determine property of the estate issue, rather than analyzing whether claims were generalized or particularized as did <u>Emoral</u>), <u>cert. denied sub nom.</u> <u>Picard v. HSBC Bank Plc</u>, 134 S.Ct. 2895 (2014); <u>Ahcom, Ltd. v. Smeding</u>, 623 F.3d 1248, 1249 (9th Cir. 2010) (holding that creditor, as opposed to trustee, was proper party to assert alter ego action); <u>In re Savage Indus., Inc.</u>, 43 F.3d at 722 (concluding non-debtor's successor liability claim against asset purchaser could not be extinguished by Section 363 sale without notice, and thus implicitly concluding claim belonged to tort claimant and not estate).  In any event, <u>Emoral</u> has little relevance here, as the injured claimants there had notice of the settlement and had actually appeared to contest it, such that no due process issues were before the court.  <u>See</u> <u>In re Emoral, Inc.</u>, 740 F.3d at 877, 882 (construing estate release language in court-approved settlement agreement, which was negotiated with participation of diacetyl plaintiffs, to release successor liability claims).

arguments that, had a claimant been properly noticed, he would have lost anyway.  See New
Concept Hous., Inc. v. Poindexter (In re New Concept Hous., Inc.), 951 F.2d 932, 942 (8th Cir.
1991) (dismissing as "sheer improper speculation" and "hindsight rationalization[]" the argument
that an improperly noticed debtor's objection would not have made any difference in approval of
settlement); Consol. Coal Co. v. Borda, 171 F.3d 175, 184 (4th Cir. 1999) (finding that a 16-year
delay in providing notice of a claim stripped the claimant of a full and fair opportunity to defend
itself and refusing to speculate on whether the claimant would be successful now on the merits);
White v. Chance Indus., Inc. (In re Chance Indus., Inc.), 367 B.R. 689, 709 (Bankr. D. Kan.
2006) (refusing to enforce discharge and plan injunction against tort claimant who received no
notice and finding due process violation notwithstanding debtor's speculation that the tort
claimant's participation in confirmation process would not have changed the result).[45]

Although New GM cites a multitude of decisions in support of its argument that
"prejudice" is a required element of a due process violation, the cases it cites do not support its
contention.  Most of the cases illustrate the unremarkable proposition that if, despite inadequate
notice, a party is provided with an *actual* opportunity to be heard, it has not suffered a due
process violation.[46]  Thus, for example, in In re Caldor, Inc., N.Y., 240 B.R. at 188, relied upon

---

[45]  Contrary to New GM's assertions, In re Chrysler LLC, 405 B.R. 84 (Bankr. S.D.N.Y. 2009), cert. granted,
judgment vacated sub nom. Indiana State Police Pension Trust v. Chrysler LLC, 558 U.S. 1087 (2009), did not
involve "the same type of due process objections relating to unknown product defects that Plaintiffs make herein."
Br. at 46.  The ISD was not an "unknown product defect," as was the issue in Chrysler, but rather a defect that was
widely known throughout Old GM.  The due process objections raised herein are, therefore, not the "same type" as
those addressed in Chrysler.

[46]  Perry v. Blum, 629 F.3d 1, 17 (1st Cir. 2010) (although defendants were removed then re-joined to the action, the
defendants were original parties to the action and testified extensively at the trial); Rosson v. Fitzgerald (In re
Rosson), 545 F.3d 764, 775-76 (9th Cir. 2008) (party "had an opportunity to present [his] arguments" in a motion
for reconsideration); Oan Servs., Inc. v. Official Comm. of Unsecured Creditors of Nat'l Telecomms., Inc. (In re
Parcel Consultants, Inc.), 58 F. App'x 946, 950-51 (3d Cir. 2003) (appeals court considered full substantive
arguments on appeal); Global Commercial Fin., L.L.C. v. Old Kent Bank (In re U.S. Kids, Inc.), No. 97-1939, 1999
WL 196509, at *5 (6th Cir. Mar. 25, 1999) (unnoticed party introduced evidence, offered witnesses and cross-
examined witnesses at the summary proceeding in which it appeared and participated); Rapp v. U.S. Dep't of
Treasury, Office of Thrift Supervision, 52 F.3d 1510, 1520 (10th Cir. 1995) (parties appeared and participated in

by New GM, the court rejected a due process challenge where the objectant had an opportunity, albeit belatedly, to contest an order that had granted super-priority status to some claims but not the objectant's. Id. at 584.  These cases are irrelevant because here Plaintiffs had neither notice nor an opportunity to be heard.

Edwards and Paris fall into a second category of cases that have rejected due process challenges by erroneously concluding that the would-be objectant was not deprived of any property.  Thus in Edwards and Paris, the courts rationalize their conclusion that no due process violation occurs when a Section 363 sale extinguishes liens or bars claims without notice by reasoning that, in any event, the creditor's claim attaches to the proceeds of the sale.  As long as the price is adequate—so the reasoning goes—the creditor can have no deprivation of property. See In re Edwards, 962 F.2d at 645 ("[T]his case appears to work no great hardship" where the creditor "does not suggest that the property was worth more than [the sale price]."); In re Paris Indus. Corp., 132 B.R. at 510 ("[T]he liquidation of the assets and their replacement with cash . . . has not affected [the creditors'] ability to recover on their claim.").  The flaw in this analysis is that it fails to take into account the loss of the very property interest that is being eliminated without due process: the state law successor-in-interest claim potentially available against the successor-in-interest to the debtor.  See supra Section I.A.3.  In what is clearly *dicta* given the court's finding that claimant had been afforded an opportunity to be heard, the court in Pearl-Phil

_____

hearing); City Equities Anaheim, Ltd. v. Lincoln Plaza Dev. Co. (In re City Equities Anaheim, Ltd.), 22 F.3d 954, 959 (9th Cir. 1994) (debtor raised arguments before bankruptcy court); YBA Nineteen, LLC v. IndyMac Venture, LLC (In re YBA Nineteen, LLC), 505 B.R. 289, 300 (S.D. Cal. 2014) (debtor received extension of time to comply with order despite late initial notice); Parker, 430 B.R. at 97-98 (creditor had opportunity to take discovery and argue before the court); Cont'l Cas. Co. v. Gen. Dev. Corp. (In re Gen. Dev. Corp.), 165 B.R. 685, 688 (S.D. Fla. 1994) (bankruptcy court vacated original settlement order and reinstated it after hearing originally unnoticed surety's objections); Apex Oil Co. v. Vanguard Oil & Serv. Co. (In re Vanguard Oil & Serv. Co., Inc.), 88 B.R. 576, 580 (E.D.N.Y. 1988) (creditor filed sale objection and appeared at hearing); In re Caldor, Inc., N.Y., 240 B.R. 180, 188 (Bankr. S.D.N.Y. 1999) (creditor had subsequent opportunity to contest entry of order), aff'd sub nom. Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp., 266 B.R. 575 (S.D.N.Y. 2001).

commented that the claimant had not suffered an "actual deprivation" of property where the claimant was insolvent because the claimant, even if deprived of due process, was no worse off than if he had appeared and successfully opposed the sale order. Pearl-Phil, 266 B.R. at 579. As discussed infra however, this kind of hindsight analysis is prohibited by controlling Supreme Court precedent so that, if it had been determinative of a remedy in Pearl-Phil (which it did not), such ruling would have been in error.

### B.    The Pre-Sale Plaintiffs Were Reasonably Ascertainable Claimants At The Time Of The 363 Sale.

As explained supra, if the debtor either knows or can "reasonably ascertain" both the existence of a claim and the identity of the person holding it, that person is deemed a "known creditor" entitled to direct notice. See In re Crystal Oil Co., 158 F.3d at 297 (claim is reasonably ascertainable where the debtor has in its possession information that "*reasonably suggests* both the claim for which the debtor may be liable and the entity to whom he would be liable") (emphasis added).  Following these clear rules, the members of the Pre-Sale Class were known creditors of Old GM as of the time of the entry of the Sale Order and were entitled to direct notice of the Sale.

### 1.    Old GM Knew Of The ISD And That It Was A Safety Defect.

Belying the assertion that Old GM did not know owners and lessees of Defective Vehicles had claims arising from the ISD and thus was not obligated to provide them with notice of the Sale, Old GM was (as New GM is today) subject to a comprehensive statutory and regulatory scheme that imposed upon it *an affirmative duty* to know of safety defects in its products and, upon learning of such defects, to promptly provide notice of those defects as well as to take other remedial action.  Thus, contrary to New GM's argument, Old GM already had

the data it needed to discharge its due process obligations and no "impracticable and extended search[]" was necessary to identify the claims of members of the Pre-Sale Class. Br. at 28.

The National Traffic and Motor Vehicle Safety Act (the "**Safety Act**"), as amended in 2000 by the Transportation Recall Enhancement, Accountability and Documentation Act (the "**TREAD Act**"), and related regulations require motor vehicle manufactures to obtain and submit to NHTSA, on a quarterly basis, data concerning incidents involving death or injury, claims relating to property damage received by the manufacturer, warranty claims paid by the manufacturer, consumer complaints, and field reports prepared by the manufacturer's employees or representatives concerning failure, malfunction, lack of durability or other performance issues. See 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.  These "early warning reports" must be retained by manufacturers together with all underlying records on which they are based.  See 49 C.F.R. §§ 576.5 to 576.6.

The Safety Act further requires immediate action when a manufacturer determines or should determine that a safety defect exists.  See United States v. Gen. Motors Corp., 574 F. Supp. 1047, 1049-50 (D.D.C. 1983).  A "safety defect" is defined by regulation to include any defect that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident . . . ."  See 49 U.S.C. § 30102(a)(8).  Within five days of learning about a safety defect, a manufacturer *must* notify NHTSA and provide a description of the vehicles potentially containing the defect, including "make, line, model year, [and] the inclusive dates (month and year) of manufacture," a description of how these vehicles differ from similar vehicles not included in the recall, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related.  See 49

U.S.C. § 30118(c); 49 C.F.R. §§ 573.6(b)-(c).  Then, "within a reasonable time"[47] after deciding

that a safety issue exists, the manufacturer *must* notify the owners of the defective vehicles.  See

49 C.F.R. §§ 577.5(a), 577.7(a).  Violating these notification requirements can result in a

maximum civil penalty of $35,000,000.  See 49 U.S.C. § 30165(a)(1).

Old GM used several processes to identify safety issues, including the TREAD database

and PRTS.  See V.R. at 282-313.  The TREAD database, used to store the data required for the

quarterly NHTSA early warning reports, was the principal database used by Old GM to track

incidents related to its products.  See id. at 306.  The database included information from the

following: (i) customer service requests; (ii) repair orders from dealers; (iii) internal and external

surveys; (iv) field reports from employees who bought GM-branded vehicles and from Captured

Test Fleet reports;[48] (v) complaints from the OnStar call center; and (vi) a database maintained

by GM legal staff to track data concerning complaints filed in court.  Id.  A TREAD reporting

team would conduct monthly database searches and prepare scatter graphs to identify spikes in

the number of accidents or complaints related to various GM-branded vehicles.  See id. at 307.

The PRTS is a database that tracks engineering problems identified in testing and manufacturing,

through warranty data, and through customer feedback.  See id. at 282.  The PRTS process

involves five steps: "identification of the issue; identification of the root cause; identification of a

solution; implementation of the solution; and feedback."  See V.R. at 284.

---

[47]   49 C.F.R. § 577.7(a) was amended effective October 11, 2013, to replace "within a reasonable time" to "no later than 60 days" from the filing of the NHTSA notification.

[48]   Captured Test Fleet reports were submitted by employees who were given vehicles and asked to document any problems that arose while driving.  See V.R. at 300.  The Quality Group would review, summarize, and group these reports into categories.  See id.

41

Documents reflecting internal activity associated with Old GM's compliance related activities, which have become known to Plaintiffs (without the benefit of discovery here) no doubt represent the tip of the iceberg of what Old GM knew and include, *inter alia*:

- presentations on and settlements with respect to car crash cases involving the Ion and Cobalt approved by the Old GM general counsel's Roundtable Committee, see DC Stipulated Facts ¶¶ 14(D)(ii), 14(L), 14(U)(i);

- Captured Test Fleet vehicle reports from 2002-2006, in which issues with the Ignition Switch were noted by program team executives, see id. ¶¶ 14(FF); V.R. 59;

- at least four PRTS Reports related to the ISD, at least one of which explicitly identified defects in the Ignition Switch that allowed the key to be inadvertently cycled to the off position, see DC Stipulated Facts ¶¶ 14(B)(ii), 14(F)(i)-(ii), 14(V)(ii), 22;

- at least two service bulletins issued by Old GM in December 2005 and October 2006 with respect to vehicles that contained the ISD, see id. ¶¶ 10, 11;

- claim reports resulting from the ISD from 2005-2009 received by various dealers or dealerships of Old GM and accessible to persons working for or employed by Old GM, see id. ¶¶ 14(F), 21, 22;

- NHTSA's crash investigation on airbag non-deployment in a 2005 Chevrolet Cobalt and the related legal department file on the crash and investigation, see V.R. at 103-04 & n.419-20, 110 & n.453; Case No: CA05-049, Calspan On-Site Air Bag Non-Deployment Investigation, Crash Data Research Ctr., Calspan Corp. (Feb. 2009), available at http://docs.house.gov/meetings/IF/IF02/20140401/102033/HHRG-113-IF02-20140401-SD029.pdf, attached to the Weisfelner Decl. as **Exhibit L**;

- Trooper Young's 2007 report on a crash finding that the ISD likely caused airbag non-deployment, located in Old GM's legal department's files, see DC Stipulated Facts 14(H)(i), 14(BB);

- various reports on crashes involving airbag non-deployment reviewed by Old GM's legal staff in 2006, see id. ¶¶ 14(A)(i), 14(C)(iii), 14(D)(i)-(ii), 14(L), 14(O)(i)-(ii), 14(T), 14(CC), 14(DD); and

- a 2007 Warranty, Settlement and Release Agreement and Covenant Not to Sue with Delphi, which includes a chart with entries regarding "ignition switch failure," see id. ¶ 14(I)(vi).

