# **EXHIBIT 3**

**NOT FOR PUBLICATION**
**REDACTED VERSION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

STEVEN NEWMAN,

     plaintiff,

     v.

GENERAL MOTORS CORP.,

     defendant.

Civil Action No. 02-135 (KSH)

**OPINION**

**March 23, 2005**

**SHWARTZ, United States Magistrate Judge**

## I.    INTRODUCTION

This matter has come before the Court following hearings conducted pursuant to Haines

v. Liggett Group, Ltd., 975 F.2d 81 (3d Cir. 1992) to determine if the crime-fraud exception and

the holding of In re Kozlov, 79 N.J. 232 (1979) should compel the production of documents and

information for which defendant asserts attorney-client privilege and work-product protection.

The Court holds that, in light of the circumstances of this case, certain documents and

information that relates to the prior state litigation shall be disclosed.[1]

---

[1]The Court is mindful of the Court of Appeals for the Third Circuit's admonition that "care must be taken that, following any determination that an exception [to the attorney-client privilege] applies, the matters covered by the exception be kept under seal or appropriate court-imposed privacy procedures until all avenues of appeal are exhausted." Haines, 975 F.2d at 97. Accordingly, this Opinion shall be filed in both a redacted and unredacted form. An unredacted version shall be filed under seal and shall be sent to the defendant. Once the parties' avenues for appeal have been exhausted, if the holdings herein remain, or if otherwise ordered, the Clerk of the Court shall unseal and disclose to the plaintiff an unredacted version of this Opinion.

## II.  THE NEW JERSEY STATE LITIGATION

Plaintiff claims that defendant GM fraudulently concealed information in a prior lawsuit, in which, Michael Green, sued defendant General Motors ("GM") in New Jersey state court for injuries he sustained because of the defective roof design of the GM automobile he was driving. That matter proceeded to trial in 1993 and resulted in a mistrial. In 1996, the jury in the second trial awarded plaintiff more than $17 million.

GM appealed, arguing that plaintiff's expert's proposed alternative roof design was not practicable or safer, plaintiff's design was "simply an imagined concept that exists nowhere but in the mind of [G]reen's expert: no vehicle has ever been produced or sold using this design;" (P-11 at 38), and the expert's opinion was inadmissible "since this hypothetical design had never been implemented by any car manufacturer . . . ." (id. at 39). During the appeal, however, Green's attorney, Maurice Donovan, Esq., who is also plaintiff's counsel in the instant matter, learned that GM had produced documents in a Tennessee products liability case that had been requested but not produced in Green v. GM, which, he argues, demonstrate GM's knowledge, consideration, and rejection of the alternative design Green's expert proffered. Green's attorney filed a motion before the New Jersey Appellate Division to supplement the appellate record with certain documents produced in the Tennessee case ("Documents A-H")[2], which was granted. On March 18, 1998, the New Jersey Appellate Division affirmed the jury's verdict and observed "[a]lthough plaintiff in this case had requested all testing of alternative designs, defendant did not

---

[2]The Court shall refer to the documents plaintiff argues were withheld in Green v. GM as Documents A-H, which are documents appended to plaintiff's motion to supplement the record in the Green appeal. Plaintiff argues Documents A-H exemplify many documents produced in the Tennessee litigation that were not produced in Green.

supply plaintiff with the testing of a design remarkably similar to the one suggested by plaintiff's expert." Green v. General Motors Corp., 310 N.J. Super. 507, 525 (App. Div. 1998). The Appellate Division remanded the case and a modified judgement was subsequently entered in the amount of $14,126,013.83.

## III.   THE FEDERAL CASE AND PRIVILEGE ASSERTION

On November 19, 2001, plaintiff Stephen Newman, the executor of Green's estate, filed the instant lawsuit in New Jersey Superior Court, Essex County, Law Division, alleging that GM's failure to provide Documents A-H constituted fraudulent concealment of evidence (Complt. at ¶¶ 21-27), negligent concealment of evidence (id. at ¶¶ 28-30), and a violation of the New Jersey Racketeer Influenced and Corrupt Organizations Act ("RICO") (id. at ¶¶ 31-54). Defendant removed the case on the basis of diversity jurisdiction on January 11, 2002 and, on February 12, 2002, filed a motion to dismiss, which was denied.

Discovery proceeded and plaintiff requested information and documents related to the communications between GM and its counsel in the Green case. GM asserted attorney-client privilege and work-product immunity to prevent disclosure of the documents. Plaintiff argued the crime-fraud exception and the principles of In re Kozlov, 79 N.J. 232 (1979) pierce any basis to withhold documents and testimony.

In June, 2004, the Court found that the plaintiff had presented facts constituting a prima facie showing that, if believed by a prudent person, would support plaintiff's theory that GM perpetuated a "fraud", as that term is broadly defined in Ocean Spray Cranberries, Inc. v. Holt Cargo Systems, 345 N.J. Super. 515, 523 (Law Div. 2000). The Court concluded that GM personnel knew about information related to alternative design, alternative design was an issue in

3

Green, and information about alternative designs was withheld. The Court noted GM's affirmative representation to the New Jersey Appellate Division that the proposed alternative design Green offered was an "imagined concept" and "no vehicle has ever been produced or sold using this design" was contrary to the true state of affairs. The Court further observed that GM's assertion that its failure to disclose "could" have been inadvertent was belied by the fact it possessed alternative roof designs and knew of cars that had been manufactured with such designs.

As a result of finding that the plaintiff made a prima facie showing, the Court, guided by Haines and other cases, conducted an evidentiary proceeding at which "the party defending the privilege [was] given the opportunity to be heard, by evidence and argument, at the hearing seeking an exception to the privilege." Haines, 975 F.2d at 96-97. The parties were told that GM, as the party asserting the privilege, would be given an opportunity to rebut plaintiff's evidence with evidence and argument and if the apparent fraudulent purpose is satisfactorily explained then the privilege would be upheld. In re Feldberg, 862 F.2d 622, 626 (7th Cir. 1988); Gutter v. E.I. Dupont De Nemours, 124 F. Supp. 2d 1291, 1307 (S.D. Fla. 2000).

The parties were advised that the Court would consider evidence, including the communications and documents themselves, to determine whether or not the preponderance of the evidence, "if believed by the fact-finder[,] would be sufficient to support a finding that the elements of the crime-fraud exception were met." Haines, 975 F.2d at 95-96; see, e.g., Med. Lab. Mgmt. Consultants v. American Broad. Cos., Inc., 30 F. Supp. 2d 1182, 1206 (D. Ariz. 1988); Laser Indus., Ltd. v. Reliant Techs., Inc., 167 F.R.D. 417, 439 n.35 & 441 (N.D. Cal. 1996); see also Feldberg, 862 F.2d at 626 (prima facie showing to warrant an in camera review

4

need only be "enough to require explanation rather than evidence that by itself satisfies a more-likely-than-not standard").

The purpose of the proceedings was not to determine if the Appellate Division's observations were right or wrong, but to collect evidence and to determine if the preponderance of the evidence showed that the communications were made "with an intent to further an unlawful act" and that "there is a logical nexus between the advice and the act." Prudential Ins. Co. v. Massaro, No. CIV.A.97-2022, 2000 WL 1176541, at *10-11 (D.N.J. Aug. 11, 2000). Using the Ocean Spray definition of fraud, this "unlawful act" would include "confederating with clients to allow [the] court and [opposing] counsel to labor under a misapprehension as to the true state of affairs." Ocean Spray, 345 N.J. Super at 522 (citations omitted). Thus, the Court reviewed the evidence to determine if it is more likely than not that the communications were used in furtherance of intentionally allowing the plaintiff and the state court to labor under a misapprehension as to the true state of affairs and that there is a logical nexus between the communication and the deceptive act.

These hearings were originally scheduled for September, 2004 but were adjourned at the request of counsel. The hearings ultimately occurred on November 9, 10, 12, 19, 2004, December 2, 6, 20, 2004, and January 5, 2005. The parties presented a total of twelve witnesses and thousands of pages of documents.

To comply with the dictates of Haines, the Court followed a protocol whereby the plaintiff and defendant were both present in the courtroom for the presentation of nonprivileged testimony. The defendant presented its direct examination of the witness regarding non-privileged topics and the plaintiff was then provided an opportunity to cross-examine the witness.

5

The plaintiff was then excused from the courtroom and the defendant continued its direct examination ex parte, in camera, and on the record.  During this phase, the defendant presented testimony and/or documents that it wished to shield from disclosure.  Each document is listed on the log which is attached to the Order entered with this Opinion.[3]  As documents were identified, and as testimony was elicited, the Court asked questions of the witness about the document or surrounding circumstances.  At times, these questions led to modifications to the defendant's privilege log and the plaintiff was presented with privilege logs that memorialized these changes.

In addition, the parties introduced exhibits during the testimony of various witnesses.  With the exception of exhibits D-2, D-7 and D-8[4], each party was privy to all of the exhibits.

At the conclusion of the testimony, the parties were given an opportunity to present arguments.  Those arguments occurred on January 5, 2005.  A portion of the defendant's argument was ex parte, in camera, and under seal.  The remainder of the defendant's argument and the plaintiff's entire argument took place in open court.

Before turning to the Court's ruling, the Court notes that the process that Haines suggests for conducting such proceedings in civil cases could be improved.  The Haines process inevitably involves a one-sided presentation of the evidence.  While the Court engaged in thorough questioning of the witnesses and closely scrutinized the documents, the Court does not, and should not, approach the process as an adversary would.  The absence of an adversarial

---

[3]With the exception of Tabs 27, 36, 55, 194, 214, 234, 236, 289, 292, 307, and 353, the documents listed on the log were identified during the hearings.

[4]These exhibits were presented during the in camera proceedings.  In addition, defendant made an in camera PowerPoint presentation on January 5, 2005, which the Court has marked as Exhibit 42.

6

interrogator may impact the type of questioning that takes place and, ultimately, the evidence revealed. Classic cross-examination is often viewed as a mechanism for testing the truth of various assertions and adversary counsel carries out this task. While an in camera, ex parte process protects the privacy of the documents and information for which the privilege is asserted, it does not allow for such "truth testing." To balance these goals, courts may consider requiring the challenger to have a separate attorney participate in the process who understands the legal positions of the party challenging the privilege, would be well-versed in the facts of the case, and would be present during all of the testimony, cross-examine witnesses, and respond to arguments. Because this attorney would be "tainted" with the privileged information, however, he or she could not disclose what was learned and could play no other role in the case. While the cost of retaining this additional "taint" attorney would have to be borne initially by the party challenging the privilege and the client would need to understand that neither the client nor the trial attorney could be privy to what was learned during the in camera proceeding, this is a technique that may enable the court to develop a fuller record. This, however, is not contemplated protocol under Haines and thus was not used.

The Court turns to the record developed during the in camera hearings mindful that the discovery rules are broadly construed to seek truth and promote adjudication of matters on their merits; they are not mechanisms of concealment. See, e.g., Paced v. Macy's, 193 F.3d 766, 777 (3d Cir. 1999) (stating the Federal Rules of Civil Procedure provide for liberal discovery) (citations omitted); see also Oliviero v. Porter Hayden Co., 241 N.J. Super. 381, 387 (App. Div. 1990) (finding the broad scope of New Jersey rules of discovery is designed "to eliminate, as far as possible, concealment and surprise in the trial of lawsuits to the end that judgments rest upon

7

real merits of the causes and not upon the skill and maneuvering of counsel."); see also Hickman v. Taylor, 329 U.S. 495, 506 (1947) (recognizing "the [attorney-client] privilege limitation must be restricted to its narrowest bounds.").

## IV. GM'S ACTIVITY IN *GREEN V. GM*

### A. *GM's Initial Assignment of Counsel*

Michael Green filed a complaint in Essex County Superior Court against GM on June 1, 1988, alleging GM negligently manufactured or distributed the 1986 Camaro ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

### B. *Plaintiff's Interrogatories*

The parties served discovery.[5] Plaintiff served its first set of interrogatories on September 15, 1988. (P-10A.) Interrogatory number 27 asked:

> Has said product or products of the same or identical design as said product been certified by any entity or examined and tested and approved by any such entity examining or testing such products? If so, then state:
> (a) Name and address of any such entity;
> (b) The date on which any certification, approval, or endorsement was given;
> (c) Describe and identify any documents by whatever name called reflecting any such action.
> Note: Consider this a request for the production of copies of any and all writings by whatever name called that relate to or reflect the

---

[5] Plaintiff initially failed to respond to discovery served upon him and, on April 28, 1989, the Complaint was dismissed. On July 10, 1989, plaintiff's complaint was reinstated after he submitted discovery responses. ██████████████ 

approval, endorsement, or certification of said product or products
of the identical design.

(Id. at 17-18.) Interrogatory 52 requested details regarding how design criteria for the T-roof

structure were established. (Id. at 36.) Interrogatory 68 asked:

Did you consider any alternative approach to the design or
construction of said product?

(Id. at 46.) Interrogatory 69 provided:

If you [sic] answer to the the [sic] immediately preceding question
is in the affirmative, then:
    (a)    Describe in detail each and every alternative
        approach;
    (b)    Describe in detail the objections to or reasons why
        you did not follow or adopt each such alternative
        approach.

(Id. at 47-48.) Interrogatory 70 provided:

Describe any and all predictive analyses, studies tests,
investigations, or examinations which relate to or reflect your
consideration of each alternative approach to the design or
construction of said product, by stating the name of the author(s),
title of the document containing or reflecting both the performance
of and the results of any such predictive analysis, study, test,
investigation, or examination and the date(s) on which the same
was or were conducted and completed.

