**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>**MOTORS LIQUIDATION COMPANY,** *et al.*, **f/k/a General Motors Corp.,** *et al.*,<br><br>**Debtors.** | Chapter 11<br><br>Case No. 09-50026 (REG)<br><br>(Jointly Administered) |

## RESPONSE OF GUC TRUST ADMINISTRATOR AND PARTICIPATING UNITHOLDERS TO NEW GM'S OPENING BRIEF ON THRESHOLD ISSUES CONCERNING ITS MOTIONS TO ENFORCE THE SALE ORDER AND INJUNCTION

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Phone: (212) 351-4000
Fax: (212) 351-4035

*Attorneys for Wilmington Trust Company, as Trustee for and Administrator of the Motors Liquidation Company General Unsecured Creditors Trust*

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Phone: (212) 872-1000
Fax: (212) 872-1002

*Attorneys for the Participating Unitholders*

December 16, 2014

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................ 4

    I.    The Sale Of General Motors Corporation's Assets In 2009 ........................................ 4

        A.   Notice Of The Sale Hearing.................................................................... 4

        B.   The Sale Hearing.................................................................................... 5

        C.   The Sale Order ....................................................................................... 6

        D.   New GM's Assumed Liabilities And Old GM's Retained Liabilities................. 7

    II.   The Confirmation Of Motors Liquidation Company's Bankruptcy Plan In 2011 ....... 8

    III.  The GUC Trust's Administrative Function .................................................. 9

    IV.  New GM's Vehicle Recalls In 2014 ......................................................... 10

        A.   Ignition Switch Recalls........................................................................ 10

        B.   Other Recalls........................................................................................ 11

        C.   New GM's Admissions Of Wrongdoing .......................................... 11

    V.   New GM Moves To Enforce The July 2009 Sale Order Against Plaintiffs Asserting Causes Of Action Relating To New GM's Vehicle Recalls In 2014 ........ 12

ARGUMENT ...................................................................................................... 14

    I.    Due Process Threshold Issue:  Plaintiffs' Due Process Rights Would Be Violated  If The Sale Order Were Applied To Bar Their Causes Of Action Against New GM ................................................. 14

        A.   At The Time Of The Sale, The Pre-Sale Plaintiffs And Post-Sale Plaintiffs Had No "Claims" Under The Bankruptcy Code ................................ 14

        B.   The Sale Order Should Not Be Applied To Bar  Plaintiffs' Causes Of Action Against New GM.................................................. 19

        C.   To Preserve Their Constitutional Due Process Rights, Plaintiffs Are Not Required To Speculate About What Might Have Occurred If The Defects Disclosed By New GM's Recalls In 2014 Had Been Disclosed Earlier........... 27

## TABLE OF CONTENTS
### (Continued)

**Page**

II. Remedies Threshold Issue:  The Sale Order Should Be Voided As To Plaintiffs...... 33

    A. Plaintiffs' Causes Of Action Are Properly Directed Against New GM ............ 34

    B. Courts Have Repeatedly Held That A Section 363 Purchaser Is Precluded From Taking Property Free And Clear Of All Interests Where A Pre-Sale Claimant Was Deprived Of Due Process Prior To Entry Of The Sale Order .... 36

III. Threshold Issue On New GM's Assumed Liabilities And Old GM's Retained Liabilities:  New GM Is Responsible For Plaintiffs' Alleged Economic Injuries From New GM's Recalls And New GM's Violation Of Federal Recall Laws .......... 39

    A. Under The Express Terms Of The Sale Agreement, New GM's Assumed Liabilities Encompass Plaintiffs' Alleged Economic Injuries From New GM's Recalls ................................................................................................. 39

    B. New GM Is Also Responsible For Plaintiffs' Alleged Economic Losses From New GM's Violation Of Federal Recall Laws........................................ 43

IV. The Legal Standard For "Fraud On The Court" ....................................... 45

CONCLUSION.................................................................................................... 47

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acevedo v. Van Dorn Plastic Mach. Co.*,
   68 B.R. 495 (Bankr. E.D.N.Y. 1986)................................................................ 24, 25, 26

*Burton v. Chrysler Group., LLC (In re Old Carco)*,
   492 B.R. 392 (Bankr. S.D.N.Y. 2013).............................................................. 18, 42

*Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
   428 B.R. 43 (S.D.N.Y. 2010)........................................................................... 37

*Castillo v. Gen. Motors LLC (In re Motors Liquidation Co.)*,
   2012 WL 1339496 (Bankr. S.D.N.Y. Apr. 17, 2012)...................................... 42

*Compak Cos. LLC v. Johnson*,
   415 B.R. 334 (N.D. Ill. 2009) ......................................................... 3, 35, 36, 37, 38

*Doktor v. Werner Co.*,
   762 F. Supp. 2d 494 (E.D.N.Y. 2011) ............................................................ 39

*Doolittle v. Cnty. of Santa Cruz (In re Metzger)*,
   346 B.R. 806 (Bankr. N.D. Cal. 2006) ............................................... 3, 36, 37, 38

*Douglas v. Stamco*,
   363 F. App'x 100 (2d Cir. 2010) .................................................................... 39

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
   871 F. Supp. 2d 143 (E.D.N.Y. 2012) ......................................................... *passim*

*Esposito v. New York*,
   2012 WL 5499882 (S.D.N.Y. Nov. 13, 2012)............................................... 45, 46

*Fogel v. Zell*,
   221 F.3d 955 (7th Cir.2000) ........................................................................... 17

*Gabauer v. Chemtura Corp. (In re Chemtura Corp.)*,
   505 B.R. 427 (S.D.N.Y. 2014)........................................................................ 24

*Gleason v. Jandrucko*,
   860 F.2d 556 (2d Cir. 1988) ........................................................................... 45, 46

*Hadges v. Yonkers Racing Corp.*,
   48 F.3d 1320 (2d Cir. 1995) ........................................................................... 45

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,
   322 U.S. 238 (1944)........................................................................................ 45

*In re Bartle*,
   560 F.3d 724 (7th Cir. 2009) .......................................................................... 1, 29

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*In re BFW Liquidation, LLC,*
  471 B.R. 652 (Bankr. N.D. Ala. 2012) ................................................. 34

*In re Caldor, Inc.-NY,*
  240 B.R. 180 (Bankr. S.D.N.Y. 1999) ................................................. 31

*In re Chrysler LLC,*
  576 F.3d 108 (2d Cir. 2009) ................................................. 21

*In re Chrysler LLC,*
  592 F.3d 370 (2d Cir. 2010) ................................................. 21

*In re City Equities Anaheim, Ltd.,*
  22 F.3d 954 (9th Cir. 1994) ................................................. 29

*In re Edwards,*
  962 F.2d 641 (7th Cir. 1992) ................................................. 30

*In re Ex-Cel Concrete Co., Inc.,*
  178 B.R. 198 (B.A.P. 9th Cir. 1995) ................................................. 30

*In re Fernwood Markets,*
  73 B.R. 616 (Bankr. E.D. Pa. 1987) ................................................. 36

*In re Flanagan,*
  415 B.R. 29 (D. Conn. 2009) ................................................. 18

*In re Food Mgmt. Grp., LLC,*
  380 B.R. 677 (Bankr. S.D.N.Y. 2008) ................................................. 45

*In re Gen. Motors Corp.,*
  407 B.R. 463 (Bankr. S.D.N.Y. 2009) ................................................. 6, 7, 8, 32, 33

*In re Heiney,*
  194 B.R. 898 (D. Colo. 1996) ................................................. 29

*In re Hexcel Corp.,*
  239 B.R. 564 (N.D. Cal. 1999) ................................................. 22, 26, 32

*In re Hoffinger,*
  307 B.R. 112 (Bankr. E.D. Ark. 2004) ................................................. 19

*In re Hoti Enters., L.P.,*
  2012 WL 6720378 (S.D.N.Y. Dec. 27, 2012) ................................................. 46

*In re Kewanee Boiler Corp.,*
  198 B.R. 519 (Bankr. N.D. Ill. 1996) ................................................. 2, 21, 25, 35

*In re Lehman Bros. Holdings, Inc.,*
  761 F.3d 303 (2d Cir. 2014) ................................................. 40

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*In re Lehman Bros., Inc.*,
  478 B.R. 570 (S.D.N.Y. 2012) ............................................................... 40

*In re Motors Liquidation Co.*,
  447 B.R. 142 (Bankr. S.D.N.Y. 2011) ..................................................... 41

*In re Old Carco LLC*,
  423 B.R. 40 (Bankr. S.D.N.Y. 2010) ....................................................... 46

*In re Parcel Consultants, Inc.*,
  58 F. App'x 946 (3d Cir. 2003) ........................................................ 27, 29

*In re Paris Indus. Corp.*,
  132 B.R. 504 (D. Me. 1991) ..................................................................... 30

*In re Polycel Liquidation, Inc.*,
  2006 WL 4452982 (Bankr. D.N.J. Apr. 18, 2006) ............................ 30, 39

*In re Ritchie Risk-Linked Strategies Trading (Ir.) Ltd.*,
  471 B.R. 331 (Bankr. S.D.N.Y. 2012) ......................................... 19, 30, 36

*In re Rosson*,
  545 F.3d 764 (9th Cir. 2008) ................................................................... 29

*In re Trans World Airlines, Inc.*,
  322 F.3d 283 (3d Cir. 2003) ..................................................................... 37

*In re Trico Marine Servs., Inc.*,
  360 B.R. 53 (Bankr. S.D.N.Y. 2006) ....................................................... 46

*In re U.S. Kids, Inc.*,
  178 F.3d 1297, 1999 WL 196509 (6th Cir. 1999) .................................... 27

*In re Vanguard Oil & Serv. Co.*,
  88 B.R. 576 (E.D.N.Y. 1988) ................................................................... 31

*In re Waterman Steamship Corp.*,
  141 B.R. 552 (Bankr. S.D.N.Y. 1992) ............................................... 24, 25

*In re YBA Nineteen, LLC*,
  505 B.R. 289 (S.D. Cal. 2014) ................................................................. 27

*Indiana State Police Pension Trust v. Chrysler LLC*,
  558 U.S. 1087 (2009) ............................................................................... 21

*Johnson v. Bell*,
  605 F.3d 333 (6th Cir. 2010) ................................................................... 45

*Kane v. Johns-Manville Corp.*,
  843 F.2d 636 (2d Cir. 1988) .................................................................... 28

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

*King v. First Am. Investigations, Inc.*,
  287 F.3d 91 (2d Cir. 2002) ............................................................. 45, 46

*Koepp v. Holland*,
  2014 WL 6600418 (2d Cir. Nov. 21, 2014) (summary order)................................. 2, 16, 19, 30

*Kupferman v. Consolidated Research & Mfg. Corp.*,
  459 F.2d 1072 (2d Cir. 1972) ............................................................. 45

*Lee v. Marvel Enters., Inc.*,
  765 F. Supp. 2d 440 (S.D.N.Y. 2011) ................................................. 45, 46

*Lemelle v. Universal Mfg. Corp.*,
  18 F.3d 1268 (5th Cir. 1994) ........................................................ 18, 21, 25

*LinkCo, Inc. v. Akikusa*,
  615 F. Supp. 2d 130 (S.D.N.Y. 2009) .................................................... 46

*LinkCo, Inc. v. Naoyuki Akikusa*,
  367 F. App'x 180 (2d Cir. 2010) ...................................................... 45, 46

*LTV Steel Co. v. Shalala (In re Chateaugay Corp.)*,
  53 F.3d 478 (2d Cir. 1995) ............................................................. 15

*MacArthur Co. v. Johns-Manville Corp.*,
  837 F.2d 89 (2d Cir. 1988) ............................................................. 35

*Mauro Motors Inc. v. Old Carco LLC*,
  420 F. App'x 89 (2d Cir. 2011) ........................................................ 46

*Metal Founds. Acquisition, LLC v. Reinert (In re Reinert)*,
  467 B.R. 830 (Bankr. W.D. Pa. 2012) ................................................... 24

*Molla v. Adamar of N.J., Inc.*,
  2014 WL 2114848 (D.N.J. May 21, 2014) ................................................. 34

*Morgan Olson, LLC v. Frederico (In re Grumman Olson Indus., Inc.)*,
  467 B.R. 694 (S.D.N.Y. 2012) ........................................................ *passim*

*Morgenstein v. Motors Liquidation Co. (In re Motors Liquidation Co.)*
  462 B.R. 494 (Bankr. S.D.N.Y. Jan. 18, 2012) .......................................... 9, 31

*Mullane v. Cent. Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950)................................................................... 24, 27

*Norton v. Town of Islip*,
  239 F. Supp. 2d 264 (E.D.N.Y.) ......................................................... 29

*Olin Corp. v. Am. Home Assurance Co.*,
  704 F.3d 89 (2d Cir. 2012) ............................................................. 40

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
   430 B.R. 65 (S.D.N.Y. 2010)................................................................ 31, 37

*Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*,
   266 B.R. 575 (S.D.N.Y. 2001)..................................................................... 31

*Pension Benefit Guar. Corp. v. Oneida Ltd.*,
   562 F.3d 154 (2d Cir. 2009) .................................................................. 15, 17

*Perry v. Blum*,
   629 F.3d 1 (1st Cir. 2010)........................................................................... 27

*Polycel Structural Foam, Inc. v. Pool Builders Supply of the Carolinas*
   (*In re Polycel Liquidation, Inc.*), 2007 WL 77336 (D.N.J. Jan. 8, 2007)................ 3, 36, 37, 38

*Rapp v. U.S. Dep't of Treasury, Office of Thrift Supervision*,
   52 F.3d 1510 (10th Cir. 1995) ................................................................... 29

*Schwinn Cycling & Fitness Inc. v. Benonis (In re Schwinn Bicycle Co.)*,
   210 B.R. 747 (Bankr. N.D. Ill. 1997) .................................................. 21, 25, 35, 38

*Sec. Inv. Prot. Corp. v. Blinder, Robinson & Co.*,
   962 F.2d 960 (10th Cir. 1992) ................................................................... 29

*Travelers Cas. & Sur. Co. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*,
   600 F.3d 135 (2d Cir. 2010) ............................................................ 2, 16, 19, 30

*Trusky v. Gen. Motors Co. (In re Motors Liquidation Co.)*,
   2013 WL 620281 (Bankr. S.D.N.Y. Feb. 19, 2013) ............................................... 43

*Turney v. F.D.I.C.*,
   18 F.3d 865 (10th Cir. 1994) .................................................................... 29

*United States v. LTV Corp. (In re Chateaugay Corp.)*,
   944 F.2d 997 (2d Cir. 1991) ...................................................... 2, 15, 16, 18, 19, 20

*Weldon v. United States*,
   225 F.3d 647, 2000 WL 1134358 (2d Cir. 2000) ................................................... 45

*White v. Chance Indus., Inc. (In re Chance Indus., Inc.)*,
   367 B.R. 689 (Bankr. D. Kan. 2006) ................................................... 19, 21, 25, 28

### Statutes

11 U.S.C. § 101(5)(A)...................................................................................... 16

11 U.S.C. § 363.............................................................................................. 5

### Other Authorities

Laura B. Bartell, *Due Process for the Unknown Future Claim in Bankruptcy—Is This
   Notice Really Necessary?*, 78 Am. Bankr. L.J. 339 (2004)....................................... 25

Wilmington Trust Company ("**WTC**"), as Trustee for and Administrator of the Motors

Liquidation Company General Unsecured Creditors Trust (the "**GUC Trust**"), and certain

unaffiliated holders of beneficial units of the GUC Trust (the "**Participating Unitholders**"),

respectfully submit this response to the opening brief filed by General Motors, LLC ("**New

GM**") on the four threshold issues relating to its motions to enforce the sale order entered by this

Court on July 5, 2009 (the "**Sale Order**") against plaintiffs who have filed lawsuits against New

GM asserting causes of action arising out of New GM's recall notices in 2014.

