Hearing Date and Time:  February 4, 2015 at 9:45 a.m. (Eastern Time)

KING & SPALDING LLP

1185 Avenue of the Americas
New York, New York 10036
Telephone:    (212) 556-2100
Facsimile:     (212) 556-2222
Arthur Steinberg
Scott Davidson

KIRKLAND & ELLIS LLP

300 North LaSalle
Chicago, IL 60654
Telephone:    (312) 862-2000
Facsimile:     (312) 862-2200

Richard C. Godfrey, P.C. (admitted *pro hac vice*)
Andrew B. Bloomer, P.C. (admitted *pro hac vice*)

*Attorneys for General Motors LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------X

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **MOTORS LIQUIDATION COMPANY,** *et al.,* | : | **Case No.:  09-50026 (REG)** |
| **f/k/a General Motors Corp.,** *et al.* | : | |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

----------------------------------------------------------------x

**REPLY BRIEF BY GENERAL MOTORS LLC ON THRESHOLD ISSUES**
**CONCERNING ITS MOTIONS TO ENFORCE THE SALE ORDER AND INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 7

I.    DUE PROCESS THRESHOLD ISSUE:  PLAINTIFFS HAVE
      NOT DEMONSTRATED A DUE PROCESS VIOLATION ................................................ 7

A.   Old GM Provided Plaintiffs With Proper Notice Of The 363 Sale ................................... 7

  1.   Plaintiffs Were "Unknown" Creditors ..................................................... 7

  2.   The Purpose of Notice in the 363 Sale Context ......................................... 11

  3.   Plaintiffs' Claims Were Not Ascertainable In the 363 Sale Context .......................... 14

B.   The Publication Notice Approved By The Court And Served By
     Old GM Satisfied Due Process For Unknown Creditors Such As Plaintiffs ................... 18

  1.   The Publication Notice Encompassed Plaintiffs' Claims ........................................... 18

  2.   For A Sale Notice, There Is No Requirement That A Debtor Identify
       Every Type Of Putative Claim And How That Claim May Be Impacted In
       A Section 363 Transaction .......................................................... 19

  3.   The Toxic Tort Cases In the Bar Date Context Are Inapposite ................................. 25

C.   It Would Have Been Impractical And Unduly Expensive For Old GM
     To Identify In Its Notice Every Specific Type Of Putative Claim
     Against It And How That Claim Might Be Impacted In The 363 Sale ........................... 27

D.   Plaintiffs Cannot Demonstrate That They
     Were Prejudiced By The Publication Notice ................................................. 28

  1.   The Case Law Is Clear That A Showing Of Prejudice Is Required
       To Establish A Due Process Violation In The Bankruptcy Sale Context ................... 28

  2.   Plaintiffs Incorrectly Contend That Prejudice Is
       Not Necessary To  Establish A Due Process Violation
       In The Bankruptcy Sale Context ................................................. 30

  3.   Plaintiffs' Non-Bankruptcy Cases Are Inapposite ...................................... 31

  4.   Plaintiffs Cannot Demonstrate That They  Were Prejudiced By
       The Allegedly Insufficient Notice ............................................. 34

II.   REMEDIES THRESHOLD ISSUE:  IF A REMEDY IS WARRANTED,
      THE COURT SHOULD NOT REVOKE THE SALE ORDER AND
      INJUNCTION, BUT INSTEAD SHOULD ALLOW PLAINTIFFS
      TO SEEK A RECOVERY FROM THE PROCEEDS OF THE 363 SALE ......................... 36

  A.  Plaintiffs Seek To Avoid Their Burden Under Fed. R. Civ. P. 60(b) .............................. 38

  B.  Plaintiffs' Cases Are Inapposite And Do Not Mandate Exempting Plaintiffs
      From The Sale Order And Injunction As A Remedy ........................................................ 38

  C.  Plaintiffs' Proposed Remedy Would Be Improper In This Case ..................................... 46

      1.   Plaintiffs' Proposed Remedy Is At Odds With Governing Case Law ........................ 46

      2.   Plaintiffs' Proposed Remedy Would  Impermissibly Rewrite
           The Sale Order And Injunction ................................................................................... 48

      3.   Plaintiffs' Proposed Remedy Would Give Them An Improper Windfall .................. 49

  D.  Plaintiffs' Remedy Should Be To Seek A Recovery
      From The  Proceeds Of The Sale, Just As Other
      Creditors Of Old GM Have Done ...................................................................................... 50

      1.   Plaintiffs Do Not Seek The Remedy Of Voiding The  Entire Sale,
           And That Remedy Is Unavailable In Any Event ........................................................ 50

      2.   Allowing Plaintiffs To Pursue A Recovery Against  The Sale
           Proceeds Is A Proper And Adequate Remedy ............................................................ 51

III.  OLD GM CLAIM THRESHOLD ISSUE:  CLAIMS ASSERTED
      IN THE CONSOLIDATED COMPLAINTS ARE RETAINED
      LIABILITIES OF OLD GM AND NOT ASSUMED LIABILITIES OF NEW GM ........... 55

  A.  Any Successor Liability Theory Is Meritless And
      Thus The Claims Contained in the Pre-Sale Consolidated
      Complaint And The Pre-Sale Accident Cases Should Be Dismissed ............................... 57

  B.  Claims Predicated On Old GM Vehicles, Parts Or Conduct
      Contained In The Post-Sale Consolidated Complaint Should Be Dismissed ................... 60

      1.   The Bankruptcy Court Clearly Has Subject Matter
           Jurisdiction to Enjoin the Claims Asserted by Plaintiffs ........................................... 60

      2.   The GUC Trust's Strained Reading Of Assumed Liabilities Is Erroneous ............... 63

      a.   The Provision In The Sale Order And Injunction Regarding
           The Assumption Of Certain Product Liabilities Cannot Be Distorted
           To Include The Economic Loss Claims Asserted By Plaintiffs ................................. 63

b.  New GM's Purchase Of Books And Records Does Not Mean
That New GM Somehow Also Assumed  Liabilities Merely Set
Forth In Those Books And Records..............................................................................66

3.  Plaintiffs Cannot Avoid The Sale Order And Injunction By
Re-Characterizing Their Claims Arising From Old GM Vehicles As Direct
Claims Against New GM, As New GM Assumed No Broad Duty To Buyers
Of Old GM Vehicles And Plaintiffs Have Alleged No Relationship Between
Themselves And New GM From Which Any Such Duty Could Arise ......................67

4.  Neither Plaintiffs Nor The GUC Trust Have Asserted,
Or Can  Assert, Claims Based On A Violation Of The Recall Covenant...................72

IV.  THERE IS NO MATERIAL DISPUTE REGARDING
THE LEGAL STANDARD FOR "FRAUD ON THE COURT" ........................................76

CONCLUSION.......................................................................................................................78

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                  <u>Page(s)</u>

*Acevedo v. Van Dorn Plastic Machinery Co.*,
  68 B.R. 495 (Bankr. E.D.N.Y. 1986) .................................................... 24

*Adams v. Copper Beach Townhome Communities, L.P.*,
  816 A.2d 301 (Pa. Super. Ct. 2003) ...................................................... 70

*Ahcom, Ltd. v. Smeding*,
  623 F.3d 1248 (9th Cir. 2010) .............................................................. 58

*Amstadt v. U.S. Brass Corp.*,
  919 S.W.2d 644 (Tex. 1996) .................................................................. 71

*Arch Wireless, Inc. v. Nationwide Paging, Inc. (In re Arch Wireless)*,
  534 F.3d 76 (1st Cir. 2008) ............................................................. 39, 41

*Ayres v. GMC*,
  234 F.3d 514 (11th Cir. 2000) ......................................................... 73, 74

*Bailey v. Smith*,
  No. 13–05–085–CV, 2006 WL 1360846 (Tex. App. May 18, 2006) ..................... 71

*Brunswick Hosp. Ctr., Inc. v. New York Dep't of Health (In re Brunswick Hosp. Ctr.)*,
  No. 892-80487-20, 1997 Bankr. LEXIS 2184 (Bankr. E.D.N.Y. Sept. 12, 1997) ............ 15

*Burton v. Chrysler Group, LLC (In re Old Carco)*,
  492 B.R. 392 (Bankr. S.D.N.Y. 2013) ........................................... 8, 9, 25, 70

*Cameron v. Terrell & Garrett, Inc.*,
  618 S.W.2d 535 (Tex. 1981) .................................................................. 71

*Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
  428 B.R. 43 (S.D.N.Y. 2010) ......................................................... 49, 61, 62

*Cedar Tide Corp. v. Chandler's Cove Inn, Ltd.*,
  859 F.2d 1127 (2d Cir. 1988) .......................................................... 39, 50

*Cel-Tech Comm'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
  973 P.2d 527 (Cal. 1999) ...................................................................... 75

*Chemetron Corp. v. Jones*,
  72 F.3d 341 (3d Cir. 1995) .................................................................... 17

*Citicorp Mortgage, Inc. v. Brooks (In re Ex-Cel Concrete Co.)*,
  178 B.R. 198 (B.A.P. 9th Cir. 1995) ................................................... 24, 52

*City of New York v. New York, N.H. & H.R. Co.*,
  344 U.S. 293 (1953) ................................................................. 15, 39, 41

*Colgan v. Leatherman Tool Grp., Inc.*,
  38 Cal. Rptr.3d 36 (Cal. App. Ct. 2006) .................................................. 75

*Compak Cos., LLC v. Johnson*,
  415 B.R. 334 (N.D. Ill. 2009) ............................................................... 42

*Consolidated Coal Co. v. Borda*,
   171 F.3d 175 (4th Cir. 1999) ................................................................. 32
*Conway v. White Trucks*,
   885 F.2d 90 (3d Cir. 1989)................................................................. 51, 52
*Covey v. Town of Somers*,
   351 U.S. 141 (1956)............................................................................... 22
*Doolittle v. Cnty. of Santa Cruz (In re Metzger)*,
   346 B.R. 806 (Bankr. N.D. Cal. 2006) ................................. 11, 24, 42, 43
*Douglas v. Stamco*,
   363 F. App'x 100, 102 (2d Cir. 2010) ............................................... 47, 50
*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
   747 F.3d 145 (2d Cir. 2014).................................................. 24, 39, 41, 42
*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
   871 F. Supp. 2d 143 (E.D.N.Y. 2012), *rev'd*, 747 F.3d 145 (2d Cir. 2014) ............................ 24
*Factors' & Traders' Ins. Co. v. Murphy*,
   111 U.S. 738 (1884).............................................................. 39, 46, 50, 54
*Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV*,
   209 F.3d 252 (3d Cir. 2000)................................................................... 17
*Fox v. Picard (In re Madoff)*,
   848 F. Supp. 2d 469 (S.D.N.Y. 2012)...................................................... 58
*Fuentes v. Shevin*,
   407 U.S. 67 (1972) ................................................................................ 32
*Furst v. Einstein Moomjy, Inc.*,
   860 A.2d 435 (N.J. 2004)....................................................................... 71
*Gabauer v. Chemtura Corp. (In re Chemtura Corp.)*,
   505 B.R. 427 (S.D.N.Y. 2014)............................................................... 25
*Handy v. Gen. Motors Corp.*,
   518 F.2d 786 (9th Cir. 1975) ........................................................... 73, 74
*In re Agway, Inc.*,
   313 B.R. 31 (Bankr. N.D.N.Y. 2004) ..................................................... 20
*In re Alper Holdings USA*,
   386 B.R. 441 (Bankr. S.D.N.Y. 2008).................................................... 58
*In re Arch Wireless*,
   332 B.R. 241 (Bankr. D. Mass. 2005), *aff'd*, 534 F.3d 76 (1st Cir. 2008) .............................. 14
*In re Bartle*,
   560 F.3d 724 (7th Cir. 2008) ................................................................. 30
*In re Bernard L. Madoff Investment Securities LLC*,
   721 F.3d 54 (2d Cir. 2013)..................................................................... 58
*In re BFW Liquidation, LLC*,
   471 B.R. 652 (Bankr. N.D. Ala. 2012) ................................................... 51

*In re Caldor, Inc., N.Y.*,
  240 B.R. 180 (Bankr. S.D.N.Y. 1999), *aff'd sub nom.*, *Pearl-Phil GMT (Far E.)*
  *Ltd. v. Caldor Corp.*, 266 B.R. 575 (S.D.N.Y. 2001) ............................................ 28
*In re Chateaugay Corp.*,
  201 B.R. 48 (Bankr. S.D.N.Y. 1996) .................................................................. 13
*In re Chrysler LLC*,
  405 B.R. 84 (Bankr. S.D.N.Y. 2009), *aff'd*, (2d Cir. 2009) ...................................... 8
*In re Drexel Burnham Lambert Grp. Inc.*,
  151 B.R. 674 (Bankr. S.D.N.Y. 1993), *aff'd*, 157 B.R. 532 (S.D.N.Y.) ................................ 15
*In re Edwards*,
  962 F.2d 641 (7th Cir. 1992) ........................................................ 29, 51, 52, 53, 54
*In re Emoral, Inc.*,
  740 F.3d 875 (3d Cir. 2014), *cert denied sub nom.*, *Diacetyl Plaintiffs v. Aaroma*
  *Holdings, LLC*, 135 S. Ct. 436 (2014) .................................................................. 57
*In re Enron Corp.*,
  No. 01-16034 (AJG), 2006 WL 898031 (Bankr. S.D.N.Y. Mar. 29, 2006) ............................ 11
*In re Eveleth Mines, LLC*,
  312 B.R. 634 (Bankr. D. Minn. 2004) .................................................................. 12
*In re Feldman*,
  261 B.R. 568 (Bankr. E.D.N.Y. 2001)................................................................ 14, 15
*In re Fernwood Markets*,
  73 B.R. 616 (Bankr. E.D. Pa. 1987) .......................................................... 47, 50, 54
*In re Food Mgmt. Grp., LLC*,
  380 B.R. 677 (Bankr. S.D.N.Y. 2008)................................................................ 77
*In re Freedom Industries*,
  Case No. 14- 20017 (Bankr. S.D. W. Va. Jan. 17, 2014) ...................................... 26
*In re Gen. Motors Corp.*,
  407 B.R. 463 (Bankr. S.D.N.Y. 2009)......................... 2, 4, 5, 8, 18, 35, 36, 57, 59, 66
*In re Gen. Motors Corp.*,
  No. M. 57(LAK), 2009 WL 2033079 (S.D.N.Y. July 9, 2009)........................................ 36
*In re Grumman Olson Indus., Inc.*,
  467 B.R. 694 (S.D.N.Y. 2012)................................................................ 25, 44
*In re Heiney*,
  194 B.R. 898 (D. Col. 1996)........................................................................ 35
*In re Hexcel Corp.*,
  239 B.R. 564 (N.D. Ca. 1999) .................................................................... 23
*In re Interstate Cigar Co.*,
  150 B.R. 305 (Bankr. E.D.N.Y. 1993)................................................................ 17
*In re Jamesway Corp.*,
  Nos. 95B 44821 (JLG), 96/8389A, 1997 WL 327105 (Bankr. S.D.N.Y. 1997) ...................... 20

*In re Johns-Manville Corp.*,
  759 F.3d 206 (2d Cir. 2014) .......................................................................... 48

*In re Keene Corp.*,
  164 B.R. 844 (Bankr. S.D.N.Y. 1994) ........................................................... 58

*In re Kewanee Boiler Corp.*,
  198 B.R. 519 (Bankr. N.D. Ill. 1996) ............................................................ 45

*In re Leckie Smokeless Coal Co.*,
  99 F.3d 573 (4th Cir. 1996) ........................................................................... 62

*In re Lehman Bros. Holdings Inc.*,
  445 B.R. 143 (Bankr. S.D.N.Y. 2011), *aff'd in part and rev'd in part on*
  *other grounds*, 478 B.R. 570 (S.D.N.Y. 2012), *aff'd*, 761 F.3d 303 (2d Cir. 2014). ............... 40

*In re Lehman Bros. Holdings, Inc.*,
  No. 08-13555, 2014 WL 7229473 (S.D.N.Y. Dec. 18, 2014) ...................... 52, 54

*In re Motors Liquidation Co.*,
  462 B.R. 494 (Bankr. S.D.N.Y. 2012) .................................................. 7, 47, 49

*In re Motors Liquidation Company*,
  447 B.R. 142 (Bankr. S.D.N.Y. 2011) ....................................................... 64, 65

*In re New Century TRS Holdings, Inc.*,
  No. 07-10416 (BLS), 2014 WL 842637 (Bankr. D. Del. Mar. 4, 2014) ................ 10

*In re PCH Associates*,
  949 F.2d 585 (2d Cir. 1991) ........................................................................... 49

*In re Placid Oil Co.*,
  753 F.3d 151 (5th Cir. 2014) ......................................................................... 20

*In re Polycel Liquidation, Inc.*,
  No. 00-62780, 2006 WL 4452982 (Bankr. D. N.J. Apr. 18, 2006), *aff'd*,
  2007 WL 77336 (D.N.J. Jan. 8, 2007) .................................... 24, 40, 42, 43

*In re Ritchie Risk-Linked Strategies Trading (Ir.) Ltd.*,
  471 B.R. 331 (Bankr. S.D.N.Y. 2012) ........................................................... 40

*In re The Lady H Coal Co., Inc.*,
  199 B.R. 595 (S.D. W. Va. 1996) .................................................................. 12

*In re Thomson McKinnon Secs. Inc.*,
  130 B.R. 717 (Bankr. S.D.N.Y. 1991) ........................................................... 15

*In re Tougher Industries, Inc.*,
  Nos. 06–12960, 07–10022, 2013 WL 1276501 (Bankr. N.D.N.Y. Mar. 27, 2013) ................ 62

*In re Trans World Airlines, Inc.*,
  322 F.3d 283 (3d Cir. 2003) ..................................................................... 47, 50

*In re Trico Marine Services, Inc.*,
  360 B.R. 53 (Bankr. S.D.N.Y. 2006) ............................................................. 77

*In re Tronox Inc.*,
  Case No. 09-10156 (Bankr. S.D.N.Y. May 28, 2009) .................................... 26

*In re XO Commc'ns. Inc.*,
　301 B.R. 782 (Bankr. S.D.N.Y. 2003) ................................................................. 17

*Inkel v. Pride Chevrolet-Pontiac, Inc.*,
　945 A.2d 855 (Vt. 2008) ...................................................................................... 71

*J. Andrew Lange, Inc. v. FAA*,
　208 F.3d 389 (2d Cir. 2000) ................................................................................ 31

*Johns'-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*,
　517 F.3d 52 (2d Cir. 2008) .................................................................................. 63

*Katz v. Aetna Cas. & Sur. Co.*,
　972 F.2d 53 (3d Cir. 1992) ................................................................................... 70

*King v. First Am. Investigations, Inc.*,
　287 F.3d 91 (2d Cir. 2002) .................................................................................. 78

*Koepp v. Holland*,
　688 F. Supp. 2d 65 (N.D.N.Y. 2010), *aff'd*, 2014 U.S. App. LEXIS
　22108 (2d Cir. Nov. 21, 2014) ............................................................................ 15

*Koepp v. Holland*,
　No. 13-4097, 2014 U.S. App. LEXIS 22108 (2d Cir. Nov. 21, 2014) .............. 39, 43

*Kupferman v. Consol. Research and Mfg. Corp.*,
　459 F.2d 1072 (2d Cir. 1972) .............................................................................. 76

*Lane Hollow Coal Co. v. Dir., Office Workers' Comp. Programs, U.S. Dep't of Labor*,
　137 F.3d 799 (4th Cir. 1998) ......................................................................... 31, 32

*Levander v. Prober (In re Levander)*,
　180 F.3d 1114 (9th Cir. 1999) ............................................................................ 77

*Louisiana Department of Environmental Quality v. Crystal Oil Co. (In re Crystal Oil Co.)*,
　158 F.3d 291 (5th Cir. 1998) .............................................................................. 16

*LTV Corp. v. Back (In re Chateaugay Corp.)*,
　201 B.R. 48 (Bankr. S.D.N.Y. 1996) .................................................................. 29

*MacArthur Co. v. Johns-Manville Corp.*,
　837 F.2d 89 (2d Cir. 1988) ....................................................................... 12, 54, 61

*Mauro Motors Inc. v. Old Carco LLC*,
　420 Fed. App'x 89 (2d Cir. 2011) ....................................................................... 38

*McCabe v. Daimler AG*,
　948 F. Supp. 2d 1347 (N.D. Ga. 2013) .............................................................. 74

*Mennonite Bd. Of Missions v. Adams*,
　462 U.S. 791 (1983) ....................................................................................... 15, 40

*Metal Founds. Acquisition, LLC v. Reinert (In re Reinert)*,
　467 B.R. 830 (Bankr. W.D. Pa. 2012) ............................................................ 25, 44

*Molla v. Adamar of N.J., Inc.*,
　No. 11-6470 (JBS/KMW), 2014 WL 2114848 (D. N.J. May 21, 2014) .................. 41, 47, 54

*Molo Oil Co. v. River City Ford Truck Sales, Inc.*,
    578 N.W.2d 222 (Iowa 1998) ........................................................................... 71

*Mullane v. Central Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950)........................................................................ 15, 16, 17, 40

*Nat'l Pipe & Plastics, Inc. v. N.P.P. Liquidation Co.*,
    No. 96-1676 (PJW), No. 96-1676 (PJW), 2000 WL 33712292 (Bankr.
    D. Del. Sept. 25, 2000) ............................................................................... 15, 24

*New Concept Housing, Inc. v. Poindexter (In re New Concept Housing, Inc.)*,
    951 F.2d 932 (8th Cir. 1991) ....................................................................... 32, 33

*Ninth Ave. v. Remedial Grp.*,
    195 B.R. 716 (N.D. Ind. 1996) ..................................................................... 13, 14

*Nissan Motor Co. Ltd. v. Armstrong*,
    145 S.W.3d 131 (Tex. 2004)............................................................................... 69

*Paris Mfg. Corp. v. Ace Hardware Corp. (In re Paris Indus. Corp.)*,
    132 B.R. 504 (D. Me. 1991) .......................................................... 12, 29, 30, 34, 54

*Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
    430 B.R. 65 (S.D.N.Y. 2010)................................................................... 45, 49, 51

*Pearl-Phil GMT (Far E.) Ltd. V. Caldor Corp.*,
    266 B.R. 575 (S.D.N.Y. 2001)............................................................................ 28

*People of the State of Cal. v. Gen. Motors L.L.C. (In re Gen. Motors Ignition Switch Litig.)*,
    No. 14cv7787, 2014 WL 6655796 (S.D.N.Y. Nov. 24, 2014) .............................. 75

*Pfizer Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co., Inc.)*,
    676 F.3d 45 (2d Cir. 2012).................................................................................. 61

*Richards v. Jefferson Co.*,
    517 U.S. 793 (1996) .......................................................................................... 40

*Schroeder v. City of New York*,
    371 U.S. 208 (1962).......................................................................................... 22

*Schwinn Cycling & Fitness Inc. v. Benonis*,
    217 B.R. 790 (N.D. Ill. 1997) ...................................................................... 39, 44

*Sinclair v. Merck & Co., Inc.*,
    948 A.2d 587 (N.J. 2008).................................................................................. 71

*Solow Bldg. Co., LLC v. ATC Assocs. Inc.*,
    175 F. Supp. 2d 465 (E.D.N.Y. 2001) .............................................................. 15

*St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.*,
    884 F.2d 688 (2d Cir. 1989)............................................................................... 58

*State of Iowa ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.*,
    694 N.W.2d 518 (Iowa 2005) ............................................................................ 71

*Tillman v. Camelot Music, Inc.*,
    408 F.3d 1300 (10th Cir. 2005) .................................................................... 23, 24

*Travelers Casualty & Surety Co. v. Chubb Indemnity Insurance Co.*
  (*In re Johns-Manville Corp.*),
  600 F.3d 135 (2d Cir. 2010), *cert. denied*, 131 S. Ct. 644 (2010) .......................... 22, 23, 39, 44
*Travelers Indem. Co. v. Bailey*,
  557 U.S. 137 (2009) ...................................................................................... 60, 63
*Tri-Cran, Inc. v. Fallon (In re Tri-Cran, Inc.)*,
  98 B.R. 609 (Bankr. D. Mass. 1989) ................................................................ 52, 53
*Trusky v. Gen. Motors LLC (In re Motors Liquidation Co.)*,
  Adv. Proc. No. 09–09803, 2013 WL 620281 (Bankr. S.D.N.Y. Feb. 19, 2013) ................. 4, 65
*Tulsa Prof'l Collection Servs., Inc. v. Pope*,
  485 U.S. 478 (1988), on remand, *Matter of Estate of Pope*, 808 P.2d 640 (1990) .................. 15
*Valley Forge Towers S. Condominium v. Ron-Ike Foam Insulators, Inc.*,
  574 A.2d 641 (Pa. Super. Ct. 1990) ........................................................................ 70
*Vancouver Women's Health Collective Soc. v. A.H. Robins Co., Inc.*,
  820 F.2d 1359 (4th Cir. 1987) .............................................................................. 27
*Waterman S.S. Corp. v. Aguiar (In re Waterman S.S. Corp.)*,
  141 B.R. 552 (Bankr. S.D.N.Y. 1992), *aff'd in part, vacated and
  remanded*, 157 B.R. 220 (S.D.N.Y. 1993) .......................................................... 25, 26
*Waterman S.S. Corp. v. Aguiar (In re Waterman S.S. Corp.)*,
  157 B.R. 220 (S.D.N.Y. 1993) .............................................................................. 39
*Werwinski v. Ford Motor Co.*,
  286 F.3d 661 (3d Cir. 2002) ................................................................................. 70
*Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus., Inc.)*,
  43 F.3d 714 (1st Cir. 1994) .................................................................... 13, 25, 39, 44
*White v. Chance Indus., Inc. (In re Chance Indus., Inc.)*,
  367 B.R. 689 (Bankr. D. Kan. 2006) ............................................................. 8, 33, 34
*Wolff v. Chrysler Group LLC*,
  Adv. Proc. 10-05007 (Bankr. S.D.N.Y. July 30, 2010) ......................................... 12, 28, 36, 55
*Zerand-Bernal Grp., Inc. v. Cox*,
  23 F.3d 159 (7th Cir. 1994) ................................................................................. 62
*Zurich Am. Ins. Co. v. Tessler (In re J.A. Jones, Inc.)*,
  492 F.3d 242 (4th Cir. 2007) ............................................................................... 18

## Statutes

11 U.S.C. § 101(5) ................................................................................................ 33
11 U.S.C. § 363(f) ................................................................................ 2, 17, 18, 61, 62
11 U.S.C. § 363(m) ...................................................................................... 52, 53
Cal. Bus. & Prof. Code § 17203 ...................................................................... 75
Fed. R. Bankr. Proc. 9005 ................................................................................ 30
Fed. R. Civ. P. 60(b) ........................................................................... 38, 44, 53
Fed. R. Civ. P. 60(d)(3) ................................................................................... 76
N.J. Stat. Ann. § 2A:58C-1(b)(3) .................................................................... 71

## Other Authorities

David. J. Marchitelli,
   Annotation, *Liability of Successor Corporation for Injury or Damage Caused
   by Product Issued by Predecessor, Based on the "Product Line" Successor Liability*,
   18 A.L.R. 6th 629 (2006) ............................................................................. 59
Ezra H. Cohen,
   *Successor Liability in § 363 Sales*, AM. BANKR. INS. J. (Nov. 2003) ...................................... 59
William Hao,
   *The Effects of Bankruptcy Discharge and Sale on Successor Liability Claims*,
   17 J. BANKR. L. & PRAC. 3 art. 4 (June 2008) ........................................................ 59

# INTRODUCTION[1]

The Responses[2] try to make this case into something it is not.  This matter is not about whether Old GM should have done a better investigation of the ignition switch issue.  Rather, this case is about (i) whether, in the context of a 363 sale, under the dire circumstances of *Old GM's* bankruptcy case, the 363 Sale notice given to Plaintiffs by Old GM was not sufficient and Plaintiffs were prejudiced thereby such that they were deprived of due process (and, if so, the remedies for Old GM's infraction), and (ii) whether Plaintiffs are asserting claims against New GM in the Consolidated Complaints that are barred by the Sale Order and Injunction.

