# Exhibit E

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                         :
In re                                    :      Chapter 11 Case No.
                                         :
MOTORS LIQUIDATION COMPANY, et al.,      :      09-50026 (REG)
        f/k/a General Motors Corp., et al.      :
                                         :
                    Debtors.             :      (Jointly Administered)
                                         :
------------------------------------------------------------x
```

<div style="text-align:center">

**DEBTORS' REPLY IN SUPPORT OF OBJECTION TO**
**PROOFS OF CLAIM NOS. 16440 AND 16441 FILED BY MICHAEL A. SCHWARTZ**

</div>

# TABLE OF CONTENTS

**Page**

Preliminary Statement .................................................................................................. 1

Reply Argument and Authorities .................................................................................. 3

    A.    This Court Should Refuse to Apply Bankruptcy Rule 7023 to the Saturn
Putative Class Claims ........................................................................................ 3

          1.    The Saturn Plaintiffs Failed to Timely Move Under Bankruptcy
Rule 9014 ................................................................................................. 4

          2.    The Saturn Putative Class Claim Was Not Certified Prior to the
Commencement Date ............................................................................... 8

          3.    Adequate Notice of the Chapter 11 Cases and the Bar Date Was
Provided to All Members of the Putative Class ....................................... 9

    B.    The Putative Class Cannot Satisfy the Requirements of Rule 23 ....................... 11

          1.    Numerous Individual Issues Predominate Over Any Common
Questions ................................................................................................. 11

               a)    Individual Factual Issues Predominate with Regard to the
Saturn Plaintiffs' State-Only Consumer Fraud Sub-Classes ....... 12

               b)    Individual Factual Issues Predominate with Regard to the
Multi-State and State-Only Breach of Implied Warranty
Sub-Classes .................................................................................. 14

               c)    Individual Legal Issues Predominate with regard to the
Saturn Plaintiffs' Multi-State Implied Warranty Sub-
Classes .......................................................................................... 16

          2.    A Class Action Is Not Superior to Other Available Methods for
Fairly and Efficiently Adjudicating this Controversy ............................. 18

          3.    The Putative Class Is Overinclusive and Not Ascertainable ................... 21

          4.    "Typicality" Cannot Be Established by the Saturn Plaintiffs ................. 22

Conclusion and Requested Relief ................................................................................. 23

## TABLE OF AUTHORITIES

Page(s)

### CASES

*In re Am. Reserve Corp.*,
  840 F.2d 487 (7th Cir. 1988) ...................................................19

*American Suzuki Motor Corp. v. Superior Court*,
  37 Cal. App. 4th 1291 (1995) ...................................................20

*Bachrach v. Chase Inv. Servs. Corp.*,
  No. 06-2785 (WJM), 2007 WL 3244186 (D.N.J. Nov. 1, 2007)............................21

*In re Bally Total Fitness of Greater N. Y., Inc.*,
  402 B.R. 616 (Bankr. S.D.N.Y.), *aff'd*, 411 B.R. 142 (S.D.N.Y. 2009) ..................3

*In re Bally Total Fitness of Greater N.Y., Inc.*,
  411 B.R. 142 (S.D.N.Y. 2009) ...................................................10

*Barden v. Hurd Millwork Co., Inc.*,
  No. 06-C-46, 2006 U.S. Dist. LEXIS 63926 (E.D. Wis. Mar. 28, 2008) ...............15

*Bassett v. Kia Motors Am., Inc.*,
  212 F.R.D. 271 (E.D. Pa. 2002), *vacated and remanded by*,
  357 F.3d 392 (3d Cir. 2004)......................................................15

*Black Diamond Props., Inc. v. Haines*,
  940 So. 2d 1176 (Fla. Ct. App. 2006) ............................................12, 14

*In re Blockbuster Inc.*,
  ----- B.R. ---, 2011 WL 180035 (Bankr. S.D.N.Y. Jan. 20, 2011)............................3

*In re Bridgestone/Firestone, Inc.*,
  288 F.3d 1012 (7th Cir. 2002), *cert. denied*, 537 U.S. 1105 (2003)......................20

*Castano v. Am. Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996) ......................................................12, 14, 16

*Charron v. Pinnacle Group N.Y. LLC*,
  269 F.R.D. 221 (S.D.N.Y. 2010) ...................................................21

*In re Charter Co.*,
  876 F.2d 866 (11th Cir. 1989), *cert. dismissed*, 496 U.S. 944 (1990).............................4, 5, 6

*In re Chateaugay Corp.*,
  104 B.R. 626 (S.D.N.Y. 1989), *appeal dismissed*, 930 F.2d 245 (2d Cir. 1991) .................4, 5

*Chin v. Chrysler Corp.*,
  182 F.R.D. 448 (D. N.J. 1998) ................................................................................20

*In re Circuit City Stores, Inc.*,
  No. 08-35653, 2010 WL 2208014 (Bankr. E.D. Va. 2010),
  *aff'd*, 439 B.R. 652 (E.D. Va. 2010) .......................................................................7

*Cole v. Gen. Motors Corp.*,
  484 F.3d 717 (5th Cir. 2007) ..........................................................................16, 18

*Compaq Computer v. Lapray*,
  135 S.W.3d 657 (Tex. 2004) ...................................................................................17

*In re Computer Learning Ctrs, Inc.*,
  344 B.R. 79 (Bankr. E.D. Va. 2006) ........................................................................6

*In re Craft*,
  321 B.R. 189 (Bankr. N.D. Tex. 2005) .....................................................................7

*In re Ephedra Prods. Liab. Litig.*,
  329 B.R. 1 (S.D.N.Y. 2005) .........................................................................3, 5, 6, 8

*In re Ford Motor Co. Ignition Switch Prod. Liab. Litig.*,
  174 F.R.D. 332 (D.N.J. 1997) .................................................................................20

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,
  194 F.R.D. 484 (D.N.J. 2000), *reconsideration denied*,
  No. Civ. A. 96-1814 (JBS), 2001 WL 1869820 (D.N.J. Feb. 8, 2001) ...................17

*Ford Motor Co. v. Rice*,
  726 So. 2d 626 (Ala. 1998) .....................................................................................20

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  903 F.2d 176 (2d Cir. 1990), *cert. denied*, 498 U.S. 1025 (1991) .........................22

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982) .................................................................................................12

*Georgine v. Amchem Prods., Inc.*,
  83 F.3d 610 (3d Cir.), *cert. granted by*, 519 U.S. 957 (1996),
  *aff'd*, 521 U.S. 591 (1997) .....................................................................................16

*Graham Hydraulic Power, Inc. v. Stewart & Stevenson Power, Inc.*,
  797 P.2d 835 (Colo. Ct. App. 1990) ........................................................................18

*In re Initial Public Offerings Secs. Litig.*,
  471 F.3d 24 (2d Cir. 2006) ...............................................................................11, 12

iii

*In re Jamesway Corp.*,
    No. 95 B 44821 (JLG), 1997 WL 327105 (Bankr. S.D.N.Y. June 12, 1997)..........................10

*Katz v. Image Innovations Holdings, Inc.*,
    No. 06 CIV 3707 (JGK), 2010 U.S. Dist. LEXIS 73929 (S.D.N.Y. July 22, 2010) ..............11

*Kitzes v. Home Depot U.S.A., Inc.*,
    872 N.E.2d 53 (Ill. App. Ct. 2007) .............................................................................................12

*Lackowski v. Twinlabs Corp.*,
    No. 00-75058, 2001 U.S. Dist. LEXIS 25634 (E.D. Mich. Dec. 28, 2001) ............................15

*Marino v. Home Depot U.S.A., Inc.*,
    245 F.R.D. 729 (S.D. Fla. 2007)........................................................................................12, 14

*Martin v. Amana Refrigeration, Inc.*,
    435 N.W.2d 364 (Iowa 1989) .....................................................................................................15

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
    339 U.S 306 (1950)................................................................................................................2, 10

*In re Musicland Holding Corp.*,
    362 B.R. 644 (Bankr. S.D.N.Y. 2007) .................................................................................6, 19

*Nacci v. Volkswagen of Am., Inc.*,
    325 A.2d 617 (Del. Super. Ct. 1974) .........................................................................................17

*In re Nw. Airlines Corp.*,
    No. 05-17930 (ALG), 2007 WL 2815917 (Bankr. S.D.N.Y. Sept. 26, 2007)............................6

*Ragland Mills, Inc. v. Gen. Motors Corp.*,
    763 S.W.2d 357 (Mo. Ct. App. 1989).........................................................................................15

*In re Sacred Heart Hosp. of Norristown*,
    177 B.R. 16 (Bankr. E.D. Pa. 1995) .......................................................................................8, 9

*Samuel-Bassett v. Kia Motors Am., Inc.*,
    No. 2199 Jan. Term 2001, 2004 Phila. Ct. Com. Pl. LEXIS 149 (Sept. 17, 2004) .................15

*Sanneman v. Chrysler Corp.*,
    191 F.R.D. 441 (E.D. Pa. 2000)..................................................................................................14

*Settlemires v. Jones*,
    736 So.2d 471 (Miss. Ct. App. 1999) .........................................................................................18

iv

*Sikes v. Teleline, Inc.*,
281 F.3d 1350 (11th Cir.), *reh'g denied*, 35 F. App'x 859 (11th Cir.),
*cert. denied,* 537 U.S. 884 (2002) ...................................................................12, 14

*In re Thomson McKinnon Secs Inc.*,
133 B.R. 39 (Bankr. S.D.N.Y. 1991), *aff'd*, 141 B.R. 31 (S.D.N.Y. 1992) ..............6

*In re Tronox Inc.*,
No. 09-10156, 2010 WL 1849394 (Bankr. S.D.N.Y. May 6, 2010) .........................7

*Truckway, Inc. v. Gen. Elec.*,
No. Civ. A. 91-0122, 1992 WL 70575 (E.D. Pa. Mar. 30, 1992)............................13

*Venezia v. Miller Brewing Co.*,
626 F.2d 188 (1st Cir. 1980) ..................................................................................17

*Walsh v. Ford Motor Co.*,
130 F.R.D. 260 (D.D.C.), *reconsideration denied*, 130 F.R.D. 514 (D.D.C. 1990),
*appeal dismissed*, 945 F.2d 1188 (D.C. Cir. 1991).................................................17

*Walsh v. Ford Motor Co.*,
807 F.2d 1000 (D.C. Cir. 1986), *cert. denied*, 482 U.S. 915 (1987) .......................17

*In re Waterman S.S. Corp.*,
157 B.R. 220 (S.D.N.Y. 1993), *remanded to*, 200 B.R. 770
(Bankr. S.D.N.Y. 1996) .......................................................................................9, 10

*Weigner v. City of N.Y.*,
852 F.2d 646 (2d Cir. 1988), *cert. denied*, 488 U.S. 1005 (1989) .........................10

*In re Woodward & Lothrop Holdings, Inc.*,
205 B.R. 365 (Bankr. S.D.N.Y. 1997) ...................................................................18

*In re XO Commc'n's, Inc.*,
301 B.R. 782 (Bankr. S.D.N.Y. 2003), *aff'd*, No. 04 CIV. 01489 LAK,
2004 WL 2414815 (S.D.N.Y. June 14, 2004) ........................................................11

*Ziegelmann v. DaimlerChrysler Corp.*,
649 N.W.2d 556 (N.D. 2002) .................................................................................20

## STATUTES/RULES

11 U.S.C. § 105(a) ....................................................................................................4

11 U.S.C. § 502(c) ...................................................................................................21

Fed. R. Bankr. P. 1015(c) .........................................................................................4

v

Fed. R. Bankr. P. 7023 ............................................................................................1, 3, 4, 6

Fed. R. Bankr. P. 9007 ...................................................................................................4

Fed. R. Bankr. P. 9014 .........................................................................................4, 5, 6, 8

Fed. R. Civ. P. 23 .....................................................................................3, 4, 6, 11, 12, 18, 22

US_ACTIVE:\43618064\07\72240.0639

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

Motors Liquidation Company (f/k/a General Motors Corporation) ("**MLC**") and

its affiliated debtors, as debtors in possession (collectively, the "**Debtors**") file this reply (the

"**Reply**") to the response (ECF 8893-95) (the "**Response**") interposed to their objection dated

December 17, 2010 (ECF 8179-82) (the "**Objection**"), for an order disallowing and expunging

Proofs of Claim Nos. 16440 and 16441 (collectively, the "**Saturn Putative Class Claim**")

brought on behalf of a putative class (the "**Putative Class**") and respectfully represent:

## Preliminary Statement

1.      The Saturn Plaintiffs[1] provide no viable grounds – and cite to no

applicable authority – to defeat the Debtors' request that this Court exercise its discretion to

disallow and expunge the Saturn Putative Class Claim.  The Saturn Plaintiffs' arguments are

defective in three main respects.[2]

2.      First, application of Bankruptcy Rule 7023 to a class proof of claim is

discretionary and should be denied here because allowing the Saturn Putative Class Claim to

proceed would result in prejudice to the Debtors' estates and be unfair to other creditors.

Distributions on account of the asserted Saturn Putative Class Claim for over $300 million would

have to be set aside while the litigation of the Saturn Putative Class Claim grinds on.  Such a

reservation of the Debtors' estates is particularly inappropriate where, as here, the Saturn

Plaintiffs waited *over a year after the Bar Date* to move for the application of Rule 7023, and the

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Objection.

[2] The Saturn Plaintiffs' arguments are defective in other respects as well, but in the interest of brevity and in respect of this Court's time, the Debtors will not refute all of the numerous misstatements of law and fact in Plaintiffs' Response.

1

Putative Class was not certified as a class action by any court prepetition.  ***Indeed, the Saturn Plaintiffs are unable to cite any bankruptcy case within the Second Circuit in which a pre-certification class claim was allowed.***  Without any support, the Saturn Plaintiffs request this Bankruptcy Court to take the extraordinary and unprecedented action of permitting class treatment in these circumstances.  Their request should be denied.

