IN THE DISTRICT COURT OF GALVESTON COUNTY, TEXAS

10TH JUDICIAL DISTRICT

DORIS POWLEDGE, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF ADAM POWLEDGE, DECEASED, THE ESTATE OF RACHEL POWLEDGE, DECEASED, THE ESTATE OF ISAAC POWLEDGE, DECEASED, THE ESTATE OF CHRISTIAN POWLEDGE, DECEASED, AND THE ESTATE OF JACOB POWLEDGE, DECEASED, AND CONNIE MCNEIL AS NEXT FRIEND TO AUSTIN POWLEDGE, A MINOR; AND AMBER POWLEDGE, AND MARY LOU POWLEDGE INDIVIDUALLY,

PLAINTIFFS,

vs. ) No. 07-CV 1040

GENERAL MOTORS CORPORATION,

DEFENDANTS.

VIDEOTAPED DEPOSITION OF LINDA PAIGE GILMAN

SAN DIEGO, CALIFORNIA

OCTOBER 9, 2008

Diane Delaney-Dauphine
CSR No. 3612

INDEX

DEPONENT: LINDA PAIGE GILMAN EXAMINATION

By Mr. Hanson 5,47
By Mr. Counts 20,34

INDEX OF EXHIBITS

For the Defendants
NO. DESCRIPTION PAGE

3 Photocopies of photographs 4

APPEARANCES:

For Plaintiffs:

THE TRACEY FIRM
By Andrew Counts, Esq. (Via Telephonically)
5473 Blair Road
Suite 200
Dallas, Texas 75231

For Defendant:
HANSON, MAREK, BOYLCOM, GREENE
By Kent B. Hanson, Esq.
527 Marquette Avenue
Suite 2300
Minneapolis, Minnesota 55402
(612)342-2880

ALSO PRESENT:

Rick Accurso
James Robbins, Videographer

Videotaped deposition of LINDA PAIGE GILMAN, taken by the Defendants at 701 B Street, San Diego, California, on Thursday, the 9th day of October, 2008, at 9:34 a.m., before Diane Delaney-Dauphine, CSR No. 3612.

THE VIDEOGRAPHER: My name is James Robbins. I'm a videotape operator with U.S. Legal Support located in Sherman Oaks, California. This is the beginning of the videotaped deposition of Linda Paige Gilman beginning at 9:34 a.m. on October 9th, 2008, in the matter of Powledge versus General Motors, cause number 07-CV 1040 taken at 701 B Street, conference room 3E in San Diego, California. And this deposition is being taken on behalf of defense.

And may we please have introductions, beginning with the witness. Just state your name.

THE WITNESS: My name is Paige Gilman.

THE VIDEOGRAPHER: Counsel.

MR. COUNTS: Andrew Counts for the plaintiffs.

MR. HANSON: And Kent Hanson for General Motors Corporation.

THE VIDEOGRAPHER: And would the reporter please administer the oath.

(Exhibit Gilman 3 was marked for identification and retained by counsel.)

LINDA PAIGE GILMAN,

having been duly administered an oath, testified as follows:

///

EXAMINATION

BY MR. HANSON:

Q. Good morning, ma'am.

A. Good morning.

Q. Would you state your name and address, please.

A. Paige Gilman. My full name is Linda Paige Gilman. I go by my middle name Paige. I live at 820 26th Street here in San Diego, California. The zip code is 92102.

Q. Now, ma'am, my name is Kent Hanson. I'm an attorney representing General Motors. Have you ever given a deposition before, ma'am?

A. No, I have not.

Q. I guessed that that would be your answer, so I want to make sure that you're clear on the procedure before we get into the heart of things. I will be asking you questions, and when I'm done asking questions, Mr. Counts will have a chance to ask you anything that he would like to.

Your answers and all of the questions are being taken down word for word by the court reporter sitting here at the end of the table, and, in addition, of course, we have the procedure being videotaped.

A. Uh-huh.

Q. The purpose here today is to get your -- your

Page 6

answers as accurately as we possibly can. So I would appreciate it if you would do a couple of things. If at any time you're asked a question that is not clear to you, will you please say that so the question can be restated?
A. Yes.
Q. Another thing I would ask you to do is use words other than nods or gestures so that when a transcript is prepared it's clear what you meant to say.
A. I understand.
Q. Now, the fact that you should be asked a question doesn't mean you have to know the answer. We don't want you to guess, but that doesn't mean you have to be a hundred percent sure either. If you recall something but you're just not completely clear about it, just say so. Okay?
A. I understand.
Q. And the last thing I would ask you to make an effort to do is to let the questions be completely finished before you start answering. That's not a normal way to have a conversation with people. So it sometimes takes a little bit of effort, and the reason we're going to do that is to make it easier for the court reporter so she doesn't have to deal with two people talking at the same time. Okay?

Page 7

A. I understand.
Q. All right. Now, you're a resident of California; true?
A. Yes, I am.
Q. And you were -- you came here today because you were contacted and a subpoena was delivered to you; is that also true, ma'am?
A. That's true.
Q. Now, what we're hoping to do here today is to preserve your testimony so that it can be shown, if necessary, to a jury in Texas at the trial of this matter. You do not live in Texas; true?
A. That's true.
Q. I would like to get a little bit of background on you, if I can, ma'am. First, how old are you? And I don't mean to pry.
A. I'm 60.
Q. How long have you lived in California?
A. Since 1971.
Q. How far did you go with your formal education, ma'am?
A. Junior college degree.
Q. And do you work outside of the home?
A. I'm retired.
Q. Okay. What are you retired from?

Page 8

A. 22 years at the University of California San Diego. I worked at Scripps Institution of Oceanography for a professor and managed his laboratory.
Q. And Scripps is affiliated with UCSD?
A. Yes, it's the campus of UCSD.
Q. When did you retire?
A. Four years ago, September '04.
Q. Are you married, ma'am?
A. Yes, I am.
Q. What's your husband's name?
A. Rick Accurso, A-c-c-u-r-s-o.
Q. As I understand it, you were a witness to a crash that occurred on IH45 in October of -- in October of 2005; is that true?
A. Yes.
Q. How did you come to be in Texas at that time?
A. I grew up in Texas, and I was back visiting my family. We spent 17 days cleaning my mother's house. She was 85 at the time.
Q. So you were there to help out your mother?
A. Yes.
Q. Were you alone or was someone with you at the time that you saw this crash happen?
A. My husband was with me.
Q. Anybody else?

Page 9

A. No.
Q. Now, we may come back to this later. I'm jumping ahead just a little bit. After you saw the crash occur, you were interviewed by some police officers; is that right?
A. Yes.
Q. Do you remember that?
A. Yes.
Q. Do you remember that they videotaped that interview?
A. Yes.
Q. And would you tell us, please, whether you've had a chance to review the video recording of what you told the police as part of your preparation for this testimony here today?
A. Yes, I have.
Q. Now, do you recall where the crash happened?
A. Yes.
Q. Could you describe it, please. I mean what the configuration of the highway is in that area.
A. I hope I'm answering this correctly. I was coming from the Holland Road exit heading south to get on the freeway on 45 south. I wanted to get off at the very next exit which was Texas City. Getting on the road the freeway on-ramp is configured so that you pick

up a fair amount of speed by the time you actually get on the freeway. You don't have to change lanes, and it blends into the -- the number four lane, the slow lane on the right, so I was prepared to stay in that lane to get off at the next exit.

Q. So your intention was to be on the IH45 only for a short while; is that true?

A. That's true.

MR. COUNTS: Kent, I'm sorry. I'm just barely hearing Ms. Gilman. Could she speak up a little more, a little closer.

THE WITNESS: Certainly.

MR. HANSON: Let me see if we can move the speaker phone a little closer to her, too, and see if that helps you out.

THE WITNESS: Certainly. Does this make a difference?

MR. COUNTS: Yes. That is helpful.

THE WITNESS: Okay.

BY MR. HANSON:

Q. All right. Do you recall how many lanes there are southbound in the area that you were traveling on?

A. I believe there's four.

Q. In any case, this is a divided highway?

A. Yes.

Q. And you were in the far right lane?

A. Yes.

Q. Do you recall how fast you were going before you noticed anything out of the ordinary?

A. I believe I had reached 60.

Q. Do you recall what kind of car you were driving?

A. Yes, it was a Malibu.

Q. Was it your car?

A. No, it was a rental car.

Q. You had driven it from where?

A. My sister's house. We were staying with my sister and her husband in -- they call it Santa Fe.

Q. Do you recall what color the Malibu was that you were driving?

A. Green.

Q. Now, you've already told us that you witnessed a crash. When did you first notice the vehicle that was involved in the crash?

A. I had just gotten on the freeway, and the best way I can describe this it was almost like remembering a slide show. I saw this car coming up in the service lane at a very high rate of speed.

Q. What do you mean by the "service lane"?

A. The shoulder of the road on the right. The

emergency -- emergency road on the right.

Q. Where were you looking when you first noticed it? Did you pick it up in a mirror or --

A. In the rearview mirror.

Q. So you noticed it coming up fast; is that what you said?

A. Very fast. I remember -- this was so fast. I remember having an intent of moving over one lane and had looked over my left shoulder to see if that was possible, and the next thing I knew our car had been hit on the passenger side by this vehicle that was coming up at a rapid rate.

Q. So were you looking over your shoulder at the time that this car hit you?

A. No. I was looking into -- I was looking into my driver's side rearview mirror. So from the time I saw him -- or her, the vehicle, and acknowledged it, it had hit my car.

Q. So you didn't actually see it when it hit your car; is that true?

A. That's true.

Q. Now, what did you feel in terms of what part of your vehicle you thought had been hit?

A. In all honesty I felt like the whole right-hand side of the car had been taken off. I had no idea what

had happened. It was a tremendous impact.

Q. So what did you do?

A. I attempted to brake, and I pulled into this shoulder of the road.

Q. Would that be to your right or your left?

A. That would be my right. My husband had looked over his shoulder because he thought maybe we were in a high-speed chase, and perhaps this car was being chased by another vehicle or by the police. Just reflex action.

Q. Okay.

A. And his comment -- I never actually stopped my car. His comment was we need to get their license number. I think it's a hit-and-run.

Q. So your husband made a comment to the effect that you should get the license number, and as a consequence of that, did you make any effort to see the license number?

A. Yes, I did. I began to accelerate while I was driving on the shoulder of the road. I believed from what I had seen this car was probably going straight through the grass over to the feeder road on the right-hand side.

Q. Let me stop you for a moment here. When you say a feeder road over to the right, I would like to

show you some photographs that we marked before we got started here today as Gilman Exhibit 3, and there are ten photographs. I've numbered each page 1 through 10.
And just using the very first page, could you tell us do you see what you're referring to as the feeder road in that photograph?
A. Yes. It's across the grass on the right-hand side of the picture.
Q. Would you just turn that photograph around so that it -- and lift it up so that it would show.
And I'm going to ask the videographer if he can see it.
Okay. So just point. Now, you've got your left finger pointing over to the feeder road?
A. Yes.
Q. That would be on the right-hand side of the photograph as we're looking at it?
A. That's true.
Q. Then you would have been traveling where? The lanes that you were traveling in would be over by your right hand in the left side of the photograph?
A. That is true.
Q. So would you just put your finger -- point out to that. So the area where you have put your finger now is the area where you pulled over to stop?

A. Yes.
Q. Okay. Now, you mentioned something about beginning to accelerate. And you can put the photograph down for the time being. What were you referring to when you said you began to accelerate?
A. After the initial impact, I started to slow down because I didn't know what was happening. Then I began to accelerate. I never came to a stop. I began to accelerate so I could catch up with this car and get the license plate number.
Q. Where was this car traveling when you were trying to catch up?
A. It was in the middle of the grass.
Q. Going across between the freeway and the feeder road?
A. At that point it was going -- I thought it was going across. It went down the center.
Q. So when you first -- just to make sure I'm understanding this. When you first saw it going into the grass, you thought it was going to go across the grass to the feeder road?
A. That's true.
Q. Then did it change course at some point?
A. It never went across the grass. Once it was in the grass, it stayed in the center.

