# Exhibit B

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JEANINE BACHELDER;
BRYAN BASTIDAS;
BENITA BLACK;
DEBBIE CHAMPAGNE, INDIVIDUALLY
    AND AS REPRESENTATIVE OF THE
    ESTATE OF DUSTIN CHAMPAGNE,
    DECEASED;
AMANDA DELP;
ASHLEY DIXON;
ANDRE EDWARDS;
DAVID FRITZE, INDIVIDUALLY & AS
    REPRESENTATIVE OF THE ESTATE OF
    DEAN FRITZE, DECEASED AND AS
    REPRESENTATIVE OF THE ESTATE OF
    MINEVA FRITZE, DECEASED;
CHASITY BLISS KITZMILLER GREEN;
TESSAMENA HANKERSON;
EDUARDO JIMENEZ, JR., INDIVIDUALLY
    AND AS REPRESENTATIVE OF THE
    ESTATE OF JORDON JIMENEZ,
    DECEASED;
EUGENE LANDRY;
GINA LAWRIMORE;
LINDA SHAFFER, INDIVIDUALLY AND AS
    REPRESENTATIVE OF THE ESTATE OF
    LLOYD SHAFFER, DECEASED;
MAURICE SHAFFER;
DAWN SIMECEK;
AUSTIN LEE SLADE;
THOMAS STAFFORD, INDIVIDUALLY AND
    AS REPRESENTATIVE OF THE ESTATE
    OF THEODORE STAFFORD, DECEASED
JUDD WEISJAHN, INDIVIDUALLY AND AS
    REPRESENTATIVE OF THE ESTATE OF
    RACHAEL WEISJAHN, DECEASED;
and
CORINNA WILSON

vs.

GENERAL MOTORS LLC

CASE NO.



15 CV 155

JURY TRIAL DEMANDED



## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs, JEANINE BACHELDER; BRYAN BASTIDAS; BENITA BLACK; DUSTIN CHAMPAGNE; AMANDA DELP; ASHLEY DIXON; ANDRE EDWARDS; DAVID FRITZE, INDIVIDUALLY & AS REPRESENTATIVE OF THE ESTATE OF DEAN FRITZE, DECEASED AND AS REPRESENTATIVE OF THE ESTATE OF MINEVA FRITZE, DECEASED; CHASITY BLISS KITZMILLER GREEN; TESSAMENA HANKERSON; EDUARDO JIMENEZ, JR., INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF JORDON JIMENEZ, DECEASED; EUGENE LANDRY; GINA LAWRIMORE; LINDA SHAFFER, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF LLOYD SHAFFER, DECEASED; MAURICE SHAFFER; DAWN SIMECEK; AUSTIN LEE SLADE; THOMAS STAFFORD, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF THEODORE STAFFORD, DECEASED; JUDD WEISJAHN, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF RACHAEL WEISJAHN, DECEASED; and CORINNA WILSON (collectively referred to as "Plaintiffs" and individually referred to by the Plaintiff's last name), bring this action against GENERAL MOTORS LLC; and/or its related subsidiaries, successors, or affiliates ("GM").

## INTRODUCTION

1.    This case involves tragic and wrongful deaths as well as serious and permanent personal injuries that were suffered by Plaintiffs as the result of an egregious and unprecedented failure to disclose and actively conceal a known defect in GM vehicles.

2.    An auto manufacturer should never make profits more important than safety and should never conceal defects that exist in its vehicles from consumers or the public. GM's Vehicle

Safety Chief, Jeff Boyer has stated that: "Nothing is more important than the safety of our customers in the vehicles they drive." Yet GM failed to live up to this commitment.

3.      The first priority of a car manufacturer should be to ensure that its vehicles are safe, and particularly that its vehicles have operable ignition systems, airbags, power-steering, power brakes, and other safety features that can prevent or minimize the threat of death or serious bodily harm in a collision. In addition, a car manufacturer must take all reasonable steps to ensure that, once a vehicle is running, it operates safely and its critical safety systems (such as engine control, braking, and airbag systems) work properly until such time as the driver shuts the vehicle down.

4.      Moreover, a manufacturer that is aware of dangerous design defects that cause its vehicles to shut down during operation, or the vehicles' airbags not to deploy, must promptly disclose and remedy such defects.

## BACKGROUND

5.      Since at least 2003, GM has sold millions of vehicles throughout the United States and worldwide that have a safety defect in which the vehicle's ignition switch can inadvertently move from the "run" position to the "accessory" or "off" position during ordinary driving conditions, resulting in a loss of power, vehicle speed control, and braking, as well as a failure of the vehicle's airbags to deploy.

6.      There are at least two main reasons why the GM ignition switch systems are defective. The first is that the ignition switch is simply weak and therefore does not hold the key in place in the "run" position. On information and belief, the ignition switch weakness is due to a defective part known as a "detent plunger."

7.      The second reason that the ignition switch systems are defective is due to the low position of the switches in the GM vehicles referenced below. That causes the keys, and the fobs

3

that hang off the keys, to hang so low in the GM vehicles that the drivers' knees can easily bump them and inadvertently shut down the vehicle.

