Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 09-50026-reg

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6   MOTORS LIQUIDATION COMPANY, et al.,

7   f/k/a General Motors Corp., et al.

8

9        Debtors.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12

13                U.S. Bankruptcy Court

14                One Bowling Green

15                New York, NY 10004-1408

16

17

18                February, 18, 2015

19                9:00 AM

20

21  B E F O R E :

22  HON ROBERT E. GERBER

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  K. HARRIS

1    Hearing re:    Oral argument on Motion to Enforce

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

Page 3

1   A P P E A R A N C E S :

2

3   KING & SPALDING, LLP

          Attorneys for General Motors, LLC

4

          1185 Avenue of the Americas

5

          New York, New York 10036

6

7

    BY:  ARTHUR J. STEINBERG, ESQ.

8

          SCOTT DAVIDSON, ESQ.

9

10

    GOODWIN PROCTER, LLP

11

          Attorneys for Pre-Sale Accident Victims

12

          The New York Times Building

13

          620 Eighth Avenue

14

          New York, New York 10018

15

16   BY:  WILLIAM P. WEINTRAUB, ESQ.

17

18   BROWN RUDNICK

19        Attorneys for Certain Plaintiffs

20        Seven Times Square

21        New York, New York 10036

22

23   BY:  EDWARD WEISFELNER, ESQ.

24

25   GOLENBOCK. EISEMAN, ASSOR, BELL & PESKOE, LLP

1       Attorneys for Groman Plaintiffs

2       437 Madison Avenue

3       New York, New York 10022

4

5   BY:  JONATHAN L. FLAXER, ESQ.

6

7   GIBSON, DUNN & CRUTCHER, LLP

8       Attorneys for Wilmington Trust Company as

9       GUC Trust Administrator

10      200 Park Avenue

11      New York, New York 10166

12

13  BY:  LISA H. RUBIN, ESQ.

14       KEITH R. MARTORANA, ESQ.

15       MATTHEW WILLIAMS, ESQ

16

17  AKIN, GUMP, STRAUSS, HAUER & FELD, LLP

18       Attorneys for GUC Trust Unit Trust Holders

19       One Bryant Park

20       New York, New York 10036

21

22  BY:  DANNY GOLDIN

23

24  STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

25       Attorneys for Barron & Budd & Grant

Page 5

1          2323 Bryan Street, Suite 2200

2          Dallas, Texas 75201

3

4    BY:  SANDER L. ESSERMAN, ESQ.

5

6    KIRKLAND & ELLIS, LLP

7          Attorneys for General Motors, LLC

8          300 North LaSalle

9          Chicago, Illinois 60654

10

11   BY:  RICHARD C. GODFRY, ESQ.

12

13   GENERAL MOTORS COMPANY

14         Attorney Office of the General Counsel

15         400 Renaissance Center

16         P.O. Box 400

17         Detroit, MI 48265

18

19   BY:  L. JOSEPH LINES III

20

21   APPEARING TELEPHONICALLY:

22         STEPHEN J. BLAUNER

23         NICHOLAS P. BROWN

24         BRANA L. CIONI

25         KEN COLLIER

Page 6

1        RYAN ELLIS

2        BENJAMIN D.FEDER

3        PETER FELDMAN

4        EBBA GEBISA

5        DAVID S. GREENBERG

6        JOSHUA HERMAN

7        DANIEL KAMENSKY

8        MICHELE F. KYROUZ

9        KENNETH MALMAN

10       DAVID J. PARSONS

11       LINDA SANDLER

12       LAUREN SHUMEJDA

13       ANDREW SORKIN

14       ANIER TIWANA

15       SAMUEL WECHSLER

16       EDWARD WEISFELNER

17       JAMES WILTON

18       ELNAZ ZARRINI

19

20

21

22

23

24

25

Page 7

1              P R O C E E D I N G S

2              CLERK:  All rise.

3              THE COURT:  Good morning.  Have seats everybody.

4    Okay, am I correct that we're up to your reply, Mr.

5    Steinberg?

6              MR. STEINBERG:  Yes, your Honor.

7              THE COURT:  Come on up please.

8              MR. STEINBERG:  Good morning.  Arthur Steinberg

9    from King & Spalding with my colleagues from yesterday.

10             Your Honor, yesterday when I was listening to the

11   plaintiff's arguments it seemed that they were trying to

12   make this case into something that it's not.  This matter is

13   not about whether Old GM personnel could have done a better

14   investigation of the ignition switch issue or other parts

15   that have been recalled.

16             The issue of what Old GM knew is relevant in this

17   hearing for a singular purpose, that being did Old GM have

18   the requisite knowledge such that economic loss plaintiffs'

19   unasserted tort claims were reasonably ascertainable.  If it

20   did, arguably the economic loss plaintiffs were entitled to

21   direct mail notice.  If not, publication notice was

22   sufficient.

23             Your Honor asked yesterday what was the standard

24   for reasonably ascertainable and context in this case is

25   very important.  Citing to you cases that talk about

Page 8

1   contractual claims or where litigation has started is

2   interesting, but the real cases are how did the courts

3   approach the situation when you had an unasserted tort

4   claim.  And there when you're in that circumstance here the

5   Court looks at the distinction between what is reasonably

6   ascertainable and what is reasonably foreseeable and

7   reasonably foreseeable does not make a creditor a known

8   creditor.

9           And what plaintiffs in the GUC Trust argued

10  yesterday was the reasonably foreseeable standard.  And the

11  case that best highlights what the difference was between

12  reasonably ascertainable and reasonably foreseeable in the

13  unasserted tort claim area is the Third Circuit decision in

14  Chemetron 72 2F3d 341 and Chemetron was a claims bar date

15  case and you know from yesterday my opinion that the claims

16  bar date cases are different than the sale cases.  The sale

17  cases are easier the bar date cases arguable sometimes

18  require greater notice.

19          But in the Chemetron case, the Third Circuit said

20  that reasonable diligence in identifying claims does not

21  require impracticable or extended searches in the name of

22  due process.  A debtor does not have a duty to search out

23  every possible creditor and urge that entity to make a claim

24  against it.  So what you heard yesterday were people saying

25  the notice should have said there is a safety defect so you

Page 9

1    should consider what the ramifications are and here the

2    Third Circuit is saying that even in the bar date context,

3    the notice that goes out doesn't have to urge people to file

4    a claim.

5             THE COURT:  Pause please if you would Mr.

6    Steinberg because Chemetron wasn't one of the cases that I

7    read in advance.  Was Chemetron, I mean I heard the language

8    you read, was that a failure to notify in the claims context

9    or a failure to notify in the 363 context?

10            MR. STEINBERG:  Claims context.

11            THE COURT:  And you pointed out before that a

12   higher standard might at least arguably be imposed in claims

13   when you have more time to do it than you would in a 363?

14            MR. STEINBERG:  That's correct, your Honor.

15            THE COURT:  Okay.

16            MR. STEINBERG:  And then it goes on what is

17   required is not a vast open-ended investigation.  If a

18   creditor could have been discovered upon investigation, but

19   does not in the ordinary course of business come to the

20   attention of the debtor, the creditor is not a known

21   creditor which is I think the refutation to Mr. Weisfelner's

22   argument about it should have shown up in the TREAD sheets

23   and it should have then translated to the books and records

24   of the company.

25            Then the Chemetron case focuses where the

Page 10

1    requisite search should come.  It said the requisite search

2    comes from the debtor's own books and records.  Efforts

3    beyond a careful examination of those documents are

4    generally not required.  And then the Court goes on in

5    talking about the dangers of using the reasonable

6    foreseeable test.  When a reasonably foreseeable standard is

7    used, you create an impossible burden on the debtors.  Such

8    a requirement would completely vitiate the important goal of

9    a prompt and effectual administration and settlement of the

10   debtor's estates.  Courts should not force debtors to

11   anticipate speculative suits based on lengthy chains of

12   causation.

13           And that is, I think, the answer to your question

14   about the danger of doing what the plaintiffs and the GUC

15   Trust has urged you to do as the type of notice that should

16   be done in the 363 sale notice context.  The fact of the

17   matter is they have never been able to show you anything

18   that approaches the type of notice that they're urging that

19   your Honor should have given and approved in this case.

20   There is no precedent like this.  They're asking you to

21   break new ground.

22           Judge Lifland in the Spiegel case talked about the

23   same type of concepts.  He said that the debtors not

24   required to employ a crystal ball when one complaint is

25   filed to determine whether any other similar claims exist.

Page 11

1    Everyone who may conceivably have a claim is not entitled to

2    actual notice.  Efforts beyond a careful examination of the

3    debtor's books and records are generally not required.

4              THE COURT:  All right.  Let me interrupt you with

5    this similar question.  Is that in the 363 context or the

6    claims context?

7              MR. STEINBERG:  That was a plan injunction

8    context.

9              THE COURT:  Plan injunction which expunges claims.

10   Plans typically don't come early in the case, they come

11   after a while.  All right, keep going.

12             MR. STEINBERG:  Another example which is an In Re:

13   Agway, which is a bar date case.  It was a Judge Gerling

14   case in the Northern District of New York.  It was

15   interesting in that it cited three Bankruptcy Court

16   decisions from the Southern District of New York -- Brooks

17   Fashion, L.F.  Rothschild and Best Products -- all for the

18   same proposition, that a debtor is not charged with the

19   knowledge or existence of a contingent claim absent a

20   claimant's express statement of its intent to lodge a claim

21   against the debtor.

22             And then, your Honor, in our briefing we cited was

23   we thought was an important case which I did not discuss

24   yesterday, but is on the same point, which is the New

25   Century case from the Bankruptcy Court in Delaware and that

1    was also a bar date case.

2            There a late file claimant asserted that she was a

3    known creditor and should have received direct mail notice

4    of the bar date because at the time of the bar date the

5    debtor had done internal investigations of the lending

6    practices that she was complaining about.  There was a

7    pending examiner investigation at the time relating to those

8    lending practices and there were many, many lawsuits based

9    on such lending practices.

10           The court held that that claimant was an unknown

11   creditor and hat publication notice was proper.  The

12   existence of litigation in one person does not make every

13   customer in the same category a known creditor.

14           We cited in our papers also the Enron decision,

15   also a bar date case.  There a formal FERC investigation

16   commenced prior to the bar date and that did not transform a

17   contingent creditor, there the State of Montana, who

18   ultimately was determined to be a victim of Enron's market

19   manipulation, into being a known creditor.

20           And we also talked about the Burton case and the

21   Burton case we think is important on a number of different

22   grounds including this ground because in Burton, the Court

23   had to face the due process issue.  The decision talks about

24   successor liability/due process and there the claimant was

25   arguing that they were future creditors, sort of like the

1    same argument that the GUC Trust made and Judge Bernstein

2    rejected that argument.  And said if you weren't a future

3    creditor then you were an unknown creditor.

4          Many Burton plaintiffs were not subject to the

5    recall so the issue of whether there was a recall and that

6    distinguished Burton from our case is not relevant.  Burton

7    there were two different vehicles at stake.  One of them had

8    the recall, the others didn't.  When Judge Bernstein ruled

9    in this matter he ruled across the board for the recalled

10   and unrecalled people and said that publication notice in

11   this case was sufficient.

12         Burton was also relevant because the judge was not

13   prepared to just accept what the parties did and he wanted

14   to enforce and protect the order that had been entered in

15   Chrysler.  So when the economic loss plaintiffs asserted a

16   failure to disclose claim, he said that doesn't apply to you

17   as a matter of law because it only applies to accident

18   victims, not you, and I'm not letting you insert that claim

19   as a backdoor successor liability claim and he had that

20   claim stricken.

21         He also distinguished the Grumman case.  He said

22   that Grumman is not applicable to an economic loss claim

23   situation here.  And he also said that my ruling is

24   applicable not only to the original purchasers of the cars

25   before the sale, but also applicable to the people who

Page 14

1    bought the cars on the used sale market after the sale.  He

2    didn't draw the distinction that the plaintiffs have tried

3    to do in the pre-sale and the post-sale consolidate

4    complaint.  He said across the board if you're involving an

5    old Chrysler vehicle you are barred.

6            Now against this backdrop you have three

7    dispositive facts that are not really controverted in this

8    case which I think address this issue.  One is that the

9    named plaintiffs in the pre-sale consolidated complaint did

10   not file any court pleadings or otherwise commence

11   litigation against Old GM with respect to the ignition

12   switch in their vehicle so that the claimants didn't come

13   forward and assert a claim.  The second --

14            THE COURT:  Time out.  Are you talking about in

15   Chrysler or here?

16            MR. STEINBERG:  Here.  Here.  I've now switched to

17   the uncontroverted facts in this case that the named

18   plaintiffs in the economic loss complaints have never

19   asserted a litigation claim or asserted a claim against Old

20   GM at the time of the sale relating to the ignition switch

21   in their vehicle.

22            THE COURT:  Okay.  So, your point is they weren't

23   done with litigation docket.  Of course, Mr. Weisfelner is

24   going to say in eight seconds in surrebuttal that's because

25   they didn't know they had a claim.

Page 15

1          MR. STEINBERG:  Well, that's true.  That's true.

2     They could say that, but then they get to the second factor.

3          THE COURT:  Okay, keep going.

4          MR. STEINBERG:  The second factor is that, and you

5     heard it yesterday, that some of these people had this car

6     for five years before the sale was actually approved and

7     they never asserted a claim.  So, it wasn't like they didn't

8     know that they had a claim for the month before the sale.

9     This was a situation where they were actually driving their

10    cars for five years and they didn't assert a claim and

11    that's relevant for the reasonably ascertainable, reasonably

12    foreseeable standard.  So the length of time that someone

13    doesn't assert a claim becomes a relevant factor for seeing

14    whether something is reasonably ascertainable or not.

15         And then the third thing is that the Old GM books

16    and records did not show any of these liabilities to the

17    named plaintiffs.  So those three factors you have right

18    here.  A known creditor status for section 363 notice

19    purposes cannot depend on events that took place years

20    before the sale when there was no pending litigation as of

21    the sale.

22         Known creditor status for a Section 363 sale

23    notice purposes cannot be determined by piecing together

24    separate items of information oftentimes related to

25    different events acquired over many years by different

Page 16

1   personnel and then concluding that something should have

2   been included in the books and records even though it wasn't

3   there.   That is the reasonably foreseeable standard.   That

4   is not what the cases say is the reasonably ascertainable

5   standards.

6          Borrowing the imputation cases, those concepts

7   that are used to show corporate liability is just not

8   germane to determining whether a claim was reasonably

9   ascertainable for Section 363 notice purposes.   In a mega

10   bankruptcy case like Old GM was, with hundreds of thousands

11   of employees working for a debtor, that could never be the

12   standard for a Section 363 sale notice purposes.   To impose

13   something like that would be unprecedented, would wreak

14   havoc for Section 363 sales which is a fundamental part of

15   today's Chapter 11 process.

16          I'd like to now turn to a discussion on some of

17   the cases that were highlighted by my opponents.   In our

18   briefing we distinguish them and we discuss them, but I

19   think that there are five or six cases that require some

20   further noting because I think they were used for a purpose

21   that doesn't necessarily support their proposition.

22          The first was the DPWN case, which the GUC Trust

23   talked about in their presentation and this --

24          THE COURT:   Are you talking about the circuit one

25   of the Gleeson one?

Page 17

1           MR. STEINBERG:  Well, I was going to talk about

2      the fact that Ms.  Rubin was referring to the Gleeson one

3      which was the District Court opinion which was reversed by

4      the Second Circuit.

5           THE COURT:  Right, so we have to slice and dice

6      John Gleeson's decision to see what parts remain after the

7      reversal and what don't.

8           MR. STEINBERG:  That's right.

9           THE COURT:  Okay.

10          MR. STEINBERG:  And I just wanted to point out

11     that that discussion where you were referring to Judge

12     Gleeson's opinion was a decision that was ultimately

13     reversed.  And when you read the opinion in the Second

14     Circuit, the Second Circuit was critical of the lower court

15     opinion, remanded it and gave him instructions of how the

16     opinion should be approached.  And DPWN was a plan discharge

17     case, it wasn't a 363 case and involved a claim

18     extinguishment circumstance.  And when you deal with the

19     plan discharge and the bar date case there's something

20     that's fundamental which is that the person who allegedly

21     didn't do what was correct from a due process viewpoint is

22     trying to take advantage of that and say that that claim is

23     otherwise barred.  So the person who's being accused of

24     doing something wrong is now trying to hide behind the fact

25     that they did something wrong.

Page 18

1           In the 363 context when someone is going against

2     the good faith purchaser for value, that construct doesn't

3     hold anymore.  The purchaser didn't do anything wrong.  The

4     purchaser was the good faith person who actually paid money,

5     is the bona fide purchaser and that's why those cases are

6     not necessarily matching up to the 363 context.  It really

7     is essentially saying that a debtor shouldn't profit from

8     hiding its role in an antitrust conspiracy.

9           But when you slice and dice the Second Circuit

10    opinion from the District Court opinion, there are two

11    things that I think are relevant.  One was the Second

12    Circuit saying a debtor will normally be less likely to be

13    charged with knowledge that it has violated the law than it

14    has when it owes money unrelated to a law violation.  There

15    the letter Second Circuit is saying that it's easy to figure

16    out whether you were reasonably ascertainable in the

17    contract context where you actually have books and records

18    showing the liability.  It becomes much more difficult when

19    you're dealing with violations of law which are in the

20    nature of a tort.

21          And then, which I think is highly relevant, the

22    Second Circuit also said, and this is why I think you can

23    read in that they were being critical of the lower court,

24    whether due process required United to give DHL explicit

25    notice of an antitrust claim should not be decided that the

Page 19

1    appellate level before the District Court has considered

2    these matters under appropriate standards.  So there the

3    Second Circuit was saying I know you looked at this as a

4    focus as to whether United should have told the claimant

5    something.  I'm not sure whether that's right.  I'm not

6    ruling on that issue.  I've given you my guidelines of how

7    you should approach this issue.  Go back and figure out

8    whether there is a cause of action that exists and there it

9    was done in the context where the Second Circuit said they

10   filed an inconsistent pleading and your Honor you should

11   have taken into account that they may not have stated a

12   cause of action.

13           So that I think is the relevant part of the DPWN

14   case that I wanted to point out to your Honor.

15           In the Excel Concrete case, there a known secured

16   creditor did not get notice of the sale.  They actually sent

17   it to the wrong attorney and it was determined that the

18   proceeds were not sufficient to cover the lien.  The trustee

19   who was presenting the case to the Court misrepresented to

20   the Court that the sale proceeds were sufficient to pay the

21   lien and that the purchaser -- and that he and the purchaser

22   found out that that was not the case before the sale closed.

23   So the title company closed the situation even though the

24   lien wasn't sufficient -- the proceeds weren't sufficient to

25   satisfy the lien and even though they had told the Court

Page 20

1    that that was wrong, they told them an opposite thing and

2    nevertheless the title company closed and the purchaser in

3    that case was deemed not to be a bona fide purchaser.  And

4    that's why the Court said this is not Edwards.  Edwards

5    dealt with a bona fide purchaser situation here.  Here the

6    purchaser was not a bona fide purchaser.  I don't have to

7    protect that person in the context of an appeal.

8              The Folger case.  The Folger case was a situation

9    where the purchaser bought accounts receivable and sued a

10   prepetition account debtor.  The account debtor wanted to

11   defend by saying he had a recoupment, an affirmative defense

12   to the claim that was being asserted.  The purchaser said I

13   bought this free and clear of liens and claims, I strip you

14   of your recruitment defense and there the Court said that's

15   not true.  The notice of sale didn't say that affirmative

16   defenses were being extinguished by the sale, it only said

17   interests and therefore no relief like that was ever

18   authorized.

19             This was a case where the Court was basically

20   saying that account debtor can assert its defense because I

21   didn't strip them of that right in the 360(f) sale.

22             Koepp, that's the recent Second Circuit case.

23   That's not a Bankruptcy Code case.  That's a railroad

24   reorganization case under Section 77 of the Bankruptcy Act.

25   There the creditor held an easement of record, but got no

Page 21

1   notice of the plan which attempted to extinguish the

2   easement.  The Court said that the relevant order that dealt

3   with this was the consummation order and the consummation

4   order could not extinguish this encumbrance since the

5   easement holder was not a claimant or a stockholder and the

6   consummation order only applied to holders of such rights.

7   So there the court was saying that the order that I entered

8   didn't extinguish something.  It didn't have to delve into a

9   due process type right.

10           Metzger --

11           THE COURT:  Stop on Koepp for a second because

12   Koepp is cited by your opponents at two levels and you dealt

13   with one of them.  But they also cite it for the proposition

14   that to relieve somebody from an order of that character you

15   don't have to seek 9024 and 60(b) relief.  Do you have

16   anything to tell me on that other prong that they're

17   arguing?

18           MR. STEINBERG:  Yeah.  I think that that's true in

19   Koepp because they didn't have to do it because the order

20   didn't authorize the relief so you didn't have to set aside

21   the relief.

22           THE COURT:  So your point is that because the

23   order didn't cover it you didn't have to blow away the

24   order.

25           MR. STEINBERG:  That's correct.

Page 22

1              THE COURT:  Okay.

2              MR. STEINBERG:  Metzger.  There a county with a

3    covenant that ran with the land as to a land development was

4    a known creditor entitled to direct mail notice which was

5    not provided.  There was nothing in the case indicating that

6    there was publication notice.  The purchaser was arguing

7    that the covenant was wiped out by the sale.  The sale

8    proceeds couldn't address the issue about whether the land

9    development covenant existed or not.  The Court found that

10   since the purchaser knew about the covenant it really wasn't

11   a bona fide purchaser at the time of the sale.  Not our

12   situation.

13             National Pipe, and this is a case where I actually

14   think you need to understand the dynamics of what was going

15   on in this case.  There the bankruptcy court, the bankruptcy

16   judge was extremely annoyed about what happened here.  A

17   known --

18             THE COURT:  Is this the Peter Walsh case?

19             MR. STEINBERG:  That's correct.  There a

20   bankruptcy judge, there in that situation a known creditors

21   who had actually sued the debtor prior to the sale and would

22   have been on the top 20 claims if they had been listed did

23   not get notice and the court said that that person should

24   get notice.  Now it affected a remedy as against the

25   purchaser.  But the reason why it did that was that under

Page 23

1    the plan that the debtor had, an indemnity fund was set up

2    vis-à-vis the purchaser.  If claims had been made against

3    the purchaser, the purchaser had the right to make a claim

4    against the indemnity fund.

5           The claim that was at issue here was less than the

6    remaining proceeds in the indemnity fund.  So what the judge

7    did when he knew he was ordering this decision because he

8    granted both relief at the same time, said you could make a

9    claim against the purchaser and I'm letting the purchaser

10   make the claim against the indemnity fund and now go figure

11   it out.  And what happened was the case was settled for an

12   amount that was taken out of the indemnity fund and the

13   purchaser didn't pay anything except it got some of its

14   legal fees reimbursed.  That's what actually happened in

15   National Pipe.

16          Ninth Avenue v.  Remedial.  Creditor was at least

17   an unknown creditor.  That's what the Court determined.  So

18   that the publication notice was fine.  The issue in that

19   case was whether a CERCLA claim arose after the sale because

20   that was when it was discovered and if so it would be

21   binding on the purchaser.  Notably if the creditor could

22   assert a claim against the debtor that would have protected

23   the purchaser and since the plaintiffs here argue that they

24   were known creditors, this case actually supports New GM's

25   position.

Page 24

1           Reinert.  It was a Section 363 sale notice and it

2       said it did not say that it would sell free and clear of

3       specific domain names and that the claimant asserted

4       ownership in certain domain names.  The Court said that the

5       sale order did not determine ownership of the domain name so

6       that the claimant was free to claim ownership to the assets

7       after the sale.  That's essentially the same thing as what I

8       was saying with Koepp.  There the Court was saying I don't

9       have to touch my sale order because my sale order didn't

10      strip anybody of these rights.

11           THE COURT:  Because it didn't cover it in the

12      first place?

13           MR. STEINBERG:  That's correct.  And then the last

14      one I want to talk about is Savage Industries.  There, and I

15      think your Honor is familiar with this case, no notice of

16      any kind, including publications, was provided for the sale.

17      The court did not approve the sale terms or the no successor

18      liability finding and therefore the sale procedure was so

19      deeply flawed and the order itself not covering successor

20      liability that there was no reason to enforce the sale order

21      against the claimant.

22           Your Honor may recall that in the -- at the sale

23      hearing in 2009 objectors tried to argue Savage Industries

24      to you and say that this falls within the rubric of Savage

25      Industries and your Honor quickly went back and said that's

Page 25

1    not our case here.  We have publication notice.  It was

2    widespread.

3              THE COURT:  You're being too kind.  I don't

4    remember that back and forth.  Was that something I

5    addressed in the opinion or do I need to go to the

6    underlying transcript?

7              MR. STEINBERG:  I think it's in the transcript.

8    It's in the transcript and if your Honor at some point in

9    time we'll -- we can provide you the citation to the

10   transcript.  But Savage Industries --

11             THE COURT:  And that was in the back and forth in

12   that case kind of like I have with all of you guys?

13             MR. STEINBERG:  That's correct.  It was I think

14   Harvey Miller said something in response and then your Honor

15   picked up on that as well.  So the argument -- Savage

16   Industries was clearly a case that was discussed at the sale

17   hearing and the case doesn't get better with age.  It's the

18   same issue and the same reason.

19             Now, your Honor, we highlighted two things

20   yesterday that would allow you to decide these issues

21   without regard to the reasonable ascertainable due process

22   issue.  In effect to sort of decide these issues on other

23   grounds and I just wanted to quickly tick them off because I

24   think it's important to know that you don't necessarily have

25   to jump into the weeds on the reason ascertainable issue if

Page 26

1    you don't want to.

2           One is that we argued that there was no due

3    process violation because there was no property right

4    extinguished by the 363 sale and we gave four reasons for

5    that.  Just to quickly tick them off, a 363(f) sale doesn't

6    extinguish a claim, sales attach to the proceeds of sale.

7    Two, we've cited to you and your Honor had expressed some

8    reservations about it, but we cited to you the Emoral case

9    which relied on Keane which was a Southern District case

10   which said that it's a bankruptcy estate asset and therefore

11   the debtor had the right to give it up as part of the sale

12   process.

13          Third, we highlighted to you federal preemption

14   argument which was clearly set forth in White Motor and was

15   alluded to in your sale decision in footnote 99 and four, we

16   said that as a matter of fact and law your Honor had

17   determined that there was no successor liability claim

18   because there was no continuity of ownership and that with

19   regard to the product line exception, that doesn't apply to

20   economic loss claims or would apply to pre-sale accident

21   claims.

22          And there I would just like to point out that in

23   the case of Conway v.  White Trucks 885 F.2d 90 (3d Cir.

24   1989) the Court sort of dealt with this issue when it said

25   that if you add -- and it was dealing with the Pennsylvania

Page 27

1  product line exception, said that if you could have made a

2  claim against the seller here, you don't have an ability to

3  go against the purchaser and in this particular case clearly

4  everybody who was a plaintiff in this case had the ability

5  to go against the seller.  They had the ability to go

6  against the sale proceeds, make a claim.  Whether they did

7  it or not and whether there was a problem in that, that

8  wasn't a New GM issue.  That was strictly an Old GM issue,

9  Old GM presented the bar date.  Old GM was responsible for

10  the notice of what was there and Old GM dealt with that.

11  It's clearly not something that New GM was dealing with.

12         The second thing I said which allows you not to

13  deal with the reasonable ascertainable issue is the

14  prejudice point and I think, your Honor, there you and I

15  when we were talking about this thing, I actually think we

16  were saying the same thing, but we were saying it in a

17  different way and maybe the best analogy was, and hopefully

18  I'm right when I say this, is that I was saying it was an

19  element of the claim and you were saying I could see it as a

20  remedy, but not as the process.  And I guess the way that I

21  approached it was that when I think of a claim I think of

22  the liability aspect of something and the damage aspect of

23  something.

24         So, if someone had a due process violation that's

25  technically a --

1          THE COURT:  So you're focusing on the partly

2     metaphysical distinction of whether for it to be a dup

3     violation it's got to be a violation end of discussion or

4     whether the prejudice, which I would consider as the second

5     thing that needs to be addressed, although Mr. Weisfelner

6     argued to the contrary, is part or not of the initial

7     failure to provide due process conclusion.

8          MR. STEINBERG:  That's correct, your Honor.  I

9     looked at it as if I were litigating a case I would

10    sometimes argue to a judge there were no damages.  That's

11    the equivalent of saying no prejudice.  You could have

12    argued that there was a liability, the plaintiff didn't

13    suffer any damages and therefore they have no claim.  So I

14    wasn't slicing and dicing it the way that you were, I was

15    just saying that when you consider the issue overall you

16    have to consider prejudice and we cited so many cases in our

17    brief that talk about the prejudice.  And, your Honor, when

18    you approach this issue at various points in time after the

19    sale also used prejudice type concepts.

20          So, in the Morgenstein case, which your Honor had,

21    you noted that the result in the plan would have been the

22    same even if they disclosed another product defect.  In the

23    Robley matter you said that the publication notice guarded

24    the attention of objectors who made the same argument that

25    Robley counsel would have made, the prepetition accident

Page 29

1   plaintiff's cases.

2           Your Honor was introducing the concept of no

3   prejudice here for purposes of analyzing whether there was

4   an overall due process argument that was made.

5           THE COURT:  Let's go with that for a second.  If I

6   agree with you that prejudice has to be shown before I grant

7   any relief for a due process violation, the distinction you

8   just articulated doesn't matter.  But if I were to agree

9   with Mr. Weisfelner that I can and should grant relief

10  solely on the basis of finding a due process violation

11  without focusing on whether or not it makes a difference,

12  then the distinction you're talking would make a big

13  difference.

14          MR. STEINBERG:  That's correct, your Honor, and

15  I'd like to be able to show you a couple of the no prejudice

16  arguments that will illustrate why I think I'm correct on

17  this on its most basic level.  And I think it was

18  established yesterday because no one refuted it and I think

19  it's clearly true.

20          If the plaintiffs didn't get a direct mail notice,

21  but because of the publication notice, the fact that they

22  may have been trade creditors or shareholders so they got

23  notice otherwise besides being a vehicle owner, if they got

24  direct mail notice or they were aware of the sale hearing

25  because of the publication notice or the media coverage,

Page 30

1    then what was the prejudice?  I understand they talked about

2    you needed to specify the notice, but what's the difference

3    whether they should have gotten a mail notice or they

4    otherwise were aware of the hearing and had the ability to

5    show up?

6            That's why the cases when you read the cases they

7    say well, if you knew about the hearing anyway, if you

8    otherwise knew about it then you didn't have a prejudice and

9    that's why I went through yesterday the distinction when

10   they cited the cases that talked about merely being aware of

11   the bankruptcy filing doesn't give you awareness of the bar

12   date.  Well, that's true because the bar date sets a

13   deadline for the extinguishment of a claim and merely

14   knowing that there's a bankruptcy doesn't tell you that a

15   bar date has been entered.

16           But that's not the same thing as if you were aware

17   that there was a sale hearing.  If I knew that there was a

18   sale hearing and I could have shown up and I chose not to

19   show up then there's no prejudice and that's an element of

20   why I believe prejudice is an element of establishing due

21   process.

22           The argument that we made about no prejudice that

23   if they had shown up they wouldn't have said anything about

24   successor liability that your Honor hadn't heard.  One of

25   the questions that your Honor had asked was what would you

Page 31

1    have told me that was different?  There was nothing that

2    they said that was different.  There's nothing new to say.

3          That's an element of no prejudice which is if you

4    weren't going to say anything new -- that's why you see in

5    these cases that said if I had given you notice what would

6    you have said?  What would have been the difference as a

7    practical matter?  And if you can't articulate what the

8    difference was that would have in effect in any way change

9    the view then the ruling wasn't going to be --

10          THE COURT:  Well, if I heard Mr. Weisfelner right

11    he was not arguing that it would have changed my legal

12    analysis on the successor liability issues.  He was arguing

13    that if New GM had revealed to the world how bad its guys

14    had acted it would have created such a Congressional uproar

15    that Congress would have pressured Treasury or Treasury

16    would have felt so reluctant to assist GM that the whole

17    case might have been different.

18          MR. STEINBERG:  Well, I think that if you want to

19    -- that was the other element which is that if the recall

20    had come to light just before the sale or during the sale

21    process and there was this massive safety defect that had to

22    be dealt with and that was going to impact what the

23    purchaser otherwise would have to pay because the purchaser

24    was taking on the recall covenant, the purchaser could have

25    backed out of the transaction I assume.  And if that's the

Page 32

1    case where does that get them?  Right?  What happens in this

2    case if this purchaser walks away from the transaction?

3    That's another element of no prejudice argument which is

4    that if they had shown up and opposed the sale and opposed

5    the no successor liability finding and the sale hadn't gone

6    through they would have been in a worse off situation than

7    they are now.  That's another reason why the no prejudice

8    affects the due process argument.

9          The other thing, your Honor, is that no prejudice

10   is illustrated by the fact that the notice actually

11   attracted hundreds of objections and the arguments that

12   they're making now were made by people exactly the same and

13   your Honor considered them as part of the sale hearing.  So,

14   the first thing on successor liability was that the

15   creditors committee, the fiduciary for all of the unsecured

16   creditors including the plaintiffs, the fiduciary that had

17   three tort creditors on their committee of 15, they filed an

18   objection objecting to the no successor liability finding.

19   They ultimately agreed at the end when there was a change

20   that was made to support the sale.  But they were trying to

21   fight that throughout the process.

22         The Center for Auto Safety filed an objection.

23   They are a not-for-profit entity that provides consumers

24   with a voice for auto safety and quality.  That's what they

25   have on their website.  They stated in their objection that

Page 33

1   the sale process should not release consumer claims for

2   losses as a result of defects in Old GM vehicles.  They

3   argued that New GM should assume broader warranty-related

4   claims and not be shielded by successor liability.  They

5   claimed it was unfair to apply the no successor liability

6   finding to vehicle owners who may not realize they had a

7   claim against Old GM as of the sale hearing.

8           Their objection was overruled and their argument

9   was also raised on the appeal of the sale order in Campbell

10  and was rejected.  There were over 40 states attorney

11  generals who showed up opposing the no successor liability

12  finding including the state attorney general of California

13  who Mr. Esserman was talking about who filed another lawsuit

14  against New General Motors and they objected to the sale.

15  They argued at the sale hearing that New GM should take on

16  liability such as implied warranties, additional expressed

17  warranties, statutory warranties.  They argued that the sale

18  agreement divested customers of legal rights without regard

19  to state laws that may when a claim is eventually be made be

20  made to hold otherwise.  They were essentially arguing the

21  product line exception and their argument was rejected.

22          And this Court remarked in your sale decision that

23  you well understood the circumstances of the tort claimants

24  and that they could look to New General Motors as an

25  additional source of recovery.  If they could not look to it

Page 34

1    they would get less.  But the Court recognized that if New

2    GM did not get this protection it would not close the

3    transaction and the purchaser had the right to close which

4    liabilities to assume as part of the transaction.

5           It's critical to understand that the no successor

6    liability finding was not from the perspective of any

7    individual creditor and it was not from the perspective of

8    any objectors to the sale.  So it's not a matter of

9    conjecture of how the Court would have ruled if plaintiffs,

10   as compared to the other tort claimants, had raised the same

11   objection to the no successor liability finding.  The result

12   was intended to apply to all creditors, the known creditors,

13   the unknown creditors and the future creditors and the

14   result would have been the same.

15          And I remarked yesterday that the issue with

16   regard to the pre-sale accident plaintiffs about expanding

17   the sale -- carving them out from protection from the no

18   successor liability was actually urged at the sale hearing

19   and they tried to make their showing that the claims aren't

20   that much and so why don't you just take them on and the

21   government said no.  And then we also made the point that

22   the government had refused to pay economic loss claims and

23   that if they were not specifically assuming warranty claims

24   and tort claims, which are the retained liabilities, then it

25   automatically follows that they were not going to assume

Page 35

1    economic loss claims which are built on those foundations.

2    The government refused to take on the class-action

3    settlements which were economic loss claims.  The Castillo

4    case, the Dex-Cool case, the Soders case, those claims were

5    fixed.  In contrast, the government certainly would not have

6    assumed economic loss claims, as now being asserted by the

7    plaintiffs, which are potentially very large and have never

8    been determined.  And the government was never going to take

9    on economic loss claims for the diminution in value of a car

10   and leave the pre-sale accident victims out there.  It was

11   drawing the hard line of only taking on what was

12   commercially reasonable.

13          So, your Honor, those are the four reasons why

14   that the no prejudice element, that the fact that people

15   argued the same points, the fact that no one is advancing a

16   new argument on successor liability, the no prejudice is

17   shown because they were otherwise aware of the sale hearing

18   and no prejudice is shown because if they were right they

19   would have had a worse result than they have right now.

20          All of those things determine why there was no due

21   process violation because there was no prejudice.  And you

22   could either get it there directly because it's an element

23   of whether there's a claim or you can get there because you

24   decided to parse it through between liability and remedy.

25          I'd like to say a few words about the notice that

Page 36

1   was sent by Old GM with regard to the sale motion.  One, the

2   direct mail notice that went out included every party who

3   was in litigation with Old GM at the time.  This included

4   all pre-sale accident plaintiffs who were in litigation and

5   thus any litigant suing Old GM with respect to its vehicle,

6   in essence the active plaintiffs' bar at the time got direct

7   mail notice of the sale.

8         THE COURT:  Pause please, Mr. Steinberg, and if

9   you were about to answer that next forgive me.  Were any of

10  the people who were suing Old GM back in 2009 suing for

11  something other than a death or injury or property damage in

12  a car wreck such as the economic types of loss that are now

13  being alleged?

14        MR. STEINBERG:  I actually don't know the answer

15  to that, your Honor.  I do know that in looking at some of

16  the more recent complaints it seems that they sue for

17  multiple reasons.  But I don't have the answer.

18        THE COURT:  Sure.  But when you're in a car wreck

19  you know it.  We all know that people sue for things other

20  than being in car wrecks.  But I guess your answer was you

21  don't know whether back in 2009 people had sued for stuff

22  other than car wrecks.

23        MR. STEINBERG:  Well, I'm sure that Old GM for

24  things other than car wrecks because Castillo, Dex-Cool and

25  Soders were those types of claims.

Page 37

1          THE COURT:  Oh, I see.  And they got actual

2      notice.

3          MR. STEINBERG:  Yeah.

4          THE COURT:  Okay.

5          MR. STEINBERG:  In fact, your Honor may remember

6      that was it Castillo that I argued that they got a

7      distribution in the case and therefore they had chosen their

8      remedy against Old GM and therefore that they're judicially

9      estopped from pursuing.  So there was a --

10         THE COURT:  You'll have to forgive me.  I've had

11     20 or 25 of these decisions now and they tend to blur.

12         MR. STEINBERG:  Okay.  So the second point is that

13     besides now we're seeing the active form plaintiffs' bar,

14     the sale notice also included anybody who filed a notice of

15     appearance in the case.  So, in this highly publicized case

16     anybody who wanted to monitor it got direct mail notice of

17     the sale.

18         And the Fourth Circuit in Vancouver Women's v.

19     A.H.  Robbins, 820 F.2d 1359, properly noted that a

20     bankruptcy court approving a notice procedure must balance

21     the needs of notification of potential claimants with the

22     interest of existing creditors and claimants and bankruptcy

23     estates' resources are always limited and the bankruptcy

24     court must use discretion in balancing these interests when

25     deciding how much to spend on notification.

Page 38

1              THE COURT:  What case were you reading from?

2              MR. STEINBERG:  This is Vancouver Women's v.  A.H.

3      Robbins, 820 F.2d 1359 on page 1364 Fourth Circuit 1987.

4              THE COURT:  Fourth Circuit.

5              MR. STEINBERG:  Right.  Now, Mr. Weisfelner said

6      it was hard for him to do the math if you had applied it to

7      27 million vehicles instead of 70 million vehicles.  If you

8      accept my math in a very sort of rough basis if four million

9      people cost, four million vehicles cost $3 million then 28

10     would cost $21 million so the cost would be around $20

11     million.  You can quibble with me by $1 million, but that's

12     roughly what it would cost.

13             THE COURT:  All right, so in substance you were

14     just working off of cost per million.

15             MR. STEINBERG:  That's correct.

16             THE COURT:  In terms of sending out mail notices.

17             MR. STEINBERG:  That's right and that's the way it

18     was priced in the Garden City application.

19             THE COURT:  Your noticing agent, that's the way it

20     billed?

21             MR. STEINBERG:  That's right.  The Old GM sale

22     order was actually filed publicly on 8Ks so the original

23     sale agreement was signed on a June 1, 2009 8K, the

24     amendment was on the July 2, 2009 8K.  So there was

25     additional notice of the sale agreement and what was going

1    on by virtue of securities filings.  The sale motion --

2          THE COURT:  Pause once again.  The proposed sale

3    order, closely similar, but not identical to the one that

4    was ultimately entered on the 4th of July weekend, was filed

5    in the ECF docket on I think the first day of the case, June

6    1st.  If not June 1st, June 2nd.

7          Was the proposed sale also part or an attachment

8    or an exhibit to that 8K?

9          MR. STEINBERG:  I think it was just the sale

10   agreement.

11         THE COURT:  The sale agreement.

12         MR. STEINBERG:  That's correct.

13         THE COURT:  Which provided for successor

14   liability.

15         MR. STEINBERG:  Provided for no successor

16   liability.

17         THE COURT:  Excuse me, for no success liability.

18         MR. STEINBERG:  And set forth what the retained

19   liabilities were.

20         THE COURT:  Okay.

21         MR. STEINBERG:  The sale motion when it was filed,

22   the lawyers had said up front that it was not practical to

23   serve all contingent creditors and the publication notice

24   should be sufficient.  And so when your Honor entered the

25   sale procedures order you said that Old GM was not required

Page 40

1    to serve direct mail notice to unknown creditors and that

2    clearly pre-sale accident plaintiffs who had not commenced

3    litigation or made a claim against old GM were unknown

4    creditors.

5            Your Honor actually found that way in the Robley

6    case afterwards.  At the time of the sale as well as now

7    Bankruptcy Court's for the Southern District of New York had

8    established guidelines for bankruptcy asset sales.  Your

9    Honor had asked what should be the procedures.  The

10    bankruptcy judges of this district have actually tried to

11    try to tell their practitioners what they think should be

12    the procedures subject to individual judges modifying it.

13            And the guidelines at the time in 2009 set forth

14    the notice procedures generally, who should get notice, and

15    what the content of the sale notice should be.  The orders

16    that your Honor entered in this case were broader than the

17    guidelines.  You went beyond the guidelines.  The guidelines

18    don't actually say you have to notify by direct mail known

19    creditors and the publication notice that was given here was

20    to non-widely circulated people.

21            So when your Honor asked the question what should

22    be the guidelines, the courts, the judges have told the

23    practitioners they think as a general proposition the

24    guidelines should be.

25            THE COURT:  Do you know whether our present

Page 41

1   guidelines are the same as those we had in the summer of

2   2009?

3          MR. STEINBERG:  They changed, but I don't think

4   they've changed in these points.

5          THE COURT:  Do you have or do I have in have in

6   the record is the better way of putting it, what the

7   guidelines were back then?  I assume I could take judicial

8   notice of --

9          MR. STEINBERG:  You could take judicial notice.

10         THE COURT:  -- if they're available, but I don't

11  know if we keep old guidelines on the website.

12         MR. STEINBERG:  We can provide them to your Honor

13  after we show it to the other side to make sure they're

14  comfortable that we're providing the right guidelines.  But

15  we can do that after this hearing.

16         THE COURT:  All right.

17         MR. STEINBERG:  And I said your Honor had actually

18  ruled on this notice issue in the Robley case and the Robley

19  case is actually a very important case because it was a

20  post-sale contested matter arising in the Old GM case.

21  Robley was a pre-sale accident claim and who did not sue Old

22  GM prior to the sale and the Court confirmed that Old GM was

23  not required to send direct mail notice to vehicle owners

24  who had not sued Old GM and that publication notice was

25  sufficient.  So your Honor actually had this issue, not in

Page 42

1   the context of the ignition switch case, but you have this

2   issue before.

3             The Court referred to the circumstances

4   surrounding the 363 sale and that Old GM did not have the

5   luxury of sending notice by mail to hundreds of thousands of

6   GM car owners.  I'm being passed a note that in the Robley

7   case --

8             THE COURT:  Talk into the mic if you would please.

9             MR. STEINBERG:  I'm sorry, I was being passed a

10  note that the Savage Industries case was actually also

11  discussed in the Robley case that your Honor got, in the

12  Robley transcript.

13            So, Robley I think is relevant here.  The pre-sale

14  accident plaintiffs in litigation, as I said, at the time of

15  the sale received direct mail notice and that was approved

16  by the Court.  People refer to the Powledge matter here.

17  The Powledge matter was a circumstance where not only did

18  they get the notice, they actually filed a claim in the

19  bankruptcy case.  They actually went in litigation.  They

20  actually went to mediation.  They actually got paid from the

21  Old GM bankruptcy estate.  So, pre-sale accident plaintiffs,

22  and they're part of the group that Mr. Weintraub represents,

23  they are people who filed claims against old GM, having

24  gotten notice and actually have gotten a distribution.

25            The form of direct mail notice and the publication

Page 43

1   notice was approved by the sales procedures order and that's

2   significant.  Your Honor in the Chemtura case said that

3   bankruptcy judges look at the form of the notice and make a

4   judgment as to whether it was reasonably calculated to

5   achieve the notice that the Constitution and tradition

6   concepts of fairness requires.

7          Now, you know, I know that someone could say that

8   the concept of a computer is garbage in, garbage out, and I

9   don't mean to try to foist this on you saying that -- I

10  mean, you approved it based on the knowledge that you had.

11  But it's significant for purposes of the cases that the

12  notice that was actually, the notice in controversy, was

13  approved by a court and was reviewed by the court and it was

14  significant in this case in that that notice was never

15  challenged by all of the objectors to the plan including the

16  creditors committee.  And it was never challenged on the

17  claim specificity notice at all too.

18         Everybody recognized that that was appropriate

19  notice.  In fact I would challenge the other side to find me

20  a 363 notice that has the Chemtura specificity of specific

21  claims.  I'm sure if it exists they would have put it in

22  their briefing.  It doesn't exist as far as I can tell and

23  it would be crazy to do that in the context of this case

24  because Old GM was selling free and clear of all of its

25  liabilities, not just the liabilities of these plaintiffs.

Page 44

1    So what would that notice have said about listing all the

2    claims that were free and clear?  What would it have said

3    about listing all of the claims that would no longer be able

4    to assert a de facto merger type claim?  What would that

5    notice have said?  How long would it have taken?  How much

6    would that have cost?  How much would that have delayed the

7    sale?  No one ever thinks that would make sense at all.

8           Judge Gonzales had the same issue, by the way, in

9    Chrysler and there he had the publication notice for

10   potential future tort claimants was sufficient from a due

11   process perspective.  The sale decision confirmed that the

12   notice was proper.  Paragraph E of the sale order says

13   potential contingent warranty claims were unknown creditors

14   entitled to publication notice.  Economic loss plaintiffs

15   held contingent warranty claims, contingent in the sense

16   they had not brought their claims against Old GM as of the

17   sale, contingent in that they were arguing that they had a

18   latent design defect.  The same --

19          THE COURT:  Pause Mr. Steinberg.  Does that suffer

20   from the potential attack of the same garbage in garbage out

21   expression used a minute ago?

22          MR. STEINBERG:  Well, you know, I don't think so

23   because when someone says that it's free and clear of

24   contingent warranty claims, there's a recognition that those

25   claims haven't been asserted and you don't know what they

1    are and they could be anything.  And therefore when you're

2    saying that with respect to those claims that publication

3    notice is sufficient, then I think that that's the case.

4            I think if your Honor said does that bring me back

5    to the reasonable ascertainable, reasonable foreseeable

6    standard, that probably is true.  You're probably back to

7    say whether that was sufficient.  It gets you back to that

8    issue.

9            But the concept that at the time that you approve

10   this you knew that you were approving publication notice for

11   what would otherwise be latent design defects, potential

12   recalls down the road, I mean, every car manufacturer does a

13   recall at some point in time.  They do it every year.  I

14   mean, New GM did a lot of recalls last year, but if you go

15   through the history of recalls they all do it every year.

16   It was anticipated that you could have this circumstance.

17   It was anticipated that you could have a circumstance that

18   related to Old GM conduct, the conduct of the Old GM

19   employees and that's why paragraph AA of the sale order says

20   that New GM is not assuming the conduct of Old GM whether it

21   was disclosed or whether it was undisclosed.  It just wasn't

22   picking that up.  It was getting that fresh start.  It was

23   not assuming those liabilities at all.

24           The claim-specific notice issue.  Your Honor, you

25   asked what the sale notice should have said and I think the

Page 46

1    short answer is the sale notice properly said what it was

2    supposed to say.  The sale would be free and clear of

3    claims, all claims except if it was an assumed liability.

4    You didn't need to break it down to its components.  It gave

5    assets to the sale agreement which said that there was no

6    successor liability.  The sale motion described this as a

7    special relief that was being requested there and it also

8    defined what the retained liabilities were.

9             THE COURT:  I understand the benefit of oral

10   argument.  I'm going back to review the briefs, particularly

11   Mr. Weintraub's brief, because the question I had asked was

12   based on I think page 26 of his brief.

13            He says that even if you had mailed the notice, if

14   you spent the, what are we talking, $20 million bucks, is

15   that what it would have cost to send out mail notice

16   roughly?  Mr. Weintraub says that even if you sent out

17   mailed notice to everybody whose car was subject to an

18   ignition switch defect, I presume like it was to the car

19   wreck victims, it wouldn't have done the job because it

20   didn't provide the information that the recall notices, if

21   they had been sent out, would have provided.

22            That's a variant of what you're saying I think.

23   Can you comment on that please?

24            MR. STEINBERG:  Sure.  One is that your Honor

25   actually had this issue and decided this issue with the

Page 47

1    Saturn plaintiffs' case.  There the Court said that

2    publication notice did not require the debtor to notify

3    claimants about the problem in their car.  If anyone had a

4    problem with a failed timing chain he or she would have

5    known then and could easily have filed a regular proof of

6    claim in this case.  The Court ruled that the quality of the

7    363 sale notice was not even debatable.  It was

8    unquestionably satisfactory and that was right.  363 sale

9    notices --

10              THE COURT:  That was one of my decisions?

11              MR. STEINBERG:  It related to the Saturn

12   plaintiffs --

13              THE COURT:  Yeah, that was (indiscernible).  I'm

14   sorry?

15              MR. STEINBERG:  It was in a transcript on February

16   10, 2011 and what I was reading from was on page 41, lines

17   16 to 42 and I think it was attached to our reply brief,

18   right?  So it was part of our reply brief.

19              But your Honor was right because 363 sale notices

20   don't have this type of claim specificity.  There's not a

21   precedent that's out there that says that that's what you're

22   supposed to do and that's because the focus of a 363 sale is

23   not the quantification of the liabilities or the ability to

24   assert liabilities.  The purpose of the 363 sale notice is

25   to notify people that there's a sale, that this is what

Page 48

1    we're trying to do and to try to get the most people bidding

2    on the asset and to try to get the best price.  And there

3    was no --

4              THE COURT:  Pause please.  363 notices when

5    they're done right have double or triple barreled

6    significance.  The main reason why we have notices in 363

7    sales, and you don't even have to have a hearing if nobody

8    objects although of course I've never seen that, is so that

9    the creditor community is comfortable that the existing

10   captains of the ship, which are usually still debtors in

11   possession, aren't giving away the store and giving away the

12   estate's assets for too little.

13             But they also give the creditors of the world

14   notice of what the 363 orders are going to say because I've

15   never seen a 363 order, and there's a lot of people in the

16   courtroom, I don't know if anybody left in here has been

17   practicing longer than I have, they never say you're

18   authorized to do this sale.  They go on for five, 10 or 100

19   pages laying out a zillion conditions, protections and other

20   things incident of the sale and I've always assumed that if

21   somebody thinks the sale itself is okay, but thinks the

22   order has offensive stuff in it he, she or it can complain.

23             And this is really a category II case.  Nobody on

24   the other side of your table contends that Old GM shouldn't

25   have been sold.  They're complaining about what the order

Page 49

```
 1   said.  So, we can't wholly divorce ourselves, can we, from

 2   the fact that people might care about both halves.

 3              MR. STEINBERG:  Well, your Honor, I think that

 4   there are certainly circumstances were people do care about

 5   both halves.  I mean, in the sale order there's probably

 6   five paragraphs relating to the TPC lenders which I was

 7   involved in which talked about how they would be dealt with

 8   as part of the sale.

 9              THE COURT:  Well, warehouses or something where

10   the lien is attached to the proceeds who had a valuation

11   fight on it?

12              MR. STEINBERG:  That's correct.  So there I think

13   it is relevant.  But here what we're talking about is

14   successor liability.  It was the condition to the deal.

15   There wasn't anything to debate about what the order was

16   going to say about successor liability.  Either it was going

17   to be in, that there was no successor liability.  You're

18   going to have paragraph 46 that said that there was no de

19   facto merger, etcetera, etcetera or there wasn't going to be

20   a sale.  That was what was involved.  This wasn't an aspect

21   where there were nuances here and this wasn't applied just

22   to hurt the plaintiff's bar.  This was applied across the

23   board.  And this wasn't something that was hidden or

24   debatable.  There actually is no debate on successor

25   liability.  It was an up or down proposition.
```

1          And the reason why I focused on the fact that the

2    sale hearing didn't try to quantify liabilities and

3    therefore Mr. Weintraub's argument I don't think holds

4    water, is that there was no evidence that was presented at

5    the sale hearing as any specific contingent liability.

6    There was no trial exhibit that was introduced to try to

7    justify the sale on that basis and that after the sale

8    hearing it's significant that when they did the bar date

9    that there were 70,000 claims that were filed and 29,000 of

10   those claims were unliquidated.  People said they had

11   claims, but they couldn't put a number on it.  There was no

12   attempt, it would have been ludicrous to try to deal with

13   those issues at the sale hearing and the original claims

14   filed against Old GM after the sale in the aggregate, and

15   you get this information from the disclosure statement that

16   was filed in this case, was $270 billion.

17          THE COURT:  What was that?  $270 billion?

18          MR. STEINBERG:  $270 billion.

19          THE COURT:  What's that?  I'm sorry.

20          MR. STEINBERG:  That the aggregate unsecured

21   claims filed against Old GM as a result of the bar date.

22          THE COURT:  So, if I hear you right, by the time

23   of the bar date there were $270 billion of claims against

24   Old GM.  The 29,000 and 70,000, that's number of claims I

25   take it.

1          MR. STEINBERG:  That's correct.  29,000 --

2          THE COURT:  And that's as of June of 2009?

3          MR. STEINBERG:  That was the claims that were

4    filed, there were 29,000 of the 70,000 claims filed that

5    were unliquidated.  They couldn't put a number on it.

6          THE COURT:  I see and that's the number of claims

7    that asserted in the aggregate $270 billion?

8          MR. STEINBERG:  70,000 claims asserted $270

9    billion of claims.  29,000 of the 70,000 claims asserted

10   couldn't put a number on it.

11         THE COURT:  Okay.

12         MR. STEINBERG:  And your Honor may recall from

13   reading the GUC Trust reports, the allowed claims in this

14   case are somewhere between $32 and $33 billion.  So there's

15   been an 85 percent reduction or more of the claims that were

16   filed.  So no one was trying to tackle the claims.  No one

17   was trying to fix the claims.  No one was trying to

18   extinguish the claims and that was why I read yesterday the

19   comments where Your Honor was saying that's an issue for

20   another day.

21         So the argument about the -- should have been

22   specific notice in the sale, because you needed to identify

23   the claims, is I submit, irrelevant especially if the issue

24   was relating to successor liability which was a fundamental,

25   foundational element of the sale.

Page 52

1           The other thing to sort of illustrate this point

2     was that the purchase price actually had an adjustment

3     feature that if the aggregate claims equal $35 billion or

4     more there would be additional purchase price consideration

5     paid by New General Motors.  So, there was no attempt to

6     figure out what the claims were, they didn't know.  All they

7     were saying to the creditor body is you're getting a pot.

8     Augment the pot if the claims get to be too big, but we

9     can't determine that now.  That will be determined

10    throughout the course of this case.

11          And there was no incentive to suppress claims as

12    part of the sale.  Old GM was insolvent by billions of

13    dollars.  Recognition of additional unsecured claims would

14    not have created a further impediment for the sale.  In

15    fact, the more insolvent Old MS was the more compelling a

16    case was for the 363 sale.  And your Honor sort of said the

17    same thing in Morgenstein when talking about the plan.  It

18    said if you had another product liability claims we were

19    carving up the limited pot of assets.  It wouldn't have

20    mattered.  People may have gotten a little less, but it

21    wouldn't have changed anything and that would have been the

22    same thing here because the government had offered an amount

23    way beyond what anybody else would have paid.  Because the

24    government, and it came out in your sale decision, was

25    paying not for the value of these assets, just the value of

Page 53

1    these assets, they were paying for the impact on the

2    domestic automobile industry, the need to maintain the

3    national interest of having a domestic automobile industry,

4    preserving jobs and trying to stem a severe recession at the

5    time.  This was part of government overall bailouts of

6    certain industries to try reverse the worst recession that

7    the country had exhibited since the Great Depression.  So

8    the government was paying an amount way beyond what anybody

9    else would have paid.

10            And I think, your Honor, when you think about the

11   claim-specific notice you have to think about the

12   ramifications of other section 363 cases.  If you accept Mr.

13   Weintraub's view and impose a duty on sellers to tell people

14   that they have a claim when their claim is not being

15   extinguished that would be unprecedented.  That would have

16   cost, that would have delay.  Ms.  Rubin said you should use

17   the Chemtura notice.  Where?  Who?  Who actually has ever

18   done that?  What judge has ever required that?  How

19   impractical a solution would that be?

20            Let me turn to the remedy section.  The remedy

21   cited, the cases cited by the plaintiffs are readily

22   distinguishable from the situation at hand because notice

23   was extensively given and the Court approved the form of the

24   notice and that's much different than the cases that the

25   plaintiffs cite when there was no notice given for any of

1    the sale process and the New GM the government was a good

2    faith purchaser for value.  The designated counsel brief

3    cites the U.S.  Treasury as not being aware of the ignition

4    switch issue so they've essentially, even with the benefit

5    of hindsight, conceding the good faith issue.  And what New

6    GM did after the sale or didn't do after the sale is not

7    relative to the good faith finding that the Court made as of

8    the sale.

9              Mr. Weintraub read from Section 363(m) of the

10   Bankruptcy Code to say that it protects the validity of the

11   sale.  And I think I have used 363(m) to talk about the

12   rationale, the reasons for that to benefit bona fide

13   purchasers.  He put the period in the middle of the section.

14   When the section goes on, when they talk about the validity

15   of the sale they say that it's to the entity that purchased

16   the property in good faith.  So, it's not protecting the

17   validity of the transaction.  It's protecting the validity

18   of the transaction to the good faith purchaser.  The purpose

19   of that section is to protect on appeal the rights of the

20   bona fide purchaser for value.  You need to introduce that

21   clause to understand what the section is trying to deal

22   with.

23             The plaintiffs in the GUC Trust believe that

24   notice and a bar date of a Section 363 sale or equivalent,

25   and I won't repeat again why for all the reasons I said

Page 55

1   yesterday why I don't believe that's correct at all and that

2   that Mullane's due process issues are for the particular

3   circumstances and in Campbell they talked about the

4   particularities and peculiarities of the Old GM case

5   dictating what the due process notice should be.

6          The sale order specifically said New GM was not

7   responsible for Old GM's conduct and it anticipated that

8   there would be unknown claimants and future claimants that

9   would be bound by the order.  It's therefore unfair to

10  fashion a remedy against New GM when the circumstances

11  complained of now was expressly contemplated by the sale

12  order.  And we talked about before, and I won't delve into

13  it much more, my simple proposition is that you can't have a

14  partial revocation of the sale order and that there is no

15  difference between partially revoking the sale order to make

16  it inapplicable to the plaintiffs and entering a new order

17  holding that the sale order is inapplicable to the

18  plaintiffs.  It's functionally the same thing and we're not

19  writing on a clean slate here.

20         The plaintiff suggested relief would violate the

21  integration clause of the sale order in paragraph 69 and it

22  would violate the Campbell ruling which talked about you

23  can't do elective surgery and you can't knock out the props

24  upon which the foundational element of the sale was made.

25         And your Honor actually dealt with this in the

Page 56

1    Morgenstein case in a different context.  When you looked at

2    saying I just want to be carved out of the plan and I want

3    to have in effect -- and your Honor said that that's really

4    a partial revocation of the plan and to say something else

5    is really just a play on words and I would say that the same

6    reasoning that your Honor did by sifting through what was

7    being asked for applies here.

8            THE COURT:  What did the circuit do in the Johns-

9    Manville Chubb situation?  I take it that there it was

10   pretty clear that the order as it originally came out of

11   Judge Lifland's court had covered by its literal terms in

12   this era of plain meaning and textual analysis, all that

13   stuff the Supreme Court tells us, had covered a claim of the

14   type that (indiscernible) Chubb, but the circuit exempted

15   Chubb from the application of that order even though it

16   didn't knock out the entire order.

17           MR. STEINBERG:  I think that my recollection of it

18   was not that.  I think the Second Circuit interpreted the

19   order saying it couldn't possibly have tried to enjoin this

20   cause of action and therefore it was never really intended -

21   -

22           THE COURT:  But was that a diplomatic way of

23   saying that nobody in their right mind could have included a

24   provision of that character in the agreement or in the

25   order?

Page 57

1          MR. STEINBERG:  I think they actually used words

2     almost to that effect which was beyond the contemplation of

3     anybody to have included that there.  So, you know, it is

4     what it is, but that's the way they dealt with the issue.

5          THE COURT:  You're hitting on what would have been

6     counterintuitive to me being a bankruptcy judge for 15 years

7     and a lawyer for 30 before that.  But when the circuit tells

8     me that something's okay I listen to the circuit.

9          MR. STEINBERG:  Well yeah, I think if your Honor

10     was to hold that what they're asking for now was beyond what

11     you had found in the sale order and that you couldn't have

12     contemplated that you were releasing successor liability

13     then you'd have to deal with the Chubb analysis.  I don't

14     think you have -- you don't have that there.  Your Honor was

15     explicit when you're dealing with successor liability.  You

16     were explicit about who it would be applied to.  It was

17     applied across the board to anybody and therefore I think

18     Manville IV doesn't apply to this case at all.  Manville IV

19     is predicated on remedies because they claim that they

20     couldn't have been contemplated at the time of a plan

21     injunction and that's not what these plaintiffs are saying.

22     These plaintiffs are saying I was a known creditor and I

23     should have had direct mail notice.  They're the polar

24     opposite of the people complaining about in Manville IV.

25          And Manville IV has the issue that the injunction

Page 58

1    -- by the way, the Campbell case says plan injunctions are

2    different than injunctions under a 363 sale.  They're meant

3    to accomplish different purposes.  The 363 sale has the

4    bankruptcy policy objectives of trying to give certainty to

5    the purchaser, finality in trying to achieve the best

6    purchase price, not necessarily involved in the same way in

7    the plan injunction.  But beyond that the sale order clearly

8    tie into the res.  The injunction that your Honor gives in a

9    363 sale is protecting the person who's buying the asset.

10   In the Manville IV case they're saying you enjoined the

11   claim that was a direct claim between one insurer and

12   another insurer that existed prepetition and that you had no

13   right to do that, it was beyond your jurisdiction to do

14   that.

15          There's no question you have jurisdiction to issue

16   a 363 sale injunction.  In Manville IV they said they

17   couldn't have issued that injunction from the beginning and

18   therefore it was beyond their contemplation.

19          The issue as far back as in Factors' & Traders,

20   which is a Supreme Court case from I think the 1880s,

21   understood that when you deal with a sale order it's not

22   possible to in effect give partial relief to some people and

23   leave everybody else the same.  It said that if you are

24   going to vacate it for one lienholder you have to vacate it

25   for all lienholders.  And the fundamental element of that is

Page 59

1    that it's unfair to give the plaintiffs the benefits of the

2    sale order, the fact that we actually -- New GM is doing the

3    recall now, the fact that we did glove box warranty repairs

4    throughout this entire period of time, and then say they're

5    exempt from the other provisions of the order.

6              And the cases are consistent that the plaintiff

7    should not be in a better position than they would have been

8    if notice had been given under the 363 sale notice.  The

9    Stamco case, the Fernwood case, the Transaction World

10   Airlines case cautioned against providing these windfalls to

11   people who complained of the sale.

12             And then one final thing about the remedy section.

13   The GUC Trust unit holders argue -- will be arguing later

14   about equitable (indiscernible).  They say it's too late to

15   fashion a remedy as against them.  But you've heard Ms.

16   Rubin say yesterday that there should be a remedy that's

17   fashioned against New General Motors.  I'm not sure how

18   they'll be drawing the distinction as to why they get the

19   free ride and we shouldn't, but it's clear that from New

20   GM's perspective we are five and a half years since the

21   sale, there have been billions of transactions that have

22   been done by virtue of the 363 sale.  The appeal of the sale

23   order was dismissed as statutorily moot and equitably moot

24   already.  So, how they think that they get a free ride and

25   those concepts don't apply to us will be a mystery to me,

Page 60

1       but I'll be listening to that argument later on.

2              Finally, the Old GM claim threshold issue.  With

3       regard to the used car purchasers I'd like you to think

4       about this example.  If the Old GM vehicle had not been

5       resold after the 36e sale, the owners claim would be

6       subsumed in the pre-sale consolidated complaint.  Claims

7       therein are conceded to be retained liabilities.  In other

8       words, it's conceded that New GM was not responsible for

9       maintaining the value of Old GM vehicles sold before the 363

10      sale.  The fact that an owner decides to sell its used Old

11      GM vehicle to another party in a transaction which did not

12      involve New GM cannot transform what is otherwise a retained

13      liability into an assumed liability of New GM.

14             Stated otherwise, the purchaser of a used Old GM

15      vehicle from a third-party does not have greater rights

16      against New GM than its third-party seller had against New

17      GM.  It's derivative of whatever the seller could give them.

18             The fact that used car purchasers are claims are

19      really successor liability claims was further evidenced when

20      Mr. Esserman talked about the causes of actions asserted

21      against New GM in the post-sale consolidated complaint.

22      Clearly New GM did not make representations or sell the Old

23      GM vehicles to the used car purchasers or receive any of the

24      sale consideration thus causes of actions that he talked

25      about, like unjust enrichment, rescission, fraudulent

Page 61

1    concealment, false advertising as set forth in the consumer

2    statutes all deal with the point of sale event and that

3    clearly has no merit to New GM who was a stranger to the

4    used car sale transaction.

5            Under section 2.3 of the sale agreement, the

6    definition of retained liabilities is everything that is not

7    as an assumed liability.  Ms.  Rubin read from Section

8    2.3(b) to say that the purchaser is not assuming any

9    liability of the seller and that's where she stopped.

10           The rest of Section 2.3(b) says that the purchaser

11   is not assuming any liability of the seller whether

12   occurring, accruing, before, at or after the closing.  He

13   contemplated the situation.  The actual term liability is

14   defined in the sale agreement to include unknown liabilities

15   as well as undisclosed liabilities.  Thus my argument, which

16   was that there was no gap in responsibility as it relates to

17   Old GM vehicles and that the parties specifically parse out

18   who is going to be responsible for what aspect of an Old GM

19   vehicle, was dealt with by the sale agreement.  And no one

20   tried to address paragraph 46 of the sale order.  There

21   paragraph 46 said that Old GM, except for assumed

22   liabilities which don't apply, will not have a liability for

23   any claim A, that relates to the production of vehicles

24   prior to the closing date.  And by the way, it doesn't use

25   the term retained liabilities.  It just says it

Page 62

1    categorically -- New GM shall not have any liability for any

2    claim that relates to production of vehicles prior to the

3    closing date.

4            And it separately says New GM shall not have any

5    liability for any claim that is otherwise assertable against

6    Old GM.  And clearly you heard from Mr. Weisfelner yesterday

7    and --

8            THE COURT:  The second one you were reading from,

9    is that a continuation of 46 or it different?

10           MR. STEINBERG:  That's also part of 46.  So the

11   sale order specifically talked about this, you're not

12   responsible for Old GM vehicles.  It confirmed my reading of

13   the sale agreement.  The sale agreement expressly

14   contemplated that Old GM employees would be hired by you GM.

15   It was one of the benefits of the sale.  Section 6.17 of the

16   sale agreement talks about that.  It also says in paragraph

17   AA of the sale order that New GM would not be liable for the

18   conduct of Old GM and that protection applied for claims

19   that arose before or after the sale that are based on Old GM

20   conduct.

21           THE COURT:  That comes back full circle to one of

22   the things that I telegraphed was of interest to me

23   yesterday.  You said two different things or the language of

24   the sale agreement says two different things or, excuse me,

25   the sale order.  I'm not sure if it's on 46 or if it's

Page 63

1    somewhere else.

2            In the first you said New GM isn't responsible for

3    anything that relates to and then I forgot how the words in

4    between relates to and Old GM --

5            MR. STEINBERG:  It says relates to the production

6    of vehicles prior to the closing date.

7            THE COURT:  Okay.  Then the second one you said

8    that New GM isn't responsible for --

9            MR. STEINBERG:  Any --

10           THE COURT:  -- anything that was the fault of Old

11   GM or words to that effect.

12           MR. STEINBERG:  That was otherwise assertable

13   against Old GM.

14           THE COURT:  Okay.  You see how they're different?

15           MR. STEINBERG:  Yes.

16           THE COURT:  And if that distinction had been

17   brought to my attention in 2009 I'm not sure what I would

18   have done under those circumstances.  I'm not sure today.  I

19   guess I can think it through.

20           MR. STEINBERG:  Well, your Honor, there could be

21   lots of claims that are assertable against Old GM that have

22   nothing to do with the production of vehicles prior to the

23   closing date.  It could have been monies loaned.

24           THE COURT:  Yeah, but that isn't what I'm talking

25   about.  It's suppose -- it gets back to some of the points

Page 64

1    that Mr. Esserman was making about what he calls independent

2    tortious conduct.  If it is independent tortious conduct by

3    New GM, but happens to involve something that was originally

4    manufactured before the sale date by Old GM in some respects

5    that's where the rubber hits the road.

6              MR. STEINBERG:  Yes, but my argument, your Honor,

7    is, and I think it's borne out by the sale agreement and the

8    sale order, that unless it was covered by the glove box

9    warranty or the Lemon Law or related to an accident or

10   involved New GM having to comply with the federal laws

11   relating to recall -- unless it fits within those buckets

12   that there was no longer any responsibility by New GM for an

13   old GM vehicle.

14             THE COURT:  As a matter of contract.

15             MR. STEINBERG:  As a matter of contract.

16             THE COURT:  And then your opponents are contending

17   that if they had shown up at the hearing, well they would

18   have been arguing for the world, but for the more persuasive

19   part of what they'd be arguing for they'd say limit to not

20   sticking us with anything that was really defaultive of GM.

21             MR. STEINBERG:  Your Honor, if there was a latent

22   design defect, if the ignition switch was designed

23   incorrectly, should have had more torque than it did, if

24   that was the argument that was made and that was relating to

25   an Old GM vehicle any claim that's derivative of that was a

Page 65

1    retained liability.  The government --

2                THE COURT:  As a matter of contract.

3                MR. STEINBERG:  As a matter of contract.  The

4    government wasn't taking that on.

5                THE COURT:  All right, go on.

6                MR. STEINBERG:  So, finally the covenant to comply

7    with federal law relates to recalls and that's in Section

8    6.15 of the sale agreement.

9                THE COURT:  6.15 of the sale agreement?

10               MR. STEINBERG:  Right.  And Ms. Rubin was talking

11   about that yesterday, 6.15.

12               THE COURT:  The recall obligation.

13               MR. STEINBERG:  Right.

14               THE COURT:  And compliance with federal law?

15               MR. STEINBERG:  That's right.  And that's not part

16   --

17               THE COURT:  Pause before you go on.  Excuse me.

18   Is there a counterpart in the sale order?

19               MR. STEINBERG:  Yes.

20               THE COURT:  And the number of that please.

21               MR. STEINBERG:  I'm going to have someone look it

22   up.

23               THE COURT:  Have somebody look it up.  Keep going,

24   but don't finish before you give me that.

25               MR. STEINBERG:  The definition of what's an

Page 66

1    assumed liability versus a retained liability is based on

2    what's in Section 2 of the sale agreement.  So a covenant in

3    Section 6 doesn't affect what is an assumed liability or a

4    retained liability.  It's a separate independent obligation

5    by the purchaser to comply with federal law.  But it doesn't

6    change the contract between Old GM and New GM as to what was

7    an assumed liability or a retained liability.  And so

8    therefore a failure to timely make a recall for Old GM

9    vehicles could not change what otherwise was a retained

10   liability into something else.

11          And in fact when you look at the post-sale

12   consolidated -- paragraph 17 of the sale order.  When you

13   look at the post-sale consolidated complaint, they actually

14   don't make a claim for breach of Section 6.15 of the recall

15   provision.  They're not actually making a claim like that.

16   Instead they try to do it in a more clever way.  They try to

17   say that there were consumer statutes and that the failure

18   to timely recall was a breach of those consumer statutes.

19          But the substance of a retained liability with

20   respect to Old GM vehicles cannot be transformed into a New

21   GM liability based on this type of pleading.  Consumer

22   statutes cannot be used to create an alternate remedy

23   against New GM for a retained liability, especially when the

24   sale agreement Section 2.3(b)11 says Old GM is not liable

25   for torts.

Page 67

1          The sale agreement was clear as to what specific

2     liabilities New GM would assume with respect to Old GM

3     vehicles, parts and conduct.  If the parties to the sale

4     agreement had intended for New GM to assume this broad new

5     category of liabilities based on the eventuality that there

6     could be a recall in the future they would have clearly said

7     so as an assumed liability in the sale agreement and they

8     didn't do so.

9          Your Honor, I'm going to conclude with this.  When

10    we did the Trusky matter and your Honor was trying to give

11    guidance to other courts as to how you interpret the sale

12    order, we set forth what we were asking your Honor to do and

13    so I'd like to list the six things that we think underlie

14    the motions to enforce that we ask your Honor to do.

15         One, that the pre-sale accident claims are barred

16    by the sale order.  Two, that the pre-sale consolidated

17    complaint is barred by the sale order.  Three, that the

18    economic loss claims for Old GM vehicles in the post-sale

19    consolidated complaint are barred by the sale order and this

20    essentially means the used car purchasers.  Four, all

21    governmental claims based on consumer statutes for Old GM

22    vehicles are barred by the sale order.  This includes the

23    State of California claims and it should be noted, as I said

24    before, that the state AG was an objector to the 363 sale,

25    appeared at the sale hearing and we believe this is an end

Page 68

1    run around what had already been determined.

2            THE COURT:  Is this the one that was already

3    before Judge Furman?

4            MR. STEINBERG:  That's correct, where he remanded

5    it back.

6            THE COURT:  I beg your pardon?

7            MR. STEINBERG:  He remanded it back.  He issued a

8    decision saying that the removal statute did not allow for

9    this client to come into the MDL.  So it's now --

10           THE COURT:  Did he rule on the merits of whether

11    any of the issues that are (indiscernible)?

12           MR. STEINBERG:  The condition before -- the only

13    issue that was before Judge Furman was whether removal was

14    appropriate or whether it should be remanded.  The sides had

15    agreed before that that your Honor would be able to

16    determine this issue and they entered into a stay

17    stipulation so that your Honor could enter into a decision

18    with regard to the motion to enforce.

19           Your Honor, we actually have this as a contested

20    matter just to remind you where, you know, the procedure

21    was.  We designate this as subject to the motion to enforce.

22    They have a certain period of time to file an objection and

23    the State of California filed an objection saying I just

24    want to be able to argue the remand issue.  I agree to be

25    abide by the stay.  We stipulated that that would be

Page 69

1    sufficient for a stay stipulation and then it was argued

2    before Judge Burman.

3                THE COURT:  Go ahead.

4                MR. STEINBERG:  Item number five, substantial

5    portions of the post-sale consolidated complaint are copied

6    from the pre-sale consolidated complaint and they refer to

7    numerous events that took place before the 363 sale with

8    respect to Old GM's conduct.  Paragraph AA of the sale order

9    expressly provides that New GM is not responsible for claims

10   arising in any way in connection with any acts or failures

11   to act of Old GM whether that conduct was known or unknown

12   at the time of the sale.  To the extent that the post-sale

13   consolidated complaint seeks punitive damages based on Old

14   GM's conduct, that conduct is expressly barred by the sale

15   order.

16               And lastly, all claims related to New GM vehicles

17   where there was an Old GM part installed by a third-party

18   that was unrelated to New GM when New GMs didn't sell that

19   part to the third-party are barred by the sale order.

20               THE COURT:  Can you qualify that by saying that

21   New GM didn't provide an Old GM part to the --

22               MR. STEINBERG:  That's correct.

23               THE COURT:  -- to the mechanic?

24               MR. STEINBERG:  That's correct.  I qualify it by

25   that.  If New GM installed it or if New GM sold the part

Page 70

1    that installed it we're not looking for protection from the

2    sale order.

3              THE COURT:  So you're now answering the question

4    that bothered me yesterday.

5              MR. STEINBERG:  That's correct.  And this

6    primarily relates to the early -- one of the early ignition

7    switch recalls.  With that, your Honor, I'm finished with my

8    reply.

9              THE COURT:  Okay.  I'm going to give you a chance

10   to surreply, Mr. Weisfelner or on of your allies.  But let's

11   take 10 minutes before we do that.

12             MR. WEISFELNER:  Thank you, judge.

13             CLERK:  All rise.

14             THE COURT:  Have seats please.

15             MR. STEINBERG:  Your Honor, I asked Mr. Weisfelner

16   if I can just say two things to your Honor.  One, on the

17   Savage Industries case I was told by my colleagues that I

18   may have merged the sale hearing to the Robley hearing so

19   Savage Industries was discussed by your Honor at the Robley

20   hearing on June 1, 2010 on pages 60 to 61.

21             And the other thing was with response to your

22   Honor's question --

23             THE COURT:  Pause.  But not at the 2009.

24             MR. STEINBERG:  Not at the sale hearing as far as

25   someone could do a quick search.

Page 71

1            The other thing was that the old guidelines for

2      the sale is on the Court's website.  It's a general order

3      and it's specifically referenced in the sale motion.  That's

4      the notation I have.

5            THE COURT:  The one that was made back in 2009.

6            MR. STEINBERG:  That's correct.

7            THE COURT:  Okay.  Mr. Weisfelner.

8            MR. WEISFELNER:  Your Honor, for the record,

9      Edward Weisfelner of Brown Rudnick, designated counsel on

10     behalf of the lead plaintiffs.

11           Your Honor, first I want to thank the Court for

12     the opportunity afforded us to in effect I guess surreply.

13     Your Honor, I will tell you that when I was preparing for

14     today's session the focus I had was on three concepts;

15     precedent, policy and prejudice.  And quite frankly, I had

16     not given a lot of additional thought to the notion of

17     whether or not from a due process perspective the creditors

18     at issue here were known or unknown or, as Mr. Steinberg

19     argued for about an hour and a half this morning, whether

20     they were reasonably ascertainable or reasonably foreseeable

21     and the reason for that, and I presume it's my mistake, was

22     that at the outset of yesterday's hearing, your Honor

23     cautioned the parties that they should go ahead with the

24     outline of their presentation with one exception and that

25     was that there was enough to require a recall back in 2009

Page 72

1   and that GM acted badly.

2          And, your Honor, as a consequence I took, and I

3   think all of us took, a lot of our respective outlies out of

4   the equation as we had intended to demonstrate as a matter

5   of fact based on the record that's been established in this

6   case, that's the stipulated facts, 179 paragraphs, the

7   Valukas Report, that in point of fact what Old GM knew and

8   for that matter what New GM subsequently knew as car

9   manufacturers are reflected in federally mandated books and

10  records.  Those federally mandated books and records contain

11  the requisite information to put those companies, each of

12  them, on notice that there was a pervasive serious safety

13  defect that they were required to report and recall and that

14  as a matter of law, and in particular the cases cited in

15  Valukas at about page 279, the DC Circuit cases U.S.  v.

16  GM, stood for the proposition that what a car manufacturer

17  knows is a function of what it actually knows or what it

18  constructively knows as a matter of law.

19          And I know that I incurred bit of your Honor's

20  righteous indignation if not wrath when there were some

21  elements of what GM's conduct did pre-2009 that could have

22  been categorized as more salacious.  And I appreciated that

23  your Honor wanted me to back off or at the time I

24  appreciated your Honor wanted me to back off, because again,

25  I took your Honor's opening comments to say we're no longer

Page 73

1    talking about whether these creditors from a bankruptcy due

2    process perspective were known versus unknown.

3            If they had to do a recall, I assume my mistake

4    potentially, your Honor was telling us that you're going to

5    presume they were required in 2009 to do a recall.  Then I

6    thought then that meant automatically that for due process

7    purposes as a matter of bankruptcy law these were known

8    creditors and their due process rights flowed from whether

9    or not in fact they were known.

10           Now, your Honor, I think I can, with your Honor's

11   permission, correct my potential mistake about reading too

12   much into your Honor's commentary about let's all assume

13   that GM acted badly and were required to do a recall in

14   2009.  And I'm not going to re-do the argument that I had

15   prepared for yesterday, but rather than take your Honor

16   through meticulous elements of the record that was

17   stipulated to, I think it would suffice, if your Honor would

18   allow me, to reference just a couple of provisions that I

19   think are directly on point from the Valukas report and not

20   the body of the Valukas report, but its very introduction.

21           What Valukas tells us is that the ignition switch-

22   -

23           THE COURT:  Let's make sure we're on the same page

24   --

25           MR. WEISFELNER:  Sure.

Page 74

1           THE COURT:  -- because I'm not sure if we are.

2     You're starting correctly with my observation that New GM

3     knew enough to have engaged in a recall before the summer of

4     2009.  The legal issue, I don't understand it to be a

5     factual issue, the legal issue -- as such at least, unless

6     there are facts that enable me to bridge the gap -- is

7     whether knowledge of the duty to make a recall is, as you

8     contend, or is not, as Mr. Steinberg contends, knowledge

9     within the meaning of the due process cases of whether

10    creditors are known or unknown.  And of course what we're

11    talking about is not car wreck victims because they've

12    already been taken care of unless Mr. Weintraub is right,

13    that they have to know not just that they were in wrecks and

14    that they had potential claims, but arguments they could

15    make in connection with that.

16           Now, what are you trying to tell me here?  Are you

17    trying to focus on the precedents of whether knowledgeable

18    recall obligation, which is effectively conceded, is the

19    same or different or is it something other than the

20    precedents that bear on that?

21           MR. WEISFELNER:  Oh, I think that the knowledge of

22    the need to conduct a recall is as a matter of fact and law

23    for due process purposes the equivalent of the concession

24    that these creditors were for bankruptcy and due process

25    purposes creditors at the time of the 2009, were known

Page 75

1  creditors, reasonably ascertainable and that the ability to

2  give them notice in terms of knowing their addresses and

3  where they lived was reasonably ascertainable as a matter of

4  bankruptcy law, due process in a 363 context.

5          And let me just give you one of the quotations out

6  of Valukas I think bears directly on this point.  And maybe

7  before I do that let's take a step back and appreciate

8  something.  So, it's the 2009 hearing and GM comes in on

9  this hypothetical and says your Honor, we just want to make

10  sure that you're aware before you approve the notice that

11  we've just conducted a recall and the recall we're

12  conducting is as to the ignition switches.  They're bad.

13  The torque is way below specifications and it's a safety

14  recall because if it runs -- turns into the accessory or off

15  position these cars will stall, you will lose power

16  steering, you'll lose power brakes and the airbags, if you

17  were involved in a crash, will deploy making your accident

18  that much more severe.

19          What would have been the entitlement of the

20  plaintiffs at that point?  Not necessarily a monetary damage

21  amount for economic loss.  The plaintiffs would have said

22  had the defect been disclosed I'm entitled to a new part.

23  I'm entitled to an ignition switch that works and all of the

24  attendant costs associated with you replacing my bad

25  ignition switch.

Page 76

1          THE COURT:  We're talking -- you're saying in

2    substance that even though they could have been claimants

3    for $50 or $100 or $200 but whatever it takes to replace the

4    switch, if GM doesn't do it for free it still makes them

5    creditors.

6          MR. WEISFELNER:  Well yeah and not only that,

7    judge, but there are all sorts so attendant damages that,

8    again, I think are better discussed and adjudicated in front

9    of Judge Furman.  But the point is if they would have come

10   to you as you were considering and contemplating the notice

11   to go out and said well, you know, we have a number of cars

12   and the number of cars is about 12 million that have a

13   safety problem in them and we're going to do a couple of

14   things.  We are going to replace those parts, that that

15   wouldn't have been enough.  The other thing they would have

16   had to do was to afford, as an example, someone who's got

17   this defective part the opportunity to rent a car at their

18   cost.

19          This is a known safety defect.  If I continue to

20   drive the car with this ignition switch, chances are I could

21   be involved in an accident where my airbags don't deploy and

22   I die.  So guess what, I'm not driving this car anymore and

23   GM, give me a rental car.  Come pick up the car.  I'm not

24   driving it to the station.  I'm not driving it to the repair

25   center.

Page 77

1              My point, your Honor, is that, and maybe it was a

2      mistake, when we made the connection between this is a

3      safety recall that GM should have done where the conclusion

4      is a matter of due process and bankruptcy law, that that

5      meant your Honor was telling us that you don't have to argue

6      that these were known creditors from a bankruptcy

7      perspective.

8              What Valukas tells us in the introduction to his

9      report is the following.  Investigators at Old GM were

10     neither diligent nor incisive.  They quote -- and this is

11     the important part -- "failed to search for or obtain

12     critical documents within GM's own files or publicly

13     available documents that linked the ignition switch defect

14     to airbag non-deployment."

15             You heard a lot from Mr. Steinberg about what are

16     the right books and records, notwithstanding Drexel's

17     comments about pennies on the floor, remember this is a car

18     company.  A car company by federal law and regulations

19     determines whether or not it has a safety defect and as a

20     consequence if it's sold to a car with a safety defect you

21     are a creditor.  You're a known creditor.  And GM is to

22     determine whether or not it sold you a faulty car with a

23     safety defect by looking at its books and records, the ones

24     that the federal law tells them they have to maintain -- the

25     TREAD database, the PTRS database -- not their ledgers, not

Page 78

1    their accounting books and records, but the records that the

2    government tells a car manufacturer these are the ones that

3    you've got to retain.

4         They failed to search for or obtain critical

5    documents within GM's own files or publicly available.  He

6    goes on to indicate in his introduction, Valukas does, that

7    GM failed to take certain basic investigative steps and the

8    introduction to the report concludes that many individuals

9    have substantial responsibility and that committees and

10   groups failed to demand action in the face of mounting

11   injuries and fatalities, to make themselves or others

12   accountable and, this is the again critical part from a due

13   process perspective, to "marshal the information and

14   expertise at their disposal."

15        GM had information at its disposal.  Information

16   it was required by federal law to maintain which told GM or

17   should have told GM or GM was on constructive knowledge that

18   it was selling product with a known safety defect and yet it

19   didn't disclose it.  And, your Honor, I think that that

20   permeates much of Mr. Steinberg's argument, and I want to

21   get back to the point I was going to raise which is

22   precedent, policy and prejudice.  But we heard a lot about

23   what the contract, the agreement and the effectuating order

24   provides.  And I was struck with the conclusion that so you

25   mean to tell me that you can contract away the result of a

Page 79

1    due process violation.  You can contemplate what a litigant

2    might have already -- might have said had they been afforded

3    due process and just contract away the result so that you

4    have an order that gets entered that you have no opportunity

5    to contest or talk about, but if it got entered whether you

6    had due process or not doesn't really matter.  That can't be

7    the law.

8            Your Honor, let me go back and start where I was

9    going to start today before I heard a whole new argument

10   about whether these plaintiffs were known and unknown and

11   start with precedent and policy considerations.  And, your

12   Honor, I understand and I appreciate that this is an

13   important matter and that 363 has important policy

14   considerations for bankruptcy cases, bankruptcy

15   practitioners, people like me that make their living in the

16   bankruptcy context.  Very often we find cases where

17   companies do need to in a very quick fashion undergo a 363

18   sale to avoid wholesale liquidation and this case is even

19   more dramatic because we literally had the U.S.  auto

20   industry at risk, as the record clearly demonstrates.

21           But in terms of setting policy and precedent it's

22   terribly important that we all keep in mind that we are

23   talking about a car manufacturer and in my generation, and

24   maybe for many successive generations in the future,

25   certainly in the past we've had all of two -- count them,

Page 80

1    two -- car manufacturers that have gone through Chapter 11

2    in the context of 363 sales.  The specific and unique facts

3    and circumstances of those two car company cases will not, I

4    assert, set policy for 363s generally and there's a reason

5    for that.  The facts in this case, as opposed to Chrysler,

6    the facts in this case demonstrate that the debtor, GM, knew

7    that there was an ignition switch defect, knew that it was a

8    safety probably, knew at the time of the sale that it had an

9    absolute obligation to change out the part and or accord

10    damages or recognize damages on account of the plaintiffs

11    which may ultimately have to get dealt with later on in the

12    case.

13            THE COURT:  Pause please, Mr. Weisfelner.

14            MR. WEISFELNER:  Certainly.

15            THE COURT:  I infer from what you just said then

16    that as you try to harmonize this case with 363 law

17    generally and what needs to be done under 363s, that if New

18    GM had prior to the June 1st 2009 Chapter 11 filing the

19    notice it gave out then by publication, if it had issued the

20    recall notices required under law that would have skinned

21    the cat in terms of notifying the world.

22            MR. WEISFELNER:  I think it would have gone a long

23    way towards skinning the cat, yes your Honor.  First of all

24    it would have effectively put people on notice of two things

25    that didn't happen in this case when you talk about

Page 81

1    prejudice.

2          Prejudice number two, I'll get back to prejudice

3    numbers one and bring it closer to the 2009 sale, but

4    prejudice number two, the ultimate prejudice in this case

5    and I think it's completely disingenuous and artificial to

6    separate what happened in 2009 when your Honor approved the

7    sale from what ultimately happened when there was a bar date

8    set in this case and from what ultimately happened in terms

9    of distributions to general unsecured creditors.

10          The same problem that affected the sale, affected

11   the ability of people to make claims on the proceeds of

12   those sales, to have their legitimate claims attached to

13   those proceeds because the cover up, GM's failure to give

14   notice of the ignition switch defect presenting a known

15   safety hazard which killed scores of people and injured

16   scores of people pre-sale were never disclosed as of the bar

17   date.  So the ability to attach to those proceeds didn't

18   exist and I'll go through some statistics on that in a

19   second.

20          Pulling back through the prejudice associated with

21   what happened in front of this Court at the 2009 hearing,

22   now, Your Honor, we talked about prejudice in a couple of

23   different ways.  I'm going to try it one more time to be

24   specific, because I think the elements of prejudice are

25   multiple.  Number one, we argued that the cases tell us that

Page 82

1    you're not supposed to do a hindsight, look back or

2    speculate as to what might have happened.  But let's assume

3    that Your Honor believes that such hindsight or speculation

4    would be appropriate.

5              Well, Your Honor, we have the US Treasury.  The US

6    Treasury is in there, recognizing the interests, the

7    national interests of keeping this car company alive,

8    keeping the industry functioning, for the benefit of

9    employees, customers, supplies and the whole universe of

10   affected parties.  And Treasury drew a line in the sand that

11   said, "We will only allow new GM to assume those liabilities

12   that we think are 'commercially reasonable'."

13             And then I think about the Feinberg protocol, and

14   as Your Honor knows, the Feinberg protocol is a voluntary

15   program - I put the word voluntary in air quotes, the record

16   couldn't reflect that my fingers were going like this - but

17   it was a voluntary program that new GM put in place through

18   Ken Feinberg, which is already recognized, I think the

19   number is 56, pre-sale death claims, and I forgot the exact

20   number of pre-sale injury claims, and there are hundreds of

21   pending claims, still pending in that hopper.

22             But we all know that GM's contention is -- new

23   GM's contention is, the sale order bars all those claims.

24   New GM is undertaking the Feinberg protocol why?  I suggest

25   to you that they're undertaking the Feinberg protocol

Page 83

1    because they recognize that there is a public perception

2    problem, a Congressional inquiry concern, an Attorney

3    General ongoing investigation, both criminal and civil

4    investigations, and that providing this pot of money for

5    people who might otherwise be barred under their

6    interpretation of the sale order, is a good "commercially

7    reasonable thing for them to do" to protect, preserve and

8    enhance their brand, after this firestorm of negative

9    publicity.

10           Well, Your Honor, if GM after the fact, reaches

11   the conclusion that opening up the floodgates to pre-

12   petition claims -- and by the way, only if they comply with

13   the Feinberg protocol, so it's not like they're saying,

14   "Hey, listen, if you had a pre-petition death or accident,

15   we're paying you."  It's, "If you had a pre-petition death

16   or accident and you comply with the Feinberg protocol, we'll

17   pay you the amounts that we want to pay you," but they're

18   doing that because they say it's commercially reasonable.

19           Well, now, I'm supposed to take my time machine,

20   go back to 2009 and the question that you're being asked is,

21   if we laid this out for Treasury, I could take Harry Wilson,

22   who is no longer asking GM to spend $8 billion of its $25

23   billion dollars cash on its balance sheet, to make

24   distributions to shareholders.  I know have Harry Wilson in

25   front of me, who's a member of the task force, and I say,

Page 84

1    "Harry, come on, you want to preserve GM's commercial

2    ability to move forward, enhance the brand?  You've got to

3    give me a carve-out for these specific claims.  Not any

4    warranty claim, not any defect in the car that may arise in

5    the future.  A known safety defect that's killed people,

6    that rendered these cars basically undriveable if people

7    knew what was wrong with them.  Harry, you've got to give me

8    a carve-out on this one, because if we go into the Court in

9    front of Judge Gerber, he may force you to give the carve-

10   out."

11          I don't know what Harry would have said when he

12   went back to Treasury and the rest of the task force.  I

13   don't know what Your Honor would have determined, but I do

14   know at a minimum, we're talking about old GM and the second

15   after the 2009 sale order was entered, new GM both had

16   recall responsibilities.  That meant, you can't write me a

17   check to satisfy my concern.  You've got to replace the

18   part.  This is a dangerous part.  Replace it.

19          And I don't know what Your Honor would have done

20   in 2009, had they bothered to give me notice of a known

21   safety defect.  I want to make sure that we have the math

22   right, because Your Honor has gotten all sorts of

23   representations about the math.  I don't know why it

24   matters, but we talk about the cost of doing some sort of

25   direct notice.  And Your Honor, I'm not going to argue

Page 85

1    Garden City, and I'm not going to argue what was in their

2    fee application.  Your Honor knows or could take judicial

3    notice of the fact that Garden City has a profit margin

4    built into --

5              THE COURT:  Well, I take it you have a more

6    fundamental point, and clearly, whether it makes some of the

7    other facts moot or not, if I heard you right, and I don't

8    think I heard Mr. Steinberg dispute this portion, you have a

9    statutory obligation to send out recall notices at some

10   point, and is your point as simple as, if new GM has to do

11   it -- excuse me, if old GM has to send out those recall

12   notices anyway, the incremental cost of supplemental mail

13   notices aren't all that important?

14             MR. WEISFELNER:  It's that, but Your Honor, also,

15   you were given some figures that just don't make any sense.

16   There are 70 million GM cars on the road.  I'm not concerned

17   about 70 million GM cars on the road.  They recalled 27

18   million cars.  I'm not concerned about 27 million cars.  I'm

19   concerned about the 13 million cars that have an ignition

20   switch defect, which was a known safety defect, and by the

21   way, of those 13, 3 of them, 3 million, are acknowledged to

22   have been post-sale new GM-sold and manufactured, affected

23   cars.  So we had 10 million ignition switch affected cars,

24   as of 2009, and if you do the algebraic math that 70 million

25   would cost you 42 million, to give the right notice, even

Page 86

1    with a built in profit margin, you're talking about $6

2    million dollars.

3              THE COURT:  But help me on this, and if I'm seeing

4    ghosts in the closet, correct me.  You're not shy.  I

5    thought I heard arguments from either you or Mr. Esserman or

6    both, that the contention being made on the Plaintiff's side

7    is that the failure to deal with the ignition switches

8    damaged the GM brand, and is some Court of competent

9    jurisdiction then going to hear an argument that there are

10   70 million vehicles that lost value and not just the 27

11   million that are the subject of the recalls, or the lesser

12   13 million to which you just made reference?

13             MR. WEISFELNER:  Your Honor, I will tell you that

14   my input into this matter is focused, laser-focused, on the

15   12, 13 million cars affected with the ignition switch

16   defect.  I've read the two consolidated complaints.  I'm not

17   counsel of record there, but I guess I would be surprised if

18   the Plaintiffs in those actions aren't likewise looking for

19   recompense for the people without ignition switch defects in

20   their car, on the theory, which may or may not be upheld by

21   Judge Furman - I'll start using Furman instead of Court of

22   competent jurisdiction - may or may not be considered by

23   Judge Furman as giving rise to cognizable claims and causes

24   of action.

25             I mean, I've read that as part of the complaint,

Page 87

1    but my job is just to demonstrate to Your Honor that those

2    people that were the subject of the ignition switch defect

3    were known Creditors whose identity were reasonably

4    ascertainable because there were Federally mandated books

5    and records that GM was aware of, it wasn't a matter of

6    foreseeability.  They were known.  You know when you sell a

7    defective product to someone, you've given them a claim that

8    sounds in the nature of money damages or, in a car company

9    case, replace this part and all of the attendant damages

10   that are associated with "replace this dangerous part".

11          And Your Honor, again, you know, we think about

12   prejudice and we think about -- I think yesterday, you and I

13   had a colloquy about who was looking to get a leg up, and

14   frankly, I'm sensitive to the notion that, when you think

15   about economic loss Plaintiffs and you compare them to other

16   people that were impacted by GM's bankruptcy, economic loss

17   Plaintiffs may not have the same sympathetic allure that

18   some of Mr. Weintraub's clients do because they're either

19   dead or seriously injured.

20          And Mr. Steinberg has made a lot of people driving

21   eight-year-old cars that just have a switch that needs to be

22   repaired, and it being hard to generate a lot of sympathy

23   for those people.  Well, sympathy as compared to whom?

24   Sympathy as compared to new GM?  Because it's new GM who's

25   looking to enforce the order.  Sympathy for new GM, when we

Page 88

1    talk about the assumption that old GM was required to do a

2    recall in 2009 because it new as a matter of law that there

3    was a safety defect that impacted these cars, that were

4    subjecting people to death and personal injury, let's not

5    forget that new GM, for a period of approximately five full

6    years, maintained the fiction that there was nothing wrong

7    with those cars, continued to allow on the highways and

8    byways of this country, cars that by definition, posed a

9    serious safety defect to the general public.

10          It's new GM that likewise failed to determine,

11   based on records it was mandated to maintain under Federal

12   law, that these cars had to be recalled.  And as Mary Barra

13   has admitted, people did bad things and bad things happened,

14   such that 17, I think is the right number, new GM employees

15   were fired for misconduct and negligence relating to the

16   ignition switch.

17          So again, let's balance the relative equities.  I

18   have economic loss Plaintiffs, I have new GM.  I have

19   economic loss Plaintiffs.  Should they really do better

20   than, for example, the bond holders, the trade Creditors,

21   the employees who had their pension claims reduced, that are

22   represented by the GUC Trust and the unit holders that are

23   represented by Aiken?  Is it fair for them to do better?

24   Well, let's think about this.  Had the bar date, or the bar

25   notice, reflected what GM, both old and new, knew at the

1    time that the bar order was being prosecuted, then my

2    constituency would have flooded the bar -- the claims notice

3    with their claims.

4            THE COURT:  You would have flooded it to a

5    material extent, because $10 billion dollars of extra claims

6    is certainly going to be something that gets the GUC Trust's

7    attention --

8            MR. WEISFELNER:  Especially since --

9            THE COURT:  But -- forgive me.

10            MR. WEISFELNER:  Sure.

11            THE COURT:  But in the claims process, you don't

12    get punitive damages, you don't get RICO damages, because

13    there's well-established authority.  I think I held this

14    earlier in GM in the (indiscernible) opinion, that punitives

15    in the claims context, in a liquidating plan, penalized the

16    wrong guys.  They penalized the innocent unsecured

17    Creditors.

18            MR. WEISFELNER:  Right, and Your Honor --

19            THE COURT:  So you're talking about wager claims,

20    but you're not talking about the claims of the full

21    magnitude that we have here.

22            MR. WEISFELNER:  And again, Your Honor, I would

23    agree with you if we were focused on the nature of the

24    claims, that the Plaintiffs, had they gotten notice, could

25    have asserted against the residual estate.  Your Honor, I

Page 90

1    respectfully disagree with you, although I don't think it

2    was your intention to tell me that the claims that the

3    Plaintiffs could have served against new GM under the right

4    theory, with the right proof, at an eventual trial, couldn't

5    assert punitive damages.

6            But I agree with you that, as to the claims pool

7    here, understand that - and you heard some math on this one

8    too, but I think it's important that you know what the facts

9    are - there was about $9.4 billion dollars of value in the,

10   for lack of a better term, Creditor trust, as of March 2011.

11   There was an initial distribution that took that number down

12   to $1.2 billion dollars, that's as of December of 2011.  In

13   other words, 87 percent of the pot is gone.  There was $843

14   million left, or about 9 percent of the pot left, at or

15   about the time that the recalls were finally, finally

16   undertaken.

17           And Your Honor, there was some dialogue yesterday

18   about the November distribution.  You should know, Your

19   Honor, that that distribution was all of $240 million

20   dollars, or about 2.6 percent of the initial $9.4 billion

21   dollars.  My point is that whatever our claims were, or

22   would have been, with our without punitives, and I

23   understand Your Honor's contention, it would have materially

24   diluted the pot that was otherwise available for the GUC

25   Trust beneficiaries, but more than just dilution, you have

Page 91

1    the time value issue.

2            Your Honor knows, I know from other case

3    experiences, that when you have disputed claims, the time

4    and effort it takes to resolve those disputed claims, and I

5    would venture to guess that the claims that would have been

6    asserted by the Plaintiffs, had they gotten appropriate

7    notice, which they didn't, might not have been accepted by

8    the GUC Trust on the face value of it, and there would have

9    had to have been a determination as to what the correct

10   amount of those claims were.

11           My guess is that some lawyer or group of lawyers

12   may have purported to represent them during the claims

13   administration process and asked for a whopping reserve, and

14   would have prevented any interim distributions to the GUC

15   unit holders until those claims were resolved.  My point is

16   that, another, unintended beneficiary of the prejudice that

17   befell the economic loss Plaintiffs, were the GUC Trust

18   beneficiaries, who didn't suffer dilution from our claims,

19   and didn't have to wait or spend the money to adjudicate our

20   claims before they could make a distribution.  Your Honor,

21   when we talk about prejudice and we focused before on, what

22   is it that we would have had anyone do differently, had we

23   been here with appropriate notice in 2009?

24           I think the entire discussion that was had about

25   the various provisions of the order, and what they did or

Page 92

1    didn't do with respect to carve-outs and retained liability,

2    makes my point.  Let's assume again, as we started this

3    hearing, with the presumption that old GM had a recall

4    obligation, which it failed to perform, and it's recall

5    obligation that had failed to perform for a period of

6    approximately seven years.

7              In 2002, some people claimed that the knowledge

8    dates back even before 2002, to when the ignition switch was

9    first being designed and everyone knew that it didn't meet

10   its torque requirements, but for an extended period of time

11   before the 2009 sale was being considered, GM knew but

12   failed to disclose, that it had a safety defect.

13             Now it discloses it at the hearing, because we're

14   taking our hypothetical time machine back, because we're

15   told that you've got to find some sort of prejudice as a

16   pre-condition to showing a due process violation.  We think

17   this whole exercise doesn't make any sense, that's what

18   Fuentes tells us, that's what other cases tell us, but let's

19   assume we go through that exercise.  I'm back in 2009.  I

20   don't know if it's me or Mr. Esserman or Mr. Weintraub, or

21   some other bankruptcy lawyer representing the Plaintiffs,

22   not the Plaintiffs who showed up in 2009 who didn't know

23   anything about the defective ignition switch and that it was

24   killing people and injuring people, but people who show up

25   now to represent those people who have a safety defect in

Page 93

1   their car.

2            Do you think we wouldn't be fly-specking the order

3   to insure that whatever liability we thought, as a car

4   manufacturer with an admitted safety defect, would need to

5   undertake for the benefit of people who had the switch in

6   their cars.  Don't you think we would have had an

7   opportunity right then and there to convince Treasury, if

8   not Your Honor, that given their acknowledgement of putting

9   defective parts on the road, we were entitled to protection

10  in the order to insure that they were going to take the

11  switch out.  Give me a switch that works.  Prevent me from

12  falling into the same category of people that drove their

13  cars into trees when their power failed and their air bags

14  didn't deploy.

15           Lots of other things that I think effective

16  counsel may have been able to achieve back in 2009, but

17  we'll never know, because no counsel was accorded the

18  ability to be effective, because no counsel was told, "Hey,

19  we happened to sell 12 million cars with a defective

20  ignition switch that, guess what, in normal conditions,

21  could jump from run to accessory to off, no power steering,

22  no power brakes, and don't worry about it, because any real

23  man can restart the car and try and drive the car off the

24  road."

25           But they now know it's a known safety defect, they

Page 94

1    now know that it causes death and injury, but do you think

2    that competent counsel may have been able to suggest to

3    Treasury, "Listen, you're setting aside shares of new GM and

4    cash that have the value of $9.8 billion dollars.  In order

5    to make this thing work, now that we know there's a safety

6    defect, maybe you need to bump it up by $2 billion dollars."

7            And maybe Treasury would have said, "Okay," and

8    maybe they would have given us the $2 billion in the form of

9    stock, and maybe they would have given it to us in the form

10   of additional warrants.  I don't know.  We weren't there.

11   We weren't given an opportunity to protect our rights and

12   our interests.  There's a flex provision that says that if

13   the claims are more than $35 billion, they've got to put in

14   more money.

15           More money, by the way, equates, if I've run the

16   math correctly, to about another $8- or $9 hundred million

17   dollars.  But you don't get to the flex provision unless the

18   claims go from the current estimate of $32, up to $35

19   billion.

20           Well, if someone as good as Mr. Weintraub or Mr.

21   Esserman were there representing the Plaintiffs at the time,

22   they may have succeeded in convincing Harry Wilson and the

23   rest of Treasury to make the flex provision different.  You

24   would have added more value if the claims exceeded a lower

25   threshold number.  I don't know.   No effective counsel was

1    there because there was no notice.  Your Honor, this is the

2    problem with saying that, if you have a due process

3    violation, you're not entitled to a remedy unless you show

4    prejudice.

5              That's not what the cases demonstrate, but even if

6    they did, how much more prejudice could we lay out for you?

7    The inability to make sure that the order protected people.

8    The inability to make sure that these switches got switched

9    out by a car manufacturer who has Federal obligations, like

10   new GM.  New GM.

11             The other point I want to make, Your Honor, is a

12   lot of discussion, a lot of effort to make sure that, from

13   Your Honor's perspective, you characterize all of these

14   people, I guess with the limited expectation of Mr.

15   Weintraub, as here, waving the flag for economic loss

16   Plaintiffs who don't deserve a lot of Your Honor's sympathy.

17             Your Honor, I think that that's a purposeful

18   misdirection by new GM, because they're painfully aware of

19   the types of Plaintiffs that are in the two consolidated

20   complaints, and lest there be any confusion, I just want to

21   make sure that Your Honor is clear to the extent that we

22   weren't good enough in making ourselves clear in our

23   pleadings, there, in essence, are three types of Plaintiffs.

24   Plaintiff category number one are Plaintiffs who bought cars

25   from new GM that were manufactured by new GM, and what I

Page 96

1   think I've heard today, if not yesterday, was a concession

2   by Mr. Steinberg that new GM does not seek to enforce the

3   2009 sale order against those Plaintiffs who bought cars

4   from new GM that were manufactured by new GM.

5          He does hold out, of course, the contention that,

6   to the extent that you bought a car from new GM, and it

7   contained a part that was manufactured by old GM, "Huh huh,

8   not so fast, we're not conceding anything on that score."

9   Think about that from the construct of what Your Honor told

10  us at the outset of the hearing.  Old GM had an obligation

11  to recall these cars, and if we're going to make believe

12  that it told the world that at the sale hearing.  So, new GM

13  says, "I have no liability for selling a car with a defect

14  that I know exists.  I know it exists," because new GM is

15  charged with the same knowledge, as a matter of Federal

16  statutes, and cases that construe when a car manufacturer is

17  deemed to know it has a safety defect, that's new GM is

18  deemed to know.

19         But new GM, even though it's deemed to know that

20  the ignition switch is a safety defect, sells a car with

21  that safety defect and says, "Not my responsibility because

22  it was engineered by DiGiorgio and all the old guys at old

23  GM, and by contract, I don't have that liability.  By

24  contract, I don't have that liability.

25         So, notwithstanding the fact that your due process

Page 97

1    rights were violated and that we kept this dangerous

2    condition a secret, I contracted away my exposure for the

3    ramifications of my violation of Federal law and, knowing

4    that there was a due process violation, I'm going to

5    contract away any exposure I might have as a consequence."

6    That's not the way it works.

7              Category number two. Plaintiffs who bought cars

8    manufactured by old GM after the sale hearing in July 2009.

9    GM's argument suggests that GM doesn't know that there's a

10   used car market.  They sell a car to one owner and that's

11   it.  They have no way of knowing, nor should they be

12   responsible for the fact that there's this weird thing that

13   happens.  People sell and buy used cars.  From a due process

14   perspective, it is crystal clear, that in July of 2009,

15   there was no way for GM to give notice of the sale to

16   anybody that was going to buy a car in the future, new or in

17   the used car market.

18             That's Grumman Olsen, pure and simple.  You can't

19   give notice, from a due process perspective, to someone who

20   doesn't have a pre-petition relationship.  Why?  They're not

21   Creditors.  Can you imagine someone who walks in -- you

22   know, there's this new commercial I see on TV, where someone

23   walks up to a guy who owns a car and says, "Be careful of

24   that car.  I'm the next owner.  Don't get it dirty, don't

25   let your dog jump in the car, because I'm the new -- I'll be

1   the new owner."

2            Can you imagine that person having come into Court

3   in connection with the bar date and saying, "I'd like to

4   file a claim because I'm thinking about buying a GM car, or

5   I bought a GM car, used car, after the date of the filing of

6   the petition."  You bought a car after the date of the

7   filing of the petition?  As of the date of the filing of the

8   petition, what was your Creditor status?  "I don't know."

9   Well, there was no Creditor status on behalf of Plaintiffs

10  that didn't own GM cars pre-sale, pre-petition.  No notice

11  would have been possible to that class.

12           And then finally, the third class of Plaintiffs

13  are the people who bought cars manufactured by old GM before

14  the July 2009 sale hearing.  And Your Honor, I must

15  emphasize this.  People in category three have claims

16  asserted that do not rise and/or fall on the question of

17  whether or not there is successor liability, as a matter of

18  law.  There are other theories, under which, even Plaintiffs

19  in category number three can assert claims against new GM

20  that once again, do not rely on successor liability

21  theories.

22           All of the Plaintiffs in categories one, two or

23  three, are asserting claims against new GM, direct

24  liability, for its own knowledge, conduct and breach of

25  affirmative duties that they had.  They're not just

1    repacking successor liability-type claims.

2         Your Honor, I'm just going through my notes.  I

3    don't know that I really have much, if anything else, to

4    argue, but I think what's amazing about this case is that we

5    did have a three-month process, where in order to avoid

6    discovery, the parties sat and went through a detailed

7    stipulation of fact exercise.  The Valukas Report, which is

8    obviously part of the record, it's never been opposed, it

9    was part of my affidavit, is in the record.

10        Those stipulations, that Valukas Report, the cases

11   cited by Valukas beginning at page 279 of, I think it's one

12   of the appendices, talks about - and it's almost as if

13   Valukas was prescient about what the issues before the

14   bankruptcy court were going to be - can you consider the

15   victims of the ignition switch defect to be known Creditors

16   as a matter of law?  The answer is, yes, they're known

17   Creditors as a matter of law, both product liability law,

18   and specifically car manufactural law, and it's applicable

19   in this case as a matter of due process.

20        If you've had a violation of due process, which,

21   Your Honor, I suggest, is incontrovertible, the remaining

22   questions are, do you require prejudice in order to remedy

23   that violation?  I think, Your Honor, we have laid out for

24   you all sorts of prejudice.  The problem I have is that it

25   requires us to imagine what might have happened had we

1    gotten notice back in 2009, a difficult proposition which

2    the case law suggests we're not supposed to embark on.

3            And Your Honor, what's the appropriate remedy?

4    Your Honor, I think the appropriate remedy in a case where,

5    because of the actions of old GM and new GM, which precluded

6    any of these Plaintiffs from being able to attach their

7    claims to the proceeds of the sale, because many of these

8    Plaintiffs had no claim in a bankruptcy context, and

9    therefore, any order that Your Honor entered that sold

10   assets free and clear of claims, doesn't impact people who

11   aren't Creditors at the time, and most significantly,

12   because every Plaintiff in either of the two actions have

13   asserted direct claims against new GM, this Court ought not

14   enforce the 2009 order as to these specific Creditors.

15           In doing so, you won't prejudice 363 Sales.  This

16   is a unique, special, very different situation.  It involves

17   a car company, first and foremost.  Not like we're going to

18   have a lot more car company bankruptcies.  And it involves a

19   car company that purposefully failed to disclose a serious

20   safety issue.  Not a latent safety issue that may arise in

21   the future.  A current safety issue that was causing

22   accidents and deaths and serious injuries, and GM knew it,

23   and didn't tell anybody about it.

24           And then new GM, who picked up the tread database,

25   picked up the PTRS reporting database, picked up all of the

Page 101

1    internal information on customer complaints, picked up all

2    the information regarding warranty claims.  All of the

3    information they were required by law to maintain, and

4    still, through and including the bar date process, didn't

5    disclose, and didn't disclose again for any number of years.

6    Under those unique facts and circumstances, new GM is not

7    entitled, as a matter of law or as a matter of equity, to

8    enforce the 2009 order against our narrow class of

9    Plaintiffs.  Thank you, Judge.

10            THE COURT:  All right, thank you.  Mr. Weintraub?

11            MR. WEINTRAUB:  Good morning, Your Honor. William

12   Weintraub of Goodwin Procter for the pre-sale accident

13   Plaintiffs.  Speaking third, you always have the misfortune

14   of having to rewrite and redo everything, so my presentation

15   may be somewhat anecdotal, but I'm going to try to hit some

16   of the things that I think Mr. Weisfelner did not hit and

17   address the --

18            THE COURT:  Disjointed is okay.  Anecdotal isn't.

19            MR. WEINTRAUB:  [LAUGHS]  I'll just be disjointed

20   today, Your Honor.  I think, Your Honor, with respect to

21   notice, you really cannot separate the sale notice that was

22   given here from the seven-year non-disclosure of the

23   ignition switch defect.  Generic notice might have been

24   sufficient in a case where knowledge of the existence of the

25   ignition switch defect was widespread.

Page 102

1            Generic notice may have been sufficient, had there

2      been a prior recall, but without that widespread knowledge,

3      but without that widespread knowledge, without that prior

4      recall, that generic notice was not informative to the

5      people that needed to be informed to come to Court to make

6      their best arguments against the imposition of the successor

7      liability shield.

8            And without going through much of what Mr.

9      Weisfelner said about prejudice, I think the prejudice to

10     the clients that my group represents is different, because

11     we were injured pre-sale, but nonetheless, the prejudice

12     that we suffered was that we would have challenged the

13     equity, and all of this would have been in the context of

14     disclosure of the contents of the Valukas Report.  The

15     Plaintiffs would have challenged the equity of the Buyer's

16     request for protection in the context of the withheld

17     information.

18            The Plaintiffs would have challenged the good

19     faith of the Buyer and the Seller.  The Plaintiffs would

20     have questioned the absence of a prior recall, the absence

21     of warning to unsuspecting drivers and most of all, as I

22     said yesterday, Your Honor, the Plaintiffs would have

23     questioned the actions of their own Federal government in

24     trying to push through a sale in light of historical non-

25     disclosure, faced with, now a new and disturbing factual

1    record.  I think the dynamics would have been very different

2    if that had been the case here.

3            With respect to what the notice should have been,

4    Your Honor, we did address that yesterday but since it was

5    re-argued again today, we think that content is what drives

6    due process, and the generic notice here was imply

7    insufficient, whether you were giving people notice by mail,

8    or in some cases, we've done notice by postcard to save

9    money, or notice by publication.

10           Without the recall, without the widespread

11   knowledge of the existence of the ignition switch defect,

12   what should have been disclosed were the conditions that

13   were attendant to that ignition switch defect, which were

14   unexpected stalling, loss of power brakes, loss of power

15   steering, and disengagement of air bags in the event of a

16   collision.

17           Now, Mr. Steinberg said, "Does that mean that we

18   have to disclose hundreds of thousands of items that might

19   have to be disclosed to people because they might have

20   claims?" and I think the answer to that, Your Honor, is no.

21   What you should have disclosed was this ignition switch

22   defect because there was a seven-year history within GM of

23   investigating this ignition switch defect.  There was a

24   wealth of information in tread in the PRST database within

25   GM, so this should have been disclosed.

Page 104

1          And, if there are any other types of defects that

2     had not been disclosed for seven years under the same

3     circumstances, those probably should have been disclosed,

4     too.  But what I'm here to talk about is the ignition switch

5     defect, and that should have been disclosed,

6          Your Honor.  One of the things that was mentioned

7     by Mr. Steinberg was the Robie decision, and we actually

8     discussed Robie in our brief in a footnote on page 18.  And

9     one of the things that we noted in Robie was that, when

10    ruling against Mr. Robie, this Court made clear that the

11    result might have been different had there been evidence

12    that old GM had known of Mr. Robie's injuries and chose to

13    use publication notice rather than a more effective method.

14         That's what our brief says, and then in the

15    parenthetical, we have a quote from the transcript.  "If GM

16    knew back then that your client had already been injured,

17    and chose to use the publication route rather than a way

18    that would get to him more directly, that kind of factual

19    circumstance would have troubled me."

20         And we think, Your Honor, that GM's knowledge of

21    the ignition switch defect and the fact that every car,

22    every car that had that ignition switch in it was defective,

23    and entitled to repair, that put everybody in the category

24    of being a known Creditor, not --

25         THE COURT:  Are you suggesting that any of your

Page 105

1    150 guys had been in accidents that old GM knew about?

2              MR. WEINTRAUB:  I'm sure that people were in

3    accidents that old GM knew about.

4              THE COURT:  Your guys.

5              MR. WEINTRAUB:  Yes.

6              THE COURT:  And you're saying --

7              MR. WEINTRAUB:  When I say -- that's kind of a --

8    not based upon actual knowledge, but the reason I say that

9    I'm sure is because I think some of these lawsuits, like

10   Powledge, was pre-bankruptcy, and we know that GM maintained

11   a database, I forget what the acronym was for it, accidents

12   --

13             THE COURT:  Mr. -- that's kind of my point, Mr.

14   Weintraub.  I'm just trying to get my arms around the facts.

15   I thought I heard Mr. Steinberg say that the Powledge family

16   got actual notice.

17             MR. WEINTRAUB:  Well, you know, the Powledge

18   family is in a whole different bucket.  The reason that the

19   Powledge family is in a whole different bucket was, not only

20   did the car have the defective ignition switch and not only

21   did they have litigation with GM, what the contention is by

22   the Powledge family, is that they were in discovery with GM

23   and had issued discovery that should have, if GM was being

24   truthful, given them the information about the ignition

25   switch defect.

1          THE COURT:  Well, this is the first I've heard in

2     these two days about discovery violations.  Discovery

3     violations don't occur often, but when they do, they bug me

4     like they bug a lot of people, but --

5          MR. WEINTRAUB:  I didn't acknowledge --

6          THE COURT:  I guess what you're arguing is, not

7     just that you can unwind a settlement or do a lawsuit over

8     by reason of the settlement agreement, but you can go after

9     a different Defendant.

10          MR. WEINTRAUB:  No, what I'm arguing -- I didn't

11     raise Powledge.  Mr. Weisfelner and Mr. Steinberg raised

12     Powledge.  Your Honor, ask me about Powledge.  I happen to

13     know about Powledge because I've been working with

14     Powledge's lawyer.  I also happen to know that Powledge --

15     it may not have reached Your Honor's desk yet, but I think

16     about a week or two ago, they filed a motion in the

17     Bankruptcy Court to vacate their settlement.

18          THE COURT:  Well, somebody did.  I don't remember

19     the name of the litigant.

20          MR. WEINTRAUB:  It's Powledge.  So, you ask me

21     about Powledge, and Powledge is not, I think, typical, but

22     there may be other instances where people were in discovery

23     with General Motors and did not get what they felt to be

24     candid and appropriate responses, and in fact, one of the --

25     we submitted three stipulated facts that have not been

Page 107

1   disputed, and one of the stipulated facts that we submitted

2   was that the underlying circumstances of what GM said to

3   people who had been injured and what those people have said

4   back to GM have not yet been established.

5           THE COURT:  Go on, please.

6           MR. WEINTRAUB:  So, my point, with respect to

7   Robie, Your Honor, was that we think that the ignition

8   switch defect, and knowing that the car had needed repair,

9   and that applies to everyone, not just people who had

10  accidents, but people who have the economic damages claims,

11  put them into the same bucket that you were concerned about

12  with Mr. Robie.  If GM knew something and didn't say

13  something, that may change things.

14          What I'd like to do, Your Honor, is go back

15  through some of the cases that were cited here, Your Honor,

16  by Mr. Steinberg and just revisit them a bit.  Chemtron was

17  an interesting case because that was a bankruptcy of a

18  company that, as I recall, stored radioactive waste, and

19  there was a discharge in that case and years after the

20  discharge, people came forward with radiation illness and

21  said that our claim shouldn't be barred because we didn't

22  have notice of the case.

23          And what the Court held in Chemtron was that it

24  would have been too burdensome and impossible for the Debtor

25  to find out who had lived near this radioactive site during

Page 108

1    the relevant years, and in fact, people who said they had

2    visited there were injured and the Court said it would be

3    impossible for the Debtor to know who had been an overnight

4    guest in somebody's house during those periods of time, so

5    those people were not entitled to direct notice.

6           We think that, certainly my clients, who had

7    accidents, and Mr. Weisfelner's clients who had a car with

8    the ignition switch defect, do not fall into the category

9    for the reasons Mr. Weisfelner stated, of Creditors that you

10   didn't know the identity of and couldn't find.  So Chemtron

11   is a very different case from our case.

12          Mr. Steinberg also talked about New Century.  In

13   New Century, what the Court held was that, "we cannot find

14   that a particular borrower had irregularities in their loan

15   file, which would give rise to a Truth in Lending and other

16   types of violations, just because there were generic

17   assertions that, in general, this mortgage lender was lax,

18   and that each loan file was different and had to stand of

19   fall on its own facts, and therefore, this particular

20   claimant didn't qualify for direct notice, because no one

21   would have known she was a Creditor without reviewing her

22   loan file, and that was not a requirement that the Court was

23   willing to put on the Debtor.

24          Obviously, again, for the reasons Mr. Weisfelner

25   said, this case is very different.  This case was a known

Page 109

1    defect baked into the DNA of every one of the affected

2    vehicles.  It was no difference between the ignition switch

3    in my Cobalt from his Cobalt from her Cobalt, if it all had

4    the same platform, it all had the same defect.  And our

5    contention is that General Motors knew about that.

6          Likewise, Your Honor, with respect to Enron, what

7    Enron dealt with was an external investigation where the

8    company, the Debtor, would have no way of knowing what the

9    results or consequences of an external investigation by a

10   Government lender might be.  It might be absolved, it might

11   not be absolved.  So, the Court held that that wasn't enough

12   to require notice.

13         Again, we think, because we have a known ignition

14   switch defect across the board in all of the affected

15   vehicles, it's a very different case.  The burden, we think,

16   Your Honor, was primarily not a due process case, and the

17   only reason due process was discussed in the Burton case was

18   because the Plaintiffs there, who were not future Creditors,

19   tried to categorize themselves as future Creditors, but once

20   you got past that very small discussion of Grumman Olsen,

21   that case was basically a contract interpretation case,

22   where the Court looked at whether or not these were assumed

23   liabilities.  You didn't have the due process violation in

24   Chrysler and the seven years of non-disclosure that you have

25   here.

Page 110

1          DPWN.  The premise of the District Court was that

2     the Debtor had particular and peculiar knowledge that no one

3     else had, and for that reason, the Debtor should have given

4     notice to DHL.  What the Second Circuit did, was it said,

5     "We've looked at this complaint," because this was done on a

6     motion to dismiss.  "We've looked at this complaint, and we

7     think there are some indications in this complaint that DHL

8     may have known about this anyway," so what the Second

9     Circuit did was send it back to the District Court to

10    develop a factual record as to whether or not,

11    notwithstanding what DHL has said in its complaint, it

12    actually did know that there were antitrust and price fixing

13    violations.

14          That's not the case here, because only GM knew

15    about the ignition switch defect.  The Folger case.  The

16    Folger case, I think, is a good case for us.  That was the

17    case where the Court held that the assets were not held free

18    and clear of the supplier's defenses.  And what the Court

19    said was, the content of the notice of sale, the content of

20    the notice of the sale, was insufficient to give notice to

21    this party who was obligated on accounts receivable, that

22    there was an effort to sell free and clear of its defenses.

23          The Cook case, or the Keck case, Your Honor, which

24    is the Second Circuit case that follows Manville.  Whether

25    or not it's a summary order, what that case did was, it

Page 111

1    expressly followed Manville, and what the Court stated at

2    page 2 of the Lexus decision, is, "Bankruptcy Courts cannot

3    extinguish interested parties who lack notice of, or did not

4    participate in the proceedings.

5           See, for example, in re Johns Manville.  (Holding

6    the bankruptcy is no exception to the due process principle

7    that one is not bound by a judgment in personam in

8    litigation in which he is not designated as a party, or to

9    which he has not been made a party by service of process.)"

10   And that's the important point, Your Honor, not that Keck

11   had involved a 363 Sale.  Keck relies on Manville, and

12   Manville makes it very clear that there is no dispensation

13   from due process just because you're in a bankruptcy case.

14   Due process is just as important as subject matter

15   jurisdiction.

16          My favorite case of all, Your Honor.  The Factors'

17   case, that's the old Supreme Court case from the 1800s.

18          THE COURT:  Which one?

19          MR. WEINTRAUB:  Factors'.

20          THE COURT:  Mm hmm.

21          MR. WEINTRAUB:  That case is not a sale free and

22   clear of liens, and I would urge the Court to read that

23   case.

24          THE COURT:  Do you have a cite for me to make it

25   easier for me?

Page 112

1              MR. WEINTRAUB:  Yes.  111 U.S. 738.

2              THE COURT:  Okay.

3              MR. WEINTRAUB:  What happened in that case was,

4       there was a bankruptcy sale.  The bankruptcy sale was done

5       subject to the liens of four lienholders who thought they

6       were working in concert, and those four lienholders took

7       title to the property in their respective names,

8       collectively.  And what they did was, they paid off the

9       taxes, rehabilitated the property and wanted to sell it.

10      One of the (indiscernible) four lienholders said, "Wait a

11      minute.  I wasn't part of this.  I wasn't part of this

12      group.  Nobody told me about this," even though there was

13      evidence that this person was represented by an agent at the

14      hearing.

15             What the State Court did, because I think it was

16      started in State Court and then made it to Federal Court,

17      they ruled that there was a merger -- well, what this

18      recalcitrant lienholder argued was, "Not only was I not part

19      of this group, but when this group took title, even though

20      the liens were kept in place, the lesser title merged into

21      the greater title.  So now, their lien has been

22      extinguished, they're the owners.  I wasn't part of this and

23      I didn't get notice, therefore I'm the only surviving lien,

24      jumping ahead of everybody."

25             And what the Supreme Court said was, "Wait a

Page 113

1    minute, that's not what seemed to have happened here.  What

2    seemed to have happened here is you're all working together,

3    and if these guys didn't think you were working together, if

4    they were wrong, we're not going to let you argue that there

5    was a merge, which by the way there wasn't those liens are

6    still good," so the Supreme Court determined that there

7    wasn't a merger of the lesser title into the greater title,

8    they said, "We're going to do a do-over, because either

9    you're going to live by the agreement that we thought you

10   made, or we're just going to do the whole sale over again,

11   and you're going to get the exact same rights that you had

12   before.  So we're not going to let you, basically, turn on

13   your partners and say that you were not part of this."

14           So it's a completely distinguishable case and it

15   can't be subject to the proposition that sales free and

16   clear of liens will be set aside or not set aside under

17   certain circumstances because it never was a sale free and

18   clear of liens.

19           Lastly, Your Honor, with respect to remedies,

20   without belaboring the point, we think that Manville 4

21   controls, and we think that Manville 5 makes it clear that

22   you're not invalidating or blue penciling the order.  You're

23   just applying the order as entered, only against those

24   people who had appropriate notice.

25           What the Supreme Court said in Bailey, which was

Page 114

1    the case that resulted in the coming back down, the Supreme

2    Court said that the language of the agreement at issue here,

3    which was basically an agreement that went back to 1986, and

4    then Judge Lifland entered a clarifying order, I think, in

5    2004, where they tried to do whatever they were trying to

6    do, I won't speculate, Your Honor. The Supreme Court said

7    that that language in the agreement actually did cover

8    direct claims, and it held that, in Bailey, that subject

9    matter jurisdiction was res judicata, even though, without

10   commenting on whether or not there was subject matter

11   jurisdiction, the Court said it's too late to collaterally

12   attack it, except those who were not given notice of the

13   original order are not bound by it.

14          And when it went back down, the only issue back

15   below was the effect of this ruling, this due process

16   ruling, on whether or not Travelers still had to pay the,

17   whatever it was, three or four hundred million dollars,

18   which ultimately, the Second Circuit had said they had to

19   pay.  But we think that Manville 4 is the law of this

20   Circuit, and we think that Keck recognizes that.  Thank you,

21   Your Honor.

22          THE COURT:  All right, thank you.  Okay, Ms.

23   Rubin, come on up.

24          MS. RUBIN:  I'm sorry, Your Honor, and I beg you

25   to indulge me just for a few minutes.  Mr. Weintraub

Page 115

1    actually covered some of what I intended to cover, which was

2    to talk about some of the cases that had been discussed by

3    Mr. Steinberg this morning, and point out to Your Honor some

4    of the factual distinctions that Mr. Weintraub so ably

5    covered, particularly with respect to the Chemtron case, the

6    Manville case and the DPWN case.

7            There are a couple of things that I wanted to

8    clarify for Your Honor or answer for Your Honor if we could.

9    The first is, you made a reference to the 150 people that

10   Mr. Weintraub represented, and yesterday you questioned

11   whether or not that was, in fact, the case, given the number

12   that you recalled from the GUC Trust brief.  I wanted to

13   clarify --

14           THE COURT:  I think you had said something like

15   eight and he had said something like 150 --

16           MS. RUBIN: Yes.

17           THE COURT:  -- and that had given rise to the

18   confusion.

19           MS. RUBIN:  Yes, and I wanted to clarify where the

20   confusion arises.  At the time that the GUC Trust submitted

21   its brief, it based its count on the number of pre-sale --

22   I'm sorry, pre-closing accident victims who actually had

23   pre-closing accidents based on schedules filed by new GM in

24   connection with its motion to enforce.

25           At that time, meaning when new GM filed its motion

Page 116

1    to enforce, in its original motion, it cabined the Edwards

2    case that Mr. Weintraub spoke about with you yesterday and

3    said, "At this point in time, we don't consider that to be a

4    pre-closing accident case.  We reserve the right to come

5    back to Your Honor and schedule that case."

6            To the best of my knowledge, the Edwards case has

7    never since been part of any of the subsequent schedules

8    that have been filed.  I certainly encourage Mr. Steinberg

9    and Mr. Davidson to correct me if I'm wrong.  By our counts,

10   at this point in time, there are 31 cases, or rather 31

11   Plaintiffs that qualify as pre-closing accident victims, not

12   including those in the Edwards case.

13           Again, that's based on a count of the schedules

14   filed by new GM, and just in terms of the motion to enforce

15   that GM had originally filed, it talked about the Edwards

16   case.  There's footnote 6 in that motion to enforce.  That

17   motion was filed, I believe, on August 1st of 2014.  I,

18   unfortunately, don't have the docket number with me.

19           To turn to the other issues, Mr. Steinberg asked

20   this morning, or he raised the point this morning, that

21   there's no situation in a prior 363 Sale in which a

22   Chemtura-like notice has previously been approved.  Well,

23   Your Honor, I would pose a different question, or a

24   different retort to that, which is, there's no company

25   that's ever been accused of doing what old GM and new GM

Page 117

1   collectively have been found to do here, which is, to

2   withhold from the public, information justifying the recall

3   of millions of vehicles.

4          With respect to the ignition switch defect alone,

5   I think Mr. Weisfelner pointed out to you that there are 2.6

6   million vehicles encompassed in what new GM considers the

7   ignition switch recall.  There are additional 12 million,

8   give or take, vehicles that have ignition switch-related

9   defects.  They were described in press releases in ways that

10  are almost identical to the ignition switch defect as new GM

11  considers it alone.  So, with respect to the assertion that

12  there's no case in the history of the Bankruptcy Courts that

13  find Chemtura notices appropriate in a 363 Sale context, nor

14  am I aware of any circumstance or situation that presents

15  itself precisely like this.

16         That raises another point.  Your Honor asked Mr.

17  Weisfelner if the recall notices had been timely issued,

18  would that have obviated the need for more disclosure in the

19  notice?  Mr. Weisfelner said that he thought it would have

20  largely addressed it.  I'll take a step further.  If the

21  recall notices had been timely issued here, yes, I believe

22  that the publication notice here would have been

23  appropriate, but barring that, that's not the situation

24  we're in.

25         Barring that, yes, I believe the Chemtura notice

Page 118

1    would have been appropriate here, because this situation,

2    like Chemtura, and in fact, even like Chemtron, where the

3    Debtor had been participating in clean up of the toxic site

4    for 18 years, there was clearly contemplation that folks

5    would have claims based on their exposure.  They just

6    couldn't find the people in those circumstances that might

7    have claims because, as Mr. Weintraub pointed out, the

8    people who were posing claims at that point were guests of

9    those who owned the property in the vicinity.

10           This is even worse than that, Your Honor.  If they

11   in fact, knew enough to have issued a recall in 2008, no one

12   has says to you, in that circumstance, had they in fact

13   issued the recall, those folks would not have constituted

14   known Creditors, even by the more stringent standards that

15   Mr. Steinberg is asking you to adopt in terms of, reasonably

16   ascertainable from books and records.

17           In terms of some of the cases that have been

18   discussed, one case that didn't come back to Your Honor on

19   this side is the Ex-Cel case, and Mr. Steinberg represented

20   to you that that case was decided on different facts because

21   the Purchaser there was found not to be a good faith

22   purchaser.

23           Respectfully, Your Honor, I would disagree.

24   There's a footnote in that case that indicates that while

25   the good faith of the Purchaser was, as Ninth Circuit

1    Bankruptcy Appellate Panel said, in doubt, they then go on

2    to say the following, Your Honor, and I quote, "We therefore

3    respectfully disagree with Edwards, to the extent that it

4    allows considerations such as," and it provides a list, and

5    one of them is as follows: "The innocence or good faith of

6    third parties involved in bankruptcy sales."  In other

7    words, the Ex-Cel case is saying, whether or not someone is

8    a good faith Purchaser, we disagree with Edwards to the

9    extent that it allows considerations like the good faith of

10   that Purchaser, and I'll further quote, "to justify

11   departures from due process standards in adjudicating

12   property rights."

13           Your Honor, Mr. Steinberg, I think, also

14   referenced Judge Gonzalez's decision in the Chrysler case

15   with respect to future claimants, and I know that there's

16   been a lot of discussion about whether the used car

17   purchasers here constitute future claimants.  I certainly

18   was one who made an argument to Your Honor yesterday that

19   they do.  Without revisiting that argument, I will just say

20   that, as Your Honor is well aware, when the Second Circuit

21   issued its decision in the Chrysler matter at the time that

22   Your Honor entered his sale decision, oral argument had

23   already been held, Your Honor was well aware of the

24   arguments that had been made.

25           The sale decision reflects Your Honor's

Page 120

1    understanding of what that decision would have reflected.

2    But the decision in the Chrysler matter was not issued until

3    after Your Honor issued the sale decision, and in that

4    decision --

5                THE COURT:  No, the written decision in Chrysler

6    wasn't issued until after I issued my decision, but the oral

7    decision of the Second Circuit in Chrysler, which was

8    confirmed by a written order at the time, had held that

9    Judge Gonzalez's decision was affirmed for substantially the

10   reasons set forth by the Bankruptcy Court, and if your point

11   is that a decision of I don't know how many pages of the

12   Second Circuit self-destructs because after the fact, the

13   Supreme Court on the appeal by those Indiana bond holders

14   had directed that the judgment be reversed as moot, it's

15   more difficult to see how it was moot at the time that the

16   Circuit issued the first of its orders.

17               MS. RUBIN:  That actually wasn't my point, Your

18   Honor, and I don't disagree with the factual predicate that

19   you just laid forth, and I apologize for suggesting

20   otherwise.

21               My only point was to suggest, when the Second

22   Circuit did issue its written opinion, at the end of that

23   opinion, it said that it was going to affirm Judge Gonzalez

24   in so far as approving the 363 order free and clear of

25   future claims was consistent with the bankruptcy code, but

Page 121

1    as Your Honor knows, it caveated and left for a future day,

2    whether or not the disposal of those claims was in fact

3    constitutional and said that, when and if the case came

4    before it that raised post-sale claims that could not have

5    been anticipated and were properly qualified as future

6    claims, it would revisit that issue.  That's all I meant to

7    suggest to Your Honor.

8            Let me return, if I can, Your Honor, to the sale

9    agreement itself.  So, Mr. Steinberg referenced the sale

10   agreement this morning and said that I may have

11   mischaracterized the language in 2.3(b), which pertains to

12   retained liabilities, saying that I didn't read to Your

13   Honor the rest of that provision.  Respectfully, even if I

14   had read the remainder of the provision, it doesn't change

15   the fact that the definition of retained liabilities in this

16   sale agreement still pertains to the liability of any

17   Seller, and all of the liability as it's defined there, is

18   still referential to the liability of any Seller.  You can't

19   escape that phrase, so whether it arises or accrues before

20   or after the closing, the definition or retained liabilities

21   still goes back to, and is inseparable from, the liability

22   of any Seller.

23           Now, to the extent that the sale order goes beyond

24   that in paragraph 46, I'll also point Your Honor, as Mr.

25   Steinberg did, to paragraph 17 of the sale order, which

Page 122

1    pertains to the recall-related obligations that new GM took

2    upon itself, saying from and after the closing, and I'll --

3    I'm reading from the sale order, "the Purchaser shall comply

4    with the certification, reporting and recall requirements of

5    the National Traffic and Motor Vehicle Safety Act, as

6    amended and recodified."  And it goes on to --

7            THE COURT:  Yeah, can you reference by number,

8    because that's (indiscernible).

9            MS. RUBIN:  Sure, it's paragraph 17 of the sale

10   order, Your Honor.

11           THE COURT:  Okay, and I think --

12           MS. RUBIN:  And --

13           THE COURT:  Pause for a second.  I think that's

14   the same one that Mr. Steinberg made reference to before.

15           MS. RUBIN:  It is.  It's no different than the

16   provision that Mr. Steinberg was referencing.  My only

17   point, Your Honor, is Mr. Steinberg has framed for you a

18   universe, as you know, where everything in the sale

19   agreement is either a retained or assumed liability, and

20   there can be no other liability for new GM whatsoever, in

21   respect of vehicles manufactured by old GM.

22           To the extent that paragraph 46 purports to

23   provide him with that protection, I'll revert back to what

24   Mr. Weisfelner and Mr. Weintraub ably said, which is, to the

25   extent that Your Honor is going to consider prejudice to be

Page 123

1    an essential component of the test for due process here,

2    that is the prejudice to them.

3           Had they been aware of the recall-worthy safety

4    defects, either through a recall notice, or through a

5    modification of the publication notice that was provided

6    here, or even a notice that had been sent to each of their

7    clients' homes, there's no doubt in my mind that they would

8    have come to this Court and complained about the language in

9    paragraph 46.  They would have complained about the purchase

10   price.  They would have complained about the upward

11   adjustment provision, as Mr. Weisfelner points out, because

12   where we are now in terms of allowed, general unsecured

13   claims, we're at about the $32 billion dollar mark, and the

14   upwards adjustment, as Mr. Weisfelner pointed out to you

15   correctly, doesn't kick in until the $35 billion dollar

16   mark.

17          That means we've got $3.2 billion dollars, not

18   just in claims, in allowed, general unsecured claims to go

19   before the GUC Trust is entitled to any of the adjustment of

20   the purchase price in terms of securities.  And at that

21   point, what comes back to the GUC Trust, it's not shares and

22   warrants, Your Honor. It's just shares.

23          Now, paragraph AA of the sale order was also

24   referenced by Mr. Steinberg, and I don't read paragraph AA

25   to say what he does.  I read paragraph AA to talk about

Page 124

1    Successor and Transferee liability, and not, more broadly,

2    to suggest that new GM can never be culpable for its own

3    actions in respect of the subject vehicles that we're

4    talking about here, and again, Your Honor, I'll read to you

5    partially, not because I'm trying to be obfuscatory, but

6    only for the matter of time.

7            It says, "the transfer of the purchase assets to

8    the Purchaser will be a legal, valid and effective transfer

9    of the purchased assets, and except for the assumed

10   liabilities, will vest the Purchaser with all right, title

11   and interest of the Sellers to the purchased assets, free

12   and clear of liens, claims, encumbrances and other

13   interests," and then again, going down a couple of lines to

14   just take out some of the additional language, "based on any

15   Successor or Transferee liability," and then goes on to say,

16   "including, but not limited to," to define what Successor or

17   Transferee liability mean, again, I don't take that

18   paragraph to suggest that new GM could not be liable to

19   folks in the Plaintiffs' position, for actions of their own

20   making.

21           THE COURT:  Their own making, being new GM's own

22   making, is contrasted to old GM's making.

23           MS. RUBIN:  Yes, that's correct, Your Honor.  New

24   GM's own making.  And Your Honor mentioned yesterday that he

25   thought that the argument that any of Plaintiffs' claims

Page 125

1    fell into the definition of assumed liabilities was not a

2    particularly good one, so I won't waste your time with that,

3    except to say this, Your Honor.

4        The definition of assumed liabilities includes at

5    Section 2.3(a) 11 of the sale agreement the following.  "All

6    liabilities arising out of, relating to, in respect of, or

7    in connection with, the use, ownership or sale of the

8    purchased assets after the sale," and then Your Honor, in a

9    separate provision of the sale order, in the definition of

10   purchased assets, there is a portion of the definition --

11       THE COURT:  But you've made that argument in your

12   brief.

13       MS. RUBIN:  I did.

14       THE COURT:  Are you saying that that trumps

15   prohibitions against successor liability?

16       MS. RUBIN:  No, what I'm saying, Your Honor, is,

17   to the extent that Mr. Steinberg has submitted to you that

18   his client is only liable for assumed liabilities, the

19   express definition of assumed liabilities within the sale

20   agreement encompasses his client's own use of purchased

21   assets, meaning old GM's books, records, legal records,

22   databases, including some of the same databases that Mr.

23   Weisfelner has amply referred to in his argument earlier

24   this morning.

25       That's not a successor liability argument, Your

Page 126

1   Honor.  That's talking about when new GM assumed the assets

2   that they purchased on day one, they would be liable from

3   that point forward as an assumed liability, their use of

4   those purchased assets, including all of the books and

5   records that they held on to. In fact, Your Honor, in

6   mediating claims with those who made claims against the

7   Estate, to the extent that Motors Liquidation Company and

8   subsequently, the Trust, needed information about particular

9   accidents or litigation that had commenced before, where did

10  they go for that information?  They went to new GM.

11        For example, in the Phillips case that Mr.

12  Weintraub was referring to earlier, when MLC was mediating

13  that case, when they needed more information about, "What is

14  this case about?  What are her claims?  Is there any merit

15  to them?"  Where did they go for that information?  They

16  went to their liaison in the new GM in-house legal

17  department.

18        So, to say that new GM has no liability predicated

19  on their use of the purchased assets, including books,

20  records, legal records, databases, I think is a fairly

21  specious argument.  Recognizing that Your Honor has already

22  indicated that that's not an argument he's necessarily pre-

23  disposed to.

24        The final thing I'll say is, I think my colleagues

25  over here have talked at great length about prejudice and

Page 127

1    the points of 363 hearings.  I'll just say this.  There's

2    not a single case that new GM can cite to you that stands

3    for the proposition that due process works by proxy.  So,

4    while they have cited to you --

5                 THE COURT:  Works by proxy?

6                 MS. RUBIN:  Works by proxy, in other words, the

7    fact that I get due process doesn't mean that Mr. Weisfelner

8    gets due process, doesn't mean Mr. Steele gets due process,

9    Mr. Esserman gets due process.  We all may be similarly

10   situated in some way, but that's not the way the law stands.

11   That's not what our Constitution mandates or entails.  So,

12   Mr. Steinberg can say a bunch of similarly situated people

13   did in fact get notice, they showed up at the sale hearing

14   and made some arguments, I think Mr. Weisfelner has amply

15   refuted that the arguments being made were, in fact, the

16   arguments he would have made, had he been given adequate

17   notice.

18                 But putting that aside, there's no case that I'm

19   aware of that stands for the proposition that giving due

20   process to someone like you necessarily fulfills a company's

21   due process obligations in the course of a bankruptcy or in

22   any other proceeding, for that matter.

23                 The final thing that I would say is, Your Honor

24   obviously has indicated that precedent is very important to

25   him, and the concern about what would happen here if he

Page 128

1    finds that the appropriate remedy for a due process

2    violation is to find that Mr. Weisfelner and Mr. Weintraub

3    and Mr. Esserman's clients are necessarily exempt from the

4    363 Sale order and injunction entered here.  But let me pose

5    a different question.

6            If there is no remedy here for the clear due

7    process violation, and I'll submit that if Your Honor is

8    willing to find that new GM knew enough that it should have

9    triggered a recall, that there is a due process violation

10   here.  If there's no remedy here for a clear due process

11   violation, maybe that gives prospective 363 Purchasers some

12   minimal additional comfort, but what else is it going to

13   signal?  That companies are entitled to saddle Creditors

14   with the knowing misconduct not just of the Debtor, but of

15   the Purchaser?  I don't know that that necessarily is

16   justice either, Your Honor, and with that, I'll rest.  Thank

17   you, Your Honor.

18            THE COURT:  All right.

19            MR. STEINBERG:  I have just 90 seconds, Your

20   Honor.

21            THE COURT:  [LAUGHS]

22            MR. STEINBERG:  You can hold me to the 90 seconds.

23   I'll stop at that point.

24            THE COURT:  Go ahead.

25            MR. STEINBERG:  Mr. Weisfelner said that he was

Page 129

1    only aware of two manufacture -- car manufacturing cases.  I

2    just point out White Motors, another car manufacturing case,

3    75 B.R. 944.  It was the case that I cited to before, which

4    talks about successor liability being Federally pre-empted.

5    Mr. Weintraub and I actually agree that the Edwards case is

6    part of the motion to enforce.  When I refer to paragraph AA

7    of the sale order, I was talking about old GM conduct, not

8    new GM conduct, and I don't really know what Mr. Weintraub

9    was talking about as three stipulated, non-disputed facts

10   that we agreed to, because I don't think we agreed to

11   anything.  But I rest with that.

12             THE COURT:  All right.

13             MR. WEINTRAUB:  I need to respond to that, Your

14   Honor.

15             THE COURT:  Go ahead.

16             MR. WEINTRAUB:  When Mr. Steinberg says he doesn't

17   know what those facts are, they were sent to him.  They were

18   sent to him and it said, "You can object to them, not object

19   to them, agree or disagree."  There was never a response.  I

20   filed them with the Court, they were served on him, they

21   were part of the record in the case.  They have never been

22   disputed.

23             MR. STEINBERG:  Oh, but they have.  I'll show you

24   the 11.

25             MR. WEINTRAUB:  You have disputed them?

Page 130

1           THE COURT:  All right.  Folks, this isn't the

2      English Parliament.  Speak to me.  All right, am I correct

3      that we can still finish with this in about 40 minutes?

4           MR. STEINBERG:  This is correct, Your Honor.

5           THE COURT:  Ms. Newman? Was that a yes?

6           MS. NEWMAN:  I think so, Your Honor.

7           THE COURT:  All right.  A ten-minute recess, and

8      then we're going to go take mootness next.  We're in recess.

9           [PAUSE RECORDING]

10          [RESUME RECORDING]

11          THE CLERK:  All rise.

12          THE COURT:  Have seats, please.  Ms. Newman,

13     you're leading off.

14          MS. NEWMAN:  Yes, Your Honor.  Good afternoon,

15     Your Honor.  For the record, I'm Deborah Newman from Akin

16     Gump on behalf of the participating unit holders, and I will

17     be addressing the equitable mootness threshold issue on

18     behalf of both the participating unit holders and the GUC

19     Trust administrator.

20          Your Honor, as I'm sure you are well aware, the

21     law of equitable mootness is well-settled in the Second

22     Circuit and was recently re-affirmed by the Second Circuit

23     in its BGI decision, the cite of which is 772 F3D 102.  A

24     claim that would require a material modification of a

25     substantially consummated plan of liquidation is presumed to

Page 131

1    be equitable moot, unless the claimant can satisfy all of

2    the factors established in the Second Circuit Chateaugay

3    decision that have been held to apply to liquidations.  Of

4    course, there is no dispute here that the plan has been

5    substantially consummated.

6             In allowing Plaintiffs to assert their claims

7    against the GUC Trust now, claims that they allege to be in

8    the multiple billions of dollars, would require a material

9    modification of the substantially consummated plan.  The

10   plan cleanly provides that GUC Trust beneficiaries consist

11   only of Creditors that have held allowed or disputed claims

12   as of the effective date, the Defendants in the currently

13   pending JP Morgan action, and the holders of the publicly

14   traded GUC Trust units.

15            Expanding these beneficiaries now to include

16   Plaintiffs and their multiple billions of dollars of claims

17   would require that the plan be materially modified.

18            Now, turning to the showing the Plaintiffs must

19   overcome to defeat the presumption that their claims are

20   equitable moot as against the GUC Trust, those factors

21   require Plaintiffs to show one, that they acted diligently

22   in pursuing claims against the GUC Trust; two, that they

23   provided notice of their potential claims against the GUC

24   Trust and these proceedings to all parties who could be

25   affected by their claims if allowed against the GUC Trust;

Page 132

1   three, that the Court can fashion relief for Plaintiffs, and

2   can do so without inequitably impacting the rights of third

3   parties; and four, that providing such relief will not

4   unravel intricate transactions so as to knock the props out

5   from under them, and create an unmanageable and

6   uncontrollable situation for the Court.

7           Your Honor, Plaintiffs cannot satisfy any of these

8   factors.

9           THE COURT:  Were you directing those from

10  Chateaugay or from something else?

11          MS. NEWMAN:  I'm sorry, Your Honor, I didn't hear

12  you.

13          THE COURT:  Were you paraphrasing Chateaugay or?

14          MS. NEWMAN:  Yes, Your Honor. I was paraphrasing

15  Chateaugay as it subsequently then applied in the context of

16  plans of liquidation which omit one of the Chateaugay

17  factors, which is the factor that requires a showing that

18  awarding the relief will not affect the reorganized Debtor

19  from emerging as a revitalized entity.

20          THE COURT:  Mm hmm.

21          MS. NEWMAN:  And you can find those factors as

22  applied towards a liquidation in the BGI decision, recently

23  -- the recent Second Circuit BGI decision.

24          THE COURT:  Okay.

25          MS. NEWMAN:  Most glaring, Your Honor, of these

Page 133

1    factors and the failure -- the Plaintiffs' failure to meet

2    them, is the point that Your Honor alluded to yesterday,

3    which is that Plaintiffs have taken no actions whatsoever to

4    pursue claims against the GUC Trust or to stay GUC Trust

5    distributions.  Quite the contrary, Plaintiffs have taken

6    pains to point out that they were not pursuing claims

7    against the GUC Trust. Now, under binding Second Circuit

8    case law, this factor alone mandates a ruling that equitable

9    mootness would bar any of the Plaintiffs' claims against the

10   GUC Trust.

11        Plaintiffs argue in their opposition brief that

12   this Chateaugay factor should not apply to them, given their

13   argument that their procedural due process rights were

14   violated, because they were given insufficient notice of the

15   bar date and the confirmation order.  But Your Honor, in

16   BGI, the appellants were similarly arguing that Judge

17   Glenn's decision denying their motion to file late claims

18   should be reversed because they were provided insufficient

19   notice of the bar date, in violation of their due process

20   rights.

21        And the Second Circuit affirmed the District

22   Court's ruling that those appellants' claims were equitably

23   moot, because, notwithstanding the claims of insufficient

24   notice and procedural due process violations, because the

25   appellants had failed to seek a stay of a liquidating

Page 134

1    Trust's distributions after becoming aware of their claims

2    or alleged claims, and because the appellants there had

3    failed to provide notice to general, unsecured Creditors,

4    who would be stripped of their recoveries if the relief that

5    appellants had sought, had been granted.

6            Here, Plaintiffs' argument that their procedural

7    due process claims should relive them of having to comply

8    with Chateaugay's diligence factor rings especially hollow,

9    given that Plaintiffs chose for strategic reasons, not to

10   pursue claims against the GUC Trust and not to seek to stay

11   the GUC Trust's distributions even after they became aware

12   of their alleged claims, and there's no dispute about that,

13   Your Honor.

14           Under binding Second Circuit case law, the

15   ramification of that strategic decision is that any claims

16   the Plaintiffs may seek to pursue against the GUC Trust now

17   or in the future, are barred by the doctrine of equitable

18   mootness.  And this is the case, Your Honor, even if the

19   Court accepts Mr. Weisfelner's somewhat half-hearted

20   argument that the reason that Plaintiffs chose not to seek a

21   stay was because they believed that they would not have been

22   able to obtain one under the law.  Even if that is so, Your

23   Honor, the case law is clear that what is important to

24   satisfy in Chateaugay's diligence factor is that a claimant

25   seek a stay, not that it obtain one.

Page 135

1              And the Second Circuit stated, Your Honor, in

2      Chateaugay, for example, that a party who fails to seek a

3      stay, quote, "does so at his own risk."  In the Metro Media

4      decision, the Second Circuit said, "A chief consideration

5      under Chateaugay 2 is whether the appellant sought a stay of

6      confirmation."  The Court went on to say, "We insist that a

7      party seek a stay, even if it may seem highly unlikely that

8      the Bankruptcy Court will issue one."

9              And in the Campbell case, Your Honor, Judge

10     Buchwald said, it's footnote 30, "We emphasize that the

11     Second Circuit has made it clear that an appellant is

12     obligated to protect its litigation position by seeking a

13     stay, even where a stay may be unlikely to be granted."

14     Judge Buchwald went on to say, "At oral argument, it became

15     clear that appellant's counsel deliberately chose not to

16     seek a stay because he was confident that the appeal would

17     not be equitably mooted.  This was an audacious litigation

18     strategy.  Nonetheless, having chosen not to seek the stay,

19     appellants are now faced with the consequences of that

20     choice."

21             A known litigation risk did not give appellants

22     license to flout well-settled procedural rules.  Accepting

23     appellants' arguments to the contrary would both frustrate

24     the policy of the equitable mootness doctrine, and undermine

25     the doctrine itself.  All of these cases mandate that the

Page 136

1    ramification of Plaintiffs' decision not to seek a stay of

2    Trust distributions, or to assert claims against the GUC

3    Trust, is that Plaintiffs' claims are equitable moot.

4           Turning to the notice factor under the Chateaugay

5    decision, Your Honor, Plaintiffs have also failed to satisfy

6    this factor.  They have not provided any notice to GUC Trust

7    beneficiaries whose remaining recoveries could be completely

8    eviscerated if Plaintiffs are permitted to pursue claims

9    against the GUC Trust.  Plaintiffs argue, in their

10   opposition papers, that they satisfied this factor because

11   the GUC Trust administrator and the participating unit

12   holders have notice of these proceedings, and the GUC Trust

13   provided notice of the motions to enforce and the threshold

14   issues in its public disclosures beginning in May 2014.

15          But this falls far short of the notice required by

16   Chateaugay, which necessitates actual notice to all parties

17   that could be adversely affected by Plaintiffs claims, as

18   Judge Marrero stated in Calpine, Your Honor, an assertion

19   that potentially affected parties may have had constructive

20   or actual notice is not sufficient to satisfy the burden of

21   establishing that such parties had notice, and that's at 390

22   B.R. 508, the pinpoint cite is 522.

23          Here, Your Honor, the potentially affected

24   parties, the parties who could be significantly adversely

25   affected if Plaintiffs are permitted to pursue the GUC

Page 137

1    Trust's assets, go far beyond the GUC Trust administrator

2    and the participating unit holders that we represent, and

3    they include all GUC Trust unit holders and the holders of

4    disputed claims and allowed claims that have not yet

5    received distributions.  There is no evidence in the record

6    that all of these parties were provided with actual notice.

7          Now, Your Honor, turning to the next two

8    Chateaugay factors that apply here, Plaintiffs and new GM

9    also both spend a significant amount of time in their briefs

10   arguing that relief can be fashioned for Plaintiffs from GUC

11   Trust's assets without harming innocent third parties, or

12   knocking the props out from under the plan.  This just is

13   not the case, Your Honor.

14         First, as Ms. Rubin has touched upon both

15   yesterday and today, as things currently stand, there are no

16   assets in the GUC Trust that could be awarded to the

17   Plaintiffs.  All of the GUC Trust's assets have been

18   allocated to fund recoveries to the Defendants in the JPM

19   litigation in the event that they are required to disgorge

20   the distributions that they received in connection with the

21   bankruptcy, disputed claims that have not yet been resolved,

22   allowed claims that have not yet received distributions, and

23   GUC Trust administrative costs and taxes.

24         And even Plaintiffs appear to concede that the GUC

25   Trust assets cannot be diverted from these allocations to

Page 138

1     the --

2                THE COURT:  All right, pause just for a minute.  I

3     let you go on for a long time --

4                MS. NEWMAN:  Sure.

5                THE COURT:  -- without interrupting, but you

6     haven't hit yet on the things that are of the most concern

7     to me.

8                MS. NEWMAN:  Okay.

9                THE COURT:  You're relying on the failure to

10    provide notice to the GUC Trust beneficiaries, but I've

11    heard for about a day and a half about another kind of

12    failure to provide notice, and in substance, you're saying

13    that the failure to give your guys notice trumps the failure

14    to give Mr. Weisfelner's guys and Mr. Weintraub's guys their

15    notice.  I haven't heard anybody else speak yet, but somehow

16    I suspect that one or another of them is going to say that,

17    because they weren't given notice of the provision in the

18    confirmation order that you are talking about, that's not

19    any more binding on them than the sale order is, and my

20    task, obviously confined by the limits of law, is to do

21    what's fair and right.

22               Now, I haven't heard you mention yet, if you ever

23    will, 502(j), but that kind of contemplates a situation

24    where you have late arrivers at the party, or different

25    claims, and seems to set out a roadmap for what's equitable,

1   which is that you don't give people who already got

2   distributions and claims, you don't make them give any money

3   back, but to the extent you haven't given out any more, you

4   do a stop, look and listen to make sure that those who may

5   have been prejudiced before, catch up.

6            Also, it's my impression, I haven't gotten a

7   mandate yet, but the Circuit didn't like my decision on JP

8   Morgan Chase, and presumably, if things materialize now, I

9   know there are issues on who owns the cause of action, which

10   I ruled on, but which a District Judge says was not ripe.

11   Arguably, it's riper now, but that would bring in a pot of

12   money beyond what you have now, which presumably will be

13   distributed to the unsecured Creditor community, unless

14   something else happens.

15            MS. NEWMAN:  Okay.

16            THE COURT:  Can you address what's really bugging

17   -- I mean, a tactical choice --

18            MS. NEWMAN:  Sure.  Sure, sure.

19            THE COURT:  -- that's the low hanging fruit, okay?

20            MS. NEWMAN:  Yes.

21            THE COURT:  Okay?  Let's talk about the harder

22   stuff.

23            MS. NEWMAN:  Sure, Your Honor, I'd be happy to do

24   that, and I'm going to start in the reverse order of the way

25   in which you posed the questions and begin with the JPM

Page 140

1    question.  I think Your Honor --

2            THE COURT:  Forgive me.  You haven't appeared

3    before me as much as many people.  I hate acronyms.  JP

4    Morgan?

5            MS. NEWMAN:  Yes, Your Honor, JP Morgan.

6            THE COURT:  JPM is JP Morgan Chase?

7            MS. NEWMAN:  Yes, Your Honor, I will keep that in

8    mind.

9            THE COURT:  Okay.

10            MS. NEWMAN:  And I apologize to the Court.  I will

11    begin by addressing Your Honor's question with respect to

12    the JP Morgan litigation, and I think, Your Honor, I

13    understand the status of the JP Morgan litigation to

14    actually be the reverse of what you just articulated.  Given

15    the recent rulings in the JP Morgan litigation, my

16    understanding is that JP Morgan will, at least the way

17    things stand and as I acknowledge as you did, that there is

18    a lot more that will likely transpire in that case, but

19    there is a cha -- given the reversal of Your Honor's

20    decision, JP Morgan may be required to disgorge the

21    distributions that it was provided with in the bankruptcy,

22    and if that is the case, then JP Morgan, then, will have a

23    resulting claims against the GUC Trust.

24            THE COURT:  An unsecured claim.

25            MS. NEWMAN:  An unsecured claim, and so, of the

Page 141

1    approximately $700 million dollars worth of assets in shares

2    and warrants that are currently in the Trust, I think

3    approximately, between $400 and $500 million dollars would

4    then have to be paid out to the Defendants in the JP Morgan

5    litigation.  So, where things currently stand I think has

6    actually been a negative development, from the GUC Trust's

7    perspective, because it is more likely now that the assets

8    in the GUC Trust that have been reserved for the JP Morgan

9    litigation will now have to be distributed.

10            THE COURT:  Forgive me, that sounds upside down to

11   me.

12            MS. NEWMAN:  Okay.

13            THE COURT:  I thought the whole idea of the JP

14   Morgan / Trust litigation was to make JP Morgan Chase give

15   back the amounts that it got as a secured Creditor.

16            MS. NEWMAN:  That's correct.

17            THE COURT:  And it has to pay back in

18   (indiscernible) dollars, money that you're now going to give

19   out in (indiscernible) bankruptcy dollars.

20            MS. NEWMAN:  So, that's correct with one

21   exception, which is that the money that will be paid by the

22   JP Morgan liti -- Defendants goes not to the GUC Trust but

23   to a separate avoidance action Trust, and the beneficiaries

24   of the avoidance action Trust, and I -- if I say something

25   that's incorrect, I assume that someone from the GUC Trust

Page 142

1    will correct me because they're more familiar with these

2    facts, but I think that what happened was that avoidance

3    action Trust interests were distributed to certain general

4    unsecured Creditors.

5            I'm not sure that the whole general unsecured

6    Creditor community received those Trust interests, but the

7    entire GUC Trust -- excuse me, the entire unsecured

8    community received interests in the GUC Trust and here is

9    Mr. Martorana, who may correct something that I said.

10           The bottom line, just before Mr. Martorana comes

11   in and cleans up what I just probably fumbled, is that the

12   money that's being paid by the defense in the JP Morgan

13   litigation in the event that they are ultimately required to

14   disgorge, goes to a Trust that is not the GUC Trust, that is

15   different from the GUC Trust, and it does not share an

16   identity of beneficiaries with the GUC Trust.

17           THE COURT:  Go on.

18           MS. NEWMAN:  And if I --

19           MR. MARTORANA:  Sorry.  To be clear, Your Honor,

20   again, Keith Martorana, Gibson, Dunn & Crutcher, on behalf

21   of the GUC Trust.  Just to clarify how things work between

22   those two different Trusts, the plan provided for two

23   different Trusts to be set up, the GUC Trust, an the

24   avoidance action Trust.  Both had, potentially, the same

25   beneficiaries at the outset, which was general unsecured

Page 143

1    Creditors for the GUC Trust and for the avoidance action

2    Trust.  It was either the DIP lenders or the general

3    unsecured Creditors, and that has not been decided yet, as

4    you well know and as you've noted.

5            But what happened subsequently was that the GUC

6    Trust -- the beneficiaries of the GUC Trust were given units

7    that became transferrable.  So you end up with a situation

8    where you've got one Trust, which is the avoidance action

9    Trust, which may recover on the JP Morgan action.  If that

10   happens, cash comes into that Trust, the beneficiaries of

11   that Trust will be either Treasury, who may benefit from the

12   cash, or it will be the original general unsecured

13   Creditors, which include bond holders and trade claims and

14   employee claims, and then you've got a completely different

15   set of beneficiaries of the GUC Trust.

16           Potentially, now, you have people that were either

17   original holders of claims or people that have sold their

18   units into the market and the unit holders, who bought them

19   in the secondary market, are now the beneficiaries of the

20   GUC Trust.

21           So, you could have a situation where cash is

22   collected by the avoidance action Trust, but does not

23   actually go out to general unsecured Creditors.  So, just to

24   clarify.

25           THE COURT:  All right, thank you.

Page 144

1          MS. NEWMAN:  Yes, and just to add to that, I think

2     it's clear that you certainly will have -- there will be GUC

3     Trust unit holders who will not benefit, who have bought

4     their units in the aftermarket and will not benefit at all

5     from what happens with the JP Morgan litigation and the

6     avoidance action Trust, because they didn't receive

7     interests in the avoidance action Trust.

8          THE COURT:  Mm hmm.

9          MS. NEWMAN:  So, turning next to the first

10    question that Your Honor posed, reconciling the notice

11    requirements and the alleged lack of notice here, and

12    Section 502(j) of the Bankruptcy Code.  To begin with, it's

13    not clear to me that Section 502(j) applies here --

14         THE COURT:  Well, it plainly doesn't apply by its

15    terms.

16         MS. NEWMAN:  Okay.

17         THE COURT:  The question is, doesn't that

18    establish kind of a Congressional intent for what's just --

19         MS. NEWMAN:  Mm hmm.

20         THE COURT:  -- when you have latecomers to a

21    liquidating situation.

22         MS. NEWMAN:  So I think you have to go back to the

23    Second Circuit's ruling in BGI where they said, "Look, we

24    acknowledge that these claimants are saying they never

25    received notice of the bar date, but even after they'd

Page 145

1    realized what was happening, they didn't show up.  They

2    didn't seek to stay Trust distributions."  And in that -- in

3    those circumstances, their claims are equitably moot, and I

4    think this --

5              THE COURT:  Forgive me, and you're saying that

6    applies not just to the incremental distribution that was

7    made in late 2014, but the whole salami?

8              MS. NEWMAN:  I think it -- I think that when you

9    are balancing the equities between unit holders and other

10   GUC Trust beneficiaries, who have an expectation of what the

11   finite amount of liabilities of the GUC Trust is, and with

12   respect to unit holders, went out into the market and

13   purchased units in reliance on that finite amount of

14   potential claims.

15             When you are trying to reconcile the potential

16   prejudice of that universe of parties with the potential

17   prejudice to Plaintiffs by not being able -- by precluding

18   them from pursuing the GUC Trust, you have to take into

19   account, and the Second Circuit says you have to take into

20   account, what have the Plaintiffs done to protect themselves

21   against the prejudice?  And here, they've done nothing, and

22   the Second Circuit says quite clearly, Your Honor, they have

23   to try to stay distributions.  They have to, even if they

24   think there's no chance they're ever going to be able to do

25   it, they have to go the Court and try.

1            And, they have to put GUC Trust beneficiaries on

2    notice that they may come in and wipe out any remaining

3    distributions that those GUC Trust beneficiaries are

4    expecting.  They have to do that, and there's a reason for

5    that requirement, because GUC Trust units have continued to

6    trade, since February of 2014, no doubt.  And the people who

7    continue to purchase those GUC Trust units, they were

8    entitled, under Second Circuit law to be told, "Hey, you may

9    not want to buy that unit because you may not be get --

10   there may be no more distributions, and while you think, you

11   know, you can conduct an assessment of what the potential

12   claims against the GUC Trust may be, there may be multiple

13   billions of dollars of claims that will be piled upon what

14   you think is the finite amount of liabilities."

15            THE COURT:  I'm with you.  Keep going.

16            MS. NEWMAN:  Okay, so Your Honor, I think where I

17   left my outline was talking about the Plaintiffs' argument,

18   and this argument was made by new GM as well, that the Court

19   can fashion relief out of the GUC Trust's assets without

20   harming innocents, GUC Trust's beneficiaries and without

21   knocking the props out from under the plan.  And I touched

22   upon this a little bit in responding to Your Honor's

23   questions.

24            There are, as I said before I started to respond

25   to Your Honor's questions, there are no assets in there

Page 147

1    right now that could be -- they're -- all of the assets are

2    reserved for the known GUC Trust liabilities, and to the

3    extent that those known GUC Trust liabilities turn out to be

4    less than is currently estimated, for reasons of fairness,

5    what I just went over, equity, the plan, the confirmation

6    order, all demand that the unit holders receive those

7    assets.

8             THE COURT:  Slice and dice that, please, Ms.

9    Newman.

10            MS. NEWMAN:  Sure.

11            THE COURT:  Because you make a very strong

12   argument for the equity of not tapping funds that have been

13   reserved for people whose claims haven't been totally filed,

14   but haven't been either allowed or disallowed, so they

15   shouldn't be prejudiced.

16            MS. NEWMAN:  Mm hmm.

17            THE COURT:  But it's at least possible, especially

18   given your luck, not luck, skill, in reducing claims from

19   the initial enormous amount they were to the much lesser

20   amount, that you may be equally successful now, and that

21   you're going to have extra stuff at the end.

22            MS. NEWMAN:  Mm hmm.

23            THE COURT:  You're arguing, in a sense, that that

24   should become a windfall to those who arrived at the party

25   first, rather than those who, it might turn out, have

Page 148

1    equally valid claims.

2              MS. NEWMAN:  Oh, Your Honor, I don't think that's

3    a windfall.  The GUC Trust units, as Mr. Martorana said,

4    have been trading.  They are freely tradable.  I think the

5    number is approximately 100 million worth of GUC Trust units

6    have traded since the date when they became freely tradable

7    through November of 2014, and I'm sure today that number is

8    larger, and -- excuse me, that's 100 million in number.

9    It's $2.1 million in value, and I don't think there can be

10   any question that the people who purchased those GUC Trust

11   units, did so based on the GUC Trust disclosures of what the

12   maximum amount of claims against the GUC Trust could

13   possibly be.

14             And so, it's not a windfall.  For them, had they

15   made a decision, which I believe they most likely did, no

16   one would purchase the GUC Trust units saying, "Well, I'm

17   going to make an assessment that there are not going to be

18   any more distributions made from the GUC Trust," certainly

19   they purchased those units based on their estimation, given

20   what was known at the time, that there would be additional

21   distributions, and to take those distributions away now, I

22   don't think would be a windfall.

23             I think it would be highly prejudicial to the unit

24   holders, and I think that's entirely consistent, Your Honor,

25   with the statements that you made in addressing the

Page 149

1    equitable mootness argument, although it was not decided, in

2    the Morgenstein case.

3            People are entitled to rely on what is known under

4    the plan about what the total maximum amount of liabilities

5    for the GUC Trust could be when they purchased their GUC

6    Trust units, and that is especially the case here, when

7    Plaintiffs have done nothing to apprise them of the risk

8    that those liabilities could be increased by multiple

9    billions of dollars, as Plaintiffs say.

10           I wanted to talk briefly, Your Honor, about the

11   accordion feature under the sale agreement, because that was

12   raised in Plaintiffs' briefing that, perhaps the accordion

13   feature could solve this question and that the funds that

14   new GM may be required to pay under the accordion feature

15   could be used to fund Plaintiffs' claims against the GUC

16   Trust.  As Ms. Rubin stated this morning, the accordion

17   feature, or the requirement for new GM to pay additional

18   funds under the sale agreement does not kick in unless

19   allowed claims reach $35 billion dollars.

20           Right now, they're at approximately $32 billion

21   dollars, so getting -- we hope that that won't -- that the

22   allowed claims will never go up to the $35 billion and that

23   this will be resolved today or shortly after today, but

24   getting from the $32 billion to the $35 billion, with

25   respect to Plaintiffs' claims should that happen, would

Page 150

1   clearly require the GUC Trust to expend a significant amount

2   of both time and money, and it's unclear how much money is -

3   - how much the value of the securities left in the GUC Trust

4   is available to fund, really, anything, given the reserves

5   that have already been established.

6          So, I don't think it's realistic that the funds

7   that would come in -- could potentially come in under the

8   accordion feature in the sale agreement could be used to

9   fund Plaintiffs' claims.  Certainly, that could not be done

10  without prejudicing existing GUC Trust beneficiaries.

11         Additionally, I will just note that the amount

12  that's required under that accordion feature is a maximum

13  of, I think, approximately a billion dollars based on

14  today's share prices of new GM common stock, and it's

15  something like $160 million for every billion dollars in

16  allowed claims over $35 billion, so it's really a small

17  fraction of what the Plaintiffs' allowed claims would be,

18  because remember we'd have to have at least $3 billion to

19  get up to the $35 billion dollar threshold, and then another

20  billion to get that $160 million that would be required

21  under the sale agreement.  It really would be a very small

22  fraction of Plaintiffs' claims.

23         Plaintiffs also made an argument that perhaps

24  their claims could be funded by dividends that the GUC Trust

25  received from new GM.  I think that's also very unrealistic.

Page 151

1    To date, new GM has ---

2            THE COURT:  That's dividends on what's, in

3    substance, a kind of like Treasury stock?  In other words,

4    dividends you get on the shares you're holding in reserve?

5            MS. NEWMAN:  Correct, dividends paid on the shares

6    that are owned by the GUC Trust, Your Honor.  To date, the

7    GUC Trust has received $14 million, a little bit less than

8    $14 million dollars in dividends, and approximately $4

9    million dollars of that has been distributed.  That's

10   clearly going to be a drop in the bucket for what Plaintiffs

11   are alleging are going to -- the amount of the claims the

12   Plaintiffs are alleging or asserting.

13           Your Honor, I can speak to the ripeness issue, if

14   it's something that your Court -- that Your Honor would like

15   me to --

16           THE COURT:  You mean the Colleen McMahon ripeness

17   issue?

18           MS. NEWMAN:  Well, there was an argument made by

19   both Plaintiffs and new GM that the equitable mootness

20   threshold is not ripe for adjudication.  We understand --

21           THE COURT:  Oh, I'm still thinking the JP Morgan

22   Chase.

23           MS. NEWMAN:  Sure.

24           THE COURT:  Go ahead.

25           MS. NEWMAN:  Okay, so we --

Page 152

1                THE COURT:  Yeah, we better address it.

2                MS. NEWMAN:  Okay, so we understood Your Honor to

3      say when we were here in August, well, my partner Mr. Golden

4      was here in August, that as a matter of fundamental

5      fairness, Your Honor wanted to consider all potential

6      avenues of recovery for Plaintiffs at the same time.

7                As a matter of fundamental fairness both to the

8      Court and to all the parties, and we agree that that is the

9      best approach and the only approach that is fair, but as a

10     matter of law, the equitable mootness threshold issue

11     clearly presents a real and substantial controversy of

12     sufficient immediacy to warrant adjudication by this Court.

13               Now, new GM has stated repeatedly that Plaintiffs

14     do not need to, and should not be permitted to, pursue

15     claims against new GM because they may instead pursue claims

16     against the GUC Trust.  And the Plaintiffs have demanded

17     that the GUC Trust withhold future distributions in reserve

18     for their claims notwithstanding that they've taken no

19     actions to actually assert claims against the GUC Trust, or

20     to stay distributions, or to obtain an order from Your Honor

21     staying distributions.

22               I think it's plain that a ruling from the Court

23     clarifying that the Plaintiffs cannot, at this late date,

24     pursue assets that rightfully belong to GUC Trust

25     beneficiaries, will solidify and clarify the parties' rights

Page 153

1    and be to the benefit of everyone in this room.

2         Your Honor, I think that -- unless Your Honor has

3    additional questions, I think we'll rest and reserve some

4    time for rebuttal.

5         THE COURT:  Fair enough.  Who's next?  Mr.

6    Weisfelner?

7         MR. WEISFELNER:  Your Honor, I don't have a lot to

8    say.  I think we will rest on our papers.  I just want to

9    make one point.  As to the argument Ms. Newman made about

10   prejudice and failure to pursue remedies, I just want to

11   stress the fact that the distribution, to which Plaintiffs

12   took no action, was all of about $240 million dollars, or

13   some two percent of what the initial distribution was.  And

14   Your Honor asked the question, I don't think $240 million or

15   2.6 percent in any way, shape or form, represents the

16   proverbial salami.  So, as to the prejudice argument, I

17   think I'd underscore that.

18        The other point is, GUC unit holders.  Now, we

19   don't have a record beyond what's in the stipulations, but

20   I'm going to bet, because I know a little bit about Trusts

21   that were created from a plan of reorganization, and how

22   they tend to operate, but I'm going to bet that the value of

23   those units went down dramatically after the recalls took

24   place, and certainly after the statements by new GM that

25   they thought the right remedy was for the Plaintiffs to go

Page 154

1      attack the GUC Trust.

2              I don't know what Debtor notice could be given to

3      the GUC unit holders, other than through their counsel,

4      other than through the public statements made by both GM

5      and, for that matter, the GUC Trust administrator with

6      regard to the possible implications for the market value of

7      their units.  And other than that Your Honor, unless you

8      have any questions, we'll just -- we'll rest on our papers.

9              THE COURT:  Fair enough, thank you.  Mr.

10     Steinberg?

11             MR. STEINBERG:  Your Honor, the issue of equitable

12     mootness assumes that the Plaintiffs claims are retained

13     liabilities and that they're assertable against the old GM

14     Estate, but for equitable mootness principles.  Its premise

15     on the Creditors' expectations from the confirmation order

16     in the plan, and in a somewhat circular argument, the GUC

17     Trust argues equitable mootness based on their own quarterly

18     reports.

19             Importantly, the mootness doctrines predicated on

20     point of seeking to upset the confirmation order, and that's

21     why they went through the Chateaugay factors, but no one has

22     tried to do that.  The time to appeal has expired already,

23     and the underlying premise of the equitable mootness issue

24     is that claims will be filed against the GUC Trust by the

25     Plaintiffs, but that never occurred.

Page 155

1            In October, when the Plaintiffs were given a

2    chance to re-plead their consolidated complaints in the MDL,

3    they did not assert a claim against the GUC Trust or the old

4    GM Estate.  And then, as people talked about today, the

5    Plaintiff took no action to stop the GUC Trust from

6    distributing over $200 million dollars in a distribution in

7    November of 2014.

8            So the question that we raise in our papers is,

9    why is this issue ripe for anything at this point in time?

10   We don't know what is going to be asserted, and we don't

11   know what the defense is.  We're actually trying to deal

12   with the tail instead of the actual issue at all.

13           I share with Mr. Weisfelner's concerns as to

14   whether the GUC Trust is as broke as they say, and certainly

15   the impact of the JP Morgan litigation, and other than that,

16   I'll rest on my papers, because I do think in our papers, we

17   cited to some actual statements which we didn't think was

18   true, and we wanted the record to be clarified.  Thank you.

19           THE COURT:  Okay.  Thanks.  Ms. Newman, reply?

20           MS. NEWMAN:  I'll be brief, Your Honor.  I just --

21   to respond to Mr. Weisfelner's argument that the can't think

22   of any better notice than the GUC Trust disclosures, it is

23   clear, based on the existing case law, and in particular,

24   the Calpine case --

25           THE COURT:  Hold the mic closer to you, please?

1              MS. NEWMAN:  Sure.  I can lean a little forward,

2      too -- and also in the Calpine case, there were similar

3      arguments made that it's incumbent upon the Creditors

4      Committee, the Debtors, to provide notice, and that people,

5      in fact, did have actual notice of what was being sought in

6      the Calpine case, and that argument was rejected, and the

7      Court very clearly held that it is -- the party seeking the

8      modification must show that it provided actual notice to

9      parties who could be adversely affected by the relief it was

10     seeking.

11             With respect --

12             THE COURT:  Well, forgive me, Ms. Newman.

13             MS. NEWMAN:  Sure.

14             THE COURT:  How did you, or Mr. Golden, show up if

15     it weren't for the fact that somehow you knew that there was

16     a threat to your constituency's interest?

17             MS. NEWMAN:  Well, it's quite clear, Your Honor,

18     that certain unit holders did know, but we don't represent

19     the entire universe of unit holders, nor do we represent all

20     GUC Trust beneficiaries.  So the fact that some people may

21     know, some beneficiaries, some unit holders may be aware,

22     does not satisfy the necessary showing that all unit

23     holders, all beneficiaries be provided with notice that

24     their recoveries may be significantly impaired and

25     potentially completely eviscerated.

Page 157

1          With respect to Mr. Steinberg's argument that this

2    is not the time to address this, I'll just note, Your Honor,

3    I think it's highly ironic that new GM is taking the

4    position that the Court should refrain from ruling on this

5    issue while saying at the same time, that Plaintiffs can and

6    should be pursuing the GUC Trust.  Under the requirements

7    under applicable law about the kind of dispute that is

8    necessary in order to render a dispute right and ready for

9    adjudication, I think we clearly satisfy that standard.

10          THE COURT:  All right, thank you.

11          MS. NEWMAN:  Thank you, Your Honor.

12          THE COURT:  All right, folks, it's been a long day

13    and a half.  I'm going to take all of the matters under

14    submission.  Has a transcript already been ordered by any of

15    the people who have argued?

16          MR. STEINBERG:  Your Honor, we tried to order the

17    transcript yesterday so I could prepare for today, but it

18    hasn't arrived today.  I assume it'll come --

19          MAN:  You should get yesterday's today.

20          MR. STEINBERG:  I assume we'll get yesterday's

21    today, and we'll order today's transcript as well, and as a

22    courtesy, I guess, to Your Honor and to the other parties,

23    anybody wants a transcript, we'll provide it.

24          THE COURT:  Well, somehow, I suspect that there's

25    going to be a pile of appeals.  You're going to need a

Page 158

1    transcript for the record on appeal.  Get it to my Chambers

2    as quickly as you can.  United States Congress being what it

3    is, I don't know if we have the funding to order them on our

4    own.  Would you provide them, please?

5              MR. STEINBERG:  Absolutely.

6              THE COURT:  Thanks very much.  Very helpful

7    arguments all around.  We're adjourned.

8              MR. STEINBERG:  Thank you, Judge.

9

10             (Whereupon these proceedings were concluded at

11    1:14 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 159

1                    C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4      transcript is a true and accurate record of the proceedings.

5

6      Sonya
       Ledanski Hyde

       Digitally signed by Sonya Ledanski
       Hyde
       DN: cn=Sonya Ledanski Hyde, o, ou,
       email=digital1@veritext.com, c=US
       Date: 2015.02.20 15:15:59 -05'00'

7

8      Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20      Veritext Legal Solutions

21      330 Old Country Road

22      Suite 300

23      Mineola, NY 11501

24

25      Date:  February 20, 2015

| & | | | |
|---|---|---|---|

**&**

**&**   3:3,25 4:7,17,24
4:25,25 5:6 7:9
58:19 142:20

**0**

**09-50026**   1:3

**1**

**1**   38:11,23 70:20
**1.2**   90:12
**10**   47:16 48:18
70:11 85:23 89:5
**100**   48:18 76:3
148:5,8
**10004-1408**   1:15
**10018**   3:14
**10022**   4:3
**10036**   3:5,21 4:20
**10166**   4:11
**102**   130:23
**11**   16:15 66:24 80:1
80:18 125:5 129:24
**111**   112:1
**11501**   159:23
**1185**   3:4
**12**   76:12 86:15
93:19 117:7
**13**   85:19,21 86:12
86:15
**1359**   37:19 38:3
**1364**   38:3
**14**   151:7,8
**15**   32:17 57:6
**150**   105:1 115:9,15
**16**   47:17
**160**   150:15,20
**17**   66:12 88:14
121:25 122:9
**179**   72:6
**18**   1:18 104:8 118:4
**1800s**   111:17
**1880s**   58:20
**1986**   114:3
**1987**   38:3
**1989**   26:24
**1:14**   158:11

**1st**   39:6,6 80:18
116:17

**2**

**2**   38:24 66:2 94:6,8
111:2 135:5
**2.1**   148:9
**2.3**   61:5,8,10 66:24
121:11 125:5
**2.6**   90:20 117:5
153:15
**20**   22:22 37:11
38:10 46:14 159:25
**200**   4:10 76:3 155:6
**2002**   92:7,8
**2004**   114:5
**2008**   118:11
**2009**   24:23 36:10,21
38:23,24 40:13 41:2
51:2 63:17 70:23
71:5,25 72:21 73:5
73:14 74:4,25 75:8
80:18 81:3,6,21
83:20 84:15,20
85:24 88:2 91:23
92:11,19,22 93:16
96:3 97:8,14 98:14
100:1,14 101:8
**2010**   70:20
**2011**   47:16 90:10,12
**2014**   116:17 136:14
145:7 146:6 148:7
155:7
**2015**   1:18 159:25
**21**   38:10
**2200**   5:1
**2323**   5:1
**240**   90:19 153:12,14
**25**   37:11 83:22
**26**   46:12
**27**   38:7 85:17,18
86:10
**270**   50:16,17,18,23
51:7,8
**279**   72:15 99:11
**28**   38:9
**29,000**   50:9,24 51:1
51:4,9

**2f3d**   8:14
**2nd**   39:6

**3**

**3**   38:9 85:21,21
150:18
**3.2**   123:17
**30**   57:7 135:10
**300**   5:8 159:22
**31**   116:10,10
**32**   51:14 94:18
123:13 149:20,24
**33**   51:14
**330**   159:21
**341**   8:14
**35**   52:3 94:13,18
123:15 149:19,22
149:24 150:16,19
**360**   20:21
**363**   9:9,13 10:16
11:5 15:18,22 16:9
16:12,14 17:17 18:1
18:6 24:1 26:4,5
42:4 43:20 47:7,8
47:19,22,24 48:4,6
48:14,15 52:16
53:12 54:9,11,24
58:2,3,9,16 59:8,22
60:9 67:24 69:7
75:4 79:13,17 80:2
80:16 100:15
111:11 116:21
117:13 120:24
127:1 128:4,11
**363s**   80:4,17
**36e**   60:5
**390**   136:21
**3d**   26:23

**4**

**4**   113:20 114:19
151:8
**40**   33:10 130:3
**400**   5:15,16 141:3
**41**   47:16
**42**   47:17 85:25
**437**   4:2

**46**   49:18 61:20,21
62:9,10,25 121:24
122:22 123:9
**48265**   5:17
**4th**   39:4

**5**

**5**   113:21
**50**   76:3
**500**   141:3
**502**   138:23 144:12
144:13
**508**   136:22
**522**   136:22
**56**   82:19

**6**

**6**   66:3 86:1 116:16
**6.15**   65:8,9 66:14
**6.15.**   65:11
**6.17**   62:15
**60**   21:15 70:20
**60654**   5:9
**61**   70:20
**620**   3:13
**69**   55:21

**7**

**70**   38:7 85:16,17,24
86:10
**70,000**   50:9,24 51:4
51:8,9
**700**   141:1
**72**   8:14
**738**   112:1
**75**   129:3
**75201**   5:2
**77**   20:24
**772**   130:23

**8**

**8**   83:22 94:16
**820**   37:19 38:3
**843**   90:13
**85**   51:15
**87**   90:13
**885**   26:23
**8k**   38:23,24 39:8

**8ks** 38:22

**9**

**9** 90:14 94:16
**9.4** 90:9,20
**9.8** 94:4
**90** 26:23 128:19,22
**9024** 21:15
**944** 129:3
**99** 26:15
**9:00** 1:19

**a**

**a.h.** 37:19 38:2
**aa** 45:19 62:17 69:8
  123:23,24,25 129:6
**abide** 68:25
**ability** 27:2,4,5 30:4
  47:23 75:1 81:11,17
  84:2 93:18
**able** 10:17 29:15
  44:3 68:15,24 93:16
  94:2 100:6 134:22
  145:17,24
**ably** 115:4 122:24
**absence** 102:20,20
**absent** 11:19
**absolute** 80:9
**absolutely** 158:5
**absolved** 109:10,11
**accept** 13:13 38:8
  53:12
**accepted** 91:7
**accepting** 135:22
**accepts** 134:19
**accessory** 75:14
  93:21
**accident** 3:11 13:17
  26:20 28:25 34:16
  35:10 36:4 40:2
  41:21 42:14,21 64:9
  67:15 75:17 76:21
  83:14,16 101:12
  115:22 116:4,11
**accidents** 100:22
  105:1,3,11 107:10
  108:7 115:23 126:9

**accomplish** 58:3
**accord** 80:9
**accorded** 93:17
**accordion** 149:11
  149:12,14,16 150:8
  150:12
**account** 19:11
  20:10,10,20 80:10
  145:19,20
**accountable** 78:12
**accounting** 78:1
**accounts** 20:9
  110:21
**accrues** 121:19
**accruing** 61:12
**accurate** 159:4
**accused** 17:23
  116:25
**achieve** 43:5 58:5
  93:16
**acknowledge** 106:5
  140:17 144:24
**acknowledged**
  85:21
**acknowledgement**
  93:8
**acquired** 15:25
**acronym** 105:11
**acronyms** 140:3
**act** 20:24 69:11
  122:5
**acted** 31:14 72:1
  73:13 131:21
**action** 19:8,12 35:2
  56:20 78:10 86:24
  131:13 139:9
  141:23,24 142:3,24
  143:1,8,9,22 144:6
  144:7 153:12 155:5
**actions** 60:20,24
  86:18 100:5,12
  102:23 124:3,19
  133:3 152:19
**active** 36:6 37:13
**acts** 69:10
**actual** 11:2 37:1
  61:13 105:8,16

136:16,20 137:6
  155:12,17 156:5,8
**add** 26:25 144:1
**added** 94:24
**additional** 33:16,25
  38:25 52:4,13 71:16
  94:10 117:7 124:14
  128:12 148:20
  149:17 153:3
**additionally** 150:11
**address** 14:8 22:8
  61:20 101:17 103:4
  139:16 152:1 157:2
**addressed** 25:5 28:5
  117:20
**addresses** 75:2
**addressing** 130:17
  140:11 148:25
**adequate** 127:16
**adjourned** 158:7
**adjudicate** 91:19
**adjudicated** 76:8
**adjudicating**
  119:11
**adjudication**
  151:20 152:12
  157:9
**adjustment** 52:2
  123:11,14,19
**administration**
  10:9 91:13
**administrative**
  137:23
**administrator** 4:9
  130:19 136:11
  137:1 154:5
**admitted** 88:13
  93:4
**adopt** 118:15
**advance** 9:7
**advancing** 35:15
**advantage** 17:22
**adversely** 136:17,24
  156:9
**advertising** 61:1
**affect** 66:3 132:18

**affidavit** 99:9
**affirm** 120:23
**affirmative** 20:11
  20:15 98:25
**affirmed** 120:9
  130:22 133:21
**afford** 76:16
**afforded** 71:12 79:2
**aftermarket** 144:4
**afternoon** 130:14
**ag** 67:24
**age** 25:17
**agent** 38:19 112:13
**aggregate** 50:14,20
  51:7 52:3
**ago** 44:21 106:16
**agree** 29:6,8 68:24
  89:23 90:6 129:5,19
  152:8
**agreed** 32:19 68:15
  129:10,10
**agreement** 33:18
  38:23,25 39:10,11
  46:5 56:24 61:5,14
  61:19 62:13,13,16
  62:24 64:7 65:8,9
  66:2,24 67:1,4,7
  78:23 106:8 113:7
  114:2,3,7 121:9,10
  121:16 122:19
  125:5,20 149:11,18
  150:8,21
**agway** 11:13
**ahead** 69:3 71:23
  112:24 128:24
  129:15 151:24
**aiken** 88:23
**air** 82:15 93:13
  103:15
**airbag** 77:14
**airbags** 75:16 76:21
**airlines** 59:10
**akin** 4:17 130:15
**al** 1:6,7
**algebraic** 85:24
**alive** 82:7

allege 131:7
alleged 36:13 134:2
  134:12 144:11
allegedly 17:20
alleging 151:11,12
allies 70:10
allocated 137:18
allocations 137:25
allow 25:20 68:8
  73:18 82:11 88:7
allowed 51:13
  123:12,18 131:11
  131:25 137:4,22
  147:14 149:19,22
  150:16,17
allowing 131:6
allows 27:12 119:4
  119:9
alluded 26:15 133:2
allure 87:17
alternate 66:22
amazing 99:4
amended 122:6
amendment 38:24
americas 3:4
amount 23:12 52:22
  53:8 75:21 91:10
  137:9 145:11,13
  146:14 147:19,20
  148:12 149:4 150:1
  150:11 151:11
amounts 83:17
  141:15
amply 125:23
  127:14
analogy 27:17
analysis 31:12
  56:12 57:13
analyzing 29:3
andrew 6:13
anecdotal 101:15
  101:18
anier 6:14
annoyed 22:16
answer 10:13 36:9
  36:14,17,20 46:1
  99:16 103:20 115:8

answering 70:3
anticipate 10:11
anticipated 45:16
  45:17 55:7 121:5
antitrust 18:8,25
  110:12
anybody 24:10
  37:14,16 48:16
  52:23 53:8 57:3,17
  97:16 100:23
  138:15 157:23
anymore 18:3 76:22
anyway 30:7 85:12
  110:8
apologize 120:19
  140:10
appeal 20:7 33:9
  54:19 59:22 120:13
  135:16 154:22
  158:1
appeals 157:25
appear 137:24
appearance 37:15
appeared 67:25
  140:2
appearing 5:21
appellant 135:5,11
appellants 133:16
  133:25 134:2,5
  135:19,21
appellants’ 133:22
  135:23
appellant’s 135:15
appellate 19:1
  119:1
appendices 99:12
applicable 13:22,24
  13:25 99:18 157:7
application 38:18
  56:15 85:2
applied 21:6 38:6
  49:21,22 57:16,17
  62:18 132:15,22
applies 13:17 56:7
  107:9 144:13 145:6
apply 13:16 26:19
  26:20 33:5 34:12

57:18 59:25 61:22
  131:3 133:12 137:8
  144:14
applying 113:23
appreciate 75:7
  79:12
appreciated 72:22
  72:24
apprise 149:7
approach 8:3 19:7
  28:18 152:9,9
approached 17:16
  27:21
approaches 10:18
appropriate 19:2
  43:18 68:14 82:4
  91:6,23 100:3,4
  106:24 113:24
  117:13,23 118:1
  128:1
approve 24:17 45:9
  75:10
approved 10:19
  15:6 42:15 43:1,10
  43:13 53:23 81:6
  116:22
approving 37:20
  45:10 120:24
approximately 88:5
  92:6 141:1,3 148:5
  149:20 150:13
  151:8
area 8:13
aren’t 85:13 86:18
  100:11
arguable 8:17
arguably 7:20 9:12
  139:11
argue 23:23 24:23
  28:10 59:13 68:24
  77:5 84:25 85:1
  99:4 113:4 133:11
  136:9
argued 8:9 26:2
  28:6,12 33:3,15,17
  35:15 37:6 69:1
  71:19 81:25 103:5

112:18 157:15
argues 154:17
arguing 12:25
  21:17 22:6 31:11,12
  33:20 44:17 59:13
  64:18,19 106:6,10
  133:16 137:10
  147:23
argument 2:1 9:22
  13:1,2 25:15 26:14
  28:24 29:4 30:22
  32:3,8 33:8,21
  35:16 46:10 50:3
  51:21 60:1 61:15
  64:6,24 73:14 78:20
  79:9 86:9 97:9
  119:18,19,22
  124:25 125:11,23
  125:25 126:21,22
  133:13 134:6,20
  135:14 146:17,18
  147:12 149:1
  150:23 151:18
  153:9,16 154:16
  155:21 156:6 157:1
arguments 7:11
  29:16 32:11 74:14
  86:5 102:6 119:24
  127:14,15,16
  135:23 156:3 158:7
arises 115:20
  121:19
arising 41:20 69:10
  125:6
arms 105:14
arose 23:19 62:19
arrived 147:24
  157:18
arrivers 138:24
arthur 3:7 7:8
articulate 31:7
articulated 29:8
  140:14
artificial 81:5
ascertainable 7:19
  7:24 8:6,12 15:11
  15:14 16:4,9 18:16

25:21,25 27:13 45:5
71:20 75:1,3 87:4
118:16
**aside**  21:20 94:3
113:16,16 127:18
**asked**  7:23 30:25
40:9,21 45:25 46:11
56:7 70:15 83:20
91:13 116:19
117:16 153:14
**asking**  10:20 57:10
67:12 83:22 118:15
**aspect**  27:22,22
49:20 61:18
**assert**  14:13 15:10
15:13 20:20 23:22
44:4 47:24 80:4
90:5 98:19 131:6
136:2 152:19 155:3
**assertable**  62:5
63:12,21 154:13
**asserted**  12:2 13:15
14:19,19 15:7 20:12
24:3 35:6 44:25
51:7,8,9 60:20
89:25 91:6 98:16
100:13 155:10
**asserting**  98:23
151:12
**assertion**  117:11
136:18
**assertions**  108:17
**assessment**  146:11
148:17
**asset**  26:10 40:8
48:2 58:9
**assets**  24:6 46:5
48:12 52:19,25 53:1
100:10 110:17
124:7,9,11 125:8,10
125:21 126:1,4,19
137:1,11,16,17,25
141:1,7 146:19,25
147:1,7 152:24
**assist**  31:16
**associated**  75:24
81:20 87:10

**assor**  3:25
**assume**  31:25 33:3
34:4,25 41:7 67:2,4
73:3,12 82:2,11
92:2,19 141:25
157:18,20
**assumed**  35:6 46:3
48:20 60:13 61:7,21
66:1,3,7 67:7
109:22 122:19
124:9 125:1,4,18,19
126:1,3
**assumes**  154:12
**assuming**  34:23
45:20,23 61:8,11
**assumption**  88:1
**attach**  26:6 81:17
100:6
**attached**  47:17
49:10 81:12
**attachment**  39:7
**attack**  44:20 114:12
154:1
**attempt**  50:12 52:5
**attempted**  21:1
**attendant**  75:24
76:7 87:9 103:13
**attention**  9:20
28:24 63:17 89:7
**attorney**  5:14 19:17
33:10,12 83:2
**attorneys**  3:3,11,19
4:1,8,18,25 5:7
**attracted**  32:11
**audacious**  135:17
**augment**  52:8
**august**  116:17
152:3,4
**authority**  89:13
**authorize**  21:20
**authorized**  20:18
48:18
**auto**  32:22,24 79:19
**automatically**  34:25
73:6
**automobile**  53:2,3

**available**  41:10
77:13 78:5 90:24
150:4
**avenue**  3:4,13 4:2
4:10 23:16
**avenues**  152:6
**avoid**  79:18 99:5
**avoidance**  141:23
141:24 142:2,24
143:1,8,22 144:6,7
**awarded**  137:16
**awarding**  132:18
**aware**  29:24 30:4
30:10,16 35:17 54:3
75:10 87:5 95:18
117:14 119:20,23
123:3 127:19 129:1
130:20 134:1,11
156:21
**awareness**  30:11

**b**

**b**  1:21 21:15 61:8
61:10 66:24 121:11
**b.r.**  129:3 136:22
**back**  19:7 24:25
25:4,11 36:10,21
41:7 45:4,6,7 46:10
58:19 62:21 63:25
68:5,7 71:5,25
72:23,24 75:7 78:21
79:8 81:2,20 82:1
83:20 84:12 92:8,14
92:19 93:16 100:1
104:16 107:4,14
110:9 114:1,3,14,14
116:5 118:18
121:21 122:23
123:21 139:3
141:15,17 144:22
**backdoor**  13:19
**backdrop**  14:6
**backed**  31:25
**bad**  31:13 75:12,24
88:13,13
**badly**  72:1 73:13
**bags**  93:13 103:15

**bailey**  113:25 114:8
**bailouts**  53:5
**baked**  109:1
**balance**  37:20 83:23
88:17
**balancing**  37:24
145:9
**ball**  10:24
**bankruptcies**
100:18
**bankruptcy**  1:1,13
1:23 11:15,25 16:10
20:23,24 22:15,15
22:20 26:10 30:11
30:14 37:20,22,23
40:7,8,10 42:19,21
43:5 54:10 57:6
58:4 73:1,7 74:24
75:4 77:4,6 79:14
79:14,16 87:16
92:21 99:14 100:8
105:10 106:17
107:17 111:2,6,13
112:4,4 117:12
119:1,6 120:10,25
127:21 135:8
137:21 140:21
141:19 144:12
**bar**  8:14,16,17 9:2
11:13 12:1,4,4,15
12:16 17:19 27:9
30:11,12,15 36:6
37:13 49:22 50:8,21
50:23 54:24 81:7,16
88:24,24 89:1,2
98:3 101:4 133:9,15
133:19 144:25
**barra**  88:12
**barred**  14:5 17:23
67:15,17,19,22
69:14,19 83:5
107:21 134:17
**barreled**  48:5
**barring**  117:23,25
**barron**  4:25
**bars**  82:23

**based** 10:11 12:8
43:10 46:12 62:19
66:1,21 67:5,21
69:13 72:5 88:11
105:8 115:21,23
116:13 118:5
124:14 148:11,19
150:13 154:17
155:23
**basic** 29:17 78:7
**basically** 20:19 84:6
109:21 113:12
114:3
**basis** 29:10 38:8
50:7
**bear** 74:20
**bears** 75:6
**becoming** 134:1
**befell** 91:17
**beg** 68:6 114:24
**beginning** 58:17
99:11 136:14
**behalf** 71:10 98:9
130:16,18 142:20
**belaboring** 113:20
**believe** 30:20 54:23
55:1 67:25 96:11
116:17 117:21,25
148:15
**believed** 134:21
**believes** 82:3
**bell** 3:25
**belong** 152:24
**beneficiaries** 90:25
91:18 131:10,15
136:7 138:10
141:23 142:16,25
143:6,10,15,19
145:10 146:1,3,20
150:10 152:25
156:20,21,23
**beneficiary** 91:16
**benefit** 46:9 54:4,12
82:8 93:5 143:11
144:3,4 153:1
**benefits** 59:1 62:15

**benjamin** 6:2
**bernstein** 13:1,8
**best** 8:11 11:17
27:17 48:2 58:5
102:6 116:6 152:9
**bet** 153:20,22
**better** 7:13 25:17
41:6 59:7 76:8
88:19,23 90:10
152:1 155:22
**beyond** 10:3 11:2
40:17 52:23 53:8
57:2,10 58:7,13,18
121:23 137:1
139:12 153:19
**bgi** 130:23 132:22
132:23 133:16
144:23
**bidding** 48:1
**big** 29:12 52:8
**billed** 38:20
**billion** 50:16,17,18
50:23 51:7,9,14
52:3 83:22,23 89:5
90:9,12,20 94:4,6,8
94:13,19 123:13,15
123:17 149:19,20
149:22,24,24
150:13,15,16,18,19
150:20
**billions** 52:12 59:21
131:8,16 146:13
149:9
**binding** 23:21
133:7 134:14
138:19
**bit** 72:19 107:16
146:22 151:7
153:20
**blauner** 5:22
**blow** 21:23
**blue** 113:22
**blur** 37:11
**board** 13:9 14:4
49:23 57:17 109:14
**body** 52:7 73:20

**bona** 18:5 20:3,5,6
22:11 54:12,20
**bond** 88:20 120:13
143:13
**books** 9:23 10:2
11:3 15:15 16:2
18:17 72:9,10 77:16
77:23 78:1 87:4
118:16 125:21
126:4,19
**borne** 64:7
**borrower** 108:14
**borrowing** 16:6
**bothered** 70:4
84:20
**bottom** 142:10
**bought** 14:1 20:9,13
95:24 96:3,6 97:7
98:5,6,13 143:18
144:3
**bound** 55:9 111:7
114:13
**bowling** 1:14
**box** 5:16 59:3 64:8
**brakes** 75:16 93:22
103:14
**brana** 5:24
**brand** 83:8 84:2
86:8
**breach** 66:14,18
98:24
**break** 10:21 46:4
**bridge** 74:6
**brief** 28:17 46:11
46:12 47:17,18 54:2
104:8,14 115:12,21
125:12 133:11
155:20
**briefing** 11:22
16:18 43:22 149:12
**briefly** 149:10
**briefs** 46:10 137:9
**bring** 45:4 81:3
139:11
**broad** 67:4
**broader** 33:3 40:16

**broadly** 124:1
**broke** 155:14
**bromberg** 4:24
**brooks** 11:16
**brought** 44:16
63:17
**brown** 3:18 5:23
71:9
**bryan** 5:1
**bryant** 4:19
**buchwald** 135:10
135:14
**bucket** 105:18,19
107:11 151:10
**buckets** 64:11
**bucks** 46:14
**budd** 4:25
**bug** 106:3,4
**bugging** 139:16
**building** 3:12
**built** 35:1 85:4 86:1
**bump** 94:6
**bunch** 127:12
**burden** 10:7 109:15
136:20
**burdensome** 107:24
**burman** 69:2
**burton** 12:20,21,22
13:4,6,6,12 109:17
**business** 9:19
**buy** 97:13,16 146:9
**buyer** 102:19
**buyer's** 102:15
**buying** 58:9 98:4
**byways** 88:8

| c |
| --- |

**c** 3:1 5:11 7:1 159:1
159:1
**cabined** 116:1
**calculated** 43:4
**california** 33:12
67:23 68:23
**calls** 64:1
**calpine** 136:18
155:24 156:2,6
**campbell** 33:9 55:3
55:22 58:1 135:9

candid 106:24
can't 84:16 97:18
  113:15 121:18
  155:21
captains 48:10
car 15:5 35:9 36:12
  36:18,20,22,24 42:6
  45:12 46:17,18 47:3
  60:3,18,23 61:4
  67:20 72:8,16 74:11
  76:17,20,22,23,23
  77:17,18,20,22 78:2
  79:23 80:1,3 82:7
  84:4 86:20 87:6
  93:1,3,23,23 95:9
  96:6,13,16,20 97:10
  97:10,16,17,23,24
  97:25 98:4,5,5,6
  99:18 100:17,18,19
  104:21,22 105:20
  107:8 108:7 119:16
  129:1,2
care 49:2,4 74:12
careful 10:3 11:2
  97:23
cars 13:24 14:1
  15:10 75:15 76:11
  76:12 84:6 85:16,17
  85:18,18,19,23,23
  86:15 87:21 88:3,7
  88:8,12 93:6,13,19
  95:24 96:3,11 97:7
  97:13 98:10,13
carve 84:3,8,9 92:1
carved 56:2
carving 34:17 52:19
case 1:3 7:12,24
  8:11,15,19 9:25
  10:19,22 11:10,13
  11:14,23,25 12:1,15
  12:20,21 13:6,11,21
  14:8,17 16:10,22
  17:17,17,19 19:14
  19:15,19,22 20:3,8
  20:8,19,22,23,24
  22:5,13,15,18 23:11
  23:19,24 24:15 25:1

25:12,16,17 26:8,9
  26:23 27:3,4 28:9
  28:20 31:17 32:1,2
  35:4,4,4 37:7,15,15
  38:1 39:5 40:6,16
  41:18,19,19,20 42:1
  42:7,10,11,19 43:2
  43:14,23 45:3 47:1
  47:6 48:23 50:16
  51:14 52:10,16 55:4
  56:1 57:18 58:1,10
  58:20 59:9,9,10
  70:17 72:6 79:18
  80:5,6,12,16,25
  81:4,8 87:9 91:2
  99:4,19 100:2,4
  101:24 103:2
  107:17,19,22
  108:11,11,25,25
  109:15,16,17,21,21
  110:14,15,16,16,17
  110:23,23,24,25
  111:13,16,17,17,21
  111:23 112:3
  113:14 114:1 115:5
  115:6,6,11 116:2,4
  116:5,6,12,16
  117:12 118:18,19
  118:20,24 119:7,14
  121:3 126:11,13,14
  127:2,18 129:2,3,5
  129:21 133:8
  134:14,18,23 135:9
  137:13 140:18,22
  149:2,6 155:23,24
  156:2,6
cases 7:25 8:2,16,16
  8:17,17 9:6 16:4,6
  16:17,19 18:5 28:16
  29:1 30:6,6,10 31:5
  43:11 53:12,21,24
  59:6 72:14,15 74:9
  79:14,16 80:3 81:25
  92:18 95:5 96:16
  99:10 103:8 107:15
  115:2 116:10
  118:17 129:1

135:25
cash 83:23 94:4
  143:10,12,21
castillo 35:3 36:24
  37:6
cat 80:21,23
catch 139:5
categorically 62:1
categories 98:22
categorize 109:19
categorized 72:22
category 12:13
  48:23 67:5 93:12
  95:24 97:7 98:15,19
  104:23 108:8
causation 10:12
cause 19:8,12 56:20
  139:9
causes 60:20,24
  86:23 94:1
causing 100:21
cautioned 59:10
  71:23
caveated 121:1
cel 118:19 119:7
center 5:15 32:22
  76:25
century 11:25
  108:12,13
cercla 23:19
certain 3:19 24:4
  53:6 68:22 78:7
  113:17 142:3
  156:18
certainly 35:5 49:4
  79:25 80:14 89:6
  108:6 116:8 119:17
  144:2 148:18 150:9
  153:24 155:14
certainty 58:4
certification 122:4
certified 159:3
cha 140:19
chain 47:4
chains 10:11
challenge 43:19

challenged 43:15,16
  102:12,15,18
chambers 158:1
chance 70:9 145:24
  155:2
chances 76:20
change 31:8 32:19
  66:6,9 80:9 107:13
  121:14
changed 31:11 41:3
  41:4 52:21
chapter 16:15 80:1
  80:18
character 21:14
  56:24
characterize 95:13
charged 11:18
  18:13 96:15
chase 139:8 140:6
  141:14 151:22
chateaugay 131:2
  132:10,13,15,16
  133:12 135:2,5
  136:4,16 137:8
  154:21
chateaugay's 134:8
  134:24
check 84:17
chemetron 8:14,14
  8:19 9:6,7,25
chemtron 107:16
  107:23 108:10
  115:5 118:2
chemtura 43:2,20
  53:17 116:22
  117:13,25 118:2
chicago 5:9
chief 135:4
choice 135:20
  139:17
chose 30:18 104:12
  104:17 134:9,20
  135:15
chosen 37:7 135:18
chrysler 13:15 14:5
  14:15 44:9 80:5
  109:24 119:14,21

120:2,5,7
**chubb** 56:9,14,15
57:13
**cioni** 5:24
**cir** 26:23
**circle** 62:21
**circuit** 8:13,19 9:2
16:24 17:4,14,14
18:9,12,15,22 19:3
19:9 20:22 37:18
38:3,4 56:8,14,18
57:7,8 72:15 110:4
110:9,24 114:18,20
118:25 119:20
120:7,12,16,22
130:22,22 131:2
132:23 133:7,21
134:14 135:1,4,11
139:7 145:19,22
146:8
**circuit's** 144:23
**circular** 154:16
**circulated** 40:20
**circumstance** 8:4
17:18 42:17 45:16
45:17 104:19
117:14 118:12
**circumstances**
33:23 42:3 49:4
55:3,10 63:18 80:3
101:6 104:3 107:2
113:17 118:6 145:3
**citation** 25:9
**cite** 21:13 53:25
111:24 127:2
130:23 136:22
**cited** 11:15,22
12:14 21:12 26:7,8
28:16 30:10 53:21
53:21 72:14 99:11
107:15 127:4 129:3
155:17
**cites** 54:3
**citing** 7:25
**city** 38:18 85:1,3
**civil** 83:3

**claim** 8:4,13,23 9:4
11:1,19,20 13:16,18
13:19,20,22 14:13
14:19,19,25 15:7,8
15:10,13 16:8 17:17
17:22 18:25 20:12
23:3,5,9,10,19,22
24:6 26:6,17 27:2,6
27:19,21 28:13
30:13 33:7,19 35:23
40:3 41:21 42:18
43:17 44:4 45:24
47:6,20 53:11,14,14
56:13 57:19 58:11
58:11 60:2,5 61:23
62:2,5 64:25 66:14
66:15 84:4 87:7
98:4 100:8 107:21
130:24 140:24,25
155:3
**claimant** 12:2,10,24
19:4 21:5 24:3,6,21
108:20 131:1
134:24
**claimant's** 11:20
**claimants** 14:12
33:23 34:10 37:21
37:22 44:10 47:3
55:8,8 76:2 119:15
119:17 144:24
**claimed** 33:5 92:7
**claims** 7:19 8:1,14
8:15,20 9:8,10,12
10:25 11:6,9 20:13
22:22 23:2 26:20,21
33:1,4 34:19,22,23
34:24 35:1,3,4,6,9
36:25 42:23 43:21
44:2,3,13,15,16,24
44:25 45:2 46:3,3
50:9,10,11,13,21,23
50:24 51:3,4,6,8,9,9
51:13,15,16,17,18
51:23 52:3,6,8,11
52:13,18 60:6,18,19
62:18 63:21 67:15
67:18,21,23 69:9,16

74:14 81:11,12
82:19,20,21,23
83:12 84:3 86:23
88:21 89:2,3,5,11
89:15,19,20,24 90:2
90:6,21 91:3,4,5,10
91:12,15,18,20
94:13,18,24 98:15
98:19,23 99:1 100:7
100:10,13 101:2
103:20 107:10
114:8 118:5,7,8
120:25 121:2,4,6
123:13,18,18
124:12,25 126:6,6
126:14 131:6,7,11
131:16,19,22,23,25
133:4,6,9,17,22,23
134:1,2,7,10,12,15
136:2,3,8,17 137:4
137:4,21,22 138:25
139:2 140:23
143:13,14,17 145:3
145:14 146:12,13
147:13,18 148:1,12
149:15,19,22,25
150:9,16,17,22,24
151:11 152:15,15
152:18,19 154:12
154:24
**clarified** 155:18
**clarify** 115:8,13,19
142:21 143:24
152:25
**clarifying** 114:4
152:23
**class** 35:2 98:11,12
101:8
**clause** 54:21 55:21
**clean** 55:19 118:3
**cleanly** 131:10
**cleans** 142:11
**clear** 20:13 24:2
43:24 44:2,23 46:2
56:10 59:19 67:1
95:21,22 97:14
100:10 104:10

110:18,22 111:12
111:22 113:16,18
113:21 120:24
124:12 128:6,10
134:23 135:11,15
142:19 144:2,13
155:23 156:17
**clearly** 25:16 26:14
27:3,11 29:19 40:2
58:7 60:22 61:3
62:6 67:6 79:20
85:6 118:4 145:22
150:1 151:10
152:11 156:7 157:9
**clerk** 7:2 70:13
130:11
**clever** 66:16
**client** 68:9 104:16
125:18
**clients** 87:18 102:10
108:6,7 128:3
**clients'** 123:7
**client's** 125:20
**close** 34:2,3
**closed** 19:22,23
20:2
**closely** 39:3
**closer** 81:3 155:25
**closet** 86:4
**closing** 61:12,24
62:3 63:6,23 115:22
115:23 116:4,11
121:20 122:2
**cobalt** 109:3,3,3
**code** 20:23 54:10
120:25 144:12
**cognizable** 86:23
**collaterally** 114:11
**colleagues** 7:9
70:17 126:24
**collected** 143:22
**collectively** 112:8
117:1
**colleen** 151:16
**collier** 5:25
**collision** 103:16

colloquy 87:13
come 7:7 9:19 10:1
11:10,10 14:12
31:20 68:9 76:9,23
84:1 98:2 102:5
114:23 116:4
118:18 123:8 146:2
150:7,7 157:18
comes 10:2 62:21
75:8 123:21 142:10
143:10
comfort 128:12
comfortable 41:14
48:9
coming 114:1
commence 14:10
commenced 12:16
40:2 126:9
comment 46:23
commentary 73:12
commenting 114:10
comments 51:19
72:25 77:17
commercial 84:1
97:22
commercially 35:12
82:12 83:6,18
committee 32:15,17
43:16 156:4
committees 78:9
common 150:14
community 48:9
139:13 142:6,8
companies 72:11
79:17 128:13
company 1:6 4:8
5:13 9:24 19:23
20:2 77:18,18 80:3
82:7 87:8 100:17,18
100:19 107:18
109:8 116:24 126:7
company's 127:20
compare 87:15
compared 34:10
87:23,24
compelling 52:15

competent 86:8,22
94:2
complain 48:22
complained 55:11
59:11 123:8,9,10
complaining 12:6
48:25 57:24
complaint 10:24
14:4,9 60:6,21
66:13 67:17,19 69:5
69:6,13 86:25 110:5
110:6,7,11
complaints 14:18
36:16 86:16 95:20
101:1 155:2
completely 10:8
81:5 113:14 136:7
143:14 156:25
compliance 65:14
comply 64:10 65:6
66:5 83:12,16 122:3
134:7
component 123:1
components 46:4
computer 43:8
concealment 61:1
concede 137:24
conceded 60:7,8
74:18
conceding 54:5 96:8
conceivably 11:1
concept 29:2 43:8
45:9
concepts 10:23 16:6
28:19 43:6 59:25
71:14
concern 83:2 84:17
127:25 138:6
concerned 85:16,18
85:19 107:11
concerns 155:13
concert 112:6
concession 74:23
96:1
conclude 67:9
concluded 158:10

concludes 78:8
concluding 16:1
conclusion 28:7
77:3 78:24 83:11
concrete 19:15
condition 49:14
68:12 92:16 97:2
conditions 48:19
93:20 103:12
conduct 45:18,18
45:20 55:7 62:18,20
64:2,2 67:3 69:8,11
69:14,14 72:21
74:22 98:24 129:7,8
146:11
conducted 75:11
conducting 75:12
confident 135:16
confined 138:20
confirmation
133:15 135:6
138:18 147:5
154:15,20
confirmed 41:22
44:11 62:12 120:8
confusion 95:20
115:18,20
congress 31:15
158:2
congressional 31:14
83:2 144:18
conjecture 34:9
connection 69:10
74:15 77:2 98:3
115:24 125:7
137:20
consequence 72:2
77:20 97:5
consequences 109:9
135:19
consider 9:1 28:4
28:15,16 99:14
116:3 122:25 152:5
consideration 52:4
60:24 135:4
considerations
79:11,14 119:4,9

considered 19:1
32:13 86:22 92:11
considering 76:10
considers 117:6,11
consist 131:10
consistent 59:6
120:25 148:24
consolidate 14:3
consolidated 14:9
60:6,21 66:12,13
67:16,19 69:5,6,13
86:16 95:19 155:2
conspiracy 18:8
constituency 89:2
constituency's
156:16
constitute 119:17
constituted 118:13
constitution 43:5
127:11
constitutional
121:3
construct 18:2 96:9
constructive 78:17
136:19
constructively
72:18
construe 96:16
consumer 33:1 61:1
66:17,18,21 67:21
consumers 32:23
consummated
130:25 131:5,9
consummation 21:3
21:3,6
contain 72:10
contained 96:7
contemplate 79:1
contemplated 55:11
57:12,20 61:13
62:14
contemplates
138:23
contemplating
76:10
contemplation 57:2
58:18 118:4

**contend** 74:8
**contending** 64:16
**contends** 48:24 74:8
**content** 40:15 103:5
 110:19,19
**contention** 82:22,23
 86:6 90:23 96:5
 105:21 109:5
**contents** 102:14
**contest** 79:5
**contested** 41:20
 68:19
**context** 7:24 9:2,8,9
 9:10 10:16 11:5,6,8
 18:1,6,17 19:9 20:7
 42:1 43:23 56:1
 75:4 79:16 80:2
 89:15 100:8 102:13
 102:16 117:13
 132:15
**contingent** 11:19
 12:17 39:23 44:13
 44:15,15,17,24 50:5
**continuation** 62:9
**continue** 76:19
 146:7
**continued** 88:7
 146:5
**continuity** 26:18
**contract** 18:17
 64:14,15 65:2,3
 66:6 78:23,25 79:3
 96:23,24 97:5
 109:21
**contracted** 97:2
**contractual** 8:1
**contrary** 28:6 133:5
 135:23
**contrast** 35:5
**contrasted** 124:22
**controls** 113:21
**controversy** 43:12
 152:11
**controverted** 14:7
**convince** 93:7
**convincing** 94:22

**conway** 26:23
**cook** 110:23
**cool** 35:4 36:24
**copied** 69:5
**corp** 1:7
**corporate** 16:7
**correct** 7:4 9:14
 17:21 21:25 22:19
 24:13 25:13 28:8
 29:14,16 38:15
 39:12 49:12 51:1
 55:1 68:4 69:22,24
 70:5 71:6 73:11
 86:4 91:9 116:9
 124:23 130:2,4
 141:16,20 142:1,9
 151:5
**correctly** 74:2
 94:16 123:15
**cost** 38:9,9,10,10,12
 38:14 44:6 46:15
 53:16 76:18 84:24
 85:12,25
**costs** 75:24 137:23
**couldn't** 82:16 90:4
 108:10 118:6
**counsel** 5:14 28:25
 54:2 71:9 86:17
 93:16,17,18 94:2,25
 135:15 154:3
**count** 79:25 115:21
 116:13
**counterintuitive**
 57:6
**counterpart** 65:18
**country** 53:7 88:8
 159:21
**counts** 116:9
**county** 22:2
**couple** 29:15 73:18
 76:13 81:22 115:7
 124:13
**course** 9:19 14:23
 48:8 52:10 74:10
 96:5 127:21 131:4
**court** 1:1,13 7:3,7
 8:5 9:5,11,15 10:4

11:4,9,15,25 12:10
12:22 14:10,14,22
15:3 16:24 17:3,5,9
17:14 18:10,23 19:1
19:19,20,25 20:4,14
20:19 21:2,7,11,22
22:1,9,15,18,23
23:17 24:4,8,11,17
25:3,11 26:24 28:1
29:5 31:10 33:22
34:1,9 36:8,18 37:1
37:4,10,20,24 38:1
38:4,13,16,19 39:2
39:11,13,17,20
40:25 41:5,10,16,22
42:3,8,16 43:13,13
44:19 46:9 47:1,6
47:10,13 48:4 49:9
50:17,19,22 51:2,6
51:11 53:23 54:7
56:8,11,13,22 57:5
58:20 62:8,21 63:7
63:10,14,16,24
64:14,16 65:2,5,9
65:12,14,17,20,23
68:2,6,10 69:3,20
69:23 70:3,9,14,23
71:5,7,11 73:23
74:1 76:1 80:13,15
81:21 84:8 85:5
86:3,8,21 89:4,9,11
89:19 98:2 99:14
100:13 101:10,18
102:5 104:10,25
105:4,6,13 106:1,6
106:17,18 107:5,23
108:2,13,22 109:11
109:22 110:1,9,17
110:18 111:1,17,18
111:20,22,24 112:2
112:15,16,16,25
113:6,25 114:2,6,11
114:22 115:14,17
120:5,10,13 122:7
122:11,13 123:8
124:21 125:11,14
127:5 128:18,21,24

129:12,15,20 130:1
130:5,7,12 132:1,6
132:9,13,20,24
134:19 135:6,8
138:2,5,9 139:16,19
139:21 140:2,6,9,10
140:24 141:10,13
141:17 142:17
143:25 144:8,14,17
144:20 145:5,25
146:15,18 147:8,11
147:17,23 151:2,14
151:16,21,24 152:1
152:8,12,22 153:5
154:9 155:19,25
156:7,12,14 157:4
157:10,12,24 158:6
**court's** 40:7 71:2
**courtesy** 157:22
**courtroom** 48:16
**courts** 8:2 10:10
 40:22 67:11 111:2
 117:12
**court's** 133:22
**covenant** 22:3,7,9
 22:10 31:24 65:6
 66:2
**cover** 19:18 21:23
 24:11 81:13 114:7
 115:1
**coverage** 29:25
**covered** 56:11,13
 64:8 115:1,5
**covering** 24:19
**crash** 75:17
**crazy** 43:23
**create** 10:7 66:22
 132:5
**created** 31:14 52:14
 153:21
**creditor** 8:7,8,23
 9:18,20,21 12:3,11
 12:13,17,19 13:3,3
 15:18,22 19:16
 20:25 22:4 23:16,17
 23:21 34:7 48:9
 52:7 57:22 77:21,21

90:10 98:8,9 104:24
108:21 139:13
141:15 142:6
**creditors** 12:25
22:20 23:24 29:22
32:15,16,17 34:12
34:12,13,13 37:22
39:23 40:1,4,19
43:16 44:13 48:13
71:17 73:1,8 74:10
74:24,25 75:1 76:5
77:6 81:9 87:3
88:20 89:17 97:21
99:15,17 100:11,14
108:9 109:18,19
118:14 128:13
131:11 134:3 142:4
143:1,3,13,23 156:3
**creditors'** 154:15
**criminal** 83:3
**critical** 17:14 18:23
34:5 77:12 78:4,12
**crutcher** 4:7 142:20
**crystal** 10:24 97:14
**culpable** 124:2
**current** 94:18
100:21
**currently** 131:12
137:15 141:2,5
147:4
**customer** 12:13
101:1
**customers** 33:18
82:9

**d**

**d** 7:1
**d.feder** 6:2
**dallas** 5:2
**damage** 27:22
36:11 75:20
**damaged** 86:8
**damages** 28:10,13
69:13 76:7 80:10,10
87:8,9 89:12,12
90:5 107:10
**danger** 10:14

**dangerous** 84:18
87:10 97:1
**dangers** 10:5
**daniel** 6:7
**danny** 4:22
**database** 77:25,25
100:24,25 103:24
105:11
**databases** 125:22
125:22 126:20
**date** 8:14,16,17 9:2
11:13 12:1,4,4,15
12:16 17:19 27:9
30:12,12,15 50:8,21
50:23 54:24 61:24
62:3 63:6,23 64:4
81:7,17 88:24 98:3
98:5,6,7 101:4
131:12 133:15,19
144:25 148:6 151:1
151:6 152:23
159:25
**dates** 92:8
**david** 6:5,10
**davidson** 3:8 116:9
**day** 39:5 51:20
121:1 126:2 138:11
157:12
**days** 106:2
**dc** 72:15
**de** 44:4 49:18
**dead** 87:19
**deadline** 30:13
**deal** 17:18 27:13
49:14 50:12 54:21
57:13 58:21 61:2
86:7 155:11
**dealing** 18:19 26:25
27:11 57:15
**dealt** 20:5 21:2,12
26:24 27:10 31:22
49:7 55:25 57:4
61:19 80:11 109:7
**death** 36:11 82:19
83:14,15 88:4 94:1
**deaths** 100:22

**debatable** 47:7
49:24
**debate** 49:15,24
**deborah** 130:15
**debtor** 8:22 9:20
11:18,21 12:5 16:11
18:7,12 20:10,10,20
22:21 23:1,22 26:11
47:2 80:6 107:24
108:3,23 109:8
110:2,3 118:3
128:14 132:18
154:2
**debtor's** 10:2,10
11:3
**debtors** 1:9 10:7,10
10:23 48:10 156:4
**december** 90:12
**decide** 25:20,22
**decided** 18:25 35:24
46:25 118:20 143:3
149:1
**decides** 60:10
**deciding** 37:25
**decision** 8:13 12:14
12:23 17:6,12 23:7
26:15 33:22 44:11
52:24 68:8,17 104:7
111:2 119:14,21,22
119:25 120:1,2,3,4
120:5,6,7,9,11
130:23 131:3
132:22,23 133:17
134:15 135:4 136:1
136:5 139:7 140:20
148:15
**decisions** 11:16
37:11 47:10
**deemed** 20:3 96:17
96:18,19
**deeply** 24:19
**defaultive** 64:20
**defeat** 131:19
**defect** 8:25 28:22
31:21 44:18 46:18
64:22 72:13 75:22
76:19 77:13,19,20

77:23 78:18 80:7
81:14 84:4,5,21
85:20,20 86:16 87:2
88:3,9 92:12,25
93:4,25 94:6 96:13
96:17,20,21 99:15
101:23,25 103:11
103:13,22,23 104:5
104:21 105:25
107:8 108:8 109:1,4
109:14 110:15
117:4,10
**defective** 76:17 87:7
92:23 93:9,19
104:22 105:20
**defects** 33:2 45:11
86:19 104:1 117:7
123:4
**defend** 20:11
**defendant** 106:9
**defendants** 131:12
137:18 141:4,22
**defense** 20:11,14,20
142:12 155:11
**defenses** 20:16
110:18,22
**define** 124:16
**defined** 46:8 61:14
121:17
**definition** 61:6
65:25 88:8 121:15
121:20 125:1,4,9,10
125:19
**delaware** 11:25
**delay** 53:16
**delayed** 44:6
**deliberately** 135:15
**delve** 21:8 55:12
**demand** 78:10
147:6
**demanded** 152:16
**demonstrate** 72:4
80:6 87:1 95:5
**demonstrates** 79:20
**denying** 133:17
**department** 126:17

**departures** 119:11
**depend** 15:19
**deploy** 75:17 76:21
93:14
**deployment** 77:14
**depression** 53:7
**derivative** 60:17
64:25
**described** 46:6
117:9
**deserve** 95:16
**design** 44:18 45:11
64:22
**designate** 68:21
**designated** 54:2
71:9 111:8
**designed** 64:22 92:9
**desk** 106:15
**destructs** 120:12
**detailed** 99:6
**determination** 91:9
**determine** 10:25
24:5 35:20 52:9
68:16 77:22 88:10
**determined** 12:18
15:23 19:17 23:17
26:17 35:8 52:9
68:1 84:13 113:6
**determines** 77:19
**determining** 16:8
**detroit** 5:17
**develop** 110:10
**development** 22:3,9
141:6
**dex** 35:4 36:24
**dhl** 18:24 110:4,7
110:11
**dialogue** 90:17
**dice** 17:5 18:9 147:8
**dicing** 28:14
**dictating** 55:5
**didn't** 91:7,18,19
92:1,9,22 93:14
98:10 100:23 101:4
101:5 106:5,10
107:12,21 108:10
108:20 109:23

112:23 113:3
118:18 121:12
132:11 139:7 144:6
145:1,2 155:17
**die** 76:22
**difference** 8:11
29:11,13 30:2 31:6
31:8 55:15 109:2
**different** 8:16 12:21
13:7 15:25,25 27:17
31:1,2,17 53:24
56:1 58:2,3 62:9,23
62:24 63:14 74:19
81:23 94:23 100:16
102:10 103:1
104:11 105:18,19
106:9 108:11,18,25
109:15 116:23,24
118:20 122:15
128:5 138:24
142:15,22,23
143:14
**differently** 91:22
**difficult** 18:18
100:1 120:15
**digiorgio** 96:22
**diligence** 8:20 134:8
134:24
**diligent** 77:10
**diligently** 131:21
**diluted** 90:24
**dilution** 90:25
91:18
**diminution** 35:9
**dip** 143:2
**diplomatic** 56:22
**direct** 7:21 12:3
22:4 29:20,24 36:2
36:6 37:16 40:1,18
41:23 42:15,25
57:23 58:11 84:25
98:23 100:13 108:5
108:20 114:8
**directed** 120:14
**directing** 132:9
**directly** 35:22 73:19
75:6 104:18

**dirty** 97:24
**disagree** 90:1
118:23 119:3,8
120:18 129:19
**disallowed** 147:14
**discharge** 17:16,19
107:19,20
**disclose** 13:16 78:19
92:12 100:19 101:5
101:5 103:18
**disclosed** 28:22
45:21 75:22 81:16
103:12,19,21,25
104:2,3,5
**discloses** 92:13
**disclosure** 50:15
101:22 102:14,25
109:24 117:18
**disclosures** 136:14
148:11 155:22
**discovered** 9:18
23:20
**discovery** 99:6
105:22,23 106:2,2
106:22
**discretion** 37:24
**discuss** 11:23 16:18
42:11 70:19 76:8
104:8 109:17 115:2
118:18
**discussed** 25:16
**discussion** 16:16
17:11 28:3 91:24
95:12 109:20
119:16
**disengagement**
103:15
**disgorge** 137:19
140:20 142:14
**disingenuous** 81:5
**disjointed** 101:18
101:19
**dismiss** 110:6
**dismissed** 59:23
**dispensation**
111:12

**disposal** 78:14,15
121:2
**disposed** 126:23
**dispositive** 14:7
**dispute** 85:8 131:4
134:12 157:7,8
**disputed** 91:3,4
107:1 129:9,22,25
131:11 137:4,21
**distinction** 8:5 14:2
28:2 29:7,12 30:9
59:18 63:16
**distinctions** 115:4
**distinguish** 16:18
**distinguishable**
53:22 113:14
**distinguished** 13:6
13:21
**distributed** 139:13
141:9 142:3 151:9
**distributing** 155:6
**distribution** 37:7
42:24 90:11,18,19
91:20 145:6 153:11
153:13 155:6
**distributions** 81:9
83:24 91:14 133:5
134:1,11 136:2
137:5,20,22 139:2
140:21 145:2,23
146:3,10 148:18,21
148:21 152:17,20
152:21
**district** 1:2 11:14
11:16 17:3 18:10
19:1 26:9 40:7,10
110:1,9 133:21
139:10
**disturbing** 102:25
**diverted** 137:25
**divested** 33:18
**dividends** 150:24
151:2,4,5,8
**divorce** 49:1
**dna** 109:1
**docket** 14:23 39:5
116:18

doctrine 134:17
135:24,25
doctrines 154:19
documents 10:3
77:12,13 78:5
doesn't 25:17 92:17
97:9,20 100:10
121:14 123:15
127:7,8 129:16
144:14,17
dog 97:25
doing 10:14 17:24
59:2 83:18 84:24
100:15 116:25
dollar 123:13,15
150:19
dollars 52:13 83:23
86:2 89:5 90:9,12
90:20,21 94:4,6,17
114:17 123:17
131:8,16 141:1,3,18
141:19 146:13
149:9,19,21 150:13
150:15 151:8,9
153:12 155:6
domain 24:3,4,5
domestic 53:2,3
don't 84:11,13,19
84:23 85:7,15 89:11
89:12 90:1 92:20
93:6,22 94:10,17,25
95:16 96:23,24
97:24,24 98:8 99:3
106:3,18 116:3,18
120:11,18 123:24
124:17 128:15
129:8,10 139:1,2
148:2,9,22 150:6
153:7,14,19 154:2
155:10,10 156:18
158:3
double 48:5
doubt 119:1 123:7
146:6
dpwn 16:22 17:16
19:13 110:1 115:6

dramatic 79:19
dramatically
153:23
draw 14:2
drawing 35:11
59:18
drew 82:10
drexel's 77:16
drive 76:20 93:23
drivers 102:21
drives 103:5
driving 15:9 76:22
76:24,24 87:20
drop 151:10
drove 93:12
due 8:22 12:23,24
17:21 18:24 21:9
25:21 26:2 27:24
28:7 29:4,7,10
30:20 32:8 35:20
44:10 55:2,5 71:17
73:1,6,8 74:9,23,24
75:4 77:4 78:12
79:1,3,6 92:16 95:2
96:25 97:4,13,19
99:19,20 103:6
109:16,17,23 111:6
111:13,14 114:15
119:11 123:1 127:3
127:7,8,8,9,19,21
128:1,6,9,10 133:13
133:19,24 134:7
dunn 4:7 142:20
dup 28:2
duties 98:25
duty 8:22 53:13
74:7
dynamics 22:14
103:1

e

e 1:21,21,22 3:1,1
7:1,1 44:12 159:1
earlier 89:14
125:23 126:12
early 11:10 70:6,6
easement 20:25
21:2,5

easier 8:17 111:25
easily 47:5
easy 18:15
ebba 6:4
ecf 39:5
economic 7:18,20
13:15,22 14:18
26:20 34:22 35:1,3
35:6,9 36:12 44:14
67:18 75:21 87:15
87:16 88:18,19
91:17 95:15 107:10
ecro 1:25
edward 3:23 6:16
71:9
edwards 20:4,4
116:1,6,12,15 119:3
119:8 129:5
effect 25:22 31:8
56:3 57:2 58:22
63:11 71:12 114:15
effective 93:15,18
94:25 104:13 124:8
131:12
effectively 74:18
80:24
effectual 10:9
effectuating 78:23
effort 91:4 95:12
110:22
efforts 10:2 11:2
eight 14:24 87:21
115:15
eighth 3:13
eiseman 3:25
either 35:22 49:16
86:5 87:18 100:12
113:8 122:19 123:4
128:16 143:2,11,16
147:14
elective 55:23
element 27:19
30:19,20 31:3,19
32:3 35:14,22 51:25
55:24 58:25
elements 72:21
73:16 81:24

ellis 5:6 6:1
elnaz 6:18
embark 100:2
emerging 132:19
emoral 26:8
emphasize 98:15
135:10
employ 10:24
employee 143:14
employees 16:11
45:19 62:14 82:9
88:14,21
empted 129:4
enable 74:6
encompassed 117:6
encompasses
125:20
encourage 116:8
encumbrance 21:4
encumbrances
124:12
ended 9:17
enforce 2:1 13:14
24:20 67:14 68:18
68:21 87:25 96:2
100:14 101:8
115:24 116:1,14,16
129:6 136:13
engaged 74:3
engineered 96:22
english 130:2
enhance 83:8 84:2
enjoin 56:19
enjoined 58:10
enormous 147:19
enrichment 60:25
enron 12:14 109:6,7
enron's 12:18
entails 127:11
enter 68:17
entered 13:14 21:7
30:15 39:4,24 40:16
68:16 79:4,5 84:15
100:9 113:23 114:4
119:22 128:4
entering 55:16

[entire - factors]                                                                 Page 13

**entire**  56:16 59:4
  91:24 142:7,7
  156:19
**entirely**  148:24
**entitled**  7:20 11:1
  22:4 44:14 75:22,23
  93:9 95:3 101:7
  104:23 108:5
  123:19 128:13
  146:8 149:3
**entitlement**  75:19
**entity**  8:23 32:23
  54:15 132:19
**equal**  52:3
**equally**  147:20
  148:1
**equates**  94:15
**equation**  72:4
**equitable**  59:14
  130:17,21 131:1,20
  133:8 134:17
  135:24 136:3
  138:25 149:1
  151:19 152:10
  154:11,14,17,23
**equitably**  59:23
  133:22 135:17
  145:3
**equities**  88:17 145:9
**equity**  101:7 102:13
  102:15 147:5,12
**equivalent**  28:11
  54:24 74:23
**era**  56:12
**escape**  121:19
**especially**  51:23
  66:23 89:8 134:8
  147:17 149:6
**esq**  3:7,8,16,23 4:5
  4:13,14,15 5:4,11
**essence**  36:6 95:23
**essential**  123:1
**essentially**  18:7
  24:7 33:20 54:4
  67:20
**esserman**  4:24 5:4
  33:13 60:20 64:1

**esserman's**  128:3
**establish**  144:18
**established**  29:18
  40:8 72:5 89:13
  107:4 131:2 150:5
**establishing**  30:20
  136:21
**estate**  26:10 42:21
  89:25 126:7 154:14
  155:4
**estate's**  48:12
**estates**  10:10 37:23
**estimate**  94:18
**estimated**  147:4
**estimation**  148:19
**estopped**  37:9
**et**  1:6,7
**etcetera**  49:19,19
**event**  61:2 103:15
  137:19 142:13
**events**  15:19,25
  69:7
**eventual**  90:4
**eventuality**  67:5
**eventually**  33:19
**everybody**  7:3 27:4
  43:18 46:17 58:23
  104:23 112:24
**evidence**  50:4
  104:11 112:13
  137:5
**evidenced**  60:19
**eviscerated**  136:8
  156:25
**ex**  118:19 119:7
**exact**  82:19 113:11
**exactly**  32:12
**examination**  10:3
  11:2
**examiner**  12:7
**example**  11:12 60:4
  76:16 88:20 111:5
  126:11 135:2
**exceeded**  94:24

**excel**  19:15
**exception**  26:19
  27:1 33:21 71:24
  111:6 141:21
**excuse**  39:17 62:24
  65:17 85:11 142:7
  148:8
**exempt**  59:5 128:3
**exempted**  56:14
**exercise**  92:17,19
  99:7
**exhibit**  39:8 50:6
**exhibited**  53:7
**exist**  10:25 43:22
  81:18
**existed**  22:9 58:12
**existence**  11:19
  12:12 101:24
  103:11
**existing**  37:22 48:9
  150:10 155:23
**exists**  19:8 43:21
  96:14,14
**expanding**  34:16
  131:15
**expectation**  95:14
  145:10
**expectations**  154:15
**expecting**  146:4
**expend**  150:1
**experiences**  91:3
**expertise**  78:14
**expired**  154:22
**explicit**  18:24 57:15
  57:16
**exposure**  97:2,5
  118:5
**express**  11:20
  125:19
**expressed**  26:7
  33:16
**expression**  44:21
**expressly**  55:11
  62:13 69:9,14 111:1
**expunges**  11:9
**extended**  8:21
  92:10

**extensively**  53:23
**extent**  69:12 89:5
  95:21 96:6 119:3,9
  121:23 122:22,25
  125:17 126:7 139:3
  147:3
**external**  109:7,9
**extinguish**  21:1,4,8
  26:6 51:18 111:3
**extinguished**  20:16
  26:4 53:15 112:22
**extinguishment**
  17:18 30:13
**extra**  89:5 147:21
**extremely**  22:16

---
**f**
---

**f**  1:7,21 6:8 20:21
  26:5 159:1
**f.2d**  26:23 37:19
  38:3
**f3d**  130:23
**face**  12:23 78:10
  91:8
**faced**  102:25 135:19
**fact**  10:16 17:2,24
  26:16 29:21 32:10
  35:14,15 37:5 43:19
  49:2 50:1 52:15
  59:2,3 60:10,18
  66:11 72:5,7 73:9
  74:22 83:10 85:3
  96:25 97:12 99:7
  104:21 106:24
  108:1 115:11 118:2
  118:11,12 120:12
  121:2,15 126:5
  127:7,13,15 153:11
  156:5,15,20
**facto**  44:4 49:19
**factor**  15:2,4,13
  132:17 133:8,12
  134:8,24 136:4,6,10
**factors**  15:17 58:19
  131:2,20 132:8,17
  132:21 133:1 137:8
  154:21

**factors'** 111:16,19

**facts** 14:7,17 72:6
74:6 80:2,5,6 85:7
90:8 101:6 105:14
106:25 107:1
108:19 118:20
129:9,17 142:2

**factual** 74:5 102:25
104:18 110:10
115:4 120:18

**failed** 47:4 77:11
78:4,7,10 88:10
92:4,5,12 93:13
100:19 133:25
134:3 136:5

**fails** 135:2

**failure** 9:8,9 13:16
28:7 66:8,17 81:13
86:7 133:1,1 138:9
138:12,13,13
153:10

**failures** 69:10

**fair** 88:23 138:21
152:9 153:5 154:9

**fairly** 126:20

**fairness** 43:6 147:4
152:5,7

**faith** 18:2,4 54:2,5,7
54:16,18 102:19
118:21,25 119:5,8,9

**fall** 98:16 108:8,19

**falling** 93:12

**falls** 24:24 136:15

**false** 61:1

**familiar** 24:15
142:1

**family** 105:15,18,19
105:22

**far** 43:22 58:19
70:24 120:24
136:15 137:1

**fashion** 11:17 55:10
59:15 79:17 132:1
146:19

**fashioned** 59:17
137:10

**fast** 96:8

**fatalities** 78:11

**fault** 63:10

**faulty** 77:22

**favorite** 111:16

**feature** 52:3 149:11
149:13,14,17 150:8
150:12

**february** 1:18 47:15
146:6 159:25

**federal** 26:13 64:10
65:7,14 66:5 77:18
77:24 78:16 88:11
95:9 96:15 97:3
102:23 112:16

**federally** 72:9,10
87:4 129:4

**fee** 85:2

**fees** 23:14

**feinberg** 82:13,14
82:18,24,25 83:13
83:16

**feld** 4:17

**feldman** 6:3

**fell** 125:1

**felt** 31:16 106:23

**ferc** 12:15

**fernwood** 59:9

**fiction** 88:6

**fide** 18:5 20:3,5,6
22:11 54:12,20

**fiduciary** 32:15,16

**fight** 32:21 49:11

**figure** 18:15 19:7
23:10 52:6

**figures** 85:15

**file** 9:3 12:2 14:10
68:22 98:4 108:15
108:18,22 133:17

**filed** 10:25 19:10
32:17,22 33:13
37:14 38:22 39:4,21
42:18,23 47:5 50:9
50:14,16,21 51:4,4
51:16 68:23 106:16
115:23,25 116:8,14
116:15,17 129:20

**filing** 147:13 154:24

**files** 77:12 78:5

**filing** 30:11 80:18
98:5,7,7

**filings** 39:1

**final** 59:12 126:24
127:23

**finality** 58:5

**finally** 60:2 65:6
90:15,15 98:12

**find** 43:19 79:16
92:15 107:25
108:10,13 117:13
118:6 128:2,8
132:21

**finding** 24:18 29:10
32:5,18 33:6,12
34:6,11 54:7

**finds** 128:1

**fine** 23:18

**fingers** 82:16

**finish** 65:24 130:3

**finished** 70:7

**finite** 145:11,13
146:14

**fired** 88:15

**firestorm** 83:8

**first** 16:22 24:12
32:14 39:5 63:2
71:11 80:23 92:9
100:17 106:1 115:9
120:16 137:14
144:9 147:25

**fits** 64:11

**five** 15:6,10 16:19
48:18 49:6 59:20
69:4 88:5

**fix** 51:17

**fixed** 35:5

**fixing** 110:12

**flag** 95:15

**flawed** 24:19

**flaxer** 4:5

**flex** 94:12,17,23

**flooded** 89:2,4

**floodgates** 83:11

**floor** 77:17

**flout** 135:22

**flowed** 73:8

**fly** 93:2

**focus** 19:4 47:22
71:14 74:17

**focused** 50:1 86:14
86:14 89:23 91:21

**focuses** 9:25

**focusing** 28:1 29:11

**foist** 43:9

**folger** 20:8,8 110:15
110:16

**folks** 118:4,13
124:19 130:1
157:12

**followed** 111:1

**following** 77:9
119:2 125:5

**follows** 34:25
110:24 119:5

**footnote** 26:15
104:8 116:16
118:24 135:10

**force** 10:10 83:25
84:9,12

**foregoing** 159:3

**foremost** 100:17

**foreseeability** 87:6

**foreseeable** 8:6,7,10
8:12 10:6,6 15:12
16:3 45:5 71:20

**forget** 88:5 105:11

**forgive** 36:9 37:10
89:9 140:2 141:10
145:5 156:12

**forgot** 63:3 82:19

**form** 37:13 42:25
43:3 53:23 94:8,9
153:15

**formal** 12:15

**forth** 25:4,11 26:14
39:18 40:13 61:1
67:12 120:10,19

**forward** 14:13 84:2
107:20 126:3 156:1

**found**  19:22 22:9
40:5 57:11 117:1
118:21
**foundational**  51:25
55:24
**foundations**  35:1
**four**  26:4,15 35:13
38:8,9 67:20 112:5
112:6,10 114:17
132:3
**fourth**  37:18 38:3,4
**fraction**  150:17,22
**framed**  122:17
**frankly**  71:15 87:14
**fraudulent**  60:25
**free**  20:13 24:2,6
43:24 44:2,23 46:2
59:19,24 76:4
100:10 110:17,22
111:21 113:15,17
120:24 124:11
**freely**  148:4,6
**fresh**  45:22
**front**  39:22 76:8
81:21 83:25 84:9
**fruit**  139:19
**frustrate**  135:23
**fuentes**  92:18
**fulfills**  127:20
**full**  62:21 88:5
89:20
**fumbled**  142:11
**function**  72:17
**functionally**  55:18
**functioning**  82:8
**fund**  23:1,4,6,10,12
137:18 149:15
150:4,9
**fundamental**  16:14
17:20 51:24 58:25
85:6 152:4,7
**funded**  150:24
**funding**  158:3
**funds**  147:12
149:13,18 150:6
**furman**  68:3,13
76:9 86:21,21,23

**further**  16:20 52:14
60:19 117:20
119:10
**future**  12:25 13:2
34:13 44:10 55:8
67:6 79:24 84:5
97:16 100:21
109:18,19 119:15
119:17 120:25
121:1,5 134:17
152:17

## g

**g**  7:1
**gap**  61:16 74:6
**garbage**  43:8,8
44:20,20
**garden**  38:18 85:1,3
**gebisa**  6:4
**general**  1:7 3:3 5:7
5:13,14 33:12,14,24
40:23 52:5 59:17
71:2 81:9 83:3 88:9
106:23 108:17
109:5 123:12,18
134:3 142:3,5,25
143:2,12,23
**generally**  10:4 11:3
40:14 80:4,17
**generals**  33:11
**generate**  87:22
**generation**  79:23
**generations**  79:24
**generic**  101:23
102:1,4 103:6
108:16
**gerber**  1:22 84:9
**gerling**  11:13
**germane**  16:8
**getting**  45:22 52:7
149:21,24
**ghosts**  86:4
**gibson**  4:7 142:20
**give**  18:24 26:11
30:11 48:13 58:4,22
59:1 60:17 65:24
67:10 70:9 75:2,5
76:23 81:13 84:3,7

84:9,20 85:25 93:11
97:15,19 108:15
110:20 117:8
135:21 138:13,14
139:1,2 141:14,18
**given**  10:19 19:6
31:5 40:19 53:23,25
59:8 71:16 85:15
87:7 93:8 94:8,9,11
101:22 105:24
110:3 114:12
115:11,17 127:16
133:12,14 134:9
138:17 139:3
140:14,19 143:6
147:18 148:19
150:4 154:2 155:1
**gives**  58:8 128:11
**giving**  48:11,11
86:23 103:7 127:19
**glaring**  132:25
**gleeson**  16:25 17:2
**gleeson's**  17:6,12
**glenn's**  133:17
**glove**  59:3 64:8
**gm**  7:13,16,17
14:11,20 15:15
16:10 27:8,8,9,9,10
27:11 31:13,16 33:2
33:3,7,15 34:2 36:1
36:3,5,10,23 37:8
38:21 39:25 40:3
41:20,22,22,24 42:4
42:6,21,23 43:24
44:16 45:14,18,18
45:20,20 48:24
50:14,21,24 52:12
54:1,6 55:4,6,10
59:2 60:2,4,8,9,11
60:12,13,14,16,17
60:21,22,23 61:3,17
61:18,21 62:1,4,6
62:12,14,14,17,18
62:19 63:2,4,8,11
63:13,21 64:3,4,10
64:12,13,20,25 66:6
66:6,8,20,21,23,24

67:2,2,4,18,21 69:9
69:11,16,17,18,21
69:21,25,25 72:1,7
72:8,16 73:13 74:2
75:8 76:4,23 77:3,9
77:21 78:7,15,16,17
78:17 80:6,18 82:11
82:17,24 83:10,22
84:14,15 85:10,11
85:16,17,22 86:8
87:5,24,24,25 88:1
88:5,10,14,18,25
89:14 90:3 92:3,11
94:3 95:10,10,18,25
95:25 96:2,4,4,6,7
96:10,12,14,17,19
96:23 97:8,9,15
98:4,5,10,13,19,23
100:5,5,13,22,24
101:6 103:22,25
104:12,15 105:1,3
105:10,21,22,23
107:2,4,12 110:14
115:23,25 116:14
116:15,25,25 117:6
117:10 122:1,20,21
124:2,18 126:1,10
126:16,18 127:2
128:8 129:7,8 137:8
146:18 149:14,17
150:14,25 151:1,19
152:13,15 153:24
154:4,13 155:4
157:3
**gm's**  23:24 55:7
59:20 69:8,14 72:21
77:12 78:5 81:13
**gms**  69:18
**gm's**  82:22,23 84:1
87:16 97:9 104:20
124:21,22,24
125:21
**go**  19:7 23:10 25:5
27:3,5,5 29:5 45:14
48:18 65:5,17 69:3
71:23 76:11 79:9
81:18 83:20 84:8

92:19 94:18 106:8
107:5,14 119:1
123:18 126:10,15
128:24 129:15
130:8 137:1 138:3
142:17 143:23
144:22 145:25
149:22 151:24
153:25
**goal** 10:8
**godfry** 5:11
**goes** 9:3,16 10:4
54:14 78:6 121:21
121:23 122:6
124:15 141:22
142:14
**going** 11:11 14:24
15:3 17:1 18:1
22:14 31:4,9,22
34:25 35:8 38:25
46:10 48:14 49:16
49:16,18,19 58:24
61:18 65:21,23 67:9
70:9 73:4,14 76:13
76:14 78:21 79:9
81:23 82:16 84:25
85:1 86:9 89:6
93:10 96:11 97:4,16
99:2,14 100:17
101:15 102:8 113:4
113:8,9,10,11,12
120:23 122:25
124:13 128:12
130:8 138:16
139:24 141:18
145:24 146:15
147:21 148:17,17
151:10,11 153:20
153:22 155:10
157:13,25,25
**golden** 152:3
156:14
**goldin** 4:22
**golenbock** 3:25
**gonzales** 44:8
**gonzalez** 120:23

**gonzalez's** 119:14
120:9
**good** 7:3,8 18:2,4
54:1,5,7,16,18 83:6
94:20 95:22 101:11
102:18 110:16
113:6 118:21,25
119:5,8,9 125:2
130:14
**goodwin** 3:10
101:12
**gotten** 30:3 42:24
42:24 52:20 84:22
89:24 91:6 100:1
139:6
**government** 34:21
34:22 35:2,5,8
52:22,24 53:5,8
54:1 65:1,4 78:2
102:23 109:10
**governmental**
67:21
**grant** 4:25 29:6,9
**granted** 23:8 134:5
135:13
**great** 53:7 126:25
**greater** 8:18 60:15
112:21 113:7
**green** 1:14
**greenberg** 6:5
**groman** 4:1
**ground** 10:21 12:22
**grounds** 12:22
25:23
**group** 42:22 91:11
102:10 112:12,19
112:19
**groups** 78:10
**grumman** 13:21,22
97:18 109:20
**guarded** 28:23
**guc** 4:9,18 8:9 10:14
13:1 16:22 51:13
54:23 59:13 88:22
89:6 90:24 91:8,14
91:17 115:12,20
123:19,21 130:18

131:7,10,14,20,22
131:23,25 133:4,4,7
133:10 134:10,11
134:16 136:2,6,9,11
136:12,25 137:1,3
137:10,16,17,23,24
138:10 140:23
141:6,8,22,25 142:7
142:8,14,15,16,21
142:23 143:1,5,6,15
143:20 144:2
145:10,11,18 146:1
146:3,5,7,12,19,20
147:2,3 148:3,5,10
148:11,12,16,18
149:5,5,15 150:1,3
150:10,24 151:6,7
152:16,17,19,24
153:18 154:1,3,5,16
154:24 155:3,5,14
155:22 156:20
157:6
**guess** 27:20 36:20
63:19 71:12 76:22
86:17 91:5,11 93:20
95:14 106:6 157:22
**guest** 108:4
**guests** 118:8
**guidance** 67:11
**guidelines** 19:6 40:8
40:13,17,17,17,22
40:24 41:1,7,11,14
71:1
**gump** 4:17 130:16
**guy** 97:23
**guys** 25:12 31:13
89:16 96:22 105:1,4
113:3 138:13,14,14

**h**

**h** 4:13
**half** 59:20 71:19
134:19 138:11
157:13
**halves** 49:2,5
**hand** 53:22
**hanging** 139:19

**happen** 80:25
106:12,14 127:25
149:25
**happened** 22:16
23:11,14 81:6,7,8
81:21 82:2 88:13
93:19 99:25 112:3
113:1,2 142:2 143:5
**happening** 145:1
**happens** 32:1 64:3
97:13 139:14
143:10 144:5
**happy** 139:23
**hard** 35:11 38:6
87:22
**harder** 139:21
**harming** 137:11
146:20
**harmonize** 80:16
**harris** 1:25
**harry** 83:21,24 84:1
84:7,11 94:22
**harvey** 25:14
**hasn't** 157:18
**hat** 12:11
**hate** 140:3
**hauer** 4:17
**haven't** 138:6,15,22
139:3,6 140:2
147:13,14
**havoc** 16:14
**hazard** 81:15
**hear** 50:22 86:9
132:11
**heard** 8:24 9:7 15:5
30:24 31:10 59:15
62:6 77:15 78:22
79:9 85:7,8 86:5
90:7 96:1 105:15
106:1 138:11,15,22
**hearing** 2:1 7:17
24:23 25:17 29:24
30:4,7,17,18 32:13
33:7,15 34:18 35:17
41:15 48:7 50:2,5,8
50:13 64:17 67:25
70:18,18,20,24

[hearing - important]                                                                 Page 17

71:22 75:8 81:21
92:3,13 96:10,12
97:8 98:14 112:14
127:13
**hearings** 127:1
**hearted** 134:19
**held** 12:10 20:25
44:15 89:13 107:23
108:13 109:11
110:17,17 114:8
119:23 120:8 126:5
131:3,11 156:7
**help** 86:3
**helpful** 158:6
**herman** 6:6
**hey** 83:14 93:18
146:8
**he's** 126:22
**hidden** 49:23
**hide** 17:24
**hiding** 18:8
**higher** 9:12
**highlighted** 16:17
25:19 26:13
**highlights** 8:11
**highly** 18:21 37:15
135:7 148:23 157:3
**highways** 88:7
**hindsight** 54:5 82:1
82:3
**hired** 62:14
**historical** 102:24
**history** 45:15
103:22 117:12
**hit** 101:15,16 138:6
**hits** 64:5
**hitting** 57:5
**hmm** 111:20 132:20
144:8,19 147:16,22
**hold** 18:3 33:20
57:10 96:5 128:22
155:25
**holder** 21:5
**holders** 4:18 21:6
59:13 88:20,22
91:15 120:13
130:16,18 131:13

136:12 137:2,3,3
143:13,17,18 144:3
145:9,12 147:6
148:24 153:18
154:3 156:18,19,21
156:23
**holding** 55:17 111:5
151:4
**holds** 50:3
**hollow** 134:8
**homes** 123:7
**hon** 1:22
**honor** 7:6,10,23
9:14 10:19 11:22
19:10,14 24:15,22
24:25 25:8,14,19
26:7,16 27:14 28:8
28:17,20 29:2,14
30:24,25 32:9,13
35:13 36:15 37:5
39:24 40:5,9,16,21
41:12,17,25 42:11
43:2 45:4,24 46:24
47:19 49:3 51:12,19
52:16 53:10 55:25
56:3,6 57:9,14 58:8
63:20 64:6,21 67:9
67:10,12,14 68:15
68:17,19 70:7,15,16
70:19 71:8,11,13,22
72:2,23,24 73:4,10
73:15,17 75:9 77:1
77:5 78:19 79:8,12
80:23 81:6,22 82:3
82:5,14 83:10 84:13
84:19,22,25 85:2,14
86:13 87:1,11 89:18
89:22,25 90:17,19
91:2,20 93:8 95:1
95:11,17,21 96:9
98:14 99:2,21,23
100:3,4,9 101:11,20
101:20 102:22
103:4,20 104:6,20
106:12 107:7,14,15
109:6,16 110:23
111:10,16 113:19

114:6,21,24 115:3,8
115:8 116:5,23
117:16 118:10,18
118:23 119:2,13,18
119:20,22,23 120:3
120:18 121:1,7,8,13
121:24 122:10,17
122:25 123:22
124:4,23,24 125:3,8
125:16 126:1,5,21
127:23 128:7,16,17
128:20 129:14
130:4,6,14,15,20
132:7,11,14,25
133:2,15 134:13,18
134:23 135:1,9
136:5,18,23 137:7
137:13 139:23
140:1,5,7,12 142:19
144:10 145:22
146:16 148:2,24
149:10 151:6,13,14
152:2,5,20 153:2,2
153:7,14 154:7,11
155:20 156:17
157:2,11,16,22
**honor's** 70:22 72:19
72:25 73:10,12
**honor's** 90:23 95:13
95:16 106:15
119:25 140:11,19
146:22,25
**hope** 149:21
**hopefully** 27:17
**hopper** 82:21
**hour** 71:19
**house** 108:4 126:16
**huh** 96:7,7
**hundred** 94:16
114:17
**hundreds** 16:10
32:11 42:5 82:20
103:18
**hurt** 49:22
**hyde** 2:25 159:3,8
**hypothetical** 75:9
92:14

**i**

**idea** 141:13
**identical** 39:3
117:10
**identify** 51:22
**identifying** 8:20
**identity** 87:3 108:10
142:16
**ignition** 7:14 14:11
14:20 42:1 46:18
54:3 64:22 70:6
73:21 75:12,23,25
76:20 77:13 80:7
81:14 85:19,23 86:7
86:15,19 87:2 88:16
92:8,23 93:20 96:20
99:15 101:23,25
103:11,13,21,23
104:4,21,22 105:20
105:24 107:7 108:8
109:2,13 110:15
117:4,7,8,10
**ii** 48:23
**iii** 5:19
**illinois** 5:9
**illness** 107:20
**illustrate** 29:16
52:1
**illustrated** 32:10
**imagine** 97:21 98:2
99:25
**immediacy** 152:12
**impact** 31:22 53:1
100:10 155:15
**impacted** 87:16
88:3
**impacting** 132:2
**impaired** 156:24
**impediment** 52:14
**implications** 154:6
**implied** 33:16
**imply** 103:6
**important** 7:25
10:8 11:23 12:21
25:24 41:19 77:11
79:13,13,22 85:13
90:8 111:10,14

127:24 134:23
**importantly** 154:19
**impose** 16:12 53:13
**imposed** 9:12
**imposition** 102:6
**impossible** 10:7
  107:24 108:3
**impracticable** 8:21
**impractical** 53:19
**impression** 139:6
**imputation** 16:6
**inability** 95:7,8
**inapplicable** 55:16
  55:17
**incentive** 52:11
**incident** 48:20
**incisive** 77:10
**include** 61:14
  131:15 137:3
  143:13
**included** 16:2 36:2
  36:3 37:14 56:23
  57:3
**includes** 67:22
  125:4
**including** 12:22
  24:16 32:16 33:12
  43:15 101:4 116:12
  124:16 125:22
  126:4,19
**inconsistent** 19:10
**incontrovertible**
  99:21
**incorrect** 141:25
**incorrectly** 64:23
**increased** 149:8
**incremental** 85:12
  145:6
**incumbent** 156:3
**incurred** 72:19
**indemnity** 23:1,4,6
  23:10,12
**independent** 64:1,2
  66:4
**indiana** 120:13
**indicate** 78:6

**indicated** 126:22
  127:24
**indicates** 118:24
**indicating** 22:5
**indications** 110:7
**indignation** 72:20
**indiscernible** 47:13
  56:14 59:14 68:11
  89:14 112:10 122:8
  141:18,19
**individual** 34:7
  40:12
**individuals** 78:8
**indulge** 114:25
**industries** 24:14,23
  24:25 25:10,16
  42:10 53:6 70:17,19
**industry** 53:2,3
  79:20 82:8
**inequitably** 132:2
**infer** 80:15
**information** 15:24
  46:20 50:15 72:11
  78:13,15,15 101:1,2
  101:3 102:17
  103:24 105:24
  117:2 126:8,10,13
  126:15
**informative** 102:4
**informed** 102:5
**initial** 28:6 90:11,20
  147:19 153:13
**injunction** 11:7,9
  57:21,25 58:7,8,16
  58:17 128:4
**injunctions** 58:1,2
**injured** 81:15 87:19
  102:11 104:16
  107:3 108:2
**injuries** 78:11
  100:22 104:12
**injuring** 92:24
**injury** 36:11 82:20
  88:4 94:1
**innocence** 119:5
**innocent** 89:16
  137:11

**innocents** 146:20
**input** 86:14
**inquiry** 83:2
**inseparable** 121:21
**insert** 13:18
**insist** 135:6
**insolvent** 52:12,15
**installed** 69:17,25
  70:1
**instances** 106:22
**instructions** 17:15
**insufficient** 103:7
  110:20 133:14,18
  133:23
**insure** 93:3,10
**insurer** 58:11,12
**integration** 55:21
**intended** 34:12
  56:20 67:4 72:4
  115:1
**intent** 11:20 144:18
**intention** 90:2
**interest** 37:22 53:3
  62:22 124:11
  156:16
**interested** 111:3
**interesting** 8:2
  11:15 107:17
**interests** 20:17
  37:24 82:6,7 94:12
  124:13 142:3,6,8
  144:7
**interim** 91:14
**internal** 12:5 101:1
**interpret** 67:11
**interpretation** 83:6
  109:21
**interpreted** 56:18
**interrupt** 11:4
**interrupting** 138:5
**intricate** 132:4
**introduce** 54:20
**introduced** 50:6
**introducing** 29:2
**introduction** 73:20
  77:8 78:6,8

**invalidating** 113:22
**investigating**
  103:23
**investigation** 7:14
  9:17,18 12:7,15
  83:3 109:7,9
**investigations** 12:5
  83:4
**investigative** 78:7
**investigators** 77:9
**involve** 60:12 64:3
**involved** 17:17 49:7
  49:20 58:6 64:10
  75:17 76:21 111:11
  119:6
**involves** 100:16,18
**involving** 14:4
**ironic** 157:3
**irregularities**
  108:14
**irrelevant** 51:23
**isn't** 101:18 130:1
**issue** 7:14,16 12:23
  13:5 14:8 19:6,7
  22:8 23:5,18 25:18
  25:22,25 26:24 27:8
  27:8,13 28:15,18
  34:15 41:18,25 42:2
  44:8 45:8,24 46:25
  46:25 51:19,23 54:4
  54:5 57:4,25 58:15
  58:19 60:2 68:13,16
  68:24 71:18 74:4,5
  74:5 91:1 100:20,20
  100:21 114:2,14
  120:22 121:2,6
  130:17 135:8
  151:13,17 152:10
  154:11,23 155:9,12
  157:5
**issued** 58:17 68:7
  80:19 105:23
  117:17,21 118:11
  118:13 119:21
  120:2,3,6,6,16
**issues** 25:20,22
  31:12 50:13 55:2

68:11 99:13 116:19
136:14 139:9
**item** 69:4
**items** 15:24 103:18
**it'll** 157:18
**it's** 83:13,15,18
85:14 87:24 88:10
90:8 92:4,20 93:25
96:19 99:8,11,12,18
106:20 109:15
110:25 113:14
114:11 120:14
121:17 122:9,15
123:21,22 135:10
139:6,11 144:2,12
147:17 148:9,14
150:2,6,14,16
151:14 152:22
156:3,17 157:3,12
**iv** 57:18,18,24,25
58:10,16
**i'd** 29:15 98:3
107:14 139:23
153:17
**i'll** 86:21 97:25
101:19 117:20
119:10 121:24
122:2,23 124:4
126:24 127:1 128:7
128:16,23 129:23
155:16,20 157:2
**i'm** 81:23 83:19
84:25 85:1,16,18,18
86:3,16 87:14 92:19
97:4,24,25 98:4
99:2 101:15 104:4
105:2,9,14 106:10
112:23 114:24
115:22 116:9 122:3
124:5 125:16
127:18 130:15,20
132:11 139:24
142:5 146:15 148:7
148:16 151:21
153:20,22 157:13
**i've** 86:16,25 94:15
96:1 106:1,13

138:10

## j

**j** 3:7 5:22 6:10
138:23 144:12,13
**james** 6:17
**job** 46:19 87:1
**jobs** 53:4
**john** 17:6
**johns** 56:8 111:5
**jonathan** 4:5
**joseph** 5:19
**joshua** 6:6
**jp** 131:13 139:7
140:3,5,6,12,13,15
140:16,20,22 141:4
141:8,13,14,22
142:12 143:9 144:5
151:21 155:15
**jpm** 137:18 139:25
140:6
**judge** 1:23 10:22
11:13 13:1,8,12
17:11 22:16,20 23:6
28:10 44:8 53:18
56:11 57:6 68:3,13
69:2 70:12 76:7,9
84:9 86:21,23 101:9
114:4 119:14 120:9
120:23 133:16
135:9,14 136:18
139:10 158:8
**judges** 40:10,12,22
43:3
**judgment** 43:4
111:7 120:14
**judicata** 114:9
**judicial** 41:7,9 85:2
**judicially** 37:8
**july** 38:24 39:4 97:8
97:14 98:14
**jump** 25:25 93:21
97:25
**jumping** 112:24
**june** 38:23 39:5,6,6
51:2 70:20 80:18
**jurisdiction** 58:13
58:15 86:9,22

111:15 114:9,11
**justice** 128:16
**justify** 50:7 119:10
**justifying** 117:2

## k

**k** 1:7,25
**kamensky** 6:7
**keane** 26:9
**keck** 110:23 111:10
111:11 114:20
**keep** 11:11 15:3
41:11 65:23 79:22
140:7 146:15
**keeping** 82:7,8
**keith** 4:14 142:20
**ken** 5:25 82:18
**kenneth** 6:9
**kept** 97:1 112:20
**kick** 123:15 149:18
**killed** 81:15 84:5
**killing** 92:24
**kind** 24:16 25:3,12
104:18 105:7,13
138:11,23 144:18
151:3 157:7
**king** 3:3 7:9
**kirkland** 5:6
**knew** 7:16 22:10
23:7 30:7,8,17
45:10 72:7,8 74:3
80:6,7,8 84:7 88:25
92:9,11 100:22
104:16 105:1,3
107:12 109:5
110:14 118:11
128:8 156:15
**knock** 55:23 56:16
132:4
**knocking** 137:12
146:21
**know** 8:15 14:25
15:8 19:3 25:24
36:14,15,19,19,21
40:25 41:11 43:7,7
44:22,25 48:16 52:6
57:3 68:20 72:19
74:13 76:11 82:22

83:24 84:11,13,14
84:19,23 87:6,11
90:8,18 91:2 92:20
92:22 93:17,25 94:1
94:5,10,25 96:14,14
96:17,18,19 97:9,22
98:8 99:3 105:10,17
106:13,14 108:3,10
110:12 119:15
120:11 122:18
128:15 129:8,17
139:9 143:4 146:11
153:20 154:2
155:10,11 156:18
156:21 158:3
**knowing** 30:14 75:2
97:3,11 107:8 109:8
128:14
**knowledge** 7:18
11:19 18:13 43:10
74:7,8,21 78:17
92:7 96:15 98:24
101:24 102:2,3
103:11 104:20
105:8 110:2 116:6
**knowledgeable**
74:17
**known** 8:7 9:20
12:3,13,19 15:18,22
19:15 22:4,17,20
23:24 34:12 40:18
47:5 57:22 69:11
71:18 73:2,7,9
74:10,25 76:19 77:6
77:21 78:18 79:10
81:14 84:5,20 85:20
87:3,6 93:25 99:15
99:16 104:12,24
108:21,25 109:13
110:8 118:14
135:21 147:2,3
148:20 149:3
**knows** 72:17,17,18
82:14 85:2 91:2
121:1
**koepp** 20:22 21:11
21:12,19 24:8

**kyrouz**  6:8

**l**

**l**  4:5 5:4,19,24
**l.f.**  11:17
**lack**  90:10 111:3
  144:11
**laid**  83:21 99:23
  120:19
**land**  22:3,3,8
**language**  9:7 62:23
  114:2,7 121:11
  123:8 124:14
**large**  35:7
**largely**  117:20
**larger**  148:8
**lasalle**  5:8
**laser**  86:14
**lastly**  69:16 113:19
**late**  12:2 59:14
  114:11 133:17
  138:24 145:7
  152:23
**latecomers**  144:20
**latent**  44:18 45:11
  64:21 100:20
**laughs**  101:19
  128:21
**lauren**  6:12
**law**  13:17 18:13,14
  18:19 26:16 64:9
  65:7,14 66:5 72:14
  72:18 73:7 74:22
  75:4 77:4,18,24
  78:16 79:7 80:16,20
  88:2,12 97:3 98:18
  99:16,17,17,18
  100:2 101:3,7
  114:19 127:10
  130:21 133:8
  134:14,22,23
  138:20 146:8
  152:10 155:23
  157:7
**laws**  33:19 64:10
**lawsuit**  33:13 106:7
**lawsuits**  12:8 105:9

**lawyer**  57:7 91:11
  92:21 106:14
**lawyers**  39:22 91:11
**lax**  108:17
**lay**  95:6
**laying**  48:19
**lead**  71:10
**leading**  130:13
**lean**  156:1
**leave**  35:10 58:23
**ledanski**  2:25 159:3
  159:8
**ledgers**  77:25
**left**  48:16 90:14,14
  121:1 146:17 150:3
**leg**  87:13
**legal**  23:14 31:11
  33:18 74:4,5 124:8
  125:21 126:16,20
  159:20
**legitimate**  81:12
**lemon**  64:9
**lender**  108:17
  109:10
**lenders**  49:6 143:2
**lending**  12:5,8,9
  108:15
**length**  15:12 126:25
**lengthy**  10:11
**lesser**  86:11 112:20
  113:7 147:19
**lest**  95:20
**letter**  18:15
**letting**  13:18 23:9
**let's**  82:2 88:4,17,24
  92:2,18 139:21
**level**  19:1 29:17
**levels**  21:12
**lexus**  111:2
**liabilities**  15:16
  34:4,24 39:19 43:25
  43:25 45:23 46:8
  47:23,24 50:2 60:7
  61:6,14,15,22,25
  67:2,5 82:11 109:23
  121:12,15,20
  124:10 125:1,4,6,18

  125:19 145:11
  146:14 147:2,3
  149:4,8 154:13
**liability**  12:24 13:19
  16:7 18:18 24:18,20
  26:17 27:22 28:12
  30:24 31:12 32:5,14
  32:18 33:4,5,11,16
  34:6,11,18 35:16,24
  39:14,16,17 46:3,6
  49:14,16,17,25 50:5
  51:24 52:18 57:12
  57:15 60:13,13,19
  61:7,9,11,13,22
  62:1,5 65:1 66:1,1,3
  66:4,7,7,10,19,21
  66:23 67:7 92:1
  93:3 96:13,23,24
  98:17,20,24 99:1,17
  102:7 121:16,17,18
  121:21 122:19,20
  124:1,15,17 125:15
  125:25 126:3,18
  129:4
**liable**  62:17 66:24
  124:18 125:18
  126:2
**liaison**  126:16
**license**  135:22
**lien**  19:18,21,24,25
  49:10 112:21,23
**lienholder**  58:24
  112:18
**lienholders**  58:25
  112:5,6,10
**liens**  20:13 111:22
  112:5,20 113:5,16
  113:18 124:12
**lifland**  10:22 114:4
**lifland's**  56:11
**light**  31:20 102:24
**likewise**  86:18
  88:10 109:6
**limit**  64:19
**limited**  37:23 52:19
  95:14 124:16

**limits**  138:20
**linda**  6:11
**line**  26:19 27:1
  33:21 35:11 82:10
  142:10
**lines**  5:19 47:16
  124:13
**linked**  77:13
**liquidating**  89:15
  133:25 144:21
**liquidation**  1:6
  79:18 126:7 130:25
  132:16,22
**liquidations**  131:3
**lisa**  4:13
**list**  67:13 119:4
**listed**  22:22
**listen**  57:8 83:14
  94:3 139:4
**listening**  7:10 60:1
**listing**  44:1,3
**literal**  56:11
**literally**  79:19
**liti**  141:22
**litigant**  36:5 79:1
  106:19
**litigating**  28:9
**litigation**  8:1 12:12
  14:11,19,23 15:20
  36:3,4 40:3 42:14
  42:19 105:21 111:8
  126:9 135:12,17,21
  137:19 140:12,13
  140:15 141:5,9,14
  142:13 144:5
  155:15
**little**  48:12 52:20
  146:22 151:7
  153:20 156:1
**live**  113:9
**lived**  75:3 107:25
**living**  79:15
**llc**  3:3 5:7
**llp**  3:3,10,25 4:7,17
  5:6
**loan**  108:14,18,22

**loaned** 63:23
**lodge** 11:20
**long** 44:5 80:22
    138:3 157:12
**longer** 44:3 48:17
    64:12 72:25 83:22
**look** 33:24,25 43:3
    65:21,23 66:11,13
    82:1 139:4 144:23
**looked** 19:3 28:9
    56:1 109:22 110:5,6
**looking** 36:15 70:1
    77:23 86:18 87:13
    87:25
**looks** 8:5
**lose** 75:15,16
**loss** 7:18,20 13:15
    13:22 14:18 26:20
    34:22 35:1,3,6,9
    36:12 44:14 67:18
    75:21 87:15,16
    88:18,19 91:17
    95:15 103:14,14
**losses** 33:2
**lost** 86:10
**lot** 45:14 48:15
    71:16 72:3 77:15
    78:22 87:20,22
    95:12,12,16 100:18
    106:4 119:16
    140:18 153:7
**lots** 63:21 93:15
**low** 139:19
**lower** 17:14 18:23
    94:24
**luck** 147:18,18
**ludicrous** 50:12
**luxury** 42:5

**m**

**m** 54:9,11
**machine** 83:19
    92:14
**madison** 4:2
**magnitude** 89:21
**mail** 7:21 12:3 22:4
    29:20,24 30:3 36:2
    36:7 37:16 38:16

40:1,18 41:23 42:5
    42:15,25 46:15
    57:23 85:12 103:7
**mailed** 46:13,17
**main** 48:6
**maintain** 53:2
    77:24 78:16 88:11
    101:3
**maintained** 88:6
    105:10
**maintaining** 60:9
**making** 32:12 64:1
    66:15 75:17 95:22
    124:20,21,22,22,24
**malman** 6:9
**man** 93:23 157:19
**mandate** 135:25
    139:7
**mandated** 72:9,10
    87:4 88:11
**mandates** 127:11
    133:8
**manipulation** 12:19
**manufactural**
    99:18
**manufacture** 129:1
**manufactured** 64:4
    85:22 95:25 96:4,7
    97:8 98:13 122:21
**manufacturer**
    45:12 72:16 78:2
    79:23 93:4 95:9
    96:16
**manufacturers** 72:9
    80:1
**manufacturing**
    129:1,2
**manville** 56:9 57:18
    57:18,24,25 58:10
    58:16 110:24 111:1
    111:5,11,12 113:20
    113:21 114:19
    115:6
**march** 90:10
**margin** 85:3 86:1
**mark** 123:13,16

**market** 12:18 14:1
    97:10,17 143:18,19
    145:12 154:6
**marrero** 136:18
**marshal** 78:13
**martorana** 4:14
    142:9,10,19,20
    148:3
**mary** 88:12
**massive** 31:21
**matching** 18:6
**material** 89:5
    130:24 131:8
**materialize** 139:8
**materially** 90:23
    131:17
**math** 38:6,8 84:21
    84:23 85:24 90:7
    94:16
**matter** 1:5 7:12
    10:17 13:9,17 26:16
    28:23 29:8 31:7
    34:8 41:20 42:16,17
    64:14,15 65:2,3
    67:10 68:20 72:4,8
    72:14,18 73:7 74:22
    75:3 77:4 79:6,13
    86:14 87:5 88:2
    96:15 98:17 99:16
    99:17,19 101:7,7
    111:14 114:9,10
    119:21 120:2 124:6
    127:22 152:4,7,10
    154:5
**mattered** 52:20
**matters** 19:2 84:24
    157:13
**matthew** 4:15
**maximum** 148:12
    149:4 150:12
**mcmahon** 151:16
**mdl** 68:9 155:2
**mean** 9:7 43:9,10
    45:12,14 49:5 78:25
    86:25 103:17
    124:17 127:7,8
    139:17 151:16

**meaning** 56:12 74:9
    115:25 125:21
**means** 67:20 123:17
**meant** 58:2 73:6
    77:5 84:16 121:6
**mechanic** 69:23
**media** 29:25 135:3
**mediating** 126:6,12
**mediation** 42:20
**meet** 92:9 133:1
**mega** 16:9
**member** 83:25
**mention** 138:22
**mentioned** 104:6
    124:24
**merely** 30:10,13
**merge** 113:5
**merged** 70:18
    112:20
**merger** 44:4 49:19
    112:17 113:7
**merit** 61:3 126:14
**merits** 68:10
**metaphysical** 28:2
**method** 104:13
**meticulous** 73:16
**metro** 135:3
**metzger** 21:10 22:2
**mi** 5:17
**mic** 42:8 155:25
**michele** 6:8
**middle** 54:13
**miller** 25:14
**million** 38:7,7,8,9,9
    38:10,11,11,14
    46:14 76:12 85:16
    85:17,18,18,19,21
    85:23,24,25 86:2,10
    86:11,12,15 90:14
    90:19 93:19 94:16
    114:17 117:6,7
    141:1,3 148:5,8,9
    150:15,20 151:7,8,9
    153:12,14 155:16
**millions** 117:3
**mind** 56:23 79:22
    123:7 140:8

mineola 159:23
minimal 128:12
minimum 84:14
minute 44:21
  112:11 113:1 130:7
  138:2
minutes 70:11
  114:25 130:3
mischaracterized
  121:11
misconduct 88:15
  128:14
misdirection 95:18
misfortune 101:13
misrepresented
  19:19
mistake 71:21 73:3
  73:11 77:2
mlc 126:12
mm 111:20 132:20
  144:8,19 147:16,22
modification 123:5
  130:24 131:9 156:8
modified 131:17
modifying 40:12
monetary 75:20
money 18:4,14 83:4
  87:8 91:19 94:14,15
  103:9 139:2,12
  141:18,21 142:12
  150:2,2
monies 63:23
monitor 37:16
montana 12:17
month 15:8 99:5
moot 59:23,23 85:7
  120:14,15 131:1,20
  133:23 136:3 145:3
mooted 135:17
mootness 130:8,17
  130:21 133:9
  134:18 135:24
  149:1 151:19
  152:10 154:12,14
  154:17,19,23
morgan 131:13
  139:8 140:4,5,6,12

140:13,15,16,20,22
141:4,8,14,14,22
142:12 143:9 144:5
151:21 155:15
morgenstein 28:20
  52:17 56:1 149:2
morning 7:3,8
  71:19 101:11 115:3
  116:20,20 121:10
  125:24 149:16
mortgage 108:17
motion 2:1 36:1
  39:1,21 46:6 68:18
  68:21 71:3 106:16
  110:6 115:24,25
  116:1,14,16,17
  129:6 133:17
motions 67:14
  136:13
motor 26:14 122:5
motors 1:6,7 3:3 5:7
  5:13 33:14,24 52:5
  59:17 106:23 109:5
  126:7 129:2
mounting 78:10
move 84:2
mullane's 55:2
multiple 36:17
  81:25 131:8,16
  146:12 149:8
mystery 59:25

n

n 3:1 7:1 159:1
name 8:21 24:5
  106:19
named 14:9,17
  15:17
names 24:3,4 112:7
narrow 101:8
national 22:13
  23:15 53:3 82:7
  122:5
nature 18:20 87:8
  89:23
near 107:25
necessarily 16:21
  18:6 25:24 58:6

75:20 126:22
  127:20 128:3,15
necessary 156:22
  157:8
necessitates 136:16
need 22:14 25:5
  46:4 53:2 54:20
  74:22 79:17 93:4
  94:6 117:18 129:13
  152:14 157:25
needed 30:2 51:22
  102:5 107:8 126:8
  126:13
needs 28:5 37:21
  80:17 87:21
negative 83:8 141:6
negligence 88:15
neither 77:10
never 10:17 14:18
  15:7 16:11 35:7,8
  43:14,16 48:8,15,17
  56:20 81:16 93:17
  99:8 113:17 116:7
  124:2 129:19,21
  144:24 149:22
  154:25
nevertheless 20:2
new 1:2,15 3:5,5,12
  3:14,14,21,21 4:3,3
  4:11,11,20,20 10:21
  11:14,16,24 23:24
  27:8,11 31:2,4,13
  33:3,14,15,24 34:1
  35:16 40:7 45:14,20
  52:5 54:1,5 55:6,10
  55:16 59:2,17,19
  60:8,12,13,16,16,21
  60:22 61:3 62:1,4
  62:17 63:2,8 64:3
  64:10,12 66:6,20,23
  67:2,4,4 69:9,16,18
  69:18,21,25,25 72:8
  74:2 75:22 79:9
  80:17 82:11,17,22
  82:24 84:15 85:10
  85:22 87:24,24,25
  88:2,5,10,14,18,25

90:3 94:3 95:10,10
  95:18,25,25 96:2,4
  96:4,6,12,14,17,19
  97:16,22,25 98:1,19
  98:23 100:5,13,24
  101:6 102:25
  108:12,13 115:23
  115:25 116:14,25
  117:6,10 122:1,20
  124:2,18,21,23
  126:1,10,16,18
  127:2 128:8 129:8
  137:8 146:18
  149:14,17 150:14
  150:25 151:1,19
  152:13,15 153:24
  157:3
newman 130:5,6,12
  130:14,15 132:11
  132:14,21,25 138:4
  138:8 139:15,18,20
  139:23 140:5,7,10
  140:25 141:12,16
  141:20 142:18
  144:1,9,16,19,22
  145:8 146:16 147:9
  147:10,16,22 148:2
  151:5,18,23,25
  152:2 153:9 155:19
  155:20 156:1,12,13
  156:17 157:11
nicholas 5:23
ninth 23:16 118:25
non 40:20 77:14
  101:22 102:24
  109:24 129:9
normal 93:20
normally 18:12
north 5:8
northern 11:14
notably 23:21
notation 71:4
note 42:6,10 150:11
  157:2
noted 28:21 37:19
  67:23 104:9 143:4

[notes - order]                                                                 Page 23

notes   99:2
notice   7:21,21 8:18
  8:25 9:3 10:15,16
  10:18 11:2 12:3,11
  13:10 15:18,23 16:9
  16:12 18:25 19:16
  20:15 21:1 22:4,6
  22:23,24 23:18 24:1
  24:15 25:1 27:10
  28:23 29:20,21,23
  29:24,25 30:2,3
  31:5 32:10 35:25
  36:2,7 37:2,14,14
  37:16,20 38:25
  39:23 40:1,14,14,15
  40:19 41:8,9,18,23
  41:24 42:5,15,18,24
  42:25 43:1,3,5,12
  43:12,14,17,19,20
  44:1,5,9,12,14 45:3
  45:10,24,25 46:1,13
  46:15,17 47:2,7,24
  48:14 51:22 53:11
  53:17,22,24,25
  54:24 55:5 57:23
  59:8,8 72:12 75:2
  75:10 76:10 80:19
  80:24 81:14 84:20
  84:25 85:3,25 88:25
  89:2,24 91:7,23
  95:1 97:15,19 98:10
  100:1 101:21,21,23
  102:1,4 103:3,6,7,8
  103:9 104:13
  105:16 107:22
  108:5,20 109:12
  110:4,19,20,20
  111:3 112:23
  113:24 114:12
  116:22 117:19,22
  117:25 123:4,5,6
  127:13,17 131:23
  133:14,19,24 134:3
  136:4,6,12,13,15,16
  136:20,21 137:6
  138:10,12,13,15,17
  144:10,11,25 146:2

  154:2 155:22 156:4
  156:5,8,23
notices   38:16 46:20
  47:9,19 48:4,6
  80:20 85:9,12,13
  117:13,17,21
noticing   38:19
notification   37:21
  37:25
notify   9:8,9 40:18
  47:2,25
notifying   80:21
noting   16:20
notion   71:16 87:14
notwithstanding
  77:16 96:25 110:11
  133:23 152:18
november   90:18
  148:7 155:7
nuances   49:21
number   12:21
  50:11,24 51:5,6,10
  65:20 69:4 76:11,12
  81:2,4,25 82:19,20
  88:14 90:11 94:25
  95:24 97:7 98:19
  101:5 115:11,21
  116:18 122:7 148:5
  148:7,8
numbers   81:3
numerous   69:7
ny   1:15 159:23

o

o   1:21 7:1 159:1
obfuscatory   124:5
object   129:18,18
objected   33:14
objecting   32:18
objection   32:18,22
  32:25 33:8 34:11
  68:22,23
objections   32:11
objectives   58:4
objector   67:24
objectors   24:23
  28:24 34:8 43:15

objects   48:8
obligated   110:21
  135:12
obligation   65:12
  66:4 74:18 80:9
  85:9 92:4,5 96:10
obligations   95:9
  122:1 127:21
observation   74:2
obtain   77:11 78:4
  134:22,25 152:20
obviated   117:18
obviously   99:8
  108:24 127:24
  138:20
occur   106:3
occurred   154:25
occurring   61:12
october   155:1
offensive   48:22
offered   52:22
office   5:14
oftentimes   15:24
oh   37:1 74:21
  129:23 148:2
  151:21
okay   7:4 9:15 14:22
  15:3 17:9 22:1 37:4
  37:12 39:20 48:21
  51:11 57:8 63:7,14
  70:9 71:7 94:7
  101:18 112:2
  114:22 122:11
  132:24 138:8
  139:15,19,21 140:9
  141:12 144:16
  146:16 151:25
  152:2 155:19
old   7:13,16,17 14:5
  14:11,19 15:15
  16:10 27:8,9,9,10
  33:2,7 36:1,3,5,10
  36:23 37:8 38:21
  39:25 40:3 41:11,20
  41:21,22,24 42:4,21
  42:23 43:24 44:16
  45:18,18,20 48:24

  50:14,21,24 52:12
  52:15 55:4,7 60:2,4
  60:9,10,14,22 61:17
  61:18,21 62:6,12,14
  62:18,19 63:4,10,13
  63:21 64:4,13,25
  66:6,8,20,24 67:2
  67:18,21 69:8,11,13
  69:17,21 71:1 72:7
  77:9 84:14 85:11
  87:21 88:1,25 92:3
  96:7,10,22,22 97:8
  98:13 100:5 104:12
  105:1,3 111:17
  116:25 122:21
  124:22 125:21
  129:7 154:13 155:3
  159:21
olsen   97:18 109:20
omit   132:16
once   39:2 98:20
  109:19
ones   77:23 78:2
ongoing   83:3
open   9:17
opening   72:25
  83:11
operate   153:22
opinion   8:15 17:3
  17:12,13,15,16
  18:10,10 25:5 89:14
  120:22,23
opponents   16:17
  21:12 64:16
opportunity   71:12
  76:17 79:4 93:7
  94:11
opposed   32:4,4 80:5
  99:8
opposing   33:11
opposite   20:1 57:24
opposition   133:11
  136:10
oral   2:1 46:9 119:22
  120:6 135:14
order   13:14 21:2,3
  21:4,6,7,14,19,23

21:24 24:5,9,9,19
24:20 33:9 38:22
39:3,25 43:1 44:12
45:19 48:15,22,25
49:5,15 55:6,9,12
55:14,15,16,17,21
56:10,15,16,19,25
57:11 58:7,21 59:2
59:5,23 61:20 62:11
62:17,25 64:8 65:18
66:12 67:12,16,17
67:19,22 69:8,15,19
70:2 71:2 78:23
79:4 82:23 83:6
84:15 87:25 89:1
91:25 93:2,10 94:4
95:7 96:3 99:5,22
100:9,14 101:8
110:25 113:22,23
114:4,13 120:8,24
121:23,25 122:3,10
123:23 125:9 128:4
129:7 133:15
138:18,19 139:24
147:6 152:20
154:15,20 157:8,16
157:21 158:3

**ordered**  157:14
**ordering**  23:7
**orders**  40:15 48:14
  120:16
**ordinary**  9:19
**original**  13:24
  38:22 50:13 114:13
  116:1 143:12,17
**originally**  56:10
  64:3 116:15
**ought**  100:13
**outlies**  72:3
**outline**  71:24
  146:17
**outs**  92:1
**outset**  71:22 96:10
  142:25
**overall**  28:15 29:4
  53:5

**overcome**  131:19
**overnight**  108:3
**overruled**  33:8
**owes**  18:14
**owned**  118:9 151:6
**owner**  29:23 60:10
  97:10,24 98:1
**owners**  33:6 41:23
  42:6 60:5 112:22
**ownership**  24:4,5,6
  26:18 125:7
**owns**  97:23 139:9

**p**

**p**  3:1,1,16 5:23 7:1
**p.c.**  4:24
**p.o.**  5:16
**page**  38:3 46:12
  47:16 72:15 73:23
  99:11 104:8 111:2
**pages**  48:19 70:20
  120:11
**paid**  18:4 42:20
  52:5,23 53:9 112:8
  141:4,21 142:12
  151:5
**painfully**  95:18
**pains**  133:6
**panel**  119:1
**papers**  12:14
  136:10 153:8 154:8
  155:8,16,16
**paragraph**  44:12
  45:19 49:18 55:21
  61:20,21 62:16
  66:12 69:8 121:24
  121:25 122:9,22
  123:9,23,24,25
  124:18 129:6
**paragraphs**  49:6
  72:6
**paraphrasing**
  132:13,14
**pardon**  68:6
**parenthetical**
  104:15
**park**  4:10,19

**parliament**  130:2
**parse**  35:24 61:17
**parsons**  6:10
**part**  16:14 19:13
  26:11 28:6 32:13
  34:4 39:7 42:22
  47:18 49:8 52:12
  53:5 62:10 64:19
  65:15 69:17,19,21
  69:25 75:22 76:17
  77:11 78:12 80:9
  84:18,18 86:25 87:9
  87:10 96:7 99:8,9
  112:11,11,18,22
  113:13 116:7 129:6
  129:21
**partial**  55:14 56:4
  58:22
**partially**  55:15
  124:5
**participate**  111:4
**participating**  118:3
  130:16,18 136:11
  137:2
**particular**  27:3
  55:2 72:14 108:14
  108:19 110:2 126:8
  155:23
**particularities**  55:4
**particularly**  46:10
  115:5 125:2
**parties**  13:13 61:17
  67:3 71:23 82:10
  99:6 111:3 119:6
  131:24 132:3
  136:16,19,21,24,24
  137:6,11 145:16
  152:8 156:9 157:22
**parties'**  152:25
**partly**  28:1
**partner**  152:3
**partners**  113:13
**parts**  7:14 17:6 67:3
  76:14 93:9
**party**  36:2 60:11,15
  60:16 69:17,19
  110:21 111:8,9

135:2,7 138:24
147:24 156:7
**passed**  42:6,9
**pause**  9:5 36:8 39:2
  44:19 48:4 65:17
  70:23 80:13 122:13
  130:9 138:2
**pay**  19:20 23:13
  31:23 34:22 83:17
  83:17 114:16,19
  141:17 149:14,17
**paying**  52:25 53:1,8
  83:15
**peculiar**  110:2
**peculiarities**  55:4
**penalized**  89:15,16
**penciling**  113:22
**pending**  12:7 15:20
  82:21,21 131:13
**pennies**  77:17
**pennsylvania**  26:25
**pension**  88:21
**people**  8:24 9:3
  13:10,25 15:5 32:12
  35:14 36:10,19,21
  38:9 40:20 42:16,23
  47:25 48:1,15 49:2
  49:4 50:10 52:20
  53:13 57:24 58:22
  59:11 79:15 80:24
  81:11,15,16 83:5
  84:5,6 86:19 87:2
  87:16,20,23 88:4,13
  92:7,24,24,24,25
  93:5,12 95:7,14
  97:13 98:13,15
  100:10 102:5 103:7
  103:19 105:2 106:4
  106:22 107:3,3,9,10
  107:20 108:1,5
  113:24 115:9 118:6
  118:8 127:12 139:1
  140:3 143:16,17
  146:6 147:13
  148:10 149:3 155:4
  156:4,20 157:15

**percent** 51:15 90:13
  90:14,20 153:13,15
**perception** 83:1
**perform** 92:4,5
**period** 54:13 59:4
  68:22 88:5 92:5,10
**periods** 108:4
**permeates** 78:20
**permission** 73:11
**permitted** 136:8,25
  152:14
**person** 12:12 17:20
  17:23 18:4 20:7
  22:23 58:9 98:2
  112:13
**personal** 88:4
**personam** 111:7
**personnel** 7:13 16:1
**perspective** 34:6,7
  44:11 59:20 71:17
  73:2 77:7 78:13
  95:13 97:14,19
  141:7
**persuasive** 64:18
**pertains** 121:11,16
  122:1
**pervasive** 72:12
**peskoe** 3:25
**peter** 6:3 22:18
**petition** 83:12,14,15
  97:20 98:6,7,8,10
**phillips** 126:11
**phrase** 121:19
**pick** 76:23
**picked** 25:15
  100:24,25,25 101:1
**picking** 45:22
**piecing** 15:23
**pile** 157:25
**piled** 146:13
**pinpoint** 136:22
**pipe** 22:13 23:15
**place** 15:19 24:12
  69:7 82:17 112:20
  153:24
**plain** 56:12 152:22

**plainly** 144:14
**plaintiff** 27:4 28:12
  55:20 59:6 95:24
  100:12 155:5
**plaintiff's** 7:11 29:1
  49:22
**plaintiffs** 3:19 4:1
  7:18,20 8:9 10:14
  13:4,15 14:2,9,18
  15:17 23:23 29:20
  32:16 34:9,16 35:7
  36:4,6 37:13 40:2
  42:14,21 43:25
  44:14 47:1,12 53:21
  53:25 54:23 55:16
  55:18 57:21,22 59:1
  71:10 75:20,21
  79:10 80:10 86:18
  87:15,17 88:18,19
  89:24 90:3 91:6,17
  92:21,22 94:21
  95:16,19,23,24 96:3
  97:7 98:9,12,18,22
  100:6,8 101:9,13
  102:15,18,19,22
  109:18 116:11
  131:6,16,18,21
  132:1,7 133:3,5,11
  134:9,16,20 136:5,8
  136:9,17,25 137:8
  137:10,17,24
  145:17,20 149:7,9
  150:23 151:10,12
  151:19 152:6,13,16
  152:23 153:11,25
  154:12,25 155:1
  157:5
**plaintiffs'** 124:19
  124:25 133:1,9
  134:6 136:1,3
  146:17 149:12,15
  149:25 150:9,17,22
**plaintiff's** 86:6
**plan** 11:7,9 17:16
  17:19 21:1 23:1
  28:21 43:15 52:17
  56:2,4 57:20 58:1,7

89:15 130:25 131:4
  131:9,10,17 137:12
  142:22 146:21
  147:5 149:4 153:21
  154:16
**plans** 11:10 132:16
**platform** 109:4
**play** 56:5
**plead** 155:2
**pleading** 19:10
  66:21
**pleadings** 14:10
  95:23
**please** 7:7 9:5 36:8
  42:8 46:23 48:4
  65:20 70:14 80:13
  107:5 130:12 147:8
  155:25 158:4
**plifka** 4:24
**pm** 158:11
**point** 11:24 14:22
  17:10 19:14 21:22
  25:8 26:22 27:14
  34:21 37:12 45:13
  52:1 61:2 72:7
  73:19 75:6,20 76:9
  77:1 78:21 85:6,10
  85:10 90:21 91:15
  92:2 95:11 105:13
  107:6 111:10
  113:20 115:3 116:3
  116:10,20 117:16
  118:8 120:10,17,21
  121:24 122:17
  123:21 126:3
  128:23 129:2 133:2
  133:6 153:9,18
  154:20 155:9
**pointed** 9:11 117:5
  118:7 123:14
**points** 28:18 35:15
  41:4 63:25 123:11
  127:1
**polar** 57:23
**policy** 58:4 71:15
  78:22 79:11,13,21
  80:4 135:24

**pool** 90:6
**portion** 85:8 125:10
**portions** 69:5
**pose** 116:23 128:4
**posed** 88:8 139:25
  144:10
**posing** 118:8
**position** 23:25 59:7
  75:15 124:19
  135:12 157:4
**possession** 48:11
**possible** 8:23 58:22
  98:11 147:17 154:6
**possibly** 56:19
  148:13
**post** 14:3 41:20
  60:21 66:11,13
  67:18 69:5,12 85:22
  121:4
**postcard** 103:8
**pot** 52:7,8,19 83:4
  90:13,14,24 139:11
**potential** 37:21
  44:10,13,20 45:11
  73:11 74:14 131:23
  145:14,15,16
  146:11 152:5
**potentially** 35:7
  73:4 136:19,23
  142:24 143:16
  150:7 156:25
**power** 75:15,16
  93:13,21,22 103:14
  103:14
**powledge** 42:16,17
  105:10,15,17,19,22
  106:11,12,12,13,14
  106:20,21,21
**powledge's** 106:14
**practical** 31:7 39:22
**practices** 12:6,8,9
**practicing** 48:17
**practitioners** 40:11
  40:23 79:15
**pre** 3:11 14:3,9
  26:20 34:16 35:10
  36:4 40:2 41:21

42:13,21 60:6 67:15
67:16 69:6 72:21
81:16 82:19,20
83:11,14,15 92:16
97:20 98:10,10
101:12 102:11
105:10 115:21,22
115:23 116:4,11
126:22 129:4
**precedent** 10:20
47:21 71:15 78:22
79:11,21 127:24
**precedents** 74:17
74:20
**precisely** 117:15
**precluded** 100:5
**precluding** 145:17
**predicate** 120:18
**predicated** 57:19
126:18 154:19
**preemption** 26:13
**prejudice** 27:14
28:4,11,16,17,19
29:3,6,15 30:1,8,19
30:20,22 31:3 32:3
32:7,9 35:14,16,18
35:21 71:15 78:22
81:1,2,2,4,4,20,22
81:24 87:12 91:16
91:21 92:15 95:4,6
99:22,24 100:15
102:9,9,11 122:25
123:2 126:25
145:16,17,21
153:10,16
**prejudiced** 139:5
147:15
**prejudicial** 148:23
**prejudicing** 150:10
**premise** 110:1
154:14,23
**prepare** 157:17
**prepared** 13:13
73:15
**preparing** 71:13
**prepetition** 20:10
28:25 58:12

**prescient** 99:13
**present** 40:25
**presentation** 16:23
71:24 101:14
**presented** 27:9 50:4
**presenting** 19:19
81:14
**presents** 117:14
152:11
**preserve** 83:7 84:1
**preserving** 53:4
**press** 117:9
**pressured** 31:15
**presumably** 139:8
139:12
**presume** 46:18
71:21 73:5
**presumed** 130:25
**presumption** 92:3
131:19
**pretty** 56:10
**prevent** 93:11
**prevented** 91:14
**previously** 116:22
**price** 48:2 52:2,4
58:6 110:12 123:10
123:20
**priced** 38:18
**prices** 150:14
**primarily** 70:6
109:16
**principle** 111:6
**principles** 154:14
**prior** 12:16 22:21
41:22 61:24 62:2
63:6,22 80:18 102:2
102:3,20 116:21
**probably** 45:6,6
49:5 80:8 104:3
142:11
**problem** 27:7 47:3
47:4 76:13 81:10
83:2 95:2 99:24
**procedural** 133:13
133:24 134:6
135:22

**procedure** 24:18
37:20 68:20
**procedures** 39:25
40:9,12,14 43:1
**proceeding** 127:22
**proceedings** 111:4
131:24 136:12
158:10 159:4
**proceeds** 19:18,20
19:24 22:8 23:6
26:6 27:6 49:10
81:11,13,17 100:7
**process** 8:22 12:23
12:24 16:15 17:21
18:24 21:9 25:21
26:3,12 27:20,24
28:7 29:4,7,10
30:21 31:21 32:8,21
33:1 35:21 44:11
54:1 55:2,5 71:17
73:2,6,8 74:9,23,24
75:4 77:4 78:13
79:1,3,6 89:11
91:13 92:16 95:2
96:25 97:4,13,19
99:5,19,20 101:4
103:6 109:16,17,23
111:6,9,13,14
114:15 119:11
123:1 127:3,7,8,8,9
127:20,21 128:1,7,9
128:10 133:13,19
133:24 134:7
**procter** 3:10 101:12
**product** 26:19 27:1
28:22 33:21 52:18
78:18 87:7 99:17
**production** 61:23
62:2 63:5,22
**products** 11:17
**profit** 18:7 32:23
85:3 86:1
**program** 82:15,17
**prohibitions** 125:15
**prompt** 10:9
**prong** 21:16

**proof** 47:5 90:4
**proper** 12:11 44:12
**properly** 37:19 46:1
121:5
**property** 26:3 36:11
54:16 112:7,9 118:9
119:12
**proposed** 39:2,7
**proposition** 11:18
16:21 21:13 40:23
49:25 55:13 72:16
100:1 113:15 127:3
127:19
**props** 55:23 132:4
137:12 146:21
**prosecuted** 89:1
**prospective** 128:11
**protect** 13:14 20:7
54:19 83:7 94:11
135:12 145:20
**protected** 23:22
95:7
**protecting** 54:16,17
58:9
**protection** 34:2,17
62:18 70:1 93:9
102:16 122:23
**protections** 48:19
**protects** 54:10
**protocol** 82:13,14
82:24,25 83:13,16
**proverbial** 153:16
**provide** 25:9 28:7
41:12 46:20 69:21
122:23 134:3
138:10,12 156:4
157:23 158:4
**provided** 22:5
24:16 39:13,15
46:21 123:5 131:23
133:18 136:6,13
137:6 140:21
142:22 156:8,23
**provides** 32:23 69:9
78:24 119:4 131:10
**providing** 41:14
59:10 83:4 132:3

provision 56:24
66:15 94:12,17,23
121:13,14 122:16
123:11 125:9
138:17
provisions 59:5
73:18 91:25
proxy 127:3,5,6
prst 103:24
ptrs 77:25 100:25
public 83:1 88:9
117:2 136:14 154:4
publication 7:21
12:11 13:10 22:6
23:18 25:1 28:23
29:21,25 39:23
40:19 41:24 42:25
44:9,14 45:2,10
47:2 80:19 103:9
104:13,17 117:22
123:5
publications 24:16
publicity 83:9
publicized 37:15
publicly 38:22
77:12 78:5 131:13
pulling 81:20
punitive 69:13
89:12 90:5
punitives 89:14
90:22
purchase 52:2,4
58:6 123:9,20 124:7
146:7 148:16
purchased 54:15
124:9,11 125:8,10
125:20 126:2,4,19
145:13 148:10,19
149:5
purchaser 18:2,3,4
18:5 19:21,21 20:2
20:3,5,6,6,9,12 22:6
22:10,11,25 23:2,3
23:3,9,9,13,21,23
27:3 31:23,23,24
32:2 34:3 54:2,18
54:20 58:5 60:14

61:8,10 66:5 118:21
118:22,25 119:8,10
122:3 124:8,10
128:15
purchasers 13:24
54:13 60:3,18,23
67:20 119:17
128:11
pure 97:18
purported 91:12
purports 122:22
purpose 7:17 16:20
47:24 54:18
purposeful 95:17
purposefully
100:19
purposes 15:19,23
16:9,12 29:3 43:11
58:3 73:7 74:23,25
pursue 133:4
134:10,16 136:8,25
152:14,15,24
153:10
pursuing 37:9
131:22 133:6
145:18 157:6
push 102:24
put 43:21 50:11
51:5,10 54:13 72:11
80:24 82:15,17
94:13 104:23
107:11 108:23
146:1
putting 41:6 93:8
127:18

**q**

qualified 121:5
qualify 69:20,24
108:20 116:11
quality 32:24 47:6
quantification
47:23
quantify 50:2
quarterly 154:17
question 10:13 11:5
40:21 46:11 58:15
70:3,22 83:20 98:16

116:23 128:5 140:1
140:11 144:10,17
148:10 149:13
153:14 155:8
questioned 102:20
102:23 115:10
questions 30:25
99:22 139:25
146:23,25 153:3
154:8
quibble 38:11
quick 70:25 79:17
quickly 24:25 25:23
26:5 158:2
quite 71:15 133:5
145:22 156:17
quotations 75:5
quote 77:10 104:15
119:2,10 135:3
quotes 82:15

**r**

r 1:21 3:1 4:14 7:1
159:1
radiation 107:20
radioactive 107:18
107:25
railroad 20:23
raise 78:21 106:11
155:8
raised 33:9 34:10
106:11 116:20
121:4 149:12
raises 117:16
ramification 134:15
136:1
ramifications 9:1
53:12 97:3
ran 22:3
rationale 54:12
reach 149:19
reached 106:15
reaches 83:10
read 9:7,8 17:13
18:23 30:6 51:18
54:9 61:7 86:16,25
111:22 121:12,14
123:24,25 124:4

readily 53:21
reading 38:1 47:16
51:13 62:8,12 73:11
122:3
ready 157:8
real 8:2 93:22
152:11
realistic 150:6
realize 33:6
realized 145:1
really 14:7 18:6
22:10 48:23 56:3,5
56:20 60:19 64:20
79:6 88:19 99:3
101:21 129:8
139:16 150:4,16,21
reason 22:25 24:20
25:18,25 32:7 48:6
50:1 71:21 80:4
105:8,18 106:8
109:17 110:3
134:20 146:4
reasonable 8:20
10:5 25:21 27:13
35:12 45:5,5 83:7
83:18
reasonable' 82:12
reasonably 7:19,24
8:5,6,7,10,12,12
10:6 15:11,11,14
16:3,4,8 18:16 43:4
71:20,20 75:1,3
87:3 118:15
reasoning 56:6
reasons 26:4 35:13
36:17 54:12,25
108:9,24 120:10
134:9 147:4
rebuttal 153:4
recalcitrant 112:18
recall 13:5,5,8
24:22 31:19,24
45:13 46:20 51:12
59:3 64:11 65:12
66:8,14,18 67:6
71:25 72:13 73:3,5
73:13 74:3,7,18,22

75:11,11,14 77:3
80:20 84:16 85:9,11
88:2 92:3,4 96:11
102:2,4,20 103:10
107:18 117:2,7,17
117:21 118:11,13
122:1,4 123:3,4
128:9
**recalled** 7:15 13:9
85:17 88:12 115:12
**recalls** 45:12,14,15
65:7 70:7 86:11
90:15 153:23
**receivable** 20:9
110:21
**receive** 60:23 144:6
147:6
**received** 12:3 42:15
137:5,20,22 142:6,8
144:25 150:25
151:7
**recess** 130:7,8
**recession** 53:4,6
**recodified** 122:6
**recognition** 44:24
52:13
**recognize** 80:10
83:1
**recognized** 34:1
43:18 82:18
**recognizes** 114:20
**recognizing** 82:6
126:21
**recollection** 56:17
**recompense** 86:19
**reconcile** 145:15
**reconciling** 144:10
**record** 20:25 41:6
71:8 72:5 73:16
79:20 82:15 86:17
99:8,9 103:1 110:10
129:21 130:15
137:5 153:19
155:18 158:1 159:4
**recording** 130:9,10
**records** 9:23 10:2
11:3 15:16 16:2

18:17 72:10,10
77:16,23 78:1,1
87:5 88:11 118:16
125:21,21 126:5,20
126:20
**recoupment** 20:11
**recover** 143:9
**recoveries** 134:4
136:7 137:18
156:24
**recovery** 33:25
152:6
**recruitment** 20:14
**redo** 101:14
**reduced** 88:21
**reducing** 147:18
**reduction** 51:15
**refer** 42:16 69:6
129:6
**reference** 73:18
86:12 115:9 122:7
122:14
**referenced** 71:3
119:14 121:9
123:24
**referencing** 122:16
**referential** 121:18
**referred** 42:3
125:23
**referring** 17:2,11
126:12
**reflect** 82:16
**reflected** 72:9 88:25
120:1
**reflects** 119:25
**refrain** 157:4
**refused** 34:22 35:2
**refutation** 9:21
**refuted** 29:18
127:15
**reg** 1:3
**regard** 25:21 26:19
33:18 34:16 36:1
60:3 68:18 154:6
**regarding** 101:2
**regular** 47:5

**regulations** 77:18
**rehabilitated** 112:9
**reimbursed** 23:14
**reinert** 24:1
**rejected** 13:2 33:10
33:21 156:6
**related** 15:24 33:3
45:18 47:11 64:9
69:16 117:8 122:1
**relates** 61:16,23
62:2 63:3,4,5 65:7
70:6
**relating** 12:7 14:20
49:6 51:24 64:11,24
88:15 125:6
**relationship** 97:20
**relative** 54:7 88:17
**release** 33:1
**releases** 117:9
**releasing** 57:12
**relevant** 7:16 13:6
13:12 15:11,13
18:11,21 19:13 21:2
42:13 49:13 108:1
**reliance** 145:13
**relied** 26:9
**relief** 20:17 21:15
21:20,21 23:8 29:7
29:9 46:7 55:20
58:22 132:1,3,18
134:4 137:10
146:19 156:9
**relies** 111:11
**relieve** 21:14
**relive** 134:7
**reluctant** 31:16
**rely** 98:20 149:3
**relying** 138:9
**remain** 17:6
**remainder** 121:14
**remaining** 23:6
99:21 136:7 146:2
**remand** 68:24
**remanded** 17:15
68:4,7,14
**remarked** 33:22
34:15

**remedial** 23:16
**remedies** 57:19
113:19 153:10
**remedy** 22:24 27:20
35:24 37:8 53:20,20
55:10 59:12,15,16
66:22 95:3 99:22
100:3,4 128:1,6,10
153:25
**remember** 25:4
37:5 77:17 106:18
150:18
**remind** 68:20
**removal** 68:8,13
**renaissance** 5:15
**render** 157:8
**rendered** 84:6
**rent** 76:17
**rental** 76:23
**reorganization**
20:24 153:21
**reorganized** 132:18
**repacking** 99:1
**repair** 76:24 104:23
107:8
**repaired** 87:22
**repairs** 59:3
**repeat** 54:25
**repeatedly** 152:13
**replace** 76:3,14
84:17,18 87:9,10
**replacing** 75:24
**reply** 7:4 47:17,18
70:8 155:19
**report** 72:7,13
73:19,20 77:9 78:8
99:7,10 102:14
**reporting** 100:25
122:4
**reports** 51:13
154:18
**represent** 91:12
92:25 137:2 156:18
156:19
**representations**
60:22 84:23

**represented** 88:22 88:23 112:13 115:10 118:19
**representing** 92:21 94:21
**represents** 42:22 102:10 153:15
**request** 102:16
**requested** 46:7
**require** 8:18,21 16:19 47:2 71:25 99:22 109:12 130:24 131:8,17,21 150:1
**required** 9:17 10:4 10:24 11:3 18:24 39:25 41:23 53:18 72:13 73:5,13 78:16 80:20 88:1 101:3 136:15 137:19 140:20 142:13 149:14 150:12,20
**requirement** 10:8 108:22 146:5 149:17
**requirements** 92:10 122:4 144:11 157:6
**requires** 43:6 99:25 132:17
**requisite** 7:18 10:1 10:1 72:11
**res** 58:8 114:9
**rescission** 60:25
**reservations** 26:8
**reserve** 91:13 116:4 151:4 152:17 153:3
**reserved** 141:8 147:2,13
**reserves** 150:4
**residual** 89:25
**resold** 60:5
**resolve** 91:4
**resolved** 91:15 137:21 149:23
**resources** 37:23
**respect** 14:11 36:5 45:2 66:20 67:2

69:8 92:1 101:20 103:3 107:6 109:6 113:19 115:5 117:4 117:11 119:15 122:21 124:3 125:6 140:11 145:12 149:25 156:11 157:1
**respectfully** 90:1 118:23 119:3 121:13
**respective** 72:3 112:7
**respects** 64:4
**respond** 129:13 146:24 155:21
**responding** 146:22
**response** 25:14 70:21 129:19
**responses** 106:24
**responsibilities** 84:16
**responsibility** 61:16 64:12 78:9 96:21
**responsible** 27:9 55:7 60:8 61:18 62:12 63:2,8 69:9 97:12
**rest** 61:10 84:12 94:23 121:13 128:16 129:11 153:3,8 154:8 155:16
**restart** 93:23
**result** 28:21 33:2 34:11,14 35:19 50:21 78:25 79:3 104:11
**resulted** 114:1
**resulting** 140:23
**results** 109:9
**resume** 130:10
**retain** 78:3
**retained** 34:24 39:18 46:8 60:7,12 61:6,25 65:1 66:1,4 66:7,9,19,23 92:1

121:12,15,20 122:19 154:12
**retort** 116:24
**return** 121:8
**revealed** 31:13
**reversal** 17:7 140:19
**reverse** 53:6 139:24 140:14
**reversed** 17:3,13 120:14 133:18
**revert** 122:23
**review** 46:10
**reviewed** 43:13
**reviewing** 108:21
**revisit** 107:16 121:6
**revisiting** 119:19
**revitalized** 132:19
**revocation** 55:14 56:4
**revoking** 55:15
**rewrite** 101:14
**richard** 5:11
**rico** 89:12
**ride** 59:19,24
**right** 11:4,11 15:17 17:5,8 19:5 20:21 21:9 23:3 26:3,11 27:18 31:10 32:1 34:3 35:18,19 38:5 38:13,17,21 41:14 41:16 47:8,18,19 48:5 50:22 56:23 58:13 65:5,10,13,15 74:12 77:16 84:22 85:7,25 88:14 89:18 90:3,4 93:7 101:10 114:22 116:4 124:10 128:18 129:12 130:1,2,7 138:2,21 143:25 147:1 149:20 153:25 157:8,10,12
**righteous** 72:20
**rightfully** 152:24
**rights** 21:6 24:10 33:18 54:19 60:15

73:8 94:11 97:1 113:11 119:12 132:2 133:13,20 152:25
**rings** 134:8
**ripe** 139:10 151:20 155:9
**ripeness** 151:13,16
**riper** 139:11
**rise** 7:2 70:13 86:23 98:16 108:15 115:17 130:11
**risk** 79:20 135:3,21 149:7
**road** 45:12 64:5 85:16,17 93:9,24 159:21
**roadmap** 138:25
**robbins** 37:19 38:3
**robert** 1:22
**robie** 104:7,8,9,10 107:7,12
**robie's** 104:12
**robley** 28:23,25 40:5 41:18,18,21 42:6,11,12,13 70:18 70:19
**role** 18:8
**room** 153:1
**rothschild** 11:17
**rough** 38:8
**roughly** 38:12 46:16
**route** 104:17
**rubber** 64:5
**rubin** 4:13 17:2 53:16 59:16 61:7 65:10 114:23,24 115:16,19 120:17 122:9,12,15 124:23 125:13,16 127:6 137:14 149:16
**rubric** 24:24
**rudnick** 3:18 71:9
**rule** 68:10
**ruled** 13:8,9 34:9 41:18 47:6 112:17

139:10
**rules** 135:22
**ruling** 13:23 19:6
  31:9 55:22 104:10
  114:15,16 133:8,22
  144:23 152:22
  157:4
**rulings** 140:15
**run** 68:1 93:21
  94:15
**runs** 75:14
**ryan** 6:1

**s**

**s** 3:1 6:5 7:1
**saddle** 128:13
**safety** 8:25 31:21
  32:22,24 72:12
  75:13 76:13,19 77:3
  77:19,20,23 78:18
  80:8 81:15 84:5,21
  85:20 88:3,9 92:12
  92:25 93:4,25 94:5
  96:17,20,21 100:20
  100:20,21 122:5
  123:3
**salacious** 72:22
**salami** 145:7 153:16
**sale** 3:11 8:16,16
  10:16 13:25 14:1,1
  14:3,3,9,20 15:6,8
  15:20,21,22 16:12
  19:16,20,22 20:15
  20:16,21 22:7,7,11
  22:21 23:19 24:1,5
  24:7,9,9,16,17,18
  24:20,22 25:16 26:4
  26:5,6,11,15,20
  27:6 28:19 29:24
  30:17,18 31:20,20
  32:4,5,13,20 33:1,7
  33:9,14,15,17,22
  34:8,16,17,18 35:10
  35:17 36:1,4,7
  37:14,17 38:21,23
  38:25 39:1,2,7,9,11
  39:21,25 40:2,6,15
  41:20,21,22 42:4,13

42:15,21 44:7,11,12
44:17 45:19,25 46:1
46:2,5,6 47:7,8,19
47:22,24,25 48:18
48:20,21 49:5,8,20
50:2,5,7,7,13,14
51:22,25 52:12,14
52:16,24 54:1,6,6,8
54:11,15,24 55:6,11
55:14,15,17,21,24
57:11 58:2,3,7,9,16
58:21 59:2,8,11,21
59:22,22 60:5,6,10
60:21,24 61:2,4,5
61:14,19,20 62:11
62:13,13,15,16,17
62:19,24,25 64:4,7
64:8 65:8,9,18 66:2
66:11,12,13,24 67:1
67:3,7,11,15,16,16
67:17,18,19,22,24
67:25 69:5,6,7,8,12
69:12,14,19 70:2,18
70:24 71:2,3 79:18
80:8 81:3,7,10,16
82:19,20,23 83:6
84:15 85:22 92:11
96:3,12 97:8,15
98:10,14 100:7
101:12,21 102:11
102:24 110:19,20
111:11,21 112:4,4
113:10,17 115:21
116:21 117:13
119:22,25 120:3
121:4,8,9,16,23,25
122:3,9,18 123:23
125:5,7,8,9,19
127:13 128:4 129:7
138:19 149:11,18
150:8,21
**sales** 16:14 26:6
  40:8 43:1 48:7 80:2
  81:12 100:15
  113:15 119:6
**samuel** 6:15

**sand** 82:10
**sander** 5:4
**sandler** 6:11
**sat** 99:6
**satisfactory** 47:8
**satisfied** 136:10
**satisfy** 19:25 84:17
  131:1 132:7 134:24
  136:5,20 156:22
  157:9
**saturn** 47:1,11
**savage** 24:14,23,24
  25:10,15 42:10
  70:17,19
**save** 103:8
**saying** 8:24 9:2 18:7
  18:12,15 19:3 20:11
  20:20 21:7 24:8,8
  27:16,16,18,19
  28:11,15 43:9 45:2
  46:22 51:19 52:7
  56:2,19,23 57:21,22
  58:10 68:8,23 69:20
  76:1 83:13 95:2
  98:3 105:6 119:7
  121:12 122:2
  125:14,16 138:12
  144:24 145:5
  148:16 157:5
**says** 44:12,23 45:19
  46:13,16 47:21 58:1
  61:10,25 62:4,16,24
  63:5 66:24 75:9
  94:12 96:13,21
  97:23 104:14
  118:12 124:7
  129:16 139:10
  145:19,22
**schedule** 116:5
**schedules** 115:23
  116:7,13
**score** 96:8
**scores** 81:15,16
**scott** 3:8
**search** 8:22 10:1,1
  70:25 77:11 78:4

**searches** 8:21
**seats** 7:3 70:14
  130:12
**second** 14:13 15:2,4
  17:4,13,14 18:9,11
  18:15,22 19:3,9
  20:22 21:11 27:12
  28:4 29:5 37:12
  56:18 62:8 63:7
  81:19 84:14 110:4,8
  110:24 114:18
  119:20 120:7,12,21
  122:13 130:21,22
  131:2 132:23 133:7
  133:21 134:14
  135:1,4,11 144:23
  145:19,22 146:8
**secondary** 143:19
**seconds** 14:24
  128:19,22
**secret** 97:2
**section** 15:18,22
  16:9,12,14 20:24
  24:1 53:12,20 54:9
  54:13,14,19,21,24
  59:12 61:5,7,10
  62:15 65:7 66:2,3
  66:14,24 125:5
  144:12,13
**secured** 19:15
  141:15
**securities** 39:1
  123:20 150:3
**see** 17:6 27:19 31:4
  37:1 51:6 63:14
  97:22 111:5 120:15
**seeing** 15:13 37:13
  86:3
**seek** 21:15 96:2
  133:25 134:10,16
  134:20,25 135:2,7
  135:16,18 136:1
  145:2
**seeking** 135:12
  154:20 156:7,10
**seeks** 69:13

**seen** 48:8,15
**self** 120:12
**sell** 24:2 60:10,22
  69:18 87:6 93:19
  97:10,13 110:22
  112:9
**seller** 27:2,5 60:16
  60:17 61:9,11
  102:19 121:17,18
  121:22
**sellers** 53:13 124:11
**selling** 43:24 78:18
  96:13
**sells** 96:20
**send** 41:23 46:15
  85:9,11 110:9
**sending** 38:16 42:5
**sense** 44:7,15 85:15
  92:17 147:23
**sensitive** 87:14
**sent** 19:16 36:1
  46:16,21 123:6
  129:17,18
**separate** 15:24 66:4
  81:6 101:21 125:9
  141:23
**separately** 62:4
**serious** 72:12 88:9
  100:19,22
**seriously** 87:19
**serve** 39:23 40:1
**served** 90:3 129:20
**service** 111:9
**session** 71:14
**set** 21:20 23:1 26:14
  39:18 40:13 61:1
  67:12 80:4 81:8
  113:16,16 120:10
  138:25 142:23
  143:15
**sets** 30:12
**setting** 79:21 94:3
**settled** 23:11 130:21
  135:22
**settlement** 10:9
  106:7,8,17

**settlements** 35:3
**seven** 3:20 92:6
  101:22 103:22
  104:2 109:24
**severe** 53:4 75:18
**shape** 153:15
**share** 142:15
  150:14 155:13
**shareholders** 29:22
  83:24
**shares** 94:3 123:21
  123:22 141:1 151:4
  151:5
**sheet** 83:23
**sheets** 9:22
**shield** 102:7
**shielded** 33:4
**ship** 48:10
**short** 46:1 136:15
**shortly** 149:23
**shouldn't** 107:21
  147:15
**show** 10:17 15:16
  16:7 29:15 30:5,19
  41:13 92:24 95:3
  129:23 131:21
  145:1 156:8,14
**showed** 33:11 92:22
  127:13
**showing** 18:18
  34:19 92:16 131:18
  132:17 156:22
**shown** 9:22 29:6
  30:18,23 32:4 35:17
  35:18 64:17
**shumejda** 6:12
**shy** 86:4
**side** 41:13 43:19
  48:24 86:6 118:19
**sides** 68:14
**sifting** 56:6
**signal** 128:13
**signed** 38:23
**significance** 48:6
**significant** 43:2,11
  43:14 50:8 137:9
  150:1

**significantly** 100:11
  136:24 156:24
**similar** 10:25 11:5
  39:3 156:2
**similarly** 127:9,12
  133:16
**simple** 55:13 85:10
  97:18
**single** 127:2
**singular** 7:17
**site** 107:25 118:3
**situated** 127:10,12
**situation** 8:3 13:23
  15:9 19:23 20:5,8
  22:12,20 32:6 53:22
  56:9 61:13 100:16
  116:21 117:14,23
  118:1 132:6 138:23
  143:7,21 144:21
**six** 16:19 67:13
**skill** 147:18
**skinned** 80:20
**skinning** 80:23
**slate** 55:19
**slice** 17:5 18:9
  147:8
**slicing** 28:14
**small** 109:20 150:16
  150:21
**soders** 35:4 36:25
**sold** 48:25 60:9
  69:25 77:20,22
  85:22 100:9 143:17
**solely** 29:10
**solidify** 152:25
**solution** 53:19
**solutions** 159:20
**solve** 149:13
**somebody** 21:14
  48:21 65:23 106:18
**somebody's** 108:4
**something's** 57:8
**somewhat** 101:15
  134:19 154:16
**sonya** 2:25 159:3,8
**sorkin** 6:13

**sorry** 42:9 47:14
  50:19 114:24
  115:22 132:11
  142:19
**sort** 12:25 25:22
  26:24 38:8 52:1,16
  84:24 92:15
**sorts** 76:7 84:22
  99:24
**sought** 134:5 135:5
  156:5
**sounds** 87:8 141:10
**source** 33:25
**southern** 1:2 11:16
  26:9 40:7
**spalding** 3:3 7:9
**speak** 130:2 138:15
  151:13
**speaking** 101:13
**special** 46:7 100:16
**specific** 24:3 43:20
  45:24 50:5 51:22
  53:11 67:1 80:2
  81:24 84:3 100:14
**specifically** 34:23
  55:6 61:17 62:11
  71:3 99:18
**specifications** 75:13
**specificity** 43:17,20
  47:20
**specify** 30:2
**specious** 126:21
**specking** 93:2
**speculate** 82:2
  114:6
**speculation** 82:3
**speculative** 10:11
**spend** 37:25 83:22
  91:19 137:9
**spent** 46:14
**spiegel** 10:22
**spoke** 116:2
**square** 3:20
**stake** 13:7
**stall** 75:15
**stalling** 103:14

stamco 59:9
stand 108:18
  137:15 140:17
  141:5
standard 7:23 8:10
  9:12 10:6 15:12
  16:3,12 45:6 157:9
standards 16:5 19:2
  118:11 119:11
stands 127:2,10,19
start 45:22 79:8,9
  79:11 86:21 139:24
started 8:1 92:2
  112:16 146:24
starting 74:2
state 12:17 33:12,19
  67:23,24 68:23
  112:15,16
stated 19:11 32:25
  60:14 108:9 111:1
  135:1 136:18
  149:16 152:13
statement 11:20
  50:15
statements 148:25
  153:24 154:4
  155:17
states 1:1 33:10
  158:2
station 76:24
statistics 81:18
status 15:18,22 98:8
  98:9 140:13
statute 68:8
statutes 61:2 66:17
  66:18,22 67:21
  96:16
statutorily 59:23
statutory 33:17
  85:9
stay 68:16,25 69:1
  133:4,25 134:10,21
  134:25 135:3,5,7,13
  135:13,16,18 136:1
  145:2,23 152:20
staying 152:21

steele 127:8
steering 75:16
  93:21 103:15
steinberg 3:7 7:5,6
  7:8,8 9:6,10,14,16
  11:7,12 14:16 15:1
  15:4 17:1,8,10
  21:18,25 22:2,19
  24:13 25:7,13 28:8
  29:14 31:18 36:8,14
  36:23 37:3,5,12
  38:2,5,15,17,21
  39:9,12,15,18,21
  41:3,9,12,17 42:9
  44:19,22 46:24
  47:11,15 49:3,12
  50:18,20 51:1,3,8
  51:12 56:17 57:1,9
  62:10 63:5,9,12,15
  63:20 64:6,15,21
  65:3,6,10,13,15,19
  65:21,25 68:4,7,12
  69:4,22,24 70:5,15
  70:24 71:6,18 74:8
  77:15 85:8 87:20
  96:2 103:17 104:7
  105:15 106:11
  107:16 108:12
  115:3 116:8,19
  118:15,19 119:13
  121:9,25 122:14,16
  122:17 123:24
  125:17 127:12
  128:19,22,25
  129:16,23 130:4
  154:10,11 157:16
  157:20 158:5,8
steinberg's 78:20
steinberg's 157:1
stem 53:4
step 75:7 117:20
stephen 5:22
steps 78:7
sticking 64:20
stipulated 68:25
  72:6 73:17 106:25
  107:1 129:9

stipulation 68:17
  69:1 99:7
stipulations 99:10
  153:19
stock 94:9 150:14
  151:3
stockholder 21:5
stood 72:16
stop 21:11 128:23
  139:4 155:5
stopped 61:9
store 48:11
stored 107:18
stranger 61:3
strategic 134:9,15
strategy 135:18
strauss 4:17
street 5:1
stress 153:11
stricken 13:20
strictly 27:8
stringent 118:14
strip 20:13,21 24:10
stripped 134:4
strong 147:11
struck 78:24
stuff 36:21 48:22
  56:13 139:22
  147:21
stutzman 4:24
subject 13:4 40:12
  46:17 68:21 86:11
  87:2 111:14 112:5
  113:15 114:8,10
  124:3
subjecting 88:4
submission 157:14
submit 51:23 128:7
submitted 106:25
  107:1 115:20
  125:17
subsequent 116:7
subsequently 72:8
  126:8 132:15 143:5
substance 38:13
  66:19 76:2 138:12
  151:3

substantial 69:4
  78:9 152:11
substantially 120:9
  130:25 131:5,9
subsumed 60:6
succeeded 94:22
success 39:17
successful 147:20
successive 79:24
successor 12:24
  13:19 24:17,19
  26:17 30:24 31:12
  32:5,14,18 33:4,5
  33:11 34:5,11,18
  35:16 39:13,15 46:6
  49:14,16,17,24
  51:24 57:12,15
  60:19 98:17,20 99:1
  102:6 124:1,15,16
  125:15,25 129:4
sue 36:16,19 41:21
sued 20:9 22:21
  36:21 41:24
suffer 28:13 44:19
  91:18
suffered 102:12
suffice 73:17
sufficient 7:22
  13:11 19:18,20,24
  19:24 39:24 41:25
  44:10 45:3,7 69:1
  101:24 102:1
  136:20 152:12
suggest 82:24 94:2
  99:21 120:21 121:7
  124:2,18
suggested 55:20
suggesting 104:25
  120:19
suggests 97:9 100:2
suing 36:5,10,10
suite 5:1 159:22
suits 10:11
summary 110:25
summer 41:1 74:3
supplemental 85:12

**supplier's**  110:18
**supplies**  82:9
**support**  16:21
  32:20
**supports**  23:24
**suppose**  63:25
**supposed**  46:2
  47:22 82:1 83:19
  100:2
**suppress**  52:11
**supreme**  56:13
  58:20 111:17
  112:25 113:6,25
  114:1,6 120:13
**sure**  19:5 36:18,23
  41:13 43:21 46:24
  59:17 62:25 63:17
  63:18 73:23,25 74:1
  75:10 84:21 89:10
  95:7,8,12,21 105:2
  105:9 122:9 130:20
  138:4 139:4,18,18
  139:18,23 142:5
  147:10 148:7
  151:23 156:1,13
**surgery**  55:23
**surprised**  86:17
**surrebuttal**  14:24
**surreply**  70:10
  71:12
**surrounding**  42:4
**surviving**  112:23
**suspect**  138:16
  157:24
**switch**  7:14 14:12
  14:20 42:1 46:18
  54:4 64:22 70:7
  73:21 75:23,25 76:4
  76:20 77:13 80:7
  81:14 85:20,23
  86:15,19 87:2,21
  88:16 92:8,23 93:5
  93:11,11,20 96:20
  99:15 101:23,25
  103:11,13,21,23
  104:4,21,22 105:20
  105:25 107:8 108:8

109:2,14 110:15
  117:4,7,8,10
**switched**  14:16 95:8
**switches**  75:12 86:7
  95:8
**sympathetic**  87:17
**sympathy**  87:22,23
  87:24,25 95:16

**t**

**t**  159:1,1
**table**  48:24
**tackle**  51:16
**tactical**  139:17
**tail**  155:12
**take**  17:22 33:15
  34:20 35:2,8 41:7,9
  50:25 56:9 70:11
  73:15 75:7 78:7
  83:19,21 85:2,5
  93:10 117:8,20
  124:14,17 130:8
  145:18,19 148:21
  157:13
**taken**  19:11 23:12
  44:5 74:12 133:3,5
  152:18
**takes**  76:3 91:4
**talk**  7:25 17:1 24:14
  28:17 42:8 54:11,14
  79:5 80:25 84:24
  88:1 91:21 104:4
  115:2 123:25
  139:21 149:10
**talked**  10:22 12:20
  16:23 30:1,10 49:7
  55:3,12,22 60:20,24
  62:11 81:22 108:12
  116:15 126:25
  155:4
**talking**  10:5 14:14
  16:24 27:15 29:12
  33:13 46:14 49:13
  52:17 63:24 65:10
  73:1 74:11 76:1
  79:23 84:14 86:1
  89:19,20 124:4
  126:1 129:7,9

138:18 146:17
**talks**  12:23 62:16
  99:12 129:4
**tapping**  147:12
**task**  83:25 84:12
  138:20
**taxes**  112:9 137:23
**technically**  27:25
**telegraphed**  62:22
**telephonically**  5:21
**tell**  21:16 30:14
  40:11 43:22 53:13
  71:13 74:16 78:25
  81:25 86:13 90:2
  92:18 100:23
**telling**  73:4 77:5
**tells**  56:13 57:7
  73:21 77:8,24 78:2
  92:18
**ten**  130:7
**tend**  37:11 153:22
**term**  61:13,25 90:10
**terms**  24:17 38:16
  56:11 75:2 79:21
  80:21 81:8 116:14
  118:15,17 123:12
  123:20 144:15
**terribly**  79:22
**test**  10:6 123:1
**texas**  5:2
**textual**  56:12
**thank**  70:12 71:11
  101:9,10 114:20,22
  128:16 143:25
  154:9 155:18
  157:10,11 158:8
**thanks**  155:19
  158:6
**that's**  84:5 90:12
  92:17,18 95:5,17
  96:17 97:6,10,18
  104:14 105:7,13
  110:14 111:10,17
  113:1 116:13,25
  117:23 121:6 122:8
  122:13 124:23
  125:25 126:1,22

127:10,11 136:21
  138:18 139:19
  141:16,20,25
  142:12 148:2,8,24
  150:12,25 151:2,9
  154:20
**theories**  98:18,21
**theory**  86:20 90:4
**there's**  89:13 94:5
  94:12 97:9,12,22
  116:16,21,24
  117:12 118:24
  119:15 123:7 127:1
  127:18 128:10
  134:12 145:24
  146:4 157:24
**they'd**  144:25
**they're**  82:25 83:13
  83:17 87:18 95:18
  97:20 98:25 99:16
  112:22 142:1
  145:24 147:1
  149:20 154:13
**they've**  94:13
  145:21 152:18
**thing**  15:15 20:1
  24:7 27:12,15,16
  28:5 30:16 32:9,14
  52:1,17,22 55:18
  59:12 70:21 71:1
  76:15 83:7 94:5
  97:12 126:24
  127:23
**things**  18:11 25:19
  35:20 36:19,24
  48:20 62:22,23,24
  67:13 70:16 76:14
  80:24 88:13,13
  93:15 101:16 104:6
  104:9 107:13 115:7
  137:15 138:6 139:8
  140:17 141:5
  142:21
**think**  9:21 10:13
  12:21 14:8 16:19,20
  18:11,21,22 19:13
  21:18 22:14 24:15

25:7,13,24 27:14,15
27:21,21 29:16,17
29:18 31:18 39:5,9
40:11,23 41:3 42:13
44:22 45:3,4,25
46:12,22 47:17 49:3
49:12 50:3 53:10,10
53:11 54:11 56:17
56:18 57:1,9,14,17
58:20 59:24 60:3
63:19 64:7 67:13
72:3 73:10,17,19
74:21 75:6 76:8
78:19 80:22 81:5,24
82:12,13,18 85:8
87:11,12,12,14
88:14,24 89:13 90:1
90:8 91:24 92:16
93:2,6,15 94:1
95:17 96:1,9 99:4
99:11,23 100:4
101:16,20 102:9
103:1,5,20 104:20
105:9 106:15,21
107:7 108:6 109:13
109:15 110:7,16
112:15 113:3,20,21
114:4,19,20 115:14
117:5 119:13
122:11,13 126:20
126:24 127:14
129:10 130:6 140:1
140:12 141:2,5
142:2 144:1,22
145:4,8,8,24 146:10
146:14,16 148:2,4,9
148:22,23,24 150:6
150:13,25 152:22
153:2,3,8,14,17
155:16,17,21 157:3
157:9
**thinking** 98:4
151:21
**thinks** 44:7 48:21
48:21
**third** 8:13,19 9:2
15:15 26:13 60:15

60:16 69:17,19
98:12 101:13 119:6
132:2 137:11
**thought** 11:23
71:16 73:6 86:5
93:3 105:15 112:5
113:9 117:19
124:25 141:13
153:25
**thousands** 16:10
42:5 103:18
**threat** 156:16
**three** 11:15 14:6
15:17 32:17 67:17
71:14 95:23 98:15
98:19,23 99:5
106:25 114:17
129:9 132:1
**threshold** 60:2
94:25 130:17
136:13 150:19
151:20 152:10
**tick** 25:23 26:5
**tie** 58:8
**time** 9:13 12:4,7
14:14,20 15:12
22:11 23:8 25:9
28:18 36:3,6 40:6
40:13 42:14 45:9,13
50:22 53:5 57:20
59:4 68:22 69:12
72:23 74:25 80:8
81:23 83:19 89:1
90:15 91:1,3 92:10
92:14 94:21 100:11
108:4 115:20,25
116:3,10 119:21
120:8,15 124:6
125:2 137:9 138:3
148:20 150:2 152:6
153:4 154:22 155:9
157:2,5
**timely** 66:8,18
117:17,21
**times** 3:12,20
**timing** 47:4

**title** 19:23 20:2
112:7,19,20,21
113:7,7 124:10
**tiwana** 6:14
**today** 63:18 79:9
96:1 101:20 103:5
137:15 148:7
149:23,23 155:4
157:17,18,19,21
**today's** 16:15 71:14
**today's** 150:14
157:21
**told** 19:4,25 20:1
31:1 40:22 70:17
78:16,17 92:15
93:18 96:9,12
112:12 146:8
**top** 22:22
**torque** 64:23 75:13
92:10
**tort** 7:19 8:3,13
18:20 32:17 33:23
34:10,24 44:10
**tortious** 64:2,2
**torts** 66:25
**total** 149:4
**totally** 147:13
**touch** 24:9
**touched** 137:14
146:21
**toxic** 118:3
**tpc** 49:6
**tradable** 148:4,6
**trade** 29:22 88:20
143:13 146:6
**traded** 131:14
148:6
**traders** 58:19
**trading** 148:4
**tradition** 43:5
**traffic** 122:5
**transaction** 31:25
32:2 34:3,4 54:17
54:18 59:9 60:11
61:4
**transactions** 59:21
132:4

**transcribed** 2:25
**transcript** 25:6,7,8
25:10 42:12 47:15
104:15 157:14,17
157:21,23 158:1
159:4
**transfer** 124:7,8
**transferee** 124:1,15
124:17
**transferrable** 143:7
**transform** 12:16
60:12
**transformed** 66:20
**translated** 9:23
**transpire** 140:18
**travelers** 114:16
**tread** 9:22 77:25
100:24 103:24
**treasury** 31:15,15
54:3 82:5,6,10
83:21 84:12 93:7
94:3,7,23 143:11
151:3
**trees** 93:13
**trial** 50:6 90:4
**tried** 14:2 24:23
34:19 40:10 56:19
61:20 109:19 114:5
154:22 157:16
**triggered** 128:9
**triple** 48:5
**troubled** 104:19
**trucks** 26:23
**true** 15:1,1 20:15
21:18 29:19 30:12
45:6 155:18 159:4
**trumps** 125:14
138:13
**trusky** 67:10
**trust** 4:8,9,18,18
8:9 10:15 13:1
16:22 51:13 54:23
59:13 88:22 90:10
90:25 91:8,17
115:12,20 123:19
123:21 126:8
130:19 131:7,10,14

131:20,22,24,25
133:4,4,7,10 134:10
134:16 136:2,3,6,9
136:11,12 137:1,3
137:16,23,25
138:10 140:23
141:2,8,14,22,23,24
141:25 142:3,6,7,8
142:14,14,15,16,21
142:23,24 143:1,2,6
143:6,8,9,10,11,15
143:20,22 144:3,6,7
145:2,10,11,18
146:1,3,5,7,12
147:2,3 148:3,5,10
148:11,12,16,18
149:5,6,16 150:1,3
150:10,24 151:6,7
152:16,17,19,24
154:1,5,17,24 155:3
155:5,14,22 156:20
157:6
**trustee** 19:18
**trusts** 142:22,23
153:20
**trust's** 89:6 134:1
134:11 137:1,11,17
141:6 146:19,20
**truth** 108:15
**truthful** 105:24
**try** 40:11 43:9 48:1
48:2 50:2,6,12 53:6
66:16,16 80:16
81:23 93:23 101:15
145:23,25
**trying** 7:11 17:22
17:24 32:20 48:1
51:16,17,17 53:4
54:21 58:4,5 67:10
74:16,17 102:24
105:14 114:5 124:5
145:15 155:11
**turn** 16:16 53:20
113:12 116:19
147:3,25
**turning** 131:18
136:4 137:7 144:9

**turns** 75:14
**tv** 97:22
**two** 13:7 18:10
21:12 25:19 26:7
62:23,24 67:16
70:16 79:25 80:1,3
80:24 81:2,4 86:16
95:19 97:7 98:22
100:12 106:2,16
129:1 131:22 137:7
142:22,22 153:13
**type** 10:15,18,23
21:9 28:19 44:4
47:20 56:14 66:21
99:1
**types** 36:12,25
95:19,23 104:1
108:16
**typical** 106:21
**typically** 11:10

**u**

**u.s.** 1:13,23 54:3
72:15 79:19 112:1
**ultimate** 81:4
**ultimately** 12:18
17:12 32:19 39:4
80:11 81:7,8 114:18
142:13
**unasserted** 7:19 8:3
8:13
**unclear** 150:2
**uncontrollable**
132:6
**uncontroverted**
14:17
**undergo** 79:17
**underlie** 67:13
**underlying** 25:6
107:2 154:23
**undermine** 135:24
**underscore** 153:17
**understand** 22:14
30:1 34:5 46:9
54:21 74:4 79:12
90:7,23 140:13
151:20

**understanding**
120:1 140:16
**understood** 33:23
58:21 152:2
**undertake** 93:5
**undertaken** 90:16
**undertaking** 82:24
82:25
**undisclosed** 45:21
61:15
**undriveable** 84:6
**unexpected** 103:14
**unfair** 33:5 55:9
59:1
**unfortunately**
116:18
**unintended** 91:16
**unique** 80:2 100:16
101:6
**unit** 4:18 59:13
88:22 91:15 130:16
130:18 136:11
137:2,3 143:18
144:3 145:9,12
146:9 147:6 148:23
153:18 154:3
156:18,19,21,22
**united** 1:1 18:24
19:4 158:2
**units** 131:14 143:6
143:18 144:4
145:13 146:5,7
148:3,5,11,16,19
149:6 153:23 154:7
**universe** 82:9
122:18 145:16
156:19
**unjust** 60:25
**unknown** 12:10
13:3 23:17 34:13
40:1,3 44:13 55:8
61:14 69:11 71:18
73:2 74:10 79:10
**unliquidated** 50:10
51:5
**unmanageable**
132:5

**unprecedented**
16:13 53:15
**unquestionably**
47:8
**unravel** 132:4
**unrealistic** 150:25
**unrecalled** 13:10
**unrelated** 18:14
69:18
**unsecured** 32:15
50:20 52:13 81:9
89:16 123:12,18
134:3 139:13
140:24,25 142:4,5,7
142:25 143:3,12,23
**unsuspecting**
102:21
**unwind** 106:7
**upheld** 86:20
**uproar** 31:14
**upset** 154:20
**upside** 141:10
**upward** 123:10
**upwards** 123:14
**urge** 8:23 9:3
111:22
**urged** 10:15 34:18
**urging** 10:18
**use** 37:24 53:16
61:24 104:13,17
125:7,20 126:3,19
**usually** 48:10

**v**

**v** 23:16 26:23 37:18
38:2 72:15
**vacate** 58:24,24
106:17
**valid** 124:8 148:1
**validity** 54:10,14,17
54:17
**valuation** 49:10
**value** 18:2 35:9
52:25,25 54:2,20
60:9 86:10 90:9
91:1,8 94:4,24
148:9 150:3 153:22
154:6

valukas   72:7,15
    73:19,20,21 75:6
    77:8 78:6 99:7,10
    99:11,13 102:14
vancouver   37:18
    38:2
variant   46:22
various   28:18 91:25
vast   9:17
vehicle   14:5,12,21
    29:23 33:6 36:5
    41:23 60:4,11,15
    61:19 64:13,25
    122:5
vehicles   13:7 33:2
    38:7,7,9 60:9,23
    61:17,23 62:2,12
    63:6,22 66:9,20
    67:3,18,22 69:16
    86:10 109:2,15
    117:3,6,8 122:21
    124:3
venture   91:5
veritext   159:20
versus   66:1 73:2
vest   124:10
vicinity   118:9
victim   12:18
victims   3:11 13:18
    35:10 46:19 74:11
    99:15 115:22
    116:11
view   31:9 53:13
viewpoint   17:21
violate   55:20,22
violated   18:13 97:1
    133:14
violation   18:14 26:3
    27:24 28:3,3 29:7
    29:10 35:21 79:1
    92:16 95:3 97:3,4
    99:20,23 109:23
    128:2,7,9,11 133:19
violations   18:19
    106:2,3 108:16
    110:13 133:24

virtue   39:1 59:22
vis   23:2,2
visited   108:2
vitiate   10:8
voice   32:24
voluntary   82:14,15
    82:17

## w

wager   89:19
wait   91:19 112:10
    112:25
walks   32:2 97:21,23
walsh   22:18
want   24:14 26:1
    31:18 56:2,2 68:24
    71:11 75:9 78:20
    83:17 84:1,21 95:11
    95:20 146:9 153:8
    153:10
wanted   13:13 17:10
    19:14 20:10 25:23
    37:16 72:23,24
    112:9 115:7,12,19
    149:10 152:5
    155:18
wants   157:23
warehouses   49:9
warning   102:21
warrant   152:12
warranties   33:16
    33:17,17
warrants   94:10
    123:22 141:2
warranty   33:3
    34:23 44:13,15,24
    59:3 64:9 84:4
    101:2
wasn't   87:5 109:11
    112:11,11,22 113:5
    113:7 120:6,17
waste   107:18 125:2
water   50:4
waving   95:15
way   27:17,20 28:14
    31:8 38:17,19 40:5
    41:6 44:8 52:23
    53:8 56:22 57:4

58:1,6 61:24 66:16
    69:10 75:13 80:23
    83:12 85:21 94:15
    97:6,11,15 104:17
    109:8 113:5 127:10
    127:10 139:24
    140:16 153:15
ways   81:23 117:9
we've   26:7 75:11
    79:25
wealth   103:24
website   32:25 41:11
    71:2
wechsler   6:15
weeds   25:25
week   106:16
weekend   39:4
weintraub   3:16
    42:22 46:16 54:9
    74:12 92:20 94:20
    95:15 101:10,11,12
    101:19 105:2,5,7,14
    105:17 106:5,10,20
    107:6 111:19,21
    112:1,3 114:25
    115:4,10 116:2
    118:7 122:24
    126:12 128:2 129:5
    129:8,13,16,25
weintraub's   46:11
    50:3 53:13
weintraub's   87:18
    138:14
weird   97:12
weisfelner   3:23
    6:16 14:23 28:5
    29:9 31:10 38:5
    62:6 70:10,12,15
    71:7,8,9 73:25
    74:21 76:6 80:13,14
    80:22 85:14 86:13
    89:8,10,18,22
    101:16 102:9
    106:11 108:9,24
    117:5,17,19 122:24
    123:11,14 125:23
    127:7,14 128:2,25

153:6,7
weisfelner's   9:21
weisfelner's   108:7
    134:19 138:14
    155:13,21
went   24:25 30:9
    36:2 40:17 42:19,20
    84:12 99:6 114:3,14
    126:10,16 135:6,14
    145:12 147:5
    153:23 154:21
weren't   94:10,11
    95:22 138:17
    156:15
we'd   150:18
we'll   83:16 93:17
    153:3 154:8,8
    157:20,21,23
we're   70:1 83:15
    84:14 92:13,14 96:8
    96:11 100:2,17
    113:4,8,10,12
    117:24 123:13
    124:3 130:8,8
    155:11 158:7
we've   103:8 110:5,6
    123:17
whatsoever   122:20
    133:3
what's   99:4 100:3
    138:21,25 139:16
    144:18 151:2
    153:19
white   26:14,23
    129:2
wholesale   79:18
wholly   49:1
whopping   91:13
who's   83:25 87:24
    153:5
widely   40:20
widespread   25:2
    101:25 102:2,3
    103:10
william   3:16 101:11
williams   4:15

| | | |
|---|---|---|
| **willing**  108:23 128:8 | **written**  120:5,8,22 | 157:25 |
| **wilmington**  4:8 | **wrong**  17:24,25 18:3 19:17 20:1 84:7 88:6 89:16 113:4 116:9 | **you've**  84:2,7,17 87:7 92:15 99:20 125:11 143:4,8,14 |
| **wilson**  83:21,24 94:22 | | |
| **wilton**  6:17 | **x** | **z** |
| **windfall**  147:24 148:3,14,22 | **x**  1:4,10 | **zarrini**  6:18 **zillion**  48:19 |
| **windfalls**  59:10 | **y** | **à** |
| **wipe**  146:2 | **yeah**  21:18 37:3 47:13 57:9 63:24 76:6 122:7 152:1 | **à**  23:2 |
| **wiped**  22:7 | | |
| **withheld**  102:16 | | |
| **withhold**  117:2 152:17 | **year**  45:13,14,15 87:21 101:22 103:22 | |
| **women's**  37:18 38:2 | | |
| **won't**  100:15 114:6 125:2 149:21 | **years**  15:6,10,19,25 57:6 59:20 88:6 92:6 101:5 104:2 107:19 108:1 109:24 118:4 | |
| **word**  82:15 | | |
| **words**  35:25 56:5 57:1 60:8 63:3,11 90:13 119:7 127:6 151:3 | | |
| | **yesterday**  7:9,10,23 8:10,15,24 11:24 15:5 25:20 29:18 30:9 34:15 51:18 55:1 59:16 62:6,23 65:11 70:4 73:15 87:12 90:17 96:1 102:22 103:4 115:10 116:2 119:18 124:24 133:2 137:15 157:17 | |
| **work**  94:5 142:21 | | |
| **working**  16:11 38:14 106:13 112:6 113:2,3 | | |
| **works**  75:23 93:11 97:6 127:3,5,6 | | |
| **world**  31:13 48:13 59:9 64:18 80:21 96:12 | | |
| **worry**  93:22 | | |
| **worse**  32:6 35:19 118:10 | | |
| **worst**  53:6 | **yesterday's**  71:22 **yesterday's**  157:19 157:20 | |
| **worth**  141:1 148:5 | | |
| **worthy**  123:3 | **york**  1:2,15 3:5,5,12 3:14,14,21,21 4:3,3 4:11,11,20,20 11:14 11:16 40:7 | |
| **wouldn't**  93:2 | | |
| **wrath**  72:20 | | |
| **wreak**  16:13 | | |
| **wreck**  36:12,18 46:19 74:11 | **you're**  82:1 83:20 86:1,4 89:19,20 94:3 95:3 105:6 106:6 111:13 113:2 113:9,11,22,22 130:13 138:9,12 141:18 145:5 147:21,23 151:4 | |
| **wrecks**  36:20,22,24 74:13 | | |
| **write**  84:16 | | |
| **writing**  55:19 | | |