# Exhibit B

**USDC Western District of Louisiana**
**Shreveport, Lafayette, Monroe, Alexandria**

James Williams; Steven Douglas
Williams, individually and on
behalf of the deceased Cheryl
Clay Williams
v.
General Motors LLC
4/7/2015 5:15 cv 1070
(Shreveport)

Wrongful death. Defendant's defective automobile led to
the death of Cheryl Williams in a car accident.
Download

W. Singleton

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA.

| | | |
|---|---|---|
| JAMES WILLIAMS AND STEVEN DOUGLAS WILLIAMS, INDIVIDUALLY, AND ON BEHALF OF) THE DECEASED CHERYL CLAY WILLIAMS | ) ) ) ) ) ) | |
| Plaintiff, | ) ) ) | Civil Action No.: _____ |
| v. | ) ) | COMPLAINT WITH JURY DEMAND |
| GENERAL MOTORS, LLC, | ) ) ) | |
| Defendant. | ) ) | |

## COMPLAINT FOR DAMAGES

Comes now Plaintiff, James Williams, individually, and on behalf of his deceased wife, Cheryl Clay Williams and Steven Douglas Williams, individually, and on behalf of his deceased mother, Cheryl Clay Williams, by and through undersigned Counsel of Record and pursuant to the Federal Rules of Civil Procedure, and files this Complaint against Defendant, General Motors, LLC ("GM"), and alleges upon information and belief and based on the investigation of counsel to date as follows:

## NATURE OF THE ACTION

1.      On or about March 13, 2009, Decedent, Cheryl Clay Williams ("Mrs. Williams"), was involved in a motor vehicle accident in Bossier Parish, Louisiana, while driving a 2003 Cadillac CTS, VIN Number 1G6DM579330120614, manufactured by Defendant GM.

2.      Plaintiff now has information and belief that certain operational parts in that 2003 Cadillac CTS, were knowingly defective, and/or improperly designed, manufactured, or installed

1

by Defendant GM so as to have caused the loss of control which ultimately led to the collision and resulting injuries, damages, and death of Mrs. Williams on or about March 13, 2009.

3.    Therefore, Plaintiff brings this civil action for such amounts as are reasonable in these premises, and also punitive damages.

4.    The claims asserted herein arise out of the design, selection, inspection, testing, manufacture, assembly, equipping, marketing, distribution, and sale of an uncrashworthy, defective, and unreasonable dangerous automobile.

5.    This product liability action also includes claims for general negligence, gross negligence, reckless conduct, breach of warranty, and wrongful death.

6.    At the time of her death, Mrs. Williams was married to James Williams and was the mother of the then minor child, Steven Douglas Williams. Thus, James Williams and Steven Douglas Williams are the proper parties to bring this survival action under Louisiana Civil Code Article 2315.1, and this action for wrongful death under Louisiana Civil Code Article 2315.2.

## THE INCIDENT

7.    On or about March 13, 2009, Decedent Cheryl Clay Williams was driving a 2003 Cadillac CTS, VIN Number 1G6DM579330120614, west on Panther Drive in Bossier City, Bossier Parish, Louisiana.

8.    Upon information and belief, Mrs. Williams then entered the intersection of Shreveport Barksdale Highway and Panther Drive to navigate a left turn onto Shreveport Barksdale Highway, when suddenly and without warning the subject vehicle malfunctioned.

9.    Thereafter, Mrs. Williams' vehicle was struck by a tractor trailer, which was being driven south bound on Shreveport Barksdale Highway.

2

10.     Mrs. Williams was seriously injured and ultimately died, as a result of the collision. Immediately prior to her death, Mrs. Williams was trapped in her vehicle, while emergency workers attempted to extract her from the vehicle.

11.     Mrs. Williams sustained internal injuries and bleeding, before she became unresponsive and dies as a result of her injuries.

12.     Since the time of Mrs. Williams' motor vehicle accident, the subject vehicle has been recalled as a result of defects with its ignition switch in its component parts, per GM Recall # N140172 and NHTSA Recall # 14V394, effective July 21, 2014.

13.     Upon information and belief, the safety defects in the Vehicle, subject to those recalls, were a cause of Mrs. Williams' vehicle malfunction that day and ultimately led to the collision at issue in this Complaint.

14.     More specifically, upon information and belief, a defect in the ignition switch in the vehicle caused the key to unintentionally move away from the "run" position during the Incident and interfered with the engine power, power steering, and/or power brake functions in the vehicle when the vehicle malfunctioned, ultimately causing Plaintiff's injuries during the crash.

15.     Defendant GM is one of the largest vehicle manufacturers in the United States and designed and manufactured the vehicle at issue in this Complaint sometime in or around 2003.

16.     Prior to the Incident on March 13, 2009, Defendant GM had not reported any potential problems with the vehicle and/or any other vehicles of its kind and had not recalled the vehicle and/or any other vehicles of its kind for defects or other design/operational issues.

17.     Despite that fact, however, upon information and belief, prior to March 13, 2009, Defendant GM was in the business of designing, manufacturing, testing, and selling and/or distributing vehicles in Louisiana that were knowingly unsafe and dangerous, defective, and/or

3

hazardous for public consumers' ordinary use, including but not limited to vehicle at issue in this Complaint.

18.     Also upon information and belief, Defendant GM knew about the safety related defects in Mrs. Williams' vehicle for at least ten years before the subject Recall was issued, but did nothing to recall, remedy, warn, or protect against the problem prior to the time that Mrs. Williams' accident occurred.

19.     As a result, although the vehicle and its component sub-assemblies were in the same essential condition as they were at the time it left Defendant's control, at the time of the Incident, the aforementioned vehicle was defective in its design and was not reasonably safe to drive.

20.     Had the vehicle and/or its component parts functioned properly, however, on the Incident at issue in this Complaint may have never occurred.

21.     Therefore, by reason of the foregoing, and for its failure to provide a vehicle that was reasonably safe for its intended use, Defendant GM is liable for all damages, injuries and losses suffered and sustained as a result of the Incident at issue in this Complaint.

## THE PARTIES, JURISDICTION, AND VENUE

22.     At all times relevant herein, Mrs. Williams was a citizen and resident of Bossier Parish, State of Louisiana.

23.     At all times relevant herein, Defendant GM is and was a for-profit corporation organized under the laws of the State of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan 48265.

24.     At all times relevant herein, Defendant GM is and was the successor corporation to General Motors Corporation ("GMC"), which underwent bankruptcy in 2009.  Through that

bankruptcy and an asset sale on July 10, 2009, GM acquired substantially all assets and assumed

certain liabilities of GMC.

25.    At all times relevant herein, among the liabilities and obligations expressly retained by

GM after the bankruptcy are:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting
> and recall requirements of the National Traffic and Motor Vehicle Act, the
> Transportation Recall Enhancement, Accountability and Documentation Act, the Clean
> Air Act, the California Health and Safety Code, and similar laws, in each case, to the
> extent applicable in respect of vehicles and vehicle parts manufactured or distributed by
> [GMC].

26.    Also through the bankruptcy sale on July 10, 2009, GM expressly assumed:

> [A]ll Liabilities arising under express written warranties of [GMC] that are specifically
> identified as warranties and delivered in connection with the sale of new, certified used or
> pre-owned vehicles or new or remanufactured motor vehicles parts and equipment
> (including services parts, accessories, engines, and transmissions) manufactured or sold
> by [GMC] or Purchaser prior to or after the Closing and (B) all obligations under Lemon
> Laws.

27.    At all times relevant herein, GM acquired and operated GMC and ran it as a continuous

business enterprise, that transaction constituted a sale of assets amount to a *de facto* merger or

consolidation, and GM is a mere continuation of GMC.  Also, because there was an express and

implied assumption of liability during, after, and through the bankruptcy sale on July 10, 2009,

and GM was aware from its inception of the significant ignition switch defect in it vehicles

produced, GM is liable through successor liability for the deceptive and unfair acts and

omissions of GMC, as further detailed herein.

28.    Hereinafter, GM and GMC, together will be referred to as ("GM" or "GM Defendant")

unless otherwise necessary and distinguished further for the purpose of this Complaint.

29.    At all times relevant herein, the event out of which this cause of action arose occurred on

or about March 13, 2009, at the intersection of Shreveport Barksdale Highway and Panther Drive

in Bossier Parish, Louisiana.

30.    At all times relevant herein, Defendant GM is and was licensed to conduct substantial

business in the State of Louisiana, regularly caused its products to be sold in Louisiana, and the

cause of action arises out of a tort committed in Louisiana, such that personal jurisdiction is

proper under Louisiana Code § 13:3201 et. Seq. and the Due Process Clause of the Fifth and

fourteenth Amendments of the Constitution of the United States of America.

31.    Defendant GM has a certificate of Authority to Transact Business in Louisiana, and may

be served by and through its registered agent for services of process, Corporation Service

Company, at 320 Somerulos Street, Baton Rouge, Louisiana 70802-6129.

32.    This Honorable Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §

1391(a)(1) because the amount in controversy exceeds $75,000.00, exclusive of interest and

costs, and diversity of citizenship exists between the parties.

