# Exhibit G

4/29/2014 2:31:36 PM
JOHN D. KINARD
District Clerk
Galveston County, Texas

CAUSE NO. ___14-CV-0477___

| | | |
|---|---|---|
| DORIS PHILLIPS, f/k/a DORIS POWLEDGE, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF ADAM POWLEDGE, DECEASED, THE ESTATE OF RACHEL POWLEDGE, DECEASED, THE ESTATE OF ISAAC POWLEDGE, DECEASED, THE ESTATE OF CHRISTIAN POWLEDGE, DECEASED, AND THE ESTATE OF JACOB POWLEDGE, DECEASED, *Petitioner-Plaintiff,* | § § § § § § § § § § § § | IN THE DISTRICT COURT OF |
| | § § | Galveston County - 10th District Court |
| VS. | § § | GALVESTON COUNTY, TEXAS |
| GENERAL MOTORS CORPORATION, *Respondent-Defendant,* | § § § § § | |
| AND | § § § | |
| DORIS PHILLIPS, f/k/a DORIS POWLEDGE, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF ADAM POWLEDGE, DECEASED, THE ESTATE OF RACHEL POWLEDGE, DECEASED, THE ESTATE OF ISAAC POWLEDGE, DECEASED, THE ESTATE OF CHRISTIAN POWLEDGE, DECEASED, AND THE ESTATE OF JACOB POWLEDGE, DECEASED, *Plaintiff,* | § § § § § § § § § § § § § § | |
| VS. | § § | |
| GENERAL MOTORS CORPORATION, AND GENERAL MOTORS LLC. *Defendants.* | § § § | ____ JUDICIAL DISTRICT COURT |

Status Conference - 7/24/14

inability to steer." Such a significant malfunction, according to GM, was implausible given that "[Dori] cannot demonstrate any defect and any alleged 'recall'" of the 2004 Malibu that would have contributed to the accident.

A cornerstone of GM's legal defense to the 2007 lawsuit was a particularly nefarious accusation—that Adam Powledge was not the victim of a GM defect, but was a murderer and intended to kill himself and his children.[1] This defense was used throughout the litigation as a means of undermining Dori's case.

We now know that GM was aware that the power steering system on the 2004 Malibu—identical to the 2004-2007 Saturn Ion and part of the March 31, 2014 recall—could cause a loss of control. But GM put off a recall and never disclosed this information during the 2007 litigation. Years later, after bankruptcy forced Dori and other tort plaintiffs to accept penny-on-the-dollar settlements, GM finally disclosed information that supports Dori's theory of the case. Rather than a lack of evidence concerning "any defect and any alleged 'recall,'" GM had mountains of evidence that demonstrate its drive-by-wire electrical systems—including the power steering and cruise control systems—were harming thousands of GM customers nationwide.

But GM fraudulently concealed this information, and lied under oath regarding related electrical failures. In the course of this fraud, GM conspired in bankruptcy, waiting to disclose this information until well after the bankruptcy sale. In hindsight, the financial collapse of 2008-2009 created the perfect opportunity for GM to shed the many

---

[1] <u>Exhibit A</u>, *correspondence from A. Zambrano* dated July 27, 2010 at pp. 7; <u>Exhibit B</u>, *Expert Report of S. Syson* dated July 14, 2008, pp. 5 - 15; and <u>Exhibit C</u>, *Rebuttal Assessment Report of S. Syson*, pp. 2, 5, and 6; *See also* <u>Exhibit D</u>, *Report of B. Bowman* dated February 18, 2009, pp. 3.

## JURISDICTION AND VENUE

This Court has jurisdiction over this controversy because the damages sought by Plaintiffs are within the jurisdictional limits of this Court. Plaintiffs seek damages between $50 million and $300 million.

Venue is proper in this county because all or a substantial part of the actions giving rise to this lawsuit occurred in Galveston County. Tex. Civ. Prac. & Rem. Code §15.015.

## VERIFIED PETITION FOR BILL OF REVIEW

The affidavit of Dori Powledge Phillips in support of a petition for bill of review is filed with this Original Petition For Bill Of Review as Exhibit E, and is incorporated herein by reference for all purposes.

## FACTUAL BACKGROUND

On October 18, 2005 Adam Powledge was driving his four children, Isaac, Rachel, Christian, and Jacob to school in the family's 2004 Chevrolet Malibu. As Adam approached the 4600 Block of I-45 North near the intersection of Holland Road, he lost control of the vehicle. Witnesses described the Malibu traveling at a high rate of speed, even as other vehicles began slowing for approaching traffic. As the Malibu drove off the interstate and onto the median it made a straight-line that was so direct in its trajectory that there is one explanation for its course—a vehicle malfunction.

Adam, Rachel, Isaac, Christian and Jacob died at the scene. The wreckage was so severe that valuable evidence was lost. As traumatic as the accident was, GM's subsequent actions have caused further trauma to Plaintiffs.

5

murder his children.

Plaintiffs bring their Original Petition for Bill of Review and Original Petition to right this incredible wrong.

## PETITION FOR BILL OF REVIEW

Plaintiffs filed suit against GM on September 6, 2007, *Doris Powledge, et al. v. General Motors Corp.* The parties litigated—believing GM was conducting itself as a forthright litigant—for almost 2-years. Then, on June 1, 2009 GM filed for bankruptcy in United States Bankruptcy Court in New York.[3] Shortly after GM's bankruptcy the 2007 Lawsuit was transferred to the bankruptcy court.

The parties subsequently reached a settlement in bankruptcy. This settlement was based on several factors, most significantly that GM was in bankruptcy and was vigorously defending itself. GM hired multiple experts in its defense, and accused Adam Powledge of negligent and purposeful actions that caused the wreck.

GM has committed a fraud on the public for over a decade. That fraud has been acutely felt by the Powledge family.

In the prior suit GM wrongfully and fraudulently withheld evidence that prohibited Plaintiffs from fully and fairly making their claims.[4] The underlying settlement was based on GM's extrinsic fraud and the settlement should be overturned. Plaintiffs stand ready to deposit the settlement proceeds into the registry of the Court.

---

[3] Exhibit G, *In re General Motors Corp.*, Cause No. 09-50026, filed June 1, 2009.
[4] Exhibit H, *"Sending Alerts Instead, G.M. Delayed Car Recalls," New York Times*, April 19, 2014; http://www.nytimes.com/2014/04/20/business/sending-alerts-gm-delayed-recall-of-cars.html?_r=0.

## ORIGINAL PETITION

### *Claims*

### FRAUD

Plaintiffs expected—and had the right to expect—that GM would adhere to due process and would respect the litigation process, this Court, and act lawfully in defending itself against Plaintiffs' claims. GM had actual knowledge of the evidence it was withholding, and withheld that evidence purposefully. The intentional misrepresentations, including lying under oath and withholding key documents that would prove Plaintiffs' claims and undermine GM's defense that Adam Powledge acted purposefully demonstrates an intent to deceive Plaintiffs. Plaintiffs relied upon GM as—at a minimum—a litigant that would not violate the law as it litigated with Plaintiffs.

GM and its agents, made numerous misrepresentations. GM's representations were known to be false when made or made recklessly without knowledge of the truth and were made as positive assertions. GM made material misrepresentations to Plaintiffs or failed to disclose material facts to Plaintiffs concerning GM's knowledge of the causes of the underlying accident.

GM intended that Plaintiffs rely on these false or unknowing statements to their detriment and injury upon the false statements and impressions of fact being made, and on the presumption that no material facts of the contrary existed. Plaintiffs relied to their detriment upon the false statements and impressions of fact purposely created by GM. As a result, Plaintiffs have been damaged in an amount within the jurisdictional limits of the Court.

Ultimately, Plaintiffs will ask a jury of their peers to assess a fair and reasonable amount of money damages as compensation for its economic and non-economic injuries, physical pain and mental anguish, loss of society, medical expenses, as well as punishment for GM's actions. Additionally, Plaintiffs seek pre- and post-judgment interest and costs of court, and attorneys' fees.

## EXEMPLARY DAMAGES

GM's actions as described above were intentional and made with knowing disregard for Plaintiffs' rights and/or with malice towards Plaintiffs. Plaintiffs pray for punitive damages in addition to compensatory damages.

## PRAYER

WHEREFORE, Plaintiffs pray that General Motors Corporation and General Motors LLC be duly cited to appear and answer herein and that upon final trial the Court order that the Final Judgment in Cause No. 07-CV-1040, styled *Powledge, et al. v. General Motors Corp.*, be set aside and vacated; that the Court enter judgment for Plaintiffs as outlined above, and for such other and further relief at law or in equity to which Plaintiffs may be justly entitled.

# EXHIBIT
# A

WEIL, GOTSHAL & MANGES LLP

Mary Burdin, Esq.
July 27, 2010
Page 2

hired new counsel. While Claimants now distance themselves from such agreement, it is important to note that the expert report of Stephen Syson, upon which Claimants rely for virtually every assertion made in their Opening Statement, is exactly the same analysis that was presented before the $375,000 settlement agreement was reached. This is an important consideration to MLC's posture and position for mediation.

There is no doubt that a judge or jury will sympathize with the Claimants and their loss, but they will also require them to prove the vehicle was defective. To do so, there would need to be a finding that the cruise control system malfunctioned, the brakes failed, the brake electrical disconnect switch failed, and the steering stopped working, *all* at the same time. When consideration is given to how the vehicle actually works, none of these claims are credible, much less all of them.

## II.    FACTUAL BACKGROUND

### A.    The Accident

On October 18, 2005, Adam Powledge ("Powledge"), was driving his 2004 Chevrolet Malibu, VIN 1G1ND52F34M598780,[1] at approximately the 4600 block of Interstate 45, and near the intersection of Holland Road, in Texas City, Galveston County, Texas. (*See* Pls. Fourth Am. Pet., attached hereto as Exhibit A, ¶ 1.) According to witnesses, Mr. Powledge sideswiped another vehicle before going off the road and onto the grass shoulder/median between the freeway and the access road. He entered the median at a shallow angle, then came back down into the center of the median, where he drove a considerable distance in a straight line, at high speed, directly into a large support post for an overhead highway sign. (*See* photographs attached as Exhibit B.)

Witnesses say Mr. Powledge made no apparent attempt to maneuver the Malibu back onto the road or to slow down or stop. Linda Paige Gilman, the driver of the car that was sideswiped, testified in her deposition that she watched the car the whole time, and the brake lights never came on. (*See* Gilman Dep. 19:4-20, attached hereto as Exhibit C.)

Due to the speed and location of the impact, the Malibu split in half and caught fire. All occupants died from blunt force trauma, including head injuries and multiple fractures. It is unknown why Mr. Powledge drove into the pole without steering or braking to avoid it. What is

---

[1] Plaintiff Doris A. Powledge ("Mrs. Powledge") purchased the Malibu used from Norman Frede Chevrolet in Houston, Texas on January 21, 2005. At the time, the vehicle had 22,682 miles on it. The vehicle previously was registered in California to Alamo Rent-A-Car, which had purchased the vehicle new from Prospect Motors in Jackson, California. At no time during its history of usage did anyone report a problem with the acceleration, steering, or braking control systems of the car.

WEIL, GOTSHAL & MANGES LLP

Mary Burdin, Esq.
July 27, 2010
Page 4

> The former venue of the Action prior to the chapter 11 filing was the 10th Judicial District Court in Galveston County, Texas (the "Texas State Court"), and the Action was pending before the Honorable David E. Garner.

