# <u>Exhibit 6</u>

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

BENJAMIN W. PILLARS,
as Personal Representative of the Estate of
KATHLEEN ANN PILLARS, deceased,

      Plaintiffs,                      Case No. 1:15-cv-11360-TLL-PTM

v.                                   Hon. Thomas L. Ludington

GENERAL MOTORS LLC,

      Defendant.
_____/

THE MASTROMARCO FIRM
VICTOR J. MASTROMARCO, JR.  (P34564)
Attorneys for Plaintiff
1024 N. Michigan Avenue
 Saginaw, Michigan  48602
(989) 752-1414
vmastromar@aol.com

BOWMAN AND BROOKE LLP
THOMAS P. BRANIGAN (P41774)
Attorneys for Defendant
41000 Woodward Ave., Ste. 200 East
Bloomfield Hills, Michigan 48304
(248)205-3300
thomas.branigan@bowmanandbrooke.com

_____/

## PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO MOTION FOR REMAND TO THE BAY COUNTY CIRCUIT COURT

NOW COMES the Plaintiff, BENJAMIN W. PILLARS, as Personal Representative of the Estate of KATHLEEN ANN PILLARS, deceased, by and through his attorneys, THE MASTROMARCO FIRM, and hereby submits his reply to Defendant's response and against requests that this Honorable Court pursuant to 28 U.S.C.A. § 1447 (c) issue an order of remand of the above-captioned case to the Bay County Circuit Court for the reasons as set forth more fully in the brief filed in support of this reply as well as in support of his motion.

Respectfully submitted,

THE MASTROMARCO FIRM

Dated: May 29, 2015                By: /s/ Victor J. Mastromarco, Jr.
                                    Victor J. Mastromarco, Jr. (P34564)
                                    Attorney for Plaintiff
                                    1024 N. Michigan Avenue
                                    Saginaw, Michigan 48602
                                    (989) 752-1414
                                    vmastromar@aol.com

THE MASTROMARCO FIRM, 1024 N. Michigan Ave., Saginaw, MI 48602 (989) 752-1414

# BRIEF IN SUPPORT

## INTRODUCTION

New GM in its response urges this Court to refrain from ruling on the motion for remand stating that allowing the Judicial Panel on Multidistrict Litigation to the decide the issue of remand. New GM's argument is misplaced for at least two reasons.

First, a motion for remand has been filed with this Court rather than with the Multidistrict Litigation panel. The motion before the Multidistrict Litigation panel is a motion to vacate the Conditional Transfer Order rather than a motion for remand. A copy of the Multidistrict Litigation Docket Entry is attached as **Exhibit A**. As explained in Plaintiff's principle brief, issues of remand should be decided before all other matters. See <u>University of South Alabama v. American Tobacco Co.</u>, 68 F.3d 405, 410 (11th Cir. 1999).

Second, the issue raised by New GM in its notice of removal before this Court is unique as explained more fully in this reply. New GM has not raised this issue in any other proceeding. Accordingly, this Court's addressing the issue raised before this Court will not result in an inconsistent ruling.[1]

---

[1] Even if an inconsistent ruling was possible, none of the cases cited by New GM are binding upon this Court and none of the cases cited by New GM stands for the proposition that this Court cannot decide issues of jurisdiction.

Page 3 of 8

# REBUTTAL ARGUMENT

New GM in its response to Plaintiff's motion does not dispute the fact that it admitted in its notice of removal that, in the context of Plaintiff's claims against it, it is responsible for any "occurrences" that happen on or after the July 10, 2009, closing date. Again, New GM made the following representation in its notice of removal:

> GM LLC admits it ultimately assumed a narrow band of certain liabilities, including the following as provided in Section 2.3(a)(ix) of the Sale Order and/or the Amended and Restated Master Sale and Purchase Agreement:
>
>> all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of accidents, incidents **or other distinct and discreet occurrences that happen on or after the Closing Date [July 10, 2009]** and arise from such motor vehicles' operation or performance. (Emphasis Added by Plaintiff).

(See page 4, footnote 1 of Notice of Removal - Exhibit 2 to Motion for Remand).

The Court should also note that New GM made the same representations in paragraph seventeen (17) of its Answer to Plaintiff's Amended Complaint.[2] Accordingly, New GM's answer to the complaint along with its response to

---

[2] New GM attached a copy of the complaint to its notice of removal as Exhibit D. The Court should note that the Plaintiff had already amended his complaint and served said amendment on New GM at the time of removal. For the purpose of this motion, reference to the amended complaint is not necessary since the changes/additions made in the amendment are not material to the limited issue before this Court.

THE MASTROMARCO FIRM, 1024 N. Michigan Ave., Saginaw, MI 48602 (989) 752-1414

Plaintiff's motion further demonstrates that there is no dispute as to which version of the purchase agreement which New GM has chosen to rely upon in the context of Plaintiff's pending lawsuit before this Court.[3]

The position taken by New GM in the above-captioned lawsuit is significant, since, as the Bankruptcy Court has noted in its rulings, the Amended and Restated Master Sale and Purchase Agreement was superseded by subsequent amendments to said agreement wherein the phrase, "*__or other distinct and discreet occurrences that happen on or after the Closing Date [July 10, 2009]__*" was removed. A copy of the Bankruptcy Court's Decision is attached as **Exhibit B**.

The undersigned is not aware of a single case where New GM has chosen to rely upon the above-mention language which only appears in the original purchase agreement.  In other words, the arguments raised by New GM in the present case are unique. There is no reason why this Court should not decide the issue. See In re Consol. Fen-Phen Cases, No. 03 CV 3081 (JG), 2003 WL 22682440 (E.D.N.Y. Nov. 12, 2003). A copy of the District Court Decision is attached as **Exhibit C**.

Furthermore, the bankruptcy court has never been asked by New GM to rule upon the original purchase agreement or the language, "*__or other distinct and__*

---

[3] New GM in its response has not challenged the fact that it is bound by the clear and unequivocal admissions of its attorneys in its submissions to this Court. Barnes v. Owens-Corning Fiberglass Corp., 201 F.3d 815, 829 (6th Cir. 2000), MacDonald v. Gen. Motors Corp., 110 F.3d 337, 340 (6th Cir. 1997).

THE MASTROMARCO FIRM, 1024 N. Michigan Ave., Saginaw, MI 48602 (989) 752-1414

*discreet occurrences that happen on or after the Closing Date [July 10, 2009]"*.

(See **Exhibit B**, see also Exhibit 6 to Motion for Remand). This fact has been

noted by the bankruptcy court in at least one of its rulings:

> Though it is undisputed that "incidents" remained in the MSPA after
> additional words "or other distinct and discrete occurrences," were deleted,
> neither side was able, or chose, to explain, by evidence, why the latter words
> were dropped, and what, if any relevance the dropping of the additional
> words might have as to the meaning of the word "incidents" that remained.

(**Exhibit B**). Again, it remains Plaintiff's position that the phrase, "***or other***

***distinct and discreet occurrences that happen on or after the Closing Date [July***

***10, 2009]"***is significant.

New GM also does not challenge in its response the proposition that courts

are to give the words their ordinary meaning. The definition of "occurrence" is,

"the action, fact, or instance of occurring ... 'something that takes place; an event

or incident.'" See the American Heritage Dictionary of the English Language 1219

(5th ed. 2011). A copy of the American Heritage Dictionary definition was

attached as Exhibit 6 to Plaintiff's motion for remand. Likewise, the Merriam–

Webster's Collegiate Dictionary 858 (11th ed. 2003) defines "occurrence" as,

"something that occurs... the action or instance of occurring". A copy of the

Merriam–Webster's Dictionary definition was attached as Exhibit 7 to the motion

for remand.

THE MASTROMARCO FIRM, 1024 N. Michigan Ave., Saginaw, MI 48602 (989) 752-1414

As pointed out in Plaintiff's motion, the Plaintiff brought wrongful death causes of action on behalf of the estate. (See Exhibit 3 to Motion for Remand). The death of the decedent on March 24, 2012, occurred almost three (3) years after the bankruptcy closing date, is certainly a distinct and discreet occurrence as the term "occurrence" is defined by two (2) major dictionaries.[4] New GM in its response does not dispute this fact.

As such, the Plaintiff again requests that this Court find a lack of subject matter jurisdiction and remand Plaintiff's case back to the Bay County Circuit Court.

