# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re                                          :        Chapter 11
                                               :
MOTORS LIQUIDATION COMPANY, *et al.*,          :        Case No.: 09-50026 (REG)
          f/k/a General Motors Corp., *et al.* :
                                               :        (Jointly Administered)
                              Debtors.         :
------------------------------------------------------------x

DECISION ON MOTION TO ENFORCE SALE
ORDER

APPEARANCES:

KING & SPALDING LLP
*Counsel for General Motors LLC (New GM)*
1185 Avenue of the Americas
New York, New York 10036
By:    Arthur J. Steinberg, Esq. (argued)
       Scott I. Davidson, Esq.

KIRKLAND & ELLIS LLP
*Counsel for General Motors LLC (New GM)*
300 North LaSalle
Chicago, Illinois 60654
By:    Richard C. Godfrey, Esq.
       Andrew B. Bloomer, Esq.

BROWN RUDNICK
*Designated Counsel and Counsel for Economic Loss Plaintiffs*
Seven Times Square
New York, New York 10036
By:    Edward S. Weisfelner, Esq. (argued)
       David J. Molton, Esq.
       May Orenstein, Esq.
       Howard S. Steel, Esq.
       Rebecca L. Fordon, Esq.

STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.
*Designated Counsel and Counsel for Economic Loss Plaintiffs*
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
By:    Sander L. Esserman, Esq. (argued)

GOODWIN PROCTER, LLP
*Designated Counsel and Counsel for Pre-Sale Accident Victim Plaintiffs*
The New York Times Building
620 Eighth Avenue
New York, New York 10018
By:    William P. Weintraub, Esq. (argued)
       Eamonn O'Hagan, Esq.
       Gregory W. Fox, Esq.

GOLENBOCK, EISEMAN, ASSOR, BELL & PESKOE, LLP
*Counsel for Groman Plaintiffs*
437 Madison Avenue
New York, New York 10022
BY:    Jonathan L. Flaxer, Esq. (argued)
       S. Preston Ricardo, Esq.

GIBSON, DUNN & CRUTCHER, LLP
*Counsel for Wilmington Trust Company as*
*GUC Trust Administrator*
200 Park Avenue
New York, New York 10166
BY:    Lisa H. Rubin, Esq. (argued)
       Keith R. Martorana, Esq.
       Matthew Williams, Esq.
       Adam H. Offenhartz, Esq.
       Aric H. Wu, Esq.

AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
*Counsel for Participating GUC Trust Unit Trust Holders*
One Bryant Park
New York, New York 10036
By:    Daniel Golden, Esq.
       Deborah J. Newman, Esq. (argued)
       Jamison A. Diehl, Esq.
       Naomi Moss, Esq.

Introduction ........................................................................................................................... 1
Summary of Conclusions ...................................................................................................... 5
   1.   Due Process ................................................................................................................ 6
      (a) Notice Before Entry of Sale Order ............................................................... 7
      (b) Notice Before Expungement of Claims ........................................................ 9
      (c) Requirement for Prejudice ........................................................................... 10
   2.   Remedies .................................................................................................................. 12
   3.   Assumed Liabilities ................................................................................................ 14
   4.   Equitable Mootness ................................................................................................ 15
   5.   Fraud on the Court .................................................................................................. 16
   6.   Certification to the Circuit ..................................................................................... 17
Facts ...................................................................................................................................... 17
   1.   Background .............................................................................................................. 17
   2.   Chapter 11 Filing ................................................................................................... 18
   3.   The Sale Motion and Notice Order ....................................................................... 19
   4.   Notice of the Sale ................................................................................................... 20
   5.   Objections to Free and Clear Provisions .............................................................. 20
   6.   Sale Agreement—Relevant Provisions ................................................................ 23
   7.   The Sale Order ........................................................................................................ 26
   8.   Matters After the Sale ............................................................................................ 27
   9.   The GUC Trust and its Operation .......................................................................... 28
   10.   Knowledge of the Ignition Switch Defect .......................................................... 32
   11.   The Motion to Enforce ......................................................................................... 33
   12.   The Threshold Issues ........................................................................................... 34
Discussion ............................................................................................................................ 35
I. Due Process ...................................................................................................................... 35
A. Underlying Principles ..................................................................................................... 36
   1.   Mullane .................................................................................................................... 36
   2.   Second Circuit Guidance ....................................................................................... 41
   3.   Guidance from Lower Courts ................................................................................. 45
   4.   The "Known"-"Unknown" Creditor Distinction ................................................. 46
B. The Particular Issues Here .............................................................................................. 52
   1.   Do Due Process Requirements Apply? ................................................................. 52
   2.   Notice by Publication ............................................................................................. 61
   3.   Known Claim Analysis .......................................................................................... 62
   4.   The Requirement for Prejudice ............................................................................. 69
   5.   Application of Those Principles to Economic Loss Plaintiffs ............................ 77
      (a)   Successor Liability ..................................................................................... 77
      (b)   New GM's Own Wrongful Acts ............................................................... 82
      (c) The Used Car Purchasers ........................................................................... 85
   6.   Application of Those Principles to Pre-Closing Accident Plaintiffs ................... 89
   7.   Application to Filing of Claims ............................................................................. 90
II.  Remedies ........................................................................................................................ 92
A. The Sale Order ................................................................................................................ 92
   1.   Prejudice As Affecting Remedy ........................................................................... 93
   2.   Attaching Claims to Sale Proceeds ....................................................................... 94

    3.    Protection of Purchasers of Estate Assets ............................................................ 95
    4.    Effect of Constitutional Violations ...................................................................... 97
    5.    Remedies Conclusion............................................................................................ 106
B.  Claims......................................................................................................................... 107
III.  Assumed Liabilities ................................................................................................. 107
IV. Equitable Mootness .................................................................................................. 108
A.  Underlying Principles ............................................................................................... 108
B.  Applying Those Principles Here ............................................................................. 111
    1.    Ability to Fashion Effective Relief...................................................................... 112
    2.    Effect on Re-emergence of Debtor as Revitalized Corporate Entity;................. 114
    3.    Unraveling Intricate Transactions........................................................................ 114
    4.    Adversely Affected Parties ................................................................................... 118
    5.    Pursuit of Stay Remedies ..................................................................................... 119
V.  Fraud on the Court .................................................................................................. 122
    1.    Effect on Process of Adjudication ....................................................................... 125
    2.    Victim of the Fraud............................................................................................... 129
    3.    Particular Standards to Apply ............................................................................... 130
VI. Certification to Circuit............................................................................................ 131
Conclusion ........................................................................................................................ 133

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

## Introduction

In this contested matter in the chapter 11 case of Debtor Motors Liquidation

Company, previously known as General Motors Corporation ("**Old GM**"), General

Motors LLC ("**New GM**")—the acquirer of most of Old GM's assets in a section 363

sale back in July 2009—moves for an order enforcing provisions of the July 5, 2009

order (the "**Sale Order**") by which this Court approved New GM's purchase of Old

GM's assets.[1]

The Sale Order, filed in proposed form on the first day of Old GM's chapter 11

case with Old GM's motion for the sale's approval, was entered, in a slightly modified

form, within a few hours after this Court issued its opinion approving the sale.[2]  There

were approximately 850 objections to the 363 Sale, the proposed Sale Order, or both.

But the most serious were those relating to elements of the Sale Order ("**Free and Clear**

**Provisions**"), discussed in more detail below, that provided that New GM would

purchase Old GM's assets "free and clear" of successor liability claims.  After lengthy

analysis,[3] the Court overruled those objections.

In March 2014, New GM announced to the public, for the first time, serious

defects in ignition switches that had been installed in Chevy Cobalts and HHRs, Pontiac

---

[1]    ECF No. 12620.  New GM's motion has been referred to by New GM, the other parties, and the
Court as the "**Motion to Enforce.**"

[2]    *See In re General Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009) (Gerber, J.) (the "*Sale
Opinion*"), *stay pending appeal denied*, 2009 WL 2033079 (S.D.N.Y. Jul. 9, 2009) (Kaplan, J.)
(the "*Stay Opinion*"), *appeal dismissed and aff'd sub nom Campbell v. General Motors Corp.*,
428 B.R. 43 (S.D.N.Y. 2010) (Buchwald, J.) ("*Affirmance Opinion #1*" and  *Parker v. General
Motors Corp.*, 430 B.R. 65 (S.D.N.Y. 2010) (Sweet, J.) ("*Affirmance Opinion #2*"), *appeal
dismissed*, No. 10–4882–bk (2d Cir. July 28, 2011) (*per curiam*, Jacobs, CJ, and Hall and Carney,
JJ.), *cert. denied*, 132 S.Ct. 1023 (2012).

[3]    *See Sale Opinion*, 407 B.R. at 499-506.

G5s and Solstices, and Saturn Ions and Skys (the "**Ignition Switch Defect**"), going back to the 2005 model year.  In the Spring of 2014 (though many have queried why Old GM and/or New GM failed to do so much sooner), New GM then issued a recall of the affected vehicles, under which New GM would replace the defective switches, and bear the costs for doing so.

New GM previously had agreed to assume responsibility for any accident claims involving post-sale deaths, personal injury, and property damage—which would include any that might have resulted from the Ignition Switch Defect.  But New GM's announcement was almost immediately followed by the filing of about 60 class actions in courts around the United States, seeking compensatory damages, punitive damages, RICO damages and attorneys fees for *other* kinds of losses to consumers—"**Economic Loss**"—alleged to have resulted from the Ignition Switch Defect.  The claims for Economic Loss include claims for alleged reduction in the resale value of affected cars, other economic loss (such as unpaid time off from work when getting an ignition switch replaced), and inconvenience.  The Court has been informed that the number of class actions now pending against New GM—the great bulk of which were brought by or on behalf of individuals claiming Economic Loss ("**Economic Loss Plaintiffs**")—now exceeds 140.  Though the amount sought by Economic Loss Plaintiffs is for the most part unliquidated, it has been described as from $7 to $10 billion.  Most of those actions ("**Ignition Switch Actions**") are now being jointly administered, for pretrial purposes, in a multi-district proceeding before the Hon. Jesse Furman, U.S.D.J., in the Southern District of New York (the "**MDL Court**").

-2-

New GM here seeks to enforce the Sale Order's provisions, quoted below, blocking economic loss lawsuits against New GM on claims involving vehicles and parts manufactured by Old GM.[4]  New GM argues that while it had voluntarily undertaken, under the Sale Order, to take on an array of Old GM liabilities (for the post-sale accidents involving both Old GM and New GM vehicles just described; under the express warranty on the sale of any Old GM or New GM vehicle (the **"Glove Box Warranty"**); to satisfy statutory recall obligations with respect to Old GM and New GM vehicles alike; and under Lemon Laws, again with respect to Old GM and New GM vehicles alike), the Sale Order blocked any others—including those in these suits for Economic Loss.

The Sale Order, as discussed below, plainly so provides.  But as to 70 million Old GM cars whose owners had not been in accidents of which they'd advised Old GM, the Sale Order was entered with notice only by publication.  And those owning cars with Ignition Switch Defects (again, those who had not been in accidents known to Old GM)—an estimated 27 million in number—were given neither individual mailed notice of the 363 Sale, nor mailed notice of the opportunity to file claims for any losses they allegedly suffered.  And more importantly, from the perspective of these car owners, they were not given *recall notices* which (in addition to facilitating switch replacement before accidents took place), they contend were essential to enabling them to respond to the published notices to object to the 363 Sale or to file claims.

---

[4]    There may be misunderstandings as to the matters now before the Court.  New GM has already undertaken to satisfy claims for death, personal injury, and property damage in accidents occurring after the 363 Sale—involving vehicles manufactured by New GM and Old GM alike.  Except for the *pre*-Sale accidents that are the subject of the Pre-Closing Accident Plaintiffs' contentions, addressed below (where those plaintiffs wish to sue New GM in lieu of Old GM), this controversy does not involve death, personal injury, or property damage arising in accidents.  Instead it involves only *economic losses* allegedly sustained with respect to Old GM vehicles or parts.

Then, after New GM filed the Motion to Enforce, two other categories of Plaintiffs came into the picture. One was another group of Ignition Switch Defect plaintiffs (the "**Pre-Closing Accident Plaintiffs**") who (unlike the Economic Loss Plaintiffs) are suing with respect to actual accidents. But because those accidents involved Old GM and took place *before* the 363 Sale Closing—and taking on pre-closing accident liability was not commercially necessary to New GM's future success—they were not among the accidents involving Old GM vehicles for which New GM agreed to assume responsibility. The Pre-Closing Accident Plaintiffs have (or at least had) the right to assert claims against Old GM (the only entity that was in existence at the time their accidents took place), but they nevertheless wish to proceed against New GM. New GM brought a second motion to enforce the Sale Order[5] with respect to the Pre-Closing Accident Plaintiffs, and issues with respect to this Plaintiff group were heard in tandem with the Motion to Enforce.

The other category of Plaintiffs later coming into the picture ("**Non-Ignition Switch Plaintiffs**") brought actions asserting Economic Loss claims as to GM branded cars that *did not have* Ignition Switch Defects, including cars made by New GM and Old GM alike. In fact, most of their cars did not have defects, and/or were not the subject of recalls, at all. But they contend, in substance, that the Ignition Switch Defect caused damage to "the brand,"[6] resulting in Economic Loss to them. New GM brought still

---

[5]    ECF No. 12807.

[6]    *See* Day 1 Arg. Tr. at 137:4-138:16, Feb. 17, 2015 ("[PL. COUNSEL]: The revelation of New GM's extensive deceptions tarnished the brand further . . .They allege that new GM concealed and suppressed material facts about the quality of its vehicle and the GM brand."); Day 2 Arg. Tr. at 61:16-62:5, Feb. 18, 2015 ("THE COURT: I thought I heard arguments from either you or Mr. Esserman or both, that the contention being made on the Plaintiffs' side is that the failure to deal with the ignition switches damaged the GM brand, and is some Court of competent jurisdiction then going to hear an argument that there are 70 million vehicles that lost value and not just the 27 million that are the subject of the recalls, or the lesser 13 million to which you just made

another motion[7] to enforce the Sale Order with respect to them, though this third motion
has been deferred pending the determination of the issues here.

In this Court, the first two groups of Plaintiffs, whose issues the Court could
consider on a common set of stipulated facts and is in major respects considering
together,[8] contend that by reason of Old GM's failure to send out recall notices, they
never learned of the Ignition Switch Defect, and that the Sale Order is unenforceable
against them.

<u>Summary of Conclusions</u>

New GM is right when it says that most of the claims now asserted against it are
proscribed under the Sale Order. But that is only the start, and not the end, of the
relevant inquiry. And assuming, as the Plaintiffs argue, that Old GM's and then New
GM's delay in announcing the Ignition Switch Defect to the driving public was
unforgiveable, that too is only the start, and not the end of the relevant inquiry.

The real issues before the Court involve questions of procedural due process, and
what to do about it if due process is denied: (1) what notice was sufficient; (2) to what
extent an assertedly aggrieved individual's lack of prejudice from insufficient notice

---

reference? [PL. COUNSEL]: I'm not counsel of record there, but I guess I would be surprised if
the Plaintiffs in those actions aren't likewise looking for recompense for the people without
ignition switch defects in their car, on the theory, which may or may not be upheld by Judge
Furman . . . as giving rise to cognizable claims and causes of action.") Though not mentioned by
Plaintiffs' counsel then, those claims were made with respect to cars made by Old GM, *see, e.g.,*
Consolidated Amended Complaint for Post-Sale Vehicles ¶¶ 820-825, and thus were violative of
the Sale Order, to the extent it remains enforceable.

[7]    ECF No. 12808.

