was careful to provide all of them with actual notice.[155] That of course was the right thing to do, and under other circumstances, it would do the job.[156] But here we have the unique fact that Old GM knew enough to send out recall notices (to meet a statutory obligation to car owners, and, more importantly, to forestall the injury or death which, without corrective action, would result), whose mailing, coupled with the publication notice it could appropriately send, would have been more than sufficient. But Old GM did not do so.

New GM calls the Court's attention to its earlier decision in *Morgenstein,* in which this Court held that the plaintiffs there were "unknown" creditors, who could not use lack of actual notice to vacate the confirmation order in this case—though admittedly they received notice only by publication. There the plaintiffs (on their own behalf and a class they wished to represent) sought to bring an untimely class proof of claim after the bar date and after Old GM's liquidation plan went effective. But they failed to plausibly allege any evidentiary facts supporting their contention that Old GM *knew* that the alleged design defect affected the vehicles they owned. Nor were their vehicles subject to a recall. Old GM's knowledge of the Ignition Switch Defect here, and of its need to effect a recall of the Plaintiffs' cars here, makes *Morgenstein* a different case.

New GM also calls this Court's attention to Judge Bernstein's decision in *Old Carco*[157]—the *Chrysler* chapter 11 case—which in many respects is closely on point, and

---

[155]    *See* Day 1 Arg. Tr. at 78-79.

[156]    New GM also points out that it is much easier for a debtor to recognize contractual obligations than those that may arise in tort, for alleged violations of law, or in other instances where the debtor and possible claimants have not had personal dealings. That is true, and it underscores why publication notice for claimants in the latter categories is normally sufficient. But here, once again, Old GM personnel knew of the need to send out recall notices, where to send them, and why they needed to go out. This changes everything.

[157]    *See* n.15, *supra.*

with which this Court fully agrees.  There, after Old Carco's[158] own 363 sale, owners of

Jeep Wranglers and Dodge Durangos manufactured by Old Carco brought a class action

for economic loss against New Chrysler in the District Court in Delaware, alleging that

their cars suffered from a design flaw known as "fuel spit back."  As here, the affected

car owners in *Old Carco* had received notice only by publication.  With the same issue as

to whether the *Old Carco* sale order's free and clear provisions barred the economic loss

claims there, the Delaware District Court referred that question to the *Old Carco*

bankruptcy court.  Judge Bernstein concluded that Old Carco's Sale Order did indeed bar

those economic loss claims, and found no due process impediment to enforcing the *Old

Carco* sale order against those asserting the economic loss claims there—even against

those who bought their cars in the used car market[159]—finding that their claims had

arisen when their cars had been manufactured, which was before Old Carco's 363 sale.

But while *Old Carco* plainly was correctly decided, it is distinguishable from this

case, in a highly significant respect.  Old Carco had *already* issued at least three recall

notices for the "fuel spit back" problem for certain Durango and other Old Carco vehicles

before the original purchasers bought their vehicles from Old Carco,[160] avoiding the

exact problem this Court has identified here.

The publication notice here given, which otherwise would have been perfectly

satisfactory (especially given the time exigencies), was insufficient, because from Old

GM's perspective, owners of cars with Ignition Switch Defects had "known" claims.

---

[158]   Just as Old GM came to be officially known as "Motors Liquidation Co." after the 363 Sale here, the former Chrysler came to be officially known as "Old Carco" after its 363 sale.

[159]   *See* 492 B.R. at 403.

[160]   *Id.* at 395 (Old Carco issued a "safety defect recall in 2002"; "a second safety recall … in 2005"; and a "further safety recall" in January 2009).

Because Old GM failed to provide the notice required under the Safety Act (which, if given before Old GM's chapter 11 filing, could have been followed by the otherwise satisfactory post-filing notice by publication), the Plaintiffs were denied the notice due process requires.

### 4.    The Requirement for Prejudice

But the Court's determination that Plaintiffs were denied the notice due process requires does not necessarily mean that they were "denied due process." The latter turns on the extent to which a denial of due process also requires a showing of resulting prejudice.

Plaintiffs argue that once they have shown the denial of the notice that due process requires, any resulting prejudice is simply irrelevant. In their view, the denial of the notice that due process requires means that they need not show anything more, and that the Court need not, and should not, think about how things might have been different if they had received the notice that was denied.

The Court disagrees. The contention runs contrary to massive caselaw, and common sense.

Though the Second Circuit, so far as the parties' briefing has revealed and this Court is aware, has not ruled on this issue,[161] no less than six other Circuits have. They have repeatedly, and very explicitly, identified prejudice as an essential element of a denial of due process claim—saying, in exactly these words or words that are very close,

---

[161]    In the recent cases in which the Circuit granted relief for denials of due process, the prejudice to the party that had received inadequate notice was obvious, and no other party in the case had made the exact same argument that the party failing to get notice might have made. *See Manville-2010*, 600 F.3d at 154-58 (injunction against insurer's non-derivative claims that had no relation to bankruptcy); *DPWN*, 747 F.3d at 151 (discharge of claim); *Koepp*, 593 Fed. Appx. at 23 (extinguishment of easement).

that "a party who claims to be aggrieved by a violation of procedural due process must

show prejudice."[162] So have lower courts in this District (at both the District Court[163]

---

[162] *Perry*, 629 F.3d at 17. *See also Rapp v. U.S. Dep't of Treasury, Office of Thrift Supervision*, 52 F.3d 1510, 1520 (10th Cir. 1995) ("***Rapp***") ("In order to establish a due process violation, petitioners must demonstrate that they have sustained prejudice as a result of the allegedly insufficient notice."); *Brock v. Dow Chemical U.S.A.*, 801 F.2d 926, 930-31 (7th Cir. 1986) ("***Brock***") (in context of review of administrative order affecting an employer where improper notice was alleged, "it must be noted that, unless the employer demonstrates that the lack of formal notice was prejudicial, we will not order that the charges be dismissed"); *Savina Home Indus., Inc. v. Sec'y of Labor*, 594 F.2d 1358, 1365 (10th Cir. 1979) ("***Savina Home Industries***") (in considering due process claim, fact that "no prejudice has been alleged" was identified as one of two factors supporting conclusion that "no due process violation has been established"); *In re New Concept Housing, Inc.*, 951 F.2d 932, 939 (8th Cir. 1991) ("***New Concept Housing***") (ruling that failure to give the debtor notice of a hearing on the approval of a settlement violated two of the Federal Rules of Bankruptcy Procedure, but (rejecting the views of the dissenter that the failure to provide notice of the hearing resulted in a denial of due process that could not be subject to harmless error analysis) that "the violation of these rules constituted harmless error, because the Debtor's presence at the hearing would not have changed its outcome. The Debtor had neither a legal nor factual basis for establishing that the settlement was unreasonable."). *See also In re Parcel Consultants, Inc.*, 58 Fed. Appx. 946, 951 (3d Cir. 2003) (unpublished) ("***Parcel Consultants***") ("Proof of prejudice is a necessary element of a due process claim."); *Cedar Bluff Broad., Inc. v. Rasnake*, 940 F.2d 651 (Table), 1991 U.S. App. LEXIS 17220, at *7, 1991 WL 141035, at *2 (4th Cir. Aug. 1, 1991) (unpublished) ("***Cedar Bluff Broadcasting***") (creditor complaining of notice deficiency failed to show, among other things, "that it was prejudiced by the lack of notice to general creditors").

The Plaintiffs cite one case at the Circuit level which they argue would lead to a different conclusion, *Lane Hollow Coal Co. v. Director, Office of Workers' Compensation Programs*, 137 F.3d 799 (4th Cir. 1998) ("***Lane Hollow Coal***"). They quote a line from the opinion that the claimant is not obligated to demonstrate a "reasonable likelihood that the result of this claim would have been different absent the violation," *id.* at 807, though this is not the same as holding that there is no requirement to show prejudice, as the *Lane Hollow Coal* court itself seemed to recognize. There the Fourth Circuit vacated, in part, an administrative law judge determination granting benefits to a coal miner's widow when there was a 17-year delay in notifying the coal mine operator of the claim, by which time evidence was no longer available and the coal mine operator was thus deprived of the opportunity to mount a meaningful defense. *Id.* at 807. The *Lane Hollow Coal* court did not cite or criticize its earlier holding in *Cedar Bluff Broadcasting* that had denied relief based on a failure to show a lack of prejudice, and in fact stated that *"[t]o be sure, there are 'due process' cases in which we require a showing that the error complained of actually prejudiced the result on the merits....*" *Id.* at 808 (emphasis added). Though the other cases were not named or otherwise substantively addressed, the *Lane Hollow Coal* court continued "but these cases are of a much different ilk." *Id.* And it declined to authorize "speculation about the would-have-been and could-have-been" if notice had not been denied for those 17 years. *Id.* at 807. *Lane Hollow Coal* is insufficient, in this Court's view, to trump the holdings of the ten cases expressly holding that prejudice is an element of any due process claim. Rather, it is better read as merely assuming that there was in fact prejudice, and holding that a finding of an absence of prejudice when evidence was unavailable after a 17 year delay would necessarily have been based on unacceptable speculation. A later (and very similar) Fourth Circuit holding upon which the Plaintiffs likewise rely, *Consolidation Coal Co. v. Borda*, 171 F.3d 175 (4th Cir. 1999), supports this Court's view. *See id.* at 183 ("It is not the mere fact of the government's delay that violates due process, but *rather the prejudice resulting from such delay*.") (emphasis added).

and Bankruptcy Court[164] levels), and elsewhere.[165] Several of the above were bankruptcy

cases, in which litigants sought to be relieved of bankruptcy court orders based on

contentions of denial of due process.[166]

Neither the Plaintiffs, nor the GUC Trust (which is allied with the Plaintiffs on

this issue), cite any case that contradicts that authority.[167] Rather, they variously argue

---

[163]    *See Caldor-District,* 266 B.R. at 583 ("even if notice was inadequate, the objecting party must demonstrate prejudice as a result thereof") (citing, *inter alia, Rapp*); *Affirmance Opinion #2,* 430 B.R. at 99 (rejecting appellant Parker's contentions that he was denied due process as a result of the expedited hearing on the 363 Sale in this case, as "Parker was in no way prejudiced by the expedited schedule").

[164]    *See Caldor-Bankruptcy,* 240 B.R. at 188 ("Thus, in addition to establishing that the means of notification employed by Caldor was inadequate, Pearl must demonstrate that it was prejudiced because it did not receive adequate notice.") (citing, *inter alia, Rapp, Brock,* and *Savina Home Industries*).

[165]    *In re Gen. Dev. Corp.,* 165 B.R. 685, 688 (S.D. Fla. 1994) (Aronovitz, J.) (**"General Development"**) ("A creditor's due process rights are not violated where the creditor has suffered no prejudice.").

[166]    *See Cedar Bluff Broadcasting,* n.162 *supra* (bankruptcy court order converting case to chapter 7); *Caldor-District* and *Caldor-Bankruptcy,* nn. 163 and 164 *supra* (bankruptcy court wind-down order); *General Development,* n.165 *supra* (bankruptcy court approval of settlement); *Affirmance Opinion #2,* n. 163 *supra* (the Sale Order in this case).

[167]    *See* Pl. Br. at 36-39; GUC Trust Opp. at 27-32 & nn.9 and 10. The GUC Trust does, however, cite and quote at length a Bankruptcy Court decision, *White v. Chance Indus., Inc. (In re Chance Indus., Inc.),* 367 B.R. 689 (Bankr. D. Kan. 2006) (Nugent, C.J.) (**"Chance Industries"**), in which Judge Nugent addressed a situation in which a child was injured on a debtor-manufactured amusement ride after the confirmation of a reorganization plan, allegedly as a result of the reorganized debtor's wrongful prepetition conduct. *See id.* at 692. Judge Nugent ruled, correctly in this Court's view, that because the child was injured after confirmation, and had no prepetition (or even pre-confirmation) relationship with the debtor, *see id.* at 701, the child did not have a claim capable of being discharged, see *id.* at 703-04, and could not be bound by a confirmation order as to which, for obvious reasons, he was not given notice. (Of course that situation is not present here, because New GM expressly assumed liability for death or injuries taking place after the 363 Sale, even if involving vehicles made by Old GM.)

The GUC Trust relies on language that came after that holding in which Judge Nugent declined to agree with an argument that the failure to provide notice to the child was "harmless error," based on the argument before him that the plan—which provided for no future claims representative, but nevertheless sought to bar future claims—would not have changed after an objection and would have been confirmed anyway. *See id.* at 709. But the GUC Trust takes Judge Nugent's comments out of context. Judge Nugent made his "harmless error" observations in the context of his discussion, see *id.* at 709-10 & n.81, of the reorganized debtor's invocation of Fed.R.Bankr.P. 9005, and Fed.R.Civ.P. 61, which together provide that in bankruptcy, as elsewhere, courts should "disregard all errors and defects that do not affect any party's substantial rights." Understandably, Judge Nugent considered that the matter before him affected substantive rights. Though the word "prejudice" never was used in his opinion (which of course undercuts the GUC Trust's argument), he effectively ruled that the child would be substantively prejudiced—by "the extinguishing of an

-71-

that "the Due Process Clause protects . . . the right to be heard, not the right to win;[168] that all of the above cases are distinguishable on their facts;[169] and that imposition of a prejudice requirement would require the Court to speculate as to the outcome if appropriate notice had been provided.[170] The first contention is overly simplistic, the second misses the point; and the third fails based on a mistaken assumption.

As to the first, the issue is not, as Plaintiffs, argue, whether the Due Process clause guarantees "a right to win." Of course it is true that there is no constitutional right to win—though ironically, under the Plaintiffs' argument (that inadequate notice automatically gives them the win), they effectively seek exactly that. The real issue is rather whether, assuming that there has been a denial of the right to be heard, more is necessary to establish a *judicially cognizable* due process violation—*i.e.*, a right to the desired curative relief. The caselaw answers that; it requires the arguably injured party to show prejudice from the denial.

---

unknown claim that has yet to accrue," *id.* at 709—thus making Rule 61 harmless error analysis inappropriate.

The Plaintiffs also cite *Chance Industries, see* Pl. Br. at 37, but only for further support for their contention (with which, as noted above, the Court agrees) that in defective notice cases, speculation as to what the outcome would have been with proper notice is inappropriate. They read Judge Nugent's ruling has having rejected the *Chance Industries* debtor's arguments "notwithstanding [the] debtor's speculation that the tort claimant's participation in confirmation process would not have changed the result." *Id.* This Court agrees with that reading, and would even go farther; it reads Judge Nugent's *Chance Industries* opinion as suggesting that if the objection had been raised, he would have denied confirmation of the plan on those terms.

*Chance Industries* represents an excellent example of what courts do when they think parties are prejudiced; it does not stand for the notion that prejudice doesn't matter. *Chance Industries* did not, and could not, contradict the decisions of its own Tenth Circuit, *see Rapp* and *Savina Home Industries,* n.162, *supra,* that are among those expressly imposing a requirement for showing prejudice.

[168]    Pl. Br. at 4.

[169]    *See id.* at 37-39; GUC Trust Opp. at 27 n.9 and 29 n.10.

[170]    *See* Pl. Br. at 36-37; GUC Trust Opp. at 27.

-72-

The Plaintiffs' and GUC Trust's second argument is that "the cases [New GM] cites do not support its contention."[171] But of course they do. Because due process cases are heavily fact-driven, it is hardly surprising that the Plaintiffs can point out factual distinctions between the ten cases discussed above[172] and this one. But the Court does not rely upon those cases for their factual similarity to this one; it relies on them for the *legal principles* that each enunciates, in very clear terms—as stated by the First Circuit in *Perry*, for example, "a party who claims to be aggrieved by a violation of procedural due process *must show prejudice*."[173]

The third contention does not go to the existence of the requirement for showing prejudice. It goes to *how* the Court should examine possible prejudice—and in particular, whether courts should speculate as to resulting harm once they have been presented with a showing of insufficient notice.

