HAGENS BERMAN SOBOL SHAPIRO LLP
Steve W. Berman (*pro hac vice*)
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
Telephone:  206-623-7292

– and –

ROBINSON CALCAGNIE ROBINSON
SHAPIRO DAVIS, INC.
Mark P. Robinson, Jr. (*pro hac vice*)
19 Corporate Plaza Drive
Newport Beach, CA 92660
Telephone:  940-720-1292

*Counsel for The People of the State of*
*California, acting by and through Orange*
*County District Attorney Tony Rackauckas*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
IN RE:                                          :       Chapter 11
                                                      :
MOTORS LIQUIDATION COMPANY, *et al*., :       No. 09-50026 (REG)
f/k/a GENERAL MOTORS CORP., *et al*.,      :
                                                      :       (Jointly Administered)
                                 Debtors.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

<u>**PEOPLE OF THE STATE OF CALIFORNIA'S "NO STRIKE" PLEADING**</u>

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...............................................................................................1

II. BACKGROUND ................................................................................................4

    A.  The State's claims target only New GM's post-Sale misconduct...........................4

    B.  The State claims that New GM independently violated the California
        UCL and FAL. ...............................................................................7

III. ARGUMENT .....................................................................................................9

    A.  On its face, the Sale Order does not bar the State's claims based on
        New GM's violations of its own independent legal duties. ......................................9

    B.  The Bankruptcy Court did not have jurisdiction to provide New GM
        with immunity for its own post-Sale violations of its independent legal
        obligations. ...........................................................................................11

    C.  The fact that the *California* Complaint contains factual allegations
        about Old GM does not mean that the legal claims in the Complaint
        are based on the conduct, cars or parts of Old GM..................................14

        1.  The Sale Order enjoins legal "claims," *not* factual allegations. .................14

        2.  The Complaint's factual allegations concerning pre-bankruptcy
            events are proper, since (a) New GM has knowledge of
            pre-bankruptcy information because the same personnel
            worked at Old GM; and (b) pre-bankruptcy events provide
            context for New GM's alleged misconduct. ...............................................15

            a.  An employee's knowledge of facts learned in the scope of
                her employment is broadly imputed to the corporate employer. ...16

            b.  The knowledge of GM personnel who worked at *both* Old
                and New GM is properly imputed to New GM. ...........................18

            c.  The remaining allegations concerning Old GM and
                pre-bankruptcy events provide context for the
                post-bankruptcy claims arising solely from the independent
                actions of New GM. ...................................................22

IV. CONCLUSION...................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re 1031 Tax Grp., LLC,*
2011 U.S. Dist. LEXIS 33755 (S.D.N.Y. Mar. 29, 2011) .......................................................13

*Albert v. Alex. Brown Mgmt. Servs., Inc.,*
2005 Del. Ch. LEXIS 133 (Del. Ch. Aug. 26, 2005) ............................................................19

*Allard v. Arthur Andersen & Co. (USA),*
924 F. Supp. 488 (S.D.N.Y. 1996).......................................................................................17

*Columbia Pictures Corp. v. DeToth,*
87 Cal. App. 2d 620 (1948) ................................................................................................18

*Copeman Labs. Co. v. Gen. Motors Corp.,*
36 F. Supp. 755 (E.D. Mich. 1941).......................................................................................19

*In re Cuyahoga Equip. Corp.,*
980 F.2d 110 (2d Cir. 1992).................................................................................................12

*In re Gen. Motors LLC Ignition Switch Litig.,*
2014 WL 6655796 (S.D.N.Y. Nov. 24, 2014)........................................................................5

*In re Johns-Manville Corp.,*
517 F.3d 52 (2d Cir. 2008), *rev'd on other grounds sub nom., Travelers*
*Indem. Co. v. Bailey*, 557 U.S. 137 (2009) ..........................................................................11

*In re Johns-Manville Corp.,*
600 F.3d 135 (2d Cir. 2010).................................................................................................13

*Kellogg Brown & Root Servs., Inc. v. United States,*
728 F.3d 1348 (Fed. Cir. 2013)............................................................................................18

*Kirschner v. KPMG LLP,*
938 N.E.2d 941 (N.Y. 2010)................................................................................................17

*Link v. Wabash R.R. Co.,*
370 U.S. 626 (1962).............................................................................................................17

*Mack v. Dep't of Alcoholic Beverage Control,*
178 Cal. App. 2d 149 (1960) ..........................................................................................16, 17

010440-12 787422 V1

*In re Motors Liquidation Co.*,
  2015 Bankr. LEXIS 1296 (Bankr. S.D.N.Y. Apr. 15, 2015)........................................... *passim*

*N.Y. Marine & Gen. Ins. Co. v. Tradeline L.L.C.*,
  266 F.3d 112 (2d Cir. 2001).......................................................................................17

*O'Riordan v. Federal Kemper Life Assurance Co.*,
  114 P.3d 753 (Cal. 2005) .......................................................................................17, 18

*Ortega v. Natural Balance Inc.*,
  2013 WL 6596792 (C.D. Cal. Dec. 16, 2013) ...........................................................2

*In re Quigley Co., Inc.*,
  676 F.3d 45 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 2849 (2013) ...........................12

*United States v. Gen. Motors Corp.*,
  574 F. Supp. 1047 (D.D.C. 1983). ............................................................................21

*Upjohn Co. v. New Hampshire Ins. Co.*,
  476 N.W.2d 392 (Mich. 1991)...................................................................................19

*Veal v. Geraci*,
  23 F.3d 722 (2d Cir. 1994).........................................................................................17

*In re Wood*,
  825 F.2d 90 (5th Cir. 1987) .......................................................................................12

*Woods v. Maytag Co.*,
  807 F. Supp. 2d 112 (E.D.N.Y. 2011) ......................................................................18

*Zerand-Bernal Grp. v. Cox*,
  23 F.3d 159 (7th Cir. 1994) .............................................................................11, 12, 13

### STATUTES

28 U.S.C. § 1334(b) ...........................................................................................................12

49 U.S.C. § 30101. ...............................................................................................................3

49 U.S.C. § 30118(c) ........................................................................................................21

49 U.S.C. § 30165(a)(1)....................................................................................................21

49 U.S.C. § 30166(m)(3) ..................................................................................................21

Cal. Civ. Code § 232.........................................................................................................16

