# Exhibit B

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ORANGE COUNTY DISTRICT ATTORNEY
Tony Rackauckas, District Attorney
Joseph D'Agostino, Senior Assistant District Attorney
401 Civil Center Drive
Santa Ana, CA 92701-4575
Tel: (714) 834-3600
Fax: (714) 648-3636

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange
**07/01/2014** at 12:58:00 PM
Clerk of the Superior Court
By Irma Cook,Deputy Clerk

– In association with –

Mark P. Robinson, Jr., SBN 05442
Kevin F. Calcagnie, SBN 108994
Scot D. Wilson, SBN 223367
ROBINSON CALCAGNIE ROBINSON
  SHAPIRO DAVIS, INC.
19 Corporate Plaza Drive
Newport Beach, CA 92660
Tel: (949) 720-1288
Fax: (949) 720-1292
mrobinson@rcrlaw.net

Steve W. Berman (*Pro Hac Vice* Pending)
Andrew Volk (*Pro Hac Vice* Pending)
HAGENS BERMAN SOBOL
  SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel: (206) 623-7292
Fax: (206) 623-0594
steve@hbsslaw.com

*Attorneys for Plaintiff*
*THE PEOPLE OF THE STATE OF CALIFORNIA*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF ORANGE – COMPLEX LITIGATION DIVISION**

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through Orange County District Attorney Tony Rackauckas,<br><br>                              Plaintiff,<br><br>    v.<br><br>GENERAL MOTORS LLC<br><br>                              Defendant. | Case No. 30-2014-00731038-CU-BT-CXC<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW AND FALSE ADVERTISING LAW** |

010440-12  692229 V1

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................................................... 1

II. PLAINTIFF'S AUTHORITY ............................................................................................. 5

III. DEFENDANT .................................................................................................................... 6

IV. JURISDICTION AND VENUE .......................................................................................... 6

V. FACTUAL BACKGROUND .............................................................................................. 6

    A. There Are Serious Safety Defects in Millions of GM Vehicles Across Many
       Models and Years, and, Until Recently, GM Concealed them from Consumers.......... 6

        1. The ignition switch defects.............................................................................. 8

        2. The power steering defect. ............................................................................ 16

        3. Airbag defect. ................................................................................................ 17

        4. The brake light defect. .................................................................................. 20

        5. Shift cable defect .......................................................................................... 23

        6. Safety belt defect. ......................................................................................... 25

        7. Ignition lock cylinder defect........................................................................ 26

        8. The Camaro key-design defect. .................................................................... 27

        9. The ignition key defect. ................................................................................ 27

        10. At least 26 other defects were revealed by GM in recalls during the
            first half of 2014. ........................................................................................... 27

    B. GM Valued Cost-Cutting Over Safety, and Actively Encouraged Employees
       to Conceal Safety Issues............................................................................................ 33

    C. The Ignition Switch Defects Have Harmed Consumers in Orange County
       and the State .............................................................................................................. 38

    D. Given GM's Knowledge of the Defects and the Risk to Public Safety, it
       Was Obliged to Promptly Disclose and Remedy the Defects. ................................... 38

    E. GM's Misrepresentations and Deceptive, False, Untrue and Misleading
       Advertising, Marketing and Public Statements ........................................................ 42

VI. CAUSES OF ACTION...................................................................................................... 52

    FIRST CAUSE OF ACTION:  VIOLATION OF BUSINESS AND PROFESSIONS
    CODE SECTION 17200 ............................................................................................... 52

FIRST AMENDED COMPLAINT

SECOND CAUSE OF ACTION:  VIOLATION OF BUSINESS AND PROFESSIONS
CODE SECTION 17500 .........................................................................................................55

PRAYER FOR RELIEF.............................................................................................................57

- ii -

FIRST AMENDED COMPLAINT

1    Plaintiff, the People of the State of California ("Plaintiff" or "the People"), by and through

2    Tony Rackauckas, District Attorney for the County of Orange ("District Attorney"), alleges the

3    following, on information and belief:

4    ## I.    INTRODUCTION

5    1.    This is a law enforcement action which primarily seeks to protect the public safety

6    and welfare, brought by a governmental unit in the exercise of and to enforce its police power. *City*

7    *& Cnty. of San Francisco v. PG & E Corp.,* 433 F.3d 1115, 1124-1125 (9th Cir. 2006). The action

8    is  brought by Tony Rackauckas, District Attorney of the County of Orange, under California

9    Business and Professions Code sections 17200 *et seq.*, the Unfair Competition Law ("UCL"), and

10    17500 *et seq.*, the False Advertising Law ("FAL"), and involves sales, leases, or other wrongful

11    conduct or injuries occurring in California.  The defendant is General Motors LLC ("Defendant" or

12    "GM"), which is based in Detroit, Michigan.

13    2.    This case arises from GM's egregious failure to disclose, and the affirmative

14    concealment of, at least 35 separate known defects in vehicles sold by GM, and by its predecessor,

15    "Old GM" (collectively, "GM-branded vehicles").  By concealing the existence of the many known

16    defects plaguing many models and years of GM-branded vehicles and the fact that GM values cost-

17    cutting over safety, and concurrently marketing the GM brand as "safe" and "reliable," GM enticed

18    vehicle purchasers to buy GM vehicles under false pretenses.

19    3.    This action seeks to hold GM liable only for its **own** acts and omissions **after** the

20    July 10, 2009 effective date of the Sale Order and Purchase Agreement through which GM

21    acquired virtually all of the assets and certain liabilities of Old GM.

22    4.    A vehicle made by a reputable manufacturer of safe and reliable vehicles is worth

23    more than an otherwise similar vehicle made by a disreputable manufacturer that is known to

24    devalue safety and to conceal serious defects from consumers and regulators.  GM Vehicle Safety

25    Chief Jeff Boyer has recently stated that:  "Nothing is more important than the safety of our

26    customers in the vehicles they drive."  Yet GM failed to live up to this commitment, instead

27    choosing to conceal at least 35 serious defects in over 17 million GM-branded vehicles sold in the

28    United States (collectively, the "Defective Vehicles").

010440-12  692229 V1

FIRST AMENDED COMPLAINT

5.    The systematic concealment of known defects was deliberate, as GM followed a consistent pattern of endless "investigation" and delay each time it became aware of a given defect. In fact, recently revealed documents show that GM valued cost-cutting over safety, trained its personnel to ***never*** use the words "defect," "stall," or other words suggesting that any GM-branded vehicles are defective, routinely chose the cheapest part supplier without regard to safety, and discouraged employees from acting to address safety issues.

6.    Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act")[1] and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose the defect.[2] If it is determined that the vehicle is defective, the manufacturer may be required to notify vehicle owners, purchasers, and dealers of the defect, and may be required to remedy the defect.[3]

7.    GM ***explicitly assumed*** the responsibilities to report safety defects with respect to all GM-branded vehicles as required by the TREAD Act.  GM also had the same duty under California law.

8.    When a manufacturer with TREAD Act responsibilities is aware of myriad safety defects and fails to disclose them as GM has done, that manufacturer's vehicles are not safe.  And when that manufacturer markets and sells its new vehicles by touting that its vehicles are "safe," as GM has also done, that manufacturer is engaging in deception.

9.    GM has recently been forced to disclose that it had been concealing a large number of known safety defects in GM-branded vehicles ever since its inception in 2009, and that other defects arose on its watch due in large measure to GM's focus on cost-cutting over safety, its discouragement of raising safety issues and its training of employees to avoid using language such as "stalls," "defect" or "safety issue" in order to avoid attracting the attention of regulators.  As a result, GM has been forced to recall over 17 million vehicles in some 40 recalls covering 35 separate defects during the first five and a half months of this year –20 times more than during the

---

[1] 49 U.S.C. §§ 30101-30170.

[2] 49 U.S.C. § 30118(c)(1) & (2).

[3] 49 U.S.C. § 30118(b)(2)(A) & (B).

1    same period in 2013.  The cumulative negative effect on the value of the vehicles sold by GM has

2    been both foreseeable and significant.

3        10.    The highest-profile defect concealed by GM concerns the ignition switches in more

4    than 1.5 million vehicles sold by GM's predecessor (the "ignition switch defect").  The ignition

5    switch defect can cause the affected vehicles' ignition switches to inadvertently move from the

6    "run" position to the "accessory" or "off" position during ordinary driving conditions, resulting in a

7    loss of power, vehicle speed control, and braking, as well as a failure of the vehicle's airbags to

8    deploy.  GM continued to use defective ignition switches in "repairs" of vehicles it sold after July

9    10, 2009.

10        11.    For the past five years, GM received reports of crashes and injuries that put GM on

11    notice of the serious safety issues presented by its ignition switch system.  GM was aware of the

12    ignition switch defects (and many other serious defects in numerous models of GM-branded

13    vehicles) *from the very date of its inception on July 10, 2009.*

14        12.    Yet, despite the dangerous nature of the ignition switch defects and the effects on

15    critical safety systems, GM concealed the existence of the defects and failed to remedy the problem

16    from the date of its inception until February of 2014.  In February and March of 2014, GM issued

17    three recalls for a combined total of 2.19 million vehicles with the ignition switch defects.

18        13.    On May 16, 2014, GM entered a Consent Order with NHTSA in which it admitted

19    that it violated the TREAD Act by not disclosing the ignition switch defect, and agreed to pay the

20    maximum available civil penalties for its violations.

21        14.    Unfortunately for all owners of vehicles sold by GM, the ignition switch defect was

22    only one of a seemingly never-ending parade of recalls in the first half of 2014 – many concerning

23    safety defects that had been long known to GM.

24        15.    Between 2003 and 2010, over 1.3 million GM-branded vehicles in the United States

25    were sold with a safety defect that causes the vehicle's electric power steering ("EPS") to suddenly

26    fail during ordinary driving conditions and revert back to manual steering, requiring greater effort

27    by the driver to steer the vehicle and increasing the risk of collisions and injuries (the "power

28    steering defect").

16.     As with the ignition switch defect, GM was aware of the power steering defect from the date of its inception, and concealed the defect for years.

17.     From 2007 until at least 2013, nearly 1.2 million GM-branded vehicles were sold in the United States with defective wiring harnesses.  Increased resistance in the wiring harnesses of driver and passenger seat-mounted, side-impact air bag ("SIAB") in the affected vehicles may cause the SIABs, front center airbags, and seat belt pretensioners to not deploy in a crash (the "airbag defect").  The vehicles' failure to deploy airbags and pretensioners in a crash increases the risk of injury and death to the drivers and front-seat passengers.

18.     Once again, GM knew of the dangerous airbag defect from the date of its inception on July 10, 2009, but chose instead to conceal the defect, and marketed its vehicles as "safe" and "reliable."

19.     To take just one more example, between 2003 and 2012, 2.4 million GM-branded vehicles in the United States were sold with a wiring harness defect that could cause brake lamps to fail to illuminate when the brakes are applied or cause them to illuminate when the brakes are not engaged (the "brake light defect").  The same defect could also disable traction control, electronic stability control, and panic braking assist operations.  Though GM received hundreds of complaints and was aware of at least 13 crashes caused by this defect, it waited until May of 2014 before finally ordering a full recall.

20.     As further detailed in this First Amended Complaint, the ignition switch, power steering, airbag, and brake light defects are just 4 of the *35* separate defects that resulted in 40 recalls of GM-branded vehicles in the first five and a half months of 2014, affecting over 17 million vehicles.  Most or all of these recalls are for safety defects, and many of the defects were apparently known to GM, but concealed for years.

21.     This case arises from GM's breach of its obligations and duties, including but not limited to:  (i) its concealment of, and failure to disclose that, as a result of a spate of safety defects, over 17 million Defective Vehicles were on the road nationwide – and many hundreds of thousands in California; (ii) its failure to disclose the defects despite its TREAD Act obligations; (iii) its failure to disclose that it devalued safety and systemically encouraged the concealment of known

1    defects; (iv) its continued use of defective ignition switches as replacement parts; (v) its sale of

2    used "GM certified" vehicles that were actually plagued with a variety of known safety defects;

3    and (vi) its repeated and false statements that its vehicles were safe and reliable, and that it stood

4    behind its vehicles after they were purchased.

5         22.    From its inception in 2009, GM has known that many defects exist in millions of

6    GM-branded vehicles sold in the United States.  But, to protect its profits and to avoid remediation

7    costs and a public relations nightmare, GM concealed the defects and their sometimes tragic

8    consequences.

9         23.    GM violated the TREAD Act by failing to timely inform NHTSA of the myriad

10   safety defects plaguing GM-branded vehicles and allowed the Defective Vehicles to remain on the

11   road.  In addition to violating the TREAD Act, GM fraudulently concealed the defects from owners

12   and from purchasers of new and used vehicles sold after July 10, 2009, and even used defective

13   ignition switches as replacement parts.  These same acts and omissions also violated California law

14   as detailed below.

15        24.    GM's failure to disclose the many defects, as well as advertising and promotion

16   concerning GM's record of building "safe" cars of high quality, violated California law.

17                          **II.    PLAINTIFF'S AUTHORITY**

18        25.    Tony Rackauckas, District Attorney of the County of Orange, acting to protect the

19   public as consumers from unlawful, unfair, and fraudulent business practices, brings this action in

20   the public interest in the name of the People of the State of California for violations of the Unfair

21   Competition Law pursuant to California Business and Professions Code Sections 17200, 17204 and

22   17206, and for violations of the False Advertising Law pursuant to California Business and

23   Professions Code Sections 17500, 17535 and 17536.  Plaintiff, by this action, seeks to enjoin GM

24   from engaging in the unlawful, unfair, and fraudulent business practices alleged herein, and seeks

25   civil penalties for GM's violations of the above statutes.

