# Exhibit C

STATE OF ARIZONA
Mark Brnovich, Attorney General
Office of the Attorney General
1275 West Washington Street
Phoenix, Arizona 85006
Telephone:  949-720-1288

- and -

HAGENS BERMAN SOBOL SHAPIRO LLP
Steve W. Berman (*pro hac vice*)
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
Telephone:  206-623-7292

*Counsel for the State of Arizona*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
IN RE:                                          :     Chapter 11
                                                :
MOTORS LIQUIDATION COMPANY, *et al.*, :     No. 09-50026 (REG)
f/k/a GENERAL MOTORS CORP., *et al.*,    :
                                                :     (Jointly Administered)
                             Debtors.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**<u>STATE OF ARIZONA'S "NO STRIKE" PLEADING</u>**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................ 1

II.    BACKGROUND ......................................................................................... 4

    A.    The State's allegations target only New GM's post-Sale misconduct .................. 4

    B.    The State alleges that New GM independently violated the Arizona Consumer Fraud Act. ............................................................................ 6

III.    ARGUMENT ............................................................................................. 7

    A.    On its face, the Sale Order does not bar the State's claims. ................................ 7

    B.    The Bankruptcy Court did not have jurisdiction to provide New GM with immunity for its own post-Sale violations of its independent legal obligations. ........................................................................................ 9

    C.    The fact the *Arizona* Complaint contains factual allegations about Old GM does not mean that the claims in the Complaint are based on the conduct, cars or parts of Old GM. ....................................................... 12

        1.    The Sale Order enjoins "claims," *not* allegations. ................................... 12

        2.    The Complaint's allegations concerning pre-bankruptcy events are proper, since (a) New GM has knowledge of pre-bankruptcy information because its employees had knowledge of that information; and (b) pre-bankruptcy events provide context for New GM's alleged misconduct. ................................................ 13

            a.    An employee's knowledge of facts learned in the scope of her employment is broadly imputed to the corporate employer. ..................................................................... 14

            b.    The knowledge of GM personnel who worked at *both* Old and New GM is properly imputed to New GM. ........................ 16

            c.    The remaining allegations concerning Old GM and pre-bankruptcy events provide context for the post-bankruptcy claims arising solely from the independent actions of New GM. ..................................................................... 21

IV.    CONCLUSION ......................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re 1031 Tax Grp., LLC,*
    2011 U.S. Dist. LEXIS 33755 (S.D.N.Y. Mar. 29, 2011) ..................................................11

*Albert v. Alex. Brown Mgmt. Servs., Inc.,*
    2005 Del. Ch. LEXIS 133 (Del. Ch. Aug. 26, 2005) ............................................................17

*Allard v. Arthur Andersen & Co. (USA),*
    924 F. Supp. 488 (S.D.N.Y. 1996)......................................................................................15

*Cameron v. Shuttleworth,*
    251 P.2d 659 (Ariz. 1952).............................................................................................14, 15

*Copeman Labs. Co. v. Gen. Motors Corp.,*
    36 F. Supp. 755 (E.D. Mich. 1941).......................................................................................17

*In re Cuyahoga Equip. Corp.,*
    980 F.2d 110 (2d Cir. 1992)..................................................................................................10

*First Ala. Bank of Montgomery, N.A. v. First State Ins. Co.,*
    899 F.2d 1045 (11th Cir. 1990) ............................................................................................16

*Fridena v. Evans,*
    622 P.2d 463 (Ariz. 1980) ....................................................................................................14

*In re Johns-Manville Corp.,*
    517 F.3d 52 (2d Cir. 2008), *rev'd on other grounds sub nom., Travelers
    Indem. Co. v. Bailey,* 557 U.S. 137 (2009) .......................................................................9, 10

*In re Johns-Manville Corp.,*
    600 F.3d 135 (2d Cir. 2010)..................................................................................................11

*Kellogg Brown & Root Servs., Inc. v. United States,*
    728 F.3d 1348 (Fed. Cir. 2013).............................................................................................17

*Kirschner v. KPMG LLP,*
    938 N.E.2d 941 (N.Y. 2010)..................................................................................................15

*Link v. Wabash R.R. Co.,*
    370 U.S. 626 (1962)...............................................................................................................15

*Manley v. Ticor Title Ins. Co. of Cal.*,
    816 P.2d 225 (1991)..................................................................................14

*In re Motors Liquidation Co.*,
    2015 Bankr. LEXIS 1296 (Bankr. S.D.N.Y. Apr. 15, 2015)........................... *passim*

*N.Y. Marine & Gen. Ins. Co. v. Tradeline L.L.C.*,
    266 F.3d 112 (2d Cir. 2001)......................................................................15

*Queiroz v. Harvey*,
    205 P.3d 1120 (Ariz. 2009)........................................................................16

*In re Quigley Co., Inc.*,
    676 F.3d 45 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 2849 (2013) ...........................10

*S Dev. Co. v. Pima Capital Mgmt.*
    31 P.3d 123 (Ariz. Ct. App. 2001)...................................................14, 15, 16

*United States v. Gen. Motors Corp.*,
    574 F. Supp. 1047 (D.D.C. 1983)................................................................19

*Upjohn Co. v. New Hampshire Ins. Co.*,
    476 N.W.2d 392 (Mich. 1991)....................................................................17

*Veal v. Geraci*,
    23 F.3d 722 (2d Cir. 1994).........................................................................15

*Woods v. Maytag Co.*,
    807 F. Supp. 2d 112 (E.D.N.Y. 2011) .........................................................17

*Zerand-Bernal Grp. v. Cox*,
    23 F.3d 159 (7th Cir. 1994) .............................................................9, 10, 11

## STATUTES

28 U.S.C. § 1334(b) ........................................................................................10

49 U.S.C. § 30101 ............................................................................................3

49 U.S.C. § 30118(c) ......................................................................................19

49 U.S.C. § 30165(a)(1)...................................................................................19

49 U.S.C. § 30166(m)(3)..................................................................................19

A.R.S. § 44-1522(A) .........................................................................................6

09-50026-reg   Doc 13214   Filed 06/16/15   Entered 06/16/15 11:58:06   Main Document
Pg 9 of 49

