

## IN THE CIRCUIT COURT FOR OF TENNESSEE FOR THE
## TWENTY-FIFTH JUDICIAL DISTRICT AT RIPLEY, LAUDERDALE COUNTY

| | |
|---|---|
| WILLIAM GAMBLE, individually and as Parent and Next Friend of M.G., Minor; and BRANDY FENTON, individually and as Parent and Next Friend of L.F., Minor, ) ) ) ) ) | |
| Plaintiffs, ) | |
| v. ) | No. 6737 |
| DOLLY WALTON, individually and as Parent and Next Friend of A.W., a Minor, ) ) ) | |
| Defendant/Cross-Party Plaintiff ) | **FILED** |
| v. ) | AUG 2 5 2014 *SK* |
| GENERAL MOTORS, LLC; and STONERIDGE, INC., d/b/a POLLAK ENGINEERED PRODUCTS, ) ) ) ) | RICHARD JENNINGS CIRCUIT COURT CLERK |
| Cross-Party Defendants. ) | |

### CROSS CLAIM OF DOLLY WALTON

1.      Dolly Walton, as Mother and Next Friend of the minor child, A.W., asserts this third-party and/or cross claim pursuant to Rules 13.07 of the Tennessee Rules of Civil Procedure as follows:

### Summary of Claims

2.      General Motors ("GM") is one of the largest care and truck manufacturers in the United States.  It is designed and manufactured the 2006 Pontiac Grand Prix ("Grand Prix") that is at issue in this case, along with over a million other similar cars. All of these cars contained the same safety-related defects.

3.      Years before April Walton's injuries, GM and Stoneridge, Inc. knew about the safety-related defects in the Pontiac Grand Prix, and did nothing to recall or fully

remedy the defects or warn users about them. Rather, GM intentionally, purposely, fraudulently, and systematically concealed the defects from the National Highway Traffic Safety Administration ("NHTSA") and the driving public.

4.    GM's misconduct, fraudulent concealment, and systematic concealments of the safety-related defects, toll the statute of limitations that might otherwise be applicable in this action.

## Parties

5.    Dolly Walton and April Walton are citizens and residents of Dyer County, Tennessee. Dolly Walton is the mother of April, who during all material times and at the time this pleading is filed, is a minor child under 18 years of age with a date of birth of October 16, 1996.

6.    GM is a Delaware limited liability company doing business in all fifty states with its principal place of business in Detroit, Michigan. GM does business in this district and division and maintains its registered agent here as well. GM is the successor corporation to General Motors Corporation ("GMC"), which underwent bankruptcy in 2009. Through that bankruptcy and asset sale from GMC to GM, GM assumed the liabilities of GM as set out herein. GM may be served via its registered agent: Corporation Service Company, 2908 Poston Avenue, Nashville, TN 37203-1312.

7.    Stoneridge, Inc., d/b/a Pollak Engineered Products ("Stoneridge") is an Ohio corporation with its principal places of business in Ohio and Massachusetts. Stoneridge may be served via the Tennessee Secretary of State on its registered agent: C.T. Corporation System, 1300 East Ninth Street, Cleveland, OH 44114.

## Jurisdiction and Venue

8.    GM and Stoneridge are subject to the jurisdiction of and venue in this Court.

## Factual Background

9.      Dolly Walton owned a 2006 Pontiac Grand Prix (VIN No. 2G2WP582461279009) that she purchased in the Fall of 2012.

10.     In the afternoon of March 18, 2013, April Walton was driving her mother's 2006 Pontiac Grand Prix southbound on Tennessee Highway 51. She was wearing her lap/shoulder belt. A cloth wallet hung from the ignition key ring. Two passengers (M.G. and L.F.) were in the car at this time.

11.     While driving through Lauderdale County, Tennessee, the 2006 Pontiac Grand Prix vehicle left the southbound lane of Highway 51 and entered the grass median. At this point, April Walton lost control of the Grand Prix and drove over a culvert. Without power steering or brakes the vehicle crossed over the northbound lanes of Highway 51 and entered the shoulder of the northbound lane before striking a tree trunk where the vehicle and its occupants came to a stop.

12.     Upon and after impact with the tree, the Grand Prix's airbags did not deploy and April Walton and the passengers were seriously injured.

13.     Investigation of the vehicle wreckage found that the ignition key was in the "accessory position."

14.     Because of the nature of the crash, the known safety-related defects in the 2006 Grand Prix caused the ignition key in the Walton car to turn from the "run" to "accessory" position as April Walton drove the car. Once the key turned, the engine shut off. The safety-related defects in the Grand Prix shut off the power steering, and greatly reduced the braking power and function, and disabled the airbags that otherwise would have deployed upon impact and substantially reduced April Walton's injuries.

