# Exhibit 2

# 15-1958

**IN THE**

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

_____

In re:

MOTORS LIQUIDATION COMPANY,
f/k/a GENERAL MOTORS CORPORATION,

*Debtors.*

_____

CELESTINE ELLIOTT, LAWRENCE ELLIOTT AND BERNICE SUMMERVILLE,

*Petitioners,*

—against—

GENERAL MOTORS LLC,

*Respondent.*

_____

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
CHAPTER 11 CASE NO. 09-50026 (REG)
HONORABLE ROBERT E. GERBER, UNITED STATES BANKRUPTCY JUDGE, PRESIDING

**RESPONSE AND CROSS-PETITION FOR PERMISSION
FOR DIRECT APPEAL UNDER 28 U.S.C. § 158(d)(2)(A)**

RICHARD C. GODFREY, P.C.
ANDREW B. BLOOMER, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

ARTHUR STEINBERG
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
(212) 556-2100

*Attorneys for General Motors LLC*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure, General Motors LLC, a Delaware limited liability company, states that it is owned by a single entity, General Motors Holdings LLC, also a Delaware limited liability company. General Motors LLC's only member is General Motors Holdings LLC. General Motors Holdings LLC's only member is General Motors Company, a Delaware corporation with its principal place of business in Wayne County, Michigan. General Motors Company has 100% ownership interest in General Motors Holdings LLC.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES ..................................................................... iii

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................4

A.    The 363 Sale and the Motions to Enforce the Sale Order and
      Injunction.........................................................................4

B.    The Issues Resolved by the Bankruptcy Court's Decision and
      Judgment..........................................................................8

C.    The Bankruptcy Court's Certification of a Direct Appeal ...........................12

QUESTIONS PRESENTED FOR REVIEW ..........................................................12

RELIEF SOUGHT ..............................................................................14

WHY THE DIRECT APPEAL SHOULD BE ALLOWED ..................................................14

A.    The Questions Presented Involve Matters of Public Importance.................15

B.    An Immediate Appeal will Materially Advance the Progress of the
      Case................................................................................19

CONCLUSION .................................................................................20

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE & CM/ECF FILING

APPENDIX

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
  428 B.R. 43 (S.D.N.Y. 2010)..............................................................17

*In re Edwards*,
  962 F.2d 641 (7th Cir. 1992)...........................................................18

*In re General Motors LLC Ignition Switch Litig.*,
  Case No. 14-MD 2543 (JMF) ............................................................7

*In re Motors Liquidation Co.*,
  529 B.R. 510 (Bankr. S.D.N.Y. 2015)................................... passim

*Mark IV Indus., v. N.M. Env't Dep't*,
  452 B.R. 385 (S.D.N.Y. 2011).........................................................16

*Osterneck v. Ernst & Whinney*,
  489 U.S. 169 (1989)...........................................................................2

*Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
  430 B.R. 65 (S.D.N.Y. 2010)...........................................................17

*Weber v. U.S. Tr.*,
  484 F.3d 154 (2d Cir. 2007)..................................................... 19, 20

**Statutes**

28 U.S.C. § 1291 ..................................................................................2

28 U.S.C. § 158...................................................................... 4, 12, 14, 20

**Rules**

Fed. R. Bankr. P. 8002 .........................................................................1

Fed. R. Bankr. P. 8006 .........................................................................1

# INTRODUCTION

On June 18, 2015, Petitioners filed their Petition for a direct appeal of the judgment[1] by the United States Bankruptcy Court for the Southern District of New York enforcing the terms and injunction provisions of an order ("Sale Order and Injunction") entered by the bankruptcy court that approved an agreement ("Sale Agreement") transferring substantially all of the assets of Motors Liquidation Company (f/k/a General Motors Corporation) ("Old GM") to General Motors LLC ("New GM").[2]  While New GM does not agree with much of what was stated by Petitioners in their Petition for a direct appeal, New GM does agree that this Court should authorize a direct appeal of all issues pertaining to the judgment.  But the Petition is premature.  Certain plaintiffs (represented by the same counsel as Petitioners) have a pending motion to amend the judgment which has not been ruled on by the bankruptcy court.  Pursuant to Rule 8002(b)(2) of the Federal Rules of Bankruptcy Procedure, the filing of the motion to amend renders the notices and cross-notices of appeal ineffective until that motion to amend is decided by the bankruptcy court.  Thus, the time period for filing a petition with this Court pursuant to Bankruptcy Rule 8006(g) has not started to run and this Court does not

---

[1]  Capitalized terms not defined herein shall have the meanings ascribed to them in the judgment, dated June 1, 2015, which is attached hereto as **Exhibit "A."**

[2]  A copy of the Sale Order and Injunction, with the Sale Agreement (and its amendments) attached as an exhibit, is attached hereto as **Exhibit "B."**

yet have jurisdiction over the judgment.[3]    Accordingly, New GM believes this Court should either (i) deny the Petition without prejudice to the Petitioners re-filing it when the certification becomes effective by operation of law, or (ii) hold the Petition (and this Cross-Petition) in abeyance (subject to further amendment based on the bankruptcy court's ruling on the motion to amend) until the bankruptcy court resolves the motion to amend.

In the event the Petition is timely now, New GM submits this Response and Cross-Petition. Given the importance of the judgment and the legal questions it raises, the bankruptcy court, on its own motion, certified the judgment for immediate appeal to this Court on all three grounds specified in Section 158(d)(2)(A).  New GM agrees with the bankruptcy court, and Petitioners, that all appeals and cross-appeals should proceed directly in this Court.

*****

The appeals and cross-appeals arise from one of the most significant bankruptcy proceedings in history, concern important legal issues, and involve matters of public importance.  The resolution of all issues on appeal will have an effect not only on these particular litigants, but also more generally on bankruptcy

---

[3]    *See Osterneck v. Ernst & Whinney*, 489 U.S. 169, 174 (1989) (noting that rules depriving notice of appeal of effectiveness during pendency of certain post judgment motions "work to implement the finality requirement of 28 U.S.C. § 1291 by preventing the filing of an effective notice of appeal until the District Court has had an opportunity to dispose of all motions that seek to amend or alter what otherwise might appear to be a final judgment").

cases, and the bankruptcy sale process, which is a critical aspect of Chapter 11 bankruptcy cases.  A central question relating to the issues on appeal is the type of notice due in the bankruptcy sale context to holders of un-asserted, unsecured, tort claims for purposes of due process.  The appeal also addresses whether unsecured tort claimants, whose arguments were made at the sale hearing by other tort claimants, and expressly rejected by the bankruptcy court when entering the Sale Order and Injunction, can nevertheless assert such claims years later against the purchaser, when the Sale Order and Injunction expressly precludes such claims. The issues on appeal further concern the appropriate remedy for an alleged due process violation in the bankruptcy sale context, where: (a) any defective sale notice was given by the seller—not the purchaser, (b) if the sale had been rejected by the bankruptcy court, the seller would have liquidated and unsecured creditors (including tort claimants) would have received nothing, (c) tort claimants had the ability, after the sale, to file claims against the seller and receive a portion of the sale proceeds, (d) appeals relating to the Sale Order and Injunction were previously dismissed as being equitably moot, and (e) the Sale Order and Injunction did not permit modifications to the Sale Agreement.

Resolution of this appeal will ultimately affect hundreds of lawsuits and thousands of plaintiffs, and myriad equity holders of New GM, not to mention debtors and creditors in other bankruptcy cases.  It will also play a significant role

in claims and defenses that may be pursued in the multidistrict litigation ("MDL")

pending in the United States District Court for the Southern District of New York.

A direct appeal to this Court will provide for a "prompt, determinative ruling" of

all issues on appeal that would materially advance the progress of the MDL, as

well as many other state court lawsuits alleging claims against New GM barred by

the Sale Order and Injunction.

The appeals and cross-appeals of the judgment, therefore, fall squarely

within the category of proceedings contemplated by 28 U.S.C. § 158(d)(2)(A) for

direct appeal to the circuit courts.   For these reasons, New GM respectfully

requests that this Court authorize a direct appeal from the judgment once it

becomes effective.

## BACKGROUND

**A.    The 363 Sale and the Motions to Enforce the Sale Order and Injunction**

In June 2009, in the midst of a national financial crisis, Old GM was

insolvent with no alternative other than to seek bankruptcy protection to sell its

assets. A newly created, government-sponsored entity, which became the

predecessor to New GM, was the only viable purchaser; but it would not purchase

Old GM's assets unless the sale was free and clear of substantially all liens and

claims.   Through a bankruptcy-approved sale process under Section 363 of the

Bankruptcy Code, New GM acquired Old GM's assets, free and clear of all liens

and claims, other than claims expressly assumed by New GM under the Sale Agreement.  The bankruptcy court approved the sale ("363 Sale") and the terms of the Sale Agreement in the Sale Order and Injunction.  This transaction set the framework for New GM to begin its business operations six years ago. Fundamentally, New GM was structured to be a business enterprise that would not be burdened with any liabilities retained by Old GM.

Under the Sale Agreement, New GM assumed only three categories of liabilities for vehicles and parts sold by Old GM: (a) post-sale accidents involving Old GM vehicles causing personal injury, loss of life or property damage; (b) repairs provided for under the "Glove Box Warranty"—a specific written warranty, of limited duration, that only covers repairs and replacement of parts and not monetary damages; and (c) Lemon Law claims (as defined in the Sale Agreement) essentially tied to the failure to honor the Glove Box Warranty.  All other liabilities relating to vehicles and parts sold by Old GM were "Retained Liabilities" of Old GM.  *See* Sale Agreement § 2.3(b).  Various provisions of the Sale Agreement and the Sale Order and Injunction provide that New GM would have no responsibility for any liabilities (except for Assumed Liabilities) predicated on Old GM conduct, relating to the operation of Old GM's business, or the production of vehicles and parts before July 10, 2009.  *See, e.g.*, Sale Order and Injunction ¶¶ AA, 8, 46. Creditors and other parties in interest were expressly enjoined from asserting such

liabilities, including successor liability claims, against New GM. *See, e.g.*, *id.* ¶¶ 8, 9, 46.

Independent of the Assumed Liabilities and Retained Liabilities under the Sale Agreement, New GM covenanted to perform Old GM's recall responsibilities under federal law. *See* Sale Agreement ¶ 6.15(a). Beginning in February 2014, New GM began to recall certain vehicles, many of which were manufactured by Old GM, that might contain a defective ignition switch. Immediately after the first ignition-switch recall, plaintiffs began filing lawsuits throughout the country against New GM asserting claims with respect to the recalled Old GM vehicles. New GM initiated additional recalls in 2014, many of which also concern vehicles and parts manufactured by Old GM.

At present, there are hundreds of lawsuits pending against New GM (involving thousands of plaintiffs) relating to the 2014 recalls, a substantial portion of which implicate the Sale Order and Injunction. Many of these lawsuits seek to recover against New GM for Retained Liabilities of Old GM, such as: (i) damages based on accidents that occurred prior to the closing of the 363 Sale, and/or (ii) alleged economic losses for the diminution in value of mature Old GM vehicles.

Given that many of the lawsuits contained allegations and/or causes of action that violated the Sale Order and Injunction, New GM filed three motions

with the bankruptcy court (one in April 2014 and two in August 2014) seeking to

enforce the Sale Order and Injunction:

    (i)    the "Ignition Switch Motion to Enforce," which concerns many dozens of lawsuits ("Ignition Switch Actions") that seek economic losses against New GM relating to allegedly defective ignition switches in Old GM vehicles and/or New GM vehicles containing Old GM parts;

    (ii)    the "Monetary Relief Motion to Enforce," which concerns lawsuits that seek economic losses against New GM relating to issues other than ignition switches in Old GM vehicles and/or New GM vehicles containing Old GM parts; and

    (iii)    the "Pre-Sale Accident Motion to Enforce," which concerns lawsuits that assert claims against New GM based on accidents involving Old GM vehicles that occurred prior to the closing of the 363 Sale.

After the filing of the motions to enforce, other lawsuits were filed against

New GM asserting similar claims.    These lawsuits were designated as being

subject to the motions to enforce by the filing of supplemental schedules with the

bankruptcy court, and serving the plaintiffs involved with all relevant pleadings.

Approximately 140 lawsuits are subject to the motions to enforce.

The MDL, *In re General Motors LLC Ignition Switch Litig.*, Case No. 14-

MD 2543 (JMF), pending in the Southern District of New York, was originally

established to conduct coordinated proceedings in the Ignition Switch Actions.

The focus of the MDL has expanded to include other lawsuits, including those

seeking economic damages and personal injury loss with respect to vehicles

recalled for non-ignition switch issues.    At present, over 210 cases involving

7

thousands of plaintiffs have been transferred to or filed directly in the MDL. A substantial majority of those cases are subject to the motions to enforce.

Even after the bankruptcy court entered judgment, expressly holding that many of the Plaintiffs' claims are barred (as described in detail below), New GM continues to be served with new complaints asserting the same or similar claims that are barred by the judgment and the Sale Order and Injunction.

## B.    The Issues Resolved by the Bankruptcy Court's Decision and Judgment

In connection with the Motions to Enforce, the parties and the Bankruptcy Court agreed to address certain issues.  First, while the Sale Order and Injunction on its face applied to bar many of the Plaintiffs' claims, an issue raised by Plaintiffs and addressed by the Bankruptcy Court was whether Old GM had complied with due process when providing notice of the 363 Sale.   If the Bankruptcy Court concluded that Old GM did not comply with due process, a second issue was what was the appropriate remedy and against whom.  A third issue was whether any of the claims asserted against New GM were Retained Liabilities of Old GM.  The fourth and last issue was whether any claims for Retained Liabilities of Old GM could still be asserted against the Old GM bankruptcy estate, or were they equitably moot.  The bankruptcy court ruled on each of the issues pursuant to a set of stipulated facts agreed to by the parties. After extensive briefing and lengthy oral argument, the bankruptcy court rendered

a 138-page decision ("Decision").  *See In re Motors Liquidation Co.*, 529 B.R. 510

(Bankr. S.D.N.Y. 2015).

First, the court found that the 363 Sale publication notice did not comport

with due process.  Although the court recognized that publication notice in a 363

Sale is ordinarily satisfactory, such notice "was not [in this case] enough for those

whose cars had Ignition Switch Defects—because from Old GM's perspective, the

facts that gave rise to its recall obligation resulted in 'known' claims."  Decision,

529 B.R. at 525.  According to the bankruptcy court, "[b]ecause owners of cars

with Ignition Switch Defects received neither the notice required under the Safety

Act nor any reasonable substitute (either of which, if given before Old GM's

chapter 11 filing, could have been followed by the otherwise satisfactory post-

filing notice by publication), they were denied the notice that due process

requires."  *Id.*

Next, notwithstanding the finding of insufficient notice, the bankruptcy court

held that to establish a due process violation, Plaintiffs must demonstrate that they

sustained prejudice as a result of the insufficient notice.  With one exception for

the Ignition Switch Plaintiffs, the court found that "[n]either the [Ignition Switch]

Plaintiffs nor the [Ignition Switch] Pre-Closing Sale Plaintiffs were prejudiced

with respect to the Sale Order's Free and Clear Provisions."  *Id.* at 526.  In

particular, the court found that the arguments advanced by Plaintiffs had been

made before, and that the bankruptcy court's prior rulings rejecting such arguments applied to and barred Plaintiffs' claims: "[t]hus insofar as successor liability is concerned, while the Plaintiffs established a failure to provide them with the notice due process requires, they did not establish a due process violation. The Free and Clear Provisions stand."[4] *Id.*

The one exception where the court did find prejudice was to the extent the Ignition Switch Plaintiffs had "Independent Claims" against New GM based solely on New GM's independent conduct. Those Plaintiffs were purportedly prejudiced by the "overbreadth" of the Sale Order and Injunction, *i.e.*, "that the proposed Sale Order . . . should have allowed them to assert claims involving Old GM vehicles and parts so long as they were basing their claims solely on New GM conduct, and not based on any kind of successor liability or any other act by Old GM." *Id*. at 526-27.

With respect to remedies, the bankruptcy court concluded that remedying a constitutional violation trumps the property rights of the purchaser, as well as the public interest in the finality of bankruptcy sales. *Id.* at 527. Accordingly, the court held that the Sale Order and Injunction would be modified almost six years

---

[4]   The "Free and Clear Provisions" also apply to "Used Car Purchasers," *i.e.*, those Plaintiffs who "acquired cars manufactured by Old GM in the aftermarket after the 363 Sale (*e.g.*, from their original owners, or used car dealers). They too were not prejudiced by the inability to make successor liability arguments that others made, and, in addition, they can have no greater rights than the original owners of their cars had." Decision, 529 B.R. 526 n.14.

later to allow the assertion of "Independent Claims," defined as "claims or causes of action asserted by Ignition Switch Plaintiffs against New GM (whether or not involving Old GM vehicles or parts) that are based solely on New GM's own, independent, post-Closing acts or conduct."  Judgment ¶ 4.  The bankruptcy court made clear, however, that it would continue to enforce the prohibitions against successor liability and New GM would not be liable for Old GM conduct: "Claims premised in any way on Old GM conduct are properly proscribed under the Sale Agreement and the Sale Order, and by reason of the Court's other rulings, the prohibitions against the assertion of such claims stand." Decision, 529 B.R. at 528.

Finally, the bankruptcy court found that the equitable mootness doctrine applies, to the extent the Plaintiffs seek to file late proofs of claim against the Old GM bankruptcy estate and seek a recovery from the Old GM General Unsecured Creditors Trust.  *Id.* at 529.

Consistent with these rulings, on June 1, 2015, the bankruptcy court issued its judgment, enjoining numerous Plaintiffs from pursuing their claims against New GM.  Specifically, the court ordered that: (i) "Ignition Switch Pre-Closing Accident Plaintiffs . . . [are] stayed and enjoined from prosecuting any lawsuit against New GM" (Judgment ¶ 8(a)); (ii) "[e]xcept for Independent Claims and Assumed Liabilities . . ., all claims and/or causes of action that the Ignition Switch Plaintiffs may have against New GM concerning an Old GM vehicle or part

11

seeking to impose liability or damages based in whole or in part on Old GM conduct (including, without limitation, on any successor liability theory of recovery) are barred and enjoined pursuant to the Sale Order" (*id.* ¶ 9); and (iii) the rulings in the Judgment applied to other plaintiffs, including Non-Ignition Switch Pre-Closing Accident Plaintiffs and Non-Ignition Switch Plaintiffs (*id.* ¶ 13).

## C.    The Bankruptcy Court's Certification of a Direct Appeal

Finally, the bankruptcy court determined that all questions respecting its judgment should be certified for this Court's direct review.  The bankruptcy court concluded that "each of the three bases for a certification [in 28 U.S.C. § 158(d)(2) are] present," explaining that (i) "this is a matter of considerable public importance," (ii) "the underlying legal issues are important as well, as are their potential effect, going forward, on due process in chapter 11 cases, and on 363 sales and the claims allowance process in particular," and (iii) "an immediate appeal from the judgment in this matter is likely to advance proceedings in both this case and the MDL case."  Decision, 529 B.R. at 597-98.  On June 1, 2015, the bankruptcy court entered its certification order (attached hereto as **Exhibit "C"**).

## QUESTIONS PRESENTED FOR REVIEW

New GM's cross-appeal raises the following questions:

1.    Whether the bankruptcy court erred in finding that the Ignition Switch Plaintiffs and the Ignition Switch Pre-Closing Accident Plaintiffs were "known"

creditors of Old GM for purposes of determining the notice required by due process of the 363 Sale, where (i) no claims were brought by such creditors prior to the 363 Sale, (ii) the stipulated record did not support the bankruptcy court's conclusion that Old GM knew there was a safety defect that warranted a recall, and (iii) Plaintiffs did not dispute that they were aware of the 363 Sale, and the bankruptcy court had approved the form of the 363 Sale notice?

2.    Whether the bankruptcy court erred in finding that the Ignition Switch Plaintiffs were prejudiced by the failure to give the notice required by due process with respect to Independent Claims, and that the Sale Order and Injunction should be modified almost six years after it was entered, where (i) the Sale Agreement expressly set forth the liabilities assumed by New GM with respect to Old GM vehicles/parts, and Independent Claims were not included therein, (ii) the allegedly defective 363 Sale notice was sent by Old GM (not New GM), (iii) appeals of the Sale Order and Injunction were dismissed years ago as being equitably moot, (iv) the Sale Order and Injunction provides that it cannot be modified, and (v) the Sale Order and Injunction holds that New GM acquired the assets from Old GM in good faith and for fair value?

Other parties in interest have appealed from the judgment, raising questions on appeal that concern, among other things, due process, equitable mootness, and

subject matter jurisdiction.  All of these appellate questions should be heard by this Court in the first instance.

## RELIEF SOUGHT

New GM requests that this Court authorize a direct appeal from the bankruptcy court's judgment pursuant to 28 U.S.C. § 158(d)(2).

## WHY THE DIRECT APPEAL SHOULD BE ALLOWED

Pursuant to 28 U.S.C. § 158(d)(2)(A), the bankruptcy court may certify a direct appeal to the relevant United States Court of Appeals if any one of the following three independent circumstances is satisfied:

    (i)    the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;

    (ii)    the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or

    (iii)    an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken.

28 U.S.C. § 158(d)(2)(A).

On its own motion, the bankruptcy court certified the judgment for immediate appeal, finding the bases "for a certification [under 28 U.S.C. § 158(d)(2)] to be present."  Decision, 529 B.R. at 597.  That conclusion is manifestly correct.

14

## A.    The Questions Presented Involve Matters of Public Importance

The appeals and cross-appeals concern a sale order that was entered by the bankruptcy court six years ago in one of the largest and highest profile bankruptcy cases in history.  The Sale Order and Injunction was the most important event in the Old GM bankruptcy, not only for Old GM and its creditors, but for the public at large, as the 363 Sale saved hundreds of thousands of jobs and alleviated significant harm to the overall U.S. economy that likely would have occurred absent the 363 Sale.

Almost five years after the entry of the Sale Order and Injunction, New GM, in compliance with its recall covenant under the Sale Agreement, instituted various recalls concerning both Old GM and New GM vehicles.  Such recalls prompted hundreds of lawsuits against New GM by thousands of plaintiffs.  The bankruptcy court found that many of these lawsuits, either in whole or in part, violated the Sale Order and Injunction.  It also found that, based on insufficient notice by Old GM (not New GM), the Sale Order and Injunction could be modified years later (notwithstanding the terms of the Sale Order and Injunction), after all appeals of the Sale Order and Injunction had been resolved, to the detriment of New GM, a good faith purchaser for fair value.

The appeals and cross-appeals, therefore, involve matters of significant public importance.  "Public importance exists when the matter on appeal

15

'transcend[s] the litigants and involves a legal question the resolution of which will advance the cause of jurisprudence to a degree that is usually not the case.'" *Mark IV Indus., v. N.M. Env't Dep't*, 452 B.R. 385, 388-89 (S.D.N.Y. 2011) (citations omitted).  As the bankruptcy court found, the issues here involve matters of public importance because the rulings will potentially affect, in general, other chapter 11 cases and, in particular, the 363 sale process and claims allowance process.  *See* Decision, 529 B.R. at 598.  Two issues in particular stand out.

*First*, critical to the bankruptcy court's decision is its conclusion that the Ignition Switch Plaintiffs (and many of the Ignition Switch Pre-Closing Accident Plaintiffs) were known creditors of Old GM, even though it was undisputed the books and records of Old GM did not list them as creditors and they had not commenced a lawsuit against Old GM prior to the bankruptcy filing or asserted any type of demand against Old GM.    Whether a creditor is "known" or "unknown" for bankruptcy noticing purposes is a key issue that arises in countless bankruptcy cases.  This distinction determines how a creditor will be provided notice of events in a bankruptcy case.  If a creditor is "known" to the debtor, the creditor must be provided with actual direct mail notice of actions that will affect their rights.  If a creditor is "unknown," publication notice setting forth the relief the debtor seeks is sufficient.  New GM submits that the bankruptcy court's ruling that Plaintiffs were "known" creditors is inconsistent with applicable precedent.

How this issue is ultimately resolved here will undoubtedly inform how notice issues are resolved in countless other bankruptcy cases.

**Second**, like the Sale Order and Injunction in this case, orders that approve Bankruptcy Code Section 363 sales typically contain provisions that protect the purchaser from liabilities and claims not expressly assumed.  The finality of those orders is critical to the bankruptcy process.  The Sale Order and Injunction here was appealed shortly after it was entered in 2009, with creditors seeking to undo these important provisions.  The United States District Court for the Southern District of New York dismissed those appeals as equitably moot years ago, and refused to modify the Sale Order and Injunction.  *See Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 428 B.R. 43, 52 (S.D.N.Y. 2010) ("the very nature of the requested relief, to the extent it could even be granted, would result in an inequitable rewriting of the Sale Order. The ability to interlineate the Sale Order was never within the power of the Bankruptcy Court in the first instance."); *see also Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 430 B.R. 65 (S.D.N.Y. 2010).

Now, six years later, after New GM has engaged in many millions of discrete transactions, the bankruptcy court has held that the Sale Order and Injunction can be modified such that it did not apply to certain creditors for Independent Claims against New GM because of a notice issue not of the

purchaser's making.    Such a ruling will have a profound effect on future bankruptcy cases, where the debtor seeks to sell its assets free and clear of liens and claims.  If prospective purchasers have reason to doubt that the sale order they obtain from a bankruptcy court will be upheld, and fear that important provisions in a sale order can, years later, be modified or undone because of acts undertaken, not by them but by the debtor, the ability of a debtor to maximize its assets and obtain the highest and best price in a Section 363 sale will be jeopardized.  Such a result will have a significant impact on future bankruptcy cases and 363 sales. This important issue of law should be decided by this Court without delay.

In sum, the bankruptcy court's rulings with respect to due process and modifications of sale orders will have a wide-ranging impact on myriad bankruptcy cases, both now and in the future.  Such rulings not only affect the thousands of plaintiffs to this litigation (in both the bankruptcy court and the MDL), but also concern the policy goals of the Bankruptcy Code and 363 sales.[5]  Given the public importance of this case, and the significant bankruptcy issues it presents, the Court should accept a direct appeal and decide these issues now.

---

[5]    *See e.g.*, *In re Edwards*, 962 F.2d 641, 645 (7th Cir. 1992) ("The strong policy of finality of bankruptcy sales embodied in section 363(m) provides, in turn, strong support for the principle that a bona fide purchaser at a bankruptcy sale gets good title[, and t]he policy would mean rather little if years after the sale a secured creditor could undo it by showing that . . . he hadn't got notice of it.").

**B.    An Immediate Appeal will Materially Advance the Progress of the Case**

The bankruptcy court's rulings do not affect just one plaintiff and one defendant.    They affect potentially thousands of plaintiffs who have already commenced hundreds of lawsuits against New GM that are barred, in whole or in part, by the Sale Order and Injunction.    The bankruptcy court's decision also affects other parties who have yet to commence a lawsuit against New GM; it is clear that parties will not stop asserting claims against New GM until this Court finally determines all issues in these appeals and cross-appeals. *See, e.g.*, *Weber v. U.S. Tr.*, 484 F.3d 154, 158 (2d Cir. 2007) (an appeal will materially advance the progress of a case "where a bankruptcy court has made a ruling which, if correct, will essentially determine the result of future litigation, [and] the parties adversely affected by the ruling might very well fold up their tents if convinced that the ruling has the approval of the court of appeals, but will not give up until that becomes clear").

Going first to the district court, and then to this Court, will not advance the progress of this case; it will have the opposite effect.    Many of the lawsuits that are subject to the motions to enforce—both in the MDL and in state courts nationwide—have been stayed pending a final ruling on the motions to enforce (including through all appellate levels).    Given the importance of the issues, it is virtually certain that, if the district court heard the appeal in the first instance, any

ruling by that court would inevitably find its way here.  This Court can ensure that the appeals process (as well as the underlying litigation) concludes sooner, rather than later, by accepting these appeals and cross-appeals on this complete, stipulated record, for direct review. The issues and record on appeal will be the same in the district court as in this Court.  This is not a case that would benefit from "percolation through the district court" as such process would not "cast more light on the issue and facilitate a wise and well-informed decision."  *Id.* at 161. Accordingly, this Court should act now on these appeals and cross-appeals to materially advance the outcome of this important litigation.

## CONCLUSION

For the reasons stated above, New GM respectfully requests that the Court, at the appropriate time, authorize a direct appeal of all questions raised in connection with the judgment pursuant to 28 U.S.C. § 158(d)(2)(A).

Dated: New York, New York
         June 29, 2015

Respectfully submitted,

      /s/ Arthur Steinberg

Richard C. Godfrey, P.C.
Andrew B. Bloomer, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Arthur Steinberg
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York  10036
Telephone:(212) 556-2100
Facsimile:(212) 556-2222
asteinberg@kslaw.com

*Attorneys for General Motors LLC*

20

## <u>CERTIFICATE OF COMPLIANCE</u>

This Response and Cross-Petition complies with the page limitation of Rule 5 of the Federal Rules of Appellate Procedure because it does not exceed 20 pages, exclusive of the disclosure statement, the proof of service, and the accompanying documents required by Rule 5(b)(1)(E).

This Response and Cross-Petition complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.


Dated:      New York, New York
            June 29, 2015

                                        Respectfully submitted,

                                        __/s/ Arthur Steinberg_____
                                        Arthur Steinberg

## <u>CERTIFICATE OF SERVICE & CM/ECF FILING</u>

I hereby certify that I caused the foregoing **Response and Cross-Petition for Permission for Direct Appeal Under 28 U.S.C. § 158(d)(2)(A)** to be served on Counsel for Respondents *via* Electronic Mail and one (1) copy via Next Business Day Delivery to:

Gary Peller
GARY PELLER, ESQ.
600 New Jersey Avenue, NW
Washington, DC  20001
peller@law.georgetown.edu

*Counsel for the Petitioners Elliott*
*Plaintiffs and Sesay Plaintiffs*

Matthew J. Williams
Keith R. Martorana
Lisa Rubin
Adam Offenhartz
Aric Wu
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166
mjwilliams@gibsondunn.com
kmartorana@gibsondunn.com
lrubin@gibsondunn.com
aoffenhartz@gibsondunn.com
awu@gibsondunn.com

*Counsel for Wilmington Trust Company*
*as GUC Trust Administrator*

Alexander Schmidt
Malcolm T. Brown
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY  10016
schmidt@whafh.com
brown@whafh.com

*Counsel for ABC Flooring, Inc., et al.*

Jonathan L. Flaxer
Preston Ricardo
GOLENBOCK EISENMAN
  ASSOR BELL & PESKOE LLP
437 Madison Avenue
New York, NY  10022
jflaxer@golenbock.com
pricardo@golenbock.com

*Counsel for Groman Plaintiffs*

Sander L. Esserman
STUTZMAN, BROMBERG,
  ESSERMAN & PLIFKA
2323 Bryan Street, Suite 2200
Dallas, TX  75201

esserman@sbep-law.com

*Designated Counsel for Economic
Loss Plaintiffs*

Daniel H. Golden
Deborah Newman
Jamison Diehl
Naomi Moss
AKIN GUMP STRAUSS
  HAUER & FELD LLP
One Bryant Park
New York, NY  10036
dgolden@akingump.com
djnewman@akingump.com
jdiehl@akingump.com
nmoss@akingump.com

*Counsel for Participating GUC Trust
Unit Holders*

William Weintraub
Gregory Fox
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018
wweintraub@goodwinprocter.com
eohagan@goodwinprocter.com
gfox@goodwinprocter.com

*Designated Counsel for Pre-Sale
Accident Plaintiffs*

Edward S. Weisfelner
Howard Steel
David Molton
May Orenstein
BROWN RUDNICK LLP
Seven Times Square
New York, NY  10036
eweisfelner@brownrudnick.com
hsteel@brownrudnick.com
dmolton@brownrudnick.com
morenstein@brownrudnick.com

*Designated Counsel for Economic Loss
Plaintiffs*

I certify that an electronic copy was filed using the CM/ECF system and that three (3) paper copies of the foregoing **Response and Cross-Petition for Permission for Direct Appeal Under 28 U.S.C. § 158(d)(2)(A)** were sent to the Clerk's Office by hand delivery to:

Clerk of Court
United States Court of Appeals, Second Circuit
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007
(212) 857-8500

on this 29th day of June, 2015.

Respectfully submitted,

   /s/ Arthur Steinberg
Arthur Steinberg

# APPENDIX

# TABLE OF CONTENTS

**Description**                                                    **Exhibit**

Judgment,
    No. 09-br-50026, Dkt. No. 13177 (Bankr. S.D.N.Y. June 1, 2015) ..............A

Sale Order and Injunction, with Sale Agreement,
    No. 09-br-50026, Dkt. No. 2968 (Bankr. S.D.N.Y. July 9, 2009) ................B

Order, Pursuant to 28 U.S.C. § 158(d), and Fed. R. Bankr. P. 8006(e),
    Certifying Judgment for Direct Appeal to Second Circuit,
    No. 09-br-50026, Dkt. No. 13178 (Bankr. S.D.N.Y. June 1, 2015) ..............C

# Exhibit A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
In re                                          :      Chapter 11
                                               :
MOTORS LIQUIDATION COMPANY, *et al.*,          :      Case No.: 09-50026 (REG)
      f/k/a General Motors Corp., *et al.*   :
                                               :
               Debtors.      :      (Jointly Administered)
-------------------------------------------------------------x

## JUDGMENT

For the reasons set forth in the Court's *Decision on Motion to Enforce Sale Order*, entered on April 15, 2015 ("**Decision**"),[1] it is hereby ADJUDGED as follows:

1.     The Ignition Switch Plaintiffs and the Ignition Switch Pre-Closing Accident Plaintiffs (collectively, the "**Plaintiffs**") were "known creditors" of the Debtors.  The Plaintiffs did not receive the notice of the sale of assets of Old GM to New GM ("**363 Sale**") that due process required.

2.     Except with respect to Independent Claims (as herein defined), the Ignition Switch Plaintiffs were not prejudiced by their lack of notice of the 363 Sale, and they thus failed to demonstrate a due process violation with respect to the 363 Sale.

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Decision. For purposes of this Judgment, the following terms shall apply: (i) "**Ignition Switch Plaintiffs**" shall mean plaintiffs that have commenced a lawsuit against New GM asserting economic losses based on or arising from the Ignition Switch in the Subject Vehicles (each term as defined in the *Agreed and Disputed Stipulations of Fact Pursuant to the Court's Supplemental Scheduling Order, Dated July 11, 2014*, filed on August 8, 2014 [Dkt. No. 12826], at 3); (ii) "**Pre-Closing Accident Plaintiffs**" shall mean plaintiffs that have commenced a lawsuit against New GM based on an accident or incident that occurred prior to the closing of the 363 Sale; (iii) "**Ignition Switch Pre-Closing Accident Plaintiffs**" shall mean that subset of the Pre-Closing Accident Plaintiffs that had the Ignition Switch in their Subject Vehicles; (iv) "**Non-Ignition Switch Pre-Closing Accident Plaintiffs**" shall mean that subset of Pre-Closing Accident Plaintiffs that are not Ignition Switch Pre-Closing Accident Plaintiffs; and (v) "**Non-Ignition Switch Plaintiffs**" shall mean plaintiffs that have commenced a lawsuit against New GM asserting economic losses based on or arising from an alleged defect, other than the Ignition Switch, in an Old GM vehicle.

-1-

3.      The Ignition Switch Pre-Closing Accident Plaintiffs were not prejudiced by their lack of notice of the 363 Sale, and they thus failed to demonstrate a due process violation with respect to the 363 Sale.

4.      With respect to the Independent Claims, the Ignition Switch Plaintiffs were prejudiced by the failure to give them the notice of the 363 Sale that due process required.  The Ignition Switch Plaintiffs established a due process violation with respect to the Independent Claims.  The Sale Order shall be deemed modified to permit the assertion of Independent Claims.  For purposes of this Judgment, "**Independent Claims**" shall mean claims or causes of action asserted by Ignition Switch Plaintiffs against New GM (whether or not involving Old GM vehicles or parts) that are based solely on New GM's own, independent, post-Closing acts or conduct.  Nothing set forth herein shall be construed to set forth a view or imply whether or not Ignition Switch Plaintiffs have viable Independent Claims against New GM.

5.      Except for the modification to permit the assertion  of Independent Claims by the Ignition Switch Plaintiffs, the Sale Order shall remain unmodified and in full force and effect.

6.      The Plaintiffs were prejudiced by the failure to receive the notice due process required of the deadline ("**Bar Date**") to file proofs of claim against the Old GM bankruptcy estate.  Any Plaintiff may petition the Bankruptcy Court (on motion and notice) for authorization to file a late or amended proof of claim against the Old GM bankruptcy estate.  The Court has not determined the extent to which any late or amended proof of claim will ultimately be allowed or allowed in a different amount.  But based on the doctrine of equitable mootness, in no event shall assets of the GUC Trust held at any time in the past, now, or in the future (collectively, the "**GUC Trust Assets**") (as defined in the Plan) be used to satisfy any claims of the Plaintiffs, nor will Old GM's Plan be modified with respect to such claims; *provided* that nothing in this

Judgment shall impair any party's rights with respect to the potential applicability of Bankruptcy

Code section 502(j) to any claims that were previously allowed or disallowed by the Court.  The

constraints on recourse from GUC Trust Assets shall not apply to any Ignition Switch Plaintiff,

Pre-Closing Accident Plaintiff, or Non-Ignition Switch Plaintiff who had a claim previously

allowed or disallowed by the Court, but in no event shall he or she be entitled to increase the

amount of any allowed claim without the prior authorization of the Bankruptcy Court or an

appellate court following an appeal from the Bankruptcy Court.

7.      Any claims and/or causes of action brought by the Ignition Switch Pre-Closing

Accident Plaintiffs that seek to hold New GM liable for accidents or incidents that occurred prior

to the closing of the 363 Sale are barred and enjoined pursuant to the Sale Order.  The Ignition

Switch Pre-Closing Accident Plaintiffs shall not assert or maintain any such claim or cause of

action against New GM.

8.      (a)      Subject to the other provisions of this paragraph 8, each Ignition Switch

Pre-Closing Accident Plaintiff (including without limitation the Ignition Switch Pre-Closing

Accident Plaintiffs identified on Exhibit "A" attached hereto) is stayed and enjoined from

prosecuting any lawsuit against New GM.

(b)      Within two (2) business days of the entry of this Judgment, New GM shall

serve a copy of this Judgment on counsel in the lawsuits identified on Exhibit "A," by e-mail,

facsimile, overnight mail or, if none of the foregoing are available, regular mail, with a cover

note that states:  "The attachment is the Judgment entered by the Bankruptcy Court.  Please

review the Judgment, including without limitation, the provisions of paragraph 8 of the

Judgment."

-3-

(c)     If counsel for an Ignition Switch Pre-Closing Accident Plaintiff (including, but not limited to, one identified on Exhibit "A") believes that, notwithstanding the Decision and this Judgment, it has a good faith basis to maintain that its lawsuit against New GM should not be stayed, it shall file a pleading with this Court within 17 business days of this Judgment ("**No Stay Pleading**").  The No Stay Pleading shall not reargue issues that were already decided by the Decision, this Judgment, or any other decision, order, or judgment of this Court.  If a No Stay Pleading is timely filed, New GM shall have 17 business days to respond to such pleading.  The Court will schedule a hearing thereon if it believes one is necessary.

9.  Except for  Independent Claims and Assumed Liabilities (if any), all claims and/or causes of action that the Ignition Switch Plaintiffs may have against New GM concerning an Old GM vehicle or part seeking to impose liability or damages based in whole or in part on Old GM conduct (including, without limitation, on any successor liability theory of recovery) are barred and enjoined pursuant to the Sale Order, and such lawsuits shall remain stayed pending appeal of the Decision and this Judgment.

10.     (a)     The lawsuits stayed pursuant to the preceding paragraph shall include those on the attached Exhibit "B."  The lawsuits identified on Exhibit "B" include the Pre-Sale Consolidated Complaint.

(b)     Within two (2) business days of the entry of this Judgment, New GM shall serve a copy of this Judgment on counsel in the lawsuits identified on Exhibit "B", by e-mail, facsimile, overnight mail or, if none of the foregoing are available, regular mail, with a cover note that states: "The attachment is the Judgment entered by the Bankruptcy Court.  Please review the Judgment, including without limitation, the provisions of paragraph 10 of the Judgment."

(c)    If a counsel listed on Exhibit "B" believes that, notwithstanding the

Decision and this Judgment, it has a good faith basis to maintain that its lawsuit against New GM

should not be stayed, it shall file a No Stay Pleading with this Court within 17 business days of

this Judgment.  The No Stay Pleading shall not reargue issues that were already decided by the

Decision and this Judgment, or any other decision or order of this Court.  If a No Stay Pleading

is timely filed, New GM shall have 17 business days to respond to such pleading.  The Court will

schedule a hearing thereon if it believes one is necessary.

11.    (a)    The complaints in the lawsuits listed on the attached Exhibit "C"

("**Hybrid Lawsuits**") include claims and allegations that are permitted under the Decision and

this Judgment and others that are not.  Accordingly, until and unless the complaint in a Hybrid

Lawsuit is (x) amended to assert solely claims and allegations permissible under the Decision

and this Judgment (as determined by this or any higher court, if necessary), or (y) is judicially

determined (by this or any higher court) not to require amendment, that lawsuit is and shall

remain stayed.  The Hybrid Lawsuits include the Post-Sale Consolidated Complaint.  Within two

(2) business days of the entry of this Judgment, New GM shall serve a copy of this Judgment on

counsel in the Hybrid Lawsuits, by e-mail, facsimile, overnight mail or, if none of the foregoing

are available, regular mail, with a cover note that states: "The attachment is the Judgment entered

by the Bankruptcy Court.  Please review the Judgment, including without limitation, the

provisions of paragraph 11 of the Judgment."

(b)    Notwithstanding the stay under the preceding subparagraph, however, the

complaints in the actions listed in Exhibit "C" may, if desired, be amended in accordance with

the subparagraphs that follow.  Subject to the other provisions of this paragraph 11, and unless

the applicable complaint already has been dismissed without prejudice pursuant to an order

-5-

entered in MDL 2543, each Plaintiff in a Hybrid Lawsuit wishing to proceed at this time may

amend his or her complaint on or before June 12, 2015, such that any allegations, claims or

causes of action concerning an Old GM vehicle or part seeking to impose liability or damages

based on Old GM conduct (including, without limitation, any successor liability theory of

recovery) are stricken, and only Independent Claims are pled.

(c)     If a counsel listed in the lawsuits on Exhibit "C" believes that,

notwithstanding the Decision and this Judgment, it has a good faith basis to maintain that its

allegations, claims or causes of action against New GM should not be stricken, it shall file a

pleading with this Court within 17 business days of this Judgment ("**No Strike Pleading**").  The

No Strike Pleading shall not reargue issues that were already decided by the Decision and

Judgment.  If a No Strike Pleading is timely filed, New GM shall have 17 business days to

respond to such pleading.  The Court will schedule a hearing thereon if it believes one is

necessary.

(d)     If an Ignition Switch Plaintiff fails to either (i) amend his or her respective

complaints on or before June 12, 2015, such that all allegations, claims and/or causes of action

concerning an Old GM vehicle or part seeking to impose liability or damages based on Old GM

conduct (including, without limitation, any successor liability theory of recovery) are stricken,

and only Independent Claims are pled, or (ii) timely file a No Strike Pleading with the Court

within the time period set forth above, New GM shall be permitted to file with this Court a notice

of presentment on five (5) business days' notice, with an attached order ("**Strike Order**") that

directs the Ignition Switch Plaintiff to strike specifically-identified allegations, claims and/or

causes of action contained in his or her complaint that violate the Decision, this Judgment and/or

the Sale Order (as modified by the Decision and this Judgment), within 17 business days of

-6-

receipt of the Strike Order.

(e)     For any allegations, claims or causes of action of the Ignition Switch
Plaintiffs listed on Exhibit "C" that are stricken pursuant to this Judgment (voluntarily or
otherwise), (i) the statute of limitations shall be tolled from the date of the amended complaint to
30 days after all appeals of the Decision and Judgment are decided, and (ii) if the Decision and
Judgment are reversed on appeal such that the appellate court finds that the Ignition Switch
Plaintiffs can make the allegations, or maintain the claims or causes of action, against New GM
heretofore stricken pursuant to this Judgment, all of the Ignition Switch Plaintiffs' rights against
New GM that existed prior to the striking of such claims or causes of action pursuant to this
Judgment shall be reinstated as if the striking of such claims or causes of action never occurred.

(f)     Notwithstanding the foregoing, to the extent (but only the extent)
acceptable to the MDL Court, the Plaintiff in any lawsuit listed on Exhibit "C" may elect not to
amend his or her complaint and may await the outcome of appellate review of this Judgment.  If
that plaintiff thereafter determines to proceed with his or her lawsuit, the plaintiff's counsel shall
provide notice to New GM, and the procedures set forth above shall apply.

12.     (a)     The lawsuits captioned *People of California v. General Motors LLC, et
al.*, No. 30-2014-00731038-CU-BT-CXC (Orange County, Cal.) and *State of Arizona v. General
Motors LLC*, No. CV2014-014090 (Maricopa County, Ariz.)  (the "**State Lawsuits**") likewise
include claims and allegations that are permitted under the Decision and this Judgment and
others that are not.  Accordingly, until and unless the complaint in a State Lawsuit is
(x) amended to assert solely claims and allegations permissible under the Decision and this
Judgment (as determined by this or any higher court, if necessary), or (y) is judicially determined
(by this or any higher court) not to require amendment, that lawsuit is and shall remain stayed.

-7-

09-50026-reg   Doc 13172   Filed 06/01/15   Entered 06/01/15 15:03:17   Main Document
Pg 8 of 21

Within two (2) business days of the entry of this Judgment, New GM shall serve a copy of this

Judgment on counsel in the State Lawsuits, by e-mail, facsimile, overnight mail or, if none of the

foregoing are available, regular mail, with a cover note that states: "The attachment is the

Judgment entered by the Bankruptcy Court.  Please review the Judgment, including without

limitation, the provisions of paragraph 12 of the Judgment."

       (b)    Notwithstanding the stay under the preceding subparagraph, however, the

State Lawsuits may, if desired, be amended in accordance with the subparagraphs that follow.

Subject to the other provisions of this paragraph 12, and unless the applicable complaint already

has been dismissed without prejudice, each Plaintiff in a State Lawsuit ("**State Plaintiff**")

wishing to proceed at this time may amend its complaint on or before June 12, 2015, such that

any allegations, claims or causes of action concerning an Old GM vehicle or part seeking to

impose liability or damages based on Old GM conduct (including, without limitation, any

successor liability theory of recovery) are stricken, and only Independent Claims are pled.

       (c)    If a counsel in a State Lawsuit believes that, notwithstanding the Decision

and this Judgment, it has a good faith basis to maintain that its allegations, claims or causes of

action against New GM should not be stricken, it shall file a No Strike Pleading with this Court

within 17 business days of this Judgment.  The No Strike Pleading shall not reargue issues that

were already decided by the Decision and Judgment.  If a No Strike Pleading is timely filed,

New GM shall have 17 business days to respond to such pleading.  The Court will schedule a

hearing thereon if it believes one is necessary.

       (d)    If a State Plaintiff fails to either (i) amend its complaint, on or before June

12, 2015, such that all allegations, claims and/or causes of action concerning an Old GM vehicle

or part seeking to impose liability or damages based on Old GM conduct (including, without

limitation, any successor liability theory of recovery) are stricken, and only Independent Claims

are pled, or (ii) timely file a No Strike Pleading with the Court within the time period set forth

above, New GM shall be permitted to file with this Court a notice of presentment on five (5)

business days' notice, with an attached Strike Order that directs such State Plaintiff to strike

specifically-identified allegations, claims and/or causes of action contained in its complaint that

violate the Decision, this Judgment and/or the Sale Order (as modified by the Decision and

Judgment), within 17 business days of receipt of the Strike Order.

(e)     For any allegations, claims or causes of action of a State Plaintiff that are

stricken pursuant to this Judgment (voluntarily or otherwise), (i) the statute of limitations shall be

tolled from the date of the amended complaint to 30 days after all appeals of the Decision and

Judgment are decided, and (ii) if the Decision and Judgment are reversed on appeal such that the

appellate court finds that the State Plaintiff can make the allegations, or maintain the claims or

causes of action, against New GM heretofore stricken pursuant to this Judgment, all of the State

Plaintiff's rights against New GM that existed prior to the striking of such allegations, claims or

causes of action pursuant to this Judgment shall be reinstated as if their striking never occurred.

(f)     Notwithstanding the foregoing, a State Plaintiff may elect not to amend its

complaint and may await the outcome of appellate review of this Judgment.  If such plaintiff

thereafter determines to proceed with its lawsuit, the plaintiff's counsel shall provide notice to

New GM, and the procedures set forth above shall apply.

13.     (a)     The rulings set forth herein and in the Decision that proscribe claims and

actions being taken against New GM shall apply to the "Identified Parties"[2] who were heard

---

[2]     "**Identified Parties**" as defined in the Court's Scheduling Order entered on May 16, 2014
(ECF No. 12697), and persons that have asserted Pre-Closing personal injury and wrongful death claims
against New GM based on the Ignition Switch Defect (as defined in the Decision).

-9-

09-50026-reg   Doc 13172-1   Filed 06/01/15   Entered 06/01/15 03:17:00   Main Document
Pg 10 of 21

during the proceedings regarding the Four Threshold Issues and any other parties who had notice

of the proceedings regarding the Four Threshold Issues and the opportunity to be heard in

them—including, for the avoidance of doubt, the plaintiffs in the *Bledsoe*, *Elliott* and *Sesay*

lawsuits listed on Exhibit "C." They shall also apply to any other plaintiffs in these proceedings

(including, without limitation, the Non-Ignition Switch Pre-Closing Accident Plaintiffs and Non-

Ignition Switch Plaintiffs identified on Exhibit "D" attached hereto), subject to any objection

("**Objection Pleading**") submitted by any such party within 17 business days of the entry of this

Judgment. New GM shall file a response to any such Objection Pleading within 17 business

days of service. The Court will schedule a hearing thereon if it believes one is necessary. To

the extent an issue shall arise in the future as to whether (i) the Non-Ignition Switch Pre-Closing

Accident Plaintiffs and Non-Ignition Switch Plaintiffs were known or unknown creditors of the

Debtors, (ii) the doctrine of equitable mootness bars the use of any GUC Trust Assets to satisfy

late-filed claims of the Non-Ignition Switch Pre-Closing Accident Plaintiffs and Non-Ignition

Switch Plaintiffs, or (iii) the Non-Ignition Switch Pre-Closing Accident Plaintiffs or Non-

Ignition Switch Plaintiffs were otherwise bound by the provisions of the Sale Order, the Non-

Ignition Switch Pre-Closing Accident Plaintiffs or Non-Ignition Switch Plaintiffs shall be

required to first seek resolution of such issues from this Court before proceeding any further

against New GM and/or the GUC Trust.

(b)    Within two (2) business days of the entry of this Judgment, New GM shall

serve a copy of this Judgment on counsel for the Non-Ignition Switch Pre-Closing Accident

Plaintiffs or Non-Ignition Switch Plaintiffs identified on Exhibit "D", by e-mail, facsimile,

overnight mail or, if none of the foregoing are available, regular mail, with a cover note that

states: "The attachment is the Judgment entered by the Bankruptcy Court. Please review the

Judgment, including without limitation, the provisions of paragraph 13 of the Judgment."

(c)     If a counsel for a Non-Ignition Switch Pre-Closing Accident Plaintiff or
Non-Ignition Switch Plaintiff listed on Exhibit "D" believes that, notwithstanding the Decision
and this Judgment, it has a good faith basis to maintain that its lawsuit, or certain claims or
causes of action contained therein, against New GM should not be dismissed or stricken, it shall
file a pleading with this Court within 17 business days of this Judgment ("**No Dismissal
Pleading**").  Such No Dismissal Pleading may request, as part of any good faith basis to
maintain a lawsuit (or certain claims or causes of action contained therein) against New GM, (i)
an opportunity to select one or more designated counsel from among the affected parties to
address the Four Threshold Issues with respect to particular defects in the vehicles involved in
the accidents or incidents that form the basis for the subject claims, and (ii) the establishment of
appropriate procedures (including a briefing schedule and discovery, if appropriate) with respect
thereto.  If a No Dismissal Pleading is timely filed, New GM shall have 17 business days to
respond to such pleading.  The Court will schedule a hearing thereon if it believes one is
necessary.

(d)     If counsel for a Non-Ignition Switch Pre-Closing Accident Plaintiff or a
Non-Ignition Switch Plaintiff believes that, notwithstanding the Decision and this Judgment, it
has a good faith basis to believe that any of the GUC Trust Assets may be used to satisfy late
proofs of claim filed by them that may ultimately be allowed by the Bankruptcy Court, it shall
file a pleading with this Court within 17 business days of this Judgment ("**GUC Trust Asset
Pleading**").  The GUC Trust Asset Pleading shall not reargue issues that were already decided
by the Decision and Judgment.  If a GUC Trust Asset Pleading is timely filed, the GUC Trust,

the GUC Trust Unitholders and/or New GM shall have 17 business days to respond to such

pleading.  The Court will schedule a hearing thereon if it believes one is necessary.

(e)       If a Non-Ignition Switch Pre-Closing Accident Plaintiff or Non-Ignition

Switch Plaintiff listed on Exhibit "D" fails to timely file a No Dismissal Pleading or a GUC

Trust Asset Pleading with the Court within the time period set forth in paragraphs 13(c) and (d)

above, New GM, the GUC Trust and/or the GUC Trust Unitholders, as applicable, shall be

permitted to file with this Court a notice of presentment on five (5) business days' notice, with an

attached order ("**Dismissal Order**") that directs the Non-Ignition Switch Pre-Closing Accident

Plaintiff or Non-Ignition Switch Plaintiff to dismiss with prejudice its lawsuit, or certain claims

or causes of action contained therein that violate the Decision, this Judgment and/or the Sale

Order (as modified by the Decision and Judgment), within 17 business days of receipt of the

Dismissal Order.  For any lawsuit, or any claims or causes of action contained therein, of the

Non-Ignition Switch Pre-Closing Accident Plaintiffs or Non-Ignition Switch Plaintiffs that are

dismissed pursuant to this Judgment, (i) the statute of limitations shall be tolled from the date of

dismissal to 30 days after all appeals of the Decision and Judgment are decided, and (ii) if the

Decision and Judgment are reversed on appeal, such that the appellate court finds that the Non-

Ignition Switch Pre-Closing Accident Plaintiffs or Non-Ignition Switch Plaintiffs can make the

allegations, or maintain the lawsuit or claims or causes of action, against New GM and/or the

GUC Trust heretofore dismissed or stricken pursuant to this Judgment, all of the Non-Ignition

Switch Pre-Closing Accident Plaintiffs' or Non-Ignition Switch Plaintiffs' rights against New

GM and/or the GUC Trust that existed prior to the dismissal of their lawsuit or the striking of

claims or causes of action pursuant to this Judgment shall be reinstated as if the dismissal or the

striking of such claims or causes of action never occurred.

09-50026-reg   Doc 13172-1   Filed 06/01/15   Entered 06/01/15 05:03:17   Main Document
Pg 13 of 21

(f)     Notwithstanding the provisions of this Paragraph 13, any plaintiff whose lawsuit would otherwise have to be dismissed, in whole or in part, under this Paragraph 13 may elect, by notice filed on ECF and served upon New GM and the GUC Trust (no later than 14 days after the entry of this judgment), to stay the lawsuit instead.  Except as the Court may otherwise provide by separate order (entered on stipulation or on motion), the provisions of Paragraph 13 shall then apply to any request for relief from that stay.

14.     The Court adopts the legal standard for "fraud on the court" as set forth in the Decision.

15.     (a)     By agreement of New GM, Designated Counsel for the Ignition Switch Plaintiffs, the GUC Trust, and the GUC Trust Unitholders, and as approved by the Court, no discovery in the Bankruptcy Court was conducted in connection with the resolution of the Four Threshold Issues.  The Ignition Switch Pre-Closing Accident Plaintiffs did not challenge the earlier decision not to seek discovery in the Bankruptcy Court in connection with the Bankruptcy Court's determination of the Four Threshold Issues.  New GM, Designated Counsel, the Groman Plaintiffs, the GUC Trust, and the GUC Trust Unitholders developed and submitted to the Court a set of agreed upon stipulated facts.  Such parties also submitted to the Bankruptcy Court certain disputed facts and exhibits.  The Court decided the Four Threshold Issues on the agreed upon stipulated facts only.

(b)     The Court has determined that the agreed-upon factual stipulations were sufficient for purposes of determining the Four Threshold Issues; that none of the disputed facts were or would have been material to the Court's conclusions as to any of the Four Threshold Issues; and that treating any disputed fact as undisputed would not have affected the outcome or reasoning of the Decision.

(c)    The Groman Plaintiffs requested discovery with respect to the Four Threshold Issues but the other parties opposed that request, and the Court denied that request. To the extent the Groman Plaintiffs' discovery request continues, it is denied without prejudice to renewal in the event that after appeal of this Judgment, the discovery they seek becomes necessary or appropriate.

(d)    For these reasons (and others), the findings of fact in the Decision shall apply only for the purpose of this Court's resolution of the Four Threshold Issues, and shall have no force or applicability in any other legal proceeding or matter, including without limitation, MDL 2543. Notwithstanding the foregoing, in all events, however, the Decision and Judgment shall apply with respect to (a) the Court's interpretation of the enforceability of the Sale Order, and (b) the actions of the affected parties that are authorized and proscribed by the Decision and Judgment.

16.    The Court shall retain exclusive jurisdiction, to the fullest extent permissible under law, to construe or enforce the Sale Order, this Judgment, and/or the Decision on which it was based. For the avoidance of doubt, except as otherwise provided in this Judgment, the Sale Order remains fully enforceable, and in full force and effect. This Judgment shall not be collaterally attacked, or otherwise subjected to review or modification, in any Court other than this Court or any court exercising appellate authority over this Court.

17.    Count One of the amended complaint ("**Groman Complaint**") filed in *Groman et al v. General Motors LLC* (Adv. Proc. No. 14-01929 (REG)) is dismissed with prejudice. The remaining counts of the Groman Complaint that deal with the "fraud on the court" issue are deferred and stayed until 30 days after all appeals of the Decision and Judgment are decided. With respect to Count One of the Groman Complaint, (i) the statute of limitations shall be tolled

from the date of dismissal of Count One to 30 days after all appeals of the Decision and

Judgment are decided, and (ii) if the Decision and Judgment are reversed or modified on appeal

such that the appellate court finds that the Groman Plaintiffs can maintain the cause of action in

Count One of the Groman Complaint heretofore dismissed pursuant to this Judgment, the

Groman Plaintiffs' rights against New GM that existed as of the dismissal of Count One shall be

reinstated as if the dismissal of Count One never occurred.

18.    (a)    New GM is hereby authorized to serve this Judgment and the Decision

upon any additional party (or his or her attorney) (each, an "**Additional Party**") that commences

a lawsuit and/or is not otherwise on Exhibits "A" through "D" hereto (each, an "**Additional**

**Lawsuit**") against New GM that would be proscribed by the Sale Order (as modified by the

Decision and this Judgment).  Any Additional Party shall have 17 business days upon receipt of

service by New GM of the Decision and Judgment to dismiss, without prejudice, such Additional

Lawsuit or the allegations, claims or causes of action contained in such Additional Lawsuit that

would violate the Decision, this Judgment, or the Sale Order (as modified by the Decision and

this Judgment).

(b)    If any Additional Party has a good faith basis to maintain that the

Additional Lawsuit or certain allegations, claims or causes of action contained in such Additional

Lawsuit should not be dismissed without prejudice, such Additional Party shall, within 17

business days upon receipt of the Decision and Judgment, file with this Court a No Dismissal

Pleading explaining why such Additional Lawsuit or certain claims or causes of action contained

therein should not be dismissed without prejudice. The No Dismissal Pleading shall not reargue

issues that were already decided by the Decision and Judgment.  New GM shall file a response to

the No Dismissal Pleading within 17 business days of service of the No Dismissal Pleading.  The

Court will schedule a hearing thereon if it believes one is necessary.

(c)    If an Additional Party fails to either (i) dismiss without prejudice the Additional Lawsuit or the claims and/or causes of action contained therein that New GM asserts violates the Decision, Judgment, and/or Sale Order (as modified by the Decision and this Judgment), or (ii) timely file a No Dismissal Pleading with the Court within the time period set forth above, New GM shall be permitted to file with this Court a notice of presentment on five (5) business days' notice, with an attached Dismissal Order that directs the Additional Party to dismiss without prejudice the Additional Lawsuit or the claims and/or causes of action contained therein that violate the Decision, this Judgment and/or the Sale Order (as modified by the Decision and this Judgment), within 17 business days of receipt of the Dismissal Order.  With respect to any lawsuit that is dismissed pursuant to this paragraph, (i) the statute of limitations shall be tolled from the date of dismissal of such lawsuit to 30 days after all appeals of the Decision and Judgment are decided, and (ii) if the Decision and Judgment are reversed on appeal such that the appellate court finds that the Additional Party can maintain the lawsuit heretofore dismissed pursuant to this Judgment, the Additional Party's rights against New GM that existed as of the dismissal of the lawsuit shall be reinstated as if the dismissal of the lawsuit never occurred.

(d)    For the avoidance of doubt, nothing in this paragraph 18 shall apply to the Amended Consolidated Complaint to be filed in MDL 2543 on or before June 12, 2015.

Dated: New York, New York
    June 1, 2015

_s/ Robert E. Gerber_____
United States Bankruptcy Judge

-16-

**Exhibit "A": Complaints Alleging Pre-Closing Ignition Switch Accidents To Be Stayed**

Bachelder, et al. v. General Motors LLC, MDL No. 1:15-cv-00155-JMF (S.D.N.Y.)[3]

Betancourt Vega v. General Motors LLC, et al., No. 3:15-cv-01245-DRD (D.P.R.)
(MDL No. 1:15-cv-02638)

Bledsoe, et al. v. General Motors LLC, MDL No. 1:14-cv-07631-JMF (S.D.N.Y.)[4]

Boyd, et al. v. General Motors LLC, No. 4:14-cv-01205-HEA (E.D. Mo.)
(MDL No. 1:14-cv-08385)[5]

Doerfler-Bashucky v. General Motors LLC, et al., No. 5:15-cv-00511-GTS-DEP (N.D.N.Y.)

Edwards, et al. v. General Motors LLC, MDL No. 1:14-cv-06924-JMF (S.D.N.Y.)[6]

Johnston-Twining v. General Motors LLC, et al., No. 3956 (Philadelphia County, Pa.)

Meyers v. General Motors LLC, No. 1:15-cv-00177-CCC (M.D. Pa.)

Occulto v. General Motors Co., et al., No. 15-cv-1545 (Lackawanna County, Pa.)

Scott v. General Motors Company, et al., No. 8:15-cv-00307-JDW-AEP (M.D. Fla.)
(MDL No. 1:15-cv-01790)

Vest v. General Motors LLC, et al., No. 1:14-cv-24995-DAF (S.D. W.Va.)
(MDL No. 1:14-cv-07475)

---

[3] The *Bachelder* complaint includes both Ignition Switch and non-Ignition Switch Pre-Closing Accident vehicles subject to the Judgment. Accordingly, it is listed both on Exhibits "A" and "D."

[4] The *Bledsoe* complaint includes both Ignition Switch and non-Ignition Switch Pre-Closing Accident vehicles subject to the Judgment. Accordingly, it is listed both on Exhibits "A" and "D." In addition, the *Bledsoe* complaint includes economic loss claims regarding Old GM conduct and vehicles and, therefore, also appears on Exhibit "C."

[5] The *Boyd* complaint contains allegations regarding both a Pre-Closing ignition switch accident and one or more Post-Closing ignition switch accidents. To the extent the complaint concerns one or more Post-Closing ignition switch accidents, those portions of the *Boyd* complaint that assert Product Liabilities (as defined in the Sale Agreement) based on a Post-Closing ignition switch accident are not subject to the Judgment.

[6] The *Edwards* complaint includes both Ignition Switch and non-Ignition Switch Pre-Closing Accident vehicles subject to the Judgment. Accordingly, it is listed both on Exhibits "A" and "D."

## Exhibit "B": Economic Loss Complaints To Be Stayed

Hailes, et al. v. General Motors LLC, et al., No. 15PU-CV00412 (Pulaski County, Mo.)

In re General Motors LLC Ignition Switch Litigation, 14-MD-2543, *Consolidated Class Action Complaint Against New GM For Recalled Vehicles Manufactured By Old GM and Purchased Before July 11, 2009*

## Exhibit "C": Complaints Containing Particular Allegations
## And/Or Claims Barred By Sale Order To Be Stricken

### Post-Sale Personal Injury/Wrongful Death Complaints With Economic Loss Claims To Be Stricken:

Ackerman v. General Motors Corp., et al., No. MRS-L-2898-14 (Morris County, N.J.)

Austin, et al. v. General Motors LLC, No. 2015-L- 000026 (St. Clair County, Ill.)

Berger, et al. v. General Motors LLC, No. 9241/2014 (Kings County, N.Y.)

Casey, et al.  v. General Motors LLC, et al., No. 2014-54547 (Texas MDL)

Colarossi v. General Motors, et al., No. 14-22445 (Suffolk County, N.Y.)

Dobbs v. General Motors LLC, et al., No. 49D051504PL010527 (Marion County, Ind.)

Felix, et al. v. General Motors LLC, No. 1422-CC09472 (City of St. Louis, Mo.)

Gable, et al. v. Walton, et al., No. 6737 (Lauderdale County, Tenn.)

Goins v. General Motors LLC, et al., No. 2014-CI40 (Yazoo County, Miss.)

Grant v. General Motors LLC, et al., No. 2014CV02570MG (Clayton County, Ga.)

Green v. General Motors LLC, et al., No. 15-144964-NF (Oakland County, Mich.)

Hellems v. General Motors LLC, No. 15-459-NP (Eaton County, Mich.)

Hinrichs v. General Motors LLC, et al., No. 15-DCV-221509 (Texas MDL)

Jackson v. General Motors LLC, et al., No. 2014-69442 (Texas MDL)

Largent v. General Motors LLC, et al., No. 14-006509-NP (Wayne County, Mich.)

Licardo v. General Motors LLC, No. 03236 (Fulton County, N.Y.)

Lincoln, et al. v. General Motors LLC, No. 2015-0449-CV (Steuben County, N.Y.)

Lucas v. General Motors LLC, et al., No. 15-CI-00033 (Perry County, Ky.)

Miller v. General Motors LLC, et al., No. CACE-15-002297 (Broward County, Fla.)

Mullin, et al. v. General Motors LLC, et al., No. BC568381 (Los Angeles County, Cal.)

Nelson v. General Motors LLC, et al., No. D140141 (Texas MDL)

Petrocelli v. General Motors LLC, et al., No. 14-17405 (Suffolk County, N.Y.)

Polanco, et al. v. General Motors LLC, et al., No. CIVRS1200622 (San Bernardino County, Cal.)

Quiles v. Catsoulis, et al., No. 702871/14 (Queens County, N.Y.)

Quintero v. General Motors LLC, et al., No. 15-995 (Orleans Parish, La.)

Shell, et al. v. General Motors LLC, No. 1522-CC00346 (City of St. Louis, Mo.)

Solomon v. General Motors LLC, No. 15A794-1 (Cobb County, Ga.)

Spencer v. General Motors LLC, et al., No. D-1-GN-14-001337 (Texas MDL)

Szatkowski, et al. v. General Motors LLC, et al., No. 2014-08274-0 (Luzerne County, Pa.)

Tyre v. General Motors LLC, et al., No. GD-14-010489 (Allegheny County, Pa.)

Wilson v. General Motors LLC, et al., No. 2014-29914 (Texas MDL)

## Post-Sale Economic Loss Complaints With Old GM Allegations/Claims To Be Stricken:

Bledsoe, et al. v. General Motors LLC, MDL No. 1:14-cv-07631-JMF (S.D.N.Y.)

Elliott, et al. v. General Motors LLC, No. 1:14-cv-00691-KBJ (D.D.C.)
(MDL No. 1:14-cv-08382)

Sesay, et al. v. General Motors LLC, et al., MDL No.1:14-cv-06018-JMF (S.D.N.Y.)

In re General Motors LLC Ignition Switch Litigation, 14-MD-2543, *Consolidated Complaint Concerning All GM-Branded Vehicles That Were Acquired July 11, 2009 or Later*

## **Exhibit "D": Non-Ignition Switch Complaints Subject to the Judgment**

**Personal Injury/Wrongful Death Complaints:**

Abney, et al. v. General Motors LLC, MDL No. 1:14-cv-05810-JMF (S.D.N.Y.)[7]

Bachelder, et al. v. General Motors LLC, MDL No. 1:15-cv-00155-JMF (S.D.N.Y.)

Bacon v. General Motors LLC, MDL No. 1:15-cv-00918-JMF (S.D.N.Y.)

Edwards, et al. v. General Motors LLC, MDL No. 1:14-cv-06924-JMF (S.D.N.Y.)

Phillips-Powledge v. General Motors LLC, No. 3:14-cv-00192 (S.D. Tex.)
(MDL No. 1:14-cv-08540)

Pillars v. General Motors LLC, No. 1:15-cv-11360-TLL-PTM (E.D. Mich.)

Williams, et al. v. General Motors LLC, No. 5:15-cv-01070-EEF-MLH (W.D. La.)
(MDL No. 1:15-cv-03272)

**Economic Loss Complaints:**

Bledsoe, et al. v. General Motors LLC, MDL No. 1:14-cv-07631-JMF (S.D.N.Y.)

Elliott, et al. v. General Motors LLC, No. 1:14-cv-00691-KBJ (D.D.C.)
(MDL No. 1:14-cv-08382)

Sesay, et al. v. General Motors LLC, et al., MDL No.1:14-cv-06018-JMF (S.D.N.Y.)

Watson, et al. v. General Motors LLC, et al., No. 6:14-cv-02832 (W.D. La.)

---

[7]    The *Abney* complaint includes a non-Ignition Switch Pre-Closing Accident vehicle subject to the Judgment.

# Exhibit B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                   :

In re                              :          **Chapter 11 Case No.**
                                   :

**GENERAL MOTORS CORP.,** *et al.*,   :          **09-50026 (REG)**
                                   :

          **Debtors.**          :          **(Jointly Administered)**
                                   :

------------------------------------------------------------------x

**ORDER (I) AUTHORIZING SALE OF ASSETS PURSUANT**
**TO AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT**
**WITH NGMCO, INC., A U.S. TREASURY-SPONSORED PURCHASER;**
**(II) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY**
**CONTRACTS AND UNEXPIRED LEASES IN CONNECTION**
<u>**WITH THE SALE; AND (III) GRANTING RELATED RELIEF**</u>

Upon the motion, dated June 1, 2009 (the "**Motion**"), of General Motors

Corporation ("**GM**") and its affiliated debtors, as debtors in possession (collectively, the

"**Debtors**"), pursuant to sections 105, 363, and 365 of title 11, United States Code (the

"**Bankruptcy Code**") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**") for, among other things, entry of an order authorizing and

approving (A) that certain Amended and Restated Master Sale and Purchase Agreement, dated as

of June 26, 2009, by and among GM and its Debtor subsidiaries (collectively, the "**Sellers**") and

NGMCO, Inc., as successor in interest to Vehicle Acquisition Holdings LLC (the "**Purchaser**"),

a purchaser sponsored by the United States Department of the Treasury (the "**U.S. Treasury**"),

together with all related documents and agreements as well as all exhibits, schedules, and

addenda thereto (as amended, the "**MPA**"), a copy of which is annexed hereto as Exhibit "A"

(excluding the exhibits and schedules thereto); (B) the sale of the Purchased Assets[1] to the

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the
Motion or the MPA.

Purchaser free and clear of liens, claims, encumbrances, and interests (other than Permitted Encumbrances), including rights or claims based on any successor or transferee liability; (C) the assumption and assignment of the Assumable Executory Contracts; (D) the establishment of certain Cure Amounts; and (E) the UAW Retiree Settlement Agreement (as defined below); and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York of Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in accordance with this Court's Order, dated June 2, 2009 (the "**Sale Procedures Order**"), and it appearing that no other or further notice need be provided; and a hearing having been held on June 30 through July 2, 2009, to consider the relief requested in the Motion (the "**Sale Hearing**"); and upon the record of the Sale Hearing, including all affidavits and declarations submitted in connection therewith, and all of the proceedings had before the Court; and the Court having reviewed the Motion and all objections thereto (the "**Objections**") and found and determined that the relief sought in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as contemplated by Bankruptcy Rule 6003 and is in the best interests of the Debtors, their estates and creditors, and other parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

2

FOUND AND DETERMINED THAT:

A.      The findings and conclusions set forth herein and in the Court's Decision dated July 5, 2009 (the "Decision") constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, made applicable to this proceeding pursuant to Fed. R. Bankr. P. 9014.

> Formatted: Font: Bold

B.      To the extent any of the following findings of fact or Findings of Fact in the Decision constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law or Conclusions of Law in the Decision constitute findings of fact, they are adopted as such.

C.      This Court has jurisdiction over the Motion, the MPA, and the 363 Transaction pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

D.      The statutory predicates for the relief sought in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code as supplemented by Bankruptcy Rules 2002, 6004, and 6006.

E.      As evidenced by the affidavits and certificates of service and Publication Notice previously filed with the Court, in light of the exigent circumstances of these chapter 11 cases and the wasting nature of the Purchased Assets and based on the representations of counsel at the Sale Procedures Hearing and the Sale Hearing, (i) proper, timely, adequate, and sufficient notice of the Motion, the Sale Procedures, the 363 Transaction, the procedures for assuming and assigning the Assumable Executory Contracts as described in the Sale Procedures Order and as modified herein (the "**Modified Assumption and Assignment Procedures**"), the UAW Retiree

09-50026-reg   Doc 2968   Filed 07/05/09   Entered 07/05/09 20:17:21   Main Document
Pg 4 of 91

Settlement Agreement, and the Sale Hearing have been provided in accordance with Bankruptcy

Rules 2002(a), 6004(a), and 6006(c) and in compliance with the Sale Procedures Order; (ii) such

notice was good and sufficient, reasonable, and appropriate under the particular circumstances of

these chapter 11 cases, and reasonably calculated to reach and apprise all holders of liens, claims,

encumbrances, and other interests, including rights or claims based on any successor or

transferee liability, about the Sale Procedures, the sale of the Purchased Assets, the 363

Transaction, and the assumption and assignment of the Assumable Executory Contracts, and to

reach all UAW-Represented Retirees about the UAW Retiree Settlement Agreement and the

terms of that certain Letter Agreement, dated May 29, 2009, between GM, the International

Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the

"**UAW**"), and Stember, Feinstein, Doyle & Payne, LLC (the "**UAW Claims Agreement**")

relating thereto; and (iii) no other or further notice of the Motion, the 363 Transaction, the Sale

Procedures, the Modified Assumption and Assignment Procedures, the UAW Retiree Settlement

Agreement, the UAW Claims Agreement, and the Sale Hearing or any matters in connection

therewith is or shall be required.  With respect to parties who may have claims against the

Debtors, but whose identities are not reasonably ascertainable by the Debtors (including, but not

limited to, potential contingent warranty claims against the Debtors), the Publication Notice was

sufficient and reasonably calculated under the circumstances to reach such parties.

   F. On June 1, 2009, this Court entered the Sale Procedures Order approving

the Sale Procedures for the Purchased Assets.  The Sale Procedures provided a full, fair, and

reasonable opportunity for any entity to make an offer to purchase the Purchased Assets.  The

Debtors received no bids under the Sale Procedures for the Purchased Assets.  Therefore, the

Purchaser's bid was designated as the Successful Bid pursuant to the Sale Procedures Order.

US_ACTIVE:\43085833\07\43085833_7.DOC\.     4

G.      As demonstrated by (i) the Motion, (ii) the testimony and other evidence
proffered or adduced at the Sale Hearing, and (iii) the representations of counsel made on the
record at the Sale Hearing, in light of the exigent circumstances presented, (a) the Debtors have
adequately marketed the Purchased Assets and conducted the sale process in compliance with the
Sale Procedures Order; (b) a reasonable opportunity has been given to any interested party to
make a higher or better offer for the Purchased Assets; (c) the consideration provided for in the
MPA constitutes the highest or otherwise best offer for the Purchased Assets and provides fair
and reasonable consideration for the Purchased Assets; (d) the 363 Transaction is a sale of
deteriorating assets and the only alternative to liquidation available for the Debtors; (e) if the 363
Transaction is not approved, the Debtors will be forced to cease operations altogether; (f) the
failure to approve the 363 Transaction promptly will lead to systemic failure and dire
consequences, including the loss of hundreds of thousands of auto-related jobs; (g) prompt
approval of the 363 Transaction is the only means to preserve and maximize the value of the
Debtors' assets; (h) the 363 Transaction maximizes fair value for the Debtors' parties in interest;
(i) the Debtors are receiving fair value for the assets being sold; (j) the 363 Transaction will
provide a greater recovery for the Debtors' creditors than would be provided by any other
practical available alternative, including liquidation under chapters 7 or 11 of the Bankruptcy
Code; (k) no other entity has offered to purchase the Purchased Assets for greater economic
value to the Debtors or their estates; (l) the consideration to be paid by the Purchaser under the
MPA exceeds the liquidation value of the Purchased Assets; and (m) the Debtors' determination
that the MPA constitutes the highest or best offer for the Purchased Assets and that the 363
Transaction represents a better alternative for the Debtors' parties in interest than an immediate
liquidation constitute valid and sound exercises of the Debtors' business judgment.

H.      The actions represented to be taken by the Sellers and the Purchaser are

appropriate under the circumstances of these chapter 11 cases and are in the best interests of the

Debtors, their estates and creditors, and other parties in interest.

I.       Approval of the MPA and consummation of the 363 Transaction at this

time is in the best interests of the Debtors, their creditors, their estates, and all other parties in

interest.

J.       The Debtors have demonstrated compelling circumstances and a good,

sufficient, and sound business purpose and justification for the sale of the Purchased Assets

pursuant to the 363 Transaction prior to, and outside of, a plan of reorganization and for the

immediate approval of the MPA and the 363 Transaction because, among other things, the

Debtors' estates will suffer immediate and irreparable harm if the relief requested in the Motion

is not granted on an expedited basis.  In light of the exigent circumstances of these chapter 11

cases and the risk of deterioration in the going concern value of the Purchased Assets pending

the 363 Transaction, time is of the essence in (i) consummating the 363 Transaction, (ii)

preserving the viability of the Debtors' businesses as going concerns, and (iii) minimizing the

widespread and adverse economic consequences for the Debtors, their estates, their creditors,

employees, the automotive industry, and the national economy that would be threatened by

protracted proceedings in these chapter 11 cases.

K.      The consideration provided by the Purchaser pursuant to the MPA (i) is

fair and reasonable, (ii) is the highest and best offer for the Purchased Assets, (iii) will provide a

greater recovery to the Debtors' estates than would be provided by any other available

alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the

Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the

District of Columbia.

US_ACTIVE:\43085833\07\43085833_7.DOC\.                                6

L.      The 363 Transaction must be approved and consummated as promptly as practicable in order to preserve the viability of the business to which the Purchased Assets relate as a going concern.

M.      The MPA was not entered into and none of the Debtors, the Purchaser, or the Purchasers' present or contemplated owners have entered into the MPA or propose to consummate the 363 Transaction for the purpose of hindering, delaying, or defrauding the Debtors' present or future creditors.  None of the Debtors, the Purchaser, nor the Purchaser's present or contemplated owners is entering into the MPA or proposing to consummate the 363 Transaction fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to any of the foregoing.

N.      In light of the extensive prepetition negotiations culminating in the MPA, the Purchaser's commitment to consummate the 363 Transaction is clear without the need to provide a good faith deposit.

O.      Each Debtor (i) has full corporate power and authority to execute the MPA and all other documents contemplated thereby, and the sale of the Purchased Assets has been duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the MPA, (iii) has taken all corporate action necessary to authorize and approve the MPA and the consummation by the Debtors of the transactions contemplated thereby, and (iv) subject to entry of this Order, needs no consents or approvals, other than those expressly provided for in the MPA which may be waived by the Purchaser, to consummate such transactions.

US_ACTIVE:\43085833\07\43085833_7.DOC\.                                7

P.     The consummation of the 363 Transaction outside of a plan of reorganization pursuant to the MPA neither impermissibly restructures the rights of the Debtors' creditors, allocates or distributes any of the sale proceeds, nor impermissibly dictates the terms of a liquidating plan of reorganization for the Debtors. The 363 Transaction does not constitute a *sub rosa* plan of reorganization. The 363 Transaction in no way dictates distribution of the Debtors' property to creditors and does not impinge upon any chapter 11 plan that may be confirmed.

Q.     The MPA and the 363 Transaction were negotiated, proposed, and entered into by the Sellers and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions. Neither the Sellers, the Purchaser, the U.S. Treasury, nor their respective agents, officials, personnel, representatives, and advisors, has engaged in any conduct that would cause or permit the MPA to be avoided under 11 U.S.C. § 363(n).

R.     The Purchaser is a newly-formed Delaware corporation that, as of the date of the Sale Hearing, is wholly-owned by the U.S. Treasury. The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

S.     Neither the Purchaser, the U.S. Treasury, nor their respective agents, officials, personnel, representatives, or advisors is an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

T.     Upon the Closing of the 363 Transaction, the Debtors will transfer to the Purchaser substantially all of its assets. In exchange, the Purchaser will provide the Debtors with (i) cancellation of billions of dollars in secured debt; (ii) assumption by the Purchaser of a portion of the Debtors' business obligations and liabilities that the Purchaser will satisfy; and (iii) no less than 10% of the Common Stock of the Purchaser as of the Closing (100% of which the

8

Debtors' retained financial advisor values at between $38 billion and $48 billion) and warrants to

purchase an additional 15% of the Common Stock of the Purchaser as of the Closing, the

combination of which the Debtors' retained financial advisor values at between $7.4 billion and

$9.8 billion (which amount, for the avoidance of doubt, does not include any amount for the

Adjustment Shares).

U.    The Purchaser, not the Debtors, has determined its ownership composition

and capital structure.  The Purchaser will assign ownership interests to certain parties based on

the Purchaser's belief that the transfer is necessary to conduct its business going forward, that the

transfer is to attain goodwill and consumer confidence for the Purchaser and to increase the

Purchaser's sales after completion of the 363 Transaction.  The assignment by the Purchaser of

ownership interests is neither a distribution of estate assets, discrimination by the Debtors on

account of prepetition claims, nor the assignment of proceeds from the sale of the Debtors'

assets.  The assignment of equity to the New VEBA (as defined in the UAW Retiree Settlement

Agreement) and 7176384 Canada Inc. is the product of separately negotiated arm's-length

agreements between the Purchaser and its equity holders and their respective representatives and

advisors.  Likewise, the value that the Debtors will receive on consummation of the 363

Transaction is the product of arm's-length negotiations between the Debtors, the Purchaser, the

U.S. Treasury, and their respective representatives and advisors.

V.    The U.S. Treasury and Export Development Canada ("**EDC**"), on behalf

of the Governments of Canada and Ontario, have extended credit to, and acquired a security

interest in, the assets of the Debtors as set forth in the DIP Facility and as authorized by the

interim and final orders approving the DIP Facility (Docket Nos. 292 and 2529, respectively).

Before entering into the DIP Facility and the Loan and Security Agreement, dated as of

December 31, 2008 (the "**Existing UST Loan Agreement**"), the Secretary of the Treasury, in

consultation with the Chairman of the Board of Governors of the Federal Reserve System and as

communicated to the appropriate committees of Congress, found that the extension of credit to

the Debtors is "necessary to promote financial market stability," and is a valid use of funds

pursuant to the statutory authority granted to the Secretary of the Treasury under the Emergency

Economic Stabilization Act of 2008, 12 U.S.C. §§ 5201 et seq. ("**EESA**"). The U.S. Treasury's

extension of credit to, and resulting security interest in, the Debtors, as set forth in the DIP

Facility and the Existing UST Loan Agreement and as authorized in the interim and final orders

approving the DIP Facility, is a valid use of funds pursuant to EESA.

       W.     The DIP Facility and the Existing UST Loan Agreement are loans and

shall not be recharacterized. The Court has already approved the DIP Facility. The Existing

UST Loan Agreement bears the undisputed hallmarks of a loan, not an equity investment.

Among other things:

       (i)     The U.S. Treasury structured its prepetition transactions with GM as (a) a loan, made pursuant to and governed by the Existing UST Loan Agreement, in addition to (b) a separate, and separately documented, equity component in the form of warrants;

       (ii)     The Existing UST Loan Agreement has customary terms and covenants of a loan rather than an equity investment. For example, the Existing UST Loan Agreement contains provisions for repayment and pre-payment, and provides for remedies in the event of a default;

       (iii)     The Existing UST Loan Agreement is secured by first liens (subject to certain permitted encumbrances) on GM's and the guarantors' equity interests in most of their domestic subsidiaries and certain of their foreign subsidiaries (limited in most cases to 65% of the equity interests of the pledged foreign subsidiaries), intellectual property, domestic real estate (other than manufacturing plants or facilities) inventory that was not pledged to other lenders, and cash and cash equivalents in the United States;

       (iv)     The U.S. Treasury also received junior liens on certain additional collateral, and thus, its claim for recovery on such collateral under the Existing UST Loan Agreement is, in part, junior to the claims of other creditors;

       (v)     the Existing UST Loan Agreement requires the grant of security by its terms, as well as by separate collateral documents, including: (a) a guaranty and

security agreement, (b) an equity pledge agreement, (c) mortgages and deeds of trust, and (d) an intellectual property pledge agreement;

(vi)     Loans under the Existing UST Loan Agreement are interest-bearing with a rate of 3.00% over the 3-month LIBOR with a LIBOR floor of 2.00%. The Default Rate on this loan is 5.00% above the non-default rate.

(vii)     The U.S. Treasury always treated the loans under the Existing UST Loan Agreement as debt, and advances to GM under the Existing Loan Agreement were conditioned upon GM's demonstration to the United States Government of a viable plan to regain competitiveness and repay the loans.

(viii)     The U.S. Treasury has acted as a prudent lender seeking to protect its investment and thus expressly conditioned its financial commitment upon GM's meaningful progress toward long-term viability.

Other secured creditors of the Debtors also clearly recognized the loans under the Existing UST Loan Agreement as debt by entering into intercreditor agreements with the U.S. Treasury in order to set forth the secured lenders' respective prepetition priority.

X.     This Court has previously authorized the Purchaser to credit bid the amounts owed under both the DIP Facility and the Existing UST Loan Agreement and held the Purchaser's credit bid to be, for all purposes, a "Qualified Bid" under the Sale Procedures Order.

Y.     The Debtors, the Purchaser, and the UAW, as the exclusive collective bargaining representative of the Debtors' UAW-represented employees and the authorized representative of the persons in the Class and the Covered Group (as described in the UAW Retiree Settlement Agreement) (the "**UAW-Represented Retirees**") under section 1114(c) of the Bankruptcy Code, engaged in good faith negotiations in conjunction with the 363 Transaction regarding the funding of "retiree benefits" within the meaning of section 1114(a) of the Bankruptcy Code and related matters.  Conditioned upon the consummation of the 363 Transaction and the approval of the Bankruptcy Court granted in this Order, the Purchaser and the UAW will enter into that certain Retiree Settlement Agreement, dated as of the Closing Date (the "**UAW Retiree Settlement Agreement**"), which is Exhibit D to the MPA, which resolves

issues with respect to the provision of certain retiree benefits to UAW-Represented Retirees as

described in the UAW Retiree Settlement Agreement.  As set forth in the UAW Retiree

Settlement Agreement, the Purchaser has agreed to make contributions of cash, stock, and

warrants of the Purchaser to the New VEBA (as defined in the UAW Retiree Settlement

Agreement), which will have the obligation to fund certain health and welfare benefits for the

UAW-Represented Retirees.  The New VEBA will also be funded by the transfer of assets from

the Existing External VEBA and the assets in the UAW Related Account of the Existing Internal

VEBA (each as defined in the UAW Retiree Settlement Agreement).  GM and the UAW, as the

authorized representative of the UAW-Represented Retirees, as well as the representatives for

the class of plaintiffs in a certain class action against GM (the "**Class Representatives**"),

through class counsel, Stemper, Feinstein, Doyle and Payne LLC ("**Class Counsel**"), negotiated

in good faith the UAW Claims Agreement, which requires the UAW and the Class

Representatives to take actions to effectuate the withdrawal of certain claims against the Debtors,

among others, relating to retiree benefits in the event the 363 Transaction is consummated and

the Bankruptcy Court approves, and the Purchaser becomes fully bound by, the UAW Retiree

Settlement Agreement, subject to reinstatement of such claims to the extent of any adverse

impact to the rights or benefits of UAW-Represented Retirees under the UAW Retiree

Settlement Agreement resulting from any reversal or modification of the 363 Transaction, the

UAW Retiree Settlement Agreement, or the approval of the Bankruptcy Court thereof, the

foregoing as subject to the terms of, and as set forth in, the UAW Claims Agreement.

Z.      Effective as of the Closing of  the 363 Transaction, the Debtors will

assume and assign to the Purchaser the UAW Collective Bargaining Agreement and all liabilities

thereunder.  The Debtors, the Purchaser, the UAW and Class Representatives intend that their

actions in connection with the UAW Retiree Settlement Agreement and related undertakings

12

incorporate the compromise of certain claims and rights and shall be deemed to satisfy the

requirements of 29 U.S.C. § 186(c)(2).

AA.    The transfer of the Purchased Assets to the Purchaser will be a legal, valid,

and effective transfer of the Purchased Assets and, except for the Assumed Liabilities, will vest

the Purchaser with all right, title, and interest of the Sellers to the Purchased Assets free and clear

of liens, claims, encumbrances, and other interests (other than Permitted Encumbrances),

including rights or claims (for purposes of this Order, the term "claim" shall have the meaning

ascribed to such term in section 101(5) of the Bankruptcy Code) based on any successor or

transferee liability, including, but not limited to (i) those that purport to give to any party a right

or option to effect any forfeiture, modification, right of first refusal, or termination of the Sellers'

or the Purchaser's interest in the Purchased Assets, or any similar rights and (ii) (a) those arising

under all mortgages, deeds of trust, security interests, conditional sale or other title retention

agreements, pledges, liens, judgments, demands, encumbrances, rights of first refusal or charges

of any kind or nature, if any, including, but not limited to, any restriction on the use, voting,

transfer, receipt of income, or other exercise of any attributes of ownership and (b) all claims

arising in any way in connection with any agreements, acts, or failures to act, of any of the

Sellers or any of the Sellers' predecessors or affiliates, whether known or unknown, contingent

or otherwise, whether arising prior to or subsequent to the commencement of these chapter 11

cases, and whether imposed by agreement, understanding, law, equity or otherwise, including,

but not limited to, claims otherwise arising under doctrines of successor or transferee liability.

BB.    The Sellers may sell the Purchased Assets free and clear of all liens,

claims, encumbrances, and other interests of any kind or nature whatsoever (other than Permitted

Encumbrances), including rights or claims based on any successor or transferee liability,

because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the

Bankruptcy Code has been satisfied. Those (i) holders of liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability, and (ii) non-Debtor parties to the Assumable Executory Contracts who did not object, or who withdrew their Objections, to the 363 Transaction or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those (i) holders of liens, claims, and encumbrances, and (ii) non-Debtor parties to the Assumable Executory Contracts who did object, fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and, to the extent they have valid and enforceable liens or encumbrances, are adequately protected by having such liens or encumbrances, if any, attach to the proceeds of the 363 Transaction ultimately attributable to the property against or in which they assert a lien or encumbrance. To the extent liens or encumbrances secure liabilities that are Assumed Liabilities under this Order and the MPA, no such liens or encumbrances shall attach to the proceeds of the 363 Transaction.

CC. Under the MPA, GM is transferring all of its right, title, and interest in the Memphis, TN SPO Warehouse and the White Marsh, MD Allison Transmission Plant (the "**TPC Property**") to the Purchaser pursuant to section 363(f) of the Bankruptcy Code free and clear of all liens (including, without limitation, the TPC Liens (as hereinafter defined)), claims, interests, and encumbrances (other than Permitted Encumbrances). For purposes of this Order, "**TPC Liens**" shall mean and refer to any liens on the TPC Property granted or extended pursuant to the TPC Participation Agreement and any claims relating to that certain Second Amended and Restated Participation Agreement and Amendment of Other Operative Documents (the "**TPC Participation Agreement**"), dated as of June 30, 2004, among GM, as Lessee, Wilmington Trust Company, a Delaware corporation, not in its individual capacity except as expressly stated herein but solely as Owner Trustee (the "**TPC Trustee**") under GM Facilities Trust No. 1999-I (the "**TPC Trust**"), as Lessor, GM, as Certificate Holder, Hannover Funding Company LLC, as

US_ACTIVE:\43085833\07\43085833_7.DOC\.                    14

CP Lender, Wells Fargo Bank Northwest, N.A., as Agent, Norddeutsche Landesbank

Girozentrale (New York Branch), as Administrator, and Deutsche Bank, AG, New York Branch,

HSBC Bank USA, ABN AMRO Bank N.V., Royal Bank of Canada, Bank of America, N.A.,

Citicorp USA, Inc., Merrill Lynch Bank USA, Morgan Stanley Bank, collectively, as Purchasers

(collectively, with CP Lender, Agent and Administrator, the "**TPC Lenders**"), together with the

Operative Documents (as defined in the TPC Participation Agreements (the "**TPC Operative**

**Documents**").

       DD.    The Purchaser would not have entered into the MPA and would not

consummate the 363 Transaction (i) if the sale of the Purchased Assets was not free and clear of

all liens, claims, encumbrances, and other interests (other than Permitted Encumbrances),

including rights or claims based on any successor or transferee liability or (ii) if the Purchaser

would, or in the future could, be liable for any such liens, claims, encumbrances, and other

interests, including rights or claims based on any successor or transferee liability (collectively,

the "**Retained Liabilities**"), other than, in each case, the Assumed Liabilities.  The Purchaser

will not consummate the 363 Transaction unless this Court expressly orders that none of the

Purchaser, its affiliates, their present or contemplated members or shareholders (other than the

Debtors as the holder of equity in the Purchaser), or the Purchased Assets will have any liability

whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or

by payment, setoff, or otherwise, directly or indirectly, any liens, claims, encumbrances, and

other interests, including rights or claims based on any successor or transferee liability or

Retained Liabilities, other than as expressly provided herein or in agreements made by the

Debtors and/or the Purchaser on the record at the Sale Hearing or in the MPA.

       EE.    The Debtors have demonstrated that it is an exercise of their sound

business judgment to assume and assign the Purchased Contracts to the Purchaser in connection

US_ACTIVE:\43085833\07\43085833_7.DOC\.          15

with the consummation of the 363 Transaction, and the assumption and assignment of the

Purchased Contracts is in the best interests of the Debtors, their estates and creditors, and other

parties in interest. The Purchased Contracts being assigned to, and the liabilities being assumed

by, the Purchaser are an integral part of the Purchased Assets being purchased by the Purchaser,

and, accordingly, such assumption and assignment of the Purchased Contracts and liabilities are

reasonable, enhance the value of the Debtors' estates, and do not constitute unfair discrimination.

       FF.     For the avoidance of doubt, and notwithstanding anything else in this

Order to the contrary:

- The Debtors are neither assuming nor assigning to the Purchaser the agreement to provide certain retiree medical benefits specified in (i) the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between the Company and the UAW, and (ii) the Settlement Agreement, dated February 21, 2008, between the Company and the UAW (together, the "**VEBA Settlement Agreement**");

- at the Closing, and in accordance with the MPA, the UAW Collective Bargaining Agreement, and all liabilities thereunder, shall be assumed by the Debtors and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code. Assumption and assignment of the UAW Collective Bargaining Agreement is integral to the 363 Transaction and the MPA, are in the best interests of the Debtors and their estates, creditors, employees, and retirees, and represent the exercise of the Debtors' sound business judgment, enhances the value of the Debtors' estates, and does not constitute unfair discrimination;

- the UAW, as the exclusive collective bargaining representative of employees of the Purchaser and the "authorized representative" of the UAW-Represented Retirees under section 1114(c) of the Bankruptcy Code, GM, and the Purchaser engaged in good faith negotiations in conjunction with the 363 Transaction regarding the funding of retiree health benefits within the meaning of section 1114(a) of the Bankruptcy Code. Conditioned upon the consummation of the 363 Transaction, the UAW and the Purchaser have entered into the UAW Retiree Settlement Agreement, which, among other things, provides for the financing by the Purchaser of modified retiree health care obligations for the Class and Covered Group (as defined in the UAW Retiree Settlement Agreement) through contributions by the Purchaser (as referenced in paragraph Y herein). The New VEBA will also be funded by the transfer of the UAW Related Account from the Existing Internal VEBA and the assets of the Existing External VEBA to the New VEBA (each as defined in the UAW Retiree Settlement Agreement). The Debtors, the

Purchaser, and the UAW specifically intend that their actions in connection with the UAW Retiree Settlement Agreement and related undertakings incorporate the compromise of certain claims and rights and shall be deemed to satisfy the requirements of 29 U.S.C. § 186(c)(2);

- the Debtors' sponsorship of the Existing Internal VEBA (as defined in the UAW Retiree Settlement Agreement) shall be transferred to the Purchaser under the MPA.

GG.    The Debtors have (i) cured and/or provided adequate assurance of cure (through the Purchaser) of any default existing prior to the date hereof under any of the Purchased Contracts that have been designated by the Purchaser for assumption and assignment under the MPA, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, and (ii) provided compensation or adequate assurance of compensation through the Purchaser to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Purchased Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and the Purchaser has provided adequate assurance of future performance under the Purchased Contracts, within the meaning of section 365(b)(1)(C) of the Bankruptcy Code.  The Modified Assumption and Assignment Procedures are fair, appropriate, and effective and, upon the payment by the Purchaser of all Cure Amounts (as hereinafter defined) and approval of the assumption and assignment for a particular Purchased Contract thereunder, the Debtors shall be forever released from any and all liability under the Purchased Contracts.

HH.    The Debtors are the sole and lawful owners of the Purchased Assets, and no other person has any ownership right, title, or interest therein.  The Debtors' non-Debtor Affiliates have acknowledged and agreed to the 363 Transaction and, as required by, and in accordance with, the MPA and the Transition Services Agreement, transferred any legal, equitable, or beneficial right, title, or interest they may have in or to the Purchased Assets to the Purchaser.

US_ACTIVE:\43085833\07\43085833_7.DOC\.                    17

II.     The Debtors currently maintain certain privacy policies that govern the use
of "personally identifiable information" (as defined in section 101(41A) of the Bankruptcy Code)
in conducting their business operations.  The 363 Transaction may contemplate the transfer of
certain personally identifiable information to the Purchaser in a manner that may not be
consistent with certain aspects of their existing privacy policies.  Accordingly, on June 2, 2009,
the Court directed the U.S. Trustee to promptly appoint a consumer privacy ombudsman in
accordance with section 332 of the Bankruptcy Code, and such ombudsman was appointed on
June 10, 2009.  The Privacy Ombudsman is a disinterested person as required by section 332(a)
of the Bankruptcy Code.  The Privacy Ombudsman filed his report with the Court on July 1,
2009 (Docket No. 2873) (the "**Ombudsman Report**") and presented his report at the Sale
Hearing, and the Ombudsman Report has been reviewed and considered by the Court.  The Court
has given due consideration to the facts, including the exigent circumstances surrounding the
conditions of the sale of personally identifiable information in connection with the 363
Transaction.  No showing has been made that the sale of personally identifiable information in
connection with the 363 Transaction in accordance with the provisions of this Order violates
applicable nonbankruptcy law, and the Court concludes that such sale is appropriate in
conjunction with the 363 Transaction.

JJ.     Pursuant to Section 6.7(a) of the MPA, GM offered Wind-Down
Agreements and Deferred Termination Agreements (collectively, the "**Deferred Termination
Agreements**") in forms prescribed by the MPA to franchised motor vehicle dealers, including
dealers authorized to sell and service vehicles marketed under the Pontiac brand (which is being
discontinued), dealers authorized to sell and service vehicles marketed under the Hummer,
Saturn and Saab brands (which may or may not be discontinued depending on whether the
brands are sold to third parties) and dealers authorized to sell and service vehicles marketed

under brands which will be continued by the Purchaser.  The Deferred Termination Agreements were offered as an alternative to rejection of the existing Dealer Sales and Service Agreements of these dealers pursuant to section 365 of the Bankruptcy Code and provide substantial additional benefits to dealers which enter into such agreements.  Approximately 99% of the dealers offered Deferred Termination Agreements accepted and executed those agreements and did so for good and sufficient consideration.

KK.     Pursuant to Section 6.7(b) of the MPA, GM offered Participation Agreements in the form prescribed by the MPA to dealers identified as candidates for a long term relationship with the Purchaser.  The Participation Agreements provide substantial benefits to accepting dealers, as they grant the opportunity for such dealers to enter into a potentially valuable relationship with the Purchaser as a component of a reduced and more efficient dealer network.  Approximately 99% of the dealers offered Participation Agreements accepted and executed those agreements.

LL.     This Order constitutes approval of the UAW Retiree Settlement Agreement and the compromise and settlement embodied therein.

MM.   This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Consistent with Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order to the full extent to which those rules provide, but that its Order should not become effective instantaneously.  Thus the Court will shorten, but not wholly eliminate, the periods set forth in Fed.R.Bankr.P. 6004(h) and 6006, and expressly directs entry of judgment as set forth in accordance with the provisions of Paragraph 70 below.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

US_ACTIVE:\43085833\07\43085833_7.DOC\.     19

**General Provisions**

1.      The Motion is granted as provided herein, and entry into and performance under, and in respect of, the MPA and the 363 Transaction is approved.

2.      All Objections to the Motion or the relief requested therein that have not been withdrawn, waived, settled, or resolved, and all reservation of rights included in such Objections, are overruled on the merits other than a continuing Objection (each a "**Limited Contract Objection**") that does not contest or challenge the merits of the 363 Transaction and that is limited to (a) contesting a particular Cure Amount(s) (a "**Cure Objection**"), (b) determining whether a particular Assumable Executory Contract is an executory contract that may be assumed and/or assigned under section 365 of the Bankruptcy Code, and/or (c) challenging, as to a particular Assumable Executory Contract, whether the Debtors have assumed, or are attempting to assume, such contract in its entirety or whether the Debtors are seeking to assume only part of such contract.  A Limited Contract Objection shall include, until resolved, a dispute regarding any Cure Amount that is subject to resolution by the Bankruptcy Court , or pursuant to the dispute resolution procedures established by the Sale Procedures Order or pursuant to agreement of the parties, including agreements under which an objection to the Cure Amount was withdrawn in connection with a reservation of rights under such dispute resolution procedures.  Limited Contract Objections shall not constitute objections to the 363 Transaction, and to the extent such Limited Contract Objections remain continuing objections to be resolved before the Court, the hearing to consider each such Limited Contract Objection shall be adjourned to August 3, 2009 at 9:00a.m. (the "**Limited Contract Objection Hearing**").  Within two (2) business days of the entry of this Order, the Debtors shall serve upon each of the counterparties to the remaining Limited Contract Objections a notice of the Limited Contract Objection Hearing.  The Debtors or any party that withdraws, or has withdrawn, a Limited

Deleted: July __
Deleted: __:__ _.

US_ACTIVE:\43085833\07\43085833_7.DOC\.        20

Contract Objection without prejudice shall have the right, unless it has agreed otherwise, to

schedule the hearing to consider a Limited Contract Objection on not less than fifteen (15) days

notice to the Debtors, the counterparties to the subject Assumable Executory Contracts, the

Purchaser, and the Creditors' Committee, or within such other time as otherwise may be agreed

by the parties.

### Approval of the MPA

3.      The MPA, all transactions contemplated thereby, and all the terms and

conditions thereof (subject to any modifications contained herein) are approved.  If there is any

conflict between the MPA, the Sale Procedures Order, and this Order, this Order shall govern.

4.      Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the

Debtors are authorized to perform their obligations under, and comply with the terms of, the

MPA and consummate the 363 Transaction pursuant to, and in accordance with, the terms and

provisions of the MPA and this Order.

5.      The Debtors are authorized and directed to execute and deliver, and

empowered to perform under, consummate, and implement, the MPA, together with all

additional instruments and documents that the Sellers or the Purchaser deem necessary or

appropriate to implement the MPA and effectuate the 363 Transaction, and to take all further

actions as may reasonably be required by the Purchaser for the purpose of assigning, transferring,

granting, conveying, and conferring to the Purchaser or reducing to possession the Purchased

Assets or as may be necessary or appropriate to the performance of the obligations as

contemplated by the MPA.

6.      This Order and the MPA shall be binding in all respects upon the Debtors,

their affiliates, all known and unknown creditors of, and holders of equity security interests in,

any Debtor, including any holders of liens, claims, encumbrances, or other interests, including

US_ACTIVE:\43085833\07\43085833_7.DOC\.                    21

rights or claims based on any successor or transferee liability, all non-Debtor parties to the

Assumable Executory Contracts, all successors and assigns of the Purchaser, each Seller and

their Affiliates and subsidiaries, the Purchased Assets, all interested parties, their successors and

assigns, and any trustees appointed in the Debtors' chapter 11 cases or upon a conversion of any

of such cases to cases under chapter 7 of the Bankruptcy Code and shall not be subject to

rejection.  Nothing contained in any chapter 11 plan confirmed in any of the Debtors' chapter 11

cases or the order confirming any such chapter 11 plan shall conflict with or derogate from the

provisions of the MPA or this Order.

**Transfer of Purchased Assets Free and Clear**

7.    Except for the Assumed Liabilities, pursuant to sections 105(a) and 363(f)

of the Bankruptcy Code, the Purchased Assets shall be transferred to the Purchaser in accordance

with the MPA, and, upon the Closing, shall be free and clear of all liens, claims, encumbrances,

and other interests of any kind or nature whatsoever (other than Permitted Encumbrances),

including rights or claims based on any successor or transferee liability, and all such liens,

claims, encumbrances, and other interests, including rights or claims based on any successor or

transferee liability, shall attach to the net proceeds of the 363 Transaction in the order of their

priority, with the same validity, force, and effect that they now have as against the Purchased

Assets, subject to any claims and defenses a Seller or any other party in interest may possess

with respect thereto.

8.    Except as expressly permitted or otherwise specifically provided by the

MPA or this Order, all persons and entities, including, but not limited to, all debt security

holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade

creditors, dealers, employees, litigation claimants, and other creditors, holding liens, claims,

encumbrances, and other interests of any kind or nature whatsoever, including rights or claims

based on any successor or transferee liability, against or in a Seller or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Sellers, the Purchased Assets, the operation of the Purchased Assets prior to the Closing, or the 363 Transaction, are forever barred, estopped, and permanently enjoined (with respect to future claims or demands based on exposure to asbestos, to the fullest extent constitutionally permissible) from asserting against the Purchaser, its successors or assigns, its property, or the Purchased Assets, such persons' or entities' liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability.

9.      This Order (a) shall be effective as a determination that, as of the Closing, (i) no claims other than Assumed Liabilities, will be assertable against the Purchaser, its affiliates, their present or contemplated members or shareholders, successors, or assigns, or any of their respective assets (including the Purchased Assets); (ii) the Purchased Assets shall have been transferred to the Purchaser free and clear of all claims (other than Permitted Encumbrances); and (iii) the conveyances described herein have been effected; and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is directed to accept for filing any and all of the documents

US_ACTIVE:\43085833\07\43085833_7.DOC\.                          23

and instruments necessary and appropriate to consummate the transactions contemplated by the
MPA.

10.      The transfer of the Purchased Assets to the Purchaser pursuant to the MPA
constitutes a legal, valid, and effective transfer of the Purchased Assets and shall vest the
Purchaser with all right, title, and interest of the Sellers in and to the Purchased Assets free and
clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever
(other than Permitted Encumbrances), including rights or claims based on any successor or
transferee liability, other than the Assumed Liabilities.

11.      On the Closing of the 363 Transaction, each of the Sellers' creditors and
any other holder of a lien, claim, encumbrance, or other interest, is authorized and directed to
execute such documents and take all other actions as may be necessary to release its lien, claim,
encumbrance (other than Permitted Encumbrances), or other interest in the Purchased Assets, if
any, as such lien, claim, encumbrance, or other interest may have been recorded or may
otherwise exist.

12.      If any person or entity that has filed financing statements, mortgages,
mechanic's liens, lis pendens, or other documents or agreements evidencing a lien, claim,
encumbrance, or other interest in the Sellers or the Purchased Assets (other than Permitted
Encumbrances) shall not have delivered to the Sellers prior to the Closing, in proper form for
filing and executed by the appropriate parties, termination statements, instruments of satisfaction,
releases of all liens, claims, encumbrances, or other interests, which the person or entity has with
respect to the Sellers or the Purchased Assets or otherwise, then (a) the Sellers are authorized and
directed to execute and file such statements, instruments, releases, and other documents on
behalf of the person or entity with respect to the Sellers or the Purchased Assets, and (b) the
Purchaser is authorized to file, register, or otherwise record a certified copy of this Order, which

shall constitute conclusive evidence of the release of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever in the Sellers or the Purchased Assets.

13.     All persons or entities in possession of any of the Purchased Assets are directed to surrender possession of such Purchased Assets to the Purchaser or its respective designees at the time of Closing of the 363 Transaction.

14.     Following the Closing of the 363 Transaction, no holder of any lien, claim, encumbrance, or other interest (other than Permitted Encumbrances) shall interfere with the Purchaser's title to, or use and enjoyment of, the Purchased Assets based on, or related to, any such lien, claim, encumbrance, or other interest, or based on any actions the Debtors may take in their chapter 11 cases.

15.     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to the Purchaser in accordance with the MPA and this Order; *provided, however*, that the foregoing restriction shall not prevent any person or entity from appealing this Order or opposing any appeal of this Order.

16.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Purchased Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the 363 Transaction contemplated by the MPA.

17.     From and after the Closing, the Purchaser shall comply with the certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety Act, as amended and recodified, including by the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety

US_ACTIVE:\43085833\07\43085833_7.DOC\.                25

09-50026-reg Doc 2968-4 Filed 07/05/09 Entered 07/05/09 23:57:21 Main Document
Pg 26 of 51

Code, and similar Laws, in each case, to the extent applicable in respect of motor vehicles, vehicles, motor vehicle equipment, and vehicle parts manufactured or distributed by the Sellers prior to the Closing.

18.     Notwithstanding anything to the contrary in this Order or the MPA, (a) any Purchased Asset that is subject to any mechanic's, materialman's, laborer's, workmen's, repairman's, carrier's liens and other similar Encumbrances arising by operation of law or statute in the Ordinary Course of Business for amounts that are not delinquent or that are being contested in good faith by appropriate proceedings, or any lien for Taxes, the validity or amount of which is being contested in good faith by appropriate proceedings, and statutory liens for current Taxes not yet due, payable, or delinquent (or which may be paid without interest or penalties) shall continue to be subject to such lien after the Closing Date if and to the extent that such lien (i) is valid, perfected and enforceable as of the Commencement Date (or becomes valid, perfected and enforceable after the Commencement Date as permitted by section 546(b) or 362(b)(18) of the Bankruptcy Code), (ii) could not be avoided by any Debtor under sections 544 to 549, inclusive, of the Bankruptcy Code or otherwise, were the Closing not to occur; and (iii) the Purchased Asset subject to such lien could not be sold free and clear of such lien under applicable non-bankruptcy law, and (b) any Liability as of the Closing Date that is secured by a lien described in clause (a) above (such lien, a "**Continuing Lien**") that is not otherwise an Assumed Liability shall constitute an Assumed Liability with respect to which there shall be no recourse to the Purchaser or any property of the Purchaser other than recourse to the property subject to such Continuing Lien. The Purchased Assets are sold free and clear of any reclamation rights, *provided, however,* that nothing, in this Order or the MPA shall in any way impair the right of any claimant against the Debtors with respect to any alleged reclamation right to the extent such reclamation right is not subject to the prior rights of a holder of a security interest in

US_ACTIVE:\43085833\07\43085833_7.DOC\.                26

the goods or proceeds with respect to which such reclamation right is alleged, or impair the

ability of a claimant to seek adequate protection against the Debtors with respect to any such

alleged reclamation right. Further, nothing in this Order or the MPA shall prejudice any rights,

defenses, objections or counterclaims that the Debtors, the Purchaser, the U.S. Treasury, EDC,

the Creditors' Committee or any other party in interest may have with respect to the validity or

priority of such asserted liens or rights, or with respect to any claim for adequate protection.

### Approval of the UAW Retiree Settlement Agreement

19.     The UAW Retiree Settlement Agreement, the transactions contemplated

therein, and the terms and conditions thereof, are fair, reasonable, and in the best interests of the

retirees, and are approved.  The Debtors, the Purchaser, and the UAW are authorized and

directed to perform their obligations under, or in connection with, the implementation of the

UAW Retiree Settlement Agreement and to comply with the terms of the UAW Retiree

Settlement Agreement, including the obligation of the Purchaser to reimburse the UAW for

certain expenses relating to the 363 Transaction and the transition to the New VEBA

arrangements.  The amendments to the Trust Agreement (as defined in the UAW Retiree

Settlement Agreement) set forth on Exhibit E to the UAW Retiree Settlement Agreement, are

approved, and the Trust Agreement is reformed accordingly.

20.     In accordance with the terms of the UAW Retiree Settlement Agreement,

(I) as of the Closing, there shall be no requirement to amend the Pension Plan as set forth in

section 15 of the Henry II Settlement (as such terms are defined in the UAW Retiree Settlement

Agreement); (II) on the later of December 31, 2009, or the Closing of the 363 Transaction (the

"**Implementation Date**"), (i) the committee and the trustees of the Existing External VEBA (as

defined in the UAW Retiree Settlement Agreement) are directed to transfer to the New VEBA all

assets and liabilities of the Existing External VEBA and to terminate the Existing External

US_ACTIVE:\43085833\07\43085833_7.DOC\.

VEBA within fifteen (15) days thereafter, as provided under Section 12.C of the UAW Retiree

Settlement Agreement, (ii) the trustee of the Existing Internal VEBA is directed to transfer to the

New VEBA the UAW Related Account's share of assets in the Existing Internal VEBA within

ten (10) business days thereafter as provided in Section 12.B of the UAW Retiree Settlement

Agreement, and, upon the completion of such transfer, the Existing Internal VEBA shall be

deemed to be amended to terminate participation and coverage regarding Retiree Medical

Benefits for the Class and the Covered Group, effective as of the Implementation Date (each as

defined in the UAW Retiree Settlement Agreement); and (III) all obligations of the Purchaser

and the Sellers to provide Retiree Medical Benefits to members of the Class and Covered Group

shall be governed by the UAW Retiree Settlement Agreement, and, in accordance with section

5.D of the UAW Retiree Settlement Agreement, all provisions of the Purchaser's Plan relating to

Retiree Medical Benefits for the Class and/or the Covered Group shall terminate as of the

Implementation Date or otherwise be amended so as to be consistent with the UAW Retiree

Settlement Agreement (as each term is defined in the UAW Retiree Settlement Agreement), and

the Purchaser shall not thereafter have any such obligations as set forth in Section 5.D of the

UAW Retiree Settlement Agreement.

**Approval of GM's Assumption of the UAW Claims Agreement**

21.     Pursuant to section 365 of the Bankruptcy Code, GM's assumption of the

UAW Claims Agreement is approved, and GM, the UAW, and the Class Representatives are

authorized and directed to perform their obligations under, or in connection with, the

implementation of the UAW Claims Agreement and comply with the terms of the UAW Claims

Agreement.

US_ACTIVE:\43085833\07\43085833_7.DOC\.                          28

**Assumption and Assignment to the Purchaser of Assumable Executory Contracts**

22.     Pursuant to sections 105(a), 363, and  365 of the Bankruptcy Code and subject to and conditioned upon (a) the Closing of the 363 Transaction, (b) the occurrence of the Assumption Effective Date, and (c) the resolution of any relevant Limited Contract Objections, other than a Cure Objection, by order of this Court overruling such objection or upon agreement of the parties, the Debtors' assumption and assignment to the Purchaser of each Assumable Executory Contract (including, without limitation, for purposes of this paragraph 22) the UAW Collective Bargaining Agreement) is approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are deemed satisfied.

23.     The Debtors are authorized and directed in accordance with sections 105(a) and 365 of the Bankruptcy Code to (i) assume and assign to the Purchaser, effective as of the Assumption Effective Date, as provided by, and in accordance with, the Sale Procedures Order, the Modified Assumption and Assignment Procedures, and the MPA, those Assumable Executory Contracts that have been designated by the Purchaser for assumption pursuant to sections 6.6 and 6.31 of the MPA and that are not subject to a Limited Contract Objection other than a Cure Objection, free and clear of all liens, claims, encumbrances, or other interests of any kind or nature whatsoever (other than Permitted Encumbrances), including rights or claims based on any successor or transferee liability, other than the Assumed Liabilities, and (ii) execute and deliver to the Purchaser such documents or other instruments as the Purchaser reasonably deems may be necessary to assign and transfer such Assumable Executory Contracts and Assumed Liabilities to the Purchaser.  The Purchaser shall Promptly Pay (as defined below) the following (the "**Cure Amount**"):  (a) all amounts due under such Assumable Executory Contract as of the Commencement Date as reflected on the website established by the Debtors (the "**Contract Website**"), which is referenced and is accessible as set forth in the Assumption and Assignment

Notice or as otherwise agreed to in writing by an authorized officer of the parties (for this

purpose only, Susanna Webber shall be deemed an authorized officer of the Debtors) (the

"**Prepetition Cure Amount**"), less amounts, if any, paid after the Commencement Date on

account of the Prepetition Cure Amount (such net amount, the "**Net Prepetition Cure**

**Amount**"), plus (b) any such amount past due and owing as of the Assumption Effective Date, as

required under the Modified Assumption and Assignment Procedures, exclusive of the Net

Prepetition Cure Amount.  For the avoidance of doubt, all of the Debtors' rights to assert credits,

chargebacks, setoffs, rebates, and other claims under the Purchased Contracts are purchased by

and assigned to the Purchaser as of the Assumption Effective Date.  As used herein, "**Promptly**

**Pay**" means (i) with respect to any Cure Amount (or portion thereof, if any) which is undisputed,

payment as soon as reasonably practicable, but not later than five (5) business days after the

Assumption Effective Date, and (ii) with respect to any Cure Amount (or portion thereof, if any)

which is disputed, payment as soon as reasonably practicable, but not later than five (5) business

days after such dispute is resolved or such later date upon agreement of the parties and, in the

event Bankruptcy Court approval is required, upon entry of a final order of the Bankruptcy

Court.  On and after the Assumption Effective Date, the Purchaser shall (i) perform any

nonmonetary defaults that are required under section 365(b) of the Bankruptcy Code; *provided*

that such defaults are undisputed or directed by this Court and are timely asserted under the

Modified Assumption and Assignment Procedures, and (ii) pay all undisputed obligations and

perform all obligations that arise or come due under each Assumable Executory Contract in the

ordinary course.  Notwithstanding any provision in this Order to the contrary, the Purchaser shall

not be obligated to pay any Cure Amount or any other amount due with respect to any

Assumable Executory Contract before such amount becomes due and payable under the

applicable payment terms of such Contract.

24.     The Debtors shall make available a writing, acknowledged by the Purchaser, of the assumption and assignment of an Assumable Executory Contract and the effective date of such assignment (which may be a printable acknowledgment of assignment on the Contract Website).  The Assumable Executory Contracts shall be transferred and assigned to, pursuant to the Sale Procedures Order and the MPA, and thereafter remain in full force and effect for the benefit of, the Purchaser, notwithstanding any provision in any such Assumable Executory Contract (including those of the type described in sections 365(b)(2), (e)(1), and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Sellers shall be relieved from any further liability with respect to the Assumable Executory Contracts after such assumption and assignment to the Purchaser.  Except as may be contested in a Limited Contract Objection, each Assumable Executory Contract is an executory contract or unexpired lease under section 365 of the Bankruptcy Code and the Debtors may assume each of their respective Assumable Executory Contracts in accordance with section 365 of the Bankruptcy Code.  Except as may be contested in a Limited Contract Objection other than a Cure Objection, the Debtors may assign each Assumable Executory Contract in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assumable Executory Contract that prohibit or condition the assignment of such Assumable Executory Contract or terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assumable Executory Contract, constitute unenforceable antiassignment provisions which are void and of no force and effect in connection with the transactions contemplated hereunder.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Purchaser of each Assumable Executory Contract have been satisfied, and, pursuant to section 365(k) of the Bankruptcy Code, the

Debtors are hereby relieved from any further liability with respect to the Assumable Executory

Contracts, including, without limitation, in connection with the payment of any Cure Amounts

related thereto which shall be paid by the Purchaser.  At such time as provided in the Sale

Procedures Order and the MPA, in accordance with sections 363 and 365 of the Bankruptcy

Code, the Purchaser shall be fully and irrevocably vested in all right, title, and interest of each

Purchased Contract.  With respect to leases of personal property that are true leases and not

subject to recharacterization, nothing in this Order or the MPA shall transfer to the Purchaser an

ownership interest in any leased property not owned by a Debtor.  Any portion of any of the

Debtors' unexpired leases of nonresidential real property that purport to permit the respective

landlords thereunder to cancel the remaining term of any such leases if the Sellers discontinue

their use or operation of the Leased Real Property are void and of no force and effect and shall

not be enforceable against the Purchaser, its assignees and sublessees, and the landlords under

such leases shall not have the right to cancel or otherwise modify such leases or increase the rent,

assert any Claim, or impose any penalty by reason of such discontinuation, the Sellers' cessation

of operations, the assignment of such leases to the Purchaser, or the interruption of business

activities at any of the leased premises.

     25.    Except in connection with any ongoing Limited Contract Objection, each

non-Debtor party to an Assumable Executory Contract is forever barred, estopped, and

permanently enjoined from (a) asserting against the Debtors or the Purchaser, their successors or

assigns, or their respective property, any default arising prior to, or existing as of, the

Commencement Date, or, against the Purchaser, any counterclaim, defense, or setoff (other than

defenses interposed in connection with, or related to, credits, chargebacks, setoffs, rebates, and

other claims asserted by the Sellers or the Purchaser in its capacity as assignee), or other claim

asserted or assertable against the Sellers and (b) imposing or charging against the Debtors, the

Purchaser, or its Affiliates any rent accelerations, assignment fees, increases, or any other fees as a result of the Sellers' assumption and assignment to the Purchaser of the Assumable Executory Contracts.  The validity of such assumption and assignment of the Assumable Executory Contracts shall not be affected by any dispute between the Sellers and any non-Debtor party to an Assumable Executory Contract.

26.     Except as expressly provided in the MPA or this Order, after the Closing, the Debtors and their estates shall have no further liabilities or obligations with respect to any Assumed Liabilities other than certain Cure Amounts as provided in the MPA, and all holders of such claims are forever barred and estopped from asserting such claims against the Debtors, their successors or assigns, and their estates.

27.     The failure of the Sellers or the Purchaser to enforce at any time one or more terms or conditions of any Assumable Executory Contract shall not be a waiver of such terms or conditions, or of the Sellers' and the Purchaser's rights to enforce every term and condition of the Assumable Executory Contracts.

28.     The authority hereunder for the Debtors to assume and assign an Assumable Executory Contract to the Purchaser includes the authority to assume and assign an Assumable Executory Contract, as amended.

29.     Upon the assumption by a Debtor and the assignment to the Purchaser of any Assumable Executory Contract and the payment of the Cure Amount in full, all defaults under the Assumable Executory Contract shall be deemed to have been cured, and any counterparty to such Assumable Executory Contract shall be prohibited from exercising any rights or remedies against any Debtor or non-Debtor party to such Assumable Executory Contract based on an asserted default that occurred on, prior to, or as a result of, the Closing, including the type of default specified in section 365(b)(1)(A) of the Bankruptcy Code.

US_ACTIVE:\43085833\07\43085833_7.DOC\.          33

30.     The assignments of each of the Assumable Executory Contracts are made
in good faith under sections 363(b) and (m) of the Bankruptcy Code.

31.     Entry by GM into the Deferred Termination Agreements with accepting
dealers is hereby approved.  Executed Deferred Termination Agreements represent valid and
binding contracts, enforceable in accordance with their terms.

32.     Entry by GM into the Participation Agreements with accepting dealers is
hereby approved and the offer by GM of entry into the Participation Agreements and entry into
the Participation Agreements was appropriate and not the product of coercion.  The Court makes
no finding as to whether any specific provision of any Participation Agreement governing the
obligations of Purchaser and its dealers is enforceable under applicable provisions of state law.
Any disputes that may arise under the Participation Agreements shall be adjudicated on a case by
case basis in an appropriate forum other than this Court.

33.     Nothing contained in the preceding two paragraphs shall impact the
authority of any state or of the federal government to regulate Purchaser subsequent to the
Closing.

34.     Notwithstanding any other provision in the MPA or this Order, no
assignment of any rights and interests of the Debtors in any federal license issued by the Federal
Communications Commission ("**FCC**") shall take place prior to the issuance of FCC regulatory
approval for such assignment pursuant to the Communications Act of 1934, and the rules and
regulations promulgated thereunder.

### **TPC Property**

35.     The TPC Participation Agreement and the other TPC Operative
Documents are financing transactions secured to the extent of the TPC Value (as hereinafter
defined) and shall be Retained Liabilities.

US_ACTIVE:\43085833\07\43085833_7.DOC\.                    34

36.     As a result of the Debtors' interests in the TPC Property being transferred

to the Purchaser free and clear of all liens, claims, interests, and encumbrances (other than

Permitted Encumbrances), including, without limitation, the TPC Lenders' Liens and Claims,

pursuant to section 363(e) of the Bankruptcy Code, the TPC Lenders shall have an allowed

secured claim in a total amount equal to the fair market value of the TPC Property on the

Commencement Date under section 506 of the Bankruptcy Code (the "**TPC Value**"), as

determined at a valuation hearing conducted by this Court or by mutual agreement of the

Debtors, the Purchaser, and the TPC Lenders (such claim, the "**TPC Secured Claim**").  Either

the Debtors, the Purchaser, the TPC Lenders, or the Creditors' Committee may file a motion with

this Court to determine the TPC Value on twenty (20) days notice.

37.     Pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate

protection for the TPC Secured Claim and for the sole benefit of the TPC Lenders, at the Closing

or as soon as commercially practicable thereafter, but in any event not later than five (5) business

days after the Closing, the Purchaser shall place $90,700,000 (the "**TPC Escrow Amount**") in

cash into an interest-bearing escrow account (the "**TPC Escrow Account**") at a financial

institution selected by the Purchaser and acceptable to the other parties (the "**Escrow Bank**").

Interest earned on the TPC Escrow Amount from the date of deposit through the date of the

disposition of the proceeds of such account (the "**TPC Escrow Interest**") will follow principal,

such that interest earned on the amount of cash deposited into the TPC Escrow Account equal to

the TPC Value shall be paid to the TPC Lenders and interest earned on the balance of the TPC

Escrow Amount shall be paid to the Purchaser.

38.     Promptly after the determination of the TPC Value, an amount of cash

equal to the TPC Secured Claim plus the TPC Lenders' pro rata share of the TPC Escrow

Interest shall be released from the TPC Escrow Account and paid to the TPC Lenders (the "**TPC**

**Payment**") without further order of this Court.  If the TPC Value is less than $90,700,000, the

TPC Lenders shall have, in addition to the TPC Secured Claim, an aggregate allowed unsecured

claim against GM's estate equal to the lesser of (i) $45,000,000 and (ii) the difference between

$90,700,000 and the TPC Value (the "**TPC Unsecured Claim**").

        39.     If the TPC Value exceeds $90,700,000, the TPC Lenders shall be entitled

to assert a secured claim against GM's estate to the extent the TPC Lenders would have an

allowed claim for such excess under section 506 of the Bankruptcy Code (the "**TPC Excess**

**Secured Claim**"); *provided, however*, that any TPC Excess Secured Claim shall be paid from the

consideration of the 363 Transaction as a secured claim thereon and shall not be payable from

the proceeds of the Wind-Down Facility; *and provided further, however,* that the Debtors, the

Creditors' Committee, and all parties in interest shall have the right to contest the allowance and

amount of the TPC Excess Secured Claim under section 506 of the Bankruptcy Code (other than

to contest the TPC Value as previously determined by the Court).  All parties' rights and

arguments respecting the determination of the TPC Secured Claim are reserved; *provided,*

*however*, that in consideration of the settlement contained in these paragraphs, the TPC Lenders

waive any legal argument that the TPC Lenders are entitled to a secured claim equal to the face

amount of their claim under section 363(f)(3) or any other provision of the Bankruptcy Code

solely as a matter of law, including, without limitation, on the grounds that the Debtors are

required to pay the full face amount of the TPC Lenders' secured claims in order to transfer, or

as a result of the transfer of, the TPC Property to the Purchaser.  After the TPC Payment is made,

any funds remaining in the TPC Escrow Account plus the Purchasers' pro rata share of the TPC

Escrow Interest shall be released and paid to the Purchaser without further order of this Court.

Upon the receipt of the TPC Payment by the TPC Lenders, other than any right to payment from

GM on account of the TPC Unsecured Claim and the TPC Excess Secured Claim, the TPC

Lenders' Claims relating to the TPC Property shall be deemed fully satisfied and discharged,

including, without limitation, any claims the TPC Lenders might have asserted against the

Purchaser relating to the TPC Property, the TPC Participation Agreement, or the TPC Operative

Documents.  For the avoidance of doubt, any and all claims of the TPC Lenders arising from or

in connection with the TPC Property, the TPC Participation Agreement, or the TPC Operative

Documents shall be payable solely from the TPC Escrow Account or GM and shall be

nonrecourse to the Purchaser.

        40.      The TPC Lenders shall not be entitled to payment of any fees, costs, or

expenses (including legal fees) except to the extent that the TPC Value results in a TPC Excess

Secured Claim and is thereby oversecured under the Bankruptcy Code and such claim is allowed

by the Court as a secured claim under section 506 of the Bankruptcy Code.

        41.      In connection with the foregoing, and pursuant to Section 11.2 of the TPC

Trust Agreement, GM, as the sole Certificate Holder and Beneficiary under the TPC Trust,

together with the consent of GM as the Lessee, effective as of the date of the Closing, (a)

exercises its election to terminate the TPC Trust and (b) in connection therewith, assumes all of

the obligations of the TPC Trust and TPC Trustee under or contemplated by the TPC Operative

Documents to which the TPC Trust or TPC Trustee is a party and all other obligations of the

TPC Trust or TPC Trustee incurred under the TPC Trust Agreement (other than obligations set

forth in clauses (i) through (iii) of the second sentence of Section 7.1 of the TPC Trust

Agreement).

        42.      As a condition precedent to the 363 Transaction, in connection with the

termination of the TPC Trust, effective as of the date of the Closing, all of the assets of the TPC

Trust (the "**TPC Trust Assets**") shall be distributed to GM, as sole Certificate Holder and

beneficiary under the TPC Trust, including, without limitation, the following:

(i)    Industrial Development Revenue Real Property Note (General Motors Project) Series 1999-I, dated November 18, 1999, in the principal amount of $21,700,000, made by the Industrial Development Board of the City of Memphis and County of Shelby, Tennessee, to PVV Southpoint 14, LLC, as assigned by Assignment and Assumption of Loan and Loan Documents dated as of November 18, 1999, between PVV Southpoint 14, LLC, as Assignor, to the TPC Trustee of the TPC Trust, as Assignee, recorded as JW1268 in the records of the Shelby County Register of Deeds (the "**TPC Tennessee Ground Lease**");

(ii)    Real Property Lease Agreement dated as of November 18, 1999, between the Industrial Development Board of the City of Memphis and County of Shelby, Tennessee, as Lessor, and PVV Southpoint 14, LLC, as Lessee, recorded as JW1262 in the records of the Shelby County Register of Deeds, as assigned by Assignment and Assumption of Real Property Lease dated as of November 18, 1999, between PVV Southpoint 14, LLC, as Assignor, to the TPC Trustee of the TPC Trust, as Assignee, recorded as JW1267 in the records of the Shelby County Register of Deeds;

(iii)    Deed of Trust dated as of November 18, 1999, between the Industrial Development Board of the City of Memphis and County of Shelby, Tennessee, as Grantor, in favor of Mid-South Title Corporation, as Trustee, for the benefit of PVV Southpoint 14, LLC, Beneficiary, recorded as JW1263 in the records of the Shelby County Register of Deeds, as assigned by Assignment and Assumption of Loan and Loan Documents dated as of November 18, 1999, between PVV Southpoint 14, LLC, as Assignor, to the TPC Trustee of the TPC Trust, as Assignee, recorded as JW1268 in the records of the Shelby County Register of Deeds;

(iv)    Assignment of Rents and Lease dated as of November 18, 1999, between the Industrial Development Board of the City of Memphis and County of Shelby, Tennessee, as Assignor, and PVV Southpoint 14, LLC, as Assignee, recorded as JW1264 in the records of the Shelby County Register of Deeds, as assigned by Assignment and Assumption of Loan and Loan Documents dated as of November 18, 1999, between PVV Southpoint 14, LLC, as Assignor, to the TPC Trustee of the TPC Trust, as Assignee, recorded as JW1268 in the records of the Shelby County Register of Deeds;

(v)    The Tennessee Master Lease (as defined in the TPC Participation Agreement);

(vi)    A certain tract of land being known and designated as Lot 1, as shown on  a Subdivision Plat entitled "Final Plat – Lot 1, Whitemarsh Associates, LLC Property," which Plat is recorded among the Land Records of Baltimore County in Plat Book SM No. 71 at folio 144, Maryland, together with a certain tract of land being known and designated as "1.1865 Acre of Highway Widening," as shown on a Subdivision Plat entitled "Final Plat – Lot 1, Whitemarsh Associates, LLC Property," which Plat is recorded among the Land Records of Baltimore County in Plat Book SM No. 71 at folio 144, Baltimore, Maryland, saving and excepting from the above described property all that land conveyed to the State of Maryland to the use of the State Highway Administration of the Department of Transportation dated November 24, 2003, and

recorded among the Land Records of Baltimore County in Liber 19569, folio 074, Maryland, together with all rights, easements, covenants, licenses, and appurtenances associated with the ownership thereof in any way, including, without limitation, those easements benefiting Parcel 1 set forth in the Declaration and Agreement Respecting Easements, Restrictions and Operations, between the TPC Trust, GM, and Whitemarsh Associates, LLC, recorded among the Land Records of Baltimore County in Liber 14019, folio 430, as amended (collectively, the "**Maryland Property**");

(vii)  alternatively to the transfer of a direct interest in the Maryland Property pursuant to item (vi) above, if such documents are still extant, the following interests shall be transferred:  (a) Ground Lease Agreement dated as of September 8, 1999, between the TPC Trustee of the TPC Trust. as lessor, and Maryland Economic Development Corporation, as lessee, recorded among the Land Records of Baltimore County in Liber 14019, folio 565, (b) Sublease Agreement dated as of September 8, 1999, between the Maryland Economic Development Corporation, as sublessor, and the TPC Trustee of the TPC Trust, as sublessee, recorded among the Land Records of Baltimore County in Liber 14019, folio 589, together with (c) all agreements, loan agreements, notes, rights, obligations, and interests held by the TPC Trustee of the TPC Trust and/or issued by the TPC Trustee of the TPC Trust in connection therewith; and

(viii)  The Maryland Master Lease (as defined in the TPC Participation Agreement).

43.     As a result of the distribution of the TPC Trust Assets, effective as of the date of the Closing, title to the leasehold interest of the TPC Trustee of the TPC Trust under the TPC Tennessee Ground Lease and the lessor's interest under the Tennessee Master Lease shall be held by GM, as are the lessor's and lessee's interests under the Tennessee Master Lease, and as permitted by the TPC Trust Agreement, the Tennessee Master Lease shall hereby be terminated, and GM shall succeed to all rights of the lessor thereunder to the property leased thereby, together with all rights, easements, covenants, licenses, and appurtenances associated with the ownership thereof in any way.

44.     As a result of the distribution of the TPC Trust Assets, effective as of the date of the Closing, title to the Maryland Property, the lessor's and lessee's interests under the Maryland Master Lease shall be held by GM, and as permitted by the TPC Trust Agreement, the Maryland Master Lease shall hereby be terminated, and GM shall succeed to all rights of the

lessor thereunder to the property leased thereby, together with all rights, easements, covenants, licenses, and appurtenances associated with the ownership thereof in any way.

45.    All of the TPC Trust Assets and the TPC Property are Purchased Assets under the MPA and shall be transferred by GM pursuant thereto to the Purchaser free and clear of all liens, claims, encumbrances, and interests (other than Permitted Encumbrances), including, without limitation, any liens, claims, encumbrances, and interests of the TPC Lenders.  To the extent any of the TPC Trust Assets are executory contracts and unexpired leases, they shall be Assumable Executory Contracts, which shall be assumed by GM and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code and the Sale Procedures Order.

### Additional Provisions

46.    Except for the Assumed Liabilities expressly set forth in the MPA, none of the Purchaser, its present or contemplated members or shareholders, its successors or assigns, or any of their respective affiliates or any of their respective agents, officials, personnel, representatives, or advisors shall have any liability for any claim that arose prior to the Closing Date, relates to the production of vehicles prior to the Closing Date, or otherwise is assertable against the Debtors or is related to the Purchased Assets prior to the Closing Date.  The Purchaser shall not be deemed, as a result of any action taken in connection with the MPA or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Purchased Assets, to:  (i) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with respect to any obligations arising under the Purchased Assets from and after the Closing); (ii) have, de facto or otherwise, merged with or into the Debtors; or (iii) be a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors.  Without limiting the foregoing, the Purchaser shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any claims,

including, but not limited to, under any theory of successor or transferee liability, de facto merger or continuity, environmental, labor and employment, and products or antitrust liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted, or unasserted, fixed or contingent, liquidated or unliquidated.

47.    Effective upon the Closing and except as may be otherwise provided by stipulation filed with or announced to the Court with respect to a specific matter or an order of the Court, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Purchaser, its present or contemplated members or shareholders, its successors and assigns, or the Purchased Assets, with respect to any (i) claim against the Debtors other than Assumed Liabilities, or (ii) successor or transferee liability of the Purchaser for any of the Debtors, including, without limitation, the following actions:  (a) commencing or continuing any action or other proceeding pending or threatened against the Debtors as against the Purchaser, or its successors, assigns, affiliates, or their respective assets, including the Purchased Assets; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Debtors as against the Purchaser, its successors, assigns, affiliates, or their respective assets, including the Purchased Assets; (c) creating, perfecting, or enforcing any lien, claim, interest, or encumbrance against the Debtors as against the Purchaser or its successors, assigns, affiliates, or their respective assets, including the Purchased Assets; (d) asserting any setoff, right of subrogation, or recoupment of any kind for any obligation of any of the Debtors as against any obligation due the Purchaser or its successors, assigns, affiliates, or their respective assets, including the Purchased Assets; (e) commencing or continuing any action, in any manner or place, that does not comply, or is inconsistent with, the provisions of this Order or other orders of this Court, or

the agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or refusing to renew any license, permit, or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with such assets.  Notwithstanding the foregoing, a relevant taxing authority's ability to exercise its rights of setoff and recoupment are preserved.

48.    Except for the Assumed Liabilities, or as expressly permitted or otherwise specifically provided for in the MPA or this Order, the Purchaser shall have no liability or responsibility for any liability or other obligation of the Sellers arising under or related to the Purchased Assets.  Without limiting the generality of the foregoing, and except as otherwise specifically provided in this Order and the MPA, the Purchaser shall not be liable for any claims against the Sellers or any of their predecessors or Affiliates, and the Purchaser shall have no successor, transferee, or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor, or transferee liability, labor law, de facto merger, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, with respect to the Sellers or any obligations of the Sellers arising prior to the Closing.

49.    The Purchaser has given fair and substantial consideration under the MPA for the benefit of the holders of liens, claims, encumbrances, or other interests.  The consideration provided by the Purchaser for the Purchased Assets under the MPA is greater than the liquidation value of the Purchased Assets and shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

50.     The consideration provided by the Purchaser for the Purchased Assets
under the MPA is fair and reasonable, and the Sale may not be avoided under section 363(n) of
the Bankruptcy Code.

51.     If there is an Agreed G Transaction (determined no later than the due date,
with extensions, of GM's tax return for the taxable year in which the 363 Transaction occurs), (i)
the MPA shall, and hereby does, constitute a "plan" of GM and the Purchaser solely for purposes
of sections 368 and 354 of the Tax Code, and (ii) the 363 Transaction, as set forth in the MPA,
and the subsequent liquidation of the Sellers, are intended to constitute a tax reorganization of
GM pursuant to section 368(a)(1)(G) of the Tax Code.

52.     This Order (a) shall be effective as a determination that, except for the
Assumed Liabilities, at Closing, all liens, claims, encumbrances, and other interests of any kind
or nature whatsoever existing as to the Sellers with respect to the Purchased Assets prior to the
Closing (other than Permitted Encumbrances) have been unconditionally released and
terminated, and that the conveyances described in this Order have been effected, and (b) shall be
binding upon and govern the acts of all entities, including, without limitation, all filing agents,
filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars
of deeds, administrative agencies, governmental departments, secretaries of state, federal, state,
and local officials, and all other persons and entities who may be required by operation of law,
the duties of their office, or contract, to accept, file, register, or otherwise record or release any
documents or instruments, or who may be required to report or insure any title or state of title in
or to any of the Purchased Assets.

53.     Each and every federal, state, and local governmental agency or
department is authorized to accept any and all documents and instruments necessary or
appropriate to consummate the transactions contemplated by the MPA.

54.      Any amounts that become payable by the Sellers to the Purchaser pursuant to the MPA (and related agreements executed in connection therewith, including, but not limited to, any obligation arising under Section 8.2(b) of the MPA) shall (a) constitute administrative expenses of the Debtors' estates under sections 503(b)(1) and 507(a)(1) of the Bankruptcy Code and (b) be paid by the Debtors in the time and manner provided for in the MPA without further Court order.

55.      The transactions contemplated by the MPA are undertaken by the Purchaser without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and were negotiated by the parties at arm's length, and, accordingly, the reversal or modification on appeal of the authorization provided in this Order to consummate the 363 Transaction shall not affect the validity of the 363 Transaction (including the assumption and assignment of any of the Assumable Executory Contracts and the UAW Collective Bargaining Agreement), unless such authorization is duly stayed pending such appeal.  The Purchaser is a purchaser in good faith of the Purchased Assets and the Purchaser and its agents, officials, personnel, representatives, and advisors are entitled to all the protections afforded by section 363(m) of the Bankruptcy Code.

56.      The Purchaser is assuming the obligations of the Sellers pursuant to and subject to conditions and limitations contained in their express written warranties, which were delivered in connection with the sale of vehicles and vehicle components prior to the Closing of the 363 Transaction and specifically identified as a "warranty."  The Purchaser is not assuming responsibility for Liabilities contended to arise by virtue of other alleged warranties, including implied warranties and statements in materials such as, without limitation, individual customer communications, owner's manuals, advertisements, and other promotional materials, catalogs, and point of purchase materials.  Notwithstanding the foregoing, the Purchaser has assumed the

US_ACTIVE:\43085833\07\43085833_7.DOC\.                    44

Sellers' obligations under state "lemon law" statutes, which require a manufacturer to provide a consumer remedy when the manufacturer is unable to conform the vehicle to the warranty, as defined in the applicable statute, after a reasonable number of attempts as further defined in the statute, and other related regulatory obligations under such statutes.

57.     Subject to further Court order and consistent with the terms of the MPA and the Transition Services Agreement, the Debtors and the Purchaser are authorized to, and shall, take appropriate measures to maintain and preserve, until the consummation of any chapter 11 plan for the Debtors, (a) the books, records, and any other documentation, including tapes or other audio or digital recordings and data in, or retrievable from, computers or servers relating to or reflecting the records held by the Debtors or their affiliates relating to the Debtors' business, and (b) the cash management system maintained by the Debtors prior to the Closing, as such system may be necessary to effect the orderly administration of the Debtors' estates.

58.     The Debtors are authorized to take any and all actions that are contemplated by or in furtherance of the MPA, including transferring assets between subsidiaries and transferring direct and indirect subsidiaries between entities in the corporate structure, with the consent of the Purchaser.

59.     Upon the Closing, the Purchaser shall assume all liabilities of the Debtors arising out of, relating to, in respect of, or in connection with workers' compensation claims against any Debtor, except for workers' compensation claims against the Debtors with respect to Employees residing in or employed in, as the case may be as defined by applicable law, the states of Alabama, Georgia, New Jersey, and Oklahoma.

60.     During the week after Closing, the Purchaser shall send an e-mail to the Debtors' customers for whom the Debtors have usable e-mail addresses in their database, which will provide information about the Purchaser and procedures for consumers to opt out of being

US_ACTIVE:\43085833\07\43085833_7.DOC\.                45

contacted by the Purchaser for marketing purposes. For a period of ninety (90) days following the Closing Date, the Purchaser shall include on the home page of GM's consumer web site (www.gm.com) a conspicuous disclosure of information about the Purchaser, its procedures for consumers to opt out of being contacted by the Purchaser for marketing purposes, and a notice of the Purchaser's new privacy statement. The Debtors and the Purchaser shall comply with the terms of established business relationship provisions in any applicable state and federal telemarketing laws. The Dealers who are parties to Deferred Termination Agreements shall not be required to transfer personally identifying information in violation of applicable law or existing privacy policies.

61.     Nothing in this Order or the MPA releases, nullifies, or enjoins the enforcement of any Liability to a governmental unit under Environmental Laws or regulations (or any associated Liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, or operator of property after the date of entry of this Order. Notwithstanding the foregoing sentence, nothing in this Order shall be interpreted to deem the Purchaser as the successor to the Debtors under any state law successor liability doctrine with respect to any Liabilities under Environmental Laws or regulations for penalties for days of violation prior to entry of this Order. Nothing in this paragraph should be construed to create for any governmental unit any substantive right that does not already exist under law.

62.     Nothing contained in this Order or in the MPA shall in any way (i) diminish the obligation of the Purchaser to comply with Environmental Laws, or (ii) diminish the obligations of the Debtors to comply with Environmental Laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code. The definition of Environmental Laws in the MPA shall be amended to delete the words "in existence on the date of the Original Agreement." For purposes of clarity, the exclusion of asbestos liabilities in

section 2.3(b)(x) of the MPA shall not be deemed to affect coverage of asbestos as a Hazardous

Material with respect to the Purchaser's remedial obligations under Environmental Laws.

63.    No law of any state or other jurisdiction relating to bulk sales or similar

laws shall apply in any way to the transactions contemplated by the 363 Transaction, the MPA,

the Motion, and this Order.

64.    The Debtors shall comply with their tax obligations under 28 U.S.C.

§ 960, except to the extent that such obligations are Assumed Liabilities.

65.    Notwithstanding anything contained in their respective organizational

documents or applicable state law to the contrary, each of the Debtors is authorized and directed,

upon and in connection with the Closing, to change their respective names, and any amendment

to the organizational documents (including the certificate of incorporation) of any of the Debtors

to effect such a change is authorized and approved, without Board or shareholder approval.

Upon any such change with respect to GM, the Debtors shall file with the Court a notice of

change of case caption within two (2) business days of the Closing, and the change of case

caption for these chapter 11 cases shall be deemed effective as of the Closing.

66.    The terms and provisions of the MPA and this Order shall inure to the

benefit of the Debtors, their estates, and their creditors, the Purchaser, and their respective

agents, officials, personnel, representatives, and advisors.

67.    The failure to specifically include any particular provisions of the MPA in

this Order shall not diminish or impair the effectiveness of such provision, it being the intent of

the Court that the MPA be authorized and approved in its entirety, except as modified herein.

68.    The MPA and any related agreements, documents, or other instruments

may be modified, amended, or supplemented by the parties thereto and in accordance with the

terms thereof, without further order of the Court, provided that any such modification,

amendment, or supplement does not have a material adverse effect on the Debtors' estates. Any

such proposed modification, amendment, or supplement that does have a material adverse effect

on the Debtors' estates shall be subject to further order of the Court, on appropriate notice.

69.     The provisions of this Order are nonseverable and mutually dependent on

each other.

70.     As provided in Fed.R.Bankr.P. 6004(h) and 6006(d), this Order shall not

be stayed for ten days after its entry, and instead shall be effective as of 12:00 noon, EDT, on

Thursday, July 9, 2009. The Debtors and the Purchaser are authorized to close the 363

Transaction on or after 12:00 noon on Thursday, July 9. Any party objecting to this Order must

exercise due diligence in filing any appeal and pursuing a stay or risk its appeal being foreclosed

as moot in the event Purchaser and the Debtors elect to close prior to this Order becoming a Final

Order.

71.     This Court retains exclusive jurisdiction to enforce and implement the

terms and provisions of this Order, the MPA, all amendments thereto, any waivers and consents

thereunder, and each of the agreements executed in connection therewith, including the Deferred

Termination Agreements, in all respects, including, but not limited to, retaining jurisdiction to (a)

compel delivery of the Purchased Assets to the Purchaser, (b) compel delivery of the purchase

price or performance of other obligations owed by or to the Debtors, (c) resolve any disputes

arising under or related to the MPA, except as otherwise provided therein, (d) interpret,

implement, and enforce the provisions of this Order, (e) protect the Purchaser against any of the

Retained Liabilities or the assertion of any lien, claim, encumbrance, or other interest, of any

kind or nature whatsoever, against the Purchased Assets, and (f) resolve any disputes with

respect to or concerning the Deferred Termination Agreements. The Court does not retain

jurisdiction to hear disputes arising in connection with the application of the Participation

**Deleted:** Pursuant to Bankruptcy Rules 6004(h) and 6006(d), this Order shall not be stayed for ten days after its entry and shall be effective immediately upon entry, and the Debtors and the Purchaser are authorized to close the 363 Transaction immediately upon entry of this Order.

09-50026-mg Doc 13272-2 Filed 07/02/15 Entered 07/02/15 14:33:06 Exhibit 2
Pg 103 of 380

Agreements, stockholder agreements or other documents concerning the corporate governance of

the Purchaser, and documents governed by foreign law, which disputes shall be adjudicated as

09-50026-mg  Doc 13272-2  Filed 07/02/15  Entered 07/02/15 14:33:06  Exhibit 2
Pg 104 of 380

necessary under applicable law in any other court or administrative agency of competent

jurisdiction.

Dated: New York, York
      July <u>5</u>, 2009


                           _____s/Robert E. Gerber_____
                           UNITED STATES BANKRUPTCY JUDGE

09-50026-reg Doc 2968-7 Filed 07/05/09 Entered 07/05/09 23:17:21 Main Document
Pg 51 of 81

09-50026-reg   Doc 2968-1   Filed 07/09/09   Entered 07/09/09 23:17:21   Exhibit A
Pg 91 of 3

## Exhibit A

**AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT**

EXECUTION COPY

AMENDED AND RESTATED

MASTER SALE AND PURCHASE AGREEMENT

BY AND AMONG

GENERAL MOTORS CORPORATION,

SATURN LLC,

SATURN DISTRIBUTION CORPORATION

AND

CHEVROLET-SATURN OF HARLEM, INC.,

*as Sellers*

AND

NGMCO, INC.,

*as Purchaser*

DATED AS OF

JUNE 26, 2009

# TABLE OF CONTENTS

**DESCRIPTION**                                                                                          **PAGE**


ARTICLE I DEFINITIONS .......................................................................................... 2

Section 1.1        Defined Terms. .............................................................................2
Section 1.2        Other Interpretive Provisions. ......................................................23

ARTICLE II PURCHASE AND SALE ........................................................................ 23

Section 2.1        Purchase and Sale of Assets; Assumption of Liabilities...........................23
Section 2.2        Purchased and Excluded Assets.......................................................23
Section 2.3        Assumed and Retained Liabilities. ...................................................28
Section 2.4        Non-Assignability. .........................................................................32

ARTICLE III CLOSING; PURCHASE PRICE ........................................................... 33

Section 3.1        Closing. ......................................................................................33
Section 3.2        Purchase Price..............................................................................34
Section 3.3        Allocation....................................................................................35
Section 3.4        Prorations. ..................................................................................35
Section 3.5        Post-Closing True-up of Certain Accounts..............................................36

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS ............................ 37

Section 4.1        Organization and Good Standing........................................................37
Section 4.2        Authorization; Enforceability. ........................................................37
Section 4.3        Noncontravention; Consents...........................................................37
Section 4.4        Subsidiaries.................................................................................38
Section 4.5        Reports and Financial Statements; Internal Controls.............................38
Section 4.6        Absence of Certain Changes and Events. .............................................39
Section 4.7        Title to and Sufficiency of Assets......................................................41
Section 4.8        Compliance with Laws; Permits. ......................................................41
Section 4.9        Environmental Laws.....................................................................42
Section 4.10       Employee Benefit Plans.................................................................42
Section 4.11       Labor Matters..............................................................................44
Section 4.12       Investigations; Litigation. ..............................................................45
Section 4.13       Tax Matters..................................................................................45
Section 4.14       Intellectual Property and IT Systems...................................................46
Section 4.15       Real Property. .............................................................................47
Section 4.16       Material Contracts.........................................................................48
Section 4.17       Dealer Sales and Service Agreements for Continuing Brands. ..................49
Section 4.18       Sellers' Products. .........................................................................49
Section 4.19       Certain Business Practices. ............................................................49
Section 4.20       Brokers and Other Advisors............................................................50

Section 4.21          Investment Representations. ........................................................50
Section 4.22          No Other Representations or Warranties of Sellers. ...............................51

ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER ....................... 51

Section 5.1           Organization and Good Standing. ............................................................51
Section 5.2           Authorization; Enforceability. .................................................................52
Section 5.3           Noncontravention; Consents. ...................................................................52
Section 5.4           Capitalization. ..........................................................................................53
Section 5.5           Valid Issuance of Shares. .........................................................................54
Section 5.6           Investment Representations. .....................................................................54
Section 5.7           Continuity of Business Enterprise. ..........................................................55
Section 5.8           Integrated Transaction. ............................................................................55
Section 5.9           No Other Representations or Warranties of Sellers. ...............................55

ARTICLE VI COVENANTS ........................................................................................ 56

Section 6.1           Access to Information. ..............................................................................56
Section 6.2           Conduct of Business. ................................................................................57
Section 6.3           Notices and Consents. ..............................................................................60
Section 6.4           Sale Procedures; Bankruptcy Court Approval. ........................................61
Section 6.5           Supplements to Purchased Assets. ...........................................................62
Section 6.6           Assumption or Rejection of Contracts. ....................................................62
Section 6.7           Deferred Termination  Agreements; Participation Agreements. ..............65
Section 6.8           [Reserved] .................................................................................................66
Section 6.9           Purchaser Assumed Debt; Wind Down Facility. .....................................66
Section 6.10          Litigation  and Other Assistance. ............................................................66
Section 6.11          Further Assurances. ..................................................................................67
Section 6.12          Notifications. ............................................................................................68
Section 6.13          Actions by Affiliates. ...............................................................................69
Section 6.14          Compliance Remediation. ........................................................................69
Section 6.15          Product Certification, Recall and Warranty Claims. ...............................69
Section 6.16          Tax Matters; Cooperation. .......................................................................69
Section 6.17          Employees; Benefit Plans; Labor Matters. ..............................................74
Section 6.18          TARP. .......................................................................................................79
Section 6.19          Guarantees; Letters of Credit. ..................................................................79
Section 6.20          Customs Duties. ........................................................................................79
Section 6.21          Termination of Intellectual Property Rights. ...........................................79
Section 6.22          Trademarks. ..............................................................................................80
Section 6.23          Preservation of Records. ..........................................................................81
Section 6.24          Confidentiality. .........................................................................................81
Section 6.25          Privacy Policies. .......................................................................................82
Section 6.26          Supplements to Sellers' Disclosure Schedule. ........................................82
Section 6.27          Real Property Matters. .............................................................................82
Section 6.28          Equity Incentive Plans. ............................................................................84
Section 6.29          Purchase of Personal Property Subject to Executory Contracts. .............84

Section 6.30    Transfer of Riverfront Holdings, Inc. Equity Interests or Purchased Assets;
                Ren Cen Lease. ........................................................................................84
Section 6.31    Delphi Agreements. ................................................................................85
Section 6.32    GM Strasbourg S.A. Restructuring. ........................................................85
Section 6.33    Holding Company Reorganization. ..........................................................85
Section 6.34    Transfer of Promark Global Advisors Limited and Promark Investment
                Trustees Limited Equity Interests. ..........................................................86
Section 6.35    Transfer of Equity Interests in Certain Subsidiaries. ................................86

ARTICLE VII CONDITIONS TO CLOSING ................................................................. 86

Section 7.1     Conditions to Obligations of Purchaser and Sellers. ................................86
Section 7.2     Conditions to Obligations of Purchaser. ..................................................87
Section 7.3     Conditions to Obligations of Sellers. .......................................................91

ARTICLE VIII TERMINATION ..................................................................................... 93

Section 8.1     Termination. ...........................................................................................93
Section 8.2     Procedure and Effect of Termination. ......................................................94

ARTICLE IX MISCELLANEOUS .................................................................................. 95

Section 9.1     Survival of Representations, Warranties, Covenants and Agreements and
                Consequences of Certain Breaches. .........................................................95
Section 9.2     Notices. ..................................................................................................95
Section 9.3     Fees and Expenses; No Right of Setoff. ...................................................97
Section 9.4     Bulk Sales Laws. ....................................................................................97
Section 9.5     Assignment. ............................................................................................97
Section 9.6     Amendment. ...........................................................................................98
Section 9.7     Waiver. ...................................................................................................98
Section 9.8     Severability. ...........................................................................................98
Section 9.9     Counterparts; Facsimiles. ........................................................................98
Section 9.10    Headings. ...............................................................................................98
Section 9.11    Parties in Interest. ...................................................................................98
Section 9.12    Governing Law. ......................................................................................99
Section 9.13    Venue and Retention of Jurisdiction. .......................................................99
Section 9.14    Waiver of Jury Trial. ..............................................................................99
Section 9.15    Risk of Loss. ..........................................................................................99
Section 9.16    Enforcement of Agreement. .....................................................................99
Section 9.17    Entire Agreement. .................................................................................100
Section 9.18    Publicity. ..............................................................................................100
Section 9.19    No Successor or Transferee Liability. .....................................................100
Section 9.20    Time Periods. .......................................................................................101
Section 9.21    Sellers' Disclosure Schedule. ................................................................101
Section 9.22    No Binding Effect. ................................................................................101

# EXHIBITS

Exhibit A        Form of Parent Warrant A
Exhibit B        Form of Parent Warrant B
Exhibit C        UAW Active Labor Modifications
Exhibit D        Form of UAW Retiree Settlement Agreement
Exhibit E        Form of VEBA Warrant
Exhibit F        Certain Excluded Owned Real Property
Exhibit G        Certain Retained Workers' Compensation Claims
Exhibit H        Form of Sale Procedures Order
Exhibit I        Form of Sale Approval Order
Exhibit J-1      Form of Deferred Termination Agreement for Saturn Discontinued
                 Brand Dealer Agreements
Exhibit J-2      Form of Deferred Termination Agreement for Hummer Discontinued
                 Brand  Dealer Agreements
Exhibit J-3      Form of Deferred Termination Agreement for non-Saturn and
                 non-Hummer Discontinued Brand Dealer Agreements and Excluded
                 Continuing Brand Dealer Agreements
Exhibit K        Form of Participation Agreement
Exhibit L        Form of Subdivision Master Lease
Exhibit M        Form of Assignment and Assumption of Willow Run Lease
Exhibit N        Form of Ren Cen Lease
Exhibit O        Form of Equity Registration Rights Agreement
Exhibit P        Form of Bill of Sale
Exhibit Q        Form of Assignment and Assumption Agreement
Exhibit R        Form of Novation Agreement
Exhibit S        Form of Government Related Subcontract Agreement
Exhibit T        Form of Intellectual Property Assignment Agreement
Exhibit U        Form of Transition Services Agreement
Exhibit V        Form of Assignment and Assumption of Real Property Leases
Exhibit W        Form of Assignment and Assumption of Harlem Lease
Exhibit X        Form of Master Lease Agreement
Exhibit Y        Form of Certificate of Designation of Purchaser for Preferred Stock
Exhibit Z        VEBA Note Term Sheet

## AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT

THIS AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT (this "Agreement"), dated as of June 26, 2009, is made by and among General Motors Corporation, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), Chevrolet-Saturn of Harlem, Inc., a Delaware corporation ("Harlem," and collectively with Parent, S LLC and S Distribution, "Sellers," and each a "Seller"), and NGMCO, Inc., a Delaware corporation and successor-in-interest to Vehicle Acquisition Holdings LLC, a Delaware limited liability company ("Purchaser").

WHEREAS, on June 1, 2009 (the "Petition Date"), the Parties entered into that certain Master Sale and Purchase Agreement (the "Original Agreement"), and, in connection therewith, Sellers filed voluntary petitions for relief (the "Bankruptcy Cases") under Chapter 11 of Title 11, U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, pursuant to Sections 363 and 365 of the Bankruptcy Code, Sellers desire to sell, transfer, assign, convey and deliver to Purchaser, and Purchaser desires to purchase, accept and acquire from Sellers all of the Purchased Assets (as hereinafter defined) and assume and thereafter pay or perform as and when due, or otherwise discharge, all of the Assumed Liabilities (as hereinafter defined), in each case, in accordance with the terms and subject to the conditions set forth in this Agreement and the Bankruptcy Code;

WHEREAS, on the Petition Date, Purchaser entered into equity subscription agreements with each of Canada, Sponsor and the New VEBA (each as hereinafter defined), pursuant to which Purchaser has agreed to issue, on the Closing Date (as hereinafter defined), the Canada Shares, the Sponsor Shares, the VEBA Shares, the VEBA Note and the VEBA Warrant (each as hereinafter defined);

WHEREAS, pursuant to the equity subscription agreement between Purchaser and Canada, Canada has agreed to (i) contribute on or before the Closing Date an amount of Indebtedness (as hereinafter defined) owed to it by General Motors of Canada Limited ("GMCL"), which results in not more than $1,288,135,593 of such Indebtedness remaining an obligation of GMCL, to Canada immediately following the Closing (the "Canadian Debt Contribution") and (ii) exchange immediately following the Closing the $3,887,000,000 loan to be made by Canada to Purchaser for additional shares of capital stock of Purchaser;

WHEREAS, the transactions contemplated by this Agreement are in furtherance of the conditions, covenants and requirements of the UST Credit Facilities (as hereinafter defined) and are intended to result in a rationalization of the costs, capitalization and capacity with respect to the manufacturing workforce of, and suppliers to, Sellers and their Subsidiaries (as hereinafter defined);

WHEREAS, it is contemplated that Purchaser may, in accordance with the terms of this Agreement, prior to the Closing (as hereinafter defined), engage in one or more related transactions (the "Holding Company Reorganization") generally designed to reorganize

Purchaser and one or more newly-formed, direct or indirect, wholly-owned Subsidiaries of Purchaser into a holding company structure that results in Purchaser becoming a direct or indirect, wholly-owned Subsidiary of a newly-formed Delaware corporation ("Holding Company"); and

WHEREAS, it is contemplated that Purchaser may, in accordance with the terms of this Agreement, direct the transfer of the Purchased Assets on its behalf by assigning its rights to purchase, accept and acquire the Purchased Assets and its obligations to assume and thereafter pay or perform as and when due, or otherwise discharge, the Assumed Liabilities, to Holding Company or one or more newly-formed, direct or indirect, wholly-owned Subsidiaries of Holding Company or Purchaser.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the Parties (as hereinafter defined) hereby agree as follows:

# ARTICLE I
# DEFINITIONS

*Section 1.1    Defined Terms.*    As used in this Agreement, the following terms have the meanings set forth below or in the Sections referred to below:

"Adjustment Shares" has the meaning set forth in **Section 3.2(c)(i)**.

"Advisory Fees" has the meaning set forth in **Section 4.20**.

"Affiliate" has the meaning set forth in Rule 12b-2 of the Exchange Act.

"Affiliate Contract" means a Contract between a Seller or a Subsidiary of a Seller, on the one hand, and an Affiliate of such Seller or Subsidiary of a Seller, on the other hand.

"Agreed G Transaction" has the meaning set forth in **Section 6.16(g)(i)**.

"Agreement" has the meaning set forth in the Preamble.

"Allocation" has the meaning set forth in **Section 3.3**.

"Alternative Transaction" means the sale, transfer, lease or other disposition, directly or indirectly, including through an asset sale, stock sale, merger or other similar transaction, of all or substantially all of the Purchased Assets in a transaction or a series of transactions with one or more Persons other than Purchaser (or its Affiliates).

"Ancillary Agreements" means the Parent Warrants, the UAW Active Labor Modifications, the UAW Retiree Settlement Agreement, the VEBA Warrant, the Equity Registration Rights Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the Novation Agreement, the Government Related Subcontract Agreement, the Intellectual Property Assignment Agreement, the Transition Services Agreement, the Quitclaim Deeds, the

Assignment and Assumption of Real Property Leases, the Assignment and Assumption of Harlem Lease, the Master Lease Agreement, the Subdivision Master Lease (if required), the Saginaw Service Contracts (if required), the Assignment and Assumption of Willow Run Lease, the Ren Cen Lease, the VEBA Note and each other agreement or document executed by the Parties pursuant to this Agreement or any of the foregoing and each certificate and other document to be delivered by the Parties pursuant to **ARTICLE VII**.

"Antitrust Laws" means all Laws that (i) are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or the lessening of competition through merger or acquisition or (ii) involve foreign investment review by Governmental Authorities.

"Applicable Employee" means all (i) current salaried employees of Parent and (ii) current hourly employees of any Seller or any of its Affiliates (excluding Purchased Subsidiaries and any dealership) represented by the UAW, in each case, including such current salaried and current hourly employees who are on (a) long-term or short-term disability, military leave, sick leave, family medical leave or some other approved leave of absence or (b) layoff status or who have recall rights.

"Arms-Length Basis" means a transaction between two Persons that is carried out on terms no less favorable than the terms on which the transaction would be carried out by unrelated or unaffiliated Persons, acting as a willing buyer and a willing seller, and each acting in his own self-interest.

"Assignment and Assumption Agreement" has the meaning set forth in **Section 7.2(c)(v)**.

"Assignment and Assumption of Harlem Lease" has the meaning set forth in **Section 7.2(c)(xiii)**.

"Assignment and Assumption of Real Property Leases" has the meaning set forth in **Section 7.2(c)(xii)**.

"Assignment and Assumption of Willow Run Lease" has the meaning set forth in **Section 6.27(e)**.

"Assumable Executory Contract" has the meaning set forth in **Section 6.6(a)**.

"Assumable Executory Contract Schedule" means Section 1.1A of the Sellers' Disclosure Schedule.

"Assumed Liabilities" has the meaning set forth in **Section 2.3(a)**.

"Assumed Plans" has the meaning set forth in **Section 6.17(e)**.

"Assumption Effective Date" has the meaning set forth in **Section 6.6(d)**.

"Bankruptcy Avoidance Actions" has the meaning set forth in **Section 2.2(b)(xi)**.

"Bankruptcy Cases" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Benefit Plans" has the meaning set forth in **Section 4.10(a)**.

"Bidders" has the meaning set forth in **Section 6.4(c)**.

"Bids" has the meaning set forth in **Section 6.4(c)**.

"Bill of Sale" has the meaning set forth in **Section 7.2(c)(iv)**.

"Business Day" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by Law to be closed in the City of New York, New York.

"CA" has the meaning set forth in **Section 6.16(g)(i)**.

"Canada" means 7176384 Canada Inc., a corporation organized under the Laws of Canada, and a wholly-owned subsidiary of Canada Development Investment Corporation, and its successors and assigns.

"Canada Affiliate" has the meaning set forth in **Section 9.22**.

"Canada Shares" has the meaning set forth in **Section 5.4(c)**.

"Canadian Debt Contribution" has the meaning set forth in the Recitals.

"Claims" means all rights, claims (including any cross-claim or counterclaim), investigations, causes of action, choses in action, charges, suits, defenses, demands, damages, defaults, assessments, rights of recovery, rights of set-off, rights of recoupment, litigation, third party actions, arbitral proceedings or proceedings by or before any Governmental Authority or any other Person, of any kind or nature, whether known or unknown, accrued, fixed, absolute, contingent or matured, liquidated or unliquidated, due or to become due, and all rights and remedies with respect thereto.

"Claims Estimate Order" has the meaning set forth in **Section 3.2(c)(i)**.

"Closing" has the meaning set forth in **Section 3.1**.

"Closing Date" has the meaning set forth in **Section 3.1**.

"Collective Bargaining Agreement" means any collective bargaining agreement or other written or oral agreement, understanding or mutually recognized past practice with respect to Employees, between any Seller (or any Subsidiary thereof) and any labor organization or other Representative of Employees (including the UAW Collective Bargaining Agreement, local agreements, amendments, supplements and letters and memoranda of understanding of any kind).

-4-

"Common Stock" has the meaning set forth in **Section 5.4(b)**.

"Confidential Information" has the meaning set forth in **Section 6.24.**

"Confidentiality Period" has the meaning set forth in **Section 6.24**.

"Continuing Brand Dealer Agreement" means a United States dealer sales and service Contract related to one or more of the Continuing Brands, together with all other Contracts between any Seller and the relevant dealer that are related to the dealership operations of such dealer other than Contracts identified on Section 1.1B of the Sellers' Disclosure Schedule, each of which Contract identified on Section 1.1B of the Sellers' Disclosure Schedule shall be deemed to be a Rejectable Executory Contract.

"Continuing Brands" means each of the following vehicle line-makes, currently distributed in the United States by Parent or its Subsidiaries: Buick, Cadillac, Chevrolet and GMC.

"Contracts" means all purchase orders, sales agreements, supply agreements, distribution agreements, sales representative agreements, employee or consulting agreements, leases, subleases, licenses, product warranty or service agreements and other binding commitments, agreements, contracts, arrangements, obligations and undertakings of any nature (whether written or oral, and whether express or implied).

"Copyright Licenses" means all Contracts naming a Seller as licensee or licensor and providing for the grant of any right to reproduce, publicly display, publicly perform, distribute, create derivative works of or otherwise exploit any works covered by any Copyright.

"Copyrights" means all domestic and foreign copyrights, whether registered or unregistered, including all copyright rights throughout the universe (whether now or hereafter arising) in any and all media (whether now or hereafter developed), in and to all original works of authorship (including all compilations of information or marketing materials created by or on behalf of any Seller), acquired, owned or licensed by any Seller, all applications, registrations and recordings thereof (including applications, registrations and recordings in the United States Copyright Office or in any similar office or agency of the United States or any other country or any political subdivision thereof) and all reissues, renewals, restorations, extensions and revisions thereof.

"Cure Amounts" means all cure amounts payable in order to cure any monetary defaults required to be cured under Section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by the applicable Seller and assignment to Purchaser of the Purchased Contracts.

"Damages" means any and all Losses, other than punitive damages.

"Dealer Agreement" has the meaning set forth in **Section 4.17**.

"Deferred Executory Contract" has the meaning set forth in **Section 6.6(c)**.

"Deferred Termination Agreements" has the meaning set forth in **Section 6.7(a)**.

"Delayed Closing Entities" has the meaning set forth in **Section 6.35**.

"Delphi" means Delphi Corporation.

"Delphi Motion" means the motion filed by Parent with the Bankruptcy Court in the Bankruptcy Cases on June 20, 2009, seeking authorization and approval of (i) the purchase, and guarantee of purchase, of certain assets of Delphi, (ii) entry into certain agreements in connection with the sale of substantially all of the remaining assets of Delphi to a third party, (iii) the assumption of certain Executory Contracts in connection with such sale, (iv) entry into an agreement with the PBGC in connection with such sale and (v) entry into an alternative transaction with the successful bidder in the auction for the assets of Delphi.

"Delphi Transaction Agreements" means (i) either (A) the MDA, the SPA, the Loan Agreement, the Operating Agreement, the Commercial Agreements and any Ancillary Agreements (in each case, as defined in the Delphi Motion), which any Seller is a party to, or (B) in the event that an Acceptable Alternative Transaction (as defined in the Delphi Motion) is consummated, any agreements relating to the Acceptable Alternative Transaction, which any Seller is a party to, and (ii) in the event that the PBGC Agreement is entered into at or prior to the Closing, the PBGC Agreement (as defined in the Delphi Motion) and any ancillary agreements entered into pursuant thereto, which any Seller is a party to, as each of the agreements described in clauses (i) or (ii) hereof may be amended from time to time.

"DIP Facility" means that certain Secured Superpriority Debtor-in-Possession Credit Agreement entered into or to be entered into by Parent, as borrower, certain Subsidiaries of Parent listed therein, as guarantors, Sponsor, as lender, and Export Development Canada, as lender.

"Discontinued Brand Dealer Agreement" means a United States dealer sales and service Contract related to one or more of the Discontinued Brands, together with all other Contracts between any Seller and the relevant dealer that are related to the dealership operations of such dealer other than Contracts identified on Section 1.1B of the Sellers' Disclosure Schedule, each of which Contract identified on Section 1.1B of the Sellers' Disclosure Schedule shall be deemed to be a Rejectable Executory Contract.

"Discontinued Brands" means each of the following vehicle line-makes, currently distributed in the United States by Parent or its Subsidiaries: Hummer, Saab, Saturn and Pontiac.

"Disqualified Individual" has the meaning set forth in **Section 4.10(f)**.

"Employees" means (i) each employee or officer of any of Sellers or their Affiliates (including (a) any current, former or retired employees or officers, (b) employees or officers on long-term or short-term disability, military leave, sick leave, family medical leave or some other approved leave of absence and (c) employees on layoff status or with recall rights); (ii) each consultant or other service provider of any of Sellers or their Affiliates who is a former employee, officer or director of any of Sellers or their Affiliates; and (iii) each individual recognized under any Collective Bargaining Agreement as being employed by or having rights to

employment by any of Sellers or their Affiliates. For the avoidance of doubt, Employees includes all employees of Sellers or any of their Affiliates, whether or not Transferred Employees.

"Employment-Related Obligations" means all Liabilities arising out of, related to, in respect of or in connection with employment relationships or alleged or potential employment relationships with Sellers or any Affiliate of Sellers relating to Employees, leased employees, applicants, and/or independent contractors or those individuals who are deemed to be employees of Sellers or any Affiliate of Sellers by Contract or Law, whether filed or asserted before, on or after the Closing. "Employment-Related Obligations" includes Claims relating to discrimination, torts, compensation for services (and related employment and withholding Taxes), workers' compensation or similar benefits and payments on account of occupational illnesses and injuries, employment Contracts, Collective Bargaining Agreements, grievances originating under a Collective Bargaining Agreement, wrongful discharge, invasion of privacy, infliction of emotional distress, defamation, slander, provision of leave under the Family and Medical Leave Act of 1993, as amended, or other similar Laws, car programs, relocation, expense-reporting, Tax protection policies, Claims arising out of WARN or employment, terms of employment, transfers, re-levels, demotions, failure to hire, failure to promote, compensation policies, practices and treatment, termination of employment, harassment, pay equity, employee benefits (including post-employment welfare and other benefits), employee treatment, employee suggestions or ideas, fiduciary performance, employment practices, the modification or termination of Benefit Plans or employee benefit plans, policies, programs, agreements and arrangements of Purchaser, including decisions to provide plans that are different from Benefit Plans, and the like. Without limiting the generality of the foregoing, with respect to any Employees, leased employees, and/or independent contractors or those individuals who are deemed to be employees of Sellers or any Affiliate of Sellers by Contract or Law, "Employment-Related Obligations" includes payroll and social security Taxes, contributions (whether required or voluntary) to any retirement, health and welfare or similar plan or arrangement, notice, severance or similar payments required under Law, and obligations under Law with respect to occupational injuries and illnesses.

"Encumbrance" means any lien (statutory or otherwise), charge, deed of trust, pledge, security interest, conditional sale or other title retention agreement, lease, mortgage, option, charge, hypothecation, easement, right of first offer, license, covenant, restriction, ownership interest of another Person or other encumbrance.

"End Date" has the meaning set forth in **Section 8.1(b)**.

"Environment" means any surface water, groundwater, drinking water supply, land surface or subsurface soil or strata, ambient air, natural resource or wildlife habitat.

"Environmental Law" means any Law in existence on the date of the Original Agreement relating to the management or Release of, or exposure of humans to, any Hazardous Materials; or pollution; or the protection of human health and welfare and the Environment.

"Equity Incentive Plans" has the meaning set forth in **Section 6.28**.

"Equity Interest" means, with respect to any Person, any shares of capital stock of (or other ownership or profit interests in) such Person, warrants, options or other rights for the purchase or other acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, options or rights for the purchase or other acquisition from such Person of such shares (or such other ownership or profits interests) and other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting.

"Equity Registration Rights Agreement" has the meaning set forth in **Section 7.1(c)**.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is part of the same controlled group, or under common control with, or part of an affiliated service group that includes any Seller, within the meaning of Section 414(b), (c), (m) or (o) of the Tax Code or Section 4001(a)(14) of ERISA.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Assets" has the meaning set forth in **Section 2.2(b)**.

"Excluded Cash" has the meaning set forth in **Section 2.2(b)(i)**.

"Excluded Continuing Brand Dealer Agreements" means all Continuing Brand Dealer Agreements, other than those that are Assumable Executory Contracts.

"Excluded Contracts" has the meaning set forth in **Section 2.2(b)(vii)**.

"Excluded Entities" has the meaning set forth in **Section 2.2(b)(iv)**.

"Excluded Insurance Policies" has the meaning set forth in **Section 2.2(b)(xiii)**.

"Excluded Personal Property" has the meaning set forth in **Section 2.2(b)(vi)**.

"Excluded Real Property" has the meaning set forth in **Section 2.2(b)(v)**.

"Excluded Subsidiaries" means, collectively, the direct Subsidiaries of Sellers included in the Excluded Entities and their respective direct and indirect Subsidiaries, in each case, as of the Closing Date.

"Executory Contract" means an executory Contract or unexpired lease of personal property or nonresidential real property.

"Executory Contract Designation Deadline" has the meaning set forth in **Section 6.6(a)**.

"Existing Internal VEBA" has the meaning set forth in **Section 6.17(h)**.

-8-

"Existing Saginaw Wastewater Facility" has the meaning set forth in **Section 6.27(b)**.

"Existing UST Loan and Security Agreement" means the Loan and Security Agreement, dated as of December 31, 2008, between Parent and Sponsor, as amended.

"FCPA" has the meaning set forth in **Section 4.19**.

"Final Determination" means (i) with respect to U.S. federal income Taxes, a "determination" as defined in Section 1313(a) of the Tax Code or execution of an IRS Form 870-AD and, (ii) with respect to Taxes other than U.S. federal income Taxes, any final determination of Liability in respect of a Tax that, under applicable Law, is not subject to further appeal, review or modification through proceedings or otherwise, including the expiration of a statute of limitations or a period for the filing of Claims for refunds, amended Tax Returns or appeals from adverse determinations.

"Final Order" means (i) an Order of the Bankruptcy Court or any other court or adjudicative body as to which the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending, or (ii) in the event that an appeal, writ of certiorari, reargument or rehearing thereof has been sought, such Order of the Bankruptcy Court or any other court or adjudicative body shall have been affirmed by the highest court to which such Order was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, however, that no Order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such Order.

"FSA Approval" has the meaning set forth in **Section 6.34**.

"G Transaction" has the meaning set forth in **Section 6.16(g)(i)**.

"GAAP" means the United States generally accepted accounting principles and practices as in effect from time to time, consistently applied throughout the specified period.

"GMAC" means GMAC LLC.

"GM Assumed Contracts" has the meaning set forth in the Delphi Motion.

"GMCL" has the meaning set forth in the Recitals.

"Governmental Authority" means any United States or non-United States federal, national, provincial, state or local government or other political subdivision thereof, any entity, authority, agency or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states.

"Government Related Subcontract Agreement" has the meaning set forth in **Section 7.2(c)(vii)**.

"Harlem" has the meaning set forth in the Preamble.

"Hazardous Materials" means any material or substance that is regulated, or can give rise to Claims, Liabilities or Losses, under any Environmental Law or a Permit issued pursuant to any Environmental Law, including any petroleum, petroleum-based or petroleum-derived product, polychlorinated biphenyls, asbestos or asbestos-containing materials, lead and any noxious, radioactive, flammable, corrosive, toxic, hazardous or caustic substance (whether solid, liquid or gaseous).

"Holding Company" has the meaning set forth in the Recitals.

"Holding Company Reorganization" has the meaning set forth in the Recitals.

"Indebtedness" means, with respect to any Person, without duplication:  (i) all obligations of such Person for borrowed money (including all accrued and unpaid interest and all prepayment penalties or premiums in respect thereof); (ii) all obligations of such Person to pay amounts evidenced by bonds, debentures, notes or similar instruments (including all accrued and unpaid interest and all prepayment penalties or premiums in respect thereof); (iii) all obligations of others, of the types set forth in clauses (i)-(ii) above that are secured by any Encumbrance on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, but only to the extent so secured; (iv) all unreimbursed reimbursement obligations of such Person under letters of credit issued for the account of such Person; (v) obligations of such Person under conditional sale, title retention or similar arrangements or other obligations, in each case, to pay the deferred purchase price for property or services, to the extent of the unpaid purchase price (other than trade payables and customary reservations or retentions of title under Contracts with suppliers, in each case, in the Ordinary Course of Business); (vi) all net monetary obligations of such Person in respect of interest rate, equity and currency swap and other derivative transaction obligations; and (vii) all guarantees of or by such Person of any of the matters described in clauses (i)-(vi) above, to the extent of the maximum amount for which such Person may be liable pursuant to such guarantee.

"Intellectual Property" means all Patents, Trademarks, Copyrights, Trade Secrets, Software, all rights under the Licenses and all concepts, ideas, know-how, show-how, proprietary information, technology, formulae, processes and other general intangibles of like nature, and other intellectual property to the extent entitled to legal protection as such, including products under development and methodologies therefor, in each case acquired, owned or licensed by a Seller.

"Intellectual Property Assignment Agreement" has the meaning set forth in **Section 7.2(c)(viii)**.

"Intercompany Obligations" has the meaning set forth in **Section 2.2(a)(iv)**.

"Inventory" has the meaning set forth in **Section 2.2(a)(viii)**.

"IRS" means the United States Internal Revenue Service.

"Key Subsidiary" means any direct or indirect Subsidiary (which, for the avoidance of doubt, shall only include any legal entity in which a Seller, directly or indirectly, owns greater than 50% of the outstanding Equity Interests in such legal entity) of Sellers (other than trusts) with assets (excluding any Intercompany Obligations) in excess of Two Hundred and Fifty Million Dollars ($250,000,000) as reflected on Parent's consolidated balance sheet as of March 31, 2009 and listed on Section 1.1C of the Sellers' Disclosure Schedule.

"Knowledge of Sellers" means the actual knowledge of the individuals listed on Section 1.1D of the Sellers' Disclosure Schedule as to the matters represented and as of the date the representation is made.

"Law" means any and all applicable United States or non-United States federal, national, provincial, state or local laws, rules, regulations, directives, decrees, treaties, statutes, provisions of any constitution and principles (including principles of common law) of any Governmental Authority, as well as any applicable Final Order.

"Landlocked Parcel" has the meaning set forth in **Section 6.27(c)**.

"Leased Real Property" means all the real property leased or subleased by Sellers, except for any such leased or subleased real property subject to any Contracts designated as Excluded Contracts.

"Lemon Laws" means a state statute requiring a vehicle manufacturer to provide a consumer remedy when such manufacturer is unable to conform a vehicle to the express written warranty after a reasonable number of attempts, as defined in the applicable statute.

"Liabilities" means any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any Law, Claim, Order, Contract or otherwise.

"Licenses" means the Patent Licenses, the Trademark Licenses, the Copyright Licenses, the Software Licenses and the Trade Secret Licenses.

"Losses" means any and all Liabilities, losses, damages, fines, amounts paid in settlement, penalties, costs and expenses (including reasonable and documented attorneys', accountants', consultants', engineers' and experts' fees and expenses).

"LSA Agreement" means the Amended and Restated GM-Delphi Agreement, dated as of June 1, 2009, and any ancillary agreements entered into pursuant thereto, which any Seller is a party to, as each such agreement may be amended from time to time.

"Master Lease Agreement" has the meaning set forth in **Section 7.2(c)(xiv)**.

"Material Adverse Effect" means any change, effect, occurrence or development that, individually or in the aggregate, has or would reasonably be expected to have a material adverse effect on the Purchased Assets, Assumed Liabilities or results of operations of Parent and its

Purchased Subsidiaries, taken as a whole; provided, however, that the term "Material Adverse Effect" does not, and shall not be deemed to, include, either alone or in combination, any changes, effects, occurrences or developments: (i) resulting from general economic or business conditions in the United States or any other country in which Sellers and their respective Subsidiaries have operations, or the worldwide economy taken as a whole; (ii) affecting Sellers in the industry or the markets where Sellers operate (except to the extent such change, occurrence or development has a disproportionate adverse effect on Parent and its Subsidiaries relative to other participants in such industry or markets, taken as a whole); (iii) resulting from any changes (or proposed or prospective changes) in any Law or in GAAP or any foreign generally accepted accounting principles; (iv) in securities markets, interest rates, regulatory or political conditions, including resulting or arising from acts of terrorism or the commencement or escalation of any war, whether declared or undeclared, or other hostilities; (v) resulting from the negotiation, announcement or performance of this Agreement or the DIP Facility, or the transactions contemplated hereby and thereby, including by reason of the identity of Sellers, Purchaser or Sponsor or any communication by Sellers, Purchaser or Sponsor of any plans or intentions regarding the operation of Sellers' business, including the Purchased Assets, prior to or following the Closing; (vi) resulting from any act or omission of any Seller required or contemplated by the terms of this Agreement, the DIP Facility or the Viability Plans, or otherwise taken with the prior consent of Sponsor or Purchaser, including Parent's announced shutdown, which began in May 2009; and (vii) resulting from the filing of the Bankruptcy Cases (or any other bankruptcy, insolvency or similar proceeding filed by any Subsidiary of Parent) or from any action approved by the Bankruptcy Court (or any other court in connection with any such other proceedings).

"New VEBA" means the trust fund established pursuant to the Settlement Agreement.

"Non-Assignable Assets" has the meaning set forth in **Section 2.4(a)**.

"Non-UAW Collective Bargaining Agreements" has the meaning set forth in **Section 6.17(m)(i)**.

"Non-UAW Settlement Agreements" has the meaning set forth in **Section 6.17(m)(ii)**.

"Notice of Intent to Reject" has the meaning set forth in **Section 6.6(b)**.

"Novation Agreement" has the meaning set forth in **Section 7.2(c)(vi)**.

"Option Period" has the meaning set forth in **Section 6.6(b)**.

"Order" means any writ, judgment, decree, stipulation, agreement, determination, award, injunction or similar order of any Governmental Authority, whether temporary, preliminary or permanent.

"Ordinary Course of Business" means the usual, regular and ordinary course of business consistent with the past practice thereof (including with respect to quantity and frequency) as and to the extent modified in connection with (i) the implementation of the Viability Plans; (ii) Parent's announced shutdown, which began in May 2009; and (iii) the Bankruptcy Cases (or any other bankruptcy, insolvency or similar proceeding filed by or in respect of any Subsidiary of

Parent), in the case of clause (iii), to the extent such modifications were approved by the Bankruptcy Court (or any other court or other Governmental Authority in connection with any such other proceedings), or in furtherance of such approval.

"Organizational Document" means (i) with respect to a corporation, the certificate or articles of incorporation and bylaws or their equivalent; (ii) with respect to any other entity, any charter, bylaws, limited liability company agreement, certificate of formation, articles of organization or similar document adopted or filed in connection with the creation, formation or organization of a Person; and (iii) in the case of clauses (i) and (ii) above, any amendment to any of the foregoing other than as prohibited by **Section 6.2(b)(vi)**.

"Original Agreement" has the meaning set forth in the Recitals.

"Owned Real Property" means all real property owned by Sellers (including all buildings, structures and improvements thereon and appurtenances thereto), except for any such real property included in the Excluded Real Property.

"Parent" has the meaning set forth in the Preamble.

"Parent Employee Benefit Plans and Policies" means all (i) "employee benefit plans" (as defined in Section 3(3) of ERISA) and all pension, savings, profit sharing, retirement, bonus, incentive, health, dental, life, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, other equity, executive or deferred compensation, hospitalization, post-retirement (including retiree medical or retiree life, voluntary employees' beneficiary associations, and multiemployer plans (as defined in Section 3(37) of ERISA)), severance, retention, change in control, vacation, cafeteria, sick leave, fringe, perquisite, welfare benefits or other employee benefit plans, programs, policies, agreements or arrangements (whether written or oral), including those plans, programs, policies, agreements and arrangements with respect to which any Employee covered by the UAW Collective Bargaining Agreement is an eligible participant, (ii) employment or individual consulting Contracts and (iii) employee manuals and written policies, practices or understandings relating to employment, compensation and benefits, and in the case of clauses (i) through (iii), sponsored, maintained, entered into, or contributed to, or required to be maintained or contributed to, by Parent.

"Parent SEC Documents" has the meaning set forth in **Section 4.5(a)**.

"Parent Shares" has the meaning set forth in **Section 3.2(a)(iii)**.

"Parent Warrant A" means warrants to acquire 45,454,545 shares of Common Stock issued pursuant to a warrant agreement, substantially in the form attached hereto as **Exhibit A**.

"Parent Warrant B" means warrants to acquire 45,454,545 shares of Common Stock issued pursuant to a warrant agreement, substantially in the form attached hereto as **Exhibit B**.

"Parent Warrants" means collectively, Parent Warrant A and Parent Warrant B.

"Participation Agreement" has the meaning set forth in **Section 6.7(b)**.

"Parties" means Sellers and Purchaser together, and "Party" means any of Sellers, on the one hand, or Purchaser, on the other hand, as appropriate and as the case may be.

"Patent Licenses" means all Contracts naming a Seller as licensee or licensor and providing for the grant of any right to manufacture, use, lease, or sell any invention, design, idea, concept, method, technique or process covered by any Patent.

"Patents" means all inventions, patentable designs, letters patent and design letters patent of the United States or any other country and all applications (regular and provisional) for letters patent or design letters patent of the United States or any other country, including applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof, and all reissues, divisions, continuations, continuations in part, revisions, reexaminations and extensions or renewals of any of the foregoing.

"PBGC" has the meaning set forth in **Section 4.10(a)**.

"Permits" has the meaning set forth in **Section 2.2(a)(xi)**.

"Permitted Encumbrances" means all (i) purchase money security interests arising in the Ordinary Course of Business; (ii) security interests relating to progress payments created or arising pursuant to government Contracts in the Ordinary Course of Business; (iii) security interests relating to vendor tooling arising in the Ordinary Course of Business; (iv) Encumbrances that have been or may be created by or with the written consent of Purchaser; (v) mechanic's, materialmen's, laborer's, workmen's, repairmen's, carrier's liens and other similar Encumbrances arising by operation of law or statute in the Ordinary Course of Business for amounts that are not delinquent or that are being contested in good faith by appropriate proceedings and for which appropriate reserves have been established; (vi) liens for Taxes, the validity or amount of which is being contested in good faith by appropriate proceedings, and statutory liens for current Taxes not yet due, payable or delinquent (or which may be paid without interest or penalties); (vii) with respect to the Transferred Real Property that is Owned Real Property, other than Secured Real Property Encumbrances at and following the Closing: (a) matters that a current ALTA/ACSM survey, or a similar cadastral survey in any country other than the United States, would disclose, the existence of which, individually or in the aggregate, would not materially and adversely interfere with the present use of the affected property; (b) rights of the public, any Governmental Authority and adjoining property owners in streets and highways abutting or adjacent to the applicable Owned Real Property; (c) easements, licenses, rights-of-way, covenants, servitudes, restrictions, encroachments, site plans, subdivision plans and other Encumbrances of public record or that would be disclosed by a current title commitment of the applicable Owned Real Property, which, individually or in the aggregate, would not materially and adversely interfere with the present use of the applicable Owned Real Property; and (d) such other Encumbrances, the existence of which, individually or in the aggregate, would not materially and adversely interfere with or affect the present use or occupancy of the applicable Owned Real Property; (viii) with respect to the Transferred Real Property that is Leased Real Property: (1) matters that a current ALTA/ACSM survey, or a similar cadastral survey in any country other than the United States, would disclose; (2) rights of the public, any Governmental Authority and adjoining property owners in streets and highways

-14-

abutting or adjacent to the applicable Leased Real Property; (3) easements, licenses, rights-of-way, covenants, servitudes, restrictions, encroachments, site plans, subdivision plans and other Encumbrances of public record or that would be disclosed by a current title commitment of the applicable Leased Real Property or which have otherwise been imposed on such property by landlords; (ix) in the case of the Transferred Equity Interests, all restrictions and obligations contained in any Organizational Document, joint venture agreement, shareholders agreement, voting agreement and related documents and agreements, in each case, affecting the Transferred Equity Interests; (x) except to the extent otherwise agreed to in the Ratification Agreement entered into by Sellers and GMAC on June 1, 2009 and approved by the Bankruptcy Court on the date thereof or any other written agreement between GMAC or any of its Subsidiaries and any Seller, all Claims (in each case solely to the extent such Claims constitute Encumbrances) and Encumbrances in favor of GMAC or any of its Subsidiaries in, upon or with respect to any property of Sellers or in which Sellers have an interest, including any of the following: (1) cash, deposits, certificates of deposit, deposit accounts, escrow funds, surety bonds, letters of credit and similar agreements and instruments; (2) owned or leased equipment; (3) owned or leased real property; (4) motor vehicles, inventory, equipment, statements of origin, certificates of title, accounts, chattel paper, general intangibles, documents and instruments of dealers, including property of dealers in-transit to, surrendered or returned by or repossessed from dealers or otherwise in any Seller's possession or under its control; (5) property securing obligations of Sellers under derivatives Contracts; (6) rights or property with respect to which a Claim or Encumbrance in favor of GMAC or any of its Subsidiaries is disclosed in any filing made by Parent with the SEC (including any filed exhibit); and (7) supporting obligations, insurance rights and Claims against third parties relating to the foregoing; and (xi) all rights of setoff and/or recoupment that are Encumbrances in favor of GMAC and/or its Subsidiaries against amounts owed to Sellers and/or any of their Subsidiaries with respect to any property of Sellers or in which Sellers have an interest as more fully described in clause (x) above; it being understood that nothing in this clause (xi) or preceding clause (x) shall be deemed to modify, amend or otherwise change any agreement as between GMAC or any of its Subsidiaries and any Seller.

"Person" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, joint venture, limited liability company, Governmental Authority or other entity.

"Personal Information" means any information relating to an identified or identifiable living individual, including (i) first initial or first name and last name; (ii) home address or other physical address, including street name and name of city or town; (iii) e-mail address or other online contact information (e.g., instant messaging user identifier); (iv) telephone number; (v) social security number or other government-issued personal identifier such as a tax identification number or driver's license number; (vi) internet protocol address; (vii) persistent identifier (e.g., a unique customer number in a cookie); (viii) financial account information (account number, credit or debit card numbers or banking information); (ix) date of birth; (x) mother's maiden name; (xi) medical information (including electronic protected health information as defined by the rules and regulations of the Health Information Portability and Privacy Act, as amended); (xii) digitized or electronic signature; and (xiii) any other information that is combined with any of the above.

-15-

"Personal Property" has the meaning set forth in **Section 2.2(a)(vii)**.

"Petition Date" has the meaning set forth in the Recitals.

"PLR" has the meaning set forth in **Section 6.16(g)(i)**.

"Post-Closing Tax Period" means any taxable period beginning after the Closing Date and the portion of any Straddle Period beginning after the Closing Date.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

"Preferred Stock" has the meaning set forth in **Section 5.4(b)**.

"Privacy Policy" means, with respect to any Person, any written privacy policy, statement, rule or notice regarding the collection, use, access, safeguarding and retention of Personal Information or "Personally Identifiable Information" (as defined by Section 101(41A) of the Bankruptcy Code) of any individual, including a customer, potential customer, employee or former employee of such Person, or an employee of any of such Person's automotive or parts dealers.

"Product Liabilities" has the meaning set forth in **Section 2.3(a)(ix)**.

"Promark UK Subsidiaries" has the meaning set forth in **Section 6.34**.

"Proposed Rejectable Executory Contract" has the meaning set forth in **Section 6.6(b)**.

"Purchase Price" has the meaning set forth in **Section 3.2(a)**.

"Purchased Assets" has the meaning set forth in **Section 2.2(a)**.

"Purchased Contracts" has the meaning set forth in **Section 2.2(a)(x)**.

"Purchased Subsidiaries" means, collectively, the direct Subsidiaries of Sellers included in the Transferred Entities, and their respective direct and indirect Subsidiaries, in each case, as of the Closing Date.

"Purchased Subsidiaries Employee Benefit Plans" means any (i) defined benefit or defined contribution retirement plan maintained by any Purchased Subsidiary and (ii) severance, change in control, bonus, incentive or any similar plan or arrangement maintained by a Purchased Subsidiary for the benefit of officers or senior management of such Purchased Subsidiary.

"Purchaser" has the meaning set forth in the Preamble.

"Purchaser Assumed Debt" has the meaning set forth in **Section 2.3(a)(i)**.

"Purchaser Expense Reimbursement" has the meaning set forth in **Section 8.2(b)**.

"Purchaser Material Adverse Effect" has the meaning set forth in **Section 5.3(a)**.

"Purchaser's Disclosure Schedule" means the Schedule pertaining to, and corresponding to the Section references of this Agreement, delivered by Purchaser immediately prior to the execution of the Original Agreement.

"Quitclaim Deeds" has the meaning set forth in **Section 7.2(c)(x)**.

"Receivables" has the meaning set forth in **Section 2.2(a)(iii)**.

"Rejectable Executory Contract" has the meaning set forth in **Section 6.6(b)**.

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, dumping, discarding, burying, abandoning or disposing into the Environment of Hazardous Materials that is prohibited under, or reasonably likely to result in a Liability under, any applicable Environmental Law.

"Relevant Information" has the meaning set forth in **Section 6.16(g)(ii)**.

"Relevant Transactions" has the meaning set forth in **Section 6.16(g)(i)**.

"Ren Cen Lease" has the meaning set forth in **Section 6.30**.

"Representatives" means all officers, directors, employees, consultants, agents, lenders, accountants, attorneys and other representatives of a Person.

"Required Subdivision" has the meaning set forth in **Section 6.27(a)**.

"Restricted Cash" has the meaning set forth in **Section 2.2(a)(ii)**.

"Retained Liabilities" has the meaning set forth in **Section 2.3(b)**.

"Retained Plans" means any Parent Employee Benefit Plan and Policy that is not an Assumed Plan.

"Retained Subsidiaries" means all Subsidiaries of Sellers and their respective direct and indirect Subsidiaries, as of the Closing Date, other than the Purchased Subsidiaries.

"Retained Workers' Compensation Claims" has the meaning set forth in **Section 2.3(b)(xii)**.

"RHI" has the meaning set forth in **Section 6.30**.

"RHI Post-Closing Period" has the meaning set forth in **Section 6.30**.

"S Distribution" has the meaning set forth in the Preamble.

"S LLC" has the meaning set forth in the Preamble.

"Saginaw Landfill" has the meaning set forth in **Section 6.27(b)**.

"Saginaw Metal Casting Land" has the meaning set forth in **Section 6.27(b)**.

"Saginaw Nodular Iron Land" has the meaning set forth in **Section 6.27(b)**.

"Saginaw Service Contracts" has the meaning set forth in **Section 6.27(b)**.

"Sale Approval Order" has the meaning set forth in **Section 6.4(b)**.

"Sale Hearing" means the hearing of the Bankruptcy Court to approve the Sale Procedures and Sale Motion and enter the Sale Approval Order.

"Sale Procedures and Sale Motion" has the meaning set forth in **Section 6.4(b)**.

"Sale Procedures Order" has the meaning set forth in **Section 6.4(b)**.

"SEC" means the United States Securities and Exchange Commission.

"Secured Real Property Encumbrances" means all Encumbrances related to the Indebtedness of Sellers, which is secured by one or more parcels of the Owned Real Property, including Encumbrances related to the Indebtedness of Sellers under any synthetic lease arrangements at the White Marsh, Maryland GMPT - Baltimore manufacturing facility and the Memphis, Tennessee (SPO - Memphis) facility.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Seller" or "Sellers" has the meaning set forth in the Preamble.

"Seller Group" means any combined, unitary, consolidated or other affiliated group of which any Seller or Purchased Subsidiary is or has been a member for federal, state, provincial, local or foreign Tax purposes.

"Seller Key Personnel" means those individuals described on Section 1.1E of the Sellers' Disclosure Schedule.

"Seller Material Contracts" has the meaning set forth in **Section 4.16(a)**.

"Sellers' Disclosure Schedule" means the Schedule pertaining to, and corresponding to the Section references of this Agreement, delivered by Sellers to Purchaser immediately prior to the execution of this Agreement, as updated and supplemented pursuant to **Section 6.5**, **Section 6.6** and **Section 6.26**.

"Series A Preferred Stock" has the meaning set forth in **Section 5.4(b)**.

"Settlement Agreement" means the Settlement Agreement, dated February 21, 2008 (as amended, supplemented, replaced or otherwise altered from time to time), among Parent, the UAW and certain class representatives, on behalf of the class of plaintiffs in the class action of

*Int'l Union, UAW, et al. v. General Motors Corp.*, Civil Action No. 07-14074 (E.D. Mich. filed Sept. 9, 2007).

"Shared Executory Contracts" has the meaning set forth in **Section 6.6(d)**.

"Software" means all software of any type (including programs, applications, middleware, utilities, tools, drivers, firmware, microcode, scripts, batch files, JCL files, instruction sets and macros) and in any form (including source code, object code, executable code and user interface), databases and associated data and related documentation, in each case owned, acquired or licensed by any Seller.

"Software Licenses" means all Contracts naming a Seller as licensee or licensor and providing for the grant of any right to use, modify, reproduce, distribute or create derivative works of any Software.

"Sponsor" means the United States Department of the Treasury.

"Sponsor Affiliate" has the meaning set forth in **Section 9.22**.

"Sponsor Shares" has the meaning set forth in **Section 5.4(c)**.

"Straddle Period" means a taxable period that includes but does not end on the Closing Date.

"Subdivision Master Lease" has the meaning set forth in **Section 6.27(a)**.

"Subdivision Properties" has the meaning set forth in **Section 6.27(a)**.

"Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation, limited liability company, partnership or other legal entity (in each case, other than a joint venture if such Person is not empowered to control the day-to-day operations of such joint venture) of which such Person (either alone or through or together with any other Subsidiary) owns, directly or indirectly, more than fifty percent (50%) of the Equity Interests, the holder of which is entitled to vote for the election of the board of directors or other governing body of such corporation, limited liability company, partnership or other legal entity.

"Superior Bid" has the meaning set forth in **Section 6.4(d)**.

"TARP" means the Troubled Assets Relief Program established by Sponsor under the Emergency Economic Stabilization Act of 2008, Public Law No. 110-343, effective as of October 3, 2008, as amended by Section 7001 of Division B, Title VII of the American Recovery and Reinvestment Act of 2009, Public Law No. 111-5, effective as of February 17, 2009, as may be further amended and in effect from time to time and any guidance issued by a regulatory authority thereunder and other related Laws in effect currently or in the future in the United States.

"Tax" or "Taxes" means any federal, state, provincial, local, foreign and other income, alternative minimum, accumulated earnings, personal holding company, franchise, capital stock,

net worth or gross receipts, income, alternative or add-on minimum, capital, capital gains, sales, use, ad valorem, franchise, profits, license, privilege, transfer, withholding, payroll, employment, social, excise, severance, stamp, occupation, premium, goods and services, value added, property (including real property and personal property taxes), environmental, windfall profits or other taxes, customs, duties or similar fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts imposed by any Governmental Authority, including any transferee, successor or secondary liability for any such tax and any Liability assumed by Contract or arising as a result of being or ceasing to be a member of any affiliated group or similar group under state, provincial, local or foreign Law, or being included or required to be included in any Tax Return relating thereto.

"<u>Tax Code</u>" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"<u>Taxing Authority</u>" means, with respect to any Tax, the Governmental Authority thereof that imposes such Tax and the agency, court or other Person or body (if any) charged with the interpretation, administration or collection of such Tax for such Governmental Authority.

"<u>Tax Return</u>" means any return, report, declaration, form, election letter, statement or other information filed or required to be filed with any Governmental Authority with respect to Taxes, including any schedule or attachment thereto or amendment thereof.

"<u>Trademark Licenses</u>" means all Contracts naming any Seller as licensor or licensee and providing for the grant of any right concerning any Trademark together with any goodwill connected with and symbolized by any such Trademark or Trademark Contract, and the right to prepare for sale or lease and sell or lease any and all products, inventory or services now or hereafter owned or provided by any Seller or any other Person and now or hereafter covered by such Contracts.

"<u>Trademarks</u>" means all domestic and foreign trademarks, service marks, collective marks, certification marks, trade dress, trade names, business names, d/b/a's, Internet domain names, designs, logos and other source or business identifiers, and all general intangibles of like nature, now or hereafter owned, adopted, used, acquired, or licensed by any Seller, all applications, registrations and recordings thereof (including applications, registrations and recordings in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof) and all reissues, extensions or renewals thereof, together with all goodwill of the business symbolized by or associated with such marks.

"<u>Trade Secrets</u>" means all trade secrets or Confidential Information, including any confidential technical and business information, program, process, method, plan, formula, product design, compilation of information, customer list, sales forecast, know-how, Software, and any other confidential proprietary intellectual property, and all additions and improvements to, and books and records describing or used in connection with, any of the foregoing, in each case, owned, acquired or licensed by any Seller.

"Trade Secret Licenses" means all Contracts naming a Seller as licensee or licensor and providing for the grant of any rights with respect to Trade Secrets.

"Transfer Taxes" means all transfer, documentary, sales, use, stamp, registration and other similar Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the transactions contemplated hereby and not otherwise exempted under the Bankruptcy Code, including relating to the transfer of the Transferred Real Property.

"Transfer Tax Forms" has the meaning set forth in **Section 7.2(c)(xi)**.

"Transferred Employee" has the meaning set forth in **Section 6.17(a)**.

"Transferred Entities" means all of the direct Subsidiaries of Sellers and joint venture entities or other entities in which any Seller has an Equity Interest, other than the Excluded Entities.

"Transferred Equity Interests" has the meaning set forth in **Section 2.2(a)(v)**.

"Transferred Real Property" has the meaning set forth in **Section 2.2(a)(vi)**.

"Transition Services Agreement" has the meaning set forth in **Section 7.2(c)(ix)**.

"Transition Team" has the meaning set forth in **Section 6.11(c)**.

"UAW" means the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America.

"UAW Active Labor Modifications" means the modifications to the UAW Collective Bargaining Agreement, as agreed to in the 2009 Addendum to the 2007 UAW-GM National Agreement, dated May 17, 2009, the cover page of which is attached hereto as **Exhibit C** (the 2009 Addendum without attachments), which modifications were ratified by the UAW membership on May 29, 2009.

"UAW Collective Bargaining Agreement" means any written or oral Contract, understanding or mutually recognized past practice between Sellers and the UAW with respect to Employees, including the UAW Active Labor Modifications, but excluding the agreement to provide certain retiree medical benefits specified in the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between Parent and the UAW, and the Settlement Agreement.  For purpose of clarity, the term "UAW Collective Bargaining Agreement" includes all special attrition programs, divestiture-related memorandums of understanding or implementation agreements relating to any unit or location where covered UAW-represented employees remain and any current local agreement between Parent and a UAW local relating to any unit or location where UAW-represented employees are employed as of the date of the Original Agreement.  For purposes of clarity, nothing in this definition extends the coverage of the UAW-GM National Agreement to any Employee of S LLC, S Distribution, Harlem, a Purchased Subsidiary or one of Parent's Affiliates; nothing in this Agreement creates a direct employment relationship with a Purchased Subsidiary's employee or an Affiliate's Employee and Parent.

"UAW Retiree Settlement Agreement" means the UAW Retiree Settlement Agreement to be executed prior to the Closing, substantially in the form attached hereto as **Exhibit D**.

"Union" means any labor union, organization or association representing any employees (but not including the UAW) with respect to their employment with any of Sellers or their Affiliates.

"United States" or "U.S." means the United States of America, including its territories and insular possessions.

"UST Credit Bid Amount" has the meaning set forth in **Section 3.2(a)(i)**.

"UST Credit Facilities" means (i) the Existing UST Loan and Security Agreement and (ii) those certain promissory notes dated December 31, 2008, April 22, 2009, May 20, 2009, and May 27, 2009, issued by Parent to Sponsor as additional compensation for the extensions of credit under the Existing UST Loan and Security Agreement, in each case, as amended.

"UST Warrant" means the warrant issued by Parent to Sponsor in consideration for the extension of credit made available to Parent under the Existing UST Loan and Security Agreement.

"VEBA Shares" has the meaning set forth in **Section 5.4(c)**.

"VEBA Note" has the meaning set forth in **Section 7.3(g)(iv)**.

"VEBA Warrant" means warrants to acquire 15,151,515 shares of Common Stock issued pursuant to a warrant agreement, substantially in the form attached hereto as **Exhibit E**.

"Viability Plans" means (i) Parent's Restructuring Plan for Long-Term Viability, dated December 2, 2008; (ii) Parent's 2009-2014 Restructuring Plan, dated February 17, 2009; (iii) Parent's 2009-2014 Restructuring Plan: Progress Report, dated March 30, 2009; and (iv) Parent's Revised Viability Plan, all as described in Parent's Registration Statement on Form S-4 (Reg. No 333-158802), initially filed with the SEC on April 27, 2009, in each case, as amended, supplemented and/or superseded.

"WARN" means the Workers Adjustment and Retraining Notification Act of 1988, as amended, and similar foreign, state and local Laws.

"Willow Run Landlord" means the Wayne County Airport Authority, or any successor landlord under the Willow Run Lease.

"Willow Run Lease" means that certain Willow Run Airport Lease of Land dated October 11, 1985, as the same may be amended, by and between the Willow Run Landlord, as landlord, and Parent, as tenant, for certain premises located at the Willow Run Airport in Wayne and Washtenaw Counties, Michigan.

"Willow Run Lease Amendment" has the meaning set forth in **Section 6.27(e)**.

"Wind Down Facility" has the meaning set forth in **Section 6.9(b)**.

        Section 1.2    *Other Interpretive Provisions.*  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole (including the Sellers' Disclosure Schedule) and not to any particular provision of this Agreement, and all Article, Section, Sections of the Sellers' Disclosure Schedule and Exhibit references are to this Agreement unless otherwise specified. The words "include", "includes" and "including" are deemed to be followed by the phrase "without limitation." The meanings given to terms defined herein are equally applicable to both the singular and plural forms of such terms. Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms. Except as otherwise expressly provided herein, all references to "Dollars" or "$" are deemed references to lawful money of the United States. Unless otherwise specified, references to any statute, listing rule, rule, standard, regulation or other Law (a) include a reference to the corresponding rules and regulations and (b) include a reference to each of them as amended, modified, supplemented, consolidated, replaced or rewritten from time to time, and to any section of any statute, listing rule, rule, standard, regulation or other Law, including any successor to such section. Where this Agreement states that a Party "shall" or "will" perform in some manner or otherwise act or omit to act, it means that the Party is legally obligated to do so in accordance with this Agreement.

## ARTICLE II
## PURCHASE AND SALE

        Section 2.1    *Purchase and Sale of Assets; Assumption of Liabilities.*  On the terms and subject to the conditions set forth in this Agreement, other than as set forth in **Section 6.30**, **Section 6.34** and **Section 6.35**, at the Closing, Purchaser shall (a) purchase, accept and acquire from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Purchaser, free and clear of all Encumbrances (other than Permitted Encumbrances), Claims and other interests, the Purchased Assets and (b) assume and thereafter pay or perform as and when due, or otherwise discharge, all of the Assumed Liabilities.

        Section 2.2    *Purchased and Excluded Assets.*

        (a)      The "Purchased Assets" shall consist of the right, title and interest that Sellers possess and have the right to legally transfer in and to all of the properties, assets, rights, titles and interests of every kind and nature, owned, leased, used or held for use by Sellers (including indirect and other forms of beneficial ownership), whether tangible or intangible, real, personal or mixed, and wherever located and by whomever possessed, in each case, as the same may exist as of the Closing, including the following properties, assets, rights, titles and interests (but, in every case, excluding the Excluded Assets):

        (i)      all cash and cash equivalents, including all marketable securities, certificates of deposit and all collected funds or items in the process of collection at Sellers' financial institutions through and including the Closing, and all bank deposits, investment accounts and lockboxes related thereto, other than the Excluded Cash and Restricted Cash;

(ii)      all restricted or escrowed cash and cash equivalents, including restricted marketable securities and certificates of deposit (collectively, "Restricted Cash") other than the Restricted Cash described in **Section 2.2(b)(ii)**;

(iii)      all accounts and notes receivable and other such Claims for money due to Sellers, including the full benefit of all security for such accounts, notes and Claims, however arising, including arising from the rendering of services or the sale of goods or materials, together with any unpaid interest accrued thereon from the respective obligors and any security or collateral therefor, other than intercompany receivables (collectively, "Receivables");

(iv)      all intercompany obligations ("Intercompany Obligations") owed or due, directly or indirectly, to Sellers by any Subsidiary of a Seller or joint venture or other entity in which a Seller or a Subsidiary of a Seller has any Equity Interest;

(v)      (A) subject to **Section 2.4**, all Equity Interests in the Transferred Entities (collectively, the "Transferred Equity Interests") and (B) the corporate charter, qualification to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, corporate seal, minute books, stock transfer books, blank stock certificates and any other documents relating to the organization, maintenance and existence of each Transferred Entity;

(vi)      all Owned Real Property and Leased Real Property (collectively, the "Transferred Real Property");

(vii)      all machinery, equipment (including test equipment and material handling equipment), hardware, spare parts, tools, dies, jigs, molds, patterns, gauges, fixtures (including production fixtures), business machines, computer hardware, other information technology assets, furniture, supplies, vehicles, spare parts in respect of any of the foregoing and other tangible personal property (including any of the foregoing in the possession of manufacturers, suppliers, customers, dealers or others and any of the foregoing in transit) that does not constitute Inventory (collectively, "Personal Property"), including the Personal Property located at the Excluded Real Property and identified on Section 2.2(a)(vii) of the Sellers' Disclosure Schedule;

(viii)      all inventories of vehicles, raw materials, work-in-process, finished goods, supplies, stock, parts, packaging materials and other accessories related thereto (collectively, "Inventory"), wherever located, including any of the foregoing in the possession of manufacturers, suppliers, customers, dealers or others and any of the foregoing in transit or that is classified as returned goods;

(ix)      (A) all Intellectual Property, whether owned, licensed or otherwise held, and whether or not registrable (including any Trademarks and other Intellectual Property associated with the Discontinued Brands), and (B) all rights

-24-

and benefits associated with the foregoing, including all rights to sue or recover for past, present and future infringement, misappropriation, dilution, unauthorized use or other impairment or violation of any of the foregoing, and all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing;

(x)    subject to **Section 2.4**, all Contracts, other than the Excluded Contracts (collectively, the "Purchased Contracts"), including, for the avoidance of doubt, (A) the UAW Collective Bargaining Agreement and (B) any Executory Contract designated as an Assumable Executory Contract as of the applicable Assumption Effective Date;

(xi)    subject to **Section 2.4**, all approvals, Contracts, authorizations, permits, licenses, easements, Orders, certificates, registrations, franchises, qualifications, rulings, waivers, variances or other forms of permission, consent, exemption or authority issued, granted, given or otherwise made available by or under the authority of any Governmental Authority, including all pending applications therefor and all renewals and extensions thereof (collectively, "Permits"), other than to the extent that any of the foregoing relate exclusively to the Excluded Assets or Retained Liabilities;

(xii)    all credits, deferred charges, prepaid expenses, deposits, advances, warranties, rights, guarantees, surety bonds, letters of credit, trust arrangements and other similar financial arrangements, in each case, relating to the Purchased Assets or Assumed Liabilities, including all warranties, rights and guarantees (whether express or implied) made by suppliers, manufacturers, contractors and other third parties under or in connection with the Purchased Contracts;

(xiii)    all Claims (including Tax refunds) relating to the Purchased Assets or Assumed Liabilities, including the Claims identified on Section 2.2(a)(xiii) of the Sellers' Disclosure Schedule and all Claims against any Taxing Authority for any period, other than Bankruptcy Avoidance Actions and any of the foregoing to the extent that they relate exclusively to the Excluded Assets or Retained Liabilities;

(xiv)    all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials, reports and other materials (in whatever form or medium), including Tax books and records and Tax Returns used or held for use in connection with the ownership or operation of the Purchased Assets or Assumed Liabilities, including the Purchased Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers, legal records and information and other data;

(xv)     all goodwill and other intangible personal property arising in connection with the ownership, license, use or operation of the Purchased Assets or Assumed Liabilities;

(xvi)     to the extent provided in **Section 6.17(e)**, all Assumed Plans;

(xvii)     all insurance policies and the rights to the proceeds thereof, other than the Excluded Insurance Policies;

(xviii)     any rights of any Seller, Subsidiary of any Seller or Seller Group member to any Tax refunds, credits or abatements that relate to any Pre-Closing Tax Period or Straddle Period; and

(xix)     any interest in Excluded Insurance Policies, only to the extent such interest relates to any Purchased Asset or Assumed Liability.

(b)     Notwithstanding anything to the contrary contained in this Agreement, Sellers shall retain all of their respective right, title and interest in and to, and shall not, and shall not be deemed to, sell, transfer, assign, convey or deliver to Purchaser, and the Purchased Assets shall not, and shall not be deemed to, include the following (collectively, the "Excluded Assets"):

(i)     cash or cash equivalents in an amount equal to $950,000,000 (the "Excluded Cash");

(ii)     all Restricted Cash exclusively relating to the Excluded Assets or Retained Liabilities;

(iii)     all Receivables (other than Intercompany Obligations) exclusively related to any Excluded Assets or Retained Liabilities;

(iv)     all of Sellers' Equity Interests in (A) S LLC, (B) S Distribution, (C) Harlem and (D) the Subsidiaries, joint ventures and the other entities in which any Seller has any Equity Interest and that are identified on Section 2.2(b)(iv) of the Sellers' Disclosure Schedule (collectively, the "Excluded Entities");

(v)     (A) all owned real property set forth on **Exhibit F** and such additional owned real property set forth on Section 2.2(b)(v) of the Sellers' Disclosure Schedule (including, in each case, any structures, buildings or other improvements located thereon and appurtenances thereto) and (B) all real property leased or subleased that is subject to a Contract designated as an "Excluded Contract" (collectively, the "Excluded Real Property");

(vi)     all Personal Property that is (A) located at the Transferred Real Property and identified on Section 2.2(b)(vi) of the Sellers' Disclosure Schedule, (B) located at the Excluded Real Property, except for those items identified on Section 2.2(a)(vii) of the Sellers' Disclosure Schedule or (C) subject to a Contract

designated as an Excluded Contract (collectively, the "Excluded Personal Property");

(vii)     (A) all Contracts identified on Section 2.2(b)(vii) of the Sellers' Disclosure Schedule immediately prior to the Closing, (B) all pre-petition Executory Contracts designated as Rejectable Executory Contracts, (C) all pre-petition Executory Contracts (including, for the avoidance of doubt, the Delphi Transaction Agreements and GM Assumed Contracts) that have not been designated as or deemed to be Assumable Executory Contracts in accordance with **Section 6.6** or **Section 6.31**, or that are determined, pursuant to the procedures set forth in the Sale Procedures Order, not to be assumable and assignable to Purchaser, (D) all Collective Bargaining Agreements not set forth on the Assumable Executory Contract Schedule and (E) all non-Executory Contracts for which performance by a third-party or counterparty is substantially complete and for which a Seller owes a continuing or future obligation with respect to such non-Executory Contracts (collectively, the "Excluded Contracts"), including any accounts receivable arising out of or in connection with any Excluded Contract; it being understood and agreed by the Parties hereto that, notwithstanding anything to the contrary herein, in no event shall the UAW Collective Bargaining Agreement be designated or otherwise deemed or considered an Excluded Contract;

(viii)     all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials, reports and other materials (in whatever form or medium) relating exclusively to the Excluded Assets or Retained Liabilities, and any books, records and other materials that any Seller is required by Law to retain;

(ix)     the corporate charter, qualification to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, corporate seal, minute books, stock transfer books, blank stock certificates and any other documents relating to the organization, maintenance and existence of each Seller and each Excluded Entity;

(x)     all Claims against suppliers, dealers and any other third parties relating exclusively to the Excluded Assets or Retained Liabilities;

(xi)     all of Sellers' Claims under this Agreement, the Ancillary Agreements and the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551 (inclusive), 553, 558 and any other applicable provisions of the Bankruptcy Code, and any related Claims and actions arising under such sections by operation of Law or otherwise, including any and all proceeds of the foregoing (the "Bankruptcy Avoidance Actions"), but in all cases, excluding all rights and Claims identified on Section 2.2(b)(xi) of the Sellers' Disclosure Schedule;

(xii)    all credits, deferred charges, prepaid expenses, deposits and advances, warranties, rights, guarantees, surety bonds, letters of credit, trust arrangements and other similar financial arrangements, in each case, relating exclusively to the Excluded Assets or Retained Liabilities;

(xiii)    all insurance policies identified on Section 2.2(b)(xiii) of the Sellers' Disclosure Schedule and the rights to proceeds thereof (collectively, the "Excluded Insurance Policies"), other than any rights to proceeds to the extent such proceeds relate to any Purchased Asset or Assumed Liability;

(xiv)    all Permits, to the extent that they relate exclusively to the Excluded Assets or Retained Liabilities;

(xv)    all Retained Plans; and

(xvi)    those assets identified on Section 2.2(b)(xvi) of the Sellers' Disclosure Schedule.

*Section 2.3    Assumed and Retained Liabilities.*

(a)    The "Assumed Liabilities" shall consist only of the following Liabilities of Sellers:

(i)    $7,072,488,605 of Indebtedness incurred under the DIP Facility, to be restructured pursuant to the terms of **Section 6.9** (the "Purchaser Assumed Debt");

(ii)    all Liabilities under each Purchased Contract;

(iii)    all Intercompany Obligations owed or due, directly or indirectly, by Sellers to (A) any Purchased Subsidiary or (B) any joint venture or other entity in which a Seller or a Purchased Subsidiary has any Equity Interest (other than an Excluded Entity);

(iv)    all Cure Amounts under each Assumable Executory Contract that becomes a Purchased Contract;

(v)    all Liabilities of Sellers (A) arising in the Ordinary Course of Business during the Bankruptcy Case through and including the Closing Date, to the extent such Liabilities are administrative expenses of Sellers' estates pursuant to Section 503(b) of the Bankruptcy Code and (B) arising prior to the commencement of the Bankruptcy Cases to the extent approved by the Bankruptcy Court for payment by Sellers pursuant to a Final Order (and for the avoidance of doubt, Sellers' Liabilities in clauses (A) and (B) above include Sellers' Liabilities for personal property Taxes, real estate and/or other ad valorem Taxes, use Taxes, sales Taxes, franchise Taxes, income Taxes, gross receipt Taxes, excise Taxes, Michigan Business Taxes and Michigan Single Business Taxes), in each case, other than (1) Liabilities of the type described in

**Section 2.3(b)(iv)**, **Section 2.3(b)(vi)** and **Section 2.3(b)(ix)**, (2) Liabilities arising under any dealer sales and service Contract and any Contract related thereto, to the extent such Contract has been designated as a Rejectable Executory Contract, and (3) Liabilities otherwise assumed in this **Section 2.3(a)**;

(vi)      all Transfer Taxes payable in connection with the sale, transfer, assignment, conveyance and delivery of the Purchased Assets pursuant to the terms of this Agreement;

(vii)      (A) all Liabilities arising under express written warranties of Sellers that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws;

(viii)      all Liabilities arising under any Environmental Law (A) relating to conditions present on the Transferred Real Property, other than those Liabilities described in **Section 2.3(b)(iv)**, (B) resulting from Purchaser's ownership or operation of the Transferred Real Property after the Closing or (C) relating to Purchaser's failure to comply with Environmental Laws after the Closing;

(ix)      all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of accidents, incidents or other distinct and discreet occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance (for avoidance of doubt, Purchaser shall not assume, or become liable to pay, perform or discharge, any Liability arising or contended to arise by reason of exposure to materials utilized in the assembly or fabrication of motor vehicles manufactured by Sellers and delivered prior to the Closing Date, including asbestos, silicates or fluids, regardless of when such alleged exposure occurs);

(x)      all Liabilities of Sellers arising out of, relating to, in respect of, or in connection with workers' compensation claims against any Seller, except for Retained Workers' Compensation Claims;

(xi)      all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the Closing;

(xii)      all Liabilities (A) specifically assumed by Purchaser pursuant to **Section 6.17** and (B) arising out of, relating to or in connection with the salaries and/or wages and vacation of all Transferred Employees that are accrued and unpaid (or with respect to vacation, unused) as of the Closing Date;

-29-

(xiii)    (A) all Employment-Related Obligations and (B) Liabilities under any Assumed Plan, in each case, relating to any Employee that is or was covered by the UAW Collective Bargaining Agreement, except for Retained Workers Compensation Claims;

(xiv)    all Liabilities of Sellers underlying any construction liens that constitute Permitted Encumbrances with respect to Transferred Real Property; and

(xv)    those other Liabilities identified on Section 2.3(a)(xv) of the Sellers' Disclosure Schedule.

(b)    Each Seller acknowledges and agrees that pursuant to the terms and provisions of this Agreement, Purchaser shall not assume, or become liable to pay, perform or discharge, any Liability of any Seller, whether occurring or accruing before, at or after the Closing, other than the Assumed Liabilities.  In furtherance and not in limitation of the foregoing, and in all cases with the exception of the Assumed Liabilities, neither Purchaser nor any of its Affiliates shall assume, or be deemed to have assumed, any Indebtedness, Claim or other Liability of any Seller or any predecessor, Subsidiary or Affiliate of any Seller whatsoever, whether occurring or accruing before, at or after the Closing, including the following (collectively, the "Retained Liabilities"):

(i)    all Liabilities arising out of, relating to, in respect of or in connection with any Indebtedness of Sellers (other than Intercompany Obligations and the Purchaser Assumed Debt), including those items identified on  Section 2.3(b)(i) of the Sellers' Disclosure Schedule;

(ii)    all Intercompany Obligations owed or due, directly or indirectly, by Sellers to (A) another Seller, (B) any Excluded Subsidiary or (C) any joint venture or other entity in which a Seller or an Excluded Subsidiary has an Equity Interest (other than a Transferred Entity);

(iii)    all Liabilities arising out of, relating to, in respect of or in connection with the Excluded Assets, other than Liabilities otherwise retained in this **Section 2.3(b)**;

(iv)    all Liabilities (A) associated with noncompliance with Environmental Laws (including for fines, penalties, damages and remedies); (B) arising out of, relating to, in respect of or in connection with the transportation, off-site storage or off-site disposal of any Hazardous Materials generated or located at any Transferred Real Property; (C) arising out of, relating to, in respect of or in connection with third-party Claims related to Hazardous Materials that were or are located at or that migrated or may migrate from any Transferred Real Property, except as otherwise required under applicable Environmental Laws; (D) arising under Environmental Laws related to the Excluded Real Property; or (E) for environmental Liabilities with respect to real property formerly owned, operated or leased by Sellers (as of the Closing), which, in the case of clauses (A),

(B) and (C), arose prior to or at the Closing, and which, in the case of clause (D) and (E), arise prior to, at or after the Closing;

(v)     except for Taxes assumed in **Section 2.3(a)(v)** and **Section 2.3(a)(vi)**, all Liabilities with respect to any (A) Taxes arising in connection with Sellers' business, the Purchased Assets or the Assumed Liabilities and that are attributable to a Pre-Closing Tax Period (including any Taxes incurred in connection with the sale of the Purchased Assets, other than all Transfer Taxes), (B) other Taxes of any Seller and (C) Taxes of any Seller Group, including any Liability of any Seller or any Seller Group member for Taxes arising as a result of being or ceasing to be a member of any Seller Group (it being understood, for the avoidance of doubt, that no provision of this Agreement shall cause Sellers to be liable for Taxes of any Purchased Subsidiary for which Sellers would not be liable absent this Agreement);

(vi)     all Liabilities for (A) costs and expenses relating to the preparation, negotiation and entry into this Agreement and the Ancillary Agreements (and the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements, which, for the avoidance of doubt, shall not include any Transfer Taxes), including Advisory Fees, (B) administrative fees, professional fees and all other expenses under the Bankruptcy Code and (C) all other fees and expenses associated with the administration of the Bankruptcy Cases;

(vii)     all Employment-Related Obligations not otherwise assumed in **Section 2.3(a)** and **Section 6.17**, including those arising out of, relating to, in respect of or in connection with the employment, potential employment or termination of employment of any individual (other than any Employee that is or was covered by the UAW Collective Bargaining Agreement) (A) prior to or at the Closing (including any severance policy, plan or program that exists or arises, or may be deemed to exist or arise, as a result of, or in connection with, the transactions contemplated by this Agreement) or (B) who is not a Transferred Employee arising after the Closing and with respect to both clauses (A) and (B) above, including any Liability arising out of, relating to, in respect of or in connection with any Collective Bargaining Agreement (other than the UAW Collective Bargaining Agreement);

(viii)     all Liabilities arising out of, relating to, in respect of or in connection with Claims for infringement or misappropriation of third party intellectual property rights;

(ix)     all Product Liabilities arising in whole or in part from any accidents, incidents or other  occurrences that happen prior to the Closing Date;

(x)     all Liabilities to third parties for death, personal injury, other injury to Persons or damage to property, in each case, arising out of asbestos exposure;

(xi)     all Liabilities to third parties for Claims based upon Contract, tort or any other basis;

(xii)    all workers' compensation Claims with respect to Employees residing in or employed in, as the case may be as defined by applicable Law, the states set forth on **Exhibit G** (collectively, "Retained Workers' Compensation Claims");

(xiii)   all Liabilities arising out of, relating to, in respect of or in connection with any Retained Plan;

(xiv)    all Liabilities arising out of, relating to, in respect of or in connection with any Assumed Plan or Purchased Subsidiaries Employee Benefit Plan, but only to the extent such Liabilities result from the failure of such Assumed Plan or Purchased Subsidiaries Employee Benefit Plan to comply in all respects with TARP or such Liability related to any changes to or from the administration of such Assumed Plan or Purchased Subsidiaries Employee Benefit Plan prior to the Closing Date;

(xv)     the Settlement Agreement, except as provided with respect to Liabilities under Section 5A of the UAW Retiree Settlement Agreement; and

(xvi)    all Liabilities arising out of, related to or in connection with any (A) implied warranty or other implied obligation arising under statutory or common law without the necessity of an express warranty or (B) allegation, statement or writing by or attributable to Sellers.

*Section 2.4     Non-Assignability.*

(a)     If any Contract, Transferred Equity Interest (or any interest therein), Permit or other asset, which by the terms of this Agreement, is intended to be included in the Purchased Assets is determined not capable of being assigned or transferred (whether pursuant to Sections 363 or 365 of the Bankruptcy Code) to Purchaser at the Closing without the consent of another party thereto, the issuer thereof or any third party (including a Governmental Authority) ("Non-Assignable Assets"), this Agreement shall not constitute an assignment thereof, or an attempted assignment thereof, unless and until any such consent is obtained.  Subject to **Section 6.3**, Sellers shall use reasonable best efforts, and Purchaser shall use reasonable best efforts to cooperate with Sellers, to obtain the consents necessary to assign to Purchaser the Non-Assignable Assets before, at or after the Closing; provided, however, that neither Sellers nor Purchaser shall be required to make any expenditure, incur any Liability, agree to any modification to any Contract or forego or alter any rights in connection with such efforts.

(b)     To the extent that the consents referred to in **Section 2.4(a)** are not obtained by Sellers, except as otherwise provided in the Ancillary Documents to which one or more Sellers is a party, Sellers' sole responsibility with respect to such Non-Assignable Assets shall be to use reasonable best efforts, at no cost to Sellers, to (i) provide to Purchaser the benefits of any Non-Assignable Assets; (ii) cooperate in any

reasonable and lawful arrangement designed to provide the benefits of any
Non-Assignable Assets to Purchaser without incurring any financial obligation to
Purchaser; and (iii) enforce for the account of Purchaser and at the cost of Purchaser any
rights of Sellers arising from any Non-Assignable Asset against such party or parties
thereto; provided, however, that any such efforts described in clauses (i) through (iii)
above shall be made only with the consent, and at the direction, of Purchaser.  Without
limiting the generality of the foregoing, with respect to any Non-Assignable Asset that is
a Contract of Leased Real Property for which a consent is not obtained on or prior to the
Closing Date, Purchaser shall enter into a sublease containing the same terms and
conditions as such lease (unless such lease by its terms prohibits such subleasing
arrangement), and entry into and compliance with such sublease shall satisfy the
obligations of the Parties under this **Section 2.4(b)** until such consent is obtained.

(c)     If Purchaser is provided the benefits of any Non-Assignable Asset
pursuant to **Section 2.4(b)**, Purchaser shall perform, on behalf of the applicable Seller,
for the benefit of the issuer thereof or the other party or parties thereto, the obligations
(including payment obligations) of the applicable Seller thereunder or in connection
therewith arising from and after the Closing Date and if Purchaser fails to perform to the
extent required herein, Sellers, without waiving any rights or remedies that they may
have under this Agreement or applicable Laws, may (i) suspend their performance under
**Section 2.4(b)** in respect of the Non-Assignable Asset that is the subject of such failure to
perform unless and until such situation is remedied, or (ii) perform at Purchaser's sole
cost and expense, in which case, Purchaser shall reimburse Sellers' costs and expenses of
such performance immediately upon receipt of an invoice therefor.  To the extent that
Purchaser is provided the benefits of any Non-Assignable Asset pursuant to **Section
2.4(b),** Purchaser shall indemnify, defend and hold Sellers harmless from and against any
and all Liabilities relating to such Non-Assignable Asset and arising from and after the
Closing Date (other than such Damages that have resulted from the gross negligence or
willful misconduct of Sellers).

(d)     For the avoidance of doubt, the inability of any Contract, Transferred
Equity Interest (or any other interest therein), Permit or other asset, which by the terms of
this Agreement is intended to be included in the Purchased Assets to be assigned or
transferred to Purchaser at the Closing shall not (i) give rise to a basis for termination of
this Agreement pursuant to **ARTICLE VIII** or (ii) give rise to any right to any
adjustment to the Purchase Price.

## ARTICLE III
## CLOSING; PURCHASE PRICE

*Section 3.1     Closing.*  The closing of the transactions contemplated by this
Agreement (the "Closing") shall occur on the date that falls at least three (3) Business Days
following the satisfaction and/or waiver of all conditions to the Closing set forth in
**ARTICLE VII** (other than any of such conditions that by its nature is to be satisfied at the
Closing, but subject to the satisfaction or waiver of such conditions), or on such other date as the
Parties mutually agree, at the offices of Jenner & Block LLP, 919 Third Avenue, New York City,
New York 10022-3908, or at such other place or such other date as the Parties may agree in

writing. The date on which the Closing actually occurs shall be referred to as the "Closing Date," and except as otherwise expressly provided herein, the Closing shall for all purposes be deemed effective as of 9:00 a.m., New York City time, on the Closing Date.

Section 3.2    Purchase Price.

(a)    The purchase price (the "Purchase Price") shall be equal to the sum of:

(i)    a Bankruptcy Code Section 363(k) credit bid in an amount equal to:  (A) the amount of Indebtedness of Parent and its Subsidiaries as of the Closing pursuant to the UST Credit Facilities, and (B) the amount of Indebtedness of Parent and its Subsidiaries as of the Closing under the DIP Facility, less $8,022,488,605 of Indebtedness under the DIP Facility (such amount, the "UST Credit Bid Amount");

(ii)    the UST Warrant (which the Parties agree has a value of no less than $1,000);

(iii)    the valid issuance by Purchaser to Parent of (A) 50,000,000 shares of Common Stock (collectively, the "Parent Shares") and (B) the Parent Warrants; and

(iv)    the assumption by Purchaser or its designated Subsidiaries of the Assumed Liabilities.

(b)    On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall (i) offset, pursuant to Section 363(k) of the Bankruptcy Code, the UST Credit Bid Amount against Indebtedness of Parent and its Subsidiaries owed to Purchaser as of the Closing under the UST Credit Facilities and the DIP Facility; (ii) transfer to Parent, in accordance with the instructions provided by Parent to Purchaser prior to the Closing, the UST Warrant; and (iii) issue to Parent, in accordance with the instructions provided by Parent to Purchaser prior to the Closing, the Parent Shares and the Parent Warrants.

(c)

(i)    Sellers may, at any time, seek an Order of the Bankruptcy Court (the "Claims Estimate Order"), which Order may be the Order confirming Sellers' Chapter 11 plan, estimating the aggregate allowed general unsecured claims against Sellers' estates.  If in the Claims Estimate Order, the Bankruptcy Court makes a finding that the estimated aggregate allowed general unsecured claims against Sellers' estates exceed $35,000,000,000, then Purchaser will, within five (5) days of entry of the Claims Estimate Order, issue 10,000,000 additional shares of Common Stock (the "Adjustment Shares") to Parent, as an adjustment to the Purchase Price.

(ii)    The number of Adjustment Shares shall be adjusted to take into account any stock dividend, stock split, combination of shares, recapitalization,

merger, consolidation, reorganization or similar transaction with respect to the Common Stock, effected from and after the Closing and before issuance of the Adjustment Shares.

(iii)    At the Closing, Purchaser shall have authorized and, thereafter, shall reserve for issuance the Adjustment Shares that may be issued hereunder.

Section 3.3    *Allocation.*  Following the Closing, Purchaser shall prepare and deliver to Sellers an allocation of the aggregate consideration among Sellers and, for any transactions contemplated by this Agreement that do not constitute an Agreed G Transaction pursuant to **Section 6.16**, Purchaser shall also prepare and deliver to the applicable Seller a proposed allocation of the Purchase Price and other consideration paid in exchange for the Purchased Assets, prepared in accordance with Section 1060, and if applicable, Section 338, of the Tax Code (the "Allocation").  The applicable Seller shall have thirty (30) days after the delivery of the Allocation to review and consent to the Allocation in writing, which consent shall not be unreasonably withheld, conditioned or delayed.  If the applicable Seller consents to the Allocation, such Seller and Purchaser shall use such Allocation to prepare and file in a timely manner all appropriate Tax filings, including the preparation and filing of all applicable forms in accordance with applicable Law, including Forms 8594 and 8023, if applicable, with their respective Tax Returns for the taxable year that includes the Closing Date and shall take no position in any Tax Return that is inconsistent with such Allocation; provided, however, that nothing contained herein shall prevent the applicable Seller and Purchaser from settling any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of such Allocation, and neither the applicable Seller nor Purchaser shall be required to litigate before any court, any proposed deficiency or adjustment by any Taxing Authority challenging such Allocation.  If the applicable Seller does not consent to such Allocation, the applicable Seller shall notify Purchaser in writing of such disagreement within such thirty (30) day period, and thereafter, the applicable Seller shall attempt in good faith to promptly resolve any such disagreement.  If the Parties cannot resolve a disagreement under this **Section 3.3**, such disagreement shall be resolved by an independent accounting firm chosen by Purchaser and reasonably acceptable to the applicable Seller, and such resolution shall be final and binding on the Parties.  The fees and expenses of such accounting firm shall be borne equally by Purchaser, on the one hand, and the applicable Seller, on the other hand.  The applicable Seller shall provide Purchaser, and Purchaser shall provide the applicable Seller, with a copy of any information described above required to be furnished to any Taxing Authority in connection with the transactions contemplated herein.

Section 3.4    *Prorations.*

(a)    The following prorations relating to the Purchased Assets shall be made:

(i)    Except as provided in **Section 2.3(a)(v)** and **Section 2.3(a)(vi)**, in the case of Taxes with respect to a Straddle Period, for purposes of Retained Liabilities, the portion of any such Tax that is allocable to Sellers with respect to any Purchased Asset shall be:

(A)     in the case of Taxes that are either (1) based upon or related to income or receipts, or (2) imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible), other than Transfer Taxes, equal to the amount that would be payable if the taxable period ended on the Closing Date; and

(B)     in the case of Taxes imposed on a periodic basis, or otherwise measured by the level of any item, deemed to be the amount of such Taxes for the entire Straddle Period (after giving effect to amounts which may be deducted from or offset against such Taxes) (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period), multiplied by a fraction, the numerator of which is the number of days in the period ending on the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

In the case of any Tax based upon or measured by capital (including net worth or long-term debt) or intangibles, any amount thereof required to be allocated under this clause (i) shall be computed by reference to the level of such items on the Closing Date. All determinations necessary to effect the foregoing allocations shall be made in a manner consistent with prior practice of the applicable Seller, Seller Group member, or Seller Subsidiary.

(ii)     All charges for water, wastewater treatment, sewers, electricity, fuel, gas, telephone, garbage and other utilities relating to the Transferred Real Property shall be prorated as of the Closing Date, with Sellers being liable to the extent such items relate to the Pre-Closing Tax Period, and Purchaser being liable to the extent such items relate to the Post-Closing Tax Period.

(b)     If any of the foregoing proration amounts cannot be determined as of the Closing Date due to final invoices not being issued as of the Closing Date, Purchasers and Sellers shall prorate such items as and when the actual invoices are issued to the appropriate Party.  The Party owing amounts to the other by means of such prorations shall pay the same within thirty (30) days after delivery of a written request by the paying Party.

*Section 3.5     Post-Closing True-up of Certain Accounts.*

(a)     Sellers shall promptly reimburse Purchaser in U.S. Dollars for the aggregate amount of all checks, drafts and similar instruments of disbursement, including wire and similar transfers of funds, written or initiated by Sellers prior to the Closing in respect of any obligations that would have constituted Retained Liabilities at the Closing, and that clear or settle in accounts maintained by Purchaser (or its Affiliates) at or following the Closing.

(b)     Purchaser shall promptly reimburse Sellers in U.S. Dollars for the aggregate amount of all checks, drafts and similar instruments of disbursement, including

wire and similar transfers of funds, written or initiated by Sellers following the Closing in respect of any obligations that would have constituted Assumed Liabilities at the Closing, and that clear or settle in accounts maintained by Sellers (or their Affiliates) at or following the Closing.

# ARTICLE IV
# REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as disclosed in the Parent SEC Documents or in the Sellers' Disclosure Schedule, each Seller represents and warrants severally, and not jointly, to Purchaser as follows:

    *Section 4.1    Organization and Good Standing.*  Each Seller and each Purchased Subsidiary is duly organized and validly existing under the Laws of its jurisdiction of organization.  Subject to the limitations imposed on Sellers as a result of having filed the Bankruptcy Cases, each Seller and each Purchased Subsidiary has all requisite corporate, limited liability company, partnership or similar power, as the case may be, and authority to own, lease and operate its properties and assets and to carry on its business as now being conducted.  Each Seller and each Purchased Subsidiary is duly qualified or licensed or admitted to do business, and is in good standing in (where such concept is recognized under applicable Law), the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, in each case, except where the failure to be so qualified, licensed or in good standing would not reasonably be expected to have a Material Adverse Effect.  Sellers have made available to Purchaser prior to the execution of this Agreement true and complete copies of Sellers' Organizational Documents, in each case, as in effect on the date of this Agreement.

    *Section 4.2    Authorization; Enforceability.*  Subject to the entry and effectiveness of the Sale Approval Order, each Seller has the requisite corporate or limited liability company power and authority, as the case may be, to (a) execute and deliver this Agreement and the Ancillary Agreements to which such Seller is a party; (b) perform its obligations hereunder and thereunder; and (c) consummate the transactions contemplated by this Agreement and the Ancillary Agreements to which such Seller is a party.  Subject to the entry and effectiveness of the Sale Approval Order, this Agreement constitutes, and each Ancillary Agreement, when duly executed and delivered by each Seller that is a party thereto, shall constitute, a valid and legally binding obligation of such Seller (assuming that this Agreement and such Ancillary Agreements constitute valid and legally binding obligations of Purchaser), enforceable against such Seller in accordance with its respective terms and conditions, except as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent transfer and other similar Laws relating to or affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability, including principles of commercial reasonableness, good faith and fair dealing.

    *Section 4.3    Noncontravention; Consents.*

    (a)    Subject, in the case of clauses (i), (iii) and (iv), to the entry and effectiveness of the Sale Approval Order, the execution, delivery and performance by each Seller of this Agreement and the Ancillary Agreements to which it is a party, and (subject to the entry of the Sale Approval Order) the consummation by such Seller of the

transactions contemplated hereby and thereby, do not (i) violate any Law to which the Purchased Assets are subject; (ii) conflict with or result in a breach of any provision of the Organizational Documents of such Seller; (iii) result in a material breach or constitute a material default under, or create in any Person the right to terminate, cancel or accelerate any material obligation of such Seller pursuant to any material Purchased Contract (including any material License); or (iv) result in the creation or imposition of any Encumbrance, other than a Permitted Encumbrance, upon the Purchased Assets, except for any of the foregoing in the case of clauses (i), (iii) and (iv), that would not reasonably be expected to have a Material Adverse Effect.

(b)    Subject to the entry and effectiveness of the Sale Approval Order, no consent, waiver, approval, Order, Permit, qualification or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority (other than the Bankruptcy Court) is required by any Seller for the consummation by each Seller of the transactions contemplated by this Agreement or by the Ancillary Agreements to which such Seller is a party or the compliance by such Seller with any of the provisions hereof or thereof, except for (i) compliance with the applicable requirements of any Antitrust Laws and (ii) such consent, waiver, approval, Order, Permit, qualification or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority, the failure of which to be received or made would not reasonably be expected to have a Material Adverse Effect.

*Section 4.4    Subsidiaries.*    Section 4.4 of the Sellers' Disclosure Schedule identifies each Purchased Subsidiary and the jurisdiction of organization thereof.  There are no Equity Interests in any Purchased Subsidiary issued, reserved for issuance or outstanding.  All of the outstanding shares of capital stock, if applicable, of each Purchased Subsidiary have been duly authorized, validly issued, are fully paid and nonassessable and are owned, directly or indirectly, by Sellers, free and clear of all Encumbrances other than Permitted Encumbrances. Sellers, directly or indirectly, have good and valid title to the outstanding Equity Interests of the Purchased Subsidiaries and, upon delivery by Sellers to Purchaser of the outstanding Equity Interests of the Purchased Subsidiaries (either directly or indirectly) at the Closing, good and valid title to the outstanding Equity Interests of the Purchased Subsidiaries will pass to Purchaser (or, with respect to any Purchased Subsidiary that is not a direct Subsidiary of a Seller, the Purchased Subsidiary with regard to which it is a Subsidiary will continue to have good and valid title to such outstanding Equity Interests).  None of the outstanding Equity Interests in the Purchased Subsidiaries has been conveyed in violation of, and none of the outstanding Equity Interests in the Purchased Subsidiaries has been issued in violation of (a) any preemptive or subscription rights, rights of first offer or first refusal or similar rights or (b) any voting trust, proxy or other Contract (including options or rights of first offer or first refusal) with respect to the voting, purchase, sale or other disposition thereof.

*Section 4.5    Reports and Financial Statements; Internal Controls.*

(a)    (i) Parent has filed or furnished, or will file or furnish, as applicable, all forms, documents, schedules and reports, together with any amendments required to be made with respect thereto, required to be filed or furnished with the SEC from April 1, 2007 until the Closing (the "Parent SEC Documents"), and (ii) as of their respective

filing dates, or, if amended, as of the date of the last such amendment, the Parent SEC Documents complied or will comply in all material respects with the requirements of the Securities Act and the Exchange Act, as applicable, and none of the Parent SEC Documents contained or will contain any untrue statement of a material fact or omitted or will omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, subject, in the case of Parent SEC Documents filed or furnished during the period beginning on the date of the Original Agreement and ending on the Closing Date, to any modification by Parent of its reporting obligations under Section 12 or Section 15(d) of the Exchange Act as a result of the filing of the Bankruptcy Cases.

(b)     (i) The consolidated financial statements of Parent included in the Parent SEC Documents (including all related notes and schedules, where applicable) fairly present or will fairly present in all material respects the consolidated financial position of Parent and its consolidated Subsidiaries, as at the respective dates thereof, and (ii) the consolidated results of their operations and their consolidated cash flows for the respective periods then ended (subject, in the case of the unaudited statements, to normal year-end audit adjustments and to any other adjustments described therein, including the notes thereto) in conformity with GAAP (except, in the case of the unaudited statements, as permitted by the SEC) applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto), subject, in the case of Parent SEC Documents filed or furnished during the period beginning on the date of the Original Agreement and ending on the Closing Date, to any modification by Parent of its reporting obligations under Section 12 or Section 15(d) of the Exchange Act as a result of the filing of the Bankruptcy Cases.

(c)     Parent maintains a system of internal control over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for inclusion in the Parent SEC Documents in accordance with GAAP and maintains records that (i) in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of Parent and its consolidated Subsidiaries, (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures are made only in accordance with appropriate authorizations and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of assets.  There are no (A) material weaknesses in the design or operation of the internal controls of Parent or (B) to the Knowledge of Sellers, any fraud, whether or not material, that involves management or other employees of Parent or any Purchased Subsidiary who have a significant role in internal control.

*Section 4.6     Absence of Certain Changes and Events.*  From January 1, 2009 through the date hereof, except as otherwise contemplated, required or permitted by this Agreement, there has not been:

(a)     (i) any declaration, setting aside or payment of any dividend or other distribution (whether in cash, securities or other property or by allocation of additional Indebtedness to any Seller or any Key Subsidiary without receipt of fair value) with

respect to any Equity Interests in any Seller or any Key Subsidiary or any repurchase for value of any Equity Interests or rights of any Seller or any Key Subsidiary (except for dividends and distributions among its Subsidiaries) or (ii) any split, combination or reclassification of any Equity Interests in Sellers or any issuance or the authorization of any issuance of any other Equity Interests in respect of, in lieu of or in substitution for Equity Interests of Sellers;

(b)     other than as is required by the terms of the Parent Employee Benefit Plans and Policies, the Settlement Agreement, the UAW Collective Bargaining Agreement or consistent with the expiration of a Collective Bargaining Agreement or as may be required by applicable Law, in each case, as may be permitted by TARP or under any enhanced restrictions on executive compensation agreed to by Parent and Sponsor, any (i) grant to any Seller Key Personnel of any increase in compensation, except increases required under employment Contracts in effect as of January 1, 2009, or as a result of a promotion to a position of additional responsibility, (ii) grant to any Seller Key Personnel of any increase in retention, change in control, severance or termination compensation or benefits, except as required under any employment Contracts in effect as of January 1, 2009, (iii) other than in the Ordinary Course of Business, adoption, termination of, entry into or amendment or modification of, in a material manner, any Benefit Plan, (iv) adoption, termination of, entry into or amendment or modification of, in a material manner, any employment, retention, change in control, severance or termination Contract with any Seller Key Personnel or (v) entry into or amendment, modification or termination of any Collective Bargaining Agreement or other Contract with any Union of any Seller or Purchased Subsidiary;

(c)     any material change in accounting methods, principles or practices by any Seller, Purchased Subsidiary or Seller Group member or any material joint venture to which any Seller or Purchased Subsidiary is a party, in each case, materially affecting the consolidated assets or Liabilities of Parent, except to the extent required by a change in GAAP or applicable Law, including Tax Laws;

(d)     any sale, transfer, pledge or other disposition by any Seller or any Purchased Subsidiary of any portion of its assets or properties not in the Ordinary Course of Business and with a sale price or fair value in excess of $100,000,000;

(e)     aggregate capital expenditures by any Seller or any Purchased Subsidiary in excess of $100,000,000 in a single project or group of related projects or capital expenditures in excess of $100,000,000 in the aggregate;

(f)     any acquisition by any Seller or any Purchased Subsidiary (including by merger, consolidation, combination or acquisition of any Equity Interests or assets) of any Person or business or division thereof (other than acquisitions of portfolio assets and acquisitions in the Ordinary Course of Business) in a transaction (or series of related transactions) where the aggregate consideration paid or received (including non-cash equity consideration) exceeded $100,000,000;

(g)      any discharge or satisfaction of any Indebtedness by any Seller or any Purchased Subsidiary in excess of $100,000,000, other than the discharge or satisfaction of any Indebtedness when due in accordance with its terms;

(h)      any alteration, whether through a complete or partial liquidation, dissolution, merger, consolidation, restructuring, reorganization or in any other manner, the legal structure or ownership of any Seller or any Key Subsidiary or any material joint venture to which any Seller or any Key Subsidiary is a party, or the adoption or alteration of a plan with respect to any of the foregoing;

(i)      any amendment or modification to the material adverse detriment of any Key Subsidiary of any material Affiliate Contract or Seller Material Contract, or termination of any material Affiliate Contract or Seller Material Contract to the material adverse detriment of any Seller or any Key Subsidiary, in each case, other than in the Ordinary Course of Business;

(j)      any event, development or circumstance involving, or any change in the financial condition, properties, assets, liabilities, business, or results of operations of Sellers or any circumstance, occurrence or development (including any adverse change with respect to any circumstance, occurrence or development existing on or prior to the end of the most recent fiscal year end) of Sellers that has had or would reasonably be expected to have a Material Adverse Effect; or

(k)      any commitment by any Seller, any Key Subsidiary (in the case of clauses (a), (g) and (h) above) or any Purchased Subsidiary (in the case of clauses (b) through (f) and clauses (h) and (j) above) to do any of the foregoing.

Section 4.7      *Title to and Sufficiency of Assets.*

(a)      Subject to the entry and effectiveness of the Sale Approval Order, at the Closing, Sellers will obtain good and marketable title to, or a valid and enforceable right by Contract to use, the Purchased Assets, which shall be transferred to Purchaser, free and clear of all Encumbrances other than Permitted Encumbrances.

(b)      The tangible Purchased Assets of each Seller are in normal operating condition and repair, subject to ordinary wear and tear, and sufficient for the operation of such Seller's business as currently conducted, except where such instances of noncompliance with the foregoing would not reasonably be expected to have a Material Adverse Effect.

Section 4.8      *Compliance with Laws; Permits.*

(a)      Each Seller and each Purchased Subsidiary is in compliance with and is not in default under or in violation of any applicable Law, except where such non-compliance, default or violation would not reasonably be expected to have a Material Adverse Effect.   Notwithstanding anything contained in this **Section 4.8(a)**, no representation or warranty shall be deemed to be made in this **Section 4.8(a)** in respect of

the matters referenced in **Section 4.5**, **Section 4.9**, **Section 4.10**, **Section 4.11** or **Section 4.13**, each of which matters is addressed by such other Sections of this Agreement.

(b)     (i) Each Seller has all Permits necessary for such Seller to own, lease and operate the Purchased Assets and (ii) each Purchased Subsidiary has all Permits necessary for such entity to own, lease and operate its properties and assets, except in each case, where the failure to possess such Permits would not reasonably be expected to have a Material Adverse Effect.  All such Permits are in full force and effect, except where the failure to be in full force and effect would not reasonably be expected to have a Material Adverse Effect.

Section 4.9     *Environmental Laws.*  Except as would not reasonably be expected to have a Material Adverse Effect, to the Knowledge of Sellers, (a) each Seller and each Purchased Subsidiary has conducted its business on the Transferred Real Property in compliance with all applicable Environmental Laws; (b) none of the Transferred Real Property currently contains any Hazardous Materials, which could reasonably be expected to give rise to an undisclosed Liability under applicable Environmental Laws; (c) as of the date of this Agreement, no Seller or Purchased Subsidiary has received any currently unresolved written notices, demand letters or written requests for information from any Governmental Authority indicating that such entity may be in violation of any Environmental Law in connection with the ownership or operation of the Transferred Real Property; and (d) since April 1, 2007, no Hazardous Materials have been transported in violation of any applicable Environmental Law, or in a manner reasonably foreseen to give rise to any Liability under any Environmental Law, from any Transferred Real Property as a result of any activity of any Seller or Purchased Subsidiary. Except as provided in **Section 4.8(b)** with respect to Permits under Environmental Laws, Purchaser agrees and understands that no representation or warranty is made in respect of environmental matters in any Section of this Agreement other than this **Section 4.9**.

Section 4.10     *Employee Benefit Plans.*

(a)     Section 4.10 of the Sellers' Disclosure Schedule sets forth all material Parent Employee Benefit Plans and Policies and Purchased Subsidiaries Employee Benefit Plans (collectively, the "Benefit Plans").  Sellers have made available, upon reasonable request, to Purchaser true, complete and correct copies of (i) each material Benefit Plan, (ii) the three (3) most recent annual reports on Form 5500 (including all schedules, auditor's reports and attachments thereto) filed with the IRS with respect to each such Benefit Plan (if any such report was required by applicable Law), (iii) the most recent actuarial or other financial report prepared with respect to such Benefit Plan, if any, (iv) each trust agreement and insurance or annuity Contract or other funding or financing arrangement relating to such Benefit Plan and (v) to the extent not subject to confidentiality restrictions, any material written communications received by Sellers or any Subsidiaries of Sellers from any Governmental Authority relating to a Benefit Plan, including any communication from the Pension Benefit Guaranty Corporation (the "PBGC"), in respect of any Benefit Plan, subject to Title IV of ERISA.

(b)     Except as would not reasonably be expected to have a Material Adverse Effect, (i) each Benefit Plan has been administered in accordance with its terms, (ii) each

of Sellers, any of their Subsidiaries and each Benefit Plan is in compliance with the applicable provisions of ERISA, the Tax Code, all other applicable Laws (including Section 409A of the Tax Code, TARP or under any enhanced restrictions on executive compensation agreed to by Sellers with Sponsor) and the terms of all applicable Collective Bargaining Agreements, (iii) there are no (A) investigations by any Governmental Authority, (B) termination proceedings or other Claims (except routine Claims for benefits payable under any Benefit Plans) or (C) Claims, in each case, against or involving any Benefit Plan or asserting any rights to or Claims for benefits under any Benefit Plan that could give rise to any Liability, and there are not any facts or circumstances that could give rise to any Liability in the event of any such Claim and (iv) each Benefit Plan that is intended to be a Tax-qualified plan under Section 401(a) of the Tax Code (or similar provisions for Tax-registered or Tax-favored plans of non-United States jurisdictions) is qualified and any trust established in connection with any Benefit Plan that is intended to be exempt from taxation under Section 501(a) of the Tax Code (or similar provisions for Tax-registered or Tax-favored plans of non-United States jurisdictions) is exempt from United States federal income Taxes under Section 501(a) of the Tax Code (or similar provisions under non-United States law).  To the Knowledge of Sellers, no circumstance and no fact or event exists that would be reasonably expected to adversely affect the qualified status of any Benefit Plan.

(c)     None of the Parent Employee Benefit Plans and Policies or any material Purchased Subsidiaries Employee Benefit Plans that is an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) has failed to satisfy, as applicable, the minimum funding standards (as described in Section 302 of ERISA or Section 412 of the Tax Code), whether or not waived, nor has any waiver of the minimum funding standards of Section 302 of ERISA or Section 412 of the Tax Code been requested.

(d)     No Seller or any ERISA Affiliate of any Seller (including any Purchased Subsidiary) (i) has any actual or contingent Liability (A) under any employee benefit plan subject to Title IV of ERISA other than the Benefit Plans (except for contributions not yet due), (B) to the PBGC (except for the payment of premiums not yet due), which Liability, in each case, has not been fully paid as of the date hereof, or, if applicable, which has not been accrued in accordance with GAAP or (C) under any "multiemployer plan" (as defined in Section 3(37) of ERISA), or (ii) will incur withdrawal Liability under Title IV of ERISA as a result of the consummation of the transactions contemplated hereby, except for Liabilities with respect to any of the foregoing that would not reasonably be expected to have a Material Adverse Effect.

(e)     Neither the execution of this Agreement or any Ancillary Agreement nor the consummation of the transactions contemplated hereby (alone or in conjunction with any other event, including termination of employment) will entitle any member of the board of directors of Parent or any Applicable Employee who is an officer or member of senior management of Parent to any increase in compensation or benefits, any grant of severance, retention, change in control or other similar compensation or benefits, any acceleration of the time of payment or vesting of any compensation or benefits (but not including, for this purpose, any retention, stay bonus or other incentive plan, program, arrangement that is a Retained Plan) or will require the securing or funding of any

compensation or benefits or limit the right of Sellers, any Subsidiary of Sellers or Purchaser or any Affiliates of Purchaser to amend, modify or terminate any Benefit Plan. Any new grant of severance, retention, change in control or other similar compensation or benefits to any Applicable Employee, and any payout to any Transferred Employee under any such existing arrangements, that would otherwise occur as a result of the execution of this Agreement or any Ancillary Agreement (alone or in conjunction with any other event, including termination of employment), has been waived by such Applicable Employee or otherwise cancelled.

(f)     No amount or other entitlement currently in effect that could be received (whether in cash or property or the vesting of property) as a result of the actions contemplated by this Agreement and the Ancillary Agreements (alone or in combination with any other event) by any Person who is a "disqualified individual" (as defined in Treasury Regulation Section 1.280G-1) (each, a "Disqualified Individual") with respect to Sellers would be an "excess parachute payment" (as defined in Section 280G(b)(1) of the Tax Code).  No Disqualified Individual or Applicable Employee is entitled to receive any additional payment (e.g., any Tax gross-up or any other payment) from Sellers or any Subsidiaries of Sellers in the event that the additional or excise Tax required by Section 409A or 4999 of the Tax Code, respectively is imposed on such individual.

(g)     All individuals covered by the UAW Collective Bargaining Agreement are either Applicable Employees or employed by a Purchased Subsidiary.

(h)     Section 4.10(h) of the Sellers' Disclosure Schedule lists all non-standard individual agreements currently in effect providing for compensation, benefits and perquisites for any current and former officer, director or top twenty-five (25) most highly paid employee of Parent and any other such material non-standard individual agreements with non-top twenty-five (25) employees.

*Section 4.11   Labor Matters.*  There is not any labor strike, work stoppage or lockout pending, or, to the Knowledge of Sellers, threatened in writing against or affecting any Seller or any Purchased Subsidiary.  Except as would not reasonably be expected to have a Material Adverse Effect: (a) none of Sellers or any Purchased Subsidiary is engaged in any material unfair labor practice; (b) there are not any unfair labor practice charges or complaints against Sellers or any Purchased Subsidiary pending, or, to the Knowledge of Sellers, threatened, before the National Labor Relations Board; (c) there are not any pending or, to the Knowledge of Sellers, threatened in writing, union grievances against Sellers or any Purchased Subsidiary as to which there is a reasonable possibility of adverse determination; (d) there are not any pending, or, to the Knowledge of Sellers, threatened in writing, charges against Sellers or any Purchased Subsidiary or any of their current or former employees before the Equal Employment Opportunity Commission or any state or local agency responsible for the prevention of unlawful employment practices; (e) no union organizational campaign is in progress with respect to the employees of any Seller or any Purchased Subsidiary and no question concerning representation of such employees exists; and (f) no Seller nor any Purchased Subsidiary has received written communication during the past five (5) years of the intent of any Governmental Authority responsible for the enforcement of labor or employment Laws to conduct an investigation of or

affecting Sellers or any Subsidiary of Sellers and, to the Knowledge of Sellers, no such investigation is in progress.

Section 4.12    Investigations; Litigation.  (a) To the Knowledge of Sellers, there is no investigation or review pending by any Governmental Authority with respect to any Seller that would reasonably be expected to have a Material Adverse Effect, and (b) there are no actions, suits, inquiries or proceedings, or to the Knowledge of Sellers, investigations, pending against any Seller, or relating to any of the Transferred Real Property, at law or in equity before, and there are no Orders of or before, any Governmental Authority, in each case that would reasonably be expected to have a Material Adverse Effect.

Section 4.13    Tax Matters.  Except as would not reasonably be expected to have a Material Adverse Effect, (a) all Tax Returns required to have been filed by, with respect to or on behalf of any Seller, Seller Group member or Purchased Subsidiary have been timely filed (taking into account any extension of time to file granted or obtained) and are correct and complete in all respects, (b) all amounts of Tax required to be paid with respect to any Seller, Seller Group member or Purchased Subsidiary (whether or not shown on any Tax Return) have been timely paid or are being contested in good faith by appropriate proceedings and have been reserved for in accordance with GAAP in Parent's consolidated audited financial statements, (c) no deficiency for any amount of Tax has been asserted or assessed by a Taxing Authority in writing relating to any Seller, Seller Group member or Purchased Subsidiary that has not been satisfied by payment, settled or withdrawn, (d) there are no audits, Claims or controversies currently asserted or threatened in writing with respect to any Seller, Seller Group member or Purchased Subsidiary in respect of any amount of Tax or failure to file any Tax Return, (e) no Seller, Seller Group member or Purchased Subsidiary has agreed to any extension or waiver of the statute of limitations applicable to any Tax Return, or agreed to any extension of time with respect to a Tax assessment or deficiency, which period (after giving effect to such extension or waiver) has not yet expired, (f) no Seller, Seller Group member or Purchased Subsidiary is a party to or the subject of any ruling requests, private letter rulings, closing agreements, settlement agreements or similar agreements with any Taxing Authority for any periods for which the statute of limitations has not yet run, (g) no Seller, Seller Group member or Purchased Subsidiary (A) has any Liability for Taxes of any Person (other than any Purchased Subsidiary), including as a transferee or successor, or pursuant to any contractual obligation (other than pursuant to any commercial Contract not primarily related to Tax), or (B) is a party to or bound by any Tax sharing agreement, Tax allocation agreement or Tax indemnity agreement (in every case, other than this Agreement and those Tax sharing, Tax allocation or Tax indemnity agreements that will be terminated prior to Closing and with respect to which no post-Closing Liabilities will exist), (h) each of the Purchased Subsidiaries and each Seller and Seller Group member has withheld or collected all Taxes required to have been withheld or collected and, to the extent required, has paid such Taxes to the proper Taxing Authority, (i) no Seller, Seller Group member or Purchased Subsidiary will be required to make any adjustments in taxable income for any Tax period (or portion thereof) ending after the Closing Date, including pursuant to Section 481(a) or 263A of the Tax Code or any similar provision of foreign, provincial, state, local or other Law as a result of transactions or events occurring, or accounting methods employed, prior to the Closing, nor is any application pending with any Taxing Authority requesting permission for any changes in accounting methods that relate to any Seller, Seller Group member or Purchased Subsidiary, (j) the Assumed Liabilities were incurred through the

-45-

Ordinary Course of Business, (k) there are no Tax Encumbrances on any of the Purchased Assets or the assets of any Purchased Subsidiary (other than Permitted Encumbrances for which appropriate reserves have been established (and to the extent that such liens relate to a period ending on or before December 31, 2008, the amount of any such Liability is accrued or reserved for as a Liability in accordance with GAAP in the audited consolidated balance sheet of Sellers at December 31, 2008)), (l) none of the Purchased Subsidiaries or Sellers has been a "distributing corporation" or a "controlled corporation" in a distribution intended to qualify under Section 355(a) of the Tax Code, (m) none of the Purchased Subsidiaries, Sellers or Seller Group members has participated in any "listed transactions" or "reportable transactions" within the meaning of Treasury Regulations Section 1.6011-4, (n) there are no unpaid Taxes with respect to any Seller, Seller Group member or Purchased Asset for which Purchaser will have liability as a transferee or successor and (o) the most recent financial statements contained in the Parent SEC Documents reflect an adequate reserve for all Taxes payable by Sellers, the Purchased Subsidiaries and the members of all Seller Groups for all taxable periods and portions thereof through the date of such financial statements.

### Section 4.14    *Intellectual Property and IT Systems.*

(a)    Except as would not reasonably be expected to have a Material Adverse Effect: (i) each Seller and each Purchased Subsidiary owns, controls, or otherwise possesses sufficient rights to use, free and clear of all Encumbrances (other than Permitted Encumbrances) all Intellectual Property necessary for the conduct of its business in substantially the same manner as conducted as of the date hereof; and (ii) all Intellectual Property owned by Sellers that is necessary for the conduct of the business of Sellers and each Purchased Subsidiary as conducted as of the date hereof is subsisting and in full force and effect, has not been adjudged invalid or unenforceable, has not been abandoned or allowed to lapse, in whole or in part, and to the Knowledge of Sellers, is valid and enforceable.

(b)    Except as would not reasonably be expected to have a Material Adverse Effect, all necessary registration, maintenance and renewal fees in connection with the Intellectual Property owned by Sellers have been paid and all necessary documents and certificates in connection with such Intellectual Property have been filed with the relevant patent, copyright, trademark or other authorities in the United States or applicable foreign jurisdictions, as the case may be, for the purposes of prosecuting, maintaining or renewing such Intellectual Property.

(c)    Except as would not reasonably be expected to have a Material Adverse Effect, no Intellectual Property owned by Sellers is the subject of any licensing or franchising Contract that prohibits or materially restricts the conduct of business as presently conducted by any Seller or Purchased Subsidiary or the transfer of such Intellectual Property.

(d)    Except as would not reasonably be expected to have a Material Adverse Effect: (i) the Intellectual Property or the conduct of Sellers' and the Purchased Subsidiaries' businesses does not infringe, misappropriate, dilute, or otherwise violate or conflict with the trademarks, patents, copyrights, inventions, trade secrets, proprietary

information and technology, know-how, formulae, rights of publicity or any other intellectual property rights of any Person; (ii) to the Knowledge of Sellers, no other Person is now infringing or in conflict with any Intellectual Property owned by Sellers or Sellers' rights thereunder; and (iii) no Seller or any Purchased Subsidiary has received any written notice that it is violating or has violated the trademarks, patents, copyrights, inventions, trade secrets, proprietary information and technology, know-how, formulae, rights of publicity or any other intellectual property rights of any third party.

(e)      Except as would not reasonably be expected to have a Material Adverse Effect, no holding, decision or judgment has been rendered by any Governmental Authority against any Seller, which would limit, cancel or invalidate any Intellectual Property owned by Sellers.

(f)      No action or proceeding is pending, or to the Knowledge of Sellers, threatened, on the date hereof that (i) seeks to limit, cancel or invalidate any Intellectual Property owned by Sellers or such Sellers' ownership interest therein; and (ii) if adversely determined, would reasonably be expected to have a Material Adverse Effect.

(g)      Except as would not reasonably be expected to have a Material Adverse Effect, Sellers and the Purchased Subsidiaries have taken reasonable actions to (i) maintain, enforce and police their Intellectual Property; and (ii) protect their material Software, websites and other systems (and the information therein) from unauthorized access or use.

(h)      Except as would not reasonably be expected to have a Material Adverse Effect: (i) each Seller and Purchased Subsidiary has taken reasonable steps to protect its rights in, and confidentiality of, all the Trade Secrets, and any other confidential information owned by such Seller or Purchased Subsidiary; and (ii) to the Knowledge of Sellers, such Trade Secrets have not been disclosed by Sellers to any Person except pursuant to a valid and appropriate non-disclosure, license or any other appropriate Contract that has not been breached.

(i)      Except as would not reasonably be expected to have a Material Adverse Effect, there has not been any malfunction with respect to any of the Software, electronic data processing, data communication lines, telecommunication lines, firmware, hardware, Internet websites or other information technology equipment of any Seller or Purchased Subsidiary since April 1, 2007, which has not been remedied or replaced in all respects.

(j)      Except as would not reasonably be expected to have a Material Adverse Effect: (i) the consummation of the transactions contemplated by this Agreement will not cause to be provided or licensed to any third Person, or give rise to any rights of any third Person with respect to, any source code that is part of the Software owned by Sellers; and (ii) Sellers have implemented reasonable disaster recovery and back-up plans with respect to the Software.

*Section 4.15   Real Property.*   Each Seller owns and has valid title to the Transferred Real Property that is Owned Real Property owned by it and has valid leasehold or

subleasehold interests, as the case may be, in all of the Transferred Real Property that is Leased Real Property leased or subleased by it, in each case, free and clear of all Encumbrances, other than Permitted Encumbrances. Each of Sellers and the Purchased Subsidiaries has complied with the terms of each lease, sublease, license or other Contract relating to the Transferred Real Property to which it is a party, except any failure to comply that would not reasonably be expected to have a Material Adverse Effect.

*Section 4.16    Material Contracts.*

(a)    Except for this Agreement, the Parent Employee Benefit Plans and Policies, except as filed with, or disclosed or incorporated in, the Parent SEC Documents or except as set forth on Section 4.16 of the Sellers' Disclosure Schedule, as of the date hereof, no Seller is a party to or bound by (i) any "material contract" (as such term is defined in Item 601(b)(10) of Regulation S-K of the SEC); (ii) any non-compete or exclusivity agreement that materially restricts the operation of Sellers' core business; (iii) any asset purchase agreement, stock purchase agreement or other agreement entered into within the past six years governing a material joint venture or the acquisition or disposition of assets or other property where the consideration paid or received for such assets or other property exceeded $500,000,000 (whether in cash, stock or otherwise); (iv) any agreement or series of related agreements with any supplier of Sellers who directly support the production of vehicles, which provided collectively for payments by Sellers to such supplier in excess of $250,000,000 during the 12-month period ended December 31, 2008; (v) any agreement or series of related agreements with any supplier of Sellers who does not directly support the production of vehicles, which, provided collectively for payments by Sellers to such supplier in excess of $100,000,000 during the 12-month period ended April 30, 2009; (vi) any Contract relating to the lease or purchase of aircraft; (vii) any settlement agreement where a Seller has paid or may be required to pay an amount in excess of $100,000,000 to settle the Claims covered by such settlement agreement; (viii) any material Contract that will, following the Closing, as a result of transactions contemplated hereby, be between or among a Seller or any Retained Subsidiary, on the one hand, and Purchaser or any Purchased Subsidiary, on the other hand (other than the Ancillary Agreements); and (ix) agreements entered into in connection with a material joint venture (all Contracts of the type described in this **Section 4.16(a)** being referred to herein as "<u>Seller Material Contracts</u>").

(b)    No Seller is in breach of or default under, or has received any written notice alleging any breach of or default under, the terms of any Seller Material Contract or material License, where such breach or default would reasonably be expected to have a Material Adverse Effect. To the Knowledge of Sellers, no other party to any Seller Material Contract or material License is in breach of or default under the terms of any Seller Material Contract or material License, where such breach or default would reasonably be expected to have a Material Adverse Effect. Except as would not reasonably be expected to have a Material Adverse Effect, each Seller Material Contract or material License is a valid, binding and enforceable obligation of such Seller that is party thereto and, to the Knowledge of Sellers, of each other party thereto, and is in full force and effect, except as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent transfer and other similar Laws

relating to or affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability, including principles of commercial reasonableness, good faith and fair dealing.

Section 4.17   *Dealer Sales and Service Agreements for Continuing Brands.* Parent is not in breach of or default under the terms of any United States dealer sales and service Contract for Continuing Brands other than any Excluded Continuing Brand Dealer Agreement (each, a "<u>Dealer Agreement</u>"), where such breach or default would reasonably be expected to have a Material Adverse Effect.  To the Knowledge of Sellers, no other party to any Dealer Agreement is in breach of or default under the terms of such Dealer Agreement, where such breach or default would not reasonably be expected to have a Material Adverse Effect.  Except as would not reasonably be expected to have a Material Adverse Effect, each Dealer Agreement is a valid and binding obligation of Parent and, to the Knowledge of Sellers, of each other party thereto, and is in full force and effect, except as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent transfer and other similar Laws relating to or affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability, including principles of commercial reasonableness, good faith and fair dealing.

Section 4.18   *Sellers' Products.*

(a)      To the Knowledge of Sellers, since April 1, 2007, neither Sellers nor any Purchased Subsidiary has conducted or decided to conduct any material recall or other field action concerning any product developed, designed, manufactured, sold, provided or placed in the stream of commerce by or on behalf of any Seller or any Purchased Subsidiary.

(b)      As of the date hereof, there are no material pending actions for negligence, manufacturing negligence or improper workmanship, or material pending actions, in whole or in part, premised upon product liability, against or otherwise naming as a party any Seller, Purchased Subsidiary or any predecessor-in-interest of any of the foregoing Persons, or to the Knowledge of Sellers, threatened in writing or of which Seller has received written notice that involve a product liability Claim resulting from the ownership, possession or use of any product manufactured, sold or delivered by any Seller, any Purchased Subsidiary or any predecessor-in-interest of any of the foregoing Persons, which would reasonably be expected to have a Material Adverse Effect.

(c)      To the Knowledge of Sellers and except as would not reasonably be expected to have a Material Adverse Effect, no supplier to any Seller has threatened in writing to cease the supply of products or services that could impair future production at a major production facility of such Seller.

Section 4.19   *Certain Business Practices.*  Each of Sellers and the Purchased Subsidiaries is in compliance with the legal requirements under the Foreign Corrupt Practices Act, as amended (the "<u>FCPA</u>"), except for such failures, whether individually or in the aggregate, to maintain books and records or internal controls as required thereunder that are not

material.  To the Knowledge of Sellers, since April 1, 2007, no Seller or Purchased Subsidiary, nor any director, officer, employee or agent thereof, acting on its, his or her own behalf or on behalf of any of the foregoing Persons, has offered, promised, authorized the payment of, or paid, any money, or the transfer of anything of value, directly or indirectly, to or for the benefit of: (a) any employee, official, agent or other representative of any foreign Governmental Authority, or of any public international organization; or (b) any foreign political party or official thereof or candidate for foreign political office for the purpose of influencing any act or decision of such recipient in the recipient's official capacity, or inducing such recipient to use his, her or its influence to affect any act or decision of such foreign government or department, agency or instrumentality thereof or of such public international organization, or securing any improper advantage, in the case of both clause (a) and (b) above, in order to assist any Seller or any Purchased Subsidiary to obtain or retain business for, or to direct business to, any Seller or any Purchased Subsidiary and under circumstances that would subject any Seller or any Purchased Subsidiary to material Liability under any applicable Laws of the United States (including the FCPA) or of any foreign jurisdiction where any Seller or any Purchased Subsidiary does business relating to corruption, bribery, ethical business conduct, money laundering, political contributions, gifts and gratuities, or lawful expenses.

Section 4.20   Brokers and Other Advisors.   No broker, investment banker, financial advisor, counsel (other than legal counsel) or other Person is entitled to any broker's, finder's or financial advisor's fee or commission (collectively, "Advisory Fees") in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Sellers or any Affiliate of any Seller.

Section 4.21   Investment Representations.

(a)    Each Seller is acquiring the Parent Shares for its own account solely for investment and not with a view to, or for sale in connection with, any distribution thereof in violation of the Securities Act or the applicable securities Laws of any jurisdiction. Each Seller agrees that it shall not transfer any of the Parent Shares, except in compliance with the Securities Act and with the applicable securities Laws of any other jurisdiction.

(b)    Each Seller is an "Accredited Investor" as defined in Rule 501(a) promulgated under the Securities Act.

(c)    Each Seller understands that the acquisition of the Parent Shares to be acquired by it pursuant to the terms of this Agreement involves substantial risk. Each Seller and its officers have experience as an investor in the Equity Interests of companies such as the ones being transferred pursuant to this Agreement and each Seller acknowledges that it can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of its investment in the Parent Shares to be acquired by it pursuant to the transactions contemplated by this Agreement.

(d)    Each Seller further understands and acknowledges that the Parent Shares have not been registered under the Securities Act or under the applicable securities Laws of any jurisdiction and agrees that the Parent Shares may not be sold, transferred, offered

for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act or under the applicable securities Laws of any jurisdiction, or, in each case, an applicable exemption therefrom.

(e)     Each Seller acknowledges that the offer and sale of the Parent Shares has not been accomplished by the publication of any advertisement.

*Section 4.22   No Other Representations or Warranties of Sellers.*  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS **ARTICLE IV**, NONE OF SELLERS AND ANY PERSON ACTING ON BEHALF OF A SELLER MAKES ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, ANY OF THEIR AFFILIATES, SELLERS' BUSINESS, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR WITH RESPECT TO ANY OTHER INFORMATION PROVIDED TO PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  WITHOUT LIMITING THE FOREGOING, EXCEPT AS SET FORTH IN THE REPRESENTATIONS AND WARRANTIES OF SELLERS CONTAINED IN THIS **ARTICLE IV**, SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, WITH RESPECT TO (A) MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE, TITLE OR NON-INFRINGEMENT OF THE PURCHASED ASSETS, (B) ANY INFORMATION, WRITTEN OR ORAL AND IN ANY FORM PROVIDED OR MADE AVAILABLE (WHETHER BEFORE OR, IN CONNECTION WITH ANY SUPPLEMENT, MODIFICATION OR UPDATE TO THE SELLERS' DISCLOSURE SCHEDULE PURSUANT TO **SECTION 6.5**, **SECTION 6.6** OR **SECTION 6.26,** AFTER THE DATE HEREOF) TO PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES, INCLUDING IN "DATA ROOMS" (INCLUDING ON-LINE DATA ROOMS), MANAGEMENT PRESENTATIONS, FUNCTIONAL "BREAK-OUT" DISCUSSIONS, RESPONSES TO QUESTIONS SUBMITTED ON BEHALF OF THEM OR OTHER COMMUNICATIONS BETWEEN THEM OR ANY OF THEIR REPRESENTATIVES, ON THE ONE HAND, AND SELLERS, THEIR AFFILIATES, OR ANY OF THEIR REPRESENTATIVES, ON THE OTHER HAND, OR ON THE ACCURACY OR COMPLETENESS OF ANY SUCH INFORMATION, OR ANY PROJECTIONS, ESTIMATES, BUSINESS PLANS OR BUDGETS DELIVERED TO OR MADE AVAILABLE TO PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES OR (C) FUTURE REVENUES, EXPENSES OR EXPENDITURES, FUTURE RESULTS OF OPERATIONS (OR ANY COMPONENT THEREOF), FUTURE CASH FLOWS OR FUTURE FINANCIAL CONDITION (OR ANY COMPONENT THEREOF) OF SELLERS' BUSINESS OR THE PURCHASED ASSETS.

# ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers as follows:

*Section 5.1     Organization and Good Standing.*  Purchaser is a legal entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of

incorporation. Purchaser has the requisite corporate power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

Section 5.2    *Authorization; Enforceability.*

(a)    Purchaser has the requisite corporate power and authority to (i) execute and deliver this Agreement and the Ancillary Agreements to which it is a party; (ii) perform its obligations hereunder and thereunder; and (iii) consummate the transactions contemplated by this Agreement and the Ancillary Agreements to which it is a party.

(b)    This Agreement constitutes, and each of the Ancillary Agreements to which Purchaser is a party, when duly executed and delivered by Purchaser, shall constitute, a valid and legally binding obligation of Purchaser (assuming that this Agreement and such Ancillary Agreements constitute valid and legally binding obligations of each Seller that is a party thereto and the other applicable parties thereto), enforceable against Purchaser in accordance with its respective terms and conditions, except as may be limited by applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent transfer and other similar Laws relating to or affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability, including principles of commercial reasonableness, good faith and fair dealing.

Section 5.3    *Noncontravention; Consents.*

(a)    The execution and delivery by Purchaser of this Agreement and the Ancillary Agreements to which it is a party, and (subject to the entry of the Sale Approval Order) the consummation by Purchaser of the transactions contemplated hereby and thereby, do not (i) violate any Law to which Purchaser or its assets is subject; (ii) conflict with or result in a breach of any provision of the Organizational Documents of Purchaser; or (iii) create a breach, default, termination, cancellation or acceleration of any obligation of Purchaser under any Contract to which Purchaser is a party or by which Purchaser or any of its assets or properties is bound or subject, except for any of the foregoing in the cases of clauses (i) and (iii), that would not reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby or thereby or to perform any of its obligations under this Agreement or any Ancillary Agreement to which it is a party (a "Purchaser Material Adverse Effect").

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required by Purchaser for the consummation by Purchaser of the transactions contemplated by this Agreement or the Ancillary Agreements to which it is a party or the compliance by Purchaser with any of the provisions hereof or thereof, except for (i) compliance with the applicable requirements of any Antitrust Laws and (ii) such consent, waiver, approval, Order, Permit, qualification or authorization of, or declaration or filing with, or notification to, any Governmental Authority, the failure of which to be received

or made would not, individually or in the aggregate, reasonably be expected to have a Purchaser Material Adverse Effect.

    *Section 5.4    Capitalization.*

    (a)    As of the date hereof, Sponsor holds beneficially and of record 1,000 shares of common stock, par value $0.01 per share, of Purchaser, which constitutes all of the outstanding capital stock of Purchaser, and all such capital stock is validly issued, fully paid and nonassessable.

    (b)    Immediately following the Closing, the authorized capital stock of Purchaser (or, if a Holding Company Reorganization has occurred prior to the Closing, Holding Company) will consist of 2,500,000,000 shares of common stock, par value $0.01 per share ("Common Stock"), and 1,000,000,000 shares of preferred stock, par value $0.01 per share ("Preferred Stock"), of which 360,000,000 shares of Preferred Stock are designated as Series A Fixed Rate Cumulative Perpetual Preferred Stock, par value $0.01 per share (the "Series A Preferred Stock").

    (c)    Immediately following the Closing, (i) Canada or one or more of its Affiliates will hold beneficially and of record 58,368,644 shares of Common Stock and 16,101,695 shares of Series A Preferred Stock (collectively, the "Canada Shares"), (ii) Sponsor or one or more of its Affiliates collectively will hold beneficially and of record 304,131,356 shares of Common Stock and 83,898,305 shares of Series A Preferred Stock (collectively, the "Sponsor Shares") and (iii) the New VEBA will hold beneficially and of record 87,500,000 shares of Common Stock and 260,000,000 shares of Series A Preferred Stock (collectively, the "VEBA Shares"). Immediately following the Closing, there will be no other holders of Common Stock or Preferred Stock.

    (d)    Except as provided under the Parent Warrants, VEBA Warrants, Equity Incentive Plans or as disclosed on the Purchaser's Disclosure Schedule, there are and, immediately following the Closing, there will be no outstanding options, warrants, subscriptions, calls, convertible securities, phantom equity, equity appreciation or similar rights, or other rights or Contracts (contingent or otherwise) (including any right of conversion or exchange under any outstanding security, instrument or other Contract or any preemptive right) obligating Purchaser to deliver or sell, or cause to be issued, delivered or sold, any shares of its capital stock or other equity securities, instruments or rights that are, directly or indirectly, convertible into or exercisable or exchangeable for any shares of its capital stock. There are no outstanding contractual obligations of Purchaser to repurchase, redeem or otherwise acquire any shares of its capital stock or to provide funds to, or make any material investment (in the form of a loan, capital contribution or otherwise) in, any other Person. There are no voting trusts, shareholder agreements, proxies or other Contracts or understandings in effect with respect to the voting or transfer of any of the shares of Common Stock to which Purchaser is a party or by which Purchaser is bound. Except as provided under the Equity Registration Rights Agreement or as disclosed in the Purchaser's Disclosure Schedule, Purchaser has not granted or agreed to grant any holders of shares of Common Stock or securities

convertible into shares of Common Stock registration rights with respect to such shares under the Securities Act.

(e)     Immediately following the Closing, (i) all of the Canada Shares, the Parent Shares and the Sponsor Shares will be duly and validly authorized and issued, fully paid and nonassessable, and will be issued in accordance with the registration or qualification provisions of the Securities Act or pursuant to valid exemptions therefrom and (ii) none of the Canada Shares, the Parent Shares or the Sponsor Shares will be issued in violation of any preemptive rights.

Section 5.5     *Valid Issuance of Shares.* The Parent Shares, Adjustment Shares and the Common Stock underlying the Parent Warrants, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement and the related warrant agreement, as applicable, will be (a) validly issued, fully paid and nonassessable and (b) free of restrictions on transfer other than restrictions on transfer under applicable state and federal securities Laws and Encumbrances created by or imposed by Sellers.  Assuming the accuracy of the representations of Sellers in **Section 4.21**, the Parent Shares, Adjustment Shares and Parent Warrants will be issued in compliance with all applicable federal and state securities Laws.

Section 5.6     *Investment Representations.*

(a)     Purchaser is acquiring the Transferred Equity Interests for its own account solely for investment and not with a view to, or for sale in connection with, any distribution thereof in violation of the Securities Act or the applicable securities Laws of any jurisdiction. Purchaser agrees that it shall not transfer any of the Transferred Equity Interests, except in compliance with the Securities Act and with the applicable securities Laws of any other jurisdiction.

(b)     Purchaser is an "Accredited Investor" as defined in Rule 501(a) promulgated under the Securities Act.

(c)     Purchaser understands that the acquisition of the Transferred Equity Interests to be acquired by it pursuant to the terms of this Agreement involves substantial risk.  Purchaser and its officers have experience as an investor in Equity Interests of companies such as the ones being transferred pursuant to this Agreement and Purchaser acknowledges that it can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of its investment in the Transferred Equity Interests to be acquired by it pursuant to the transactions contemplated hereby.

(d)     Purchaser further understands and acknowledges that the Transferred Equity Interests have not been registered under the Securities Act or under the applicable securities Laws of any jurisdiction and agrees that the Transferred Equity Interests may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act or under the applicable securities Laws of any jurisdiction, or, in each case, an applicable exemption therefrom.

       (e)      Purchaser acknowledges that the offer and sale of the Transferred Equity Interests has not been accomplished by the publication of any advertisement.

       *Section 5.7     Continuity of Business Enterprise.*  It is the present intention of Purchaser to directly, or indirectly through its Subsidiaries, continue at least one significant historic business line of each Seller, or use at least a significant portion of each Seller's historic business assets in a business, in each case, within the meaning of Treas. Reg. § 1.368-1(d).

       *Section 5.8     Integrated Transaction.*  Sponsor has contributed, or will, prior to the Closing, contribute the UST Credit Facilities, a portion of the DIP Facility that is owed as of the Closing and the UST Warrant to Purchaser solely for the purposes of effectuating the transactions contemplated by this Agreement.

       *Section 5.9     No Other Representations or Warranties of Sellers.*  PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN **ARTICLE IV**, NONE OF SELLERS AND ANY PERSON ACTING ON BEHALF OF A SELLER MAKES ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, ANY OF THEIR AFFILIATES, SELLERS' BUSINESS, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR WITH RESPECT TO ANY OTHER INFORMATION PROVIDED TO PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  WITHOUT LIMITING THE FOREGOING, EXCEPT AS SET FORTH IN THE REPRESENTATIONS AND WARRANTIES OF SELLERS CONTAINED IN **ARTICLE IV**, PURCHASER FURTHER HEREBY ACKNOWLEDGES AND AGREES THAT SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, WITH RESPECT TO (A) MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE, TITLE OR NON-INFRINGEMENT OF THE PURCHASED ASSETS, (B) ANY INFORMATION, WRITTEN OR ORAL AND IN ANY FORM PROVIDED OR MADE AVAILABLE (WHETHER BEFORE OR, IN CONNECTION WITH ANY SUPPLEMENT, MODIFICATION OR UPDATE TO THE SELLERS' DISCLOSURE SCHEDULE PURSUANT TO **SECTION 6.5**, **SECTION 6.6** OR **SECTION 6.26,** AFTER THE DATE HEREOF) TO PURCHASER OR ANY OF ITS REPRESENTATIVES, INCLUDING IN "DATA ROOMS" (INCLUDING ON-LINE DATA ROOMS), MANAGEMENT PRESENTATIONS, FUNCTIONAL "BREAK-OUT" DISCUSSIONS, RESPONSES TO QUESTIONS SUBMITTED ON BEHALF OF IT OR OTHER COMMUNICATIONS BETWEEN IT OR ANY OF ITS AFFILIATES OR REPRESENTATIVES, ON THE ONE HAND, AND SELLERS, THEIR AFFILIATES, OR ANY OF THEIR REPRESENTATIVES, ON THE OTHER HAND, OR ON THE ACCURACY OR COMPLETENESS OF ANY SUCH INFORMATION OR (C) ANY PROJECTIONS, ESTIMATES, BUSINESS PLANS OR BUDGETS DELIVERED TO OR MADE AVAILABLE TO PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES OR (D) FUTURE REVENUES, EXPENSES OR EXPENDITURES, FUTURE RESULTS OF OPERATIONS (OR ANY COMPONENT THEREOF), FUTURE CASH FLOWS OR FUTURE FINANCIAL CONDITION (OR ANY COMPONENT THEREOF) OF SELLERS' BUSINESS OR THE PURCHASED ASSETS.

**ARTICLE VI**
**COVENANTS**

*Section 6.1      Access to Information.*

(a)      Sellers agree that, until the earlier of the Executory Contract Designation Deadline and the termination of this Agreement, Purchaser shall be entitled, through its Representatives or otherwise, to have reasonable access to the executive officers and Representatives of Sellers and the properties and other facilities, businesses, books, Contracts, personnel, records and operations (including the Purchased Assets and Assumed Liabilities) of Sellers and their Subsidiaries, including access to systems, data, databases for benefit plan administration; provided however, that no such investigation or examination shall be permitted to the extent that it would, in Sellers' reasonable determination, require any Seller, any Subsidiary of any Seller or any of their respective Representatives to disclose information subject to attorney-client privilege or in conflict with any confidentiality agreement to which any Seller, any Subsidiary of any Seller or any of their respective Representatives are bound (in which case, to the extent requested by Purchaser, Sellers will use reasonable best efforts to seek an amendment or appropriate waiver, or necessary consents, as may be required to avoid such conflict, or restructure the form of access, so as to permit the access requested); provided further, that notwithstanding the notice provisions in **Section 9.2** hereof, all such requests for access to the executive officers of Sellers shall be directed, prior to the Closing, to the Chief Financial Officer of Parent or his designee, and following the Closing, to the Chief Restructuring Officer of Parent or his or her designee.  If any material is withheld pursuant to this **Section 6.1(a)**, Seller shall inform Purchaser in writing as to the general nature of what is being withheld and the reason for withholding such material.

(b)      Any investigation and examination contemplated by this **Section 6.1** shall be subject to restrictions set forth in **Section 6.24** and under applicable Law.  Sellers shall cooperate, and shall cause their Subsidiaries and each of their respective Representatives to cooperate, with Purchaser and its Representatives in connection with such investigation and examination, and each of Purchaser and its Representatives shall use their reasonable best efforts to not materially interfere with the business of Sellers and their Subsidiaries.  Without limiting the generality of the foregoing, subject to **Section 6.1(a),** such investigation and examination shall include reasonable access to Sellers' executive officers (and employees of Sellers and their respective Subsidiaries identified by such executive officers), offices, properties and other facilities, and books, Contracts and records (including any document retention policies of Sellers) and access to accountants of Sellers and each of their respective Subsidiaries (provided that Sellers and each of their respective Subsidiaries, as applicable, shall have the right to be present at any meeting between any such accountant and Purchaser or Representative of Purchaser, whether such meeting is in person, telephonic or otherwise) and Sellers and each of their respective Subsidiaries and their Representatives shall prepare and furnish to Purchaser's Representatives such additional financial and operating data and other information as Purchaser may from time to time reasonably request, subject, in each case, to the confidentiality restrictions outlined in this **Section 6.1**.  Notwithstanding anything contained herein to the contrary, Purchaser shall consult with Sellers prior to conducting

-56-

any environmental investigations or examinations of any nature, including Phase I and Phase II site assessments and any environmental sampling in respect of the Transferred Real Property.

> Section 6.2    Conduct of Business.

(a)    Except as (i) otherwise expressly contemplated by or permitted under this Agreement, including the DIP Facility; (ii) disclosed on Section 6.2 of the Sellers' Disclosure Schedule; (iii) approved by the Bankruptcy Court (or any other court or other Governmental Authority in connection with any other bankruptcy, insolvency or similar proceeding filed by or in respect of any Subsidiary of Parent); or (iv) required by or resulting from any changes to applicable Laws, from and after the date of this Agreement and until the earlier of the Closing and the termination of this Agreement, Sellers shall and shall cause each Purchased Subsidiary to (A) conduct their operations in the Ordinary Course of Business, (B) not take any action inconsistent with this Agreement or with the consummation of the Closing, (C) use reasonable best efforts to preserve in the Ordinary Course of Business and in all material respects the present relationships of Sellers and each of their Subsidiaries with their respective customers, suppliers and others having significant business dealings with them, (D) not take any action to cause any of Sellers' representations and warranties set forth in **ARTICLE IV** to be untrue in any material respect as of any such date when such representation or warranty is made or deemed to be made and (E) not take any action that would reasonably be expected to materially prevent or delay the Closing.

(b)    Subject to the exceptions contained in clauses (i) through (iv) of **Section 6.2(a)**, each Seller agrees that, from and after the date of this Agreement and until the earlier of the Closing and the termination of this Agreement, without the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), such Seller shall not, and shall not permit any of the Key Subsidiaries (and in the case of clauses (i), (ix), (xiii) or (xvi), shall not permit any Purchased Subsidiary) to:

> (i)    take any action with respect to which any Seller has granted approval rights to Sponsor under any Contract, including under the UST Credit Facilities, without obtaining the prior approval of such action from Sponsor;

> (ii)    issue, sell, pledge, create an Encumbrance or otherwise dispose of or authorize the issuance, sale, pledge, Encumbrance or disposition of any Equity Interests of the Transferred Entities, or grant any options, warrants or other rights to purchase or obtain (including upon conversion, exchange or exercise) any such Equity Interests;

> (iii)    declare, set aside or pay any dividend or make any distribution (whether in cash, securities or other property or by allocation of additional Indebtedness to any Seller or any Key Subsidiary without receipt of fair value with respect to any Equity Interest of Seller or any Key Subsidiary), except for dividends and distributions among the Purchased Subsidiaries;

(iv) directly or indirectly, purchase, redeem or otherwise acquire any Equity Interests or any rights to acquire any Equity Interests of any Seller or Key Subsidiary;

(v) materially change any of its financial accounting policies or procedures or any of its methods of reporting income, deductions or other material items for financial accounting purposes, except as permitted by GAAP, a SEC rule, regulation or policy or applicable Law, or as modified by Parent as a result of the filing of the Bankruptcy Cases;

(vi) adopt any amendments to its Organizational Documents or permit the adoption of any amendment of the Organizational Documents of any Key Subsidiary or effect a split, combination or reclassification or other adjustment of Equity Interests of any Purchased Subsidiary or a recapitalization thereof;

(vii) sell, pledge, lease, transfer, assign or dispose of any Purchased Asset or permit any Purchased Asset to become subject to any Encumbrance, other than a Permitted Encumbrance, in each case, except in the Ordinary Course of Business or pursuant to a Contract in existence as of the date hereof (or entered into in compliance with this **Section 6.2**);

(viii) (A) incur or assume any Indebtedness for borrowed money or issue any debt securities, except for Indebtedness for borrowed money incurred by Purchased Subsidiaries under existing lines of credit (including through the incurrence of Intercompany Obligations) to fund operations of Purchased Subsidiaries and Indebtedness for borrowed money incurred by Sellers under the DIP Facility or (B) assume, guarantee, endorse or otherwise become liable or responsible (whether directly, contingently or otherwise) for the obligations of any other Person, except for Indebtedness for borrowed money among any Seller and Subsidiary or among the Subsidiaries;

(ix) discharge or satisfy any Indebtedness in excess of $100,000,000 other than the discharge or satisfaction of any Indebtedness when due in accordance with its originally scheduled terms;

(x) other than as is required by the terms of a Parent Employee Benefit Plan and Policy (in effect on the date hereof and set forth on Section 4.10 of the Sellers' Disclosure Schedule), any Assumed Plan (in effect on the date hereof) the UAW Collective Bargaining Agreement or consistent with the expiration of a Collective Bargaining Agreement, the Settlement Agreement, the UAW Retiree Settlement Agreement or as may be required by applicable Law or TARP or under any enhanced restrictions on executive compensation agreed to by Sellers and Sponsor, (A) increase the compensation or benefits of any Employee of Sellers or any Purchased Subsidiary (except for increases in salary or wages in the Ordinary Course of Business with respect to Employees who are not current or former directors or officers of Sellers or Seller Key Personnel), (B) grant any severance or termination pay to any Employee of Sellers or any Purchased

Subsidiary except for severance or termination pay provided under any Parent Employee Benefit Plan and Policy or as the result of a settlement of any pending Claim or charge involving a Governmental Authority or litigation with respect to Employees who are not current or former officers or directors of Sellers or Seller Key Personnel), (C) establish, adopt, enter into, amend or terminate any Benefit Plan (including any change to any actuarial or other assumption used to calculate funding obligations with respect to any Benefit Plan or any change to the manner in which contributions to any Benefit Plan are made or the basis on which such contributions are determined), except where any such action would reduce Sellers' costs or Liabilities pursuant to such plan, (D) grant any awards under any Benefit Plan (including any equity or equity-based awards), (E) increase or promise to increase or provide for the funding under any Benefit Plan, (F) forgive any loans to Employees of Sellers or any Purchased Subsidiary (other than as part of a settlement of any pending Claim or charge involving a Governmental Authority or litigation in the Ordinary Course of Business or with respect to obligations of Employees whose employment is terminated by Sellers or a Purchased Subsidiary in the Ordinary Course of Business, other than Employees who are current or former officers or directors of Sellers or Seller Key Personnel or directors of Sellers or a Purchased Subsidiary) or (G) exercise any discretion to accelerate the time of payment or vesting of any compensation or benefits under any Benefit Plan;

(xi)     modify, amend, terminate or waive any rights under any Affiliate Contract or Seller Material Contract (except for any dealer sales and service Contracts or as contemplated by **Section 6.7**) in any material respect in a manner that is adverse to any Seller that is a party thereto, other than in the Ordinary Course of Business;

(xii)     enter into any Seller Material Contract other than as contemplated by **Section 6.7**;

(xiii)     acquire (including by merger, consolidation, combination or acquisition of Equity Interests or assets) any Person or business or division thereof (other than acquisitions of portfolio assets and acquisitions in the Ordinary Course of Business) in a transaction (or series of related transactions) where the aggregate consideration paid or received (including non-cash equity consideration) exceeds $100,000,000;

(xiv)     alter, whether through a complete or partial liquidation, dissolution, merger, consolidation, restructuring, reorganization or in any other manner, the legal structure or ownership of any Key Subsidiary, or adopt or approve a plan with respect to any of the foregoing;

(xv)     enter into any Contract that limits or otherwise restricts or that would reasonably be expected to, after the Closing, restrict or limit in any material respect (A) Purchaser or any of its Subsidiaries or any successor thereto or (B) any Affiliates of Purchaser or any successor thereto, in the case of each of

clause (A) or (B), from engaging or competing in any line of business or in any geographic area;

(xvi)     enter into any Contracts for capital expenditures, exceeding $100,000,000 in the aggregate in connection with any single project or group of related projects;

(xvii)     open or reopen any major production facility; and

(xviii)     agree, in writing or otherwise, to take any of the foregoing actions.

Section 6.3     *Notices and Consents.*

(a)     Sellers shall and shall cause each of their Subsidiaries to, and Purchaser shall use reasonable best efforts to, promptly give all notices to, obtain all material consents, approvals or authorizations from, and file all notifications and related materials with, any third parties (including any Governmental Authority) that may be or become necessary to be given or obtained by Sellers or their Affiliates, or Purchaser, respectively, in connection with the transactions contemplated by this Agreement.

(b)     Each of Purchaser and Parent shall, to the extent permitted by Law, promptly notify the other Party of any communication it or any of its Affiliates receives from any Governmental Authority relating to the transactions contemplated by this Agreement and permit the other Party to review in advance any proposed substantive communication by such Party to any Governmental Authority.  Neither Purchaser nor Parent shall agree to participate in any material meeting with any Governmental Authority in respect of any significant filings, investigation (including any settlement of the investigation), litigation or other inquiry unless it consults with the other Party in advance and, to the extent permitted by such Governmental Authority, gives the other Party the opportunity to attend and participate at such meeting; provided, however, in the event either Party is prohibited by applicable Law or such Governmental Authority from participating in or attending any such meeting, then the Party who participates in such meeting shall keep the other Party apprised with respect thereto to the extent permitted by Law.  To the extent permitted by Law, Purchaser and Parent shall coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other Party may reasonably request in connection with the foregoing, including, to the extent reasonably practicable, providing to the other Party in advance of submission, drafts of all material filings, submissions, correspondences or other written communications, providing the other Party with an opportunity to comment on the drafts, and, where practicable, incorporating such comments, if any, into the final documents. To the extent permitted by applicable Law, Purchaser and Parent shall provide each other with copies of all material correspondences, filings or written communications between them or any of their Representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement or the transactions contemplated by this Agreement.

(c)     None of Purchaser, Parent or their respective Affiliates shall be required to pay any fees or other payments to any Governmental Authorities in order to obtain any authorization, consent, Order or approval (other than normal filing fees and administrative fees that are imposed by Law on Purchaser), and in the event that any fees in addition to normal filing fees imposed by Law may be required to obtain any such authorization, consent, Order or approval, such fees shall be for the account of Purchaser.

(d)     Notwithstanding anything to the contrary contained herein, no Seller shall be required to make any expenditure or incur any Liability in connection with the requirements set forth in this **Section 6.3**.

> Section 6.4     *Sale Procedures; Bankruptcy Court Approval.*

(a)     This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers and the Bankruptcy Court of higher or better competing Bids with respect to an Alternative Transaction.  Nothing contained herein shall be construed to prohibit Sellers and their respective Affiliates and Representatives from soliciting, considering, negotiating, agreeing to, or otherwise taking action in furtherance of, any Alternative Transaction but only to the extent that Sellers determine in good faith that such actions are permitted or required by the Sale Procedures Order.

(b)     On the Petition Date, Sellers filed with the Bankruptcy Court the Bankruptcy Cases under the Bankruptcy Code and a motion (and related notices and proposed Orders) (the "Sale Procedures and Sale Motion"), seeking entry of (i) the sale procedures order, in the form attached hereto as **Exhibit H** (the "Sale Procedures Order"), and (ii) the sale approval order, in the form attached hereto as **Exhibit I** (the "Sale Approval Order").    The Sale Approval Order shall declare that if there is an Agreed G Transaction, (A) this Agreement constitutes a "plan" of Parent and Purchaser solely for purposes of Sections 368 and 354 of the Tax Code and (B) the transactions with respect to Parent described herein, in combination with the subsequent liquidation of Sellers, are intended to constitute a reorganization of Parent pursuant to Section 368(a)(1)(G) of the Tax Code.  To the extent reasonably practicable, Sellers shall consult with and provide Purchaser and the UAW a reasonable opportunity to review and comment on material motions, applications and supporting papers prepared by Sellers in connection with this Agreement prior to the filing or delivery thereof in the Bankruptcy Cases.

(c)     Purchaser acknowledges that Sellers may receive bids ("Bids") from prospective purchasers (such prospective purchasers, the "Bidders") with respect to an Alternative Transaction, as provided in the Sale Procedures Order.  All Bids (other than Bids submitted by Purchaser) shall be submitted with two copies of this Agreement marked to show changes requested by the Bidder.

(d)     If Sellers receive any Bids, Sellers shall have the right to select, and seek final approval of the Bankruptcy Court for, the highest or otherwise best Bid or Bids from the Bidders (the "Superior Bid"), which will be determined in accordance with the Sale Procedure Order.

(e)     Sellers shall use their reasonable best efforts to obtain entry of the Sale Approval Order on the Bankruptcy Court's docket as soon as practicable, and in no event no later than July 10, 2009.

(f)     Sellers shall use reasonable best efforts to comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the transactions contemplated by this Agreement, including serving on all required Persons in the Bankruptcy Cases (including all holders of Encumbrances and parties to the Purchased Contracts), a notice of the Sale Procedures and Sale Motion, the Sale Hearing and the objection deadline in accordance with Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (as modified by Orders of the Bankruptcy Court), the Sale Procedures Order or other Orders of the Bankruptcy Court, including General Order M-331 issued by the Bankruptcy Court, and any applicable local rules of the Bankruptcy Court.

(g)     Sellers shall provide Purchaser with a reasonable opportunity to review and comment on all motions, applications and supporting papers prepared by Sellers in connection with this Agreement (including forms of Orders and of notices to interested parties) prior to the filing or delivery thereof in the Bankruptcy Cases.  All motions, applications and supporting papers prepared by Sellers and relating to the approval of this Agreement (including forms of Orders and of notices to interested parties) to be filed or delivered on behalf of Sellers shall be reasonably acceptable in form and substance to Purchaser.  Sellers shall provide written notice to Purchaser of all matters that are required to be served on Sellers' creditors pursuant to the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.  In the event the Sale Procedures Order and the Sale Approval Order is appealed, Sellers shall use their reasonable best efforts to defend such appeal.

(h)     Purchaser agrees, to the extent reasonably requested by Sellers, to cooperate with and assist Sellers in seeking entry of the Sale Procedures Order and the Sale Approval Order by the Bankruptcy Court, including attending all hearings on the Sale Procedures and Sale Motion.

Section 6.5     *Supplements to Purchased Assets.*  Purchaser shall, from the date hereof until the Executory Contract Designation Deadline, have the right to designate in writing additional Personal Property it wishes to designate as Purchased Assets if such Personal Property is located at a parcel of leased real property where the underlying lease has been designated as a Rejectable Executory Contract pursuant to **Section 6.6** following the Closing.

Section 6.6     *Assumption or Rejection of Contracts.*

(a)     The Assumable Executory Contract Schedule sets forth a list of Executory Contracts entered into by Sellers that Sellers may assume and assign to Purchaser in accordance with this **Section 6.6(a)** (each, an "Assumable Executory Contract").  Any Contract identified on Section 6.6(a)(i) of the Sellers' Disclosure Schedule and Section 6.6(a)(ii) of the Sellers' Disclosure Schedule shall automatically be designated as an

Assumable Executory Contract and deemed to be set forth on the Assumable Executory Contract Schedule. Purchaser may, until the Executory Contract Designation Deadline, designate in writing any additional Executory Contract it wishes to designate as an Assumable Executory Contract and include on the Assumable Executory Contract Schedule, or any Assumable Executory Contract it no longer wishes to designate as an Assumable Executory Contract and remove from the Assumable Executory Contract Schedule; provided, however, that (i) Purchaser may not designate as an Assumable Executory Contract any (A) Rejectable Executory Contract, unless Sellers have consented to such designation in writing or (B) Contract that has previously been rejected by Sellers pursuant to Section 365 of the Bankruptcy Code, and (ii) Purchaser may not remove from the Assumable Executory Contract Schedule (v) the UAW Collective Bargaining Agreement, (w) any Contract identified on Section 6.6(a)(i) of the Sellers' Disclosure Schedule or Section 6.6(a)(ii) of the Sellers' Disclosure Schedule, (x) any Contract that has been previously assumed by Sellers pursuant to Section 365 of the Bankruptcy Code, (y) any Deferred Termination Agreement (or the related Discontinued Brand Dealer Agreement or Continuing Brand Dealer Agreement) or (z) any Participation Agreement (or the related Continuing Brand Dealer Agreement). Except as otherwise provided above, for each Assumable Executory Contract, Purchaser must determine, prior to the Executory Contract Designation Deadline, the date on which it seeks to have the assumption and assignment become effective, which date may be the Closing Date or a later date (but not an earlier date). The term "Executory Contract Designation Deadline" shall mean the date that is thirty (30) calendar days following the Closing Date, or if such date is not a Business Day, the next Business Day, or if mutually agreed upon by the Parties, any later date up to and including the Business Day immediately prior to the date of the confirmation hearing for Sellers' plan of liquidation or reorganization. For the avoidance of doubt, the Executory Contract Designation Deadline may be extended by mutual agreement of the Parties with respect to any single unassumed and unassigned Executory Contract, groups of unassumed and unassigned Executory Contracts or all of the unassumed and unassigned Executory Contracts.

(b)     Sellers may, until the Closing, provide written notice (a "Notice of Intent to Reject") to Purchaser of Sellers' intent to designate any Executory Contract (that has not been designated as an Assumable Executory Contract) as a Rejectable Executory Contract (each a "Proposed Rejectable Executory Contract"). Following receipt of a Notice of Intent to Reject, Purchaser shall as soon as reasonably practicable, but in no event later than fifteen (15) calendar days following receipt of a Notice of Intent to Reject (the "Option Period"), provide Sellers written notice of Purchaser's designation of one or more Proposed Rejectable Executory Contracts identified in such Notice of Intent to Reject as an Assumable Executory Contract. Each Proposed Rejectable Executory Contract that has not been designated by Purchaser as an Assumable Executory Contract during the applicable Option Period shall automatically, without further action by Sellers, be designated as a Rejectable Executory Contract. A "Rejectable Executory Contract" is an Executory Contract that Sellers may, but are not obligated to, reject pursuant Section 365 of the Bankruptcy Code.

(c)     Immediately following the Closing, each Executory Contract entered into by Sellers and then in existence that has not previously been designated as an Assumable

Executory Contract, a Rejectable Executory Contract or a Proposed Rejectable Executory Contract, and that has not otherwise been assumed or rejected by Sellers pursuant to Section 365 of the Bankruptcy Code, shall be deemed to be an Executory Contract subject to subsequent designation by Purchaser as an Assumable Executory Contract or a Rejectable Executory Contract (each a "<u>Deferred Executory Contract</u>").

(d)     All Assumable Executory Contracts shall be assumed and assigned to Purchaser on the date (the "<u>Assumption Effective Date</u>") that is the later of (i) the date designated by the Purchaser and (ii) the date following expiration of the objection deadline if no objection, other than to the Cure Amount, has been timely filed or the date of resolution of any objection unrelated to Cure Amount, as provided in the Sale Procedures Order; <u>provided</u>, <u>however</u>, that in the case of each (A) Assumable Executory Contract identified on Section 6.6(a)(i) of the Sellers' Disclosure Schedule, (2) Deferred Termination Agreement (and the related Discontinued Brand Dealer Agreement or Continuing Brand Dealer Agreement) designated as an Assumable Executory Contract and (3) Participation Agreement (and the related Continuing Brand Dealer Agreement) designated as an Assumable Executory Contract, the Assumption Effective Date shall be the Closing Date and (B) Assumable Executory Contract identified on Section 6.6(a)(ii) of the Sellers' Disclosure Schedule, the Assumption Effective Date shall be a date that is no later than the date set forth with respect to such Executory Contract on Section 6.6(a)(ii) of the Sellers' Disclosure Schedule.  On the Assumption Effective Date for any Assumable Executory Contract, such Assumable Executory Contract shall be deemed to be a Purchased Contract hereunder.  If it is determined under the procedures set forth in the Sale Procedures Order that Sellers may not assume and assign to Purchaser any Assumable Executory Contract, such Executory Contract shall cease to be an Assumable Executory Contract and shall be an Excluded Contract and a Rejectable Executory Contract.  Except as provided in **Section 6.31**, notwithstanding anything else to the contrary herein, any Executory Contract that has not been specifically designated as an Assumable Executory Contract as of the Executory Contract Designation Deadline applicable to such Executory Contract, including any Deferred Executory Contract, shall automatically be deemed to be a Rejectable Executory Contract and an Excluded Contract hereunder.  Sellers shall have the right, but not the obligation, to reject, at any time, any Rejectable Executory Contract; <u>provided</u>, <u>however</u>, that Sellers shall not reject any Contract that affects both Owned Real Property and Excluded Real Property (whether designated on **<u>Exhibit F</u>** or now or hereafter designated on Section 2.2(b)(v) of the Sellers' Disclosure Schedule), including any such Executory Contract that involves the provision of water, water treatment, electric, fuel, gas, telephone and other utilities to any facilities located at the Excluded Real Property, whether designated on **<u>Exhibit F</u>** or now or hereafter designated on Section 2.2(b)(v) of the Sellers' Disclosure Schedule (the "<u>Shared Executory Contracts</u>"), without the prior written consent of Purchaser.

(e)     From and after the Closing and during the applicable period specified below, Purchaser shall be obligated to pay or cause to be paid all amounts due in respect of Sellers' performance (i) under each Proposed Rejectable Executory Contract, during the pendency of the applicable Option Period under such Proposed Rejectable Executory Contract, (ii) under each Deferred Executory Contract, for so long as such Contract remains a Deferred Executory Contract, (iii) under each Assumable Executory Contract,

as long as such Contract remains an Assumable Executory Contract and (iv) under each GM Assumed Contract, until the applicable Assumption Effective Date.  At and after the Closing and until such time as any Shared Executory Contract is either (y) rejected by Sellers pursuant to the provision set forth in this **Section 6.6** or (z) assumed by Sellers and subsequently modified with Purchaser's consent so as to no longer be applicable to the affected Owned Real Property, Purchaser shall reimburse Sellers as and when requested by Sellers for Purchasers' and its Affiliates' allocable share of all costs and expenses incurred under such Shared Executory Contract.

(f)      Sellers and Purchaser shall comply with the procedures set forth in the Sale Procedures Order with respect to the assumption and assignment or rejection of any Executory Contract pursuant to, and in accordance with, this **Section 6.6**.

(g)      No designation of any Executory Contract for assumption and assignment or rejection in accordance with this **Section 6.6** shall give rise to any right to any adjustment to the Purchase Price.

(h)      Without limiting the foregoing, if, following the Executory Contract Designation Deadline, Sellers or Purchaser identify an Executory Contract that has not previously been identified as a Contract for assumption and assignment, and such Contract is important to Purchaser's ability to use or hold the Purchased Assets or operate its businesses in connection therewith, Sellers will assume and assign such Contract and assign it to Purchaser without any adjustment to the Purchase Price; provided that Purchaser consents and agrees at such time to (i) assume such Executory Contract and (ii) and discharge all Cure Amounts in respect hereof.

Section 6.7      *Deferred Termination Agreements; Participation Agreements.*

(a)      Sellers shall, and shall cause their Affiliates to, use reasonable best efforts to enter into short-term deferred voluntary termination agreements in substantially the form attached hereto as **Exhibit J-1** (in respect of all Saturn Discontinued Brand Dealer Agreements), **Exhibit J-2** (in respect of all Hummer Discontinued Brand Dealer Agreements) and **Exhibit J-3** (in respect of all non-Saturn and non-Hummer Discontinued Brand Dealer Agreements and all Excluded Continuing Brand Dealer Agreements) that will, when executed by the relevant dealer counterparty thereto, modify the respective Discontinued Brand Dealer Agreements and selected Continuing Brand Dealer Agreements (collectively, the "Deferred Termination Agreements").  For the avoidance of doubt, (i) each Deferred Termination Agreement, and the related Discontinued Brand Dealer Agreement or Continuing Brand Dealer Agreement modified thereby, will automatically be an Assumable Executory Contract hereunder upon valid execution of such Deferred Termination Agreement by the parties thereto and (ii) all Discontinued Brand Dealer Agreements that are not modified by a Deferred Termination Agreement, and all Continuing Brand Dealer Agreements that are not modified by either a Deferred Termination Agreement or a Participation Agreement, will automatically be a Rejectable Executory Contract hereunder.

-65-

     (b)    Sellers shall, and shall cause their Affiliates to, use reasonable best efforts to enter into agreements, substantially in the form attached hereto as **Exhibit K** that will modify all Continuing Brand Dealer Agreements (other than the Continuing Brand Dealer Agreements that are proposed to be modified by Deferred Termination Agreements) (the "<u>Participation Agreements</u>").   For the avoidance of doubt, (i) all Participation Agreements, and the related Continuing Brand Dealer Agreements, will automatically be Assumable Executory Contracts hereunder upon valid execution of such Participation Agreement and (ii) all Continuing Brand Dealer Agreements that are proposed to be modified by a Participation Agreement and are not modified by a Participation Agreement will be offered Deferred Termination Agreements pursuant to **Section 6.7(a)**.

     *Section 6.8*    *[Reserved]*

     *Section 6.9*    *Purchaser Assumed Debt; Wind Down Facility.*

     (a)    Purchaser shall use reasonable best efforts to agree with Sponsor on the terms of a restructuring of the Purchaser Assumed Debt so as to be assumed by Purchaser immediately prior to the Closing.  Purchaser shall use reasonable best efforts to enter into definitive financing agreements with respect to the Purchaser Assumed Debt so that such agreements are in effect as promptly as practicable but in any event no later than the Closing.

     (b)    Sellers shall use reasonable best efforts to agree with Sponsor on the terms of a restructuring of $950,000,000 of Indebtedness accrued under the DIP Facility (as restructured, the "<u>Wind Down Facility</u>") to provide for such Wind Down Facility to be non-recourse, to accrue payment-in-kind interest at LIBOR plus 300 basis points, to be secured by all assets of Sellers (other than the Parent Shares, Adjustment Shares, Parent Warrants and any securities received in respect thereof), and to be subject to mandatory repayment from the proceeds of asset sales (other than the sale of Parent Shares, Adjustment Shares, Parent Warrants and any securities received in respect thereof). Sellers shall use reasonable best efforts to enter into definitive financing agreements with respect to the Wind Down Facility so that such agreements are in effect as promptly as practicable but in any event no later than the Closing.

     *Section 6.10*   *Litigation and Other Assistance.*  In the event and for so long as any Party is actively contesting or defending against any action, investigation, charge, Claim or demand by a third party in connection with any transaction contemplated by this Agreement, the other Parties shall reasonably cooperate with the contesting or defending Party and its counsel in such contest or defense, make available its personnel and provide such testimony and access to its books, records and other materials as shall be reasonably necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party; <u>provided</u>, <u>however</u>, that no Party shall be required to provide the contesting or defending party with any access to its books, records or materials if such access would violate the attorney-client privilege or conflict with any confidentiality obligations to which the non-contesting or defending Party is subject.  In addition, the Parties agree to cooperate in connection with the making or filing of claims, requests for information, document retrieval and other activities in connection with any

and all Claims made under insurance policies specified on Section 2.2(b)(xiii) of the Sellers' Disclosure Schedule to the extent any such Claim relates to any Purchased Asset or Assumed Liability.  For the avoidance of doubt, this **Section 6.10** shall not apply to any action, investigation, charge, Claim or demand by any of Sellers or their Affiliates, on the one hand, or Purchaser or any of its Affiliates, on the other hand.

*Section 6.11    Further Assurances.*

(a)    Upon the terms and subject to the conditions set forth in this Agreement, each of the Parties shall use their reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all actions necessary, proper or advisable to consummate and make effective as promptly as practicable, the transactions contemplated by this Agreement in accordance with the terms hereof and to bring about the satisfaction of all other conditions to the other Parties' obligations hereunder; provided, however, that nothing in this Agreement shall obligate Sellers or Purchaser, or any of their respective Affiliates, to waive or modify any of the terms and conditions of this Agreement or any documents contemplated hereby, except as expressly set forth herein.  The Parties acknowledge that Sponsor's acquisition of interest is a sovereign act and that no filings should be made by Sponsor or Purchaser in non-United States jurisdictions.

(b)    The Parties shall negotiate the forms, terms and conditions of the Ancillary Agreements, to the extent the forms thereof are not attached to this Agreement, on the basis of the respective term sheets attached to this Agreement, in good faith, with such Ancillary Agreements to set forth terms on an Arms-Length Basis and incorporate usual and customary provisions for similar agreements.

(c)    Until the Closing, Sellers shall maintain a team of appropriate personnel (each such team, a "Transition Team") to assist Purchaser and its Representatives in connection with Purchaser's efforts to complete prior to the Closing the activities described below.  Sellers shall use their reasonable best efforts to cause the Transition Team to (A) meet with Purchaser and its Representatives on a regular basis at such times as Purchaser may reasonably request and (B) take such action and provide such information, including background and summary information, as Purchaser and its Representatives may reasonably request in connection with the following activities:

(i)    evaluation and identification of all Contracts that Purchaser may elect to designate as Purchased Contracts or Excluded Contracts, consistent with its rights under this Agreement;

(ii)    evaluation and identification of all assets and entities that Purchaser may elect to designate as Purchased Assets or Excluded Assets, consistent with its rights under this Agreement;

(iii)    maintaining and obtaining necessary governmental consents, permits, authorizations, licenses and financial assurance for operation of the business by Purchaser following the Closing;

(iv)     obtaining necessary third party consents for operation of the business by Purchaser following the Closing;

(v)     implementing the optimal structure for Purchaser and its subsidiaries to acquire and hold the Purchased Assets and operate the business following the Closing;

(vi)     implementing the assumption of all Assumed Plans and otherwise satisfying the obligations of Purchaser as provided in **Section 6.17** with respect to Employment Related Obligations; and

(vii)     such other transition matters as Purchaser may reasonably determine are necessary for Purchaser to fulfill its obligations and exercise its rights under this Agreement.

*Section 6.12     Notifications.*

(a)     Sellers shall give written notice to Purchaser as soon as practicable upon becoming aware of any event, circumstance, condition, fact, effect or other matter that resulted in, or that would reasonably be likely to result in (i) any representation or warranty set forth in **ARTICLE IV** being or becoming untrue or inaccurate in any material respect as of any date on or after the date hereof (as if then made, except to the extent such representation or warranty is expressly made only as of a specific date, in which case, as of such date), (ii) the failure by Sellers to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by Sellers under this Agreement or (iii) a condition to the Closing set forth in **Section 7.1** or **Section 7.2** becoming incapable of being satisfied; provided, however, that no such notification shall affect or cure a breach of any of Sellers' representations or warranties, a failure to perform any of the covenants or agreements of Sellers or a failure to have satisfied the conditions to the obligations of Sellers under this Agreement.  Such notice shall be in form of a certificate signed by an executive officer of Parent setting forth the details of such event and the action which Parent proposes to take with respect thereto.

(b)     Purchaser shall give written notice to Sellers as soon as practicable upon becoming aware of any event, circumstance, condition, fact, effect or other matter that resulted in, or that would reasonably be likely to result in (i) any representation or warranty set forth in **ARTICLE V** being or becoming untrue or inaccurate in any material respect with respect to Purchaser as of any date on or after the date hereof (as if then made, except to the extent such representation or warranty is expressly made only as of a specific date, in which case, as of such date), (ii) the failure by Purchaser to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by Purchaser under this Agreement or (iii) a condition to the Closing set forth in **Section 7.1** or **Section 7.3** becoming incapable of being satisfied; provided, however, that no such notification shall affect or cure a breach of any of Purchaser's representations or warranties, a failure to perform any of the covenants or agreements of Purchaser or a failure to have satisfied the conditions to the obligations of Purchaser under this Agreement.  Such notice shall be in a form of a certificate signed by

an executive officer of Purchaser setting forth the details of such event and the action which Purchaser proposes to take with respect thereto.

Section 6.13    *Actions by Affiliates.*    Each of Purchaser and Sellers shall cause their respective controlled Affiliates, and shall use their reasonable best efforts to ensure that each of their respective other Affiliates (other than Sponsor in the case of Purchaser) takes all actions reasonably necessary to be taken by such Affiliate in order to fulfill the obligations of Purchaser or Sellers, as the case may be, under this Agreement.

Section 6.14    *Compliance Remediation.*    Except with respect to the Excluded Assets or Retained Liabilities, prior to the Closing, Sellers shall use reasonable best efforts to, and shall use reasonable best efforts to cause their Subsidiaries to use their reasonable best efforts to, cure in all material respects any instances of non-compliance with Laws or Orders, failures to possess or maintain Permits or defaults under Permits.

Section 6.15    *Product Certification, Recall and Warranty Claims.*

(a)    From and after the Closing, Purchaser shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.

(b)    From and after the Closing, Purchaser shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser prior to or after the Closing and (ii) Lemon Laws.  In connection with the foregoing clause (ii), (A) Purchaser shall continue to address Lemon Law Claims using the same procedural mechanisms previously utilized by the applicable Sellers and (B) for avoidance of doubt, Purchaser shall not assume Liabilities arising under the law of implied warranty or other analogous provisions of state Law, other than Lemon Laws, that provide consumer remedies in addition to or different from those specified in Sellers' express warranties.

(c)    For the avoidance of doubt, Liabilities of the Transferred Entities arising from or in connection with products manufactured or sold by the Transferred Entities remain the responsibility of the Transferred Entities and shall be neither Assumed Liabilities nor Retained Liabilities for the purposes of this Agreement.

Section 6.16    *Tax Matters; Cooperation.*

(a)    Prior to the Closing Date, Sellers shall prepare and timely file (or cause to be prepared and timely filed) all Tax Returns required to be filed prior to such date (taking into account any extension of time to file granted or obtained) that relate to Sellers, the Purchased Subsidiaries and the Purchased Assets in a manner consistent with

past practices (except as otherwise required by Law), and shall provide Purchaser prompt opportunity for review and comment and shall obtain Purchaser's written approval prior to filing any such Tax Returns. After the Closing Date, at Purchaser's election, Purchaser shall prepare, and the applicable Seller, Seller Subsidiary or Seller Group member shall timely file, any Tax Return relating to any Seller, Seller Subsidiary or Seller Group member for any Pre-Closing Tax Period or Straddle Period due after the Closing Date or other taxable period of any entity that includes the Closing Date, subject to the right of the applicable Seller to review any such material Tax Return. Purchaser shall prepare and file all other Tax Returns required to be filed after the Closing Date in respect of the Purchased Assets. Sellers shall prepare and file all other Tax Returns relating to the Post-Closing Tax Period of Sellers, subject to the prior review and approval of Purchaser, which approval may be withheld, conditioned or delayed with good reason. No Seller or Seller Group member shall be entitled to any payment or other consideration in addition to the Purchase Price with respect to the acquisition or use of any Tax items or attributes by Purchaser, any Purchased Subsidiary or Affiliates thereof. At Purchaser's request, any Seller or Seller Group member shall designate Purchaser or any of its Affiliates as a substitute agent for the Seller Group for Tax purposes. Purchaser shall be entitled to make all determinations, including the right to make or cause to be made any elections with respect to Taxes and Tax Returns of Sellers, Seller Subsidiaries, Seller Groups and Seller Group members with respect to Pre-Closing Tax Periods and Straddle Periods and with respect to the Tax consequences of the Relevant Transactions (including the treatment of such transactions as an Agreed G Transaction) and the other transactions contemplated by this Agreement, including (i) the "date of distribution or transfer" for purposes of Section 381(b) of the Tax Code, if applicable; (ii) the relevant Tax periods and members of the Seller Group and the Purchaser and its Affiliates; (iii) whether the Purchaser and/or any of its Affiliates shall be treated as a continuation of Seller Group; and (iv) any other determinations required under Section 381 of the Tax Code. Purchaser shall have the sole right to represent the interests, as applicable, of any Seller, Seller Group member or Purchased Subsidiary in any Tax proceeding in connection with any Tax Liability or any Tax item for any Pre-Closing Tax Period, Straddle Period or other Tax period affecting any such earlier Tax period. After the Closing, Purchaser shall have the right to assume control of any PLR or CA request filed by Sellers or any Affiliate thereof, including the right to represent Sellers and their Affiliates and to direct all professionals acting on their behalf in connection with such request, and no settlement, concession, compromise, commitment or other agreements in respect of such PLR or CA request shall be made without Purchaser's prior written consent.

(b)     All Taxes required to be paid by any Seller or Seller Group member for any Pre-Closing Tax Period or any Straddle Period shall be timely paid. To the extent a Party hereto is liable for a Tax pursuant to this Agreement and such Tax is paid or payable by another Party or such other Party's Affiliates, the Party liable for such Tax shall make payment in the amount of such Tax to the other Party no later than three (3) days prior to the due date for payment of such Tax, unless a later time for payment is agreed to in writing by such other Party. To the extent that any Seller or Seller Group member receives or realizes the benefit of any Tax refund, abatement or credit that is a Purchased Asset, such Seller or Seller Group member receiving the benefit shall transfer

an amount equal to such refund, abatement or credit to Purchaser within fourteen (14) days of receipt or realization of the benefit.

(c)    Purchaser and Sellers shall provide each other with such assistance and non-privileged information relating to the Purchased Assets as may reasonably be requested in connection with any Tax matter, including the matters contemplated by this **Section 6.16**, the preparation of any Tax Return or the performance of any audit, examination or other proceeding by any Taxing Authority, whether conducted in a judicial or administrative forum.  Purchaser and Sellers shall retain and provide to each other all non-privileged records and other information reasonably requested by the other and that may be relevant to any such Tax Return, audit, examination or other proceeding.

(d)    After the Closing, at Purchaser's election, Purchaser shall exercise exclusive control over the handling, disposition and settlement of any inquiry, examination or proceeding (including an audit) by a Governmental Authority (or that portion of any inquiry, examination or proceeding by a Governmental Authority) with respect to Sellers, any Subsidiary of Sellers or any Seller Group, underlined provided that to the extent any such inquiry, examination or proceeding by a Governmental Authority could materially affect the Taxes due or payable by Sellers, Purchaser shall control the handling, disposition and settlement thereof, subject to reasonable consultation rights of Sellers.  Each Party shall notify the other Party (or Parties) in writing promptly upon learning of any such inquiry, examination or proceeding.  The Parties and their Affiliates shall cooperate with each other in any such inquiry, examination or proceeding as a Party may reasonably request.  Neither Parent nor any of its Affiliates shall extend, without Purchaser's prior written consent, the statute of limitations for any Tax for which Purchaser or any of its Affiliates may be liable.

(e)    Notwithstanding anything contained herein, Purchaser shall prepare and Sellers shall timely file all Tax Returns required to be filed in connection with the payment of Transfer Taxes.

(f)    From the date of this Agreement to and including the Closing Date, except to the extent relating solely to an Excluded Asset or Retained Liability, no Seller, Seller Group member or Purchased Subsidiary shall, without the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed, and shall not be withheld if not resulting in any Tax impact on Purchaser or any Purchased Asset), (i) make, change, or terminate any material election with respect to Taxes (including elections with respect to the use of Tax accounting methods) of any Seller, Seller Group member or Purchased Subsidiary or any material joint venture to which any Seller or Purchased Subsidiary is a party, (ii) settle or compromise any Claim or assessment for Taxes (including refunds) that could be reasonably expected to result in any adverse consequence on Purchaser or any Purchased Asset following the Closing Date, (iii) agree to an extension of the statute of limitations with respect to the assessment or collection of the Taxes of any Seller, Seller Group member or Purchased Subsidiary or any material joint venture of which any Seller or Purchased Subsidiary is a party or (iv) make or surrender any Claim for a refund of a material amount of the Taxes of any of

Sellers or Purchased Subsidiaries or file an amended Tax Return with respect to a material amount of Taxes.

(g)

(i) Purchaser shall treat the transactions with respect to Parent described herein, in combination with the subsequent liquidation of Sellers (such transactions, collectively, the "Relevant Transactions"), as a reorganization pursuant to 368(a)(1)(G) of the Tax Code with any actual or deemed distribution by Parent qualifying solely under Sections 354 and 356 of the Tax Code but not under Section 355 of the Tax Code (a "G Transaction") if (x) the IRS issues a private letter ruling ("PLR") or executes a closing agreement ("CA"), in each case reasonably acceptable to Purchaser, confirming that the Relevant Transactions shall qualify as a G Transaction for U.S. federal income Tax purposes, or (y) Purchaser determines to treat the Relevant Transactions as so qualifying (clause (x) or (y), an "Agreed G Transaction"). In connection with the foregoing, Sellers shall use their reasonable best efforts to obtain a PLR or execute a CA with respect to the Relevant Transactions at least seven (7) days prior to the Closing Date. At least three (3) days prior to the Closing Date, Purchaser shall advise Parent in writing as to whether Purchaser has made a determination regarding the treatment of the Relevant Transactions for U.S. federal income Tax purposes and, if applicable, the outcome of any such determination.

(ii) On or prior to the Closing Date, Sellers shall deliver to Purchaser all information in the possession of Sellers and their Affiliates that is reasonably related to the determination of whether the Relevant Transactions constitute an Agreed G Transaction ("Relevant Information"), and, after the Closing, Sellers shall promptly provide to Purchaser any newly produced or obtained Relevant Information. For the avoidance of doubt, the Parties shall cooperate in taking any actions and providing any information that Purchaser determines is necessary or appropriate in furtherance of the intended U.S. federal income Tax treatment of the Relevant Transactions and the other transactions contemplated by this Agreement.

(iii) If Purchaser has not determined as of the Closing Date whether to treat the Relevant Transactions as an Agreed G Transaction, Purchaser shall make such determination in accordance with this **Section 6.16** prior to the due date (including validly obtained extensions) for filing the corporate income Tax Return for Parent's U.S. affiliated group (as defined in Section 1504 of the Tax Code) for the taxable year in which the Closing Date occurs, and shall convey such decision in writing to Parent, which decision shall be binding on Parent.

(iv) If the Relevant Transactions constitute an Agreed G Transaction under this **Section 6.16**: (A) Sellers shall use their reasonable best efforts, and Purchaser shall use reasonable best efforts to assist Sellers, to effectuate such treatment and the Parties shall not take any action or position inconsistent with, or

fail to take any necessary action in furtherance of, such treatment (subject to **Section 6.16(g)(vi)**); (B) the Parties agree that this Agreement shall constitute a "plan" of Parent and Purchaser for purposes of Sections 368 and 354 of the Tax Code; (C) the board of directors of Parent and Purchaser shall, by resolution, approve the execution of this Agreement and expressly recognize its treatment as a "plan" of Parent and Purchaser for purposes of Sections 368 and 354 of the Tax Code, and the treatment of the Relevant Transactions as a G Transaction for federal income Tax purposes; (D) Sellers shall provide Purchaser with a statement setting forth the adjusted Tax basis of the Purchased Assets and the amount of net operating losses and other material Tax attributes of Sellers and any Purchased Subsidiary that are available as of the Closing Date and after the close of any taxable year of any Seller or Seller Group member that impacts the numbers previously provided, all based on the best information available, but with no Liability for any errors or omissions in information; and (E) Sellers shall provide Purchaser with an estimate of the cancellation of Indebtedness income that Sellers and any Seller Group member anticipate realizing for the taxable year that includes the Closing Date, and shall provide revised numbers after the close of any taxable year of any Seller or Seller Group member that impacts this number.

(v)    If the Relevant Transactions do not constitute an Agreed G Transaction under this **Section 6.16**, the Parties hereby agree, and Sellers hereby consent, to treat the sale of the Purchased Assets by Parent as a taxable asset sale for all Tax purposes, to make any elections pursuant to Section 338 of the Tax Code requested by Purchaser, and to report consistently herewith for purposes of **Section 3.3**. In addition, the Parties hereby agree, and Sellers hereby consent, to treat the sales of the Purchased Assets by S Distribution and Harlem as taxable asset sales for all Tax purposes, to make any elections pursuant to Section 338 of the Tax Code requested by Purchaser, and to report consistently herewith for purposes of **Section 3.3**.

(vi)    No Party shall take any position with respect to the Relevant Transactions that is inconsistent with the position determined in accordance with this **Section 6.16**, unless, and then only to the extent, otherwise required to do so by a Final Determination.

(vii)    Each Seller shall liquidate, as determined for U.S. federal income Tax purposes and to the satisfaction of Purchaser, no later than December 31, 2011, and each such liquidation may include a distribution of assets to a "liquidating trust" within the meaning of Treas. Reg. § 301.7701-4, the terms of which shall be satisfactory to Purchaser.

(viii)    Effective no later than the Closing Date, Purchaser shall be treated as a corporation for federal income Tax purposes.

Section 6.17    *Employees; Benefit Plans; Labor Matters.*

(a)        *Transferred Employees.*  Effective as of the Closing Date, Purchaser or
one of its Affiliates shall make an offer of employment to each Applicable Employee.
Notwithstanding anything herein to the contrary and except as provided in an individual
employment Contract with any Applicable Employee or as required by the terms of an
Assumed Plan, offers of employment to Applicable Employees whose employment rights
are subject to the UAW Collective Bargaining Agreement as of the Closing Date, shall be
made in accordance with the applicable terms and conditions of the UAW Collective
Bargaining Agreement and Purchaser's obligations under the Labor Management
Relations Act of 1974, as amended.  Each offer of employment to an Applicable
Employee who is not covered by the UAW Collective Bargaining Agreement shall
provide, until at least the first anniversary of the Closing Date, for (i) base salary or
hourly wage rates initially at least equal to such Applicable Employee's base salary or
hourly wage rate in effect as of immediately prior to the Closing Date and (ii) employee
pension and welfare benefits, Contracts and arrangements that are not less favorable in
the aggregate than those listed on Section 4.10 of the Sellers' Disclosure Schedule, but
not including any Retained Plan, equity or equity-based compensation plans or any
Benefit Plan that does not comply in all respects with TARP.  For the avoidance of doubt,
each Applicable Employee on layoff status, leave status or with recall rights as of the
Closing Date, shall continue in such status and/or retain such rights after Closing in the
Ordinary Course of Business.  Each Applicable Employee who accepts employment with
Purchaser or one of its Affiliates and commences working for Purchaser or one of its
Affiliates shall become a "Transferred Employee."   To the extent such offer of
employment by Purchaser or its Affiliates is not accepted, Sellers shall, as soon as
practicable following the Closing Date, terminate the employment of all such Applicable
Employees.  Nothing in this **Section 6.17(a)** shall prohibit Purchaser or any of its
Affiliates from terminating the employment of any Transferred Employee after the
Closing Date, subject to the terms and conditions of the UAW Collective Bargaining
Agreement.  It is understood that the intent of this **Section 6.17(a)** is to provide a
seamless transition from Sellers to Purchaser of any Applicable Employee subject to the
UAW Collective Bargaining Agreement.  Except for Applicable Employees with non-
standard individual agreements providing for severance benefits, until at least the first
anniversary of the Closing Date, Purchaser further agrees and acknowledges that it shall
provide to each Transferred Employee who is not covered by the UAW Collective
Bargaining Agreement and whose employment is involuntarily terminated by Purchaser
or its Affiliates on or prior to the first anniversary of the Closing Date, severance benefits
that are not less favorable than the severance benefits such Transferred Employee would
have received under the applicable Benefit Plans listed on Section 4.10 of the Sellers'
Disclosure Schedule.  Purchaser or one of its Affiliates shall take all actions necessary
such that Transferred Employees shall be credited for their actual and credited service
with Sellers and each of their respective Affiliates, for purposes of eligibility, vesting and
benefit accrual (except in the case of a defined benefit pension plan sponsored by
Purchaser or any of its Affiliates in which Transferred Employees may commence
participation after the Closing that is not an Assumed Plan), in any employee benefit
plans (excluding equity compensation plans or programs) covering Transferred
Employees after the Closing to the same extent as such Transferred Employee was

entitled as of immediately prior to the Closing Date to credit for such service under any similar employee benefit plans, programs or arrangements of any of Sellers or any Affiliate of Sellers; provided, however, that such crediting of service shall not operate to duplicate any benefit to any such Transferred Employee or the funding for any such benefit. Such benefits shall not be subject to any exclusion for any pre-existing conditions to the extent such conditions were satisfied by such Transferred Employees under a Parent Employee Benefit Plan as of the Closing Date, and credit shall be provided for any deductible or out-of-pocket amounts paid by such Transferred Employee during the plan year in which the Closing Date occurs.

(b)    *Employees of Purchased Subsidiaries.*   As of the Closing Date, those employees of Purchased Subsidiaries who participate in the Assumed Plans, may, subject to the applicable Collective Bargaining Agreement, for all purposes continue to participate in such Assumed Plans, in accordance with their terms in effect from time to time.  For the avoidance of any doubt, Purchaser shall continue the employment of any current Employee of any Purchased Subsidiary covered by the UAW Collective Bargaining Agreement on the terms and conditions of the UAW Collective Bargaining Agreement in effect immediately prior to the Closing Date, subject to its terms; provided, however, that nothing in this Agreement shall be construed to terminate the coverage of any UAW-represented Employee in an Assumed Plan if such Employee was a participant in the Assumed Plan immediately prior to the Closing Date. Further provided, that nothing in this Agreement shall create a direct employment relationship between Parent or Purchaser and an Employee of a Purchased Subsidiary or an Affiliate of Parent.

(c)    *No Third Party Beneficiaries.* Nothing contained herein, express or implied, (i) is intended to confer or shall confer upon any Employee or Transferred Employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment, (ii) except as set forth in **Section 9.11**, is intended to confer or shall confer upon any individual or any legal Representative of any individual (including employees, retirees, or dependents or beneficiaries of employees or retirees and including collective bargaining agents or representatives) any right as a third-party beneficiary of this Agreement or (iii) shall be deemed to confer upon any such individual or legal Representative any rights under or with respect to any plan, program or arrangement described in or contemplated by this Agreement, and each such individual or legal Representative shall be entitled to look only to the express terms of any such plans, program or arrangement for his or her rights thereunder. Nothing herein is intended to override the terms and conditions of the UAW Collective Bargaining Agreement.

(d)    *Plan Authority.*   Nothing contained herein, express or implied, shall prohibit Purchaser or its Affiliates, as applicable, from, subject to applicable Law and the terms of the UAW Collective Bargaining Agreement, adding, deleting or changing providers of benefits, changing, increasing or decreasing co-payments, deductibles or other requirements for coverage or benefits (e.g., utilization review or pre-certification requirements), and/or making other changes in the administration or in the design, coverage and benefits provided to such Transferred Employees.  Without reducing the obligations of Purchaser as set forth in **Section 6.17(a)**, no provision of this Agreement

shall be construed as a limitation on the right of Purchaser or its Affiliates, as applicable, to suspend, amend, modify or terminate any employee benefit plan, subject to the terms of the UAW Collective Bargaining Agreement.  Further, (i) no provision of this Agreement shall be construed as an amendment to any employee benefit plan, and (ii) no provision of this Agreement shall be construed as limiting Purchaser's or its Affiliate's, as applicable, discretion and authority to interpret the respective employee benefit and compensation plans, agreements arrangements, and programs, in accordance with their terms and applicable Law.

(e)    *Assumption of Certain Parent Employee Benefit Plans and Policies.*  As of the Closing Date, Purchaser or one of its Affiliates shall assume (i) the Parent Employee Benefit Plans and Policies set forth on Section 6.17(e) of the Sellers' Disclosure Schedule as modified thereon, and all assets, trusts, insurance policies and other Contracts relating thereto, except for any that do not comply in all respects with TARP or as otherwise provided in **Section 6.17(h)** and (ii) all employee benefit plans, programs, policies, agreements or arrangements (whether written or oral) in which Employees who are covered by the UAW Collective Bargaining Agreement participate and all assets, trusts, insurance and other Contracts relating thereto (the "Assumed Plans"), for the benefit of the Transferred Employees and Sellers and Purchaser shall cooperate with each other to take all actions and execute and deliver all documents and furnish all notices necessary to establish Purchaser or one of its Affiliates as the sponsor of such Assumed Plans including all assets, trusts, insurance policies and other Contracts relating thereto. Other than with respect to any Employee who was or is covered by the UAW Collective Bargaining Agreement, Purchaser shall have no Liability with respect to any modifications or changes to Benefit Plans contemplated by Section 6.17(e) of the Sellers' Disclosure Schedule, or changes made by Parent prior to the Closing Date, and Purchaser shall not assume any Liability with respect to any such decisions or actions related thereto, and Purchaser shall only assume the Liabilities for benefits provided pursuant to the written terms and conditions of the Assumed Plan as of the Closing Date. Notwithstanding the foregoing, the assumption of the Assumed Plans is subject to Purchaser taking all necessary action, including reduction of benefits, to ensure that the Assumed Plans comply in all respects with TARP.  Notwithstanding the foregoing, but subject to the terms of any Collective Bargaining Agreement to which Purchaser or one of its Affiliates is a party, Purchaser and its Affiliates may, in its sole discretion, amend, suspend or terminate any such Assumed Plan at any time in accordance with its terms.

(f)    *UAW Collective Bargaining Agreement.*  Parent shall assume and assign to Purchaser, as of the Closing, the UAW Collective Bargaining Agreement and all rights and Liabilities of Parent relating thereto (including Liabilities for wages, benefits and other compensation, unfair labor practices, grievances, arbitrations and contractual obligations).  With respect to the UAW Collective Bargaining Agreement, Purchaser agrees to (i) recognize the UAW as the exclusive collective bargaining representative for the Transferred Employees covered by the terms of the UAW Collective Bargaining Agreement, (ii) offer employment to all Applicable Employees covered by the UAW Collective Bargaining Agreement with full recognition of all seniority rights, (iii) negotiate with the UAW over the terms of any successor collective bargaining agreement upon the expiration of the UAW Collective Bargaining Agreement and upon timely

demand by the UAW, (iv) with the agreement of the UAW or otherwise as provided by Law and to the extent necessary, adopt or assume or replace, effective as of the Closing Date, employee benefit plans, policies, programs, agreements and arrangements specified in or covered by the UAW Collective Bargaining Agreement as required to be provided to the Transferred Employees covered by the UAW Collective Bargaining Agreement, and (v) otherwise abide by all terms and conditions of the UAW Collective Bargaining Agreement. For the avoidance of doubt, the provisions of this **Section 6.17(f)** are not intended to (A) give, and shall not be construed as giving, the UAW or any Transferred Employee any enhanced or additional rights or (B) otherwise restrict the rights that Purchaser and its Affiliates have, under the terms of the UAW Collective Bargaining Agreement.

(g) *UAW Retiree Settlement Agreement.* Prior to the Closing, Purchaser and the UAW shall have entered into the UAW Retiree Settlement Agreement.

(h) *Assumption of Existing Internal VEBA.* Purchaser or one of its Affiliates shall, effective as of the Closing Date, assume from Sellers the sponsorship of the voluntary employees' beneficiary association trust between Sellers and State Street Bank and Trust Company dated as of December 17, 1997, that is funded and maintained by Sellers ("Existing Internal VEBA") and, in connection therewith, Purchaser shall, or shall cause one of its Affiliates to, (i) succeed to all of the rights, title and interest (including the rights of Sellers, if any) as plan sponsor, plan administrator or employer) under the Existing Internal VEBA, (ii) assume any responsibility or Liability relating to the Existing Internal VEBA and each Contract established thereunder or relating thereto, and (iii) to operate the Existing Internal VEBA in accordance with, and to otherwise comply with the Purchaser's obligations under, the New UAW Retiree Settlement Agreement between Purchaser and the UAW, effective as of the Closing and subject to approval by a court having jurisdiction over this matter, including the obligation to direct the trustee of the Existing Internal VEBA to transfer the UAW's share of assets in the Existing Internal VEBA to the New VEBA. The Parties shall cooperate in the execution of any documents, the adoption of any corporate resolutions or the taking of any other reasonable actions to effectuate such succession of the settlor rights, title, and interest with respect to the Existing Internal VEBA. For avoidance of doubt, Purchaser shall not assume any Liabilities relating to the Existing Internal VEBA except with respect to such Contracts set forth in Section 6.17(h) of the Sellers' Disclosure Schedule.

(i) *Wage and Tax Reporting.* Sellers and Purchaser agree to apply, and cause their Affiliates to apply, the standard procedure for successor employers set forth in Revenue Procedure 2004-53 for wage and employment Tax reporting.

(j) *Non-solicitation.* Sellers shall not, for a period of two (2) years from the Closing Date, without Purchaser's written consent, solicit, offer employment to or hire any Transferred Employee.

(k) *Cooperation.* Purchaser and Sellers shall provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this **Section 6.17**; provided, that all

records, information systems data bases, computer programs, data rooms and data related to any Assumed Plan or Liabilities of such, assumed by Purchaser, shall be transferred to Purchaser.

(l)     *Union Notifications.*     Purchaser and Sellers shall reasonably cooperate with each other in connection with any notification required by Law to, or any required consultation with, or the provision of documents and information to, the employees, employee representatives, the UAW and relevant Governmental Authorities and governmental officials concerning the transactions contemplated by this Agreement, including any notice to any of Sellers' retired Employees represented by the UAW, describing the transactions contemplated herein.

(m)     *Union-Represented Employees (Non-UAW).*

(i)     Effective as of the Closing Date, Purchaser or one of its Affiliates shall assume the collective bargaining agreements, as amended, set forth on Section 6.17(m)(i) of the Sellers' Disclosure Schedule (collectively, the "Non-UAW Collective Bargaining Agreements") and make offers of employment to each current employee of Parent who is covered by them in accordance with the applicable terms and conditions of such Non-UAW Collective Bargaining Agreements, such assumption and offers conditioned upon (A) the non-UAW represented employees' ratification of the amendments thereto (including termination of the application of the Supplemental Agreements Covering Health Care Program to retirees and the reduction to retiree life insurance coverage) and (B) Bankruptcy Court approval of Settlement Agreements between Purchaser and such Unions and Proposed Memorandum of Understanding Regarding Retiree Health Care and Life Insurance between Sellers and such Unions, as identified on Section 6.17(m)(ii) of the Sellers' Disclosure Schedule and satisfaction of all conditions stated therein.  Each such non-UAW hourly employee on layoff status, leave status or with recall rights as of the Closing Date shall continue in such status and/or retain such rights after the Closing in the Ordinary Course of Business, subject to the terms of the applicable Non-UAW Collective Bargaining Agreement.   Other than as set forth in this **Section 6.17(m)**, no non-UAW collective bargaining agreement shall be assumed by Purchaser.

(ii)     Section 6.17(m)(ii) of the Sellers' Disclosure Schedule sets forth agreements relating to post-retirement health care and life insurance coverage for non-UAW retired employees (the "Non-UAW Settlement Agreements"), including those agreements covering retirees who once belonged to Unions that no longer have any active employees at Sellers.  Conditioned on both the approval of the Bankruptcy Court and the non-UAW represented employees' ratification of the amendments to the applicable Non-UAW Collective Bargaining Agreement providing for such coverage as described in **Section 6.17(m)(i)** above, Purchaser or one of its Affiliates shall assume and enter into the agreements identified on Section 6.17(m)(ii) of the Sellers' Disclosure Schedule.  Except as set forth in those agreements identified on Section 6.17(m)(i) and Section 6.17(m)(ii) of the Sellers' Disclosure Schedule,  Purchaser shall not assume any Liability to provide

post-retirement health care or life insurance coverage for current or future hourly non-UAW retirees.

(iii)        Other than as expressly set forth in this **Section 6.17(m)**, Purchaser assumes no Employment-Related Obligations for non-UAW hourly Employees. For the avoidance of doubt, (A) the provisions of **Section 6.17(f)** shall not apply to this **Section 6.17(m)** and (B) the provisions of this **Section 6.17(m)** are not intended to (y) give, and shall not be construed as giving, any non-UAW Union or the covered employee or retiree of any Non-UAW Collective Bargaining Agreement any enhanced or additional rights or (z) otherwise restrict the rights that Purchaser and its Affiliates have under the terms of the Non-UAW Collective Bargaining Agreements identified on Section 6.17(m)(i) of the Sellers' Disclosure Schedule.

*Section 6.18    TARP.*  From and after the date hereof and until such time as all amounts under the UST Credit Facilities have been paid in full, forgiven or otherwise extinguished or such longer period as may be required by Law, subject to any applicable Order of the Bankruptcy Court, each of Sellers and Purchaser shall, and shall cause each of their respective Subsidiaries to, take all necessary action to ensure that it complies in all material respects with TARP or any enhanced restrictions on executive compensation agreed to by Sellers and Sponsor prior to the Closing.

*Section 6.19    Guarantees; Letters of Credit.*  Purchaser shall use its reasonable best efforts to cause Purchaser or one or more of its Subsidiaries to be substituted in all respects for each Seller and Excluded Entity, effective as of the Closing Date, in respect of all Liabilities of each Seller and Excluded Entity under each of the guarantees, letters of credit, letters of comfort, bid bonds and performance bonds (a) obtained by any Seller or Excluded Entity for the benefit of the business of Sellers and their Subsidiaries and (b) which is assumed by Purchaser as an Assumed Liability.  As a result of such substitution, each Seller and Excluded Entity shall be released of its obligations of, and shall have no Liability following the Closing from, or in connection with any such guarantees, letters of credit, letters of comfort, bid bonds and performance bonds.

*Section 6.20    Customs Duties.*  Purchaser shall reimburse Sellers for all customs-related duties, fees and associated costs incurred by Sellers on behalf of Purchaser with respect to periods following the Closing, including all such duties, fees and costs incurred in connection with co-loaded containers that clear customs intentionally or unintentionally under any Seller's importer or exporter identification numbers and bonds or guarantees with respect to periods following the Closing.

*Section 6.21    Termination of Intellectual Property Rights.*  Each Seller agrees that any rights of any Seller, including any rights arising under Contracts, if any, to any and all of the Intellectual Property transferred to Purchaser pursuant to this Agreement (including indirect transfers resulting from the transfer of the Transferred Equity Interests and including transfers resulting from this **Section 6.21**), whether owned or licensed, shall terminate as of the Closing. Before and after the Closing, each Seller agrees to use its reasonable best efforts to cause the Retained Subsidiaries to do the following, but only to the extent that such Seller can do so

without incurring any Liabilities to such Retained Subsidiaries or their equity owners or creditors as a result thereof: (a) enter into a written Contract with Purchaser that expressly terminates any rights of such Retained Subsidiaries, including any rights arising under Contracts, if any, to any and all of the Intellectual Property transferred to Purchaser pursuant to this Agreement (including indirect transfers resulting from the transfer of the Transferred Equity Interests), whether owned or licensed; and (b) assign to Purchaser or its designee(s): (i) all domestic and foreign trademarks, service marks, collective marks, certification marks, trade dress, trade names, business names, d/b/a's, Internet domain names, designs, logos and other source or business identifiers and all general intangibles of like nature, now or hereafter owned, adopted, used, acquired, or licensed by any Seller, all applications, registrations and recordings thereof (including applications, registrations and recordings in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof), and all reissues, extensions or renewals thereof, together with all goodwill of the business symbolized by or associated with such marks, in each case, that are owned by such Retained Subsidiaries and that contain or are confusingly similar with (whether in whole or in part) any of the Trademarks; and (ii) all other intellectual property owned by such Retained Subsidiaries.  Nothing in this **Section 6.21** shall preserve any rights of Sellers or the Retained Subsidiaries, or any third parties, that are otherwise terminated or extinguished pursuant to this Agreement or applicable Law, and nothing in this **Section 6.21** shall create any rights of Sellers or the Retained Subsidiaries, or any third parties, that do not already exist as of the date hereof.  Notwithstanding anything to the contrary in this **Section 6.21**, Sellers may enter into (and may cause or permit any of the Purchased Subsidiaries to enter into) any of the transactions contemplated by Section 6.2 of the Sellers' Disclosure Schedule.

*Section 6.22    Trademarks.*

(a)    At or before the Closing (i) Parent shall take any and all actions that are reasonably necessary to change the corporate name of Parent to a new name that bears no resemblance to Parent's present corporate name and that does not contain, and is not confusingly similar with, any of the Trademarks; and (ii) to the extent that the corporate name of any Seller (other than Parent) or any Retained Subsidiary resembles Parent's present corporate name or contains or is confusingly similar with any of the Trademarks, Sellers (including Parent) shall take any and all actions that are reasonably necessary to change such corporate names to new names that bear no resemblance to Parent's present corporate name, and that do not contain and are not confusingly similar with any of the Trademarks.

(b)    As promptly as practicable following the Closing, but in no event later than ninety (90) days after the Closing (except as set forth in this **Section 6.22(b)**), Sellers shall cease, and shall cause the Retained Subsidiaries to cease, using the Trademarks in any form, whether by removing, permanently obliterating, covering, or otherwise eliminating all Trademarks that appear on any of their assets, including all signs, promotional or advertising literature, labels, stationery, business cards, office forms and packaging materials.  During such time period, Sellers and the Retained Subsidiaries may continue to use Trademarks in a manner consistent with their usage of the Trademarks as of immediately prior to the Closing, but only to the extent reasonably necessary for them to continue their operations as contemplated by the Parties as of the

Closing.  If requested by Purchaser within a reasonable time after the Closing, Sellers and
Retained Subsidiaries shall enter into a written agreement that specifies quality control of
such Trademarks and their underlying goods and services.  For signs and the like that
exist as of the Closing on the Excluded Real Property, if it is not reasonably practicable
for Sellers or the Retained Subsidiaries to remove, permanently obliterate, cover or
otherwise eliminate the Trademarks from such signs and the like within the time period
specified above, then Sellers and the Retained Subsidiaries shall do so as soon as
practicable following such time period, but in no event later than one-hundred eighty
(180) days following the Closing.

      (c)     From and after the date of this Agreement and, until the earlier of the
Closing or termination of this Agreement, each Seller shall use its reasonable best efforts
to protect and maintain the Intellectual Property owned by Sellers that is material to the
conduct of its business in a manner that is consistent with the value of such Intellectual
Property.

      (d)     At or prior to the Closing, Sellers shall provide a true, correct and
complete list setting forth all worldwide patents, patent applications, trademark
registrations and applications and copyright registrations and applications included in the
Intellectual Property owned by Sellers.

      *Section 6.23    Preservation of Records.*  The Parties shall preserve and keep all
books and records that they own immediately after the Closing relating to the Purchased Assets,
the Assumed Liabilities and Sellers' operation of the business related thereto prior to the Closing
for a period of six (6) years following the Closing Date or for such longer period as may be
required by applicable Law, unless disposed of in good faith pursuant to a document retention
policy.  During such retention period, duly authorized Representatives of a Party shall, upon
reasonable notice, have reasonable access during normal business hours to examine, inspect and
copy such books and records held by the other Parties for any proper purpose, except as may be
prohibited by Law or by the terms of any Contract (including any confidentiality agreement);
<u>provided</u> to the extent that disclosing any such information would reasonably be expected to
constitute a waiver of attorney-client, work product or other legal privilege with respect thereto,
the Parties shall take all reasonable best efforts to permit such disclosure without the waiver of
any such privilege, including entering into an appropriate joint defense agreement in connection
with affording access to such information.  The access provided pursuant to this **Section 6.23**
shall be subject to such additional confidentiality provisions as the disclosing Party may
reasonably deem necessary.

      *Section 6.24    Confidentiality.*  During the Confidentiality Period, Sellers and
their Affiliates shall treat all trade secrets and all other proprietary, legally privileged or sensitive
information related to the Transferred Entities, the Purchased Assets and/or the Assumed
Liabilities (collectively, the "<u>Confidential Information</u>"), whether furnished before or after the
Closing, whether documentary, electronic or oral, labeled or otherwise identified as confidential,
and regardless of the form of communication or the manner in which it is or was furnished, as
confidential, preserve the confidentiality thereof, not use or disclose to any Person such
Confidential Information and instruct their Representatives who have had access to such
information to keep confidential such Confidential Information.  The "<u>Confidentiality Period</u>"

shall be a period commencing on the date of the Original Agreement and (a) with respect to a trade secret, continuing for as long as it remains a trade secret and (b) for all other Confidential Information, ending four (4) years from the Closing Date. Confidential Information shall be deemed not to include any information that (i) is now available to or is hereafter disclosed in a manner making it available to the general public, in each case, through no act or omission of Sellers, any of their Affiliates or any of their Representatives, or (ii) is required by Law to be disclosed, including any applicable requirements of the SEC or any other Governmental Authority responsible for securities Law regulation and compliance or any stock market or stock exchange on which any Seller's securities are listed.

Section 6.25   *Privacy Policies.*   At or prior to the Closing, Purchaser shall, or shall cause its Subsidiaries to, establish Privacy Policies that are substantially similar to the Privacy Policies of Parent and the Purchased Subsidiaries as of immediately prior to the Closing, and Purchaser or its Affiliates, as applicable, shall honor all "opt-out" requests or preferences made by individuals in accordance with the Privacy Policies of Parent and the Purchased Subsidiaries and applicable Law; provided that such Privacy Policies and any related "opt-out" requests or preferences are delivered or otherwise made available to Purchaser prior to the Closing, to the extent not publicly available.

Section 6.26   *Supplements to Sellers' Disclosure Schedule.*   At any time and from time to time prior to the Closing, Sellers shall have the right to supplement, modify or update Section 4.1 through Section 4.22 of the Sellers' Disclosure Schedule (a) to reflect changes and developments that have arisen after the date of the Original Agreement and that, if they existed prior to the date of the Original Agreement, would have been required to be set forth on such Sellers' Disclosure Schedule or (b) as may be necessary to correct any disclosures contained in such Sellers' Disclosure Schedule or in any representation and warranty of Sellers that has been rendered inaccurate by such changes or developments. No supplement, modification or amendment to Section 4.1 through Section 4.22 of the Sellers' Disclosure Schedule shall without the prior written consent of Purchaser, (i) cure any inaccuracy of any representation and warranty made in this Agreement by Sellers or (ii) give rise to Purchaser's right to terminate this Agreement unless and until this Agreement shall be terminable by Purchaser in accordance with **Section 8.1(f)**.

Section 6.27   *Real Property Matters.*

(a)      Sellers and Purchaser acknowledge that certain real properties (the "Subdivision Properties") may need to be subdivided or otherwise legally partitioned in accordance with applicable Law (a "Required Subdivision") so as to permit the affected Owned Real Property to be conveyed to Purchaser separate and apart from adjacent Excluded Real Property. Section 6.27 of the Sellers' Disclosure Schedule contains a list of the Subdivision Properties that was determined based on the current list of Excluded Real Property. Section 6.27 of the Sellers' Disclosure Schedule may be updated at any time prior to the Closing to either (i) add additional Subdivision Properties or (ii) remove any Subdivision Properties, which have been determined to not require a Required Subdivision or for which a Required Subdivision has been obtained. Purchaser shall pay for all costs incurred to complete all Required Subdivisions. Sellers shall cooperate in good faith with Purchaser in connection with the completion with all Required

Subdivisions, including executing all required applications or other similar documents with Governmental Authorities.  To the extent that any Required Subdivision for a Subdivision Property is not completed prior to Closing, then at Closing, Sellers shall lease to Purchaser only that portion of such Subdivision Property that constitutes Owned Real Property pursuant to the Master Lease Agreement (Subdivision Properties) substantially in the form attached hereto as **Exhibit L** (the "Subdivision Master Lease"). Upon completion of a Required Subdivision affecting an Owned Real Property that is subject to the Subdivision Master Lease, the Subdivision Master Lease shall be terminated as to such Owned Real Property and such Owned Real Property shall be conveyed to Purchaser by Quitclaim Deed for One Dollar ($1.00) in stated consideration.

(b)    Sellers and Purchaser acknowledge that the Saginaw Nodular Iron facility in Saginaw, Michigan (the "Saginaw Nodular Iron Land") contains a wastewater treatment facility (the "Existing Saginaw Wastewater Facility") and a landfill (the "Saginaw Landfill") that currently serve the Owned Real Property commonly known as the GMPT - Saginaw Metal Casting facility (the "Saginaw Metal Casting Land").  The Saginaw Nodular Iron Land has been designated as an Excluded Real Property under Section 2.2(b)(v) of the Sellers' Disclosure Schedule.  At the Closing (or within sixty (60) days after the Closing with respect to the Saginaw Landfill), Sellers shall enter into one or more service agreements with one or more third party contractors (collectively, the "Saginaw Service Contracts") to operate the Existing Saginaw Wastewater Facility and the Saginaw Landfill for the benefit of the Saginaw Metal Casting Land.  The terms and conditions of the Saginaw Service Contracts shall be mutually acceptable to Purchaser and Sellers; provided that the term of each Saginaw Service Contract shall not extend beyond December 31, 2012, and Purchaser shall have the right to terminate any Saginaw Service Contract upon prior written notice of not less than forty-five (45) days.  At any time during the term of the Saginaw Service Contracts, Purchaser may elect to purchase the Existing Saginaw Wastewater Facility, the Saginaw Landfill, or both, for One Dollar ($1.00) in stated consideration; provided that (i) Purchaser shall pay all costs and fees related to such purchase, including the costs of completing any Required Subdivision necessary to effectuate the terms of this **Section 6.27(b)**, (ii) Sellers shall convey title to the Existing Saginaw Wastewater Facility, the Saginaw Landfill and/or such other portion of the Saginaw Nodular Iron Land as is required by Purchaser to operate the Existing Saginaw Wastewater Facility and/or the Saginaw Landfill, including lagoons, but not any other portion of the Saginaw Nodular Iron Land, to Purchaser by quitclaim deed and (iii) Sellers shall grant Purchaser such easements for utilities over the portion of the Saginaw Nodular Iron Land retained by Sellers as may be required to operate the Existing Saginaw Wastewater Facility and/or the Saginaw Landfill.

(c)    Sellers and Purchaser acknowledge that access to certain Excluded Real Property owned by Sellers or other real properties owned by Excluded Entities and certain Owned Real Property that may hereafter be designated as Excluded Real Property on Section 2.2(b)(v) of the Sellers' Disclosure Schedule (a "Landlocked Parcel") is provided over land that is part of the Owned Real Property.  To the extent that direct access to a public right-of-way is not obtained for any Landlocked Parcel by the Closing, then at Closing,  Purchaser, in its sole election, shall for each such Landlocked Parcel either (i) grant an access easement over a mutually agreeable portion of the adjacent

Owned Real Property for the benefit of the Landlocked Parcel until such time as the Landlocked Parcel obtains direct access to the public right-of-way, pursuant to the terms of a mutually acceptable easement agreement, or (ii) convey to the owner of the affected Landlocked Parcel by quitclaim deed such portion of the adjacent Owned Real Property as is required to provide the Landlocked Parcel with direct access to a public right-of-way.

(d)     At and after Closing, Sellers and Purchasers shall cooperate in good faith to investigate and resolve all issues reasonably related to or arising in connection with Shared Executory Contracts that involve the provision of water, water treatment, electricity, fuel, gas, telephone and other utilities to both Owned Real Property and Excluded Real Property.

(e)     Parent shall use reasonable best efforts to cause the Willow Run Landlord to execute, within thirty (30) days after the Closing, or at such later date as may be mutually agreed upon, an amendment to the Willow Run Lease which extends the term of the Willow Run Lease until December 31, 2010 with three (3) one-month options to extend, all at the current rental rate under the Willow Run Lease (the "Willow Run Lease Amendment").  In the event that the Willow Run Lease Amendment is approved and executed by the Willow Run Landlord, then Purchaser shall designate the Willow Run Lease as an Assumable Executory Contract and Parent and Purchaser, or one of its designated Subsidiaries, shall enter into an assignment and assumption of the Willow Run Lease substantially in the form attached hereto as **Exhibit M** (the "Assignment and Assumption of Willow Run Lease").

*Section 6.28   Equity Incentive Plans.*   Within a reasonable period of time following the Closing, Purchaser, through its board of directors, will adopt equity incentive plans to be maintained by Purchaser for the benefit of officers, directors, and employees of Purchaser that will provide the opportunity for equity incentive benefits for such persons ("Equity Incentive Plans").

*Section 6.29   Purchase of Personal Property Subject to Executory Contracts.* With respect to any Personal Property subject to an Executory Contract that is nominally an unexpired lease of Personal Property, if (a) such Contract is recharacterized by a Final Order of the Bankruptcy Court as a secured financing or (b) Purchaser, Sellers and the counterparty to such Contract agree, then Purchaser shall have the option to purchase such personal property by paying to the applicable Seller for the benefit of the counterparty to such Contract an amount equal to the amount, as applicable (i) of such counterparty's allowed secured Claim arising in connection with the recharacterization of such Contract as determined by such Order or (ii) agreed to by Purchaser, Sellers and such counterparty.

*Section 6.30   Transfer of Riverfront Holdings, Inc. Equity Interests or Purchased Assets; Ren Cen Lease.*  Notwithstanding anything to the contrary set forth in this Agreement, in lieu of or in addition to the transfer of Sellers' Equity Interest in Riverfront Holdings, Inc., a Delaware corporation ("RHI"), Purchaser shall have the right at the Closing or at any time during the RHI Post-Closing Period, to require Sellers to cause RHI to transfer good and marketable title to, or a valid and enforceable right by Contract to use, all or any portion of the assets of RHI

to Purchaser.  Purchaser shall, at its option, have the right to cause Sellers to postpone the transfer of Sellers' Equity Interest in RHI and/or title to the assets of RHI to Purchaser up until the earlier of (i) January 31, 2010 and (ii) the Business Day immediately prior to the date of the confirmation hearing for Sellers' plan of liquidation or reorganization (the "RHI Post-Closing Period"); provided, however, that (a) Purchaser may cause Sellers to effectuate said transfers at any time and from time to time during the RHI-Post Closing Period upon at least five (5) Business Days' prior written notice to Sellers and (b) at the closing, RHI, as landlord, and Purchaser, or one of its designated Subsidiaries, as tenant, shall enter into a lease agreement substantially in the form attached hereto as **Exhibit N** (the "Ren Cen Lease") for the premises described therein.

Section 6.31    *Delphi Agreements.*  Notwithstanding anything to the contrary in this Agreement, including **Section 6.6**:

(a)    Subject to and simultaneously with the consummation of the transactions contemplated by the MDA or of an Acceptable Alternative Transaction (in each case, as defined in the Delphi Motion), (i) the Delphi Transaction Agreements shall, effective immediately upon and simultaneously with such consummation, (A) be deemed to be Assumable Executory Contracts and (B) be assumed and assigned to Purchaser and (ii) the Assumption Effective Date with respect thereto shall be deemed to be the date of such consummation.

(b)    The LSA Agreement shall, effective at the Closing, (i) be deemed to be an Assumable Executory Contract and (B) be assumed and assigned to Purchaser and (ii) the Assumption Effective Date with respect thereto shall be deemed to be the Closing Date. To the extent that any such agreement is not an Executory Contract, such agreement shall be deemed to be a Purchased Contract.

Section 6.32    *GM Strasbourg S.A. Restructuring.*  The Parties acknowledge and agree that General Motors International Holdings, Inc., a direct Subsidiary of Parent and the direct parent of GM Strasbourg S.A., may, prior to the Closing, dividend its Equity Interest in GM Strasbourg S.A. to Parent, such that following such dividend, GM Strasbourg S.A. will become a wholly-owned direct Subsidiary of Parent.  Notwithstanding anything to the contrary in this Agreement, the Parties further acknowledge and agree that following the consummation of such restructuring at any time prior to the Closing, GM Strasbourg S.A. shall automatically, without further action by the Parties, be designated as an Excluded Entity and deemed to be set forth on Section 2.2(b)(iv) of the Sellers' Disclosure Schedule.

Section 6.33    *Holding Company Reorganization.*  The Parties agree that Purchaser may, with the prior written consent of Sellers, reorganize prior to the Closing such that Purchaser may become a direct or indirect, wholly-owned Subsidiary of Holding Company on such terms and in such manner as is reasonably acceptable to Sellers, and Purchaser may assign all or a portion of its rights and obligations under this Agreement to Holding Company (or one or more newly formed, direct or indirect, wholly-owned Subsidiaries of Holding Company) in accordance with **Section 9.5**.  In connection with any restructuring effected pursuant to this **Section 6.33**, the Parties further agree that, notwithstanding anything to the contrary in this Agreement (a) Parent shall receive securities of Holding Company with the same rights and

privileges, and in the same proportions, as the Parent Shares and the Parent Warrants, in each case, in lieu of the Parent Shares and Parent Warrants, as Purchase Price hereunder, (b) Canada, New VEBA and Sponsor shall receive securities of Holding Company with the same rights and privileges, and in the same proportions, as the Canada Shares, VEBA Shares, VEBA Warrant and Sponsor Shares, as applicable, in each case, in connection with the Closing and (c) New VEBA shall receive the VEBA Note issued by the same entity that becomes the obligor on the Purchaser Assumed Debt.

Section 6.34  *Transfer of Promark Global Advisors Limited and Promark Investment Trustees Limited Equity Interests.*  Notwithstanding anything to the contrary set forth in this Agreement, in the event approval by the Financial Services Authority (the "FSA Approval") of the transfer of Sellers' Equity Interests in Promark Global Advisors Limited and Promark Investments Trustees Limited (together, the "Promark UK Subsidiaries") has not been obtained as of the Closing Date, Sellers shall, at their option, have the right to postpone the transfer of Sellers' Equity Interests in the Promark UK Subsidiaries until such time as the FSA Approval is obtained.  If the transfer of Sellers' Equity Interests in the Promark UK Subsidiaries is postponed pursuant to this **Section 6.34**, then (a) Sellers and Purchaser shall effectuate the transfer of Sellers' Equity Interests in the Promark UK Subsidiaries no later than five (5) Business Days following the date that the FSA Approval is obtained and (b) Sellers shall enter into a transitional services agreement with Promark Global Advisors, Inc. in the form provided by Promark Global Advisors, Inc., which shall include terms and provisions regarding:  (i) certain transitional services to be provided by Promark Global Advisors, Inc. to the Promark UK Subsidiaries, (ii) the continued availability of director and officer liability insurance for directors and officers of the Promark UK Subsidiaries and (iii) certain actions on the part of the Promark UK Subsidiaries to require the prior written consent of Promark Global Advisors, Inc., including changes to employee benefits or compensation, declaration of dividends, material financial transactions, disposition of material assets, entry into material agreements, changes to existing business plans, changes in management and the boards of directors of the Promark UK Subsidiaries and other similar actions.

Section 6.35  *Transfer of Equity Interests in Certain Subsidiaries.*  Notwithstanding anything to the contrary set forth in this Agreement, the Parties may mutually agree to postpone the transfer of Sellers' Equity Interests in those Transferred Entities as are mutually agreed upon by the Parties ("Delayed Closing Entities") to a date following the Closing.

# ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.1  *Conditions to Obligations of Purchaser and Sellers.*  The respective obligations of Purchaser and Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment or written waiver (to the extent permitted by applicable Law), prior to or at the Closing, of each of the following conditions:

(a)  The Bankruptcy Court shall have entered the Sale Approval Order and the Sale Procedures Order on terms acceptable to the Parties and reasonably acceptable to the UAW, and each shall be a Final Order and shall not have been vacated, stayed or

reversed; provided, however, that the conditions contained in this **Section 7.1(a)** shall be satisfied notwithstanding the pendency of an appeal if the effectiveness of the Sale Approval Order has not been stayed.

(b)     No Order or Law of a United States Governmental Authority shall be in effect that declares this Agreement invalid or unenforceable or that restrains, enjoins or otherwise prohibits the consummation of the transactions contemplated by this Agreement.

(c)     Sponsor shall have delivered, or caused to be delivered to Sellers and Purchaser an equity registration rights agreement, substantially in the form attached hereto as **Exhibit O** (the "Equity Registration Rights Agreement"), duly executed by Sponsor.

(d)     Canada shall have delivered, or caused to be delivered to Sellers and Purchaser the Equity Registration Rights Agreement, duly executed by Canada.

(e)     The Canadian Debt Contribution shall have been consummated.

(f)     The New VEBA shall have delivered, or caused to be delivered to Sellers and Purchaser, the Equity Registration Rights Agreement, duly executed by the New VEBA.

(g)     Purchaser shall have received (i) consents from Governmental Authorities, (ii) Permits and (iii) consents from non-Governmental Authorities, in each case with respect to the transactions contemplated by this Agreement and the ownership and operation of the Purchased Assets and Assumed Liabilities by Purchaser from and after the Closing, sufficient in the aggregate to permit Purchaser to own and operate the Purchased Assets and Assumed Liabilities from and after the Closing in substantially the same manner as owned and operated by Sellers immediately prior to the Closing (after giving effect to (A) the implementation of the Viability Plans; (B) Parent's announced shutdown, which began in May 2009; and (C) the Bankruptcy Cases (or any other bankruptcy, insolvency or similar proceeding filed by or in respect of any Subsidiary of Parent).

(h)     Sellers shall have executed and delivered definitive financing agreements restructuring the Wind Down Facility in accordance with the provisions of **Section 6.9(b)**.

Section 7.2     Conditions to Obligations of Purchaser.     The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment or written waiver, prior to or at the Closing, of each of the following conditions; provided, however, that in no event may Purchaser waive the conditions contained in **Section 7.2(d)** or **Section 7.2(e)**:

(a)     Each of the representations and warranties of Sellers contained in **ARTICLE IV** of this Agreement shall be true and correct (disregarding for the purposes of such determination any qualification as to materiality or Material Adverse Effect) as of

the Closing Date as if made on the Closing Date (except for representations and warranties that speak as of a specific date or time, which representations and warranties shall be true and correct only as of such date or time), except to the extent that any breaches of such representations and warranties, individually or in the aggregate, have not had, or would not reasonably be expected to have, a Material Adverse Effect.

(b)     Sellers shall have performed or complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by Sellers prior to or at the Closing.

(c)     Sellers shall have delivered, or caused to be delivered, to Purchaser:

(i)     a certificate executed as of the Closing Date by a duly authorized representative of Sellers, on behalf of Sellers and not in such authorized representative's individual capacity, certifying that the conditions set forth in **Section 7.2(a)** and **Section 7.2(b)** have been satisfied;

(ii)     the Equity Registration Rights Agreement, duly executed by Parent;

(iii)     stock certificates or membership interest certificates, if any, evidencing the Transferred Equity Interests (other than in respect of the Equity Interests held by Sellers in RHI, Promark Global Advisors Limited, Promark Investments Trustees Limited and the Delayed Closing Entities, which the Parties agree may be transferred following the Closing in accordance with **Section 6.30**, **Section 6.34** and **Section 6.35**), duly endorsed in blank or accompanied by stock powers (or similar documentation) duly endorsed in blank, in proper form for transfer to Purchaser, including any required stamps affixed thereto;

(iv)     an omnibus bill of sale, substantially in the form attached hereto as **Exhibit P** (the "Bill of Sale"), together with transfer tax declarations and all other instruments of conveyance that are necessary to effect transfer to Purchaser of title to the Purchased Assets, each in a form reasonably satisfactory to the Parties and duly executed by the appropriate Seller;

(v)     an omnibus assignment and assumption agreement, substantially in the form attached hereto as **Exhibit Q** (the "Assignment and Assumption Agreement"), together with all other instruments of assignment and assumption that are necessary to transfer the Purchased Contracts and Assumed Liabilities to Purchaser, each in a form reasonably satisfactory to the Parties and duly executed by the appropriate Seller;

(vi)     a novation agreement, substantially in the form attached hereto as **Exhibit R** (the "Novation Agreement"), duly executed by Sellers and the appropriate United States Governmental Authorities;

(vii)    a government related subcontract agreement, substantially in the form attached hereto as **Exhibit S** (the "Government Related Subcontract Agreement"), duly executed by Sellers;

(viii)    an omnibus intellectual property assignment agreement, substantially in the form attached hereto as **Exhibit T** (the "Intellectual Property Assignment Agreement"), duly executed by Sellers;

(ix)    a transition services agreement, substantially in the form attached hereto as **Exhibit U** (the "Transition Services Agreement"), duly executed by Sellers;

(x)    all quitclaim deeds or deeds without warranty (or equivalents for those parcels of Owned Real Property located in jurisdictions outside of the United States), in customary form, subject only to Permitted Encumbrances, conveying the Owned Real Property to Purchaser (the "Quitclaim Deeds"), duly executed by the appropriate Seller;

(xi)    all required Transfer Tax or sales disclosure forms relating to the Transferred Real Property (the "Transfer Tax Forms"), duly executed by the appropriate Seller;

(xii)    an assignment and assumption of the leases and subleases underlying the Leased Real Property, in substantially the form attached hereto as **Exhibit V** (the "Assignment and Assumption of Real Property Leases"), together with such other instruments of assignment and assumption that are necessary to transfer the leases and subleases underlying the Leased Real Property located in jurisdictions outside of the United States, each duly executed by Sellers; provided, however, that if it is required for the assumption and assignment of any lease or sublease underlying a Leased Real Property that a separate assignment and assumption for such lease or sublease be executed, then a separate assignment and assumption of such lease or sublease shall be executed in a form substantially similar to **Exhibit V** or as otherwise required to assume or assign such Leased Real Property;

(xiii)    an assignment and assumption of the lease in respect of the premises located at 2485 Second Avenue, New York, New York, substantially in the form attached hereto as **Exhibit W** (the "Assignment and Assumption of Harlem Lease"), duly executed by Harlem;

(xiv)    an omnibus lease agreement in respect of the lease of certain portions of the Excluded Real Property that is owned real property, substantially in the form attached hereto as **Exhibit X** (the "Master Lease Agreement"), duly executed by Parent;

(xv)    *[Reserved]*;

(xvi)        the Saginaw Service Contracts, if required, duly executed by the appropriate Seller;

(xvii)        any easement agreements required under **Section 6.27(c)**, duly executed by the appropriate Seller;

(xviii)        the Subdivision Master Lease, if required, duly executed by the appropriate Sellers;

(xix)        a certificate of an officer of each Seller (A) certifying that attached to such certificate are true and complete copies of (1) such Seller's Organizational Documents, each as amended through and in effect on the Closing Date and (2) resolutions of the board of directors of such Seller, authorizing the execution, delivery and performance of this Agreement and the Ancillary Agreements to which such Seller is a party, the consummation of the transactions contemplated by this Agreement and such Ancillary Agreements and the matters set forth in **Section 6.16(e)**, and (B) certifying as to the incumbency of the officer(s) of such Seller executing this Agreement and the Ancillary Agreements to which such Seller is a party;

(xx)        a certificate in compliance with Treas. Reg. §1.1445-2(b)(2) that each Seller is not a foreign person as defined under Section 897 of the Tax Code;

(xxi)        a certificate of good standing for each Seller from the Secretary of State of the State of Delaware;

(xxii)        their written agreement to treat the Relevant Transactions and the other transactions contemplated by this Agreement in accordance with Purchaser's determination in **Section 6.16**;

(xxiii)        payoff letters and related Encumbrance-release documentation (including, if applicable, UCC-3 termination statements), each in a form reasonably satisfactory to the Parties and duly executed by the holders of the secured Indebtedness; and

(xxiv)        all books and records of Sellers described in **Section 2.2(a)(xiv)**.

(d)        The UAW Collective Bargaining Agreement shall have been ratified by the membership, shall have been assumed by the applicable Sellers and assigned to Purchaser, and shall be in full force and effect.

(e)        The UAW Retiree Settlement Agreement shall have been executed and delivered by the UAW and shall have been approved by the Bankruptcy Court as part of the Sale Approval Order.

(f)        The Canadian Operations Continuation Agreement shall have been executed and delivered by the parties thereto in the form previously distributed among them.

Section 7.3   *Conditions to Obligations of Sellers.*   The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment or written waiver, prior to or at the Closing, of each of the following conditions; provided, however, that in no event may Sellers waive the conditions contained in **Section 7.3(h)** or **Section 7.3(i)**:

(a)   Each of the representations and warranties of Purchaser contained in **ARTICLE V** of this Agreement shall be true and correct (disregarding for the purpose of such determination any qualification as to materiality or Purchaser Material Adverse Effect) as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which representations and warranties shall be true and correct only as of such date or time), except to the extent that any breaches of such representations and warranties, individually or in the aggregate, have not had, or would not reasonably be expected to have, a Purchaser Material Adverse Effect.

(b)   Purchaser shall have performed or complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by it prior to or at the Closing.

(c)   Purchaser shall have delivered, or caused to be delivered, to Sellers:

(i)   Parent Warrant A (including the related warrant agreement), duly executed by Purchaser;

(ii)   Parent Warrant B (including the related warrant agreement), duly executed by Purchaser;

(iii)   a certificate executed as of the Closing Date by a duly authorized representative of Purchaser, on behalf of Purchaser and not in such authorized representative's individual capacity, certifying that the conditions set forth in **Section 7.3(a)** and **Section 7.3(b)** are satisfied;

(iv)   stock certificates evidencing the Parent Shares, duly endorsed in blank or accompanied by stock powers duly endorsed in blank, in proper form for transfer, including any required stamps affixed thereto;

(v)   the Equity Registration Rights Agreement, duly executed by Purchaser;

(vi)   the Bill of Sale, together with all other documents described in **Section 7.2(c)(iv)**, each duly executed by Purchaser or its designated Subsidiaries;

(vii)   the Assignment and Assumption Agreement, together with all other documents described in **Section 7.2(c)(v)**, each duly executed by Purchaser or its designated Subsidiaries;

(viii)   the Novation Agreement, duly executed by Purchaser or its designated Subsidiaries;

(ix)      the Government Related Subcontract Agreement, duly executed by Purchaser or its designated Subsidiary;

(x)      the Intellectual Property Assignment Agreement, duly executed by Purchaser or its designated Subsidiaries;

(xi)      the Transition Services Agreement, duly executed by Purchaser or its designated Subsidiaries;

(xii)      the Transfer Tax Forms, duly executed by Purchaser or its designated Subsidiaries, to the extent required;

(xiii)      the Assignment and Assumption of Real Property Leases, together with all other documents described in **Section 7.2(c)(xii)**, each duly executed by Purchaser or its designated Subsidiaries;

(xiv)      the Assignment and Assumption of Harlem Lease, duly executed by Purchaser or its designated Subsidiaries;

(xv)      the Master Lease Agreement, duly executed by Purchaser or its designated Subsidiaries;

(xvi)      *[Reserved]*;

(xvii)      the Subdivision Master Lease, if required, duly executed by Purchaser or its designated Subsidiaries;

(xviii)      any easement agreements required under **Section 6.27(c)**, duly executed by Purchaser or its designated Subsidiaries;

(xix)      a certificate of a duly authorized representative of Purchaser (A) certifying that attached to such certificate are true and complete copies of (1) Purchaser's Organizational Documents, each as amended through and in effect on the Closing Date and (2) resolutions of the board of directors of Purchaser, authorizing the execution, delivery and performance of this Agreement and the Ancillary Agreements to which Purchaser is a party, the consummation of the transactions contemplated by this Agreement and such Ancillary Agreements and the matters set forth in **Section 6.16(g)**, and (B) certifying as to the incumbency of the officer(s) of Purchaser executing this Agreement and the Ancillary Agreements to which Purchaser is a party; and

(xx)      a certificate of good standing for Purchaser from the Secretary of State of the State of Delaware.

(d)      *[Reserved]*

(e)     Purchaser shall have filed a certificate of designation for the Preferred Stock, substantially in the form attached hereto as **Exhibit Y**, with the Secretary of State of the State of Delaware.

(f)     Purchaser shall have offset the UST Credit Bid Amount against the amount of Indebtedness of Parent and its Subsidiaries owed to Purchaser as of the Closing under the UST Credit Facilities pursuant to a Bankruptcy Code Section 363(k) credit bid and delivered releases and waivers and related Encumbrance-release documentation (including, if applicable, UCC-3 termination statements) with respect to the UST Credit Bid Amount, in a form reasonably satisfactory to the Parties and duly executed by Purchaser in accordance with the applicable requirements in effect on the date hereof, (iii) transferred to Sellers the UST Warrant and (iv) issued to Parent, in accordance with instructions provided by Parent, the Purchaser Shares and the Parent Warrants (duly executed by Purchaser).

(g)     Purchaser shall have delivered, or caused to be delivered, to Canada, Sponsor and/or the New VEBA, as applicable:

(i)     certificates representing the Canada Shares, the Sponsor Shares and the VEBA Shares in accordance with the applicable equity subscription agreements in effect on the date hereof;

(ii)     the Equity Registration Rights Agreement, duly executed by Purchaser;

(iii)     the VEBA Warrant (including the related warrant agreement), duly executed by Purchaser; and

(iv)     a note, in form and substance consistent with the terms set forth on **Exhibit Z** attached hereto, to the New VEBA (the "VEBA Note").

(h)     The UAW Collective Bargaining Agreement shall have been ratified by the membership, shall have been assumed by Purchaser, and shall be in full force and effect.

(i)     The UAW Retiree Settlement Agreement shall have been executed and delivered, shall be in full force and effect, and shall have been approved by the Bankruptcy Court as part of the Sale Approval Order.

# ARTICLE VIII
# TERMINATION

*Section 8.1     Termination.*     This Agreement may be terminated, and the transactions contemplated hereby may be abandoned, at any time prior to the Closing Date as follows:

(a)     by the mutual written consent of Sellers and Purchaser;

(b)     by either Sellers or Purchaser, if (i) the Closing shall not have occurred on or before August 15, 2009, or such later date as the Parties may agree in writing, such date not to be later than September 15, 2009 (as extended, the "End Date"), and (ii) the Party seeking to terminate this Agreement pursuant to this **Section 8.1(b)** shall not have breached in any material respect its obligations under this Agreement in any manner that shall have proximately caused the failure of the transactions contemplated hereby to close on or before such date;

(c)     by either Sellers or Purchaser, if the Bankruptcy Court shall not have entered the Sale Approval Order by July 10, 2009;

(d)     by either Sellers or Purchaser, if any court of competent jurisdiction in the United States or other United States Governmental Authority shall have issued a Final Order permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement or the sale of a material portion of the Purchased Assets;

(e)     by Sellers, if Purchaser shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform has not been cured by the End Date, provided that (i) Sellers shall have given Purchaser written notice, delivered at least thirty (30) days prior to such termination, stating Sellers' intention to terminate this Agreement pursuant to this **Section 8.1(e)** and the basis for such termination and (ii) Sellers shall not have the right to terminate this Agreement pursuant to this **Section 8.1(e)** if Sellers are then in material breach of any its representations, warranties, covenants or other agreements set forth herein;

(f)     by Purchaser, if Sellers shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would (if it occurred or was continuing as of the Closing Date) give rise to the failure of a condition set forth in **Section 7.2(a)** or **Section 7.2(b)** to be fulfilled, (ii) cannot be cured by the End Date, provided that (i) Purchaser shall have given Sellers written notice, delivered at least thirty (30) days prior to such termination, stating Purchaser's intention to terminate this Agreement pursuant to this **Section 8.1(f)** and the basis for such termination and (iii) Purchaser shall not have the right to terminate this Agreement pursuant to this **Section 8.1(f)** if Purchaser is then in material breach of any its representations, warranties, covenants or other agreements set forth herein; or

(g)     by either Sellers or Purchaser, if  the Bankruptcy Court shall have entered an Order approving an Alternative Transaction.

Section 8.2     *Procedure and Effect of Termination.*

(a)     If this Agreement is terminated pursuant to **Section 8.1**, this Agreement shall become null and void and have no effect, and all obligations of the Parties hereunder shall terminate, except for those obligations of the Parties set forth this **Section 8.2** and **ARTICLE IX**, which shall remain in full force and effect; provided that nothing

herein shall relieve any Party from Liability for any material breach of any of its representations, warranties, covenants or other agreements set forth herein. If this Agreement is terminated as provided herein, all filings, applications and other submissions made pursuant to this Agreement shall, to the extent practicable, be withdrawn from the agency or other Person to which they were made.

(b) If this Agreement is terminated by Sellers or Purchaser pursuant to **Section 8.1(a)** through **Section 8.1(d)** or **Section 8.1(g)** or by Purchaser pursuant to **Section 8.1(f)**, Sellers, severally and not jointly, shall reimburse Purchaser for its reasonable, out-of-pocket costs and expenses (including reasonable attorneys' fees) incurred by Purchaser in connection with this Agreement and the transactions contemplated hereby (the "Purchaser Expense Reimbursement"). The Purchaser Expense Reimbursement shall be paid as an administrative expense Claim of Sellers pursuant to Section 503(b)(1) of the Bankruptcy Code.

(c) Except as expressly provided for in this **Section 8.2**, any termination of this Agreement pursuant to **Section 8.1** shall be without Liability to Purchaser or Sellers, including any Liability by Sellers to Purchaser for any break-up fee, termination fee, expense reimbursement or other compensation as a result of a termination of this Agreement.

(d) If this Agreement is terminated for any reason, Purchaser shall, and shall cause each of its Affiliates and Representatives to, treat and hold as confidential all Confidential Information, whether documentary, electronic or oral, labeled or otherwise identified as confidential, and regardless of the form of communication or the manner in which it was furnished. For purposes of this **Section 8.2(d)**, Confidential Information shall be deemed not to include any information that (i) is now available to or is hereafter disclosed in a manner making it available to the general public, in each case, through no act or omission of Purchaser, any of its Affiliates or any of their Representatives, or (ii) is required by Law to be disclosed.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.1** *Survival of Representations, Warranties, Covenants and Agreements and Consequences of Certain Breaches.* The representations and warranties of the Parties contained in this Agreement shall be extinguished by and shall not survive the Closing, and no Claims may be asserted in respect of, and no Party shall have any Liability for any breach of, the representations and warranties. All covenants and agreements contained in this Agreement, including those covenants and agreements set forth in **ARTICLE II** and **ARTICLE VI**, shall survive the Closing indefinitely.

**Section 9.2** *Notices.* Any notice, request, instruction, consent, document or other communication required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been sufficiently given or served for all purposes (a) upon delivery when personally delivered; (b) on the delivery date after having been sent by a nationally or internationally recognized overnight courier service (charges prepaid); (c) at the time received

when sent by registered or certified mail, return receipt requested, postage prepaid; or (d) at the time when confirmation of successful transmission is received (or the first Business Day following such receipt if the date of such receipt is not a Business Day) if sent by facsimile, in each case, to the recipient at the address or facsimile number, as applicable, indicated below:

|  |  |
|---|---|
| If to any Seller: | General Motors Corporation |
|  | 300 Renaissance Center |
|  | Tower 300, 25th Floor, Room D55 |
|  | M/C 482-C25-D81 |
|  | Detroit, Michigan 48265-3000 |
|  | Attn: General Counsel |
|  | Tel.: 313-667-3450 |
|  | Facsimile: 248-267-4584 |
|  |  |
| With copies to: | Jenner & Block LLP |
|  | 330 North Wabash Avenue |
|  | Chicago, Illinois 60611-7603 |
|  | Attn:  Joseph P. Gromacki |
|  |      Michael T. Wolf |
|  | Tel.:  312-222-9350 |
|  | Facsimile:  312-527-0484 |
|  |  |
|  | and |
|  |  |
|  | Weil Gotshal & Manges LLP |
|  | 767 Fifth Avenue |
|  | New York, New York 10153 |
|  | Attn: Harvey R. Miller |
|  |      Stephen Karotkin |
|  |      Raymond Gietz |
|  | Tel.: 212-310-8000 |
|  | Facsimile: 212-310-8007 |
|  |  |
| If to Purchaser: | NGMCO, Inc. |
|  | c/o The United States Department of the Treasury |
|  | 1500 Pennsylvania Avenue, NW |
|  | Washington D.C. 20220 |
|  | Attn: Chief Counsel Office of Financial Stability |
|  | Facsimile: 202-927-9225 |

With a copy to:          Cadwalader, Wickersham & Taft LLP
                         One World Financial Center
                         New York, New York 10281
                         Attn:   John J. Rapisardi
                                 R. Ronald Hopkinson
                         Tel.:  212-504-6000
                         Facsimile:  212-504-6666

provided, however, if any Party shall have designated a different addressee and/or contact information by notice in accordance with this **Section 9.2**, then to the last addressee as so designated.

     *Section 9.3     Fees and Expenses; No Right of Setoff.*  Except as otherwise provided in this Agreement, including **Section 8.2(b)**, Purchaser, on the one hand, and each Seller, on the other hand, shall bear its own fees, costs and expenses, including fees and disbursements of counsel, financial advisors, investment bankers, accountants and other agents and representatives, incurred in connection with the negotiation and execution of this Agreement and each Ancillary Agreement and the consummation of the transactions contemplated hereby and thereby.  In furtherance of the foregoing, Purchaser shall be solely responsible for (a) all expenses incurred by it in connection with its due diligence review of Sellers and their respective businesses, including surveys, title work, title inspections, title searches, environmental testing or inspections, building inspections, Uniform Commercial Code lien and other searches and (b) any cost (including any filing fees) incurred by it in connection with notarization, registration or recording of this Agreement or an Ancillary Agreement required by applicable Law.  No Party nor any of its Affiliates shall have any right of holdback or setoff or assert any Claim or defense with respect to any amounts that may be owed by such Party or its Affiliates to any other Party (or Parties) hereto or its or their Affiliates as a result of and with respect to any amount that may be owing to such Party or its Affiliates under this Agreement, any Ancillary Agreement or any other commercial arrangement entered into in between or among such Parties and/or their respective Affiliates.

     *Section 9.4     Bulk Sales Laws.*  Each Party hereto waives compliance by the other Parties with any applicable bulk sales Law.

     *Section 9.5     Assignment.*  Neither this Agreement nor any of the rights, interests or obligations provided by this Agreement may be assigned or delegated by any Party (whether by operation of law or otherwise) without the prior written consent of the other Parties, and any such assignment or delegation without such prior written consent shall be null and void; provided, however, that, without the consent of Sellers, Purchaser may assign or direct the transfer on its behalf on or prior to the Closing of all, or any portion, of its rights to purchase, accept and acquire the Purchased Assets and its obligations to assume and thereafter pay or perform as and when due, or otherwise discharge, the Assumed Liabilities, to Holding Company or one or more newly-formed, direct or indirect, wholly-owned Subsidiaries of Holding Company or Purchaser; provided, further, that no such assignment or delegation shall relieve Purchaser of any of its obligations under this Agreement.  Subject to the preceding sentence and except as otherwise expressly provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

Section 9.6    *Amendment.*  This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by a duly authorized representative or officer of each of the Parties.

Section 9.7    *Waiver.*  At any time prior to the Closing, each Party may (a) extend the time for the performance of any of the obligations or other acts of the other Parties; (b) waive any inaccuracies in the representations and warranties contained in this Agreement or in any document delivered pursuant hereto; or (c) waive compliance with any of the agreements or conditions contained herein (to the extent permitted by Law).  Any such waiver or extension by a Party (i) shall be valid only if, and to the extent, set forth in a written instrument signed by a duly authorized representative or officer of the Party to be bound and (ii) shall not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement.  The failure in any one or more instances of a Party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege in this Agreement conferred, or the waiver by said Party of any breach of any of the terms, covenants or conditions of this Agreement shall not be construed as a subsequent waiver of, or estoppel with respect to, any other terms, covenants, conditions, rights or privileges, but the same will continue and remain in full force and effect as if no such forbearance or waiver had occurred.

Section 9.8    *Severability.*  Whenever possible, each term and provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law.  If any term or provision of this Agreement, or the application thereof to any Person or any circumstance, is held to be illegal, invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefore in order to carry out, so far as may be legal, valid and enforceable, the intent and purpose of such illegal, invalid or unenforceable provision and (b) the remainder of this Agreement or such term or provision and the application of such term or provision to other Persons or circumstances shall remain in full force and effect and shall not be affected by such illegality, invalidity or unenforceability, nor shall such invalidity or unenforceability affect the legality, validity or enforceability of such term or provision, or the application thereof, in any jurisdiction.

Section 9.9    *Counterparts; Facsimiles.*  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same agreement.  All signatures of the Parties may be transmitted by facsimile or electronic delivery, and each such facsimile signature or electronic delivery signature (including a pdf signature) will, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and be binding upon such Party.

Section 9.10    *Headings.*  The descriptive headings of the Articles, Sections and paragraphs of, and Schedules and Exhibits to, this Agreement, and the table of contents, table of Exhibits and table of Schedules contained in this Agreement, are included for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit, modify or affect any of the provisions hereof.

Section 9.11    *Parties in Interest.*  This Agreement shall be binding upon and inure solely to the benefit of each Party hereto and their respective permitted successors and

assigns; provided, that (a) for all purposes each of Sponsor, the New VEBA, and Canada shall be express third-party beneficiaries of this Agreement and (b) for purposes of **Section 2.2(a)(x)** and **(xvi)**, **Section 2.2(b)(vii)**, **Section 2.3(a)(x)**, **(xii)**, **(xiii)** and **(xv)**, **Section 2.3(b)(xv)**, **Section 4.6(b)**, **Section 4.10**, **Section 5.4(c)**, **Section 6.2(b)(x)**, **(xv)** and **(xvii)**, **Section 6.4(a)**, **Section 6.4(b)**, **Section 6.6(a)**, **(d)**, **(f)** and **(g)**, **Section 6.11(c)(i)** and **(vi)**, **Section 6.17**, **Section 7.1(a)** and **(f)**, **Section 7.2(d)** and **(e)** and **Section 7.3(g)**, **(h)** and **(i)**, the UAW shall be an express third-party beneficiary of this Agreement. Subject to the preceding sentence, nothing express or implied in this Agreement is intended or shall be construed to confer upon or give to any Person, other than the Parties, their Affiliates and their respective permitted successors or assigns, any legal or equitable Claims, benefits, rights or remedies of any nature whatsoever under or by reason of this Agreement.

       *Section 9.12    Governing Law.*  The construction, interpretation and other matters arising out of or in connection with this Agreement (whether arising in contract, tort, equity or otherwise) shall in all respects be governed by and construed (a) to the extent applicable, in accordance with the Bankruptcy Code, and (b) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York, without giving effect to rules governing the conflict of laws.

       *Section 9.13    Venue and Retention of Jurisdiction.*  Each Party irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court for any litigation arising out of or in connection with this Agreement and the transactions contemplated hereby (and agrees not to commence any litigation relating thereto except in the Bankruptcy Court, other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court as described herein); provided, however, that this **Section 9.13** shall not be applicable in the event the Bankruptcy Cases have closed, in which case the Parties irrevocably and unconditionally submit to the exclusive jurisdiction of the federal courts in the Southern District of New York and state courts of the State of New York located in the Borough of Manhattan in the City of New York for any litigation arising out of or in connection with this Agreement and the transactions contemplated hereby (and agree not to commence any litigation relating thereto except in the federal courts in the Southern District of New York and state courts of the State of New York located in the Borough of Manhattan in the City of New York, other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court as described herein).

       *Section 9.14    Waiver of Jury Trial.*  EACH PARTY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY DISPUTE IN CONNECTION WITH OR RELATING TO THIS AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN, AND AGREES TO TAKE ANY AND ALL ACTION NECESSARY OR APPROPRIATE TO EFFECT SUCH WAIVER.

       *Section 9.15    Risk of Loss.*  Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Purchased Assets shall be borne exclusively by Sellers.

       *Section 9.16    Enforcement of Agreement.*  The Parties agree that irreparable damage would occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or were otherwise breached.  It is accordingly agreed that the

Parties shall, without the posting of a bond, be entitled, subject to a determination by a court of competent jurisdiction, to an injunction or injunctions to prevent any such failure of performance under, or breaches of, this Agreement, and to enforce specifically the terms and provisions hereof and thereof, this being in addition to all other remedies available at law or in equity, and each Party agrees that it will not oppose the granting of such relief on the basis that the requesting Party has an adequate remedy at law.

      Section 9.17  *Entire Agreement.*  This Agreement (together with the Ancillary Agreements, the Sellers' Disclosure Schedule and the Exhibits) contains the final, exclusive and entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersedes all prior and contemporaneous agreements and understandings, whether written or oral, among the Parties with respect to the subject matter hereof and thereof.  Neither this Agreement nor any Ancillary Agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

      Section 9.18  *Publicity.*  Prior to the first public announcement of this Agreement and the transactions contemplated hereby, Sellers, on the one hand, and Purchaser, on the other hand, shall consult with each other regarding, and share with each other copies of, their respective communications plans, including draft press releases and related materials, with regard to such announcement.  Neither Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party or Parties, as applicable, which approval shall not be unreasonably withheld, conditioned or delayed, unless, in the sole judgment of the Party intending to make such release, disclosure is otherwise required by applicable Law, or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Sellers list securities; provided, that the Party intending to make such release shall use reasonable best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party or Parties, as applicable, with respect to the text thereof; provided, further, that, notwithstanding anything to the contrary contained in this section, no Party shall be prohibited from publishing, disseminating or otherwise making public, without the prior written approval of the other Party or Parties, as applicable, any materials that are derived from or consistent with the materials included in the communications plan referred to above.  In an effort to coordinate consistent communications, the Parties shall agree upon procedures relating to all press releases and public announcements concerning this Agreement and the transactions contemplated hereby.

      Section 9.19  *No Successor or Transferee Liability.*  Except where expressly prohibited under applicable Law or otherwise expressly ordered by the Bankruptcy Court, upon the Closing, neither Purchaser nor any of its Affiliates or stockholders shall be deemed to (a) be the successor of Sellers; (b) have, de facto, or otherwise, merged with or into Sellers; (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers; or (d) other than as set forth in this Agreement, be liable for any acts or omissions of Sellers in the conduct of Sellers' business or arising under or related to the Purchased Assets.  Without limiting

the generality of the foregoing, and except as otherwise provided in this Agreement, neither Purchaser nor any of its Affiliates or stockholders shall be liable for any Claims against Sellers or any of their predecessors or Affiliates, and neither Purchaser nor any of its Affiliates or stockholders shall have any successor, transferee or vicarious Liability of any kind or character whether known or unknown as of the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to Sellers' business or any obligations of Sellers arising prior to the Closing, except as provided in this Agreement, including Liabilities on account of any Taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of Sellers' business prior to the Closing.

Section 9.20    *Time Periods.*  Unless otherwise specified in this Agreement, an action required under this Agreement to be taken within a certain number of days or any other time period specified herein shall be taken within the applicable number of calendar days (and not Business Days); provided, however, that if the last day for taking such action falls on a day that is not a Business Day, the period during which such action may be taken shall be automatically extended to the next Business Day.

Section 9.21    *Sellers' Disclosure Schedule.*  The representations and warranties of Sellers set forth in this Agreement are made and given subject to the disclosures contained in the Sellers' Disclosure Schedule.  Inclusion of information in the Sellers' Disclosure Schedule shall not be construed as an admission that such information is material to the business, operations or condition of the business of Sellers, the Purchased Assets or the Assumed Liabilities, taken in part or as a whole, or as an admission of Liability of any Seller to any third party.  The specific disclosures set forth in the Sellers' Disclosure Schedule have been organized to correspond to Section references in this Agreement to which the disclosure may be most likely to relate; provided, however, that any disclosure in the Sellers' Disclosure Schedule shall apply to, and shall be deemed to be disclosed for, any other Section of this Agreement to the extent the relevance of such disclosure to such other Section is reasonably apparent on its face.

Section 9.22    *No Binding Effect.*  Notwithstanding anything in this Agreement to the contrary, no provision of this Agreement shall (i) be binding on or create any obligation on the part of Sponsor, the United States Government or any branch, agency or political subdivision thereof (a "Sponsor Affiliate") or the Government of Canada, or any crown corporation, agency or department thereof (a "Canada Affiliate") or (ii) require Purchaser to initiate any Claim or other action against Sponsor or any Sponsor Affiliate or otherwise attempt to cause Sponsor, any Sponsor Affiliate, Government of Canada or any Canada Affiliate to comply with or abide by the terms of this Agreement.  No facts, materials or other information received or action taken by any Person who is an officer, director or agent of Purchaser by virtue of such Person's affiliation with or employment by Sponsor, any Sponsor Affiliate, Government of Canada or any Canada Affiliate shall be attributed to Purchaser for purposes of this Agreement or shall form the basis of any claim against such Person in their individual capacity.

[Remainder of the page left intentionally blank]

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
    Name:  Frederick A. Henderson
    Title:   President and Chief Executive
            Officer


SATURN LLC


By: _____
    Name:  Jill Lajdziak
    Title:   President


SATURN DISTRIBUTION CORPORATION


By: _____
    Name:  Jill Lajdziak
    Title:   President


CHEVROLET-SATURN OF HARLEM, INC.


By: _____
    Name:  Michael Garrick
    Title:   President


NGMCO, INC.


By: _____
    Name:  Sadiq A. Malik
    Title:   Vice President and Treasurer

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
     Name:  Frederick A. Henderson
     Title:    President and Chief Executive
             Officer

SATURN LLC

By: _____
     Name:  Jill Lajdziak
     Title:    President

SATURN DISTRIBUTION CORPORATION

By: _____
     Name:  Jill Lajdziak
     Title:    President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
     Name:  Michael Garrick
     Title:    President

NGMCO, INC.

By: _____
     Name:  Sadiq A. Malik
     Title:    Vice President and Treasurer

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
     Name:  Frederick A. Henderson
     Title:   President and Chief Executive
              Officer

SATURN LLC

By: _____
     Name:  Jill Lajdziak
     Title:   President

SATURN DISTRIBUTION CORPORATION

By: _____
     Name:  Jill Lajdziak
     Title:   President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
     Name:  Michael Garrick
     Title:   President

NGMCO, INC.

By: _____
     Name:  Sadiq A. Malik
     Title:   Vice President and Treasurer

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
      Name:  Frederick A. Henderson
      Title:   President and Chief Executive
                 Officer

SATURN LLC

By: _____
      Name:  Jill Lajdziak
      Title:   President

SATURN DISTRIBUTION CORPORATION

By: _____
      Name:  Jill Lajdziak
      Title:   President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
      Name:  Michael Garrick
      Title:   President

NGMCO, INC.

By: _____
      Name:  Sadiq A. Malik
      Title:   Vice President and Treasurer

SIGNATURE PAGE TO THE AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT

# FIRST AMENDMENT TO AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT

THIS FIRST AMENDMENT TO AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT, dated as of June 30, 2009 (this "Amendment"), is made by and among General Motors Corporation, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), Chevrolet-Saturn of Harlem, Inc., a Delaware corporation ("Harlem," and collectively with Parent, S LLC and S Distribution, "Sellers," and each a "Seller"), and NGMCO, Inc., a Delaware corporation and successor-in-interest to Vehicle Acquisition Holdings LLC, a Delaware limited liability company ("Purchaser").

WHEREAS, Sellers and Purchaser have entered into that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (the "Purchase Agreement"); and

WHEREAS, the Parties desire to amend the Purchase Agreement as set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the Parties hereby agree as follows:

Section 1.     *Capitalized Terms.*  All capitalized terms used but not defined herein shall have the meanings specified in the Purchase Agreement.

Section 2.     *Amendments to Purchase Agreement.*

(a)     **Section 2.3(a)(v)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

> (v)     all Liabilities of Sellers (A) arising in the Ordinary Course of Business during the Bankruptcy Cases through and including the Closing Date, to the extent such Liabilities are administrative expenses of Sellers' estates pursuant to Section 503(b) of the Bankruptcy Code and (B) arising prior to the commencement of the Bankruptcy Cases, to the extent approved by the Bankruptcy Court for payment by Sellers pursuant to a Final Order (and for the avoidance of doubt, Sellers' Liabilities in clauses (A) and (B) above include all of Sellers' Liabilities for personal property Taxes, real estate and/or other ad valorem Taxes, use Taxes, sales Taxes, franchise Taxes, income Taxes, gross receipt Taxes, excise Taxes, Michigan Business Taxes and Michigan Single Business Taxes and other Liabilities mentioned in the Bankruptcy Court's Order - Docket No. 174), in each case, other than (1) Liabilities of the type described in **Section 2.3(b)(iv)**, **Section 2.3(b)(vi)**, **Section 2.3(b)(ix)** and **Section 2.3(b)(xii)**, (2) Liabilities arising under any dealer sales and service Contract and any Contract related thereto, to the extent such Contract has been designated as

a Rejectable Executory Contract, and (3) Liabilities otherwise assumed in this **Section 2.3(a)**;

(b)    **Section 2.3(a)(ix)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(ix)    all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of death, personal injury or other injury to Persons or damage to property caused by accidents or incidents first occurring on or after the Closing Date and arising from such motor vehicles' operation or performance (for avoidance of doubt, Purchaser shall not assume, or become liable to pay, perform or discharge, any Liability arising or contended to arise by reason of exposure to materials utilized in the assembly or fabrication of motor vehicles manufactured by Sellers and delivered prior to the Closing Date, including asbestos, silicates or fluids, regardless of when such alleged exposure occurs);

(c)    **Section 2.3(b)(xii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(xii)    all workers' compensation Claims with respect to Employees residing or employed in, as the case may be and as defined by applicable Law, (A) the states set forth on **Exhibit G** and (B) if the State of Michigan (1) fails to authorize Purchaser and its Affiliates operating within the State of Michigan to be a self-insurer for purposes of administering workers' compensation Claims or (2) requires Purchaser and its Affiliates operating within the State of Michigan to post collateral, bonds or other forms of security to secure workers' compensation Claims, the State of Michigan (collectively, "Retained Workers' Compensation Claims");

(d)    **Section 6.6(d)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(d)    All Assumable Executory Contracts shall be assumed and assigned to Purchaser on the date (the "Assumption Effective Date") that is the later of (i) the date designated by the Purchaser and (ii) the date following expiration of the objection deadline if no objection, other than to the Cure Amount, has been timely filed or the date of resolution of any objection unrelated to Cure Amount, as provided in the Sale Procedures Order; provided, however, that in the case of each (A) Assumable Executory Contract identified on Section 6.6(a)(i) of the Sellers' Disclosure Schedule, (2) Deferred Termination Agreement (and the related Discontinued Brand Dealer Agreement or Continuing Brand Dealer Agreement)

designated as an Assumable Executory Contract and (3) Participation Agreement (and the related Continuing Brand Dealer Agreement) designated as an Assumable Executory Contract, the Assumption Effective Date shall be the Closing Date and (B) Assumable Executory Contract identified on Section 6.6(a)(ii) of the Sellers' Disclosure Schedule, the Assumption Effective Date shall be a date that is no later than the date set forth with respect to such Executory Contract on Section 6.6(a)(ii) of the Sellers' Disclosure Schedule.  As soon as reasonably practicable following a determination that an Executory Contract shall be designated as an Assumable Executory Contract hereunder, Sellers shall use reasonable best efforts to notify each third party to such Executory Contract of their intention to assume and assign such Executory Contract in accordance with the terms of this Agreement and the Sale Procedures Order.  On the Assumption Effective Date for any Assumable Executory Contract, such Assumable Executory Contract shall be deemed to be a Purchased Contract hereunder.  If it is determined under the procedures set forth in the Sale Procedures Order that Sellers may not assume and assign to Purchaser any Assumable Executory Contract, such Executory Contract shall cease to be an Assumable Executory Contract and shall be an Excluded Contract and a Rejectable Executory Contract.  Except as provided in **Section 6.31**, notwithstanding anything else to the contrary herein, any Executory Contract that has not been specifically designated as an Assumable Executory Contract as of the Executory Contract Designation Deadline applicable to such Executory Contract, including any Deferred Executory Contract, shall automatically be deemed to be a Rejectable Executory Contract and an Excluded Contract hereunder.  Sellers shall have the right, but not the obligation, to reject, at any time, any Rejectable Executory Contract; provided, however, that Sellers shall not reject any Contract that affects both Owned Real Property and Excluded Real Property (whether designated on **Exhibit F** or now or hereafter designated on Section 2.2(b)(v) of the Sellers' Disclosure Schedule), including any such Executory Contract that involves the provision of water, water treatment, electric, fuel, gas, telephone and other utilities to any facilities located at the Excluded Real Property, whether designated on **Exhibit F** or now or hereafter designated on Section 2.2(b)(v) of the Sellers' Disclosure Schedule (the "Shared Executory Contracts"), without the prior written consent of Purchaser.

     *Section 3.*    *Effectiveness of Amendment.*  Upon the execution and delivery hereof, the Purchase Agreement shall thereupon be deemed to be amended and restated as set forth in Section 2, as fully and with the same effect as if such amendments and restatements were originally set forth in the Purchase Agreement.

     *Section 4.*    *Ratification of Purchase Agreement; Incorporation by Reference.*  Except as specifically provided for in this Amendment, the Purchase Agreement is hereby confirmed and ratified in all respects and shall be and remain in full force and effect in accordance with its terms.  This Amendment is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement, including **Article IX** thereof, which sections are hereby incorporated into this Amendment, mutatis mutandis, as if they were set forth in their entirety herein.

Section 5.    *Counterparts.* This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same agreement.  All signatures of the Parties may be transmitted by facsimile or electronic delivery, and each such facsimile signature or electronic delivery signature (including a pdf signature) will, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and be binding upon such Party.

[Remainder of page intentionally left blank]

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: __Frederick A. Henderson (signature)_____

    Name:  Frederick A. Henderson
    Title:  President and Chief Executive
           Officer

SATURN LLC

By: _____

    Name:  Jill Lajdziak
    Title:  President

SATURN DISTRIBUTION CORPORATION

By: _____

    Name:  Jill Lajdziak
    Title:  President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____

    Name:  Michael Garrick
    Title:  President

NGMCO, INC.

By: _____

    Name:  Sadiq Malik
    Title:  Vice President and Treasurer

IN WITNESS WHEREOF, each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
    Name: Frederick A. Henderson
    Title: President and Chief Executive
    Officer

SATURN LLC

By: _____
    Name: Jill Lajdziak
    Title: President

SATURN DISTRIBUTION CORPORATION

By: _____
    Name: Jill Lajdziak
    Title: President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name: Michael Garrick
    Title: President

NGMCO, INC.

By: _____
    Name: Sadiq Malik
    Title: Vice President and Treasurer

IN WITNESS WHEREOF, each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
    Name: Frederick A. Henderson
    Title: President and Chief Executive
           Officer

SATURN LLC

By: _____
    Name: Jill Lajdziak
    Title: President

SATURN DISTRIBUTION CORPORATION

By: _____
    Name: Jill Lajdziak
    Title: President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name: Michael Garrick
    Title: President

NGMCO, INC.

By: _____
    Name: Sadiq Malik
    Title: Vice President and Treasurer

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
    Name: Frederick A. Henderson
    Title:  President and Chief Executive
            Officer

SATURN LLC

By: _____
    Name: Jill Lajdziak
    Title:  President

SATURN DISTRIBUTION CORPORATION

By: _____
    Name: Jill Lajdziak
    Title:  President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name: Michael Garrick
    Title:  President

NGMCO, INC.

By: _____
    Name: Sadiq Malik
    Title:  Vice President and Treasurer

09-50026-mg    Doc 2968-2    Filed 07/05/09    Entered 07/05/09 23:14:33    Exhibit MSPA
Pg 225 of 382

## SECOND AMENDMENT TO AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT

THIS SECOND AMENDMENT TO AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT, dated as of July 5, 2009 (this "Amendment"), is made by and among General Motors Corporation, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), Chevrolet-Saturn of Harlem, Inc., a Delaware corporation ("Harlem," and collectively with Parent, S LLC and S Distribution, "Sellers," and each a "Seller"), and NGMCO, Inc., a Delaware corporation and successor-in-interest to Vehicle Acquisition Holdings LLC, a Delaware limited liability company ("Purchaser").

WHEREAS, Sellers and Purchaser have entered into that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (as amended, the "Purchase Agreement");

WHEREAS, Sellers and Purchaser have entered into that certain First Amendment to Amended and Restated Master and Purchase Agreement; and

WHEREAS, the Parties desire to amend the Purchase Agreement as set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the Parties hereby agree as follows:

Section 1.    *Capitalized Terms.*  All capitalized terms used but not defined herein shall have the meanings specified in the Purchase Agreement.

Section 2.    *Amendments to Purchase Agreement.*

(a)    The following new definition of "Advanced Technology Credits" is hereby included in **Section 1.1** of the Purchase Agreement:

"Advanced Technology Credits" has the meaning set forth in **Section 6.36**.

(b)    The following new definition of "Advanced Technology Projects" is hereby included in **Section 1.1** of the Purchase Agreement:

"Advanced Technology Projects" means development, design, engineering and production of advanced technology vehicles and components, including the vehicles known as "the Volt", "the Cruze" and components, transmissions and systems for vehicles employing hybrid technologies.

(c)    The definition of "Ancillary Agreements" is hereby amended and restated in its entirety to read as follows:

"<u>Ancillary Agreements</u>" means the Parent Warrants, the UAW Active Labor Modifications, the UAW Retiree Settlement Agreement, the VEBA Warrant, the Equity Registration Rights Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the Intellectual Property Assignment Agreement, the Transition Services Agreement, the Quitclaim Deeds, the Assignment and Assumption of Real Property Leases, the Assignment and Assumption of Harlem Lease, the Master Lease Agreement, the Subdivision Master Lease (if required), the Saginaw Service Contracts (if required), the Assignment and Assumption of Willow Run Lease, the Ren Cen Lease, the VEBA Note and each other agreement or document executed by the Parties pursuant to this Agreement or any of the foregoing and each certificate and other document to be delivered by the Parties pursuant to **ARTICLE VII**.

(d)     The following new definition of "Excess Estimated Unsecured Claim Amount" is hereby included in **Section 1.1** of the Purchase Agreement:

"<u>Excess Estimated Unsecured Claim Amount</u>" has the meaning set forth in **Section 3.2(c)(i)**.

(e)     The definition of "Permitted Encumbrances" is hereby amended and restated in its entirety to read as follows:

"<u>Permitted Encumbrances</u>" means all (i) purchase money security interests arising in the Ordinary Course of Business; (ii) security interests relating to progress payments created or arising pursuant to government Contracts in the Ordinary Course of Business; (iii) security interests relating to vendor tooling arising in the Ordinary Course of Business; (iv) Encumbrances that have been or may be created by or with the written consent of Purchaser; (v) mechanic's, materialmen's, laborer's, workmen's, repairmen's, carrier's liens and other similar Encumbrances arising by operation of law or statute in the Ordinary Course of Business for amounts that are not delinquent or that are being contested in good faith by appropriate proceedings; (vi) liens for Taxes, the validity or amount of which is being contested in good faith by appropriate proceedings, and statutory liens for current Taxes not yet due, payable or delinquent (or which may be paid without interest or penalties); (vii) with respect to the Transferred Real Property that is Owned Real Property, other than Secured Real Property Encumbrances at and following the Closing: (a) matters that a current ALTA/ACSM survey, or a similar cadastral survey in any country other than the United States, would disclose, the existence of which, individually or in the aggregate, would not materially and adversely interfere with the present use of the affected property; (b) rights of the public, any Governmental Authority and adjoining property owners in streets and highways abutting or adjacent to the applicable Owned Real Property; (c) easements, licenses, rights-of-way, covenants, servitudes, restrictions, encroachments, site plans, subdivision plans and other Encumbrances of public record or that would be disclosed by a current title commitment of the applicable Owned Real Property, which, individually or in the aggregate, would not materially and adversely interfere with the present use

of the applicable Owned Real Property; and (d) such other Encumbrances, the existence of which, individually or in the aggregate, would not materially and adversely interfere with or affect the present use or occupancy of the applicable Owned Real Property; (viii) with respect to the Transferred Real Property that is Leased Real Property: (1) matters that a current ALTA/ACSM survey, or a similar cadastral survey in any country other than the United States, would disclose; (2) rights of the public, any Governmental Authority and adjoining property owners in streets and highways abutting or adjacent to the applicable Leased Real Property; (3) easements, licenses, rights-of-way, covenants, servitudes, restrictions, encroachments, site plans, subdivision plans and other Encumbrances of public record or that would be disclosed by a current title commitment of the applicable Leased Real Property or which have otherwise been imposed on such property by landlords; (ix) in the case of the Transferred Equity Interests, all restrictions and obligations contained in any Organizational Document, joint venture agreement, shareholders agreement, voting agreement and related documents and agreements, in each case, affecting the Transferred Equity Interests; (x) except to the extent otherwise agreed to in the Ratification Agreement entered into by Sellers and GMAC on June 1, 2009 and approved by the Bankruptcy Court on the date thereof or any other written agreement between GMAC or any of its Subsidiaries and any Seller, all Claims (in each case solely to the extent such Claims constitute Encumbrances) and Encumbrances in favor of GMAC or any of its Subsidiaries in, upon or with respect to any property of Sellers or in which Sellers have an interest, including any of the following: (1) cash, deposits, certificates of deposit, deposit accounts, escrow funds, surety bonds, letters of credit and similar agreements and instruments; (2) owned or leased equipment; (3) owned or leased real property; (4) motor vehicles, inventory, equipment, statements of origin, certificates of title, accounts, chattel paper, general intangibles, documents and instruments of dealers, including property of dealers in-transit to, surrendered or returned by or repossessed from dealers or otherwise in any Seller's possession or under its control; (5) property securing obligations of Sellers under derivatives Contracts; (6) rights or property with respect to which a Claim or Encumbrance in favor of GMAC or any of its Subsidiaries is disclosed in any filing made by Parent with the SEC (including any filed exhibit); and (7) supporting obligations, insurance rights and Claims against third parties relating to the foregoing; and (xi) all rights of setoff and/or recoupment that are Encumbrances in favor of GMAC and/or its Subsidiaries against amounts owed to Sellers and/or any of their Subsidiaries with respect to any property of Sellers or in which Sellers have an interest as more fully described in clause (x) above; it being understood that nothing in this clause (xi) or preceding clause (x) shall be deemed to modify, amend or otherwise change any agreement as between GMAC or any of its Subsidiaries and any Seller.

(f)     The following new definition of "Purchaser Escrow Funds" is hereby included in **Section 1.1** of the Purchase Agreement:

"Purchaser Escrow Funds" has the meaning set forth in **Section 2.2(a)(xx)**.

(g)    **Section 2.2(a)(xii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

> (xii)    all credits, Advanced Technology Credits, deferred charges, prepaid expenses, deposits, advances, warranties, rights, guarantees, surety bonds, letters of credit, trust arrangements and other similar financial arrangements, in each case, relating to the Purchased Assets or Assumed Liabilities, including all warranties, rights and guarantees (whether express or implied) made by suppliers, manufacturers, contractors and other third parties under or in connection with the Purchased Contracts;

(h)    **Section 2.2(a)(xviii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

> (xviii) any rights of any Seller, Subsidiary of any Seller or Seller Group member to any Tax refunds, credits or abatements that relate to any Pre-Closing Tax Period or Straddle Period;

(i)    **Section 2.2(a)(xix)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

> (xix)    any interest in Excluded Insurance Policies, only to the extent such interest relates to any Purchased Asset or Assumed Liability; and

(j)    A new **Section 2.2(a)(xx)** is hereby added to the Purchase Agreement to read as follows:

> (xx)    all cash and cash equivalents, including all marketable securities, held in (1) escrow pursuant to, or as contemplated by that certain letter agreement dated as of June 30, 2009, by and between Parent, Citicorp USA, Inc., as Bank Representative, and Citibank, N.A., as Escrow Agent or (2) any escrow established in contemplation or for the purpose of the Closing, that would otherwise constitute a Purchased Asset pursuant to **Section 2.2(a)(i)** (collectively, "Purchaser Escrow Funds");

(k)    **Section 2.2(b)(i)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

> (i)    cash or cash equivalents in an amount equal to $1,175,000,000 (the "Excluded Cash");

(l)    **Section 2.2(b)(ii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

> (ii)    all Restricted Cash exclusively relating to the Excluded Assets or Retained Liabilities, which for the avoidance of doubt, shall not be deemed to include Purchaser Escrow Funds;

(m)    **Section 2.3(a)(viii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(viii)    all Liabilities arising under any Environmental Law (A) relating to the Transferred Real Property, other than those Liabilities described in **Section 2.3(b)(iv)**, (B) resulting from Purchaser's ownership or operation of the Transferred Real Property after the Closing or (C) relating to Purchaser's failure to comply with Environmental Laws after the Closing;

(n)    **Section 2.3(a)(xii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(xii)    all Liabilities (A) specifically assumed by Purchaser pursuant to **Section 6.17** or (B) arising out of, relating to or in connection with the salaries and/or wages and vacation of all Transferred Employees that are accrued and unpaid (or with respect to vacation, unused) as of the Closing Date;

(o)    **Section 2.3(b)(iv)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(iv)    all Liabilities (A) associated with noncompliance with Environmental Laws (including for fines, penalties, damages and remedies); (B) arising out of, relating to, in respect of or in connection with the transportation, off-site storage or off-site disposal of any Hazardous Materials generated or located at any Transferred Real Property; (C) arising out of, relating to, in respect of or in connection with third party Claims related to Hazardous Materials that were or are located at or that were Released into the Environment from Transferred Real Property prior to the Closing, except as otherwise required under applicable Environmental Laws; (D) arising under Environmental Laws related to the Excluded Real Property, except as provided under Section 18.2(e) of the Master Lease Agreement or as provided under the "Facility Idling Process" section of Schedule A of the Transition Services Agreement; or (E) for environmental Liabilities with respect to real property formerly owned, operated or leased by Sellers (as of the Closing), which, in the case of clauses (A), (B) and (C), arose prior to or at the Closing, and which, in the case of clause (D) and (E), arise prior to, at or after the Closing;

(p)    **Section 2.3(b)(xii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(xii)    all workers' compensation Claims with respect to Employees residing or employed in, as the case may be and as defined by applicable Law, the states set forth on **Exhibit G** (collectively, "Retained Workers' Compensation Claims");

(q)    **Section 3.2(a)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

5

(a)    The purchase price (the "<u>Purchase Price</u>") shall be equal to the sum of:

(i)    a Bankruptcy Code Section 363(k) credit bid in an amount equal to: (A) the amount of Indebtedness of Parent and its Subsidiaries as of the Closing pursuant to the UST Credit Facilities, and (B) the amount of Indebtedness of Parent and its Subsidiaries as of the Closing under the DIP Facility, less $8,247,488,605 of Indebtedness under the DIP Facility (such amount, the "<u>UST Credit Bid Amount</u>");

(ii)    the UST Warrant (which the Parties agree has a value of no less than $1,000);

(iii)    the valid issuance by Purchaser to Parent of (A) 50,000,000 shares of Common Stock (collectively, the "<u>Parent Shares</u>") and (B) the Parent Warrants; and

(iv)    the assumption by Purchaser or its designated Subsidiaries of the Assumed Liabilities.

For the avoidance of doubt, immediately following the Closing, the only indebtedness for borrowed money (or any guarantees thereof) of Sellers and their Subsidiaries to Sponsor, Canada and Export Development Canada is amounts under the Wind Down Facility.

(r)    **Section 3.2(c)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(c)

(i)    Sellers may, at any time, seek an Order of the Bankruptcy Court (the "<u>Claims Estimate Order</u>"), which Order may be the Order confirming Sellers' Chapter 11 plan, estimating the aggregate allowed general unsecured claims against Sellers' estates. If in the Claims Estimate Order, the Bankruptcy Court makes a finding that the estimated aggregate allowed general unsecured claims against Sellers' estates exceed $35,000,000,000, then Purchaser will, within five (5) Business Days of entry of the Claims Estimate Order, issue additional shares of Common Stock (the "<u>Adjustment Shares</u>") to Parent, as an adjustment to the Purchase Price, based on the extent by which such estimated aggregate general unsecured claims exceed $35,000,000,000 (such amount, the "<u>Excess Estimated Unsecured Claim Amount</u>;" in the event this amount exceeds $7,000,000,000 the Excess Estimated Unsecured Claim Amount will be reduced to a cap of $7,000,000,000).  The number of Adjustment Shares to be issued will be equal to the number of shares, rounded up to the next whole share, calculated by multiplying (i) 10,000,000 shares of Common Stock (adjusted to take into account any stock dividend, stock split, combination of shares, recapitalization, merger, consolidation, reorganization or similar transaction with respect to the

Common Stock, effected from and after the Closing and before issuance of the Adjustment Shares) and (ii) a fraction, (A) the numerator of which is Excess Estimated Unsecured Claim Amount (capped at $7,000,000,000) and (B) the denominator of which is $7,000,000,000.

(ii)     At the Closing, Purchaser will have authorized and, thereafter, will reserve for issuance the maximum number of shares of Common Stock issuable as Adjustment Shares.

(s)     **Section 6.9(b)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(b)     Sellers shall use reasonable best efforts to agree with Sponsor on the terms of a restructuring of $1,175,000,000 of Indebtedness accrued under the DIP Facility (as restructured, the "Wind Down Facility") to provide for such Wind Down Facility to be non-recourse, to accrue payment-in-kind interest at the Eurodollar Rate (as defined in the Wind-Down Facility) plus 300 basis points, to be secured by all assets of Sellers (other than the Parent Shares, Adjustment Shares, Parent Warrants and any securities or proceeds received in respect thereof). Sellers shall use reasonable best efforts to enter into definitive financing agreements with respect to the Wind Down Facility so that such agreements are in effect as promptly as practicable but in any event no later than the Closing.

(t)     **Section 6.17(e)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(e)     *Assumption of Certain Parent Employee Benefit Plans and Policies*. As of the Closing Date, Purchaser or one of its Affiliates shall assume (i) the Parent Employee Benefit Plans and Policies set forth on Section 6.17(e) of the Sellers' Disclosure Schedule as modified thereon, and all assets, trusts, insurance policies and other Contracts relating thereto, except for any that do not comply in all respects with TARP or as otherwise provided in **Section 6.17(h)** and (ii) all employee benefit plans, programs, policies, agreements or arrangements (whether written or oral) in which Employees who are covered by the UAW Collective Bargaining Agreement participate and all assets, trusts, insurance and other Contracts relating thereto (collectively, the "Assumed Plans"), and Sellers and Purchaser shall cooperate with each other to take all actions and execute and deliver all documents and furnish all notices necessary to establish Purchaser or one of its Affiliates as the sponsor of such Assumed Plans including all assets, trusts, insurance policies and other Contracts relating thereto. Other than with respect to any Employee who was or is covered by the UAW Collective Bargaining Agreement, Purchaser shall have no Liability with respect to any modifications or changes to Benefit Plans contemplated by Section 6.17(e) of the Sellers' Disclosure Schedule, or changes made by Parent prior to the Closing Date, and Purchaser shall not assume any Liability with respect to any such decisions or actions related thereto, and Purchaser shall only assume the Liabilities for benefits provided pursuant to the written terms and conditions of

the Assumed Plan as of the Closing Date. Notwithstanding the foregoing, the
assumption of the Assumed Plans is subject to Purchaser taking all necessary
action, including reduction of benefits, to ensure that the Assumed Plans comply
in all respects with TARP.  Notwithstanding the foregoing, but subject to the
terms of any Collective Bargaining Agreement to which Purchaser or one of its
Affiliates is a party, Purchaser and its Affiliates may, in its sole discretion, amend,
suspend or terminate any such Assumed Plan at any time in accordance with its
terms.

(u)    A new **Section 6.17(n)** is hereby added to the Purchase Agreement to read as
follows:

(n)    *Harlem Employees*.    With respect to non-UAW employees of
Harlem, Purchaser or one of its Affiliates may make offers of employment to such
individuals at its discretion.  With respect to UAW-represented employees of
Harlem and such other non-UAW employees who accept offers of employment
with Purchaser or one of its Affiliates, in addition to obligations under the UAW
Collective Bargaining Agreement with respect to UAW-represented employees,
Purchaser shall assume all Liabilities arising out of, relating to or in connection
with the salaries and/or wages and vacation of all such individuals that are
accrued and unpaid (or with respect to vacation, unused) as of the Closing Date.
With respect to non-UAW employees of Harlem who accept such offers of
employment, Purchaser or one of its Affiliates shall take all actions necessary
such that such individuals shall be credited for their actual and credited service
with Sellers and each of their respective Affiliates, for purposes of eligibility,
vesting and benefit accrual in any employee benefit plans (excluding equity
compensation plans or programs) covering such individuals after the Closing;
provided, however, that such crediting of service shall not operate to duplicate
any benefit to any such individual or the funding for any such benefit. Purchaser
or one of its Affiliates, in its sole discretion, may assume certain employee benefit
plans maintained by Harlem by delivering written notice (which such notice shall
indentify such employee benefit plans of Harlem to be assumed) to Sellers of such
assumption on or before the Closing, and upon delivery of such notice, such
employee benefit plans shall automatically be deemed to be set forth on Section
6.17(e) of the Sellers' Disclosure Schedules.  All such employee benefit plans that
are assumed by Purchaser or one of its Affiliates pursuant to the preceding
sentence shall be deemed to be Assumed Plans for purposes of this Agreement.

(v)    A new **Section 6.36** is hereby added to the Purchase Agreement to read as
follows:

*Section 6.36    Advanced Technology Credits*.    The Parties agree that
Purchaser shall, to the extent permissible by applicable Law (including all rules,
regulations and policies pertaining to Advanced Technology Projects), be entitled
to receive full credit for expenditures incurred by Sellers prior to the Closing
towards Advanced Technology Projects for the purpose of any current or future
program sponsored by a Governmental Authority providing financial assistance in

connection with any such project, including any program pursuant to Section 136 of the Energy Independence and Security Act of 2007 ("Advanced Technology Credits"), and acknowledge that the Purchase Price includes and represents consideration for the full value of such expenditures incurred by Sellers.

(w)     **Section 7.2(c)(vi)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(vi)     *[Reserved]*;

(x)     **Section 7.2(c)(vii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(vii)     *[Reserved]*;

(y)     **Section 7.3(c)(viii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(viii)     *[Reserved]*;

(z)     **Section 7.3(c)(ix)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(ix)     *[Reserved]*;

(aa)     **Section 7.3(f)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(f)     Purchaser shall have (i) offset the UST Credit Bid Amount against the amount of Indebtedness of Parent and its Subsidiaries owed to Purchaser as of the Closing under the UST Credit Facilities and the DIP Facility pursuant to a Bankruptcy Code Section 363(k) credit bid and delivered releases and waivers and related Encumbrance-release documentation (including, if applicable, UCC-3 termination statements) with respect to the UST Credit Bid Amount, in a form reasonably satisfactory to the Parties and duly executed by Purchaser in accordance with the applicable requirements in effect on the date hereof, (ii) transferred to Sellers the UST Warrant and (iii) issued to Parent, in accordance with instructions provided by Parent, the Purchaser Shares and the Parent Warrants (duly executed by Purchaser).

(bb)     **Exhibit R** to the Purchase Agreement is hereby deleted in its entirety.

(cc)     **Exhibit S** to the Purchase Agreement is hereby deleted in its entirety.

(dd)     **Exhibit U** to the Purchase Agreement is hereby replaced in its entirety with **Exhibit U** attached hereto.

(ee)    **Exhibit X** to the Purchase Agreement is hereby replaced in its entirety with **Exhibit X** attached hereto.

(ff)    Section 2.2(b)(iv) of the Sellers' Disclosure Schedule is hereby replaced in its entirety with Section 2.2(b)(iv) of the Sellers' Disclosure Schedule attached hereto.

(gg)    Section 4.4 of the Sellers' Disclosure Schedule is hereby replaced in its entirety with Section 4.4 of the Sellers' Disclosure Schedule attached hereto.

(hh)    Section 6.6(a)(i) of the Sellers' Disclosure Schedule is hereby replaced in its entirety with Section 6.6(a)(i) of the Sellers' Disclosure Schedule attached hereto.

Section 3.    *Effectiveness of Amendment.*  Upon the execution and delivery hereof, the Purchase Agreement shall thereupon be deemed to be amended and restated as set forth in Section 2, as fully and with the same effect as if such amendments and restatements were originally set forth in the Purchase Agreement.

Section 4.    *Ratification of Purchase Agreement; Incorporation by Reference.*  Except as specifically provided for in this Amendment, the Purchase Agreement is hereby confirmed and ratified in all respects and shall be and remain in full force and effect in accordance with its terms.  This Amendment is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement, including **Article IX** thereof, which sections are hereby incorporated into this Amendment, mutatis mutandis, as if they were set forth in their entirety herein.

Section 5.    *Counterparts.*  This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same agreement.  All signatures of the Parties may be transmitted by facsimile or electronic delivery, and each such facsimile signature or electronic delivery signature (including a pdf signature) will, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and be binding upon such Party.

[Remainder of page intentionally left blank]

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _Frederick A. Henderson_

Name: Frederick A. Henderson
Title: President and Chief Executive
Officer

SATURN LLC

By: _____

Name: Jill Lajdziak
Title: President

SATURN DISTRIBUTION CORPORATION

By: _____

Name: Jill Lajdziak
Title: President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____

Name: Michael Garrick
Title: President

NGMCO, INC.

By: _____

Name: Sadiq Malik
Title: Vice President and Treasurer

**IN WITNESS WHEREOF**, each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
   Name: Frederick A. Henderson
   Title: President and Chief Executive
      Officer

SATURN LLC

By: _____
   Name: Jill Lajdziak
   Title: President

SATURN DISTRIBUTION CORPORATION

By: _____
   Name: Jill Lajdziak
   Title: President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
   Name: Michael Garrick
   Title: President

NGM CO, INC.

By: _____
   Name: Sadiq Malik
   Title: Vice President an I Treasurer

IN WITNESS WHEREOF, each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
    Name:  Frederick A. Henderson
    Title:   President and Chief Executive
            Officer

SATURN LLC

By: _____
    Name:  Jill Lajdziak
    Title:   President

SATURN DISTRIBUTION CORPORATION

By: _____
    Name:  Jill Lajdziak
    Title:   President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name:  Michael Garrick
    Title:   President

NGMCO, INC.

By: _____
    Name: Sadiq Malik
    Title:   Vice President and Treasurer

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
    Name:  Frederick A. Henderson
    Title:   President and Chief Executive
             Officer

SATURN LLC

By: _____
    Name:  Jill Lajdziak
    Title:   President

SATURN DISTRIBUTION CORPORATION

By: _____
    Name:  Jill Lajdziak
    Title:   President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name:  Michael Garrick
    Title:   President

NGMCO, INC.

By: _____
    Name:  Sadiq Malik
    Title:  Vice President and Treasurer

# Exhibit C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
In re                                            :          Chapter 11
                                                 :
MOTORS LIQUIDATION COMPANY, *et al.*,            :          Case No.: 09-50026 (REG)
        f/k/a General Motors Corp., *et al.*     :
                                                 :          (Jointly Administered)
                        Debtors.                 :
---------------------------------------------------------------x

ORDER, PURSUANT TO 28 U.S.C. § 158(d),
AND FED.R.BANKR.P. 8006(e), CERTIFYING JUDGMENT FOR
DIRECT APPEAL TO SECOND CIRCUIT

The Court having considered entry of this order on its own motion, and for the reasons

set forth in its Decision on Motion to Enforce Sale Order, dated April 15, 2015 (the "**Decision**"),

it is ORDERED:

1. Pursuant to 28 U.S.C. § 158(d), and Fed.R.Bankr.P. 8006(e), the Judgment entered

this day in this case is certified for direct appeal to the United States Court of Appeals for the

Second Circuit (the "**Court of Appeals**"). Pursuant to Fed.R.Bankr.P. 8006(e)(1), a copy of the

Decision, which contains the information required by Fed.R.Bankr.P. 8006(f)(2)(A)-(D), is

attached as Exhibit A.

2. Pursuant to Fed.R.Bankr.P. 8006(a), this Certification shall be effective at such time,

and only at such time, that a timely appeal has been taken in the manner required by

Fed.R.Bankr.P. 8003 or 8004, and the notice of appeal has become effective under

Fed.R.Bankr.P. 8002.

3. Pursuant to Fed.R.Bankr.P. 8006(g), the parties are reminded of the need to file a

petition for permission to appeal, in accordance with Fed.R.App.P. 6(c), no later than 30 days

after this certification has become effective.

4.  The parties' stipulation that they shall not file any voluntary supplemental statements regarding the Court's certification of the Appeal as allowed pursuant to Bankruptcy Rule 8006(e)(2), and that they shall submit all statements either in support or against certification of the Appeal in the Court of Appeals, is so ordered by this Court.

5.  The Ignition Switch Plaintiffs, the Pre-Closing Accident Plaintiffs, the Non-Ignition Switch Plaintiffs, New GM, the GUC Trust, the GUC Trust Unitholders and the Groman Plaintiffs each reserve all of their rights with respect to the Appeal, including the right to challenge any of the factual and legal findings made by this Court in the Decision and to challenge certification for direct appeal.

6.  Except as otherwise ordered by the Court of Appeals, appellate proceedings (including, but not limited to the filing of briefs or any motions) are stayed, and the deadlines for the filing of such are tolled, pursuant to 28 U.S.C. § 158(d)(1)(D), pending the order of the Court of Appeals determining whether it will hear the appeal; *provided* that notwithstanding the foregoing, the deadlines:  (x) for the filing of notices of appeal or of cross-appeal; (y) for the designation of the record; or (z) for any statements of issues on appeal are NOT so stayed, nor shall the deadlines for their filing be tolled, in the absence of a further order by this Court or the Court of Appeals.  Likewise, except as otherwise ordered by the Court of Appeals, the District Court or this Court, the Clerk of the Bankruptcy Court shall refrain from transmitting the Record on Appeal and any associated documents to the District Court until the Court of Appeals determines whether it will hear the appeal instead.

7.  For the avoidance of doubt, the preceding paragraph relates only to appellate proceedings, and the stay and tolling of time limits therein, pending the Court of Appeals' decision as to where appeals from the Judgment will be heard.  Nothing in this Order shall be

-2-

deemed to order a stay of the underlying Judgment itself.  Nor shall this Order stay or prohibit

the filing of any documents in or for the benefit of the Court of Appeals, including without

limitation, any filings under Fed.R.Bankr.P. 8006(e)(2) or under the Federal Rules of Appellate

Procedure.


Dated: New York, New York                     _____*s/ Robert E. Gerber*_____
      June 1, 2015                                   United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

In re                                              :        Chapter 11
                                                   :
MOTORS LIQUIDATION COMPANY, *et al.*,  :        Case No.: 09-50026 (REG)
      f/k/a General Motors Corp., *et al.*   :
                                                   :        (Jointly Administered)
                 Debtors.   :

-----------------------------------------------------------x

## DECISION ON MOTION TO ENFORCE SALE
## ORDER

APPEARANCES:

KING & SPALDING LLP
*Counsel for General Motors LLC (New GM)*
1185 Avenue of the Americas
New York, New York 10036
By:    Arthur J. Steinberg, Esq. (argued)
        Scott I. Davidson, Esq.

KIRKLAND & ELLIS LLP
*Counsel for General Motors LLC (New GM)*
300 North LaSalle
Chicago, Illinois 60654
By:    Richard C. Godfrey, Esq.
        Andrew B. Bloomer, Esq.

BROWN RUDNICK
*Designated Counsel and Counsel for Economic Loss Plaintiffs*
Seven Times Square
New York, New York 10036
By:    Edward S. Weisfelner, Esq. (argued)
        David J. Molton, Esq.
        May Orenstein, Esq.
        Howard S. Steel, Esq.
        Rebecca L. Fordon, Esq.

STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.
*Designated Counsel and Counsel for Economic Loss Plaintiffs*
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
By:    Sander L. Esserman, Esq. (argued)

GOODWIN PROCTER, LLP
*Designated Counsel and Counsel for Pre-Sale Accident Victim Plaintiffs*
The New York Times Building
620 Eighth Avenue
New York, New York 10018
By:   William P. Weintraub, Esq. (argued)
      Eamonn O'Hagan, Esq.
      Gregory W. Fox, Esq.

GOLENBOCK, EISEMAN, ASSOR, BELL & PESKOE, LLP
*Counsel for Groman Plaintiffs*
437 Madison Avenue
New York, New York 10022
BY:   Jonathan L. Flaxer, Esq. (argued)
      S. Preston Ricardo, Esq.

GIBSON, DUNN & CRUTCHER, LLP
*Counsel for Wilmington Trust Company as*
*GUC Trust Administrator*
200 Park Avenue
New York, New York 10166
BY:   Lisa H. Rubin, Esq. (argued)
      Keith R. Martorana, Esq.
      Matthew Williams, Esq.
      Adam H. Offenhartz, Esq.
      Aric H. Wu, Esq.

AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
*Counsel for Participating GUC Trust Unit Trust Holders*
One Bryant Park
New York, New York 10036
By:   Daniel Golden, Esq.
      Deborah J. Newman, Esq. (argued)
      Jamison A. Diehl, Esq.
      Naomi Moss, Esq.

Introduction .................................................................................................... 1
Summary of Conclusions ............................................................................... 5
   1.   Due Process .......................................................................................... 6
     (a) Notice Before Entry of Sale Order ............................................. 7
     (b) Notice Before Expungement of Claims .................................... 9
     (c) Requirement for Prejudice ....................................................... 10
   2.   Remedies ............................................................................................ 12
   3.   Assumed Liabilities ........................................................................... 14
   4.   Equitable Mootness ........................................................................... 15
   5.   Fraud on the Court ............................................................................ 16
   6.   Certification to the Circuit ................................................................ 17
Facts ............................................................................................................... 17
   1.   Background ......................................................................................... 17
   2.   Chapter 11 Filing .............................................................................. 18
   3.   The Sale Motion and Notice Order ................................................... 19
   4.   Notice of the Sale .............................................................................. 20
   5.   Objections to Free and Clear Provisions .......................................... 20
   6.   Sale Agreement—Relevant Provisions ............................................ 23
   7.   The Sale Order .................................................................................. 26
   8.   Matters After the Sale ....................................................................... 27
   9.   The GUC Trust and its Operation ..................................................... 28
   10.   Knowledge of the Ignition Switch Defect ........................................ 32
   11.   The Motion to Enforce ...................................................................... 33
   12.   The Threshold Issues ........................................................................ 34
Discussion ...................................................................................................... 35
I. Due Process ................................................................................................ 35
A. Underlying Principles ............................................................................... 36
   1.   Mullane .............................................................................................. 36
   2.   Second Circuit Guidance ................................................................... 41
   3.   Guidance from Lower Courts ............................................................ 45
   4.   The "Known"-"Unknown" Creditor Distinction ............................. 46
B. The Particular Issues Here ........................................................................ 52
   1.   Do Due Process Requirements Apply? ............................................. 52
   2.   Notice by Publication ....................................................................... 61
   3.   Known Claim Analysis ..................................................................... 62
   4.   The Requirement for Prejudice ........................................................ 69
   5.   Application of Those Principles  to Economic Loss Plaintiffs ........... 77
     (a)   Successor Liability ................................................................. 77
     (b)   New GM's Own Wrongful Acts ............................................ 82
     (c) The Used Car Purchasers .......................................................... 85
   6.   Application of Those Principles to Pre-Closing Accident Plaintiffs ... 89
   7.   Application to Filing of Claims ......................................................... 90
II.  Remedies .................................................................................................. 92
A. The Sale Order ........................................................................................... 92
   1.   Prejudice As Affecting Remedy ....................................................... 93
   2.   Attaching Claims to Sale Proceeds .................................................. 94

09-50026-reg   Doc 13178-1   Filed 06/01/15   Entered 06/01/15 07:42:33   Main Document
Pg 247 of 381

    3.     Protection of Purchasers of Estate Assets ............................................ 95

    4.     Effect of Constitutional Violations ..................................................... 97

    5.     Remedies Conclusion............................................................................ 106

B.  Claims.......................................................................................................... 107

III.  Assumed Liabilities ........................................................................................ 107

IV. Equitable Mootness ......................................................................................... 108

A.  Underlying Principles ................................................................................. 108

B.  Applying Those Principles Here ................................................................. 111

    1.     Ability to Fashion Effective Relief ..................................................... 112

    2.     Effect on Re-emergence of Debtor as Revitalized Corporate Entity; ................ 114

    3.     Unraveling Intricate Transactions ...................................................... 114

    4.     Adversely Affected Parties .................................................................. 118

    5.     Pursuit of Stay Remedies .................................................................... 119

V.  Fraud on the Court .......................................................................................... 122

    1.     Effect on Process of Adjudication ...................................................... 125

    2.     Victim of the Fraud............................................................................. 129

    3.     Particular Standards to Apply ............................................................. 130

VI.  Certification to Circuit................................................................................... 131

Conclusion .......................................................................................................... 133

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

<u>Introduction</u>

In this contested matter in the chapter 11 case of Debtor Motors Liquidation

Company, previously known as General Motors Corporation ("**Old GM**"), General

Motors LLC ("**New GM**")—the acquirer of most of Old GM's assets in a section 363

sale back in July 2009—moves for an order enforcing provisions of the July 5, 2009

order (the "**Sale Order**") by which this Court approved New GM's purchase of Old

GM's assets.[1]

The Sale Order, filed in proposed form on the first day of Old GM's chapter 11

case with Old GM's motion for the sale's approval, was entered, in a slightly modified

form, within a few hours after this Court issued its opinion approving the sale.[2]  There

were approximately 850 objections to the 363 Sale, the proposed Sale Order, or both.

But the most serious were those relating to elements of the Sale Order ("**Free and Clear**

**Provisions**"), discussed in more detail below, that provided that New GM would

purchase Old GM's assets "free and clear" of successor liability claims.  After lengthy

analysis,[3] the Court overruled those objections.

In March 2014, New GM announced to the public, for the first time, serious

defects in ignition switches that had been installed in Chevy Cobalts and HHRs, Pontiac

---

[1]    ECF No. 12620.  New GM's motion has been referred to by New GM, the other parties, and the
       Court as the "**Motion to Enforce**."

[2]    *See In re General Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009) (Gerber, J.) (the "*Sale
       Opinion* "), *stay pending appeal denied,* 2009 WL 2033079 (S.D.N.Y. Jul. 9, 2009) (Kaplan, J.)
       (the "*Stay Opinion*"), *appeal dismissed and aff'd sub nom Campbell v. General Motors Corp.*,
       428 B.R. 43 (S.D.N.Y. 2010) (Buchwald, J.) ("*Affirmance Opinion #1*) and  *Parker v. General
       Motors Corp.*, 430 B.R. 65 (S.D.N.Y. 2010) (Sweet, J.) ("*Affirmance Opinion #2*), *appeal
       dismissed*, No. 10–4882–bk (2d Cir. July 28, 2011) (*per curiam*, Jacobs, CJ, and Hall and Carney,
       JJ.), *cert. denied*, 132 S.Ct. 1023 (2012).

[3]    *See Sale Opinion*, 407 B.R. at 499-506.

G5s and Solstices, and Saturn Ions and Skys (the "**Ignition Switch Defect**"), going back
to the 2005 model year.  In the Spring of 2014 (though many have queried why Old GM
and/or New GM failed to do so much sooner), New GM then issued a recall of the
affected vehicles, under which New GM would replace the defective switches, and bear
the costs for doing so.

New GM previously had agreed to assume responsibility for any accident claims
involving post-sale deaths, personal injury, and property damage—which would include
any that might have resulted from the Ignition Switch Defect.  But New GM's
announcement was almost immediately followed by the filing of about 60 class actions in
courts around the United States, seeking compensatory damages, punitive damages,
RICO damages and attorneys fees for *other* kinds of losses to consumers—"**Economic
Loss**"—alleged to have resulted from the Ignition Switch Defect.  The claims for
Economic Loss include claims for alleged reduction in the resale value of affected cars,
other economic loss (such as unpaid time off from work when getting an ignition switch
replaced), and inconvenience.  The Court has been informed that the number of class
actions now pending against New GM—the great bulk of which were brought by or on
behalf of individuals claiming Economic Loss ("**Economic Loss Plaintiffs**")—now
exceeds 140.  Though the amount sought by Economic Loss Plaintiffs is for the most part
unliquidated, it has been described as from $7 to $10 billion.  Most of those actions
("**Ignition Switch Actions**") are now being jointly administered, for pretrial purposes, in
a multi-district proceeding before the Hon. Jesse Furman, U.S.D.J., in the Southern
District of New York (the "**MDL Court**").

-2-

New GM here seeks to enforce the Sale Order's provisions, quoted below, blocking economic loss lawsuits against New GM on claims involving vehicles and parts manufactured by Old GM.[4]  New GM argues that while it had voluntarily undertaken, under the Sale Order, to take on an array of Old GM liabilities (for the post-sale accidents involving both Old GM and New GM vehicles just described; under the express warranty on the sale of any Old GM or New GM vehicle (the "**Glove Box Warranty**"); to satisfy statutory recall obligations with respect to Old GM and New GM vehicles alike; and under Lemon Laws, again with respect to Old GM and New GM vehicles alike), the Sale Order blocked any others—including those in these suits for Economic Loss.

The Sale Order, as discussed below, plainly so provides.  But as to 70 million Old GM cars whose owners had not been in accidents of which they'd advised Old GM, the Sale Order was entered with notice only by publication.  And those owning cars with Ignition Switch Defects (again, those who had not been in accidents known to Old GM)—an estimated 27 million in number—were given neither individual mailed notice of the 363 Sale, nor mailed notice of the opportunity to file claims for any losses they allegedly suffered.  And more importantly, from the perspective of these car owners, they were not given *recall notices* which (in addition to facilitating switch replacement before accidents took place), they contend were essential to enabling them to respond to the published notices to object to the 363 Sale or to file claims.

---

[4]    There may be misunderstandings as to the matters now before the Court.  New GM has already undertaken to satisfy claims for death, personal injury, and property damage in accidents occurring after the 363 Sale—involving vehicles manufactured by New GM and Old GM alike.  Except for the *pre*-Sale accidents that are the subject of the Pre-Closing Accident Plaintiffs' contentions, addressed below (where those plaintiffs wish to sue New GM in lieu of Old GM), this controversy does not involve death, personal injury, or property damage arising in accidents.  Instead it involves only *economic losses* allegedly sustained with respect to Old GM vehicles or parts.

Then, after New GM filed the Motion to Enforce, two other categories of
Plaintiffs came into the picture.  One was another group of Ignition Switch Defect
plaintiffs (the "**Pre-Closing Accident Plaintiffs**") who (unlike the Economic Loss
Plaintiffs) are suing with respect to actual accidents.  But because those accidents
involved Old GM and took place *before* the 363 Sale Closing—and taking on pre-closing
accident liability was not commercially necessary to New GM's future success—they
were not among the accidents involving Old GM vehicles for which New GM agreed to
assume responsibility.  The Pre-Closing Accident Plaintiffs have (or at least had) the right
to assert claims against Old GM (the only entity that was in existence at the time their
accidents took place), but they nevertheless wish to proceed against New GM.  New GM
brought a second motion to enforce the Sale Order[5] with respect to the Pre-Closing
Accident Plaintiffs, and issues with respect to this Plaintiff group were heard in tandem
with the Motion to Enforce.

The other category of Plaintiffs later coming into the picture ("**Non-Ignition
Switch Plaintiffs**") brought actions asserting Economic Loss claims as to GM branded
cars that *did not have* Ignition Switch Defects, including cars made by New GM and Old
GM alike.  In fact, most of their cars did not have defects, and/or were not the subject of
recalls, at all.  But they contend, in substance, that the Ignition Switch Defect caused
damage to "the brand,"[6] resulting in Economic Loss to them.  New GM brought still

---

[5]     ECF No. 12807.

[6]     *See* Day 1 Arg. Tr. at 137:4-138:16, Feb. 17, 2015 ("[PL. COUNSEL]:  The revelation of New
        GM's extensive deceptions tarnished the brand further . . .They allege that new GM concealed and
        suppressed material facts about the quality of its vehicle and the GM brand."); Day 2 Arg. Tr. at
        61:16-62:5, Feb. 18. 2015 ("THE COURT:  I thought I heard arguments from either you or Mr.
        Esserman or both, that the contention being made on the Plaintiffs' side is that the failure to deal
        with the ignition switches damaged the GM brand, and is some Court of competent jurisdiction
        then going to hear an argument that there are 70 million vehicles that lost value and not just the 27
        million that are the subject of the recalls, or the lesser 13 million to which you just made

-4-

another motion[7] to enforce the Sale Order with respect to them, though this third motion
has been deferred pending the determination of the issues here.

In this Court, the first two groups of Plaintiffs, whose issues the Court could
consider on a common set of stipulated facts and is in major respects considering
together,[8] contend that by reason of Old GM's failure to send out recall notices, they
never learned of the Ignition Switch Defect, and that the Sale Order is unenforceable
against them.

### Summary of Conclusions

New GM is right when it says that most of the claims now asserted against it are
proscribed under the Sale Order. But that is only the start, and not the end, of the
relevant inquiry. And assuming, as the Plaintiffs argue, that Old GM's and then New
GM's delay in announcing the Ignition Switch Defect to the driving public was
unforgiveable, that too is only the start, and not the end of the relevant inquiry.

The real issues before the Court involve questions of procedural due process, and
what to do about it if due process is denied: (1) what notice was sufficient; (2) to what
extent an assertedly aggrieved individual's lack of prejudice from insufficient notice

---

reference? [PL. COUNSEL]: I'm not counsel of record there, but I guess I would be surprised if
the Plaintiffs in those actions aren't likewise looking for recompense for the people without
ignition switch defects in their car, on the theory, which may or may not be upheld by Judge
Furman . . . as giving rise to cognizable claims and causes of action.") Though not mentioned by
Plaintiffs' counsel then, those claims were made with respect to cars made by Old GM, *see, e.g.,*
Consolidated Amended Complaint for Post-Sale Vehicles ¶¶ 820-825, and thus were violative of
the Sale Order, to the extent it remains enforceable.

[7]   ECF No. 12808.

[8]   When they can be referred to together, they are collectively referred to as the "**Plaintiffs**." Their
bankruptcy counsel, retained and then designated to act for the large number of plaintiffs whose
counsel at least generally litigate tort matters, rather than bankruptcy issues, have been referred to
as "**Designated Counsel**." As the two groups of Plaintiffs' circumstances overlap in part and
diverge in part, one brief was filed by Designated Counsel for Economic Loss Plaintiffs, and
another by Designated Counsel for Pre-Closing Accident Plaintiffs—with the latter relying on the
former's brief with respect to overlapping themes. References to "Pl. Br." are thus to the main
brief filed by the Economic Loss Plaintiffs' Designated Counsel.

matters; (3) what remedies are appropriate for any due process denial; and (4) to what extent sale orders can be modified after the fact at the expense of those who purchased assets from an estate on the expectation that the sale orders would be enforced in accordance with their terms.  They also involve the needs and concerns of Old GM creditors whose claims are pending, and of holders of units of the Old GM General Unsecured Creditors Trust ("**GUC Trust**"), formed for the benefit of unsecured creditors when Old GM confirmed its liquidating plan of reorganization (the "**Plan**")—all of whom would be prejudiced if Old GM's remaining assets were tapped to satisfy an additional $7 to $10 billion in claims.

For the reasons discussed at length below, the Court concludes:

*1. Due Process*

Notice must be provided in bankruptcy cases, as in plenary litigation, that is "reasonably calculated, under all the circumstances" to apprise people of the pendency of any proceeding that may result in their being deprived of any property, and to "afford them an opportunity to present their objections."[9]  The Second Circuit, like many other courts, has held that "the Due Process Clause requires the best notice practical under the circumstances."[10]  But "actual" (*i.e.*, personalized) notice is required for "known" creditors—those whose names and addresses are "reasonably ascertainable."[11] "Constructive" notice (typically provided by publication) can be used when it is the best

---

[9]     *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("***Mullane***") (citations omitted).

[10]    *In re Drexel Burnham Lambert Grp.*, 995 F.2d 1138, 1144 (2d Cir. 1993) ("***Drexel Burnham***"). The *Drexel Burnham* chapter 11 case generated several opinions relevant to this controversy.  The Court has given another of them a different shorthand name to help tell it apart.  *See* n.105 below.

[11]    *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 800 (1983) ("***Mennonite Board***").

notice practical under the circumstances.  But publication notice, as a substitute for actual notice, at least normally is insufficient for "known" creditors.

In the bankruptcy context, those general principles apply to both the notice required incident to sale approval motions, on the one hand, and to claims allowance, on the other.  And in this case, the Court ultimately reaches largely the same conclusions with respect to each.  But the different circumstances applicable to the sale process (to be completed before a grievously bleeding Old GM ran out of money) and the claims process (which lacked comparable urgency) cause the Court to reach those conclusions in different ways.

*(a) Notice Before Entry of Sale Order*

The Court disagrees with New GM's contention that imposing free and clear provisions doesn't result in a potential deprivation of property, and thus concludes that due process requirements apply.  But the caselaw—in plenary litigation and in bankruptcy cases alike—permits, and indeed requires, consideration of practicality.

There was extraordinary urgency in connection with the 363 Sale.  In June 2009, Old GM was bleeding cash at an extraordinary rate.  And U.S. and Canadian governmental authorities, who had agreed to provide cash to keep Old GM alive until the closing of a 363 sale, had conditioned their willingness to continue the necessary funding on the approval of the 363 Sale by July 10, 2009, only 40 days after the chapter 11 filing.

Given that urgency, with the sale hearing to commence 29 days after the Petition Date; objections due 18 days after the Petition Date; and 70 million Old GM vehicles on the road, notice by publication to vehicle owners was obviously proper.  Indeed, it was essential.  It would be wholly unreasonable to expect actual notice of the 363 Sale hearing then to have been mailed to the owners of the 70 million GM cars on the road at

the time, or even the 27 million whose cars were then (or later became) the subject of pending recalls. Though notice by publication would at least normally also be acceptable in instances involving considerably smaller bodies of creditors, this is exactly the kind of situation for which notice by publication is the norm. Under normal circumstances, notice by publication would easily be sufficient under *Mullane, Drexel Burnham,* and their respective progeny.

But the Court must also determine whether the knowledge of many Old GM personnel of the Ignition Switch Defect removes this case from the general rule. While there is no indication on this record, if there ever will be, that Old GM's bankruptcy counsel knew of the need to focus on notice to owners of cars with Ignition Switch Defects, at least 24 business and in-house legal personnel at Old GM were aware of the problem. As of June 2009, when entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required, under the National Traffic and Motor Vehicle Safety Act (the "**Safety Act**"), to send out mailed recall notices to owners of affected Old GM vehicles. And Old GM knew to whom it had to mail the recall notices, and had addresses for them.

The adequacy of notice issue is nevertheless close, however, because while Old GM had a known recall obligation, and knew the names and addresses of those owning the vehicles that were affected, Old GM gave *actual* notice of the 363 Sale to anyone who had previously asserted a claim against it for injury or death—by reason of Ignition Switch Defects or otherwise. And only a subset (and, possibly a small subset) of the others who were entitled to Ignition Switch Defect recall notices would later turn out to have been injured, killed, or economically damaged as a result of the circumstances that

-8-

led to the recall, or want to object to the 363 Sale or any of its terms.  That *some* of them would be killed or injured was known; *who they would be* was not.

But on balance the Court believes that the distinction is insufficient to be meaningful.  The known safety hazard that engendered the unsatisfied recall obligations gave rise to claims associated with the repair (and assertedly, though this is yet to be decided, decreases in value) of the cars and would give rise to more claims if car occupants were killed or injured as a result.  Old GM knew—even if it knew the particular identities of only *some* cars that had been in Ignition Switch Defect accidents— that the defect had caused accidents; that is exactly why this particular recall was required.  And Old GM also knew, from the same facts that caused it to be on notice of the need for the recall, that *others*, in the future, would be in accidents as well.

The publication notice here given, which otherwise would have been perfectly satisfactory (especially given the time exigencies), was not by itself enough for those whose cars had Ignition Switch Defects—because from Old GM's perspective, the facts that gave rise to its recall obligation resulted in "known" claims, as that expression is used in due process jurisprudence.  Because owners of cars with Ignition Switch Defects received neither the notice required under the Safety Act nor any reasonable substitute (either of which, if given before Old GM's chapter 11 filing, could have been followed by the otherwise satisfactory post-filing notice by publication), they were denied the notice that due process requires.

### (b) Notice Before Expungement of Claims

By contrast to the 363 Sale, there was no particular urgency with respect to the allowance of claims.  Claims could be (and ultimately were) considered in a less hurried fashion.  And while notice only by publication to 70 million (or even 27 million) vehicle

-9-

owners not known by Old GM to have been in accidents would be the norm for the

claims process as well (and notice by publication, applicable in this respect and others, is

what this Court then approved), the fact is that even at the later times set as deadlines for

the filing of claims, Old GM still had not sent out notice of the recall, and Old GM car

owners were still unaware of any resulting potential claims.

In the claims allowance respect too, the Court concludes that Old GM's

knowledge of facts sufficient to justify notice of a recall, and its failure to provide the

recall notice, effectively resulted in a denial of the notice due process requires.

### (c) Requirement for Prejudice

Though the Court has found failures, insofar as the Plaintiffs are concerned, to

provide the notice that due process requires, that does not by itself mean that they have

established a due process violation. The Court categorically rejects the Plaintiffs'

contention that prejudice is irrelevant. Rather, in order to establish a due process

violation, they must demonstrate that they have sustained prejudice as a result of the

allegedly insufficient notice.[12]

In some instances, a lack of notice plainly results in prejudice, as in instances in

which the earlier judicial action cannot be undone. In others, it does not—and it can be

cured by providing the opportunity to be heard at a later time, and, where the law permits

and requires, vacating or modifying the earlier order, or exempting parties from the

order's effect. In every case, however, a denial of notice need not result in an automatic

win for the party that failed to get appropriate notice the first time around. Instead that

party should get the full and fair hearing it was initially denied, with the Court then

---

[12]     *Perry v. Blum*, 629 F.3d 1, 17 (1st Cir. 2010); *accord* all of the other cases cited in nn.162 through
164 *infra*.

focusing on the extent to which prejudice actually resulted—and, of course, on achieving

the right outcome on the merits, which in a perfect world would have been reached the

first time.[13]

> Both groups of Plaintiffs were plainly prejudiced with respect to the bar date for

filing claims.  But the Pre-Closing Accident Plaintiffs were not prejudiced at all, and the

Economic Loss Plaintiffs were prejudiced only in part, by the failure to give them the

requisite notice in connection with the 363 Sale.  Neither the Economic Loss Plaintiffs

nor the Pre-Closing Sale Plaintiffs were prejudiced with respect to the Sale Order's Free

and Clear Provisions.  Back in 2009, the Court heard many others make the same

arguments, and rejected them.  The Court now has heard from both the Economic Loss

Plaintiffs and Pre-Closing Accident Plaintiffs with respect to the Free and Clear

Provisions and successor liability, with full and fair opportunity to be heard.  And neither

Plaintiff group has advanced any arguments on successor liability that were not

previously made, and made exceedingly well before.  Their principal contention—that

they would have won by reason of public outrage, political pressure, or the U.S.

Treasury's anger with Old GM, when they would not have won in the courtroom—is the

very speculation that they rightfully criticize.  Thus insofar as successor liability is

concerned, while the Plaintiffs established a failure to provide them with the notice due

---

[13]   That was referred to in oral argument here, initially by the Court, as a "do-over."  In many, if not most, instances, that will be required, but in many, if not most, cases that will also be sufficient.  What is critical, however it is accomplished, is that the Court gauge in a non-speculative fashion whether (and how) the outcome might have been different if the requisite notice had been provided.

process requires, they did not establish a due process violation.  The Free and Clear Provisions stand.[14]

But the Economic Loss Plaintiffs were prejudiced in one respect.  Nobody else had argued a point that they argue now:  that the proposed Sale Order was overly broad, and that it should have allowed them to assert claims involving Old GM vehicles and parts so long as they were basing their claims *solely on New GM conduct*, and not based on any kind of successor liability or any other act by Old GM.  If the Economic Loss Plaintiffs had made that argument back in 2009, the Court would have agreed with them.  And by contrast to their predictions as to possible results of public outrage, this is not at all speculative, since the Court had ruled on closely similar issues before, seven years earlier, and, indeed, again in that very same *Sale Opinion*.  Here, by contrast, the failure to provide the notice that due process requires was coupled with resulting prejudice.  The Economic Loss Plaintiffs were not furnished the opportunity to make the overbreadth argument back in 2009, and in that respect they were prejudiced.  The failure to be heard on this latter argument necessarily must be viewed as having affected the earlier result.

Thus, with respect to Sale Order overbreadth, the Economic Loss Plaintiffs suffered a denial of due process, requiring the Court to then turn to the appropriate remedy.

### 2. *Remedies*

As noted above, the Court has rejected the Plaintiffs' contention that prejudice is irrelevant to a claim for denial of due process.  And it has likewise rejected the notion

---

[14]     They also stand with respect to a subset of Economic Loss Plaintiffs (the "**Used Car Purchasers**") who acquired cars manufactured by Old GM in the aftermarket after the 363 Sale (*e.g.*, from their original owners, or used car dealers).  They too were not prejudiced by the inability to make successor liability arguments that others made, and, in addition, they can have no greater rights than the original owners of their cars had.

that the denial of the notice that due process requires means that the Plaintiffs should automatically win.  But to the extent they were prejudiced (and the Court has determined that the Economic Loss Plaintiffs *were* prejudiced with respect to Sale Order overbreadth), they deserve a remedy tailored to the prejudice they suffered, to the extent the law permits.

The Court rejects, for reasons discussed below, New GM's contention that the principles under which property is sold free and clear of liens, with the liens to attach instead to sale proceeds, apply universally to interests other than liens—as relevant here, interests permitting the assertion of successor liability.  But New GM's next several points—that purchasers of assets acquire property rights too, and that taking away purchasers' contractually bargained-for rights strikes at the heart of understandings critically important to the bankruptcy system—have great merit.  They have so much merit, in fact, that were it not for the fact that the Plaintiffs' claim is a constitutional one, the Court would not deny enforcement of the Sale Order, in whole or in part.  There is no good reason to give creditors asserting successor liability claims recovery rights greater than those of other creditors.  And as importantly or more so, the interests inherent in the enforceability of 363 orders (on which the buyers of assets should justifiably be able to rely, and on which the interests of creditors, keenly interested in the maximization of estate value, likewise rest) are hugely important.

But the Court concludes that remedying a constitutional violation must trump those concerns.  Decisions of the Second Circuit and other courts hold, or suggest (with little in the way of countervailing authority), that with or without reliance on Fed.R.Civ.P. 60(b), lower courts may—and should—deny enforcement, against those

-13-

who were prejudiced thereby, of even cherry-picked components of sale orders that have
been entered with denials of due process.  Those cases make clear that it is not necessary
for a court to invalidate the sale order in full.  That is so whether or not the Court declares
the order, or part of it, to be "void."  And if the order can be declared to be void (or if it
can be selectively enforced, to avoid enforcing it against one denied due process),
provisions in the order providing that it is nonseverable fall as well.

In the absence of a constitutional violation, the Court suspects that the power to
deny full enforcement of a sale order (assuming that such is even permissible) will rarely,
if ever, be invoked.  The principles underlying the finality of 363 sale orders are much
too important.  But in cases where a sale order can be declared to be void (and orders
entered without due process are subject to such a consequence), sale orders may be
modified, or selectively enforced, as well.

*3.   Assumed Liabilities*

In light of the Court's conclusions, summarized above, New GM's concerns as to
the limited liabilities that New GM assumed are not as significant as they might
otherwise have been.  New GM is right that it expressly declined to assume any liabilities
based on Old GM's wrongful conduct, and that these were "retained liabilities" to be
satisfied by Old GM.  But the Court's ruling that it will continue to enforce prohibitions
against successor liability makes New GM's concerns as to that academic.  And to the
extent, if any, that New GM might be liable on claims based solely on any wrongful
conduct on its own part (and in no way relying on wrongful conduct by Old GM), New
GM would have such liability not because it had assumed any Old GM liabilities, or was
responsible for anything wrong that Old GM did, but only because it had engaged in
independently wrongful, and otherwise actionable, conduct on its own.

-14-

But it is plain that to the extent the Plaintiffs seek to impose successor liability, or to rely, in suits against New GM, on any wrongful conduct by Old GM, these are actually claims against Old GM, and not New GM.  It also is plain that any court analyzing claims that are supposedly against New GM only must be extraordinarily careful to ensure that they are not in substance successor liability claims, "dressed up to look like something else."[15]  Claims premised in any way on Old GM conduct are properly proscribed under the Sale Agreement and the Sale Order, and by reason of the Court's other rulings, the prohibitions against the assertion of such claims stand.

### 4. *Equitable Mootness*

Because the successor liability claims start by being claims against Old GM, the Court also must consider the GUC Trust's concerns as to Equitable Mootness.  The Court recognizes that mootness concerns will materially, if not entirely, impair the Plaintiffs' ability to collect on any allowed claims against Old GM (or more precisely, the GUC Trust) that they otherwise might have.  But nevertheless, the Court concludes, contrary to its original instincts at the outset of this controversy, that the GUC Trust is right in its mootness contentions, and that the rights of GUC Trust beneficiaries cannot be impaired at this late time.

Mootness doctrine already made a return of past distributions from all of Old GM's many thousands of creditors unthinkable.  But the Court, being mindful of the Second Circuit's holdings that mootness doctrine does not foreclose relief where *some* meaningful relief can be fashioned, originally thought that mootness concerns would not foreclose at least some relief—such as permitting the late filing of claims, and thereby

---

[15]    *Burton v. Chrysler Grp., LLC* (*In re Old Carco*), 492 B.R. 392, 405 (Bankr. S.D.N.Y. 2013) (Bernstein, C.J.) ("***Old Carco***").

permitting Economic Loss Plaintiffs to share in assets remaining in the GUC Trust.  In

the course of subsequent briefing, however, the GUC Trust and its unit holders (the

"**Unitholders**") pointed out (along with other reasons for denial of relief) that granting

relief now to the Plaintiffs would require not just the allowance of late claims (which by

itself would be acceptable), but also *the modification of the confirmation order*—and

with it, impairment of the rights of the Unitholders, especially those who acquired those

units in post-confirmation trading.  Though late claims filed by the Plaintiffs might still

be allowed, assets transferred to the GUC Trust under the Plan could not now be tapped

to pay them.  Under the mootness standards laid down by the Second Circuit in its

leading decisions in the area,[16] GUC Trust Unitholders must be protected from a

modification of the Plan.

   5.   *Fraud on the Court*

          Believing that rulings now might expedite or moot further litigation down the

road, the Court also undertook to rule on the legal standards applicable to litigation over

whether, in connection with the entry of the Sale Order, there might have been a fraud on

the Court.  Though they become less important for reasons discussed below, the Court

provides them in Section V.

          Of the standards for establishing fraud on the Court, discussed below, three are

particularly relevant here.  One is that fraud on the court requires action that does or

attempts to defile the *court itself*.  Another, related to the first, is that establishing a fraud

on the Court requires defrauding the *court*, as contrasted to a non-judicial victim (such as

---

[16]     *See Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. Official Comm. of
Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.)*, 988 F.2d 322 (2d Cir. 1993)
("*Chateaugay I*"); *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944 (2d Cir.
1993) ("*Chateaugay II*"); *Beeman v. BGI Creditors' Liquidating Trust (In re BGI, Inc.)*, 772 F.3d
102 (2d Cir. 2014) ("*BGI*").

a vehicle owner). A third is because it involves an effect on the Court (as contrasted to any injured third parties), it turns on the knowledge and intent of *those actually interfacing with the Court*. In each of those respects, and its application otherwise, establishing a fraud on the Court requires a knowing and purposeful effort to subvert the judicial process.

      6.  *Certification to the Circuit*

      The issues here are important, difficult, and involve the application of often conflicting authority. Their prompt determination will affect further proceedings not just in this Court, but also the MDL Court. The Court believes that it should certify its judgment for direct review by the Circuit.

Facts[17]

      1.  *Background*

      In late 2008 and the first half of 2009, Old GM—then the only "GM"—was in extremis. As the Court found in the *Sale Opinion*, Old GM had suffered a steep erosion in revenues, significant operating losses, and a dramatic loss of liquidity, putting its future in grave jeopardy. It was bleeding cash at an extraordinary rate.

      Old GM was assisted in December 2008 by an emergency infusion of cash by the Bush administration, and then again, in January and February 2009, by two more emergency infusions of cash by the Obama administration. But the latter declared that its financial support would last for only a limited period of time, and that Old GM would have to address its problems as a matter of great urgency.

---

[17]    The Court asked the parties to agree on stipulated facts, and they did so. By analogy to motions for summary judgment, the Court has relied only on undisputed facts. To avoid lengthening this Decision further, the Court has limited its citations to quotations and the most important matters.

-17-

In March 2009, the U.S. Treasury ("**Treasury**"), whose Presidential Task Force on the Auto Industry ("**Auto Task Force**") was quarterbacking the rescue effort, gave Old GM 60 days to submit a viable restructuring plan.  Failure to accomplish that would force Old GM to liquidate.  But Old GM was unable to achieve an out-of-court restructuring.  It quickly became obvious that Old GM's only viable option was to file a chapter 11 case and to sell its assets through a 363 Sale, shed of the great bulk of its prepetition liabilities.  The acquirer ultimately became New GM.

The urgency at the time is apparent.  The cash bleeding was brutal; Old GM suffered negative cash flow of $9.4 billion in the first quarter of 2009 alone.[18]  Without a very quick end to the bleeding, Old GM would plunge into liquidation.  Apart from the loss to Old GM's creditors, Old GM's liquidation would result in the loss of over 200,000 jobs at Old GM alone, and grievous loss to the approximately 11,500 vendors, with more than 500,000 workers, in the Supplier Chain.[19]  Liquidation would also result in virtually no recovery for any of Old GM's prepetition creditors—including Pre-Closing Accident Plaintiffs and Economic Loss Plaintiffs before the Court now.

2. *Chapter 11 Filing*

On June 1, 2009 (the "**Petition Date**")—40 days prior to the deadline imposed under the critical DIP Financing—Old GM and three affiliates commenced these now jointly administered chapter 11 cases before this Court.  That same day, Old GM filed the motion (the "**Sale Motion**") for authority to engage in the required 363 Sale.

---

[18]  *Sale Opinion*, 407 B.R. at 476, 479.

[19]  *Id.* at 476, 477 n.6.  The Supplier Chain is the body of vendors that supply parts and subassemblies that go into the vehicles that are manufactured by the U.S. Big Three—GM, Chrysler, and Ford— and many of their foreign counterparts, at least those that manufacture vehicles in the U.S.  The Court learned, in connection with the 363 Sale Hearing back in 2009, that the majority of the value that would go into a GM vehicle would in fact have come from the Supplier Chain.

### 3.  The Sale Motion and Notice Order

In its Sale Motion, GM asked the Court to authorize the 363 Sale "free and clear of all other 'liens, claims, encumbrances and other interests,' including, specifically, 'all successor liability claims.'"

Specifically, GM submitted a proposed order to the Court (the "**Proposed Sale Order**") containing provisions directed at cutting off successor liability except in the respects where successor liability was contractually assumed.  As the Court noted in 2009, the Proposed Sale Order would effectuate a free and clear sale through a double-barreled approach:

> First, the Proposed Sale Order contains a finding—and a decretal provision to similar effect—that the Debtors may sell the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability.

> Second, the Proposed Sale Order would enjoin all persons (including "litigation claimants") holding liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability, from asserting them against New GM or the Purchased Assets.[20]

Along with its submission of the Proposed Sale Order, GM moved for court approval of the sale procedures, and for an order fixing and approving the form and manner of notice.  After hearing argument on the motion, the Court approved the sale procedures, and the next day entered an order laying out the procedures for the upcoming 363 Sale (the "**Sale Procedures Order**").

---

[20]     *Sale Opinion*, 407 B.R. at 483 (internal citations omitted).

4. *Notice of the Sale*

As relevant here, the Sale Procedures Order provided for *actual* notice to
25 categories of persons and entities, including, among many others, all parties who were
known to have asserted any lien, claim, encumbrance, or interest in or on the Purchased
Assets; all vehicle owners involved in actual litigation with Old GM (or, who though not
yet involved in actual litigation, had asserted claims or otherwise threatened to sue); and
all other known creditors.[21]

And the Sale Procedures Order additionally provided for constructive notice, by
publication, in the *Wall Street Journal* (global edition); *New York Times* (national
edition); *Financial Times* (global edition); *USA Today* (national edition); *Detroit Free
Press*; *Detroit News*; in the Canadian *Le Journal de Montreal*, *Montreal Gazette*, *The
Globe and Mail,* and *The National Post*; and on the website of Old GM's noticing agent,
The Garden City Group.[22]

The notice of hearing on the proposed 363 Sale ("**Sale Notice**") provided the
general terms of the sale, including the date and location at which the sale was to occur,
and instructions for those wishing to object or otherwise respond. The Sale Notice did
not, however, attempt to describe the claims any recipient might have against Old GM, or
any bases for objections to the sale or Proposed Sale Order that any notice recipient
might wish to assert.

5. *Objections to Free and Clear Provisions*

Many of the 850 parties objecting to the Sale Motion made limited objections—
not opposing the 363 Sale or its timing as such, but objecting instead to provisions in the

---

[21]    *See* Sale Procedures Order ¶¶ 9(a)(i) through (xxv), 9(b)(i) through (ii) (ECF No. 274).

[22]    *See id.* ¶ 9(e); *see also* New GM Stipulations of Fact ¶¶ 22-23 (ECF No. 12826-2).

-20-

09-50026-reg   Doc 13178-1   Filed 06/01/15   Entered 06/01/15 01:23:30   Main Document
Pg 9 of 341

Proposed Sale Order.  They argued that New GM should assume certain kinds of claims;

that the Free and Clear Provisions limiting successor liability were improper; or both.

More specifically:

(a) Many of the states' Attorneys General ("**AGs**"), assisted in

significant part by an attorney with the National Association of Attorneys'

General well known for her expertise in the interplay between bankruptcy

law and states' regulatory needs and concerns, argued that New GM

should assume consumer claims for implied, express, and statutory

warranties.[23]

(b) Old GM's Official Committee of Unsecured Creditors (the

"**Creditors' Committee**"), representing unsecured creditors of all types

(including tort plaintiffs and other vehicle owners), objected to the

Proposed Sale Order because (as the Creditors' Committee well

understood) it would cut off state law successor liability and limit any

current or future claimants to recovery from the assets "left behind in the

old company."[24]

(c) The Ad Hoc Committee of Consumer Victims (the "**Consumer**

**Victims Committee**"); attorneys for individual accident litigants (the

"**Individual Accident Litigants**"); attorneys for asbestos victim litigants

(the "**Asbestos Litigants**"); and the Center for Auto Safety, Consumer

Action, Consumers for Auto Reliability and Safety, National Association

of Consumer Advocates, and Public Citizen (collectively, the "**Consumer**

---

[23]     *See* AGs Objections, ECF Nos. 1926 and 2043.

[24]     Creditors' Committee Objection at 3 (ECF No. 2362).

-21-

**Organizations,**"  and, together with the others, the "**Successor Liability
Objectors**") likewise argued that Old GM could not sell its assets free and
clear of any rights or claims based on successor or transferee liability.[25]

The Successor Liability Objectors argued that shedding potential successor
liability was not permitted under Bankruptcy Code section 363(f).  They further argued
that section 363(f) "authorize[d] the sale of property free and clear only of 'interests in'
property to be sold, not *in personam* claims against the Purchaser under theories of
successor liability."[26]  They further argued that the Court "lack[ed] jurisdiction to enjoin
actions between non-debtor product liability claimants and the Purchaser post-closing
since resolution of these claims [would] not affect the Debtors' estates."[27]  And they
argued that the Free and Clear  Provisions would violate due process—asserting that
individuals who might have future claims for injuries "cannot have received meaningful
notice that the bankruptcy proceeding was resolving their rights or a meaningful
opportunity to protect those rights, which otherwise might allow a state law cause of
action for their injuries."[28]

In the *Sale Opinion*, the Court considered, but ultimately rejected, those
contentions and similar ones.  Relying on, among other things, the then recent opinions
by the Bankruptcy Court in *Chrysler*[29] (which had recently issued its own sale order with

---

[25]   *See* Successor Liability Objectors' Limited Obj. (ECF No. 2041).

[26]   Successor Liability Objectors' Mem. of Law at 2 (ECF No. 2050).

[27]   *Id.*

[28]   *Id.*

[29]   *See In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009) (" **Chrysler** "), (Gonzalez, CJ.), *aff'd
for substantially the reasons stated in the opinions below,* No. 09–2311–bk (2d Cir. Jun. 5, 2009)
("**Chrysler Circuit Order** "), *temporary stay vacated and further denied,* 556 U.S. 960 (June
9, 2009), *Circuit written opinion issued,* 576 F.3d 108 (2d Cir. Aug. 5, 2009) ("**Chrysler Circuit**

free and clear provisions); of the Second Circuit (which, three weeks before the Old GM

363 Sale hearing, affirmed the *Chrysler* decision for "substantially the same reasons

articulated by the bankruptcy court"[30]); and earlier authority,[31] this Court overruled the

objections to the Free and Clear Provisions—determining, after lengthy analysis, that

New GM should be protected against successor liability claims.[32]

    *6.  Sale Agreement—Relevant Provisions*

       The agreement under which the 363 Sale would take place, which had the formal

name of "Amended and Restated Master Sale and Purchase Agreement," dated June 26,

2009 (often referred to by the parties as the "**ARMSPA**" but by this Court as the "**Sale**

**Agreement**"), was originally filed with the Sale Motion on June 1, 2009.  It was

thereafter amended—in respects relevant here (1) to incorporate an agreement with the

AGs under which New GM would assume liabilities under state Lemon Laws, and (2) to

provide that New GM would assume responsibility for any and all accidents or incidents

---

    *Opinion"), judgment vacated and case remanded with instructions to dismiss appeal as moot*,
558 U.S. 1087 (Dec. 14, 2009).

[30]   *See Chrysler Circuit Order.*  The Circuit first issued a short written order, affirming for
"substantially the reasons articulated by the Bankruptcy Court," *id.*, and advising that its order
would be followed by a written order more fully explaining the Circuit's ruling.  The Circuit
thereafter issued a lengthy opinion explaining its earlier ruling in great detail.  *See Chrysler
Circuit Opinion.*  But about four months later, the Circuit's "judgment" was vacated by the United
States Supreme Court with directions to dismiss the appeal as moot.  What the Supreme Court
meant by "judgment" in that context was not explained, but one can infer (though the Supreme
Court did not explain this either) that the appeal was moot at the time the Circuit's written opinion
was issued, since Chrysler's 363 sale had already closed.  But even assuming that the controversy
was moot by the time the Circuit issued the *Chrysler Circuit* written opinion), the controversy was
not moot when the Circuit issued its initial affirmance order—the *Chrysler Circuit Order*—
preceding the Chrysler 363 sale closing, upon which this Court also relied.  And assuming,
*arguendo*, that, by reason of these matters of timing, the Circuit's written *Chrysler Circuit
Opinion* can no longer be regarded as binding on the lower courts in the Second Circuit (a matter
this Court has no need to decide), the Court thinks the Circuit's written thinking on the subject
should continue to be respected.

[31]   *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 288–90 (3d Cir. 2003); *United Mine Workers
of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d
573, 581–82 (4th Cir.1996).

[32]   *See Sale Opinion*, 407 B.R. at 499-506.

giving rise to death, personal injury, or property damage after the date of closing of the

363 Sale, irrespective of whether the vehicle was manufactured by Old GM or New GM.

The Sale Agreement, in its Section 2.3, listed liabilities that New GM would

assume ("**Assumed Liabilities**"), on the one hand, and that Old GM would retain

("**Retained Liabilities**"), on the other.  Those that would be assumed by agreement were

listed in subsection (a); those that would be retained (which would cover everything else)

were listed in subsection (b).  As provided in subsection (a), Assumed Liabilities

included:

> (a) Claims for "**Product Liabilities**" (a term defined in the Sale
>
> Agreement), with respect to which New GM would assume (but assume
>
> only) those that arose out of "accidents or incidents"[33] occurring on or
>
> after the Closing Date;[34]

---

[33]  The Court addressed the meaning of "incidents" in its decisions in *In re Motors Liquidation Co.*, 447 B.R. 142, 149 (Bankr. S.D.N.Y. 2011) (Gerber, J.) (" **GM–Deutsch**"), and *In re Motors Liquidation Co.*, 513 B.R. 467 (Bankr. S.D.N.Y. 2014) (Gerber, J.) ("**GM-Phaneuf**").  In *GM-Deutsch*, the Court accepted the explanation proffered by New GM counsel in which he stated that the language was drafted to cover situations similar to accidents that might not be said to be accidents, such as a car catching on fire, blowing up, or running off the road—in each case where it could cause a physical injury to someone.  447 B.R. at 148 n.20.  In *GM-Phaneuf*, the Court made reference to its earlier *GM-Deutsch* ruling, describing it, in a parenthetical following the citation, as "construing the 'incidents' portion of the '"accidents or incidents' language (in the context of claims against New GM by the estate of a consumer who had been in an accident before the 363 Sale, but died thereafter) as covering more than just "accidents," but covering things that were similar, such as fires, explosions, or other definite events that caused injuries and resulted in the right to sue").  513 B.R. at 472 n.17.

[34]  Sale Agreement § 2.3(a)(ix) (as amended) (ECF No. 2968-2).  As a practical matter the great bulk of covered occurrences would be accidents.  For brevity, except where quoting language that did not do likewise, the Court uses "**Accidents**" to cover anything within that category.

The "**Closing Date**"—the date the 363 Sale closed, under the authority of the Sale Order—turned out to be July 10, 2009.

-24-

(b) Repairs or the replacement of parts provided for under the

Glove Box Warranty;[35] and

(c) Lemon Law claims.[36]

And as noted in the Sale Decision, "an important change [] was made in the [Sale

Agreement] after the filing of the motion" which broadened the Assumed Liabilities to

include "*all* product liability claims arising from accidents or other discrete incidents

arising from operation of GM vehicles occurring subsequent to the closing of the

363 Transaction, *regardless of when the product was purchased.*"[37]

But by contrast, the liabilities retained by Old GM—and not assumed by New

GM—expressly included:  (a) Product Liabilities arising in whole or in part from any

Accidents, that happened *prior to* the Closing Date;[38] and (b) Liabilities to third parties

for prepetition claims based on contract, tort, or any other basis.[39]

The Sale Agreement also required New GM to comply with recall obligations

imposed by federal and state law, even for cars or parts manufactured by Old GM.[40]

---

[35]     Sale Agreement § 2.3(a)(vii).  This is a duty to make, or cause to be made, the necessary repairs.
It is not a monetary obligation.  *See Trusky v. General Motors Co. (In re Motors Liquidation Co.),*
2013 Bankr. LEXIS 620, at *26, 2013 WL 620281, at *9 (Bankr. S.D.N.Y. Feb. 19, 2013)
(Gerber, J.) ("**GM-Trusky**") ("Performance of repairs and needed adjustments is the exclusive
remedy under this written warranty.  What is recoverable, in substance, is specific performance of
the repair or replacement obligation for otherwise qualifying defects.").

[36]     *See* Sale Agreement §2.3(a)(vii).  Lemon Law claims were added as an assumed liability during
the course of the 363 Sale hearing after negotiation with the AGs**.**  Additionally, and importantly
here, New GM undertook to comply with its statutory recall obligations, even with respect to Old
GM manufactured vehicles.  Though to the extent these related to Old GM manufactured vehicles,
these might be thought of as Old GM liabilities to be assumed, they were not characterized as
such.  But the characterization doesn't matter; what is clear is that New GM agreed that it would
be responsible for them.

[37]     407 B.R. at 481–82 (emphasis in original).

[38]     Sale Agreement § 2.3(b)(ix).  The Pre-Closing Accident Plaintiffs' claims are in this category.

[39]     Sale Agreement § 2.3(b)(xi).  The Economic Loss Plaintiffs' Claims are in this category.

[40]     *See* Sale Agreement § 6.15(a) ("From and after the Closing, Purchaser shall comply with the
certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety

09-50026-reg   Doc 13178-1   Filed 06/01/15   Entered 06/01/15 17:23:00   Main Document
Pg 273 of 341

### 7. *The Sale Order*

As previously discussed, the Court overruled objections to Free and Clear

Provisions, and the Sale Order thus had five (somewhat duplicative) provisions, including

injunctive provisions, protecting New GM from successor liability.

One provided, for example, that except for Assumed Liabilities, Old GM's assets

were acquired "free and clear of all liens, claims, encumbrances, and other interests of

any kind or nature whatsoever [other than permitted liens], *including rights or claims*

*based on any successor or transferee liability,*" with "all such liens, claims,

encumbrances, and other interests, *including rights or claims based on any successor or*

*transferee liability,* [to] attach to the net proceeds" of the Sale.[41]

Three others provided that "*no claims, other than Assumed Liabilities, will be*

*assertable against the Purchaser* [New GM];"[42] that New GM would have no liability

"*for any claim that arose prior to the Closing Date, relates to the production of vehicles*

*prior to the Closing Date, or otherwise is assertable against the Debtors or is related to*

*the Purchased Assets prior to the Closing Date*";[43] and that "*the Purchaser shall have no*

*successor, transferee, or vicarious liabilities of any kind or character.*"[44]  And another

included injunctive provisions barring assertion of successor liability claims.[45]

---

Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean
Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent
applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.").

[41]   Sale Order ¶ 7 (ECF No. 2968) (emphasis added).

[42]   *Id.* at ¶ 9(a) (reformatted for readability, emphasis added).

[43]   *Id.* at ¶ 46 (reformatted for readability, emphasis added).

[44]   *Id.* at ¶ 48 (reformatted for readability, emphasis added).

[45]   *Id.* at ¶ 8 (the "**Injunctive Provision**").

09-50026-reg   Doc 13178-1   Filed 06/01/15   Entered 06/01/15 15:07:23   Main Document
Pg 273 of 380

But tracking the language of the Sale Agreement, almost verbatim, the Sale Order imposed certain recall and other obligations on New GM in accordance with federal and state law, even with respect to parts and vehicles manufactured by Old GM:

> From and after the Closing, the Purchaser shall comply with the certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety Act, as amended and recodified, including by the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar Laws, in each case, to the extent applicable in respect of motor vehicles, vehicles, motor vehicle equipment, and vehicle parts manufactured or distributed by the Sellers prior to the Closing.[46]

And the Sale Order also addressed severability: "The provisions of this Order are nonseverable and mutually dependent on each other."[47]

### 8. *Matters After the Sale*

Upon the closing of the 363 Sale, New GM provided Old GM, as provided in the Sale Agreement, shares of New GM common stock and warrants (the "**New GM Securities**"), to be later distributed to Old GM creditors pursuant to a future plan.

In September 2009, about two months after the Sale was completed, the Court entered an order (the "**Bar Date Order**") establishing November 30, 2009, as the deadline (the "**Bar Date**") for proofs of claim to be filed against Old GM, and approved the form and manner of notice of the Bar Date. The Bar Date Order allowed for publication notice to holders of unknown claims. The Plaintiffs here are among those who received publication notice only as to any claims they might have against Old GM.

---

[46]    *Id.* at ¶ 17.

[47]    *Id.* at ¶ 69.

-27-

In March 2011, Old GM filed the Plan, and without opposition anything like the opposition that the 363 Sale had engendered (though the opposition was sufficient to warrant a written opinion),[48] the Plan was confirmed.  On March 29, 2011, the Court entered an order (the "**Confirmation Order**") confirming the Plan.

The Plan became effective on March 31, 2011 (the "**Effective Date**"), and the Plan provided that it would be deemed substantially consummated as of the Effective Date.  The parties have stipulated that the Plan has been substantially consummated.[49]

    *9.   The GUC Trust and its Operation*

Among many other things, the Confirmation Order authorized the creation of the GUC Trust.  Under the agreement by which the GUC Trust was formed (the "**GUC Trust Agreement**"), only certain categories of persons or entities were made beneficiaries.  The GUC Trust Agreements limited GUC Trust Beneficiaries to:

> (i) the holders of *allowed* general unsecured claims against Old GM that existed as of the Effective Date;

> (ii) the holders of claims asserted against Old GM that *were disputed* as of the Effective Date ("**Disputed Claims**") and *subsequently allowed* (collectively with claims that were allowed as of the Effective Date, "**Allowed Claims**"),

> (iii) the holders of potential general unsecured claims ("**JPMorgan Claims**") that might arise in connection with the GUC Trust's lien

---

[48]    *See In re Motors Liquidation Co.*, 447 B.R. 198 (Bankr. S.D.N.Y. 2011) (Gerber, J.) (the "***Confirmation Decision***").

[49]    Equitable Mootness Stipulated Facts ¶ 18 (ECF No. 12826-4); s*ee also Morgenstein v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 462 B.R. 494, 501 n. 36 (Bankr. S.D.N.Y. 2012) (Gerber, J.) ("***Morgenstein***") ("[T]he Plan already has been substantially consummated."), *aff'd* 12-cv-01746-AJN, ECF No. 21 (S.D.N.Y. Aug. 9, 2012) (Nathan, J.).

avoidance action relating to a mistakenly released financing statement;[50]

and

       (iv) the holders of units of beneficial interest (each, a "**GUC Trust Unit**")[51] in the GUC Trust.

The GUC Trust Agreement also set forth provisions governing the GUC Trust's ability to distribute the New GM Securities and their proceeds (collectively, the "**GUC Trust Assets**"), which were intended to ensure that the Unitholders would receive, as promptly as practicable, any GUC Trust Assets that were not necessary to fund the Allowed Claims (or potential Allowed Claims); any additional JPMorgan Claims; or projected liquidation and administrative costs of the GUC Trust (collectively, the "**GUC**

---

[50]     Before Old GM's Plan was confirmed, the Creditors' Committee brought an adversary proceeding seeking a determination that the principal lien securing a syndicated $1.5 billion term loan (the "**Term Loan**") that had been made to GM in November 2006 was terminated in October 2008, before the filing of GM's chapter 11 case—thereby making most of the $1.5 billion in indebtedness under the Term Loan unsecured. The defendants were the syndicate members who together made the Term Loan and JPMorgan Chase Bank, N.A. ("**JPMorgan**"), the agent under the facility. On cross-motions for summary judgment in that adversary proceeding, this Court ruled in favor of JPMorgan, but that decision, after an intermediate certification to the Delaware Supreme Court, was thereafter reversed by the Second Circuit and remanded to this Court. *See Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JP Morgan Chase Bank, N.A* (*In re Motors Liquidation Co.*), 486 B.R. 596 (Bankr. S.D.N.Y. 2013) ("*GM-UCC-3 Opinion*"), *question certified for determination by Delaware Supreme Court*, 755 F.3d 78 (2d Cir. 2014), *question answered*, 103 A.3d 1010 (Del. 2014), *rev'd and remanded*, 777 F.3d 100 (2d Cir. 2015), *rehearing en banc denied*, No.13-2187 ECF No. 179 (2d Cir. Apr. 13, 2015).

     When Old GM's Plan was confirmed, after that adversary proceeding was commenced, the Creditors' Committee's right to pursue that litigation devolved to another trust created under the Plan—the "Avoidance Action Trust." Depending on the outcome of further litigation in this Court, it is possible that a portion (and perhaps a major portion) of the Term Loan Debt would have to be paid to the Avoidance Action Trust and then result in additional unsecured claims against the GUC Trust. *See* 486 B.R. at 615 n.54 ("To the extent that the Committee might be successful in this adversary proceeding, the amount paid to JPMorgan and the Lenders would be subject to recapture, as provided in the final DIP Financing Order when the payoff of the Term Loan was authorized. In that event, after the return of the amount previously paid on what was thought to be a duly secured claim, the Lenders would still have a claim for the Term Loan debt, but would have only an unsecured claim, sharing *pari passu* with the many billions of dollars of other unsecured claims in GM's chapter 11 case.").

[51]     The GUC Trust Units are freely tradable. As reported by Bloomberg Finance, as of October 21, 2014, approximately 100 million GUC Trust Units had been bought and sold since June 14, 2012, and the aggregate value of those GUC Trust Units (based on daily closing prices) totaled approximately $2.1 billion.

**Trust Liabilities**"), and that the GUC Trust would retain sufficient assets to fund those liabilities.

By January 2012, more than two years after the original Bar Date, many claims continued to be filed against Old GM.  On January 1, 2012 (nearly a year after the Effective Date), the GUC Trust filed a motion (the "**Late Filed Claims Motion**") seeking an order disallowing late filed claims.[52]  Under the requested order, any future late filed claims would be disallowed unless, among other things, the claimant filed a motion with the Court seeking permission to file a late proof of claim.

The Court granted the GUC Trust's Late Filed Claims Motion, and in February 2012, entered its order (the "**Late Filed Claims Order**") implementing that ruling.

The Late Filed Claims Order explicitly stated that "nothing in [the Late Filed Claims Order] shall prevent any claimant submitting a Late Claim from filing a motion with the Court seeking to have its Late Claim deemed timely filed."[53]  Likewise, none of the Plan, Confirmation Order, and GUC Trust Agreement prohibited late filed claims.  In two known instances, late filed claims have been allowed in the Old GM bankruptcy case both before and after the Effective Date.  Under the Plan, a late filed proof of claim may be subsequently adjudicated as an Allowed General Unsecured Claim.

In April and May 2011, initial distributions—consisting of 75% of the New GM Securities, along with nearly 30 million GUC Trust Units—were made to those who had Allowed Claims as of the Effective Date.  The only New GM Securities that were not distributed were those that could be necessary to fund GUC Trust Liabilities[54]—

---

[52]     ECF No. 11351.

[53]     Late Filed Claims Order at 2 (ECF No. 11394).

[54]     Equitable Mootness Stipulated Facts ¶ 35 (ECF No. 12826-4).

principally claims that as of that time had been neither allowed or disallowed, and administrative costs.

Between May 2011 and the end of September 2014, the GUC Trust made distributions on formerly Disputed Claims that had thereafter been resolved.  Similarly, in July and October 2011, and December 2013, the GUC Trust made additional distributions of New GM Securities—to the end that by September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities and nearly 32 million GUC Trust Units.

On October 24, 2014, the GUC Trust Administrator disclosed that it was planning on making still another distribution, scheduled for November 12, 2014.  Shortly thereafter, certain Plaintiffs' counsel wrote the GUC Trust's counsel advising that Plaintiffs were "known potential contingent beneficiaries of the GUC Trust and the GUC Trust should not make any further distributions unless and until it demonstrates that adequate reserves ha[d] been established with respect to Plaintiffs' potential claims against Old GM and/or the GUC Trust that could be in the multiple billions of dollars."[55] The next day, counsel for the GUC Trust Administrator replied that it would *not* establish reserves for the Plaintiffs' claims, and that it was going forward with the planned November 2014 GUC Trust Distribution.  Plaintiffs chose, for admitted strategic reasons,[56] not to seek a stay of the GUC Trust's distributions.

The GUC Trust Administrator then made that distribution, without establishing any reserves for the Plaintiffs' claims.

---

[55]     *See* ECF No. 13029, Exhibit A, at 3.

[56]     *See* Day 1 Arg. Tr. at 112:13-16 ("yes, there was a strategic element to the decision that was taken on our side").

-31-

As of December 16, 2014, the GUC Trust had total assets of approximately
$773.7 million, comprised principally of New GM Securities, though with approximately
$64 million in commercial paper, demand notes, and cash equivalents.[57]

The GUC Trust Assets stand to be augmented upon allowance of any Plaintiffs'
claims against Old GM and/or the GUC Trust through an "accordion feature"[58] in the
Sale Agreement and any order by the Court requiring New GM to contribute more money
or New GM Common Stock to the GUC Trust.[59]

### 10. Knowledge of the Ignition Switch Defect

In February and March of 2014, New GM informed the Safety Administration of
the Ignition Switch Defect, and that a recall would be conducted to address it.  New GM
does not contend, and there is no evidence in the record from which the Court now could
find, that any Plaintiff knew of the Ignition Switch Defect before New GM's
announcement in the Spring of 2014.  But more than a few at Old GM knew of it as of
the time of Old GM's chapter 11 filing.  The parties stipulated that at least 24 Old GM
personnel (all of whom were transferred to New GM), including engineers, senior
managers, and attorneys, were informed or otherwise aware of the Ignition Switch Defect
prior to the Sale Motion, as early as 2003.[60]

---

[57]     *See* GUC Trust Q3 2014 Form 10-Q at 1, 12.

[58]     Under the Sale Agreement, New GM agreed to provide additional consideration to Old GM if the
aggregate amount of Allowed General Unsecured Claims against Old GM exceeded $35 billion.
*See* Equitable Mootness Stipulated Facts ¶ 5.  In such case, New GM is required to issue
additional shares of New GM Common Stock to the GUC Trust.  *Id.*

[59]     *See id.* ¶ 32.

[60]     *See* Pl. Stipulated Facts ¶ 14 (ECF No. 12826-2).

New GM does not dispute that Old GM personnel knew enough as of the time of Old GM's June 2009 bankruptcy filing for Old GM then to have been obligated, under the Safety Act, to conduct a recall of the affected vehicles.[61]

### 11. The Motion to Enforce

Very nearly immediately after New GM's Spring 2014 announcement, a large number of class actions—the earliest Ignition Switch Actions—were commenced against New GM, asserting, among other things, successor liability. In April 2014, New GM filed the Motion to Enforce, contending that most of the claims in the Ignition Switch Actions related to vehicles or parts manufactured and sold by Old GM, and that the Sale Order's Free and Clear Provisions, and injunctions against successor liability, proscribed such claims. In August 2014, New GM filed similar motions to enforce the Sale Order against the Pre-Closing Accident Plaintiffs and the Non-Ignition Switch Plaintiffs, though the latter is on hold pending the rulings here.

In June 2014, the Judicial Panel on Multidistrict Litigation established MDL 2543 and designated the United States District Court for the Southern District of New York as the MDL court, assigning Judge Furman to oversee coordinated proceedings for the actions assigned to the MDL. New GM has stated in its Reply that "[t]here are over 140 class action lawsuits currently pending against [it], with more being filed."[62] The Court understands the great bulk of these to involve economic loss claims.

At an August 11, 2014 case management conference in MDL 2543, it was determined that certain plaintiffs' counsel who had been designated to take the lead in MDL 2543 ("**Lead Counsel**") would file a consolidated master complaint for all

---

[61]    See id.; see also Pl. Br. at 47; Day 1 Arg. Tr. at 91:1-18; Day 2 Arg. Tr. at 7:11-19, 13:5-10.

[62]    New GM Reply at 45.

economic loss actions. This Court then adjusted the briefing and argument of the issues here to take into consideration any claims added or dropped in MDL 2543. In October 2014, Lead Counsel filed two Consolidated Complaints, each seeking class action treatment. The first—referred to by many as the "Pre-Sale Consolidated Complaint"— seeks damages from New GM on behalf of class members who purchased vehicles with an Ignition Switch Defect (which necessarily would have been manufactured by Old GM) *before* the closing of the 363 Sale.[63]

The second—referred to by some as the "Post-Sale Consolidated Complaint"— seeks relief on behalf of class members who had purchased vehicles *after* the closing of the 363 Sale.[64]

### 12. The Threshold Issues

After this Court held conferences with the parties to establish means to most efficiently litigate the issues here, the parties identified, at the Court's request, four threshold issues for judicial determination. They were:

> Whether Plaintiffs' procedural due process rights were violated in connection with the Sale Motion and the Sale Order and Injunction, or alternatively, whether Plaintiffs' procedural due process rights would be violated if the Sale Order and Injunction is enforced against them (the "**Due Process Threshold Issue**");
>
> If procedural due process was violated as described in (a) above, whether a remedy can or should be fashioned as a result of such violation and, if so, against whom (the "**Remedies Threshold Issue**");

---

[63]     These would all be barred under the Sale Order, to the extent it is enforceable.

[64]     Some of these would be barred under the Sale Order and some would not, depending on whether the vehicle acquired after the 363 Sale had been previously manufactured by Old GM, or had Old GM parts.

> Whether any or all of the claims asserted in the
> Ignition Switch Actions are claims against the Old
> GM bankruptcy estate (and/or the GUC Trust) (the
> "**Old GM Claim Threshold Issue**");[65] and

> If any or all of the claims asserted in the Ignition
> Switch Actions are or could be claims against the
> Old GM bankruptcy estate (and/or the GUC Trust),
> should such claims or the actions asserting such
> claims nevertheless be disallowed/dismissed on
> grounds of equitable mootness (the "**Equitable
> Mootness Threshold Issue**").[66]

The Court also asked for briefing on the legal standards that would apply to any claims

asserting Fraud on the Court, and announced that it would rule on those as well.[67]

The Court addresses those issues, in some instances breaking them down further

and restating them slightly to conform to a more appropriate framework, in the discussion

to follow.

Discussion

I.

Due Process

The Due Process Threshold Issue requires the Court to decide, with respect to the

Sale Order, whether

> (1) as New GM contends and the Plaintiffs dispute, insufficient
> notice of the 363 Sale hearing could not result in a deprivation of due
> process (principally because any successor liability claims would belong

---

[65]   They agreed, however, that the issue of whether a claim asserted in the Ignition Switch Actions
would be timely and/or meritorious against the Old GM bankruptcy estate (and/or the GUC Trust)
is not a Threshold Issue.

[66]   *See* Supplemental Scheduling Order, dated Jul. 11, 2014, ECF No. 12770.  Though the Threshold
Issues were first identified before the Consolidated Complaints were filed, nobody has suggested
that what has been pleaded in the Consolidated Complaint requires any change in the Threshold
Issues.

[67]   *Id.*

-35-

to the Old GM estate, and not to the Plaintiffs, and because the Plaintiffs'

rights would attach to the sale proceeds), as there would not be the

requisite potential deprivation of property;

(2) as the Plaintiffs contend and New GM disputes, the Plaintiffs

failed to get the notice due process requires (and related to that, whether

the Plaintiffs had "known claims" as that expression is used in the due

process jurisprudence); and

(3) as New GM contends and the Plaintiffs dispute, prejudice is an

essential element of any claim for a denial of due process, and the

Plaintiffs failed to show the requisite prejudice here, with respect to all or

some of their claims.

After the Court does so, it then must decide the extent to which the Sale Order

remains subject to attack, and any areas as to which the Plaintiffs, or some of them, may

potentially qualify for a remedy.  The Court also believes that it should address these

same issues with respect to the allowance of Plaintiff claims against Old GM, from which

their successor liability contentions emanate, and which cannot appropriately be divorced

from any due process analysis.  Discussion of these matters follows.

A.

Underlying Principles

*1. Mullane*

All parties, appropriately, begin with the Supreme Court's decision in *Mullane*—

which Plaintiffs describe as "the seminal Supreme Court case establishing due process

-36-

requirements for creditors in a bankruptcy proceeding.'"[68]  They are right to start with

*Mullane*; it is the seminal Supreme Court opinion clarifying what due process requires in

litigation.  But it was not a bankruptcy case.[69]  In *Mullane,* the Supreme Court held that a

statute authorizing notice by publication of a proposed judicial settlement of a "common

trust," holding the assets of 113 smaller trusts, failed to satisfy due process requirements

for the trust's known beneficiaries.[70]  The common trust had "many" beneficiaries.[71]  But

---

[68]  Pl. Br. at 27.

[69]  Nevertheless, considerable authority, by the Second Circuit and other circuit courts, holds, not surprisingly, that due process requirements apply in bankruptcy cases, just as they do in plenary litigation.  *See, e.g., DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 150 (2d Cir. 2014) (Newman, Pooler, and Livingston, JJ) ("*DPWN*") ("[A] claim cannot be discharged if the claimant is denied due process because of lack of adequate notice."); *In re Johns–Manville Corp.*, 600 F.3d 135, 153–54 (2d Cir. 2010) (*per curiam*) ("*Manville-2010,*"sometimes also referred to as "*Manville IV*") (Calabresi and Wesley, JJ) (ruling that due process was denied in dispute over whether an earlier bankruptcy court order in a chapter 11 case properly enjoined not only claims directed at Travelers insurance policies in the *res* of the Manville estate, but also non-derivative claims by Chubb that sought to impose liability on Travelers separately); *Koepp v. Holland*, 593 Fed. Appx. 20 (2d Cir. 2014) (Summary Order, Katzmann, CJ, and Hall and Livingston, JJ) ("*Koepp*") (ruling that due process was denied in dispute over easements on land previously owned by a debtor reorganized under § 77 of the now-superseded Bankruptcy Act); *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 n.1 (3d Cir. 1995) ("*Chemetron*") ("Although *Mullane* involved the notice due beneficiaries on judicial settlement of accounts by the trustee of a common trust fund, subsequent courts have interpreted the case to set the standard for notice required under the Due Process Clause in Chapter 11 bar date cases."); *In re Edwards*, 962 F.2d 641 (7th Cir. 1992) ("*Edwards*") (considering due process contentions by a secured creditor whose interest was extinguished in a free and clear section 363 sale without notice, though ultimately ruling in favor of a bona fide purchaser).

[70]  *See Mullane*, 339 U.S. at 320 ("We hold the notice of judicial settlement of accounts required by the New York Banking Law § 100-c(12) is incompatible with the requirements of the Fourteenth Amendment as a basis for adjudication depriving known persons whose whereabouts are also known of substantial property rights.").

[71]  *Id.* at 309.  But the Plaintiffs exaggerate, however, when they assert that the *Mullane* court ruled as it did notwithstanding the "very large" number of beneficiaries involved.  Pl. Br. at 27.  Actually, the *Mullane* court said that "the record [did] not show the number or residence of the beneficiaries," 339 U.S. at 309, though it also said that there were 113 contributing trusts, with aggregate assets of about $3 million.  *Id.*  A $3 million trust corpus was a bigger number in 1950 than it is now, but the likely number of individuals having interests in the 113 contributing trusts whose collective assets led to that $3 million corpus would at least seemingly be many orders of magnitude smaller than the huge number of vehicle owners here—of 27 million cars with Ignition Switch Defects and of 70 million on the road.  That and the fact later mentioned by the *Mullane* court that mailed notices had been sent to ascertainable beneficiaries in the past, which was "persuasive" as to the Trust Company's ability to mail notice there, *see* 339 U.S. at 319, suggests that the number to be given mailed notice there, while relatively large, was much less than huge, most likely in the thousands (and perhaps low thousands), rather than tens of millions.

despite that (and even though the statute authorized service by publication), the Court

found that because the trustee, Central Hanover Bank & Trust Company (the "**Trust**

**Company**"), seeking the judicial settlement of the trust for which it was responsible,

could with due diligence ascertain their names and addresses, they were entitled to mailed

notice of the settlement.

In reaching that result, the *Mullane* court started with the recognition that while

"[a] construction of the Due Process Clause which would place impossible or impractical

obstacles in the way could not be justified," the Court would have to "balance" against

that interest an individual's right to be heard.[72]  It continued by observing that while it

"ha[d] not committed itself to any formula" in achieving that balance, "a few general

principles stand out in the books."[73]  One was that:

> An elementary and fundamental requirement of due
> process in any proceeding which is to be accorded
> finality is notice reasonably calculated, under all the
> circumstances, to apprise interested parties of the
> pendency of the action and afford them an
> opportunity to present their objections.[74]

Others were that "[t]he notice must be of such nature as reasonably to convey the

required information . . . and it must afford a reasonable time for those interested to make

their appearance."[75]

The *Mullane* court qualified its statement of those general requirements, however,

by including an element of practicality:

> But if with due regard for the practicalities and
> peculiarities of the case these conditions are

---

[72]   *Id.* at 313-14.

[73]   *Id.* at 314.

[74]   *Id.*

[75]   *Id.*

09-50026-reg   Doc 13378-1   Filed 08/01/15   Entered 08/01/15 17:23:04   Main Document
Pg 340 of 341

> reasonably met the constitutional requirements are
> satisfied. The criterion is not the possibility of
> conceivable injury, but the just and reasonable
> character of the requirements, having reference to
> the subject with which the statute deals.[76]

And once again recognizing the need for practicality, it stated that

> [t]he reasonableness and hence the constitutional
> validity of any chosen method may be defended on
> the ground that it is in itself reasonably certain to
> inform those affected, or, *where conditions do not
> reasonably permit such notice*, that the form chosen
> is not substantially less likely to bring home notice
> than other of the *feasible* and customary
> substitutes.[77]

The *Mullane* court expressly endorsed the use of publication when it would not be

practical to provide better notice:

> This Court has not hesitated to approve of resort to
> publication as a customary substitute in another
> class of cases where it is not reasonably possible or
> practicable to give more adequate warning. Thus it
> has been recognized that, in the case of persons
> missing or unknown, employment of an indirect and
> even a probably futile means of notification is all
> that the situation permits and creates no
> constitutional bar to a final decree foreclosing their
> rights.
>
> Those beneficiaries represented by appellant whose
> interests or whereabouts could not with due
> diligence be ascertained come clearly within this
> category. As to them the statutory notice [*i.e.*,
> notice by publication] is sufficient. However great
> the odds that publication will never reach the eyes
> of such unknown parties, it is not in the typical case
> much more likely to fail than any of the choices
> open to legislators endeavoring to prescribe the best
> notice practicable.[78]

---

[76]   *Id.* at 314-15 (internal quotation marks deleted).

[77]   *Id.* at 315 (emphasis added) (citations omitted).

[78]   *Id.* at 317 (citations omitted).

In a later post-*Mullane* decision,[79] the Supreme Court reiterated this.

> In the years since *Mullane* the Court has adhered to
> these principles, balancing the "interest of the State"
> and "the individual interest sought to be protected
> by the Fourteenth Amendment."  The focus is on
> the reasonableness of the balance, and, as *Mullane*
> itself made clear, whether a particular method of
> notice is reasonable depends on the particular
> circumstances.[80]

Thus it is hardly surprising that the Supreme Court has also stated, albeit in a

different context (there, deciding the extent of the hearing required before a revocation of

a former inmate's parole), that "[i]t has been said so often by this Court and others as not

to require citation of authority that due process is flexible and calls for such procedural

protections as the particular situation demands."[81]

Finally, the *Mullane* court made one other point—one which is frequently

overlooked—of considerable relevance here.  It recognized that notice to *others* with an

interest in objecting could ameliorate prejudice (and impliedly, if not expressly, even the

existence of constitutionally deficient notice in the first place) to those who did not get

notice.  It observed:

> This type of trust presupposes a large number of
> small interests.  *The individual interest does not
> stand alone but is identical with that of a class.*  The
> rights of each in the integrity of the fund and the
> fidelity of the trustee are shared by many other
> beneficiaries.  *Therefore notice reasonably certain
> to reach most of those interested in objecting is
> likely to safeguard the interests of all, since any
> objections sustained would inure to the benefit of
> all.*  We think that under such circumstances
> reasonable risks that notice might not actually reach

---

[79]  *Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478 (1988) ("***Tulsa Collection Services***").

[80]  *Id.* at 484.

[81]  *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("***Morrissey***").

> every beneficiary are justifiable. 'Now and then an
> extraordinary case may turn up, but constitutional
> law, like other mortal contrivances, has to take
> some chances, and in the great majority of
> instances, no doubt, justice will be done.'[82]

### 2. Second Circuit Guidance

The Second Circuit has given the lower courts in this Circuit more specific

guidance, in several key cases. In its 1989 decision in *Weigner v. City of New York*,[83] the

Circuit held that "[t]he proper inquiry [on a due process contention] is whether the

[noticing party] *acted reasonably in selecting means likely to inform persons affected*, not

whether each property owner actually received notice."[84]

Then, in its 1993 decision in *Drexel Burnham*, first mentioned above,[85] the

Circuit put forward its understanding of *Mullane's* principles by stating that "no person

may be deprived of life, liberty or property by an adjudicatory process without first being

afforded notice and a full opportunity to appear and be heard, *appropriate to the nature of

a given case.*"[86]

There, the "given case," a proceeding in the *Drexel Burnham* chapter 11 case,

involved the approval of a settlement under which, among other things, Drexel Burnham

and a sub-class of its securities claimants pooled their recoveries from lawsuits Drexel

Burnham had brought against its former officers and directors, and the settling parties

granted a release to former officer Michael Milken. As here, the *Drexel Burnham*

objectors were apparently troubled that the settlement would impair their recoveries

---

[82]    *Mullane*, 339 U.S. at 319 (emphasis added).

[83]    852 F.2d 646 (2d Cir. 1988) ("***Weigner***"), *cert. denied,* 488 U.S. 1005 (1989).

[84]    *Id.* at 649 (emphasis added).

[85]    *See* n.10 *supra*.

[86]    995 F.2d at 1144 (emphasis added).

against parties other than the debtor itself.  The objectors raised both due process and substantive objections to the settlement—contending, in the due process prong of their objection, that the notice of the proposed settlement that had been mailed to 7,700 Drexel bankruptcy claimants was insufficiently descriptive of the proposed settlement.

In that context, as part of its due process analysis, the Circuit observed in *Drexel Burnham* that "[n]o rigid constitutionally mandated standard governs the contents of notice in a case like the one before us.  Rather, the Due Process Clause requires *the best notice practical under the circumstances*."[87]  And once again citing *Mullane*, the Circuit continued that "the Supreme Court has warned against interpreting this notice requirement so inflexibly as to make it an 'impractical or impossible obstacle[].'"[88]

Similarly, in its 2014 decision in *DPWN*,[89] the Second Circuit reiterated that "whether notice comports with due process requirements turns on the *reasonableness* of the notice, a *flexible* standard that often turns on what the debtor or the claimant knew about the claim or, with reasonable diligence, should have known."[90]

Like *Weigner* before it (where the notice had also been mailed), *Drexel Burnham* was a *quality* of notice case, rather than a *means* of notice case.[91]  Nevertheless, its

---

[87]   *Drexel Burnham*, 995 F.2d at 1144 (citing *Mullane*) (emphasis added).

[88]   *Id.* (once again citing *Mullane*).  With a *cf.*, the Circuit also cited, and quoted, a considerably older Supreme Court decision, *Grannis v. Ordean*, 234 U.S. 385, 395 (1914), quoting the earlier opinion's observation that the Due Process Clause "does not impose an unattainable standard of accuracy."

[89]   747 F.3d 145.

[90]   *Id*. at 150 (citing *Mullane* and *Chemetron*) (emphasis added).

[91]   It considered whether the duly mailed notice was still insufficient, because it didn't tell creditors enough.  In that respect, *Drexel Burnham* considered  a contention like the Pre-Closing Accident Plaintiffs' assertions here that "Old GM did not disclose the existence of the Ignition Switch defect in the Sale Motion or in the Sale Notice mailed to Pre-Closing Accident Plaintiffs that had already sued Old GM" (Pre-Closing Accident Pl. Br. at 9) and "[t]he notice that Old GM provided with respect to the 363 Sale was constitutionally deficient … regardless of whether the notice was mailed directly to the Plaintiff or published in the newspaper." (*Id.* at 26; accord *id.* at 29).

direction that notice must be "*appropriate to the nature of a given case*"[92] was not

limited to cases of the first type.  And *Mullane*, the opinion on which the *Drexel*

*Burnham* court relied, was a case of the second type.  For each of those reasons, along

with common sense, the Court reads the Circuit's *Drexel Burnham* directions that "the

Due Process Clause requires the best notice practical under the circumstances,"[93] and that

the notice requirement should not be interpreted "so inflexibly as to make it an

'impractical or impossible obstacle'"[94]—each of which was derived by citing *Mullane*—

as applicable to cases involving either the *means* or the *quality* of any notice whose

adequacy is questioned.

Then, though it involves a materially different factual situation, the Circuit's

decision in *DPWN* is nevertheless significant in several respects.  *DPWN* was an antitrust

case, but with a bankruptcy discharge defense.  The plaintiff there, the well-known

courier DHL, which used United Airlines for cargo delivery services, sued United under

the Sherman Act, alleging price-fixing.  United had been reorganized in a chapter 11 case

in Chicago, at the conclusion of which it received a discharge of its debts, and moved to

dismiss the antitrust action under Rule 12(b)(6), relying on its earlier discharge.[95]

DHL (which had earlier received mailed notice in the bankruptcy of the

opportunity to file claims, but without particularized mention of United's susceptibility to

antitrust claims) had anticipated the discharge defense, and proactively pleaded a

potential basis for avoiding it—that it lacked sufficient notice of the availability of its

---

[92]     995 F.2d at 1144**.**

[93]     *Id.*

[94]     *Id.*

[95]     *See* 747 F.3d at 147.

antitrust claim to satisfy due process requirements for rendering that claim discharged. The District Court, taking that allegation as true, declined to dismiss at that state of the proceedings. But the Circuit remanded, considering the allegation to be too conclusory to pass *Iqbal*[96] scrutiny, and directed the District Court to conduct further inquiry as to whether it was supportable. More specifically, the Circuit remanded for District Court inquiry as to *DHL's* knowledge of its potential antitrust claim during United's chapter 11 case, and *United's* knowledge with respect to a DHL claim.[97]

*DPWN* also suggests two other concerns that turn out not to be determinative in this case, but that may well be important in others. First, it suggests (if it does not also require) a two-step methodology that should be used, to the extent applicable, in examining contentions that the notice that due process requires was denied. The first step calls for inquiry as to whether the *claimant* knew of the claim it might assert.[98] The second step calls for the lower court to determine whether the claim was, from the perspective of the *notice-giver* (often a debtor in a bankruptcy case), a "known" claim, obligating the notice-giver to provide actual, and possibly more detailed, notice.[99]

The second is a hint that in some cases, it may be the *quality*—as contrasted to the *means*—of notice that matters. That might suggest that even if the means of notice were entirely satisfactory (as it obviously was when DHL received *mailed* notice of the bankruptcy and of the deadline to file claims), notice lacking the requisite quality might

---

[96]     *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

[97]     *See* 747 F.3d at 153.

[98]     This Court said "to the extent applicable," however, because here New GM does not contend that any of the Plaintiffs knew of the Ignition Switch Defect, or had the means to ascertain it. Thus all parties here, and the Court, go straight to the second step.

[99]     That "known claim" second step, of course, is one of the most important elements of this Court's inquiry here.

nevertheless warrant relief. And this suggests that *notice of the bankruptcy* is not enough,

or even the *deadline for the filing of claims*—and that assuming that the debtor has

knowledge of the existence of the claim (which debtors will typically have in the case of

contractual obligations but typically won't have with respect to non-contractual ones),

something more detailed in the way of notice might have to be provided.[100]

### 3. Guidance from Lower Courts

Courts below the Circuit level likewise have been sensitive to the need for

practicality and flexibility in due process analysis. In *Affirmance Opinion #2*, referred to

by several parties in their briefs as "*Parker*," on one of the appeals from the *Sale*

*Decision*, Judge Sweet considered a number of objections by appellant Oliver Parker, a

bondholder, claiming that the 363 Sale violated his due process rights. Before rejecting

Parker's contentions, Judge Sweet synthesized the underlying law, making reference to

*Mullane* and *Morrissey* in the Supreme Court, and *Drexel Burnham* in the Circuit:

> The U.S. Supreme Court has repeatedly emphasized
> the flexibility of the due process requirement, which
> simply "calls for such procedural protections as the
> particular situation demands." An "elementary and
> fundamental requirement of due process . . . is
> notice reasonably calculated, under all the

---

[100] Importantly, however, the *DPWN* court did not do away with the "known" claim requirement. And that is understandable. Unless the debtor knew of the claim or could reasonably ascertain its existence (a task that is particularly challenging for noncontractual obligations), the debtor could not provide sufficiently detailed notice, and the bankruptcy system could not operate. Debtors (with resulting prejudice to their genuinely known creditors) would be subject to extraordinary expense and uncertainty in trying to think up, and explain in sufficient detail, claims that potential creditors might assert. They would be uncertain whether all of their claims could actually be discharged. And the process would be particularly fraught with peril under the rushed circumstances that typify section 363 sales. Though the *DPWN* court did not lay it down as a legal principle, it made another very important observation as to claims that are known and those that are not. It observed that "a debtor will normally be less likely to be charged with knowledge that it has violated the law than that it owes money unrelated to a law violation." 747 F.3d at 151. That is equally true with respect to many types of tort liabilities, especially product liability claims. Both violations of law and tort liabilities present challenges in knowing of the existence of the claim that are quite different from those in knowing of contractual obligations or transactions (such as the granting of liens or easements) involving earlier grants of property interests.

> circumstances, to apprise interested parties of the
> pendency of the action and afford them an
> opportunity to present their objections." In short,
> the constitutional requirements of due process are
> satisfied if notice is given with "due regard for the
> practicalities and peculiarities of the case."[101]

Thus New GM is right when, quoting *Mullane* and *Affirmance Opinion #2*, it

argues that "[d]ue process is a flexible standard." In fact, New GM's point that due

process is "flexible" comes verbatim from the Supreme Court's opinion in *Morrissey*,[102]

and also appears in so many words in *DPWN*.[103] But as *Morrissey* also at least implies,

the caselaw does not support a wholly standardless flexibility.[104] Other authority—

especially authority addressing the "known"-"unknown" claim distinction discussed in

the subsection that follows—rather suggests a standard requiring a fairly thoughtful, and

sometimes nuanced, consideration of the circumstances, to ascertain whether any failure

to provide better notice (either more direct or more detailed) can appropriately be

excused.

### 4. The "Known"-"Unknown" Creditor Distinction

Apart from focusing on the practicality of requiring notice by one means or

another, and of one argued level of detail or another, a court also has to focus on whether

providing notice to one particular person or entity, or group of such, is required in the

first place. As an abstract matter, that latter issue turns on whether those to be noticed

---

[101]    *Affirmance Opinion #2*, 430 B.R. at 97 (citations omitted).

[102]    *See* 408 U.S. at 481 ("It has been said so often by this Court and others as not to require citation of
authority that due process is flexible and calls for such procedural protections as the particular
situation demands.").

[103]    *See* 747 F.3d at 150.

[104]    *See* 408 U.S. at 481 ("To say that the concept of due process is flexible does not mean that judges
are at large to apply it to any and all relationships. Its flexibility is in its scope once it has been
determined that some process is due; it is a recognition that not all situations calling for procedural
safeguards call for the same kind of procedure.").

(which in bankruptcy most commonly are creditors and those with ownership or security

interests in estate property) are "known," on the one hand, or "unknown," on the other.[105]

Stating the distinction is easy; applying it is much more difficult.

　　In many cases, whether the notice recipient would want the right to file a claim or

to be heard—and hence is "known"—is obvious.  In others, as here, it is much less so.

Caselaw, at the Supreme Court and, especially, in the lower courts, has provided some

guidance in this area.  But it has been less than totally helpful.

　　*Mullane,* which was decided 65 years ago, did not yet make a "known"-

"unknown" distinction, nor did it yet use the expression "reasonably ascertainable,"

which later became the standard, as discussed below.  But *Mullane* did say—apart from

saying that actual notice wasn't required for those whose interests were

"conjectural"[106]—that actual notice was not required for those who, "although they could

be discovered upon investigation, do not in due course of business come to knowledge of

the common trustee."[107]  That is plainly a rejection of a duty of investigation.  But it is

---

[105]　　*See, e.g., Chemetron,* 72 F.3d at 347 ("As characterized by the Supreme Court, a 'known' creditor
is one whose identity is either known or 'reasonably ascertainable by the debtor.'  An 'unknown'
creditor is one whose 'interests are either conjectural or future or, although they could be
discovered upon investigation, do not in due course of business come to knowledge [of the
debtor].'") (citations omitted); *In re Drexel Burnham Lambert Grp.,* 151 B.R. 674, 680 (Bankr.
S.D.N.Y. 1993) (Conrad, J) ("**Drexel Burnham-Bankruptcy**") ("For purposes of determining
constitutionally acceptable notice of an impending bar date, bankruptcy law divides creditors into
two groups: known and unknown.  According to well-established case law, due process requires
that a debtor's known creditors be afforded actual notice of the bar date . . . For obvious reasons,
debtors need not provide actual notice to unknown creditors.  It is widely held that unknown
creditors are entitled to no more than constructive notice (i.e., notice by publication) of the bar
date.") (citations omitted).

[106]　　339 U.S. at 317.  "Conjectural" has since been joined by "conceivable" and "speculative."  *See In
re Thomson McKinnon Sec., Inc.,* 130 B.R. 717, 720 (Bankr. S.D.N.Y. 1991) (Schwartzberg, J.)
("**Thomson McKinnon**"); *In re XO Commc'ns, Inc.,* 301 B.R. 782, 793 (Bankr. S.D.N.Y. 2003)
(Gonzalez, C.J.) ("**XO Communications**") (quoting *Thomson McKinnon*).  With each of those
three words, the idea is the same; many claims are *possible,* but to be known they must be much
more than that.

[107]　　339 U.S. at 317.

-47-

less helpful when the notice-giver has considerable knowledge, but lacks knowledge of
every detail.

The standard was clarified somewhat thereafter.  In its 1983 decision in
*Mennonite Board*, a post-*Mullane* opinion (though once again in a non-bankruptcy
context), the Supreme Court held that notice by mail or by other means "as certain to
ensure actual notice" was required if the name and address of the entity to be notified was
"*reasonably ascertainable*."[108]  But the *Mennonite Board* court did not flesh out the
standards in determining what the "reasonably ascertainable" standard required—
concluding only that when the name of the mortgagee and its county in Ohio were shown
on the underlying mortgage, but the mortgagee's full mailing address was not,[109] the
"reasonably ascertainable" requirement was satisfied, and actual notice was required.[110]

Likewise, in *Tulsa Collection Services*,[111] another nonbankruptcy post-*Mullane*
decision about five years after *Mennonite Board*, the Supreme Court repeated that if a
claimant's identity was "known or reasonably ascertainable," actual notice was
required.[112]  But once again, the Court did not flesh out the standards for "reasonably

---

[108]    462 U.S. at 800.  In a dissent in which Justices Powell and Rehnquist joined, Justice O'Connor
argued for a more flexible standard (and hence a greater willingness to accept notice by
publication), considering it a departure from the "balancing required by *Mullane*."  *Id.* at 806.  But
this view secured only three votes.

[109]    *See id.* at 798 n.4; *id.* at 805 (dissent).

[110]    Without stating in so many words that it would embody the standard, the *Mennonite Board* court
said in a footnote that "[w]e assume that the mortgagee's address could have been ascertained by
reasonably diligent efforts."  462 U.S. at 798 n.4.  But it did not say whether, in determining
whether a claimant's interest or address was "reasonably ascertainable," how much in the way of
"diligent efforts" was required, or what would happen if efforts were insufficiently diligent.

[111]    *See* n.79 *supra*.

[112]    485 U.S. at 490.  Conversely, the Court made clear that actual notice need not be provided to
claimants who are *not* actually known or "reasonably ascertainable."  In fact, speaking of the other
extreme, it stated:

> Nor is everyone who may conceivably have a claim properly
> considered a creditor entitled to actual notice.  Here, as in

-48-

ascertainable," and on the record there presented, simply remanded for a factual

determination as to that issue.[113]

However lower courts have addressed the applicable standards more extensively

than the Supreme Court did.  In its 1995 decision in *Chemetron*, the Third Circuit

provided more guidance, focusing in particular on the opposite extreme.  After reading

the language in the *Mennonite Board* footnote quoted above to say that a creditor's

identity is "reasonably ascertainable" if that creditor can be identified through

"reasonably diligent efforts," the *Chemetron* court went on to say that "[r]easonable

diligence does not require 'impracticable and extended searches . . . in the name of due

process.'"[114]  And it stated further that:

> The requisite search instead focuses on the debtor's
> own books and records.  Efforts beyond a careful
> examination of these documents are generally not
> required.  Only those claimants who are identifiable
> through a diligent search are "reasonably
> ascertainable" and hence "known" creditors.[115]

Importantly, the *Chemetron* court declined to apply a "reasonably foreseeable"

standard that had appeared in dictum in an earlier case in this District[116]—finding

---

*Mullane,* it is reasonable to dispense with actual notice to
those with mere "conjectural" claims.  *Id.*

[113]    *Id.* at 491 ("Appellee of course was aware that her husband endured a long stay at St. John
Medical Center, but it is not clear that this awareness translates into a knowledge of appellant's
claim.  We therefore must remand the case for further proceedings to determine whether
"reasonably diligent efforts," would have identified appellant and uncovered its claim.") (citation
omitted).

[114]    72 F.3d at 346.

[115]    *Id.* at 347.  The *Chemetron* court emphasized, however, that while some courts had held,
regardless of the circumstances, that the "reasonably ascertainable" standard would require only
an examination of the debtor's books and records, without an analysis of the specific facts of each
case, it did not construe the standard that narrowly.  It pointed out that situations could arise when
creditors are "reasonably ascertainable" although not identifiable through the debtor's books and
records.  *Id.* at n.2.

[116]    *See In re Brooks Fashion Stores, Inc.*, 124 B.R. 436 (Bankr. S.D.N.Y. 1991) (Blackshear, J.)
("***Brooks Fashion Stores***")

-49-

insufficient a contention that "Chemetron knew or should have known that it was reasonably foreseeable" that it could suffer claims from individuals living near the debtor's waste dump.[117]   The *Chemetron* court explained:

> In the instant case, the bankruptcy court failed to apply the "reasonably ascertainable" standard.  It instead crafted a "reasonably foreseeable" test from dictum in *In re Brooks Fashion Stores, Inc.,* 124 B.R. 436 (Bankr. S.D.N.Y. 1991).  In applying this test, the bankruptcy court found that "Chemetron knew or should have known that it was reasonably foreseeable that it could suffer claims from individuals living near the Bert Avenue Dump...."  It therefore found that claimants were known creditors.
>
> We hold that in substituting a broad "reasonably foreseeable" test for the "reasonably ascertainable" standard, the bankruptcy court applied an incorrect rule of law.  This constitutes clear error.  The bankruptcy court's expansive test departed from established rules of law and produced a result in conflict with other decisions.  Even if we were writing on a blank slate, we would reject the bankruptcy court's expansive standard.  Put simply, such a test would place an impossible burden on debtors.[118]

To the contrary, the *Chemetron* court held that "[a] debtor does not have a 'duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it," and that what is required "is not a vast, open-ended investigation."[119] Applying these standards, the Third Circuit rejected the contention that though the debtor could reasonably *foresee* that parties present in the immediate vicinity of its toxic waste

---

[117]    72 F.3d at 347.

[118]    *Id.* (citations omitted).

[119]    *Id.* at 346.

dump would have toxic tort claims against it, their claims would thereby become

"known." As a result, it ruled, publication notice was sufficient.

Since then, *Chemetron*, rather than *Brooks Fashion Stores*, has been followed in

this District[120] and elsewhere.[121] In his 2003 decision in *XO Communications*, Chief

Judge Gonzalez cited *Brooks Fashion Stores* for a different proposition, but relied on

*Chemetron* for the latter's rejection of the "reasonably foreseeable" standard. And

fleshing out the standards further, Judge Gonzalez quoted another decision in the *Drexel

Burnham* chapter 11 case:

> Reasonable diligence in ferreting out known
> creditors will, of course, vary in different contexts
> and may depend on the nature of the property
> interest held by the debtor. Applying *Mullane's*
> "reasonable under the circumstances" standard, due
> process requires a reasonable search for contingent
> or unmatured claims so that ascertainable creditors
> can receive adequate notice of the bar date. What is
> reasonable depends on the particular facts of each
> case. A debtor need not be omnipotent or
> clairvoyant. A debtor is obligated, however, to

---

[120] *See XO Communications*, 301 B.R. at 793 (citing *Chemetron* as "emphasizing that claimants must be reasonably ascertainable, not reasonably foreseeable").

[121] *See Louisiana Dep't of Envtl. Quality v. Crystal Oil Co. (In re Crystal Oil Co.)*, 158 F.3d 291, 297 (5th Cir. 1998) ("**Crystal Oil**"). In *Crystal Oil*, the Fifth Circuit affirmed a bankruptcy court's order declining to allow an environmental agency's late filing of a claim, even though the environmental agency had received notice only by publication. Though the "evidence could go either way," see *id.* at 298, the bankruptcy court's determination that the environmental claim was not "reasonably ascertainable" was held not to be clearly erroneous. Though Crystal Oil had dealt with environmental agencies in the past, including this one, the Fifth Circuit held that there could be "no basis for concluding that a debtor is required to send notices to any government agency that possibly may have a claim against it." *Id.* at 297. And it further held that even though the Louisiana Department of Environmental Quality had a telephone call with an individual at Crystal Oil discussing the particular polluted site with which it later would assert a claim, and Crystal looked up its records and erroneously concluded that it had no relationship with the property (because the records that would confirm ownership were "ancient ones in long-term storage"), the environmental agency was not a "reasonably ascertainable," and hence "known," creditor. *See id.* at 297-98. In articulating the standard, the Fifth Circuit stated that "[a]s we read these cases, in order for a claim to be reasonably ascertainable, the debtor must have in his possession, at the very least, some specific information that reasonably suggests both the claim for which the debtor may be liable and the entity to whom he would be liable." *Id.* at 297.

-51-

> undertake more than a cursory review of its records
> and files to ascertain its known creditors.[122]

The takeaway from the cases discussing the general principles helping courts decide what are "known" and "unknown" claims is that the debtor must make effective use of the information already available, but the fact that additional claims may be "foreseeable" does not make them "known." Then, in each case, the Court must determine on which side of the line the facts before it fall.

### B.

### The Particular Issues Here

*1. Do Due Process Requirements Apply?*

New GM argues preliminarily that due process requirements did not apply to the 363 Sale at all, because this Court's earlier bar to successor liability did not result in a deprivation of property. The Court cannot agree.

New GM premises that argument on five separate contentions:

> (1) that in most 363 sales (including this one), claims or interests would attach to the sale proceeds, and thus that there is no extinguishment of a property right;

> (2) that there was no extinguishment of a property right, because any successor liability claims really belonged to the Old GM estate;

> (3) that section 363(f) of the Bankruptcy Code preempts—*i.e.,* trumps—state laws imposing successor liability;

---

[122]    301 B.R. at 793-94 (*quoting Drexel Burnham-Bankruptcy*, 151 B.R at 681).

> (4) that the Court already ruled that there was no continuity of
>
> ownership between purchaser and seller, and thus no basis for successor
>
> liability; and

> (5) that there could be no successor liability anyway for Economic
>
> Loss Plaintiffs, because, unlike accident victims, they would not get the
>
> benefit of the "product line exception."

The Court finds these preliminary contentions unpersuasive.

New GM is right when it says that in bankruptcy sales—either from the start or by

agreement to resolve objections—creditors with *security interests or other liens* regularly

get substitute liens on sale proceeds when estate property subject to their liens is sold to a

third party, and that the bankruptcy community regularly regards that as a fair substitute.

But comparable protection often cannot be provided for claims or interests other than

liens. And here that comparable protection could not effectively be obtained.[123] Neither

---

[123]   Thus Judge Posner, speaking for the Seventh Circuit in *Edwards*, *see* n.69 *supra*, was correct when he observed that the failure to give a lien creditor notice of a section 363 sale resulted in no more than a *de minimis* deprivation of property, since the value of the secured creditor's interest in the property (*i.e.*, the value of its lien) was no more than the value of the property, and the sale proceeds were the best measure of that. *See* 962 F.2d at 645 ("[secured creditor] Guernsey does not suggest that the property was worth more than the $85,000 that the bankrupt estate received for selling it—and if it was worth no more Guernsey suffered only a trivial loss of interest (the interest on $7,000 during the period it was in the hands of the trustee) as a result of the failure to notify it of the sale."). But as this Court explained in the *Sale Opinion*, see 407 B.R. at 501, "we know that 'interest' includes more than just a lien." Because estate property can be sold free and clear of many types of claims and interests apart from liens, it would at least generally be inappropriate to apply *Edwards*-style analysis to claims and interests other than liens whose value is capped at the value of the property sold (and hence the available sale proceeds).

For that reason, although the Court agrees with nearly all of the analysis in *In re Paris Indus. Corp.*, 132 B.R. 504 (D. Me. 1991) (Hornby, J.) ("*Paris Industries*") (a non-lien case in which plaintiffs were enjoined from asserting successor liability in a tort action against an estate's assets' purchaser, and where the court concluded that "the liquidation of the assets and their replacement with cash (which was then apparently distributed to a secured creditor) has not affected [the plaintiffs'] ability to recover on their claim," *id.* at 510), the Court agrees with the portion it has just quoted only in part. The *Paris Industries* plaintiffs might have recovered more from the purchaser if their successor liability theory survived and prevailed. But this Court agrees with the next observation made by the *Paris Industries* court, pointing to a different kind of lack of prejudice—"[t]he irony of [the plaintiffs'] argument is that they would not even be able to make

back in 2009, nor in 2011 when Old GM's plan was confirmed, did anyone suggest that

Old GM's product liability creditors became secured creditors—the natural corollary of

New GM's position.  They were ordinary members of the unsecured creditor class,

sharing in the proceeds of the 363 Sale in accordance with the usual bankruptcy priorities

waterfall.[124]  That would not, of course, make a sale free and clear of successor liability

claims improper.  But it likewise does not make it true that the Economic Loss Plaintiffs

asserting successor liability claims would have "no property interest that was

extinguished," as argued by New GM,[125] and thus no interests at stake and no interest in

being heard.  Rather, the Economic Loss Plaintiffs would have the same interest in being

heard as the accident victims who likewise wanted to (and did) oppose successor liability.

The Court ultimately overruled the latter's objections on the merits, but there never was

any doubt that they had a right to be heard.

      The Court also cannot agree with New GM's second contention in this regard—

that successor liability claims did not really belong to the Economic Loss Plaintiffs and

Pre-Closing Accident Plaintiffs who might wish to assert them, but were actually claims

owned by Old GM.  Though New GM offers caselaw support that at first blush supports

its position, New GM's contention sidesteps the basic fact that a prepetition right that the

Plaintiffs had to at least try to sue a successor was taken away from them, without giving

them a chance to be heard as to whether or not that was proper.

---

their claim against [the purchaser] were it not for the sale, for it is only by the sale of assets and
the doctrine of successor liability that they can even assert such a claim."  *Id.*  There, as here, the
plaintiffs would have received no more in a liquidation.

[124]    *See* Plan at §§ 1.79, 4.3 (ECF No. 9941-1).

[125]    *See* New GM Reply at 36.

New GM relies on three cases in support of its contention: *In re Keene Corp.*,[126] *In re Emoral, Inc.*,[127] (which heavily relied on *Keene*), and *In re Alper Holdings USA*.[128] Each of *Keene* and *Alper Holdings*, in this Court's view, was properly decided; *Emoral,* a 2-1 decision with a cogently articulated dissent by Judge Cowen, probably was not. But whether or not all were properly decided, none supports the conclusion, which New GM asks the Court to reach, that tort litigants' interest in pursuing successor liability was so minimal that they didn't even have a right to be heard.

*Keene*, the first of the three, involved approximately 1,600 lawsuits by asbestos plaintiffs who at least arguably had claims against the debtor Keene. But their rights to recover against the debtor were impaired when Keene transferred over $200 million of its assets to its then affiliates during the 1980s and then spun off the affiliates.[129] Not surprisingly, the transfer and spin-off triggered fraudulent conveyance claims, initially brought prepetition. In those same prepetition actions, asbestos plaintiffs also brought claims against the transferees, asserting successor liability and tort liability based on piercing the corporate veil.[130]

Thereafter, Keene filed a chapter 11 case. Judge Bernstein granted the Keene estate's motion for an injunction blocking the continued prosecution of those actions, concluding that they were violative of section 362(a)(1) of the Code, which bars, among other things, the continuation of suits to recover on claims against the debtor that arose

---

[126] *Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844 (Bankr. S.D.N.Y. 1994) (Bernstein, C.J.) ("*Keene*").

[127] 740 F.3d 875 (3d Cir. 2014), *cert. denied,* 135 S. Ct. 436 (2014) ("*Emoral*").

[128] 386 B.R. 441 (Bankr. S.D.N.Y. 2008) (Lifland, C.J.) ("*Alper Holdings*").

[129] *See* 164 B.R. at 846.

[130] *See id.* at 847-48.

-55-

09-50026-reg   Doc 13178-1   Filed 06/01/15   Entered 06/01/15 01:23:06   Main Document
Pg 302 of 380

before the filing of the bankruptcy case.[131]  He noted that the fraudulent conveyance

claims became the estate's claims to prosecute under section 544 of the Code, and

reasoned, properly, that "the Wrongful Transfer Claims should be asserted, in the first

instance, by Keene or any other estate representative designated for that purpose."[132]  He

likewise blocked the asbestos plaintiffs' efforts to go after the defendants on corporate

veil piercing and successor tort liability theories, noting that the thrust of those actions

would be to "subject all of the assets of these non-debtor defendants to the claims of

Keene's creditors."[133]  Even with respect to the successor liability claims, he read them as

a species of fraudulent transfer claim,[134] with the purpose of increasing the assets of the

estate as a whole to satisfy the claims of the creditor community as a whole.[135]

     Given the asbestos plaintiffs' effort in *Keene* to recover assets that should have

been recovered for the benefit of all (and, notably, the transfer of their litigation rights to

the estate under section 544), Judge Bernstein's ruling in *Keene* was plainly correct.  But

in *Emoral*, which followed and heavily relied on *Keene*, the distinction between a benefit

to all and a benefit to individual creditors seeking to impose successor liability was

blurred—and it was this blurring that triggered Judge Cowen's dissent, and, in this

Court's view, the greater persuasiveness of Judge Cowen's view.

---

[131]    *See id.* at 848-49; *accord id.* at 850.

[132]    *Id.* at 849.

[133]    *Id.* at 850.

[134]    *Id.* at 853.

[135]    *Id.*  ("In any event, the remedy against a successor corporation for the tort liability of the
predecessor is, like the piercing remedy, an equitable means of expanding the assets available to
satisfy creditor claims.  The class action plaintiffs that invoke it allege a *general* injury, their
standing depends on their status as creditors of Keene, and their success would have the effect of
*increasing the assets available for distribution to all creditors*. For the same reasons stated with
respect to the piercing claims, claims based upon successor liability should be asserted by the
trustee on behalf of all creditors.") (emphasis added).

*Emoral* involved a prepetition sale of assets from a company (known most commonly as Palorome International, but later renamed Emoral) that manufactured diacetyl, a chemical used in the food flavoring industry that was the subject of many toxic tort suits. Emoral later filed for bankruptcy protection, and disputes arose between the Emoral estate's trustee and the buyer of the assets, a company called Aaroma—including, most significantly, claims by the trustee that the prepetition asset sale had been a fraudulent transfer. The trustee and Aaroma settled those disputes; as part of the settlement, the trustee agreed to release Aaroma from any causes of action that were property of the Emoral estate. But at the bankruptcy court hearing considering the propriety of the settlement, the trustee's representative stated that any successor liability claims against Aaroma didn't belong to the Emoral estate, and that the trustee therefore couldn't release them.[136] Aaroma's counsel argued that whether or not the diacetyl plaintiffs' causes of action were property of the estate (and therefore covered by the release) was not an issue before the bankruptcy court at that time, and the approval order was modified to provide, in substance, that nothing in the approval order or the underlying sale agreement would operate as a bar to prosecution of any claims that weren't property of the Emoral estate.[137]

Thereafter, plaintiffs asserting diacetyl injury claims sued Aaroma, arguing for successor liability and citing the trustee's remarks that their claims didn't belong to the estate, and that the estate couldn't release them. In a 2-1 decision (and disagreeing with the Bankruptcy Court, which had held to the contrary), the *Emoral* majority held, relying heavily on *Keene*, that the claims did in fact belong to the estate, and that Aaroma was

---

[136]    740 F.3d at 877.

[137]    *Id.*

thus protected.  The two judges in the majority did so based on their view that as a legal matter, the claim for successor liability was for the benefit of all of the estate's creditors.  But they did not, so far as this Court can discern, parse the plaintiffs' complaint to focus on what the plaintiffs were actually asking for, to see if that was actually true.  Judge Cowen, dissenting (who agreed with the conclusion of the Bankruptcy Court), found the majority's mechanical approach troublesome for several reasons, most significantly because the majority failed to consider, as a factual matter, what he considered to be critical—whether  plaintiffs bringing the diacetyl claims would be suing for themselves or for the benefit of all.[138]

The third case, *Alper Holdings*, offered by New GM with a "*See also*," involved an objection to claims.  Somewhat like *Emoral* (though *Emoral* involved successor liability claims, rather than alter ego claims) *Alper Holdings,* decided by Chief Judge Lifland, involved an issue as to whether alter ego claims had been previously released by the estate.[139]  As in all of these cases, the focus was on whether the injury was to creditors as whole or only to particular ones.  And as Judge Bernstein had done in *Keene*, and as Judge Cowen dissenting in *Emoral* did (and as his colleagues should have done), Judge Lifland looked, as a factual matter, to the nature of the successor liability claims, to see if they were asserted for the benefit of all of the estate's creditors or only to particular ones.[140]

---

[138]     *See id.* at 885-86 & n.1.

[139]     *See* 386 B.R. at 446.

[140]     *See id.* ("[I]t was clear based upon the conduct alleged by the Holt Plaintiffs that such alter ego claims were of a generalized nature and did not allege a 'particularized injury' specific only to the Holt Plaintiffs.  Accordingly, this Court held that such alter ego claims were in fact property of Saltire's bankruptcy estate and were, therefore, released under section 13.1 of the Saltire Plan.").

Importantly, none of *Keene*, *Emoral*, or *Alper Holdings* involved a 363 sale, nor considered the rights of plaintiffs to be heard before a free and clear order was entered. And for that reason, they are not as important as they might otherwise appear at first blush. But on the principle for which they are cited—that taking away the right to sue on a successor liability theory isn't a deprivation of property from the person who might wish to sue—they are at best irrelevant to New GM's position and at worst harmful to it. Each of *Keene*, *Alper Holdings* and Judge Cowen in *Emoral* focused on whether the particular successor liability action sought to recover for the benefit of all, on the one hand, or to secure a private benefit, on the other.[141] If it is the latter, a party at risk of losing that private benefit deserves the opportunity to be heard.

As the Court noted in oral argument,[142] theories of successor liability, when permissible, permit a claimant to assert claims not just against the transferor of the assets, but also against the transferee; they provide a second target for recovery. Here the Plaintiffs have not purported to sue for the benefit of Old GM creditors generally; they have instead sued to advance their own, personal, interests. They have not asked New GM to make a payment to Old GM; they want New GM's money for themselves. Taking away the right to recover from that additional defendant (where such a right otherwise

---

[141]    In that connection, the Plaintiffs point to a 2013 decision of the Second Circuit, *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC),* 721 F.3d 54 (2d Cir. 2013) ("**Madoff**"). *Madoff* is not as closely on point as the Plaintiffs suggest, as it was a *Wagoner* Rule *in pari delicto* case; it involved neither a 363 sale nor claims of successor liability. Nevertheless, the Plaintiffs properly observe (Pl. Br. at 36 n.44) that *Madoff* focused, as a factual matter, on whether the underlying creditor claims, in the *in pari delicto* context, were personal to the creditor or really belonged to the debtor corporation, and it tends to undercut New GM's position in that regard. *See* 721 F.3d at 70 (rejecting the trustee's contention that he could bring claims against third party financial institutions because his "claim [was] a general one, with no particularized injury arising from it," and that the claims against the financial institutions were "common to all customers because all customers were similarly injured by Madoff's fraud and the Defendants' facilitation").

[142]    *See* Day 1 Arg. Tr. at 41.

exists under the law of those states that permit such) may easily be understood as a matter of bankruptcy policy, and the supremacy clause, but it nevertheless represents a taking of rights from the perspective of the tort plaintiff who loses the right to sue the successor.

New GM's last three reasons for why Plaintiffs would not have any due process rights at all require considerably less discussion.  As the third of its five reasons, New GM argues that section 363(f) of the Bankruptcy Code prevails over state laws imposing successor liability.  That is true, but that is why New GM should *win on the merits*.  It does not justify denying those who might wish to argue otherwise the opportunity to be heard.

As the fourth of its five reasons, New GM argues that the Court already ruled that there was no continuity of ownership between purchaser and seller, and thus no basis for successor liability.  Once again that is true, but it was done before the Plaintiffs had appeared in the case.  The Court cannot rely on conclusions it reached in a hearing to which the Plaintiffs were not invited as a basis for retroactively blessing the failure to invite them.

As the fifth of its five reasons, New GM argues that there could be no successor liability anyway for Economic Loss Plaintiffs, because, unlike accident victims, they would not get the benefit of the "product line exception."  That too might be true (though it could vary depending on the particular state whose law would apply), but it once again goes to the merits—not the Plaintiffs' rights to be heard before successor liability claims were barred.

For these reasons, the Court concludes that the Plaintiffs were entitled to due

process in the context of each of the sale and claims processes—requiring the Court then

to consider whether they received it.

### 2.  *Notice by Publication*

Having determined that the Plaintiffs did have due process rights, the Court must

determine whether those rights were violated.  The first (though not last) issue in that

inquiry is whether notice by publication to owners of Old GM vehicles not known by Old

GM to have been in accidents was, as a general matter, constitutionally sufficient.  It

plainly was.

As noted above, the Second Circuit has held that the proper inquiry on a due

process contention is whether the noticing party (here Old GM)[143] "acted reasonably in

selecting means likely to inform persons affected . . . ."[144]  The notice required is that

"appropriate to the nature of a given case,"[145] and "*the best notice practical under the*

*circumstances*."[146]  The very reason why property is sold under section 363, and not

under a reorganization plan, is because time and liquidity constraints do not permit a

more leisurely process.[147]

---

[143]     The Court is not persuaded by New GM's contention that because it was Old GM and not New
GM that may have provided insufficient notice, New GM should not be penalized for that.  It is
the possible failure to provide requisite notice—and not who was responsible for it—that results in
the need for the Court to take judicial action.  The potential constitutional violation must trump
determinations of fault and New GM's contractual rights.

[144]     *Weigner*, 852 F.2d at 649.

[145]     *Drexel Burnham*, 995 F.2d at 1144.

[146]     *Id.* at 1144 (citing *Mullane*) (emphasis added).

[147]     It should go without saying that the urgency of the situation is a hugely important factor in
determining what is the best notice practical under the circumstances.  Exemplifying this is *Pearl-
Phil GMT (Far East) Ltd. v. Caldor Corp. (In re Caldor Corp.),*266 B.R. 575 (S.D.N.Y. 2001)
(Casey, J.) ("*Caldor-District*" ), *aff'g In re Caldor Corp.,* 240 B.R. 180 (Bankr. S.D.N.Y. 1999)
(Garrity, J.) ("*Caldor-Bankruptcy*").  There Judge Casey of the District Court, affirming an order
of Judge Garrity of this Court, rejected contentions by the appellant that it had been denied due

Actual notice to those in the 27 categories above resulted in mailed notice of the 363 Sale to over 4 million people and entities[148]—including any known by Old GM to have been in accidents. But given the urgency of GM's circumstances, it would be wholly unreasonable to expect individual mailed notice of the 363 Sale hearing to go to the owners of the approximately 70 million GM cars then on the road, or even the approximately 27 million whose cars were then (or later became) the subject of pending recalls.

This is exactly the kind of situation for which notice by publication would be the norm. Old GM's counsel could hardly be faulted for availing itself of that approach. Under normal circumstances, notice by publication to Old GM vehicle owners— describing the upcoming sale and the fact that New GM would be assuming only very limited types of Old GM liabilities—would be the only kind of notice that would be practical under circumstances like these, and would easily meet the Supreme Court's and the Second Circuit's requirements.

*3. Known Claim Analysis*

But Old GM's ability to provide notice by publication, rather than actual notice, rests on the premise that those who received publication notice only did not have "known" claims. For that reason, both sides debate at length whether owners of cars with

---

process when it failed to get notice in advance of Judge Garrity's order (in the face of Caldor's inability to continue in business during the course of its chapter 11 case) authorizing the prompt wind-down of Caldor's business operations and restraining payment on anything more than a pro-rata basis, of administrative claims that had accrued before the time of that order. *See* 266 B.R. at 579, 583. Judge Casey applied the Second Circuit's *Weigner* test of whether the noticing party "acted reasonably," as contrasted to whether there was actual receipt of notice. And recognizing that Caldor was faced "with the formidable task of providing notice to approximately 35,000 entities," *id.* at 583, and that the record was "replete with evidence as to Caldor's dire financial circumstances," *id.* at n.5, he found Caldor's actions "reasonable given the circumstances under which it was operating." *Id.* at 583.

[148]    *See* Davidson Decl. ¶ 5, New GM Appx. of Exh. 1 (ECF No. 12982-1).

Ignition Switch Defects—but who had neither been in accidents of which Old GM was aware, nor sued Old GM or manifested any intent to sue—were "reasonably ascertainable (and thus "known") creditors, on the one hand, or no more than "foreseeable" (and thus "unknown") creditors on the other.

That question is close. It is true, as New GM argues, that Old GM sent out actual notice of the 363 sale (and later, of the Bar Date) to anyone who had sued it or manifested a possible intention to sue, and that all or nearly all of those with Ignition Switch Defects were not yet in that category. It also is true that sending out notice of a recall is not the same as expecting to be sued; that not all recalls are the same in terms of the risk of resulting death or injury; and indeed that many (and perhaps most) recalls might not result from the risk of death or injury at all.

But it is also true that at least 24 Old GM engineers, senior managers and attorneys knew of the Ignition Switch Defect and the need to send out recall notices—and of the reasons why recall notices had to go out, here. And it is uncontroverted that Old GM had enough knowledge of the Ignition Switch Defect to be required, under the Safety Act, to send out mailed recall notices to owners of affected Old GM vehicles, and knew the names and addresses to whom it had to send them. On balance the Court concludes that by reason of the knowledge of those 24 individuals, the owners of cars with Ignition Switch Defects had "known" claims, from Old GM's perspective, as that expression is used in the due process jurisprudence.

The caselaw does not require actual notice to those whose claims are merely "foreseeable." But the caselaw requires actual notice to claimants whose identity is

"reasonably ascertainable."[149]  So the Court must consider how this case fits in that
spectrum when 24 Old GM personnel knew of the need to conduct a recall (and with that,
of the need to fix the cars); and, in addition, a critical safety situation; and, in addition,
the exact names and addresses of the owners of the cars that were at risk.

Preliminarily, there can be no doubt that the names and addresses of the car
owners whose cars Old GM's personnel knew to be subject to the recall obligation—and
here, to have safety defects as well—were "reasonably ascertainable" and, in fact,
actually known.  Old GM (like New GM later) was subject to the Safety Act, which
requires vehicle manufacturers to keep records of vehicle ownership, including vehicle
owners' names and addresses.  Once Old GM knew which cars had the Ignition Switch
Defect, Old GM knew exactly to whom, and where, it had to send the statutorily required
recall notice.

But not all of those with Ignition Switch Defects would be killed, injured, or want
to sue Old GM on economic claims.  Those 24 Old GM personnel did not have
knowledge of *which particular* car owners with Ignition Switch Defects would later be
killed or injured in accidents, but they knew that some would—which is why Old GM
needed to conduct the recall.  Those Old GM personnel also knew that all of those
vehicle owners had a statutory right to get their cars fixed at Old GM's (and later New
GM's) expense.

Taking the easier element first, the duty to fix the cars with Ignition Switch
Defects was owed to every one of those whose cars were subject to the known recall

---

[149]     *See* pages 49 et seq. *supra*.

obligation.  That aspect of Old GM's obligations was not subject to the uncertainty of whether or not there would be a subsequent accident or lawsuit.

The other element is plainly harder, but the Court comes out the same way.  Old GM faced the recall obligation and known claims here not by reason of any kind of actuarial foreseeability (or the reality that in any line of endeavor, people can make mistakes and others can be hurt as a result), but by reason of the *known safety risk* that required the recall—*i.e.*, that here there was known death or injury in the making to someone (or many) in the body of people whose names and addresses were known, with the only uncertainty being who, exactly, those killed or injured might be.  It is not a satisfactory answer, in this Court's view, to say that because the particular individuals in a known group who would turn out to be accident victims were unknown, all of them were unknown.  Rather than concluding that because of that uncertainty, *none* were entitled to notice, the Court concludes that *all* of them were.

New GM understandably points to a considerable body of caselaw holding, in substance, that creditors are not "known" unless their status as such is reflected in the debtor's "books and records."  That is true, but what "books and records" means in this context is all important.  At oral argument on its motion, New GM understandably did not press its earlier position[150] that its financial accounting (and in particular, liabilities on its balance sheet) would be determinative of whether claims were known.[151]  And for good reason:  such a view would fail to comport with the caselaw or common sense.  The "books and records" standard does not rest on whether the notice-giver has booked a liability or created a reserve on its balance sheet; on the treatment of the loss contingency

---

[150]  *See* New GM Opening Br. at 27-29.

[151]  *See* Day 1 Arg. Tr. at 78 ("I agree it's not the financial statements.").

under FASB 5 standards; or on whether the debtor has acknowledged its responsibility

for the claim;[152] it merely requires having the requisite knowledge in one way or another

that can be relatively easily ascertained and thereafter used incident to the noticing

process.  In the Court's view, the standard requires much more than the fact that

somewhere, buried in a company's books, is information from which the liability could

be ascertained,[153] and the Court doubts (though under the facts here it does not need to

decide) that the knowledge of one or very few people in a large enterprise would be

enough to meet the standard.[154]  But "books and records" must be construed in a fashion

consistent with the Supreme Court's requirements that "known" liabilities include those

that are not just actually known, but also "reasonably ascertainable."

New GM points out that it maintained a "litigation calendar," showing people

who had sued it, threatened to do so, or even made claims against it, and that Old GM

---

[152]    See, e.g., Drexel-Burnham-Bankruptcy, n.105 supra, 151 B.R. at 681-82 (in late proof of claim context, holding that a guaranty liability not booked on the balance sheet was still a known claim, reflected on the debtor's "books and records," and that accounting practices were not determinative).

[153]    See, e.g., XO Communications, 301 B.R. at 793-94 (in late proof of claim context, noting that "[w]hat is reasonable depends on the particular facts of each case.  A debtor need not be omnipotent or clairvoyant.  A debtor is obligated, however, to undertake more than a cursory review of its records and files to ascertain its known creditors.").

[154]    The Court has based its conclusion that the Plaintiffs were known creditors here on the fact that at least 24 Old GM engineers, senior managers, and attorneys knew of the Ignition Switch Defect—a group large in size and relatively senior in position.  The Court has drawn this conclusion based not (as the Plaintiffs argue) on any kind of automatic or mechanical imputation drawn from agency doctrine (which the Court would find to be of doubtful wisdom), but rather on its view that a group of this size is sufficient for the Court to conclude that a "critical mass" of Old GM personnel had the requisite knowledge—i.e., were in a position to influence the noticing process. Cf. Weisfelner v. Fund 1 (In re Lyondell Chemical Co.), 503 B.R. 348, 389 (Bankr. S.D.N.Y. 2014) (Gerber, J.) (in a case alleging an intentional fraudulent conveyance in an LBO, rejecting arguments based on automatic imputation of a CEO's alleged intent under ordinary agency rules, and ruling that if a creditor litigation trust pressing those claims could not plead facts supporting intent to hinder, delay or defraud on the part of a "critical mass of the directors who made the decisions in question," it would then have to allege facts plausibly suggesting that the CEO, who was only one member of a multi-member Board, could nevertheless control the disposition of Lyondell's property) (emphasis in original).

was careful to provide all of them with actual notice.[155]  That of course was the right

thing to do, and under other circumstances, it would do the job.[156]  But here we have the

unique fact that Old GM knew enough to send out recall notices (to meet a statutory

obligation to car owners, and, more importantly, to forestall the injury or death which,

without corrective action, would result), whose mailing, coupled with the publication

notice it could appropriately send, would have been more than sufficient.  But Old GM

did not do so.

New GM calls the Court's attention to its earlier decision in *Morgenstein,* in

which this Court held that the plaintiffs there were "unknown" creditors, who could not

use lack of actual notice to vacate the confirmation order in this case—though admittedly

they received notice only by publication.  There the plaintiffs (on their own behalf and a

class they wished to represent) sought to bring an untimely class proof of claim after the

bar date and after Old GM's liquidation plan went effective.  But they failed to plausibly

allege any evidentiary facts supporting their contention that Old GM *knew* that the

alleged design defect affected the vehicles they owned.  Nor were their vehicles subject

to a recall.  Old GM's knowledge of the Ignition Switch Defect here, and of its need to

effect a recall of the Plaintiffs' cars here, makes *Morgenstein* a different case.

New GM also calls this Court's attention to Judge Bernstein's decision in *Old

Carco*[157]—the *Chrysler* chapter 11 case—which in many respects is closely on point, and

---

[155]        *See* Day 1 Arg. Tr. at 78-79.

[156]        New GM also points out that it is much easier for a debtor to recognize contractual obligations
than those that may arise in tort, for alleged violations of law, or in other instances where the
debtor and possible claimants have not had personal dealings.  That is true, and it underscores why
publication notice for claimants in the latter categories is normally sufficient.  But here, once
again, Old GM personnel knew of the need to send out recall notices, where to send them, and
why they needed to go out.  This changes everything.

[157]        *See* n.15, *supra*.

with which this Court fully agrees.  There, after Old Carco's[158] own 363 sale, owners of

Jeep Wranglers and Dodge Durangos manufactured by Old Carco brought a class action

for economic loss against New Chrysler in the District Court in Delaware, alleging that

their cars suffered from a design flaw known as "fuel spit back."  As here, the affected

car owners in *Old Carco* had received notice only by publication.  With the same issue as

to whether the *Old Carco* sale order's free and clear provisions barred the economic loss

claims there, the Delaware District Court referred that question to the *Old Carco*

bankruptcy court.  Judge Bernstein concluded that Old Carco's Sale Order did indeed bar

those economic loss claims, and found no due process impediment to enforcing the *Old

Carco* sale order against those asserting the economic loss claims there—even against

those who bought their cars in the used car market[159]—finding that their claims had

arisen when their cars had been manufactured, which was before Old Carco's 363 sale.

But while *Old Carco* plainly was correctly decided, it is distinguishable from this

case, in a highly significant respect.  Old Carco had *already* issued at least three recall

notices for the "fuel spit back" problem for certain Durango and other Old Carco vehicles

before the original purchasers bought their vehicles from Old Carco,[160] avoiding the

exact problem this Court has identified here.

The publication notice here given, which otherwise would have been perfectly

satisfactory (especially given the time exigencies), was insufficient, because from Old

GM's perspective, owners of cars with Ignition Switch Defects had "known" claims.

---

[158]     Just as Old GM came to be officially known as "Motors Liquidation Co." after the 363 Sale here,
the former Chrysler came to be officially known as "Old Carco" after its 363 sale.

[159]     *See* 492 B.R. at 403.

[160]     *Id.* at 395 (Old Carco issued a "safety defect recall in 2002";  "a second safety recall … in 2005";
and a "further safety recall" in January 2009).

Because Old GM failed to provide the notice required under the Safety Act (which, if

given before Old GM's chapter 11 filing, could have been followed by the otherwise

satisfactory post-filing notice by publication), the Plaintiffs were denied the notice due

process requires.

### 4.   *The Requirement for Prejudice*

But the Court's determination that Plaintiffs were denied the notice due process

requires does not necessarily mean that they were "denied due process."  The latter turns

on the extent to which a denial of due process also requires a showing of resulting

prejudice.

Plaintiffs argue that once they have shown the denial of the notice that due

process requires, any resulting prejudice is simply irrelevant.  In their view, the denial of

the notice that due process requires means that they need not show anything more, and

that the Court need not, and should not, think about how things might have been different

if they had received the notice that was denied.

The Court disagrees.  The contention runs contrary to massive caselaw, and

common sense.

Though the Second Circuit, so far as the parties' briefing has revealed and this

Court is aware, has not ruled on this issue,[161] no less than six other Circuits have.  They

have repeatedly, and very explicitly, identified prejudice as an essential element of a

denial of due process claim—saying, in exactly these words or words that are very close,

---

[161]     In the recent cases in which the Circuit granted relief for denials of due process, the prejudice to
the party that had received inadequate notice was obvious, and no other party in the case had made
the exact same argument that the party failing to get notice might have made.  *See Manville-2010*,
600 F.3d at 154-58 (injunction against insurer's non-derivative claims that had no relation to
bankruptcy); *DPWN*, 747 F.3d at 151 (discharge of claim); *Koepp*, 593 Fed. Appx. at 23
(extinguishment of easement).

that "a party who claims to be aggrieved by a violation of procedural due process must

show prejudice."[162]  So have lower courts in this District (at both the District Court[163]

---

[162]    *Perry*, 629 F.3d at 17.  *See also Rapp v. U.S. Dep't of Treasury, Office of Thrift Supervision*, 52 F.3d 1510, 1520 (10th Cir. 1995) ("**Rapp**") ("In order to establish a due process violation, petitioners must demonstrate that they have sustained prejudice as a result of the allegedly insufficient notice."); *Brock v. Dow Chemical U.S.A.*, 801 F.2d 926, 930-31 (7th Cir. 1986) ("**Brock**") (in context of review of administrative order affecting an employer where improper notice was alleged, "it must be noted that, unless the employer demonstrates that the lack of formal notice was prejudicial, we will not order that the charges be dismissed"); *Savina Home Indus., Inc. v. Sec'y of Labor*, 594 F.2d 1358, 1365 (10th Cir. 1979) ("**Savina Home Industries**") (in considering due process claim, fact that "no prejudice has been alleged" was identified as one of two factors supporting conclusion that "no due process violation has been established"); *In re New Concept Housing, Inc.*, 951 F.2d 932, 939 (8th Cir. 1991) ("**New Concept Housing**") (ruling that failure to give the debtor notice of a hearing on the approval of a settlement violated two of the Federal Rules of Bankruptcy Procedure, but (rejecting the views of the dissenter that the failure to provide notice of the hearing resulted in a denial of due process that could not be subject to harmless error analysis) that "the violation of these rules constituted harmless error, because the Debtor's presence at the hearing would not have changed its outcome.  The Debtor had neither a legal nor factual basis for establishing that the settlement was unreasonable.").  *See also In re Parcel Consultants, Inc.*, 58 Fed. Appx. 946, 951 (3d Cir. 2003) (unpublished) ("**Parcel Consultants**") ("Proof of prejudice is a necessary element of a due process claim."); *Cedar Bluff Broad., Inc. v. Rasnake*, 940 F.2d 651 (Table), 1991 U.S. App. LEXIS 17220, at *7, 1991 WL 141035, at *2 (4th Cir. Aug. 1, 1991) (unpublished) ("**Cedar Bluff Broadcasting**") (creditor complaining of notice deficiency failed to show, among other things, "that it was prejudiced by the lack of notice to general creditors").

The Plaintiffs cite one case at the Circuit level which they argue would lead to a different conclusion, *Lane Hollow Coal Co. v. Director, Office of Workers' Compensation Programs*, 137 F.3d 799 (4th Cir. 1998) ("**Lane Hollow Coal**").  They quote a line from the opinion that the claimant is not obligated to demonstrate a "reasonable likelihood that the result of this claim would have been different absent the violation," *id.* at 807, though this is not the same as holding that there is no requirement to show prejudice, as the *Lane Hollow Coal* court itself seemed to recognize.  There the Fourth Circuit vacated, in part, an administrative law judge determination granting benefits to a coal miner's widow when there was a 17-year delay in notifying the coal mine operator of the claim, by which time evidence was no longer available and the coal mine operator was thus deprived of the opportunity to mount a meaningful defense.  *Id.* at 807.  The *Lane Hollow Coal* court did not cite or criticize its earlier holding in *Cedar Bluff Broadcasting* that had denied relief based on a failure to show a lack of prejudice, and in fact stated that *"[t]o be sure, there are 'due process' cases in which we require a showing that the error complained of actually prejudiced the result on the merits…."  Id.* at 808 (emphasis added).  Though the other cases were not named or otherwise substantively addressed, the *Lane Hollow Coal* court continued "but these cases are of a much different ilk."  *Id.*  And it declined to authorize "speculation about the would-have-been and could-have-been" if notice had not been denied for those 17 years.  *Id.* at 807.  *Lane Hollow Coal* is insufficient, in this Court's view, to trump the holdings of the ten cases expressly holding that prejudice is an element of any due process claim.  Rather, it is better read as merely assuming that there was in fact prejudice, and holding that a finding of an absence of prejudice when evidence was unavailable after a 17 year delay would necessarily have been based on unacceptable speculation.  A later (and very similar) Fourth Circuit holding upon which the Plaintiffs likewise rely, *Consolidation Coal Co. v. Borda*, 171 F.3d 175 (4th Cir. 1999), supports this Court's view.  *See id.* at 183 ("It is not the mere fact of the government's delay that violates due process, but *rather the prejudice resulting from such delay*.") (emphasis added).

-70-

and Bankruptcy Court[164] levels), and elsewhere.[165] Several of the above were bankruptcy

cases, in which litigants sought to be relieved of bankruptcy court orders based on

contentions of denial of due process.[166]

Neither the Plaintiffs, nor the GUC Trust (which is allied with the Plaintiffs on

this issue), cite any case that contradicts that authority.[167] Rather, they variously argue

---

[163] *See Caldor-District*, 266 B.R. at 583 ("even if notice was inadequate, the objecting party must demonstrate prejudice as a result thereof") (citing, *inter alia, Rapp*); *Affirmance Opinion #2*, 430 B.R. at 99 (rejecting appellant Parker's contentions that he was denied due process as a result of the expedited hearing on the 363 Sale in this case, as "Parker was in no way prejudiced by the expedited schedule").

[164] *See Caldor-Bankruptcy*, 240 B.R. at 188 ("Thus, in addition to establishing that the means of notification employed by Caldor was inadequate, Pearl must demonstrate that it was prejudiced because it did not receive adequate notice.") (citing, *inter alia, Rapp, Brock,* and *Savina Home Industries*).

[165] *In re Gen. Dev. Corp.*, 165 B.R. 685, 688 (S.D. Fla. 1994) (Aronovitz, J.) ("**General Development**") ("A creditor's due process rights are not violated where the creditor has suffered no prejudice.").

[166] *See Cedar Bluff Broadcasting*, n.162 *supra* (bankruptcy court order converting case to chapter 7); *Caldor-District* and *Caldor-Bankruptcy,* nn. 163 and 164 *supra* (bankruptcy court wind-down order); *General Development,* n.165 *supra* (bankruptcy court approval of settlement); *Affirmance Opinion #2*, n. 163 *supra* (the Sale Order in this case).

[167] *See* Pl. Br. at 36-39; GUC Trust Opp. at 27-32 & nn.9 and 10. The GUC Trust does, however, cite and quote at length a Bankruptcy Court decision, *White v. Chance Indus., Inc. (In re Chance Indus., Inc.)*, 367 B.R. 689 (Bankr. D. Kan. 2006) (Nugent, C.J.) ("**Chance Industries**"), in which Judge Nugent addressed a situation in which a child was injured on a debtor-manufactured amusement ride after the confirmation of a reorganization plan, allegedly as a result of the reorganized debtor's wrongful prepetition conduct. *See id.* at 692. Judge Nugent ruled, correctly in this Court's view, that because the child was injured after confirmation, and had no prepetition (or even pre-confirmation) relationship with the debtor, *see id.* at 701, the child did not have a claim capable of being discharged, *see id.* at 703-04, and could not be bound by a confirmation order as to which, for obvious reasons, he was not given notice. (Of course that situation is not present here, because New GM expressly assumed liability for death or injuries taking place after the 363 Sale, even if involving vehicles made by Old GM.)

The GUC Trust relies on language that came after that holding in which Judge Nugent declined to agree with an argument that the failure to provide notice to the child was "harmless error," based on the argument before him that the plan—which provided for no future claims representative, but nevertheless sought to bar future claims—would not have changed after an objection and would have been confirmed anyway. *See id.* at 709. But the GUC Trust takes Judge Nugent's comments out of context. Judge Nugent made his "harmless error" observations in the context of his discussion, see *id.* at 709-10 & n.81, of the reorganized debtor's invocation of Fed.R.Bankr.P. 9005, and Fed.R.Civ.P. 61, which together provide that in bankruptcy, as elsewhere, courts should "disregard all errors and defects that do not affect any party's substantial rights." Understandably, Judge Nugent considered that the matter before him affected substantive rights. Though the word "prejudice" never was used in his opinion (which of course undercuts the GUC Trust's argument), he effectively ruled that the child would be substantively prejudiced—by "the extinguishing of an

-71-

that "the Due Process Clause protects . . . the right to be heard, not the right to win;[168]

that all of the above cases are distinguishable on their facts;[169] and that imposition of a

prejudice requirement would require the Court to speculate as to the outcome if

appropriate notice had been provided.[170]  The first contention is overly simplistic, the

second misses the point; and the third fails based on a mistaken assumption.

As to the first, the issue is not, as Plaintiffs, argue, whether the Due Process

clause guarantees "a right to win."  Of course it is true that there is no constitutional right

to win—though ironically, under the Plaintiffs' argument (that inadequate notice

automatically gives them the win), they effectively seek exactly that.  The real issue is

rather whether, assuming that there has been a denial of the right to be heard, more is

necessary to establish a *judicially cognizable* due process violation—*i.e.*, a right to the

desired curative relief.  The caselaw answers that; it requires the arguably injured party to

show prejudice from the denial.

---

unknown claim that has yet to accrue," *id.* at 709—thus making Rule 61 harmless error analysis
inappropriate.

The Plaintiffs also cite *Chance Industries, see* Pl. Br. at 37, but only for further support for their
contention (with which, as noted above, the Court agrees) that in defective notice cases,
speculation as to what the outcome would have been with proper notice is inappropriate.  They
read Judge Nugent's ruling has having rejected the *Chance Industries* debtor's arguments
"notwithstanding [the] debtor's speculation that the tort claimant's participation in confirmation
process would not have changed the result."  *Id.*  This Court agrees with that reading, and would
even go farther; it reads Judge Nugent's *Chance Industries* opinion as suggesting that if the
objection had been raised, he would have denied confirmation of the plan on those terms.

*Chance Industries* represents an excellent example of what courts do when they think parties are
prejudiced; it does not stand for the notion that prejudice doesn't matter.  *Chance Industries* did
not, and could not, contradict the decisions of its own Tenth Circuit, *see Rapp* and *Savina Home
Industries*, n.162, *supra*, that are among those expressly imposing a requirement for showing
prejudice.

[168]   Pl. Br. at 4.

[169]   *See id.* at 37-39; GUC Trust Opp. at 27 n.9 and 29 n.10.

[170]   *See* Pl. Br. at 36-37; GUC Trust Opp. at 27.

The Plaintiffs' and GUC Trust's second argument is that "the cases [New GM] cites do not support its contention."[171]  But of course they do.  Because due process cases are heavily fact-driven, it is hardly surprising that the Plaintiffs can point out factual distinctions between the ten cases discussed above[172] and this one.  But the Court does not rely upon those cases for their factual similarity to this one; it relies on them for the *legal principles* that each enunciates, in very clear terms—as stated by the First Circuit in *Perry*, for example, "a party who claims to be aggrieved by a violation of procedural due process *must show prejudice*."[173]

The third contention does not go to the existence of the requirement for showing prejudice.  It goes to *how* the Court should examine possible prejudice—and in particular, whether courts should speculate as to resulting harm once they have been presented with a showing of insufficient notice.

In that third contention, the Plaintiffs cite *Fuentes v. Shevin*,[174] in which the Supreme Court reversed the judgments of three-judge District Courts that had upheld the constitutionality of Florida and Pennsylvania replevin statutes that denied a prior opportunity to be heard before chattels were taken from consumers' possession, in several instances without a lawsuit.[175]  The Plaintiffs do not argue that *Fuentes*, or any principles it articulated, trumped any of the holdings to which this Court has just referred—that a showing of prejudice must be made before court orders entered with insufficient notice are undone.  Nor could they, as *Fuentes* involved facts nothing like

---

[171]      Pl. Br. at 37; *accord* GUC Trust Opp. at 27 n.9, 29 n.10.

[172]      *See* n.162 *supra*.

[173]      629 F.3d at 17 (emphasis added).

[174]      407 U.S. 67 (1972) ("***Fuentes***").

[175]      *See id.* at 71-72 and n.4.

this case, and instead involved a facial attack on the constitutionality of statutes that

authorized the seizure of property without any notice, and, in many cases, any earlier

judicial action at all. The different, later, possible judicial outcomes to which *Fuentes*

referred (and upon which the Plaintiffs rely)[176] related to judicial proceedings that never

took place, and (for good reasons) needed to take place.

The Plaintiffs then argue a different proposition, on which they are on stronger

ground; they say that courts should reject "speculation" that the litigant would have lost

anyway. And in this respect, the Court agrees with them. In determining prejudice,

courts should not speculate as to outcome if an aggrieved party was denied the notice to

which it was entitled. If there is a non-speculative reason to doubt the reliability of the

outcome, the Court agrees that it should take action—though the opposite is also true.

For that reason, the Court believes that it here should neither deny, nor grant, relief to the

Plaintiffs here based on a request by either side that the Court engage in speculation.[177]

The Court will refrain from doing so.

Finally, and apart from the caselaw previously noted, the Plaintiffs' contention

that prejudice need not be shown in cases like this one runs contrary not just to existing

law, but also fairness and sound policy. Bankruptcy sale due process cases, much more

than in plenary litigation, involve competing interests—including those of parties who

---

[176]     *See* 407 U.S. at 87 ("To one who protests against the taking of his property without due process of law, it is no answer to say that in his particular case due process of law would have led to the same result because he had no adequate defense upon the merit."), quoted at Pl. Br. at 36.

[177]     But that view, once again, does not go to the requirement that prejudice must be shown; it goes only to how the required prejudice should or should not be found.

       To avoid the need for such speculation, it is very possible that in a case where it made a difference, the Court would not require, incident to ascertaining the existence of prejudice, that the result *would* have been different; the Court might well hold that it should suffice that there is a reasonable likelihood that the result *could* have been different. But the Court does not need to decide that here. In this case, there are no matters argued by either side where the distinction would matter.

have acquired property rights as buyers of estate assets, and have a justifiable expectation

that when they acquire assets pursuant to a bankruptcy court order, they can rely on what

the order says.  That was an important element of the Seventh Circuit's opinion in

*Edwards*,[178] in which that court held that a bona fide purchaser of property in a free and

clear sale acquired good title to it, even though a second mortgagee had not received

notice of the sale until more than a year later.

The *Edwards* court noted that "[i]f purchasers at judicially approved sales of

property of a bankrupt estate, and their lenders, cannot rely on the deed that they receive

at the sale, it will be difficult to liquidate bankrupt estates at positive prices,"[179] and that

"the liquidation of bankrupt estates will be impeded if the bona fide purchaser cannot

obtain a good title, and creditors will suffer."[180]  That does not mean, at least in this

Court's view, that the purchasers of assets automatically should win, but it does mean

that their needs and concerns—and the protection of their own property rights—cannot be

disregarded either.

The *Edwards* court twice addressed the competing interests on matters of this

character:

> We are left with the practical question, in what
> circumstances can a civil judgment be set aside
> without limit of time and without regard to the harm
> to innocent third parties?  The answer requires a

---

[178]   *See* n.69 *supra*.  The Plaintiffs argue that *Edwards*, which was written by Judge Posner, was wrongly decided.  *See* Pl. Br. at 34.  But the Court believes *Edwards* was correct in its result, and in most of its analysis—especially insofar as it focuses on the prejudice (or lack of prejudice) to the party that received inadequate notice, and speaks of others' property rights that likewise need to be taken into account.

[179]   962 F.2d at 643.

[180]   *Id.* at 645.

consideration of competing interests rather than a
formula.[181]

And again:

> To take away a person's property—and a lien is
> property—without compensation or even notice is
> pretty shocking, but we have property rights *on both*
> *sides of the equation here,* since [the second
> mortgagee] wants to take away property that [the
> purchaser] bought and [the purchaser's lender]
> financed, without compensating them for their
> loss.[182]

The Court is mindful of concerns articulated by Chief Judge Jacobs dissenting in

*Petrie Retail*[183] (even though they were not embraced by the *Petrie Retail* majority) that

the requirements of law in bankruptcy cases should not be trumped by concerns as to

whether they might have a chilling effect on sales in bankruptcy cases, on the one hand,

or "promote[] the sale of the assets marketed by bankrupt estates," on the other.  And for

reasons discussed below, the Court believes that in the Second Circuit, the requirements

of due process would trump the interests of finality and maximizing creditor recovery.

But in bankruptcy, the interests inherent in the enforceability of 363 orders (on which the

buyers of assets should justifiably be able to rely, and the interests of creditors depending

on the maximization of estate value likewise rest) are hugely important.  And to the

extent that courts can respect and enforce sale orders as written unless there is genuine

prejudice, they should do so.  Since parties' competing needs and concerns "are on both

sides of the equation here,"[184] that means that in instances in which prejudice has not

---

[181]     *Id.* at 644 (citation omitted).

[182]     *Id.* at 645 (emphasis added).

[183]     *See Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223, 233 (2d Cir.
2002) ("***Petrie Retail***") (Jacobs, C.J., dissenting).

[184]     *Edwards*, 962 F.2d at 645.

-76-

been shown, there is no good reason for depriving asset purchasers of their own property rights—and of the benefits for which they provided value to a chapter 11 estate.

And the facts here (which may present a relatively uncommon situation)—where while insufficient notice was given, others duly given notice made the same, and indeed better, arguments against successor liability, and lost—raise an additional common sense and fairness concern. It defies common sense—and also is manifestly unfair—to give those who have not been prejudiced the bonanza of exemption from a ruling as to which other creditors, with no lesser equities in their favor, were heard on the merits, lost, and now have to live with the result.

For all of these reasons, the Court holds—consistent with the ten other cases that have held likewise—that even where inadequate notice has been given, prejudice is an essential element for vacating or modifying an order implementing a 363 sale.

5.   *Application of Those Principles*
     *to Economic Loss Plaintiffs*

Having concluded that the Economic Loss Plaintiffs were denied the notice due process requires, but that establishing a claim for a denial of due process requires a showing of prejudice, the Court must then consider the extent to which they were prejudiced as a result. The Court finds that they were not at all prejudiced with respect to successor liability, but that they were prejudiced with respect to overbreadth of the Sale Order.

(a)   *Successor Liability*

After arguing that prejudice need not be shown, and that they should win without any prejudice at all (contentions that the Court has rejected), the Plaintiffs go on to argue

that even if prejudice must be established, it was shown.[185]  They argue that if they had

the opportunity to be heard, the result would have been different.  Insofar as successor

liability is concerned, the Court easily rejects that contention.

It is undisputed that although the Plaintiffs did not get adequate notice of the

363 Sale hearing, over 4 million others did, including a very large number who

vigorously argued against the Free and Clear Provisions, but ultimately failed.  While the

Plaintiffs quote from *Mullane* repeatedly, and rely on *Mullane* principles even more

often, they overlook the language in *Mullane* that expressly addressed situations where

many would be similarly affected—and where all, because of incomplete notice, might

not be able to be heard, but many could.

*Mullane* recognizes that where notice is imperfect, the ability of others to argue

the point would preclude the prejudice that might result if *none* could.  It even suggests

that in such instances, there is no persuasive claim that even notice was defective.  In

language that the Plaintiffs fail to address, the *Mullane* court stated:

> This type of trust presupposes a large number of
> small interests.  *The individual interest does not
> stand alone but is identical with that of a class.*  The
> rights of each in the integrity of the fund and the
> fidelity of the trustee are shared by many other
> beneficiaries.  *Therefore notice reasonably certain
> to reach most of those interested in objecting is
> likely to safeguard the interests of all, since any
> objections sustained would inure to the benefit of
> all.*  We think that under such circumstances
> reasonable risks that notice might not actually reach
> every beneficiary are justifiable.  'Now and then an
> extraordinary case may turn up, but constitutional
> law, like other mortal contrivances, has to take

---

[185]      *See* Pl. Br. at 58-60.

some chances, and in the great majority of
instances, no doubt, justice will be done.'[186]

Here, as in the situation addressed in *Mullane*, the notice that was sufficient to trigger

many objections to the Free and Clear Provisions was "likely to safeguard the interests of

all."[187]  If those who got notice and made those objections had been successful, the

"objections sustained would inure to the benefit of all.[188]  These observations by the

Supreme Court bolster the conclusion that there was no prejudice here.  In fact, just as the

*Mullane* court declared that "under such circumstances, reasonable risks that notice might

not actually reach every beneficiary [were] justifiable," that element of the *Mullane*

holding strongly suggests that notice that did not reach the subset of vehicle owners with

Ignition Switch Defects was not constitutionally deficient in the first place.[189]

But even if *Mullane* does not by itself dispose of the question, the Plaintiffs'

failure to show any reason why the Free and Clear Provisions were improperly imposed

does.  That failure underscores the lack of prejudice here.[190]  Notably, the Plaintiffs do

---

[186]     *Mullane*, 339 U.S. at 318-19 (emphasis added).

[187]     *Id.*

[188]     *Id.*

[189]     However, while that conclusion follows from what the Supreme Court said in the quoted
language, the Court prefers to analyze the matter in terms of the massive caselaw requiring a
showing of prejudice.  The distinction doesn't matter with respect to the Free and Clear
Provisions, because so many people argued against them.  But it could matter with respect to
overbreadth, discussed below, where those with notice didn't make an overbreadth argument.  The
Court is more comfortable in denying relief in instances where people made the same argument
and lost than it is in instances where those with notice failed to make the argument at all.

[190]     *See Paris Industries, supra* n.123, 132 B.R. at 510 ("I conclude that [objectors] were in no way
prejudiced by the lack of notice and their inability to appear and argue their position on the sale.
They have made no showing that, if they had been notified and had appeared, they could have
made any arguments to dissuade the bankruptcy court from issuing its order that the assets be sold
free and clear of all claims."); *Austin v. BFW Liquidation, LLC (In re BFW Liquidation, LLC),*
471 B.R. 652, 672-73 (Bankr. N.D. Ala. 2012) (Cohen, J.) (declining to set aside bankruptcy sale
even though a creditor was not given notice of it where creditors' committee and many creditors
participated in the process and court could conclude that all creditors' interests in the sale were
adequately represented by that committee and those creditors, and the creditor "did not allege in

-79-

not argue that when the Court barred successor liability back in 2009, it got it wrong.[191]

They do not bring to the Court's attention any cases that other objectors missed, or any

statutory or other authority suggesting a different outcome on the successor liability

merits.  In fact, they offer no legally based arguments as to why they would have, or even

*could* have, succeeded on the successor liability legal argument when all of the other

objectors failed.[192]

Rather, while the Plaintiffs recognize that the Court would not have let GM go

into the liquidation that would have resulted if the Court denied approval of the 363 Sale,

they argue that they could have defeated the successor liability injunction for reasons

unrelated to its propriety as a matter of bankruptcy law.  While criticizing New GM for

improper speculation,[193] they ask the Court to rely on the speculation they prefer;[194] they

---

her complaint that she possessed any grounds for opposing the sale which she could have raised
had she been notified of the sale before it was authorized").

[191]   *See* Pl. Br. at 58-60.  The closest they come is an accusation that it is New GM that is engaging in
speculation, and a suggestion that the Court would not have written "exactly the same opinion."
*See* Pl. Br. at 58-59 ("New GM's argument speculatively presumes that this Court would have
written exactly the same opinion in July of 2009 *even if* it had been aware of the ISD, the now
well-documented campaign to cover it up, and Old GM's abdication of its legal duties to owners
and lessees of Defective Vehicles.") (emphasis in original).  In light of the Plaintiffs' failure to put
forward any new successor liability arguments or caselaw authority, the Facts section of any
opinion might have added a paragraph or two, but the legal discussion would not at all have
changed—nor, more importantly, would the outcome.

The Plaintiffs also argue, though only in a footnote, that if they had an opportunity to be heard,
they would have objected to a finding in the Sale Order that New GM was a "good faith
purchaser" (relevant under Bankruptcy Code section 363(m)), and that the Court likely would
have agreed with them.  *See* Pl. Br. at 59 n.67.  That contention does not help them.  Their
prediction of the Court's ruling if they had made such an argument is speculative, but even if such
a ruling might have come to pass, it would not have an effect on the inclusion of provisions
imposing successor liability.  "Good faith purchaser" findings provide safe harbors for buyers *on
appeal*; they do not go to whether or not a sale should be approved, or the nature or extent of any
provisions barring successor liability.  *See* section 363(m).

[192]   The Court would have fully and fairly considered any such argument now if it had been made, but
(presumably because of the absence of supporting authority) that is not the Plaintiffs' argument
here.

[193]   *See* Pl. Br. at 4 ("New GM's self-serving speculation regarding possible outcomes had the ISD
been disclosed and notice to the Pre-Sale Class been given are not even plausible."); *id.* at 58
("New GM's argument speculatively presumes that this Court would have written exactly the

ask the Court to accept the likelihood that by reason of public outrage or public pressure,
they could have required Old GM or Treasury to rewrite the deal to accede to their
desires.[195]   And they know, or should, the fundamental principle of bankruptcy law that a
buyer of assets cannot be required to take on liabilities it doesn't want.

So it requires no speculation for the Court to rule that given Old GM's
circumstances at the time, the Court would not have disapproved the 363 Sale or
conditioned its approval on modifications to the carefully negotiated restructuring to
favor one or more groups seeking special treatment.

As noted above, the Court agrees with the Plaintiffs and the GUC Trust that
speculation is inappropriate on an inquiry of this nature.   But gauging the outcome on the
bar of successor liability if Plaintiffs had been heard does not at all involve speculation,
especially since they offered no authority beyond what the other objectors offered in
2009.   Rather, it is the Plaintiffs' alternative argument—that they could have succeeded
by reason of public outrage, political pressure, or Treasury's anger with Old GM, when

---

same opinion in July of 2009 . . . ."); *id.* at 59 ("New GM cannot support its speculation as to the
potential outcome had Old GM disclosed, that on the eve of filing for bankruptcy, that it had put
millions of cars on the road with a known but hidden life-threatening defect while failing to
disclose that fact to those most affected by it.").

[194]   *See* Pl. Br. at 59 ("[I]t is equally or even more likely that Old GM and Treasury—who, New GM
acknowledges, was the one to draw 'the line in the sand'—would have chosen to deal with
objections from Plaintiffs in the same way it chose to deal with objections from consumer safety
groups, by adding Plaintiffs' claims to assumed liabilities."); *id.* at 4 ("[T]here is no way to
determine, some five years later, what the outcome would have been had the bombshell of Old
GM's concealment of this massive safety defect been made known to the Court, the Treasury,
Congress, the public, the press and the various objectors.").

[195]   *See id.* at 4-5 ("[H]ad the Court and governmental authorities known that Old GM had knowingly
placed millions of cars on the road with a life-threatening safety defect (and that New GM
intended to continue to allow such cars to remain on the road with those known defects), it is not
reasonable to assume (as New GM does) that such a revelation could only have resulted in a
disastrous liquidation and the end of GM as a functioning company.   Instead, it is likely that such
an outcome would have still been avoided (for numerous reasons, political, national economic and
otherwise, that were still significant, compelling and extant), *and that the entry of the Sale Order
would have been conditioned on New GM's assumption of all related liabilities so as to ensure the
commercial success of the purchasing entity.*") (emphasis added).

-81-

they could not prevail in the courtroom—that asks the Court to speculate.  For the very reason the Plaintiffs themselves advance, the Court should not, and will not, do so.

Insofar as the Free and Clear Provisions' prohibition of successor liability claims are concerned, while the Plaintiffs failed to receive the notice due process requires, they were not prejudiced as a result.  Thus they have failed to establish a claim for a denial of due process.  The Free and Clear Provisions must stand.

   *(b)    New GM's Own Wrongful Acts*

What the Court would have done in the face of a Sale Order overbreadth objection is likewise not subject to speculation.  The Court follows its own precedent.  If the Plaintiffs had been heard to make the argument back in 2009 that they are making now—that they should have the right to allege claims based on wrongful conduct by New GM alone, without any reliance on anything that Old GM might have done—the Court would have entered a narrower order, as it did in similar situations.  In this respect, the Economic Loss Plaintiffs were prejudiced.

The Court has twice dealt with what is effectively the same issue before.  In another chapter 11 case on the Court's watch, quite a number of years before the 363 Sale in this case, Magnesium Corporation of America ("**MagCorp**"), one of the two debtors in that case,[196] had massive bond debt, environmental, and other liabilities, leading to a chapter 11 filing in August 2001.  In May 2002, lacking an ability to reorganize, MagCorp sought approval of a 363 sale to US Magnesium, an affiliate, of substantially all of its assets, with free and clear provisions that would protect the purchaser from successor liability on the debtors' legacy claims—including, most significantly,

---

[196]    *In re Magnesium Corp. of Am.*, No. 01-14312-reg ("***MagCorp***).

MagCorp's environmental liabilities to the EPA and other U.S. Government entities. Understandably upset that it would have to recover its very substantial claims from a shell that at the time seemed largely worthless, the Government objected to the free and clear provisions.

Consistent with the law at the time (which was even clearer by 2009), the Court nevertheless granted the requested free and clear provisions. But it further ruled that *while successor liability would be proscribed,* US Magnesium would not be protected with respect to any future matters *that were its own liability.* As part of its dictated rulings, the Court stated:

> When you are talking about free and clear of liens, it means you don't take it subject to claims which, in essence, carry with the property. It doesn't absolve you from compliance with the law going forward.[197]

And though it later rejected an effort by the Government to reargue the free and clear provisions there, the Court then said:

> I've made it clear that the new owners will have to comply with the law and will be subject to any and all obligations that the EPA or other regulatory authorities can impose with respect to the new owners of the land, including requiring that they do whatever they have to do with cleaning up their land if it's messed up.[198]

The Court's sale order in *MagCorp* therefore included, after its free and clear provisions, a key proviso:

> provided, however, that *nothing contained herein shall* (a) release US Magnesium LLC or any affiliate or insider thereof from any claim of the

---

[197]    Tr. of Hr'g, Jun 4, 2002, No. 01-14312 ECF No. 290, at 129:21-25.

[198]    *Id.* at 132:22-133:5 (transcription errors corrected).

> United States against US Magnesium or such
> affiliate or insider which existed immediately prior
> to the Closing (but not as a successor in interest to
> the Seller) and (b) *excuse US Magnesium LLC from
> any obligations under applicable law* (including,
> without limitation, RCRA or other environmental
> laws) *as the owner and operator of the Assets (but
> not as successor in interest to Seller).*[199]

Similarly, at the 2009 sale hearing in this case, certain objectors voiced concerns

that any approval order would too broadly release either Old GM or New GM from their

respective duties to comply with environmental laws and cleanup obligations. After they

did so, the Court noted that it had originally shared their concerns, but that their concerns

were addressed by amendments to the proposed order that were made after objections

were filed. [200]  The Sale Order in this case was amended to say:

> Nothing in this Order or the [Sale Agreement]
> releases, nullifies, or enjoins the enforcement of any
> Liability to a governmental unit under
> Environmental Laws or regulations (or any
> associated Liabilities for penalties, damages, cost
> recovery, or injunctive relief) that any entity would
> be subject to as the owner, lessor, or operator of
> property after the date of entry of this Order.
> Notwithstanding the foregoing sentence, nothing in
> this Order shall be interpreted to deem the
> Purchaser as the successor to the Debtors under any
> state law successor liability doctrine with respect to
> any Liabilities under Environmental Laws or
> regulations for penalties for days of violation prior
> to entry of this Order.  Nothing in this paragraph
> should be construed to create for any governmental
> unit any substantive right that does not already exist
> under law.[201]

---

[199]   Order, No. 01-14312 ECF No. 283 (Jun. 5, 2002) ¶ 13 (underlining in original but emphasis by italics added).

[200]   *See Sale Opinion*, 407 B.R. at 507-08.

[201]   *Id.* at 507.  Another provision provided similarly:  "Nothing contained in this Order or in the [Sale Agreement] shall in any way (i) diminish the obligation of the Purchaser to comply with Environmental Laws…."  *Id.* at 507-08.

-84-

Here the Sale Order, in addition to barring successor liability (which for reasons

discussed above, remains fully appropriate), also proscribed any claims involving

vehicles and parts manufactured by Old GM, even if the claims might rely solely on

wrongful conduct by New GM alone.  By not having the opportunity to argue that such

was inappropriate here (and to seek a proviso similar to the ones granted in *MagCorp* and

for the environmental objectors here), the Economic Loss Plaintiffs were prejudiced.

They thus established an actionable denial of due process with respect to Sale Order

overbreadth.

### (c) The Used Car Purchasers

A subset of the Economic Loss Plaintiffs, the Used Car Purchasers (whom the

Plaintiffs refer to as the "Post-Sale Class"), assert that they have special rights—to assert

claims for successor liability when nobody else can—because they had not yet purchased

their cars at the time of the 363 Sale.  The Court cannot agree.  Aside from the illogic and

unfairness of the contention, it is erroneous as a matter of law, for at least two reasons.

First, when the Court issued the Sale Order, approving the disposition of Old GM

assets—a matter over which the Court had unquestionable subject matter jurisdiction,

derived from its statutory subject matter jurisdiction under 28 U.S.C. § 1334 and, more

importantly for these purposes, the *in rem* jurisdiction the Court had over estate assets

then being sold—those assets were sold free and clear of successor liability claims.  The

substance of the Sale Order was to proscribe claims based on the transferor Old GM's

conduct that could be argued to travel with the assets transferred.[202]  The bar against

---

[202]   *See Sale Opinion*, 407 B.R. at 501 (as part of Court's analysis that successor liability claims were
"interests" properly subject to a free and clear order, recognizing that "we know that an 'interest'
is something that may accompany the transfer of the underlying property, and where bankruptcy

successor liability claims premised on continued ownership of the property traveled with the property. The Used Car Plaintiffs would thus be bound by the *in rem* nature of that order except to the extent that its enforcement, by reason of due process concerns, would be improper as to them.

Because they were unknown at the time, and were not even creditors (not having yet acquired the cars they now assert have decreased value), mailed notice was impossible, and publication notice (or for that matter, actual notice) would not have been meaningful to them, even if Old GM had previously sent out recall notices. Thus the Used Car Purchasers were denied the notice due process requires to bind them to the Free and Clear Provisions,[203] just as the remainder of the Plaintiffs were.

But like the other Plaintiffs, the Used Car Purchasers were not prejudiced, because others made the same arguments that Used Car Plaintiffs might have made, and the Court rejected those contentions. Especially since purchasers of estate property under sale orders have property rights too, the methodology for correcting a denial of an opportunity to be heard under such circumstances (if not others as well) should be (1) at least temporarily relieving an adversely affected litigant of the effect of the order, and then (2) giving the adversely affected litigant the opportunity to be heard that was previously denied—referred to colloquially by this Court, in oral argument, as a "do-over"[204]—fixing any damage that might have resulted from an incorrect or incomplete

---

policy, as implemented by the drafters of the Code, requires specific provisions to ensure that it *will not* follow the transfer.") (emphasis in original).

[203]   *See Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus., Inc.)*, 445 B.R. 243 (Bankr. S.D.N.Y. 2011) (Bernstein, C.J.) ("**Grumman Olson-Bankruptcy**"), *aff'd* 467 B.R. 694, 706-07 (S.D.N.Y. 2012) (Oetkin, J.) ("**Grumman Olson-District**") (finding due process concerns made bar of successor liability unenforceable against claimants who were unknown, future, claimants at the time of the sale) (collectively, the "**Grumman Olson Decisions**").

[204]   *See* Day 1 Arg. Tr. at 15, 20, 21.

ruling the first time.  Granting any more than that would favor the Plaintiffs with an outcome that the Court has already determined is contrary to existing law, and would grant them a wholly inappropriate windfall.

Like the other Economic Loss Plaintiffs (and for that matter, the Pre-Closing Accident Plaintiffs), if the Used Car Purchasers made arguments at this time that were not previously raised, the Court believes that it would be obligated to consider those arguments now, and effectively give Used Car Plaintiffs a do-over.  But once again like the other Plaintiffs, the Used Car Plaintiffs have identified no arguments they might have made that others did not.  As with the other Plaintiffs, the denial of notice gave them the chance to be heard on the merits at a later time, but not to an automatic win.

Second (assuming *arguendo* that they were injured), the Used Car Owners were injured as the successors in ownership to individuals or entities who had been the prior owners of their Old GM cars.  And for each of them, an earlier owner was in the body of owners of Old GM vehicles who were bound by the Free and Clear Provisions.  With exceptions not applicable here (such as holders in due course of negotiable instruments), the successor in interest to a person or entity cannot acquire greater rights than his, her, or its transferor.[205]  That is the principle underlying the *Wagoner* Rule,[206] which, while an amalgam of state and federal law, is firmly embedded in the law in the Second Circuit.[207]

---

[205]   *See Tital Real Estate Ventures, LLC v. MJCC Realty L.P. (In re Flanagan)*, 415 B.R. 29, 42 (D. Conn. 2009) (Underhill, J.) ("In acquiring the estate's rights and interests . . . Titan [the acquiror from a trustee] acquired no more and no less than whatever rights and interests to MJCC and its properties the estate possessed at the time of the assignment . . . Titan can only prevail on its claims if, and to the extent that, the Trustee would have prevailed on those claims at the time of the assignment.").

[206]   *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991) ("***Wagoner***").

[207]   *See, e.g., Buchwald v. The Renco Group, Inc. (In re Magnesium Corp. of America)*, 399 B.R. 722, 757 nn. 113 & 114 (Bankr. S.D.N.Y. 2009) (Gerber, J.) (applying *Wagoner* Rule to hold chapter 7

And that principle has likewise been applied to creditors seeking better treatment than the
assignors of their claims.[208]  Thus it is not at all surprising to this Court that in *Old
Carco,*[209] Judge Bernstein blocked the suits by those who bought *used* 2005 and 2006
Dodge Durangos or Jeep Wranglers,[210] distinguishing *Grumman Olson-Bankruptcy* on
the ground that those plaintiffs "*or their predecessors (the previous owners of the
vehicles) had a pre-petition relationship with Old Carco, and the design flaws that they
now point to existed pre-petition.*"[211]

Thus the caselaw requires that New GM receive the same protection from Used
Car Owners' successor liability claims that it had from their assignors'.

The Used Car Purchasers' contention that they deserve better treatment than other
GM vehicle owners is also illogical and unfair.  As New GM argues, with considerable
force, "an owner of an Old GM vehicle should not be able to 'end-run' the applicability
of the Sale Order and Injunction by merely selling that vehicle after the closing of the
363 Sale . . . if the Sale Order and Injunction would have applied to the original owner
who purchased the vehicle prior to the 363 Sale, it equally applies to the current owner

---

trustee to *in pari delicto* defenses applicable to the corporation and its management whom the
trustee replaced).

[208]    *See In re KB Toys, Inc.*, 736 F.3d 247, 252-54 (3rd Cir. 2013) ("**KB Toys**") (a trade claim that was
subject to disallowance in the hands of the original claimant as a preferential transfer was similarly
disallowable in the hands of a subsequent transferee).  Like the Third Circuit in *KB Toys, see id.* at
254 n.11, the Court has considered, but declined to follow, the contrary holding in *Enron Corp. v.
Springfield Assocs. (In re Enron Corp.)*, 379 B.R. 425 (S.D.N.Y. 2007) (Scheindlin, J.) ("**Enron-
District**"), which had held that susceptibility for equitable subordination and claims disallowance
would continue if a transfer was by way of an "assignment," but not by "sale."  The Third Circuit
in *KB Toys* court found this distinction to be "problematic," *id.*, and for that reason and others, it
followed the contrary decisions in *Enron Corp. v. Avenue Special Situations Fund II, LP (In re
Enron Corp.)*, 340 B.R. 180 (Bankr. S.D.N.Y. 2006) (Gonzalez, J.) ("**Enron-Bankruptcy**") (which
the *Enron-District* court had reversed), and in *In re Metiom, Inc.*, 301 B.R. 634 (Bankr. S.D.N.Y.
2003) (Drain, J.), with which this Court, like the Third Circuit, agrees.

[209]    *See* n.157 *supra.*

[210]    *See Old Carco*, 492 B.R. at 399.

[211]    492 B.R. at 403 (emphasis added).

who purchased the vehicle after the 363 Sale."[212]  There is no basis in logic or fairness for a different result.

For all of these reasons, the Court concludes, after what is effectively *de novo* review (focused on the non-showing by Used Car Purchasers of anything they might have argued to defeat the Free and Clear Provisions beyond anything previously argued), that Used Car Purchasers have likewise failed to make a showing of prejudice, and the Free and Clear Provisions stand for them as well.

6. *Application of Those Principles*
   *to Pre-Closing Accident Plaintiffs*

Like the Economic Loss Plaintiffs whose claims the Court just addressed, the Pre-Closing Accident Plaintiffs seek to impose successor liability on New GM.  But though the Court has found that they did not get the notice due process requires, they were not prejudiced by the failure.

Preliminarily, the Court's determination that the Economic Loss Plaintiffs were not prejudiced by the Free and Clear Provisions applies equally to the Pre-Closing Accident Plaintiffs.  The Pre-Closing Accident Plaintiffs likewise have offered no arguments here as to why the Court's earlier order proscribing successor liability was wrong.  And it requires no speculation here for the Court again to find no basis for a different legal result.  In fact, many of the objectors whose contentions the Court rejected back in 2009 were asserting the exact same types of claims the Pre-Closing Accident Plaintiffs have—claims for injury or death from pre-closing accidents, involving vehicles or parts manufactured by Old GM.  While the Pre-Closing Accident Plaintiffs' claims (premised upon actual injury or death, and, at least allegedly, from the safety risk of

---

[212]    *See* New GM Opening Br. at 66.

which Old GM was aware), might be regarded by many as more sympathetic than those of Economic Loss Plaintiffs, they nevertheless are efforts to impose successor liability. And contentions that the Pre-Closing Accident Plaintiffs would successfully impose successor liability by reason of political concerns are once again speculative, just as the similar arguments of the Economic Loss Plaintiffs were.

The arguments as to Sale Order breadth that the Economic Loss Plaintiffs might have asserted would not be relevant to the Pre-Closing Accident Plaintiffs. To the extent the Sale Order was overbroad, it was so as to any claims that might arise *solely by reason of New GM's conduct*. The Pre-Closing Accident Plaintiffs suffered the injury or death underlying their claims in Old GM cars, and with Old GM parts. Any actionable conduct causing that injury or death took place before the 363 Sale—and necessarily was by Old GM, not New GM, and indeed before New GM could have done anything wrong.

If the overbreadth objection were sustained and the Sale Order could be, and were, fixed (a matter addressed in Section II below, dealing with Remedies), the Pre-Closing Accident Plaintiffs still could not assert claims against New GM.

The Pre-Closing Accident Plaintiffs did not suffer the prejudice that is an element to a denial of due process claim.

### 7. *Application to Filing of Claims*

Much of the analysis above applies equally to the allowance of claims. But due process analysis in the claims allowance context must take into account two differences. First, here there was not the same degree of urgency with respect to the deadline for filing claims. And second, while prejudice is required in the claims context as well, the denial of the opportunity to file a timely proof of claim—and with it, the likely or certain expungement of one's claim—is at least generally, if not always, classic prejudice.

-90-

As noted above, due process analysis requires the consideration of the surrounding circumstances. While the need for urgency in a judicial process is the paradigmatic example of a relevant circumstance, the converse is also true. When the urgency is lacking, the hugely important factor of impracticality by reason of time constraints drops out of the picture. In contrast to the 363 sale process, claims could be (and ultimately were) considered in a less hurried fashion.

Nevertheless, were it not for the fact that Ignition Switch Defects were known claims (for reasons discussed in Section I(A)(5) above), service of notice of the Bar Date by the publication that here was utilized[213] would still be adequate. Old GM was careful to send out notice of the Bar Date to any who had brought suit against Old GM or expressed to Old GM their belief that they might have claims, and the Court approved Old GM's proposals for notice by publication to those not known by Old GM to have potential claims against the Old GM estate.

But with respect to the allowance of claims, the failure to send out Ignition Switch Defect recall notices, much more clearly than with respect to notice of the 363 Sale, resulted in the denial of the notice that due process requires. And though a showing of prejudice here too is required, the Court finds that the denial of timely notice of the Old

---

[213] The Plaintiffs seek to compare and contrast the highly detailed and carefully structured publication notice that this Court authorized with respect to worker claims that might have arisen by reason of their exposure to the chemical diacetyl, in another case on the Court's watch, *Chemtura* (No. 09–11233 (reg)), where a challenge to the adequacy of the notice was rejected by this Court and later affirmed on appeal. *See Gabauer v. Chemtura Corp. (In re Chemtura Corp.),* 505 B.R. 427 (S.D.N.Y. 2014) (Furman, J.). The comparison is not an apt one. There, as a result of a shared desire of the debtor and the Court to provide the best notice possible to workers who might have been exposed to diacetyl (and because Chemtura wanted to lean over backwards to get a discharge of such claims on which it could rely), the Court established special measures, such as notices with an unusually detailed discussion of the possibility of illness, postings of notices in each potentially affected plant, notices in local community newspapers, and publication in both English and Spanish. But these measures are properly thought of as "best practices," or at least an excess of caution, which would not establish a minimum standard for the quality of notice that is constitutionally required.

-91-

GM Bar Date prejudiced the Plaintiffs with respect to any claims they might have filed against Old GM.

By reason of its failure to provide the Plaintiffs with either the notice required under the Safety Act or any other form of written notice, Old GM failed to provide the Plaintiffs with the notice that due process requires.[214]  And because that failure prejudiced them in filing timely claims, the Plaintiffs were prejudiced as a result.  The failure to give the Plaintiffs the notice that due process requires, coupled with the prejudice to them that resulted, denied the Plaintiffs the requisite due process.

## II.

## Remedies

The second threshold issue requires the Court to determine the appropriate remedies for any denials of due process that the Court may have found.  Once again, the Court focuses on the Sale Order and claims allowance process separately.

## A.

## The Sale Order

The Plaintiffs argue that the Court should simply deny New GM enforcement of the Sale Order "as to the objecting claimant[s] who did not receive due process,"[215] (*i.e.*, as to *them*), even with respect to the same successor liability as to which the Court ruled against others who got notice and argued against it.  They argue, in substance, that they

---

[214]    The Court does not need to decide, and does not decide (in either this context or in the context of the adequacy of notice of the 363 Sale), a matter also debated by the parties—the  extent to which a detailed notice describing the types of claims Plaintiffs might assert (or, by analogy, of how they might be adversely affected by the Free and Clear Provisions) was required as a matter of due process law.  Because Old GM failed to send out *any* recall notices, or provide *any* alternative form of notice to those with Ignition Switch Defects, whatever, the degree of detail that might otherwise be required is academic.

[215]    Pl. Br. at 62.

09-50026-reg Doc 13178 Filed 06/01/15 Entered 06/01/15 14:33:06 Main Document
Pg 339 of 341

should be permanently absolved from the Sale Order's Free and Clear Provisions irrespective of whether those provisions were right or wrong. Not surprisingly, the Court rejects this contention.

By the same token, New GM argues that the Plaintiffs' remedy, if any, is to enforce their claims against the proceeds of the 363 Sale, and that the unitary nature of the Sale Order requires that the Court either enforce it as a whole or vacate it as a whole—while also reminding the Court (though the Court need hardly be reminded) that unwinding the sale at this point is unthinkable. Though these contentions are not as offensive as the Plaintiffs', these too are flawed.

Like the Due Process issue, the Court analyzes the Remedies issue in ways materially different than the parties here do—in accordance with the discussion that follows.

### 1. *Prejudice As Affecting Remedy*

For reasons discussed above,[216] the Court has already rejected the Plaintiffs' contention that prejudice is irrelevant to the existence of a due process violation resulting from a denial of the requisite notice. That limits, though it does not eliminate, the matters for which a remedy must be crafted.

Here the Plaintiffs failed to receive notice they might have used to join others likewise arguing against the Free and Clear Provisions. But the others made those points, and made them well. And while the prejudice analysis might be different if the Plaintiffs now identified successor liability points others failed to make, here no such points have

---

[216]     *See* page 71 & nn.162 through 165 *supra*.

-93-

been identified.  On the Free and Clear Provisions barring successor liability, there is no

prejudice; thus no due process claim; and thus nothing to remedy.[217]

But on the Plaintiffs' second principal matter of concern—the overbreadth of the

Sale Order—the situation is different.  There is a flaw in the order, protecting New GM

from liability on claims that, while they involve Old GM vehicles or Old GM parts, do

not rest on successor liability, and instead rely on New GM's alleged wrongful conduct

alone.  The Plaintiffs could have made overbreadth arguments if given appropriate notice

before the 363 Sale hearing, and to that extent they were prejudiced.  And for that the

Plaintiffs should be entitled to remedial relief to the extent the law otherwise permits.

### 2.  *Attaching Claims to Sale Proceeds*

So it is necessary then to turn to New GM's points.  In several respects, New GM

is right, but in material respects New GM extends existing law too far, or fails to

recognize the holdings or implications of existing precedent.

Over-extension of existing law is the problem with respect to New GM's first

point: its contention that the Plaintiffs' claims should attach to the 363 Sale Proceeds.

That often works fine; courts routinely provide that upon sales of estate property subject

to a lien, the rights of parties with liens on the collateral that was sold attach to the

---

[217]  Even if prejudice did not need to be found as an element of a claim of denial of due process in the first place, prejudice would nevertheless be a critical element in determining the proper remedy. As noted above, the Court believes that the methodology for the correction of a denial of an opportunity to be heard in a sale order context should be (1) at least temporarily relieving an adversely affected litigant of the effect of the order, and then (2) giving the adversely affected litigant the opportunity to be heard that was previously denied—repairing any damage that might have resulted from an incorrect or incomplete ruling the first time.  Apart from the unfairness of treating the Plaintiffs better than others similarly situated, granting them any more than that would favor the Plaintiffs with an outcome that the Court has already determined is contrary to existing law, and grant them a wholly inappropriate windfall.

-94-

proceeds instead.[218]  And since the secured component of a claim protected by a lien

cannot exceed the value of the collateral, that will typically eliminate any prejudice to the

lien creditor.  That was the situation in *Edwards*, which (because it involved a lien)

reached the right bottom line.  But as this Court noted above,[219] the claims and interests

proscribed by a sale order can go beyond mere liens, and New GM's analysis can work

only for liens—or, perhaps, any similar interests whose value is capped by the value of

collateral being sold.  If another kind of interest was impacted—as it has been here—a

different remedy must be considered.

     New GM's second point (that the Sale Order cannot be vacated or modified at this

late point in time) breaks down into several distinct, but related, points—raising issues of

bankruptcy policy and the finality of judicial sales; of due process law; and of respect for

the nonseverability provisions in orders upon which many rely.  Each raises matters of

legitimate concern from New GM's perspective.  But they can be taken only so far.

    *3.  Protection of Purchasers of Estate Assets*

     New GM points out that the buyers of assets from chapter 11 estates acquire

property interests too—as recognized by the Seventh Circuit in *Edwards*[220]—and that

taking away those purchasers' contractually bargained-for rights strikes at the heart of

understandings critically important to the bankruptcy system.  In this respect, New GM is

---

[218]     In fact, the Court did exactly that at the time of the 363 Sale, with respect to lenders (the "**TPC Lenders**") who had liens on a transmission manufacturing plant in Maryland, and a service parts distribution center in Tennessee, that went over to New GM in the Sale.  *See In re Motors Liquidation Co.,* 482 B.R. 485, 487 (Bankr. S.D.N.Y. 2012) (Gerber, J).  After a series of negotiations, the TPC Lenders and Old GM agreed to protective provisions under which the proposed sale could go through while protecting the TPC Lenders' lien rights.  The two properties were sold free and clear of liens; cash proceeds were put into an escrow account, to which the TPC Lenders' liens would attach; and the Court later ruled on valuation issues that would determine the TPC Lenders' monetary entitlement.

[219]     *See* page 54 et seq. & n.123, *supra*.

[220]     *See* nn.69 & 123 *supra*.

right.  The Second Circuit has repeatedly recognized the importance to the bankruptcy

system of concerns before the Court here.  In one instance, the Circuit observed that

"[w]e have long recognized the value of finality in judicial sales."[221]  In another, the

Circuit affirmed a District Court judgment dismissing successor liability claims after a

bankruptcy sale, observing that:

> Allowing the plaintiff to proceed with his tort claim
> directly against [the asset purchaser] would be
> inconsistent with the Bankruptcy Code's priority
> scheme because plaintiff's claim is otherwise a low-
> priority, unsecured claim.  Moreover, to the extent
> that the "free and clear" nature of the sale (as
> provided for in the Asset Purchase Agreement
> ("APA") and § 363(f)) was a crucial inducement in
> the sale's successful transaction…it is evident that
> the potential chilling effect of allowing a tort claim
> subsequent to the sale would run counter to a core
> aim of the Bankruptcy Code, which is to maximize
> the value of the assets and thereby maximize
> potential recovery to the creditors.[222]

For all of these reasons, if it were not for the fact that the Plaintiffs' claim is a

constitutional one, the Court would decline to deny enforcement of the Sale Order, in

whole or in part.  There is no good reason to give creditors asserting successor liability

claims recovery rights greater than those of other creditors.  And as importantly or more

so, the interests inherent in the enforceability of 363 orders (on which the buyers of assets

---

[221]     *Licensing by Paolo, Inc. v. Sinatra (In re Gucci),* 126 F.3d 380, 387 (2d Cir. 1997) ("**Gucci**").

[222]     *Douglas v. Stamco,* 363 Fed. Appx. 100, 102 (2d Cir. 2010) (summary opinion, Katzmann,
Walker, and Feinberg, C.JJ.) (quoting *In re Trans World Airlines, Inc.,* 322 F.3d 283, 292 (3d Cir.
2003) ("To allow the [plaintiff] to assert successor liability claims against [the purchaser] while
limiting other creditors' recourse to the proceeds of the asset sale would be inconsistent with the
Bankruptcy Code's priority scheme.")) (citation, and footnote reference explaining why "free and
clear" nature of the sale was an inducement there, omitted).

should justifiably be able to rely,[223] and on which the interests of creditors, keenly

interested in the maximization of estate value, likewise rest) are hugely important.[224]

### 4. *Effect of Constitutional Violations*

But we here have a constitutional violation—a denial of due process. In such an

instance, the Court must then determine whether doctrine that would bar modification of

the Sale Order under less extreme circumstances has to give way to constitutional

concerns. The Court concludes that it must.

New GM has called the Court's attention to two decisions in which courts

declined to grant relief from sale orders where those seeking the relief received

---

[223] *See, e.g., In re Lehman Bros. Holdings Inc.*, 445 B.R. 143 (Bankr. S.D.N.Y. 2011) (Peck, J.) ("***Lehman***"), *aff'd in part and rev'd in part on other grounds*, 478 B.R. 570 (S.D.N.Y. 2012), *aff'd*, 761 F.3d 303 (2d Cir. 2014). As Judge Peck observed in *Lehman*, declining to grant Rule 60(b) relief as to a sale order even though significant information was not provided to him (and even while recognizing that sale orders are not exempt from Rule 60(b) relief when cause is shown):

> This tension relating to finality naturally exists to some extent in every motion under Rule 60(b) but the Court views final sale orders as falling within a select category of court order that may be worthy of greater protection from being upset by later motion practice. Sale orders ordinarily should not be disturbed or subjected to challenges under Rule 60(b) unless there are truly special circumstances that warrant judicial intervention and the granting of relief from the binding effect of such orders.

*Id.* at 149.

[224] There is also a policy concern, though the Court does not suggest that a policy concern could trump the requirements of law, or, especially, parties' constitutional rights. But those in the bankruptcy community would instantly understand it. As the court noted in *In re White Motor Credit Corp.*, 75 B.R. 944, 951 (N.D. Ohio 1987):

> The effects of successor liability in the context of a corporate reorganization preclude its imposition. The successor liability specter would chill and deleteriously affect sales of corporate assets, forcing debtors to accept less on sales to compensate for this potential liability. This negative effect on sales would only benefit product liability claimants, thereby subverting specific statutory priorities established by the Bankruptcy Code. This result precludes successor liability imposition.

inadequate notice.[225]  But in each case the party seeking the relief was found not to have

been materially prejudiced or prejudiced at all.  New GM has not called the Court's

attention to any case in which an order was found to have been entered with a prejudicial

denial of due process and the court nevertheless denied relief.[226]  By contrast, the

Plaintiffs have called the Court's attention, and/or the Court has found, six decisions—

including two by the Second Circuit—modifying, or declining to enforce as against

adversely affected parties, earlier orders in instances where those parties were denied due

process and also prejudiced thereby.[227]

---

[225]    *See Edwards*, n.69, and *Paris Industries*, n.123 *supra*.

[226]    In its reply, New GM calls the Court's attention to the Supreme Court's decision in *Factors' & Traders Ins. Co. v. Murphy*, 111 U.S. 738 (1884) ("*Factors'*"), a case in which one of the several noteholders of four notes secured by a common mortgage failed to get notice of a free and clear sale, and the Court determined that the choices there were to either uphold a free and clear sale order in full or wholly invalidate it.  *See* New GM Reply Br. at 46.  It is true that the Court there saw those two options as the only fair alternatives.  But the Court's ruling was to that effect not because of a holding that courts lack the power to more selectively enforce orders where a person is denied notice, but because doing so under the facts there (where the party not given notice would get a leg up over her fellow noteholders) would be unfair to the other noteholders, invalidating their liens while upholding only hers.  *Factors'* thus does not support New GM's position in the respect for which it was cited.  It does, however, support New GM in a different, and ultimately more important, respect—New GM's point that the Plaintiffs cannot secure relief based on a lack of notice alone, without showing prejudice.  *Factors'* evidences courts' reluctance to grant windfalls to those who claim to have received deficient notice, and their concern instead with a fair result.

[227]    *See Manville-2010*, n.69 *supra*, 600 F.3d at 153-54 (after ruling that due process was denied, ruling that an adversely affected insurer was not bound by an earlier bankruptcy court order); *Koepp*, n.69 *supra,* 593 Fed. Appx. 20 (ruling that easement holder was not deprived of her interest when her predecessor was not given notice of a railroad reorganization consummation order that extinguished the predecessor's interest); *Doolittle v. Cnty. of Santa Cruz (In re Metzger),* 346 B.R. 806, 819 (Bankr. N.D. Cal. 2006) (Weisbrodt, J.) ("*Metzger*") (finding sale order void to the extent (but only the extent) it affected the rights of an entity with an interest in the sold property that did not receive due process); *In re Polycel Liquidation, Inc.,* 2006 Bankr. LEXIS 4545, at *25-26, 31-34, 2006 WL 4452982, at *9, 11-12 (Bankr. D.N.J. Apr. 18, 2006) ("*Polycel-Bankruptcy*") (Lyons, J.) (after ruling that due process to an entity was denied by reason of failure to provide notice, voiding sale to extent, but only the extent, that it conveyed that entity's property), *aff'd,* 2007 U.S. Dist. LEXIS 955, 2007 WL 77336 (D.N.J. Jan. 8, 2007) ("*Polycel-District*") (Cooper, J.) (holding, *inter alia*, that Bankruptcy Court was not bound to either void the sale or let the sale stand); *Compak Cos., LLC v. Johnson,* 415 B.R. 334, 342 (N.D. Ill. 2009) ("*Compak*") (holding that patent licensors' interests could not be extinguished by a sale order without due process, notwithstanding *Edwards,* given that the lienholder in *Edwards* had suffered only a trivial loss of interest); *Grumman Olson-Bankruptcy*, 445 B.R. 243, *aff'd* 467 B.R.

-98-

The latter decisions reached those results by varied means (and some with
reference to Fed.R.Civ.P. 60(b) and some without it), but they all came to the same
bottom line.  They relieved the adversely affected party of the effects of the order insofar
as it prejudiced that party.  New GM insufficiently recognizes the significance of those
decisions.

The decision most closely on point is *Metzger*.  There the debtor in a chapter 11
case owned land to be later developed for the construction of townhouses that was subject
to a deed restriction entered into with the county under which four of the units later to be
constructed had to be sold at below market rates.  The debtor sold the property under a
free and clear order in 1992, but without notice to the county.  In 2006, 14 years after the
court issued the sale order, the purchaser's successor found itself in a dispute with the
county over the continuing validity of the restriction, and sought to enforce the free and
clear provisions.  As here, the county contended that it could not be bound by the free and
clear provisions, because it was not given notice of the hearing at which the sale was
approved.[228]

On those facts, the *Metzger* court ruled, under Fed. R. Civ. P. 60(b),[229] that the
order was "void as to the County's interest."[230]  It continued:

> The Court has some flexibility in creating a remedy
> here and need not and will not find the entire sale
> void on these facts.  The Court need only find, and
> does find, that the County's interest in the Property
> survived the sale to [the purchaser].  The 1992 Sale

---

694, 706-07 (finding due process concerns made bar of successor liability unenforceable against
claimants who were unknown, future, claimants at the time of the sale).

[228]   *See* 346 B.R. at 809-10.

[229]   With exceptions not applicable here, Rule 60(b) applies in cases under the Bankruptcy Code under
Fed. R. Bankr. P. 9024.

[230]   *Id.* at 819.

Order is to that limited extent void because the
County's due process rights were violated.[231]

Addressing remedy in the same fashion are the Bankruptcy Court and District

Court decisions in *Polycel*.  There the debtor sold its property (or what it said was its

property) free and clear, in a 363 sale.  The property assertedly conveyed to the buyer

included commercial molds used in the manufacture of prefabricated panels used to form

the interior surface of inground swimming pools.  But a third party, Pool Builders Supply

of the Carolinas ("**Pool Builders Supply**"), which without dispute was not given notice

of the sale, and which contended that it was the true owner of the molds, sought relief

from the sale order asserting that its property was taken without due process.

The Bankruptcy Court granted relief under Rule 60(b), voiding the sale order as to

Pool Builders Supply alone (keeping the remainder of the sale order intact), and the

Bankruptcy Court's determination was affirmed on appeal.  The *Polycel-Bankruptcy*

court balanced the competing concerns of bankruptcy court finality and due process

requirements, and concluded that the latter should prevail.  Disagreeing with so much of

*Edwards* that considered that the interests of finality to outweigh the due process

concerns, the *Polycel-Bankruptcy* court stated:

> This court is inclined to disagree with the reasoning
> of the Seventh Circuit, and instead follows the more
> persuasive line of cases that recognize the
> importance of affording parties their due process
> rights over the interest of finality in bankruptcy
> sales.
>
> Although this court agrees that the interest of
> finality is an important part of ensuring
> participation in bankruptcy sales, this cannot trump

---

[231]     *Id.* (citations omitted).

-100-

> constitutionally mandated due process requirements
> for notice and an opportunity to be heard.[232]

Addressing the Remedies issue in the same fashion is *Compak.* There, a suit over patent infringement and the entitlement to patent royalties turned on whether a patent license could be extinguished in a 363 sale of all of the debtor's assets. A sublicensee of the patent rights was not given notice of a 363 sale that would extinguish the sublicensee's claims.[233] After discussion of the prejudice the sublicensee suffered, and distinguishing *Edwards* because of the much greater "interests at stake," the *Compak* court concluded that "the Sale Order is 'void' insofar as it purports to extinguish the defendants' license."[234]

In the *Grumman Olson Opinions,* Judges Bernstein and Oetkin dealt with a factual variant of the 363 sale order cases discussed above. Those decisions, unlike those previously discussed, did not involve individuals who were supposed to get notice but didn't get it, but rather people who the debtor *could not have given notice to,* because they did not have claims or interests yet.

There certain of the assets of the debtor Grumman Olson, a manufacturer of truck bodies that were installed in complete vehicles, had been sold in a 363 sale with protection against successor liability claims. Prior to its bankruptcy, Grumman Olson sold a truck body that was incorporated into a vehicle sold to Federal Express; years later (long after the sale), a FedEx employee was injured when the FedEx truck she was driving hit a telephone pole, and she and her husband (who joined in the lawsuit) sued the asset purchaser under successor liability doctrine. For obvious reasons (as they had no

---

[232]     2006 Bankr. LEXIS 4545, at *30, 2006 WL 4452982, at *10-11 (citations omitted).

[233]     *See* 415 B.R. at 337.

[234]     *See id.* at 342-43.

contact with the debtor prior to the sale), the woman and her husband were not known to the debtor at the time of the sale and received no notice of the sale hearing. Judge Bernstein ruled that they did not have claims (as they had not yet suffered injuries before the sale, and had no earlier contact with the debtor), but his more important conclusion for our purposes was that they could not be bound by the sale order. He concluded that "the Sale Order does not affect their rights to sue [the purchaser]."[235] He did so without resort to Rule 60(b), and without invalidating the sale order as to anyone else or in any other respect.

The Second Circuit has twice addressed these issues in ways relevant here, though in situations not quite as similar to those addressed above. In *Manville-2010*, the Circuit considered the effect of a denial of due process in connection with a bankruptcy court order—though not in connection with a sale order, or, of course, one with free and clear provisions. Though most of the details of that fairly complex controversy need not be discussed here, *Manville-2010* is important for the Circuit's conclusion as to the appropriate remedy after it found a due process violation.

There the debtor Manville, which had been subject to massive liabilities resulting from its manufacture of asbestos (and whose insurance policies, notwithstanding coverage disputes, were its most valuable asset), entered into a series of settlements and settlement clarifications in the 1980s with a group of its insurers, including Travelers, its primary insurer, which were approved by Bankruptcy Court orders.[236] Under the settlement documents, in exchange for sizable contributions to a settlement fund, the insurers were relieved of all obligations related to the disputed policies, and the insurers

---

[235]     445 B.R. at 254.

[236]     *See* 600 F.3d at 138-39.

-102-

would be protected from claims based on such obligations by bankruptcy court injunctive orders. By bankruptcy court orders entered in 1986, claims related to the policies were channeled to a trust created for addressing Manville's liabilities, and injunctive orders implemented broad releases protecting the settling insurers on "Policy Claims"—defined as "any and all claims . . . by any Person . . . based upon, arising out of or related to any or all of the Policies" at issue in the settlement.[237]

But another insurer, Chubb, was not a party to the settlements approved in the 1980s,[238] and had not received notice then that its own claims would be (or at least could be) enjoined too. Chubb thus argued that it could not, as a matter of due process, be bound by the 1986 Orders' terms.[239]

For reasons unnecessary to discuss here, the Circuit agreed that Chubb had been denied due process. But it did not vacate the 1986 Orders in their entirety. It held simply that "[u]nder the unique circumstances of this case, there can be little doubt that the publication notice employed by the bankruptcy court in 1984 was insufficient to bind Chubb to the 2004 interpretation of the 1986 Orders."[240]

The *Manville-2010* court did not invoke Rule 60(b) in support of its decision, or even mention it. Nor did it expressly discuss whether orders could be invalidated only in part by reason of a denial of due process. But *Manville-2010* necessarily must be read as having concluded that after a denial of due process prejudicing only a single party (even if the order affects other parties, and affecting those other parties is unthinkable), the

---

[237]   *Id.* at 139.

[238]   *Id.* at 143.

[239]   *See id.* at 148.

[240]   *Id.* at 157; accord *id.* at 158 ("Chubb is therefore not bound by the terms of the 1986 Orders. Consequently, it may attack the Orders collaterally as jurisdictionally void. And, as we held in *Manville III,* that attack is meritorious.").

-103-

partial denial of enforcement of that order, insofar as it binds that party alone, is permissible.

To the same effect is the Circuit's decision in *Koepp*,[241] which, while a Summary Order not binding on the lower courts in the Second Circuit, further evidences the Circuit's thinking on whether orders can be less than fully enforced without wholly vacating them. *Koepp*, unlike *Manville-2010*, involved a free and clear order. As relevant here, the Circuit considered a party's claim to easements on land conveyed to a reorganized company (in a § 77 railroad reorganization under the now superseded Bankruptcy Act) under a reorganization plan with free and clear provisions not materially different than those in the Free and Clear order here. Notice had not been given to the easement owner's predecessor when the reorganization plan had been approved, and for that reason, the Circuit concluded that the District Court correctly ruled that the railroad reorganization consummation order (analogous to a confirmation order under present law) did not extinguish the easements. Once again, the Circuit did not invoke Rule 60(b), nor did it invalidate the consummation order. It simply declined to find the free and clear provisions enforceable against the adversely affected party.

New GM points out, in this connection, that Rule 60(b) provides that a court "may relieve a party … from a final judgment, order or proceeding" for the reason, among others, that "the *judgment* is void,"[242] and does not speak of relieving parties from *provisions within* judgments or orders—*i.e.*, a partial invalidation. And New GM further points out that the Sale Order expressly provided that it was not severable, and that this was a material element of the understanding under which it acquired Old GM's assets,

---

[241]     593 Fed. Appx. 20.

[242]     Fed. R. Civ. P. 60(b) and 60(b)(4).

-104-

and took on many, but not all, of Old GM's liabilities. For that reason, New GM argues that the Court can only void the Sale Order in its entirety (which obviously is not an option here) or enforce the sale order as written. In an ordinary situation—one not involving a denial of due process—the Court would agree with New GM; the Court well understands how 363 sale agreements and sale orders are carefully drafted, and how the buyers of assets contemplate taking on certain identified liabilities, but no more. But here failures of notice gave rise, in part,[243] to denials of due process, and that distorts the balancing under which concerns of predictability and finality otherwise prevail.

In each of *Manville-2010, Koepp, Metzger, Polycel-District, Polycell-Bankruptcy, Compak,* and the two *Grumman Olson Opinions,* after they found what they determined to be denials of due process, the courts granted what in substance was a partial denial of enforcement of the order in question—either by invocation of Rule 60(b) in some fashion (finding the order void only to a certain extent, or as to an identified party)[244] or without mentioning Rule 60(b) at all.[245] In *Polycel-Bankruptcy,* for instance, the Bankruptcy Court concluded, after its 60(b) analysis, "*[t]o that extent,* the Sale Order is void...."[246] In *Manville-2010*, the Circuit found the earlier order unenforceable against Chubb without mention of Rule 60(b) at all. Though they reached their bottom lines by different

---

[243]     It will be remembered that the Plaintiffs were denied due process only with respect to the Sale Order's overbreadth. They were not prejudiced with respect to the Free and Clear Provisions, and cannot claim a denial of due process, or, of course a remedy, with respect to those.

[244]     *See Metzger*, 346 B.R. at 816; *Polycel-District*, 2007 WL 77336, at *9, 2007 U.S. Dist. LEXIS 955, at *28; *Polycel-Bankruptcy*, 2006 WL 4452982, at *1, 6-8, 11, 2006 Bankr. LEXIS 4545, at *1-2, 17-26, 31-34; *Compak*, 415 B.R. at 341.

[245]     *See Manville-2010*, 600 F.3d at 153-54; *Koepp*, 593 Fed. Appx. at 23; *Grumman Olson-Bankruptcy*, 445 B.R. at 245, 254-55 (considering ability of purchaser's successor after a 363 sale to enforce sale order against one injured after the sale, without reference to Rule 60(b)); *Grumman Olson-District*, 467 B.R. at 696, 699-700 (affirming *Grumman Olson-Bankruptcy*, and likewise not relying on Rule 60(b)).

[246]     2006 WL 4452982, at *12, 2006 Bankr. LEXIS 4545, at *34 (emphasis added).

paths, the takeaway from those cases—especially in the aggregate—is effectively as stated by the Bankruptcy Court in *Metzger*—that "[t]he Court has some flexibility in creating a remedy here and need not . . . find the entire sale void on these facts," and that the sale order was "to that limited extent void."[247]

For that reason, New GM's point that the Sale Order provided that it was a unitary document, and that the Free and Clear Provisions could not be carved out of it, cannot be found to be controlling once a court finds that there has been a due process violation. If a court applies Rule 60(b) analysis, and determines, as in *Metzger* and *Polycel-Bankruptcy*, that a sale order can be declared void to a "limited extent," the provisions providing for the sale order's unitary nature fall along with any other objectionable provisions. And if a court considers it unnecessary even to rely on Rule 60(b) at all (as in *Manville-2010* and *Koepp*), it can selectively decline enforceability as the Circuit did in those cases.

### 5. *Remedies Conclusion*

For these reasons, the Court concludes that—as in *Manville-2010*, *Koepp*, and the lower court cases—it can excuse the Economic Loss Plaintiffs[248] from compliance with elements of the Sale Order without voiding the Sale Order in its entirety. And the Court further concludes that on the narrow facts here—where the reason for relief is of constitutional dimension—the nonseverability provisions of the Sale Order do not bar such relief.

---

[247]    346 B.R. at 819.

[248]    It will be recalled that this applies only to the overbreadth objection, and thus does not benefit the Pre-Closing Accident Plaintiffs. For lack of prejudice—and any showing that either group of Plaintiffs would have successfully made any successor liability arguments that others did not make—the Free and Clear Provisions stand.

## B.

## Claims

The remedy with respect to the denial of notice sufficient to enable the filing of claims before the Bar Date is obvious.  That is leave to file late claims.  And the Court may grant leave from the deadline imposed by the Court's Bar Date Order, just as the Circuit relieved Chubb and the easements owner from enforcement of the earlier orders in *Manville-2010* and *Koepp*.

There is of course a separate issue as to whether the Plaintiffs should have the ability to tap GUC Trust assets that are being held for other creditors and claimants, even if later claims were allowed.  But that separate issue is discussed in Section IV below.

## III.

## Assumed Liabilities

Although once regarded as important enough to be a threshold issue, determination of what liabilities New GM agreed to assume (and conversely declined to assume) is now of very little importance.  The Plaintiffs have not disputed what the Sale Agreement and Sale Order say.[249]  Earlier potential disputes over what they say have now been overtaken by the issues as to whether any Sale Order protections are unenforceable.

New GM is right that it expressly declined to assume any liabilities based on Old GM's wrongful conduct.  But the Court's ruling that it will continue to enforce

---

[249]  The GUC Trust, however, raises an issue of that character, contending, somewhat surprisingly, that New GM voluntarily assumed economic loss claims—taking on liability (beyond for death and personal injury) for "other injury to Persons" with respect to "incidents first occurring on or after the Closing Date . . . ."  GUC Trust Br. at 40, citing Sale Agreement § 2.3(a)(ix).  But the GUC Trust misunderstands the Sale Agreement.  The language to which the GUC Trust referred did not relate to economic loss claims, but rather to death, personal injury, or property damage caused by "accidents or incidents" occurring after the Closing Date—which included, in addition to accidents, things that were similar, such as fires, explosions or a car running off the road.  *See GM-Deutsch* and *GM-Phaneuf*, n.33 *supra*.

prohibitions against successor liability makes New GM's concerns as to that academic. And to the extent, if any, that New GM might be liable on claims based solely on any wrongful conduct on its own part (and in no way relying on wrongful by Old GM), New GM would be liable not because it had assumed any Old GM liabilities (or was responsible for anything that Old GM might have done wrong), but only because New GM had engaged in independently wrongful, and otherwise actionable, conduct on its own.

Under the circumstances, the Court need not say any more about what liabilities New GM assumed.

## IV.
### Equitable Mootness

Understandably concerned that the successor liability claims that the Economic Loss and Pre-Closing Accident Plaintiffs seek to saddle New GM with are still prepetition claims—and that the Court could reason that to the extent those claims have merit and New GM is not liable for them, *somebody* is likely to be—the GUC Trust and its Participating Unitholders argue that tapping the recoveries of GUC Trust Unitholders would be barred by the doctrine of Equitable Mootness. Though the Court's original instinct was to the contrary (and it once thought that at least partial relief might be available), the Court has been persuaded that they are right.

### A.

### Underlying Principles

The parties do not dispute the underlying principles, nor that three holdings of the Second Circuit largely determine the mootness issues here—the Circuit's two 1993 *Chateaugay* decisions, involving appeals by the Creditors' Committee of LTV

-108-

Aerospace[250] and creditor Frito-Lay[251] in the *LTV* chapter 11 cases, and the Circuit's

2014 *BGI* decision, involving an appeal by creditors seeking to file untimely class proofs

of claim against debtor Borders Books in the *BGI* chapter 11 cases.[252]

The mootness cases start with the proposition that while the Constitution requires

the dismissal of cases as moot whenever effective relief cannot be fashioned, the related,

prudential, doctrine of equitable mootness requires dismissal where relief *can* be

fashioned, but implementation of such relief would be inequitable.[253]  The doctrine of

equitable mootness reflects the "pragmatic principle" that "with the passage of time after

a judgment in equity and implementation of that judgment, effective relief . . . becomes

impractical, imprudent, and therefore inequitable."[254]  This principle is "especially

pertinent" in proceedings in bankruptcy cases, "where the ability to achieve finality is

essential to the fashioning of effective remedies."[255]

In *BGI*, the Circuit explained that:

> Equitable mootness is a prudential doctrine under
> which a district court [and by extension, any
> appellate court] may in its discretion dismiss a
> bankruptcy appeal "when, even though effective
> relief could conceivably be fashioned,
> implementation of that relief would be inequitable."
> The doctrine "requires the district court to carefully

---

[250]   *See Chateaugay I*, n.16 *supra*.

[251]   *See Chateaugay II,* n.16 *supra*.

[252]   *See BGI*, n.16 *supra*.

[253]   *See Church of Scientology v. United States*, 506 U.S. 9, 12 (1992); *Deutsche Bank AG v.
        Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 143 (2d
        Cir. 2005).

[254]   *Id*. at 144 (quotations and citations omitted); *see also Alsohaibi v. Arcapita Bank B.S.C.(c) (In re
        Arcapita Bank B.S.C.(c))*, 2014 U.S. Dist. LEXIS 1053, at *14-15, 2014 WL 46552, at *5,
        (S.D.N.Y. Jan. 6, 2014) (Scheindlin, J.) ("**Arcapita Bank**").

[255]   *Chateaugay I*, 988 F.2d at 325; *see also Compania Internacional Financiera S.A. (In re Calpine
        Corp.)*, 390 B.R. 508, 517 (S.D.N.Y. 2008) (Marrero, J.) ("**Calpine-District**"), *aff'd by summary
        order*, 354 Fed. Appx. 479 (2d Cir. 2009) ("**Calpine-Circuit**").

balance the importance of finality in bankruptcy
proceedings against the appellant's right to review
and relief."[256]

And the Circuit there made clear that the doctrine of equitable mootness applies to

chapter 11 liquidations as well as reorganizations.[257]

But while mootness doctrine has been applied most frequently in bankruptcy

appeals, it has broader application, including other instances likewise presenting

situations where a court has to balance the importance of finality against a party's desire

for relief.  "[T]he doctrine is not limited to appeals from confirmation orders, and has

been applied in a variety of contexts, including . . . injunctive relief, leave to file untimely

proofs of claim, class certification, property rights, asset sales, and payment of prepetition

wages."[258]

In *Chateaugay II*, the Circuit held that substantial consummation of a

reorganization plan is a "momentous event," but it does not necessarily make it

impossible or inequitable for an appellate court to grant effective relief in all cases.[259]

The Circuit synthesized earlier law to say that substantial consummation will not moot an

appeal if all of the following circumstances exist:

(a) the court can still order some effective relief;

---

[256]    772 F.3d at 107 (quoting *In re Charter Commc'ns, Inc.,* 691 F.3d 476, 481 (2d Cir. 2012) ("***Charter Communications***")) (internal quotation marks omitted).

[257]    772 F.3d at 109.  *See also Schaefer v. Superior Offshore Int'l, Inc. (In re Superior Offshore Int'l, Inc.),* 591 F.3d 350, 353–54 (5th Cir. 2009) (applying equitable mootness analysis to liquidation plan).

[258]    *Arcapita Bank,* 2014 Bankr. LEXIS 1053, at *19, 2014 WL 46552, at *5.  *See also BGI,* 772 F.3d at 109 (stating that earlier cases "suggest that the doctrine of equitable mootness has already been accorded broad reach, without apparent ill effect," and citing *Arcapita Bank* approvingly for the latter's statement that the "doctrine of equitable mootness 'has been applied in a variety of contexts'").

[259]    See 10 F.3d at 952.

(b) such relief will not affect "the re-emergence of the debtor as a revitalized corporate entity";

(c) such relief will not unravel intricate transactions so as to "knock the props out from under the authorization for every transaction that has taken place" and "create an unmanageable, uncontrollable situation for the Bankruptcy Court";

(d) the "parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings," and

(e) the appellant "pursue[d] with diligence all available remedies to obtain a stay of execution of the objectionable order . . . if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from."[260]

Those five factors are typically referred to as the *Chateaugay* factors. "Only if all five *Chateaugay* factors are met, and if the appellant prevails on the merits of its legal claims, will relief be granted."[261]

## B.

### Applying Those Principles Here

Here, the parties have stipulated, and the Court has previously found, that the Plan has been substantially consummated.[262] That, coupled with the requirement that all of the *Chateaugay* factors must be shown to avoid mootness, effectively gives rise to a presumption of mootness. The Court can find that some of the *Chateaugay* factors necessary to trump that presumption have been satisfied. But the Court cannot find that they all have been.

---

[260] *Id.* at 952-53.

[261] *Charter Communications,* 691 F.3d at 482; *accord BGI*, 772 F.3d at 110.

[262] Equitable Mootness Stipulated Facts ¶ 18. This Court found likewise in an earlier proceeding in Old GM's chapter 11 case, *Morgenstein)*, 462 B.R. at 501 n.36 ("[T]he Plan already has been substantially consummated"). Neither New GM nor the Plaintiffs here were parties to *Morgenstein*, and they thus are not bound by *res judicata* or collateral estoppel as to that finding. But their stipulation to substantial consummation makes those doctrines academic.

-111-

### 1. Ability to Fashion Effective Relief

The first factor that must be established in order to overcome the presumption of equitable mootness is that the Court can fashion effective relief. Fashioning effective relief here would require two steps:

> (1) allowing the Plaintiffs to file late claims, after the Bar Date; and

> (2) allowing the GUC Trust's limited assets to be tapped for satisfying those claims.

The first step would not be particularly difficult. But the second could not be achieved. There would be two problems foreclosing the Court's ability to fashion effective relief.

First, the initial step would be effective relief for the Plaintiffs only if the second step could likewise be achieved. And the initial step would be of value (and the second step could be achieved) only if there were assets in the GUC Trust not already allocated for other purposes (such as other creditors' not-yet-liquidated claims, or expenses of the GUC Trust), or if value reserved for others were taken away. It is undisputed that there are no such available assets, and taking away value previously reserved for those whose claims have not yet been either allowed nor disallowed would be inequitable wholly apart from unfairness to GUC Trust investors.[263]

---

[263] Plaintiffs' counsel acknowledged as much. *See* Day 1 Arg. Tr. at 113:15-23 ("by the time of the recalls, by the time the plaintiffs got organized and began their litigation, by the time we were retained in this case, a substantial majority of the funds originally in the GUC Trust had been dispersed to GUC Trust beneficiaries and it would have been impossible or very close to impossible to put the ignition switch defect plaintiffs back in the same position they would have been in had they been given enough information to file a claim before the bar date.").

Old GM's plan of reorganization (which as noted was a liquidating plan), made
no distributions on claims for as long as they were disputed—not even partial
distributions with respect to any undisputed portions.  That was not unusually harsh; it is
"a regular feature of reorganization plans approved in this Court."[264]  But to ameliorate
the unfairness that would otherwise result, Old GM was required to, and did, establish
reserves sufficient to satisfy the disputed claims.

Those reserves were a point of controversy at the time of confirmation; creditors
whose claims then were disputed contended that the reserves had to be segregated.[265]
The Court overruled their objection to the extent they demanded *segregated* reserves, but
agreed that reserves had to be established, and in the full amount of their disputed
claims.[266]  Removing that protection now would be grossly unfair to holders of disputed
claims, who would have understandably expected at least the more modest protection that
they did receive.

Additionally, the terms of the Plan that provided for the reserves were binding
contractual commitments.  They could not be altered without revoking the entirety of the
Plan and Confirmation Order.[267]  But revocation of the Confirmation Order would be
impermissible under the Bankruptcy Code, which provides for such revocation only in

---

[264]   *Confirmation Decision*, 447 B.R. at 213 & n.34.

[265]   *See id.* at 216-17.

[266]   *See id.* at 217 ("While, as noted above, caselaw requires that reserves be established for holders of
disputed claims, it does not impose any additional requirement that such reserves be *segregated*
for each holder of a disputed claim."); *id.* at n.50 ("[W]ithout creating reserves of some kind, I
have some difficulty seeing how one could provide the statutorily required equal treatment when
dealing with the need to make later distributions on disputed claims that ultimately turn out to be
allowed, especially in cases, like this one, with a liquidating plan.").

[267]   *See Morgenstein*, 462 B.R. at 504 ("A confirmed plan takes on the attributes of a contract . . .
modification of a contract only in part, without revoking it in whole, raises grave risks of upsetting
the expectations of those who provided the necessary assents.") (quotations omitted).

limited circumstances that are not present here.[268] For that reason or others, no party requests it.

### 2. *Effect on Re-emergence of Debtor as Revitalized Corporate Entity*

The second factor that needs to be satisfied is that granting relief would not affect the "reemergence of the debtor as a revitalized corporate entity."

Old GM became the subject of a liquidation. It will not be revitalized. To the extent (which the Court believes is minimal) that any effect on New GM by reason of tapping the GUC Trust's assets would be relevant, the Court can see no adverse effect on New GM.

This factor can be deemed to be either inapplicable or to have been satisfied.[269] Either way, it is not an impediment to relief.

### 3. *Unraveling Intricate Transactions*

The third factor is that "such relief will not unravel intricate transactions so as to 'knock the props out from under the authorization for every transaction that has taken place' and 'create an unmanageable, uncontrollable situation for the Bankruptcy Court.'"

The manageability problems would not necessarily be matters of great concern, but the Unitholders are right in their contention that granting relief here would "knock the props out" from the transactions under which they acquired their units.

---

[268]     *See* 11 U.S.C. § 1144.

[269]     *See Beeman v. BGI Creditors' Liquidating Trust (In re BGI, Inc.)*, 2013 U.S. Dist. LEXIS 77740, at *24-25 (S.D.N.Y. May 22, 2013) (Andrew Carter, J.) ("**BGI-District**") ("All parties agree the second Chateaugay factor is inapplicable because the Debtor has liquidated its assets and will not re-emerge as a new corporate entity."); *cf. BGI*, 772 F.3d at 110 n.15 ("All parties agreed that the second *Chateaugay* factor—whether such relief will 'affect the re-emergence of the debtor as a revitalized corporate entity'—was inapplicable because Borders liquidated its assets and would not emerge as a new corporate entity.").

-114-

Allowing a potential $7 to $10 billion in claims against the GUC Trust now would be extraordinarily unjust for the purchasers of GUC Trust units after confirmation. With the Bar Date having already come and gone, they would have made their purchases based on the claims mix at the time—a then-known universe of claims that, by reason of then-pending and future objections to disputed and unliquidated claims, *could only go down*. Of course, the extent to which the aggregate claims would go down was uncertain; that was the economic bet that buyers of GUC Trust units made. But they could not be expected to foresee that the amount of claims would actually go *up*. They also could not foresee that future distributions would be delayed while additional claims were filed and litigated. Allowing the aggregate claims against the GUC Trust now to go up (and by $7 to $10 billion, no less) would indeed "knock the props" out of their justifiable reliance on the claims mix that was in place when GUC Trust Units were acquired.

In *Morgenstein*, certain creditors sought, after the Bar Date and Effective Date, to file and recover on a class proof of claim in an estimated amount of $180 million, "whose assertion . . . would [have been] barred under the Debtor's reorganization plan . . . and confirmation order."[270] The Court denied the relief sought on other grounds. But it noted that even though the creditors were not seeking to recoup distributions that had already been made, permitting them to proceed even against the assets remaining in the GUC Trust raised "fairness concerns."[271] And on the record then before it, the Court added that "mootness concerns may very well still exist."[272] It continued that it suspected, but was not yet in a position to find, that:

---

[270]    *Morgenstein*, 462 B.R. at 496-97.

[271]    *Id.* at 509.

[272]    *Id.*

> hundreds of thousands (or more) of shares and
> warrants, with a value of many millions (or more)
> of dollars, traded since the Plan became effective,
> having been bought and sold based on estimates of
> Plan recoveries *premised on the claims mix at the
> time the Plan was confirmed.*[273]

When the Court made those observations, it lacked the evidentiary record it has now.  But the record now before the Court confirms the Court's earlier suspicions.

When a large number of transactions have taken place in the context of then-existing states of facts, changing the terrain upon which they foreseeably would have relied makes changing that terrain inequitable.  Thus, understandably, the caselaw has evidenced a strong reluctance to modify that terrain.

*BGI* is particularly relevant, since there, as here, the issues before the court involved the allowance of late claims and contentions of inadequate notice.  In *BGI*, the bankruptcy court, following confirmation of Borders' plan of liquidation, had denied the appellants leave to assert late priority claims, and refused to certify a class of creditors holding unused gift cards issued by the debtor Borders Books.[274]  The appellants argued that they had not received adequate notice of the bar date, and thus that the bankruptcy court had erred when it denied them that relief.

But the BGI liquidating trust had already distributed more than $80 million, and there was an additional approximately $61 million remaining for distribution.[275]  In holding that those appeals were equitably moot, Judge Carter in the District Court approvingly quoted Judge Glenn's finding in the Bankruptcy Court that allowing appellants to file late claims "would result in massive prejudice to the estate because the

---

[273]     *Id.* (emphasis added).

[274]     *See BGI*, n.16 *supra*, 772 F.3d at 106; *BGI-District*, 2013 U.S. Dist. LEXIS 77740, at *2.

[275]     *BGI-District*, 2013 U.S. Dist. LEXIS 77740, at *16.

distributions to general unsecured creditors who filed timely proofs of claim would be severely impacted."[276]  The Circuit, in affirming Judge Carter's District Court ruling, approved this finding.[277]  Other cases too, though not as closely on point as *BGI*, have held similarly.[278]

Finally, although most courts have held that Bankruptcy Courts have the discretion to allow the filing of class proofs of claim,[279] and this Court, consistent with the authority in this district, has adhered to the majority view,[280] courts recognize that "[t]he costs and delay associated with class actions are not compatible with liquidation cases where the need for expeditious administration of assets is paramount"—and that "[c]reditors who are not involved in the class litigation should not have to wait for payment of their distributive liquidated share while the class action grinds on."[281]  Thus Unitholders would be prejudiced even if Plaintiffs' claims were ultimately disallowed.

The Court cannot find this third *Chateaugay* factor to have been satisfied.

---

[276]   *Id.* at *25-26.

[277]   *See BGI*, 772 F.3d at 110 n.15 ("Observing that the transactions in a liquidation proceeding may not be as complex as those in a reorganization proceeding, the court nonetheless predicted, *persuasively*, that allowing Appellants to file late claims and certifying a class of gift card holders would have 'a disastrous effect' on the remainder of the liquidated estate and the distributions under the Plan.") (emphasis added).

[278]   *See Calpine-District*, 390 B.R. at 520 (finding that appellant had failed to satisfy the first *Chateaugay* factor based, in part, on the court's view that "modifying the TEV in a consummated plan of reorganization that so many parties have relied upon in making at least some potentially irrevocable decisions would be inequitable."); *In re Enron Corp.,* 326 B.R. 497, 504 (S.D.N.Y. 2005) (Marrero, J.) (holding that it would be "manifestly inequitable" to modify even a single provision of a substantially consummated plan "that so many parties have relied upon in making various, potentially irrevocable, decisions.").

[279]   *See, e.g., Thomson McKinnon*, 133 B.R. at 40.

[280]   *See In re Motors Liquidation Co.*, 447 B.R. 150, 156-57 (Bankr. S.D.N.Y. 2011) (Gerber, J.) ("**GM-Apartheid**").

[281]   *Thomson McKinnon,* 133 B.R. at 41.

4. *Adversely Affected Parties*

The fourth *Chateaugay* factor requires a showing that the third parties affected by the relief sought have had notice of and an opportunity to participate in the proceedings.[282]  It requires individual notice, and cannot be satisfied by an "assertion . . . that [affected parties] may have constructive or actual notice."[283]  But here there has been no material resulting prejudice from the failure to provide the notice, and this slightly complicates the analysis.

Many who would be adversely affected by tapping GUC Trust assets did not get the requisite notice.  They would include the current holders of Disputed Claims; the syndicate members in JPMorgan Chase's Term Loan; the holders of Allowed Claims who have not yet received a distribution, and third-party Unitholders that have purchased or held GUC Trust Units based on the publicly disclosed amounts of potential GUC Trust Liabilities.

But the briefing by the GUC Trust and so-called "Participating Unitholders" (a subset of the larger Unitholder constituency), and the oral argument by one of the Participating Unitholders' counsel, very effectively articulated the objections that all, or

---

[282]    *See BGI,* 772 F.3d at 110 ("Here, we agree with the District Court that Appellants failed to satisfy at least the fourth … *Chateaugay* factor[]: i.e., ensuring adequate process for parties who would be adversely affected . . . As to the fourth factor, Appellants did not establish that the general unsecured creditors—who could be stripped of their entire recovery if the proposed class was certified"—received notice of their appeal to the District Court.") (citations, internal quotation marks, and brackets deleted); *Arcapita Bank,* 2014 U.S. Dist. LEXIS 1053, at *21, 2014 WL 46552, at *7 ("Appellant does not contend that the numerous third parties who have participated in and relied on the transactions completed pursuant to the Plan have been notified.  Accordingly, Appellant fails to satisfy the fourth *Chateaugay* factor."); *O'Connor v. Pan Am Corp. (In re Pan Am Corp.),* 2000 U.S. Dist. LEXIS 2562, at *15, 2000 WL 254010, at *4 (S.D.N.Y. Mar. 7, 2000) (Casey, J) ("***Pan Am***") (the fact that the appellant "did not notify any of the holders of administrative claims of her intent to challenge the distribution order" weighed in favor of a finding of equitable mootness).

[283]    *See Calpine-District,* 390 B.R. at 522 ("An assertion by Appellants that purchasers of New Calpine Common Stock may have constructive or actual notice is not sufficient to satisfy their burden of establishing that such purchasers had notice of the Appeals and an opportunity to participate in the proceedings.").

substantially all, of the absent parties would share.  The Court doubts that any of those

adversely affected parties could make the mootness arguments any better.  Those who did

not file their own briefs, or make the same oral argument, were not prejudiced.

Because the other mootness factors are so lopsided, the Court does not need to

decide whether prejudice is a requirement here, as it is in the due process analysis

discussed above.  The Court assumes, in an excess of caution, that this factor is not an

impediment to granting relief.

### 5. *Pursuit of Stay Remedies*

Finally, the Court agrees in part with the contention by the GUC Trust and the

Participating Unitholders that the Plaintiffs have not "pursued with diligence all available

remedies to obtain a stay of execution of the objectionable order," and "the failure to do

so creates a situation rendering it inequitable to reverse the orders"[284]—enough to find

that this factor has not been satisfied.

Of course the Plaintiffs could not be expected to have sought a stay of the

Confirmation Order when they were then unaware of Ignition Switch claims.  Nor, for the

same reason, could the Plaintiffs be faulted for not having filed claims with Old GM or

the GUC Trust before the Ignition Switch Defect came to light.  So the Court cannot find

this factor to be satisfied based on any inaction before the Spring of 2014, at which time

New GM issued the recall notices and alerted the Plaintiffs to the possibility that they

might have legal rights of which they were previously unaware.

Rather, this factor has to be analyzed in different terms—focusing instead on the

Plaintiffs' failure to seek a stay of *additional* distributions to Old GM creditors and

---

[284]     GUC Trust Opening Br. at 31 (quoting *Affirmance Opinion #2*, 430 B.R. at 80, which in turn
quoted *Chateaugay II*, 10 F.3d at 952-53).

Unitholders after it learned, on October 24, 2014, that the GUC Trust announced that it
was planning on making another distribution. By this time, of course, the Ignition Switch
Defect was well known (and most of the 140 class actions had already been filed), and
the Court had identified, as an issue it wanted briefed, whether the Plaintiffs' claims were
more properly asserted against Old GM. As the Court noted at oral argument, at that
stage in the litigation process—when the Court considered it entirely possible that it
would rule that it would be the GUC Trust that is responsible for the Plaintiffs' otherwise
viable claims—the Court would have made the GUC Trust wait before making additional
distributions "in a heartbeat."[285]

Without dispute, the failure to block the November distribution did not result
from a lack of diligence. It resulted, as the Plaintiffs candidly admitted, from tactical
choice.[286] Their reason for that tactical choice would be obvious to any litigator,[287] but it
was still a tactical choice.

And it is inappropriate to disregard that tactical choice in light of the Plaintiffs'
decision to allow further distributions to be made. In November 2014, additional GUC
Trust assets went out the door. And while tapping the assets distributed in November
2014 might have been as inequitable as tapping those that now remain, it makes the

---

[285]     *See* Day 1 Arg. Tr. at 111:7-15.

[286]     *See* Day 1 Arg. Tr. at 112:13-113:1 ("Now, I will also tell Your Honor . . . yes there was a
          strategic element to the decision that was taken on our side . . . Yes Your Honor, the decision was
          made not to pursue it.") (transcription errors corrected; further explanation for reasons underlying
          the strategic element deleted).

[287]     Any litigators in the Plaintiffs' lawyers shoes would understandably prefer to proceed against a
          solvent entity (New GM) rather than one with much more limited assets (the GUC Trust)—
          especially since so much of the GUC Trust's assets had already been distributed. And doing
          anything to suggest that Old GM or the GUC Trust was the appropriate entity against whom to
          proceed could undercut their position that they should be allowed to proceed against New GM.

-120-

09-50026-reg    Doc 13178    Filed 06/01/15    Entered 06/01/15 01:42:33    Main Document
Pg 367 of 381

challenges of granting even some relief more difficult.  Here too circumstances of this

character have been regarded as significant in considering the fifth *Chateaugay* factor.[288]

      *BGI* is relevant in this respect too.  The court in *BGI-District,* later affirmed by

the Circuit, held that the appellants "did not pursue their claims with all diligence,"

noting that the "[a]ppellants' counsel began reviewing the case in early December and

was retained by the end of December," but that the appellants "did not appear at the

confirmation hearing or file any objections to the Plan," and "did not seek reconsideration

of or appeal the confirmation order or seek a stay of the Effective Date."[289]  It concluded,

and the Circuit agreed, that "[t]he fact that no stay of distributions was sought by

Appellants until almost a year after they entered the bankruptcy litigation and the Plan

was confirmed indicates the lack of diligence with which Appellants moved."[290]

      The circumstances here are similar.  The Plaintiffs began filing their actions as

early as February 2014.  Yet the Plaintiffs have taken no steps to seek a stay from the

Court preventing the GUC Trust from making further distributions, or, except by one

letter, to put affected third parties on notice of an intention to assert claims over the GUC

Trust Assets.  They have been frank in explaining why: they prefer to pursue claims

against New GM first, and resort to the GUC Trust only if necessary.  But even though

---

[288]    *See Pan Am*, 2000 WL 254010, at *4, 2000 U.S. Dist. LEXIS 2562, at *15 (finding that appellant failed to satisfy the fifth *Chateaugay* factor where she "never sought a stay of execution of the distribution order" and "did not notify any of the holders of administrative claims of her intent to challenge the distribution order.").  *See also Affirmance Opinion #1,* 428 B.R. at 62, and n.30 ("Appellants' deliberate failure to 'pursue with diligence all available remedies to obtain a stay of execution of the objectionable order' has indeed 'created a situation rendering it inequitable to reverse the orders appealed from'"; "the Second Circuit has made it clear that an appellant is obligated to protect its litigation position by seeking a stay . . . .").

[289]    2013 U.S. Dist. LEXIS 77740, at *32-33.

[290]    *BGI-District*, 2013 U.S. Dist. LEXIS 77740, at *33; *accord BGI*, 772 F.3d at 110-11 (quoting *BGI-District*).

-121-

their tactical reasoning is understandable, the underlying fact remains; their failure to diligently pursue claims against the GUC Trust precludes them from doing so now.

*  *  *

Thus at least three of the five *Chateaugay* factors *cut against* overcoming the presumption in favor of mootness, when all must favor overcoming that presumption. And shifting from individual factors to the big picture, we can see the overriding problem. We here don't have a reorganized debtor continuing in business that would continue to make money and that, by denial of discharge, could absorb additional claims. We have a GUC Trust, funded by discrete bundles of assets—that had been reserved for identified claims under Old GM's reorganization plan—with no unallocated assets left for additional claims. Entities in the marketplace have bought units of the GUC Trust as an investment based upon the GUC Trust's ability to *reduce* the once huge universe of claims against New GM, in a context where the universe of claims could not increase. Allowing $7 to $10 billion (or even much lower amounts) of additional claims against the GUC Trust would wholly frustrate those investors' legitimate expectations, and, indeed, "knock the props" out from the trading in GUC Trust Units that was an important component of the plan.

Granting relief to the Plaintiffs here would simply replace hardship to the Plaintiffs with hardship to others.

## V.

## Fraud on the Court

After receipt of the various parties' briefs, it now appears that the standards for establishing fraud on the court (one of the bases for relief under Fed.R.Civ.P. 60(b))—though once regarded as important enough to be a Threshold Issue—are not as important

as they were originally perceived to be.  That is so because fraud on the court issues bear

on the time by which a motion for 60(b) relief can be brought—but (as discussed in

Section II above), several courts, including the Second Circuit, when faced with denials

of due process, have invalidated particular provisions in orders *without addressing* Rule

60(b), and because, even under Rule 60(b), an order entered without due process can be

declared to be void, and without regard to the time limitations that are applicable to relief

for fraud, among other things.  But for the sake of completeness, the Court nevertheless

decides them.

With exceptions not relevant here, Fed. R. Civ. P. 60, captioned "Relief from a

Judgment or Order," applies in bankruptcy cases under Fed.R.Bankr.P. 9024.  Its

subsection (b) provides, in relevant part:

> (b) GROUNDS FOR RELIEF FROM A FINAL
> JUDGMENT, ORDER, OR PROCEEDING.  On motion
> and just terms, the court may relieve a party or its
> legal representative from a final judgment, order, or
> proceeding for the following reasons:
>
>> (1) mistake, inadvertence, surprise, or
>> excusable neglect;
>>
>> …
>>
>> (3) fraud (whether previously called
>> intrinsic or extrinsic), misrepresentation, or
>> misconduct by an opposing party;
>>
>> (4) the judgment is void;
>>
>> … or
>>
>> (6) any other reason that justifies relief.[291]

---

[291] *Id.* (portions that are not even arguably applicable omitted).

-123-

Then, Rule 60's subsection (c), captioned "Timing and Effect of the Motion," provides,

in relevant part:

> (1) *Timing.* A motion under Rule 60(b) must be
> made within a reasonable time—and for reasons (1),
> (2), and (3) no more than a year after the entry of
> the judgment or order or the date of the proceeding.

And its subsection (d), captioned "Other Powers to Grant Relief," provides, in relevant

part:

> (d) Other Powers to Grant Relief.  This rule does
> not limit a court's power to:
>
> …
>
> (3) set aside a judgment for fraud on the
> court.[292]

As explained by the Supreme Court in *Hazel-Atlas Glass*,[293] an early decision

considering Rule 60(b), the federal courts have had a long-standing aversion to altering or

setting aside final judgments at times long after their entry[294] "spring[ing] from the belief

that in most instances society is best served by putting an end to litigation after a case has

been tried and judgment entered."[295]  But there likewise has been a rule of equity to the

effect that under certain circumstances—one of which is after-discovered fraud—relief

could be granted against judgments regardless of the term of their entry.[296]  That

equitable rule was fashioned "to fulfill a universally recognized need for correcting

---

[292]   This last provision, now in a separate subsection (d), was once part of Rule 60(b).  It has been described by the Circuit as a "savings clause."  *See Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1325 (2d Cir. 1995) ("**Hadges**").

[293]   *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) ("**Hazel-Atlas Glass**").

[294]   The original rule looked to "the *term* at which the judgments were finally entered."  *See id.* at 244 (emphasis added).  The one year time-limit under Rule 60(b) approximates that.

[295]   *Id.*

[296]   *Id.*

injustices which, in certain instances, are deemed sufficiently gross to demand a
departure from rigid adherence to the term rule." [297]

As explained by the Second Circuit in its frequently cited 1985 decision in *Leber-
Krebs*,[298] *Hazel-Atlas* deliberately did not define the metes and bounds of this "fraud on
the court" doctrine, but it did make clear that it has always been "characterized by
flexibility which enables it to meet new situations which demand equitable intervention,
and to accord all the relief necessary to correct the particular injustices involved in these
situations." [299]

"Out of deference to the deep rooted policy in favor of the repose of judgments
entered during past terms, courts of equity have been cautious in exercising their power
over such judgments.  But where the occasion has demanded, where enforcement of the
judgment is 'manifestly unconscionable', they have wielded the power without
hesitation."[300]

It is in that context—where the injustices are "sufficiently gross," and where
enforcement of the judgment would be "manifestly unconscionable"—that federal courts
may consider requests to modify long-standing judgments for fraud on the court.

### 1.  *Effect on Process of Adjudication*

Consistent with that, the Second Circuit has repeatedly stated that a "fraud on the
court" under Fed. R. Civ. P. 60(d)(3) embraces:

> only that species of fraud which does or attempts to,
> defile the court itself, or is a fraud perpetrated by
> officers of the court so that the judicial machinery

---

[297]    *Id.*

[298]    *Leber–Krebs, Inc. v. Capitol Records,* 779 F.2d 895 (2d Cir.1985) ("**Leber-Krebs**").

[299]    *Id.* at 899.

[300]    *Hazel-Atlas Glass,* 322 U.S. at 244-45 (*quoting Pickford v. Talbott,* 225 U.S. 651, 657 (1912)).

cannot perform in the usual manner its impartial
task of adjudging cases . . . .[301]

In *Hadges* (one the several Second Circuit decisions making the distinction

between fraud of a more generalized nature and defrauding the Court), the Circuit

explained that fraud is a basis for relief under both Rule 60(b)(3) and Rule 60's savings

clause.[302] But "the type of fraud necessary to sustain an independent action attacking the

finality of a judgment is narrower in scope than that which is sufficient for relief by

timely motion."[303]

In its repeatedly cited 1972 decision in *Kupferman*, the Circuit, speaking through

Judge Friendly, emphasized the additional requirements for any showing of fraud on the

court.  "Obviously it cannot be read to embrace any conduct of an adverse party of which

the court disapproves; to do so would render meaningless the one-year limitation on

motions under F.R.Civ.P. 60(b)(3)."[304]  Rather, "[f]raud upon the court as distinguished

from fraud on an adverse party *is limited to fraud which seriously affects the integrity of

the normal process of adjudication*."[305]

Bankruptcy courts in this district, deciding particular cases under the Circuit's

pronouncements, have permitted claims of fraud on the court to proceed in cases with a

sufficiently egregious effect on the integrity of the litigation process, but have rejected

---

[301]    *Kupferman v. Consol. Research and Mfg. Corp.*, 459 F.2d 1072, 1078 (2d Cir. 1972)
(**Kupferman**") (quotation marks omitted); *accord Hadges*, 48 F.3d at 1325 (*quoting Kupferman*);
*Transaero, Inc. v. La Fuerza Area Boliviana*, 24 F.3d 457, 460 (2d Cir. 1994) ("**Transaero**") *on
reh'g in part sub nom.* 38 F.3d 648 (2d Cir. 1994); *Gleason v. Jandrucko*, 860 F.2d 556, 558-59
(2d Cir. 1988) ("**Gleason**"); *Serzysko v. Chase Manhattan Bank*, 461 F.2d 699, 702 (2d Cir. 1972).
*See also Grubin v. Rattet (In re Food Mgmt. Grp., LLC)*, 380 B.R. 677, 714 (Bankr. S.D.N.Y.
2008) (Glenn, J.) ("**Food Management Group**") (*quoting Kupferman*).

[302]    *Hadges*, 48 F.3d at 1325.

[303]    *Id.  See also Gleason,* 860 F.2d at 559; *Transaero,* 24 F.3d at 460.

[304]    *Kupferman*, 459 F.2d at 1078.

[305]    *Gleason,* 860 F.2d at 559 (internal quote marks deleted).

them in cases lacking such an effect. In his well known decision in *Clinton Street Foods*,[306] Judge Bernstein found *Leber-Krebs* to be instructive,[307] and denied a 12(b)(6) motion insofar as it sought to dismiss a trustee's claims of a fraud on the court.[308] But that was in the context of a case involving bid-rigging in a bankruptcy court auction. There the complaint alleged that the defendants—the assets' purchaser and three potential competing bidders—lied when the bankruptcy court inquired about any bidding agreements. The defendants' lies contributed to the acceptance of the winning bid and the approval of the Sale Order; the trustee lacked the opportunity to discover the fraud in light of the summary nature of the sale proceeding and the relatively short time frame (only three weeks between the filing of the sale application and the auction); and defendants benefited from the lie to the Court.[309]

In *Food Management*, Judge Glenn of this Court, analyzing *Clinton Street Foods* and *Leber–Krebs*, likewise denied a motion to dismiss a fraud on the court claim, where there was once again alleged manipulation of an auction, by reason of a failure to disclose the participation of insiders in an ostensible third party bid for estate assets.[310]

---

[306]    *Gazes v. DelPrete*, (*In re Clinton Street Food Corp.*), 254 B.R. 523 (Bankr. S.D.N.Y. 2000) (Bernstein, C.J.) ("***Clinton Street Foods***").

[307]    *Id.* at 533. He synthesized the bases for the *Leber-Krebs* finding of fraud on the court based on an attachment garnishee's false denials of ownership of debtor property as based on (1) the defendant's misrepresentation to the court, (2) the denial of the motion to confirm the attachment based on the misrepresentation, (3) the lack of an opportunity to discover the misrepresentation and either bring it to the court's attention or bring a timely turnover proceeding against the garnishee, and (4) the benefit the defendant derived by inducing the erroneous decision. *Id.* After *Clinton Street Foods*, these factors, referred to as the *Leber-Krebs* factors, have repeatedly been applied in fraud on the court decisions.

[308]    *Id.*

[309]    *Id.* at 533.

[310]    *See* 380 B.R. at 715.

But in *Ticketplanet*, [311] four years earlier, Judge Gropper of this Court, also

analyzing *Clinton Street Foods* and *Leber–Krebs*, found the allegations of fraud on the

court to be insufficient.  He explained that fraud on the court encompasses only that

conduct that "seriously affects the integrity of the normal process of adjudication," and it

is available "only to prevent a grave miscarriage of justice."[312]  There the trustee charged

that the defendants' actions (both before and after the chapter 11 filing) were taken to

protect themselves and benefit a secured lender that thereafter obtained relief from the

stay to foreclose on estate assets.  The alleged wrongful actions included a failure to

adequately disclose the competing interest of the debtor's largest shareholder; the

appointment of a straw-man at the helm of the debtor; a direction to the debtor's counsel

not to fight the lift stay motion; and efforts to engineer a dismissal of the initial chapter

11 case rather than a conversion once the lender had taken control of the debtor's assets.

But the basic facts with respect to a relation between the corporate principals, the debtor

and its lender were known,[313] and the alleged nondisclosure "did not substantially impact

the Court's ruling at the Lift Stay hearing."[314]  Relief was not necessary "to prevent a

grave miscarriage of justice."[315]

The takeaway from these cases is that relief can be granted only where there has

been not just an impact on the *accuracy of outcome* of the Court's adjudicative process,

---

[311]    *Tese-Milner v. TPAC, LLC* (*In re Ticketplanet.com*)*,* 313 B.R. 46, 64 (Bankr. S.D.N.Y. 2004)
(Gropper, J.) (***Ticketplanet***").

[312]    *Id.*

[313]    *Id.* at 65.

[314]    *Id.*

[315]    *Id.*

but also on the *integrity of the judicial process* itself, and then only where a denial of relief would be "manifestly unconscionable."

### 2.   *Victim of the Fraud*

Thus the failure to disclose pertinent facts relating to a controversy before the court, or even perjury regarding such facts, whether to an adverse party or to the court, does not without more constitute "fraud upon the court" and does not merit relief under Fed. R. Civ. P. 60(d)(3).[316]

In *Hoti Enterprises*, Judge Seibel affirmed the bankruptcy court's denial of reconsideration of a cash collateral order based on alleged fraud by a lender in its representation that it had a secured claim.  She held that "neither perjury nor non-disclosure by itself amounts to anything more than fraud involving injury to a single litigant" covered by Fed. R. Civ. P. 60(b)(3), and therefore, is not the type of egregious misconduct necessary for relief under Fed. R. Civ. P. 60(d).[317]  That rule also means that assuming, arguendo, Old GM had attempted to defraud car owners, that would not be enough.  It would need to have defrauded *the Court.*

---

[316]    *See, e.g., Gleason*, 860 F.2d at 559-60; *Hoti Enters., L.P. v. GECMC 2007 C-1 Burnett Street, LLC ( In re Hoti Enters., L.P. )*, 2012 U.S. Dist. LEXIS 182395, at *12-13, 2012 WL 6720378, at * 3-4 (S.D.N.Y. Dec. 27, 2012) (Seibel, J.).

[317]    *Hoti Enters.*, 2012 U.S. Dist. LEXIS 182395, at *12-13, 2012 WL 6720378, at *3-4.  Courts from other jurisdictions have reached the same conclusion.  *See In re Tevis*, 2014 Bankr. LEXIS 406, at *12, 2014 WL 345207, at *4 (B.A.P. 9th Cir. Jan. 30, 2014) ("Mere nondisclosure of evidence is typically not enough to constitute fraud on the court, and 'perjury by a party or witness, by itself, is not normally fraud on the court."); *In re Andrada Fin., LLC*, 2011 Bankr. LEXIS 1779, at *21, 2011 WL 3300983, at *7 (B.A.P. 9th Cir. Apr. 7, 2011); *In re Levander*, 180 F.3d 1114, 1119 (9th Cir. 1999); *Simon v. Navon*, 116 F.3d 1, 6 (1st Cir. 1997); *Wilson v. Johns-Manville Sales Corp.*, 873 F.2d 869, 872 (5th Cir. 1989); *In re Mucci*, 488 BR 186, 193-94 & n.8 (Bankr. D. N.M. 2013) (Jacobvitz, J.); *In re Galanis*, 71 B.R. 953, 960 (Bankr. D. Conn. 1987) (Shiff, J.) ("It is well established that the failure to disclose allegedly pertinent facts relating to a controversy before the court, whether to an adverse party or to the court, does not constitute "fraud upon the court" for purposes of setting aside a judgment . . . .").

-129-

3.  *Particular Standards to Apply*

In each of *Ticketplane*t and *Food Management*, after discussion of *Leber-Krebs* and *Clinton Street Foods*, the courts listed matters to be considered in analyzing a fraud on the court claim for sufficiency, as extracted from *Leber-Krebs* and *Clinton Street Foods*.  They were:

> (1) the defendant's misrepresentation to the court;
>
> (2) the impact on the motion as a consequence of that misrepresentation;
>
> (3) the lack of an opportunity to discover the misrepresentation and either bring it to the court's attention or bring an appropriate corrective proceeding; and
>
> (4) the benefit the defendants derived by inducing the erroneous decision.[318]

With the courts in *Clinton Street Foods, Ticketplanet, and Food Management* having looked to those factors to supplement the Supreme Court and Circuit holdings discussed above, this Court will too.

Together, the above cases thus suggest a methodology to apply in determining whether any fraud rises to the level of fraud on the court.  First, as *Kupferman*, *Hadges* and the other Circuit cases make clear, the Court must ascertain whether the alleged fraud is of a type that defiles the court itself; is perpetrated by officers of the court; or seriously affects the *integrity* of the normal process of adjudication.  Then the Court must analyze the alleged fraud in the context of the *Leber–Krebs* factors, as applied in *Clinton Street Foods*, *Ticketplanet*, and *Food Management*.  The *Leber-Krebs* factors bring into the

---

[318]      313 B.R. at 64.

analysis, among other things, requirements of an interface with the court;[319] an injury to

the court or the judicial system (as contrasted to an injury to one or more individuals);[320]

impact by the fraud on the workings of the judicial system; a nexus between the fraud and

injury to the judicial system; and one or more benefits to the wrongful actor(s) by reason

of the fraud on the court.

      The takeaway from these cases is also that there can be no fraud on the court by

accident.  Those engaging in the fraud must be attempting to subvert the legal process in

connection with whatever the court is deciding.  There likewise cannot be a fraud on the

court by imputation alone.  There must be a direct nexus between the knowledge and

intent of any wrongdoer and communications to the court.  If the fraud has taken place

elsewhere (and is unknown to those actually communicating with the court), the requisite

attempt to defile the Court itself and subvert the legal process is difficult, if not

impossible, to show.

## VI.

### Certification to Circuit

      As the Court did with respect to one other (but much less than all) of its earlier

decisions in Old GM's chapter 11 case,[321] the Court certifies its judgment here for direct

review by the Second Circuit.  Here too, in this Court's view, this is one of those rare

occasions where the Circuit might wish to consider immediate review as an option.

---

[319]    Thus, if the fraud is not linked to either a communication to the court, or a nondisclosure to the court under circumstances where there is a duty to speak with the matter that was not disclosed, that requirement is not satisfied.

[320]    *See SEC v. ESM Grp., Inc.,* 835 F.2d 270, 273 (11th Cir. 1988) (holding that fraud on the court is the type of fraud which prevents or impedes the proper functioning of the judicial process, and it must threaten public injury, as distinguished from injury to a particular litigant), *cert denied*, 486 U.S. 1055 (1988).

[321]    *See GM-UCC-3 Opinion,* n.50 *supra*, 486 B.R. at 646-47.

In that connection, 28 U.S.C. § 158 grants a court of appeals jurisdiction to hear appeals from final judgments of the bankruptcy court under limited circumstances.  First the bankruptcy court (acting on its own motion or on the request of a party to the judgment), or all the appellants and appellees acting jointly, must certify that—

> (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;

> (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or

> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken....[322]

Then the Court of Appeals decides whether it wishes to hear the direct appeal.[323]

In this case, the Court considers each of the three bases for a certification to be present.  With respect to the first prong, the decision here is one of law based on undisputed facts.  There are no controlling decisions of the Second Circuit on the issues here beyond the most basic fundamentals.  And this is a matter of considerable public importance.  Additionally, though the $7 to $10 billion in controversy here may be regarded as personal to the Plaintiffs and New GM, the underlying legal issues are important as well, as are their potential effect, going forward, on due process in chapter 11 cases, and on 363 sales and the claims allowance process in particular.

---

[322]  28 U.S.C. § 158(d).

[323]  *Id.; see also In re General Motors Corp.*, 409 B.R. 24, 27 (Bankr. S.D.N.Y. 2009) (Gerber, J.) (“***GM-Sale Appeal Certification Decision***”) (“The Circuit does not have to take the appeal, however, and can decide whether or not to do so in the exercise of its discretion.”).

-132-

With respect to the second prong, available authorities, while helpful to a point, came nowhere close to addressing a factual situation of this nature. The issues were complicated by broad language in the caselaw, and conflicting decisions.[324]

With respect to the third prong, the Court believes that an immediate appeal from the judgment in this matter is likely to advance proceedings in both this case (if the Court is called upon to do anything further) and the MDL case. Plainly a second level of appeal (which would otherwise be almost certain, given the stakes and importance of the controversy) would have a foreseeable adverse effect on the ability of the MDL Court to proceed with the matters on its watch.

## Conclusion

The Court's conclusions as to the Threshold Issues were set forth at the outset of this Decision, and need not be repeated here. Based on its conclusions as to the Threshold Issues as discussed above, the Court will not allow either the Economic Loss Plaintiffs (including the Used Car Purchasers subset of Economic Loss Plaintiffs) or the Pre-Closing Sale Plaintiffs to be exempted from the Sale Order's Free and Clear Provisions barring the assertion of claims for successor liability. The Economic Loss Plaintiffs (but not the Pre-Closing Sale Claimants) may, however, assert otherwise viable claims against New GM for any causes of action that might exist arising solely out of New GM's own, independent, post-Closing acts, so long as those Plaintiffs' claims do not in any way rely on any acts or conduct by Old GM. The Plaintiffs may file late claims,

---

[324]    In one of its earlier decisions in the *GM* case, *see GM-Sale Appeal Certification Decision*, 409 B.R. at 27-29, the Court denied certification to the Circuit of the appeals from the Sale Order following the *Sale Opinion*, even though, as the subsequent history of the *Sale Opinion* indicates, *see* n.2 *supra*, one of them ultimately did go up to the Circuit. This Court denied certification there because while GM's well-being and that of its suppliers, as a business matter, had substantial public importance, the legal issues were not particularly debatable. Here they are plainly so.

-133-

and to the extent otherwise appropriate such late claims may hereafter be allowed—but the assets of the GUC Trust may not be tapped to satisfy them, nor will Old GM's Plan be modified in this or any other respect.

The Court will not lengthen this decision further by specifically addressing any more of the contentions that were raised in the more than 300 pages of briefing on the Motion to Enforce and its sister motions.  The Court has canvassed those contentions and satisfied itself that no material points other than those it has specifically addressed were raised and have merit.

The parties are to caucus among themselves to see if there is agreement that no further issues need be determined at the Bankruptcy Court level.  If they agree (as the Court is inclined to believe) that there are none, they are to attempt to agree on the form of a judgment (without prejudice, of course, to their respective rights to appeal) consistent with the Court's rulings here.  If they cannot agree (after good faith efforts to try to agree), any party may settle a judgment (or, if deemed preferable, an order), with a time for response agreed upon in advance by the parties.  After the Court has been presented with one or more proposed judgments or orders, the Court will enter a judgment or order in the form it regards as most appropriate, and a separate order providing the necessary certification for review under § 158(d).

Dated: New York, New York          _s/Robert E. Gerber_____
      April 15, 2015          United States Bankruptcy Judge