# Exhibit 3

# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

### MOTION INFORMATION STATEMENT

Docket Number(s): **15-1958**                                    Caption [use short title]

Motion for: **Leave to Intervene In Appeal And**    Elliott, et al. v. General Motors LLC, et al. (In re
**To Respond to Petition for Permission**    Motors Liquidation Co., et al., f/k/a General Motors
**To Appeal**    Corp., et al.)

Set forth below precise, complete statement of relief sought:

The Ignition Switch Plaintiffs and Ignition Switch

Pre-Closing Accident Plaintiffs respectfully move

for leave to intervene in the captioned appeal and

to respond to the petition for permission to

appeal under Fed. R. Civ. P. 24(a)(1) and (a)(2).

Celestine Elliott, Lawrence Elliott, Bernice
Summerville (Appellants); General Motors LLC
(Cross-Appellant); Wilmington Trust Company
(Trustee)

MOVING PARTY: Ignition Switch Plaintiffs and Ignition Switch    OPPOSING PARTY: (Trustee)
Pre-Closing Accident Plaintiffs
  ☑ Plaintiff          ☐ Defendant
  ☑ Appellant/Petitioner    ☐ Appellee/Respondent

MOVING ATTORNEY: **Edward S. Weisfelner**    OPPOSING ATTORNEY: Gary Peller; Arthur Steinberg; Scott
Davidson; Lisa Rubin

[name of attorney, with firm, address, phone number and e-mail]

**Brown Rudnick LLP, 7 Times Square**    Lisa Rubin    Gary Peller    Arthur Steinberg
                                         Gibson, Dunn    600 New Jersey Ave., NW    Scott Davidson
**NY, NY 10036 / Tel: 212-209-4800**    & Crutcher LLP    Washington, DC 20001    King & Spalding LLP
                                         200 Park Ave.    202-662-9122    1185 Ave. of the Americas
**eweisfelner@brownrudnick.com**    NY, NY 10166    peller@law.georgetown.edu    NY, NY 10036
                                         lrubin@gibsondunn.com                     T: 212-556-2100
                                                                                    asteinberg@kslaw.com
                                                                                    sdavidson@kslaw.com

Court-Judge/Agency appealed from: U.S. Bankruptcy Court for the Southern District of New York/Judge Robert E. Gerber

| Please check appropriate boxes: | FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL: |
|---|---|

Has movant notified opposing counsel (required by Local Rule 27.1):    Has request for relief been made below?          ☐ Yes  ☐ No
  ☑ Yes  ☐ No (explain):_____    Has this relief been previously sought in this Court?  ☐ Yes  ☐ No
                                                     Requested return date and explanation of emergency:_____

Opposing counsel's position on motion:
  ☑ Unopposed  ☐ Opposed  ☐ Don't Know
Does opposing counsel intend to file a response?
  ☐ Yes  ☐ No  ☑ Don't Know

Is oral argument on motion requested?    ☑ Yes  ☐ No  (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    ☐ Yes  ☑ No  If yes, enter date:_____

Signature of Moving Attorney:
/s/Edward S. Weisfelner    Date: June 29, 2015    Service by: ☐ CM/ECF  ☑ Other [Attach proof of service]

**Form T-1080** (rev. 12-13)

No. 15–1958

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

IN RE: MOTORS LIQUIDATION COMPANY,
F/K/A GENERAL MOTORS CORPORATION,

---

CELESTINE ELLIOTT, *ET AL.*,

*Plaintiffs-Appellants,*

*v.*

GENERAL MOTORS LLC, *ET AL.*,

*Defendants-Appellees.*

---

**MOTION FOR LEAVE TO INTERVENE IN APPEAL AND TO RESPOND
TO PETITIONERS' PETITION FOR PERMISSION TO APPEAL**

---

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Edward S. Weisfelner | Sander L. Esserman | William P. Weintraub |
| David J. Molton | STUTZMAN, | Gregory W. Fox |
| May Orenstein | BROMBERG, | GOODWIN PROCTOR LLP |
| Howard S. Steel | ESSERMAN & | The New York Times Bldg. |
| BROWN RUDNICK LLP | PLIFKA, A | 620 Eighth Avenue |
| Seven Times Square | PROFESSIONAL | New York, New York 10018 |
| New York, New York 10036 | CORPORATION | T: 212-813-8800 |
| T: 212-209-4800 | 2323 Bryan Street | wweintraub@goodwinproctor.com |
| eweisfelner@brownrudnick.com | Suite 2200 | gfox@goodwinproctor.com |
| dmolton@brownrudnick.com | Dallas, Texas 75201 | |
| morenstein@brownrudnick.com | T: 214-969-4900 | |
| hsteel@brownrudnick.com | esserman@sbep-law.com | |

*Co-Designated Counsel for the Ignition Switch Plaintiffs
and the Ignition Switch Pre-Closing Accident Plaintiffs*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

No corporate disclosure statement is required for the Plaintiffs, each of whom is an individual and not a corporate entity.

The Ignition Switch Plaintiffs[1] and Ignition Switch Pre-Closing Accident Plaintiffs[2] (collectively, the "Plaintiffs"), by and through their undersigned counsel, respectfully move (the "Motion") for leave to intervene in the above-referenced appeal (the "Appeal") and respond to *Celestine Elliott's, Lawrence Elliott's, and Bernice Summerville's Petition for Permission to Appeal a Judgment and*

---

[1]  As defined in the *Judgment*, *In re Motors Liquidation Co.*, Bankr. No. 09-50026 [ECF No. 13177] (Bankr. S.D.N.Y. June 1, 2015) (the "Judgment"), the term "Ignition Switch Plaintiffs" shall mean Plaintiffs who have commenced a lawsuit against New GM asserting economic losses based on or arising from the Ignition Switch in the Subject Vehicles (each term as defined in the *Agreed and Disputed Stipulations of Fact Pursuant to the Court's Supplemental Scheduling Order, Dated July 11, 2014*, *In re Motors Liquidation Co.*, Bankr. No. 09-50026 [ECF No. 12826] (Bankr. S.D.N.Y. Aug. 8, 2014), at 3). Because the Subject Vehicles in the Judgment are *only* those vehicles involved in the February and March 2014 Recalls (Recall No. 14-V-047), the term Ignition Switch Plaintiffs as used in this Motion includes only Plaintiffs who own or lease those vehicles, and does not include those Plaintiffs who own or lease other vehicles with defective ignition switches (made by both Old and New GM) that were recalled in June and July of 2014. Except where otherwise indicated, references to "ECF No. __" are to docket entries in the Bankruptcy Court proceedings: *In re Motors Liquidation Co.*, Bankr. Case No. 09-50026 (REG).

[2]  As defined in the Judgment, the term "Ignition Switch Pre-Closing Accident Plaintiffs" shall mean Plaintiffs that had the Ignition Switch in their Subject Vehicles and that have commenced a lawsuit against New GM based on an accident or incident that occurred prior to the closing of the 363 Sale. Goodwin Procter LLP was engaged by Co-Lead Counsel in *In re: General Motors Ignition Switch Litigation* (14-MD-2543 (JMF)) to address certain issues of bankruptcy law affecting the Ignition Switch Pre-Closing Accident Plaintiffs.

*Associated Orders of the Bankruptcy Court* (the "Petition").[3]  Granting the Motion

is appropriate for the reasons and legal authority set forth in the *Memorandum of*

*Law* and *Declaration of Edward S. Weisfelner, Esq.*, submitted contemporaneously

with this Motion.

Under Federal Rule of Civil Procedure 24(a)(1), the Plaintiffs seek to

intervene in the Appeal pursuant to their unqualified statutory right under 11

U.S.C. § 1109(b).  The Plaintiffs are also entitled to intervene in the Appeal as of

right under Federal Rule of Civil Procedure 24(a)(2) because the Plaintiffs'

represent a substantial super-majority of the plaintiffs in the MDL Action,[4] are

represented by Lead Counsel in the MDL Action, and have a vital interest in the

Appeal and outcome of the Petition for Permission.  Moreover, the Plaintiffs

recently filed a motion to withdraw the reference from the Bankruptcy Court with

regard to certain pleadings pertaining to their right to assert claims against New

---

[3]  The Plaintiffs have appealed the *Decision on Motion to Enforce Sale Order*, *In re Motors Liquidation Co.*, 529 B.R. 510 (Bankr. S.D.N.Y. 2015), and Judgment to the District Court.  The Plaintiffs file this Motion because they are not listed as a party to this Appeal on the Elliott Notice of Appeal or as a party to the Appeal on this Court's docket.  Given Plaintiffs' appeals of the Decision and Judgment, they may respond to the Petition as a matter of right under Bankruptcy Rule 8016, but file this Motion out of an abundance of caution to conform to any additional procedural requirements.

[4]  The term "MDL Action" refers to the *In re General Motors LLC Ignition Switch Litigation*, Case No. 14-MD-2543 (S.D.N.Y.), over which District Court Judge Jesse M. Furman presides.

GM under the Judgment.[5]    The Plaintiffs anticipate that the Motion to Withdraw will be assigned to Judge Furman.  Accordingly, consolidating the appeals of the Decision and Judgment with these proceedings in the District Court is substantively appropriate and sound case management.

The Plaintiffs informed Petitioners' counsel, counsel for Respondent-General Motors LLC ("New GM") and counsel for Motors Liquidation Company GUC Trust Administrator (the "GUC Trust Administrator") of their intention to seek to intervene in this Appeal.  Petitioners' counsel has indicated that the Petitioners do not oppose this Motion.  Counsel for New GM has indicated that New GM does not oppose this Motion.  Counsel for the GUC Trust Administrator has indicated that the GUC Trust Administrator does not oppose this Motion.

---

[5] *See Motion to Withdraw the Reference for the Ignition Switch Plaintiffs' No Strike Pleading with Regard to the Second Amended Consolidated Complaint; and the Non-Ignition Switch Plaintiffs' (I) Objection Pleading with Regard to the Second Amended Consolidated Complaint and (II) GUC Trust Asset Pleading*, dated June 24, 2015 [ECF No. 13250] (the "Motion to Withdraw").

3

DATED this 29th day of June, 2015.

Respectfully Submitted,

**BROWN RUDNICK LLP**

By: */s/ Edward S. Weisfelner*
Edward S. Weisfelner
David J. Molton
May Orenstein
Howard S. Steel
Seven Times Square
New York, New York 10036
T: 212-209-4800
E: eweisfelner@brownrudnick.com
E: dmolton@brownrudnick.com
E: morenstein@brownrudnick.com
E: hsteel@brownrudnick.com

-and-

**STUTZMAN, BROMBERG,
ESSERMAN & PLIFKA, P.C.**
Sander L. Esserman
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
T: 214-969-4900
E: esserman@sbep-law.com

*Co-Designated Counsel & Counsel to
Ignition Switch Plaintiffs, Represented
in the MDL Proceeding by Co-Lead
Counsel*

-and-

**GOODWIN PROCTOR LLP**
William P. Weintraub
Gregory W. Fox

The New York Times Bldg.
620 Eighth Avenue
New York, New York 10018
T: 212-813-8800
wweintraub@goodwinproctor.com
gfox@goodwinproctor.com

*Co-Designated Counsel & Counsel to
Ignition Switch Pre-Closing Accident
Plaintiffs, Represented in the MDL
Proceeding by Co-Lead Counsel:*

Steve W. Berman
**HAGENS BERMAN SOBOL
SHAPIRO LLP**
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101

-and-

555 Fifth Avenue, Suite 1700
New York, New York 10017

*Co-Lead Counsel with a primary focus
on Economic Loss Cases*

Elizabeth J. Cabraser
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, California 94111

-and-

250 Hudson Street, 8th Floor
New York, New York 10013

*Co-Lead Counsel with a primary focus
on Economic Loss Cases*

5

Robert C. Hilliard
**HILLIARD MUÑOZ GONZALES LLP**
719 S. Shoreline Boulevard, Suite 500
Corpus Christi, Texas 78401

*Co-Lead Counsel with a primary focus on Personal Injury Cases*

No. 15–1958

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

_____

IN RE: MOTORS LIQUIDATION COMPANY,
F/K/A GENERAL MOTORS CORPORATION,

_____

CELESTINE ELLIOTT, *ET AL.*,

*Plaintiffs-Appellants,*

*v.*

GENERAL MOTORS LLC, *ET AL.*,

*Defendants-Appellees.*

_____

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR LEAVE TO
INTERVENE IN APPEAL AND TO RESPOND TO PETITIONERS'
PETITION FOR PERMISSION TO APPEAL**

_____

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Edward S. Weisfelner | Sander L. Esserman | William P. Weintraub |
| David J. Molton | STUTZMAN, | Gregory W. Fox |
| May Orenstein | BROMBERG, | GOODWIN PROCTOR LLP |
| Howard S. Steel | ESSERMAN & | The New York Times Bldg. |
| BROWN RUDNICK LLP | PLIFKA, A | 620 Eighth Avenue |
| Seven Times Square | PROFESSIONAL | New York, New York 10018 |
| New York, New York 10036 | CORPORATION | T: 212-813-8800 |
| T: 212-209-4800 | 2323 Bryan Street | wweintraub@goodwinproctor.com |
| eweisfelner@brownrudnick.com | Suite 2200 | gfox@goodwinproctor.com |
| dmolton@brownrudnick.com | Dallas, Texas 75201 | |
| morenstein@brownrudnick.com | T: 214-969-4900 | |
| hsteel@brownrudnick.com | esserman@sbep-law.com | |

*Co-Designated Counsel for the Ignition Switch Plaintiffs
and the Ignition Switch Pre-Closing Accident Plaintiffs*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................2

BACKGROUND ...................................................................................4

I.     New GM's Concealment Of The Ignition Switch Defect. ...............................4

II.    Establishment Of The MDL Action  And The Appointment Of Co-Lead Counsel. ....................................................................................5

III.   Proceedings In The Bankruptcy Court  Following The Disclosure Of The Ignition Switch Defect. ...................................................................8

IV.    The Bankruptcy Court's Decision And Judgment. ......................................10

V.     Plaintiffs' Appeal From The Decision And Judgment. .................................12

VI.    Petitioners' Appeal From and Motion for  Reconsideration Of The Decision and Judgment. .............................................................................13

ARGUMENT ....................................................................................14

I.     The Motion To Intervene Should Be Granted Under Federal Rule 24. ..........14

       A.     The Plaintiffs Have An Unqualified Statutory  Right To Intervene In The Appeal Under Federal Rule 24(a)(1). ......................15

       B.     The Plaintiffs Are Entitled  To Intervene As Of Right Under Federal Rule 24(a)(2). .........................................................16

CONCLUSION ..................................................................................18

# TABLE OF AUTHORITIES

**Page**

*Adelphia Commc'ns Corp. v. Rigas (In re Adelphia Commc'ns Corp.)*,
   285 B.R. 848 (Bankr. S.D.N.Y. 2002) ................................................. 16

*Algonquin Gas Transmission Co. v. Fed. Power Comm'n*,
   201 F.2d 334 (1st Cir. 1953) .............................................................. 15

*Carter v. Welles-Bowen Realty, Inc.*,
   628 F.3d 790 (6th Cir. 2010) ............................................................. 15

*Floyd v. City of New York*,
   770 F.3d 1051 (2d Cir. 2014) ...................................................... 14, 15

*Int'l Union v. Scofield*,
   382 U.S. 205 (1965) ........................................................................... 14

*In re Motors Liquidation Co.*,
   529 B.R. 510 (Bankr. S.D.N.Y. 2015) ........................................ *passim*

*Term Loan Holder Comm. v. Ozer Grp., L.L.C. (In re Caldor Corp.)*,
   303 F.3d 161 (2d Cir. 2002) ......................................................... 15, 16

*Weber v. U.S. Tr.*,
   484 F.3d 154 (2d Cir. 2007) ............................................................... 17

**Statutes**

11 U.S.C. § 1109(b) .................................................................... 4, 15, 16

Fed. R. Bankr. P. 8002(b) ................................................................... 2

Fed. R. Bankr. P. 8016 ......................................................................... 3

Fed. R. Bankr. P. 8006(a)(3) ................................................................ 2

Fed. R. Civ. P. 24(a)(1) .................................................................. 4, 15

Fed. R. Civ. P. 24(a)(2) .................................................................. 4, 16

The Ignition Switch Plaintiffs[1] and Ignition Switch Pre-Closing Accident

Plaintiffs[2] (collectively, the "Plaintiffs"), by and through their undersigned counsel,

respectfully submit this *Memorandum of Law* in support of the *Motion for Leave to*

*Intervene in Appeal and to Respond to Petitioners' Petition for Permission to*

*Appeal* (the "Motion").  By the Motion, the Plaintiffs request that this Court permit

the Plaintiffs to intervene in the above-referenced appeal (the "Appeal") and to

respond to *Celestine Elliott's, Lawrence Elliott's, and Bernice Summerville's*

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Decision on Motion to Enforce Sale Order*, *In re Motors Liquidation Co.*, 529 B.R. 510 (Bankr. S.D.N.Y. 2015) (the "Decision") or in the *Judgment*, dated June 1, 2015 [ECF No. 13177] (the "Judgment").  As defined in the Judgment, the term "Ignition Switch Plaintiffs" shall mean Plaintiffs who have commenced a lawsuit against New GM asserting economic losses based on or arising from the Ignition Switch in the Subject Vehicles (each term as defined in the *Agreed and Disputed Stipulations of Fact Pursuant to the Court's Supplemental Scheduling Order, Dated July 11, 2014*, filed on August 8, 2014 [ECF No. 12826] (the "Stipulations of Fact"), at 3).  Because the Subject Vehicles in the Judgment are *only* those vehicles involved in the February and March 2014 Recalls (Recall No. 14-V-047), the term Ignition Switch Plaintiffs as used in this Memorandum of Law includes only Plaintiffs who own or lease those vehicles, and does not include those Plaintiffs who own or lease other vehicles with defective ignition switches (made by both Old and New GM) that were recalled in June and July of 2014.  Except where otherwise indicated, references to "ECF No. __" are to docket entries in the Bankruptcy Court proceedings:  *In re Motors Liquidation Co.*, Bankr. Case No. 09-50026 (REG).

[2]  As defined in the Judgment, the term "Ignition Switch Pre-Closing Accident Plaintiffs" shall mean Plaintiffs that had the Ignition Switch in their Subject Vehicles and that have commenced a lawsuit against New GM based on an accident or incident that occurred prior to the closing of the 363 Sale.  Goodwin Procter LLP was engaged by Co-Lead Counsel in *In re: General Motors Ignition Switch Litigation* (14-MD-2543 (JMF)) to address certain issues of bankruptcy law affecting the Ignition Switch Pre-Closing Accident Plaintiffs.

1

*Petition for Permission to Appeal a Judgment and Associated Orders of the Bankruptcy Court* (the "Petition").  In support of the Motion, the Plaintiffs state as follows:

## PRELIMINARY STATEMENT

Plaintiffs file this Motion seeking authority to intervene in this Appeal and submit a response to the Petition for Permission.[3]  The Plaintiffs are represented by Lead Counsel in the *General Motors LLC* ("New GM") *Ignition Switch Litigation* before Judge Jesse M. Furman of the U.S. District Court for the Southern District of New York (the "MDL Action").[4]  The Plaintiffs have appealed the Decision and

---

[3]    The Petition is procedurally improper and ineffective as Petitioners previously filed a motion for reconsideration of the Decision and Judgment that remains pending before the Bankruptcy Court.  *See Bledsoe Plaintiffs' Motion to Amend Findings Pursuant to FRBP 7052, for Reargument Pursuant to Local Bankruptcy Rule 9023.1, to Alter or Amend the Judgment Pursuant to FRBP 9023, and For Relief From the Judgment Pursuant to FRBP 9024*, dated June 11, 2015 [ECF No. 13196] (the "Motion for Reconsideration").  Under Bankruptcy Rule 8002(b), the filing of the Motion for Reconsideration tolled the time to appeal the Decision and Judgment until entry of an order with respect to the Motion for Reconsideration.  *See* Fed. R. Bankr. P. 8002(b)(1)-(2).  As a result, the certification of the direct appeal to the Second Circuit from the Bankruptcy Court is not yet effective.  *See* Fed. R. Bankr. P. 8006(a)(3).  Accordingly, until the Motion for Reconsideration is resolved, the Petition is likely void and any responses thereto premature.  However, out of an abundance of caution, the Plaintiffs file this Motion now given the key issues at stake raised by the Petition and reserve their rights with respect to whether the Bankruptcy Court's certification is effective or any of the notices of appeal of the Decision and Judgment are effective given the Motion for Reconsideration.

[4]    While the Plaintiffs have appealed the Decision and Judgment to the District Court as set forth herein, the Plaintiffs file this Motion because they are not listed as a party to this Appeal on the Elliott Notice of Appeal (as defined

Judgment to the District Court and, contrary to the views of the Petitioners, believe the appeal should be heard by the District Court in the first instance.

Respectfully, Lead Counsel should be permitted to participate in these proceedings. Lead Counsel was appointed by Judge Furman to represent the views of *all* plaintiffs in the MDL Action. Conversely, Petitioners' counsel represents no more than twelve plaintiffs.[5] This Court should not permit Petitioners, who chose not to participate in the process developed under the direction of the Bankruptcy Court for the hearing and determination of certain "Threshold Issues" bearing on the rights of plaintiffs to pursue claims against New GM to potentially prejudice the rights of those plaintiffs and a putative class in the MDL Action for whom Lead Counsel has undertaken a duty of representation. Accordingly, the Plaintiffs request that this Court enter an Order allowing them to intervene in this Appeal

---

below) or as a party to the Appeal on this Court's docket. Given Plaintiffs' appeals of the Decision and Judgment, they may respond to the Petition as a matter of right under Bankruptcy Rule 8016, but file this Motion out of an abundance of caution to conform to any additional procedural requirements.

[5] Petitioners' counsel represents the following plaintiffs in the MDL Action: (1) Ishmael Sesay and (2) Joanne Yearwood (collectively, the "Sesay Plaintiffs"); (3) Lawrence Elliott, (4) Celestine Elliott, and (5) Bernice Summerville (collectively, the "Elliott Plaintiffs"); and (6) Sharon Bledsoe, (7) Cina Farmer, (8) Paul Fordham, (9) Momoh Kanu, (10) Tynesia Mitchell, (11) Dierra Thomas; and (12) James Tibbs (together with Lawrence and Celestine Elliott, the "Bledsoe Plaintiffs").

and file the Plaintiffs' *Opposition to the Petition for Permission* (the "Opposition").[6]

The Plaintiffs have an unqualified statutory right to intervene in the Appeal under Fed. R. Civ. P. 24(a)(1) and 11 U.S.C. § 1109(b), and are entitled to intervene as of right pursuant to Fed. R. Civ. P. 24(a)(2). Therefore, as set forth below, the relief requested in the Motion is appropriate.

## BACKGROUND

### I.    New GM's Concealment Of The Ignition Switch Defect.

In February and March of 2014, New GM disclosed the existence of the Ignition Switch Defect, a safety defect in multiple model years of GM-branded vehicles which causes the loss of power, an inability to control speed and braking functions, and the disablement of airbags. In its Consent Order with the National Highway Safety Administration, New GM conceded that it violated the law by failing to properly disclose the Ignition Switch Defect and conduct a timely recall.[7] New GM concealed the existence of the Ignition Switch Defect from the public for nearly five years notwithstanding it knew of the potential for it to cause injury and

---

[6]    A copy of the Plaintiffs' Opposition is attached as **Exhibit A** to the *Declaration of Edward S. Weisfelner, Esq.* (the "Weisfelner Declaration") submitted in support of the Motion. Plaintiffs reserve the right to supplement the Opposition given the impact of the Motion for Reconsideration on the timing of its submission.

[7]    *See* Consent Order, In re TQ14-001 NHTSA Recall No. 14V-047 (U.S. Dep't of Transp. May 16, 2014), *available at* http://www.nhtsa.gov/staticfiles/ communications/pdf/May-16-2014-TQ14-001-Consent-Order.pdf, at 4.

death.  To date, the Ignition Switch Defect has been linked to 119 deaths and 243 serious injuries.[8]  As the Bankruptcy Court recognized, at least twenty-four (24) Old GM personnel, including engineers, senior managers, and attorneys, were informed or otherwise aware of the Ignition Switch Defect, all of whom were transferred to New GM.  *See In re Motors Liquidation Co.*, 529 B.R. at 524, 538, 557.  Following the February and March recall, New GM issued numerous recalls for other safety defects, including ignition switch defects in an additional 11 million vehicles.  In all, New GM recalled approximately 26 million vehicles in the first seven months of 2014.[9]

## II.   Establishment Of The MDL Action And The Appointment Of Co-Lead Counsel.

Following the Ignition Switch recalls in 2014, over 150 class actions and lawsuits have been filed against New GM alleging economic loss damages, including those actions initiated by the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs.[10]

---

[8]   *See* Detailed Overall Program Statistics, GM Ignition Compensation Claims Resolution Facility (June 26, 2015), *available at* http://www.gmignition compensation.com/docs/ProgramStatistics.pdf.

[9]   *See* Stipulations of Fact, Ex. D ¶ 77.

[10]  *See In re Motors Liquidation Co.*, 529 B.R. at 521, 539; Motors Liquidation Company GUC Trust (Form 10-K for year ended March 31, 2015) (May 22, 2015), at 21.

On June 9, 2014, the Judicial Panel on Multidistrict Litigation ordered certain economic loss suits against New GM to be transferred to the District Court for consolidated pretrial proceedings in the MDL Action.[11]

In the MDL Action, Judge Furman actively manages discovery and pretrial proceedings in the consolidated actions involving the Ignition Switch and other defects, convenes regular status conferences, had issued over sixty (60) case management orders, presides over phased discovery including the production of millions of documents and scores of depositions, and has set bellwether trials for 2016. The Court-appointed Co-Lead Counsel and other counsel designated by Order No. 5[12] are responsible for the prosecution and discovery of common claims and questions.

On July 18, 2014, the District Court established an application procedure to select Lead Counsel and other leadership positions in the MDL Action. Any attorney who had filed an action consolidated into the MDL Action was eligible to

---

[11] *See* Transfer Order, *In re Gen. Motors Ignition Switch Litig.*, MDL No. 2543 [ECF No. 266] (J.P.M.L. June 12, 2014); Order No. 1, *In re General Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 [ECF No. 19] (S.D.N.Y. June 24, 2014), at 1.

[12] *See* Order No. 5, *In re General Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 [ECF No. 70] (S.D.N.Y. July 18, 2014); MDL Action Orders and Transcripts, *available at* MDL 2543 official website, http://www.gmignitionmdl.com.

apply for a leadership position.[13]   On July 28, 2014, Petitioners' counsel, Gary

Peller (hereinafter, "Peller") submitted his application to serve as Lead Counsel.[14]

On August 15, 2014, the District Court appointed Steve W. Berman of

Hagens Berman Sobol Shapiro LLP, Elizabeth J. Cabraser of Lieff Cabraser

Heimann & Bernstein, LLP, and Robert C. Hilliard of Hilliard Muñoz Gonzales

LLP as Co-Lead Counsel.[15]   Peller's application was rejected.[16]

Brown Rudnick LLP and Goodwin Proctor LLP serve as special bankruptcy

counsel ("Designated Counsel") to Lead Counsel in the bankruptcy proceedings

before Judge Robert E. Gerber in the U.S. Bankruptcy Court for the Southern

District of New York.

Co-Lead Counsel are charged by Order of the Court with acting for all

plaintiffs in the MDL Action by, *inter alia*, presenting written and oral arguments

and suggestions to the District Court and working with opposing counsel in

developing and implementing a litigation plan, initiating and organizing discovery

requests and responses, and conducting the principal examination of deponents and

---

[13]   *Id.* at 4.

[14]   *See* Letter from Gary Peller to Hon. Jesse M. Furman, *In re General Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 [ECF No. 115] (S.D.N.Y. July 28, 2014).

[15]   *See* Order No. 8, *In re General Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 [ECF No. 249] (S.D.N.Y. Aug. 15, 2014).

[16]   The Court also appointed a nine-member Executive Committee, a Plaintiff Liaison Counsel, and Federal/State Liaison Counsel.  *See id.* at 3.  Peller was not appointed to any of these posts.

retaining experts.  *See* Order No. 5.  Peller has no leadership role in the MDL

Action.

## III.   Proceedings In The Bankruptcy Court Following The Disclosure Of The Ignition Switch Defect.

In April 2014, New GM filed the Ignition Switch Motion to Enforce seeking

to enjoin the prosecution of numerous lawsuits, including class actions arising out

of the Ignition Switch Defect.[17]

The Bankruptcy Court identified four threshold issues relating to the Motion

to Enforce for judicial determination (the "Threshold Issues").[18]

The Bankruptcy Court then directed certain parties to meet and confer to

establish agreed and disputed stipulated facts in connection with the contested

---

[17]  *See Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction*, dated April 21, 2014 [ECF No. 12620] (the "Ignition Switch Motion to Enforce").

[18]  *See Scheduling Order Regarding (I) Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 To Enforce the Court's July 5, 2009 Sale Order and Injunction, (II) Objection Filed by Certain Plaintiffs in Respect thereto, and (III) Adversary Proceeding No. 14-01929*, dated May 16, 2014 [ECF No. 12697] (the "Scheduling Order"), at 4.  The Threshold Issues include: (i) whether plaintiffs' due process rights were violated in connection with the Sale Order, or would be violated by enforcement of the Sale Order; (ii) if so, what was the appropriate remedy for the due process violation; (iii) whether any claims asserted in the Ignition Switch Actions were against Old GM; and (iv) if so, whether such claims should be disallowed/dismissed on grounds of equitable mootness.  *See In re Motors Liquidation Co.*, 529 B.R. at 539-40.

Ignition Switch Motion to Enforce.[19]   On August 8, 2014, the parties filed the

Stipulations of Fact.[20]

Counsel for Petitioners chose not to participate in the development of the

Threshold Issues, the Stipulations of Fact, or the briefing submitted to the

Bankruptcy Court on the Threshold Issues despite having a full opportunity to do

so.[21]

Instead, counsel for the Petitioners filed pleadings and letters[22] seeking

special treatment and recognition of the asserted right to "go it alone."[23]   For

---

[19]  *See* Scheduling Order at 4; *Supplemental Scheduling Order Regarding (I) Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction, (II) Objection Filed by Certain Plaintiffs in Respect thereto, and (III) Adversary Proceeding No. 14-01929*, dated July 11, 2014 [ECF No. 12770], at 4.

[20]  *See* ECF No. 12826.  A true and correct copy of the Stipulations of Fact are attached as **Exhibit B** to the Weisfelner Declaration.

[21]  On December 6, 2014, pursuant to the Bankruptcy Court's instruction, Designated Bankruptcy Counsel for the Ignition Switch Plaintiffs circulated drafts of their Threshold Issues Briefs to all plaintiffs involved in the bankruptcy proceedings.  *See Endorsed Order*, dated Aug. 22, 2014 [ECF No. 12869].  Designated Bankruptcy Counsel for the Ignition Switch Plaintiffs solicited input and comments on the drafts from other plaintiffs' counsel, including counsel to the Petitioners. Counsel to the Petitioners did not comment.

[22]  *See, e.g.*, ECF No. 12737 (Endorsed Order Regarding Letter by Peller's co-counsel, Daniel Hornal); ECF Nos. 12761, 12766, 12769, 12777, 12783 (Letters filed by Hornal); ECF No. 12774 (Motion to Dismiss Party filed by Hornal); ECF No. 12788 (Response filed by Peller); ECF Nos. 12821, 12830 (Letters filed by Peller); ECF No. 12822 (Notice of filing Counter-Order by Peller); ECF No. 12828 (Supplemental Notice of Counter-Order filed by Peller); ECF No. 12839 (Notice of Appeal filed by Peller); ECF No. 12870

example, Peller filed at least three "No Stay Pleadings" with the Bankruptcy Court seeking to move his clients' actions ahead of all other plaintiffs' actions.[24] All of the efforts of counsel for the Petitioners were rejected by Judge Gerber[25] who characterized Peller's arguments as "frivolous."[26]

## IV.    The Bankruptcy Court's Decision And Judgment.

On April 15, 2015, the Bankruptcy Court issued its Decision.[27] It held that the Ignition Switch Defect was known to Old GM at the time it filed its chapter 11 cases and for some time prior to that date, and the Subject Vehicles should have

---

(Motion to Dismiss Party filed by Peller); ECF No. 12871 (Motion to Amend filed by Peller); ECF No. 12872 (Motion for an Order of Abstention filed by Peller); ECF No. 12883 (Amended Motion to Dismiss Party filed by Peller); ECF No. 12948 (Memorandum of Law Regarding No Stay Pleading filed by Peller); ECF No. 13002 (Amended Notice of Appeal filed by Peller); ECF No. 13004 (Notice of Appeal filed by Peller); ECF Nos. 13005 and 13007 (Motions Seeking Leave to Appeal filed by Peller).

[23]   *See Decision with Respect to No Stay Pleading and Related Motion to Dismiss for Lack of Subject Matter Jurisdiction (Elliott Plaintiffs)*, dated Aug. 6, 2014 [ECF No. 12815], at 9.

[24]   *See* ECF Nos. 12766; 12774; 12871 (Elliott Plaintiffs' No Stay Pleadings); ECF Nos. 12830; 12835; 12868; 12883 (Sesay Plaintiffs' No Stay Pleadings); ECF No. 12948 (Bledsoe Plaintiffs' No Stay Pleading).

[25]   *See* ECF Nos. 12771; 12815; 12933 (Orders and Decision denying Elliott Plaintiffs' No Stay Pleadings); ECF Nos. 12835; 12877; 12989 (Orders and Decision denying Sesay Plaintiffs' No Stay Pleadings); ECF No. 12991 (Order denying Bledsoe Plaintiffs' No Stay Pleading).

[26]   *See* ECF No. 12815, at 2-3; *Decision with Respect to No Stay Pleading, and Related Motion for Abstention (Sesay Plaintiffs)*, dated November 10, 2014 [ECF No. 12989], at 1-2, 5; *see also Endorsed Order*, dated Nov. 10, 2014 [ECF No. 12991].

[27]   *See* ECF No. 13109.

been recalled prior to Old GM's June 2009 bankruptcy filing. *See In re Motors Liquidation Co.*, 529 B.R. at 538. As a result, the Bankruptcy Court found that the Plaintiffs were "known" creditors of the Debtor who were entitled to notice and an opportunity to be heard in connection with the Old GM bankruptcy proceedings. *See In re Motors Liquidation Co.*, 529 B.R. at 525, 557. It further held that the Plaintiffs had been prejudiced by the failure of New GM to provide them with an opportunity to object to the breadth of the Sale Order as it applied to New GM's own conduct. *See id.* at 524-27. The Bankruptcy Court further held that, as a result of this due process violation, the Sale Order would be deemed modified so that notwithstanding its overbreadth as issued, the Plaintiffs could now assert "claims or causes of action . . . against New GM (whether or not involving Old GM vehicles or parts) that are based solely on New GM's own, independent, post-Closing acts or conduct." Judgment ¶ 4; *see In re Motors Liquidation Co.*, 529 B.R. at 598. The Bankruptcy Court also held that the Plaintiffs' due process rights were violated by the failure to provide them with notice of the Bar Date and, thus, they could assert late proofs of claim against the Old GM estate. *See In re Motors Liquidation Co.*, 529 B.R. at 583.[28]

---

[28] Despite this finding, the Bankruptcy Court also found that while "late claims filed by the Plaintiffs might still be allowed, assets transferred to the GUC Trust under the Plan could not now be tapped to pay them." *See In re Motors Liquidation Co.*, 529 B.R. at 529.

On June 1, 2015, the Bankruptcy Court entered the Judgment implementing the Decision. *See* ECF No. 13177.[29]

On the same day, the Bankruptcy Court entered its *Order, Pursuant to 28 U.S.C. § 158(d), and Fed. R. Bankr. P. 8006(e), Certifying Judgment for Direct Appeal to Second Circuit*, dated June 1, 2015 [ECF No. 13178] (the "Certification Order"). The Certification Order permits the parties to the Decision and Judgment to pursue a direct appeal to this Court. *Id.* ¶ 1.

## V.    Plaintiffs' Appeal From The Decision And Judgment.

On June 2, 2015, the Ignition Switch Plaintiffs filed a *Notice of Appeal* from the Decision and Judgment to the District Court. *See* ECF No. 13185.

On June 10, 2015, the Ignition Switch Pre-Closing Accident Plaintiffs filed a *Notice of Appeal* from the Decision and Judgment to the District Court.[30] *See* ECF No. 13194.

On June 16, 2015, the Ignition Switch Plaintiffs filed the *Appellants' Statement Of Issues On Appeal And Designation Of Items To Be Included In the Record On Appeal*. *See* ECF No. 13219.

---

[29] A true and correct copy of the Judgment is attached as **Exhibit C** to the Weisfelner Declaration.

[30] The Decision and Judgment are subject to appeal by several other parties. *See* ECF Nos. 13200 (Notice of Cross-Appeal for New GM); 13209 (Notice of Appeal for Groman Plaintiffs).

On June 22, 2015, the Ignition Switch Pre-Closing Accident Plaintiffs filed the *Ignition Switch Pre-Closing Accident Plaintiffs' Statement Of Issues And Designation Of Record On Appeal*. *See* ECF. No. 13236.

## VI. Petitioners' Appeal From And Motion For Reconsideration Of The Decision and Judgment.

On June 1, 2015, the Petitioners filed an *Amended Notice of Appeal* from the Judgment to the District Court (the "Elliott Notice of Appeal"). *See* ECF No. 13179. The Elliott Notice of Appeal designated four parties to the appeal: (i) Lawrence Elliott-Appellant; (ii) Celestine Elliott-Appellant; (iii) Bernice Summerville-Appellant; and (iv) New GM-Appellee. *See id.* at 1.

On the same day, the Sesay Plaintiffs filed a *Notice of Appeal* from the Judgment. *See* Notice of Appeal, dated June 1, 2015 [ECF No. 13180].

On June 11, 2015, the Bledsoe Plaintiffs (which, as defined by Peller, include Petitioners Celestine Elliott and Lawrence Elliott) filed the Motion for Reconsideration. *See* ECF No. 13196.

Counsel for the Petitioners and New GM then entered a stipulation setting a July 6, 2015 deadline for New GM to respond to the Motion for Reconsideration. *See* ECF No. 13203. A hearing date for the Motion for Reconsideration has not yet been scheduled.

On June 15, 2015, notwithstanding the Motion for Reconsideration, Peller filed the *Elliott Plaintiffs/Appellants' Statement of the Issues And Designation Of Items To Be Included In The Record On Appeal*. *See* ECF No. 13207.

On June 18, 2015, the Petitioners filed the Petition and served it on Designated Counsel for the Plaintiffs via email.[31]

## ARGUMENT

## I.    The Motion To Intervene Should Be Granted Under Federal Rule 24.

Intervention on appeal may be permitted under the criteria set forth in Federal Rule of Civil Procedure 24, notwithstanding that such rule is not expressly applicable to appeals. *See Int'l Union v. Scofield*, 382 U.S. 205, 217 n.10 (1965) ("The Federal Rules of Civil Procedure, of course, apply only in the federal district courts. Still, the policies underlying intervention may be applicable in appellate courts. Under Rule 24(a)(2) or Rule 24(b)(2), we think the charged party would be entitled to intervene.").

This Court has likewise recognized that Rule 24 of the Federal Rules of Civil Procedure applies to the consideration of motions to intervene by appellate courts. *See Floyd v. City of New York*, 770 F.3d 1051, 1062 & n.39 (2d Cir. 2014)

---

[31]    *See* Email from Gary Peller (Georgetown University), to Edward S. Weisfelner (Brown Rudnick LLP), et al., *re: In re Motors Liquidation Company; Case No: 09-50026 -- Service of Petition for Permission to Appeal* (June 18, 2015 10:23 PM), a true and correct copy is attached as **Exhibit D** to the Weisfelner Declaration.

(applying criteria found in Rule 24 to uphold denial of motions to intervene on appeal).  Other circuit courts have adopted the same position.  *See, e.g.*, *Algonquin Gas Transmission Co. v. Fed. Power Comm'n*, 201 F.2d 334, 342 (1st Cir. 1953) (holding that appellate proceedings should be "guide[d] . . . by analogy to Rule 24 of the Federal Rules of Civil Procedure"); *Carter v. Welles-Bowen Realty, Inc.*, 628 F.3d 790, 790 (6th Cir. 2010) ("On appeal, we may grant either intervention of right or permissive intervention.").

As set forth below, the Plaintiffs meet the Federal Rule 24 requirements for intervention as of right in this Appeal.

### A.    The Plaintiffs Have An Unqualified Statutory Right To Intervene In The Appeal Under Federal Rule 24(a)(1).

Federal Rule 24(a)(1) provides "[o]n timely motion, the court must permit anyone to intervene who: (1) is given an unconditional right to intervene by a federal statute."  Fed. R. Civ. P. 24(a)(1) (emphasis supplied).  Under Bankruptcy Code Section 1109(b), "[a] party in interest, including . . . a creditor . . . may raise and may appear and be heard on any issue in a case under this chapter."  11 U.S.C. § 1109(b).

Given that the Bankruptcy Court concluded that the Plaintiffs were "known" creditors of Old GM, Bankruptcy Code Section 1109(b) provides the Plaintiffs with an unqualified and unconditional right to intervene in the Appeal.  *See* 11 U.S.C. § 1109(b); *In re Motors Liquidation Co.*, 529 B.R. at 560; *Term Loan*

15

*Holder Comm. v. Ozer Grp., L.L.C. (In re Caldor Corp.)*, 303 F.3d 161, 169 (2d Cir. 2002) ("We hold, therefore, that the phrase 'any issue in a case' plainly grants a right to raise, appear and be heard on *any issue* regardless whether it arises in a contested matter or an adversary proceeding."); *Adelphia Commc'ns Corp. v. Rigas (In re Adelphia Commc'ns Corp.)*, 285 B.R. 848, 850-51 (Bankr. S.D.N.Y. 2002) (holding that creditors, as intervenors under section 1109, "may 'raise and may appear and be heard on any issue'" in the proceedings).

Accordingly, the Plaintiffs have an unconditional statutory right to intervene in the Appeal.

### B.    The Plaintiffs Are Entitled To Intervene As Of Right Under Federal Rule 24(a)(2).

The Plaintiffs are also entitled to intervene in the Appeal as of right under Federal Rule 24(a)(2).  Rule 24(a) provides:

> On timely motion, the court must permit anyone to intervene who:
>
> (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2).

The Plaintiffs have a vital interest in the Appeal as any decision on the Appeal will apply to the same issues that are the subject of Plaintiffs' appeal to the

District Court, including, *inter alia*, the Plaintiffs' right to bring claims against New GM as successor to Old GM, notwithstanding the "free and clear" language of the Sale Order. The Petition seeks to have this Court hear that an appeal in the first instance rather than, if necessary, only after the issues have first been decided by the District Court.

Allowing the District Court to hear the appeal in the first instance would "facilitate a wise and well-informed decision." *See Weber v. U.S. Tr.*, 484 F.3d 154, 161 (2d Cir. 2007). Judge Furman has superior knowledge and experience with the facts and legal issues relating to the Ignition Switch Defect litigation that will provide essential context for the appeal. Moreover, as is shown more fully in the Opposition, the appeal meets none of the requirements for direct certification set forth in 28 U.S.C. § 158(d)(2). It does not present any question of law as to which there is no controlling authority in this Circuit, nor does it concern a question of law requiring the resolution of conflicting decisions.

Moreover, the Plaintiffs recently filed a motion to withdraw the reference from the Bankruptcy Court with regard to certain pleadings pertaining to their right to assert claims against New GM under the Judgment.[32] The Plaintiffs anticipate

---

[32] *See Motion to Withdraw the Reference for the Ignition Switch Plaintiffs' No Strike Pleading with Regard to the Second Amended Consolidated Complaint; and the Non-Ignition Switch Plaintiffs' (I) Objection Pleading with Regard to the Second Amended Consolidated Complaint and (II) GUC Trust Asset Pleading*, dated June 24, 2015 [ECF No. 13250].

that the motion to withdraw the reference will be heard by Judge Furman.  Having the appeal from the Decision and Judgment and proceedings on that Decision and Judgment heard by the same court (the District Court) will both facilitate their conclusion and avoid inconsistent or duplicative proceedings.

Therefore, the Plaintiffs have an interest in the Petition and should be granted the right to intervene under Rule 24(a)(2).

## CONCLUSION

WHEREFORE, the Plaintiffs respectfully request that this Court enter an Order:   (i) allowing the Plaintiffs to intervene in the Appeal and file the Opposition; and (ii) granting such other further relief that is just and proper.

Dated:      June 29, 2015
            New York, New York

Respectfully submitted,

**BROWN RUDNICK LLP**

By: */s/ Edward S. Weisfelner*
Edward S. Weisfelner
David J. Molton
May Orenstein
Howard S. Steel
Seven Times Square
New York, New York 10036
T: 212-209-4800
E: eweisfelner@brownrudnick.com
E: dmolton@brownrudnick.com
E: morenstein@brownrudnick.com
E: hsteel@brownrudnick.com

-and-

**STUTZMAN, BROMBERG,
ESSERMAN & PLIFKA, P.C.**
Sander L. Esserman
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
T: 214-969-4900
E: esserman@sbep-law.com

*Co-Designated Counsel & Counsel to
Ignition Switch Plaintiffs, Represented
in the MDL Proceeding by Co-Lead
Counsel*

**GOODWIN PROCTOR LLP**
William P. Weintraub
Gregory W. Fox
The New York Times Bldg.
620 Eighth Avenue
New York, New York 10018
T: 212-813-8800
wweintraub@goodwinproctor.com

19

gfox@goodwinproctor.com

*Co-Designated Counsel & Counsel to
Ignition Switch Pre-Closing Accident
Plaintiffs, Represented in the MDL
Proceeding by Co-Lead Counsel:*


Steve W. Berman
**HAGENS BERMAN SOBOL
SHAPIRO LLP**
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101

-and-

555 Fifth Avenue, Suite 1700
New York, New York 10017

*Co-Lead Counsel with a primary focus
on Economic Loss Cases*

Elizabeth J. Cabraser
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, California 94111

-and-

250 Hudson Street, 8th Floor
New York, New York 10013

*Co-Lead Counsel with a primary focus
on Economic Loss Cases*

Robert C. Hilliard
**HILLIARD MUÑOZ GONZALES
LLP**
719 S. Shoreline Boulevard, Suite 500

20

Corpus Christi, Texas 78401

*Co-Lead Counsel with a primary focus
on Personal Injury Cases*

No. 15–1958

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

IN RE: MOTORS LIQUIDATION COMPANY,
F/K/A GENERAL MOTORS CORPORATION,

_____

CELESTINE ELLIOTT, *ET AL.*,

*Plaintiffs-Appellants*,

*v.*

GENERAL MOTORS LLC, *ET AL.*,

*Defendants-Appellees*.

_____

## DECLARATION OF EDWARD S. WEISFELNER, ESQ.
## IN SUPPORT OF MOTION TO INTERVENE

_____

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

I, **EDWARD S. WEISFELNER**, **Esq.** hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information and belief:

1.    I am a partner in the law firm of Brown Rudnick LLP, co-designated counsel to the Ignition Switch Plaintiffs.[1]

2.    This Declaration and the Exhibits annexed hereto are submitted in support of the Motion.

3.    Annexed hereto as **Exhibit A** is a true and correct copy of the Plaintiffs' *Opposition to Petition for Permission to Appeal*.

4.    Annexed hereto as **Exhibit B** is a true and correct copy of the *Agreed and Disputed Stipulations of Fact Pursuant to the Court's Supplemental Scheduling Order, Dated July 11, 2014*, In re Motors Liquidation Co., Bankr. No. 09-50026 [ECF No. 12826] (Bankr. S.D.N.Y. Aug. 8, 2014).

5.    Annexed hereto as **Exhibit C** is a true and correct copy of the *Judgment*, In re Motors Liquidation Co., Bankr. No. 09-50026 [ECF No. 13177] (Bankr. S.D.N.Y. June 1, 2015).

6.    Annexed hereto as **Exhibit D** is a true and correct copy of the Email from Gary Peller (Georgetown University), to Edward S. Weisfelner (Brown

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the *Motion For Leave To Intervene In Appeal And To Respond To Petitioners' Petition For Permission To Appeal* (the "Motion").

Rudnick LLP), et al., *re: In re Motors Liquidation Company; Case No: 09-50026 -*

*- Service of Petition for Permission to Appeal* (June 18, 2015 10:23 PM).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 29, 2015

          */s/   Edward S. Weisfelner*
              Edward S. Weisfelner

# EXHIBIT A

No. 15–1958

———————————

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————————

IN RE: MOTORS LIQUIDATION COMPANY,
F/K/A GENERAL MOTORS CORPORATION,

———————————

CELESTINE ELLIOTT, *ET AL.*,

*Plaintiffs-Appellants,*

*v.*

GENERAL MOTORS LLC, *ET AL.*,

*Defendants-Appellees.*

———————————

## OPPOSITION TO PETITIONS FOR PERMISSION TO APPEAL

———————————

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Edward S. Weisfelner | Sander L. Esserman | William P. Weintraub |
| David J. Molton | STUTZMAN, | Gregory W. Fox |
| May Orenstein | BROMBERG, | GOODWIN PROCTOR LLP |
| Howard S. Steel | ESSERMAN & | The New York Times Bldg. |
| BROWN RUDNICK LLP | PLIFKA, A | 620 Eighth Avenue |
| Seven Times Square | PROFESSIONAL | New York, New York 10018 |
| New York, New York 10036 | CORPORATION | T: 212-813-8800 |
| T: 212-209-4800 | 2323 Bryan Street | wweintraub@goodwinproctor.com |
| eweisfelner@brownrudnick.com | Suite 2200 | gfox@goodwinproctor.com |
| dmolton@brownrudnick.com | Dallas, Texas 75201 | |
| morenstein@brownrudnick.com | T: 214-969-4900 | |
| hsteel@brownrudnick.com | esserman@sbep-law.com | |

*Co-Designated Counsel for the Ignition Switch Plaintiffs*
*and the Ignition Switch Pre-Closing Accident Plaintiffs*

## CORPORATE DISCLOSURE STATEMENT

No corporate disclosure statement is required for the Plaintiffs, each of whom is an individual and not a corporate entity.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................2

BACKGROUND ..............................................................................................3

I.    New GM's Concealment Of The Ignition Switch Defect. ..........................3

II.   Establishment Of The MDL Action And The
      Appointment Of Co-Lead Counsel. .........................................................5

III.  Proceedings In The Bankruptcy Court Following
      The Disclosure Of The Ignition Switch Defect. ........................................7

IV.   The Bankruptcy Court's Decision And Judgment. ...................................10

V.    Plaintiffs' Appeal From The Decision And Judgment. .............................12

VI.   Petitioners' Appeal From and Motion for Reconsideration
      Of The Decision and Judgment..............................................................13

ARGUMENT ................................................................................................14

I.    The Elliott Petition is Procedurally Improper...........................................14

II.   The Petitions Should Be Denied Because
      Direct Appeal Is Unwarranted. ..............................................................15

   A.  The Appeal Does Not Involve A Question Of Law As To
       Which There Is No Controlling Decision. ...............................................15

   B.  The Appeal Does Not Involve a Question of Law
       Requiring Resolution of Conflicting Decisions. .......................................18

   C.  This Court's Acceptance Of The Appeal Will Not Materially Advance The
       Progress Of The Case. .........................................................................19

CONCLUSION ..............................................................................................20

# TABLE OF AUTHORITIES

**Page**

*Am. Home Mortg. Inv. Corp. v. Lehman Bros. (In re Am. Home Mortg. Inv. Corp.)*,
 408 B.R. 42 (D. Del. 2009) ................................................................ 17

*Beeman v. BGI Creditors' Liquidating Trust (In re BGI, Inc.)*,
 772 F.3d 102 (2d Cir. 2014) ............................................................. 17

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
 747 F.3d 145 (2d Cir. 2014) ............................................................. 16

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*,
 10 F.3d 944 (2d Cir. 1993) ............................................................... 17

*Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*,
 517 F.3d 52 (2d Cir. 2008), *rev'd on other grounds sub nom.*
 *Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009) ....................... 16

*Koepp v. Holland*,
 593 F. App'x 20 (2d Cir. 2014) .................................................. 16, 19

*In re Motors Liquidation Co.*,
 529 B.R. 510 (Bankr. S.D.N.Y. 2015) ......................................... *passim*

*Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. Official Comm. Of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.)*,
 988 F.2d 322 (2d Cir. 1993) ............................................................. 17

*Pfizer Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co., Inc.)*,
 676 F.3d 45 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 2849 (2013) .................... 16

*Ritchie Capital Mgmt., L.L.C. v. Stoebner*,
 No. 12-3038, 2013 U.S. Dist. LEXIS 79636 (D. Minn. June 6, 2013) ..................................................................................... 17

*Travelers Cas. & Sur. Co. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*,
　　600 F.3d 135 (2d Cir. 2010) ........................................................................16, 17

*Weber v. U.S. Tr.*,
　　484 F.3d 154 (2d Cir. 2007) ..................................................................2, 18, 19

## Statutes

Fed. R. Bankr. P. 8002(b) ....................................................................................3, 15

Fed. R. Bankr. P. 8006(a)(3)................................................................................3, 15

The Ignition Switch Plaintiffs[1] and Ignition Switch Pre-Closing Accident Plaintiffs[2] (collectively, the "Plaintiffs"), by and through their undersigned counsel, hereby oppose (this "Opposition") *Celestine Elliott's, Lawrence Elliott's, and Berenice Summerville's Petition for Permission to Appeal a Judgment and Associated Orders of the Bankruptcy Court* (the "Elliott Petition") and New GM's Cross-Petition for Permission for Direct Appeal (the "Cross-Petition, and together with the Elliott Petition, the "Petitions"). In support of this Opposition, the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Decision on Motion to Enforce Sale Order*, In re Motors Liquidation Co., 529 B.R. 510 (Bankr. S.D.N.Y. 2015) (the "Decision") or in the *Judgment*, dated June 1, 2015 [ECF No. 13177] (the "Judgment"). As defined in the Judgment, the term "Ignition Switch Plaintiffs" shall mean Plaintiffs who have commenced a lawsuit against New GM asserting economic losses based on or arising from the Ignition Switch in the Subject Vehicles (each term as defined in the *Agreed and Disputed Stipulations of Fact Pursuant to the Court's Supplemental Scheduling Order, Dated July 11, 2014*, filed on August 8, 2014 [ECF No. 12826] (the "Stipulations of Fact"), at 3). Because the Subject Vehicles in the Judgment are *only* those vehicles involved in the February and March 2014 Recalls (Recall No. 14-V-047), the term Ignition Switch Plaintiffs as used in this Memorandum of Law includes only Plaintiffs who own or lease those vehicles, and does not include those Plaintiffs who own or lease other vehicles with defective ignition switches (made by both Old and New GM) that were recalled in June and July of 2014. Except where otherwise indicated, references to "ECF No. __" are to docket entries in the Bankruptcy Court proceedings: *In re Motors Liquidation Co.*, Bankr. Case No. 09-50026 (REG).

[2] As defined in the Judgment, the term "Ignition Switch Pre-Closing Accident Plaintiffs" shall mean Plaintiffs that had the Ignition Switch in their Subject Vehicles and that have commenced a lawsuit against New GM based on an accident or incident that occurred prior to the closing of the 363 Sale. Goodwin Procter LLP was engaged by Co-Lead Counsel in *In re: General Motors Ignition Switch Litigation* (14-MD-2543 (JMF)) to address certain issues of bankruptcy law affecting the Ignition Switch Pre-Closing Accident Plaintiffs.

Plaintiffs respectfully state as follows:

## PRELIMINARY STATEMENT

For the reasons set forth below, the Petitions should be denied. The Plaintiffs, who are represented by Lead Counsel in the *General Motors LLC* ("New GM") *Ignition Switch Litigation* (the "MDL Action") have appealed the Decision and Judgment to the District Court for the Southern District of New York (the "District Court") to be heard, in the first instance, by that Court. The District Court is the court before which is now pending the MDL Action involving claims against New GM arising from the Ignition Switch Defect and other defects in GM-branded vehicles.

The Petitions should be denied (and appeal heard by the District Court in the first instance) because the requirements for certification of a direct appeal to the Second Circuit under 28 U.S.C. § 158(d) are not met here. The appeal does not present any questions of law without controlling authority in this Circuit, nor does it concern questions of law requiring the resolution of conflicting decisions. Given the District Court's substantial experience conducting the MDL Action and familiarity with the facts and issues on appeal, this is a situation where a decision from the District Court "would cast more light on the issue and facilitate a wise and well-informed decision by the Second Circuit." *See Weber v. U.S. Tr.*, 484 F.3d 154, 161 (2d Cir. 2007). Accordingly, the Plaintiffs oppose direct appeal.

However, this Court need not make a determination at present regarding whether the criteria for direct appeal to the Second Circuit are satisfied here because some of the same individuals who are petitioning this Court for a direct appeal are concurrently seeking reconsideration by the Bankruptcy Court of the Decision and Judgment.[3]    Under Bankruptcy Rule 8006(a)(3), the Bankruptcy Court's certification of a direct appeal to the Second Circuit is not yet effective and under Bankruptcy Rule 8002, Petitioners' and Plaintiffs' appeals are tolled, pending resolution of the Motion for Reconsideration.[4]    Accordingly, any consideration of the Petitions is inappropriate and the Petitions should be stricken as void or held in abeyance until the Motion for Reconsideration is resolved (with rights to respond commensurately tolled).[5]

## **BACKGROUND**

### I.    **New GM's Concealment Of The Ignition Switch Defect.**

In February and March of 2014, New GM disclosed the existence of the Ignition Switch Defect, a safety defect in multiple model years of GM-branded

---

[3]    *See Bledsoe Plaintiffs' Motion to Amend Findings Pursuant to FRBP 7052, for Reargument Pursuant to Local Bankruptcy Rule 9023.1, to Alter or Amend the Judgment Pursuant to FRBP 9023, and For Relief From the Judgment Pursuant to FRBP 9024,* dated June 11, 2015 [ECF No. 13196] (the "Motion for Reconsideration").

[4]    *See* Fed. R. Bankr. P. 8006(a)(3); Fed. R. Bankr. P. 8002(b)(1)-(2).

[5]    The Plaintiffs expressly reserve and do not waive their rights to supplement this Opposition in response to a procedurally proper petition for permission to directly appeal the Decision and/or the Judgment and to supplement this response to the Cross-Petition.

vehicles which causes the loss of power, an inability to control speed and braking functions, and the disablement of airbags.  In its Consent Order with the National Highway Safety Administration, New GM conceded that it violated the law by failing to properly disclose the Ignition Switch Defect and conduct a timely recall.[6]

New GM concealed the existence of the Ignition Switch Defect from the public for nearly five years notwithstanding it knew of the potential for it to cause injury and death.  To date, the Ignition Switch Defect has been linked to 119 deaths and 243 serious injuries.[7]  Although New GM knew about the Ignition Switch Defect since its inception in 2009, it concealed its existence from the public for nearly five years.  As the Bankruptcy Court recognized, at least twenty-four (24) Old GM personnel, including engineers, senior managers, and attorneys, were informed or otherwise aware of the Ignition Switch Defect, all of whom were transferred to New GM.  *See In re Motors Liquidation Co.*, 529 B.R. at 524, 538, 557.  Following the February and March recall, New GM issued numerous recalls for other safety defects, including ignition switch defects in an additional 11 million vehicles.  In all, New GM recalled approximately 26 million vehicles in the

---

[6]    *See* Consent Order, In re TQ14-001 NHTSA Recall No. 14V-047 (U.S. Dep't of Transp. May 16, 2014), *available at* http://www.nhtsa.gov/staticfiles/ communications/pdf/May-16-2014-TQ14-001-Consent-Order.pdf, at 4.

[7]    *See* Detailed Overall Program Statistics, GM Ignition Compensation Claims Resolution Facility (June 26, 2015), *available at* http://www.gmignition compensation.com/docs/ProgramStatistics.pdf.

first seven months of 2014.[8]

## II.   Establishment Of The MDL Action And The Appointment Of Co-Lead Counsel.

Following the Ignition Switch recalls in 2014, over 150 class actions and lawsuits have been filed against New GM alleging economic loss damages, including those actions initiated by the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs.[9]

On June 9, 2014, the Judicial Panel on Multidistrict Litigation ordered certain economic loss suits against New GM to be transferred to the District Court for consolidated pretrial proceedings in the MDL Action.[10]   In the MDL Action, Judge Furman actively manages discovery and pretrial proceedings in the consolidated actions involving the Ignition Switch and other defects, convenes regular status conferences, had issued over fifty (50) case management orders, presides over phased discovery including the production of millions of documents and scores of depositions, and has set bellwether trials for 2016.   The Court-

---

[8]   *See* Stipulations of Fact, Ex. D ¶ 77.

[9]   *See In re Motors Liquidation Co.*, 529 B.R. at 521, 539; Motors Liquidation Company GUC Trust (Form 10-K for year ended March 31, 2015) (May 22, 2015), at 21.

[10]   *See* Transfer Order, *In re Gen. Motors Ignition Switch Litig.*, MDL No. 2543 [ECF No. 266] (J.P.M.L. June 12, 2014); Order No. 1, *In re General Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 [ECF No. 19] (S.D.N.Y. June 24, 2014), at 1.

appointed Co-Lead Counsel and other counsel designated by Order No. 5[11] are responsible for the prosecution and discovery of common claims and questions.

On July 18, 2014, the District Court established an application procedure to select Lead Counsel and other leadership positions in the MDL Action.[12]   Any attorney who had filed an action consolidated into the MDL Action was eligible to apply for a leadership position.[13]   On July 28, 2014, the Elliott Petitioners' counsel, Gary Peller (hereinafter, "Peller") submitted his application to serve as Lead Counsel.[14]

On August 15, 2014, the District Court appointed Steve W. Berman of Hagens Berman Sobol Shapiro LLP, Elizabeth J. Cabraser of Lieff Cabraser Heimann & Bernstein, LLP, and Robert C. Hilliard of Hilliard Muñoz Gonzales

---

[11]   *See* Order No. 5, *In re General Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 [ECF No. 70] (S.D.N.Y. July 18, 2014); MDL Action Orders and Transcripts, *available at* MDL 2543 official website, http://www.gmignitionmdl.com.

[12]   *See* Order No. 5, *In re General Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 [ECF No. 70] (S.D.N.Y. July 18, 2014).

[13]   *Id.* at 4.

[14]   *See* Letter from Gary Peller to Hon. Jesse M. Furman, *In re General Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 [ECF No. 115] (S.D.N.Y. July 28, 2014).   Petitioners' counsel represents the following plaintiffs in the MDL Action:  (1) Ishmael Sesay and (2) Joanne Yearwood (collectively, the "Sesay Plaintiffs"); (3) Lawrence Elliott, (4) Celestine Elliott, and (5) Bernice Summerville (collectively, the Elliott Plaintiffs); and (6) Sharon Bledsoe, (7) Cina Farmer, (8) Paul Fordham, (9) Momoh Kanu, (10) Tynesia Mitchell, (11) Dierra Thomas; and (12) James Tibbs (together with Lawrence and Celestine Elliott, the "Bledsoe Plaintiffs").

LLP as Co-Lead Counsel.[15]  Peller's application was rejected.[16]  Brown Rudnick

LLP and Goodwin Proctor LLP serve as special bankruptcy counsel ("Designated

Counsel") to Lead Counsel in the bankruptcy proceedings before Judge Robert E.

Gerber in the U.S. Bankruptcy Court for the Southern District of New York.

Co-Lead Counsel are charged by Order of the Court with acting for all

plaintiffs in the MDL Action by, *inter alia*, presenting written and oral arguments

and suggestions to the District Court and working with opposing counsel in

developing and implementing a litigation plan, initiating and organizing discovery

requests and responses, and conducting the principal examination of deponents and

retaining experts.  *See* Order No. 5.  Peller has no leadership role in the MDL

Action.

## III.     Proceedings In The Bankruptcy Court Following The Disclosure Of The Ignition Switch Defect.

In April 2014, New GM filed the Ignition Switch Motion to Enforce seeking

to enjoin the prosecution of numerous lawsuits, including class actions arising out

of the Ignition Switch Defect.[17]  The Bankruptcy Court identified four threshold

---

[15]  *See* Order No. 8, *In re General Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 [ECF No. 249] (S.D.N.Y. Aug. 15, 2014).

[16]  The Court also appointed a nine-member Executive Committee, a Plaintiff Liaison Counsel, and Federal/State Liaison Counsel.  *See id.* at 3.  Peller was not appointed to any of these posts.

[17]  *See Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction*, dated April 21, 2014 [ECF No. 12620] (the "Ignition Switch Motion to Enforce").

issues relating to the Motion to Enforce for judicial determination (the "Threshold Issues").[18]

The Bankruptcy Court then directed certain parties to meet and confer to establish agreed and disputed stipulated facts in connection with the contested Ignition Switch Motion to Enforce.[19]  On August 8, 2014, the parties filed the Stipulations of Fact.[20]

Counsel for the Elliott Petitioners chose not to participate in the development of the Threshold Issues, the Stipulations of Fact, or the briefing submitted to the Bankruptcy Court on the Threshold Issues despite having a full

---

[18]  *See Scheduling Order Regarding (I) Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 To Enforce the Court's July 5, 2009 Sale Order and Injunction, (II) Objection Filed by Certain Plaintiffs in Respect Thereto, and (III) Adversary Proceeding No. 14-01929*, dated May 16, 2014 [ECF No. 12697] (the "Scheduling Order"), at 4.   The Threshold Issues include: (i) whether plaintiffs' due process rights were violated in connection with the Sale Order, or would be violated by enforcement of the Sale Order; (ii) if so, what was the appropriate remedy for the due process violation; (iii) whether any claims asserted in the Ignition Switch Actions were against Old GM; and (iv) if so, whether such claims should be disallowed/dismissed on grounds of equitable mootness.  *See In re Motors Liquidation Co.*, 529 B.R. at 539-40.

[19]  *See* Scheduling Order at 4; *Supplemental Scheduling Order Regarding (I) Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction, (II) Objection Filed by Certain Plaintiffs in Respect thereto, and (III) Adversary Proceeding No. 14-01929*, dated July 11, 2014 [ECF No. 12770], at 4.

[20]  *See* ECF No. 12826.  A true and correct copy of the Stipulations of Fact are attached as **Exhibit B** to the Declaration of Edward S. Weisfelner (the "Weisfelner Declaration").

opportunity to do so.[21]    Instead, counsel for the Petitioners filed pleadings and

letters[22] seeking special treatment and recognition of the asserted right to "go it

alone."[23]    For example, Peller filed at least three "No Stay Pleadings" with the

Bankruptcy Court seeking to move his clients' actions ahead of all other plaintiffs'

actions.[24] All of the efforts of counsel for the Elliott Petitioners were rejected[25] by

---

[21]    On December 6, 2014, pursuant to the Bankruptcy Court's instruction, Designated Bankruptcy Counsel for the Ignition Switch Plaintiffs circulated drafts of their Threshold Issues Briefs to all plaintiffs involved in the bankruptcy proceedings. *See Endorsed Order*, dated Aug. 22, 2014 [ECF No. 12869]. Designated Bankruptcy Counsel for the Ignition Switch Plaintiffs solicited input and comments on the drafts from other plaintiffs' counsel, including counsel to the Elliott Petitioners. Counsel to the Elliott Petitioners did not comment.

[22]    *See, e.g.*, ECF No. 12737 (Endorsed Order Regarding Letter by Peller's co-counsel, Daniel Hornal); ECF Nos. 12761, 12766, 12769, 12777, 12783 (Letters filed by Hornal); ECF No. 12774 (Motion to Dismiss Party filed by Hornal); ECF No. 12788 (Response filed by Peller); ECF Nos. 12821, 12830 (Letters filed by Peller); ECF No. 12822 (Notice of filing Counter-Order by Peller); ECF No. 12828 (Supplemental Notice of Counter-Order filed by Peller); ECF No. 12839 (Notice of Appeal filed by Peller); ECF No. 12870 (Motion to Dismiss Party filed by Peller); ECF No. 12871 (Motion to Amend filed by Peller); ECF No. 12872 (Motion for an Order of Abstention filed by Peller); ECF No. 12883 (Amended Motion to Dismiss Party filed by Peller); ECF No. 12948 (Memorandum of Law Regarding No Stay Pleading filed by Peller); ECF No. 13002 (Amended Notice of Appeal filed by Peller); ECF No. 13004 (Notice of Appeal filed by Peller); ECF Nos. 13005 and 13007 (Motions Seeking Leave to Appeal filed by Peller).

[23]    *See Decision with Respect to No Stay Pleading and Related Motion to Dismiss for Lack of Subject Matter Jurisdiction (Elliott Plaintiffs)*, dated Aug. 6, 2014 [ECF No. 12815], at 9.

[24]    *See* ECF Nos. 12766; 12774; 12871 (Elliott Plaintiffs' No Stay Pleadings); ECF Nos. 12830; 12835; 12868; 12883 (Sesay Plaintiffs' No Stay Pleadings); ECF No. 12948 (Bledsoe Plaintiffs' No Stay Pleading).

Judge Gerber who characterized Peller's arguments as "frivolous."[26]

## IV.   The Bankruptcy Court's Decision And Judgment.

On April 15, 2015, the Bankruptcy Court issued its Decision.[27]  It held that the Ignition Switch Defect was known to Old GM at the time it filed its chapter 11 cases and for some time prior to that date, and the Subject Vehicles should have been recalled prior to Old GM's June 2009 bankruptcy filing.  *See In re Motors Liquidation Co.*, 529 B.R. at 538.  As a result, the Bankruptcy Court found that the Plaintiffs were "known" creditors of the Debtor who were entitled to notice and an opportunity to be heard in connection with the Old GM bankruptcy proceedings. *See id.* at 525, 557.  It further held that the Plaintiffs had been prejudiced by the failure of New GM to provide them with an opportunity to object to the breadth of the Sale Order as it applied to New GM's own conduct.  *See id.* at 524-27.  The Bankruptcy Court further held that, as a result of this due process violation, the Sale Order would be deemed modified so that notwithstanding its overbreadth as issued, the Plaintiffs could now assert "claims or causes of action . . . against New

---

[25]  *See* ECF Nos. 12771; 12815; 12933 (Orders and Decision denying Elliott Plaintiffs' No Stay Pleadings); ECF Nos. 12835; 12877; 12989 (Orders and Decision denying Sesay Plaintiffs' No Stay Pleadings); ECF No. 12991 (Order denying Bledsoe Plaintiffs' No Stay Pleading).

[26]  *See* ECF No. 12815, at 2-3; *Decision with Respect to No Stay Pleading, and Related Motion for Abstention (Sesay Plaintiffs)*, dated November 10, 2014 [ECF No. 12989], at 1-2, 5; *see also Endorsed Order*, dated Nov. 10, 2014 [ECF No. 12991].

[27]  *See* ECF No. 13109.

GM (whether or not involving Old GM vehicles or parts) that are based solely on New GM's own, independent, post-Closing acts or conduct." Judgment ¶ 4; *see In re Motors Liquidation Co.*, 529 B.R. at 598. The Bankruptcy Court also held that the Plaintiffs' due process rights were violated by the failure to provide them with notice of the Bar Date and, thus, they could assert late proofs of claim against the Old GM estate. *See In re Motors Liquidation Co.*, 529 B.R. at 583.[28]

The Bankruptcy Court certified its Judgment for direct review by this Court. The Bankruptcy Court found that the Decision was based on "undisputed facts," that there were no controlling decisions of the Second Circuit on the issues "beyond the most basic fundamentals," and that the legal issues addressed in the Decision would affect due process, 363 sales, and the claims allowance procedures in future chapter 11 cases. *See In re Motors Liquidation Co.*, 529 B.R. at 597-98.

The Bankruptcy Court found that intermediate appeal to the District Court, "would have a foreseeable adverse effect on the ability of the MDL Court to proceed with the matters on its watch." *Id.*

On June 1, 2015, the Bankruptcy Court entered the Judgment implementing the Decision. *See* ECF No. 13177. On the same day, the Bankruptcy Court entered its *Order, Pursuant to 28 U.S.C. § 158(d), and Fed. R. Bankr. P. 8006(e),*

---

[28] Despite this finding, the Bankruptcy Court also found that while "late claims filed by the Plaintiffs might still be allowed, assets transferred to the GUC Trust under the Plan could not now be tapped to pay them." *See In re Motors Liquidation Co.*, 529 B.R. at 529.

*Certifying Judgment for Direct Appeal to Second Circuit*, dated June 1, 2015 [ECF No. 13178] (the "Certification Order"). The Certification Order permits the parties to the Decision and Judgment to pursue a direct appeal to this Court. *Id.* ¶ 1. The Certification Order provides that it "shall be effective at such time, and only at such time, that a timely appeal has been taken in the manner required by Fed. R. Bankr. P. 8003 or 8004, and the notice of appeal *has become effective* under Fed. R. Bankr. P. 8002." *Id.* ¶ 2 (emphasis supplied).

## V.   Plaintiffs' Appeal From The Decision And Judgment.

On June 2, 2015, the Ignition Switch Plaintiffs filed a *Notice of Appeal* from the Decision and Judgment to the District Court. *See* ECF No. 13185.

On June 10, 2015, the Ignition Switch Pre-Closing Accident Plaintiffs filed a *Notice of Appeal* from the Decision and Judgment to the District Court.[29] *See* ECF No. 13194.

On June 16, 2015, the Ignition Switch Plaintiffs filed the *Appellants' Statement Of Issues On Appeal And Designation Of Items To Be Included In the Record On Appeal*. *See* ECF No. 13219.

On June 22, 2015, the Ignition Switch Pre-Closing Accident Plaintiffs filed the *Ignition Switch Pre-Closing Accident Plaintiffs' Statement Of Issues And*

---

[29] The Decision and Judgment are subject to appeal by several other parties. *See* ECF Nos. 13200 (Notice of Cross-Appeal for New GM); 13209 (Notice of Appeal for Groman Plaintiffs).

*Designation Of Record On Appeal.  See* ECF. No. 13236.

## VI.    Petitioners' Appeal From and Motion for Reconsideration Of The Decision and Judgment.

On June 1, 2015, the Petitioners filed an *Amended Notice of Appeal* from the Judgment to the District Court (the "Elliott Notice of Appeal").  *See* ECF No. 13179.  The Elliott Notice of Appeal designated four parties to the appeal: (i) Lawrence Elliott-Appellant; (ii) Celestine Elliott-Appellant; (iii) Bernice Summerville-Appellant; and (iv) New GM-Appellee. *See id.* at 1.

On the same day, the Sesay Plaintiffs filed a *Notice of Appeal* from the Judgment.  *See* Notice of Appeal, dated June 1, 2015 [ECF No. 13180].

On June 11, 2015, the Bledsoe Plaintiffs (which, as defined by Peller, include Petitioners Celestine Elliott and Lawrence Elliott) filed the Motion for Reconsideration.  *See* ECF No. 13196.

Counsel for the Petitioners and New GM then entered a stipulation setting a July 6, 2015 deadline for New GM to respond to the Motion for Reconsideration. *See* ECF No. 13203.  A hearing date for the Motion for Reconsideration has not yet been scheduled.

On June 15, 2015, notwithstanding the Motion for Reconsideration, Peller filed the *Elliott Plaintiffs/Appellants' Statement of the Issues And Designation Of Items To Be Included In The Record On Appeal.  See* ECF No. 13207.

On June 18, 2015, the Elliott Petitioners filed the Elliott Petition and served

13

it on Designated Counsel for the Plaintiffs via email.[30]    The Elliott Petitioners

argue, "interests in judicial economy and efficiency *may* support granting the

petition for permission to appeal." Petition at 7 (emphasis added).    The Elliott

Petitioners submit, however, that "given the . . . District Court's familiarity with

the issues presented, initial review by that Court may facilitate this Court's

eventual review, and they have no objection to their appeal being heard by [the

District] Court in the first instance." *Id.* at 7-8.    The Elliott Petitioners also

disagree with the Bankruptcy Court's characterization of the issues below as either

"'difficult'" or requiring the "'application of often conflicting authority.'" *Id.* at 6

(quoting *In re Motors Liquidation Co.*, 529 B.R. at 529).

On June 29, 2015, Cross-Petitioner, New GM, filed the Cross-Petition

requesting that the Court authorize a direct appeal from the Judgment once it

becomes effective. *See* Cross-Petition at 4.

## ARGUMENT

### I.    The Elliott Petition is Procedurally Improper.

This Court has jurisdiction to hear appeals from "final" decisions and

judgments. *See* 28 U.S.C. §§ 158(a)(1), 158(d)(2)(A).    Given the Motion for

---

[30]    *See* Email from Gary Peller (Georgetown University), to Edward S. Weisfelner
(Brown Rudnick LLP), et al., *re: In re Motors Liquidation Company; Case No:
09-50026 -- Service of Petition for Permission to Appeal* (June 18, 2015 10:23
PM), a true and correct copy is attached as **Exhibit D** to the Weisfelner
Declaration.

Reconsideration, the Judgment is not final. The Elliott Petition is procedurally improper and ineffective, and should be stricken or held in abeyance pending resolution of the Motion for Reconsideration.

The Motion for Reconsideration remains pending before the Bankruptcy Court. Upon filing the Motion for Reconsideration, the Elliott Petitioners tolled the time to appeal for all parties under Bankruptcy Rule 8002(b), until entry of an order resolving the Motion for Reconsideration. *See* Fed. R. Bankr. P. 8002(b)(1)-(2). As a result, the certification of the direct appeal from the Bankruptcy Court is not yet effective. *See* Fed. R. Bankr. P. 8006(a)(3) ("certification of a judgment . . . of a bankruptcy court for direct review in a court of appeals . . . is effective when: [*inter alia*] the notice of appeal has become effective under Rule 8002"). Accordingly, until the Motion for Reconsideration is resolved, the Judgment is not a final order and the Petition is void.

## II.    **The Petitions Should Be Denied Because Direct Appeal Is Unwarranted.**

Even if the Petitions could be construed as procedurally proper, they should be denied, because the appeal does not meet any of the requirements for direct certification under 28 U.S.C. § 158(d)(2)(A).

### A. The Appeal Does Not Involve A Question Of Law As To Which There Is No Controlling Decision.

The appeal does not involve a question of law as to which there is no controlling decision. Neither the Elliott Petitioners nor New GM assert otherwise.

Indeed, a plethora of Second Circuit law directly controls the correct outcome on appeal. For example:

- *Travelers Cas. & Sur. Co. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 600 F.3d 135, 158 (2d Cir. 2010) ("*Manville IV*") is controlling authority with respect to the issue of whether the Plaintiffs must demonstrate prejudice to establish a due process violation in connection with the entry or enforcement of the Sale Order. There, this Court held that an insurance company's due process rights were violated because it was not provided appropriate notice of the hearing that led to an order which precluded the insurance company from bringing its claim against a primary liability insurer for contribution and indemnity. *Manville IV*, 600 F.3d at 153-54. Without imposing any requirement of a showing of "prejudice" and, indeed, without discussing such a purported requirement, this Court held that the due process violation was sufficient to render the relevant order inapplicable to the adversely affected insurance company. *Id.*

- On the issue of whether the Plaintiffs failed to demonstrate prejudice in connection with the entry or enforcement of the Sale Order, the following cases each stand for the proposition that the denial of an opportunity for Plaintiffs to be heard necessarily satisfies any prejudice requirement: *Manville IV*, 600 F.3d at 153-54; *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 150 (2d Cir. 2014); and *Koepp v. Holland*, 593 F. App'x 20, 23 (2d Cir. 2014).

- On the issue of whether the Bankruptcy Court had jurisdiction to enjoin claims against New GM based on New GM's own independent, post-Closing acts or conduct, directly on point are: *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 517 F.3d 52, 66-68 (2d Cir. 2008) (holding that, despite a "common nucleus of operative facts involving" the debtor and the insurer, bankruptcy order enjoining third-party claims against insurers predicated on insurer's independent misconduct were unrelated to *res* of the estate and outside the scope of the bankruptcy court's injunctive power), *rev'd on other grounds sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009); and *Pfizer Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co., Inc.)*, 676 F.3d 45, 61-62 (2d Cir. 2012) (finding that bankruptcy court lacks jurisdiction to enjoin a claim against a third party where such claim would not have an effect on the *res* of the bankruptcy estate), *cert. denied*, 133 S. Ct. 2849 (2013).

- On the issue of whether the Sale Order may be enforced by enjoining and barring claims asserted against New GM where such claims "concern[] an Old GM vehicle or part," and through the creation of procedures for staying, striking or

dismissing such claims, on point is: *Manville IV*, 600 F.3d at 158 (holding that a claimant could not be bound by bankruptcy court orders where, even with notice, "it could not have anticipated . . . that its . . . claims . . . would be enjoined"), *cert. denied* 131 S. Ct. 644 (2010).

•      On the issue of whether the doctrine of equitable mootness applies to the Plaintiffs' potential claims against the Old GM estate, the Bankruptcy Court recognized, and the parties did not dispute, that "three holdings of the Second Circuit largely determine the mootness issues here[:]"    *Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. Official Comm. Of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.)*, 988 F.2d 322 (2d Cir. 1993); *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944 (2d Cir. 1993); and *Beeman v. BGI Creditors' Liquidating Trust (In re BGI, Inc.)*, 772 F.3d 102 (2d Cir. 2014).  *See In re Motors Liquidation Co.*, 529 B.R. at 84.

Moreover, to warrant certification for direct appeal under 28 U.S.C. § 158(d)(2)(A)(i), the appeal must involve a "lack of controlling precedent ***on a purely legal question***."  *Ritchie Capital Mgmt., L.L.C. v. Stoebner*, No. 12-3038, 2013 U.S. Dist. LEXIS 79636, at *10 (D. Minn. June 6, 2013) (emphasis added). Where the issues presented on appeal involve "mixed questions that implicate the particular circumstances of this case . . . they are not pure legal questions warranting direct certification."  *Am. Home Mortg. Inv. Corp. v. Lehman Bros. (In re Am. Home Mortg. Inv. Corp.)*, 408 B.R. 42, 44 (D. Del. 2009); *see also Weber*, 484 F.3d at 158 (2d Cir. 2007) ("[A] 'direct appeal would be most appropriate where [the court] is called upon to resolve a question of law not heavily dependent on the particular facts of a case, because such questions can often be decided based on an incomplete or ambiguous record.'").

The appeal will not involve a "purely legal question," but mixed questions of law and fact not appropriate for direct review. At the Bankruptcy Court's direction there has been no discovery on the Threshold Issues. Yet, a key finding by the Bankruptcy Court was that the Plaintiffs had failed to demonstrate prejudice from the inclusion in the Sale Order of a provision that New GM would succeed to Old GM's business "free and clear" of certain liabilities. On appeal, a court may find that the Stipulations of Fact do not support the Bankruptcy Court's findings or that such a finding was inappropriate absent a fully developed record after discovery. Accordingly, additional discovery may be inevitable on remand.

Additionally, the appeal of the Decision and Judgment will necessarily implicate the "particular circumstances" of this case as discovery in the MDL Action progresses. For example, the appellate court will be called to determine whether, *under the specific factual circumstances of this case*, the Bankruptcy Court erred in holding, *inter alia*, that: (i) the Sale Order may be enforced so as to enjoin claims and/or causes of action against New GM where such claims "concern[] an Old GM vehicle or part;" and (ii) the Plaintiffs failed to demonstrate prejudice in connection with the entry or enforcement of the Sale Order.

### B. The Appeal Does Not Involve a Question of Law Requiring Resolution of Conflicting Decisions.

The appeal does not require a "resolution of conflicting decisions." Existing, controlling authority is not in conflict as to the elements of a due process

violation, the applicability of the due process clause of the Constitution to bankruptcy, and the available remedies for such a violation. *See Koepp*, 593 F. App'x at 23 ("Bankruptcy courts cannot extinguish the interests of parties who lacked notice of or did not participate in the proceedings.").

The controlling case law provided the Bankruptcy Court with the necessary tools to fashion an appropriate remedy, had it chosen to do so. In short, the result below, which left the Plaintiffs without the full remedy Plaintiffs are entitled to, was not the consequence of conflicting case law.

### C. This Court's Acceptance Of The Appeal Will Not Materially Advance The Progress Of The Case.

New GM is wrong asserting that if the District Court hears the appeal in the first instance the case will not advance. *See* Cross-Petition at 19-20. As a general matter, "district courts tend to resolve bankruptcy appeals faster than the courts of appeals." *Weber*, 484 F.3d at 160. This general rule holds especially true here, where the District Court has presided over the MDL Action for nearly two years and is well-versed in the extensive factual background and legal issues underlying this appeal. For these reasons, New GM is also wrong asserting that the District Court will not shed more light on the issues on appeal. *See* Cross-Petition at 19-20. Under these circumstances, the District Court will be able to sharply focus the issues for any subsequent review by this Court. Accordingly "[a]ny cost to speed in permitting district court review will likely be outweighed by the benefit of such

review on casting light on the issues and facilitating a wise and well-informed decision." *Id.*

Moreover, the stated goal of the MDL Action is to centralize consideration of all claims arising from the Ignition Switch Defect before the District Court. *See* Transfer Order, *In re Gen. Motors Ignition Switch Litig.*, MDL No. 2543 [ECF No. 266] (J.P.M.L. June 12, 2014). It is therefore proper for the District Court to review, in the first instance, any and all issues relating to the Ignition Switch Defect, including the appeal of the Decision and Judgment.

In addition, given the likelihood of remand for further proceedings (including discovery), a direct appeal to this Court will not appreciably accelerate a process that has already taken more than a year (despite the Bankruptcy Court's prohibition of discovery and efforts to streamline the process through the Threshold Issues).

## CONCLUSION

**WHEREFORE**, the Plaintiffs respectfully request that the Court: (i) deny the Petition; and (ii) grant the Plaintiffs such other and further relief as is just and proper.

DATED this 29th day of June, 2015.

Respectfully Submitted,

**BROWN RUDNICK LLP**

By:  _/s/ Edward S. Weisfelner_
Edward S. Weisfelner
David J. Molton
May Orenstein
Howard S. Steel
Seven Times Square
New York, New York 10036
T: 212-209-4800
E: eweisfelner@brownrudnick.com
E: dmolton@brownrudnick.com
E: morenstein@brownrudnick.com
E: hsteel@brownrudnick.com

-and-

**STUTZMAN, BROMBERG,
ESSERMAN & PLIFKA, P.C.**
Sander L. Esserman
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
T: 214-969-4900
E: esserman@sbep-law.com

_Co-Designated Counsel & Counsel to
Ignition Switch Plaintiffs, Represented
in the MDL Proceeding by Co-Lead
Counsel_

-and-

**GOODWIN PROCTOR LLP**
William P. Weintraub
Gregory W. Fox

21

The New York Times Bldg.
620 Eighth Avenue
New York, New York 10018
T: 212-813-8800
wweintraub@goodwinproctor.com
gfox@goodwinproctor.com

*Co-Designated Counsel & Counsel to
Ignition Switch Pre-Closing Accident
Plaintiffs, Represented in the MDL
Proceeding by Co-Lead Counsel:*

Steve W. Berman
**HAGENS BERMAN SOBOL
SHAPIRO LLP**
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101

-and-

555 Fifth Avenue, Suite 1700
New York, New York 10017

*Co-Lead Counsel with a primary focus
on Economic Loss Cases*

Elizabeth J. Cabraser
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, California 94111

-and-

250 Hudson Street, 8th Floor
New York, New York 10013

*Co-Lead Counsel with a primary focus
on Economic Loss Cases*

22

Robert C. Hilliard
**HILLIARD MUÑOZ GONZALES LLP**
719 S. Shoreline Boulevard, Suite 500
Corpus Christi, Texas 78401

*Co-Lead Counsel with a primary focus on Personal Injury Cases*

# **<u>EXHIBIT B</u>**

**COUNSEL FOR THE PARTIES ARE**
**LISTED IN THE SIGNATURE BLOCK**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **MOTORS LIQUIDATION COMPANY**, *et al.*, | : | **Case No.: 09-50026 (REG)** |
| f/k/a **General Motors Corp.,** *et al.* | : | |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

-----------------------------------------------------------------x

## AGREED AND DISPUTED STIPULATIONS OF FACT PURSUANT TO THE
## COURT'S SUPPLEMENTAL SCHEDULING ORDER, DATED JULY 11, 2014

Counsel for the Identified Parties[1] hereby provide, pursuant to the Supplemental
Scheduling Order, their agreed-upon[2] and disputed Stipulations of Fact relating to the Four
Threshold Issues,[3] as defined in the Supplemental Scheduling Order.

Upon consent of all of the Counsel for the Identified Parties, or upon approval by the
Court after good cause shown, any party (a) may seek to amend or modify these agreed-upon
factual stipulations, or (b) may use documents, testimony or other evidence that is not
specifically referenced in these stipulations including documents produced after the date of these
stipulations. It should also be noted that while Counsel for the Identified Parties agreed to the
accuracy of the factual stipulations set forth below, in certain instances, they could not agree that
such factual stipulations are relevant and/or are admissible evidence for the Court's

---

[1]  As defined in the *Supplemental Scheduling Order Regarding (I) Motion Of General Motors LLC Pursuant To
11 U.S.C. §§ 105 And 363 To Enforce The Court's July 5, 2009 Sale Order And Injunction, (II) Objection Filed
By Certain Plaintiffs In Respect Thereto, And (III) Adversary Proceeding No. 14-01929*, which was entered by
the Court on July 11, 2014 ("**Supplemental Scheduling Order**").

[2]  Each of the Counsel for the Identified Parties reserves the right to rely on any of the stipulations of fact agreed
upon by Counsel for the Identified Parties in support of any of the Four Threshold Issues.

[3]  For the avoidance of doubt, the issue of whether a claim asserted in the Ignition Switch Actions is timely and/or
meritorious against the Old GM bankruptcy estate (and/or the GUC Trust) is not a Threshold Issue.

1

determination of the Four Threshold Issues. The parties have reserved their relevance and/or other evidentiary objections (including hearsay, privilege or other types of admissibility objections) to such factual stipulations. After a party understands how such factual stipulations will be asserted by another party in its pleadings and/or briefs relating to the Four Threshold Issues, it may ask the Court for an evidentiary ruling as to its admissibility prior to the oral argument on the Four Threshold Issues. Any party's failure to object to the use of such factual stipulations with respect to the Court's determination of the Four Threshold Issues shall not be deemed a waiver on relevance and/or other evidentiary objections (including hearsay, privilege or other types of admissibility objections) with respect to the use of such factual stipulations (including without limitation the documents or testimony which support such factual stipulations) for any other purpose in any proceeding before the Bankruptcy Court, the Court in MDL 2543, any other court or tribunal, or otherwise.

Counsel for the Identified Parties agree that each may refer to the following categories of documents and/or pleadings in connection with the Court's determination of the Four Threshold Issues. All such documents speak for themselves.

a. All pleadings, briefs, declarations, affidavits, orders, decisions, evidence admitted by the Bankruptcy Court, reports filed by the GUC Trust, and deposition and hearing transcripts in adversary proceedings or contested matters arising under, in, or related to the Old GM bankruptcy case, including without limitation, appeals of any decisions emanating from the Bankruptcy Court.

b. All filings with the Securities and Exchange Commission by Old GM, New GM and the GUC Trust.

c. All press releases issued by Old GM, New GM and the GUC Trust.

d. The GUC Trust Agreement, and any amendments thereto.

e. The complaints (and any amendments thereof) filed in the Ignition Switch Actions, and any pleadings filed with the United States District Court for the

2

Southern District of New York, 14-MD-2543 (JMF); 14-MC-2543 ("**MDL Court**").

f.      Information contained on Bloomberg Financial with respect to the share price and trading volume of the GUC Trust Units, New GM stock and warrants.

Counsel for the Identified Parties also agree on the following definitions[4] for each of their

Stipulations of Fact:

a.      "**Ignition Switch**" shall mean an ignition switch designed and/or sold by Old GM in the Subject Vehicles that may unintentionally move out of the "run" position, resulting in a partial loss of electrical power and turning off the engine. (Consent Order, In re TQ14-001, NHTSA Recall No. 14V-047 (Dep't of Transp., Nat'l Highway Safety Admin. Dated May 16, 2014 ("**Consent Order**") at 2, ¶¶5; Part 573 Defect Notice filed by New GM with the National Highway Traffic Safety Administration ("**NHTSA**"), dated February 7, 2014.).

b.      "**Subject Vehicles**" are (1) 2005-2007 Chevrolet Cobalt and Pontiac G5, 2003-2007 Saturn Ion, 2006-2007 Chevrolet HHR, 2005-2006 Pontiac Pursuit (Canada), 2006-2007 Pontiac Solstice and 2007 Saturn Sky vehicles; and (2) 2008-2010 Pontiac Solstice and G5; 2008-2010 Saturn Sky; 2008-2010 Chevrolet Cobalt; and 2008-2011 Chevrolet HHR vehicles -- certain of the vehicles in this second category may have been repaired using a defective Ignition Switch that had been sold to dealers or aftermarket wholesalers.    Statements about the Ignition Switch apply to the Subject Vehicles listed in the second category only to the extent that the Subject Vehicles were actually repaired using a defective Ignition Switch. (Part 573 Defect Notices filed by New GM with the NHTSA, dated February 7, 2014, February 24, 2014, and March 28, 2014, hereinafter "**Feb. 7 Notice**", "**Feb. 24 Notice**", and "**March 28 Notice**").

Attached to this document are (a) New GM's agreed-upon factual stipulations, and

disputed factual stipulations (Exhibit "A"), (b) Designated Counsel/Groman Plaintiffs agreed-

upon factual stipulations and Designated Counsel's disputed factual stipulations (Exhibit "B"),

(C) Groman Plaintiffs' disputed factual stipulations (Exhibit "C"), and (D) the GUC

Trust/Unitholders agreed-upon factual stipulations and disputed factual stipulations (Exhibit

"D").

---

[4]     The definitions in these stipulations of fact are agreed to for the sole purpose of the Four Threshold Issues identified by the Bankruptcy Court in its Supplemental Scheduling Order. Counsel for the Identified Parties do not stipulate to the definitions set forth in these stipulations for any other purpose in either the Bankruptcy Court, in MDL 2543, or otherwise.

Dated: New York, New York
August 8, 2014                    Respectfully submitted,

                    /s/ Arthur Steinberg
                    Arthur Steinberg
                    Scott Davidson
                    KING & SPALDING LLP
                    1185 Avenue of the Americas
                    New York, New York 10036
                    Telephone:  (212) 556-2100
                    Facsimile:  (212) 556-2222

                    -and-

                    Richard C. Godfrey, P.C. (admitted *pro hac vice*)
                    Andrew B. Bloomer, P.C. (admitted *pro hac vice*)
                    KIRKLAND & ELLIS LLP
                    300 North LaSalle
                    Chicago, IL 60654
                    Telephone: (312) 862-2000
                    Facsimile: (312) 862-2200

                    *Attorneys for General Motors LLC*

                    /s/ Edward S. Weisfelner
                    Edward S. Weisfelner
                    David J. Molton
                    Howard S. Steel
                    BROWN RUDNICK LLP
                    7 Times Square New York, New York 10036
                    Telephone: 212-209-4800

                    -and-

4

23414081v2

_/s/ Elihu Inselbuch_
Elihu Inselbuch
Peter Van N. Lockwood
CAPLIN & DRYSDALE, CHARTERED
600 Lexington Ave., 21st Fl.
New York, New York 10021
Telephone: 212-379-6000

-and-


_/s/ Sander L. Esserman_
Sander L. Esserman
STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA, A PROFESSIONAL CORPORATION
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Telephone: 214-969-4900

*Designated Counsel for Certain Plaintiffs*


_/s/ Jonathan L. Flaxer_
Jonathan L. Flaxer
S. Preston Ricardo
Michael S. Weinstein
GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
437 Madison Avenue
New York, New York 10022
Telephone: (212) 907-7300
Facsimile: (212) 754-0330

-and-

Alexander H. Schmidt, Esq.
Stacey Kelly Breen, Esq.
Malcolm T. Brown, Esq.
WOLF HALDENSTEIN ADLER FREEMAN
& HERZ LLP
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

*Counsel for the Groman Plaintiffs*

5

/s/ Lisa H. Rubin
Matthew J. Williams
Lisa H. Rubin
Keith Martorana
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

*Attorneys for Wilmington Trust Company*


/s/ Daniel Golden
AKIN GUMP STRAUSS HAUER & FELD LLP
Daniel Golden
Deborah J. Newman
Jamison Diehl
Naomi Moss
One Bryant Park, Bank of America Tower
New York, NY 10036-6745
Phone: (212) 872-8010
Facsimile: (212) 872-1002

*Attorneys for the Ad Hoc Group of Unitholders*

6

# Exhibit A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **MOTORS LIQUIDATION COMPANY,** *et al.*, | : | **Case No.: 09-50026 (REG)** |
| **f/k/a General Motors Corp.,** *et al.* | : | |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

---------------------------------------------------------------X

### GENERAL MOTORS LLC'S AGREED-UPON STIPULATIONS OF FACT IN CONNECTION WITH THE FOUR THRESHOLD ISSUES IDENTIFIED IN THIS COURT'S JULY 11, 2014 SUPPLEMENTAL SCHEDULING ORDER[1]

Pursuant to this Court's *Supplemental Scheduling Order, Dated July 11, 2014, Regarding (i) the Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction, (ii) the Objection Filed by Certain Plaintiffs in Respect Thereto, and (iii) Adversary Proceeding No. 14-01929* (the "**Supplemental Scheduling Order**"), General Motors LLC ("**New GM**"), hereby submits the following agreed-upon stipulations of fact concerning the Four Threshold Issues.

In addition, annexed hereto as Exhibit "1" are New GM's proposed stipulation of fact that have not been agreed to by the other Counsel for the Identified Parties, and annexed hereto as Exhibit "2" are New GM's responses to proposed stipulation of fact identified by other Counsel for the Identified Parties that have not been agreed to by New GM.

---

[1]    Unless otherwise indicated, capitalized terms not defined herein shall have the meanings ascribed to them in the Supplemental Scheduling Order (as defined herein).

1

## AGREED-UPON STIPULATIONS OF FACT

1.      In March 2009, the U.S. Government gave Old GM sixty days to submit a viable restructuring plan or, otherwise, Old GM would be forced to liquidate.

2.      On June 1, 2009 ("**Petition Date**"), General Motors Corporation ("**Old GM**") and three of its direct and indirect subsidiaries, Saturn, LLC, n/k/a MLCS, LLC ("**MLCS**"), Saturn Distribution Corporation, n/k/a MLCS Distribution Corporation ("**MLCS Distribution**"), and Chevrolet-Saturn of Harlem Inc., n/k/a MLC of Harlem, Inc. ("**MLCS Harlem**" and collectively with Old GM, MLCS, and MLCS Distribution, the "**Debtors**") commenced cases under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**" or "**Court**").

3.      Frederick Henderson, former CEO of Old GM, testified as follows: "The U.S. Treasury, in late December 2008, provided the necessary financing to temporarily sustain Old GM's operations. The U.S. Treasury, however, provided such financing on the express condition that Old GM develop a business plan that would fundamentally transform Old GM (operationally and financially) into a viable and profitable American OEM capable of meeting the competitive and environmental challenges of the 21st century. Thereafter, in March 2009, the U.S. Treasury indicated that, if Old GM was unable to complete an effective out-of-court restructuring, it should consider a new, more aggressive viability plan under an expedited Court-supervised process to avoid erosion of asset value. After exploring numerous options, including seeking potential sources of financing (both public and private) and strategic alliances, it became evident that, in light of the ongoing economic crisis, Old GM would not be able to achieve an effective out-of-court restructuring, and the only viable option was the 363 Transaction." *Affidavit of*

*Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2* ("**Henderson Affidavit**")
(Dkt. No. 21), ¶¶ 13-14.

4.      This Court found in its Sale Decision, "[a]t the time that the U.S. Treasury first
extended credit to GM, there was absolutely no other source of financing available. No party
other than Treasury conveyed its willingness to loan funds to [Old] GM and thereby enable it to
continue operating." *Decision on Debtors' Motion for Approval of (1) Sale of Assets to Vehicle
Acquisition Holdings LLC; (2) Assumption and Assignment of Related Executory Contracts; and
(3) Entry into UAW Retiree Settlement Agreement* ("**Sale Decision**") (Dkt. No. 2967) Sale
Decision, p. 8.

5.      In a prior proceeding related to Old GM's bankruptcy, the Court found that, "it
was the intent and structure of the 363 Sale, as agreed on by the [U.S. Treasury] and Old GM,
that the New GM would start business with as few legacy liabilities as possible, and that
presumptively, liabilities would be left behind and not assumed." *See In re Motors Liquidation
Co.*, 09-50026 REG, 2012 WL 1339496, at \*3 (Bankr. S.D.N.Y. Apr. 17, 2012) *aff'd*, 500 B.R.
333 (S.D.N.Y. 2013) ("**Castillo Decision**").

6.      This Court previously found in *Castillo* as follows:

Auto Task Force member Harry Wilson . . ., under cross-examination by objectors
to the 363 Sale, testified that "[o]ur thinking [as] a commercial buyer of the assets
that will constitute [New GM] was to assess what *[l]iabilities were commercially
necessary* for the success of [New GM]." He later said "we're focused on *which
assets and which liabilities we needed for the success of New GM.*" And again:
"We focused on which assets we wanted to buy and *which liabilities were
necessary for the* commercial success of New GM. In short, by the end of the 363
Sale hearing it was clear not only to Old GM and Treasury, but also to the Court
and to the public, that the goal of the 363 Sale was to pass on to Old GM's
purchaser—what thereafter became New GM—only those liabilities that were
commercially necessary to the success of New GM.

*See Castillo* Decision, at \*4.

7.    On the Petition Date, Old GM filed the Sale Motion with the Bankruptcy Court. *See* Sale Motion.[2]

8.    Vehicle Acquisition Holdings LLC (n/k/a New GM), the purchaser under the Sale Agreement,[3] was not the movant under the Sale Motion. *Id.*

9.    Vehicle Acquisition Holdings LLC was a United States Treasury-sponsored Delaware limited liability company formed on May 29, 2009. Sale Agreement, at 1.

10.    At the time the Sale Motion was filed, Old GM was in possession of all of its books and records.

11.    As of June 30, 2009, none of the Named Plaintiffs[4] in the Ignition Switch Actions had filed any court pleadings or otherwise commenced litigation (*i.e.*, asserting a claim or seeking a remedy based on economic loss, warranty, Lemon Law, *etc.*) against Old GM with respect to the defective Ignition Switch in a Subject Vehicle. Annexed hereto as Exhibit "3" is a list of all Named Plaintiffs known to New GM as of the date hereof.

12.    As of June 30, 2009, none of the Named Plaintiffs in the Ignition Switch Actions had commenced litigation against Vehicle Acquisition Holdings LLC with respect to their Subject Vehicles.

13.    AP Services, LLC ("**APS**") was retained by Old GM to provide interim management and restructuring services. *See Motion Of The Debtors Pursuant To 11 U.S.C. § 363*

---

[2]    The full title of the Sale Motion is *Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k), and (m), and 35 and Fed. R. Bankr. P. 2002, 6004, and 6006, to (I) Approve (A) the Sale Pursuant to the Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, a U.S. Treasury-Sponsored Purchaser, Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Other Relief; and (II) Schedule Sale Approval Hearing* ("**Sale Motion**") (Dkt. No. 92).

[3]    The full title of the Sale Agreement is *Amended and Restated Master Sale and Purchase Agreement By and Among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation and Chevrolet-Saturn of Harlem, Inc., as Sellers and NGMCO, Inc., as Purchaser* (as amended, "**Sale Agreement**") (Dkt. No. 2968-1).

[4]    "**Named Plaintiffs**" shall mean all of the plaintiffs named in the Ignition Switch Actions that are designated as a putative class representative or are listed as an individual plaintiff therein.

4

23406468v4

*For An Order Authorizing The Debtors To Employ And Retain AP Services, LLC As Crisis Managers And To Designate Albert A. Koch As Chief Restructuring Officer, Nunc Pro Tunc To The Petition Date, dated June 12, 2009* ("**APS Application**") (Dkt. No. 952).

14. The tasks assigned to APS by Old GM included overseeing "the administration of the Debtors' bankruptcy case, including compliance with bankruptcy court reporting requirements and the discharge of obligations of the Debtors pursuant to the Bankruptcy Code." *Id.* at 6.

15. Albert Koch, vice chairman and managing director of AlixPartners LLP in June 2009, testified as follows: "Other members of the AlixPartners' team have been involved in assisting with preparations for the 363 sale, developing operating plans to acquire select U.S. locations of Delphi, contract review protocol, identifying dealers whose contracts would be transitioned to wind down agreements. assisting with the mechanics of preparing for a bankruptcy filing, working with the Treasurer's office to improve cash forecasting and other tasks that assisted Company employees to prepare for and execute the restructuring." *Declaration of Albert Koch* ("**Koch Declaration**") (Dkt. No. 435), at 4.

16. Old GM's bankruptcy counsel (Weil Gotshal & Manges ("**WGM**")), was retained to, among other things, (i) "prepare on behalf of the Debtors, as debtors in possession, all necessary motions, applications, answers, orders, reports, and other papers in connection with the administration of the Debtors' estates," (ii) "take all necessary action in connection with the" Sale Motion, and (iii) "perform all other necessary legal services in connection with the prosecution of these chapter 11 cases." *See Application of the Debtors Pursuant to 11 U.S.C. §§ 327(a) and 328 (a) and Fed. R. Bankr. P. 2014(a) for Authority to Employ Weil, Gotshal &*

5

23406468v4

*Manges LLP as Attorneys for the Debtors, Nunc Pro Tunc to the Commencement Date*, dated June 12, 2009 ("**WGM Retention Application**") (Dkt. No. 949), ¶ 8.

17. Vehicle Acquisition Holdings LLC did not decide which parties would receive direct mail notice of the Sale Motion or how notice would be provided.

18. In 2009, Old GM had a contract with R. L. Polk and Company that allowed it to obtain, for vehicle recall notification purposes, vehicle owner name and address information.

19. Old GM requested of the Bankruptcy Court that direct mail notice of the Sale Motion and the relief requested therein be served on the categories of individuals and entities listed on Exhibit "4" annexed hereto. *See* Sale Procedures Order, ¶ 9.[5]

20. No direct mail notice of the Sale Motion and the relief requested therein was sent (a) to the Ignition Switch Plaintiffs in their capacity as owners of Subject Vehicles, or (b) as a general matter, to a category of "owners of Old GM vehicles".

21. There are owners of Old GM vehicles that did receive direct mail notice of the Sale Motion because they were in another category of entities who did receive direct mail notice of the Sale Motion (*i.e.*, as an equity security holder, contract counterparty, vendor, *etc.*), or someone may have otherwise given them the direct mail notice of the Sale Motion.

22. Old GM requested of the Bankruptcy Court, and the Bankruptcy Court approved, that notice of the relief requested in the Sale Motion be published, by June 5, 2009, or as soon as practicable thereafter (i) once in (a) the global edition of *The Wall Street Journal*, (b) the national edition of *The New York Times*, (c) the global edition of *The Financial Times*, (d) the national edition of *USA Today*, (e) *Detroit Free Press/Detroit News*, (f) *Le Journal de Montreal*, (g)

---

[5] The full title of the Sale Procedures Order is *Order Pursuant to 11 U.S.C. §§ 105, 363, and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006 (I) Approving Procedures for Sale of Debtors' Assets Pursuant to Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, a U.S. Treasury-Sponsored Purchaser; (II) Scheduling Bid Deadline and Sale Hearing Date; (III) Establishing Assumption and Assignment Procedures; and (IV) Fixing Notice Procedures and Approving Form of Notice* ("**Sale Procedures Order**") (Dkt. No. 274).

23406468v4

*Montreal Gazette*, (h) *The Globe and Mail*, and (i) *The National Post*, and (ii) on the website of the Debtors' proposed claims and noticing agent, The Garden City Group, Inc., at http://www.gmcourtdocs.com (the "**Publication Notice**"). *See* Sale Motion, at 25; Sale Procedures Order, at 8.

23.     The Publication Notice did occur on or before June 11, 2009 in each newspaper identified in the preceding paragraph. The Garden City Group posted the notice of the Sale Motion on its public website as required by the Sale Procedures Order. *See Certificate of Publication*, filed by The Garden City Group ("**Cert. of Publication**") (Dkt. No. 2757); Sale Procedures Order, at 8.

24.     The Sale Procedures Order was not appealed.

25.     Neither the direct mail notice nor the Publication Notice sent in connection with the Sale Motion discussed the Ignition Switch or most liabilities or potential liabilities of Old GM.

26.     Under the Sale Agreement, either Old GM or Vehicles Acquisition Holdings LLC, the purchaser sponsored by the U.S. Treasury, could terminate the Sale Agreement if certain deadlines were not met. Sale Agreement, § 8.1.

27.     Under the Sale Agreement, either the sellers or purchaser could terminate the Sale Agreement if the Bankruptcy Court did not enter an order approving the sale by July 10, 2009. Sale Agreement, § 8.1.

28.     No qualified party other than Vehicle Acquisition Holdings LLC sought to purchase the assets of Old GM. *See* Sale Decision, at 15, 39; Sale Order and Injunction, at 5.[6]

---

[6]     The full title of the Sale Order and Injunction is *Order (I) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement with NGMCO, Inc., a U.S. Treasury-Sponsored Purchaser; (II) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (III) Granting Related Relief* ("**Sale Order and Injunction**") (Dkt. No. 2968).

7

23406468v4

29.     The Court found in its Sale Decision and Sale Order and Injunction that, if the

Sale Agreement was terminated and the 363 Sale to Vehicle Acquisition Holdings LLC had not

taken place, Old GM would have liquidated its assets. *See* Sale Decision, at 23; Sale Order and

Injunction, at 5.

30.     The Court found in its Sale Decision and Sale Order and Injunction that, if the

Sale Agreement was terminated and the 363 Sale to Vehicle Acquisition Holdings LLC had not

taken place, Old GM would not have been able to continue in business. *See* Sale Order and

Injunction, at 5.

31.     Numerous objections and responses to the Sale Motion were filed with the

Bankruptcy Court. *See* Omnibus Reply.[7]

32.     Among the objections to the Sale Motion were objections filed by (i) The

Personal Injury Claimants[8] and entities and/or groups (as described in paragraph 36 below); (ii)

the Ad Hoc Committee of Consumer Victims; (iii) the States' Attorneys General; and (iv) the

Official Committee of Unsecured Creditors ("**Creditors Committee**").

33.     The Creditors Committee was comprised of 15 members, including workers,

suppliers, dealers, tort creditors, and other unsecured creditors of Old GM. *See Appointment of

Committee of Unsecured Creditors* ("**Appt. of Creditors Committee**") (Dkt. No. 356).

34.     The Creditors Committee is statutorily charged with representing the interests of

all unsecured creditors.

---

[7]     The full title of the Omnibus Reply is *Debtors to Objections to Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k), and (m) and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006, to Approve (A) the Sale Pursuant to the Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, A U.S. Treasury-Sponsored Purchaser, Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Other Relief* ("**Omnibus Reply**") (Dkt. No. 2645).

[8]     The Personal Injury Claimants were Callan Campbell, Kevin Junso, *et al.*, Edwin Agosto, Kevin Chadwick, *et al.*, and Joseph Berlingieri.

8

35.     Three of the Creditors Committee's members (Genoveva Bermudez, Mark Buttita, and Kevin Schoenl) were tort claimants or representatives of tort claimants. *See id.*; Creditors Committee, at 5.

36.     The following entities and/or groups, among others, filed an objection to the Sale Motion, and described themselves in their objection as follows:

a.      **The Center for Auto Safety** says that it is a non-profit consumer advocacy organization that, among other things, works for strong federal safety standards to protect drivers and passengers. The Center states that it was founded in 1970 to provide consumers a voice for auto safety and quality in Washington, DC, and to help "lemon" owners fight back across the country. The Center claims to advocate for auto safety before the Department of Transportation and in the courts.

b.      **Consumer Action** says that it is a national non-profit education and advocacy organization serving more than 9,000 community-based organizations with training, educational modules, and multi-lingual consumer publications since 1971. Consumer Action claims to serve consumers nationwide by advancing consumer rights in the fields of credit, banking, housing, privacy, insurance, and utilities.

c.      **Consumers for Auto Reliability and Safety ("CARS")** states that it is a national, award-winning non-profit auto safety and consumer advocacy organization dedicated to preventing motor vehicle-related fatalities, injuries, and economic losses. CARS claims to have worked to enact legislation to protect the public and successfully petitioned the National Highway Traffic Safety Administration for promulgation of regulations to improve protections for consumers.

d.      **National Association of Consumer Advocates ("NACA")** is a non-profit association of attorneys and advocates who claims that its primary focus is the protection and representation of consumers. NACA's stated mission is to promote justice for all consumers by maintaining a forum for communication, networking, and information sharing among consumer advocates across the country, particularly regarding legal issues, and by serving as a voice for its members and consumers in the ongoing struggle to curb unfair or abusive business practices that affect consumers.

e.      **Public Citizen**, a consumer advocacy organization, that claims to be nonpartisan. It is a non-profit group founded in 1971 with members

9

nationwide. Public Citizen claims to advocate before Congress, administrative agencies, and the courts for strong and effective health and safety regulation, and also claims to have a long history of advocacy on matters related to auto safety. In addition, through litigation and lobbying, Public Citizen states that it works to preserve consumers' access to state-law remedies for injuries caused by consumer products, such as state product liability laws.

*Objection to the Sale Motion filed by Personal Injury Claimants and Consumer Advocacy Groups* (Dkt. No. 2041), at 4-5.

37.     The Center for Auto Safety, Consumer Action, Consumers for Auto Reliability and Safety, National Association of Consumer Advocates, and Public Citizen claimed to be non-profit organizations that work to protect consumers, including consumers who would be affected by Old GM's bankruptcy case. *See id.* at 4.

38.     The Ad Hoc Committee of Consumer Victims claimed to represent more than 300 members who each had product liability tort claims involving personal injuries against Old GM. *See* Objection to the Sale Motion filed by the Ad Hoc Committee of Consumer Victims (Dkt. No. 1997), at 2.

39.     Counsel for the entities or groups identified in paragraph 36 above, the Ad Hoc Committee of Consumer Victims, the States' Attorneys General, and the Creditors Committee all appeared at and at least certain of them participated in the Sale Hearing. *See* Transcript of 363 Sale Hearing held on June 30, 2009; Transcript of 363 Sale Hearing held on July 1, 2009; Transcript of 363 Sale Hearing held on July 2, 2009.

40.     Arguments were raised in connection with the Sale Motion by, among others, the consumer advocacy groups, the Ad Hoc Committee of Consumer Victims, the States' Attorneys General and/or the Creditors Committee. *See* Objection to the Sale Motion filed by the Ad Hoc Committee of Consumer Victims; Objections to the Sale Motion filed by the States Attorneys

10

General (Dkt. No. 1928 and 2043); Objection to the Sale Motion filed by Personal Injury
Claimants and Consumer Advocacy Groups; Objection to the Sale Motion filed by the Official
Committee of Unsecured Creditors (Dkt. No. 2362).

41.     The States' Attorneys General raised arguments against the 363 Sale. *See*
Objections to the Sale Motion filed by the States Attorneys General, at 10-14.

42.     After the Petition Date, representatives of Old GM, the U.S. Treasury, the
Creditors Committee, and the States Attorneys General negotiated various provisions of the Sale
Agreement. As a result of these negotiations, Old GM and the U.S. Treasury agreed on certain
modifications to the Sale Agreement. As stated by counsel for the Attorneys General: "We have
worked very hard since the beginning of the case with debtors' counsel initially, with Treasury
counsel, almost everybody in this room at some point or another, it feels like. And I think a great
number of improvements have been made in this agreement over that time period. The first was
the assumption of the future product liability claims. Obviously, we -- you know, in a perfect
world, we would not be distinguishing between those two categories, but certainly that's better
than none of them. And it certainly goes a ways to addressing issues that were raised by the state
Attorney Generals." Sale Hearing Transcript, July 2, 2009, 194. Counsel for the Attorneys
General stated further: "We also wanted to be sure that lemon laws were covered under the
notion of warranty claims, but they did not specifically refer to state lemon laws, and that
coverage is being picked up." *Id.* at 196. This Court also found as follows: "Significantly also,
the AG concerns resulted in one change in the game plan—assumption of liabilities under
Lemon Laws—but no others, and the Lemon Laws change was made *expressly*." *Castillo
Decision*, at *13.

23406468v4

43.     This Court further found that, around this same time, "[t]he AGs urged in argument before the Court that New GM take on liabilities broader than those that would be undertaken under the Sale Agreement as initially proposed—including implied warranties, additional express warranties, statutory warranties, and obligations under Lemon Laws." *Castillo* Decision, at *5. The U.S. Treasury and Old GM declined to amend the Sale Agreement to assume these types of liabilities (except for Lemon Laws, as defined the Sale Agreement). *See id.*

44.     The Personal Injury Claimants and the consumer advocacy groups argued at the 363 Sale hearing, *inter alia*, that New GM should assume broader warranty-related claims and that New GM should not be shielded from successor liability claims. *See* Transcript of 363 Sale Hearing held on July 1, 2009, at 295-324.

45.     The Ad Hoc Committee of Consumer Victims objected to the 363 Sale, arguing, among other things, that, "knowing that it is seeking an order which would eliminate tort claims, GM has continued to advertise and sell GM vehicles without advising unwitting consumers that it is seeking to bar future claims for injuries arising from defects in vehicles sold before the closing." *See* Objection to the Sale Motion filed by the Ad Hoc Committee of Consumer Victims, at ¶ 38.

46.     In another objection, it was argued: "GM's attempt to enjoin successor liability claims against the Purchaser must be denied because it violates applicable law, notice, and due process requirements." Objection to the Sale Motion filed by Personal Injury Claimants and Consumer Advocacy Groups, ¶ 18; *see also id.* ("A sale of GM's assets 'free and clear' of future tort and product liability claims violates due process because people who have not yet suffered injury from defects in GM vehicles do not know that they will be injured in the future cannot be

12

given meaningful notice of that their rights are being adjudicated or a meaningful opportunity to be heard.").

47.     Representatives from the U.S. Treasury declined to make further changes to the Sale Agreement with respect to Assumed Liabilities and Retained Liabilities (as such terms are defined in the Sale Agreement). *See Castillo Decision*, *5-7.

48.     The hearing on the Sale Motion took place before the Bankruptcy Court on June 30, 2009, July 1, 2009 and July 2, 2009.

49.     Old GM presented evidence to the Court in connection with the hearing on the Sale Motion.

50.     According to the Court's Sale Decision, if Old GM liquidated its assets in 2009, unsecured creditors would have received nothing from the Old GM bankruptcy estate. *See* Sale Decision, at 3.

51.     As of March 31, 2009, Old GM had consolidated reported global assets and liabilities of approximately $82,290,000,000 and $172,810,000,000, respectively. *See* Henderson Affidavit, ¶ 101; Sale Decision, at 5.

52.     According to the Court's Sale Decision, as of the Petition Date, if Old GM liquidated its assets, its liquidation asset value would be less than 10% of $82 billion. Sale Decision, at 5.

53.     According to the Court's Sale Decision, the consideration transferred by New GM to Old GM under the Sale Agreement as of the closing date of the 363 Sale was estimated to be worth not less than $45 billion, plus the value of equity interests in New GM. Sale Decision, at 18.

23406468v4

54.     No specific contingent liabilities were identified in the Sale Motion or in any trial exhibits used during the Sale Hearing. *See generally* Sale Motion; Transcript of 363 Sale Hearing held on June 30, 2009; Transcript of 363 Sale Hearing held on July 1, 2009; Transcript of 363 Sale Hearing held on July 2, 2009.

55.     Objectors to the 363 Sale presented evidence at the Sale Hearing that the book value of certain contingent liabilities was approximately $934 million. *See* Sale Decision, at 21; Transcript of Sale Hearing, June 30, 2009, at 157-159.

56.     On July 10, 2009, each of the Debtors consummated a sale of substantially all of its assets in a transaction under Section 363 of the Bankruptcy Code (the "**363 Sale**") to an acquisition vehicle, NGMCO, Inc. (as successor in interest to Vehicle Acquisition Holdings LLC), pursuant to the Sale Agreement, and (ii) the Sale Order and Injunction. Following the 363 Sale, Old GM changed its name to Motors Liquidation Company ("**MLC**") and the acquisition vehicle later became New GM.

57.     The New GM Common Stock and both series of New GM Warrants (collectively, the "New GM Securities") are currently listed on the New York Stock Exchange.

58.     New GM and the Debtors further agreed that New GM would provide additional consideration if the aggregate amount of allowed general unsecured claims against the Debtors exceed $35 billion. (*See* Sale Agreement, § 3.2(c)). In that event, New GM will be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries. (*See id.*). The number of additional shares of New GM Common Stock to be issued will be equal to the number of such shares, rounded up to the next whole share, calculated by multiplying (i) 30 million shares (adjusted to take into account any stock dividend, stock split, combination of shares, recapitalization, merger, consolidation, reorganization or similar

14

transaction with respect to such New GM Common Stock from and after the closing of the 363

Sale and before issuance of additional shares) and (ii) a fraction, (A) the numerator of which is

the amount by which allowed general unsecured claims exceed $35 billion (such excess amount

being capped at $7 billion) and (B) the denominator of which is $7 billion."[9]  (*See* Motors

Liquidation Company GUC Trust Quarterly GUC Trust Reports as of September 30, 2013 at 6).

59.     At the time the 363 Sale was approved, Old GM had not filed its schedules of

assets and liabilities with the Court.

60.     At the time the 363 Sale was approved, there was no deadline or bar date for

general unsecured creditors to file proofs of claim.

61.     The Plaintiffs in the Ignition Switch Actions are not parties under the Sale

Agreement.

62.     The Personal Injury Claimants objected to and appealed the Sale Order and

Injunction. *See Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 428 B.R. 43

(S.D.N.Y. 2010) (Buchwald, J.).

63.     The Sale Order and Injunction was upheld on appeal by two different District

Court Judges.  *See id.*; *Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 430

B.R. 65 (S.D.N.Y. 2010) (Sweet, J.).

64.     While the appellants in *Campbell* originally sought to appeal the Sale Order and

Injunction to the Court of Appeals for the Second Circuit, that appeal was subsequently

withdrawn by the parties to the appeal pursuant to a stipulation so-ordered on September 23,

---

9   *See* Second Amendment to Sale Agreement, Section 2(r) (amending Section 3.2(c) of the Sale Agreement)
    ("Sellers may, at any time, seek an Order of the Bankruptcy Court ... estimating the aggregate allowed general
    unsecured claims against Sellers' estates ... [and if] the Bankruptcy Court makes a finding that the estimated
    allowed general unsecured claims against Sellers' estates exceed $35,000,000,000, then Purchaser will ... issue
    additional shares of Common Stock ...."). While the Sale Agreement initially provided for the issuance of up
    to 10,000,000 additional shares, this number has subsequently been adjusted for the three-for-one split of New
    GM Common Stock. (*See* Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan, at 16-17 n.2
    (Dkt. No. 8023).

23406468v4

2010. In addition, while the appellant in *Parker* originally sought to appeal the Sale Order and Injunction to the Court of Appeals for the Second Circuit, that appeal was subsequently dismissed by the Court of Appeals for the Second Circuit on July 28, 2011 on equitable mootness grounds for appellant's failure to seek a stay of the Sale Order and Injunction. *See Parker v. Motors Liquidation Company*, Case No. 10-4882-bk (2d Cir. July 28, 2011). There were no further appeals of the Sale Order and Injunction.

65.    On December 15, 2011 (the "Dissolution Date"), as required by the Plan, MLC filed its certificate of dissolution. (*See* Form 10-K Annual Report for Motors Liquidation Company GUC Trust for the Fiscal Year Ended March 31, 2014, filed May 22, 2014 ("GUC Trust 2014 Form 10-K") at 3). Pursuant to an *Assignment and Assumption Agreement (GUC Trust)*, dated that same day, Old GM assigned to the GUC Trust certain assets and agreements, and the GUC Trust assumed certain obligations of Old GM. *See* Assignment and Assumption Agreement (GUC Trust), § 1.

66.    All of the Ignition Switch Actions include vehicles and/or parts designed and manufactured by Old GM.

67.    None of the Ignition Switch Actions seek repairs of Old GM vehicles under the Glove Box Warranty.

68.    None of the claims asserted in the Ignition Switch Actions constitute claims under Lemon Laws as defined by the Sale Agreement (as contrasted with state law definitions of lemon laws).

23406468v4

# Exhibit 1

## EXHIBIT "1"

### NEW GM'S PROPOSED STIPULATIONS OF FACT NOT
### AGREED TO BY OTHER COUNSEL FOR THE IDENTIFIED PARTIES

1. On the Petition Date, Old GM's general ledger, and other corporate books and records listing Old GM's liabilities, did not list any Plaintiffs in the Ignition Switch Actions as having a claim or liability owed to them by Old GM relating to the defective Ignition Switches in the Subject Vehicles.

2. New GM did not sell a vehicle with a defective Ignition Switch, nor did it sell defective Ignition Switches to be used as repair parts.

3. After the expiration of the Bar Date established by the Bankruptcy Court for general unsecured creditors to file claims against the Debtors (*i.e.*, November 30, 2009), certain claimants filed late proofs of claim in the Debtors' bankruptcy case, and some of those claims became allowed claims against the Debtors.

4. As of June 30, 2009, none of the Named Plaintiffs in the Ignition Switch Actions had filed any court pleadings or otherwise commenced litigation (*i.e.*, asserting a claim or seeking a remedy based on economic loss, warranty, Lemon Law, *etc.*) against Old GM with respect to their Subject Vehicle.

5. In 2009, approximately 75 million Old GM vehicles were in use in the United States.

6. Old GM's noticing agent, the Garden City Group ("GCG"), provided direct mail notice of the 363 Sale to approximately 4 million persons and entities in June 2009. See Certificate of Service, filed by The Garden City Group ("Sale Motion Notice") (Dkt. No. 973).

17

# Exhibit 2

## EXHIBIT "2"

## NEW GM'S RESPONSES TO PROPOSED STIPULATIONS
## OF FACT BY OTHER COUNSEL FOR THE IDENTIFIED
## PARTIES NOT AGREED TO BY NEW GM

A.   **New GM's Responses to Designated Counsel's**
     **Proposed Facts To Which New GM Does Not Stipulate**

1.      On November 19, 2004, Old GM personnel opened a Problem Resolution
Tracking System report to address a complaint at a press event that a Subject Vehicle could be
"keyed off with knee while driving. This was the first of six reports opened between 2004 and
2009 in connection with moving stalls in the Cobalt." (V.R. at 63). As part of the November 19,
2004 Problem Resolution Tracking System investigation, Old GM engineers suggested solutions
to address the complaint that the ignition could be "keyed off with knee while driving," and
presented them to the Current Production Improvement Team. (V.R. at 64-68).

> **NEW GM RESPONSE**: The Stipulation is incomplete. The Valukas Report
> also says: "As a critical decision point, the problem described in the November
> 19, 2004 PRTS was assigned a severity level of 3 - on a scale of 1 (most severe)
> to 4 (least severe)." (V.R. at 63). The Valukas Report describes the severity
> levels as follows: "After identifying the issue, the originator of a PRTS selects a
> severity level for the problem. The severity level is a significant factor in the
> priority given to a PRTS report, with more severe issues addressed more urgently.
> The originator selects the severity level from a drop-down menu that includes
> brief descriptions of four options, which, during the relevant time period, were:
>
> Code 1: Possibly Safety / Regulatory Issues / Walk Home / No Build
>
> Code 2: Major Issues- an issue that would cause the customer to immediately
> return the vehicle to the dealership or cause excessive cost or labor impact at the
> assembly plant
>
> Code 3: Moderate Issues - fix on the next trip to dealership or cause moderate cost
> or labor impact at the assembly plant
>
> Code 4: Annoyance / Continuous Improvement" (V.R. at 41-42).

2.      As Old GM's Program Engineering Manager for the Chevrolet Cobalt
when it was launched, Gary Altman would have been present at Current Production
Improvement Team and Vehicle and Process Integration Review meetings in which
possible solutions were presented to address reports that drivers had inadvertently turned
off the ignition switch in Cobalt vehicles by hitting their knees against the key or key fob.
(V.R. at 63-67).

18

**NEW GM RESPONSE**: This is not a fact and is speculation. It is also not supported by the Valukas Report. The Report does not state that Gary Altman attended or possibly attended meetings.

3.    A May 2007 case evaluation, by Old GM's outside counsel, of an accident in a 2004 Saturn Ion in which the airbag failed to deploy despite the fact that the vehicle went off the road, traveled through a brush line and struck a tree head on, resulting in one fatality and one severe injury, was deemed "unusual." "In discussing the technical issues in the case, outside counsel explained that, given the severity of the impact, the airbag non-deployment 'must be' attributable to power loss." (V.R. at 124-125).

   **NEW GM RESPONSE**: The reference in the response which relates to what "outside counsel explained" should not have been cited because of the attorney client/work-product privileges.

4.    A January 2008 second evaluation by Old GM outside counsel of a non-deployment case involving a Subject Vehicle hitting a tree concluded that "[t]he impact with the tree was clearly severe enough to warrant deployment of the vehicle's airbags. As a result, from a technical standpoint, there is a potential problem with the non-deployment, which was originally attributed to a pre-collision power loss." While outside counsel and Old GM Field Performance Assessment Engineer Manuel Peace thought the non-deployment event was not caused by a power loss, outside counsel concluded that "it was likely 'that a jury will find that the vehicle was defective' [and] GM eventually settled the case in 2008." (V.R. at 129-30).

   **NEW GM RESPONSE**: The reference in the response which relates to what "outside counsel concluded" should not have been cited because of the attorney client/work-product privileges. The stipulation is also incomplete. The Valukas Report also states:    "After further analysis of the accident sequence and information in the SDM download it appears that the non-deployment was not caused by a power loss but by some error in the SDM which caused it to misinterpret this significant crash as a non-deployment event." (V.R. at 129-30).

5.    In March 2009, Old GM CEO Rick Wagoner had a "back-up" slide of a slide deck that included a reference to the Cobalt's inadvertent shut-off issue, that was presented at a meeting of the Vehicle Program Review team.    That slide, in a 72-page slide presentation, described a proposed change in the Cobalt's key design from a slot to a hole. The slide deck was found in the data collected from Wagoner's computer from March 2009. (V.R. at 245).

   **NEW GM RESPONSE**: The Stipulation is incomplete. The Valukas Report goes on to state as follows: "The back-up slide focused solely on warranty cost reduction and did not characterize the matter as a safety issue or mention airbag non-deployment, accidents or fatalities.    Wagoner does not recollect reviewing any part of the slide deck." (V.R. at 245). After going through the background of the slide deck and investigating whether

19

Wagoner was informed of its contents, the Valukas Report states as follows: "There is no forensic evidence that Wagoner reviewed any specific slide within the presentation. As noted, Wagoner does not recollect viewing the presentation or the back-up slides; about three weeks later, on March 29, 2009, Wagoner agreed to resign as CEO at the request of the U.S. government's Auto Task Force. Contemporaneous e-mails he exchanged with the person who provided the summary notes of the meeting do not mention the Cobalt issue or any other specific topic." (V.R. at 247).

6.    In furtherance of Old GM's admitted culture of avoiding responsibility, an Old GM 2008 Q1 Interior Technical Learning Symposium presentation provided examples of comments and phrases employees should avoid using in reports:

i.    "This is a lawsuit waiting to happen . . ." ; "unbelievable engineering screw up . . . "; "this is a safety and security issue . . ."; "scary for the customer . . . "; "kids and wife panicking over the situation . . . "; "i believe the wheels are too soft and weak and could cause serious problems. . ."; "dangerous . . . Almost cause accident."

ii.    The Old GM Symposium presentation also stated that documents used for reports and presentations should only concern engineering results, facts, and judgments. Some examples of words or phrases that are to be avoided are: *always* (emphasis in original), annihilate, apocalyptic, bad, Band- Aid, big time, brakes like an "X" car, cataclysmic, catastrophic, Challenger, chaotic, Cobain, condemns, Corvair-like, crippling, critical, dangerous, deathtrap, debilitating, decapitating, *defect* (emphasis in original), defective, detonate, disemboweling, enfeebling, evil, eviscerated, explode, failed, failure, flawed, genocide, ghastly, grenadelike, grisly, gruesome, Hindenburg, Hobbling, Horrific, impaling, inferno, Kevorkianesque, lacerating, life –threatening, maiming, malicious, mangling, maniacal, mutilating, *never* (emphasis in original), potentially-disfiguring, powder keg, problem, rolling sarcophagus (tomb or coffin), safety, safety related, serious, spontaneous combustion, startling, suffocating, suicidal, terrifying, Titanic, tomblike, unstable, widow-maker, words or phrases with biblical connotation, you're toast.

**NEW GM RESPONSE:** This is an exhibit to the NHTSA Consent Order. The Stipulation is incomplete. The presentation also states:

"In a corporation the size of GM, writing is in many cases the only way to communicate globally because of time changes, number of people involved, etc.

• Write "smart."

-Be factual, not fantastic, in your writing.

• When identifying product risks, make sure they are addressed and closed out.

• Our writing must always be based only on fact, without judgmental adjectives and speculation.

• Understand that there really aren't any secrets in this company.

- For anything you say or do, ask yourself how you would react if it was reported in a major newspaper or on television.

• Don't be cute or clever.

-The words you choose could be taken out of context to

suggest you meant something much worse than what was intended.

-This may be especially easy to do in an e-mail, when there might be a temptation to use a casual tone to describe a potentially serious safety risk."

In addition, the lead in to the list set forth in (i) is: "Examples of comments that do not help identify and solve problems."

Also, the lead in to (ii) is as follows: "Documents used for reports and presentations should contain only engineering results, facts, and judgments. These documents should not contain speculations, opinions, vague non descriptive words, or words with emotional connotations. Some examples of words or phrases that are to be avoided are . . . ."

The Valukas Report also states: "Leadership at GM has tried to counter this culture with clear messages that employees should raise issues. 'Winning With Integrity' (the code of conduct) instructs employees to raise problems (although it does not explicitly reference vehicle safety) and ensure they receive proper attention, and to conduct themselves with the highest ethical standards." (V.R. at 255). The Valukas Report goes on to state that the author of the presentation used the phrases and words "as an attempt at humor," and that "[t]he employee who presented the training was later told by a lawyer who saw a version of this training to remove the slide listing words never to be used." (V.R. at 254 and n. 1156).

7. "In addition to being trained on how to write, a number of GM employees reported that they did not take notes at all critical safety meetings because they believed GM lawyers did not want such notes taken." (V.R. at 254).

**NEW GM RESPONSE:** The Stipulation is incomplete. The Valukas Report also states: "No witness was able to identify a lawyer who gave such an instruction, no lawyer

21

reported having given such an instruction, and we have found no documents ore-mails reflecting such an instruction."

## B.    New GM's Responses to Groman Plaintiffs' Proposed Facts To Which New GM Does Not Stipulate[10]

1.    During his employment, William Kemp reported to the General Counsel of GM North America. (V.R. at 104).

**NEW GM RESPONSE:** This assertion is vague. The Valukas Report discusses this person's role at the time the Report was written, and not for the entire time during the person's career as the stipulation suggests.

2.    During his employment, Larry Buonomo reported to the General Counsel of GM North America. (V.R. at 104).

**NEW GM RESPONSE:** This assertion is vague. The Valukas Report discusses this person's role at the time the Report was written, and not for the entire time during the person's career as the stipulation suggests.

3.    When the ignition switch is turned to Accessory or Off, a Subject Vehicle would lose power brakes. (V.R. at 25).

**NEW GM RESPONSE:** The loss of power brakes under these circumstances would not happen immediately. This is a matter of engineering and has been confirmed by New GM engineers.

4.    In 2003, Old GM became aware of Saturn customer complaints about intermittent engine stalls while driving. (V.R. at 54).

**NEW GM RESPONSE:** This assertion is incomplete. The Valukas Report goes on to state: "Witnesses recalled that the vast majority of claims concerning the Ion involved

---

[10]  In the evening on Thursday, August 7, 2014 – the night before the agreed upon stipulations of fact were due to be delivered to the Court and hours after New GM received a list of proposed stipulations of fact not agreed to and which New GM herein responds, the Groman Plaintiffs sent the other Counsel for the Identified Parties (including New GM) an additional 87 proposed stipulations of fact that have not been agreed to. Until that time, New GM believed that all of the other Counsel for the Identified Parties (including the Groman Plaintiffs) had already delivered their disputed stipulations of fact. New GM has not had an appropriate opportunity to respond to the Groman Plaintiffs' new list of disputed stipulated facts.

complaints of 'no crank/no start' problems, which arose from electrical, rather than mechanical, problems with the Ignition Switch." (V.R. at 54).

5.      In October 2003, a Field Performance Report, 3101/2003/US, lists 65 Ion stalls and states: "Customers comment of intermittent stall while driving. In most cases, there are no trouble codes associated with the stall. " This Field Performance Report lists a vehicle with 15 miles as the youngest vehicle affected. (V.R. at 54-55).

> **NEW GM RESPONSE:** This assertion is incomplete. Some of the stalls were due to "heavy key chains." (V.R. at 54). In addition, the October 2003 Field Performance Report "was canceled in January 2004 for the purported reason that a different report already resolved the issue." (V.R. at 55)

6.      Before 2008, a handful of Old GM engineers other than Raymond DeGiorgio also received information describing the change to the Ignition Switch for the model year 2008 Chevrolet Cobalt, including four engineers who received a June 30, 2006 email from Delphi to DeGiorgio stating that the detent plunger had been changed "to increase torque forces to be within specification." (V.R. 102).

> **NEW GM RESPONSE:** This assertion is incomplete. The Valukas Report goes on to states that these engineers were "in other departments" and "were not involved in the investigations that ensued in the coming years, nor did they hold a position, like DeGiorgio's, with responsibility for the Ignition Switch." (V.R. at 102 n.417).

7.      When first told of the Ignition Switch Defect in or about March 2005, Steven Oakley formed the view that the Ignition Switch Defect was a safety issue. (V.R. at 76).

> **NEW GM RESPONSE:** This assertion is unsupported. The Valukas Report goes on to state that "Gary Altman, the PEM for the Cobalt program team, and other engineers told him [Oakley] it was not ( safety issue), and he deferred to them. (V.R. at 76). This portion of the Valukas Report discusses Oakley's review of an event wherein the driver's knee contacted the key fob. The problem did not occur when the fob was removed from the key. Oakley assigned the incident with the lowest rating (4) "annoyance or continuous improvement." (V.R. at 76).

8.      In or about November 15, 2004, one individual was killed and another was severely injured in a crash involving a 2004 Saturn Ion where the airbags did not deploy. (V.R. at 124). Manuel Peace, an Old GM engineer who assisted Old GM's legal department in evaluating cases, did a case evaluation for this incident. (V.R. 124). In his case evaluation, Peace stated he had never seen a situation like this where the airbags did not deploy, and that the best explanation for why the airbags did not deploy was that the vehicle lost power. (V.R. at 125)

23

**NEW GM RESPONSE:** This assertion is incomplete. The Valukas Report notes that neither individual was wearing their seatbelts at the time of the accident. In addition, the Report states that "Peace , however, had not determined precisely how the vehicle lost power…. Peace does not recall the case or what he did to investigate it." (V.R. at 125).

9.      At some point between 2007 and the commencement of Old GM's bankruptcy case, John Sprague and the Field Performance Assessment team observed a pattern of airbag non-deployments in Cobalts and Ions. (V.R. at 9, 118-19, 134).

**NEW GM RESPONSE:** This assertion is unsupported. The Valukas Report does not say that John Sprague or anyone else noticed a "pattern of airbag non-deployments," but instead that the FPA team in 2009 " had not realized that the observed pattern of non-deployments could have been caused by a change in power mode signal that disabled airbag sensors." (V.R. at 134-135).

10.     At the time John Sprague and Brian Everest met with Continental, Sprague and Everest knew that the rotation of the ignition switch from Run to Accessory or Off could cause the Sensing and Diagnostic Module to receive a power mode message of Accessory or Off. (V.R. at 135).

**NEW GM RESPONSE:** This assertion is unsupported. The Valukas Report does not state that Sprague and Everest knew. (V.R. at 135).

11.     At or about the time of the meeting with Continental in May 2009, Brian Everest and John Sprague had spoken with members of Old GM's Product Investigations group about the non-deployment of airbags in Cobalts. (V.R. at 135).

**NEW GM RESPONSE:** This assertion is unsupported and incomplete. The Valukas Report states that: "Before receiving the Continental report, Everest and Sprague explained, the FPA team had not realized that the observed pattern of Cobalt non-deployments could have been caused by a change of power mode signal that disabled airbag sensors." It goes on to state that Sprague gathered further information, and the engineers first focused their attention on the vehicles electric system. It was in this context that Sprague and Everest spoke to the engineering team about the non-deployment issue.

24

12.    Joseph Taylor, an Old GM Program Quality Manager who administered the Captured Test Fleet program for the Chevrolet Cobalt drove a 2005 Cobalt test vehicle and personally experienced moving stalls with the Cobalt. (V.R. at 58).

**NEW GM RESPONSE:** This assertion is incomplete. The Valukas Report goes on to state that Taylor did not recall any Capture Test Fleet ("CTF") "reports of Ignition Switch or stalling issues for the Cobalt, either during the initial 2004 CTF or in subsequent model years." (V.R. at 58.) It further states that Taylor did not report the stalling instances in his CTF Reports "because he did not regard them as significant." "Taylor, like many other GM engineers, did not regard stalling as a safety issue." (V.R. at 59).

25

# Exhibit 3

# IN RE NEW GM VIS LITIGATION
## EXHIBIT 3 - 358 NAMED PLAINTIFFS KNOWN TO NEW GM

| CASE | NUMBER | COURT | PLAINTIFF |
|------|--------|-------|-----------|
| Arnold et al. v. General Motors LLC et al. | 1:14-cv-05325-JMF | USDC SDNY | Arnold, Phillip R. |
| Arnold et al. v. General Motors LLC et al. | 1:14-cv-05325-JMF | USDC SDNY | Painter, Patrick C. |
| Ashbridge v. General Motors LLC et al. | 1:14-cv-04781-JMF | USDC SDNY | Ashbridge, Amy |
| Ashworth et al. v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Booher, Lynda |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Ashworth, Dianne |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Moore, Karen |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Dean, David |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | De Atley, Sandra |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Glantz, Paul |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Roads, Cathy |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Serpa, Moraima |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Anderson, Steven |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Witmer, Matthew |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Willis, Joanna |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Weingarten, Marsha |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Webster, Aaron |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Wallace, Jamie |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Walker, Maple |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Vanevery, Julie |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Ulrich, Natahsa |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Tucker, Kristen |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Trickey, Debby |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Thompson, Amanda |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Switzer, Stephen |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Sussell, Kathy |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Suman, Joseph |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Stovall, AJ |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Stevens, Geraldine |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Stephans, Lori |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Snover, Ann |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Smith, Karla |

DMSLIBRARY01:23416963.1

## IN RE NEW GM VIS LITIGATION
### EXHIBIT 3 - 358 NAMED PLAINTIFFS KNOWN TO NEW GM

| CASE | NUMBER | COURT | PLAINTIFF |
|---|---|---|---|
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Skinner, Tracy |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Shorter, Karissa |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Scott, Ladena |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Schneider, Donna |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Rolling, Gregory |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Rice, Randall |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Quinn, Juanita |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Pope, Ledell |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Pinon, Jessica |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Pereira-Lopez, Migdalia |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Palsmeier, Lawrence |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Oswald, Frank |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Onyeador. Misty |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Morgan, Chris |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Moore, Robert |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Milton, Bonnie |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Miller, Brian |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Miles, Leslie |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | McMath. Dionne |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Matamoros, David |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Macon, Sharon |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Lynn, Kari |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Lein, Dina |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Lee, Theresa |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Lech, Donna |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Kidd, Amy |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Kennedy, Jamie |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Joseph, Jean |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Jones, Lakeisha |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Jackson, Gloria |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Jackson, Cheryl |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Ingram, Christine |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Humphries, Emily |

DMSLIBRARY01:23416963.1

# IN RE NEW GM VIS LITIGATION
## EXHIBIT 3 - 358 NAMED PLAINTIFFS KNOWN TO NEW GM

| CASE | NUMBER | COURT | PLAINTIFF |
|------|--------|-------|-----------|
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Howell, Simmion |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Honeywood, Cecilia |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Foster, Deloris |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Bryant, Virginia |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Frankhouser, Deena |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Fuller, Kara |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Averhart, Balisha |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Caratozzolo, James |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Gallo, Salvatore |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Gretch, Nicholas |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Collins, Sonja |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Gums, Elridge |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Hendrickson, Jamie |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Cooper, Robert |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Batchelor, Cheree |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Covert, Daniel |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Hernandez, Christina |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Higgins, Jillian |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Crosby, Christina |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Hite, Kenneth |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Battee, Percy |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Dean, Allicia |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Dodge, Scott |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Downing, David |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Beardsley, Everett |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Dutton, Brandi |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Feehley, William |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Bellomy, Karen |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Follmer, Janice |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Birney, Neddie |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Black, Ellis |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Black, Tahnea |
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Bowman, Vanessa |

3

# IN RE NEW GM VIS LITIGATION
## EXHIBIT 3 - 358 NAMED PLAINTIFFS KNOWN TO NEW GM

| CASE | NUMBER | COURT | PLAINTIFF |
|---|---|---|---|
| Ashworth v. General Motors LLC | 1:14-cv-04804-JMF | USDC SDNY | Bryant, Pamela |
| Balls et al v. General Motors LLC | 1:14-cv-04691-JMF | USDC SDNY | Balls, Jeffery |
| Balls et al. v. General Motors LLC | 1:14-cv-04691-JMF | USDC SDNY | Balls, Tammie |
| Bedford Auto Wholesale Inc. v. General Motors LLC | 1:14-cv-05356-JMF | USDC SDNY | Bedford Auto Wholsale Inc |
| Bender v. General Motors LLC | 1:14-cv-04768-JMF | USDC SDNY | Bender, Larry |
| Benton v. General Motors LLC | 1:14-cv-04268-JMF | USDC SDNY | Benton, Sylvia |
| Biggs v. General Motors LLC et al. | 1:14-cv-05358-JMF | USDC SDNY | Biggs, Lorie |
| Brandt v. General Motors LLC | 1:14-cv-04340-JMF | USDC SDNY | Brandt, Daryl |
| Brandt v. General Motors LLC | 1:14-cv-04340-JMF | USDC SDNY | Brandt, Maria |
| Brown v. General Motors LLC | 1:14-cv-04715-JMF | USDC SDNY | Brown, Kimberly |
| Brown v. General Motors LLC | 1:14-cv-04715-JMF | USDC SDNY | Shipley, Dan |
| Burton v. General Motors LLC et al. | 1:14-cv-04771-JMF | USDC SDNY | Burton, Deneise |
| Camlan v. General Motors LLC | 1:14-cv-04741-JMF | USDC SDNY | Camlan, Inc. |
| Camlan v. General Motors LLC | 1:14-cv-04741-JMF | USDC SDNY | Marquez, Salvador R. |
| Camlan v. General Motors LLC | 1:14-cv-04741-JMF | USDC SDNY | Pina, Randall |
| Camlan v. General Motors LLC | 1:14-cv-04741-JMF | USDC SDNY | Books, Amalia |
| Childre v. General Motors LLC et al. | 1:14-cv-05332-JMF | USDC SDNY | Childre, Brittany |
| Coleman v. General Motors LLC | 1:14-cv-04731-JMF | USDC SDNY | Coleman, Jomaka |
| Corbett et al. v. General Motors LLC | 1:14-cv-05754-JMF | USDC SDNY | Corbett, Diana |
| Corbett et al. v. General Motors LLC | 1:14-cv-05754-JMF | USDC SDNY | Barnes, Gertrude |
| Corbett et al. v. General Motors LLC; | 1:14-cv-05754-JMF | USDC SDNY | Barnes, Michael |
| Cox v. General Mottors LLC | 1:14-cv-04701-JMF | USDC SDNY | Cox, Ronald |
| Darby v. General Motors LLC | 1:14-cv-04692-JMF | USDC SDNY | Darby, Larry |
| Deighan v. General Motors LLC et al. | 1:14-cv-04858-JMF | USDC SDNY | Deighan, Kathleen |
| Deluco v. General Motors LLC | 1:14-cv-02713-JMF | USDC SDNY | Deluco, Robin |
| DePalma et al v. General Motors LLC et al. | 1:14-cv-05501-JMF | USDC SDNY | McCann, Bob |
| DePalma et al v. General Motors LLC et al. | 1:14-cv-05501-JMF | USDC SDNY | McCann, Dorothy |
| DePalma et al v. General Motors LLC et al. | 1:14-cv-05501-JMF | USDC SDNY | Pollastro, Paul J. |
| DePalma et al. v. General Motors LLC et al. | 1:14-cv-05501-JMF | USDC SDNY | DePalma, Austin |
| Desutter et al. v. General Motors LLC | 1:14-cv-04685-JMF | USDC SDNY | Desutter, Michelle |
| Desutter et al. v. General Motors LLC | 1:14-cv-04685-JMF | USDC SDNY | White, Robert |
| Desutter et al. v. General Motors LLC | 1:14-cv-04685-JMF | USDC SDNY | Ferguson, Joie |
| Detton v. General Motors LLC et al. | 1:14-cv-04784-JMF | USDC SDNY | Detton, Sarah |

4

**IN RE NEW GM VIS LITIGATION**
**EXHIBIT 3 - 358 NAMED PLAINTIFFS KNOWN TO NEW GM**

| CASE | NUMBER | COURT | PLAINTIFF |
|---|---|---|---|
| Detton v. General Motors LLC et al. | 1:14-cv-04784-JMF | USDC SDNY | Detton, Jeff |
| Deushane v. General Motors LLC | 1:14-cv-04732-JMF | USDC SDNY | Deushane, Taylor |
| Dinco et al. v. General Motors LLC | 1:14-cv-04727-JMF | USDC SDNY | Dinco, Deanna |
| Dinco et al. v. General Motors LLC | 1:14-cv-04727-JMF | USDC SDNY | Butler, David |
| Dinco et al. v. General Motors LLC | 1:14-cv-04727-JMF | USDC SDNY | Blinsmon, Curtis |
| Dinco et al. v. General Motors LLC | 1:14-cv-04727-JMF | USDC SDNY | Henderson, Aaron |
| Dinco et al. v. General Motors LLC | 1:14-cv-04727-JMF | USDC SDNY | Belford, Grace |
| Dinco et al. v. General Motors LLC | 1:14-cv-04727-JMF | USDC SDNY | Terry, Nathan |
| Dinco et al. v. General Motors LLC | 1:14-cv-04727-JMF | USDC SDNY | Pesce, Michael |
| Dinco et al. v. General Motors LLC | 1:14-cv-04727-JMF | USDC SDNY | Haskins, Rhonda |
| Dinco et al. v. General Motors LLC | 1:14-cv-04727-JMF | USDC SDNY | Gearin, Jennifer |
| Dinco et al. v. General Motors LLC | 1:14-cv-04727-JMF | USDC SDNY | Revak, Arlene |
| Dinco et al. v. General Motors LLC | 1:14-cv-04727-JMF | USDC SDNY | Mathis, George |
| Dinco et al. v. General Motors LLC | 1:14-cv-04727-JMF | USDC SDNY | Dias, Mary |
| Dinco et al. v. General Motors LLC | 1:14-cv-04727-JMF | USDC SDNY | Amezquita, Michael |
| Dinco et al. v. General Motors LLC | 1:14-cv-04727-JMF | USDC SDNY | De Vargas, Lorraine |
| Dinco et al. v. General Motors LLC | 1:14-cv-04727-JMF | USDC SDNY | Tefft, Dawn |
| Dinco et al. v. General Motors LLC | 1:14-cv-04727-JMF | USDC SDNY | Taylor, Bonnie |
| Dinco et al. v. General Motors LLC | 1:14-cv-04727-JMF | USDC SDNY | Gordon, Jerrile |
| Dinco et al. v. General Motors LLC | 1:14-cv-04727-JMF | USDC SDNY | Hunter, Keisha |
| Dinco et al. v. General Motors LLC | 1:14-cv-04727-JMF | USDC SDNY | Rouse, Les |
| Dinco et al. v. General Motors LLC | 1:14-cv-04727-JMF | USDC SDNY | Anderson, Sheree |
| Duarte v. General Motors LLC et al. | 1:14-cv-04667-JMF | USDC SDNY | Duarte, Ruth |
| Edwards_C et al. v. General Motors LLC et al. | 1:14-cv-04684-JMF | USDC SDNY | Edwards, Cynthia |
| Edwards_C et al. v. General Motors LLC et al. | 1:14-cv-04684-JMF | USDC SDNY | Thomas, Madeline |
| Edwards_C et al. v. General Motors LLC et al. | 1:14-cv-04684-JMF | USDC SDNY | Prassel, Jay |
| Edwards_C et al. v. General Motors LLC et al. | 1:14-cv-04684-JMF | USDC SDNY | Madewell, Hope |
| Edwards_C et al. v. General Motors LLC et al. | 1:14-cv-04684-JMF | USDC SDNY | Ball, Jeanne Jones |
| Elliott_C v. General Motors LLC et al. | 1:14-cv-05323-JMF | USDC SDNY | Elliott, Colin |
| Elliott_L et al. v. General Motors LLC | 1:14-cv-00691-KBJ | USDC DC | Elliott, Lawrence M. |
| Elliott_L et al. v. General Motors LLC | 1:14-cv-00691-KBJ | USDC DC | Elliot, Celestine V. |
| Elliott_L et al. v. General Motors LLC | 1:14-cv-00691-KBJ | USDC DC | Summerville, Berenice |
| Emerson et al. v. General Motors LLC et al. | 1:14-cv-04650-JMF | USDC SDNY | Emerson, Jonathan |

# IN RE NEW GM VIS LITIGATION
## EXHIBIT 3 - 358 NAMED PLAINTIFFS KNOWN TO NEW GM

| CASE | NUMBER | COURT | PLAINTIFF |
|------|--------|-------|-----------|
| Emerson et al. v. General Motors LLC et al. | 1:14-cv-04650-JMF | USDC SDNY | Barbiaux, Melinda |
| Emerson et al. v. General Motors LLC et al. | 1:14-cv-04650-JMF | USDC SDNY | Brown Davis, Carter |
| Emerson et al. v. General Motors LLC et al. | 1:14-cv-04650-JMF | USDC SDNY | Garrett, Dawn |
| Emerson et al. v. General Motors LLC et al. | 1:14-cv-04650-JMF | USDC SDNY | Hicks, Thomas |
| Emerson et al. v. General Motors LLC et al. | 1:14-cv-04650-JMF | USDC SDNY | Lawson, Barb |
| Emerson et al. v. General Motors LLC et al. | 1:14-cv-04650-JMF | USDC SDNY | Moore, Carlton |
| Emerson et al. v. General Motors LLC et al. | 1:14-cv-04650-JMF | USDC SDNY | Perkins, Janet |
| Espineira v. General Motors LLC, et al. | 1:14-cv-04637-JMF | USDC SDNY | Espineira, Reynaldo A. |
| Favro v. General Motors LLC, et al. | 1:14-cv-04752-JMF | USDC SDNY | Favro, Hilarie |
| Forbes v. General Motors LLC | 1:14-cv-04798-JMF | USDC SDNY | Forbes, Debra E. |
| Foster v. General Motors LLC et al. | 1:14-cv-04775-JMF | USDC SDNY | Foster, Joyce |
| Frank v. General Motors LLC | 1:14-cv-21652-MGC | USDC SD Fla | Frank, Nancy Hausmann |
| Fugate v. General Motors LLC | 1:14-cv-04714-JMF | USDC SDNY | Fugate, Jolene |
| Gebremariam v. General Motors LLC | 1:14-cv-05340-JMF | USDC SDNY | Gebremariam, Mesafint |
| Groman v General Motors LLC | 1:14-cv-02458-JMF | USDC SDNY | Groman, Steven |
| Grumet et al v. General Motors LLC | 1:14-cv-04690-JMF | USDC SDNY | Grumet, Elizabeth Y. |
| Grumet et al v. General Motors LLC | 1:14-cv-04690-JMF | USDC SDNY | ABC Flooring INC |
| Grumet et al v. General Motors LLC | 1:14-cv-04690-JMF | USDC SDNY | Sullivan, Marcus |
| Grumet et al v. General Motors LLC | 1:14-cv-04690-JMF | USDC SDNY | Saxson, Katelyn |
| Grumet et al v. General Motors LLC | 1:14-cv-04690-JMF | USDC SDNY | Clinton, Amy C. |
| Grumet et al v. General Motors LLC | 1:14-cv-04690-JMF | USDC SDNY | Clinton, Allison C. |
| Harris et al. v. General Motors LLC et al. | 1:14-cv-04672-JMF | USDC SDNY | Harris, Alicia |
| Harris et al. v. General Motors LLC et al. | 1:14-cv-04672-JMF | USDC SDNY | Toth, Kristin |
| Henry et al. v. General Motors LLC et al. | 1:14-cv-04811-JMF | USDC SDNY | Youngblood, Rebecca |
| Henry et al. v. General Motors LLC et al. | 1:14-cv-04811-JMF | USDC SDNY | Gladson, Pam |
| Henry et al. v. General Motors LLC et al. | 1:14-cv-04811-JMF | USDC SDNY | Henry, Shenyesa |
| Heuler v. General Motors LLC | 1:14-cv-04345-JMF | USDC SDNY | Heuler, Nicole |
| Higginbotham v. General Motors LLC et al. | 1:14-cv-04759-JMF | USDC SDNY | Higginbotham, Drew |
| Holliday, et al. v. General Motors LLC, et al. | 1:14-cv-05506-JMF | USDC SDNY | Holliday, Kevin |
| Holliday, et al. v. General Motors LLC, et al. | 1:14-cv-05506-JMF | USDC SDNY | Calvillo, Elvira |
| Hurst v. General Motors Company | 1:14-cv-04707-JMF | USDC SDNY | Hurst, Kim |
| Ibanez v. General Motors LLC | 1:14-cv-05880-JMF | USDC SDNY | Ibanez, Alondra |
| Ibanez v. General Motors LLC | 1:14-cv-05880-JMF | USDC SDNY | Degado, Sylvia |

DMSLIBRARY01:23416963.1

# IN RE NEW GM VIS LITIGATION
## EXHIBIT 3 - 358 NAMED PLAINTIFFS KNOWN TO NEW GM

| CASE | NUMBER | COURT | PLAINTIFF |
|---|---|---|---|
| Jawad v. General Motors LLC | 1:14-cv-04348-JMF | USDC SDNY | Jawad, Adnan |
| Johnson v. General Motors LLC | 1:14-cv-05347-JMF | USDC SDNY | Johnson, Elizabeth D. |
| Jones_P v. General Motors LLC | 1:14-cv-04350-JMF | USDC SDNY | Jones, Peggy Sue |
| Kandziora v. General Motors LLC et. al. | 2:14-cv-00801-AEG | USDC ED Wis | Kandziora, Erin E. |
| Kelley et al. v. General Motors Company et al. | 1:14-cv-04272-JMF | USDC SDNY | Kelley, Devorah |
| Kelley et al. v. General Motors Company et al. | 1:14-cv-04272-JMF | USDC SDNY | Whittington, Frederick |
| Kluessendorf v. General Motors LLC et al. | 1:14-cv-05035-JMF | USDC SDNY; | Kluessendorf, Sandra |
| Knetzke v. General Motors LLC et al. | 1:14-cv-04641-JMF | USDC SDNY | Knetzke, Jacob P. |
| Kosovec v. General Motors LLC et al. | 3:14-cv-00354-RS-EMT | USDC ND Fla | Kosovec, Wendy |
| Lannon et al. v. General Motors LLC et al. | 1:14-cv-04676-JMF | USDC SDNY | Lannon, Michelle |
| Lannon et al. v. General Motors LLC et al. | 1:14-cv-04676-JMF | USDC SDNY | Little, Jeaninne |
| Lareine et al. v. General Motors LLC et al. | 1:14-cv-04717-JMF | USDC SDNY | Lareine, Lianne |
| Lareine et al. v. General Motors LLC et al. | 1:14-cv-04717-JMF | USDC SDNY | Chandler, Marguerite |
| Lareine et al. v. General Motors LLC et al. | 1:14-cv-04717-JMF | USDC SDNY | Evans, James |
| Lareine et al. v. General Motors LLC et al. | 1:14-cv-04717-JMF | USDC SDNY | LaGoe, Bonita |
| Lareine et al. v. General Motors LLC et al. | 1:14-cv-04717-JMF | USDC SDNY | Jordanides, Lea |
| Lareine et al. v. General Motors LLC et al. | 1:14-cv-04717-JMF | USDC SDNY | Rodriguez, Yvonne E. |
| Letterio v. General Motors LLC et al. | 1:14-cv-04857-JMF | USDC SDNY | Letterio, Noel Joyce |
| Leval v. General Motors LLC | 1:14-cv-04802-JMF | USDC SDNY | Leval, Vernon |
| Levine v. General Motors LLC | 1:14-cv-04661-JMF | USDC SDNY | Levine, Michael |
| Lewis v. General Motors LLC et al. | 1:14-cv-04720-JMF | USDC SDNY | Lewis, Tracy |
| Maciel et al. v. General Motors LLC | 1:14-cv-04339-JMF | USDC SDNY | Maciel, Galdina |
| Maciel et al. v. General Motors LLC | 1:14-cv-04339-JMF | USDC SDNY | Cortez, Daniel |
| Maciel et al. v. General Motors LLC | 1:14-cv-04339-JMF | USDC SDNY | Wade, Cindy |
| Maciel et al. v. General Motors LLC | 1:14-cv-04339-JMF | USDC SDNY | Dewitt, Zachary |
| Maciel et al. v. General Motors LLC | 1:14-cv-04339-JMF | USDC SDNY | Cheraso, Roberta |
| Maciel et al. v. General Motors LLC | 1:14-cv-04339-JMF | USDC SDNY | Smith, Demetrius |
| Maciel et al. v. General Motors LLC | 1:14-cv-04339-JMF | USDC SDNY | Byrd, Jenee |
| Maciel et al. v. General Motors LLC | 1:14-cv-04339-JMF | USDC SDNY | Leyva, Ashuhan |
| Maciel et al. v. General Motors LLC | 1:14-cv-04339-JMF | USDC SDNY | Gresik, Jim |
| Maciel et al. v. General Motors LLC | 1:14-cv-04339-JMF | USDC SDNY | Steele, Barbara Ellis |
| Maciel et al. v. General Motors LLC | 1:14-cv-04339-JMF | USDC SDNY | Raygoza, Maria |
| Maciel et al. v. General Motors LLC | 1:14-cv-04339-JMF | USDC SDNY | Gray, Barbara |

DMSLIBRARY01:23416963.1

# IN RE NEW GM VIS LITIGATION
## EXHIBIT 3 - 358 NAMED PLAINTIFFS KNOWN TO NEW GM

| CASE | NUMBER | COURT | PLAINTIFF |
|---|---|---|---|
| Maciel et al. v. General Motors LLC | 1:14-cv-04339-JMF | USDC SDNY | Bennett, Michele |
| Malaga et al. v. General Motors LLC | 1:14-cv-04738-JMF | USDC SDNY | Malaga, Javier F. |
| Malaga et al. v. General Motors LLC | 1:14-cv-04738-JMF | USDC SDNY | Estencion, Estella |
| Markle v. General Motors LLC et al. | 1:14-cv-04662-JMF | USDC SDNY | Markle, Peyton |
| Mazzocchi v. General Motors LLC et al. | 1:14-cv-02714-JMF | USDC SDNY | Mazzocchi, Marie |
| McCarthy v. General Motors et al. | 1:14-cv-04758-JMF | USDC SDNY | McCarthy, Karen |
| McConnell v. General Motors | 1:14-cv-04270-JMF | USDC SDNY | McConnell, Katie Michelle |
| Nava v. General Motors LLC, et al. | 1:14-cv-04754-JMF | USDC SDNY | Nava, Sonia |
| Nettleton v. General Motors LLC et al. | 1:14-cv-04760-JMF | USDC SDNY | Nettleton Auto Sales, INC. |
| Phaneuf et al. v. General Motors LLC | 1:14-cv-03298-JMF | USDC SDNY | Phaneuf, Lisa |
| Phaneuf et al. v. General Motors LLC | 1:14-cv-03298-JMF | USDC SDNY | Smith, Adam |
| Phaneuf et al. v. General Motors LLC | 1:14-cv-03298-JMF | USDC SDNY | Garcia, Mike |
| Phaneuf et al. v. General Motors LLC | 1:14-cv-03298-JMF | USDC SDNY | Delacruz, Javier |
| Phaneuf et al. v. General Motors LLC | 1:14-cv-03298-JMF | USDC SDNY | Sileo, Steve |
| Phaneuf et al. v. General Motors LLC | 1:14-cv-03298-JMF | USDC SDNY | Bucci, Steven |
| Phaneuf et al. v. General Motors LLC | 1:14-cv-03298-JMF | USDC SDNY | Padilla, David |
| Phaneuf et al. v. General Motors LLC | 1:14-cv-03298-JMF | USDC SDNY | Cabral, Catherine |
| Phaneuf et al. v. General Motors LLC | 1:14-cv-03298-JMF | USDC SDNY | Cabral, Joseph |
| Phillip et al. v. General Motors LLC | 1:14-cv-04630-JMF | USDC SDNY | Phillip, Kyle |
| Phillip et al. v. General Motors LLC | 1:14-cv-04630-JMF | USDC SDNY | Torres, Evelyn |
| Phillip et al. v. General Motors LLC | 1:14-cv-04630-JMF | USDC SDNY | Kirkpatrick, Kelly |
| Phillip et al. v. General Motors LLC | 1:14-cv-04630-JMF | USDC SDNY | Berry, Steve |
| Phillip et al. v. General Motors LLC | 1:14-cv-04630-JMF | USDC SDNY | Johnson, Eslie |
| Phillip et al. v. General Motors LLC | 1:14-cv-04630-JMF | USDC SDNY | Berry, Diane |
| Ponce v. General Motors LLC | 1:14-cv-04265-JMF | USDC SDNY | Ponce, Martin |
| Powell v. General Motors LLC | 1:14-cv-04778-JMF | USDC SDNY | Powell, Amy |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Huff, Diana |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Wright, Linda |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Cave, Melissa |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Carden, Stephanie Renee |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Genovese, Kim |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Brooks, Penny |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Pickens, Judy |

DMSLIBRARY01:23416963.1

# IN RE NEW GM VIS LITIGATION
## EXHIBIT 3 - 358 NAMED PLAINTIFFS KNOWN TO NEW GM

| CASE | NUMBER | COURT | PLAINTIFF |
|------|--------|-------|-----------|
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Cnossen, Diana |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Wyman, Robert |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Murray, Judy |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Ramirez, Esperanza |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Mancieri, Garrett S. |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Dail, Robert |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Laverdiere, Antonia |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Bernick, William |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Zivnuska, Philip |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Valdez, Yolanda |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Smith, Kimberly |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Graciano, Michael |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Tomlinson, Blair |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Cole, Laura |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Nelson, Norma Lee |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Claggion, Yolanda |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Wright, Alphonso |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Stocchi, Demealla |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Hansen, Patrick |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Gutchewsky, Cathy |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | England, William Jr. |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Mortell, Jane |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Barnes, Betty |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Romero, Bernadette |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Lambert, Marguerite |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | West, Lisa |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Taylor, Erik |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Hobby, Sarah |
| Ramirez et al. v. General Motors LLC | 1:14-cv-04267-JMF | USDC SDNY | Counts, April |
| Ratzlaff et al v. General Motors LLC | 1:14-cv-04346-JMF | USDC SDNY | Barker, Patricia |
| Ratzlaff et al v. General Motors LLC | 1:14-cv-04346-JMF | USDC SDNY | Ratzlaff, Daniel |
| Roach v. General Motors LLC et al. | 1:14-cv-04810-JMF ; | USDC SDNY | Roach, Rex |
| Robinson v. General Motors LLC | 1:14-cv-04699-JMF | USDC SDNY | Lewis, Richard |

9

## IN RE NEW GM VIS LITIGATION
## EXHIBIT 3 - 358 NAMED PLAINTIFFS KNOWN TO NEW GM

| CASE | NUMBER | COURT | PLAINTIFF |
|------|--------|-------|-----------|
| Robinson v. General Motors LLC | 1:14-cv-04699-JMF | USDC SDNY | Robinson, Sara |
| Robinson v. General Motors LLC | 1:14-cv-04699-JMF | USDC SDNY | Helcl, John |
| Robinson v. General Motors LLC | 1:14-cv-04699-JMF | USDC SDNY | Petersen, Denise |
| Ross_J et al. v. General Motors LLC et al. | 1:14-cv-04756-JMF | USDC SDNY | Bellin, Robert |
| Ross_J et al. v. General Motors LLC et al. | 1:14-cv-04756-JMF | USDC SDNY | Ross, Janice |
| Ross_J et al. v. General Motors LLC et al. | 1:14-cv-04756-JMF | USDC SDNY | Chambers, George |
| Roush et al. v. General Motors LLC | 1:14-cv-04704-JMF | USDC SDNY | Roush, Jennifer |
| Roush et al. v. General Motors LLC | 1:14-cv-04704-JMF | USDC SDNY | Roush, Randall |
| Ruff et al. v. General Motors et al. | 1:14-cv-04764-JMF | USDC SDNY | Ruff, Lisa |
| Ruff et al. v. General Motors et al. | 1:14-cv-04764-JMF | USDC SDNY | Marx, Sherri |
| Rukeyser v. General Motors LLC | 1:14-cv-5715-UA | USDC SDNY | Rukeyser, William L. |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Saclo, Ken |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Cohen, Mel |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Malone, Tiffany |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Orona, Dawn |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Teicher, Lisa |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Nagle, Sue |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Young, Robert |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Luthander, Robbie |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Holleman, Heather |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Clinton, Jeremy |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Tyson, Tommy |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Talbot, Dawn |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Heath, Tara |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Sloan, Sarah |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Condon, Bonnie |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Wilson, Derek |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Kielman, Sherry |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Levine, Sandra |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Glasgow, Jennifer |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Owens, Michael |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Doucette, Shawn |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Miller, Geraldine |

# IN RE NEW GM VIS LITIGATION
## EXHIBIT 3 - 358 NAMED PLAINTIFFS KNOWN TO NEW GM

| CASE | NUMBER | COURT | PLAINTIFF |
|---|---|---|---|
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Wessel, Christa |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Maas, Pamela |
| Saclo et al. v. General Motors LLC et al. | 1:14-cv-04751-JMF | USDC SDNY | Stewart, Elizabeth |
| Salazar v. General Motors et al. | 1:14-cv-04859-JMF | USDC SDNY | Salazar III, Jesse |
| Salerno v. General Motors LLC et al. | 1:14-cv-04799-JMF | USDC SDNY | Salerno, Nicole |
| Santiago v. General Motors LLC | 1:14-cv-04632-JMF | USDC SDNY | Santiago, Maria Elena |
| Satele et al. v. General Motors LLC | 1:14-cv-04273-JMF | USDC SDNY | Onofre, Carlota |
| Satele et al. v. General Motors LLC | 1:14-cv-04273-JMF | USDC SDNY | Satele, Telso |
| Sesay et al. v. General Motors LLC et al. | 14-cv-6018 | USDC SDNY | Sesay, Ishmail |
| Sesay et al. v. General Motors LLC et al. | 14-cv-6018 | USDC SDNY | Yearwood, Joanne |
| Shollenberger v. General Motors LLC | 1:14-cv-04338-JMF | USDC SDNY | Shollenberger, Chris |
| Silvas et al. v. General Motors LLC | 1:14-cv-04342-JMF | USDC SDNY | Silvas, Charles |
| Silvas et al. v. General Motors LLC | 1:14-cv-04342-JMF | USDC SDNY | Silvas, Grace |
| Skillman v. General Motors LLC et al. | 1:14-cv-03326-JMF | USDC SDNY | Skillman, Meaghan |
| Smith_V v. General Motors LLC et al. | 1:14-cv-05338-JMF | USDC SDNY | Smith, Vickie |
| Spangler v. General Motors LLC | 1:14-cv-04755-JMF | USDC SDNY | Spangler, Randi |
| Stafford Chapman v. General Motors et al. | 1:14-cv-05345-JMF | USDC SDNY | Stafford-Chapman, Aletha |
| Stafford v. General Motors LLC | 1:14-cv-04808-JMF | USDC SDNY | Stafford, Richard |
| Taylor v. General Motors Company | 1:14-cv-04686-JMF | USDC SDNY | Taylor, John W. |
| The People of the State of California v. General Motors LLC | 30-2014-00731038-CU-BT-CXC | Orange Co. | California |
| Thomas Stevenson v. General Motors LLC | 1:14-cv-05137-JMF | USDC SDNY | Stevenson, Thomas |
| Turpyn et al. v. General Motors LLC et al. | 1:14-cv-05328-JMF | USDC SDNY | Turpyn, Janet |
| Turpyn et al. v. General Motors LLC et al. | 1:14-cv-05328-JMF | USDC SDNY | Turpyn, Richard |
| Villa et al. v. General Motors LLC et al. | 1:14-cv-04801-JMF | USDC SDNY | Villa, AmberLynn I. |
| Villa et al. v. General Motors LLC et al. | 1:14-cv-04801-JMF | USDC SDNY | Cohen, Jack |
| Villa et al. v. General Motors LLC et al. | 1:14-cv-04801-JMF | USDC SDNY | Bell, Helen |
| Villa et al. v. General Motors LLC et al. | 1:14-cv-04801-JMF | USDC SDNY | Armstrong, Caitlyn |
| Villa et al. v. General Motors LLC et al. | 1:14-cv-04801-JMF | USDC SDNY | Keenan, Frank |
| Witherspoon v. General Motors LLC et al. | 1:14-cv-04702-JMF | USDC SDNY | Witherspoon, Patrice |
| Woodward v. General Motors LLC et al. | 1:14-cv-04226-JMF | USDC SDNY | Woodward, Rudy |

DMSLIBRARY01:23416963.1

# Exhibit 4

## EXHIBIT "4"

## INDIVIDUALS AND ENTITIES WHO RECEIVED
## DIRECT MAIL NOTICE OF THE 363 SALE

(i)     the attorneys for the U.S. Treasury,

(ii)    the attorneys for Export Development Canada,

(iii)   the attorneys for the agent under the Debtors' pre-petition secured term loan agreement,

(iv)    the attorneys for the agent under the Debtors' pre-petition amended and restated secured revolving credit agreement,

(v)     the attorneys for the statutory committee of unsecured creditors appointed in the Debtors' chapter 11 cases (the "Creditors Committee") (if no statutory committee of unsecured creditors has been appointed, the holders of the fifty largest unsecured claims against the Debtors on a consolidated basis),

(vi)    the attorneys for the UAW,

(vii)   the attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—Communications Workers of America,

(viii)  the United States Department of Labor,

(ix)    the attorneys for the National Automobile Dealers Association,

(x)     the attorneys for the ad hoc bondholders committee,

(xi)    any party who, in the past three years, expressed in writing to the Debtors an interest in the Purchased Assets and who the Debtors and their representatives reasonably and in good faith determine potentially have the financial wherewithal to effectuate the transaction contemplated in the MPA,

(xii)   non-Debtor parties to the Assumable Executory Contracts,

(xiii)  all parties who are known to have asserted any lien, claim, encumbrance, or interest in or on the Purchased Assets,

(xiv)   the Securities and Exchange Commission,

(xv)    the Internal Revenue Service,

(xvi)   all applicable state attorneys general, local environmental enforcement agencies, and local regulatory authorities,

(xvii)  all applicable state and local taxing authorities,

(xviii) the Federal Trade Commission,

(xix)   all applicable state attorneys general,

(xx)    United States Attorney General/Antitrust Division of the Department of Justice,

(xxi)   the U.S. Environmental Protection Agency and similar state agencies,

(xxii)  the United States Attorney's Office,

(xxiii) all dealers with current agreements for the sale or leasing of GM brand vehicles,

(xxiv)  the Office of the United States Trustee for the Southern District of New York,

(xxv)   all entities that requested notice in these chapter 11 cases under Bankruptcy Rule 2002,

(xxvi)  all other known creditors, and

(xxvii) all equity security holders of the Debtors of record as of May 27, 2009.

27

# Exhibit B

**COUNSEL FOR THE PARTIES ARE**
**LISTED IN THE SIGNATURE BLOCK**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **MOTORS LIQUIDATION COMPANY,** *et al.*, | : | **Case No.: 09-50026 (REG)** |
| **f/k/a General Motors Corp.,** *et al.* | : | |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

-------------------------------------------------------------X

### CERTAIN PLAINTIFFS, THROUGH DESIGNATED COUNSEL, AND THE *GROMAN* PLAINTIFFS' AGREED-UPON STIPULATIONS OF FACT IN CONNECTION WITH THE FOUR THRESHOLD ISSUES IDENTIFIED IN THIS COURT'S JULY 11, 2014 SUPPLEMENTAL SCHEDULING ORDER[1]

Pursuant to this Court's *Supplemental Scheduling Order, Dated July 11, 2014, Regarding (i) the Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction, (ii) the Objection Filed by Certain Plaintiffs in Respect Thereto, and (iii) Adversary Proceeding No. 14-01929* (the "**Supplemental Scheduling Order**"), Certain Plaintiffs, through Designated Counsel, and the *Groman* Plaintiffs (hereinafter "**Plaintiffs**") hereby submit the following agreed-upon stipulations of fact concerning the Four Threshold Issues.[2]

In addition, annexed hereto as Exhibit "A" are Certain Plaintiffs' proposed stipulations of fact that have not been agreed to by New GM.

---

[1] Unless otherwise indicated, capitalized terms not defined herein shall have the meanings ascribed to them in the Supplemental Scheduling Order (as defined herein).

[2] Plaintiffs reserve the right to rely on any of the stipulations of fact agreed upon by Counsel for the Identified Parties.

## AGREED-UPON STIPULATIONS OF FACT

1. When the Ignition Switch is turned to the "Accessory" or "Off" position in the Subject Vehicles, power to a part called the Sensing Diagnostic Module is lost. The Sensing Diagnostic Module determines when and whether airbags should deploy. When the Sensing Diagnostic Module is powered down, the airbags will not deploy. If the Sensing Diagnostic Module loses power during a crash, the Sensing Diagnostic Module's crash sensing protection would continue (and airbags could still deploy) for approximately 150 milliseconds after the power loss. But if the Sensing Diagnostic Module loses power prior to the crash, then the Sensing Diagnostic Module would power down and would not trigger airbag deployment. (V.R. at 28-29).[3]

2. According to New GM, the Subject Vehicles were recalled in 2014 (the **"Ignition Switch Recall"**).

3. In connection with the Ignition Switch Recall, New GM stated that:

There is a risk, under certain conditions, that your ignition switch may move out of the "run" position, resulting in a partial loss of electrical power and turning off the engine . . . If the ignition switch is not in the run position, the airbags may not deploy if the vehicle is involved in a crash, increasing the risk of injury or fatality.

(General Motors, Ignition Recall Safety Information Frequently Asked Questions (2014), *available at* http://gmignitionupdate.com/faq.html#L (last visited May 23, 2014)).

---

[3] "V.R." refers to Anton R. Valukas, Report to Board of Directors of General Motors Company Regarding Ignition Recalls, dated May 29, 2014, which can be found at http://www.nhtsa.gov/staticfiles/nvs/pdf/Valukas-report-on-gm-redacted.pdf.

2

4.　　In 2003, Thomas Gottschalk, Old GM's[4] former general counsel, stated to members of Old GM's legal department in a memorandum that "[i]f you as an attorney are aware of any threatened, on-going, or past violation of a federal, state or local law or regulation . . . it is your responsibility to respond appropriately." (V.R. at 109).

5.　　Gottschalk's memorandum also discussed what to do if one's superiors had concluded that appropriate action had been taken in response to a perceived problem, but the more junior lawyer disagreed. If they believed that the conclusion was wrong, the more junior lawyer should continue to seek an appropriate resolution. Gottschalk said it was the duty of the more junior lawyers to bring the situation to the attention of their supervisors or their supervisors' supervisors, as necessary. If the more junior lawyers believed that their supervisor had not addressed the issue appropriately or if the more junior lawyer felt that bringing it to the attention of their supervisors would be futile, the more junior lawyers were told to pursue it higher in the organization – if necessary, to the General Counsel. (V.R. at 109-110).

6.　　In a February 19, 2004 report concerning the model year 2004 Saturn Ion, Old GM employee Onassis Matthews stated: "The location of the ignition key was in the general location where my knee would rest (I am 6'3" tall, not many places to put my knee). On several occasions, I inadvertently turn [sic] the ignition key off with my knee while driving down the road. For a tall person, the location of the ignition key should be moved to a place that will not be inadvertently switched to the off position." (V.R. at 57).

7.　　In an April 15, 2004 report concerning the model year 2004 Saturn Ion, Old GM employee Raymond P. Smith reported experiencing a one-time inadvertent shut-off, and

---

[4] **"Old GM"** means Motors Liquidation Company, formerly known as General Motors Corporation.

that "I thought that my knee had inadvertently turned the key to the off position." (V.R. at

57).

8.    In 2004, an engineer in Old GM's High Performance Vehicle Operations

Group reported that the driver repeatedly experienced a moving stall during a track test of the

Chevrolet Cobalt SS when the driver's knee slightly grazed the key fob.

9.    An Old GM 2005 Problem Resolution Tracking System report states, in part:

"Customer concern is that the vehicle ignition will turn off while driving."

http://democrats.energycommerce.house.gov/sites/default/files/documents/GM-PRTS-Chevrolet-

Cobalt-March-2005.pdf.

10.    In December 2005, Old GM issued Service Bulletin 05-02-35-007 (the

**December 2005 Service Bulletin**") to its dealers, with the subject reference "Information on

Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and No DTCs ("**Diagnostic**

**Trouble Codes**")" for the 2005-2006 Chevrolet Cobalt, 2006 Chevrolet HHR, 2003-2006 Saturn

Ion, and 2006 Pontiac Solstice vehicles. (Apr. 1 Cong. Hr'g, Doc. 12).[5]

A.    The December 2005 Service Bulletin stated that the concern about

inadvertently turning off the ignition "is more likely to occur if the driver is short and has a

large and/or heavy key chain" and that, when a customer brought his or her vehicle in for

service, he or she "should be advised of this potential and should take steps to prevent it – such

as removing unessential items from their key chain."

---

[5] The hearing transcript can be found at *The GM Ignition Switch Recall: Why Did It Take So Long?: Hearing Before the Subcommittee on Oversight and Investigations of the H. Comm. on Energy and Commerce*, 2014 WL 1317290 (2014). The hearing transcript and the documents released by Congress in connection with the hearing can be found at http://energycommerce.house.gov/hearing/%E2%80%pC-gm-ignition-switch-recall-why-did-it-take-so-long%E2%80%9D. (last visited July 24, 2014). Citation to "Doc. ___" refer to the documents produced by New GM to Congress in connection with the hearings regarding the Ignition Switch Recall before the House Energy and Commerce Committee on April 1, 2014.

B.     The December 2005 Service Bulletin also stated that "there is potential

for the driver to inadvertently turn off the ignition due to low ignition key cylinder

torque/effort."

C.     Old GM did not issue any public statements related to the December 2005

Service Bulletin. (Apr. 1 Cong. Hr'g at 35).

D.     The December 2005 Service Bulletin did not describe the issue as

involving a "stall." (V.R. at 93).

E.     Prior to this time, Steven Oakley, [6] an Old GM brand quality manager, had

written a service bulletin request form that used the term "stall." (V.R. at 92).

11.     In October 2006, Old GM updated the December 2005 Service Bulletin

(hereinafter referred to, with that update, as the **"October 2006 Service Bulletin"**) to include

additional vehicle models and model years – namely, the 2007 Saturn Ion, 2007 Saturn Sky, the

2007 Chevrolet HHR, the 2007 Pontiac Solstice, and the 2007 Pontiac G5. (Feb. 7 Notice; Feb.

24 Notice).

A.     The October 2006 Service Bulletin stated:

> There is potential for the driver to inadvertently turn off the ignition due to
> low ignition key cylinder torque/effort.  The concern is more likely to
> occur if the driver is short and has a large and/or heavy key chain.  In
> these cases, this condition was documented and the driver's knee would
> contact the key chain while the vehicle was turning and the steering
> column was adjusted all the way down.  This is more likely to happen to a
> person who is short, as they will have the seat positioned closer to the
> steering column.  In cases that fit this profile, question the customer
> thoroughly to determine if this may [sic] the cause.  The customer should
> be advised of this potential and should take steps to prevent it – such as
> removing unessential items from their key chain.

---

[6] Oakley is discussed infra at ¶ 15,S.

5

B.    The October 2006 Service Bulletin did not describe the issue as involving
a "stall."

12.    When Gary Altman, Old GM's Program Engineering Manager for the
Chevrolet Cobalt, was asked at a deposition whether "it would be true that if it was a safety
recall, the dealership and the consumers would be more aware of the issue than if it were a
technical service bulletin," Altman replied: "I'm sure it is.  It has to go through NHTSA.  It goes
through the public announcement, the record, and I'm pretty concerned—or pretty sure that
every customer would be contacted." (Altman Dep. 54:3-11).

13.    "In 2006, one Better Business Bureau arbitrator decision mandated that Old
GM repurchase a Cobalt from a customer who complained of intermittent stalling." (V.R. 89, fn.
378).

14.    Certain Old GM Personnel and New GM Personnel, as they relate to the
Ignition Switch, are as follows:

A.    Alan Adler was Old GM's manager for safety communications in the Fall
of 2006.  (V.R. at 57-58).

i.    On October 24, 2006, a crash occurred in which a 2005 Cobalt left
the road and struck a telephone box and two trees, leaving two passengers dead and the driver
severely injured.  The crash first came to Old GM's attention on November 15, 2006, through a
TV reporter's inquiry.  Adler e-mailed Dwayne Davidson, Senior Manager for TREAD
Reporting at Old GM, and others, copying Old GM employees Gay Kent, Jaclyn Palmer, Brian
Everest, and Douglas Wachtel, with the subject line "2005 Cobalt Air Bags – Fatal Crash;
Alleged Non-Deployment," asking whether anyone knew about the accident and other airbag
incidents involving the Cobalt (the **November 2006 Adler E-mail**").  Certain recipients

6

responded to the e-mail and provided available data on Cobalt frontal airbag claims. (V.R. at
114).

        ii.    Adler was a Transferred Employee (as such term is defined in the
Sale Agreement), after the 363 Sale. (V.R. at 140).

       B.    Gary Altman was Old GM's Program Engineering Manager for the
Chevrolet Cobalt when it was launched. (V.R. at 57-58). As of June 2013 he had worked at Old
GM and then New GM for approximately 35 years. (Altman Dep. 6:12-15).

        i.    "Around the time of the Cobalt launch, two reports surfaced of
moving stalls caused by a driver bumping the key fob or chain with his knee. First, at a summer
or fall 2004 press event associated with the launch of the Cobalt in Santa Barbara, California, a
journalist informed Doug Parks, the Cobalt Chief Engineer, that while adjusting his seat in the
Cobalt he was driving, the journalist had turned off the car by hitting his knee against the key fob
or chain. Parks asked Gary Altman, the Program Engineering Manager, to follow up on the
complaint by trying to replicate the incident and to determine a fix." (V.R. at 59-60). "After the
Cobalt press event, Altman and another GM engineer test drove a Cobalt at the Milford Proving
Grounds and replicated the incident described by the journalist." (V.R. at 60).

        ii.    The entity within Old GM responsible for opening and reviewing the
November 2004 Problem Resolution Tracking System was a Current Production Improvement
Team. (V.R. at 63-64). The Current Production Improvement Team included a cross-section of
business people and engineers, along with the Program Engineering Manager that was
responsible for the vehicle. (V.R. at 64). It was chaired by the Vehicle Line Director, who was
the business lead for the vehicle program and reported directly to the Vehicle Line Executive,
who at the time was Lori Queen. (V.R. at 64).

7

iii. An Old GM November 19, 2004 Problem Resolution Tracking

System was closed with no action on March 9, 2005. (V.R. at 60). There were multiple reasons

given for closing the November 2004 Problem Resolution Tracking System investigation and,

ultimately, certain Old GM personnel concluded that none of the solutions represents an

acceptable business case. (*Id.*; Doc. 8, at GMHEC000001735; V.R. at 69). The phrase "none of

the solutions represents an acceptable business case" was a standard phrase by certain Old GM

personnel for closing a Problem Resolution Tracking System investigation without action. (V.R.

at 69). Here, according to certain Old GM personnel, the proposed changes were not

implemented because none of them were guaranteed to resolve the problem completely. (*Id.*).

iv. In May 2005, Steven Oakley opened a Field Performance Report to

investigate a complaint by Jack Weber, an Old GM engineer who reported turning off a

Chevrolet Cobalt SS with his knee while "heel-toe downshifting." (V.R. at 76).

v. Altman has testified, *inter alia*, that:

a)    movement of the ignition key from the "Run" position to

the "Accessory" position in the 2005 Chevrolet Cobalt can be dangerous in certain situations.

(Altman Dep. 12:5-10, 23-25; 23:23-24:2).

b)    when the ignition key moves from the "Run" position to the

"Accessory" position in the 2005 Chevrolet Cobalt, the engine stalls and power steering stops

working. (Altman Dep. 10:14-22).

vi. In February 2009, Old GM engineer Joseph Manson copied Altman

on an e-mail which, among other things, stated that the issue with respect to the Cobalt key

(keyed off with knee while driving) "has been around since man first lumbered out of [the] sea

and stood on two feet." (V.R. at 132-33).

8

vii.  Altman was a Transferred Employee (as such term is defined in the
Sale Agreement), after the 363 Sale. *(See, e.g.,* V.R. at 222).

C.    Kathy Anderson was an Old GM Field Performance Assessment engineer
who was assigned to gather information and assess technical issues in lawsuits and claims not in
litigation. (V.R. at 105-106). Field Performance Assessment engineers conduct their own
technical assessments, which might include reviewing police reports and medical records,
interviewing witnesses, inspecting vehicles, and analyzing Sensing Diagnostic Module data.
(V.R. at 106). Oftentimes, Field Performance Assessment engineers share their technical
assessments with product litigation staff attorneys and outside counsel, assist in responding to
plaintiffs' discovery requests, and may testify as experts or 30(b)(6) witnesses. "FPA engineers'
technical assessments are the lawyers' primary source of technical information for the early case
evaluations, and are a critical factor in the evaluation of settlement decisions." (V.R. at 106).

i.    In 2006, Anderson investigated two fatal crashes:  the July 4, 2004
fatal crash of a 2004 Saturn Ion (the **"July 2004 Fatal Crash"**) and the July 29, 2005 fatal crash
of a 2005 Chevrolet Cobalt (the **"July 2005 Fatal Crash"**).  (V.R. at 110, 112).  In the July 2004
Fatal Crash, a vehicle occupant died after her 2004 Saturn Ion left the road at high speed, went
over a low curb, braked, and then struck a large utility pole head on. The airbag did not deploy.
(V.R. at 112).  In the July 2005 Fatal Crash, the airbags did not deploy.  (V.R. at 110).

ii.    "Settlements of between $100,000 and $1.5 million (a limit which
was eventually increased to $2 million) required approval at a committee known as the
"Roundtable."  The Roundtable Committee met weekly, and was led by the Litigation Practice
Area Manager, and all product litigation staff attorneys were invited to attend.  Settlement offers
between $2 and $5 million required approval of a group called the Settlement Review

9

Committee, which met monthly, and was chaired by the head of global litigation. Members of the
Settlement Review Committee included both the GC of GM North America and Kemp. When a
case was before the Roundtable or the Settlement Review Committee, the responsible product
litigation staff attorney would present his/her case." (V.R. at 106-108).

       iii.    FPA engineers Manuel Peace, Kathy Anderson, and Douglas Brown
of the Old GM Legal Staff were assigned to the July 2004 Fatal Crash and the July 2005 Fatal
Crash. (V.R. at 110). Anderson and the other investigators identified the July 2004 Fatal Crash
as one in which there should have been an airbag deployment, and that the deployment likely
would have saved the occupant's life. (V.R. at 112-113).

       iv.    Anderson was a Transferred Employee (as such term is defined in the
Sale Agreement), after the 363 Sale. (*See, e.g.,* V.R. at 141).

     D.    Douglas Brown was in-house counsel at Old GM. (V.R. at 110). In late
2005 and 2006, Cobalt and Ion airbag non-deployment cases began to reach the Old GM Legal
Staff, including Brown. (V.R. at 103 & n.419).

       i.    Brown was assigned to the July 2004 Fatal Crash and the July 2005
Fatal Crash. (*Id.*; V.R. at 124-126).

       ii.    On October 3, 2006, Brown presented the July 2004 Fatal Crash to a
Roundtable meeting, and reported that despite extensive analysis, the engineers have no solid
technical explanation. The engineers agree that 1) the airbags should have deployed; 2) the
Sensing Diagnostic Module did not record the crash event, for unknown reasons; and 3) it is
reasonably likely that deployment of the driver airbag would have prevented death in this
accident. The Roundtable granted settlement authority and Old GM settled the case. (V.R. at
113).

iii.    On November 15, 2006, Jaclyn Palmer forwarded to Brown an e-mail sent by Alan Adler that referred to the October 26, 2006 fatal crash of a 2005 Cobalt in which the airbag did not deploy. In the November 2006 Adler e-mail, Adler asked if anyone knew about the accident. (V.R. at 114).

iv.    Brown was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale.

E.    Eric Buddrius was an engineer in Old GM's Product Investigations unit. The Product Investigations unit at Old GM was the primary unit charged with investigating and resolving significant engineering problems, including both customer satisfaction and safety problems. (V.R. at 86). The Old GM Product Investigations group would present its findings at one or more weekly Information Status Review meetings attended by the Field Performance Evaluation Director, the Product Investigations Director, and representatives from the Legal Department, Customer Care and After Sales, Field Performance Evaluation, and Product Investigation. (V.R. at 290).

i.    Witnesses have inconsistent recollections as to whether the Product Investigations group became involved in the Cobalt airbag non-deployment issues at this stage. One witness, Brian Everest, reported that in April 2007, the Field Performance Assessment group transitioned the Cobalt airbag matter to the Product Investigations unit, where it was assumed by Buddrius. Documents in Buddrius's files indicate that he was working on the issue, and a May 4, 2007 Investigation Status Review Presentation Planning Worksheet states that Buddrius was scheduled to present on an issue described as "Cobalt/Ion Airbag (NHTSA discussion item)." Buddrius has no recollection of involvement. (V.R. at 119-120).

11

ii.     Continental manufactured the Sensing Diagnostic Module for the

Chevrolet Cobalt. (V.R. at 29).

iii.    According to Brian Everest, on May 15, 2009, Buddrius attended a

meeting with Continental along with his colleagues John Sprague, Brian Everest, Lisa Stacey,

James Churchwell, William Hohnstadt, John Dolan, and Legal Staff Attorney Jaclyn Palmer, to

discuss Continental's findings regarding a Cobalt crash (hereinafter, the **"May 2009 Continental**

**Meeting"**). Continental provided a report regarding a September 13, 2008 accident involving a

2006 Chevrolet Cobalt (the **"Continental Report"**).

iv.     The Continental Report stated that the Sensing Diagnostic Module

did not deploy the airbag because the algorithms were disabled at the start of the event. The

report identified two possible causes for the disabled algorithm: (a) the vehicle experienced

"loss of battery" or (b) the Sensing Diagnostic Module received a power mode status of "Off"

from the body control module (BCM). (V.R. at 134).

v.      Buddrius was a Transferred Employee (as such term is defined in the

Sale Agreement), after the 363 Sale. (V.R. at 153 n.685).

F.      William K. Chase worked for Old GM and then New GM from 1984

through 2009. (Chase Dep. 7:2-3, 6:24-7:3). In 2005, Chase worked as a warranty engineer in

the warranty engineering department at Old GM, where he was responsible for trying to reduce

warranty costs for vehicles produced in Lordstown, Ohio, where the Cobalt and the Pontiac G5

were produced. (Chase Dep. 7:16-8:2, 20:14-18). Old GM's warranty system contained reports

of incidents that included dealer comments on incidents, if the dealer had chosen to enter a

comment. (Chase Dep. 12:23-13:3). Those reports were organized by labor code, included the

12

VIN, dealer name, the amount charged against the claim, any comments, any customer codes, and any trouble codes the dealer might have entered. (Chase Dep. 8:3-8).

      i.      According to Chase, he first learned of a problem with the 2005 Cobalt in 2005 from Steve Oakley, the Cobalt brand quality manager at the time. (Chase Dep. 7:7-14). Oakley brought the issue to Chase's attention by submitting a Problem Resolution Tracking System report (PRTS No. N182276) on May 16, 2005 and asked Chase to estimate the warranty impact. (Chase Dep. 8:3-8).

      ii.     Pursuant to a PRTS initiated in February 2009, a design change was implemented to change the ignition key design for 2010 Chevrolet Cobalt vehicles from a slot to a hole. (Feb. 7 Notice; Feb. 24 Notice; Chase Dep. 31:20-32:11).

      iii.    Chase was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale.

      G.     James Churchwell was an Old GM engineer. (V.R. at 135, 150 n.666). According to Everest, Churchwell attended the May 2009 Continental Meeting. (V.R. at 134-135).

      i.      Churchwell was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale. (V.R. at 153).

      H.     Dwayne Davidson was Old GM's Senior Manager for TREAD Reporting. (V.R. at 113-114, 117). Davidson received the November 2006 Adler E-mail. (V.R. at 114). Davidson thereafter conducted a search of Old GM's TREAD database that yielded over 700 records of field reports and complaints, which he offered to summarize. (V.R. at 114 n.477).

      i.      In February 2007, Wisconsin State Patrol Trooper Keith Young wrote a Collision Analysis & Reconstruction Report about a fatal crash in October 2006 of a 2005

13

Chevrolet Cobalt (the **"Wisconsin Report"**). Davidson stated that, in 2007, he obtained a copy

of the Wisconsin Report. The Wisconsin Report stated that it appears likely that the vehicle's

key turned to Accessory as a result of the low key cylinder torque/effort and connected this to the

failure of the airbags to deploy. Davidson stated he obtained the Wisconsin Report from

someone at Old GM Legal in 2007 and that he provided the Wisconsin Report to NHTSA in

2007 in connection with GM's quarterly death and injury report. None of the GM lawyers and

engineers interviewed in connection with the Valukas Report who were working on Cobalt

matters recall being aware of the Wisconsin Report until 2014. (V.R. at 116-118).

           ii.      Davidson was a Transferred Employee (as such term is defined in the

Sale Agreement), after the 363 Sale. (*See, e.g.,* V.R. at 159).

           I.      Raymond DeGiorgio was an Old GM Design Release Engineer.[7] (V.R. at

37). A Design Release Engineer is responsible for a particular component or part in a vehicle.

(V.R. at 37 n.114). He had worked at Old GM as a Design Release Engineer since 1991,

focusing on vehicle switches. DeGiorgio was the project or lead design engineer for the Ignition

Switch used in the 2003 Saturn Ion and 2005 Chevrolet Cobalt. (DeGiorgio Dep. 11:6-10; 13:7-

10, 18-19). Additionally, he was the lead design engineer for an ignition switch that replaced the

Ignition Switch. (DeGiorgio Dep. 11:11-15; 21:5-9). He took over responsibility as Design

Release Engineeer for the Ignition Switch between October 1999 and March 2001. (V.R. at 6,

37, 212).

           i.      On March 22, 2001, DeGiorgio "finalized" the specification for the

Ignition Switch, a designation that signaled to the supplier that additional changes to the switch

---

[7] Old GM's Design Release Engineers had responsibility for working with Old GM's suppliers to develop specific vehicle components for use in particular Old GM vehicles - their "design" responsibilities - and to ensure that those components satisfied Old GM's requirements and specifications before ultimately approving the part for use in an Old GM vehicle – "releasing" the part.

14

were not anticipated and memorialized accepted agreements related to the specification at that point in time. (V.R. at 38). The supplier for the Ignition Switch was Delphi Mechatronics ("**Delphi**"). The initial specification for the Ignition Switch included a "TARGET" force displacement curve specifying 20 Newton-centimeters ("**N-cm**") as the torque needed to turn the ignition from "Run" to "Accessory." (V.R. at 36). By March 2001, based on DeGiorgio's finalization of the torque requirement, the torque necessary to move the Ignition Switch from Run to Accessory was, pursuant to the specification, required to fall somewhere between 15 N-cm and 25 N-cm. (V.R. at 39). In September 2001, DeGiorgio corresponded with representatives of Koyo Steering Systems North America ("**Koyo**"), the supplier of the Ion steering column into which Delphi's switch was installed.   In his correspondence, DeGiorgio stated he recently learned that 10 of 12 prototype switches from Delphi failed to meet engineering requirements, and the failure is significant, adding that DeGiorgio himself must ensure this new design meets engineering requirements.   (V.R. at 44). According to DeGiorgio, the "engineering requirements" and failures he referenced in this e-mail were electrical requirements and not failures related to the Ignition Switch torque. (V.R. at 44-45).

            ii.     At the same time that DeGiorgio was dealing with electrical problems with the Ignition Switch, Delphi was also conducting tests on the mechanical requirements, including the torque required to turn the Ignition Switch. (V.R. at 45). In February 2002, Delphi personnel informed DeGiorgio that the accessory detent was at 9.5 N-cm, which was below DeGiorgio's requested target based on TALC samples, and advised DeGiorgio that the torque could be increased, but there were risks that changes would trigger other issues. These risks included cracking of the rotors, premature wear-out of the detent, and impact on the electrical functions (particularly the printed circuit board). (V.R. at 46-47).

15

iii.     DeGiorgio approved production of the Ignition Switch, although it
did not meet the Specification. (V.R. at 38-40, 50, 52). The Ignition Switch was installed in
Saturn Ion and Chevrolet Cobalt vehicles. *(See, e.g.,* V.R. at 53).

iv.     Problems with the Ignition Switch were brought to DeGiorgio's
attention in 2003, 2004, and 2005. (V.R. at 53). These included at least one complaint that the
Ignition Switch in a customer's vehicle had insufficient torque and caused that vehicle to shut off
while driving. (V.R. at 77). In 2005, DeGiorgio received torque test results from Old GM's
review of the Ignition Switch turning from the "Run" to the "Accessory" position in certain
Chevrolet Cobalt vehicles. (DeGiorgio Dep. 58:4-19). DeGiorgio discussed changes to the
Ignition Switch used in the Chevrolet Cobalt with John Hendler and later proposed changes to
the Cobalt VAPIR Team. (2014 House Panel Report, e-mail from Raymond DeGiorgio to
Andrew C. Brenz, dated Nov. 22, 2004 (GMHEC000330211-14)).

v.     In 2006, DeGiorgio approved a change in the Ignition Switch that
increased the torque required to turn the key, but there was no change to the part number. (V.R.
at 9-10, 39). NHTSA was not informed of the change to the Ignition Switch. (Apr. 1 Cong. Hr'g
at 75).

vi.     On or about August 14, 2007, Old GM entered into a Warranty
Settlement Agreement with Delphi (as a debtor in bankruptcy) where the estimated warranty
costs could exceed $1 million (the "**Delphi Settlement**"). The Delphi Settlement identified 49
issues that were resolved as part of the settlement, including something labelled "ignition switch
failure" on the model year 2003-04 Saturn Ion and model year 2005-06 Chevrolet Cobalt.

vii.     DeGiorgio was a Transferred Employee (as such term is defined in
the Sale Agreement), after the 363 Sale. (V.R. at 179).

16

J.      John Dolan was an electrical engineer for Old GM and, according to

Everest, attended the May 2009 Continental Meeting. (V.R. at 134, 165).

i.      Dolan was a Transferred Employee (as such term is defined in the

Sale Agreement), after the 363 Sale. (V.R. at 174 n.793).

K.      Brian Everest, an engineer, was an Old GM Field Performance

Assessment Supervisor. (V.R. at 114, 118-119). John Sprague an Old GM Field Performance

Assessment Engineer stated that he generally remembers sharing his Excel spreadsheet listing

the various Cobalt accidents and non-deployments with Everest, but he does not remember

sharing the spreadsheet at any formal meeting. (V.R. at 119). Everest attended the May 2009

Continental Meeting. (V.R. at 134). At some point after that time, Everest investigated how the

Cobalt's Body Control Module, the part responsible for controlling the engine, could send a

power mode status of "Off" to the Sensing Diagnostic Module. (V.R. at 135).

i.      Everest was a Transferred Employee (as such term is defined in the

Sale Agreement), after the 363 Sale. (V.R. at 153).

L.      Michael Gruskin was an attorney for Old GM and then for New GM.

(V.R. at 110). At some point in time, he headed GM's product litigation team. (V.R. at 105,

110). In addition, Gruskin chaired the Settlement Review Committee and the Roundtable[8] from

September 2007 to March 2012. (V.R. at 107). During the time Gruskin chaired the

Roundtable (which generally met on a weekly basis), the Roundtable reviewed the following

crashes. First, in September 2007, the Roundtable reviewed a crash involving a person who

sustained severe injuries after his 2005 Saturn Ion ran into the rear of an illegally parked tractor

trailer on June 26, 2005 (the "**June 2005 Non-Fatal Crash**"). The presentation made at the

---

[8] The Roundtable is discussed *supra* at ¶15,C, ii.

17

Roundtable indicated that the Sensing Diagnostic Module data was incomplete and inaccurate, as a probable result of power loss during the crash. Second, in July 2008 the Roundtable reviewed a December 29, 2006 crash of a 2005 Chevrolet Cobalt which caused serious injuries and in which neither Old GM nor outside counsel had an explanation for why the airbag did not deploy. According to the Sensing Diagnostic Module data, the ignition was in the Run position at the time of the accident.

                i.     Gruskin was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale.

              M.     Victor Hakim was an Old GM employee, who, as of June 11, 2013, had been with Old GM and then New GM for 43 years. (Hakim Dep. 6:23-7:1). Hakim testified at his deposition that there was a summary Excel spreadsheet from the Old GM Company Vehicle Evaluation Program, which contained comments from drivers of Ion vehicles. (Hakim Dep. 155:9-15). The Old GM Company Vehicle Evaluation Program spreadsheet included a January 9, 2004 statement from one driver of a Saturn Ion that the Ignition Switch was positioned too low on the steering column, that the keys hit his knee while driving, that the Ignition Switch should be raised on the steering column at least one inch, that this was a basic design flaw, and that it should be corrected if Old GM wanted repeat sales. (Hakim Dep. 155:23-24; 156:22-157:5).

              i.     Hakim was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale. *(See, e.g.,* V.R. at 145).

              N.     William Hohnstadt was an Old GM sensing performance engineer. (V.R. at 134). On July 16, 2007, Hohnstadt received Sensing Diagnostic Module data from Continental relating to a Cobalt crash in which the airbags did not deploy. The report concluded that the vehicle's Sensing Diagnostic Module had experienced loss of battery prior to the non-

18

deployment.  (V.R. at 126, 127 n.543).  According to one witness, Hohnstadt attended the May

2009 Continental Meeting.  (V.R. at 134).

       i.    Hohnstadt was a Transferred Employee (as such term is defined in

the Sale Agreement), after the 363 Sale.

       O.    William J. Kemp was Old GM's Counsel for Engineering Organization,

and was a member of Old GM's Settlement Review Committee.  (V.R. at 104).  He was an Old

GM senior attorney who worked closely with the engineering groups and who had shared

responsibility for safety issues in the legal department.  (V.R. at 85).  Kemp sat on the

Settlement Review Committee, whose purpose was to determine whether and at what price to

settle product liability lawsuits.  "A reason for that assignment is to ensure that information from

lawsuits finds its way into GM's safety function, that is, to the engineers who make safety

decisions." (V.R. at 105, 108).

       i.    In the late spring of 2004, certain Old GM employees, including Gay

Kent, discussed engine stalling with NHSTA.  (V.R. at 72).  On June 3, 2004, during the meeting

with NHTSA, Old GM personnel presented their perspective on engine stalls—specifically, that

those occurring on acceleration required more rigorous review.  GM also represented to NHTSA

that in assessing a given stall, it considered severity, incident rate, and warning to the driver.

Kemp's notes related to this meeting indicate NHTSA told Old GM that, in a case where the

number of failures was "inordinately high," the factors considered by Old GM to assess the

problem should be considered but did not necessarily "immunize" a manufacturer from

conducting a safety recall.  (V.R. at 73-74).

       ii.    In or around June 2005, Kemp was informed of an article to be

published in the Cleveland Plain Dealer that criticized Old GM's response to engine stall in the

Cobalt. Kemp suggested that Old GM should give the columnist a videotape demonstration showing the remoteness of this risk. Elizabeth Zatina, another Old GM attorney, responded that she was not optimistic we can come up with something compelling. Kemp replied that they can't stand hearing, after the article is published, that they didn't do enough to defend a brand new launch. (V.R. at 85-86).

               iii.    Kemp was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale. (V.R. at 151).

          P.    Gay Kent was Old GM's Director of Product Investigations. In or around 2005, Old GM Product Investigations Manager Douglas Wachtel assigned Old GM Product Investigations employee Elizabeth Kiihr to investigate the Cobalt Ignition Switch shut-off. (V.R. at 86). In addition, Wachtel and Gay Kent obtained a Cobalt and drove around Old GM's property in Warren, Michigan. Kent had a long and heavy key chain and was able to knock the Ignition Switch from "Run" to "Accessory" by moving her leg so that her jeans caused friction against the fob. Wachtel could reproduce the phenomenon more easily, but still only by contacting the key chain rather than hitting bumps in the road. (V.R. at 87).

               i.    On March 29, 2007, a group of Old GM engineers, including Gay Kent and Brian Everest, attended a Quarterly Review meeting at NHTSA headquarters. During that meeting, or during a break, NHTSA officials told the Old GM representatives that they had observed a number of airbag non-deployments in Cobalt and Ion vehicles. NHTSA made no formal request and did not ask Old GM to report back to it about the non-deployment issue.

               ii.    Kent was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale.

          Q.    Elizabeth Kiihr was an engineer in Old GM's Product Investigations unit.

      i.    Kiihr was assigned in or around 2005 to investigate the Cobalt

Ignition Switch shut-off. (V.R. at 86).

      ii.    Kiihr created a file in 2005 that contained customer complaints and a

copy of a February 2005 "Preliminary Information" on engine stalls in the Cobalt. (V.R. at 66,

156). The file contained, among other things: (a) several TREAD data reports regarding the

Cobalt; (b) PowerPoint presentations, including presentations from an Investigation Status

Review meeting in 2005 and a Vehicle and Progress Integration Review ("**VAPIR**")[9] meeting in

2005; (c) a cost estimate for changing the design of the key; and (d) a copy of a Product

Investigation Bulletin titled "Engine Stalls, Loss of Electrical Systems, and No DTCs." (V.R. at

164).

      iii.    Kiihr was a Transferred Employee (as such term is defined in the Sale

Agreement), after the 363 Sale.

    R.    Alberto Manzor was an Old GM engineer.

      i.    Manzor became involved in the investigation of the Cobalt ignition

switch in the spring of 2005. Manzor claims that he said, at the time, that the Cobalt ignition

switch issue was incorrectly categorized as a moderate issue and should have been classified as a

safety issue. (V.R. at 83). There was no documentary evidence of Manzor making such a

statement. Manzor claims that he said that he discussed his safety concerns about the Cobalt,

including the potential for airbag non-deployment, with Doug Parks, Gary Altman, and an Old

GM safety engineer, Naveen Ramachandrarappa Nagapola, but these employees either do not

recall or else deny the conversation took place. (V.R. at 83-84). On June 17, 2005, Manzor

---

[9] VAPIR (Vehicle and Process Integration Review), by design, includes a cross-section of Vehicle System
Engineers because they are supposed to be able to recognize whether an issue impacts other functions within the
vehicle. (V.R. at 66).

conducted testing on the Cobalt Ignition Switch, and the proposed GMT 191 Ignition Switch, at
Old GM's Milford Proving Ground, to evaluate how the Ignition Switches performed using a key
with a slotted key head versus a key head with a hole. (V.R. at 81). According to Manzor, these
experiments demonstrated that changing the key head design and replacing the Ignition Switch
had the potential to address the torque problem. They also demonstrated that the rotational
torque required to move the key out of "Run" was 10 N-cm. This was below the specification of
15 to 25 N-cm. (V.R. at 82). However, neither Parks nor Manzor compared the test results to the
actual specification.

           ii.     Following the tests, Manzor took steps to expedite the key-head
design change of the ignition key. Later, in June 2005, the Old GM Vehicle and Process
Integration Review Committee approved a service fix for existing customers—a plug that could
be inserted into keys when customers came to the dealer reporting problems – and a change to
the key for production in the future (a change that was not implemented). On July 12, 2005,
another Preliminary Information was issued, stating (only for the 2005 Cobalt and 2005 Pontiac
Pursuit) that a fix was available (the key insert). Certain Old GM engineers still regarded the
key head design change as only a temporary solution – or, as one engineer described it, a "band-
aid." (V.R. at 82-83).

           iii.    Manzor was a Transferred Employee (as such term is defined in the
Sale Agreement), after the 363 Sale.

      S.     Steven Oakley was a brand quality manager for Old GM in 2005 and had
been continuously employed by Old GM since 1990. (Oakley Dep. 7:1-6, 18-20).

           i.      In or around March 2005, Oakley first became aware of an issue
with the Ignition Switch. (Oakley Dep. 12:8-14, 16-19, 22-23; 14:9-22; *see also* V.R. at 86, 92).

22

Around that time, Oakley drafted a service bulletin request form describing the engine-cut-off problems as a stall, but the Technical Service Bulletin issued in December 2005 did not use that language. (V.R. at 76). Oakley has stated, at times, that he was reluctant to push hard on safety issues because of his perception that his predecessor had been pushed out of his job for doing just that. In this particular event, Oakley stated that his initial concern that the Ignition Switch presented a safety issue was alleviated after discussions with the engineers. (V.R. at 93).

ii.     Oakley received a customer demand that Old GM repurchase the customer's Cobalt in May 2005 because the Ignition Switch shut off during normal driving with no apparent contact between the driver's knee and the key chain or fob. (V.R. at 76). Oakley forwarded this information internally at Old GM, stating that the customer reported that the ignition switch goes to the off position too easily shutting the car off.  (V.R. at 76 n.309). Oakley told Old GM employee Joseph Joshua, to whom he forwarded the customer demand, that

the field rep will swap the parts if we want them to. He is concerned that this will not correct the condition, as he feels several stock cars at the dealership have about the same level of effort for the switch. They would like to have a column sent to them that we have some kind of confidence is better than what they are taking out. Again, if you just want a swap out we can do this, but without the ability to measure the effort, I have a hard time persuading them this will actually fix the car.

(V.R. at 77).

iii.     One of the people the e-mail was forwarded to was DeGiorgio, who does not remember receiving this e-mail. (V.R. at 77).

iv.     Oakley was a Transferred Employee (as such term defined is defined in the Sale Agreement), after the 363 Sale.

T.     Jaclyn C. Palmer was an Old GM product liability attorney and attended Roundtable meetings. (V.R. at 108). Palmer, described as an "airbag lawyer," received the

23

November 2006 Adler E-mail and forwarded it to Doug Brown, another Old GM airbag lawyer,
so that he could be prepared for any potential claims related to the 2005 crash involving a Cobalt
in which the airbag failed to deploy. (V.R. at 114, n.477). Palmer attended the May 2009
Continental Meeting. (V.R. at 135).

      i.    Palmer was a Transferred Employee (as such term is defined in the
Sale Agreement), after the 363 Sale. *(See, e.g.,* V.R. at 140-141).

      ii.    Doug Parks was Old GM's Vehicle Chief Engineer for the Chevrolet
Cobalt leading up to its launch.  V.R. at 57-58). In late 2004, Parks asked Altman to follow up
on a complaint that the driver had turned off a Cobalt by hitting his knee against the key fob
(V.R. at 59-60). Altman was able to replicate the incident. (V.R. at 60). On May 4, 2005, Parks
sent an e-mail to various Old GM personnel including Altman, regarding "GMX 001: Inadvertent
Ign turn-off," writing, "for service, can we come up with a 'plug' to go into the key that centers
the ring through the middle of the key and not the edge/slot? This appears to me to be the only
real, quick solution." (Doc. 12).

      iii.    Parks was a Transferred Employee (as such term is defined in the Sale
Agreement), after the 363 Sale.

      U.    Manuel Peace was an Old GM Field Performance Assessment Engineer.
He investigated at least three crashes in Saturn Ion or Chevrolet Cobalt vehicles, including the
July 2004 Fatal Crash, the June 2005 Non-Fatal Crash, and the July 2005 Fatal Crash. (V.R. at
110, 112, 124, 126). Peace and Kathy Anderson were assigned to investigate the July 2004 Fatal
Crash and the July 2005 Fatal Crash. Peace and the other Old GM investigators identified the
July 2004 Fatal Crash as a crash in which there should have been an airbag deployment and that

24

it was reasonably likely that the deployment of the driver airbag would have prevented the
occupant's death in this accident.  (V.R. at 111-113).

            i.     In 2007, Old GM's Legal Staff was made aware of the June 2005
Non-Fatal Crash.  (V.R. at 125-126).  Manuel Peace and John Sprague were the Old GM Field
Performance Assessment investigators and Doug Brown was the Old GM lawyer assigned to the
June 2005 Non-Fatal Crash.  (V.R. at 126).  The investigation proceeded to a Roundtable
presentation on September 18, 2007.  (*Id.*).

            ii.    Peace was a Transferred Employee (as such term is defined in the
Sale Agreement), after the 363 Sale.

            V.    Craig St. Pierre worked for a company called Ortech, the supplier of the
Chevrolet Cobalt ignition cylinder, as a supplier resident engineer for approximately five years.
During this time, he maintained a desk at Old GM.  (St. Pierre Dep. 7:10-13; 8:3-13; 10:1-18).
During the launch of the Chevrolet Cobalt, St. Pierre learned that there was a problem with the
ignition key turning from the "Run" to the "Accessory" position under normal operating
conditions.  He was made aware of this problem so that he could communicate back to Ortech.
(St. Pierre Dep. 8:22-25; 10:1-8).

            i.     By September 13, 2005, St. Pierre and Trush determined that the
detent effort in the Ignition Switch in the Cobalt was too low. (St. Pierre Dep. 14:11-15:3).

            ii.    In September 2005, regarding the Ignition Switch problem, St. Pierre
stated in a Problem Resolution Tracking System Report that the detent efforts on Ignition Switch
are too low allowing the key to be cycled to off position inadvertently.  Changes to the key can
be made to reduce the moment which can be applied to key by key ring/keys.  This will assist in
limiting the issue but will not completely eliminate it.  Changes to the switch will not be

forthcoming from electrical group until model year 2007. (2005 PRTS, originated May 17, 2005, at GMHEC0000001748).

iii.    David Kepczynski was an Old GM engineering group manager. In 2006, Kepczynski recommended closing the 2005 PRTS without action because the business case was not accepted by the program team. Kepczynski also stated that a service fix was already available and in the field. (2005 PRTS, originated May 17, 2005, at GMHEC000001750-1751).

W.    Keith Schultz was Manager of Internal Investigations in Old GM's Product Investigations unit at or around March, 2007. (V.R. at 118).

i.    After Old GM personnel returned from a March 29, 2007 meeting with NHTSA, in which NHTSA officials had told the Old GM representatives that they had observed airbag non-deployments in the Cobalt and Ion vehicles, Everest and John Sprague, an Old GM Field Performance Assessment airbag engineer, compiled information on Cobalt and Ion NISMs (as defined in paragraph 15, X) and lawsuits. Dwayne Davidson pulled the TREAD data for similar instances. (V.R. at 118). Sprague began compiling an Excel spreadsheet listing the various Cobalt accidents and non-deployments to look for trends, but he did not remember sharing the spreadsheet at any formal meeting. (V.R. at 118-119). Schultz sent an e-mail to Brian Everest and John Sprague on May 3, 2007, stating that they were planning to have a brief discussion on the Cobalt/Ion Air Bag non-deployment issue tomorrow as part of their bi-weekly Investigation Status Review and that they were both welcome to join for this discussion and that it may be helpful if at least one of them can. (V.R. at 119 n. 500).

ii.    Schultz was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale.

26

X. John Sprague was an Old GM Field Performance Assessment Engineer. His job was to support Old GM's products liability defense team. (V.R. at 9). According to Everest, in 2007, Sprague was asked by Schultz to compile information on Cobalt and Ion not-in-suit matters and lawsuits. (V.R. at 118). Sprague investigated the June 2005 Non-Fatal Crash. (V.R. at 126). According to Everest, he also attended the May 2009 Continental Meeting. (V.R. at 134).

    i. After the meeting with Continental in May 2009, Sprague collected information regarding power mode status, added it to his spreadsheet, and discovered that the power mode status was recorded as Off or Accessory in a number of accidents. (V.R. 135)

    ii. Sprague was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale. (*See, e.g.,* V.R. at 141).

Y. Lisa Stacey was an Old GM Field Performance Assessment engineer. (V.R. at 132). In late 2008 or early 2009, Old GM Field Performance Assessment engineers learned about a September 13, 2008 Cobalt crash in Stevensville, Michigan, which resulted in two deaths (the "**September 2008 Fatal Crash**"). After the September 2008 Fatal Crash was reported to an ESIS[10] employee, Old GM opened a "rumor file." (V.R. at 132). "Rumor files" were an informal tracking system by which ESIS investigators or other Old GM legal staff would start files on cases that were not formally involved in litigation but potentially could lead to litigation. (V.R. at 122). Rumor files were noted by some as being hard to track, difficult to access, and not easily searchable. Stacey reviewed the publicly available information, examined the vehicle, and visited the crash scene. She thought that this was an incident where an airbag deployment would have been expected. Old GM acquired the vehicle involved in the September

---

[10] ESIS acted as a claims administrator for Old GM and conducts field investigations and processes NISM claims. They maintained offices at Old GM and worked with Old GM's Legal Staff.

27

2008 Fatal Crash and provided the vehicle's Sensing Diagnostic Module to its supplier,

Continental, for further analysis. (V.R. at 132). Stacey also attended the May 2009 Continental

Meeting.

   i. Stacey was a Transferred Employee (as such term is defined in the

Sale Agreement), after the 363 Sale.

   Z. David Trush was the Old GM design engineer for the ignition cylinder and

key of the 2005 Chevrolet Cobalt. (Trush Dep. 11:1-3). In 2004, Trush first learned of a

concern that the Saturn Ion's key could move from the "Run" position to the "Accessory"

position after receiving a call from an Old GM employee. (Trush 20:11-16; 21:10-17). Trush

did not recall the specifics of the conversation.

   i. At some point, Trush became aware of an incident occurring in the

Fall of 2004 involving a Chevrolet Cobalt in which, while driving the vehicle, the driver's knee

bumped the key in such a manner as to turn off the ignition. (Trush Dep. 32:22-33:9).

   ii. Trush testified that, as of February 2009, he had feedback from the

Lordstown, Ohio, plant that assembled the Chevrolet Cobalt that, while installing the steering

column in a vehicle, the workers at the plant were inadvertently hitting the ignition key and

moving the key to different positions. (Trush Dep. 108:20-111:21).

   iii. Trush was a Transferred Employee (as such term is defined in the

Sale Agreement), after the 363 Sale.

   AA. Douglas Wachtel was a manager in Old GM's Product Investigations unit.

   i. Wachtel was copied on the November 2006 Adler E-mail. (V.R. at

114). In his e-mail response to Adler, Wachtel reviewed existing field actions involving the

Cobalt and recommended that Old GM acquire Event Data Recorder data. (V.R. at 114 n.477).

28

Wachtel was sent an e-mail from an Old GM employee, Christopher Janik, that contained a

summary of the two Cobalt frontal airbag non-deployment claims in the NHTSA database. (*Id.*).

   ii.  In March-April 2007, Old GM's technical bulletin group proposed

publishing a revised version of the December 2005 Service Bulletin that would change the

subject line to include the word "stalls." The proposed title was: "Information on Inadvertent

Turning off of Key Cylinder, Loss of Electrical System, Hesitation, Stalls and No DTCs Set."

(V.R. at 120).

   iii.  On April 24, 2007, Wachtel (then Old GM Senior Manager – Internal

Investigation, Product Investigations) provided his approval to add the word "stall" to the

symptoms section of the bulletin. Wachtel later forwarded this e-mail chain to Gay Kent.

   iv.  Old GM had no record of publication of the 2007 Technical Service

Bulletin. (*See, e.g.,* V.R. at 145).

   v.  Kemp instructed Wachtel to open a 2011 Product Investigation into

the ignition switch issue, and Wachtel assigned the investigation to Brian Stouffer. (V.R. at 145)

   vi.  During this investigation, Stouffer was given material regarding the

2005 Cobalt moving stall and quickly located the December 2005 Service Bulletin. (V.R. at

145).

   vii.  Wachtel was a Transferred Employee (as such term is defined on the

Sale Agreement), after the 363 Sale. (*See, e.g.,* V.R. at 145).

   BB.  In February 2007, ESIS Claims Administrator Kristy Gibb received a copy

of Wisconsin State Trooper Keith Young's "Collision Analysis & Reconstruction Report." (V.R.

at 112).

CC.     In September 2006, Dykema Gossett, LLP, an Old GM outside law firm, sent to Old GM's legal staff a case evaluation regarding the July 2004 Fatal Crash. (V.R. at 112).

DD.     In May 2007, Hartline, Dacus, Berger & Dryer, LLP (**"Hartline Dacus"**) submitted to Old GM an evaluation of an airbag non-deployment crash involving the November 2004 Fatal Crash that said that Old GM's FPA engineer did not determine precisely how the vehicle lost power. (V.R. at 124-125). In January 2008, Hartline Dacus submitted its second evaluation of the November 2004 Fatal Crash to Old GM. (V.R. at 129-130).

EE.     The Captured Test Fleet was a group of early production cars driven by Old GM employees who were charged with identifying problems before launch. (V.R. at 58).

FF.     Captured Test Fleet reports were organized by the Old GM Quality Group and spreadsheets were sent to the chief engineer, the Program Engineering Manager, and the program team, and were discussed at weekly team meetings.   (V.R. at 300).

15.     Old GM collected data from unspecified vehicles equipped with the OnStar Advanced Automated Crash Notification during the time period of May 2005-2006. (*See A Study of US Crash Statistics From Automated Crash Notification Data* by M.K. Verma, R.C. Lange and D.C. McGarry, General Motors Corp., ESV paper number 07-0058-0, available at *http://www-nrd.nhtsa.dot.gov/pdf/esv/esv20/07-0058-O.pdf*). During that time period, there were 1,045 recorded frontal crashes with frontal airbag deployment in the unspecified Advance Automated Crash Notification equipped vehicles. In addition, there were 356 cases of 'non-deployment' in unspecified Advanced Automated Crash Notification equipped vehicles where the predetermined thresholds for Advanced Automated Crash Notification in frontal impact were

reached or exceeded. The study does not indicate whether data was collected from any of the Subject Vehicles. (*Id.*).

16.     According to Bill Merrill (an Old GM Red X North America Manager whom Old GM Product Investigations engineer Brian Stouffer emailed to request assistance from the Red X team to examine changes on the Cobalt between 2007 and 2008 model years), at his March 18, 2014 interview – "if an [Old GM] employee tried to raise a safety issue five years ago, the employee would get pushback." (V.R. at 187, 252).

17.     Old GM employee Andrew Brenz or Alberto Manzor described a GM phenomenon of avoiding responsibility, as the "'GM Salute,' a crossing of the arms and pointing outward towards others, indicating that the responsibility belongs to someone else, not me." (V.R. at 255).

18.     New GM CEO Mary Barra "described a phenomenon known as the 'GM Nod.'" In one part of the Report, Barra described the nod as "when everyone nods in agreement to a proposed plan of action, but then leaves the room with no intention to follow through, and the nod is an empty gesture." (V.R. at 256). In another part of the Report, it is described as "when everyone nods in agreement to a proposed plan of action, but then leaves the room and does nothing." (V.R. at 2).

19.     Barra stated that problems occurred during a prior vehicle launch as a result of engineers being unwilling to identify issues out of concern that it would delay the launch. (V.R. at 252).

20.     Barra testified that a cost-benefit analysis on a safety issue or a safety defect is not acceptable. (Apr. 1 Cong. Hr'g, at 32).

31

21.    New GM informed NHTSA in July 2014 that, in 2003, GM learned of a customer complaint of intermittent vehicle shut offs in a MY 2003 Grand Am from a Michigan dealership. Despite multiple attempts, the dealership could not duplicate the condition. GM's Brand Quality Manager for the Grand Am personally visited the dealership and requested that the customer demonstrate the problem. The customer had an excess key ring and mass (containing approximately 50 keys and a set of brass knuckles), and was able to recreate the shut off upon driving over a speed bump at approximately 30-35 mph.

22.    On January 7, 2003, GM opened Problem Resolution Tracking System 0084/2003. On May 22, 2003, GM issued a voicemail to dealerships describing the condition and identifying the relevant population of vehicles as 1999 through 2003 MY Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am. The notice directed dealers to pay attention to the key size and mass of the customer's key ring in order to better diagnose the customer's complaint. On July 24, 2003, Engineering Work Order (EWO) 211722 was initiated to increase the detent plunger force on the ignition switch replacing P/N 22688239 with P/N 22737173. This was a running change made in 2004 to the Malibu, Grand Am and the Alero. The production and service stock disposition for P/N 22688239 was designated "use," so it is possible that P/N 22688239 was used to service vehicles. New GM informed NHTSA in July 2014 that, on March 17, 2004, EWO 317693 was initiated to increase the detent plunger force on the ignition switch on the Grand Prix in order to maintain commonality between the Grand Prix and the Malibu, Grand Am and the Alero. The old Grand Prix part number, P/N10310896, was not changed to a new part number when the detent plunger force was changed, rather P/N 10310896 remained the part number for the new ignition switch. The service stock disposition was designated "use," so it is possible that the old switch was used to service vehicles.

23.     Chris Johnson was General Counsel of GM North America from October 15,

2001 until October 31, 2008.

24.     On September 1, 2006, Robert Osborne succeeded Thomas Gottschalk as Old

GM's General Counsel and maintained that position until July 2009.

25.     Michael Robinson was General Counsel of GM North America from

November 1, 2008 until September 30, 2009.

26.     From 2001 through early July 2009, the General Counsel of GM North

America for Old GM reported to Old GM's General Counsel.

27.     Prior to the 363 Sale, Old GM initiated at least eight vehicle recalls in 2009

that were unrelated to the Ignition Switch Defect. *See* Recalls 09V036000; 09V073000;

09V080000; 09V116000; 09V153000; 09V154000; 09V155000; 09V172000.

61730333 v3-WorksiteUS-000002/3179

33

# Exhibit A

## EXHIBIT A

### CERTAIN PLAINTIFFS' PROPOSED STIPULATIONS
### OF FACT NOT AGREED TO BY NEW GM

1.      On November 19, 2004, Old GM personnel opened a Problem Resolution

Tracking System report to address a complaint at a press event that a Subject Vehicle could be

"keyed off with knee while driving. This was the first of six reports opened between 2004 and

2009 in connection with moving stalls in the Cobalt." (V.R. at 63). As part of the November 19,

2004 Problem Resolution Tracking System investigation, Old GM engineers suggested solutions

to address the complaint that the ignition could be "keyed off with knee while driving," and

presented them to the Current Production Improvement Team. (V.R. at 64-68).

2.      As Old GM's Program Engineering Manager for the Chevrolet Cobalt when it

was launched, Gary Altman would have been present at Current Production Improvement Team

and Vehicle and Process Integration Review meetings in which possible solutions were presented

to address reports that drivers had inadvertently turned off the ignition switch in Cobalt vehicles

by hitting their knees against the key or key fob. (V.R. at 63-67).

3.      A May 2007 case evaluation, by Old GM's outside counsel, of an accident in a

2004 Saturn Ion in which the airbag failed to deploy despite the fact that the vehicle went off the

road, traveled through a brush line and struck a tree head on, resulting in one fatality and one

severe injury, was deemed "unusual." "In discussing the technical issues in the case, outside

counsel explained that, given the severity of the impact, the airbag non-deployment 'must be'

attributable to power loss." (V.R. at 124-125).

4.      A January 2008 second evaluation by Old GM outside counsel of a non-

deployment case involving a Subject Vehicle hitting a tree concluded that "[t]he impact with the

tree was clearly severe enough to warrant deployment of the vehicle's airbags. As a result, from a technical standpoint, there is a potential problem with the non-deployment, which was originally attributed to a pre-collision power loss." While outside counsel and Old GM Field Performance Assessment Engineer Manuel Peace thought the non-deployment event was not caused by a power loss, outside counsel concluded that "it was likely 'that a jury will find that the vehicle was defective' [and] GM eventually settled the case in 2008." (V.R. at 129-30).

5.      In March 2009, Old GM CEO Rick Wagoner had a "back-up" slide of a slide deck that included a reference to the Cobalt's inadvertent shut-off issue, that was presented at a meeting of the Vehicle Program Review team. That slide, in a 72-page slide presentation, described a proposed change in the Cobalt's key design from a slot to a hole. The slide deck was found in the data collected from Wagoner's computer from March 2009. (V.R. at 245).

6.      In furtherance of Old GM's admitted culture of avoiding responsibility, an Old GM 2008 Q1 Interior Technical Learning Symposium presentation provided examples of comments and phrases employees should avoid using in reports:

i.      "This is a lawsuit waiting to happen . . ." ; "Unbelievable Engineering screw up . . . "; "This is a safety and security issue . . ."; "Scary for the customer . . . "; "Kids and wife panicking over the situation . . . "; "I believe the wheels are too soft and weak and could cause serious problems. . ."; "Dangerous . . . almost cause accident."

ii.      The presentation also stated that documents used for reports and presentations should only concern engineering results, facts, and judgments. Some examples of words or phrases that are to be avoided are: *always* (emphasis in original), annihilate, apocalyptic, bad, Band-Aid, big time, brakes like an "X" car, cataclysmic, catastrophic, Challenger, chaotic, Cobain, condemns, Corvair-like, crippling, critical, dangerous, deathtrap,

debilitating, decapitating, *defect* (emphasis in original), defective, detonate, disemboweling,

enfeebling, evil, eviscerated, explode, failed, failure, flawed, genocide, ghastly, grenadelike,

grisly, gruesome, Hindenburg, Hobbling, Horrific, impaling, inferno, Kevorkianesque, lacerating,

life-threatening, maiming, malicious, mangling, maniacal, mutilating, *never* (emphasis in

original), potentially-disfiguring, powder keg, problem, rolling sarcophagus (tomb or coffin),

safety, safety related, serious, spontaneous combustion, startling, suffocating, suicidal, terrifying,

Titanic, tomblike, unstable, widow-maker, words or phrases with biblical connotation, you're

toast.

7.      "In addition to being trained on how to write, a number of GM employees

reported that they did not take notes at all critical safety meetings because they believed GM

lawyers did not want such notes taken." (V.R. at 254).

8.      Between the years 2003 and 2012, consumers raised 133 warranty claims with

GM dealers about 2003-2007 Ion vehicles, 2005-2007 Cobalt vehicles, 2006-2007 HHR

vehicles, a 2006 Solstice, and two 2007 G5 vehicles, that unexpectedly stalled or turned off when

going over bumps or when the key was struck. (Supplemental Memorandum, dated April 1,

2014, U.S. House of Representatives Committee on Energy and Commerce Democratic Staff, at

1-2, which can be found at:

http://democrats.energycommerce.house.gov/sites/default/files/documents/Supplemental-Memo-

GM-Warranty-Claims-2014-4-1.pdf.

# Exhibit C

## Groman Plaintiffs' Disputed Stipulated Facts

1. From at least 2001 through early July 2009, the Old GM "lawyers in charge of safety issues ... reported to the General Counsel of GM North America." (V.R. at 104).

2. From at least 2001 through early July 2009, the Old GM "lawyers in charge of product liability litigation reported to the General Counsel of GM North America." (V.R. at 104).

3. During his employment, William Kemp reported to the General Counsel of GM North America. (V.R. at 104).

4. During his employment, Larry Buonomo reported to the General Counsel of GM North America. (V.R. at 104).

5. As of the date of the filing of Old GM's bankruptcy case, Michael Robinson was aware of and possessed information that drivers of Subject Vehicles had experienced moving stalls while driving Subject Vehicles.

6. As of the date of the filing of Old GM's bankruptcy case, Michael Robinson was aware of and possessed information that some or all of the moving stalls were related to a defective Ignition Switch.

7. Before commencement of Old GM's bankruptcy case, William Kemp provided information about moving stalls experienced in Subject Vehicles to Chris Johnson.

8. Before commencement of Old GM's bankruptcy case, William Kemp provided information about moving stalls experienced in Subject Vehicles to Michael Robinson.

9. Before commencement of Old GM's bankruptcy case, William Kemp provided information about the defective Ignition Switches to Chris Johnson.

10. Before commencement of Old GM's bankruptcy case, William Kemp provided information about the defective Ignition Switches to Michael Robinson.

11. Before commencement of Old GM's bankruptcy case, Larry Buonomo was an Old GM lawyer in charge of product liability litigation.

12. Before commencement of Old GM's bankruptcy case, Larry Buonomo provided information about moving stalls experienced in Subject Vehicles to Chris Johnson.

13. Before commencement of Old GM's bankruptcy case, Larry Buonomo provided information about moving stalls experienced in Subject Vehicles to Michael Robinson.

14. Before commencement of Old GM's bankruptcy case, Larry Buonomo provided information about the defective Ignition Switches to Chris Johnson.

1

15. Before commencement of Old GM's bankruptcy case, Larry Buonomo provided information about the defective Ignition Switches to Michael Robinson.

16. Before commencement of Old GM's bankruptcy case, Chris Johnson provided information about moving stalls experienced in Subject Vehicles to Robert Osborne.

17. Before commencement of Old GM's bankruptcy case, Chris Johnson provided information about moving stalls experienced in Subject Vehicles to Thomas Gottschalk.

18. Before commencement of Old GM's bankruptcy case, Chris Johnson provided information about the defective Ignition Switches to Robert Osborne.

19. Before commencement of Old GM's bankruptcy case, Chris Johnson provided information about the defective Ignition Switches to Thomas Gottschalk.

20. Before commencement of Old GM's bankruptcy case, Michael Robinson provided information about moving stalls experienced in Subject Vehicles to Robert Osborne.

21. Before commencement of Old GM's bankruptcy case, Michael Robinson provided information about the defective Ignition Switches to Robert Osborne.

22. During the pendency of Old GM's bankruptcy case, Robert Osborne provided information about moving stalls experienced in Subject Vehicles to Michael Millikin.

23. During the pendency of Old GM's bankruptcy case, Robert Osborne provided information about the defective Ignition Switches to Michael Millikin.

24. The Delphi Settlement's reference to the phrase "ignition switch failure" is the defective Ignition Switch.

25. Larry Buonomo was involved in or participated in some manner in the Delphi Settlement.

26. Larry Buonomo received information that the phrase "ignition switch failure," which is mentioned on the chart attached to the Delphi Settlement, refers or relates to the defective Ignition Switch.

27. Larry Buonomo provided information regarding the "ignition switch failure" mentioned on the chart attached to the Delphi Settlement to Chris Johnson.

28. William Kemp was involved in or participated in some manner in the Delphi Settlement.

29. William Kemp received information that the phrase "ignition switch failure," which is mentioned on the chart attached to the Delphi Settlement, refers or relates to the defective Ignition Switch.

2

30. William Kemp provided information regarding the "ignition switch failure" mentioned on the chart attached to the Delphi Settlement to Chris Johnson.

31. Chris Johnson was involved in or participated in some manner in the Delphi Settlement.

32. Chris Johnson received information that the phrase "ignition switch failure," which is mentioned on the chart attached to the Delphi Settlement, refers or relates to the defective Ignition Switch.

33. Chris Johnson provided information regarding the "ignition switch failure" mentioned on the chart attached to the Delphi Settlement to Robert Osborne.

34. Robert Osborne was involved in or participated in some manner in the Delphi Settlement.

35. Robert Osborne received information that the "ignition switch failure" mentioned on the chart attached to the Delphi Settlement refers or relates to the defective Ignition Switch.

36. Robert Osborne provided information regarding the "ignition switch failure" mentioned on the chart attached to the Delphi Settlement to Frederick "Fritz" Henderson.

37. Frederick "Fritz" Henderson was involved in or participated in some manner in the Delphi Settlement.

38. Frederick "Fritz" Henderson received information that the phrase "ignition switch failure," which is mentioned on the chart attached to the Delphi Settlement, refers or relates to the defective Ignition Switch.

39. Before commencement of Old GM's bankruptcy case, the following Old GM officers, managers, or employees (among others named) were aware of the defective Ignition Switch:

| | |
|---|---|
| (a) | Rick Wagoner; |
| (b) | Thomas G. Stephens; |
| (c) | John Calabrese; |
| (d) | Alicia Boler-Davis; |
| (e) | Jim Frederico; |
| (f) | Terry Woychowski; |
| (g) | Each GM employee fired by New GM in connection with the subject matter of the Valukas Report. |

40. Before commencement of Old GM's bankruptcy case, the following Old GM officers, managers, or employees (among others named) were aware of the liabilities or potential legal exposure to Old GM arising from or related to the defective Ignition Switch:

| | |
|---|---|
| (a) | Rick Wagoner; |
| (b) | Thomas G. Stephens; |

3

    (c)    John Calabrese;

    (d)    Alicia Boler-Davis;

    (e)    Jim Frederico;

    (f)    Terry Woychowski;

    (g)    Each GM employee fired by New GM in connection with the subject matter of the Valukas Report.

41. Both Old GM and New GM implemented internal controls and compliance procedures designed to ensure compliance with the reporting and other legal requirements of the Safety Act and TREAD Act.

42. Senior compliance officers at Old GM had final authority to report safety issues to NHTSA.

43. Old GM's senior compliance officers were senior executives within various departments of Old GM, including the general counsel's office.

44. Before entry of the Sale Order, Old GM disclosed the defective Ignition Switch or related potential claims to the U.S. Government.

45. Before entry of the Sale Order, Old GM did not disclose the defective Ignition Switch or related potential claims to the U.S. Government.

46. Before entry of the Sale Order, Old GM and the U.S. Government had discussions or other communications concerning whether potential claims arising from the defective Ignition Switch should be retained liabilities of Old GM or assumed liabilities of New GM.

47. Before entry of the Sale Order, Old GM and the U.S. Government had no discussions or other communications concerning whether potential claims arising from the defective Ignition Switch should be retained liabilities of Old GM or assumed liabilities of New GM.

48. Before entry of the Sale Order, Old GM and the U.S. Government reached no agreement concerning whether potential claims arising from the defective Ignition Switch should be retained liabilities of Old GM.

49. Prior to the commencement of Old GM's bankruptcy case, Old GM employees who participated in a Company Vehicle Evaluation Program ("**CVEP**") with respect to the Subject Vehicles submitted incident reports to Old GM that reflected that the Old GM employees experienced moving stalls and/or accidents where the keys moved into the 'Accessory' or 'Off' position.

50. Prior to the commencement of Old GM's bankruptcy case, Old GM employees who participated in a CVEP with respect to the Subject Vehicles submitted incident reports to Old GM that reflected that the airbags did not deploy in frontal collisions.

4

51. Prior to the commencement of Old GM's bankruptcy case, Old GM received warranty reports from dealers concerning Subject Vehicles in the CVEP that that the driver experienced moving stalls and/or accidents where the keys moved into the 'Accessory' or 'Off' position.

52. Prior to the commencement of Old GM's bankruptcy case, Old GM received warranty reports from dealers concerning Subject Vehicles in the CVEP that that the driver experienced a frontal collision where the airbag did not deploy.

53. NHTSA sent nineteen "death inquiries" to GM regarding crashes of Subject Vehicles. Ruiz, Rebecca R. and Ivory, Danielle, *Documents Show General Motors Kept Silent on Fatal Crashes*, New York Times, July 15, 2014.

54. A "death inquiry" that an automaker receives from NHTSA requests further information regarding data reported by the automaker in an EWR. Ruiz, Rebecca R. and Ivory, Danielle, *Documents Show General Motors Kept Silent on Fatal Crashes*, New York Times, July 15, 2014.

55. NHTSA sent "death inquiries" to GM regarding the fatal crashes of Benjamin Hair and Amy Kosilla, who each were driving Subject Vehicles. Ruiz, Rebecca R. and Ivory, Danielle, *Documents Show General Motors Kept Silent on Fatal Crashes*, New York Times, July 15, 2014.

56. In response to these "death inquiries," GM did not explain to NHTSA the cause of the crashes. Ruiz, Rebecca R. and Ivory, Danielle, *Documents Show General Motors Kept Silent on Fatal Crashes*, New York Times, July 15, 2014.

57. At the time of those death inquiries, GM was aware that the accident at issue involved a moving stall and airbag non-deployment.

58. In connection with NHTSA's death inquiry for the 2006 Wisconsin Fatal Crash, GM told NHTSA that it did not have sufficient reliable information to accurately assess the cause of the incident. Ruiz, Rebecca R. and Ivory, Danielle, *Documents Show General Motors Kept Silent on Fatal Crashes*, New York Times, July 15, 2014.

59. At the time of the death inquiry for the 2006 Wisconsin Fatal Crash, GM was aware that the accident at issue involved a moving stall and airbag non-deployment.

60. In connection with NHTSA's death inquiry of a 2009 crash of an Subject Vehicle in Tennessee, GM told NHTSA that it had not looked into the circumstances of the crash. Ruiz, Rebecca R. and Ivory, Danielle, *Documents Show General Motors Kept Silent on Fatal Crashes*, New York Times, July 15, 2014.

61. At the time GM told NHTSA that it had not looked into the circumstances of the 2009 crash in Tennessee, GM had already in fact conducted a review of that crash. Ruiz,

5

Rebecca R. and Ivory, Danielle, *Documents Show General Motors Kept Silent on Fatal Crashes*, New York Times, July 15, 2014.

62. At the time of the death inquiry for the 2009 crash in Tennessee, GM was aware that the accident at issue involved a moving stall and airbag non-deployment.

63. In each of the six lawsuits involving non-deployment of airbags in Subject Vehicles prior to commencement of Old GM's bankruptcy case, Old GM's legal department was aware that accident related to a moving stall.

64. At all times between 2000 through commencement of Old GM's bankruptcy case, Old GM submitted Early Warning Reports ("**EWR**") to NHTSA pursuant to 49 CFR § 579.21(b)(1).

65. According to EWRs submitted to NHTSA before commencement of Old GM's bankruptcy case, Old GM had received information about at least 503 accidents in which it was alleged or proved that the death or injury reported in the EWR was caused by a possible defect in Subject Vehicles.

66. These accidents reported in Old GM's EWRs before commencement of Old GM's bankruptcy case include at least:

      a.     317 claims relating to a Chevrolet Cobalt;
      b.     98 claims relating to a Saturn Ion;
      c.     54 claims relating to a Chevrolet HHR;
      d.     19 claims relating to a Pontiac Solstice;
      e.     10 claims relating to a Pontiac G5; and
      f.     5 claims relating to a Saturn Sky.

67. Before commencement of Old GM's bankruptcy case, the EWR data was accessible by Old GM.

68. Old GM did not disclose to the Bankruptcy Court any of, or only a few of, the 503 or more accidents identified in the EWR data referenced in paragraph 66 hereof or any claims arising therefrom.

69. Subsequent to the 363 Sale, New GM submitted EWRs to NHTSA concerning Subject Vehicles.

70. Had Old GM conducted a recall of the Subject Vehicles before commencement of Old GM's bankruptcy case, the recall would have cost Old GM several hundred million dollars or more [or, alternatively, $_____.  (NOTE: GM to suggest amount)].

71. At some point between 2007 and the commencement of Old GM's bankruptcy case, John Sprague hypothesized that the defective Ignition Switch caused the airbag non-deployments in some or all of the Subject Vehicles.  (V.R. at 9)

6

72. Raymond DeGiorgio was granted authority under Old GM's chain of authority and/or policies and procedures to approve a change to the ignition switch. (V.R. at 101).

73. At all times between 2001 and 2008, under Old GM's chain of authority and/or policies and procedures, Raymond DeGiorgio was authorized to approve or disapprove the inclusion and use of an ignition switch in a new vehicle. (V.R. at 101).

74. When the ignition switch is turned to Accessory or Off, a Subject Vehicle would lose power brakes. (V.R. at 25).

75. In 2003, Old GM became aware of Saturn customer complaints about intermittent engine stalls while driving. (V.R. at 54).

76. In October 2003, a Field Performance Report, 3101/2003/US, lists 65 Ion stalls and states: "Customers comment of intermittent stall while driving. In most cases, there are no trouble codes associated with the stall." This Field Performance Report lists a vehicle with 15 miles as the youngest vehicle affected. (V.R. at 54-55).

77. Before 2008, a handful of Old GM engineers other than Raymond DeGiorgio also received information describing the change to the Ignition Switch for the model year 2008 Chevrolet Cobalt, including four engineers who received a June 30, 2006 email from Delphi to DeGiorgio stating that the detent plunger had been changed "to increase torque forces to be within specification." (V.R. at 102).

78. When first told of the defective Ignition Switch in or about March 2005, Steven Oakley formed the view that the defective Ignition Switch was a safety issue. (V.R. at 76).

79. In or about November 15, 2004, one individual was killed and another was severely injured in a crash involving a 2004 Saturn Ion where the airbags did not deploy. (V.R. at 124). Manuel Peace, an Old GM engineer who assisted Old GM's legal department in evaluating cases, did a case evaluation for this incident. (V.R. at 124). In his case evaluation, Peace stated he had never seen a situation like this where the airbags did not deploy, and that the best explanation for why the airbags did not deploy was that the vehicle lost power. (V.R. at 125)

80. At some point between 2007 and the commencement of Old GM's bankruptcy case, John Sprague and the Field Performance Assessment team observed a pattern of airbag non-deployments in Cobalts and Ions. (V.R. at 9, 118-19, 134).

81. At the time John Sprague and Brian Everest met with Continental, Sprague and Everest knew that the rotation of the ignition switch from Run to Accessory or Off could cause the Sensing and Diagnostic Module to receive a power mode message of Accessory or Off. (V.R. at 135).

82. At or about the time of the meeting with Continental in May 2009, Brian Everest and John Sprague had spoken with members of Old GM's Product Investigations group about the non-deployment of airbags in Cobalts.  (V.R. at 135).

83. Joseph Taylor, an Old GM Program Quality Manager who administered the Captured Test Fleet program for the Chevrolet Cobalt drove a 2005 Cobalt test vehicle and personally experienced moving stalls with the Cobalt.  (V.R. at 58).

8

# Exhibit D

| GIBSON, DUNN & CRUTCHER LLP | AKIN GUMP STRAUSS HAUER & FELD LLP |
|---|---|
| 200 Park Avenue | One Bryant Park, Bank of America Tower |
| New York, New York 10166 | New York, New York 10036 |
| Telephone: (212) 351-4000 | Telephone: (212) 872-8010 |
| Facsimile: (212) 351-4035 | Facsimile: (212) 872-1002 |
| Matthew J. Williams | Daniel Golden |
| Lisa H. Rubin | Deborah J. Newman |
| Keith Martorana | Jamison A. Diehl |
|  | Naomi Moss |
|  |  |
| *Attorneys for Wilmington Trust Company* | *Attorneys for the Unitholders* |

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re:** | Chapter 11 |
| **MOTORS LIQUIDATION COMPANY,** *et al.*, **f/k/a General Motors Corp.,** *et al.*, | Case No. 09-50026 (REG) |
| | (Jointly Administered) |
| **Debtors.** | |

## AGREED UPON AND DISPUTED STIPULATIONS OF FACT REGARDING
## THE EQUITABLE MOOTNESS THRESHOLD ISSUE[1]

Pursuant to this Court's *Supplemental Scheduling Order, Dated July 11, 2014, Regarding*

*(i) the Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the*

*Court's July 5, 2009 Sale Order and Injunction, (ii) the Objection Filed by Certain Plaintiffs in*

*Respect Thereto, and (iii) Adversary Proceeding No. 14-01929* (the "July Scheduling Order"),

Wilmington Trust Company, as trustee for and trust administrator of the Motors Liquidation

Company GUC Trust (the "GUC Trust"), and certain unaffiliated holders of beneficial units of

---

[1] Unless otherwise indicated, capitalized terms not defined herein shall have the meanings ascribed to them in the July Scheduling Order (as defined herein).

the Motors Liquidation Company GUC Trust (each, a "Unitholder" and collectively, the

"Unitholders") hereby submit the following agreed upon stipulations of fact concerning the

Equitable Mootness Threshold Issue (the "Equitable Mootness Stipulations").

In addition, annexed hereto as Attachment 1 is the GUC Trust's and the Unitholders'

proposed stipulations of fact that have not been agreed to by the other Counsel for the Identified

Parties.

## THE GENERAL MOTORS CORPORATION BANKRUPTCY

1.      On June 1, 2009, General Motors Corporation ("Old GM") and three of its direct

and indirect subsidiaries, Saturn, LLC, n/k/a MLCS, LLC ("MLCS"), Saturn Distribution

Corporation, n/k/a MLCS Distribution Corporation ("MLCS Distribution"), and Chevrolet-

Saturn of Harlem Inc., n/k/a MLC of Harlem, Inc. ("MLCS Harlem" and collectively with Old

GM, MLCS, and MLCS Distribution, the "Debtors") commenced cases under chapter 11 of title

11 of the United States Code in the United States Bankruptcy Court for the Southern District of

New York (the "Bankruptcy Court").

2.      On July 10, 2009, each of the Debtors consummated a sale of substantially all of

its assets in a transaction under Section 363 of the Bankruptcy Code (the "363 Sale") to an

acquisition vehicle, NGMCO, Inc., pursuant to (i) that certain Amended and Restated Master

Sale and Purchase Agreement, dated June 26, 2009, among the Debtors and New GM (as

amended, the "Sale Agreement"), and (ii) an order of the Bankruptcy Court, dated July 5, 2009

(the "Sale Order"). Following the 363 Sale, Old GM changed its name to Motors Liquidation

Company ("MLC") and the acquisition vehicle later became General Motors LLC ("New GM").

3.      The consideration provided by New GM to the Debtors under the Sale Agreement

was set forth in the Sale Decision as follows:

2

"Old GM is to receive consideration estimated to be worth approximately $45 billion, plus the value of equity interests that it will receive in New GM. It will come in the following forms:

i.      a credit bid by the U.S. Treasury and EDC, who will credit bid the

        majority of the indebtedness outstanding under their DIP facility and the

        Treasury Prepetition Loan;

ii.     the assumption by New GM of approximately $6.7 billion of indebtedness

        under the DIP facilities, plus an additional $1.175 billion to be advanced

        by the U.S. Treasury under a new DIP facility (the 'Wind Down Facility')

        whose proceeds will be used by Old GM to wind down its affairs;

iii.    the surrender of the warrant that had been issued by Old GM to Treasury

        in connection with the Treasury Prepetition Loan;

iv.     10% of the post-closing outstanding shares of New GM [(the "New GM

        Common Stock")], plus an additional 2% if the estimated amount of

        allowed prepetition general unsecured claims against Old GM exceeds $35

        billion;

v.      two warrants, each to purchase 7.5% of the post-closing outstanding

        shares of New GM, with an exercise price based on a $15 billion equity

        valuation and a $30 billion equity valuation, respectively [(the two series

        of warrants, the "New GM Warrants")]; and

vi.     the assumption of liabilities, including those noted [in the Sale Decision]."

        Sale Decision, at 18-19.

4.      The New GM Common Stock and both series of New GM Warrants (collectively, the "New GM Securities") are currently listed on the New York Stock Exchange.

3

5. New GM and the Debtors further agreed that New GM would provide additional consideration if the aggregate amount of allowed general unsecured claims against the Debtors exceed $35 billion. *(See* Sale Agreement, § 3.2(c)). In that event, New GM will be required to issue additional shares of New GM Common Stock for the benefit of the GUC Trust's beneficiaries. *(See id.).* The number of additional shares of New GM Common Stock to be issued will be equal to the number of such shares, rounded up to the next whole share, calculated by multiplying (i) 30 million shares (adjusted to take into account any stock dividend, stock split, combination of shares, recapitalization, merger, consolidation, reorganization or similar transaction with respect to such New GM Common Stock from and after the closing of the 363 Sale and before issuance of additional shares) and (ii) a fraction, (A) the numerator of which is the amount by which allowed general unsecured claims exceed $35 billion (such excess amount being capped at $7 billion) and (B) the denominator of which is $7 billion."[2] *(See* Motors Liquidation Company GUC Trust Quarterly GUC Trust Reports as of September 30, 2013 at 6).

6. On September 16, 2009, the Bankruptcy Court entered its *Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim (Including Claims Under Section 503(b)(9) of the Bankruptcy Code) and Procedures Relating Thereto and Approving the Form and Manner of Notice Thereof* (the "Bar Date Order"). (Dkt. No. 4079).

---

[2] *See* Second Amendment to Sale Agreement, Section 2(r) (amending Section 3.2(c) of the Sale Agreement) ("Sellers may, at any time, seek an Order of the Bankruptcy Court ... estimating the aggregate allowed general unsecured claims against Sellers' estates ... [and if] the Bankruptcy Court makes a finding that the estimated allowed general unsecured claims against Sellers' estates exceed $35,000,000,000, then Purchaser will ... issue additional shares of Common Stock ...."). While the Sale Agreement initially provided for the issuance of up to 10,000,000 additional shares, this number has subsequently been adjusted for the three-for-one split of New GM Common Stock. *(See Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan* at 17-18 n.2). (Dkt. No. 8023).

4

7.      Pursuant to the Bar Date Order, the Bankruptcy Court established November 30,

2009 as the deadline for each person or entity to file a proof of claim against any of the Debtors

(the "Bar Date"), and approved the form and manner of notice of the Bar Date. (Bar Date Order

at 2 ¶(a)).

## THE PLAN

8.      On August 31, 2010, the Debtors filed the *Debtors' Joint Chapter 11 Plan* with

the Bankruptcy Court. (Dkt. No. 6829). On March 18, 2011, the Debtors filed the *Debtors'*

*Second Amended Joint Chapter 11 Plan* with the Bankruptcy Court (the "Plan"). (Dkt. No.

9836). The Plan is a plan of liquidation.

9.      On December 8, 2010, the Debtors filed the *Disclosure Statement for Debtors'*

*Amended Joint Chapter 11 Plan* with the Bankruptcy Court (the "Disclosure Statement"). (Dkt.

No. 8023).

10.     On December 8, 2010, the Bankruptcy Court entered an *Order Granting Motion*

*(I) Approving Notice of Disclosure Statement Hearing; (II) Approving Disclosure Statement;*

*(III) Establishing a Record Date; (IV) Establishing Notice and Objection Procedures for*

*Confirmation of the Plan; (V) Approving Notice Packages and Procedures for Distribution*

*Thereof; (VI) Approving the Forms of Ballots and Establishing Procedures for Voting on the*

*Plan; and (VII) Approving the Form of Notices to Non-Voting Classes Under the Plan.* (Dkt.

No. 8043).

11.     The Plan, as described in the Disclosure Statement designates six (6) distinct

classes of claims or equity interests: Class 1 – secured claims; Class 2 – priority non-tax claims;

Class 3 – general unsecured claims; Class 4 – property environmental claims; Class 5 – asbestos

personal injury claims; and, Class 6 – equity interests in MLC. (Disclosure Statement at 4-8).

5

12.     The aggregate amount of General Unsecured Claims filed against the Debtors
on or before the Bar Date, as well as the General Unsecured Claims listed on the Debtors'
schedules was approximately $270 billion. (Disclosure Statement at 57).

13.     The Plan provides for the GUC Trust to be established on the Effective Date (as
defined below) under the terms of the Plan and Confirmation Order (as defined below) and the
Motors Liquidation Company GUC Trust Agreement dated as of March 30, 2011 (as amended,
the "GUC Trust Agreement").

14.     Under the terms of the Plan, for each $1,000 in amount of allowed general
unsecured claims against the Debtors that existed as of the date the Plan became effective
(together with the disputed general unsecured claims asserted against the Debtors that are
subsequently allowed, the "Allowed General Unsecured Claims"), the holders of such claims
were entitled to receive (upon delivery of any information required by the GUC Trust)
approximately 3.80 shares of New GM Common Stock, and approximately 3.46 warrants of each
series of New GM Warrants, exclusive of any securities received, or to be received, in respect of
GUC Trust Units (as defined below). (*See* Plan § 6.2; GUC Trust Agreement at Ex. A-1). The
holders of Allowed General Unsecured Claims were also entitled to receive one unit of beneficial
interest in the GUC Trust (a "GUC Trust Unit") for each $1,000 in amount of Allowed General
Unsecured Claims. (*Id.*). Under the terms of the Plan, holders of disputed general unsecured
claims against the Debtors were entitled to receive subsequent distributions of New GM
Securities and GUC Trust Units in respect of such claims only if and to the extent that their
disputed general unsecured claims were subsequently allowed. (*See* Plan § 7.4).

15.     On March 29, 2011, the Bankruptcy Court entered its *Findings of Fact,
Conclusions of Law, and Order Pursuant to Sections 1129(a) and (b) of the Bankruptcy Code*

*and Rule 3020 of the Federal Rules of Bankruptcy Procedure Confirming Debtors' Second
Amended Joint Plan* (the "Confirmation Order"). (Dkt. No. 9941).

16.     The Plan became effective on March 31, 2011 (the "Effective Date"). (Dkt No.
10056).

17.     The Plan provided that on the Effective Date, the Plan would be deemed to be
substantially consummated. (Plan §12.2).

18.     The Plan has been substantially consummated. *See In re Motors Liquidation Co.*,
462 B.R. 494, 501 n. 36 (Bankr. S.D.N.Y. 2012) ("[T]he Plan already has been substantially
consummated").

19.     On December 15, 2011 (the "Dissolution Date"), as required by the Plan, MLC
was dissolved. (*See* Form 10-K Annual Report for Motors Liquidation Company GUC Trust for
the Fiscal Year Ended March 31, 2014, filed May 22, 2014 ("GUC Trust 2014 Form 10-K") at
3).

20.     Prior to the confirmation of the Plan by the Bankruptcy Court, certain general
unsecured claims were traded.

21.     As of the Effective Date, there were approximately: (a) $29.771 billion in
Allowed General Unsecured Claims (the "Initial Allowed General Unsecured Claims") (*see*
GUC Trust 2014 Form 10-K at 6); (b) $8.154 billion in disputed general unsecured claims,
which did not include potential Term Loan Avoidance Action Claims (defined below) (*id.* at 7);
and (c) potentially $1.5 billion in additional general unsecured claims (the "Term Loan
Avoidance Action Claims," and together with the disputed general unsecured claims, the
"Disputed General Unsecured Claims") as a result of an avoidance action styled *Official
Committee of Unsecured Creditors of Motors Liquidation Co. v. JP Morgan Chase Bank, N.A. et
al.*, Adv. Pro. No 09-00504 (Bankr. S.D.N.Y. July 31, 2009) (the "JPM Action").

7

22.     The plaintiff in the JPM Action seeks to recover approximately $1.5 billion in payments made by Old GM to JPMorgan Chase Bank, N.A., on behalf of a consortium of prepetition lenders (the "JPM Action Defendants").

23.     On the Dissolution Date, the right to prosecute the JPM Action was transferred to a trust established under the Plan for the purpose of holding and prosecuting the JPM Action (the "Avoidance Action Trust"). The Avoidance Action Trust is separate from the GUC Trust. The JPM Action is now being prosecuted by the Avoidance Action Trust and is currently on appeal to the Second Circuit. Wilmington Trust Company acts as Trustee for each of the Avoidance Action Trust and the GUC Trust.

24.     The Bankruptcy Court rendered a decision in the JPM Action. *Official Committee of Unsecured Creditors of Motors Liquidation Co. v. JP Morgan Chase Bank, N.A. et al.*, 486 B.R. 596 (Bankr. S.D.N.Y. 2013).

25.     The Second Circuit certified a question of law to the Delaware Supreme Court in the JPM Action. *Official Committee of Unsecured Creditors of Motors Liquidation Co. v. JP Morgan Chase Bank, N.A. et al.*, Case No. 13-2187-bk (2d Cir. June 17, 2014).

26.     If the plaintiff is successful in the JPM Action, and any subsequent ancillary proceedings, and any JPM Defendant(s) actually disgorges funds to the Avoidance Action Trust in connection therewith, any such JPM Action Defendant will be treated as an allowed general unsecured creditor of MLC with Term Loan Avoidance Action Claims equaling the amount that they actually disgorge to the Avoidance Action Trust (which, in the aggregate, could be up to $1.5 billion, exclusive of prejudgment interest). The beneficiaries of any amounts ultimately disgorged by the JPM Action Defendants is a matter of dispute, as both the lenders that provided MLC with debtor-in-possession financing (the "DIP Lenders"), and the Committee, on behalf of holders of Allowed General Unsecured Claims, are each claiming an exclusive right to such

8

proceeds. Although the Bankruptcy Court granted summary judgment in favor of the
Committee, finding that the holders of Allowed General Unsecured Claims were the proper
beneficiaries of the Avoidance Action Trust (and thus the proceeds of the JPM Action), the
United States District Court for the Southern District of New York (the "District Court") vacated
the Bankruptcy Court's decision and order for want of subject matter jurisdiction. The District
Court specifically found that the issue regarding the identity of the proper beneficiaries of the
Avoidance Action Trust was not and would not be ripe for adjudication unless and until the JPM
Action were decided in favor of the Avoidance Action Trust. In the event that it is determined
that the holders of Allowed General Unsecured Claims are entitled to the proceeds (if any) of the
JPM Action, then such proceeds (if any) will be contributed to the Avoidance Action Trust, for
distribution to the holders of Allowed General Unsecured Claims (following the reimbursement
of certain fees and expenses to the DIP Lenders).

27.     If the defendants are successful in the JPM Action (including with respect to any
appeals), $1.5 billion of Disputed General Unsecured Claims will be eliminated from Old GM's
bankruptcy estate, and certain of the New GM Securities that have been reserved will be
available for distribution. As of the Effective Date, the total aggregate amount of general
unsecured claims, both allowed and disputed, asserted against the Debtors, including potential
Term Loan Avoidance Action Claims, was approximately $39.426 billion. (*See* April 21, 2011
Form 8-K of the Motors Liquidation GUC Trust at 4).

## The GUC Trust

28.     The GUC Trust was formed on March 30, 2011 as a statutory trust under the
Delaware Statutory Trust Act. (*See* GUC Trust Agreement at 13, Article II, § 2.1). The GUC
Trust is, among other things, responsible for implementing the Plan, including distributing New
GM Securities and GUC Trust Units to holders of Allowed General Unsecured Claims in

9

satisfaction of their claims, resolving Disputed General Unsecured Claims that were outstanding

as of the Effective Date, distributing New GM Securities and GUC Trust Units in satisfaction of

such Disputed General Unsecured Claims that are subsequently allowed, and resolving

remaining disputed administrative expense claims, priority tax claims, priority non-tax claims

and secured claims against the Debtors. (*See id.* at 3, Background § G).

29.     The "GUC Trust Beneficiaries" are as defined in the GUC Trust Agreement in

Background § F.

30.     As of the Effective Date, the corpus of the GUC Trust consisted of approximately

$52.7 million in cash contributed by the Debtors to fund the administrative fees and expenses

(including certain tax obligations) incurred by the GUC Trust in administering its duties pursuant

to the Plan and the GUC Trust Agreement (the "Administrative Fund"). (*See* GUC Trust 2014

Form 10-K at 3). The cash comprising the Administrative Fund was obtained by MLC from the

DIP Lenders and is subject to a lien held by the DIP Lenders, with any excess funds remaining in

the Administrative Fund required to be returned to the DIP Lenders, according to the GUC Trust

2014 Form 10-K, after (i) the satisfaction in full of all Wind Down Costs and other liabilities of

the GUC Trust (subject to the terms of the GUC Trust Agreement), and (ii) the winding up of the

GUC Trust's affairs. (*Id.*). The Administrative Fund cannot be used to make distributions to

holders of Allowed General Unsecured Claims. (*Id.*).

31.     Pursuant to the Plan, on the Dissolution Date, MLC transferred to the GUC Trust

(i) record ownership of all of its then remaining New GM Securities, which consisted of

30,967,561 shares of New GM Common Stock, 28,152,186 New GM Series A Warrants and

28,152,186 New GM Series B Warrants, (ii) approximately $2.0 million designated for certain

public reporting costs, and (iii) approximately $1.4 million designated for reimbursing the

indenture trustees and the fiscal and paying agents under the Debtors' prepetition debt issuances

10

for costs associated with, among other things, administering distributions to registered holders of
the Debtors' prepetition debt issuances. (*See* GUC Trust 2014 Form 10-K at 4).

32.    Under the terms of the GUC Trust Agreement, the GUC Trust Administrator is
authorized to determine whether the GUC Trust may be entitled to receive a distribution of
additional New GM Common Stock as a result of the aggregate amount of Allowed General
Unsecured Claims exceeding $35 billion, and, if the GUC Trust is so entitled, to request the
issuance of such additional shares by New GM to the GUC Trust. (*See* GUC Trust Agreement, §
2.3(d)).

33.    Each GUC Trust Unit represents "the contingent right to receive, on a *pro rata*
basis, the excess assets of the GUC Trust, including additional New GM Securities (if and to the
extent such New GM Securities are not required for satisfaction of the Resolved Allowed
Claims), Dividend Cash associated with such additional New GM Securities and Other
Administrative Cash, if any, available for distribution in respect of the GUC Trust Units, either
through a periodic distribution as provided for under the GUC Trust Agreement, or upon the
dissolution of the GUC Trust, in each case subject to the terms and conditions of the GUC Trust
Agreement and the Plan." (GUC Trust 2014 Form 10-K at 5-6).

## GUC TRUST DISTRIBUTIONS

34.    On April 21, 2011, and as supplemented by a distribution completed on or around
May 26, 2011, an initial distribution (the "Initial Distribution") of more than 75% of the New
GM Securities then held by the GUC Trust was made to the holders of Initial Allowed General
Unsecured Claims. (*See* April 21, 2011 Form 8-K of the Motors Liquidation GUC Trust at 2).[3]

---

[3]    Prior to December 15, 2011, the date on which all remaining New GM Securities held by MLC were transferred
by MLC to the GUC Trust, the GUC Trust either requisitioned New GM Securities from MLC and itself made the

[Footnote continued on next page]

11

35.   According to the GUC Trust 2014 Form 10-K, the New GM Securities that were
not distributed in the Initial Distribution were the New GM Securities that would be necessary to
pay the holders of Disputed General Unsecured Claims that become Allowed General Unsecured
Claims (the "Resolved Allowed Claims"), New GM Securities associated with holders of
Allowed General Unsecured Claims that had not provided sufficient information to the GUC
Trust to permit distribution ("Information Deficient Claims"), and those New GM Securities that
were otherwise set aside from distribution ("Set Aside Securities") for the purposes of funding
then-current or projected liquidation and administrative costs and other liabilities of the GUC
Trust (including income taxes).  The distributable assets currently held by the GUC Trust are set
forth in the GUC Trust 2014 Form 10-K.

36.   The GUC Trust Agreement sets forth provisions relating to when distributions
should be made.

37.   According to the GUC Trust Agreement, "[a]s promptly as practicable following
the beginning of each calendar quarter, beginning with the second calendar quarter, the GUC
Trust Administrator, with the approval of the GUC Trust Monitor, shall deliver to each holder, if
any, of a Disputed General Unsecured Claim or other Claim that has become a Resolved
Allowed General Unsecured Claim during the prior calendar quarter (or, in the case of the
second calendar quarter, since the Initial Distribution Record Date) a distribution consisting of . .
. the pro rata amount of GUC Trust Distributable Assets that the holder of such Resolved
Allowed General Unsecured Claim would have received had such Resolved Allowed General
Unsecured Claim been an Initial Allowed General Unsecured Claim," and "a number of Units"

[Footnote continued from previous page]
distribution of the New GM Securities, or requested that MLC make the distributions to the accounts of allowed
claim holders designated by the GUC Trust. After December 15, 2011, all distributions of New GM Securities
were made directly by the GUC Trust.

12

as provided in the GUC Trust Agreement." (*See* GUC Trust Agreement, Article V, §5.3(a); *see also* GUC Trust 2014 Form 10-K at 6)).

38.    The GUC Trust made quarterly distributions on July 28, 2011, October 28, 2011, January 13, 2012, April 27, 2012, August 3, 2012, November 5, 2012, February 8, 2013, May 10, 2013, August 9, 2013, October 31, 2013 and May 9, 2014, each in respect of Disputed General Unsecured Claims that were resolved in the immediately preceding fiscal quarter. (GUC Trust 2014 Form 10-K at 6).

39.    On October 21, 2013, the Bankruptcy Court entered an order (the "Nova Scotia Order") approving a settlement agreement (the "Nova Scotia Settlement") relating to claims arising from the 8.375% guaranteed notes due December 7, 2015 and the 8.875% guaranteed notes due July 10, 2023, in each case issued in 2003 by General Motors Nova Scotia Finance Company (the "Nova Scotia Claims"). (GUC Trust 2014 Form 10-K at 12). Pursuant to the Settlement Agreement, the Nova Scotia Claims were reduced and allowed in an aggregate amount of $1.55 billion. As a result, on or about December 2, 2013, in accordance with the Nova Scotia Settlement and the Nova Scotia Order, the GUC Trust made a distribution solely to holders of the allowed Nova Scotia Claims, consisting of, in the aggregate, 6,174,015 shares of New GM Common Stock, 5,612,741 New GM Series A Warrants, 5,612,741 New GM Series B Warrants, and 1,550,000 GUC Trust Units. (*Id.*).

40.    In addition, on or about December 23, 2013, in accordance with the Nova Scotia Settlement and the Nova Scotia Order, the GUC Trust made a special distribution of Excess GUC Trust Distributable Assets to all holders of GUC Trust Units, consisting of 6,735,070 shares of New GM Common Stock, 6,122,789 New GM Series A Warrants, and 6,122,789 New GM Series B Warrants. (*Id.*).

13

41.    The following table details the New GM Securities that have been distributed to

holders of Allowed General Unsecured Claims by the GUC Trust:

|  | Shares of New GM Common Stock | A Warrants | B Warrants |
|---|---|---|---|
| April 21, 2011 Distribution: | 113,194,172 | 102,903,821 | 102,903,821 |
| July 28, 2011 Distribution: | 3,342,831 | 3,038,936 | 3,038,936 |
| October 28, 2011 Distribution: | 2,468,218 | 2,243,834 | 2,243,834 |
| January 13, 2012 Distribution: | 188,180 | 171,074 | 171,074 |
| April 27, 2012 Distribution: | 450,555 | 409,612 | 409,612 |
| August 3, 2012 Distribution: | 484,553 | 440,510 | 440,510 |
| November 2, 2012 Distribution: | 116,508 | 105,910 | 105,910 |
| February 8, 2013 Distribution: | 42,151 | 38,325 | 38,325 |
| May 10, 2013 Distribution: | 115,029 | 104,570 | 104,570 |
| August 9, 2013 Distribution: | 221,014 | 200,924 | 200,924 |
| October 31, 2013 Distribution: | 42,122 | 38,293 | 38,293 |
| December 2, 2013 Nova Scotia Settlement Distribution: | 6,174,015 | 5,612,741 | 5,612,741 |
| May 9, 2014 Distribution: | 43,310 | 39,371 | 39,371 |

*Available at* https://www.mlcguctrust.com/FAQDocuments.aspx.

42.    As of March 31, 2014, the GUC Trust has distributed (or was obligated to

distribute), in the aggregate, 134,106,321 shares of New GM Common Stock, 121,914,975 of

each series of New GM Warrants and 31,853,702 GUC Trust Units in respect of Allowed

General Unsecured Claims aggregating approximately $31.854 billion.  (GUC Trust 2014 Form

10-K at 6).

## CLAIMS AGAINST THE GUC TRUST AND GUC TRUST ASSETS

43. According to the GUC Trust, Allowed General Unsecured Claims, as of March 31, 2014, totaled approximately $31.854 billion.

44. As of March 31, 2014, the Maximum Amount (as such term is defined in and calculated in accordance with the GUC Trust Agreement) of Disputed General Unsecured Claims (inclusive of the potential Term Loan Avoidance Action Claims) totaled approximately $1.579 billion. (GUC Trust 2014 Form 10-K at 51). In the event such claims become Allowed General Unsecured Claims, the GUC Trust will distribute to the holders of such claims their pro rata distribution of New GM Securities.

45. According to the GUC Trust, the GUC Trust's aggregate holdings of New GM Securities (i.e., New GM Common Stock and New GM Warrants), at fair value, as of March 31, 2014, was $1.1 billion. The $1.1 billion includes certain assets that have been reserved or set aside to fund the GUC Trust's potential costs of liquidation and potential tax liabilities. Specifically, New GM Securities aggregating $51.6 million (excluding related dividend cash) have been reserved, or set aside, for projected GUC Trust fees, costs and expenses to be incurred beyond 2014 (including $3.5 million for projected dividend taxes), and $536.3 million (excluding related dividend cash) of New GM Securities have been reserved, or set aside, for potential taxes on distribution. As a result, as of March 31, 2014, the number of New GM Securities included in the GUC Trust's aggregate holdings of New GM Securities, includes an aggregate of 8,072,042 shares of New GM Common Stock, 7,338,194 New GM Series A Warrants, and 7,338,194 New GM Series B Warrants, which have been so reserved or set aside.

46. According to the GUC Trust, with respect to distributable assets, as of March 31, 2014, the GUC Trust held remaining distributable assets (which, for the avoidance of doubt, excluded Set Aside Securities and New GM Securities associated with the Information Deficient

15

Claims) of 7,138,543 shares of New GM Common Stock, 6,489,475 of each series of New GM
Warrants, and $2,141,564 of dividend cash, which have all been set aside in respect of current
Disputed General Unsecured Claims (including the potential Term Loan Avoidance Action
Claims), and will be distributed to the holders of such claims in the event that they become
Resolved Allowed Claims. (*Id.* at 31).

## TRADING OF GUC TRUST UNITS

47.    Pursuant to a No Action Letter received from the United States Securities and
Exchange Commission ("SEC") on May 23, 2012 (the "No Action Letter"), the GUC Trust Units
are transferable in accordance with the procedures of the Depository Trust Company ("DTC")
and its direct and indirect participants.

48.    While the No Action Letter allows for the transferability of GUC Trust Units in
accordance with DTC procedures, the GUC Trust may not encourage the transfer of the GUC
Trust Units it has distributed pursuant to the GUC Trust Agreement, and may not take any
actions to facilitate or promote a trading market in the GUC Trust Units.

49.    Beginning April 28, 2011, and quarterly thereafter, the GUC Trust has made
public securities filings that reflected the then-current amount of outstanding Disputed General
Unsecured Claims. With each public filing, the GUC Trust adjusted the then-current amount of
outstanding Allowed General Unsecured Claims and outstanding Disputed General Unsecured
Claims to reflect the resolution of the Disputed General Unsecured Claims.

50.    The GUC Trust has also filed quarterly reports (the "GUC Trust Reports") with
the Bankruptcy Court which reflected the then-current amount of Allowed General Unsecured
Claims and Disputed General Unsecured Claims.

51.    As of June 14, 2012, the GUC Trust Units became freely tradable OTC, and are
quoted on Bloomberg Finance, L.P.

16

52.     Each of the GUC Trust Reports published by the GUC Trust set forth the then
current aggregate amount of Allowed General Unsecured Claims and the Maximum Amount (as
such term is defined in and calculated in accordance with the GUC Trust Agreement) of all
Disputed General Unsecured Claims, adjusted to reflect the disposition of Disputed General
Unsecured Claims to date. The Maximum Amount of Allowed General Unsecured Claims, as
reflected in the quarterly GUC Trust Reports, has continually gone down over time.

53.     The March 31, 2014 GUC Trust Report indicates that the total aggregate amount
of claims (allowed and disputed) is $33,433,130. (March 31, 2014 GUC Trust Report, Ex. A).

54.     Counsel for the Identified Parties may refer to reports by Bloomberg Finance,
L.P. for information relating to trading volume of the GUC Trust Units and the daily prices of
GUC Trust Units.

## THE PLAN'S STATEMENTS REGARDING GUC TRUST BENEFICIARIES

55.     Pursuant to the Plan, the GUC Trust Agreement provides in relevant part: "No
provision of the Plan, the Confirmation Order or this Trust Agreement, and no mere enumeration
herein of the rights or privileges of any GUC Trust Beneficiary, shall give rise to any liability of
such GUC Trust Beneficiary solely in its capacity as such, whether such liability is asserted by
any Debtor, by creditors or employees of any Debtor, or by any other Person. GUC Trust
Beneficiaries are deemed to receive the GUC Trust Distributable Assets in accordance with the
provisions of the Plan, the Confirmation Order and this Trust Agreement in exchange for their
Allowed General Unsecured Claims or on account of their Units, as applicable, without further
obligation or liability of any kind, subject to the provisions of this Trust Agreement." (GUC
Trust Agreement, § 3.2).

17

## **NEW GM'S RECALLS**

56.     On February 7, 2014, New GM sent a letter (the "February 7 Letter") to the

National Highway Traffic Safety Administration ("NHTSA") indicating that New GM, through

its Executive Field Action Decision Committee, decided "to conduct a safety related recall for

certain 2005-2007 model year Chevrolet Cobalt and 2007 model year Pontiac G5 vehicles." An

attachment to the February 7 Letter indicates that 619,122 vehicles were potentially involved in

the recall.

57.     On February 25, 2014, New GM sent another letter to NHTSA (the "February 25

Letter"). The February 25 Letter indicates that on February 24, 2014, New GM, through its

Executive Field Action Decision Committee, decided "to conduct a safety recall" for 2003-2007

model years Saturn Ion, 2006-2007 model years Chevrolet HHR, 2006-2007 model years Pontiac

Solstice, and 2007 model year Saturn Sky vehicles (collectively with the recall described in the

February 7 Letter, the "Ignition Switch Recall"). An attachment to the February 25 Letter

reflects that 748,024 vehicles were potentially involved in this recall.

58.     On February 25, 2014, New GM publicly announced that it was expanding the

Ignition Switch Recall to include the 2003-2007 model years Saturn Ion, 2006-2007 model years

Chevrolet HHR, 2006-2007 model years Pontiac Solstice, and 2007 model year Saturn Sky

vehicles.

59.     On March 28, 2014, New GM sent a letter to NHTSA indicating that on March

20, 2014, New GM, acting through its Executive Field Action Decision Committee, decided "to

conduct a safety related recall" of "Ignition & Start Switches manufactured in Mexico by: Delphi

Packard Electrical/Electronic Architecture" (the "March 28 Letter"). The March 28 Letter

explains that

> [New GM] has decided that a defect which relates to motor vehicle safety exists
> in GM Parts and ACDelco Ignition & Start Switch service part number 10392423,

18

and the following Ignition & Start Switch Housing Kits that contain or may
contain part number 10392423: GM Parts and ACDelco service part numbers
10392737, 15857948, 15854953, 15896640, and 25846762. [New GM] records
indicate these service parts may have been installed during repairs in some 2008-
2010 MY Chevrolet Cobalt, 2008-2011 MY Chevrolet HHR, 2008-2010 MY
Pontiac Solstice, 2008-2010 MY Pontiac G5, and 2008-2010 MY Saturn Sky
vehicles.

60.    The March 28 Letter also states that "[t]he ignition switch torque performance on

vehicles repaired with GM Parts and ACDelco Ignition & Start Switch part number 10392423 or

assemblies that contain part number 10392423 may not meet General Motors' specification."

61.    The March 28 Letter further states that on March 27, 2014, New GM acting

through its Executive Field Action Decision Committee, decided that "to provide a

comprehensive remedy, GM will replace the ignition switch on all 2008-2010 MY Chevrolet

Cobalt, 2008-2011 MY Chevrolet HHR, 2008-2010 MY Pontiac Solstice, 2008-2010 MY

Pontiac G5, and 2008-2010 MY Saturn Sky vehicles in order to replace all potentially suspect

service parts."

62.    Through an attachment to the March 28 Letter, New GM reported that 823,788

vehicles were potentially involved in this recall.

63.    On March 28, 2014, New GM issued a press release stating that it would "replace

the ignition switch in all model years of its Chevrolet Cobalt, HHR, Pontiac G5, Solstice, and

Saturn Ion and Sky" in the U.S. since faulty ignition switches may have been used to repair the

vehicles (the "March 28 Announcement").   (*See* http://media.gm.com/media/us/en/gm/news.

detail.html/content/Pages/news/us/en/2014/mar/0328-ignition-service.html).

64.    In its March 28 Announcement, New GM explained that "[a]bout 95,000 faulty

switches were sold to dealers and aftermarket wholesalers," of which "about 90,000 were used to

repair older vehicles that were repaired before they were recalled in February," and that

"[b]ecause it is not feasible to track down all the parts, the company is taking the extraordinary

19

step of recalling 824,000 more vehicles in the U.S. to ensure that every car has a current ignition switch."

65. On April 10, 2014, New GM filed a Form 8-K with the SEC. According to the press release attached thereto as Exhibit 99.1, New GM added "ignition lock cylinders to its safety recall of 2.2 million older model cars in the United States." The press release states that the cars covered by this recall were 2003-2007 model years Saturn Ion, 2005-2010 model years Chevrolet Cobalt, 2006-2010 model years Pontiac Solstice, 2007-2010 model years Pontiac G5, 2007-2010 model years Saturn Sky, and 2006-2011 model years Chevrolet HHR, and that "the cylinders can allow removal of the ignition key while the engine is running, leading to a possible rollaway, crash and occupant or pedestrian injuries."

66. On March 17, 2014, New GM filed a Form 8-K with the SEC regarding three safety recalls involving approximately 1.5 million vehicles (collectively, the "March 17 Recall"). The March 17, 2014 press release attached thereto as Exhibit 99.1 states that the three recalls cover:

(a) 303,000 2009-2014 model years Chevrolet Express and GMC Savana vehicles with gross vehicle weight under 10,000 pounds, which New GM stated "do not comply with a head impact requirement for unrestrained occupants, requiring a rework of the passenger instrument panel material;"

(b) 63,900 2013-2014 model years Cadillac XTS full-size sedans, in which pressure created by a brake booster pump can "lead to the dislodging of a plug in the brake booster pump relay, allowing corrosive elements to enter the connector and form a low-resistance short that could lead to overheating, melting of plastic components and a possible engine compartment fire;" and

(c) 1.18 million 2008-2013 model years Buick Enclave and GMC Acadia, 2009-2013 model years Chevrolet Traverse, and 2008-2010 model years Saturn Outlook vehicles to correct for "the non-deployment of the side impact restraints, which include driver and passenger seat-mounted side air bags, front center air bag (if equipped), and the seat belt pretensioners."

20

*GM Redoubles Safety Efforts, Announces New Recalls*, Mar. 17, 2014.[4]

67.    On April 1, 2014, New GM filed a Form 8-K with the SEC regarding a safety

recall of approximately 1.3 million vehicles "for the correction of electric power steering assist

conditions" (the "Power Steering Assist Recall"). The March 31, 2014 press release attached

thereto as Exhibit 99.1 describes a potential "sudden loss of electric power steering assist"

occurring in the recalled vehicles, which include:

> a. Chevrolet Malibu: All model year 2004 and 2005, and some model year
>    2006 and model year 2008 and 2009 vehicles;
>
> b. Chevrolet Malibu Maxx: All model year 2004 and 2005, and some 2006
>    model year;
>
> c. Chevrolet HHR (Non-Turbo): Some model year 2009 and 2010 vehicles;
>
> d. Chevrolet Cobalt: Some model year 2010 vehicles;
>
> e. Saturn Aura: Some model year 2008 and 2009 vehicles;
>
> f. Saturn ION: All model year 2004 to 2007 vehicles;
>
> g. Pontiac G6: All model year 2005, and some model year 2006 and model
>    year 2008 and 2009 vehicles; and
>
> h. Service parts installed into certain vehicles before May 31, 2010 under a
>    previous safety recall.

*GM Recalls Older Model Vehicles to Fix Power Steering*, Mar. 31, 2014.

68.    In its March 31, 2014 press release, New GM states that the 2004-2007 model

years Saturn Ion, the 2009-2010 model years Chevrolet HHR, and the 2010 model year

Chevrolet Cobalt "are included in previously announced recalls for ignition switches that may

---

[4] *Available at* http://media.gm.com/media/us/en/gm (last visited June 2, 2014).

not meet GM specification for torque performance" and that "[r]epairs for the ignition switch and power steering assist may require separate dealership visits depending on parts availability." (*Id.*).

69.    On May 15, 2014, New GM filed a Form 8-K with the SEC concerning five additional safety recalls involving approximately 2.7 million vehicles (collectively, the "May 15 Recall"). According to New GM's May 15, 2014 press release attached thereto as Exhibit 99.1, the "largest recall" among the May 15 Recall involves 2,440,524 2004-2012 model years Chevrolet Malibu, 2004-2007 model years Chevrolet Malibu Maxx, 2005-2010 model years Pontiac G6 and 2007-2010 model years Saturn Aura vehicles in the U.S. to "modify the brake lamp wiring harness." The "[a]ffected vehicles could have a corrosion develop in the wiring harness for the body control module" and the "condition could result in brake lamps failing to illuminate when the brakes are applied," "brake lamps illuminating when the brakes are not engaged," and the disabling of "cruise control, traction control, electronic stability control, and panic braking assist operation." *GM Announces Five Safety Recalls*, May 15, 2014.[5]

70.    The May 15 Recall also includes the recall of more than 111,889 2005-2007 model years Chevrolet Corvettes "for [a] potential loss of low-beam headlamp operation" that "could reduce the driver's visibility, increasing the risk of a crash." (*Id.*).

71.    The remaining recalls announced through the May 15 Recall cover:

(a)    140,067 2014 model year Chevrolet Malibu vehicles due to the "disabling of hydraulic brake boost that can require greater pedal efforts;"

(b)    19,225 2013-2014 model years Cadillac CTS vehicles "for a condition in which the windshield wiper system may become inoperable after a vehicle jump start with wipers active and restricted, such as by ice and snow," causing a "[p]otential lack of visibility [that] could increase the risk of a crash;" and

---

[5] *Available at* http://media.gm.com/media/us/en/gm (last visited June 2, 2014).

22

(c)    477 2014 model year Chevrolet Silverado and GMC Sierra vehicles and 2015
model year Chevrolet Tahoe vehicles, in which an "attachment to the steering
gear rack . . . may not be tightened to specification," potentially leading a "crash
[to] occur without warning."

(*Id.*).

72.    On May 20, 2014, New GM filed a Form 8-K with the SEC concerning four new

safety recalls involving approximately 2.42 million vehicles (the "May 20 Recall"). The May

20, 2014 press release attached thereto as Exhibit 99.1 indicates that the May 20 Recall covers:

(a)    1,339,355 2009-2014 model years Buick Enclave, Chevrolet Traverse, and GMC
Acadia vehicles and 2009-2010 model years Saturn Outlook vehicles "because
front safety lap belt cables can fatigue and separate over time" and during a crash,
"a separated cable could increase the risk of injury to front seat passengers;"

(b)    1,075,102 "previous generation" 4-speed automatic transmission and 2004-2008
model years Chevrolet Malibu and 2005-2008 model years Pontiac G6 vehicles
"because of a shift cable that could wear out over time," potentially preventing the
driver from "select[ing] a different gear, remov[ing] the key from the ignition, or
plac[ing] the transmission in park;"

(c)    1,402 2015 model year Cadillac Escalades and Escalade ESV vehicles "because
an insufficiently heated plastic weld that attaches the passenger side air bag to the
instrument panel assembly could result in a partial deployment of the air bag in
the event of a crash," leading New GM to stop sale of all 2015 Escalade and
Escalade ESV vehicles and to contact customers who had taken delivery of these
vehicles to instruct them "to not let occupants sit in the front passenger seat until
the vehicle has been serviced;" and

(d)    58 2015 model year Chevrolet Silverado HD and GMC Sierra HD vehicles
"because retention clips attaching the generator fuse block to the vehicle body can
become loose and lead to a potential fire."

*GM Recalls 2.42 Million Vehicles in Four U.S. Recalls*, May 16, 2014.[6]

73.    On June 16, 2014, New GM filed a Form 8-K with the SEC "regarding safety

recalls of certain models primarily to rework or replace the ignition keys on approximately 3.16

---

[6] *Available at* http://media.gm.com/media/us/en/gm (last visited June 2, 2014).

million U.S. cars from the 2000 to 2014 model years" (collectively, the "June 16 Recall").

According to New GM's June 16, 2014 press release attached thereto as Exhibit 99.1, the June

16 Recall involves 2005-2009 model years Buick Lacrosse, 2006-2014 model years Chevrolet

Impala, 2000-2005 model years Cadillac Deville, 2004-2011 model years Cadillac DTS, 2006-

2011 model years Buick Lucerne, 2004-2005 model years Buick Regal LS & GS, and 2006-2008

model years Chevy Monte Carlo vehicles.

74.     In an interview dated June 26, 2014 with Matt Lauer of the Today Show, Mary

Barra, Chief Executive Officer of New GM, was asked whether New GM would be issuing

additional recalls. Ms. Barra responded: "It's—it's possible."

75.     On June 30, 2014, New GM filed a Form 8-K with the SEC concerning additional

safety recalls covering approximately 7.6 million vehicles in the U.S. (collectively, the "June 30

Recall"). According to New GM's June 30, 2014 press release attached thereto as Exhibit 99.1,

the June 30 Recall involves about 7.6 million vehicles from the 1997 to 2014 model years and

relates to "inadvertent ignition key rotation." (*Id.*).

76.     On July 23, 2014, New GM announced six additional safety recalls covering a

total of 717,949 vehicles in the U.S. (collectively, the "July 23 Recall"). According to New

GM's July 23, 2014 press release, the recalls cover vehicles from model years 2010 through

2015 and pertain to safety-related defects in those vehicles' front turn signals, front-turn signal

bulbs, roof-rail air bags, electric power steering, power height adjustable seats, lower control arm

bolts, and incomplete welds on seat hook bracket assemblies.

77.     The Ignition Switch Recall, the March 17 Recall, the Power Steering Assist

Recall, the May 15 Recall, the May 20 Recall, the June 16 Recall, the June 30 Recall, and the

July 23 Recall are among the recalls that New GM has issued since January 1, 2014, but they are

not the only recalls New GM has announced since that time. According to New GM, 25,484,746

24

vehicles in the U.S. from model years 1997-2015 have been recalled since January 13, 2014 to

date. *See* GM Q1 and Q2 2014 North American Recalls Including Exports.[7]

---

*Available at http://media.gm.com/content/dam/Media/images/US/Release_Images/2014/05-2014/recalls/Recalls-Running-Total.jpg* (last visited July 28, 2014).

# Attachment 1

## ATTACHMENT 1

### THE GUC TRUST'S AND UNITHOLDERS'
### PROPOSED STIPULATIONS OF FACT NOT AGREED TO
### BY OTHER COUNSEL FOR THE IDENTIFIED PARTIES

1.     As of August 8, 2014, New GM has not confirmed that there will not be additional recalls of vehicles relating to the Ignition Switch.

2.     As of March 31, 2014, the sum of (i) Allowed General Unsecured Claims (approximately $31.854 billion, as reported in paragraph 45 of the Equitable Mootness Stipulations) and (ii) the Maximum Amount (as such term is defined in and calculated in accordance with the GUC Trust Agreement) of Disputed General Unsecured Claims that could become Resolved Allowed Claims (approximately $1.579 billion, as reported in paragraph 46 of the Equitable Mootness Stipulations) totaled approximately $33.433 billion.

3.     Based on closing prices of New GM Securities, as reported by Bloomberg Finance, L.P., as of July 16, 2014, the total value of GUC Trust assets set aside for distribution in respect of current Disputed General Unsecured Claims (including the potential Term Loan Avoidance Action Claims) is approximately $576,905,901.

4.     While certain late claims have been allowed in the Old GM bankruptcy case, less than 1% (0.093%) of total allowed claims as of the Bar Date were allowed subsequent to the Bar Date but before the Effective Date, and less than 1% (0.147%) of total allowed claims as of the Bar Date were allowed subsequent to the Bar Date and after the Effective Date.

5.     As reported by Bloomberg Finance L.P., as of July 14, 2014, approximately 96 million GUC Trust Units have been bought and sold since June 14, 2012.

6.     As reported by Bloomberg Finance L.P., as of July 14, 2014, the aggregate trading value of the GUC Trust Units that have traded since June 14, 2012 (based on daily closing prices) totals approximately $1.993 billion.

7.     On August 8, 2014, New GM announced five new safety recalls of 269,001 model years

2002-2004, 2009-2010, and 2013-2015 vehicles (collectively, the "August 8 Recall"). *GM*

*Announces Recalls*, Aug. 8, 2014.[8] Among the vehicles recalled through the August 8 Recall are

202,115 model years 2002-2004 Saturn VUEs "because the ignition key can possibly be

removed when the vehicle is not in the off position." According to New GM, New GM has

recalled 25,754,356 vehicles in the U.S. from model years 1997-2015 since January 13, 2014 to

date. *See* GM 2014 Year-to-Date North American Recalls Including Exports.[9]

---

[8] Available at *http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Aug/0808-recalls.html* (last visited Aug. 8, 2014).

[9] *Available at* http://media.gm.com/content/dam/Media/images/US/Release_Images/2014/05-2014/recalls/Recalls-Running-Total-pdf.pdf (last visited Aug. 8, 2014).

27

# **EXHIBIT C**

09-50026-reg   Doc 13172-1   Filed 06/01/15   Entered 06/01/15 03:47:00   Main Document
Pg 193 of 229

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
In re                                              :        Chapter 11
                                                   :
MOTORS LIQUIDATION COMPANY, *et al.*,              :        Case No.: 09-50026 (REG)
       f/k/a General Motors Corp., *et al.*            :
                                                   :
           Debtors.                        :        (Jointly Administered)
-------------------------------------------------------------------x

JUDGMENT

For the reasons set forth in the Court's *Decision on Motion to Enforce Sale Order*, entered on April 15, 2015 ("**Decision**"),[1] it is hereby ADJUDGED as follows:

1.      The Ignition Switch Plaintiffs and the Ignition Switch Pre-Closing Accident Plaintiffs (collectively, the "**Plaintiffs**") were "known creditors" of the Debtors.  The Plaintiffs did not receive the notice of the sale of assets of Old GM to New GM ("**363 Sale**") that due process required.

2.      Except with respect to Independent Claims (as herein defined), the Ignition Switch Plaintiffs were not prejudiced by their lack of notice of the 363 Sale, and they thus failed to demonstrate a due process violation with respect to the 363 Sale.

---

[1]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Decision. For purposes of this Judgment, the following terms shall apply: (i) "**Ignition Switch Plaintiffs**" shall mean plaintiffs that have commenced a lawsuit against New GM asserting economic losses based on or arising from the Ignition Switch in the Subject Vehicles (each term as defined in the *Agreed and Disputed Stipulations of Fact Pursuant to the Court's Supplemental Scheduling Order, Dated July 11, 2014*, filed on August 8, 2014 [Dkt. No. 12826], at 3); (ii) "**Pre-Closing Accident Plaintiffs**" shall mean plaintiffs that have commenced a lawsuit against New GM based on an accident or incident that occurred prior to the closing of the 363 Sale; (iii) "**Ignition Switch Pre-Closing Accident Plaintiffs**" shall mean that subset of the Pre-Closing Accident Plaintiffs that had the Ignition Switch in their Subject Vehicles; (iv) "**Non-Ignition Switch Pre-Closing Accident Plaintiffs**" shall mean that subset of Pre-Closing Accident Plaintiffs that are not Ignition Switch Pre-Closing Accident Plaintiffs; and (v) "**Non-Ignition Switch Plaintiffs**" shall mean plaintiffs that have commenced a lawsuit against New GM asserting economic losses based on or arising from an alleged defect, other than the Ignition Switch, in an Old GM vehicle.

-1-

09-50026-reg Doc 13172-1 Filed 06/01/15 Entered 06/01/15 03:17:00 Main Document
Pg 194 of 221

3.      The Ignition Switch Pre-Closing Accident Plaintiffs were not prejudiced by their lack of notice of the 363 Sale, and they thus failed to demonstrate a due process violation with respect to the 363 Sale.

4.      With respect to the Independent Claims, the Ignition Switch Plaintiffs were prejudiced by the failure to give them the notice of the 363 Sale that due process required.  The Ignition Switch Plaintiffs established a due process violation with respect to the Independent Claims.  The Sale Order shall be deemed modified to permit the assertion of Independent Claims.  For purposes of this Judgment, "**Independent Claims**" shall mean claims or causes of action asserted by Ignition Switch Plaintiffs against New GM (whether or not involving Old GM vehicles or parts) that are based solely on New GM's own, independent, post-Closing acts or conduct.  Nothing set forth herein shall be construed to set forth a view or imply whether or not Ignition Switch Plaintiffs have viable Independent Claims against New GM.

5.      Except for the modification to permit the assertion  of Independent Claims by the Ignition Switch Plaintiffs, the Sale Order shall remain unmodified and in full force and effect.

6.      The Plaintiffs were prejudiced by the failure to receive the notice due process required of the deadline ("**Bar Date**") to file proofs of claim against the Old GM bankruptcy estate.  Any Plaintiff may petition the Bankruptcy Court (on motion and notice) for authorization to file a late or amended proof of claim against the Old GM bankruptcy estate.  The Court has not determined the extent to which any late or amended proof of claim will ultimately be allowed or allowed in a different amount.  But based on the doctrine of equitable mootness, in no event shall assets of the GUC Trust held at any time in the past, now, or in the future (collectively, the "**GUC Trust Assets**") (as defined in the Plan) be used to satisfy any claims of the Plaintiffs, nor will Old GM's Plan be modified with respect to such claims; *provided* that nothing in this

09-50026-reg  Doc 13172-1  Filed 06/01/15  Entered 06/01/15 15:03:17  Main Document
Pg 3 of 21

Judgment shall impair any party's rights with respect to the potential applicability of Bankruptcy

Code section 502(j) to any claims that were previously allowed or disallowed by the Court.  The

constraints on recourse from GUC Trust Assets shall not apply to any Ignition Switch Plaintiff,

Pre-Closing Accident Plaintiff, or Non-Ignition Switch Plaintiff who had a claim previously

allowed or disallowed by the Court, but in no event shall he or she be entitled to increase the

amount of any allowed claim without the prior authorization of the Bankruptcy Court or an

appellate court following an appeal from the Bankruptcy Court.

7.      Any claims and/or causes of action brought by the Ignition Switch Pre-Closing

Accident Plaintiffs that seek to hold New GM liable for accidents or incidents that occurred prior

to the closing of the 363 Sale are barred and enjoined pursuant to the Sale Order.  The Ignition

Switch Pre-Closing Accident Plaintiffs shall not assert or maintain any such claim or cause of

action against New GM.

8.      (a)      Subject to the other provisions of this paragraph 8, each Ignition Switch

Pre-Closing Accident Plaintiff (including without limitation the Ignition Switch Pre-Closing

Accident Plaintiffs identified on Exhibit "A" attached hereto) is stayed and enjoined from

prosecuting any lawsuit against New GM.

(b)      Within two (2) business days of the entry of this Judgment, New GM shall

serve a copy of this Judgment on counsel in the lawsuits identified on Exhibit "A," by e-mail,

facsimile, overnight mail or, if none of the foregoing are available, regular mail, with a cover

note that states:  "The attachment is the Judgment entered by the Bankruptcy Court.  Please

review the Judgment, including without limitation, the provisions of paragraph 8 of the

Judgment."

(c)       If counsel for an Ignition Switch Pre-Closing Accident Plaintiff
(including, but not limited to, one identified on Exhibit "A") believes that, notwithstanding the
Decision and this Judgment, it has a good faith basis to maintain that its lawsuit against New GM
should not be stayed, it shall file a pleading with this Court within 17 business days of this
Judgment ("**No Stay Pleading**").  The No Stay Pleading shall not reargue issues that were
already decided by the Decision, this Judgment, or any other decision, order, or judgment of this
Court.  If a No Stay Pleading is timely filed, New GM shall have 17 business days to respond to
such pleading.  The Court will schedule a hearing thereon if it believes one is necessary.

9.  Except for  Independent Claims and Assumed Liabilities (if any), all claims and/or
causes of action that the Ignition Switch Plaintiffs may have against New GM concerning an Old
GM vehicle or part seeking to impose liability or damages based in whole or in part on Old GM
conduct (including, without limitation, on any successor liability theory of recovery) are barred
and enjoined pursuant to the Sale Order, and such lawsuits shall remain stayed pending appeal of
the Decision and this Judgment.

10.     (a)      The lawsuits stayed pursuant to the preceding paragraph shall include
those on the attached Exhibit "B."  The lawsuits identified on Exhibit "B" include the Pre-Sale
Consolidated Complaint.

(b)      Within two (2) business days of the entry of this Judgment, New GM shall
serve a copy of this Judgment on counsel in the lawsuits identified on Exhibit "B", by e-mail,
facsimile, overnight mail or, if none of the foregoing are available, regular mail, with a cover
note that states: "The attachment is the Judgment entered by the Bankruptcy Court.  Please
review the Judgment, including without limitation, the provisions of paragraph 10 of the
Judgment."

-4-

(c)     If a counsel listed on Exhibit "B" believes that, notwithstanding the

Decision and this Judgment, it has a good faith basis to maintain that its lawsuit against New GM

should not be stayed, it shall file a No Stay Pleading with this Court within 17 business days of

this Judgment.  The No Stay Pleading shall not reargue issues that were already decided by the

Decision and this Judgment, or any other decision or order of this Court.  If a No Stay Pleading

is timely filed, New GM shall have 17 business days to respond to such pleading.  The Court will

schedule a hearing thereon if it believes one is necessary.

11.     (a)     The complaints in the lawsuits listed on the attached Exhibit "C"

("**Hybrid Lawsuits**") include claims and allegations that are permitted under the Decision and

this Judgment and others that are not.  Accordingly, until and unless the complaint in a Hybrid

Lawsuit is (x) amended to assert solely claims and allegations permissible under the Decision

and this Judgment (as determined by this or any higher court, if necessary), or (y) is judicially

determined (by this or any higher court) not to require amendment, that lawsuit is and shall

remain stayed.  The Hybrid Lawsuits include the Post-Sale Consolidated Complaint.  Within two

(2) business days of the entry of this Judgment, New GM shall serve a copy of this Judgment on

counsel in the Hybrid Lawsuits, by e-mail, facsimile, overnight mail or, if none of the foregoing

are available, regular mail, with a cover note that states: "The attachment is the Judgment entered

by the Bankruptcy Court.  Please review the Judgment, including without limitation, the

provisions of paragraph 11 of the Judgment."

(b)     Notwithstanding the stay under the preceding subparagraph, however, the

complaints in the actions listed in Exhibit "C" may, if desired, be amended in accordance with

the subparagraphs that follow.  Subject to the other provisions of this paragraph 11, and unless

the applicable complaint already has been dismissed without prejudice pursuant to an order

entered in MDL 2543, each Plaintiff in a Hybrid Lawsuit wishing to proceed at this time may

amend his or her complaint on or before June 12, 2015, such that any allegations, claims or

causes of action concerning an Old GM vehicle or part seeking to impose liability or damages

based on Old GM conduct (including, without limitation, any successor liability theory of

recovery) are stricken, and only Independent Claims are pled.

(c)      If a counsel listed in the lawsuits on Exhibit "C" believes that,

notwithstanding the Decision and this Judgment, it has a good faith basis to maintain that its

allegations, claims or causes of action against New GM should not be stricken, it shall file a

pleading with this Court within 17 business days of this Judgment ("**No Strike Pleading**").  The

No Strike Pleading shall not reargue issues that were already decided by the Decision and

Judgment.  If a No Strike Pleading is timely filed, New GM shall have 17 business days to

respond to such pleading.  The Court will schedule a hearing thereon if it believes one is

necessary.

(d)      If an Ignition Switch Plaintiff fails to either (i) amend his or her respective

complaints on or before June 12, 2015, such that all allegations, claims and/or causes of action

concerning an Old GM vehicle or part seeking to impose liability or damages based on Old GM

conduct (including, without limitation, any successor liability theory of recovery) are stricken,

and only Independent Claims are pled, or (ii) timely file a No Strike Pleading with the Court

within the time period set forth above, New GM shall be permitted to file with this Court a notice

of presentment on five (5) business days' notice, with an attached order ("**Strike Order**") that

directs the Ignition Switch Plaintiff to strike specifically-identified allegations, claims and/or

causes of action contained in his or her complaint that violate the Decision, this Judgment and/or

the Sale Order (as modified by the Decision and this Judgment), within 17 business days of

-6-

receipt of the Strike Order.

(e)     For any allegations, claims or causes of action of the Ignition Switch

Plaintiffs listed on Exhibit "C" that are stricken pursuant to this Judgment (voluntarily or

otherwise), (i) the statute of limitations shall be tolled from the date of the amended complaint to

30 days after all appeals of the Decision and Judgment are decided, and (ii) if the Decision and

Judgment are reversed on appeal such that the appellate court finds that the Ignition Switch

Plaintiffs can make the allegations, or maintain the claims or causes of action, against New GM

heretofore stricken pursuant to this Judgment, all of the Ignition Switch Plaintiffs' rights against

New GM that existed prior to the striking of such claims or causes of action pursuant to this

Judgment shall be reinstated as if the striking of such claims or causes of action never occurred.

(f)     Notwithstanding the foregoing, to the extent (but only the extent)

acceptable to the MDL Court, the Plaintiff in any lawsuit listed on Exhibit "C" may elect not to

amend his or her complaint and may await the outcome of appellate review of this Judgment.  If

that plaintiff thereafter determines to proceed with his or her lawsuit, the plaintiff's counsel shall

provide notice to New GM, and the procedures set forth above shall apply.

12.     (a)     The lawsuits captioned *People of California v. General Motors LLC, et

al.*, No. 30-2014-00731038-CU-BT-CXC (Orange County, Cal.) and *State of Arizona v. General

Motors LLC*, No. CV2014-014090 (Maricopa County, Ariz.)  (the "**State Lawsuits**") likewise

include claims and allegations that are permitted under the Decision and this Judgment and

others that are not.  Accordingly, until and unless the complaint in a State Lawsuit is

(x) amended to assert solely claims and allegations permissible under the Decision and this

Judgment (as determined by this or any higher court, if necessary), or (y) is judicially determined

(by this or any higher court) not to require amendment, that lawsuit is and shall remain stayed.

09-50026-reg   Doc 13172-1   Filed 06/01/15   Entered 06/01/15 15:03:17   Main Document
Pg 209 of 221

Within two (2) business days of the entry of this Judgment, New GM shall serve a copy of this

Judgment on counsel in the State Lawsuits, by e-mail, facsimile, overnight mail or, if none of the

foregoing are available, regular mail, with a cover note that states: "The attachment is the

Judgment entered by the Bankruptcy Court.  Please review the Judgment, including without

limitation, the provisions of paragraph 12 of the Judgment."

    (b)    Notwithstanding the stay under the preceding subparagraph, however, the

State Lawsuits may, if desired, be amended in accordance with the subparagraphs that follow.

Subject to the other provisions of this paragraph 12, and unless the applicable complaint already

has been dismissed without prejudice, each Plaintiff in a State Lawsuit ("**State Plaintiff**")

wishing to proceed at this time may amend its complaint on or before June 12, 2015, such that

any allegations, claims or causes of action concerning an Old GM vehicle or part seeking to

impose liability or damages based on Old GM conduct (including, without limitation, any

successor liability theory of recovery) are stricken, and only Independent Claims are pled.

    (c)    If a counsel in a State Lawsuit believes that, notwithstanding the Decision

and this Judgment, it has a good faith basis to maintain that its allegations, claims or causes of

action against New GM should not be stricken, it shall file a No Strike Pleading with this Court

within 17 business days of this Judgment.  The No Strike Pleading shall not reargue issues that

were already decided by the Decision and Judgment.  If a No Strike Pleading is timely filed,

New GM shall have 17 business days to respond to such pleading.  The Court will schedule a

hearing thereon if it believes one is necessary.

    (d)    If a State Plaintiff fails to either (i) amend its complaint, on or before June

12, 2015, such that all allegations, claims and/or causes of action concerning an Old GM vehicle

or part seeking to impose liability or damages based on Old GM conduct (including, without

limitation, any successor liability theory of recovery) are stricken, and only Independent Claims

are pled, or (ii) timely file a No Strike Pleading with the Court within the time period set forth

above, New GM shall be permitted to file with this Court a notice of presentment on five (5)

business days' notice, with an attached Strike Order that directs such State Plaintiff to strike

specifically-identified allegations, claims and/or causes of action contained in its complaint that

violate the Decision, this Judgment and/or the Sale Order (as modified by the Decision and

Judgment), within 17 business days of receipt of the Strike Order.

(e)     For any allegations, claims or causes of action of a State Plaintiff that are

stricken pursuant to this Judgment (voluntarily or otherwise), (i) the statute of limitations shall be

tolled from the date of the amended complaint to 30 days after all appeals of the Decision and

Judgment are decided, and (ii) if the Decision and Judgment are reversed on appeal such that the

appellate court finds that the State Plaintiff can make the allegations, or maintain the claims or

causes of action, against New GM heretofore stricken pursuant to this Judgment, all of the State

Plaintiff's rights against New GM that existed prior to the striking of such allegations, claims or

causes of action pursuant to this Judgment shall be reinstated as if their striking never occurred.

(f)     Notwithstanding the foregoing, a State Plaintiff may elect not to amend its

complaint and may await the outcome of appellate review of this Judgment.  If such plaintiff

thereafter determines to proceed with its lawsuit, the plaintiff's counsel shall provide notice to

New GM, and the procedures set forth above shall apply.

13.     (a)     The rulings set forth herein and in the Decision that proscribe claims and

actions being taken against New GM shall apply to the "Identified Parties"[2] who were heard

---

[2]     "**_Identified Parties_**" as defined in the Court's Scheduling Order entered on May 16, 2014
(ECF No. 12697), and persons that have asserted Pre-Closing personal injury and wrongful death claims
against New GM based on the Ignition Switch Defect (as defined in the Decision).

during the proceedings regarding the Four Threshold Issues and any other parties who had notice

of the proceedings regarding the Four Threshold Issues and the opportunity to be heard in

them—including, for the avoidance of doubt, the plaintiffs in the *Bledsoe*, *Elliott* and *Sesay*

lawsuits listed on Exhibit "C."  They shall also apply to any other plaintiffs in these proceedings

(including, without limitation, the Non-Ignition Switch Pre-Closing Accident Plaintiffs and Non-

Ignition Switch Plaintiffs identified on Exhibit "D" attached hereto), subject to any objection

("**Objection Pleading**") submitted by any such party within 17 business days of the entry of this

Judgment.  New GM shall file a response to any such Objection Pleading within 17 business

days of service.  The Court will schedule a hearing thereon if it believes one is necessary.   To

the extent an issue shall arise in the future as to whether (i) the Non-Ignition Switch Pre-Closing

Accident Plaintiffs and Non-Ignition Switch Plaintiffs were known or unknown creditors of the

Debtors, (ii) the doctrine of equitable mootness bars the use of any GUC Trust Assets to satisfy

late-filed claims of the Non-Ignition Switch Pre-Closing Accident Plaintiffs and Non-Ignition

Switch Plaintiffs, or (iii) the Non-Ignition Switch Pre-Closing Accident Plaintiffs or Non-

Ignition Switch Plaintiffs were otherwise bound by the provisions of the Sale Order, the Non-

Ignition Switch Pre-Closing Accident Plaintiffs or Non-Ignition Switch Plaintiffs shall be

required to first seek resolution of such issues from this Court before proceeding any further

against New GM and/or the GUC Trust.

       (b)      Within two (2) business days of the entry of this Judgment, New GM shall

serve a copy of this Judgment on counsel for the Non-Ignition Switch Pre-Closing Accident

Plaintiffs or Non-Ignition Switch Plaintiffs identified on Exhibit "D", by e-mail, facsimile,

overnight mail or, if none of the foregoing are available, regular mail, with a cover note that

states: "The attachment is the Judgment entered by the Bankruptcy Court.  Please review the

09-50026-reg   Doc 13172-1   Filed 06/01/15   Entered 06/01/15 03:17:04   Main Document
Pg 11 of 21

Judgment, including without limitation, the provisions of paragraph 13 of the Judgment."

   (c) If a counsel for a Non-Ignition Switch Pre-Closing Accident Plaintiff or
Non-Ignition Switch Plaintiff listed on Exhibit "D" believes that, notwithstanding the Decision
and this Judgment, it has a good faith basis to maintain that its lawsuit, or certain claims or
causes of action contained therein, against New GM should not be dismissed or stricken, it shall
file a pleading with this Court within 17 business days of this Judgment ("**No Dismissal
Pleading**").  Such No Dismissal Pleading may request, as part of any good faith basis to
maintain a lawsuit (or certain claims or causes of action contained therein) against New GM, (i)
an opportunity to select one or more designated counsel from among the affected parties to
address the Four Threshold Issues with respect to particular defects in the vehicles involved in
the accidents or incidents that form the basis for the subject claims, and (ii) the establishment of
appropriate procedures (including a briefing schedule and discovery, if appropriate) with respect
thereto.  If a No Dismissal Pleading is timely filed, New GM shall have 17 business days to
respond to such pleading.  The Court will schedule a hearing thereon if it believes one is
necessary.

   (d) If counsel for a Non-Ignition Switch Pre-Closing Accident Plaintiff or a
Non-Ignition Switch Plaintiff believes that, notwithstanding the Decision and this Judgment, it
has a good faith basis to believe that any of the GUC Trust Assets may be used to satisfy late
proofs of claim filed by them that may ultimately be allowed by the Bankruptcy Court, it shall
file a pleading with this Court within 17 business days of this Judgment ("**GUC Trust Asset
Pleading**").  The GUC Trust Asset Pleading shall not reargue issues that were already decided
by the Decision and Judgment.  If a GUC Trust Asset Pleading is timely filed, the GUC Trust,

the GUC Trust Unitholders and/or New GM shall have 17 business days to respond to such

pleading.  The Court will schedule a hearing thereon if it believes one is necessary.

      (e)      If a Non-Ignition Switch Pre-Closing Accident Plaintiff or Non-Ignition

Switch Plaintiff listed on Exhibit "D" fails to timely file a No Dismissal Pleading or a GUC

Trust Asset Pleading with the Court within the time period set forth in paragraphs 13(c) and (d)

above, New GM, the GUC Trust and/or the GUC Trust Unitholders, as applicable, shall be

permitted to file with this Court a notice of presentment on five (5) business days' notice, with an

attached order ("**Dismissal Order**") that directs the Non-Ignition Switch Pre-Closing Accident

Plaintiff or Non-Ignition Switch Plaintiff to dismiss with prejudice its lawsuit, or certain claims

or causes of action contained therein that violate the Decision, this Judgment and/or the Sale

Order (as modified by the Decision and Judgment), within 17 business days of receipt of the

Dismissal Order.  For any lawsuit, or any claims or causes of action contained therein, of the

Non-Ignition Switch Pre-Closing Accident Plaintiffs or Non-Ignition Switch Plaintiffs that are

dismissed pursuant to this Judgment, (i) the statute of limitations shall be tolled from the date of

dismissal to 30 days after all appeals of the Decision and Judgment are decided, and (ii) if the

Decision and Judgment are reversed on appeal, such that the appellate court finds that the Non-

Ignition Switch Pre-Closing Accident Plaintiffs or Non-Ignition Switch Plaintiffs can make the

allegations, or maintain the lawsuit or claims or causes of action, against New GM and/or the

GUC Trust heretofore dismissed or stricken pursuant to this Judgment, all of the Non-Ignition

Switch Pre-Closing Accident Plaintiffs' or Non-Ignition Switch Plaintiffs' rights against New

GM and/or the GUC Trust that existed prior to the dismissal of their lawsuit or the striking of

claims or causes of action pursuant to this Judgment shall be reinstated as if the dismissal or the

striking of such claims or causes of action never occurred.

   (f)  Notwithstanding the provisions of this Paragraph 13, any plaintiff whose lawsuit would otherwise have to be dismissed, in whole or in part, under this Paragraph 13 may elect, by notice filed on ECF and served upon New GM and the GUC Trust (no later than 14 days after the entry of this judgment), to stay the lawsuit instead.  Except as the Court may otherwise provide by separate order (entered on stipulation or on motion), the provisions of Paragraph 13 shall then apply to any request for relief from that stay.

   14.  The Court adopts the legal standard for "fraud on the court" as set forth in the Decision.

   15.  (a)  By agreement of New GM, Designated Counsel for the Ignition Switch Plaintiffs, the GUC Trust, and the GUC Trust Unitholders, and as approved by the Court, no discovery in the Bankruptcy Court was conducted in connection with the resolution of the Four Threshold Issues.  The Ignition Switch Pre-Closing Accident Plaintiffs did not challenge the earlier decision not to seek discovery in the Bankruptcy Court in connection with the Bankruptcy Court's determination of the Four Threshold Issues.  New GM, Designated Counsel, the Groman Plaintiffs, the GUC Trust, and the GUC Trust Unitholders developed and submitted to the Court a set of agreed upon stipulated facts.  Such parties also submitted to the Bankruptcy Court certain disputed facts and exhibits.  The Court decided the Four Threshold Issues on the agreed upon stipulated facts only.

   (b)  The Court has determined that the agreed-upon factual stipulations were sufficient for purposes of determining the Four Threshold Issues; that none of the disputed facts were or would have been material to the Court's conclusions as to any of the Four Threshold Issues; and that treating any disputed fact as undisputed would not have affected the outcome or reasoning of the Decision.

(c)     The Groman Plaintiffs requested discovery with respect to the Four Threshold Issues but the other parties opposed that request, and the Court denied that request. To the extent the Groman Plaintiffs' discovery request continues, it is denied without prejudice to renewal in the event that after appeal of this Judgment, the discovery they seek becomes necessary or appropriate.

(d)     For these reasons (and others), the findings of fact in the Decision shall apply only for the purpose of this Court's resolution of the Four Threshold Issues, and shall have no force or applicability in any other legal proceeding or matter, including without limitation, MDL 2543.  Notwithstanding the foregoing, in all events, however, the Decision and Judgment shall apply with respect to (a) the Court's interpretation of the enforceability of the Sale Order, and (b) the actions of the affected parties that are authorized and proscribed by the Decision and Judgment.

16.     The Court shall retain exclusive jurisdiction, to the fullest extent permissible under law, to construe or enforce the Sale Order, this Judgment, and/or the Decision on which it was based.  For the avoidance of doubt, except as otherwise provided in this Judgment, the Sale Order remains fully enforceable, and in full force and effect.  This Judgment shall not be collaterally attacked, or otherwise subjected to review or modification, in any Court other than this Court or any court exercising appellate authority over this Court.

17.     Count One of the amended complaint ("**Groman Complaint**") filed in *Groman et al v. General Motors LLC* (Adv. Proc. No. 14-01929 (REG)) is dismissed with prejudice.  The remaining counts of the Groman Complaint that deal with the "fraud on the court" issue are deferred and stayed until 30 days after all appeals of the Decision and Judgment are decided. With respect to Count One of the Groman Complaint, (i) the statute of limitations shall be tolled

from the date of dismissal of Count One to 30 days after all appeals of the Decision and

Judgment are decided, and (ii) if the Decision and Judgment are reversed or modified on appeal

such that the appellate court finds that the Groman Plaintiffs can maintain the cause of action in

Count One of the Groman Complaint heretofore dismissed pursuant to this Judgment, the

Groman Plaintiffs' rights against New GM that existed as of the dismissal of Count One shall be

reinstated as if the dismissal of Count One never occurred.

18.      (a)      New GM is hereby authorized to serve this Judgment and the Decision

upon any additional party (or his or her attorney) (each, an "**Additional Party**") that commences

a lawsuit and/or is not otherwise on Exhibits "A" through "D" hereto (each, an "**Additional

Lawsuit**") against New GM that would be proscribed by the Sale Order (as modified by the

Decision and this Judgment).  Any Additional Party shall have 17 business days upon receipt of

service by New GM of the Decision and Judgment to dismiss, without prejudice, such Additional

Lawsuit or the allegations, claims or causes of action contained in such Additional Lawsuit that

would violate the Decision, this Judgment, or the Sale Order (as modified by the Decision and

this Judgment).

(b)      If any Additional Party has a good faith basis to maintain that the

Additional Lawsuit or certain allegations, claims or causes of action contained in such Additional

Lawsuit should not be dismissed without prejudice, such Additional Party shall, within 17

business days upon receipt of the Decision and Judgment, file with this Court a No Dismissal

Pleading explaining why such Additional Lawsuit or certain claims or causes of action contained

therein should not be dismissed without prejudice. The No Dismissal Pleading shall not reargue

issues that were already decided by the Decision and Judgment.  New GM shall file a response to

the No Dismissal Pleading within 17 business days of service of the No Dismissal Pleading.  The

-15-

09-50026-reg   Doc 13172-1   Filed 06/01/15   Entered 06/01/15 15:03:17   Main Document
Pg 16 of 22

Court will schedule a hearing thereon if it believes one is necessary.

        (c)     If an Additional Party fails to either (i) dismiss without prejudice the Additional Lawsuit or the claims and/or causes of action contained therein that New GM asserts violates the Decision, Judgment, and/or Sale Order (as modified by the Decision and this Judgment), or (ii) timely file a No Dismissal Pleading with the Court within the time period set forth above, New GM shall be permitted to file with this Court a notice of presentment on five (5) business days' notice, with an attached Dismissal Order that directs the Additional Party to dismiss without prejudice the Additional Lawsuit or the claims and/or causes of action contained therein that violate the Decision, this Judgment and/or the Sale Order (as modified by the Decision and this Judgment), within 17 business days of receipt of the Dismissal Order.  With respect to any lawsuit that is dismissed pursuant to this paragraph, (i) the statute of limitations shall be tolled from the date of dismissal of such lawsuit to 30 days after all appeals of the Decision and Judgment are decided, and (ii) if the Decision and Judgment are reversed on appeal such that the appellate court finds that the Additional Party can maintain the lawsuit heretofore dismissed pursuant to this Judgment, the Additional Party's rights against New GM that existed as of the dismissal of the lawsuit shall be reinstated as if the dismissal of the lawsuit never occurred.

        (d)     For the avoidance of doubt, nothing in this paragraph 18 shall apply to the Amended Consolidated Complaint to be filed in MDL 2543 on or before June 12, 2015.

Dated: New York, New York           *s/ Robert E. Gerber*
       June 1, 2015                United States Bankruptcy Judge

**Exhibit "A": Complaints Alleging Pre-Closing Ignition Switch Accidents To Be Stayed**

Bachelder, et al. v. General Motors LLC, MDL No. 1:15-cv-00155-JMF (S.D.N.Y.)[3]

Betancourt Vega v. General Motors LLC, et al., No. 3:15-cv-01245-DRD (D.P.R.)
(MDL No. 1:15-cv-02638)

Bledsoe, et al. v. General Motors LLC, MDL No. 1:14-cv-07631-JMF (S.D.N.Y.)[4]

Boyd, et al. v. General Motors LLC, No. 4:14-cv-01205-HEA (E.D. Mo.)
(MDL No. 1:14-cv-08385)[5]

Doerfler-Bashucky v. General Motors LLC, et al., No. 5:15-cv-00511-GTS-DEP (N.D.N.Y.)

Edwards, et al. v. General Motors LLC, MDL No. 1:14-cv-06924-JMF (S.D.N.Y.)[6]

Johnston-Twining v. General Motors LLC, et al., No. 3956 (Philadelphia County, Pa.)

Meyers v. General Motors LLC, No. 1:15-cv-00177-CCC (M.D. Pa.)

Occulto v. General Motors Co., et al., No. 15-cv-1545 (Lackawanna County, Pa.)

Scott v. General Motors Company, et al., No. 8:15-cv-00307-JDW-AEP (M.D. Fla.)
(MDL No. 1:15-cv-01790)

Vest v. General Motors LLC, et al., No. 1:14-cv-24995-DAF (S.D. W.Va.)
(MDL No. 1:14-cv-07475)

---

[3]     The *Bachelder* complaint includes both Ignition Switch and non-Ignition Switch Pre-Closing Accident
vehicles subject to the Judgment.  Accordingly, it is listed both on Exhibits "A" and "D."

[4]     The *Bledsoe* complaint includes both Ignition Switch and non-Ignition Switch Pre-Closing Accident
vehicles subject to the Judgment.  Accordingly, it is listed both on Exhibits "A" and "D."  In addition, the
*Bledsoe* complaint includes economic loss claims regarding Old GM conduct and vehicles and, therefore,
also appears on Exhibit "C."

[5]     The *Boyd* complaint contains allegations regarding both a Pre-Closing ignition switch accident and one or
more Post-Closing ignition switch accidents.  To the extent the complaint concerns one or more Post-
Closing ignition switch accidents, those portions of the *Boyd* complaint that assert Product Liabilities (as
defined in the Sale Agreement) based on a Post-Closing ignition switch accident are not subject to the
Judgment.

[6]     The *Edwards* complaint includes both Ignition Switch and non-Ignition Switch Pre-Closing Accident
vehicles subject to the Judgment.  Accordingly, it is listed both on Exhibits "A" and "D."

09-50026-reg   Doc 13772   Filed 08/01/19   Entered 08/01/19 15:03:17   Main Document
Pg 18 of 21

**Exhibit "B": Economic Loss Complaints To Be Stayed**

Hailes, et al. v. General Motors LLC, et al., No. 15PU-CV00412 (Pulaski County, Mo.)

In re General Motors LLC Ignition Switch Litigation, 14-MD-2543, *Consolidated Class Action Complaint Against New GM For Recalled Vehicles Manufactured By Old GM and Purchased Before July 11, 2009*

## Exhibit "C": Complaints Containing Particular Allegations And/Or Claims Barred By Sale Order To Be Stricken

### Post-Sale Personal Injury/Wrongful Death Complaints With Economic Loss Claims To Be Stricken:

Ackerman v. General Motors Corp., et al., No. MRS-L-2898-14 (Morris County, N.J.)

Austin, et al. v. General Motors LLC, No. 2015-L- 000026 (St. Clair County, Ill.)

Berger, et al. v. General Motors LLC, No. 9241/2014 (Kings County, N.Y.)

Casey, et al.  v. General Motors LLC, et al., No. 2014-54547 (Texas MDL)

Colarossi v. General Motors, et al., No. 14-22445 (Suffolk County, N.Y.)

Dobbs v. General Motors LLC, et al., No. 49D051504PL010527 (Marion County, Ind.)

Felix, et al. v. General Motors LLC, No. 1422-CC09472 (City of St. Louis, Mo.)

Gable, et al. v. Walton, et al., No. 6737 (Lauderdale County, Tenn.)

Goins v. General Motors LLC, et al., No. 2014-CI40 (Yazoo County, Miss.)

Grant v. General Motors LLC, et al., No. 2014CV02570MG (Clayton County, Ga.)

Green v. General Motors LLC, et al., No. 15-144964-NF (Oakland County, Mich.)

Hellems v. General Motors LLC, No. 15-459-NP (Eaton County, Mich.)

Hinrichs v. General Motors LLC, et al., No. 15-DCV-221509 (Texas MDL)

Jackson v. General Motors LLC, et al., No. 2014-69442 (Texas MDL)

Largent v. General Motors LLC, et al., No. 14-006509-NP (Wayne County, Mich.)

Licardo v. General Motors LLC, No. 03236 (Fulton County, N.Y.)

Lincoln, et al. v. General Motors LLC, No. 2015-0449-CV (Steuben County, N.Y.)

Lucas v. General Motors LLC, et al., No. 15-CI-00033 (Perry County, Ky.)

Miller v. General Motors LLC, et al., No. CACE-15-002297 (Broward County, Fla.)

Mullin, et al. v. General Motors LLC, et al., No. BC568381 (Los Angeles County, Cal.)

Nelson v. General Motors LLC, et al., No. D140141 (Texas MDL)

Petrocelli v. General Motors LLC, et al., No. 14-17405 (Suffolk County, N.Y.)

Polanco, et al. v. General Motors LLC, et al., No. CIVRS1200622 (San Bernardino County, Cal.)

Quiles v. Catsoulis, et al., No. 702871/14 (Queens County, N.Y.)

Quintero v. General Motors LLC, et al., No. 15-995 (Orleans Parish, La.)

Shell, et al. v. General Motors LLC, No. 1522-CC00346 (City of St. Louis, Mo.)

Solomon v. General Motors LLC, No. 15A794-1 (Cobb County, Ga.)

Spencer v. General Motors LLC, et al., No. D-1-GN-14-001337 (Texas MDL)

Szatkowski, et al. v. General Motors LLC, et al., No. 2014-08274-0 (Luzerne County, Pa.)

Tyre v. General Motors LLC, et al., No. GD-14-010489 (Allegheny County, Pa.)

Wilson v. General Motors LLC, et al., No. 2014-29914 (Texas MDL)

**Post-Sale Economic Loss Complaints With Old GM Allegations/Claims To Be Stricken:**

Bledsoe, et al. v. General Motors LLC, MDL No. 1:14-cv-07631-JMF (S.D.N.Y.)

Elliott, et al. v. General Motors LLC, No. 1:14-cv-00691-KBJ (D.D.C.)
(MDL No. 1:14-cv-08382)

Sesay, et al. v. General Motors LLC, et al., MDL No.1:14-cv-06018-JMF (S.D.N.Y.)

In re General Motors LLC Ignition Switch Litigation, 14-MD-2543, *Consolidated Complaint Concerning All GM-Branded Vehicles That Were Acquired July 11, 2009 or Later*

## Exhibit "D": Non-Ignition Switch Complaints Subject to the Judgment

**Personal Injury/Wrongful Death Complaints:**

Abney, et al. v. General Motors LLC, MDL No. 1:14-cv-05810-JMF (S.D.N.Y.)[7]

Bachelder, et al. v. General Motors LLC, MDL No. 1:15-cv-00155-JMF (S.D.N.Y.)

Bacon v. General Motors LLC, MDL No. 1:15-cv-00918-JMF (S.D.N.Y.)

Edwards, et al. v. General Motors LLC, MDL No. 1:14-cv-06924-JMF (S.D.N.Y.)

Phillips-Powledge v. General Motors LLC, No. 3:14-cv-00192 (S.D. Tex.)
(MDL No. 1:14-cv-08540)

Pillars v. General Motors LLC, No. 1:15-cv-11360-TLL-PTM (E.D. Mich.)

Williams, et al. v. General Motors LLC, No. 5:15-cv-01070-EEF-MLH (W.D. La.)
(MDL No. 1:15-cv-03272)

**Economic Loss Complaints:**

Bledsoe, et al. v. General Motors LLC, MDL No. 1:14-cv-07631-JMF (S.D.N.Y.)

Elliott, et al. v. General Motors LLC, No. 1:14-cv-00691-KBJ (D.D.C.)
(MDL No. 1:14-cv-08382)

Sesay, et al. v. General Motors LLC, et al., MDL No.1:14-cv-06018-JMF (S.D.N.Y.)

Watson, et al. v. General Motors LLC, et al., No. 6:14-cv-02832 (W.D. La.)

---

[7]     The *Abney* complaint includes a non-Ignition Switch Pre-Closing Accident vehicle subject to the Judgment.

# **<u>EXHIBIT D</u>**

**Molino, Elizabeth A.**

| | |
|---|---|
| **From:** | Gary Peller <peller@law.georgetown.edu> |
| **Sent:** | Thursday, June 18, 2015 10:23 PM |
| **To:** | Davidson, Scott |
| **Cc:** | Steel, Howard S.; 'Weintraub, William P'; 'schmidt@whafh.com'; 'Briana L. Cioni'; Weisfelner, Edward S.; 'jflaxer@golenbock.com'; Williams, Matt J.; Martorana, Keith R.; 'Golden, Daniel'; 'Newman, Deborah'; 'Bloomer, Andrew B. (abloomer@kirkland.com)'; 'Feller, Leonid (leonid.feller@kirkland.com)'; 'rcheck@kirkland.com'; 'rgodfrey@kirkland.com'; 'esserman@sbep-law.com'; 'Moss, Naomi'; Molton, David J.; Rubin, Lisa H. (LRubin@gibsondunn.com); Steinberg, Arthur; Asher, Jennifer; Rodriguez, David John; ECABRASER@lchb.com; Steve@hbsslaw.com; bobh@hmglawfirm.com; Erick Quezada(fwd) |
| **Subject:** | In re Motors Liquidation Company; Case No: 09-50026 -- Service of Petition for Permission to Appeal |
| **Attachments:** | Elliott Parties petition .pdf |

Counsel:

Please find attached the *Elliott* parties' Petition for Permission to Appeal, to be filed with the Second Circuit Court of Appeals via its ECF system.

Gary Peller

Gary Peller
600 New Jersey Avenue, N.W.
Washington, D.C. 20001
(202) 662-9122
(202) 662-9680 (facsimile)
peller@law.georgetown.edu

This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message.

# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

```
------------------------------------------------ X
                                      -------- :   From a decision of
CELESTINE ELLIOT, et al.,                     :   THE UNITED STATES
Plaintiffs and Petitioners,                   :   BANKRUPTCY COURT
                                              :   FOR THE SOUTHERN
           v.                                 :   DISTRICT OF NEW YORK
                                              :   Before The Honorable Judge
                                              :   Robert E. Gerber
GENERAL MOTORS LLC, et al.,                   :   Case No. 09-50026
Defendants and Respondents,                   X
```

## CELESTINE ELLIOTT'S, LAWRENCE ELLIOTT'S, AND BERENICE SUMMERVILLE'S PETITION FOR PERMISSION TO APPEAL A JUDGMENT AND ASSOCIATED ORDERS OF THE BANKRUPTCY COURT

Celestine Elliott, Lawrence Elliott, and Berenice Summerville ("the *Elliott* Parties"), through undersigned counsel, hereby petition pursuant to Federal Rule of Appellate Procedure 5 and 28 U.S.C. § 158(d) for permission to appeal a Judgment and associated rulings and orders of the Bankruptcy Court.

## I.    STATEMENT OF FACTS NECESSARY TO UNDERSTAND THE QUESTIONS PRESENTED

On July 10, 2009, General Motors LLC ("New GM") acquired substantially all the assets of General Motors Corporation ("Old GM") in a "free and clear" sale authorized under 28 U.S.C. §363 of the Bankruptcy Code. In connection with the sale, the Bankruptcy Court issued a Sale Order and Injunction ("the 2009 Order"),

1

which authorized the sale of assets "free and clear" of liabilities to be retained by Old GM.

The 2009 Order enjoins the assertion of any claim asserting "successor or transferee liability" against New GM unless the claim is otherwise assumed. The 2009 Order does not address direct, non-derivative claims that might be asserted against New GM based on *its own conduct* after the sale, the only types of claims asserted by the *Elliott* Parties. The *Elliott* Parties were not notified of the 2009 proceedings  and had no opportunity to participate in them prior to the Order's entry, as their claims against New GM had not yet arisen.

Starting in February 2014, and in piecemeal fashion ever since, New GM has publicly admitted that *its* employees and lawyers knew about various safety-related defects in millions of vehicles, including the vehicle models owned by the *Elliott* Parties, and that *New GM* failed to disclose those defects as *it* was required to do by law. GM'S CEO, Mary Barra attributed New GM's "failure to disclose critical pieces of information,"[2] in her words, to New GM's policies and practices that mandated and rewarded the elevation of profit over safety concerns.

The *Elliott* parties are Plaintiffs and putative class representatives in *Elliott et al. v. General Motors, LLC*, et al., a lawsuit pending before the United States District Court for the Southern District of New York (Furman, J.) and consolidated

---

[2] Dominic Rushe, *GM Chief Mary Barra: 'pattern of incompetence' caused fatal recall delay*, The Guardian (June 5, 2014), http://www.theguardian.com/business/2014/jun/05/gm-mary-barra-fatal-recall-incompetence-neglect.

in the multidistrict litigation styled *In re GM Ignition Switch*, 14-md-2543-JMF .
The Elliotts filed their lawsuit on April 1, 2014. They jointly own a 2006 Chevrolet
Cobalt, one of the vehicles that New GM admits contained a dangerous ignition
switch hazard that has caused the death or injury of thousands of people. Ms.
Summerville, who joined the lawsuit when the Elliotts amended their complaint in
July 2014, owns a 2010 Chevrolet Cobalt, a model that New GM recalled because
of the risk that it may have had the hazardous ignition switch installed during a
repair. In addition to their ignition switch related claims for relief, the *Elliott*
parties also allege that their vehicles contain a fuel pump hazard that, they allege,
New GM continues to deny and/or minimize. The Elliott parties assert only direct
claims against New GM, a non-debtor, based on alleged breaches of independent,
non-derivative duties that New GM owed them, claims bearing no conceivable
relationship to the *res* of debtor General Motors Corporation ("Old GM"), whose
Bankruptcy case is long over. The *Elliott* parties' First Amended Complaint
explicitly disclaim reliance on any successor, transferee or derivative theories of
liability.

On April 21, 2014, New GM initiated a series of "contested matters" in the
Bankruptcy Court[3] against the *Elliott* parties and scores of other "ignition switch
lawsuits" that had been filed against New GM.  New GM moved the Bankruptcy

---

[3] F. R. Bank. P. 9014.

Court to enforce its 2009 Order by restraining the various parties New GM listed

on a bulk schedule, including the *Elliott* parties, from suing New GM for claims

related to "ignition switch defects" insofar as such claims were based on liability

that Old GM retained under the 2009 Order.[4] New GM later filed two parallel

motions to enforce the 2009 Order, one against Pre-Closing Accident Plaintiffs and

a second directed at Other Monetary Plaintiffs asserting non-ignition switch

hazards in vehicles made by Old GM.[5]

On August 5, 2014, the Bankruptcy Court denied the *Elliott* parties' motion to

dismiss for lack of subject matter jurisdiction and its "No Stay Pleading." On

November 10, 2014, the Bankruptcy Court denied the *Elliott* parties' motion for

reconsideration, in which they had contended that enjoining them from pursuing

their independent, non-derivative claims against New GM violated their Due

Process rights, as they had no notice or opportunity to be heard prior to the entry of

the 2009 Order.

On June 1, 2015, the Bankruptcy Court entered its Judgment on New GM's

Motion to Enforce the 2009 Sale Order and Injunction, construing the 2009 Order

to bar the *Elliott* Plaintiffs from proceeding with their claims against New GM for

---

[4] *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction*, [Dkt. No. 12620], at 3. (*emphasis added*)

[5] *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Courts July 5, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits*, [Dkt. No. 12807]; *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Courts July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions)*, [Dkt. No. 12808].

its own wrongdoing. The Court enforced the 2009 Order through the issuance of a successive injunction that bars the *Elliott* Plaintiffs from asserting some of their (non-ignition switch) claims entirely and censors the allegations they may make in support of the (ignition switch related) claims they are permitted to assert.[6]

## II.    QUESTIONS PRESENTED

Does the Constitution grant the Bankruptcy Court the power categorically to suspend the application of all laws imposing civil liability on New GM, a non-debtor, for its own wrongdoing?

Did the Bankruptcy Court err in concluding that it had subject matter jurisdiction to enjoin the prosecution of the *Elliott* Parties' direct, non-successor liability claims for injuries caused by New GM's breaches of independent, non-derivative duties?

Did the Bankruptcy Court err in enforcing the 2009 Order against the *Elliott* Parties, even though they did not receive the notice and opportunity to be heard required by the Due Process Clause for preclusion of *in personam* claims against New GM?

Does the Bankruptcy court have the power to enforce its 2009 Order by censoring what the *Elliott* Parties may say in support of claims that are not barred by that Order?

---

[6] Pursuant to F. R. Bank. P. 8006(e), the Bankruptcy court's certification for direct appeal became effective when the *Elliott* Plaintiffs filed their Notice of Appeal from the Judgment. This petition is accordingly timely.

5

## III.    RELIEF SOUGHT

The *Elliott* Parties seek reversal of the Bankruptcy Courts' Judgment and related Orders enjoining and censoring their independent, non-derivative claims against New GM for its own wrongdoing and a remand mandating dismissal of GM's Motion to Enforce the 2009 Order against them in its entirety.

## IV.    JUDGMENT AND ORDERS APPEALED FROM

The *Elliott* Parties appeal from the Bankruptcy Court's Judgment (Attached Exhibit A) on New GM's Motion to Enforce the 2009 Sale Order and Injunction. Additionally, Plaintiffs appeal from the Decision on the Motion to Enforce the 2009 Sale Order and Injunction (Attached Exhibit B); the Endorsed Order Denying the Elliott Plaintiffs' Motion to Alter or Amend and Denying Plaintiffs' Motion for Abstention (Attached Exhibit C); and the Decision Denying the Elliott Plaintiffs' No Stay Pleading (Attached Exhibit D).

## V.    THE APPEAL'S AUTHORIZATION BY STATUTE OR RULE AND THE REASONS WHY THE APPEAL SHOULD BE ALLOWED

The Bankruptcy Court has concluded that the "issues here are important, difficult, and involve the application of often conflicting authority. Their prompt determination will affect further proceedings not just in this Court, but also the MDL Court. The Court believes that it should certify its judgment for direct review

6

by the Circuit."[7] By separate order, it certified this appeal pursuant to 28 U.S.C.
§158(d). [8]

The *Elliott* parties do not agree with the Bankruptcy Court's characterization
of the issues as either "difficult" or requiring the "application of often conflicting
authority."

With respect to their subject matter jurisdiction and due process contentions,
the Bankruptcy Court made clear errors of law in explicitly refusing to follow
controlling rulings by this Court in *In re Johns-Manville Corp.*, 517 F.3d 52, 68
(2d Cir. 2008) (Manville II) (bankruptcy court lacks subject matter jurisdiction
over direct claims against non-debtor based on alleged breaches of independent,
non-derivative duties); *In re Johns-Manville Corp.*, 600 F.3d 135, 158 (2d Cir.
2010) (Manville III) (parties who did not participate in bankruptcy proceedings not
precluded from challenging its subject matter jurisdiction to enjoin *in
personam* claims against non-debtor).

Because reversal on any of the issues presented would conclude the
proceedings below, interests in judicial economy and efficiency may support
granting the petition for permission to appeal. Alternatively, the *Elliott* Parties
believe that, given the United States District Court's familiarity with the issues

---

[7] *Decision on Motion to Enforce Sale Order*, [Dkt. No. 13109], at 17.

[8] *Order Pursuant to 28 U.S.C. § 158(d), and Fed.R.Bank.P. 8006(e), Certifying Judgment for Direct Appeal to*

[8] *Order Pursuant to 28 U.S.C. § 158(d), and Fed.R.Bank.P. 8006(e), Certifying Judgment for Direct Appeal to
Second Circuit*, [Dkt. No. 13178].

presented, initial review by that Court may facilitate this Court's eventual review,

and they have no objection to their appeal being heard by that Court in the first

instance. They file this petition to ensure that this Court's consideration of the

Bankruptcy Court's Certification Order begins without delay.


Respectfully submitted,

*/s/ Gary Peller*_____
Gary Peller (*pro hac vice pending*)
600 New Jersey Ave. NW
Washington, DC  20001
(202) 662-9122
peller@law.georgetown.edu
Counsel for Celestine Elliott,
Lawrence Elliott, and Berenice
Summerville

## Certificate of Service

I hereby certify that on June 18, 2015, I caused this Celestine Elliott's,

Lawrence Elliott's and Berenice Summerville's Petition for Permission to Appeal a

Judgment and Associated Orders of the Bankruptcy Court to be served via

electronic mail and first class mail upon the following counsel, including counsel

for respondent General Motors LLC:


Brown Rudnick LLP
ATTN Edward S Weisfelner, Esq.
7 Times Square, 47th FL
New York, NY 10036
eweisfelner@brownrudnick.com

Stutzman Bromberg Esserman &
Plifka PC
ATTN, Sander Esserman, Esq.
2323 Bryan Street Suite 2200
Dallas, TX 75201
esserman@sbep-law.com

Goodwin Procter LLP
ATTN, William P Weintraub, Esq.
The New York Times Bldg.
620 Eighth Ave
New York, NY 10018
wweintraub@goodwinprocter.com

Wolf Haldenstein Alder Freeman &
Herz LLP
ATTN, Alexander H Schmidt, Esq.
270 Madison Ave
New York, NY 10116
Schmidt@whafh.com

Golenbock Eiseman Assor Bell &
Peskoe LLP
ATTN, Jonathan L Flaxer, Esq.
437 Madison Ave
New York, NY 10022
jflaxer@golenbock,com

Gibson Dunn & Crutcher LLP
ATTN, Lisa H Rubin, Esq.
200 Park Avenue
New York, NY 10166-0193
lrubin@gibsondunn.com

Akin Gump Strauss Hauer & Feld
LLP
ATTN, Daniel H Golden, Esq.
One Bryant Park
New York, NY 10036
dgolden@akingump.com

King & Spalding LLP
ATTN, Arthur J Steinberg, Esq.
1185 Avenue of the Americas

New York, NY 10036
asteinberg@sklaw.com

Dated: June 18, 2015

/s/ Gary Peller_____
Gary Peller (*pro hac vice pending*)
600 New Jersey Ave. NW
Washington, DC  20001
(202) 662-9122
peller@law.georgetown.edu
Counsel for Celestine Elliott,
Lawrence Elliott, and Berenice
Summerville

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing *Motion for Leave to Intervene to Respond to Petitioners' Petition for Permission to Appeal,* supporting *Memorandum of Law*, and *Declaration of Edward S. Weisfelner* with exhibits to be served on Counsel for Petitioners and Respondents *via* Electronic Mail and one (1) copy via Next Business Day Delivery to:

Gary Peller
600 New Jersey Avenue, NW
Washington, DC 20001
T: 202-662-9122
peller@law.georgetown.edu

*Counsel for Petitioners*

**KING & SPALDING LLP**
Arthur J. Steinberg
Scott I. Davidson
1185 Avenue of the Americas
New York, New York 10036
T: 212-556-2100
E: asteinberg@kslaw.com
E: sdavidson@kslaw.com

**KIRKLAND & ELLIS LLP**
Richard C. Godfrey
Andrew B. Bloomer
300 North LaSalle
Chicago, Illinois 60654
T: 312-862-2000
E: rgodfrey@kirkland.com
E: abloomer@kirkland.com

*Counsel for Respondents*

**GIBSON, DUNN & CRUTCHER, LLP**
Lisa H. Rubin
Matthew Williams
Adam H. Offenhartz
Aric H. Wu
Keith R. Martorana
200 Park Avenue
New York, New York 10166
T: 212-351-3845
E: lrubin@gibsondunn.com
E: mjwilliams@gibsondunn.com
E: aoffenhartz@gibsondunn.com
E: awu@gibsondunn.com
E: kmartorana@gibsondunn.com

*Counsel for Wilmington Trust Co., as trustee and administrator of the GUC Trust*

**GOLDENBOCK, EISEMAN, ASSOR, BELL & PESKOE, LLP**
Jonathan L. Flaxer
S. Preston Ricardo
437 Madison Avenue
New York, New York 10022
T: 212-907-7300
E: jflaxer@golenbock.com
E: pricardo@golenbock.com

*Counsel for Groman Plaintiffs*

**AKIN, GUMP, STRAUSS, HAUER & FELD, LLP**
Daniel Golden
Deborah J. Newman
Jamison A. Diehl
Naomi Moss
One Bryant Park
New York, New York, 10036
T: 212-872-1000
E: dgolden@akingump.com
E: djnewman@akingump.com
E: jdiehl@akingump.com
E: nmoss@akingump.com

*Counsel for Participating GUC Trust Unit Trust Holders*

2

I certify that an electronic copy was submitted to newcases@ca2.gov and that three (3) paper copies of the foregoing *Motion for Leave to Intervene to Respond to Petitioners' Petition for Permission to Appeal,* supporting *Memorandum of Law*, and *Declaration of Edward S. Weisfelner* with exhibits were sent to the Clerk's Office by Next Business Day delivery to:

Clerk of Court
United States Court of Appeals, Second Circuit
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007
(212) 857-8500

on this 29th day of June, 2015

Respectfully submitted,

*/s/ Edward S. Weisfelner*
Edward S. Weisfelner