# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x
IN RE:                                                   :          **14-MD-2543 (JMF)**
**GENERAL MOTORS LLC**                       :
**IGNITION SWITCH LITIGATION**            :
-----------------------------------------------------------------------x

-----------------------------------------------------------------------x          **CASE NO.**
_____
**SHARON BLEDSOE, CELESTINE ELLIOTT,**          :
**LAWRENCE ELLIOTT, CINA FARMER, PAUL**          :          **CLASS ACTION FOR**
**FORDHAM, MOMOH KANU, TYNESIA**                       :          **DECLARATIVE, INJUNCTIVE,**
**MITCHELL, DIERRA THOMAS, and JAMES TIBBS,** :          **AND MONETARY RELIEF**
                                                                                 :
**Plaintiffs,**                                                       :          **REPRESENTATIVE**
**ACTION**
                                                                                 :          **FOR DECLARATIVE,**
**v.**                                                                  :          **INJUNCTIVE, AND**
                                                                                            **MONETARY**
                                                                                 :          **RELIEF ON BEHALF OF THE**
**GENERAL MOTORS LLC,**                                   :          **PEOPLE OF THE DISTRICT**
                                                                                            **OF COLUMBIA**
**Defendant.**                                                      :
-----------------------------------------------------------------------x          **JURY TRIAL DEMANDED**

## COMPLAINT

### INTRODUCTORY STATEMENT

Plaintiffs SHARON BLEDSOE, CELESTINE ELLIOTT, LAWRENCE ELLIOTT,

CINA FARMER, PAUL FORDHAM, MOMOH KANU, TYNESIA MITCHELL, DIERRA

THOMAS, and JAMES TIBBS (collectively "Plaintiffs') bring this action for themselves, and

on behalf of all persons similarly situated, who own or have owned the substandard and

dangerous vehicles identified below.

Lawrence Elliott, Celestine Elliott, and James Tibbs also bring this action as

representatives of the People of the District of Columbia ("the District"), to vindicate the

public interest in safety, to protect themselves and other residents of and commuters and other

1

visitors to the District from the unreasonable and imminent danger of death, serious bodily injury, and property damage that the historic misconduct of General Motors LLC ("GM") has loosed upon the City, as well as to seek all other available relief.

In February 2014, GM publicly admitted that--for every single day of its existence as a new entity, distinct from General Motors Corporation ("Old GM")—GM failed to disclose— and its engineers, lawyers, and other employees actively concealed--the dangers that use of millions of GM vehicles entails. GM's season of shame began with its admission that it had concealed an ignition switch defect in some 1.6 million vehicles, a defect, described in greater detail below, causing death serious injury to hundreds while GM knew but failed to disclose its danger. Since purporting to come clean about its wrongdoing, and after promising to transform a culture that let greed trump the dictates of responsible corporate conduct, GM has been forced to admit that its misconduct was far more widespread than its initial confession revealed. GM has since issued expanded recalls for more and more vehicles that present the same ignition switch danger. GM has also issued or expanded prior recalls for a wide range of other safety hazards that Plaintiffs' vehicles and others present and that GM had concealed or minimized, some 28 million vehicles since February 2014 and counting, a boggling tally of corporate irresponsibility, and a frighteningly sharp reflection of how widespread GM's reckless endangerment of the Plaintiffs and the public, in America and abroad, has been. Plaintiffs seek redress for GM's wrongdoing.

## PARTIES

1.      Plaintiffs Sharon Bledsoe, Cina Farmer, Paul Fordham, Momoh Kanu, Tynesia Mitchell, and Dierra Thomas, are each citizens and residents of Maryland.

2.      Plaintiffs Celestine Elliott, Lawrence Elliott, and James Tibbs are each citizens and residents of the District of Columbia.

3.      Ms Bledsoe owns a 2008 Chevrolet Cobalt that she purchased new from a Chevrolet

dealer in December 2007, in the state of Georgia. As described below, she suffered personal

injury, emotional distress, and property damage in two accidents caused by the dangerous

ignition switch in the vehicle while driving in and a resident of Georgia.

4.      Mr. and Mrs. Elliott jointly own a 2006 Chevrolet Trailblazer that they purchased new

in 2006 from a Chevrolet dealer in the District of Columbia.

5.      Ms. Farmer owns a 2005 Chevrolet Cobalt that she purchased new in 2007 in the state

of Maryland. As described below, she suffered personal injury, emotional distress, and

property damage in an accident in December 2013 caused by the dangerous ignition switch in

her vehicle while driving in and a resident of the state of Maryland.

6.      Mr. Fordham owns a 2006 Pontiac G6 that he purchased used in November 2012 from

a Chevrolet Dealership in Maryland.

7.      Mr. Kanu currently owns a 2000 Chevrolet Impala. He is a former owner of a 2006

Chevrolet Impala. He bought both cars from private parties in the state of Maryland. He

suffered property damage and economic loss when he was involved an accident caused by the

dangerous ignition switch in the 2006 Impala and he had to take a total loss on the car after the

accident.

8.      Ms. Mitchell owns a 2007 Chevrolet HHR that she purchased in 2010 from a used car

dealer in Maryland.

9.      Ms. Thomas owns a 2006 Chevrolet Cobalt that she purchased from a private party in

2006.

10.     Mr. Tibbs owns a 2007 Chevrolet Impala that he purchased in 2011 from a private

party in the District of Columbia.  He was involved in an accident caused by the dangerous

ignition related hazard that his car presents.

11.     General Motors LLC is a limited liability company formed under the laws of Delaware with its principal place of business in Detroit, Michigan. Each of its members is a citizen and/or resident of the state of Michigan. On July 10, 2009, it began conducting the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the vehicles of class members, and other motor vehicles and motor vehicle components throughout the United States. Plaintiffs' claims and allegations against GM refer solely to this entity.

## JURISDICTION AND VENUE

12.     Jurisdiction is also proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states different from Defendant's home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1404, by the consent of both parties.

## FACTUAL BACKGROUND

*1.     GM's Practice of Concealing and Minimizing Safety Risks*

14.     GM instituted its own and continued policies and practices of its predecessor intended to conceal and minimize safety related risks in GM products from Plaintiffs, class members, investors, litigants, courts, law enforcement officials, the NHTSA, and other governmental officials. In furtherance of its illegal scheme, GM trained and directed its employees and dealers to take various measures to avoid exposure of safety related product risks.

15.     Defendants first deployed their campaign of deception on the day that GM began operating. The scheme continued at least until its exposure began in early 2014. Through their deception, GM recklessly endangered the safety of Plaintiffs, their families, and members of

the public. Defendants' wrongful acts and omissions harmed and continues to harm Plaintiffs and the public by exposing them to increased risk of death or serious bodily injury.