The extensive documentation of the ISD in Old GM's books and records, including internal reports and investigations, distinguishes this case from those in which the information available to a debtor was not of a nature to alert it to the possibility of a lawsuit or impose a duty

of notice.  See In re Enron Corp., No. 01-16034, 2006 WL 898031, at *5 (Bankr. S.D.N.Y. Mar.

29, 2006) (Gonzalez, J.) (existence of federal regulatory agency investigation of debtor did not

make potential claim by the State of Montana known to the debtor); In re Envirodyne Indus.,

Inc., 206 B.R. 468, 474 (Bankr. N.D. Ill. 1997) (issuance of Department of Justice subpoena did

not mean that the debtor knew that antitrust claims existed against it, requiring the debtor to

provide actual notice to all potential claimants), aff'd, 214 B.R. 338 (N.D. Ill. 1997); see also In

re Spiegel, Inc., 354 B.R. 51, 56-57 (Bankr. S.D.N.Y. 2006) (no basis for due process violation

where, although *similar* pre-confirmation copyright action had been filed against debtor's

licensee, plaintiffs did not allege that a proper examination of the books and records would have

uncovered the basis for *their* claim against debtor), aff'd, 269 F. App'x 56 (2d Cir. 2008).[49]

Nor is it possible for New GM to argue that even if Old GM knew of the ISD, it was

unaware of the claims and interests of the Pre-Sale Class.  Such claims were neither conjectural

nor future, see Mullane, 339 U.S. at 317, but gave rise, under a panoply of state statutes and

common law, to fully mature, present and cognizable legal claims for, *inter alia*, economic loss

damages, which had already accrued as of the time of the Sale.  See supra Factual Background,

Section M.  It is a matter of public record that, by the Petition Date, Old GM had settled a

number of class action lawsuits seeking damages for economic losses arising from defects in Old

GM vehicles.  See *Order Pursuant to Fed. R. Bankr. P. 9019 and Fed. R. Civ. P. Rule 23*

---

[49]  Similarly wide of the mark is New GM's reliance on the Robley matter in which New GM successfully enjoined
a claim based on a pre-Sale accident involving an Old GM vehicle.  See Br. at 35-36.  Critical to this Court's
reasoning there was that Old GM had *no knowledge* of the facts surrounding Mr. Robley's claim prior to the Sale,
making Mr. Robley, unlike Plaintiffs, an "unknown creditor" for which publication notice was constitutionally
sufficient.  See *Motion of Gen. Motors, LLC for Entry of An Order Pursuant to 11 U.S.C. Section 105 Enforcing 363
Sale Order* Hr'g Tr. 28:2-10, In re Motors Liquidation Co., Case No. 09-50026 (Bankr. S.D.N.Y. June 1, 2010)
("**Robley Hr'g Tr.**") (attached as **Exhibit N** to the New GM Appendix).  The Court, in fact, recognized that
publication notice would be suspect if Old GM had knowledge of Mr. Robley's claim prior to the Sale.  See id. ("If
GM knew back then that your client had already been injured and chose to use the publication route rather than a
way that would get to him more directly, that kind of factual circumstance would have troubled me.").

43

*Approving Agreement Resolving Proof of Claim No. 51095 and Implementing Modified Dex-Cool Class Settlement*, In re Motors Liquidation Co., No. 09-50026 (Bankr. S.D.N.Y. May 4, 2011), ECF No. 10172 (pre-petition settlement, modified and implemented post-petition, see ECF No. 9905, relating to defects in intake manifold gaskets), attached hereto as **Exhibit 4**; *Final Judgment*, Castillo v. Gen. Motors Corp., No. 07-2142 (E.D. Cal. Apr. 16, 2009), ECF No. 74 (pre-petition settlement, see ECF No. 48, relating to defective transmissions), attached hereto as **Exhibit 5**; *Final Judgment*, Zwicker v. Gen. Motors Corp., No. 07-0291 (W.D. Wash. Nov. 7, 2008), ECF No. 31 (pre-petition settlement, see ECF No. 31-2, relating to defective transmissions), attached hereto as **Exhibit 6**.  Accordingly, the "interest" of members of the Pre-Sale Class was known to Old GM.  See Mullane, 339 U.S. at 317-18 (limiting "unknown" status to claimants whose "interests" were unknown to the debtor).  For this reason, contrary to New GM's argument, it cannot be relevant, let alone determinative, whether any member of the Pre-Sale Class had actually commenced litigation based on the ISD against Old GM at the time of the Sale Hearing.[50]

New GM nevertheless wrongly suggests that members of the Pre-Sale Class had only "un-asserted" and "contingent" claims at the time of the Sale and thus were not "known" creditors entitled to direct notice.  Br. at 27-28.  In the Second Circuit, courts are clear that a contingent claim is one that "does not become an obligation until the occurrence of a future

---

[50]  Nor is New GM correct that Plaintiffs' claims are "contingent." Br. at 27-29.  Plaintiffs' successor liability claims arose from events that occurred prior to the sale—indeed, the ISD existed for over a decade prior to Old GM's bankruptcy, unbeknownst to all Plaintiffs although known to Old GM—and were not dependent on any later occurrence.  See In re Thomson McKinnon Secs. Inc., 130 B.R. 717, 720 (Bankr. S.D.N.Y. 1991) (holding that debtor's pre-petition obligation to deliver certain shares to creditor gave rise to liability that "was fixed, noncontingent and not disputed").  Plaintiffs' claims are therefore distinguishable from claims long recognized as contingent, such as contribution or indemnity claims.  See Agway, 313 B.R. at 39 (entity with unasserted contingent contribution and indemnity claim was not known creditor); In re Union Hosp. Ass'n of the Bronx, 226 B.R. 134, 139-40 (Bankr. S.D.N.Y. 1998) (in action seeking to file a late proof of claim for contribution and indemnity, court found that claims were too far removed from debtors' records; reasoning, *inter alia*, that the claims could only have been known to debtor if and when the claimants were ultimately adjudged liable in separate state court suits).

event," in contrast to a non-contingent claim, for which all events giving rise to liability for the debt have occurred.  In re R.H. Macy & Co., 283 B.R. 140, 146 (S.D.N.Y. 2002) (quoting Mazzeo v. United States (In re Mazzeo), 131 F.3d 295, 303 (2d Cir. 1997)).  For claims asserted in the Pre-Petition Action, the claimants' pre-petition injury was their purchase of a car containing the defect, giving rise to an immediate non-contingent claim.  See Factual Background, Section L.  Thus, Plaintiffs' claims can be distinguished from claims that arise only upon a future event, such as contribution and indemnity claims that arise only upon a primary judgment, and of which the debtor would have had no knowledge unless it was party to the primary suit.  See In re Agway, Inc., 313 B.R. at 36-37 (claim against debtor for contribution and indemnity against was "uncertain and speculative" where debtor was not party to primary suit).

New GM suggests that the court in Burton v. Chrysler Group, LLC (In re Old Carco LLC), 492 B.R. 392 (Bankr. S.D.N.Y. 2013) ("**Burton**") considered similar claims to Plaintiffs' and found them to be contingent and not "known" creditors.  See Br. at 30.  But the court in Burton had no occasion to consider whether the plaintiffs were known creditors, because the plaintiffs did not make such an argument, instead only arguing that they were *future* creditors as to whom no notice could be sufficient.  Id. at 402-03; see also *Plaintiffs' Opposition to Chrysler Group, LLC's Motion to Dismiss Second Amended Complaint* at 16-17, Burton v. Chrysler Grp., LLC (In re Old Carco LLC), No. 13-01109 (ECF No. 15), attached hereto as **Exhibit 7**.  The Burton court rejected the "future claims" characterization, noting that the defects had occurred pre-sale and the claims were therefore "*[a]t a minimum* contingent" (*i.e.*, claims for which some future contingency is in the plaintiffs reasonable contemplation)—and thus not truly future. Burton, 492 B.R. at 403 (emphasis supplied).  Indeed, elsewhere in the opinion, in concluding that direct independent claims against the successor failed on the merits (albeit properly

45

pleaded),[51] the court noted that the proximate cause for any injury occurred as a result of a pre-sale defect, thereby undercutting any argument that the claims were in fact contingent. Id. at 405 (characterizing the actions as seeking recovery for pre-sale design flaw because each plaintiff purchased a defective vehicle that "require[d] more servicing and was worth less money").[52]

Finally, New GM mischaracterizes the law when it suggests that contingent creditors are only known creditors if they have actually asserted claims. A debtor's due diligence in identifying claims and claimants includes "a reasonable search for contingent or unmatured claims." Drexel Burnham, 151 B.R. at 681. The cases New GM cites for its purported rule to the contrary stand instead for the unremarkable proposition—inapplicable here—that, where a debtor has no way to learn of a claim against it or the identity of the claimant, that claimant is not "known."[53]

---

[51]    As Plaintiffs demonstrate elsewhere in the brief, the court's focus on the substantive elements of the plaintiffs' claims was unnecessary and inappropriate for its analysis of the plaintiffs' direct claims, but it is useful in demonstrating the court's view of when the claims arose.

[52]    New GM's selective quoting of Burton to suggest that vehicle owners always know they have claims because vehicles often need to be repaired is incomplete and misleading. See Br. at 30. The full quote, following an explanation that, because of the multiple recalls, it was within the plaintiffs' contemplation that their vehicles would need to be repaired, reads: "*Anyone who owns a car contemplates that it will need to be repaired, particularly when, as here, Old Carco had already issued at least two and possibly three recall notices for the 'fuel spit back' problem for certain Durango and other Old Carco vehicles before the original purchasers bought their vehicles from Old Carco.*" Burton, 492 B.R. at 403 (emphasis added); see DPWN Holdings (USA), Inc. v. United Air Lines, Inc., 747 F.3d 145, 150 (2d Cir. 2014) (where claim against debtor was based on debtor's alleged violation of law, whether claimant in fact had knowledge of her claim at the time of a sale may be relevant to the due process inquiry).

[53]    See, e.g., In re New Century TRS Holdings, Inc., No. 07-10416, 2014 WL 842637, at *4-5 (Bankr. D. Del. Mar. 4, 2014), appeal pending No. 14-822 (D. Del. June 25, 2014) (putative creditor could not have been "known" as of the bar date because her claim first arose after the bar date had passed); In re XO Commc'ns, Inc., 301 B.R. 782, 794-95 (Bankr. S.D.N.Y. 2003) (holding that claimant that filed for bankruptcy after debtor had filed for bankruptcy and that asserted preference claim against debtor was not known creditor of debtor because debtor was not notified of claimant's bankruptcy filing and had no way of knowing claimant would pursue preference claim, and debtor and claimant's long-standing business relationship was not a sufficient basis to make claimant known creditor), aff'd, No. 04 Civ. 01489LAK, 2004 WL 2414815 (S.D.N.Y. June 14, 2004); Brooks Fashion Stores, Inc. v. Michigan Emp't Sec. Comm'n (In re Brooks Fashion Stores, Inc.), 124 B.R. 436, 444 (Bankr. S.D.N.Y. 1991) (holding that taxing authority was unknown creditor because taxing authority's claim was based on pre-petition taxes that the debtor had paid when due and debtor was not aware of any redetermination with respect to previously paid taxes);

46

Nor does <u>Morgenstein v. Motors Liquidation Co. (In re Motors Liquidation Co.)</u>, 462 B.R. 494 (Bankr. S.D.N.Y. 2012), support New GM's argument that a plaintiff's product liability claims are not ascertainable from Old GM's "books and records" and that such a plaintiff is not a "known creditor."  Br. at 27.  As the Court is well-aware, the plaintiff in <u>Morgenstein</u> *did not* challenge the adequacy of notice and the Court was not required to make any findings about whether the plaintiff's claims were ascertainable from Old GM's records.   Instead the Court dismissed the claim in <u>Morgenstein</u> because the plaintiff made only "conclusory statements," alleged without evidentiary facts, that the debtor knew about and fraudulently concealed the alleged defect, such that the allegations did not satisfy the Rule 9(b) pleading standard applicable to the plaintiff's fraud on the court action.  <u>See Morgenstein</u>, 462 B.R. at 506-08.  New GM's citation to <u>Morgenstein</u> in the due process context is therefore inapposite.  And, in any event, here even New GM has acknowledged Old GM's wrongful conduct, and commissioned a fact-finder (Mr. Valukas) to investigate the wrongdoing for purposes of ferreting out the truth, and making vastly-needed business and safety improvements.