(Id. at 48.)



9



It appears GM first responsed to the plaintiff's discovery demands after it received plaintiff's expert report.

## C.     *The Damask Report*

By letter dated June 26, 1989, plaintiff provided GM a copy of Arthur **Damask's expert**

report (the "Damask Report"), which summarized plaintiff's view of how the roof **design**

contributed to his injuries. The Damask Report stated:

> [t]he cause of the glass insert coming down on Green's head is **that**
> when the car was distorted the T-bar pulled the windshield
> downward. This constitutes a design defect by the manufacturer.
> This type of mechanical behavior could and should have been
> anticipated in the design. It could have easily been designed
> around by having the T-bar inserted, like a tent pole, into the **rear**
> roof section. Thus, in a distorting collision, it would simply pull
> out.

[6] Thus, as of June 26, 1989, GM knew about plaintiff's roof **defect theory.**



---

[6]The report also described plaintiff's theory that the tires on the car had a lower
coefficient of friction that caused it to spin out.



### D.    GM's Discovery Responses After the Damask Report







The final version of GM's responses to plaintiff's interrogatories are dated **October 27,**

1989. (D-1.) GM's final responses asserted "General Objections" as to all of **plaintiff's**

interrogatories, including the following:

> GM objects to these Interrogatories as overbroad, in seeking
> information not reasonably calculated to lead to the discovery of
> admissible evidence. Plaintiff's discovery is not limited to any
> particular parts, components or systems of the subject vehicle.
> Further, Plaintiff's complaint does not identify any specific parts or
> components allegedly defective. As there are more than fifteen
> thousand component parts in the subject vehicle, plaintiff's failure
> to limit discovery to any particular parts or components renders the
> discovery grossly overbroad.

(Id. at 1.) GM's response to plaintiff's Interrogatory 27 stated in part:

> Without waiving its objections, GM states that if plaintiff
> would specify the components or parts at issue in this litigation,
> GM would respond accordingly.

15

> To the extent plaintiff is claiming a defect in the roof
> design of the 1986 Camaro Z28, General Motors states that it will
> produce, upon execution of an appropriate Stipulation of
> Confidentiality and Protective Order, FMVSS 216 compliance
> testing materials relating to the 1986 Camaro Z28.

(Id. at 18.) With respect to Interrogatory 52, GM responded in part as follows:

> GM objects to this Interrogatory as vague and ambiguous in
> that plaintiff fails to define with reasonable particularity what is
> meant by the term "design criteria." GM further objects to this
> Interrogatory as overbroad and burdensome and harassing in that
> plaintiff has failed to identify the component parts or systems at
> issue in this litigation.

> To the extent plaintiff is claiming a defect in the roof
> design of the 1986 Camaro Z28, General Motors states that it will
> produce upon the execution of an appropriate Stipulation of
> Confidentiality and Protective Order representative drawings of the
> roof system of the 1986 Chevrolet Camaro Z28.

(Id. at 36-37.) With respect to Interrogatory 68, GM responded in part as follows:

> GM objects to this Interrogatory as vague and ambiguous in
> that plaintiff fails to define with reasonable particularity what is
> meant by any "alternative approach to the design or construction of
> said product." It further objects to this Interrogatory as overbroad
> and potentially burdensome and harassing in that it is not limited to
> any specific component part or system of the subject vehicle.

> Without waiving its objections, GM states that if plaintiff
> would specify some component part or system of the vehicle in
> issue, it will respond accordingly.

> To the extent plaintiff is claiming a defect in the roof
> design of the 1986 Camaro Z28, General Motors states that it will
> produce upon the execution of an appropriate Stipulation of
> Confidentiality and Protective Order representative drawings of the
> roof system of the 1986 Chevrolet Camaro Z28.

(Id. at 47.) GM's response to Interrogatory 69 refers plaintiff to its response to Interrogatory 68.

(Id.) In response to Interrogatory 70, GM's responses stated in part as follows:

16

GM objects to this Interrogatory on the grounds that it is overbroad, burdensome, vague and ambiguous inasmuch as the design and development of the 1986 Camaro was an evolutionary process involving many engineers over several years and 15,000 component parts.

GM further objects to this Interrogatory as potentially seeking information of a confidential or proprietary nature and/or information subject to the self-critical analysis privilege.

Without waiving its objections, GM states that if plaintiff would specify the components or parts at issue in this litigation it will identify engineering personnel knowledgable [sic] about the components or parts in controversy. Joseph S. Rice of General Motors Engineering Staff is generally knowledgeable about certain aspects of the design of the 1986 Camaro Z28.

(Id. at 48.) Thus, despite plaintiff's statement that the claimed defect was limited to the roof and tires and despite GM's understanding of the plaintiff's theory as explained by Dr. Damask, GM claimed it did not know the plaintiff asserted a roof defect[9], persisted with marginally responsive answers to plaintiff's interrogatories, and provided information that was not necessarily called for by the interrogatory.





### E.    The July 20, 1990 Discovery Hearing and August 3, 1990 Discovery Order

██████████████████, plaintiff's counsel objected to GM's responses and

filed an application to compel more specific responses.  GM sought a protective order related to

information it claimed represented confidential business information.  The trial judge, former



Judge Carol Ferentz, held a hearing on July 20, 1990 and issued an Order dated **August 3, 1990.**

(D-3.) The August 3, 1990 Order struck GM's "General Objections" and objections on the basis

that the demands were "vague and ambiguous." (Id., ¶ 1, 2.) Judge Ferentz further ordered GM

to provide more specific responses to a number of interrogatories, including Interrogatories 27,

68, 69, and 70. (Id., ¶ 3.) Judge Ferentz's Order limited the scope of discovery to

> the information and documentation relating to the roof
> system/structure and any connected or related parts, including the
> left rear portion of the 1982 through 1986 model years Chevrolet
> Camaro manufactured with a T-roof . . . .

(Id., ¶ 5.)[11]



---

[11]The Order further directed GM to obtain and serve plaintiff with a copy of the transcript
of the July 20, 1990 hearing. (D-3, ¶ 6.) According to Mr. Murray's testimony, the transcript
was ordered but never obtained.

[12]



The F-Car Project Center was created to co-locate engineers, designers, and others who worked on the Camaro, which is known to GM as the F-Car. Dr. Rice testified that GM created the 1978-1982 F-Car Project Center as a central repository for work and information related to the design and development of the F-Car. Dr. Rice stated he knew that at some point the F-Car Project Center ceased to exist and learned at a much later time that the documents from the center were copied on microfiche and placed in a location near the former F-Car Project Center. The fiche was organized in two ways: subject matter files and writer's or author files.

Fisher Body was a division of GM that conducted research and development related to the bodies of GM automobiles, including the F-Car.

20







### F.     GM's Supplemental Responses to Plaintiff's Interrogatories

Pursuant to the August 3, 1990 Order, GM drafted supplemental interrogatory responses.



Case 2:02-cv-00195-KSF-PS Document 60 Filed 03/24/03 Page 25 of 27 PageID #: 444



25



On or about September 20, 1990, GM produced supplemental responses to plaintiff's interrogatories and notice to produce. (Exhibits D-4, D-5, and D-12.) The transmittal letter advised that GM had gathered another 1,100 pages of documents that would be produced upon execution of a protective order.[19] The final supplemental responses pursuant to Judge Ferentz's August 3, 1990 Order are marked as Exhibit D-4. GM's response to Interrogatory 27 states in part:

> General Motors further states that it has conducted a search of its records for all 1982-86 T-top Camaros testing of any kind relating to the roof structure and supporting members and, subject to protective order, will produce documentation including but not limited to structural target analyses, stiffness and stress analysis, modal analysis, tests regarding hatch retention, and rear and front barrier crash test as part of the New Car Assessment Program.

---

[19]The cover letter was not produced for the Court's review but was shown during defendant's January 5, 2005 in camera PowerPoint presentation. (D-41 at 43.)

(D-4 at 18.) ████████████████████████████████████████████

████████████████ GM's response to Interrogatory 52 states:

> The design criteria of the roof system of the 1982-1986 Camaro
> were established as the result of efforts of many engineers over
> several years, the end result of which are the design drawings that
> are being produced pursuant to protective order. In addition to all
> other design drawings and tests that GM is producing subject to
> protective order, GM is conducting a review of design-related
> documents on microfiche and will produce hard copies of available
> documents responsive to this interrogatory, if any, as soon as
> practicable.

(Id. at 34-35.) ████████████████████████████████████████

██████████████████████████ With respect to Interrogatory 68, GM responded as

follows:

> Yes. The design of a roof structure (and other components) of a
> vehicle such as the 1982-1986 Camaro is an evolutionary process
> involving literally hundreds of engineers over several years. This
> process inevitably involves the considerations, analysis and
> rejection of different approaches to a roof design. In particular,
> GM considered, and adopted another alternative structure, i.e., the
> hard top model, in addition to the T-top. For detail on the design
> process, see the documents GM is producing in response to
> interrogatories Nos. 27 and 52.

(Id. at 44.) ███████████████████████████████████████████

█████████████████████████ GM's final version of GM's

response to Interrogatory 69 refers plaintiff to its response to Interrogatory 68 and its response to

Interrogatory 70 refers plaintiff to the GM owner's manual it had previously produced. (Id. at

45.)

### G. *Other Discovery Conduct*

Before summarizing the evidence regarding RKC's review of the documents from the F-

Car Project Center ██████████████████████, the Court will review other aspects of

GM's discovery-related conduct.





Plaintiff deposed Dr. Rice on May 11, 1992. At his deposition, Dr. Rice stated GM may have conducted an F-Car rollover test for the purpose of litigation.

29



### H.    The _Green v. General Motors_ Trials

In early 1993, the parties tried the Green v. GM to a hung jury ("Green I").  In early 1996,

the second trial took place ("Green II").  Plaintiff's expert, Arthur Damask, was medically

unavailable to testify in Green II and plaintiff hired Don Phillips as his expert.  Mr. Phillips' two

theories of alternative design were the hard-top and another design that had two side rails.[21]

Mr. Phillips testified that after he was retained, he reviewed the discovery demands and responses (P-10A and P-10B) and felt that not everything that should have been produced was produced. He did not know about the F-Car Project Center while working on the Green trial and only learned of its existence in late summer of 1997. He stated he never saw the F-Car microfiche or the index of the subject files marked as Exhibit 11. Mr. Phillips stated he did not have crash reports at the time of his report but received them before his deposition. His review of the discovery told him either that there were tests missing or GM did not do enough tests to determine crash worthiness. In January, 1996, the Friday before trial commenced, Mr. Phillips received additional crash tests and ultimately found 112 crash tests and videotapes were not produced. Mr. Phillips further stated there were no alternative documents produced before trial. At the hearing, GM argued that its reference to the hard-top in its September 13, 1990 supplemental response to Interrogatory 68 constituted disclosure of an alternative design. (D-4 at 44.)

Between the Green I and Green II trials, additional depositions occurred. On November 10, 1995, Mr. Donovan asked GM's counsel about the peer vehicles to which Mr. Orlowsky made reference in his deposition. ████████████████████████████████████

_____

[21]Mr. Phillips testified he came up with his design when working in the "autocross" racing community to determine if they could make a T-top with a removable bar along the driver's side. He learned the design would not meet the racing industry standards without a bar over the driver's door. Mr. Phillips testified he was unaware of any cars with his design at the time of the Green II trial but during the hearing he identified the Lancia Spider as embodying a variation of his design. Mr. Phillips also identified the Rover as having the same roof system.



███████ Mr. Donovan's request discovery precipitated a motion **to compel**

discovery related to peer vehicles, ████████████, which was denied ████████████

████

The jury in <u>Green II</u> awarded plaintiff $17,767,175.

### I. *The <u>Green II</u> Appeal*

GM appealed the <u>Green II</u> verdict arguing, in part, that plaintiff offered **insufficient**

evidence of a reasonable alternative design to the T-roof. ███████████████

███████████████████████████████████████

███████████████████████████████████

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

1575-1607.)



filed its brief,

which stated:

> The second "alternative" roof that Phillips identified was a concept
> of his own imagining that would have incorporated a structure to
> connect the top of the A-pillar to the top of the B-pillar.



### J.   *Johnson v. General Motors*

In September of 1995, GM became a defendant in an F-car product liability litigation in a

Tennessee state court case captioned <u>Johnson v. GM</u>. <u>Johnson</u> dealt with the driver of a pickup

truck who sustained injury when an F-Car allegedly spun out of control hitting his pickup and a

piece of the T-top's glass panel struck him in the head, causing brain damage. Plaintiff's expert

in <u>Johnson</u> was Don Phillips, who offered alternative designs for the T-roof latching mechanism

and T-roof design.

<u>Johnson</u> spanned several years with extensive discovery demands. Patrick M. Ardis,

plaintiff's counsel in <u>Johnson</u>, described the discovery process in <u>Johnson</u> as a "war of attrition"

involving numerous motions to compel, 116 depositions, and over $1 million expended by the

plaintiff in discovery-related expenses. For example, Mr. Ardis testified that GM denied

33

knowledge of the whereabouts of "components" of the vehicle for a year while it had full knowledge that a GM subsidiary had purchased the entire car.[23] Mr. Ardis testified that another example of GM's lack of forthcomingness in <u>Johnson</u> occurred when Mr. Phillips inspected the <u>Green</u> discovery in connection with the <u>Johnson</u> case at Mr. Tansey's office and not all <u>Green</u> materials were made available to him.