## INTRODUCTION

In 2014, New GM has issued 80 recall notices encompassing more than 30 million

vehicles, many of which contained ignition switch defects that New GM has been aware of, and

concealed, for years.  More than 170 lawsuits have been filed in connection with these recalls,

including the lawsuits at issue here, in which Plaintiffs seek damages for the economic losses and

bodily harm caused by New GM's barrage of recalls and concealed defects.  New GM has now

moved to enforce the Court's July 2009 Sale Order as to these lawsuits, asking the Court to

shield it from liability notwithstanding that Plaintiffs' claims did not arise until *after* the Sale

Order was entered.  As explained herein, New GM's request exceeds the bounds of both

constitutional due process and the Sale Order, and therefore, must be denied.

***Due Process Threshold Issue.***  New GM contends that Plaintiffs "have not been deprived

of due process" because any "alleged notice deficiency" was harmless error.  *See* Opening Brief

by General Motors LLC on Threshold Issues Concerning its Motions to Enforce the Sale Order

and Injunction, dated Nov. 5, 2014 ("**New GM Br.**"), at 36-40 (Dkt. 12981).  It is well

established, however, that "creditors have a constitutional right to be heard on their claims, and

the denial of that right to them is the denial of due process which is never harmless error."  *In re

Bartle*, 560 F.3d 724, 730 (7th Cir. 2009) (internal quotation omitted).

Here, because New GM did not disclose the ignition switch or other defects until 2014, Plaintiffs did not hold claims against Old GM at the time of the Sale.  Under the Bankruptcy Code, even a contingent claim arises only if a party's cause of action against the debtor was "within the actual or presumed contemplation" of the party and the debtor at the time of the petition.  *United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1003 (2d Cir. 1991) ("*Chateaugay I*"); *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 871 F. Supp. 2d 143, 158 (E.D.N.Y. 2012) ("*DPWN*"), *aff'd in relevant part*, 747 F.3d 145 (2d Cir. 2014) ("*DPWN II*").  Because the recall notices were not issued until 2014, Plaintiffs could not have contemplated their causes of action when the Sale Order was entered in July 2009.

Even if it is found that Plaintiffs did hold claims at the time of the Sale, they did not have "sufficient information to assert their claims in the bankruptcy proceedings," much less an opportunity to be heard on their claims.  *DPWN*, 871 F. Supp. 2d at 158; *see also In re Kewanee Boiler Corp.*, 198 B.R. 519, 530 (Bankr. N.D. Ill. 1996) (explaining that "no meaningful notice can be given to individuals who do not yet know they suffer from injury").

The Sale Order "cannot extinguish the interests of parties who lacked notice of or did not participate in the proceedings."  *Koepp v. Holland*, __ F. App'x __, 2014 WL 6600418, at *3 (2d Cir. Nov. 21, 2014) (summary order); *see also Travelers Cas. & Sur. Co. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 600 F.3d 135, 149 (2d Cir. 2010) ("With respect to due process, it is of no moment whether the terms of the 1986 Orders have been, in effect, read by the bankruptcy court to bar Chubb's claims.  Put differently, the text of the orders that were ultimately entered in 1986 does not speak to whether Chubb was afforded due process during the proceedings that led to the entry of those orders in the first place.").

***Remedies Threshold Issue.*** Although Plaintiffs' causes of action are directed against New GM, not the GUC Trust, New GM urges Plaintiffs to pursue "proceeds of the sale" by suing the GUC Trust. New GM Br. at 57. New GM never explains, however, how any "proceeds of the sale" could be distributed to those who had no pre-Sale claims. Moreover, even if Plaintiffs were somehow deemed to have had pre-Sale "claims" arising out of New GM's recalls in 2014, the Sale Order is properly voided as to Plaintiffs because they were deprived of due process in connection with the Sale. Indeed, contrary to New GM's contention that "setting aside the Sale Order and Injunction as it applies to Plaintiffs is not a viable remedy for inadequate notice" (New GM Br. at 51), courts have repeatedly held that a Section 363 purchaser is precluded from taking property free and clear of all interests where a pre-sale claimant has been deprived of due process. *See*, *e.g.*, *Compak Cos. LLC v. Johnson*, 415 B.R. 334, 343 (N.D. Ill. 2009); *Polycel Structural Foam, Inc. v. Pool Builders Supply of the Carolinas* (*In re Polycel Liquidation, Inc.*), 2007 WL 77336, at *8-9 (D.N.J. Jan. 8, 2007); *Doolittle v. Cnty. of Santa Cruz (In re Metzger)*, 346 B.R. 806, 819 (Bankr. N.D. Cal. 2006).

***Threshold Issue On New GM's Assumed Liabilities And Old GM's Retained Liabilities In Connection With The Sale.*** New GM argues that "Plaintiffs seek to hold New GM liable for a variety of [Old GM's] Retained Liabilities" (New GM Br. at 2), but ignores that Plaintiffs allege economic injuries resulting from New GM's recalls in 2014. Under the Sale Agreement, New GM's "Assumed Liabilities" encompass alleged economic injuries arising out of "incidents," such as New GM's recalls in 2014, "first occurring on or after the Closing Date" in July 2009. New GM is also responsible for any economic injuries that Plaintiffs may have suffered as a result of New GM's violations of federal recall laws. Both the Sale Order and the Sale Agreement require New GM to comply with recall laws relating to vehicles and parts

3

manufactured or distributed by Old GM, and New GM has entered into a consent order with the

National Highway Traffic Safety Administration ("**NHTSA**") admitting that it violated federal

recall laws.  Only New GM could be liable for economic injuries arising out of New GM's

violations of federal recall laws.  Indeed, there is no language in either the Sale Order or the Sale

Agreement designating such injuries as "Retained Liabilities" of Old GM.

For all these reasons, the GUC Trust Administrator and Participating Unitholders

respectfully submit that Plaintiffs have properly directed their causes of action against New GM,

rather than the GUC Trust.[1]

## FACTUAL BACKGROUND

### I.    The Sale Of General Motors Corporation's Assets In 2009

On June 1, 2009, General Motors Corporation ("**Old GM**") filed a Chapter 11 petition for

bankruptcy and a motion seeking approval to sell substantially all of its assets, pursuant to 11

U.S.C. § 363 (the "**Sale**"), to an entity that became New GM, in accordance with the terms of a

Master Sale and Purchase Agreement and related documents.  (Dkt. 1, 92).

### A.    Notice Of The Sale Hearing

On June 2, 2009, this Court entered an order adopting procedures for the Sale (the "**Sale**

**Procedures Order**"), including procedures for direct mail notice of a hearing on the Sale (the

"**Sale Hearing**") to "all . . . known creditors."  (Dkt. 274 ¶ 9).  Direct mail notice was not sent to

every person who owned an Old GM vehicle.  *See* New GM Agreed-Upon Stipulation of Facts

("**New GM SOF**"), ¶ 20 (Dkt. 12826, Ex. A); Declaration of Herb Kiefer ¶ 3 (employee of both

Old GM and New GM stating that the named plaintiffs in lawsuits subject to New GM's motions

to enforce would not have been listed on Old GM's ledgers as creditors in June 2009 "by reason

---

[1]    As directed by the Court, the GUC Trust and the Participating Unitholders have also briefed the legal
standard for a Rule 60(d)(3) motion regarding "fraud on the court."  *See infra* Argument § IV.

of the fact that they were an owner of an Old GM vehicle") (Dkt. 12982, Ex. 3). Rather, direct

mail notice was limited to known creditors and others not relevant here. *See* New GM SOF ¶ 21,

Ex. 4.

The Sale Procedures Order also included procedures for publication notice in various

global, national, and local newspapers. (Dkt. 274 ¶ 9). The notice that was ultimately published

included, among other things, information about the Sale Hearing, the terms of the Sale, the

procedures for objecting to the Sale, certain restrictions on creditors, and how to file a proof of

claim. (Dkt. 2757).

Neither the direct mail notices nor the publication notices stated that any Old GM

vehicles contained one or more serious defects that could cause personal injury, death, economic

loss, or other injuries to persons or property. *See* New GM SOF ¶ 25.

### B.    The Sale Hearing

The Sale Hearing commenced on June 30, 2009 and concluded on July 2, 2009. *Id.* ¶ 48.

At the Sale Hearing, certain parties raised a concern about persons who theoretically could have

been exposed to asbestos, but whose asbestos-related injury had not yet manifested. In response,

the Court proposed adding language to the sale order stating that it would bind future asbestos

claimants "to the fullest extent" possible under the U.S. Constitution. Hr'g Tr. July 2, 2009 at

166:13-16 (Exhibit 1 to the Declaration of Lisa H. Rubin, dated Dec. 16, 2014 ("Rubin Decl.")).

There was no discussion at the Sale Hearing, however, about whether persons injured by the then

yet-to-occur recalls were adequately represented at the Sale Hearing, or whether the rights of

such unknown claimants could be adjudicated in the proceeding. *See, e.g.*, Hr'g Tr. July 1, 2009

at 325:7-333:13 (Rubin Decl., Ex. 2) (discussing future asbestos claimants); Hr'g Tr. July 2,

2009 at 95:11-101:8 (Rubin Decl., Ex. 1) (same). Indeed, although multiple objections to the

proposed Sale were filed, ***none*** of the objecting parties represented the named plaintiffs (or the

5

putative classes some of them purport to represent) against whom New GM has filed its motions

to enforce. *See, e.g.*, Hr'g Tr. July 2, 2009 at 100:4-15 ("And no one is representing [future

claimants] here."); *see also* Dkt. 1997 ¶ 4 (reflecting parties on whose behalf brief was

submitted); Dkt. 2043 at 6-7 (same); Dkt. 2176 ¶¶ 6-14 (same); Dkt. 2362 ¶ 9 (same).

    **C.**    **The Sale Order**

On July 5, 2009, this Court entered (i) an order approving the Sale (the "**Sale Order**")

(Dkt. 2968) pursuant to the terms of an Amended and Restated Master Sale and Purchase

Agreement, dated June 26, 2009 (the "**Sale Agreement**") (Rubin Decl., Ex. 3); and (ii) an

accompanying decision (the "**Sale Decision**") (Dkt. 2967). The Sale closed on July 10, 2009.

*See* New GM SOF ¶ 56; GUC Trust SOF ¶ 2 (Dkt. 12826, Ex. D). Following the Sale, Old GM

changed its name to Motors Liquidation Company ("**MLC**"). *See* New GM SOF ¶ 56.

Under the terms of the Sale Agreement, New GM acquired substantially all of Old GM's

assets, including Old GM's real property, inventory of vehicles and spare parts, and books and

records, for consideration estimated to be worth approximately $45 billion, including New GM

stock and warrants to purchase additional New GM stock (together, "**New GM Securities**"). *See*

*In re Gen. Motors Corp.*, 407 B.R. 463, 482 (Bankr. S.D.N.Y. 2009).

In a section of the Sale Decision entitled "Asbestos Issues," the Court noted that "[t]he

Asbestos Litigants' counsel represent only individuals with *present* asbestos ailments," and that

there was a "separate issue" regarding "claims for *future* injuries that people exposed to asbestos

might suffer when they don't yet know of their ailments or the need to sue or assert a claim." *Id.*

at 506. The Court further noted that there were "classic standing *and* ripeness issues" relating to

those future claims because claims for individuals whose asbestos-related injuries had not yet

manifested were "not yet 'claims' as defined in the Bankruptcy Code." *Id.* at 506-07 (emphasis

in original). In this regard, the Court thus "fully recognize[d] that the notice" for the Sale

Hearing would be ineffective and even "constitutionally suspect" for those who, "without knowledge of an ailment that had not yet manifested itself, . . . would be in no position to file a present claim." *Id.* at 507. Accordingly, the Court "add[ed] language to the injunction paragraph" of the Sale Order "applicable (only) to asbestos claims and demands, making the injunction enforceable 'to the fullest extent constitutionally permissible.'" *Id.*

The Sale Decision contained no discussion of claims by then-unknown claimants injured by yet-to-occur recalls of those vehicles.

### D.    New GM's Assumed Liabilities And Old GM's Retained Liabilities

The Sale Order approved the Sale Agreement and "all the terms and conditions thereof." (Dkt. 2968 ¶ 3). The Sale Agreement established which assets would be purchased by New GM (the **"Purchased Assets"**) and set forth certain Assumed Liabilities that New GM agreed to assume as well as Retained Liabilities that would remain with Old GM and its bankruptcy estate.