Based on the stipulated factual record and the uncontroverted facts, it is clear that, as of the 363 Sale: (a) none of the Named Plaintiffs had brought litigation against Old GM with respect to the ignition switch in their vehicles (New GM SOF, ¶ 11), (b) Old GM's books and records did not reflect any liabilities to vehicle owners relating to their ignition switch (*see* Kiefer Decl., **Opening Brief Appendix, Exh. "3."**), (c) the disclosure schedules to the Sale Agreement did not reference any issues with respect to the ignition switches,[3] and (d) Old GM

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the *Opening Brief by General Motors LLC on Threshold Issues Concerning Its Motions to Enforce the Sale Order and Injunction* [Dkt. No. 12981] ("**New GM Opening Brief**").  The Appendix of Exhibits filed with the New GM Opening Brief is referred to herein as the "**Opening Brief Appendix**."  Exhibits referenced in this Reply are contained in the Reply Appendix ("**Reply Appendix**"), which is being filed simultaneously herewith.

[2] The Responses to the Old GM Opening Brief were: (a) *Responsive Brief by Designated Counsel for Pre-Closing Accident Plaintiffs on Threshold Issues Concerning New GM's Motions to Enforce the Sale Order and Injunction* [Dkt. No. 13021] ("**Accident Plaintiffs' Brief**"), (b) *Designated Counsel's Opposition to New GM's Motions for Enforcement of Sale Order and Injunction* [Dkt. No. 13025] ("**Economic Loss Plaintiffs' Opposition**"); (c) *Response of GUC Trust Administrator and Participating Unitholders to New GM's Opening Brief on Threshold Issues Concerning Its Motions to Enforce the Sale Order and Injunction* [Dkt. No. 13030] ("**GUC Trust Brief**") (when applicable, the three responses will be collectively referred to as the "**Responses**"); and (d) *The Groman Plaintiffs' Response to That Part of New GM's Opening Brief Regarding the "Fraud on the Court Legal Standard"* [Dkt. No. 13028] ("**Groman Plaintiffs' Supplemental Brief**").

[3] Under Section 4.18 of the Sale Agreement and Disclosure Schedule 4.18 relating thereto, Old GM was required to disclose to New GM potential issues relating to products it manufactured.  The fact that many vehicles were listed on Disclosure Schedule 4.18 (involved in product recalls, special coverage programs and customer satisfaction programs), but the alleged ignition switch issue was not, strongly indicates that Old GM had not determined at the time of the 363 Sale that there allegedly was a widespread ignition switch defect, and that such vehicle owners were

had not concluded there was a wide-spread problem with the ignition switches it was then investigating.[4]

Plaintiffs' only basis for suing New GM for damages based on Old GM vehicles is on a "successor liability" theory. Significantly, however, this Court previously found that a successor liability claim would not be viable based on, among other things, the structure of the 363 Sale transaction (*e.g.*, the purchaser was an unrelated entity then owned primarily by the Governments). *See, e.g.*, Sale Order and Injunction, ¶¶ R, 47, 48. In addition, this Court previously ruled that if a successor liability claim existed at all, it was not extinguished,[5] but attached to the proceeds of the 363 Sale pursuant to Section 363(f) of the Bankruptcy Code. *See In re Gen. Motors Corp.*, 407 B.R. 463, 500-01 (Bankr. S.D.N.Y. 2009); *see also* Sale Order and Injunction, ¶¶ BB, 7.

Plaintiffs' argument as to why the Court's "no successor liability" finding should not be binding on them glosses over two critically important points. ***First***, successor liability, in the bankruptcy context, is a derivative claim (not a direct claim[6]) that was held by the Old GM bankruptcy estate (not Plaintiffs); it was deemed released by the Estate as part of the 363 Sale.

---

creditors. A copy of Disclosure Schedule 4.18, filed with the Court on June 27, 2009 [Dkt. No. 2649-1] is contained in the **Reply Appendix as Exhibit "A."**

[4]  Plaintiffs' reference to selected documents describing isolated instances of a malfunctioning vehicle only show that either Old GM had no answers for the problem being reviewed, or such instances were explained by factors other than an alleged widespread design defect relating to the ignition switch. Moreover, the fact that certain Old GM employees investigated ignition switch-related concerns, years before the 363 Sale, does not mean, as Plaintiffs have suggested, that such investigations caused Old GM to conclude in June 2009 there allegedly was a widespread ignition switch defect.

[5]  Economic Loss Plaintiffs concede this point when, among other things, they argue that their remedies against Old GM are extant, and not "equitably moot." *See Designated Counsel's Response to the Participating Unitholders' and GUC Trust Administrator's Opening Memorandum of Law Respecting the Equitable Mootness Threshold Issue* [Dkt. No. 13029] ("**Economic Loss Plaintiffs' Equitable Mootness Brief**").

[6]  In this context, "direct claim" means a claim individualized to the claimant, as compared to a claim held by all creditors of Old GM (a derivative claim). This Court held that, even if the successor liability claim was individualized, principles of federal preemption (Section 363(f)) would insulate the buyer from such liability. *Gen. Motors*, 407 B.R. at 503 n.99.

**Second**, the successor liability issue against New GM only exists because the 363 Sale closed. Plaintiffs' due process argument is that, if proper notice had been given, they would have successfully opposed the 363 Sale. However, the consequences of defeating the 363 Sale would have been: (a) New GM would have purchased nothing, so there would be no claim against it, (b) their claim against Old GM would have been extant (the same result as when the 363 Sale closed), and (c) Old GM would have liquidated and their alleged claims would have been worthless (as contrasted to having a recovery against the 363 Sale proceeds because the transaction closed).

There is no question that Old GM provided extensive publication notice of the 363 Sale, and there was extensive media coverage relating to the 363 Sale. Notably, while complaining about the 363 Sale notice given, Plaintiffs do not contend that their purported class was unaware of the 363 Sale (and Plaintiffs would know). Rather, they complain that the Court-approved Sale notice should have been delivered in a different manner (direct mail instead of publication), and the notice was deficient because they were unaware (and should have been made aware in the Sale notice) of the ignition switch or other alleged defects in their vehicles. But such detail is not required. The 363 Sale notice informed Plaintiffs of the relevant facts regarding the 363 Sale: (a) the 363 Sale would be free and clear of claims and other interests (*i.e.*, successor liability claims), and (b) the Sale Agreement was available for review, and that Agreement clearly provided that New GM would not assume the precise claims that Plaintiffs now assert. Plaintiffs argue that they should have had the right to argue the successor liability point for themselves, but they do not, and cannot dispute, that their position was extensively briefed and argued at the Sale Hearing by States' attorneys general, consumer advocacy groups, and members of the plaintiffs'

3

bar.  And, conspicuously, Plaintiffs proffer nothing new that they would have argued at the Sale

Hearing that would have changed the result.[7]

In **Reply Point I** (Due Process Threshold Issue), New GM rebuts Plaintiffs' contention

that they were "known" creditors of Old GM entitled to direct mail notice of the 363 Sale.

Additionally, there is no basis for Plaintiffs' alternative, novel argument that the Court-approved

publication notice received by them should now be determined, over five and half years after the

fact, to be insufficient because it did not identify in detail the claims that Plaintiffs assert they

have against Old GM.  Numerous courts, including this one, have found that notices, like the one

provided to Plaintiffs, imparted sufficient information regarding 363 sales.

New GM also demonstrates why a showing of prejudice is necessary to overturn a 363

sale order on due process grounds, and that Plaintiffs cannot make this showing.  Plaintiffs'

contention that their arguments on successor liability could have swayed the Court is belied by

both the uncontroverted facts, and their failure to identify any new, meritorious argument.  It is

indisputable that New GM would only assume liabilities of Old GM that it believed were

commercially necessary;[8] it was not assuming economic loss claims against Old GM;[9] it was not

assuming pre-363 Sale accident claims;[10] and it was not going forward with the 363 Sale unless it

---

[7] Plaintiffs gloss over the fact that the 363 Sale notice given was sufficiently wide-spread that it engendered numerous objections from similarly situated parties making the same arguments that they claim they would have made.

[8] *See Trusky v. Gen. Motors LLC (In re Motors Liquidation Co.)*, Adv. Proc. No. 09–09803, 2013 WL 620281, at *8 (Bankr. S.D.N.Y. Feb. 19, 2013).

[9] *Id.* at *2.  Prior to the 363 Sale, Old GM disclosed to New GM that there were class actions for economic losses based on other claimed product defects.  Significantly, the Governments refused to assume such additional monetary liabilities.  Plaintiffs' speculation that they would have fared differently has no basis.  To the contrary, at the Sale Hearing, the Governments rejected other tort claimants' requests for special treatment of their claims.  *See* New GM SOF, ¶¶ 36-47.

[10] *See Gen. Motors*, 407 B.R. at 482, 500.

received the "no successor liability" finding.[11]  And, without the 363 Sale, it was clear that Old

GM would have liquidated and unsecured claimants (as Plaintiffs purport to be) would have

received nothing.

In ***Reply Point II*** (Remedies Threshold Issue), New GM highlights that the Responses

fail to answer New GM's argument that there is no basis for a revocation of a final 363 sale

order, and Plaintiffs transparent attempt to side-step the issue, by arguing that the Sale Order and

Injunction should simply not be applied to them, is unavailing.  Saddling New GM, a good faith

purchaser for value, with an alleged flaw in a notice procedure that it did not cause, with

substantial dollars of claimed new liabilities that it never agreed to assume, was not the deal the

Court approved.  To rewrite this material term now, years after the fact, and contrary to the

integration clause in the Sale Agreement, is an impermissible revocation of the Sale Agreement

and the "final and non-appealable" Sale Order and Injunction.   Under the governing law,

Plaintiffs have no remedy against New GM if it is determined that Old GM failed to provide

them with proper notice of the 363 Sale.  Assuming Plaintiffs can show prejudice, their remedy

would be against the Old GM bankruptcy estate and the 363 Sale proceeds, not New GM.

In ***Reply Point III*** (Old GM Claim Threshold Issue), New GM shows that with respect to

the Pre-Sale Consolidated Complaint, Plaintiffs never had a successor liability claim. With

respect to the Post-Sale Consolidated Complaint, New GM shows that it had no independent

duty to owners of Old GM vehicles who bought in the secondary market after the 363 Sale

("**Used Car Purchasers**").  The Sale Agreement and Sale Order and Injunction is clear that,

---

[11] *Id.* at 500; *see also* Sale Order and Injunction, ¶ DD ("Purchaser would not have entered into the [Sale Agreement] and would not consummate the 363 [Sale] (i) if the sale of the Purchased Assets was not free and clear of all liens, claims, encumbrances, and other interests (other than Permitted Encumbrances), including rights or claims based on any successor or transferee liability or (ii) if the Purchaser would, or in the future could, be liable for any such liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability . . ., other than, in each case, the Assumed Liabilities.").

with respect to Old GM vehicles (or parts sold by Old GM to a third party), there can only be

two alternatives: either the resulting claim is an Assumed Liability (which Plaintiffs concede is

not the case), or *all* other claims relating to Old GM vehicles or parts are Retained Liabilities of

Old GM.   There is no third option; the Sale Agreement was drafted to cover all permutations.

Further, Plaintiffs' attempt in the Post-Sale Consolidated Complaint to hold New GM liable to

Used Car Purchasers improperly exalts "form over substance."   Simply alleging that New GM

has a "duty" under state consumer protection laws does not make it so.   Indeed, no statute cited

by Plaintiffs purports to extend duties to an entity, like New GM, that did not design,

manufacture, sell, distribute or advertise the Used Car Purchasers' vehicles.   Simply stated, Used

Car Purchasers are seeking damages for a design defect in Old GM vehicles.[12]   Such claims are

Retained Liabilities under the Sale Agreement (*see* Sale Agreement, § 2.3(b)), and remain so

after the 363 Sale.   The fact that after the 363 Sale (a) the owner may have sold the Old GM

vehicle in the secondary market, (b) the Used Car Purchaser discovers the design defect, and (c)

the Used Car Purchaser believes that the brand related to its mature Old GM vehicle was

"tarnished," does not alter the status of the claim—it remains a Retained Liability of Old GM.

New GM also shows that the covenant to comply with federal law relating to recalls does not

create a private right of action for Used Car Purchasers.   Moreover, a Sale Agreement covenant

is unrelated to the determination of whether a claim is a Retained Liability under the Sale

Agreement.

In ***Reply Point IV*** ("Fraud on the Court"—Legal Standard), New GM explains that the

parties largely agree on the standard, and reiterates the point (which all parties essentially

---

[12]   *See, e.g.*, Post-Sale Consolidated Complaint, ¶ 892 ("Without limitation, the Defective Ignition Switch Vehicles
share common design defects . . . .), ¶ 2560 ("The Defective Ignition Switch Vehicles contained a design defect,
namely, a faulty ignition system that fails under reasonably foreseeable use, resulting in stalling, loss of brakes,
power steering, and airbags, among other safety issues, as detailed herein more fully.").

concede), that the factual predicate for Plaintiffs' alleged "fraud on the court" allegation is the same as the predicate for Plaintiffs' meritless, due process argument.

## ARGUMENT

## I.    DUE PROCESS THRESHOLD ISSUE:  PLAINTIFFS HAVE NOT DEMONSTRATED A DUE PROCESS VIOLATION

### A.    Old GM Provided Plaintiffs With Proper Notice Of The 363 Sale

#### 1.    Plaintiffs Were "Unknown" Creditors

At the time of Old GM's bankruptcy, Old GM had sold millions of vehicles that contained the ignition switch that New GM later recalled.  In the Responses, Plaintiffs identify only a relatively small number of accidents and complaints that were reported to Old GM that purportedly related to vehicles with the ignition switch.  Indeed, Plaintiffs concede that millions of consumers drove these vehicles, for years, with no indication that they had an ignition switch issue.[13]  Thus, at the time of the 363 Sale, the alleged defective ignition switch had generally functioned properly for the overwhelming majority of Old GM vehicle owners.

There is nothing in the stipulated factual record to support Plaintiffs' contention that Old GM had determined that the alleged ignition switch defect was a systematic safety defect affecting vehicle owners such that they were known creditors of Old GM entitled to direct mail notice of the 363 Sale.  This Court's ruling in *Morgenstein*[14] is directly on point.  This Court held that publication notice was sufficient for the Morgenstein plaintiffs, who were deemed unknown creditors.  *Id*., 462 B.R. at 506 n.55.  The Court rejected the Morgenstein plaintiffs' argument that, even if the spindle rod defect in other vehicles (which was known to Old GM) was similar to the alleged undisclosed defect in their vehicles, they should have been treated as known

---

[13]  Economic Loss Plaintiffs' "claim specific" sale notice argument is predicated on them not knowing that there was an ignition switch issue and, thus, not knowing that they were creditors of Old GM at the time of the 363 Sale.

[14]  *See In re Motors Liquidation Co.*, 462 B.R. 494 (Bankr. S.D.N.Y. 2012) ("***Morgenstein***").

creditors for (claim/plan discharge) notice purposes. Plaintiffs try to distinguish *Morgenstein* on

the basis that the Morgenstein plaintiffs' factual allegations were conclusory and insufficient, but

their arguments fail for the same reason. Moreover, unlike in *Morgenstein* where the plaintiffs'

claims were extinguished, here, Plaintiffs' claims are not; Plaintiffs retain the ability to assert

claims against the Old GM bankruptcy estate and the 363 Sale proceeds.[15]

The holding in *Burton v. Chrysler Group, LLC* (*In re Old Carco*), 492 B.R. 392 (Bankr.

S.D.N.Y. 2013) ("**_Burton_**") is also on point. In that case, the debtor sold its assets in a 363 sale

free and clear of claims, including successor liability claims. The court held that "non-claim

specific" sale notice to vehicle owners, by publication, was appropriate.[16] Judge Bernstein

rejected the Burton plaintiffs' argument that they were deprived of due process because they did

not receive adequate notice.[17] Plaintiffs try to distinguish *Burton* on the grounds that the Burton

plaintiffs mistakenly argued that they held future claims,[18] but that is a distinction without a

difference. To render his ruling, Judge Bernstein necessarily had to analyze the nature of the

---

[15]   *See Gen. Motors*, 407 B.R. at 495-96 (the Sale Agreement "does not dictate the terms of a plan of reorganization, as it does not attempt to dictate or restructure the rights of the creditors of this estate. It merely brings in value. Creditors will thereafter share in that value pursuant to a chapter 11 plan subject to confirmation by the Court.").

[16]   *See generally In re Chrysler LLC*, 405 B.R. 84, 109 (Bankr. S.D.N.Y. 2009), *aff'd*, (2d Cir. 2009); *see also In re Chrysler LLC*, Case No. 09-50002 (AJG), Sale Procedures Order, ¶ K [Dkt. No. 492] (Bankr. S.D.N.Y. May 8, 2009) (**Reply Appendix, Exh. "B"**).

[17]   *Burton*, 492 B.R. at 402-03; *see also Burton Plaintiffs' Opposition to Motion to Dismiss* (**Opening Brief Appendix, Exh. "DD"**), dated March 21, 2012, ¶¶ 41, 66.

[18]   Economic Loss Plaintiffs' Opposition, at 45. Ironically, the GUC Trust makes the same future claims argument as the Burton plaintiffs. As noted in *White v. Chance Indus., Inc. (In re Chance Indus., Inc.)*, 367 B.R. 689, 705 (Bankr. D. Kan. 2006), "[u]nknown future claimants" are those claimants who "have not had any pre-petition contact with debtor or debtor's product . . . ." *Id.* at 705. That is not the Plaintiffs (or their predecessors). They held a claim against Old GM within the meaning of Section 101(5) of the Bankruptcy Code. *See e.g.*, *In re Chemtura Corp.*, Case No. 09-11233, Hr'g Tr. 33:11-21, February 4, 2013 [Dkt. No. 5818] ("Judges in this Court have consistently held that claims for injuries from [prepetition] exposure to products alleged to cause tort injuries are prepetition claims. The claim arises at the time of exposure regardless of when the injury manifests or when the claimant receives a formal diagnosis. *See In re Chateaugay Corp.*, 2009 Westlaw 367490 at *6 (Bankr. S.D.N.Y. 2009) (Lifland J.) *In re Quigley Company Inc.*, 383 Br. 19, 27 (Bankr. S.D.N.Y. 2008) (Bernstein J) both holding that if a plaintiff was exposed to asbestos before the petition date, he or she held a prepetition claim.").

Burton plaintiffs' claims and make a determination that the sale notice was sufficient to satisfy due process.

The Responses also attempt to distinguish *Burton* on the grounds that fuel-spit-back recalls were issued prior to Chrysler's bankruptcy. That distinction actually undermines Plaintiffs' position.[19] Presumably, if the owner of a prepetition recalled vehicle is an unknown creditor for purposes of a 363 sale notice, then certainly an owner whose vehicle was not recalled should be treated the same way. Even more telling, however, is that most of the Burton plaintiffs' vehicles were ***not*** the subject of a recall notice. Specifically, the Burton plaintiffs included owners of certain model year Dodge Durangos and Jeep Wranglers. *Id*. at 399-400. Prior to bankruptcy, the Dodge Durango had been subject to a fuel-spit back recall (*id.* at 395); but the Jeep Wranglers at issue had not.[20] Judge Bernstein dismissed the Jeep Wrangler owners' economic loss claims even though no prior recall had been issued for those vehicles.[21] Thus, the occurrence of prior recalls did not affect the *Burton* holding. As Judge Bernstein noted, which is equally applicable here, "[a]nyone who owns a car contemplates that it will need to be repaired." *Id.* at 403.

Finally, with respect to owners who purchased their used vehicles from third parties after the Chrysler 363 sale, Judge Bernstein noted that "[t]he plaintiffs ***or their predecessors*** (the previous owners of the vehicles) had a pre-petition relationship with Old Carco, and the design flaws that they now point to existed pre-petition." *Id.* (emphasis added). Judge Bernstein treated these claimants the same as owners who had bought their vehicles from the debtor—their claims

---

[19]   Economic Loss Plaintiffs' Opposition, at 46 n.52; Accident Plaintiffs' Brief, at 24; GUC Trust Brief, at 18.

[20]   Seven of the nine named plaintiffs owned Jeep Wranglers that were not subject to a recall. *Id.* at 399.

[21]   While a "Technical Service Bulletin" was issued with respect to certain Jeep Wranglers, the court in *Burton* specifically noted that it was "not a safety recall, did not advise current owners of a flaw, safety defect or hazard, and the customer had to complain about the problem in order to take advantage of the extended warranty." *Burton*, 492 B.R. at 396.

were dismissed.   The same result should hold for the Used Car Purchasers, who wrongfully claim they are not bound by the Sale Order and Injunction.

Plaintiffs' claims here are also similar to the allegations made by the "unknown" creditor plaintiff, Ms. Cromwell, in *In re New Century TRS Holdings, Inc.*, No. 07-10416 (BLS), 2014 WL 842637 (Bankr. D. Del. Mar. 4, 2014).   Plaintiffs attempt to distinguish *New Century* by asserting that Ms. Cromwell's claims did not "arise" until after the bar date, but they are wrong.[22]   In *New Century*, the court expressly held to the contrary: "Ms. Cromwell's claim is a pre-petition claim because it is based completely upon events that occurred as of the pre-petition loan closing." *Id.* at *8 n.13.   Plaintiffs also attempt to distinguish *New Century* on the grounds that "the circumstances of each loan were different" or "unique,"[23] but that was not a finding made by the court nor is it supported by the record.   To the contrary, Ms. Cromwell contended that New Century's pre-petition fraudulent lending practices were systemic, and they impacted an entire class of customers.   *Id.* at *5.   The court rejected the plaintiff's contention that an entire class of customers with un-asserted claims were "known" creditors, even though New Century employees knew there were problems due to the pendency of existing litigation.   *Id.* at *6.   The *New Century* decision refutes Plaintiffs' imputation argument.[24]    Clearly, New Century employees knew information relating to potential wrong-doing as reflected in the existing litigation.   But that was not sufficient, from New Century's corporate perspective, to alter the status of customers, for notice purposes, from unknown creditor to known creditor status.