       3.     Second, the notice of these bankruptcy cases and the Bar Date provided to the Putative Class satisfies the requirements of Due Process.  Notice of the chapter 11 filing of General Motors Corporation and the Bar Date was published throughout the United States, and the Bar Date notice and the claim form were, and remain, posted internationally on the MLC website.  (*See* Bar Date Order at 7.)  Courts routinely hold that publication notice to unknown claimants – even pursuant to less extensive notice programs and in lower-profile bankruptcies – is constitutional, "however great the odds that publication will never reach the eyes of such unknown parties."  *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S 306, 317 (1950).  Moreover, even if the law required a notice to provide information about each claimant's specific, potential claims against the bankruptcy estate – *and it does not* – the Saturn Plaintiffs argue that each member of the Putative Class has already sustained expensive engine damage caused by the allegedly defective timing chains, (*see* Resp. at 1-2), and thus, individual class members had more than adequate personal knowledge of a potential claim against the Debtors.  Further, the Debtors would be hard-pressed to find a handful of Americans who were not aware of the chapter 11 filing of General Motors Corporation, including its subsidiary, Saturn, LLC.  Finally, notwithstanding the chance to do so, none of the members of the Saturn Putative Class (save for counsel for the named plaintiffs) filed a claim against the Debtors.  For these reasons,

the notice program satisfies the requirements of Due Process and the Saturn Putative Class Claim

should be expunged.

        4.     Third, the Putative Class cannot meet the requirements of Rule 23 of the

Federal Rules of Civil Procedure ("**Rule 23**").  The cases cited by the Saturn Plaintiffs fail to

support allowance of the Saturn Putative Class Claim here, given the need for individualized

proofs in their case regarding causation, notice, and damages.  Moreover, the Saturn Putative

Class Claim should be disallowed because a class action is not a superior method of adjudicating

this controversy, as the Bankruptcy Rules or National Highway Traffic Safety Administration

("**NHTSA**") procedures both provide more efficient and effective procedures than a class action

device in these circumstances.  For all of these reasons, and those set forth in the Objection, the

Saturn Putative Class Claim should be expunged.

<u>**Reply Argument and Authorities**</u>

**A.**     **This Court Should Refuse to Apply Bankruptcy Rule 7023 to the Saturn Putative Class Claims**

        5.     Application of Rule 7023 to class proofs of claim lies within the sound

discretion of the court.  *See In re Ephedra Prods. Liab. Litig.*, 329 B.R. 1, 5 (S.D.N.Y. 2005).

The Saturn Plaintiffs concede that class treatment of a proof of claim is appropriate only where

the plaintiffs have moved for application of Bankruptcy Rule 7023, and in only two principal

situations:  (i) where a class has been certified prepetition by a non-bankruptcy court; or (ii)

where there has no actual or constructive notice to the class members of the bankruptcy case and

the bar date.  (*See* Resp. at 13-14 (citing *In re Bally Total Fitness of Greater N. Y., Inc.*, 402 B.R.

616, 620 (Bankr. S.D.N.Y.), *aff'd*, 411 B.R. 142 (S.D.N.Y. 2009).)  *See In re Blockbuster Inc.*, --

--- B.R. ---, No. 10-14997, 2011 WL 180035, at *3 (Bankr. S.D.N.Y. Jan. 20, 2011) (Lifland, J.).

Here, the Saturn Putative Class Claim should be expunged because:  (1) the Saturn Plaintiffs

3

09-50026-reg   Doc 12049-5   Filed 01/16/15   Entered 01/16/15 16:50:08   Exhibit E
Pg 12 of 65

failed to timely file their motion for class treatment; (2) the Putative Class was not certified prepetition; and (3) actual or constructive notice has been provided to the Putative Class of these bankruptcy cases and the Bar Date.

1.   The Saturn Plaintiffs Failed to Timely Move Under Bankruptcy Rule 9014

6.     Initially, the Saturn Plaintiffs try to shoehorn into their Response an alleged "cross-motion" under Bankruptcy Rule 9014 for application of Bankruptcy Rule 7023.[3] This belated, reactive "cross-motion" should not save their claim from expunction.

7.     The Bar Date elapsed a year and two months ago, the Saturn Plaintiffs filed their proofs of claim a year and three months ago, and these chapter 11 cases have been pending for over a year and a half.  During this entire period of time, the Saturn Plaintiffs did nothing to seek class treatment.  Only when the Debtors objected to their proof of claim did they seek application of Bankruptcy Rule 7023.

8.     The Saturn Plaintiffs' answer to this inexcusable delay is to rely on a few outdated cases that do not represent the law in this District.  (*See* Resp. at 10-12 (arguing holding of *In re Charter Co.*, 876 F.2d 866 (11th Cir. 1989), *cert. dismissed*, 496 U.S. 944 (1990) was adopted by *In re Chateaugay Corp.,* 104 B.R. 626 (S.D.N.Y. 1989), *appeal dismissed*, 930 F.2d 245 (2d Cir. 1991).)  As this Court recently recognized, a putative class claimant is *not* required

---

[3] As an initial matter, the Saturn Plaintiffs' attempt to have their cross-motion considered out of time is wholly improper, and the Debtors reserve their rights to respond to the alleged cross-motion at a later time in accordance with the Bankruptcy Rules, the local rules of this Court, and the Fifth Amended Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case Management Procedures, dated January 3, 2011 (ECF 8360).  Contrary to the Saturn Plaintiffs' assertion otherwise, the issue of class certification is *not* "now fully briefed and before this Court."  (*See* Resp. at 12.)  As of the date of the filing of this Reply, the Saturn Plaintiffs have not issued a notice of hearing for their alleged cross-motion.  Further, the Saturn Plaintiffs have attached evidence to their alleged cross-motion that the Debtors have not had the opportunity to test, including nine (9) sworn declarations submitted by a purported expert and the Saturn Plaintiffs.  As requested in the Objection (*see* Obj. at 11 n.6), in the event this Court determines to apply Rule 23 to the Saturn Putative Class Claim, the Debtors should have the opportunity to engage in class-certification discovery to test the Saturn Plaintiffs' sweeping, unsubstantiated representations about the nature of the class members' allegations and file an appropriate response to the Saturn Plaintiffs' motion.

to wait until an objection is made to the claim before requesting class treatment in the Southern

District of New York.  (*See* Bench Decision on Apartheid Claimants' Motion for Class

Certification, and on Debtors' Objection to Apartheid Claimants' Underlying Claims at 21-22

(Jan. 28, 2011) (ECF 9026) (the "**Bench Order**"), attached hereto as **Exhibit "A."**)

Specifically, courts in the Southern District of New York have ***rejected*** the holding of *In re*

*Charter Co.*[4]

9.      Although in the past there has been debate among courts as to when a

claim becomes a "contested matter" such that a claimant must seek class treatment, (*see* Bench

Order at 21-22), the issue was squarely addressed by Judge Rakoff five years ago in *In re*

*Ephedra Prods. Liability Litigation*, 329 B.R. at 7.  In that case, Judge Rakoff rejected *In re*

*Charter Co.* and held that claimants had the right to move for class certification from the

moment debtors' chapter 11 petition was filed, and that, in any event, the filing of a proof of

claim constitutes a "contested matter" triggering the court's discretion to apply Bankruptcy Rule

7023 under Bankruptcy Rule 9014.  *In re Ephedra Prods. Liab. Litig.*, 329 B.R. at 7.

10.      Judge Rakoff squarely rejected the view that a claimant was required to

wait to move under Bankruptcy Rule 9014 until the debtor objected to the claim.  He reasoned

that if that were the law, a debtor could "prevent the claimant from asking the bankruptcy court

to apply Rule 23 simply by withholding their objection until the eve of confirmation and then

moving to expunge the class claim on the grounds that applying Rule 23 would unduly delay

---

[4] In *In re Chateaugay Corp.*, the court refused to determine whether an objection was necessary to trigger the
claimant's obligation to file a motion under Bankruptcy Rule 9014, although it "seriously question[ed]" whether *In
re Charter Co.* was correct.  104 B.R. at 632-33.

administration." *Id.* at 6.  Bankruptcy courts in the Southern District – including this Court (*see*

Bench Order at 21-22) – have recognized the *Ephedra* decision as binding on this point.[5]

11.    Indeed, a Bankruptcy Rule 7023 motion "should be filed as soon as

practicable" and should be denied if it comes so late as to prejudice any party.  *See In re*

*Musicland Holding Corp.*, 362 B.R. at 654 (citing *In re Computer Learning Ctrs., Inc.*, 344 B.R.

79 (Bankr. E.D. Va. 2006)).  In fact, the United States Bankruptcy Court for the Southern

District of New York has disallowed class claims where claimants disregarded compliance with

Bankruptcy Rule 9014, specifically recognizing that such claims should not be allowed to "grind

on" while other creditors wait for their anticipated distributions pursuant to a plan of liquidation.[6]

And this Bankruptcy Court recently disallowed class claims because the claimants failed to file

their motion for class certification "at the earliest possible time," when they moved

approximately a year after the Commencement Date and ten months after the filing of their

proofs of claim, and where adjudication of their claims would materially delay distributions to

---

[5] *See, e.g.*, *In re Musicland Holding Corp.*, 362 B.R. 644, 652 (Bankr. S.D.N.Y. 2007) (Bernstein, J.) (where claimants moved for certification before debtor filed claim objection, court noted that claimants "could have made the motion sooner," and "[a]lthough the delay does not automatically disqualify the class claim, it bears on the exercise of the discretion whether to apply Rule 23"); *In re Nw. Airlines Corp.*, No. 05-17930 (ALG), 2007 WL 2815917, at *4 (Bankr. S.D.N.Y. Sept. 26, 2007) (Gropper, J.) ("[T]he reasoning of *Charter* with respect to the procedural issues has been rejected in this district."); *see also id.* (holding "the putative class here bears full responsibility for failing to bring an earlier motion to seek application of Bankruptcy Rule 7023" and further distinguishing *In re Charter Co.* because, in that case, "the putative class had been granted class certification by the court of original instance, and the Court did not consider whether there would have been adverse consequences to the debtors' other creditors from the delay in raising the issue in the bankruptcy court").  The reasoning by this Court, as well as Judges Rakoff, Berstein, and Gropper, is squarely in line with the plain language of the governing rules.  Bankruptcy Rule 7023, by incorporating Rule 23, requires that the class certification decision be made "at an early practicable time."  *See* Fed. R. Bankr. P. 7023; Fed. R. Civ. P. 23(c)(1)(A).

[6] *See In re Thomson McKinnon Secs Inc.*, 133 B.R. 39, 40 (Bankr. S.D.N.Y. 1991) (disallowing class claim for failure to file motion under Rule 9014 because "the costs and delay associated with class actions are not compatible with liquidation cases where the need for expeditious administration of assets is paramount so that all creditors, including those not within the class, may receive a distribution as soon as possible"), *aff'd*, 141 B.R. 31 (S.D.N.Y. 1992).

creditors and materially increase the administrative costs of these chapter 11 cases. (*See* Bench
Order at 3, 22.)

12.     Here, the Saturn Plaintiffs waited even longer:  the Saturn Plaintiffs filed
their proofs of claim a year and three months ago, and these chapter 11 cases have been pending
for over a year and a half.  Indeed, permitting the Saturn Putative Class Claim to proceed as a
class claim on the eve of the March 3rd confirmation hearing would delay the distribution of
over $300 million the Debtors' estates and prejudice other creditors.  *See In re Craft*, 321 B.R.
189, 198-199 (Bankr. N.D. Tex. 2005) (refusing to apply Bankruptcy Rule 7023 where the
"putative class representatives . . . waited too long to seek invocation of Rule 23"); *In re Circuit
City Stores, Inc.*, No. 08-35653, 2010 WL 2208014, at *5 (Bankr. E.D. Va. 2010) (holding
request to apply Bankruptcy Rule 7023 thirteen months after filing claim is "far too late"), *aff'd*,
439 B.R. 652 (E.D. Va. 2010).

13.     In an attempt to minimize their failure to timely move for application of
Bankruptcy Rule 7023, the Saturn Plaintiffs argue that the Saturn Putative Class Claim is "ripe
for Alternative Dispute Procedures, including Mandatory Mediation," (*see* Resp. at 12), that their
counsel has been in "repeated" contact with Debtors' counsel "in order to prepare for
mediation,"[7] and that because Debtors did not indicate that they intended to object to the Saturn
Putative Class Claim, any delay is the Debtors' fault.  (*See* Resp. at 12 n.6.)  These arguments

---

[7] The only evidence of this alleged "repeated" contact submitted by the Saturn Plaintiffs is their claim capping
letters, which were submitted on March 1, 2010, over nine months after the Commencement Date and three months
after the Bar Date.  (*See* Resp. at Ex. B.)  Regardless, the Saturn Plaintiffs' failure to properly prosecute their claims
in these chapter 11 cases because they thought they might engage in alternative dispute resolution procedures does
not excuse them from complying with the Bankruptcy Rules, particularly since no indication was given that
mediation was appropriate under the circumstances.  *Cf. In re Tronox Inc.*, No. 09-10156, 2010 WL 1849394, at *2
(Bankr. S.D.N.Y. May 6, 2010) (denying putative class counsel's request to extend bar date based on plaintiffs'
excuse that they thought it better to wait to file proof of claim on behalf of the putative class until after their
appointment as lead putative class counsel in the underlying lawsuit).

7

miss the mark.  The Debtors never designated the Saturn Putative Class Claim for application of

the alternative dispute resolution procedures, and do not intend to do so, as the Debtors believe

the claim has no value as a matter of law and do not want to waste assets of the estates with

mediation expenses.  More importantly, whether culpability for the Saturn Plaintiffs' failure to

timely move for class certification lies with the Saturn Plaintiffs or not, who is at "fault" does not

matter.  At this point in time, it would be unfair to the Debtors' other creditors to set aside of

$300 million of the Debtors' estates and incur increased administrative costs so that the Saturn

Putative Class Claim could proceed.

       14.     Accordingly, because the Saturn Plaintiffs failed to timely comply with

Rule 9014, the Saturn Putative Class Claim should be expunged.

      2.    <u>The Saturn Putative Class Claim Was Not Certified Prior to the Commencement
Date</u>

       15.     The Putative Class was not certified at the time of the Debtors' chapter 11

filing, and it remains uncertified today.  Courts overwhelmingly refuse to allow class claims

where the putative class was not certified prepetition because of the threat of undue delay and

prejudice to the Debtors' estates and other claimants.  *See In re Ephedra Prods. Liab. Litig.*, 329

B.R. at 5; *In re Sacred Heart Hosp. of Norristown*, 177 B.R. 16, 22 (Bankr. E.D. Pa. 1995).  ***The
Saturn Plaintiffs are unable to proffer any case within the Second Circuit in which a class
claim that was not certified prepetition was allowed,*** and the Debtors have been unable to find a

single case in the Second Circuit granting the unprecedented relief sought by the Saturn Plaintiffs

here.  Lack of prepetition certification of the Putative Class is fatal, and the Saturn Putative Class

Claim should be expunged.[8]

---

[8] Indeed, courts have even refused to permit claims on behalf of classes certified prepetition to proceed in
bankruptcy.  *See, e.g., In re Ephedra Prods. Liab. Litig.*, 329 B.R. at 9.