Q. Did you make any observation of the speed of this car at any point?
A. I remember telling the officers that it was 80 or 90 miles an hour, and I'm not sure I'm qualified to judge that.
Q. So that was an impression that you had. You're not saying it's necessary --
A. That --
Q. Let me finish my questions entirely. That's an example of what we were talking about before. It's just totally normal for people to talk to each other that way.
When you say that you had told the officer that the speed of this car was 80 to 90 miles an hour, that was an impression; you're not saying you're necessarily correct; is that right?
A. That's true.
Q. You do know it was going considerably faster than you?
A. That's true.
Q. And you knew you were going around 60?
A. That's true.
Q. Now, after the vehicle had hit your vehicle, you told us you were trying to get the license plate. Did you keep watching the car after it had entered the

grass median?
A. I never took my eyes off that car.
Q. Would you describe for the jury, please, what path you saw it follow.
A. It went straight down the center of the grass directly towards the bottom of the footing of the sign that it ultimately crashed into.
Q. Now, if we -- coming back for a moment to the photographs that I showed you earlier. Let me just flip through a little bit here. The one that we were looking at -- actually perhaps you can hold this up.
Am I tethered to the point where if I move I'm going to go off mike?
THE VIDEOGRAPHER: It depends on how fast you go.
MR. HANSON: I'm going to see if I can't do this in a way that doesn't get too much in the way.
Q. Okay. I've relocated to your side here. The first photograph in Exhibit 3, if we look back here in the distance where my finger is pointing, are we able there to see where the car ended up?
A. It's just behind that, yeah.
Q. So it's right back in this area here; is that correct?
A. Yes.

Q. Okay. Then let's just move forward so we can get a little closer. Looking now at page 4, photograph No. 4 of this exhibit, we can again -- we've moved a little closer now. You can see the tracks heading into the median, can you not?
A. Yes.
Q. And then we can see the car back --
A. Yes.
Q. -- approximately here where I'm pointing?
A. Yes.
Q. Now, moving along to photograph 10, can you see the pole and the vehicle at rest --
A. Absolutely.
Q. -- the pole that it hit, that is?
A. Yes.
Q. And leading up to it, do you see these tracks?
A. Yes. Yes.
Q. Could you tell the jury whether those tracks follow the path that you saw this car take into the pole?
A. Absolutely.
Q. So let me step back around again and get out of your way. Now, you told us that you watched it the whole way?
A. Yes.

Q. Did you ever see the driver or anything that the driver was doing? I mean before it hit the pole.
A. No.
Q. At any point from the time when the car entered the median until it straightened out heading toward the pole did you see the car make any kind of steering maneuver where it went either to the left or the right?
A. Absolutely not.
Q. Did you see any braking or brake lights?
A. None.
Q. Did you keep watching to look for brake lights?
A. Continuously.
Q. So you were -- is it true, ma'am, that you were specifically paying attention to whether those brake lights came on?
A. Totally.
Q. And did you see any brake lights?
A. There were no brake lights.
Q. Are you certain of that?
A. I'm absolutely certain.
Q. And with respect to the steering, how sure are you that there was no steering effort made either to go to the left or the right?
MR. COUNTS: Objection to the form.
THE WITNESS: There was no gyrations, no

swerving. The car just never deviated.
BY MR. HANSON:
Q. The tracks that we were talking about a few moments ago in photograph 10 of Exhibit 3 where we can see the straight tracks heading toward the pole --
A. Yes.
Q. -- how sure are you that those are tracks that were made by this car before it hit the pole?
A. I'm absolutely certain.
Q. So for whatever the length is of ground that's covered by the tracks that we can see in the photographs, for at least that length did you observe any steering maneuver at all?
A. Absolutely none.
Q. And again no braking maneuver ever at any time?
A. Absolutely.
Q. No brake lights ever at any time?
A. None.
MR. HANSON: Thank you. I have no more questions.

EXAMINATION

BY MR. COUNTS:
Q. Mrs. Gilman, my name is Andrew Counts. Can you

hear me okay?
A. Yes, I can.
Q. I don't have very many questions for you. Mr. Hanson is the one that -- he's the one that has the right to go first. I think I just have a few follow-up questions. Okay?
A. Certainly.
Q. Ma'am, when you were traveling down -- you were going southbound; is that right?
A. Yes.
Q. When you were traveling southbound, how long had you been on the freeway? In other words, had you just left somebody's house, and you were only on the freeway for one minute, or had you been traveling for some time?
A. Oh, no. We had just left my sister's house. Probably taken us less than five minutes to get from her home to that freeway get-on.
Q. So you were on the freeway for about five minutes; is that right?
A. No. No. No. We were on the freeway just a split second almost. Just barely part of a moment.
Q. You had just merged onto the freeway?
A. Yes.
Q. What is the speed limit on the freeway?

A. I believe it's 65.
Q. And you believe you were traveling around 60; is that right?
A. Yes.
Q. Did you have your cruise control on?
A. No.
Q. Were you listening to the radio?
A. No.
Q. Were the windows down in your vehicle?
A. No.
Q. Were you having any sort of conversation with your husband?
A. No.
Q. So you were just coasting there in silence; is that right?
A. Yes.
Q. So after the other vehicle struck your vehicle, how long of a time did it take or -- strike that question.
After the other vehicle struck your vehicle, how far did that vehicle travel before it entered the median?
A. I believe it was at that moment.
Q. So you did not see that other vehicle strike your vehicle; is that right?

A. That is true.
Q. So when you turned and looked, that vehicle was already in the median?
A. Yes.
Q. Okay. Before you had said that you felt there was a tremendous impact and that you felt as if the right side of your vehicle had been taken off; is that what you said?
A. Yes, I did.
Q. After the accident, did you get out of your car and look at the right side of your vehicle?
A. Yes.
Q. How much damage was there to your vehicle on the right-hand side?
A. The mirror had been entirely severed off, and there was only the faintest haze that the car had grazed us. We were able to just wipe it down with wax, and there wasn't even an actual scratch, but the mirror was just absolutely severed.
Q. After the other vehicle struck your vehicle, you said that you attempted to brake; is that right?
A. That's true.
Q. How much did you slow down?
A. I'm not certain how to answer that. It was reflex. I didn't come to a stop.

Q. Did you come to where you were traveling maybe at 10 to 15 miles an hour, or could you estimate for me as to how much you had slowed down after that happened?
A. I'd actually be guessing, so I really, really can't say. It was just a reflex of having the impact and hitting the brake and then realizing immediately I wanted to catch up with the car and get its license plate number.
Q. Before you said that you had slowed down and your husband had said that you needed to get the other car's license plate; is that correct?
A. That's true.
Q. And you had pulled over to the side of the road; is that right?
A. We were slowing down. Yes, we had pulled over to the -- I had pulled over to the soft side of the road.
Q. To the shoulder?
A. Shoulder, yes.
Q. When you pulled over to the shoulder and after your husband had said to you we need to get this car's license plate number, then you started to accelerate; is that right?
A. Yes.
Q. When you started to accelerate, at that point

in time how far ahead of you was the other vehicle?
A. That's -- that's really tough. It was so far ahead and moving so fast I couldn't see his license plate number, and I was trying to catch up to visualize that so -- I don't know how to accurately answer that question.
Q. Can you give any estimate at all as to how far ahead of you he was when you started to accelerate?
A. No. I'd be making it up, so I can't answer that.
Q. Okay. In any event, then you proceeded to travel down on the service road -- on the shoulder of the road; is that right?
A. Yes. Yes.
Q. What was the traffic like at that time?
A. It wasn't like rush hour traffic. It was moderate but it wasn't anything -- I've seen much worse there. There wasn't anything exceptional about it.
Q. Were many cars going by up in the far right lane while you were on the shoulder?
A. I can't answer that question. I wasn't looking to the -- I wasn't looking over my left shoulder at that point.
Q. Were you concerned at all while you were driving in the shoulder that you may be in an accident

with somebody in the far right-hand lane?
A. No. Because I was pulled way over to the right.
Q. Were your right-hand tires onto the grass area?
A. Onto the shoulder. I would say all four of my tires were on the shoulder.
Q. All four of your tires were on the shoulder. So was -- the left side of your vehicle was it pretty close to the right hand -- the far right-hand lane?
A. No. Because I was getting further away as I progressed, but, no, I didn't feel like I was -- even looking back, I don't feel like I had my left side of my car in the far right-hand lane.
Q. Did the tires -- did the right-hand tires of your vehicle did they ever go into the grassy part of the median?
A. Probably, yes. And I'm saying that by looking at the picture. We ended up that the car was in that position, so, yes.
Q. You believe that the right-hand tires of your vehicle went into the grassy area; is that correct?
A. Yes. But in my mind the difference between the shoulder road and the grassy area is kind of ambiguous.
Q. Okay. The shoulder part of the road has those little -- on the left-hand side of the shoulder those

little ridges that when you roll over them makes a big loud noise; is that right?
A. The asphalt ends and it goes into the dirt.
Q. The left-hand part of the shoulder -- okay? -- and maybe one of the pictures show this. There are those little ridges that when your tires go over them make a loud noise just to let you know you're going over there; is that right?
A. I know what you're talking about if you're in a traffic lane, but I don't understand it if you're on the shoulder of the road.
Q. Can you look at those pictures that are in front of you. Do those pictures show the shoulder of the road?
A. Yes.
Q. And in those pictures that show the shoulder, the asphalt, can you see little horizontal lines going all the way down the shoulder?
A. No, I can't. Am I not looking at the right --
MR. HANSON: Hold on a second, Counsel. Let's make it clear what we're looking at here. I'm showing the witness now the photograph 1 of Exhibit 3. This is a photograph taken from a perspective that's -- that's got mile marker 17 right in the immediate foreground, and it's looking almost directly down --

MR. COUNTS: Okay.
MR. HANSON: -- what I think you're calling the shoulder lane. It's the one that's not actually a travel lane but it's still asphalt. Does that make sense to you?
MR. COUNTS: That's right.
MR. HANSON: Okay. I'm handing that to the witness now.
THE WITNESS: Okay. What I'm looking at here it looks like maybe a long time ago it was painted with stripes. Is this what we're discussing right where the car went off?
MR. HANSON: Counsel, may I?
I think he's asking you about what separates the travel lane of the freeway from the shoulder that's still the paved portion.
Is that right, sir?
MR. COUNTS: Yeah. In the pictures I'm looking at, there are the little horizontal lines that are actually gouged into the asphalt or actually --
THE WITNESS: Okay. I do understand. I do understand. I'm looking at photo 3. I do understand what you're saying.
BY MR. COUNTS:
Q. Do you see those little gouges?

A. Yes, I do.
Q. And they go all the way down the shoulder?
A. Yes.
Q. Did the left part -- your left tires, did they ever go over those gouges?
A. Yes, they did.
Q. So the whole time that you were driving down the shoulder were your left tires on those gouges?
A. They could have been, but I believe I was further to the right. I'd even gotten past that.
Q. You believe you were further to the right?
A. Yes.
Q. And at some point in time you believe that your right tires actually went onto the grass; is that correct?
A. Well, went off of the asphalt to where there's shale.
Q. In some of the pictures it shows -- there's a shoulder and on the shoulder there's little beads of asphalt and going even further there's the actual green grass?
A. Right. I don't think I got into the green grass, no.
Q. You don't ever believe you got to the green grass?

A. No. No. No. No.
Q. Okay.
A. No.
Q. Now, as you're traveling, there's a little -- there's a sign; is that right? A big sign before you get to the accident site?
A. That says "travel time"?
Q. Well, ma'am, let me ask you this question.
A. Okay.
Q. My understanding from deposing the officer in this accident on his report he said the following about what you told him. Okay?
A. Uh-huh.
Q. He said, "Vehicle drove about one-eighth of a mile and went around a large traffic directional sign that was in the median and then went another one-eighth of a mile and struck a steel traffic sign frame"; is that right?
A. That's true.
Q. Do you know what the big -- the large traffic directional sign is that I'm referring to?
A. That would be the one I'm looking at that says "travel time."
Q. Okay.
MR. HANSON: For the record, Counsel, it's

shown in photograph 1 of Exhibit 3.
MR. COUNTS: Okay. Thank you.
Q. From the time that you looked over and noticed that the other vehicle was in the grassy median until the time that the accident actually happened, how long a time was that? How many seconds was that?
A. That's another tough one. I'd be guessing and that's not right to do.
Q. Can you give me any sort of an estimation?
A. No, I really can't.
Q. Okay. When you were driving on the shoulder of the road, how fast did your vehicle get? You were accelerating; correct?
A. Yes.
Q. Up until what speed did you accelerate?
A. Once again, I just had a few seconds, so I wasn't looking at the speedometer.
Q. Do you have any idea from your perception of how fast you may have been going?
A. No, I don't.
Q. Okay.
A. There was too much happening too fast. I don't know.
Q. Would you describe it as kind of a chaotic event?