8.      As used in this complaint, the "Defective Vehicles" refers to the GM vehicles sold in the United States that have defective ignition switches, defective power steering; defective airbags, defective seatbelts, and/or defective powertrains, including the following makes and model years:

- 2005 Chevrolet Cobalt
- 2006 Chevrolet Cobalt
- 2007 Chevrolet Cobalt
- 2009 Chevrolet Cobalt
- 2007 Chevrolet Silverado
- 2007 Chevrolet Trailblazer
- 2006 Chevrolet HHR
- 2003 Saturn Ion
- 2002 Cadillac Deville
- 1997 Pontiac Grand Am
- 1999 Pontiac Grand Prix
- 2006 Pontiac Grand Prix

9.      Because of defects in their design, manufacture, and/or assembly, the ignition switch installed in the Defective Vehicles are, by their nature, loose and improperly positioned and are susceptible to failure during normal and expected conditions. The ignition module is located in a position in the vehicle that allows a driver to contact the key ring, and inadvertently switch the ignition position.

10.      Because of its faulty design and improper positioning, the ignition switch can unexpectedly and suddenly move from the "on" or "run" position while the vehicle is in operation to the "off" or "accessory" position (the "Ignition Switch Defect"), which can occur at any time during normal and proper operation of the Defective Vehicles, meaning the ignition can suddenly switch off while it is moving at 65 mph on the freeway, leaving the driver unable to control the vehicle.

4

11.     GM installed these defective ignition switch systems in models from at least 2003 through at least 2011.  GM promised that these vehicles would operate safely and reliably.  This promise turned out to be false in several material respects.  In reality, GM concealed and did not fix a serious quality and safety problem plaguing its vehicles.

12.     More importantly, the Ignition Switch Defect in GM's vehicles could have been easily avoided.  From at least 2005 to the present, GM received reports of crashes and injuries that put GM on notice of the serious safety issues presented by its ignition switch system.

13.     GM has acknowledged that the Ignition Switch Defect has caused at least thirteen deaths.  GM has refused, however, to disclose the identities of those it counts among these thirteen deaths.  Independent safety regulators have recorded 303 deaths associated with only the Saturn Ion and Chevrolet Cobalt Defective Vehicle models due to the Ignition Switch Defect. The actual number of deaths for all Defective Vehicle models is expected to be much higher.

14.     Despite the dangerous nature of this defect and its effects on critical safety systems, GM concealed its existence and did not disclose to consumers that its vehicles – which GM for years had advertised as "safe" and "reliable" – were in fact neither safe nor reliable.

15.     GM has now also acknowledged further defective ignition switches, defect air bags, defective power steering, defective seatbelts as well as defective powertrains in one or more of these vehicles.

16.     These cases arise from the tragic deaths of Dustin Champagne; Dean Fritze; Mineva Fritze; Jordon Jimenez; Lloyd Shaffer and Rachael Weisjahn; and the serious and permanent personal injuries of Jeanine Bachelder; Bryan Bastidas; Benita Black; Amanda Delp; Ashley Dixon; Andre Edwards; Chasity Bliss Kitzmiller Green; Tessamena Hankerson; Eugene Landry; Gina Lawrimore; Maurice Shaffer; Dawn Simecek; Austin Lee Slade and Corinna Wilson, as a

5

result of GM's breach of its obligations and duties, including GM's failure to disclose that, as a result of the Defects, at least 10 million or more GM vehicles (and almost certainly more, including the vehicles complained of herein) may have or did have the propensity to shut down during normal driving conditions creating an extreme and unreasonable risk of accident, serious bodily harm, and death.

17.     Many of the Defective Vehicles were originally designed, manufactured, marketed, and placed into the stream of commerce by GM's predecessor. GM's predecessor, General Motors Corporation (referred to as "Old GM") also violated these obligations and duties by designing and marketing vehicles with defective ignition switch systems, and then by failing to disclose that defect even after it became aware that the ignition switch defect was causing fatal accidents.  In addition to the liability arising out of the statutory obligations assumed by GM, GM also has successor liability for the deceptive and unfair acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the Ignition Switch Defects.

18.     GM's predecessor, Old GM filed for bankruptcy in 2009.  In July 2009, the bankruptcy court approved the sale of GM's predecessor to GM.  Notwithstanding the prior bankruptcy or contractual obligations under the sale agreement, GM is liable for its own conduct. From its inception in 2009 and while extolling the safety and reliability of its vehicles, GM had its own independent knowledge of the defects in its vehicles, yet chose to conceal them.

19.     Specifically, GM has actual knowledge that, because of the way in which the ignition was designed and integrated into the Defective Vehicles, the ignition switch can suddenly fail during normal operation, cutting off engine power and certain electrical systems in the cars, which, in turn, disables key vehicle components, safety features (like airbags), or other vehicle functions, leaving occupants vulnerable to crashes, serious injuries, and death.

20.     Although GM had, and has had, actual knowledge of safety defects in the Defective Vehicles for years, they fraudulently concealed and continue to fraudulently conceal material facts regarding the extent and nature of safety defects in the Defective Vehicles and what must be done to remedy the defects.

21.     GM has not only fraudulently concealed material facts relating to the safety defects in the Defective Vehicles for years, but it has also made affirmative fraudulent and misleading statements, and it is continuing to make fraudulent and misleading statements to the public and to Plaintiffs regarding the nature and extent of the safety defects in the Defective Vehicles.

22.     Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"),[1] and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose the defect.[2] If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must remedy the defect.[3]

23.     GM also violated the TREAD Act by failing to timely inform NHTSA of the ignition switch defects and allowed cars to remain on the road with these defects.  These same acts and omissions also violated various State consumer protection laws as detailed below.