33.    Venue of this action lies in the Western District of Louisiana pursuant to 28 U.S.C. §

1391(a) as it is the judicial district in which a substantial part of the event or omissions giving

rise to the claim occurred.

## NATURE OF THE CLAIM

### A.  GM's Duty to Disclose Serious Safety Defects

34.    Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully

herein.

35.    Upon information and belief, the Vehicle at issue in this Complaint had safety-related

design defects making it unsafe to operate on March 13, 2009.

36.     Based upon the evidence that has recently come to light, defendant GM had knowledge about these defects in its vehicles, since at least 2001, but intentionally, purposely, fraudulently, and systematically concealed the information from the public up until its first recall in February of 2014.

37.     Under the Motor Vehicle Safety Act (the "Safety Act"), 49 U.S.C. § 30101 et. seq., and the Transportation Recall Enhancement, Accountability, and Documentation Act (the "Tread Act"), 49 U.S.C. § 30170, Defendant GM is required to recall and repair motor vehicle defects related to safety or which cause the vehicle to be non-compliant with the Federal Motor Vehicle Safety Standards ("FMVSS").

38.     Under the Safety Act, the Secretary of Transportation "shall prescribe motor vehicle safety standards." 49 U.S.C. § 30111(a). The Act prohibits, with certain limited exceptions, the manufacturer for sale or the delivery in interstate commerce of any vehicle that does not comply with the standards promulgated in accordance with the Act 49 U.S.C. § 30115.

39.     The Safety Act requires that a manufacturer of motor vehicles certify to the distributor or dealer that the "vehicle or equipment complies with applicable motor vehicle safety standards." 49 U.S.C. § 30115.

40.     If a manufacturer learns that a vehicle contains a defect and that defect is related to motor safety or the vehicle does not comply with proper application of the FMVSS, the manufacturer must inform the Secretary of Transportation.  49 U.S.C. § 30118(c)(1)-(2).  If the Secretary of Transportation determines that the vehicle is defective or noncompliant with the FMVSS, it will require the manufacturer to notify the owners, purchasers and dealers of the defect and require it to remedy the defect or noncompliance.  49 U.S.C. § 30118(b)(2)(A) & (B).

7

09-50026-mg    Doc 13108-2    Filed 04/15/15    Entered 04/15/15 11:02:08    Exhibit B
Case 5:15-cv-01070   Document 19 Filed 04/07/15   Page 8 of 47 PageID #: 8

Pg 10 of 50

41.    Defendant GM violated the Tread Act by failing to timely inform NHTSA of the ignition witch defects and allowed vehicles to remain on the road with these defects. These same acts and omissions also violated various State consumer protection laws, as detailed bellow.

42.    If Defendant GM had informed the Secretary of Transportation that its vehicles were not in compliance with FMVSS 206, the Secretary would have required it to notify owners, purchasers, and dealers, and to remedy the defect in accordance with 49 U.S.C. § 30119.

43.    Thus, Defendant GM had a duty to warn the Plaintiff of defective and noncompliant parts, ignition switch problems, and/or brake or power steering issues in its vehicles, and to have remedied those defects prior to the time that the accident at issue in this Complaint occurred.

44.    Alternatively, even if Defendant GM believed the Vehicle to have complied, it knew that certain defective parts in its Vehicle were unsafe and in a defective condition such that it had a duty to fully disclose and warn purchasers, owners, and dealers about those defects as well.

45.    At all times relevant to this Complaint, the Defendant GM engaged in a scheme to keep concealed known and identified defects and to permit dangerous vehicles to remain on the road, to avoid the cost of recalling and/or repairing the unsafe and defective vehicles at the expense of the public and their safety.

### B. GM's Fraudulent Conduct in Concealing the Defects

#### 1) GM First Learns About the Safety Related Defects in its Vehicles

46.    Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

47.    In 2001, during developmental testing of one of its vehicles – the 2003 Saturn Ion –GM first learned that the engines in those vehicles were stalling due to ignition system defects. At

8

that time, however, GM chose not to fix, disclose, or address the problem or those defects discovered.

48.     In 2002, GM first began manufacturing and selling 2003 Saturn Ions with the known ignition switch defects, and later it began selling Cadillac CTS's and many other different types of vehicles with known defects as well.

49.     In 2004, GM engineers first reported that the defective ignition switches on the Saturn Ion (and its other vehicles) was so weak and so low on the steering column that a driver's knee could easily bump the key and turn off the vehicle. At that time, the GM engineer perceived the defect to be serious enough to include, in his January 2004 GM program report, that "[t]his is a basic design flaw and should be corrected if we want repeat sales."

50.     Nevertheless, GM began manufacturing and selling vehicles with the same defective ignition key system previously reported and observed. In October of 2004, Gary Altman-GM's program-engineering manager for the Cobalt-drove the Cobalt, with the standard key and key fob, and during that test drive, bumped the key with his knee, causing the engine to turn off and stall. Altman reported that incident to GM.

51.     In response to Altman's report, GM launched an engineering inquiry to investigate the potential for the key to move from the "run" to the "accessory/off" position during ordinary driving conditions. This inquiry is known within GM as a Problem Resolution Tracking System Inquiry ("PRTS"). The specific complaint which resulted in the PRTS was that the "the vehicle can be keyed off with knee while driving." On February 1, 2005, as part of the PRTS, GM engineers concluded that:

> There are two main reasons that [sic] we believe can cause a lower effort in turning the key: 1. A low torque detent in the ignition switch. 2. A low position of the lock module in the column. (PRTS–Complete Report N172404).

52.    As part of the PRTS, GM engineers also began looking into ways to solve the problem of the key moving from the "run" to the "accessory/off" position during ordinary driving.

53.    On February 18, 2005, GM engineers presented several possible solutions to the Cockpit Program Integration Team ("CPIT"). GM engineers determined the only "sure solution" to fixing the problem of the key inadvertently moving from the "run" to the "accessory/off" position required changing from a low mount to a high mount lock module, which would considerably reduce the possibility of the key/key fob being impacted by a driver.

54.    According to GM engineers, this change in the key position on the lock module, combined with increasing the detent in the ignition switch, would be a "sure solution." GM, however, through Altman, rejected this "sure solution," in part, because the cost to implement the solution would be too high.

55.    During this PRTS, GM also considered changing the key from a slot to a hole as a way to attempt to contain this problem, but not as a solution to the problem. Changing the key from a slot to a hole would reduce the lever arm of the key and the key chain. With the slot design, the key chain would hang lower on the key which would increase the torque force on the ignition switch when the chain was contacted or moved in any way. GM engineers determined this key change would significantly reduce the chance of the key inadvertently moving from the "run" to the "accessory/off" position during ordinary driving maneuvers.

56.    A GM engineer conducted a cost analysis of this key change and determined that the cost to make this change would be less than one dollar per vehicle or around 57 cents per part. Nevertheless, GM rejected this proposed key change and, on March 9, 2005, GM closed the PRTS without taking any steps to fix the defective ignition systems in its vehicles. The PRTS detailed the reasons why GM took no action:

Per GMX001 PEM's [Gary Altman] directive we are closing this PRTS with no action. The main reasons are as following: All possible solutions were presented to CPIT and VAPTR: a. The lead-time for all the solutions is too long. b. The tooling cost and piece price are too high. c. None of the solutions seem to fully countermeasure the possibility of the key being turned (ignition turn off) during driving. Thus **none of the solutions represents an acceptable business case.** (emphasis added)

57.     On February 28, 2005, GM first issued a bulletin recall to its dealers regarding engine-stalling incidents in certain vehicles it manufactured – or more specifically, in 2005 Cobalts and 2005 Pontiac Pursuits (the Canadian version of the Pontiac G5).

58.     The February 28, 2005, bulletin addressed the potential for drivers of these vehicles to inadvertently turn off the ignition due to low key ignition cylinder torque/effort.

59.     In that first February 28, 2005 recall bulletin, GM provided the following recommendations/instructions to its authorized dealers – **but not to Plaintiff or the public in general:**

> There is potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effort. The concern is more likely to occur if the driver is short and has a large heavy key chain.
>
> In the cases this condition was documented, the driver's knee would contact the key chain while the vehicle was turning. The steering column was adjusted all the way down. This is more likely to happen to a person that is short as they will have the seat positioned closer to the steering column.
>
> In cases that fit this profile, question the customer thoroughly to determine if this may the cause. The customer should be advised of this potential and to take steps, such as removing unessential items from their key chains, to prevent it.
> Please follow this diagnosis process thoroughly and complete each step. If the condition exhibited is resolved without completing every step, the remaining steps do not need to be performed.

60.     At that time, however, GM knew that the inadvertent turning off of the ignition in its vehicles was due to design defects in the ignition system in those vehicles, but failed to disclose and, in fact, concealed, the February 28, 2005 bulletin information from the public and sent affirmative representations to dealers that did not accurately describe the nature of the problem.

11

61.    Indeed, rather than disclosing this serious safety problem that uniformly affected all of its vehicle owners and distributors, GM instead concealed and obscured the problem, electing to wait until customers brought their vehicles to a dealership after an engine-stalling incident, and even offered its own dealers incomplete, incorrect, and insufficient descriptions of the defects and the correct manner in which to remedy them as well.