C.    **The Chapter 11 Filing**

> On June 1, 2009, GM commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The bankruptcy stayed all proceedings relating to the Action. Shortly after filing, GM filed a motion to essentially sell its assets and transfer certain liabilities to Vehicle Acquisition Holdings, LLC, which has now changed its name to General Motors Company ("New GM"). New GM is a Delaware corporation. On July 5, 2009, the Bankruptcy Court issued an order approving the asset-sale motion ("Sale Order"). Liability for all claims or causes of action asserted in this Action against MLC have been retained by MLC.

> On September 16, 2009, the Bankruptcy Court entered the Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Rule 3003(c)(3) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") Establishing the Deadline for Filing Proofs of Claim (Including Claims Under Bankruptcy Code Section 503(b)(9)) and Procedures Relating Thereto and Approving the Form and Manner of Notice Thereof establishing November 30, 2009 at 5:00 p.m. (Eastern) as the deadline to file proofs of claim against MLC based on prepetition claims.

> On November 24, 2009, four proofs of claim based on the Action were filed by Angel Hagmaier, Esq. ("Hagmaier") with the Bankruptcy Court on behalf of Plaintiffs Mrs. Powledge and Amber, Austin, and Mary Powledge and assigned claims number 44614, 44615, 44616, and 44617 (the "Proofs of Claim"), each asserting a claim for $250,000,000.

> On February 23, 2010, the Bankruptcy Court entered the Order Pursuant to 11 U.S.C. § 1050(a) and General Order M-390 Authorizing Implementation of Alternate Dispute Procedures, Including Mandatory Mediation (the "ADR Order") [Docket No. 5037]. (*See* ADR Order, attached hereto as Exhibit F.) The ADR Order provides a mechanism whereby MLC can designate a claim for mediation by requesting that a Claimant "cap" their claim at a fixed amount. Specifically, the ADR Order states that "if the claim Amount Cap is accepted by [MLC], the Claim Amount Cap will become binding on the Designated Claimants, and the ultimate value of his or her Unliquidated/Litigation Claim will not exceed the Claim Amount Cap." (ADR Order (Ex. F) at 4-5.)[4]

---

[4] If the "cap" is accepted by MLC, MLC may then be responsible for all or a portion of the fees and costs associated with any subsequent mediation, as consideration for the "cap" forever barring a claimant from seeking recovery above this "cap."

US_ACTIVE:\43448454\11\72240.0639

WEIL, GOTSHAL & MANGES LLP

Mary Burdin, Esq.
July 27, 2010
Page 6

area. Following the deposition of Plaintiffs' expert and the exchange of the reports and test data prepared by defense experts (as discussed below), a settlement was negotiated with Mr. Tracy in which it was agreed that Claimants would settle all claims for the sum of $375,000. This agreement was reached in mid-April, 2009. Although Mr. Tracy advised that he had been given full authority to negotiate a settlement, Mrs. Powledge refused to follow through with the settlement agreed to by counsel. On April 24, 2009, Mr. Tracy and Mr. Buzbee filed their Unopposed Motion to Withdraw as Counsel of Record. On June 25, 2009, the Texas Court granted the motion.

The chapter 11 filing occurred shortly thereafter. On June 15, 2009, Plaintiffs filed their Designation of Attorney-in-Charge appointing Hagmaier as new counsel for Plaintiffs. On June 25, 2010, Dax O. Faubus filed his Notice of Appearance with the Bankruptcy Court, joining in Hagmaier as counsel for the Plaintiffs. (*See* Notice of Appearance, attached hereto as Exhibit M.)

### III.    MLC'S POSITION

**A.    Claimants Cannot Prove That the Crash Was Caused By a Product Defect**

Claimants' assertion that MLC is strictly liable for the car accident fails because Claimants cannot prove that the crash was caused by a product defect. (*See* Pet. ¶ 14.) Texas has adopted section 402A of the Restatement (Second) of Torts, providing for strict liability for the sale of dangerously defective products. *See McKisson v. Sales Affiliates, Inc.,* 416 S.W.2d 787, 788-89 (Tex. 1967). The essential elements of a strict liability case are: (1) a product defect; (2) that existed at the time the product left the manufacturer's hands; (3) the defect made the product unreasonably dangerous; and (4) the defect was a producing cause of plaintiff's injuries. *See Rourke v. Garza,* 530 S.W.2d 794, 798, 801 (Tex. 1975), *abrogated on other grounds by, Ford Motor Co. v. Ledesma,* 242 S.W.3d 32 (Tex. 2007); *Parsons v. Ford Motor Co.,* 85 S.W.3d 323, 330 (Tex. App.—Austin 2002, pet. denied).

Here, Claimants have no evidence of any actual product defect. This is fatal to their case, under any theory of recovery. At best, Claimants have a set of mismatched *theories,* none of which have been substantiated by scientific evidence or testing on the part of their expert, and all of which have either been rebutted by videotaped testing performed by MLC, or disavowed in Claimants' own expert's deposition testimony.

Numerous entirely independent defects are alleged in Claimants' effort to make out a claim that the car was somehow responsible for this tragic incident. For all of these claims, Claimants rely upon the report of Mr. Stephen Syson (the "Claimants' Expert"). What they overlook is that the Claimants' Expert gave a deposition at which he admitted that he had no actual evidence to support the assertions contained in his report. Claimants further ignore the fact that the Claimants' Expert's theories were rebutted by actual vehicle testing. The testing is described in detail in the reports of four defense experts: (1) electrical engineer David G.

WEIL, GOTSHAL & MANGES LLP

Mary Burdin, Esq.
July 27, 2010
Page 8

 Accordingly, Claimants' claims fail because they cannot demonstrate that there was any defect in the vehicle. *See Rourke*, 530 S.W.2d at 798; *Parsons*, 85 S.W.3d at 330.

 Moreover, Claimants' reliance on alleged vehicle recalls and consumer complaints is not persuasive. Claimants' Opening Statement, in the section titled "The Defective Car," places great emphasis upon a list of recalls taken from the National Highway Traffic Safety Administration ("NHTSA") website and upon complaints allegedly made to the NHTSA by drivers or passengers of other vehicles. None of this information is admissible in court, much less persuasive. The reliance upon recalls is entirely misplaced. (*See* Opening Statement at 8 and attachments C and D.) Claimants neglect to mention that Claimants' Expert himself admitted under oath at deposition that not a single one of the recalls applies to the car at issue. (*See* Dep. of Stephen Syson, 18:6-12, excerpts attached hereto as Exhibit R.) The recalls cited by the Claimants' Expert are simply irrelevant and would not be admissible at trial.

 Similarly, statements allegedly made by other consumers are unreliable, inadmissible hearsay. This is well established under Texas law:

> Complaint letters in a manufacturer's files may be true, but they also may be accusatory and self-serving; they are rarely under oath and never subject to cross-examination. As they are necessarily out-of-court statements, they are hearsay if offered to prove the truth of the assertions therein – that the incidents complained of occurred as reported . . . Thus, consumer complaints in a company's files are generally hearsay within hearsay, and require their own exception in addition to that for business records generally.

*Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 139-140 (Tex. 2004). While the law grants certain exemptions to the hearsay rule to "data, findings, and reports" *made* by government agencies, those exemptions do not apply to "out-of-court complaints" *sent* to the government from third parties who are not under oath. *Id.* at 142 (emphasis added). Thus, because Claimants cannot demonstrate any defect and any alleged "recalls" or consumer statements are irrelevant and inadmissible, Claimants' claims will fail at trial.

## B. Plaintiff's Burden of Proof in an Unintended Acceleration Case

 It is important to note that Plaintiffs will bear the burden of proof at trial. The proof required in an unintended acceleration case has been clearly stated by the Texas Supreme Court:

> In all [unintended acceleration] cases, it was not enough that a vehicle accelerated when claimants swore they had done nothing. Instead, we have consistently required competent expert testimony and objective proof

WEIL, GOTSHAL & MANGES LLP

Mary Burdin, Esq.
July 27, 2010
Page 10

Under the facts of this case, there is ample evidence from which it could be found that Mr. Powledge was negligent. Eye witness, Linda Paige Gilman, testified in her deposition that she watched the Powledge car the whole time from when it passed her until it hit the overhead sign support pole. The car drove in a straight line into the pole, and she is "absolutely certain" that the brake lights never came on. (*See* Dep. of Linda Paige Gilman, 19:4-20:1, Ex. C.) The evidence will also show that after the crash, the throttle was found to be held in an open position. Claimants' own expert conceded when his deposition was taken that, at best, the condition of the throttle post-crash only proves the throttle was applied at impact. (*See* Dep. of Stephen Syson, 117:1-18, Ex. R.) This is exactly what would occur if the driver's foot was on the gas pedal at impact. This evidence supports the conclusion that the crash was caused entirely by driver error. At the very least, it constitutes comparative fault that would reduce or bar recovery.

**D.    Claimants Will No Longer Have Access to a "More Favorable" State Forum**

Claimants imply that if mediation is not successful, they will benefit from a favorable state court forum—the Texas Court. However, any determination regarding the allowance or disallowance of Claimants' claims is a core proceeding to be determined by the Bankruptcy Court, not the Texas Court.

Cases or proceedings "arising under" or "arising in" a case under title 11 are considered core proceedings.[5] By filing a proof of claim, a creditor renders his claims core proceedings and necessarily becomes a party under the bankruptcy court's core jurisdiction and submits himself to the "equitable power of the bankruptcy court to disallow its claim." *Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.),* 896 F.2d 1384, 1389 (2d Cir. 1990) (citing *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33 (1989)); *see S.G. Phillips Constructors, Inc. v. City of Burlington (In re S.G. Phillips Constructors, Inc.),* 45 F.3d 702, 705 (2d Cir. 1995). (*See* Proofs of Claim, attached hereto as Exhibit S.)

---

[5] Although section 157(b)(2) of title 28 of the United States Code specifically excludes from the definition of core the "liquidation or estimation of contingent or unliquidated personal injury or wrongful death claims against the estate for purposes of distribution in a case under title 11" (28 U.S.C. § 157(b)(2)), this exclusion is of no moment because this matter does not concern "the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims" so as to implicate Section 157(b)(2)(B), but rather merely concerns the allowance or disallowance of timely filed Proofs of Claim as a matter of law. *In re Alper Holdings USA,* 386 B.R. 441, 450 (Bankr. S.D.N.Y.) (stating that in personal injury action the courts in the Second Circuit have repeatedly held that proceedings to determine the allowance or disallowance of claims are core matters), *aff'd,* 398 B.R. 736 (S.D.N.Y. 2008); *see also In re Chateaugay Corp.,* 111 B.R. 67, 76 (Bankr. S.D.N.Y. 1990) ("the bankruptcy court must have jurisdiction to make the threshold determination of whether as a matter of law, a claim exists which can be asserted against the debtor, even if that claim sounds in personal injury or wrongful death"), *aff'd,* 146 B.R. 339 (S.D.N.Y. 1992).

WEIL, GOTSHAL & MANGES LLP

Mary Burdin, Esq.
July 27, 2010
Page 12

*Royal Dutch Airlines*, 454 F. Supp. 425 (S.D.N.Y. 1978). However, in situations where the recovery of punitive damages by some creditors depletes the recovery afforded to other creditors, courts have regularly exercised their equitable power pursuant to section 105 of the Bankruptcy Code to disallow or subordinate punitive damage claims. *See, e.g., In re Johns-Manville*, 68 B.R. at 627; *In re A.H. Robins Co., Inc.*, 89 B.R. 555, 562 (E.D. Va. 1988). Awarding punitive damage claims to certain unsecured creditors in cases where all unsecured creditors are not receiving full satisfaction of their claims in effect forces those impaired creditors to pay for the debtor's wrongful conduct. *See In re Johns-Manville Corp.*, 68 B.R. 618, 627-28 (Bankr. S.D.N.Y. 1986) (stating "it is well within the authority of this court to disallow a claim for punitive damages . . . where allowing such a claim would ill serve the policy of such awards").