## CONCLUSION

As such and as set forth more fully in the above-mentioned paragraphs, the Plaintiff respectfully requests that the Court remand the above-captioned case to the Bay County Circuit Court.

Respectfully submitted,

THE MASTROMARCO FIRM

Dated: June 2, 2015

By: /s/ Victor J. Mastromarco, Jr.
Victor J. Mastromarco, Jr. (P34564)
Attorney for Plaintiff
1024 N. Michigan Avenue
Saginaw, Michigan 48602
(989) 752-1414
vmastromar@aol.com

---

[4] Furthermore, the death of the Plaintiff was the result of the injuries she sustained from her operation of a General Motors vehicle. (See Exhibit 3 to Motion for Remand).

Page 7 of 8

## PROOF OF SERVICE

I hereby certify that on **June 2, 2015**, I presented the foregoing papers to the Clerk of the Court for the filing and uploading to the CM/ECF system, which will send notification of such filing to the following: **Andrew Baker Bloomer & Thomas P. Branigan**.

THE MASTROMARCO FIRM

Dated: June 2, 2015
By: */s/ Victor J. Mastromarco, Jr.*
Victor J. Mastromarco, Jr.
Attorney for Plaintiff
1024 N. Michigan Avenue
Saginaw, Michigan 48602
(989) 752-1414
vmastromar@aol.com

THE MASTROMARCO FIRM, 1024 N. Michigan Ave., Saginaw, MI 48602 (989) 752-1414

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

BENJAMIN W. PILLARS,
as Personal Representative of the Estate of
KATHLEEN ANN PILLARS, deceased,

      Plaintiffs,                Case No. 1:15-cv-11360-TLL-PTM

v.                                 Hon. Thomas L. Ludington

GENERAL MOTORS LLC,

      Defendant.

_____/

THE MASTROMARCO FIRM
VICTOR J. MASTROMARCO, JR.  (P34564)
Attorneys for Plaintiff
1024 N. Michigan Avenue
 Saginaw, Michigan  48602
(989) 752-1414
vmastromar@aol.com

BOWMAN AND BROOKE LLP
THOMAS P. BRANIGAN (P41774)
Attorneys for Defendant
41000 Woodward Ave., Ste. 200 East
Bloomfield Hills, Michigan 48304
(248)205-3300
thomas.branigan@bowmanandbrooke.com

_____/

## EXHIBIT INDEX
## PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO MOTION FOR
## REMAND TO THE BAY COUNTY CIRCUIT COURT

| EXHIBIT A | NOTICE OF ELECTRONIC FILING |
|-----------|------------------------------|
| EXHBIT B | MOTIONTO ENFORCE 363 |
| EXHIBIT C | IN re CONSOLIDATED FEN-PHEN CASES |

From: JPMLCMECF <JPMLCMECF@jpml.uscourts.gov>
To: JPMLCMDECF <JPMLCMDECF@jpml.uscourts.gov>
Subject: Activity in Case MDL No. 2543 IN RE: General Motors LLC Ignition Switch Litigation Motion and Brief to Vacate Conditional Transfer Order
Date: Wed, May 6, 2015 1:55 pm

---

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

United States

United States Judicial Panel on Multidistrict Litigation

## Notice of Electronic Filing

The following transaction was entered by Mastromarco, Victor on 5/6/2015 at 1:55 PM EDT and filed on 5/6/2015
Case Name:     IN RE: General Motors LLC Ignition Switch Litigation
Case Number:     MDL No. 2543
Filer:
Document Number: 712

Docket Text:
MOTION TO VACATE CONDITIONAL TRANSFER ORDER WITH BRIEF IN SUPPORT (CTO-38) *re: pldg. (3 in MIE/1:15-cv-11360)* Filed by Plaintiff Benjamin W. Pillars (Attachments: # (1) Brief Brief in Support of Motion to Vacate CTO 38, # (2) Exhibit 1 - Schedule of Actions, # (3) Exhibit 2 - Defendant's Notice of Removal, # (4) Exhibit 3 - State Court Complaint, # (5) Exhibit 4 - American Heritage Dictionary Print out, # (6) Exhibit 5- Merriam Webster Dictionary Print out, # (7) Exhibit 6 - Shamieh v. HCB Financial, # (8) Exhibit 7 - Decision on Motion to Enforce Sale, # (9) Exhibit 8 - Westlaw Print Out, # (10) Exhibit 9 - State of Michigan Traffic Crash Report, # (11) Exhibit 10 - Affidavit of Russell C. Babcock, # (12) Exhibit 11 - Civil Docket Sheets, # (13) Proof of Service)

Associated Cases: MDL No. 2543, MIE/1:15-cv-11360 (Mastromarco, Victor)

Case Name:     Pillars v. General Motors LLC
Case Number:     MIE/1:15-cv-11360
Filer:     Benjamin W. Pillars
Document Number: 7



PLAINTIFF'S EXHIBIT
A

Docket Text:
MOTION TO VACATE CONDITIONAL TRANSFER ORDER WITH BRIEF IN SUPPORT (CTO-38) *re: pldg. (3 in MIE/1:15-cv-11360)* Filed by Plaintiff Benjamin W. Pillars (Attachments: # [1] Brief Brief in Support of Motion to Vacate CTO 38, # [2] Exhibit 1 - Schedule of Actions, # [3] Exhibit 2 - Defendant's Notice of Removal, # [4] Exhibit 3 - State Court Complaint, # [5] Exhibit 4 - American Heritage Dictionary Print out, # [6]

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------
)
In re:                                                  )          Chapter 11
                                                        )
Motors Liquidation Company., *et al.*,                  )          Case No. 09-50026(REG)
    f/k/a General Motors Corp., *et al.*                 )
                                                        )
                               Debtors.              )          Jointly Administered
                                                        )
--------------------------------------------------------

## DECISION ON NEW GM'S MOTION TO
## ENFORCE SECTION 363 ORDER WITH
## RESPECT TO PRODUCT LIABILITY CLAIM OF
## ESTATE OF BEVERLY DEUTSCH

APPEARANCES:

WEIL, GOTSHAL & MANGES LLP
Counsel for General Motors, LLC
767 Fifth Avenue
New York, New York 10153
By:     Stephen Karotkin, Esq. (argued)
         Harvey R. Miller, Esq.
         Joseph H. Smolinsky, Esq.

BARRY NOVACK
Counsel for Plaintiff Sanford Deutsch
8383 Wilshire Blvd. Suite 830
Beverly Hills, California 90211-2407
By:    Barry Novack, Esq. (argued)

NORRIS MCLAUGHLIN & MARCUS, PA
Local Counsel for Sanford Deutsch
875 Third Ave., 8th Floor
New York, NY 10022
By:    Melissa Peña, Esq.



ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE

In this contested matter in the chapter 11 case of Motors Liquidation Company

(formerly, General Motors Corp., and referred to here as **"Old GM"**) and its affiliates,

General Motors LLC (**"New GM"**) seeks a determination from this Court that New GM

did not assume the liabilities associated with a tort action in which a car accident took

place before the date (**"Closing Date"**) upon which New GM acquired the business of

Old GM, but the accident victim died thereafter.[1] The issue turns on the construction of

the documents under which New GM agreed to assume liabilities from Old GM—which

provided that New GM would assume liabilities relating to "accidents or incidents" "first

occurring on or after the Closing Date"—and in that connection, whether a liability of

this character is or is not one of the types of liabilities that New GM thereby agreed to

assume.

Upon consideration of those documents, the Court concludes that the liability in

question was not assumed by New GM.  However, if a proof of claim was not previously

filed against Old GM with respect to the accident in question, the Court will permit one

to be filed within 30 days of the entry of the order implementing this Decision, without

prejudice to rights to appeal this determination.

The Court's Findings of Fact and Conclusions of Law in connection with this

determination follow.

---

[1]  Technically speaking, the motion is denominated as one to Enforce the 363 Sale Order, which
protects New GM from liabilities it did not assume.  The Court here speaks to the motion's
substance.