[8]    When they can be referred to together, they are collectively referred to as the **"Plaintiffs."** Their
bankruptcy counsel, retained and then designated to act for the large number of plaintiffs whose
counsel at least generally litigate tort matters, rather than bankruptcy issues, have been referred to
as **"Designated Counsel."** As the two groups of Plaintiffs' circumstances overlap in part and
diverge in part, one brief was filed by Designated Counsel for Economic Loss Plaintiffs, and
another by Designated Counsel for Pre-Closing Accident Plaintiffs—with the latter relying on the
former's brief with respect to overlapping themes. References to "Pl. Br." are thus to the main
brief filed by the Economic Loss Plaintiffs' Designated Counsel.

matters; (3) what remedies are appropriate for any due process denial; and (4) to what extent sale orders can be modified after the fact at the expense of those who purchased assets from an estate on the expectation that the sale orders would be enforced in accordance with their terms. They also involve the needs and concerns of Old GM creditors whose claims are pending, and of holders of units of the Old GM General Unsecured Creditors Trust ("**GUC Trust**"), formed for the benefit of unsecured creditors when Old GM confirmed its liquidating plan of reorganization (the "**Plan**")—all of whom would be prejudiced if Old GM's remaining assets were tapped to satisfy an additional $7 to $10 billion in claims.

For the reasons discussed at length below, the Court concludes:

*1. Due Process*

Notice must be provided in bankruptcy cases, as in plenary litigation, that is "reasonably calculated, under all the circumstances" to apprise people of the pendency of any proceeding that may result in their being deprived of any property, and to "afford them an opportunity to present their objections."[9] The Second Circuit, like many other courts, has held that "the Due Process Clause requires the best notice practical under the circumstances."[10] But "actual" (*i.e.*, personalized) notice is required for "known" creditors—those whose names and addresses are "reasonably ascertainable."[11] "Constructive" notice (typically provided by publication) can be used when it is the best

---

[9]    *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("*Mullane*") (citations omitted).

[10]    *In re Drexel Burnham Lambert Grp.*, 995 F.2d 1138, 1144 (2d Cir. 1993) ("*Drexel Burnham*"). The *Drexel Burnham* chapter 11 case generated several opinions relevant to this controversy. The Court has given another of them a different shorthand name to help tell it apart. *See* n.105 below.

[11]    *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 800 (1983) ("*Mennonite Board*").

notice practical under the circumstances. But publication notice, as a substitute for actual

notice, at least normally is insufficient for "known" creditors.

In the bankruptcy context, those general principles apply to both the notice

required incident to sale approval motions, on the one hand, and to claims allowance, on

the other. And in this case, the Court ultimately reaches largely the same conclusions

with respect to each. But the different circumstances applicable to the sale process (to be

completed before a grievously bleeding Old GM ran out of money) and the claims

process (which lacked comparable urgency) cause the Court to reach those conclusions in

different ways.

   *(a) Notice Before Entry of Sale Order*

The Court disagrees with New GM's contention that imposing free and clear

provisions doesn't result in a potential deprivation of property, and thus concludes that

due process requirements apply. But the caselaw—in plenary litigation and in

bankruptcy cases alike—permits, and indeed requires, consideration of practicality.

There was extraordinary urgency in connection with the 363 Sale. In June 2009,

Old GM was bleeding cash at an extraordinary rate. And U.S. and Canadian

governmental authorities, who had agreed to provide cash to keep Old GM alive until the

closing of a 363 sale, had conditioned their willingness to continue the necessary funding

on the approval of the 363 Sale by July 10, 2009, only 40 days after the chapter 11 filing.

Given that urgency, with the sale hearing to commence 29 days after the Petition

Date; objections due 18 days after the Petition Date; and 70 million Old GM vehicles on

the road, notice by publication to vehicle owners was obviously proper. Indeed, it was

essential. It would be wholly unreasonable to expect actual notice of the 363 Sale

hearing then to have been mailed to the owners of the 70 million GM cars on the road at

the time, or even the 27 million whose cars were then (or later became) the subject of pending recalls. Though notice by publication would at least normally also be acceptable in instances involving considerably smaller bodies of creditors, this is exactly the kind of situation for which notice by publication is the norm. Under normal circumstances, notice by publication would easily be sufficient under *Mullane, Drexel Burnham,* and their respective progeny.

But the Court must also determine whether the knowledge of many Old GM personnel of the Ignition Switch Defect removes this case from the general rule. While there is no indication on this record, if there ever will be, that Old GM's bankruptcy counsel knew of the need to focus on notice to owners of cars with Ignition Switch Defects, at least 24 business and in-house legal personnel at Old GM were aware of the problem. As of June 2009, when entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required, under the National Traffic and Motor Vehicle Safety Act (the "**Safety Act**"), to send out mailed recall notices to owners of affected Old GM vehicles. And Old GM knew to whom it had to mail the recall notices, and had addresses for them.

The adequacy of notice issue is nevertheless close, however, because while Old GM had a known recall obligation, and knew the names and addresses of those owning the vehicles that were affected, Old GM gave *actual* notice of the 363 Sale to anyone who had previously asserted a claim against it for injury or death—by reason of Ignition Switch Defects or otherwise. And only a subset (and, possibly a small subset) of the others who were entitled to Ignition Switch Defect recall notices would later turn out to have been injured, killed, or economically damaged as a result of the circumstances that

led to the recall, or want to object to the 363 Sale or any of its terms. That *some* of them would be killed or injured was known; *who they would be* was not.

But on balance the Court believes that the distinction is insufficient to be meaningful. The known safety hazard that engendered the unsatisfied recall obligations gave rise to claims associated with the repair (and assertedly, though this is yet to be decided, decreases in value) of the cars and would give rise to more claims if car occupants were killed or injured as a result. Old GM knew—even if it knew the particular identities of only *some* cars that had been in Ignition Switch Defect accidents— that the defect had caused accidents; that is exactly why this particular recall was required. And Old GM also knew, from the same facts that caused it to be on notice of the need for the recall, that *others*, in the future, would be in accidents as well.

The publication notice here given, which otherwise would have been perfectly satisfactory (especially given the time exigencies), was not by itself enough for those whose cars had Ignition Switch Defects—because from Old GM's perspective, the facts that gave rise to its recall obligation resulted in "known" claims, as that expression is used in due process jurisprudence. Because owners of cars with Ignition Switch Defects received neither the notice required under the Safety Act nor any reasonable substitute (either of which, if given before Old GM's chapter 11 filing, could have been followed by the otherwise satisfactory post-filing notice by publication), they were denied the notice that due process requires.

### (b) Notice Before Expungement of Claims

By contrast to the 363 Sale, there was no particular urgency with respect to the allowance of claims. Claims could be (and ultimately were) considered in a less hurried fashion. And while notice only by publication to 70 million (or even 27 million) vehicle

owners not known by Old GM to have been in accidents would be the norm for the

claims process as well (and notice by publication, applicable in this respect and others, is

what this Court then approved), the fact is that even at the later times set as deadlines for

the filing of claims, Old GM still had not sent out notice of the recall, and Old GM car

owners were still unaware of any resulting potential claims.

In the claims allowance respect too, the Court concludes that Old GM's

knowledge of facts sufficient to justify notice of a recall, and its failure to provide the

recall notice, effectively resulted in a denial of the notice due process requires.

*(c) Requirement for Prejudice*

Though the Court has found failures, insofar as the Plaintiffs are concerned, to

provide the notice that due process requires, that does not by itself mean that they have

established a due process violation.  The Court categorically rejects the Plaintiffs'

contention that prejudice is irrelevant.  Rather, in order to establish a due process

violation, they must demonstrate that they have sustained prejudice as a result of the

allegedly insufficient notice.[12]

In some instances, a lack of notice plainly results in prejudice, as in instances in

which the earlier judicial action cannot be undone.  In others, it does not—and it can be

cured by providing the opportunity to be heard at a later time, and, where the law permits

and requires, vacating or modifying the earlier order, or exempting parties from the

order's effect.  In every case, however, a denial of notice need not result in an automatic

win for the party that failed to get appropriate notice the first time around.  Instead that

party should get the full and fair hearing it was initially denied, with the Court then

---

[12]    *Perry v. Blum*, 629 F.3d 1, 17 (1st Cir. 2010); *accord* all of the other cases cited in nn.162 through
164 *infra*.

-10-

focusing on the extent to which prejudice actually resulted—and, of course, on achieving

the right outcome on the merits, which in a perfect world would have been reached the

first time.[13]

Both groups of Plaintiffs were plainly prejudiced with respect to the bar date for

filing claims. But the Pre-Closing Accident Plaintiffs were not prejudiced at all, and the

Economic Loss Plaintiffs were prejudiced only in part, by the failure to give them the

requisite notice in connection with the 363 Sale. Neither the Economic Loss Plaintiffs

nor the Pre-Closing Sale Plaintiffs were prejudiced with respect to the Sale Order's Free

and Clear Provisions. Back in 2009, the Court heard many others make the same

arguments, and rejected them. The Court now has heard from both the Economic Loss

Plaintiffs and Pre-Closing Accident Plaintiffs with respect to the Free and Clear

Provisions and successor liability, with full and fair opportunity to be heard. And neither

Plaintiff group has advanced any arguments on successor liability that were not

previously made, and made exceedingly well before. Their principal contention—that

they would have won by reason of public outrage, political pressure, or the U.S.

Treasury's anger with Old GM, when they would not have won in the courtroom—is the

very speculation that they rightfully criticize. Thus insofar as successor liability is

concerned, while the Plaintiffs established a failure to provide them with the notice due

---

[13]    That was referred to in oral argument here, initially by the Court, as a "do-over." In many, if not
most, instances, that will be required, but in many, if not most, cases that will also be sufficient.
What is critical, however it is accomplished, is that the Court gauge in a non-speculative fashion
whether (and how) the outcome might have been different if the requisite notice had been
provided.

process requires, they did not establish a due process violation.  The Free and Clear Provisions stand.[14]

But the Economic Loss Plaintiffs were prejudiced in one respect.  Nobody else had argued a point that they argue now:  that the proposed Sale Order was overly broad, and that it should have allowed them to assert claims involving Old GM vehicles and parts so long as they were basing their claims *solely on New GM conduct*, and not based on any kind of successor liability or any other act by Old GM.  If the Economic Loss Plaintiffs had made that argument back in 2009, the Court would have agreed with them. And by contrast to their predictions as to possible results of public outrage, this is not at all speculative, since the Court had ruled on closely similar issues before, seven years earlier, and, indeed, again in that very same *Sale Opinion*.  Here, by contrast, the failure to provide the notice that due process requires was coupled with resulting prejudice.  The Economic Loss Plaintiffs were not furnished the opportunity to make the overbreadth argument back in 2009, and in that respect they were prejudiced.  The failure to be heard on this latter argument necessarily must be viewed as having affected the earlier result.

Thus, with respect to Sale Order overbreadth, the Economic Loss Plaintiffs suffered a denial of due process, requiring the Court to then turn to the appropriate remedy.

*2.  Remedies*

As noted above, the Court has rejected the Plaintiffs' contention that prejudice is irrelevant to a claim for denial of due process.  And it has likewise rejected the notion

---

[14]    They also stand with respect to a subset of Economic Loss Plaintiffs (the "**Used Car Purchasers**") who acquired cars manufactured by Old GM in the aftermarket after the 363 Sale (*e.g.*, from their original owners, or used car dealers).  They too were not prejudiced by the inability to make successor liability arguments that others made, and, in addition, they can have no greater rights than the original owners of their cars had.

that the denial of the notice that due process requires means that the Plaintiffs should automatically win. But to the extent they were prejudiced (and the Court has determined that the Economic Loss Plaintiffs *were* prejudiced with respect to Sale Order overbreadth), they deserve a remedy tailored to the prejudice they suffered, to the extent the law permits.

The Court rejects, for reasons discussed below, New GM's contention that the principles under which property is sold free and clear of liens, with the liens to attach instead to sale proceeds, apply universally to interests other than liens—as relevant here, interests permitting the assertion of successor liability. But New GM's next several points—that purchasers of assets acquire property rights too, and that taking away purchasers' contractually bargained-for rights strikes at the heart of understandings critically important to the bankruptcy system—have great merit. They have so much merit, in fact, that were it not for the fact that the Plaintiffs' claim is a constitutional one, the Court would not deny enforcement of the Sale Order, in whole or in part. There is no good reason to give creditors asserting successor liability claims recovery rights greater than those of other creditors. And as importantly or more so, the interests inherent in the enforceability of 363 orders (on which the buyers of assets should justifiably be able to rely, and on which the interests of creditors, keenly interested in the maximization of estate value, likewise rest) are hugely important.

But the Court concludes that remedying a constitutional violation must trump those concerns. Decisions of the Second Circuit and other courts hold, or suggest (with little in the way of countervailing authority), that with or without reliance on Fed.R.Civ.P. 60(b), lower courts may—and should—deny enforcement, against those

who were prejudiced thereby, of even cherry-picked components of sale orders that have

been entered with denials of due process. Those cases make clear that it is not necessary

for a court to invalidate the sale order in full. That is so whether or not the Court declares

the order, or part of it, to be "void." And if the order can be declared to be void (or if it

can be selectively enforced, to avoid enforcing it against one denied due process),

provisions in the order providing that it is nonseverable fall as well.

In the absence of a constitutional violation, the Court suspects that the power to

deny full enforcement of a sale order (assuming that such is even permissible) will rarely,

if ever, be invoked. The principles underlying the finality of 363 sale orders are much

too important. But in cases where a sale order can be declared to be void (and orders

entered without due process are subject to such a consequence), sale orders may be

modified, or selectively enforced, as well.

3. *Assumed Liabilities*

In light of the Court's conclusions, summarized above, New GM's concerns as to

the limited liabilities that New GM assumed are not as significant as they might

otherwise have been. New GM is right that it expressly declined to assume any liabilities

based on Old GM's wrongful conduct, and that these were "retained liabilities" to be

satisfied by Old GM. But the Court's ruling that it will continue to enforce prohibitions

against successor liability makes New GM's concerns as to that academic. And to the

extent, if any, that New GM might be liable on claims based solely on any wrongful

conduct on its own part (and in no way relying on wrongful conduct by Old GM), New

GM would have such liability not because it had assumed any Old GM liabilities, or was

responsible for anything wrong that Old GM did, but only because it had engaged in

independently wrongful, and otherwise actionable, conduct on its own.

-14-

But it is plain that to the extent the Plaintiffs seek to impose successor liability, or to rely, in suits against New GM, on any wrongful conduct by Old GM, these are actually claims against Old GM, and not New GM. It also is plain that any court analyzing claims that are supposedly against New GM only must be extraordinarily careful to ensure that they are not in substance successor liability claims, "dressed up to look like something else."[15] Claims premised in any way on Old GM conduct are properly proscribed under the Sale Agreement and the Sale Order, and by reason of the Court's other rulings, the prohibitions against the assertion of such claims stand.

### 4. *Equitable Mootness*

Because the successor liability claims start by being claims against Old GM, the Court also must consider the GUC Trust's concerns as to Equitable Mootness. The Court recognizes that mootness concerns will materially, if not entirely, impair the Plaintiffs' ability to collect on any allowed claims against Old GM (or more precisely, the GUC Trust) that they otherwise might have. But nevertheless, the Court concludes, contrary to its original instincts at the outset of this controversy, that the GUC Trust is right in its mootness contentions, and that the rights of GUC Trust beneficiaries cannot be impaired at this late time.