In that third contention, the Plaintiffs cite *Fuentes v. Shevin*,[174] in which the Supreme Court reversed the judgments of three-judge District Courts that had upheld the constitutionality of Florida and Pennsylvania replevin statutes that denied a prior opportunity to be heard before chattels were taken from consumers' possession, in several instances without a lawsuit.[175] The Plaintiffs do not argue that *Fuentes*, or any principles it articulated, trumped any of the holdings to which this Court has just referred—that a showing of prejudice must be made before court orders entered with insufficient notice are undone. Nor could they, as *Fuentes* involved facts nothing like

---

[171]    Pl. Br. at 37; *accord* GUC Trust Opp. at 27 n.9, 29 n.10.

[172]    *See* n.162 *supra*.

[173]    629 F.3d at 17 (emphasis added).

[174]    407 U.S. 67 (1972) ("*Fuentes*").

[175]    *See id.* at 71-72 and n.4.

this case, and instead involved a facial attack on the constitutionality of statutes that

authorized the seizure of property without any notice, and, in many cases, any earlier

judicial action at all. The different, later, possible judicial outcomes to which *Fuentes*

referred (and upon which the Plaintiffs rely)[176] related to judicial proceedings that never

took place, and (for good reasons) needed to take place.

    The Plaintiffs then argue a different proposition, on which they are on stronger

ground; they say that courts should reject "speculation" that the litigant would have lost

anyway. And in this respect, the Court agrees with them. In determining prejudice,

courts should not speculate as to outcome if an aggrieved party was denied the notice to

which it was entitled. If there is a non-speculative reason to doubt the reliability of the

outcome, the Court agrees that it should take action—though the opposite is also true.

For that reason, the Court believes that it here should neither deny, nor grant, relief to the

Plaintiffs here based on a request by either side that the Court engage in speculation.[177]

The Court will refrain from doing so.

    Finally, and apart from the caselaw previously noted, the Plaintiffs' contention

that prejudice need not be shown in cases like this one runs contrary not just to existing

law, but also fairness and sound policy. Bankruptcy sale due process cases, much more

than in plenary litigation, involve competing interests—including those of parties who

---

[176]  *See* 407 U.S. at 87 ("To one who protests against the taking of his property without due process of law, it is no answer to say that in his particular case due process of law would have led to the same result because he had no adequate defense upon the merit."), quoted at Pl. Br. at 36.

[177]  But that view, once again, does not go to the requirement that prejudice must be shown; it goes only to how the required prejudice should or should not be found.

To avoid the need for such speculation, it is very possible that in a case where it made a difference, the Court would not require, incident to ascertaining the existence of prejudice, that the result *would* have been different; the Court might well hold that it should suffice that there is a reasonable likelihood that the result *could* have been different. But the Court does not need to decide that here. In this case, there are no matters argued by either side where the distinction would matter.

have acquired property rights as buyers of estate assets, and have a justifiable expectation

that when they acquire assets pursuant to a bankruptcy court order, they can rely on what

the order says. That was an important element of the Seventh Circuit's opinion in

*Edwards*,[178] in which that court held that a bona fide purchaser of property in a free and

clear sale acquired good title to it, even though a second mortgagee had not received

notice of the sale until more than a year later.

The *Edwards* court noted that "[i]f purchasers at judicially approved sales of

property of a bankrupt estate, and their lenders, cannot rely on the deed that they receive

at the sale, it will be difficult to liquidate bankrupt estates at positive prices,"[179] and that

"the liquidation of bankrupt estates will be impeded if the bona fide purchaser cannot

obtain a good title, and creditors will suffer."[180] That does not mean, at least in this

Court's view, that the purchasers of assets automatically should win, but it does mean

that their needs and concerns—and the protection of their own property rights—cannot be

disregarded either.

The *Edwards* court twice addressed the competing interests on matters of this

character:

> We are left with the practical question, in what
> circumstances can a civil judgment be set aside
> without limit of time and without regard to the harm
> to innocent third parties? The answer requires a

---

[178]    *See* n.69 *supra.* The Plaintiffs argue that *Edwards*, which was written by Judge Posner, was
wrongly decided. *See* Pl. Br. at 34. But the Court believes *Edwards* was correct in its result, and
in most of its analysis—especially insofar as it focuses on the prejudice (or lack of prejudice) to
the party that received inadequate notice, and speaks of others' property rights that likewise need
to be taken into account.

[179]    962 F.2d at 643.

[180]    *Id.* at 645.

consideration of competing interests rather than a
formula.[181]

And again:

> To take away a person's property—and a lien is
> property—without compensation or even notice is
> pretty shocking, but we have property rights *on both
> sides of the equation here,* since [the second
> mortgagee] wants to take away property that [the
> purchaser] bought and [the purchaser's lender]
> financed, without compensating them for their
> loss.[182]

The Court is mindful of concerns articulated by Chief Judge Jacobs dissenting in

*Petrie Retail*[183] (even though they were not embraced by the *Petrie Retail* majority) that

the requirements of law in bankruptcy cases should not be trumped by concerns as to

whether they might have a chilling effect on sales in bankruptcy cases, on the one hand,

or "promote[] the sale of the assets marketed by bankrupt estates," on the other. And for

reasons discussed below, the Court believes that in the Second Circuit, the requirements

of due process would trump the interests of finality and maximizing creditor recovery.

But in bankruptcy, the interests inherent in the enforceability of 363 orders (on which the

buyers of assets should justifiably be able to rely, and the interests of creditors depending

on the maximization of estate value likewise rest) are hugely important. And to the

extent that courts can respect and enforce sale orders as written unless there is genuine

prejudice, they should do so. Since parties' competing needs and concerns "are on both

sides of the equation here,"[184] that means that in instances in which prejudice has not

---

[181]    *Id.* at 644 (citation omitted).

[182]    *Id.* at 645 (emphasis added).

[183]    *See Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223, 233 (2d Cir.
2002) (*"Petrie Retail"*) (Jacobs, C.J., dissenting).

[184]    *Edwards*, 962 F.2d at 645.

been shown, there is no good reason for depriving asset purchasers of their own property rights—and of the benefits for which they provided value to a chapter 11 estate.

And the facts here (which may present a relatively uncommon situation)—where while insufficient notice was given, others duly given notice made the same, and indeed better, arguments against successor liability, and lost—raise an additional common sense and fairness concern. It defies common sense—and also is manifestly unfair—to give those who have not been prejudiced the bonanza of exemption from a ruling as to which other creditors, with no lesser equities in their favor, were heard on the merits, lost, and now have to live with the result.

For all of these reasons, the Court holds—consistent with the ten other cases that have held likewise—that even where inadequate notice has been given, prejudice is an essential element for vacating or modifying an order implementing a 363 sale.

5.  *Application of Those Principles
    to Economic Loss Plaintiffs*

Having concluded that the Economic Loss Plaintiffs were denied the notice due process requires, but that establishing a claim for a denial of due process requires a showing of prejudice, the Court must then consider the extent to which they were prejudiced as a result. The Court finds that they were not at all prejudiced with respect to successor liability, but that they were prejudiced with respect to overbreadth of the Sale Order.

(a)  *Successor Liability*

After arguing that prejudice need not be shown, and that they should win without any prejudice at all (contentions that the Court has rejected), the Plaintiffs go on to argue

-77-

that even if prejudice must be established, it was shown.[185]  They argue that if they had the opportunity to be heard, the result would have been different.  Insofar as successor liability is concerned, the Court easily rejects that contention.

It is undisputed that although the Plaintiffs did not get adequate notice of the 363 Sale hearing, over 4 million others did, including a very large number who vigorously argued against the Free and Clear Provisions, but ultimately failed.  While the Plaintiffs quote from *Mullane* repeatedly, and rely on *Mullane* principles even more often, they overlook the language in *Mullane* that expressly addressed situations where many would be similarly affected—and where all, because of incomplete notice, might not be able to be heard, but many could.

*Mullane* recognizes that where notice is imperfect, the ability of others to argue the point would preclude the prejudice that might result if *none* could.  It even suggests that in such instances, there is no persuasive claim that even notice was defective.  In language that the Plaintiffs fail to address, the *Mullane* court stated:

> This type of trust presupposes a large number of small interests. *The individual interest does not stand alone but is identical with that of a class.*  The rights of each in the integrity of the fund and the fidelity of the trustee are shared by many other beneficiaries. *Therefore notice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all, since any objections sustained would inure to the benefit of all.*  We think that under such circumstances reasonable risks that notice might not actually reach every beneficiary are justifiable. 'Now and then an extraordinary case may turn up, but constitutional law, like other mortal contrivances, has to take

---

[185]      *See* Pl. Br. at 58-60.

> some chances, and in the great majority of
> instances, no doubt, justice will be done.'[186]

Here, as in the situation addressed in *Mullane*, the notice that was sufficient to trigger

many objections to the Free and Clear Provisions was "likely to safeguard the interests of

all."[187] If those who got notice and made those objections had been successful, the

"objections sustained would inure to the benefit of all.[188] These observations by the

Supreme Court bolster the conclusion that there was no prejudice here. In fact, just as the

*Mullane* court declared that "under such circumstances, reasonable risks that notice might

not actually reach every beneficiary [were] justifiable," that element of the *Mullane*

holding strongly suggests that notice that did not reach the subset of vehicle owners with

Ignition Switch Defects was not constitutionally deficient in the first place.[189]

But even if *Mullane* does not by itself dispose of the question, the Plaintiffs'

failure to show any reason why the Free and Clear Provisions were improperly imposed

does. That failure underscores the lack of prejudice here.[190] Notably, the Plaintiffs do

---

[186]    *Mullane*, 339 U.S. at 318-19 (emphasis added).

[187]    *Id.*

[188]    *Id.*

[189]    However, while that conclusion follows from what the Supreme Court said in the quoted
language, the Court prefers to analyze the matter in terms of the massive caselaw requiring a
showing of prejudice. The distinction doesn't matter with respect to the Free and Clear
Provisions, because so many people argued against them. But it could matter with respect to
overbreadth, discussed below, where those with notice didn't make an overbreadth argument. The
Court is more comfortable in denying relief in instances where people made the same argument
and lost than it is in instances where those with notice failed to make the argument at all.

[190]    *See Paris Industries, supra* n.123, 132 B.R. at 510 ("I conclude that [objectors] were in no way
prejudiced by the lack of notice and their inability to appear and argue their position on the sale.
They have made no showing that, if they had been notified and had appeared, they could have
made any arguments to dissuade the bankruptcy court from issuing its order that the assets be sold
free and clear of all claims."); *Austin v. BFW Liquidation, LLC (In re BFW Liquidation, LLC)*,
471 B.R. 652, 672-73 (Bankr. N.D. Ala. 2012) (Cohen, J.) (declining to set aside bankruptcy sale
even though a creditor was not given notice of it where creditors' committee and many creditors
participated in the process and court could conclude that all creditors' interests in the sale were
adequately represented by that committee and those creditors, and the creditor "did not allege in

-79-

not argue that when the Court barred successor liability back in 2009, it got it wrong.[191]

They do not bring to the Court's attention any cases that other objectors missed, or any

statutory or other authority suggesting a different outcome on the successor liability

merits.  In fact, they offer no legally based arguments as to why they would have, or even

*could* have, succeeded on the successor liability legal argument when all of the other

objectors failed.[192]

Rather, while the Plaintiffs recognize that the Court would not have let GM go

into the liquidation that would have resulted if the Court denied approval of the 363 Sale,

they argue that they could have defeated the successor liability injunction for reasons

unrelated to its propriety as a matter of bankruptcy law.  While criticizing New GM for

improper speculation,[193] they ask the Court to rely on the speculation they prefer;[194] they

---

her complaint that she possessed any grounds for opposing the sale which she could have raised
had she been notified of the sale before it was authorized").

[191]    *See* Pl. Br. at 58-60.  The closest they come is an accusation that it is New GM that is engaging in
speculation, and a suggestion that the Court would not have written "exactly the same opinion."
*See* Pl. Br. at 58-59 ("New GM's argument speculatively presumes that this Court would have
written exactly the same opinion in July of 2009 *even if* it had been aware of the ISD, the now
well-documented campaign to cover it up, and Old GM's abdication of its legal duties to owners
and lessees of Defective Vehicles.") (emphasis in original).  In light of the Plaintiffs' failure to put
forward any new successor liability arguments or caselaw authority, the Facts section of any
opinion might have added a paragraph or two, but the legal discussion would not at all have
changed—nor, more importantly, would the outcome.

The Plaintiffs also argue, though only in a footnote, that if they had an opportunity to be heard,
they would have objected to a finding in the Sale Order that New GM was a "good faith
purchaser" (relevant under Bankruptcy Code section 363(m)), and that the Court likely would
have agreed with them.  *See* Pl. Br. at 59 n.67.  That contention does not help them.  Their
prediction of the Court's ruling if they had made such an argument is speculative, but even if such
a ruling might have come to pass, it would not have an effect on the inclusion of provisions
imposing successor liability.  "Good faith purchaser" findings provide safe harbors for buyers *on
appeal*; they do not go to whether or not a sale should be approved, or the nature or extent of any
provisions barring successor liability.  *See* section 363(m).

[192]    The Court would have fully and fairly considered any such argument now if it had been made, but
(presumably because of the absence of supporting authority) that is not the Plaintiffs' argument
here.

[193]    *See* Pl. Br. at 4 ("New GM's self-serving speculation regarding possible outcomes had the ISD
been disclosed and notice to the Pre-Sale Class been given are not even plausible."); *id.* at 58
("New GM's argument speculatively presumes that this Court would have written exactly the

ask the Court to accept the likelihood that by reason of public outrage or public pressure, they could have required Old GM or Treasury to rewrite the deal to accede to their desires.[195] And they know, or should, the fundamental principle of bankruptcy law that a buyer of assets cannot be required to take on liabilities it doesn't want.

So it requires no speculation for the Court to rule that given Old GM's circumstances at the time, the Court would not have disapproved the 363 Sale or conditioned its approval on modifications to the carefully negotiated restructuring to favor one or more groups seeking special treatment.

As noted above, the Court agrees with the Plaintiffs and the GUC Trust that speculation is inappropriate on an inquiry of this nature. But gauging the outcome on the bar of successor liability if Plaintiffs had been heard does not at all involve speculation, especially since they offered no authority beyond what the other objectors offered in 2009. Rather, it is the Plaintiffs' alternative argument—that they could have succeeded by reason of public outrage, political pressure, or Treasury's anger with Old GM, when

---

same opinion in July of 2009 . . . ."); *id.* at 59 ("New GM cannot support its speculation as to the potential outcome had Old GM disclosed, on the eve of filing for bankruptcy, that it had put millions of cars on the road with a known but hidden life-threatening defect while failing to disclose that fact to those most affected by it.").

[194]    *See* Pl. Br. at 59 ("[I]t is equally or even more likely that Old GM and Treasury—who, New GM acknowledges, was the one to draw 'the line in the sand'—would have chosen to deal with objections from Plaintiffs in the same way it chose to deal with objections from consumer safety groups, by adding Plaintiffs' claims to assumed liabilities."); *id.* at 4 ("[T]here is no way to determine, some five years later, what the outcome would have been had the bombshell of Old GM's concealment of this massive safety defect been made known to the Court, the Treasury, Congress, the public, the press and the various objectors.").

[195]    *See id.* at 4-5 ("[H]ad the Court and governmental authorities known that Old GM had knowingly placed millions of cars on the road with a life-threatening safety defect (and that New GM intended to continue to allow such cars to remain on the road with those known defects), it is not reasonable to assume (as New GM does) that such a revelation could only have resulted in a disastrous liquidation and the end of GM as a functioning company. Instead, it is likely that such an outcome would have still been avoided (for numerous reasons, political, national economic and otherwise, that were still significant, compelling and extant), *and that the entry of the Sale Order would have been conditioned on New GM's assumption of all related liabilities so as to ensure the commercial success of the purchasing entity.*") (emphasis added).

they could not prevail in the courtroom—that asks the Court to speculate. For the very reason the Plaintiffs themselves advance, the Court should not, and will not, do so.