Cal. Civ. Code § 17200........................................................................................................8

Cal. Civ. Code § 17500........................................................................................................8

**OTHER AUTHORITIES**

3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private
    Corporations § 790 (1994) ...........................................................................................17

49 C.F.R. § 573.6(b)-(c)......................................................................................................21

49 C.F.R. §§ 576.5-576.6....................................................................................................21

49 C.F.R. §§ 577.5(a)..........................................................................................................21

49 C.F.R. § 577.7(a)............................................................................................................21

49 C.F.R. § 579.21 ..............................................................................................................21

Restatement (Third) of Agency § 5.03 cmt. b ...........................................................17

Restatement (Third) of Agency § 5.03 cmt. c............................................................19

010440-12  787422 V1

The People of the State of California, acting by and through Orange County District Attorney Tony Rackauckas, submit this No Strike Pleading in accordance with paragraph 12(c) of this Court's Judgment dated June 1, 2015.  For the reasons stated herein, the State submits that the Sale Order neither does, nor properly could, enjoin any of the claims or allegations in the *California* action.[1]

## I.    INTRODUCTION

The *California* action is a law enforcement action for civil penalties and injunctive relief against General Motors LLC ("New GM") based ***exclusively*** on New GM's independent violations of the California's Unfair Competition Law ("**UCL**") (Cal. Bus. Code § 17200) and False Advertising Law ("**FAL**") (Cal Bus. Code § 17500).  The *California* action seeks to hold New GM liable for only its ***own*** acts and omissions after this Court approved the 363 Transaction[2] and New GM began operations on July 11, 2009.   The *California* action does not seek to recover any remedies resulting from the actions or conduct of General Motors Corporation ("Old GM") and therefore is not subject to this Court's Sale Order bar on claims against New GM arising from or related to the conduct of  Old GM.[3]  Accordingly, under the

---

[1] The "*California* action" is *The People of the State of California, acting by and through Orange County District Attorney Tony Rackauckas v. General Motors LLC*, Case No.: 30-2014-00731038-CU-BT-CXC, pending in the Orange County Superior Court before Judge Kim G. Dunning, and a copy of the First Amended Complaint is attached as Exhibit A.

[2] The term "363 Transaction" refers to the sale of Old GM's assets to New GM pursuant to 11 U.S.C. § 363, as effectuated by this Court's July 5, 2009 Sale Order.  Capitalized terms used but not defined herein shall have the meanings ascribed to them in this Court's *Decision on Motion to Enforce Sale Order,* entered on April 15, 2015, ("Decision"), and reported as *In re Motors Liquidation Co.,* 2015 Bankr. LEXIS 1296 (Bankr. S.D.N.Y. Apr. 15, 2015).

[3] In response to this Court's statements at page 6 n.8 of its *Decision re Form of Judgment*, entered on May 27, 2015, the State wishes to be clear: the State has never questioned this Court's jurisdiction to enforce the Sale Order, and has never had anything but respect for the authority of

- 1 -

logic of this Court's Decision, the *California* action consists exclusively of Independent Claims, and should be permitted to proceed without amendment.

Plaintiff alleges that New GM is liable for civil penalties as a result of its post-July 10, 2009 conduct in (i) concealing the existence of the many known defects plaguing an astounding number of models and years of GM-branded vehicles;[4] (ii) maintaining a corporate culture that valued cost-cutting over safety and actively discouraged GM personnel from flagging or addressing safety issues, while (iii) falsely marketing its brand and its vehicles as safe and reliable.  *See, e.g.,* ¶¶ 2-5, 9.[5]  In fact, the *California* action is limited to New GM's conduct occurring after June 27, 2010; that is because the UCL has a four year statute of limitations,[6] and the original complaint was filed on June 27, 2014.  The State's claims for violations of the California UCL and FAL target New GM's conduct in creating safety defects, concealing known safety defects, and falsely marketing its vehicles as safe and reliable.  ¶¶ 253-273.

Simply put, the State's claims arose after the 363 Transaction, and are based _solely_ on the post-Sale conduct of New GM.   As such, the claims do not fall properly within the category of claims barred or released by the Sale Order.  Moreover, as a matter of law, the Sale Order cannot bar claims based solely on the conduct of the non-debtor New GM that did not arise until ***after***

---

this Court.  The reason that the State is not now amending its Complaint is because of its strong belief that under the Sale Order, and the logic of the Decision, the *California* action should be free to proceed.

[4] The term "GM vehicles" (or "GM-branded vehicles") is used in the Complaint as a generic term for GM vehicles—regardless of whether they were sold by Old GM or New GM.  In either case, the *California* action seeks to impose liability only on New GM for its own, post-Sale Order conduct.

[5] References preceded by "¶" are to the paragraphs of the *California* First Amended Complaint for Violations of California Unfair Competition Law and False Advertising Law, attached hereto as Ex. A.

[6] *See Ortega v. Natural Balance Inc.*, 2013 WL 6596792, at *4 (C.D. Cal. Dec. 16, 2013).

- 2 -

the 363 Transaction.  There is no precedent for providing immunity for future wrongdoing to a

purchaser in a 363 transaction—no matter how much more enticing that would make the offer of

sale—and no court has the subject matter jurisdiction to grant such immunity.  Accordingly, the

State's claims are not subject to the injunction in the Sale Order.

The State is not alone in its belief that New GM violated the law.  Indeed, New GM has

conceded as much by entering into a Consent Order with the National Highway Safety

Administration ("NHTSA"), in which it "admits that it violated the Safety Act by failing to

provide notice to NHTSA [of the ignition switch defects] … within five working days as

required by" the Act and applicable regulations.[7]  And the Department of Justice has reportedly

found evidence of criminal wrongdoing by New GM in connection with its cover-up of the

ignition switch defect.[8]  Surely New GM can be held liable for its own violations of California

law.