26

27

28

## III.    DEFENDANT

26.    Defendant General Motors LLC ("GM") is a foreign limited liability company formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan.  GM was incorporated in 2009.

27.    GM has significant contacts with Orange County, California, and the activities complained of herein occurred, in whole or in part, in Orange County, California.

28.    At all times mentioned GM was engaged in the business of designing, manufacturing, distributing, marketing, selling, leasing, certifying, and warrantying the GM cars that are the subject of this First Amended Complaint, throughout the State of California, including in Orange County, California.

## IV.    JURISDICTION AND VENUE

29.    This Court has jurisdiction over this matter pursuant to the California Constitution, Article XI, section 10 and California Code of Civil Procedure ("CCP") section 410.10 because GM transacted business and committed the acts complained of herein in California, specifically in the County of Orange.  The violations of law alleged herein were committed in Orange County and elsewhere within the State of California.

30.    Venue is proper in Orange County, California, pursuant to CCP section 395 and because many of the acts complained about occurred in Orange County.

## V.    FACTUAL BACKGROUND

**A.    There Are Serious Safety Defects in Millions of GM Vehicles Across Many Models and Years, and, Until Recently, GM Concealed them from Consumers.**

31.    In the first five and a half months of 2014, GM announced some 40 recalls affecting over 17 million GM-branded vehicles from model years 2003-2014.  The recalls concern 35 separate defects.  The numbers of recalls and serious safety defects are unprecedented, and can only lead to one conclusion:  GM and its predecessor sold a large number of unsafe vehicle models with myriad defects during a long period of time.

32.    Even more disturbingly, the available evidence shows a common pattern:  From its inception in 2009, GM knew about an ever-growing list of serious safety defects in millions of

1    GM-branded vehicles, but concealed them from consumers and regulators in order to boost sales

2    and avoid the cost and publicity of recalls.

3        33.    GM inherited from Old GM a company that valued cost-cutting over safety, actively

4    discouraged its personnel from taking a "hard line" on safety issues, avoided using "hot" words

5    like "stall" that might attract the attention of NHTSA and suggest that a recall was required, and

6    trained its employees to avoid the use of words such as "defect" that might flag the existence of a

7    safety issue.  GM did nothing to change these practices.

8        34.    The Center for Auto Safety recently stated that it has identified 2,004 death and

9    injury reports filed by GM with federal regulators in connection with vehicles that have recently

10   been recalled.[4]  Many of these deaths and injuries would have been avoided had GM complied with

11   its TREAD Act obligations over the past five years.

12       35.    The many defects concealed by GM affected key safety systems in GM vehicles,

13   including the ignition, power steering, airbags, brake lights, gear shift systems, and seatbelts.

14       36.    The available evidence shows a consistent pattern:  GM learned about a particular

15   defect and, often at the prodding of regulatory authorities, "investigated" the defect and decided

16   upon a "root cause."  GM then took minimal action – such as issuing a carefully-worded

17   "Technical Service Bulletin" to its dealers, or even recalling a very small number of affected

18   vehicles.  All the while, the true nature and scope of the defects were kept under wraps, vehicles

19   affected by the defects remained on the road, and GM enticed consumers to purchase its vehicles

20   by touting the safety, quality, and reliability of its vehicles, and presenting itself as a manufacturer

21   that stands behind its products.

22       37.    The nine defects affecting the greatest number of vehicles are discussed in some

23   detail below, and the remainder are summarized thereafter.

24

25

26

27

---

28   [4] *See Thousands of Accident Reports Filed Involving Recalled GM Cars: Report*, Irvin Jackson
(June 3, 2014).

**1.       The ignition switch defects.**

38.       The ignition switch defects can cause the vehicle's engine and electrical systems to shut off, disabling the power steering and power brakes and causing non-deployment of the vehicle's airbag and the failure of the vehicle's seatbelt pretensioners in the event of a crash.

39.       The ignition switch systems at issue are defective in at least three major respects. The first is that the switches are simply weak; because of a faulty "detent plunger," the switch can inadvertently move from the "run" to the "accessory" or "off" position.

40.       The second defect is that, due to the low position of the ignition switch, the driver's knee can easily bump the key (or the hanging fob below the key), and cause the switch to inadvertently move from the "run" to the "accessory" or "off" position.

41.       The third defect is that the airbags immediately become inoperable whenever the ignition switch moves from the "run" to the "accessory" position.  As NHTSA's Acting Administrator, David Friedman, recently testified before Congress, NHTSA is not convinced that the non-deployment of the airbags in the recalled vehicles is solely attributable to a mechanical defect involving the ignition switch:

> And it may be even more complicated than that, actually.  And that's one of the questions that we actually have in our timeliness query to General Motors.  It is possible that it's not simply that the – the power was off, but a much more complicated situation where the very specific action of moving from on to the accessory mode is what didn't turn off the power, but may have disabled the algorithm.
>
> That, to me, frankly, doesn't make sense.  From my perspective, if a vehicle – certainly if a vehicle is moving, the airbag's algorithm should require those airbags to deploy.  Even if the – even if the vehicle is stopped and you turn from 'on' to 'accessory,' I believe that the airbags should be able to deploy.
>
> So this is exactly why we're asking General Motors this question, to understand is it truly a power issue or is there something embedded in their [software] algorithm that is causing this, something that should have been there in their algorithm.[5]

---

[5] Congressional Transcript, Testimony of David Friedman, Acting Administrator of NHTSA (Apr. 2, 2014), at 19.

FIRST AMENDED COMPLAINT

42.     Vehicles with defective ignition switches are, therefore, unreasonably prone to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the vehicles.

43.     Alarmingly, GM knew of the deadly ignition switch defects and at least some of their dangerous consequences from the date of its inception on July 10, 2009, but concealed its knowledge from consumers and regulators.

44.     In part, GM's knowledge of the ignition switch defects arises from the fact that key personnel with knowledge of the defects remained in their same positions once GM took over from Old GM.

45.     For example, the Old GM Design Research Engineer who was responsible for the rollout of the defective ignition switch in 2003 was Ray DeGiorgio.  Mr. DeGiorgio continued to serve as an engineer at GM until April 2014 when he was suspended as a result of his involvement in the defective ignition switch problem.  Later in 2014, in the wake of the GM Report,[6] Mr. DeGiorgio was fired.

46.     In 2001, two years *before* vehicles with the defective ignition switches were ever available to consumers, Old GM privately acknowledged in an internal pre-production report for the model/year ("MY") 2003 Saturn Ion that there were problems with the ignition switch.[7]  Old GM's own engineers had personally experienced problems with the ignition switch.  In a section of the internal report titled "Root Cause Summary," Old GM engineers identified "two causes of failure," namely:  "[l]ow contact force and low detent plunger force."[8]  The report also stated that the GM person responsible for the issue was Ray DeGiorgio.[9]

47.     Mr. DeGiorgio actively concealed the defect, both while working for Old GM *and* while working for GM.

---

[6] References to the "GM Report" are to the "*Report to Board of Directors of General Motors Company Regarding Ignition Switch Recalls*," Anton R. Valukas, Jenner & Block (May 29, 2014).

[7] GM Report/Complaint re "Electrical Concern" opened July 31, 2001, GMHEC000001980-90.

[8] *Id*. at GMHEC000001986.

[9] *Id*. at GMHEC000001981, 1986.

48.    Similarly, Gary Altman was Old GM's program-engineering manager for the Cobalt, which is one of the models with the defective ignition switches and hit the market in MY 2005.  He remained as an engineer at GM until he was suspended on April 10, 2014, by GM for his role in the ignition switch problem and then fired in the wake of the GM Report.

49.    On October 29, 2004, Mr. Altman test-drove a Cobalt.  While he was driving, his knee bumped the key and the vehicle shut down.

50.    In response to the Altman incident, Old GM opened an engineering inquiry, known as a "Problem Resolution Tracking System inquiry" ("PRTS"), to investigate the issue.  According to the chronology provided to NHTSA by GM in March 2014, engineers pinpointed the problem and were "able to replicate this phenomenon during test drives."

51.    The PRTS concluded in 2005 that:

> There are two main reasons that we believe can cause a lower effort in turning the key:
>
> 1.    A low torque detent in the ignition switch and
>
> 2.    A low position of the lock module in the column.[10]

52.    The 2005 PRTS further demonstrates the knowledge of Ray DeGiorgio (who, like Mr. Altman, worked for Old GM and continued until very recently working for GM), as the PRTS's author states that "[a]fter talking to Ray DeGiorgio, I found out that it is close to impossible to modify the present ignition switch.  The switch itself is very fragile and doing any further changes will lead to mechanical and/or electrical problems."[11]

53.    Gary Altman, program engineering manager for the 2005 Cobalt, recently admitted that Old GM engineering managers (including himself and Mr. DeGiorgio) knew about ignition switch problems in the vehicle that could disable power steering, power brakes, and airbags, but launched the vehicle anyway because they believed that the vehicles could be safely coasted off the road after a stall.  Mr. Altman insisted that "the [Cobalt] was maneuverable and controllable" with the power steering and power brakes inoperable.

---

[10] Feb. 1, 2005 PRTS at GMHEC000001733.

[11] *Id.*

54.    Incredibly, GM now claims that it and Old GM did not view vehicle stalling and the loss of power steering as a "safety issue," but only as a "customer convenience" issue.[12] GM bases this claim on the equally incredible assertion that, at least for some period of time, it was not aware that when the ignition switch moves to the "accessory" position, the airbags become inoperable – even though Old GM itself designed the airbags to not deploy under that circumstance.[13]

55.    Even crediting GM's claim that some at the Company were unaware of the rather obvious connection between the defective ignition switches and airbag non-deployment, a stall and loss of power steering and power brakes is a serious safety issue under any objective view.  GM *itself* recognized in 2010 that a loss of power steering *standing alone* was grounds for a safety recall, as it did a recall on such grounds.

56.    In fact, as multiple GM employees confirm, GM *intentionally* avoids using the word "stall" "because such language might draw the attention of NHTSA" and "may raise a concern about safety, which suggests GM should recall the vehicle…."[14]

57.    Rather than publicly admitting the dangerous safety defects in the vehicles with the defective ignition switches, GM attempted to attribute these and other incidents to "driver error." GM continued to receive reports of deaths in Cobalts involving steering and/or airbag failures from its inception up through at least 2012.

58.    In April 2006, the GM design engineer who was responsible for the ignition switch in the recalled vehicles, Design Research Engineer Ray DeGiorgio, authorized part supplier Delphi to implement changes to fix the ignition switch defect.[15] The design change "was implemented to increase torque performance in the switch."[16] However, testing showed that, even with the proposed change, the performance of the ignition switch was *still* below original specifications.[17]

---

[12] GM Report at 2.

[13] *Id.*

[14] GM Report at 92-93.

[15] General Motors Commodity Validation Sign-Off (Apr. 26, 2006), GMHEC000003201. *See also* GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology at 2.

[16] *Id.*

[17] Delphi Briefing, Mar. 27, 2014.

59.    Modified ignition switches – with greater torque – started to be installed in 2007 model/year vehicles.[18]  In what a high-level engineer at Old GM now calls a "cardinal sin" and "an extraordinary violation of internal processes," Old GM changed the part design *but kept the old part number*.[19]  That makes it impossible to determine from the part number alone which GM vehicles produced after 2007 contain the defective ignition switches.

60.    At a May 15, 2009 meeting, Old GM engineers (soon to be GM engineers) learned that data in the black boxes of Chevrolet Cobalts showed that the dangerous ignition switch defects existed in hundreds of thousands of Defective Vehicles.  But still GM did not reveal the defect to NHTSA, Plaintiff, or consumers.

61.    After the May 15, 2009 meeting, GM continued to get complaints of unintended shut down and continued to investigate frontal crashes in which the airbags did not deploy.

62.    After the May 15, 2009 meeting, GM told the families of accident victims related to the ignition switch defects that it did not have sufficient evidence to conclude that there was any defect.  In one case involving the ignition switch defects, GM threatened to sue the family of an accident victim for reimbursement of its legal fees if the family did not dismiss its lawsuit.  In another, GM sent the victim's family a terse letter, saying there was no basis for any claims against GM.  These statements were part of GM's campaign of deception.

63.    In July 2011, GM legal staff and engineers met regarding an investigation of crashes in which the air bags did not deploy.  The next month, in August 2011, GM initiated a Field Performance Evaluation ("FPE") to analyze multiple frontal impact crashes involving MY 2005-2007 Chevrolet Cobalt vehicles and 2007 Pontiac G5 vehicles, as well as a review of information related to the Ion, HHR, and Solstice vehicles, and airbag non-deployment.[20]

64.    GM continued to conceal and deny what it privately knew – that the ignition switches were defective.  For example, in May 2012, GM engineers tested the torque of the

---

[18] GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology at 2.

[19] "'*Cardinal sin*': *Former GM engineers say quiet '06 redesign of faulty ignition switch was a major violation of protocol.*" *Automotive News* (Mar. 26, 2014).