# OTHER AUTHORITIES

3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private
   Corporations § 790 (1994) ............................................................................................... 15

49 C.F.R. § 573.6(b)-(c) ................................................................................................................ 19

49 C.F.R. §§ 576.5-576.6 .............................................................................................................. 19

49 C.F.R. §§ 577.5(a) .................................................................................................................... 19

49 C.F.R. § 577.7(a) ...................................................................................................................... 19

49 C.F.R. § 579.21 ......................................................................................................................... 19

Restatement (Third) of Agency § 5.03 cmt. b ............................................................................... 15

Restatement (Third) of Agency § 5.03 cmt. c ............................................................................... 17

The State of Arizona *ex rel.* Mark Brnovich, the Attorney General*,* submits this No Strike

Pleading in accordance with paragraph 12(c) of this Court's Judgment dated June 1, 2015.  For

the reasons stated herein, the State submits that the Sale Order neither does, nor properly could,

enjoin any of the claims or allegations in the *Arizona* action.[1]

## I.    INTRODUCTION

The *Arizona* action is a law enforcement action for civil penalties and injunctive relief

against General Motors LLC ("New GM") that brings legal claims based exclusively on New

GM's independent violations of the Arizona Consumer Fraud Act, A.R.S. § 44-1521, *et seq*.

The *Arizona* action seeks to hold New GM liable for only its own acts and omissions after this

Court approved the 363 Transaction[2] and New GM began operations on July 10, 2009.   The

*Arizona* action does not seek to recover damages to consumers resulting from the actions or

conduct of General Motors Corporation ("Old GM") and therefore is not subject to this Court's

Sale Order bar on claims against New GM arising from or related to the conduct of Old GM.

Accordingly, under the logic of this Court's Decision, the *Arizona* action consists exclusively of

Independent Claims, and should be permitted to proceed without amendment.

Plaintiff alleges that New GM is liable for civil penalties as a result of its post-July 10,

2009 conduct due to its decisions to (i) conceal the existence of the many known defects

---

[1] The "*Arizona* action" is *State of Arizona v. General Motors LLC,* No. CV2014-014090
(Maricopa County Superior Court, Arizona), and a copy of the Complaint is attached as Exhibit
A.

[2] The term "363 Transaction" refers to the sale of Old GM's assets to New GM pursuant to
11 U.S.C. § 363, as effectuated by this Court's July 5, 2009 Sale Order.  Capitalized terms used
but not defined herein shall have the meanings ascribed to them in this Court's *Decision on
Motion to Enforce Sale Order,* entered on April 15, 2015, ("Decision"), and reported as *In re
Motors Liquidation Co.,* 2015 Bankr. LEXIS 1296 (Bankr. S.D.N.Y. Apr. 15, 2015).

plaguing an astounding number of models and years of GM-branded vehicles;[3] (ii) maintain a corporate culture that valued cost-cutting over safety and actively discouraged New GM personnel from flagging or addressing safety issues; and (iii) falsely market its brand and its vehicles as safe and reliable. *See, e.g.,* ¶¶ 8-10.[4] The State's claim for violations of the Arizona Consumer Fraud Act targets New GM's conduct in creating safety defects, concealing known safety defects, and falsely marketing its vehicles as safe and reliable. ¶¶ 494-511.

Simply put, the State's claims arose after the 363 Transaction, and are based solely on the post-Sale conduct of New GM. The State's legal claims are therefore Independent Claims under the logic of this Court's Decision. In fact, the claims do not fall properly within the category of claims barred or released by the Sale Order. Moreover, as a matter of law, the Sale Order cannot bar claims based solely on the conduct of the non-debtor New GM that did not arise until ***after*** the 363 Transaction. There is no precedent for providing immunity for future wrongdoing to a purchaser in a 363 transaction—no matter how much more enticing that would make the offer of sale—and no court has the subject matter jurisdiction to grant such immunity. Accordingly, the State's claims are not subject to the injunction in the Sale Order.

The State is not alone in its belief that New GM violated the law. Indeed, New GM has conceded as much by entering into a Consent Order with the National Highway Safety Administration ("NHTSA"), in which it "admits that it violated the Safety Act by failing to provide notice to NHTSA [of the ignition switch defects] … within five working days as

---

[3] The term "GM vehicles" (or "GM-branded vehicles") is used in the Complaint as a generic term for GM vehicles—regardless of whether they were sold by Old GM or New GM. In either case, the *Arizona* action seeks to impose liability only on New GM for its own, post-Sale Order conduct.

[4] References preceded by "¶" are to the paragraphs of the *Arizona* Complaint, attached hereto as Ex. A.

required by" the Act and applicable regulations.[5]  The Department of Justice has also reportedly

found evidence of criminal wrongdoing by New GM in connection with its cover-up of the

ignition switch defect.[6]  Surely New GM can be held liable for its own violations of Arizona law.

Finally, this Court should reject New GM's argument that the mere mention of Old GM

or pre-bankruptcy events somehow renders the *Arizona* Complaint improper (in whole or in

part).  By its own terms, the Sale Order enjoins legal ***"claims,"*** or causes of action—and not

factual allegations.  In fact, the pre-Sale conduct alleged in the Complaint involved Old GM

personnel that New GM employed in the same or similar capacities.  Hence, just as employees'

knowledge acquired in the scope of their employment was imputed to Old GM under Arizona

law, it was also imputed to New GM because New GM elected to employ them.  When New GM

chose to maintain dozens of Old GM employees who were aware of the Ignition Switch Defect

and "relatively senior in position,"[7] those employees carried that knowledge into New GM.  The

*Arizona* Complaint concerns, in part, New GM's failure to act on that knowledge, and its failure

to act on additional information it learned.  The State's legal claims arise solely from New GM's

---

[5] *See* Consent Order at 4 (available at
http://www.nhtsa.gov/staticfiles/communications/pdf/May-16-2014-TQ14-001-Consent-
Order.pdf).  The "Safety Act" refers to the National Traffic Vehicle and Motor Vehicle Safety
Act, 49 U.S.C. § 30101, *et seq.,* as amended by the Transportation Recall, Enhancement,
Accountability and Documentation Act (the "TREAD Act").  In Section 6.15 of the Sale
Agreement through which it acquired substantially all of the assets and assumed certain
responsibilities of Old GM, New GM agreed to abide by all Safety Act obligations with respect
to vehicles and parts manufactured by Old GM.