3

15.     The 2006 Pontiac Grand Prix has safety-related design defects. First, a low torque detent in the ignition switch allows the key to be inadvertently turned from the run to accessory/off position. Second, because of the low position of the key lock module, a driver can inadvertently bump key fob or chain which results in the key turning from run to the accessory/off position. Third, the key sold with the Grand Prix has a slot design which allows the key fob or chain to hang lower on the key and increases the chance of the key inadvertently moving from the run to accessory/off position during ordinary driving maneuvers. The design of the ignition switch, position of the key lock module, and slot design of the key are hereinafter referred to as the "Key System."

16.     In 2001, during the developmental testing of the 2003 Saturn Ion, GM learned that the engines in those cars were stalling due to defects in the Key System. GM chose not to fix the defects.

17.     In February 2002 GM approved the ignition switch design despite warnings from the part's producer Delphi that the part does not meet specifications.

18.     In 2002, GM began manufacturing and selling the 2003 Saturn Ions with the defective Key System. It later began selling Chevrolet Cobalts with the same defective Key System.

19.     Stoneridge is an ignition switch design and manufacturing company and designed the defective ignition switch used in the 2006 Pontiac Grand Prix.

20.     Several years before the manufacture and sale of the 2006 Pontiac Grand Prix, Stoneridge manufactured and supplied to GM for installation in its vehicles including the subject vehicle, ignition switches that failed to meet the minimum torque specified by GM as necessary to turn the ignition from "run" to "accessory."

21.     Despite the failure of its supplies' ignition switches to meet minimum torque specifications, GM personnel made a decision to use ignition switches in many makes and models of its cars, including the 2006 Pontiac Grand Prix, that fell below GM's own mechanical specifications for torque — that is, they required less force to turn the key than the designed had mandated.

22.     Due to this decision, ignition switches were installed in GM vehicles, including the subject 2006 Pontiac Grand Prix, that could fail to keep the car powered in circumstances that drivers could encounter, and could cause moving stalls on the highway and loss of power steering and braking and loss of airbag and seatbelt pretensioners.

23.     The ignition switch used in the subject vehicle manufactured and supplied by Stoneridge contains ignition switch part number P/N10310896 that has torque below GM specifications.

24.     Both GM and Stoneridge knew prior to the manufacture and sale of the subject vehicle that the ignition switch installed in the subject vehicle was defective and unreasonably dangerous due to the low torque necessary to turn the switch from the "run" to the "accessory" position.

25.     Prior to the time GM manufactured and sold the subject 2006 Pontiac Grand Prix at issue in this case, GM personnel, knew that the ignitions switches GM was installing in its vehicles could unintentionally move from the "run" position to the "accessory" or "off" positions due to the low torque necessary to turn the switch.

26.     GM communicated the problem to Stoneridge at least by March 2004, well before the manufacture of the 2006 Pontiac Grand Prix and the accident in this case.

27.     On or about February 26, 2003, the National Highway Transportation Safety Administration ("NHTSA") received the first complaint of unexpected stalling or shutdown in GM cars.

28.     In 2003, GM learned of a customer complaint of intermittent vehicle shut offs in a MY 2003 Grand Am from a Michigan dealership. Despite multiple attempts, the dealership could not duplicate the condition. GM's Brand Quality Manager for the Grand Am personally visited the dealership and requested the customer demonstrate the problem. The customer had an excess key ring and mass (containing approximately 50 keys and a set of brass knuckles), and was able to recreate the shut off upon driving over a speed bump at approximately 30-35 miles mph.

29.     On January 7, 2003 GM opened Problem Resolution Tracking System Inquiry, a GM engineering investigation into the Key System in certain GM models, "PRTS 0084/2003."

30.     On May 22, 2003, GM issued a voicemail to dealerships describing the condition and identifying the relevant population of vehicles as 1999 through 2003 MY Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am. The voicemail directed dealers to pay attention to the key size and mass of the customer's key ring in order to better diagnose the customer's complaint.

31.     On July 24, 2003, Engineering Work Order (EWO) 211722 was initiated to increase the detent plunger force on the ignition switch replacing P/N 22688239 with P/N 22737173. This was a running change made in 2004 to the Malibu, Grand Am and the Alero. The production and service stock disposition for P/N 22688239 was designated "use", so it is possible that P/N 22688239 was used to service vehicles.

32.    In 2004, GM engineers reported that the ignition switch on the Saturn Ion was so weak and so low on the steering column that a driver's knee could easily bump the key and turn off the car.

33.    This defect was sufficiently serious for a GM engineer, in January 2004, as part of GM's vehicle evaluation program, to affirmatively conclude, in writing, that "[t]his is a basic design flaw and should be corrected if we want repeat sales."

34.    In 2004, GM began manufacturing and selling the 2005 Chevrolet Cobalt. The Cobalt was a sister vehicle (essentially the same car with a different badge or name) of the Saturn Ion. As noted, GM installed the same Key System on the 2005 Cobalt as it did on the Saturn Ion.