16.    As of the date of the filing of this Complaint, the United States Department of Justice has opened, and is pursuing, a criminal investigation into GM's campaign of deceit.

17.    GM's Chief Executive Officer Mary Barra admitted on behalf of the company that GM employees knew about safety-related defects in millions of vehicles and that GM did not disclose those defects as it was required to do by law. Ms. Barra attributed GM's "failure to disclose critical pieces of information," in her words, to GM's policies and practices that mandated and rewarded the unreasonable elevation of cost concerns over safety risks. For example, GM chose to use and then conceal defective ignition switches in vehicles in order to save less than ten dollars per vehicle.

18.    This case arises from GM's concerted and systematic practice and policy of denying, diminishing, and failing to remediate safety related hazards that GM vehicles pose.

19.    GM mandated that its personnel avoid exposing GM to the risk of having to recall vehicles with safety-related risks by limiting the action that GM would take with respect to such risks to the issuance of a Technical Service Bulletin or an Information Service Bulletin.

20.    GM directed its engineers and other employees to falsely characterize safety-related risks – including the risks described in this complaint – in their reports, business and technical records as "customer convenience" issues, to avoid being forced to recall vehicles as the relevant law requires, and/or to issue narrower recalls than the circumstances warranted.

21.    GM trained its engineers and other employees in the use of euphemisms to avoid disclosure to the NHTSA and others of the safety risks posed by risks in GM products.

22.     GM directed its employees to avoid the word "stall" in describing vehicles experiencing a moving stall, because it was a "hot word" that could alert the NHTSA and others to safety risks associated with GM products, and force GM to incur the costs of a recall.

        a.  A "moving stall" is a particularly dangerous condition because the driver of a moving vehicle in such circumstances no longer has control over key components of steering and/or braking, and air bags will not deploy in any, increasingly likely, serious accident.

23.     GM directed its engineering and other personnel to avoid the word "problem," and instead use a substitute terms, such as "issue," "concern," or "matter," with the intent of deceiving plaintiffs and the public.

24.     GM instructed its engineers and other employees not to use the term "safety" and refer instead to "potential safety implications."

25.     GM instructed its engineers and other employees to avoid the term "defect" and substitute the phrase "does not perform to design."

26.     GM's managerial practices were designed to ensure that its employees and officials would not investigate or respond to safety-related risks, and thereby avoid creating a record that could be detected by governmental officials, litigants or the public.

27.     In a practice GM management labeled "the GM nod," GM managers were trained to feign engagement in safety related product risks issues in meetings by nodding in response to suggestions about steps that they company should take. Protocol dictated that, upon leaving the meeting room, the managers would not respond to or follow up on the safety issues raised therein.

28.     GM's lawyers discouraged note-taking at critical product safety meetings to avoid creation of a written record and thus avoid outside detection of safety-related risks and GM's

refusal to respond to and/or GM's continuing concealment of those risks. GM employees understood that no notes should be taken during meetings about safety related issues, and existing employees instructed new employees in this policy. GM did not describe the "no-notes policy" in writing to evade detection of their campaign of concealment.

29.    GM would change part design without a corresponding change in part number, in an attempt to conceal the fact that the original part design was risk. GM concealed the fact that it manufactured cars with intentionally mislabeled part numbers, making the parts difficult for GM, Plaintiffs, class members, law enforcement officials, the NHTSA, and other governmental officials to identify. GM knew from its inception that the part number irregularity was intended to conceal the faulty ignition switches in Plaintiffs' and class members' vehicles.

30.    GM directed dealers to misrepresent the safety risks associated with the product risks of its vehicles. New GM followed this practice with respect to the dangerous ignition switches from its inception in October 2009 until its campaign of concealment of the ignition switch risk began to unravel in February 2014.

31.    GM directed its lawyers and any outside counsel it engaged to act to avoid disclosure of safety related risks in GM products. These actions included settling cases raising safety issues, demanding that GM's victims agree to keep their settlements secret, threatening and intimidating potential litigants into not bringing litigation against New GM by falsely claiming such suits are barred by Order of the Bankruptcy Court, and settling cases for amounts of money that did not require GM managerial approval, so management officials could maintain their veneer of ignorance concerning the safety related risks.

32.    In one case, GM threatened the family of an accident victim with liability for GM's legal fees if the family did not withdraw its lawsuit, misrepresenting to the family that their lawsuit was barred by Order of GM's Bankruptcy Court. In another case, GM communicated

to the family of the victim of a fatal accident caused by the faulty ignition switch that their

claim has no basis, even though GM knew that its communication was false and designed to

further GM's campaign of concealment and deceit. In other cases, GM falsely claimed that

accidents or injuries were due to the driver when it knew the accidents were likely caused by

the dangerous product risks GM concealed.

33.    The systematic concealment of known defects was deliberate, as GM followed a

consistent pattern of endless "investigation" and delay each time it became aware of a given

defect. GM routinely chose the cheapest part supplier without regard to safety, and discouraged

employees from acting to address safety issues.

34.    Under the Transportation Recall Enhancement, Accountability and Documentation Act,

49 U.S.C. § 30101, et seq. ("TREAD Act"), and its accompanying regulations, when a

manufacturer learns that a vehicle contains a safety defect, the manufacturer must properly

disclose the defect. If it is determined that the vehicle is defective, the manufacturer may be

required to notify vehicle owners, purchasers, and dealers of the defect, and may be required to

remedy the defect.

35.    When a manufacturer with TREAD Act responsibilities is aware of safety defects and

fails to disclose them as GM has done, the manufacturer's vehicles are not safe.

36.    The array of defects that GM had failed to disclose and has only in the past few months

revealed includes: (1) ignition switch  defect, (2) power steering defect, (3) airbag defect (4)

brake light defect, (5) shift cable defect, (6) safety belt defect, (7) ignition lock cylinder defect,

(8) key design defect, (9) ignition key defect, (10) transmission oil cooler line defect, (11)

power management mode software defect, (12) substandard front passenger airbags, (13) light

control module defect, (14) front axle shaft defect, (15) brake boost defect, (16) low-beam

headlight defect, (17) vacuum line brake booster defect, (18) fuel gauge defect, (19)

acceleration defect, (20) flexible flat cable airbag defect, (21) windshield wiper defect, (22)

brake rotor defect, (23) passenger-side airbag defect, (24) electronic stability control defect,

(25) steering tie-rod defect, (26) automatic transmission shift cable adjuster, (27) fuse block

defect, (28) diesel transfer pump defect, (29) base radio defect, (30) shorting bar defect, (31)

front passenger airbag end cap defect, (32) sensing and diagnostic module ("SDM") defect,

(33) sonic turbine shaft, (34) electrical system defect, (35) seatbelt tensioning system defect,

and (36) master power door switch defect.