## 2.    Agency Principles Confirm Old GM's Actual Knowledge.

Knowledge of the ISD was wide-reaching and extensive within Old GM, including among Old GM's counsel, management, and lead design engineers.  <u>See</u> Factual Background,

---

<u>Grant v. U.S. Home Corp. (In re U.S.H. Corp. of N.Y.)</u>, 223 B.R. 654, 660 (Bankr. S.D.N.Y. 1998) (holding that debtors could not have discovered plaintiffs' pre-petition claims arising from homes built by debtors because such claims were not based on the violation of a "standard or law which required [debtors] to build according to [applicable] standards," but rather were based only on debtors' failure to meet voluntary insurance industry guidelines for home construction); <u>accord</u> <u>Chemetron Corp. v. Jones</u>, 72 F.3d 341, 347-48 (3d Cir. 1995) (affirming district court finding that claimants were unknown creditors because title search of contaminated homes on which claims were based would not have revealed identity of vast majority of claimants, most of whom were only guests in the contaminated homes, and debtor had no other way of identifying, locating or providing actual notice to claimants), <u>cert. denied sub nom.</u> <u>Jones v. Chemetron Corp.</u>, 517 U.S. 1137 (1996); <u>Charter Crude Oil Co. v. Petroleos Mexicanos (In re Charter Co.)</u>, 125 B.R. 650, 655-57 (M.D. Fla. 1991) (reversing and remanding bankruptcy court's finding that claimant was a known creditor entitled to actual notice of bar date because bankruptcy court did not consider evidence that claimant had abandoned or resolved claim prior to debtors' bankruptcy filings, and abused discretion in not considering evidence showing that claimant's claim was not reasonably ascertainable).

Section F. Under agency principles of universal application,[54] the knowledge of these employees and counsel must be imputed to Old GM.[55]   Imputation of knowledge to the corporation is proper even if it is never communicated[56] and even if employees fail to properly report their knowledge to senior management because of negligence, omissions, or general organizational incompetence.[57]   Here, Old GM's counsel, management, lead engineers and other personnel acquired knowledge of the ISD while performing their duties, using systems and procedures that Old GM maintained to comply with its legal obligations and that gave Old GM the ability to identify the ISD.

New GM's suggestion that only a "limited" number of Old GM personnel were aware of the ISD is therefore wrong, as is any assertion that only Old GM's low- or mid-level employees knew of it.   And, in any event, an employee's position within the corporate hierarchy is

---

[54] Plaintiffs take no position as to which law will control on a choice of law analysis, but submit that the law on these issues is substantially the same across the law of Michigan (where Old GM was based), Delaware (where it was incorporated), and New York (most frequently analyzed in this District) and therefore discuss the law applicable in all jurisdictions.

[55] New York Marine & Gen. Ins. Co. v. Tradeline L.L.C., 266 F.3d 112, 122 (2d Cir. 2001); Allard v. Arthur Andersen & Co. (USA), 924 F. Supp. 488, 494-95 (S.D.N.Y. 1996) (applying New York and Michigan law to impute the knowledge and conduct of corporate officials acting within the scope of their employment); see also Link v. Wabash R.R. Co., 370 U.S. 626, 633-34 (1962) ("[E]ach party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.") (citation omitted), reh'g denied, 371 U.S. 873 (1962); Veal v. Geraci, 23 F.3d 722, 725 (2d Cir. 1994) ("[U]nder traditional principles of agency the attorney's knowledge must be imputed to [the client].").

[56] Kirschner v. KPMG LLP, 938 N.E.2d 941, 950-51 (N.Y. 2010) (applying legal presumption that agents communicate information to principals).

[57] In re Tex. E. Transmission Corp. PCB Contamination Ins. Coverage Litig., 870 F. Supp. 1293, 1325 n.41 (E.D. Pa. 1992) (finding that the ignorance of some employees will not be imputed to the corporate employer), aff'd, 15 F.3d 1249 (3d Cir. 1994); 3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 790 (1994) (noting that it has been widely held that a corporation is charged with imputed knowledge "even though the officer or agent does not in fact communicate the knowledge to the corporation"); Restatement (Third) of Agency § 5.03 cmt. b ("A principal may not rebut imputation of an agent's notice of a fact by establishing that the agent kept silent.").   Courts have imposed a conclusive presumption that the agent has discharged his duty to impart the principal with all his knowledge which is necessary for the principal's protection or guidance.   First Ala. Bank of Montgomery, N.A. v. First State Ins. Co., 899 F.2d 1045, 1061 n.8 (11th Cir. 1990) (citing Nat'l Union Fire Ins. Co. v. Lomax Johnson Ins. Agency, Inc., 496 So.2d 737, 739 (Ala. 1986)).   These legal presumptions are intended "to avoid the injustice which would result if the principal could have an agent conduct business for him and at the same time shield himself from the consequences which would ensue from knowledge of conditions or notice of the rights and interests of others had the principal transacted his own business in person."   Id.

irrelevant for purposes of imputation, so long as she obtained the knowledge while acting within

the scope of her authority.[58]   Further, a corporation is charged with the collective knowledge of

all of its employees even if no single individual possessed all of the relevant knowledge or was

individually responsible for acting on it.[59]   The Michigan Supreme Court applied this "imputed

collective knowledge" standard in Upjohn Co. v. New Hampshire Ins. Co., 476 N.W.2d 392

(Mich. 1991), reh'g denied, 503 N.W.2d 442 (Mich. 1991), where it considered an insurance

claim for damages from the continuous leaking of toxic materials from a corroded underground

storage tank, which was regularly monitored by the plaintiff corporation's employees.   Id. at

395-96.   The court held that information available to the corporation, "through its various

employees and through its records," permitted a finding that the corporation had expected the

leak, and *refused* to ignore knowledge obtained by individual employees, even if they could not

comprehend its full import.  Id. at 400-01.

>  **3.    Old GM Had Standard Procedures For
>          Effecting Recalls That Made The Identities And Mailing
>          Addresses Of Pre-Sale Class Members Reasonably Ascertainable.**

Regulations promulgated under NHTSA require manufacturers of motor vehicles to

provide notification regarding safety defects by first class mail to registered owners of vehicles

---

[58]   See Kellogg Brown & Root Servs., Inc. v. United States, 728 F.3d 1348, 1369-70 (Fed. Cir. 2013) (reversing holding that employees were insufficiently senior in the corporate hierarchy for their actions and knowledge to be imputed), cert. denied, 135 S. Ct. 167 (2014); Woods v. Maytag Co., 807 F. Supp. 2d 112, 126-27 (E.D.N.Y. 2011) (imputing authorized Maytag repairman's knowledge of oven's defects and of attempts to conceal the defects to Maytag, where repairmen obtained this knowledge in the course of repairing Maytag ovens).

[59]   See Copeman Labs. Co. v. Gen. Motors Corp., 36 F. Supp. 755, 762 (E.D. Mich. 1941) ("The knowledge possessed by a corporation about a particular thing is the sum total of all the knowledge which its officers and agents, who are authorized and charged with the doing of the particular thing acquire, while acting under and within the scope of their authority."); Albert v. Alex. Brown Mgmt. Servs., Inc., No. 762-N, 2005 Del. Ch. LEXIS 133, at *39 (Del. Ch. Aug. 26, 2005) ("Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal."); Restatement (Third) of Agency § 5.03 cmt. c. ("Organizations are treated as possessing the collective knowledge of their employees and other agents, when that knowledge is material to the agents' duties, however the organization may have configured itself or its internal practices for transmission of information.").

and, if the owner cannot be reasonably ascertained, to the most recent purchaser known to the manufacturer ascertainable through state records and other sources. <u>See</u> 49 C.F.R. § 577.7(a). On those occasions prior to the Sale when Old GM decided to recall vehicles, its ordinary practice and the method for doing so was to outsource the task of obtaining owner contact information to R.L. Polk and Company ("**R.L. Polk**"), a service provider. <u>See</u> New GM Stipulated Facts ¶ 18. Shortly before the Sale, in April 2009, Old GM sent registered letters informing owners/lessors of a recall of its model year 1997-2003 3.8 liter V6 engine Chevrolet, Buick, Oldsmobile, and Pontiac vehicles.[60] In keeping with Old GM's ordinary practice, New GM used registration information obtained through R.L. Polk to mail notice of the Ignition Switch Recall in 2014. <u>See</u> <u>Ignition Recall Safety Information: Frequently Asked Questions</u>, General Motors, http://www.gmignitionupdate.com/faq.html#L3 (last visited Dec. 10, 2014) ("The current owner information from your state vehicle registration will be used to mail out customer communication for the recall."). That Old GM had a legal obligation to notify owners of its vehicles of safety defects, that it had a system in place and always available to it that it had used to comply with this obligation, and that this system has even been used to notify owners of vehicles with this particular product defect—the ISD—should be conclusive of any possible dispute regarding whether the identities and addresses of owners of Defective Vehicles were discoverable to Old GM with reasonable diligence.[61] <u>See</u> <u>Mullane</u>, 339 U.S. at 319 (finding fact

---

[60] <u>See</u> Letter from George Person, Chief, Recall Management Division, NHTSA, to Gay P. Kent, Director, Product Investigations, General Motors Corp. (Apr. 10, 2009), <u>available at</u> http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/ download/ doc/ACM8195398/RCAK-07V589-4556.pdf/, attached to the Weisfelner Decl. as **Exhibit M**.

[61] Old GM was also required to notify lessees directly where its contracts with lessors so provided or where the relevant lessee information was registered with states. 49 C.F.R. § 577.7(a)(2)(i). For any remaining lessees, it was required to provide notice to their respective lessors. <u>See</u> 49 C.F.R. §§ 577.5(h), 577.7(a)(2)(iv).

that trust company gave direct notice to beneficiaries at the time of trust fund establishment to be "persuasive" of the absence of undue burden).

The availability of the recall system for notifying claimants of a defect makes this case distinct from the cases cited by New GM. For example, in Beeman v. BGI Creditors' Liquidating Trust (In re BGI, Inc.), 772 F.3d 102 (2d Cir. 2014), the Second Circuit ultimately affirmed the bankruptcy court's finding that holders of gift cards issued by the debtors were "unknown" creditors, because the debtor "'had no reasonable method' for ascertaining gift card holders' 'addresses or identifying information.'" Id. at 106 n.6 (quoting In re BGI, Inc., 476 B.R. 812, 824 (Bankr. S.D.N.Y. 2012), aff'd, 772 F.3d 102 (2d Cir. 2014)) (emphasis added). The company's purchaser database contained no information linking to specific gift cards purchased, the gift card database contained no information about purchasers, and neither was helpful, in any event, for identifying the ultimate recipients of gift cards. See In re BGI, Inc., 476 B.R. at 821-22. Here, in contrast, Old GM's recall system gave it access to registration information (including name and address) for owners or lessees of the Defective Vehicles, as well information regarding parts—including the faulty Ignition Switch—used in those Defective Vehicles.

Similarly, in In re New Century TRS Holdings, Inc., not only did the creditor's claim not arise until after the bar date, see 2014 WL 842637, at *4 (noting that, by the claimant's own declaration, her problem with her loans did not arise until months after the bar date had passed), but also nothing in the record suggested that her claim could have been discovered upon investigation. Id. at *5-6. Although, there the debtor had on file the names and addresses of its customers, and further had information about which loans had so-called "scratch-and-dent" or "kick-out" problems, assignment to those categories had no correlation to whether the party had

a claim against the debtor.  Id.  Here, Plaintiffs were not just undifferentiated "customers" who could potentially make general allegations against Old GM.  Rather, Old GM had established methods to determine the identities and addresses of persons who had vehicles with the defective Ignition Switch.  Nor could it be said that their identification as the owners of vehicles with an ISD would be uncorrelated to their claims.  The claims directly relate to the receipt of a vehicle with an ISD.

New GM is wrong and disingenuous in asserting that ascertaining the names and addresses of owners or lessees of defective cars would have entailed "a vast open-ended investigation."  See Br. at 28.  Old GM was (and New GM is) required by law to maintain an ability to notify vehicle owners/lessees of safety issues and recalls.  The procedures Old GM had in place to satisfy this obligation—and that New GM employed in 2014 to notify owners/lessees of the Ignition Switch Recalls—enabled Old GM to readily identify the names and mailing addresses of vehicle owners/lessees in order to provide them with notice of the Sale Motion.