Mr. Ardis testified he learned of the <u>Green</u> case and sought disclosure of information about <u>Green</u> through motion practice. Mr. Ardis sought sanctions[24] against GM for their failure to disclose the <u>Green</u> case but the Judge reserved decision on the sanctions motion. Deborah Russell, GM's counsel in <u>Johnson</u>, testified she learned about <u>Green</u> when trying to respond to discovery demands regarding other cases and claims but <u>Green</u> was not identified in the <u>Johnson</u> discovery because GM only searched for claims dealing with side impact and injury from broken glass and GM's summary sheet about <u>Green</u> identified it as a rollover roof crush case. When Mr. Ardis discovered <u>Green</u> and raised the issue, GM produced the <u>Green</u> Complaint and, after motion practice, the discovery in <u>Green</u>.

Mr. Ardis further testified that GM never mentioned the F-Car Project Center during the <u>Johnson</u> case and that he learned about it through his consultant, Paul Levins, who believed it might exist because he had previously learned of a "J-Car Project Center" in an unrelated case.

---

[23]GM tried to explain why it responded in this fashion. The way it parsed words was similar to that the Court observed in connection with Dr. Rice's attempt to distinguish the words "design" verses "configuration".

[24]Mr. Ardis filed two motions for sanctions against GM for its failure to identify <u>Green</u> and GM opposed the motions, explaining that it believed <u>Green</u> fell into a different category of cases. The first Motion was heard on August 15, 1997 (D-17) and the second on May 4, 1998 (D-18). Ms. Russell testified the court denied the sanctions motions. Mr. Ardis testified the Court reserved the right to revisit them at the time of trial. The <u>Johnson</u> case settled before trial.

Mr. Ardis testified that his assistant, Kathy Frazier, inquired with Joseph Ziembro of GM about the F-Car Project Center documents during her January 6, 1997 document inspection at GM in connection with another F-Car case captioned Saturday v. GM. On January 7, 1997, Mr. Ardis wrote to Ms. Russell and requested access to the F-Car Project Center documents. He testified Ms. Russell did not deny their existence but debated him about the scope of his review. Ms. Russell testified that she was aware that Mr. Ardis asked for access to the F-Car Project Center but she did not know how this came about. Ms. Russell testified she received a call from GM regarding plaintiff's inquiries. She thinks she spoke with Carol Snowden, Mr. Ziembro's assistant at GM, and they discussed that there was no pending request to inspect F-Car Project Center documents. In a January 14, 1997 letter to plaintiff's counsel, Ms. Russell stated GM's position that the plaintiff in Johnson made no specific request to inspect the F-Car Project Center files before January 7, 1997. (D-24 at 2; D-25.) Ultimately, GM granted Mr. Ardis's team access to the F-Car Project Center documents. (D-28.) Ms. Russell testified that members of Mr. Ardis' trial team began a review of documents at GM's headquarters on or about January 20, 1997. After the review, the parties argued about the protective order under which selected documents would be copied and produced. In February of 1997, plaintiff filed a motion to compel and the Court entered a modified protective order requiring production of F-Car Project Center documents by May 26, 1997. GM actually produced the requested documents in June of 1997.

During the summer and fall of 1997, Mr. Ardis reviewed the documents GM produced from the F-Car Project Center, which he testified were responsive to his discovery demands of October 5, 1995. In November of 1997, Mr. Phillips, who was serving as plaintiff's expert in

<div align="center">35</div>

both <u>Green</u> and <u>Johnson</u>, showed Mr. Ardis the <u>Green II</u> appellate brief. Mr. Ardis told Mr.

Phillips he had documents that he asserted showed GM lied in its statements about Mr. Phillips'

alternative design in <u>Green II</u>.

After reading the <u>Green II</u> appellate brief, on December 4, 1997, Mr. Ardis sent GM a

letter enclosing a motion to modify the protective order in <u>Johnson</u>

> to allow Plaintiffs to share documents produced by Defendant
> General Motors with New Jersey counsel for Plaintiff in the case of
> <u>Green vs. General Motors</u>, and, for Wolff Ardis, P.C. or Green's
> New Jersey counsel to file with the New Jersey Court any
> documents deemed necessary regarding fraud perpetrated by GM
> on the New Jersey court.

(D-30.) Ms. Russell testified that the December 4, 1997 letter was the first time she learned

Ardis wanted to share documents with counsel in <u>Green</u>.

On December 5, 1997, Ms. Russell forwarded Mr. Ardis' letter to GM and Mr. Langan.

(Tab 355.) ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███ after a December 12, 1997 hearing on the matter, the <u>Johnson</u> protective order was amended

to allow Mr. Ardis to share documents with plaintiff's counsel in <u>Green</u>. On December 12, 1997,

the modified protective order in <u>Johnson</u> was filed (D-31; P-7) and Mr. Ardis thereafter sent Mr.

Donovan the GM discovery from <u>Johnson</u>. It was among those documents that Mr. Donovan

discovered Documents A-H.

## K.   Documents A-H

Documents A-H are GM internal memoranda from 1978 that reference alternative approaches to the T-top roof design of the 1982 F-Car. (D-6.) Document A is a July 24, 1978 memo from R.H. Knickerbocker, the Chief Engineer of the F-Car Project Center, calling for a meeting on the "passive restraint philosophy to be applied to the 1982 'F' Car" and stating "it appears no one is very interested in a full frame front door glass nor is there any great interest it appears in pursuing an alternative to the 'T' hatch roof." (D-6, Document A.)

Document B is dated July 31, 1978 and outlines considerations related to the T-hatch, including cost, sales price, front and rear barrier performance and impact performance. (Id., Document B.)

Document C is a September 5, 1978 memo by Mr. Knickerbocker suggesting information to be reviewed at an October 11, 1978 Chief Engineers Project Center Review Meeting. (Id., Document C.) Under the caption "Decision Items", Mr. Knickerbocker proposes a "Roof Option Review" and states "design alternatives at the present time that would probably be the T hatch and the Vista Vent designs . . . ." (Id.)[25]

Document D is a preliminary handout for the October 11, 1978 meeting. (Id., Document D.) In discussing "Roof Design Considerations", Document D states

> The most probable considerations would be:
> •     'T' hatch (current 'F' production)

---

[25]Dr. Rice said Phillips' design was not like the Vista Vent, which involved a single piece to create a moon roof with no center bar and Phillips' design included a center bar. Mr. Phillips, on the other hand, testified that the key to his alternative design was the use of roof rails from the A pillar to the B pillar, creating a "halo" roof and the middle rail is immaterial to providing extra roof strength. Phillips testified the Vista Vent and Modified Vista Vent are similar to his design in that they also have side pillars.

37

- Vista Vent (1980 'X' production)
- Modified Vista Vent (Similar to some European Offerings)

(Id., Document D at 2.) Document D describes the T-hatch as having a "most striking, macho appearance, [and] proven sales performance". (Id.) The document describes the "Vista Vent" as "less striking [in] appearance" and states "increased sales volume might be anticipated because of the lower sales price." (Id.) Document D also compares ride characteristics and impact and roof-crush performance of the T-roof, Vista Vent, and the Modified Vista Vent designs. (Id., Document D at 3-5.)

Document E is an October 11, 1978 memo from D.J. Agresta, administrative engineer of GM's F-Car Project Center, that summarizes the Chief Engineers Project Center Review meeting minutes. (Id., Document E.) The memo stated the alternative designs were "reviewed considering the possible impacts of Marketing, Mass, Structure, Manufacturing, Reliability and Serviceability . . . ." and that "Fisher Body is to stop work on the design of the Modified Vista Vent." (Id., Document E at 1.) Document F is dated October 17, 1978 and summarizes the results of the meeting and attaches drawings of the T-hatch, the Vista Vent, and the Modified Vista Vent. (Id., Document F.) Document G is a one-page document dated October 30, 1978 stating the T-roof option was confirmed as the mainstream design program. (Id., Document G.)

Document H is a November 10, 1978 memo from Stephan Kennel and Mitchel Scherba of the F-Car Project Center. (Id., Document H.) The last page of Document H illustrates the "conventional 'T' roof" and the "Lancia Spider Type Roof." (Id., Document H at 4.) The Lancia Spider Type Roof embodies the Modified Vista Vent design with a removable glass roof and two side bars whereas the T-roof has one bar in the center of the roof with two removable glass

38

plates. The memo states, in part, that "[s]mall side rails of the Lancia type are more efficient structurally than the 'T' roof center beam. The Lancia type side rails can achieve 'T' roof performance with a structural mass savings of 4-5 Kg." (Id., Document H at 1.) The memo further states "[i]n addition to better roof crush and barrier characteristics the Lancia type should be superior for door latch and window sealing." (Id.)

### L. *Supplementation to the Appellate Division*

The plaintiff in Green moved before the New Jersey Appellate Division to supplement the record with Documents A-H and the motion was granted. The Appellate Division affirmed the verdict but modified the damage award and remanded the matter for further proceedings. In its opinion, the Appellate Division observed that

> following the verdict in this case and the attendant press coverage, plaintiff's attorneys were contacted by attorneys representing a plaintiff in a similar accident in Tennessee where defendant had apparently been more forthcoming in its discovery. Although plaintiff in this case had requested all testing of alternative designs, defendant did not supply plaintiff with the testing of a design remarkably similar to the one suggested by plaintiff's expert.

Green, 310 N.J. Super. at 525. Following the denial of GM's application for certification to the New Jersey Supreme Court and the remand, the trial court entered an amended judgment in the amount of $14,126,013.83.

### M. *GM's Explanation*

At the hearing, GM introduced documents and testimony in camera in an attempt to explain why Documents A-H were not produced in Green. ███████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████ The

39

Court now turns to the portions of the record that relate to GM's theory.



. Hasson involved a plaintiff claiming a product defect in a 1986 Chevrolet Camaro Iroc. (D-4 at 27.)

---

[26]As stated previously, writer's files are organized by author of the documents contained in the file. Subject files are organized by subject matter. The content of the F-Car Project Center subject files is reflected in a twenty-five page index (D-11), which was organized by the code of the component or part to which the documents pertain. Numerous witnesses testified that searching the index requires someone with technical expertise.



Among the 1,600 documents was

the F-Car Program Summary Plan Book, which references the "Project Center" on its cover. (D-

38.) In the table of contents for the Plan Book, Section P identifies the Project Center

Organization and includes an organizational chart. (Id.) Moreover, the book mentions R.H.

Knickerbocker, among many other GM engineers. (Id., bates GM001160.)

GM seemingly argues that between August 8, 1990 and October 9, 1990, Dr. Rice and

Myrna Ade, who is not an engineer and does not have a technical background, reviewed and

selected documents from the F-Car Project Center for counsel to review. While she did not

recall working on Green, at the hearing Ms. Ade provided a general overview of the procedure

41

she followed when assigned a document review. She stated she would obtain the microfiche, meet with an engineer to get instructions as to what to look for, copy documents in order of the fiche cards, place a slip of colored paper between the documents obtained from a particular fiche card, and then an engineer or product discovery group coordinator would retrieve materials to be reviewed. Though GM argues Ms. Ade reviewed the documents at Dr. Rice's instruction in the Green case, Ms. Ade did not recall who assigned her the task, what type of documents she was to print, whether or not such documents were subsequently reviewed for production, and generally had no recollection of the Green case. Ms. Ade further testified that she: (a) did not recall if she reviewed the entire F-Car Project Center file or parts of it, and (b) knows Dr. Rice but did not recall if he assigned her the Green document review project. Similarly, Dr. Rice testified had no independent recollection of such a review in Green and did not recall working on the Green case with Ms. Ade.

At the hearing, Ms. Ade testified via video conference from defendant's attorney's office. At the video conference, she reviewed three boxes of documents. ████████████████

████████████████████████████████████████

████████████████████████████████████████

████ [27] ████████████████████████████

[27] ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████



The three boxes contained a total of 6,490 pages of documents.









Ultimately, GM produced all 65 pages.[34]

[35]Also on August 22, 1991, the Morley Cramer firm served GM's supplemental response to Interrogatory 52 and the documents received from the RKC firm upon the plaintiff. (See letter of August 22, 1991 from plaintiff's counsel to Mr. Murray shown at defendant's January 5, 2005 PowerPoint presentation.) The cover letter enclosing the documents stated

In connection with the Supplemental response to this interrogatory,



## V.   DISCUSSION

### A.   *Findings Regarding the Applicability of the Attorney-Client Privilege and Work-Product Rule*

Based upon the documents and testimony, the Court concludes that, with the exception of

the document under Tab 328, which does not relate to this case, and Tabs 27, 36, 55, 194, 214,

215, 234, 236, 289, 292, 307, and 353, for which no authenticating testimony was provided[36], the

documents on the log qualify as attorney-client communications[37], work-product[38]

---

> General Motors is producing, pursuant to the Protective Order
> entered by the Court on October 19, 1990, of documents relating to
> the "T" hatch roof design and "F"-car roof construction.

(Id.) The letter to the plaintiff made no mention of the F-Car Project Center.

[36]Despite the absence of testimony, the Court was able to determine if the documents
were covered by the attorney-client privilege or work-product doctrine based upon their contents
and the Court's knowledge of the roles the authors and recipients played.

[37]The privilege statute in New Jersey states:

> communications between lawyer and his client in the course of that
> relationship and in professional confidence, are privileged, and a
> client has a privilege (a) to refuse to disclose any such
> communication, and (b) to prevent his lawyer from disclosing it . . .