Among other items, the Purchased Assets include "all books, records . . . files, documents, correspondence . . . reports and other materials," including "legal records and information and other data." Sale Agreement § 2.2(a)(xiv) (Rubin Decl., Ex. 3). New GM's Assumed Liabilities include "all Liabilities arising out of . . . or in connection with the use, ownership or sale of the Purchased Assets *after the Closing*," *id.* § 2.3(a)(xi) (emphasis added), and:

> All Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by [Old GM] (collectively, "**Product Liabilities**"), which arise directly out of death, personal injury or other injury to Persons or damage to property caused by accidents or incidents first occurring on or after the Closing Date and arising from such motor vehicles' operation or performance.

*Id.* § 2.3(a)(ix). In the Sale Decision, the Court noted that, through "an important change" made after the filing of the motion to approve the Sale, this particular category of Assumed Liabilities

was "broaden[ed] . . . substantially" to include "*all* product liability claims arising from accidents

or other discrete incidents . . . occurring subsequent to the closing of the 363 Transaction,

*regardless of when the product was purchased*."  407 B.R. at 481–82 (emphasis in original).

The Sale Agreement states that New GM "shall not assume, or become liable to pay,

perform, or discharge any Liability of *any Seller*, whether occurring or accruing before, at or

after the Closing, other than the Assumed Liabilities," and contrasts those Assumed Liabilities

against a list of Retained Liabilities.  Sale Agreement § 2.3(b) (Rubin Decl., Ex. 3) (emphasis

added).  The Retained Liabilities include "all Product Liabilities arising in whole or in part from

any accidents, incidents or other occurrences that happen prior to the [July 10, 2009] Closing

Date."  *Id.* § 2.3(b)(ix).

The Sale Agreement states that, since April 1, 2007, there had been no "material recall or

other field action" or decision to issue a material recall or field action concerning any product

designed, manufactured, or sold by Old GM.  Sale Agreement § 4.18(a) (Rubin Decl., Ex. 3).  In

addition, the Sale Agreement and the Sale Order provide that, as of the Sale's closing, New GM

"shall comply with the certification, reporting and recall requirements of the National Traffic and

Motor Vehicle Safety Act [the "**Safety Act**"]. . . to the extent applicable *in respect of vehicles

and vehicle parts manufactured or distributed by Seller*."  *Id.* § 6.15(a) (emphasis added); *see

also* Sale Order ¶ 17 (Dkt. 2968).

## II.    The Confirmation Of Motors Liquidation Company's Bankruptcy Plan In 2011

On August 31, 2010, MLC and the remaining debtors filed their initial Chapter 11 plan.

(Dkt. 6829).  On March 18, 2011, MLC and the remaining debtors filed their second amended

plan (the "**Plan**").  (Dkt. 9836).  On March 29, 2011, this Court entered an order confirming the

Plan (the "**Confirmation Order**").  (Dkt. 9941).  The Plan became effective on March 31, 2011

(the "**Effective Date**"), and MLC was dissolved on December 15, 2011.  GUC Trust SOF ¶¶ 16,

19.

As the parties have stipulated and the Court has found, "the Plan already has been

substantially consummated."  *Morgenstein v. Motors Liquidation Co.* (*In re Motors Liquidation

Co.)*, 462 B.R. 494, 501 n.36 (Bankr. S.D.N.Y. Jan. 18, 2012); *see also* GUC Trust SOF ¶ 18.

## III.    The GUC Trust's Administrative Function

As part of the Court's confirmation of the Plan, the GUC Trust was formed on March 30,

2011.  GUC Trust Agreement § 2.1 (Rubin Decl., Ex. 4); GUC Trust SOF ¶¶ 13, 28.  The GUC

Trust is a statutory trust under the Delaware Statutory Trust Act, and its beneficiaries are limited

expressly to the holders of Allowed General Unsecured Claims against the Debtors that existed

as of the Effective Date; the holders of claims asserted against the Debtors that were disputed as

of the Effective Date and have become Allowed General Unsecured Claims subsequently; the

holders of units of beneficial interest in the GUC Trust (the "**GUC Trust Units**"); and the

holders of potential general unsecured claims that may arise in connection with a specific

litigation not relevant here (collectively, the "**GUC Trust Beneficiaries**").  *See* GUC Trust

Agreement, Background § F (Rubin Decl., Ex. 4); GUC Trust SOF ¶ 29; Dkt. 9836 § 12.14.

WTC is the Trustee for, and the Trust Administrator of, the GUC Trust.  GUC Trust SOF ¶ 23.

The GUC Trust is responsible for distributing New GM Securities and GUC Trust Units

to the GUC Trust Beneficiaries.  *Id.* ¶ 28.  The GUC Trust is also charged with resolving

disputed general unsecured claims and remaining disputed administrative expense claims,

priority tax claims, priority non-tax claims and secured claims against the Debtors.  GUC Trust

Agreement, Background § G (Rubin Decl., Ex. 4).  Moreover, pursuant to the Plan, following the

dissolution of MLC on December 15, 2011, the GUC Trust has been responsible for

administratively closing the debtors' cases.  *See* GUC Trust SOF ¶ 28.

Under its foundational documents, other than payments made for its own costs and expenses, the GUC Trust may distribute GUC Trust Assets only to GUC Trust Beneficiaries. *See, e.g.*, GUC Trust Agreement, Background § F (Rubin Decl., Ex. 4); *id.* § 3.1(a); *see also* GUC Trust SOF ¶ 29; Dkt. 9836 § 12.14.

The GUC Trust is not a general successor to the Old GM estate.  Instead, the Plan, the Confirmation Order, and the GUC Trust Agreement each make clear that the GUC Trust is Old GM's successor solely within the meaning of Section 1145 of the Bankruptcy Code, which exempts the GUC Trust from the requirements of Section 5 of the Securities Act of 1933 in connection with its distribution of New GM Securities and GUC Trust units.  *See* Dkt. 9836 § 6.6; Dkt. 9941 ¶ 13; GUC Trust Agreement, Background § E (Rubin Decl., Ex. 4); *see also* Dkt. 12930 at 9-14.

## IV.   New GM's Vehicle Recalls In 2014

In January 2014, New GM issued its first of 80 vehicle recalls this year.  Those recalls resulted in the filing of lawsuits that are the subject of New GM's motions to enforce and are at issue here.

### A.   Ignition Switch Recalls

Between February 7, 2014 and March 28, 2014, New GM recalled more than two million vehicles in the U.S. due to an ignition switch defect.  *See* GUC Trust SOF ¶¶ 56-62; *see also* Dkt. 12826 at 3.  As a result of that defect, a running vehicle's power can be inadvertently shut off, resulting in the loss of engine power, power steering, and power brakes, and the disabling of the vehicle's airbags.  Plaintiffs' SOF ¶¶ 1-3 (Dkt. 12826, Ex. B).

Although New GM stated in March 2014 that it had "identified" all the ignition switch issues and was "fixing them," New GM subsequently announced six additional recalls related to ignition switch issues.  *See* Barra 4/1/14 written testimony, dated Mar. 31, 2014 (Rubin Decl.,

10

Ex. 5); GUC Trust SOF ¶¶ 65, 73, 75; GUC Trust Proposed SOF ¶ 7 (Dkt. 12826, Ex. D, Attach. 1).  These additional recalls affected another 12.5 million vehicles.  *See* Recalls Chart (Rubin Decl., Ex. 6).

In total, New GM has recalled 16.5 million vehicles worldwide, including 14.7 million in the U.S., for ignition switch defects.  *Id*.  The recalled vehicles encompass 1997 to 2014 model year vehicles.  *Id*.

### B.      Other Recalls

Between January and November 2014, New GM also issued more than 70 vehicle recalls for issues unrelated to the ignition switch defect, including non-deployment of side impact restraints, sudden loss of electric power steering assist, seat belt separation issues, incomplete welds on the seat hook bracket assemblies, and headlamp driving module failure.  GUC Trust SOF ¶¶ 66, 67, 69, 72, 76; Recalls Chart (Rubin Decl., Ex. 6).

In total, New GM has recalled 13.5 million vehicles worldwide, including almost 12 million in the U.S., for issues unrelated to the ignition switch defect.  Recalls Chart (Rubin Decl., Ex. 6).  The recalled vehicles encompass 1997 to 2015 model year vehicles.  *Id*.

### C.      New GM's Admissions Of Wrongdoing

In May 2014, New GM entered into a consent order, through which it "admit[ted] that it violated the Safety Act by failing to provide notice" to the NHTSA of the ignition switch defect and agreed to pay the "maximum civil penalty for a related series of violations in the sum of thirty-five million dollars."  New GM Consent Order ¶¶ 10-11 (Rubin Decl., Ex. 7).  New GM is also "the subject of various inquiries, investigations, subpoenas and requests for information from the U.S. Attorney's Office for the Southern District of New York, Congress, the SEC, Transport Canada, and 48 state attorneys general."  New GM Form 10-Q, dated Oct. 24, 2014, at 53 (Rubin Decl., Ex. 8).

To address what New GM's CEO has described as "a unique set of mistakes that were made over an extended period of time," New GM has "removed fifteen employees" and "added 35 safety investigators to identify and address issues much more quickly." Barra prepared testimony, dated July 17, 2014 (Rubin Decl., Ex. 9). New GM has also established a compensation fund (the "**Feinberg Compensation Fund**") for personal injuries or deaths from accidents involving vehicles subject to the ignition switch recalls announced between February 7, 2014 and March 18, 2014. *Id.* New GM has not extended the Feinberg Compensation Fund, however, to economic losses relating to *any* of New GM's vehicle recalls, personal injuries or deaths from accidents involving vehicles subject to the ignition switch recalls announced after March 28, 2014, or to personal injuries or deaths from accidents involving vehicles subject to New GM's recalls for issues unrelated to the ignition switch defect. *See* Feinberg Compensation Fund Protocol at 2-4 (Rubin Decl., Ex. 10). Rather, New GM has chosen to compensate only a limited group of ignition switch victims despite describing the cause of other, later ignition-switch-related recalls in substantially similar terms. *Compare, e.g.*, 3/28/14 New GM Press Release (Rubin Decl., Ex. 11), *with* 6/30/14 New GM Press Release (Rubin Decl., Ex. 12), *and* 8/8/14 New GM Press Release (Rubin Decl., Ex. 13).

## V.    New GM Moves To Enforce The July 2009 Sale Order Against Plaintiffs Asserting Causes Of Action Relating To New GM's Vehicle Recalls In 2014

In the wake of New GM's myriad recalls, more than 170 lawsuits have been filed against New GM. *See* New GM Form 10-Q, dated Oct. 24, 2014, at 17 (Rubin Decl., Ex. 8). The lawsuits allege, among other things, economic losses related to the ignition switch recalls in 2014, economic losses related to the other recalls in 2014, and personal injury claims arising from pre-Sale accidents caused by the defects that New GM disclosed through its recalls in 2014. *Id.* at 53.

12

Many of these lawsuits have been consolidated before the Honorable Jesse M. Furman in the U.S. District Court for the Southern District of New York in *In re General Motors LLC Ignition Switch Litigation* (the "**MDL Proceeding**").  The economic loss actions in the MDL Proceeding have been consolidated into two complaints:  (i) a complaint concerning recalled cars "manufactured by Old GM and purchased before July 11, 2009" (the "**Pre-Sale Consolidated Complaint**"); and (ii) a complaint concerning all GM-branded vehicles acquired after July 11, 2009, irrespective of whether they were recalled by New GM or whether they were manufactured by Old GM or New GM (the "**Post-Sale Consolidated Complaint**," and together with the Pre-Sale Consolidated Complaint, the "**Consolidated Complaints**").

New GM has filed three Motions to Enforce the Sale Order in order to bar (i) causes of action alleging economic loss resulting from the ignition switch recalls (the "**Ignition Switch Motion**") (Dkt. 12620); (ii) causes of action alleging economic loss resulting from other recalls (the "**Non-Ignition Switch Motion**") (Dkt.12808); and (iii) causes of action for personal injury or wrongful death arising from pre-Sale accidents (the "**Pre-Closing Accident Motion**") (Dkt. 12807).

New GM's motions are thus directed to barring any causes of action by (i) plaintiffs who acquired a recalled vehicle before the Sale and allege economic loss as a result of New GM's recalls and the defects that caused them ("**Pre-Sale Plaintiffs**"); (ii) plaintiffs who, after the Sale, acquired a vehicle manufactured by Old GM and allege economic loss as a result of New GM's recalls and the defects that caused them ("**Post-Sale Plaintiffs**"); and (iii) plaintiffs who acquired a recalled vehicle before the Sale and allege a personal injury or wrongful death arising from a pre-Sale accident ("**Pre-Closing Accident Plaintiffs**"). *See* New GM Br. at 5-6.

13

According to New GM, the Pre-Sale Plaintiffs, Post-Sale Plaintiffs, and Pre-Closing

Accident Plaintiffs (collectively, the "**Plaintiffs**") are precluded by the July 2009 Sale Order

from asserting any causes of action relating to New GM's vehicle recalls of pre-petition vehicles

in 2014.  Rather than accept its responsibility for these causes of action, New GM suggested at a

May 2014 hearing that Plaintiffs "explore" as an "alternative" causes of action against the GUC

Trust.  Hr'g Tr. May 2, 2014 at 31, 83 (Rubin Decl., Ex. 14).  In the Consolidated Complaints

filed in October 2014, New GM is the only named defendant.  No causes of action are asserted

against the GUC Trust.

## ARGUMENT

**I.    Due Process Threshold Issue:  Plaintiffs' Due Process Rights Would Be Violated
       If The Sale Order Were Applied To Bar Their Causes Of Action Against New GM**

Plaintiffs' due process rights would be violated if the Sale Order were applied to bar their

causes of action against New GM.

### A.    At The Time Of The Sale, The Pre-Sale Plaintiffs And Post-Sale Plaintiffs
         Had No "Claims" Under The Bankruptcy Code

New GM contends that the Pre-Sale Plaintiffs' and Post-Sale Plaintiffs' causes of action

are barred because "New GM acquired the Purchased Assets free and clear of all claims" (New

GM Br. at 14), but ignores that a "free and clear" order entered under Section 363(f) of the

Bankruptcy Code does not extinguish a cause of action that "does not fall under the definition of

'claim' [under the Bankruptcy Code]."  *Morgan Olson, LLC v. Frederico (In re Grumman Olson*

*Indus., Inc.)*, 467 B.R. 694, 704 (S.D.N.Y. 2012).