---

[22]  Economic Loss Plaintiffs' Opposition, at 51.

[23]  Accident Plaintiffs' Brief, at 25-26.

[24]  Plaintiffs' imputation argument is that information known to *any* of the tens of thousands of Old GM employees should be imputed to Old GM so that such isolated pieces of information are bundled together so as to constitute the collective corporate knowledge of Old GM.   Based on that artificial construct, Plaintiffs contend that they were known creditors as of the 363 Sale.

Tellingly, Plaintiffs do not attempt to distinguish *In re Enron Corp.*, No. 01-16034 (AJG), 2006 WL 898031, at *4-5 (Bankr. S.D.N.Y. Mar. 29, 2006),[25] in which the court held that victims of Enron's electricity market manipulation with un-asserted claims were not "known" creditors to Enron, notwithstanding that prior to the bar date, Enron had actual knowledge that the federal government was investigating it for such market manipulation. Judge Gonzales' ruling also undercuts Plaintiffs' "imputation" argument. Clearly, certain employees had knowledge of the government's pending investigation. That knowledge, however, was not determinative as to the Court's ruling that, from the employer's perspective, holders of un-asserted claims were unknown creditors for notice purposes.

### 2.    The Purpose of Notice in the 363 Sale Context

As discussed in New GM's Opening Brief, the nature of the notice for due process purposes depends on the bankruptcy event at issue. *See Doolittle v. Cnty. of Santa Cruz (In re Metzger)*, 346 B.R. 806, 818 (Bankr. N.D. Cal. 2006) (discussing how different bankruptcy events "give rise to different due process standards"). Notice of a 363 sale is markedly different than notice of a claims bar date or plan discharge. In a claims bar date/plan discharge situation, if a claim is not timely asserted, it is extinguished. In a 363 sale, the claim or interest is generally not lost, but instead, as here, attaches to the proceeds of sale. As explained by the court in *In re Eveleth Mines, LLC*:

> Through [a 363 Sale], third parties' "interests" in property are detached from the asset to be sold, and then may be reattached to the cash or in-kind proceeds of sale that the trustee receives. As a matter of statute or under general equitable principles, the remedy has been a part of American bankruptcy law for well over a century. By affording clear title to purchasers from the estate, sales under § 363(f) make the estate's assets more attractive in the market. This, in turn, can "maximize the value of the asset[s], and thus enhance the payout made to creditors" on a full administration of the estate.

---

[25] *Enron* is cited in the New GM Opening Brief on pages 28 and 31.

312 B.R. 634, 649-50 (Bankr. D. Minn. 2004) (internal citations omitted); *see also In re The Lady H Coal Co., Inc.*, 199 B.R. 595, 605 (S.D. W. Va. 1996) ("Extensive case law exists that claims are directed to the proceeds of a free and clear sale of property and may not subsequently be asserted against a successor.").  In *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89 (2d Cir. 1988), the court held that "[i]t has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition."  *Id.* at 93; *see also* Sale Order and Injunction, ¶ P ("The 363 Transaction in no way dictates distribution of the Debtors' property to creditors and does not impinge upon any chapter 11 plan that may be confirmed."); *Wolff v. Chrysler Group LLC*, Adv. Proc. 10-05007, *Opinion Granting Defendant's Motion to Dismiss* (Bankr. S.D.N.Y. July 30, 2010) [Dkt. No. 43] ("***Wolff* Opinion**") (**Reply Appendix, Exh. "C"**), at 22 ("The purpose of the sale was not to effect a plan of reorganization and set distributions to classes of claimants, but to maximize the value of the estate and support the best possible recoveries under a separately confirmed plan." (citation omitted)).

These holdings are consistent with *Paris Manufacturing Corp. v. Ace Hardware Corp. (In re Paris Industries Corp.),* 132 B.R. 504 (D. Me. 1991), which recognizes the principle that the function of a 363 sale is to maximize the value of the debtor's assets, convert those assets to cash, and then distribute the proceeds pursuant to the statutory priorities of creditors in bankruptcy.  In *In re Chateaugay Corp.*, Judge Lifland approved the reasoning in *Paris Industries*:

> *Paris Indus. Corp.*, supra, 132 B.R. 504, is also on point. … After the sale, the state court plaintiffs were injured while using one of the debtor's products. The bankruptcy court enjoined the plaintiffs' state court claim against the purchaser— even though they had no other recourse—because if the state court held that the sale order was ineffective in protecting the purchaser from these claims, the purchaser "would have grounds for seeking rescission of the 1987 sale, having

12

bargained for a sale free and clear of liability." 132 B.R. at 507. The court rejected the notion that the sale order did not apply to the product liability claim because the incident took place after the sale. ***The court also held that the plaintiffs were not prejudiced by the sale because all the sale did was take a pot of assets and convert them into cash.*** The fact that the cash was subsequently distributed to creditors in accordance with bankruptcy law and that left the plaintiffs without recovery on a claim did not mean that they were adversely affected by the sale. [citation omitted]

201 B.R. 48, 64 (Bankr. S.D.N.Y. 1996) (emphasis added).

Plaintiffs ignore Judge Lifland's decision and seek to discredit *Paris Industries* by misrepresenting holdings from other jurisdictions. They state that "the First Circuit itself has rejected the district court's reasoning in *Paris Indus.*" Economic Loss Plaintiffs' Opposition, at 34 n.42 (citing *Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Industries, Inc.)*, 43 F.3d 714, 721-22 (1st Cir. 1994)). However, Plaintiffs misconstrue *Savage Industries*. There, the debtor, a gun manufacturer, purportedly sold its assets in a free and clear sale. The court approved the sale in principle, but did not approve the terms of the asset sale or the sale agreement itself. The debtor provided no notice of the sale to a consumer injured by a gun manufactured by the debtor, or to its distributor. The debtor did not provide notice by publication or any other means. The court briefly discussed whether the claimants before it were known or unknown creditors, but made no ruling on that issue because the sale procedure was so deeply flawed (*i.e.*, no notice whatsoever and a private, non-court approved sale). The First Circuit opinion in *Savage Industries* in no way diminishes *Paris Industries*. In fact, it approvingly cites to *Paris Industries* as an illustration of a proper sales procedure. *Savage Industries*, 43 F.3d at 722 n.10.

The only other case that Plaintiffs cite as "rejecting" *Paris Industries* is *Ninth Avenue v. Remedial Group*, 195 B.R. 716 (N.D. Ind. 1996) (*see* Economic Loss Plaintiffs' Opposition, at 34 n.42), but it does no such thing. The holding in *Ninth Avenue* merely distinguishes *Paris*

*Industries* to the extent that it could be construed as support for the proposition that a 363 sale can extinguish "future claims that did not arise until after the bankruptcy proceedings concluded." *Id.* at 732. The court in *Ninth Avenue* cited approvingly to *Paris Industries* for the proposition that the court properly "enjoin[ed] creditors from filing a suit against the asset purchaser when they can file a claim against the predecessor in the bankruptcy court." *Id.* Plaintiffs in this case are not future claimants. In fact, by labelling themselves as known creditors (albeit improperly), they have conceded that their claims arose before the bankruptcy proceeding and may be asserted against Old GM.[26] Thus, *Ninth Avenue* is actually supportive of New GM's position.

As demonstrated in the next sections, the due process cases that Plaintiffs cite are not in the 363 sale context where, as here, claims were transferred to the sale proceeds, and not extinguished.

### 3.    Plaintiffs' Claims Were Not Ascertainable In the 363 Sale Context

It is well-settled law that a debtor's general ledger is critical to determining a company's known creditors for 363 sale notice purposes. In their Responses, Plaintiffs identify limited examples in which courts have looked at facts outside a company's general ledger to determine if a claimant was otherwise known to the noticing party.[27] The cases Plaintiffs cite are all distinguishable. They demonstrate that, in circumstances far different from the matter at hand, a claimant may still be "known" to the noticing party without regard to the debtor's books and records: (i) where the claimant affirmatively communicated to the debtor that a claim existed,[28]

---

[26] Also, this concession is evidenced by the fact that the Economic Loss Plaintiffs unequivocally assert their right to make claims against the GUC Trust and the 363 Sale proceeds. *See* Economic Loss Plaintiffs' Equitable Mootness Brief, at 2-3, 19-22.

[27] Economic Loss Plaintiffs' Opposition, at 26-31, 39-47; Accident Plaintiffs' Brief, at 13-19.

[28] *In re Arch Wireless*, 332 B.R. 241, 254 (Bankr. D. Mass. 2005), *aff'd*, 534 F.3d 76 (1st Cir. 2008); *In re Feldman*, 261 B.R. 568, 576-77 (Bankr. E.D.N.Y. 2001); *Solow Bldg. Co., LLC v. ATC Assocs. Inc.*, 175 F. Supp. 2d 465,

(ii) in a proceeding relating to real property where the claimant held a recorded interest in the

real property records,[29] (iii) where the debtor had a clearly defined contractual obligation to pay

the claimant,[30] or (iv) where an outstanding lawsuit filed by the claimant existed against the

debtor.[31]

   *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306 (1950), does not support

Plaintiffs' position.  *Mullane* is not a sale case, nor is it a bankruptcy case.  It is a matter that

involved extinguishing a claim and the constitutionality of a state statute.  In *Mullane*, a trustee

bank sent notice by publication to the trust beneficiaries regarding judicial settlement of the trust.

*Id*. at 309-10.  The notice complied with the New York statutory scheme, but the Supreme Court

held that the state statutory scheme of publication notice violated due process.  Notably, the trust

beneficiaries were *included* in the books and records of the trustee.  *Id.* at 318-19.  Moreover,

---

471-72 (E.D.N.Y. 2001); *Brunswick Hosp. Ctr., Inc. v. New York Dep't of Health* (*In re Brunswick Hosp. Ctr.*), No. 892-80487-20, 1997 Bankr. LEXIS 2184, at *13-*14 (Bankr. E.D.N.Y. Sept. 12, 1997).

[29] *Koepp v. Holland*, 688 F. Supp. 2d 65, 92 (N.D.N.Y. 2010), *aff'd*, 2014 U.S. App. LEXIS 22108 (2d Cir. Nov. 21, 2014); *Mennonite Bd. Of Missions v. Adams*, 462 U.S. 791, 800 (1983); *In re Feldman*, 261 B.R. 568, 576 -77 (Bankr. E.D.N.Y. 2001); *City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 297 (1953).

[30] For example, in *In re Drexel Burnham Lambert Group Inc.*, 151 B.R. 674, 680 (Bankr. S.D.N.Y. 1993), *aff'd*, 157 B.R. 532 (S.D.N.Y.), the debtor executed an unconditional guaranty in favor of the claimant.  In analyzing the distinction between known and unknown creditors in the bar date context, the court made the following observations: (i) "[r]easonable diligence in ferreting out known creditors will, of course, vary in different contexts and may depend on the nature of the property interest held by the debtor," (ii) "[w]hat is reasonable depends on the particular facts of each case," and (iii) a "debtor need not be omnipotent or clairvoyant."  *Id.* at 680-81.  In addition, "[o]bviously, a debtor need not notify all entities with which it has had contractual relations."  *Id*. at 682.  However, "[w]hen comparing a guaranty to any other contract in which a debtor is a party, we conclude that the obligation under an unconditional guaranty puts the guarantor on continuing notice that a contingent claim exists for the payment of a debt."  *Id.*  A claim based on an unconditional guaranty is obviously very different from the types of claims that Plaintiffs allege here.

The other cases of this ilk that Plaintiffs cite are similarly distinguishable.  *See Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478 (1988), on remand, *Matter of Estate of Pope*, 808 P.2d 640 (1990) (in non-bankruptcy proceeding concerning Oklahoma probate laws, where only publication notice was given, hospital that provided extended services to decedent immediately prior to his death was a known creditor and therefore entitled to actual notice of deadline to assert a claim); *In re Thomson McKinnon Secs. Inc.*, 130 B.R. 717, 720 (Bankr. S.D.N.Y. 1991) (customer who purchased securities from debtor, but never received the securities, was a known creditor as reflected on the debtor's books and thus entitled to actual notice of the bar date).

[31] *Nat'l Pipe & Plastics, Inc. v. N.P.P. Liquidation Co*., No. 96-1676 (PJW), No. 96-1676 (PJW), 2000 WL 33712292, at *32 (Bankr. D. Del. Sept. 25, 2000).

there were only a limited number of beneficiaries, and the transaction irrevocably affected their pecuniary rights.  *Id.*

Here, in contrast, there are millions of vehicle owners at issue, they were not included on Old GM's general ledger, they had not commenced litigation against New GM with respect to the ignition switch, the 363 Sale did not strip them of any rights, and  they had no direct rights against New GM at the time of the 363 Sale.  In fact, as noted, the 363 Sale gave Plaintiffs an opportunity for a recovery from the sale proceeds that they would not have had if the 363 Sale did not go through.

*Louisiana Department of Environmental Quality v. Crystal Oil Co.* (*In re Crystal Oil Co.*), 158 F.3d 291 (5th Cir. 1998), a case cited by Plaintiffs (*see* Economic Loss Plaintiffs' Opposition, at 28, 39), actually supports New GM's position that Plaintiffs were unknown creditors entitled to publication notice only.  In *Crystal Oil*, the Fifth Circuit affirmed the bankruptcy court's holding that the Louisiana Department of Environmental Quality (LDEQ) was an unknown creditor with respect to an environmental liability claim arising from a release at a site owned by the debtor.  *Id.* at 297-98.  The Fifth Circuit so held even though prior to the debtor's bankruptcy (1) the debtor received a phone call from LDEQ investigating the site, (2) the debtor erroneously informed LDEQ that it had no connection to the site (it was a previous owner of the site); and (3) after the inquiry from LDEQ, the debtor's security/environmental compliance officer drafted an internal memo stating "[y]ou may want to use caution in releasing any information as there could be environmental problems."  *Id.* at 293-94, 296-98.  The court's holding demonstrates that a governmental and internal company investigation into a possible

16

claim, without more, is not sufficient to make a claim "reasonably ascertainable" or "known."[32]
*Crystal Oil* also further debunks Plaintiffs' imputation argument.

*In re Interstate Cigar Co.*, 150 B.R. 305 (Bankr. E.D.N.Y. 1993), is similarly of no help
to Plaintiffs.  In that case, there was no question that the debtor knew it had a liability to the
Pension Benefit Guaranty Corporation ("**PBGC**") and, presumably, the books and records
reflected that claim.  The creditors committee sought to expunge the claim as being untimely,
while acknowledging that PBGC's claim was known to the debtor at the time of the bankruptcy
filing.  *Id*. at 310.  It nevertheless contended that notice of the bar date was proper because, based
on the ERISA statutory scheme, it had provided notice to the plan administrator (who had the
obligation to report bankruptcy events to PBGC), and that was sufficient.  *Id*. at 309.  The court
rejected that argument, holding that PBGC should have received direct notice.  *Id.* at 309-10.
*Interstate Cigar* involved an indisputably known creditor as reflected on the debtor's books, and
is therefore readily distinguishable from Plaintiffs' contentions.

*Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252 (3d Cir. 2000), is
also readily distinguishable.  In *Folger,* the Third Circuit did not address whether the claimant
was known or reasonably ascertainable to the debtor.  There, a notice of auction provided that a
363 sale would be free and clear of all liens, claims and interests.  *Id.* at 265.  The primary issue
in the case was whether "interests" as used in Section 363(f) of the Bankruptcy Code included
affirmative defenses held in connection with a contract dispute.  The Third Circuit found that it
did not, and that such defenses could not be extinguished in a Section 363(f) sale.  Here,

---

[32]  The case law is clear that "reasonably ascertainable" does not mean "reasonably foreseeable."  *Chemetron Corp. v. Jones*, 72 F.3d 341, 347 (3d Cir. 1995); *In re XO Commc'ns. Inc.*, 301 B.R. 782, 793 (Bankr. S.D.N.Y. 2003) (citing *Chemetron*).  Creditors will be deemed "unknown even if they "could be discovered upon investigation, [but] do not in due course of business come to [the] knowledge [of the debtor.]"  *Mullane*, 339 U.S. at 317.  Plaintiffs are such unknown creditors.

Plaintiffs' claims (which are not affirmative defenses) are clearly encompassed within the term "interests" as used in Section 363(f).[33]

The Accident Plaintiffs' reliance on *Zurich Am. Ins. Co. v. Tessler (In re J.A. Jones, Inc.)*, 492 F.3d 242 (4th Cir. 2007) (Accident Plaintiffs' Brief, at 14) is likewise misplaced. In *J.A. Jones*, a bar date case, the debtor was a general contractor who worked on the interstate highway where an accident occurred. *Id.* at 245. The court held that the estate of one of the victims was a "known" creditor to the debtor even though the estate had not yet filed a lawsuit prior to the bar date (*id.* at 252-53) because, among other reasons, prior to its bankruptcy, (i) the debtor had extensive information about the well-publicized, horrific accident and reported to its insurer its expectation that the accident would result in a claim against the debtor (*id.* at 246-47), (ii) the insurer took extensive steps to prepare for the litigation that it expected to ensue (*id.* at 251-52), and (iii) the debtor's project manager assigned to the construction project where the accident occurred testified that the debtor "anticipated" a lawsuit based on the accident (*id.* at 247, 251). There is nothing in the stipulated factual record that is anything like the facts in *J.A. Jones*.

Decisively, the Economic Loss Plaintiffs have not provided this Court with any applicable precedent that supports a finding that they were "known" to Old GM at the time of the 363 Sale. New GM is not aware of any such precedent.

**B.     The Publication Notice Approved By The Court And Served By Old GM Satisfied Due Process For Unknown Creditors Such As Plaintiffs**

     **1.     The Publication Notice Encompassed Plaintiffs' Claims**

Old GM gave publication notice of the 363 Sale in accordance with the Sale Procedures Order,[34] and thus, Old GM vehicle owners received constructive notice of the 363 Sale.[35] The

---

[33] *See Gen. Motors*, 407 B.R. at 501-505.

[34] Plaintiffs have not moved to vacate the Sale Procedures Order (which approved the form of Publication Notice).

Publication Notice listed a website where GM's Sale Motion and the Sale Agreement were available. These documents made clear that the purchaser was only taking responsibility for certain defined "Assumed Liabilities" and was seeking protection from all other Old GM liabilities, including successor liability claims. Therefore, all Old GM vehicle owners had notice that the purchaser would not assume a wide-range of liabilities that Old GM arguably owed to them, including the claims that Plaintiffs now assert. All Old GM vehicle owners had the opportunity to object to the 363 Sale. As discussed in New GM's Opening Brief, and not refuted by the Responses, Old GM's wide-spread notice, and the extensive media attention to this matter, was sufficient to engender numerous objections, including those made on behalf of vehicle owners (similarly situated to Plaintiffs) by government agencies, non-profit organizations, and plaintiffs' attorneys. In particular, the issue of successor liability in the context of a vehicle owner who had not yet experienced any problem with his car was explicitly raised and argued—but rejected by this Court. *See* New GM Opening Brief, at 41-43. These objectors also argued due process concerns that consumers might not understand the full impact of the 363 Sale. *Id.* This Court overruled those arguments as well.

> **2.      For A Sale Notice, There Is No Requirement That A Debtor Identify Every Type Of Putative Claim And How That Claim May Be Impacted In A Section 363 Transaction**

In the bar date context, the Fifth Circuit recently held, as a general matter, that claim-specific notice is not required for unknown creditors. Specifically,

> We have never required bar date notices to contain information about specific potential claims. To the contrary, we have determined that publication in the national edition of the *Wall Street Journal* discharges the pre-confirmation claims of unknown creditors. *In re Crystal Oil*, 158 F.3d at 295, 297–98.

---

[35]  Plaintiffs' argument that a claimant's knowledge of a debtor's bankruptcy proceeding does not relieve the debtor of providing notice of a 363 Sale (Economic Loss Plaintiffs' Opposition, at 31), is irrelevant since (i) they do not contend that their purported class was unaware of the 363 Sale, (ii) notice of the 363 Sale was given and widely published, and (iii) the 363 Sale was widely reported in the media.

> Furthermore, neither the Bankruptcy Code nor Rules require bar date notices to apprise creditors of potential claims. *See* Fed. R. Bankr. P. 2002(f) (requiring only that notice state "time allowed for filing claims").
>
> We hold that because a bar date notice need not inform unknown claimants of the nature of their potential claims, Placid's notices were substantively sufficient to satisfy due process. Placid's notice informed claimants of the existence of the bankruptcy case, the opportunity to file proofs of claim, relevant deadlines, consequences of not filing a proof of claim, and how proofs of claim should be filed. We decline to articulate a new rule that would require more specific notice for unknown, potential asbestos claimants.

*See In re Placid Oil Co.*, 753 F.3d 151, 158 (5th Cir. 2014). The same reasoning applies here.

If anything, claimants in the bar date/plan discharge context (where their claims can be extinguished) may be entitled to more claim-specific notice than claimants in the 363 sale context (where the claims are not discharged, but attach to the proceeds of sale). But even in the bar date notice context, claim-specific notice is generally not required. In *In re Jamesway Corp.*, Nos. 95B 44821 (JLG), 96/8389A, 1997 WL 327105 (Bankr. S.D.N.Y. 1997), for example, plaintiffs who sought class certification in connection with alleged violations of the WARN Act, argued that the bar date notice was "inadequate because it [did] not specifically advise former employees that they might need to file WARN Act claims." *Id.* at *9. The court disagreed, finding that the debtor "was not bound to advise the employees of the exact nature of their claims." *Id.* at *9; *see also In re Agway, Inc.*, 313 B.R. 31, 43 (Bankr. N.D.N.Y. 2004) ("The Debtors' obligation to provide Empire notice of the Bar Date does not require them, as Empire otherwise argues, to spoonfeed Empire—one of literally thousands of creditors in this case—the nature and amount of its contingent claim against them.").

This issue was specifically raised in Old GM's bankruptcy case in connection with an objection to class proofs of claim ("**Saturn Claim Objection**") filed by a putative class of Saturn owners ("**Saturn Plaintiffs**"). The claims allegedly arose from the timing chain in

20

certain Saturn vehicles, with the Saturn Plaintiffs alleging causes of action (similar to those

asserted by Plaintiffs here) for unjust enrichment, breach of warranty of merchantability and

violations of various consumer protection statutes.[36]  Old GM argued that "the notice [provided]

was adequate and the debtors are not obligated to provide every unknown claimant with a notice

that sets forth the bases for every potential claim they could have against the estates."[37]  At the

hearing on the Saturn Claim Objection, this Court approved the publication notice given:

> [T]he quality of the notice here is not even debatable. The notice within the
> United States was unquestionably satisfactory. And as I noted before, . . ., the
> filing of the GM Chapter 11 case was well known. Paraphrasing Judge Kaplan's
> observation back in July 2009, on a stay application from my 363 decision, the
> filing of the GM Chapter 11 case was an event of which no sentient American
> was unaware.
>
> Here, the class is made up of U.S. citizens who are car owners and who, it may
> reasonably be inferred, watch television, listen to the radio, read newspapers and
> knew any problems that had infected GM and had resulted in GM's bankruptcy. It
> would be incorrect to argue that they did not have notice. I'm not persuaded by
> the distinction that I heard in oral argument that I should consider notice of GM's
> bankruptcy to be an unsatisfactory substitute for telling people that they have
> problems in their vehicles with respect to their bad timing chains. If anyone had a
> problem with a failed timing chain, he or she would know that and could easily
> file a regular proof of claim in this case.

Hr'g Tr. 41:16-42:10, February 10, 2011.[38]

Plaintiffs do not cite a single case, and New GM is not aware of any, in which the court

held that, in a 363 sale context, an unknown creditor was entitled to claim-specific notice.  All of

the notices attached as exhibits to the Economic Loss Plaintiffs' Opposition involved bar date

notices in toxic tort cases. *See* discussion in Section I.B.3, *infra*.  Plaintiffs' argument about the

---

[36]  *See Debtors' Objection to Proofs of Claim Nos. 16440 and 16441 filed by Michael A. Schwartz*, dated December
17, 2010 [Dkt. No. 8179] (**Reply Appendix, Exh. "D"**).

[37]  *Debtors Reply in Support of Objection to Proofs of Claim Nos. 16440 and 16441 filed by Michael A. Schwartz*,
dated January 31, 2011 [Dkt. No. 8973], ¶ 17 (**Reply Appendix, Exh. "E"**).