3.      Adequate Notice of the Chapter 11 Cases and the Bar Date Was Provided to All
Members of the Putative Class

16.      In a desperate attempt to avoid expunction, the Saturn Plaintiffs argue that
the Bankruptcy Court should permit them to prosecute a class claim because the Debtors
purportedly failed to provide adequate notice to the members of the Putative Class.  The sole
basis for their argument that notice was insufficient is that the Debtors "failed to inform putative
Saturn Class members about the existence of their claims regarding the defective Class
Vehicles."  (See Resp. at 14; see also id. at 15.)  But the Saturn Plaintiffs fail to cite a single case
where a bankruptcy court has permitted class treatment of a proof of claim because the absent
class members did not receive actual or constructive notice of the bar date[9], let alone a case
where a bankruptcy court permitted class treatment of a proof of claim because the absent,
unknown class members did not receive *actual notice about the existence of their specific claims*.

17.      The reason for their failure is simple:  the notice was adequate and the
Debtors are not obligated to provide every unknown claimant with a notice that sets forth the
bases for every potential claim they could have against the estates.  Indeed, "the debtor is not
required to search out each conceivable or possible creditor and urge the creditor to file a proof
of claim."  *In re Waterman S.S. Corp.*, 157 B.R. 220, 221 (S.D.N.Y. 1993).  On the contrary, the
law is clear that the proper inquiry in evaluating the adequacy of notice is whether a party "acted
reasonably in selecting means to inform persons affected . . ., not whether each claimant actually

---

[9] The Saturn Plaintiffs cite *In re Sacred Heart* in support of the proposition that "the class device may provide the
only form of notice to [putative class members] and are advisable to utilize" where the notice of a debtors'
bankruptcy and bar date are inadequate. (*See* Resp. at 14.)  But the court *In re Sacred Heart* refused to grant class
treatment of the putative class claim and denied class certification because, as here, the putative class was not
certified prepetition, and because all members of the putative class either received notice of the bankruptcy
proceedings through actual or constructive means.  *See In re Sacred Heart Hosp. of Norristown*, 177 B.R. at * 20
(denying motion for class certification when class not certified pre-bankruptcy and finding no evidence that debtor
excluded or failed to provide proper notice to putative class members).

9

received notice." *In re Jamesway Corp.*, No. 95 B 44821 (JLG), 1997 WL 327105, at *1 (Bankr.

S.D.N.Y. June 12, 1997) (quoting *Weigner v. City of N.Y.*, 852 F.2d 646, 649 (2d Cir. 1988),

*cert. denied*, 488 U.S. 1005 (1989)); *In re Waterman S.S. Corp.*, 157 B.R. at 221.

18. Here, the Saturn Plaintiffs concede that the identities and addresses of the

approximately 391,635 members of the Putative Class are currently unknown, but that they each

were aware that their timing chains had failed, resulting in costly repairs. (*See* Resp. at 9, 16.)

Actual notice to putative members of all the various class claims asserted against the Debtors

could have lead to the actual service upon every person in the United States, as General Motors

Corporation vehicles have been sold and resold to tens of millions of unknown persons around

the world. The Debtors have already published notice internationally and mailed over 1.7

million individual notices, at a cost of over $1.3 million to the Debtors' estates. Notice of the

Bar Date was published internationally, in over 90 countries, in *The Financial Times* (Worldwide

Edition), *The Wall Street Journal* (Global Edition), *USA Today* (Monday through Thursday), *The

New York Times* (National), *Detroit Free Press*, *Detroit News*, *LeJournal de Montreal* (French),

*Montreal Gazette* (English), *The Globe and Mail*, (Canada), and *The National Post*. (*See* Bar

Date Order at 7.) The claim form and Bar Date notice were also published on the MLC website

(www.motorsliquidationdocket.com and www.motorsliquidation.com). Courts in the Southern

District of New York have repeatedly refused to permit class proofs of claim to proceed on a

class basis when members of the class received notice by publication.[10] Further, this Court has

---

[10] *See In re Bally Total Fitness of Greater N.Y., Inc.*, 411 B.R. 142, 146 (S.D.N.Y. 2009) (affirming denial of motion
for leave to file class claim where part of putative class received only publication notice and holding such notice
"was still legally adequate"); *see also In re Jamesway Corp.*, 1997 WL 327105, at *8 (denying class certification in
adversary proceeding even though putative class members alleged they failed to receive notice because "the fact that
these plaintiffs or other Proposed Class members may not have received a Claim Package that was mailed to them or
read published notice of the Bar Date is irrelevant as a matter of due process"); *Mullane*, 339 U.S. at 317 ("[I]n the
case of persons missing or unknown, employment of an indirect ***and even a probably futile means of notification*** is
all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights.") (emphasis

already noted that the bankruptcy filing of General Motors Corporation "got worldwide

attention," and that this Court would "have great difficulty seeing how the notice provided here

could be criticized in any way in an ordinary commercial bankruptcy situation." (Bench Order at

28, 28 n.78.)  Class counsel neither objected to the proposed notice nor provided a list of

additional persons to be served.

      19.    Because the notice of the bankruptcy and the Bar Date was adequate, the

Saturn Putative Class Claim should be disallowed.

**B.    The Putative Class Cannot Satisfy the Requirements of Rule 23[11]**

    1.    <u>Numerous Individual Issues Predominate Over Any Common Questions</u>[12]

      20.    Even if the Saturn Plaintiffs could convince this Court to overlook their

delayed request for class treatment and the lack of precedent to support their request for

certification, the Putative Class could not be certified under Rule 23(b)(3) because common

---

added); *In re XO Commcn's, Inc.*, 301 B.R. 782, 792-93 (Bankr. S.D.N.Y. 2003) (concluding publication of bar date satisfies requirements of Due Process with respect to providing notice to unknown creditors), *aff'd*, No. 04 CIV. 01489 LAK, 2004 WL 2414815 (S.D.N.Y. June 14, 2004).

[11] The Saturn Plaintiffs cite an unpublished district court opinion in support of the proposition that a court determining whether to grant class certification "should refrain from deciding any material factual disputes between the parties concerning the merits of the claims, and should accept the underlying allegations as true." (*See* Resp. at 17 (citing *Katz v. Image Innovations Holdings, Inc.*, No. 06 CIV 3707 (JGK), 2010 U.S. Dist. LEXIS 73929 (S.D.N.Y. July 22, 2010).)  This is not the law in the Second Circuit.  Instead, it is well established that a district judge may certify a class *only after* making determinations that each Rule 23 requirement has been met, and such determination "can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement . . . even a merits issue that is identical with a Rule 23 requirement."  *See In re Initial Public Offerings Secs. Litig.*, 471 F.3d 24, 34, 41 (2d Cir. 2006) ("There is no reason to lessen a district court's obligation to make a determination that every Rule 23 requirement is met before certifying a class just because of some or even full overlap of that requirement with a merits issue.").  Accordingly, in determining whether Rule 23 has been satisfied, this Court should not accept the Saturn Plaintiffs' factual allegations as true absent evidentiary proof that the Debtors have had the opportunity to test through discovery.

[12] In their Response, the Saturn Plaintiffs clarify that they seek certification solely under Rule 23(b)(3), not Rule 23(b)(2).  Despite the Saturn Plaintiffs' claim to the contrary, the Consolidated Amended Complaint also seeks injunctive relief and made class allegations pursuant to Rule 23(b)(2).  (*See* Consolidated Am. Compl. at 107 (seeking injunctive relief); *id.* ¶ 139 (alleging "Defendants acted or refused to act on grounds generally applicable to the Class").)  *See also* Fed. R. Civ. P. 23(b)(2) (class certification appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class").

questions of law or fact do not predominate over individualized issues with regard to the Putative

Class.  *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982) (reversing class certification

when plaintiffs failed to conduct rigorous analysis of differences in law and fact); *In re Initial*

*Pub. Offerings Secs. Litig.*, 471 F.3d at 33 (analysis must be "rigorous").  Accordingly, the

Saturn Putative Class Claim should be expunged.

       a)       ***Individual Factual Issues Predominate with Regard to the Saturn***
                        ***Plaintiffs' State-Only Consumer Fraud Sub-Classes***

       21.       Numerous individual issues exist concerning reliance, causation,

materiality, and damages based on the alleged misrepresentations or omissions that form the

basis of the Saturn Plaintiffs' state consumer fraud claims.  Indeed, "for these reasons, generally,

claims involving allegations of fraud may not proceed as a class." *Black Diamond Props., Inc. v.*

*Haines*, 940 So. 2d 1176, 1178 (Fla. Ct. App. 2006) (reversing certification of class action

because consumer fraud claims required individual testimony to prove misrepresentation and

damages); *see also Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1362-66 (11th Cir.) (certification of

fraud class action vacated because individual issues of reliance and causation predominated);

*reh'g denied*, 35 F. App'x 859 (11th Cir.), *cert. denied,* 537 U.S. 884 (2002); *Castano v. Am.*

*Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996) (class action based on state consumer protection

statutes "cannot be certified when individual reliance will be an issue"); *Kitzes v. Home Depot*

*U.S.A., Inc.*, 872 N.E.2d 53, 62 (Ill. App. Ct. 2007) (individual questions concerning

representations, whether each customer was deceived, and damages predominated in state

consumer fraud action).  In fact, individual fact issues pervade the Saturn Plaintiffs' consumer

fraud claims regardless of whether the claims are based solely on alleged omissions, and not

misrepresentations, as the Saturn Plaintiffs now argue.[13]  *See, e.g.*, *Marino v. Home Depot U.S.A., Inc.*, 245 F.R.D. 729, 737 (S.D. Fla. 2007) (proposed class of Florida consumers not certified in action under Florida Deceptive and Unfair Trade Practices Act because plaintiff could not establish that same omission occurred for every putative class member, necessitating inquiry into individual circumstances of each class member); *Truckway, Inc. v. Gen. Elec.*, No. Civ. A. 91-0122, 1992 WL 70575, at *5, *7 (E.D. Pa. Mar. 30, 1992) (individual issues predominated in state consumer fraud action "[b]ecause not all members of the class would have relied on the alleged fraudulent material omissions and misrepresentation . . . and because a determination of whether each member of the class was defrauded . . . would require each class member to individually prove the issue of reliance and fraud on a case by case basis").

22.      The Saturn Plaintiffs' state consumer fraud claims present a multitude of individual issues concerning, among other things:  whether a misrepresentation or omission occurred; whether each misrepresentation or omission was material; whether each class member purchased a vehicle as a result of such statements or omissions; whether each class member was damaged by the alleged misrepresentation or omission, and if so, how much.[14]  These individual

---

[13] In an attempt to save the Saturn Putative Class Claim from disallowance under Rule 23(b)(3), the Saturn Plaintiffs argue that their fraud claims are not based on misrepresentations, but rather omissions.  (Resp. at 43.)  But the Consolidated Amended Complaint makes numerous, class-wide allegations regarding alleged misrepresentations of fact to the members of the Putative Class that are not suitable for class certification, including, *inter alia*:

- the maintenance schedules state that the Timing Chain on the Class Vehicles required neither inspection nor replacement during the life of the Class Vehicle, (Consolidated Am. Compl. ¶¶ 6-16);

- General Motors Corporation "highlighted the inclusion of a steel timing chain, as opposed to a rubber timing belt, in Saturn vehicles as a selling point in the marketing materials," (*id.* ¶ 52);

- "Saturn dealers routinely proclaimed the virtues of a steel timing chain in the Class Vehicles," (*id.* ¶ 52); and

- the dealership informed a member of the Putative Class that "the timing chain was supposed to be no maintenance and didn't even need to be checked until 100,000 miles," (*id.* at 42).

[14] Even the bare-bones declarations of the Saturn Plaintiffs demonstrate the divergent factual issues underpinning each claim with respect to damages, including whether the Class Vehicle had been repaired or rendered inoperable, the amount of damages, and whether there are consequential damages aside from repair or the cost of the vehicle.

issues defeat the factual predominance requirement for class certification of the Saturn Plaintiffs'

fraud claims.  *See Black Diamond Props.*, 940 So. 2d at 1178; *Sikes*, 281 F.3d at 1362-66;

*Castano*, 84 F.3d at 745; *Marino*, 245 F.R.D. at 737.

       b)    ***Individual Factual Issues Predominate with Regard to the Multi-State and State-Only Breach of Implied Warranty Sub-Classes***

23.      The Saturn Plaintiffs' multi-state and state-only implied warranty sub-

classes also fail the predominance requirement of Rule 23(b)(3).  Individualized factual inquiries

would need to be performed to address the issues of if, or when, timing chain failure occurs; the

causation of any such timing chain failure; whether the allegedly defective timing chain is

covered by warranty; whether the allegedly defective timing chain was already repaired by

MLC; whether the class member provided proper notice of the alleged breach of warranty to

MLC; whether a class member's claims are barred by the statue of limitations or other

affirmative defenses such as comparative negligence (caused by, *inter alia*, the plaintiff's failure

to properly maintain the vehicle or improper use of the vehicle); and what the appropriate

remedy should be for any particular class member.  *See Sanneman v. Chrysler Corp.*, 191 F.R.D.

441, 449 (E.D. Pa. 2000) (individualized issues regarding putative class members' usage and

maintenance of vehicles precluded certification and noting "[c]ourts are hesitant to certify classes

in litigation where individual use factors present themselves, such as cases involving allegedly

defective motor vehicles and parts.").

---

(*See* Resp. at Ex. D (William Anderson testifying that cost of repair was $3,700), Ex. E (Antonio Burgos testifying that his car has not been repaired because cost would be between $3,000 and $4,000), Ex. F (Jennifer Caldwell testifying that cost of repair was over $2,700), Ex. G (Amy Faust testifying that her vehicle would cost between $2,800 and $6,000 to repair, and that she further owed $1,500 on her car loan and paid mechanic nearly $1,000 to diagnose the problem), Ex. H (Jesus Leal testifying that cost of repair was over $2,400), Ex. I (Jeanne Menzer testifying that cost of repair was over $1,900), Ex. J (Charles Reid testifying that cost of repair was over $900); Ex. K (Cynthia Scott testifying that cost of repair would be $2,200 and car had been rendered inoperable).