A. Well, being -- having our car struck was very startling, and so much of this happened in seconds. Once I realized my husband and I were okay and the car was still moving, I totally focused on this other vehicle and -- I'm not sure how to answer that. I was watching this car thinking it was getting ready to get away, and at some point I realized it was going straight into this -- it was going to hit the pole. It wasn't making any effort not to go away.
Q. When did you realize that you and your husband were okay; that you hadn't suffered any injuries?
A. Within seconds after we were hit and our car was still moving, and he had turned around to see if anyone was following us.
Q. Okay. How did you realize your husband wasn't hurt? Did you look over at your husband to see if he had any signs of injuries on him?
A. He said he was okay. He didn't look like he was not okay and his, you know, reaction.
Q. So you looked over at him to see if he was okay; correct?
A. Well, of course, yeah.
Q. How long did that take to do?
A. A split second. I had to look over there anyway. That was the side of the car that was hit.

Q. Okay. And when did you realize that you hadn't sustained any injuries in the accident?
A. Immediately.
Q. Did you look at yourself to see if you had any cuts or abrasions or anything?
A. No. I knew I didn't.
Q. Ma'am, the other car ultimately ended up crashing. How far away from your vehicle was that vehicle when the crash occurred?
A. Well, we were right there. It was so close that I had to back up because I was afraid of the fire.
Q. I'm not sure if you understand my question, ma'am. When the other vehicle -- the moment that it struck the -- the obstacle, when the crash ultimately occurred --
A. Right.
Q. -- how far back was your vehicle from that vehicle?
A. Less than a hundred yards.
Q. Less than a hundred yards?
A. Yes. And by the time I pulled my car to a full stop, I had to back up because I was too close to the flames.
Q. But just focusing on the time when it impacted the barrier. Okay?

A. Yes.
Q. You were less than a hundred yards; is that correct?
A. I would say that's true.
Q. So you had time to pull over to the shoulder and decelerate and then accelerate. By that time you were less than a hundred yards at the moment of impact; is that right?
A. Yes.
Q. So would you say that you were traveling pretty fast in the shoulder, or are you just not remembering it?
A. I don't remember my speed on the shoulder. I was trying to accelerate to get an ID on this car.
Q. When you were driving -- you don't remember if vehicles were passing you in the right-hand lane while you were driving in the shoulder; is that correct?
A. I was not aware of anything that was going on to my left-hand side.
Q. Were there vehicles traveling on the feeder road while you were on the shoulder?
A. I don't remember seeing anything.
Q. Were any cars honking at you while you were driving on the shoulder?
A. No.

Q. So after the accident happened, you ultimately bring your car to a stop; correct?
A. True.
Q. You brought it to a stop approximately how far from the crashed vehicle?
A. I'm not good at feet. I don't know whether to say 200 feet or 300 feet. I'm just not good at distance. It was not a safe distance to be close to a flame so I backed up.
Q. Okay. Did you get out of your car at some point and go and check on the occupants of the vehicle that were crashed?
A. Yes, I did.
Q. And how close did you get to the vehicle?
A. Pretty close. I was very worried that I was way too close to the flames. I was at this point not sure what to do if there were people in the car.
Q. Let me ask you this: When you first stopped your vehicle after the accident occurred, had you driven past the site of the accident or had you stopped before the site of the accident, north or south of the accident?
A. I understand. I was north of the accident. I did not drive past it.
Q. Okay. At any time after the accident did you

move your vehicle after you had initially stopped it?
A. Yes. I backed up because I was too close to the flames.
Q. When did the flames appear on the vehicle?
A. Instantaneously.
Q. So the vehicle crashed into the barrier and all of a sudden bam, it's on fire?
A. Instantaneously.
Q. Was there any progression of the flames on the vehicle, or was it just the whole things was engulfed in flames the moment it hit the barrier?
A. It was engulfed in flames when it hit the barrier. I mean the barrier caused it. It was not burning before it hit the barrier.
Q. I understand that. What I'm asking is after it hit the barrier, immediately was the whole vehicle in flames or only just a small flame?
A. The whole vehicle was in flames, but it continued to burn, so more burned from the time I looked at it. From the time I walked up to it, I saw more of it burning.
Q. Okay. How long did it take you to walk up to the vehicle after the moment of impact?
A. Oh, just seconds.
Q. So you stopped your vehicle, got out of your

car, and you walked over to the vehicle?
A. Yes, it just took seconds.
Q. Okay. It took you a few seconds to get to the vehicle; right?
A. A split second, yeah.
Q. Did you look inside the vehicle to see if there were any occupants inside the vehicle?
A. I could see his torso.
Q. The driver's torso?
A. Yes.
Q. Where was that at?
A. It was -- I was looking south, and it was in the center of where the car had split down the middle.
Q. Was he half in the vehicle and half out, or was he all the way out of the vehicle?
A. The car was split down the center, so it was split open, and from where I was sitting -- standing, I could see what appeared to be his left shoulder and the backside and the left side of his face.
Q. And where were they at? Where was his back shoulder and his left side of his face?
A. In the very middle.
Q. In the middle of the car?
A. Yes.
Q. Was his entire body outside of the car?

A. Well, the car was split opened. It was like someone had just taken a knife and cut it down the center and sprayed it open like a lamb chop or something.
Q. Was the windshield busted out?
A. That was on the other side. The car was opened up. I wasn't really paying attention to the windshield.
Q. Okay.
A. It was probably busted out because the car was split in half.
Q. Was the driver on fire?
A. At that moment, no. While I was standing there, the body fell backwards as if he would fall backwards into the dashboard of the car and disappeared into the flames.
Q. Into the flames inside the vehicle?
A. Yes.
Q. Okay. Now, where was your husband while all this was going on?
A. He was behind me. I wasn't watching him, so I don't know if he was in the car or out of the car or what he was doing.
Q. Did either you or your husband ever attempt to look inside the vehicle to see if there were anymore occupants?

A. No.
Q. Were the side windows of the car were they shattered to where you could actually see inside of the vehicle?
A. I didn't get to the side. I didn't see anyone else in the car. I just saw that.
Q. When you say you didn't get to the side, are you saying you couldn't see the side windows of the vehicle?
A. I didn't walk totally -- I didn't continue further around to look into the car at the side. I only saw him from the view of the north looking south. So I didn't walk around the car.
Q. Oh, so you were ahead of the vehicle. So you were looking at the hood, not the rear; is that right?
A. I was looking at the rear.
Q. You were looking at the rear?
A. Yes.
Q. The back window?
A. Well, it split open, so by then it was just a pile of rubbish. It wasn't definable. It was just a mass of steel.
Q. Okay. But I'm trying to understand where your vantage point was. From what direction --
A. From the back. From the back of the car.

Q. You were -- what we would normally term the back of the vehicle, you were looking at the back window part essentially; is that correct?
A. Well, there wasn't a window there. The car was split in half.
Q. Ma'am, I'm just asking about your vantage point. Okay? Let's assume the vehicle hit the barrier and didn't burst into flames and destroy itself. Okay?
A. Right.
Q. When you were actually looking at it, the vantage point where you were at, were you behind it?
A. I was behind it.
Q. Okay. So you were behind the vehicle. Okay. Did you ever get around to the side or the front of the vehicle?
A. No, I did not.
Q. So from behind the vehicle you could see the driver; is that correct?
A. Yes. Yes.
Q. So was the back window gone then?
MR. HANSON: Objection. Asked and answered.
BY MR. COUNTS:
Q. Is that correct, ma'am?
A. It was either gone or caved in or split in half. I don't have a visual recollection of seeing any

particular windows.
Q. Okay. Did your husband at any point in time ever go to the side or the front of the vehicle?
A. I believe he went to the side.
Q. Do you have a specific recollection of seeing him go to the side?
A. He went further up than I did, so I believe he made it to the side.
Q. While you were standing there immediately after the accident happened, were any other witnesses coming to look at the vehicle?
A. Yes.
Q. Do you remember what those witnesses looked like?
A. Yes.
Q. Give me a physical description of them.
A. One of them was a woman named Bonnie who was traveling from Biovista to go to Houston and had stopped her car, and she climbed over -- she was headed northbound. She climbed over the freeway and made it through four lanes of traffic -- I could not believe she did it -- and was standing at the side of the accident.
Q. And her name was Bonnie?
A. Yes.
Q. Have you spoken with her since the day of the

accident?
A. No.
Q. What did she look like? What was her physical description?
A. She was blonde.
Q. Were there any other witnesses?
A. None that I know of.
Q. How long after the accident occurred did anybody go and look inside the vehicle to see if there were other occupants?
A. Not until the police came.
Q. And how long after the accident was that?
A. Maybe three minutes, five minutes.
Q. Do you remember how long it was?
A. Three minutes maybe. Three to five minutes.
Q. I want to go back now a little bit. While you were inside the car driving on the shoulder, were either you or your husband saying anything to one another?
A. I don't believe we were.
Q. You weren't saying, like, let's hurry and get up there or anything of that nature?
A. Oh, no. No.
Q. When you stopped your vehicle on the side of the road, did you or your husband say anything to one another?

A. Nothing that hasn't been related in this deposition.
Q. What do you mean by that?
A. He had mentioned the fact that we needed to get an ID on this person.
Q. After you had stopped after the accident he said that?
A. The minute we were hit.
Q. That's what I'm asking. From the time -- earlier you said before the accident happened you weren't talking; correct?
A. True.
Q. And then after the vehicle hit the mirror off your vehicle, your husband said: Let's go get the license plate number of that car; is that correct?
A. Essentially, yes. Yes.
Q. Aside from him saying that to you, was there ever any other conversation between you and your husband?
A. No. Specifically my cell phone was on the console, and I don't know if he picked it up or he picked his phone up, and I said: We're on Interstate 45 south before the Texas City exit. Because I grew up there and I assumed he didn't know where we were, so that was another thing that was said.

Q. After the accident happened did -- and you saw it, did you and your husband say anything to one another?
A. Specifically I don't remember anything. There wasn't a lot we could say.
Q. There wasn't a lot to say?
A. No.
Q. Now, after this accident occurred -- it was about three years ago; is that right?
A. Yes.
Q. At any point in time has any investigator talked to you about this accident?
A. Mark Bird.
Q. Mark Bird did?
A. Yes.
Q. And who is Mark Bird?
A. He's an investigator hired by General Motors.
Q. And when did he speak to you?
A. He called me last October and said there would be a deposition, and he wanted me to know that there was going to be legal proceedings and that he'd be contacting me with information on the deposition.
Q. Did he say anything else?
A. No.
Q. How long did that conversation last?

A. I don't know.
Q. Since the day you spoke with Mr. Bird, have you spoken with any other investigator?
A. No.
Q. Have you spoken with Mr. Bird since that time?
A. Yes.
Q. When did you speak to him again?
A. There's been several times trying to get the dates arranged for this deposition.
Q. Mr. Bird has been trying to set a deposition with you?
A. This particular deposition for today.
Q. How many times have you talked to him?
A. I really don't know. I don't know. I don't have records.
Q. You don't have any memory of how many times you talked with him?
A. No, I don't.
Q. Did you tell the officer that you could not estimate a speed that the vehicle was doing?
A. I told the officer I thought it was 80 or 90, and I also said I wasn't sure I was qualified to make that estimation, but that was my reaction.
Q. And is it fair to say that you don't know what, if anything, may have been wrong with the vehicle?

Page 46

A. Wrong?
Q. You don't know whether there was something wrong with the throttle or the cruise control or the brake pedal? You don't know any of that stuff; is that fair to say?
A. Oh, that's certainly fair to say. I didn't see there was any indication there was a problem.
Q. I'm sorry, ma'am. I'm looking over my notes right now --
A. That's okay.
Q. -- to see if I have anymore questions.
A. That's okay.
Q. How long did you spend at the scene of the accident?
A. About two hours.
Q. And did you leave the scene of the accident after -- strike that.
When did you leave the scene of the accident? What had occurred? Had you already spoken to the officers and given your statement?
A. Yeah. We stayed through that. We were there at least two hours.
Q. Aside from talking to the officers and giving your statement, what else did you do in that two hours?
A. I guess waited for people to get organized.