24.     Upon information and belief, prior to the sale of the Defective Vehicles, GM knew of the Ignition Switch Defect through sources such as pre-release design, manufacturing, and field testing data; in-warranty repair data; early consumer complaints made directly to GM, collected by the National Highway Transportation Safety Administration's Office of Defect Investigation ("NHTSA ODI") and/or posted on public online vehicle owner forums; field testing done in

_____

[1]     49 U.S.C.§§ 30101-30170
[2]     49 U.S.C. § 30118(c)(l) & (2).
[3]     49 U.S.C. § 30118(b)(2)(A) & (B)

7

response to those complaints; aggregate data from GM dealers; and accident data. Yet, despite this knowledge, GM failed to disclose and actively concealed the Ignition Switch Defect from Plaintiffs and the public, and continued to market and advertise the Defective Vehicles as reliable and safe vehicles, which they are not.

25.      In addition to the ignition switches, it is now believed that the faulty wiring system in the ignition switches also created the defective air bags and defective power steering, and that these defects resulted in the injuries and damages complained of herein.

26.      Plaintiffs were also damaged by the acts and omissions of Old GM for which GM is liable through successor liability.

**PARTIES**

27.      Jeanine Bachelder is a resident of Dickinson, Texas.

28.      Bryan Bastidas is a resident of Santa Ana, California.

29.      Benita Black is a resident of Waldorf, Maryland.

30.      Debbie Champagne, Individually and as Representative of the Estate of Dustin Champagne, Deceased, is a resident of Belcourt, ND.

31.      Amanda Delp is a resident of Virginia.

32.      Ashley Dixon is a resident of New Jersey.

33.      Andre Edwards is a resident of Michigan.

34.      David Fritze, Individually and as Representative of the Estate of Dean Fritze, Deceased, and as Representative of the Estate of Mineva Fritze, Deceased, is a resident of Minnesota.

35.      Chasity Bliss Kitzmiller Green, is a resident of West Virginia.

36.      Tessamena Hankerson, is a resident of Georgia.

37.    Eduardo Jimenez, Jr., Individually and as Representative of the Estate of Jordon Jimenez, Deceased, is a resident of Washington.

38.    Eugene Landry is a resident of Louisiana.

39.    Gina Lawrimore is a resident of South Carolina.

40.    Linda Shaffer, Individually and as Representative of the Estate of Lloyd Shaffer, Deceased; and Maurice Shaffer, are residents of Mississippi.

41.    Dawn Simecek is a resident of Florida.

42.    Austin Lee Slade is a resident of Arizona.

43.    Thomas Stafford, Individually and as Representative of the Estate of Theodore Stafford, is a resident of Michigan.

44.    Judd Weisjahn, Individually and as Representative of the Estate of Rachael Weisjahn, Deceased, is a resident of California.

45.    Corinna Wilson is a resident of Maryland.

46.    General Motors Corporation was a Delaware corporation with its headquarters in Detroit, Michigan. The Corporation through its various entities designed, manufactured, marketed, distributed and sold Pontiac, Saturn, Chevrolet and other brand automobiles in Michigan, the State of Texas, and multiple other locations in the United States and worldwide.

47.    In 2009, General Motors Corporation ("Old GM") filed for bankruptcy, and substantially all of its assets were sold pursuant to a Master Sales and Purchase Agreement ("Agreement") to General Motors LLC ("GM")

48.    Under the Agreement, General Motors LLC also expressly assumed certain liabilities of General Motors Corporation, including certain statutory requirements:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and

> Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.

In addition, General Motors LLC expressly set forth that it:

> shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [General Motors Corporation] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser prior to or after the Closing and (ii) Lemon Laws.

49.     Because GM acquired and operated General Motors Corporation and ran it as a continuing business enterprise, and because GM was aware from its inception of the Ignition Switch Defects in the Defective Vehicles, GM is liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint.

50.     General Motors LLC is a Delaware corporation with its headquarters in Detroit, Michigan. General Motors LLC is registered with the Secretary of State and conducts business in all fifty states (including the District of Columbia). GM was incorporated in 2009 and on July 10, 2009, acquired substantially all assets and assumed certain liabilities of General Motors Corporation through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

51.     At all times relevant herein, General Motors Corporation and its successor in interest General Motors LLC were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Defective Vehicles, and other motor vehicles and motor vehicle components throughout the United States.

52.     GM is referred to in this Complaint as "Defendant".

## JURISDICTION AND VENUE

53.      Plaintiffs' filing of this Complaint in this district does not alter the choice-of-law analysis and does not constitute a waiver of any of the Plaintiffs' rights to transfer to another district at the conclusion of pretrial proceedings in this case.  Plaintiffs have filed this Complaint in this district in order to advance the efficient and orderly resolution of claims arising from Defendant's conduct and its attendant nationwide devastating effects.  At the conclusion of pretrial proceedings in this case, Plaintiffs will be entitled to transfer their claim to the state of their residence.

54.      This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000.00 and Plaintiffs are citizens of a different state than Defendant.

55.      Venue is proper in this District under 28 U.S.C. § 1391 because Defendant, as a corporation, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.  Additionally, Defendant transacts business within the District, and some of the events establishing the claims arose in this District.

## FACTUAL ALLEGATIONS

*The Defective Vehicles*

56.      The Chevrolet Cobalt was a compact car introduced in the United States in 2004 for the 2005 model year.  The Cadillac Deville was introduced in 1949, and the last model to be formally known as a De Ville was the 2005 Cadillac DeVille, a full-size sedan, the largest car in the Cadillac model range.  The Pontiac Grand Prix was a luxury car first introduced in 1962, and was discontinued in 2008.  The Chevrolet HHR was a compact SUV introduced in the United States in 2005, and discontinued in 2011.  The Pontiac Grand Am was a mid-size car and later a

11

compact car introduced in 1972, and discontinued in 2005. The Saturn Ion was a compact car introduced in 2003 and discontinued in 2007. The Chevrolet Colorado is a compact pickup truck introduced in 2004 and discontinued in 2012.