62.    In March 2005, following its receipt of a customer complaint that his/her Cobalt vehicle ignition turned off while driving, GM opened another PRTS — Complete Report (0793/2005US). Steve Oakley, the brand quality manager for the Cobalt, originated the PRTS. As part of the

PRTS, Mr. Oakley reviewed an email dated March 9, 2005 from Jack Weber, a GM engineer.

The subject of the email was "Cobalt SS Ignition Turn Off." In the email Mr. Weber stated:

I've had a chance to drive a Cobalt SS and attempt to turn off the ignition during heel/toe down shifting. Much to my surprise, the first time I turned off the ignition switch was during a normal traffic brake application on I96. After that I was able to do a static reproduction of the condition in a parking lot. I've attached photos of the condition with comments. My Anthropometric Measurements are attached below:

> I've had a chance to drive a Cobalt SS and attempt to turn off the ignition during heel/toe down shifting. Much to my surprise, the first time I turned off the ignition switch was during a normal traffic brake application on I96. After that I was able to do a static reproduction of the condition in a parking lot. I've attached photos of the condition with comments. My Anthropometric Measurements are attached below:
>
> Static view of keys, fob and registration hitting knee.
>
> Position of RKE fob during normal driving. Dynamic evaluation.
>
> View of steering column cover and Pass Key 3+"lump" under the key slot.

12

Key in run position, knee contacting the fob and the split ring is pulling on the key to move it to the "off" position. Static evaluation.

Fob has levered around the steering column cover and turned the ignition off.

Unobstructed view of the fob and column cover.

Attached below is documentation of a RAMSIS study performed to attempt to duplicate the real world condition.

Please call at (586) 986-0622 with questions.

Jack Weber

At that time, Mr. Weber had clearly identified the defects in the ignition system in its vehicles for GM, but GM continued to fail to heed and actively concealed the warnings.

63.    Despite that clear evidence, GM engineers still decided not to reconsider any of the proposed solutions discussed during the February 2005 PRTS. Instead, the GM engineers leading the PRTS recommended that sole corrective action GM should recommend would be to advise customers to remove excess material from their key rings, even though GM knew that the inadvertent turning off of the ignition in these vehicles was due to design defects in its vehicles, and was not limited to drivers having excess key ring materials.

64.    In May 2005, GM received another customer complaint and opened another PRTS. During that PRTS, GM decided to redesign the key in order to reduce the possibility that a driver may inadvertently turn the key from the "run" to the "accessory/off" position during ordinary driving. Despite that initial safety/redesign commitment, however, GM ultimately failed to follow through on its own decision and closed this PRTS without any action, further concealing what it knew from the public and continuing to subject the public, including the Plaintiff, to the defective vehicles' serious safety risks.

65.    In September of 2005, GM first received notice of a defect related accident and death.

On July 29, 2005, Decedent Amber Marie Rose, a sixteen-year-old from Clinton, Maryland, had been driving a 2005 Cobalt when she ran off the road and struck a tree head-on. She had died as a result of the injuries sustained in the crash.

66.    GM opened an internal investigation file pertaining to the incident, and during its investigation learned: (1) that the Cobalt the Decedent had been driving was in the "accessory/off" position at the time of the crash, and (2) that the driver's side frontal airbag should have deployed given the circumstances of the accident. Upon information and belief, GM subsequently entered into a confidential settlement agreement with that Decedent's mother, but still, the defect was not corrected or publicly disclosed.

67.    As of February 2005, GM's own internal engineers had repeatedly issued reports to the company informing them about the danger of the ignition switch defect discussed in this Complaint, and as early as July of 2005, GM was placed on notice that the defect was serious enough to cause a deadly crash.

68.    Pursuant to 49 C.F.R. § 573.6, which requires an automobile manufacturer to "furnish a report to the NHTSA for each defect . . . related to motor vehicle safety."

69.    Instead of complying with its legal obligations, however, GM fraudulently concealed the ignition switch defects in its vehicles from the public–including the Plaintiff—and continued to manufacture and sell vehicles with known safety defects.

70.    And further, as a result of its failure to timely expose its knowledge and/or effectively recall its vehicles with known defects/defective parts, in or about 2003, GM manufactured and designed the Vehicle using the identical and/or substantially similar component parts as those vehicles discussed above and contained the same defective and dangerous ignition switch which had previously been identified to GM.

14

### 2) The Accident Toll Rises – GM Investigates Further, But Continues its Concealment and Fraudulent Misrepresentations to the Public

71.    Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

72.    In December 2005, shortly after it commenced its internal investigation into the incident leading to Amber's death, GM issued a Technical Service Bulletin (05-02-35-007) (the "TSB"). The TSB, which GM affirmatively represented applied to 2005–2006 Chevrolet Cobalts, 2006 Chevrolet HHRs, 2005–2006 Pontiac Pursuit, 2006 Pontiac Solstices, and 2003–2006 Saturn Ions, provided, "Information on inadvertent Turning of Key Cylinder, Loss of Electrical System and no DTCs," provided the following service information:

> There is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort.
>
> The concern is more likely to occur if the driver is short and has a large and/or heavy key chain. In these cases, this condition was documents and the driver's knee would contact the key chain while the vehicle was turning and the steering column was adjusted all the way down. This is more likely to happen to a person who is short, as they have the seat positioned closer to the steering column.
>
> In cases that fit this profile, question the customer thoroughly to determine if this may be the cause. The customer should be advised of this potential and should take steps to prevent it - such as removing unessential items from their key chain.
>
> Engineering has come up with an insert for the key ring so that it goes from a "slot" design to a hole design. As a result, the key ring cannot move up and down in the slot any longer - it can only rotate on the hole. In addition, the previous key ring has been replaced with a smaller, 13 mm (0.5 in) design. This will result in the keys not hanging as low as in the past.

73.    At the time GM issued this statement, however, GM had provided information that was false and misleading. In the two PRTSs GM issued before it issued the TSB, GM engineers never represented that short drivers or heavy key chains were the reasons why these incidents were happening. Indeed, at the time it issued the TSB, GM knew that these incidents were not

15

caused by short drivers with heavy key chains but that they were, instead, caused by safety related defects in the ignition systems of its vehicles.

74.     In 2005, GM began buying back Cobalts from certain customers who were experiencing engine stalling incidents, but never informed the public of that fact. Indeed, GM refused to buy back some of the vehicles, despite engine stalling incident complaints, and never informed its customers of the TSB or availability of the key insert alternative.

75.     On November 17, 2005, shortly after Decedent Amber Marie Rose's death report and immediately before GM issued the TSB, both mentioned above, there was another incident involving the defect in Baldwin, Louisiana. In that incident, a 2005 Cobalt had run off the road and collided with a tree, and the frontal airbags had not deployed. GM received notice of the accident, and opened a file – the "Colbert" file – to investigate, but still did not take action to correct, fix, or publicly report the defect.

76.     On February 10, 2006, shortly after GM's issuance of the TSB, another incident occurred in Lanexa, Virginia. There, another a 2005 Cobalt had run off the road and collided with a light pole, and the frontal airbags had not deployed. The download of the SDM (the vehicle's "black box") showed the key was in the "accessory/off" position at the time of the crash. GM received notice of this accident, opened a file, referred to it as the "Carroll" incident, but still did not take action to correct, fix, or publicly report the defect.

77.     On March 14, 2006, in Frederick, Maryland, another 2005 Cobalt accident occurred. In that incident, the vehicle had run off the road, collided with a utility pole, and the frontal airbags had not deployed. The download of the SDM showed the key was in the "accessory/off" position at the time of the crash. GM received notice of this incident, opened a file, referred to it as the "Oakley" incident, but still did not take action to correct, fix, or publicly report the defect.

16

78.    On August 1, 2006, following its receipt of a customer complaint about a Cobalt stalling while driving, GM opened yet another PRTS relating to this issue. GM closed this PRTS on October 2, 2006 however, without taking any action.

79.    In October 2006, GM updated the TSB (05-02-35-007) to include additional model years: the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, 2007 Cobalt and 2007 Pontiac Solstice and G5. These vehicles had the same safety-related defects in the Key System as the vehicles in the original TSB. All of the vehicles identified in the original TSB are hereinafter referred to as the "Defective Vehicles."

80.    On December 29, 2006, in Sellenville, Pennsylvania, another 2005 Cobalt drove off the road and hit a tree. The frontal airbags failed to deploy. GM was notified, opened a file, and referred to it as the "Frei" incident, but still did not take action to correct, fix, or publicly report the defect.

81.    On February 6, 2007, in Shaker Township, Pennsylvania, a 2006 Cobalt incident occurred. In that incident, the vehicle ran off the road and hit a truck. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. GM received notice of this incident, opened a file, and referred to it as the "White" incident, but still did not take action to correct, fix, or publicly report the defect.

82.    In August 2007, GM met with its Sensing and Diagnostic Module ("SDM") supplier, Continental, to review SDM data from a crash of a 2005 Chevrolet Cobalt where the airbags failed to deploy.