Punitive damage claims are particularly inappropriate in instances such as this one, where the debtor is liquidating, as there is no deterrent purpose in awarding punitive damages. Notably, in chapter 7 liquidations, punitive damages are subject to statutory subordination and relegated to a fourth level in the distribution scheme—below that of unsecured claims—because they may be cut off when available funds are insufficient to pay even compensatory damages. 11 U.S.C. § 726(a)(4).[7]

Here, Claimants appear to seek punitive damages based on MLC's alleged "tradition" of placing unreasonably dangerous products on the market, specifically the Malibu. (*See* Opening Statement at 9.) However, MLC is liquidating. Further, under MLC's anticipated chapter 11 plan, unsecured creditors will not receive full value on account of their claims.[8] Thus, it is very unlikely that Claimants would be able to recover punitive damages against MLC even if they had evidence to support such claims, which they do not.[9]

2.    *Damages Recoverable in a Wrongful Death Claim Are Limited*

Moreover, the Claimants' claims for conscious pain and suffering lack factual support. "In Texas, only pain consciously suffered and experienced is compensable." *Ruiz v.*

---

[7] Although section 726(a)(4) of the Bankruptcy Code is not directly applicable to chapter 11 cases, in addition to the court's equitable authority under section 105 of the Bankruptcy Code, courts have also contemplated that section 510(c) of the Bankruptcy Code provides statutory authority for the subordination of punitive damage claims in chapter 11 cases. *See In re Colin*, 44 B.R. 806, 810 (Bankr. S.D.N.Y. 1984) ("the [] trustee's claim for punitive damages against the estate shall, pursuant to § 510(c) of the [Bankruptcy] Code, be accorded a status inferior to all general nonsubordinated unsecured claims."); *In re Johns-Manville Corp.*, 68 B.R. at 627 ("Finally, it should be observed that arguably under § 510 of the [Bankruptcy] Code, bankruptcy courts have the statutory power to subordinate claims for punitive damages.").

[8] The most Claimants could hope to receive would be punitive damages that would be equitably subordinated to unsecured claims.

[9] Even if Claimants somehow were able to obtain an award for punitive damages in state court—and they cannot—the Bankruptcy Court would have to examine such award.

WEIL, GOTSHAL & MANGES LLP

Mary Burdin, Esq.
July 27, 2010
Page 14

## IV.    CONCLUSION

We appreciate your services as mediator and look forward to seeing you in your office on August 9, 2010.  In the meantime, if you have any questions, please call us.

Respectfully submitted,

Angela C. Zambrano

cc:    Angel Hagmaier, Esq.
       Dax O. Faubus, Esq.
       Kent B. Hanson, Esq.
       Joseph H. Smolinsky, Esq.

# SYSON-HILLE
## and
## ASSOCIATES

**Engineering Services**
**Since 1982**

The Tracy Law Firm                                    July 14. 2008
5473 Blair Road. #200
Dallas, TX  75231

**Attn:** Mr. E. Todd Tracy

Re:  **POWLEDGE vs. GENERAL MOTORS CORPORATION**

Dear Mr. Tracy.

## I.    ASSIGNMENT

A.    Since my education, training, and experience encompasses almost all aspects of automobile design and engineering. my task in this case was to try and determine, based upon a reasonable degree of probability. whether or not a defect existed in the subject vehicle, and whether such a defect "most likely" caused the accident and the resulting deaths to the Powledge family.  I say "most likely" because, although the evidence may be strong and overwhelming on a particular point, still, we may never know with "certainty" what occurred in the Powledge vehicle before the impact.

B.    In ascertaining whether a defect was present in the subject vehicle, naturally. I had to first determine whether other causes of the accident existed.  Although one could come up with a number of scenarios which "possibly" could have occurred. the most "probable" other such causes would have been:  (1) whether this accident was intentionally caused by Mr. Powledge (i.e., whether he was committing suicide); (2) whether Mr. Powledge unintentionally caused the accident because of some physical ailment (i.e., stroke, heart attack. seizure. etc.); (3) whether the accident.was caused by something inside the vehicle, like a floor mat/stuck pedal/pedal misapplication; and  (4) whether an environmental. mechanical. or electrical defect existed in the vehicle that caused unwanted acceleration.

## II.    QUALIFICATIONS

B.    My curriculum vita is attached as **Attachment A.**

**REPORT OF STEPHEN R. SYSON – PAGE 1**

7394 Calle Real, Suite F. Goleta. CA 93117 • (805) 685-8517 • 685-3519 • FAX (805) 685-9480



**SYSON-HILLE**
and
**ASSOCIATES**

H.    If a component fails during developmental testing, the responsible design engineer would be expected to take corrective action to control or eliminate the causes of the failure.

I.    Failure during controlled testing, if not corrected, is predictive of failure under field conditions.

## III.   DESIGN EXPERIENCE

During my almost 40-year career, I have:

A.    Designed the following prototype hardware while working for General Motors:

    1.    The upward deploying air cushion passive restraint system "air pillow" used on many of today's automobiles (US Patent: 3,801,126);

    2.    The steering column mounting system for the GM do Brasil Opala;

    3.    The prototype steering column mounting system for the GM X body (US Patent: 4,241,937).

B.    Participated in the analysis, testing and development of structural designs for the following GM vehicles:

    1.    1976-1997 G (full size) van;

    2.    1977-1990 B-C (full size) car;

    3.    1978-1986 A-G (intermediate) car; and

    4.    1980-1984 X (compact) car.

C.    Analyzed the structural performance and overall crash safety assessment for the "Competitive Car Program." As part of that program I reviewed the crash test data and high speed motion pictures of both front and rear crash tests of vehicles from auto manufacturers in the US, Japan and Europe.

D.    Represented General Motors on the SAE (Society of Automotive Engineers) impact simulation subcommittee.

E.    Represented the GM Safety Research and Development Laboratory at the 1979 E body (sport luxury) Project Center.

F.    Performed the structural analysis and testing for the Large Research Safety Vehicle (LRSV) structure at Minicars. (Struble, 1981)

G.    Supervised the development of new restraint systems for the Volvo 240 series vehicle under NHTSA contract. (Foster, 1981) and presented the design proposals to Volvo for approval. Volvo adopted the design proposals and there were NO driver fatalities in 240 series vehicles on US highways for several years after their release into production. (Insurance Institute for Highway Safety, 1995)

**SYSON-HILLE**
and
**ASSOCIATES**

## V.    ANALYSIS OF AN INTENTIONAL ACTION BY MR. POWLEDGE CAUSING THE ACCIDENT

A.    My analysis began with a study of the facts and physical evidence, including:

1. The police accident report. police video and scene photographs;
2. Scene photographs and video by Michael Williams taken on October 25, 2005;
3. Scene photographs and scene diagram by Scientific Analysis taken on October 30. 2005;
4. Scene photographs and video by Dr. Mike Andrews and Kirk Parks taken April 17. 2008;
5. The Galveston County Medical Examiner's Reports;
6. National Weather Service data;
7. The Malibu Classic at issue. an undamaged exemplar Malibu Classic. and an undamaged Malibu;
8. Discovery materials. including depositions from this and other cases;
9. Literature regarding brake systems. speed controls. cruise controls, and other causes of stuck throttle;
10. NHTSA customer reports for other vehicle speed control failures;
11. NHTSA recalls on cruise control systems; and
12. Medical / Employment records of Adam Powledge.

B.    Examination of the above facts and physical evidence leads to several conclusions and comments:

1. Mr. Adam Powledge was driving the Malibu Classic. Jacob Powledge was the right front passenger. and Isaac. Rachel and Christian Powledge were riding in the back seat. All occupants were wearing their seatbelts.
2. The Malibu Classic was traveling at a high rate of speed on southbound Interstate 45 in Texas City. Texas.
3. The following is Corporal Rich's description of the collision:

| INVESTIGATORS NARRATIVE OPINION OF WHAT HAPPENED (ATTACH SHEETS IF NECESSARY) |
|---|
| Unit#1 had struck another unit while southbound damaging the other units passenger side rearview mirror while on the freeway. TCPD case #05-10165. Unit #1 then drove onto the grass median between the main lanes of the freeway and the two lane feeder road. Unit #1 drove 1,418 feet in the grass median from the time it left the main lanes of the freeway until it struck a steel support beam for a traffic direction sign owned by the Texas Department Of Transportation. |
| This vehicle split in half and caught fire killing all of the occupants. |
| It's unknown why the driver drove in the median for such a long time. |

4. The accident scene was inspected by Dr. Mike Andrews and Kirk Parks at my request on April 17, 2008. Cones were put up to replicate the measurement information from the police investigation. Following the replication of the police measurements. police photographs were used to place chalk paint marks in the vehicle tire pathways that could be seen and utilized from the police photographs.



**SYSON-HILLE**
and
**ASSOCIATES**

E.  The eyewitnesses indicated that the Malibu Classic was traveling 80-90 mph as it left the travel lane shoulder and entered the median. The impact damage to the vehicle supports that it was traveling at a high rate of speed. I believe that it would be impossible to accurately determine a closing speed or delta velocity using any type of crush measurements because the vehicle is simply too damaged. In fact, the vehicle was literally in pieces after the accident and upon being towed away from the scene. Further, there is no pole impact testing with a vehicle traveling at speeds approaching 80 mph that have been conducted on the subject vehicle. Therefore, there is no test data to correlate with the vehicle damage seen in the photographs prior to its removal from the scene. Lastly, using any type of computer program for this accident requires too many subjective variable inputs that can improperly influence the outcome.

F.  Mr. Powledge was able to steer and control his vehicle and thus avoided striking several vehicles that were on I-45. He managed only to slightly sideswipe another Malibu side mirror to side mirror before leaving the travel lane of I-45 and entering the grass median. Damage to the other Malibu is shown below:



G.  After his departure from the southbound travel lanes of I-45 into the grass median, Mr. Powledge was able to steer and control his vehicle such that he managed to avoid a guardrail, a large electric box, a reflector post, and a traffic information sign pillar by moving toward the opposite side of the median. Based on the initial travel path of the Powledge vehicle after the vehicle left I-45, it appears that Mr. Powledge was trying to get onto the feeder road.

REPORT OF STEPHEN R. SYSON – PAGE 7



**SYSON-HILLE**
**and**
**ASSOCIATES**

J.    The contact with the drainage culvert is evident in a police photograph where there is clearly a "curb strike" type dent in the rim and a large cut in the tire at the same position. This event would have rapidly deflated his left front drive tire and immediately pulled the Powledge vehicle back to the left (toward the middle of the grass median).



K.    Scene measurements by Scientific Analysis regarding the grass median include: width 50'; west side slope is 7 degrees; east side slope is 10 degrees; depth is 2'; flow line is 24' wide. The sloped sides would re-direct Mr. Powledge's vehicle back to the center of the grass median and make steering even more difficult to the right (toward the feeder road).



REPORT OF STEPHEN R. SYSON – PAGE 9



**SYSON-HILLE**
and
**ASSOCIATES**



O.   During one of my many inspections of the subject vehicle, the brake pedal was located. The brake pedal has significant deformation in the forward direction. In other words, the flat part of the pedal that your foot applies pressure to is bent from the rear to the front of the vehicle. This almost conclusively proves that Mr. Powledge had his foot on the brake pedal at the time of the impact. If Mr. Powledge was trying to commit suicide, it does not make sense that he would be applying his brakes at the moment of impact.