1

<u>Findings of Fact</u>

In June 2007, Beverly Deutsch was severely injured in an accident while she was driving a 2006 Cadillac sedan. She survived the car accident, but in August 2009, she died from the injuries that she previously had sustained.[2]

In January 2010, the Estate of Beverly Deutsch, the Heirs of Beverly Deutsch, and Sanford Deutsch (collectively "**Deutsch Estate**") filed a Third Amended Complaint against New GM (and others) in a state court lawsuit in California (the "**Deutsch Estate Action**"), claiming damages arising from the accident, the injuries which Beverly sustained, and her wrongful death. The current complaint superseded the original complaint in the Deutsch Estate Action, which was filed in April 2008, before the filing of Old GM's chapter 11 case.

In July 2009, this Court entered its order (the "**363 Sale Order**") approving the sale of Old GM's assets, under section 363 of the Bankruptcy Code, to the entity now known as New GM. The 363 Sale Order, among other things, approved an agreement that was called an Amended and Restated Master Sale and Purchase Agreement (the "**MSPA**").

The MSPA detailed which liabilities would be assumed by New GM, and provided that all other liabilities would be retained by Old GM. The MSPA provided, in its § 2.3(a)(ix), that New GM would not assume any claims with respect to product liabilities (as such term was defined in the MSPA, "**Product Liability Claims**") of the Debtors except those that "arise directly out of death, personal injury or other injury to Persons or damage to property caused by *accidents or incidents* first occurring on or after

---

[2]   There is no contention by either side that her death resulted from anything other than the earlier accident.

the Closing Date [July 10, 2009] … "[3]  Thus, those Product Liability Claims that arose

from "accidents or incidents" occurring before July 10, 2009 would not be assumed by

New GM, but claims arising from "accidents or incidents" occurring on or after July 10,

2009 would be.

Language in an earlier version of the MSPA differed somewhat from its final

language, as approved by the Court.  Before its amendment, the MSPA provided for New

GM to assume liabilities except those caused by "accidents, incidents, *or other distinct*

*and discrete occurrences.*"[4]

The 363 Sale Order provides that "[t]his Court retains exclusive jurisdiction to

enforce and implement the terms and provisions of this Order" and the MSPA, including

"to protect the Purchaser [New GM] against any of the Retained Liabilities or the

assertion of any … claim … of any kind or nature whatsoever, against the Purchased

Assets."[5]

Discussion

The issue here is one of contractual construction.  As used in the MSPA, when

defining the liabilities that New GM would assume, what do the words "accidents or

incidents," that appear before "first occurring on or after the Closing Date," mean?  It is

undisputed that the accident that caused Beverly Deutsch's death took place in June 2007,

more than two years prior to the closing.  But her death took place after the closing.  New

GM argues that Beverly Deutsch's injuries arose from an "accident" and an "incident"

---

[3]   Amended Master Sale and Purchase Agreement, at § 2.3(a)(ix) (as modified by First Amendment) (emphasis added).

[4]   Amended Master Sale and Purchase Agreement, at § 2.3(a)(ix) (prior to modification by First Amendment) (emphasis added) (typographical error corrected).

[5]   363 Sale Order ¶ 71.

3

that took place in 2007, and that her death did likewise. But the Deutsch Estate argues

that while the "accident" took place in 2007, her death was a separate "incident"—and

that the latter took place only in August 2009, after the closing of the sale to New GM

had taken place.

Ultimately, while the Court respects the skill and fervor with which the point was

argued, it cannot agree with the Deutsch Estate. Beverly Deutsch's death in 2009 was the

*consequence* of an event that took place in 2007, which undisputedly, was an accident

and which also was an incident, which is a broader word, but fundamentally of a similar

type. The resulting death in 2009 was not, however, an "incident[] first occurring on or

after the Closing Date," as that term was used in the MSPA.

As usual, the Court starts with textual analysis. The key provision of the MSPA,

§ 2.3(a)(ix), set forth the extent to which Product Liability Claims were assumed by New

GM. Under that provision, New GM assumed:

> (ix) all Liabilities to third parties for death, personal
> injury, or other injury to Persons or damage to
> property caused by motor vehicles designed for
> operation on public roadways or by the component
> parts of such motor vehicles and, in each case,
> manufactured, sold or delivered by Sellers
> (collectively), "Product Liabilities"), *which arise
> directly out of death, personal injury or other injury
> to Persons or damage to property caused by
> accidents or incidents first occurring on or after the
> Closing Date and arising from such motor vehicles'
> operation or performance* (for avoidance of doubt,
> Purchaser shall not assume or become liable to pay,
> perform or discharge, any Liability arising or
> contended to arise by reason of exposure to
> materials utilized in the assembly or fabrication of
> motor vehicles manufactured by Sellers and
> delivered prior to the Closing Date, including

4

asbestos, silicates or fluids, regardless of when such
alleged exposure occurs).[6]

The key words, of course, are "accidents" and "incidents," neither of which are defined

anywhere else in the MSPA, and whose interpretation, accordingly, must turn on their

common meaning and any understandings expressed by one side to the other in the

course of contractual negotiations.  Also important are the words "first occurring on or

after the Closing Date," which modify the words "accidents" and "incidents," and shed

light on the former words' meaning.

The word "accidents," of course, is not ambiguous.  "Accidents" has sufficiently

clear meaning on its own, and in any event its interpretation is not subject to debate, as

both sides agree that Beverly Deutsch's death resulted from an accident that took place in

2007, at a time when, if "accidents" were the only controlling word, liability for the

resulting death would not be assumed by New GM.  The ambiguity, if any, is instead in

the word "incidents," which is a word that by its nature is more inclusive and less precise.

But while "incidents" may be deemed to be somewhat ambiguous, neither side

asked for an evidentiary hearing to put forward parol evidence as to its meaning.  Though

it is undisputed that "incidents" remained in the MSPA after additional words "or other

distinct and discrete occurrences," were deleted, neither side was able, or chose, to

explain, by evidence, why the latter words were dropped, and what, if any relevance the

dropping of the additional words might have as to the meaning of the word "incidents"

that remained.  The words "or other distinct and discrete occurrences" could have been

deleted as redundant, to narrow the universe of claims that were assumed, or for some

---

[6]       Amended Master Sale and Purchase Agreement, at § 2.3(a)(ix) (as modified by First Amendment)
(emphasis added).

5

other reason. Ultimately, the Court is unable to derive sufficient indication of the parties'
intent as to the significance, if any, of deleting the extra words.

So the Court is left with the task of deriving the meaning of the remaining words
"accidents or incidents" from their ordinary meaning, the words that surround them,
canons of construction, and the Court's understanding when it approved the 363 Sale as
to how the MSPA would deal with prepetition claims against Old GM. Ultimately these
considerations, particularly in the aggregate, point in a single direction—that a death
resulting from an earlier "accident[] or incident[]" was not an "incident[] first occurring"
after the closing.

Starting first with ordinary meaning, definitions of "incident" from multiple
sources are quite similar. They include, as relevant here,[7] "an occurrence of an action or
situation felt as a separate unit of experience";[8] "an occurrence of an action or situation
that is a separate unit of experience";[9] "[a] discrete occurrence or happening";[10]
"something that happens, especially a single event";[11] "a definite and separate
occurrence; an event";[12] or, as proffered by the Deutsch Estate, "[a] separate and definite
occurrence: EVENT."[13] In ways that vary only in immaterial respects, all of the

---

[7]    The word "incident" has other meanings, in other contexts, which most commonly follow
       definitions of the type quoted here. Particularly since the definition proffered by the Deutsch
       Estate is so similar to the others, the Court does not understand either side to contend that
       definitions of "incident" in other contexts are relevant here.

[8]    Webster's Third New International Dictionary Unabridged (1993) at 1142.

[9]    Merriam-Webster's Collegiate Dictionary (11th ed. 2003) at 629.

[10]   Black's Law Dictionary (8th ed. 2004) at 777.

[11]   Encarta Dictionary: English (North America),
       http://encarta.msn.com/encnet/features/dictionary/dictionaryhome.aspx (query word "incident" in
       search field).

[12]   American Heritage College Dictionary (4th ed. 2004) at 700.

[13]   Deutsch Estate Reply Br. at 4 (quoting Webster's II New College Dictionary (1999) at 559).

6

definitions articulate the concept of a separate and identifiable event. And, and of course, from words that follow, "arising from such motor vehicles' operation or performance," the event must be understood to relate to be one that that involves a motor vehicle. Accidents, explosions or fires all fit comfortably within that description. Deaths or other consequences that result from earlier accidents, explosions or fires technically might fit as well, but such a reading is much less natural and much more strained.