Mootness doctrine already made a return of past distributions from all of Old GM's many thousands of creditors unthinkable. But the Court, being mindful of the Second Circuit's holdings that mootness doctrine does not foreclose relief where *some* meaningful relief can be fashioned, originally thought that mootness concerns would not foreclose at least some relief—such as permitting the late filing of claims, and thereby

---

[15]     *Burton v. Chrysler Grp., LLC* (*In re Old Carco*), 492 B.R. 392, 405 (Bankr. S.D.N.Y. 2013) (Bernstein, C.J.) ("*Old Carco*").

-15-

permitting Economic Loss Plaintiffs to share in assets remaining in the GUC Trust. In the course of subsequent briefing, however, the GUC Trust and its unit holders (the "**Unitholders**") pointed out (along with other reasons for denial of relief) that granting relief now to the Plaintiffs would require not just the allowance of late claims (which by itself would be acceptable), but also *the modification of the confirmation order*—and with it, impairment of the rights of the Unitholders, especially those who acquired those units in post-confirmation trading. Though late claims filed by the Plaintiffs might still be allowed, assets transferred to the GUC Trust under the Plan could not now be tapped to pay them. Under the mootness standards laid down by the Second Circuit in its leading decisions in the area,[16] GUC Trust Unitholders must be protected from a modification of the Plan.

  *5. Fraud on the Court*

     Believing that rulings now might expedite or moot further litigation down the road, the Court also undertook to rule on the legal standards applicable to litigation over whether, in connection with the entry of the Sale Order, there might have been a fraud on the Court. Though they become less important for reasons discussed below, the Court provides them in Section V.

     Of the standards for establishing fraud on the Court, discussed below, three are particularly relevant here. One is that fraud on the court requires action that does or attempts to defile the *court itself*. Another, related to the first, is that establishing a fraud on the Court requires defrauding the *court*, as contrasted to a non-judicial victim (such as

---

[16]      *See Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.)*, 988 F.2d 322 (2d Cir. 1993) ("***Chateaugay I***"); *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944 (2d Cir. 1993) ("***Chateaugay II***"); *Beeman v. BGI Creditors' Liquidating Trust (In re BGI, Inc.)*, 772 F.3d 102 (2d Cir. 2014) ("***BGI***").

a vehicle owner). A third is because it involves an effect on the Court (as contrasted to any injured third parties), it turns on the knowledge and intent of *those actually interfacing with the Court.* In each of those respects, and its application otherwise, establishing a fraud on the Court requires a knowing and purposeful effort to subvert the judicial process.

### 6. *Certification to the Circuit*

The issues here are important, difficult, and involve the application of often conflicting authority. Their prompt determination will affect further proceedings not just in this Court, but also the MDL Court. The Court believes that it should certify its judgment for direct review by the Circuit.

Facts[17]

### 1. *Background*

In late 2008 and the first half of 2009, Old GM—then the only "GM"—was in extremis. As the Court found in the *Sale Opinion*, Old GM had suffered a steep erosion in revenues, significant operating losses, and a dramatic loss of liquidity, putting its future in grave jeopardy. It was bleeding cash at an extraordinary rate.

Old GM was assisted in December 2008 by an emergency infusion of cash by the Bush administration, and then again, in January and February 2009, by two more emergency infusions of cash by the Obama administration. But the latter declared that its financial support would last for only a limited period of time, and that Old GM would have to address its problems as a matter of great urgency.

---

[17] The Court asked the parties to agree on stipulated facts, and they did so. By analogy to motions for summary judgment, the Court has relied only on undisputed facts. To avoid lengthening this Decision further, the Court has limited its citations to quotations and the most important matters.

In March 2009, the U.S. Treasury ("**Treasury**"), whose Presidential Task Force on the Auto Industry ("**Auto Task Force**") was quarterbacking the rescue effort, gave Old GM 60 days to submit a viable restructuring plan. Failure to accomplish that would force Old GM to liquidate. But Old GM was unable to achieve an out-of-court restructuring. It quickly became obvious that Old GM's only viable option was to file a chapter 11 case and to sell its assets through a 363 Sale, shed of the great bulk of its prepetition liabilities. The acquirer ultimately became New GM.

The urgency at the time is apparent. The cash bleeding was brutal; Old GM suffered negative cash flow of $9.4 billion in the first quarter of 2009 alone.[18] Without a very quick end to the bleeding, Old GM would plunge into liquidation. Apart from the loss to Old GM's creditors, Old GM's liquidation would result in the loss of over 200,000 jobs at Old GM alone, and grievous loss to the approximately 11,500 vendors, with more than 500,000 workers, in the Supplier Chain.[19] Liquidation would also result in virtually no recovery for any of Old GM's prepetition creditors—including Pre-Closing Accident Plaintiffs and Economic Loss Plaintiffs before the Court now.

2. *Chapter 11 Filing*

On June 1, 2009 (the "**Petition Date**")—40 days prior to the deadline imposed under the critical DIP Financing—Old GM and three affiliates commenced these now jointly administered chapter 11 cases before this Court. That same day, Old GM filed the motion (the "**Sale Motion**") for authority to engage in the required 363 Sale.

---

[18]    *Sale Opinion*, 407 B.R. at 476, 479.

[19]    *Id.* at 476, 477 n.6. The Supplier Chain is the body of vendors that supply parts and subassemblies that go into the vehicles that are manufactured by the U.S. Big Three—GM, Chrysler, and Ford— and many of their foreign counterparts, at least those that manufacture vehicles in the U.S. The Court learned, in connection with the 363 Sale Hearing back in 2009, that the majority of the value that would go into a GM vehicle would in fact have come from the Supplier Chain.

3.  *The Sale Motion and Notice Order*

In its Sale Motion, GM asked the Court to authorize the 363 Sale "free and clear of all

other 'liens, claims, encumbrances and other interests,' including, specifically, 'all

successor liability claims.'"

Specifically, GM submitted a proposed order to the Court (the "**Proposed Sale**

**Order**") containing provisions directed at cutting off successor liability except in the

respects where successor liability was contractually assumed.  As the Court noted in

2009, the Proposed Sale Order would effectuate a free and clear sale through a double-

barreled approach:

> First, the Proposed Sale Order contains a finding—
> and a decretal provision to similar effect—that the
> Debtors may sell the Purchased Assets free and
> clear of all liens, claims, encumbrances, and other
> interests, including rights or claims based on any
> successor or transferee liability.
>
> Second, the Proposed Sale Order would enjoin all
> persons (including "litigation claimants") holding
> liens, claims, encumbrances, and other interests,
> including rights or claims based on any successor or
> transferee liability, from asserting them against
> New GM or the Purchased Assets.[20]

Along with its submission of the Proposed Sale Order, GM moved for court

approval of the sale procedures, and for an order fixing and approving the form and

manner of notice.  After hearing argument on the motion, the Court approved the sale

procedures, and the next day entered an order laying out the procedures for the upcoming

363 Sale (the "**Sale Procedures Order**").

---

[20]    *Sale Opinion*, 407 B.R. at 483 (internal citations omitted).

-19-

4. *Notice of the Sale*

As relevant here, the Sale Procedures Order provided for *actual* notice to 25 categories of persons and entities, including, among many others, all parties who were known to have asserted any lien, claim, encumbrance, or interest in or on the Purchased Assets; all vehicle owners involved in actual litigation with Old GM (or, who though not yet involved in actual litigation, had asserted claims or otherwise threatened to sue); and all other known creditors.[21]

And the Sale Procedures Order additionally provided for constructive notice, by publication, in the *Wall Street Journal* (global edition); *New York Times* (national edition); *Financial Times* (global edition); *USA Today* (national edition); *Detroit Free Press*; *Detroit News*; in the Canadian *Le Journal de Montreal*, *Montreal Gazette*, *The Globe and Mail,* and *The National Post*; and on the website of Old GM's noticing agent, The Garden City Group.[22]

The notice of hearing on the proposed 363 Sale ("**Sale Notice**") provided the general terms of the sale, including the date and location at which the sale was to occur, and instructions for those wishing to object or otherwise respond. The Sale Notice did not, however, attempt to describe the claims any recipient might have against Old GM, or any bases for objections to the sale or Proposed Sale Order that any notice recipient might wish to assert.

5. *Objections to Free and Clear Provisions*

Many of the 850 parties objecting to the Sale Motion made limited objections—not opposing the 363 Sale or its timing as such, but objecting instead to provisions in the

---

[21]    *See* Sale Procedures Order ¶¶ 9(a)(i) through (xxv), 9(b)(i) through (ii) (ECF No. 274).

[22]    *See id.* ¶ 9(e); *see also* New GM Stipulations of Fact ¶¶ 22-23 (ECF No. 12826-2).

-20-

Proposed Sale Order. They argued that New GM should assume certain kinds of claims; that the Free and Clear Provisions limiting successor liability were improper; or both. More specifically:

(a) Many of the states' Attorneys General ("**AGs**"), assisted in significant part by an attorney with the National Association of Attorneys' General well known for her expertise in the interplay between bankruptcy law and states' regulatory needs and concerns, argued that New GM should assume consumer claims for implied, express, and statutory warranties.[23]

(b) Old GM's Official Committee of Unsecured Creditors (the "**Creditors' Committee**"), representing unsecured creditors of all types (including tort plaintiffs and other vehicle owners), objected to the Proposed Sale Order because (as the Creditors' Committee well understood) it would cut off state law successor liability and limit any current or future claimants to recovery from the assets "left behind in the old company."[24]

(c) The Ad Hoc Committee of Consumer Victims (the "**Consumer Victims Committee**"); attorneys for individual accident litigants (the "**Individual Accident Litigants**"); attorneys for asbestos victim litigants (the "**Asbestos Litigants**"); and the Center for Auto Safety, Consumer Action, Consumers for Auto Reliability and Safety, National Association of Consumer Advocates, and Public Citizen (collectively, the "**Consumer**

---

[23]    *See* AGs Objections, ECF Nos. 1926 and 2043.

[24]    Creditors' Committee Objection at 3 (ECF No. 2362).

Organizations," and, together with the others, the "**Successor Liability**

**Objectors**") likewise argued that Old GM could not sell its assets free and

clear of any rights or claims based on successor or transferee liability.[25]

The Successor Liability Objectors argued that shedding potential successor

liability was not permitted under Bankruptcy Code section 363(f). They further argued

that section 363(f) "authorize[d] the sale of property free and clear only of 'interests in'

property to be sold, not *in personam* claims against the Purchaser under theories of

successor liability."[26] They further argued that the Court "lack[ed] jurisdiction to enjoin

actions between non-debtor product liability claimants and the Purchaser post-closing

since resolution of these claims [would] not affect the Debtors' estates."[27] And they

argued that the Free and Clear Provisions would violate due process—asserting that

individuals who might have future claims for injuries "cannot have received meaningful

notice that the bankruptcy proceeding was resolving their rights or a meaningful

opportunity to protect those rights, which otherwise might allow a state law cause of

action for their injuries."[28]

In the *Sale Opinion*, the Court considered, but ultimately rejected, those

contentions and similar ones. Relying on, among other things, the then recent opinions

by the Bankruptcy Court in *Chrysler*[29] (which had recently issued its own sale order with

---

[25]    *See* Successor Liability Objectors' Limited Obj. (ECF No. 2041).

[26]    Successor Liability Objectors' Mem. of Law at 2 (ECF No. 2050).

[27]    *Id.*

[28]    *Id.*

[29]    *See In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009) (" *Chrysler* "), (Gonzalez, CJ.), *aff'd for substantially the reasons stated in the opinions below*, No. 09–2311–bk (2d Cir. Jun. 5, 2009) ("*Chrysler Circuit Order*"), *temporary stay vacated and further stay denied*, 556 U.S. 960 (June 9, 2009), *Circuit written opinion issued*, 576 F.3d 108 (2d Cir. Aug. 5, 2009) ("*Chrysler Circuit*

free and clear provisions); of the Second Circuit (which, three weeks before the Old GM

363 Sale hearing, affirmed the *Chrysler* decision for "substantially the same reasons

articulated by the bankruptcy court"[30]); and earlier authority,[31] this Court overruled the

objections to the Free and Clear Provisions—determining, after lengthy analysis, that

New GM should be protected against successor liability claims.[32]

6.    *Sale Agreement—Relevant Provisions*

The agreement under which the 363 Sale would take place, which had the formal

name of "Amended and Restated Master Sale and Purchase Agreement," dated June 26,

2009 (often referred to by the parties as the "**ARMSPA**" but by this Court as the "**Sale**

**Agreement**"), was originally filed with the Sale Motion on June 1, 2009.  It was

thereafter amended—in respects relevant here (1) to incorporate an agreement with the

AGs under which New GM would assume liabilities under state Lemon Laws, and (2) to

provide that New GM would assume responsibility for any and all accidents or incidents

---

*Opinion"), judgment vacated and case remanded with instructions to dismiss appeal as moot,*
558 U.S. 1087 (Dec. 14, 2009).

[30]    *See Chrysler Circuit Order.*  The Circuit first issued a short written order, affirming for
"substantially the reasons articulated by the Bankruptcy Court," *id.*, and advising that its order
would be followed by a written order more fully explaining the Circuit's ruling.  The Circuit
thereafter issued a lengthy opinion explaining its earlier ruling in great detail.  *See Chrysler
Circuit Opinion.*  But about four months later, the Circuit's "judgment" was vacated by the United
States Supreme Court with directions to dismiss the appeal as moot.  What the Supreme Court
meant by "judgment" in that context was not explained, but one can infer (though the Supreme
Court did not explain this either) that the appeal was moot at the time the Circuit's written opinion
was issued, since Chrysler's 363 sale had already closed.  But even assuming that the controversy
was moot by the time the Circuit issued the *Chrysler Circuit* written opinion), the controversy was
not moot when the Circuit issued its initial affirmance order—the *Chrysler Circuit Order*—
preceding the Chrysler 363 sale closing, upon which this Court also relied.  And assuming,
*arguendo*, that, by reason of these matters of timing, the Circuit's written *Chrysler Circuit
Opinion* can no longer be regarded as binding on the lower courts in the Second Circuit (a matter
this Court has no need to decide), the Court thinks the Circuit's written thinking on the subject
should continue to be respected.

[31]    *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 288–90 (3d Cir. 2003); *United Mine Workers
of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d
573, 581–82 (4th Cir.1996).

[32]    *See Sale Opinion*, 407 B.R. at 499-506.

giving rise to death, personal injury, or property damage after the date of closing of the

363 Sale, irrespective of whether the vehicle was manufactured by Old GM or New GM.

The Sale Agreement, in its Section 2.3, listed liabilities that New GM would

assume ("**Assumed Liabilities**"), on the one hand, and that Old GM would retain

("**Retained Liabilities**"), on the other.  Those that would be assumed by agreement were

listed in subsection (a); those that would be retained (which would cover everything else)

were listed in subsection (b).  As provided in subsection (a), Assumed Liabilities

included:

> (a) Claims for "**Product Liabilities**" (a term defined in the Sale
>
> Agreement), with respect to which New GM would assume (but assume
>
> only) those that arose out of "accidents or incidents"[33] occurring on or
>
> after the Closing Date;[34]

---

[33]    The Court addressed the meaning of "incidents" in its decisions in *In re Motors Liquidation Co.*, 447 B.R. 142, 149 (Bankr. S.D.N.Y. 2011) (Gerber, J.) (" *GM–Deutsch*"), and *In re Motors Liquidation Co.*, 513 B.R. 467 (Bankr. S.D.N.Y. 2014) (Gerber, J.) ("*GM-Phaneuf*").  In *GM-Deutsch*, the Court accepted the explanation proffered by New GM counsel in which he stated that the language was drafted to cover situations similar to accidents that might not be said to be accidents, such as a car catching on fire, blowing up, or running off the road—in each case where it could cause a physical injury to someone.  447 B.R. at 148 n.20.  In *GM-Phaneuf*, the Court made reference to its earlier *GM-Deutsch* ruling, describing it, in a parenthetical following the citation, as "construing the 'incidents' portion of the '"accidents or incidents' language (in the context of claims against New GM by the estate of a consumer who had been in an accident before the 363 Sale, but died thereafter) as covering more than just "accidents," but covering things that were similar, such as fires, explosions, or other definite events that caused injuries and resulted in the right to sue").  513 B.R. at 472 n.17.