Insofar as the Free and Clear Provisions' prohibition of successor liability claims are concerned, while the Plaintiffs failed to receive the notice due process requires, they were not prejudiced as a result. Thus they have failed to establish a claim for a denial of due process. The Free and Clear Provisions must stand.

(b)    *New GM's Own Wrongful Acts*

What the Court would have done in the face of a Sale Order overbreadth objection is likewise not subject to speculation. The Court follows its own precedent. If the Plaintiffs had been heard to make the argument back in 2009 that they are making now—that they should have the right to allege claims based on wrongful conduct by New GM alone, without any reliance on anything that Old GM might have done—the Court would have entered a narrower order, as it did in similar situations. In this respect, the Economic Loss Plaintiffs were prejudiced.

The Court has twice dealt with what is effectively the same issue before. In another chapter 11 case on the Court's watch, quite a number of years before the 363 Sale in this case, Magnesium Corporation of America ("**MagCorp**"), one of the two debtors in that case,[196] had massive bond debt, environmental, and other liabilities, leading to a chapter 11 filing in August 2001. In May 2002, lacking an ability to reorganize, MagCorp sought approval of a 363 sale to US Magnesium, an affiliate, of substantially all of its assets, with free and clear provisions that would protect the purchaser from successor liability on the debtors' legacy claims—including, most significantly,

---

[196]    *In re Magnesium Corp. of Am.*, No. 01-14312-reg ("*MagCorp*).

MagCorp's environmental liabilities to the EPA and other U.S. Government entities. Understandably upset that it would have to recover its very substantial claims from a shell that at the time seemed largely worthless, the Government objected to the free and clear provisions.

Consistent with the law at the time (which was even clearer by 2009), the Court nevertheless granted the requested free and clear provisions. But it further ruled that *while successor liability would be proscribed,* US Magnesium would not be protected with respect to any future matters *that were its own liability.* As part of its dictated rulings, the Court stated:

> When you are talking about free and clear of liens, it means you don't take it subject to claims which, in essence, carry with the property. It doesn't absolve you from compliance with the law going forward.[197]

And though it later rejected an effort by the Government to reargue the free and clear provisions there, the Court then said:

> I've made it clear that the new owners will have to comply with the law and will be subject to any and all obligations that the EPA or other regulatory authorities can impose with respect to the new owners of the land, including requiring that they do whatever they have to do with cleaning up their land if it's messed up.[198]

The Court's sale order in *MagCorp* therefore included, after its free and clear provisions, a key proviso:

> provided, however, that *nothing contained herein shall* (a) release US Magnesium LLC or any affiliate or insider thereof from any claim of the

---

[197]    Tr. of Hr'g, Jun 4, 2002, No. 01-14312 ECF No. 290, at 129:21-25.

[198]    *Id.* at 132:22-133:5 (transcription errors corrected).

> United States against US Magnesium or such
> affiliate or insider which existed immediately prior
> to the Closing (but not as a successor in interest to
> the Seller) and (b) *excuse US Magnesium LLC from
> any obligations under applicable law* (including,
> without limitation, RCRA or other environmental
> laws) *as the owner and operator of the Assets (but
> not as successor in interest to Seller).*[199]

Similarly, at the 2009 sale hearing in this case, certain objectors voiced concerns

that any approval order would too broadly release either Old GM or New GM from their

respective duties to comply with environmental laws and cleanup obligations. After they

did so, the Court noted that it had originally shared their concerns, but that their concerns

were addressed by amendments to the proposed order that were made after objections

were filed.[200] The Sale Order in this case was amended to say:

> Nothing in this Order or the [Sale Agreement]
> releases, nullifies, or enjoins the enforcement of any
> Liability to a governmental unit under
> Environmental Laws or regulations (or any
> associated Liabilities for penalties, damages, cost
> recovery, or injunctive relief) that any entity would
> be subject to as the owner, lessor, or operator of
> property after the date of entry of this Order.
> Notwithstanding the foregoing sentence, nothing in
> this Order shall be interpreted to deem the
> Purchaser as the successor to the Debtors under any
> state law successor liability doctrine with respect to
> any Liabilities under Environmental Laws or
> regulations for penalties for days of violation prior
> to entry of this Order. Nothing in this paragraph
> should be construed to create for any governmental
> unit any substantive right that does not already exist
> under law.[201]

---

[199]    Order, No. 01-14312 ECF No. 283 (Jun. 5, 2002) ¶ 13 (underlining in original but emphasis by
italics added).

[200]    *See Sale Opinion*, 407 B.R. at 507-08.

[201]    *Id.* at 507. Another provision provided similarly: "Nothing contained in this Order or in the [Sale
Agreement] shall in any way (i) diminish the obligation of the Purchaser to comply with
Environmental Laws...." *Id.* at 507-08.

Here the Sale Order, in addition to barring successor liability (which for reasons

discussed above, remains fully appropriate), also proscribed any claims involving

vehicles and parts manufactured by Old GM, even if the claims might rely solely on

wrongful conduct by New GM alone.  By not having the opportunity to argue that such

was inappropriate here (and to seek a proviso similar to the ones granted in *MagCorp* and

for the environmental objectors here), the Economic Loss Plaintiffs were prejudiced.

They thus established an actionable denial of due process with respect to Sale Order

overbreadth.

*(c) The Used Car Purchasers*

A subset of the Economic Loss Plaintiffs, the Used Car Purchasers (whom the

Plaintiffs refer to as the "Post-Sale Class"), assert that they have special rights—to assert

claims for successor liability when nobody else can—because they had not yet purchased

their cars at the time of the 363 Sale.  The Court cannot agree.  Aside from the illogic and

unfairness of the contention, it is erroneous as a matter of law, for at least two reasons.

First, when the Court issued the Sale Order, approving the disposition of Old GM

assets—a matter over which the Court had unquestionable subject matter jurisdiction,

derived from its statutory subject matter jurisdiction under 28 U.S.C. § 1334 and, more

importantly for these purposes, the *in rem* jurisdiction the Court had over estate assets

then being sold—those assets were sold free and clear of successor liability claims.  The

substance of the Sale Order was to proscribe claims based on the transferor Old GM's

conduct that could be argued to travel with the assets transferred.[202]  The bar against

---

[202]    *See Sale Opinion*, 407 B.R. at 501 (as part of Court's analysis that successor liability claims were
"interests" properly subject to a free and clear order, recognizing that "we know that an 'interest'
is something that may accompany the transfer of the underlying property, and where bankruptcy

successor liability claims premised on continued ownership of the property traveled with the property. The Used Car Plaintiffs would thus be bound by the *in rem* nature of that order except to the extent that its enforcement, by reason of due process concerns, would be improper as to them.

Because they were unknown at the time, and were not even creditors (not having yet acquired the cars they now assert have decreased value), mailed notice was impossible, and publication notice (or for that matter, actual notice) would not have been meaningful to them, even if Old GM had previously sent out recall notices. Thus the Used Car Purchasers were denied the notice due process requires to bind them to the Free and Clear Provisions,[203] just as the remainder of the Plaintiffs were.

But like the other Plaintiffs, the Used Car Purchasers were not prejudiced, because others made the same arguments that Used Car Plaintiffs might have made, and the Court rejected those contentions. Especially since purchasers of estate property under sale orders have property rights too, the methodology for correcting a denial of an opportunity to be heard under such circumstances (if not others as well) should be (1) at least temporarily relieving an adversely affected litigant of the effect of the order, and then (2) giving the adversely affected litigant the opportunity to be heard that was previously denied—referred to colloquially by this Court, in oral argument, as a "do-over"[204]—fixing any damage that might have resulted from an incorrect or incomplete

---

policy, as implemented by the drafters of the Code, requires specific provisions to ensure that it *will not* follow the transfer.") (emphasis in original).

[203]    *See Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus., Inc.)*, 445 B.R. 243 (Bankr. S.D.N.Y. 2011) (Bernstein, C.J.) ("***Grumman Olson-Bankruptcy***"), *aff'd* 467 B.R. 694, 706-07 (S.D.N.Y. 2012) (Oetkin, J.) ("***Grumman Olson-District***") (finding due process concerns made bar of successor liability unenforceable against claimants who were unknown, future, claimants at the time of the sale) (collectively, the "***Grumman Olson Decisions***").

[204]    *See* Day 1 Arg. Tr. at 15, 20, 21.

ruling the first time. Granting any more than that would favor the Plaintiffs with an outcome that the Court has already determined is contrary to existing law, and would grant them a wholly inappropriate windfall.

Like the other Economic Loss Plaintiffs (and for that matter, the Pre-Closing Accident Plaintiffs), if the Used Car Purchasers made arguments at this time that were not previously raised, the Court believes that it would be obligated to consider those arguments now, and effectively give Used Car Plaintiffs a do-over. But once again like the other Plaintiffs, the Used Car Plaintiffs have identified no arguments they might have made that others did not. As with the other Plaintiffs, the denial of notice gave them the chance to be heard on the merits at a later time, but not to an automatic win.

Second (assuming *arguendo* that they were injured), the Used Car Owners were injured as the successors in ownership to individuals or entities who had been the prior owners of their Old GM cars. And for each of them, an earlier owner was in the body of owners of Old GM vehicles who were bound by the Free and Clear Provisions. With exceptions not applicable here (such as holders in due course of negotiable instruments), the successor in interest to a person or entity cannot acquire greater rights than his, her, or its transferor.[205] That is the principle underlying the *Wagoner* Rule,[206] which, while an amalgam of state and federal law, is firmly embedded in the law in the Second Circuit.[207]

---

[205]    *See Tital Real Estate Ventures, LLC v. MJCC Realty L.P. (In re Flanagan)*, 415 B.R. 29, 42 (D. Conn. 2009) (Underhill, J.) ("In acquiring the estate's rights and interests . . . Titan [the acquiror from a trustee] acquired no more and no less than whatever rights and interests to MJCC and its properties the estate possessed at the time of the assignment . . . Titan can only prevail on its claims if, and to the extent that, the Trustee would have prevailed on those claims at the time of the assignment.").

[206]    *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991) ("*Wagoner*").

[207]    *See, e.g., Buchwald v. The Renco Group, Inc. (In re Magnesium Corp. of America)*, 399 B.R. 722, 757 nn. 113 & 114 (Bankr. S.D.N.Y. 2009) (Gerber, J.) (applying *Wagoner* Rule to hold chapter 7

And that principle has likewise been applied to creditors seeking better treatment than the assignors of their claims.[208] Thus it is not at all surprising to this Court that in *Old Carco*,[209] Judge Bernstein blocked the suits by those who bought *used* 2005 and 2006 Dodge Durangos or Jeep Wranglers,[210] distinguishing *Grumman Olson-Bankruptcy* on the ground that those plaintiffs *"or their predecessors (the previous owners of the vehicles)* had a pre-petition relationship with Old Carco, and the design flaws that they now point to existed pre-petition."[211]

Thus the caselaw requires that New GM receive the same protection from Used Car Owners' successor liability claims that it had from their assignors'.

The Used Car Purchasers' contention that they deserve better treatment than other GM vehicle owners is also illogical and unfair. As New GM argues, with considerable force, "an owner of an Old GM vehicle should not be able to 'end-run' the applicability of the Sale Order and Injunction by merely selling that vehicle after the closing of the 363 Sale . . . if the Sale Order and Injunction would have applied to the original owner who purchased the vehicle prior to the 363 Sale, it equally applies to the current owner

---

[208] trustee to *in pari delicto* defenses applicable to the corporation and its management whom the trustee replaced).

[208] *See In re KB Toys, Inc.*, 736 F.3d 247, 252-54 (3rd Cir. 2013) ("*KB Toys*") (a trade claim that was subject to disallowance in the hands of the original claimant as a preferential transfer was similarly disallowable in the hands of a subsequent transferee). Like the Third Circuit in *KB Toys, see id.* at 254 n.11, the Court has considered, but declined to follow, the contrary holding in *Enron Corp. v. Springfield Assocs. (In re Enron Corp.)*, 379 B.R. 425 (S.D.N.Y. 2007) (Scheindlin, J.) ("*Enron-District*"), which had held that susceptibility for equitable subordination and claims disallowance would continue if a transfer was by way of an "assignment," but not by "sale." The Third Circuit in *KB Toys* court found this distinction to be "problematic," *id.*, and for that reason and others, it followed the contrary decisions in *Enron Corp. v. Avenue Special Situations Fund II, LP (In re Enron Corp.)*, 340 B.R. 180 (Bankr. S.D.N.Y. 2006) (Gonzalez, J.) ("*Enron-Bankruptcy*") (which the *Enron-District* court had reversed), and in *In re Metiom, Inc.*, 301 B.R. 634 (Bankr. S.D.N.Y. 2003) (Drain, J.), with which this Court, like the Third Circuit, agrees.

[209] *See* n.157 *supra.*

[210] *See Old Carco*, 492 B.R. at 399.

[211] 492 B.R. at 403 (emphasis added).

-88-

who purchased the vehicle after the 363 Sale."[212] There is no basis in logic or fairness for a different result.

For all of these reasons, the Court concludes, after what is effectively *de novo* review (focused on the non-showing by Used Car Purchasers of anything they might have argued to defeat the Free and Clear Provisions beyond anything previously argued), that Used Car Purchasers have likewise failed to make a showing of prejudice, and the Free and Clear Provisions stand for them as well.

6. *Application of Those Principles to Pre-Closing Accident Plaintiffs*

Like the Economic Loss Plaintiffs whose claims the Court just addressed, the Pre-Closing Accident Plaintiffs seek to impose successor liability on New GM. But though the Court has found that they did not get the notice due process requires, they were not prejudiced by the failure.

Preliminarily, the Court's determination that the Economic Loss Plaintiffs were not prejudiced by the Free and Clear Provisions applies equally to the Pre-Closing Accident Plaintiffs. The Pre-Closing Accident Plaintiffs likewise have offered no arguments here as to why the Court's earlier order proscribing successor liability was wrong. And it requires no speculation here for the Court again to find no basis for a different legal result. In fact, many of the objectors whose contentions the Court rejected back in 2009 were asserting the exact same types of claims the Pre-Closing Accident Plaintiffs have—claims for injury or death from pre-closing accidents, involving vehicles or parts manufactured by Old GM. While the Pre-Closing Accident Plaintiffs' claims (premised upon actual injury or death, and, at least allegedly, from the safety risk of

---

[212]    *See* New GM Opening Br. at 66.

which Old GM was aware), might be regarded by many as more sympathetic than those of Economic Loss Plaintiffs, they nevertheless are efforts to impose successor liability. And contentions that the Pre-Closing Accident Plaintiffs would successfully impose successor liability by reason of political concerns are once again speculative, just as the similar arguments of the Economic Loss Plaintiffs were.

The arguments as to Sale Order breadth that the Economic Loss Plaintiffs might have asserted would not be relevant to the Pre-Closing Accident Plaintiffs. To the extent the Sale Order was overbroad, it was so as to any claims that might arise *solely by reason of New GM's conduct*. The Pre-Closing Accident Plaintiffs suffered the injury or death underlying their claims in Old GM cars, and with Old GM parts. Any actionable conduct causing that injury or death took place before the 363 Sale—and necessarily was by Old GM, not New GM, and indeed before New GM could have done anything wrong.

If the overbreadth objection were sustained and the Sale Order could be, and were, fixed (a matter addressed in Section II below, dealing with Remedies), the Pre-Closing Accident Plaintiffs still could not assert claims against New GM.

The Pre-Closing Accident Plaintiffs did not suffer the prejudice that is an element to a denial of due process claim.