Finally, this Court should reject New GM's argument that the mere mention of Old GM

or pre-bankruptcy events somehow renders the *California* Complaint improper (in whole or in

part).  By its own terms, the Sale Order enjoins ***"claims*,"** or causes of action – and not factual

allegations.  In fact, the pre-Sale conduct alleged in the Complaint involved Old GM personnel

---

[7] *See* Consent Order at 4 (available at
http://www.nhtsa.gov/staticfiles/communications/pdf/May-16-2014-TQ14-001-Consent-
Order.pdf).  The "Safety Act" refers to the National Traffic Vehicle and Motor Vehicle Safety
Act, 49 U.S.C. § 30101, *et seq.,* as amended by the Transportation Recall, Enhancement,
Accountability and Documentation Act (the "TREAD Act").  In Section 6.15 of the Sale
Agreement through which it acquired substantially all of the assets and assumed certain
responsibilities of Old GM, New GM agreed to abide by all Safety Act obligations with respect
to vehicles and parts manufactured by Old GM.

[8] *See, e.g., "G.M. Inquiry Said to Find Criminal Wrongdoing,"* N.Y. Times (May 22, 2015)
(available at http://www.nytimes.com/2015/05/23/business/gm-inquiry-said-to-find-criminal-
wrongdoing.html?_r=0); *GM CEO Says She's Been Interviewed in Ignition Switch Probe*,
Associated Press (June 10, 2015) (available at http://www.latimes.com/business/la-fi-hy-gm-
barra-20150609-story.html).

that New GM employed in the same or similar capacities.  Hence, just as employees' knowledge acquired in the scope of their employment was imputed to Old GM under California law, it was also imputed to New GM.  When New GM chose to maintain dozens of Old GM employees who were aware of the Ignition Switch Defect and "relatively senior in position,"[9] those employees carried that knowledge into New GM.   The *California* Complaint focuses in part on what New GM did and did not do given that knowledge.  The State's claims arise solely from New GM's conduct, and the propriety of the action should not turn on whether or not the term "Old GM" appears in the Complaint, or on whether the New GM employees with knowledge of dangerous defects had previously worked for Old GM.

In sum, the *California* action has been delayed long enough, and should now proceed in California state court.[10]

## II.     BACKGROUND

### A.     The State's claims target only New GM's post-Sale misconduct.

The State commenced the *California* action in California State court against New GM on June 27, 2014, seeking an injunction and civil penalties from New GM as a remedy for New

---

[9] *In re Motors Liquidation Co.*, 2015 Bankr. LEXIS 1296, at *111 n.154.

[10] The State is mindful of this Court's admonition that "the No Strike Pleading shall not reargue issues that were already decided by the Decision and Judgment."  Judgment, ¶ 12(c). But the State also notes the Court's statement in the Decision that, apart from the claims of the Pre-Closing Accident Plaintiffs, the "matters now before the Court" and addressed by the Decision "involves only *economic losses* allegedly sustained with respect to Old GM vehicles or parts."  *In re Motors Liquidation Co.*, 2015 Bankr. LEXIS 1296, at *7 n.4 (emphasis in original); *see also id.* at *11 n.8 (noting that briefs were filed on behalf of personal injury and "Economic Loss Plaintiffs" only).  The State, of course, does not seek "economic losses" of any sort, let alone "losses sustained with respect to Old GM vehicles or parts."  Instead, the State's law enforcement claims seek civil penalties and injunctive relief based solely on New GM's post-Sale acts and omissions.  The State does not believe that this Court has yet decided the issues addressed herein given the unique circumstances of the *California* action.

GM's misleading misrepresentations to California consumers concerning the safety and

reliability of its vehicles, the integrity of the New GM brand, and New GM's alleged

concealment of defects in certain GM-branded vehicles or parts.  After the State filed an

Amended Complaint on June 27, 2014, New GM filed a Notice of Removal.  Then, on October

9, 2014, the State filed a motion to remand.  (14–MD–2543 Docket No. 335.)

On November 24, 2014, Judge Furman granted Plaintiff's motion to remand and directed

the *California* action back to the Orange County Superior Court where it was filed.  *In re Gen.*

*Motors LLC Ignition Switch Litig.*, 2014 WL 6655796, at *8 (S.D.N.Y. Nov. 24, 2014).  In his

remand order, Judge Furman noted that: "The Amended Complaint asserts that the case is a 'law

enforcement action which primarily seeks to protect the public safety and welfare, brought by a

governmental unit in the exercise of and to enforce its police power' and that [the State] only

seeks to hold New GM liable for its '*own* acts and omissions *after* the July 10, 2009 effective

date' of the Sale Order. (Am. Compl. ¶¶ 1, 3 (emphasis in original))."  *In re Gen. Motors LLC*

*Ignition Switch Litig.,* 2014 WL 6655796, at *1.  In fact, the Amended Complaint expressly

states that:

> This action seeks to hold [New] GM liable only for its *own* acts
> and omissions *after* the July 10, 2009 effective date of the Sale
> Order and Purchase Agreement through which [New] GM acquired
> virtually all of the assets and certain liabilities of Old GM.  [¶
> 3].[11]

As the Amended Complaint alleges, after the 363 Transaction, New GM "told the world

that it was a new and improved company" committed to innovation, safety and maintaining a

---

[11] As this paragraph makes clear, the term "GM" in the Amended Complaint refers to what is
referred to by lawyers and judges in this litigation as "New GM."  *See also, e.g.,* ¶ 10 (defining
"Defendant General Motors LLC" as "GM.");  ¶ 22 ("From its inception in 2009, GM has known
that many defects exist in GM-branded vehicles.").

010440-12 787422 V1

strong brand.  ¶ 238.  The Amended Complaint provides many examples of New GM's public

statements to that effect, and New GM's marketing of its vehicles as safe, reliable and of high-

quality.  ¶¶ 228-247.  New GM made these misrepresentations in order "misle[a]d and/or

deceive[] [California consumers] into believing that they would be purchasing a safe and reliable

vehicle built by a reputable manufacturer that values safety and stands behind its vehicles after

they are sold…."  ¶ 261.   Indeed, "[a] vehicle made by a reputable manufacturer of safe and

reliable vehicles is worth more than an otherwise similar vehicle made by a disreputable

manufacturer that is known to devalue safety and to conceal serious defects from consumers and

regulators," ¶ 4, and New GM successfully—and falsely—branded itself as the former.