[20] GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology at 2.

ignition switches in numerous Old GM vehicles.[21]  The results from the GM testing showed that the majority of the vehicles tested from the 2003 to 2007 model/years had torque performance at or below 10 Newton centimeters ("Ncm"), which was below the original design specifications required by GM.[22]  Around the same time, high ranking GM personnel continued to internally review the history of the ignition switch issue.[23]

65.    In September 2012, GM had a GM Red X Team Engineer (a special engineer assigned to find the root cause of an engineering design defect) examine the changes between the 2007 and 2008 Chevrolet Cobalt models following reported crashes where the airbags failed to deploy and the ignition switch was found in the "off" or "accessory" position.[24]

66.    The next month, in October of 2012, Design Research Engineer Ray DeGiorgio (the lead engineer on the defective ignition switch) sent an email to Brian Stouffer of GM regarding the "2005-7 Cobalt and Ignition Switch Effort," stating:  "If we replaced switches on ALL the model years, i.e., 2005, 2006, 2007 the piece price would be about $10.00 per switch."[25]

67.    The October 2012 email makes clear that GM considered implementing a recall to fix the defective ignition switches in the Chevy Cobalt vehicles, but declined to do so in order to save money.

68.    In April 2013, GM again *internally* acknowledged that it understood that there was a difference in the torque performance between the ignition switch parts in later model Chevrolet Cobalt vehicles compared with the 2003-2007 model/year vehicles.[26]

69.    Notwithstanding what GM actually knew and privately acknowledged,[27] its public statements and position in litigation was radically different.  For example, in May 2013, Brian Stouffer testified in deposition in a personal injury action (*Melton v. General Motors*) that the Ncm

---

[21] GMHEC000221427; *see also* Mar. 11, 2014 Ltr. to NHTSA, attached chronology.

[22] *Id*.

[23] GMHEC000221438.

[24] Email from GM Field Performance Assessment Engineer to GM Red X Team Engineer (Sept. 6, 2012, 1:29:14 p.m., GMHEC000136204).

[25] GMHEC000221539.

[26] GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology at 4.

[27] *See* GMHEC000221427.

performance (a measurement of the strength of the ignition switch) was ***not*** substantially different as between the early (*e.g.*, 2005) and later model year (*e.g.*, 2008) Chevrolet Cobalt vehicles.[28]

70.    Similarly, a month before Mr. Stouffer's testimony, in April 2013, GM engineer Ray DeGiorgio denied the existence of any type of ignition switch defect:

> Q:  Did you look at, as a potential failure mode for this switch, the ease of which the key could be moved from run to accessory?
>
> . . .
>
> THE WITNESS:  No, because in our minds, moving the key from, I want to say, ***run to accessory is not a failure mode, it is an expected condition***.  It is important for the customer to be able to rotate the key fore and aft, so as long as we meet those requirements, ***it's not deemed as a risk.***
>
> Q:  Well, it's not expected to move from run to accessory when you're driving down the road at 55 miles an hour, is it?
>
> . . .
>
> THE WITNESS:  ***It is expected for the key to be easily and smoothly transitioned from one state to the other*** without binding and without harsh actuations.
>
> Q: And why do you have a minimum torque requirement from run to accessory?
>
> . . .
>
> THE WITNESS:  It's a design feature that is required.  You don't want anything flopping around.  You want to be able to control the dimensions and basically provide – one of the requirements in this document talks about having a smooth transition from detent to detent.  One of the criticisms – I shouldn't say criticisms.  One of the customer complaints we have had in the – and previous to this was he had cheap feeling switches, they were cheap feeling, they were higher effort, and the intent of this design was to provide a smooth actuation, provide a high feeling of a robust design.  That was the intent.
>
> Q:  I assume the intent was also to make sure that when people were using the vehicle under ordinary driving conditions, that if the key was in the run position, it wouldn't just move to the accessory position, correct?
>
> . . .

---

[28] GMHEC000146933.  That said, "[t]he modified switches used in 2007-2011 vehicles were also approved by GM despite not meeting company specifications." Mar. 31, 2014 Ltr. to Mary Barra from H. Waxman, D. DeGette, and J. Schankowsky.

A:  That is correct, but also – it was not intended – **the intent was to make the transition to go from run to off with relative ease.**[29]

71.    Brian Stouffer, in an email to Delphi regarding the ignition switch in the Chevy Cobalt, acknowledged that the ignition switch in early Cobalt vehicles – although bearing the same part number – was different than the ignition switch in later Cobalt vehicles.[30]  Mr. Stouffer claimed that "[t]he discovery of the plunger and spring change was made aware to GM during a [sic] course of a lawsuit (*Melton v. GM*)."[31]  Delphi personnel responded that GM had authorized the change back in 2006 but the part number had remained the same.[32]

72.    Eventually, the defect could no longer be ignored or swept under the rug.

73.    After analysis by GM's Field Performance Review Committee and the Executive Field Action Decision Committee ("EFADC"), the EFADC finally ordered a recall of **some** of the vehicles with defective ignition switches on January 31, 2014.

74.    Initially, the EFADC ordered a recall of only the Chevrolet Cobalt and Pontiac G5 for model years 2005-2007.

75.    After additional analysis, the EFADC expanded the recall on February 24, 2014, to include the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion for model years 2003-2007, and the Saturn Sky for model year 2007.

76.    Most recently, on March 28, 2014, GM expanded the recall a third time, to include Chevrolet Cobalts, Pontiac G5s and Solstices, Saturn Ions and Skys from the 2008 through 2010 model years, and Chevrolet HHRs from the 2008 through 2011 model years.

77.    All told, GM has recalled some 2.19 million vehicles in connection with the ignition switch defect.

78.    In a video message addressed to GM employees on March 17, 2014, CEO Mary Barra admitted that the Company had made mistakes and needed to change its processes.

---

[29] GMHEC000138906 (emphasis added).

[30] GMHEC000003197.

[31] *Id.  See also* GMHEC000003156-3180.

[32] *See* GMHEC000003192-93.

79.     According to Ms. Barra, "[s]omething went terribly wrong in our processes in this instance, and terrible things happened."  Barra went on to promise, "[w]e will be better because of this tragic situation if we seize this opportunity."[33]

80.     Based on its egregious conduct in concealing the ignition switch defect, GM recently agreed to pay the maximum possible civil penalty in a Consent Order with the National Highway Traffic Safety Administration ("NHTSA") and admitted that it had violated its legal obligations to promptly disclose the existence of known safety defects.

**2.     The power steering defect.**

81.     Between 2003 and 2010, over 1.3 million GM-branded vehicles in the United States were sold with a safety defect that causes the vehicle's electric power steering ("EPS") to suddenly fail during ordinary driving conditions and revert back to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries.

82.     As with the ignition switch defects, GM was aware of the power steering defect long before it took anything approaching full remedial action.

83.     When the power steering fails, a message appears on the vehicle's dashboard, and a chime sounds to inform the driver.  Although steering control can be maintained through manual steering, greater driver effort is required, and the risk of an accident is increased.

84.     In 2010, GM first recalled Chevy Cobalt and Pontiac G5 models for these power steering issues, yet it did **not** recall the many other vehicles that had the very same power steering defect.

85.     Documents released by NHTSA show that GM waited years to recall nearly 335,000 Saturn Ions for power steering failure – despite receiving nearly 4,800 consumer complaints and more than 30,000 claims for warranty repairs.  That translates to a complaint rate of 14.3 incidents per thousand vehicles and a warranty claim rate of 9.1 percent.  By way of

---

[33] "*Something Went 'Very Wrong' at G.M., Chief Says.*"  N.Y. TIMES (Mar. 18, 2014).

1   comparison, NHTSA has described as "high" a complaint rate of 250 complaints per 100,000

2   vehicles.[34] Here, the rate translates to 1430 complaints per 100,000 vehicles.

3       86.    In response to the consumer complaints, in September 2011 NHTSA opened an

4   investigation into the power steering defect in Saturn Ions.

5       87.    NHTSA database records show complaints from Ion owners as early as June 2004,

6   with the first injury reported in May 2007.

7       88.    NHTSA linked approximately 12 crashes and two injuries to the power steering

8   defect in the Ions.

9       89.    In 2011, GM missed yet another opportunity to recall the additional vehicles with

10  faulty power steering when CEO Mary Barra – then head of product development – was advised by

11  engineer Terry Woychowski that there was a serious power steering issue in Saturn Ions.

12  Ms. Barra was also informed of the ongoing NHTSA investigation.  At the time, NHTSA

13  reportedly came close to concluding that Saturn Ions should have been included in GM's 2005

14  steering recall of Cobalt and G5 vehicles.

15      90.    Yet GM took no action for four years.  It wasn't until March 31, 2014, that GM

16  finally recalled the approximately 1.3 million vehicles in the United States affected by the power

17  steering defect.

18      91.    After announcing the March 31, 2014 recall, Jeff Boyer, GM's Vice President of

19  Global Vehicle Safety, acknowledged that GM recalled some of these same vehicle models

20  previously for the *same issue*, but that GM "did not do enough."

21      **3.    Airbag defect.[35]**

22      92.    From 2007 until at least 2013, nearly 1.2 million GM-branded vehicles in the United

23  States were sold with defective wiring harnesses.  Increased resistance in the wiring harnesses of

24  driver and passenger seat-mounted, side-impact air bag ("SIAB") in the affected vehicles may

25  cause the SIABs, front center airbags, and seat belt pretensioners to not deploy in a crash.  The

26  _____

27      [34] *See* http://www-odi.nhtsa.dot.gov/cars/problems/defect/-
    results.cfm?action_number=EA06002&SearchType=QuickSearch&summary=true.

28      [35] This defect is distinct from the airbag component of the ignition switch defect discussed
    above and from other airbag defects affecting a smaller number of vehicles, discussed below.

1    vehicles' failure to deploy airbags and pretensioners in a crash increases the risk of injury and

2    death to the drivers and front-seat passengers.

3          93.    Once again, GM knew of the dangerous airbag defect long before it took anything

4    approaching the requisite remedial action.

5          94.    As the wiring harness connectors in the SIABs corrode or loosen over time,

6    resistance will increase.  The airbag sensing system will interpret this increase in resistance as a

7    fault, which then triggers illumination of the "SERVICE AIR BAG" message on the vehicle's

8    dashboard.  This message may be intermittent at first and the airbags and pretensioners will still

9    deploy.  But over time, the resistance can build to the point where the SIABs, pretensioners, and

10    front center airbags will not deploy in the event of a collision.[36]

11          95.    The problem apparently arose when GM made the switch from using gold-plated

12    terminals to connect its wire harnesses to cheaper tin terminals in 2007.

13          96.    In June 2008, Old GM noticed increased warranty claims for airbag service on

14    certain of its vehicles and determined it was due to increased resistance in airbag wiring.  After

15    analysis of the tin connectors in September 2008, Old GM determined that corrosion and wear to

16    the connectors was causing the increased resistance in the airbag wiring.  It released a technical

17    service bulletin on November 25, 2008, for 2008-2009 Buick Enclaves, 2009 Chevy Traverse,

18    2008-2009 GMC Acadia, and 2008-2009 Saturn Outlook models, instructing dealers to repair the

19    defect by using Nyogel grease, securing the connectors, and adding slack to the line.  Old GM also

20    began the transition back to gold-plated terminals in certain vehicles.  At that point, Old GM

21    suspended all investigation into the defective airbag wiring and took no further action.[37]

22          97.    In November 2009, GM learned of similar reports of increased airbag service

23    messages in 2010 Chevy Malibu and 2010 Pontiac G6 vehicles.  After investigation, GM

24    concluded that corrosion and wear in the same tin connector was the root of the airbag problems in

25    the Malibu and G6 models.[38]

26

27           [36] *See* GM Notice to NHTSA dated March 17, 2014, at 1.

            [37] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 1-2.

28          [38] *See id.*, at 2.

98.    In January 2010, after review of the Malibu and G6 airbag connector issues, GM concluded that ignoring the service airbag message could increase the resistance such that an SIAB might not deploy in a side impact collision.  On May 11, 2010, GM issued a Customer Satisfaction Bulletin for the Malibu and G6 models and instructed dealers to secure both front seat-mounted, side-impact airbag wire harnesses and, if necessary, reroute the wire harness.[39]

99.    From February to May 2010, GM revisited the data on vehicles with faulty harness wiring issues, and noted another spike in the volume of the airbag service warranty claims.  This led GM to conclude that the November 2008 bulletin was "not entirely effective in correcting the [wiring defect present in the vehicles]."  On November 23, 2010, GM issued another Customer Satisfaction Bulletin for certain 2008 Buick Enclave, 2008 Saturn Outlook, and 2008 GMC Acadia models built from October 2007 to March 2008, instructing dealers to secure SIAB harnesses and re-route or replace the SIAB connectors.[40]

100.    GM issued a revised Customer Service Bulletin on February 3, 2011, requiring replacement of the front seat-mounted side-impact airbag connectors in the same faulty vehicles mentioned in the November 2010 bulletin.  In July 2011, GM again replaced its connector, this time with a Tyco-manufactured connector featuring a silver-sealed terminal.[41]

101.    But in 2012, GM noticed another spike in the volume of warranty claims relating to SIAB connectors in vehicles built in the second half of 2011.  After further analysis of the Tyco connectors, it discovered that inadequate crimping of the connector terminal was causing increased system resistance.  In response, GM issued an internal bulletin for 2011-12 Buick Enclave, Chevy Traverse, and GMC Acadia vehicles, recommending dealers repair affected vehicles by replacing the original connector with a new sealed connector.[42]

102.    The defect was still uncured, however, because in 2013 GM again marked an increase in service repairs and buyback activity due to illuminated airbag service lights.  On

---

[39] See id.
[40] See id., at 3.
[41] See id.
[42] See id., at 4.