[6] *See, e.g., "G.M. Inquiry Said to Find Criminal Wrongdoing,"* N.Y. Times (May 22, 2015)
(available at http://www.nytimes.com/2015/05/23/business/gm-inquiry-said-to-find-criminal-
wrongdoing.html?_r=0); *GM CEO Says She's Been Interviewed in Ignition Switch Probe*,
Associated Press (June 10, 2015) (available at http://www.latimes.com/business/la-fi-hy-gm-
barra-20150609-story.html).

[7] *In re Motors Liquidation Co.*, 2015 Bankr. LEXIS 1296, at *111 n.154.

conduct, and the propriety of the action should not turn on whether or how often the term "Old

GM" appears in the Complaint or on whether the New GM employees with knowledge of

dangerous defects had previously worked for Old GM.

In sum, the *Arizona* action has been delayed long enough and should now proceed in

Arizona state court.[8]

## II.   BACKGROUND

### A.   The State's claims target only New GM's post-Sale misconduct.

The State commenced the *Arizona* action against New GM on November 19, 2014,

seeking an injunction, civil penalties and profit disgorgement from New GM as a remedy for

New GM's misleading misrepresentations to Arizona consumers concerning the safety and

reliability of certain of its vehicles, the integrity of the New GM brand, and New GM's alleged

concealment of defects in certain GM-branded vehicles or parts.

As the Complaint alleges, after the 363 Transaction, "New GM repeatedly proclaimed

that it was a company committed to innovation, safety and maintaining a strong brand." ¶ 6, ¶¶

35-78.  New GM made these misrepresentations in order "to boost vehicle sales while knowing

---

[8] The State is mindful of this Court's admonition that "the No Strike Pleading shall not
reargue issues that were already decided by the Decision and Judgment." Judgment, ¶ 12(c).
But the State also notes the Court's statement in the Decision that, apart from the claims of the
Pre-Closing Accident Plaintiffs," the "matters now before the Court" and addressed by the
Decision "involves only *economic losses* allegedly sustained with respect to Old GM vehicles or
parts." *In re Motors Liquidation Co.*, 2015 Bankr. LEXIS 1296 at *7 n.4 (emphasis in original);
*see also id.* at *11 n.8 (noting that briefs were filed on behalf of personal injury and "Economic
Loss Plaintiffs" only).  The State's claims, of course, do not seek "economic losses" of any sort,
let alone "losses sustained with respect to Old GM vehicles or parts."  Instead, the State's law
enforcement claims seek civil penalties, profit disgorgement and injunctive relief based solely on
New GM's post-Sale acts and omissions.  The State does not believe that this Court has yet
decided the issues addressed herein given the unique circumstances of the *Arizona* action and the
arguments asserted herein.

- 4 -

that millions of GM-branded vehicles, across numerous models and years, were plagued with serious and concealed safety defects." ¶ 79.

In reality, New GM failed to disclose, and affirmatively concealed, both its own systemic devaluation of safety[9] and a staggering and ever-growing number of safety defects in GM-branded vehicles. ¶ 115. The Complaint further alleges that New GM's systematic concealment of safety defects was deliberate:

> The available evidence shows a consistent pattern: New GM learned about a particular defect, and, often only at the prodding of regulatory authorities, "investigated" the defect and decided upon a "root cause." New GM then took minimal action—such as issuing a carefully-worded "Technical Service Bulletin" to its dealers, or even recalling a limited number of the vehicles with the defect. All the while, the true nature and scope of the defects were kept under wraps, vehicles affected by the defects remained on the road, New GM continued to create new defects in new vehicles, and New GM enticed consumers to purchase its vehicles by touting the safety, quality, and reliability of its vehicles, and presenting itself as a manufacturer that stands behind its products. [¶ 122.]

Now the truth has come out, as (i) New GM was forced to disclose scores of serious defects in a series of recalls affecting over 27 million GM-branded vehicles (*see* ¶¶ 64-461 (describing many of the defects, and explaining that New GM was aware of them prior to 2014 but chose to conceal them)); (ii) information about New GM's systemic de-valuation of safety and active discouragement of personnel who might otherwise flag safety issues has been publicized in a report by Anton Valukas commissioned by New GM (*see* ¶¶ 82-112); and (iii) in a Consent Order with NHTSA, New GM admitted that it had violated its legal obligations to promptly disclose the existence of known safety defects (¶ 85). As a result of the revelation of

---

[9] *See, e.g.,* ¶¶ 82-114.

New GM's fraudulent omissions and misrepresentations, and New GM's extreme mishandling of safety issues, the value of **all** GM-branded vehicles sold after New GM's inception has diminished. ¶¶ 10, 23.