35.    On March 17, 2004, EWO 317693 was initiated to increase the detent plunger force on the ignition switch on the Grand Prix in order to maintain commonality between the Grand Prix and the Malibu, Grand Am and the Alero. The old Grand Prix part number, P/N 10310896 was not changed to a new part number when the detent plunger force was changed. Rather P/N 10310896 remained the part number for the new ignition switch, effectively concealing that a change had been made. The service stock disposition was designated "use", and it is likely that the old switch continued to be used.

36.    On October 29, 2004, around the time of GM's market launch of the 2005 Cobalt, Gary Altman — GM's program-engineering manager for the Cobalt — test drove the Cobalt with the standard key and key fob. During the test drive, when Altman's knee bumped the key, the engine turned off, causing the engine to stall. Altman reported this incident to GM.

37.    In November 2004 and in response to Altman's report, GM launched an engineering inquiry to investigate the potential for the key to move from the "run" to

the "accessory/off" position during ordinary driving conditions. The inquiry is known within GM as a Problem Resolution Tracking System Inquiry ("PRTS"). The specific complaint which resulted in the PRTS was that "the vehicle can be keyed off with knee while driving."

38.    On February 1, 2005, as part of the PRTS, GM engineers concluded:

> There are two main reasons that [sic] we believe can cause a lower effort in turning the key: 1. A low torque detent in the ignition switch. 2. A low position of the lock module in the column. (PRTS – Complete Report N172404).

39.    As part of the PRTS, GM engineers began looking into ways to solve the problem of the key moving from the "run" to the "accessory/off" position during driving.

40.    On February 18, 2005, GM engineers presented several possible solutions to the Cockpit Program Integration Team ("CPIT"). GM engineers determined the only "sure solution" to fixing the problem of the key inadvertently moving from the "run" to the "accessory/off" position required changing from a low mount to a high mount lock module, which would considerably reduce the possibility of the key/key fob being impacted by the driver.

41.    According to GM engineers, this change in the key position on the lock module, **combined with** increasing the detent in the ignition switch, would be a "sure solution."

42.    During this PRTS, GM also considered changing the key from a slot to a hole as a way to attempt to contain this problem, but not as a solution to the problem.

43.    Changing the key from a slot to a hole would reduce the lever arm of the key and the key chain. With the slot design, the key chain would hang lower on the key which would increase the torque force on the ignition switch when the chain was

8

contacted or moved in any way. GM engineers determined this key change would significantly reduce the chance of the key inadvertently moving from the "run" to the "accessory/off" position during ordinary driving maneuvers.

44.    A GM engineer conducted a cost analysis of this key change and determined that the cost to make this change would be less than one dollar per vehicle or around 56 cents per part.

45.    GM rejected this proposed key change, and on March 9, 2005, GM closed the PRTS without taking any further steps to fix the defective Key System in Ions and Cobalts. The PRTS detailed the reasons why GM took no action.

> Per GMX001 PEM's [Gary Altman] directive we are closing this PRTS with no action. The main reasons are as following: All possible solutions were presented to CPIT and VAPIR: a. The lead-time for all the solutions is too long. b. The tooling cost and piece price are too high. c. None of the solutions seem to fully countermeasure the possibility of the keys being turned (ignition turn off) during driving. Thus **none of the solutions represents an acceptable business case.** (emphasis added)

46.    On February 28, 2005, GM issued a bulletin to its dealers regarding engine-stalling incidents in 2005 Cobalts and 2005 Pontiac Pursuits (the Canadian version of the Pontiac G5).

47.    The February 28, 2005, bulletin addressed the potential for drivers of these vehicles to inadvertently turn off the ignition due to low key ignition cylinder torque/effort.

48.    In the February 28, 2005, bulletin, GM provided the following recommendations/instructions to its dealers – **but not to NTHSA or the public in general:**

> There is potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder

09-50026-mg    Doc 13228-1    Filed 06/18/15    Entered 06/18/15 17:08:53    Exhibit
Filed Cross-Claim of Dolly Walton    Pg 10 of 27

torque/effort. The concern is more likely to occur if the driver is short and has a large heavy key chain.

In the cases this condition was documented, the driver's knee would contact the key chain while the vehicle was turning. The steering column was adjusted all the way down. This is more likely to happen to a person that is short as they will have the seat positions closer to the steering column.

In cases that fit this profile, question the customer thoroughly to determine if this may the cause. The customer should be advised of this potential and to take steps, such as removing unessential items from their key chains, to prevent it.

Please follow this diagnosis process thoroughly and complete each step. If the condition exhibited is resolved without completing every step, the remaining steps do not need to be performed.

49.    At that time, however, GM knew that the inadvertent turning off of the ignition in the vehicles was due to design defects in the Key System in those vehicles, including the Pontiac Grand Prix, and **was not** limited to short drivers using large heavy key chains.

50.    GM failed to disclose and, in fact, concealed the February 28, 2005 bulletin and/or the information contained therein, from GM car owners, and sent affirmative representations to dealers that did not accurately describe the nature of the problem, the multiple design steps needed for a "sure solution" to the problem, and GM's knowledge of it.