37.    GM has received reports of crashes and injuries that put GM on notice of the serious

safety issues presented by many of these defects.  Given the continuity of engineers, corporate

counsel, and other key personnel from Old GM to GM, GM was aware of many of the defects

from the very date of its inception on July 10, 2009.

38.    GM advanced its culture of concealment by actively denying liability for fatal

accidents.  In 2005, Defunct GM customer Adam Powledge lost control of his vehicle,

slamming into a highway median and killing himself and his four children. In the ensuing suit

GM nefariously framed the incident as a suicide, disavowing any connection between the

accident and an electrical failure, despite GM's knowledge that the Malibu Mr. Powledge

drove had a steering defect that likely was the real cause of the tragedy. Then, in April 2014,

GM finally admitted that Adam Powledge's Chevrolet Malibu had a steering defect—the same

one that Mr. Fordham's vehicles possesses-that was consistent with the loss of control over the

vehicle that led to his death and that of his four children. The Powledge saga is but one

dramatic example of the lengths that GM, its attorneys, risk personnel, and others went to

further the GM campaign of denial and deceit.

39.    Despite the dangerous nature of many of the defects and their effects on critical safety

systems, GM concealed the existence of the defects and failed to remedy the problems in an

appropriate or timely manner. The continuation of GM's deceptive practices has created a public safety hazard. GM instituted and continued policies and practices intended to conceal safety related defects in GM products from Plaintiffs, the public, investors, litigants, courts, law enforcement officials, the NHTSA, and other governmental officials. In furtherance of its illegal scheme, GM trained and directed its employees and dealers to take various measures to avoid exposure of safety related product defects.

2.    *Failure to Disclose and Concealment of Ignition Switch Hazard (Bledsoe, Farmer, Mitchell, Thomas vehicles; NHTSA Campaign Numbers 14V047000; 14V171000; 14E021000*

40.    GM has admitted that the ignition switches in the vehicles owned by Mses. Bledsoe, Farmer, Mitchell, and Thomas and models with the same design of ignition switch owned by class members are dangerous and pose a safety hazard.  It has recalled all the vehicles pursuant to NHTSA recall campaign 14V047000, covering models: CHEVROLET   COBALT   2005-2010; CHEVROLET   HHR   2006-2011; PONTIAC   G5   2007-2010; PONTIAC SOLSTICE   2006-2010; SATURN   ION   2003-2007; SATURN   SKY   2007-2010.

41.    GM has also admitted that, from its inception in 2009, various New GM engineers, attorneys, and management officials knew of, and took measures to conceal, the ignition switch risk and/or diminish its significance. GM has been found guilty of failing to disclose this risk to Plaintiffs, class members, and governmental officials as required by law, and the NHTSA has fined New GM the maximum penalty that agency is authorized to impose.

42.    GM has known since June 10, 2009, that the faulty ignition switch in the Plaintiffs' and class members' vehicles poses or posed a serious safety and public health hazard because the faulty ignition switch causes moving stalls in which the driver loses power steering, power brakes, and in the increased likelihood of an accident, the airbag will not deploy.

43.     Rather than notifying the NHTSA, GM instead decided that Plaintiffs and class members, and millions of drivers and pedestrians, would face imminent risk of injury and death due to the dangerous ignition switches in Plaintiffs' and class members' vehicles. GM and other parties associated with it, including parts suppliers, agreed to conceal safety related risks presented by the ignition switches from Plaintiffs, class members, law enforcement officials, other governmental officials, litigants, courts, and investors.

44.     GM and other parties associated with it knew that the design of the faulty ignition switch in Plaintiffs and class members' cars had been altered without a corresponding change in part number, in gross violation of normal engineering practices and standards. Part labeling fraud is particularly dangerous in vehicle parts potentially related to safety because it makes tracing and identifying faulty parts very difficult, and will delay the detection of critical safety risks.

45.     In 2012, more GM employees learned that the ignition switches in vehicles from model years 2003, 2004, 2005, 2006, and 2007 exhibited torque performance below the specifications originally established by GM. Rather than notify Plaintiffs, class members, or the NHTSA, GM continued to conceal the nature of the risk.

46.     In April 2013, GM hired an outside engineering-consulting firm to investigate the ignition switch system. The resulting report concluded that the ignition switches in early model Cobalt and Ion vehicles did not meet GM's torque specification. Rather than notify Plaintiffs, class members, or the NHTSA, GM still continued to conceal the nature of the Ignition Switch Risk until 2014.

47.     NHTSA's Fatal Analysis Reporting System (FARS) reveals 303 deaths of front seat occupants in 2005-07 Cobalts and 2003-07 Ions where the airbags failed to deploy in non-rear impact crashes, models of GM vehicles owned by Ms. Bledsoe, Farmer, Mitchell, and Thomas.

48.    On April 10, 2014, GM issued another recall for the same vehicles, this time because the ignition key can be removed while ignition is not in the off position, creating a risk of "rollaway" and risks to pedestrians and property damage. NHTSA Recall Campaign 14V171000.

49.    On April 30, 2014, GM issued yet another recall for these same vehicles, this time because the after-market ignition switches that were used to replace the faulty ignition switches pursuant to the prior recalls were themselves faulty and presented the same risks. NHTSA Recall Campaign 14E021000.

    3.    *Failure to Disclose and Concealment of "Ignition Key" Hazard (Kanu, Tibbs 2007; 2006 Impala) NHTSA Recall Campaign 14V355000; (Kanu) (2000 Impala) NHTSA Recall Campaign 14V40000*

50.    Mr. Kanu's 2006 Chevrolet Impala and Mr. Tibbs' 2007 Chevrolet Impala have a dangerous ignition switch related hazard that could, unexpectedly and without warning, shut down the car's engine and electrical systems while the car is in motion - rendering the power steering, anti-lock brakes and airbags inoperable. This hazard is the subject of NHTSA Recall campaign 14V355000, and exists in the following models: BUICK  LACROSSE  2005-2009; BUICK  LUCERNE  2006-2011; CADILLAC DEVILLE  2000-2005; CADILLAC  DTS  2006-2011; CHEVROLET  IMPALA  2006-2014; CHEVROLET  MONTE CARLO  2006-2007.

51.    Mr. Tibbs has already been involved in an accident, in October 2013, in which his car turned off while he was driving when the vehicle hit a pothole in the road, and, because of the dangerous ignition switch related defect, Mr. Tibbs lost control of the vehicle and the vehicle only stopped when it hit a tree.  The airbag did not deploy despite the impact. This and the related ignition switch hazards in GM vehicles have already helped kill or seriously injure hundreds of people across the United States. Rather than disclose the risk, GM employees,

lawyers, and others concealed it.