## C.    GM Did Not Apprise Plaintiffs That Their Interests Could Be Affected By The Sale Order.

New GM makes no attempt to argue that anything less than direct notice can ever be sufficient notice for known creditors;[62] nor does it argue that Plaintiffs received direct notice.  Therefore, if this Court finds that the members of the Pre-Sale Class were known creditors, it follows that their due process rights were violated.  But even if, counter-factually, Old GM had been unable to provide direct notice, the constructive notice that Old GM provided was plainly

---

[62]  New GM does suggest that Old GM was not required to provide direct notice, even to known creditors whose interests would be extinguished by the order, because noticing all 70 million owners of GM vehicles would have been too expensive.  See Br. at 33-34.  But New GM cites no facts in the record (because none exit) to support the underlying assumption of its argument regarding costs (i.e., that every GM car owner would be entitled as known creditors to direct notice of the Sale Motion).  In any event, New GM significantly exaggerates the cost, as Plaintiffs nowhere allege that all 70 million GM vehicles on the road as of the Sale Order contained the ISD.

deficient to inform claimants such as those in the Pre-Sale Class that their rights could be affected by the Sale. Old GM never, either through direct notice or through publication notice, disclosed the existence of the ISD, identified the make or model numbers of the Defective Vehicles, or explained that economic loss or other injuries from the purchase of a Defective Vehicle could be substantively affected by entry of the Sale Order. Without this information, no reader of the publication notice that was actually provided by Old GM could possibly know that they even had a claim against Old GM, and thus publication notice was ineffective to inform Plaintiffs that their rights could be affected.[63]

The mere fact that notice was published will not make it adequate if the *persons to whom the notice is directed have no knowledge, or ability to understand, that they hold rights that are about to be taken away*. See Schroeder, 371 U.S. at 212-14; Covey, 351 U.S. at 144-47. Unsurprisingly, then, courts in this circuit and other circuits routinely hold that notice informing creditors that some claims may be barred will fall short of due process if it does not inform the creditors in question of their claims or potential claims. See, e.g., Manville IV, 600 F.3d at 158 (holding claimant could not be bound by bankruptcy court orders where, even with notice, "it could not have anticipated . . . that its . . . claims . . . would be enjoined"); Waterman Steamship Corp. v. Aguiar (In re Waterman S.S. Corp.), 141 B.R. 552, 558 (Bankr. S.D.N.Y. 1992) (finding notice ineffective if readers would not have known it affected their rights), aff'd in part, vacated

---

[63] The ability of Plaintiffs to determine, based on Old GM's publication notice, that they had claims that could have been affected by the 363 Sale is significantly different than the ability of those claimants who knew they had concrete interests in Old GM. For example, in this Court's discussion of the Robley matter, the Court was persuaded that the publication notice given was adequate as to Robley, because having received it, and having been injured while driving a GM car, he had clearly understood enough to show up in court to object to the Sale. See Robley Hr'g Tr. 61:5-13. The Court relied upon In re Savage Industries, Inc., 43 F.3d at 721, to conclude that publication notice was sufficient. See Robley Hr'g Tr. 60:8-61:4. However, in In re Savage Industries, Inc., the court had no occasion to address the quality of publication notice that would have been sufficient. Id. at 721-22. The case did not, therefore, suggest that the bare notice of proceedings would have been sufficient without facts indicating why the claimants would have had claims.

and remanded, 157 B.R. 220 (S.D.N.Y. 1993); Acevedo, 68 B.R. at 499 ("A creditor who is

notified of the bankruptcy but not of his claim is in the same position as a creditor who has

notice of his claim, but not of the bankruptcy."); see also Folger Adam Sec. Inc., 209 F.3d at 265

(even where creditor received notice of Section 363 sale motion, notice was constitutionally

insufficient where it failed to describe the interests that would be affected by the free and clear

sale).

The constructive notice provided by the debtor in Gabauer v. Chemtura Corp. (In re

Chemtura Corp.), 505 B.R. 427, 430 (S.D.N.Y. 2014) (Furman, J.), provides a textbook example

of what constitutionally adequate notice must contain in order to inform tort claimants, even

those whose identities are unknown, that their rights may be affected.  Chemtura had been a

manufacturer of diacetyl, a toxic chemical whose use may have resulted in injuries to, among

others, workers at particular, known facilities.  Id. at 428-29.  The debtor sent "site-specific"

publication notices targeted towards unknown creditors, published in the geographical locations

where exposure was most likely to have occurred, and explained not only that Chemtura had

manufactured diacetyl but that any person who had been exposed to the chemical "*may have a

claim under various legal theories for damages.*"  Id. at 431 (emphasis added).

In upholding the sufficiency of notice given by publication, the district court held that

potential future claimants "could have anticipated that their substantive rights might be affected

by the Bar Date and taken steps . . . to protect their rights."  See id.  Likewise in In re Tronox

Inc., the published bar date notice used to notify unknown claimants injured by exposure to a

toxin explained where such exposure could have occurred and further explained that anyone

injured from exposure, regardless of whether that exposure had become apparent, must file a

claim by the bar date.  See *Tronox's Motion for Entry of an Oder (A) Setting Bar Dates for*

*Filing Proofs of Claim, (B) Approving the Form and Manner for Filing Proofs of Claim and (C) Approving Notice Thereof* at Ex. E, Case No. 09-10156 (Bankr. S.D.N.Y. May 28, 2009) (ECF No. 399), as approved by the Court (ECF No. 466), attached hereto as **Exhibit 8**; accord *Notice and Motion for Approval of Proposed Publication Notice of Claims Bar Date and Publication Schedule and Request for Expedited Consideration* at Ex. A, In re Freedom Indus., Case No. 14-20017 (Bankr. S.D.W. Va. Jan. 17, 2014) (ECF No. 421) (bar date notice explained that Freedom Industries spilled chemicals into the Elk River on January 19, 2014, and provided: "*If you believe that you have a claim against Freedom resulting from the Chemical Spill . . . you must file [a] proof of claim.*") (emphasis added), attached hereto as **Exhibit 9**.

Here, in contrast, Old GM's published notices did not disclose that Old GM cars were affected by the ISD, nor did they identify the make or model number of the Defective Vehicles or explain that claims regarding economic loss or other injuries from purchase of a Defective Vehicle could be substantively affected by the Sale Order. As the Court of Appeals for the Tenth Circuit has explained: "When a party conceals the necessary facts upon which a claim is to be made, that party cannot benefit from publication by notice. *Due process does not allow a debtor who has actively concealed facts necessary to the presentation of certain claims to notify by publication those persons adversely affected by the active concealment.*" Tillman v. Camelot Music, Inc., 408 F.3d 1300, 1308 (10th Cir. 2005) (emphasis added). The notices were therefore insufficient to apprise members of the Pre-Sale Class of the substantive impact on their rights if the Sale was approved.

D.    **No Notice Could Be Sufficient To The Post-Sale Claimants As Unknown Creditors.**

The claims of the Post-Sale Class did not exist at the time of the Sale Hearing. From the vantage point of the date of the Sale Hearing, the identities of the members of the Post-Sale Class

were neither known nor ascertainable.  However, as of that date, it was certain that following the

Sale, Defective Vehicles would be purchased by members of the public at prices that did not

reflect the ISD.  Accordingly, on the day of the Sale Order, the unknown members of the Post-

Sale Class were "future claimants."  See Grumman, 467 B.R. at 703 (future claimants are holders

of "a claim against a purchaser that is based on pre-bankruptcy conduct of the debtor that did not

cause any harm to an identifiable claimant until after the bankruptcy closed.").  Because future

claimants cannot possibly be provided notice of a bankruptcy, "for due process reasons, ***their***

***claims cannot be discharged***" by an order of the bankruptcy court.  Id. at 707 (collecting cases

in support of same) (emphasis added); see also id. at 704-05 ("Generally, courts have held that

future claims cannot be considered 'claims' that are dealt with and discharged by a confirmation

plan.") (collecting cases in support of same).

Grumman is directly on point.  There, the bankruptcy court order approving a sale

included an injunction against tort claims brought against the purchaser ("**Purchaser**") based on

allegedly defective products manufactured and sold by the debtor ("**Seller**") prior to the sale,

including any claims based on theories of vicarious or successor liability.  Id.  at 697.  Post-sale,

the plaintiff was injured while driving a truck with the Seller's defective product parts, and

brought personal injury claims based on theories of state law successor liability against the

Purchaser.  It was not disputed that the plaintiff had not received notice of the sale.

The district court found that the sale order could not be enforced to enjoin plaintiff's

claims, reasoning that enforcing such an injunction against the plaintiff, whose identity was

unknown and unknowable at the time of the sale, would violate both bankruptcy procedure and

due process.  Id. at 696; see also Chateaugay Corp. v. LTV Corp. (In re Chateaugay Corp.), 944

F.2d  997, 1003 (2d Cir. 1991) (analyzing appropriate notice to be given to claimants who are not

only unidentified, but unidentifiable, and noting that "[t]o expect 'claims' to be filed by those who have not yet had any contact whatever with the tort-feasor has been characterized as 'absurd.'") (citations omitted). So too here. Because members of the Post Sale Class were future claimants, there was no way Old GM could have provided them with constitutionally adequate notice of the Sale Hearing and, therefore, the Sale Order cannot be enforced to bar their state law successor liability claims against New GM.[64]

New GM's contention that "a Plaintiff who purchased a used Old GM vehicle after the 363 Sale should not have any greater rights than the original owner of that vehicle," and thus that the Post-Sale Class assumed the Sale Order by "assignment," is without any merit. See Br. at 66 (citing In re Flanagan, 415 B.R. 29, 42 (D. Conn. 2009)). First, a member of the Post-Sale Class that purchased a used Old GM vehicle has the *same* rights against New GM as does a member of the Pre-Sale Class in that both have been injured by New GM's fraudulent conduct and violations of its legal obligations. Moreover, both have economic loss injuries relating to diminution of value and are entitled to other economic and injunctive remedies. New GM has cited *no authority* for the proposition that the rights of future claimants (such as members of the Post-Sale Class) are defined or circumscribed by claimants existing at the time of a Section 363 sale.[65] Flanagan, the sole case with which New GM attempts to support this proposition, is both

---

[64] New GM attempts to distinguish Grumman by pointing out that the Grumman plaintiff did not argue that she should have received notice of the 363 sale. That is no real distinction; the Post-Sale Class likewise does not argue they should have received notice of the 363 Sale. Indeed, because the members of the Post-Sale Class were future creditors, notice was impossible. New GM's "distinction" only underlines that Grumman is on all fours with respect to the rights of the Post-Sale Class.

[65] Elsewhere in its brief, see Br. at 48, New GM cites to Burton in support of the proposition it is permissible to bar the claims of persons who might be later injured as a result of the defect. Burton, 492 B.R. at 403. However, the Court's reasoning, which relied, in part, on the fact that both plaintiffs and their "predecessors" (*i.e.*, prior owners of the cars) had a pre-petition relationship with Old Carco is of no import here. See id. Rather, the Court's decision in Burton highlights the importance of a claimants' knowledge for due process purposes. See supra note 51. The plaintiffs in Burton are unlike Plaintiffs here, where both Plaintiffs and their predecessors had no knowledge of the ISD given Old and New GM's intentional cover-up of the defect.

57

legally and factually inapposite.  In <u>Flanagan</u>, applying the unremarkable and wholly distinct rule

that a trustee acting pursuant to 11 U.S.C. § 541 is subject to all of the same defenses as the

debtor pre-bankruptcy, the court held that the trustee's Section 541 claim to recover assets was

barred by *in pari delicto*.  <u>Flanagan</u>, 415 B.R. at 33-34.

Even if, arguendo, members of the Post-Sale Class are subject to the Sale Order to the

same extent as members of the Pre-Sale Class, this would be of no help to New GM.  The Sale

Order is not binding on the Pre-Sale Class.  <u>See</u> <u>infra</u> Sections I.B to I.C.[66]

## E.    In Addition To Being Legally Unsupportable, <br>New GM's Inevitability Argument Is Factually Unfounded.

Notwithstanding the total deprivation of Plaintiffs' successor liability claims without

notice, New GM argues that this deprivation is not a due process violation because, had Plaintiffs

had an opportunity to object to the Sale Order, they could not have succeeded.  Even crediting

New GM's argument that the inevitability of the result is somehow relevant to the due process

inquiry (which it is not; <u>see</u> <u>supra</u> Section I.A.4), here the result, if Plaintiffs had been properly

noticed and appeared, was far from inevitable.  The ISD has affected millions of cars and

constitutes a severe safety issue as to the operation of those cars.  The nation has now witnessed

the political, public relations and legal firestorm that has resulted from the long-overdue

disclosure of the ISD and the related revelations of Old GM and New GM misconduct.  New

GM's argument speculatively presumes that this Court would have written exactly the same

opinion in July of 2009 *even if* it had been aware of the ISD, the now well-documented campaign

to cover it up, and Old GM's abdication of its legal duties to owners and lessees of Defective

---

[66]    New GM acknowledges the converse is true.  <u>See</u> Br. at 66 (stating that "*if* the Sale Order and Injunction would have applied to the original owner who purchased the vehicle prior to the 363 Sale, it equally applies to the current owner who purchased the vehicle after the 363 Sale.") (emphasis added).