N.J.S.A. 2A:84A-20. The Court of Appeals for the Third Circuit states the traditional elements
of the attorney-client privilege as follows:

> (1) the asserted holder of the privilege is or sought to become a client;
> (2) the person to whom the communication was made
>> (a) is a member of the bar of a court, or his or her subordinate, and
>> (b) in connection with this communication is acting as a lawyer;
> (3) the communication relates to a fact of which the attorney was informed
>> (a) by his client
>> (b) without the presence of strangers
>> (c) for the purpose of securing primarily either
>>> (i) an opinion of law or
>>> (ii) legal services or
>>> (iii) assistance in some legal proceeding, and
>> (d) not for the purpose of committing a crime or tort; and
> (4) the privilege has been
>> (a) claimed and
>> (b) not waived by the client.

Montgomery County v. MicroVote Corp., 175 F.3d 296, 301 (3d Cir. 1999). Here, the Court has
made findings with respect to each of the documents that GM produced for in camera review.
The Court's findings are embodied in the Appendix A to the Order issued on the date hereof.

[38] Rule 26 (b)(3) of the Federal Rules of Civil Procedure provides:

> Subject to the provisions of subdivision (b)(4) of this rule, a party
> may obtain discovery of documents and tangible things otherwise
> discoverable under subdivision (b)(1) of this rule and prepared in
> anticipation of litigation or for trial by or for another party or by or
> for that party's representative (including the other party's attorney,
> consultant, surety, indemnitor, insurer, or agent) only upon a
> showing that the party seeking discovery has substantial need of
> the materials in the preparation of the party's case and that the
> party is unable without undue hardship to obtain the substantial
> equivalent of the materials by other means. In ordering discovery
> of such materials when the required showing has been made, the
> court shall protect against disclosure of the mental impressions,
> conclusions, opinions, or legal theories of an attorney or other
> representative of a party concerning the litigation.

Rule 26(b)(3) essentially establishes "two tiers of protection: first, work prepared in anticipation

49

or both. In some cases, GM has asserted that the documents are shielded from disclosure based upon both doctrines and on other occasions it seeks protection based on only one of the doctrines. GM's position with respect to each document is memorialized in Exhibit 39.[39] The Appendix to the Order reveals the Court's conclusion as to whether a particular document is an attorney-client communication, work-product, or both. In reaching a conclusion that the attorney-client privilege did not apply, the Court concluded that the documents did not contain a communication between counsel and client. In reaching a conclusion that the work-product rule did not apply, the Court concluded that the document did not embody attorney work-product.

### B.    Waiver

The attorney-client privilege and work-product rule are not impenetrable. For example, documents memorializing privileged communications or work-product must be disclosed if there has been a waiver of the protections of either doctrine, such as by disclosure to a third-party or by placing the privileged information in issue.[40] In reviewing documents in camera, the Court

---

of litigation by an attorney or his agent is discoverable only upon a showing of need and hardship; second, 'core' or 'opinion' work-product that encompasses the 'mental impressions, conclusions, opinion, or legal theories of an attorney or other representative of a party concerning the litigation' is 'generally afforded near absolute protection from discovery.'" In re Cendent Corp., 343 F.3d 658, 663 (3d Cir. 2003) (quoting United States v. Nobles, 422 U.S. 225, 238-239 (1975)). The work-product doctrine is also subject to the "crime-fraud" exception, In re Grand Jury Proceedings (FMC), 604 F.2d 798, 802-03 (3d Cir. 1979), which is addressed *infra*.

[39]After the hearings, defendant submitted a Fifth Amended Privilege Log, which the Court has marked as Exhibit D-39.

[40]A further reason to compel disclosure of the documents is that GM has placed its communications in issue and, therefore, has waived the attorney-client privilege and work-product protection with regard to those documents. On November 15, 2004, the Court entered an Order that provided:

no later than **November 19, 2004**, the defendant shall (a) elect

50

whether or not it will rely on communications with and/or actions
of legal counsel to defend against plaintiff's claims, and (b)
disclose to the plaintiff the information required to be disclosed
under Fed. R. Civ. P. 26, including but not limited to the identities
of the persons likely to have discoverable information that it may
use to support its claims or defenses and disclose the documents
the defendant may use to support its claims or defenses. Failure to
identify and disclose such information may bar defendant from
introducing such information as evidence at trial.

In response, defendant served initial disclosures pursuant to Rule 26(a)(1)(A), in which it
objected to the disclosure of privileged materials:

The Supplemental Disclosures set forth below include or refer to
documents or information relating to GM's defense in . . . Green v.
GM . . . that are protected from discovery by the attorney-client and
common interest privileges and the work-product doctrine. GM
makes these Supplemental Disclosures solely for the purpose of
defending against the clams [sic] asserted against it in the present
lawsuit. GM neither intends nor acquiesces in any subject-matter
waiver of the attorney-client or common interest privilege or the
work-product protections applicable to the information disclosed or
referred to below.

(GM Rule 26 Disclosures at 1.) Notwithstanding its objections, GM stated that "the following
individuals may have information that GM may use to support its defenses . . . .": in-house
attorneys Douglas Brown and Thomas Ziolkowski, GM legal assistant, Susan Rhodes, GM
engineer Dr. Joseph Rice, GM expert in the Green case, Ronald Orlowski, plaintiff's attorney,
Maurice Donovan, Esq., K&E attorney J. Andrew Langan, former K&E attorney David Coulson
and Ron Betman, local counsel in the Green case, Thomas F. Tansey and Joseph G. Murray,
McGuire Woods attorney, Deborah Russell, GM product discovery group coordinator in the
Johnson case, Joe Ziembro, GM employees Arthur Armstrong, Gerald S. Kaspzyk, RKC
attorneys William (Bud) Kirk and Robert Rudock, GM employee Kathleen Marshall, and former
RKC legal assistant Eileen Rooney. (Id. at 2-4.) In identifying documents that GM "may use to
support is claims or defenses," GM listed "[d]ocuments protected by discovery from the attorney-
client privilege, common interest privilege or work-product doctrine relating to GM's retrieval,
review and production of documents for purposes of complying with the Green Court's August 3,
1990 Order, including those documents listed on GM's Second Amended Privilege Log in this
case." (Id. at 4, ¶ 3.) GM further listed documents that it claimed were privileged "that are listed
on the Second Amended Privilege Log, which was prepared in response to plaintiff's amended
request for production of documents in this case" (id. at 4, ¶ 4.), those "that post-date the time
period in which plaintiff requested documents in his amended request for production of

learned that certain communications for which defendant asserts a privilege were provided to a

representative of Royal Insurance, its insurer. By Order dated November 15, 2004, the Court, <u>sua</u>

<u>sponte</u>, requested that the parties brief the issue of "whether or not the disclosure of documents to

---

documents in this case . . . ." (<u>id.</u> at 4, ¶ 5), the discovery exchanged in the <u>Johnson</u> case (<u>id.</u> at 4,
¶ 6), and documents GM claims are privileged "that relate to the circumstances under which the
F-Car Project Center documents were produced to the plaintiffs in a case known as <u>Johnson v.</u>
<u>General Motors Corporation</u>" (<u>id.</u> at 4, ¶ 6).

The "in issue" exception to the attorney-client privilege applies "where a party has
asserted a claim or defense <u>that he intends to prove by use of the privileged materials.</u>" <u>Pittston</u>
<u>Co. v. Allianz Ins. Co.</u>, 143 F.R.D. 66, 71 (D.N.J. 1992) (emphasis added); <u>North River Ins. v.</u>
<u>Philadelphia Reinsurance Corp.</u>, 797 F. Supp. 363, 370 (D.N.J. 1992). Advice of counsel "is not
in issue merely because it is relevant, and does not necessarily become in issue merely because
the attorney's advice might affect the client's state of mind in a relevant manner." <u>Rhone-</u>
<u>Poulenc Rorer Inc. v. Home Indem. Co.</u>, 32 F.3d 851, 863 (3d Cir. 1994). Rather, as the Court of
Appeals for the Third Circuit has stated, "[t]he advice of counsel is placed in issue where the
client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or
describing an attorney-client communication." <u>Id.</u> When these circumstances are present, the
attorney-client privilege should yield upon a showing of (1) a legitimate need to reach the
evidence sought to be shielded; (2) relevance and materiality of that evidence to the issue before
the Court; and (3) a fair preponderance of the evidence by the party asserting the privilege
including all reasonable inferences that the information cannot be obtained from a less intrusive
source. <u>Pittston Co.</u>, 143 F.R.D. at 71 (citations and quotations omitted). An important factor in
this determination is that the party seeking the protection must have injected the communications
into the action. <u>Id.</u>

For the reasons set forth in this opinion's discussion the <u>Kozlov</u> factors, the Court finds
that each of the documents that are to be disclosed also meet the <u>Pittston</u> criteria. Therefore, the
"in issue" doctrine provides an alternative basis for disclosure of the documents that Appendix A
to the Court's Order indicates shall be disclosed.

The Court notes the defendant's copious disclaimers about its unwillingness to waive any
privileges it has asserted. Allowing defendant to use documents and information at trial and
simultaneously assert the work-product rule or attorney-client privilege to shield them from
discovery, however, deprives its adversary the opportunity to investigate the information it will
be faced with at trial. That result would be contrary to the liberal rules of discovery, Rule
26(a)(1)(A), and the spirit of the "in issue" doctrine. Accordingly, defendant's Rule 26
disclosure, which preserves its ability to use the information at trial, renders its disclaimers
ineffective.

an insurance carrier constitutes a waiver of the privilege/work-product assertion as to those documents or if the 'common interest' doctrine or another legal principle allows the defendant to continue to shield the documents, . . . ." [Docket Entry No. 53.]

Plaintiff argues that GM disclosed communications to its insurer pursuant to its obligations under the policy to apprise the insurer of the status of the case. (Donovan Ltr. Nov. 9, 2004 at 3.) Plaintiff argues if GM's counsel disclosed communications to the insurer pursuant to its contractual obligations then GM was not seeking legal assistance but complying with the insurer's "self protective steps taken as part of the adversarial aspect of the insurer-insured relationship", and the privilege is waived. (Id.) Moreover, plaintiff argues the "community interest" doctrine does not shield the communications in question because GM and it insurer's interests were not sufficiently aligned. (Id.)

Defendant argues that disclosures to Royal, although it is a third-party, does not waive privilege because defendant and the insurer shared a "common interest." (See Payerle Ltr. Nov. 22, 2004 at 1-3.) Defendant argues the "common interest doctrine" preserves the privilege here because the disclosures were made (1) due to actual or anticipated litigation; (2) for the purpose of furthering a common interest of the successful defense of the Green case; and (3) with the expectation that the communications would remain privileged. (Id. at 3.) Accordingly, defendant argues the privilege was not waived.

                  i.     **Waiver Law**

A party may waive an attorney-client privilege through purposeful disclosure, partial disclosure, and careless disclosure by client. Edna Epstein, The Attorney-Client Privilege and the Work-Product Doctrine, 292-309 (4th ed. 2001). Under the waiver doctrine, when

53

"[c]onduct touches a certain point of disclosure, fairness requires that the privilege shall cease whether he intended that result or not." 8 J. Wigmore, Evidence § 2327 at 636 (1961).

The record shows that certain communications for which GM has asserted the privilege were disclosed to someone other than the attorney or client. These communications are among the documents identified on Appendix A to the Order. One column of Appendix A identifies the document and another identifies who authored and/or received copies of the document. If testimony was offered to show that one or more of those identified recipients was Royal Insurance or its representatives, then the letters "ci" appear in the column entitled "Privilege."[41] The designation "ci" signifies that the document was disclosed to Royal or its representatives and that the common interest doctrine applies as the basis for concluding that such disclosures do not operate to waive the privilege.

### ii.    The Common Interest Doctrine

Under the common interest doctrine, "although an attorney actually represents only one party, there is no waiver of the attorney-client privilege by disclosure of privileged communications to third parties with a 'community of interest.'" Pittston Co., 143 F.R.D. at 69. Under New Jersey law, the common interest doctrine [42] may be asserted where the disclosure is

---

[41] The entries in the "Privilege" column also memorialize the Court's findings as to whether a document is covered by the attorney-client privilege and work-product rule.

[42] The common interest doctrine only applies "when it has been determined that the defendant insurer is obligated to defend the underlying action brought against the insured," NL Indus. v. Commercial Union Ins. Co., 144 F.R.D 225, 231 (D.N.J. 1992) (internal quotations omitted), and only "when the parties 'have employed a lawyer to act for them in common.'" HM Holdings, Inc. v. Lumbermens Mut. Cas. Co., 259 N.J. Super. 308, 315 (App. Div. 1992) (emphasis in original) (quoting N.J. Evid. R. 26(2)(c)). The common interest doctrine "trumps an insured's claim of privilege where there is admittedly a common interest between the insurers and the insureds in minimizing exposure in the underlying . . . claims, but there is sharp dispute

54

made: (1) due to actual or anticipated litigation; (2) for the purposes of furthering a common

interest; and (3) in a manner not inconsistent with maintaining confidentiality against adverse

parties. Laporta v. Gloucester County Bd. of Chosen Freeholders, 340 N.J. Super. 254, 262

(App. Div. 2001) (citations omitted). "Common interest" communications need not be among

counsel for the clients but cover communications between counsel for a party and individual or

entity with a common interest. Id. Moreover, the parties' interests need not be identical for the

common interest privilege to apply but a finding that the parties shared a "common purpose" is

sufficient. Id.