The Bankruptcy Code defines a "claim" as a "right to payment, whether or not such right

is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured,

disputed, undisputed, legal, equitable, secured, or unsecured."  11 U.S.C. § 101(5)(A).  While a

"claim" under the Bankruptcy Code encompasses "all legal obligations of the debtor,"

*Chateaugay I*, 944 F.2d at 1003, "the definition's reach is not infinite." *Pension Benefit Guar.*

*Corp. ("PBGC") v. Oneida Ltd.*, 562 F.3d 154, 157 (2d Cir. 2009) (citing *LTV Steel Co. v.*

*Shalala (In re Chateaugay Corp.)* ("*Chateaugay II*"), 53 F.3d 478, 497 (2d Cir. 1995)).

New GM's assertion that the Pre-Sale Plaintiffs and the Post-Sale Plaintiffs held

"contingent litigation claims" (New GM Br. at 29) is wrong.[2]  Rather, as the Second Circuit has

explained, a contingent "claim" under the Bankruptcy Code exists *only if* the party has a pre-

petition relationship with the debtor, *and* the party's causes of action against the debtor were

"within the actual or presumed contemplation" of the party and the debtor at the time of the

petition.  *Chateaugay I*, 944 F.2d at 1003-05; *see also DPWN*, 871 F. Supp. 2d at 152-53 & n.5;

*Grumman*, 445 B.R. at 252.  Expanding the definition of "claims" to include those causes of

action of which the claimants themselves are not yet aware would involve "enormous practical

and constitutional problems," as "potential victims are not only unidentified, but there is no way

to identify them."  *Chateaugay I*, 944 F.2d at 1003.

Here, neither the Pre-Sale Plaintiffs nor the Post-Sale Plaintiffs could have contemplated

their causes of action when the Sale Order was entered in July 2009 because the recalls were not

issued, and the defects were not disclosed, until *five years later* in 2014.  *See Grumman*, 445

B.R. at 252-53 (explaining that *Chateaugay I* "distinguish[es] between contingent or unmatured

claims, which are 'claims' within the meaning of § 101(5), and potential future tort claims,

which are not").  Where, as here, the causes of action at issue were unknown at the time of the

bankruptcy proceeding, they "cannot be considered 'claims' that are dealt with and discharged."

---

[2]   New GM does not, and cannot, argue that the Post-Sale Plaintiffs who purchased *New GM* vehicles
after entry of the Sale Order somehow had "claims" against Old GM.  Accordingly, in discussing the
Post-Sale Plaintiffs herein, the GUC Trust and the Participating Unitholders refer to those Post-Sale
Plaintiffs who purchased an *Old GM* vehicle after the Sale.

15

*Grumman*, 467 B.R. at 704-05; *see also Koepp*, 2014 WL 6600418, at *3 ("Bankruptcy courts

cannot extinguish the interests of parties who lacked notice of or did not participate in the

proceedings."); *Johns-Manville*, 600 F.3d at 149 ("With respect to due process, it is of no

moment whether the terms of the 1986 Orders have been, in effect, read by the bankruptcy court

to bar Chubb's claims.  Put differently, the text of the orders that were ultimately entered in 1986

does not speak to whether Chubb was afforded due process during the proceedings that led to the

entry of those orders in the first place.").  Thus, Plaintiffs' causes of action did not exist when the

Sale Order was entered, and the Sale Order cannot be invoked to bar them.

The decision in *Grumman* is instructive.  There, the plaintiffs sued Morgan Olson, the

Section 363 purchaser of truck parts, for post-sale injuries that they sustained while driving a

truck that included a part manufactured by the debtor.  Morgan Olson moved for summary

judgment based on the sale order, which provided that "Morgan would not be deemed to be a

successor of the Debtor or be responsible for 'any liability of the Debtor' as a result of the

consummation of the sale."  445 B.R. at 250.  The plaintiffs argued that they were "basing their

claims on what Morgan did *after* the sale," but the court instead analyzed whether the plaintiffs

may have instead held a pre-sale claim against the debtor and were therefore violating the sale

order by pursuing a successor liability claim against Morgan Olson.  *Id.* at 250-51 (emphasis in

original).

After canvassing authorities on when a "claim" under the Bankruptcy Code arises, the

bankruptcy court in *Grumman* held that the plaintiffs had no pre-sale "claim" under the

Bankruptcy Code because their causes of action involved "pre-petition conduct that ha[d] not yet

resulted in any tortious consequence" at the time of the sale order.  *Id.* at 253 (citing *Chateaugay

I*, 944 F.2d at 1003-04).  The court also explained that even a plaintiff who did have a pre-

petition relationship with a debtor would similarly have no pre-sale "claim" if that plaintiff's alleged injury did not occur until after the sale:

> I am not suggesting that someone who buys a defective product pre-petition but is not injured until after the bankruptcy has a pre-petition claim for his or her personal injury. For example, there are many GM cars currently on the road that were manufactured and sold prior to GM's 2009 bankruptcy sale. Statistically, some will be involved in future accidents resulting in serious personal injury or death to the owner. The owners do not have "claims" in the GM case for injury or death that may or may not occur years from now.

*Grumman*, 445 B.R. at 253 n.9; *accord Fogel v. Zell*, 221 F.3d 955, 960 (7th Cir.2000).

New GM attempts to distinguish *Grumman* on the ground that the plaintiffs in *Grumman* "did not suffer [their] accident and injury until after the section 363 sale" and "had no reason to believe that the debtor's 363 sale might impact [their] rights." New GM Br. at 47. But that is precisely the situation here. The Pre-Sale Plaintiffs and the Post-Sale Plaintiffs did not suffer their alleged economic losses until the New GM recalls in 2014 and had no reason to think the Sale might impact their rights.

Moreover, the Post-Sale Plaintiffs did not even have a pre-Sale relationship with Old GM. Obviously, a party that has no pre-petition relationship with a debtor cannot have a "right to payment" from that debtor or otherwise contemplate any causes of action against the debtor at the time of the petition. *See PBGC*, 562 F.3d at 157 ("[T]he existence of a valid bankruptcy claim depends on (1) whether the claimant possessed a right to payment, and (2) whether that right arose before the filing of the petition."); *White v. Chance Indus., Inc. (In re Chance Indus., Inc.)*, 367 B.R. 689, 705 (Bankr. D. Kan. 2006) ("Unknown future claimants who have not had any pre-petition contact with debtor or debtor's product do not fit the definition of a 'creditor' under the Bankruptcy Code. . . . [A] creditor must hold a pre-petition claim."); *In re Hoffinger*, 307 B.R. 112, 121-23 (Bankr. E.D. Ark. 2004) (same).

17

Faced with this reality, New GM cites to *Burton v. Chrysler Group, LLC (In re Old Carco)*, 492 B.R. 392 (Bankr. S.D.N.Y. 2013), arguing that "a Plaintiff who purchased a used Old GM vehicle after the 363 Sale should not have any greater rights than the original owner of that vehicle."  New GM Br. at 66.[3]  New GM's reliance on *Burton* is misplaced.  In *Burton*, purchasers of used vehicles manufactured by Old Carco brought suit against New Chrysler, a Section 363 purchaser, more than two years after the Section 363 sale for a "'fuel spit back' design flaw and the attendant safety defects and hazards."  *Id.* at 399.  While the *Burton* court held that owners of cars manufactured pre-petition held contingent claims, notwithstanding that they may have been unaware of the alleged design flaws in their specific cars prior to the sale, the court noted expressly that "Old Carco had already issued at least two and possibly three recall notices" for the design flaw at issue "*before the original purchasers bought their vehicles*."  *Id.* at 403 (emphasis added).  That is not the situation here.  Indeed, no notice of the defects at issue here was provided until *five years after* the Sale.

If the Court were to interpret *Old Carco* in the manner urged by New GM, *every* owner of products manufactured by a firm that files for bankruptcy protection would have to file a proof of claim in order to protect its rights, *regardless* of whether it had any reason to believe that it actually held any claim against the debtor.  That cannot be, and is not, the law.  *See Chateaugay I*, 944 F.2d at 1003; *Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268, 1277-78 (5th Cir. 1994) (explaining that a "claim" under the Bankruptcy Code cannot be held by persons "whom the record indicates were completely unknown and unidentified at the time [the debtor] filed its

---

[3]  New GM also cites *In re Flanagan*, 415 B.R. 29 (D. Conn. 2009) for the irrelevant observation that a purchaser of an interest in the debtor's property acquires "no more or less than" what the debtor possessed.  *Id.* at 42.  That is not the issue here.  What is at issue here, and what *Flanagan* does not address at all, is how a "claim" is defined under the Bankruptcy Code, when a "claim" arises, and whether a party has a "claim" under the Code if it had no pre-sale relationship with the debtor.

18

petition and whose rights depended entirely on the fortuity of future occurrences"); *Chance*, 367

B.R. at 705 (rejecting debtor's theory that "any person in the future who might" touch its

products had a claim); *Hoffinger*, 307 B.R. at 118 ("[S]atisfaction of due process requires more

than mere existence on planet Earth (and in this instance, perhaps the unborn) that puts the

person harmed, *i.e., the claimant*, on notice that he or she has a claim.").

In sum, the Pre-Sale Plaintiffs and the Post-Sale Plaintiffs could not have contemplated

their causes of action when the Sale Order was entered in July 2009 because the recall notices

that caused their alleged economic losses did not occur until 2014.  Accordingly, the Pre-Sale

Plaintiffs and the Post-Sale Plaintiffs had no "claims" against Old GM under the Bankruptcy

Code that could be barred by the successor liability provisions of the Sale Order.  *See*

*Chateaugay I*, 944 F.2d at 1003-05; *Grumman*, 467 B.R. at 703-10.

### B.    The Sale Order Should Not Be Applied To Bar Plaintiffs' Causes Of Action Against New GM

Even if any of the Plaintiffs had "claims" under the Bankruptcy Code against Old GM at

the time of the Sale, their causes of action against New GM only would be barred if unknown,

future causes of action could be extinguished by the Sale Hearing and Sale Order consistent with

the due process requirements of the U.S. Constitution.  Indeed, as the Second Circuit reiterated

just last month, "[b]ankruptcy courts cannot extinguish the interests of parties who lacked notice

of or did not participate in the proceedings."  *Koepp*, 2014 WL 6600418, at *3 (citing *Johns-*

*Manville*, 600 F.3d at 153-54; *Grumman*, 467 B.R. at 706); *see also In re Ritchie Risk-Linked*

*Strategies Trading (Ir.) Ltd.*, 471 B.R. 331, 338-39 (Bankr. S.D.N.Y. 2012) (explaining that "a

sale order under section 363(f) of the Code that purports to free a purchaser from the debtor's

liabilities does not bind parties in interest that did not receive appropriate notice of the sale.") .

19

As explained below, because the notices in June 2009 did not disclose or otherwise identify the ignition switch or other defects that are the subject of the recall notices that New GM issued in 2014, Plaintiffs had no reason to attend, much less participate in, the Sale Hearing. Accordingly, Plaintiffs' due process rights would be violated if the Sale Order were applied to bar their causes of action against New GM.

### 1.    The Pre-Sale Plaintiffs And Post-Sale Plaintiffs

New GM never explains, nor could it, how "enforcing" the Sale Order against the Pre-Sale Plaintiffs or Post-Sale Plaintiffs could comport with due process when their causes of action were not only unknown to Old GM, but also unknown to the Pre-Sale Plaintiffs and Post-Sale Plaintiffs. The purpose of requiring notice to creditors is to provide them with an "opportunity to participate in the [bankruptcy] proceedings." *Grumman*, 467 B.R. at 710. In *Chateaugay I*, the Second Circuit provided a hypothetical to illustrate the futility of notice when the potential "claimants" had no reason to believe that a bankruptcy proceeding might impact their rights:

> Defining claims to include any ultimate right to payment arising from pre-petition conduct by the debtor . . . yields questionable results. Consider, for example, a company that builds bridges around the world. It can estimate that of 10,000 bridges it builds, one will fail, causing 10 deaths. Having built 10,000 bridges, it becomes insolvent and files a petition in bankruptcy. Is there a "claim" on behalf of the 10 people who will be killed when they drive across the one bridge that will fail someday in the future? If the only test is whether the ultimate right to payment will arise out of the debtor's pre-petition conduct, the future victims have a "claim." Yet it must be obvious that enormous practical and perhaps constitutional problems would arise from recognition of such a claim. The potential victims are not only unidentified, but there is no way to identify them. Sheer fortuity will determine who will be on that one bridge when it crashes. What notice is to be given to these potential claimants?

944 F.2d at 1003.

In short, "no meaningful notice can be given to individuals who do not yet know they suffer from injury." *In re Kewanee Boiler Corp.*, 198 B.R. 519, 530 (Bankr. N.D. Ill. 1996); *see also Grumman*, 467 B.R. at 708 ("The Fredericos did not receive adequate notice of their

potential claim in the Grumman bankruptcy proceedings because, at the time of the bankruptcy, there was no way for anyone to know that the Fredericos ever would have a claim."); *Schwinn Cycling & Fitness Inc. v. Benonis (In re Schwinn Bicycle Co.)*, 210 B.R. 747, 761 (Bankr. N.D. Ill. 1997) ("[S]ince the [plaintiffs' injury] had not yet occurred, notice was quite impossible."), *aff'd*, 217 B.R. 790 (N.D. Ill. 1997). "Because parties holding future claims cannot possibly be identified and, thus, cannot be provided notice of the bankruptcy, courts consistently hold that, for due process reasons, their claims cannot be discharged by the bankruptcy courts' orders." *Grumman*, 467 B.R. at 707 (citing *Lemelle*, 18 F.3d at 1277; *Chance*, 367 B.R. at 709-10; *Kewanee*, 198 B.R. at 539).[4]

New GM mistakenly relies on the publication notice of the Sale Hearing in June 2009. *See* New GM Br. at 33-36. Mere notice of the "pending bankruptcy proceedings," including notice of the Sale Hearing, is not sufficient to apply the Sale Order against the Plaintiffs. *DPWN*, 871 F. Supp. 2d at 157; *see also see also In re Hexcel Corp.*, 239 B.R. 564, 571 (N.D. Cal. 1999) (explaining that publication notice is insufficient "for a potential creditor who had no way of

---

[4]    Both the bankruptcy court and the district court in *Grumman* specifically considered *In re Chrysler LLC*, 576 F.3d 108 (2d Cir. 2009), which was issued on August 5, 2009, one month after the Sale Order here was entered, and subsequently vacated. *See Indiana State Police Pension Trust v. Chrysler LLC*, 558 U.S. 1087 (2009); *In re Chrysler LLC*, 592 F.3d 370 (2d Cir. 2010). In *Chrysler*, the bankruptcy court entered a Section 363 sale order that "extinguished the right to pursue claims 'on any theory of successor or transferee liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.'" 576 F.3d at 127. Rather than provide an unqualified affirmance of the sale order, the Second Circuit affirmed the order only "insofar as it constituted a valid exercise of authority under the Bankruptcy Code" and expressly "decline[d] to delineate the scope of the bankruptcy court's authority to extinguish future claims, until such time as [it is] presented with an actual claim for an injury that is caused by Old Chrysler, that occurs after the Sale, and that is cognizable under state successor liability law." *Id.* Moreover, in the wake of *Chrysler*, "every case . . . addressing this issue has concluded for reasons of practicality or due process, or both, that a person injured after the sale (or confirmation) by a defective product manufactured and sold prior to the bankruptcy does not hold a 'claim' in the bankruptcy case and is not affected by either the § 363(f) sale order or the discharge under 11 U.S.C. § 1141(d)." *Grumman*, 445 B.R. at 254.

knowing that it may have a claim against the debtor sometime in the future"). To comport with due process, Plaintiffs must have been provided with "sufficient information to assert their claims in the bankruptcy proceedings." *DPWN*, 871 F. Supp. 2d at 158.