[38]  Relevant excerpts of the February 10, 2011 transcript are contained in the **Reply Appendix as Exhibit "F."**

adequacy of the 363 sale notice provided is also based on a faulty premise. There were no claims being "taken away" from Plaintiffs as part of the 363 Sale.

Schroeder v. City of New York, 371 U.S. 208 (1962), and Covey v. Town of Somers, 351 U.S. 141 (1956), offer no support for Plaintiffs. Neither case concerns a bankruptcy or a 363 sale. In addition, in both cases, the plaintiffs were known to have an interest in property and there was an attempt to extinguish their rights. Schroeder was a condemnation proceeding where appellant's property interest was clearly known. Covey concerned the foreclosure of a tax lien, the appellant was known by town officials to be incompetent, and the Supreme Court found that notice on a known incompetent did not satisfy due process. Covey, 351 U.S. at 146. Neither case supports the proposition that publication notice in the 363 Sale context has to contain claim specific information for unknown creditors.

Plaintiffs' reliance on Travelers Casualty & Surety Co. v. Chubb Indemnity Insurance Co. (In re Johns-Manville Corp.), 600 F.3d 135 (2d Cir. 2010), cert. denied, 131 S. Ct. 644 (2010) ("**Manville IV**") underscores the absence of authority supporting Plaintiffs' position. In Manville IV, the court did not hold that the debtor should have given claim-specific notice to Chubb, nor did the court suggest that some other form of notice could have barred Chubb's claims against Travelers. Instead, the court held that "Chubb was not an interested party in Manville's chapter 11 proceedings" (id. at 157), and that the bankruptcy court did not have jurisdiction to enjoin the types of claims asserted by Chubb against non-debtor Travelers. Chubbs' claims (unlike the situation for an injunction arising from a 363 sale) were not part of or related to the res of the debtor's bankruptcy estate. Id. at 152-53. The court found that the types of claims that Chubb brought against Travelers were unimaginable at the time the bankruptcy court issued its orders years before, that no one involved with the orders contemplated these

22

types of claims or that they would be forever barred, and that the claims were not encompassed by the terms of the prior notices/orders. *Id.* at 156-58.

Unlike *Manville IV*, Plaintiffs assert that Old GM should have given them better notice of the 363 Sale—not that no notice could have been provided. Thus, Plaintiffs' position is diametrically opposite to Chubb's situation in *Manville IV*. Moreover, nothing in *Manville IV* even remotely suggests that "unknown" claimants should be given claim-specific notice. Also, unlike *Manville IV*'s unimaginable claims, successor liability claims and other consumer-oriented claims were not only imagined, they were expressly addressed at the Sale Hearing and ruled upon. Lastly, as contrasted to *Manville IV*, the no successor liability finding made in the context of the 363 Sale was related to a sale of the res of Old GM's bankruptcy estate.[39]

Plaintiffs' reliance on *Tillman v. Camelot Music, Inc.*, 408 F.3d 1300 (10th Cir. 2005) is also unavailing. *Tillman* is a plan discharge case and not a 363 sale notice case. In addition, the Tenth Circuit did not hold that notice to an "unknown" claimant had to contain any specific language to apprise it of its claims. *Tillman* concerned a debtor that took life insurance policies out on its employees. The debtor knew that the policies existed and that its employees held an interest in them, but actively prevented the employees and their families from discovering the policies. The court ultimately found that "[b]ecause [the debtor] actively concealed the existence of the [insurance] policies from all potential plaintiffs, publication by notice did not discharge

---

[39]    The GUC Trust's reliance on *In re Hexcel Corp.*, 239 B.R. 564 (N.D. Ca. 1999) is also misplaced. *Hexcel* concerned a plan discharge, and not a 363 sale. In addition, *Hexcel* involved a contribution claim arising from a class action toxic tort case which was filed years after the debtor's plan was confirmed. There, the court found that a claim should not be discharged "if the parties could not reasonably contemplate the potential existence of the future claim prior to the reorganization." *Id.* at 567. That is not Plaintiffs' contention here.

Plaintiff's claim." *Id.* at 1308.  *Tillman* is thus inapposite; it holds essentially that a fraud-doer

(who was responsible for giving notice) should not profit from his bad acts.[40]

Plaintiffs' other cited cases relating to adequate notice (all claim extinguishment cases)

are distinguishable from the controversy herein.  For example, in *Citicorp Mortgage, Inc. v.*

*Brooks (In re Ex-Cel Concrete Co.)*, 178 B.R. 198, 205 (B.A.P. 9th Cir. 1995), a known secured

creditor did not get notice of a sale and the sale proceeds were insufficient to satisfy its lien.  In

*National Pipe & Plastics, Inc. v. N.P.P. Liquidation Co.*, No. 96-1676 (PJW), 2000 WL

33712292, at *10 (Bankr. D. Del. Sept. 25, 2000), the court found that the creditor was clearly a

known creditor (even though not scheduled by the debtor), having commenced a lawsuit against

the debtor pre-petition, and its claim, if allowed, would have ranked among the debtor's twenty

largest creditors.  In *Doolittle v. County of Santa Cruz (In re Metzger)*, 346 B.R. 806, 819

(Bankr. N.D. Cal. 2006), a county with a covenant as to land development was a known creditor

entitled to direct notice that was not provided.  In *Acevedo v. Van Dorn Plastic Machinery Co.*,

68 B.R. 495 (Bankr. E.D.N.Y. 1986), the debtor was aware that there would be an indemnity

claim filed against it and, thus, should have given notice of the bar date to such claimant.

Other cases cited by Plaintiffs that actually involved 363 sales are not relevant because

they purported to sell property that did not belong to the debtor in the first instance, so Section

363(f) was not applicable.  *See In re Polycel Liquidation, Inc.*, No. 00-62780, 2006 WL

4452982, at *9, *11 (Bankr. D. N.J. Apr. 18, 2006), *aff'd*, 2007 WL 77336 (D.N.J. Jan. 8, 2007);

*Metal Founds. Acquisition, LLC v. Reinert (In re Reinert)*, 467 B.R. 830, 831-32 (Bankr. W.D.

---

[40]   *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 871 F. Supp. 2d 143 (E.D.N.Y. 2012), *rev'd*, 747 F.3d 145
(2d Cir. 2014 is similar to *Tillman* in that it is a plan discharge case. There, it was alleged that the debtor was
involved in an antitrust conspiracy and the claimant was not aware of it and could not have learned of it "through the
exercise of reasonable diligence until after the confirmation of the reorganized plan."  *DPWN Holdings*, 871 F.
Supp. 2d at 157.  It is worth noting that the Second Circuit reversed and remanded the decision of the district court
because it was "skeptical of [the claimant's] contention that it was not aware of, or with reasonable diligence could
not have become aware of, its antitrust claim in time to assert it in the bankruptcy proceeding." *DPWN Holdings*,
747 F.3d at 152.

Pa. 2012).  The remaining cases cited by Plaintiffs did not hold that unknown creditors were entitled to claim-specific notice.  *See Savage Industries*, 43 F.3d at 721-22 (holding that purchaser did not obtain debtor's assets "free and clear" where debtor gave no notice, including publication notice, of the sale); *In re Grumman Olson Indus., Inc.*, 467 B.R. 694 (S.D.N.Y. 2012) (no notice could have been given to future creditor with no connection to the debtor who was injured after plan confirmation).

### 3.    The Toxic Tort Cases In the Bar Date Context Are Inapposite

The cases that Plaintiffs cite, *Waterman Steamship Corp. v. Aguiar (In re Waterman S.S. Corp.)*, 141 B.R. 552 (Bankr. S.D.N.Y. 1992), *aff'd in part, vacated and remanded*, 157 B.R. 220 (S.D.N.Y. 1993), and *Gabauer v. Chemtura Corp. (In re Chemtura Corp.)*, 505 B.R. 427 (S.D.N.Y. 2014), do not support Plaintiffs' contentions that they were entitled to direct mail notice.  In those cases, the alleged victims were clearly unknown creditors and they were entitled to publication notice only.  The issue in those cases was the form of publication notice. However, *Waterman* and *Chemtura* are totally different situations from the one at issue.  They are bar date cases involve debtors that knew that they had a toxic tort problem that needed to be addressed in their plan.  The purpose of the bar date and discharge publication notice was to make sure that claims were filed by victims who may not have known that they were exposed,[41] so that their claims could be extinguished under the debtors' plan.  The notices were not sent out, as here, in the context of a business facing immediate liquidation if its assets were not promptly sold.  Rather, the notices were part of the more deliberate claims resolution process, central to the plan process, where the consequences of failing to timely file a claim were fatal to the creditor.  The broad notice provisions may well have been beyond what was strictly required for

---

[41]  As the *Burton* court noted, every vehicle owner knows that there may ultimately be a repair issue relating to their vehicle.  *See Burton*, 492 B.R. at 403.

due process purposes.  But, like in a class action settlement, they were prepared to be overly inclusive to ensure that all possible claimants to a settlement fund have an opportunity to participate therein.

In contrast, the purpose of the 363 Sale notice was far different.  The only unknown in *Waterman* and *Chemtura* was which persons would be impacted by the latent disease—in other words the identity of the claimants themselves.[42]  Here, Old GM had not determined that there was a pervasive ignition switch safety problem and that claims would inevitably be brought against it.

The same fact pattern in *Waterman* and *Chemtura* is present in the other toxic tort cases that Plaintiffs cite.  In *In re Tronox Inc*., Case No. 09-10156 (Bankr. S.D.N.Y. May 28, 2009), the debtors were liable for various legacy liabilities assumed in connection with a spinoff from their former parent company, and those legacy liabilities were known to the debtor and a primary reason for the bankruptcy filing.  Tronox was aware of approximately 120 tort suits related to such liabilities, but it did not know all potential claim holders.  That is not the situation here.

Similarly, in *In re Freedom Industries*, Case No. 14- 20017 (Bankr. S.D. W. Va. Jan. 17, 2014), the debtor was responsible for a catastrophic chemical release.  Within weeks of the spill, numerous lawsuits were filed causing Freedom Industries to file for bankruptcy.  Although Freedom Industries did not know who precisely was damaged by the chemicals it had released, it unquestionably knew that harm was inflicted on people and property impacted by the release,

---

[42] In *Waterman*, based on well-documented, well-publicized and well-known industry wide asbestos problems stretching back decades, the debtor unquestionably knew that the asbestos on board its vessels would inflict harm on persons who came into contact with it. 141 B.R, at 557.  In *Chemtura*, the debtor also unquestionably knew that it faced an onslaught of litigation relating to diacetyl based on a wave of claims filed against it (and other companies) years before it filed for bankruptcy.  In its bankruptcy, Chemtura told the court that "the diacetyl-related claims are potentially among the largest unsecured claims pending against the estate."  *See Chemtura's Memorandum of Law in Support of Chemtura Corporation's Motion for a Temporary Restraining Order and Preliminary Injunction Staying the Diacetyl Litigation and Future Diacetyl Actions*, *Chemtura Corp. v. Smith (In re Chemtura Corp.)*, Adv. Proc. No. 09-01282-REG (Bankr. S.D.N.Y. June 17, 2009) [Dkt. No. 3], at 1 (**Reply Appendix, Exh "G"**).

and that litigation was already underway. Again, the debtor had actual knowledge of the putative claims that were central to its case, but not the identity of the claimant. Thus, *Freedom Industries* is not analogous.

### C.    It Would Have Been Impractical And Unduly Expensive For Old GM To Identify In Its Notice Every Specific Type Of Putative Claim Against It And How That Claim Might Be Impacted In The 363 Sale

Plaintiffs' suggestion of an unwieldy, expensive and time-consuming notice was simply not required or appropriate. Issuing a notice that identifies every specific potential type of putative unknown claim and how that claim may be impacted by a 363 sale transaction makes little sense. There also would have been a dramatic increase in the cost of mailing and publishing such a notice, and a critical delay in creating and serving such a notice. The resultant delay and expense would have caused further deterioration of the Old GM estate. Due process does not require such an unworkable or wasteful notice procedure, particularly where such extensive notice would not have had any impact on the outcome of the 363 Sale. Courts have routinely held that bankruptcy judges have an obligation to avoid wasteful notice procedures that diminish the resources available to the estate. *See Vancouver Women's Health Collective Soc. v. A.H. Robins Co., Inc.*, 820 F.2d 1359, 1364 (4th Cir. 1987) ("In bankruptcy, the court has an obligation not only to the potential claimants, but also to existing claimants and the petitioner's stockholders. The court must balance the needs of notification of potential claimants with the interest of existing creditors and claimants. A bankrupt estate's resources are always limited and the bankruptcy court must use discretion in balancing these interests when deciding how much to spend on notification."); *see also* Sale Procedures Order, ¶ C ("The Purchased Assets are 'wasting assets' that will not retain going concern value over an extended period of time. As such, the Debtors' estates will suffer immediate and irreparable harm if the relief requested in the Motion is not granted on an expedited basis consistent . . . ."); *id.*, ¶ E (contemplating that there

27

could be contingent warranty claims and they would be treated as unknown creditors for 363

Sale notice purposes); *see also Wolff* Opinion, at 21-22 (discussing due process concerns, and

finding that the "circumstances of the bankruptcy necessitated the form of the sale; Old Carco

could not meet all of its obligations and was rapidly losing value . . . .").

**D.**      **Plaintiffs Cannot Demonstrate That They**
            **Were Prejudiced By The Publication Notice**

**1.**      **The Case Law Is Clear That A Showing Of Prejudice Is Required**
            **To Establish A Due Process Violation In The Bankruptcy Sale Context**

As contrasted to Plaintiffs' inapposite cases, New GM's Opening Brief provided specific,

on-point, authority showing that prejudice is required to establish a due process violation in the

bankruptcy sale context.  Plaintiffs' attempt to distinguish those cases fails.

For example, *Caldor* confirms that a showing of prejudice is required for a party to

establish that it has been deprived of due process:

> Even if a party is not afforded prior notice, a subsequent finding against it on the
> merits of the underlying litigation can overcome its objection on due process
> grounds. . . . Thus, in addition to establishing that the means of notification
> employed by Caldor was inadequate, Pearl must demonstrate ***that it was
> prejudiced*** because it did not receive adequate notice.

*In re Caldor, Inc., N.Y.*, 240 B.R. 180, 188 (Bankr. S.D.N.Y. 1999), *aff'd sub nom.*, *Pearl-Phil*

*GMT (Far E.) Ltd. v. Caldor Corp.*, 266 B.R. 575 (S.D.N.Y. 2001) (emphasis added).  While the

plaintiff in *Caldor* had the opportunity to later contest the wind-down-order after it was issued,

the court did not indicate that the prejudice requirement was impacted by that fact.  In fact, in the

district court affirmance, the principle was again enunciated: "[E]ven if notice was inadequate,

the objecting party must demonstrate ***prejudice*** as a result thereof."  *Pearl Phil*, 266 B.R. at 585

(emphasis added); *see also Wolff* Opinion, at 21, 23 ("Mr. Wolff requests modification of the

Sale Order based on due process concerns possibly related to the speed of the sale, but his legal

argument would not have prevailed even had he made a timely objection before entry of the Sale

Order" and "Mr. Wolff challenges the sale process on a general level, but absent New Chrysler's involvement in this case, Old Carco would have been in no better position to pay Mr. Wolff's claim than it is now.").[43]

Plaintiffs' criticism of *In re Edwards,* 962 F.2d 641 (7th Cir. 1992), is misguided.  As demonstrated on pages 57-59 hereof, unlike the claimants in *Edwards*, Plaintiffs had no individualized claim.  Even if they did, unlike in *Edwards*, they are protected by their claim attaching to the proceeds of sale.[44]

> Plaintiffs' critique of *In re Paris Industries* misses the mark; the case is on point:
>
> The question is whether their lack of notice [of the bankruptcy court's order of sale] somehow prevents the bankruptcy court from issuing its injunction to enforce the prior order and requires it to defer to Illinois state proceeding.  I conclude that [plaintiffs] were not ***prejudiced*** by their lack of notice. . . . Since they have shown no prejudice, there was no need for the bankruptcy court to vacate its earlier order as it applies to [plaintiffs].

*Paris Mfg. Corp. v. Ace Hardware Corp. (In re Paris Indus. Corp.),* 132 B.R. 504, 509-10 (D. Me. 1991) (emphasis added).  While Plaintiffs are correct that the court noted in *Paris Industries* that the plaintiffs "lost nothing by virtue of the sale,"[45] it is also true that the *Paris Industries* court found that plaintiffs "have made no showing that, if they had been notified and appeared, they could have made any arguments to dissuade the bankruptcy court from issuing its order that the assets be sold free and clear of all claims."  *Id.* at 510.  A lack of economic hardship is one form of showing no prejudice, and thus no due process violation.  Indeed, the *Paris Industries* court made clear that the no-notice argument does not serve as a justification for imposing

---

[43]    Plaintiffs' attempt to distinguish *Caldor* on the grounds that the "no prejudice" argument is only applicable where there was no deprivation of property makes little sense.  The "actual deprivation" discussion precedes the due process analysis, which is contained in a separate section of the opinion.

[44]    Plaintiffs cited no case law that holds *Edwards* has somehow been rejected in the Second Circuit.

[45]    Another court later clarified that the plaintiffs remained without recovery on their claim when the cash from the bankruptcy sale was subsequently distributed to creditors in accordance with bankruptcy law.  *LTV Corp. v. Back (In re Chateaugay Corp.),* 201 B.R. 48, 64 (Bankr. S.D.N.Y. 1996).

successor liability, which is exactly what Plaintiffs are trying to do here. *Id.* at 510 & n.13 (citing *Conway v. White Trucks*, 885 F.2d 90, 96 (3d Cir. 1989)).

The GUC Trust's passing attempt to distinguish the case law requiring prejudice by pointing to the harmless error rule under Fed. R. Bankr. Proc. 9005 is off-the-mark. Fed. R. Bankr. Proc. 9005, which incorporates Fed. R. Civ. Proc. 61, allows a court to correct an error in a prior order if the correction does not affect substantial rights. Plaintiffs have not sought to invoke Rule 61 and neither has New GM. The GUC Trust's attempt to conflate two separate concepts—harmless error standard, which is not sought, with the prejudice element of a bankruptcy sale due process argument—should be rejected.

Finally, the GUC Trust undermines its argument when it cites to *In re Bartle*, which supports New GM's position:

> Bartle did not indicate to the district court what argument or evidence he would have presented in opposition to the government's motion. Even in his briefing to this court he has not done so. Instead, he has characterized his appeal as presenting a purely procedural argument. ***But procedures do not exist for their own sake; they exist to protect the parties' rights.*** We cannot say that Bartle's substantial rights were affected by an erroneous deprivation of an opportunity to be heard on the government's motion to dismiss ***when he has not set forth what he would have brought to the court's attention in opposition to that motion***.

*In re Bartle,* 560 F.3d 724, 730 (7th Cir. 2008) (emphasis added).

### 2.    Plaintiffs Incorrectly Contend That Prejudice Is Not Necessary To Establish A Due Process Violation In The Bankruptcy Sale Context

Plaintiffs rely on the wrong standard when attempting to refute New GM's position that the party must show that it suffered prejudice as a result of an allegedly insufficient notice to be deprived of due process. Plaintiffs argue that no such showing of prejudice is required, relying heavily on inapposite, non-bankruptcy cases. Economic Loss Plaintiffs' Opposition, at 36-37. Since the Fifth Amendment due process analysis is fact- and context-specific, Plaintiffs' non-bankruptcy cases are not persuasive precedent for ignoring the prejudice requirement long

recognized by numerous courts specifically in the bankruptcy sale order context. *See, e.g., J. Andrew Lange, Inc. v. FAA,* 208 F.3d 389, 392 (2d Cir. 2000) ("The due process clause is 'flexible and calls for such procedural protections as the particular situation demands.'") (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)).

### 3.    <u>Plaintiffs' Non-Bankruptcy Cases Are Inapposite</u>

Plaintiffs cite to *Lane Hollow Coal Co. v. Director, Office Of Workers' Compensation Programs, United States Department Of Labor,* 137 F.3d 799 (4th Cir. 1998) (*see* Economic Loss Plaintiffs' Opposition, at 36), which has nothing to do with a bankruptcy sale order, and actually recognizes the prejudice element by the delay in notifying the defendant of its liability. In *Lane Hollow*, the Department of Labor's Benefits Review Board awarded black lung and survivor's benefits to the widow of a former coal miner and directed that liability for these benefits should rest upon an operator who had not been named in the proceeding until more than ten years had passed and was not notified that it had been named for another five years.  Given the extraordinary delay in notifying the operator of its potential liability, the court held that the operator had been precluded from mounting a defense because evidence disproving a connection between the mine operation and the lung condition had become unavailable.  It is in that context of a two-party dispute (and not in the context of a 363 Sale involving potentially millions of parties) that the Fourth Circuit held that it would "not require a showing of 'actual prejudice' in the sense that there is a reasonable likelihood that the result of this claim would have been different absent the violation." *Id.* at 807.

This case is quite different than *Lane Hollow*.  Notably, *Lane Hollow* specifically acknowledged that in other types of due process cases, prejudice is required: "To be sure, there are 'due process' cases in which we require a showing that the error complained of actually

31

prejudiced the result on the merits, but these cases are of a much different ilk." *Lane Hollow*, 137

F.3d at 808.[46]

Similarly, Plaintiffs cannot rely on *Fuentes v. Shevin,* 407 U.S. 67 (1972), in support of

their argument that no prejudice should be required for a due process violation in the context of a

bankruptcy sale order.   In *Fuentes* (a non-bankruptcy case), two individuals bought household

goods under installment contracts.   After they defaulted, the sellers—under applicable state

statutes—recovered the goods without any notice to the purchasers.  The Supreme Court found

that the state statutes authorizing summary seizure of goods by state agents with no notice

violated the due process clause under the Fourteenth Amendment.   It was in that context—the

constitutionality of a state statute and the seizure of property without notice—that the Supreme

Court noted the right to be heard does not depend upon an advance showing that one will surely

prevail at the hearing.

In the same vein, the GUC Trust's reliance on *Mullane v. Central. Hanover Bank & Trust*

*Co.* for the proposition that no prejudice should be required for a due process violation in the

bankruptcy sale context is misguided.   Similar to *Fuentes*, the Supreme Court in *Mullane*

analyzed the constitutionality of a state statute.   Moreover, *Mullane* is not a bankruptcy case, and

it never addressed the prejudice requirement because, like *Fuentes*, the case is about the general

inadequacy of a statutory notice requirement, not its application to a particular claimant.

Plaintiffs' reference to *New Concept Housing, Inc. v. Poindexter (In re New Concept*

*Housing, Inc.)*, 951 F.2d 932, 942 (8th Cir. 1991) (*see* Economic Loss Plaintiffs' Opposition, at

---

[46]  *Lane Hollow* has not been cited in a single bankruptcy decision published on LEXIS or Westlaw.  *Consolidated Coal Co. v. Borda*, 171 F.3d 175 (4th Cir. 1999), is another black lung case and inapplicable for the same reasons as *Lane Hollow*.  There, the coal mine operator was similarly not timely informed of its liability for black lung benefits awarded to a former coal miner.  The court cited to *Lane Hollow* in support of its conclusion that while the award of benefits is affirmed, the operator cannot be held responsible because the 15+ year delay *prejudiced* the operator's opportunity to defend against the allegations.

37), supports New GM's position that, to establish a due process violation, Plaintiffs must show that they would have made a material difference to the outcome of the proceeding.  Remarkably, without noting it as such, Plaintiffs cited to the dissent.  The majority decision in *New Concept Housing* did not find a due process violation:

> We conclude, however, that failure to give the Debtor notice of the hearing, in this case, constitutes harmless error. . . .  Because we believe that the bankruptcy court would have approved the proposed settlement between Claimants and the Trustee even if the Debtor had been given notice and appeared at the hearing, we find that upholding the bankruptcy court's order allowing the Claim and approving the settlement is not inconsistent with substantial justice.

*Id.* at 937-38.