14

24.     Although the Saturn Plaintiffs, in a cursory manner, set forth the
rudimentary law of implied warranty in each jurisdiction, this does not change the fact that
individualized factual issues would predominate over common ones with respect to establishing
liability for breach of implied warranty as to each sub-class.  For instance, Missouri law requires
each member of the Putative Class to have provided "notice to the seller of the injury."  *Ragland
Mills, Inc. v. Gen. Motors Corp.,* 763 S.W.2d 357, 360 (Mo. Ct. App. 1989).  This notice
requirement is important, as it serves "to afford the seller an opportunity to arm himself for
negotiation and litigation."  *Id.* at 361.  Individualized inquiries would be required to determine
which, if any, of the members of the Missouri sub-class provided the Debtors with this statutorily
required notice.  Further, as for Nebraska, Michigan, Iowa, and Pennsylvania, the Saturn
Plaintiffs failed to provide any authority shedding light on whether and how common factual
issues predominate over individualized issues with regard to the states' laws of implied warranty.
(*See* Resp. at 29 (citing *Barden v. Hurd Millwork Co., Inc.,* No. 06-C-46, 2006 U.S. Dist. LEXIS
63926 (E.D. Wis. Mar. 28, 2008) (applying Wisconsin, *not* Nebraska, law)); *id.* at 29 (citing
*Lackowski v. Twinlabs Corp.*, No. 00-75058, 2001 U.S. Dist. LEXIS 25634, at *28-29 (E.D.
Mich. Dec. 28, 2001)); *id.* at 28 (citing *Martin v. Amana Refrigeration, Inc.*, 435 N.W.2d 364
(Iowa 1989).)[15]

25.     Accordingly, factual issues would predominate with respect to the Saturn
Plaintiffs' multi-state and state-only implied warranty sub-classes, and the Saturn Putative Class
Claim should be disallowed.

---

[15] Further, the cases cited by the Saturn Plaintiffs under Pennsylvania law have either been appealed or reversed.
*See Samuel-Bassett v. Kia Motors Am., Inc.*, No. 2199 Jan. Term 2001, 2004 Phila. Ct. Com. Pl. LEXIS 149 (Sept.
17, 2004); *Bassett v. Kia Motors Am., Inc.*, 212 F.R.D. 271 (E.D. Pa. 2002), *vacated and remanded by*, 357 F.3d
392, 403 (3d Cir. 2004).

c)   ***Individual Legal Issues Predominate with regard to the Saturn Plaintiffs' Multi-State Implied Warranty Sub-Classes***

26.    Plaintiffs have lumped together the implied warranty laws of twenty-eight different states and seek class certification based upon those twenty-eight states' supposed "similar treatment" of the laws of implied warranty.[16] (*See* Resp. at 36.)  When, as here, a class action would be governed by the laws of multiple states, "variations in state law may swamp any common issues and defeat predominance."  *Castano*, 84 F.3d at 741; *accord Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 627 (3d Cir.) (predominance defeated, in part, by number of applicable, differing state legal standards), *cert. granted by*, 519 U.S. 957 (1996), *aff'd*, 521 U.S. 591, 624 (1997).  The party seeking class certification must therefore "provide an 'extensive analysis' of state law variations to reveal whether the[y] pose 'insuperable obstacles.'"  *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007).  For example, in *Cole*, plaintiffs seeking certification of a class action containing breach of implied warranty claims provided the district court with:

   (i)    an extensive catalog of the statutory text of the state warranty laws implicated;

   (ii)   the text of the relevant provisions of the Uniform Commercial Code ("UCC") of each state;

   (iii)  an overview of textual variations in the relevant UCC provisions adopted in each jurisdiction; and

   (iv)   a report from an expert on contract law who opined, after analyzing the variations, that "the few variations in the provisions of UCC Article 2 relevant to this case are such that they do not affect the result."

---

[16] In their Response, the Saturn Plaintiffs clarify for the first time that they seek certification of not one class, (*see* Consolidated Am. Compl. ¶139), but rather ***eleven*** state-by-state sub-classes and ***two*** multi-state sub-classes.  (*See* Resp. at 36.)

*Id.* at 725.  Despite that analysis and expert testimony, the court nevertheless concluded that the plaintiffs still "did not sufficiently demonstrate the predominance requirement because they failed both to undertake the required 'extensive analysis' of variations in state law concerning their claims and to consider how those variations impact predominance."  *Id.*

27.    Here, there has been no such rigorous analysis of each state's implied liability laws and the differences among them.  Regardless of the fact that each of the twenty-eight states has adopted the UCC, the possibilities for differences in state law abound because the UCC looks to the laws of implied warranty in each individual state.  *See, e.g., Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1016-17 (D.C. Cir. 1986) (rejecting notion that no variations in state implied warranty laws relevant to class action exist, and noting that "court[s] cannot accept such an assertion 'on faith'. . . [t]he Uniform Commercial Code is not uniform.") (internal citations omitted), *cert. denied*, 482 U.S. 915 (1987).  Indeed, there are variances in the laws of the twenty-eight jurisdictions with regard to (i) individual plaintiff's requirements for providing notice of breach,[17] (ii) whether merchantability may be presumed by the laws of the state,[18] (iii) variations in how each state defines "merchantability,"[19] (iv) whether warranty protections in

[17] State law varies on what constitutes reasonable notice and to whom notice should be given, and other courts considering the issue in the class certification context have noted that these variations impact predominance. *See, e.g., Compaq Computer v. Lapray*, 135 S.W.3d 657, 673-75 (Tex. 2004) (collecting cases and noting variation in state law regarding notice among factors defeating predominance); *Walsh v. Ford Motor Co.*, 130 F.R.D. 260, 276 (D.D.C.) (notice requirements vary by state), *reconsideration denied*, 130 F.R.D. 514 (D.D.C. 1990), *appeal dismissed*, 945 F.2d 1188 (D.C. Cir. 1991).

[18] In some jurisdictions, use of a vehicle for a certain period of time without experiencing a defect gives rise to a presumption that the vehicle is merchantable. *See, e.g., Walsh*, 130 F.R.D. at 273 (prolonged use of product raises presumption of merchantability in certain states and would require individualized inquiry into each state's requirements and each plaintiff's circumstances).

[19] *See In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 194 F.R.D. 484, 489 (D.N.J. 2000), *reconsideration denied*, No. Civ. A. 96-1814 (JBS), 2001 WL 1869820 (D.N.J. Feb. 8, 2001); *compare Nacci v. Volkswagen of Am., Inc.*, 325 A.2d 617, 620 (Del. Super. Ct. 1974) (under Delaware law, merchantability standard is whether ordinary manufacturer would pursue different design), *with Venezia v. Miller Brewing Co.*, 626 F.2d 188, 190 (1st Cir. 1980) (under Massachusetts law, merchantability examines reasonable consumer expectations).

17

each state extend to used vehicles,[20] and (v) whether each state permits waiver of implied

warranty, and, if so, the requisite circumstances.[21]  Such variations in state law would not only

create multiple and diverse legal standards, but also multiply the individualized factual

determinations that the Court would be required to undertake via individualized hearings.  *See*

*Cole*, 484 F.3d at 726 (court abused its discretion in determining predominance requirement was

satisfied in implied warranty action where variations in state law necessitated multiple legal

standards and individual fact determinations).

    28.    Because of the potential for significant differences between the implied

warranty laws of the twenty-eight states, that common questions of law *do not* predominate with

regard to the two multi-state implied warranty sub-classes.

    2.    A Class Action Is Not Superior to Other Available Methods for Fairly and
           Efficiently Adjudicating this Controversy

    29.    Further, class treatment of the Saturn Putative Class Claim is not superior

to other available methods for fairly and efficiently adjudicating the claims of the members of

the Putative Class.  *See* Fed. R. Civ. P. 23(b)(3)(D).  Courts in this jurisdiction have repeatedly

held that the right to file an individual claim in bankruptcy proceedings obviates the need for

class treatment, as the bankruptcy procedures can provide a superior method of protecting

claimants' rights and administrating large numbers of claims.  As *In re Woodward & Lothrop*

*Holdings, Inc.* observed:

---

[20] The Putative Class is composed of purchasers of both new and used cars.  These variations in state law would impact the legal standards class members would be held to and, among other things, how trial would be affected by the need to conduct individualized inquiries into whether class members bought new or used cars).  *See, e.g.*, *Cole*, 484 F.3d at 730 (noting substantial variations in state law concerning warranty protection for purchasers of new versus used cars).

[21] *Compare Settlemires v. Jones*, 736 So.2d 471, 474 (Miss. Ct. App. 1999) ("implied warranty of merchantability may not be waived or disclaimed") *with Graham Hydraulic Power, Inc. v. Stewart & Stevenson Power, Inc.*, 797 P.2d 835, 838 (Colo. Ct. App. 1990) (conspicuous written disclaimer waives implied warranties).

> [W]hile the class action ordinarily provides compensation that
> cannot otherwise be achieved by aggregating small claims, the
> bankruptcy creditor can, with a minimum of effort, file a proof of
> claim and participate in distributions.  In addition, there may be
> little economic justification to object to a modest claim, even
> where grounds exist.  Hence, a creditor holding such a claim may
> not have to do anything more to prove his case or vindicate his
> rights.

205 B.R. 365, 376 (Bankr. S.D.N.Y. 1997) (citations omitted); *see also In re Musicland Corp.*,

362 B.R. at 650-51 ("Bankruptcy provides the same procedural advantages as a class action.  In

fact, it provides more advantages.  Creditors . . . don't have to hire a lawyer, and can participate

in the distribution for the price of a stamp."); *In re Am. Reserve Corp.*, 840 F.2d 487, 490 (7th

Cir. 1988) (discussing whether class device should be applicable in bankruptcy proceedings as

bankruptcy achieves benefits of consolidation of claims "without the need for class suits – class

actions are a headache for judges").  Further, this Court recently noted that the class action

treatment is not superior to the bankruptcy process:

> [T]he inherent simplicity of the bankruptcy process tends to make
> class action treatment *not* superior, as a general matter and in this
> case, because an individual claimant would need only to fill out
> and return a proof of claim form.  And the deterrence class actions
> often provide would be of little utility in a case like this one, where
> Old GM is liquidating, and any punishment for any wrongful Old
> GM conduct would be borne by Old GM's innocent creditors.

(Bench Order at 19 (emphasis in original).)  Here, despite ample notice of the Bar Date and

opportunity to file a claim against the Debtors, no member of the Putative Class (each of whom,

as alleged by the Saturn Plaintiffs, have already sustained alleged failure of their timing chains

causing expensive damage to their vehicles) filed an individual claim in these bankruptcy cases,

aside from counsel on behalf of the Saturn Plaintiffs.  Accordingly, the Saturn Putative Class

Claim should be disallowed.

19

30.     Further, while the Debtors dispute that any remedy is necessary or

appropriate, it is clear that NHTSA, a federal agency with the administrative and technical

expertise to address national automotive safety issues, is a superior forum to deal with the issues

raised by the Saturn Plaintiffs.  In *American Suzuki Motor Corp. v. Superior Court*, 37 Cal. App.

4th 1291 (1995), the court noted:

> We, too, believe an impartial determination as to whether the
> Samurai is defectively designed should be made, and, to the extent
> the flaw is found to exist, Suzuki should be required to make
> necessary repairs.  It is our opinion, however, that under the
> circumstances of this case it is a perversion of both the class action
> device and warranty law to allow a ruling on the "defect issue" to
> be secured in connection with an implied warranty action.  The
> remedy which will best promote consumer safety, and which will
> address real parties concern that "tragic consequences" will result
> if the defect is not remedied, is to petition NHTSA for a defect
> investigation.

*Id.* at 1299-1300; *see also In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1019 (7th Cir. 2002)

(Easterbrook, J.) (regulation by NHTSA is superior to class action lawsuit), *cert. denied*, 537

U.S. 1105 (2003); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 464 (D. N.J. 1998) ("the

administrative remedy provided by NHTSA . . . is more appropriate than civil litigation"); *In re

Ford Motor Co. Ignition Switch Prod. Liab. Litig.*, 174 F.R.D. 332, 353 (D.N.J. 1997) ("there is

insufficient justification to burden the judicial system with plaintiffs' claims while there exists an

administrative remedy . . . that can handle those claims in a more efficient manner"); *Ziegelmann

v. DaimlerChrysler Corp.*, 649 N.W.2d 556, 562 (N.D. 2002) ("the proper remedy is to petition

[NHTSA] for a defect investigation"); *Ford Motor Co. v. Rice*, 726 So. 2d 626, 631 (Ala. 1998)

(persons claiming defect are not without a remedy since "if the NHTSA determines that a vehicle

contains a defect, then it may issue an order directing . . . a recall").  Accordingly, class action

procedures are not superior to the other methods available to the members of the Putative Class

to seek redress for their claims, and the Saturn Putative Class Claim should be disallowed.

       3.      <u>The Putative Class Is Overinclusive and Not Ascertainable</u>

       31.     The Saturn Plaintiffs' argument that the Putative Class is not overinclusive

and is therefore ascertainable (*see* Resp. at 15-16), is also without merit.  While the Saturn

Plaintiffs correctly note that the class definition excludes vehicles that were recalled whose

timing chain had failed—a fact that Debtors acknowledge in the Objection— the Saturn

Plaintiffs confuse the recalled vehicles with vehicles that were repaired by the Debtors, free of

charge, *under warranty*.  (*See* Obj. at 31; Resp. at 16.)  Indeed, the Consolidated Amended

Complaint alleges that the Debtors repaired, under warranty and free of charge, over 2,000 class

vehicles with broken timing chains.  (Consol. Am. Compl. ¶ 127.)  Here, while the class

definition includes "all persons who purchased the Class Vehicles in the Class States whose

timing chain has failed (the Class)," it *does not* exclude vehicles that were repaired under

warranty (rather than recall).  Thus, the Putative Class includes many members who do not have

viable claims because, by Plaintiffs own admission, those members have already been

compensated when their vehicles were repaired under warranty.  (*Id.* ¶¶ 1, 137.)  Accordingly,

because the proposed class definition includes class members without viable claims, the

definition is overinclusive.  *See, e.g.*, *Bachrach v. Chase Inv. Servs. Corp.*, No. 06-2785 (WJM),

2007 WL 3244186, at *2 (D.N.J. Nov. 1, 2007) ("Courts may deny certification where the

proposed class includes many members without claims."); *see also Charron v. Pinnacle Group*

*N.Y. LLC*, 269 F.R.D. 221, 228 (S.D.N.Y. 2010) ("The Second Circuit has cautioned against

certifying overbroad classes.").