Page 47

Trying to figure out what was going to happen next. Sat on the side of the road.
Q. Aside from being involved with this accident, had you ever been involved in any other accidents before?
A. Fender bender but even that was 30 years ago.
Q. But just one fender bender 30 years ago; is that right?
A. Yeah. I had one as a teenager too, so, yeah. No, I -- I don't have a history --
Q. You haven't been involved in an accident aside from this one in the last 30 years?
A. No.
Q. Okay. Do you remember whether or not your adrenaline was going after the accident?
A. Afterwards? Well, of course.
MR. COUNTS: Ma'am, I think that's all the questions I have for you. Thank you.
THE WITNESS: You're welcome.

EXAMINATION

BY MR. HANSON:
Q. Ma'am, there are a few things I want to try to clarify here.
A. Sure.

Page 48

Q. And I'm going to try to do this briefly.
Now, did you say that you had picked up a cell phone at some point in time, you or your husband, to call in this accident?
A. Yes.
Q. That happened when? At what point?
A. Just that moment. It just so happened the cell phone was sitting there, and I just kind of -- I don't know if he used my cell phone or not. I know he did call.
Q. "He" meaning your husband?
A. Yes.
Q. Do you know whether this was before or after you had stopped your car?
A. I doubt if we had stopped the car. You'd have to ask him. I remember he was looking back to see. I don't know.
Q. But what you do know for sure is your husband called in this accident pretty immediately after it happened?
A. Yes. Yes.
Q. Your estimate was that it was three to five minutes before the police got there?
A. I'm guessing that. I think that was probably pretty accurate.

Page 49

Q. Now, I'm going to come back in a moment when you say you're guessing that and talking about being asked to estimate time and being asked to estimate distances and being asked to estimate speeds. Okay?
A. Uh-huh.
Q. I want to make sure we're clear on what you're sure about and what you kind of are not so sure about. All right?
A. Okay.
Q. Now, before we get to that, I want to ask you about what you noticed when you approached the car with respect to the occupants. All right? Did you ever, ma'am, at any time see any sign of any kind at all that anybody in that car had survived the crash?
A. No.
Q. Was there any sign of life at all that you were able to see or hear or observe in any other way?
A. No.
Q. I want to get clear what you meant when you were talking about the shoulder because I think that could be a little confused here, and perhaps we could use those photographs again. And using whichever one you think shows it best. Maybe the third page. Page No. 3. Okay? Is that a good one?
A. That one looks good.

Q. Okay. And if you would just turn it over to that. When you refer to the shoulder, please point out to the jury what you mean when you say you were driving on the shoulder.
A. The shoulder is the area to the right of the slow lane.
Q. Okay. Now, in that photograph we can see a squad car, can we not?
A. Yes.
Q. So where -- what you're calling the shoulder is where with respect to that squad car?
A. There are two squad cars here. It would be to the right. There's two people standing here. That would be the shoulder of the road, and also this shale area would be the shoulder of the road to me.
Q. Now, when you say you were driving down the shoulder after you had been hit, you started to slow down; you told us that?
A. Uh-huh.
Q. Is it correct, too, that from what it felt like to you -- the impact that just took off your mirror felt to you like a pretty big impact?
A. That's true.
Q. Turned out it was just the mirror taken off?
A. That's true.

Q. In any case, after that happened you slowed down at first and then started to speed up?
A. Yes.
Q. While you were starting to speed up, were you on the pavement or off onto that gravel, if you know?
A. I think probably I had part -- two wheels on this paved shoulder and probably two wheels on the gravel.
Q. Now, were you paying any particular attention to where your wheels were while you were watching this car go through the median?
A. No.
Q. Were you paying any particular attention to what the distances were between you and the car while you were watching what was going on?
A. No, I was not.
Q. Were you paying any particular attention to your own speed while you were watching that car go through the median?
A. No, I wasn't.
Q. What were you paying attention to? What were you focused on?
A. I was focused on that car. I was trying to get the license plate number.
Q. And while you were focused on that car -- well,

let me back up.
You told us that you continued to follow up to get within a hundred yards by the time that it hit the pole; right? Is that correct?
A. Yes.
Q. While you were watching that car after it had hit you and while you were trying to see what it was doing, see if you could see a license number, did the car appear to you to be gaining speed or maintaining speed or what?
A. It appeared to be gaining speed.
Q. Now, did you have the entire time that you watched it a clear view of the brake lights?
A. Yes.
Q. And during that entire time while you had a clear view of the brake lights, did they ever come on?
A. No.
Q. And would it be true, ma'am, that you just -- well, let me back up. Another thing here before I get to that.
Again with -- and I'm going to step around again, if I may, and do this as quickly as I can. Watch the cord.
Counsel asked you a question about a sign that you had referred to to the police. Do I have my finger

on that sign now? This is page 3 --
A. That's true.
Q. -- of Exhibit 3.
A. That's true.
Q. And we can see the tracks --
A. Yes.
Q. -- in the foreground, can we not?
A. This is true.
Q. And as we follow it through then, at first the vehicle was going what looked like diagonally across the median?
A. True.
Q. But then when it got to the area of the sign, did it go by the sign on the right as we look at this photograph?
A. Yes, it did.
Q. Did it ever actually get as far up as the feeder road?
A. No, it did not.
Q. So it went toward the feeder road, around this first sign, and then back into the median?
A. True.
Q. And then from that point -- we're on page 10 -- -- photograph 10 of Exhibit 3.
A. Straight in.

Q. Just straight dead on into the pole?
A. Yes. Yes.
Q. Now, are you able to offer to the jury -- do you have any idea why that car just drove straight into the pole?
MR. COUNTS: Objection. Form.
THE WITNESS: I would -- it's not for me to say. I assumed it was a suicide.
BY MR. HANSON:
Q. Would it be true, ma'am, that you really can't say why it went straight into the pole --
A. No.
Q. -- what you know is that it did; it just went straight into the pole?
A. It did.
MR. HANSON: That's all the questions I have.
MR. COUNTS: I have a few more follow-up questions.

EXAMINATION
BY MR. COUNTS:
Q. You were focused on the car in front of you; correct?
A. Correct.
Q. Were you focused on you and your husband's

safety while you were driving on the shoulder?
A. Actually I don't think so.
Q. Looking at the shoulder -- I think I'm looking at the same picture you are right now of the two squad cars and the sign and the two men standing there. Is that the one you were just talking about?
MR. HANSON: The last one, Counsel -- let me clarify -- the last one we were talking about would be the tenth image of the police photos. It's the one that just shows the two tracks just leading straight to the pole at impact.
MR. COUNTS: One of the pictures I think she was talking about with you was the one with two squad cars.
THE WITNESS: Yeah, it was the third one.
MR. HANSON: There's two or three of them that show that. She was looking at what has been marked as photograph 3 of Exhibit 3.
BY MR. COUNTS:
Q. I just want to talk about that photograph. Okay?
A. Okay.
Q. You can see the gouge marks in the shoulder I was talking about earlier, correct, on the left-hand side?

A. True, yes.
Q. On the right-hand side of the shoulder, you can see where the tracks and the median begin with the other car; correct?
A. Yes.
Q. And then you can see that little area off the side of the shoulder where I think you described shells or little pieces of asphalt?
A. Yes.
MR. HANSON: I think she said shale, Counsel.
MR. COUNTS: Shale. Sorry.
Q. That shale, that area off the side of the asphalt where it's just little pebbles and bits of it --
A. Yes.
Q. -- that is not -- that is not level with the shoulder; correct? In other words, it's at an angle; is that right?
A. Right.
Q. Do you remember traveling down and your right tires being not level with the rest of your car?
A. I believe I stated before that my left driver's wheels were probably on the asphalt part of the defined shoulder, and my passenger wheels were probably into the gravelly area.
Q. But you just don't remember whether you felt

the sensation of your vehicle being tilted is what I'm saying; is that fair?
A. I can't remember at that moment having that feeling or sensation.
Q. Okay. In looking at that picture that has the two squad cars and the two individuals standing there at the side and the track and the median --
A. Yes. Yes.
Q. -- is that where you pulled your vehicle over initially, or is it farther down the road?
A. It was farther back. Not much farther back but farther back.
Q. Okay.
A. Probably a bit farther back. Maybe an eighth of a mile.
Q. Backwards, backwards from the picture?
A. Yes.
MR. HANSON: Let's clarify. What do you mean by "back"? Is it north, south? Can we do it that way?
BY MR. COUNTS:
Q. In other words, further away from the sign in the picture?
A. Yes.
Q. When the other vehicle went around the sign as you can see in the tracks in the median, you couldn't

see the vehicle for that entire time when it was behind the sign, could you?

A. Well, it's not much of an obstruction. As I said, the way from where he took off I thought he was going to go over and get on the other feeder road, and you can see from the tracks he didn't do that. He went around that sign there and went straight into the piling that he had the impact on.

Q. Do you see the big sign in the picture; right?

A. Right.

Q. And left of that sign there's a little guardrail?

A. Right.

Q. Did you have to go around that guardrail and get back into the right-hand lane of traffic when you were traveling on the shoulder?

A. Well, by then that was getting pretty close. I'm sure I had to go around it, yeah.

Q. You just don't remember one way or the other?

A. I went around it to the left-hand side of it. I didn't get in the grass.

Q. That's what I mean.

A. No, I didn't get in the grass.

Q. But you had to get your vehicle somewhat into the far right-hand lane to do that; is that correct?

MR. HANSON: Excuse me, Counsel. What do you mean by the "far right-hand lane"? Do you mean the paved shoulder or do you mean the travel lane?

MR. COUNTS: Travel lane.

THE WITNESS: You could stay in the shoulder and still transfer a set.

BY MR. COUNTS:

Q. When you were approaching that guardrail, did you ever look in your left rearview mirror or over your left shoulder to see if there were any cars coming?

A. I don't have any recollection of doing that.

Q. When did you learn that there were children in the car, ma'am?

A. Oh, after the fire people came and they put tarps around the car, and then it was basically one at a time. They didn't actually announce it. It was sort of a murmur going through the crowd.

MR. COUNTS: That's all the questions I have. Thank you.

MR. HANSON: I have nothing further. Thank you very much, ma'am, for taking the time to come here today and give this testimony.

THE WITNESS: You're welcome.

MR. HANSON: Let's take a couple minutes break, if we may.

THE VIDEOGRAPHER: Off the record at 10:39.

MR. HANSON: Off the video record but on the written record. There will be a transcript that's prepared of this testimony, ma'am. It's going to have basically a typed up booklet version of the questions you were asked and answers you gave. You have a right, if you choose to, to read the transcript, sign indicating that you've done that and make a notation indicating anywhere where you think the answer should be different from what they appear. You don't need to do that, but you may if you choose. All we need from you is for you to tell us whether you want to do that or if you waive that.

THE WITNESS: Would it help you?

MR. HANSON: It's not about helping me. It's whether you want to do it or not. It's whether you're comfortable leaving it as it is or if you would like to read and sign. It's entirely your choice.

THE WITNESS: I would probably like to see it.

MR. HANSON: All right. We'll arrange for that to be done then. Thank you.

(The deposition concluded at 10:50 a.m.)

I, LINDA PAIGE GILMAN, hereby declare under penalty of perjury under the laws of the State of California that I have read the foregoing deposition transcript. Corrections, additions, and/or changes, if any, were noted in ink, and the same is now a full, true, and correct transcript of my testimony.

Executed this________day of________________, 2008, at San Diego, California.