57.     These vehicles were constructed on GM's GMT355 Platform, GM's Delta Platform, GM's A Platform, GM's G Platform and GM's W-body 2nd Gen Platform.

58.     Upon information and belief, GM promoted these Defective Vehicles as safe and reliable in numerous marketing and advertising materials.

*GM Field Reports and Internal Testing Reveal a Problem*

59.     In 2001, during pre-production of the 2003 Saturn Ion, GM engineers learned that the ignition switch could unintentionally move from the "run" position to the "accessory" or "off" position. In an internal report generated at the time, GM identified the cause of the problem as "low detent plunger force." The "detent" is part of the ignition switch's inner workings that keeps the switch from rotating from one setting to another unless the driver turns the key. The report stated that than an "ignition switch design change" was believed to have resolved the problem.

60.     In 2003, a second report documented an incident with a Saturn Ion where "a service technician observed a stall while driving." There the technician noted that the owner had several keys on the key ring and surmised that the "weight of the keys had worn out the ignition switch" and replaced the switch and closed the matter.

61.     GM engineers encountered the problem again in 2004 just prior to the launch of the 2005 Chevrolet Cobalt. GM learned of an incident in which a Cobalt vehicle suddenly switched out of the "run" position and lost engine power. GM engineers were able to replicate this problem during test drives of the Cobalt. According to GM, an engineering inquiry known as a Problem Resolution Tracking System ("PRTS") was able to pinpoint the problem and evaluate a number of

12

solutions; however, after considering "lead time required, cost, and effectiveness," GM decided to do nothing.

62.      After the Chevrolet Cobalt entered the market in 2004, GM began receiving complaints about incidents of sudden loss of engine power.  GM engineers determined that the low torque in the ignition switch could cause the key to move from the "run" to the "accessory" or "off" position under ordinary driving conditions with normal key chains because "detent efforts on ignition switch are too low, allowing key to be cycled to off position inadvertently." Specifically, in February 2005, GM engineers concluded that "there are two main reasons that we believe can cause a lower effort in turning the key: a lower torque detent in the ignition switch . . . [and a] low position of the lock module [on] the [steering] column."

63.      Additional PRTSs were opened to investigate the problem, and in May 2005, GM engineers proposed redesigning the key head from a "slotted" to a "hole" configuration to prevent inadvertent shifting of the key in the ignition.  Although GM initially approved the design, the company once again declined to act.

64.      In testimony April 1, 2014, before the House Committee on Energy and Commerce, GM CEO Mary Barra explained that the proposed "fix" for the Ignition Switch Defect was rejected in 2005 because it would have taken too long and cost too much.  Ms. Barra testified that GM's decision-making was the product of a "cost culture" versus a "culture that focuses on safety and quality."

65.      In April 2006, GM finally approved a design change for the Chevrolet Cobalt's ignition switch.  According to GM, the changes included a new detent plunger and spring, but there was no corresponding change in the ignition switch part number.  GM estimates that the redesigned ignition switch was produced for all Subject Vehicles during the 2007 model year.  On

information and belief, this redesigned ignition switch did not cure the defect in the original switch and also did not meet design specifications.

66.     The newly designed switch and the faulty ignition switch both had the same part number assigned to them.  Upon information and belief, this action was intended to make it difficult to trace the defective switch back to its original design in 2001.

67.     After another PRTS in 2009, GM redesigned the Chevrolet Cobalt key, changing the top of the key from a "slot" design to a "hole" design—as had been suggested in 2005. GM instituted the change after finding that consumers "with substantially weighted key chains/additional keys hanging from ignition key have experienced accidental ignition shut-off" and the design change was intended to "significantly reduce downward force and the likelihood of this occurrence." The new key design was produced for the 2010 model year.  On information and belief, this redesigned ignition switch did not cure the defect in the original switch and also did not meet design specifications.

68.     The component required to fix the Ignition Switch Defect costs approximately $2 to $5. GM management estimated that replacement components would cost an additional 90 cents per vehicle, but would only save 10 to 15 cents in warranty costs.

69.     GM also now acknowledges that Field Product Reports and PRTS reports related to the Subject Vehicles from 2003 and 2006 concerned engine stalling in the Saturn Ion and may be related to the Ignition Switch Defect.

***GM Issues Information Service Bulletins***

70.     In 2005, as a result of internal investigation, GM issued an Information Service Bulletin entitled the "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35-007) to GM dealers warning about a stalling problem related

14

to inadvertent shifting of the ignition switch. The bulletin applied to 2005 and 2006 Chevrolet Cobalt, 2006 Chevrolet HHR, 2005 and 2006 Pontiac Pursuit (Canada only), 2006 Pontiac Solstice, and 2003 to 2006 Saturn Ion, which all had the same ignition switch.

71.     The bulletin advised that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort," noting that risk was greater "if the driver is short and has a large and/or heavy key chain" such that "the driver's knee would contact the key chain while the vehicle was turning."  GM dealers were told to inform consumers of this risk, and recommend "removing unessential items from their key chain." The bulletin also informed dealers that GM had developed an insert for the key ring so that "the key ring cannot move up and down in the slot any longer – it can only rotate on the hole" and that the key ring has been replaced by a smaller design such that "the keys [will] not hang[ ] as low as in the past."