83.    On August 6, 2007, in Cross Lanes, West Virginia, a 2006 Cobalt rear-ended a truck. The frontal airbags failed to deploy. GM received notice of this incident, opened a file, and

referred to it as the "McCormick" incident, but still did not take action to correct, fix, or publicly

report the defect.

84.     In September 2007, the Chief of the Defect Assessment Division within the Office of

Defects Investigation ("ODI") of the National Highway Traffic Safety Administration

("NHTSA") emailed other ODI officials and proposed an investigation of "frontal airbag non-

deployment [sic] in the 2003-2006 Chevrolet Cobalt/Saturn Ion."  This email went on to state

that the:

> ". . . issue was promoted by a pattern of reported non-deployments in VOQ
> [Vehicle Owners' Questionnaire] complaints that was first observed in early
> 2005. Since that time, [the Defects Assessment Division] has followed up on the
> complaints, enlisted the support of NCSA's Special Crash Investigations (SCI)
> team, discussed the matter with GM, and received a related EWD Referral.
> Notwithstanding GM's indications that they see no specific problem pattern,
> DAD perceives a pattern of non-deployments in these vehicles that does not exist
> in their peers . . . ."

This email from the Chief of the Defect Assessment Division at NHTSA shows that, as of

September 2007, GM was deliberately misleading in a report to NHTSA and concealing the

defects in its vehicles' ignition systems in violation of federal law.

85.     On September 25, 2007, in New Orleans, Louisiana, a 2007 Cobalt lost control and struck

a guardrail. Despite there being a frontal impact in this incident, the frontal airbags failed to

deploy. GM received notice of this incident, opened a file, and referred to it as the "Gathe"

incident, but still did not take action to correct, fix, or publicly report the defect.

86.     On October 16, 2007, in Lyndhurst, Ohio, a 2005 Cobalt traveled off road and hit a tree.

The frontal airbags failed to deploy. GM received notice of this incident, opened a file, and

referred to it as the "Breen" incident, but still did not take action to correct, fix, or publicly report

the defect.

87.    On April 5, 2008, in Sommerville, Tennessee, a 2006 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. GM received notice of this incident, opened a file, and referred to it as the "Freeman" incident, but still did not take action to correct, fix, or publicly report the defect.

88.    On May 21, 2008, in Argyle, Wisconsin, a 2007 G5 traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. GM received notice of this incident, opened a file, and referred to it as the "Wild" incident, but still did not take action to correct, fix, or publicly report the defect.

89.    On May 28, 2008, in Lufkin, Texas, a 2007 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "McDonald" incident, but still did not take action to correct, fix, or publicly report the defect.

90.    On September 13, 2008, in Lincoln Township, Michigan, a 2006 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "Harding" incident, but still did not take action to correct, fix, or publicly report the defect.

91.    On November 29, 2008, in Rolling Hills Estates, California, a 2008 Cobalt traveled off the road and hit a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "Dunn" incident, but still did not take action to correct, fix, or publicly report the defect.

92.     On December 6, 2008, in Lake Placid, Florida, a 2007 Cobalt traveled off the road and hit a utility pole. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. GM received notice of this incident, opened a file, and referred to it as the "Grondona" incident, but still did not take action to correct, fix, or publicly report the defect.

93.     In February 2009, GM opened yet another PRTS with respect to the Defective Vehicles – this time to investigate why the slot in the key in its vehicles allowed the key chain to hang too low in the vehicles, as well as the inadvertent shutting off of the vehicles. Through this PRTS, GM determined that changing the key from a slot to a hole would significantly reduce the likelihood of inadvertent turning off the ignition switch.

94.     In March 2009, GM approved of the design change in the key from the slot to a hole. According to GM, this redesigned change was implemented in model year 2010 Cobalts. GM, however, chose not to provide these redesigned keys the owners or lessees of any of the vehicles implicated in the TSB, including the 2003 Ion.

95.     The timeline below gives a short overview of some key points between 2004 and the present, as discussed above:

| 2001-2004 GM learns Key Systems are defective. | 2005-2009 GM learns of hundreds of field reports of Key System failures and multiple fatalities. | 2010-2014 GM learns of more field reports of Key System failures and additional fatalities. |
| --- | --- | --- |
| **2005** GM engineers' proposed fix rejected; Amber Rose dies after airbag | **2009** GM declares and emerges from bankruptcy. | **2014** GM issues inadequate recall over 10 years after learning its ignition switch systems |

fails to deploy.                                                    are defective.

96.     Therefore, throughout this entire time period, GM was selling defective vehicles to

consumers for full price, and consumers were purchasing them believing that the vehicles were

non-defective, but all the while GM was concealing the extent and nature of the serious and

dangerous defects mentioned above.

### 3) GM's Affirmative Misrepresentations to the Public and the Bankruptcy Court

97.     Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully

herein.

98.     Also despite its knowledge of the extent and nature of the dangerous defects in its

vehicles, at all times relevant, GM marketed and continued to market that its vehicles, although

equipped with defective ignition switches, were safe and reliable when, in fact, the opposite was

true.

99.     Since as early as 2001, GM knew that the defective design of the ignition switches

presented serious safety issues, but rather than replacing the defective ignition switch, or

notifying NHTSA of the danger, GM expressly and intentionally made it a business decision to

continue concealing the defects from the public to boost vehicle sales and maximize profits.

100.    Prior to its bankruptcy filing in 2009, in a section called "safety," on its website, GM had

included the following statement:

> OUR COMMITMENT
>
> Your family's safety is important to us. Whether it's a short errand around town
> or a cross-country road trip, Chevrolet is committed to keeping you and your
> family safe — from the start of your journey to your destination.

That's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind. Choose from the safety features below to learn more about how they work, and which Chevy vehicles offer them.

101.   Similarly, it had promoted its Saturn vehicle line on television with statements like, "Putting people first" and in print ad campaigns had featured statements like, "Need is where you begin. In vehicles, it's about things like reliability, durability and, of course, safety. That's where we started when developing our new line of cars" to increase sales.   Thru statements like these, GM clearly made affirmative misrepresentations to the public that its vehicles were safe when, in fact, the company had failed to disclose the known defects.

102.   On June 1, 2009, when the "Old" GM ("GMC") filed bankruptcy in the Southern District of New York, and a "New" GM was incorporated to, on July 10, 2009, acquire substantially all assets and assume certain liability of GMC through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code, GM also fraudulently concealed these ignition defects from the federal Bankruptcy Court as well.

103.   So even as GM took billions of dollars in taxpayer money from the U.S. Government and obtained the U.S. Government's sponsorship of a plan of reorganization that salvaged the company's very existence, it continued to conceal and failed to disclose its knowledge about the ignition switch defects to the Bankruptcy Court, the U.S. Government, to persons who owned or leased GM vehicles containing the defective ignition switch at that time, and/or to any other interested parties in violation of the law.

### 4) GM's Continued Fraudulent Concealment/ Misrepresentation from 2009 Going Forward

104.   Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

09-50026-mg   Doc 13108-2   Filed 04/15/15   Entered 04/15/15 11:02:08   Exhibit B
Case 5:15-cv-01070   Document 1   Filed 04/07/15   Page 23 of 47 PageID #: 23

Pg 25 of 50

105.    After the Bankruptcy Court approved the sale of GMC to GM on July 10, 2009, without knowledge of these misrepresentations aforementioned and above, a "New" GM was formed that not only had assumed the liabilities of GMC for its bad actions prior to the acquisition but which also possessed its own independent knowledge of the defects in its vehicles and independently chose to continue to conceal the defect as well.

106.    More specifically, the "New" GM had actual knowledge that, because of the way in which the ignition was designed and integrated into the Defective Vehicles, the ignition switch could fail during normal operation, cutting off engine power and certain electrical systems in the vehicles, which, in turn, would disable key vehicle components, safety features (like airbags), or other vehicle functions, leaving occupants vulnerable to crashes, serious injuries, and death.

107.    In part, GM's knowledge of the ignition switch defects arises from the fact that key personnel with knowledge of the defects remained in their same positions once GM took over from "Old" GMC. For example, the Design Research Engineer who was responsible for the rollout of the defective ignition switch in 2003 was Raymond DeGiorgio. Mr. DeGiorgio continued to serve as an engineer at Old GM and GM until April 2014 when he was suspended as a result of his involvement in the defective ignition switch crisis. In the wake of the *Report to the Board of Directors of General Motors Company Regarding the Ignition Switch Recalls*, authored by Anton R. Valukas of Jenner & Block (May 29, 2014) (hereinafter "the Valukas Report"), Mr. DeGiorgio was fired, for he knew about and actively concealed the defect while working for both GM and "Old" GMC.