**REPORT OF STEPHEN R. SYSON – PAGE 11**



**SYSON-HILLE**
and
**ASSOCIATES**

R.  The driver's latch plate and buckle was located among the debris. The driver's latch plate is still in its respective buckle. It does not make sense that a person predisposed to killing himself in a vehicle crash would buckle up for safety before killing himself.



S.  Further, the buckle from the right front and one buckle from the rear seat were located in the debris.. The latch plates were likewise in place in each of these buckles. Photographs taken by the police have the other two rear seat buckles documented. Again, the latch plates are inserted. It does not make sense that a man intent on killing all of his children would make them buckle up for safety before he killed them in a vehicle crash.

T.  The police report indicates that seat belt status was "unknown." However, the evidence proves that all 5 occupants had their seat belts buckled at the time of the accident.



REPORT OF STEPHEN R. SYSON – PAGE 13



SYSON-HILLE
and
ASSOCIATES



W.    I pulled the National Weather Service data for rainfall in the area to determine if the tire marks from the Powledge vehicle that were photographed by the police and the Williams' could have been due to wet ground. According to the two reporting stations for the National Weather Service for this area, there was no precipitation from October 11-18. (Attachment B). As such, the tire marks in the grass median cannot be attributed to wet ground conditions.

X.    Knowing that there were at least three other vehicles that were clearly in the grass median, this begs the question, why didn't these other vehicles leave any tire marks in the grass median when the Powledge vehicle left such well-defined tire marks? The answer is simple. The Powledge vehicle's rear tires were braking while the front tires were accelerating. The other vehicles' in the grass median did not experience a similar condition as the Powledge vehicle. The fact that these tire marks are still present 12 days (date Scientific Analysis photographed scene) after this accident reinforce the dramatic nature in which the tire marks were made.

Y.    Based on a reasonable degree of engineering probability, the totality of the evidence proves that this accident was not intentionally caused by Mr. Powledge.

**REPORT OF STEPHEN R. SYSON – PAGE 15**



**SYSON-HILLE**
**and**
**ASSOCIATES**

E.  Pedal misapplication can also be ruled out due to the brake pad spalling and disrupted grass and soil in the median.

F.  The totality of evidence supports proper brake pedal application, not improper gas pedal misapplication.

## VIII.  ANALYSIS OF A MECHANICAL/ELECTRICAL FAILURE OR ENVIRONMENTAL CONDITION CAUSING THE ACCIDENT

A.  Based on the tire marks in the grass median, the evidence is overwhelming that Mr. Powledge was braking at the time of the impact, and that he had been for a lengthy period of time before the impact. Naturally, the question becomes: why did his vehicle not stop?

B.  Contrary to GM's position in its build sheet for this particular vehicle, and in its answers to discovery, the subject vehicle clearly does have ABS components in place. These components are only used on ABS systems and were connected to the vehicle's wiring harness.



C.  In fact, the service manual for this vehicle shows that Malibu Classic vehicles with hub mounted speed sensors have anti-lock brake systems.

D.  So why would the vehicle's engine be racing when the brakes were being applied hard enough to bend the brake pedal, overheat the brake pads and leave defined tire braking marks?

**REPORT OF STEPHEN R. SYSON – PAGE 17.**



SYSON-HILLE
and
ASSOCIATES

 

J.    I then inspected the power train of an exemplar 2004 Malibu Classic. The throttle was controlled by two cables. One cable attached to the throttle pedal, while the other attached to a stepper-motor type cruise control.



K.    The 2004 Malibu Service Manual also indicates that, when a Malibu Classic is equipped with a cruise control, both accelerator pedal and cruise control input to the throttle are through pull-type cables. However, it should be noted that an exemplar 2004 Malibu built just 3 months prior to this Malibu Classic had drive by wire throttle system and integrated electronic cruise control.

L.    There is a number of customer complaints from other Ecotec engine based vehicles indicating that this design occasionally results in an unwanted acceleration condition. (Attachment C.) Some of the complaints demonstrate that the throttle return spring, or other device to close the throttle (if the throttle cable, or throttle control electro-mechanical systems fail), is inadequate to close the throttle and prevent a runaway vehicle.

REPORT OF STEPHEN R. SYSON – PAGE 19



**SYSON-HILLE**
**and**
**ASSOCIATES**

O.    A throttle control system. like that on the subject Chevrolet Malibu Classic, which does not meet FMVSS 124 is defective and unreasonably dangerous.

P.    The cruise control for the subject vehicle was also studied to evaluate its propensity to fail. The vehicle industry has had numerous recalls for mechanical and electrical cruise control failures dating back to the mid-1980's.

- 1984 Oldsmobile Cutlass- cruise control cable may separate from the conduit end fitting;
- 1984 Corvette- cruise control vacuum solenoid valves may malfunction:
- 1984 Toyota Camry- cruise control computer malfunctions due to continuous exposure to cold ambient temperature.

Q.    The subject vehicle uses a stepper motor type cruise control. The stepper motor cruise control has had numerous failures over its design and service life. GM stepper motor cruise controls have been reported to the NHTSA for unwanted acceleration problems. In fact, I downloaded the NHTSA database for reports on GM vehicles that have stepper motors and similar cable attachments as the subject vehicle where a complaint was registered for unwanted acceleration. **(Attachment C)**. Many of these complaints sound eerily similar to the Powledge accident.

R.    Stepper motor cruise controls are subject to intermittent electromechanical failure modes that have been documented for years. These include exposure to excessive heat and cold. moisture. open intermittent circuits and short circuits as well as failures associated with Electromagnetic Interference (EMI) and Radio Frequency Interference (RFI).

S.    The vehicle industry has known for years that sudden acceleration can occur when intermittent electrical malfunctions happen. A 1988 Japanese government study on unwanted acceleration found that *"continued analysis of and investigation of malfunctioning of the electronic devices taking into consideration not only electromagnetic noise but environmental conditions such as temperature. humidity. and vibration are needed."*

T.    Intermittent electronic failures are recognized by the *Electronic Troubleshooting Handbook:*

> *Whenever too much heat is applied to electrical or electronic devices. problems occur. Heat increases resistance of circuits. which in turn increases the current. Heat will cause the materials to expand, dry out, crack, blister. and wear down much more quickly: sooner or later. the device will break down.*

> *Moisture (water and other liquids) causes expansion. warping. quicker wear. and abnormal current flow (short circuits).*

**REPORT OF STEPHEN R. SYSON – PAGE 21**

**SYSON-HILLE**
and
**ASSOCIATES**

Use of vehicular electronic stability controls is growing. A new quartz MEMS
gyroscope can handle the harsh under-hood environment, where temperatures
exceed 125°C and shock and vibration are significant.

Apr 1 2007
By: Leon E. Coldiron, System Design Automotive
Sensors

# sensors

Y.    Failing to properly locate, shield, protect and/or insulate a cruise control module
is a defect that renders the vehicle unreasonably dangerous because the circuitry
can be corrupted, which affects performance.

Z.    Based on a reasonable degree of probability, I believe that a mechanical/electrical
or environmental failure in the design of the throttle body and/or cruise control
system occurred which caused the Powledge vehicle to experience unwanted
acceleration.  A manufacturing defect also existed in that improper testing,
analysis, evaluation and real world environmental impact study was not
conducted as I discuss in section XI below.

AA.   The brake system was then incapable of stopping the vehicle while its engine
raced out of control.  In reviewing the NHTSA database, many people have
reported that their vehicle accelerated out of control after the brakes were applied.
Still others reported that the engine continued to accelerate after the brakes were
applied, and others reported that the brakes did not stop the vehicle properly
during an unwanted acceleration. (**Attachments C, D**).

BB.   This unwanted acceleration and inability to stop was the producing cause of the
loss of control of the vehicle and its ultimate accident.

## IX.    ALTERNATIVE DESIGNS RE ENVIRONMENTAL/MECHANICAL/ELECTRICAL FAILURES

A.    Throttle control system that actually meets FMVSS 124.

B.    Drive by wire and integrated cruise control module, as used on the Malibu that
preceded this vehicle by 3 months.

C.    Ignition cutoff under panic braking conditions.

D.    Fuel cutoff or fuel restrictor device.

E.    Relocate cruise control module so that it is free from EMI / RFI contacts, hot and
cold temperature fluctuations as well as moisture and pollutants.

F.    Redundant fail safe designs so in the event of a failure, there is a "work around"
system to prevent loss of system control.

G.    Speed sensitive acceleration cruise control based on European Patent 1375233A1.



**SYSON-HILLE**
and
**ASSOCIATES**

2. Accelerated stress test planning including load detection, failure detection, and response monitoring analysis;

3. Overstress limits are explored in a vehicle environment;

4. Accelerated life testing based on step 3; and

5. Correlate accelerated stress tests results to field life estimates.

I. I have seen no PoF analysis conducted by GM of the speed control system, cruise control module or braking system for the subject vehicle.

## XI.   CONCLUSIONS

A. The Ecotec power train, like that used in the 2004 Malibu Classic, is unreasonably susceptible to vehicle speed control failures, which dealers are often unable to diagnose or cure. **(Attachments C and D).**

B. Since the subject 2004 Chevrolet Malibu Classic engine's throttle control system is presently stuck 70 to 80% open, the throttle control system fails to meet FMVSS 124. Failure to comply with FMVSS 124 is negligence per se.

C. The cruise control on the subject vehicle is mounted so close to the engine and engine components, exposure to all of the heat, moisture, and excessive vibration can create just the type of environment to produce a failure. That failure may be inoperability or a permanent opening of the throttle body in a multi-mode failure. This location, lack of shielding/insulation can cause an environmental, mechanical or electrical failure.

D. The brakes are incapable of stopping the vehicle when the throttle, speed control or cruise control malfunctions and the vehicle experiences unwanted acceleration.

E. The brake system, throttle control, vehicle speed control and cruise control system is defectively designed and manufactured for the reasons stated above.

## XII.   SUMMARY

A. A vehicle throttle control system, speed control and/or cruise control that experiences unwanted acceleration makes a vehicle defective and unreasonably dangerous. Failing to properly test, evaluate, analyze and study the components in real life vehicle environments is a manufacturing defect.

B. A vehicle whose brakes fail to timely stop the vehicle when unwanted acceleration occurs is defective and unreasonably dangerous.

C. The driver has limited time and control options. For example, he could turn off the ignition, leaving a vehicle that is very hard to brake and steer, and has limited electrical power.

**SYSON-HILLE**
*and*
**ASSOCIATES**

H.    If the subject vehicle was tested under real world conditions. the components discussed in this report would fail to comply with even these mediocre safety standards.

*This report is subject to amendment and supplementation subject to a review of additional documents to be produced by the defendant in this matter. Further, I would like the opportunity to comment on any reports provided by the defendant in this matter.*

Sincerely

Stephen R. Syson
Syson-Hille & Associates

## ATTACHMENTS:

A.    Curriculum Vita
B.    Weather Service Data
C.    Stuck Throttle Database from NHTSA
D.    NHTSA recalls on speed control defects
E.    Other supporting materials referenced in the report

## REFERENCES:

Anderson. A.F.. "Reliability in Electromagnetic Systems: The role of electrical contact resistance in maintaining automobile speed control system integrity." IET Colloquium on Electromagnetic Systems, May 24. 2007.

Anderson. Antony, "A Note on Automobile Cruise Control Faults and Sudden Acceleration [or Unintended Acceleration]," January 16, 2002.

Carlsen, Kjell. "Sneak Analysis: Boeing's Electrical Systems Engineering Quality Program Applied To The Automotive Industry." 1988.

Gunnehed. Mats. "Risk Assessment of Cruise Control." Swedish Defence Research Establishment. FOA report E 30010-3.3. May 1988.

Kimseng, K.. Hoit, M., Tiwari. N.. and Pecht. M., "Physics-of-failure assessment of a cruise control module," Microelectronics Reliability v. 39, pgs. 1423-1444. 1999.