Turning next to words that surround the words "accidents or incidents," these words provide an interpretive aid to the words they modify. The word "incident[]" is followed by the words "first occurring." In addition to defining the relevant time at which the incident must take place (*i.e.*, after the closing), that clause inserts the word "first" before "occurring." That suggests, rather strongly, that it was envisioned that some types of incidents could take place over time or have separate sub-occurrences, or that one incident might relate to an earlier incident, with the earliest incident being the one that matters. Otherwise it would be sufficient to simply say "occurring," without adding the word "first." This too suggests that the consequences of an incident should not be regarded as a separate incident, or that even if they are, the incident that first occurs is the one that controls.

Canons of construction tend to cut in opposite directions, though on balance they favor New GM. The Deutsch Estate appropriately points to the canon of construction against "mere surplusage," which requires different words of a contract or statute to be construed in a fashion that gives them separate meanings, so that no word is superfluous.[14] The Court would not go as far as to say that the words "accident" and

---

[14]    *See, e.g., Sprietsman v. Mercury Marine*, 537 U.S. 51, 63 (2003) (a statute's preemption clause, which applied to "a [state or local] law or regulation" did not preempt common law tort claims,

"incident" cannot *ever* cover the same thing—or, putting it another way, that they *always* must be different.[15] But the Court agrees with the Deutsch Estate that they cannot *always* mean the same thing. "Incidents" must have been put there for a reason, and should be construed to add something in at least some circumstances.

But how different the two words "accidents" and "incidents" can properly be understood to be —and in particular, whether "incidents" can be deemed to separately exist[16] when they are a foreseeable consequence, or are the resulting injury, from the accidents or incidents that cause them—is quite a different matter. A second canon of construction, *"noscitur a sociis,"* provides that "words grouped in a list should be given related meaning."[17] Colloquially, "a word is known by the company it keeps …"[18] For instance, in *Dole,* in interpreting a phrase of the Paper Work Reduction Act, the Supreme Court invoked *noscitur a sociis* to hold that words in a list, while meaning different things, should nevertheless be read to place limits on how broadly some of those words might be construed. The *Dole* court stated:

> [t]hat a more limited reading of the phrase
> "reporting and recordkeeping requirements" was
> intended derives some further support from the
> words surrounding it. The traditional canon of

---

because if "law" were read that broadly, it might also be interpreted to include regulations, which would render the express reference to "regulation" in the preemption clause superfluous). *See also* Gustafson v. Alloyd Co., 513 U.S. 561, 574 (1995) ("*Alloyd*") (in statutory construction context, "the Court will avoid a reading which renders some words altogether redundant.").

[15]    As previously noted, "incident" is a word that is inherently broader than "accident." Every accident could fairly be described as an incident. But not every incident could fairly be described as an accident.

[16]    It is important to note that to prevail on this motion, the Deutsch Estate must show that the alleged "incident" that is the resulting death was a wholly separate "incident." Even if the death took place after the Closing Date, if the death was an incident that was part of an earlier incident, it could not be said to be *"first occurring"* after the Closing Date.

[17]    *Dole v. United Steelworkers of America*, 494 U.S. 26, 36 (1990).

[18]    *Alloyd*, 513 U.S. at 575 (applying *noscitur a sociis* in context of statutory interpretation).

8

construction, *noscitur a sociis*, dictates that words grouped in a list should be given related meaning.[19]

Here application of the canon against surplusage makes clear, as the Deutsch Estate argues, that "incidents" must at least sometimes mean something different than "accidents"—but application of that canon does not tell us when and how. The second canon, *noscitur a sociis*, does that, and effectively trumps the doctrine of surplusage because it tells us that "accidents" and "incidents" should be given related meaning.

The Deutsch Estate argues that the Court should construe a death resulting from an earlier "accident" or "incident" to be a separate and new "incident" that took place at a later time. But ultimately, the Court concludes that it cannot do so. While it is easy to conclude that "accidents" and "incidents," as used in the MSPA, will not necessarily be the same in all cases, they must still be somewhat similar. "Incidents" cannot be construed so broadly as to cover what are simply the consequences of earlier "accidents" or other "incidents."

Applying *noscitur a sociis* in conjunction with the canon against "mere surplusage" tells us that the two words "accidents" and "incidents" must be understood as having separate meanings in at least some cases, but that these meanings should be conceptually related. At oral argument, the Court asked counsel for New GM an important question: if an "incident" would not necessarily be an "accident," what would it be? What would it cover? Counsel for New GM came back with a crisp and very

---

[19]     *Dole*, at 36. (internal quotations and citations omitted) (emphasis in original). *See also Massachusetts v. Morash*, 490 U.S. 107, 114-15 (1989) (quoting *Schreiber v. Burlington Northern Inc.*, 472 U.S. 1, 8 (1985)); *Alloyd*, 513 U.S. at 575 ("This rule we rely upon to avoid ascribing to one word a *meaning so broad that it is inconsistent with its accompanying words*, thus giving unintended breadth to the Acts of Congress." (emphasis added) (internal quotation marks deleted)).

9

logical answer; he said that "incident" would cover a situation where a car caught fire or had blown up, or some problem had arisen by means other than a collision.[20]

Conversely, the interpretation for which the Deutsch Estate argues—that "incidents" refers to *consequences* of earlier accidents or incidents—is itself violative or potentially violative, of the two interpretive canons discussed above.  It is violative of *noscitur a sociis*, since a death or other particular injury is by its nature distinct from the circumstance—collision, explosion, fire, or other accident or incident—that causes the resulting injury in the first place.  The Deutsch Estate interpretation also tends to run counter to the doctrine against mere surplusage upon which the Deutsch Estate otherwise relies, making meaningless the words "first occurring" which follow the words "accidents or incidents," in any cases where death or other particular injury is the consequence of an explosion, fire, or other non-collision incident that causes the resulting injury.

The simple interpretation, and the one this Court ultimately provides, is that "incidents," while covering more than just "accidents," are similar; they relate to fires, explosions, or other definite events that *cause* injuries and *result* in the right to sue, as contrasted to describing the *consequences* of those earlier events, or that relate to the resulting damages.

---

[20]    Counsel for New GM answered:

> Now, what's the difference between an accident or an incident, if it were relevant with respect to product liability claims? And I think there's an easy answer. You could have a car accident. Or you could have a car catching on fire; that's not necessarily an accident; that's an incident. Or a car could blow up with someone in the car. Or something else could happen; some other malfunction could cause a fire or injury to someone, not an accident with another vehicle necessarily; or an accident where you ran off the road. So I think that's easily explained.

Transcript, at 31.

10

Finally, this Court's earlier understanding of the purposes of New GM's willingness to assume certain liabilities of Old GM is consistent with the Court's conclusion at this time as well. When the Court approved GM's 363 Sale, this Court noted, in its opinion, that New GM had chosen to broaden its assumption of product liabilities.[21] The MSPA was amended to provide for the assumption of liabilities not just for product liability claims for motor vehicles and parts delivered after the Closing Date (as in the original formulation), but also, for "all product liability claims arising from *accidents or other discrete incidents* arising from operation of GM vehicles occurring subsequent to the closing of the 363 Transaction, regardless of when the product was purchased."[22] As reflected in the Court's decision at the time, the Court understood that New GM was undertaking to assume the liabilities for "accidents or other discrete incidents" that hadn't yet taken place.

Finally, the Deutsch Estate notes another interpretative canon, that ambiguities in a contract must be read against the drafter.[23] If the matter were closer, the Court might consider doing so.[24] But the language in question is not

---

[21]     *See In Re General Motors Corp.*, 407 B.R. 463, 481-82 (Bankr. S.D.N.Y. 2009). *appeal dismissed and aff'd*, 428 B.R. 43 (S.D.N.Y. 2010), and 430 B.R. 65 (S.D.N.Y. 2010).

[22]     *Id.* (emphasis added and original emphasis deleted)

[23]     *See Jacobson v. Sassower*, 66 N.Y.2d 991, 993 (N.Y. 1985) ("In cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language"); *Cf. Aetna Casualty & Surety Co. v. General Time Corp.*, 704 F.2d 80, 85 (2d Cir. 1983) ("Since the insurer is assumed to have control over drafting the contract provisions, it is fair to hold it responsible for ambiguous terms, and accord the insured the benefit of uncertainties which the insurer could have, but failed to clarify").