[34]    Sale Agreement § 2.3(a)(ix) (as amended) (ECF No. 2968-2).  As a practical matter the great bulk of covered occurrences would be accidents.  For brevity, except where quoting language that did not do likewise, the Court uses "**Accidents**" to cover anything within that category.

The "**Closing Date**"—the date the 363 Sale closed, under the authority of the Sale Order—turned out to be July 10, 2009.

(b) Repairs or the replacement of parts provided for under the

Glove Box Warranty;[35] and

(c) Lemon Law claims.[36]

And as noted in the Sale Decision, "an important change [] was made in the [Sale

Agreement] after the filing of the motion" which broadened the Assumed Liabilities to

include "*all* product liability claims arising from accidents or other discrete incidents

arising from operation of GM vehicles occurring subsequent to the closing of the

363 Transaction, *regardless of when the product was purchased*."[37]

But by contrast, the liabilities retained by Old GM—and not assumed by New

GM—expressly included: (a) Product Liabilities arising in whole or in part from any

Accidents, that happened *prior to* the Closing Date;[38] and (b) Liabilities to third parties

for prepetition claims based on contract, tort, or any other basis.[39]

The Sale Agreement also required New GM to comply with recall obligations

imposed by federal and state law, even for cars or parts manufactured by Old GM.[40]

---

[35]    Sale Agreement § 2.3(a)(vii). This is a duty to make, or cause to be made, the necessary repairs.
It is not a monetary obligation. *See Trusky v. General Motors Co. (In re Motors Liquidation Co.),*
2013 Bankr. LEXIS 620, at *26, 2013 WL 620281, at *9 (Bankr. S.D.N.Y. Feb. 19, 2013)
(Gerber, J.) ("*GM-Trusky*") ("Performance of repairs and needed adjustments is the exclusive
remedy under this written warranty. What is recoverable, in substance, is specific performance of
the repair or replacement obligation for otherwise qualifying defects.").

[36]    *See* Sale Agreement §2.3(a)(vii). Lemon Law claims were added as an assumed liability during
the course of the 363 Sale hearing after negotiation with the AGs. Additionally, and importantly
here, New GM undertook to comply with its statutory recall obligations, even with respect to Old
GM manufactured vehicles. Though to the extent these related to Old GM manufactured vehicles,
these might be thought of as Old GM liabilities to be assumed, they were not characterized as
such. But the characterization doesn't matter; what is clear is that New GM agreed that it would
be responsible for them.

[37]    407 B.R. at 481–82 (emphasis in original).

[38]    Sale Agreement § 2.3(b)(ix). The Pre-Closing Accident Plaintiffs' claims are in this category.

[39]    Sale Agreement § 2.3(b)(xi). The Economic Loss Plaintiffs' Claims are in this category.

[40]    *See* Sale Agreement § 6.15(a) ("From and after the Closing, Purchaser shall comply with the
certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety

7. *The Sale Order*

As previously discussed, the Court overruled objections to Free and Clear

Provisions, and the Sale Order thus had five (somewhat duplicative) provisions, including

injunctive provisions, protecting New GM from successor liability.

One provided, for example, that except for Assumed Liabilities, Old GM's assets

were acquired "free and clear of all liens, claims, encumbrances, and other interests of

any kind or nature whatsoever [other than permitted liens], *including rights or claims*

*based on any successor or transferee liability,*" with "all such liens, claims,

encumbrances, and other interests, *including rights or claims based on any successor or*

*transferee liability,* [to] attach to the net proceeds" of the Sale.[41]

Three others provided that "*no claims, other than Assumed Liabilities, will be*

*assertable against the Purchaser* [New GM];"[42] that New GM would have no liability

"*for any claim that arose prior to the Closing Date, relates to the production of vehicles*

*prior to the Closing Date, or otherwise is assertable against the Debtors or is related to*

*the Purchased Assets prior to the Closing Date*";[43] and that "*the Purchaser shall have no*

*successor, transferee, or vicarious liabilities of any kind or character.*"[44]  And another

included injunctive provisions barring assertion of successor liability claims.[45]

---

Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.").

[41]    Sale Order ¶ 7 (ECF No. 2968) (emphasis added).

[42]    *Id.* at ¶ 9(a) (reformatted for readability, emphasis added).

[43]    *Id.* at ¶ 46 (reformatted for readability, emphasis added).

[44]    *Id.* at ¶ 48 (reformatted for readability, emphasis added).

[45]    *Id.* at ¶ 8 (the "**Injunctive Provision**").

But tracking the language of the Sale Agreement, almost verbatim, the Sale Order imposed certain recall and other obligations on New GM in accordance with federal and state law, even with respect to parts and vehicles manufactured by Old GM:

> From and after the Closing, the Purchaser shall comply with the certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety Act, as amended and recodified, including by the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar Laws, in each case, to the extent applicable in respect of motor vehicles, vehicles, motor vehicle equipment, and vehicle parts manufactured or distributed by the Sellers prior to the Closing.[46]

And the Sale Order also addressed severability: "The provisions of this Order are nonseverable and mutually dependent on each other."[47]

### 8. *Matters After the Sale*

Upon the closing of the 363 Sale, New GM provided Old GM, as provided in the Sale Agreement, shares of New GM common stock and warrants (the "**New GM Securities**"), to be later distributed to Old GM creditors pursuant to a future plan.

In September 2009, about two months after the Sale was completed, the Court entered an order (the "**Bar Date Order**") establishing November 30, 2009, as the deadline (the "**Bar Date**") for proofs of claim to be filed against Old GM, and approved the form and manner of notice of the Bar Date. The Bar Date Order allowed for publication notice to holders of unknown claims. The Plaintiffs here are among those who received publication notice only as to any claims they might have against Old GM.

---

[46]    *Id.* at ¶ 17.

[47]    *Id.* at ¶ 69.

In March 2011, Old GM filed the Plan, and without opposition anything like the
opposition that the 363 Sale had engendered (though the opposition was sufficient to
warrant a written opinion),[48] the Plan was confirmed.  On March 29, 2011, the Court
entered an order (the "**Confirmation Order**") confirming the Plan.

The Plan became effective on March 31, 2011 (the "**Effective Date**"), and the
Plan provided that it would be deemed substantially consummated as of the Effective
Date.  The parties have stipulated that the Plan has been substantially consummated.[49]

9.    *The GUC Trust and its Operation*

Among many other things, the Confirmation Order authorized the creation of the
GUC Trust.  Under the agreement by which the GUC Trust was formed (the "**GUC
Trust Agreement**"), only certain categories of persons or entities were made
beneficiaries.  The GUC Trust Agreements limited GUC Trust Beneficiaries to:

> (i) the holders of *allowed* general unsecured claims against Old
> GM that existed as of the Effective Date;
>
> (ii) the holders of claims asserted against Old GM that *were
> disputed* as of the Effective Date ("**Disputed Claims**") and *subsequently
> allowed* (collectively with claims that were allowed as of the Effective
> Date, "**Allowed Claims**"),
>
> (iii) the holders of potential general unsecured claims ("**JPMorgan
> Claims**") that might arise in connection with the GUC Trust's lien

---

[48]    *See In re Motors Liquidation Co.*, 447 B.R. 198 (Bankr. S.D.N.Y. 2011) (Gerber, J.) (the
"*Confirmation Decision*").

[49]    Equitable Mootness Stipulated Facts ¶ 18 (ECF No. 12826-4); *see also Morgenstein v. Motors
Liquidation Co. (In re Motors Liquidation Co.)*, 462 B.R. 494, 501 n. 36 (Bankr. S.D.N.Y. 2012)
(Gerber, J.) ("*Morgenstein*") ("[T]he Plan already has been substantially consummated."), *aff'd*
12-cv-01746-AJN, ECF No. 21 (S.D.N.Y. Aug. 9, 2012) (Nathan, J.).

avoidance action relating to a mistakenly released financing statement;[50]

and

(iv) the holders of units of beneficial interest (each, a "**GUC Trust**

**Unit**")[51] in the GUC Trust.

The GUC Trust Agreement also set forth provisions governing the GUC Trust's

ability to distribute the New GM Securities and their proceeds (collectively, the "**GUC**

**Trust Assets**"), which were intended to ensure that the Unitholders would receive, as

promptly as practicable, any GUC Trust Assets that were not necessary to fund the

Allowed Claims (or potential Allowed Claims); any additional JPMorgan Claims; or

projected liquidation and administrative costs of the GUC Trust (collectively, the "**GUC**

---

[50]    Before Old GM's Plan was confirmed, the Creditors' Committee brought an adversary proceeding seeking a determination that the principal lien securing a syndicated $1.5 billion term loan (the "**Term Loan**") that had been made to GM in November 2006 was terminated in October 2008, before the filing of GM's chapter 11 case—thereby making most of the $1.5 billion in indebtedness under the Term Loan unsecured. The defendants were the syndicate members who together made the Term Loan and JPMorgan Chase Bank, N.A. ("**JPMorgan**"), the agent under the facility. On cross-motions for summary judgment in that adversary proceeding, this Court ruled in favor of JPMorgan, but that decision, after an intermediate certification to the Delaware Supreme Court, was thereafter reversed by the Second Circuit and remanded to this Court. *See Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JP Morgan Chase Bank, N.A (In re Motors Liquidation Co.)*, 486 B.R. 596 (Bankr. S.D.N.Y. 2013) ("**GM-UCC-3 Opinion**"), *question certified for determination by Delaware Supreme Court*, 755 F.3d 78 (2d Cir. 2014), *question answered*, 103 A.3d 1010 (Del. 2014), *rev'd and remanded*, 777 F.3d 100 (2d Cir. 2015), *rehearing en banc denied*, No.13-2187 ECF No. 179 (2d Cir. Apr. 13, 2015).

When Old GM's Plan was confirmed, after that adversary proceeding was commenced, the Creditors' Committee's right to pursue that litigation devolved to another trust created under the Plan—the "Avoidance Action Trust." Depending on the outcome of further litigation in this Court, it is possible that a portion (and perhaps a major portion) of the Term Loan Debt would have to be paid to the Avoidance Action Trust and then result in additional unsecured claims against the GUC Trust. *See* 486 B.R. at 615 n.54 ("To the extent that the Committee might be successful in this adversary proceeding, the amount paid to JPMorgan and the Lenders would be subject to recapture, as provided in the final DIP Financing Order when the payoff of the Term Loan was authorized. In that event, after the return of the amount previously paid on what was thought to be a duly secured claim, the Lenders would still have a claim for the Term Loan debt, but would have only an unsecured claim, sharing *pari passu* with the many billions of dollars of other unsecured claims in GM's chapter 11 case.").

[51]    The GUC Trust Units are freely tradable. As reported by Bloomberg Finance, as of October 21, 2014, approximately 100 million GUC Trust Units had been bought and sold since June 14, 2012, and the aggregate value of those GUC Trust Units (based on daily closing prices) totaled approximately $2.1 billion.

**Trust Liabilities**"), and that the GUC Trust would retain sufficient assets to fund those liabilities.

By January 2012, more than two years after the original Bar Date, many claims continued to be filed against Old GM. On January 1, 2012 (nearly a year after the Effective Date), the GUC Trust filed a motion (the "**Late Filed Claims Motion**") seeking an order disallowing late filed claims.[52] Under the requested order, any future late filed claims would be disallowed unless, among other things, the claimant filed a motion with the Court seeking permission to file a late proof of claim.

The Court granted the GUC Trust's Late Filed Claims Motion, and in February 2012, entered its order (the "**Late Filed Claims Order**") implementing that ruling.

The Late Filed Claims Order explicitly stated that "nothing in [the Late Filed Claims Order] shall prevent any claimant submitting a Late Claim from filing a motion with the Court seeking to have its Late Claim deemed timely filed."[53] Likewise, none of the Plan, Confirmation Order, and GUC Trust Agreement prohibited late filed claims. In two known instances, late filed claims have been allowed in the Old GM bankruptcy case both before and after the Effective Date. Under the Plan, a late filed proof of claim may be subsequently adjudicated as an Allowed General Unsecured Claim.

In April and May 2011, initial distributions—consisting of 75% of the New GM Securities, along with nearly 30 million GUC Trust Units—were made to those who had Allowed Claims as of the Effective Date. The only New GM Securities that were not distributed were those that could be necessary to fund GUC Trust Liabilities[54]—

---

[52]     ECF No. 11351.

[53]     Late Filed Claims Order at 2 (ECF No. 11394).

[54]     Equitable Mootness Stipulated Facts ¶ 35 (ECF No. 12826-4).

principally claims that as of that time had been neither allowed or disallowed, and administrative costs.

Between May 2011 and the end of September 2014, the GUC Trust made distributions on formerly Disputed Claims that had thereafter been resolved. Similarly, in July and October 2011, and December 2013, the GUC Trust made additional distributions of New GM Securities—to the end that by September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities and nearly 32 million GUC Trust Units.

On October 24, 2014, the GUC Trust Administrator disclosed that it was planning on making still another distribution, scheduled for November 12, 2014. Shortly thereafter, certain Plaintiffs' counsel wrote the GUC Trust's counsel advising that Plaintiffs were "known potential contingent beneficiaries of the GUC Trust and the GUC Trust should not make any further distributions unless and until it demonstrates that adequate reserves ha[d] been established with respect to Plaintiffs' potential claims against Old GM and/or the GUC Trust that could be in the multiple billions of dollars."[55] The next day, counsel for the GUC Trust Administrator replied that it would *not* establish reserves for the Plaintiffs' claims, and that it was going forward with the planned November 2014 GUC Trust Distribution. Plaintiffs chose, for admitted strategic reasons,[56] not to seek a stay of the GUC Trust's distributions.

The GUC Trust Administrator then made that distribution, without establishing any reserves for the Plaintiffs' claims.

---

[55]    *See* ECF No. 13029, Exhibit A, at 3.

[56]    *See* Day 1 Arg. Tr. at 112:13-16 ("yes, there was a strategic element to the decision that was taken on our side").

As of December 16, 2014, the GUC Trust had total assets of approximately

$773.7 million, comprised principally of New GM Securities, though with approximately

$64 million in commercial paper, demand notes, and cash equivalents.[57]

The GUC Trust Assets stand to be augmented upon allowance of any Plaintiffs'

claims against Old GM and/or the GUC Trust through an "accordion feature"[58] in the

Sale Agreement and any order by the Court requiring New GM to contribute more money

or New GM Common Stock to the GUC Trust.[59]

### 10. Knowledge of the Ignition Switch Defect

In February and March of 2014, New GM informed the Safety Administration of

the Ignition Switch Defect, and that a recall would be conducted to address it. New GM

does not contend, and there is no evidence in the record from which the Court now could

find, that any Plaintiff knew of the Ignition Switch Defect before New GM's

announcement in the Spring of 2014. But more than a few at Old GM knew of it as of

the time of Old GM's chapter 11 filing. The parties stipulated that at least 24 Old GM

personnel (all of whom were transferred to New GM), including engineers, senior

managers, and attorneys, were informed or otherwise aware of the Ignition Switch Defect

prior to the Sale Motion, as early as 2003.[60]

---

[57]     See GUC Trust Q3 2014 Form 10-Q at 1, 12.

[58]     Under the Sale Agreement, New GM agreed to provide additional consideration to Old GM if the
aggregate amount of Allowed General Unsecured Claims against Old GM exceeded $35 billion.
See Equitable Mootness Stipulated Facts ¶ 5. In such case, New GM is required to issue
additional shares of New GM Common Stock to the GUC Trust. Id.