### 7. *Application to Filing of Claims*

Much of the analysis above applies equally to the allowance of claims. But due process analysis in the claims allowance context must take into account two differences. First, here there was not the same degree of urgency with respect to the deadline for filing claims. And second, while prejudice is required in the claims context as well, the denial of the opportunity to file a timely proof of claim—and with it, the likely or certain expungement of one's claim—is at least generally, if not always, classic prejudice.

As noted above, due process analysis requires the consideration of the surrounding circumstances. While the need for urgency in a judicial process is the paradigmatic example of a relevant circumstance, the converse is also true. When the urgency is lacking, the hugely important factor of impracticality by reason of time constraints drops out of the picture. In contrast to the 363 sale process, claims could be (and ultimately were) considered in a less hurried fashion.

Nevertheless, were it not for the fact that Ignition Switch Defects were known claims (for reasons discussed in Section I(A)(5) above), service of notice of the Bar Date by the publication that here was utilized[213] would still be adequate. Old GM was careful to send out notice of the Bar Date to any who had brought suit against Old GM or expressed to Old GM their belief that they might have claims, and the Court approved Old GM's proposals for notice by publication to those not known by Old GM to have potential claims against the Old GM estate.

But with respect to the allowance of claims, the failure to send out Ignition Switch Defect recall notices, much more clearly than with respect to notice of the 363 Sale, resulted in the denial of the notice that due process requires. And though a showing of prejudice here too is required, the Court finds that the denial of timely notice of the Old

---

[213]    The Plaintiffs seek to compare and contrast the highly detailed and carefully structured publication notice that this Court authorized with respect to worker claims that might have arisen by reason of their exposure to the chemical diacetyl, in another case on the Court's watch, *Chemtura* (No. 09–11233 (reg)), where a challenge to the adequacy of the notice was rejected by this Court and later affirmed on appeal. *See Gabauer v. Chemtura Corp. (In re Chemtura Corp.)*, 505 B.R. 427 (S.D.N.Y. 2014) (Furman, J.). The comparison is not an apt one. There, as a result of a shared desire of the debtor and the Court to provide the best notice possible to workers who might have been exposed to diacetyl (and because Chemtura wanted to lean over backwards to get a discharge of such claims on which it could rely), the Court established special measures, such as notices with an unusually detailed discussion of the possibility of illness, postings of notices in each potentially affected plant, notices in local community newspapers, and publication in both English and Spanish. But these measures are properly thought of as "best practices," or at least an excess of caution, which would not establish a minimum standard for the quality of notice that is constitutionally required.

GM Bar Date prejudiced the Plaintiffs with respect to any claims they might have filed

against Old GM.

By reason of its failure to provide the Plaintiffs with either the notice required

under the Safety Act or any other form of written notice, Old GM failed to provide the

Plaintiffs with the notice that due process requires.[214] And because that failure

prejudiced them in filing timely claims, the Plaintiffs were prejudiced as a result. The

failure to give the Plaintiffs the notice that due process requires, coupled with the

prejudice to them that resulted, denied the Plaintiffs the requisite due process.

## II.

### Remedies

The second threshold issue requires the Court to determine the appropriate

remedies for any denials of due process that the Court may have found. Once again, the

Court focuses on the Sale Order and claims allowance process separately.

### A.

### The Sale Order

The Plaintiffs argue that the Court should simply deny New GM enforcement of

the Sale Order "as to the objecting claimant[s] who did not receive due process,"[215] (*i.e.*,

as to *them*), even with respect to the same successor liability as to which the Court ruled

against others who got notice and argued against it. They argue, in substance, that they

---

[214]    The Court does not need to decide, and does not decide (in either this context or in the context of the adequacy of notice of the 363 Sale), a matter also debated by the parties—the extent to which a detailed notice describing the types of claims Plaintiffs might assert (or, by analogy, of how they might be adversely affected by the Free and Clear Provisions) was required as a matter of due process law. Because Old GM failed to send out *any* recall notices, or provide *any* alternative form of notice to those with Ignition Switch Defects, whatever, the degree of detail that might otherwise be required is academic.

[215]    Pl. Br. at 62.

should be permanently absolved from the Sale Order's Free and Clear Provisions

irrespective of whether those provisions were right or wrong. Not surprisingly, the Court

rejects this contention.

By the same token, New GM argues that the Plaintiffs' remedy, if any, is to

enforce their claims against the proceeds of the 363 Sale, and that the unitary nature of

the Sale Order requires that the Court either enforce it as a whole or vacate it as a

whole—while also reminding the Court (though the Court need hardly be reminded) that

unwinding the sale at this point is unthinkable. Though these contentions are not as

offensive as the Plaintiffs', these too are flawed.

Like the Due Process issue, the Court analyzes the Remedies issue in ways

materially different than the parties here do—in accordance with the discussion that

follows.

### 1. Prejudice As Affecting Remedy

For reasons discussed above,[216] the Court has already rejected the Plaintiffs'

contention that prejudice is irrelevant to the existence of a due process violation resulting

from a denial of the requisite notice. That limits, though it does not eliminate, the matters

for which a remedy must be crafted.

Here the Plaintiffs failed to receive notice they might have used to join others

likewise arguing against the Free and Clear Provisions. But the others made those points,

and made them well. And while the prejudice analysis might be different if the Plaintiffs

now identified successor liability points others failed to make, here no such points have

---

[216]     *See* page 71 & nn.162 through 165 *supra*.

been identified. On the Free and Clear Provisions barring successor liability, there is no

prejudice; thus no due process claim; and thus nothing to remedy.[217]

But on the Plaintiffs' second principal matter of concern—the overbreadth of the

Sale Order—the situation is different. There is a flaw in the order, protecting New GM

from liability on claims that, while they involve Old GM vehicles or Old GM parts, do

not rest on successor liability, and instead rely on New GM's alleged wrongful conduct

alone. The Plaintiffs could have made overbreadth arguments if given appropriate notice

before the 363 Sale hearing, and to that extent they were prejudiced. And for that the

Plaintiffs should be entitled to remedial relief to the extent the law otherwise permits.

### 2.  *Attaching Claims to Sale Proceeds*

So it is necessary then to turn to New GM's points. In several respects, New GM

is right, but in material respects New GM extends existing law too far, or fails to

recognize the holdings or implications of existing precedent.

Over-extension of existing law is the problem with respect to New GM's first

point: its contention that the Plaintiffs' claims should attach to the 363 Sale Proceeds.

That often works fine; courts routinely provide that upon sales of estate property subject

to a lien, the rights of parties with liens on the collateral that was sold attach to the

---

[217]  Even if prejudice did not need to be found as an element of a claim of denial of due process in the
first place, prejudice would nevertheless be a critical element in determining the proper remedy.
As noted above, the Court believes that the methodology for the correction of a denial of an
opportunity to be heard in a sale order context should be (1) at least temporarily relieving an
adversely affected litigant of the effect of the order, and then (2) giving the adversely affected
litigant the opportunity to be heard that was previously denied—repairing any damage that might
have resulted from an incorrect or incomplete ruling the first time. Apart from the unfairness of
treating the Plaintiffs better than others similarly situated, granting them any more than that would
favor the Plaintiffs with an outcome that the Court has already determined is contrary to existing
law, and grant them a wholly inappropriate windfall.

proceeds instead.[218] And since the secured component of a claim protected by a lien

cannot exceed the value of the collateral, that will typically eliminate any prejudice to the

lien creditor. That was the situation in *Edwards*, which (because it involved a lien)

reached the right bottom line. But as this Court noted above,[219] the claims and interests

proscribed by a sale order can go beyond mere liens, and New GM's analysis can work

only for liens—or, perhaps, any similar interests whose value is capped by the value of

collateral being sold. If another kind of interest was impacted—as it has been here—a

different remedy must be considered.

New GM's second point (that the Sale Order cannot be vacated or modified at this

late point in time) breaks down into several distinct, but related, points—raising issues of

bankruptcy policy and the finality of judicial sales; of due process law; and of respect for

the nonseverability provisions in orders upon which many rely. Each raises matters of

legitimate concern from New GM's perspective. But they can be taken only so far.

*3. Protection of Purchasers of Estate Assets*

New GM points out that the buyers of assets from chapter 11 estates acquire

property interests too—as recognized by the Seventh Circuit in *Edwards*[220]—and that

taking away those purchasers' contractually bargained-for rights strikes at the heart of

understandings critically important to the bankruptcy system. In this respect, New GM is

---

[218]    In fact, the Court did exactly that at the time of the 363 Sale, with respect to lenders (the "**TPC Lenders**") who had liens on a transmission manufacturing plant in Maryland, and a service parts distribution center in Tennessee, that went over to New GM in the Sale. *See In re Motors Liquidation Co.*, 482 B.R. 485, 487 (Bankr. S.D.N.Y. 2012) (Gerber, J). After a series of negotiations, the TPC Lenders and Old GM agreed to protective provisions under which the proposed sale could go through while protecting the TPC Lenders' lien rights. The two properties were sold free and clear of liens; cash proceeds were put into an escrow account, to which the TPC Lenders' liens would attach; and the Court later ruled on valuation issues that would determine the TPC Lenders' monetary entitlement.

[219]    *See* page 54 et seq. & n.123, *supra*.

[220]    *See* nn.69 & 123 *supra*.

right. The Second Circuit has repeatedly recognized the importance to the bankruptcy system of concerns before the Court here. In one instance, the Circuit observed that "[w]e have long recognized the value of finality in judicial sales."[221] In another, the Circuit affirmed a District Court judgment dismissing successor liability claims after a bankruptcy sale, observing that:

> Allowing the plaintiff to proceed with his tort claim directly against [the asset purchaser] would be inconsistent with the Bankruptcy Code's priority scheme because plaintiff's claim is otherwise a low-priority, unsecured claim. Moreover, to the extent that the "free and clear" nature of the sale (as provided for in the Asset Purchase Agreement ("APA") and § 363(f)) was a crucial inducement in the sale's successful transaction…it is evident that the potential chilling effect of allowing a tort claim subsequent to the sale would run counter to a core aim of the Bankruptcy Code, which is to maximize the value of the assets and thereby maximize potential recovery to the creditors.[222]

For all of these reasons, if it were not for the fact that the Plaintiffs' claim is a constitutional one, the Court would decline to deny enforcement of the Sale Order, in whole or in part. There is no good reason to give creditors asserting successor liability claims recovery rights greater than those of other creditors. And as importantly or more so, the interests inherent in the enforceability of 363 orders (on which the buyers of assets

---

[221] *Licensing by Paolo, Inc. v. Sinatra (In re Gucci),* 126 F.3d 380, 387 (2d Cir. 1997) ("*Gucci*").

[222] *Douglas v. Stamco,* 363 Fed. Appx. 100, 102 (2d Cir. 2010) (summary opinion, Katzmann, Walker, and Feinberg, C.JJ.) (quoting *In re Trans World Airlines, Inc.,* 322 F.3d 283, 292 (3d Cir. 2003) ("To allow the [plaintiff] to assert successor liability claims against [the purchaser] while limiting other creditors' recourse to the proceeds of the asset sale would be inconsistent with the Bankruptcy Code's priority scheme.")) (citation, and footnote reference explaining why "free and clear" nature of the sale was an inducement there, omitted).

should justifiably be able to rely,[223] and on which the interests of creditors, keenly

interested in the maximization of estate value, likewise rest) are hugely important.[224]

### 4. *Effect of Constitutional Violations*

But we here have a constitutional violation—a denial of due process. In such an

instance, the Court must then determine whether doctrine that would bar modification of

the Sale Order under less extreme circumstances has to give way to constitutional

concerns. The Court concludes that it must.

New GM has called the Court's attention to two decisions in which courts

declined to grant relief from sale orders where those seeking the relief received

---

[223]   *See, e.g., In re Lehman Bros. Holdings Inc.*, 445 B.R. 143 (Bankr. S.D.N.Y. 2011) (Peck, J.)
("*Lehman*"), *aff'd in part and rev'd in part on other grounds*, 478 B.R. 570 (S.D.N.Y. 2012),
*aff'd*, 761 F.3d 303 (2d Cir. 2014). As Judge Peck observed in *Lehman*, declining to grant Rule
60(b) relief as to a sale order even though significant information was not provided to him (and
even while recognizing that sale orders are not exempt from Rule 60(b) relief when cause is
shown):

> This tension relating to finality naturally exists to some extent
> in every motion under Rule 60(b) but the Court views final
> sale orders as falling within a select category of court order
> that may be worthy of greater protection from being upset by
> later motion practice. Sale orders ordinarily should not be
> disturbed or subjected to challenges under Rule 60(b) unless
> there are truly special circumstances that warrant judicial
> intervention and the granting of relief from the binding effect
> of such orders.

*Id.* at 149.

[224]   There is also a policy concern, though the Court does not suggest that a policy concern could
trump the requirements of law, or, especially, parties' constitutional rights. But those in the
bankruptcy community would instantly understand it. As the court noted in *In re White Motor
Credit Corp.*, 75 B.R. 944, 951 (N.D. Ohio 1987):

> The effects of successor liability in the context of a corporate
> reorganization preclude its imposition. The successor liability
> specter would chill and deleteriously affect sales of corporate
> assets, forcing debtors to accept less on sales to compensate
> for this potential liability. This negative effect on sales would
> only benefit product liability claimants, thereby subverting
> specific statutory priorities established by the Bankruptcy
> Code. This result precludes successor liability imposition.

inadequate notice. [225] But in each case the party seeking the relief was found not to have been materially prejudiced or prejudiced at all. New GM has not called the Court's attention to any case in which an order was found to have been entered with a prejudicial denial of due process and the court nevertheless denied relief. [226] By contrast, the Plaintiffs have called the Court's attention, and/or the Court has found, six decisions—including two by the Second Circuit—modifying, or declining to enforce as against adversely affected parties, earlier orders in instances where those parties were denied due process and also prejudiced thereby.[227]

---

[225]    *See Edwards*, n.69, and *Paris Industries*, n.123 *supra*.

[226]    In its reply, New GM calls the Court's attention to the Supreme Court's decision in *Factors' & Traders Ins. Co. v. Murphy*, 111 U.S. 738 (1884) ("*Factors'*"), a case in which one of the several noteholders of four notes secured by a common mortgage failed to get notice of a free and clear sale, and the Court determined that the choices there were to either uphold a free and clear sale order in full or wholly invalidate it. *See* New GM Reply Br. at 46. It is true that the Court there saw those two options as the only fair alternatives. But the Court's ruling was to that effect not because of a holding that courts lack the power to more selectively enforce orders where a person is denied notice, but because doing so under the facts there (where the party not given notice would get a leg up over her fellow noteholders) would be unfair to the other noteholders, invalidating their liens while upholding only hers. *Factors'* thus does not support New GM's position in the respect for which it was cited. It does, however, support New GM in a different, and ultimately more important, respect—New GM's point that the Plaintiffs cannot secure relief based on a lack of notice alone, without showing prejudice. *Factors'* evidences courts' reluctance to grant windfalls to those who claim to have received deficient notice, and their concern instead with a fair result.