In reality, New GM failed to disclose, and affirmatively concealed, both its own systemic

devaluation of safety[12] and a staggering and ever-growing number of safety defects in GM-

branded vehicles.  ¶¶ 31, 224.[13]  The Complaint further alleges that New GM's systematic

concealment of safety defects was deliberate:

> From its inception in 2009, [New] GM knew about an ever-
> growing list of serious safety defects in millions of GM-branded
> vehicles, but concealed them from consumers and regulators in
> order to boost sales and avoid the cost and publicity of recalls. [¶
> 32] ***
>
> The available evidence shows a consistent pattern: [New] GM
> learned about a particular defect and, often only at the prodding of
> regulatory authorities, "investigated" the defect and decided upon a
> "root cause."  [New] GM then took minimal action – such as
> issuing a carefully-worded "Technical Service Bulletin" to its
> dealers, or even recalling a very small number of affected vehicles.
> All the while, the true nature and scope of the defects were kept
> under wraps, vehicles affected by the defects remained on the road,

---

[12] *See, e.g.,* ¶¶ 179-211.

[13] The parade of recalls continued on throughout 2014, covering many millions of more
vehicles with many more safety defects.

and [New] GM enticed consumers to purchase its vehicles by
touting the safety, quality, and reliability of its vehicles, and
presenting itself as a manufacturer that stands behind its products.
[¶ 36.]

Now the truth has come out, as (i) New GM was forced to disclose scores of serious

defects in a never-ending series of recalls affecting over 17 million GM-branded vehicles (¶ 224;

*see* ¶¶ 38-177 (describing the defects that had been revealed as of the time of the filing of the

Amended Complaint, and explaining that New GM was often aware of them prior to 2014 but

chose to conceal them)); (ii) information about New GM's systemic de-valuation of safety and

active discouragement of personnel who might otherwise flag safety issues has been publicized

in a report by Anton Valukas commissioned by New GM (*see* ¶¶ 179-211); and  (iii) in a

Consent Order with NHTSA, New GM admitted that it had violated its legal obligations to

promptly disclose the existence of known safety defects (¶ 13).  As a result of the revelation of

New GM's fraudulent omissions and misrepresentations, and New GM's extreme mishandling of

safety issues, the value of *all* GM-branded vehicles sold after New GM's inception has

diminished.  ¶ 224.

**B.      The State claims that New GM independently violated the California UCL and
FAL.**

The State asserts only claims against New GM solely for its post-Sale violations of

California law.  As the Amended Complaint alleges, the *California* action:

arises from [New] GM's breach of its obligations and duties,
including but not limited to: (i) its concealment of, and failure to
disclose that, as a result of a spate of safety defects, over 17
million Defective Vehicles were on the road nationwide – and
many hundreds of thousands in California; (ii) its failure to
disclose the defects despite its TREAD Act obligations; (iii) its
failure to disclose that it devalued safety and systemically
encouraged the concealment of known defects; (iv) its continued
use of defective ignition switches as replacement parts; (v) its sale

- 7 -

of used "GM certified" vehicles that were actually plagued with a
variety of known safety defects; and (vi) its repeated and false
statements that its vehicles were safe and reliable, and that it stood
behind its vehicles after they were purchased.  [¶ 21.]

The Amended Complaint asserts that this conduct of New GM violated the California

UCL, which prohibits "unfair competition," including "any unlawful, unfair or fraudulent

business act or practice and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. Code

§ 17200.  *See* ¶¶ 253-264.  The Amended Complaint also asserts that New GM's conduct

violated the California FAL, which states that:

> It is unlawful for any … corporation … with intent directly or
> indirectly to dispose of real or personal property . . . to induce the
> public to enter into any obligation relating thereto, to make or
> disseminate or cause to be made or disseminated  … from this state
> before the public in any state, in any newspaper or other
> publication, or any advertising device, … or in any other manner
> or means whatever, including over the Internet, any statement …
> which is untrue or misleading, and which is known, or which by
> the exercise of reasonable care should be known, to be untrue or
> misleading.

Cal. Bus. Code § 17500.  By definition, then, New GM can only be held liable if *it* committed

unlawful, unfair or fraudulent business acts or practices, or if *it* promulgated untrue or

misleading advertising.  The claims necessarily arise exclusively from the alleged acts and

omissions of New GM and did not accrue until after the Sale Order.

Likewise, in the Prayer for Relief, all the remedies are targeted at New GM's conduct, as

the State seeks to (A) enjoin New GM from committing further acts of unfair competition; and

(B) obtain civil penalties from New GM for its violations of the UCL and FAL.  Ultimately,

there are two possible results in the *California* action:  (i) New GM is found to have *itself*

violated the California UCL and/or FAL by using unlawful, unfair or fraudulent business acts or

- 8 -

practices, and/or promulgating untrue or misleading advertising, and is therefore subject to civil

penalties and injunctive relief; *or* (ii) New GM is found not to have violated the California

statutes and New GM therefore prevails.  The *California* Complaint simply cannot be read as an

effort to hold New GM liable for the conduct of Old GM—under a successor liability theory, a

transferee theory, or any other theory.

## III.    ARGUMENT

**A.    On its face, the Sale Order does not bar the State's claims based on New GM's violations of its own independent legal duties.**

The Sale Order has no application to the State's claims against New GM for New GM's

post-Sale violations of the California UCL and FAL.  The claims do not attempt to hold New

GM liable for the conduct of Old GM—whether on a successor liability theory, a "transferee"

theory, or any other theory.  Under the plain language of the Sale Order, and the logic of this

Court's Decision, the State's claims against the non-debtor New GM are Independent Claims and

should proceed in California State Court without further impediment.

New GM has argued that it is has no liability for at least certain of the State's claims

under paragraph 46 of the Sale Order, which reads as follows:

> Except for the Assumed Liabilities expressly set forth in the [Sale Agreement], *… [New GM] … shall [not] have any liability for any claim that arose prior to the Closing Date, relates to the production of vehicles prior to the Closing Date, or otherwise is assertable against [Old GM] . . . prior to the Closing Date*. … Without limiting the foregoing, *[New GM] shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any claims, including, but not limited to, under any theory of successor or transferee liability, de facto merger or continuity … and products . . . liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.*  [Emphasis added.]

- 9 -

The State's claims did not arise prior to the Closing Date of the 363 Transaction, as the conduct of New GM about which the State complains had not yet occurred.  Nor do the claims "relate[] to the ***production*** of vehicles prior to the Closing Date;" the State does not seek to hold New GM liable for the "production" of any vehicles prior to the Sale date, but rather for its own post-Sale misconduct.  Finally, the State's claims were never "assertable against Old GM," as they are based on the conduct of New GM and did not arise until ***after*** Old GM ceased to exist.  Paragraph 46 cannot be read to bar the State's claims.