October 4, 2013, GM opened an investigation into airbag connector issues in 2011-2013 Buick

Enclave, Chevy Traverse, and GMC Acadia models.  The investigation revealed an increase in

warranty claims for vehicles built in late 2011 and early 2012.[43]

103.    On February 10, 2014, GM concluded that corrosion and crimping issues were again

the root cause of the airbag problems.[44]

104.    GM initially planned to issue a less-urgent Customer Satisfaction Program to

address the airbag flaw in the 2010-2013 vehicles.  But it wasn't until a call with NHTSA on

March 14, 2014, that GM finally issued a full-blown safety recall on the vehicles with the faulty

harness wiring – years after it first learned of the defective airbag connectors, after four

investigations into the defect, and after issuing at least six service bulletins on the topic.  The recall

as first approved covered only 912,000 vehicles, but on March 16, 2014, it was increased to cover

approximately 1.2 million vehicles.[45]

105.    On March 17, 2014, GM issued a recall for 1,176,407 vehicles potentially afflicted

with the defective airbag system.  The recall instructs dealers to remove driver and passenger SIAB

connectors and splice and solder the wires together.[46]

**4.    The brake light defect.**

106.    Between 2004 and 2012, approximately 2.4 million GM-branded vehicles in the

United States were sold with a safety defect that can cause brake lamps to fail to illuminate when

the brakes are applied or to illuminate when the brakes are not engaged; the same defect can

disable cruise control, traction control, electronic stability control, and panic brake assist operation,

thereby increasing the risk of collisions and injuries.[47]

107.    Once again, GM knew of the dangerous brake light defect for years before it took

anything approaching the requisite remedial action.  In fact, although the brake light defect has

---

[43] *See id.*

[44] *See id.*, at 5.

[45] *See id.*

[46] *See id.*

[47] *See* GM Notification Campaign No. 14V-252 dated May 28, 2014, at 1.

1    caused at least 13 crashes since 2008, GM did not recall all 2.4 million vehicles with the defect

2    until May 2014.

3         108.    The vehicles with the brake light defect include the 2004-2012 Chevrolet Malibu,

4    the 2004-2007 Malibu Maxx, the 2005-2010 Pontiac G6, and the 2007-2010 Saturn Aura.[48]

5         109.    According to GM, the brake defect originates in the Body Control Module (BCM)

6    connection system. "Increased resistance can develop in the [BCM] connection system and result

7    in voltage fluctuations or intermittency in the Brake Apply Sensor (BAS) circuit that can cause

8    service brakes lamp malfunction."[49] The result is brake lamps that may illuminate when the brakes

9    are not being applied and may not illuminate when the brakes are being applied. [50]

10         110.    The same defect can also cause the vehicle to get stuck in cruise control if it is

11    engaged, or cause cruise control to not engage, and may also disable the traction control, electronic

12    stability control, and panic-braking assist features.[51]

13         111.    GM now acknowledges that the brake light defect "may increase the risk of a

14    crash."[52]

15         112.    As early as September 2008, NHTSA opened an investigation for model year 2005-

16    2007 Pontiac G6 vehicles involving allegations that the brake lights may turn on when the driver

17    had not depressed the brake pedal and may turn on when the brake pedal was depressed.[53]

18         113.    During its investigation of the brake light defect in 2008, Old GM found elevated

19    warranty claims for the brake light defect for MY 2005 and 2006 vehicles built in January 2005,

20    and found "fretting corrosion in the BCM C2 connector was the root cause" of the problem.[54] Old

21    GM and its part supplier Delphi decided that applying dielectric grease to the BCM C2 connector

22

23

24    [48] *Id.*

25    [49] *Id.*

26    [50] *Id.*

27    [51] *Id.*

28    [52] *Id.*

    [53] *Id.* at 2.

    [54] *Id.*

- 21 -

FIRST AMENDED COMPLAINT

1    would be "an effective countermeasure to the fretting corrosion."[55]  Beginning in November of

2    2008, the company began applying dielectric grease in its vehicle assembly plants.[56]

3            114.    On December 4, 2008, Old GM issued a TSB recommending the application of

4    dielectric grease to the BCM C2 connector for the MY 2005-2009, Pontiac G6, 2004-2007

5    Chevrolet Malibu/Malibu Maxx and 2008 Malibu Classic and 2007-2009 Saturn Aura vehicles.[57]

6    One month later, in January 2009, Old GM recalled only a small subset of the vehicles with the

7    brake light defect – 8,000 MY 2005-2006 Pontiac G6 vehicles built during the month of January,

8    2005.[58]

9            115.    Not surprisingly, the brake light problem was far from resolved.

10           116.    In October 2010, GM released an updated TSB regarding "intermittent brake lamp

11    malfunctions," and added MY 2008-2009 Chevrolet Malibu/Malibu Maxx vehicles to the list of

12    vehicles for which it recommended the application of dielectric grease to the BCM C2 connector.[59]

13           117.    In September of 2011, GM received an information request from Canadian

14    authorities regarding brake light defect complaints in vehicles that had not yet been recalled.  Then,

15    in June 2012, NHTSA provided GM with additional complaints "that were outside of the build

16    dates for the brake lamp malfunctions on the Pontiac G6" vehicles that had been recalled.[60]

17           118.    In February of 2013, NHTSA opened a "Recall Query" in the face of 324

18    complaints "that the brake lights do not operate properly" in Pontiac G6, Malibu and Aura vehicles

19    that had not yet been recalled.[61]

20           119.    In response, GM asserts that it "investigated these occurrences looking for root

21    causes that could be additional contributors to the previously identified fretting corrosion," but that

22

23    _____

24    [55] *Id.*

25    [56] *Id* at 3.

      [57] *Id.* at 2.

26    [58] *Id.*

27    [59] *Id.*

      [60] *Id.*

28    [61] *Id.* at 3.

1    it continued to believe that "fretting corrosion in the BCM C2 connector" was the "root cause" of

2    the brake light defect.[62]

3         120.    In June of 2013, NHTSA upgraded its "Recall Query" concerning brake light

4    problems to an "Engineering Analysis."[63]

5         121.    In August 2013, GM found an elevated warranty rate for BCM C2 connectors in

6    vehicles built **after** Old GM had begun applying dielectric grease to BCM C2 connectors at its

7    assembly plants in November of 2008.[64]  In November of 2013, GM concluded that "the amount of

8    dielectric grease applied in the assembly plant starting November 2008 was insufficient…."[65]

9         122.    Finally, in March of 2014, "GM engineering teams began conducting analysis and

10   physical testing to measure the effectiveness of potential countermeasures to address fretting

11   corrosion.  As a result, GM determined that additional remedies were needed to address fretting

12   corrosion."[66]

13        123.    On May 7, 2014, GM's Executive Field Action Decision Committee finally decided

14   to conduct a safety recall.

15        124.    According to GM, "Dealers are to attach the wiring harness to the BCM with a

16   spacer, apply dielectric lubricant to both the BCM CR and harness connector, and on the BAS and

17   harness connector, and relearn the brake pedal home position."[67]

18        125.    Once again, GM sat on and concealed its knowledge of the brake light defect, and

19   did not even consider available countermeasures (other than the application of grease that had

20   proven ineffective) until March of this year.

21   **5.    Shift cable defect**

22        126.    From 2004 through 2010, more than 1.1 million GM-branded vehicles were sold

23   throughout the United States with a dangerously defective transmission shift cable.  The shift cable

24   _____

25   [62] *Id.*

     [63] *Id.*

26   [64] *Id.*

     [65] *Id.*

27   [66] *Id.* at 4.

     [67] *Id.*

28

1    may fracture at any time, preventing the driver from switching gears or placing the transmission in

2    the "park" position.  According to GM, "[i]f the driver cannot place the vehicle in park, and exits

3    the vehicle without applying the park brake, the vehicle could roll away and a crash could occur

4    without prior warning."[68]

5        127.    Yet again, GM knew of the shift cable defect long before it issued the recent recall

6    of more than 1.1 million vehicles with the defect.

7        128.    In May of 2011, NHTSA informed GM that it had opened an investigation into

8    failed transmission cables in 2007 model year Saturn Aura vehicles.  In response, GM noted "a

9    cable failure model in which a tear to the conduit jacket could allow moisture to corrode the

10   interior steel wires, resulting in degradation of shift cable performance, and eventually, a possible

11   shift cable failure."[69]

12       129.    Upon reviewing these findings, GM's Executive Field Action Committee conducted

13   a "special coverage field action for the 2007-2008 MY Saturn Aura vehicles equipped with 4 speed

14   transmissions and built with Leggett & Platt cables."  GM apparently chose that cut-off date

15   because, on November 1, 2007, Kongsberg Automotive replaced Leggett & Platt as the cable

16   provider.[70]

17       130.    GM did not recall any of the vehicles with the shift cable defect at this time, and

18   limited its "special coverage field action" to the 2007-2008 Aura vehicles even though "the same

19   or similar Leggett & Platt cables were used on … Pontiac G6 and Chevrolet Malibu (MMX380)

20   vehicles."

21       131.    In March 2012, NHTSA sent GM an Engineering Assessment request to investigate

22   transmission shift cable failures in 2007-2008 MY Auras, Pontiac G6s, and Chevrolet Malibus.[71]

23       132.    In responding to the Engineering Assessment request, GM for the first time "noticed

24   elevated warranty rates in vehicles built with Kongsberg shift cables."  Similar to their predecessor

25

26   _____

    [68] *See* GM letter to NHTSA Re: NHTSA Campaign No. 14V-224 dated May 22, 2014, at 1.
27   [69] *Id.* at 2.
    [70] *Id.*
28   [71] *Id.*

vehicles built with Leggett & Platt shift cables, in the vehicles built with Kongsberg shift cables "the tabs on the transmission shift cable end may fracture and separate without warning, resulting in failure of the transmission shift cable and possible unintended vehicle movement."[72]

133.    Finally, on September 13, 2012, the Executive Field Action Decision Committee decided to conduct a safety recall.  This initial recall was limited to 2008-2010 MY Saturn Aura, Pontiac G6, and Chevrolet Malibu vehicles with 4-speed transmission built with Kongsberg shifter cables, as well as 2007-2008 MY Saturn Aura and 2005-2007 MY Pontiac G6 vehicles with 4-speed transmissions which may have been serviced with Kongsberg shift cables.[73]

134.    But the shift cable problem was far from resolved.

135.    In March of 2013, NHTSA sent GM a second Engineering Assessment concerning allegations of failure of the transmission shift cables on all 2007-2008 MY Saturn Aura, Chevrolet Malibu, and Pontiac G6 vehicles.[74]

136.    GM continued its standard process of "investigation" and delay.  But by May 9, 2014, GM was forced to concede that "the same cable failure mode found with the Saturn Aura 4-speed transmission" was present in a wide population of vehicles.[75]

137.    Finally, on May 19, 2014, GM's Executive Field Actions Decision Committee decided to conduct a safety recall of more than 1.1 million vehicles with the defective shift cable issue, including the following models and years (as of May 23, 2014):  MY 2007-2008 Chevrolet Saturn; MY 2004-2008 Chevrolet Malibu; MY 2004-2007 Chevrolet Malibu Maxx; and MY 2005-2008 Pontiac G6.

**6.    Safety belt defect.**

138.    Between the years 2008-2014, more than 1.4 million GM-branded vehicles were sold with a dangerous safety belt defect.  According to GM, "[t]he flexible steel cable that connects the safety belt to the vehicle at the outside of the front outside of the front outboard seating

---

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *Id.*

- 25 -

1  positions can fatigue and separate over time as a result of occupant movement into the seat.  In a

2  crash, a separated cable could increase the risk of injury to the occupant."[76]

3      139.    On information and belief, GM knew of the safety belt defect long before it issued

4  the recent recall of more than 1.3 million vehicles with the defect.

5      140.    While GM has yet to submit its full chronology of events to NHTSA, suffice to say

6  that GM has waited some five years before disclosing this defect.  This delay is consistent with

7  GM's long period of concealment of the other defects as set forth above.

8      141.    On May 19, 2014, GM's Executive Field Action Decision Committee decided to

9  conduct a recall of the following models and years in connection with the safety belt defect:  MY

10  2009-2014 Buick Enclave; MY 2009-2014 Chevrolet Traverse; MY 2009-2014 GMC Acadia; and

11  MY 2009-2010 Saturn Outlook.

12      **7.    Ignition lock cylinder defect.**

13      142.    On April 9, 2014, GM recalled 2,191,014 GM-branded vehicles to address faulty

14  ignition lock cylinders.[77]  Though the vehicles are the same as those affected by the ignition switch

15  defect,[78] the lock cylinder defect is distinct.

16      143.    In these vehicles, faulty ignition lock cylinders can allow removal of the ignition

17  key while the engine is not in the "Off" position.  If the ignition key is removed when the ignition

18  is not in the "Off" position, unintended vehicle motion may occur.  That could cause a vehicle

19  crash and injury to the vehicle's occupants or pedestrians.  As a result, some of the vehicles with

20  faulty ignition lock cylinders may fail to conform to Federal Motor Vehicle Safety Standard

21  number 114, "*Theft Prevention and Rollaway Prevention*."[79]

22      144.    On information and belief, GM was aware of the ignition lock cylinder defect for

23  years before finally acting to remedy it.

24

25  _____

26  [76] *See* GM Notice to NHTSA dated May 19, 2014, at 1.

   [77] *See* GM Notice to NHTSA dated April 9, 2014.