### B. The State claims that New GM independently violated the Arizona Consumer Fraud Act.

The State's Complaint asserts only claims against New GM solely for its post-Sale violations of the Arizona Consumer Fraud Act. The Complaint alleges that "New GM's false representations and/or omissions concerning the safety and reliability of its vehicles, and its concealment of a plethora of known safety defects plaguing its vehicles and its brand, caused Arizona residents to purchase GM-branded vehicles under false pretenses." ¶ 22. The Complaint asserts that this conduct of New GM violated A.R.S. § 44-1522(A), which declares unlawful:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

*See* ¶¶ 497-498. As the Complaint makes clear, the unlawful practices at issue are those committed by New GM "in connection with the sale and lease of GM-branded vehicles on or after July 11, 2009." *Id.* ¶ 498; *see also id.* ¶ 503. The claims necessarily arise exclusively from the alleged acts and omissions of New GM, and did not accrue until after the Sale Order. Likewise, in the Prayer for Relief, all the remedies are targeted at New GM's conduct, as the State seeks (A) to enjoin New GM from engaging in **its own** unlawful acts and practices as alleged in the Complaint; (B) an Order that New GM disgorge its profits or gains from **its own**

- 6 -

unlawful practices; and (C) an Order that New GM pay penalties for each of *its own* willful

violations of the Consumer Fraud Act.  Ultimately, there are two possible results in the Arizona

Action:  (i) New GM is found to have itself used deceptive, fraudulent and/or unfair acts or

practices in violation of the Arizona Consumer Fraud Act, and is therefore subject to civil

penalties (if its acts are found willful), disgorgement of its wrongful gains and injunctive relief;

or (ii) New GM is found not to have violated the Arizona Consumer Fraud Act, and New GM

therefore prevails.  The *Arizona* Complaint simply cannot be read as an effort to hold New GM

liable for the conduct of Old GM—under a successor liability theory, a "transferee" theory, or

any other theory.

## III.    ARGUMENT

**A.    On its face, the Sale Order does not bar the State's claims based on New GM's violations of its own independent legal duties.**

The Sale Order has no application to the State's claims against New GM for New GM's

post-Sale violations of Arizona's Consumer Fraud Act.  The claims do not attempt to hold New

GM liable for the conduct of Old GM.  Under the plain language of the Sale Order, and the logic

of this Court's Decision, the State's claims against the non-debtor New GM are Independent

Claims that should proceed in Arizona state court without further impediment.

New GM has argued that it is has no liability for at least certain of the State's claims

under paragraph 46 of the Sale Order, which reads as follows:

> Except for the Assumed Liabilities expressly set forth in the [Sale
> Agreement], *... [New GM] ... shall [not] have any liability for
> any claim that arose prior to the Closing Date, relates to the
> production of vehicles prior to the Closing Date, or otherwise is
> assertable against [Old GM] . . . prior to the Closing Date*. ...
> Without limiting the foregoing, *[New GM] shall not have any
> successor, transferee, derivative, or vicarious liabilities of any*

> **kind or character for any claims, including, but not limited to,
> under any theory of successor or transferee liability, de facto
> merger or continuity … and products . . . liability, whether
> known or unknown as of the Closing, now existing or hereafter
> arising, asserted or unasserted, fixed or contingent, liquidated or
> unliquidated.** [Emphasis added.]

The State's claims did not arise prior to the Closing Date of the 363 Transaction, as the conduct

of New GM about which the State complains had not yet occurred. Nor do the claims "relate[]

to the **production** of vehicles prior to the Closing Date"—the State does not seek to hold New

GM liable for the "production" of any vehicles prior to the Sale date, but rather for its own post-

Sale misconduct. Finally, the State's claims were never "assertable against Old GM," as they are

based on the conduct of New GM and did not arise until **after** Old GM ceased to exist.

Paragraph 46 cannot be read to bar the State's claims.

New GM also claims immunity from some or all of the State's claims based on the

injunction in the Sale Order, but that injunction cannot be read to bar the State's claims. Under

the injunction:

> [A]ll persons and entities … holding liens, claims, encumbrances,
> and other **interests of any kind or nature whatsoever, including
> rights or claims based on any successor or transferee liability,
> against [Old GM] or the Purchased Assets** (whether legal or
> equitable, secured or unsecured, matured or unmatured, contingent
> or noncontingent, senior or subordinated), **arising under or in any
> way relating to, [Old GM], the Purchased Assets, the operation of
> the Purchased Assets prior to the Closing . . . are forever barred,
> estopped, and permanently enjoined . . . from asserting against
> [New GM] . . . such persons' or entities' liens, claims,
> encumbrances, and other interests, including rights or claims
> based on any successor or transferee liability.**

Sale Order, ¶ 8 (emphasis added).

010440-13 785617 V1

Once again, the State does not assert any claims based on successor or transferee liability, and its legal claims neither "arise under" nor are "related to" the conduct of Old GM. While the Complaint contains factual allegations pre-dating the existence of Old GM, the State's legal claims arise solely from New GM's own post-Sale misconduct. The injunction cannot be read as providing New GM with immunity for its future misconduct, and has no application to the State's claims.

## B.      The Bankruptcy Court did not have jurisdiction to provide New GM with immunity for its own post-Sale violations of its own independent legal obligations.

If the Sale Order had purported to enjoin claims against New GM for its own post-Sale conduct, such an injunction would extend beyond the jurisdiction of the bankruptcy court. Subject matter jurisdiction in a bankruptcy proceeding over third-party claims (such as the non-derivative claims of the State) can extend only to actions affecting the *res* of the bankruptcy estate. *In re Johns-Manville Corp.*, 517 F.3d 52, 66-68 (2d Cir. 2008), *rev'd on other grounds sub nom., Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009) (holding that, despite a "common nucleus of operative facts involving" the debtor and the insurer, bankruptcy order enjoining actions unrelated to the *res* of the estate are outside the scope of the bankruptcy court's injunction power). The Sale Order cannot properly bar the *Arizona* action.

While a bankruptcy court assuredly has jurisdiction to interpret and enforce its own 363 transaction orders, that ancillary jurisdiction exists only to the extent that the court has the jurisdiction to enter the 363 transaction order itself. *See Zerand-Bernal Grp. v. Cox*, 23 F.3d 159, 164 (7th Cir. 1994) (affirming the bankruptcy court's holding that it "lacked jurisdiction" to enjoin a post-363 transaction claim against a non-debtor: "[T]he fact that the bankruptcy court, in the order approving the bankruptcy sale and later in the plan of reorganization, purported

- 9 -

expressly to assume jurisdiction … could not confer jurisdiction. A court cannot write its own jurisdictional ticket."); *see also In re Johns-Manville Corp.*, 517 F.3d at 65 n.22 ("The ancillary jurisdiction courts possess to enforce their own orders 'is itself limited by the jurisdictional limits of the order sought to be enforced.'").