51.    Rather than disclosing this serious safety problem that uniformly affected Pontiac Grand Prix cars, GM instead concealed and obscured the problems, electing to wait until customers brought their cars to a dealership after an engine-stalling incident, and offered even its own dealers only an incomplete, incorrect, and insufficient description of the defects and the manner in which to actually remedy them.

52.    Pursuant to 49 C.F.R. § 573.6, which requires an automobile manufacturer to "furnish a report to the NHTSA for each defect . . . related to motor vehicle safety," GM had a duty, no later than February 2005 to disclose the safety-related defects in the Saturn Ion and Chevrolet Cobalt vehicles.

53.    Instead of complying with its legal obligations, however, GM fraudulently concealed the Key System defect from the public and continued to manufacture and sell Pontiac Grand Prix and other GM models with these known safety defects.

54.    In March 2005, following the receipt of a customer complaint that his/her Cobalt vehicle ignition turned off while driving, GM opened another PRTS – Complete Report (0793/2005-US).    Steve Oakley, the brand quality manager for the Cobalt, originated the PRTS.    As part of the PRTS, Mr. Oakley reviewed an email dated March 9, 2005 from Jack Weber, a GM engineer.    The subject of the email was "Cobalt SS Ignition Turn Off."    In the email Mr. Weber stated:

> I've had a chance to drive a Cobalt SS and attempted to turn off the ignition during heel/toe down shifting.    Much to my surprise, the first time I turned off the ignition switch was during a normal traffic brake application on I-96.    After that I was able to do a static reproduction of the condition in a parking lot.    I've attached photos of the condition with comments.    My anthropometric Measurements are attached below:
>
> Static view of keys, fob and registration hitting knee.
>
> Position of RKE fob during normal driving.    Dynamic evaluation.
>
> View of steering column cover and Pass Key 3+ "lump" under the key slot.
>
> Key in run position, knee contacting the fob and the split ring is pulling on the key to move it to the "off" position. Static evaluation.
>
> Fob has levered around the steering column cover and turned the ignition off.

Unobstructed view of the fob and column cover.

Attached below is documentation of a RAMSIS study performed to attempt to duplicate the real world condition.

Please call at (586) 986-0622 with questions.

Jack Weber

Mr. Weber clearly identified the defects in the Key System while he was driving the Cobalt.

55.     Despite the clear evidence of the safety-related defect with the Key System, during the March 2005 PRTS, GM engineers decided not to reconsider any of the proposed solutions discussed during the February 2005 PRTS. Instead, the GM engineers leading the PRTS recommended that sole corrective action GM should recommend would be to advise customers to remove excess materials from their key rings, **even though GM knew that the inadvertent turning off of the ignition in these vehicles was due to design defects in the Key System in those vehicles, and was not limited to drivers having excess key ring materials.**

56.     In May 2005, GM, following its receipt of another customer complaint that his/her Cobalt vehicle ignition turned off while driving, it opened another PRTS.

57.     During the May 2005 PRTS, GM decided to redesign the key in order to reduce the possibility that a driver may inadvertently turn the key from the "run" to the "accessory/off" position during ordinary driving.

58.     GM ultimately failed to follow through on its own decision and closed this PRTS without any action, further concealing what it knew from the public and continuing to subject the public to the defective vehicles' serious safety risks.

59.     At our about this time, GM, through Alan Adler, GM's Manager, Product Safety Communications, issued the following statement with respect to the Chevrolet

Cobalt's inadvertent shut-off problems, affirmatively representing in its "Statement on

Chevrolet Cobalt Inadvertent Shut-offs" that:

> In rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the ignition key to the accessory or off position while the car is running.
>
> When this happens, the Cobalt is still controllable. The engine can be restarted after shifting to neutral.
>
> GM has analyzed this condition and believes it may occur when a driver overloads a key ring, or when the driver's leg moves amid factors such as steering column position, seat height and placement. Depending on these factors, a driver can unintentionally turn the vehicle off.
>
> Service advisers are telling customers they can virtually eliminate this possibility by taking several steps, including removing non-essential material from their key rings.
>
> Ignition systems are designed to have "on" and "off" positions, and practically any vehicle can have power to a running engine cut off by inadvertently bumping the ignition from the run to accessory or off position.

GM's statement, however, was demonstrably false and misleading.

60.    GM's internal testing documents showed that stalling incidents occurred

when drivers were using keys with standard key fob. GM knew that these incidents

were not caused by heavy key chains or a diver's size and seating position. GM knew

that removing the non-essential material from key rings would not "virtually eliminate"

the possibility of inadvertent bumping of the ignition key from the "run" to the

"accessory/off" position while the car is running.

61.    GM's above-referenced statement was further demonstrably false and

misleading because GM knew that these incidents were ultimately caused by the safety-

related defects in the Key System identified in the February 2005 PRTS.