52.     Mr. Kanu's 2000 Chevrolet Impala has a dangerous ignition switch related hazard that could, unexpectedly and without warning, shut down the car's engine and electrical systems while the car is in motion - rendering the power steering, anti-lock brakes and airbags inoperable. This hazard is the subject of NHTSA Recall campaign 14V40000, and covers the following models: CHEVROLET   IMPALA   2000-2005; CHEVROLET MALIBU CLASSIC   1997-2005;

CHEVROLET   MONTE CARLO   2000-2005; OLDSMOBILE   ALERO   1999-2004; OLDSMOBILE INTRIGUE   1998-2002; PONTIAC   GRAND AM   2000-2005; PONTIAC GRAND PRIX   2004-2008.

53.     GM claims that this hazard is distinct from the "ignition switch" hazard described above and requires remediation of key replacement rather than ignition switch replacement.

54.     GM knew but failed to disclose to Mr. Tibbs, Mr. Kanu, governmental officials, or putative class members that their cars were dangerous to operate, until it finally issued the recalls described above.

55.     In connection with NHTSA Campaign No. 14V355000, on June 20, 2014 GM issued a Stop-Delivery Order to dealers in preparation for an upcoming safety recall.  It instructed dealers to stop delivery in 2006-2014 Chevrolet Impala (Fleet Only) vehicles in new or used vehicle inventory.  It described the problem:  "The ignition switch on these vehicles may inadvertently move out of the 'run' position if the key is carrying added weight and the vehicle goes off the road or experiences some other jarring event."

56.     On the same date GM issued notice of its decision to conduct a safety recall to the NHTSA.  However, GM failed to disclose the history of its awareness of the ignition key problem.  Instead, GM simply described the potential for the ignition key to move away from

the "run" position should it the vehicle go off-road or experience a "jarring" event.  It warned that should the key move away from the "run" position, "engine power, power steering and power breaking will be affected, increasing the risk of crash."  More over, this could result in "airbags not deploying increasing the potential for occupant injury in certain kinds of crashes."

57.     On June 24, 2014 the NHTSA acknowledged the recall in letter to the Director of Field Product Investigations and Evaluations at General Motors, which carried the subject "Ignition Switch may Turn Off."

58.     The NHTSA described the problem as concerning the "electrical system: ignition."  It described the problem: "This defect can affect the safe operation of the airbag system.  Until this recall is performed, customers should remove all items from their key rings, leaving only the ignition key… In the affected vehicles, the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the run position, turning off the engine."

59.     In "consequence," according to the recall papers, "if the key is not in the run position, the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury.  Additionally, a key knocked out of the run position will cause loss of engine power, power steering, and power braking, increasing the risk of a vehicle crash.

60.     The "Remedy" in the recall provides: "GM will notify owners, and dealers will install two 13mm key rings and key insert into the vehicle's ignition keys, free of charge. The manufacturer has not yet provided a notification schedule."

61.     On June 25, 2014 GM issued a notice to GM dealers explaining vehicles involved in three upcoming safety recalls.  It listed the following: Recall 14172 – Ignition Switch recall for 2003 – 2014 Cadillac CTS and 2004 -2006 Cadillac SRX, Recall 14299- Ignition Switch for,

14

among other vehicles, the 2014 Chevrolet Impala Limited (Fleet Only), and Recall 14250-Ignition Key for, among other vehicles, the 2005 – 2006 Chevrolet Impala.

62.    On July 2, 2014, in a letter meant to supersede its previous correspondence, GM notified the NHTSA that it had possession of information regarding the ignition key problem since its inception on July 10, 2009, that consisted of a reliable report that "the vehicle stalled after hitting a large bump when going from gravel road to pavement while driving at about 45 mph." Since October 2009, GM did not take appropriate measures to investigate the serious risk the information it possessed suggested, particularly when considered with other information GM possessed regarding ignition switch related risks.

63.    In the same July 2 letter, GM claimed that during a document review related to a Cobalt ignition switch problem in 2014, it discovered information in its possession that led it to the recall for Mr. Kanu's 2006 Impala and Mr. Tibbs's 2007 Impala and other vehicles with the same hazard. GM revealed that the issue was brought to the Product Investigation group on April 30, 2014. Between May 1, 2014 and June 6, 2014 "the investigator worked with GM subject matter experts to gather and analyze data relating to the ignition switch used on the 2006 Impala." GM reported that "although ignition switches themselves performed below the target specification, the ignition switch system as a whole as installed in the vehicles' steering columns performed approximately at the target specification." GM also reviewed its databases including its TREAD, warranty, customer satisfaction, and Engineering Analysis database, and NHTSA's Vehicle Owner's Questionnaire database; after which the investigator made a presentation regarding the ignition switch at an Open Investigation review meeting.

64.    In the same July 2nd letter, GM then revealed that only after the presentation and meeting did do road testing of the Impala using the ignition switches under review.  These tests revealed that: "when a slotted key is carrying added weight, the torque performance of the

ignition system may be insufficient to resist energy generated when a vehicle goes off road or

experiences some other jarring event, potentially resulting in the unintentional movement of

the key away from the 'run' position." After review of GM and NHTSA data the investigator

presented to the SFADA. The SFAHA then "directed the investigator to work with other GM

personnel to further refine the potential recall population so that it accurately included the

vehicles using the identified ignition switches that were subject to the condition identified in

the road tests. On July 15, 2014 the SFASA decided to conduct a recall of that population.

65.     Finally, on June 14, 2014 GM announced its safety recall. GM issued a 573 letter for

the NHTSA on June 20, referenced above, admitting its knowledge of the hazard and its failure

to disclose the risk to NHTSA.

66.     In a separate recall for an "ignition key" risk presenting identical hazards, on July 3,

2014, GM notified NHTSA that it was recalling Mr. Kanu's 2000 Impala and some 6.7 million

other GM vehicles, encompassing the following models: CHEVROLET   IMPALA   2000-

2005; CHEVROLET MALIBU CLASSIC   1997-2005; CHEVROLET MONTE

CARLO   2000-2005;

  OLDSMOBILE   ALERO   1999-2004; OLDSMOBILE   INTRIGUE   1998-2002;

PONTIAC GRAND AM   2000-2005; PONTIAC   GRAND PRIX   2004-2008.

67.     In this recall, NHTSA Recall Campaign 14V400, GM described the defect as involving

the "detent plunger force on the ignition switch" and admitted that it had information regarding

the hazard as soon as it began its business on July 10, 2009. GM failed to disclose, and actively

concealed, this hazard from Plaintiffs and government officials. GM admits that in 2004 when

the detent plunger force was redesigned, GM did not change the part number to reflect the

change.