Vehicles.[67]    It also presumes that, despite the sheer numbers of citizens the ISD adversely

impacted, giving proper notice to such persons could only have resulted in either the

extinguishment of ISD-related economic claims or everyone simply throwing up their hands and

leaving Old GM to a liquidation.[68]    These two outcomes were, of course, not the only ones

possible or even probable in the counterfactual scenario of Old GM complying with its

obligations.  Based on what is now understood to have been a gross violation by Old GM of both

the law and the public trust, it is equally or even more likely that Old GM and Treasury—who,

New GM acknowledges, was the one to draw "the line in the sand"—would have chosen to deal

with objections from Plaintiffs in the same way it chose to deal with objections from consumer

safety groups, by adding Plaintiffs' claims to assumed liabilities.  In any event, New GM cannot

support its speculation as to the potential outcome had Old GM disclosed, on the eve of filing for

bankruptcy, that it had put millions of cars on the road with a known but hidden life-threatening

defect while failing to disclose that fact to those most affected by it.

    Nor does the fact that some consumer groups challenged the Sale Motion (with some

successfully persuading New GM to assume liabilities) mean that Pre-Sale Class members'

---

[67]  At the very least, Plaintiffs could have presented a compelling argument that New GM was not a "good faith purchaser" due to its knowledge of the ISD.  A determination of good faith not only considers whether the purchaser buys in good faith and for fair value, but also considers the integrity of the purchaser's conduct during the course of the sale proceeding.  In re Gucci, 126 F.3d 380, 390 (2d Cir. 1997).  This good-faith requirement prohibits fraudulent, collusive actions specifically intended to affect the sale price or outcome of the sale.  Id.  New GM's omissions with respect to the known ISD throughout preparation for and during the sale itself indicate a fraudulent action intended to affect the outcome of the sale—namely to avoid the significant liabilities arising from the ISD and prevent them from delaying or interfering with the sale.  Plaintiffs could have been expected to raise these issues at the Sale Hearing had the ISD been disclosed.

[68]  It is clear, for example, that the U.S. Treasury was kept entirely in the dark regarding the existence of the ISD and Old GM's "inexcusable" failure to disclose it.  In response to a question regarding what "went wrong in terms of the ignition switch recall, why it took so long," and whether there was "any hint of this at the Auto Taskforce that there was some problem like this looming," Harry Wilson, a key member of the Auto Task Force and U.S. Treasury official at the time of the 363 Sale, replied: "***Absolutely not.  Let's be very direct and clear about that.  We didn't know about anything like this.***" See The Brookings Inst., Recovery Road? An Assessment of the Auto Bailout and the State of U.S. Manufacturing – A Discussion with Chrysler Chairman and CEO Sergio Marchionne and Larry Summers Panel Tr. at 36 (May 21, 2014) (emphasis added), attached to the Weisfelner Decl. as **Exhibit N**.

constitutionally protected right to notice and an opportunity to be heard may be denied. Revealingly, New GM cites no legal authority for this proposition, and Plaintiffs are aware of none. Contrary to the implications of New GM's argument, the participation of another party in interest does obviate the need for the *claimant* to receive due process. See, e.g., Nelson v. Adams USA, Inc., 529 U.S. 460, 469-72 (2000) (failure to provide notice to civil defendant not excusable as harmless even where another party purportedly had the same claims and defenses as defendant); Molamphy v. Town of S. Pines, No. 02-00720, 2004 WL 419789, at *10 (M.D.N.C. Mar. 3, 2004) (criticizing the notion that due process defects are curable based on the participation of similarly situated parties as "encourag[ing] sloppy practices, the avoidance of which is the rationale behind requiring adequate notice in the first instance"). Indeed, basic principles of claim preclusion hold that a party with even a "similar" interest, where not a legal representative of the missing claimant,[69] cannot bind a missing claimant. See Ruiz v. Comm'r of Dep't of Transp. of City of New York, 679 F. Supp. 341, 348 (S.D.N.Y. 1988) ("Where the prior action is brought by individuals who purport to be members of a class sharing similar interests, but where the class is not certified, an adverse decision in the prior action will not preclude other individuals who were not personally involved in the prior action.").

---

[69] In the case of a confirmation order affecting the rights of "future claimants," some courts suggest that the due process rights of such future claimants can be satisfied through the participation of a "virtual representative"—but that representative must have an express or implied legal relationship with the future claimants and be accountable to those future claimants. See, e.g., In re Fairchild Aircraft Corp., 184 B.R. 910, 928-32 (Bankr. W.D. Tex. 1995), vacated on other grounds, 220 B.R. 909 (Bankr. W.D. Tex. 1998) (noting in *dicta* that bankruptcy court order may extend to future claims if a future claims representative had been appointed or other legal representative was appointed); Meza v. Gen. Battery Corp., 908 F.2d 1262, 1268-73 (5th Cir. 1990) (describing concepts of virtual representatives and adequate representatives, and finding union did not adequately represent interests of union members). Plaintiffs in the Pre-Sale Class were known creditors, not future claimants, and this line of cases is inapplicable to them. In any event, the parties that appeared certainly had no express or implied legal relationship with Plaintiffs, whether Pre-Sale or Post-Sale Class members.

II.     **Remedies Threshold Issue.**

    A.     **This Court Should Deny The Motions To Enforce The Sale Order,
As They Purport To Deprive Plaintiffs of Property Without Due Process.**

A party "is not bound by a judgment *in personam* in a litigation in which he is not

designated as a party or to which he has not been made a party by service of process." Richards

v. Jefferson Co., 517 U.S. 793, 798 (1996).  Thus, in bankruptcy proceedings, a creditor's claim

cannot be barred by a discharge and plan injunction where the creditor received inadequate

notice under due process standards.[70]  See DPWN Holdings (USA), Inc., 747 F.3d at 150-53

(holding that "[a] claim cannot be discharged if the claimant is denied due process because of

lack of adequate notice," remanding motion to dismiss post-confirmation complaint for

determination of due process facts, and stating that a creditor was not required to seek relief from

confirmation order to proceed with claim); see also Arch Wireless v. Nationwide Paging, Inc. (In

re Arch Wireless), 534 F.3d 76, 87 (1st Cir. 2008) (dismissing debtor's motion for contempt

against creditor for bringing post-confirmation complaint, and holding that the plan confirmation

order's discharge injunction could not extinguish claims for acts or omissions occurring prior to

the confirmation date where creditor received inadequate notice of the bankruptcy proceedings);

Waterman S.S. Corp. v. Aguiar (In re Waterman S.S. Corp.), 157 B.R. 220, 222 (S.D.N.Y. 1993)

(in debtor's action to enjoin commencement of post-confirmation complaint against the debtor

for pre-petition claims, holding that discharge order and injunction could not be enforced against

known asbestosis claimants who received inadequate notice of the bar date).

---

[70]  The Second Circuit has also applied this rule to the releases of claims against third parties in settlements.  See
Manville IV, 600 F.3d at 158 (holding settlement order barring claims against the debtor's insurance carriers was
unenforceable against a non-settling insurer that sought to assert a claim for indemnity and contribution against a
settling insurer).

This approach must apply to New GM's Motions to enforce the Sale Order against Plaintiffs who did not receive adequate notice.  Where purchasers seek to enforce Section 363 orders against persons who did not receive adequate notice consistent with due process, lower courts—including in this district—simply deny the purchasers their requested relief and refuse to enforce the Section 363 sale order as to the objecting claimant who did not receive due process.

The Second Circuit recently recognized this principle in the case of Koepp v. Holland, 2014 U.S. App. LEXIS 22108, at *5, holding (although in the context of a transfer of assets in a reorganization) that "[b]ankruptcy courts cannot extinguish the interests of parties who lacked notice of or did not participate in the proceedings."  Id. (emphasis added).  There, the Second Circuit affirmed the district court's finding that an order that purported to vest certain real property in a reorganized railroad free and clear of interests could not operate to extinguish plaintiffs' predecessor-in-interest's easements on land belonging to the railroad where there was no evidence that the predecessor-in-interest received notice of the bankruptcy.  See id. at *5-7. The Second Circuit relied on the generally accepted principles provided by it in Manville IV, 600 F.3d at 153-54, as well as upon the decision of the district court in Grumman, 467 B.R. at 706, for its conclusion that a creditor who does not receive notice of bankruptcy proceedings cannot be bound by a judgment entered by the court that purports to extinguish its claims.  Koepp, 2014 U.S. App. LEXIS 22108, at *5-6.

In Grumman, the district court dismissed an action brought by a purchaser to enforce a 363 sale order and injunction barring personal injury claims against a claimant who had not received adequate notice.  467 B.R. at 696.  The district court first observed that "the Second Circuit [has] rejected the argument that bankruptcy provides a special 'remedial scheme' that creates an exception to the 'principle of general application in Anglo-American jurisprudence

62

that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process."  Id. at 706 (further reasoning that even the "special remedial scheme" afforded by bankruptcy proceedings can only extinguish creditors' rights "if the scheme is otherwise consistent with due process") (quoting Manville IV, 600 F.3d at 153-54).  As a result, the district court concluded that "the Sale Order [could not] be enforced in [a] manner" to prevent the claimants "from even bringing suit in the first place" because they were denied adequate notice of the proceedings and thus could not be bound by the order's terms.  Id. at 709.

Courts around the country have come to the same conclusion.  For example, in In re Savage Industries, Inc., 43 F.3d at 722, the First Circuit held that the bankruptcy court had improperly granted a purchaser's request to enjoin a state law successor liability suit brought by a creditor who had not received notice of a Section 363 sale purportedly barring those claims. The court held that, regardless of whether the creditors' state successor liability claims constituted an "interest" in the debtor for purposes of a Section 363 sale, such an interest could only be "extinguishable under section 363(f) 'after notice and hearing.'"  Id. at 721 (quoting 11 U.S.C. § 102(1)).  As a result, the court reasoned that there could "be no question that [the creditors'] claim could not be extinguished absent a showing that [the creditor] was afforded appropriate notice in the particular circumstances."  Id. at 721.  In finding that "it was never determined 'appropriate in the particular circumstances' for [the] Debtor . . . and [the successor] to dispense with all notice and opportunity to be heard on the part of potential claimants," the court held that "it would border on the bizarre to conclude that the third-party complaint [alleging successor liability claims] . . . threatened disruption to any legitimate function served by the Bankruptcy Code priority scheme."  Id. at 722.

Similarly, in <u>Schwinn Cycling & Fitness Inc. v. Benonis</u>, 217 B.R. 790 (N.D. Ill. 1997),

the district court held that the bankruptcy court had properly dismissed an action brought by a

purchaser to enforce a Section 363 sale order against claimants who had no notice of the sale or

bankruptcy.  <u>Id.</u> at 797.  Again, the district court concluded that enjoining the claimants' claims

against the purchaser as the purchaser requested would itself effectively violate their rights to

due process.  <u>Id.</u> ("[The purchaser's] attempt to enjoin the [claimants'] state court action would,

in effect, deny them of their rights to due process."); <u>see also</u> <u>In re Reinert</u>, 467 B.R. at 832

(dismissing action by purchaser to enforce sale order against creditor who received insufficient

notice, and holding that, *inter alia*, because creditor had received insufficient notice he was not

bound by its terms).

### B.    No Rule Or Standard Prohibits This Court's Denial Of The Motions.

Ignoring the ample precedent for this Court to refuse to enforce the Sale Order against

persons who received no constitutionally sufficient notice, New GM suggests that Plaintiffs are

asking this Court to revoke the Sale Order under Rule 60(b)(4), and then throws up a variety of

purported obstacles to Rule 60(b)(4) relief that they say Plaintiffs cannot satisfy.[71]  Some courts

do address the question of enforceability of a Section 363 sale order issued without notice by

applying Rule 60(b)(4).  But in contrast to those cases, in which lienholders typically seek to

reinstate liens or other property rights extinguished by a Section 363(f) order because non-

enforcement of the sale order cannot grant complete relief, <u>see, e.g.</u>, <u>In re Ex-Cel Concrete Co.</u>,

---

[71]  Contrary to New GM's arguments, in which it cites only cases applying *other* subsections of Rule 60(b), <u>see</u> Br. at 23-24, the standards for relief from judgment under Rule 60(b)(4) for a due process violation are in any event substantially identical to those applicable here: a finding of a due process violation requires relief from the judgment.  <u>See</u> <u>Cent. Vt. Pub. Corp. v. Herbert</u>, 341 F.3d 186, 189 (2d Cir. 2003) (a court has no discretion to deny a Rule 60(b)(4) motion if the court finds a due process violation); <u>see also</u> <u>Grace v. Bank Leumi Trust Co. of N.Y.</u>, 443 F.3d 180, 193 (2d Cir. 2006) (relief from judgment proper under Rule 60(b)(4) where judgment entered "in a manner inconsistent with due process of law").

178 B.R. at 205 (affirming Rule 60(b)(4) relief from sale extinguishing lien without due process),[72] here the Court can grant complete relief by simply refusing to enforce the Sale Order against Plaintiffs and resort to Rule 60(b)(4) is unnecessary.[73]  The only remedy required for the violation of Plaintiffs' due process rights is to deny New GM's Motions to enforce—a remedy that does not require revoking or even partially revoking the Sale Order.