The common interest doctrine is often invoked by parties who once shared common

interests but who later become adverse to obtain attorney-client communications that occurred

while their interests were aligned, such as in an insurance coverage dispute. See, e.g., NL Indus.

v. Commercial Union Ins. Co., 144 F.R.D 225, 230-31 (D.N.J. 1992). Few reported cases

address the issue of whether or not defense counsel's disclosure of a communication to

defendant's insurer constitutes a waiver of privilege. For example, in Fey v. Stauffer Chemical

---

between insurers and insured regarding insurance coverage." Pittston, 143 F.R.D. at 69 (quoting
Carey-Canada, Inc. v. Aetna Cas & Sur. Co., 118 F.R.D. 250, 251 (D.D.C. 1987)). The common
interest doctrine exception does not exist, however, where

> the documents were prepared in an atmosphere of uncertainty as to
> the scope of any identity of interest shared by the plaintiff and . . .
> [the insurer]. In this context plaintiffs could reasonably have
> expected that documents concerning settlement in the underlying
> cases would be privileged and hence undiscoverable.

Id. (citing Carey Canada, 118 F.R.D. at 251). The Carey Canada court emphasized that the
communications sought were made after the interests of the parties had diverged. Carey Canada,
118 F.R.D. at 252. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

55

Company, 19 F.R.D. 526, 529 (D. Neb. 1956), the United States District Court for the District of Nebraska held that work-product protection extends to materials contained in an insurance company's files that consisted, in part, of defense counsel's mental impressions.[43]

In Lectrolarm Custom Systems v. Pelco Sales, Inc., 212 F.R.D. 567 (E.D. Ca. 2002), plaintiff moved to compel the production of otherwise privileged information defendant's counsel shared with defendant's insurer pursuant to a cooperation clause in an insurance policy. Id. at 569. After discussing the origin of the common interest doctrine in federal case law, the United States District Court for the Eastern District of California held disclosure of privileged communications by defendant's counsel to defendant's insurer did not waive attorney-client privilege or work-product rule, even where insurer was denying coverage, to the extent those communications related to their "common interest" in defending the underlying lawsuit. Id. at 572.

In O'Brien v. Tuttle, 21 Pa. D. & C.3d 319 (Ct. Comm. Pl. 1981), the Pennsylvania Court of Common Pleas held that the attorney-client privilege protects an insured's communication to

---

[43] In Fey, plaintiff's counsel demanded the insurer's file at the deposition of a claims handler and defense counsel objected on the grounds that it contains privileged and work-product protected materials created by defendant's carrier-appointed attorney. Id. at 526. The court noted that the file included "opinions upon the questions of the liability of [defendant], actual or potential, loss reserves, settlement possibilities and desirabilities, and, generally, all such communications as may reasonably be expected to pass between the insurer of a defendant . . . and the attorneys by it employed . . . ." Id. at 528. The district court held such contents were protectible under the work-product doctrine espoused in Hackman v. Taylor, 329 U.S. 495 (1947). While the case does not mention the common interest doctrine, it recognizes its purpose by finding work-product protection extends to the defendant's insurer and the insurer's non-attorney employees. Id. at 528-29. The Court's reasoning further reflects the reality that mental impressions of the carrier-appointed defense counsel might routinely be found in the insurer's files and, therefore, there is an expectation of confidentiality with respect to such materials.

56

its insurer-appointed defense counsel that were disclosed for the purpose of permitting the insurer

to evaluate the claim. O'Brien was a medical malpractice case in which plaintiff sought to

compel production of a questionnaire the plaintiff's doctor had completed at the behest of his

insurance carrier. Id. at 319. The doctor delivered the completed questionnaire to his carrier-

appointed defense counsel who in turn provided it to the carrier for evaluation of the plaintiff's

claim. Id. at 319-320. The court denied the motion to compel the production of the

questionnaire "because the relationship among counsel, the insurance carrier and the insured is a

joint representation by a common attorney for the mutual benefit of the insured and insurance

carrier, and because the attorney-client privilege protects any confidential communication

between the parties through their common attorney . . . ." Id. at 327. In its reasoning, the Court

noted that

> [t]he standard insurance policy requires the insurance company to
> defend the insured, and in fulfillment of its contractual obligation
> to its insured, the insurer secures the attorney to represent
> defendant insured in the lawsuit. By virtue of its contractual duty
> to defend, control over the litigation rests in the insurance
> company. In addition, the standard cooperation provision of the
> policy requires the insured to disclose to the insurer the
> circumstances surrounding the claim. Because of this relationship
> between the insurer and the insured, the attorney selected by the
> insurer to represent the insured serves as counsel for both the
> insured and insurer.

Id. at 322.

Here, GM shared the common interest in defending against the Green Litigation. The

Court notes first that communications that were disclosed to Royal were prepared for, and

disseminated in furtherance of, GM's defense in the then-pending Green litigation and, second,

that both Royal and GM shared an interest in successfully defending that litigation. Thus, the

57

first two considerations under <u>LaPorta</u> are satisfied.

Third, the communications appear to have been made in a manner consistent with

confidential communications.



See <u>Lectrolarm Custom Sys.</u>, 212 F.R.D. at 572 (holding even where

there is a dispute over coverage, communications between an insured and its insurer in

furtherance of the defense of the underlying third-party claim are protected by the common

interest doctrine).

From both the testimony and the contents of the documents, it appears that Royal and GM

shared the common interest of lodging a successful defense in the <u>Green</u> case.

Since the communications at issue related to the then-ongoing <u>Green</u> litigation, they were

made by counsel in furtherance of GM's defense, the benefit of which inured to Royal, and were

made with the expectation of confidentiality and were not publicly disclosed[44], the Court finds

those communications fall within the common interest doctrine. Accordingly, no privilege or

work-product protection was waived by virtue of the disclosure of the documents to the insurer.

Having concluded that disclosure to the insurance company is not a waiver, the Court

now turns to whether or not the attorney-client privilege and/or the work-product assertion

should be pierced.

## C. Crime-Fraud Exception to the Attorney-Client Privilege and Work-product Rule

In the series of opinions delivered in this case, the Court set forth the legal standards for

the crime-fraud exception to the attorney-client privilege and the work-product rule and the more

detailed discussions are incorporated herein by reference. Suffice it to say, the attorney-client

privilege is to be strictly construed, it is not absolute, and is subject to exceptions. In re Nackson,

---

[44] Plaintiff cites cases dealing with non-privileged statements of an insured to an investigator before litigation was commenced or an obligation to defend attached, which are distinguishable. See State v. Pavin, 202 N.J. Super. 255, 263 (App. Div. 1985) (finding recorded interview of insured by insurance adjuster was not privileged because it was made before litigation and the adjuster was not acting at the direction of defense counsel); Pfender v. Torres, 336 N.J. Super 379, 388 (App. Div. 2001) (holding no privilege existed for transcripts of tape recorded statements by insured to insurance investigator because the statement was not taken at the direction of the insured's attorney, the case had not yet been assigned, litigation was not pending, and, at that early point, the insurance company "might well have had interest other than protection of this insured's rights."). Further, Westinghouse Electric Corporation v. Republic of the Philippines, 951 F.2d 1414 (3d Cir. 1991) is inapposite. Westinghouse did not address the common interest doctrine and there can be no argument that the relationship between investigating governmental agencies at issue in Westinghouse is similar to that between the insured and its insurer who may be liable for indemnification. Cf. In re State Comm'n of Investigation Subpoena Number 5441, 226 N.J. Super. 461, 468 (App. Div. 1988) (holding the New Jersey School Boards Association's disclosure of an internal investigation report to the New Jersey School Boards Association Insurance Group, a related organization, was not a waiver because the two shared a "sufficient community of interest . . . ."). The Westinghouse case, therefore, does not apply here.

59

114 N.J. 527, 537 (1989); Fellerman v. Bradley, 99 N.J. 493, 503 (1985); Halbach v. Bowman, 369 N.J. Super. 323, 329 (App. Div. 2004); Horon Holding Corp. v. McKenzie, 341 N.J. Super. 117, 124-25 (App. Div. 2001); Jadlowski v. Owens-Corning Fiberglass Corp., 283 N.J. Super. 199, 217 (App. Div. 1995) (stating "[t]here are times when the privilege must give way to a full and fair inquiry."). Because privileges lead to the withholding of information, and this conflicts the judicial policy that favors the fullest disclosure of the facts, legislatures and courts have to "fashion limited exceptions to the [attorney-client] privilege." Fellerman, 99 N.J. at 502. The crime-fraud exception is a "statutory recognition of a situation in which the purpose of the [attorney-client] privilege would not be served by its enforcement." Id. at 503; N.J.S.A. 2A:84A-20(2)(a). Both the protections of the attorney-client privilege and work-product rule can be pierced if the elements of the crime-fraud exception are satisfied. N.J.S.A. 2A:84A-20 (crime-fraud exception to the attorney-client privilege); Fellerman, 99 N.J. at 503 (same); In re Grand Jury Proceedings (FMC Corp.), 604 F.2d 798, 802-03 (3d Cir. 1979) (the crime-fraud exception applies to the work-product rule); see also General Foods Corp. v. Nestle Co., Inc., No. CIV.A.79-1844, 1982 WL 170987, at *5 (D.N.J. Oct. 14, 1982) (applying crime-fraud exception to documents for which party has asserted work-product protection).

The Court of Appeals for the Third Circuit stated that a prima facie showing that the crime fraud exception to the attorney-client privilege applies is made where "the party seeking discovery . . . present[s] evidence which, if believed . . . would be sufficient to support a finding that the elements of the crime-fraud exception were met." Haines, 975 F.2d at 95-96. On June 16, 2004, this Court found that plaintiff established a prima facie showing that the crime fraud exception applied. Defendant was, therefore, afforded the opportunity to rebut plaintiff's

60

showing with evidence and testimony.  See id. at 97.  At this juncture, to require actual disclosure
of the materials at issue, the record must show that the communications were

> made with an intent to further an unlawful act.  Moreover, a logical
> link must exist between the privileged communications and the
> proposed crime or fraud; it must be the advice that leads to the
> deed . . . .  [T]he cases consistently require a specific nexus
> between the supposed fraud and the attorney consultation for the
> exception to exist.

Massaro, 2000 WL 1176541, at *10.  In short, to pierce the privilege, the Court must find that the
evidence, if believed by the fact finder, would show that the subject communications were made
"with an intent to further an unlawful act," United States v. White, 887 F.2d 267, 271 (D.D.C.
1989), and that a logical nexus exists between the advice and the wrongful act.[45]  Haines, 975
F.2d at 95.  This burden must be shown by a preponderance of the evidence.  See, e.g., Medical
Lab. Mgmt. Consultants v. American Broad. Cos., Inc., 30 F. Supp. 2d 1182, 1206 (D. Ariz.
1998) (holding, to pierce the attorney-client privilege based on the crime-fraud exception, "the
district court must determine, by a preponderance of the evidence, whether the exception is
justified, taking into account 'the entire record.'").

   The Court has considered the parties' arguments and the evidence, including the
documents themselves, to determine if the record presents "evidence which, if believed by the

_____

[45]  Laser Indus., Ltd. v. Reliant Technologies, 167 F.R.D. 417, 439 n.35 (N.D. Cal. 1996)
(holding that if the evidence and argument show that the likelihood the holder of the privilege
sought or used legal advice to commit a fraud is no greater than the likelihood he did not, then
the proof is considered in equipoise and the privilege will not be pierced.  The privilege will be
pierced if the record shows fraud by a preponderance of the evidence.  Put differently, the
privilege will be pierced only if the court concludes based upon the evidence, including the
communication itself, and arguments, that it is at least marginally more likely than not that the
holder of the privilege sought or used legal advice to commit or try to to commit a crime or
fraud.)

61

fact-finder, would be sufficient to support a finding that the elements of the crime fraud

exception were met." Haines, 975 F.2d at 95-96. The Court examined the evidence mindful that

it was required to "weigh all the evidence submitted, without systematically drawing inferences

in favor of either party." In re Grand Jury Subpoena, 220 F.R.D. 130, 141-42 (D. Mass. 2004)

(addressing inferences in the context of a work-product challenge). Indeed, if the Court

> in the pretrial period concludes that the evidence and argument are
> essentially in equipoise, i.e., that the evidence commands
> exculpatory and inculpatory inferences equally, the judge must
> deny the motion to penetrate the privilege under the crime/fraud
> exception.
>
> . . .
>
> [and] . . . a judge sitting in a civil case must deny a motion to
> penetrate the attorney-client privilege under the crime/fraud
> exception if, after considering all the evidence and argument
> offered by both the challenger and the party who is invoking the
> privilege, the judge cannot say that it is more likely than not that
> the party resisting the disclosures sought or used legal advice to
> commit or to try to commit a crime or fraud .

Laser Indus., v. Reliant Tech., Inc., 167 F.R.D. 417, 438, 441 (N.D. Cal. 1996); cf. Nackson, 114

N.J. at 537 (addressing inferences in the context of the Kozlov rule and stating "it must be shown

'to the satisfaction of the trial judge, by a fair preponderance of the evidence, including all

reasonable inferences, that . . . the information . . . could not be secured from any less intrusive

source.'").