Here, the publication notice in June 2009 was insufficient because it did not disclose the ignition switch or other defects that are the subject of the recall notices. The Pre-Sale Plaintiffs and Post-Sale Plaintiffs thus "would have [had] no way of identifying and asserting their claims" prior to entry of the Sale Order. *Id.*; *see also Hexcel*, 239 B.R. at 571 ("It is difficult to imagine . . . how the announcement of a bankruptcy proceeding published in the *Wall Street Journal* could possibly satisfy due process concerns for a potential creditor who had no way of knowing that it may have a claim against the debtor sometime in the future. . . . Hexcel confuses the requirement that creditors be given notice of the bankruptcy proceeding (which it satisfied) with the requirement that parties must have some notice of potential claims they might have against the bankruptcy petitioner before those claims are discharged (which could not possibly have been satisfied)."); Laura B. Bartell, *Due Process for the Unknown Future Claim in Bankruptcy—Is This Notice Really Necessary?*, 78 Am. Bankr. L.J. 339, 344-45 (2004) ("[N]otice by publication is an exercise in futility as applied to creditors who are not only unknown to the debtor, but are also unknown to themselves.").

The decision in *DPWN* is instructive. There, the plaintiff filed suit against the reorganized United Air Lines ("New United") more than five years after the bankruptcy court confirmed United's plan of reorganization. 871 F. Supp. at 149. According to plaintiff, United knowingly participated in, but concealed until well after its bankruptcy proceedings, violations of the federal antitrust laws. *Id.* at 147-48. New United moved to dismiss on the ground that the plaintiff's claims had been discharged by the bankruptcy court's confirmation order. *Id.* at 149.

In assessing New United's motion to dismiss, the court explained that "[b]efore a claim may be discharged in a bankruptcy proceeding, the claimant must . . . be afforded notice and an opportunity to be heard." *Id.* at 153. Although there was "no dispute" that the plaintiff "received actual notice of United's bankruptcy proceedings, including the key procedural events leading up to the confirmation of United's reorganization plan and the discharge of all its debts," it was also undisputed that the plaintiff "could not have discovered [New] United's alleged antitrust violations until after the confirmation of the plan." *Id.* at 153, 155. Because the plaintiff "lacked knowledge as to the *existence* of any claim whatsoever," *id.* at 153 (emphasis in original), the court denied New United's motion to dismiss:

> [D]ue process requires notice not just that there is a pending case or hearing, but of the nature of the charges or claims that will be adjudicated. . . . The due process rights of an unknowing victim of a debtor's secret unlawful conduct are not protected by the victim's receipt of notice of the debtor's bankruptcy proceedings. Absent any practicable means of identifying what claim he might have, such a victim is no more able to become a claimant in the bankruptcy proceeding than if he had not received notice at all. . . .

> [T]he claimant was completely unaware of the antitrust conspiracy and could not have learned of its antitrust claim through the exercise of reasonable diligence until after the confirmation of the reorganization plan. Under these circumstances, discharge of the claim satisfies due process only if the debtor notified the claimant not only of the pending bankruptcy proceedings, but also provided sufficient information to apprise the claimant of the nature of the claim to be discharged. . . .

> [T]here is no reason the debtor should be afforded the benefit of a discharge simply because it has given its unsuspecting victims notice of the bankruptcy proceedings while concealing the basis of its liability. Those victims would have no way of identifying and asserting their claims in the bankruptcy proceedings. The generic notice they received would amount to a meaningless gesture, not notice reasonably calculated to "afford them an opportunity to present their objections" to the discharge of the claims.

*Id.* at 155-58 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950));[5]

*see also In re Waterman Steamship Corp.*, 141 B.R. 552, 559 (Bankr. S.D.N.Y. 1992) (holding

that claimants who "had yet to manifest any detectible injury prior to confirmation" could not

"be deemed to have relinquished substantive rights when, even if that individual had read the

'notice,' those individuals would have remained completely unaware that their substantive rights

were affected."), *aff'd in relevant part*, 157 B.R. 220, 222 (S.D.N.Y. 1993); *Acevedo v. Van*

*Dorn Plastic Mach. Co.*, 68 B.R. 495, 499 (Bankr. E.D.N.Y. 1986) ("A creditor who is notified

of the bankruptcy but not of his claim is in the same position as a creditor who has notice of his

claim, but not of the bankruptcy."); *Metal Founds. Acquisition, LLC v. Reinert (In re Reinert)*,

467 B.R. 830, 832 (Bankr. W.D. Pa. 2012) ("Baha was actually served with the notice of hearing

on the Sale Motion.  However, this does not change the Court's analysis or conclusion. . . . The

notice of hearing may have been sufficient to notify Baha of the pendency of the action, but it

did not sufficiently advise Baha that its alleged ownership interest in the domain names was at

issue in the proceeding.").

In arguing that this Court should overlook that "the 363 sale notice did not identify or

describe" the ignition switch or other defects that are the subject of the recall notices because this

Court "expressly approved the ***content*** of the direct mail notice and the Publication Notice"

(New GM Br. at 36), New GM ignores that (i) the ignition switch and other defects that New

GM did not disclose until 2014 were also unknown to the Court when the Sale Procedures Order

---

[5]  *Compare with Gabauer v. Chemtura Corp. (In re Chemtura Corp.)*, 505 B.R. 427, 430-431 (S.D.N.Y.
2014) (holding that "[n]otice in this case was sufficient to bar Appellants' claims" because the debtor
published notice that "put those who worked at Firmeich – including Appellants – on notice that (1)
they might have been exposed to diacetyl while working at the plant; (2) they might have been injured
by that exposure; (3) they would have a claim even if their injury had not yet manifested itself; and
(4) they would lose their rights to recover on that claim if they did not file a proof of claim form by
the Bar Date").

was entered in June 2009; and (ii) the due process requirements of the U.S. Constitution cannot be "overlooked."

Because the publication notice in June 2009 did not disclose or otherwise identify the ignition switch or other defects that are the subject of the recall notices, the Pre-Sale Plaintiffs' and Post-Sale Plaintiffs' due process rights would be violated if the Sale Order were applied to bar their causes of action against New GM.  *See DPWN*, 871 F. Supp. at 155-58; *Grumman*, 467 B.R. at 707; *Waterman*, 141 B.R. at 559; *Acevedo*, 68 B.R. at 499; *Lemelle*, 18 F.3d at 1277; *Chance*, 367 B.R. at 709-10; *Schwinn*, 210 B.R. at 761; *Kewanee*, 198 B.R. at 530-31.

### 2.  The Pre-Closing Accident Plaintiffs

Although there are nearly 700 named plaintiffs in the cases that New GM has dubbed the "Pre-Closing Accident Cases," only eight of these plaintiffs assert causes of action related to personal injuries or death in a pre-Sale accident.[6]  The remaining plaintiffs in the "Pre-Closing Accident Cases" either allege (i) personal injuries or wrongful death stemming from post-Sale accidents, for which New GM has assumed liability (*see* Sale Agreement § 2.3(a)(ix) (Rubin Decl., Ex. 3)); or (ii) economic losses resulting from New GM's recalls in 2014.[7]

---

[6]  *See* Compl. Ex. A, *Abney v. General Motors LLC*, No. 1:14-cv-05810 (S.D.N.Y. July 29, 2014); Compl. ¶ 127, *Bledsoe v. General Motors LLC*, No. 1:14-cv-07631 (S.D.N.Y. Sep. 19, 2014); Compl. ¶ 2, *Boyd v. General Motors LLC*, No. 4:14-cv-01205 (E.D. Mo. May 27, 2014); Am. Compl. ¶ 63, *Vest v. General Motors LLC*, No. 1:14-cv-24995 (S.D. W.Va. July 2, 2014); Pls.' Second Am. Pet. For Bill of Review and Second Am. Compl. at 7, *Phillips-Powledge v. Gen. Motors LLC*, No. 3:14-cv-00192 (S.D. Tex. July 7, 2014).

[7]  *See, e.g.*, *Abney* Compl. ¶ 17 & Ex. A (asserting "claims . . . for personal injury and/or wrongful death stemming from post-sale accidents – that is, the accidents in question occurred on or after July 10, 2009"); *Bledsoe* Compl. ¶¶ 4-10, 98, 104 (non-Pre-Sale Accident Plaintiffs' claims based on "diminished value of their GM vehicles and the lost use and enjoyment of the vehicles . . . and exposure to increased risk of death or serious bodily injury"); *Boyd* Compl. ¶¶ 20, 21, 85, 94, 117 (non Pre-Closing Accident Plaintiffs' claims based on "personal injury, economic and non-economic damages and death").

New GM contends that those few plaintiffs in the "Pre-Closing Accident Cases" who actually assert causes of action related to personal injuries or death in a *pre-Sale* accident have no due process argument.  While the Pre-Closing Accident Plaintiffs might have contemplated *some* cause of action against Old GM, they certainly were not aware of the causes of action they assert now.  In July 2009, the ignition switch and other defects that New GM disclosed in 2014 were *not* known to the Pre-Closing Accident Plaintiffs.[8]  Indeed, as New GM admits, neither the direct mail notices nor the publication notices stated that any Old GM vehicles contained one or more serious defects that could cause personal injury, death, or other injuries to persons or property.  *See* New GM SOF ¶ 25.

Without notice of these defects, the Pre-Sale Accident Plaintiffs had no reason to believe that their accidents, or the deaths of their loved ones, were caused by serious defects in those cars (*i.e.*, the defects that New GM revealed for the first time in 2014).  Instead, they may well have believed one of the drivers was at fault, that road or weather conditions were to blame, or even that one of the drivers suffered a sudden health crisis.  The Pre-Sale Accident Plaintiffs did not forfeit their right to adequate notice of their claims simply because they or their loved ones were personally injured or died in pre-Sale accidents involving vehicles that, unbeknownst to them at the time, featured serious safety defects.  *See DPWN*, 871 F. Supp. 2d at 154-55; *Acevedo*, 68 B.R. at 499; *Hexcel*, 239 B.R. at 571.

Because the publication notice in June 2009 did not disclose or otherwise identify the ignition switch or other defects that are the subject of the recall notices, the Pre-Closing Accident

---

[8]    *See*, *e.g.*, *Boyd* Compl. ¶ 11 ("GM concealed the defects and their tragic consequences and allowed unsuspecting vehicle owners to continue driving highly dangerous vehicles"); *Vest* Compl. ¶ 98 ("It was only at the time GM made its understanding of the defective nature of the ignition switch [public] in 2014 that Jason Vest and other members of the family . . . discovered that the ignition switch in the 2005 Chevrolet Cobalt driven by Mrs. Vest at the time of her death was defective").

Plaintiffs' due process rights would be violated if the Sale Order were applied to bar their causes of action against New GM.

### C.   To Preserve Their Constitutional Due Process Rights, Plaintiffs Are Not Required To Speculate About What Might Have Occurred If The Defects Disclosed By New GM's Recalls In 2014 Had Been Disclosed Earlier

Although Plaintiffs had no reason to believe that any of their rights would be impacted at the Sale Hearing because "the 363 sale notice did not identify or describe" the ignition switch or other defects that are the subject of the recall notices, New GM contends that any "alleged notice deficiency" was harmless error and that Plaintiffs "have not been deprived of due process." *See* New GM Br. at 36-50. New GM is wrong.

As the Supreme Court has explained, "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action *and afford them an opportunity to present their objections*." *Mullane*, 339 U.S. at 315 (emphasis added).

Here, because the ignition switch and other defects that are the subject of the recall notices were not disclosed until New GM's recall notices in 2014 – five years *after* the Sale Hearing – Plaintiffs "could not have received [adequate] notice or an opportunity to participate in the bankruptcy proceedings" that resulted in the entry of the Sale Order in July 2009.[9] *Grumman*, 467 B.R. at 696. Thus, "enforcing the bankruptcy court's [Sale Order] to take away their right to bring a claim would violate bankruptcy procedure and due process." *Id.*

---

[9]   By contrast, in the cases New GM cites, the claimant had a meaningful opportunity to be heard. *See, e.g.*, *Perry v. Blum*, 629 F.3d 1, 17 (1st Cir. 2010) ("[T]he Yellins had a meaningful opportunity to be heard."); *In re Parcel Consultants, Inc.*, 58 F. App'x 946, 951 (3d Cir. 2003) ("OAN has had a full opportunity to present its argument"); *In re U.S. Kids, Inc.*, 178 F.3d 1297, 1999 WL 196509, at *4-5 (6th Cir. 1999) ("Global introduced evidence, offered a witness, and vigorously cross-examined the witness"); *In re YBA Nineteen, LLC*, 505 B.R. 289, 300 (S.D. Cal. 2014) ("The Scheduling Order and October 3, 2013 hearing provided Debtor with sufficient notice and opportunity to be heard.").