Finally, the only bankruptcy-related sale case that Plaintiffs cite, *White v. Chance Indus., Inc. (In re Chance Indus., Inc.)*, 367 B.R. 689 (Bankr. D. Kan. 2006), is readily distinguishable. In *Chance*, the defendant bought an amusement ride called the Zipper from a company that later filed for Chapter 11.  No future claims fund was established, and the bankruptcy plan did not provide for a future claims representative. The debtor's assets were transferred under the plan to an entity owned by the debtor's equity holder.  After the plan was confirmed, a child was injured on the Zipper ride.  The court found that the minor's claim was not a "claim" within the meaning of 11 U.S.C. § 101(5).  The court could have ended its analysis there.  However, in *dictum*, the court observed that even if the minor had a claim, it could not have been constitutionally extinguished because no future claims fund was established and no future claims representative was appointed or provided any notice.  The case concerns a post-363 sale accident with a victim who never had any relationship with the debtor.  Here, it was up to Old GM, after the 363 Sale, to deal with the future claim representative issue referred to in *Chance*; that was never a New

GM issue.  In any event, here, that type of controversy would not have arisen because New GM

assumed the type of claim (*i.e.*, a post-sale accident) that was asserted in *Chance*.[47]

### 4. Plaintiffs Cannot Demonstrate That They Were Prejudiced By The Allegedly Insufficient Notice

Plaintiffs do not even attempt to show that they were prejudiced by the allegedly

insufficient notice, nor could they. *See* New GM Opening Brief, at 40-50.   The record

demonstrates that Plaintiffs' argument on successor liability, including the insufficient notice

argument, had been previously made to and rejected by this Court.   *See, e.g.*, Hr'g Tr. 59:9-

62:12, June 1, 2010 [Dkt. No. 5961] (rejecting Mr. Shane Robley's arguments); *see also id.* at

56:4-25, 62:13-64:24 (rejecting Mr. Deutsch's arguments); *see also* New GM Opening Brief, at

40-50.   Plaintiffs completely fail to identify any new fact or legal argument they would have

raised to object to the 363 Sale that was not already presented by others and considered but

rejected by the Court.   *Id.*; *see, e.g., Paris Industries,* 132 B.R. at 510 ("They have made no

showing that, if they had been notified and had appeared, they could have made any arguments

to dissuade the bankruptcy court from issuing its order that the assets be sold free and clear of all

claims.").

The Court should reject the Accident Plaintiffs' attempt to introduce a novel, and

unsupported concept of "prejudice" in the bankruptcy sale context.   They argue prejudice

because "they were deprived of a meaningful day in court to argue the true state of affairs with

the knowledge that they were injured."   Accident Plaintiffs' Brief, at 36.   Cases such as *Bartle*

---

[47]   It bears noting that in *Chance*, in reviewing the prepetition relationship test, the court stated that "[t]here must be some connection or nexus between the pre-petition relationship and the pre-petition conduct giving rise to the claim."   *Id.*, 367 B.R. at 706.   The court then stated, "[i]n other words, the debtor's prepetition conduct (*i.e.* designing, manufacturing and selling an allegedly defective or dangerous product) must be the basis for liability."   *Id.*   Old GM's designing, manufacturing and selling the allegedly defective vehicles is precisely the conduct that gives rise to the claim of Plaintiffs (or their successors) against Old GM, and is a firm basis to enforce the Sale Order and Injunction against them.

refute their position.  Clearly, there were lawyers at the Sale Hearing representing individuals involved in pre-Sale accidents.  The issue they presented was whether New GM should assume their claims.  Piling on more claims (such as Plaintiffs) would not have increased the likelihood of the Governments assuming all pre-Sale accident claims.  Indeed, at some point in the Sale Hearing, they tried to argue (to no avail) the opposite. (*i.e.*, the tort claims were sufficiently small that the Governments should just assume them all).  *See* Hr'g Tr. 157:15-165:19, June 30, 2009.[48]

The GUC Trust's citation to *In re Heiney,* 194 B.R. 898 (D. Col. 1996) is irrelevant to the due process/prejudice argument in the sale context.  In *Heiney*, the court never addressed the prejudice criteria and it was not a 363 sale case.  As always, context is important.  In *Heiney*, a request was made for an extension of time to file a non-dischargeability complaint on behalf of a known creditor whom the debtor had failed to provide any notice.  The court in *Heiney* reversed the denial of the time extension request based on the facts specific to that case.

Plaintiffs' meritless contentions should be put in context.  At the time of Old GM's bankruptcy, in the face of Old GM having to liquidate while being insolvent by billions of dollars, Plaintiffs presumably contend that they would have wanted to make their tarnished GM-brand argument (asserting an unsecured claim for monetary damages) at the 363 Sale Hearing.[49]  But for what purpose?  To oppose the 363 Sale to seek a better deal knowing if the deal failed or if the sale was delayed any further, they would get nothing?  Others (like numerous state attorneys general, consumer groups, plaintiffs lawyers, *etc.*), in the exact same position as

---

[48]  It should not be forgotten that the Governments were insisting on a very firm and short deadline by which the Court would have to approve the 363 Sale. *See Gen. Motors*, 407 B.R. at 484-85.  If the deadline was not met, the Governments reserved the right to withdraw their offer.  The Court was not willing to play "Russian roulette."  *See id.* at 493.  Time was of the essence, and protracted creditor negotiations would have been unavailing.  The Governments were firm on the type of liabilities New GM was willing to assume, and the economic loss claims and the pre-363 Sale accident claims asserted by Plaintiffs were not among them.

[49]   As of such time, the bankruptcy filing and uncertainty whether Old GM would liquidate had, in some respects "tarnished" its brand already.

Plaintiffs, tried that precise litigation strategy and failed.  Judge Kaplan referenced this point

when he denied a stay of the Sale Decision sought by the Ad Hoc Committee of Asbestos

Personal Injury Claimants.  *See In re Gen. Motors Corp.*, No. M. 57(LAK), 2009 WL 2033079,

at *1 (S.D.N.Y. July 9, 2009) ("[T]his case evokes the old adage that one ought to be careful of

what one wishes. I say that because there is every reason to believe that the individuals the

Committee represents would be worse off, and certainly not better off, if it were to obtain a stay

than if a stay were denied.").

## II.    REMEDIES THRESHOLD ISSUE:  IF A REMEDY IS WARRANTED, THE COURT SHOULD NOT REVOKE THE SALE ORDER AND INJUNCTION, BUT INSTEAD SHOULD ALLOW PLAINTIFFS TO SEEK A RECOVERY FROM THE PROCEEDS OF THE 363 SALE

Assuming *arguendo* that Plaintiffs can establish a due process violation that caused them

prejudice, which they cannot, revoking the Sale Order and Injunction as to Plaintiffs is not the

proper remedy.  The cases Plaintiffs cite in support of that remedy are all distinguishable.  For

the most part, those cases involved situations where the bankruptcy court's order **completely**

**extinguished** the creditor's property interest.  Here, in contrast, Plaintiffs had no property interest

that was extinguished.[50]  To the extent they had any claim, it was against Old GM and they

retained that claim after the 363 Sale.[51]

According to Plaintiffs, they are not seeking to vacate the Sale Order and Injunction; they

just do not want that Order to apply to them.  But were the Court to strip New GM of the

protections contained in the Sale Order and Injunction, including the "no successor liability"

---

[50]    The Sale Order and Injunction found that there was no viable successor liability claim.  Even if it did exist, the successor liability claim belonged to the bankruptcy estate, not Plaintiffs, and Old GM, as the holder of that claim released it as part of the 363 Sale.

[51]    *See Gen.* Motors, 407 B.R. at 474 ("GM's assets simply are being sold, with the consideration to GM to be hereafter distributed to stakeholders, consistent with their statutory priorities, under a subsequent plan.").  This principle was also recognized in the *Chrysler* case.  *See Wolff* Opinion, at 22 ("The sale did not discharge any liabilities; instead, it left some liabilities as obligations of Old Carco for resolution under a plan.").

finding, and expose it to substantial dollars of alleged claims, that is exactly the result that would

ensue.  New GM has cited clear authority supporting the proposition that, in the Section 363 sale

context, where notice was provided, it is improper to revoke or void a sale order as to a single

creditor or certain group of creditors just because they did not receive adequate notice of the sale.

Rather, the appropriate remedy in such a situation is for those creditors to seek a recovery against

the proceeds of sale, just like other creditors of the debtor.[52]  This remedy is consistent with

sound congressional policy of promoting finality for 363 sale orders, and protecting *bona fide*

purchasers like New GM.  It serves to maximize the value of the bankruptcy estate for creditors,

and it prevents general unsecured creditors like Plaintiffs from unjustifiably catapulting

themselves into a more favorable position compared to similar-priority and even higher-priority

creditors.

Plaintiffs' proposed remedy is as unworkable as it is improper.  As courts have

recognized, it is not possible to exempt just some creditors from the reach of a sale order,

especially where (as here) the sale order was crafted to balance myriad competing interests and

the creditors claiming exemption are a large, amorphous class of claimants with as-of-yet

unquantifiable claims.   Indeed, by approving an express integration clause in the Sale

Agreement, this Court recognized the impossibility of exempting just some claims and creditors

from the Sale Order and Injunction.[53]  Accordingly, if the Plaintiffs can demonstrate that Old GM

committed a due process violation that prejudiced Plaintiffs, the Court should hold that

Plaintiffs' remedy is to seek a recovery from the proceeds of the sale.

---

[52]  According to the *Motors Liquidation Company GUC Trust Quarterly GUC Trust Reports As Of September 30, 2014*, filed on November 12, 2014 [Dkt. No. 12997], as of September 30, 2014, the value of New GM Securities held by the GUC Trust was approximately $1 billion.  *Id.* at p. 11.  This amount does not take into consideration a distribution (valued at over $200 million) made by the GUC Trust in November, 2014, while the briefing on the Four Threshold Issues was underway.

[53]  *See* Sale Order and Injunction, ¶ 69 ("The provisions of this Order are nonseverable and mutually dependent on each other.").

A.    **Plaintiffs Seek To Avoid Their Burden Under Fed. R. Civ. P. 60(b)**

As an initial matter, the Responses do not even attempt to satisfy the extraordinarily high burden for seeking relief from an order under Fed. R. Civ. P. 60(b), which may be granted in only the "most exceptional of circumstances" *and* cannot "impose undue hardship on other parties." *See* New GM Opening Brief, at 23 (citing, *e.g.*, *Mauro Motors Inc. v. Old Carco LLC*, 420 Fed. App'x 89 (2d Cir. 2011)). Plaintiffs concede that the Fed. R. Civ. P. 60(b) standard is the "standard applicable here." Economic Loss Plaintiffs' Opposition, at 64 n.71. Importantly, Plaintiffs never explain how the remedy that they propose satisfies Rule 60(b); their proposed remedy undoubtedly imposes an "undue hardship" on New GM, and they have not presented the "most exceptional of circumstances."

Plaintiffs also eventually concede, as they must, that courts have applied Fed. R. Civ. P. 60(b) in determining whether a sale order should be voided to remedy a due process violation. Economic Loss Plaintiffs Opposition, at 64 & n.71. Plaintiffs, however, seek to distinguish those cases on the basis that the courts allegedly did not have available the remedy of finding that the sale order was unenforceable against the objecting party only because that would not have granted such party "complete relief." Economic Loss Plaintiffs' Opposition, at 64. Nothing in their cited cases remotely support this distinction.

B.    **Plaintiffs' Cases Are Inapposite And Do Not Mandate
Exempting Plaintiffs From The Sale Order And Injunction As A Remedy**

Plaintiffs contend that voiding the Sale Order and Injunction as to them is the only proper remedy for Old GM's alleged violation of Plaintiffs' due process rights. But, as discussed in New GM's Opening Brief and Sections III.C.1, III.C.2 and III.C.3 below, Plaintiffs' proposed remedy is improper. Only two possible remedies can be applied for a due process violation in the context of a sale order: (1) voiding the entire sale and putting the parties all back to square

38

one, or (2) allowing the claimant to proceed against the proceeds of the sale.  *See* New GM Opening Brief, at 52, 56; *Factors' & Traders' Ins. Co. v. Murphy*, 111 U.S. 738, 742-43 (1884); *Cedar Tide Corp. v. Chandler's Cove Inn, Ltd.*, 859 F.2d 1127, 1128 (2d Cir. 1988).  The cases Plaintiffs cite in support of their argument do not provide otherwise.  Each of their cases is easily distinguished.

The vast majority of the cases that Plaintiffs cite do not involve a 363 sale order at all, but rather a plan discharge (or some other form of bankruptcy relief).  *See DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145 (2d Cir. 2014) (discharge); *Arch Wireless, Inc. v. Nationwide Paging, Inc. (In re Arch Wireless)*, 534 F.3d 76 (1st Cir. 2008) (discharge); *Waterman S.S. Corp. v. Aguiar (In re Waterman S.S. Corp.)*, 157 B.R. 220 (S.D.N.Y. 1993) (discharge); *City of New York v. N.Y., N.H. & H.R. Co.*, 344 U.S. 293 (1953) (discharge); *In re Savage Indus.*, 43 F.3d 714 (1st Cir. 1994) (injunction); *Schwinn Cycling & Fitness Inc. v. Benonis*, 217 B.R. 790 (N.D. Ill. 1997) (plan confirmation).  In those circumstances, the remedy is fashioned against the party who caused the notice deficiency and is seeking to have the claim against it extinguished.

*Manville IV* is inapposite in that the court in that case held that the settlement order in the plan could not bar claims against the non-debtor insurer that the plan injunction did not contemplate.  *Manville IV* is also distinguishable because there was an utter lack of notice in the case.  *See Manville IV*, 600 F.3d at 151.  *Koepp v. Holland*, No. 13-4097, 2014 U.S. App. LEXIS 22108, at *5-6 (2d Cir. Nov. 21, 2014), was decided for a similar reason (no notice given to easement holder whose interest appeared in the real property records and was therefore a known creditor entitled to actual notice).  The same is true for *Savage Industries*, 43 F.3d at 722 (no notice whatsoever given to creditor, not even an attempt to provide notice—debtor had

"dispense[d] with all notice and opportunity to be heard on the part of potential claimants") and *Polycel*, 2006 WL 4452982, at *8 n.6 ("The issue in this case is the lack of notice, not the adequacy.").[54]  And, certain of Plaintiffs' cases were not decided in the bankruptcy context at all, nor did they even address the issue of what is the proper remedy for a due process violation in a sale context.  *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (non-bankruptcy context; no discussion of remedy for due process violation); *Richards v. Jefferson Co.*, 517 U.S. 793, 798 (1996) (non-bankruptcy context; issue related to claim preclusion); *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 800 (1983) (non-bankruptcy context; no discussion of remedy for due process violation).[55]

The Sale Order and Injunction entered in this case presents different considerations.  This is not a situation where a remedy can be fashioned against the good-faith purchaser, who was not responsible for the alleged notice infraction.  As properly reflected in *Lehman*, "the Court views final Sale Orders and Injunctions as falling within a select category of court orders that may be worthy of greater protection from being upset by later motion practice."  *In re Lehman Bros. Holdings Inc.*, 445 B.R. 143, 149-50 (Bankr. S.D.N.Y. 2011), *aff'd in part and rev'd in part on other grounds*, 478 B.R. 570 (S.D.N.Y. 2012), *aff'd*, 761 F.3d 303 (2d Cir. 2014).  Allowing for the revocation of a 363 sale, either in whole or in part, years after its consummation would jettison well-established policies promoting asset purchases, which are necessary to maximize the value of the bankruptcy estate for creditors and appropriately prioritize creditor recovery.

---

[54]  *Polycel* is also distinguishable because it involved a 363 sale that purported to sell property that did not belong to the debtor.

[55]  *In re Ritchie Risk-Linked Strategies Trading (Ir.) Ltd.*, 471 B.R. 331 (Bankr. S.D.N.Y. 2012), is cited for the proposition that Plaintiffs should not be bound by the Sale Order and Injunction because of improper notice.  *See* GUC Trust Br., at 19.  Although that case did involve a sale order, the language cited by Plaintiffs was clearly *dicta* because the court there found that the allegedly aggrieved creditor received proper notice of the sale and that there was no due process violation.  *Ritchie Risk-Linked Strategies*, 471 B.R. at 338.

The discharge cases, in particular, are inapposite in the context of a 363 sale. *See Molla v. Adamar of N.J., Inc.,* No. 11-6470 (JBS/KMW), 2014 WL 2114848, at *4 (D. N.J. May 21, 2014) (distinguishing discharge cases in holding that 363 buyer who purchased assets "free and clear" cannot be held liable for the claims of a creditor who did not have notice of the sale). As noted above, in a discharge case, the creditor's property right is ***entirely extinguished*** by the discharge order; in contrast, property rights in a sale order are generally not extinguished but, like here, are transferred to the sale proceeds. The focus of the discharge case, for notice purposes, is the liability at issue. In a 363 sale, for notice purposes, the focus is on the propriety of the sale and the sale terms.

Thus, unlike the situation here where creditors with economic loss claims like Plaintiffs can seek to recover against the proceeds of the bankruptcy sale (just like other creditors), there are no sale proceeds in a discharge case against which a creditor allegedly deprived of due process can recover. Unlike a 363 sale order, a discharge "destroys" the creditor's claim, and there is no alternative remedy for a due process violation in such cases other than non-enforcement of the discharge order as to the aggrieved creditor. *See, e.g., City of New York, N.H. & H.R. Co.*, 344 U.S. at 294 ("reorganization of [a] railroad under § 77 of the Bankruptcy Act destroyed and barred enforcement of liens which New York City had imposed on specific parcels of the railroad's real estate for street, sewer and other improvements"); *Arch Wireless*, 534 F.3d at 83 (discharge would have "abolishe[d] the property rights of [the] creditors" in question).[56]

---

[56] Notably, in *DPWN Holdings*, 747 F.3d at 150, 153 (a plan discharge case), although the court said that "a claim cannot be discharged if the claimant is denied due process because of lack of adequate notice," that was *dicta*, as the court did not find a due process violation or fashion a remedy for any such violation, but rather "remand[ed] for further consideration." The matter was remanded to determine if a claimant (DPH) had knowledge or reasonably could have obtained knowledge of the debtor's (United) alleged antitrust violations prior to confirmation of the debtor's plan. Unlike here, *DPWN Holdings* concerned a tension between the enforcement of two federal laws (bankruptcy law and antitrust law). In addition, the Second Circuit specifically stated that the "issue here is not whether the known facts would have permitted pleading a sufficient antitrust claim outside of bankruptcy, but only whether such a claim could have been filed within a bankruptcy proceeding where the 'fresh start' principle operates

The same reasoning applies to cases involving a 363 sale order where the sale order purported to completely extinguish a property right of the creditor—one that arguably could never be covered by the 363 sale proceeds. *See Compak Cos., LLC v. Johnson,* 415 B.R. 334, 342 (N.D. Ill. 2009) (patent license extinguished); *Polycel Liquidation*, 2006 WL 4452982, at *11 (right to proprietary pool molds belonging to claimant, not the debtor, extinguished); *Doolittle v. Cnty. of Santa Cruz (In re Metzger)*, 346 B.R. 806, 819 (Bankr. N.D. Cal. 2006) (county's right to enforce affordable housing covenant requiring owner of real estate development to make certain units available at low cost extinguished).  Here, the 363 Sale did not "destroy" any creditor claims; instead, it converted Old GM's assets into a pool of cash and other consideration that would later, through the plan process, be allocated to creditors.

For example, in *Compak*, the creditor who allegedly did not receive notice held a license to a patent owned by the debtor.  The sale order in that case entirely extinguished the creditor's patent license.  415 B.R. at 343.  Because the creditor would have no alternative remedy for the loss of the patent license (a unique property interest), and because the "Bankruptcy Code contains special protections for patent licensees," the court held that the sale order could not be enforced to terminate the creditor's license.  *Id.*

Likewise, in *Polycel*, the sale order purported to extinguish an un-notified creditor's ownership interests in proprietary "molds" used in constructing swimming pools.  2006 WL 4452982, at *11.  In holding the sale order inapplicable to this creditor, the court stressed that (i) "[t]he Molds are unique," (ii) the "debtor did not own" the molds, (iii) the creditor "has a strong interest in regaining ownership of the Molds as they are a significant part of the company's assets," (iv) "the Molds were not listed on the appraisal" documents that the buyer reviewed

---

to channel all 'claims' broadly defined by the Bankruptcy Code, into a forum well suited to determine whether such claims deserve exploration and adjudication."  *Id.* at 152.

when considering the purchase, (v) the buyer explicitly purchased the debtor's assets "subject to the rights of third party persons who [(like the creditor there)] can prove an unencumbered ownership interest in same," (vi) no sale proceeds would be available to compensate the creditor, and (vii) the molds would be "useless" in the hands of the buyer because the buyer and creditor would no longer be doing business together.  *Id.*    The court observed further that it had fashioned this remedy "based upon the unique factual matrices underlying" the dispute and that it arrived at this remedy after "weighing [the relevant] factors."  *Id.*; *see also Metzger,* 346 B.R. at 819 (where sale order purported to extinguish county's right to enforce affordable housing covenant requiring owner of real estate development to make certain units available at low cost, court held that county was not bound by sale order because there was no alternative remedy— monetary compensation to the county was not a viable remedy given the nature of the county's lien); *Koepp v. Holland*, No. 13-4097, 2014 U.S. App. LEXIS 22108, at *8-9 (2d Cir. Nov. 21, 2014)  (finding non-enforcement remedy appropriate as to claimant whose easement could not be extinguished by the sale).

Similarly, in other cases that Plaintiffs cite involving a 363 sale, the court did not void the sale order itself—partially or otherwise—because the sale order **did not preclude the claims at issue.**  Contrary to Plaintiffs' contention, these cases do not hold that a creditor deprived of due process must be excepted from the terms of the sale order; they simply held that the creditor's claims survived and could be pursued against the purchaser.  And that is because of the common-sense notion that a creditor cannot be bound by an order that did not address its interests in the first place.[57]  For example, as discussed above, in *Savage Industries*, the terms of the sale that

---

[57] As addressed above, *Manville IV* deals with an order approving a settlement rather than a 363 sale order and involved a situation where orders approving a settlement between the estate and its insurer several years earlier were interpreted to preclude Chubb's direct claims against Travelers.  Chubb, who challenged the settlement order for

barred the claimant's successor liability claim against the purchaser were privately negotiated *subsequent* to the sale order; they were ***not*** court-approved, and never addressed successor liability.  43 F.3d at 717.  Thus, there was nothing in that sale order to revoke or unwind under Rule 60(b).   The order that the *Savage Industries* court ultimately determined was not enforceable as to the claimant was the bankruptcy court's subsequent injunction of the claimant's prosecution of successor liability claims.  The court there did not determine that the sale order was unenforceable as to the claimant; it merely held that its successor liability claims survived under those facts.

Likewise, in *Metal Foundations Acquisition, LLC v. Reinert (In re Reinert)*, 467 B.R. 830, 831-32 (Bankr. W.D. Pa. 2012), the court specifically stated that the basis for its decision that the un-notified creditor was not bound by the sale order was that there was no determination made in connection with the sale order that the property at issue (domain names) was actually owned by the estate:  "Nothing in the Sale Motion itself sought a determination or declaratory judgment that the bankruptcy estate actually owned the unspecified domain names at issue.  As a result, Baha is not bound by the terms of the order approving the Sale Motion (because there is no affirmative relief contained in it which consists of a determination of Baha's rights vis-à-vis the estate's interest)."  *Id.* at 832.

And, as discussed in New GM's Opening Brief, the decision in *Grumman* is inapposite because it involved "future" claims by claimants who were unidentifiable at the time of the sale order and who had no relationship with the debtor.  467 B.R. at 706-07.  These future claims were not viewed as "claims" under the Bankruptcy Code.  *Id.*; s*ee also Schwinn Cycling & Fitness Inc. v. Benonis*, 217 B.R. 790 (N.D. Ill. 1997) (same).  Of course, that issue is not present

---

lack of notice, did not hold a claim against the estate and instead sought to pursue its own claim based on the independent wrongdoing of Travelers.  *See* 600 F.3d at 153.

in this case because New GM assumed the *Grumman* type claim (*i.e.*, a post-sale accident claim).[58]  Moreover, Plaintiffs concede that their Pre-Sale Consolidated Complaint claims are not future claims, thus rendering *Grumman* entirely inapplicable.  And, with respect to their Post-Sale Consolidated Complaints, while Used Car Purchasers were not known as of the 363 Sale, they are nevertheless not future creditors in the manner discussed in *Grumman*.  The original owners of the used vehicles were known to Old GM and they had a legal relationship with Old GM.  When Used Car Purchasers bought their Old GM vehicles, that did not create a new legal relationship with New GM.  In other words, a Retained Liability remained so, notwithstanding any subsequent transfer of an Old GM vehicle.

Moreover, all of Plaintiffs' cases involve either a single creditor or a very limited number of creditors.  They do not, as here, involve a purported class of claimants with as-of-yet unquantifiable claims.  There are over 140 class action lawsuits currently pending against New GM, with more being filed.  Potentially millions of Old GM vehicle owners purport to assert economic loss claims against New GM.  If excepting a single creditor from the Sale Order and Injunction would effectively rewrite the Order, as the Court held in *Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 430 B.R. 65, 81-82 (S.D.N.Y. 2010) (finding that rewriting terms of Sale Order to place on New GM responsibility to pay Parker would "knock the props out from under the authorization for every transactions that have occurred since the sale was consummated"), there can be no doubt that excepting this large amorphous class from the Sale Order and Injunction would do so as well.  The entire package of consideration for the 363 Sale was extensively negotiated and finalized on the condition that New GM would be responsible

---

[58]  For this reason, the GUC Trust's reliance on *In re Kewanee Boiler Corp.*, 198 B.R. 519 (Bankr. N.D. Ill. 1996) is also misplaced.  There, the claimant was injured by an allegedly defective boiler many months after the debtor's plan was confirmed, and the debtor had made no attempt to provide future tort creditors with a special representative.  In contrast, here, New GM agreed to assume these types of post-sale accident product liabilities.

only for "Assumed Liabilities"—not the unquantifiable potential liabilities for the alleged economic loss claims at issue here. Converting these alleged claims against Old GM into "Assumed Liabilities" would rewrite the Sale Agreement.