4.      "Typicality" Cannot Be Established by the Saturn Plaintiffs

32.      The Saturn Putative Class Claim also fail to meet the typicality element of

Rule 23(a).  Indeed, the Saturn Plaintiffs rely heavily on *Gary Plastic Packaging Corp. v. Merrill*

*Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176 (2d Cir. 1990), *cert. denied*, 498 U.S. 1025

(1991), to support their argument that the typicality requirement has been met.  (*See* Resp. at 19,

22.)  But in that case, the Second Circuit affirmed the district court's refusal to certify the class

because the representative plaintiff was subject to several unique defenses, calling into question

whether typicality and adequacy requirements of Rule 23 were satisfied.  *Gary Plastic*

*Packaging Corp.*, 903 F.2d at 180.  Similarly, here, while each Saturn Plaintiff's claim allegedly

arises from certain of the Debtors' Products that the Saturn Plaintiffs claim to have purchased

and operated, allegedly in reliance upon defendants' alleged misrepresentations as to the

standard and quality of the timing chains and oiling nozzles in such vehicles, the Putative Class

would include persons who followed differing maintenance programs, operated their vehicles

differently, and purchased vehicles under a variety of factual circumstances, resulting in a

divergent of factual issues regarding causation, damages, reliance, and notice.[22]  For these

reason, the Saturn Putative Class Claim also does not satisfy Rule 23(a).

---

[22] At a minimum, prior to certification, the Debtors would need to take discovery related to the Saturn Plaintiffs'
bald assertions that "[n]one of the Saturn Plaintiffs are subject to unique defenses,"  that "[n]one of the Saturn
Plaintiffs have antagonistic or conflicting claims with the Class members that they seek to represent," and that the
Saturn Plaintiffs subjected their Class Vehicles to "normal use."  (*See* Resp. at 5, 19, 21, 22, 23.)

09-50026-reg   Doc 8973-9   Filed 01/31/11   Entered 01/31/11 12:53:03   Main Document
Pg 30 of 65

**Conclusion and Requested Relief**

WHEREFORE, for the reasons set forth above and in the Objection, the Debtors

respectfully request that the Court (i) disallow and expunge the Saturn Putative Class Claim in its

entirety; and (ii) grant the Debtors such other and further relief as is just.[23]

Dated: New York, New York
       January 31, 2011

<div style="margin-left:40%">

/s/ Joseph H. Smolinsky
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

</div>

---

[23] Should the Court find it appropriate to permit the Saturn Putative Class Claim to proceed as a class claim in whole or in part, the Debtors reserve their rights to request that an expedited procedure be established in this Court to quickly liquidate such claim.

23

09-50026-mg    Doc 12049-5    Filed 01/16/15    Entered 01/16/15 16:50:02    Exhibit E
Pg 32 of 65

## Exhibit A

**Bench Decision on Apartheid Claimants' Motion for Class Certification, and on Debtors'
Objection to Apartheid Claimants' Underlying Claims, dated January 28, 2011 (ECF 9026)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____

|                                              |     |                          |
|----------------------------------------------|-----|--------------------------|
|                                              | )   |                          |
| In re:                                       | )   | Chapter 11               |
|                                              | )   |                          |
| Motors Liquidation Company., *et al.*,       | )   | Case No. 09-50026(REG)   |
|    f/k/a General Motors Corp., *et al.* | )   |                          |
|                                              | )   |                          |
|                Debtors. | )   | Jointly Administered     |
|                                              | )   |                          |

_____

BENCH DECISION[1] ON APARTHEID
CLAIMANTS' MOTION FOR CLASS
CERTIFICATION, AND ON DEBTORS'
OBJECTION TO APARTHEID CLAIMANTS'
UNDERLYING CLAIMS

APPEARANCES:

WEIL, GOTSHAL & MANGES LLP
Attorney for Debtors
767 Fifth Avenue
New York, New York 10153
By:    Harvey R. Miller, Esq.
        Stephen Karotkin, Esq.
        Joseph H. Smolinsky, Esq.
        Angela C. Zambrano, Esq. (argued)

HAUSFELD LLP
Attorney for Sakwe Balintulo, *et al.*, and
  on behalf of all those similarly situated
11 Broadway, Suite 615
New York, NY 10004
By:    Steig Olson, Esq. (argued)
        Michael Hausfeld, Esq.

---

[1]    I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting or more extensive or polished discussion. Because they often start as scripts for decisions to be dictated in open court, they typically have a more conversational tone

08-50026-mg Doc 12049-5 Filed 01/16/15 Entered 01/16/15 16:50:08 Exhibit E Pg 33 of 65

NAGEL RICE LLP
Attorney for Lungisile Ntsebeza *et al*., and
  on behalf of all those similarly situated
103 Eisenhower Parkway
Roseland, NJ 07068
By:    Diane Sammons, Esq. (argued)

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In the jointly administered chapter 11 cases of Debtor Motors Liquidation
Company, formerly General Motors Corporation ("**Old GM**," and with its debtor
affiliates, the "**Debtors**"), I have two contested matters evolving from lawsuits brought
against Old GM, prepetition, which, after the filing of proofs of claim by the plaintiffs,
now are before me in the form of claims against the Old GM estate.

The lawsuits were brought by residents of South Africa under the Alien Tort
Statute,[2] which allows foreign nationals to bring actions in the federal courts of the
United States against those alleged to have committed torts in violation of the "law of
nations"—*i.e.*, international law.  As described more fully below, the former plaintiffs
(now claimants) (the "**Apartheid Claimants**") allege, in general terms, that they were
victims of the infamous system of apartheid in South Africa, and that Old GM aided and
abetted the perpetrators of the apartheid system, to the Apartheid Claimants' injury.

In the first of the two contested matters now before me, the Apartheid Claimants
move for certification of their claims as class proofs of claim, on behalf of themselves
and other victims of apartheid.  In the second of two contested matters before me, the
Debtors seek to disallow the claims, on a class basis or otherwise.

For the reasons that follow, I conclude, notwithstanding my abhorrence of
apartheid, that:

---

[2]      28 U.S.C. § 1350.  It provides, in full:

         The district courts shall have original jurisdiction of any civil
         action by an alien for a tort only, committed in violation of the
         law of nations or a treaty of the United States.

-1-

09-50026-reg    Doc 8973    Filed 09/11/11    Entered 09/11/11 21:53:03    Main Document
Pg 35 of 65

        (1)  class certification, which is discretionary in bankruptcy cases

and appropriate less frequently than in plenary litigation, must be denied

under the facts presented here; and that

        (2) under controlling Second Circuit authority,[3] binding on me and

every other lower court in the Second Circuit, the underlying claims must

now be disallowed.

My Findings of Fact, Conclusions of Law, and bases for the exercise of my

discretion in connection with these determinations follow.

<div align="center">Findings of Fact</div>

*1. Procedural History*

The claims pending before this Court were first raised in plenary non-bankruptcy

litigation—in  two related lawsuits brought by 26 named plaintiffs in two separate groups

(the "**Botha Plaintiffs**" and the "**Balintulo Plaintiffs**"),[4] alleging that Old GM and other

multinational corporations aided and abetted South Africa's apartheid regime.  The

lawsuits were initially filed in 2002 and 2003.  In their current form, the two claimant

groups seek allowed claims on the part of Old GM for damages of the type originally

sought in the earlier lawsuits.

The earlier lawsuits had a lengthy and somewhat convoluted history, the specifics

of which need not be laid out at length in this Decision.  It is sufficient for present

purposes to say that until recently, it was held in the course of that litigation and related

litigation that claims under the Alien Tort Statute for corporate aiding and abetting

---

[3]     *See Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010) ("*Kiobel*").

[4]     Or the "**Botha Claimants**" and "**Balintulo Claimants**," when dealing with their claims as they
were thereafter asserted in this Court.

<div align="center">-2-</div>

violations of international law were legally cognizable, and could be heard in the U.S.

federal courts. That changed, at least in the Second Circuit, after the Circuit's *Kiobel*

decision, discussed above and below.

On June 1, 2009, when those lawsuits were ongoing, the Debtors filed their

chapter 11 cases. On September 16, 2009, I signed an order establishing November 30,

2009 as the "Bar Date"—the deadline for filing claims—in these chapter 11 cases, and

setting forth procedures for filing proofs of claim against the Debtors.

On August 29, 2009, the Botha Plaintiffs filed a proof of claim against Old GM,

and on October 9, 2009, the Botha Plaintiffs filed a second, largely similar, proof of

claim. The Botha Plaintiffs' action had not been certified as a class action as of the time

that the Debtors filed their chapter 11 cases. They first moved for class treatment of their

claims in these chapter 11 cases on June 22, 2010, about a year after Old GM's chapter

11 filing, and about 10 months after the filing of their proofs of claim.

Similarly, the Balintulo Plaintiffs' action had not been certified as a class action

as of the time that these chapter 11 cases were commenced. The Balintulo Plaintiffs filed

their proof of claim on October 14, 2009, and first moved for class treatment on the same

day that the Botha Claimants did, June 22, 2010.

*2. Botha Claimants' Claims*

The Botha Plaintiffs' claims in this Court, as in their complaint in the district

court, allege causes of action for (i) "apartheid as a crime against humanity";

(ii) "extrajudicial killing"; (iii) "torture"; and (iv) "cruel, inhuman or degrading

treatment."

As set forth in greater detail in their earlier complaint and proof of claim, the

Botha Claimants seek recovery from Old GM based on Old GM's participation in South

African apartheid, and/or aiding and abetting South Africa's apartheid system.   It is

alleged, for example, that Old GM produced military vehicles that were used by South

African security forces in their efforts to maintain the apartheid regime,[5] and that Old

GM engaged in workplace segregation and retaliation against Old GM employees who

engaged in union and/or anti-apartheid activity.[6]

The Botha Claimants seek compensatory damages, "including general and special

damages"; punitive damages; disgorgement of profits, and costs of suit, including

attorneys' fees.  The Botha claim describes the amount of the claim as "TBD," since

"[t]he amount of this claim is contingent based upon pending litigation."[7]

The Botha Claimants seek that relief on their own behalf and on behalf of a

putative class of:

> [A]ll black South African citizens (and their heirs
> and beneficiaries) who during the period from 1973
> to 1994 suffered injuries as a result of Defendants'
> violations of the law of nations by their complicity
> in such violations caused by South African state
> officials, employees or agents or by their actions in
> replicating the apartheid system in their own
> internal operations.[8]

*3.  Balintulo Plaintiffs' Claim*

The Balintulo Claimants' claim alleges two "counts" against the Debtors.  The

first, on behalf of four putative classes, described momentarily, is "for the crime of

---

[5]      Botha Putative Class Claim, Botha Cmplt., ¶¶ 85-88.

[6]      *Id.* at ¶¶ 89-94.

[7]      Botha Putative Class Claim.

[8]      Botha Putative Class Claim, Botha Cmplt., ¶ 149.

-4-

apartheid." It alleges that Old GM provided substantial assistance to the South African

security forces knowing that the security forces were violating international law;[9] that this

assistance had a substantial effect on the perpetration of its criminal and tortious activities

against the purported classes; and that Old GM "aided and abetted" and/or ratified the

actions of the apartheid regime.[10]

The second, on behalf of one of those four classes only, is for "the crime of

extrajudicial killing," and makes aiding and abetting allegations substantially similar to

those in the first count.[11]

The Balintulo Claimants seek, among other things, a declaration that "Defendants

knowingly and intentionally aided and abetted the commission of a tort in violation of

international law enforceable in this court as federal common law and the law of

nations," compensatory damages, punitive damages, and costs.[12] Like the Botha

Claimants' claim, the amount of the Balintulo Claimants' claim is "TBD," as "[t]he

amount of this claim is contingent based upon pending litigation as outlined in the

attached Complaint."[13]

The Balintulo Claimants' claim proposes four distinct classes:

> The "Extrajudicial Killing Class," defined as "[a]ll
> persons who are the surviving personal
> representatives—including parents, spouses,
> children, siblings, and dependents—of persons who
> were subject to *extrajudicial killing* by South
> African security forces during the period from 1960
> to 1994."

---

[9]     Balintulo Putative Class Claim, Balintulo Cmplt., ¶ 316.

[10]    *Id.* ¶¶ 317, 320.

[11]    *Id.* ¶¶ 331-39.

[12]    *Id.* at 87-88.

[13]    Balintulo Putative Class Claim, Rider.

The "Torture Class," defined as "[a]ll persons who
were themselves subject to *torture and rape* by
South African security forces during the period
from 1960 to 1994."

The "Detention Class," defined as "[a]ll persons
who were themselves subject to *prolonged unlawful
detention* by South African security forces during
the period from 1960 to 1994."

The "Cruel Treatment Class," defined as "[a]ll
persons who were themselves subject to *cruel,
inhuman, and degrading treatment* by South
African security forces during the period from 1960
to 1994." [14]

## Discussion

I consider the two separate contested matters in turn.

## I.

## Class Certification

### A.  *Class Certification of Claims in Bankruptcy Cases*

While I normally start with textual analysis in any dispute where such is relevant,

textual analysis is of only limited utility here.  The Bankruptcy Code is silent on the

extent to which a claim may be filed on behalf of persons other than the claimant, or the

standards under which a court might find that to be appropriate.[15]  And as relevant here,[16]

---

[14]     Balintulo Putative Class Claim, Balintulo Cmplt. ¶ 36 (emphasis added in each case).

[15]     The closest potentially applicable section, Bankruptcy Code section 501, provides, in relevant
part:

> (a) A creditor or an indenture trustee may file a proof of
> claim . . .

> (b) If a creditor does not timely file a proof of such creditor's
> claim, an entity that is liable to such creditor with the debtor,
> or that has secured such creditor, may file a proof of such
> claim.

> (c) If a creditor does not timely file a proof of such creditor's
> claim, the debtor or the trustee may file a proof of such claim.

the Bankruptcy Rules are as well.  Class certification in cases under the Bankruptcy Code

is expressly addressed in Fed. R. Bankr. P. 7023, which provides that "Rule 23

F.R.Civ.P. applies in adversary proceedings."  But claims allowance matters, when

objected to, are contested matters, not adversary proceedings, and instead are governed

by Bankruptcy Rule 9014, which is silent as to class action treatment, or incorporation of

Civil Rule 23.