______________________________

LINDA PAIGE GILMAN

A
able (4) 17:20 23:17 49:17 54:3
abrasions (1) 33:5
absolutely (8) 18:13,21 19:8,20 20:9,14,17 23:19
accelerate (11) 13:19 15:3,5,8,9 24:22,25 25:8 31:15 34:6,14
accelerating (1) 31:13
accident (31) 23:10 25:25 30:6,11 31:5 33:2 35:1,19 35:20,21,22,23,25 41:10,22 42:1,8 42:12 43:6,10 44:1,8,12 46:14 46:16,18 47:3,11 47:15 48:4,19
accidents (1) 47:4
accurate (1) 48:25
accurately (2) 6:1 25:5
Accurso (2) 3:13 8:11
acknowledged (1) 12:17
action (1) 13:10
actual (2) 23:18 29:20
ADAM (1) 1:5
addition (1) 5:22
additions (1) 61:4
address (1) 5:5
administer (1) 4:18
administered (1) 4:23
adrenaline (1) 47:15
affiliated (1) 8:4
afraid (1) 33:11
ago (6) 8:7 20:4 28:10 44:9 47:6,7
ahead (5) 9:3 25:1 25:3,8 39:14
AMBER (1) 1:9
ambiguous (1) 26:23
amount (1) 10:1
Andrew (3) 3:4 4:14 20:25
and/or (1) 61:4
angle (1) 56:16
announce (1) 59:16
answer (8) 5:14 6:12 23:24 25:5,9 25:21 32:5 60:9
answered (1) 40:21
answering (2) 6:20 9:21
answers (3) 5:20 6:1 60:6
anybody (3) 8:25 42:9 49:14
anymore (2) 38:24 46:11
anyway (1) 32:25
appear (3) 36:4 52:9 60:10
APPEARANCES (1) 3:1
appeared (2) 37:18 52:11
appreciate (1) 6:2
approached (1) 49:11
approaching (1) 59:8
approximately (2) 18:9 35:4
area (14) 9:20 10:22 14:24,25 17:23 26:4,21,23 50:5,15 53:13 56:6,12,24
arrange (1) 60:20
arranged (1) 45:9
aside (4) 43:17 46:23 47:3,11
asked (8) 6:3,11 40:21 49:3,3,4 52:24 60:4
asking (6) 5:17,17 28:14 36:15 40:6 43:9
asphalt (9) 27:3,17 28:4,20 29:16,20 56:8,13,22
assume (1) 40:7
assumed (2) 43:24 54:8
attempt (1) 38:23
attempted (2) 13:3 23:21
attention (6) 19:14 38:7 51:9,13,17 51:21
attorney (1) 5:11
AUSTIN (1) 1:8
Avenue (1) 3:9
aware (1) 34:18
A-c-c-u-r-s-o (1) 8:11
a.m (3) 3:24 4:5 60:22

B
B (3) 3:8,22 4:7
back (30) 8:17 9:2 17:8,19,23 18:7 18:22 26:12 33:11 33:17,22 37:20 39:19,25,25 40:2 40:2,20 42:16 48:16 49:1 52:1 52:19 53:21 57:11 57:11,12,14,19 58:15
backed (2) 35:9 36:2
background (1) 7:14
backside (1) 37:19
backwards (4) 38:13 38:14 57:16,16
bam (1) 36:7
barely (2) 10:9 21:22
barrier (8) 33:25 36:6,11,13,13,14 36:16 40:7
basically (2) 59:15 60:5
beads (1) 29:19
began (4) 13:19 15:5,8,8
beginning (4) 4:3,5 4:10 15:3
behalf (1) 4:9
believe (15) 10:23 11:5 22:1,2,23 26:20 29:9,11,13 29:24 41:4,7,21 42:19 56:21
believed (1) 13:20
bender (2) 47:6,7
best (2) 11:20 49:23
big (5) 27:1 30:5 30:20 50:22 58:9
Biovista (1) 41:18
Bird (6) 44:13,14 44:16 45:2,5,10
bit (6) 6:22 7:14 9:3 17:10 42:16 57:14
bits (1) 56:13
Blair (1) 3:4
blends (1) 10:3
blonde (1) 42:5
body (2) 37:25 38:13
BOKLCOM (1) 3:8
Bonnie (2) 41:17,23
booklet (1) 60:5
bottom (1) 17:6
brake (12) 13:3 19:9,11,14,17,18 20:18 23:21 24:6 46:4 52:13,16
braking (1) 19:9
break (1) 59:24
breaking (1) 20:15
briefly (1) 48:1
bring (1) 35:2
brought (1) 35:4
burn (1) 36:19
burned (1) 36:19
burning (2) 36:14 36:21
burst (1) 40:8
busted (2) 38:5,9

C
California (10) 1:18 3:23 4:3,8 5:8 7:3,18 8:1 61:3,8
call (3) 11:13 48:4 48:10
called (2) 44:19 48:19
calling (2) 28:2 50:10
campus (1) 8:5
car (81) 11:6,9,10 11:22 12:10,14,18 12:20,25 13:8,13 13:21 15:9,11 16:2,14,25 17:2 17:21 18:7,19 19:4,6 20:1,8 23:10,16 24:7 26:13,18 28:12 32:1,3,6,12,25 33:7,21 34:14 35:2,10,17 37:1 37:13,16,23,25 38:1,6,9,14,21,21 39:2,6,11,13,25

40:4 41:19 42:17 43:15 48:14,15 49:11,14 50:8,11 51:11,14,18,23,25 52:6,9 54:4,22 56:4,20 59:13,15
**cars (7)** 25:19 34:23 50:12 55:5 55:14 57:6 59:10
**car's (2)** 24:11,21
**case (2)** 10:24 51:1
**catch (4)** 15:9,12 24:7 25:4
**cause (1)** 4:6
**caused (1)** 36:13
**caved (1)** 40:24
**cell (4)** 43:20 48:2 48:7,9
**center (6)** 15:17,25 17:5 37:13,16 38:3
**certain (4)** 19:19 19:20 20:9 23:24
**certainly (4)** 10:12 10:16 21:7 46:6
**chance (2)** 5:18 9:13
**change (2)** 10:2 15:23
**changes (1)** 61:4
**chaotic (1)** 31:24
**chase (1)** 13:8
**chased (1)** 13:8
**check (1)** 35:11
**children (1)** 59:12
**choice (1)** 60:18
**choose (2)** 60:7,11
**chop (1)** 38:3
**CHRISTIAN (1)** 1:7
**City (2)** 9:24 43:23
**clarify (3)** 47:24 55:8 57:18
**cleaning (1)** 8:18
**clear (9)** 5:15 6:3 6:9,15 27:21 49:6 49:19 52:13,16
**climbed (2)** 41:19 41:20
**close (9)** 26:9 33:10,22 35:8,14 35:15,16 36:2 58:17
**closer (4)** 10:11,14 18:2,4
**coasting (1)** 22:14
**code (1)** 5:8
**college (1)** 7:22
**color (1)** 11:14
**come (7)** 8:16 9:2 23:25 24:1 49:1 52:16 59:21
**comfortable (1)** 60:17
**coming (7)** 9:22 11:22 12:5,11 17:8 41:10 59:10
**comment (3)** 13:12 13:13,15
**completely (2)** 6:15 6:19
**concerned (1)** 25:24
**concluded (1)** 60:22
**conference (1)** 4:7
**configuration (1)** 9:20
**configured (1)** 9:25
**confused (1)** 49:21
**CONNIE (1)** 1:8
**consequence (1)** 13:17
**considerably (1)** 16:18
**console (1)** 43:21
**contacted (1)** 7:6
**contacting (1)** 44:22
**continue (1)** 39:10
**continued (2)** 36:19 52:2
**Continuously (1)** 19:12
**control (2)** 22:5 46:3
**conversation (4)** 6:21 22:11 43:18 44:25
**cord (1)** 52:23
**Corporation (2)** 1:12 4:16
**correct (24)** 16:16 17:24 24:11 26:21 29:15 31:13 32:21 34:3,17 35:2 40:3 40:18,23 43:11,15 50:20 52:4 54:23 54:24 55:24 56:4 56:16 58:25 61:6
**Corrections (1)** 61:4
**correctly (1)** 9:21
**counsel (9)** 4:13,20 27:20 28:13 30:25 52:24 55:7 56:10 59:1
**Counts (27)** 2:4 3:4 4:14,14 5:18 10:9 10:18 19:24 20:24 20:25 28:1,6,18 28:24 31:2 40:22 47:17 54:6,17,21 55:12,19 56:11 57:20 59:4,7,18
**COUNTY (1)** 1:1
**couple (2)** 6:2 59:24
**course (4)** 5:23 15:23 32:22 47:16
**court (3)** 1:1 5:21 6:24
**covered (1)** 20:11
**crash (9)** 8:13,23 9:4,17 11:18,19 33:9,14 49:14
**crashed (4)** 17:7 35:5,12 36:6
**crashing (1)** 33:8
**crowd (1)** 59:17
**cruise (2)** 22:5 46:3
**CSR (2)** 1:24 3:24
**cut (1)** 38:2
**cuts (1)** 33:5

D

**D (1)** 2:1
**Dallas (1)** 3:5
**damage (1)** 23:13
**dashboard (1)** 38:14
**dates (1)** 45:9
**day (4)** 3:23 41:25 45:2 61:7
**days (1)** 8:18
**dead (1)** 54:1
**deal (1)** 6:24
**DECEASED (5)** 1:5,6 1:6,7,8
**decelerate (1)** 34:6
**declare (1)** 61:1
**Defendant (1)** 3:7
**Defendants (3)** 1:13 2:8 3:22
**defense (1)** 4:9
**definable (1)** 39:21
**defined (1)** 56:22
**degree (1)** 7:22
**Delaney-Dauphin...** 1:23 3:24
**delivered (1)** 7:6
**depends (1)** 17:14
**DEPONENT (1)** 2:2
**deposing (1)** 30:10
**deposition (13)** 1:17 3:21 4:4,8 5:12 43:2 44:20 44:22 45:9,10,12 60:22 61:3
**describe (4)** 9:19 11:21 17:3 31:24
**described (1)** 56:7
**description (3)** 2:9 41:16 42:4
**destroy (1)** 40:8
**deviated (1)** 20:1
**diagonally (1)** 53:10
**Diane (2)** 1:23 3:24
**Diego (6)** 1:18 3:22 4:8 5:8 8:2 61:8
**difference (2)** 10:17 26:22
**different (1)** 60:10
**direction (1)** 39:24
**directional (2)** 30:15,21
**directly (2)** 17:6 27:25
**dirt (1)** 27:3
**disappeared (1)** 38:14
**discussing (1)** 28:11
**distance (3)** 17:20 35:8,8
**distances (2)** 49:4 51:14
**DISTRICT (2)** 1:1,2
**divided (1)** 10:24
**doing (5)** 19:2 38:22 45:20 52:8 59:11
**DORIS (1)** 1:4
**doubt (1)** 48:15
**drive (1)** 35:24
**driven (2)** 11:11 35:19
**driver (4)** 19:1,2 38:11 40:18
**driver's (3)** 12:16 37:9 56:21
**driving (13)** 11:7

11:15 13:20 25:25 29:7 31:11 34:15 34:17,24 42:17 50:3,16 55:1
**drove (2)** 30:14 54:4
**duly (1)** 4:23

E

**E (1)** 2:1
**earlier (3)** 17:9 43:10 55:24
**easier (1)** 6:23
**education (1)** 7:20
**effect (1)** 13:15
**effort (5)** 6:19,22 13:17 19:22 32:9
**eighth (1)** 57:14
**either (6)** 6:14 19:7,22 38:23 40:24 42:17
**emergency (2)** 12:1 12:1
**ended (3)** 17:21 26:18 33:7
**ends (1)** 27:3
**engulfed (2)** 36:10 36:12
**entered (3)** 16:25 19:4 22:21
**entire (4)** 37:25 52:12,15 58:1
**entirely (3)** 16:9 23:15 60:18
**Esq (2)** 3:4,8
**essentially (2)** 40:3 43:16
**ESTATE (5)** 1:4,5,6 1:6,7
**estimate (7)** 24:2 25:7 45:20 48:22 49:3,3,4
**estimation (2)** 31:9 45:23
**event (2)** 25:11 31:25
**EXAMINATION (5)** 2:2 5:1 20:23 47:21 54:20
**example (1)** 16:10
**exceptional (1)** 25:18
**Excuse (1)** 59:1
**Executed (1)** 61:7
**exhibit (10)** 4:19 14:2 17:19 18:3 20:4 27:22 31:1 53:3,24 55:18
**EXHIBITS (1)** 2:7
**exit (4)** 9:22,24 10:5 43:23
**eyes (1)** 17:2