72.     On July 19, 2005, the New York Times reported that Chevrolet dealers were telling Cobalt owners to remove extra items from their key rings to prevent accidental stalling of their vehicles.  Alan Adler, GM's Manager for Safety Communications, stated that the problem manifested in only "rare cases when a combination of factors is present." Adler advised that consumers "can virtually eliminate this possibility by taking several steps, including removing nonessential material from their key rings."

73.     The Times reporter noted that his wife had already encountered the problem with the Chevrolet Cobalt: she was driving on a freeway, accidentally bumped the steering column with her knee, and found the engine "just went dead."  She was able to safely coast to the side of the road.  When the vehicle was brought back to the Chevrolet dealer for an inspection, nothing was found wrong and they were advised of the service bulletin. The reporter stated that the key chain

being used at the time of the stalling incident was provided by GM, and included only the key fob and a tag.

74.     GM, in a statement at the time through Adler, insisted that this problem was not a safety issue because "[w]hen this happens, the Cobalt is still controllable" and the "engine can be restarted after shifting to neutral." Adler also claimed that this ignition issue was widespread because "practically any vehicle can have power to a running engine cut off by inadvertently bumping the ignition...."

75.     In October 2006, GM updated the Information Service Bulletin, "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35- 007A) to include additional vehicles and model years.  Specifically, GM included the 2007 Chevrolet Cobalt, the 2007 Chevrolet HHR, the 2007 Pontiac G5, the 2007 Pontiac Solstice, the 2007 Saturn Ion, and the 2007 Saturn Sky. The updated bulletin included the same service advisories to GM dealers as the earlier version.

76.     According to GM, the service bulletin was the appropriate response "given that the car's steering and braking systems remained operational even after a loss of engine power." GM reports that GM dealers provided 474 key inserts to GM vehicle owners who brought their vehicles in for servicing.

***Reports of Unintended Engine Shut Down***

77.     A number of reports from warranty and technical assistance data beginning in 2003, "addressed complaints of stalling Ion vehicles." Despite these reports, the Saturn Ion remained in production until 2007.

78.    On May 26, 2005, a reporter for The Daily Item in Sunbury, Pennsylvania reviewed the Chevrolet Cobalt and found that during his test drives of the vehicle there were "[u]nplanned engine shutdowns [that] happened four times during a hard-driving test week" with the vehicle.

**Crash Reports and Data**

79.    The Defendant knew of the Ignition Switch Defect and its deadly consequences for consumers, but concealed that information from safety regulators and the public.

80.    National Highway Traffic Safety Administration (NHTSA) data shows that there were three fatal car crashes involving Saturn Ions due to a failure of the airbag to deploy prior to July 2005.

81.    In July 2005, a sixteen-year old was killed when her 2005 Chevrolet Cobalt crashed with the ignition switch in the accessory mode, which disabled the airbag.

82.    In 2006, there were at least two fatalities associated with a Chevrolet Cobalt crash. Information from the car's data recorder indicated that the ignition switch was in "accessory" instead of run, and the front airbags failed to deploy.

83.    In 2007, GM reviewed available sensor data from nine front-impact Cobalt crashes where the airbags did not deploy. GM discovered that in four of the crashes, the ignition was in the "accessory position." Crash information for the other Subject Vehicles was not reviewed.

84.    In 2007, NHTSA's early warning division reviewed available data provided by GM on airbag non-deployments in Chevrolet Cobalt vehicles. This review identified 43 incidents in which airbags may not have deployed in a crash. The early warning division referred the case to NHTSA's data analysis division for further screening. A defects panel was convened, but after reviewing the data and consulting with GM, the panel ultimately concluded that "[t]he data available at the time of this evaluation did not indicate a safety defect or defect trend that would

17

warrant the agency opening a formal investigation." In prepared remarks delivered April 1, 2014, to the Committee on Energy and Commerce, NHTSA Acting Administrator David Friedman stated, "At the time of these reviews, NHTSA did not have the information that GM has since provided—for instance, new evidence linking airbag non-deployment to faulty ignition switches."

85.    GM has identified 23 frontal-impact crashes in the United States involving 2005 to 2007 Chevrolet Cobalts and 2007 Pontiac G5s in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy.

86.    GM has identified 8 frontal-impact crashes in the United States involving 2003 to 2007 Saturn Ion vehicles in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy.  These crashes resulted in four fatalities and six injuries to occupants.

87.    GM has identified 3 frontal-impact crashes in the United States involving 2006 and 2007 model year Chevrolet HHR vehicles in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy.  These crashes resulted in three injuries to occupants.

**FACTS SPECIFIC TO EACH PLAINTIFF**

88.    On July 23, 2007, Jeanine Bachelder was driving a 2006 Chevrolet Cobalt (VIN 1G1AL55F667790211), when suddenly and unexpectedly, the vehicle inexplicably went off the road, and collided with a sign, resulting in severe and permanent injuries to Bachelder.  The airbags did not deploy in this accident.  This vehicle is subject to recalls involving the ignition switch, power steering assist and air bags, as well as multiple other recalls.

89.    On April 2, 2007, Bryan Bastidas was driving a 2006 Chevrolet Cobalt (VIN 1G1AK55F867620726), when suddenly and unexpectedly, the vehicle shut off, the steering

locked, resulting in a crash and severe and permanent injuries to Bastidas. The air bags did not deploy in this accident. This vehicle is subject to recalls involving the ignition switch, power steering assist and air bags, as well as multiple other recalls.