108.    Similarly, Gary Altman who was the program-engineering manager mentioned previously for the Cobalt at GMC knew about the defect and remained an engineer at GM, all throughout the transition, until he was suspended on April 10, 2014. Eventually, he was also

23

fired for his role in the ignition switch defect cover-up in the wake of the Valukas Report. In connection with that investigation, Mr. Altman recently admitted that engineering managers (including himself and Mr. DeGiorgio) knew about ignition switch problems in the Defective Vehicles that could cause them to stall, and disable power steering and power brakes, but that GMC launched the vehicle anyway because they believed that the vehicles could be safely steered off the road after a stall. Mr. Altman was adamant that "the [Cobalt] was maneuverable and controllable" with the power steering and power brakes inoperable. Nevertheless, all throughout the relevant period, GM continued to claim that it did not view vehicle stalling and the loss of power steering as a "safety issue," but rather as a "customer convenience" issue,[1] and even went so far as to allege that it was not aware that when the ignition switch moves to the "accessory" position, the airbags become inoperable even though GM itself had previously designed the airbags to not deploy in that exact circumstance.

109.    Additionally, in 2010, the "New" GM began its own formal investigations into the defect in its vehicles and its deathly consequences. More specifically, that year, GM initiated a new investigation into the frontal airbag non-deployment incidents in the Chevrolet Cobalts and Pontiac G5s and subsequently elevated that investigation to a Field Performance Evaluation ("FPE").

110.    In August 2011, GM assigned Engineering Group Manager, Brian Stouffer as the Field Performance Assessment Engineer ("FPAE") to assist with the FPE investigation. In the spring of 2012, Stouffer asked Jim Federico, a high level executive and chief engineer at GM, to oversee the FPE investigation. Federico was the "executive champion" for the investigation to help coordinate resources for the FPE investigation.

---

1 Valukas Report at pg. 2

111.    In May 2012, GM engineers tested the torque on the ignition switches for 2005-2009 Cobalt, 2007, 2009 Pontiac G5, 2006-2009 HHR, and 2003-2007 Ion vehicles in a junkyard. The results of these tests showed that the torque required to turn the ignition switches in most of these vehicles from the "run" to the "accessory/off" position did not meet GM's minimum torque specification requirements, including the 2008-2009 vehicles. These results were reported to Stouffer and other members of the FPE.

112.    In September 2012, Stouffer requested assistance from a "Red X Team" as part of the FPE investigation. The Red X Team was a group of engineers within GM assigned to find the root cause of the airbag non-deployments in frontal accidents involving Chevrolet Cobalts and Pontiac G5s. By that time, however, it was clear that the root cause of the airbag non-deployments in a majority of the frontal accidents was the defective ignition switch. The Red X Team became involved in the investigation shortly after Mr. Stouffer's request.

113.    During the field-performance-evaluation process, GM determined that, although increasing the detent in the ignition switch would reduce the chance that the key would inadvertently move from the "run" to the "accessory/off" position, it would not be a total solution to the problem.

114.    Indeed, the GM engineers identified several additional ways to actually fix the problem. These ideas included adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the run position, and adding a push button to the lock cylinder to prevent it from slipping out of run. GM rejected each of these ideas.

115.    The GM engineers clearly understood that increasing the detent in the ignition switch alone was not a solution to the problem but GM concealed – and continued to conceal – from the public, the nature and extent of the defects.

116.    By 2012, Federico, Stouffer, and the remaining members of the Red X Team knew that the Key System in the Ion, the Cobalt, and the G5 vehicles had safety-related defects that would cause the key to move from the "run" to the "accessory/off" position while driving these vehicles.  They also knew that when this happened the airbags would no longer work in frontal crashes.

117.    Federico, Stouffer, and the other members of the Red X Team also understood that these safety-related defects had caused or contributed to numerous accidents and multiple fatalities.  Despite this knowledge, GM chose to conceal this information from the public, NHTSA, and the Plaintiff.

118.    Under 49 C.F.R. ¶ 573.6, GM had a duty in 2012 to disclose the safety-related defects in the Ion, Cobalt, and G5 vehicles, however, rather than comply with its legal obligations, GM continued to fraudulently conceal these defects from the Plaintiff, the public, and the U.S. Government well into 2014.

### 5) The "New" GM Continues the Fraudulent Misrepresentation by Promoting its Defective Vehicles as Safe and Reliable from 2009 Going Forward

119.    Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

120.    Despite its knowledge about the dangerous vehicle defects, since the transition in 2009 going forward, the "New" GM not only continued to fraudulently conceal material facts related to the safety defects in its vehicles, but also continued to make affirmative fraudulent and

misleading statements to the public regarding the nature and extent of those safety defects and
the dangers they might pose to unaware drivers as well.

121.    More specifically, in advertisements and company literature in 2010, the "New" GM
boasted about the safety, reliability, and quality of its vehicles. For example, in a radio ad that
GM ran from its inception, in July of 2009, until about July 16, of 2010, it stated that, "[a]t GM,
building quality cars is the most important thing we can do."

122.    Also, in a 2010 television ad, GM stated that, "Chevrolet's ingenuity and integrity remain
strong, exploring new areas of design and power, while continuing to make some of the safest
vehicles on earth."

123.    Further, in its 2011 Annual Report, Defendant GM affirmatively represented to the public
that it was building vehicles in the normal course with an emphasis on design excellence, quality
and performance:

> And across the globe, other GM vehicles are gaining similar acclaim for design
> excellence, quality and performance, including the Holden Commodore in
> Australia, the Chevrolet Agile in Brazil, the Buick LaCrosse in China and many
> others.
>
> The company's progress is early evidence of a new business model that begins
> and ends with great vehicles. We are leveraging our global resources and scale to
> maintain stringent cost management while taking advantage of growth and
> revenue opportunities around the world, to ultimately deliver sustainable results
> for all of our shareholders.

124.    In its 2012 Annual Report, GM also falsely indicated that it had changed its structure to
create more "accountability":

> That work continues, and it has been complemented by changes to our design and
> engineering organization that have flattened the structure and created more
> accountability for produce execution, profitability and customer satisfaction;

And in that same report, also falsely represented that product quality was a key focus:

Product quality and long-term durability are two other areas that demand our
unrelenting attention, even though we are doing well on key measures.

125.    Defendant GM also continued to run these national ad campaigns well into 2013. In

April of 2013, GM ran a national print campaign in which it stated that, "[w]hen lives are on the

line, you need a dependable vehicle you can rely on. Chevrolet and GM ... for power,

performance and safety."

126.    Also, in a 2013 Letter to Stockholders, GM noted that its brand had grown in value and

that it designed the "World's Best Vehicles":

> Dear Stockholder:
>
> Your company is on the move once again. While there were highs and lows in
> 2011, our overall report card shows very solid marks, including record net income
> attributable to common stockholders of $7.6 billion and EBIT-adjusted income of
> $8.3 billion.
>
> GM's overall momentum, including a 13 percent sales increase in the United
> States, created new jobs and drove investments. We have announced investments
> in 29 U.S. facilities totaling more than $7.1 billion since July 2009, with more
> than 17,500 jobs created or retained.
>
> Design, Build and Sell the World's Best Vehicles
>
> This pillar is intended to keep the customer at the center of everything we do, and
> success is pretty easy to define. It means creating vehicles that people desire,
> value and are proud to own. When we get this right, it transforms our reputation
> and the company's bottom line.
>
> Strengthen Brand Value
>
> Clarity of purpose and consistency of execution are the cornerstones of our
> product strategy, and two brands will drive our global growth. They are
> Chevrolet, which embodies the qualities of value, reliability, performance and
> expressive design; and Cadillac, which creates luxury vehicles that are
> provocative and powerful. At the same time the Holden, Buick, GMC, Baojun,
> Opel and Vauxhall brands are being carefully cultivated to satisfy as many
> customers as possible in select regions.
>
> Each day the cultural change underway at GM becomes more striking. The old
> internally focused, consensus-driven and overly complicated GM is being

reinvented brick by brick, by truly accountable executives who know how to take calculated risks and lead global teams that are committed to building the best vehicles in the world as efficiently as we can.

That's the crux of our plan. The plan is something we can control. We like the results we're starting to see and we're going to stick to it – always.

127.   Despite these ads, however, all throughout the relevant period, Defendant GM possessed knowledge and information vastly superior to that of consumers about the defective design and function of the ignition switches in its vehicles.

128.   Nevertheless, Defendant GM made false representations to the public about the quality of its vehicles to boost vehicle sales and maximize profits without ever informing consumers or the public about the potential dangers those defects might present.

129.   In this way, the "New" GM intentionally prioritized profits over public safety and health. For example, one "directive" at GM was identified in the Valukas Report as "cost is everything;" meaning all levels of employees at GM should focus on controlling costs.[2]

130.   For support, as disclosed in that report, Mark Reuss (former President of GM North America and current Executive Vice President for Global Product Development) had previously stated that GM "emphasized timing over quality;" "there was resistance or reluctance to raise issues or concerns in the GM culture," and "the atmosphere at GM "discouraged individuals from raising safety concerns."[3]

131.   Since that time, GM's CEO, Mary Barra, has also noted that GM engineers were "unwilling to identify issues out of concern that it would delay the launch" of a vehicle.[4]   She

---

2 Valukas Report at pgs. 249-250.
3 Valukas Report at pgs. 249-250.

4 *Id.*

said that GM often "pushed back" on describing matters as safety issues, resulting in "GM personnel fail[ing] to raise significant issues to key decision-makers."[5]

132.    In this way, from 2009 going forward, the "New" GM continued to intentionally deceive the public thru affirmative misrepresentations about the quality of its vehicles, to maximize profits, despite the serious, dangerous health and safety risks.