# EXHIBIT
# C

**Dr. James W. Lighthall**

Dr. Lighthall comments on eyewitness testimony, *"No brake lights were observed on the Powledge vehicle that would indicate braking prior to impact."* Dr. Lighthall implies that the testimony is only consistent with Mr. Powledge not applying his brakes. There are other equally likely explanations, including the fact that the witnesses were not in a suitable position to observe the Malibu's brake lights, that they weren't paying close attention, that the movement of the vehicle distracted their attention from the brake lights, or that the electro-mechanical problem causing the vehicle's throttle to stick open was affecting the brake lights, as indicated by several GM throttle control recalls.

Eyewitness testimony is often difficult to treat as reliable. Mr. Rick Accurso, for example, states on page 23 of his deposition that he wasn't even looking for brake lights. His wife, Linda Gilman, says on page 19 of her deposition that she's certain there were no brake lights, while on page 20, despite that certainty, she failed to observe Mr. Powledge steering around at least two objects in the median. She also indicates that the Powledge Malibu was so far ahead of her that she couldn't see his license plate, yet she had a clear view of his brake lights. Mr. Klibert says in his deposition that he didn't see any brake lights, but he also has Mr. Powledge striking the wrong side of the Gilman/Accurso vehicle. Ms. Gilman describes Mr. Powledge as being in the vehicle, while Mr. Klibert describes him as being thrown out. Mr. Klibert says there was lots of traffic, while Ms. Gilman describes traffic as being light. Mr. Klibert indicates that Mr. Powledge slowed after striking the Gilman vehicle, but Ms. Gilman and Mr. Accurso describe no such slowing. Mr. Klibert, like Ms. Gilman, fails to observe Mr. Powledge steering around various objects in the median.

Dr. Lighthall says in his report, *"Emergency braking concomitant to a severe frontal impact results in fracture/dislocation of the ankle and displacement of the bones of the ankle into the lower leg. The forces associated with this type of displacement cause the bones of lower leg, the tibia and fibula, to fracture. The resultant lower leg injury is a segmental spiral fracture termed a Pylon fracture. There is inconsistent information in the coroner's report; regardless, there is no indication in the report of an ankle fracture or fractures of the lower leg."* Mr. Powledge's lower right and part of his upper right leg was separated. The right lower leg (the part which might be fractured) is missing.

Dr. Lighthall says, *"Photographs of the path of travel of the Powledge vehicle taken at the accident scene are straight and true, indicating the driver did not attempt to make any evasive maneuver, either through braking or steering, to avoid impact."* This statement is so clearly false as to render any further statements by Dr. Lighthall moot. It is obvious, based on the fact that he failed to note Mr. Powledge's injury pattern in the scene photos, that Dr. Lighthall did not look at the scene photographs carefully. As noted above, the police photographs and accident diagram clearly show Mr. Powledge driving around obstacles, until impact with a drain damages his left front wheel and tire.

The remainder of Dr. Lighthall's report serves only to speculate why Mr. Powledge drove in a "straight" path, based on his erroneous interpretation of the scene evidence.

Expert Report Assessment, Page #2

Numerous GM vehicles have similar features. Many have stepper motor cruise controls. There are 14 recalls of GM vehicles with cruise controls since 1988. Only one relates to a problem that would not affect proper stepper motor cruise operation. GM uses stepper motor cruise controls in millions of vehicles, but hundreds of thousands have been recalled. Therefore, one cannot conclude, based on the presence of features in the throttle control system that don't always work, using a microprocessor that is not recommended for such uses, that the throttle control system did not malfunction in the Powledge case.

### Karl Stopchinski

Mr. Stopchinski makes a number of statements in his report that are inconsistent. On page 3 for example, he makes two statements that are not in complete agreement. First, he states, *"Another group of objects in the grassy median along the vehicle path is comprised of an access panel, a concrete bordered drain, and reflector post that are about 700 feet from the final impact point. The Powledge vehicle drove along the west side of these objects while remaining in the grassy median."*

On that same page he contradicts that statement, *"The vehicle then travelled (sic) another approximately 700 feet, crossed the concrete drain...."* On page 4, he compounds the inconsistency, *"Police photographs showing their condition reveal minor localized deformation of wheel on the inboard flange and adjacent abrasions and/or cuts on the tire. There was nothing along the vehicle's path prior to impact that would cause this type of damage."* The wheel damage is certainly more than minor, and it was clearly caused by impacting the drain some 700 feet prior to impact.

Mr. Stopchinski also makes comments about the throttle being stuck in the open position, *"A section of the throttle body including the throttle valve and lever that had been broken free from the vehicle was inspected. It was not burned. The throttle section was fractured from the intake manifold and a portion of the inlet tube was attached. This inlet tube was removed and photographed. The throttle valve shaft was deformed and the throttle lever was broken from the shaft. The throttle valve was found fixed in an open position greater than full throttle. In my opinion, no conclusion can be made about the position of the throttle at impact based upon its current position. The extreme vehicle damage and movement of the throttle body and connected components that occurred during the impact likely forced the throttle lever/valve past the fully open position, deforming and pinning it in place. The return springs remained approximately in place and would have forcefully acted on the throttle lever to close the throttle in its normal operating condition. The cable mounting bracket was attached and deformed and a portion of the accelerator pedal cable remains attached to the bracket. The accelerator cable was ripped apart in the crash."* This statement makes no engineering sense. Since the throttle shaft is bent, the throttle must have been open, when the damage occurred. Besides, there are no stock Malibu vehicles that I am aware of that can travel 80 to 90 miles per hour without the throttle plate being open.

Expert Report Assessment, Page #4

Neither a medical problem nor suicidal tendencies is consistent with Mr. Powledge's driving for more than half of the vehicle's off-road excursion. Then. the only injury producing contact occurs after the left front wheel and tire are damaged, and the vehicle becomes less controllable.

Safer alternative designs, such as a vacuum reservoir or electrically driven vacuum pump were readily available, and would have made the vehicle ACTUALLY perform the way the defense experts CLAIM it would.

Bowman Consulting LLC
4660 Fenton Road
Hartland, Michigan 48353

### Engineering Report
### Powledge v. General Motors Corporation
### February 18, 2009

I am a mechanical engineer with over 36 years of experience in automotive engineering. I received a Bachelor of Science Degree from Rochester Institute of Technology in 1971 and a Master of Science Degree from Stanford University in 1972. I have completed the Traffic Accident Reconstruction course at Northwestern University. My Curriculum Vitae is attached.

## Material Reviewed

I have reviewed the following documents relating to this case:
Texas Accident Report # 05-10172
Deposition of Corporal C. Rich
Deposition of B. Quiroga
Deposition of R. Klibert
Report by Mr. S. Syson
80 MPH video of path
Photographs of exemplar throttle body
Photographs of scene by Dr. Andrews
Photographs of exemplar cruise control
Photographs of exemplar throttle cable
Photographs by Texas City Police
Photographs by Texas City Fire Marshal
Photographs by M. Byrd
Photographs by D. McKendry
Photographs of vehicle-source unknown
Video of scene by L. Williams
Photographs of scene by L. Williams
Photographs by Scientific Analysis

Additionally, I have inspected the subject vehicle involved in this accident and have inspected the accident scene.

I inspected the subject vehicle on December 11, 2008. I specifically inspected the brake system. I disassembled the rear wheels, tires and brake drum. The keepers were still on both rear drums. The rear brakes were intact and showed no adverse wear or heat degradation. The right front brake assembly was covered in melted aluminum and I did not attempt to disassemble the right front brake. I took photographs of the previously disassembled left front brake pads and measured the thickness (inboard 0.360-0.376, outboard 0.430-0.440 inches). I photographed the throttle body which was stored separate from the vehicle. I located and photographed the brake pedal assembly.

### Design

The brake system on the 2004 Chevrolet Malibu Classic is vacuum power assisted dual piston hydraulic master cylinder with front disc and rear drum brakes. Some vehicles were manufactured with antilock brake system (ABS) and some were manufactured without ABS. The subject vehicle was not manufactured with ABS. All of these vehicles were manufactured with a diagonal split brake system.

### Discussion

My inspection revealed that the only brake system concern is that the left front brake pads were worn beyond the replacement thickness. This is poor owner maintenance but still provided maximum braking capability. The subject vehicle did not have an ABS brake system even though the wheel bearings had ABS wheel speed sensors. This is because it is less expensive and higher quality control to manufacture all of these vehicles with ABS wheel bearings, than to have two different kinds (ABS and non-ABS). I found no evidence of overheating of either the front or rear brakes. I have run many vehicles, including an exemplar in this matter, to the point of brake failure due to overheating. This vehicle has none of the characteristics of overheating.

Mr. Syson states that the front brakes of the subject vehicle did not operate due to overheat. One of the demonstrations shows that when the front brakes overheat, the rear brakes do not work. This is because the brake system is a diagonal split. The left front and right rear brakes work off the same chamber of the master cylinder; while the right front and left rear work off the other chamber. Therefore, when the front brakes fail due to overheat the rear brakes also fail.

3

# CURRICULUM VITAE

## BRUCE R. BOWMAN

Automotive Engineer with expertise in the design, testing, processing, manufacturing, and service maintenance of passenger cars and trucks. Primary areas include brake systems, front drive, rear axles, suspension, trailer towing, windshield wipers, engines, and carburetor. Additional expertise is in accident reconstruction and human factors of traffic accidents and driver reaction.

## EDUCATION

Stanford University - Master of Science in Mechanical Engineering 1972
Rochester Institute of Technology - B.S. in Mechanical Engineering 1971
Williamsport Technical Institute - Diploma in Diesel Mechanics 1966
Cornell University - Courses in Agriculture 1964
General Motors - various courses in testing and mechanics
Northwestern University - Traffic Accident Reconstruction 1990

## PROFESSIONAL ORGANIZATIONS

Society of Automotive Engineers - SAE International
Automotive Service Excellence - ASE certified mechanic

## WORK HISTORY

July 2001 to Present

Bowman Consulting LLC
Product Liability Consultant

General Motors Corporation

Product Analysis – Apr.1989 to June 2001          Senior Consultant
Investigation of concerns of General Motors products, non-litigation and litigation. Provide technical support, investigation, consultation, experimentation, analysis, and expert testimony concerning products.

Engineering Investigation – Oct.1985 to Apr.1989          Staff Project Engineer
Investigation of field concerns of General Motors products. Provide technical investigation, experimentation, analysis and recommendations to various engineering groups within General Motors. This was not generally involved with litigation.

Brake and Bearing Systems – Oct.1982 to Oct.1985          Staff Project Engineer
Testing and analysis of new and experimental brake systems, including antilock.

Vehicle Emission Laboratory – Sept.1972 to Oct.1982          Project Engineer
Testing and analysis of all phases of vehicle exhaust emission technology including development of computer controlled engine parameters.

Rochester Products Division – Jan.1966 to Sept.1972          Technician/Mechanic
Testing and development of carburetors, fuel injection, evaporative canisters, and air injection systems.

August 2008

## AFFIDAVIT OF DORI POWLEDGE PHILLIPS

STATE OF TEXAS      §
                    §
COUNTY OF HARRIS    §

BEFORE ME, the undersigned authority, personally appeared Dori Powledge Phillips, who being duly sworn, deposed as follows:

"My name is Dori Powledge Phillips, I am over 18 years of age and of sound mind. I declare under penalty and perjury that the following is within my personal knowledge and is true and correct.