[24]     In that event, the Court would then have to consider the specifics of the negotiating environment at the time. The Deutsch Estate was of course not a party to those negotiations at all. But there was little in the record at the time of the 363 Sale, and there is nothing in the record now, as to who, if anybody, had control over the drafting of any MSPA terms.

11

that ambiguous, and the relevant considerations, fairly decisively, all tip in the same direction. While it cannot be said that the Deutsch Estate's position is a frivolous one, the issues are not close enough to require reading the language against the drafter.

Conclusion

The Deutsch Estate's interpretation of "accident or incident" is not supportable. Thus, the Debtor's motion is granted, and the Deutsch Estate may not pursue this claim against New GM.[25] New GM is to settle an order consistent with this opinion. The time to appeal from this determination will run from the time of the resulting order, and not from the date of filing of this Decision.

Dated: New York, New York
      January 5, 2011

    *s/Robert E. Gerber*
    United States Bankruptcy Judge

---

[25]    Under the circumstances, however, since the Deutsch Estate's issues were fairly debatable and plainly raised in good faith, the Court will provide the Deutsch Estate with 30 days from the resulting order to file a claim against Old GM if it has not already done so, without prejudice to its underlying position and any rights of appeal.

2003 WL 22682440
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

In re CONSOLIDATED FEN–PHEN CASES

No. 03 CV 3081(JG), CV–03–3082, CV–
03–3594, CV–03–3595, CV–03–3885, CV–
03–3886, CV–03–3887, CV–03–3889, CV–
03–3898, CV–03–4869.    |    Nov. 12, 2003.

Consumers sued manufacturer of diet drugs and its subsidiaries in state court, seeking recovery under New York law for personal injuries purportedly caused by use of drugs, asserting claims for negligence, strict liability, breach of warranty, fraud and misrepresentation, concert of action, alternative liability, market share liability, and enterprise liability. Manufacturer removed action to federal court. Consumers moved to remand to state court. The District Court, Gleeson, J., held that nondiverse subsidiary was fraudulently joined to avoid removal.

Motion denied.

West Headnotes (4)

[1]    **Federal Courts**
      ⚖ Effect of transfer and subsequent proceedings
      District courts retain jurisdiction during pendency of conditional transfer to multidistrict litigation panel to decide motion to remand removed action to state court. 28 U.S.C.A. § 1407.

      1 Cases that cite this headnote

[2]    **Removal of Cases**
      ⚖ Improper or collusive joinder of parties
      Nondiverse subsidiary of manufacturer of diet drugs was fraudulently joined as defendant to avoid removal to federal court of putative class action brought by consumers to recover for personal injuries allegedly caused by use of drugs; consumers could not possibly

recover from subsidiary, since subsidiary neither marketed nor sold drugs in United States.

9 Cases that cite this headnote

[3]    **Negligence**
      ⚖ Necessity and Existence of Duty
      **Torts**
      ⚖ Duty and breach thereof in general
      Under New York law, defendant must owe duty to plaintiff, which is not merely general duty to society, but specific duty to injured person; without duty running directly to injured person there can be no liability.

      Cases that cite this headnote

[4]    **Negligence**
      ⚖ Contractual duty
      **Torts**
      ⚖ Contractual duty
      Contractual obligation will generally not give rise to tort liability in favor of third party under New York law.

      Cases that cite this headnote



**Attorneys and Law Firms**

Denise Rubin, Napoli, Kaiser, Bern & Associates, LLP, Great River, New York, for Plaintiffs.

Mario D'Angelo, Hariton & D'Angelo, Great River, New York, for Plaintiffs.

Michael D. Schissel, Pamela Miller, Arnold & Porter, New York, NY, for Wyeth Defendants.

Raquel Millman, Bingham & McCutchen, New York, NY, for Defendant Celltech.

*MEMORANDUM AND ORDER*

GLEESON, J.

**\*1** THIS DOCUMENT RELATES TO CV–03–3082, CV–03–3594, CV–03–3595, CV–03–3885, CV–03–3886, CV–

03–3887, CV–03–3889, CV–03–3898, CV–03–3899, CV–03–3900, CV–03–3901, CV–03–3902, CV–03–3903, CV–03–3904, CV–03–3905, CV–03–3908, CV–03–3910, CV–03–3912, CV–03–3967, CV–03–3968, CV–03–4122, CV–03–4123, CV–03–4357, CV–03–4869.

In these twenty-five actions, plaintiffs [1] seek recovery under New York law for personal injuries purportedly arising from their use of the drugs Pondimin (fenfluramine) and Redux (dexfenfluramine) and/or phentermine, otherwise known collectively as the diet drug "Fen–Phen." Fen–Phen was manufactured, marketed and sold by Wyeth, formerly known as American Home Products Corp. ("Wyeth"), and other Wyeth affiliates (collectively the "Wyeth defendants"). [2] These actions were commenced in New York state court and removed by the Wyeth defendants on the basis of diversity citizenship. The plaintiffs now move to remand these actions back to state court on the ground that subject matter jurisdiction is lacking. In particular, they maintain that there is no diversity because one of the Wyeth defendants, Wyeth–Ayerst International, Inc. ("Wyeth International"), is a New York corporation and plaintiffs are citizens of New York. For the reasons set forth below, the motion is denied.

## BACKGROUND

Over six years ago, individuals who had allegedly ingested and suffered various heart injuries from Fen–Phen filed a class action in New York Supreme Court against the Wyeth defendants—*In Re: New York Diet Drug Litigation* (Index No. 700000/98) (the "*Diet Drug Litigation*"). In the complaint (the "Master Complaint"), various New York causes of action were alleged against, among other entities, the Wyeth defendants that developed, marketed and sold Fen–Phen in New York. Wyeth International, a defendant in the cases before me, was not named in the Master Complaint. These causes of action included negligence, strict product liability, breach of express warranty, breach of implied warranty, fraud and misrepresentation, negligence per se, concert of action, alternative liability, market share liability and enterprise liability. (Master Compl. Sec. A.) Eventually, the parties in the *Diet Drug Litigation* reached settlement.

The non-settling plaintiffs exercised their right to file suit against the Wyeth defendants (in New York state court) by filing "opt-out" forms. The plaintiffs in the present case filed such forms in the *Diet Drug Litigation*. In their amended complaints, these plaintiffs adopted the ten causes of action listed above from the Master Complaint in the *Diet Drug*

*Litigation*, without any modification. (Amend.Compl.¶ 15.) Plaintiffs did modify the roster of defendants, however. In addition to the Wyeth entities who were named in the original suit, plaintiffs added Wyeth International, a New York corporation. (Amend Compl. ¶ 14.) Wyeth International is owned by a company that is a wholly-owned subsidiary of Wyeth. As noted earlier, plaintiffs are also citizens of New York.

**\*2** The Wyeth defendants removed the actions, notwithstanding the absence of complete diversity, and challenge what they perceive to be the "fraudulent joinder" of a diversity-destroying defendant—Wyeth International. Plaintiffs then filed motions to remand to state court.

The Wyeth defendants also notified the Judicial Panel on Multidistrict Litigation (the "MDL Panel") as to the existence of these cases (as well as related cases pending in the Southern District of New York). In so doing, they wish to facilitate the transfer of these cases to the Eastern District of Pennsylvania for consolidation (for pretrial purposes) with MDL No. 1203 (the "MDL Court"). The MDL Court has been handling the federal diet drug litigation since 1998. *See In re: Diet Drugs Products Liability Litig.,* 990 F.Supp. 834 (J.P.M.L.1998). Thereafter, on August 26, 2003, the MDL Panel issued an order that conditionally transferred these actions (as well as the related actions in the Southern District of New York) to the MDL Court. The plaintiffs here have challenged that order. The MDL Panel has announced that it will hear argument on that challenge on November 20, 2003.

## DISCUSSION

### A. *The Conditional Transfer to the MDL Court*
The Wyeth defendants request that I defer consideration of plaintiffs' remand motions until the MDL Panel has made the determination as to final transfer of these actions to the MDL Court. In particular, they believe that by doing so, I will "conserve judicial resources and ensure that similar issues of fraudulent joinder are decided uniformly and consistently by a court with intimate familiarity and experience in the diet drug cases." (Def's Mem. Law Opp. Pls' Mot. Remand at 5.)