[59]     See id. ¶ 32.

[60]     See Pl. Stipulated Facts ¶ 14 (ECF No. 12826-2).

-32-

New GM does not dispute that Old GM personnel knew enough as of the time of

Old GM's June 2009 bankruptcy filing for Old GM then to have been obligated, under

the Safety Act, to conduct a recall of the affected vehicles.[61]

*11. The Motion to Enforce*

Very nearly immediately after New GM's Spring 2014 announcement, a large

number of class actions—the earliest Ignition Switch Actions—were commenced against

New GM, asserting, among other things, successor liability.  In April 2014, New GM

filed the Motion to Enforce, contending that most of the claims in the Ignition Switch

Actions related to vehicles or parts manufactured and sold by Old GM, and that the Sale

Order's Free and Clear Provisions, and injunctions against successor liability, proscribed

such claims. In August 2014, New GM filed similar motions to enforce the Sale Order

against the Pre-Closing Accident Plaintiffs and the Non-Ignition Switch Plaintiffs, though

the latter is on hold pending the rulings here.

In June 2014, the Judicial Panel on Multidistrict Litigation established MDL 2543

and designated the United States District Court for the Southern District of New York as

the MDL court, assigning Judge Furman to oversee coordinated proceedings for the

actions assigned to the MDL.  New GM has stated in its Reply that "[t]here are over 140

class action lawsuits currently pending against [it], with more being filed."[62]  The Court

understands the great bulk of these to involve economic loss claims.

At an August 11, 2014 case management conference in MDL 2543, it was

determined that certain plaintiffs' counsel who had been designated to take the lead in

MDL 2543 ("**Lead Counsel**") would file a consolidated master complaint for all

---

[61]    *See id.*; *see also* Pl. Br. at 47; Day 1 Arg. Tr. at 91:1-18; Day 2 Arg. Tr. at 7:11-19, 13:5-10.

[62]    New GM Reply at 45.

economic loss actions. This Court then adjusted the briefing and argument of the issues here to take into consideration any claims added or dropped in MDL 2543. In October 2014, Lead Counsel filed two Consolidated Complaints, each seeking class action treatment. The first—referred to by many as the "Pre-Sale Consolidated Complaint"—seeks damages from New GM on behalf of class members who purchased vehicles with an Ignition Switch Defect (which necessarily would have been manufactured by Old GM) *before* the closing of the 363 Sale.[63]

The second—referred to by some as the "Post-Sale Consolidated Complaint"—seeks relief on behalf of class members who had purchased vehicles *after* the closing of the 363 Sale.[64]

### 12. The Threshold Issues

After this Court held conferences with the parties to establish means to most efficiently litigate the issues here, the parties identified, at the Court's request, four threshold issues for judicial determination. They were:

> Whether Plaintiffs' procedural due process rights were violated in connection with the Sale Motion and the Sale Order and Injunction, or alternatively, whether Plaintiffs' procedural due process rights would be violated if the Sale Order and Injunction is enforced against them (the "**Due Process Threshold Issue**");
>
> If procedural due process was violated as described in (a) above, whether a remedy can or should be fashioned as a result of such violation and, if so, against whom (the "**Remedies Threshold Issue**");

---

[63]    These would all be barred under the Sale Order, to the extent it is enforceable.

[64]    Some of these would be barred under the Sale Order and some would not, depending on whether the vehicle acquired after the 363 Sale had been previously manufactured by Old GM, or had Old GM parts.

-34-

> Whether any or all of the claims asserted in the Ignition Switch Actions are claims against the Old GM bankruptcy estate (and/or the GUC Trust) (the **"Old GM Claim Threshold Issue"**);[65] and

> If any or all of the claims asserted in the Ignition Switch Actions are or could be claims against the Old GM bankruptcy estate (and/or the GUC Trust), should such claims or the actions asserting such claims nevertheless be disallowed/dismissed on grounds of equitable mootness (the **"Equitable Mootness Threshold Issue"**).[66]

The Court also asked for briefing on the legal standards that would apply to any claims asserting Fraud on the Court, and announced that it would rule on those as well.[67]

The Court addresses those issues, in some instances breaking them down further and restating them slightly to conform to a more appropriate framework, in the discussion to follow.

Discussion

I.

Due Process

The Due Process Threshold Issue requires the Court to decide, with respect to the Sale Order, whether

> (1) as New GM contends and the Plaintiffs dispute, insufficient
>
> notice of the 363 Sale hearing could not result in a deprivation of due
>
> process (principally because any successor liability claims would belong

---

[65]    They agreed, however, that the issue of whether a claim asserted in the Ignition Switch Actions would be timely and/or meritorious against the Old GM bankruptcy estate (and/or the GUC Trust) is not a Threshold Issue.

[66]    *See* Supplemental Scheduling Order, dated Jul. 11, 2014, ECF No. 12770. Though the Threshold Issues were first identified before the Consolidated Complaints were filed, nobody has suggested that what has been pleaded in the Consolidated Complaint requires any change in the Threshold Issues.

[67]    *Id.*

to the Old GM estate, and not to the Plaintiffs, and because the Plaintiffs'

rights would attach to the sale proceeds), as there would not be the

requisite potential deprivation of property;

> (2) as the Plaintiffs contend and New GM disputes, the Plaintiffs

failed to get the notice due process requires (and related to that, whether

the Plaintiffs had "known claims" as that expression is used in the due

process jurisprudence); and

> (3) as New GM contends and the Plaintiffs dispute, prejudice is an

essential element of any claim for a denial of due process, and the

Plaintiffs failed to show the requisite prejudice here, with respect to all or

some of their claims.

After the Court does so, it then must decide the extent to which the Sale Order

remains subject to attack, and any areas as to which the Plaintiffs, or some of them, may

potentially qualify for a remedy. The Court also believes that it should address these

same issues with respect to the allowance of Plaintiff claims against Old GM, from which

their successor liability contentions emanate, and which cannot appropriately be divorced

from any due process analysis. Discussion of these matters follows.

<u>A.</u>

<u>Underlying Principles</u>

*1. Mullane*

All parties, appropriately, begin with the Supreme Court's decision in *Mullane*—

which Plaintiffs describe as "the seminal Supreme Court case establishing due process

requirements for creditors in a bankruptcy proceeding."[68] They are right to start with *Mullane*; it is the seminal Supreme Court opinion clarifying what due process requires in litigation. But it was not a bankruptcy case.[69] In *Mullane,* the Supreme Court held that a statute authorizing notice by publication of a proposed judicial settlement of a "common trust," holding the assets of 113 smaller trusts, failed to satisfy due process requirements for the trust's known beneficiaries.[70] The common trust had "many" beneficiaries.[71] But

---

[68]    Pl. Br. at 27.

[69]    Nevertheless, considerable authority, by the Second Circuit and other circuit courts, holds, not surprisingly, that due process requirements apply in bankruptcy cases, just as they do in plenary litigation. *See, e.g., DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 150 (2d Cir. 2014) (Newman, Pooler, and Livingston, JJ) ("*DPWN*") ("[A] claim cannot be discharged if the claimant is denied due process because of lack of adequate notice."); *In re Johns–Manville Corp.*, 600 F.3d 135, 153–54 (2d Cir. 2010) (*per curiam*) ("*Manville-2010*,"sometimes also referred to as *"Manville IV"*) (Calabrese and Wesley, JJ) (ruling that due process was denied in dispute over whether an earlier bankruptcy court order in a chapter 11 case properly enjoined not only claims directed at Travelers insurance policies in the *res* of the Manville estate, but also non-derivative claims by Chubb that sought to impose liability on Travelers separately); *Koepp v. Holland*, 593 Fed. Appx. 20 (2d Cir. 2014) (Summary Order, Katzmann, CJ, and Hall and Livingston, JJ) ("*Koepp*") (ruling that due process was denied in dispute over easements on land previously owned by a debtor reorganized under § 77 of the now-superseded Bankruptcy Act); *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 n.1 (3d Cir. 1995) ("*Chemetron*") ("Although *Mullane* involved the notice due beneficiaries on judicial settlement of accounts by the trustee of a common trust fund, subsequent courts have interpreted the case to set the standard for notice required under the Due Process Clause in Chapter 11 bar date cases."); *In re Edwards*, 962 F.2d 641 (7th Cir. 1992) ("*Edwards*") (considering due process contentions by a secured creditor whose interest was extinguished in a free and clear section 363 sale without notice, though ultimately ruling in favor of a bona fide purchaser).

[70]    *See Mullane*, 339 U.S. at 320 ("We hold the notice of judicial settlement of accounts required by the New York Banking Law § 100-c(12) is incompatible with the requirements of the Fourteenth Amendment as a basis for adjudication depriving known persons whose whereabouts are also known of substantial property rights.").

[71]    *Id.* at 309. But the Plaintiffs exaggerate, however, when they assert that the *Mullane* court ruled as it did notwithstanding the "very large" number of beneficiaries involved. Pl. Br. at 27. Actually, the *Mullane* court said that "the record [did] not show the number or residence of the beneficiaries," 339 U.S. at 309, though it also said that there were 113 contributing trusts, with aggregate assets of about $3 million. *Id.* A $3 million trust corpus was a bigger number in 1950 than it is now, but the likely number of individuals having interests in the 113 contributing trusts whose collective assets led to that $3 million corpus would at least seemingly be many orders of magnitude smaller than the huge number of vehicle owners here—of 27 million cars with Ignition Switch Defects and of 70 million on the road. That and the fact later mentioned by the *Mullane* court that mailed notices had been sent to ascertainable beneficiaries in the past, which was "persuasive" as to the Trust Company's ability to mail notice there, *see* 339 U.S. at 319, suggests that the number to be given mailed notice there, while relatively large, was much less than huge, most likely in the thousands (and perhaps low thousands), rather than tens of millions.

despite that (and even though the statute authorized service by publication), the Court

found that because the trustee, Central Hanover Bank & Trust Company (the "**Trust**

**Company**"), seeking the judicial settlement of the trust for which it was responsible,

could with due diligence ascertain their names and addresses, they were entitled to mailed

notice of the settlement.

In reaching that result, the *Mullane* court started with the recognition that while

"[a] construction of the Due Process Clause which would place impossible or impractical

obstacles in the way could not be justified," the Court would have to "balance" against

that interest an individual's right to be heard.[72]  It continued by observing that while it

"ha[d] not committed itself to any formula" in achieving that balance, "a few general

principles stand out in the books."[73]  One was that:

> An elementary and fundamental requirement of due
> process in any proceeding which is to be accorded
> finality is notice reasonably calculated, under all the
> circumstances, to apprise interested parties of the
> pendency of the action and afford them an
> opportunity to present their objections.[74]

Others were that "[t]he notice must be of such nature as reasonably to convey the

required information . . . and it must afford a reasonable time for those interested to make

their appearance."[75]

The *Mullane* court qualified its statement of those general requirements, however,

by including an element of practicality:

> But if with due regard for the practicalities and
> peculiarities of the case these conditions are

---

[72]   *Id.* at 313-14.

[73]   *Id.* at 314.

[74]   *Id.*

[75]   *Id.*

> reasonably met the constitutional requirements are satisfied. The criterion is not the possibility of conceivable injury, but the just and reasonable character of the requirements, having reference to the subject with which the statute deals.[76]

And once again recognizing the need for practicality, it stated that

> [t]he reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected, or, *where conditions do not reasonably permit such notice*, that the form chosen is not substantially less likely to bring home notice than other of the *feasible* and customary substitutes.[77]

The *Mullane* court expressly endorsed the use of publication when it would not be practical to provide better notice:

> This Court has not hesitated to approve of resort to publication as a customary substitute in another class of cases where it is not reasonably possible or practicable to give more adequate warning. Thus it has been recognized that, in the case of persons missing or unknown, employment of an indirect and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights.

> Those beneficiaries represented by appellant whose interests or whereabouts could not with due diligence be ascertained come clearly within this category. As to them the statutory notice [*i.e.*, notice by publication] is sufficient. However great the odds that publication will never reach the eyes of such unknown parties, it is not in the typical case much more likely to fail than any of the choices open to legislators endeavoring to prescribe the best notice practicable.[78]

---

[76] *Id.* at 314-15 (internal quotation marks deleted).

[77] *Id.* at 315 (emphasis added) (citations omitted).

[78] *Id.* at 317 (citations omitted).

-39-

In a later post-*Mullane* decision,[79] the Supreme Court reiterated this.

> In the years since *Mullane* the Court has adhered to
> these principles, balancing the "interest of the State"
> and "the individual interest sought to be protected
> by the Fourteenth Amendment." The focus is on
> the reasonableness of the balance, and, as *Mullane*
> itself made clear, whether a particular method of
> notice is reasonable depends on the particular
> circumstances.[80]

Thus it is hardly surprising that the Supreme Court has also stated, albeit in a

different context (there, deciding the extent of the hearing required before a revocation of

a former inmate's parole), that "[i]t has been said so often by this Court and others as not

to require citation of authority that due process is flexible and calls for such procedural

protections as the particular situation demands."[81]

Finally, the *Mullane* court made one other point—one which is frequently

overlooked—of considerable relevance here. It recognized that notice to *others* with an

interest in objecting could ameliorate prejudice (and impliedly, if not expressly, even the

existence of constitutionally deficient notice in the first place) to those who did not get

notice. It observed:

> This type of trust presupposes a large number of
> small interests. *The individual interest does not
> stand alone but is identical with that of a class.* The
> rights of each in the integrity of the fund and the
> fidelity of the trustee are shared by many other
> beneficiaries. *Therefore notice reasonably certain
> to reach most of those interested in objecting is
> likely to safeguard the interests of all, since any
> objections sustained would inure to the benefit of
> all.* We think that under such circumstances
> reasonable risks that notice might not actually reach

---

[79]    *Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478 (1988) ("*Tulsa Collection Services*").

[80]    *Id.* at 484.

[81]    *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("*Morrissey*").

every beneficiary are justifiable. 'Now and then an
extraordinary case may turn up, but constitutional
law, like other mortal contrivances, has to take
some chances, and in the great majority of
instances, no doubt, justice will be done.'[82]

### 2. *Second Circuit Guidance*

The Second Circuit has given the lower courts in this Circuit more specific

guidance, in several key cases. In its 1989 decision in *Weigner v. City of New York,*[83] the

Circuit held that "[t]he proper inquiry [on a due process contention] is whether the

[noticing party] *acted reasonably in selecting means likely to inform persons affected*, not

whether each property owner actually received notice."[84]

Then, in its 1993 decision in *Drexel Burnham*, first mentioned above,[85] the

Circuit put forward its understanding of *Mullane's* principles by stating that "no person

may be deprived of life, liberty or property by an adjudicatory process without first being

afforded notice and a full opportunity to appear and be heard, *appropriate to the nature of

a given case.*"[86]

There, the "given case," a proceeding in the *Drexel Burnham* chapter 11 case,

involved the approval of a settlement under which, among other things, Drexel Burnham

and a sub-class of its securities claimants pooled their recoveries from lawsuits Drexel

Burnham had brought against its former officers and directors, and the settling parties

granted a release to former officer Michael Milken. As here, the *Drexel Burnham*

objectors were apparently troubled that the settlement would impair their recoveries

---

[82]    *Mullane,* 339 U.S. at 319 (emphasis added).

[83]    852 F.2d 646 (2d Cir. 1988) ("*Weigner*"), *cert. denied,* 488 U.S. 1005 (1989).

[84]    *Id.* at 649 (emphasis added).

[85]    *See* n.10 *supra.*

[86]    995 F.2d at 1144 (emphasis added).