[227]    *See Manville-2010*, n.69 *supra*, 600 F.3d at 153-54 (after ruling that due process was denied, ruling that an adversely affected insurer was not bound by an earlier bankruptcy court order); *Koepp*, n.69 *supra*, 593 Fed. Appx. 20 (ruling that easement holder was not deprived of her interest when her predecessor was not given notice of a railroad reorganization consummation order that extinguished the predecessor's interest); *Doolittle v. Cnty. of Santa Cruz (In re Metzger)*, 346 B.R. 806, 819 (Bankr. N.D. Cal. 2006) (Weisbrodt, J.) ("*Metzger*") (finding sale order void to the extent (but only the extent) it affected the rights of an entity with an interest in the sold property that did not receive due process); *In re Polycel Liquidation, Inc.*, 2006 Bankr. LEXIS 4545, at *25-26, 31-34, 2006 WL 4452982, at *9, 11-12 (Bankr. D.N.J. Apr. 18, 2006) ("*Polycel-Bankruptcy*") (Lyons, J.) (after ruling that due process to an entity was denied by reason of failure to provide notice, voiding sale to extent, but only the extent, that it conveyed that entity's property), *aff'd*, 2007 U.S. Dist. LEXIS 955, 2007 WL 77336 (D.N.J. Jan. 8, 2007) ("*Polycel-District*") (Cooper, J.) (holding, *inter alia*, that Bankruptcy Court was not bound to either void the sale or let the sale stand); *Compak Cos., LLC v. Johnson*, 415 B.R. 334, 342 (N.D. Ill. 2009) ("*Compak*") (holding that patent licensors' interests could not be extinguished by a sale order without due process, notwithstanding *Edwards*, given that the lienholder in *Edwards* had suffered only a trivial loss of interest; *Grumman Olson-Bankruptcy*, 445 B.R. 243, *aff'd* 467 B.R.

The latter decisions reached those results by varied means (and some with reference to Fed.R.Civ.P. 60(b) and some without it), but they all came to the same bottom line. They relieved the adversely affected party of the effects of the order insofar as it prejudiced that party. New GM insufficiently recognizes the significance of those decisions.

The decision most closely on point is *Metzger*. There the debtor in a chapter 11 case owned land to be later developed for the construction of townhouses that was subject to a deed restriction entered into with the county under which four of the units later to be constructed had to be sold at below market rates. The debtor sold the property under a free and clear order in 1992, but without notice to the county. In 2006, 14 years after the court issued the sale order, the purchaser's successor found itself in a dispute with the county over the continuing validity of the restriction, and sought to enforce the free and clear provisions. As here, the county contended that it could not be bound by the free and clear provisions, because it was not given notice of the hearing at which the sale was approved.[228]

On those facts, the *Metzger* court ruled, under Fed. R. Civ. P. 60(b),[229] that the order was "void as to the County's interest."[230] It continued:

> The Court has some flexibility in creating a remedy here and need not and will not find the entire sale void on these facts. The Court need only find, and does find, that the County's interest in the Property survived the sale to [the purchaser]. The 1992 Sale

---

694, 706-07 (finding due process concerns made bar of successor liability unenforceable against claimants who were unknown, future, claimants at the time of the sale).

[228]    *See* 346 B.R. at 809-10.

[229]    With exceptions not applicable here, Rule 60(b) applies in cases under the Bankruptcy Code under Fed. R. Bankr. P. 9024.

[230]    *Id.* at 819.

Order is to that limited extent void because the
County's due process rights were violated.[231]

Addressing remedy in the same fashion are the Bankruptcy Court and District

Court decisions in *Polycel*. There the debtor sold its property (or what it said was its

property) free and clear, in a 363 sale. The property assertedly conveyed to the buyer

included commercial molds used in the manufacture of prefabricated panels used to form

the interior surface of inground swimming pools. But a third party, Pool Builders Supply

of the Carolinas (**"Pool Builders Supply"**), which without dispute was not given notice

of the sale, and which contended that it was the true owner of the molds, sought relief

from the sale order asserting that its property was taken without due process.

The Bankruptcy Court granted relief under Rule 60(b), voiding the sale order as to

Pool Builders Supply alone (keeping the remainder of the sale order intact), and the

Bankruptcy Court's determination was affirmed on appeal. The *Polycel-Bankruptcy*

court balanced the competing concerns of bankruptcy court finality and due process

requirements, and concluded that the latter should prevail. Disagreeing with so much of

*Edwards* that considered that the interests of finality to outweigh the due process

concerns, the *Polycel-Bankruptcy* court stated:

> This court is inclined to disagree with the reasoning
> of the Seventh Circuit, and instead follows the more
> persuasive line of cases that recognize the
> importance of affording parties their due process
> rights over the interest of finality in bankruptcy
> sales.
>
> Although this court agrees that the interest of
> finality is an important part of ensuring
> participation in bankruptcy sales, this cannot trump

---

[231]    *Id.* (citations omitted).

> constitutionally mandated due process requirements
> for notice and an opportunity to be heard.[232]

Addressing the Remedies issue in the same fashion is *Compak*. There, a suit over

patent infringement and the entitlement to patent royalties turned on whether a patent

license could be extinguished in a 363 sale of all of the debtor's assets. A sublicensee of

the patent rights was not given notice of a 363 sale that would extinguish the

sublicensee's claims.[233] After discussion of the prejudice the sublicensee suffered, and

distinguishing *Edwards* because of the much greater "interests at stake," the *Compak*

court concluded that "the Sale Order is 'void' insofar as it purports to extinguish the

defendants' license." [234]

In the *Grumman Olson Opinions,* Judges Bernstein and Oetkin dealt with a

factual variant of the 363 sale order cases discussed above. Those decisions, unlike those

previously discussed, did not involve individuals who were supposed to get notice but

didn't get it, but rather people who the debtor *could not have given notice to,* because

they did not have claims or interests yet.

There certain of the assets of the debtor Grumman Olson, a manufacturer of truck

bodies that were installed in complete vehicles, had been sold in a 363 sale with

protection against successor liability claims. Prior to its bankruptcy, Grumman Olson

sold a truck body that was incorporated into a vehicle sold to Federal Express; years later

(long after the sale), a FedEx employee was injured when the FedEx truck she was

driving hit a telephone pole, and she and her husband (who joined in the lawsuit) sued the

asset purchaser under successor liability doctrine. For obvious reasons (as they had no

---

[232]    2006 Bankr. LEXIS 4545, at *30, 2006 WL 4452982, at *10-11 (citations omitted).

[233]    *See* 415 B.R. at 337.

[234]    *See id.* at 342-43.

contact with the debtor prior to the sale), the woman and her husband were not known to the debtor at the time of the sale and received no notice of the sale hearing. Judge Bernstein ruled that they did not have claims (as they had not yet suffered injuries before the sale, and had no earlier contact with the debtor), but his more important conclusion for our purposes was that they could not be bound by the sale order. He concluded that "the Sale Order does not affect their rights to sue [the purchaser]."[235] He did so without resort to Rule 60(b), and without invalidating the sale order as to anyone else or in any other respect.

The Second Circuit has twice addressed these issues in ways relevant here, though in situations not quite as similar to those addressed above. In *Manville-2010*, the Circuit considered the effect of a denial of due process in connection with a bankruptcy court order—though not in connection with a sale order, or, of course, one with free and clear provisions. Though most of the details of that fairly complex controversy need not be discussed here, *Manville-2010* is important for the Circuit's conclusion as to the appropriate remedy after it found a due process violation.

There the debtor Manville, which had been subject to massive liabilities resulting from its manufacture of asbestos (and whose insurance policies, notwithstanding coverage disputes, were its most valuable asset), entered into a series of settlements and settlement clarifications in the 1980s with a group of its insurers, including Travelers, its primary insurer, which were approved by Bankruptcy Court orders.[236] Under the settlement documents, in exchange for sizable contributions to a settlement fund, the insurers were relieved of all obligations related to the disputed policies, and the insurers

---

[235]    445 B.R. at 254.

[236]    *See* 600 F.3d at 138-39.

-102-

would be protected from claims based on such obligations by bankruptcy court injunctive orders. By bankruptcy court orders entered in 1986, claims related to the policies were channeled to a trust created for addressing Manville's liabilities, and injunctive orders implemented broad releases protecting the settling insurers on "Policy Claims"—defined as "any and all claims . . . by any Person . . . based upon, arising out of or related to any or all of the Policies" at issue in the settlement.[237]

But another insurer, Chubb, was not a party to the settlements approved in the 1980s,[238] and had not received notice then that its own claims would be (or at least could be) enjoined too. Chubb thus argued that it could not, as a matter of due process, be bound by the 1986 Orders' terms.[239]

For reasons unnecessary to discuss here, the Circuit agreed that Chubb had been denied due process. But it did not vacate the 1986 Orders in their entirety. It held simply that "[u]nder the unique circumstances of this case, there can be little doubt that the publication notice employed by the bankruptcy court in 1984 was insufficient to bind Chubb to the 2004 interpretation of the 1986 Orders."[240]

The *Manville-2010* court did not invoke Rule 60(b) in support of its decision, or even mention it. Nor did it expressly discuss whether orders could be invalidated only in part by reason of a denial of due process. But *Manville-2010* necessarily must be read as having concluded that after a denial of due process prejudicing only a single party (even if the order affects other parties, and affecting those other parties is unthinkable), the

---

[237]    *Id.* at 139.

[238]    *Id.* at 143.

[239]    *See id.* at 148.

[240]    *Id.* at 157; accord *id.* at 158 ("Chubb is therefore not bound by the terms of the 1986 Orders. Consequently, it may attack the Orders collaterally as jurisdictionally void. And, as we held in *Manville III,* that attack is meritorious.").

partial denial of enforcement of that order, insofar as it binds that party alone, is permissible.

To the same effect is the Circuit's decision in *Koepp*,[241] which, while a Summary Order not binding on the lower courts in the Second Circuit, further evidences the Circuit's thinking on whether orders can be less than fully enforced without wholly vacating them. *Koepp*, unlike *Manville-2010*, involved a free and clear order. As relevant here, the Circuit considered a party's claim to easements on land conveyed to a reorganized company (in a § 77 railroad reorganization under the now superseded Bankruptcy Act) under a reorganization plan with free and clear provisions not materially different than those in the Free and Clear order here. Notice had not been given to the easement owner's predecessor when the reorganization plan had been approved, and for that reason, the Circuit concluded that the District Court correctly ruled that the railroad reorganization consummation order (analogous to a confirmation order under present law) did not extinguish the easements. Once again, the Circuit did not invoke Rule 60(b), nor did it invalidate the consummation order. It simply declined to find the free and clear provisions enforceable against the adversely affected party.

New GM points out, in this connection, that Rule 60(b) provides that a court "may relieve a party … from a final judgment, order or proceeding" for the reason, among others, that "the *judgment* is void,"[242] and does not speak of relieving parties from *provisions within* judgments or orders—*i.e.*, a partial invalidation. And New GM further points out that the Sale Order expressly provided that it was not severable, and that this was a material element of the understanding under which it acquired Old GM's assets,

---

[241]    593 Fed. Appx. 20.

[242]    Fed. R. Civ. P. 60(b) and 60(b)(4).

and took on many, but not all, of Old GM's liabilities. For that reason, New GM argues that the Court can only void the Sale Order in its entirety (which obviously is not an option here) or enforce the sale order as written. In an ordinary situation—one not involving a denial of due process—the Court would agree with New GM; the Court well understands how 363 sale agreements and sale orders are carefully drafted, and how the buyers of assets contemplate taking on certain identified liabilities, but no more. But here failures of notice gave rise, in part,[243] to denials of due process, and that distorts the balancing under which concerns of predictability and finality otherwise prevail.

In each of *Manville-2010, Koepp, Metzger, Polycel-District, Polycell-Bankruptcy, Compak,* and the two *Grumman Olson Opinions,* after they found what they determined to be denials of due process, the courts granted what in substance was a partial denial of enforcement of the order in question—either by invocation of Rule 60(b) in some fashion (finding the order void only to a certain extent, or as to an identified party)[244] or without mentioning Rule 60(b) at all.[245] In *Polycel-Bankruptcy,* for instance, the Bankruptcy Court concluded, after its 60(b) analysis, *"[t]o that extent,* the Sale Order is void...."[246] In *Manville-2010,* the Circuit found the earlier order unenforceable against Chubb without mention of Rule 60(b) at all. Though they reached their bottom lines by different

---

[243]    It will be remembered that the Plaintiffs were denied due process only with respect to the Sale Order's overbreadth. They were not prejudiced with respect to the Free and Clear Provisions, and cannot claim a denial of due process, or, of course a remedy, with respect to those.

[244]    *See Metzger,* 346 B.R. at 816; *Polycel-District,* 2007 WL 77336, at *9, 2007 U.S. Dist. LEXIS 955, at *28; *Polycel-Bankruptcy,* 2006 WL 4452982, at *1, 6-8, 11, 2006 Bankr. LEXIS 4545, at *1-2, 17-26, 31-34; *Compak,* 415 B.R. at 341.

[245]    *See Manville-2010,* 600 F.3d at 153-54; *Koepp,* 593 Fed. Appx. at 23; *Grumman Olson-Bankruptcy,* 445 B.R. at 245, 254-55 (considering ability of purchaser's successor after a 363 sale to enforce sale order against one injured after the sale, without reference to Rule 60(b)); *Grumman Olson-District,* 467 B.R. at 696, 699-700 (affirming *Grumman Olson-Bankruptcy,* and likewise not relying on Rule 60(b)).

[246]    2006 WL 4452982, at *12, 2006 Bankr. LEXIS 4545, at *34 (emphasis added).

paths, the takeaway from those cases—especially in the aggregate—is effectively as stated by the Bankruptcy Court in *Metzger*—that "[t]he Court has some flexibility in creating a remedy here and need not . . . find the entire sale void on these facts," and that the sale order was "to that limited extent void."[247]

For that reason, New GM's point that the Sale Order provided that it was a unitary document, and that the Free and Clear Provisions could not be carved out of it, cannot be found to be controlling once a court finds that there has been a due process violation. If a court applies Rule 60(b) analysis, and determines, as in *Metzger* and *Polycel-Bankruptcy*, that a sale order can be declared void to a "limited extent," the provisions providing for the sale order's unitary nature fall along with any other objectionable provisions. And if a court considers it unnecessary even to rely on Rule 60(b) at all (as in *Manville-2010* and *Koepp*), it can selectively decline enforceability as the Circuit did in those cases.

### 5. *Remedies Conclusion*

For these reasons, the Court concludes that—as in *Manville-2010*, *Koepp*, and the lower court cases—it can excuse the Economic Loss Plaintiffs[248] from compliance with elements of the Sale Order without voiding the Sale Order in its entirety. And the Court further concludes that on the narrow facts here—where the reason for relief is of constitutional dimension—the nonseverability provisions of the Sale Order do not bar such relief.

---

[247]    346 B.R. at 819.

[248]    It will be recalled that this applies only to the overbreadth objection, and thus does not benefit the Pre-Closing Accident Plaintiffs. For lack of prejudice—and any showing that either group of Plaintiffs would have successfully made any successor liability arguments that others did not make—the Free and Clear Provisions stand.

B.

Claims

The remedy with respect to the denial of notice sufficient to enable the filing of claims before the Bar Date is obvious. That is leave to file late claims. And the Court may grant leave from the deadline imposed by the Court's Bar Date Order, just as the Circuit relieved Chubb and the easements owner from enforcement of the earlier orders in *Manville-2010* and *Koepp*.

There is of course a separate issue as to whether the Plaintiffs should have the ability to tap GUC Trust assets that are being held for other creditors and claimants, even if later claims were allowed. But that separate issue is discussed in Section IV below.

III.

Assumed Liabilities

Although once regarded as important enough to be a threshold issue, determination of what liabilities New GM agreed to assume (and conversely declined to assume) is now of very little importance. The Plaintiffs have not disputed what the Sale Agreement and Sale Order say.[249] Earlier potential disputes over what they say have now been overtaken by the issues as to whether any Sale Order protections are unenforceable.