New GM also claims immunity from some or all of the State's claims based on the injunction in the Sale Order, but that injunction cannot be read to bar the State's claims.  Under the injunction:

> [A]ll persons and entities … holding liens, claims, encumbrances, and other ***interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, against [Old GM] or the Purchased Assets*** (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), ***arising under or in any way relating to, [Old GM], the Purchased Assets, the operation of the Purchased Assets prior to the Closing . . . are forever barred, estopped, and permanently enjoined . . .  from asserting against [New GM] . . . such persons' or entities' liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability.***

Sale Order, ¶ 8 (emphasis added).

Once again, the State does not assert any claims based on successor or transferee liability, and its legal claims neither "arise under" nor are "related to" the conduct of Old GM.  Once again, while the Complaint contains factual allegations pre-dating the existence of Old GM, the State's legal claims arise solely from New GM's own post-Sale misconduct.  The injunction

- 10 -

cannot be read as providing New GM with immunity for its future misconduct, and has no

application to the State's claims.

**B.      The Bankruptcy Court did not have jurisdiction to provide New GM with immunity for its own post-Sale violations of its independent legal obligations.**

If the Sale Order had purported to enjoin claims against New GM for its own post-Sale

conduct, such an injunction would extend beyond the jurisdiction of the bankruptcy court.

Subject matter jurisdiction in a bankruptcy proceeding over third-party claims (such as the non-

derivative claims of the State) can extend only to actions affecting the *res* of the bankruptcy

estate. *In re Johns-Manville Corp.*, 517 F.3d 52, 66-68 (2d Cir. 2008), *rev'd on other grounds*

*sub nom., Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009) (holding that, despite a "common

nucleus of operative facts involving" the debtor and the insurer, bankruptcy order enjoining

actions unrelated to the *res* of the estate are outside the scope of the bankruptcy court's

injunction power).  The Sale Order cannot properly bar the *California* action.

While a bankruptcy court assuredly has jurisdiction to interpret and enforce its own 363

transaction orders, that ancillary jurisdiction exists only to the extent that the court has the

jurisdiction to enter the 363 transaction order itself.  *See Zerand-Bernal Grp. v. Cox*, 23 F.3d

159, 164 (7th Cir. 1994) (affirming the bankruptcy court's holding that it "lacked jurisdiction" to

enjoin a post-363 transaction claim against a non-debtor:  "[T]he fact that the bankruptcy court,

in the order approving the bankruptcy sale and later in the plan of reorganization, purported

expressly to assume jurisdiction … could not confer jurisdiction.  A court cannot write its own

jurisdictional ticket."); *see also In re Johns-Manville Corp.*, 517 F.3d at 65 n.22 ("The ancillary

jurisdiction courts possess to enforce their own orders 'is itself limited by the jurisdictional limits

of the order sought to be enforced.'").

- 11 -

This Court did not have subject matter jurisdiction to protect the non-debtor New GM by limiting the right of the State to bring suit against New GM for New GM's own post-Sale misconduct in breach of New GM's own independent legal duties.  Subject matter jurisdiction of bankruptcy courts is limited to "civil proceedings arising under Title 11, or arising in or related to cases under Title 11."  28 U.S.C. § 1334(b).  Because the State's claims are based solely on the non-debtor New GM's post-sale conduct, the claims cannot be said to "arise in" or "under" Title 11.  *See Zerand-Bernal Grp.*, 23 F.3d at 162 ("arising under" jurisdiction "is limited to questions that arise during the bankruptcy proceeding and concern the administration of the bankrupt estate, such as whether to discharge a debtor").  And the State's claims are not "related to" Title 11, since the outcome of the *California* action can have no conceivable effect on the bankrupt estate.  *See In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992); *see also In re Quigley Co., Inc.*, 676 F.3d 45, 61-62 (2d Cir. 2012) (bankruptcy court lacks jurisdiction to enjoin a claim against a third party where such claim would not have an effect on the *res* of the bankruptcy estate), *cert. denied*, 133  S. Ct. 2849 (2013).  *See generally In re Wood*, 825 F.2d 90, 93 (5th Cir. 1987) ("For the purpose of determining whether a particular matter falls within bankruptcy jurisdiction, it is not necessary to distinguish between proceedings 'arising under', 'arising in a case under', or 'related to a case under', title 11…. [I]t is necessary only to determine whether a matter is at least 'related to' the bankruptcy.").

This Court should reject any argument that New GM should get immunity for its own post-Sale misconduct because immunity for the non-debtor increases the value of the estate.  That a broad injunction against future claims against a purchaser might result in a buyer paying a higher price for assets in a 363 transaction is pure speculation, and in any event cannot confer

- 12 -

jurisdiction over future claims against the purchaser arising from its independent misconduct. *See Zerand-Bernal Grp.*, 23 F.3d at 164 (rejecting the argument that bankruptcy courts may immunize a purchaser from state or federal law in the interests of increasing the value of a debtor's assets). As the *Zerand-Bernal Grp.* court reasoned, the argument that "the price received in a bankruptcy sale will be lower if a court is free to disregard a condition in the sale agreement enjoining claims against the purchaser based on the seller's misconduct" should be rejected because it "proves too much":

> It implies, what no one believes, that by virtue of the arising-under jurisdiction a bankruptcy court enjoys a blanket power to enjoin all future lawsuits against a buyer at a bankruptcy sale in order to maximize the sale price; more, that the court could in effect immunize such buyers from all state and federal laws that might reduce the value of the assets bought from the bankrupt[.][14]

There is no sound reason to encourage non-debtors to pay a purchase price in a 363 transaction that reflects a belief that they are forever immunized from liability for breaches of their ***own*** independent legal duties.

Thus, as the Second Circuit reiterated in *In re Johns-Manville Corp.*, 600 F.3d 135, 153 (2d Cir. 2010), bankruptcy courts do not have jurisdiction to enjoin "claims against non-debtor third parties" where those claims are based on the non-derivative misconduct of the non-debtor and the claims do not impact the bankruptcy estate. *See also, e.g., In re 1031 Tax Grp., LLC*, 2011 U.S. Dist. LEXIS 33755, at *7 (S.D.N.Y. Mar. 29, 2011) ("federal courts are without jurisdiction to enjoin actions against third-parties not in bankruptcy when those actions are premised upon an 'independent legal duty'"). Here, again, the State's law enforcement claims

---

[14] *Zerand-Bernal Grp.*, 23 F.3d at 163 (citation omitted).