27  [78] Namely, MY 2005-2010 Chevrolet Cobalts, 2005-2011 Chevrolet HHRs, 2007-2010 Pontiac
   G5s, 2003-2007 Saturn Ions, and 2007-2010 Saturn Skys.

28  [79] GM Notice to NHTSA dated April 9, 2014, at 1.

**8.      The Camaro key-design defect.**

145.    On June 13, 2014, GM recalled more than 500,000 MY 2010-2014 Chevrolet Camaros because a driver's knee can bump the key fob out of the "run" position and cause the vehicle to lose power.  This issue that has led to at least three crashes.  GM said it learned of the issue which primarily affects drivers who sit close to the steering wheel, during internal testing it conducted following its massive ignition switch recall earlier this year.  GM knows of three crashes that resulted in four minor injuries attributed to this defect.

**9.      The ignition key defect.**

146.    On June 16, 2014, GM announced a recall of 3.36 million cars due to a problem with keys that can turn off ignitions and deactivate air bags, a problem similar to the ignition switch defects in the 2.19  million cars recalled earlier in the year.

147.    The company said that keys laden with extra weight – such as additional keys or objects attached to a key ring – could inadvertently switch the vehicle's engine off if the car struck a pothole or crossed railroad tracks.

148.    GM said it was aware of eight accidents and six injuries related to the defect.

149.    As early as December 2000, drivers of the Chevrolet Impala and the other newly recalled cars began lodging complaints about stalling with the National Highway Traffic Safety Administration.  "When foot is taken off accelerator, car will stall without warning," one driver of a 2000 Cadillac Deville told regulators in December 2000.  "Complete electrical system and engine shutdown while driving," another driver of the same model said in January 2001.  "Happened three different times to date.  Dealer is unable to determine cause of failure."

150.    The vehicles covered include the Buick Lacrosse, model years 2005-09; Chevrolet Impala, 2006-14; Cadillac Deville, 2000-05; Cadillac DTS, 2004-11; Buick Lucerne, 2006-11; Buick Regal LS and RS, 2004-05; and Chevrolet Monte Carlo, 2006-08.

**10.     At least 26 other defects were revealed by GM in recalls during the first half of 2014.**

151.    The nine defects discussed above – and the resultant 12 recalls – are but a subset of the 40 recalls ordered by GM in connection with 35 separate defects during the first five and one-

half months of 2014.  The additional 26 defects are briefly summarized in the following paragraphs.

152.  **Transmission oil cooler line defect:**  On March 31, 2014, GM recalled 489,936 MY 2014 Chevy Silverado, 2014 GMC Sierra, 2014 GMC Yukon, 2014 GMC Yukon XL, 2015 Chevy Tahoe, and 2015 Chevy Suburban vehicles.  These vehicles may have transmission oil cooler lines that are not securely seated in the fitting.  This can cause transmission oil to leak from the fitting, where it can contact a hot surface and cause a vehicle fire.

153.  **Power management mode software defect:**  On January 13, 2014, GM recalled 324,970 MY 2014 Chevy Silverado and GMC Sierra Vehicles.  When these vehicles are idling in cold temperatures, the exhaust components can overheat, melt nearby plastic parts, and cause an engine fire.

154.  **Substandard front passenger airbags:**  On March 17, 2014, GM recalled 303,013 MY 2009-2014 GMC Savana vehicles.  In certain frontal impact collisions below the air bag deployment threshold in these vehicles, the panel covering the airbag may not sufficiently absorb the impact of the collision.  These vehicles therefore do not meet the requirements of Federal Motor Vehicle Safety Standard number 201, "Occupant Protection in Interior Impact."

155.  **Light control module defect**:  On May 16, 2014, GM recalled 218,214 MY 2004-2008 Chevrolet Aveo (subcompact) and 2004-2008 Chevrolet Optra (subcompact) vehicles.  In these vehicles, heat generated within the light control module in the center console in the instrument panel may melt the module and cause a vehicle fire.

156.  **Front axle shaft defect:**  On March 28, 2014, GM recalled 174,046 MY 2013-2014 Chevrolet Cruze vehicles.  In these vehicles, the right front axle shaft may fracture and separate. If this happens while the vehicle is being driven, the vehicle will lose power and coast to a halt.  If a vehicle with a fractured shaft is parked and the parking brake is not applied, the vehicle may move unexpectedly which can lead to accident and injury.

157.  **Brake boost defect:**  On May 13, 2014, GM recalled 140,067 MY 2014 Chevrolet Malibu vehicles.  The "hydraulic boost assist" in these vehicles may be disabled; when that happens, slowing or stopping the vehicle requires harder brake pedal force, and the vehicle will

travel a greater distance before stopping.  Therefore, these vehicles do not comply with Federal Motor Vehicle Safety Standard number 135, "Light Vehicle Brake Systems," and are at increased risk of collision.

158.  **Low beam headlight defect**:  On May 14, 2014, GM recalled 103,158 MY 2005-2007 Chevrolet Corvette vehicles.  In these vehicles, the underhood bussed electrical center (UBEC) housing can expand and cause the headlamp low beam relay control circuit wire to bend.  When the wire is repeatedly bent, it can fracture and cause a loss of low beam headlamp illumination.  The loss of illumination decreases the driver's visibility and the vehicle's conspicuity to other motorists, increasing the risk of a crash.

159.  **Vacuum line brake booster defect**:  On March 17, 2014, GM recalled 63,903 MY 2013-2014 Cadillac XTS vehicles.  In these vehicles, a cavity plug on the brake boost pump connector may dislodge and allow corrosion of the brake booster pump relay connector.  This can have an adverse impact on the vehicle's brakes.

160.  **Fuel gauge defect**:  On April 29, 2014, GM recalled 51,460 MY 2014 Chevrolet Traverse, GMC Acadia and Buick Enclave vehicles.  In these vehicles, the engine control module (ECM) software may cause inaccurate fuel gauge readings.  An inaccurate fuel gauge may result in the vehicle unexpectedly running out of fuel and stalling, and thereby increases the risk of accident.

161.  **Acceleration defect**:  On April 24, 2014, GM recalled 50,571 MY 2013 Cadillac SRX vehicles.  In these vehicles, there may be a three- to four-second lag in acceleration due to faulty transmission control module programming.  That lag may increase the risk of a crash.

162.  **Flexible flat cable airbag defect**:  On April 9, 2014, GM recalled 23,247 MY 2009-2010 Pontiac Vibe vehicles.  These vehicles are susceptible to a failure in the Flexible Flat Cable ("FFC") in the spiral cable assemble connecting the driver's airbag module.  When the FFC fails, connectivity to the driver's airbag module is lost and the airbag is deactivated.  The resultant failure of the driver's airbag to deploy increases the risk of injury to the driver in the event of a crash.

163.    **Windshield wiper defect**:  On May 14, 2014, GM recalled 19,225 MY 2014 Cadillac CTS vehicles.  A defect leaves the windshield wipers in these vehicles prone to failure.  Inoperative windshield wipers can decrease the driver's visibility and increase the risk of a crash.

164.    **Brake rotor defect**:  On May 7, 2014, GM recalled 8,208 MY 2014 Chevrolet Malibu and Buick LaCrosse vehicles.  In these vehicles, GM may have accidentally installed rear brake rotors on the front brakes.  The rear rotors are thinner than the front rotors, and the use of rear rotors in the front of the vehicle may result in a front brake pad detaching from the caliper.  The detachment of a break pad from the caliper can cause a sudden reduction in braking which lengthens the distance required to stop the vehicle and increases the risk of a crash.

165.    **Passenger-side airbag defect**:  On May 16, 2014, GM recalled 1,402 MY 2015 Cadillac Escalade vehicles.  In these vehicles, the airbag module is secured to a chute adhered to the backside of the instrument panel with an insufficiently heated infrared weld.  As a result, the front passenger-side airbag may only partially deploy in the event of crash, and this will increase the risk of occupant injury.  These vehicles do not conform to Federal Motor Vehicle Safety Standard number 208, "Occupant Crash Protection."

166.    **Electronic stability control defect**:  On March 26, 2014, GM recalled 656 MY 2014 Cadillac ELR vehicles.  In these vehicles, the electronic stability control (ESC) system software may inhibit certain ESC diagnostics and fail to alert the driver that the ESC system is partially or fully disabled.  Therefore, these vehicles fail to conform to Federal Motor Vehicle Safety Standard number 126, "Electronic Stability Control Systems."  A driver who is not alerted to an ESC system malfunction may continue driving with a disabled ESC system.  That may result in the loss of directional control, greatly increasing the risk of a crash.

167.    **Steering tie-rod defect**:  On May 13, 2014, GM recalled 477 MY 2014 Chevrolet Silverado, 2014 GMC Sierra and 2015 Chevrolet Tahoe vehicles.  In these vehicles, the tie-rod threaded attachment may not be properly tightened to the steering gear rack.  An improperly tightened tie-rod attachment may allow the tie-rod to separate from the steering rack and result in a loss of steering that greatly increases the risk of a vehicle crash.

168.    **Automatic transmission shift cable adjuster**:  On February 20, 2014, GM recalled 352 MY 2014 Buick Enclave, Buick LaCrosse, Buick Regal, Verano, Chevrolet Cruze, Chevrolet Impala, Chevrolet Malibu, Chevrolet Traverse, and GMC Acadia vehicles.  In these vehicles, the transmission shift cable adjuster may disengage from the transmission shift lever.  When that happens, the driver may be unable to shift gears, and the indicated gear position may not be accurate.  If the adjuster is disengaged when the driver attempts to stop and park the vehicle, the driver may be able to shift the lever to the "PARK" position but the vehicle transmission may not be in the "PARK" gear position.  That creates the risk that the vehicle will roll away as the driver and other occupants exit the vehicle, or anytime thereafter.

169.    **Fuse block defect**:  On May 19, 2014, GM recalled 58 MY 2015 Chevrolet Silverado HD and GMC Sierra HD vehicles.  In these vehicles, the retention clips that attach the fuse block to the vehicle body can become loose allowing the fuse block to move out of position.  When this occurs, exposed conductors in the fuse block may contact the mounting studs or other metallic components, which in turn causes a "short to ground" event.  That can result in in an arcing condition, igniting nearby combustible materials and starting an engine compartment fire.

170.    **Diesel transfer pump defect**:  On April 24, 2014, GM recalled 51 MY 2014 GMC Sierra HD and 2015 Chevrolet Silverado HD vehicles.  In these vehicles, the fuel pump connections on both sides of the diesel fuel transfer pump may not be properly torqued.  That can result in a diesel fuel leak, which can cause a vehicle fire.

171.    **Base radio defect:**  On June 5, 2014, GM recalled 57,512 MY 2014 Chevrolet Silverado LD, 2014 GMC Sierra LD and model year 2015 Silverado HD, Tahoe and Suburban and 2015 GMC Sierra HD and Yukon and Yukon XL vehicles because the base radio may not work.  The faulty base radio prevents audible warnings if the key is in the ignition when the driver's door is open, and audible chimes when a front seat belt is not buckled.  Vehicles with the base radio defect are out of compliance with motor vehicle safety standards covering theft protection, rollaway protection and occupant crash protection.

172.    **Shorting bar defect:**  On June 5, 2014, GM recalled 31,520 MY 2012 Buick Verano and Chevrolet Camaro, Cruze, and Sonic compact cars for a defect in which the shorting

bar inside the dual stage driver's air bag may occasionally contact the air bag terminals. If contact occurs, the air bag warning light will illuminate. If the car and terminals are contacting each other in a crash, the air bag will not deploy. GM admits awareness of one crash with an injury where the relevant diagnostic trouble code was found at the time the vehicle was repaired. GM is aware of other crashes where air bags did not deploy but it does not know if they were related to this condition. GM conducted two previous recalls for this condition involving 7,116 of these vehicles with no confirmed crashes in which this issue was involved.

173. **Front passenger airbag end cap defect**: On June 5, 2014, GM recalled 61 model year 2013-2014 Chevrolet Spark and 2013 model year Buick Encore vehicles manufactured in Changwon, Korea from December 30, 2012 through May 8, 2013 because the vehicles may have a condition in which the front passenger airbag end cap could separate from the airbag inflator. In a crash, this may prevent the passenger airbag from deploying properly.

174. **Sensing and Diagnostic Model ("SDM") defect:** On June 5, 2014, GM recalled 33 model year 2014 Chevrolet Corvettes in the U.S. because an internal short-circuit in the sensing and diagnostic module (SDM) could disable frontal air bags, safety belt pretensioners and the Automatic Occupancy Sensing module.

175. **Sonic Turbine Shaft:** On June 11, 2014, GM recalled 21,567 Chevrolet Sonics due to a transmission turbine shaft that can malfunction.

176. **Electrical System defect:** On June 11, 2014, GM recalled 14,765 model year 2014 Buick LaCrosse sedans because a wiring splice in the driver's door can corrode and break, cutting power to the windows, sunroof, and door chime under certain circumstances.

177. **Seatbelt Tensioning System defect:** On June 11, 2014, GM recalled 8,789 model year 2004-11 Saab 9-3 convertibles because a cable in the driver's seatbelt tensioning system can break.

178. In light of GM's history of concealing known defects, there is little reason to think that either GM's recalls have fully addressed the 35 recently revealed defects or that GM has addressed each defect of which it is or should be aware.

1

**B.      GM Valued Cost-Cutting Over Safety, and Actively Encouraged Employees to Conceal Safety Issues.**

2

3

179.      Recently revealed information presents a disturbing picture of GM's approach to

4

safety issues – both in the design and manufacture stages, and in discovering and responding to

5

defects in GM-branded vehicles that have already been sold.