This Court did not have subject matter jurisdiction to protect the non-debtor New GM by limiting the rights of the State to bring suit against New GM for New GM's own post-Sale misconduct in breach of New GM's own independent legal duties. Subject matter jurisdiction of bankruptcy courts is limited to "civil proceedings arising under Title 11, or arising in or related to cases under Title 11." 28 U.S.C. § 1334(b). Because the State's claims are based solely on the non-debtor New GM's post-sale conduct, the claims cannot be said to "arise in" or "under" Title 11. *See Zerand-Bernal Grp*, 23 F.3d at 162 ("arising under" jurisdiction "is limited to questions that arise during the bankruptcy proceeding and concern the administration of the bankrupt estate, such as whether to discharge a debtor"). And the State's claims are not "related to" Title 11, since the outcome of the *Arizona* action can have no conceivable effect on the bankrupt estate. *See In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992); *see also In re Quigley Co., Inc.*, 676 F.3d 45, 61-62 (2d Cir. 2012) (bankruptcy court lacks jurisdiction to enjoin a claim against a third party where such claim would not have an effect on the *res* of the bankruptcy estate), *cert. denied*, 133 S. Ct. 2849 (2013).

This Court should reject any argument that New GM should get immunity for its own post-Sale misconduct because immunity for the non-debtor increases the value of the estate. That a broad injunction against future claims against a purchaser might result in a buyer paying a higher price for assets in a 363 transaction is pure speculation, and in any event cannot confer

- 10 -

jurisdiction over future claims against the purchaser arising from its independent misconduct. *See Zerand-Bernal Grp.*, 23 F.3d at 164 (rejecting the argument that bankruptcy courts may immunize a purchaser from state or federal law in the interests of increasing the value of a debtor's assets).  As the *Zerand-Bernal Grp.* court reasoned, the argument that "the price received in a bankruptcy sale will be lower if a court is free to disregard a condition in the sale agreement enjoining claims against the purchaser based on the seller's misconduct" should be rejected because it "proves too much":

> It implies, what no one believes, that by virtue of the arising-under jurisdiction a bankruptcy court enjoys a blanket power to enjoin all future lawsuits against a buyer at a bankruptcy sale in order to maximize the sale price; more, that the court could in effect immunize such buyers from all state and federal laws that might reduce the value of the assets bought from the bankrupt[.][10]

There is no sound reason to encourage non-debtors to pay a purchase price in a 363 transaction that reflects a belief that they are forever immunized from liability for breaches of their ***own*** independent legal duties.

Thus, as the Second Circuit reiterated in *In re Johns-Manville Corp.*, 600 F.3d 135, 153 (2d Cir. 2010), bankruptcy courts do not have jurisdiction to enjoin "claims against non-debtor third parties" where those claims are based on the non-derivative misconduct of the non-debtor and the claims do not impact the bankruptcy estate.  *See also, e.g., In re 1031 Tax Grp., LLC*, 2011 U.S. Dist. LEXIS 33755, at *7 (S.D.N.Y. Mar. 29, 2011) ("federal courts are without jurisdiction to enjoin actions against third-parties not in bankruptcy when those actions are premised upon an 'independent legal duty'").  Here, again, the State's law enforcement claims

---

[10] *Zerand-Bernal Grp.*, 23 F.3d at 163 (citation omitted).

- 11 -

are based on New GM's fraudulent concealment of the scores of defects plaguing GM-branded

vehicles; New GM's culture, which systematically devalued safety; and New GM's

misrepresentations concerning the safety and reliability of GM-branded vehicles—all in violation

of New GM's independent legal duties.  A Bankruptcy Court simply does not have jurisdiction to

enjoin such claims.

Accordingly, to the extent New GM claims that the Sale Order bars the claims in the

*Arizona* Complaint, New GM asks this Court to exercise jurisdiction that it does not have.

**C.  The fact the *Arizona* Complaint contains factual allegations about Old GM does not mean that the claims in the Complaint are based on the conduct, cars or parts of Old GM.**

**1.  The Sale Order enjoins legal "claims," *not* factual allegations.**

New GM has advanced the facile argument that any factual allegations concerning Old

GM and events that occurred prior to the bankruptcy automatically are improper under the Sale

Order.  But this Court has at least implicitly rejected that argument by holding that the Economic

Loss Plaintiffs can assert "claims involving Old GM vehicles and parts so long as they were

basing their claims *solely on New GM conduct*, and not based on any kind of successor liability

or any other act by Old GM."  *In re Motors Liquidation Co.*, 2015 Bankr. LEXIS 1296, at *22.

It is hard to envision how such a legal claim could be pled without at least mentioning that the

vehicle at issues was manufactured by Old GM.  It simply cannot be that the mere mention of

Old GM is improper.

Indeed, the Sale Order and Sale Agreement speak of legal "claims" being enjoined, ***not***

allegations.  *See supra* at 7-8 (discussing relevant provisions of Sale Order and Sale Agreement).

So it is not enough for New GM to simply point to the mention of Old GM (or pre-Sale events)

in the Complaint.   Rather, New GM must explain how it is that the State's assertion of law

- 12 -

enforcement claims against New GM for its own alleged violations of the Arizona Consumer Fraud Act are somehow claims based on the conduct of Old GM. Because New GM has not and cannot do so, the mention of Old GM cars and past events cannot be said to run afoul of the Sale Order or the Sale Agreement.