62.    Upon information and belief, drivers and/or owners of the Pontiac Grand
Prix models for which GM changed the part but not the part number, filed at least 57
complaints about unexpected stallings dating back to December 2003.

63.    But GM's affirmative concealment of the problem with the defective
vehicles, including the Pontiac Grand Prix cars, did not end there.

64.    On July 29, 2005, Amber Marie Rose, a sixteen year old Clinic, Maryland
resident, was driving a 2005 Cobalt when she drove off the road and struck a tree head-
on.  Amber's driver's side frontal airbag did not deploy and she died as a result of the
injuries she sustained in the crash.

65.    GM received notice of Amber's incident in September 2005 and opened an
internal investigation file pertaining to this incident shortly thereafter.

66.    During its investigation of the incident, GM learned that the key in
Amber's cobalt was in the "accessory/off" position at the time of the crash.

67.    During its investigation of the incident in which Amber was killed in her
Cobalt vehicle, GM also knew that the driver's side frontal airbag should have deployed
given the circumstances of the crash.  Upon information and belief, GM subsequently
entered into a confidential settlement agreement with Amber's mother.

68.    In December 2005, shortly after it commenced its internal investigation
into the incident leading to Amber's death, GM issued a Technical Service Bulletin (05-
02-35-007) (the "TSB") to GM dealers.

69.    The TSB, which GM affirmatively represented applied to 2005-2006
Chevrolet Cobalts, 2006 Chevrolet HHRs, 2005-2006 Pontiac Pursuit, 2006 Pontiac
Solstices, and 2003-2006 Saturn Ions, provided, "information on inadvertent Turning of
Key Cylinder, Loss of Electrical System and no DTCs," provided the following service
information:

There is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort.

The concern is more likely to occur if the driver is short and has a large and/or heavy key chain. In these cases, this condition was documented and the driver's knee would contact the key chain while the vehicle was turning and the steering column was adjusted all the way down. This is more likely to happen to a person who is short, as they have the seat positioned closer to the steering column.

In cases that fit this profile, question the customer thoroughly to determine if this may the cause. The customer should be advised of this potential and should take steps to prevent it – such as removing unessential items from their key chain.

Engineering has come up with an insert for the key ring so that it goes from a "slot" design to a hole design. As a result, the key cannot move up and down in the slot any longer – it can only rotate on the hole. In addition, the previous key ring has bee replaced with a smaller 13 mm (.05 in) design. This will result in the keys not having as low as in the past.

70.    As with its prior statement regarding the defective vehicles (see above), the information GM provided in this TSB was also false and misleading.

71.    In the two PRTSs GM issued before it issued the TSB, GM engineers never represented that short drivers or heavy key chains were the reasons why these incidents were happening.

72.    At the time it issued the TSB, GM knew that these incidents were happening to drivers of all sizes using keys with the standard key fobs; these incidents were not caused by short drivers with heavy key chains, but were caused by the safety-related defects in the Key System of many GM models, including the Pontiac Grand Prix.

73.    In October 2006, GM updated the TSB (05-02-35-007) to include additional model years: the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, 2007 Cobalt and 2007

Pontiac Solstice and G5. These vehicles had the same safety-related defects in the Key System as the vehicles in the original TSB.

74.    In February 2009, GM opened yet another PRTS with respect to the Defective Vehicles – this time to investigate why the slot in the key in Cobalts allowed the key chain to hang too low in the vehicles, as well as the inadvertent shutting off of the vehicles.

75.    Through this PRTS, GM determined that changing the key from a slot to a hole would significantly reduce the likelihood of inadvertent turning off the ignition switch.

76.    In March 2009, GM approved of the design change in the key from the slot to a hole. According to GM, this redesigned change was implemented in model year 2010 Chevrolet Cobalts. GM, however, chose not to provide these redesigned keys to the owners or lessees of any of the vehicles implicated in the TSB, including the 2006 Pontiac Grand Prix.

77.    This timeline gives a short overview of some key points between 2004 and the present, as discussed above.

**2001-2004**
GM learns
Key Systems
are defective.

**2005-2009**
GM learns of
hundreds of field
reports of Key
System failures and
multiple fatalities.

**2010-2014**
GM leans of more
field reports of
Key System failures
an additional fatalities.

**2005**
GM engineers'
proposed fix
rejected; Amber
Rose dies after
airbag in Cobalt
fails to deploy.

**2009**
GM declares and
emerges from
bankruptcy.

**2014**
GM issues inadequate
recall over 10 years
after learning its
Key Systems are
defective.

78.    In 2009 GM declared bankruptcy and, weeks later, it emerged from bankruptcy. Both before and after GM's bankruptcy, the Key Systems in the Defective Vehicles continued to fail and GM, in all iterations, continued to conceal the truth.

79.    In 2010, GM began a formal investigation of the frontal airbag non-deployment incidents in Chevrolet Cobalts and Pontiac G5s. GM subsequently elevated the investigation to a Field Performance Evaluation ("FPE").