4.      *Failure to Disclose and Concealment of Power Steering Defects (Fordham vehicle); NHTSA Recall Campaigns 14V15300; 14E04400*

68.     Mr. Fordham's 2006 Pontiac G6 vehicle has two dangerous power steering defects that are currently the subject of recalls. On March 21, 2014, GM issued a recall for and disclosed that Mr. Fordham's vehicle was subject to a sudden loss of power steering, increasing the risk of a crash.  NHTSA Campaign 14V15300 covers Mr. Fordham's car and the following models: CHEVROLET   COBALT   2010; CHEVROLET   HHR   2009-2010; CHEVROLET   MALIBU   2004-2006; 2008-2009; CHEVROLET   MALIBU MAXX   2004-2006; PONTIAC   G6   2005-2006, 2008-2009; SATURN   AURA   2008-2009; SATURN   ION   2004-2007.  GM admits that it knew of the power steering defect in related models since its inception but it did not disclose the risks and issue a recall until March 2014.

69.     On July 21, 2014, GM issued another recall relating to dangers in Mr. Fordham's steering, this time for a yoke providing inadequate support for a u-joint bearing resulting in premature failure and a complete loss of steering control. The NHTSA Recall Campaign14E04400 encompasses Mr. Fordham's vehicle and the following models: CHEVROLET   MALIBU   2004-2012; PONTIAC   G6   2005-2010; SATURN   AURA   2007-2009.

5.      *Failure to Disclose and Concealment of Transmission Shift Cable Defect (Fordham vehicle); NHTSA Recall Campaign 14V22400 (Fordham*)

70.     On April 30, 2014, GM disclosed that Mr. Fordham's vehicle has a defective transmission shift cable design that that poses a risk that the cable may fracture, resulting in driver loss of control or the risk of rollaways resulting in crashes. The related NHTSA Recall Campaign 14V22400 encompasses models CHEVROLET   MALIBU   2004-2008;

17

CHEVROLET   MALIBU MAXX   2004-2007; PONTIAC   G6   2005-2008;

SATURN   AURA   2007-2008.

GM admits that it knew of the risk of transmission cable fracture in similarly designed

models at least since May 2011.

6.    *Failure to Disclose and Concealment of Brake Light Defect (Fordham vehicle);
NHTSA Recall Campaign 14V25200*

71.    On May 14, 2014, GM disclosed that Mr. Fordham's vehicle has an electrical system

defect resulting in the brake lights not functioning properly, affecting various systems and

increasing the likelihood of a crash.  The NHTSA Recall Campaign 14V25200 encompasses

models CHEVROLET   MALIBU   2004-2012; CHEVROLET   MALIBU MAXX   2004-

2007; PONTIAC   G6   2005-2010; SATURN   AURA   2007-2010.

72.    GM admits that it knew of brake light failures in these model cars since its inception.

7.    *Failure to Disclose and Concealment of Master Power Door Switch Defect
(Elliotts' vehicle); NHTSA Campaign 14V404000)*

73.    Lawrence Elliott, 78 years of age, and Celestine Elliott, 73 years of age, own a 2006

Chevrolet Trailblazer for which they paid full sticker price when they purchased it from a now

defunct dealership in the District. The vehicles has had a host of problems, including two

dangerous and frightening "moving stalls," in which the Trailblazer's electrical system turned

off while Ms. Elliott was driving, resulting in loss of control over steering, braking, and the

loss of power to the airbag system

74.    The Trailblazer has a Master Power Door Module Switch that is so dangerous GM is

advising owners that the vehicles must be parked outdoors to avoid unreasonable risks of fire.

GM's treatment of the Trailblazer dangers has been consistent with the corporate culture that

has engulfed GM's cost-containment approach to risk issues presented by GM vehicles: deny

any hazard exists; if forced to concede the hazard, minimize its significance; and if nevertheless forced to act, insist on cheap rather than appropriate remediation.

75.     This is the third recall GM has conducted for this very same hazard, a process of denial and avoidance going back at least to 2012. In the previous two recalls, GM convinced governmental officials that its remediation—consisting of spraying the part with silicate rather than removing and replacing the dangerous part to eliminate the fire risk--would render the vehicles safe. GM failed to disclose the true nature of the risk to such officials, however. After years of denial, GM has finally admitted that the Elliotts' 2006 Chevrolet Trailblazer was and may remain dangerous because of the risk that its electrical components will short and start a fire inside the driver's door.

76.     After years of denial, then false claims that it had repaired the vehicles and rendered them safe to drive, GM has admitted to the NHTSA that its prior two recalls and purported repairs—when it tried to take the cheap way out, and spay the switch with a chemical coating rather than actually replace and repair the faulty switch—were failures. GM admits that the dangerous Master Power Door Switch rendered the Elliotts' SUV dangerous to drive or even to leave unattended after driving, because of the serious risk of a short in the switch causing a fire in the driver door. GM failed to disclose, concealed, and misrepresented the significant risk of electrical fires developing in the faulty Master Power Door Switch.

77.     On August 16, 2012, GM notified the NHTSA that it  was recalling "certain model year 2006 Chevrolet Trailblazer EXT and GMC Envoy XL and 2006-2007 Chevrolet Trailblazer, GMC Envoy, Buick Rainier, SAAB 9-7x, and Isuzu Ascender vehicles, originally sold or currently registered in Connecticut, Delaware, Illinois, Indiana, Iowa, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Vermont, West Virginia, Wisconsin, and the District of

Columbia" (NHTSA Report Campaign No. 12V406000). The reason for the recall was that "[f]luid may enter the driver's door module, causing corrosion that could result in a short in the circuit board." The consequence of this defect was listed in the report as follows: "A short may cause the power door lock and power window switches to function intermittently or become inoperative. The short may also cause overheating, which could melt components of the door module, producing odor, smoke, or a fire." Due to the fire risk created by the defect, GM recommended that owners park their vehicles outside. GM stated it would install a new door module if the switches did not function properly. If the switches did function properly, GM would apply a protective coating to the door module.

78.    The August 16, 2012 recall was limited to vehicles in the twenty aforementioned states and the District of Columbia. To owners outside of the aforementioned states, GM sent an Owner Notification Letter to owners of the affected vehicles instructing them to bring their vehicle to a GM service center only if they noticed switches that functioned "uncommanded, intermittently or become inoperative" or they noticed "an odor or overheated/hot switches." The letter stated that owners should seek not repairs unless they observed these symptoms their vehicle.