Nor should this Court credit New GM's argument that this Court should craft a "remedy against Old GM" instead of simply refusing to enforce the Sale Order against Plaintiffs.  New GM cites scant authority in support of this final approach, which it claims is the only proper one; and in the decisions they do cite, see Br. at 56-57, the courts found no due process violation, making the decisions oddly incongruous on the issue of the appropriate remedy for the violation of Plaintiffs' rights.  For example, Austin v. BFW Liquidation, LLC (In re BFW Liquidation, LLC), 471 B.R. 652, 669 (Bankr. N.D. Ala. 2012), did not involve the enforcement of an order extinguishing claims or interests against one whose interest was extinguished but instead

---

[72] See also Compak Cos., LLC, 415 B.R. at 343 (voiding sale order to the extent it extinguished defendants' patent license); Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.), 73 B.R. 616, 621 (Bankr. E.D. Pa. 1987) (court granted relief and allowed lienholder who did not receive adequate notice of sale to choose between voiding the sale and restoring all parties to status quo, or allowing sale to go through and attempt to attach lien to proceeds).

[73] The Seventh Circuit illustrated this distinction in a pair of decisions addressing Section 363 "free and clear" sales that extinguish, on the one hand a lienholder's interest, and on the other hand a successor liability claimant's interest.  Compare In re Edwards, 962 F.2d at 643 (a lienholder's interest that was purportedly extinguished under a sale order entered without notice could only be reinstated through voiding the part of the sale order that affected the lien), with Zerand-Bernal Grp., Inc. v. Cox, 23 F.3d 159, 164 (7th Cir. 1994) (a due process violation against a claimant with a successor liability claim that was purportedly barred under a sale order could be remedied by refusing to enforce the sale order as to that claimant on jurisdictional grounds).  The difference therefore is the nature of the interest that must be protected and the violation that must be remedied: a lienholder's interest is in the finite value of its lien which must be reinstated once an order entered without due process extinguishes it; whereas a claim for successor liability is less tangible and can be protected so long as the order purporting to extinguish the claim is not imposed without proper jurisdiction.  See Zerand-Bernal Grp., 23 F.3d at 163 (holding that the claimants' successor liability claims could not be enjoined, despite a sale pursuant to Section 363(f), on basis that, inter alia, claimants were not attempting to enforce a lien and had not been afforded "a chance to obtain a legal remedy against the predecessor [entity]").  Although some courts in the Second Circuit have reached a different conclusion regarding bankruptcy courts' subject matter jurisdiction to enjoin successor liability claims following a Section 363 sale, the distinction between the proper remedy for due process violations against in personam claims and liens stands.  See Back v. LTV Corp. (In re Chateaugay Corp.), 213 B.R. 633, 637-38 (S.D.N.Y. 1997).

concerned a complaint to set aside a sale order pursuant to Rule 60(b) of the Federal Rules of

Civil Procedure for failure to provide Rule 2002 notice to creditors.  Id.  The sale at issue in

BFW was not a sale "free and clear" of liens and interests under Section 363(f), and thus did not

implicate the due process standards derived from Mullane that are applicable when a bankruptcy

proceeding deprives a creditor of an interest in property such as a lien or successor liability

claim.  Id. at 670 (discussing relief from sale order under Rule 60(b)(6)).  Unsurprisingly then,

the court did not even cite, let alone discuss, the standards for determining a due process

violation.[74]  Id.  And, in any event, the claimant there was not even a known creditor at the time

of the sale and, thus, would not have been entitled to direct notice even if the court had applied

due process standards:  "It is not credible to suggest that [the debtor], under the scenario outlined

in the plaintiff's complaint, knew or should have known, either when it filed its case, or when it

formulated its creditor matrix, or when it noticed the sale, or when the sale took place, that the

plaintiff had acquired or would acquire a cause of action against it."  Id. at 672.  The court never

reached the appropriate remedy for a due process violation, because it did not find any had

occurred.[75]

---

[74]  In any event, and in contrast to a violation of the due process rights of individual interest holders whose interests
are extinguished by Section 363(f), which may be remedied through simple non-enforcement of the sale order, a
complete failure to provide notice or a hearing under Section 363(b) requires different relief.  See Cedar Tide Corp.
v. Chandler's Cove Inn, Ltd. (In re Cedar Tide Corp.), 859 F.2d 1127, 1133 (2d Cir. 1988) (affirming nullification of
sale that failed to comply with notice and hearing requirements of § 363(b)), cert. denied, 490 U.S. 1035 (1989);
McTigue v. Am. Sav. & Loan Ass'n of Fla. (In re First Baptist Church), 564 F.2d 677, 679 (5th Cir. 1977) (noting in
dicta that a sale may be set aside for failure to provide notice under § 363(b)).

[75]  The remaining cases New GM cites likewise did not purport to craft a different remedy for a due process
violation, as they did not find a due process violation at all.  See MacArthur Co. v. Johns-Manville Corp. (In re
Johns-Manville Corp.), 837 F.2d 89, 91, 94 (2d Cir. 1988) (finding no due process violation where objecting creditor
was given direct notice of settlement and actually appeared and objected), cert. denied, 488 U.S. 868 (1988); In re
Edwards, 962 F.2d at 645 (finding no violation of due process and noting "although unnecessarily" that the lack of
notice in that case "appear[ed] to work no great hardship" because lienholder would also have a claim against the
estate); Molla v. Adamar of N.J., Inc., No. 11-6470 (JBS/KMW), 2014 WL 2114848, at *4 (D.N.J. May 21, 2014)
(applying state substantive law to find no successor liability because purchaser of assets did "not expressly or
impliedly assume [predecessor's] liability for personal injury claims; there is no actual or de facto consolidation or
merger of the companies; [successor] is not a 'mere continuation' of [predecessor]; and the purchase was not

### C.    Principles Of Bankruptcy Policy Do Not Warrant A Different Result.

New GM is left relying on a purported public policy that protects the finality of sales that New GM argues should require enforcement of the Sale Order notwithstanding the due process violation. For the reasons argued supra, the better view, expressed by the majority of courts and supported by the Supreme Court precedent collected herein, is that due process concerns should not yield to other "considerations, such as the exigent needs of the bankruptcy system or the innocence or good faith of third parties involved in bankruptcy sales." In re Ex-Cel Concrete Co., 178 B.R. at 205; see supra Section I.A.3.

Moreover, New GM's concern that this Court's refusal to enforce the Sale Order against Plaintiffs would interfere with the Bankruptcy Code's interest in the finality of Section 363 sales is overblown. State law successor liability theory recognizes the interest in finality of asset sales, and for that reason finds successor liability appropriate only in limited circumstances. Plaintiffs believe those circumstances are present here, whereas New GM does not. But the proper place for these arguments of state law successor liability is not here but before the district court adjudicating Plaintiffs' Consolidated Complaints in the MDL Proceeding or the state courts adjudicating the relevant state law complaints. This principle is confirmed by the very decisions New GM cites as bolstering its finality point, as they determined, *on the merits*, that state law successor liability did not attach. For example, in Douglas v. Stamco, 363 F. App'x 100, 102-03 (2d Cir. 2010), the Second Circuit held that a successor entity was not subject to successor liability claims following a Section 363 sale. Id. However, Douglas did not involve any disputes

---

undertaken fraudulently to avoid liability," and in *dicta* refusing to recognize that due process principles prohibited sale without notice); see also Conway v. White Trucks, A Div. of White Motor Corp., 885 F.2d 90, 93-96 (3d Cir. 1989) (applying requirement of applicable substantive state successor liability law that claimant have no available remedy against predecessor, and holding that remedy against predecessor was available, notwithstanding lack of notice of bar date, because claimant could allege due process violation and seek to file late claim).

over proper notice or due process violations. Instead, the court's reasoning relied heavily on the state law doctrine of successor liability, and the finality of Section 363 sales arose only in the public policy balancing required for the on-the-merits state law successor liability analysis. Id. In fact, the court based its decision on the fact that the "plaintiff [was] unable to substantiate a claim for successor liability under New York law," not whether successor liability claims *per se* survived a Section 363 sale. Id. at 103. See also Doktor v. Werner Co., 762 F. Supp. 2d 494, 498-99 (E.D.N.Y. 2011) (in case with no alleged due process violations, holding that purchaser's acquisition of assets through bankruptcy proceeding "raise[d] a policy matter that strengthen[ed] the court's conclusion" that, on the merits, facts did not support state law successor liability).[76]

Finally, GM attempts to rely on the protections of Section 363(m) of the Bankruptcy Code, claiming that New GM is a good faith purchaser, and that Section 363(m) provides that the terms of the 363 Sale may not now be modified. Br. at 54. However, Section 363(m) expressly provides that the "reversal or modification *on appeal*" of a sale order does not affect the validity of the sale, and here, the Plaintiffs do not seek reversal or modification and do not appeal the Sale Order. Instead, lacking notice and an opportunity to be heard, the Plaintiffs are not bound by the Sale Order and are free to pursue their state law claims against New GM. See supra

---

[76] New GM also relies heavily upon the decisions in prior appeals or adversary proceedings stemming from the sale of Old GM to New GM. See Br. at 24-25. These decisions are not "law of the case" and are, in any event, distinguishable. The law of the case doctrine applies within the confines of one action only and does not apply to new proceedings. See Johnson v. Holder, 564 F.3d 95, 99 (2d Cir. 2009) ("The law of the case doctrine commands that 'when a court has ruled on an issue, that decision should generally be adhered to by that court *in subsequent stages **in the same case**.'") (emphasis added) (citation omitted), cert. denied, 560 U.S. 919 (2010). And even so, this Court's reasoning in Campbell and Parker did not concern the same policy issues because no due process violations were found in either case. See, e.g., Campbell, 428 B.R. at 52 (appeal of sale order challenged sale of assets to New GM free and clear of certain product liability claims without raising any due process violations); Parker, 430 B.R. at 73, 97-99 (in appeal of sale order challenging proposed transaction as "*sub rosa*" plan of reorganization based upon, *inter alia*, treatment of certain bondholders, finding that expedited sale hearings did not violate due process). The same is true for Volvo White Truck Corp. v. Chambersburg Beverage (In re White Motor Credit Corp.), 75 B.R. 944 (Bankr. N.D. Ohio 1987), in which the court found no violation of due process because the claimants had no specific interest in the property being sold and were not known claimants on the date of sale. Id. at 949-50.

Section I.A.   Accordingly, Section 363(m) is inapplicable, and New GM's reliance on it is misplaced.  See In re Polycel Liquidation, Inc., 2006 WL 4452982, at *9 (finding that Rule 60(b) motion for relief from an order was not an appeal of the order and as such, limitations of Section 363(m) were not applicable); Tri-Cran, Inc. v. Fallon (In re Tri-Cran, Inc.), 98 B.R. 609, 618 (Bankr. D. Mass. 1989) (finding Section 363(m) inapplicable where matter was not an appeal, but a motion to set aside sale filed pursuant to Rule 60(b)).[77]

### III.   Old GM Claim Threshold Issue: The Consolidated Complaints Assert Claims That Are Based On New GM's Post-Sale Conduct And Not Subject To The Sale Order.

As a preliminary matter, there can be no dispute that the Sale Order does not enjoin claims asserted by Plaintiffs, including as many as twenty-nine named class representatives suing on behalf of millions of other consumers, who purchased vehicles manufactured by New GM.[78] In fact, New GM concedes that claims involving vehicles that it manufactured are not covered by the Sale Order.   See May 2, 2014 Status Conference Hr'g Tr. 36:24-37:4, Groman v. Gen. Motors LLC, Adv. Pro. No. 14-01929 (REG) (Bankr. S.D.N.Y. 2014).[79]   New GM's liability, however, is not limited to claims asserted by Plaintiffs who purchased cars manufactured by New GM post-Sale.   Indeed, with the exception of claims expressly predicated on successor

---

[77]   Even as to appeals, New GM's claim under Section 363(m) that "any argument seeking to undo the Sale now would be equitably moot," see Br. at 54, would be incorrect, as even equitable mootness cannot justify a due process violation.   See, e.g., Campbell, 428 B.R. at 57 n.18 (noting in dicta that "due process concerns render[] mootness and res judicata doctrines inapplicable" by comparing an appeal from the Sale Order, which raised no due process issues, with Manville IV, 600 F.3d at 158, where the claimant "lacked adequate notice of the underlying channeling [injunction] and settlement orders"); IRS v. Moberg Trucking, Inc. (In re Moberg Trucking, Inc.), 112 B.R. 362, 363 (B.A.P. 9th Cir. 1990) (finding "[Section] 363(m) mootness is not applicable when the Appellant seeks to attack the § 363 sale of estate property on the grounds of improper notice").

[78]   At least nine class representatives bought cars manufactured by New GM.   In addition, thirteen class representatives own Model Year 2010 vehicles, and seven own Model Year 2009 vehicles, some or all of which may have been manufactured by New GM.   See Post-Sale Compl. ¶¶ 31, 33-35, 42, 44, 47, 48, 50, 61-62, 66, 68, 70-72, 87-88.