As more fully explained below, the record, reviewed under the preponderance of the

evidence standard, demonstrates conduct where counsel confederated with GM, even assuming

they were unaware of the client's intent, see In re Grand Jury Subpoena Duces Tecum Dated

Sept. 15, 1983, 731 F.2d 1032, 1038 (2d Cir. 1984) (holding crime-fraud communications are

excluded from the scope of the attorney-client privilege and work-product doctrine **"even if the attorney is unaware that his advice is sought in furtherance of such an improper purpose."), to** allow the court and opposing counsel to labor under a misapprehension as to the true state of affairs and defendant has failed to produce sufficient evidence of its explanation to justify its failure to disclose the F-Car Project Center documents.[46] Thus, the privilege must yield and the documents identified in Appendix A and testimony must be disclosed.

> **i.    Facts Showing GM Allowed Plaintiff to Labor under a Misapprehension**
>
> *a.    GM's Discovery Responses in __Green__*

From the outset, GM took the position that discovery was overbroad because the plaintiff did not identify the components or systems of the 1986 Camaro Z-28 that plaintiff claimed were defective. ▮▮▮▮▮▮▮▮▮▮▮ GM appeared to lodge an almost blanket refusal to respond to discovery in 1988, claiming all demands were over broad and unduly burdensome. The record, however, shows that GM knew from plaintiff's June 1, 1988 complaint that the car at issue was a 1986 F-Car. Plaintiff's service of the Damask report in June of 1989 put GM on further notice of his claim that the roof system was defective and described the nature of the defect. ▮▮▮▮▮▮

▮▮▮▮▮▮

GM manifested its knowledge of the defect in several ways. ▮▮▮▮▮▮▮▮▮▮▮

----

[46]In the context of the crime-fraud exception to New Jersey's attorney-client privilege, the term "fraud" includes "[c]onfederating with clients to allow court and counsel to labor under a misapprehension as to the true state of affairs; countenancing by silence the violation of a court order and aiding and abetting the continued contempt of another, are all frauds within the meaning of [N.J.S.A. 2A:84A-20(2)(a)] Evidence Rule 26(2)(a)." __Fellerman__, 99 N.J. at 503 (quoting __In Re Callan__, 122 N.J. Super. 479, 496 (Ch. Div.), __aff'd__, 126 N.J. Super. 103 (App. Div. 1973), __rev'd on other grounds__, 66 N.J. 401 (1975)).



Accordingly, GM knew as of June 26, 1989 that plaintiff was claiming the T-roof system the 1986 F-Car was defective and knew the specific nature of the alleged defect. In its October 27, 1989 interrogatory answers, however, GM objected to plaintiff's interrogatories, claiming they were vague, and over broad on the basis that plaintiff had failed to identify the nature of its claimed defects.[47] GM's assertion that it did not know or understand the nature of plaintiff's alleged defect after June of 1989 was without basis.



The August 3, 1990 Order, however, only identified certain interrogatories to which GM was required to respond and limited the questions to "the information and documentation relating to the roof system/structure and any connected or related parts, including the left rear portion of the 1982

---

[47]Moreover, GM's supplemental responses to 68-70 are either non-responsive or mischaracterize the nature of the interrogatory. GM's initial responses to plaintiff's interrogatories are replete with standard objections of "vague" and "ambiguous". For example, GM objected to interrogatory number 68, which sought information related to any "alternative approaches" that GM considered in designing the T-roof, on the basis of vagueness. GM's initial responses to interrogatories state "if plaintiff would specify the components or parts at issue in this litigation, GM would respond accordingly." (D-1 at 18.) Then, GM stated to the extent plaintiff claimed a roof defect, it would provide <u>design drawings</u> for the 1986 Camaro Z28's roof structure, but made no mention of alternative designs. (<u>Id.</u> at 47.) Thus, the response ignored what was requested.

64

through 1986 model years Chevrolet Camaro manufactured with a T-roof . . . ." (D-3 at 5.) The order provided no additional "clarification" regarding the component part or system to which plaintiff referred. In short, despite knowing plaintiff's claimed roof defect, GM professed ignorance about the plaintiff's position to delay or avoid disclosure of relevant and responsive information.[48]

When GM responded to discovery, it frequently attempted to recharacterize or narrow what was being requested and then after to produce information on the topic it selected. For example, in its October 27, 1989 responses to Interrogatory 68, GM offered representative design drawings of the roof system used in the vehicle but made no mention and provided no information regarding alternative approaches that it considered. (See D-1.) Relatedly, Dr. Rice testified that Documents A-H would not have been responsive to Interrogatories 68-70 because



GM's supplemental response to Interrogatory 68 lists the hard-top as an alternative design as if the hard top was the sole alternative design GM considered. This reading of GM's response to Interrogatory 68 is supported by its supplemental response to Interrogatory 69. Interrogatory 69 requests, if defendant answered Interrogatory 68 in the affirmative, that it "[d]escribe in detail each and every alternative approach; . . . ." (D-4 at 44.) GM responded to 69 by stating "[s]ee response to Interrogatory No. 68." (Id.) GM never turned over information related to alternative approaches to designing the T-Roof, which it possessed and which plaintiff's Interrogatories 68-70 appropriately sought.

they were not "alternative designs" in the engineering sense, in that they are not "design drawings" that could be used to build an actual structure. According to Dr. Rice, Documents A-H did not contain the same level of detail as that embodied in a design drawing and, therefore, these documents were not responsive to plaintiff's request. Dr. Rice called the Vista Vent and Modified Vista Vent drawings embodied in Documents A-H "alternative configurations" and "concept sketches", which were considered in 1978 but never tested in the F-Car, and that a "configuration" would not be responsive to plaintiff's discovery requests.

The plain text of the interrogatory, however, was broader.[49]  Plaintiff's Interrogatories 68-70 did not call for "alternative design drawings" but rather sought information related to "alternative approaches to the design" of the T-roof. (P-10A at 46-48.) Documents A-H are directly responsive to what was requested. These documents memorialize a meeting among GM engineers, including Mr. Knickerbocker, the chief engineer, to consider the alternative approach to the T-Roof design embodied in the Vista Vent and Modified Vista Vent roof configurations. (D-6, Document D at 2.) Document C, a September 5, 1978 memo in anticipation of an October 5, 1978 Chief Engineer's Meeting, for example, discusses "Roof Option Review" and states

> This review should contain the design alternatives at the present
> time that would probably be the 'T' hatch and the Vista Vent
> designs with a discussion of current volumes and projected
> volumes, cost and sales price, tooling costs and service and

---

[49]GM further argues that the information embodied in Documents A-H was public knowledge, as was the fact that GM actually produced 1.1 million 1980 X Cars with Vista Vent style tops. During cross-examination of Mr. Phillips, GM pointed out that these designs were implemented into cars on the market and hence equally available to Phillips. GM argues given the public availability of this information, it could not have impeded plaintiff's investigation. The issue here is not, however, whether information about the Vista Vent or Modified Vista Vent was knowable but rather whether GM ever considered the alternative designs at all. Documents A-H show that GM did just that. Thus, this argument is inappropriate.

reliability considerations.

(D-6, Document C at 1.) Documents A-H further show that GM considered these **alternative** designs and selected the T top based on marketing considerations. (D-6, Documents D at 2.) (stating that while the current T-hatch design had a "most striking, macho appearance" **and** "proven sales performance", the Vista Vent and Modified Vista Vent had a "less **striking** appearance.") ████████████████████████████████████████████**The documents** embody alternative approaches and reasons for rejecting such approaches and hence **they were** responsive to Interrogatories 68-70.

Moreover, GM's justifications for nondisclosure of Documents A-H because **they** embody designs that are nothing like plaintiff's alternative designs in <u>Green I</u> and <u>Green II</u> also fail. █████████████████████████████████████████████████████████████████
██████████████████████████████████████████Plaintiff's Interrogatories **68-70,** however, broadly demanded information related to "alternative approaches" and were **not limited** to Dr. Damask or Mr. Phillips' theories, nor did they call for design drawing of **the design** actually adopted. Thus, whether or not Documents A-H embody Dr. Damask's or Mr. **Phillips'** alternative designs is irrelevant.

Having concluded that the F-Car Project Center contained clearly responsive **documents,** the Court now turns to plaintiff's contentions that GM withheld information about the existence of the F-Car Project Center and the documents it housed. █████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

67



The final responses sent to the
plaintiff made no mention of the F-Car Project Center.

For all of these reasons, the Court finds GM's conduct in responding to interrogatories, **as** demonstrated by the communications and drafts related to those responses, shows that GM knowingly withheld information that plaintiff appropriately sought.

### b.  *The F-Car Project Center Documents*

At the hearing, the Court sought an explanation why Documents A-H were not disclosed during the <u>Green</u> case.





Several problems arise from GM's

request.  First, GM asks the Court to draw an inference in its favor, which it cannot do.  Cf. In re

Grand Jury Subpoena, 220 F.R.D. at 141-42 (holding in determining whether or not work-

product privilege applies, the Court shall evaluate evidence without drawing inferences in favor

of any party).  Second,



[redacted] Third, [redacted] Fourth, [redacted] Fifth, [redacted] Sixth, [redacted]

[redacted]

Case 2:02-cv-00139-KSH-PS    Document 60-2    Filed 03/24/05    Page 15 of 36 PageID: 492



In sum, the Court cannot draw

the inference of inadvertence



First,

Second,

Third,

These observations undermine the theory that inadvertence was the

reason for the nondisclosure.

For all of these further reasons, the Court finds GM has not provided an adequate

explanation to overcome the prima facie showing.

### c.    Dr. Rice's Role in the *Green* Litigation

Many witnesses placed a significant amount of the responsibility for production of

technical documents with Dr. Rice and deferred to him for explanation as to why documents

were not produced during discovery.

_____

It was surprising, therefore,

_____

[51]Dr. Rice appears to have been integral throughout Green I and Green II.

appears Dr. Rice was intimately involved with discovery disclosed before both Green I and
Green II.

75

when Dr. Rice testified he had no independent recollection whatsoever of his involvement in the discovery process and his inability to recall his involvement limited the Court's ability to confirm GM's theory that he or one of his staff reviewed documents that were sent to RKC and, if so, whether he followed up on those documents or ignored them.



The Court, therefore, is left with no evidence to show a technical person reviewed any of the F-Car Project Center documents and a lack of reliable testimony from Dr. Rice, who many GM witnesses described as the most able to explain why Documents A-H were not disclosed.

### d. GM's Representations on Appeal

At the hearing, Mr. Langan defended GM's appellate brief, which stated **Mr. Phillips'**

design existed nowhere but in his imagination.  Several pieces of the record, however, raise

concern about GM's statements. ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

---

[52]GM ultimately addressed Mr. Phillips' assertion in a footnote in the appellate brief
stating that the testimony showed that Phillips was only referring to a GM restraint system test
and not a roof design for a car.  (Tab 326, bates 1964; P-11 at 38-39 n.10.)

████████████████████████████████████████████████████

████████████ The statement in the appellate brief, ████████████████

████████████████████ reflects another example that suggests a desire to have the

state court and plaintiff labor under a misapprehension and further supports piercing the

privilege.

### e.    *Miscellaneous Considerations*

GM seems to have a specific perspective when it responds to discovery in civil cases. ██████



████████████████ While the court acknowledges the ongoing nature of discovery, it finds

this comment to be more akin to a strategy of withholding or deliberately not seeking out

documents known to be responsive and requiring plaintiff to exert further efforts to obtain

discovery that was properly requested. The corollary to this is if plaintiff does not persist and, for

example, file motions to compel, GM would not disclose responsive materials while

acknowledging they likely exist. GM adopted this approach in the <u>Green</u> case and, on more than

one occasion, the Plaintiff was forced to seek more specific responses. ████████████████

████████████████████████████████████████████████████

█████████████████████████████████

 These

communications and positions reflect an approach of withholding responsive discovery, and

further support a finding that defendant allowed plaintiff and the state court to have a particular

understanding about the state of affairs unless and until GM was forced to provide additional

responsive information.





Each of these examples, if believed by a reasonable prudent person, could support a finding that GM acknowledged responsive information and made a calculated decision to withhold it or delay its disclosure, thereby allowing the plaintiff and the state court to labor under a misapprehension as to the true state of affairs.

The record shows a pattern of troubling discovery conduct even beyond the <u>Green</u> litigation. Like <u>Green</u>, the plaintiff in <u>Johnson</u> had to be persistent to obtain responsive discovery. It appears the F-Car Project Center came to plaintiff's attention in <u>Johnson</u> not because of a disclosure by GM, but rather was the result of a consultant's inquiry of GM based upon experience in an unrelated "J-Car" case. GM did not voluntarily disclose its existence in <u>Green</u> and it is not clear GM would have voluntarily disclosed it's existence to counsel in <u>Johnson</u>. Similarly, in <u>Green</u>, it was only after being chastised by a New Jersey judge that GM turned to the F-Car Project Center for responsive records.

In <u>Johnson</u>, for example, plaintiff sought access to components of the subject vehicle. GM denied knowledge of the whereabouts of "components" of the vehicle at a time it knew a GM subsidiary had possession of the entire car. This tactic is reminiscent of other sharp practices employed by

81

GM and particularly by Dr. Rice.[53]



The Court further considers GM's alleged failure to disclose the <u>Green</u> case during

<u>Johnson</u>



Finally, the Court notes the dispute over whether or not GM supplied Mr. Phillips all of the

<u>Green</u> discovery in connection with the <u>Johnson</u> case.