Notwithstanding that Plaintiffs were unaware of their causes of action, and thus, either

held no claims at the time of the Sale, or did not have sufficient notice of those claims, New GM

argues that there is no due process violation unless Plaintiffs demonstrate that they "suffered

prejudice" as a result of the inadequate notice.  New GM Br. at 36.  The harmless error standard,

however, applies when there have been "procedural irregularities," *Kane v. Johns-Manville*

*Corp.*, 843 F.2d 636, 647 (2d Cir. 1988), not when a claimant who has not had any opportunity

to be heard faces a bankruptcy order that would completely extinguish her substantive rights.  As

the *Chance* court explained:

> Chance argues that even if it failed to afford due process to Jesse, that error was
> harmless because the plan would not have changed and Jesse's participation in the
> confirmation process would not have resulted in a different outcome.  Chance
> cites several cases for the harmless error rule but most involve procedural
> irregularities to a party participating in the bankruptcy proceeding; none of them
> involve the total denial of due process to a future tort claimant and the
> extinguishing of an unknown claim that has yet to accrue.

> The harmless error rule applies to procedural irregularities in bankruptcy that do not
> affect substantial rights. The Tenth Circuit Court of Appeals has rejected Chance's
> harmless error argument . . . Other courts have likewise held in the bankruptcy
> context that a denial of constitutional due process is never harmless error.

> Where there has been no effort to give any notice to Jesse or a future claims
> representative, the Court cannot conclude that the total denial of due process was
> harmless error.  Even if Jesse is deemed to have held a "claim" at the time of
> Chance's bankruptcy and confirmation hearing, the discharge of that claim
> without giving Jesse reasonable notice and the opportunity to be heard on his
> claim violates due process.

*Chance*, 367 B.R. at 709-10.

As in *Chance*, mere "procedural irregularities" are not at issue here.  Rather, Plaintiffs

were deprived of any opportunity to be heard at the Sale Hearing and now face a motion to

enforce a Section 363 sale order that was entered as a result of the Sale Hearing and that would

28

extinguish their rights if enforced against them.[10]  That is not harmless error.  Indeed, "creditors

have a constitutional right to be heard on their claims, and the denial of that right to them is the

denial of due process which is never harmless error."  *Bartle*, 560 F.3d at 730 (internal quotation

omitted); *accord Turney v. F.D.I.C.*, 18 F.3d 865, 868 (10th Cir. 1994); *Norton v. Town of Islip*,

239 F. Supp. 2d 264, 271-72 (E.D.N.Y.), *aff'd* 77 F. App'x 56 (2d Cir. 2003) (summary order).

New GM misconstrues the "prejudice" here when it contends that Plaintiffs must show

that there would have been a "material difference" to the outcome of the Sale Hearing, if

Plaintiffs had been aware that the hearing could impact their rights and appeared at the hearing.

New GM Br. at 37.  Because "[t]he purpose of due process in the setting of bankruptcy cases is

to give the parties sufficient notice in order to afford them an opportunity to participate and to

appear and object at hearing if the need arises," *In re Heiney*, 194 B.R. 898, 902 (D. Colo. 1996),

a due process violation occurs, and a claimant is "prejudiced," when a claimant is deprived of the

opportunity to participate in a bankruptcy hearing because of inadequate notice.

---

[10]   Thus, the cases that New GM cites involving procedural issues, rather than the threatened elimination
of substantive rights, are inapposite.  *See In re Rosson*, 545 F.3d 764, 775-77 (9th Cir. 2008)
(harmless error where "even after receiving notice of the conversion and having the opportunity to be
heard in opposition, [debtor] offered nothing to counter the court's finding of bad faith"); *In re Parcel
Consultants*, 58 F. App'x at 951 (deciding matter based on briefs on a motion for leave to appeal, as
opposed to merits brief, harmless error where party "had a full opportunity to present its argument");
*Rapp v. U.S. Dep't of Treasury, Office of Thrift Supervision*, 52 F.3d 1510, 1519-20 (10th Cir. 1995)
(alleged inadequate notice under Administrative Procedure Act not prejudicial where statute
incorrectly listed on notice was not "substantively different in any respect relevant to this case"); *In re
City Equities Anaheim, Ltd.*, 22 F.3d 954, 959 (9th Cir. 1994) (bankruptcy court's failure to formally
approve petition for new counsel before hearing was harmless error where original counsel submitted
a "lengthy brief" and the "prospective [new] counsel filed several supplemental declarations, argued
. . . at the hearing, and filed objections to the bankruptcy court's proposed findings"); *Sec. Inv. Prot.
Corp. v. Blinder, Robinson & Co.*, 962 F.2d 960, 966-68 (10th Cir. 1992) (changing hearing purpose
from appointing temporary receiver to issuing protective decree and appointing a trustee not
prejudicial where statute required action within three days and debtor "addressed the merits of the
issue" at the hearing).

Because it is the lack of sufficient notice and opportunity to be heard that deprives a claimant in a bankruptcy proceeding of due process, both the Second Circuit and district courts in the Second Circuit have made clear that "[b]ankruptcy courts cannot extinguish the interests of parties who lacked notice of or did not participate in the proceedings."[11] *Koepp*, 2014 WL 6600418, at \*3; *see also DPWN II*, 747 F.3d at 150 ("[A] claim cannot be discharged if the claimant is denied due process because of lack of adequate notice."); *Johns-Manville*, 600 F.3d at 157-58 (holding that "the bankruptcy court and the district court erred by rejecting Chubb's due process argument" when Chubb "did not receive adequate notice" and "was not adequately represented in the proceedings that lead to the bankruptcy court's approval of . . . the Manville Plan"); *Ritchie*, 471 B.R. at 339 (explaining that "a sale order under section 363(f) of the Code that purports to free a purchaser from the debtor's liabilities does not bind parties in interest that did not receive appropriate notice of the sale") (quotations omitted).

The Second Circuit has never held that a claimant who had no opportunity to be heard in a bankruptcy proceeding because of inadequate notice must further "prove" prejudice by speculating how the debtor, other creditors, and the court would have reacted had the claimant appeared. *See* New GM Br. at 37. Indeed, it would make little sense here to require Plaintiffs, who were not present at the Sale Hearing, to "prove" prejudice by speculating how Old GM, its

---

[11]    The Second Circuit has thus not adopted the oft-criticized view expressed in *In re Edwards*, 962 F.2d 641 (7th Cir. 1992) that "the policy of finality" should trump due process concerns. *Id.* at 645. *See In re Ex-Cel Concrete Co., Inc.*, 178 B.R. 198, 204-05 (B.A.P. 9th Cir. 1995) ("We . . . disagree with *Edwards* to the extent that it allows considerations, such as the exigent needs of the bankruptcy system . . . to justify departures from due process standards in adjudicating property rights."); *Polycel*, 2006 WL 4452982, at \*10-11 (rejecting *Edwards*). In the 22 years since *Edwards* was decided, no court in the Second Circuit has adopted it. Similarly, although the court in *In re Paris Indus. Corp.*, 132 B.R. 504 (D. Me. 1991) observed that the purpose of notice in the context of a sale of a debtor's assets is to obtain "the most that could be realized from the assets sold," *id.* at 509, no court in the Second Circuit has adopted it in the 23 years in since it was decided. Instead, "[c]ourts have rejected the premise that maximizing the value of the estate outweighs the due process rights of potential claimants." *Grumman*, 467 B.R. at 711.

30

creditors, the U.S. Treasury, this Court, and others might have acted if the ignition switch and

other defects that are the subject of the recall notices had been disclosed in 2009, rather than in

2014.  That is not a sensible "standard," but an excuse that New GM has contrived to provide a

lengthy and irrelevant rationalization for the obvious lack of due process here.  *Id.* at 40-50.

New GM mistakenly relies on *Morgenstein v. Motors Liquidation Co. (In re Motors

Liquidation Co.)*, 462 B.R. 494 (Bankr. S.D.N.Y. Jan. 18, 2012).  *Morgenstein* did not involve

any allegation of inadequate due process.  Instead, the *Morgenstein* plaintiffs alleged that Old

GM had committed a "fraud on the court," *id.* at 498, which, as New GM acknowledges

elsewhere in its brief, *requires* a showing that the fraud "influenced the court in its decision."

New GM Br. at 76.  New GM does not offer any basis, nor could it, for imposing on claimants

who had no opportunity to be heard because of inadequate notice a requirement that is applied to

plaintiffs who allege that there was a "fraud on the court."

New GM also mistakenly relies on the *Parker* decision in this bankruptcy case.  The

appellant in *Parker* was not deprived of due process, notwithstanding inadequate notice, because

he subsequently had a "full and complete opportunity to participate in the [bankruptcy]

proceedings."  *Parker*, 430 B.R. at 98.[12]  Indeed, the appellant not only "objected to the Sale,"

but also "served document requests" and received documents from GM at the deposition of Old

GM's CEO Fritz Henderson, "as [he] requested," "personally examin[ed] two of th[e three]

---

[12]    *See also In re Caldor, Inc.-NY*, 240 B.R. 180, 188 (Bankr. S.D.N.Y. 1999) ("[I]rrespective of what
transpired prior to entry of the Wind-Down and February 8 Order, we gave Pearl the opportunity to
contest entry of those orders on any basis during the course of the hearing on this motion. It chose to
assail only the legal underpinnings of those orders."), *aff'd sub nom. Pearl-Phil GMT (Far East) Ltd.
v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) ("Pearl was afforded an opportunity to contest
the Wind-Down Order and its subsequent affirmance at the August hearing.  As noted by the
Bankruptcy Court, Pearl did not introduce testimony or other evidence refuting any factual finding by
the Bankruptcy Court in entering those orders."); *In re Vanguard Oil & Serv. Co.*, 88 B.R. 576, 580
(E.D.N.Y. 1988) ("Apex had an opportunity to contest the sale or bid, yet it appeared at the sale and
failed to object. For the foregoing reasons, we find Apex's due process claim unpersuasive.").

witnesses" deposed by objectors to the Sale, and "cross-examined four witnesses during the [Sale] [H]earing." *Id.* at 70-75. That is not remotely analogous to what has happened here. Plaintiffs were not represented at the Sale Hearing, either individually or by an appointed representative. *See* Hr'g Tr. July 2, 2009, 100:4-15 (Rubin Decl., Ex. 1).

Even indulging New GM's contrived "standard" for due process, New GM mischaracterizes the history of the Sale Hearing and related submissions. For example, New GM asserts that "similarly-situated parties filed objections" to the sale (New GM Br. at 41), but there is no evidence that any objecting party was aware of the ignition switch and other defects that caused New GM's 2014 recalls at the time of the Sale Hearing. In this regard, New GM simply misses the point when it asserts that there is no "tangible prejudice as a consequence of having received Publication Notice." New GM Br. at 40. It is not the *form* of the notice that was inadequate, but the *content*. New GM "confuses the requirement that creditors be given notice of the bankruptcy proceeding (which it satisfied) with the requirement that parties must have some notice of potential claims they might have against the bankruptcy petitioner before those claims are discharged (which could not possibly have been satisfied)." *Hexcel*, 239 B.R. at 571.[13]

Moreover, in light of the sheer magnitude of New GM's recalls in 2014 and what ensued—*i.e.*, 80 recalls for ignition switch and other defects encompassing more than 30 million vehicles and the scores of government and regulatory investigations arising out of the recalls— New GM's contention that no aspect of the Sale would have changed if the ignition switch and other defects had been disclosed prior to the Sale Hearing and Plaintiffs had been afforded the

---

[13]    In connection with potential future claimants for asbestos-related injuries, this Court recognized that "the notice given on th[e] [motion to approve the Sale Order] was not fully effective, since without knowledge of an ailment that had not yet manifested itself, any recipient would be in no position to file a present claim." *In re Gen. Motors Corp.*, 407 B.R. at 507. Notice was likewise inadequate for Plaintiffs who had no knowledge of the ignition switch and other defects and therefore were in no position to file a claim or know that their rights would be impacted at the Sale Hearing.

opportunity to appear at the Sale Hearing strains credulity.  For example, as a result of

negotiations in June 2009, *after* the filing of the Sale Motion, New GM agreed to assume "*all*

product liability claims arising from accidents or other discrete incidents . . . occurring

subsequent to the closing of the 363 Transaction, *regardless of when the product was*

*purchased.*"  *In re Gen. Motors Corp.*, 407 B.R. at 481-82 (emphasis in original).  Had the

parties and the Court understood what the world now knows—that tens of millions of pre-

petition vehicles presented serious safety issues that warranted several dozen recalls and caused

death, personal injury, and economic losses to potentially millions of Plaintiffs—it is equally

possible that New GM might have agreed to assume other, concrete, and expressly delineated

categories of liabilities as well.  At the very least, it is disingenuous for New GM to insist that

*nothing* would have been different if Plaintiffs received notice of their claims.

In sum, Plaintiffs were deprived of due process because they did not receive adequate

notice in June 2009 and did not have an opportunity to participate in the Sale Hearing.

Accordingly, Plaintiffs' due process rights would be violated if the Sale Order were applied to

bar their causes of action against New GM.

## II.    Remedies Threshold Issue:  The Sale Order Should Be Voided As To Plaintiffs

Because Plaintiffs had no pre-Sale "claims" under the Bankruptcy Code, Plaintiffs have

no causes of action against the "proceeds of the sale" and have properly directed their causes of

action against New GM.[14]  Moreover, even if Plaintiffs were somehow deemed to have had pre-

Sale "claims" arising from New GM's recalls *in 2014* and the defects disclosed as a result, the

---

[14]    As set forth in opening brief on the Equitable Mootness Threshold Issue filed by the GUC Trust
Administrator and the Participating Unitholders (Dkt. 12983), the doctrine of equitable mootness bars
Plaintiffs from pursuing claims against the GUC Trust.

Sale Order is properly voided as to Plaintiffs because they were deprived of due process in connection with the Sale.

### A.    Plaintiffs' Causes Of Action Are Properly Directed Against New GM

At a May 2014 hearing, New GM suggested that Plaintiffs "explore" as an "alternative" claims against the GUC Trust.  Hr'g Tr. May 2, 2014 at 31, 83 (Rubin Decl., Ex. 14).  In the Consolidated Complaints filed in October 2014, however, the sole named defendant is New GM.  Plaintiffs did not name the GUC Trust as a defendant.  Nevertheless, New GM continues to urge Plaintiffs to pursue "proceeds of the sale" by suing the GUC Trust.  New GM Br. at 57.