## C.    Plaintiffs' Proposed Remedy Would Be Improper In This Case

### 1.    Plaintiffs' Proposed Remedy Is At Odds With Governing Case Law

Plaintiffs' requested remedy—a "determination that [Plaintiffs] are not bound by [the] terms [of the Sale Order]" but that other creditors continue to be bound by it—should be rejected. Accident Plaintiffs' Brief, at 41. Contrary to Plaintiffs' contention, ample governing precedent, including long-standing Supreme Court precedent, provides that Plaintiffs' proposed remedy is inappropriate in the circumstances of this case. The Supreme Court addressed this issue in *Factors' & Traders' Insurance Co. v. Murphy*, 111 U.S. 738 (1984). Like Plaintiffs here, the creditor there argued "[t]hat the [free and clear] sale under the order in bankruptcy ***was not binding on her***, because she was not made a party to the proceeding and ***had no notice of it***, while it was binding on all the other lienholders whose liens were thereby discharged." *Id.* at 740 (emphasis added). The Court *rejected* that proposed remedy as untenable. *Id.* at 741 ("[I]t is impossible to shut one's eyes to the injustice of the [creditor's remedy]."). As the Court explained, the creditor could not "affirm th[e] sale as free from all incumbrances except her own, thereby assuming the benefit of a decree to which she was not a party [for lack of notice], while denying its obligation on herself, without which the decree would not have been made." *Id.* at 743. The Court concluded, therefore, that the creditor's proposed partial revocation remedy was improper: "[I]t is not possible . . . to hold that this sale discharged part of the liens against the property, and increased thereby the value of other liens at the expense of the purchasers." *Id.*

Likewise, numerous other courts have rejected a creditor's attempt to be treated as exempt from a 363 sale order. *See, e.g.*, *Douglas v. Stamco*, 363 F. App'x 100, 102 (2d Cir. 2010) (rejecting plaintiff's attempt to assert successor-liability claim against buyer as contrary to the sale order); *In re Trans World Airlines, Inc.*, 322 F.3d 283, 292-93 (3d Cir. 2003) (holding that "[t]o allow claimants to assert successor liability claims against [the buyer] while [applying the sale order to] other creditors . . . would be inconsistent with the Bankruptcy Code's priority scheme"); *In re Fernwood Markets*, 73 B.R. 616, 621 (Bankr. E.D. Pa. 1987) (holding that a sale order cannot simply be held inapplicable to creditor who did not receive notice of sale; sale order cannot "be valid, or 'reaffirmed,' as to one lienholder and not to another");[59] *Molla*, 2014 WL 2114848, at *5 (rejecting creditor's argument that he should be exempt from sale order because he did not receive notice of sale); *see also Morgenstein*, 462 B.R. at 497 (rejecting creditor's argument that "the Court can cherry pick, or otherwise choose, the components of [a] confirmation order that the Court desires to revoke").

Plaintiffs try to distinguish *Douglas*, *Trans World* and *Molla* on the basis that these cases did not involve due process violations. For starters, Plaintiffs are incorrect as to *Molla*, which involved inadequate due process notice to a creditor. *Molla,* 2014 WL 2114848, at *2 ("Plaintiffs emphasized that . . . they never received adequate due process notice of the bankruptcy proceedings."). And although *Douglas* and *Trans World* did not involve due process violations, those cases amply support the broader point that selective non-enforcement of a 363 sale order is an improper remedy regardless of the context.

---

[59] The GUC Trust incorrectly states that "no Court in the Second Circuit has embraced th[e] aspect of *Fernwood*" rejecting a partial revocation remedy. GUC Trust Brief, at 36 n.16. Not only did the Supreme Court reject a partial revocation remedy in *Factors*' *v. Murphy*, by which courts in this Circuit are bound, but the Second Circuit prohibited a creditor from evading a 363 sale order in *Douglas v Stamco*. In any event, as shown above, none of the cases the GUC Trust cites as authorizing a partial revocation remedy control the remedy question here.

Finally, Plaintiffs cannot have it both ways.  They seek to obtain the benefits that New GM agreed to provide under the Sale Agreement (*i.e.*, the repair obligation under the recall covenant) but avoid the other provisions of the Sale Order and Injunction.  That clearly is not appropriate under any circumstance, but is especially unfair to New GM, a good-faith purchaser for value who was never responsible for any alleged due process violation.

### 2. Plaintiffs' Proposed Remedy Would Impermissibly Rewrite The Sale Order And Injunction

Independently, the Sale Order and Injunction expressly prohibits the partial revocation remedy that Plaintiffs seek.  As explained in the New GM Opening Brief, the Sale Order and Injunction's integration clause provides that all of its terms are non-severable and mutually dependent on each other, and it prohibits changing or partially revoking the Order's terms.  *See* New GM Opening Brief, at 25, 51, 55 (citing Sale Order and Injunction, ¶ 69).  Plaintiffs' only response is that exempting certain creditors from the Sale Order and Injunction (which they request) is somehow materially different from changing that Order (which they concede is impermissible).  *See* Accident Plaintiffs' Brief, at 41-43 (stating these are "two distinct concepts").[60]  This is formalistic double-talk.  There is no difference between partially revoking/amending the Sale Order and Injunction so as to render it inapplicable as to certain creditors and entering an order holding the Sale Order and Injunction inapplicable to those

---

[60]  Plaintiffs cite *In re Johns-Manville Corp.*, 759 F.3d 206 (2d Cir. 2014) ("**_Manville V_**"), in support of their argument that exempting certain claimants from a sale order does not amount to rewriting that order.  But *Manville V* only concerned whether certain conditions precedent had been satisfied in connection with a previous agreement. One of those conditions concerned whether the breadth of an injunction met the requirements in the parties' agreement.  The insurer (Travelers) argued that, based on the Second Circuit's holding in *Manville IV*, the condition did not occur because Chubb was permitted to maintain a suit against Travelers.  *Id.* at 216-18.  The Second Circuit disagreed, reasoning that sophisticated parties would not have bargained for an impermissible injunction.  *Id.* at 215-16.  Here, in contrast, the Sale Order and Injunction can be enforced to bar Plaintiffs' claims against New GM consistent with due process.  A 363 Sale is different than a plan injunction which extinguishes the claim.  Moreover, Plaintiffs concede they are not future claimants.  As a result, *Manville V* in no way supports Plaintiffs' argument that exempting claimants from a sale order (especially a large amorphous class of claimants like Plaintiffs here) does not constitute an amendment or partial revocation of the order.

creditors.  In both situations, the effect is the same—to remove the Plaintiffs' claims from the

scope of the Order.  *See Parker*, 430 B.R. at 81 (holding that plaintiff's request that he be

exempted from Sale Order and Injunction was the same as a request that "the terms of a carefully

negotiated [Sale Order] **be rewritten** to place on New GM the responsibility to pay [him]")

(emphasis added)); *Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 428

B.R. 43, 60-62 (S.D.N.Y. 2010) (refusing to enter order that would "rewrite," "unravel," or

"carve out" any provisions from the "integrated terms of this extensively negotiated

transaction"); New GM Opening Brief, at 25, 54-55;[61] *cf. Morgenstein*, 462 B.R. at 504 ("The

Morgenstein Plaintiffs further contend, or at least imply, that they are not seeking 'partial

revocation,' but instead are seeking 'limited revocation,' or 'carefully crafted' revocation.  That

is simply a play on words. Aside from the lack of distinction in any of the alternative

euphemisms that the Morgenstein Plaintiffs choose to describe the relief they seek, the

underlying goal, and problem, remains the same.").

### 3.    <u>Plaintiffs' Proposed Remedy Would Give Them An Improper Windfall</u>

Plaintiffs also fail to meaningfully respond to New GM's argument that allowing

Plaintiffs to partially revoke the Sale Order and Injunction, while continuing to enforce that

Order against other creditors, would give Plaintiffs an improper windfall.  *See* New GM Opening

Brief, at 55 & n.25.  As the court in *Fernwood* explained:

> [A]llowing [a creditor who did not receive notice of a 363 sale] to . . . pursue a
> claim against the [buyer] while requiring other lienholders, who may be senior to
> [that creditor], to resort to the sale proceeds just because of the fortuitous
> circumstance that [this creditor] failed to get proper notice of the sale would be
> to provide [the creditor] with an unjustified and unjustifiable windfall.

---

[61]  Plaintiffs say *Campbell* and *Parker* are not the law of the case because that doctrine "applies within the confines
of one action only and does not apply to new proceedings."  Economic Loss Plaintiffs' Opposition, at 68 n.76.  This
argument, however, is at odds with the Second Circuit's decision in *In re PCH Associates*, 949 F.2d 585, 592 (2d
Cir. 1991), which held that "[w]hile the [law of the case] doctrine is ordinarily applied in later stages of the same
lawsuit, it also has application to different lawsuits between the same parties."

73 B.R. at 621; *see also Douglas*, 363 F. App'x at 102 (holding, in 363 sale case, that "[a]llowing the plaintiff to proceed with his tort claim against [the buyer] would be inconsistent with the Bankruptcy Code's priority scheme because plaintiff's claim is otherwise a low-priority, unsecured claim"); *Trans World*, 322 F.3d at 292 (same). Plaintiffs' only response is to claim that they "did not choose to have their due process rights violated." Accident Plaintiffs' Brief, at 46-47. Plaintiffs miss the point. Neither did New GM seek to enter into a transaction where it did not obtain what it bargained for. The issue is not whether Plaintiffs chose to have their due process rights violated, but whether the remedy they propose for that alleged violation would give them an unjustified windfall in violation of the Bankruptcy Code's priority scheme. As expressly held in *Fernwood*, *Douglas*, and *Trans World*, Plaintiffs' proposed remedy would do exactly that.

**D.      Plaintiffs' Remedy Should Be To Seek A Recovery From The
         Proceeds Of The Sale, Just As Other Creditors Of Old GM Have Done**

As a general matter, where a debtor fails to give a creditor notice of a 363 sale in violation of due process, the court may grant the creditor one of two remedies: (1) in extreme circumstances where no notice is provided, the court may void the entire sale, place all the parties back to square one and do it over, thereby enabling the un-notified creditor to participate in a proper sale proceeding, or (2) the court may allow the creditor to seek a recovery from the proceeds of the sale. *See* New GM Opening Brief, at 52, 56; *see Factors*, 111 U.S. at 742-43; *Cedar Tide*, 859 F.2d at 1128; *Fernwood*, 73 B.R. at 621.

**1.      Plaintiffs Do Not Seek The Remedy Of Voiding The
         Entire Sale, And That Remedy Is Unavailable In Any Event**

Plaintiffs have not requested, and indeed have disavowed, the remedy of voiding the entire sale to New GM, and for good reason. As New GM aptly demonstrated in its Opening Brief, at this late date, it would not be possible to "undo" the 363 Sale, and any challenge

seeking to overturn the Sale Order and Injunction is equitably moot. *See* New GM Opening Brief, at 24-25, 54; *see also Parker*, 430 B.R. at 80-83 ("[T]he 363 Transaction . . . has been consummated, with all of the attendant consequences of transferring and transforming a multibillion dollar enterprise, including its relationship to third parties, governmental entities, suppliers, customers and the communities in which it does business. The doctrine of equitable mootness thus applies."); *In re BFW Liquidation, LLC*, 471 B.R. 652, 673 (Bankr. N.D. Ala. 2012).[62]  Thus, because the remedy of voiding the entire sale is off the table, the proper remedy for any due process violation in this case is to allow Plaintiffs to pursue a recovery against the proceeds of the sale.

> **2.    Allowing Plaintiffs To Pursue A Recovery Against
> The Sale Proceeds Is A Proper And Adequate Remedy**

Contrary to Plaintiffs' argument, there is ample authority for the proposition that, where a creditor fails to receive constitutionally adequate notice of a 363 sale, the proper remedy is to permit the creditor to pursue a recovery against the proceeds of the sale. *See* New GM Opening Brief, at 56.  Indeed, the two Circuit Courts of Appeals to have considered the issue have approved this remedy. *Conway v. White Trucks*, 885 F.2d 90, 96-97 (3d Cir. 1989); *In re Edwards*, 962 F.2d 641, 643-45 (7th Cir. 1992).  In *Conway*, the Third Circuit rejected the argument that a creditor in a bankruptcy sale case "should be able to sue [the buyer], despite the availability of a remedy against [the debtor], because he had no notice of any of the relevant bankruptcy proceedings." 885 F.2d at 96.  The Court explained that "if [the creditor's] notice

---

[62]  Remarkably, the Economic Loss Plaintiffs contend that the *BFW Liquidation* opinion "was not a sale 'free and clear' of liens and interests under Section 363(f), and thus did not implicate the due process standard from *Mullane*." Economic Loss Plaintiffs' Opposition, at 66.  The *BFW Liquidation* decision did arise from a section 363(f) sale of numerous grocery stores' assets along with the assignment and assumption of a large number of store leases as noted not only in the opinion itself but also in the court's docket. 471 B.R. at 669-674.  Notably, the name of the debtor and the case had to be changed from Bruno's Supermarkets, LLC to BFW Liquidation because the §363(f) purchaser, Southern Family Markets, bought the debtor's name.  Moreover, the alleged creditor argued that she had not received proper notice and thus could maintain an action against the good faith purchaser.  The court easily rejected that remedy. *Id.*

argument is meritorious, then he had a remedy against [debtor] ***and the imposition of successor liability on [buyer] is inappropriate as a matter of law***." *Id.* at 97 (emphasis added). So too here. Even assuming Plaintiffs did not receive adequate notice of the 363 Sale, they had a remedy against the proceeds of the sale, and the imposition of successor liability on New GM—a *bona fide* purchaser of Old GM's assets—is "inappropriate as a matter of law." *Id.*[63]

Likewise, in *Edwards*, the Seventh Circuit held that a *secured* creditor who failed to receive notice of a 363 sale could not pursue a claim against the *bona fide* purchaser, but could pursue a recovery against the proceeds of the sale. *See* 962 F.2d at 643-45. As Judge Posner explained, "[t]he law balances the competing interests but weighs the balance heavily in favor of the bona fide purchaser." *Id.* at 643.[64] *Edwards* recognized that voiding a 363 sale order as to an un-notified lienholder would chill asset sales, undermining the policy objectives underlying the Bankruptcy Code to maximize the value of a bankrupt estate for creditors and to appropriately prioritize creditor recovery. *See id.* at 643-44; *see also In re Lehman Bros. Holdings, Inc.*, No. 08-13555, 2014 WL 7229473, at *13 (S.D.N.Y. Dec. 18, 2014) ("Strong policy reasons exist to protect a purchaser of [bankruptcy] estate assets from future litigation costs."). That is why Section 363(m) expressly prohibits modification of an un-stayed sale order on appeal for a good faith purchaser. While Plaintiffs contend that Section 363(m) policy considerations are inapplicable here because that Code section applies only to appeals, remarkably, the case they cite to support their argument—*Tri-Cran, Inc. v. Fallon (In re Tri-Cran, Inc.),* 98 B.R. 609 (Bankr. D. Mass. 1989)—stands for the ***exact opposite*** proposition. Economic Loss Plaintiffs'

---

[63]   It is irrelevant whether Plaintiffs now, as compared to just after the 363 Sale, had a remedy against Old GM and the 363 Sale proceeds. New GM was not responsible for how the 363 Sale proceeds were disbursed by Old GM.

[64] Although the decision in *Citicorp Mortgage, Inc. v. Brooks (In re Ex-Cel Concrete Co.)*, 178 B.R. 198 (9th Cir. B.A.P. 1995), contained *dicta* critical of *Edwards*, the holding in that decision is fully consistent with *Edwards*. The buyer in *Ex-Cel Concrete* was *not* a *bona fide* purchaser (*id.* at 201-02 & n.6), and *Edwards* was clear that its holding applied only to *bona fide* purchasers (like New GM). Likewise, *Polycel* is distinguishable because, among other things, the debtor there had no right to sell the claimant's property.

Opposition, at 69. Though *Tri-Cran* stated that Section 363(m) itself did not apply because the issue was not brought on an appeal but rather pursuant to a Fed. R. Civ. P. 60 motion,[65] the court explicitly held that the *policy* underlying Section 363(m) nonetheless applied and then *rejected* the claimant's attempt to void the sale order:

> Nonetheless, the policy [Section 363(m)] implements **is as relevant and as applicable to a motion to set aside a sale as it is to an appeal from an order authorizing a sale**. In deciding whether to grant the equitable relief the Trustee seeks, the Court recognizes that the finality of bankruptcy sales serves an important policy of the Bankruptcy Code. ***Therefore, even if section 363(m) does not itself apply to the Trustee's cause of action, the policy and the rule it states must be respected.*** The Court cannot and will not vacate the sale to Fallon, which was not stayed, unless the Trustee alleges and proves that Fallon was not a purchaser in good faith.

*Tri-Cran, Inc.*, 98 B.R. at 618 (emphasis added). In light of the court's holding in *Tri-Cran*— that is, that the policy underlying Section 363(m) holds true, even outside of the appeal context—it is clear that Section 363(m) can be considered in fashioning an appropriate remedy for inadequate notice of a 363 sale. *See also Edwards*, 962 F.2d at 645 ("The strong policy of finality of bankruptcy sales embodied in section 363(m) provides, in turn, strong support for the principle that a bona fide purchaser at a bankruptcy sale gets good title[, and t]he policy would mean rather little if years after the sale a secured creditor could undo it by showing that . . . he hadn't got notice of it.").[66]

---

[65]  Plaintiffs tap dance around what statutes, procedural or otherwise, apply. To avoid the burden under Fed. R. Civ. P. 60(b), they claim resort to Fed. R. Civ. P. 60(b) is unnecessary. But to avoid cases holding that Section 363(m) prohibits the invalidation of a sale order, even in the wake of a due process violation, they cite cases saying Section 363(m) is inapplicable where a motion is brought under Fed. R. Civ. P. 60(b). They have created a "Catch-22" situation for themselves.

[66]  The GUC Trust attacks a straw-man when it accuses New GM of arguing that its proposed remedy should be adopted because bankruptcy policy objectives should "supplant" the Due Process Clause. GUC Trust Brief, at 38. New GM argues nothing of the sort. What GM does argue is that allowing Plaintiffs to pursue a recovery against the proceeds of the sale is an adequate and appropriate remedy for the alleged due process violation, as numerous courts have determined. New GM notes further that bankruptcy policy objectives fully support this remedy and, conversely, is contrary to Plaintiffs' proposed partial revocation remedy.

In keeping with *Conway*, *Edwards* and the bankruptcy policy objectives outlined above, other courts agree that recovering against the proceeds of a bankruptcy sale is an appropriate remedy for a due process violation.  *See, e.g.*, *Factors'*, 111 U.S. at 742 (due process violation can be remedied by allowing creditor "to accept such a part of the sum for which the property sold as her two notes would entitle her to"); *Molla*, 2014 WL 2114848, at *4-5 (holding that 363 sale order barred creditor's claim against buyer despite fact that creditor did not get notice of sale); *Fernwood*, 73 B.R. at 621 (creditor who did not receive notice may "attempt to attach its lien to the proceeds" of the 363 sale).

Although the Second Circuit has yet to expressly weigh in on this exact remedy question (*see Lehman Bros.*, 2014 WL 7229473, at *11 n.16 (noting "[t]his question is open in our Circuit")),[67] there is every reason to believe that it would agree with *Conway*, *Edwards* and the other cases cited above.  Indeed, in *MacArthur*, the Second Circuit declared that recovering against the proceeds of a bankruptcy sale provides an aggrieved creditor with an adequate remedy: "It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third-party is ***adequately protected if his interest is assertable against the proceeds of the disposition***."  *MacArthur*, 837 F.2d at 94 (emphasis added).

Contrary to Plaintiffs' contention, affording the recognized remedy to Plaintiffs is not inequitable at all.  Absent the 363 Sale, Plaintiffs would have had to pursue a recovery against Old GM's assets, and would have recovered nothing.  By virtue of the 363 Sale, Old GM captured its going concern value to provide a meaningful recovery for its creditors. *See, e.g.*, *Edwards*, 962 F.2d at 642; *Paris Indus.*, 132 B.R. at 510 ("[T]he liquidation of the assets and

---

[67]    As demonstrated above, and as reflected in the Southern District of New York's recent *Lehman Brothers* decision, Plaintiffs are wrong that the remedy question in this case is controlled by either the Second Circuit's *Manville IV* decision or *Koepp*.

their replacement with cash . . . has not affected [the creditors'] ability to recover on their claim."); *see also Wolff* Opinion, at 22.

Moreover, Plaintiffs do not contend that the sale price was inadequate, and the Sale Agreement provides for an upward adjustment to the purchase price if allowed claims exceed $35 billion.  Thus, Plaintiffs have a remedy against the Old GM bankruptcy estate.

## III.    OLD GM CLAIM THRESHOLD ISSUE:  CLAIMS ASSERTED IN THE CONSOLIDATED COMPLAINTS ARE RETAINED LIABILITIES OF OLD GM AND NOT ASSUMED LIABILITIES OF NEW GM

The Old GM Claim Threshold Issue is limited to (i) successor liability claims asserted in the Pre-Sale Consolidated Complaint, (ii) economic loss claims asserted in the Post-Sale Consolidated Complaint relating to vehicles or parts originally sold by Old GM, and (iii) damage demands (including punitive damages) asserted in the Post-Sale Consolidated Complaint to the extent predicated on Old GM's conduct.[68]

Plaintiffs' Consolidated Complaints are the operative documents that govern the Old GM Threshold Issue.[69]  The GUC Trust's Brief raises claims and legal theories that are not asserted in

---

[68] The Pre-Closing Accident Plaintiffs never briefed the Old GM Claim Threshold Issue and thus concede that, assuming there was no due process violation relating to the Sale Order and Injunction as it applied to their claims, the claims asserted in the Pre-Closing Accident Cases are Retained Liabilities and cannot be asserted against New GM.

Similarly, the Economic Loss Plaintiffs never briefed the viability of the Pre-Sale Consolidated Complaint in the event the Court finds (as it should) that there was no due process violation as it applied to their claims.  Thus, they concede that if the Court's prior ruling on "no successor liability" remains the law of the case (as it has been for the last five and half years), the claims asserted in the Pre-Sale Consolidated Complaint are Retained Liabilities and cannot be asserted against New GM.

[69]   In the MDL, Judge Furman entered Order No. 29 on December 18, 2014, which, among other things, dismissed without prejudice all economic loss allegations and claims not then included in the Consolidated Complaints, with the right of plaintiffs to seek leave of the District Court to reinstate their allegations or claims upon a showing of good cause within 14 days of dismissal.   *Order No. 29 Regarding the Effect of the Consolidated Complaints*, *In re Gen. Motors LLC Ignition Switch Litig.*, 1:14-md-02543-JMF (S.D.N.Y. Dec. 18, 2014) [Dkt. No. 477] (**Reply Appendix, Exh. "H"**).  The deadline to seek reinstatement has passed, and the only plaintiffs to seek reinstatement are those represented by Mr. Peller.  New GM reserves the right to seek further relief from this Court in the event additional claims are later added to the Consolidated Complaints.

the Consolidated Complaints. Their contentions (as a non-party to the Consolidated Complaints), which contradict the legal theories presented by Plaintiffs, should be disregarded.

In its Opening Brief, New GM explained why the Sale Agreement allocated *all* obligations related to Old GM vehicles and parts. *See* New GM Opening Brief, § III. There was nothing further to be addressed after the 363 Sale. The Sale Agreement specifies the limited categories of Assumed Liabilities; everything else, by definition, is a Retained Liability of Old GM. *See* Sale Agreement, §§ 2.3(a) and (b).