Bankruptcy Rule 9014(c), captioned "Application of Part VII rules," provides that

"[e]xcept as otherwise provided in this rule, and unless the court directs otherwise, the

following rules shall apply. . . ."  Rules 9014(c) continues with a fairly long listing of Part

VII Rules that (unless the court directs otherwise) apply to contested matters, but Rule

7023 is not one of them.  Thus Rule 7023 doesn't apply in contested matters, "unless the

court directs otherwise."  But while at least implying that a bankruptcy court has the

power to "direct[] otherwise," and thus to apply Rule 7023 (and hence Fed.R.Civ.P. 23)

in claims allowance contested matters, Rule 9014 is silent as to standards under which

courts should do so.

Thus, as in so many areas where the Code and Rules are silent, bankruptcy courts

look to caselaw to fill the gaps.  That caselaw is extensive, with much of it from

---

Prior to 1988, many courts had held that section 501 of the Code provides an exclusive list of those who may file a representative claim and that class proofs of claims are invalid as a matter of law because class representatives are not listed in section 501.  However, in *In re American Reserve Corp.*, 840 F.2d 487 (7th Cir.1988) ("***American Reserve***"), the Seventh Circuit held that class proofs of claim are not barred by section 501, but may be allowed in the discretion of the bankruptcy court.  *See In re Ephedra Prods. Liab. Litig.*, 329 B.R. 1, 4 (S.D.N.Y. 2005) (Rakoff, D.J., sitting as bankruptcy court after withdrawal of reference) ("***Ephedra***") (explaining the history and so holding).  Though the Second Circuit hasn't addressed the issue, *id.*, lower court decisions in this district since that time have held similarly.

[16]   Fed. R. Bankr. P. 3001(b) provides that except where proofs of claim may be filed by debtors or co-obligors, *see* Fed. R. Bankr. P. 3004 and 3005, "[a] proof of claim shall be executed by the creditor or the creditor's authorized agent."  But Bankruptcy Rule 3001 does not speak to the permissibility of class action treatment for claims either.

bankruptcy courts in this district—which, while not, strictly speaking, binding upon me, I am on record as following in the absence of clear error.[17]

In this district, it has been held that while class proofs of claim in bankruptcy are not prohibited, the right to file one is not absolute.[18]  The decision to extend Civil Rule 23's application is committed to the Court's discretion.[19]  The exercise of that discretion is informed by special considerations applicable in bankruptcy cases that are superimposed on those that apply in any determination under Civil Rule 23.  "Although the Bankruptcy Code and Rules give no express guidance for the court's exercise of this discretion, a pervasive theme is avoiding undue delay in the administration of the case."[20] And Judge Gropper of this Court has observed, "[t]he effect of a class claim on other creditors is an important factor in a court's decision whether to exercise its discretion and grant Rule 23 certification."[21]

Accordingly, the proponent of a class claim must (1) make a motion to extend the application of Rule 23 to some contested matter; (2) satisfy the requirements of Rule 23; and (3) show that the benefits derived from the use of the class claim device are

---

[17]    *See, e.g., In re Adelphia Communications Corp.,* 359 B.R. 65, 72 n.13 (Bankr.S.D.N.Y. 2007) ("This Court has been on record for many years as having held that the interests of predictability in this District are of great importance, and that where there is no controlling Second Circuit authority, it follows the decisions of other bankruptcy judges in this district in the absence of clear error.").

[18]    *In re Musicland Holding Corp.*, 362 B.R. 644, 650 (Bankr.S.D.N.Y. 2007) (Bernstein, C.J.) ("**Musicland**"); *In re Bally Total Fitness of Greater New York, Inc.,* 402 B.R. 616, 619 (Bankr.S.D.N.Y. 2009) (Lifland, C.J.) ("**Bally**"); *Ephedra,* 329 B.R. at 5.  *See also In re Sacred Heart Hospital of Norristown,* 177 B.R. 16, 22 (Bankr. E.D. Pa. 1995) (noting that the class action device may be utilized in appropriate contexts, but should be used sparingly).

[19]    *Musicland,* 362 B.R. at 650; *Bally,* 402 B.R. at 619 (same, citing *Musicland*); accord *Ephedra*, 329 B.R. at 4-5; *In re* Blockbuster, Inc., --- B.R. ---, 2011 Bankr. LEXIS 143, *4, 2011 WL 180035, *1 (Bankr.S.D.N.Y. Jan 20, 2011) (Lifland, C.J.) ("**Blockbuster**").

[20]    *Ephedra,* 329 B.R. at 5.

[21]    *In re Northwest Airlines Corp.*, 2007 WL 2815917, *3 (Bankr.S.D.N.Y. Sept. 26, 2007) (Gropper, J.) ("**Northwest Airlines**") (denying class certification, for that reason and others) (not available on Lexis).

consistent with the goals of bankruptcy.[22]  Thus where, as here, a motion has been duly

made, the claim can be asserted as a class claim if, but only if, (1) the class claim

proponent has shown compliance with the requirements of Civil Rule 23, and (2) after

consideration of consistency with bankruptcy needs and concerns, the bankruptcy court

directs that Rule 23 should apply.

### B.  Class Certification Here

#### 1.  Traditional Fed. R. Civ. P. 23 Considerations

Here I assume, without deciding, that the requested class certification satisfies the

requirements of Fed.R.Civ.P. 23(a), which requires that the class be so numerous that

joinder of all members is impracticable, that at least some questions of law or fact exist

that are common to the class; that claims of the representative parties be typical of claims

of members of the class, and that the representative parties will fairly and adequately

protect the interests of the class.  But more difficult issues exist with respect to

requirements of Rule 23(b)—and in particular, Rule 23(b)(3), which in this case, where

species of torts are alleged, would provide the basis, if any, for asserting claims of this

character as a class action in the Bankruptcy Court.[23]

Rule 23(b)(3) provides:

> (b) Types of Class Actions. A class action may be
> maintained if Rule 23(a) is satisfied and if:
>
> . . .
>
>     (3) the court finds that the questions of law
> or fact common to class members
> predominate over any questions affecting

---

[22]   *Musicland*, 362 B.R. at 651; *In re Woodward & Lothrop Holdings, Inc.,* 205 B.R. 365, 369
(Bankr.S.D.N.Y. 1997) (Bernstein, C.J.) ("**Woodward**"); *Blockbuster*, 2011 Bankr. LEXIS 143 at
*4, 2011 WL 180035 at *1.

[23]   *See* n.53 below.

only individual members, and that a class
action is superior to other available methods
for fairly and efficiently adjudicating the
controversy. The matters pertinent to these
findings include:

> (A) the class members' interests in
> individually controlling the
> prosecution or defense of separate
> actions;

> (B) the extent and nature of any
> litigation concerning the controversy
> already begun by or against class
> members;

> (C) the desirability or
> undesirability of concentrating the
> litigation of the claims in the
> particular forum; and

> (D) the likely difficulties in
> managing a class action.

Courts considering whether Civil Rule 23(b) has been satisfied thus consider two

separate requirements: (1) predominance of common issues, and (2) superiority of class

action treatment in considering the underlying issues.[24]  Here I necessarily must find that

common issues, while some plainly exist, don't predominate over individual issues, and

that class action treatment isn't the superior mechanism for dealing with the underlying

claims.

*(a) Predominance of Common Issues*

As the Supreme Court observed in *Amchem*, Fed.R.Civ.P. 23(b)(3)'s

predominance requirement is "far more demanding" than the commonality requirement

---

[24]    *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (**"Amchem"**) ("a class must meet
two requirements beyond the Rule 23(a) prerequisites: Common questions must 'predominate over
any questions affecting only individual members'; and class resolution must be 'superior to other
available methods for the fair and efficient adjudication of the controversy'").

-10-

of Rule 23(a)(2).[25]  For example, the *Amchem* court observed, in the context of an

asbestos class certification, that:

> Given the greater number of questions peculiar to
> the several categories of class members, and to
> individuals within each category, and the
> significance of those uncommon questions, any
> overarching dispute about the health consequences
> of asbestos exposure cannot satisfy the Rule
> 23(b)(3) predominance standard.[26]

The *Amchem* court went on to highlight the many differences between the

members of the proposed class:

> Class members were exposed to different asbestos-
> containing products, for different amounts of time,
> in different ways, and over different periods.  Some
> class members suffer no physical injury or have
> only asymptomatic pleural changes, while others
> suffer from lung cancer, disabling asbestosis, or
> from mesothelioma . . . Each has a different history
> of cigarette smoking, a factor that complicates the
> causation inquiry.[27]

These numerous individual issues ultimately defeated class certification.[28]

When resolution of class questions will still require case-by-case analysis of facts

with respect to each member of the class, class certification may not be appropriate.[29]

The Eleventh Circuit has stated that if "plaintiffs must still introduce a great deal of

---

[25]     *Id.* at 623-24.

[26]     *Id*. at 624.

[27]     *Id*. (citations omitted).

[28]     *Id*. at 624-25.

[29]     *See Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004) ("*Klay*"); *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1235 (11th Cir. 2000), ("Whether Avis maintains a policy or practice of discrimination may be relevant in a given case, but it certainly cannot establish that the company intentionally discriminated against every member of the putative class"); *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1006 (11th Cir. 1997) (holding that plaintiffs alleging racial discrimination had failed to show "predominance" because proof concerning existence of a general policy of racial discrimination could not establish discrimination as to any individual plaintiff).

-11-

individualized proof or argue a number of individualized legal points to establish most or

all of the elements of their individual claims, such claims are not suitable for class

certification." [30]

Here I think that while some common issues would plainly exist, individual issues

would predominate.  As the claims before me make clear, what people refer to under the

general umbrella of "apartheid" hurt people in many different ways.  While one of the

two claimant groups here (the Balintulo Claimants) tried to address that by identifying

subclasses of types of claims—extrajudicial killing,  torture and rape, detention, and

cruel, inhuman and degrading treatment—the most actionable wrongful acts were in

substance wrongful acts by themselves—apart from being concrete examples of ways by

which apartheid was a "crime against humanity."  And the latter, while I can see it as

being actionable in many individual cases, would raise many individual issues when

coming up with "injury-action-purpose" combinations.  For both the more general claim

of "crime against humanity," on the one hand, and the more specific ways by which

people were injured, on the other, I just see too many individual issues.

The complication (and in my view it's a major one) is the difficulty in

establishing, for so many people's unique injuries, causation and the requisite purpose on

the part of Old GM personnel with respect to whatever was being done to cause or

facilitate the particular injury alleged by the claimant (or class member) involved—which

in my view is not just a matter of damages but a matter necessary to fix liability in the

first place.[31]  Taking allegations as true, for example, that Old GM made motor vehicles

---

[30]     *Klay*, 382 F.3d at 1255.

[31]     Reflecting somewhat similar concerns, even though Judge Leval, in *Kiobel*, disagreed with the
majority of the *Kiobel* panel as to whether corporations are subject to claims in U.S. federal courts

-12-

that were used by South African security forces, I think many individual issues would

arise concerning how those vehicles were used, and what people at Old GM intended as

to how they'd be used.  Similarly, taking allegations as true, for purposes of this analysis,

that Old GM personnel retaliated against Old GM employees who engaged in union

and/or anti-apartheid activity, I think there are simply too many different ways by which

any wrongful conduct might have been conducted and caused a resulting injury or effect

on the employee involved, and what its purpose was.[32]

Civil actions involving mass torts are often not certified for class action treatment,

even in non-bankruptcy plenary litigation, because so many individualized legal and

individualized damages inquires are ultimately required.[33]  In *Talisman Energy*, Judge

Cote noted the similarities between Alien Tort Statute litigation and mass tort litigation,

and observed that the two are analogous for class certification purposes.[34]  In *Talisman*

*Energy*, current and former residents of southern Sudan brought suit under the Alien Tort

---

under the Alien Tort Statute, he concurred with the Circuit's judgment dismissing the claims
because of failures to make satisfactory allegations as to Shell's *"purpose to advance or facilitate*
the Nigerian government's violations of the human rights of the Ogoni people."  621 F.3d at 192
(emphasis in original).  I make no determination here as to whether the allegations in this case
would satisfy the analogous knowledge requirement, but note that, assuming they did, I would
have to determine issues of a similar nature with respect to the various class members' claims.

[32]    For instance, while I hardly condone anti-union activity, it's not clear to me that it's a violation of
international law.  It would take individualized analysis to ascertain the purpose of any action
taken against Old GM employees.

[33]    *See In re Fibreboard Corp.*, 893 F.2d 706, 712 (5th Cir.1990) ("Commonality among class
members on issues of causation and damages can be achieved only by lifting the description of the
claims to a level of generality that tears them from their substantively required moorings to actual
causation and discrete injury"); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1084 (6th Cir. 1996)
(Explaining that since there was "[n]o single happening or accident . . . [n]o one set of operative
facts establishes liability"); *In re MTBE Prods. Liab. Litig.*, 209 F.R.D. 323, 348-49 (S.D.N.Y.
2002) (denying certification of a class of residential well owners whose wells were contaminated
by MTBE); *In re Three Mile Island Litig.*, 87 F.R.D. 433, 441-42 (M.D.Pa.1980) ("the causation
element of plaintiffs' physical injury/emotional distress claims will require individual proof. In
effect, the class action would break up into separate suits").

[34]    *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 226 F.R.D. 456, 474 (S.D.N.Y. 2005)
("***Talisman Energy***").

-13-

Statute against a Canadian energy company and the government of Sudan, alleging that

they were victims of extrajudicial killing, genocide, and other violations of international

law.[35]  The plaintiffs sought certification of a putative class of:

> All non-Muslim, African Sudanese inhabitants of
> blocks 1, 2 or 4 or Unity State as far south as Leer
> and areas within ten miles thereof at any time
> during the period January 1, 1997 to June 15, 2003,
> who were injured during that period by acts of the
> Sudanese military or allied militia constituting
> genocide, extra-judicial killing, enslavement, forced
> displacement, attacks on civilians constituting war
> crimes, confiscation and destruction of property,
> torture or rape.[36]

In *Talisman Energy*, Judge Cote denied class certification because the plaintiffs

would have to show with respect to each individual class member that the injuries for

which they were claiming damages were actually caused by the campaign of genocide

and crimes against humanity targeting non-Muslim African Sudanese.  To conduct this

inquiry, factual questions that were individual to each attack would have to be

determined.[37]  Given the need for evidence of causation, and the allegations involving

hundreds of thousands of class members, hundreds of individual attacks, the massive

geographic area involved, and the six-and-a-half year time period, she found that "[t]he

challenge of presenting that individualized proof on behalf of thousands of class

members, even if it were logically feasible, will quickly dominate the proof regarding the

common issues."[38]

---

[35]    *Id.* at 457.