F

**face (2)** 37:19,21
**fact (2)** 6:11 43:4
**faintest (1)** 23:16
**fair (5)** 10:1 45:24 46:5,6 57:2
**fall (1)** 38:13
**family (1)** 8:18
**far (16)** 7:20 11:1 22:21 25:1,2,7,19 26:1,9,13 33:8,17 35:4 53:17 58:25 59:2
**fast (10)** 11:3 12:5 12:7,7 17:14 25:3 31:12,19,22 34:11
**faster (1)** 16:18
**Fe (1)** 11:13
**feeder (10)** 13:22 13:25 14:6,14 15:14,21 34:20 53:18,20 58:5
**feel (3)** 12:22 26:11,12
**feeling (1)** 57:4
**feet (3)** 35:6,7,7
**fell (1)** 38:13
**felt (6)** 12:24 23:5 23:6 50:20,21 56:25
**fender (2)** 47:6,7
**figure (1)** 47:1
**finger (5)** 14:14,23 14:24 17:20 52:25
**finish (1)** 16:9
**finished (1)** 6:20
**fire (4)** 33:11 36:7 38:11 59:14
**FIRM (1)** 3:3
**first (12)** 7:15 11:18 12:2 14:4 15:18,19 17:19 21:5 35:18 51:2 53:9,21
**five (5)** 21:17,19 42:13,15 48:22
**flame (2)** 35:9 36:17
**flames (12)** 33:23 35:16 36:3,4,9,11 36:12,17,18 38:15 38:16 40:8
**flip (1)** 17:9
**focused (6)** 32:4 51:22,23,25 54:22 54:25
**focusing (1)** 33:24
**follow (4)** 17:4 18:19 52:2 53:9
**following (2)** 30:11 32:14
**follows (1)** 4:24
**follow-up (2)** 21:5 54:17
**footing (1)** 17:6
**foregoing (1)** 61:3
**foreground (2)** 27:24 53:7
**form (2)** 19:24 54:6
**formal (1)** 7:20
**forward (1)** 18:1
**four (6)** 8:7 10:3 10:23 26:5,7 41:21
**frame (1)** 30:17
**freeway (14)** 9:23 9:25 10:2 11:20 15:14 21:12,14,18 21:19,21,23,25 28:15 41:20
**FRIEND (1)** 1:8
**front (4)** 27:13 40:14 41:3 54:22
**full (3)** 5:6 33:21 61:5
**further (13)** 26:10 29:10,11,20 39:11 41:7 57:10,11,11 57:12,14,21 59:20

G

**gaining (2)** 52:9,11
**GALVESTON (1)** 1:1
**General (5)** 1:12 4:6,15 5:11 44:17
**gestures (1)** 6:8
**getting (4)** 9:24 26:10 32:6 58:17
**get-on (1)** 21:18
**Gilman (14)** 1:17 2:2 3:21 4:4,12 4:19,22 5:6,7 10:10 14:2 20:25 61:1,11
**give (4)** 25:7 31:9 41:16 59:22
**given (2)** 5:12 46:20
**giving (1)** 46:23
**go (25)** 5:7 7:20 15:20 17:13,15 19:22 21:5 26:15 27:6 29:2,5 32:9 35:11 41:3,6,18 42:9,16 43:14 51:11,18 53:14 58:5,14,18
**goes (1)** 27:3
**going (34)** 6:23 11:3 13:21 14:11 15:14,16,17,19,20 16:18,21 17:13,16 21:9 25:19 27:7 27:17 29:20 31:19 32:7,8 34:18 38:19 44:21 47:1 47:15 48:1 49:1 51:15 52:21 53:10 58:5 59:17 60:4
**good (6)** 5:3,4 35:6 35:7 49:24,25
**gotten (2)** 11:20 29:10
**gouge (1)** 55:23
**gouged (1)** 28:20
**gouges (3)** 28:25 29:5,8
**grass (16)** 13:22 14:7 15:13,20,21 15:24,25 17:1,5 26:4 29:14,21,23 29:25 58:21,23
**grassy (4)** 26:15,21 26:23 31:4
**gravel (2)** 51:5,8
**gravelly (1)** 56:24
**grazed (1)** 23:16
**green (4)** 11:16 29:20,22,24
**GREENE (1)** 3:8
**grew (2)** 8:17 43:23
**ground (1)** 20:10
**guardrail (3)** 58:12 58:14 59:8
**guess (2)** 6:13 46:25
**guessed (1)** 5:14

guessing (4) 24:4 31:7 48:24 49:2
gyrations (1) 19:25

H

half (5) 37:14,14 38:10 40:5,25
hand (2) 14:21 26:9
handing (1) 28:7
Hanson (32) 2:4 3:8 3:8 4:15,15 5:2 5:10 10:13,20 17:16 20:2,20 21:4 27:20 28:2,7 28:13 30:25 40:21 47:22 54:9,16 55:7,16 56:10 57:18 59:1,20,24 60:2,15,20
happen (2) 8:23 47:1
happened (13) 9:17 13:1 24:3 31:5 32:2 35:1 41:10 43:10 44:1 48:6,7 48:20 51:1
happening (2) 15:7 31:22
haze (1) 23:16
headed (1) 41:19
heading (4) 9:22 18:4 19:5 20:5
hear (2) 21:1 49:17
hearing (1) 10:10
heart (1) 5:16
help (2) 8:20 60:14
helpful (1) 10:18
helping (1) 60:15
helps (1) 10:15
high (1) 11:23
highway (2) 9:20 10:24
high-speed (1) 13:8
hired (1) 44:17
history (1) 47:10
hit (22) 12:10,14 12:18,19,23 16:23 18:14 19:2 20:8 32:8,12,25 36:11 36:12,14,16 40:7 43:8,13 50:17 52:3,7
hitting (1) 24:6
hit-and-run (1) 13:14
hold (2) 17:11 27:20
Holland (1) 9:22
home (2) 7:23 21:18
honesty (1) 12:24
honking (1) 34:23
hood (1) 39:15
hope (1) 9:21
hoping (1) 7:9
horizontal (2) 27:17 28:19
hour (4) 16:4,14 24:2 25:16
hours (3) 46:15,22 46:24
house (4) 8:18 11:12 21:13,16
Houston (1) 41:18
hundred (6) 6:14 33:19,20 34:2,7 52:3
hurry (1) 42:20
hurt (1) 32:16
husband (22) 8:24 11:13 13:6,15 22:12 24:10,21 32:3,10,15,16 38:18,23 41:2 42:18,24 43:14,19 44:2 48:3,11,18
husband's (2) 8:10 54:25

I

ID (2) 34:14 43:5
idea (3) 12:25 31:18 54:4
identification (1) 4:20
IH45 (2) 8:13 10:6
image (1) 55:9
immediate (1) 27:24
immediately (5) 24:6 33:3 36:16 41:9 48:19
impact (10) 13:1 15:6 23:6 24:5 34:7 36:23 50:21 50:22 55:11 58:8
impacted (1) 33:24
impression (2) 16:6 16:15
INDEX (1) 2:7
indicating (2) 60:8 60:9
indication (1) 46:7
INDIVIDUALLY (2) 1:4,9
individuals (1) 57:6
information (1) 44:22
initial (1) 15:6
initially (2) 36:1 57:10
injuries (3) 32:11 32:17 33:2
ink (1) 61:5
inside (7) 37:6,7 38:16,24 39:3 42:9,17
Instantaneously... 36:5,8
Institution (1) 8:2
intent (1) 12:8
intention (1) 10:6
Interstate (1) 43:22
interview (1) 9:10
interviewed (1) 9:4
introductions (1) 4:10
investigator (3) 44:11,17 45:3
involved (4) 11:19 47:3,4,11
ISAAC (1) 1:6

J

JACOB (1) 1:7
James (2) 3:14 4:1
judge (1) 16:5
JUDICIAL (1) 1:2
jumping (1) 9:3
Junior (1) 7:22
jury (5) 7:11 17:3 18:18 50:3 54:3

K

keep (2) 16:25 19:11
Kent (4) 3:8 4:15 5:10 10:9
kind (7) 11:6 19:6 26:23 31:24 48:8 49:7,13
knew (2) 12:10 33:6
knife (1) 38:2
know (29) 6:12 15:7 16:18,21 25:5 27:7,9 30:20 31:23 32:19 35:6 38:21 42:7 43:21 43:24 44:20 45:1 45:14,14,24 46:2 46:4 48:9,9,13,17 48:18 51:5 54:13

L

laboratory (1) 8:3
lamb (1) 38:3
lane (22) 10:3,3,4 11:1,23,24 12:8 25:20 26:1,9,13 27:10 28:3,4,15 34:16 50:6 58:15 58:25 59:2,3,4
lanes (4) 10:2,21 14:20 41:21
large (2) 30:15,20
laws (1) 61:2
leading (2) 18:16 55:10
learn (1) 59:12
leave (2) 46:16,18
leaving (1) 60:17
left (21) 12:9 13:5 14:14,21 19:7,23 21:13,16 25:22 26:8,12 29:4,4,8 37:18,19,21 56:21 58:11 59:9,10
left-hand (5) 26:25 27:4 34:19 55:24 58:20
legal (2) 4:2 44:21
length (2) 20:10,12
let's (7) 18:1 27:20 40:7 42:20 43:14 57:18 59:24
level (2) 56:15,20
license (12) 13:13 13:16,18 15:10 16:24 24:7,11,22 25:3 43:15 51:24 52:8
life (1) 49:16
lift (1) 14:10
lights (8) 19:9,11 19:15,17,18 20:18 52:13,16
limit (1) 21:25
Linda (8) 1:17 2:2 3:21 4:4,22 5:6 61:1,11

lines (2) 27:17 28:19
listening (1) 22:7
little (23) 6:22 7:14 9:3 10:10,11 10:14 17:10 18:2 18:4 26:25 27:1,6 27:17 28:19,25 29:19 30:4 42:16 49:21 56:6,8,13 58:11
live (2) 5:7 7:12
lived (1) 7:18
located (1) 4:2
long (12) 7:18 21:11 22:18 28:10 31:5 32:23 36:22 42:8,12,14 44:25 46:13
look (16) 17:19 19:11 23:11 27:12 32:16,18,24 33:4 37:6 38:24 39:11 41:11 42:3,9 53:14 59:9
looked (8) 12:9 13:6 23:2 31:3 32:20 36:19 41:13 53:10
looking (32) 12:2 12:13,15,15 14:17 17:10 18:2 25:21 25:22 26:12,17 27:19,21,25 28:9 28:18,22 30:22 31:17 37:12 39:12 39:15,16,17 40:2 40:10 46:8 48:16 55:3,3,17 57:5
looks (2) 28:10 49:25
lot (2) 44:5,6
LOU (1) 1:9
loud (2) 27:2,7

M

maintaining (1) 52:9
making (2) 25:9 32:9
Malibu (2) 11:8,14
managed (1) 8:3
maneuver (3) 19:7 20:13,15
MAREK (1) 3:8
Mark (3) 44:13,14 44:16
marked (3) 4:19 14:1 55:17
marker (1) 27:24
marks (1) 55:23
Marquette (1) 3:9
married (1) 8:8
MARY (1) 1:9
mass (1) 39:22
matter (2) 4:6 7:12
ma'am (23) 5:3,10 5:12 7:7,15,21 8:8 19:13 21:8 30:8 33:7,13 40:6 40:23 46:8 47:17 47:23 49:13 52:18 54:10 59:13,21 60:4
MCNEIL (1) 1:8
mean (14) 6:12,13 7:16 9:19 11:24 19:2 36:13 43:3 50:3 57:18 58:22 59:2,2,3
meaning (1) 48:11
meant (2) 6:9 49:19
median (15) 17:1 18:5 19:5 22:22 23:3 26:16 30:16 31:4 51:11,19 53:11,21 56:3 57:7,25
memory (1) 45:16
men (1) 55:5
mentioned (2) 15:2 43:4
merged (1) 21:23
middle (5) 5:7 15:13 37:13,22,23
mike (1) 17:13
mile (4) 27:24 30:15,17 57:15
miles (3) 16:4,14 24:2
mind (1) 26:22
Minneapolis (1) 3:10
Minnesota (1) 3:10
MINOR (1) 1:9
minute (2) 21:14 43:8
minutes (8) 21:17 21:20 42:13,13,15 42:15 48:23 59:24
mirror (9) 12:3,4 12:16 23:15,18 43:13 50:21,24 59:9
moderate (1) 25:17
moment (12) 13:24 17:8 21:22 22:23 33:13 34:7 36:11 36:23 38:12 48:7 49:1 57:3
moments (1) 20:4
morning (2) 5:3,4
mother (1) 8:20
mother's (1) 8:18
Motors (5) 1:12 4:6 4:15 5:11 44:17
move (4) 10:13 17:12 18:1 36:1
moved (1) 18:3
moving (5) 12:8 18:11 25:3 32:4 32:13
murmur (1) 59:17