90.     Benita Black was driving a 2007 Chevrolet Cobalt (VIN 1G1AK55F767831917), when the steering locked, resulting in a crash and severe and permanent injuries to Black. This vehicle is subject to recalls involving the ignition switch, power steering assist and air bags, as well as multiple other recalls.

91.     On May 25, 2007, Dustin Champagne was a passenger in a 2007 Chevrolet Cobalt (VIN 1G1AL15F767865054), when suddenly and unexpectedly, the driver of the vehicle lost control of the vehicle and crashed, causing Champagne to be ejected and killed. The passenger air bag did not deploy during this accident. This vehicle is subject to recalls involving the ignition switch, power steering assist and air bags, as well as multiple other recalls.

92.     On May 27, 2008, Amanda Delp was driving a 2006 Chevrolet Cobalt (VIN 1G1AL15F167847522) when suddenly and unexpectedly, it veered off the roadway, rolled over, resulting in severe and permanent injuries to Delp. This vehicle is subject to recalls involving the ignition switch, power steering assist and air bags, as well as multiple other recalls.

93.     On January 10, 2007, Ashley Dixon was driving a 2003 Saturn Ion (VIN 1G8AL52F53Z119036), when suddenly and unexpectedly, she was struck head-on and the airbags failed to deploy, resulting in severe and permanent injuries to Dixon. This vehicle is subject to recalls involving the ignition switch, power steering assist and air bags, as well as multiple other recalls.

94.     On March 7, 2007, Andre Edwards was driving a 2002 Cadillac Deville (VIN 1G6AB54Y82UC06081202), when suddenly and unexpectedly, the vehicle went out of control

and struck a guard rail, resulting in severe and permanent injuries to Edwards. The air bags did not deploy. This vehicle is subject to recalls involving the ignition switch and air bags, as well as multiple other recalls.

95.    On or about January 4, 2009, Dean Fritze and Mineva Fritze were in a 2009 Chevrolet Cobalt (VIN 1G1AS558H397104338), when suddenly and unexpectedly, the vehicle went out of control, resulting in serious and fatal injuries to Dean Fritze and Mineva Fritze. This vehicle is subject to recalls involving the ignition switch, power steering assist and air bags, as well as multiple other recalls.

96.    On April 9, 2006, Chasity Bliss Kitzmiller Green was operating a 2006 Chevrolet Cobalt (VIN 1G1AM15BX67718995), when suddenly and unexpectedly, she hit a tree head-on, resulting in severe and permanent injuries to Green. The airbags did not deploy. This vehicle is subject to recalls involving the ignition switch, power steering assist and air bags, as well as multiple other recalls.

97.    On June 7, 2003, Tessamena Hankerson was operating her 1997 Pontiac Grand Am, when suddenly and unexpectedly, she lost control of her vehicle, and was struck from behind and pushed into traffic and struck by other vehicles. The air bags did not deploy. This vehicle is subject to recalls involving the ignition switch, as well as multiple other recalls.

98.    On January 23, 2007, the Decedent, Jordon Jimenez was operating a 2006 Chevrolet Cobalt (VIN 1G1AK55F467826240), when suddenly and unexpectedly, he lost control of the vehicle, resulting in fatal injuries to Jimenez. This vehicle is subject to recalls involving the ignition switch, power steering assist and air bags, as well as multiple other recalls.

99.    In 2005, Eugene Landry was operating a 2007 Chevrolet Cobalt (VIN 1G8AL52F23Z202312), when suddenly and unexpectedly, he lost control of the vehicle, resulting

in severe and permanent injuries to Landry. The airbags did not deploy. This vehicle is subject to recalls involving the ignition switch, power steering assist and air bags, as well as multiple other recalls.

100. On September 13, 2002, Gina Lawrimore was driving her 1999 Pontiac Grand Prix, when suddenly and unexpectedly, she lost control of her vehicle, hit a tractor and flipped the vehicle, resulting in severe and permanent injuries to Lawrimore. The air bags did not deploy. This vehicle is subject to recalls involving the steering and air bags, as well as multiple other recalls.

101. On February 14, 2009, the Decedent Lloyd Shaffer was operating a 2006 Pontiac Grand Prix (MS LPN 945N9) and Maurice Shaffer was a passenger in the 2006 Pontiac Grand Prix, when suddenly and unexpectedly, Lloyd Shaffer lost control of the vehicle, resulting in fatal injuries to himself and severe and permanent injuries to Maurice Shaffer. This vehicle is subject to recalls involving the ignition switch and steering, as well as multiple other recalls.

102. On November 2, 2007, Dawn Simecek was operating a 2006 Chevrolet Cobalt (VIN 1G1AP14P967665582), when suddenly and unexpectedly, she experienced a sudden loss of power while driving, causing her to lose control of the vehicle and hit a tree head-on, resulting in severe and permanent injuries to Simecek. This vehicle is subject to recalls involving the ignition switch, power steering assist and air bags, as well as multiple other recalls.

103. On March 29, 2006, Austin Lee Slade was a passenger in a 2005 Chevrolet Cobalt (VIN 1G1AK52F857572020), when suddenly and unexpectedly, the driver lost control of his vehicle, resulting in severe and permanent injuries to Slade. The airbags did not deploy. This vehicle is subject to recalls involving the ignition switch, power steering assist and air bags, as well as multiple other recalls.