### 6) GM's Recall of its Vehicles Ten Years Too Late

133.    Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

134.    At all times relevant herein, alarmingly, both GMC and GM knew of the deadly ignition switch defects in its vehicles and their dangerous consequences, but continued to actively hide and concealed it from owners, consumers, and the public by failing to recall its vehicles for years.

135.    Rather than publicly admitting the dangerous safety defects in its vehicles, however, GM attempted to attribute these and other incidents to "driver error," but as a result, every year from 2005 to 2012, received reports of serious incidents in Cobalts involving steering and/or airbag failures, including in:

- 2005: 26 Cobalt Death and Injury Incidents, including 1 death citing "airbag" as the component involved.

- 2006: 69 Cobalt Death and Injury Incidents, including 2 deaths citing "airbag" as the component involved and 4 deaths listing the component involved as "unknown."

- 2007: 87 Cobalt Death and Injury Incidents, including 3 deaths citing "airbag" as the component involved.

- 2008: 106 Cobalt Death and Injury Incidents, including 1 death citing "airbag" as the component involved and 2 deaths listing the component involved as "unknown."

---

5 *Id.* at pgs. 252-253.

- 2009: 133 Cobalt Death and Injury Incidents, including I death citing "airbag" as the component involved, 1 death citing "service brake" as the component involved, 1 death citing "steering" as component involved, and 2 deaths listing the component involved as "unknown."

- 2010: 400 Cobalt Death and Injury Incidents, including 2 deaths citing "airbag" as the component involved, 12 deaths citing "steering" as the component involved, and I death listing the component involved as "unknown."

- 2011: 187 Cobalt Death and Injury Incidents, including 2 deaths citing "airbag" as the component involved, 2 deaths citing "steering" as the component involved, and I death listing the component involved as "unknown."

- 2012: 157 Cobalt Death and Injury Incidents, including 5 deaths citing "airbag" as component involved, and 4 deaths citing "steering" as component involved.

136.    Despite these reports, it was not until 2014, after numerous assessments and facing increasing scrutiny of its conduct and the defects in its vehicles, that GM finally announced its first recall.

137.    More specifically, it was not until February 7, 2014, that GM, in a letter from Carmen Benavides, Director Product Investigations and Safety Regulations for GM first notified NHTSA that it was conducting Recall No. 13454 for certain 2005-2007 model year ("MY") Chevrolet Cobalts and 2007 MY Pontiac G5 vehicles. In that letter, GM represented that as replacement ignition switches had "become available," GM planned to replace the defective ignition switches, but only on the specific vehicles it had recalled.

138.    On February 19, 2014, a request for timeliness query of that Safety Recall 13454 was sent to NHTSA. The timeliness query pointed out that GM had failed to recall *all* of the vehicles with the defective ignition switches. That February 19, 2014 request for timeliness query also asked NHTSA to investigate GM's failure to previously fulfill its legal obligation to report the safety-related defects in its defective vehicles to NHTSA within five days of discovering that

defect. GM provided dealers with notice of the recall on February 26, 2014 and March 4, 2014, and mailed letters to current owners on March 10 and March 11, 2014.

139.    On February 24, 2014, GM in a letter from Carmen Benavides, informed NHTSA it was expanding the recall to include 2006-2007 MY Chevrolet HHR and Pontiac Solstice, 2003-2007 MY Saturn Ion, and 2007 MY Saturn Sky vehicles as well. It was in this letter that GM acknowledged, **for the first time**, that changes had been made to the ignition switches in certain defective vehicles during the 2007 model year. Specifically, GM represented that:

> On April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch proposed by the supplier, Delphi Mechatronics. The approved changes included, among other things, the use of a new detent plunger and spring that increased torque force in the ignition switch.

However, at no time before February 24, 2014 had GM disclosed this fact or any other prior knowledge of the defect at all.

140.    On March 28, 2014, GM further expanded its recall to include: 2008-2011 MY Chevrolet HHR, 2008-2010 MY Chevrolet Cobalt, 2008-2010 MY Pontiac G5, 2008-2010 MY Pontiac Soltice, 2008-2010 MY Saturn Sky, 2008-2010 MY Opel GT, and 2008-2009 MY Daewoo G2X vehicles, and on June 13, 2014, GM again extended the recall to include 2010 – 2014 MY Chevrolet Camaro vehicles as well.

141.    Three days later, on June 16, 2014, GM again extended the recall to also include: 2005-2009 MY Buick Allure, 2005-2009 MY Buick LaCrosse, 2006-2014 MY Chevrolet Impala, 2000-2005 MY Cadillac Deville, 2004-2011 MY Cadillac DTS, 2006-2011 MY Buick Lucerne, 2004-2005 MY Buick Regal LS & GS, 2006-2008 MY Chevrolet Monte Carlo vehicles.

142.    On June 18, 2014, with the recall count mounting, Defendant GM's CEO Mary Barra again testified before the United States House of Representatives Committee on Energy and

32

Commerce, Subcommittee on Oversight and Investigation, and despite her company's prior claim that the vehicle stall was merely a "customer convenience," issue in the Valukas Report, finally admitted that GM does "consider stalls to be a safety issue."

143.    Since that time, however, as has been brought to light by the Valukas Report and further confirmed by many former and current GM employees, Defendant GM has continued its attempts to downplay the defect by intentionally avoiding use of the word "stall" in its responses and reports "because [that] language might draw the attention of NHTSA," and "may raise a concern about safety, which suggests [that] GM should recall [more] vehicle[s]…"  In fact, certain GM presentation materials provided to NHTSA during the most recent investigations revealed that GM has specifically instructed its employees not to use a number of words, including:  "bad," "catastrophic," "Corvair-like," "dangerous," "decapitating," "defect," "defective," "eviscerated," "Hindenburg," "inferno," "Kevorkianesque," "life-threatening," "mutilating," "powder keg," "rolling sarcophagus," "safety," "safety-related," "suicidal," "Titanic," and "widow-maker," and instead recommended the words:

- "Issue, Condition [or] Matter" instead of "Problem"
- "Has Potential Safety Implications" instead of "Safety"
- "Broke and separated 10mm" instead of "Failed"
- "Does not perform to design" instead of "Defect/Defective"

144.    As a result, even NHTSA was able to discern GM's intent to continue to conceal the defect to avoid liability thru its company policy of avoiding certain words.  On May 16, 2014, at a press conference announcing the Consent Order concerning the ignition switch defect, David Friedman, NHTSA' Acting Administrator, announced that:

> GM must rethink the corporate philosophy reflected in the documents we reviewed, including training materials that explicitly discouraged employees from using words like 'defect,' 'dangerous,' 'safety related,' and many more essential terms for engineers and investigators to clearly communicate up the chain when they suspect a problem.

145.    To make matters worse, even after these initial public disclosures, apologies, and announcements by Defendant GM and despite the investigations and findings of fraud, all known defective GM vehicles still had not yet been recalled.

146.    On June 30, 2014, GM extended the recall yet again to include: 1997-2005 MY Chevrolet Malibu, 1998-2005 MY Oldsmobile Intrique, 1999-2004 MY Oldsmobile Alero, 1999-2005      Pontiac Grand Am, 2000-2005 MY Chevrolet Impala, 2000-2005 MY Chevrolet Monte Carlo, 2004-2008 MY Pontiac Grand Prix, 2003-2014 MY Cadillac CTS, and 2004-2006 MY Cadillac SRX vehicles as well.

147.    Ultimately, because GM continued to conceal the ignition switch defect and a staggering number of other known safety defects due in large measure to GM's focus on cost-cutting over safety, its culture of burying safety issues, and its training of employees to avoid using terms such as "stall," "defect," or "safety issue" in order to avoid the attention of regulators, GM has since been forced to recall nearly 29 million vehicles in the first half of this year and over 15 million vehicles due to the ignition defects alone.

148.    GM has since appointed a new Vehicle Safety Chief and effectively fired two of their main vehicle engineers and instructed "the dealers . . . to replace the ignition switch,"[6] presumably with one with sufficient torque to prevent the inadvertent shut down of the ignition, power steering, power brakes, and airbags.

149.    In a video message addressed to GM employees on March 17, 2014, CEO Mary Barra admitted that the Company had made mistakes and needed to change its processes. According to Ms. Barra, "Something went wrong . . . in this instance, and terrible things happened," but Barra

---

6 *Id.* at 6.

has continued to promise, "We will be better because of this tragic situation if we seize this opportunity."[7]

150.    However, GM cannot undo the damage already done, and millions of defective vehicles remain on the road to this day. Also, upon information and belief, there are other defective GM vehicles that have the deadly ignition switch defect or other defective component parts that have not yet been identified or recalled.

151.    Nevertheless, at least, at this point, the fraud has been revealed. Based upon the recalls at present, and their ever increasing expansion, it has become abundantly clear that Defendant GM intentionally and fraudulently concealed known safety defects in its vehicles, the vehicles' dangerous propensities to crash, and its resulting noncompliance with safety standards from the public, from NHSTA, from the government, and from the Plaintiff for years.