I have read Plaintiffs' Original Petition for Bill of Review and Original Petition. The facts contained in Plaintiffs' Original Petition for Bill of Review and Original Petition are true and correct. GM accused my husband of murdering my children and killing himself by intentionally crashing our 2004 Malibu. We now know that GM was engaging in a massive corporate lie designed to hide the very evidence that would have proven my case."

FURTHER AFFIANT SAYETH NAUGHT.

_Dori Powledge Phillips_
Dori Powledge Phillips

SUBSCRIBED AND SWORN TO BEFORE ME on this the 28th day of April, 2014, to certify which, witness my hand and seal of office.

_____
Notary Public, State of Texas

KELLY A. MEZA
MY COMMISSION EXPIRES
May 3, 2016

**CAUSE NO. 07-CV 1040**

| | | |
|---|---|---|
| DORIS POWLEDGE, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF ADAM POWLEDGE, DECEASED, THE ESTATE OF RACHEL POWLEDGE, DECEASED, THE ESTATE OF ISAAC POWLEDGE, DECEASED, THE ESTATE OF CHRISTIAN POWLEDGE, DECEASED, AND THE ESTATE OF JACOB POWLEDGE, DECEASED; AND CONNIE MCNEIL AS NEXT FRIEND TO AUSTIN POWLEDGE, A MINOR; AND AMBER POWLEDGE AND MARY LOU POWLEDGE, INDIVIDUALLY, | § § § § § § § § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § § | |
| and | § § | |
| RONALD ALTON POWLEDGE, | § § § | |
| Intervenor, | § § | |
| VS. | § § | 10th JUDICIAL DISTRICT |
| GENERAL MOTORS CORPORATION, | § § | |
| Defendant. | § | GALVESTON COUNTY, TEXAS |



**PLAINTIFFS' FOURTH AMENDED PETITION**

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, DORIS POWLEDGE, both in her individual capacity and as representative of the ESTATE OF ADAM POWLEDGE, deceased, the ESTATE OF RACHEL POWLEDGE, deceased, the ESTATE OF ISAAC POWLEDGE, deceased, the ESTATE OF CHRISTIAN POWLEDGE, deceased, and the ESTATE OF JACOB POWLEDGE, deceased; CONNIE MCNEIL, as next friend to AUSTIN POWLEDGE, a minor; and AMBER POWLEDGE and MARY LOU POWLEDGE, individually

### III. Facts

7.     On or about October 18, 2005, Adam Powledge was driving a 2004 Chevrolet Malibu (VIN# 1G1ND52F34M598780) at approximately the 4600 Block of IH45 North, and near the intersection of Holland Road, in Texas City, Galveston County, Texas. According to the police report, at some point in time, his vehicle apparently struck another vehicle while southbound. Mr. Powledge's vehicle then apparently drove on the grass median until it struck a steel support beam, at which point it split in half and caught fire, killing all of the occupants.

8.     At the time of the accident, Jacob Powledge was the right-front passenger, Christian Powledge was the back-right passenger, Rachel Powledge was the back-middle passenger, and Isaac Powledge was the back-left passenger.

9.     At the time of the accident, all of the occupants of the vehicle were properly seated and properly wearing their 3-point seat belts.

10.     However, despite being properly restrained, Adam Powledge, Jacob Powledge, Christian Powledge, Rachel Powledge, and Isaac Powledge all sustained fatal injuries when their vehicle failed to protect them.

### IV. Cause(s) of Action as to Defendant General Motors Corporation

11.     It was entirely foreseeable to and well-known by the Defendant that accidents and incidents involving its vehicles, such as occurred herein, would on occasion take place during the normal and ordinary use of said vehicle.

12.     The injuries and damages complained of herein occurred because the vehicle in question was not reasonably crashworthy, and was not reasonably fit for unintended, but clearly foreseeable, accidents. The vehicle in question was unreasonably dangerous in the event it should be involved in an incident such as occurred herein.

**09-50026-mg    Doc 13112-7    Filed 04/20/15    Entered 04/20/15 17:50:47    Exhibit G
Pg 40 of 58**

q.    The vehicle's cruise control failed stuck or malfunctioned.

14.    Defendant was negligent in the design, manufacture, assembly, marketing, and/or testing of the vehicle in question.

15.    The foregoing acts and/or omissions of Defendant were a producing and/or proximate cause of the Plaintiffs' damages.

16.    The foregoing acts and/or omissions of Defendant were a producing and/or proximate cause of the fatal injuries to Plaintiffs Adam Powledge, Jacob Powledge, Christian Powledge, Rachel Powledge, and Isaac Powledge.

### V.  Damages To Plaintiffs

17.    As a result of the acts and/or omissions of Defendant, Plaintiff Adam Powledge suffered disfigurement, conscious physical and emotional pain, torment, mental anguish, and/or emotional distress prior to his death, and these injuries survive his death through his estate.

18.    As a result of the acts and/or omissions of Defendant, Plaintiff Jacob Powledge suffered disfigurement, conscious physical and emotional pain, torment, mental anguish, and/or emotional distress prior to his death, and these injuries survive his death through his estate.

19.    As a result of the acts and/or omissions of Defendant, Plaintiff Christian Powledge suffered disfigurement, conscious physical and emotional pain, torment, mental anguish, and/or emotional distress prior to his death, and these injuries survive his death through his estate.

20.    As a result of the acts and/or omissions of Defendant, Plaintiff Rachel Powledge suffered disfigurement, conscious physical and emotional pain, torment,

and society, loss of consortium, and mental anguish as a result of the fatal injuries to his father, Adam Powledge.

26. As a result of the acts and/or omissions of Defendant, Plaintiff Austin Powledge has suffered a loss of inheritance of the assets that Adam Powledge, in reasonable probability, would have added to the estate and left at natural death to Plaintiff.

27. As a result of the acts and/or omissions of Defendant, Plaintiff Amber Powledge has suffered past and future: loss of care, maintenance, support, services, advice, counsel, reasonable contributions of a pecuniary value, loss of companionship and society, loss of consortium, and mental anguish as a result of the fatal injuries to her father, Adam Powledge.

28. As a result of the acts and/or omissions of Defendant, Plaintiff Amber Powledge has suffered a loss of inheritance of the assets that Adam Powledge, in reasonable probability, would have added to the estate and left at natural death to Plaintiff.

29. As a result of the acts and/or omissions of Defendant, Plaintiff Mary Lou Powledge has suffered past and future: loss of care, maintenance, support, services, advice, counsel, reasonable contributions of a pecuniary value, loss of companionship and society, loss of consortium, and mental anguish as a result of the fatal injuries to her son, Adam Powledge.

30. The above and foregoing acts and/or omissions of Defendant, resulting in the fatal injuries to Plaintiffs Adam Powledge, Jacob Powledge, Christian Powledge, Rachel Powledge, and Isaac Powledge, have caused actual damages to Plaintiffs in an amount in excess of the minimum jurisdictional limits of this Court.

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing has been sent to all counsel of record on this 1st day of July, 2008, in accordance with the Texas Rules of Civil Procedure.



E. Todd Tracy
Andrew G. Counts

(Official Form 1)(1/08)    Doc 1    Filed 06/01/09    Entered 06/01/09 07:57:51    Main Document

| United States Bankruptcy Court Pg 1 of 24<br>Southern District of New York | Voluntary Petition |
|---|---|

| **Name of Debtor** (if individual, enter Last, First, Middle):<br>**GENERAL MOTORS CORPORATION** | **Name of Joint Debtor** (Spouse) (Last, First, Middle):<br>**N/A** |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names):<br>**See Schedule 1 Attached** | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names):<br>**N/A** |
| Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) No./Complete EIN (if<br>more than one, state all):<br>**38-0572515** | Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) No./Complete EIN (if<br>more than one, state all):<br>**N/A** |

| Street Address of Debtor (No. and Street, City, and State):<br>**300 Renaissance Center**<br><br>**Detroit, Michigan** | Street Address of Joint Debtor (No. and Street, City, and State):<br>**N/A** | |
|---|---|---|
| ZIP CODE<br>**48265-3000** | | ZIP CODE |
| County of Residence or of the Principal Place of Business: **Wayne County** | County of Residence or of the Principal Place of Business:<br>**N/A** | |
| Mailing Address of Debtor (if different from street address):<br><br>ZIP CODE | Mailing Address of Joint Debtor (if different from street address):<br>**N/A**<br><br>ZIP CODE | |
| Location of Principal Assets of Business Debtor (if different from street address above):<br>**767 Fifth Avenue, New York, New York** | | ZIP CODE **10153** |

| Type of Debtor<br>(Form of Organization)<br>(Check one box.) | Nature of Business<br>(Check one box.) | Chapter of Bankruptcy Code Under Which<br>the Petition Is Filed (Check one box) |
|---|---|---|
| ☐ Individual (includes Joint Debtors)<br>*See Exhibit D on page 2 of this form.*<br>☒ Corporation (includes LLC and LLP)<br>☐ Partnership<br>☐ Other (If debtor is not one of the above<br>entities, check this box and state type of<br>entity below.)<br>_____ | ☐ Health Care Business<br>☐ Single Asset Real Estate as defined in<br>11 U.S.C. § 101 (51B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☒ Other<br><br>**Automotive Manufacturing**<br><br>Tax-Exempt Entity<br>(Check box, if applicable.)<br>☐ Debtor is a tax-exempt organization<br>under Title 26 of the United States<br>Code (the Internal Revenue Code). | ☐ Chapter 7          ☐ Chapter 15 Petition for Recognition of a Foreign<br>☐ Chapter 9                 Main Proceeding<br>☒ Chapter 11       ☐ Chapter 15 Petition for Recognition of a Foreign<br>☐ Chapter 12                 Nonmain Proceeding<br>☐ Chapter 13<br><br>**Nature of Debts** (Check one box.)<br><br>☐ Debts are primarily consumer          ☒ Debts are primarily business<br>debts, defined in 11 U.S.C. §                 debts.<br>101(8) as "incurred by an<br>individual primarily for a personal,<br>family, or household purpose." |

**Chapter 11 Debtors**

Check one box:
☐ Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).
☒ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).

Check if:
☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to
insiders or affiliates) are less than $2,190,000.

Check all applicable boxes:
☐ A plan is being filed with this petition.
☐ Acceptances of the plan were solicited prepetition from one or more classes of
creditors, in accordance with 11 U.S.C. § 1126(B).

| **Filing Fee** (Check one box) |
|---|
| ☒ Full Filing Fee attached.<br>☐ Filing Fee to be paid in installments (applicable to individuals only). Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form 3A.<br>☐ Filing Fee waiver requested (applicable to chapter 7 individuals only). Must attach signed application for the court's consideration. See Official Form 3B. |

**Statistical/Administrative Information**

☒ Debtor estimates that funds will be available for distribution to unsecured creditors.
☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for
distribution to unsecured creditors.