[1] I disagree. As plaintiffs point out, district courts retain jurisdiction during the pendency of a conditional transfer to decide remand orders. *See* Panel Rule 5.1, 199 F.R.D. 425, 427 (2001) ("The pendency of a ... conditional transfer order ... before the Panel concerning transfer ... of an action

pursuant to 28 U.S.C. § 1407 does not affect or suspend orders and pretrial proceedings in the district court in which the action is pending and does not in any way limit the pretrial jurisdiction of that court."). Moreover, the MDL Panel encouraged me to decide the issue: "If you have a motion pending before you in the action—particularly a motion to remand to state court ... you are encouraged to rule on the motion unless you conclude that the motion raises issues likely to arise in other actions in the transferee court, should we order transfer, and would best be decided there." (Sept. 24, 2003 Ltr. from MDL Panel.)

While it is true that the MDL Court has previously decided fraudulent joinder issues, it has not determined the exact issue here—the joinder of an entity marketing Fen–Phen in foreign countries. Rather, the MDL Court dealt with the different issue of joinder of pharmacies under the "learned intermediate rule," as well as the joinder of physicians. *See, e.g., In re Diet Drugs Prods. Liability Litig.,* 220 F.Supp.2d 414 (E.D.Pa.2002). Thus, the rationale of institutional competence is not strongly implicated here. As to uniformity, and whether this issue is likely to arise in other actions in the transferee court, I am aware that Judge Denny Chin in the Southern District of New York has heard argument on these cases, and to my knowledge has not decided to defer to the MDL Court.[3]

*3 In short, I do not conclude that the remand issue raised here would best be decided by the transferee court. The cases cited by the Wyeth defendants do not counsel otherwise.[4] Thus, I now proceed to the fraudulent joinder issue.

### B. Remand

#### 1. The Standard for Fraudulent Joinder
The Second Circuit set the standard for fraudulent joinder in *Pampillonia v. RJR Nabisco, Inc.,* 138 F.3d 459 (2d Cir.1998):

> In order to show that naming a non-diverse defendant is a "fraudulent joinder" effected to defeat diversity, the defendant must demonstrate, by clear and convincing evidence ... that there is no possibility, based on the pleadings, that a plaintiff can state a cause of action against the non-diverse defendant in state court. The defendant seeking removal bears a heavy burden

of proving fraudulent joiner (sic), and all factual and legal issues must be resolved in favor of the plaintiff.

*Pampillonia,* 138 F.3d at 460–61.

The language "no possibility" has been interpreted as meaning no "reasonable possibility" or "no reasonable basis." *See In re Rezulin Prods. Liability Litig.,* 133 F.Supp.2d 272, 280 & n. 4 (S.D.N.Y.2001) (explaining that "no possibility" language cannot be taken literally because then no case would meet the standard for fraudulent joinder). It has also been interpreted more strictly, as literally meaning "no possibility." *See Arseneault v. Congoleum Corp.,* No. 01 Civ. 10657, 2002 WL 472256, at *5 n. 4 (S.D.N.Y. Mar.26, 2002) (disagreeing with *In re Rezulin's* interpretation and favoring literal "no possibility" standard); *see also Stan Winston Creatures, Inc. v. Toys "R" US, Inc.,* No. 02 Civ. 9809, 2003 WL 1907978, at *4 (S.D.N.Y. Apr.17, 2003) ("legally impossible"); *Nemazee v. Premier, Inc.,* 232 F.Supp.2d 172, 178 (S.D.N.Y.2002) ("Any possibility of recovery, even if slim, militates against a finding of fraudulent joinder; only where there is 'no possibility' of recovery is such a finding warranted.") (citation omitted).

In making this inquiry, courts can look beyond the pleadings to determine if the pleadings can state a cause of action. *See Arseneault,* 2002 WL 472256, at *6 (in deciding fraudulent joinder issue, looking outside the pleadings to depositions and other evidence in the record because "[t]he Second Circuit ... has said that, on jurisdictional issues 'federal courts may look outside [the] pleadings to other evidence in the record[.]' ") (quoting *United Food & Commercial Workers Union, Local 919, AFL–CIO v. CenterMark Props. Meriden Square, Inc.,* 30 F.3d 298, 305 (2d Cir.1994)); *see also, e.g., Pampillonia,* 138 F.3d at 461–62 (looking to affidavits to determine if plaintiff's complaint alleged sufficient factual foundation to support his claims); *In re Rezulin,* 133 F.Supp.2d at 281–82 (same).

#### 2. Claims of Strict Liability, Breaches of Warranty and Negligence Per Se
*4 [2] Plaintiffs allege violations of New York law on the theory that the Wyeth defendants were "product defendants" who, among other things, manufactured, promoted and sold Fen–Phen in New York.[5] Based on this theory, plaintiffs assert that because Wyeth International marketed Fen–Phen in New York, it is liable based on strict liability, breaches of

express and implied warranty, and negligence per se. (Master Compl. ¶¶ 17–26, 34–38); (Amend.Compl.¶ 15.)[6]

Under those theories, Wyeth International's products must have been the products causing plaintiffs' injuries or they must have been in the direct chain of distribution. *See Watson v. Sharp Air Freight Servs., Inc.,* 788 F.Supp. 722, 725 (E.D.N.Y.1992) (purported violation of statute not basis for claim of negligence per se where defendant not among class of companies regulated by statute); *Joseph v. Yenkin Majestic Paint Corp.,* 261 A.D.2d 512, 512, 690 N.Y.S.2d 611 (2d Dep't 1999) ("Liability may not be imposed for breach of warranty or strict products liability upon a party that is outside the manufacture, selling, or distribution chain.") (citations omitted); *Hymowitz,* 73 N.Y.2d at 504–05, 541 N.Y.S.2d 941, 539 N.E.2d 1069 ("In a products liability action, identification of the exact defendant whose conduct injured the plaintiff is, of course, generally required.")

Here, there is no possible recovery (reasonable or otherwise)[7] from Wyeth International because it did not market or sell Fen–Phen in New York. Thus, it could not be a "product defendant" and it could not be liable under theories of strict liability, breaches of express and implied warranty or negligence per se. I find that the evidence offered by the Wyeth defendants in this regard is clear and convincing. They presented affidavits of John M. Alivernini and Michael A. Donnella, assistant secretaries of Wyeth International. The affidavits state that Wyeth International neither marketed nor sold drugs in the United States. (*See* Alivernini Aff. ¶ 4; Donnella Aff. ¶ 4.) Furthermore, the Wyeth defendants introduced the deposition of Bernard Poussot, the former president of Wyeth International, in which he testified that Wyeth International did not market Redux and marketed only Pondimin in Canada and Mexico. (*See* Poussot Dep. at 30–31.)

Plaintiffs attempt to create an issue of fact on this issue with the so-called "Jenny Craig letter." This letter, from Leslie Koll of the Jenny Craig weight loss center to Robert Essner, dated February 22, 1996, documented a meeting between the two regarding the United States launch of Redux. Underneath Essner's name is Wyeth International. Plaintiffs assert that this letter establishes the possibility that they can state a cause of action against Wyeth International as a "product defendant." I disagree. The Wyeth defendants have clearly demonstrated that this letter was mistakenly addressed to Wyeth International. When that letter was written, Essner was the president of Wyeth–Ayerst Laboratories ("WALD")

(Essner Dep. at 21–23), and the president of Wyeth International was Poussot (Poussot Dep. at 30). Furthermore, as earlier noted, Wyeth International did not market or sell either of the two drugs in question in the United States, and did not sell or market Redux (the drug mentioned in the Jenny Craig letter) anywhere at all. I also note that plaintiffs' counsel conceded their position during oral argument before Judge Chin in *Hopping v. American Home Products Corp.,* Index No. 03 Civ. 3499(DC) (S.D.N.Y. July 24, 2003).[8]

**\*5** Plaintiffs also contend that there is a receipt memorializing a donation by Wyeth International to the American Dietetic Association, and that this shows that they can possibly assert the claims discussed above against Wyeth International. But the Wyeth defendants have clearly shown that the donation came from WALD, by producing the pertinent receipts and letter documentation. (*See* Schissel Decl., Exs. O, P.) In any event, even assuming that Wyeth International did make such a contribution, it is unclear how that would support a theory that Wyeth International marketed Fen–Phen in New York, and plaintiffs have failed to articulate any such reason.[9] Accordingly, all of plaintiffs claims that depend on Wyeth International being a product defendant fail. The only remaining claims are negligence, fraud and misrepresentation.