-41-

against parties other than the debtor itself. The objectors raised both due process and

substantive objections to the settlement—contending, in the due process prong of their

objection, that the notice of the proposed settlement that had been mailed to 7,700 Drexel

bankruptcy claimants was insufficiently descriptive of the proposed settlement.

In that context, as part of its due process analysis, the Circuit observed in *Drexel*

*Burnham* that "[n]o rigid constitutionally mandated standard governs the contents of

notice in a case like the one before us. Rather, the Due Process Clause requires *the best*

*notice practical under the circumstances*."[87] And once again citing *Mullane*, the Circuit

continued that "the Supreme Court has warned against interpreting this notice

requirement so inflexibly as to make it an 'impractical or impossible obstacle[].'"[88]

Similarly, in its 2014 decision in *DPWN*,[89] the Second Circuit reiterated that

"whether notice comports with due process requirements turns on the *reasonableness* of

the notice, a *flexible* standard that often turns on what the debtor or the claimant knew

about the claim or, with reasonable diligence, should have known."[90]

Like *Weigner* before it (where the notice had also been mailed), *Drexel Burnham*

was a *quality* of notice case, rather than a *means* of notice case.[91] Nevertheless, its

---

[87]  *Drexel Burnham*, 995 F.2d at 1144 (citing *Mullane*) (emphasis added).

[88]  *Id.* (once again citing *Mullane*). With a *cf.*, the Circuit also cited, and quoted, a considerably older
Supreme Court decision, *Grannis v. Ordean*, 234 U.S. 385, 395 (1914), quoting the earlier
opinion's observation that the Due Process Clause "does not impose an unattainable standard of
accuracy."

[89]  747 F.3d 145.

[90]  *Id.* at 150 (citing *Mullane* and *Chemetron*) (emphasis added).

[91]  It considered whether the duly mailed notice was still insufficient, because it didn't tell creditors
enough. In that respect, *Drexel Burnham* considered a contention like the Pre-Closing Accident
Plaintiffs' assertions here that "Old GM did not disclose the existence of the Ignition Switch
defect in the Sale Motion or in the Sale Notice mailed to Pre-Closing Accident Plaintiffs that had
already sued Old GM" (Pre-Closing Accident Pl. Br. at 9) and "[t]he notice that Old GM provided
with respect to the 363 Sale was constitutionally deficient ... regardless of whether the notice was
mailed directly to the Plaintiff or published in the newspaper." (*Id.* at 26; accord *id.* at 29).

-42-

direction that notice must be "*appropriate to the nature of a given case*"[92] was not

limited to cases of the first type. And *Mullane*, the opinion on which the *Drexel*

*Burnham* court relied, was a case of the second type. For each of those reasons, along

with common sense, the Court reads the Circuit's *Drexel Burnham* directions that "the

Due Process Clause requires the best notice practical under the circumstances,"[93] and that

the notice requirement should not be interpreted "so inflexibly as to make it an

'impractical or impossible obstacle'"[94]—each of which was derived by citing *Mullane*—

as applicable to cases involving either the *means* or the *quality* of any notice whose

adequacy is questioned.

Then, though it involves a materially different factual situation, the Circuit's

decision in *DPWN* is nevertheless significant in several respects. *DPWN* was an antitrust

case, but with a bankruptcy discharge defense. The plaintiff there, the well-known

courier DHL, which used United Airlines for cargo delivery services, sued United under

the Sherman Act, alleging price-fixing. United had been reorganized in a chapter 11 case

in Chicago, at the conclusion of which it received a discharge of its debts, and moved to

dismiss the antitrust action under Rule 12(b)(6), relying on its earlier discharge.[95]

DHL (which had earlier received mailed notice in the bankruptcy of the

opportunity to file claims, but without particularized mention of United's susceptibility to

antitrust claims) had anticipated the discharge defense, and proactively pleaded a

potential basis for avoiding it—that it lacked sufficient notice of the availability of its

---

[92]    995 F.2d at 1144.

[93]    *Id.*

[94]    *Id.*

[95]    *See* 747 F.3d at 147.

antitrust claim to satisfy due process requirements for rendering that claim discharged.

The District Court, taking that allegation as true, declined to dismiss at that state of the

proceedings. But the Circuit remanded, considering the allegation to be too conclusory to

pass *Iqbal*[96] scrutiny, and directed the District Court to conduct further inquiry as to

whether it was supportable. More specifically, the Circuit remanded for District Court

inquiry as to *DHL's* knowledge of its potential antitrust claim during United's chapter 11

case, and *United's* knowledge with respect to a DHL claim.[97]

   *DPWN* also suggests two other concerns that turn out not to be determinative in

this case, but that may well be important in others. First, it suggests (if it does not also

require) a two-step methodology that should be used, to the extent applicable, in

examining contentions that the notice that due process requires was denied. The first step

calls for inquiry as to whether the *claimant* knew of the claim it might assert.[98] The

second step calls for the lower court to determine whether the claim was, from the

perspective of the *notice-giver* (often a debtor in a bankruptcy case), a "known" claim,

obligating the notice-giver to provide actual, and possibly more detailed, notice.[99]

   The second is a hint that in some cases, it may be the *quality*—as contrasted to the

*means*—of notice that matters. That might suggest that even if the means of notice were

entirely satisfactory (as it obviously was when DHL received *mailed* notice of the

bankruptcy and of the deadline to file claims), notice lacking the requisite quality might

---

[96]     *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

[97]     *See* 747 F.3d at 153.

[98]     This Court said "to the extent applicable," however, because here New GM does not contend that any of the Plaintiffs knew of the Ignition Switch Defect, or had the means to ascertain it. Thus all parties here, and the Court, go straight to the second step.

[99]     That "known claim" second step, of course, is one of the most important elements of this Court's inquiry here.

nevertheless warrant relief. And this suggests that *notice of the bankruptcy* is not enough, or even the *deadline for the filing of claims*—and that assuming that the debtor has knowledge of the existence of the claim (which debtors will typically have in the case of contractual obligations but typically won't have with respect to non-contractual ones), something more detailed in the way of notice might have to be provided.[100]

### 3. *Guidance from Lower Courts*

Courts below the Circuit level likewise have been sensitive to the need for practicality and flexibility in due process analysis. In *Affirmance Opinion #2*, referred to by several parties in their briefs as "*Parker*," on one of the appeals from the *Sale Decision*, Judge Sweet considered a number of objections by appellant Oliver Parker, a bondholder, claiming that the 363 Sale violated his due process rights. Before rejecting Parker's contentions, Judge Sweet synthesized the underlying law, making reference to *Mullane* and *Morrissey* in the Supreme Court, and *Drexel Burnham* in the Circuit:

> The U.S. Supreme Court has repeatedly emphasized the flexibility of the due process requirement, which simply "calls for such procedural protections as the particular situation demands." An "elementary and fundamental requirement of due process . . . is notice reasonably calculated, under all the

---

[100]    Importantly, however, the *DPWN* court did not do away with the "known" claim requirement. And that is understandable. Unless the debtor knew of the claim or could reasonably ascertain its existence (a task that is particularly challenging for noncontractual obligations), the debtor could not provide sufficiently detailed notice, and the bankruptcy system could not operate. Debtors (with resulting prejudice to their genuinely known creditors) would be subject to extraordinary expense and uncertainty in trying to think up, and explain in sufficient detail, claims that potential creditors might assert. They would be uncertain whether all of their claims could actually be discharged. And the process would be particularly fraught with peril under the rushed circumstances that typify section 363 sales. Though the *DPWN* court did not lay it down as a legal principle, it made another very important observation as to claims that are known and those that are not. It observed that "a debtor will normally be less likely to be charged with knowledge that it has violated the law than that it owes money unrelated to a law violation." 747 F.3d at 151. That is equally true with respect to many types of tort liabilities, especially product liability claims. Both violations of law and tort liabilities present challenges in knowing of the existence of the claim that are quite different from those in knowing of contractual obligations or transactions (such as the granting of liens or easements) involving earlier grants of property interests.

> circumstances, to apprise interested parties of the
> pendency of the action and afford them an
> opportunity to present their objections." In short,
> the constitutional requirements of due process are
> satisfied if notice is given with "due regard for the
> practicalities and peculiarities of the case."[101]

Thus New GM is right when, quoting *Mullane* and *Affirmance Opinion #2*, it

argues that "[d]ue process is a flexible standard." In fact, New GM's point that due

process is "flexible" comes verbatim from the Supreme Court's opinion in *Morrissey*,[102]

and also appears in so many words in *DPWN*.[103] But as *Morrissey* also at least implies,

the caselaw does not support a wholly standardless flexibility.[104] Other authority—

especially authority addressing the "known"-"unknown" claim distinction discussed in

the subsection that follows—rather suggests a standard requiring a fairly thoughtful, and

sometimes nuanced, consideration of the circumstances, to ascertain whether any failure

to provide better notice (either more direct or more detailed) can appropriately be

excused.

### 4. *The "Known"-"Unknown" Creditor Distinction*

Apart from focusing on the practicality of requiring notice by one means or

another, and of one argued level of detail or another, a court also has to focus on whether

providing notice to one particular person or entity, or group of such, is required in the

first place. As an abstract matter, that latter issue turns on whether those to be noticed

---

[101]    *Affirmance Opinion #2*, 430 B.R. at 97 (citations omitted).

[102]    *See* 408 U.S. at 481 ("It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands.").

[103]    *See* 747 F.3d at 150.

[104]    *See* 408 U.S. at 481 ("To say that the concept of due process is flexible does not mean that judges are at large to apply it to any and all relationships. Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure.").

(which in bankruptcy most commonly are creditors and those with ownership or security interests in estate property) are "known," on the one hand, or "unknown," on the other.[105] Stating the distinction is easy; applying it is much more difficult.

In many cases, whether the notice recipient would want the right to file a claim or to be heard—and hence is "known"—is obvious. In others, as here, it is much less so. Caselaw, at the Supreme Court and, especially, in the lower courts, has provided some guidance in this area. But it has been less than totally helpful.

*Mullane,* which was decided 65 years ago, did not yet make a "known"-"unknown" distinction, nor did it yet use the expression "reasonably ascertainable," which later became the standard, as discussed below. But *Mullane* did say—apart from saying that actual notice wasn't required for those whose interests were "conjectural"[106]—that actual notice was not required for those who, "although they could be discovered upon investigation, do not in due course of business come to knowledge of the common trustee."[107] That is plainly a rejection of a duty of investigation. But it is

---

[105] *See, e.g., Chemetron,* 72 F.3d at 347 ("As characterized by the Supreme Court, a 'known' creditor is one whose identity is either known or 'reasonably ascertainable by the debtor.' An 'unknown' creditor is one whose 'interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor].'") (citations omitted); *In re Drexel Burnham Lambert Grp.,* 151 B.R. 674, 680 (Bankr. S.D.N.Y. 1993) (Conrad, J) (*"Drexel Burnham-Bankruptcy"*) ("For purposes of determining constitutionally acceptable notice of an impending bar date, bankruptcy law divides creditors into two groups: known and unknown. According to well-established case law, due process requires that a debtor's known creditors be afforded actual notice of the bar date . . . For obvious reasons, debtors need not provide actual notice to unknown creditors. It is widely held that unknown creditors are entitled to no more than constructive notice (i.e., notice by publication) of the bar date.") (citations omitted).

[106] 339 U.S. at 317. "Conjectural" has since been joined by "conceivable" and "speculative." *See In re Thomson McKinnon Sec., Inc.,* 130 B.R. 717, 720 (Bankr. S.D.N.Y. 1991) (Schwartzberg, J.) (*"Thomson McKinnon"*); *In re XO Commc'ns, Inc.,* 301 B.R. 782, 793 (Bankr. S.D.N.Y. 2003) (Gonzalez, C.J.) ("XO Communications") (quoting *Thomson McKinnon*). With each of those three words, the idea is the same; many claims are *possible,* but to be known they must be much more than that.

[107] 339 U.S. at 317.

less helpful when the notice-giver has considerable knowledge, but lacks knowledge of every detail.

The standard was clarified somewhat thereafter. In its 1983 decision in *Mennonite Board*, a post-*Mullane* opinion (though once again in a non-bankruptcy context), the Supreme Court held that notice by mail or by other means "as certain to ensure actual notice" was required if the name and address of the entity to be notified was *"reasonably ascertainable."*[108] But the *Mennonite Board* court did not flesh out the standards in determining what the "reasonably ascertainable" standard required—concluding only that when the name of the mortgagee and its county in Ohio were shown on the underlying mortgage, but the mortgagee's full mailing address was not,[109] the "reasonably ascertainable" requirement was satisfied, and actual notice was required.[110]

Likewise, in *Tulsa Collection Services*,[111] another nonbankruptcy post-*Mullane* decision about five years after *Mennonite Board*, the Supreme Court repeated that if a claimant's identity was "known or reasonably ascertainable," actual notice was required.[112] But once again, the Court did not flesh out the standards for "reasonably

---

[108]   462 U.S. at 800. In a dissent in which Justices Powell and Rehnquist joined, Justice O'Connor argued for a more flexible standard (and hence a greater willingness to accept notice by publication), considering it a departure from the "balancing required by *Mullane*." *Id.* at 806. But this view secured only three votes.

[109]   *See id.* at 798 n.4; *id.* at 805 (dissent).

[110]   Without stating in so many words that it would embody the standard, the *Mennonite Board* court said in a footnote that "[w]e assume that the mortgagee's address could have been ascertained by reasonably diligent efforts." 462 U.S. at 798 n.4. But it did not say whether, in determining whether a claimant's interest or address was "reasonably ascertainable," how much in the way of "diligent efforts" was required, or what would happen if efforts were insufficiently diligent.

[111]   *See* n.79 *supra*.

[112]   485 U.S. at 490. Conversely, the Court made clear that actual notice need not be provided to claimants who are *not* actually known or "reasonably ascertainable." In fact, speaking of the other extreme, it stated:

>     Nor is everyone who may conceivably have a claim properly
>     considered a creditor entitled to actual notice. Here, as in

ascertainable," and on the record there presented, simply remanded for a factual determination as to that issue.[113]

However lower courts have addressed the applicable standards more extensively than the Supreme Court did. In its 1995 decision in *Chemetron*, the Third Circuit provided more guidance, focusing in particular on the opposite extreme. After reading the language in the *Mennonite Board* footnote quoted above to say that a creditor's identity is "reasonably ascertainable" if that creditor can be identified through "reasonably diligent efforts," the *Chemetron* court went on to say that "[r]easonable diligence does not require 'impracticable and extended searches . . . in the name of due process.'"[114] And it stated further that:

> The requisite search instead focuses on the debtor's own books and records. Efforts beyond a careful examination of these documents are generally not required. Only those claimants who are identifiable through a diligent search are "reasonably ascertainable" and hence "known" creditors.[115]

Importantly, the *Chemetron* court declined to apply a "reasonably foreseeable" standard that had appeared in dictum in an earlier case in this District[116]—finding

---

*Mullane*, it is reasonable to dispense with actual notice to those with mere "conjectural" claims. *Id.*

[113]    *Id.* at 491 ("Appellee of course was aware that her husband endured a long stay at St. John Medical Center, but it is not clear that this awareness translates into a knowledge of appellant's claim. We therefore must remand the case for further proceedings to determine whether 'reasonably diligent efforts,' would have identified appellant and uncovered its claim.") (citation omitted).

[114]    72 F.3d at 346.

[115]    *Id.* at 347. The *Chemetron* court emphasized, however, that while some courts had held, regardless of the circumstances, that the "reasonably ascertainable" standard would require only an examination of the debtor's books and records, without an analysis of the specific facts of each case, it did not construe the standard that narrowly. It pointed out that situations could arise when creditors are "reasonably ascertainable" although not identifiable through the debtor's books and records. *Id.* at n.2.