New GM is right that it expressly declined to assume any liabilities based on Old GM's wrongful conduct. But the Court's ruling that it will continue to enforce

---

[249]    The GUC Trust, however, raises an issue of that character, contending, somewhat surprisingly, that New GM voluntarily assumed economic loss claims—taking on liability (beyond for death and personal injury) for "other injury to Persons" with respect to "incidents first occurring on or after the Closing Date . . . ." GUC Trust Br. at 40, citing Sale Agreement § 2.3(a)(ix). But the GUC Trust misunderstands the Sale Agreement. The language to which the GUC Trust referred did not relate to economic loss claims, but rather to death, personal injury, or property damage caused by "accidents or incidents" occurring after the Closing Date—which included, in addition to accidents, things that were similar, such as fires, explosions or a car running off the road. *See GM-Deutsch* and *GM-Phaneuf*, n.33 *supra*.

prohibitions against successor liability makes New GM's concerns as to that academic.
And to the extent, if any, that New GM might be liable on claims based solely on any
wrongful conduct on its own part (and in no way relying on wrongful by Old GM), New
GM would be liable not because it had assumed any Old GM liabilities (or was
responsible for anything that Old GM might have done wrong), but only because New
GM had engaged in independently wrongful, and otherwise actionable, conduct on its
own.

Under the circumstances, the Court need not say any more about what liabilities
New GM assumed.

### IV.
### Equitable Mootness

Understandably concerned that the successor liability claims that the Economic
Loss and Pre-Closing Accident Plaintiffs seek to saddle New GM with are still
prepetition claims—and that the Court could reason that to the extent those claims have
merit and New GM is not liable for them, *somebody* is likely to be—the GUC Trust and
its Participating Unitholders argue that tapping the recoveries of GUC Trust Unitholders
would be barred by the doctrine of Equitable Mootness. Though the Court's original
instinct was to the contrary (and it once thought that at least partial relief might be
available), the Court has been persuaded that they are right.

### A.

### Underlying Principles

The parties do not dispute the underlying principles, nor that three holdings of the
Second Circuit largely determine the mootness issues here—the Circuit's two 1993
*Chateaugay* decisions, involving appeals by the Creditors' Committee of LTV

Aerospace[250] and creditor Frito-Lay[251] in the *LTV* chapter 11 cases, and the Circuit's

2014 *BGI* decision, involving an appeal by creditors seeking to file untimely class proofs

of claim against debtor Borders Books in the *BGI* chapter 11 cases.[252]

The mootness cases start with the proposition that while the Constitution requires

the dismissal of cases as moot whenever effective relief cannot be fashioned, the related,

prudential, doctrine of equitable mootness requires dismissal where relief *can* be

fashioned, but implementation of such relief would be inequitable.[253] The doctrine of

equitable mootness reflects the "pragmatic principle" that "with the passage of time after

a judgment in equity and implementation of that judgment, effective relief . . . becomes

impractical, imprudent, and therefore inequitable."[254] This principle is "especially

pertinent" in proceedings in bankruptcy cases, "where the ability to achieve finality is

essential to the fashioning of effective remedies."[255]

In *BGI*, the Circuit explained that:

> Equitable mootness is a prudential doctrine under
> which a district court [and by extension, any
> appellate court] may in its discretion dismiss a
> bankruptcy appeal "when, even though effective
> relief could conceivably be fashioned,
> implementation of that relief would be inequitable."
> The doctrine "requires the district court to carefully

---

[250]   *See Chateaugay I*, n.16 *supra.*

[251]   *See Chateaugay II*, n.16 *supra.*

[252]   *See BGI*, n.16 *supra.*

[253]   *See Church of Scientology v. United States*, 506 U.S. 9, 12 (1992); *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 143 (2d Cir. 2005).

[254]   *Id.* at 144 (quotations and citations omitted); *see also Alsohaibi v. Arcapita Bank B.S.C.(c) (In re Arcapita Bank B.S.C.(c))*, 2014 U.S. Dist. LEXIS 1053, at *14-15, 2014 WL 46552, at *5, (S.D.N.Y. Jan. 6, 2014) (Scheindlin, J.) ("***Arcapita Bank***").

[255]   *Chateaugay I*, 988 F.2d at 325; *see also Compania Internacional Financiera S.A. (In re Calpine Corp.)*, 390 B.R. 508, 517 (S.D.N.Y. 2008) (Marrero, J.) ("***Calpine-District***"), *aff'd by summary order*, 354 Fed. Appx. 479 (2d Cir. 2009) ("***Calpine-Circuit***").

> balance the importance of finality in bankruptcy proceedings against the appellant's right to review and relief." [256]

And the Circuit there made clear that the doctrine of equitable mootness applies to chapter 11 liquidations as well as reorganizations. [257]

But while mootness doctrine has been applied most frequently in bankruptcy appeals, it has broader application, including other instances likewise presenting situations where a court has to balance the importance of finality against a party's desire for relief. "[T]he doctrine is not limited to appeals from confirmation orders, and has been applied in a variety of contexts, including . . . injunctive relief, leave to file untimely proofs of claim, class certification, property rights, asset sales, and payment of prepetition wages." [258]

In *Chateaugay II*, the Circuit held that substantial consummation of a reorganization plan is a "momentous event," but it does not necessarily make it impossible or inequitable for an appellate court to grant effective relief in all cases. [259] The Circuit synthesized earlier law to say that substantial consummation will not moot an appeal if all of the following circumstances exist:

(a) the court can still order some effective relief;

---

[256]    772 F.3d at 107 (quoting *In re Charter Commc'ns, Inc.,* 691 F.3d 476, 481 (2d Cir. 2012) ("***Charter Communications***")) (internal quotation marks omitted).

[257]    772 F.3d at 109. *See also Schaefer v. Superior Offshore Int'l, Inc. (In re Superior Offshore Int'l, Inc.),* 591 F.3d 350, 353–54 (5th Cir. 2009) (applying equitable mootness analysis to liquidation plan).

[258]    *Arcapita Bank*, 2014 Bankr. LEXIS 1053, at *19, 2014 WL 46552, at *5. *See also BGI*, 772 F.3d at 109 (stating that earlier cases "suggest that the doctrine of equitable mootness has already been accorded broad reach, without apparent ill effect," and citing *Arcapita Bank* approvingly for the latter's statement that the "doctrine of equitable mootness 'has been applied in a variety of contexts'").

[259]    See 10 F.3d at 952.

(b) such relief will not affect "the re-emergence of the debtor as a revitalized corporate entity";

(c) such relief will not unravel intricate transactions so as to "knock the props out from under the authorization for every transaction that has taken place" and "create an unmanageable, uncontrollable situation for the Bankruptcy Court";

(d) the "parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings," and

(e) the appellant "pursue[d] with diligence all available remedies to obtain a stay of execution of the objectionable order . . . if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from."[260]

Those five factors are typically referred to as the *Chateaugay* factors. "Only if all five *Chateaugay* factors are met, and if the appellant prevails on the merits of its legal claims, will relief be granted."[261]

## B.

### Applying Those Principles Here

Here, the parties have stipulated, and the Court has previously found, that the Plan has been substantially consummated.[262] That, coupled with the requirement that all of the *Chateaugay* factors must be shown to avoid mootness, effectively gives rise to a presumption of mootness. The Court can find that some of the *Chateaugay* factors necessary to trump that presumption have been satisfied. But the Court cannot find that they all have been.

---

[260]     *Id.* at 952-53.

[261]     *Charter Communications*, 691 F.3d at 482; *accord BGI*, 772 F.3d at 110.

[262]     Equitable Mootness Stipulated Facts ¶ 18. This Court found likewise in an earlier proceeding in Old GM's chapter 11 case, *Morgenstein*), 462 B.R. at 501 n.36 ("[T]he Plan already has been substantially consummated"). Neither New GM nor the Plaintiffs here were parties to *Morgenstein*, and they thus are not bound by *res judicata* or collateral estoppel as to that finding. But their stipulation to substantial consummation makes those doctrines academic.

-111-

*1. Ability to Fashion Effective Relief*

The first factor that must be established in order to overcome the presumption of equitable mootness is that the Court can fashion effective relief. Fashioning effective relief here would require two steps:

(1) allowing the Plaintiffs to file late claims, after the Bar Date; and

(2) allowing the GUC Trust's limited assets to be tapped for satisfying those claims.

The first step would not be particularly difficult. But the second could not be achieved. There would be two problems foreclosing the Court's ability to fashion effective relief.

First, the initial step would be effective relief for the Plaintiffs only if the second step could likewise be achieved. And the initial step would be of value (and the second step could be achieved) only if there were assets in the GUC Trust not already allocated for other purposes (such as other creditors' not-yet-liquidated claims, or expenses of the GUC Trust), or if value reserved for others were taken away. It is undisputed that there are no such available assets, and taking away value previously reserved for those whose claims have not yet been either allowed nor disallowed would be inequitable wholly apart from unfairness to GUC Trust investors.[263]

---

[263] Plaintiffs' counsel acknowledged as much. *See* Day 1 Arg. Tr. at 113:15-23 ("by the time of the recalls, by the time the plaintiffs got organized and began their litigation, by the time we were retained in this case, a substantial majority of the funds originally in the GUC Trust had been dispersed to GUC Trust beneficiaries and it would have been impossible or very close to impossible to put the ignition switch defect plaintiffs back in the same position they would have been in had they been given enough information to file a claim before the bar date.").

Old GM's plan of reorganization (which as noted was a liquidating plan), made

no distributions on claims for as long as they were disputed—not even partial

distributions with respect to any undisputed portions. That was not unusually harsh; it is

"a regular feature of reorganization plans approved in this Court."[264] But to ameliorate

the unfairness that would otherwise result, Old GM was required to, and did, establish

reserves sufficient to satisfy the disputed claims.

Those reserves were a point of controversy at the time of confirmation; creditors

whose claims then were disputed contended that the reserves had to be segregated.[265]

The Court overruled their objection to the extent they demanded *segregated* reserves, but

agreed that reserves had to be established, and in the full amount of their disputed

claims.[266] Removing that protection now would be grossly unfair to holders of disputed

claims, who would have understandably expected at least the more modest protection that

they did receive.

Additionally, the terms of the Plan that provided for the reserves were binding

contractual commitments. They could not be altered without revoking the entirety of the

Plan and Confirmation Order.[267] But revocation of the Confirmation Order would be

impermissible under the Bankruptcy Code, which provides for such revocation only in

---

[264]    *Confirmation Decision*, 447 B.R. at 213 & n.34.

[265]    *See id.* at 216-17.

[266]    *See id.* at 217 ("While, as noted above, caselaw requires that reserves be established for holders of
disputed claims, it does not impose any additional requirement that such reserves be *segregated*
for each holder of a disputed claim."); *id.* at n.50 ("[W]ithout creating reserves of some kind, I
have some difficulty seeing how one could provide the statutorily required equal treatment when
dealing with the need to make later distributions on disputed claims that ultimately turn out to be
allowed, especially in cases, like this one, with a liquidating plan.").

[267]    *See Morgenstein*, 462 B.R. at 504 ("A confirmed plan takes on the attributes of a contract . . .
modification of a contract only in part, without revoking it in whole, raises grave risks of upsetting
the expectations of those who provided the necessary assents.") (quotations omitted).

-113-

limited circumstances that are not present here.[268] For that reason or others, no party requests it.

   2.   *Effect on Re-emergence of Debtor as Revitalized Corporate Entity*

      The second factor that needs to be satisfied is that granting relief would not affect the "reemergence of the debtor as a revitalized corporate entity."

      Old GM became the subject of a liquidation. It will not be revitalized. To the extent (which the Court believes is minimal) that any effect on New GM by reason of tapping the GUC Trust's assets would be relevant, the Court can see no adverse effect on New GM.

      This factor can be deemed to be either inapplicable or to have been satisfied.[269] Either way, it is not an impediment to relief.

   3.   *Unraveling Intricate Transactions*

      The third factor is that "such relief will not unravel intricate transactions so as to 'knock the props out from under the authorization for every transaction that has taken place' and 'create an unmanageable, uncontrollable situation for the Bankruptcy Court.'"

      The manageability problems would not necessarily be matters of great concern, but the Unitholders are right in their contention that granting relief here would "knock the props out" from the transactions under which they acquired their units.

---

[268]   *See* 11 U.S.C. § 1144.

[269]   *See Beeman v. BGI Creditors' Liquidating Trust (In re BGI, Inc.)*, 2013 U.S. Dist. LEXIS 77740, at *24-25 (S.D.N.Y. May 22, 2013) (Andrew Carter, J.) (**"BGI-District"**) ("All parties agree the second Chateaugay factor is inapplicable because the Debtor has liquidated its assets and will not re-emerge as a new corporate entity."); *cf. BGI*, 772 F.3d at 110 n.15 ("All parties agreed that the second *Chateaugay* factor—whether such relief will "affect the re-emergence of the debtor as a revitalized corporate entity"—was inapplicable because Borders liquidated its assets and would not emerge as a new corporate entity.").

Allowing a potential $7 to $10 billion in claims against the GUC Trust now would be extraordinarily unjust for the purchasers of GUC Trust units after confirmation. With the Bar Date having already come and gone, they would have made their purchases based on the claims mix at the time—a then-known universe of claims that, by reason of then-pending and future objections to disputed and unliquidated claims, *could only go down*. Of course, the extent to which the aggregate claims would go down was uncertain; that was the economic bet that buyers of GUC Trust units made. But they could not be expected to foresee that the amount of claims would actually go *up*. They also could not foresee that future distributions would be delayed while additional claims were filed and litigated. Allowing the aggregate claims against the GUC Trust now to go up (and by $7 to $10 billion, no less) would indeed "knock the props" out of their justifiable reliance on the claims mix that was in place when GUC Trust Units were acquired.

In *Morgenstein*, certain creditors sought, after the Bar Date and Effective Date, to file and recover on a class proof of claim in an estimated amount of $180 million, "whose assertion . . . would [have been] barred under the Debtor's reorganization plan . . . and confirmation order."[270] The Court denied the relief sought on other grounds. But it noted that even though the creditors were not seeking to recoup distributions that had already been made, permitting them to proceed even against the assets remaining in the GUC Trust raised "fairness concerns."[271] And on the record then before it, the Court added that "mootness concerns may very well still exist."[272] It continued that it suspected, but was not yet in a position to find, that:

---

[270]    *Morgenstein*, 462 B.R. at 496-97.

[271]    *Id.* at 509.

[272]    *Id.*

-115-

> hundreds of thousands (or more) of shares and
> warrants, with a value of many millions (or more)
> of dollars, traded since the Plan became effective,
> having been bought and sold based on estimates of
> Plan recoveries *premised on the claims mix at the
> time the Plan was confirmed.*[273]

When the Court made those observations, it lacked the evidentiary record it has now. But

the record now before the Court confirms the Court's earlier suspicions.

When a large number of transactions have taken place in the context of then-

existing states of facts, changing the terrain upon which they foreseeably would have

relied makes changing that terrain inequitable. Thus, understandably, the caselaw has

evidenced a strong reluctance to modify that terrain.

*BGI* is particularly relevant, since there, as here, the issues before the court

involved the allowance of late claims and contentions of inadequate notice. In *BGI*, the

bankruptcy court, following confirmation of Borders' plan of liquidation, had denied the

appellants leave to assert late priority claims, and refused to certify a class of creditors

holding unused gift cards issued by the debtor Borders Books.[274] The appellants argued

that they had not received adequate notice of the bar date, and thus that the bankruptcy

court had erred when it denied them that relief.

But the BGI liquidating trust had already distributed more than $80 million, and

there was an additional approximately $61 million remaining for distribution.[275] In

holding that those appeals were equitably moot, Judge Carter in the District Court

approvingly quoted Judge Glenn's finding in the Bankruptcy Court that allowing

appellants to file late claims "would result in massive prejudice to the estate because the

---

[273] *Id.* (emphasis added).

[274] *See BGI*, n.16 *supra*, 772 F.3d at 106; *BGI-District,* 2013 U.S. Dist. LEXIS 77740, at *2.

[275] *BGI-District*, 2013 U.S. Dist. LEXIS 77740, at *16.