- 13 -

are based on New GM's fraudulent concealment of the scores of defects plaguing GM-branded

vehicles; New GM's culture, which systematically devalued safety; and New GM's

misrepresentations concerning the safety and reliability of GM-branded vehicles—all in violation

of New GM's independent legal duties.  A Bankruptcy Court simply does not have jurisdiction to

enjoin such claims.

Accordingly, to the extent New GM claims that the Sale Order bars the claims in the

*California* Amended Complaint, New GM asks this Court to exercise jurisdiction that it does not

have.

**C.    The fact that the *California* Complaint contains factual allegations about Old GM does not mean that the legal claims in the Complaint are based on the conduct, cars or parts of Old GM.**

**1.      The Sale Order enjoins legal "claims," *not* factual allegations.**

New GM has advanced the facile argument that any factual allegations concerning Old

GM and events that occurred prior to the bankruptcy automatically are improper under the Sale

Order.  But this Court has at least implicitly rejected that argument by holding that the Economic

Loss Plaintiffs can assert "claims involving Old GM vehicles and parts so long as they were

basing their claims *solely on New GM conduct*, and not based on any kind of successor liability

or any other act by Old GM."  *In re Motors Liquidation Co.*, 2015 Bankr. LEXIS 1296, at *22.

It is hard to envision how such a legal claim could be pled without at least mentioning that the

vehicle at issues was manufactured by Old GM.   It simply cannot be that the mere mention of

Old GM is improper.

Indeed, the Sale Order and Sale Agreement speak of legal "claims" being enjoined, ***not***

factual allegations.  *See supra* at 9-10 (discussing relevant provisions of Sale Order and Sale

Agreement).  So it is not enough for New GM to simply point to the mention of Old GM (or pre-

- 14 -

Sale events) in the Complaint.  Rather, New GM must explain how it is that the State's assertion

of law enforcement claims against New GM for its own alleged violations of California law are

somehow claims based on the conduct of Old GM.  Because New GM has not and cannot do so,

the mention of Old GM cars and past events cannot be said to run afoul of the Sale Order or the

Sale Agreement.

> **2.      The Complaint's factual allegations concerning pre-bankruptcy events are
> proper, since (a) New GM has knowledge of pre-bankruptcy information
> because the same personnel worked at Old GM; and (b) pre-bankruptcy
> events provide context for New GM's alleged misconduct.**

As New GM ignores in challenging the propriety of the *California* action under the Sale

Order, the law in California and elsewhere broadly imputes an employee's knowledge to its

corporate employer.   Significantly, each of the 24 Old GM employees that this Court found to

be aware of the Ignition Switch Defect remained at New GM because New GM chose to keep

them.  As there is no reason to suppose those employees lost their knowledge of the defects on

the day Old GM became New GM, their knowledge is imputed to New GM, as is the knowledge

of all other New GM employees acting within the scope of their employment.  To impute the

knowledge of those employees to New GM is not a successor liability claim.  If New GM hadn't

elected to retain Old GM's employees, the knowledge of those employees would not be imputed

to New GM.  And if New GM or those employees had acted appropriately upon their hiring by

New GM to address (rather than conceal) the known problems, New GM would not have

liability.

New GM's knowledge of the Ignition Switch Defect and a host of other defects is, of

course, highly relevant to the State's claims against New GM.  Moreover, because of New GM's

continuing obligations under the Safety Act, the Company was under a duty to (i) continue to

- 15 -

monitor all GM vehicles that were on the road, and (ii) maintain the many records it was required to generate in connection with actual or potential safety issues.  Because of this, the actual number of New GM personnel with knowledge of the defects and safety issues in Old GM vehicles is far greater than the 24 found by this Court.  The State's claims against New GM are properly premised, in part, on the knowledge of the dozens of personnel that New GM employed who were aware of the defects and safety issues in Old GM vehicles.  That fact accounts for nearly all the allegations in the *California* Complaint that concern events that pre-date the existence of New GM.  The few remaining allegations concerning pre-bankruptcy facts are in the Complaint to provide context.  None of those allegations can possibly be used to hold New GM liable for the actions of Old GM.

<strong>a.    An employee's knowledge of facts learned in the scope of her employment is broadly imputed to the corporate employer.</strong>

Knowledge of the ignition switch defects and other pre-bankruptcy defects was wide-reaching and extensive within Old GM—and therefore New GM—including among Old GM's in-house counsel, management, and lead design engineers (most or all of whom stayed on at New GM).  Under California agency principles, the knowledge of these employees and counsel is imputed to Old GM because knowledge acquired by an agent in the scope of her employment is imputed to the principal.   That is especially clear here given that the Old GM employees with knowledge of the defects were performing the car manufacturer's obligations under the Safety Act.  *See infra* at 20-22.

According to Cal. Civ. Code § 232, "As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other."  *See, e.g., Mack v. Dep't of*

*Alcoholic Beverage Control*, 178 Cal. App. 2d 149 (1960) (knowledge of employee acquired during transaction of his employer's business is imputed to the employer with same effect as if the employer actually participated in transaction).  The law on these issues is substantially the same across the law of Michigan (where New GM is based), Delaware (where it was incorporated), and New York (most frequently analyzed before the Bankruptcy Court), and therefore the law applicable in all of these potentially relevant jurisdictions is also discussed herein.[15]

As discussed *infra* at 19-20, knowledge of the Ignition Switch Defect was widespread and communicated throughout New GM.  But even if that were not the case, employees' knowledge acquired within the scope of their employment is imputed to the corporation even if it is never communicated.   Indeed, since an agent generally has a duty to disclose matters to his or her principal, the actual knowledge of the agent is imputed to the principal.  *See, e.g., O'Riordan v. Federal Kemper Life Assurance Co.*, 114 P.3d 753 (Cal. 2005); *see also Kirschner v. KPMG LLP*, 938 N.E.2d 941, 950-51 (N.Y. 2010) (applying legal presumption that agents communicate information to principals).[16]  '"The fact that the knowledge acquired by the agent was not

---

[15] *N.Y. Marine & Gen. Ins. Co. v. Tradeline L.L.C.,* 266 F.3d 112, 122 (2d Cir. 2001); *Allard v. Arthur Andersen & Co. (USA)*, 924 F. Supp. 488, 494-95 (S.D.N.Y. 1996) (applying New York and Michigan law to impute the knowledge and conduct of corporate officials acting within the scope of their employment); *see also Link v. Wabash R.R. Co*., 370 U.S. 626, 633-34 (1962) ("[E]ach party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.") (citation omitted), *reh'g denied*, 371 U.S. 873 (1962); *Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994) ("[U]nder traditional principles of agency the attorney's knowledge must be imputed to [the client].").