6

180.      GM made very clear to its personnel that cost-cutting was more important than

7

safety, deprived its personnel of necessary resources for spotting and remedying defects, trained its

8

employees not to reveal known defects, and rebuked those who attempted to "push hard" on safety

9

issues.

10

181.      One "directive" at GM was "cost is everything." [80]  The messages from top

11

leadership at GM to employees, as well as their actions, were focused on the need to control cost. [81]

12

182.      One GM engineer stated that emphasis on cost control at GM "permeates the fabric

13

of the whole culture.'" [82]

14

183.      According to Mark Reuss (President of GMNA from 2009-2013 before succeeding

15

Mary Barra as Executive Vice President for Global Product Development, Purchasing and Supply

16

Chain in 2014), cost and time-cutting principles known as the "Big 4" at GM "emphasized timing

17

over quality." [83]

18

184.      GM's focus on cost-cutting created major disincentives to personnel who might

19

wish to address safety issues.  For example, those responsible for a vehicle were responsible for its

20

costs, but if they wanted to make a change that incurred cost and affected other vehicles, they also

21

became responsible for the costs incurred in the other vehicles. [84]

22

185.      As another cost-cutting measure, parts were sourced to the lowest bidder, even if

23

they were not the highest quality parts. [85]

24

---

[80] GM Report at 249.

25

[81] GM Report at 250.

26

[82] GM Report at 250.

27

[83] GM Report at 250.

[84] GM Report at 250.

28

[85] GM Report at 251.

186.    Because of GM's focus on cost-cutting, GM Engineers did not believe they had extra funds to spend on product improvements.[86]

187.    GM's focus on cost-cutting also made it harder for GM personnel to discover safety defects, as in the case of the "TREAD Reporting team."

188.    GM used its TREAD database (known as "TREAD") to store the data required to be reported quarterly to NHTSA under the TREAD Act.[87]  From the date of its inception in 2009, TREAD has been the principal database used by GM to track incidents related to its vehicles.[88]

189.    From 2003-2007 or 2008, the TREAD Reporting team had eight employees, who would conduct monthly searches and prepare scatter graphs to identify spikes in the number of accidents or complaints with respect to various GM-branded vehicles.  The TREAD Reporting team reports went to a review panel and sometimes spawned investigations to determine if any safety defect existed. [89]

190.    In or around 2007-08, Old GM reduced the TREAD Reporting team from eight to three employees, and the monthly data mining process pared down.[90]  In 2010, GM restored two people to the team, but they did not participate in the TREAD database searches.[91]  Moreover, until 2014, the TREAD Reporting team did not have sufficient resources to obtain any of the advanced data mining software programs available in the industry to better identify and understand potential defects.[92]

191.    By starving the TREAD Reporting team of the resources it needed to identify potential safety issues, GM helped to insure that safety issues would not come to light.

---

[86] GM Report at 251.

[87] GM Report at 306.

[88] GM Report at 306.

[89] GM Report at 307.

[90] GM Report at 307.

[91] GM Report at 307-308.

[92] GM Report at 208.

FIRST AMENDED COMPLAINT

1    192.    "[T]here was resistance or reluctance to raise issues or concerns in the GM culture."

2    The culture, atmosphere and supervisor response at GM "discouraged individuals from raising

3    safety concerns." [93]

4    193.    GM CEO Mary Barra experienced instances where GM engineers were "unwilling

5    to identify issues out of concern that it would delay the launch" of a vehicle.[94]

6    194.    GM supervisors warned employees to "never put anything above the company" and

7    "never put the company at risk."[95]

8    195.    GM "pushed back" on describing matters as safety issues and, as a result, "GM

9    personnel failed to raise significant issues to key decision-makers." [96]

10    196.    So, for example, GM discouraged the use of the word "stall" in Technical Service

11    Bulletins ("TSBs") it sometimes sent to dealers about issues in GM-branded vehicles.  According

12    to Steve Oakley, who drafted a TSB in connection with the ignition switch defects, "the term 'stall'

13    is a 'hot' word that GM generally does not use in bulletins because it may raise a concern about

14    vehicle safety, which suggests GM should recall the vehicle, not issue a bulletin."[97]  Other GM

15    personnel confirmed Oakley on this point, stating that "there was concern about the use of 'stall' in

16    a TSB because such language might draw the attention of NHTSA."[98]

17    197.    Oakley further noted that "he was reluctant to push hard on safety issues because of

18    his perception that his predecessor had been pushed out of the job for doing just that."[99]

19    198.    Many GM employees "did not take notes at all at critical safety meetings because

20    they believed GM lawyers did not want such notes taken." [100]

21

22
_____

23    [93] GM Report at 252.

24    [94] GM Report at 252.

    [95] GM Report at 252-253.

25    [96] GM Report at 253.

26    [97] GM Report at 92.

    [98] GM Report at 93.

27    [99] GM Report at 93.

28    [100] GM Report at 254.

199.    A GM training document released by NHTSA as an attachment to its Consent Order sheds further light on the lengths to which GM went to ensure that known defects were concealed. It appears that the defects were concealed pursuant to a company policy GM inherited from Old GM.

200.    The document consists of slides from a 2008 Technical Learning Symposium for "designing engineers," "company vehicle drivers," and other employees at Old GM.  On information and belief, the vast majority of employees who participated in this webinar presentation continued on in their same positions at GM after July 10, 2009.

201.    The presentation focused on recalls, and the "reasons for recalls."

202.    One major component of the presentation was captioned "Documentation Guidelines," and focused on what employees should (and should not say) when describing problems in vehicles.

203.    Employees were instructed to "[w]rite smart," and to "[b]e factual, not fantastic" in their writing.

204.    Company vehicle drivers were given examples of comments to avoid, including the following:  "This is a safety and security issue"; "I believe the wheels are too soft and weak and could cause a serious problem"; and "Dangerous … almost caused accident."

205.    In documents used for reports and presentations, employees were advised to avoid a long list of words, including: "bad," "dangerous," "defect," "defective," "failed," "flawed," "life-threatening," "problem," "safety," "safety-related," and "serious."

206.    In truly Orwellian fashion, the Company advised employees to use the words (1) "Issue, Condition [or] Matter" instead of "Problem"; (2) "Has Potential Safety Implications" instead of "Safety"; (3) "Broke and separated 10 mm" instead of "Failed"; (4) "Above/Below/Exceeds Specification" instead of "Good [or] Bad"; and (5) "Does not perform to design" instead of "Defect/Defective."

207.    As NHTSA's Acting Administrator Friedman noted at the May 16, 2014 press conference announcing the Consent Order concerning the ignition switch defect, it was GM's company policy to avoid using words that might suggest the existence of a safety defect:

> GM must rethink the corporate philosophy reflected in the
> documents we reviewed, including training materials that explicitly
> discouraged employees from using words like 'defect,' 'dangerous,'
> 'safety related,' and many more essential terms for engineers and
> investigators to clearly communicate up the chain when they suspect
> a problem.

208.    GM appears to have trained its employees to conceal the existence of known safety defects from consumers and regulators.  Indeed, it is nearly impossible to convey the potential existence of a safety defect without using the words "safety" or "defect" or similarly strong language that was verboten at GM.

209.    So institutionalized at GM was the "phenomenon of avoiding responsibility" that the practice was given a name: "the 'GM salute,'" which was "a crossing of the arms and pointing outward towards others, indicating that the responsibility belongs to someone else, not me."[101]

210.    CEO Mary Barra described a related phenomenon , "known as the 'GM nod,'" which was "when everyone nods in agreement to a proposed plan of action, but then leaves the room with no intention to follow through, and the nod is an empty gesture."[102]

211.    According to the GM Report prepared by Anton R. Valukas, part of the failure to properly correct the ignition switch defect was due to problems with GM's organizational structure.[103]  Part of the failure to properly correct the ignition switch defect was due to a corporate culture that did not care enough about safety.[104]  Part of the failure to properly correct the ignition switch defect was due to a lack of open and honest communication with NHTSA regarding safety issues.[105]  Part of the failure to properly correct the ignition switch defect was due to improper conduct and handling of safety issues by lawyers within GM's Legal Staff.[106]  On information and belief, all of these issues also helped cause the concealment of and failure to remedy the many defects that have led to the spate of recalls in the first half of 2014.

---

[101] GM Report at 255.

[102] GM Report at 256.

[103] GM Report at 259-260.

[104] GM Report at 260-261.

[105] GM Report at 263.

[106] GM Report at 264.

**C.    The Ignition Switch Defects Have Harmed Consumers in Orange County and the State**

212.    GM's unprecedented concealment of a large number of serious defects, and its irresponsible approach to safety issues, has caused damage to consumers in Orange County and throughout California.

213.    A vehicle made by a reputable manufacturer of safe and reliable vehicles who stands behind its vehicles after they are sold is worth more than an otherwise similar vehicle made by a disreputable manufacturer known for selling defective vehicles and for concealing and failing to remedy serious defects after the vehicles are sold.

214.    A vehicle purchased or leased under the reasonable assumption that it is safe and reliable is worth more than a vehicle of questionable safety and reliability due to the manufacturer's recent history of concealing serious defects from consumers and regulators.

215.    Purchasers and lessees of new and used GM-branded vehicles after the July 10, 2009, inception of GM paid more for the vehicles than they would have had GM disclosed the many defects it had a duty to disclose in GM-branded vehicles.  Because GM concealed the defects and the fact that it was a disreputable brand that valued cost-cutting over safety, these consumers did not receive the benefit of their bargain.  And the value of all their vehicles has diminished as the result of GM's deceptive conduct.

216.    If GM had timely disclosed the many defects as required by the TREAD Act and California law, California vehicle owners' GM-branded vehicles would be considerably more valuable than they are now.  Because of GM's now highly publicized campaign of deception, and its belated, piecemeal and ever-expanding recalls, so much stigma has attached to the GM brand that no rational consumer would pay what otherwise would have been fair market value for GM-branded vehicles.

**D.    Given GM's Knowledge of the Defects and the Risk to Public Safety, it Was Obliged to Promptly Disclose and Remedy the Defects.**

217.    The National Traffic and Motor Vehicle Safety Act of 1966 (the "Safety Act") requires manufacturers of motor vehicles and motor vehicle equipment to submit certain information to the National Highway Traffic Safety Administration (NHTSA) in order "to reduce

traffic accidents and deaths and injuries resulting from traffic accidents."  49 U.S.C. § 30101 *et. seq.*

218.    Under the Safety Act, the manufacturer of a vehicle has a duty to notify dealers and purchasers of a safety defect and remedy the defect without charge.  49 U.S.C. § 30118.  In November 2000, Congress enacted the Transportation Recall Enhancement, Accountability and Documentation (TREAD) Act, 49 U.S.C. §§ 30101-30170, which amended the Safety Act and directed the Secretary of Transportation to promulgate regulation expanding the scope of the information that manufacturers are required to submit to NHTSA.

219.    The Safety Act requires manufacturers to inform NHTSA within five days of discovering a defect.  49 CFR § 573.6 provides that a manufacturer "shall furnish a report to the NHTSA for each defect in his vehicles or in his items of original or replacement equipment that he or the Administrator determines to be related to motor vehicle safety, and for each noncompliance with a motor vehicle safety standard in such vehicles or items of equipment which either he or the Administrator determines to exist," and that such reports must include, among other things:  identification of the vehicles or items of motor vehicle equipment potentially containing the defect or noncompliance, including a description of the manufacturer's basis for its determination of the recall population and a description of how the vehicles or items of equipment to be recalled differ from similar vehicles or items of equipment that the manufacturer has not included in the recall; in the case of passenger cars, the identification shall be by the make, line, model year, the inclusive dates (month and year) of manufacture, and any other information necessary to describe the vehicles; a description of the defect or noncompliance, including both a brief summary and a detailed description, with graphic aids as necessary, of the nature and physical location (if applicable) of the defect or noncompliance; a chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with their dates of receipt; a description of the manufacturer's program for remedying the defect or noncompliance; and a plan for reimbursing an owner or purchaser who incurred costs to obtain a remedy for the

1      problem addressed by the recall within a reasonable time in advance of the manufacturer's

2      notification of owners, purchasers and dealers.

3            220.    Manufacturers are also required to submit "early warning reporting" (EWR) data

4      and information that may assist the agency in identifying safety defects in motor vehicles or motor

5      vehicle equipment.  *See* 49 U.S.C. § 30166(m)(3)(B).  The data submitted to NHTSA under the

6      EWR regulation includes:  production numbers (cumulative total of vehicles or items of equipment

7      manufactured in the year); incidents involving death or injury based on claims and notices received

8      by the manufacturer; claims relating to property damage received by the manufacturer; warranty

9      claims paid by the manufacturer (generally for repairs on relatively new products) pursuant to a

10     warranty program (in the tire industry these are warranty adjustment claims); consumer complaints

11     (a communication by a consumer to the manufacturer that expresses dissatisfaction with the

12     manufacturer's product or performance of its product or an alleged defect); and field reports

13     (prepared by the manufacturer's employees or representatives concerning failure, malfunction, lack

14     of durability or other performance problem of a motor vehicle or item of motor vehicle equipment).