>   **2.      The Complaint's factual allegations concerning pre-bankruptcy events are proper, since (a) New GM has knowledge of pre-bankruptcy information because its employees had knowledge of that information; and (b) pre-bankruptcy events provide context for New GM's alleged misconduct.**

As New GM ignores in challenging the propriety of the *Arizona* action under the Sale Order, the law in Arizona and elsewhere broadly imputes an employee's knowledge to its corporate employer where, as here, the employees are acting in the scope of their employment. Significantly, each of the 24 Old GM employees that this Court found to be aware of the Ignition Switch Defect remained at New GM because New GM chose to keep them. As there is no reason to suppose those employees lost their knowledge of the defects on the day Old GM became New GM, their knowledge is imputed to New GM, as is the knowledge of all other New GM employees acting within the scope of their employment. To impute the knowledge of those employees to New GM is not a successor liability claim. If New GM hadn't elected to retain Old GM's employees, the knowledge of those employees would not be imputed to New GM. And if New GM or those employees had acted appropriately upon their hiring by New GM to address (rather than conceal) the known problems, New GM would not have liability.

New GM's knowledge of the Ignition Switch Defect and a host of other defects is, of course, highly relevant to the State's claims against New GM. Moreover, because of New GM's continuing obligations under the Safety Act, the Company was under a duty to (i) continue to monitor all GM vehicles that were on the road, and (ii) maintain the many records it was required

to generate in connection with actual or potential safety issues.  Because of this, the actual

number of New GM personnel with knowledge of the defects and safety issues in Old GM

vehicles is far greater than the 24 found by this Court.  The State's claims against New GM are

properly premised, in part, on the knowledge of the dozens of personnel that New GM employed

who were aware of the defects and safety issues in Old GM vehicles.  That fact accounts for

nearly all of the allegations in the *Arizona* Complaint that concern events that pre-date the

existence of New GM.  The few remaining allegations concerning pre-bankruptcy facts are in the

Complaint to provide context.  None of those allegations can possibly be used to hold New GM

liable for the actions of Old GM.

> **a.**     **An employee's knowledge of facts learned in the scope of her**
> **employment is broadly imputed to the corporate employer.**

Knowledge of the ignition switch defects and other pre-bankruptcy defects was wide-

reaching and extensive within Old GM—and therefore New GM—including among Old GM's

in-house counsel, management, and lead design engineers (most or all of whom stayed on at

New GM).  Under Arizona agency principles, the knowledge of these employees and counsel is

imputed to Old GM because knowledge acquired by an agent in the scope of her employment is

imputed to the principal.  *S Dev. Co. v. Pima Capital Mgmt.* 31 P.3d 123, 133 (Ariz. Ct. App.

2001); *Manley v. Ticor Title Ins. Co. of Cal.*, , 816 P.2d 225, 229 (1991) (same); *Fridena v.

Evans*, 622 P.2d 463, 466 (Ariz. 1980) ("a corporation is bound by the knowledge acquired by,

or notice given to, its agents or officers which is within the scope of their authority and which is

in reference to a matter to which their authority extends"); *Cameron v. Shuttleworth*, 251 P.2d

659, 661 (Ariz. 1952) ("A person has notice of a fact if he or his agent knows the fact, has reason

to know it, should know it, or has been given a notification of it" (citing RESTATEMENT (FIRST)

- 14 -

OF AGENCY § 9 (1933)).  The law on these issues is substantially the same across the law of

Michigan (where New GM is based), Delaware (where it was incorporated), and New York

(most frequently analyzed before the Bankruptcy Court), and therefore the law applicable in all

of these potentially relevant jurisdictions is also discussed herein.[11]

As discussed *infra* at 16-18, knowledge of the Ignition Switch Defect was widespread

and communicated throughout New GM.  But even if that were not the case, employees'

knowledge acquired within the scope of their employment is imputed to the corporation even if it

is never communicated.  *Cameron v. Shuttleworth*, 251 P.2d at 662 (finding notice imputed to

principal even where agent does not relay the notice to principal); *see also Kirschner v. KPMG*

*LLP*, 938 N.E.2d 941, 950-51 (N.Y. 2010) (applying legal presumption that agents communicate

information to principals).[12]  The employee's knowledge will be imputed to his employer even if

employees fail to properly report their knowledge to senior management because of negligence,

omissions, or general organizational incompetence.  *S Dev. Co.*, 31 P.3d at 133-34 (holding

general rule of imputed knowledge applies even in negligent nondisclosure or fraud case because

focus is defendant's improper actions in light of the knowledge he possesses).  Courts impose a

---

[11] *N.Y. Marine & Gen. Ins. Co. v. Tradeline L.L.C.,* 266 F.3d 112, 122 (2d Cir. 2001); *Allard v. Arthur Andersen & Co. (USA)*, 924 F. Supp. 488, 494-95 (S.D.N.Y. 1996) (applying New York and Michigan law to impute the knowledge and conduct of corporate officials acting within the scope of their employment); *see also Link v. Wabash R.R. Co.*, 370 U.S. 626, 633-34 (1962) ("[E]ach party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.") (citation omitted), *reh'g denied*, 371 U.S. 873 (1962); *Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994) ("[U]nder traditional principles of agency the attorney's knowledge must be imputed to [the client].").

[12] *See also* 3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 790 (1994) (noting that it has been widely held that a corporation is charged with imputed knowledge "even though the officer or agent does not in fact communicate the knowledge to the corporation"); Restatement (Third) of Agency § 5.03 cmt. b ("A principal may not rebut imputation of an agent's notice of a fact by establishing that the agent kept silent.").