80.    In August 2011, GM assigned Engineer Group Manager, Brian Stouffer as the Field Performance Assessment Engineer ("FPAE") to assist with the FPE investigation.

81.    In Spring 2012, Stouffer asked Jim Federico, a high level executive and chief engineer at GM, to oversee the FPE investigation. Federico was the "executive champion" for the investigation to help coordinate resources for the FPE investigation.

82.    In May 2012, GM engineers tested the torque on the ignition switches for 2005-2009 Cobalts, 2007 and 2009 Pontiac G5s, 2006-2009 HHRs, and 2003-2007 Ion vehicles in a junkyard. The results of these tests showed that the torque required to turn the ignition switches in most of these vehicles from the "run" to the "accessory/off" position did not meet GM's minimum torque specification requirements, including the 2008-2009 vehicles. These results were reported to Stouffer and other members of the FPE.

83.    In Fall 2012, Stouffer requested assistance from a "Red X Team" as part of the FPE investigation. The Red X Team was a group of engineers within GM assigned to find the root cause of the airbag non-deployments in frontal accidents involving Chevrolet Cobalts and Pontiac G5s. By that time, however, it was clear that the root cause of the airbag non-deployments in a majority of the frontal accidents was the

defective Key System. The Red X Team became involved in the investigation shortly after Mr. Stouffer's request.

84.    During the field-performance-evaluation process, GM determined that, although increasing the detent in the ignition witch would reduce the chance that the key would inadvertently move from the "run" to the "accessory/off" position, it would not be a total solution to the problem.

85.    Indeed, the GM engineers identified several additional ways to actually fix the problem. These ideas included adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the run position, and adding a push button to the lock cylinder to prevent it from slipping out of run. GM rejected each of these ideas.

86.    GM engineers understood that the key fob may be impacted and pinched between the driver's knee and the steering column which causes the key to be inadvertently turned from the run to accessory/off position. The photographs show why the GM engineers understood that increasing the detent in the ignition switch would not be a total solution to the problem. It also shows why GM engineers believed that the additional changes to the Key System (such as the shroud) were necessary to fix the defects with the Key System.

87.    The GM engineers clearly understood that increasing the detent in the ignition switch alone was not a solution to the problem but GM concealed – and continued to conceal – from the public, the nature and extent of the defects.

88.    By 2012, Federico, Stouffer, and the remaining members of the Red X Team knew that the Key System in the Ion, the Cobalt, and the G5 vehicles had safety-related defects that would cause the key to move from the "run" to the "accessory/off"

position while driving these vehicles. They also knew that when this happened the airbags would no longer work in frontal crashes.

89.     Federico, Stouffer, and the other members of the Red X Team also understood that these safety-related defects had caused or contributed to numerous accidents and multiple fatalities. Despite this knowledge, GM chose to conceal this information from the public, NHTSA, and Plaintiff.

90.     Under 49 C.F.R. ¶573.6, GM had a duty in 2012 to disclose the safety-related defects in its vehicles, including the Pontiac Grand Prix. Rather than comply with their legal obligations, GM continued to fraudulently conceal these defects from the public and the U.S. government.

91.     On February 7, 2014, GM, in a letter from Carmen Benavides, Director – Product Investigations and Safety Regulations for GM, informed NHTSA that it was conducting Recall No. 13454 for certain 2005-2007 model year Chevrolet Cobalts and 2007 model year Pontiac G5 vehicles.

92.     In its February 7, 2014, letter to NHTSA, GM represented that as replacement ignition switches became available, GM would replace the ignition switches on the Defective Vehicles.

93.     On February 19, 2014, a request for timeliness query of General Motors' Safety Recall 13454 was sent to NHTSA. The timeliness query pointed out that GM had failed to recall all of the vehicles with the defective ignition switches.

94.     The February 19, 2014, request for timeliness query also asked NHTSA to investigate GM's failure to fulfill its legal obligation to report the safety-related defects in the Defective Vehicles to NHTSA within five days of discovery the defect.

95.    On February 24, 2014, GM in a letter from Carmen Benavides, informed NHTSA it was expanding the recall to include 2006-2007 model year (MY) Chevrolet HHR and Pontiac Solstice, 2003-2007 MY Saturn Ion, and 2007 MY Saturn Sky vehicles.

96.    GM included an Attachment to the February 24, 2014 letter.    In the Attachment, GM **for the first time** admitted that GM authorized a change in the ignition switch in 2006.  Specifically, GM stated:

> On April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch proposed by the supplier, Delphi Mechatronics.    The approved changes included, among other things, the use of a new detent plunger and spring that increased torque force in the ignition switch. This change to the ignition switch was not reflected in a corresponding change in the part number for the ignition switch.    GM believes that the supplier began providing the re-designed ignition switch to GM at some point during the 2007 model year.