79.    The NHTSA was not satisfied with GM's geographic limitation of the August 16, 2012 driver door switch recall (NHTSA Action No. EA12004), and on June 13, 2013 GM notified the NHTSA that they were expanding the recall to cover the aforementioned vehicles in all states (NHTSA Report Campaign No. 13V248000).  As part of the expanded recall GM notified consumers that unattended vehicle fire may occur in rare instances, yet also stated that the affected vehicles remained safe to drive.

80.    On September 18, 2013, Plaintiffs' 2006 Trailblazer was serviced pursuant to the previously issued recalls and a "protective coating" was applied as an attempt to address the

defective driver door switch. The Plaintiffs' relied upon GM's assurance that the protective

coating would address the defect and eliminate the risk of personal injury or property damage.

On April 1, 2014, Plaintiffs filed a pro se complaint notifying GM that critical electrical

components of the car had continued to operate ineffectively and presented risk of personal

injury and property damage.

81.    On July 2, 2014, GM issued a third recall concerning the defective driver door switch in

the same vehicle models for the same defect and fire risk (NHTSA Campaign No.

14V404000). This new recall required additional remedy for vehicles "whose modules were

modified but not replaced" under the previous two recalls. GM conceded that "[v]ehicles that

were repaired by having a protective coating applied to the driver's door module may continue

to have a safety related defect." This recall encompasses the following models:

BUICK   RAINIER   2006-2007; CHEVROLET   TRAILBLAZER   2006-2007;

CHEVROLET   TRAILBLAZER EXT   2006; GMC   ENVOY   2006-2007; GMC   ENVOY

XL   2006; ISUZU   ASCENDER   2006-2007; SAAB   9-7X   2005-2007.

82.    Since at least August 16, 2012, GM has been aware that the driver door switches in

Plaintiffs' and consumers' vehicles are defective because of their propensity to experience

thermal events such as smoke, melting, and fire, which can occur in any car regardless of what

state it is registered in. Failure of the driver door switch threatens the kind of short-circuiting

and door lock malfunction that Plaintiffs and consumers have detected, and creates an

unreasonable danger of fire, personal injury and/or property damage. GM concealed the safety

defect and risk of death or severe personal and property damage from vehicle owners outside

the recall states. GM failed to notify Plaintiffs, consumers, and governmental officials of the

full scope of the defect, and materially misled consumers.

83.    NHTSA's Office of Defect Investigations (ODI) has received 170 reports alleging a thermal event in the driver door switch in vehicles identified by GM's August 2012 recall. GM acknowledged the receipt of 619 unique consumer complaints related to the driver door switch, 77 of which led to fire with flame.

## CLASS ACTION ALLEGATIONS

84.    Plaintiffs bring this lawsuit as a class action for themselves and on behalf of all other persons similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions. All proposed Class and Subclass periods run from the inception of GM in October 2009 and continue until judgment or settlement of this case.

85.    Plaintiffs bring this action on behalf of a proposed nationwide class defined as follows: All persons in the United States who, since the inception of GM in October 2009, hold or have held a legal or equitable interest in a GM vehicle with an ignition switch hazards, an ignition key hazard, a power steering hazard, a transmission cable hazard, a brake light failure hazard, and/or a master power door switch hazard, as described in the various recalls for these conditions above.

86.    Plaintiffs also bring this action on behalf of the following Subclasses:

    a.    Mses. Bledsoe, Farmer, Mitchell and Thomas, and Mrrs. Fordham and Kanu, bring this action on behalf of all persons in the State of Maryland who, since October 2009, purchased or hold or have held a legal or equitable interest in   the dangerous vehicles described above (the "Maryland Subclass");

b. Mr. Tibbs and Mr. and Mrs. Elliott also bring this action on behalf of residents of the District of Columbia who, since October 2009, hold or have held a legal or equitable interest in the dangerous vehicles described above (the "D.C. Subclass").

87. Excluded from the Class are: (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) governmental entities; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein.

## NUMEROSITY AND ASCERTAINABILITY

88. Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder for each Class or Subclass is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in GM's possession, custody, or control, and/or from public vehicular registration records.

## TYPICALITY

89. The claims of the Plaintiffs are typical of the claims of each member of the class and subclasses in that the representative Plaintiffs, like all class members, legally or equitably own or owned a dangerous GM vehicle during the Class Plaintiffs, like all class and subclass members, have been damaged by Defendants' misconduct, namely, in being wrongfully exposed to an increased risk of death or serious bodily injury, in suffering diminished use and enjoyment of their vehicles, and in suffering the diminished market value of their vehicles.

23

Furthermore, the factual bases of Defendants' misconduct are common to all class and subclass members.

## ADEQUATE REPRESENTATION

90.     Plaintiffs will fairly and adequately represent and protect the interests of the class and subclasses. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions and in prosecuting complex federal litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the class and subclasses, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the class of subclasses.

## PREDOMINANCE OF COMMON ISSUES

91.     There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include:

a.      Whether the vehicles owned by class or subclass members during the class periods suffer from the dangerous hazards described herein?

b.      Whether the hazards posed an unreasonable danger of death or serious bodily injury?

c.      Whether GM imposed an increased risk of death or serious bodily injury on Plaintiffs and class and subclass members during the Class period?

d.      Whether GM caused Plaintiffs and class and subclass members to suffer economic loss during the Class period?

e.      Whether GM caused Plaintiffs and class and subclass members to suffer the loss of the use and enjoyment of their vehicles during the class period?

f.      Whether GM had a legal duty to disclose the dangers described above to class and subclass members?

g.      Whether GM had a legal duty to disclose the dangers described above to the NHTSA?

h.      Whether class and subclass members suffered legally compensable harm?

i.      Whether GM violated Maryland's consumer protection statute by concealing safety related hazards from Plaintiffs and governmental officials?

j.      Whether GM violated the District's consumer protection law by concealing safety hazards in Plaintiffs' vehicles?

k.      Whether the safety related hazards were material?

l.      Whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction?

m.      Whether GM should be declared responsible for notifying all Class Members of the risk and ensuring that all GM vehiclesare recalled and repaired?

n.      Whether a mandatory injunction should issue to direct GM to protect the public safety in the interim until is repairs the vehicles described herein, to remove the dangerous vehicles from the roadways and to provide their owners with suitable substitute transportation?

o.      Whether class and subclass members are entitled to recover punitive damages from GM, and, if so, what amount would be sufficient to deter Defendants from engaging in such conduct in the future and to punish Defendants for their recklessness regarding the public health and safety and their campaign of concealment?

## SUPERIORITY

92.     Plaintiffs and class and subclass members have all suffered and will continue to suffer harm and damages as a result of GMs' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, most class and subclass members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual class and subclass member's claims, it is likely that few could afford to seek legal redress for GMs' misconduct. Absent a class action, class and subclass members will continue to incur damages, and GMs' misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication. The class action is also superior for defendants, who could be forced to litigate thousands of separate actions.