[79]   Attached hereto as **Exhibit 10**.

liability asserted by members of the Pre-Sale Class, each claim asserted in the Consolidated Complaints is based on New GM's own, independent failure to fulfill the duties imposed on it by law. See Post-Sale Compl. ¶¶ 864-3200; Pre-Sale Compl. ¶¶ 815; 847-2854. In addition to the successor liability claims against New GM asserted by members of the Pre-Sale Class, Plaintiffs (on behalf of both the Pre-Sale and Post-Sale Classes) assert direct causes of action against New GM for: (i) violation of state law consumer protection statutes; (ii) fraudulent concealment; and (iii) unjust enrichment. Members of the Post-Sale Class who purchased vehicles from New GM also assert causes of action for: (i) violation of the Magnuson-Moss Warranty Act; (ii) breach of the implied warranty of merchantability; and (iii) negligence.

Even if the Sale Order were enforceable against Plaintiffs—and it is not, for the reasons described supra—the Sale Order cannot bar those claims based on New GM's post-Sale conduct for the independent reasons that this Court lacked jurisdiction to enjoin them in the Sale Order and that, in any event, the Sale Order does not apply by its terms to bar them.

**A.  The Bankruptcy Court Lacked Jurisdiction To Enjoin Future Claims Against New GM Arising Out Of Post-Sale Violations Of New GM's Independent Legal Duties.**

Assuming that the Sale Order was even directed at the claims against New GM for its own conduct (and it was not, see infra), such an injunction would extend beyond the jurisdiction of the bankruptcy court. Subject matter jurisdiction in a bankruptcy proceeding over third-party claims (such as the non-derivative claims of the Post-Sale Class) can extend only to actions affecting the res of the bankruptcy estate. Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.), 517 F.3d 52, 66-68 (2d Cir. 2008) (holding that, despite a "common nucleus of operative facts involving" the debtor and the insurer, bankruptcy order enjoining third-party claims against insurers predicated on insurer's independent misconduct were

unrelated to *res* of the estate and outside the scope of the bankruptcy court's injunction power);[80]

see also Pfizer Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co., Inc.), 676 F.3d 45,

61-62 (2d Cir. 2012) (bankruptcy court lacks jurisdiction to enjoin a claim against a third party

where such claim would not have an effect on the *res* of the bankruptcy estate), cert. denied, 133

S. Ct. 2849 (2013).   That a broad injunction against future claims against a purchaser might

result in a buyer paying a higher price for assets in a Section 363 sale is pure speculation, and in

any event cannot confer jurisdiction over future claims against the purchaser arising from its

independent misconduct.   See Zerand-Bernal Grp., 23 F.3d at 164 (rejecting the argument that

bankruptcy courts may immunize a purchaser from state or federal law in the interests of

increasing the value of a debtor's assets.)

### B.   This Court's Prior Decisions Do Not Shield New GM From Liability For Its Own Conduct.

According to New GM, this Court's prior rulings constrain it to treat Plaintiffs' claims as

liabilities retained by Old GM pursuant to the Sale Order (the "**Retained Liabilities**"), and not

liabilities that New GM agreed to assume (the "**Assumed Liabilities**").   See Br. at 58-60.   In

support, New GM principally relies on Castillo v. General Motors LLC (In re Motors

Liquidation Co.), Adv. Proc. No. 09-00509 (REG), 2012 WL 1339496 (Bankr. S.D.N.Y. Apr.

17, 2012), and Trusky v. General Motors LLC (In re Motors Liquidation Co.), Adv. Pro. No. 12–

09803, 2013 WL 620281 (Bankr. S.D.N.Y. Feb. 19, 2013).   See Br. at 61-62.   But nothing in

these decisions, let alone in the Sale Order, grants New GM immunity for a third category of

liabilities—those incurred by New GM post-Sale through its own wrongful post-Sale conduct.

---

[80]   Following a reversal on other grounds, the Second Circuit adopted this holding with the condition that only a party who was not present or represented at the hearing leading to entry of the injunction could collaterally attack the bankruptcy court's jurisdiction.   See Manville IV, 600 F.3d at 153.   As noted above, supra Section I, Plaintiffs did not have proper notice and were not present at the hearings leading to the Sale Order, so they satisfy this condition and may collaterally attack the jurisdictional basis for the order.

In Castillo, plaintiffs sought to hold New GM liable for a pre-petition settlement agreement under which Old GM agreed to pay for vehicle repairs, arguing that these repairs were an Assumed Liability because they arose under express written warranties. See Castillo, 2012 WL 1339496, at *3. The Castillo plaintiffs' argument failed because their warranties had expired. Id. at *10. Nonetheless, New GM cites Castillo for the proposition that "it was the intent and structure of the 363 Sale . . . that New GM would start business with as few legacy liabilities as possible . . . ." See Br. at 61 (quoting Castillo, 2012 WL 1339496 at *3). This intent, however, is not undermined by Plaintiffs' claims, which implicate New GM's independent liability arising post-Sale—not Old GM's legacy liabilities.

Likewise, in Trusky, plaintiffs sought to impose liability on New GM for certain product defects based on New GM's assumption of Old GM's obligations under the Glove Box Warranty. See Trusky, 2013 WL 620281, at *6-9. The Court held that New GM was liable under the warranty for claims based on defective workmanship and faulty materials, but that claims based on design defects were outside the scope of the assumed warranty obligations. The Court left it for the district judge to determine whether the claims were based on design defects or defective workmanship. See id. at *6 n.3. Here, Trusky is inapposite because the Plaintiffs do not seek to enforce warranty obligations assumed under the Sale Order.[81]

## C.   Plaintiffs Assert Direct Claims Based On New GM's Conduct.

New GM contends that Plaintiffs on behalf of the Pre-Sale Class and the Post-Sale Class assert disguised and improper successor liability claims to the extent that with respect to any such claim (i) "an Old GM vehicle is implicated," and (ii) "the claim is not an Assumed

---

[81] New GM's harangue that the Consolidated Complaints are "littered with allegations" about the conduct of Old GM is irrelevant. Old GM's conduct is referenced: (i) to establish New GM's knowledge of the ISD based on the continuity of employees; and (ii) in connection with successor liability claims asserted by Pre-Sale Class plaintiffs.

Liability." See Br. at 66.  New GM's argument is grounded on the incorrect supposition that neither the statutory nor common law of the fifty states, nor federal law, imposes independent duties on New GM vis-à-vis owners or lessees of vehicles that it did not manufacture.  See id. at 8.  In fact, Plaintiffs' claims for violations of consumer protection statutes, fraudulent concealment, and unjust enrichment arise out of New GM's own post-Sale misconduct in violation of its independent duties—not Old GM's manufacture of defective vehicles—and are thus not barred by the Sale Order.[82]  Further still, Plaintiffs received no notice of the Sale Order and are thus not bound by its terms.   Yet, even if constitutionally adequate notice had been provided to Plaintiffs (which it was not), the Sale Order is still inapplicable to the direct claims arising exclusively from New GM's conduct

For example, the Consolidated Complaints allege that New GM caused injury to Plaintiffs by violating its independent obligations under consumer protection statutes designed to safeguard the public from fraudulent practices in commerce.  Liability under these statutes is not limited to defendants who sell products to plaintiffs.   Rather, these statutes are broadly construed, and defendants are liable thereunder if: (i) they engaged in a deceptive act or practice that is likely to mislead a reasonable consumer; (ii) in connection with trade or commerce; (iii) the deception directly and proximately caused the plaintiffs' injury; and (iv) the plaintiffs suffered ascertainable loss.   See, e.g., Valley Forge Towers S. Condo. v. Ron-Ike Foam

---

[82]  The other claims in the Post-Sale Complaint—for violations of the Magnuson-Moss Warranty Act, breach of implied warranty, and negligence—are each brought only on behalf of purchasers and lessees of vehicles sold or leased as new vehicles by New GM, namely, members of the Ignition Switch Defect Subclass.  See Post-Sale Compl. ¶¶ 885 (Magnuson-Moss); 902 (Implied Warranty); 908 (Negligence).  Even New GM concedes that these claims will go forward without impediment from the Sale Order with respect to claims relating to vehicles manufactured by New GM.

Insulators, Inc., 574 A.2d 641, 645 (Pa. Super. Ct. 1990), aff'd, 605 A.2d 798 (Pa. 1992); Inkel

v. Pride Chevrolet-Pontiac, 945 A.2d 855, 858-59 (Vt. 2008).[83]

The Consolidated Complaints state viable, direct claims against New GM for violating

consumer protection statutes by engaging in deceptive post-sale conduct that misled consumers

and caused damage to Plaintiffs.  Among other things, the Consolidated Complaints allege that

New GM publicly touted its commitment to safety and product quality, including in advertising

campaigns (see Post-Sale Compl. ¶¶ 98-149; Pre-Sale Compl. ¶¶ 419-71), while simultaneously

failing to address the safety defects that New GM knew plagued GM-Branded Vehicles.

Plaintiffs were injured insofar as they overpaid for (or retained) unsafe GM-Branded Vehicles

(see Post-Sale Compl. ¶¶ 13, 193, 205, 209-92; Pre-Sale Compl. ¶¶ 99, 208-48, 474-504, 912)

whose value was diminished when New GM's deception was revealed, tarnishing the GM brand

name.   See Post-Sale Compl. ¶¶ 820-25; Pre-Sale Compl. ¶¶ 756-63.   Plaintiffs' claims for

violations of consumer protection statutes are direct, non-derivative claims against New GM

arising out of New GM's post-Sale deception, and are thus not barred by the Sale Order.

Plaintiffs' claims for fraudulent concealment, which arise out of New GM's breach of its

duty to disclose safety defects impacting GM-branded vehicles, likewise constitute direct claims

against New GM.   See Post-Sale Compl. ¶¶ 151, 153, 948; Pre-Sale Compl. ¶ 472, 883 (alleging,

inter alia, that New GM had superior, if not exclusive, knowledge of "the many serious defects

plaguing GM Branded Vehicles," that it "took steps to ensure that its employees did not reveal

---

[83]   See also Furst v. Einstein Moomjy, 860 A.2d 435, 441 (N.J. 2004) ("The Consumer Fraud Act is remedial
legislation that we construe liberally to accomplish its broad purpose of safeguarding the public."); Cameron v.
Terrell & Garrett, Inc., 618 S.W.2d 535, 540-41 (Tex. 1981) (holding that liability may be imposed upon any
defendant engaging in the proscribed deceitful conduct, regardless of whether that defendant was the seller in the
relevant transaction or the manufacturer of the goods that were sold); State ex rel. Miller v. Cutty's Des Moines
Camping Club, Inc., 694 N.W.2d 518, 526-27, 531 (Iowa 2005) (holding that the Consumer Fraud Act is not limited
to sellers or to conduct occurring prior to or contemporaneously with a sale).

known safety defects to regulators or consumers," and that Plaintiffs were injured as a result).

Nor can New GM escape liability for unjust enrichment resulting from, *inter alia*, its own failure

to timely disclose safety defects, as it was required to do under the Safety Act, and by continuing

to profit from the sale of Defective Vehicles.  See Post-Sale Compl. ¶¶ 3, 98, 150, 194, 307, 332,

373; Pre-Sale Compl. ¶¶ 419, 468.   By alleging New GM benefited from its campaign of

deception, Plaintiffs assert direct, non-derivative unjust enrichment claims against New GM.[84]

Finally, New GM asserts various arguments that go beyond the scope of the Threshold

Issues and instead concern the factual and/or legal sufficiency of Plaintiffs' claims (which are

matters for the district court in the MDL Proceeding).  See, e.g., Br. at 70 (arguing that dealers

performing repairs are not agents of New GM); id. at 72 (arguing that Plaintiffs' unjust

enrichment claims are "not credible"); id. at 73-74 (arguing that plaintiffs' negligence claims

improperly rely on the Restatement of Torts).   Plaintiffs dispute New GM's analysis and will

respond to its arguments at the appropriate time.   This Court, however, can appropriately limit its

ruling to the question of whether Plaintiffs' claims are asserted directly against New GM and

defer the issue of the *merits* of those claims against New GM to the district court.  See Trusky,

2013 WL 620281, at *6 n.3 (determining what types of claims fell under the Sale Order, but

leaving it for the district judge to adjudicate the merits of plaintiffs' claims).[85]   For this reason,

---

[84]  New GM's argument that the Post-Sale Class's Glove Box Warranty claims, implied warranty of merchantability
claims and claims for the violation of the Magnuson-Moss Warranty Act are Retained Liabilities of Old GM is
based on a mischaracterization of the Post-Sale Complaint, as (i) the Post-Sale Complaint contains no claims for
breach of Old GM's glove box warranty, and (ii) claims for breach of the implied warranty of merchantability and
violation of the Magnuson-Moss Warranty Act in the Post-Sale Complaint are asserted only on behalf of purchasers
who bought new vehicles from New GM.