In light of the above examples, the Court finds GM did not carry its burden of providing



an explanation for why the Documents A-H were not provided in the Green discovery. Thus, based upon the in camera review of the documents and witnesses' testimony, and after considering the parties' arguments, Court finds evidence that, if believed by a reasonable fact finder, supports the conclusion that GM conducted itself in a manner that allowed the state court and the plaintiff to labor under a misapprehension as to the true state of affairs. The evidence of "fraud" as described in the Ocean Spray case supports piercing the privilege asserted to shield testimony and documents that further such conduct. For all of these reasons, the Court holds that documents identified on Appendix A to the Order as "disclose" shall be disclosed to the plaintiff.

**D.    The Kozlov Exception to the Attorney-Client Privilege**

      **i.    Kozlov Test**

The New Jersey Supreme Court has held that a party may also pierce the privilege where: (1) there is a legitimate need to reach the shielded evidence; (2) there is a showing of relevancy and materiality of the evidence to the issue before the Court; and (3) the party seeking to obtain privileged information has shown by a fair preponderance of the evidence, including all reasonable inferences, that the information cannot be secured from any less intrusive means or source. In re Kozlov, 79 N.J. 232, 243-44 (1979). The Kozlov test has supported the production of otherwise privileged communications where the party holding the privilege has placed their communications "in issue" in the case,[54] Wolosoff, 196 N.J. Super. at 566, and where the communications would demonstrate that the privilege holder had information that may show if and when it became aware of dangers and liability associated with its products and if it, through

---

[54]As GM has placed the communications at issue, the Kozloz rationale also supports disclosure. See n.41, supra.

misrepresentations or omissions about the dangers, fraudulently induced another to act. Leonen v. Johns Manville, 135 F.R.D. 94, 100 (D.N.J. 1990) (Kozlov test met when a party shows the need and relevancy of this material to their case and the fact the materials are only available in the files of the party asserting the privilege and the information contained within the documents was no longer available).

### ii.    Choice of Law

Before applying the Kozlov test to the case at bar, the Court must be satisfied that application of this court-created rule of New Jersey state law applies to the conduct of the attorneys and clients in this case. Defendant argues that since the client is located in Michigan and the lawyers are licensed in states other than New Jersey that New Jersey's Kozlov rule does not govern them.[55] GM further argues that since the legal advice occurred in either Michigan, Illinois or Florida, and the communications involved attorneys licensed in those states, that those states have a greater interest in the communications and their respective privilege laws should govern the communications. Since none of those jurisdictions have a Kozlov-like attorney-client privilege exception, defendant argues, it should not provide a basis to pierce the privilege. For the reasons that follow, the Court holds the Kozlov exception requires disclosure of otherwise privileged documents set forth in Appendix A to the Court's Order.

### a.    New Jersey and Pro Hac Vice Counsel

GM and its counsel were bound by New Jersey law. First, Morley Cramer, a New Jersey law firm, represented GM in the New Jersey state court action and was bound by New Jersey

---

[55]Interestingly, GM embraced New Jersey law regarding the "common interest" doctrine to shield its communication disclosed to Royal Insurance.

84

law.  Second, by order dated December 1, 1989, K&E, GM's regional counsel from Illinois, was

granted pro hac vice admission to appear in the New Jersey state case.  The New Jersey Court

Rule governing pro hac vice admission specifically states that the "order granting admission pro

hac vice shall require the attorney to . . . abide by these rules, including all disciplinary rules."[56]

N.J. Ct. R. 1:21-2(b)(1).  The phrase "these rules" refer to the New Jersey Court rules.  Boston

Univ. v. University of Med. & Dentistry of New Jersey, 176 N.J. 141, 146 (2003).  The order

allowing the K&E lawyers to represent GM included the language that required counsel abide by

all such rules.  Relatedly, the New Jersey Rules of Evidence governed the civil case in which GM

and its counsel appeared.  N. J. Evid. R. 101(a)(2) (stating that the New Jersey Rules of evidence

"shall apply in all proceedings, civil or criminal, conducted by or under the supervision of a

court").  Rule 504 addresses the attorney-client privilege and exceptions thereto.  N.J.S.A.

2A:84A-20.  The annotations to the rule discuss Kozlov.  Given counsel's obligation to comply

with all court rules and that the proceedings in which they participated were governed by the

New Jersey Rules of Evidence, and given Kozlov is an exception to the attorney-client privilege

which is embodied in the rules, Kozlov appropriately applies to the actions of an attorney and

client who appear in a New Jersey court proceeding.  Thus, since GM appeared in the New Jersey

proceedings through K&E and Morley Cramer, they are bound by New Jersey's rules and laws.

    Furthermore, client and counsel had contact with the forum at the time of the

communication.  Indeed, all of the communications at issue were made in furtherance of GM's

---

[56]Ingemi v. Pelino & Lentz, 866 F. Supp. 156, 162 (D.N.J. 1994) (stating that "[t]hese
rules ensure that attorneys representing . . . clients in New Jersey courts are sufficiently familiar
with state law and practice to represent their clients knowledgeably and effectively . . . .")
(emphasis added).

representation by New Jersey attorneys in an ongoing New Jersey case. ████████

████████████████████████████████████████████████████████████████

████ Since these communications were in furtherance of GM's defense in the New Jersey case,

the fact that they were made to attorneys who did not appear in the action is of no consequence

and does not limit GM's obligations to operate within the bounds of New Jersey law.

### b. Conflict of Law Analysis

Furthermore, New Jersey's choice of law analysis dictates the application of New Jersey

law. A federal court exercising diversity jurisdiction applies the substantive law of the forum

state, including its choice of laws or "conflicts" of law rules. Day & Zimmerman, Inc. v.

Challoner, 423 U.S. 3, 4-5 (1975). To determine the state law to be applied in a diversity suit,

New Jersey utilizes the flexible "governmental-interest" standard. Greenfeder v. Jarvis, 302 N.J.

Super. 153, 159 (App. Div. 1997). This standard requires the application of the law of the state

with the greatest interest in resolving the particular issue raised in the underlying litigation. Id.;

Prudential Ins. Co. of America v. Nelson, 11 F. Supp. 2d 572, 577 (D.N.J. 1998). Under this

analysis, the court must initially determine "whether a conflict exists between the law of [the

interested states] . . . . Any such conflict is to be determined on an issue-by-issue basis." Id. at

578 (citations omitted). If a conflict exists, then the Court must assess the "governmental

policies underlying the law of each state and how these policies [a]re affected by each state's

contacts to the litigation and to the parties." Hoffman Equip., Inc. v. Clark Equip. Co., 750 F.

Supp. 1222, 1230 (D.N.J. 1990) (internal citations omitted). Put differently, "the court first

determines each related jurisdiction's governmental policies as evidenced by the laws of that

jurisdiction and, second, the factual contacts between each related jurisdiction and the parties.

Id. If a state's contacts are not related to the policies underlying its law, then that state does not possess an interest in having its law apply. See Pfau v. Trent Aluminum Co., 55 N.J. 511, 521-22 (1970); Mellk v. Sarahson, 49 N.J. 226, 230 (1967). As retired Judge Alfred M. Wolin observed:

> the qualitative, not the quantitative nature of a state's contacts ultimately determines whether its law should apply. If the application of a state's law to the facts of a particular case will further the state's policies, only then is a state considered interested in a matter.

Prudential, 11 F. Supp 2d. at 578 (citations and quotation marks omitted).

As stated in the Court's June, 2004 opinion, all of the jurisdictions recognize the importance of the attorney-client privilege to encourage full and frank communications between client and counsel but such a privilege must yield if the services are used in furtherance of an unlawful activity. No jurisdiction completely prohibits piercing the privilege. Each jurisdiction seeks to advance the same policies through the qualified attorney-client privilege. None other than New Jersey, however, seem to have adopted the Kozlov exception, which ensures that when there is a legitimate need to obtain the evidence, which is relevant, material, and unavailable from any other source, the privilege is pierced. Therefore, the Court must turn to the second prong of the governmental-analysis inquiry and "identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties." Veazey v. Doremus, 103 N.J. 244, 248 (1986) (citing Henry, 508 F.2d at 32).

For Kozlov to apply, New Jersey must be shown to have the greatest interest in resolving the issue at bar. One treatise has surveyed numerous cases and has identified five factors that courts have used to identify the state with the greatest interest. Paul Rice, Attorney-Client

87

Privilege in the United States §12:17 (2d ed. 2004). The factors are: (a) the location of the origin

of the attorney-client relationship; (b) the location of the domiciles, incorporation, or places

where the parties do business; (c) the location of the events leading to the causes of action; (d)

location of trial; and (e) place of discovery for which the privilege is asserted. Id. (collecting

cases). Consideration of these factors require application of New Jersey law.

Here, the attorney-client relationship arose between Michigan, the location of the client,

and Florida, Illinois, and New Jersey, the locations of the lawyers with whom the client

consulted. Thus, in isolation, and given each state's interest in governing the conduct of counsel,

this factor shows that all of the state's have an equal interest. The attorney-client relationship,

however, existed for the purpose of providing a defense in a case filed in the New Jersey state

courts and included representation by New Jersey counsel.[57]

Moreover, the privileged communications took place as part of GM's defense of a New

Jersey state civil case arising from an automobile accident that occurred in New Jersey and

involved a New Jersey plaintiff. New Jersey has an interest in protecting New Jersey residents

injured in accidents that occur in New Jersey. See Gantes v. Kason Corp., 145 N.J. 478, 484

(1996) (citing Veazey, 103 N.J. at 248-49); Mellk v. Sarahson, 49 N.J. 226 (1967) (concluding

that New Jersey's concern for protecting the plaintiff, who was a New Jersey domiciliary, gave it

a sufficient interest in the application of New Jersey law; Ohio had no interest in the application

---

[57] Cf McNulty v. Bally's Park Place, 120 F.R.D. 27, 31 (E.D. Pa. 1988) (applying New
Jersey law to a situation involving an attorney opinion letter by a New Jersey law firm for a New
Jersey client that had been prepared years before and unrelated to the Pennsylvania litigation).
While the communications here involved a non-New Jersey client and some non-New Jersey
counsel, the communications are directly related to a then-pending New Jersey case.

88

of its guest statute); Pfau v. Trent Aluminum Co., 55 N.J. 511, 525 (1970) (concluding that New Jersey might have an interest in enforcing a New Jersey "host's Duty to his guests," although New Jersey did not have an interest in protecting a plaintiff who was a Connecticut citizen). By extension, these residents have an interest in ensuring that they receive a fair and full airing of their claims arising from such accidents and that they receive accurate responses to discovery and that the tribunals before whom their cases are pending have complete and accurate information.

Furthermore, the privileged communications at issue are being sought for production and use in a New Jersey federal case. The core of the plaintiff's New Jersey federal case is a claim that the defendant made fraudulent or negligent misrepresentations to the plaintiff and to the New Jersey state courts during the discovery, trial and appeal of the New Jersey state products liability case. Plaintiff's discovery demands, the discovery Orders, the trial, and the appeal all occurred in New Jersey. New Jersey has a strong interest in examining the conduct alleged to have defrauded or deceived the New Jersey courts and a New Jersey litigant.

While the other jurisdictions may have an interest in monitoring the conduct of the attorneys they have licensed, and the client's home state has an interest in ensuring that its residents' privileged communications are shielded from improper disclosure, there is no doubt that New Jersey has the most significant interest in the issues involved in this dispute and so the choice of law provision dictate that New Jersey law, including Kozlov, apply.

### iii.    Application of Kozlov

The starting point for the Kozlov analysis is the substantive claims that the plaintiff has alleged, see Dontzin v. Myer, 301 N.J. Super. 501, 506-08 (App. Div. 1997), namely fraud, negligent misrepresentation, and a violation of the New Jersey RICO statute. While plaintiff's

89

negligence claim would appear not to require a showing of specific intent to withhold documents, at the core of plaintiff's other claims is whether or not GM representations regarding the existence of alternative approaches truthfully disclosed what they knew to be the true state affairs.

The discovery plaintiff seeks is clearly relevant. Plaintiff's causes of action involve claims about the defendant's actions and intent during the <u>Green</u> litigation.[58] The information that GM possessed, what GM told its lawyers, and what GM and its lawyers knew is relevant to establishing GM's state of mind and intent with respect to the disclosure or nondisclosure of the alternative approach documents and has probative value. Furthermore, the information will establish the conduct of counsel and client and will enable a fact finder to determine if reasonable and prudent care was taken regarding representations to the plaintiff and to the state court.[59] Thus, privileged communications about these topics would satisfy the relevance prong of <u>Kozlov</u>.

The plaintiff also has a legitimate need for the information. The information is not sought to harass, oppress, or burden the defendant. The claims require proof of what the client and lawyers knew about the topic of alternate approaches to the roof design at the time they made representations to the plaintiff and the state court and what it did or did not do in connection with its retrieval and production o responsive materials. Simply asking the in-house and outside

---

[58]<u>See</u> n.61, <u>infra</u>.

[59]

90

counsel if they ever saw Documents A-H will not enlighten the plaintiff as to what the client knew and if GM engaged in actions that caused their attorneys to intentionally withhold responsive information. Even if the lawyers unknowingly assisted in the failure to be fully forthcoming, it is legitimate to question the client and its agents about their knowledge of the documents and the process that led them not to be produced.