In arguing that Plaintiffs' remedy "should be against the proceeds of the disposition" (*id.* at 56), New GM ignores that Plaintiffs did not have pre-Sale "claims" under the Bankruptcy Code.  *See supra* Section I.  Without pre-Sale "claims," Plaintiffs have no cause of action against the "proceeds of the sale."

In its 80-page brief, New GM never explains how any "proceeds of the sale" could be distributed to those who had no pre-Sale claims.  Instead, New GM erroneously presumes that Plaintiffs had pre-Sale claims and erroneously relies on cases in which the claimants both had cognizable "claims" under the Bankruptcy Code *before* the Section 363 sale and were afforded due process in connection with the sale.  *See Molla v. Adamar of N.J., Inc.*, 2014 WL 2114848, at *3 (D.N.J. May 21, 2014) ("The bankruptcy court mandated that Tropicana Corp.'s purchase of Adamar's assets was free and clear of all claims and interests . . . These terms encompass Plaintiffs' claims, which arose . . . *before Tropicana Corp. purchased the hotel and casino*.") (emphasis added); *In re BFW Liquidation, LLC*, 471 B.R. 652, 658 (Bankr. N.D. Ala. 2012) ("On May 4, 2009, this Court approved the sale of some of the debtor's assets . . . including the store on Montclair Road. . . . The plaintiff alleges that it was in that store that someone who had stolen checks from her in 2008, used one of those checks on November 19, 2008."); *MacArthur*

*Co. v. Johns-Manville Corp.*, 837 F.2d 89, 90 (2d Cir. 1988) (holding that "free and clear"

provision applied to insurer's claims regarding "extensive litigation" *before* debtor's Chapter 11

filing).

Here, Plaintiffs had no "claims" under the Bankruptcy Code when the Sale Order was

entered in July 2009.  Thus, Plaintiffs have no causes of action against the "proceeds of the sale"

and have properly directed their causes of action against New GM.  *See Grumman*, 467 B.R. at

708 (dismissing adversary complaint filed by Section 363 purchaser to enjoin suit against

claimant who did not receive due process); *Schwinn*, 210 B.R. at 761 (same).  Far from being an

"unjustified windfall" for Plaintiffs (New GM Br. at 55), this is the only fair result.[15]  Indeed,

enforcing a sale order to enjoin post-sale claims against a Section 363 purchaser would "deny . . .

due process and violate the Bankruptcy Code's requirements of notice and opportunity to be

heard for those affected by a bankruptcy court's rulings."  *Grumman*, 467 B.R. at 711; *see also*

*Schwinn*, 210 B.R. at 760-61 ("Allowing provisions of the Sale Order to bind these Defendants,

even if that Order was intended to do so, would violate the Fifth Amendment because of fairness

and due process concerns and would also violate bankruptcy notice requirements . . . .  [T]he

Count must be dismissed.").

---

[15]    *See Kewanee*, 198 B.R. at 528 ("By chance Smith was injured later.  Also by chance he was injured
by a boiler manufactured pre-bankruptcy. . . . It is argued that [allowing Smith to pursue his causes of
action against the reorganized entity] would be unfair to prepetition claimants who must be satisfied
out of the unsecured creditors' sinking fund.  Such 'unfairness,' however, is more apparent than real.
. . . The law must deal with events as they actually occurred.  In this case, Smith had no § 101(5)
'right to payment' at all under non-bankruptcy law at any time prior to Debtor's confirmation and
therefore had no pre-petition or pre-confirmation 'claim' under that provision.  His future claim was
therefore not "contingent" or "unmatured" in any legal sense pre-petition or pre-confirmation.  Debtor
had no debt to him at all.").

**B.     Courts Have Repeatedly Held That A Section 363 Purchaser Is Precluded From Taking Property Free And Clear Of All Interests Where A Pre-Sale Claimant Was Deprived Of Due Process Prior To Entry Of The Sale Order**

Even if Plaintiffs were somehow deemed to have had pre-Sale "claims" arising out of New GM's recalls in 2014, the Sale Order is properly voided as to Plaintiffs because, as discussed in Section I above, they were deprived of due process in connection with the Sale. New GM professes to be "unaware of any legal authority" holding that a Section 363 sale order can be "voided" for a "group of claimants" who "allegedly did not receive proper notice."  New GM Br. at 52.  Yet, just a few months ago in connection with briefing on a motion by an Old GM employee for leave to pursue causes of action against New GM, the GUC Trust identified multiple cases holding that a Section 363 sale order can be voided as to claimants who were deprived of due process.  (Dkt. 12864 at 3; Dkt. 12930 at 8-9).

Where, as here, claimants were deprived of due process in connection with the entry of a Section 363 sale order, courts have repeatedly held that a Section 363 purchaser is precluded from taking property free and clear of all interests and that the claimants may properly pursue their remedy from the Section 363 purchaser.  *See, e.g.*, *Compak*, 415 B.R. at 343; *Polycel*, 2007 WL 77336, at *9; *Metzger*, 346 B.R. at 819.[16]

The reason New GM omits any reference to these cases is that they directly refute New GM's contention that "setting aside the Sale Order and Injunction as it applies to Plaintiffs is not

---

[16]  New GM's reliance on *In re Fernwood Markets*, 73 B.R. 616 (Bankr. E.D. Pa. 1987), is misplaced. In *Fernwood*, the court acknowledged that "the sale is voidable, at the option of the creditor, because he failed to receive adequate notice of the sale as required by 11 U.S.C. § 363(b)(1) and the precepts of due process of law."  *Id.* at 617.  Although the court decided in the particular circumstances of that case that "the sale is totally void or voidable, or it is valid," *id.* at 621, no court in the Second Circuit has embraced this aspect of *Fernwood*.  Instead, courts in the Second Circuit have repeatedly recognized that Section 363 sale orders are not enforceable against specific claimants who were not afforded due process in connection with a sale.  *See, e.g.*, *Grumman*, 467 B.R. at 706; *Ritchie*, 471 B.R. at 338-39.

a viable remedy for inadequate notice." New GM Br. at 51.  Indeed, in each of these cases, the

Section 363 sale order was deemed void as to the claimants because they had been deprived of

due process.  *See Compak*, 415 B.R. at 343 ("We conclude that the Sale Order is 'void' insofar as

it purports to extinguish defendants' license."); *Polycel*, 2007 WL 77336, at *8-9 ("The

Bankruptcy Court did not, as Polycel suggests, partially void or change the terms of the Sale

Order, but instead avoided the entire order as it pertains to the Molds. . . . [T]his Court agrees

with the Bankruptcy Court that Section 363(m) of the Bankruptcy Code does not preclude the

remedy fashioned here . . . Accordingly, this Court will affirm the April Order."); *Metzger*, 346

B.R. at 819 ("The Court has some flexibility in creating a remedy here and need not and will not

find the entire sale void on these facts. . . .The Court need only find, and does find, that the

County's interest in the Property survived the sale to Nusan. The 1992 Sale Order is to that

limited extent void because the County's due process rights were violated.").

     New GM does not cite any Section 363 case to the contrary.  Instead, citing cases in

which the claimants, unlike Plaintiffs here, received adequate notice, appeared at the sale

hearing, and made their objections at the hearing,[17] New GM makes the irrelevant argument that

---

[17]   *See In re Trans World Airlines, Inc.*, 322 F.3d 283 (3d Cir. 2003); *Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 428 B.R. 43 (S.D.N.Y. 2010); *Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 430 B.R. 65, 70, 81 (S.D.N.Y. 2010).  New GM also miscites *Campbell* and *Parker* for its assertion that "the law of this case" precludes the relief Plaintiffs seek.  New GM Br. at 24-25.  Unlike here, the claimants in *Campbell* and *Parker* had "claims" under the Bankruptcy Code that arose "prior to Debtors' chapter 11 filing and 363 motion" and were afforded due process in connection with the Sale.  *Campbell*, 428 B.R. at 46; *see also Parker*, 430 B.R. at 70.  Rather than seek a stay of the Sale Order, however, the pre-Sale claimants in *Campbell* and *Parker* opted to appeal the unstayed Sale Order.  The district courts dismissed the appeals under the "so-called statutory mootness rule of section 363(m)" because "[s]ection 363(m) of the Bankruptcy Code limits appellate jurisdiction over an unstayed sale order issued by a bankruptcy court to the narrow issue of whether the property was sold to a good faith purchaser."  *Campbell*, 428 B.R. at 53; *see also Parker*, 430 B.R. at 78.  That an unstayed sale order cannot be appealed effectively by pre-petition claimants under Section 363(m) has no bearing on whether future claimants to whom no meaningful notice was provided can argue that the same sale order would violate their due process rights if applied against them.

"the terms of the 363 Sale may not be modified as to New GM, who is a good faith purchaser."[18]

New GM Br. at 54. Plaintiffs are not seeking to "modify," "rewrite," or "strike" provisions of

the Sale Order "as to New GM" following a sale hearing at which they appeared and made

objections relating to claims for which they had sufficient information to assert. *See*

*In re Johns-Manville Corp.*, 759 F.3d 206, 218 (2d Cir. 2014) (noting prior *Manville* decision

holding that Chubb was not bound by the applicable orders "did not alter any aspect" of the

orders). Rather, as New GM acknowledges elsewhere in its brief, "Plaintiffs seek to void the

Sale Order and Injunction as to them [*i.e.*, Plaintiffs]" based on an alleged deprivation of due

process. *Id.* at 23. The cases that New GM studiously avoids referencing, much less addressing,

all hold that a Section 363 sale order may be properly deemed void as to claimants who were

deprived of due process. *See, e.g.*, *Compak*, 415 B.R. at 343; *Polycel*, 2007 WL 77336, at *8-9;

*Metzger*, 346 B.R. at 819; *see also Grumman*, 467 B.R. at 711; *Schwinn*, 210 B.R. at 760-61.

New GM is ultimately reduced to arguing that voiding the Sale Order as to Plaintiffs

"would run contrary to the well-established public policy objectives in bankruptcy so that a

debtor can maximize the sale value of its assets for the benefit of its creditors." New GM Br. at

52-53. Purported "public policy objectives," however, cannot supplant the due process

protections of the U.S. Constitution. Indeed, "[c]ourts have rejected the premise that maximizing

the value of the estate outweighs the due process rights of potential claimants." *Grumman*, 467

B.R. at 711; *see also In re Polycel Liquidation, Inc.*, 2006 WL 4452982, at *11 (Bankr. D.N.J.

Apr. 18, 2006), *aff'd*, 2007 WL 77336 (D.N.J. Jan. 8, 2007) ("Although this court agrees that the

---

[18]    The finding in the Sale Order that New GM was a "good faith purchaser" for purposes of Section
363(m) says nothing about whether Plaintiffs were deprived of due process in connection with the
entry of the Sale Order and cannot supplant the requirements of the U.S. Constitution. *See, e.g.*,
*Polycel*, 2007 WL 777336, at *9 & n.5 (voiding Section 363(f) sale order as to claimant who was
deprived of due process so that claimant could pursue claim against "good faith purchaser" under
Section 363(m)).

interest of finality is an important part of ensuring participation in bankruptcy sales, this cannot

trump constitutionally mandated due process requirements for notice and an opportunity to be

heard.").[19]

### III. Threshold Issue On New GM's Assumed Liabilities And Old GM's Retained Liabilities:  New GM Is Responsible For Plaintiffs' Alleged Economic Injuries From New GM's Recalls And New GM's Violation Of Federal Recall Laws

Even if the Court were to find somehow that the Pre-Sale Plaintiffs and the Post-Sale

Plaintiffs had claims against Old GM at the time of the Sale and that Plaintiffs were afforded

adequate due process, the bulk of Plaintiffs' causes of action would still be properly directed

against New GM under the express terms of the Sale Agreement.  New GM concedes that its

Assumed Liabilities include "post-sale accidents involving Old GM vehicles."  New GM Br. at

59.  Moreover, as explained below, New GM also is responsible under the terms of the Sale

Agreement for Plaintiffs' causes of action for economic losses resulting from New GM's recalls

and New GM's violation of federal recall laws.

### A. Under The Express Terms Of The Sale Agreement, New GM's Assumed Liabilities Encompass Plaintiffs' Alleged Economic Injuries From New GM's Recalls

New GM contends that Plaintiffs' causes of action for economic losses are Old GM's

Retained Liabilities because New GM's Assumed Liabilities are limited to (i) "post-sale

accidents involving Old GM vehicles and parts manufactured by Old GM"; (ii) certain limited

repairs as enumerated by a so-called Glove Box Warranty; and (iii) "Lemon Law violations as

defined in the Sale Agreement."  *Id.*

---

[19]   The cases upon which New GM relies are silent on the issue of whether "public policy objectives" may supplant constitutional due process concerns.  Indeed, *Douglas v. Stamco*, 363 F. App'x 100 (2d Cir. 2010) and *Doktor v. Werner Co.*, 762 F. Supp. 2d 494 (E.D.N.Y. 2011) did not even involve allegations of  inadequate due process or a request that a Section 363 sale order be voided as to claimants who were allegedly deprived of due process.

The Sale Agreement, however, makes clear that New GM's Assumed Liabilities (other than for warranty repairs and Lemon Law violations) are not simply limited to physical harm or property damage resulting from "post-sale accidents."  Indeed, the Sale Agreement states that New GM's Assumed Liabilities encompass all liabilities to third parties for "death, personal injury, **or other injury to Persons** or damage to property" caused by GM vehicles or their parts that arise directly out of "death, personal injury, **or other injury to Persons** or damage to property caused by accidents or **incidents first occurring on or after the Closing Date** and arising from such motor vehicles' operation or performance."  Sale Agreement, § 2.3(a)(ix) (Rubin Decl., Ex. 3) (emphasis added).