In the following sections, New GM will explain that: (a) this Court has subject matter jurisdiction to enjoin Plaintiffs' claims, (b) under the plain meaning of the Sale Agreement and Sale Order and Injunction, Plaintiffs' economic loss claims relating to Old GM vehicles, parts and conduct are not Assumed Liabilities, but Old GM's Retained Liabilities, (c) Plaintiffs have not pled viable direct claims against New GM based on secondary market sales to Used Car Purchasers, as New GM assumed no independent duties to Used Car Purchasers, and had no alleged relationship with these buyers from which an independent duty could arise; and (d) Plaintiffs cannot circumvent the Sale Order and Injunction by seeking to re-characterize Retained Liabilities related to a defective design as purported violations of New GM's recall covenant obligation.[70]

---

[70] New GM notes that the State of California and the State of Arizona (who are each represented by one of the Lead Counsel in the MDL) commenced Ignition Switch Actions against New GM, and those Actions have been made subject to the Ignition Switch Motion to Enforce. Likewise, other individual actions not subsumed in the MDL Consolidated Complaints (both inside and outside of the MDL) are subject to the Motion to Enforce. *See generally* Supplemental Schedules filed with respect to Motions to Enforce. However, neither the States nor such individual litigants have filed any pleading in response to the Motions to Enforce. Thus, the States and individual litigants presumably are relying on the arguments made by Designated Counsel (who were retained by Lead Counsel).

**A.    Any Successor Liability Theory Is Meritless And
Thus The Claims Contained in the Pre-Sale Consolidated
Complaint And The Pre-Sale Accident Cases Should Be Dismissed**

In its Opening Brief, New GM demonstrated that the Sale Order and Injunction clearly

provided that New GM is ***not*** a successor to Old GM and that New GM did not assume ***any***

successor or transferee liabilities.  *See* New GM Opening Brief, at 63-66.  The Court ruled: "the

law in this Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser

free and clear of successor liability claims, and in that connection, will issue the requested

findings and associated injunction." *Gen. Motors*, 407 B.R. at 506; *see also* Sale Order and

Injunction, ¶¶ AA, BB, DD, 6, 7, 8, 10, 46 and 47; Sale Agreement, § 9.19.

Plaintiffs have stated that regardless of the notice that they received relating to the 363

Sale, there is no reason to modify the Sale Order and Injunction.  *See* Economic Loss Plaintiffs'

Opposition, at 64-65.  Based on that concession, the factual findings in the Sale Order and

Injunction  relating to the structure of the transaction, including the arms-length nature of the sale

transaction, remain unmodified.  Those factual findings firmly establish that there is no viable

basis for Plaintiffs to assert a successor liability claim against New GM.  Thus, under any

circumstance, and regardless of the 363 Sale notice issue, Plaintiffs have no meritorious

successor liability claim against New GM.

The reasoning in *In re Emoral, Inc.*, 740 F.3d 875 (3d Cir. 2014), *cert denied sub nom.*,

*Diacetyl Plaintiffs v. Aaroma Holdings, LLC*, 135 S. Ct. 436 (2014), fully supports this Court's

ruling regarding "no successor liability."  Based on *Emoral*, the "no successor liability" holding

would be binding on Plaintiffs without regard to the type of notice they received regarding the

363 Sale.  That is because successor liability claims, rather than being individual claims of

creditors, are general claims of the bankruptcy estate, such that a debtor can compromise them,

and bind all creditors. *See id.* at 882.  Here, successor liability claims against New GM based on

57

(a) economic losses relating to Old GM vehicles and parts, and (b) pre-Sale accidents, are general, derivative (as compared to individualized) claims, such that Old GM could and did, as part of the 363 Sale, release such successor liability claims (to the extent they ever existed) on behalf of its creditors.

Designated Counsel attempt to distinguish *Emoral* by arguing that courts in the Second Circuit have rejected this argument, but they are wrong.  The Third Circuit in *Emoral* relied on *In re Keene Corp.*, 164 B.R. 844 (Bankr. S.D.N.Y. 1994), a case in this Circuit that represents the prevailing law, which found that "state law causes of action for successor liability, just as for alter ego and veil-piercing causes of action, are properly characterized as property of the bankruptcy estate." *Emoral*, 740 F.3d at 880; *see also In re Alper Holdings USA*, 386 B.R. 441 (Bankr. S.D.N.Y. 2008) (successor liability and alter ego claims were of a generalized nature, and did not allege a particularized injury, and were thus property of the estate).  Moreover, the Second Circuit has found that "[i]f a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." *St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989).[71]

Here, an economic loss claimant and a pre-Sale accident claimant have no better rights than any other Old GM creditor to assert a successor liability claim against New GM.  Such

---

[71] Designated Counsel's reliance on *In re Bernard L. Madoff Investment Securities LLC*, 721 F.3d 54 (2d Cir. 2013) is misplaced.  The Second Circuit noted that its ruling was different than the result in *St. Paul* because, among other things, "[t]he customers' claims against the Defendants are not 'common' or 'general'" and that the "Defendants' alleged wrongful acts . . . could not have harmed all customers in the same way." *Id.* at 71.  But it also noted that the different result was reached in *Fox v. Picard (In re Madoff)*, 848 F. Supp. 2d 469 (S.D.N.Y. 2012): "the court found the claims to be 'general' in the sense articulated in *St. Paul*, in that they arose from a single set of actions that harmed BLMIS and all BLMIS customers in the same way." *Madoff*, 721 F.3d at 71 n.20.

*Ahcom, Ltd. v. Smeding*, 623 F.3d 1248 (9th Cir. 2010) also does not advance Designated Counsel's arguments because the court there found that, under California law, there was no general alter ego claim that could be brought.  If there was a general alter ego claim, the estate's right to pursue it would have been "exclusive." *See id.* at 1250 ("When the trustee does have standing to assert a debtor's claim, that standing is exclusive and divests all creditors of the power to bring the claim.")(citation omitted).

claimants do not have a particularized injury they could assert against New GM as they cannot allege that New GM caused them any direct injury, given that it was Old GM (and not New GM) that manufactured and sold the allegedly defective vehicles and parts.[72]  Any potential successor liability claim would only be based on New GM's status as a purchaser in the 363 Sale, which all unsecured creditors of Old GM commonly shared.   Under such circumstance, any possible successor liability claim was property of the estate and the debtor waived such claim as part of the 363 Sale.  The Court's findings as to the waiver of the successor liability claim were proper and should remain unchanged, notwithstanding the 363 Sale notice issue raised by Plaintiffs.

Specifically, in the Sale Order and Injunction (¶ R), the Court found that "[t]he purchaser is a newly-formed Delaware corporation that, as of the date of the Sale Hearing, is wholly-owned by the U.S. Treasury."  It also found that:

> The Purchaser shall not be deemed, as a result of any action taken in connection with the MPA or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Purchased Assets, to: (i) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with respect to any obligations arising under the Purchased Assets from and after the Closing); (ii) have, de facto or otherwise, merged with

---

[72]  New GM is aware that in a few states there is case law to suggest a "product line" exception to the general rule against successor liability.  This Court ruled in the Sale Decision that such case-law was pre-empted by Section 363 of the Bankruptcy Code.  *See Gen. Motors*, 407 B.R. at 503 n.99.  But even if there were no federal preemption, Plaintiffs have not cited any case to suggest that the product line exception applies to economic loss claims or pre-Sale accident claims like those at issue here. That is no surprise. The product line exception, "is informed by the concept of strict liability and the public policy determination that, if the requirements are met, the burden caused by defective products should fall to the successor rather than the injured party."   William Hao, *The Effects of Bankruptcy Discharge and Sale on Successor Liability Claims*, 17 J. BANKR. L. & PRAC. 3 art. 4 (June 2008). Accordingly, "(w)ith respect to claims sounding in negligence, courts have unanimously declined to apply the product line exception, because the exception was derived from, and limited by principles of strict liability." David J. Marchitelli, Annotation, *Liability of Successor Corporation for Injury or Damage Caused by Product Issued by Predecessor, Based on the "Product Line" Successor Liability*, 18 A.L.R. 6th 629, § 2 (2006); *see id.* § 9.  If the strict-liability-based rationale for the product line exception does not apply to a predecessor's *negligent* conduct, it equally should not impose liability on a successor for a predecessor's alleged violations of consumer protection laws.  That would be true in any case but is particularly so where, as here, the consumer-protection law violations allegedly caused only economic losses (not damage to person or property).   Beyond that, the "paradigm for successor liability for product liability claims is when the injury occurs *after* the sale and *after* the assets of the selling corporation have been distributed."  *See* Ezra H. Cohen, *Successor Liability in § 363 Sales*, AM. BANKR. INS. J. 11, 46 (Nov. 2003) (emphasis supplied). Accordingly, the product line exception has no logical application to liabilities that accrued prior to the 363 Sale and thus no application to pre-Sale accident claims.

or into the Debtors; or (iii) be a mere continuation or substantial continuation of
the Debtors or the enterprise of the Debtors.

Sale Order and Injunction, ¶ 46.

In addition, the Sale Order and Injunction found that the "no successor liability"
determination was binding on all creditors of Old GM, whether such claimants were known or
unknown as of the 363 Sale, whether such claims existed or arose after the sale closing, whether
such claims were fixed or contingent, asserted or unasserted, liquidated or unliquidated. *Id.*,
¶ 48. Plaintiffs have raised no issues to undermine or challenge such findings, which were based
on a solid evidentiary basis and are binding on all creditors including Plaintiffs.

**B.    Claims Predicated On Old GM Vehicles, Parts Or Conduct
Contained In The Post-Sale Consolidated Complaint Should Be Dismissed**

**1.    The Bankruptcy Court Clearly Has Subject Matter
Jurisdiction to Enjoin the Claims Asserted by Plaintiffs**

As this Court previously found, Plaintiffs' argument that the Court does not have subject
matter jurisdiction here simply assumes the conclusion, *i.e.*, that the Sale Order and Injunction
does not in fact enjoin Plaintiffs' claims.[73] As the Court stated in the Elliott No Stay Decision:

> Nor is it an answer for the Elliott Plaintiffs to premise jurisdictional arguments on
> the conclusion they ultimately want me to reach—that upon construction of the
> Sale Order and the Sale Agreement, their claims would be permissible under each.
> That assumes the fact to be decided, in the proceedings the Elliott Plaintiffs wish
> to sidestep. Their argument conflates the conclusion I might reach after analysis
> of matters before me—that certain claims ultimately might not be covered by the
> Sale Order—with my jurisdiction to decide whether or not they are.

Elliott No Stay Decision, at 7. The Supreme Court has clearly stated that a court has special
expertise regarding the meaning of its own orders and therefore its interpretations are entitled to
deference. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 n.4 (2009). Thus, this Court can
review and interpret its own Sale Order and Injunction, and if it determines that Plaintiffs' claims

---

[73] *See Decision With Respect To No Stay Pleading And Related Motion To Dismiss For Lack Of Subject Matter
Jurisdiction (Elliott Plaintiffs)*, dated August 6, 2014 [Dkt. No. 12815] ("**Elliott No Stay Decision**"), at p. 7.

violate the injunction provisions contained in that Order, this Court may enforce it against Plaintiffs.[74]

Moreover, the Court clearly had jurisdiction, pursuant to Section 363(f) of the Bankruptcy Code, to enjoin claims (like Plaintiffs' claims) in connection with a "free and clear" sale with respect to the "res" of the bankruptcy estate, or claims related to the "res." Such an "injunction" is different from an injunction authorized in other sections of the Bankruptcy Code. As such, *Pfizer Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co., Inc.)*, 676 F.3d 45 (2d Cir. 2012) provides no support for Plaintiffs' argument. The issue in *Quigley* concerned an interpretation of the language used in Section 524(g) of the Bankruptcy Code, and an injunction of asbestos-related lawsuits against the parent corporation of the debtor. This matter has nothing to do with Section 524(g). As the District Court noted in *Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 428 B.R. 43 (S.D.N.Y. 2010), the "Second Circuit had cited to the 'free and clear' provision of section 363(f) as analogous authority when initially affirming the channeling injunction, but noted that the Johns-Manville injunctions were distinct from the sort of free and clear injunctions typically authorized by 363(f)." *Id.* at 58 n.18 (referring to *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89 (2d Cir. 1988)).

The argument Plaintiffs now make was in fact raised by the product liability claimants at the Sale Hearing (and rejected), and again in their appeal of the Sale Order and Injunction (also rejected). The District Court found in *Campbell*:

> Appellants challenge the Bankruptcy Court's "colorable" jurisdiction on the grounds that the Bankruptcy Court lacked authority to enjoin their *in personam* successor liability claims under section 363(f). However, at the time the Sale Opinion and Order were issued, the Bankruptcy Court's interpretation and

---

[74] The purpose of Designated Counsel agreeing to the Scheduling Order, entering into Stay Stipulations, and briefing the Four Threshold Issues was precisely for the Court to address these issues. To now suggest the Court does not have subject matter jurisdiction on the issues being briefed, especially after the Court's prior rulings on this issue, is highly improper.

exercise of its authority under section 363(f) was consistent with the opinions of at least three Second Circuit judges—whose ranks have since expanded to include a panel of three different judges who also affirmed the proposition that section 363(f) authorizes the sale of assets "free and clear" of successor tort liability, another Bankruptcy Judge in this District, as well as panels of judges in other circuits including the Third and Fourth Circuits.

428 B.R. at 57-58.  The District Court ultimately held that:

> In light of the foregoing historic and immediate precedent finding bankruptcy courts possessed of such authority pursuant to section 363(f), it is clear that the Bankruptcy Court had more than "colorable" jurisdiction to issue the Sale Order's injunctive provisions providing that the Purchased Assets would be transferred "free and clear of all liens, claims, encumbrances, and other interests ... including rights or claims based on any successor or transferee liability." Sale Order ¶ 7. Indeed, to contend otherwise is simply not a "colorable" argument.

*Id.* at 59.  It is thus clear that Section 363(f) of the Bankruptcy Code provided subject matter jurisdiction to this Court.[75]

Plaintiffs' reliance on *Zerand-Bernal Grp., Inc. v. Cox*, 23 F.3d 159 (7th Cir. 1994), is misplaced because, as the District Court found in *Campbell*, that case is not followed in this District.  *See Campbell*, 428 B.R. at 57 n.17 ("we note that courts in this District have declined to follow the more 'restrictive' interpretation of section 363(f) evinced in *Zerand–Bernal Group*" (citing *In re Portrait Corp. of Am., Inc.*, 406 B.R. 637, 641 (Bankr. S.D.N.Y. 2009)).

Accordingly, the Court has jurisdiction to enjoin claims against New GM that are based on vehicles and/or parts manufactured by Old GM, or that are based on Old GM's conduct.[76]

---

[75]  *See Campbell*, 428 B.R. at 59; *see also In re Tougher Industries, Inc.*, Nos. 06–12960, 07–10022, 2013 WL 1276501, at *6 (Bankr. N.D.N.Y. Mar. 27, 2013) ("A narrow reading of the statute [363(f)] limits the phrase 'interest in such property' to in rem interests. [citation omitted].  The Second Circuit, along with the Third, Fourth and Seventh Circuits, and the First Circuit BAP, however, have applied a more expansive interpretation to include not only in rem interests in property, but also other obligations that may 'arise from the property being sold.'" (citation omitted)); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 582 (4th Cir. 1996) ("Yet while the plain meaning of the phrase 'interest in such property' suggests that not all general rights to payment are encompassed by the statute, Congress did not expressly indicate that, by employing such language, it intended to limit the scope of section 363(f) to in rem interests, strictly defined, and we decline to adopt such a restricted reading of the statute here.").

[76]  The Sale Order and Injunction has been a final order for over five years and it is no longer subject to attack.  Thus, any arguments regarding subject matter jurisdiction can no longer be asserted by Plaintiffs or any other party

**2.      The GUC Trust's Strained Reading
Of Assumed Liabilities Is Erroneous**

The GUC Trust Brief takes great pains to argue that Plaintiffs' claims in the Consolidated

Complaints are Assumed Liabilities, and not Retained Liabilities.  What is perhaps most telling

is that the Plaintiffs themselves—the ones that have actually asserted claims against New GM in

the Consolidated Complaints—do not agree with the GUC Trust's position.  And for good

reason.  Even a cursory review of the GUC Trust's  arguments demonstrate that they are not

well-grounded in law or fact.

**a.      The Provision In The Sale Order And Injunction Regarding The
Assumption Of Certain Product Liabilities Cannot Be Distorted
To Include The Economic Loss Claims Asserted By Plaintiffs**

The GUC Trust Brief selectively quotes from the section of the Sale Agreement that

discusses New GM's assumption of Product Liabilities, and improperly attempts to shoehorn

Plaintiffs' claims into this category of Assumed Liabilities.  *See* GUC Trust Brief, Part III.A.

However, from a review of the entire provision, and this Court's previous opinion interpreting

this provision, it is clear that the GUC Trust is wrong—Plaintiffs' claims are not Assumed

Liabilities.

Section 2.3(a)(ix) of the Sale Agreement provides that Assumed Liabilities include:

> all Liabilities to third parties for death, personal injury, or other injury to Persons
> or damage to property caused by motor vehicles designed for operation on public
> roadways or by the component parts of such motor vehicles and, in each case,
> manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"),

---

in interest in these proceedings.  This is plain from a review of the Supreme Court's decision in *Travelers Indemnity Co. v. Bailey*, 557 U.S. 137 (2009), a decision which **reversed** the very case cited by the Economic Loss Plaintiffs (*i.e.*, *Johns'-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 517 F.3d 52 (2d Cir. 2008)). *See Travelers*, 557 U.S. at 152 ("On direct appeal of the 1986 Orders, anyone who objected was free to argue that the Bankruptcy Court had exceeded its jurisdiction, and the District Court or Court of Appeals could have raised such concerns *sua sponte*.  . . .  But once the 1986 Orders became final on direct review (whether or not proper exercises of bankruptcy court jurisdiction and power), they became res judicata to the 'parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.'" (citations omitted)).

which arise directly out of death, personal injury or other injury to Persons or
damage to property caused by accidents or incidents first occurring on or after the
Closing Date and arising from such motor vehicles' operation or performance[.]

The GUC Trust focuses on the clause "or other injury to Persons," which, according to
them, encompasses the economic losses asserted by Plaintiffs.  GUC Trust Brief, at 40.  This
interpretation ignores the fact that the injuries contemplated by this Section must be "directly"
tied to a vehicle "accident" or "incident"—*i.e.*, a discrete event in which the plaintiff suffered
personal, property, or "other" injuries "caused" by an accident, crash, or other similar "incident."
*See infra* pp. 65-66 (further discussing the meaning of " incidents").  None of the "economic
losses" asserted by Plaintiffs meets this definition.

Beyond that, as noted by this Court in *In re Motors Liquidation Company*, 447 B.R. 142
(Bankr. S.D.N.Y. 2011) ("**_Deutsch_ Decision**"), under the canon of construction known as
"*noscitur a sociis*," "words grouped in a list should be given related meanings." *Id.* at 148
(quoting *Dole v. United Steelworkers of Am.*, 494 U.S. 26 (1990)).  Here, the clause at issue–"or
other injury to Persons"—more appropriately means injuries such as mental anguish, loss of
consortium, or other type of injury that may have been suffered by a person not directly involved
in the accident or incident but that are nonetheless the direct result of the accident or incident.
Pure economic losses—here, claims that vehicles are worth "less" than they should be—are not
related to death, personal injury, damage to property, or any accident or related incident.

The Court should reject the GUC Trust's out-of-context reading of "other injury" for the
additional reason that it cannot be squared with the text of the Sale Agreement and Sale Order
and Injunction as a whole.  Indeed, this interpretation would create a category of Assumed
Liabilities so broad that it would encompass virtually any possible claim related to vehicles and
parts, and therefore render meaningless other provisions in the Sale Agreement and Sale Order
and Injunction that expressly define a Retained Liability.  For example, Old GM expressly

retained liabilities relating to vehicles and parts sold by Old GM with a design defect[77] and

liabilities based on the conduct of Old GM.  But, under the GUC Trust's contorted view, the

"other injury" clause of Section 2.3(a)(ix) would trump this express language and make New

GM liable for, among other things, economic damages allegedly arising from design defects in

vehicles made by Old GM.[78]

Even though the Court has previously found that, based on the canon of construction

"*noscitur a sociis*," the term "incident" must have a similar meaning to the term "accident," (*i.e.*,

that such terms must be "conceptually related") (*see Deutsch* Decision, 447 B.R. at 148), the

GUC Trust makes no attempt to explain how a recall is in any way akin to an accident.  It simply

is not.  Indeed, reference to an "incident"—which refers to a single discrete event (not a lengthy

regulatory process with multiple steps like a recall)—merely prevents the term "accident" from

being interpreted too narrowly.  All vehicle "accidents" are "incidents," but there are a small

category of other collisions or events involving personal injury or property damage that cannot

properly be described as "accidents."  *See, e.g., id.* ("The simple interpretation, and the one this

Court ultimately provides, is that 'incidents,' while covering more than just 'accidents,' are

similar; they relate to fires, explosions, or other definite events that *cause* injuries and *result* in

the right to sue, as contrasted to describing the *consequences* of those earlier events, or that relate

---

[77]  *Trusky*, 2013 WL 620281, at *2.

[78]  *See also* Sale Agreement with respect to Retained Liabilities, § 2.3(b)(xvi) (implied warranties and obligations, and allegation, statement or writing by or attributable to Old GM); § 2.3(b)(xi) (liabilities of Old GM based upon contract, tort or any other basis); Sale Order and Injunction, ¶ AA (liabilities relating to vehicles and parts sold by Old GM with a design defect, and liabilities based on the conduct of Old GM); and ¶ 56 ("The Purchaser is not assuming responsibility for Liabilities contended to arise by virtue of other alleged warranties, including implied warranties and statements in materials such as, without limitation, individual customer communications, owner's manuals, advertisements, and other promotional materials, catalogs, and point of purchase materials.").

to the resulting damages." (emphasis in original)).  "Incident" captures those additional events (and nothing else).[79]

Accordingly, it is clear that Section 2.3(a)(ix) has nothing whatsoever to do with Plaintiffs' economic loss claims.[80]  Such claims are not Product Liabilities as defined in the Sale Agreement and, thus, they are not Assumed Liabilities of New GM, but Retained Liabilities of Old GM.

**b.    New GM's Purchase Of Books And Records Does Not Mean That New GM Somehow Also Assumed Liabilities Merely Set Forth In Those Books And Records**

Contrary to the GUC Trust's argument (GUC Trust Brief, at 41-42), nowhere in the Sale Agreement does it state that New GM assumed liabilities that were ***merely referenced*** in the books and records purchased by New GM.  Such a strained reading would essentially mean that all of Old GM's known liabilities would be Assumed Liabilities, which clearly cannot be the case.  The GUC Trust's interpretation of the Sale Agreement would completely eviscerate Section 2.3(b) of the Sale Agreement, which sets forth numerous categories of Retained Liabilities, many of which are detailed in the books and records purchased by New GM.[81]  For example, as of the Petition Date, 24 tranches of unsecured Old GM debt securities

---

[79] This is consistent with findings made by the Court in its Sale Decision.  *See In re Gen. Motors Corp.*, 407 B.R. 463, 482 (Bankr. S.D.N.Y. 2009) ("[A]n important change that was made in the [Sale Agreement] after the filing of the motion . . . 'broadening the first category [Product Liabilities] substantially, [to] all product liability claims arising from accidents or other discrete incidents arising from operation of GM vehicles occurring subsequent to the closing of the 363 Transaction, regardless of when the product was purchased.").

[80] As noted, Plaintiffs have never made this argument in the Consolidated Complaints or otherwise.

[81] The GUC Trust contends that New GM mistakenly relies on *Burton* because the definition of "Product Liability Claim" in the *Chrysler* sale agreement references product recalls, and the Chrysler estate retained recall claims arising from the sale of products prior to the closing of the Chrysler sale.  GUC Trust Brief, at 42.  This, however, is wrong.  *See* Chrysler Sale Order, ¶ EE.  A copy of the relevant excerpts from the Chrysler Sale Order are contained in the **Reply Appendix as Exh. "I."**  Unlike New GM, New Chrysler actually agreed to take on as assumed liabilities Old Carco's recall obligations related to vehicles manufactured by Old Carco prior to the closing of the sale.  *Id.*  In contrast, New GM's recall obligations were set forth in the covenant section of the Sale Agreement (not the Assumed Liability section).  This distinction is critical since the definition of Retained Liabilities is everything ***not*** an Assumed Liability.

(approximately $22.88 billion in principal amount) were issued and outstanding. These liabilities were referenced in Old GM's books and records. Wilmington Trust Company, which is now the GUC Trust Administrator, was the successor indenture trustee, and never took the absurd position (as it has now) that such liabilities were Assumed Liabilities merely because they were referenced in Old GM's books and records. In sum, the mere purchase of Old GM's books and records does not mean that New GM assumed all liabilities referenced therein.[82]

### 3. Plaintiffs Cannot Avoid The Sale Order And Injunction By Re-Characterizing Their Claims Arising From Old GM Vehicles As Direct Claims Against New GM, As New GM Assumed No Broad Duty To Buyers Of Old GM Vehicles And Plaintiffs Have Alleged No Relationship Between Themselves And New GM From Which Any Such Duty Could Arise

Plaintiffs assert causes of action against New GM in the Post-Sale Consolidated Complaint with respect to Old GM vehicles and parts only for: (i) violations of state law consumer protection statutes; (ii) fraudulent concealment; and (iii) unjust enrichment.[83] Economic Loss Plaintiffs' Opposition, at 70. Plaintiffs either disclaim or do not attempt to justify as permitted against New GM: (1) successor liability claims on behalf of the Post-Sale Plaintiffs; (2) warranty, design defect, negligence, or any other tort or contract claims (other than Assumed Liabilities which they concede are not implicated by their Consolidated Complaints) related to Old GM vehicles; or (3) punitive damages or other remedies based on Old GM conduct.