[36]    *Id.* at 458.

[37]    *Id.*

[38]    *Id.* at 482-83.

Here analogous factors cause me to conclude that with respect to individuals'

claims against Old GM, individual issues would predominate.  While I assume, without

finding, that hundreds of thousands or millions of individuals were injured, in many cases

grievously, by the apartheid system as a whole, or by specific means by which it was

implemented, their rights to recover against *Old GM* for such injuries would depend not

just on their individual damages (which, if that were all, would likely not defeat class

certification),[39] but also on the numerous combinations of injury involved, action causing

it, assistance of that action, and purpose on the part of Old GM personnel to facilitate the

commission of the primary violations of international law and resulting injury on which

the aiding and abetting claims would be based.[40]

The Botha Claimants and Balintulo Claimants cite authority going the other way

or implying a contrary conclusion, *Does I v. The Gap, Inc.*,[41] *Does I v. Karadzic*,[42] and

*Hilao v. Estate of Ferdinand Marcos*.[43]  But in *Talisman Energy* Judge Cote considered

and rejected the application of each of those cases, and I think she was right to do so.

First, Judge Cote found *Gap* distinguishable, and I think she was plainly right in

that respect.   In *Gap*, the court granted a motion for class certification under Rule

23(b)(3) for approximately 30,000 factory garment workers in Saipan, Northern Mariana

Islands, who alleged that they were held in a system of peonage and involuntary servitude

---

[39]     *See, e.g., Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977) (although calculation of damages in an antitrust action would involve some individualized issues, "it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate").

[40]     *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 253, 258, 259 (2d Cir. 2009) (defining elements of cause of action for aiding and abetting violation of international law).

[41]     *Does I v. The Gap, Inc.*, 2002 WL 1000073 (D. N. Mariana Islands May 10, 2002) ("*Gap*") (not available on Lexis).

[42]     176 F.R.D. 458 (S.D.N.Y. 1997) (Leisure, J.) ("*Karadzic*").

[43]     103 F.3d 767 (9th Cir. 1996) ("*Hilao*").

-15-

created through a conspiracy among garment manufacturers in the district.[44]  The *Gap*

court rejected the defendants' argument that "at least one element of each of the

plaintiffs' claims requires individualized proof and inquiry into the plaintiffs' mental

states, alleged injuries, and causes of the alleged injuries."[45]  Rather, the *Gap* court held

that "this is a lawsuit challenging the garment production system on Saipan based upon

allegations of peonage, not a case involving 30,000 individual tort actions."[46]

Consequently, the *Gap* court found that common issues would predominate over

individual issues because it would be unnecessary to engage in "the separate adjudication

of each class members' individual claim or defense."[47]

      But *Gap* was distinguished by Judge Cote in *Talisman Energy*, since "the class [in

*Gap*] suffered an identical injury—peonage—from a common source, the garment

production system on one island . . . . If the plaintiffs succeeded . . . all that remained to

be shown would be the amount of an individual's damages."[48]  That was very different

than the situation with which she was presented there.  And it is likewise very different,

in my view, from the situation here.  As relevant here, apartheid was implemented in

many different ways, injuring people in many different ways, and Old GM's alleged

wrongful acts and purpose, if any, would have a nexus to the affected people in too many

different ways.

      In *Hilao*, in which claims were brought for torture, extrajudicial killing and

disappearance against the Estate of Philippine strongman Ferdinand Marcos, the Ninth

---

[44]     *Gap,* 2002 WL 1000073, at *2.

[45]     *Id*. at *7.

[46]     *Id.*

[47]     *Id.*

[48]     *See Talisman Energy, Inc.*, 226 F.R.D. at 483.

Circuit reviewed a lower court order which had certified claims under Rule 23(b)(3) and

established phased proceedings and sampling methods to quantify the damages the

Marcos Estate owed to the almost 10,000 Filipinos he had injured.  The panel, by a 2-1

vote as to this issue, affirmed a class judgment premised on statistical analysis as a kind

of proxy for individualized proof of injury and causation—rejecting arguments, among

others, that the typicality requirement wasn't satisfied.  But Judge Cote observed in

Talisman Energy that *Hilao* "preceded *Amchem,* and would be unlikely to survive

today."[49]  And she regarded the dissent in *Hilao* as "the better reasoned decision," which

identified the very problems that "infected" the application for class certification before

her:[50]

> To paraphrase that dissent, there may be little
> question that the Government of Sudan caused
> tremendous harm to the people of southern Sudan,
> but the question is which people and how much.[51]

Also, of course, the *Hilao* claims were brought against the Estate of Ferdinand Marcos

himself, who was charged with authorizing the killing, torture and disappearances

*personally*, and the *Hilao* action did not involve the additional issues incident to claims of

secondary liability for aiding and abetting, which at least normally requires showings not

just of the primary violation, but of additional matters applicable to the alleged aider-and-

abettor, such as substantial assistance, and a purpose or intent to advance the primary

violation.

---

[49]     *Id.*

[50]     *Id.* (citing *Hilao*, 103 F.3d at 787).

[51]     *Id.*

Similarly here, there is little question that that apartheid caused tremendous harm to people in South Africa, but the question —even apart from "how much," which might be regarded as more relevant to damages, which by itself might not defeat class certification—is which people, in what way, by what Old GM acts, and with what purpose on the part of any Old GM personnel involved.

-17-

Finally, *Karadzic* involved a failure to defend and a limited fund that made it an unusual case under the Alien Tort Statute. The claims were brought by victims (and/or survivors of victims) of genocide against Radovan Karadzic, who had declared himself president of a self-proclaimed republic within Bosnia-Herzegovina, and allegedly directed a campaign of ethnic cleansing against Bosnian Croats and Muslims. But Karadzic did not defend, on either class action treatment or the merits. He wrote a letter to the court informing it of his intention not to contest the action,[52] describing his limited financial resources. Thus, while the plaintiffs had originally moved for class certification under Rule 23(b)(3), "limited fund" class action treatment was certified instead, under Rule 23(b)(1), for the class members to allocate amongst themselves whatever Karadzic had.[53] Significantly, though he did not decide the issues, Judge Leisure observed in *Karadzic* that "[t]he Court has grave doubts about plaintiffs' ability to satisfy their burden under Rule 23(b)(3) of demonstrating that common questions of law and fact will predominate and that the proposed class action will be manageable."[54]

*(b) Class Action Superiority*

Additionally, Civil Rule 23(b)(3)(D) requires me to consider the superiority of the class action mechanism when determining whether or not to certify a class.[55] Here—

---

[52]    *Karadzic*, 176 F.R.D. at 463.

[53]    I don't think that a limited fund rationale would justify certification under Rule 23(b)(1) here. Old GM's available value is, of course, limited, but the claim to that "limited fund" isn't limited to the putative class action claimants. Old GM has a large number of other creditors who likewise have claims against Old GM's assets. The "limited fund" thus isn't to be shared solely amongst class action claimants, but instead must be shared by all of Old GM's creditors. And of course the issues here don't involve prospective relief or standards of conduct for Old GM going forward, under which Rules 23(b)(1)(A) or (b)(2) might otherwise be applicable.

[54]    *Id.*

[55]    Fed.R.Civ.P. 23(b)(3)(D) provides:

once again before considering matters unique to bankruptcy—I don't think I can make such a finding.

For *individual claimants* who were victims of acts in furtherance of apartheid, it wouldn't be that hard, if Old GM objected to their individual claims, for each individual claimant to tell his or her story, and to then ascertain whatever Old GM did and intended as relevant to that claim. But to proceed on a class action basis, I'd have to choose between holding one or more trials of extraordinary complexity, on the one hand, or taking inappropriate shortcuts as to individual issues of wrongful conduct, causation and requisite purpose and assistance, on the other. Like Judge Cote, I think the dissent in *Hilao* was better reasoned, and I think any shortcuts that would have to be taken to make class action treatment superior as an administrative matter would have to come at the expense of due process concerns.

Also, the inherent simplicity of the bankruptcy process tends to make class action treatment *not* superior, as a general matter and in this case, because an individual claimant would need only to fill out and return a proof of claim form. And the deterrence class actions often provide would be of little utility in a case like this one, where Old GM is liquidating, and any punishment for any wrongful Old GM conduct would be borne by Old GM's innocent creditors.[56]

---

. . . (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that *a class action is superior to other available methods* for fairly and efficiently adjudicating the controversy.

(emphasis added).

[56]   *See Musicland*, 362 B.R. at 650-51. As Judge Bernstein there observed:

Thus I cannot find that the requirements of 23(b)(3) have been satisfied here.

*2. Consistency With Bankruptcy Needs and Concerns*

Even more clearly, I here must find that entertaining these claims on a class action basis would significantly complicate the Debtors' chapter 11 case, making this huge case even more difficult to manage—with the likelihood, if not certainty, that consideration of these claims on a class basis would materially delay the distributions to the Debtors' thousands of other creditors. Thus, on a matter where bankruptcy judges have unquestioned discretion to determine whether class certification would inappropriately clash with bankruptcy needs and concerns, I can't authorize class action treatment here.

As Judge Rakoff observed in *Ephedra*, "bankruptcy significantly changes the balance of factors to be considered in determining whether to allow a class action and . . . class certification may be 'less desirable in bankruptcy than in ordinary civil litigation.'"[57] He further observed, quoting earlier analysis by Judge Bernstein:

> It follows that a court sitting in bankruptcy may decline to apply Rule 23 if doing so would in Judge Bernstein's words, "gum up the works" of distributing the estate.[58]

---

Bankruptcy provides the same procedural advantages as a class action. In fact, it provides more advantages. Creditors, even corporate creditors, don't have to hire a lawyer, and can participate in the distribution for the price of a stamp. They need only fill out and return the proof of claim sent with the Bar Date Notice. Furthermore, claims are "deemed allowed" under § 502(a) in the absence of an objection, in which case discovery and fact-finding are avoided altogether. Finally, where the debtor is liquidating and its managers have moved on to other jobs, the class action does not serve a deterrent effect.

*Id.* at n.8 (citations omitted).

[57]   329 B.R. at 5 (quoting *American Reserve,* 840 F.2d at 493).

[58]   329 B.R. at 5 (citing *Woodward,* 205 B.R. at 376 (in turning, citing the Seventh Circuit, speaking through Judge Easterbrook, in *American Reserve*, 840 F.2d at 491)).

-20-

Similarly, as Judge Lifland very recently explained, in *Blockbuster*:

> "[C]lass certification is often less desirable in
> bankruptcy than in ordinary civil litigation,' as
> class-based claims have the potential to adversely
> affect the administration of a case by "adding layers
> of procedural and factual complexity . . . siphoning
> the Debtors' resources and interfering with the
> orderly progression of the reorganization."[59]

Here I have material concerns as to the adverse effect that consideration of these

claims would have on the Debtors' other creditors, by reason of the delay in seeking class

certification and the further delay (even if the Apartheid Claimants were blameless) and

the burdens on the bankruptcy system that would be occasioned by the need to consider

and/or estimate their claims.

First, the Apartheid Claimants failed to file a motion for class treatment until

12 months after the Commencement Date and 8 months after the Bar Date.  Given the

substantial impact that these claims could have on the Old GM estate, the Apartheid

Claimants should have sought class certification far sooner than they did.  Since *Ephedra*,

five years ago, the importance of filing a prompt motion for class certification (and

without waiting for an objection to the claim) has been clear, and the cases requiring

prompt filing have been uniform.  And while there is law outside this district, somewhat

dated, holding otherwise,[60] and upon which the Apartheid Claimants rely, the *Charter*

view was rejected in *Ephedra*,[61] and as Judge Gropper stated in his later decision in

---

[59]    *Blockbuster*, 2011 Bankr. LEXIS at *3, 2011 WL 180035 at *1 (quoting *Bally*, 402 B.R. at 621).

[60]    *See In re Charter Co.*, 876 F.2d 866 (11th Cir. 1989) ("**Charter**").

[61]    *See* 329 B.R. at 6-7 ("The Court disagrees with *Charter*'s view that an objection was necessary in
        order to have a "contested matter" triggering the court's discretion under Rule 9014. . . . Objection
        to the class proofs of claim was not a necessary prerequisite to a motion for class certification.").

*Northwest Airlines*, "the reasoning of *Charter* with respect to the procedural issues has been rejected in this district."[62]

It is true, as observed by Judge Rakoff in *Ephedra*, that the "Code and Rules are so opaque as to the procedure governing class claims" that expungement may not be appropriate if it were based solely on procedural default.[63]  And the argument on the Apartheid Claimants' class certification motion was deferred for a time (in part to address even more urgent matters, in this case and others), and the importance of this matter made it inappropriate to decide with an immediate dictated decision from the bench. Thus, I don't see the late filing of the Apartheid Claimants' request for class certification as dispositive in and of itself.  But as Judge Rakoff observed in *Ephedra*, after noting that bankruptcy courts have the power to decide whether Rule 23 should apply when doing so could "gum up the works,"[64]

> For example, since class litigation is inherently more time-consuming than the expedited bankruptcy procedure for resolving contested matters, class litigation would have to be commenced at the earliest possible time to have a chance of being completed in the same time frame as the other matters that must be resolved before distributing the estate.[65]

Here the class certification motion was most decidedly not filed "at the earliest possible time."  And a class claim allowance determination, or even estimation, could not be achieved without materially delaying distributions to creditors, and materially increasing the administrative costs of this already very expensive case.

---

[62]    *Northwest Airlines*, 2007 WL 2815917 at *4.

[63]    *Ephedra*, 329 B.R. at 6.

[64]    *See* page 20 and n.58 *supra*.

[65]    *Ephedra*, 329 B.R. at 5.