N

N (1) 2:1
name (10) 4:1,11,12 5:5,6,7,10 8:10 20:25 41:23
named (1) 41:17
nature (1) 42:21
necessarily (1) 16:15
necessary (2) 7:11 16:7
need (4) 13:13 24:21 60:10,11
needed (2) 24:10 43:4
never (5) 13:12 15:8,24 17:2 20:1
nods (1) 6:8
noise (2) 27:2,7
normal (2) 6:21 16:11
normally (1) 40:1
north (4) 35:21,23 39:12 57:19
northbound (1) 41:20
notation (1) 60:8
noted (1) 61:5
notes (1) 46:8
notice (1) 11:18
noticed (5) 11:4 12:2,5 31:3 49:11
number (12) 4:6 10:3 13:14,16,18 15:10 24:8,22 25:4 43:15 51:24 52:8
numbered (1) 14:3

O

Oaks (1) 4:3
oath (2) 4:18,23
Objection (3) 19:24 40:21 54:6
observation (1) 16:1
observe (2) 20:12 49:17
obstacle (1) 33:14
obstruction (1) 58:3
occupants (5) 35:11 37:7 38:25 42:10 49:12
occur (1) 9:4
occurred (7) 8:13 33:9,15 35:19 42:8 44:8 46:19
Oceanography (1) 8:2
October (6) 1:19 3:23 4:5 8:13,13 44:19
offer (1) 54:3
officer (4) 16:13 30:10 45:19,21
officers (4) 9:5 16:3 46:20,23
Oh (6) 21:16 36:24 39:14 42:22 46:6 59:14
okay (58) 6:16,25 7:25 10:19 13:11 14:13 15:2 17:18 18:1 21:1,6 23:5 25:11 26:24 27:4 28:1,7,9,21 30:2 30:9,12,24 31:2 31:11,21 32:3,11 32:15,18,19,21 33:1,25 35:10,25 36:22 37:3 38:8 38:18 39:23 40:7 40:8,13,13 41:2 46:10,12 47:14 49:4,9,24 50:1,7

55:21,22 57:5,13
old (1) 7:15
Once (3) 15:24 31:16 32:3
one-eighth (2) 30:14,16
on-ramp (1) 9:25
open (3) 37:17 38:3 39:20
opened (2) 38:1,6
operator (1) 4:2
ordinary (1) 11:4
organized (1) 46:25
outside (2) 7:23 37:25

P

page (8) 2:9 14:3,4 18:2 49:23,23 53:1,23
Paige (11) 1:17 2:2 3:21 4:4,12,22 5:6,6,7 61:1,11
painted (1) 28:10
part (10) 9:14 12:22 21:22 26:15 26:24 27:4 29:4 40:3 51:6 56:22
particular (5) 41:1 45:12 51:9,13,17
passenger (2) 12:11 56:23
passing (1) 34:16
path (2) 17:4 18:19
paved (3) 28:16 51:7 59:3
pavement (1) 51:5
paying (6) 19:14 38:7 51:9,13,17 51:21
pebbles (1) 56:13
pedal (1) 46:4
penalty (1) 61:2
people (7) 6:21,25 16:11 35:17 46:25 50:13 59:14
percent (1) 6:14
perception (1) 31:18
perjury (1) 61:2
person (1) 43:5
perspective (1) 27:23
phone (6) 10:14 43:20,22 48:3,8,9
photo (1) 28:22
Photocopies (1) 2:10
photograph (17) 14:6,9,17,21 15:3 17:19 18:2,11 20:4 27:22,23 31:1 50:7 53:15 53:24 55:18,20
photographs (6) 2:10 14:1,3 17:9 20:12 49:22
photos (1) 55:9
physical (2) 41:16 42:3
pick (2) 9:25 12:3
picked (3) 43:21,22 48:2
picture (7) 14:8 26:18 55:4 57:5 57:16,22 58:9
pictures (7) 27:5 27:12,13,16 28:18 29:18 55:12
pieces (1) 56:8
pile (1) 39:21
piling (1) 58:7
plaintiffs (3) 1:10 3:2 4:14
plate (8) 15:10 16:24 24:8,11,22 25:4 43:15 51:24
please (8) 4:10,18 5:5 6:4 9:12,19 17:3 50:2
point (22) 14:13,23 15:16,23 16:2 17:12 19:4 24:25 25:23 29:13 32:7 35:11,16 39:24 40:7,11 41:2 44:11 48:3,6 50:2 53:23
pointing (3) 14:14 17:20 18:9
pole (14) 18:12,14 18:20 19:2,6 20:5 20:8 32:8 52:4 54:1,5,11,14 55:11
police (7) 9:4,14 13:9 42:11 48:23 52:25 55:9
portion (1) 28:16
position (1) 26:19
possible (1) 12:10
possibly (1) 6:1
Powledge (10) 1:4,5 1:5,6,7,7,8,9,9 4:6
preparation (1) 9:14
prepared (3) 6:9 10:4 60:4
PRESENT (1) 3:12
preserve (1) 7:10
pretty (7) 26:8 34:10 35:15 48:19 48:25 50:22 58:17
probably (11) 13:21 21:17 26:17 38:9 48:24 51:6,7 56:22,23 57:14 60:19
problem (1) 46:7
procedure (2) 5:15 5:23
proceeded (1) 25:11
proceedings (1) 44:21
professor (1) 8:3
progressed (1) 26:11
progression (1) 36:9
pry (1) 7:16
pull (1) 34:5
pulled (9) 13:3 14:25 24:13,15,16 24:20 26:2 33:21 57:9
purpose (1) 5:25
put (4) 14:23,24 15:3 59:14

Q

qualified (2) 16:4 45:22
question (9) 6:3,4 6:12 22:19 25:6 25:21 30:8 33:12 52:24
questions (14) 5:17 5:18,20 6:19 16:9 20:21 21:3,6 46:11 47:18 54:16 54:18 59:18 60:5
quickly (1) 52:22

R

RACHEL (1) 1:5
radio (1) 22:7
rapid (1) 12:12
rate (2) 11:23 12:12
reached (1) 11:5
reaction (2) 32:19 45:23
read (3) 60:7,18 61:3
ready (1) 32:6
realize (3) 32:10 32:15 33:1
realized (2) 32:3,7
realizing (1) 24:6
really (7) 24:4,4 25:2 31:10 38:7 45:14 54:10
rear (3) 39:15,16 39:17
rearview (3) 12:4 12:16 59:9
reason (1) 6:22
recall (6) 6:14 9:17 10:21 11:3,6 11:14
recollection (3) 40:25 41:5 59:11
record (4) 30:25 60:1,2,3
recording (1) 9:13
records (1) 45:15
refer (1) 50:2
referred (1) 52:25
referring (3) 14:5 15:4 30:21
reflex (3) 13:9 23:25 24:5
related (1) 43:1
relocated (1) 17:18
remember (17) 9:7,9 12:7,8 16:3 34:13 34:15,22 41:13 42:14 44:4 47:14 48:16 56:19,25 57:3 58:19
remembering (2) 11:21 34:11
rental (1) 11:10
report (1) 30:11
reporter (3) 4:17 5:21 6:24
REPRESENTATIVE (1) 1:4
representing (1)

5:11
**resident (1)** 7:2
**respect (3)** 19:21 49:12 50:11
**rest (2)** 18:12 56:20
**restated (1)** 6:5
**retained (1)** 4:20
**retire (1)** 8:6
**retired (2)** 7:24,25
**review (1)** 9:13
**Rick (2)** 3:13 8:11
**ridges (2)** 27:1,6
**right (68)** 7:2 9:5 10:4,21 11:1,25 12:1 13:5,6,25 14:21 16:16 17:23 19:7,23 21:5,9,20 22:3,15,25 23:7 23:11,21 24:14,23 25:13,19 26:3,9 27:2,8,19,24 28:6 28:11,17 29:10,11 29:14,22 30:5,18 31:8 33:10,16 34:8 37:4 39:15 40:9 44:9 46:9 47:8 49:8,12 50:5 50:13 52:4 53:14 55:4 56:17,18,19 58:9,10,13 60:6 60:20
**right-hand (16)** 12:24 13:23 14:7 14:16 23:14 26:1 26:4,9,13,14,20 34:16 56:2 58:15 58:25 59:2
**road (31)** 3:4 9:22 9:25 11:25 12:1 13:4,20,22,25 14:6,14 15:15,21 24:14,17 25:12,13 26:23,24 27:11,14 31:12 34:21 42:24 47:2 50:14,15 53:18,20 57:10 58:5
**Robbins (2)** 3:14 4:1
**roll (1)** 27:1
**room (1)** 4:7
**rubbish (1)** 39:21
**rush (1)** 25:16

**S**

**safe (1)** 35:8
**safety (1)** 55:1
**San (6)** 1:18 3:22 4:8 5:8 8:1 61:8
**Santa (1)** 11:13
**Sat (1)** 47:1
**saw (11)** 8:23 9:3 11:22 12:17 15:19 17:4 18:19 36:20 39:6,12 44:1
**saying (9)** 16:7,15 26:17 28:23 39:8 42:18,20 43:17 57:2
**says (2)** 30:7,22
**scene (3)** 46:13,16 46:18
**scratch (1)** 23:18
**Scripps (2)** 8:2,4
**second (4)** 21:22 27:20 32:24 37:5
**seconds (7)** 31:6,16 32:2,12 36:24 37:2,3
**see (55)** 10:13,14 12:9,19 13:17 14:5,12 17:16,21 18:4,7,11,16 19:1 19:6,9,17 20:5,11 22:24 25:3 27:17 28:25 32:13,16,20 33:4 37:6,8,18 38:24 39:3,5,8 40:17 42:9 46:6 46:11 48:16 49:13 49:17 50:7 52:7,8 52:8 53:5 55:23 56:3,6 57:25 58:1 58:6,9 59:10 60:19
**seeing (3)** 34:22 40:25 41:5
**seen (2)** 13:21 25:17
**sensation (2)** 57:1 57:4
**sense (1)** 28:5
**separates (1)** 28:14
**September (1)** 8:7
**service (3)** 11:22 11:24 25:12
**set (2)** 45:10 59:6
**severed (2)** 23:15 23:19
**shale (5)** 29:17 50:14 56:10,11,12
**shattered (1)** 39:3
**shells (1)** 56:7
**Sherman (1)** 4:3
**short (1)** 10:7
**shoulder (60)** 11:25 12:9,13 13:4,7,20 24:18,19,20 25:12 25:20,22,25 26:5 26:6,7,23,24,25 27:4,11,13,16,18 28:3,15 29:2,8,19 29:19 31:11 34:5 34:11,13,17,21,24 37:18,21 42:17 49:20 50:2,4,5,10 50:14,15,17 51:7 55:1,3,23 56:2,7 56:16,23 58:16 59:3,5,10
**show (7)** 11:22 14:1 14:10 27:5,13,16 55:17
**showed (1)** 17:9
**showing (1)** 27:21
**shown (2)** 7:10 31:1
**shows (3)** 29:18 49:23 55:10
**side (40)** 12:11,16 12:25 13:23 14:8 14:16,21 17:18 23:7,11,14 24:13 24:16 26:8,12,25 32:25 34:19 37:19 37:21 38:6 39:2,5 39:7,8,11 40:14 41:3,4,6,8,22 42:23 47:2 55:25 56:2,7,12 57:7 58:20
**sign (22)** 17:6 30:5 30:5,15,17,21 49:13,16 52:24 53:1,13,14,21 55:5 57:21,24 58:2,7,9,11 60:7 60:18
**signs (1)** 32:17
**silence (1)** 22:14
**sir (1)** 28:17
**sister (1)** 11:13
**sister's (2)** 11:12 21:16
**site (3)** 30:6 35:20 35:21
**sitting (3)** 5:21 37:17 48:8
**slide (1)** 11:22
**slow (5)** 10:3 15:6 23:23 50:6,17
**slowed (3)** 24:3,9 51:1
**slowing (1)** 24:15
**small (1)** 36:17
**soft (1)** 24:16
**somebody (1)** 26:1
**somebody's (1)** 21:13
**somewhat (1)** 58:24
**sorry (3)** 10:9 46:8 56:11
**sort (3)** 22:11 31:9 59:16
**south (7)** 9:22,23 35:21 37:12 39:12 43:23 57:19
**southbound (3)** 10:22 21:9,11
**speak (3)** 10:10 44:18 45:7
**speaker (1)** 10:14
**specific (1)** 41:5
**specifically (3)** 19:14 43:20 44:4
**speed (14)** 10:1 11:23 16:1,14 21:25 31:15 34:13 45:20 51:2,4,18 52:9,10,11
**speedometer (1)** 31:17
**speeds (1)** 49:4
**spend (1)** 46:13
**spent (1)** 8:18
**split (11)** 21:22 32:24 37:5,13,16 37:17 38:1,10 39:20 40:5,24
**spoke (1)** 45:2
**spoken (4)** 41:25 45:3,5 46:19
**sprayed (1)** 38:3
**squad (6)** 50:8,11 50:12 55:4,13 57:6
**standing (7)** 37:17 38:12 41:9,22 50:13 55:5 57:6
**start (1)** 6:20