104.    On February 25, 2007, the Decedent, Theodore Stafford was operating a 2006 Chevrolet Colorado (VIN 1GCDT136668246138), when suddenly and unexpectedly, he lost control of the vehicle, hit a pole and the car burst into flames, resulting in fatal injuries to Stafford. This vehicle is subject to multiple recalls.

105.    On August 28, 2008, the Decedent Rachael Weisjahn was a passenger in a 2006 Chevrolet HHR (VIN 3GNDA23P56S34932).  The driver lost control of the vehicle, causing it to rollover.  When Weisjahn exited the vehicle (i.e., became a pedestrian), she was struck by another car, resulting in her death.  This vehicle is subject to recalls involving the ignition switch and air bags, as well as multiple other recalls.

106.    On April 17, 2009, Corinna Wilson was operating a 2007 Chevrolet Cobalt (VIN 1G1AK55F577190218), when suddenly and unexpectedly, it suffered a sudden loss of power, preventing Wilson from being able to safely navigate the vehicle, and resulting in a crash and severe and permanent injuries to Wilson.  This vehicle is subject to recalls involving the ignition switch, power steering assist and air bags, as well as multiple other recalls.

## CLAIMS FOR RELIEF
## FIRST CLAIM FOR RELIEF

### Negligence, Gross Negligence and Recklessness

107.    Plaintiffs adopt and incorporate by reference all prior paragraphs of the Complaint as if set out here in full.

108.    Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement, wherein New GM acquired certain Old GM assets, New GM acquired knowledge of Old GM's activities and the defective ignition switch and other defects via the minds of the employees, officers and managers it acquired through the Sale Order.  New GM acquired knowledge of Old GM's activities and the defective ignition switch and other defects via the books

22

and records obtained and/or acquired as a result of the sale order. Thus, the duties of Old GM are part of the foundation for New GM's liability. Additionally, New GM's liability for damages is attributable to its own post-sale conduct.

109.    Old GM and New GM owed the Plaintiffs and public a duty to design, manufacture, fabricate, assemble, inspect, market, distribute, sell, and/or supply products in such a way as to avoid harm to persons using them such as Plaintiffs.

110.    Old GM and New GM owed the Plaintiffs and public a duty to detect known safety defects in GM vehicles.

111.    Old GM and New GM owed the Plaintiffs and public a duty, once it discovered the ignition switch defect, to provide thorough notice of the defect, including a warning that the defective vehicles should not be driven until an appropriate repair procedure is developed and performed.

112.    Old GM and New GM owed the Plaintiffs and public a duty, once it discovered the ignition switch defect, to ensure that an appropriate repair procedure was developed and made available to drivers.

113.    Old GM and New GM knew that their customers and the public, such as Plaintiffs, expect that the company will employ all reasonable efforts to detect safety defects, warn drivers of their existence, and develop and make available an appropriate repair procedure.

114.    Old GM and New GM's efforts to discover, provide notice of, and provide repair procedures for safety related defects exist for the benefit of the Plaintiffs, other passengers and drivers of GM vehicles. Old GM and New GM was aware that by providing maintenance and repair information and assistance, including through its authorized dealerships, Old GM and New

GM had a responsibility to Plaintiffs, other passengers and drivers to take the reasonable measures listed above.

115.    Independent of any failures by Old GM as described herein, between July 10, 2009 and March 2014, New GM breached its duties to the Plaintiffs by failing to provide appropriate notice of and repair procedures for the ignition switch defect and other defects in the Plaintiffs' vehicles.  In doing so, New GM departed from the reasonable standard of care required of it.

116.    It was foreseeable that if the New GM did not provide appropriate notice and repair procedures for the defect, the Plaintiffs and other passengers and drivers would be endangered.

117.    The Plaintiffs' injuries were reasonably foreseeable to Old GM and New GM.

118.    The Plaintiffs could not through the exercise of reasonable diligence have prevented the injuries and death caused by Old GM and New GM's negligence and gross negligence.

119.    Old GM and New GM's acts and omissions, when viewed objectively from the actor's standpoint, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.  Old GM and New GM nevertheless proceeded with conscious indifference to the rights, safety and welfare of others.

## SECOND CLAIM FOR RELIEF
### Fraudulent Concealment

120.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

121.    As set forth above, Defendant concealed and/or suppressed material facts concerning the safety of their vehicles from Plaintiffs, the public and NHTSA.  GM knew that the Defective Vehicles were designed and manufactured with defective ignition switches, defective air bags, defective power steering, defective seatbelts and defective powertrains, but GM concealed those material facts.

122.    Defendant had a duty to disclose these safety issues because they consistently marketed their vehicles as reliable and safe and proclaimed that Defendant maintains the highest safety standards.  Once Defendant made representations to the public about safety, Defendant was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

123.    In addition, Defendant had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendant who has superior knowledge and access to the facts, and Defendant knew they were not known to or reasonably discoverable by Plaintiffs. These omitted facts were material because they directly impacted the safety of the Defective Vehicles, namely the vehicles in which Plaintiffs were drivers and/or passengers resulting in their death and/or serious and permanent injuries.  Whether or not a vehicle ignition switch will unexpectedly and suddenly move to the "off" or "accessory" position, thereby disabling power steering, anti-lock brakes and air bag deployment while the car is in motion, are material safety concerns.  Defendant possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

124.    Defendant actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce consumers to purchase Defective Vehicles that caused serious injury and death.