C.    The Impact of GM's Fraud in this Case

152.    Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

153.    The first priority of an auto manufacturer should be to ensure that its vehicles are safe, and particularly that its vehicles have operable ignition systems, airbags, power steering, power brakes, and other safety features that can prevent or minimize the threat of death or serious bodily harm in a collision. In addition, an auto manufacturer must take all reasonable steps to ensure that, once a vehicle is running, it operates safely and its critical safety systems (such as engine control, braking, and airbag systems) work properly until such time as the driver shuts the vehicle down. Moreover, an auto manufacturer that is aware of dangerous design defects that

---

7 *Something Went "Very Wrong" at G.M., Chief Says,* N.Y TIMES (Mar. 18, 2014).

cause its vehicles to shut down during operation, or the vehicles' airbags not to deploy, must promptly disclose and remedy such defects.

154.    Defendant GM and certain of its employees had actual knowledge of known safety related defects as well as the identified noncompliant component parts in its vehicles, including the Cadillac CTS Vehicle at issue in this Complaint. Despite that knowledge, Defendant GM took no action to notify the public or the NHTSA of the known safety related defects until its first recall in February of 2014.

155.    An auto manufacturer should never make profits more important than safety and should never conceal defects that exist in its vehicles from consumers or the public. Defendant's Vehicle Safety Chief, Jeff Boyer has stated that: "Nothing is more important than the safety of our customers in the vehicles they drive." Yet Defendant failed to live up to this commitment.

156.    In making the decision to cover up the ignition switch defect for at least a decade, Defendant GM consciously put millions of Americans' lives at risk. Defendant GM knowingly placed on public streets more than one million defective vehicles with the propensity to shut down during normal driving conditions, creating a certainty of accidents, bodily harm, and death.

157.    Only after reviewing the information now available because of the GM recalls has Plaintiff actually realized the full scope and consequences of Defendant GM's deception.

158.    Instead of warning the general public about the known defects, Defendant GM devised a scheme to deceive the public, including the Plaintiff, by extolling the safety virtues of the defective vehicles through marketing and advertising and failure to warn prior to December of 2013.

36

159.    Defendant GM caused an event to occur, out of which this claim arises, in that it designed, tested, manufactured, assembled, installed and/ or sold a Vehicle which included defects in its component parts.

160.    Those defects in the design, testing, manufacture, assembly and/or installation were present from the design state and were known, or reasonably should have been known, to Defendant GM prior to the date of the Vehicle's manufacture, sale, distribution and/or crash.

161.    Defendant GM is a corporation, and as such can only act through its agents, servants and/or employees and it is liable for the acts and omissions of its agents, servants and/or employees.

162.    As a direct and proximate cause and result of Defendant GM's acts and/or omissions, Plaintiff James Williams, Steven Douglas Williams and Decedent Cheryl Clay Williams suffered, damages for which Defendant GM is liable, as set forth with more particularity herein.

## SUCCESSOR LIABILITY

163.    Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

164.    As discussed above, thru the bankruptcy and an asset sale of GMC, on July 10, 2009, GM acquired substantially all assets and expressly assumed certain liabilities of GMC.

165.    More specifically, GM expressly assumed certain obligations under, *inter alia*, the TREAD Act, and is liable for its non-disclosure and concealment of the ignition switch defects from the date of its formation on July 10, 2009 going forward.

166.    GM has successor liability for "Old" GM's acts and omissions in the marketing and sale of the Defective Vehicles and the Malibu at issue in this Complaint because it has continued the business enterprise of GMC, for the following reasons:

37

a.  GM admits that it knew of the ignition system defects from the very date of its formation;

b.  GM has continued in the business of designing, manufacturing, and marketing vehicles, including at least some of the same vehicles as its predecessor, GMC;

c.  GM retained the bulk of the employees of its predecessor, GMC;

d.  GM acquired owned and leased real property of its predecessor, GMC, including all machinery, equipment, tools, information technology, product inventory, and intellectual property;

e.  GM acquired the contracts, books, and records of its predecessor, GMC; and

f.  GM acquired all goodwill and other intangible personal property of its predecessor, GMC.

167.   By reason of the foregoing, as GM acquired and operated GMC and ran it as a continuing business enterprise, that transaction constituted a sale of assets amounting to a *de facto* merger or consolidation, such that GM is a mere continuation of GMC.

168.   Also, because there was an express and implied assumption of liability by GM, and it was aware from its inception of the significant ignition switch defects in its vehicles produced, Defendant GM is liable through successor liability for the deceptive and unfair acts and omissions of GMC.

## CONDITIONS PRECEDENT

169.   All conditions precedent to the bringing of this action and Plaintiff's right to the relief sought herein have occurred, have been performed or have been excused.

## FIRST CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY

170.   Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

171.    At all times relevant herein, Defendant GM was engaged in the business of designing, testing, assembling, planning, engineering, constructing, building, inspecting, marketing, advertising, distributing and selling motor vehicles to be used by the general public in the State of Louisiana, including the Vehicle at issue this Complaint.

172.    At all times relevant herein, Defendant GM is and was a "manufacturer" of motor vehicles as that term is defined by LSA-R.S. 9:2800.53 and is and was in the business of manufacturing designing, testing, assembling, planning, engineering, constructing, building, inspecting, marketing, advertising, distributing and selling motor vehicles directly and/or by and through various agencies and distributors in the State of Louisiana to be used by the general public, including the Vehicle at issue in this Complaint.

173.    At all times relevant herein, Defendant GM designed, manufactured, distributed, and sold the aforementioned Vehicle and/or its component parts in a dangerous, defective, and hazardous manner and condition such that, pursuant to LSA-R.S. 9:2800.55, when it left Defendant GM's control, it deviated in a material way from the design specifications or performance standards of Defendant GM and/or from otherwise identical units manufactured to the same design specifications or performance standards.

174.    At all times relevant herein, the subject Vehicle was also defective and unreasonably dangerous in its design, pursuant to LSA-R.S. 9:2800.56, as certain parts, including the ignition switch, the power steering, and brake functions, were manufactured and/or installed improperly and had the propensity to malfunction and cause a loss of driver control such that the foreseeable risks associated with its design or formulation exceeded the benefits associated with that design or formulation.

175.    More specifically, at all times relevant herein, the subject Vehicle contained a defect or defects that made it unsafe for its intended use, in that it incorporated an electronic ignition system that would cause it to suddenly and without warning stall and come to an abrupt stop when a component of the electronic ignition system failed.

176.    Also, at all times relevant herein, the subject Vehicle was defectively designed or formulated pursuant to LSA-R.S. 9:2800.57 by Defendant GM as it was not crashworthy and was unreasonably dangerous for foreseeable users and occupants on March 13, 2009, when the Incident occurred, yet Defendant GM failed to warn of the inherent and latent defects that made the Vehicle unsafe for its intended use.

177.    Furthermore, at all times relevant herein, the subject Vehicle also did not conform to representations made by Defendant GM pursuant to LSA-R.S. 9:2800.58, as Defendant GM had knowingly manufactured, supplied, sold, warranted as safe, and placed on the market and into the stream of commerce a defective product, unreasonably dangerous to consumers, knowing that it would reach consumers in that defective condition without substantial change once it left Defendant GM's control.

178.    At all times relevant, Defendant GM defectively designed, manufactured, tested, assembled, planned, engineered, constructed, built, inspected, distributed and sold the subject Vehicle and its component parts, including its ignition switch, power steering, and brakes, to one of its designated dealerships in or around 2003.

179.    At all times relevant herein, the defective condition of said Vehicle had already rendered the vehicle unreasonably dangerous by the time of its first sale, distribution, and for foreseeable use by Decedent Cheryl Clay Williams.

180.    At all times relevant herein, the subject Vehicle had not been changed or altered in any material respect from the time that it was manufactured and sold by Defendant GM to the time and place of the accident, and it was in substantially the same condition at the time of the accident as when it left Defendant GM's possession and control.

181.    At all times relevant herein, the defects described above rendered the Vehicle an unreasonably dangerous product and a product fraught with unexpected dangers to all foreseeable users and bystanders from the time of its manufacture and sale by Defendant GM up until the time of the Incident on March 13, 2009.

182.    As a result, on March 13, 2009, when Plaintiff was operating the Vehicle in Bossier Parish, Louisiana, the ignition switch in the Vehicle did cause the key to unintentionally move away from the "run" position during the Incident, which interfered with the engine power, power steering and/or power braking functions in the Vehicle and ultimately resulted in the multi car collision now at issue in this Complaint.

183.    More specifically, upon information and belief, on march 13, 2009, the subject Vehicle stalled as a result of the failure of certain components of the Vehicle's electronic ignition system, and there no fail-safe device in the ignition system that would have allowed the Vehicle to continue running following a failure of those necessary electronic ignition system component parts.

184.    Therefore, at all times relevant herein, the defective nature of the Vehicle was a direct and/or proximate cause of the injuries sustained on, thus rendering Defendant GM strictly liable in tort for his damages in an amount to be determined at trial.

185.    **WHEREFORE**, Plaintiff James Williams and Steven Douglas Williams, Individually, and on behalf of Cheryl Clay Williams, demand judgment against Defendant GM as described in further detail below.