THIS SPACE IS FOR COURT USE ONLY

**Estimated Number of Creditors (on a Consolidated Basis)**

| 1-49 | 50-99 | 100-199 | 200-999 | 1,000-<br>5,000 | 5,001-<br>10,000 | 10,001-<br>25,000 | 25,001-<br>50,000 | 50,001-<br>100,000 | Over<br>100,000 |
|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

**Estimated Assets (on a Consolidated Basis)**

| $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1 million | $1,000,001<br>to $10<br>million | $10,000,001<br>to $50<br>million | $50,000,001<br>to $100<br>million | $100,000,001<br>to $500<br>million | $500,000,001<br>to $1 billion | More than<br>$1 billion |
|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

**Estimated Liabilities (on a Consolidated Basis)**

| $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1 million | $1,000,001<br>to $10<br>million | $10,000,001<br>to $50<br>million | $50,000,001<br>to $100<br>million | $100,000,001<br>to $500<br>million | $500,000,001<br>to $1 billion | More than<br>$1 billion |
|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

Official Form 1) (1/08)                                                                    FORM B1, Page 3

| Voluntary Petition<br>*(This page must be completed and filed in every case)* | Name of Debtor(s):<br>**GENERAL MOTORS CORPORATION** |
|---|---|

## Signatures

| **Signature(s) of Debtor(s) (Individual/Joint)** | **Signature of a Foreign Representative** |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct.<br><br>[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.<br><br>[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. § 342(b).<br><br>I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X _____<br> Signature of Debtor<br><br>X _____<br> Signature of Joint Debtor<br><br>_____<br> Telephone Number (if not represented by attorney)<br><br>_____<br> Date | I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.<br><br>(Check only one box.)<br><br>☐  I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by 11 U.S.C. § 1515 are attached.<br><br>☐  Pursuant to 11 U.S.C. § 1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached.<br><br>X _____<br> [Signature of Foreign Representative]<br><br>_____<br> [Printed Name of Foreign Representative]<br><br>_____<br> Date |

| **Signature of Attorney*** | **Signature of Non-Attorney Bankruptcy Petition Preparer** |
|---|---|
| X  /s/ Stephen Karotkin<br> Signature of Attorney for Debtor(s)<br><br>**Stephen Karotkin**<br> Printed Name of Attorney for Debtor(s)<br><br>**Weil, Gotshal & Manges LLP**<br> Firm Name<br><br>**767 Fifth Avenue**<br> Address<br><br>**New York, New York 10153**<br><br>**(212) 310-8000**<br> Telephone Number<br><br>**June 1, 2009**<br> Date<br><br>* In a case in which § 707(b)(4)(D) applies, this signature also constitutes a certification that the attorney has no knowledge after an inquiry that the information in the schedules is incorrect. | I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19B is attached.<br><br>_____<br> Printed Name and title, if any, of Bankruptcy Petition Preparer<br><br>Social-Security number (If the bankruptcy petition preparer is not an individual, state the Social-Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110.)<br><br>_____<br> Address<br><br>X _____<br><br>_____<br> Date<br><br>Signature of bankruptcy petition preparer or officer, principal, responsible person, or partner whose Social-Security number is provided above.<br><br>Names and Social-Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual:<br><br>If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.<br><br>*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. § 156.* |

| **Signature of Debtor (Corporation/Partnership)** | |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.<br><br>The debtor requests the relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X  /s/ Frederick A. Henderson<br> Signature of Authorized Individual<br><br>**Frederick A. Henderson**<br> Printed Name of Authorized Individual<br><br>**President and Chief Executive Officer**<br> Title of Authorized Individual<br><br>**June 1, 2009**<br> Date | |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | Chapter 11 Case No. |
| | : | |
| GENERAL MOTORS CORPORATION, | : | 09-_____ (    ) |
| | : | |
| | : | |
| Debtor. | : | |

-------------------------------------------------x

## CONSOLIDATED LIST OF CREDITORS
## HOLDING 50 LARGEST UNSECURED CLAIMS[1]

      Following is the consolidated list of the creditors of General Motors Corporation and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"), holding the 50 largest noncontingent unsecured claims as of May 31, 2009.

      Except as set forth above, this list has been prepared in accordance with Rule 1007(d) of the Federal Rules of Bankruptcy Procedure and Rule 1007-1 of the Local Rules of Bankruptcy Procedure. This list does not include persons who come within the definition of "insider" set forth in section 101(31) of chapter 11 of title 11 of the United States Code.

---

[1] The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. All claims are subject to customary offsets, rebates, discounts, reconciliations, credits, and adjustments, which are not reflected on this Schedule.

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade, debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| 4. International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers – Communications Workers of America (IUE-CWA) 3461 Office Park Drive Kettering, OH 45439 United States | Attn: Mr. James Clark Phone: (937) 294-9764 Fax: (937) 298-633 2701 Dryden Road Dayton, OH 45439 United States | Employee Obligations | | $2,668,600,000[4] |
| 5. Bank of New York Mellon One Wall Street New York, NY 10286 United States | Attn: Gregory Kinder Phone: (212) 815-2576 Fax: (212) 815-5595 Global Corporate Trust, 101 Barclay, 7W New York, NY 10286 United States | Bond Debt | | $175,976,800 |
| 6. Starcom Mediavest Group, Inc. 35 W. Wacker Drive Chicago, IL 60601 United States | Attn: Laura Desmond Phone: (312) 220-3550 Fax: (312) 220-6530 35 W. Wacker Drive Chicago, IL 60601 United States | Trade Debt | | $121,543,017 |
| 7. Delphi Corp. 5725 Delphi Drive Troy, MI 48098 United States | Attn: Rodney O'Neal Phone: (248) 813-2557 Fax: (248) 813-2560 5725 Delphi Drive Troy, MI 48098 United States | Trade Debt | | $110,876,324 |

---

[4]    This liability estimated as the net present value at a 9% discount rate.

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff. | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| 12. Johnson Controls, Inc.<br><br>5757 N. Green Bay Avenue<br>Glendale, WI 53209<br>United States | Attn: Stephen A. Roell<br><br>Phone: (414)-524-2223<br>Fax: (414)-524-3000<br><br>5757 N. Green Bay Avenue<br>Milwaukee, WI 53201<br>United States | Trade Debt | | $32,830,356 |
| 13. Denso Corp.<br><br>24777 Denso Drive<br>Southfield, MI 48086<br>United States | Attn: Haruya Maruyama<br><br>Phone: (248) 350-7500<br>Fax: (248) 213-2474<br><br>24777 Denso Drive<br>Southfield, MI 48086<br>United States | Trade Debt | | $29,229,047 |
| 14. TRW Automotive Holdings, Corp.<br><br>12025 Tech Center Dr.<br>Livonia, MI 48150<br>United States | Attn: John Plant<br><br>Phone: (734) 855-2660<br>Fax: (734) 855-2473<br><br>12001 Tech Center Drive<br>Livonia, MI 48150<br>United States | Trade Debt | | $27,516,189 |
| 15. Magna International, Inc.<br><br>337 Magna Drive<br>Aurora, ON L4G 7K1<br>Canada | Attn: Don Walker<br><br>Phone: (905) 726-7040<br>Fax: (905) 726-2593<br><br>337 Magna Drive<br>Aurora, ON L4G 7K1<br>Canada | Trade Debt | | $26,745,489 |
| 16. American Axle & Mfg Holdings, Inc.<br><br>One Dauch Drive<br>Detroit, MI 48211-1198<br>United States | Attn: Richard Dauch<br><br>Phone: (313) 758-4213<br>Fax: (313) 758-4212<br><br>One Dauch Drive<br>Detroit, MI 48211<br>United States | Trade Debt | | $26,735,957 |

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or, subject to setoff | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| 22.  Tenneco Inc.<br><br><br><br>500 North Field Drive<br>Lake Forest, IL 60045<br>United States | Attn: Gregg Sherrill<br><br>Phone: (847) 482-5010<br>Fax: (847) 482-5030<br><br>500 North Field Drive<br>Lake Forest, IL 60045<br>United States | Trade Debt | | $14,837,427 |
| 23.  Yazaki Corp.<br><br><br><br>6801 Haggerty Road<br>Canton, MI 48187<br>United States | Attn: George Perry<br><br>Phone:  (734) 983-5186<br>Fax:  (734) 983-5197<br><br>6801 Haggerty Road, 48E<br>Canton, MI 48187<br>United States | Trade Debt | | $13,726,367 |
| 24.  International Automotive Components<br><br><br><br>5300 Auto Club Drive<br>Dearborn, MI 48126<br>United States | Attn: James Kamsickas<br><br>Phone: (313) 253-5208<br>Fax: (313) 240-3270<br><br>5300 Auto Club Drive<br>Dearborn, MI 48126<br>United States | Trade Debt | | $12,083,279 |
| 25.  Avis Rental Car<br><br><br><br>6 Sylvan Way<br>Parsippany, NJ 07054<br>United States | Attn: Robert Salerno<br><br>Phone: (973) 496-3514<br>Fax: (212) 413-1924<br><br>6 Sylvan Way<br>Parsippany, NJ 07054<br>United States | Trade Debt | | $12,040,768 |
| 26.  FMR Corp.<br><br><br><br>82 Devonshire St<br>Boston, MA 02109<br>United States | Attn: Robert J. Chersi<br><br>Phone: (617)563-6611<br>Fax: (617) 598-9449<br><br>82 Devonshire St<br>Boston, MA 02109<br>United States | Trade Debt | | $11,980.946 |

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff. | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| 32. Arcelor Mittal<br><br>19, Avenue De La Liberte<br>Luxembourg, L-2930<br>Luxembourg | Attn: Lakshmi Mittal<br><br>Phone: 44 20 7543 1131<br>Fax: (44 20) 7 629-7993<br><br>Berkley Square House, 7th<br>Floor Berkley Square House<br>London, England W1J6DA | Trade Debt | . | $9,549,212 |
| 33. AK Steel Holding, Corp.<br><br>9227 Centre Pointe Drive<br>Westchester, OH 45069<br>United States | Attn: Jim Wainscott<br><br>Phone: (513) 425-5412<br>Fax: (513) 425-5815<br><br>9227 Centre Pointe Drive<br>Westchester, OH 45069<br>United States | Trade Debt | | $9,116,371 |
| 34. CSX Corp.<br><br>500 Water Street, 15th Floor<br>Jacksonville, FL 32202<br>United States | Attn: Oscar Muñoz<br><br>Phone: (904) 359-1329<br>Fax: (904) 359-1859<br><br>500 Water Street, 15th Floor<br>Jacksonville, FL 32202<br>United States | Trade Debt | | $8,884,846 |
| 35. Hertz Corporation<br><br>14501 Hertz Quail Springs<br>Parkway<br>Oklahoma City, OK 73134<br>United States | Attn: .Elyse Douglas<br><br>Phone: (201) 450-2292<br>Fax: (866) 444-4763<br><br>225 Brae Boulevard Park<br>Ridge, NJ 07656<br>United States | Trade Debt | | $8,710,291 |

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| 41.  Exxon Mobil Corp.<br><br><br><br>5959 Las Colinas Boulevard<br>Irving, TX 75039<br>United States | Attn: James P. Hennessy<br><br>Phone: (703) 846-7340<br>Fax: (703) 846-6903<br><br>3225 Gallows Road<br>Fairfax, VA 22037<br>United States | Trade Debt | | $6,248,959 |
| 42.  Hitachi Ltd.<br><br><br><br>955 Warwick Road<br>P.O. Box 510<br>Harrodsburg, KY 40330<br>United States | Attn: Yasuhiko Honda<br><br>Phone: (81 34) 564-5549<br>Fax: (81 34) 564-3415<br><br>Akihabara Daibiru Building 18-13, Soto-Kanda, 1-Chome<br>Chiyoda-Ku, Tokyo, 101-8608<br>Japan | Trade Debt | | $6,168,651 |
| 43.  Mando Corp.<br><br><br><br>4201 Northpark Drive<br>Opelika, AL 36801<br>United States | Attn: Zung Su Byun<br><br>Phone: (82 31) 680-6114<br>Fax: (82 31) 681-6921<br><br>343-1, Manho-Ri ,Poseung-Myon, Pyongtaek Kyonggi,<br>South Korea, Korea | Trade Debt | | $5,459,945 |
| 44.  General Physics Corp.<br><br><br><br>1500 W. Big Beaver Rd.<br>Troy, MI 48084<br>United States | Attn: Sharon Esposito Mayer<br><br>Phone: (410) 379-3600<br>Fax: (410) 540-5302<br><br>6095 Marshalee Drive, St. 300<br>Elkridge, MD 21075<br>United States | Trade Debt | | $5,208,070 |
| 45.  Sun Capital Partners, Inc.<br><br><br><br>5200 Town Center Circle,<br>Suite 600<br>Boca Raton, FL 33486<br>United States | Attn: Mr. Kevin<br><br>Phone: (561) 948-7514<br>Fax: (561) 394-0540<br><br>5200 Town Center Circle, Suite<br>600 Boca Raton, FL 33486<br>United States | Trade Debt | | $4,747,353 |

## DECLARATION UNDER PENALTY OF PERJURY:

I, the undersigned authorized officer of the corporation named as Debtor in this case, declare under penalty of perjury that I have reviewed the foregoing Consolidated List of Creditors Holding the 50 Largest Unsecured Claims and that the list is true and correct to the best of my information and belief.

Dated: June 1, 2009

/s/ Frederick A. Henderson
Signature

NAME:  Frederick A. Henderson


TITLE:  President and Chief Executive Officer

e.  Number of shares of common stock:_____2,000,000,000 shares authorized,
800,937,541 shares issued, and 610,505,273 shares outstanding, all as of March
31, 2009._____

3.  Brief description of debtor's business:  __The debtor, together with its affiliates, is
engaged in the manufacturing, marketing, and distribution of cars and trucks
worldwide._____

4.  List the names of any person who directly or indirectly owns, controls, or holds, with
power to vote, 5% or more of the voting securities of debtor:____State Street Bank
and Trust Company (17.0%)_____

necessary, proper, or desirable to enable such Filing Subsidiary to carry out the filing in Bankruptcy Court contemplated hereby;

**RESOLVED,** that the Board sees no objection to a filing by GMCL, if determined to be appropriate by the Board of Directors of GMCL, for protection from its creditors under the Companies' Creditors Arrangement Act (the "CCAA") or to any actions taken by GMCL as are necessary, proper, or desirable to enable GMCL to carry out such filing;

## EXECUTION OF MASTER SALE AND PURCHASE AGREEMENT

**RESOLVED,** that the Board finds that the sale of substantially all of the assets of the Corporation to Auto Acquisition Corp., a new entity formed by the United States Department of the Treasury, in accordance with the Purchase Agreement (as defined below), is expedient and in the best interests of the Corporation;

**RESOLVED,** that the form, terms and provisions of the proposed Master Sale and Purchase Agreement (the "Purchase Agreement") by and among the Corporation, the Filing Subsidiaries and Vehicle Acquisition Holdings LLC., in substantially the form reviewed by the Board, are hereby approved, and the sale of substantially all of the assets of the Corporation set forth in the Purchase Agreement on the terms set forth in the Purchase Agreement be, and hereby is, authorized and approved;

**RESOLVED,** that each of the Proper Officers, or any of them, is hereby authorized and directed to execute and deliver the Purchase Agreement, with such changes therein or revisions thereto as the Proper Officer or Officers executing and delivering the same may in his or their sole and absolute discretion approve consistent with these Resolutions and with the advice of the Corporation's Legal Staff, and to cause the Corporation to carry out the terms and provisions thereof;

**RESOLVED,** that each of the Proper Officers, or any of them, is hereby authorized and directed to approve, execute and deliver from time to time such amendments, changes or modifications to the Purchase Agreement as any such Proper Officer shall, consistent with these Resolutions and with the advice of the Corporation's Legal Staff, deem necessary, proper or advisable;

**RESOLVED,** that if the Corporation determines no later than the due date (including any extensions) of the Corporation's tax return for the taxable year in which the sale contemplated by the Purchase Agreement is closed that an Agreed G Transaction (as defined in the Purchase Agreement) has occurred, (i) the Purchase Agreement will be deemed to constitute a "plan" of the Corporation for purposes of Sections 368 and 354 of the Internal Revenue Code of 1986, as amended (the "Tax Code"), and (ii) the Corporation shall treat the transactions contemplated in the Purchase Agreement, in combination with the subsequent liquidation of the Corporation and the Filing Subsidiaries (as defined in the Purchase Agreement), as a tax-free reorganization pursuant to Section 368(a)(1)(G) of the Tax Code (with any actual or deemed distribution by the Corporation qualifying solely under Sections 354 and 356 of the Tax Code but not under Section 355 of the Tax Code);

## EXECUTION OF LOAN FACILITIES – U.S. AND CANADA

**RESOLVED,** that in connection with the commencement of the Chapter 11 case by the Corporation, each of the Proper Officers, or any of them, is hereby authorized to

**RESOLVED**, that the Corporation's guarantee of certain obligations of GMCL under the Canadian Credit Agreement secured by the pledge of some or all of its ownership interest in GMCL is approved on terms to be approved by the CFO, which may include the Corporation's participation in the Canadian Credit Agreement as a borrower, consistent with the advice of the Corporation's Legal Staff;

**RESOLVED**, that the Corporation's guarantee of GMCL's obligations under the April EDC Credit Agreement as approved at the meeting of the Board on April 24, 2009 will continue to be valid, binding and enforceable until the effectiveness of the Canadian Credit Agreement, and in connection with the foregoing, the Proper Officers, or any Proper Officer, is authorized to execute and deliver a Confirmation and Acknowledgment (the "Acknowledgment") stating that the April EDC Credit Agreement may be modified or supplemented by EDC and GMCL without the Corporation's participation;

**RESOLVED**, that the Proper Officers, or any Proper Officer, is hereby authorized to execute and deliver the guaranty and any other agreements or documents to which the Corporation is a party or to take any other actions that he determines are necessary, appropriate or advisable to consummate the transactions contemplated by the Canadian Credit Agreement;

## GENERAL AUTHORIZATION AND RATIFICATION

**RESOLVED**, that each Proper Officer is authorized and directed, consistent with these Resolutions and with the advice of the Corporation's Legal Staff: (i) to negotiate, execute, deliver, certify, file and/or record, and perform, any and all of the agreements, documents, and instruments referenced herein, and such other agreements, documents, and instruments and assignments thereof as may be required or as such Proper Officer deems appropriate or advisable, or to cause the negotiation, execution, and delivery thereof, as the case may be, in such form and substance as such Proper Officer may approve, together with such changes and amendments to any of the terms and conditions thereof as such Proper Officer may approve, (ii) to negotiate, execute, deliver, certify, file and/or record, and perform any agreements, documents, certificates, consents, filings, and applications relating to the Resolutions adopted and matters ratified or approved herein and the transactions contemplated thereby, and amendments and supplements to any of the foregoing, and to take such other action as may be required or as such Proper Officer deems appropriate or advisable in connection therewith, and (iii) to do such other things as may be required, or as may in such Proper Officer's judgment be necessary, proper, or desirable, to carry out the intent and effectuate the purposes of the Resolutions adopted and matters ratified or approved herein and the consummation of the transactions contemplated hereby; and

**RESOLVED**, that all actions taken by the Proper Officers, or any of them, prior to the date of the foregoing Resolutions adopted at this meeting and within the authority conferred, are hereby ratified, confirmed, approved in all respects as the act and deed of the Corporation.

* * * * *

# EXHIBIT H

cars or being unable to maneuver them to the side of the road.

"There's no question that service bulletins have been used where recalls should have been," said Joan Claybrook, a former head of the National Highway Traffic Safety Administration, the federal agency that regulates auto safety, speaking of the auto industry as a whole. "It's highly inappropriate."

When told of the findings by The Times about G.M., Ms. Claybrook said, "I'm shocked. I can see it happening occasionally, but not as a routine. Seven is a lot."

Companies send out thousands of technical service bulletins each year. They allow an automaker to tell dealers, and sometimes car owners, about low-level problems like a faulty interior light or air conditioner. They can also act as alerts about issues the automaker does not fully understand and continues to research. But the service bulletins, which are typically directed at dealerships' service departments, are not intended to address serious safety issues, which by law must be handled by recalls monitored by the safety agency.

"A manufacturer must address a safety defect by conducting a safety recall, which requires the manufacturer to notify consumers and remedy the defect," said Nathan Naylor, a spokesman for the highway safety agency.

### An Attempt to Be Discreet

Service bulletins can be an inexpensive substitute for a recall. In January 2013, for example, G.M. engineers estimated that it would cost $41.3 million to change the ignition switches in more than 778,000 vehicles, including Cobalts and Pontiac G5s. While there is no data available on the cost of repairs that resulted from the letter to dealers and owners, experts say the financial costs and the hit to the company's reputation were likely to be softer with the relatively discreet bulletins.

The Times analysis of service bulletins was limited to General Motors. The safety agency declined to comment on how G.M. compared with other automakers, but its top defects investigator, Frank Borris, last year scolded G.M. over its lack of responsiveness on safety issues, in contrast to its peers.

"The general perception is that G.M. is slow to communicate, slow to act, and, at times, requires additional effort," Mr. Borris wrote to Carmen Benavides,

we've been quick to act from a safety recall process."

**Series of Service Bulletins**

The review by The Times found multiple instances in which the company used service bulletins instead of immediately recalling cars, with the gap between a bulletin and a recall ranging from six months to nine years.

In the case of the Saturn Ion, which had a power steering system that could suddenly turn off, there were at least three service bulletins issued over a period of nine years before G.M. finally issued a recall last month.

Just last August, Sharon Luers said, she was driving to a friend's house in Shrewsbury, Pa., in her 2004 Ion when she heard a chime and saw a warning light flash for the power steering. Almost immediately, she lost control of her car. "It took all my strength to pull over," she said.

A few days later, it happened again.

Beginning in 2005, General Motors issued service bulletins alerting technicians at dealerships that "some customers may comment that the steering wheel is hard to turn and that a message of 'PWR STR' is displayed," as one 2009 bulletin read.

In March 2010, G.M. recalled nearly 1.1 million Cobalts and Pontiac G5s for faulty power steering systems, but the Ion was not recalled, even though it used the same steering system.

By September 2011, G.M. had informed the auto safety agency — which had begun to investigate problems with the Ion — of 3,489 customer reports claiming a sudden loss of power steering in 2004-7 Ions, as well as two crash claims indicating that drivers had been injured, according to regulatory filings. It is not known if any deaths resulted from the problem.

The following month, Ms. Barra, who was then vice president for global product development, received an email from a senior G.M. engineer, telling her that the Ion might have the same power steering problems that led to the recall of the Cobalt and G5.

"Mary," the email said, "during the initial Cobalt case, the Ion data did not justify being included. The situation has been evolving. We will meet and understand the latest data."

suggesting that they tell drivers to remove objects attached to ignition keys. Only this year did the company order a recall of the cars.

Although it is G.M.'s responsibility to report safety problems, Ms. Claybrook, the former N.H.T.S.A. official, said the agency was somewhat culpable for not detecting abuses in service bulletins.

"Part of the problem is that N.H.T.S.A. is so grossly underfunded that it doesn't have time to read them as they come in," she said.

The safety agency said that it looks at every technical service bulletin it receives and may open an investigation when appropriate. The Times analysis found that car companies issue thousands of the notices each year and that safety-related bulletins may be lumped in among notices for less serious issues.

Still, automakers are required to act on serious safety problems with a recall. And when they do, it hurts them financially, and more important, in their reputation, said Daniel G. Hill, a crisis expert at Ervin Hill Strategy, a communications firm in Washington, who is familiar with the technical notices.

"But you hope that calculus hasn't been factored into the decision-making process," he said.

Christopher Jensen contributed reporting.

A version of this article appears in print on April 20, 2014, on page A1 of the New York edition with the headline: Sending Alerts, G.M. Delayed Recall of Cars.

## Next in Business Day
## Despite Big Ambitions, New York's Tech Scene Is Still Starting Up

© 2014 The New York Times Company