### 3. *Claims of Negligence, Fraud and Misrepresentation*
Perhaps in recognition of the frailties of their theory of liability premised on Wyeth International being a product defendant, plaintiffs also assert that Wyeth International is liable based on a strained, indirect theory of liability. Specifically, plaintiffs assert that Wyeth International

> was responsible for monitoring, gathering, and reporting on all adverse drug events and reports in foreign medical literature relative to injuries caused by Fen–Phen in markets outside the United States ... that [Wyeth International] had a duty to plaintiff[s] to faithfully perform these safety surveillance activities and that its failure to properly execute its obligations under Wyeth's internal [company] policy delayed Wyeth reporting the harmful effects of and injuries caused by fen-phen to the FDA [Food and Drug Administration].

As a result defendants' dangerous and defective diet drugs remained on the market and were ingested by plaintiff[s] who suffered serious fen-phen related heard valve injuries.

(Pls' Reply Mem. Supp. Mot. Remand at 8.) This eleventh hour claim fails to defeat federal jurisdiction.

Plaintiffs have neglected to allege their new theory in the Master Complaint in state court or in their Amended Complaints, before me. Although I believe that this lapse is fatal to their position, *see Vera v. Saks & Co.,* 335 F.3d 109, 116 n. 2 (2d Cir.2003) ("we generally evaluate a defendant's right to remove a case to federal court at the time the removal notice is filed.") (citing *Pullman,* 305 U.S. at 537)); *In re Rezulin,* 133 F.Supp.2d at 284–285 & n. 35 (rejecting plaintiffs' assertion that they can avoid removal by curing their complaint's deficiencies by amendment and that this possibility requires remand) (citing, e.g., *Pullman,* 305 U.S. at 537–38)); *see also Pampilloria,* 138 F.3d at 461 (joinder is to be determined "based on the pleadings"), I nonetheless address the merits of this new theory.

Plaintiffs asserted at oral argument that Wyeth International had independent liability to the New York plaintiffs based on a violation of an internal company reporting policy, pursuant to which it was obligated to report adverse drug events in other countries to Wyeth. (*See* Oct. 24, 2003 Hr'g Tr. at 17–18.) This is not so.

**\*6** **[3]** Under New York law, a defendant must owe a duty to the plaintiff. *See, e.g., Espinal v. Melville Snow Contractors, Inc.,* 98 N.Y.2d 136, 138, 746 N.Y.S.2d 120, 773 N.E.2d 485 (2002). This duty is "not merely a general duty to society but a specific duty to ... the injured person." *Hamilton,* 96 N.Y.2d at 232, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001). "Without a duty running directly to the injured person there can be no liability....". *Lauer v. City of New York,* 95 N.Y.2d 95, 100, 711 N.Y.S.2d 112, 733 N.E.2d 184 (2000). Here, Wyeth International did not owe the plaintiffs a duty to report or warn.

For example, in *Hamilton,* victims of gun violence, who could not identify the manufacturer of the gun that injured them, sued several gun makers on the theory that they caused plaintiffs' harm by negligently marketing guns in a way that created a market for criminals. The New York Court of Appeals refused to impose a duty on the gun manufacturers because the connection between the defendants and plaintiffs'

injuries was too attenuated, "running through several links in a chain consisting of at least the manufacturer, the federally licensed distributor or wholesaler, and the first retailer." *Hamilton,* 96 N.Y.2d at 234, 727 N.Y.S.2d 7, 750 N.E.2d 1055. Here too, the connection between Wyeth International and the plaintiffs' injury is remote: plaintiffs allege that (a) Wyeth International failed to report adverse drug effects to Wyeth; (b) if it had, Wyeth would have reported those irregularities to the FDA; (c) if the FDA learned of these problems, it would have pulled Fen–Phen from the market sooner, and (d) if the FDA did that, then the plaintiffs would not have ingested the harmful drugs.

**[4]** Moreover, it is well established that a contractual obligation (let alone an obligation arising from a mere internal company policy) "will generally not give rise to tort liability in favor of a third party." *Espinal,* 98 N.Y.2d at 138, 746 N.Y.S.2d 120, 773 N.E.2d 485 (citation omitted). The New York Court of Appeals has held that there are only

> three situations in which a party who enters into a contract to render services may be said to have assumed a duty of care—and thus be potentially liable in tort—to third persons: (1) where the contracting party, in failing to exercise reasonable care in the performance of his duties, "launche[s] a force or instrument of harm"; (2) where the plaintiff detrimentally relies on the continued performance of the contracting party's duties and (3) where the contracting party has entirely displaced the other party's duty to maintain the premises safely. These principles are firmly rooted in our case law, and have been generally recognized by other authorities.

*Espinal,* 98 N.Y.2d at 140, 746 N.Y.S.2d 120, 773 N.E.2d 485 (citations omitted). None of these factors is present here. Indeed, in the present case, there is not even a bond as significant as a contract—there is only an internal company policy.

By way of illustration, in *Eaves Brooks Costume Co., Inc. v. Y.B.H. Realty Corp.,* 76 N.Y.2d 220, 557 N.Y.S.2d 286, 556 N.E.2d 1093 (1990), the New York Court of Appeals held that a commercial tenant could not recover property damages against a sprinkler system maintenance company and an alarm company (who were both under contract with the building's owner) when the sprinkler and alarm malfunctioned. The court reasoned that the plaintiff had a right to seek damages directly from the building's owner, who was in a much better position than the contractors to insure against loss, and also stressed that the limited scope

of the contractors' undertakings were reflected in the low fees they were paid for their maintenance services. *Eaves Brooks,* 76 N.Y.2d at 227, 557 N.Y.S.2d 286, 556 N.E.2d 1093. Similarly, plaintiffs here presumably have a right to seek damages directly from the manufacturer/marketer of the drugs they ingested (*i.e.,* the Wyeth entities who sold Fen–Phen in New York), and indeed, those parties who directly manufactured/marketed the drugs at issue would be in a better position to insure against the harm alleged. In addition, the mere internal reporting policy upon which plaintiffs rely suggests the limited nature of Wyeth International's undertaking.

**\*7** Even if Wyeth International had been retained by Wyeth for the sole purpose of reporting the adverse drug events in other counties, it would have had no duty to these plaintiffs. The New York Court of Appeals has defined the duty of care to third parties in such situations "narrowly, more narrowly than other jurisdictions." *Ossining Union Free School Dist. v. Anderson LaRocca Anderson,* 73 N.Y.2d 417, 424, 541 N.Y.S.2d 335, 539 N.E.2d 91 (1989). Absent, at the very least, a showing that reliance by the plaintiffs on the data was the "very purpose" of Wyeth International's reporting requirement, there could be no duty. *Id.* at 424, 541 N.Y.S.2d 335, 539 N.E.2d 91. *See generally, General Motors*

*Corp. v. Villa Marin Chevrolet. Inc.,* No. 98–5206, 2000 WL 271965, at \*23–26 (E.D.N.Y. Mar.7,2000) (canvassing New York cases regarding privity requirement in negligent misrepresentation cases.) [10]

The fraud claim is equally without merit. *See Kaufman v. Cohen,* 307 A.D.2d 113, 119, 760 N.Y.S.2d 157 (1st Dep't 2003) ("To state a cause of action for fraud, a plaintiff must allege a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury .... [or] a fraud cause of action may be predicated on acts of concealment where the defendant had a duty to disclose material information.") (citations omitted). In any event, at oral argument plaintiffs conceded this claim. (*See supra* Part B.2, note 6.)

## CONCLUSION

For the foregoing reasons, the motion to remand is denied as to all plaintiffs. [11]

So Ordered.

Footnotes

1    This opinion will refer to all plaintiffs collectively, as plaintiffs' counsel has informed me that all of their claims, and the pertinent facts of their cases, are the same, with the exception of those plaintiffs who have spouses that have filed loss of consortium claims. Plaintiffs are Ann Mattarelliano, Lewis and Hadar Barsky, Carla Adiansingh, Michael Edmonds, Nyesha and Aaron F. Hall, Kim M. Yancey, Celine Azoulay and Ross A. Lewin, Jennifer Merritt, Michele Schiavone, Deena M. Schiavone, Rachel R. Mosseri, Doris Weller, Alison Groia–Deangelis, Christine Miceli–Faber and Lance Faber, Michelle Gonzalez, Jennifer A. Broser, Joyce S. Cohen–Flaster, Chanda F. Hopkins, Tara T. Jones, Joseph and Carri L. DeBlasi, Gina Young, Anaflore V. Gourgue, Tonya Johnson, Laurie L. Cohen and Jack Simony.

2    The Wyeth affiliates named in the suit are Wyeth–Ayerst Laboratories; A.H. Robins Company, Inc.; Wyeth Labs, Inc.; Wyeth–Ayerst Pharmaceuticals Inc.; Wyeth–Ayerst Laboratories Company; Ayerst Laboratories, Inc.; Wyeth Pharmaceuticals; Wyeth Research and Wyeth–Ayerst International, Inc.

3    Judge Chin has not yet published a decision in those cases.

4    For instance, the Wyeth defendants cite *Moore v. Wyeth–Ayest Laboratories,* 236 F.Supp.2d 509 (D.Md.2002), where the court deferred to the MDL Court. That case is inapposite, however, because the MDL Court was familiar with the particular issue on remand—the fraudulent joinder of pharmacies. *See Moore,* 236 F.Supp.2d at 510–11. The Wyeth defendants also marshal *In re Ivy,* 901 F.2d 7 (2d Cir.1990), and *Medical Society of the State of New York v. Connecticut General Corp.,* 187 F.Supp.2d 89 (S.D.N.Y.2001), to their defense. In *Ivy,* the issue was whether the MDL Panel properly transferred a particular case to the MDL court when there was a jurisdictional objection pending. *Ivy,* 901 F.2d at 9. The Second Circuit held that the MDL Panel did have the power to transfer the case in that situation. *Id.* In so doing, the court noted that because the jurisdictional issue was capable of arising in hundreds of district courts, principles of economy and consistency counseled in favor of transfer. *Ivy,* 901 F.2d at 9. The court in *Medical Society* followed this rationale in *Ivy* to stay proceedings on a remand motion pending a transfer ruling by the MDL Panel. *See Medical Soc'y,* 187 F.Supp. at 90 ("[t]he Second Circuit has ... intimated that allowing the transferee court to resolve the jurisdictional question may be the preferable practice.") I find that *Ivy* does not control my decision here because I am dealing with the very different

question of whether I should defer to the MDL Court to which these cases may be transferred by the MDL Panel. Thus, I find these cases to be unconvincing.

5    This section of the Master Complaint states, in full:

> At all times relevant hereto, these products defendants were engaged in the business of supplying, manufacturing, labeling distributing, promoting, developing, testing and selling the drugs Pondimin (flenfluramine), Redux (dexflenfluramine) and/or phentermine. The product defendants do business in New York and, at all times relevant hereto, sold and/or supplied Pondimin (flenfluramine), Redux (dexfluramine) and/or phentermine in interstate commerce in New York.

> (Master Compl. ¶ 4.)

6    Plaintiffs also assert claims of alternate, market share, enterprise and concert-of-action liability. (Master Compl. ¶¶ 44–56; Amend Compl. ¶ 15.) These causes of actions are not proper where the plaintiff knows the identity of the manufacturer, however. *See, e.g., Hamilton v. Beretta U.S.A. Corp.,* 96 N.Y.2d 222, 240, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001) (explaining that market share liability is used where the plaintiff cannot identify the actual manufacturer that caused the injury) (citing *Hymowitz v. Eli Lilly & Co.,* 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (1989)). These claims are easily dismissed here, as plaintiffs do not allege that they do not know whose products they ingested. Indeed, plaintiffs have not challenged this argument in their papers. (*See* Pls' Reply Mot. Remand.) In any event, plaintiffs appear to have conceded these claims at oral argument.

> DEFENDANTS: In response to our argument, the way I read their papers, they've conceded that they can't state a claim as to six of those claims and there are only four left which would be negligence, strict product liability, breach of express warranty and breach of implied warranty.

> * * *

> THE COURT: Did he accurately describe your four theories?

> PLAINTIFFS: I believe in rather simplistic fashion. The four theories, however, do remain, as [defendants] concede[ ], even taking away the six that [t]he[y] talked about earlier....

> (Oct. 24, 2003 Hr'g Tr. at 7, 14–15); (*see also* Pls' Reply Mem. Law Supp. Mot. Remand at 7–9) (explaining how their claims for negligence, strict product liability, and breaches of warranty meet the *Pampillona* standard, but failing to address how they have stated claims for the other six causes of action asserted in their amended complaints). Although plaintiffs appear to have conceded their negligence per se claim, too, I will address the merits of that count in text.

7    Whether I use the "no reasonable possibility" standard favored by *In re Rezulin* court or the stricter "no possibility" standard as elucidated in, for example, *Arseneault* (*see supra* Part B.1), the outcome is the same.

8    THE COURT: Do you agree that Mr. Essner was the president of Wyeth Ayerst Laboratory?

PLAINTIFFS: Yes, your honor.

THE COURT: And not Wyeth Ayerst International?

PLAINTIFFS: Yes, your honor.

(Hr'g Tr. at 28–29).

9    Plaintiffs' last ditch effort to resuscitate these "product defendant" claims is also unsuccessful. At the eleventh hour, plaintiffs introduced an entirely new theory of liability—that Wyeth International is the "alter ego" of one of the other Wyeth defendants who marketed and sold drugs in New York. To support that theory, they point to a decision in another litigation where the court held that the relationship between Wyeth International and another Wyeth entity was so close that they should be deemed a "single entity" for conflict of interest purposes regarding attorney representation. *See Discotrade, Ltd. v. Wyeth Ayerst Int'l, Inc.,* 200 F.Supp.2d 355, 358–59 (S.D.N.Y.2002). Plaintiffs failed to assert this theory in their complaint, which I find fatal to their claim. *See Pullman Co. v. Jenkins,* 305 U.S. 534, 537–38, 59 S.Ct. 347, 83 L.Ed. 334 (1939) (court should determine validity of removal based on pleadings in original complaint); *In re Rezulin,* 133 F.Supp.2d at 285 ("Although a defendant bears a heavy burden to establish a fraudulent joinder, it need not negate any possible theory that plaintiffs might allege in the future: Only [the] present allegations count") (quotations omitted, brackets in original). Moreover, plaintiffs did not even raise this theory in their motion for remand, or in their response to the Wyeth defendants' opposition papers. Instead, they have brought this new claim by way of a supplemental submission. (*See* Pls' Suppl. Reply Mot. Remand.) In any event, putting this timing problem aside, the argument has no merit. As the court noted in *Discotrade,* a conflict of interest analysis is "not nearly as rigorous as an 'alter ego' or 'piercing the corporate veil' analysis." 200 F.Supp.2d at 359 n. 8. Moreover, plaintiffs' counsel seemed to have backed off from this theory of liability at oral argument. (*See* Oct. 24, 2003 Hr'g Tr. at 18) ("THE COURT: I guess that what I'm trying to figure out is if you're depending on [ ] a piercing the veil type of theory. PLAINTIFFS: No, I'm saying that Wyeth–Ayerst International standing alone ... had certain responsibilities, that their failure to perform those responsibilities was in itself a basis for liability....").

10    The fact that the New York courts have not decided this exact issue does not counsel otherwise, as it is clear that there
is no chance that plaintiffs could state a claim on such theory. For instance, in *In re Rezulin,* (a fraudulent joinder case)
the court held that pharmaceutical sales representatives do not have a duty to warn the public because, by analogy,
under the "learned intermediary rule" the pharmaceutical manufacturer need only warn the prescribing physician. 133
F.Supp.2d at 282. In so holding, the court stated that, "[w]hile no Mississippi state court has resolved this precise issue,
it does not follow that a 'possibility exists that plaintiff can establish any cause of action against [the] defendant[s]." *Id.*
I find this reasoning persuasive here.

11    During oral argument, counsel for Celltech, formerly known as Medeva Pharmaceuticals, made a surprise appearance
in which she argued against remand. (*See* Oct. 24, 2003 Hr'g Tr. at 20–23.) Apparently, defendant Celltech was named
in the action in state court but counsel for plaintiffs forgot to serve Celltech. (*Id.* at 20–21, 23.) In any event, I do not need
to address Celltech's argument since I hold that these actions will remain in federal court, as Celltech wishes.

---

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.