[116]    *See In re Brooks Fashion Stores, Inc.*, 124 B.R. 436 (Bankr. S.D.N.Y. 1991) (Blackshear, J.) ("***Brooks Fashion Stores***")

-49-

insufficient a contention that "Chemetron knew or should have known that it was

reasonably foreseeable" that it could suffer claims from individuals living near the

debtor's waste dump.[117]  The *Chemetron* court explained:

> In the instant case, the bankruptcy court failed to
> apply the "reasonably ascertainable" standard.  It
> instead crafted a "reasonably foreseeable" test from
> dictum in *In re Brooks Fashion Stores, Inc.*,
> 124 B.R. 436 (Bankr. S.D.N.Y. 1991).  In applying
> this test, the bankruptcy court found that
> "Chemetron knew or should have known that it was
> reasonably foreseeable that it could suffer claims
> from individuals living near the Bert Avenue
> Dump...."  It therefore found that claimants were
> known creditors.
>
> We hold that in substituting a broad "reasonably
> foreseeable" test for the "reasonably ascertainable"
> standard, the bankruptcy court applied an incorrect
> rule of law.  This constitutes clear error.  The
> bankruptcy court's expansive test departed from
> established rules of law and produced a result in
> conflict with other decisions.  Even if we were
> writing on a blank slate, we would reject the
> bankruptcy court's expansive standard.  Put simply,
> such a test would place an impossible burden on
> debtors.[118]

To the contrary, the *Chemetron* court held that "[a] debtor does not have a 'duty

to search out each conceivable or possible creditor and urge that person or entity to make

a claim against it," and that what is required "is not a vast, open-ended investigation."[119]

Applying these standards, the Third Circuit rejected the contention that though the debtor

could reasonably *foresee* that parties present in the immediate vicinity of its toxic waste

---

[117]    72 F.3d at 347.

[118]    *Id.* (citations omitted).

[119]    *Id.* at 346.

dump would have toxic tort claims against it, their claims would thereby become

"known." As a result, it ruled, publication notice was sufficient.

Since then, *Chemetron*, rather than *Brooks Fashion Stores*, has been followed in

this District[120] and elsewhere.[121] In his 2003 decision in *XO Communications*, Chief

Judge Gonzalez cited *Brooks Fashion Stores* for a different proposition, but relied on

*Chemetron* for the latter's rejection of the "reasonably foreseeable" standard. And

fleshing out the standards further, Judge Gonzalez quoted another decision in the *Drexel*

*Burnham* chapter 11 case:

> Reasonable diligence in ferreting out known
> creditors will, of course, vary in different contexts
> and may depend on the nature of the property
> interest held by the debtor. Applying *Mullane's*
> "reasonable under the circumstances" standard, due
> process requires a reasonable search for contingent
> or unmatured claims so that ascertainable creditors
> can receive adequate notice of the bar date. What is
> reasonable depends on the particular facts of each
> case. A debtor need not be omnipotent or
> clairvoyant. A debtor is obligated, however, to

---

[120]    *See XO Communications*, 301 B.R. at 793 (citing *Chemetron* as "emphasizing that claimants must be reasonably ascertainable, not reasonably foreseeable").

[121]    *See Louisiana Dep't of Envtl. Quality v. Crystal Oil Co. (In re Crystal Oil Co.)*, 158 F.3d 291, 297 (5th Cir. 1998) ("***Crystal Oil***"). In *Crystal Oil*, the Fifth Circuit affirmed a bankruptcy court's order declining to allow an environmental agency's late filing of a claim, even though the environmental agency had received notice only by publication. Though the "evidence could go either way," see *id.* at 298, the bankruptcy court's determination that the environmental claim was not "reasonably ascertainable" was held not to be clearly erroneous. Though Crystal Oil had dealt with environmental agencies in the past, including this one, the Fifth Circuit held that there could be "no basis for concluding that a debtor is required to send notices to any government agency that possibly may have a claim against it." *Id.* at 297. And it further held that even though the Louisiana Department of Environmental Quality had a telephone call with an individual at Crystal Oil discussing the particular polluted site with which it later would assert a claim, and Crystal looked up its records and erroneously concluded that it had no relationship with the property (because the records that would confirm ownership were "ancient ones in long-term storage"), the environmental agency was not a "reasonably ascertainable," and hence "known," creditor. *See id.* at 297-98. In articulating the standard, the Fifth Circuit stated that "[a]s we read these cases, in order for a claim to be reasonably ascertainable, the debtor must have in his possession, at the very least, some specific information that reasonably suggests both the claim for which the debtor may be liable and the entity to whom he would be liable." *Id.* at 297.

undertake more than a cursory review of its records
and files to ascertain its known creditors.[122]

The takeaway from the cases discussing the general principles helping courts

decide what are "known" and "unknown" claims is that the debtor must make effective

use of the information already available, but the fact that additional claims may be

"foreseeable" does not make them "known." Then, in each case, the Court must

determine on which side of the line the facts before it fall.

B.

The Particular Issues Here

*1. Do Due Process Requirements Apply?*

New GM argues preliminarily that due process requirements did not apply to the

363 Sale at all, because this Court's earlier bar to successor liability did not result in a

deprivation of property.  The Court cannot agree.

New GM premises that argument on five separate contentions:

(1) that in most 363 sales (including this one), claims or interests

would attach to the sale proceeds, and thus that there is no extinguishment

of a property right;

(2) that there was no extinguishment of a property right, because

any successor liability claims really belonged to the Old GM estate;

(3) that section 363(f) of the Bankruptcy Code preempts—*i.e.,*

trumps—state laws imposing successor liability;

---

[122]    301 B.R. at 793-94 (*quoting Drexel Burnham-Bankruptcy*, 151 B.R at 681).

-52-

(4) that the Court already ruled that there was no continuity of

ownership between purchaser and seller, and thus no basis for successor

liability; and

(5) that there could be no successor liability anyway for Economic

Loss Plaintiffs, because, unlike accident victims, they would not get the

benefit of the "product line exception."

The Court finds these preliminary contentions unpersuasive.

New GM is right when it says that in bankruptcy sales—either from the start or by

agreement to resolve objections—creditors with *security interests or other liens* regularly

get substitute liens on sale proceeds when estate property subject to their liens is sold to a

third party, and that the bankruptcy community regularly regards that as a fair substitute.

But comparable protection often cannot be provided for claims or interests other than

liens. And here that comparable protection could not effectively be obtained.[123]  Neither

---

[123]    Thus Judge Posner, speaking for the Seventh Circuit in *Edwards, see* n.69 *supra*, was correct
when he observed that the failure to give a lien creditor notice of a section 363 sale resulted in no
more than a *de minimis* deprivation of property, since the value of the secured creditor's interest in
the property (*i.e.*, the value of its lien) was no more than the value of the property, and the sale
proceeds were the best measure of that. *See* 962 F.2d at 645 ("[secured creditor] Guernsey does
not suggest that the property was worth more than the $85,000 that the bankrupt estate received
for selling it—and if it was worth no more Guernsey suffered only a trivial loss of interest (the
interest on $7,000 during the period it was in the hands of the trustee) as a result of the failure to
notify it of the sale."). But as this Court explained in the *Sale Opinion, see* 407 B.R. at 501, "we
know that 'interest' includes more than just a lien." Because estate property can be sold free and
clear of many types of claims and interests apart from liens, it would at least generally be
inappropriate to apply *Edwards*-style analysis to claims and interests other than liens whose value
is capped at the value of the property sold (and hence the available sale proceeds).

For that reason, although the Court agrees with nearly all of the analysis in *In re Paris Indus.
Corp.*, 132 B.R. 504 (D. Me. 1991) (Hornby, J.) ("*Paris Industries*") (a non-lien case in which
plaintiffs were enjoined from asserting successor liability in a tort action against an estate's assets'
purchaser, and where the court concluded that "the liquidation of the assets and their replacement
with cash (which was then apparently distributed to a secured creditor) has not affected [the
plaintiffs'] ability to recover on their claim," *id.* at 510), the Court agrees with the portion it has
just quoted only in part. The *Paris Industries* plaintiffs might have recovered more from the
purchaser if their successor liability theory survived and prevailed. But this Court agrees with the
next observation made by the *Paris Industries* court, pointing to a different kind of lack of
prejudice—"[t]he irony of [the plaintiffs'] argument is that they would not even be able to make

-53-

back in 2009, nor in 2011 when Old GM's plan was confirmed, did anyone suggest that
Old GM's product liability creditors became secured creditors—the natural corollary of
New GM's position.  They were ordinary members of the unsecured creditor class,
sharing in the proceeds of the 363 Sale in accordance with the usual bankruptcy priorities
waterfall.[124]  That would not, of course, make a sale free and clear of successor liability
claims improper.  But it likewise does not make it true that the Economic Loss Plaintiffs
asserting successor liability claims would have "no property interest that was
extinguished," as argued by New GM,[125] and thus no interests at stake and no interest in
being heard.  Rather, the Economic Loss Plaintiffs would have the same interest in being
heard as the accident victims who likewise wanted to (and did) oppose successor liability.
The Court ultimately overruled the latter's objections on the merits, but there never was
any doubt that they had a right to be heard.

The Court also cannot agree with New GM's second contention in this regard—
that successor liability claims did not really belong to the Economic Loss Plaintiffs and
Pre-Closing Accident Plaintiffs who might wish to assert them, but were actually claims
owned by Old GM.  Though New GM offers caselaw support that at first blush supports
its position, New GM's contention sidesteps the basic fact that a prepetition right that the
Plaintiffs had to at least try to sue a successor was taken away from them, without giving
them a chance to be heard as to whether or not that was proper.

---

their claim against [the purchaser] were it not for the sale, for it is only by the sale of assets and
the doctrine of successor liability that they can even assert such a claim."  *Id.*  There, as here, the
plaintiffs would have received no more in a liquidation.

[124]    *See* Plan at §§ 1.79, 4.3 (ECF No. 9941-1).

[125]    *See* New GM Reply at 36.

-54-

New GM relies on three cases in support of its contention: *In re Keene Corp.*,[126]

*In re Emoral, Inc.*,[127] (which heavily relied on *Keene*), and *In re Alper Holdings USA*.[128]

Each of *Keene* and *Alper Holdings*, in this Court's view, was properly decided; *Emoral*, a

2-1 decision with a cogently articulated dissent by Judge Cowen, probably was not. But

whether or not all were properly decided, none supports the conclusion, which New GM

asks the Court to reach, that tort litigants' interest in pursuing successor liability was so

minimal that they didn't even have a right to be heard.

*Keene*, the first of the three, involved approximately 1,600 lawsuits by asbestos

plaintiffs who at least arguably had claims against the debtor Keene. But their rights to

recover against the debtor were impaired when Keene transferred over $200 million of its

assets to its then affiliates during the 1980s and then spun off the affiliates.[129] Not

surprisingly, the transfer and spin-off triggered fraudulent conveyance claims, initially

brought prepetition. In those same prepetition actions, asbestos plaintiffs also brought

claims against the transferees, asserting successor liability and tort liability based on

piercing the corporate veil.[130]

Thereafter, Keene filed a chapter 11 case. Judge Bernstein granted the Keene

estate's motion for an injunction blocking the continued prosecution of those actions,

concluding that they were violative of section 362(a)(1) of the Code, which bars, among

other things, the continuation of suits to recover on claims against the debtor that arose

---

[126]   *Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844 (Bankr. S.D.N.Y. 1994) (Bernstein, C.J.) ("*Keene*").

[127]   740 F.3d 875 (3d Cir. 2014), *cert. denied*, 135 S. Ct. 436 (2014) ("*Emoral*").

[128]   386 B.R. 441 (Bankr. S.D.N.Y. 2008) (Lifland, C.J.) ("*Alper Holdings*").

[129]   *See* 164 B.R. at 846.

[130]   *See id.* at 847-48.

-55-

before the filing of the bankruptcy case.[131] He noted that the fraudulent conveyance

claims became the estate's claims to prosecute under section 544 of the Code, and

reasoned, properly, that "the Wrongful Transfer Claims should be asserted, in the first

instance, by Keene or any other estate representative designated for that purpose."[132] He

likewise blocked the asbestos plaintiffs' efforts to go after the defendants on corporate

veil piercing and successor tort liability theories, noting that the thrust of those actions

would be to "subject all of the assets of these non-debtor defendants to the claims of

Keene's creditors."[133] Even with respect to the successor liability claims, he read them as

a species of fraudulent transfer claim,[134] with the purpose of increasing the assets of the

estate as a whole to satisfy the claims of the creditor community as a whole.[135]

Given the asbestos plaintiffs' effort in *Keene* to recover assets that should have

been recovered for the benefit of all (and, notably, the transfer of their litigation rights to

the estate under section 544), Judge Bernstein's ruling in *Keene* was plainly correct. But

in *Emoral*, which followed and heavily relied on *Keene*, the distinction between a benefit

to all and a benefit to individual creditors seeking to impose successor liability was

blurred—and it was this blurring that triggered Judge Cowen's dissent, and, in this

Court's view, the greater persuasiveness of Judge Cowen's view.

---

[131]    *See id.* at 848-49; *accord id.* at 850.

[132]    *Id.* at 849.

[133]    *Id.* at 850.

[134]    *Id.* at 853.

[135]    *Id.* ("In any event, the remedy against a successor corporation for the tort liability of the predecessor is, like the piercing remedy, an equitable means of expanding the assets available to satisfy creditor claims. The class action plaintiffs that invoke it allege a *general* injury, their standing depends on their status as creditors of Keene, and their success would have the effect of *increasing the assets available for distribution to all creditors*. For the same reasons stated with respect to the piercing claims, claims based upon successor liability should be asserted by the trustee on behalf of all creditors.") (emphasis added).

*Emoral* involved a prepetition sale of assets from a company (known most commonly as Palorome International, but later renamed Emoral) that manufactured diacetyl, a chemical used in the food flavoring industry that was the subject of many toxic tort suits. Emoral later filed for bankruptcy protection, and disputes arose between the Emoral estate's trustee and the buyer of the assets, a company called Aaroma—including, most significantly, claims by the trustee that the prepetition asset sale had been a fraudulent transfer. The trustee and Aaroma settled those disputes; as part of the settlement, the trustee agreed to release Aaroma from any causes of action that were property of the Emoral estate. But at the bankruptcy court hearing considering the propriety of the settlement, the trustee's representative stated that any successor liability claims against Aaroma didn't belong to the Emoral estate, and that the trustee therefore couldn't release them.[136]  Aaroma's counsel argued that whether or not the diacetyl plaintiffs' causes of action were property of the estate (and therefore covered by the release) was not an issue before the bankruptcy court at that time, and the approval order was modified to provide, in substance, that nothing in the approval order or the underlying sale agreement would operate as a bar to prosecution of any claims that weren't property of the Emoral estate.[137]

Thereafter, plaintiffs asserting diacetyl injury claims sued Aaroma, arguing for successor liability and citing the trustee's remarks that their claims didn't belong to the estate, and that the estate couldn't release them. In a 2-1 decision (and disagreeing with the Bankruptcy Court, which had held to the contrary), the *Emoral* majority held, relying heavily on *Keene*, that the claims did in fact belong to the estate, and that Aaroma was

---

[136]    740 F.3d at 877.

[137]    *Id.*

-57-

thus protected. The two judges in the majority did so based on their view that as a legal matter, the claim for successor liability was for the benefit of all of the estate's creditors. But they did not, so far as this Court can discern, parse the plaintiffs' complaint to focus on what the plaintiffs were actually asking for, to see if that was actually true. Judge Cowen, dissenting (who agreed with the conclusion of the Bankruptcy Court), found the majority's mechanical approach troublesome for several reasons, most significantly because the majority failed to consider, as a factual matter, what he considered to be critical—whether plaintiffs bringing the diacetyl claims would be suing for themselves or for the benefit of all.[138]

The third case, *Alper Holdings*, offered by New GM with a "*See also*," involved an objection to claims. Somewhat like *Emoral* (though *Emoral* involved successor liability claims, rather than alter ego claims) *Alper Holdings*, decided by Chief Judge Lifland, involved an issue as to whether alter ego claims had been previously released by the estate.[139] As in all of these cases, the focus was on whether the injury was to creditors as whole or only to particular ones. And as Judge Bernstein had done in *Keene*, and as Judge Cowen dissenting in *Emoral* did (and as his colleagues should have done), Judge Lifland looked, as a factual matter, to the nature of the successor liability claims, to see if they were asserted for the benefit of all of the estate's creditors or only to particular ones.[140]

---

[138]    *See id.* at 885-86 & n.1.

[139]    *See* 386 B.R. at 446.

[140]    *See id.* ("[I]t was clear based upon the conduct alleged by the Holt Plaintiffs that such alter ego claims were of a generalized nature and did not allege a 'particularized injury' specific only to the Holt Plaintiffs. Accordingly, this Court held that such alter ego claims were in fact property of Saltire's bankruptcy estate and were, therefore, released under section 13.1 of the Saltire Plan.").

Importantly, none of *Keene*, *Emoral*, or *Alper Holdings* involved a 363 sale, nor

considered the rights of plaintiffs to be heard before a free and clear order was entered.

And for that reason, they are not as important as they might otherwise appear at first

blush. But on the principle for which they are cited—that taking away the right to sue on

a successor liability theory isn't a deprivation of property from the person who might

wish to sue—they are at best irrelevant to New GM's position and at worst harmful to it.

Each of *Keene*, *Alper Holdings* and Judge Cowen in *Emoral* focused on whether the

particular successor liability action sought to recover for the benefit of all, on the one

hand, or to secure a private benefit, on the other.[141] If it is the latter, a party at risk of

losing that private benefit deserves the opportunity to be heard.

As the Court noted in oral argument,[142] theories of successor liability, when

permissible, permit a claimant to assert claims not just against the transferor of the assets,

but also against the transferee; they provide a second target for recovery. Here the

Plaintiffs have not purported to sue for the benefit of Old GM creditors generally; they

have instead sued to advance their own, personal, interests. They have not asked New

GM to make a payment to Old GM; they want New GM's money for themselves. Taking

away the right to recover from that additional defendant (where such a right otherwise

---

[141]    In that connection, the Plaintiffs point to a 2013 decision of the Second Circuit, *Picard v.
JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54 (2d Cir. 2013)
("*Madoff*"). *Madoff* is not as closely on point as the Plaintiffs suggest, as it was a *Wagoner* Rule
*in pari delicto* case; it involved neither a 363 sale nor claims of successor liability. Nevertheless,
the Plaintiffs properly observe (Pl. Br. at 36 n.44) that *Madoff* focused, as a factual matter, on
whether the underlying creditor claims, in the *in pari delicto* context, were personal to the creditor
or really belonged to the debtor corporation, and it tends to undercut New GM's position in that
regard. *See* 721 F.3d at 70 (rejecting the trustee's contention that he could bring claims against
third party financial institutions because his "claim [was] a general one, with no particularized
injury arising from it," and that the claims against the financial institutions were "common to all
customers because all customers were similarly injured by Madoff's fraud and the Defendants'
facilitation").

[142]    *See* Day 1 Arg. Tr. at 41.

exists under the law of those states that permit such) may easily be understood as a matter of bankruptcy policy, and the supremacy clause, but it nevertheless represents a taking of rights from the perspective of the tort plaintiff who loses the right to sue the successor.

New GM's last three reasons for why Plaintiffs would not have any due process rights at all require considerably less discussion. As the third of its five reasons, New GM argues that section 363(f) of the Bankruptcy Code prevails over state laws imposing successor liability. That is true, but that is why New GM should *win on the merits*. It does not justify denying those who might wish to argue otherwise the opportunity to be heard.

As the fourth of its five reasons, New GM argues that the Court already ruled that there was no continuity of ownership between purchaser and seller, and thus no basis for successor liability. Once again that is true, but it was done before the Plaintiffs had appeared in the case. The Court cannot rely on conclusions it reached in a hearing to which the Plaintiffs were not invited as a basis for retroactively blessing the failure to invite them.

As the fifth of its five reasons, New GM argues that there could be no successor liability anyway for Economic Loss Plaintiffs, because, unlike accident victims, they would not get the benefit of the "product line exception." That too might be true (though it could vary depending on the particular state whose law would apply), but it once again goes to the merits—not the Plaintiffs' rights to be heard before successor liability claims were barred.

For these reasons, the Court concludes that the Plaintiffs were entitled to due

process in the context of each of the sale and claims processes—requiring the Court then

to consider whether they received it.

### 2. *Notice by Publication*

Having determined that the Plaintiffs did have due process rights, the Court must

determine whether those rights were violated. The first (though not last) issue in that

inquiry is whether notice by publication to owners of Old GM vehicles not known by Old

GM to have been in accidents was, as a general matter, constitutionally sufficient. It

plainly was.

As noted above, the Second Circuit has held that the proper inquiry on a due

process contention is whether the noticing party (here Old GM)[143] "acted reasonably in

selecting means likely to inform persons affected . . . ."[144] The notice required is that

"appropriate to the nature of a given case,"[145] and *the best notice practical under the

circumstances.*"[146] The very reason why property is sold under section 363, and not

under a reorganization plan, is because time and liquidity constraints do not permit a

more leisurely process.[147]

---

[143]   The Court is not persuaded by New GM's contention that because it was Old GM and not New
        GM that may have provided insufficient notice, New GM should not be penalized for that. It is
        the possible failure to provide requisite notice—and not who was responsible for it—that results in
        the need for the Court to take judicial action. The potential constitutional violation must trump
        determinations of fault and New GM's contractual rights.

[144]   *Weigner*, 852 F.2d at 649.

[145]   *Drexel Burnham*, 995 F.2d at 1144.

[146]   *Id.* at 1144 (citing *Mullane*) (emphasis added).

[147]   It should go without saying that the urgency of the situation is a hugely important factor in
        determining what is the best notice practical under the circumstances. Exemplifying this is *Pearl-
        Phil GMT (Far East) Ltd. v. Caldor Corp. (In re Caldor Corp.)*,266 B.R. 575 (S.D.N.Y. 2001)
        (Casey, J.) (*"Caldor-District"* ), *aff'g In re Caldor Corp.*, 240 B.R. 180 (Bankr. S.D.N.Y. 1999)
        (Garrity, J.) (*"Caldor-Bankruptcy"*). There Judge Casey of the District Court, affirming an order
        of Judge Garrity of this Court, rejected contentions by the appellant that it had been denied due

Actual notice to those in the 27 categories above resulted in mailed notice of the

363 Sale to over 4 million people and entities[148]—including any known by Old GM to

have been in accidents. But given the urgency of GM's circumstances, it would be

wholly unreasonable to expect individual mailed notice of the 363 Sale hearing to go to

the owners of the approximately 70 million GM cars then on the road, or even the

approximately 27 million whose cars were then (or later became) the subject of pending

recalls.

This is exactly the kind of situation for which notice by publication would be the

norm. Old GM's counsel could hardly be faulted for availing itself of that approach.

Under normal circumstances, notice by publication to Old GM vehicle owners—

describing the upcoming sale and the fact that New GM would be assuming only very

limited types of Old GM liabilities—would be the only kind of notice that would be

practical under circumstances like these, and would easily meet the Supreme Court's and

the Second Circuit's requirements.

*3. Known Claim Analysis*

But Old GM's ability to provide notice by publication, rather than actual notice,

rests on the premise that those who received publication notice only did not have

"known" claims. For that reason, both sides debate at length whether owners of cars with

---

process when it failed to get notice in advance of Judge Garrity's order (in the face of Caldor's
inability to continue in business during the course of its chapter 11 case) authorizing the prompt
wind-down of Caldor's business operations and restraining payment on anything more than a pro-
rata basis, of administrative claims that had accrued before the time of that order. *See* 266 B.R. at
579, 583. Judge Casey applied the Second Circuit's *Weigner* test of whether the noticing party
"acted reasonably," as contrasted to whether there was actual receipt of notice. And recognizing
that Caldor was faced "with the formidable task of providing notice to approximately 35,000
entities," *id.* at 583, and that the record was "replete with evidence as to Caldor's dire financial
circumstances," *id.* at n.5, he found Caldor's actions "reasonable given the circumstances under
which it was operating." *Id.* at 583.

[148]    *See* Davidson Decl. ¶ 5, New GM Appx. of Exh. 1 (ECF No. 12982-1).

Ignition Switch Defects—but who had neither been in accidents of which Old GM was aware, nor sued Old GM or manifested any intent to sue—were "reasonably ascertainable (and thus "known") creditors, on the one hand, or no more than "foreseeable" (and thus "unknown") creditors on the other.

That question is close. It is true, as New GM argues, that Old GM sent out actual notice of the 363 sale (and later, of the Bar Date) to anyone who had sued it or manifested a possible intention to sue, and that all or nearly all of those with Ignition Switch Defects were not yet in that category. It also is true that sending out notice of a recall is not the same as expecting to be sued; that not all recalls are the same in terms of the risk of resulting death or injury; and indeed that many (and perhaps most) recalls might not result from the risk of death or injury at all.

But it is also true that at least 24 Old GM engineers, senior managers and attorneys knew of the Ignition Switch Defect and the need to send out recall notices—and of the reasons why recall notices had to go out, here. And it is uncontroverted that Old GM had enough knowledge of the Ignition Switch Defect to be required, under the Safety Act, to send out mailed recall notices to owners of affected Old GM vehicles, and knew the names and addresses to whom it had to send them. On balance the Court concludes that by reason of the knowledge of those 24 individuals, the owners of cars with Ignition Switch Defects had "known" claims, from Old GM's perspective, as that expression is used in the due process jurisprudence.

The caselaw does not require actual notice to those whose claims are merely "foreseeable." But the caselaw requires actual notice to claimants whose identity is

"reasonably ascertainable."[149] So the Court must consider how this case fits in that spectrum when 24 Old GM personnel knew of the need to conduct a recall (and with that, of the need to fix the cars); and, in addition, a critical safety situation; and, in addition, the exact names and addresses of the owners of the cars that were at risk.

Preliminarily, there can be no doubt that the names and addresses of the car owners whose cars Old GM's personnel knew to be subject to the recall obligation—and here, to have safety defects as well—were "reasonably ascertainable" and, in fact, actually known. Old GM (like New GM later) was subject to the Safety Act, which requires vehicle manufacturers to keep records of vehicle ownership, including vehicle owners' names and addresses. Once Old GM knew which cars had the Ignition Switch Defect, Old GM knew exactly to whom, and where, it had to send the statutorily required recall notice.

But not all of those with Ignition Switch Defects would be killed, injured, or want to sue Old GM on economic claims. Those 24 Old GM personnel did not have knowledge of *which particular* car owners with Ignition Switch Defects would later be killed or injured in accidents, but they knew that some would—which is why Old GM needed to conduct the recall. Those Old GM personnel also knew that all of those vehicle owners had a statutory right to get their cars fixed at Old GM's (and later New GM's) expense.

Taking the easier element first, the duty to fix the cars with Ignition Switch Defects was owed to every one of those whose cars were subject to the known recall

---

[149]    *See* pages 49 et seq. *supra.*

-64-

obligation. That aspect of Old GM's obligations was not subject to the uncertainty of whether or not there would be a subsequent accident or lawsuit.

The other element is plainly harder, but the Court comes out the same way. Old GM faced the recall obligation and known claims here not by reason of any kind of actuarial foreseeability (or the reality that in any line of endeavor, people can make mistakes and others can be hurt as a result), but by reason of the *known safety risk* that required the recall—*i.e.*, that here there was known death or injury in the making to someone (or many) in the body of people whose names and addresses were known, with the only uncertainty being who, exactly, those killed or injured might be. It is not a satisfactory answer, in this Court's view, to say that because the particular individuals in a known group who would turn out to be accident victims were unknown, all of them were unknown. Rather than concluding that because of that uncertainty, *none* were entitled to notice, the Court concludes that *all* of them were.

New GM understandably points to a considerable body of caselaw holding, in substance, that creditors are not "known" unless their status as such is reflected in the debtor's "books and records." That is true, but what "books and records" means in this context is all important. At oral argument on its motion, New GM understandably did not press its earlier position[150] that its financial accounting (and in particular, liabilities on its balance sheet) would be determinative of whether claims were known.[151] And for good reason: such a view would fail to comport with the caselaw or common sense. The "books and records" standard does not rest on whether the notice-giver has booked a liability or created a reserve on its balance sheet; on the treatment of the loss contingency

---

[150]    *See* New GM Opening Br. at 27-29.

[151]    *See* Day 1 Arg. Tr. at 78 ("I agree it's not the financial statements.").

under FASB 5 standards; or on whether the debtor has acknowledged its responsibility

for the claim;[152] it merely requires having the requisite knowledge in one way or another

that can be relatively easily ascertained and thereafter used incident to the noticing

process. In the Court's view, the standard requires much more than the fact that

somewhere, buried in a company's books, is information from which the liability could

be ascertained,[153] and the Court doubts (though under the facts here it does not need to

decide) that the knowledge of one or very few people in a large enterprise would be

enough to meet the standard.[154] But "books and records" must be construed in a fashion

consistent with the Supreme Court's requirements that "known" liabilities include those

that are not just actually known, but also "reasonably ascertainable."

New GM points out that it maintained a "litigation calendar," showing people

who had sued it, threatened to do so, or even made claims against it, and that Old GM

---

[152]  See, e.g., Drexel-Burnham-Bankruptcy, n.105 supra, 151 B.R. at 681-82 (in late proof of claim
context, holding that a guaranty liability not booked on the balance sheet was still a known claim,
reflected on the debtor's "books and records," and that accounting practices were not
determinative).

[153]  See, e.g., XO Communications, 301 B.R. at 793-94 (in late proof of claim context, noting that
"[w]hat is reasonable depends on the particular facts of each case. A debtor need not be
omnipotent or clairvoyant. A debtor is obligated, however, to undertake more than a cursory
review of its records and files to ascertain its known creditors.").

[154]  The Court has based its conclusion that the Plaintiffs were known creditors here on the fact that at
least 24 Old GM engineers, senior managers, and attorneys knew of the Ignition Switch Defect—a
group large in size and relatively senior in position. The Court has drawn this conclusion based
not (as the Plaintiffs argue) on any kind of automatic or mechanical imputation drawn from
agency doctrine (which the Court would find to be of doubtful wisdom), but rather on its view that
a group of this size is sufficient for the Court to conclude that a "critical mass" of Old GM
personnel had the requisite knowledge—i.e., were in a position to influence the noticing process.
Cf. Weisfelner v. Fund 1 (In re Lyondell Chemical Co.), 503 B.R. 348, 389 (Bankr. S.D.N.Y.
2014) (Gerber, J.) (in a case alleging an intentional fraudulent conveyance in an LBO, rejecting
arguments based on automatic imputation of a CEO's alleged intent under ordinary agency rules,
and ruling that if a creditor litigation trust pressing those claims could not plead facts supporting
intent to hinder, delay or defraud on the part of a "critical mass of the directors who made the
decisions in question," it would then have to allege facts plausibly suggesting that the CEO, who
was only one member of a multi-member Board, could nevertheless control the disposition of
Lyondell's property) (emphasis in original).

-66-