-116-

distributions to general unsecured creditors who filed timely proofs of claim would be severely impacted."[276] The Circuit, in affirming Judge Carter's District Court ruling, approved this finding.[277] Other cases too, though not as closely on point as *BGI*, have held similarly.[278]

Finally, although most courts have held that Bankruptcy Courts have the discretion to allow the filing of class proofs of claim,[279] and this Court, consistent with the authority in this district, has adhered to the majority view,[280] courts recognize that "[t]he costs and delay associated with class actions are not compatible with liquidation cases where the need for expeditious administration of assets is paramount"—and that "[c]reditors who are not involved in the class litigation should not have to wait for payment of their distributive liquidated share while the class action grinds on."[281] Thus Unitholders would be prejudiced even if Plaintiffs' claims were ultimately disallowed.

The Court cannot find this third *Chateaugay* factor to have been satisfied.

---

[276]    *Id.* at *25-26.

[277]    *See BGI*, 772 F.3d at 110 n.15 ("Observing that the transactions in a liquidation proceeding may not be as complex as those in a reorganization proceeding, the court nonetheless predicted, *persuasively*, that allowing Appellants to file late claims and certifying a class of gift card holders would have 'a disastrous effect' on the remainder of the liquidated estate and the distributions under the Plan.") (emphasis added).

[278]    *See Calpine-District*, 390 B.R. at 520 (finding that appellant had failed to satisfy the first *Chateaugay* factor based, in part, on the court's view that "modifying the TEV in a consummated plan of reorganization that so many parties have relied upon in making at least some potentially irrevocable decisions would be inequitable."); *In re Enron Corp.*, 326 B.R. 497, 504 (S.D.N.Y. 2005) (Marrero, J.) (holding that it would be "manifestly inequitable" to modify even a single provision of a substantially consummated plan "that so many parties have relied upon in making various, potentially irrevocable, decisions.").

[279]    *See, e.g., Thomson McKinnon*, 133 B.R. at 40.

[280]    *See In re Motors Liquidation Co.*, 447 B.R. 150, 156-57 (Bankr. S.D.N.Y. 2011) (Gerber, J.) ("*GM-Apartheid*").

[281]    *Thomson McKinnon*, 133 B.R. at 41.

4. *Adversely Affected Parties*

The fourth *Chateaugay* factor requires a showing that the third parties affected by

the relief sought have had notice of and an opportunity to participate in the

proceedings.[282] It requires individual notice, and cannot be satisfied by an "assertion . . .

that [affected parties] may have constructive or actual notice."[283] But here there has been

no material resulting prejudice from the failure to provide the notice, and this slightly

complicates the analysis.

Many who would be adversely affected by tapping GUC Trust assets did not get

the requisite notice. They would include the current holders of Disputed Claims; the

syndicate members in JPMorgan Chase's Term Loan; the holders of Allowed Claims who

have not yet received a distribution, and third-party Unitholders that have purchased or

held GUC Trust Units based on the publicly disclosed amounts of potential GUC Trust

Liabilities.

But the briefing by the GUC Trust and so-called "Participating Unitholders" (a

subset of the larger Unitholder constituency), and the oral argument by one of the

Participating Unitholders' counsel, very effectively articulated the objections that all, or

---

[282]    *See BGI*, 772 F.3d at 110 ("Here, we agree with the District Court that Appellants failed to satisfy
at least the fourth ... *Chateaugay* factor[]: i.e., ensuring adequate process for parties who would be
adversely affected . . . As to the fourth factor, Appellants did not establish that the general
unsecured creditors—who could be stripped of their entire recovery if the proposed class was
certified"—received notice of their appeal to the District Court.") (citations, internal quotation
marks, and brackets deleted); *Arcapita Bank*, 2014 U.S. Dist. LEXIS 1053, at *21, 2014 WL
46552, at *7 ("Appellant does not contend that the numerous third parties who have participated in
and relied on the transactions completed pursuant to the Plan have been notified. Accordingly,
Appellant fails to satisfy the fourth *Chateaugay* factor."); *O'Connor v. Pan Am Corp. (In re Pan
Am Corp.)*, 2000 U.S. Dist. LEXIS 2562, at *15, 2000 WL 254010, at *4 (S.D.N.Y. Mar. 7, 2000)
(Casey, J) ("*Pan Am*") (the fact that the appellant "did not notify any of the holders of
administrative claims of her intent to challenge the distribution order" weighed in favor of a
finding of equitable mootness).

[283]    *See Calpine-District*, 390 B.R. at 522 ("An assertion by Appellants that purchasers of New
Calpine Common Stock may have constructive or actual notice is not sufficient to satisfy their
burden of establishing that such purchasers had notice of the Appeals and an opportunity to
participate in the proceedings.").

substantially all, of the absent parties would share. The Court doubts that any of those

adversely affected parties could make the mootness arguments any better. Those who did

not file their own briefs, or make the same oral argument, were not prejudiced.

Because the other mootness factors are so lopsided, the Court does not need to

decide whether prejudice is a requirement here, as it is in the due process analysis

discussed above. The Court assumes, in an excess of caution, that this factor is not an

impediment to granting relief.

### 5. *Pursuit of Stay Remedies*

Finally, the Court agrees in part with the contention by the GUC Trust and the

Participating Unitholders that the Plaintiffs have not "pursued with diligence all available

remedies to obtain a stay of execution of the objectionable order," and "the failure to do

so creates a situation rendering it inequitable to reverse the orders"[284]—enough to find

that this factor has not been satisfied.

Of course the Plaintiffs could not be expected to have sought a stay of the

Confirmation Order when they were then unaware of Ignition Switch claims. Nor, for the

same reason, could the Plaintiffs be faulted for not having filed claims with Old GM or

the GUC Trust before the Ignition Switch Defect came to light. So the Court cannot find

this factor to be satisfied based on any inaction before the Spring of 2014, at which time

New GM issued the recall notices and alerted the Plaintiffs to the possibility that they

might have legal rights of which they were previously unaware.

Rather, this factor has to be analyzed in different terms—focusing instead on the

Plaintiffs' failure to seek a stay of *additional* distributions to Old GM creditors and

---

[284]    GUC Trust Opening Br. at 31 (quoting *Affirmance Opinion #2*, 430 B.R. at 80, which in turn
quoted *Chateaugay II*, 10 F.3d at 952-53).

-119-

Unitholders after it learned, on October 24, 2014, that the GUC Trust announced that it was planning on making another distribution. By this time, of course, the Ignition Switch Defect was well known (and most of the 140 class actions had already been filed), and the Court had identified, as an issue it wanted briefed, whether the Plaintiffs' claims were more properly asserted against Old GM. As the Court noted at oral argument, at that stage in the litigation process—when the Court considered it entirely possible that it would rule that it would be the GUC Trust that is responsible for the Plaintiffs' otherwise viable claims—the Court would have made the GUC Trust wait before making additional distributions "in a heartbeat."[285]

Without dispute, the failure to block the November distribution did not result from a lack of diligence. It resulted, as the Plaintiffs candidly admitted, from tactical choice.[286] Their reason for that tactical choice would be obvious to any litigator,[287] but it was still a tactical choice.

And it is inappropriate to disregard that tactical choice in light of the Plaintiffs' decision to allow further distributions to be made. In November 2014, additional GUC Trust assets went out the door. And while tapping the assets distributed in November 2014 might have been as inequitable as tapping those that now remain, it makes the

---

[285]    *See* Day 1 Arg. Tr. at 111:7-15.

[286]    *See* Day 1 Arg. Tr. at 112:13-113:1 ("Now, I will also tell Your Honor . . . yes there was a strategic element to the decision that was taken on our side . . . Yes Your Honor, the decision was made not to pursue it.") (transcription errors corrected; further explanation for reasons underlying the strategic element deleted).

[287]    Any litigators in the Plaintiffs' lawyers shoes would understandably prefer to proceed against a solvent entity (New GM) rather than one with much more limited assets (the GUC Trust)— especially since so much of the GUC Trust's assets had already been distributed. And doing anything to suggest that Old GM or the GUC Trust was the appropriate entity against whom to proceed could undercut their position that they should be allowed to proceed against New GM.

challenges of granting even some relief more difficult. Here too circumstances of this character have been regarded as significant in considering the fifth *Chateaugay* factor.[288]

*BGI* is relevant in this respect too. The court in *BGI-District*, later affirmed by the Circuit, held that the appellants "did not pursue their claims with all diligence," noting that the "[a]ppellants' counsel began reviewing the case in early December and was retained by the end of December," but that the appellants "did not appear at the confirmation hearing or file any objections to the Plan," and "did not seek reconsideration of or appeal the confirmation order or seek a stay of the Effective Date."[289] It concluded, and the Circuit agreed, that "[t]he fact that no stay of distributions was sought by Appellants until almost a year after they entered the bankruptcy litigation and the Plan was confirmed indicates the lack of diligence with which Appellants moved."[290]

The circumstances here are similar. The Plaintiffs began filing their actions as early as February 2014. Yet the Plaintiffs have taken no steps to seek a stay from the Court preventing the GUC Trust from making further distributions, or, except by one letter, to put affected third parties on notice of an intention to assert claims over the GUC Trust Assets. They have been frank in explaining why: they prefer to pursue claims against New GM first, and resort to the GUC Trust only if necessary. But even though

---

[288]   *See Pan Am*, 2000 WL 254010, at *4, 2000 U.S. Dist. LEXIS 2562, at *15 (finding that appellant failed to satisfy the fifth *Chateaugay* factor where she "never sought a stay of execution of the distribution order" and "did not notify any of the holders of administrative claims of her intent to challenge the distribution order."). *See also Affirmance Opinion #1*, 428 B.R. at 62, and n.30 ("Appellants' deliberate failure to 'pursue with diligence all available remedies to obtain a stay of execution of the objectionable order' has indeed 'created a situation rendering it inequitable to reverse the orders appealed from'"; "the Second Circuit has made it clear that an appellant is obligated to protect its litigation position by seeking a stay . . . .").

[289]   2013 U.S. Dist. LEXIS 77740, at *32-33.

[290]   *BGI-District*, 2013 U.S. Dist. LEXIS 77740, at *33; *accord BGI*, 772 F.3d at 110-11 (quoting *BGI-District*).

their tactical reasoning is understandable, the underlying fact remains; their failure to diligently pursue claims against the GUC Trust precludes them from doing so now.

*  *  *

Thus at least three of the five *Chateaugay* factors *cut against* overcoming the presumption in favor of mootness, when all must favor overcoming that presumption. And shifting from individual factors to the big picture, we can see the overriding problem. We here don't have a reorganized debtor continuing in business that would continue to make money and that, by denial of discharge, could absorb additional claims. We have a GUC Trust, funded by discrete bundles of assets—that had been reserved for identified claims under Old GM's reorganization plan—with no unallocated assets left for additional claims. Entities in the marketplace have bought units of the GUC Trust as an investment based upon the GUC Trust's ability to *reduce* the once huge universe of claims against New GM, in a context where the universe of claims could not increase. Allowing $7 to $10 billion (or even much lower amounts) of additional claims against the GUC Trust would wholly frustrate those investors' legitimate expectations, and, indeed, "knock the props" out from the trading in GUC Trust Units that was an important component of the plan.

Granting relief to the Plaintiffs here would simply replace hardship to the Plaintiffs with hardship to others.

V.

Fraud on the Court

After receipt of the various parties' briefs, it now appears that the standards for establishing fraud on the court (one of the bases for relief under Fed.R.Civ.P. 60(b))—though once regarded as important enough to be a Threshold Issue—are not as important

-122-

as they were originally perceived to be. That is so because fraud on the court issues bear on the time by which a motion for 60(b) relief can be brought—but (as discussed in Section II above), several courts, including the Second Circuit, when faced with denials of due process, have invalidated particular provisions in orders *without addressing* Rule 60(b), and because, even under Rule 60(b), an order entered without due process can be declared to be void, and without regard to the time limitations that are applicable to relief for fraud, among other things. But for the sake of completeness, the Court nevertheless decides them.

With exceptions not relevant here, Fed. R. Civ. P. 60, captioned "Relief from a Judgment or Order," applies in bankruptcy cases under Fed.R.Bankr.P. 9024. Its subsection (b) provides, in relevant part:

> (b) GROUNDS FOR RELIEF FROM A FINAL JUDGMENT, ORDER, OR PROCEEDING. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> …
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (4) the judgment is void;
>
> … or
>
> (6) any other reason that justifies relief.[291]

---

[291] *Id.* (portions that are not even arguably applicable omitted).

Then, Rule 60's subsection (c), captioned "Timing and Effect of the Motion," provides,

in relevant part:

> (1) *Timing*. A motion under Rule 60(b) must be
> made within a reasonable time—and for reasons (1),
> (2), and (3) no more than a year after the entry of
> the judgment or order or the date of the proceeding.

And its subsection (d), captioned "Other Powers to Grant Relief," provides, in relevant

part:

> (d) Other Powers to Grant Relief.  This rule does
> not limit a court's power to:
>
>   …
>
>     (3) set aside a judgment for fraud on the
> court.[292]

As explained by the Supreme Court in *Hazel-Atlas Glass*,[293] an early decision

considering Rule 60(b), the federal courts have had a long-standing aversion to altering or

setting aside final judgments at times long after their entry[294] "spring[ing] from the belief

that in most instances society is best served by putting an end to litigation after a case has

been tried and judgment entered."[295]  But there likewise has been a rule of equity to the

effect that under certain circumstances—one of which is after-discovered fraud—relief

could be granted against judgments regardless of the term of their entry.[296]  That

equitable rule was fashioned "to fulfill a universally recognized need for correcting

---

[292]   This last provision, now in a separate subsection (d), was once part of Rule 60(b).  It has been described by the Circuit as a "savings clause."  *See Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1325 (2d Cir. 1995) ("*Hadges*").

[293]   *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) ("*Hazel-Atlas Glass*").

[294]   The original rule looked to "the *term* at which the judgments were finally entered."  *See id.* at 244 (emphasis added).  The one year time-limit under Rule 60(b) approximates that.

[295]   *Id.*

[296]   *Id.*

injustices which, in certain instances, are deemed sufficiently gross to demand a departure from rigid adherence to the term rule." [297]

As explained by the Second Circuit in its frequently cited 1985 decision in *Leber-Krebs*,[298] *Hazel-Atlas* deliberately did not define the metes and bounds of this "fraud on the court" doctrine, but it did make clear that it has always been "characterized by flexibility which enables it to meet new situations which demand equitable intervention, and to accord all the relief necessary to correct the particular injustices involved in these situations." [299]

"Out of deference to the deep rooted policy in favor of the repose of judgments entered during past terms, courts of equity have been cautious in exercising their power over such judgments. But where the occasion has demanded, where enforcement of the judgment is 'manifestly unconscionable', they have wielded the power without hesitation."[300]

It is in that context—where the injustices are "sufficiently gross," and where enforcement of the judgment would be "manifestly unconscionable"—that federal courts may consider requests to modify long-standing judgments for fraud on the court.

*1. Effect on Process of Adjudication*

Consistent with that, the Second Circuit has repeatedly stated that a "fraud on the court" under Fed. R. Civ. P. 60(d)(3) embraces:

> only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery

---

[297]  *Id.*

[298]  *Leber–Krebs, Inc. v. Capitol Records*, 779 F.2d 895 (2d Cir.1985) ("***Leber-Krebs***").

[299]  *Id.* at 899.

[300]  *Hazel-Atlas Glass*, 322 U.S. at 244-45 (*quoting Pickford v. Talbott*, 225 U.S. 651, 657 (1912)).

cannot perform in the usual manner its impartial task of adjudging cases . . . .[301]

In *Hadges* (one the several Second Circuit decisions making the distinction between fraud of a more generalized nature and defrauding the Court), the Circuit explained that fraud is a basis for relief under both Rule 60(b)(3) and Rule 60's savings clause.[302] But "the type of fraud necessary to sustain an independent action attacking the finality of a judgment is narrower in scope than that which is sufficient for relief by timely motion."[303]

In its repeatedly cited 1972 decision in *Kupferman*, the Circuit, speaking through Judge Friendly, emphasized the additional requirements for any showing of fraud on the court. "Obviously it cannot be read to embrace any conduct of an adverse party of which the court disapproves; to do so would render meaningless the one-year limitation on motions under F.R.Civ.P. 60(b)(3)."[304] Rather, "[f]raud upon the court as distinguished from fraud on an adverse party *is limited to fraud which seriously affects the integrity of the normal process of adjudication*."[305]

Bankruptcy courts in this district, deciding particular cases under the Circuit's pronouncements, have permitted claims of fraud on the court to proceed in cases with a sufficiently egregious effect on the integrity of the litigation process, but have rejected

---

[301]    *Kupferman v. Consol. Research and Mfg. Corp.*, 459 F.2d 1072, 1078 (2d Cir. 1972) (***Kupferman***") (quotation marks omitted); *accord Hadges*, 48 F.3d at 1325 (*quoting Kupferman*); *Transaero, Inc. v. La Fuerza Area Boliviana*, 24 F.3d 457, 460 (2d Cir. 1994) ("***Transaero***") *on reh'g in part sub nom.* 38 F.3d 648 (2d Cir. 1994); *Gleason v. Jandrucko*, 860 F.2d 556, 558-59 (2d Cir. 1988) ("***Gleason***"); *Serzysko v. Chase Manhattan Bank*, 461 F.2d 699, 702 (2d Cir. 1972). *See also Grubin v. Rattet (In re Food Mgmt. Grp., LLC)*, 380 B.R. 677, 714 (Bankr. S.D.N.Y. 2008) (Glenn, J.) ("***Food Management Group***") (*quoting Kupferman*).

[302]    *Hadges*, 48 F.3d at 1325.

[303]    *Id. See also Gleason*, 860 F.2d at 559; *Transaero*, 24 F.3d at 460.

[304]    *Kupferman*, 459 F.2d at 1078.

[305]    *Gleason*, 860 F.2d at 559 (internal quote marks deleted).

them in cases lacking such an effect.  In his well known decision in *Clinton Street Foods*,[306] Judge Bernstein found *Leber–Krebs* to be instructive,[307] and denied a 12(b)(6) motion insofar as it sought to dismiss a trustee's claims of a fraud on the court.[308]  But that was in the context of a case involving bid-rigging in a bankruptcy court auction.  There the complaint alleged that the defendants—the assets' purchaser and three potential competing bidders—lied when the bankruptcy court inquired about any bidding agreements.  The defendants' lies contributed to the acceptance of the winning bid and the approval of the Sale Order; the trustee lacked the opportunity to discover the fraud in light of the summary nature of the sale proceeding and the relatively short time frame (only three weeks between the filing of the sale application and the auction); and the defendants benefited from the lie to the Court.[309]

In *Food Management*, Judge Glenn of this Court, analyzing *Clinton Street Foods* and *Leber–Krebs,* likewise denied a motion to dismiss a fraud on the court claim, where there was once again alleged manipulation of an auction, by reason of a failure to disclose the participation of insiders in an ostensible third party bid for estate assets.[310]

---

[306]    *Gazes v. DelPrete, (In re Clinton Street Food Corp.),* 254 B.R. 523 (Bankr. S.D.N.Y. 2000) (Bernstein, C.J.) ("*Clinton Street Foods*").

[307]    *Id.* at 533.  He synthesized the bases for the *Leber-Krebs* finding of fraud on the court based on an attachment garnishee's false denials of ownership of debtor property as based on (1) the defendant's misrepresentation to the court, (2) the denial of the motion to confirm the attachment based on the misrepresentation, (3) the lack of an opportunity to discover the misrepresentation and either bring it to the court's attention or bring a timely turnover proceeding against the garnishee, and (4) the benefit the defendant derived by inducing the erroneous decision. *Id.* After *Clinton Street Foods*, these factors, referred to as the *Leber-Krebs* factors, have repeatedly been applied in fraud on the court decisions.

[308]    *Id.*

[309]    *Id.* at 533.

[310]    *See* 380 B.R. at 715.

But in *Ticketplanet*, [311] four years earlier, Judge Gropper of this Court, also

analyzing *Clinton Street Foods* and *Leber–Krebs*, found the allegations of fraud on the

court to be insufficient. He explained that fraud on the court encompasses only that

conduct that "seriously affects the integrity of the normal process of adjudication," and it

is available "only to prevent a grave miscarriage of justice."[312] There the trustee charged

that the defendants' actions (both before and after the chapter 11 filing) were taken to

protect themselves and benefit a secured lender that thereafter obtained relief from the

stay to foreclose on estate assets. The alleged wrongful actions included a failure to

adequately disclose the competing interest of the debtor's largest shareholder; the

appointment of a straw-man at the helm of the debtor; a direction to the debtor's counsel

not to fight the lift stay motion; and efforts to engineer a dismissal of the initial chapter

11 case rather than a conversion once the lender had taken control of the debtor's assets.

But the basic facts with respect to a relation between the corporate principals, the debtor

and its lender were known,[313] and the alleged nondisclosure "did not substantially impact

the Court's ruling at the Lift Stay hearing."[314] Relief was not necessary "to prevent a

grave miscarriage of justice."[315]

　　　　The takeaway from these cases is that relief can be granted only where there has

been not just an impact on the *accuracy of outcome* of the Court's adjudicative process,

---

[311]　　*Tese-Milner v. TPAC, LLC* (*In re Ticketplanet.com*), 313 B.R. 46, 64 (Bankr. S.D.N.Y. 2004)
　　　　(Gropper, J.) (***Ticketplanet***").

[312]　　*Id.*

[313]　　*Id.* at 65.

[314]　　*Id.*

[315]　　*Id.*

but also on the *integrity of the judicial process* itself, and then only where a denial of

relief would be "manifestly unconscionable."

### 2. *Victim of the Fraud*

Thus the failure to disclose pertinent facts relating to a controversy before the

court, or even perjury regarding such facts, whether to an adverse party or to the court,

does not without more constitute "fraud upon the court" and does not merit relief under

Fed. R. Civ. P. 60(d)(3).[316]

In *Hoti Enterprises*, Judge Seibel affirmed the bankruptcy court's denial of

reconsideration of a cash collateral order based on alleged fraud by a lender in its

representation that it had a secured claim. She held that "neither perjury nor non-

disclosure by itself amounts to anything more than fraud involving injury to a single

litigant" covered by Fed. R. Civ. P. 60(b)(3), and therefore, is not the type of egregious

misconduct necessary for relief under Fed. R. Civ. P. 60(d).[317]  That rule also means that

assuming, arguendo, Old GM had attempted to defraud car owners, that would not be

enough.  It would need to have defrauded *the Court.*

---

[316]  *See, e.g., Gleason*, 860 F.2d at 559-60; *Hoti Enters., L.P. v. GECMC 2007 C-1 Burnett Street, LLC ( In re Hoti Enters., L.P. )*, 2012 U.S. Dist. LEXIS 182395, at *12-13, 2012 WL 6720378, at * 3-4 (S.D.N.Y. Dec. 27, 2012) (Seibel, J.).

[317]  *Hoti Enters.*, 2012 U.S. Dist. LEXIS 182395, at *12-13, 2012 WL 6720378, at *3-4. Courts from other jurisdictions have reached the same conclusion. *See In re Tevis*, 2014 Bankr. LEXIS 406, at *12, 2014 WL 345207, at *4 (B.A.P. 9th Cir. Jan. 30, 2014) ("Mere nondisclosure of evidence is typically not enough to constitute fraud on the court, and 'perjury by a party or witness, by itself, is not normally fraud on the court.'"); *In re Andrada Fin., LLC*, 2011 Bankr. LEXIS 1779, at *21, 2011 WL 3300983, at *7 (B.A.P. 9th Cir. Apr. 7, 2011); *In re Levander*, 180 F.3d 1114, 1119 (9th Cir. 1999); *Simon v. Navon*, 116 F.3d 1, 6 (1st Cir. 1997); *Wilson v. Johns-Manville Sales Corp.*, 873 F.2d 869, 872 (5th Cir. 1989); *In re Mucci*, 488 BR 186, 193-94 & n.8 (Bankr. D. N.M. 2013) (Jacobvitz, J.); *In re Galanis*, 71 B.R. 953, 960 (Bankr. D. Conn. 1987) (Shiff, J.) ("It is well established that the failure to disclose allegedly pertinent facts relating to a controversy before the court, whether to an adverse party or to the court, does not constitute "fraud upon the court" for purposes of setting aside a judgment . . . .").

3.  *Particular Standards to Apply*

In each of *Ticketplane*t and *Food Management*, after discussion of *Leber-Krebs*

and *Clinton Street Foods*, the courts listed matters to be considered in analyzing a fraud

on the court claim for sufficiency, as extracted from *Leber-Krebs* and *Clinton Street*

*Foods*.  They were:

> (1) the defendant's misrepresentation to the court;

> (2) the impact on the motion as a consequence of that misrepresentation;

> (3) the lack of an opportunity to discover the misrepresentation and either bring it to the court's attention or bring an appropriate corrective proceeding; and

> (4) the benefit the defendants derived by inducing the erroneous decision.[318]

With the courts in *Clinton Street Foods, Ticketplanet, and Food Management* having

looked to those factors to supplement the Supreme Court and Circuit holdings discussed

above, this Court will too.

Together, the above cases thus suggest a methodology to apply in determining

whether any fraud rises to the level of fraud on the court.  First, as *Kupferman*, *Hadges*

and the other Circuit cases make clear, the Court must ascertain whether the alleged fraud

is of a type that defiles the court itself; is perpetrated by officers of the court; or seriously

affects the *integrity* of the normal process of adjudication.  Then the Court must analyze

the alleged fraud in the context of the *Leber–Krebs* factors, as applied in *Clinton Street*

*Foods, Ticketplanet, and Food Management*.  The *Leber-Krebs* factors bring into the

---

[318]     313 B.R. at 64.

analysis, among other things, requirements of an interface with the court;[319] an injury to

the court or the judicial system (as contrasted to an injury to one or more individuals);[320]

impact by the fraud on the workings of the judicial system; a nexus between the fraud and

injury to the judicial system; and one or more benefits to the wrongful actor(s) by reason

of the fraud on the court.

The takeaway from these cases is also that there can be no fraud on the court by

accident.  Those engaging in the fraud must be attempting to subvert the legal process in

connection with whatever the court is deciding.  There likewise cannot be a fraud on the

court by imputation alone.  There must be a direct nexus between the knowledge and

intent of any wrongdoer and communications to the court.  If the fraud has taken place

elsewhere (and is unknown to those actually communicating with the court), the requisite

attempt to defile the Court itself and subvert the legal process is difficult, if not

impossible, to show.

## VI.

### Certification to Circuit

As the Court did with respect to one other (but much less than all) of its earlier

decisions in Old GM's chapter 11 case,[321] the Court certifies its judgment here for direct

review by the Second Circuit.  Here too, in this Court's view, this is one of those rare

occasions where the Circuit might wish to consider immediate review as an option.

---

[319]    Thus, if the fraud is not linked to either a communication to the court, or a nondisclosure to the court under circumstances where there is a duty to speak with the matter that was not disclosed, that requirement is not satisfied.

[320]    *See SEC v. ESM Grp., Inc.,* 835 F.2d 270, 273 (11th Cir. 1988) (holding that fraud on the court is the type of fraud which prevents or impedes the proper functioning of the judicial process, and it must threaten public injury, as distinguished from injury to a particular litigant), *cert denied,* 486 U.S. 1055 (1988).

[321]    *See GM-UCC-3 Opinion,* n.50 *supra,* 486 B.R. at 646-47.

-131-

In that connection, 28 U.S.C. § 158 grants a court of appeals jurisdiction to hear appeals from final judgments of the bankruptcy court under limited circumstances. First the bankruptcy court (acting on its own motion or on the request of a party to the judgment), or all the appellants and appellees acting jointly, must certify that—

> (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;

> (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or

> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken....[322]

Then the Court of Appeals decides whether it wishes to hear the direct appeal.[323]

In this case, the Court considers each of the three bases for a certification to be present. With respect to the first prong, the decision here is one of law based on undisputed facts. There are no controlling decisions of the Second Circuit on the issues here beyond the most basic fundamentals. And this is a matter of considerable public importance. Additionally, though the $7 to $10 billion in controversy here may be regarded as personal to the Plaintiffs and New GM, the underlying legal issues are important as well, as are their potential effect, going forward, on due process in chapter 11 cases, and on 363 sales and the claims allowance process in particular.

---

[322]   28 U.S.C. § 158(d).

[323]   *Id.; see also In re General Motors Corp.*, 409 B.R. 24, 27 (Bankr. S.D.N.Y. 2009) (Gerber, J.) ("***GM-Sale Appeal Certification Decision***") ("The Circuit does not have to take the appeal, however, and can decide whether or not to do so in the exercise of its discretion.").

With respect to the second prong, available authorities, while helpful to a point, came nowhere close to addressing a factual situation of this nature. The issues were complicated by broad language in the caselaw, and conflicting decisions.[324]

With respect to the third prong, the Court believes that an immediate appeal from the judgment in this matter is likely to advance proceedings in both this case (if the Court is called upon to do anything further) and the MDL case. Plainly a second level of appeal (which would otherwise be almost certain, given the stakes and importance of the controversy) would have a foreseeable adverse effect on the ability of the MDL Court to proceed with the matters on its watch.

## Conclusion

The Court's conclusions as to the Threshold Issues were set forth at the outset of this Decision, and need not be repeated here. Based on its conclusions as to the Threshold Issues as discussed above, the Court will not allow either the Economic Loss Plaintiffs (including the Used Car Purchasers subset of Economic Loss Plaintiffs) or the Pre-Closing Sale Plaintiffs to be exempted from the Sale Order's Free and Clear Provisions barring the assertion of claims for successor liability. The Economic Loss Plaintiffs (but not the Pre-Closing Sale Claimants) may, however, assert otherwise viable claims against New GM for any causes of action that might exist arising solely out of New GM's own, independent, post-Closing acts, so long as those Plaintiffs' claims do not in any way rely on any acts or conduct by Old GM. The Plaintiffs may file late claims,

---

[324] In one of its earlier decisions in the *GM* case, *see GM-Sale Appeal Certification Decision*, 409 B.R. at 27-29, the Court denied certification to the Circuit of the appeals from the Sale Order following the *Sale Opinion*, even though, as the subsequent history of the *Sale Opinion* indicates, *see* n.2 *supra*, one of them ultimately did go up to the Circuit. This Court denied certification there because while GM's well-being and that of its suppliers, as a business matter, had substantial public importance, the legal issues were not particularly debatable. Here they are plainly so.

and to the extent otherwise appropriate such late claims may hereafter be allowed—but the assets of the GUC Trust may not be tapped to satisfy them, nor will Old GM's Plan be modified in this or any other respect.

The Court will not lengthen this decision further by specifically addressing any more of the contentions that were raised in the more than 300 pages of briefing on the Motion to Enforce and its sister motions. The Court has canvassed those contentions and satisfied itself that no material points other than those it has specifically addressed were raised and have merit.

The parties are to caucus among themselves to see if there is agreement that no further issues need be determined at the Bankruptcy Court level. If they agree (as the Court is inclined to believe) that there are none, they are to attempt to agree on the form of a judgment (without prejudice, of course, to their respective rights to appeal) consistent with the Court's rulings here. If they cannot agree (after good faith efforts to try to agree), any party may settle a judgment (or, if deemed preferable, an order), with a time for response agreed upon in advance by the parties. After the Court has been presented with one or more proposed judgments or orders, the Court will enter a judgment or order in the form it regards as most appropriate, and a separate order providing the necessary certification for review under § 158(d).

Dated: New York, New York
     April 15, 2015

                            _s/Robert E. Gerber_____
                            United States Bankruptcy Judge