[16] *See also* 3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 790 (1994) (noting that it has been widely held that a corporation is charged with imputed knowledge "even though the officer or agent does not in fact communicate the knowledge to the corporation"); Restatement (Third) of Agency § 5.03 cmt. b ("A principal may not rebut imputation of an agent's notice of a fact by establishing that the agent kept silent.").

- 17 -

actually communicated to the principal … does not prevent operation of the rule.'" *O'Riordan,* 114 P.3d at 757 (quoting *Columbia Pictures Corp. v. DeToth,* 87 Cal. App. 2d 620, 630 (1948)). And the principle is "charged with knowledge which his agent acquires before the commencement of the relationship when that knowledge can reasonably be said to be present in the mind of the agent while acting for the principle." *Columbia Pictures Corp. v. DeToth*, 87 Cal. App. 2d at 631.

> **b.** **The knowledge of GM personnel who worked at *both* Old and New GM is properly imputed to New GM.**

Here, many GM attorneys, managers, lead engineers, and other personnel who worked at both Old and New GM acquired knowledge of the Ignition Switch Defect while performing their duties, using systems and procedures that Old and then New GM maintained to comply with Safety Act obligations. As this Court found, "at least 24 Old GM personnel …, including engineers, senior managers, and attorneys, were informed or otherwise aware of the Ignition Switch Defect prior to the Sale motion," and, based on that knowledge, Old GM should have conducted a recall prior to the 2009 bankruptcy. *See In re Motors Liquidation Co.*, 2015 Bankr. LEXIS 1296, at *54. In reaching this conclusion, the Court effectively rejected New GM's arguments that only a "limited" number of Old GM personnel were aware of the ignition switch defect, or that only Old GM's low- or mid-level employees knew of the defect.[17]

---

[17] In any event, an employee's position within the corporate hierarchy is irrelevant or purposes of imputation, so long as she obtained the knowledge while acting within the scope of her authority. *See Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1369-70 (Fed. Cir. 2013) (reversing holding that employees were insufficiently senior in the corporate hierarchy for their actions and knowledge to be imputed), *cert. denied*, 135 S. Ct. 167 (2014); *Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 126-27 (E.D.N.Y. 2011) (imputing authorized Maytag repairman's knowledge of oven's defects and of attempts to conceal the defects to Maytag, where repairmen obtained this knowledge in the course of repairing Maytag ovens).

Because almost all of the Old GM employees involved in the ignition switch debacle and the other safety issues involved in the State's case stayed on at New GM, and generally held the same positions at both companies, New GM can be charged with its employees' knowledge of pre-bankruptcy information from day one of its existence.  Indeed, as this Court noted, *all* of the 24 employees with knowledge of the Ignition Switch Defect transferred from Old GM to New GM.  *In re Motors Liquidation Co.*, 2015 LEXIS 1296, at *54.  And New GM does not dispute that Old GM personnel knew enough as of the time of Old GM's June 2009 bankruptcy filing for Old GM then to have been obligated to conduct a recall of the affected vehicles under the Safety Act.  *Id.* at *54-55.

Under the logic of this Court's ruling and under established California law, the pre-bankruptcy knowledge of employees who worked first at Old GM and then at New GM is imputed to New GM.  This Court based its conclusion in part on the fact that Old GM—and later

---

And a corporation is charged with the collective knowledge of all of its employees even if no single individual possessed all of the relevant knowledge or was individually responsible for acting on it.  *See Copeman Labs. Co. v. Gen. Motors Corp.*, 36 F. Supp. 755, 762 (E.D. Mich. 1941) ("The knowledge possessed by a corporation about a particular thing is the sum total of all the knowledge which its officers and agents, who are authorized and charged with the doing of the particular thing acquire, while acting under and within the scope of their authority."); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 Del. Ch. LEXIS 133, at *39 (Del. Ch. Aug. 26, 2005) ("Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal."); Restatement (Third) of Agency § 5.03 cmt. c. ("Organizations are treated as possessing the collective knowledge of their employees and other agents, when that knowledge is material to the agents' duties, however the organization may have configured itself or its internal practices for transmission of information.").  The Michigan Supreme Court applied this "imputed collective knowledge" standard in *Upjohn Co. v. New Hampshire Ins. Co.*, 476 N.W.2d 392 (Mich. 1991), *reh'g denied*, 503 N.W.2d 442 (Mich. 1991), where it considered an insurance claim for damages from the continuous leaking of toxic materials from a corroded underground storage tank, which was regularly monitored by the plaintiff corporation's employees.  476 N.W.2d at 395-96.  The court held that information available to the corporation, "through its various employees and through its records," permitted a finding that the corporation had expected the leak, and *refused* to ignore knowledge obtained by individual employees, even if they could not comprehend its full import.  *Id.* at 400-01.

New GM—engineers, senior managers, and attorneys who knew of the Ignition Switch Defect

were part of "a group large in size and relatively senior in position."  *In re Motors Liquidation*

*Co.*, 2015 Bankr. LEXIS 1296, at *111 n.154.  In this Court's opinion, "a group of this size is

sufficient for the Court to conclude that a 'critical mass' of Old GM personnel had the requisite

knowledge—*i.e.*, were in a position to influence the noticing process."  *Id.* (citing *cf. Weisfelner*

*v. Fund 1 (In re Lyondell Chemical Co.),* 503 B.R. 348, 389 (Bankr. S.D.N.Y. 2014) (Gerber,

J.)).  Necessarily, given the presence of this same "critical mass" at New GM, New GM had

knowledge of the Ignition Switch Defect from day one after the 363 Transaction.  The same

conclusion would follow if New GM had cleaned house and hired a group of engineers, senior

managers, and attorneys from a rival car company, and that group happened to be aware (or

became aware) of the Ignition Switch Defect in Old GM vehicles.  The fact that the key

employees previously worked at Old GM cannot immunize New GM from the consequences of

its failure to act appropriately on the information its employees possessed.[18]

The State's argument on imputation is bolstered by the fact that New GM had ongoing

obligations under the Safety Act to monitor GM-branded vehicles on the road, to make quarterly

reports to NHTSA, and to maintain all relevant records for five years.  The Safety Act and

related regulations require the quarterly submission to NHTSA of "early warning reporting"

data, including incidents involving death or injury, claims relating to property damage received

by the manufacturer, warranty claims paid by the manufacturer, consumer complaints, and field

---

[18] The same is true with respect to the other pre-bankruptcy defects discussed in the
Amended Complaint.  But for the purposes of this pleading the State notes that if it cannot prove
New GM's awareness (or imputed awareness) of one or more of the defects, then those defects
will fall out of the case.  *In no circumstances would (or could) the State prove that New GM
violated the California UCL or FAL based on the conduct of Old GM.*

- 20 -

reports prepared by the manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues.  49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21. Manufacturers must retain for five years all underlying records on which the early warning reports are based and all records containing information on malfunctions that may be related to motor vehicle safety.  49 C.F.R. §§ 576.5-576.6.

The Safety Act further requires *immediate* action when a manufacturer *determines or should determine that a safety defect exists*.  *United States v. Gen. Motors Corp.*, 574 F. Supp. 1047, 1050 (D.D.C. 1983).  Within five days of learning about a safety defect, a manufacturer *must* notify NHTSA and provide a description of the vehicles potentially containing the defect, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related.  49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c).  Then, "within a reasonable time"[19] after deciding that a safety issue exists, the manufacturer *must* notify the owners of the defective vehicles.  49 C.F.R. §§ 577.5(a), 577.7(a), 49 U.S.C. § 30165(a)(1).

Old and New GM used several processes to identify safety issues, including the TREAD database and Problem Resolution Tracking System ("PRTS").  *See* Valukas Report at 282-313 (available at http://www.nhtsa.gov/staticfiles/nvs/pdf/Valukas-report-on-gm-redacted.pdf).  The TREAD database, used to store the data required for the quarterly NHTSA early warning reports, was the principal database used by Old and New GM to track incidents related to GM-branded vehicles.  *Id.* at 306.  The database included information from (i) customer service requests; (ii) repair orders from dealers; (iii) internal and external surveys; (iv) field reports from employees

---

[19] 49 C.F.R. § 577.7(a) was updated, effective October 11, 2013, to replace "within a reasonable time" to "no later than 60 days" from the filing of the NHTSA notification.

- 21 -

who bought GM-branded vehicles and from Captured Test Fleet reports;[20] (v) complaints from the OnStar call center; and (vi) a database maintained by GM legal staff to track data concerning complaints filed in court. *Id.* A TREAD reporting team would conduct monthly database searches and prepare scatter graphs to identify spikes in the number of accidents or complaints related to various GM-branded vehicles. *Id.* at 307. Because the same employees carried out the TREAD Act obligations at Old and New GM, they not only retained the knowledge acquired during the days of Old GM—they were in fact required to do so.

Once again, the pre-bankruptcy allegations in the Amended Complaint concern the ignition switch defects and other defects, and are in the Complaint because the Old GM personnel with knowledge of the defects stayed on at New GM; that knowledge is imputed to New GM as a matter of law.

> **c.  The remaining allegations concerning Old GM and pre-bankruptcy events provide context for the post-bankruptcy claims arising solely from the independent actions of New GM.**

The remaining allegations concerning Old GM provide context for the *California* action—but none seek to hold New GM liable for Old GM's conduct. So, for example, the Complaint states:

> This action seeks to hold [New] GM liable only for its ***own*** acts and omissions ***after*** the July 10, 2009 effective date of the Sale Order and Purchase Agreement through which [New] GM acquired virtually all of the assets and certain liabilities of Old GM.

¶ 3. By pointing out the origins of New GM, the State is not attempting to hold New GM responsible for the actions of Old GM.

---

[20] Captured Test Fleet reports were submitted by employees who were given vehicles and asked to document any problems that arose while driving. Valukas Report at 300. The Quality Group would review, summarize, and group these reports into categories. *Id.*

To take just one more example, in its discussion of how New GM's focus on cost-cutting negatively impacted the safety of GM-branded vehicles, the State alleges that "From the date of its inception in 2009, [the Company's TREAD database] has been the principal database used by [New] GM to track [safety] incidents related to its vehicles." ¶ 188.  The New GM employees charged with monitoring the TREAD database were known as the "TREAD Reporting team." ¶¶ 187, 189.   The State further alleges that New GM "starv[ed] the TREAD Reporting team of the resources it needed to identify potential safety issues" and thereby "helped to ensure that safety issues would not come to light." ¶ 191.  By way of context, the Complaint explains that—while at one point pre-bankruptcy "the TREAD Reporting team had eight employees who would conduct monthly searches and prepare scatter graphs to identify spikes in accidents or complaints with respect to various GM-branded vehicles," New GM used only three TREAD Reporting team employees for its pared-down searches.  ¶¶ 189-190.  Once again, there is no reading of these allegations under which New GM could be held liable for the conduct of Old GM.

## IV.   CONCLUSION

For the reasons stated above, the *California* action should be allowed to proceed forthwith in California State court.


Dated:  June 16, 2015

*/s/ Steve W. Berman*
Steve W. Berman (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
Tel.:  206-623-7292
steve@hbsslaw.com


- 23 -

ROBINSON CALCAGNIE ROBINSON
SHAPIRO DAVIS, INC.
Mark P. Robinson, Jr. (*pro hac vice*)
19 Corporate Plaza Drive
Newport Beach, CA 92660
Tel.: 949-720-1288
mrobinson@rcrlaw.net

*Counsel for Plaintiff, The People of
the State of California*

- 24 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 16, 2015, I caused the People of the State of California's

"No Strike" Pleading to be filed and served upon all parties receiving notice via the Court's ECF

system.

Dated:  June 16, 2015

/s/ Steve W. Berman
Steve W. Berman (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
Tel.:  206-623-7292
steve@hbsslaw.com

- 25 -

010440-12  787422 V1