15            221.    Regulations promulgated under the TREAD Act also require manufacturers to

16     inform NHTSA of defects and recalls in motor vehicles in foreign countries.  Under 49 CFR §§

17     579.11 and 579.12 a manufacturer must report to NHTSA not later than five working days after a

18     manufacturer determines to conduct a safety recall or other safety campaign in a foreign country

19     covering a motor vehicle sold or offered for sale in the United States.  The report must include,

20     among other things:  a description of the defect or noncompliance, including both a brief summary

21     and a detailed description, with graphic aids as necessary, of the nature and physical location (if

22     applicable) of the defect or noncompliance; identification of the vehicles or items of motor vehicle

23     equipment potentially containing the defect or noncompliance, including a description of the

24     manufacturer's basis for its determination of the recall population and a description of how the

25     vehicles or items of equipment to be recalled differ from similar vehicles or items of equipment

26     that the manufacturer has not included in the recall; the manufacturer's program for remedying the

27     defect or noncompliance, the date of the determination and the date the recall or other campaign

28     was commenced or will commence in each foreign country; and identify all motor vehicles that the

manufacturer sold or offered for sale in the United States that are identical or substantially similar to the motor vehicles covered by the foreign recall or campaign.

222.    49 CFR § 579.21 requires manufacturers to provide NHTSA quarterly field reports related to the current and nine preceding model years regarding various systems, including, but not limited to, vehicle speed control.  The field reports must contain, among other things:  a report on each incident involving one or more deaths or injuries occurring in the United States that is identified in a claim against and received by the manufacturer or in a notice received by the manufacturer which notice alleges or proves that the death or injury was caused by a possible defect in the manufacturer's vehicle, together with each incident involving one or more deaths occurring in a foreign country that is identified in a claim against and received by the manufacturer involving the manufacturer's vehicle, if that vehicle is identical or substantially similar to a vehicle that the manufacturer has offered for sale in the United States, and any assessment of an alleged failure, malfunction, lack of durability, or other performance problem of a motor vehicle or item of motor vehicle equipment (including any part thereof) that is originated by an employee or representative of the manufacturer and that the manufacturer received during a reporting period.

223.    GM has known throughout the liability period that many GM-branded vehicles sold or leased in the State of California were defective – and, in many cases, dangerously so.

224.    Since the date of GM's inception, many people have been injured or died in accidents relating to the ignition switch defects alone.  While the exact injury and death toll is unknown, as a result of GM's campaign of concealment and suppression of the large number of defects plaguing over 17 million GM-branded vehicles, numerous other drivers and passengers of the Defective Vehicles have died or suffered serious injuries and property damage.  All owners and lessees of GM-branded vehicles have suffered economic damage to their property due to the disturbingly large number of recently revealed defects that were concealed by GM.  Many are unable to sell or trade their cars, and many are afraid to drive their cars.

**E.**    **GM's Misrepresentations and Deceptive, False, Untrue and Misleading Advertising, Marketing and Public Statements**

225.    Despite its knowledge of the many serious defects in millions of GM-branded vehicles, GM continued to (1) sell new Defective Vehicles; (2) sell used Defective Vehicles as "GM certified"; and (3) use defective ignition switches to repair GM vehicles, all without disclosing or remedying the defects.  As a result, the injury and death toll associated with the Defective Vehicles has continued to increase and, to this day, GM continues to conceal and suppress this information.

226.    During this time period, GM falsely assured California consumers in various written and broadcast statements that its cars were safe and reliable, and concealed and suppressed the true facts concerning the many defects in millions of GM-branded vehicles, and GM's policies that led to both the manufacture of an inordinate number of vehicles with safety defects and the subsequent concealment of those defects once the vehicles are on the road.  To this day, GM continues to conceal and suppress information about the safety and reliability of its vehicles.

227.    Against this backdrop of fraud and concealment, GM touted its reputation for safety and reliability, and knew that people bought and retained its vehicles because of that reputation, and yet purposefully chose to conceal and suppress the existence and nature of the many safety defects.  Instead of disclosing the truth about the dangerous propensity of the Defective Vehicles and GM's disdain for safety, California consumers were given assurances that their vehicles were safe and defect free, and that the Company stands behind its vehicles after they are on the road.

228.    GM has consistently marketed its vehicles as "safe" and proclaimed that safety is one of its highest priorities.

229.    It told consumers that it built the world's best vehicles:

> We truly are building a new GM, from the inside out. Our vision is clear: to design, build and sell the world's best vehicles, and we have a new business model to bring that vision to life. We have a lower cost structure, a stronger balance sheet and a dramatically lower risk profile. We have a new leadership team – a strong mix of executive talent from outside the industry and automotive veterans – and a passionate, rejuvenated workforce.

> "Our plan is to steadily invest in creating world-class vehicles, which will continuously drive our cycle of great design, high quality and higher profitability."

1          230.    It represented that it was building vehicles with design excellence, quality and

2    performance:

3                  And across the globe, other GM vehicles are gaining similar acclaim
                   for design excellence, quality and performance, including the Holden
4                  Commodore in Australia.  Chevrolet Agile in Brazil, Buick LaCrosse
                   in China and many others.
5
                   The company's progress is early evidence of a new business model
6                  that begins and ends with great vehicles.  We are leveraging our
                   global resources and scale to maintain stringent cost management
7                  while taking advantage of growth and revenue opportunities around
                   the world, to ultimately deliver sustainable results for all of our
8                  shareholders.

9    ///

10   ///

11   ///

12   ///

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

FIRST AMENDED COMPLAINT

1      231.     The theme below was repeated in advertisements, company literature, and material

2   at dealerships as the core message about GM's Brand:

> The new General Motors has one clear vision: to design, build and sell the world's
> best vehicles. Our new business model revolves around this vision, focusing on fewer
> brands, compelling vehicle design, innovative technology, improved manufacturing
> productivity and streamlined, more efficient inventory processes. The end result
> is products that delight customers and generate higher volumes and margins—
> and ultimately deliver more cash to invest in our future vehicles.

## A New Vision,
## a New Business Model

Our vision is simple, straightforward and clear: to design, build and sell the world's best vehicles. That doesn't mean just making our vehicles better than the ones they replace. We have set a higher standard for the new GM—and that means building the best.

Our vision comes to life in a continuous cycle that starts, ends and begins again with great vehicle designs. To accelerate the momentum we've already created, we reduced our North American portfolio from eight brands to four: Chevrolet, Buick, Cadillac and GMC. Worldwide, we're aggressively developing and leveraging global vehicle architectures to maximize our talent and resources and achieve optimum economies of scale.

Across our manufacturing operations, we have largely eliminated overcapacity in North America while making progress in Europe, and we're committed to managing inventory with a new level of discipline. By using our manufacturing capacity more efficiently and maintaining leaner vehicle inventories, we are reducing the need to offer sales incentives on our vehicles. These moves, combined with offering attractive, high-quality vehicles, are driving healthier margins—and at the same time building stronger brands.

Our new business model creates a self-sustaining cycle of reinvestment that drives continuous improvement in vehicle design, manufacturing discipline, brand strength, pricing and margins, because we are now able to make money at the bottom as well as the top of the industry cycles.

We are seeing positive results already. In the United States, for example, improved design, content and quality have resulted in solid gains in segment share, average transaction prices and projected residual values for the Chevrolet Equinox, Buick LaCrosse and Cadillac SRX. This is just the beginning.

FIRST AMENDED COMPLAINT

232.    It represented that it had a world-class lineup in North America:











- 45 -

FIRST AMENDED COMPLAINT

1

2

   

3

4

5

6

7

8

9

10

11

12

 

**GMC Terrain**
The GMC Terrain delivers segment-leading fuel economy of 32 mpg highway, plus uncompromising content and premium technology, in a 5-passenger, compact SUV.

**Cadillac CTS V-Coupe**
Cadillac's new CTS V-Coupe is the complete package for the driving enthusiast—a 556 hp supercharged V-8 engine, stunning lines and performance handling.

13

14

15

16

   

17

**GMC Sierra Heavy Duty**
The GMC Sierra offers heavy-duty power and performance with the proven and powerful Duramax Diesel/Allison Transmission combination and a completely new chassis with improved capabilities and ride comfort.

**GMC Yukon Hybrid**
The GMC Yukon Hybrid is America's first full-sized SUV hybrid, with city fuel economy of 20 mpg—better than a standard 6-cylinder Honda Accord and 43 percent better than any full-size SUV in its class.

**Cadillac CTS Sport Wagon**
With an available advanced direct-injected V6 engine, the Cadillac CTS Sport Wagon sets a new standard for versatility, while offering excitement and purpose.

**Cadillac SRX**
The Cadillac SRX looks and performs like no other crossover, with a cockpit that offers utility and elegance and an optional 70-inch Ultraview sunroof.

18

19

20

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

FIRST AMENDED COMPLAINT

233.    It boasted of its new "culture":



234.    In its 2012 Annual Report, GM told the world the following about its brand:

What is immutable is our focus on the customer, which requires us to
go from "good" today to "great" in everything we do, including
product design, initial quality, durability and service after the sale.

235.    GM also indicated it had changed its structure to create more "accountability"
which, as shown above, was a blatant falsehood:

- 47 -
FIRST AMENDED COMPLAINT

> That work continues, and it has been complemented by changes to our design and engineering organization that have flattened the structure and created more accountability for produce execution, profitability and customer satisfaction.

236.    And GM represented that product quality was a key focus – another blatant falsehood:

> Product quality and long-term durability are two other areas that demand our unrelenting attention, even though we are doing well on key measures.

237.    In its 2013 Letter to Stockholders GM noted that its brand had grown in value and boasted that it designed the "World's Best Vehicles":

> Dear Stockholder:
>
> Your company is on the move once again.  While there were highs and lows in 2011, our overall report card shows very solid marks, including record net income attributable to common stockholders of $7.6 billion and EBIT-adjusted income of $8.3 billion.
>
> •    GM's overall momentum, including a 13 percent sales increase in the United States, created new jobs and drove investments.  We have announced investments in 29 U.S. facilities totaling more than $7.1 billion since July 2009, with more than 17,500 jobs created or retained.
>
> Design, Build and Sell the World's Best Vehicles
>
> This pillar is intended to keep the customer at the center of everything we do, and success is pretty easy to define.  It means creating vehicles that people desire, value and are proud to own.  When we get this right, it transforms our reputation and the company's bottom line.
>
> Strengthen Brand Value
>
> Clarity of purpose and consistency of execution are the cornerstones of our product strategy, and two brands will drive our global growth.  They are Chevrolet, which embodies the qualities of value, reliability, performance and expressive design; and Cadillac, which creates luxury vehicles that are provocative and powerful.  At the same time the Holden, Buick, GMC, Baojun, Opel and Vauxhall brands are being carefully cultivated to satisfy as many customers as possible in select regions.
>
> Each day the cultural change underway at GM becomes more striking.  The old internally focused, consensus-driven and overly complicated GM is being reinvented brick by brick, by truly accountable executives who know how to take calculated risks and lead global teams that are committed to building the best vehicles in the world as efficiently as we can.

- 48 -

FIRST AMENDED COMPLAINT

1
2

        That's the crux of our plan.  The plan is something we can control.
We like the results we're starting to see and we're going to stick to
it – always.

3

    238.    Once it emerged from bankruptcy, GM told the world it was a new and improved

4

company:

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



239.    A radio ad that ran from GM's inception until July 16, 2010, stated that "[a]t GM, building quality cars is the most important thing we can do."

240.    An online ad for "GM certified" used vehicles that ran from July 6, 2009 until April 5, 2010, stated that "GM certified means no worries."

241.    GM's Chevrolet brand ran television ads in 2010 showing parents bringing their newborn babies home from the hospital, with the tagline "[a]s long as there are babies, there'll be Chevys to bring them home."

242.    Another 2010 television ad informed consumers that "Chevrolet's ingenuity and integrity remain strong, exploring new areas of design and power, while continuing to make some of the safest vehicles on earth."

243.    An online national ad campaign for GM in April of 2012 stressed "Safety. Utility. Performance."

244.    A national print ad campaign in April of 2013 states that "[w]hen lives are on the line, you need a dependable vehicle you can rely on.  Chevrolet and GM … for power, performance and safety."

245.    A December 2013 GM testimonial ad stated that "GM has been able to deliver a quality product that satisfies my need for dignity and safety."

246.    GM's website, GM.com, states:

> Innovation:  Quality & Safety; GM's Commitment to Safety; Quality and safety are at the top of the agenda at GM, as we work on technology improvements in crash avoidance and crashworthiness to augment the post-event benefits of OnStar, like advanced automatic crash notification.  Understanding what you want and need from your vehicle helps GM proactively design and test features that help keep you safe and enjoy the drive.  Our engineers thoroughly test our vehicles for durability, comfort and noise minimization before you think about them.  The same quality process ensures our safety technology performs when you need it.

247.    On February 25, 2014, GM North America President Alan Batey publically stated: "Ensuring our customers' safety is our first order of business.  We are deeply sorry and we are working to address this issue as quickly as we can."

248.     These proclamations of safety and assurances that GM's safety technology performs when needed were false and misleading because they failed to disclose the dangerous defects in millions of GM-branded vehicles, and the fact GM favored cost-cutting and concealment over safety.  GM knew or should have known that its representations were false and misleading.

249.     GM continues to make misleading safety claims in public statements, advertisements, and literature provided with its vehicles.

250.     GM violated California law in failing to disclose and in actively concealing what it knew regarding the existence of the defects, despite having exclusive knowledge of material facts not known to the Plaintiff or to California consumers, and by making partial representations while at the same time suppressing material facts.  *LiMandri v. Judkins* (1997) 52 Cal. App. 4th 326, 337, 60 Cal. Rptr. 2d 539.  In addition, GM had a duty to disclose the information that it knew about the defects because such matters directly involved matters of public safety.

251.     GM violated California law in failing to conduct an adequate retrofit campaign (*Hernandez v. Badger Construction Equip. Co.* (1994) 28 Cal. App. 4th 1791, 1827), and in failing to retrofit the Defective Vehicles and/or warn of the danger presented by the defects after becoming aware of the dangers after their vehicles had been on the market (*Lunghi v. Clark Equip. Co.* (1984) 153 Cal. App. 3d 485; *Balido v. Improved Machinery, Inc.* (1972) 29 Cal. App. 3d 633).

252.     GM also violated the TREAD Act, and the regulations promulgated under the Act, when it failed to timely inform NHTSA of the defects and allowed cars to remain on the road with these defects. By failing to disclose and actively concealing the defects, by selling new Defective Vehicles and used "GM certified" Defective Vehicles without disclosing or remedying the defects, and by using defective ignition switches for "repairs,"  GM engaged in deceptive business practices prohibited by the CLRA, Cal. Civ. Code § 1750, *et seq.*, including (1) representing that GM vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that new Defective Vehicles and ignition switches and used "GM certified" vehicles are of a particular standard, quality, and grade when they are not; (3) advertising GM vehicles with the intent not to sell them as advertised; (4) representing that the subjects of transactions involving GM

1    vehicles have been supplied in accordance with a previous representation when they have not; and

2    (5) selling Defective Vehicles in violation of the TREAD Act.

3                              **VI.    CAUSES OF ACTION**

4                              **FIRST CAUSE OF ACTION**

5            **VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200**

6            253.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

7            254.    GM has engaged in, and continues to engage in, acts or practices that constitute

8    unfair competition, as that term is defined in section 17200 of the California Business and

9    Professions Code.

10           255.    GM has violated, and continues to violate, Business and Professions Code section

11   17200 through its unlawful, unfair, fraudulent, and/or deceptive business acts and/or practices.

12   GM uniformly concealed, failed to disclose, and omitted important safety-related material

13   information that was known only to GM and that could not reasonably have been discovered by

14   California consumers.  Based on GM's concealment, half-truths, and omissions, California

15   consumers agreed to purchase or lease one or more (i) new or used GM vehicles sold on or after

16   July 10, 2009; (ii) "GM certified" Defective Vehicles sold on or after July 10, 2009; (iii) and/or to

17   have their vehicles repaired using GM's defective ignition switches.  GM also repeatedly and

18   knowingly made untrue and misleading statements in California regarding the purported reliability

19   and safety of its vehicles, and the importance of safety to the Company.  The true information

20   about the many serious defects in GM-branded vehicles, and GM's disdain for safety, was known

21   only to GM and could not reasonably have been discovered by California consumers.

22           256.    As a direct and proximate result of GM's concealment and failure to disclose the

23   many defects and the Company's institutionalized devaluation of safety, GM intended that

24   consumers would be misled into believing that that GM was a reputable manufacturer of reliable

25   and safe vehicles when in fact GM was an irresponsible manufacture of unsafe, unreliable  and

26   often dangerously defective vehicles.

27

28

**UNLAWFUL**

257.    The unlawful acts and practices of GM alleged above constitute unlawful business acts and/or practices within the meaning of California Business and Professions Code section 17200.  GM's unlawful business acts and/or practices as alleged herein have violated numerous federal, state, statutory, and/or common laws – and said predicate acts are therefore per se violations of section 17200.  These predicate unlawful business acts and/or practices include, but are not limited to, the following:  California Business and Professions Code section 17500 (False Advertising), California Civil Code section 1572 (Actual Fraud – Omissions), California Civil Code section 1573 (Constructive Fraud by Omission), California Civil Code section 1710 (Deceit), California Civil Code section 1770 (the Consumers Legal Remedies Act – Deceptive Practices), California Civil Code section 1793.2 *et seq.* (the Consumer Warranties Act), and other California statutory and common law; the National Traffic and Motor Vehicle Safety Act (49 U.S.C. § 30101 *et. seq.*), as amended by the Transportation Recall Enhancement, Accountability and Documentation TREAD Act, (49 U.S.C. §§ 30101-30170) including, but not limited to 49 U.S.C. §§ 30112, 30115, 30118 and 30166, Federal Motor Vehicle Safety Standard 124 (49 C.F.R. § 571.124), and 49 CFR §§ 573.6, 579.11, 579.12, and 579.21.

**UNFAIR**

258.    GM's concealment, omissions, and misconduct as alleged in this action constitute negligence and other tortious conduct and gave GM an unfair competitive advantage over its competitors who did not engage in such practices.  Said misconduct, as alleged herein, also violated established law and/or public policies which seek to promote prompt disclosure of important safety-related information.  Concealing and failing to disclose the nature and extent of the numerous safety defects to California consumers, before (on or after July 10, 2009) those consumers (i) purchased one or more GM vehicles; (ii) purchased used "GM certified" Defective Vehicles; or (iii) had their vehicles repaired with defective ignition switches, as alleged herein, was and is directly contrary to established legislative goals and policies promoting safety and the prompt disclosure of such defects, prior to purchase.  Therefore GM's acts and/or practices alleged herein were and are unfair within the meaning of Business and Professions Code section 17200.

259.    The harm to California consumers outweighs the utility, if any, of GM's acts and/or practices as alleged herein.  Thus, GM's deceptive business acts and/or practices, as alleged herein, were unfair within the meaning of Business and Professions Code section 17200.

260.    As alleged herein, GM's business acts and practices offend established public policies, including, but not limited to, public policies against making partial half-truths and failing to disclose important material facts to consumers.

261.    In addition, as alleged herein, GM intended that California consumers would be misled and/or deceived into believing that they would be purchasing a safe and reliable vehicle built by a reputable manufacturer that values safety and stands behind its vehicles after they are sold, when, in fact, they were in many cases obtaining a vehicle that had defects that had the potential to cause serious bodily injury and/or death, and, in every case, obtaining a vehicle made by an irresponsible manufacturer that does not value safety and was concealing myriad known safety defects in millions of GM-branded vehicles.  This practice is and was immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and thus unfair within the meaning of Business and Professions Code section 17200.

262.    At all times relevant, GM's misconduct and omissions alleged herein:  (a) caused substantial injury to the Public; (b) had no countervailing benefit to consumers or to competition that could possibly outweigh this substantial injury; and (c) caused injury that could not have been avoided or even discovered by ordinary consumers, because it resulted from GM's concealment, failure to disclose and/or omission of important safety related material information that only the Defendant knew or could have known.  Thus, GM's acts and/or practices as alleged herein were unfair within the meaning of Business and Professions Code section 17200.

**FRAUDULENT**

263.    GM's acts and practices, as alleged herein, were likely to, and did, deceive the Public.  GM's concealment, material omissions, acts, practices and non-disclosures, as alleged herein, therefore constitute fraudulent business acts and/or practices within the meaning of California Business and Professions Code section 17200.

264.    California consumers have been, and continue to be, deceived by GM's concealment and material omissions as alleged herein.  California consumers have suffered injury and lost money as a direct result of the deceptive conduct as alleged herein.  The unlawful, unfair, deceptive, and/or fraudulent business acts and practices of GM, as fully described herein, present a continuing threat to the citizens of California to be misled and/or deceived by GM as alleged herein, and/or to be substantially injured by these dangerously defective cars.

**SECOND CAUSE OF ACTION**

**VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17500**

265.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

266.    California Business and Professions Code § 17500 states: "It is unlawful for any ... corporation ... with intent directly or indirectly to dispose of real or personal property ... to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated ... from this state before the public in any state, in any newspaper or other publication, or any advertising device, ... or in any other manner or means whatever, including over the Internet, any statement ... which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

267.    GM caused to be made or disseminated through California and the United States, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to GM, to be untrue and misleading to consumers.

268.    GM has violated section 17500 because the misrepresentations and omissions regarding the safety and reliability of its vehicles and the importance of safety to the Company as set forth in this First Amended Complaint were material and likely to deceive a reasonable consumer.

269.    California consumers were exposed to and saw advertisements for GM vehicles on television, in magazines, on billboards, in brochures at dealerships, and on the Internet before purchasing GM vehicles.  Had those advertisements, window stickers, or any other materials disclosed that millions of GM-branded vehicles contained serious safety defects and that GM did

1  not value safety, consumers would not have purchased new GM vehicles on or after July 10, 2009

2  and would not have purchased "GM certified" Defective Vehicles on or after July 10, 2009.

3      270.    Despite notice of the serious safety defects in so many its vehicles, GM did not

4  disclose to consumers that its vehicles – which GM for years had advertised as "safe" and

5  "reliable" – were in fact not as safe or reliable as a reasonable consumer expected due to the risks

6  created by the many known defects, and GM's focus on cost-cutting at the expense of safety and

7  the resultant concealment of numerous safety defects.  GM never disclosed what it knew about the

8  defects.  Rather than disclose the truth, GM concealed the existence of the defects, and claimed to

9  be a reputable manufacturer of safe and reliable vehicles.

10      271.    GM, by the acts and misconduct alleged herein, violated Business & Professions

11  Code section 17500, and GM has engaged in, and continues to engage in, acts or practices that

12  constitute false advertising.

13      272.    GM has violated, and continues to violate, Business and Professions Code section

14  17500 by disseminating untrue and misleading statements as defined by Business and Professions

15  Code 17500.  GM has engaged in acts and practices with intent to induce members of the public to

16  purchase its vehicles by publicly disseminated advertising which contained statements which were

17  untrue or misleading, and which GM knew, or in the exercise of reasonable care should have

18  known, were untrue or misleading, and which concerned the real or personal property or services

19  or their disposition or performance.

20      273.    GM repeatedly and knowingly made untrue and misleading statements in California

21  regarding the purported reliability and safety of its vehicles.  The true information was known only

22  to GM and could not reasonably have been discovered by California consumers.  GM uniformly

23  concealed, failed to disclose and omitted important safety-related material information that was

24  known only to GM and that could not reasonably have been discovered by California consumers.

25  Based on GM's concealment, half-truths, and omissions, California consumers agreed (on or after

26  July 10, 2009) (i) to purchase GM vehicles; (ii) to purchase used "GM certified" Defective

27  Vehicles; and/or (iii) to have their vehicles repaired using defective ignition switches,

28

274.    As a direct and proximate result of GM's concealment and failure to disclose the many safety defects, GM intended that consumers would be misled into believing that they would be purchasing a safe and reliable vehicle built by a reputable manufacturer that values safety, when in fact they were purchasing vehicles that were in many cases dangerously defective and were in every case overpriced because they were in fact built by an irresponsible manufacturer that valued cost-cutting over safety and routinely concealed a myriad of serious defects from regulators and the public.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against GM as follows:

A.    Pursuant to Business and Professions Code sections 17203 and 17535, that GM, its employees, agents, representatives, successors, assigns, and all persons who act in concert with them be permanently enjoined from committing any acts of unfair competition, including the violations alleged herein.

B.    Pursuant to Business and Professions Code sections 17206 and 17536, that GM be ordered to pay a civil penalty in the amount of Two Thousand Five Hundred dollars ($2,500.00) for each violation of Business and Professions Code section 17200 and for Five Thousand dollars ($5,000) for each violation of Business and Professions Code section 17500 by GM in an amount according to proof.

C.    That Plaintiff recover its costs of suit, including costs of investigation.

D.    For reasonable attorneys' fees pursuant to Code of Civil Procedure section 1021.5, or other applicable law; and

E.    For such other equitable relief as is just and proper.

///

///

///

///

///

010440-12 692229 V1

FIRST AMENDED COMPLAINT

1       Dated:  July 1, 2014          Respectfully submitted,

2                                    TONY RACKAUCKAS, DISTRICT ATTORNEY
                                     COUNTY OF ORANGE, STATE OF CALIFORNIA

3

4                                    By: _Tony Rackauckas_____
                                      TONY RACKAUCKAS

5                                    Joseph D'Agostino, Senior Assistant District Attorney
                                     401 Civil Center Drive

6                                    Santa Ana, CA 92701-4575
                                     Tel: (714) 834-3600

7                                    Fax: (714) 648-3636

8       Dated:  July 1, 2014          ROBINSON, CALCAGNIE AND ROBINSON

9                                  By: _Mark P. Robinson, Jr.___

10                                   MARK P. ROBINSON, JR., SBN 05442
                                     Kevin F. Calcagnie, SBN. 108994

11                                   Scot D. Wilson, SBN. 223367
                                     ROBINSON CALCAGNIE ROBINSON

12                                     SHAPIRO DAVIS, INC.
                                     19 Corporate Plaza Drive

13                                   Newport Beach, California 92660
                                     Tel.: (949) 720-1288

14                                   Fax: (949) 720-1292
                                     mrobinson@rcrlaw.net

15

16      Dated:  July 1, 2014          HAGENS BERMAN SOBOL SHAPIRO LLP

17                                   Steve W. Berman (Pro Hac Vice Pending)
                                     Andrew Volk (Pro Hac Vice Pending)

18                                   HAGENS BERMAN SOBOL
                                      SHAPIRO LLP

19                                   1918 Eighth Avenue, Suite 3300
                                     Seattle, WA  98101

20                                   Telephone: (206) 623-7292
                                     Facsimile: (206) 623-0594

21                                   steve@hbsslaw.com

22
                                   *Attorneys for Plaintiff*

23                                   *THE PEOPLE OF THE STATE OF CALIFORNIA*

24

25

26

27

28