- 15 -

conclusive presumption that the agent has discharged his duty to impart to the principal all the

knowledge which is necessary for the principal's protection or guidance. *First Ala. Bank of

Montgomery, N.A. v. First State Ins. Co.*, 899 F.2d 1045, 1061 n.8 (11th Cir. 1990). These legal

presumptions are intended "to avoid the injustice which would result if the principal could have

an agent conduct business for him and at the same time shield himself from the consequences

which would ensue from knowledge of conditions or notice of the rights and interests of others

had the principal transacted his own business in person." *Id.* Similarly, principals may not

benefit from the inequitable conduct of their agents. *Queiroz v. Harvey*, 205 P.3d 1120, 1122

(Ariz. 2009) (recognizing that innocent third party must be protected, rather than the principal

who has retained an unscrupulous agent on whom he has relied); *see also S Dev. Co.*, 31 P.3d at

133-34 (holding principal vendor charged with knowledge of plumbing defect in apartment

complex known to its agents in action alleging fraud and nondisclosure).

> **b.    The knowledge of GM personnel who worked at *both* Old and New
> GM is properly imputed to New GM.**

Here, many GM attorneys, managers, lead engineers, and other personnel who worked at

both Old and New GM acquired knowledge of the Ignition Switch Defect while performing their

duties, using systems and procedures that Old and then New GM maintained to comply with

Safety Act obligations. As this Court found, "at least 24 Old GM personnel …, including

engineers, senior managers, and attorneys, were informed or otherwise aware of the Ignition

Switch Defect prior to the Sale motion," and, based on that knowledge, Old GM should have

conducted a recall prior to the 2009 bankruptcy. *See In re Motors Liquidation Co.*, 2015 Bankr.

LEXIS 1296, at *16. In reaching this conclusion, the Court effectively rejected New GM's

arguments that only a "limited" number of Old GM personnel were aware of the ignition switch

defect, or that only Old GM's low- or mid-level employees knew of the defect.[13]

Because almost all of the Old GM employees involved in the ignition switch debacle and

the other safety issues involved in the State's case were employed by New GM, and generally

held the same positions at both companies, New GM can be charged with its employees'

knowledge of pre-bankruptcy information.  Indeed, as this Court noted, *all* of the 24 Old GM

employees with knowledge of the Ignition Switch Defect worked for New GM.  *In re Motors*

*Liquidation Co.*, 2015 LEXIS 1296, at *54.  And New GM does not dispute that Old GM

---

[13] In any event, an employee's position within the corporate hierarchy is irrelevant or purposes of imputation, so long as she obtained the knowledge while acting within the scope of her authority.  *See Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1369-70 (Fed. Cir. 2013) (reversing holding that employees were insufficiently senior in the corporate hierarchy for their actions and knowledge to be imputed), *cert. denied*, 135 S. Ct. 167 (2014); *Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 126-27 (E.D.N.Y. 2011) (imputing authorized Maytag repairman's knowledge of oven's defects and of attempts to conceal the defects to Maytag, where repairmen obtained this knowledge in the course of repairing Maytag ovens). And a corporation is charged with the collective knowledge of all of its employees even if no single individual possessed all of the relevant knowledge or was individually responsible for acting on it.  *See Copeman Labs. Co. v. Gen. Motors Corp.*, 36 F. Supp. 755, 762 (E.D. Mich. 1941) ("The knowledge possessed by a corporation about a particular thing is the sum total of all the knowledge which its officers and agents, who are authorized and charged with the doing of the particular thing acquire, while acting under and within the scope of their authority."); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 Del. Ch. LEXIS 133, at *39 (Del. Ch. Aug. 26, 2005) ("Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal."); Restatement (Third) of Agency § 5.03 cmt. c. ("Organizations are treated as possessing the collective knowledge of their employees and other agents, when that knowledge is material to the agents' duties, however the organization may have configured itself or its internal practices for transmission of information.").  The Michigan Supreme Court applied this "imputed collective knowledge" standard in *Upjohn Co. v. New Hampshire Ins. Co.*, 476 N.W.2d 392 (Mich. 1991), *reh'g denied*, 503 N.W.2d 442 (Mich. 1991), where it considered an insurance claim for damages from the continuous leaking of toxic materials from a corroded underground storage tank, which was regularly monitored by the plaintiff corporation's employees.  476 N.W.2d at 395-96.  The court held that information available to the corporation, "through its various employees and through its records," permitted a finding that the corporation had expected the leak, and *refused* to ignore knowledge obtained by individual employees, even if they could not comprehend its full import.  *Id.* at 400-01.

- 17 -

personnel knew enough as of the time of Old GM's June 2009 bankruptcy filing for Old GM then to have been obligated to conduct a recall of the affected vehicles under the Safety Act. *Id.* at *54-55.

Under the logic of this Court's ruling and under established Arizona law, the pre-bankruptcy knowledge of employees who worked first at Old GM and then at New GM is imputed to New GM. This Court based its conclusion in part on the fact that Old GM—and later New GM—engineers, senior managers, and attorneys who knew of the Ignition Switch Defect were part of "a group large in size and relatively senior in position." *In re Motors Liquidation Co.*, 2015 Bankr. LEXIS 1296, at *111 n.154. In this Court's opinion, "a group of this size is sufficient for the Court to conclude that a 'critical mass' of Old GM personnel had the requisite knowledge—*i.e.*, were in a position to influence the noticing process." *Id.* (citing *cf. Weisfelner v. Fund 1 (In re Lyondell Chemical Co.),* 503 B.R. 348, 389 (Bankr. S.D.N.Y. 2014) (Gerber, J.)). Necessarily, given the presence of this same "critical mass" at New GM, New GM had knowledge of the Ignition Switch Defect from day one after the 363 Transaction. The same conclusion would follow if New GM had cleaned house and hired a group of engineers, senior managers, and attorneys from a rival car company, and that group happened to be aware (or became aware) of the Ignition Switch Defect in Old GM vehicles. The fact that the key employees previously worked at Old GM cannot immunize New GM from the consequences of its failure to act appropriately on the information its employees possessed.[14]

---

[14] The same is true with respect to the other pre-bankruptcy defects discussed in the Complaint. But for the purposes of this pleading the State notes that if it cannot prove New GM's awareness (or imputed awareness) of one or more of the defects, then those defects will fall out of the case. In no circumstances would (or could) the State prove that New GM violated the Consumer Fraud Act based on the conduct of Old GM.

- 18 -

The State's argument on imputation is bolstered by the fact that New GM had ongoing obligations under the Safety Act to monitor GM-branded vehicles on the road, to make quarterly reports to NHTSA, and to maintain all relevant records for five years.[15]  The Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including incidents involving death or injury, claims relating to property damage received by the manufacturer, warranty claims paid by the manufacturer, consumer complaints, and field reports prepared by the manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues.  49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.  Manufacturers must retain for five years all underlying records on which the early warning reports are based and all records containing information on malfunctions that may be related to motor vehicle safety.  49 C.F.R. §§ 576.5-576.6.

The Safety Act further requires ***immediate*** action when a manufacturer determines or should determine that a safety defect exists.  *United States v. Gen. Motors Corp.*, 574 F. Supp. 1047, 1050 (D.D.C. 1983).  Within five days of learning about a safety defect, a manufacturer *must* notify NHTSA and provide a description of the vehicles potentially containing the defect, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related.  49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c).  Then, "within a reasonable time"[16] after deciding that a safety issue exists, the manufacturer must notify the owners of the defective vehicles.  49 C.F.R. §§ 577.5(a), 577.7(a), 49 U.S.C. § 30165(a)(1).

---

[15] New GM explicitly assumed this duty with respect to Old GM cars and parts in § 6.15 of the Sale Agreement.

[16] 49 C.F.R. § 577.7(a) was updated, effective October 11, 2013, to replace "within a reasonable time" to "no later than 60 days" from the filing of the NHTSA notification.

- 19 -

Old and New GM used several processes to identify safety issues, including the TREAD
database and Problem Resolution Tracking System ("PRTS").  *See* Valukas Report at 282-313
(available at http://www.nhtsa.gov/staticfiles/nvs/pdf/Valukas-report-on-gm-redacted.pdf).  The
TREAD database, used to store the data required for the quarterly NHTSA early warning reports,
was the principal database used by Old and New GM to track incidents related to GM-branded
vehicles.  *Id.* at 306.  The database included information from (i) customer service requests; (ii)
repair orders from dealers; (iii) internal and external surveys; (iv) field reports from employees
who bought GM-branded vehicles and from Captured Test Fleet reports;[17] (v) complaints from
the OnStar call center; and (vi) a database maintained by GM legal staff to track data concerning
complaints filed in court.  *Id.*  A TREAD reporting team would conduct monthly database
searches and prepare scatter graphs to identify spikes in the number of accidents or complaints
related to various GM-branded vehicles.  *Id.* at 307.  Because the same employees carried out the
TREAD Act obligations at Old and New GM, they not only retained the knowledge acquired
during the days of Old GM—they were in fact required to do so.

Once again, the great majority of the pre-bankruptcy allegations in the Complaint
concern the Ignition Switch Defects and other defects, and are in the Complaint because the Old
GM personnel with knowledge of the defects were employed at New GM;  that knowledge is
imputed to New GM as a matter of law.

---

[17] Captured Test Fleet reports were submitted by employees who were given vehicles and
asked to document any problems that arose while driving.  Valukas Report at 300.  The Quality
Group would review, summarize, and group these reports into categories.  *Id.*

        **c.**      **The remaining allegations concerning Old GM and pre-bankruptcy events provide context for the post-bankruptcy claims arising solely from the independent actions of New GM.**

The remaining allegations concerning Old GM provide context for the *Arizona* action—but none seek to hold New GM liable for Old GM's conduct. So, for example, the Complaint states:

> New GM was incorporated in 2009 and, effective on July 11, 2009, acquired substantially all assets and assumed certain liabilities of General Motors Corporation ("Old GM") through a Section 363 Sale under Chapter 11 of the U.S. Bankruptcy Code.

¶ 29. By pointing out the origins of New GM, the State is not attempting to hold New GM responsible for the actions of Old GM.

To take just one more example, in its discussion of how New GM's focus on cost-cutting negatively impacted the safety of GM-branded vehicles, the State alleges that "From the date of New GM's inception in 2009, [the Company's TREAD database] has been the principal database used by New GM to track [safety] incidents related to its vehicles." ¶ 91. The New GM employees charged with monitoring the TREAD database were known as the "TREAD Reporting team." ¶ 90. The State further alleges that New GM "starv[ed] the TREAD Reporting team of the resources it needed to identify potential safety issues" and thereby "helped to ensure that safety issues would not come to light." ¶ 94. By way of context, the Complaint explains that—while at one point pre-bankruptcy "the TREAD Reporting team had eight employees who would conduct monthly searches and prepare scatter graphs to identify spikes in accidents or complaints with respect to various GM-branded vehicles," New GM used only three TREAD Reporting team employees for its pared-down searches. ¶¶ 92-93. Once again, there is no

- 21 -

reading of these allegations under which New GM could be held liable for the conduct of Old

GM.

## IV.    CONCLUSION

For the reasons stated above, the *Arizona* action should be allowed to proceed forthwith

in Arizona state court.

Dated:  June 16, 2015

*/s/ Steve W/ Berman*
Steve W. Berman (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
Tel.:  206-623-7292
steve@hbsslaw.com

STATE OF ARIZONA
Mark Brnovich, Attorney General
Office of the Attorney General
1275 West Washington Street
Phoenix, Arizona 85006
Telephone:  949-720-1288

*Counsel for the State of Arizona*

010440-13 785617 V1

09-50026-reg  Doc 13214  Filed 06/16/15  Entered 06/16/15 11:58:06  Main Document
Pg 29 of 29

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 16, 2015, I caused the People of the State of Arizona's "No

Strike" Pleading to be filed and served upon all parties receiving notice via the Court's ECF

system.

Dated:  June 16, 2015

*/s/ Steve W/ Berman*
Steve W. Berman (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
Tel.:  206-623-7292
steve@hbsslaw.com

010440-13 785617 V1