97.    GM then produced documents in response to Congressional requests leading up to the hearings April 1 and 2, 2014.  Among the documents produced by GM is a document titled, "GENERAL MOTORS COMMODITY VALIDATION SIGN-OFF," dated April 26, 2006.  According to this document, Delphi had met all of the sign-off requirements in order to provide a new ignition switch for certain GM vehicles.  GM has acknowledged that the ignition switch in the Cobalt was included in this design change.

98.    The design change included a new detent plunger "to increase torque force in the switch."  Mr. DeGiorgio's signature is on this page as the GM authorized engineer who signed off on this change to the ignition switch.

99.    On July 3, 2014 GM in a letter from Brian Latouf to NHTSA announced that GM was expanding its recall to including the following models:

- 1997 – 2005 Chevrolet Malibu;

- 1998 – 2002 Oldsmobile Intrigue;

- 1999 – 2004 Oldsmobile Alero;

- 1999 – 2005 Pontiac Grand Am;

- 2000 – 2005 Chevrolet Impala and Monte Carlo;

- 2004 – 2008 Pontiac Grand Prix.

In all representing 6,805,679 produced and sold in the United States for a defect in the ignition switch that causes the ignition key to turn from the "run" position to the "accessory" or "off" position. In doing so the engine cuts off as does the power steering and power brakes and disables the vehicle airbag system.

100.    On July 16, 2014, GM in a letter from Brian Latouf to NHTSA amended its July 3, 2014 letter and identified Stoneridge, Inc. d/b/a Pollak Engineered Products as the manufacturer and supplier of the defective ignition switches of the recalled vehicles, including the 2006 Pontiac Grand Prix.

<u>**Count 1: Strict Liability**</u>

101.    All preceding statements and allegations of Dolly Walton are incorporated herein and re-alleged as if expressly set forth herein.

102.    GM and Stoneridge designed, selected, inspected, tested, manufactured, assembled, equipped, marketed, distributed, and sold the Pontiac Grand Prix, and its components, including but not limited to, equipping it with the Key System.

103.    GM designed, selected, inspected, tested manufactured, assembled, equipped, marketed, distributed, and sold the Key System which was selected and installed in the Pontiac Grand Prix.

104.    GM had a legal duty to design, inspect, test, manufacture, and assemble the Grand Prix so that it would be reasonably crashworthy and provide a reasonable

degree of occupant safety in foreseeable collisions occurring in the highway environment of its expected use.

105. Stoneridge had a legal duty to design, inspect, test, manufacture, and assemble the Grand Prix so that it would be reasonably crashworthy and provide a reasonable degree of occupant safety in foreseeable collisions occurring in the highway environment of its expected use.

106. Among other things, the 2006 Pontiac Grand Prix and its Key System were unreasonably dangerous and defective in that they rendered the vehicle uncontrollable, uncrashworthy, defective, unreasonably dangerous and unsafe for foreseeable users and occupants by having an ignition switch system which allows the vehicle to stall or lose power while driving.

107. Defendants failed to adequately warn Plaintiffs and other consumers, or the public in general, about the unsafe and defective condition and design of the vehicle and its component ignition system known to Defendants, so that individuals like Plaintiffs could make informed and prudent decisions regarding traveling or riding in such vehicles.

108. At the time the 2006 Pontiac Grand Prix and component parts thereof were placed into the stream of commerce, the vehicle and the component ignition system were defective and those defects rendered the vehicle unreasonably dangerous to foreseeable users and consumers.

109. At all times material, the vehicle was being used as expected and intended and in a manner reasonably foreseeable to Defendants.

110. The vehicle was unaltered and in the same design configuration as it was at the time Defendants placed the vehicle into the stream of commerce.

111.    It was foreseeable to Defendants that the ignition switch would fail and cause users and consumers like Plaintiffs to be unable to control said vehicle and would be involved in an accident and that the airbags and related safety systems would fail at the time when the occupants needed them most.

112.    Both GM and Stoneridge owed a legal duty to warn consumers and users of 2006 Pontiac Grand Prix vehicles of the unreasonably dangerous Key System and of the condition that would allow the ignition key switch to turn from the "run" to "accessory" position.

113.    Among other things, the 2006 Pontiac Grand Prix is not crashworthy, is defective, and is unreasonably dangerous and unsafe for foreseeable users and occupants for all provisions of T.C.A. § 29-28-105, including but not limited to:

    (a)    having a Key System that is inadequately designed and constructed, and located, which may result in the key moving from the run to accessory/off position during normal driving maneuvers;

    (b)    having a Key System that allows the Pontiac Grand Prix to stall or lose engine power, and steering and/or full braking ability while driving;

    (c)    having frontal airbags that do not deploy when the key is in the accessory/off position and the vehicle strikes an object head-on;

    (d)    failing to adequately warn consumers, or the public in general, about the unsafe and defective condition and design of the vehicle known to GM, so that individuals could make informed and prudent decision regarding traveling or riding in such vehicles.

114.    The defective nature of the Pontiac Grand Prix was the proximate cause of the damages sustained by April Walton as set forth herein, thus rendering GM and Stoneridge strictly liable.

## Count 2:  Negligence

115.    All preceding statements and allegations of Dolly Walton are incorporated herein and re-alleged as if expressly set forth herein.

116.    GM and Stoneridge were negligent in designing, inspecting, testing, manufacturing, assembling, marketing, selling, and providing warnings for the 2006 Pontiac Grand Prix as set out in the paragraphs above.

117.    GM and Stoneridge's negligence proximately caused the damages sustained by April Walton as set forth herein.

## Count 3:  Breach of Implied Warranty

118.    All preceding statements and allegations of Dolly Walton are incorporated herein and re-alleged as if expressly set forth herein.

119.    GM breached its implied warranty of merchantability by selling the Pontiac Grand Prix when it was not fit for the ordinary purpose for which such goods are sold.

120.    This breach of warranty proximately caused the damages sustained by April Walton as set forth herein.

## Count 4:  Punitive Damages

121.    All preceding statements and allegations of Dolly Walton's Complaint are incorporated herein and re-alleged as if expressly set forth herein.

122.    GM, through its conduct in designing, testing, manufacturing, assembling, marketing, selling and failing to adequately repair the Pontiac Grand Prix, demonstrated a malicious want to care, evidencing a reckless indifference and disregard

to the consequences of their actions.    GM's actions also constitute fraudulent concealment.

123.    Pursuant to T.C.A. § 29-39-104, Dolly Walton on behalf of April Walton is entitled to an award of punitive damages to deter GM and other similarly situated entities from such conduct in the future.

## Damages

124.    All preceding paragraphs and allegations of Dolly Walton are incorporated herein and re-alleged as if previously set forth.

125.    The defective key lock system in the Pontiac Grand Prix alleged earlier was the proximate cause of April Walton losing control of the 2006 Pontiac Grand Prix on March 18, 2013 and slamming into a tree.

126.    As a result of General Motors' fault, April Walton suffered serious and permanent injuries that include, but are not limited to, the following:

A.    Multiple facial lacerations, fractures and related contusions and soft tissue injuries;

B.    Dental fractures, contusions and other related dental disfigurement;

C.    Multiple fractures in April Walton's right and left legs, ankles and feet;

D.    Traumatic brain injury and/or closed head injury;

E.    Multiple lacerations and contusions and related soft tissue injury and disfigurement throughout her entire body; and

F.    Post traumatic stress disorder or post traumatic stress disorder-like symptoms and other emotional dysfunction.

127.    April Walton has suffered the following damages, which include but are not limited to the following:

A.    Past and future physical pain, suffering, mental anxiety, anguish and

embarrassment;

B.    Loss of vocational and occupational capacity;

C.    Loss of enjoyment of life;

D.    Disfigurement;

E.    Permanent, partial physical disability; and

F.    Past and future hospital, doctor, physical rehabilitation, and other related

medical treatment costs.

128.    Dolly Walton alleges further that GM should be responsible for the harm

and damages suffered by minors "M.G. and "L.F." passengers in the Pontiac Grand Prix

on March 18, 2013.

129.    Dolly Walton seeks compensation for her daughter's injuries for both

special and general damages for not less than TEN MILLION DOLLARS

($10,000,000.00). Dolly Walton asks that punitive damages be assessed against General

Motors in a reasonable amount to be determined by the jury.

130.    Dolly Walton asks for a trial by jury.

WHEREFORE, Dolly Walton, on behalf of her daughter, April Walton, prays that

after all due proceedings are had that there be judgment herein in her favor and against

General Motors, awarding TEN MILLION DOLLARS ($10,000,000.00) compensation in

general and specific damages, and punitive damages to be assessed by the jury, that

there be trial by jury, and all other equitable relief.

Respectfully submitted,

By: _____

Edmund J. Schmidt III, TN Bar #021313
LAW OFFICE OF EDDIE SCHMIDT
2323 21st Avenue South, Suite 502
Nashville, Tennessee 37212
Phone (615) 678-6320
Fax (615) 454-6357
E-mail eddie@eschmidtlaw.com


Matthew E. Wright, TN Bar #022596
HARDEE, MARTIN & DONAHOE, P.A.
213 East Lafayette Street
Jackson, TN 38301
Phone (731) 424-2151
Fax (731) 424-8857
E-mail mwright@hmdlaw1.com


## CERTIFICATE OF SERVICE

I hereby certify that a copy of foregoing has been served upon the following by e-mail and first-class, postage prepaid U.S. Mail on this _22_ day of _August_, 2014:

David A. McLaughlin
MORGAN & MORGAN MEMPHIS, LLC
40 S. Main Street, Suite 2600
One Commerce Square
Memphis, TN 38103
dmclaughlin@forthepeople.com

Jeffrey Lay
JONES, HAMILTON & LAY
202 South Main Street
Dyersburg, TN 38024


_____
Edmund J. Schmidt III