Defendants have acted in a uniform manner with respect to the Plaintiffs and class and subclass members. Class and subclass wide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because GM has acted on grounds that apply generally to the class, and inconsistent adjudications with respect to the Defendants' liability would establish incompatible standards and substantially impair or impede the ability of class and subclass members to protect their interests. Class and subclass wide relief assures fair, consistent, and equitable treatment and protection of all class and subclass members

## COUNT I
### Asserted on Behalf of Plaintiffs and the Nationwide Class
#### (Common Law Fraud)

26

93.    Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs of this Complaint.

94.     At the time of its inception, GM knew that the ignition switch used or which would be placed in the Plaintiffs' and class members' vehicles could inadvertently move from "run" to "accessory" or "off," under regular driving conditions. GM also knew since its inception about the ignition key hazard, steering hazards, and brake light hazards described above. GM knew since August 2012 about the master power door switch hazard described above.  GM knew since May 2011 about the transmission cable hazard described above.

95.    The facts that their vehicles presented the above described safety hazards was material to Plaintiffs and class members. Plaintiffs and class member s had no reasonable way of learnig of the hazards that GM knew about but failed to disclose.

96.    GM's failure to disclose the risks, and its affirmative misrepresentations regarding the safety of Plaintiffs' and class members' vehicles, were intentional.

97.    Between October 2009 and February 2014, Defendants actively and intentionally concealed and/or suppressed the existence and true nature of the ignition switch and steering related hazards, and minimized the extent of the danger they posed in direct and indirect communications with Plaintiffs, class and subclass members, dealers, the NHTSA, and others.

98.    Plaintiffs and class members reasonably relied on GM's communications and material omissions to their detriment. As a result of the concealment and/or suppression of facts, Plaintiffs and Class Members have sustained and will continue to sustain injuries, consisting of the diminished value of their GM vehicles and the lost use and enjoyment of the vehicles that Defendants actions have caused, and exposure to increased risk of death or serious bodily injury.

99.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and with reckless disregard to Plaintiffs' and Class Members' rights and well-being, in order to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT II
**Asserted on Behalf of Ms. Bledsoe, Farmer, Mitchell, Thomas, and
Mr. Fordham and Kanu and the Maryland Subclass
(Violation of Maryland's Consumer Protection Act ("MDCPA"),
Md. Code, Comm. Law § 13-101 *et seq.*)**

100.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

101.    This Count is brought on behalf of Plaintiffs and the Maryland Class generally with respect to the alleged violations of MDCPA § 13-301(3).

102.    Plaintiffs are "consumers" within the meaning of MDCPA, § 13-101(c)(1).

103.     Defendants are "merchants" within the meaning of MDCPA, § 13-101(g)(1).

104.    Defendants knew the Plaintiffs and Subclass members' vehicles were dangerous. Because of the life threatening nature of the risks, their existence was a material fact that GM concealed from plaintiffs and class members in violation of Md. Code, Comm. Laws § 13-301(3).  Plaintiffs were injured thereby having to endure unreasonable risk of death, serious bodily injury, and diminution of the value of each of their vehicles.

105.    At no time during the Class Period did Mr. Sesay, Ms. Yearwood, or Subclass members have access to the pre-release design, manufacturing, and field-testing data, and they had no reason to believe that their vehicles possessed distinctive shortcomings. Throughout the Class Period, they relied on Defendants to identify any latent features that distinguished their vehicles from similar vehicles without the ignition switch risk, and the Defendants' failure to

do so tended to mislead consumers into believing no distinctive risk was present in their vehicles.

106.    With respect to the Subclass, Defendants violated Md. Code, Comm. Laws § 13-301(3) throughout the Class Period by failing to state a material fact, the omission of which tended to mislead consumers, by concealing the ignition switch risk from Plaintiffs and Subclass members.

107.    Plaintiffs seek an order enjoining Defendants' unfair or deceptive acts or practices, and attorney's fees, and any other just and proper relief available under Md. Code, Com. Laws § 13-408.

## COUNT III
### Asserted on Behalf of Mr. and Mrs. Elliott, for themselves, and as representatives of the public, and for the D.C. Subclass
### (Violation of the District of Columbia's Consumer Protection Procedures Act, "CPPA", D.C. Code § 28-3901 et seq.)

108.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

109.    This Count is brought on behalf of Mr. and Mrs. Elliott, Mr. Tibbs, and the people of the District of Columbia.

110.    Plaintiffs are "consumers" within the meaning of the CPPA, § 28-3901(a)(2).

111.    GM is a "person" and a "merchant" within the meaning of the CPPA, § 28-3901(a)(1).

112.    The CPPA, § 28-3904(d), makes it unlawful for any merchant to represent that goods or services are of a particular standard, quality, grade, style or model, if in fact they are another. The CPPA, § 28-3904(e), makes it unlawful for any merchant to misrepresent as to a material fact that has a tendency to mislead. The CPPA, § 28-3904(f), makes it unlawful for any merchant to fail to state a material fact if such failure tends to mislead.

113.    Since its inception in 2009, GM violated § 28-3904 by representing that its vehicles were safe and adequately engineered when in fact GM failed to disclose and actively concealed an unprecedented number of safety defects due in large part to Defendant's focus on cost-cutting over safety. Plaintiffs had no reason to believe that their vehicles possessed distinctive shortcomings; they relied on GM to identify latent features that distinguished Plaintiffs' and consumers' vehicles from similar vehicles without the safety related defects, and the Defendant's failure to do so tended to mislead consumers into believing the Plaintiffs' and consumers' vehicles.

114.    Plaintiffs seek treble damages, or $1,500 per violation, whichever is greater, payable to the consumer, for each act in violation of the CPPA, an order enjoining GMs' unfair or deceptive acts, practices, and omissions, attorneys' fees, punitive damages, treble damages, and any other just and proper relief available under D.C. Code § 28-3905(k)(2), including preliminary and permanent injunctive relief aimed at providing protection for the People of the District of Columbia from Defendant's reckless endangerment of the public health and their wanton disregard for the law.

### COUNT IV
### Asserted on Behalf of Plaintiffs and the Nationwide and all Subclasses
### (<u>Civil Conspiracy, Joint Action and Aiding and Abetting</u>)

115.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

116.    This Count is brought on behalf of the nationwide Class and all Subclasses.

117.    GM is liable for Plaintiffs' and class and subclass members' injuries because they entered into specific agreement, explicit and implied, with others, including but not limited to the dealers, engineers, accountants and lawyers (the co-conspirators) described in the preceding paragraphs of this Complaint, to inflict those injuries and to conceal their actions from

30

Plaintiffs, Class and Subclass members and others.  By these agreements, GM conspired to violate each of the laws that form the basis for the claims in the preceding Counts of this Complaint.

118.    GM committed overt acts in furtherance of the conspiracy.

119.    GM knew that the conduct of the co-conspirators constituted a breach of duties to the plaintiffs.

120.    GM gave substantial assistance and encouragement to the co-conspirators in their course of conduct in violation of the rights of the plaintiffs.

121.    The wrongful acts herein complained of harmed plaintiffs.

### COUNT V
**Asserted on behalf of Plaintiffs Ms. Bledsoe, Ms. Farmer, and Mr. Kanu**
**(Negligence under the common law of Georgia, Maryland, and the District)**

122.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

123.    GM had a duty to use reasonable care in the manufacture of vehicles for sale, and in warning Plaintiffs regarding the risks that use of their GM vehicles pose.

124.    By failing properly to consider and address safety risks posed by the hazards described above, GM breached its duty to use reasonable care.

125.    GM's breach of its duty to use reasonable care caused Ms. Farmer to have an accident on December 8, 2013, in which she suffered personal injury, property damage, and emotional distress.

126.    GM's breach of its duty to use reasonable care caused Mr. Kanu to have an accident in October 2013, in which he suffered property damage.

127.    GM's breach of its duty to use reasonable care caused Ms. Bledsoe to have two accidents, both in the state of Georgia.  One accident occurred on February 1, 2008, in which

Ms. Bledsoe suffered personal injury, property damage, and emotional distress. The second occurred on May 17, 2009, in which Ms. Bledsoe again suffered personal injury, property damage, and emotional distress.

128.    To the extent that any of the allegation of wrongdoing alleged in this count involve wrongdoing by Old GM, GM is responsible for that conduct because it is a successor in manufacturing to Old GM and liable for Old GM's wrongdoing.

## TOLLING OF THE STATUTE OF LIMITATIONS

129.    Any applicable statute of limitation has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

130.    The causes of action alleged herein did not accrue until Plaintiffs discovered that their vehicles had the safety related defects described herein.

131.    Plaintiffs had no reason to know that their products were defective and dangerous because of Defendants' active concealment.

## REPRESENTATIVE ACTION

132.    To remedy real and potential risks to public safety, the CPPA empowers the Plaintiffs to bring this civil action on behalf of themselves and the public against GM for its violation of District of Columbia consumer protection law. The relief Plaintiffs seek protects consumers and mitigates dangers posed by GM's reckless endangerment of the public safety. Plaintiffs bring this lawsuit as an action on their own behalves and as a representative action on behalf of the People of the District of Columbia exposed to life-threatening conditions made manifest by GM's concealment of the dangerousness of vehicles that carry a defective driver door switch.

## ALLEGATIONS IN SUPPORT OF PRELIMINARY RELIEF

133.    As of the date of the filing of this Complaint, GM concedes that it knew but did not disclose that some 20 million GM products have safety related risks that create an

unreasonable danger of death or serious bodily harm to their drivers, vehicle occupants, nearby

drivers, and bystanders.

134.    Despite purporting to come clean about its campaign of concealment and deceit

in February 2014, GM has failed to take measures to ensure that these vehicles do not remain

on the roads as a source of further death and injury. GM has recklessly endangered the public

safety and the safety of Plaintiffs and class members. GM has not effectively remedied its

policies and practices to ensure that this misconduct does not continue, and accordingly its

business practices continue to threaten the public safety, warranting that this Court impose

preliminary and permanent relief to ensure that all elements of the enterprise alleged in this

Complaint are identified and eliminated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated,

respectfully request that this Court enter a judgment against GM, and grant the following relief:

A.    Determine that this action may be maintained as a Class action and certify it as

such under Fed. R. Civ. P. 23(a) and 23(b)(3) and/or Fed. R. Civ. P. 23(b)(2), and/or Fed. R.

Civ. 23(c)(2), or alternatively certify all issues and claims that are appropriately certified; and

designate and appoint Plaintiffs as Class and Subclass Representatives and Plaintiffs' chosen

counsel as Class Counsel;

B.    Declare, adjudge and decree that Gm has recklessly endangered the

public safety and order specific steps that GM must take to restore public safety, including but

not limited to preliminary relief aimed at removing unreasonably dangerous GM vehicles from

the public streets and thoroughfares forthwith; providing safe replacement vehicles for

Plaintiffs and Class and Subclass members that do not contain safety related risks; and, in light

of the nature of GM's wrongdoing, the substantial threat to the public health it has wrongfully

33

caused, its apparent management recalcitrance or incompetence as evidenced by GM's failure to take significant remedial steps for the past six months since it has publicly admitted its years-long campaign of concealment and deceit, providing continuing judicial management over GM through the appointment of a Special Master with expertise in the automobile industry and ethical risk management practices to assist in the judicial supervision of GM's management reforms designed to ensure that the Company does not continue to threaten the public safety in the future; and permanent injunctive relief aimed at ensuring that GM deploys reasonable and responsible management controls with respect to safety or cease its business of marketing to the public complex products that can so easily be a threat of death or serious bodily injury if not manufactured properly;

C.    Declare, adjudge and decree the conduct of GM as alleged herein to be unlawful, unfair, and/or deceptive, enjoin any such future conduct, and direct Defendants to permanently, expeditiously, and completely repair the Plaintiffs', Class and Subclass Members' vehicles to eliminate the dangers they pose;

D.    Declare, adjudge and decree that GM is financially responsible for notifying all Class Members about the dangerous nature of the Class Vehicles;

E.    Declare, adjudge and decree that GM must disgorge, for the benefit of Plaintiffs, Class Members, and Subclass Members, all or part of the ill-gotten gains it received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class Members;

F.    Award Plaintiffs, Class Members, and Subclass Members the greater of actual compensatory damages or statutory damages as proven at trial;

G.    Award Plaintiff, Class Members, and Subclass Members punitive damages in such amount as proven at trial;

34

H.      Award Plaintiff, Class Members and Subclass Members their reasonable

attorneys' fees, costs, and pre-judgment and post-judgment interest; and

I.      Award Plaintiff, Class Members, and Subclass Members such other further and

different relief as the case may require or as determined to be just, equitable, and proper by this

Court.

## JURY TRIAL DEMAND

Plaintiffs request a trial by jury on all the legal claims alleged in this Complaint.

Respectfully submitted

_____

Gary Peller (GP0419)
600 New Jersey Avenue, N.W.
Washington, D.C. 2000
(202) 662-9122 (voice)
(202) 662-9680 (facsimile)
peller@law.georgetown.edu
Attorney for Plaintiffs