[85]   As explained in Trusky, while this Court has jurisdiction to construe the Sale Order, jurisdiction over monetary
controversies between non-debtor parties is questionable and "it's in the interests of justice to allow a district judge .
. . to rule on the issues that might remain once the Sale Order has been construed."  See Trusky, 2013 WL 620281,
at *1.  Similarly, courts have found a lack of bankruptcy jurisdiction over state law claims that do not require
construction of bankruptcy court orders outside the sale order injunction context without deciding the sufficiency of
the alleged state law claims.  See, e.g., Park Ave. Radiologists v. Melnick (In re Park Ave. Radiologists, P.C.), 450

and in this procedural context in which only the Threshold Issues are before this Court, New GM's reliance on <u>Burton</u> to support its position that the claims asserted in the Post-Sale Complaint are disguised successor liability claims is misplaced. In <u>Burton</u>, the bankruptcy court held that certain of plaintiffs' claims were properly asserted as direct claims against New Chrysler but nonetheless went on to address the merits of those claims and found proximate cause issues with those claims. <u>See Burton</u>, 492 B.R. at 405. This Court need not (and should not) conduct any such merits analysis, which properly will be left to the district court.

In sum, contrary to GM's contention that certain of Plaintiffs' claims are "predicated" on an "alleged design defect" by Old GM, Plaintiffs' claims are in fact based on misconduct by New GM. No prior decision of this Court, let alone the Sale Order, grants New GM a free pass to manufacture, advertise, and sell vehicles that it knows are defective, even if the defect originated at Old GM.

### D. Plaintiffs Correctly Assert Consumer-Based Claims Arising Out Of New GM's Failure To Comply With The Safety Act And Plaintiffs' Resulting Harm.

New GM does not—and cannot—dispute its extensive obligations under the Safety Act, nor that New GM is solely responsible for complying with those obligations. Instead, New GM argues that Plaintiffs cannot hold New GM liable for failing to issue the necessary recalls sooner because individual consumers lack "standing to seek damages for alleged violations of a car manufacturer's reporting and recall-related obligations to NHTSA" under the Safety Act. Br. at 75. But New GM ignores that its violation of its recall obligations forms the basis for liability under various State laws, which Plaintiffs do identify. <u>See</u> Post-Sale Compl. ¶ 1113; Pre-Sale Compl. ¶¶ 1046, 1065.

---

B.R. 461, 467-71 (Bankr. S.D.N.Y. 2011); <u>Penthouse Media Grp. v. Guccione (In re Gen. Media, Inc.)</u>, 335 B.R. 66, 74-77 (Bankr. S.D.N.Y. 2005).

For example, California's Unfair Competition Law ("<u>**UCL**</u>") prohibits "unlawful, unfair, or fraudulent business acts and practices." <u>See</u> Cal. Bus. & Prof. Code § 17200. One way to identify such unlawful, unfair, or fraudulent business practices is by demonstrating a violation of a state or national statute, such as the Safety Act. <u>See</u> <u>In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, and Prods. Liab. Litig.</u>, 754 F. Supp. 2d. 1145, 1175 (C.D. Calif. 2010) (finding allegations of a violation of the Safety Act sufficient to establish unlawful conduct in violation of the UCL); <u>Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.</u>, 973 P.2d 527, 539 (Cal. 1999) (explaining that UCL's broad coverage "borrows" the violations of other laws, treats them as unlawful practices, and makes them independently actionable under California law). Indeed, in the recent decision of <u>California v. Gen. Motors LLC</u>, No. 14-2543, 2014 WL 6655796, at *7 (S.D.N.Y. Nov. 24, 2014), Judge Furman explicitly rejected the argument that claims against New GM under the UCL arose under the Safety Act, ruling that, "although the UCL claims are predicated, in part, on alleged violations of [the Safety Act]," the State's claims nonetheless "arise solely under California state law." <u>Id.</u>

Plaintiffs are entitled to legal recourse for the violation of state law consumer protection statutes and other laws.[86] Nothing in the Safety Act or the Sale Order prohibits establishing that New GM violated State law obligations by wholly failing to live up to its reporting obligations, which require notification of a motor vehicle defect within five days of discovering such safety defect. Even if New GM's recall covenant is not a "back door" assumption by New GM of Retained Liabilities under the MSPA, New GM remains liable under state consumer protection statutes and other laws.

_____

[86] As explained above, <u>see</u> <u>supra</u> Section III.C, claims based on New GM's violation of deceptive trade and consumer protection statutes, such as the UCL, are not barred by the Sale Order.

IV.     **Fraud on the Court Standard.**

"'Fraud on the court' encompasses conduct that prevents the court from fulfilling its duty of impartially deciding cases." Grubin v. Rattet (In re Food Mgmt. Grp., LLC), 380 B.R. 677, 714-15 (Bankr. S.D.N.Y. 2008) (citing Gazes v. DelPrete (In re Clinton St. Food Corp.), 254 B.R. 523, 532 (Bankr. S.D.N.Y. 2000)).  Unlike motions to set aside a judgment under Fed. R. Civ. Pro. 60(b)(3) for fraud, a claim of fraud on the court under Fed. R. Civ. Pro. 60(d)(3) is not time-barred, although it must allege conduct other than that proscribed by Rule 60(b)(3).  See In re Old Carco LLC, 423 B.R. 40, 51-52 (Bankr. S.D.N.Y. 2010).   To succeed on a claim of fraud on the court under Rule 60(d)(3), plaintiffs must demonstrate four elements.  See Clinton St., 254 B.R. at 533 (Bankr. S.D.N.Y. 2000) (citing Leber-Krebs, Inc. v. Capitol Records, 779 F.2d 895, 899 (2d Cir. 1985)) (reciting elements); In re Food Mgmt. Grp., LLC, 380 B.R. at 714-15.

First, the perpetrator must make a misrepresentation to the court.  Clinton St., 254 B.R. at 533.  Where the misrepresentation was "intentionally false, willfully blind to the truth, or [] in reckless disregard of the truth," courts will find fraud on the court.  See Esposito v. New York, No. 07-11612, 2012 WL 5499882, at *2 (S.D.N.Y. Nov. 13, 2012).  The must fraud be directed at the court, not another party.  See Hadges v. Yonkers Racing Corp., 48 F.3d 1320, 1326 (2d Cir. 1995) ("The concept of 'fraud on the court' embraces 'only that species of fraud which does or attempts to defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases.'" (quoting Kupferman v. Consol. Research & Mfg. Corp., 459 F.2d 1072, 1078 (2d Cir. 1972))).  A failure to disclose material facts may be sufficient to establish fraud on the court if neither the court nor the adverse party had reason to question the veracity or completeness of evidence and where the court relied on the false statements or incomplete evidence.  See Levander v. Prober (In re Levander), 180 F.3d 1114, 1120 (9th Cir. 1999); see also In re Food Mgmt. Grp., LLC,

78

380 B.R. at 715 (denying motion to dismiss fraud on the court claim based on allegations that attorneys failed to disclose all material facts in presenting bidding procedures and auction bids for court approval in connection with 363 sale).[87]    Fraud on the court is not necessary limited to situations where the perpetrator is an officer of the court, and may encompass the actions of litigants.  See Esposito, 2012 WL 5499882, at *2; Clinton St., 254 B.R. at 532-33.  But, in any event, a "debtor in possession is an officer of the court and, as such, can be a perpetrator of fraud on the court."  In re Tri-Cran, Inc., 98 B.R. at 617.

Second, the misrepresentation must impact the proceedings.  Clinton St., 254 B.R. at 533. The misrepresentation need not be the primary basis for the court's ruling, but must actually deceive the court and influence the ruling.  See Esposito, 2012 WL 5499882, at *2; Old Carco, 423 B.R. at 52-53.  For example, in Clinton Street, 254 B.R. at 527, 533, the court found this element satisfied where it found the defendants' failure to disclose to an agreement not to bid during a Section 363 sale contributed to the court's acceptance of the sole bidder's bid and approval of the sale order.  By contrast, in Tese-Milner v. TPAC, LLC (In re Ticketplanet.com), 313 B.R. 46, 65 (Bankr. S.D.N.Y. 2004), the court dismissed a claim for fraud on the court because the essential facts surrounding the alleged misrepresentation were known at the time the court made its decision, so the misrepresentation did not substantially impact the court's ruling.

---

[87]  By contrast, where nondisclosures or perjury could have been challenged in the original proceeding, did not affect the court's decision, or injured only a single litigant, it will not constitute fraud on the court.  The majority of cases cited by New GM are in this context.  See, e.g., Gleason v. Jandrucko, 860 F.2d 556, 558 (2d Cir. 1988) (holding that officers' perjury in depositions was not fraud on the court when the issue of the credibility of these witnesses was already before the court and nothing prevented plaintiff from impeaching their testimony in the original proceeding); Andrada Fin., LLC v. Humara Grp., Inc. (In re Andrada Fin., LLC), No. 10-00289, 2011 WL 3300983, at *7 (B.A.P. 9th Cir. Apr. 7, 2011) (holding that appellant could not establish fraud on the court based on appellee's submission of document with alleged forged signature of appellant because appellant was in a position to know whether the signature was forged); Krietzburg v. Mucci (In re Mucci), 488 BR 186, 193-94, 193 n.8 (Bankr. D.N.M. 2013) (holding that no fraud on the court existed where the alleged fraud did not affect the court's decision); Hoti Enters., L.P. v. GECMC 2007 C-1 Burnett St., LLC (In re Hoti Enters., L.P.), No. 12-cv-5341, 2012 WL 6720378, at *3 n.4 (S.D.N.Y. Dec. 27, 2012) (alleged forgery in connection with mortgage and note that allegedly defeated a single creditor's ability to assert a secured claim did not rise to the level of a fraud on the court).

Third, there must have been no opportunity to discover the misrepresentation and either bring it to the court's attention or bring some other corrective proceeding prior to seeking relief for fraud on the court. Clinton St., 254 B.R. at 533. Thus, a movant should not use a claim of fraud on the court to attack issues that could have been raised during the original proceedings or on appeal. Compare Clinton St., 254 B.R. at 533 (holding that trustee sufficiently alleged a claim of fraud on the court in connection with a Section 363 sale when "the trustee lacked the opportunity to discover the fraud in light of the summary nature of the sale proceeding and the relatively short time frame (only three weeks between the filing of the sale application and the auction)"), with Old Carco, 423 B.R. at 54-55 (finding no fraud on the court when movants had the opportunity to raise the alleged fraud on a timely appeal).

Fourth, the perpetrator of the fraud must have derived a benefit from inducing the court's erroneous decision. Clinton St., 254 B.R. at 533. For example, in Clinton Street, where certain potential bidders had agreed that only one of them would bid during a Section 363 sale but did not disclose that fact to the court, they all benefitted from the nondisclosure—the sole bidder because it bought the assets at an artificially low price and the other non-bidders because they received payments from that bidder for agreeing not to bid. Id. at 527, 533.

The Court has not directed briefing as to whether the standard for fraud on the court has been satisfied here, and Plaintiffs reserve all rights to fully brief the issue at the appropriate time. However, for substantially the same reasons that the Sale Order did not satisfy due process with respect to Plaintiffs, Old GM's evidence regarding its compliance with due process was knowingly or recklessly incomplete and justifies a finding of fraud on the court. Old GM's evidence regarding New GM's good faith (the basis for the conclusion that successor liability was warranted) was similarly incomplete, and independently justifies a finding.

## CONCLUSION

WHEREFORE, Designated Counsel, for and on behalf of certain Plaintiffs, respectfully requests that the Court (i) deny New GM's Motions to Enforce the Sale Order and Injunction, and (ii) grant such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
        December 16, 2014                              Respectfully submitted,

                                                        _/s/ Edward S. Weisfelner_____
                                                        Edward S. Weisfelner
                                                        David J. Molton
                                                        May Orenstein
                                                        Howard S. Steel
                                                        Rebecca L. Fordon (*pro hac vice* pending)
                                                        BROWN RUDNICK LLP
                                                        Seven Times Square
                                                        New York, New York 10036
                                                        Tel: 212-209-4800
                                                        eweisfelner@brownrudnick.com
                                                        dmolton@brownrudnick.com
                                                        morenstein@brownrudnick.com
                                                        hsteel@brownrudnick.com
                                                        rfordon@brownrudnick.com

                                                        -and-

                                                        Sander L. Esserman
                                                        STUTZMAN, BROMBERG, ESSERMAN &
                                                        PLIFKA, A PROFESSIONAL
                                                        CORPORATION
                                                        2323 Bryan Street, Ste 2200
                                                        Dallas, Texas 75201
                                                        Tel: 214-969-4900
                                                        esserman@sbep-law.com

                                                        *Designated Counsel for Certain Plaintiffs,*
                                                        *Represented in the MDL Proceeding by Co-*
                                                        *Lead Counsel:*

                                                        Steve W. Berman
                                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                                        1918 Eighth Avenue, Suite 3300
                                                        Seattle, WA 98101

-and-

555 Fifth Avenue, Suite 1700
New York, New York 10017

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111

-and-

250 Hudson Street, 8th Floor
New York, New York 10013

Robert C. Hilliard
HILLIARD MUÑOZ GONZALES LLP
719 S. Shoreline Boulevard, Suite 500
Corpus Christi, Texas 78401