Finally, the Court is satisfied by a "'fair preponderance of the evidence, including all reasonable inferences, that . . . the information . . . could not be secured for any less intrusive source.'" Nackson, 114 N.J. at 537 (quoting Kozlov, 79 N.J. at 244). At oral argument, counsel for GM was unable to suggest an alternate source for the information that would adequately allow the plaintiff to probe what counsel and the client knew about the alternate approaches to the T-top, when they knew it, and why the information was not disclosed. The information is sought to determine whether or not counsel and/or client acted with the intent to mislead the plaintiff and the state court about GM's consideration of alternative approaches to the roof. The only source for this information is those who were charged with seeking and providing responsive information. The information is uniquely in the control and knowledge of GM and its various attorneys and there are no other means to secure the information other than the direct inquiry of them and a review of their communications during the relevant time period. Since the information cannot be acquired from a less intrusive source, the third prong of Kozlov is satisfied.

The Court does not apply Kozlov lightly. Indeed, the Court recognizes that its application should be limited to extraordinary circumstances where the "privilege must yield to other fundamental values of our justice system." Nackson, 114 N.J. at 532. One of the core values of

91

our system is the candid and timely disclosure of relevant and responsive information **upon** proper request. In this case, the record suggests aggressive techniques that did **not necessarily** result in the full and timely disclosure of undeniably relevant and responsive information. **The** critical issue is whether or not GM withheld responsive information to deceive **the state court or** the plaintiff about a topic ▇▇▇▇▇▇▇▇ central to every products liability case. ▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇ Here, there were a series of explicit interrogatories **seeking** undeniably relevant information about alternative approaches GM considered **and a failure to** produce clearly responsive information.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████ In the context of these factors and **GM's**

approach to discovery, the inference GM asks the Court to draw is tantamount to **inferring in**

their favor inadvertence as opposed to deliberate actions.  In light of the other **evidence reflecting**

██████████████████████████████████████████████

██████████████████████████████████████████████

█████ and the legal requirement that the Court not draw inferences in favor of **one party as**

opposed to the other, the balance tips in favor of disclosure under both the crime **fraud and**

Kozlov exceptions to the attorney-client privilege.

For all of these reasons, and recognizing that the attorney-client privilege **"results in**

suppression of evidence and to that extent is at war with the truth," and the Court **finding that**

there is no apparent "compensating gain" from shielding evidence, United Jersey Bank v.

Wolosoff, 196 N.J. Super. 553, 561 (App. Div. 1984), the Court orders production of the **specific**

documents listed on Appendix A to the Order for which the attorney-client privilege is asserted

and will permit the depositions of clients, counsel and their respective agents about the topics

embodied therein.

E.      **Exception to the Work-product Rule**

As stated supra, the evidence also supports piercing the shield given to attorney work-

product.  The work-product doctrine is governed, even in diversity cases, by uniform federal law

embodied in Fed. R. Civ. P. 26(b)(3).  United Coal Co. v. Powell Constr. Co., 839 F.2d 958, 966

(3d Cir. 1988); <u>Maertin</u>, 172 F.R.D. at 147. Rule 26(b)(3) essentially establishes "two tiers of protection: first, work prepared in anticipation of litigation by an attorney or his agent is discoverable only upon a showing of need and hardship; second, 'core' or 'opinion' work-product that encompasses the 'mental impressions, conclusions, opinion, or legal theories of an attorney or other representative of a party concerning the litigation' is 'generally afforded near absolute protection from discovery.'" <u>In re Cendent Corp.</u>, 343 F.3d 658, 663 (3d Cir. 2003) (quoting <u>United States v. Nobles</u>, 422 U.S. 225, 238-239 (1975)).

Here, GM, as the party seeking exclusion from discovery based on the general work-product exception, bears the initial burden of proving that the material was prepared in anticipation of litigation. <u>Holmes v. Pension Plan of Bethlehem Steel Corp.</u>, 213 F.3d 124, 138 (3d Cir. 2000). As Judge Stanley Chesler stated in <u>In re Gabapentin Patent Litigation</u>, 214 F.R.D. 178 (D.N.J. 2003):

> Courts generally, and in this Circuit in particular, have applied what amounts to a two part test for ascertaining whether the documents (or things) at issue should be protected under the [] work-product privilege. The first prong of the inquiry is the "reasonable anticipation" test, which requires that the court determine at what point in time litigation could reasonably have been anticipated.
>
> [T]he second prong of the test is whether the material [was] produced because of the prospect of litigation and for no other purpose. In order to determine whether a document satisfies this standard, the proper inquiry is whether in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation . . . . Finally, the articulable claim likely to lead to litigation must pertain to this particular party, not the world in general.

In re Gabapentin Patent Litig., 214 F.R.D. at 183-84 (citations and quotations omitted).[60] As stated previously, the Court finds that the documents for which the defendants provided foundational testimony meet the standard for work-product protection. The documents the Court found to constitute work-product are identified on Appendix A to the Order issued on this date.

Courts can order the production of work-product protected material "upon a showing of substantial need and inability to obtain the equivalent without undue hardship." Upjohn Co. v. United States, 449 U.S. 383, 400 (1981).

Where "core" or "opinion" work-product material is at issue, however, the required showing must be far greater. In re Cendant Corp., 343 F.3d at 663. Opinion work-product includes an attorney's legal strategy, intended proof, evaluation of the case, and inferences drawn from witnesses interviews. See Sporck v. Peil, 759 F.2d 312, 316 (3d Cir. 1985) (citations omitted). The Court of Appeals for the Third Circuit has accorded such information "an almost absolute protection from discovery because any slight factual content that such items may have is generally outweighed by the adversary system's interest in maintaining the privacy of an attorney's thought processes and in ensuring that each side relies on its own wit in preparing their respective cases." Id. (citing Upjohn Co. v. United States, 449 U.S. at 401 and In re Grand Jury Investigation, 599 F.2d 1224, 1231 (3d Cir. 1979)).

The evidence adduced supports piercing the work-product shield under the crime-fraud

---

[60] The work-product protection of GM's communications in the underlying Green case applies here because the two litigations are related. See In re Grand Jury Proceedings, 604 F.2d 798, 803 (3d Cir. 1979); Macario v. Pratt & Whitney Canada, Inc., No. CIV.A. 90-3906, 1991 WL 1004, at *5 (E.D. Pa. Jan. 2, 1991) (non-published) (holding "absent any applicable exception, the work-product materials from the previous lawsuit retain their immunity from discovery even after termination of that case."). This approach takes into account that the immunity is qualified in that it can be overcome by a showing of strong need.

95

exception. See In re Grand Jury Proceedings (FMC), 604 F.2d at 802-03; see also In re Grand

Jury Subpoena Duces Tecum Dated Sept. 15, 1983, 731 F.2d 1032, 1038 (2d Cir. 1984) (holding

"[i]t is well-established that communications that otherwise would be protected by the attorney-

client privilege or the attorney work-product privilege are not protected if they relate to client

communications in furtherance of contemplated or ongoing criminal or fraudulent conduct."); In

re Int'l Sys. & Controls Corp. Sec. Litig., 693 F.2d 1235, 1242 (5th Cir. 1983) (same). The

Court's analysis of the facts supporting piercing the attorney-client privilege also support

piercing the work-product shield and it is incorporated herein.

　　　Furthermore, to the extent the work-product immunity applies to documents that embody

non-opinion work-product, the Court finds substantial need to compel disclosure for the same

reasons set forth in its Kozlov analysis and it is incorporated herein.

　　　Moreover, the Court finds "exceptional circumstances" exist to compel disclosure for

documents for which defendant asserts opinion work-product. The Court bases its decision in

part on the Kozlov analysis and in part on the elements of plaintiff's cause of action. The

plaintiff's fraudulent concealment and RICO claims require plaintiff to make a showing of GM's

state of mind in engaging in allegedly fraudulent litigation practices.[61]  The essence of plaintiff's

---

[61]Specifically, to prove his fraudulent concealment claim, plaintiff must show that: (1)
defendant had a legal obligation to disclose evidence in connection with an existing or pending
litigation; (2) that the evidence was material to the litigation; (3) plaintiff could not reasonably
have obtained access to the evidence from another source; (4) defendant intentionally withheld,
altered or destroyed the evidence with purpose to disrupt the litigation; and (5) plaintiff was
damaged in the underlying action by having to rely on an evidential record that did not contain
the evidence defendant concealed. Rosenblit v. Zimmerman, 166 N.J. 391, 406 (2001) (stating
the tort of fraudulent concealment "may be invoked as a remedy for spoliation where those
elements exist.").

　　　Plaintiff's New Jersey's RICO claim also depends upon proof of GM's intent in making

96

claims is that GM knowingly withheld documents during the discovery process in the <u>Green</u>

litigation and lied to the New Jersey state Appellate Division in the <u>Green II</u> appeal.

Where a cause of action requires proof of the defendant's intent or state of mind, and

such evidence is embodied in work-product, courts have compelled disclosure over the assertion

of the work-product doctrine. <u>See</u>, <u>e.g.</u>, <u>Kockums Indus., Ltd. v. Salem Equip., Inc.</u>, 561 F.

Supp. 168 (D. Or. 1983). For example, in <u>Kockums</u>, the Court held defendant had a "compelling

need" to pierce the work-product privilege because, without access to the material sought, "the

defendant will have no chance to prove its potentially valid counterclaims." <u>Id.</u> at 173. In that

case, a patent infringement defendant counterclaimed for unfair competition and antitrust

violations claiming plaintiff knew its patent was invalid when it filed suit. <u>Id.</u> at 170. Defendant

sought discovery of letters between the patent holder and his counsel and plaintiff asserted work-

product and attorney-client privileges. <u>Id.</u> at 170-71. The Court held defendant was entitled to

---

representations and failing to disclose Documents A-H in the <u>Green</u> litigation. To state a claim
for civil violation of the New Jersey RICO statute, a plaintiff must show: (1) one or more persons
employed by or associated with an enterprise; (2) the enterprise engaged in or affecting interstate
or foreign commerce; (3) the defendant participated in the conduct of such enterprise's affairs;
(4) the defendant participated through a pattern of racketeering activity; and (5) such activity is
evidenced by at least two related predicate acts. <u>See</u> <u>Maxim Sewerage Corp. v. Monmouth
Ridings</u>, 273 N.J. Super. 84, 93-94 (Law Div. 1993) (citing <u>Shearin v. E.F. Hutton Group, Inc.</u>,
885 F.2d 1162, 1165 (3d Cir. 1989)). In this case, plaintiff's predicate acts are based on alleged
fraudulent concealment of documents and misrepresentations to plaintiff and the New Jersey
state court in the <u>Green</u> litigation. Thus, plaintiff's RICO claim would also require a showing of
GM's state of mind in its litigation conduct.

Plaintiff argues that New Jersey courts further recognize a cause of action for negligent
concealment of evidence as well. The elements of that tort the same for fraudulent concealment
of evidence, except plaintiff need only show that defendant negligently destroyed or withheld
evidence in a manner designed to disrupt the plaintiff's case. <u>Viviano v. CBS, Inc.</u>, 251 N.J.
Super. 113, 126 (App. Div. 1991) (citing <u>County of Solano v. Delancy</u>, 215 Cal. App.3d 1232,
264 Cal. Rptr. 721, 729 (Cal. App. 1988)).

discovery of letters because it had shown a "prima facie" case of fraud. <u>Id.</u> at 174. Specifically, the court found defendant had demonstrated the patented device was publicly displayed, demonstrated, and sold at machinery exhibition more than one year prior to application, which was not disclosed at Patent Office. <u>Id.</u> at 172. Thus, courts have found sufficient necessity to pierce work-product protection where the information and mental impressions for which doctrine is asserted form the basis of plaintiff's claims.

In light of the nature of plaintiff's claims here, the Court finds sufficiently compelling need to pierce defendant's assertion of the work-product doctrine. Plaintiff must prove the defendant's intent. The defendant acts through its representatives, some of whom are its attorneys. A source of evidence for the intent and state of mind element is the mental impressions, conclusions, opinions, or legal theories of its attorneys. Therefore, in these narrow circumstances, the Court finds exceptional circumstances exist to compel disclosure of the documents for which defendant seeks work-product protection, as outlined in Appendix A to the Order.

## VI.    CONCLUSION

For all of these reasons, the Court orders production of the specific documents listed on Appendix A to the Order for which the attorney-client privilege and work-product rule is asserted and will permit the depositions of clients, counsel and their respective agents about the topics embodied therein.

The Court reaches these conclusions based upon careful consideration of the entire record that has been presented. This ruling is reached mindful of the low evidentiary standard that must be satisfied and the fact the Court cannot draw inferences in favor of one party over another. The

decision is not to be construed as a finding for use in support of the plaintiff's claims. Indeed, the Court, "in these proceedings, is not required, nor would it be proper, to make findings as to whether or not the fraud charged was perpetrated, but [is] only to determine whether or not the evidence in the record, without more, constitutes a . . . showing," that justifies piercing the privilege. SEC v. Harrison, 80 F. Supp. 226, 232 (D.D.C. 1948). Thus, the Court is not passing on the viability of any of the plaintiff's claims. Furthermore, the ruling is not meant to signal that every discovery dispute will easily justify an inquiry into the privileged and confidential activities of client and counsel. RCA Corp. v. Data General Corp., No. CIV.A.84-270, 1986 WL 15684, at *4 (D. Del. Oct. 27, 1986) (noting "as courts have previously stated, a mere showing that an attorney has failed to produce certain documents in the course of extensive discovery will not necessarily trigger the crime-fraud exception."). Rather, the facts here present a unique set of circumstances that justify allowing disclosure of the documents and testimony.

An appropriate Order will follow.

s/ Patty Shwartz
United States Magistrate Judge

99