Thus, New GM not only assumed liabilities for "death," "personal injury," and "damage to property," but also for "***other injury* to Persons**," which includes lost value in Plaintiffs' vehicles, lost wages, child care expenses, out-of-pocket expenses for car rentals, and other economic injuries.  *Id.*; *see also Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 99 (2d Cir. 2012) ("[W]ords and phrases [in a contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions.") (quotations and citation omitted); *In re Lehman Bros., Inc.*, 478 B.R. 570, 594 (S.D.N.Y. 2012) ("Principles of contract construction favor interpretation which does not render an agreement—or any provision thereof—surplusage."), *aff'd sub nom. In re Lehman Bros. Holdings, Inc.*, 761 F.3d 303 (2d Cir. 2014).

Moreover, New GM did not only assume liabilities for injury caused by accidents, but also for "incidents first occurring on or after the Closing Date," which includes New GM's recalls in 2014.  Indeed, because the word "incident" is "not defined anywhere else in the [Sale Agreement]," this Court has previously interpreted the term "incident" to "cover[] more than just

'accidents,'" and to not only "relate to fires [and] explosions," but also to "other definite events that *cause* injuries and *result* in the right to sue . . . or that relate to the resulting damages." *In re Motors Liquidation Co.*, 447 B.R. 142, 145, 149 (Bankr. S.D.N.Y. 2011) (emphasis in original); *see also* Dkt. 12791 at 8 n.17 (noting that construction of "incident" occurred "in the context of claims against New GM by the estate of a consumer who had been in an accident before the 363 Sale, but died thereafter").

Here, New GM's recalls are "definite events that *cause[d]* [Plaintiffs'] injuries" that "result[ed] in their right to sue" and "relate to the resulting damages."[20] *In re Motors Liquidation Co.*, 447 B.R. at 149. Indeed, the Consolidated Complaints detail the relevant New GM recalls by date, the make and model of the vehicles at issue, the defects disclosed through the recall's announcement, and how they relate to Plaintiffs' claimed damages. *See, e.g.*, Pre-Sale Consolidated Complaint ¶¶ 10-18, 249-60, 270-81, 311-18, 364-66; Post-Sale Consolidated Complaint ¶¶ 293-793. Thus, under the express terms of Section 2.3(a)(ix) of the Sale Agreement (Rubin Decl., Ex. 3), New GM's Assumed Liabilities include Plaintiffs' alleged economic injury from the recalls.

In addition, New GM's Assumed Liabilities encompass obligations arising out of or related to New GM's use and ownership of the "Purchased Assets," a category that includes the Old GM books and records that New GM acquired on the *very first day of its existence*. Sale Agreement § 2.2(a)(xiv) (Rubin Decl., Ex 3); *see also id.* § 2.3(a)(xi) (including, among

---

[20]   *See* Pre-Sale Consolidated Complaint ¶ 25 (alleging "economic harm to millions to customers that manifested upon the long-delayed recalls"); Post-Sale Consolidated Complaint ¶¶ 16 ("[T]he ignition switch defect first revealed in February 2014 [through the recall] sent shockwaves throughout the country and jump-started the ever-burgeoning erosion of consumer confidence in the New GM brand"), 20 ("New GM's recalls ha[ve] so tarnished GM-branded vehicles that no reasonable consumer would have paid the price they did when the New GM brand supposedly meant safety and success"), 431-67 (alleging that delays and errors in the ignition switch recall has caused additional economic losses for Post-Sale Plaintiffs).

"Assumed Liabilities," all "Liabilities arising out of, relating to, in respect of, or in connection

with the use, ownership or sale of the Purchased Assets after the Closing").  The Consolidated

Complaints seek damages arising from New GM's failure to act on scores of company e-mails,

legal records, and reports—many of which were created prior to the Sale and expressly

purchased by New GM—that allegedly revealed the ignition switch defect and prompted the

recalls.  *See, e.g.*, Pre-Sale Consolidated Complaint ¶ 19 (alleging that due to "access to Old

GM's documents, New GM was aware of the ignition switch defects *from the very date of its*

*inception*") (emphasis in original); Post-Sale Consolidated Complaint ¶ 212 (alleging that New

GM "acquired notice and full knowledge" of the ignition switch defect, including through the

Old GM books and records it purchased, "on or around the day of its formation as an entity");

*see also id.* ¶¶ 213-53 (detailing same).

New GM mistakenly relies on *Burton*, which New GM characterizes as an economic loss

case about "defective vehicle[s] . . . that require[] more servicing and [are] worth less money."

New GM Br. at 65.  Under the sale agreement in *Burton*, product liability claims were assumed

by New Chrysler only insofar as they "arise directly from motor vehicle accidents occurring on

or after [the sale's] Closing," while expressly reserving for the debtor's estate all other product

liability claims arising from the sale of products on or prior to the closing, including claims

"arising out of, or otherwise relating to in any way . . . product recalls."  492 B.R. at at 397.  The

Sale Agreement here contains no such carve out.

New GM also mistakenly relies on two prior decisions in these proceedings.  *See Castillo*

*v. Gen. Motors LLC (In re Motors Liquidation Co.*), 2012 WL 1339496 (Bankr. S.D.N.Y. Apr.

17, 2012), *aff'd*, 500 B.R. 333 (S.D.N.Y. 2013), *aff'd*, 2014 WL 4653066 (2d Cir. Sept. 19,

2014); *Trusky v. Gen. Motors Co. (In re Motors Liquidation Co.*), 2013 WL 620281 (Bankr.

42

S.D.N.Y. Feb. 19, 2013).  Neither *Castillo* nor *Trusky* involved claims triggered by any specific,

post-sale incidents, such as the recalls, or by New GM's own use and ownership of any

Purchased Asset, like Old GM's books and records.  Here, by contrast, Plaintiffs seek damages

for economic losses arising directly from the 2014 recalls and predicated on New GM's

independent failure to act on hard evidence of the relevant defects, including through books and

records it purchased from Old GM.  Thus, Plaintiffs' causes of action for economic injury fall

within the definition of New GM's Assumed Liabilities.

### B.    New GM Is Also Responsible For Plaintiffs' Alleged Economic Losses From New GM's Violation Of Federal Recall Laws

New GM is also responsible for Plaintiffs' alleged economic losses from New GM's

violation of federal recall laws.  *See, e.g.*, Pre-Sale Consolidated Complaint ¶ 759 (alleging that

class members' vehicles "would now be safe to drive, and would have retained considerably

more of their value" "[i]f Old or New GM had timely disclosed the ignition switch defects as

required by the TREAD Act"); Post-Sale Consolidated Complaint ¶ 825 (alleging that class

members' vehicles would be worth more and/or that they would have paid less for them "[i]f

New GM had timely disclosed the many defects as required by the TREAD Act").

New GM concedes that both the Sale Order and the Sale Agreement require New GM to

comply with the federal and state recall-related laws and regulations with respect to vehicles and

parts manufactured or distributed by Old GM.  *See* New GM Br. at 75 (citing Sale Order ¶ 17,

Sale Agreement § 6.15(a) (Rubin Decl., Ex. 3)).  On May 16, 2014, New GM entered into a

consent order with NHTSA in which it admitted that it violated the Safety Act "by failing to

provide notice to NHTSA of the safety-related defect that is the subject of [New GM's ignition-

switch-related recalls on February 7, February 25, and March 28, 2014] within five working

days" as required by federal law and regulation, and agreed to pay a "maximum civil penalty" of

$35 million "for a related series of violations." New GM Consent Order ¶¶ 10-11 (Rubin Decl., Ex. 7).

Obviously, Old GM could not be liable for New GM's violation of federal recall laws. Yet, as if this were an issue of Old GM's Retained Liabilities or New GM's Assumed Liabilities, New GM argues that it bears no responsibility for its own malfeasance because it is not included within the definition of "Assumed Liabilities." New GM Br. at 75-76. The Sale Agreement precludes New GM's liability for "any Liability *of any Seller* . . . other than the Assumed Liabilities." Sale Agreement § 2.3(b) (Rubin Decl., Ex. 3) (emphasis added). New GM's violation of federal recall laws is not a liability of Old GM; therefore, it is irrelevant whether it is included in New GM's "Assumed Liabilities." What is relevant is that the Sale Order expressly states that it "shall inure to the benefit of the Debtors, their estates, and their creditors," Sale Order ¶ 66, and that neither the Sale Order nor the Sale Agreement bar parties-in-interest from seeking a remedy for New GM's breach of its obligation under the Sale Order and Sale Agreement, "[f]rom and after the Closing," to "comply with the certification, reporting and recall requirements" of the federal Safety Act, other federal and state statutes, and related regulations, "to the extent applicable" with respect to Old GM vehicles or parts. *Id.* ¶ 17; Sale Agreement § 6.15 (Rubin Decl., Ex. 3).[21]

Accordingly, New GM is also responsible for Plaintiffs' alleged economic losses from New GM's violation of federal recall laws.

---

[21] Even if New GM had only undertaken this obligation in the Sale Agreement alone, the GUC Trust has the authority to seek a remedy for its violation. *See* Dkt. 9941 ¶ 11(b) (stating that, as of the Effective Date, the GUC Trust is considered to be "a third-party beneficiary to enforce any provision of the [Sale Agreement] necessary to carry out [its] respective [fiduciary] duties").

**IV.**     <u>The Legal Standard For "Fraud On The Court"</u>

There is no serious dispute about the legal standard for a Rule 60(d)(3) motion to "set aside a judgment for fraud on the court." Fraud on the court is "'conduct; 1) on the part of an officer of the court; that 2) is directed to the judicial machinery itself; 3) is intentionally false, willfully blind to the truth, or is in reckless disregard of the truth; 4) is a positive averment or a concealment when one is under a duty to disclose; and 5) deceives the court.'" *Esposito v. New York*, 2012 WL 5499882, at *2 (S.D.N.Y. Nov. 13, 2012) (quoting *Johnson v. Bell*, 605 F.3d 333, 339 (6th Cir. 2010)). While relief under Rule 60(d)(3) is "characterized by flexibility which enables it to meet new situations which demand equitable intervention, and to accord all the relief necessary to correct the particular injustices involved in these situations," *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 248 (1944), it is "limited to fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko*, 860 F.2d 556, 559 (2d Cir. 1988).

The Second Circuit has explained that fraud on the court is "narrower in scope" than fraud on an adverse party. *King v. First Am. Investigations, Inc.*, 287 F.3d 91, 95 (2d Cir. 2002). Specifically, fraud on the court "embraces 'only that species of fraud which does or attempts to defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases.'" *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1325 (2d Cir. 1995) (quoting *Kupferman v. Consolidated Research & Mfg. Corp.*, 459 F.2d 1072, 1078 (2d Cir. 1972)); *see also LinkCo, Inc. v. Naoyuki Akikusa*, 367 F. App'x 180, 182 (2d Cir. 2010); *King*, 287 F.3d at 95; *Weldon v. United States*, 225 F.3d 647, 2000 WL 1134358, at *2 (2d Cir. 2000); *Lee v. Marvel Enters., Inc.*, 765 F. Supp. 2d 440, 451 (S.D.N.Y. 2011); *In re Food Mgmt. Grp., LLC*, 380 B.R. 677, 714 (Bankr. S.D.N.Y. 2008). Fraud on the court refers to "the most egregious conduct involving a corruption of the

45

judicial process itself," such as "bribing a judge, employing counsel to exert improper influence

on the court, and jury tampering." *Esposito*, 2012 WL 5499882 at *2 (quotation and citation

omitted); *see also In re Old Carco LLC*, 423 B.R. 40, 54 (Bankr. S.D.N.Y. 2010), *aff'd*, 2010

WL 3566908 (S.D.N.Y. Sept. 14, 2010), *aff'd sub nom. Mauro Motors Inc. v. Old Carco LLC*,

420 F. App'x 89 (2d Cir. 2011) (listing bribery of a judge or jury and fabrication of evidence by

counsel as examples of fraud on the court).

Therefore, to qualify as a fraud on the court, the conduct at issue must be intentionally

false or willfully blind to or in reckless disregard of the truth *and* directed at the judicial

machinery itself, not just other litigants. *Esposito*, 2012 WL 5499882 at *2. Under Second

Circuit law, perjury and non-disclosure of pertinent facts, including during discovery, are

insufficient in and of themselves to prove a fraud on the court because "neither perjury nor

nondisclosure, by itself, amounts to anything more than fraud involving injury to a single

litigant." *Gleason*, 860 F.2d at 560; *see also LinkCo, Inc. v. Akikusa*, 615 F. Supp. 2d 130, 135

(S.D.N.Y. 2009), *aff'd sub nom. LinkCo, Inc. v. Naoyuki Akikusa*, 367 F. App'x 180 (2d Cir.

2010); *In re Hoti Enters., L.P.*, 2012 WL 6720378, at *3-4 (S.D.N.Y. Dec. 27, 2012), *aff'd*, 549

F. App'x 43 (2d Cir. 2014); *In re Trico Marine Servs., Inc.*, 360 B.R. 53, 59-60 (Bankr. S.D.N.Y.

2006). Ultimately, not only is "the standard to prove fraud on the court [] extremely high,"

*Marvel Enters.*, 765 F. Supp. 2d at 450, but at all times, the burden is on the movant, who must

establish the fraud "by clear and convincing evidence." *King*, 287 F.3d at 95.

## CONCLUSION

For all these reasons, the GUC Trust Administrator and Participating Unitholders

respectfully submit that Plaintiffs have properly directed their causes of action against New GM,

rather than the GUC Trust.

Dated:    December 16, 2014                Respectfully submitted,

                                           GIBSON, DUNN & CRUTCHER LLP

                                           By:  ___/s/ Adam H. Offenhartz_____
                                                Adam H. Offenhartz
                                                Matthew J. Williams
                                                Aric H. Wu
                                                Lisa H. Rubin

                                           200 Park Avenue
                                           New York, New York 10166
                                           Telephone:  (212) 351-4000
                                           Facsimile:  (212) 351-4035

                                           *Attorneys for Wilmington Trust Company, as
                                           Trustee for and Administrator of the Motors
                                           Liquidation Company General Unsecured
                                           Creditors Trust*

                                           AKIN GUMP STRAUSS HAUER & FELD LLP

                                           By:  ___/s/ Daniel H. Golden_____
                                                Daniel H. Golden
                                                Deborah J. Newman
                                                Jamison A. Diehl
                                                Naomi Moss

                                           One Bryant Park
                                           New York, New York 10036
                                           Telephone:  (212) 872-1000
                                           Facsimile:  (212) 872-1002

                                           *Attorneys for the Participating Unitholders*