---

[82]   As a practical matter, the GUC Trust's "books and records" argument does not get them anywhere since Old GM's books and records made no reference to Plaintiffs' alleged claims. *See* Kiefer Decl., **Opening Brief Appendix, Exh. "3**."

[83]   Plaintiffs also state that "[m]embers of the Post-Sale Class who purchased vehicles from New GM also assert causes of action for: (i) violation of the Magnuson-Moss Warranty Act; (ii) breach of the implied warranty of merchantability; and (iii) negligence." Economic Loss Plaintiffs' Opposition, at 70. New GM does not contend that claims based on sales of vehicles manufactured by New GM after the 363 Sale are barred by the Sale Order and Injunction, unless such claims are based on Old GM parts or conduct.

To the extent that the Economic Loss Plaintiffs bring claims on behalf of post-Sale purchasers of Old GM vehicles for "economic losses," these claims arise in connection with Old GM vehicles purchased as used on the secondary market from a third party, wherein New GM is not involved in the sale.

The term "Liabilities" is defined in the Sale Agreement to include known and unknown, disclosed and undisclosed, contingent, unmatured, and undeterminable claims. *See* Sale Agreement, § 1.1. Retained Liabilities are defined as "any Liability of any Seller, whether occurring or accruing before, at ***or after the Closing***, other than the Assumed Liabilities." *Id*., § 2.3(b) (emphasis added). The claims set forth in the Post-Sale Consolidated Complaint relating to Old GM's vehicles, parts and conduct necessarily were liabilities of Old GM. Plaintiffs have conceded that their claims are not Assumed Liabilities. Thus, by definition, Plaintiffs' claims in the Consolidated Complaints relating to Old GM vehicles, parts or conduct are Retained Liabilities.

Plaintiffs attempt to escape the Retained/Assumed Liability dichotomy, and the reach of the Sale Order and Injunction, by characterizing the claims in the Post-Sale Consolidated Complaint as direct claims against New GM, arising from New GM's independent conduct that allegedly violated New GM's duties to the secondary market purchasers of Old GM vehicles. But this attempt fails because New GM simply does not have independent duties to secondary purchasers of Old GM vehicles.[84] Nor did New GM allegedly do anything from which a duty could possibly arise. New GM did not design or manufacture Old GM vehicles. And, New GM did not receive any consideration from the resale to Used Car Purchasers. Thus, any consumer

---

[84]  It bears repeating that the only "duties" to Old GM vehicle buyers assumed by New GM relate to (i) post-sale accidents involving Old GM vehicles causing personal injury, loss of life, or property damage; (ii) liabilities expressly arising from any unexpired portion of the "glove box warranty"; and (iii) Lemon Law obligations as defined in the Sale Agreement. Plaintiffs concede that their "economic loss" claims do not fall within any of these three categories.

protection, fraudulent concealment, or unjust enrichment claim based on a vehicle that Old GM designed, manufactured, and originally sold remains a Retained Liability of Old GM that cannot proceed against New GM.

Tellingly, Plaintiffs do not cite a single case in which a section 363 sale purchaser who did not assume its predecessor's liabilities (or a purchaser in any analogous situation) was held to be "directly" liable in connection with a secondary market sale of a used product initially designed, manufactured, advertised, and sold by the predecessor. Nor do they cite any even remotely analogous case in which a defendant, like New GM, that expressly disclaimed successor liability in a court-approved agreement, and otherwise had no relationship to the challenged consumer transaction, was nevertheless deemed liable to the plaintiff. And New GM is not aware of any such authority.

On the other hand, there is authority—including in at least one jurisdiction cited by Plaintiffs themselves—that even the *initial* manufacturer (*e.g.*, Old GM) has no duty or liability to a plaintiff who acquired a used vehicle in a secondary market transaction. *See Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 149 (Tex. 2004) (noting, in upholding dismissal of claims for fraud, negligent misrepresentation, and violation of the Texas consumer protection statute, that plaintiff "obtained her car from her parents six years after they bought it from [the manufacturer]; [the manufacturer] had no involvement or pecuniary interest in the transaction. There was no evidence of any specific warranty or representation [the manufacturer] ever made to her, ***and no duty to disclose either***." (emphasis added)). If the actual manufacturer like Old GM has no duty to secondary market vehicle buyers, then obviously an entity like New GM that merely purchased assets in a court-approved sale, who did not design, manufacture, advertise, or sell the vehicle has no duty either.

This result is also consistent with the *Burton* court's holding that "the Sale Order bars the claim that New Chrysler breached a duty to warn Old Carco customers that their vehicles had a design flaw." *Burton*, 492 B.R. at 405. Moreover, as stated in *Burton*, "[t]he plaintiffs **or their predecessors** (the previous owners of the vehicles) had a pre-petition relationship with Old Carco, and the design flaws that they now point to existed pre-petition." *Id.* at 403 (emphasis added). Just as in the *Burton* case, Plaintiffs here cannot avoid the Sale Order and Injunction by attempting to re-cast Retained Liabilities purportedly held by owners of Old GM vehicles as claims arising from New GM duties that do not exist.

Furthermore, neither the state consumer protection statutes cited by Plaintiffs nor the law of fraudulent concealment purport to impose liability relating to used, secondary market products upon entities that did not participate in the design, manufacture, advertising, or sale of the product. For example, interpreting the very Pennsylvania case cited by Plaintiffs, the Third Circuit observed, "[a]lthough *Valley Forge Tower*[85] held that strict privity is not always an element of the private cause of action [under the Pennsylvania Unfair Trade Practices and Consumer Protection Law], there is no indication that the court would have extended the private cause of action to a plaintiff lacking any commercial dealings with the defendant."[86] *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 57 (3d Cir. 1992). Similarly, the Vermont, New Jersey,

---

[85] *Valley Forge Towers S. Condominium v. Ron-Ike Foam Insulators, Inc.*, 574 A.2d 641 (Pa. Super. Ct. 1990), *cited at* Economic Loss Plaintiffs Opposition, at 73-74. Moreover, unlike here, *Valley Forge Towers* involved a consumer protection statute claim based on an alleged failure to honor an express written warranty, and the plaintiff condominium association had quasi dealings with the manufacturer of the roof because, although the manufacturer sold the roof through a contractor, the manufacturer gave the plaintiff an express warranty pursuant to contractual terms. *Id.* at 642-43; *see Katz*, 972 F.2d at 57. Here, the owners of Old GM cars are not asserting warranty-based claims, and New GM had no involvement in the manufacture or sale of their vehicles.

[86] The Third Circuit also has ruled that the economic loss doctrine applies to Pennsylvania consumer protection statute and fraudulent concealment claims, barring recovery for purely economic losses including claims that "the product has not met the customer's expectations, or, in other words, that the customer has received 'insufficient product value.'" *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 670-81 (3d Cir. 2002) (quoting *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 872 (1986)); *cf. Adams v. Copper Beach Townhome Communities, L.P.*, 816 A.2d 301, 305 (Pa. Super. Ct. 2003) (citing *Werwinski* favorably in context of another statute).

Texas and Iowa cases cited by Plaintiffs (*see* Economic Loss Plaintiffs' Opposition, at pp 73-74 & n.83) also involved consumer protection claims against defendants who were directly involved in the sale to plaintiffs; they did not find liability against parties who had no role in the transaction. *See e.g., Inkel v. Pride Chevrolet-Pontiac, Inc.*, 945 A.2d 855, 856, 858-59 (Vt. 2008) (customers suing dealership that sold them a truck; statute requires misrepresentation that "affected the consumer's purchasing decision"); *Furst v. Einstein Moomjy, Inc.*, 860 A.2d 435, 438 (N.J. 2004) (customer suing store that sold him carpet);[87] *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 537, 541 (Tex. 1981) (homebuyer suing seller's real estate agent for alleged misrepresentation made to induce sale; statute's applicability limited to "deceptive trade practice made in connection with the purchase or lease");[88] *State of Iowa ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.*, 694 N.W.2d 518, 520-24 (Iowa 2005) (action against camping club that charged and attempted to collect membership dues from owners of interests in campground resort).[89]

---

[87]   Additionally, the New Jersey Consumer Fraud Act claim in *Furst*, unlike here, was based on an alleged breach of an express written warranty, and the defendant did not contest the fact that it violated the Consumer Fraud Act, but only the method of determining damages. *Furst*, 860 A.2d at 439. Moreover, because the New Jersey Product Liability Act provides the sole remedy available under New Jersey law for any claim "for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty," N.J. Stat. Ann. § 2A:58C-1(b)(3), Consumer Fraud Act claims may not be maintained in cases involving products. *See Sinclair v. Merck & Co., Inc.*, 948 A.2d 587, 596 (N.J. 2008).

[88]   Indeed, the Texas Deceptive Trade Practices-Consumer Protection Act does not "reach upstream manufacturers and suppliers when their misrepresentations are not communicated to the consumer" because such sellers are too remote, but rather "the defendant's deceptive conduct must occur in connection with a consumer transaction." *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996); *see Bailey v. Smith*, No. 13–05–085–CV, 2006 WL 1360846, at *11-*12 (Tex. App. May 18, 2006) (holding upstream sellers who did not make misrepresentations to plaintiff at time of transaction not liable for consumer protection statute violation or fraud). Here, with respect to vehicles manufactured and sold by Old GM, New GM is not even in the chain of sale and, thus, is not even a remote upstream seller or anywhere in the commercial "stream" at all. Indeed, New GM did not even exist at the time such vehicles first were sold. For there to be any possibility that New GM has liability arising from the introduction of an Old GM vehicle to the consumer market, New GM must have acquired that liability expressly from Old GM in the Sale Agreement or the Sale Order and Injunction. It unquestionably did not.

[89]   Plaintiffs certainly have no viable claim under the Iowa Consumer Fraud Act because that statute does not provide a private right of action, but only allows the Iowa Attorney General to initiate an action under the statute on behalf of Iowa residents. *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 228 (Iowa 1998). Indeed, the case Plaintiffs cited was itself brought by the Iowa Attorney General.

The law of unjust enrichment likewise cannot reach a purchaser like New GM for claims based on vehicles manufactured and sold by Old GM. Indeed, that law has even less relevance to New GM, as there is no assertion that New GM ever realized (much less unjustly "retained") any financial benefit from vehicles first sold by Old GM and then later re-sold used by third parties to Plaintiffs and putative class members. As explained in New GM's Opening Brief, the Post-Sale Plaintiffs' unjust enrichment claims based on Old GM vehicles are Retained Liabilities of Old GM that may not be brought against New GM. *See* New GM Opening Brief, at 72-73.

Plaintiffs cannot escape the Sale Order and Injunction simply by re-labeling claims otherwise cognizable (if at all) only against Old GM as claims against New GM. Nor should this Court accept Plaintiffs' invitation to pass on any further inquiry to the MDL Court. To do so would permit form to triumph over substance and "artful" pleading to evade (and undermine) this Court's orders and jurisdiction. No matter what Plaintiffs call them, all of the economic loss claims involving Old GM vehicles—violation of state consumer protection statutes, fraudulent concealment, and unjust enrichment—are, *in substance*, Retained Liabilities of Old GM. And, as both this Court and the MDL Court[90] already have recognized, it is for this Court to decide in the first instance whether the Sale Order and Injunction bars those claims.

### 4.    Neither Plaintiffs Nor The GUC Trust Have Asserted, Or Can Assert, Claims Based On A Violation Of The Recall Covenant

The GUC Trust asserts that New GM is "responsible for Plaintiffs' alleged economic losses from New GM's violation of federal recall laws." GUC Trust Brief, at 43. It bases the argument on an alleged violation of the recall covenant contained in the Sale Agreement and Sale Order and Injunction. Critically, Plaintiffs have not asserted such direct claims in the

---

[90]  See Order No. 28, at 1, *In re Gen. Motors Ignition Switch Litig.*, No. 1:14-MD-02543-JMF (S.D.N.Y. Dec. 12, 2014 [Dkt. No. 474] (**Reply Appendix, Ex. "J"**).

Consolidated Complaints.    As noted above, with respect to claims relating to vehicles manufactured by Old GM, Plaintiffs only assert claims against New GM for (1) violation of state law consumer protection statutes; (2) fraudulent concealment; and (3) unjust enrichment.    *See* Economic Loss Plaintiffs' Opposition, at 70.[91]    The claims asserted in the Consolidated Complaints are not anything like the hypothetical claims raised by the GUC Trust.

Moreover, as set forth in New GM's Opening Brief, as a matter of law, individual consumers (and certainly the GUC Trust) do not have standing to seek damages for alleged violations of a vehicle manufacturer's reporting and recall-related obligations under the statutory scheme administered by NHTSA.    Indeed, the Ninth Circuit has held that "Congress did not intend to create private rights of action in favor of individual purchasers of motor vehicles when it adopted the comprehensive system of regulation to be administered by the NHTSA."    *Handy v. Gen. Motors Corp.*, 518 F.2d 786, 788 (9th Cir. 1975) (*per curiam*); *see also Ayres v. GMC*, 234 F.3d 514, 522 (11th Cir. 2000) (holding that the Safety Act confers no private right of action).

Plaintiffs cite the California Unfair Competition Law ("**UCL**") as "proof" that individuals may recover under state law for alleged failures to comply with recall obligations under the Safety Act, but this does not save their argument.    Economic Loss Plaintiffs' Opposition, at 77.    New GM's agreement to fulfill Old GM's duties under the Safety Act with respect to Old GM vehicles is not an Assumed Liability in the Sale Agreement.    *See* Sale Agreement § 2.3.    It is a separate covenant that imposes obligations on New GM which can be enforced only by NHTSA.    *See id.* § 6.15(a).    This covenant does not purport to make New GM liable to ***consumers*** or any other third party for failing to fulfill Old GM's recall obligations.

---

[91]    While Economic Loss Plaintiffs assert that a violation of the Safety Act could form the basis of a claim under a state's consumer protection statute (Economic Loss Plaintiffs' Opposition, at 74-76), no Plaintiff or other party in interest has actually asserted a claim based on a violation of the Sale Agreement, and the recall covenants contained therein.

Nor, as Plaintiffs would have it, does the covenant purport to go a giant step further and make New GM liable under state consumer protection laws like the UCL that allegedly make violations of the Safety Act actionable under state law. If the parties to the Sale Agreement had intended for New GM to assume such a broad new category of liability, they would have said so clearly and in the section of the Sale Agreement devoted to defining Assumed Liabilities. That they did not is fatal to Plaintiffs' argument.

Also, no California appellate court has held that individuals may use the UCL to make an end-run around the standing requirements of the Safety Act that preclude a private right of action. The only federal district court that has so held did so in an opinion that is in tension with both the law of the Ninth Circuit, *see Handy*, 518 F.2d at 786, and the opinion of the only other federal circuit to decide the issue, *see Ayres*, 234 F.3d at 522. *See also McCabe v. Daimler AG*, 948 F. Supp. 2d 1347, 1366 (N.D. Ga. 2013) (plaintiffs could not "overcome" the fact that Congress did not create a private right of action under the Safety Act by "fashioning an alternative [state law] claim that 'is in essence a suit to enforce the statute itself'" (quoting *Astra USA, Inc. v. Santa Clara County, Cal.*, 131 S. Ct. 1342, 1348 (2011))). Beyond that, the district court opinion did not recognize a Safety Act-based cause of action against an entity like New GM that covenanted to comply with the Safety Act in a 363 Sale but did not assume any liabilities to third persons under state law for alleged violations of the Safety Act.

Furthermore, even assuming a violation of the Safety Act could give rise to a private right of action under the UCL and that New GM somehow assumed liability for such actions under the Sale Agreement, Plaintiffs' UCL theory is a red herring that ultimately proves that Plaintiffs' attempt to characterize their claims arising from Old GM vehicles as direct claims against New GM is a sham. Individual plaintiffs may obtain only injunctive relief and restitution under the

UCL, but not damages. Cal. Bus. & Prof. Code § 17203; *Cel-Tech Comm'ns., Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 539 (Cal. 1999). Here, the claimed injunctive relief is moot since the notice and cost-free repairs offered under the recalls have long been underway. And, in the case of vehicles manufactured and sold by Old GM, restitution only can be obtained, if at all, from Old GM. As a matter of law, a claim for restitution only can be brought against a party that unlawfully retained money once belonging to the plaintiff. *See, e.g.*, *Colgan v. Leatherman Tool Grp., Inc.*, 38 Cal. Rptr.3d 36, 61 (Cal. App. Ct. 2006) (California Supreme Court has "made clear that the 'object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest.' . . . These awards are for 'money that once had been in the possession of the person to whom it [is] to be restored.'" (citations omitted)). Plaintiffs and putative class members who purchased Old GM vehicles obviously did not pay New GM anything. And New GM did not allegedly retain or possess any money that once belonged to Plaintiffs. Accordingly, any claim Plaintiffs have for restitution can only be a Retained Liability of Old GM. Plaintiffs' UCL-based theory is yet another transparent attempt to improperly transform a claim against Old GM into a claim against New GM. But Plaintiffs cannot simply change the name of the nominal defendant and invent a viable claim outside the reach of the Sale Order and Injunction.[92]

The GUC Trust asserts that it is a third-party beneficiary of the Sale Agreement, and has authority to seek a remedy for its violation. *See* GUC Trust Brief, at 44 n. 21. As support for this statement, the GUC Trust cites to the Confirmation Order, which provides, in relevant part,

---

[92]  Although Plaintiffs cite a recent remand decision in the MDL Court, Judge Furman did not actually make a substantive finding that the Orange County, California District Attorney (not an individual plaintiff), as a matter of California law, may pursue a state-based UCL claim for New GM's alleged violations of the Safety Act. Instead, Judge Furman, in the context of assessing federal jurisdiction, simply concluded that the allegation that the District Attorney's UCL claim was predicated, in part, on an alleged violation of the Safety Act—"only one small part of multiple [alleged] bases for liability"—was not enough to raise to a substantial federal question and thereby create federal removal jurisdiction. *People of the State of Cal. v. Gen. Motors L.L.C. (In re Gen. Motors Ignition Switch Litig.)*, No. 14cv7787, 2014 WL 6655796, at *7 (S.D.N.Y. Nov. 24, 2014).

as follows:  "Notwithstanding any transfers and assignments of the MSPA-Related Agreements to the Environmental Response Trust, Post-Effective Date MLC and the GUC Trust shall be deemed, and shall be entitled as, a third-party beneficiary to enforce any provision of the MSPA necessary to carry out their respective duties."  Confirmation Order [Dkt. No. 9941], at ¶ 11(b). The GUC Trust tellingly fails to identify what duty it has that would require it to seek a remedy against New GM for a purported violation of the recall covenant in the Sale Agreement.  New GM knows of no such duty, and none has been asserted.

Under the Sale Agreement and Sale Order and Injunction, New GM agreed to comply with the Safety Act, and to conduct appropriate recalls with respect Old GM vehicles.  New GM is complying with its recall obligations by providing free of charge repairs to owners of GM-branded vehicles.  New GM simply did not agree to assume the type of economic loss claims that Plaintiffs assert concerning Old GM vehicles, parts and/or conduct.  No amount of creative word-smithing by Plaintiffs can get around this ultimate fact.

## IV.  THERE IS NO MATERIAL DISPUTE REGARDING THE LEGAL STANDARD FOR "FRAUD ON THE COURT"

The parties generally agree as to the legal standard for "fraud on the court" under Fed. R. Civ. P. 60(d)(3).  As New GM stated in its Opening Brief, "fraud on the court" is:

> only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication.

*Kupferman v. Consol. Research and Mfg. Corp.*, 459 F.2d 1072, 1078 (2d Cir. 1972) (quotation marks omitted).  This same standard was set forth in the other Parties' briefs.  *See* Economic Loss Plaintiffs' Opposition, at 78; GUC Trust Brief, at 45; Groman Plaintiffs Supplemental Brief, at 1.

The issue as to whether a debtor in possession or its officers may be considered an officer of the court for the "fraud on the court" standard, has not been squarely addressed in the Second Circuit. As noted in *In re Trico Marine Services, Inc.*, 360 B.R. 53, 63 n.1 (Bankr. S.D.N.Y. 2006), "[t]he breach of a heightened duty of disclosure may make a fraud finding more likely, but it does not follow that (1) a debtor in possession is an 'officer of the court' within the meaning of the requirements for 'fraud on the court,' (2) the officers of the debtor in possession are also 'officers of the court,' or (3) every isolated perjury by an 'officer of the court' automatically becomes converted into a 'fraud on the court[.]'"[93]

In addition, there is agreement regarding the factors necessary to establish "fraud on the court," which are: "(1) a misrepresentation to the court by the defendant; (2) a description of the impact the misrepresentation had on proceedings before the court; (3) a lack of an opportunity to discover the misrepresentation and either bring it to the court's attention or bring an appropriate corrective proceeding; and (4) the benefit the defendant derived from the misrepresentation." *In re Food Mgmt. Grp., LLC*, 380 B.R. 677, 714-15 (Bankr. S.D.N.Y. 2008) (cited in New GM's Opening Brief, at 77; Economic Loss Plaintiffs' Opposition, at 78; Groman Plaintiffs Supplemental Brief, at 1-2).[94]

As set forth in the New GM Opening Brief (p.78), the failure to disclose pertinent facts relating to a controversy before the court, or even perjury regarding such facts, whether to an adverse party or to the court, does not "without more" constitute "fraud upon the court." The cases cited by Designated Counsel and the Groman Plaintiffs are not to the contrary. *See, e.g., Levander v. Prober (In re Levander)*, 180 F.3d 1114, 1120 (9th Cir. 1999) ("Generally, non-

---

[93]  In any event, who may be considered an officer of the court and in what factual context is not the focus of the "fraud on the court" legal standard briefing.

[94]  While the GUC Trust does not set forth the four factors referenced above, it does cite approvingly to *Food Mgmt. See* GUC Trust Brief, at 45.

disclosure by itself does not constitute fraud on the court" and, "[s]imilarly, perjury by a party or witness, by itself, is not normally fraud on the court.").[95]

No party has disagreed with New GM that the burden of proof in establishing fraud upon the court is on the movant and that the threshold for such burden is "clear and convincing" evidence.  *See* New GM Opening Brief, at 78 (citing *King v. First Am. Investigations, Inc.*, 287 F.3d 91 (2d Cir. 2002)).

While the Groman Plaintiffs take issue with New GM's assertion that the factual predicate for the "fraud on the court" theory is essentially the same as the Plaintiffs' due process argument, the Groman Plaintiffs agree that the factual predicate for the "fraud on the court" theory and the due process theory "overlap[] substantially[.]"  Groman Plaintiffs' Supplemental Brief, at 5.  Designated Counsel also agrees.  *See* Economic Loss Plaintiffs' Opposition, at 80 ("for substantially the same reasons that the Sale Order did not satisfy due process with respect to Plaintiffs, Old GM's evidence regarding its compliance with due process was knowingly or recklessly incomplete and justifies a finding of fraud on the court").

## CONCLUSION

None of the Responses demonstrate that Plaintiffs were denied due process in connection with the 363 Sale.  Moreover, even if they could somehow overcome that burden, Plaintiffs cannot carry their additional burden of demonstrating prejudice—*i.e.*, that the outcome of the 363 Sale would have been any different.  The Responses also do not refute New GM's argument that, in the 363 sale context, the proper remedy for a due process violation—if there was one (and there was not)—would be to penalize the actor that committed that violation (Old GM) and

---

[95] New GM did not contend in its Opening Brief, as the Groman Plaintiffs wrongly assert (*see* Groman Plaintiffs' Supplemental Brief, at 3), that under appropriate facts, nondisclosure and perjury could *never* constitute "fraud on the court."  That is why New GM used the term "without more" in its Opening Brief and why New GM's discussion of the appropriate standard is consistent with *Levander*.

not the good faith purchaser for value (New GM).  The Consolidated Complaints and the Pre-Sale Accident Cases assert claims against New GM that are clearly Retained Liabilities of Old GM.  Such actions unquestionably violate the Sale Order and Injunction, and the Sale Agreement, and should be barred.  Accordingly, the Motions to Enforce should be granted, and Plaintiffs directed to cease and desist from prosecuting their improper claims against New GM.

Dated: New York, New York
      January 16, 2015

Respectfully submitted,


 /s/ Arthur Steinberg
Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

Richard C. Godfrey, P.C. (admitted pro hac vice)
Andrew B. Bloomer, P.C. (admitted pro hac vice)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Attorneys for General Motors LLC*