Here the Debtors' plan, which has now been filed with acceptances being solicited, will be a liquidating plan, with the Debtors distributing to the value they have available (principally in the form of New GM stock), *pari passu* to their creditors.  While in a fair number of liquidating plan cases, we can deal with contested claims requiring substantial litigation by establishing plan reserves (holding back distributions to creditors of the sum put in reserve to await liquidation of the disputed claim), here we'd have to estimate the claim, under section 502(c) of the Code,[66] for either allowance or, more likely, creation of reserves.  A full claims allowance process would hugely "delay the administration of the case."  And here, even a claims estimation procedure would do likewise.

The Apartheid Claimants' claims in this case can be contrasted to the asbestos injury claims in it, which, until a recent settlement, were to be estimated under section 502(c).  There the estimation hearing was to be conducted with the testimony of three or four experts, basing their opinions as to the Debtors' likely liability for asbestos injuries based in material part on statistical analysis of the costs of settling earlier asbestos claims. The asbestos claims exposure was well suited to a kind of "macroeconomic" analysis that could estimate overall asbestos claim exposure without considering, in any material way, the strengths and weaknesses of any individual asbestos claimant's claims.  But here, by contrast, there is no prior history to work from, and an estimation of the Debtors' liability, if any, for aiding and abetting apartheid couldn't be considered without

---

[66]     That section provides, in relevant part:

(c) There shall be estimated for purpose of allowance under this section—

(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case . . .

-23-

extensive consideration of the diverse injuries to apartheid claimants, and whatever Old

GM personnel did and intended to cause them.

It is conceivable, I suppose, that if Old GM had *primary* liability for apartheid (as

Ferdinand Marcos did for the injuries he caused in *Hilao*), a section 502(c) estimation

procedure might be simpler, as then potentially subject to some kind of statistical

analysis.  But fairness to Old GM's other creditors prohibits disregard of what Old GM

personnel actually did, and intended, with respect to apartheid, and this would make any

estimation process a very lengthy and complex one, if not also wholly unwieldy.  And the

management difficulties would be particularly severe since so much of the evidence

would be coming from a foreign country.

Three factors have traditionally been most influential in determining whether or

not Civil Rule 23 should be applied in bankruptcy cases:  (1) whether the class was

certified pre-petition; (2) whether the members of the putative class received notice of the

bar date; and (3) whether class certification will adversely affect the administration of the

case.[67]  I've already discussed the third factor, finding that class certification would

materially and adversely affect the administration of the case—materially complicating it,

and materially delaying distributions to other Old GM creditors.  I now turn to the others.

The first of the other two factors also weighs against the Apartheid Claimants.

There was no prepetition class certification here.[68]

---

[67]     *See Musicland*, 362 B.R. at 654-55.

[68]     From time to time, as in a recent episode in the *Chemtura* case before me, debtors recognize the
propriety of class claims, and find it to be in the interests of their stakeholders to stipulate to class
action treatment, even though no prepetition class was certified.  I recently approved such a
stipulation, but situations of that character present facts very different from those here.

The last of the remaining matters presents closer issues.  The Apartheid Claimants argue that the notice of the Bar Date to their class members was deficient, denying them due process, and that as a result, members of the putative class largely didn't get notice of the Bar Date.  Implicit in that argument, of course, is that putative class members, while residents of South Africa, were entitled to the protections of the United States Constitution, from which the due process requirement emanates.  The Debtors dispute both matters.

To put those issues in context, I note that the Debtors published extensive notice of the Bar Date internationally—in The Financial Times (Worldwide Edition), The Wall Street Journal (Global Edition), USA Today (Monday through Thursday), The New York Times (National), Detroit Free Press, Detroit News, Le Journal de Montreal (French), Montreal Gazette (English), The Globe and Mail, (National), and The National Post.  It is undisputed that the first three of these, at least, were distributed in South Africa.

The publication was by the traditional means, and was well suited to providing notice to creditors of all of the usual types throughout the world, including in South Africa.  But the Apartheid Claimants argue, with some force, that if one were more conscientiously trying to get notice to the victims of apartheid (most or at least many of whom, one would suppose, would be poor and uneducated), one would not choose these publications.  And the Apartheid Claimants suggested two publications that would have been significantly more effective in targeting additional apartheid claimants without tremendous burden on the estate.  I think it's true that for the purpose of reaching apartheid victims, a more targeted notice would have been preferable, as potentially being

-25-

more effective in reaching the poor, and largely uneducated, putative class members living in South Africa.

Yet the people as to whom notice was arguably deficient were resident in a foreign country, and were not U.S. citizens or residents; did not have property in the U.S.; were not holders of Old GM funded debt; and with limited exceptions (such as any who might have worked in a GM plant), had no contractual dealings or direct contact with GM.

Thus, dealing first with the assumption upon which the notice arguments were made—the existence of constitutional due process rights—the Debtors dispute the underlying premise. Citing one of the decisions in the *A.H. Robins* bankruptcy case,[69] they observe that, when speaking of the foreign notice program set up for victims of allegedly dangerous Dalkon Shields in foreign countries, the Fourth Circuit flatly stated:

> Appellant argues that the foreign notice program was unconstitutional. The Constitution does not extend its guarantees to nonresident aliens living outside the United States. Because foreign claimants are not protected by the Constitution, there is no merit to the constitutional claim.[70]

The *A.H. Robins* court relied on four Supreme Court decisions to come to that conclusion,[71] though none voiced the rule as expressly as the *A.H. Robins* court did.

The Apartheid Claimants respond by saying that since that *A.H. Robins* decision came down, "no . . . court has ever relied on that statement,"[72] but they cite no authority

---

[69] *Vancouver Women's Health Collective Society v. A.H. Robins Co. (In re A.H. Robins Co.)*, 820 F.2d 1360 (4th Cir. 1987) ("**A.H. Robins**").

[70] *Id.* at 1363.

[71] *See id.*

[72] *See* Apartheid Claimants' Supp. Reply at 5. They also say, correctly, that the *A.H. Robins* court nevertheless thereafter examined the quality of the notice. *Id.*

to the contrary, nor any argument, even without support, as to why that ruling, or some

variant of it,[73] wouldn't be correct.  I have no reason to doubt the correctness of the *A.H.

Robins* court's ruling; even without other cases on point, it would seem obvious that the

reach of the United States Constitution to people throughout the world is not limitless,

and that if and when the U.S. Constitution is to apply, the person so affected must have

some kind of nexus to the United States—such as U.S. citizen status, residence in the

United States, or property here.[74]  Thus I think the Debtors' quarrel with the Apartheid

Claimants' premise is well taken.

The Debtors argue further that even if constitutional due process obligations were

owed to the South African putative class members here, they were satisfied.  Though this

aspect of the matter is closer than the remainder of the issues, I agree.

When constitutional rights to due process are applicable, due process requires that

notice must be "reasonably calculated, under all the circumstances, to apprise interested

parties of the pendency of the action and afford them an opportunity to present their

objections."[75]  And notice must be more than a "mere gesture" and the debtor must use

"means . . . such as one desirous of actually informing the absentee might reasonably

adopt to accomplish it."[76]

---

[73]   Though I don't have to decide what all of them might be, there might be some qualifications or exceptions to the broad rule as stated.  For example, if a nonresident alien had property in the United States, I would think that he or she would be entitled to U.S. constitutional protections, including due process, before that property could be taken away.

[74]   With that said, I don't think that it would necessarily follow that because the U.S. Constitution is inapplicable and all of the requirements of constitutional due process don't apply, other fairness obligations wouldn't remain.  After all, we still have an *in rem* proceeding within the United States, and bankruptcy judges still strive for fairness.  Where a creditor, wherever located, is known, for example, we still expect actual notice of the Bar Date to that creditor, with steps (like first class mail) reasonably calculated to give that creditor actual notice.

[75]   *Mullane v. Cen. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("***Mullane***").

[76]   *Id.* at 315.

But notice here was provided in the fashion that is customarily provided in large chapter 11 cases, and in plenary litigation generally. The notice here likely did not reach many potential claimants, but that does not make it deficient. For persons who are missing or unknown, "employment of an indirect and *even a probably futile* means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights."[77]

Here the GM bankruptcy was an event that got worldwide attention. Actual notice was given to the Apartheid Claimants. While a more targeted publication notice for other potential claimants would have been better, I can't find that notice wasn't given, or that the notice that was provided failed constitutional muster, even assuming that U.S. constitutional requirements would apply.[78]

While the notice in this situation was less than ideal, it was not wholly unsatisfactory. As the Debtors properly observe, no class has ever been certified in a bankruptcy court by reason of deficiencies in notice to prospective members of the putative class. And the factors as a whole—particularly the burdens on this estate and the delay that would result from a class certification here—weigh heavily in favor of denying the request to make Civil Rule 23 applicable. In an exercise of discretion, I cannot, consistent with the needs and concerns of the bankruptcy system and Old GM's creditors, make Civil Rule 23 applicable to apartheid claims in these chapter 11 cases.

---

[77]    *Id.* at 317 (emphasis added).

[78]    Obviously, it is only because of the unique nature of apartheid claims and the potential claimants that the quality of notice as these claims is debatable. I have great difficulty seeing how the notice provided here could be criticized in any way in an ordinary commercial bankruptcy situation.

## II.

## Claims Disallowance

Apart from the matter of class certification, the Debtors ask me to disallow the Apartheid Claims, whether on a class basis or insofar as Apartheid Claims might still be asserted by individual claimants. Under controlling Second Circuit authority, I must do so, and the claims must be disallowed.

On September 17, 2010, the Second Circuit held in *Kiobel* that U.S. courts do not have subject matter jurisdiction to adjudicate cases brought under the Alien Tort Statute when the allegations are against a corporation. The Circuit, speaking through Judge Cabranes, concluded that:

> No corporation has ever been subject to any form of liability (whether civil, criminal, or otherwise) under the customary international law of human rights. Rather, sources of customary international law have, on several occasions, explicitly rejected the idea of corporate liability. Thus, corporate liability has not attained a discernable, much less universal, acceptance among nations of the world in their relations *inter se*, and it cannot not, as a result, form the basis of a suit under the Alien Tort Statute.[79]

As discussed earlier, the claims of the Apartheid Claimants are based on the premise that Old GM, a corporation charged with aiding and abetting the violations of international law, may be found to be liable in the United States courts under the Alien Tort Statute. But *Kiobel,* binding authority from the Circuit, holds otherwise.

In oral argument here, the Apartheid Claimants pointed to the vigorous dissent by Judge Leval in *Kiobel* on the issue of amenability of a corporation to suit. They also

---

[79]     *Kiobel*, 621 F.3d at 148-49 (emphasis in original).

-29-

stated that the issue was raised *sua sponte* by the *Kiobel* panel, not having been briefed by any party; that a petition for rehearing *en banc* in *Kiobel* had been filed, which is now pending before the Second Circuit; and that another Second Circuit panel—the one hearing the appeal involving the non-GM corporate defendants in the original apartheid lawsuits—had failed to issue the very quick similar decision that adherence to *Kiobel* might otherwise warrant.[80]  Nevertheless, those are points for the Circuit to consider, not me; I'm bound as a lower court in the Second Circuit to abide by any Second Circuit holding.  As "corporate liability . . . cannot . . . form the basis of a suit under the ATS,"[81] and each of the claims submitted by the Apartheid Claimants is alleged against a corporation, I must disallow the remaining claims.[82]

---

[80]   *See*, Arg. Tr. 81-82, 87-88.

[81]   *Id.*

[82]   Section 502(j) of the Code provides:

> A claim that has been allowed or disallowed may be reconsidered for cause.  A reconsidered claim may be allowed or disallowed according to the equities of the case.  Reconsideration of a claim under this subsection does not affect the validity of any payment or transfer from the estate made to a holder of an allowed claim on account of such allowed claim that is not reconsidered, but if a reconsidered claim is allowed and is of the same class as such holder's claim, such holder may not receive any additional payment or transfer from the estate on account of such holder's allowed claim until the holder of such reconsidered and allowed claim receives payment on account of such claim proportionate in value to that already received by such other holder.  This subsection does not alter or modify the trustee's right to recover from a creditor any excess payment or transfer made to such creditor.

Thus, section 502(j) permits bankruptcy courts to reconsider the disallowance of claims.  If, after consideration of the pending motion for reconsideration *en banc*, the Circuit rules in a fashion that would change the rule of law now binding on me, the Apartheid Claimants may have rights to seek reconsideration of this aspect of my ruling, under section 502(j) and Bankruptcy Rule 3008, or, perhaps, other applicable law or rules.  In that event, all parties' rights as to any such request are reserved.  Of course, by reason of my earlier rulings in Part I of this Decision, any such opportunity would necessarily apply only to the named claimants here.

Finally, in oral argument here the Apartheid Claimants recognized my inability, as a lower court judge, to hold inconsistently with binding Circuit authority, but urged that I defer deciding the Debtors' *Kiobel*-based objection to their claims, pending a decision by the Circuit on the *Kiobel* plaintiffs' motion for rehearing *en banc*.[83]  But with these claims having been asserted on a class action basis, I don't have the luxury of doing so.  As the Debtors fairly observed, the Apartheid Claimants' class claims have a huge overhang in these chapter 11 cases.[84]  I must agree with the Debtors' contention that it wouldn't be prudent for me to delay deciding the claims allowance issue,[85] in light of the uncertainties as to whether reconsideration *en banc* would be granted—and, if so, when any *en banc* decision might be forthcoming—and in light of these claims' major effect on the ability to bring these chapter 11 cases to a conclusion.[86]

## Conclusion

While I share the abhorrence by most of the civilized world of apartheid, this decision cannot, of course, be premised on my personal feelings about that practice.  It must instead be pegged to the principles of plenary and bankruptcy litigation jurisprudence that govern issues as to whether class certification should be granted, and substantive rules of law articulated for the lower courts to follow by the Second Circuit.

---

[83]     *See, e.g.*, Arg. Tr. 85, 88.

[84]     *See*, Arg. Tr. 143-44.

[85]     *Id.* at 143.

[86]     I think it's possible, though the Debtors would be entitled to be heard on the matter, that if there were no longer an effort to proceed with the Apartheid Claimants' claims here on a class action basis, the requested deferral of a decision on my part to await any *en banc* determination in *Kiobel* wouldn't present the same practical problems, since the remaining individual apartheid claims might not have the same effect on other Old GM creditor recoveries.  But such a scenario isn't now before me.

-31-

For the reasons set forth above, class certification must be denied, and the claims

remaining before me must be disallowed.

Dated: New York, New York
      January <u>28</u>, 2011

          <u>**s/Robert E. Gerber**</u>
          United States Bankruptcy Judge