**started (7)** 14:2 15:6 24:22,25 25:8 50:17 51:2
**starting (1)** 51:4
**startling (1)** 32:2
**state (3)** 4:11 5:5 61:2
**stated (1)** 56:21
**statement (2)** 46:20 46:24
**stay (2)** 10:4 59:5
**stayed (2)** 15:25 46:21
**staying (1)** 11:12
**steel (2)** 30:17 39:22
**steering (4)** 19:6 19:21,22 20:13
**step (2)** 18:22 52:21
**stop (7)** 13:24 14:25 15:8 23:25 33:22 35:2,4
**stopped (10)** 13:12 35:18,20 36:1,25 41:18 42:23 43:6 48:14,15
**straight (11)** 13:21 17:5 20:5 32:7 53:25 54:1,4,11 54:14 55:10 58:7
**straightened (1)** 19:5
**Street (3)** 3:22 4:7 5:8
**strike (3)** 22:18,24 46:17
**stripes (1)** 28:11
**struck (6)** 22:17,20 23:20 30:17 32:1 33:14
**stuff (1)** 46:4
**subpoena (1)** 7:6
**sudden (1)** 36:7
**suffered (1)** 32:11
**suicide (1)** 54:8
**Suite (2)** 3:5,9
**Support (1)** 4:2
**sure (16)** 5:15 6:14 15:18 16:4 19:21 20:7 32:5 33:12 35:17 45:22 47:25 48:18 49:6,7,7 58:18
**survived (1)** 49:14
**sustained (1)** 33:2
**swerving (1)** 20:1

**T**

**table (1)** 5:22
**take (5)** 18:19 22:18 32:23 36:22 59:24
**taken (10)** 3:22 4:7 4:9 5:21 12:25 21:17 23:7 27:23 38:2 50:24
**takes (1)** 6:22
**talk (2)** 16:11 55:20
**talked (3)** 44:12 45:13,17
**talking (12)** 6:25 16:10 20:3 27:9 43:11 46:23 49:2 49:20 55:6,8,13 55:24
**tarps (1)** 59:15
**teenager (1)** 47:9
**Telephonically (1)** 3:4
**tell (5)** 9:12 14:5 18:18 45:19 60:12
**telling (1)** 16:3
**ten (1)** 14:3
**tenth (1)** 55:9
**term (1)** 40:1
**terms (1)** 12:22
**testified (1)** 4:23
**testimony (5)** 7:10 9:15 59:22 60:4 61:6
**tethered (1)** 17:12
**Texas (8)** 1:1 3:5 7:11,12 8:16,17 9:24 43:23
**Thank (6)** 20:20 31:2 47:18 59:19 59:20 60:21
**thing (5)** 6:7,18 12:10 43:25 52:19
**things (4)** 5:16 6:2 36:10 47:23
**think (16)** 13:14 21:5 28:2,14 29:22 47:17 48:24 49:20,23 51:6 55:2,3,12 56:7,10 60:9
**thinking (1)** 32:6
**third (2)** 49:23 55:15
**thought (6)** 12:23 13:7 15:16,20 45:21 58:4
**three (6)** 42:13,15 42:15 44:9 48:22 55:16
**throttle (1)** 46:3
**Thursday (1)** 3:23
**tilted (1)** 57:1
**time (44)** 6:3,25 8:16,19,23 10:1 12:14,16 15:4 19:4 20:16,18 21:15 22:18 25:1 25:15 28:10 29:7 29:13 30:7,23 31:3,5,6 33:21,24 34:5,6 35:25 36:19,20 41:2 43:9 44:11 45:5 48:3 49:3,13 52:3 52:12,15 58:1 59:16,21
**times (3)** 45:8,13 45:16
**tires (11)** 26:4,6,7 26:14,14,20 27:6 29:4,8,14 56:20
**today (7)** 5:25 7:5 7:9 9:15 14:2 45:12 59:21
**told (9)** 9:14 11:17 16:13,24 18:23 30:12 45:21 50:18 52:2
**torso (2)** 37:8,9
**totally (4)** 16:11 19:16 32:4 39:10
**tough (2)** 25:2 31:7
**TRACEY (1)** 3:3
**track (1)** 57:7
**tracks (12)** 18:4,16 18:18 20:3,5,7,11 53:5 55:10 56:3 57:25 58:6
**traffic (8)** 25:15 25:16 27:10 30:15 30:17,20 41:21 58:15
**transcript (5)** 6:9 60:3,7 61:4,6
**transfer (1)** 59:6
**travel (8)** 22:21 25:12 28:4,15 30:7,23 59:3,4
**traveling (15)** 10:22 14:19,20 15:11 21:8,11,14 22:2 24:1 30:4 34:10,20 41:18 56:19 58:16
**tremendous (2)** 13:1 23:6
**trial (1)** 7:11
**true (35)** 7:3,7,8 7:12,13 8:14 10:7 10:8 12:20,21 14:18,22 15:22 16:17,20,22 19:13 23:1,22 24:12 30:19 34:4 35:3 43:12 50:23,25 52:18 53:2,4,8,12 53:22 54:10 56:1 61:6
**try (2)** 47:23 48:1
**trying (10)** 15:12 16:24 25:4 34:14 39:23 45:8,10 47:1 51:23 52:7
**turn (2)** 14:9 50:1
**turned (3)** 23:2 32:13 50:24
**two (15)** 6:24 46:15 46:22,24 50:12,13 51:6,7 55:4,5,10 55:13,16 57:6,6
**typed (1)** 60:5

**U**

**UCSD (2)** 8:4,5
**Uh-huh (4)** 5:24 30:13 49:5 50:19
**ultimately (4)** 17:7 33:7,14 35:1
**understand (12)** 6:10,17 7:1 8:12 27:10 28:21,22,22 33:12 35:23 36:15 39:23
**understanding (2)** 15:19 30:10
**University (1)** 8:1
**use (2)** 6:7 49:22
**U.S (1)** 4:2

**V**

**vantage (3)** 39:24

40:6,11
**vehicle (77)** 11:18 12:11,17,23 13:9 16:23,23 18:12 22:9,17,17,20,20 22:21,24,25 23:2 23:7,11,13,20,20 25:1 26:8,15,21 30:14 31:4,12 32:5 33:8,9,13,17 33:18 35:5,11,14 35:19 36:1,4,6,10 36:16,18,23,25 37:1,4,6,7,14,15 38:16,24 39:4,9 39:14 40:2,7,13 40:15,17 41:3,11 42:9,23 43:13,14 45:20,25 53:10 57:1,9,24 58:1,24
**vehicles (2)** 34:16 34:20
**version (1)** 60:5
**versus (1)** 4:6
**video (2)** 9:13 60:2
**videographer (7)** 3:14 4:1,13,17 14:11 17:14 60:1
**videotape (1)** 4:2
**videotaped (5)** 1:17 3:21 4:4 5:23 9:9
**view (3)** 39:12 52:13,16
**visiting (1)** 8:17
**visual (1)** 40:25
**visualize (1)** 25:4
**vs (1)** 1:11

W

**waited (1)** 46:25
**waive (1)** 60:13
**walk (3)** 36:22 39:10,13
**walked (2)** 36:20 37:1
**want (10)** 5:15 6:13 42:16 47:23 49:6 49:10,19 55:20 60:12,16
**wanted (3)** 9:23 24:7 44:20
**wasn't (17)** 23:18 25:16,17,18,21,22 31:17 32:8,15 38:7,20 39:21 40:4 44:5,6 45:22 51:20
**Watch (1)** 52:22
**watched (2)** 18:23 52:13
**watching (8)** 16:25 19:11 32:6 38:20 51:10,15,18 52:6
**wax (1)** 23:17
**way (16)** 6:21 11:21 16:12 17:17,17 18:23,24 26:2 27:18 29:2 35:16 37:15 49:17 57:19 58:4,19
**welcome (2)** 47:19 59:23
**went (19)** 15:17,24 17:5 19:7 26:21 28:12 29:14,16 30:15,16 41:4,7 53:20 54:11,13 57:24 58:6,7,20
**weren't (2)** 42:20 43:11
**We'll (1)** 60:20
**we're (8)** 6:23 7:9 14:17 27:21 28:11 43:22 49:6 53:23
**we've (1)** 18:3
**wheels (5)** 51:6,7 51:10 56:22,23
**whichever (1)** 49:22
**window (4)** 39:19 40:2,4,20
**windows (4)** 22:9 39:2,8 41:1
**windshield (2)** 38:5 38:7
**wipe (1)** 23:17
**witness (18)** 4:11 4:12 8:12 10:12 10:16,19 19:25 27:22 28:8,9,21 47:19 54:7 55:15 59:5,23 60:14,19
**witnessed (1)** 11:17
**witnesses (3)** 41:10 41:13 42:6
**woman (1)** 41:17
**word (2)** 5:21,21
**words (4)** 6:8 21:12 56:16 57:21
**work (1)** 7:23
**worked (1)** 8:2
**worried (1)** 35:15
**worse (1)** 25:17
**written (1)** 60:3
**wrong (3)** 45:25 46:1,3

X

**x (1)** 2:1

Y

**yards (5)** 33:19,20 34:2,7 52:3
**yeah (9)** 17:22 28:18 32:22 37:5 46:21 47:9,9 55:15 58:18
**years (6)** 8:1,7 44:9 47:6,7,12

Z

**zip (1)** 5:8

0

**04 (1)** 8:7
**07-CV (2)** 1:11 4:7

1

**1 (3)** 14:3 27:22 31:1
**10 (6)** 14:3 18:11 20:4 24:2 53:23 53:24
**10TH (1)** 1:2
**10:39 (1)** 60:1
**10:50 (1)** 60:22
**1040 (2)** 1:11 4:7
**15 (1)** 24:2
**17 (2)** 8:18 27:24
**1971 (1)** 7:19

2

**20,54 (1)** 2:4
**200 (2)** 3:5 35:7
**2005 (1)** 8:14
**2008 (4)** 1:19 3:23 4:5 61:8
**22 (1)** 8:1
**2300 (1)** 3:9
**26th (1)** 5:8

3

**3 (14)** 2:10 4:19 14:2 17:19 20:4 27:22 28:22 31:1 49:24 53:1,3,24 55:18,18
**3E (1)** 4:7
**30 (3)** 47:6,7,12
**3612 (2)** 1:24 3:25

4

**4 (3)** 2:10 18:2,3
**45 (2)** 9:23 43:22

5

**5,47 (1)** 2:4
**500 (1)** 35:7
**527 (1)** 3:9
**5473 (1)** 3:4
**55402 (1)** 3:10

6

**60 (4)** 7:17 11:5 16:21 22:2
**612)342-2880 (1)** 3:10
**65 (1)** 22:1

7

**701 (2)** 3:22 4:7
**75231 (1)** 3:5

8

**80 (3)** 16:3,14 45:21
**820 (1)** 5:7
**85 (1)** 8:19

9

**9 (1)** 1:19
**9th (2)** 3:23 4:5
**9:34 (2)** 3:24 4:5
**90 (3)** 16:4,14 45:21
**92102 (1)** 5:9