125.    Plaintiffs were unaware of these omitted material facts and would not have entered into a Defective Vehicle as a passenger or driver if he had known of the concealed and/or

suppressed facts.  Defendant was in exclusive control of the material facts concerning the Ignition Switch Defect and such facts were not known to the public.

126.    As a result of the concealment and/or suppression of facts, Plaintiffs Dustin Champagne, Dean Fritze, Mineva Fritze, Jordon Jimenez, Lloyd Shaffer, Theodore Stafford and Rachael Weisjahn sustained horrific injuries and unconscionable pain and suffering prior to their death and Plaintiffs Jeanine Bachelder, Bryan Bastidas, Benita Black, Amanda Delp, Ashley Dixon, Andre Edwards, Chasity Bliss Kitzmiller Green, Tessamena Hankerson, Eugene Landry, Gina Lawrimore, Dawn Simecek, Austin Lee Slade, Theodore Stafford and Corinna Wilson sustained serious and permanent injuries and extreme pain and suffering subsequent to the accident.

127.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the public's rights and well-being to enrich Defendant.  Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### THIRD CLAIM FOR RELIEF
### Fraud by Non-Disclosure

128.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

129.    As early as 2001, during pre-production development of the Saturn Ion, Old GM became aware of issues relating to the ignition switch "passlock" system.  The 2001 report stated that the problem included a "low detent plunger force" in the ignition switch.

130.    In 2003, before the launch of the 2005 Cobalt, Old GM became aware of incidents wherein the vehicle engine would suddenly lose power in the event the key moved out of the "run" position when the driver inadvertently contacted the key or steering column.  An investigation was

26

Case 1:15-cv-00135-JMF   Document 1   Filed 01/09/15   Page 27 of 25

opened and, after consideration of lead-time required and the cost and effectiveness of potential solutions, the investigation was closed with no action taken.

131.    As set forth above, from July 2009 to the present, New GM intentionally concealed or failed to disclose material facts from the Plaintiff, the public and NHTSA.

132.    Additionally, from its inception in 2009, New GM possessed independent knowledge of the defects in the Plaintiffs' vehicles and the need to undertake multiple design steps to resolve those defects to prevent injury and economic harm to vehicle owners such as Plaintiffs. This knowledge was based, in part, on the information from records, files, reports and other documents and materials regarding the defective ignition switch maintained by Old GM, all of which were included in the assets purchased by New GM during the bankruptcy sale.

133.    Old GM had a duty to disclose the facts to the Plaintiffs and Old GM knew:  (1) that the Plaintiffs were ignorant of the material facts that New GM did not disclose and/or intentionally concealed; and (2) the Plaintiffs did not have an equal opportunity to discover the material facts that New GM did not disclose and/or intentionally concealed.  Old GM's fraud, fraudulent concealment and fraudulent non-disclosure were all components of the subject incidents of the Plaintiffs.  Because New GM acquired knowledge of Old GM's activities and the defective ignition switch as well as other defects via the minds of the employees, officers, managers, books and records obtained and/or acquired as a result of the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement and subsequent Sale Order, New GM is expressly liable to Plaintiffs.  Further, the duties of Old GM are part of the foundation for the liability acquired by New GM.

134.   Independent of any failures by Old GM as described herein, between July 10, 2009 and March, 2014, New GM breached its duties to the Plaintiffs by failing to disclose knowledge of the defective ignition switch to Plaintiffs.

135.   New GM had a duty to disclose the facts to the Plaintiffs and New GM knew:  (1) that the Plaintiffs were ignorant of the material facts that New GM did not disclose and/or intentionally concealed; and (2) the Plaintiffs did not have an equal opportunity to discover the material facts that New GM did not disclose and/or intentionally concealed.

136.   By failing to disclose these material facts, New GM intended to induce the Plaintiffs to take some action or refrain from acting.

137.   The Plaintiffs relied on New GM's non-disclosure and they were killed or injured as a result of acting without knowledge of the undisclosed facts.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendant as follows:

A.   an award to Plaintiffs for actual damages, compensatory, exemplary, and statutory penalties, damages, including interest, in an amount to be proven at trial;

B.   an award of attorneys' fees and costs, as allowed by law;

C.   an award of pre-judgment and post-judgment interest, as provided by law;

D.   leave to amend this Complaint to conform to the evidence produced at trial; and

E.   such other relief as may be appropriate under the circumstances.

Dated: January 16, 2015

RESPECTFULLY SUBMITTED,

James R. Dugan, II (LA Bar # 24785)
David B. Franco (TX Bar # 24072097)
Chad J. Primeaux (LA Bar # 30024)
THE DUGAN LAW FIRM, APLC
365 Canal Street, Suite 1000
New Orleans, Louisiana 70130
Telephone: (504) 648-0180
Facsimile: (504) 648-0181

Mitchell A. Toups (TX Bar # 20151600)
WELLER, GREEN, TOUPS & TERRELL, LLP
2615 Calder Ave., Suite 400
Beaumont, TX 77702
Telephone: (409) 838-0101
Facsimile: (409) 832-8577
Email: matoups@wgttlaw.com

Gregory K. Evans (TX Bar  No. 24002065)
Law Offices of Gregory K. Evans, PLLC
3900 Essex, Suite 690
Houston, TX  77027
(713) 840-1299
Facsimile:  (281) 254-7886
Email: greg@gevanslaw.com

James W. Flood, III
FLOOD LAW GROUP, LLP
1101 Pennsylvania Ave. NW, Suite 600
Washington, DC 20004
Telephone: (202) 756-1970
Facsimile: (202) 756-7323

*Attorneys for Plaintiffs*