## SECOND CAUSE OF ACTION
## NEGLIGENCE, GROSS NEGLIGENCE, WILLFUL AND WANTON CONDUCT

186.    Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

187.    At all times relevant herein, Defendant GM was engaged in the business of designing, manufacturing, testing, assembling, planning, engineering, constructing, building, inspecting, marketing, advertising, distributing and selling motor vehicles to be used by the general public in the State of Louisiana, including the Vehicle at issue this Complaint.

188.    At all times relevant herein, Defendant GM owed a duty to foreseeable users, including Plaintiff, to exercise due care in designing, manufacturing, testing, assembling, planning, engineering, constructing, building, inspecting, marketing, advertising, distributing and selling its vehicles, including but not limited to the Vehicle involved and at issue in this Complaint.

189.    At all times relevant herein, Defendant GM breached that duty described above, in that Defendant GM negligently and carelessly:

a.  Designed, manufactured, assembled, and distributed the Vehicle with an electronic ignition system that did not contain a fail-safe device that would allow the automobile to continue operating following a failure of a component of the electronic ignition system when Defendant GM knew, or in the exercise of reasonable care should have known, that the Vehicle would suddenly and without warning stall and come to an abrupt stop when a component of the electronic ignition system failed;

42

b. Failed to warn or give adequate notice of the tendency of the Vehicle to suddenly and without warning stall and come to an abrupt stop when a component of the electronic ignition system failed; and

c. Failed to otherwise exercise due care with respect to designing, manufacturing, assembling, and distributing the Vehicle at issue in this Complaint.

190. At all times relevant herein, Defendant GM knew or, in the exercise of reasonable diligence, should have known that the ignition switch in the Vehicle was a dangerous instrumentality if not properly designed, manufactured, tested, or inspected and that the Vehicle, therefore, presented the probability of harm to any foreseeable users unless it was free from all defects.

191. At all times relevant herein, Defendant GM also knew or, in the exercise of reasonable diligence, should have known that the ignition switch in the Vehicle was defective and/or unable to withstand the Vehicle's normal and reasonable operations in the normal course, but did nothing to recall, remedy, warn, or protect against the problem prior to the time that Mr. Smith's accident occurred.

192. At all times relevant herein, Defendant GM further knew or should have known that the defect in the Vehicle would increase the likelihood that a driver, like the Plaintiff, would be involved in an accident or crash, making the Vehicle unreasonably dangerous for a consumer and/or the Plaintiff to drive.

193. As a result, at all times relevant herein, Defendant GM had a duty to foreseeable users, and to the Plaintiff, in particular, to:

a. Inspect the Vehicle that it sold for use by the Plaintiff so as to determine whether it would be reasonably fit for its intended uses; and

43

b. Warn or give fair and adequate notice of the inherently dangerous condition existing as a
result of the negligent design and manufacture of the Vehicle.

194.    At all times relevant herein, Defendant GM breached those duties described above in that
the Defendant negligently and carelessly failed to warn plaintiff of the inherently dangerous
condition of the Vehicle and failed to inspect or test the Vehicle to determine whether it was
reasonably fit for the its intended uses prior to the Incident on March 13, 2009.

195.    At all times relevant herein, as a direct and proximate result of Defendant GM's design,
manufacture and sale of a Vehicle with unreasonably dangerous and defective component parts,
including the ignition switch, the power steering, and brake functions described above, Decedent
Cheryl Clay Williams was involved and died as a result of the automobile accident on March 13,
2009.

196.    **WHEREFORE**, Plaintiff James Williams, individually, and on behalf of his deceased
wife, Cheryl Clay Williams, demands judgment against Defendant GM as described in further
detail below.

196a.   WHEREFORE, Plaintiff Steven Douglas Williams, individually, and on behalf of his
deceased mother, Cheryl Clay Williams, demands judgment against Defendant GM as described
in further detail below.

## DAMAGES

197.    Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully
herein.

198.    As a direct and proximate result of Defendant GM's negligence, Mrs. Williams sustained
severe personal injuries and damages, which are recoverable by Plaintiff, including, but not
limited to:

44

a.    Cheryl Clay Williams' pre-death physical pain and suffering;

b.    Cheryl Clay Williams' pre-death fear and fright;

c.    Cheryl Clay Williams' pre-death mental anguish and emotional distress;

d.    Cheryl Clay Williams' disability;

e.    Cheryl Clay Williams' scaring and disfigurement;

f.    Cheryl Clay Williams' inconvenience;

g.    Cheryl Clay Williams' loss of enjoyment of life;

h.    Cheryl Clay Williams' medical expenses;

i.    Cheryl Clay Williams' lost wages and loss of future earning capacity;

j.    Cheryl Clay Williams' funeral and burial expenses;

k.    James Williams' damages for loss of consortium, services, and society;

l.    James Williams' for wrongful death of his wife including, but not limited to, loss

of love and affection, loss of service, loss of support and survival damages;

m.    Steven Douglas Williams' for wrongful death of his mother including, but not

limited to, loss of love and affection, loss of service, loss of support; survival

damages;

n.    Court costs, expert fees, and other expenses; and

o.    Any other general or equitable relief, and any other damages which may be

proven at trial.

199.    At all times relevant herein, all of the aforesaid injuries and damages were caused solely

and proximately by the wrongful acts and/or omissions of Defendant GM.

45

200.    **WHEREFORE,** Plaintiff demands judgment against Defendant GM for compensatory damages and such other and further relief as this Honorable Court or jury may deem just and proper at trial.

## PUNITIVE DAMAGES

201.    Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

202.    The actions and inactions of Defendant GM were also of such a character as to constitute a pattern or practice of willful, wanton and reckless misconduct causing substantial harm and resulting in damages to the Plaintiffs James Williams and Steven Douglas Williams, and Decedent Cheryl Clay Williams.

203.    More specifically, Defendant GM acted with a conscious and flagrant disregard for the rights and safety of Mrs. Williams, by failing to disclose the known defects in its vehicles, including but not limited to the Vehicle at issue in this Complaint.

204.    Although Defendant GM knew the defects alleged herein were contained in the Vehicle could cause severe injury and loss of life, Defendant GM took no steps to correct, warn or protect the Plaintiff from those known defects before the date of the Incident on March 13, 2009.

205.    Therefore, Defendant GM and/or its agents and servants engaged in conduct that demonstrates malice, aggravated or egregious fraud, oppression, or insult, which injured Plaintiff and exhibited willful, wanton and reckless disregard for his safety and life.

206.    By reason of the foregoing, Defendant GM is also liable for punitive and exemplary damages, plus interest, costs and attorneys' fees for having to bring this action, and such other and further relief as this Honorable Court or jury may deem just and proper at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs James Williams and Steven Douglas Williams, individually and on behalf of Cheryl Clay Williams, pray as follows:

207. For a trial by jury and judgment against Defendant GM for such sums as actual and other compensatory damages, including pain and suffering, in any amount to which he may be entitled under the laws of the State of Louisiana as a jury may determine and in excess of the minimum statutory and/or jurisdictional limit of this Honorable Court.

208. For exemplary and punitive damages against Defendant GM, in an amount as a jury may determine to halt such conduct and in excess of the minimum statutory and/or jurisdictional limit of this Honorable Court.

209. For pre-and post-judgment interest and the costs of this suit, including attorney's fees.

210. For such other and further relief to which they may be entitled and as this Honorable Court may deem just and proper.

## JURY DEMAND

211. Plaintiffs hereby demand a trial by jury on all allegations, claims and causes of action asserted herein.

Dated:   April 7, 2015                          Respectfully submitted,

                                                SINGLETON LAW FIRM

                                                **/s/ W. JAMES SINGLETON**

                                                W. JAMES SINGLETON {LBR# 17801}
                                                wjsingleton@singletonlaw.com
                                                CHRISTOPHER L. SICES {LBR #32409}
                                                csices@singletonlaw.com
                                                THE SINGLETON LAW FIRM
                                                4050 Linwood Avenue
                                                Shreveport, Louisiana 71108
                                                Telephone: 318-631-5200
                                                Facsimile:  318-636-7759
                                                ATTORNEYS FOR PLAINTIFF

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

JAMES WILLIAMS AND STEVEN DOUGLAS WILLIAMS INDIVIDUALLY AND ON BEHALF OF THE DECEASED CHERYL CLAY WILLIAMS

### DEFENDANTS

GENERAL MOTORS, LLC

(b) County of Residence of First Listed Plaintiff   CADDO PARISH, LA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   WAYNE COUNTY, MI
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

W. JAMES SINGLETON, 4050 LINWOOD AVENUE, SHREVEPORT, LA 71108, 318-631-5200

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)

(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☒ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☐ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☒ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC 1332

Brief description of cause:
FAULT KEY SYSTEM CAUSED PLAINTIFF'S DEATH IN ATUOMOBILE CRASH

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE   JESSE FURMAN

DOCKET NUMBER   14-MD-2543

DATE
04/07/2015

SIGNATURE OF ATTORNEY OF RECORD
/S/ W. JAMES SINGLETON

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE