# KING & SPALDING

King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036-4003

Tel: (212) 556-2100
Fax: (212) 556-2222
www.kslaw.com

Scott I. Davidson
Direct Dial: 212-556-2164
sdavidson@kslaw.com

July 6, 2015

**Via E-Mail And Overnight Delivery**
Kevin R. Dean, Esq.
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29465

Re:    *Edwards v. General Motors LLC*
       **Case No.: 15-cv-00481 (S.D. Miss.) (FKB)**

Dear Mr. Chaffin:

King & Spalding LLP is co-counsel with Kirkland & Ellis LLP for General Motors LLC ("**New GM**"), the defendant in the above-referenced action ("**Action**"). Reference is made to your complaint ("**Complaint**") filed in the Action which seeks, among other things, to hold New GM liable for various claims, all of which are based on an accident that occurred prior to the closing of the sale ("**Sale**") from General Motors Corporation (n/k/a Motors Liquidation Company) ("**Old GM**") to New GM.

Contrary to the allegations set forth in the Complaint, New GM is not liable for claims based on accidents that occurred prior to the closing of the Sale. The Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (as amended) ("**Sale Agreement**"), which was approved by an Order, dated July 5, 2009 ("**Sale Order and Injunction**"), of the United States Bankruptcy Court for the Southern District of New York ("**Bankruptcy Court**"), is clear in this regard, providing that Retained Liabilities (as defined in Section 2.3(b) of the Sale Agreement) of Old GM specifically include "all Product Liabilities arising in whole or in part from any accidents, incidents or other occurrences that happen prior to the Closing Date[.]" Sale Agreement, § 2.3(b)(ix). Pursuant to the Sale Order and Injunction, you are prohibited from asserting any Retained Liabilities against New GM. *See, e.g.*, Sale Order and Injunction, ¶¶ 8, 46.

The Bankruptcy Court recently issued a Judgment, dated June 1, 2015 ("**Judgment**"), which reiterated that plaintiffs, like the plaintiff in the Action, who were involved in accidents that occurred prior to the closing of the 363 Sale, are barred from asserting claims against New GM that are based on pre-Sale accidents. *See Judgment*, dated June 1, 2015 [Dkt. No. 13177]

26102928v1

Kevin R. Dean, Esq.
July 6, 2015
Page 2

("**Judgment**"),[1] ¶ 7 ("Any claims and/or causes of action brought by the Ignition Switch Pre-Closing Accident Plaintiffs that seek to hold New GM liable for accidents or incidents that occurred prior to the closing of the 363 Sale are barred and enjoined pursuant to the Sale Order. The Ignition Switch Pre-Closing Accident Plaintiffs shall not assert or maintain any such claim or cause of action against New GM."). Accordingly, the Complaint should be dismissed.

The Judgment provides procedures for the dismissal of the Action. Specifically, it provides as follows:

> New GM is hereby authorized to serve this Judgment and the Decision upon any additional party (or his or her attorney) (each, an "**Additional Party**") that commences a lawsuit and/or is not otherwise on Exhibits "A" through "D" hereto (each, an "**Additional Lawsuit**") against New GM that would be proscribed by the Sale Order (as modified by the Decision and this Judgment). Any Additional Party shall have 17 business days upon receipt of service by New GM of the Decision and Judgment to dismiss, without prejudice, such Additional Lawsuit or the allegations, claims or causes of action contained in such Additional Lawsuit that would violate the Decision, this Judgment, or the Sale Order (as modified by the Decision and this Judgment).

Judgment, ¶ 18(a). Accordingly, pursuant to the terms of the Judgment, you have 17 business days from receipt of the Decision and Judgment to dismiss the Complaint.

> To the extent you have a

> good faith basis to maintain that the [Action] . . . should not be dismissed without prejudice, [you] shall, within 17 business days upon receipt of the Decision and Judgment, file with [the Bankruptcy Court] a No Dismissal Pleading explaining why such [Action] . . . should not be dismissed without prejudice. *The No Dismissal Pleading shall not reargue issues that were already decided by the Decision and Judgment*. New GM shall file a response to the No Dismissal Pleading within 17 business days of service of the No Dismissal Pleading. The [Bankruptcy] Court will schedule a hearing thereon if it believes one is necessary.

*Id.*, ¶ 18(b) (emphasis added).

If you fail to either timely dismiss the Complaint or timely file a No Dismissal Pleading, New GM is permitted to file with the Bankruptcy Court a "notice of presentment on five (5) business days' notice, with an attached Dismissal Order that directs [you] to dismiss without prejudice the [Complaint] . . ., within 17 business days of receipt of the Dismissal Order." *Id.*, ¶ 18(c).

This letter and its attachments constitute service on you of the Judgment and Decision, which triggers the provisions in paragraph 18 of the Judgment with respect to the Action.

---

[1]    A copy of the Judgment is annexed hereto as Exhibit "A." The Judgment memorializes the rulings in the Bankruptcy Court's *Decision on Motion to Enforce Sale Order*, dated April 15, 2015 ("**Decision**"). A copy of the Decision is annexed hereto as Exhibit "B."

Kevin R. Dean, Esq.
July 6, 2015
Page 3

It is clear from a review of the Complaint that you are familiar with the Sale, the Sale Agreement and the Sale Order and Injunction. In addition, you are counsel for certain other plaintiffs in other lawsuits that are currently part of the Multi-District Litigation pending in the United States District Court for the Southern District of New York (*In re: General Motors LLC Ignition Switch Litigation*, 14-MD-2543 (JMF)) ("**MDL**"). The Sale Order and Injunction and the proceedings in the Bankruptcy Court, and their effect on the claims in the MDL, are well known. As such, you were presumably aware of the proceedings in the Bankruptcy Court that resulted in the Decision and Judgment prior to commencing the Action. In this regard, New GM hereby reserves all of its rights, including its right to seek all appropriate relief against you and the plaintiff in the Action (including sanctions) for a willful violation of the injunction provisions contained in the Sale Order and Injunction.

If you have any questions, please call me.

Very truly yours,

*/s/ Scott I. Davidson*

Scott I. Davidson

SD/hs
Encl.

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------------------------------------x
In re                                        :    Chapter 11
                                             :
MOTORS LIQUIDATION COMPANY, et al.,          :    Case No.: 09-50026 (REG)
        f/k/a General Motors Corp., et al.   :
                                             :
                          Debtors.           :    (Jointly Administered)
---------------------------------------------------------------x
```

## JUDGMENT

For the reasons set forth in the Court's *Decision on Motion to Enforce Sale Order*, entered on April 15, 2015 ("**Decision**"),[1] it is hereby ADJUDGED as follows:

1.    The Ignition Switch Plaintiffs and the Ignition Switch Pre-Closing Accident Plaintiffs (collectively, the "**Plaintiffs**") were "known creditors" of the Debtors. The Plaintiffs did not receive the notice of the sale of assets of Old GM to New GM ("**363 Sale**") that due process required.

2.    Except with respect to Independent Claims (as herein defined), the Ignition Switch Plaintiffs were not prejudiced by their lack of notice of the 363 Sale, and they thus failed to demonstrate a due process violation with respect to the 363 Sale.

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Decision. For purposes of this Judgment, the following terms shall apply: (i) "**Ignition Switch Plaintiffs**" shall mean plaintiffs that have commenced a lawsuit against New GM asserting economic losses based on or arising from the Ignition Switch in the Subject Vehicles (each term as defined in the *Agreed and Disputed Stipulations of Fact Pursuant to the Court's Supplemental Scheduling Order, Dated July 11, 2014*, filed on August 8, 2014 [Dkt. No. 12826], at 3); (ii) "**Pre-Closing Accident Plaintiffs**" shall mean plaintiffs that have commenced a lawsuit against New GM based on an accident or incident that occurred prior to the closing of the 363 Sale; (iii) "**Ignition Switch Pre-Closing Accident Plaintiffs**" shall mean that subset of the Pre-Closing Accident Plaintiffs that had the Ignition Switch in their Subject Vehicles; (iv) "**Non-Ignition Switch Pre-Closing Accident Plaintiffs**" shall mean that subset of Pre-Closing Accident Plaintiffs that are not Ignition Switch Pre-Closing Accident Plaintiffs; and (v) "**Non-Ignition Switch Plaintiffs**" shall mean plaintiffs that have commenced a lawsuit against New GM asserting economic losses based on or arising from an alleged defect, other than the Ignition Switch, in an Old GM vehicle.

3.      The Ignition Switch Pre-Closing Accident Plaintiffs were not prejudiced by their lack of notice of the 363 Sale, and they thus failed to demonstrate a due process violation with respect to the 363 Sale.

4.      With respect to the Independent Claims, the Ignition Switch Plaintiffs were prejudiced by the failure to give them the notice of the 363 Sale that due process required. The Ignition Switch Plaintiffs established a due process violation with respect to the Independent Claims. The Sale Order shall be deemed modified to permit the assertion of Independent Claims. For purposes of this Judgment, "**Independent Claims**" shall mean claims or causes of action asserted by Ignition Switch Plaintiffs against New GM (whether or not involving Old GM vehicles or parts) that are based solely on New GM's own, independent, post-Closing acts or conduct. Nothing set forth herein shall be construed to set forth a view or imply whether or not Ignition Switch Plaintiffs have viable Independent Claims against New GM.

5.      Except for the modification to permit the assertion of Independent Claims by the Ignition Switch Plaintiffs, the Sale Order shall remain unmodified and in full force and effect.

6.      The Plaintiffs were prejudiced by the failure to receive the notice due process required of the deadline ("**Bar Date**") to file proofs of claim against the Old GM bankruptcy estate. Any Plaintiff may petition the Bankruptcy Court (on motion and notice) for authorization to file a late or amended proof of claim against the Old GM bankruptcy estate. The Court has not determined the extent to which any late or amended proof of claim will ultimately be allowed or allowed in a different amount. But based on the doctrine of equitable mootness, in no event shall assets of the GUC Trust held at any time in the past, now, or in the future (collectively, the "**GUC Trust Assets**") (as defined in the Plan) be used to satisfy any claims of the Plaintiffs, nor will Old GM's Plan be modified with respect to such claims; *provided* that nothing in this

-2-

Judgment shall impair any party's rights with respect to the potential applicability of Bankruptcy Code section 502(j) to any claims that were previously allowed or disallowed by the Court. The constraints on recourse from GUC Trust Assets shall not apply to any Ignition Switch Plaintiff, Pre-Closing Accident Plaintiff, or Non-Ignition Switch Plaintiff who had a claim previously allowed or disallowed by the Court, but in no event shall he or she be entitled to increase the amount of any allowed claim without the prior authorization of the Bankruptcy Court or an appellate court following an appeal from the Bankruptcy Court.

7.     Any claims and/or causes of action brought by the Ignition Switch Pre-Closing Accident Plaintiffs that seek to hold New GM liable for accidents or incidents that occurred prior to the closing of the 363 Sale are barred and enjoined pursuant to the Sale Order. The Ignition Switch Pre-Closing Accident Plaintiffs shall not assert or maintain any such claim or cause of action against New GM.

8.     (a)     Subject to the other provisions of this paragraph 8, each Ignition Switch Pre-Closing Accident Plaintiff (including without limitation the Ignition Switch Pre-Closing Accident Plaintiffs identified on Exhibit "A" attached hereto) is stayed and enjoined from prosecuting any lawsuit against New GM.

(b)     Within two (2) business days of the entry of this Judgment, New GM shall serve a copy of this Judgment on counsel in the lawsuits identified on Exhibit "A," by e-mail, facsimile, overnight mail or, if none of the foregoing are available, regular mail, with a cover note that states: "The attachment is the Judgment entered by the Bankruptcy Court. Please review the Judgment, including without limitation, the provisions of paragraph 8 of the Judgment."

-3-

(c)     If counsel for an Ignition Switch Pre-Closing Accident Plaintiff
(including, but not limited to, one identified on Exhibit "A") believes that, notwithstanding the
Decision and this Judgment, it has a good faith basis to maintain that its lawsuit against New GM
should not be stayed, it shall file a pleading with this Court within 17 business days of this
Judgment ("**No Stay Pleading**"). The No Stay Pleading shall not reargue issues that were
already decided by the Decision, this Judgment, or any other decision, order, or judgment of this
Court. If a No Stay Pleading is timely filed, New GM shall have 17 business days to respond to
such pleading. The Court will schedule a hearing thereon if it believes one is necessary.

9. Except for Independent Claims and Assumed Liabilities (if any), all claims and/or
causes of action that the Ignition Switch Plaintiffs may have against New GM concerning an Old
GM vehicle or part seeking to impose liability or damages based in whole or in part on Old GM
conduct (including, without limitation, on any successor liability theory of recovery) are barred
and enjoined pursuant to the Sale Order, and such lawsuits shall remain stayed pending appeal of
the Decision and this Judgment.

10.    (a)     The lawsuits stayed pursuant to the preceding paragraph shall include
those on the attached Exhibit "B." The lawsuits identified on Exhibit "B" include the Pre-Sale
Consolidated Complaint.

(b)     Within two (2) business days of the entry of this Judgment, New GM shall
serve a copy of this Judgment on counsel in the lawsuits identified on Exhibit "B", by e-mail,
facsimile, overnight mail or, if none of the foregoing are available, regular mail, with a cover
note that states: "The attachment is the Judgment entered by the Bankruptcy Court. Please
review the Judgment, including without limitation, the provisions of paragraph 10 of the
Judgment."

-4-

(c)     If a counsel listed on Exhibit "B" believes that, notwithstanding the
Decision and this Judgment, it has a good faith basis to maintain that its lawsuit against New GM
should not be stayed, it shall file a No Stay Pleading with this Court within 17 business days of
this Judgment. The No Stay Pleading shall not reargue issues that were already decided by the
Decision and this Judgment, or any other decision or order of this Court. If a No Stay Pleading
is timely filed, New GM shall have 17 business days to respond to such pleading. The Court will
schedule a hearing thereon if it believes one is necessary.

11.    (a)     The complaints in the lawsuits listed on the attached Exhibit "C"
("**Hybrid Lawsuits**") include claims and allegations that are permitted under the Decision and
this Judgment and others that are not. Accordingly, until and unless the complaint in a Hybrid
Lawsuit is (x) amended to assert solely claims and allegations permissible under the Decision
and this Judgment (as determined by this or any higher court, if necessary), or (y) is judicially
determined (by this or any higher court) not to require amendment, that lawsuit is and shall
remain stayed. The Hybrid Lawsuits include the Post-Sale Consolidated Complaint. Within two
(2) business days of the entry of this Judgment, New GM shall serve a copy of this Judgment on
counsel in the Hybrid Lawsuits, by e-mail, facsimile, overnight mail or, if none of the foregoing
are available, regular mail, with a cover note that states: "The attachment is the Judgment entered
by the Bankruptcy Court. Please review the Judgment, including without limitation, the
provisions of paragraph 11 of the Judgment."

(b)     Notwithstanding the stay under the preceding subparagraph, however, the
complaints in the actions listed in Exhibit "C" may, if desired, be amended in accordance with
the subparagraphs that follow. Subject to the other provisions of this paragraph 11, and unless
the applicable complaint already has been dismissed without prejudice pursuant to an order

-5-

entered in MDL 2543, each Plaintiff in a Hybrid Lawsuit wishing to proceed at this time may

amend his or her complaint on or before June 12, 2015, such that any allegations, claims or

causes of action concerning an Old GM vehicle or part seeking to impose liability or damages

based on Old GM conduct (including, without limitation, any successor liability theory of

recovery) are stricken, and only Independent Claims are pled.

(c)    If a counsel listed in the lawsuits on Exhibit "C" believes that,

notwithstanding the Decision and this Judgment, it has a good faith basis to maintain that its

allegations, claims or causes of action against New GM should not be stricken, it shall file a

pleading with this Court within 17 business days of this Judgment ("**No Strike Pleading**"). The

No Strike Pleading shall not reargue issues that were already decided by the Decision and

Judgment. If a No Strike Pleading is timely filed, New GM shall have 17 business days to

respond to such pleading. The Court will schedule a hearing thereon if it believes one is

necessary.

(d)    If an Ignition Switch Plaintiff fails to either (i) amend his or her respective

complaints on or before June 12, 2015, such that all allegations, claims and/or causes of action

concerning an Old GM vehicle or part seeking to impose liability or damages based on Old GM

conduct (including, without limitation, any successor liability theory of recovery) are stricken,

and only Independent Claims are pled, or (ii) timely file a No Strike Pleading with the Court

within the time period set forth above, New GM shall be permitted to file with this Court a notice

of presentment on five (5) business days' notice, with an attached order ("**Strike Order**") that

directs the Ignition Switch Plaintiff to strike specifically-identified allegations, claims and/or

causes of action contained in his or her complaint that violate the Decision, this Judgment and/or

the Sale Order (as modified by the Decision and this Judgment), within 17 business days of

-6-

receipt of the Strike Order.

(e)    For any allegations, claims or causes of action of the Ignition Switch
Plaintiffs listed on Exhibit "C" that are stricken pursuant to this Judgment (voluntarily or
otherwise), (i) the statute of limitations shall be tolled from the date of the amended complaint to
30 days after all appeals of the Decision and Judgment are decided, and (ii) if the Decision and
Judgment are reversed on appeal such that the appellate court finds that the Ignition Switch
Plaintiffs can make the allegations, or maintain the claims or causes of action, against New GM
heretofore stricken pursuant to this Judgment, all of the Ignition Switch Plaintiffs' rights against
New GM that existed prior to the striking of such claims or causes of action pursuant to this
Judgment shall be reinstated as if the striking of such claims or causes of action never occurred.

(f)    Notwithstanding the foregoing, to the extent (but only the extent)
acceptable to the MDL Court, the Plaintiff in any lawsuit listed on Exhibit "C" may elect not to
amend his or her complaint and may await the outcome of appellate review of this Judgment. If
that plaintiff thereafter determines to proceed with his or her lawsuit, the plaintiff's counsel shall
provide notice to New GM, and the procedures set forth above shall apply.

12.    (a)    The lawsuits captioned *People of California v. General Motors LLC, et
al.*, No. 30-2014-00731038-CU-BT-CXC (Orange County, Cal.) and *State of Arizona v. General
Motors LLC*, No. CV2014-014090 (Maricopa County, Ariz.) (the "**State Lawsuits**") likewise
include claims and allegations that are permitted under the Decision and this Judgment and
others that are not. Accordingly, until and unless the complaint in a State Lawsuit is
(x) amended to assert solely claims and allegations permissible under the Decision and this
Judgment (as determined by this or any higher court, if necessary), or (y) is judicially determined
(by this or any higher court) not to require amendment, that lawsuit is and shall remain stayed.

-7-

Within two (2) business days of the entry of this Judgment, New GM shall serve a copy of this Judgment on counsel in the State Lawsuits, by e-mail, facsimile, overnight mail or, if none of the foregoing are available, regular mail, with a cover note that states: "The attachment is the Judgment entered by the Bankruptcy Court. Please review the Judgment, including without limitation, the provisions of paragraph 12 of the Judgment."

(b)     Notwithstanding the stay under the preceding subparagraph, however, the State Lawsuits may, if desired, be amended in accordance with the subparagraphs that follow. Subject to the other provisions of this paragraph 12, and unless the applicable complaint already has been dismissed without prejudice, each Plaintiff in a State Lawsuit ("**State Plaintiff**") wishing to proceed at this time may amend its complaint on or before June 12, 2015, such that any allegations, claims or causes of action concerning an Old GM vehicle or part seeking to impose liability or damages based on Old GM conduct (including, without limitation, any successor liability theory of recovery) are stricken, and only Independent Claims are pled.

(c)     If a counsel in a State Lawsuit believes that, notwithstanding the Decision and this Judgment, it has a good faith basis to maintain that its allegations, claims or causes of action against New GM should not be stricken, it shall file a No Strike Pleading with this Court within 17 business days of this Judgment. The No Strike Pleading shall not reargue issues that were already decided by the Decision and Judgment. If a No Strike Pleading is timely filed, New GM shall have 17 business days to respond to such pleading. The Court will schedule a hearing thereon if it believes one is necessary.

(d)     If a State Plaintiff fails to either (i) amend its complaint, on or before June 12, 2015, such that all allegations, claims and/or causes of action concerning an Old GM vehicle or part seeking to impose liability or damages based on Old GM conduct (including, without

-8-

limitation, any successor liability theory of recovery) are stricken, and only Independent Claims
are pled, or (ii) timely file a No Strike Pleading with the Court within the time period set forth
above, New GM shall be permitted to file with this Court a notice of presentment on five (5)
business days' notice, with an attached Strike Order that directs such State Plaintiff to strike
specifically-identified allegations, claims and/or causes of action contained in its complaint that
violate the Decision, this Judgment and/or the Sale Order (as modified by the Decision and
Judgment), within 17 business days of receipt of the Strike Order.

   (e) For any allegations, claims or causes of action of a State Plaintiff that are
stricken pursuant to this Judgment (voluntarily or otherwise), (i) the statute of limitations shall be
tolled from the date of the amended complaint to 30 days after all appeals of the Decision and
Judgment are decided, and (ii) if the Decision and Judgment are reversed on appeal such that the
appellate court finds that the State Plaintiff can make the allegations, or maintain the claims or
causes of action, against New GM heretofore stricken pursuant to this Judgment, all of the State
Plaintiff's rights against New GM that existed prior to the striking of such allegations, claims or
causes of action pursuant to this Judgment shall be reinstated as if their striking never occurred.

   (f) Notwithstanding the foregoing, a State Plaintiff may elect not to amend its
complaint and may await the outcome of appellate review of this Judgment. If such plaintiff
thereafter determines to proceed with its lawsuit, the plaintiff's counsel shall provide notice to
New GM, and the procedures set forth above shall apply.

  13. (a) The rulings set forth herein and in the Decision that proscribe claims and
actions being taken against New GM shall apply to the "Identified Parties"[2] who were heard

---

[2] "**Identified Parties**" as defined in the Court's Scheduling Order entered on May 16, 2014
(ECF No. 12697), and persons that have asserted Pre-Closing personal injury and wrongful death claims
against New GM based on the Ignition Switch Defect (as defined in the Decision).

-9-

during the proceedings regarding the Four Threshold Issues and any other parties who had notice

of the proceedings regarding the Four Threshold Issues and the opportunity to be heard in

them—including, for the avoidance of doubt, the plaintiffs in the *Bledsoe*, *Elliott* and *Sesay*

lawsuits listed on Exhibit "C." They shall also apply to any other plaintiffs in these proceedings

(including, without limitation, the Non-Ignition Switch Pre-Closing Accident Plaintiffs and Non-

Ignition Switch Plaintiffs identified on Exhibit "D" attached hereto), subject to any objection

("**Objection Pleading**") submitted by any such party within 17 business days of the entry of this

Judgment. New GM shall file a response to any such Objection Pleading within 17 business

days of service. The Court will schedule a hearing thereon if it believes one is necessary.    To

the extent an issue shall arise in the future as to whether (i) the Non-Ignition Switch Pre-Closing

Accident Plaintiffs and Non-Ignition Switch Plaintiffs were known or unknown creditors of the

Debtors, (ii) the doctrine of equitable mootness bars the use of any GUC Trust Assets to satisfy

late-filed claims of the Non-Ignition Switch Pre-Closing Accident Plaintiffs and Non-Ignition

Switch Plaintiffs, or (iii) the Non-Ignition Switch Pre-Closing Accident Plaintiffs or Non-

Ignition Switch Plaintiffs were otherwise bound by the provisions of the Sale Order, the Non-

Ignition Switch Pre-Closing Accident Plaintiffs or Non-Ignition Switch Plaintiffs shall be

required to first seek resolution of such issues from this Court before proceeding any further

against New GM and/or the GUC Trust.

        (b)      Within two (2) business days of the entry of this Judgment, New GM shall

serve a copy of this Judgment on counsel for the Non-Ignition Switch Pre-Closing Accident

Plaintiffs or Non-Ignition Switch Plaintiffs identified on Exhibit "D", by e-mail, facsimile,

overnight mail or, if none of the foregoing are available, regular mail, with a cover note that

states: "The attachment is the Judgment entered by the Bankruptcy Court. Please review the

Judgment, including without limitation, the provisions of paragraph 13 of the Judgment."

(c)    If a counsel for a Non-Ignition Switch Pre-Closing Accident Plaintiff or

Non-Ignition Switch Plaintiff listed on Exhibit "D" believes that, notwithstanding the Decision

and this Judgment, it has a good faith basis to maintain that its lawsuit, or certain claims or

causes of action contained therein, against New GM should not be dismissed or stricken, it shall

file a pleading with this Court within 17 business days of this Judgment ("**No Dismissal**

**Pleading**"). Such No Dismissal Pleading may request, as part of any good faith basis to

maintain a lawsuit (or certain claims or causes of action contained therein) against New GM, (i)

an opportunity to select one or more designated counsel from among the affected parties to

address the Four Threshold Issues with respect to particular defects in the vehicles involved in

the accidents or incidents that form the basis for the subject claims, and (ii) the establishment of

appropriate procedures (including a briefing schedule and discovery, if appropriate) with respect

thereto. If a No Dismissal Pleading is timely filed, New GM shall have 17 business days to

respond to such pleading. The Court will schedule a hearing thereon if it believes one is

necessary.

(d)    If counsel for a Non-Ignition Switch Pre-Closing Accident Plaintiff or a

Non-Ignition Switch Plaintiff believes that, notwithstanding the Decision and this Judgment, it

has a good faith basis to believe that any of the GUC Trust Assets may be used to satisfy late

proofs of claim filed by them that may ultimately be allowed by the Bankruptcy Court, it shall

file a pleading with this Court within 17 business days of this Judgment ("**GUC Trust Asset**

**Pleading**"). The GUC Trust Asset Pleading shall not reargue issues that were already decided

by the Decision and Judgment. If a GUC Trust Asset Pleading is timely filed, the GUC Trust,

-11-

09-50026-reg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July 2015 Letter from King & Spalding LLP    Pg 16 of 126

6    2015 Letter from King & Spaling LLP    Pg 12 of 21

the GUC Trust Unitholders and/or New GM shall have 17 business days to respond to such pleading. The Court will schedule a hearing thereon if it believes one is necessary.

        (e)    If a Non-Ignition Switch Pre-Closing Accident Plaintiff or Non-Ignition Switch Plaintiff listed on Exhibit "D" fails to timely file a No Dismissal Pleading or a GUC Trust Asset Pleading with the Court within the time period set forth in paragraphs 13(c) and (d) above, New GM, the GUC Trust and/or the GUC Trust Unitholders, as applicable, shall be permitted to file with this Court a notice of presentment on five (5) business days' notice, with an attached order ("**Dismissal Order**") that directs the Non-Ignition Switch Pre-Closing Accident Plaintiff or Non-Ignition Switch Plaintiff to dismiss with prejudice its lawsuit, or certain claims or causes of action contained therein that violate the Decision, this Judgment and/or the Sale Order (as modified by the Decision and Judgment), within 17 business days of receipt of the Dismissal Order. For any lawsuit, or any claims or causes of action contained therein, of the Non-Ignition Switch Pre-Closing Accident Plaintiffs or Non-Ignition Switch Plaintiffs that are dismissed pursuant to this Judgment, (i) the statute of limitations shall be tolled from the date of dismissal to 30 days after all appeals of the Decision and Judgment are decided, and (ii) if the Decision and Judgment are reversed on appeal, such that the appellate court finds that the Non-Ignition Switch Pre-Closing Accident Plaintiffs or Non-Ignition Switch Plaintiffs can make the allegations, or maintain the lawsuit or claims or causes of action, against New GM and/or the GUC Trust heretofore dismissed or stricken pursuant to this Judgment, all of the Non-Ignition Switch Pre-Closing Accident Plaintiffs' or Non-Ignition Switch Plaintiffs' rights against New GM and/or the GUC Trust that existed prior to the dismissal of their lawsuit or the striking of claims or causes of action pursuant to this Judgment shall be reinstated as if the dismissal or the striking of such claims or causes of action never occurred.

-12-

(f)    Notwithstanding the provisions of this Paragraph 13, any plaintiff whose lawsuit would otherwise have to be dismissed, in whole or in part, under this Paragraph 13 may elect, by notice filed on ECF and served upon New GM and the GUC Trust (no later than 14 days after the entry of this judgment), to stay the lawsuit instead. Except as the Court may otherwise provide by separate order (entered on stipulation or on motion), the provisions of Paragraph 13 shall then apply to any request for relief from that stay.

14.    The Court adopts the legal standard for "fraud on the court" as set forth in the Decision.

15.    (a)    By agreement of New GM, Designated Counsel for the Ignition Switch Plaintiffs, the GUC Trust, and the GUC Trust Unitholders, and as approved by the Court, no discovery in the Bankruptcy Court was conducted in connection with the resolution of the Four Threshold Issues. The Ignition Switch Pre-Closing Accident Plaintiffs did not challenge the earlier decision not to seek discovery in the Bankruptcy Court in connection with the Bankruptcy Court's determination of the Four Threshold Issues. New GM, Designated Counsel, the Groman Plaintiffs, the GUC Trust, and the GUC Trust Unitholders developed and submitted to the Court a set of agreed upon stipulated facts. Such parties also submitted to the Bankruptcy Court certain disputed facts and exhibits. The Court decided the Four Threshold Issues on the agreed upon stipulated facts only.

(b)    The Court has determined that the agreed-upon factual stipulations were sufficient for purposes of determining the Four Threshold Issues; that none of the disputed facts were or would have been material to the Court's conclusions as to any of the Four Threshold Issues; and that treating any disputed fact as undisputed would not have affected the outcome or reasoning of the Decision.

-13-

NB

(c)    The Groman Plaintiffs requested discovery with respect to the Four
Threshold Issues but the other parties opposed that request, and the Court denied that request.
To the extent the Groman Plaintiffs' discovery request continues, it is denied without prejudice
to renewal in the event that after appeal of this Judgment, the discovery they seek becomes
necessary or appropriate.

(d)    For these reasons (and others), the findings of fact in the Decision shall
apply only for the purpose of this Court's resolution of the Four Threshold Issues, and shall have
no force or applicability in any other legal proceeding or matter, including without limitation,
MDL 2543. Notwithstanding the foregoing, in all events, however, the Decision and Judgment
shall apply with respect to (a) the Court's interpretation of the enforceability of the Sale Order,
and (b) the actions of the affected parties that are authorized and proscribed by the Decision and
Judgment.

16.    The Court shall retain exclusive jurisdiction, to the fullest extent permissible
under law, to construe or enforce the Sale Order, this Judgment, and/or the Decision on which it
was based. For the avoidance of doubt, except as otherwise provided in this Judgment, the Sale
Order remains fully enforceable, and in full force and effect. This Judgment shall not be
collaterally attacked, or otherwise subjected to review or modification, in any Court other than
this Court or any court exercising appellate authority over this Court.

17.    Count One of the amended complaint ("**Groman Complaint**") filed in *Groman et
al v. General Motors LLC* (Adv. Proc. No. 14-01929 (REG)) is dismissed with prejudice. The
remaining counts of the Groman Complaint that deal with the "fraud on the court" issue are
deferred and stayed until 30 days after all appeals of the Decision and Judgment are decided.
With respect to Count One of the Groman Complaint, (i) the statute of limitations shall be tolled

-14-

from the date of dismissal of Count One to 30 days after all appeals of the Decision and
Judgment are decided, and (ii) if the Decision and Judgment are reversed or modified on appeal
such that the appellate court finds that the Groman Plaintiffs can maintain the cause of action in
Count One of the Groman Complaint heretofore dismissed pursuant to this Judgment, the
Groman Plaintiffs' rights against New GM that existed as of the dismissal of Count One shall be
reinstated as if the dismissal of Count One never occurred.

      18.     (a)     New GM is hereby authorized to serve this Judgment and the Decision
upon any additional party (or his or her attorney) (each, an "**Additional Party**") that commences
a lawsuit and/or is not otherwise on Exhibits "A" through "D" hereto (each, an "**Additional
Lawsuit**") against New GM that would be proscribed by the Sale Order (as modified by the
Decision and this Judgment). Any Additional Party shall have 17 business days upon receipt of
service by New GM of the Decision and Judgment to dismiss, without prejudice, such Additional
Lawsuit or the allegations, claims or causes of action contained in such Additional Lawsuit that
would violate the Decision, this Judgment, or the Sale Order (as modified by the Decision and
this Judgment).

          (b)     If any Additional Party has a good faith basis to maintain that the
Additional Lawsuit or certain allegations, claims or causes of action contained in such Additional
Lawsuit should not be dismissed without prejudice, such Additional Party shall, within 17
business days upon receipt of the Decision and Judgment, file with this Court a No Dismissal
Pleading explaining why such Additional Lawsuit or certain claims or causes of action contained
therein should not be dismissed without prejudice. The No Dismissal Pleading shall not reargue
issues that were already decided by the Decision and Judgment. New GM shall file a response to
the No Dismissal Pleading within 17 business days of service of the No Dismissal Pleading. The

-15-

Court will schedule a hearing thereon if it believes one is necessary.

        (c)     If an Additional Party fails to either (i) dismiss without prejudice the Additional Lawsuit or the claims and/or causes of action contained therein that New GM asserts violates the Decision, Judgment, and/or Sale Order (as modified by the Decision and this Judgment), or (ii) timely file a No Dismissal Pleading with the Court within the time period set forth above, New GM shall be permitted to file with this Court a notice of presentment on five (5) business days' notice, with an attached Dismissal Order that directs the Additional Party to dismiss without prejudice the Additional Lawsuit or the claims and/or causes of action contained therein that violate the Decision, this Judgment and/or the Sale Order (as modified by the Decision and this Judgment), within 17 business days of receipt of the Dismissal Order. With respect to any lawsuit that is dismissed pursuant to this paragraph, (i) the statute of limitations shall be tolled from the date of dismissal of such lawsuit to 30 days after all appeals of the Decision and Judgment are decided, and (ii) if the Decision and Judgment are reversed on appeal such that the appellate court finds that the Additional Party can maintain the lawsuit heretofore dismissed pursuant to this Judgment, the Additional Party's rights against New GM that existed as of the dismissal of the lawsuit shall be reinstated as if the dismissal of the lawsuit never occurred.

        (d)     For the avoidance of doubt, nothing in this paragraph 18 shall apply to the Amended Consolidated Complaint to be filed in MDL 2543 on or before June 12, 2015.

Dated: New York, New York
     June 1, 2015

                        *s/ Robert E. Gerber*
                        United States Bankruptcy Judge

## Exhibit "A": Complaints Alleging Pre-Closing Ignition Switch Accidents To Be Stayed

Bachelder. et al. v. General Motors LLC. MDL No. 1:15-cv-00155-JMF (S.D.N.Y.)[3]

Betancourt Vega v. General Motors LLC, et al., No. 3:15-cv-01245-DRD (D.P.R.)
(MDL No. 1:15-cv-02638)

Bledsoe, et al. v. General Motors LLC, MDL No. 1:14-cv-07631-JMF (S.D.N.Y.)[4]

Boyd, et al. v. General Motors LLC, No. 4:14-cv-01205-HEA (E.D. Mo.)
(MDL No. 1:14-cv-08385)[5]

Doerfler-Bashucky v. General Motors LLC, et al., No. 5:15-cv-00511-GTS-DEP (N.D.N.Y.)

Edwards, et al. v. General Motors LLC, MDL No. 1:14-cv-06924-JMF (S.D.N.Y.)[6]

Johnston-Twining v. General Motors LLC, et al., No. 3956 (Philadelphia County, Pa.)

Meyers v. General Motors LLC, No. 1:15-cv-00177-CCC (M.D. Pa.)

Occulto v. General Motors Co., et al., No. 15-cv-1545 (Lackawanna County, Pa.)

Scott v. General Motors Company, et al., No. 8:15-cv-00307-JDW-AEP (M.D. Fla.)
(MDL No. 1:15-cv-01790)

Vest v. General Motors LLC, et al., No. 1:14-cv-24995-DAF (S.D. W.Va.)
(MDL No. 1:14-cv-07475)

---

[3]    The *Bachelder* complaint includes both Ignition Switch and non-Ignition Switch Pre-Closing Accident
vehicles subject to the Judgment. Accordingly, it is listed both on Exhibits "A" and "D."

[4]    The *Bledsoe* complaint includes both Ignition Switch and non-Ignition Switch Pre-Closing Accident
vehicles subject to the Judgment. Accordingly, it is listed both on Exhibits "A" and "D." In addition, the
*Bledsoe* complaint includes economic loss claims regarding Old GM conduct and vehicles and, therefore,
also appears on Exhibit "C."

[5]    The *Boyd* complaint contains allegations regarding both a Pre-Closing ignition switch accident and one or
more Post-Closing ignition switch accidents. To the extent the complaint concerns one or more Post-
Closing ignition switch accidents, those portions of the *Boyd* complaint that assert Product Liabilities (as
defined in the Sale Agreement) based on a Post-Closing ignition switch accident are not subject to the
Judgment.

[6]    The *Edwards* complaint includes both Ignition Switch and non-Ignition Switch Pre-Closing Accident
vehicles subject to the Judgment. Accordingly, it is listed both on Exhibits "A" and "D."

## Exhibit "B": Economic Loss Complaints To Be Stayed

Hailes, et al. v. General Motors LLC, et al., No. 15PU-CV00412 (Pulaski County, Mo.)

In re General Motors LLC Ignition Switch Litigation, 14-MD-2543, *Consolidated Class Action Complaint Against New GM For Recalled Vehicles Manufactured By Old GM and Purchased Before July 11, 2009*

## Exhibit "C": Complaints Containing Particular Allegations And/Or Claims Barred By Sale Order To Be Stricken

## Post-Sale Personal Injury/Wrongful Death Complaints With Economic Loss Claims To Be Stricken:

Ackerman v. General Motors Corp., et al., No. MRS-L-2898-14 (Morris County, N.J.)

Austin, et al. v. General Motors LLC, No. 2015-L- 000026 (St. Clair County, Ill.)

Berger, et al. v. General Motors LLC, No. 9241/2014 (Kings County, N.Y.)

Casey, et al. v. General Motors LLC, et al., No. 2014-54547 (Texas MDL)

Colarossi v. General Motors, et al., No. 14-22445 (Suffolk County, N.Y.)

Dobbs v. General Motors LLC, et al., No. 49D051504PL010527 (Marion County, Ind.)

Felix, et al. v. General Motors LLC, No. 1422-CC09472 (City of St. Louis, Mo.)

Gable, et al. v. Walton, et al., No. 6737 (Lauderdale County, Tenn.)

Goins v. General Motors LLC, et al., No. 2014-CI40 (Yazoo County, Miss.)

Grant v. General Motors LLC, et al., No. 2014CV02570MG (Clayton County, Ga.)

Green v. General Motors LLC, et al., No. 15-144964-NF (Oakland County, Mich.)

Hellems v. General Motors LLC, No. 15-459-NP (Eaton County, Mich.)

Hinrichs v. General Motors LLC, et al., No. 15-DCV-221509 (Texas MDL)

Jackson v. General Motors LLC, et al., No. 2014-69442 (Texas MDL)

Largent v. General Motors LLC, et al., No. 14-006509-NP (Wayne County, Mich.)

Licardo v. General Motors LLC, No. 03236 (Fulton County, N.Y.)

Lincoln, et al. v. General Motors LLC, No. 2015-0449-CV (Steuben County, N.Y.)

Lucas v. General Motors LLC, et al., No. 15-CI-00033 (Perry County, Ky.)

Miller v. General Motors LLC, et al., No. CACE-15-002297 (Broward County, Fla.)

Mullin, et al. v. General Motors LLC, et al., No. BC568381 (Los Angeles County, Cal.)

Nelson v. General Motors LLC, et al., No. D140141 (Texas MDL)

Petrocelli v. General Motors LLC, et al., No. 14-17405 (Suffolk County, N.Y.)

-19-

Polanco, et al. v. General Motors LLC, et al., No. CIVRS1200622 (San Bernardino County, Cal.)

Quiles v. Catsoulis, et al., No. 702871/14 (Queens County, N.Y.)

Quintero v. General Motors LLC, et al., No. 15-995 (Orleans Parish, La.)

Shell, et al. v. General Motors LLC, No. 1522-CC00346 (City of St. Louis, Mo.)

Solomon v. General Motors LLC, No. 15A794-1 (Cobb County, Ga.)

Spencer v. General Motors LLC, et al., No. D-1-GN-14-001337 (Texas MDL)

Szatkowski, et al. v. General Motors LLC, et al., No. 2014-08274-0 (Luzerne County, Pa.)

Tyre v. General Motors LLC, et al., No. GD-14-010489 (Allegheny County, Pa.)

Wilson v. General Motors LLC, et al., No. 2014-29914 (Texas MDL)

## Post-Sale Economic Loss Complaints With Old GM Allegations/Claims To Be Stricken:

Bledsoe, et al. v. General Motors LLC, MDL No. 1:14-cv-07631-JMF (S.D.N.Y.)

Elliott, et al. v. General Motors LLC, No. 1:14-cv-00691-KBJ (D.D.C.)
(MDL No. 1:14-cv-08382)

Sesay, et al. v. General Motors LLC, et al., MDL No.1:14-cv-06018-JMF (S.D.N.Y.)

In re General Motors LLC Ignition Switch Litigation, 14-MD-2543, *Consolidated Complaint Concerning All GM-Branded Vehicles That Were Acquired July 11, 2009 or Later*

## Exhibit "D": Non-Ignition Switch Complaints Subject to the Judgment

### Personal Injury/Wrongful Death Complaints:

Abney, et al. v. General Motors LLC, MDL No. 1:14-cv-05810-JMF (S.D.N.Y.)[7]

Bachelder, et al. v. General Motors LLC, MDL No. 1:15-cv-00155-JMF (S.D.N.Y.)

Bacon v. General Motors LLC, MDL No. 1:15-cv-00918-JMF (S.D.N.Y.)

Edwards, et al. v. General Motors LLC, MDL No. 1:14-cv-06924-JMF (S.D.N.Y.)

Phillips-Powledge v. General Motors LLC, No. 3:14-cv-00192 (S.D. Tex.)
(MDL No. 1:14-cv-08540)

Pillars v. General Motors LLC, No. 1:15-cv-11360-TLL-PTM (E.D. Mich.)

Williams, et al. v. General Motors LLC, No. 5:15-cv-01070-EEF-MLH (W.D. La.)
(MDL No. 1:15-cv-03272)

### Economic Loss Complaints:

Bledsoe, et al. v. General Motors LLC, MDL No. 1:14-cv-07631-JMF (S.D.N.Y.)

Elliott, et al. v. General Motors LLC, No. 1:14-cv-00691-KBJ (D.D.C.)
(MDL No. 1:14-cv-08382)

Sesay, et al. v. General Motors LLC, et al., MDL No.1:14-cv-06018-JMF (S.D.N.Y.)

Watson, et al. v. General Motors LLC, et al., No. 6:14-cv-02832 (W.D. La.)

---

[7]    The *Abney* complaint includes a non-Ignition Switch Pre-Closing Accident vehicle subject to the Judgment.

# EXHIBIT B

Westlaw

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

H

United States Bankruptcy Court,
S.D. New York.
In re Motors Liquidation Company, et al., f/k/a General Motors Corp., et al., Debtors.

Case No.: 09‑50026 (REG) (Jointly Administered)
Signed April 15, 2015

**Background:** Purchaser at sale outside the ordinary course of business of assets of bankrupt automobile manufacturer brought adversary proceeding to enforce "free and clear of" language in sales order, and creditors with claims arising from ignition switch defects in certain models of vehicles objected on due process grounds.

**Holdings:** The Bankruptcy Court, Robert E. Gerber, J., held that:

(1) while purchasers with products liability claims against bankrupt automobile manufacturer might eventually share, as general unsecured creditors, in proceeds from court-approved sale of debtor's assets, their interest in pursuing successor liability claims against asset purchaser, whatever their merits, was not so minimal that they did not even have due process right to be heard;

(2) knowledge that at least 24 of debtor-manufacturer's engineers, senior managers, and attorneys possessed of ignition switch defect in certain vehicle models that created a safety hazard, along with knowledge of names and addresses of owners of defective cars, served to make owners of these vehicle models "known creditors," to whom debtor-manufacturer had due process obligation to provide actual notice;

(3) lack of notice did not prejudice creditors, and did not result in due process violation, at least not insofar

as it prevented them from arguing against "free and clear of" language in sales order;

(4) lack of notice prejudiced creditors insofar as it prevented them from asserting overbreadth argument, that terms of sales order protected purchaser from any liability in connection with vehicles manufactured by debtor, even for liability arising from its own acts;

(5) known creditors of debtor had due process right, not only to actual notice of proposed sale of debtor's assets free and clear, but to actual notice of debtor-or-manufacturer's bankruptcy filing itself and of deadline for filing proofs of claim;

(6) as remedy for due process violation that occurred when debtor failed to provide actual notice of proposed sale free and clear, court would direct that overbroad language in sales order did not bind creditors without requisite notice;

(7) equitable mootness doctrine prevented bankruptcy court from modifying plan confirmation order in order to allow creditors to obtain payment from trust; and

(8) decision would be certified for appeal directly to Court of Appeals.

So ordered.

West Headnotes

[1] Constitutional Law 92 &#x2015;3881

92 Constitutional Law
    92XXVII Due Process
        92XXVII(B) Protections Provided and Deprivations Prohibited in General
            92k3878 Notice and Hearing
                92k3881 k. Notice. Most Cited Cases

Elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 28 of 126

Page 2

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

circumstances, to apprise interested parties of pen-
dency of action and to afford them an opportunity to
present their objections. U.S. Const. Amend. 5.

**[2] Constitutional Law 92 ⬅3881**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(B) Protections Provided and Dep-
rivations Prohibited in General
            92k3878 Notice and Hearing
                92k3881 k. Notice. Most Cited Cases

    To satisfy due process requirements, notice must
be of such nature as reasonably to convey the required
information, and it must afford a reasonable time for
those interested to make their appearance. U.S. Const.
Amend. 5.

**[3] Constitutional Law 92 ⬅3881**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(B) Protections Provided and Dep-
rivations Prohibited in General
            92k3878 Notice and Hearing
                92k3881 k. Notice. Most Cited Cases

    Notice to others with an interest in objecting can
ameliorate prejudice, and impliedly, if not expressly,
even the existence of constitutionally deficient notice
in first place, to those who did not get the notice that
the Due Process Clause requires. U.S. Const. Amend.
5.

**[4] Constitutional Law 92 ⬅3881**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(B) Protections Provided and Dep-
rivations Prohibited in General

            92k3878 Notice and Hearing
                92k3881 k. Notice. Most Cited Cases

    Due Process Clause requires the best notice
practical under the circumstances, both in terms of the
manner in which notice is provided and the quality of
the notice; however, this notice requirement should
not be interpreted so inflexibly as to make it an im-
practical or impossible obstacle. U.S. Const. Amend.
5.

**[5] Constitutional Law 92 ⬅4478**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applica-
tions
            92XXVII(G)25 Other Particular Issues and
Applications
                92k4478 k. Bankruptcy. Most Cited
Cases

    Two-step methodology may be used by court, in
bankruptcy context, in deciding whether claimant
received notice sufficient to satisfy due process re-
quirements, under which court first inquires whether
claimant knew of the claim it might assert, and then
determines whether the claim was, from perspective of
notice-giver, often the debtor, a "known" claim, ob-
ligating the notice-giver to provide actual, and possi-
bly more detailed, notice. U.S. Const. Amend. 5.

**[6] Constitutional Law 92 ⬅3881**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(B) Protections Provided and Dep-
rivations Prohibited in General
            92k3878 Notice and Hearing
                92k3881 k. Notice. Most Cited Cases

    In some cases, even if the means of notice are

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July
6   2015 Letter from King & Spaling LLP   Pg 29 of 126

Page 3

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

entirely satisfactory, notice lacking the requisite quality might nonetheless warrant relief on due process grounds. U.S. Const. Amend. 5.

[7] Constitutional Law 92 ⟘4478

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
        92XXVII(G)25 Other Particular Issues and Applications
            92k4478 k. Bankruptcy. Most Cited Cases

Notice of debtor's bankruptcy filing, or even of deadline for filing proofs of claim, may not always be sufficient to satisfy creditor's due process rights; if debtor has knowledge of existence of claim, something more detailed in the way of notice may have to be provided. U.S. Const. Amend. 5.

[8] Constitutional Law 92 ⟘3875

92 Constitutional Law
    92XXVII Due Process
        92XXVII(B) Protections Provided and Deprivations Prohibited in General
            92k3875 k. Factors considered; flexibility and balancing. Most Cited Cases

Due process is flexible standard, that requires a fairly thoughtful, and sometimes nuanced, consideration of the circumstances, to ascertain whether any failure to provide better notice, either more direct or more detailed, can appropriately be excused. U.S. Const. Amend. 5.

[9] Constitutional Law 92 ⟘4478

92 Constitutional Law

92XXVII Due Process
    92XXVII(G) Particular Issues and Applications
        92XXVII(G)25 Other Particular Issues and Applications
            92k4478 k. Bankruptcy. Most Cited Cases

Actual notice of debtor's bankruptcy filing and of deadline for filing claims is required, as matter of due process, to creditors whose identities are known or reasonably ascertainable. U.S. Const. Amend. 5.

[10] Constitutional Law 92 ⟘4478

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
        92XXVII(G)25 Other Particular Issues and Applications
            92k4478 k. Bankruptcy. Most Cited Cases

While debtor must make effective use of information already available to identify creditors, the fact that additional claims may be foreseeable does not make them "known," or entitle creditors holding such claims, as matter of due process, to actual notice of debtor's bankruptcy filing and of deadline for filing claims. U.S. Const. Amend. 5.

[11] Bankruptcy 51 ⟘3070

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
            51k3067 Sale or Assignment of Property
                51k3070 k. Order of court and proceedings therefor in general. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 30 of 126

Page 4

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

**Constitutional Law 92 ☞4478**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applica-
tions
            92XXVII(G)25 Other Particular Issues and
Applications
                92k4478 k. Bankruptcy. Most Cited
Cases

    While purchasers with products liability claims
against bankrupt automobile manufacturer might
eventually share, as general unsecured creditors, in
proceeds from court-approved sale of Chapter 11
debtor-manufacturer's assets outside ordinary course
of its business, their interest in pursuing successor
liability claims against asset purchaser, whatever their
merits, was not so minimal that they did not even have
due process right to be heard in connection with sale
of those assets. U.S. Const. Amend. 5; 11 U.S.C.A. §
363.

**[12] Corporations And Business Organizations 101
☞2639**

101 Corporations and Business Organizations
    101X Mergers, Acquisitions, and Reorganizations
        101X(A) In General
            101k2638 Assumption of or Succession to
Transferor's Liabilities
                101k2639 k. In general. Most Cited
Cases

    Theories of successor liability, when permissible,
permit claimant to assert claims not just against the
transferor of assets, but also against transferee, and
provide a second target for recovery.

**[13] Bankruptcy 51 ☞3170**

51 Bankruptcy

511X Administration
    511X(E) Compensation of Officers and Others
        511X(E)3 Attorneys
            51k3170 k. In general. Most Cited Cases

**Constitutional Law 92 ☞4478**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applica-
tions
            92XXVII(G)25 Other Particular Issues and
Applications
                92k4478 k. Bankruptcy. Most Cited
Cases

    Bankruptcy court could not rely upon conclusion
which it reached at hearing to which purchasers with
products liability claims against bankrupt automobile
manufacturer were not invited, that there was no con-
tinuity between Chapter 11 debtor-manufacturer and
purchaser of its assets and thus no basis for asserting
successor liability claims against purchaser, as basis
for excusing lack of notice to products liability
claimants on ground that they had no due process right
to be heard. U.S. Const. Amend. 5.

**[14] Bankruptcy 51 ☞3170**

51 Bankruptcy
    511X Administration
        511X(E) Compensation of Officers and Others
            511X(E)3 Attorneys
                51k3170 k. In general. Most Cited Cases

**Constitutional Law 92 ☞4478**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applica-
tions
            92XXVII(G)25 Other Particular Issues and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg Doc 13330-1 Filed 07/29/15 Entered 07/29/15 17:13:50 Exhibit July 6 2015 Letter from King & Spaling LLP Pg 31 of 126

Page 5

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

Applications

92k4478 k. Bankruptcy. Most Cited
Cases

Notice by publication of upcoming sale of assets of bankrupt automobile manufacturer, and of fact that asset purchaser would be assuming only very limited types of Chapter 11 debtor-manufacturer's liabilities, would, as general rule, be sufficient to satisfy due process rights of owners of vehicles not known to have been involved in accident or to have filed claims against debtor-manufacturer, especially where sale was conducted on emergency basis to prevent loss of financing from postpetition lenders; it would be wholly impracticable, given emergency nature of sale, to require debtor-manufacturer to mail out actual notice to owners of the approximately 70 million vehicles built by manufacturer that were then on the road. U.S. Const. Amend. 5.

**[15] Constitutional Law 92 ⟲3881**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(B) Protections Provided and Deprivations Prohibited in General
      92k3878 Notice and Hearing
        92k3881 k. Notice. Most Cited Cases

Urgency of situation is a hugely important factor in determining what is the best notice practical under the circumstances, of kind sufficient to comply with due process requirements. U.S. Const. Amend. 5.

**[16] Bankruptcy 51 ⟲3071**

51 Bankruptcy
  51IX Administration
    51IX(B) Possession, Use, Sale, or Lease of Assets
      51k3067 Sale or Assignment of Property
        51k3071 k. Notice. Most Cited Cases

**Constitutional Law 92 ⟲4478**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(G) Particular Issues and Applications
      92XXVII(G)25 Other Particular Issues and Applications
        92k4478 k. Bankruptcy. Most Cited Cases

While notice by publication of upcoming sale of assets of bankrupt automobile manufacturer, and of fact that asset purchaser would be assuming only very limited types of Chapter 11 debtor-manufacturer's liabilities, would, as general rule, be sufficient to satisfy due process rights of owners of vehicles not known to have been involved in accident or to have filed claims against debtor-manufacturer, knowledge that at least 24 of debtor-manufacturer's engineers, senior managers, and attorneys possessed of ignition switch defect in certain vehicle models that created a safety hazard and that required recall of these vehicles, along with knowledge of names and addresses of owners of defective cars, which debtor-manufacturer was required by statute to keep, served to make owners of these vehicle models "known creditors," to whom debtor-manufacturer had due process obligation to provide actual notice, despite fact that it could not know precisely which of these owners of cars having this safety defect would be involved in accident; debtor-manufacturer's inability to say which particular individuals in this known group would turn out to be accident victims did not mean that none of them were entitled to actual notice of sale, but that all of them were. U.S. Const. Amend. 5.

**[17] Constitutional Law 92 ⟲3881**

92 Constitutional Law
  92XXVII Due Process

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July 6   2015 Letter from King & Spaling LLP   Pg 32 of 126

Page 6

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

92XXVII(B) Protections Provided and Deprivations Prohibited in General
92k3878 Notice and Hearing
92k3881 k. Notice. Most Cited Cases

Prejudice, in addition to inadequate notice or denial of right to be heard, is essential element of due process claim. U.S. Const. Amend. 5.

**[18] Constitutional Law 92 ☞3881**

92 Constitutional Law
92XXVII Due Process
92XXVII(B) Protections Provided and Deprivations Prohibited in General
92k3878 Notice and Hearing
92k3881 k. Notice. Most Cited Cases

Courts should refrain from speculation in deciding whether there was prejudice, of kind required to support due process claim; if there is non-speculative reason to doubt the reliability of the outcome, then court should take action, though the opposite is also true. U.S. Const. Amend. 5.

**[19] Bankruptcy 51 ☞3170**

51 Bankruptcy
51IX Administration
51IX(E) Compensation of Officers and Others
51IX(E)3 Attorneys
51k3170 k. In general. Most Cited Cases

**Constitutional Law 92 ☞4478**

92 Constitutional Law
92XXVII Due Process
92XXVII(G) Particular Issues and Applications
92XXVII(G)25 Other Particular Issues and Applications

92k4478 k. Bankruptcy. Most Cited Cases

While car buyers with economic loss claims arising from defective ignition switches in models of cars that they had purchased were denied notice that due process required in connection with sale outside the ordinary course of business of assets of bankrupt car manufacturer, this lack of notice did not prejudice them, and did not result in due process violation, at least not insofar as it prevented them from arguing against "free and clear of" language in sales order and thus denied them an opportunity to preserve their successor liability claims against purchaser of Chapter 11 debtor-manufacturer's assets, where numerous other parties with requisite notice of sale argued vigorously against this "free and clear of" language with no success, where car buyers did not put forth any authority or argument that these other parties had overlooked, and where car buyers, while asserting that sheer weight of opposition to "free and clear of" language might have forced court to bow to public pressure and to modify order, offered nothing but sheer speculation that bankruptcy court would have denied the carefully negotiated protection on which asset purchaser insisted to proceed with purchase with not just the risk, but the certainty, of forcing debtor-manufacturer into liquidation. U.S. Const. Amend. 5; 11 U.S.C.A. § 363(f).

**[20] Bankruptcy 51 ☞3170**

51 Bankruptcy
51IX Administration
51IX(E) Compensation of Officers and Others
51IX(E)3 Attorneys
51k3170 k. In general. Most Cited Cases

**Constitutional Law 92 ☞4478**

92 Constitutional Law
92XXVII Due Process

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July
6   2015 Letter from King & Spaling LLP   Pg 33 of 126

Page 7

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

92XXVII(G) Particular Issues and Applications

92XXVII(G)25 Other Particular Issues and Applications

92k4478 k. Bankruptcy. Most Cited Cases

Known creditors of bankrupt automobile manufacturer, consisting of car buyers with economic loss claims arising from defective ignition switches in models of cars that they had purchased, were prejudiced by lack of anything but publication notice of sale of Chapter 11 debtor-manufacturer's assets to asset purchaser free and clear of all but very limited forms of liability for vehicles built by debtor, insofar as this lack of notice prevented them from asserting overbreadth argument, that terms of sales order protected purchaser from any liability in connection with vehicles manufactured by debtor, even for liability arising from its own acts, that was not raised by other parties at hearing on sale, and that bankruptcy court had found persuasive in other cases; lack of notice violated car buyers' due process rights, insofar as it resulted in entry of overbroad sales order. U.S. Const. Amend. 5; 11 U.S.C.A. § 363(f).

[21] Bankruptcy 51 ☞3071

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
            51k3067 Sale or Assignment of Property
            51k3071 k. Notice. Most Cited Cases

Constitutional Law 92 ☞4478

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)25 Other Particular Issues and

Applications

92k4478 k. Bankruptcy. Most Cited Cases

Used car purchasers who, because they did not acquire their vehicles until after bankruptcy court had approved sale of bankrupt automobile manufacturer's assets free and clear of all but a narrow set of claims, had no notice of sale and no opportunity to object to this "free and clear of" language, were not prejudiced by this lack of notice, as required for them to assert due process challenge to binding effect of sales order upon them, where numerous other parties with requisite notice of sale argued vigorously against this "free and clear of" language with no success, and where used car buyers did not put forth any authority or argument that these other parties had overlooked. U.S. Const. Amend. 5; 11 U.S.C.A. § 363(f).

[22] Assignments 38 ☞90

38 Assignments
    38V Rights and Liabilities
        38k90 k. Nature and extent of rights of assignee in general. Most Cited Cases

Successor in interest to a person or entity cannot acquire greater rights than his, her, or its transferor.

[23] Bankruptcy 51 ☞3073

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
            51k3067 Sale or Assignment of Property
            51k3073 k. Adequate protection; sale free of liens. Most Cited Cases

Used car purchasers who did not acquire their vehicles until after bankruptcy court had approved sale of bankrupt automobile manufacturer's assets free

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 34 of 126

Page 8

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

and clear of all but a narrow set of claims could not, by purchasing cars after asset sale, acquire any greater rights than those possessed by parties from whom they purchased vehicles, who were bound by "free and clear of" language in sales order; it would be unfair to permit parties to "end-run" the applicability of sales order merely by selling vehicle after closing of asset sale. 11 U.S.C.A. § 363(f).

**[24] Bankruptcy 51 ☞3071**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
            51k3067 Sale or Assignment of Property
                51k3071 k. Notice. Most Cited Cases

**Constitutional Law 92 ☞4478**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)25 Other Particular Issues and Applications
                92k4478 k. Bankruptcy. Most Cited Cases

Pre-closing accident victims, whose injuries resulted solely from conduct of bankrupt manufacturer of vehicles with defective ignition switches and not from any action taken by purchaser of Chapter 11 debtor-manufacturer's assets, were not prejudiced by any lack of notice of sale of assets free and clear of all but very limited number of liabilities, and had no actionable due process claims, where alleged over-breadth of sales order, which protected asset purchaser from any liability in connection with vehicles manufactured by debtor, even for liability arising from its own acts, did not affect them, and where arguments against "free and clear of" language itself, which they

might have asserted at hearing on proposed sale but for alleged lack of notice, were vigorously pursued without success by numerous other parties that had received requisite notice of proposed sale. U.S. Const. Amend. 5; 11 U.S.C.A. § 363(f).

**[25] Bankruptcy 51 ☞2131**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(A) In General
            51k2127 Procedure
                51k2131 k. Notice. Most Cited Cases

**Bankruptcy 51 ☞3071**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
            51k3067 Sale or Assignment of Property
                51k3071 k. Notice. Most Cited Cases

**Constitutional Law 92 ☞4478**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)25 Other Particular Issues and Applications
                92k4478 k. Bankruptcy. Most Cited Cases

Known creditors of bankrupt automobile manufacturer, consisting of car buyers with economic loss and other claims arising from defective ignition switches in models of cars that they had purchased, had due process right, not only to actual notice of proposed sale of debtor's assets free and clear, but to actual notice of debtor-manufacturer's bankruptcy filing itself and of deadline for filing proofs of claim,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July
6   2015 Letter from King & Spaling LLP   Pg 35 of 126

Page 9

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

the denial of which prejudiced them, and gave rise to actionable due process violations, by preventing them from filing proofs of claim. U.S. Const. Amend. 5.

**[26] Bankruptcy 51 3071**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
            51k3067 Sale or Assignment of Property
                51k3071 k. Notice. Most Cited Cases

**Constitutional Law 92 4478**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)25 Other Particular Issues and Applications
                92k4478 k. Bankruptcy. Most Cited Cases

Interests in finality and in protecting settled expectations of parties, including asset purchaser, that had relied on "free and clear of" language of bankruptcy court's order approving sale of assets of bankrupt automobile manufacturer did not outweigh due process rights of known creditors, consisting of car buyers with economic loss claims arising from defective ignition switches in models of cars that they had purchased, who were denied actual notice of sale to their prejudice, in being deprived of opportunity to object to overbreadth of sales order, which protected asset purchaser from any liability in connection with vehicles manufactured by debtor, even for liability arising from its own acts; interests in finality had to give way to car buyer's due process rights, to extent that any lack of notice had prejudiced them. U.S. Const. Amend. 5; 11 U.S.C.A. § 363(f).

**[27] Bankruptcy 51 3071**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
            51k3067 Sale or Assignment of Property
                51k3071 k. Notice. Most Cited Cases

**Constitutional Law 92 4478**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)25 Other Particular Issues and Applications
                92k4478 k. Bankruptcy. Most Cited Cases

Bankruptcy court had some flexibility in crafting remedy for due process violation that occurred when known creditors of bankrupt automobile manufacturer were not provided with actual notice of sale of Chapter 11 debtor-manufacturer's assets free and clear of all but limited number of liabilities, to extent that this lack of notice had prejudiced creditors by depriving them of opportunity to object to overbreadth of sales order, which protected asset purchaser from any liability in connection with vehicles manufactured by debtor, even for liability arising from its own acts; court did not need either, one, to enforce sales order as written against creditors whose due process rights were violated or, two, to find that entire sale was void. U.S. Const. Amend. 5; 11 U.S.C.A. § 363(f).

**[28] Bankruptcy 51 3070**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 36 of 126

Page 10

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

51k3067 Sale or Assignment of Property
51k3070 k. Order of court and proceedings therefor in general. Most Cited Cases

**Bankruptcy 51 ☞3071**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
            51k3067 Sale or Assignment of Property
                51k3071 k. Notice. Most Cited Cases

**Bankruptcy 51 ☞3073**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
            51k3067 Sale or Assignment of Property
                51k3073 k. Adequate protection; sale free of liens. Most Cited Cases

**Constitutional Law 92 ☞4478**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)25 Other Particular Issues and Applications
                92k4478 k. Bankruptcy. Most Cited Cases

As remedy for due process violation that occurred when bankrupt automobile manufacturer failed to provide actual notice of proposed sale free and clear of its assets to car buyers with economic loss claims arising from defective ignition switches in models of cars that they had purchased, and thereby prejudiced these car buyers by depriving them of opportunity to object to language in sales order that purported to protect asset purchaser from any liability in connection with vehicles manufactured by debtor, even for liability arising from its own acts, bankruptcy court would find that this overbroad language in sales order was unenforceable against car buyers with such economic loss claims; nonseverability language in sales order did not bar grant of such narrowly tailored relief. U.S. Const. Amend. 5; 11 U.S.C.A. § 363(f).

**[29] Bankruptcy 51 ☞2131**

51 Bankruptcy
    51I Courts; Proceedings in General
        51I(A) In General
            51k2127 Procedure
                51k2131 k. Notice. Most Cited Cases

**Bankruptcy 51 ☞2900(2)**

51 Bankruptcy
    51VII Claims
        51VII(D) Proof; Filing
            51k2897 Time for Filing
                51k2900 Extension of Time; Excuse for Delay
                    51k2900(2) k. Lack or insufficiency of notice. Most Cited Cases

**Constitutional Law 92 ☞4478**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)25 Other Particular Issues and Applications
                92k4478 k. Bankruptcy. Most Cited Cases

Appropriate remedy for due process violation that occurred when known creditors of bankrupt automobile manufacturer were deprived of actual notice of

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 37 of 126

Page 11

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

debtor-manufacturer's bankruptcy filing and of claims
bar date, so as to prevent them from filing timely
proofs of claim, would be to grant such creditors relief
from claims bar date and an opportunity to file oth-
erwise untimely claims. U.S. Const. Amend. 5.

## [30] Federal Courts 170B ☞2111

170B Federal Courts
    170BIII Case or Controversy Requirement
        170BIII(A) In General
            170Bk2108 Mootness
                170Bk2111 k. Available and effective
relief. Most Cited Cases

## Federal Courts 170B ☞2116

170B Federal Courts
    170BIII Case or Controversy Requirement
        170BIII(A) In General
            170Bk2108 Mootness
                170Bk2116 k. Prudential mootness.
Most Cited Cases

While the Constitution requires dismissal of cases
as moot whenever effective relief cannot be fashioned,
the related, prudential, doctrine of equitable mootness
requires dismissal where relief can be fashioned, but
implementation of such relief would be inequitable.

## [31] Federal Courts 170B ☞2181

170B Federal Courts
    170BIII Case or Controversy Requirement
        170BIII(B) Particular Cases, Contexts, and
Questions
            170Bk2181 k. Bankruptcy. Most Cited
Cases

Doctrine of equitable mootness applies to Chapter
11 liquidations as well as reorganizations.

## [32] Federal Courts 170B ☞2181

170B Federal Courts
    170BIII Case or Controversy Requirement
        170BIII(B) Particular Cases, Contexts, and
Questions
            170Bk2181 k. Bankruptcy. Most Cited
Cases

While doctrine of equitable mootness has been
applied most frequently in bankruptcy appeals, it has
broader application, including other instances likewise
presenting situations in which court must balance
importance of finality against party's desire for relief.

## [33] Bankruptcy 51 ☞3776.5(5)

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3776 Effect of Transfer
                51k3776.5 Supersedeas or Stay
                    51k3776.5(5) k. Effect of want of
stay; conclusiveness of sale. Most Cited Cases

## Bankruptcy 51 ☞3781

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3781 k. Moot questions. Most Cited
Cases

In deciding whether bankruptcy appeal is equita-
bly moot, courts consider so-called *Chateaugay* fac-
tors: (1) whether court can still order some effective
relief; (2) whether this relief will affect re-emergence
of debtor as revitalized corporate entity; (3) whether
this relief will unravel intricate transactions so as to
knock the props out from under the authorization for

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July
6   2015 Letter from King & Spaling LLP   Pg 38 of 126

Page 12

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

every transaction that has taken place and create an unmanageable, uncontrollable situation for bankruptcy court; (4) whether those parties who would be adversely affected had notice of the appeal and opportunity to participate in proceedings; and (5) whether the appellant pursued with diligence all available remedies to obtain a stay of execution of objectionable order, if failure to do so creates situation rendering it inequitable to reverse the orders appealed from.

**[34] Federal Courts 170B ⟨⟩2181**

170B Federal Courts
    170BIII Case or Controversy Requirement
      170BIII(B) Particular Cases, Contexts, and Questions
        170Bk2181 k. Bankruptcy. Most Cited Cases

In case in which liquidating Chapter 11 plan had been substantially consummated, all of *Chateaugay* factors had to be satisfied in order to overcome presumption of equitable mootness.

**[35] Federal Courts 170B ⟨⟩2181**

170B Federal Courts
    170BIII Case or Controversy Requirement
      170BIII(B) Particular Cases, Contexts, and Questions
        170Bk2181 k. Bankruptcy. Most Cited Cases

While appropriate remedy for due process violation that occurred when known creditors of bankrupt automobile manufacturer were deprived of actual notice of debtor-manufacturer's bankruptcy filing and of claims bar date, so as to prevent them from filing timely proofs of claim, would be to grant such creditors relief from claims bar date and an opportunity to file otherwise untimely claims, equitable mootness

doctrine prevented bankruptcy court from modifying plan confirmation order in order to allow creditors to obtain payment on such claims from trust established for benefit of other parties based on estimate of these other parties' claims; adding another $7 to $10 billion in claims for which trust was liable would knock the props out of transactions underlying plan by altering the funding assumptions made when trust was established, and would be inequitable to other trust claimants and to purchasers of trust units, especially where creditors seeking leave to file late claims and to obtain recovery from trust had exhibited lack of due diligence in not taking any steps to halt trust distributions after becoming aware of their claims. U.S. Const. Amend. 5.

**[36] Bankruptcy 51 ⟨⟩3070**

51 Bankruptcy
    51IX Administration
      51IX(B) Possession, Use, Sale, or Lease of Assets
        51k3067 Sale or Assignment of Property
          51k3070 k. Order of court and proceedings therefor in general. Most Cited Cases

**Constitutional Law 92 ⟨⟩4478**

92 Constitutional Law
    92XXVII Due Process
      92XXVII(G) Particular Issues and Applications
        92XXVII(G)25 Other Particular Issues and Applications
          92k4478 k. Bankruptcy. Most Cited Cases

Standards for establishing "fraud on the court," of kind warranting relief even from longstanding judgment, was not issue with which bankruptcy court had to be concerned, given that it had found violation of creditors' due process rights in connection with lack of

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 39 of 126

Page 13

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

notice of sale free and clear and of claims bar date, and given that order entered without due process could be declared to be void without regard to time limitations otherwise applicable to motions for relief from judgment. Fed. R. Civ. P. 60(b).

[37] Bankruptcy 51 ⇌2164.1

51 Bankruptcy
    51III Courts; Proceedings in General
        51III(B) Actions and Proceedings in General
            51k2164 Judgment or Order
                51k2164.1 k. In general. Most Cited
Cases

    Federal courts have long-standing aversion to altering or setting aside final judgments at times long after their entry, springing from belief that, in most instances, society is best served by putting an end to litigation after case has been tried and judgment entered.

[38] Bankruptcy 51 ⇌2164.1

51 Bankruptcy
    51III Courts; Proceedings in General
        51III(B) Actions and Proceedings in General
            51k2164 Judgment or Order
                51k2164.1 k. In general. Most Cited
Cases

    When the injustices are sufficiently gross, and when enforcement of judgment would be manifestly unconscionable, federal courts may consider requests to modify even long-standing judgments for fraud on the court. Fed. R. Civ. P. 60(d)(3).

[39] Bankruptcy 51 ⇌2164.1

51 Bankruptcy
    51III Courts; Proceedings in General

[40] Bankruptcy 51 ⇌2164.1

51 Bankruptcy
    51III Courts; Proceedings in General
        51III(B) Actions and Proceedings in General
            51k2164 Judgment or Order
                51k2164.1 k. In general. Most Cited
Cases

    "Fraud on the court," of kind warranting relief even from longstanding judgments, embraces only that species of fraud which does or attempts to defile the court itself, or is fraud perpetrated by officers of court so that judicial machinery cannot perform in the usual manner its impartial task of adjudging cases. Fed. R. Civ. P. 60(d)(3).

[40] Bankruptcy 51 ⇌2164.1

51 Bankruptcy
    51III Courts; Proceedings in General
        51III(B) Actions and Proceedings in General
            51k2164 Judgment or Order
                51k2164.1 k. In general. Most Cited
Cases

    "Fraud on the court," of kind warranting relief even from longstanding judgments, cannot be read to embrace any conduct of adverse party of which court disapproves; fraud on the court, as distinguished from fraud on adverse party, is limited to fraud which seriously affects integrity of normal process of adjudication. Fed. R. Civ. P. 60(d)(3).

[41] Bankruptcy 51 ⇌2164.1

51 Bankruptcy
    51III Courts; Proceedings in General
        51III(B) Actions and Proceedings in General
            51k2164 Judgment or Order
                51k2164.1 k. In general. Most Cited
Cases

    Relief from judgment may be granted, on theory that there has been "fraud on the court," only where there has been an impact, not just on accuracy of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 40 of 126

Page 14

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

outcome of court's adjudicative process, but on integ-
rity of judicial process itself, and then only when
denial of relief would be manifestly unconscionable.
Fed. R. Civ. P. 60(d)(3).

**[42] Bankruptcy 51** &#127968;**2164.1**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(B) Actions and Proceedings in General
            51k2164 Judgment or Order
                51k2164.1 k. In general. Most Cited
Cases

    Failure to disclose pertinent facts relating to con-
troversy before court, or even perjury regarding such
facts, whether to an adverse party or to court, does not,
without more, constitute "fraud on the court," of kind
warranting relief even from longstanding judgments.
Fed. R. Civ. P. 60(d)(3).

**[43] Bankruptcy 51** &#127968;**2164.1**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(B) Actions and Proceedings in General
            51k2164 Judgment or Order
                51k2164.1 k. In general. Most Cited
Cases

    In analyzing motion for relief from judgment on a
"fraud on the court" theory, courts consider (1) liti-
gant's misrepresentation to the court, (2) impact of that
misrepresentation, (3) lack of opportunity to discover
the misrepresentation and either bring it to court's
attention or bring an appropriate corrective proceed-
ing, and (4) benefit that litigant derived by inducing
the erroneous decision. Fed. R. Civ. P. 60(d)(3).

**[44] Bankruptcy 51** &#127968;**2164.1**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(B) Actions and Proceedings in General
            51k2164 Judgment or Order
                51k2164.1 k. In general. Most Cited
Cases

    There is no "fraud on the court," of kind war-
ranting relief even from longstanding judgment, if the
fraud is not linked either to a communication to court,
or to a nondisclosure to court under circumstances
where there is duty to speak. Fed. R. Civ. P. 60(d)(3).

**[45] Bankruptcy 51** &#127968;**2164.1**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(B) Actions and Proceedings in General
            51k2164 Judgment or Order
                51k2164.1 k. In general. Most Cited
Cases

    There can be no fraud on the court by accident;
those engaging in the fraud must be attempting to
subvert the legal process in connection with whatever
court is deciding. Fed. R. Civ. P. 60(d)(3).

**[46] Bankruptcy 51** &#127968;**2164.1**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(B) Actions and Proceedings in General
            51k2164 Judgment or Order
                51k2164.1 k. In general. Most Cited
Cases

    There can be no fraud on the court, of kind war-
ranting relief even from longstanding judgment, by
imputation alone; there must be a direct nexus be-
tween the knowledge and intent of any wrongdoer and
communications to court, and if the fraud has taken
place elsewhere and is unknown to those actually

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 41 of 126

Page 15

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

communicating with court, the requisite attempt to
defile court itself and subvert legal process is difficult,
if not impossible, to show. Fed. R. Civ. P. 60(d)(3).

[47] **Bankruptcy 51 ☞3772**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3772 k. Petition for leave; appeal as of
right; certification. Most Cited Cases

    Bankruptcy court's decision on due process
claims raised by purchasers of bankrupt automobile
manufacturer's vehicles, who, despite having pur-
chased models of vehicles with known ignition switch
defects, were provided with only publication notice of
claims bar date or of sale of Chapter 11 debt-
or-manufacturer's assets free and clear of all but lim-
ited number of liabilities, would be certified for appeal
directly to the Court of Appeals, where decision in-
volved controlling question of law on which there
were no controlling decisions of the Second Circuit
Court of Appeals beyond those addressing the most
basic fundamentals, where available authorities, while
helpful to a point, came nowhere close to addressing
the factual situation presented, and where immediate
appeal was likely to advance proceedings not just in
current, but in related, case. U.S. Const. Amend. 5; 28
U.S.C.A. § 158(d).

*518 KING & SPALDING LLP, 1185 Avenue of the
Americas, New York, New York 10036, By: Arthur J.
Steinberg, Esq. (argued) Scott I. Davidson, Esq.,
Counsel for General Motors LLC (New GM)

KIRKLAND & ELLIS LLP, 300 North LaSalle,
Chicago, Illinois 60654, By: Richard C. Godfrey,
Esq., Andrew B. Bloomer, Esq., Counsel for General
Motors LLC (New GM)

BROWN RUDNICK, Seven Times Square, New

York, New York 10036, By: Edward S. Weisfelner,
Esq. (argued), David J. Molton, Esq., May Orenstein,
Esq., Howard S. Steel, Esq., *519Rebecca L. Fordon,
Esq., Designated Counsel and Counsel for Economic
Loss Plaintiffs

STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA, P.C., 2323 Bryan Street, Suite 2200, Dallas,
Texas 75201, By: Sander L. Esserman, Esq. (argued),
Designated Counsel and Counsel for Economic Loss
Plaintiffs

GOODWIN PROCTER, LLP, The New York Times
Building, 620 Eighth Avenue, New York, New York
10018, By: William P. Weintraub, Esq. (argued),
Eamonn O'Hagan, Esq., Gregory W. Fox, Esq., Des-
ignated Counsel and Counsel for Pre-Sale Accident
Victim Plaintiffs

GOLENBOCK, EISEMAN, ASSOR, BELL &
PESKOE, LLP, 437 Madison Avenue, New York,
New York 10022, BY: Jonathan L. Flaxer, Esq. (ar-
gued), S. Preston Ricardo, Esq., Counsel for Groman
Plaintiffs

GIBSON, DUNN & CRUTCHER, LLP, 200 Park
Avenue, New York, New York 10166, BY: Lisa H.
Rubin, Esq. (argued), Keith R. Martorana, Esq.,
Matthew Williams, Esq., Adam H. Offenhartz, Esq.,
Aric H. Wu, Esq., Counsel for Wilmington Trust
Company as GUC Trust Administrator

AKIN, GUMP, STRAUSS, HAUER & FELD, LLP,
One Bryant Park, New York, New York 10036, By:
Daniel Golden, Esq., Deborah J. Newman, Esq. (ar-
gued), Jamison A. Diehl, Esq., Naomi Moss, Esq.,
Counsel for Participating GUC Trust Unit Trust
Holders

DECISION ON MOTION TO ENFORCE SALE
ORDER
ROBERT E. **GERBER**, UNITED STATES

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July
6   2015 Letter from King & Spaling LLP   Pg 42 of 126

Page 16

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

BANKRUPTCY JUDGE:
Introduction...520

Summary of Conclusions...523

1. Due Process...523

(a) Notice Before Entry of Sale Order...524

(b) Notice Before Expungement of Claims...525

(c) Requirement for Prejudice...525

2. Remedies...527

3. Assumed Liabilities...528

4. Equitable Mootness...528

5. Fraud on the Court...529

6. Certification to the Circuit...529

Facts...529

1. Background...529

2. Chapter 11 Filing...530

3. The Sale Motion and Notice Order...530

4. Notice of the Sale...531

5. Objections to Free and Clear Provisions...531

6. Sale Agreement — Relevant Provisions...533

7. The Sale Order...534

8. Matters After the Sale...535

9. The GUC Trust and its Operation...536

10. Knowledge of the Ignition Switch Defect...538

11. The Motion to Enforce...538

12. The Threshold Issues...539

Discussion...540

I. Due Process...540

A. Underlying Principles...540

1. Mullane...540

2. Second Circuit Guidance...543

3. Guidance from Lower Courts...546

4. The Known Unknown Creditor Distinction...547

*520 B. The Particular Issues Here...550

1. Do Due Process Requirements Apply?...550

2. Notice by Publication...555

3. Known Claim Analysis...556

4. The Requirement for Prejudice...560

5. Application of Those Principles to Economic Loss Plaintiffs...565

(a) Successor Liability...566

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 43 of 126

Page 17

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

(b) New GMs Own Wrongful Acts...568

(c) The Used Car Purchasers...570

6. Application of Those Principles to Pre–Closing
Accident Plaintiffs...572

7. Application to Filing of Claims...573

II. Remedies...574

A. The Sale Order...574

1. Prejudice As Affecting Remedy...575

2. Attaching Claims to Sale Proceeds...575

3. Protection of Purchasers of Estate Assets...576

4. Effect of Constitutional Violations...577

5. Remedies Conclusion...582

B. Claims...583

III. Assumed Liabilities...583

IV. Equitable Mootness...583

A. Underlying Principles...584

B. Applying Those Principles Here...585

1. Ability to Fashion Effective Relief...586

2. Effect on Re-emergence of Debtor as Revital-
ized Corporate Entity...587

3. Unraveling Intricate Transactions...587

4. Adversely Affected Parties...589

5. Pursuit of Stay Remedies...590

V. Fraud on the Court...592

1. Effect on Process of Adjudication...594

2. Victim of the Fraud...595

3. Particular Standards to Apply...596

VI. Certification to Circuit...597

Conclusion...598

*Introduction*

In this contested matter in the chapter 11 case of
Debtor Motors Liquidation Company, previously
known as General Motors Corporation ("**Old GM**"),
General Motors LLC ("**New GM**") – the acquirer of
most of Old GM's assets in a section 363 sale back in
July 2009 – moves for an order enforcing provisions
of the July 5, 2009 order (the "**Sale Order**") by which
this Court approved New GM's purchase of Old GM's
assets.[FN1]

> FN1. ECF No. 12620. New GM's motion has
> been referred to by New GM, the other par-
> ties, and the Court as the "**Motion to En-
> force**."

The Sale Order, filed in proposed form on the first
day of Old GM's chapter 11 case with Old GM's mo-
tion for the sale's approval, was entered, in a slightly
modified form, within a few hours after this Court
issued its opinion approving the sale.[FN2] There were
approximately 850 objections**521** to the 363 Sale, the
proposed Sale Order, or both. But the most serious

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 44 of 126

Page 18

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

were those relating to elements of the Sale Order
("**Free and Clear Provisions**"), discussed in more
detail below, that provided that New GM would pur-
chase Old GM's assets "free and clear" of successor
liability claims. After lengthy analysis, [FN3] the Court
overruled those objections.

> FN2. *See In re General Motors Corp.,* 407
> B.R. 463 (Bankr.S.D.N.Y.2009) (Gerber, J.)
> (the " *Sale Opinion*"), *stay pending appeal
> denied,* 2009 WL 2033079 (S.D.N.Y. Jul. 9,
> 2009) (Kaplan, J.) (the " *Stay Opinion* "),
> *appeal dismissed and aff'd sub nom Camp-
> bell v. General Motors Corp.,* 428 B.R. 43
> (S.D.N.Y.2010) (Buchwald, J.) (" *Affir-
> mance Opinion # 1* ') and *Parker v. General
> Motors Corp.,* 430 B.R. 65 (S.D.N.Y.2010)
> (Sweet, J.) (" *Affirmance Opinion # 2* '),
> *appeal dismissed,* No. 10 4882 bk (2d Cir.
> July 28, 2011) (*per curiam,* Jacobs, CJ, and
> Hall and Carney, JJ.), *cert. denied,* — U.S.
> —, 132 S.Ct. 1023, 132 S.Ct. 1023 (2012).

> FN3. *See Sale Opinion,* 407 B.R. at 499 506.

In March 2014, New GM announced to the pub-
lic, for the first time, serious defects in ignition
switches that had been installed in Chevy Cobalts and
HHRs, Pontiac G5s and Solstices, and Saturn Ions and
Skys (the "**Ignition Switch Defect**"), going back to
the 2005 model year. In the Spring of 2014 (though
many have queried why Old GM and/or New GM
failed to do so much sooner), New GM then issued a
recall of the affected vehicles, under which New GM
would replace the defective switches, and bear the
costs for doing so.

New GM previously had agreed to assume re-
sponsibility for any accident claims involving
post-sale deaths, personal injury, and property dam-
age which would include any that might have re-
sulted from the Ignition Switch Defect. But New GM's

announcement was almost immediately followed by
the filing of about 60 class actions in courts around the
United States, seeking compensatory damages, puni-
tive damages, RICO damages and attorneys fees for
*other* kinds of losses to consumers "**Economic
Loss**" alleged to have resulted from the Ignition
Switch Defect. The claims for Economic Loss include
claims for alleged reduction in the resale value of
affected cars, other economic loss (such as unpaid
time off from work when getting an ignition switch
replaced), and inconvenience. The Court has been
informed that the number of class actions now pending
against New GM the great bulk of which were
brought by or on behalf of individuals claiming Eco-
nomic Loss ("**Economic Loss Plaintiffs**") now
exceeds 140. Though the amount sought by Economic
Loss Plaintiffs is for the most part unliquidated, it has
been described as from $7 to $10 billion. Most of
those actions ("**Ignition Switch Actions**") are now
being jointly administered, for pretrial purposes, in a
multi-district proceeding before the Hon. Jesse Fur-
man, U.S.D.J., in the Southern District of New York
(the "**MDL Court**").

New GM here seeks to enforce the Sale Order's
provisions, quoted below, blocking economic loss
lawsuits against New GM on claims involving vehi-
cles and parts manufactured by Old GM.[FN4] New GM
argues that while it had voluntarily undertaken, under
the Sale Order, to take on an array of Old GM liabili-
ties (for the post-sale accidents involving both Old
GM and New GM vehicles just described; under the
express warranty on the sale of any Old GM or New
GM vehicle (the "**Glove Box Warranty**"); to satisfy
statutory recall obligations with respect to Old GM
and New GM vehicles alike; and under Lemon *522
Laws, again with respect to Old GM and New GM
vehicles alike), the Sale Order blocked any oth-
ers including those in these suits for Economic Loss.

> FN4. There may be misunderstandings as to
> the matters now before the Court. New GM
> has already undertaken to satisfy claims for

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 45 of 126

Page 19

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

death, personal injury, and property damage in accidents occurring after the 363 Sale involving vehicles manufactured by New GM and Old GM alike. Except for the *pre*-Sale accidents that are the subject of the Pre Closing Accident Plaintiffs' contentions, addressed below (where those plaintiffs wish to sue New GM in lieu of Old GM), this controversy does not involve death, personal injury, or property damage arising in accidents. Instead it involves only *economic losses* allegedly sustained with respect to Old GM vehicles or parts.

The Sale Order, as discussed below, plainly so provides. But as to 70 million Old GM cars whose owners had not been in accidents of which they'd advised Old GM, the Sale Order was entered with notice only by publication. And those owning cars with Ignition Switch Defects (again, those who had not been in accidents known to Old GM)—an estimated 27 million in number—were given neither individual mailed notice of the 363 Sale, nor mailed notice of the opportunity to file claims for any losses they allegedly suffered. And more importantly, from the perspective of these car owners, they were not given *recall notices* which (in addition to facilitating switch replacement before accidents took place), they contend were essential to enabling them to respond to the published notices to object to the 363 Sale or to file claims.

Then, after New GM filed the Motion to Enforce, two other categories of Plaintiffs came into the picture. One was another group of Ignition Switch Defect plaintiffs (the "**Pre–Closing Accident Plaintiffs**") who (unlike the Economic Loss Plaintiffs) are suing with respect to actual accidents. But because those accidents involved Old GM and took place *before* the 363 Sale Closing—and taking on pre-closing accident liability was not commercially necessary to New GM's future success—they were not among the accidents involving Old GM vehicles for which New GM agreed

to assume responsibility. The Pre Closing Accident Plaintiffs have (or at least had) the right to assert claims against Old GM (the only entity that was in existence at the time their accidents took place), but they nevertheless wish to proceed against New GM. New GM brought a second motion to enforce the Sale Order [FN5] with respect to the Pre Closing Accident Plaintiffs, and issues with respect to this Plaintiff group were heard in tandem with the Motion to Enforce.

FN5. ECF No. 12807.

The other category of Plaintiffs later coming into the picture ("**Non–Ignition Switch Plaintiffs**") brought actions asserting Economic Loss claims as to GM branded cars that *did not have* Ignition Switch Defects, including cars made by New GM and Old GM alike. In fact, most of their cars did not have defects, and/or were not the subject of recalls, at all. But they contend, in substance, that the Ignition Switch Defect caused damage to "the brand," [FN6] resulting in Economic Loss to **\*523** them. New GM brought still another motion [FN7] to enforce the Sale Order with respect to them, though this third motion has been deferred pending the determination of the issues here.

FN6. *See* Day 1 Arg. Tr. at 137:4 138:16, Feb. 17, 2015 ("[PL. COUNSEL]: The revelation of New GM's extensive deceptions tarnished the brand further ... They allege that new GM concealed and suppressed material facts about the quality of its vehicle and the GM brand."); Day 2 Arg. Tr. at 61:16 62:5, Feb. 18. 2015 ("THE COURT: I thought I heard arguments from either you or Mr. Esserman or both, that the contention being made on the Plaintiffs' side is that the failure to deal with the ignition switches damaged the GM brand, and is some Court of competent jurisdiction then going to hear an argument that there are 70 million vehicles that lost value and not just the 27 million that are

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July
6   2015 Letter from King & Spaling LLP   Pg 46 of 126

Page 20

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

the subject of the recalls, or the lesser 13
million to which you just made reference?
[PL. COUNSEL]: I'm not counsel of record
there, but I guess I would be surprised if the
Plaintiffs in those actions aren't likewise
looking for recompense for the people
without ignition switch defects in their car,
on the theory, which may or may not be up-
held by Judge Furman ... as giving rise to
cognizable claims and causes of action.")
Though not mentioned by Plaintiffs' counsel
then, those claims were made with respect to
cars made by Old GM, *see, e.g.*, Consoli-
dated Amended Complaint for Post Sale
Vehicles ¶¶ 820–825, and thus were violative
of the Sale Order, to the extent it remains
enforceable.

FN7. ECF No. 12808.

In this Court, the first two groups of Plaintiffs,
whose issues the Court could consider on a common
set of stipulated facts and is in major respects consid-
ering together,[8] contend that by reason of Old GM's
failure to send out recall notices, they never learned of
the Ignition Switch Defect, and that the Sale Order is
unenforceable against them.

FN8. When they can be referred to together,
they are collectively referred to as the
"**Plaintiffs**." Their bankruptcy counsel, re-
tained and then designated to act for the large
number of plaintiffs whose counsel at least
generally litigate tort matters, rather than
bankruptcy issues, have been referred to as
"**Designated Counsel**." As the two groups of
Plaintiffs' circumstances overlap in part and
diverge in part, one brief was filed by Des-
ignated Counsel for Economic Loss Plain-
tiffs, and another by Designated Counsel for
Pre-Closing Accident Plaintiffs—with the
latter relying on the former's brief with re-
spect to overlapping themes. References to

"Pl. Br." are thus to the main brief filed by
the Economic Loss Plaintiffs' Designated
Counsel.

*Summary of Conclusions*

New GM is right when it says that most of the
claims now asserted against it are proscribed under the
Sale Order. But that is only the start, and not the end,
of the relevant inquiry. And assuming, as the Plaintiffs
argue, that Old GM's and then New GM's delay in
announcing the Ignition Switch Defect to the driving
public was unforgiveable, that too is only the start, and
not the end of the relevant inquiry.

The real issues before the Court involve questions
of procedural due process, and what to do about it if
due process is denied: (1) what notice was sufficient;
(2) to what extent an assertedly aggrieved individual's
lack of prejudice from insufficient notice matters; (3)
what remedies are appropriate for any due process
denial; and (4) to what extent sale orders can be
modified after the fact at the expense of those who
purchased assets from an estate on the expectation that
the sale orders would be enforced in accordance with
their terms. They also involve the needs and concerns
of Old GM creditors whose claims are pending, and of
holders of units of the Old GM General Unsecured
Creditors Trust ("**GUC Trust**"), formed for the ben-
efit of unsecured creditors when Old GM confirmed
its liquidating plan of reorganization (the "**Plan**")—all
of whom would be prejudiced if Old GM's remaining
assets were tapped to satisfy an additional $7 to $10
billion in claims.

For the reasons discussed at length below, the
Court concludes:

*1. Due Process*

Notice must be provided in bankruptcy cases, as
in plenary litigation, that is "reasonably calculated,
under all the circumstances" to apprise people of the
pendency of any proceeding that may result in their

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July
6   2015 Letter from King & Spaling LLP   Pg 47 of 126

Page 21

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

being deprived of any property, and to "afford them an opportunity to present their objections." [FN9] The Second Circuit, like many other courts, has held that "the Due Process Clause requires the best notice practical under the circumstances." [FN10] **\*524** But "actual" (*i.e.*, personalized) notice is required for "known" creditors—those whose names and addresses are "reasonably ascertainable." [FN11] "Constructive" notice (typically provided by publication) can be used when it is the best notice practical under the circumstances. But publication notice, as a substitute for actual notice, at least normally is insufficient for "known" creditors.

> FN9. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (" *Mullane* ") (citations omitted).

> FN10. *In re Drexel Burnham Lambert Grp.*, 995 F.2d 1138, 1144 (2d Cir.1993) (" *Drexel Burnham* "). The *Drexel Burnham* chapter 11 case generated several opinions relevant to this controversy. The Court has given another of them a different shorthand name to help tell it apart. *See* n.105 below.

> FN11. *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 800, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983) (" *Mennonite Board* ").

In the bankruptcy context, those general principles apply to both the notice required incident to sale approval motions, on the one hand, and to claims allowance, on the other. And in this case, the Court ultimately reaches largely the same conclusions with respect to each. But the different circumstances applicable to the sale process (to be completed before a grievously bleeding Old GM ran out of money) and the claims process (which lacked comparable urgency) cause the Court to reach those conclusions in different ways.

*(a) Notice Before Entry of Sale Order*

The Court disagrees with New GM's contention that imposing free and clear provisions doesn't result in a potential deprivation of property, and thus concludes that due process requirements apply. But the caselaw—in plenary litigation and in bankruptcy cases alike—permits, and indeed requires, consideration of practicality.

There was extraordinary urgency in connection with the 363 Sale. In June 2009, Old GM was bleeding cash at an extraordinary rate. And U.S. and Canadian governmental authorities, who had agreed to provide cash to keep Old GM alive until the closing of a 363 sale, had conditioned their willingness to continue the necessary funding on the approval of the 363 Sale by July 10, 2009, only 40 days after the chapter 11 filing.

Given that urgency, with the sale hearing to commence 29 days after the Petition Date; objections due 18 days after the Petition Date; and 70 million Old GM vehicles on the road, notice by publication to vehicle owners was obviously proper. Indeed, it was essential. It would be wholly unreasonable to expect actual notice of the 363 Sale hearing then to have been mailed to the owners of the 70 million GM cars on the road at the time, or even the 27 million whose cars were then (or later became) the subject of pending recalls. Though notice by publication would at least normally also be acceptable in instances involving considerably smaller bodies of creditors, this is exactly the kind of situation for which notice by publication is the norm. Under normal circumstances, notice by publication would easily be sufficient under *Mullane, Drexel Burnham,* and their respective progeny.

But the Court must also determine whether the knowledge of many Old GM personnel of the Ignition Switch Defect removes this case from the general rule. While there is no indication on this record, if there

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 48 of 126

Page 22

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

ever will be, that Old GM's bankruptcy counsel knew of the need to focus on notice to owners of cars with Ignition Switch Defects, at least 24 business and in-house legal personnel at Old GM were aware of the problem. As of June 2009, when entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required, under the National Traffic and Motor Vehicle Safety Act (the "Safety Act"), to send out mailed recall notices to owners of affected Old GM vehicles. And Old GM knew to *525 whom it had to mail the recall notices, and had addresses for them.

The adequacy of notice issue is nevertheless close, however, because while Old GM had a known recall obligation, and knew the names and addresses of those owning the vehicles that were affected, Old GM gave *actual* notice of the 363 Sale to anyone who had previously asserted a claim against it for injury or death by reason of Ignition Switch Defects or otherwise. And only a subset (and, possibly a small subset) of the others who were entitled to Ignition Switch Defect recall notices would later turn out to have been injured, killed, or economically damaged as a result of the circumstances that led to the recall, or want to object to the 363 Sale or any of its terms. That *some* of them would be killed or injured was known; *who they would be* was not.

But on balance the Court believes that the distinction is insufficient to be meaningful. The known safety hazard that engendered the unsatisfied recall obligations gave rise to claims associated with the repair (and assertedly, though this is yet to be decided, decreases in value) of the cars and would give rise to more claims if car occupants were killed or injured as a result. Old GM knew—even if it knew the particular identities of only *some* cars that had been in Ignition Switch Defect accidents – that the defect had caused accidents; that is exactly why this particular recall was required. And Old GM also knew, from the same facts that caused it to be on notice of the need for the recall, that *others,* in the future, would be in accidents as

well.

The publication notice here given, which otherwise would have been perfectly satisfactory (especially given the time exigencies), was not by itself enough for those whose cars had Ignition Switch Defects – because from Old GM's perspective, the facts that gave rise to its recall obligation resulted in "known" claims, as that expression is used in due process jurisprudence. Because owners of cars with Ignition Switch Defects received neither the notice required under the Safety Act nor any reasonable substitute (either of which, if given before Old GM's chapter 11 filing, could have been followed by the otherwise satisfactory post-filing notice by publication), they were denied the notice that due process requires.

### (b) Notice Before Expungement of Claims

By contrast to the 363 Sale, there was no particular urgency with respect to the allowance of claims. Claims could be (and ultimately were) considered in a less hurried fashion. And while notice only by publication to 70 million (or even 27 million) vehicle owners not known by Old GM to have been in accidents would be the norm for the claims process as well (and notice by publication, applicable in this respect and others, is what this Court then approved), the fact is that even at the later times set as deadlines for the filing of claims, Old GM still had not sent out notice of the recall, and Old GM car owners were still unaware of any resulting potential claims.

In the claims allowance respect too, the Court concludes that Old GM's knowledge of facts sufficient to justify notice of a recall, and its failure to provide the recall notice, effectively resulted in a denial of the notice due process requires.

### (c) Requirement for Prejudice

Though the Court has found failures, insofar as the Plaintiffs are concerned, to provide the notice that

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July
6   2015 Letter from King & Spaling LLP   Pg 49 of 126

Page 23

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

due process requires, that does not by itself mean that they have established a due process violation. The Court categorically rejects the Plaintiffs' contention that prejudice is irrelevant.*526 Rather, in order to establish a due process violation, they must demonstrate that they have sustained prejudice as a result of the allegedly insufficient notice.[FN12]

> FN12. *Perry v. Blum,* 629 F.3d 1, 17 (1st Cir.2010); *accord* all of the other cases cited in nn.162 through 164 *infra.*

In some instances, a lack of notice plainly results in prejudice, as in instances in which the earlier judicial action cannot be undone. In others, it does not   and it can be cured by providing the opportunity to be heard at a later time, and, where the law permits and requires, vacating or modifying the earlier order, or exempting parties from the order's effect. In every case, however, a denial of notice need not result in an automatic win for the party that failed to get appropriate notice the first time around. Instead that party should get the full and fair hearing it was initially denied, with the Court then focusing on the extent to which prejudice actually resulted and, of course, on achieving the right outcome on the merits, which in a perfect world would have been reached the first time.[FN13]

> FN13. That was referred to in oral argument here, initially by the Court, as a "do-over." In many, if not most, instances, that will be required, but in many, if not most, cases that will also be sufficient. What is critical, however, is that the Court gauge in a non-speculative fashion whether (and how) the outcome might have been different if the requisite notice had been provided.

Both groups of Plaintiffs were plainly prejudiced with respect to the bar date for filing claims. But the

Pre Closing Accident Plaintiffs were not prejudiced at all, and the Economic Loss Plaintiffs were prejudiced only in part, by the failure to give them the requisite notice in connection with the 363 Sale. Neither the Economic Loss Plaintiffs nor the Pre Closing Sale Plaintiffs were prejudiced with respect to the Sale Order's Free and Clear Provisions. Back in 2009, the Court heard many others make the same arguments, and rejected them. The Court now has heard from both the Economic Loss Plaintiffs and Pre Closing Accident Plaintiffs with respect to the Free and Clear Provisions and successor liability, with full and fair opportunity to be heard. And neither Plaintiff group has advanced any arguments on successor liability that were not previously made, and made exceedingly well before. Their principal contention   that they would have won by reason of public outrage, political pressure, or the U.S. Treasury's anger with Old GM, when they would not have won in the courtroom  is the very speculation that they rightfully criticize. Thus insofar as successor liability is concerned, while the Plaintiffs established a failure to provide them with the notice due process requires, they did not establish a due process violation. The Free and Clear Provisions stand.[FN14]

> FN14. They also stand with respect to a subset of Economic Loss Plaintiffs (the **"Used Car Purchasers"**) who acquired cars manufactured by Old GM in the aftermarket after the 363 Sale (*e.g.,* from their original owners, or used car dealers). They too were not prejudiced by the inability to make successor liability arguments that others made, and, in addition, they can have no greater rights than the original owners of their cars had.

But the Economic Loss Plaintiffs were prejudiced in one respect. Nobody else had argued a point that they argue now: that the proposed Sale Order was overly broad, and that it should have allowed them to assert claims involving Old GM vehicles and parts so

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 50 of 126

Page 24

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

long as they were basing their claims *solely on New GM* \*527 *conduct,* and not based on any kind of successor liability or any other act by Old GM. If the Economic Loss Plaintiffs had made that argument back in 2009, the Court would have agreed with them. And by contrast to their predictions as to possible results of public outrage, this is not at all speculative, since the Court had ruled on closely similar issues before, seven years earlier, and, indeed, again in that very same *Sale Opinion.* Here, by contrast, the failure to provide the notice that due process requires was coupled with resulting prejudice. The Economic Loss Plaintiffs were not furnished the opportunity to make the overbreadth argument back in 2009, and in that respect they were prejudiced. The failure to be heard on this latter argument necessarily must be viewed as having affected the earlier result.

Thus, with respect to Sale Order overbreadth, the Economic Loss Plaintiffs suffered a denial of due process, requiring the Court to then turn to the appropriate remedy.

*2. Remedies*

As noted above, the Court has rejected the Plaintiffs' contention that prejudice is irrelevant to a claim for denial of due process. And it has likewise rejected the notion that the denial of the notice that due process requires means that the Plaintiffs should automatically win. But to the extent they were prejudiced (and the Court has determined that the Economic Loss Plaintiffs *were* prejudiced with respect to Sale Order overbreadth), they deserve a remedy tailored to the prejudice they suffered, to the extent the law permits.

The Court rejects, for reasons discussed below, New GM's contention that the principles under which property is sold free and clear of liens, with the liens to attach instead to sale proceeds, apply universally to interests other than liens as relevant here, interests permitting the assertion of successor liability. But New GM's next several points that purchasers of assets acquire property rights too, and that taking

away purchasers' contractually bargained-for rights strikes at the heart of understandings critically important to the bankruptcy system have great merit. They have so much merit, in fact, that were it not for the fact that the Plaintiffs' claim is a constitutional one, the Court would not deny enforcement of the Sale Order, in whole or in part. There is no good reason to give creditors asserting successor liability claims recovery rights greater than those of other creditors. And as importantly or more so, the interests inherent in the enforceability of 363 orders (on which the buyers of assets should justifiably be able to rely, and on which the interests of creditors, keenly interested in the maximization of estate value, likewise rest) are hugely important.

But the Court concludes that remedying a constitutional violation must trump those concerns. Decisions of the Second Circuit and other courts hold, or suggest (with little in the way of countervailing authority), that with or without reliance on Fed. R. Civ. P. 60(b), lower courts may and should deny enforcement, against those who were prejudiced thereby, of even cherry-picked components of sale orders that have been entered with denials of due process. Those cases make clear that it is not necessary for a court to invalidate the sale order in full. That is so whether or not the Court declares the order, or part of it, to be "void." And if the order can be declared to be void (or if it can be selectively enforced, to avoid enforcing it against one denied due process), provisions in the order providing that it is nonseverable fall as well.

\*528 In the absence of a constitutional violation, the Court suspects that the power to deny full enforcement of a sale order (assuming that such is even permissible) will rarely, if ever, be invoked. The principles underlying the finality of 363 sale orders are much too important. But in cases where a sale order can be declared to be void (and orders entered without due process are subject to such a consequence), sale orders may be modified, or selectively enforced, as well.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 51 of 126

Page 25

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

### 3. Assumed Liabilities

In light of the Court's conclusions, summarized above, New GM's concerns as to the limited liabilities that New GM assumed are not as significant as they might otherwise have been. New GM is right that it expressly declined to assume any liabilities based on Old GM's wrongful conduct, and that these were "retained liabilities" to be satisfied by Old GM. But the Court's ruling that it will continue to enforce prohibitions against successor liability makes New GM's concerns as to that academic. And to the extent, if any, that New GM might be liable on claims based solely on any wrongful conduct on its own part (and in no way relying on wrongful conduct by Old GM), New GM would have such liability not because it had assumed any Old GM liabilities, or was responsible for anything wrong that Old GM did, but only because it had engaged in independently wrongful, and otherwise actionable, conduct on its own.

But it is plain that to the extent the Plaintiffs seek to impose successor liability, or to rely, in suits against New GM, on any wrongful conduct by Old GM, these are actually claims against Old GM, and not New GM. It also is plain that any court analyzing claims that are supposedly against New GM only must be extraordinarily careful to ensure that they are not in substance successor liability claims, "dressed up to look like something else." [FN15] Claims premised in any way on Old GM conduct are properly proscribed under the Sale Agreement and the Sale Order, and by reason of the Court's other rulings, the prohibitions against the assertion of such claims stand.

> FN15. Burton v. Chrysler Grp., LLC (In re Old Carco ), 492 B.R. 392, 405 (Bankr.S.D.N.Y.2013) (Bernstein, C.J.) (" Old Carco ").

### 4. Equitable Mootness

Because the successor liability claims start by being claims against Old GM, the Court also must consider the GUC Trust's concerns as to Equitable Mootness. The Court recognizes that mootness concerns will materially, if not entirely, impair the Plaintiffs' ability to collect on any allowed claims against Old GM (or more precisely, the GUC Trust) that they otherwise might have. But nevertheless, the Court concludes, contrary to its original instincts at the outset of this controversy, that the GUC Trust is right in its mootness contentions, and that the rights of GUC Trust beneficiaries cannot be impaired at this late time.

Mootness doctrine already made a return of past distributions from all of Old GM's many thousands of creditors unthinkable. But the Court, being mindful of the Second Circuit's holdings that mootness doctrine does not foreclose relief where *some* meaningful relief can be fashioned, originally thought that mootness concerns would not foreclose at least some relief—such as permitting the late filing of claims, and thereby permitting Economic Loss Plaintiffs to share in assets remaining in the GUC Trust. In the course of subsequent briefing, however, the GUC *529 Trust and its unit holders (the "**Unitholders**") pointed out (along with other reasons for denial of relief) that granting relief now to the Plaintiffs would require not just the allowance of late claims (which by itself would be acceptable), but also *the modification of the confirmation order*—and with it, impairment of the rights of the Unitholders, especially those who acquired those units in post-confirmation trading. Though late claims filed by the Plaintiffs might still be allowed, assets transferred to the GUC Trust under the Plan could not now be tapped to pay them. Under the mootness standards laid down by the Second Circuit in its leading decisions in the area,[FN16] GUC Trust Unitholders must be protected from a modification of the Plan.

> FN16. See Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. Official Comm. of Unsecured Creditors of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 52 of 126

Page 26

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

*LTV Steel Co. (In re Chateaugay Corp.)*, 988
F.2d 322 (2d Cir.1993) (" *Chateaugay I* ");
*Frito Lay, Inc. v. LTV Steel Co. (In re Cha-
teaugay Corp.)*, 10 F.3d 944 (2d Cir.1993) ("
*Chateaugay II* ); *Beeman v. BGI Creditors'
Liquidating Trust (In re BGI, Inc.)*, 772 F.3d
102 (2d Cir.2014) (" *BGI* ").

### 5. *Fraud on the Court*

Believing that rulings now might expedite or
moot further litigation down the road, the Court also
undertook to rule on the legal standards applicable to
litigation over whether, in connection with the entry of
the Sale Order, there might have been a fraud on the
Court. Though they become less important for reasons
discussed below, the Court provides them in Section
V.

Of the standards for establishing fraud on the
Court, discussed below, three are particularly relevant
here. One is that fraud on the court requires action that
does or attempts to defile the *court itself.* Another,
related to the first, is that establishing a fraud on the
Court requires defrauding the *court,* as contrasted to a
non-judicial victim (such as a vehicle owner). A third
is because it involves an effect on the Court (as con-
trasted to any injured third parties), it turns on the
knowledge and intent of *those actually interfacing
with the Court.* In each of those respects, and its ap-
plication otherwise, establishing a fraud on the Court
requires a knowing and purposeful effort to subvert
the judicial process.

### 6. *Certification to the Circuit*

The issues here are important, difficult, and in-
volve the application of often conflicting authority.
Their prompt determination will affect further pro-
ceedings not just in this Court, but also the MDL
Court. The Court believes that it should certify its
judgment for direct review by the Circuit.

*Facts* [FN17]

FN17. The Court asked the parties to agree
on stipulated facts, and they did so. By
analogy to motions for summary judgment,
the Court has relied only on undisputed facts.
To avoid lengthening this Decision further,
the Court has limited its citations to quota-
tions and the most important matters.

### *1. Background*

In late 2008 and the first half of 2009, Old
GM— then the only "GM"—was in extremis. As the
Court found in the *Sale Opinion,* Old GM had suffered
a steep erosion in revenues, significant operating
losses, and a dramatic loss of liquidity, putting its
future in grave jeopardy. It was bleeding cash at an
extraordinary rate.

Old GM was assisted in December 2008 by an
emergency infusion of cash by the Bush administra-
tion, and then again, in January and February 2009, by
two more emergency infusions of cash by the Obama
administration. But the latter declared *530 that its
financial support would last for only a limited period
of time, and that Old GM would have to address its
problems as a matter of great urgency.

In March 2009, the U.S. Treasury (**"Treasury"**),
whose Presidential Task Force on the Auto Industry
(**"Auto Task Force"**) was quarterbacking the rescue
effort, gave Old GM 60 days to submit a viable re-
structuring plan. Failure to accomplish that would
force Old GM to liquidate. But Old GM was unable to
achieve an out-of-court restructuring. It quickly be-
came obvious that Old GM's only viable option was to
file a chapter 11 case and to sell its assets through a
363 Sale, shed of the great bulk of its prepetition lia-
bilities. The acquirer ultimately became New GM.

The urgency at the time is apparent. The cash
bleeding was brutal; Old GM suffered negative cash
flow of $9.4 billion in the first quarter of 2009 alone.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July
6   2015 Letter from King & Spaling LLP   Pg 53 of 126

Page 27

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

[FN18] Without a very quick end to the bleeding, Old GM would plunge into liquidation. Apart from the loss to Old GM's creditors, Old GM's liquidation would result in the loss of over 200,000 jobs at Old GM alone, and grievous loss to the approximately 11,500 vendors, with more than 500,000 workers, in the Supplier Chain.[FN19] Liquidation would also result in virtually no recovery for any of Old GM's prepetition creditors – including Pre Closing Accident Plaintiffs and Economic Loss Plaintiffs before the Court now.

FN18. *Sale Opinion,* 407 B.R. at 476, 479.

FN19. *Id.* at 476, 477 n. 6. The Supplier Chain is the body of vendors that supply parts and subassemblies that go into the vehicles that are manufactured by the U.S. Big Three – GM, Chrysler, and Ford – and many of their foreign counterparts, at least those that manufacture vehicles in the U.S. The Court learned, in connection with the 363 Sale Hearing back in 2009, that the majority of the value that would go into a GM vehicle would in fact have come from the Supplier Chain.

## 2. Chapter 11 Filing

On June 1, 2009 (the "**Petition Date**") – 40 days prior to the deadline imposed under the critical DIP Financing – Old GM and three affiliates commenced these now jointly administered chapter 11 cases before this Court. That same day, Old GM filed the motion (the "**Sale Motion**") for authority to engage in the required 363 Sale.

## 3. The Sale Motion and Notice Order

In its Sale Motion, GM asked the Court to authorize the 363 Sale "free and clear of all other 'liens, claims, encumbrances and other interests,' including, specifically, 'all successor liability claims.' "

Specifically, GM submitted a proposed order to the Court (the "**Proposed Sale Order**") containing provisions directed at cutting off successor liability except in the respects where successor liability was contractually assumed. As the Court noted in 2009, the Proposed Sale Order would effectuate a free and clear sale through a double-barreled approach:

> First, the Proposed Sale Order contains a finding—and a decretal provision to similar effect—that the Debtors may sell the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability.

> Second, the Proposed Sale Order would enjoin all persons (including "litigation claimants") holding liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability, from asserting them against New GM or the Purchased Assets. [FN20]

FN20. *Sale Opinion,* 407 B.R. at 483 (internal citations omitted).

**\*531** Along with its submission of the Proposed Sale Order, GM moved for court approval of the sale procedures, and for an order fixing and approving the form and manner of notice. After hearing argument on the motion, the Court approved the sale procedures, and the next day entered an order laying out the procedures for the upcoming 363 Sale (the "**Sale Procedures Order**").

## 4. Notice of the Sale

As relevant here, the Sale Procedures Order provided for *actual* notice to 25 categories of persons and entities, including, among many others, all parties who were known to have asserted any lien, claim, encumbrance, or interest in or on the Purchased Assets; all vehicle owners involved in actual litigation with Old GM (or, who though not yet involved in actual litigation, had asserted claims or otherwise threatened to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July
6   2015 Letter from King & Spaling LLP   Pg 54 of 126

Page 28

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

sue); and all other known creditors. [FN21]

> FN21. *See* Sale Procedures Order ¶¶ 9(a)(i)
> through (xxv), 9(b)(i) through (ii) (ECF No.
> 274).

And the Sale Procedures Order additionally provided for constructive notice, by publication, in the *Wall Street Journal* (global edition); *New York Times* (national edition); *Financial Times* (global edition); *USA Today* (national edition); *Detroit Free Press*; *Detroit News*; in the Canadian *Le Journal de Montreal, Montreal Gazette, The Globe and Mail,* and *The National Post*; and on the website of Old GM's noticing agent, The Garden City Group. [FN22]

> FN22. *See id.* ¶ 9(e); *see also* New GM
> Stipulations of Fact ¶¶ 22 23 (ECF No.
> 12826 2).

The notice of hearing on the proposed 363 Sale ("**Sale Notice**") provided the general terms of the sale, including the date and location at which the sale was to occur, and instructions for those wishing to object or otherwise respond. The Sale Notice did not, however, attempt to describe the claims any recipient might have against Old GM, or any bases for objections to the sale or Proposed Sale Order that any notice recipient might wish to assert.

*5. Objections to Free and Clear Provisions*

Many of the 850 parties objecting to the Sale Motion made limited objections—not opposing the 363 Sale or its timing as such, but objecting instead to provisions in the Proposed Sale Order. They argued that New GM should assume certain kinds of claims; that the Free and Clear Provisions limiting successor liability were improper; or both. More specifically:

(a) Many of the states' Attorneys General ("**AGs**"), assisted in significant part by an attorney with the National Association of Attorneys' General

well known for her expertise in the interplay between bankruptcy law and states' regulatory needs and concerns, argued that New GM should assume consumer claims for implied, express, and statutory warranties. [FN23]

(b) Old GM's Official Committee of Unsecured Creditors (the "**Creditors' Committee**"), representing unsecured creditors of all types (including tort plaintiffs and other vehicle owners), objected to the Proposed Sale Order because (as the Creditors' Committee well understood) it would cut off state law successor liability and limit any current or future claimants to recovery from the *532 assets "left behind in the old company." [FN24]

(c) The Ad Hoc Committee of Consumer Victims (the "**Consumer Victims Committee**"); attorneys for individual accident litigants (the "**Individual Accident Litigants**"); attorneys for asbestos victim litigants (the "**Asbestos Litigants**"); and the Center for Auto Safety, Consumer Action, Consumers for Auto Reliability and Safety, National Association of Consumer Advocates, and Public Citizen (collectively, the "**Consumer Organizations**," and, together with the others, the "**Successor Liability Objectors**") likewise argued that Old GM could not sell its assets free and clear of any rights or claims based on successor or transferee liability. [FN25]

> FN23. *See* AGs Objections, ECF Nos.1926
> and 2043.

> FN24. Creditors' Committee Objection at 3
> (ECF No. 2362).

> FN25. *See* Successor Liability Objectors'
> Limited Obj. (ECF No.2041).

The Successor Liability Objectors argued that shedding potential successor liability was not permitted under Bankruptcy Code section 363(f). They fur-

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July 6   2015 Letter from King & Spaling LLP   Pg 55 of 126

Page 29

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

ther argued that section 363(f) "authorize[d] the sale of property free and clear only of 'interests in' property to be sold, not *in personam* claims against the Purchaser under theories of successor liability." [FN26] They further argued that the Court "lack[ed] jurisdiction to enjoin actions between non-debtor product liability claimants and the Purchaser post-closing since resolution of these claims [would] not affect the Debtors' estates." [FN27] And they argued that the Free and Clear Provisions would violate due process—asserting that individuals who might have future claims for injuries "cannot have received meaningful notice that the bankruptcy proceeding was resolving their rights or a meaningful opportunity to protect those rights, which otherwise might allow a state law cause of action for their injuries." [FN28]

> FN26. Successor Liability Objectors' Mem. of Law at 2 (ECF No.2050).

> FN27. *Id.*

> FN28. *Id.*

In the *Sale Opinion,* the Court considered, but ultimately rejected, those contentions and similar ones. Relying on, among other things, the then recent opinions by the Bankruptcy Court in *Chrysler* [FN29] (which had recently issued its own sale order with free and clear provisions); of the Second Circuit (which, three weeks before the Old GM 363 Sale hearing, affirmed the *Chrysler* decision for "substantially the same reasons articulated by the bankruptcy court" [FN30]); and earlier authority, [FN31] this *533 Court overruled the objections to the Free and Clear Provisions—determining, after lengthy analysis, that New GM should be protected against successor liability claims. [FN32]

> FN29. *See In re Chrysler LLC,* 405 B.R. 84 (Bankr.S.D.N.Y.2009) ( " *Chrysler* "), (Gonzalez, CJ.), *aff'd for substantially the*

*reasons stated in the opinions below,* No. 09–2311–bk (2d Cir. Jun. 5, 2009) ("*Chrysler Circuit Order*"), *temporary stay vacated and further stay denied,* 556 U.S. 960, 129 S.Ct. 2275, 173 L.Ed.2d 1285 (June 9, 2009), *Circuit written opinion issued,* 576 F.3d 108 (2d Cir. Aug. 5, 2009) (" *Chrysler Circuit Opinion* " ), *judgment vacated and case remanded with instructions to dismiss appeal as moot,* 558 U.S. 1087, 130 S.Ct. 1015, 175 L.Ed.2d 614 (Dec. 14, 2009).

> FN30. *See Chrysler Circuit Order.* The Circuit first issued a short written order, affirming for "substantially the reasons articulated by the Bankruptcy Court," *id.* and advising that its order would be followed by a written order more fully explaining the Circuit's ruling. The Circuit thereafter issued a lengthy opinion explaining its earlier ruling in great detail. *See Chrysler Circuit Opinion.* But about four months later, the Circuit's "judgment" was vacated by the United States Supreme Court with directions to dismiss the appeal as moot. What the Supreme Court meant by "judgment" in that context was not explained, but one can infer (though the Supreme Court did not explain this either) that the appeal was moot at the time the Circuit's written opinion was issued, since Chrysler's 363 sale had already closed. But even assuming that the controversy was moot by the time the Circuit issued the *Chrysler Circuit* written opinion), the controversy was not moot when the Circuit issued its initial affirmance order—the *Chrysler Circuit Order*—preceding the Chrysler 363 sale closing, upon which this Court also relied. And assuming, *arguendo,* that, by reason of these matters of timing, the Circuit's written *Chrysler Circuit Opinion* can no longer be regarded as binding on the lower courts in the Second Circuit (a matter this Court has no

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July
6   2015 Letter from King & Spaling LLP   Pg 56 of 126

Page 30

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

need to decide), the Court thinks the Circuit's written thinking on the subject should continue to be respected.

FN31. *See In re Trans World Airlines, Inc.,* 322 F.3d 283, 288 90 (3d Cir.2003); *United Mine Workers of Am.1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.),* 99 F.3d 573, 581 82 (4th Cir.1996).

FN32. *See Sale Opinion,* 407 B.R. at 499 506.

*6. Sale Agreement—Relevant Provisions*

The agreement under which the 363 Sale would take place, which had the formal name of "Amended and Restated Master Sale and Purchase Agreement," dated June 26, 2009 (often referred to by the parties as the "**ARMSPA**" but by this Court as the "**Sale Agreement**"), was originally filed with the Sale Motion on June 1, 2009. It was thereafter amended—in respects relevant here (1) to incorporate an agreement with the AGs under which New GM would assume liabilities under state Lemon Laws, and (2) to provide that New GM would assume responsibility for any and all accidents or incidents giving rise to death, personal injury, or property damage after the date of closing of the 363 Sale, irrespective of whether the vehicle was manufactured by Old GM or New GM.

The Sale Agreement, in its Section 2.3, listed liabilities that New GM would assume ("**Assumed Liabilities**"), on the one hand, and that Old GM would retain ("**Retained Liabilities**"), on the other. Those that would be assumed by agreement were listed in subsection (a); those that would be retained (which would cover everything else) were listed in subsection (b). As provided in subsection (a), Assumed Liabilities included:

(a) Claims for "**Product Liabilities**" (a term de-

fined in the Sale Agreement), with respect to which New GM would assume (but assume only) those that arose out of "accidents or incidents" [FN33] occurring on or after the Closing Date; [FN34]

**\*534** (b) Repairs or the replacement of parts provided for under the Glove Box Warranty; [FN35] and

(c) Lemon Law claims.[FN36]

And as noted in the Sale Decision, "an important change [ ] was made in the [Sale Agreement] after the filing of the motion" which broadened the Assumed Liabilities to include "*all* product liability claims arising from accidents or other discrete incidents arising from operation of GM vehicles occurring subsequent to the closing of the 363 Transaction, *regardless of when the product was purchased.*" [FN37]

FN33. The Court addressed the meaning of "incidents" in its decisions in *In re Motors Liquidation Co.,* 447 B.R. 142, 149 (Bankr.S.D.N.Y.2011) (Gerber, J.) (" *GM Deutsch* "), and *In re Motors Liquidation Co.,* 513 B.R. 467 (Bankr.S.D.N.Y.2014) (Gerber, J.) (" *GM Phaneuf* "). In *GM Deutsch,* the Court accepted the explanation proffered by New GM counsel in which he stated that the language was drafted to cover situations similar to accidents that might not be said to be accidents, such as a car catching on fire, blowing up, or running off the road—in each case where it could cause a physical injury to someone. 447 B.R. at 148 n. 20. In *GM Phaneuf,* the Court made reference to its earlier *GM Deutsch* ruling, describing it, in a parenthetical following the citation, as "construing the 'incidents' portion of the " 'accidents or incidents' language (in the context of claims against New GM by the estate of a consumer who had been in an accident before

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 57 of 126

Page 31

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

the 363 Sale, but died thereafter) as covering more than just "accidents," but covering things that were similar, such as fires, explosions, or other definite events that caused injuries and resulted in the right to sue"). 513 B.R. at 472 n. 17.

FN34. Sale Agreement § 2.3(a)(ix) (as amended) (ECF No. 2968 2). As a practical matter the great bulk of covered occurrences would be accidents. For brevity, except where quoting language that did not do likewise, the Court uses "**Accidents**" to cover anything within that category.

The "**Closing Date**" the date the 363 Sale closed, under the authority of the Sale Order turned out to be July 10, 2009.

FN35. Sale Agreement § 2.3(a)(vii). This is a duty to make, or cause to be made, the necessary repairs. It is not a monetary obligation. *See Trusky v. General Motors Co. (In re Motors Liquidation Co.),* 2013 Bankr.LEXIS 620, at *26, 2013 WL 620281, at *9 (Bankr.S.D.N.Y. Feb. 19, 2013) (Gerber, J.) (" *GM Trusky* ") ("Performance of repairs and needed adjustments is the exclusive remedy under this written warranty. What is recoverable, in substance, is specific performance of the repair or replacement obligation for otherwise qualifying defects.").

FN36. *See* Sale Agreement § 2.3(a)(vii). Lemon Law claims were added as an assumed liability during the course of the 363 Sale hearing after negotiation with the AGs. Additionally, and importantly here, New GM undertook to comply with its statutory recall obligations, even with respect to Old GM manufactured vehicles. Though to the extent these related to Old GM manufactured vehi-

cles, these might be thought of as Old GM liabilities to be assumed, they were not characterized as such. But the characterization doesn't matter; what is clear is that New GM agreed that it would be responsible for them.

FN37. 407 B.R. at 481 82 (emphasis in original).

But by contrast, the liabilities retained by Old GM—and not assumed by New GM—expressly included: (a) Product Liabilities arising in whole or in part from any Accidents, that happened *prior to* the Closing Date; [FN38] and (b) Liabilities to third parties for prepetition claims based on contract, tort, or any other basis.[FN39]

FN38. Sale Agreement § 2.3(b)(ix). The Pre Closing Accident Plaintiffs' claims are in this category.

FN39. Sale Agreement § 2.3(b)(xi). The Economic Loss Plaintiffs' Claims are in this category.

The Sale Agreement also required New GM to comply with recall obligations imposed by federal and state law, even for cars or parts manufactured by Old GM.[FN40]

FN40. *See* Sale Agreement § 6.15(a) ("From and after the Closing, Purchaser shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.").

09-50026-mg Doc 13330-1 Filed 07/29/15 Entered 07/29/15 17:13:50 Exhibit July 6 2015 Letter from King & Spaling LLP Pg 58 of 126

Page 32

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

*7. The Sale Order*

As previously discussed, the Court overruled objections to Free and Clear Provisions, and the Sale Order thus had five (somewhat duplicative) provisions, including injunctive provisions, protecting New GM from successor liability.

One provided, for example, that except for Assumed Liabilities, Old GM's assets were acquired "free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever [other than permitted liens], *including rights or claims based on any successor or transferee liability*," with "all such liens, claims, encumbrances, and other interests, *including rights or claims based on any succes***535** *sor or transferee liability*, [to] attach to the net proceeds" of the Sale.[FN41]

> FN41. Sale Order ¶ 7 (ECF No. 2968) (emphasis added).

Three others provided that "*no claims, other than Assumed Liabilities, will be assertable against the Purchaser* [New GM];"[FN42] that New GM would have no liability "*for any claim that arose prior to the Closing Date, relates to the production of vehicles prior to the Closing Date, or otherwise is assertable against the Debtors or is related to the Purchased Assets prior to the Closing Date*";[FN43] and that "*the Purchaser shall have no successor, transferee, or vicarious liabilities of any kind or character*."[FN44] And another included injunctive provisions barring assertion of successor liability claims.[FN45]

> FN42. *Id.* at ¶ 9(a) (reformatted for readability, emphasis added).

> FN43. *Id.* at ¶ 46 (reformatted for readability, emphasis added).

> FN44. *Id.* at ¶ 48 (reformatted for readability,

emphasis added).

> FN45. *Id.* at ¶ 8 (the "**Injunctive Provision**").

But tracking the language of the Sale Agreement, almost verbatim, the Sale Order imposed certain recall and other obligations on New GM in accordance with federal and state law, even with respect to parts and vehicles manufactured by Old GM:

> From and after the Closing, the Purchaser shall comply with the certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety Act, as amended and recodified, including by the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar Laws, in each case, to the extent applicable in respect of motor vehicles, vehicles, motor vehicle equipment, and vehicle parts manufactured or distributed by the Sellers prior to the Closing.[FN46]

> FN46. *Id.* at ¶ 17.

And the Sale Order also addressed severability: "The provisions of this Order are nonseverable and mutually dependent on each other."[FN47]

> FN47. *Id.* at ¶ 69.

*8. Matters After the Sale*

Upon the closing of the 363 Sale, New GM provided Old GM, as provided in the Sale Agreement, shares of New GM common stock and warrants (the "**New GM Securities**"), to be later distributed to Old GM creditors pursuant to a future plan.

In September 2009, about two months after the Sale was completed, the Court entered an order (the "**Bar Date Order**") establishing November 30, 2009, as the deadline (the "**Bar Date**") for proofs of claim to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July
6   2015 Letter from King & Spaling LLP   Pg 59 of 126

Page 33

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

be filed against Old GM, and approved the form and manner of notice of the Bar Date. The Bar Date Order allowed for publication notice to holders of unknown claims. The Plaintiffs here are among those who received publication notice only as to any claims they might have against Old GM.

In March 2011, Old GM filed the Plan, and without opposition anything like the opposition that the 363 Sale had engendered (though the opposition was sufficient to warrant a written opinion),[FN48] the Plan was confirmed. On March 29, 2011, the Court entered an order (the "**Confirmation Order**") confirming the Plan.

> FN48. *See In re Motors Liquidation Co.*, 447 B.R. 198 (Bankr.S.D.N.Y.2011) (Gerber, J.) (the " *Confirmation Decision* ").

\*536 The Plan became effective on March 31, 2011 (the "**Effective Date**"), and the Plan provided that it would be deemed substantially consummated as of the Effective Date. The parties have stipulated that the Plan has been substantially consummated.[FN49]

> FN49. Equitable Mootness Stipulated Facts ¶ 18 (ECF No. 12826–4); *see also Morgenstein v.Motors Liquidation Co. (In re Motors Liquidation Co.),* 462 B.R. 494, 501 n. 36 (Bankr.S.D.N.Y.2012) (Gerber, J.) (" *Morgenstein* ") ("[T]he Plan already has been substantially consummated."), *aff'd* 12–cv–01746 AJN, ECF No. 21 (S.D.N.Y. Aug. 9, 2012) (Nathan, J.).

*9. The GUC Trust and its Operation*

Among many other things, the Confirmation Order authorized the creation of the GUC Trust. Under the agreement by which the GUC Trust was formed (the "**GUC Trust Agreement**"), only certain categories of persons or entities were made beneficiaries. The GUC Trust Agreements limited GUC

Trust Beneficiaries to:

> (i) the holders of *allowed* general unsecured claims against Old GM that existed as of the Effective Date;

> (ii) the holders of claims asserted against Old GM that *were disputed* as of the Effective Date ("**Disputed Claims**") and *subsequently allowed* (collectively with claims that were allowed as of the Effective Date, "**Allowed Claims**"),

> (iii) the holders of potential general unsecured claims ("**JPMorgan Claims**") that might arise in connection with the GUC Trust's lien avoidance action relating to a mistakenly released financing statement; [FN50] and

> (iv) the holders of units of beneficial interest (each, a "**GUC Trust Unit**") [FN51] in the GUC Trust.

> > FN50. Before Old GM's Plan was confirmed, the Creditors' Committee brought an adversary proceeding seeking a determination that the principal lien securing a syndicated $1.5 billion term loan (the "**Term Loan**") that had been made to GM in November 2006 was terminated in October 2008, before the filing of GM's chapter 11 case – thereby making most of the $1.5 billion in indebtedness under the Term Loan unsecured. The defendants were the syndicate members who together made the Term Loan and JPMorgan Chase Bank, N.A. ("**JPMorgan**"), the agent under the facility. On cross-motions for summary judgment in that adversary proceeding, this Court ruled in favor of JPMorgan, but that decision, after an intermediate certification to the Delaware Supreme Court, was thereafter reversed by the Second Circuit and remanded to this Court. *See Official Comm. of Unsecured Creditors of Motors Liquidation Co. v.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 60 of 126

Page 34

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

*JP Morgan Chase Bank, N.A (In re Motors Liquidation Co.)*, 486 B.R. 596 (Bankr.S.D.N.Y.2013) (" *GM UCC 3 Opinion* "), *question certified for determination by Delaware Supreme Court*, 755 F.3d 78 (2d Cir.2014), *question answered*, 103 A.3d 1010 (Del.2014), *rev'd and remanded*, 777 F.3d 100 (2d Cir.2015), *rehearing en banc denied*, No.13-2187 ECF No. 179 (2d Cir. Apr. 13, 2015).

When Old GM's Plan was confirmed, after that adversary proceeding was commenced, the Creditors' Committee's right to pursue that litigation devolved to another trust created under the Plan—the "Avoidance Action Trust." Depending on the outcome of further litigation in this Court, it is possible that a portion (and perhaps a major portion) of the Term Loan Debt would have to be paid to the Avoidance Action Trust and then result in additional unsecured claims against the GUC Trust. *See* 486 B.R. at 615 n. 54 ("To the extent that the Committee might be successful in this adversary proceeding, the amount paid to JPMorgan and the Lenders would be subject to recapture, as provided in the final DIP Financing Order when the payoff of the Term Loan was authorized. In that event, after the return of the amount previously paid on what was thought to be a duly secured claim, the Lenders would still have a claim for the Term Loan debt, but would have only an unsecured claim, sharing *pari passu* with the many billions of dollars of other unsecured claims in GM's chapter 11 case.").

FN51. The GUC Trust Units are freely tradable. As reported by Bloomberg Finance, as of October 21, 2014, approximately 100 million GUC Trust Units had been bought and sold since June 14, 2012, and the aggregate value of those GUC Trust Units (based on daily closing prices) totaled approximately $2.1 billion.

*537 The GUC Trust Agreement also set forth provisions governing the GUC Trust's ability to distribute the New GM Securities and their proceeds (collectively, the "**GUC Trust Assets**"), which were intended to ensure that the Unitholders would receive, as promptly as practicable, any GUC Trust Assets that were not necessary to fund the Allowed Claims (or potential Allowed Claims); any additional JPMorgan Claims; or projected liquidation and administrative costs of the GUC Trust (collectively, the "**GUC Trust Liabilities**"), and that the GUC Trust would retain sufficient assets to fund those liabilities.

By January 2012, more than two years after the original Bar Date, many claims continued to be filed against Old GM. On January 1, 2012 (nearly a year after the Effective Date), the GUC Trust filed a motion (the "**Late Filed Claims Motion**") seeking an order disallowing late filed claims.[FN52] Under the requested order, any future late filed claims would be disallowed unless, among other things, the claimant filed a motion with the Court seeking permission to file a late proof of claim.

FN52. ECF No. 11351.

The Court granted the GUC Trust's Late Filed Claims Motion, and in February 2012, entered its order (the "**Late Filed Claims Order**") implementing that ruling.

The Late Filed Claims Order explicitly stated that "nothing in [the Late Filed Claims Order] shall prevent any claimant submitting a Late Claim from filing a motion with the Court seeking to have its Late Claim deemed timely filed." [FN53] Likewise, none of the Plan, Confirmation Order, and GUC Trust Agreement pro-

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July
6   2015 Letter from King & Spaling LLP   Pg 61 of 126

Page 35

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

hibited late filed claims. In two known instances, late filed claims have been allowed in the Old GM bankruptcy case both before and after the Effective Date. Under the Plan, a late filed proof of claim may be subsequently adjudicated as an Allowed General Unsecured Claim.

> FN53. Late Filed Claims Order at 2 (ECF No. 11394).

In April and May 2011, initial distributions—consisting of 75% of the New GM Securities, along with nearly 30 million GUC Trust Units—were made to those who had Allowed Claims as of the Effective Date. The only New GM Securities that were not distributed were those that could be necessary to fund GUC Trust Liabilities [FN54]—principally claims that as of that time had been neither allowed or disallowed, and administrative costs.

> FN54. Equitable Mootness Stipulated Facts ¶ 35 (ECF No. 12826-4).

Between May 2011 and the end of September 2014, the GUC Trust made distributions on formerly Disputed Claims that had thereafter been resolved. Similarly, in July and October 2011, and December 2013, the GUC Trust made additional distributions of New GM Securities—to the end that by September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities and nearly 32 million GUC Trust Units.

On October 24, 2014, the GUC Trust Administrator disclosed that it was planning on making still another distribution, scheduled for November 12, 2014. Shortly thereafter, certain Plaintiffs' counsel wrote the GUC Trust's counsel advising that Plaintiffs were "known potential contingent beneficiaries of the GUC Trust and the GUC Trust should not make any further distributions unless and until it demonstrates\*538 that adequate reserves ha[d] been estab-

lished with respect to Plaintiffs' potential claims against Old GM and/or the GUC Trust that could be in the multiple billions of dollars." [FN55] The next day, counsel for the GUC Trust Administrator replied that it would *not* establish reserves for the Plaintiffs' claims, and that it was going forward with the planned November 2014 GUC Trust Distribution. Plaintiffs chose, for admitted strategic reasons, [FN56] not to seek a stay of the GUC Trust's distributions.

> FN55. *See* ECF No. 13029, Exhibit A, at 3.

> FN56. *See* Day 1 Arg. Tr. at 112:13–16 ("yes, there was a strategic element to the decision that was taken on our side").

The GUC Trust Administrator then made that distribution, without establishing any reserves for the Plaintiffs' claims.

As of December 16, 2014, the GUC Trust had total assets of approximately $773.7 million, comprised principally of New GM Securities, though with approximately $64 million in commercial paper, demand notes, and cash equivalents. [FN57]

> FN57. *See* GUC Trust Q3 2014 Form 10-Q at 1, 12.

The GUC Trust Assets stand to be augmented upon allowance of any Plaintiffs' claims against Old GM and/or the GUC Trust through an "accordion feature" [FN58] in the Sale Agreement and any order by the Court requiring New GM to contribute more money or New GM Common Stock to the GUC Trust. [FN59]

> FN58. Under the Sale Agreement, New GM agreed to provide additional consideration to Old GM if the aggregate amount of Allowed General Unsecured Claims against Old GM exceeded $35 billion. *See* Equitable Moot-

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 62 of 126

Page 36

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

ness Stipulated Facts ¶ 5. In such case, New
GM is required to issue additional shares of
New GM Common Stock to the GUC Trust.
*Id.*

FN59. *See id.* ¶ 32.

*10. Knowledge of the Ignition Switch Defect*

In February and March of 2014, New GM in-
formed the Safety Administration of the Ignition
Switch Defect, and that a recall would be conducted to
address it. New GM does not contend, and there is no
evidence in the record from which the Court now
could find, that any Plaintiff knew of the Ignition
Switch Defect before New GM's announcement in the
Spring of 2014. But more than a few at Old GM knew
of it as of the time of Old GM's chapter 11 filing. The
parties stipulated that at least 24 Old GM personnel
(all of whom were transferred to New GM), including
engineers, senior managers, and attorneys, were in-
formed or otherwise aware of the Ignition Switch
Defect prior to the Sale Motion, as early as 2003.[FN60]

FN60. *See* Pl. Stipulated Facts ¶ 14 (ECF No.
12826 2).

New GM does not dispute that Old GM personnel
knew enough as of the time of Old GM's June 2009
bankruptcy filing for Old GM then to have been ob-
ligated, under the Safety Act, to conduct a recall of the
affected vehicles.[FN61]

FN61. *See id.; see also* Pl. Br. at 47; Day 1
Arg. Tr. at 91:1–18; Day 2 Arg. Tr. at
7:11–19, 13:5–10.

*11. The Motion to Enforce*

Very nearly immediately after New GM's Spring
2014 announcement, a large number of class ac-
tions the earliest Ignition Switch Actions were
commenced against New GM, asserting, among other
things, successor liability. In April 2014, New GM

filed the Motion to Enforce, contending that most of
the claims in the *539 Ignition Switch Actions related
to vehicles or parts manufactured and sold by Old
GM, and that the Sale Order's Free and Clear Provi-
sions, and injunctions against successor liability,
proscribed such claims. In August 2014, New GM
filed similar motions to enforce the Sale Order against
the Pre-Closing Accident Plaintiffs and the
Non-Ignition Switch Plaintiffs, though the latter is on
hold pending the rulings here.

In June 2014, the Judicial Panel on Multidistrict
Litigation established MDL 2543 and designated the
United States District Court for the Southern District
of New York as the MDL court, assigning Judge
Furman to oversee coordinated proceedings for the
actions assigned to the MDL. New GM has stated in
its Reply that "[t]here are over 140 class action law-
suits currently pending against [it], with more being
filed."[FN62] The Court understands the great bulk of
these to involve economic loss claims.

FN62. New GM Reply at 45.

At an August 11, 2014 case management con-
ference in MDL 2543, it was determined that certain
plaintiffs' counsel who had been designated to take the
lead in MDL 2543 ("**Lead Counsel**") would file a
consolidated master complaint for all economic loss
actions. This Court then adjusted the briefing and
argument of the issues here to take into consideration
any claims added or dropped in MDL 2543. In Octo-
ber 2014, Lead Counsel filed two Consolidated
Complaints, each seeking class action treatment. The
first referred to by many as the "Pre-Sale Consoli-
dated Complaint" seeks damages from New GM on
behalf of class members who purchased vehicles with
an Ignition Switch Defect (which necessarily would
have been manufactured by Old GM) *before* the
closing of the 363 Sale.[FN63]

FN63. These would all be barred under the

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 63 of 126

Page 37

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

Sale Order, to the extent it is enforceable.

The second referred to by some as the "Post Sale Consolidated Complaint"—seeks relief on behalf of class members who had purchased vehicles *after* the closing of the 363 Sale.[FN64]

> FN64. Some of these would be barred under the Sale Order and some would not, depending on whether the vehicle acquired after the 363 Sale had been previously manufactured by Old GM, or had Old GM parts.

## 12. The Threshold Issues

After this Court held conferences with the parties to establish means to most efficiently litigate the issues here, the parties identified, at the Court's request, four threshold issues for judicial determination. They were:

Whether Plaintiffs' procedural due process rights were violated in connection with the Sale Motion and the Sale Order and Injunction, or alternatively, whether Plaintiffs' procedural due process rights would be violated if the Sale Order and Injunction is enforced against them (the "**Due Process Threshold Issue**");

If procedural due process was violated as described in (a) above, whether a remedy can or should be fashioned as a result of such violation and, if so, against whom (the "**Remedies Threshold Issue**");

Whether any or all of the claims asserted in the Ignition Switch Actions are claims against the Old GM bankruptcy estate (and/or the GUC Trust) (the "**Old GM Claim Threshold Issue**");[FN65] and

*540 If any or all of the claims asserted in the Ignition Switch Actions are or could be claims against the Old GM bankruptcy estate (and/or the GUC Trust), should such claims or the actions asserting

such claims nevertheless be disallowed/dismissed on grounds of equitable mootness (the "**Equitable Mootness Threshold Issue**").[FN66]

The Court also asked for briefing on the legal standards that would apply to any claims asserting Fraud on the Court, and announced that it would rule on those as well.[FN67]

> FN65. They agreed, however, that the issue of whether a claim asserted in the Ignition Switch Actions would be timely and/or meritorious against the Old GM bankruptcy estate (and/or the GUC Trust) is not a Threshold Issue.

> FN66. *See* Supplemental Scheduling Order, dated Jul. 11, 2014, ECF No. 12770. Though the Threshold Issues were first identified before the Consolidated Complaints were filed, nobody has suggested that what has been pleaded in the Consolidated Complaint requires any change in the Threshold Issues.

> FN67. *Id.*

The Court addresses those issues, in some instances breaking them down further and restating them slightly to conform to a more appropriate framework, in the discussion to follow.

## Discussion

### I.

### Due Process

The Due Process Threshold Issue requires the Court to decide, with respect to the Sale Order, whether

(1) as New GM contends and the Plaintiffs dispute, insufficient notice of the 363 Sale hearing could not result in a deprivation of due process (principally because any successor liability claims

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 64 of 126

Page 38

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

would belong to the Old GM estate, and not to the
Plaintiffs, and because the Plaintiffs' rights would
attach to the sale proceeds), as there would not be
the requisite potential deprivation of property;

(2) as the Plaintiffs contend and New GM dis-
putes, the Plaintiffs failed to get the notice due
process requires (and related to that, whether the
Plaintiffs had "known claims" as that expression is
used in the due process jurisprudence); and

(3) as New GM contends and the Plaintiffs dis-
pute, prejudice is an essential element of any claim
for a denial of due process, and the Plaintiffs failed
to show the requisite prejudice here, with respect to
all or some of their claims.

After the Court does so, it then must decide the
extent to which the Sale Order remains subject to
attack, and any areas as to which the Plaintiffs, or
some of them, may potentially qualify for a remedy.
The Court also believes that it should address these
same issues with respect to the allowance of Plaintiff
claims against Old GM, from which their successor
liability contentions emanate, and which cannot ap-
propriately be divorced from any due process analysis.
Discussion of these matters follows.

*A.*
*Underlying Principles*

*1. Mullane*

All parties, appropriately, begin with the Supreme
Court's decision in *Mullane* which Plaintiffs de-
scribe as "the seminal Supreme Court case establish-
ing due process requirements for creditors in a bank-
ruptcy proceeding." [FN68] They are right to start with
*Mullane*; it is the seminal Supreme Court opinion
clarifying what due process requires in litigation. But
it was *541 not a bankruptcy case.[FN69] In *Mullane*, the
Supreme Court held that a statute authorizing notice
by publication of a proposed judicial settlement of a
"common trust," holding the assets of 113 smaller

trusts, failed to satisfy due process requirements for
the trust's known beneficiaries.[FN70] The common trust
had "many" beneficiaries.[FN71] But despite that (and
even though the statute authorized service by publi-
cation), the Court found that because the trustee,
Central Hanover Bank & Trust Company (the "**Trust
Company**"), seeking the judicial settlement of the
trust for which it was responsible, could with due
diligence ascertain their names and addresses, they
were entitled to mailed notice of the settlement.

FN68. Pl. Br. at 27.

FN69. Nevertheless, considerable authority,
by the Second Circuit and other circuit
courts, holds, not surprisingly, that due pro-
cess requirements apply in bankruptcy cases,
just as they do in plenary litigation. *See, e.g.,
DPWN Holdings (USA), Inc. v. United Air
Lines, Inc.,* 747 F.3d 145, 150 (2d Cir.2014)
(Newman, Pooler, and Livingston, JJ) ("
*DPWN* ") ("[A] claim cannot be discharged if
the claimant is denied due process because of
lack of adequate notice."); *In re
Johns Manville Corp.,* 600 F.3d 135,
153 54 (2d Cir.2010) *(per curiam* ) (" *Man-
ville 2010,*" sometimes also referred to as "
*Manville II* ") (Calabrese and Wesley, JJ)
(ruling that due process was denied in dispute
over whether an earlier bankruptcy court
order in a chapter 11 case properly enjoined
not only claims directed at Travelers insur-
ance policies in the *res* of the Manville estate,
but also non-derivative claims by Chubb that
sought to impose liability on Travelers sep-
arately); *Koepp v. Holland,* 593 Fed.Appx.
20 (2d Cir.2014) (Summary Order,
Katzmann, CJ, and Hall and Livingston, JJ)
(" *Koepp* ") (ruling that due process was de-
nied in dispute over easements on land pre-
viously owned by a debtor reorganized under
§ 77 of the now-superseded Bankruptcy Act);
*Chemetron Corp. v. Jones,* 72 F.3d 341, 346

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 65 of 126

Page 39

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

n. 1 (3d Cir.1995) (" *Chemetron* ") ("Although *Mullane* involved the notice due beneficiaries on judicial settlement of accounts by the trustee of a common trust fund, subsequent courts have interpreted the case to set the standard for notice required under the Due Process Clause in Chapter 11 bar date cases."); *In re Edwards,* 962 F.2d 641 (7th Cir.1992) (" *Edwards* ") (considering due process contentions by a secured creditor whose interest was extinguished in a free and clear section 363 sale without notice, though ultimately ruling in favor of a bona fide purchaser).

FN70. *See Mullane,* 339 U.S. at 320, 70 S.Ct. 652 ("We hold the notice of judicial settlement of accounts required by the New York Banking Law § 100 c(12) is incompatible with the requirements of the Fourteenth Amendment as a basis for adjudication depriving known persons whose whereabouts are also known of substantial property rights.").

FN71. *Id.* at 309, 70 S.Ct. 652. But the Plaintiffs exaggerate, however, when they assert that the *Mullane* court ruled as it did notwithstanding the "very large" number of beneficiaries involved. Pl. Br. at 27. Actually, the *Mullane* court said that "the record [did] not show the number or residence of the beneficiaries," 339 U.S. at 309, 70 S.Ct. 652, though it also said that there were 113 contributing trusts, with aggregate assets of about $3 million. *Id.* A $3 million trust corpus was a bigger number in 1950 than it is now, but the likely number of individuals having interests in the 113 contributing trusts whose collective assets led to that $3 million corpus would at least seemingly be many orders of magnitude smaller than the huge number of vehicle owners here — of 27 mil-

lion cars with Ignition Switch Defects and of 70 million on the road. That and the fact later mentioned by the *Mullane* court that mailed notices had been sent to ascertainable beneficiaries in the past, which was "persuasive" as to the Trust Company's ability to mail notice there, *see* 339 U.S. at 319, 70 S.Ct. 652, suggests that the number to be given mailed notice there, while relatively large, was much less than huge, most likely in the thousands (and perhaps low thousands), rather than tens of millions.

[1][2]In reaching that result, the *Mullane* court started with the recognition that while "[a] construction of the Due Process Clause which would place impossible or impractical obstacles in the way could not be justified," the Court would have to "balance" against that interest an *542 individual's right to be heard.[FN72] It continued by observing that while it "ha[d] not committed itself to any formula" in achieving that balance, "a few general principles stand out in the books." [FN73] One was that:

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.[FN74]

Others were that "[t]he notice must be of such nature as reasonably to convey the required information ... and it must afford a reasonable time for those interested to make their appearance." [FN75]

FN72. *Id.* at 313–14, 70 S.Ct. 652.

FN73. *Id.* at 314, 70 S.Ct. 652.

FN74. *Id.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 66 of 126

Page 40

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

FN75. *Id.*

The *Mullane* court qualified its statement of those general requirements, however, by including an element of practicality:

> But if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met the constitutional requirements are satisfied. The criterion is not the possibility of conceivable injury, but the just and reasonable character of the requirements, having reference to the subject with which the statute deals.[FN76]

> > FN76. *Id.* at 314–15, 70 S.Ct. 652 (internal quotation marks deleted).

And once again recognizing the need for practicality, it stated that

> [t]he reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected, or, *where conditions do not reasonably permit such notice,* that the form chosen is not substantially less likely to bring home notice than other of the *feasible* and customary substitutes.[FN77]

> > FN77. *Id.* at 315, 70 S.Ct. 652 (emphasis added) (citations omitted).

The *Mullane* court expressly endorsed the use of publication when it would not be practical to provide better notice:

> This Court has not hesitated to approve of resort to publication as a customary substitute in another class of cases where it is not reasonably possible or practicable to give more adequate warning. Thus it has been recognized that, in the case of persons missing or unknown, employment of an indirect and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights.

> Those beneficiaries represented by appellant whose interests or whereabouts could not with due diligence be ascertained come clearly within this category. As to them the statutory notice [*i.e.,* notice by publication] is sufficient. However great the odds that publication will never reach the eyes of such unknown parties, it is not in the typical case much more likely to fail than any of the choices open to legislators endeavoring to prescribe the best notice practicable.[FN78]

> > FN78. *Id.* at 317, 70 S.Ct. 652 (citations omitted).

In a later post-*Mullane* decision,[FN79] the Supreme Court reiterated this.

> In the years since *Mullane* the Court has adhered to these principles, balancing*543 the "interest of the State" and "the individual interest sought to be protected by the Fourteenth Amendment." The focus is on the reasonableness of the balance, and, as *Mullane* itself made clear, whether a particular method of notice is reasonable depends on the particular circumstances.[FN80]

> > FN79. *Tulsa Prof'l Collection Servs., Inc. v. Pope,* 485 U.S. 478, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988) (" *Tulsa Collection Services* ").

> > FN80. *Id.* at 484, 108 S.Ct. 1340.

Thus it is hardly surprising that the Supreme Court has also stated, albeit in a different context (there, deciding the extent of the hearing required before a revocation of a former inmate's parole), that "[i]t has been said so often by this Court and others as

["

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 68 of 126

Page 42

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

the Circuit observed in *Drexel Burnham* that "[n]o rigid constitutionally mandated standard governs the contents of notice in a case like the one before us. Rather, the Due Process Clause requires the *best notice practical under the circumstances*." [FN87] And once again citing *Mullane,* the Circuit continued that "the Supreme Court has warned against interpreting this notice requirement so inflexibly as to make it an 'impractical or impossible obstacle [ ].' " [FN88]

> FN87. *Drexel Burnham,* 995 F.2d at 1144 (citing *Mullane* ) (emphasis added).

> FN88. *Id.* (once again citing *Mullane* ). With a *cf.,* the Circuit also cited, and quoted, a considerably older Supreme Court decision, *Grannis v. Ordean,* 234 U.S. 385, 395, 34 S.Ct. 779, 58 L.Ed. 1363 (1914), quoting the earlier opinion's observation that the Due Process Clause "does not impose an unattainable standard of accuracy."

Similarly, in its 2014 decision in *DPWN,*[FN89] the Second Circuit reiterated that "whether notice comports with due process requirements turns on the *reasonableness* of the notice, a *flexible* standard that often turns on what the debtor or the claimant knew about the claim or, with reasonable diligence, should have known." [FN90]

> FN89. 747 F.3d 145.

> FN90. *Id.* at 150 (citing *Mullane* and *Chemetron* ) (emphasis added).

[4]Like *Weigner* before it (where the notice had also been mailed), *Drexel Burnham* was a *quality* of notice case, rather than a *means* of notice case.[FN91] Nevertheless, its direction that notice must be "*appropriate to the nature of a given case* " [FN92] was not limited to cases of the first type. And *Mullane,* the opinion on which the *Drexel Burnham* court relied,

was a case of the second type. For each of those reasons, along with common sense, the Court reads the Circuit's *Drexel Burnham* directions that "the Due Process Clause requires the best notice practical under the circumstances," [FN93] and that the notice requirement should not be interpreted "so inflexibly as to make it an 'impractical or impossible obstacle' " [FN94] each of which was derived by citing *Mullane* as applicable to cases involving either the *means* or the *quality* of any notice whose adequacy is questioned.

> FN91. It considered whether the duly mailed notice was still insufficient, because it didn't tell creditors enough. In that respect, *Drexel Burnham* considered a contention like the Pre-Closing Accident Plaintiffs' assertions here that "Old GM did not disclose the existence of the Ignition Switch defect in the Sale Motion or in the Sale Notice mailed to Pre Closing Accident Plaintiffs that had already sued Old GM" (Pre-Closing Accident Pl. Br. at 9) and "[t]he notice that Old GM provided with respect to the 363 Sale was constitutionally deficient ... regardless of whether the notice was mailed directly to the Plaintiff or published in the newspaper." (*Id.* at 26; accord *id.* at 29).

> FN92. 995 F.2d at 1144.

> FN93. *Id.*

> FN94. *Id.*

**\*545** Then, though it involves a materially different factual situation, the Circuit's decision in *DPWN* is nevertheless significant in several respects. *DPWN* was an antitrust case, but with a bankruptcy discharge defense. The plaintiff there, the well-known courier DHL, which used United Airlines for cargo delivery services, sued United under the Sherman Act,

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 69 of 126

Page 43

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

alleging price-fixing. United had been reorganized in a chapter 11 case in Chicago, at the conclusion of which it received a discharge of its debts, and moved to dismiss the antitrust action under Rule 12(b)(6), relying on its earlier discharge.[FN95]

> FN95. *See* 747 F.3d at 147.

DHL (which had earlier received mailed notice in the bankruptcy of the opportunity to file claims, but without particularized mention of United's susceptibility to antitrust claims) had anticipated the discharge defense, and proactively pleaded a potential basis for avoiding it— that it lacked sufficient notice of the availability of its antitrust claim to satisfy due process requirements for rendering that claim discharged. The District Court, taking that allegation as true, declined to dismiss at that state of the proceedings. But the Circuit remanded, considering the allegation to be too conclusory to pass *Iqbal*[FN96] scrutiny, and directed the District Court to conduct further inquiry as to whether it was supportable. More specifically, the Circuit remanded for District Court inquiry as to *DHL's* knowledge of its potential antitrust claim during United's chapter 11 case, and *United's* knowledge with respect to a DHL claim.[FN97]

> FN96. *See Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

> FN97. *See* 747 F.3d at 153.

[5] *DPWN* also suggests two other concerns that turn out not to be determinative in this case, but that may well be important in others. First, it suggests (if it does not also require) a two-step methodology that should be used, to the extent applicable, in examining contentions that the notice that due process requires was denied. The first step calls for inquiry as to whether the *claimant* knew of the claim it might assert.[FN98] The second step calls for the lower court to determine whether the claim was, from the perspective

of the *notice-giver* (often a debtor in a bankruptcy case), a "known" claim, obligating the notice-giver to provide actual, and possibly more detailed, notice.[FN99]

> FN98. This Court said "to the extent applicable," however, because here New GM does not contend that any of the Plaintiffs knew of the Ignition Switch Defect, or had the means to ascertain it. Thus all parties here, and the Court, go straight to the second step.

> FN99. That "known claim" second step, of course, is one of the most important elements of this Court's inquiry here.

[6][7]The second is a hint that in some cases, it may be the *quality*— as contrasted to the *means*— of notice that matters. That might suggest that even if the means of notice were entirely satisfactory (as it obviously was when DHL received *mailed* notice of the bankruptcy and of the deadline to file claims), notice lacking the requisite quality might nevertheless warrant relief. And this suggests that *notice of the bankruptcy* is not enough, or even the *deadline for the filing of claims* — and that assuming that the debtor has knowledge of the existence of the claim (which debtors will typically have in the case of contractual obligations but typically won't have with respect to non-contractual ones), something more detailed in the way of notice might have to be provided.[FN100]

> FN100. Importantly, however, the *DPWN* court did not do away with the "known" claim requirement. And that is understandable. Unless the debtor knew of the claim or could reasonably ascertain its existence (a task that is particularly challenging for non-contractual obligations), the debtor could not provide sufficiently detailed notice, and the bankruptcy system could not operate. Debtors (with resulting prejudice to their genuinely known creditors) would be subject to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 70 of 126

Page 44

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

extraordinary expense and uncertainty in trying to think up, and explain in sufficient detail, claims that potential creditors might assert. They would be uncertain whether all of their claims could actually be discharged. And the process would be particularly fraught with peril under the rushed circumstances that typify section 363 sales. Though the *DPWN* court did not lay it down as a legal principle, it made another very important observation as to claims that are known and those that are not. It observed that "a debtor will normally be less likely to be charged with knowledge that it has violated the law than that it owes money unrelated to a law violation." 747 F.3d at 151. That is equally true with respect to many types of tort liabilities, especially product liability claims. Both violations of law and tort liabilities present challenges in knowing of the existence of the claim that are quite different from those in knowing of contractual obligations or transactions (such as the granting of liens or easements) involving earlier grants of property interests.

*546 *3. Guidance from Lower Courts*

Courts below the Circuit level likewise have been sensitive to the need for practicality and flexibility in due process analysis. In *Affirmance Opinion # 2,* referred to by several parties in their briefs as " *Parker,*" on one of the appeals from the *Sale Decision,* Judge Sweet considered a number of objections by appellant Oliver Parker, a bondholder, claiming that the 363 Sale violated his due process rights. Before rejecting Parker's contentions, Judge Sweet synthesized the underlying law, making reference to *Mullane* and *Morrissey* in the Supreme Court, and *Drexel Burnham* in the Circuit:

The U.S. Supreme Court has repeatedly emphasized the flexibility of the due process requirement, which simply "calls for such procedural protections as the

particular situation demands." An "elementary and fundamental requirement of due process ... is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." In short, the constitutional requirements of due process are satisfied if notice is given with "due regard for the practicalities and peculiarities of the case." [FN101]

> FN101. *Affirmance Opinion # 2,* 430 B.R. at 97 (citations omitted).

[8]Thus New GM is right when, quoting *Mullane* and *Affirmance Opinion # 2,* it argues that "[d]ue process is a flexible standard." In fact, New GM's point that due process is "flexible" comes verbatim from the Supreme Court's opinion in *Morrissey,*[FN102] and also appears in so many words in *DPWN*[FN103] But as *Morrissey* also at least implies, the caselaw does not support a wholly standardless flexibility.[FN104] Other authority— especially authority addressing the "known"-"unknown" claim distinction discussed in the subsection that follows— rather suggests a standard requiring a fairly thoughtful, and sometimes nuanced, consideration of the circumstances,*547 to ascertain whether any failure to provide better notice (either more direct or more detailed) can appropriately be excused.

> FN102. *See* 408 U.S. at 481, 92 S.Ct. 2593 ("It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands.").

> FN103. *See* 747 F.3d at 150.

> FN104. *See* 408 U.S. at 481, 92 S.Ct. 2593 ("To say that the concept of due process is flexible does not mean that judges are at large

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 71 of 126

Page 45

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

to apply it to any and all relationships. Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure.").

*4. The "Known"-"Unknown" Creditor Distinction*

Apart from focusing on the practicality of requiring notice by one means or another, and of one argued level of detail or another, a court also has to focus on whether providing notice to one particular person or entity, or group of such, is required in the first place. As an abstract matter, that latter issue turns on whether those to be noticed (which in bankruptcy most commonly are creditors and those with ownership or security interests in estate property) are "known," on the one hand, or "unknown," on the other.[FN105] Stating the distinction is easy; applying it is much more difficult.

FN105. *See, e.g., Chemetron,* 72 F.3d at 347 ("As characterized by the Supreme Court, a 'known' creditor is one whose identity is either known or 'reasonably ascertainable by the debtor.' An 'unknown' creditor is one whose 'interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor].'") (citations omitted); *In re Drexel Burnham Lambert Grp.,* 151 B.R. 674, 680 (Bankr.S.D.N.Y.1993) (Conrad, J) (" *Drexel Burnham Bankruptcy* ") ("For purposes of determining constitutionally acceptable notice of an impending bar date, bankruptcy law divides creditors into two groups: known and unknown. According to well-established case law, due process requires that a debtor's known creditors be afforded actual notice of the bar date ... For obvious reasons, debtors need not provide actual notice to unknown creditors. It is widely held that unknown

creditors are entitled to no more than constructive notice (i.e., notice by publication) of the bar date.") (citations omitted).

In many cases, whether the notice recipient would want the right to file a claim or to be heard—and hence is "known" is obvious. In others, as here, it is much less so. Caselaw, at the Supreme Court and, especially, in the lower courts, has provided some guidance in this area. But it has been less than totally helpful.

Mullane, which was decided 65 years ago, did not yet make a "known"-"unknown" distinction, nor did it yet use the expression "reasonably ascertainable," which later became the standard, as discussed below. But *Mullane* did say—apart from saying that actual notice wasn't required for those whose interests were "conjectural"[FN106]—that actual notice was not required for those who, "although they could be discovered upon investigation, do not in due course of business come to knowledge of the common trustee."[FN107] That is plainly a rejection of a duty of investigation. But it is less helpful when the notice-giver has considerable knowledge, but lacks knowledge of every detail.

FN106. 339 U.S. at 317, 70 S.Ct. 652. "Conjectural" has since been joined by "conceivable" and "speculative." *See In re Thomson McKinnon Sec., Inc.,* 130 B.R. 717, 720 (Bankr.S.D.N.Y.1991) (Schwartzberg, J.) (" *Thomson McKinnon*"); *In re XO Comme'ns, Inc.,* 301 B.R. 782, 793 (Bankr.S.D.N.Y.2003) (Gonzalez, C.J.) (" *XO Communications*") (quoting *Thomson McKinnon* ). With each of those three words, the idea is the same; many claims are *possible,* but to be known they must be much more than that.

FN107. 339 U.S. at 317, 70 S.Ct. 652.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July 6    2015 Letter from King & Spaling LLP    Pg 72 of 126

Page 46

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

[9]The standard was clarified somewhat thereafter. In its 1983 decision in *Mennonite Board,* a post-*Mullane* opinion (though once again in a non-bankruptcy context), the Supreme Court held that notice by mail or by other means "as certain to ensure actual notice" was required if the name and address of the entity to be notified was "reasonably ascertainable." [N108] *548 But the *Mennonite Board* court did not flesh out the standards in determining what the "reasonably ascertainable" standard required  concluding only that when the name of the mortgagee and its county in Ohio were shown on the underlying mortgage, but the mortgagee's full mailing address was not, [N109] the "reasonably ascertainable" requirement was satisfied, and actual notice was required. [N110]

> FN108. 462 U.S. at 800, 103 S.Ct. 2706. In a dissent in which Justices Powell and Rehnquist joined, Justice O'Connor argued for a more flexible standard (and hence a greater willingness to accept notice by publication), considering it a departure from the "balancing required by *Mullane.*" *Id* at 806, 103 S.Ct. 2706. But this view secured only three votes.

> FN109. *See id.* at 798 n.4, 103 S.Ct. 2706; *id.* at 805, 103 S.Ct. 2706 (dissent).

> FN110. Without stating in so many words that it would embody the standard, the *Mennonite Board* court said in a footnote that "[w]e assume that the mortgagee's address could have been ascertained by reasonably diligent efforts." 462 U.S. at 798 n. 4, 103 S.Ct. 2706. But it did not say whether, in determining whether a claimant's interest or address was "reasonably ascertainable," how much in the way of "diligent efforts" was required, or what would happen if efforts were insufficiently diligent.

Likewise, in *Tulsa Collection Services,* [N111] another nonbankruptcy post- *Mullane* decision about five years after *Mennonite Board,* the Supreme Court repeated that if a claimant's identity was "known or reasonably ascertainable," actual notice was required. [N112] But once again, the Court did not flesh out the standards for "reasonably ascertainable," and on the record there presented, simply remanded for a factual determination as to that issue. [N113]

> FN111. *See* n. 79 *supra.*

> FN112. 485 U.S. at 490, 108 S.Ct. 1340. Conversely, the Court made clear that actual notice need not be provided to claimants who are *not* actually known or "reasonably ascertainable." In fact, speaking of the other extreme, it stated:

>> Nor is everyone who may conceivably have a claim properly considered a creditor entitled to actual notice. Here, as in *Mullane,* it is reasonable to dispense with actual notice to those with mere "conjectural" claims. *Id*

> FN113. *Id.* at 491, 108 S.Ct. 1340 ("Appellee of course was aware that her husband endured a long stay at St. John Medical Center, but it is not clear that this awareness translates into a knowledge of appellant's claim. We therefore must remand the case for further proceedings to determine whether "reasonably diligent efforts," would have identified appellant and uncovered its claim.") (citation omitted).

However lower courts have addressed the applicable standards more extensively than the Supreme Court did. In its 1995 decision in *Chemetron,* the Third Circuit provided more guidance, focusing in particular on the opposite extreme. After reading the

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 73 of 126

Page 47

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

language in the *Mennonite Board* footnote quoted above to say that a creditor's identity is "reasonably ascertainable" if that creditor can be identified through "reasonably diligent efforts," the *Chemetron* court went on to say that "[r]easonable diligence does not require 'impracticable and extended searches ... in the name of due process.' "[FN114] And it stated further that:

> The requisite search instead focuses on the debtor's own books and records. Efforts beyond a careful examination of these documents are generally not required. Only those claimants who are identifiable through a diligent search are "reasonably ascertainable" and hence "known" creditors.[FN115]

FN114. 72 F.3d at 346.

FN115. *Id.* at 347. The *Chemetron* court emphasized, however, that while some courts had held, regardless of the circumstances, that the "reasonably ascertainable" standard would require only an examination of the debtor's books and records, without an analysis of the specific facts of each case, it did not construe the standard that narrowly. It pointed out that situations could arise when creditors are "reasonably ascertainable" although not identifiable through the debtor's books and records. *Id.* at n. 2.

**\*549** Importantly, the *Chemetron* court declined to apply a "reasonably foreseeable" standard that had appeared in dictum in an earlier case in this District[FN116] finding insufficient a contention that "Chemetron knew or should have known that it was reasonably foreseeable" that it could suffer claims from individuals living near the debtor's waste dump.[FN117] The *Chemetron* court explained:

> In the instant case, the bankruptcy court failed to apply the "reasonably ascertainable" standard. It instead crafted a "reasonably foreseeable" test from

dictum in *In re Brooks Fashion Stores, Inc.,* 124 B.R. 436 (Bankr.S.D.N.Y.1991). In applying this test, the bankruptcy court found that "Chemetron knew or should have known that it was reasonably foreseeable that it could suffer claims from individuals living near the Bert Avenue Dump...." It therefore found that claimants were known creditors.

We hold that in substituting a broad "reasonably foreseeable" test for the "reasonably ascertainable" standard, the bankruptcy court applied an incorrect rule of law. This constitutes clear error. The bankruptcy court's expansive test departed from established rules of law and produced a result in conflict with other decisions. Even if we were writing on a blank slate, we would reject the bankruptcy court's expansive standard. Put simply, such a test would place an impossible burden on debtors.[FN118]

FN116. *See In re Brooks Fashion Stores, Inc.,* 124 B.R. 436 (Bankr.S.D.N.Y.1991) (Blackshear, J.) (" *Brooks Fashion Stores* ")

FN117. 72 F.3d at 347.

FN118. *Id* (citations omitted).

To the contrary, the *Chemetron* court held that "[a] debtor does not have a 'duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it," and that what is required "is not a vast, open-ended investigation."[FN119] Applying these standards, the Third Circuit rejected the contention that though the debtor could reasonably *foresee* that parties present in the immediate vicinity of its toxic waste dump would have toxic tort claims against it, their claims would thereby become "known." As a result, it ruled, publication notice was sufficient.

FN119. *Id* at 346.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 74 of 126

Page 48

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

Since then, *Chemetron*, rather than *Brooks Fashion Stores*, has been followed in this District [FN120] and elsewhere. [FN121] In *550 his 2003 decision in *XO Communications*, Chief Judge Gonzalez cited *Brooks Fashion Stores* for a different proposition, but relied on *Chemetron* for the latter's rejection of the "reasonably foreseeable" standard. And fleshing out the standards further, Judge Gonzalez quoted another decision in the *Drexel Burnham* chapter 11 case:

Reasonable diligence in ferreting out known creditors will, of course, vary in different contexts and may depend on the nature of the property interest held by the debtor. Applying *Mullane's* "reasonable under the circumstances" standard, due process requires a reasonable search for contingent or unmatured claims so that ascertainable creditors can receive adequate notice of the bar date. What is reasonable depends on the particular facts of each case. A debtor need not be omnipotent or clairvoyant. A debtor is obligated, however, to undertake more than a cursory review of its records and files to ascertain its known creditors. [FN122]

FN120. *See XO Communications*, 301 B.R. at 793 (citing *Chemetron* as "emphasizing that claimants must be reasonably ascertainable, not reasonably foreseeable").

FN121. *See Louisiana Dep't of Envtl. Quality v. Crystal Oil Co. (In re Crystal Oil Co.)*, 158 F.3d 291, 297 (5th Cir.1998) (" *Crystal Oil* "). In *Crystal Oil*, the Fifth Circuit affirmed a bankruptcy court's order declining to allow an environmental agency's late filing of a claim, even though the environmental agency had received notice only by publication. Though the "evidence could go either way," see *id.* at 298, the bankruptcy court's determination that the environmental claim was not "reasonably ascertainable" was held not

to be clearly erroneous. Though Crystal Oil had dealt with environmental agencies in the past, including this one, the Fifth Circuit held that there could be "no basis for concluding that a debtor is required to send notices to any government agency that possibly may have a claim against it." *Id.* at 297. And it further held that even though the Louisiana Department of Environmental Quality had a telephone call with an individual at Crystal Oil discussing the particular polluted site with which it later would assert a claim, and Crystal looked up its records and erroneously concluded that it had no relationship with the property (because the records that would confirm ownership were "ancient ones in long-term storage"), the environmental agency was not a "reasonably ascertainable," and hence "known," creditor. *See id.* at 297 98. In articulating the standard, the Fifth Circuit stated that "[a]s we read these cases, in order for a claim to be reasonably ascertainable, the debtor must have in his possession, at the very least, some specific information that reasonably suggests both the claim for which the debtor may be liable and the entity to whom he would be liable." *Id.* at 297.

FN122. 301 B.R. at 793 94 (*quoting Drexel Burnham Bankruptcy*, 151 B.R. at 681).

[10]The takeaway from the cases discussing the general principles helping courts decide what are "known" and "unknown" claims is that the debtor must make effective use of the information already available, but the fact that additional claims may be "foreseeable" does not make them "known." Then, in each case, the Court must determine on which side of the line the facts before it fall.

B.
*The Particular Issues Here*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 75 of 126

Page 49

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

*1. Do Due Process Requirements Apply?*

[11]New GM argues preliminarily that due process requirements did not apply to the 363 Sale at all, because this Court's earlier bar to successor liability did not result in a deprivation of property. The Court cannot agree.

New GM premises that argument on five separate contentions:

(1) that in most 363 sales (including this one), claims or interests would attach to the sale proceeds, and thus that there is no extinguishment of a property right;

(2) that there was no extinguishment of a property right, because any successor liability claims really belonged to the Old GM estate;

(3) that section 363(f) of the Bankruptcy Code preempts—*i.e.*, trumps—state laws imposing successor liability;

(4) that the Court already ruled that there was no continuity of ownership between purchaser and seller, and thus no basis for successor liability; and

(5) that there could be no successor liability anyway for Economic Loss Plaintiffs, because, unlike accident victims, they would not get the benefit of the "product line exception."

The Court finds these preliminary contentions unpersuasive.

*551 New GM is right when it says that in bankruptcy sales—either from the start or by agreement to resolve objections—creditors with security interests or other liens regularly get substitute liens on sale proceeds when estate property subject to their liens is sold to a third party, and that the bankruptcy community regularly regards that as a fair substitute.

But comparable protection often cannot be provided for claims or interests other than liens. And here that comparable protection could not effectively be obtained.[FN123] Neither back in 2009, nor in 2011 when Old GM's plan was confirmed, did anyone suggest that Old GM's product liability creditors became secured creditors—the natural corollary of New GM's position. They were ordinary members of the unsecured creditor class, sharing in the proceeds of the 363 Sale in accordance with the usual bankruptcy priorities waterfall.[FN124] That would not, of course, make a sale free and clear of successor liability claims improper. But it likewise does not make it true that the Economic Loss Plaintiffs asserting successor liability claims would have "no property interest that was extinguished," as argued by New GM,[FN125] and thus no interests at stake and no interest in being heard. Rather, the Economic Loss Plaintiffs would have the same interest in being heard as the accident victims who likewise wanted to (and did) oppose successor liability. The Court ultimately overruled the latter's objections on the merits, but there never was any doubt that they had a right to be heard.

> FN123. Thus Judge Posner, speaking for the Seventh Circuit in *Edwards, see* n.69 *supra,* was correct when he observed that the failure to give a lien creditor notice of a section 363 sale resulted in no more than a *de minimis* deprivation of property, since the value of the secured creditor's interest in the property (*i.e.,* the value of its lien) was no more than the value of the property, and the sale proceeds were the best measure of that. *See* 962 F.2d at 645 ("[secured creditor] Guernsey does not suggest that the property was worth more than the $85,000 that the bankrupt estate received for selling it—and if it was worth no more Guernsey suffered only a trivial loss of interest (the interest on $7,000 during the period it was in the hands of the trustee) as a result of the failure to notify it of the sale."). But as this Court explained in the

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 76 of 126

Page 50

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

*Sale Opinion*, see 407 B.R. at 501, "we know that 'interest' includes more than just a lien." Because estate property can be sold free and clear of many types of claims and interests apart from liens, it would at least generally be inappropriate to apply *Edwards*-style analysis to claims and interests other than liens whose value is capped at the value of the property sold (and hence the available sale proceeds).

For that reason, although the Court agrees with nearly all of the analysis in *In re Paris Indus. Corp.*, 132 B.R. 504 (D.Me.1991) (Hornby, J.) (" *Paris Industries* ") (a non-lien case in which plaintiffs were enjoined from asserting successor liability in a tort action against an estate's assets' purchaser, and where the court concluded that "the liquidation of the assets and their replacement with cash (which was then apparently distributed to a secured creditor) has not affected [the plaintiffs'] ability to recover on their claim," *id.* at 510), the Court agrees with the portion it has just quoted only in part. The *Paris Industries* plaintiffs might have recovered more from the purchaser if their successor liability theory survived and prevailed. But this Court agrees with the next observation made by the *Paris Industries* court, pointing to a different kind of lack of prejudice—"[t]he irony of [the plaintiffs'] argument is that they would not even be able to make their claim against [the purchaser] were it not for the sale, for it is only by the sale of assets and the doctrine of successor liability that they can even assert such a claim." *Id.* There, as here, the plaintiffs would have received no more in a liquidation.

FN124. *See* Plan at §§ 1.79, 4.3 (ECF No.

9941 1).

FN125. *See* New GM Reply at 36.

The Court also cannot agree with New GM's second contention in this regard—that successor liability claims did not really **\*552** belong to the Economic Loss Plaintiffs and Pre Closing Accident Plaintiffs who might wish to assert them, but were actually claims owned by Old GM. Though New GM offers caselaw support that at first blush supports its position, New GM's contention sidesteps the basic fact that a prepetition right that the Plaintiffs had to at least try to sue a successor was taken away from them, without giving them a chance to be heard as to whether or not that was proper.

New GM relies on three cases in support of its contention: *In re Keene Corp.*,[FN126] *In re Emoral, Inc.*,[FN127] (which heavily relied on *Keene* ), and *In re Alper Holdings USA*.[FN128] Each of *Keene* and *Alper Holdings*, in this Court's view, was properly decided; *Emoral*, a 2–1 decision with a cogently articulated dissent by Judge Cowen, probably was not. But whether or not all were properly decided, none supports the conclusion, which New GM asks the Court to reach, that tort litigants' interest in pursuing successor liability was so minimal that they didn't even have a right to be heard.

FN126. *Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844 (Bankr.S.D.N.Y.1994) (Bernstein, C.J.) (" *Keene* ").

FN127. 740 F.3d 875 (3d Cir.2014), *cert. denied,* U.S. —, 135 S.Ct. 436, 190 L.Ed.2d 328 (2014) (" *Emoral* ").

FN128. 386 B.R. 441 (Bankr.S.D.N.Y.2008) (Lifland, C.J.) (" *Alper Holdings* ").

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 77 of 126

Page 51

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

*Keene*, the first of the three, involved approximately 1,600 lawsuits by asbestos plaintiffs who at least arguably had claims against the debtor Keene. But their rights to recover against the debtor were impaired when Keene transferred over $200 million of its assets to its then affiliates during the 1980s and then spun off the affiliates.[FN129] Not surprisingly, the transfer and spin-off triggered fraudulent conveyance claims, initially brought prepetition. In those same prepetition actions, asbestos plaintiffs also brought claims against the transferees, asserting successor liability and tort liability based on piercing the corporate veil.[FN130]

FN129. *See* 164 B.R. at 846.

FN130. *See id.* at 847-48.

Thereafter, Keene filed a chapter 11 case. Judge Bernstein granted the Keene estate's motion for an injunction blocking the continued prosecution of those actions, concluding that they were violative of section 362(a)(1) of the Code, which bars, among other things, the continuation of suits to recover on claims against the debtor that arose before the filing of the bankruptcy case.[FN131] He noted that the fraudulent conveyance claims became the estate's claims to prosecute under section 544 of the Code, and reasoned, properly, that "the Wrongful Transfer Claims should be asserted, in the first instance, by Keene or any other estate representative designated for that purpose."[FN132] He likewise blocked the asbestos plaintiffs' efforts to go after the defendants on corporate veil piercing and successor tort liability theories, noting that the thrust of those actions would be to "subject all of the assets of these non-debtor defendants to the claims of Keene's creditors."[FN133] Even with respect to the successor liability claims, he read them as a species of fraudulent transfer claim,[FN134] with the purpose of increasing the assets of the estate as a whole to satisfy the claims of the creditor community as a *553 whole.[FN135]

FN131. *See id.* at 848-49; *accord id.* at 850.

FN132. *Id.* at 849.

FN133. *Id.* at 850.

FN134. *Id.* at 853.

FN135. *Id.* ("In any event, the remedy against a successor corporation for the tort liability of the predecessor is, like the piercing remedy, an equitable means of expanding the assets available to satisfy creditor claims. The class action plaintiffs that invoke it allege a *general* injury, their standing depends on their status as creditors of Keene, and their success would have the effect of *increasing the assets available for distribution to all creditors.* For the same reasons stated with respect to the piercing claims, claims based upon successor liability should be asserted by the trustee on behalf of all creditors.") (emphasis added).

Given the asbestos plaintiffs' effort in *Keene* to recover assets that should have been recovered for the benefit of all (and, notably, the transfer of their litigation rights to the estate under section 544), Judge Bernstein's ruling in *Keene* was plainly correct. But in *Emoral,* which followed and heavily relied on *Keene,* the distinction between a benefit to all and a benefit to individual creditors seeking to impose successor liability was blurred – and it was this blurring that triggered Judge Cowen's dissent, and, in this Court's view, the greater persuasiveness of Judge Cowen's view.

*Emoral* involved a prepetition sale of assets from a company (known most commonly as Palorome International, but later renamed Emoral) that manufactured diacetyl, a chemical used in the food flavoring industry that was the subject of many toxic tort

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 78 of 126

Page 52

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

suits. Emoral later filed for bankruptcy protection, and disputes arose between the Emoral estate's trustee and the buyer of the assets, a company called Aaroma including, most significantly, claims by the trustee that the prepetition asset sale had been a fraudulent transfer. The trustee and Aaroma settled those disputes; as part of the settlement, the trustee agreed to release Aaroma from any causes of action that were property of the Emoral estate. But at the bankruptcy court hearing considering the propriety of the settlement, the trustee's representative stated that any successor liability claims against Aaroma didn't belong to the Emoral estate, and that the trustee therefore couldn't release them.[FN136] Aaroma's counsel argued that whether or not the diacetyl plaintiffs' causes of action were property of the estate (and therefore covered by the release) was not an issue before the bankruptcy court at that time, and the approval order was modified to provide, in substance, that nothing in the approval order or the underlying sale agreement would operate as a bar to prosecution of any claims that weren't property of the Emoral estate.[FN137]

FN136. 740 F.3d at 877.

FN137. *Id.*

Thereafter, plaintiffs asserting diacetyl injury claims sued Aaroma, arguing for successor liability and citing the trustee's remarks that their claims didn't belong to the estate, and that the estate couldn't release them. In a 2-1 decision (and disagreeing with the Bankruptcy Court, which had held to the contrary), the *Emoral* majority held, relying heavily on *Keene,* that the claims did in fact belong to the estate, and that Aaroma was thus protected. The two judges in the majority did so based on their view that as a legal matter, the claim for successor liability was for the benefit of all of the estate's creditors. But they did not, so far as this Court can discern, parse the plaintiffs' complaint to focus on what the plaintiffs were actually asking for, to see if that was actually true. Judge

Cowen, dissenting (who agreed with the conclusion of the Bankruptcy Court), found the majority's mechanical approach troublesome for several reasons, most significantly because the majority failed to consider, as a factual *554 matter, what he considered to be critical whether plaintiffs bringing the diacetyl claims would be suing for themselves or for the benefit of all.[FN138]

FN138. *See id.* at 885-86 & n. 1.

The third case, *Alper Holdings,* offered by New GM with a "*See also,* " involved an objection to claims. Somewhat like *Emoral* (though *Emoral* involved successor liability claims, rather than alter ego claims) *Alper Holdings,* decided by Chief Judge Lifland, involved an issue as to whether alter ego claims had been previously released by the estate.[FN139] As in all of these cases, the focus was on whether the injury was to creditors as whole or only to particular ones. And as Judge Bernstein had done in *Keene,* and as Judge Cowen dissenting in *Emoral* did (and as his colleagues should have done), Judge Lifland looked, as a factual matter, to the nature of the successor liability claims, to see if they were asserted for the benefit of all of the estate's creditors or only to particular ones.[FN140]

FN139. *See* 386 B.R. at 446.

FN140. *See id.* ("[I]t was clear based upon the conduct alleged by the Holt Plaintiffs that such alter ego claims were of a generalized nature and did not allege a 'particularized injury' specific only to the Holt Plaintiffs. Accordingly, this Court held that such alter ego claims were in fact property of Saltire's bankruptcy estate and were, therefore, released under section 13.1 of the Saltire Plan.").

Importantly, none of *Keene, Emoral,* or *Alper*

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 79 of 126

Page 53

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

*Holdings* involved a 363 sale, nor considered the rights of plaintiffs to be heard before a free and clear order was entered. And for that reason, they are not as important as they might otherwise appear at first blush. But on the principle for which they are cited—that taking away the right to sue on a successor liability theory isn't a deprivation of property from the person who might wish to sue—they are at best irrelevant to New GM's position and at worst harmful to it. Each of *Keene, Alper Holdings* and Judge Cowen in *Emoral* focused on whether the particular successor liability action sought to recover for the benefit of all, on the one hand, or to secure a private benefit, on the other. [FN141] If it is the latter, a party at risk of losing that private benefit deserves the opportunity to be heard.

> FN141. In that connection, the Plaintiffs point to a 2013 decision of the Second Circuit, *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54 (2d Cir.2013) (" *Madoff*"). *Madoff* is not as closely on point as the Plaintiffs suggest, as it was a *Wagoner* Rule *in pari delicto* case; it involved neither a 363 sale nor claims of successor liability. Nevertheless, the Plaintiffs properly observe (Pl. Br. at 36 n.44) that *Madoff* focused, as a factual matter, on whether the underlying creditor claims, in the *in pari delicto* context, were personal to the creditor or really belonged to the debtor corporation, and it tends to undercut New GM's position in that regard. *See* 721 F.3d at 70 (rejecting the trustee's contention that he could bring claims against third party financial institutions because his "claim [was] a general one, with no particularized injury arising from it," and that the claims against the financial institutions were "common to all customers because all customers were similarly injured by Madoff's fraud and the Defendants' facilitation").

[12]As the Court noted in oral argument, [FN142] theories of successor liability, when permissible, permit a claimant to assert claims not just against the transferor of the assets, but also against the transferee; they provide a second target for recovery. Here the Plaintiffs have not purported to sue for the benefit of Old GM creditors generally; they have instead sued to advance their own, personal, interests. They have not asked New GM to *555 make a payment to Old GM; they want New GM's money for themselves. Taking away the right to recover from that additional defendant (where such a right otherwise exists under the law of those states that permit such) may easily be understood as a matter of bankruptcy policy, and the supremacy clause, but it nevertheless represents a taking of rights from the perspective of the tort plaintiff who loses the right to sue the successor.

> FN142. *See* Day 1 Arg. Tr. at 41.

New GM's last three reasons for why Plaintiffs would not have any due process rights at all require considerably less discussion. As the third of its five reasons, New GM argues that section 363(f) of the Bankruptcy Code prevails over state laws imposing successor liability. That is true, but that is why New GM should *win on the merits.* It does not justify denying those who might wish to argue otherwise the opportunity to be heard.

[13]As the fourth of its five reasons, New GM argues that the Court already ruled that there was no continuity of ownership between purchaser and seller, and thus no basis for successor liability. Once again that is true, but it was done before the Plaintiffs had appeared in the case. The Court cannot rely on conclusions it reached in a hearing to which the Plaintiffs were not invited as a basis for retroactively blessing the failure to invite them.

As the fifth of its five reasons, New GM argues that there could be no successor liability anyway for

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 80 of 126

Page 54

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

Economic Loss Plaintiffs, because, unlike accident victims, they would not get the benefit of the "product line exception." That too might be true (though it could vary depending on the particular state whose law would apply), but it once again goes to the merits not the Plaintiffs' rights to be heard before successor liability claims were barred.

For these reasons, the Court concludes that the Plaintiffs were entitled to due process in the context of each of the sale and claims processes requiring the Court then to consider whether they received it.

*2. Notice by Publication*
[14]Having determined that the Plaintiffs did have due process rights, the Court must determine whether those rights were violated. The first (though not last) issue in that inquiry is whether notice by publication to owners of Old GM vehicles not known by Old GM to have been in accidents was, as a general matter, constitutionally sufficient. It plainly was.

[15]As noted above, the Second Circuit has held that the proper inquiry on a due process contention is whether the noticing party (here Old GM) [FN143] "acted reasonably in selecting means likely to inform persons affected...." [FN144] The notice required is that "appropriate to the nature of a given case," [FN145] and "*the best notice practical under the circumstances.*" [FN146] The very reason why property is sold under section 363, and not under a reorganization plan, is because time and liquidity constraints*556 do not permit a more leisurely process. [FN147]

> FN143. The Court is not persuaded by New GM's contention that because it was Old GM and not New GM that may have provided insufficient notice, New GM should not be penalized for that. It is the possible failure to provide requisite notice and not who was responsible for it that results in the need for the Court to take judicial action. The poten-

tial constitutional violation must trump determinations of fault and New GM's contractual rights.

FN144. *Weigner,* 852 F.2d at 649.

FN145. *Drexel Burnham,* 995 F.2d at 1144.

FN146. *Id.* at 1144 (citing *Mullane* ) (emphasis added).

FN147. It should go without saying that the urgency of the situation is a hugely important factor in determining what is the best notice practical under the circumstances. Exemplifying this is *Pearl Phil GMT (Far East) Ltd v. Caldor Corp. (In re Caldor Corp.),* 266 B.R. 575 (S.D.N.Y.2001) (Casey, J.) (" *Caldor District* "), *aff'g In re Caldor Corp.,* 240 B.R. 180 (Bankr.S.D.N.Y.1999) (Garrity, J.) (" *Caldor Bankruptcy* "). There Judge Casey of the District Court, affirming an order of Judge Garrity of this Court, rejected contentions by the appellant that it had been denied due process when it failed to get notice in advance of Judge Garrity's order (in the face of Caldor's inability to continue in business during the course of its chapter 11 case) authorizing the prompt wind-down of Caldor's business operations and restraining payment on anything more than a pro-rata basis, of administrative claims that had accrued before the time of that order. *See* 266 B.R. at 579, 583. Judge Casey applied the Second Circuit's *Weigner* test of whether the noticing party "acted reasonably," as contrasted to whether there was actual receipt of notice. And recognizing that Caldor was faced "with the formidable task of providing notice to approximately 35,000 entities," *id* at 583, and that the record was "replete with evidence as to Caldor's dire financial cir-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July
6   2015 Letter from King & Spaling LLP   Pg 81 of 126

Page 55

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

cumstances," *id.* at n. 5, he found Caldor's actions "reasonable given the circumstances under which it was operating." *Id* at 583.

Actual notice to those in the 27 categories above resulted in mailed notice of the 363 Sale to over 4 million people and entities [FN148] including any known by Old GM to have been in accidents. But given the urgency of GM's circumstances, it would be wholly unreasonable to expect individual mailed notice of the 363 Sale hearing to go to the owners of the approximately 70 million GM cars then on the road, or even the approximately 27 million whose cars were then (or later became) the subject of pending recalls.

> FN148. *See* Davidson Decl. ¶ 5, New GM Appx. of Exh. 1 (ECF No. 12982 1).

This is exactly the kind of situation for which notice by publication would be the norm. Old GM's counsel could hardly be faulted for availing itself of that approach. Under normal circumstances, notice by publication to Old GM vehicle owners describing the upcoming sale and the fact that New GM would be assuming only very limited types of Old GM liabilities would be the only kind of notice that would be practical under circumstances like these, and would easily meet the Supreme Court's and the Second Circuit's requirements.

*3  Known Claim Analysis*

[16]But Old GM's ability to provide notice by publication, rather than actual notice, rests on the premise that those who received publication notice only did not have "known" claims. For that reason, both sides debate at length whether owners of cars with Ignition Switch Defects but who had neither been in accidents of which Old GM was aware, nor sued Old GM or manifested any intent to sue were "reasonably ascertainable (and thus "known") creditors, on the one hand, or no more than "foreseeable" (and thus "unknown") creditors on the other.

That question is close. It is true, as New GM argues, that Old GM sent out actual notice of the 363 sale (and later, of the Bar Date) to anyone who had sued it or manifested a possible intention to sue, and that all or nearly all of those with Ignition Switch Defects were not yet in that category. It also is true that sending out notice of a recall is not the same as expecting to be sued; that not all recalls are the same in terms of the risk of resulting death or injury; and indeed that many (and perhaps most) recalls might not result from the risk of death or injury at all.

*557 But it is also true that at least 24 Old GM engineers, senior managers and attorneys knew of the Ignition Switch Defect and the need to send out recall notices and of the reasons why recall notices had to go out, here. And it is uncontroverted that Old GM had enough knowledge of the Ignition Switch Defect to be required, under the Safety Act, to send out mailed recall notices to owners of affected Old GM vehicles, and knew the names and addresses to whom it had to send them. On balance the Court concludes that by reason of the knowledge of those 24 individuals, the owners of cars with Ignition Switch Defects had "known" claims, from Old GM's perspective, as that expression is used in the due process jurisprudence.

The caselaw does not require actual notice to those whose claims are merely "foreseeable." But the caselaw requires actual notice to claimants whose identity is "reasonably ascertainable." [FN149] So the Court must consider how this case fits in that spectrum when 24 Old GM personnel knew of the need to conduct a recall (and with that, of the need to fix the cars); and, in addition, a critical safety situation; and, in addition, the exact names and addresses of the owners of the cars that were at risk.

> FN149. *See* pages 49 et seq. *supra*

Preliminarily, there can be no doubt that the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 82 of 126

Page 56

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

names and addresses of the car owners whose cars Old GM's personnel knew to be subject to the recall obligation and here, to have safety defects as well were "reasonably ascertainable" and, in fact, actually known. Old GM (like New GM later) was subject to the Safety Act, which requires vehicle manufacturers to keep records of vehicle ownership, including vehicle owners' names and addresses. Once Old GM knew which cars had the Ignition Switch Defect, Old GM knew exactly to whom, and where, it had to send the statutorily required recall notice.

But not all of those with Ignition Switch Defects would be killed, injured, or want to sue Old GM on economic claims. Those 24 Old GM personnel did not have knowledge of *which particular* car owners with Ignition Switch Defects would later be killed or injured in accidents, but they knew that some would which is why Old GM needed to conduct the recall. Those Old GM personnel also knew that all of those vehicle owners had a statutory right to get their cars fixed at Old GM's (and later New GM's) expense.

Taking the easier element first, the duty to fix the cars with Ignition Switch Defects was owed to every one of those whose cars were subject to the known recall obligation. That aspect of Old GM's obligations was not subject to the uncertainty of whether or not there would be a subsequent accident or lawsuit.

The other element is plainly harder, but the Court comes out the same way. Old GM faced the recall obligation and known claims here not by reason of any kind of actuarial foreseeability (or the reality that in any line of endeavor, people can make mistakes and others can be hurt as a result), but by reason of the *known safety risk* that required the recall—*i.e.*, that here there was known death or injury in the making to someone (or many) in the body of people whose names and addresses were known, with the only uncertainty being who, exactly, those killed or injured might be. It is not a satisfactory answer, in this Court's view, to say that because the particular individuals in a

known group who would turn out to be accident victims were unknown, all of them were unknown. Rather than concluding that because of that uncertainty, *none* were entitled to *558 notice, the Court concludes that *all* of them were.

New GM understandably points to a considerable body of caselaw holding, in substance, that creditors are not "known" unless their status as such is reflected in the debtor's "books and records." That is true, but what "books and records" means in this context is all important. At oral argument on its motion, New GM understandably did not press its earlier position [FN150] that its financial accounting (and in particular, liabilities on its balance sheet) would be determinative of whether claims were known.[FN151] And for good reason: such a view would fail to comport with the caselaw or common sense. The "books and records" standard does not rest on whether the notice-giver has booked a liability or created a reserve on its balance sheet; on the treatment of the loss contingency under FASB 5 standards; or on whether the debtor has acknowledged its responsibility for the claim; [FN152] it merely requires having the requisite knowledge in one way or another that can be relatively easily ascertained and thereafter used incident to the noticing process. In the Court's view, the standard requires much more than the fact that somewhere, buried in a company's books, is information from which the liability could be ascertained,[FN153] and the Court doubts (though under the facts here it does not need to decide) that the knowledge of one or very few people in a large enterprise would be enough to meet the standard. [FN154] But "books and records" must be construed in a fashion consistent with the Supreme Court's requirements that "known" liabilities include those that are not just actually known, but also "reasonably ascertainable."

FN150. *See* New GM Opening Br. at 27 29.

FN151. *See* Day 1 Arg. Tr. at 78 ("I agree it's not the financial statements.").

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July
6   2015 Letter from King & Spaling LLP   Pg 83 of 126

Page 57

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

FN152.            *See,*            *e.g.,*
*Drexel Burnham Bankruptcy,* n. 105 *supra,*
151 B.R. at 681–82 (in late proof of claim
context, holding that a guaranty liability not
booked on the balance sheet was still a
known claim, reflected on the debtor's
"books and records," and that accounting
practices were not determinative).

FN153. *See, e.g., AO Communications,* 301
B.R. at 793–94 (in late proof of claim con-
text, noting that "[w]hat is reasonable de-
pends on the particular facts of each case. A
debtor need not be omnipotent or clairvoy-
ant. A debtor is obligated, however, to un-
dertake more than a cursory review of its
records and files to ascertain its known cred-
itors.").

FN154. The Court has based its conclusion
that the Plaintiffs were known creditors here
on the fact that at least 24 Old GM engineers,
senior managers, and attorneys knew of the
Ignition Switch Defect—a group large in size
and relatively senior in position. The Court
has drawn this conclusion based not (as the
Plaintiffs argue) on any kind of automatic or
mechanical imputation drawn from agency
doctrine (which the Court would find to be of
doubtful wisdom), but rather on its view that
a group of this size is sufficient for the Court
to conclude that a "critical mass" of Old GM
personnel had the requisite knowledge—*i.e.,*
were in a position to influence the noticing
process. *Cf. Weisfelner v. Fund I (In re
Lyondell Chemical Co.),* 503 B.R. 348, 389
(Bankr.S.D.N.Y.2014) (Gerber, J.) (in a case
alleging an intentional fraudulent convey-
ance in an LBO, rejecting arguments based
on automatic imputation of a CEO's alleged
intent under ordinary agency rules, and rul-
ing that if a creditor litigation trust pressing

those claims could not plead facts supporting
intent to hinder, delay or defraud on the part
of a "critical mass of the *directors* who made
the decisions in question," it would then have
to allege facts plausibly suggesting that the
CEO, who was only one member of a mul-
ti-member Board, could nevertheless control
the disposition of Lyondell's property) (em-
phasis in original).

New GM points out that it maintained a "litiga-
tion calendar," showing people who had sued it,
threatened to do so, or even made claims against it,
and that Old GM was careful to provide all of them
with *559 actual notice. [FN155] That of course was the
right thing to do, and under other circumstances, it
would do the job.[FN156] But here we have the unique
fact that Old GM knew enough to send out recall
notices (to meet a statutory obligation to car owners,
and, more importantly, to forestall the injury or death
which, without corrective action, would result), whose
mailing, coupled with the publication notice it could
appropriately send, would have been more than suffi-
cient. But Old GM did not do so.

FN155. *See* Day 1 Arg. Tr. at 78–79.

FN156. New GM also points out that it is
much easier for a debtor to recognize con-
tractual obligations than those that may arise
in tort, for alleged violations of law, or in
other instances where the debtor and possible
claimants have not had personal dealings.
That is true, and it underscores why publica-
tion notice for claimants in the latter catego-
ries is normally sufficient. But here, once
again, Old GM personnel knew of the need to
send out recall notices, where to send them,
and why they needed to go out. This changes
everything.

New GM calls the Court's attention to its earlier

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 84 of 126

Page 58

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

decision in *Morgenstein,* in which this Court held that
the plaintiffs there were "unknown" creditors, who
could not use lack of actual notice to vacate the con-
firmation order in this case— though admittedly they
received notice only by publication. There the plain-
tiffs (on their own behalf and a class they wished to
represent) sought to bring an untimely class proof of
claim after the bar date and after Old GM's liquidation
plan went effective. But they failed to plausibly allege
any evidentiary facts supporting their contention that
Old GM *knew* that the alleged design defect affected
the vehicles they owned. Nor were their vehicles
subject to a recall. Old GM's knowledge of the Igni-
tion Switch Defect here, and of its need to effect a
recall of the Plaintiffs' cars here, makes *Morgenstein* a
different case.

New GM also calls this Court's attention to Judge
Bernstein's decision in *Old Carco* [FN157] — the *Chrysler*
chapter 11 case — which in many respects is closely on
point, and with which this Court fully agrees. There,
after Old Carco's [FN158] own 363 sale, owners of Jeep
Wranglers and Dodge Durangos manufactured by Old
Carco brought a class action for economic loss against
New Chrysler in the District Court in Delaware, al-
leging that their cars suffered from a design flaw
known as "fuel spit back." As here, the affected car
owners in *Old Carco* had received notice only by
publication. With the same issue as to whether the *Old
Carco* sale order's free and clear provisions barred the
economic loss claims there, the Delaware District
Court referred that question to the *Old Carco* bank-
ruptcy court. Judge Bernstein concluded that Old
Carco's Sale Order did indeed bar those economic loss
claims, and found no due process impediment to en-
forcing the *Old Carco* sale order against those as-
serting the economic loss claims there — even against
those who bought their cars in the used car market
[FN159] — finding that their claims had arisen when their
cars had been manufactured, which was before Old
Carco's 363 sale.

FN157. *See* n.15, *supra*

FN158. Just as Old GM came to be officially
known as "Motors Liquidation Co." after the
363 Sale here, the former Chrysler came to
be officially known as "Old Carco" after its
363 sale.

FN159. *See* 492 B.R. at 403.

But while *Old Carco* plainly was correctly de-
cided, it is distinguishable from this case, in a highly
significant respect. Old Carco had *already* issued at
least three recall notices for the "fuel spit back"
problem*560 for certain Durango and other Old Carco
vehicles before the original purchasers bought their
vehicles from Old Carco,[FN160] avoiding the exact
problem this Court has identified here.

FN160. *Id.* at 395 (Old Carco issued a "safety
defect recall in 2002"; "a second safety recall
... in 2005"; and a "further safety recall" in
January 2009).

The publication notice here given, which other-
wise would have been perfectly satisfactory (espe-
cially given the time exigencies), was insufficient,
because from Old GM's perspective, owners of cars
with Ignition Switch Defects had "known" claims.
Because Old GM failed to provide the notice required
under the Safety Act (which, if given before Old GM's
chapter 11 filing, could have been followed by the
otherwise satisfactory post-filing notice by publica-
tion), the Plaintiffs were denied the notice due process
requires.

*4. The Requirement for Prejudice*

[17]But the Court's determination that Plaintiffs
were denied the notice due process requires does not
necessarily mean that they were "denied due process."
The latter turns on the extent to which a denial of due
process also requires a showing of resulting prejudice.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July 6    2015 Letter from King & Spaling LLP    Pg 85 of 126

Page 59

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

Plaintiffs argue that once they have shown the denial of the notice that due process requires, any resulting prejudice is simply irrelevant. In their view, the denial of the notice that due process requires means that they need not show anything more, and that the Court need not, and should not, think about how things might have been different if they had received the notice that was denied.

The Court disagrees. The contention runs contrary to massive caselaw, and common sense.

Though the Second Circuit, so far as the parties' briefing has revealed and this Court is aware, has not ruled on this issue,[FN161] no less than six other Circuits have. They have repeatedly, and very explicitly, identified prejudice as an essential element of a denial of due process claim   saying, in exactly these words or words that are very close, that "a party who claims to be aggrieved by a violation of procedural due process must show prejudice."[FN162] So have *561 lower courts in this District (at both the District Court [FN163] and Bankruptcy Court [FN164] levels), and elsewhere.[FN165] Several of the above were bankruptcy cases, in which litigants sought to be relieved of bankruptcy court orders based on contentions of denial of due process.[FN166]

> FN161. In the recent cases in which the Circuit granted relief for denials of due process, the prejudice to the party that had received inadequate notice was obvious, and no other party in the case had made the exact same argument that the party failing to get notice might have made. See *Manville 2010*, 600 F.3d at 154  58 (injunction against insurer's non-derivative claims that had no relation to bankruptcy); *DPWN*, 747 F.3d at 151 (discharge of claim); *Koepp*, 593 Fed.Appx. at 23 (extinguishment of easement).

FN162. *Perry*, 629 F.3d at 17. *See also Rapp v. U.S. Dep't of Treasury, Office of Thrift Supervision*, 52 F.3d 1510, 1520 (10th Cir.1995) (" *Rapp* ") ("In order to establish a due process violation, petitioners must demonstrate that they have sustained prejudice as a result of the allegedly insufficient notice."); *Brock v. Dow Chemical U.S.A.*, 801 F.2d 926, 930 31 (7th Cir.1986) (" *Brock* ") (in context of review of administrative order affecting an employer where improper notice was alleged, "it must be noted that, unless the employer demonstrates that the lack of formal notice was prejudicial, we will not order that the charges be dismissed"); *Savina Home Indus., Inc. v. Sec'y of Labor*, 594 F.2d 1358, 1365 (10th Cir.1979) (" *Savina Home Industries* ") (in considering due process claim, fact that "no prejudice has been alleged" was identified as one of two factors supporting conclusion that "no due process violation has been established"); *In re New Concept Housing, Inc.*, 951 F.2d 932, 939 (8th Cir.1991) (" *New Concept Housing* ") (ruling that failure to give the debtor notice of a hearing on the approval of a settlement violated two of the Federal Rules of Bankruptcy Procedure, but (rejecting the views of the dissenter that the failure to provide notice of the hearing resulted in a denial of due process that could not be subject to harmless error analysis) that "the violation of these rules constituted harmless error, because the Debtor's presence at the hearing would not have changed its outcome. The Debtor had neither a legal nor factual basis for establishing that the settlement was unreasonable."). *See also In re Parcel Consultants, Inc.*, 58 Fed.Appx. 946, 951 (3d Cir.2003) (unpublished) ( " *Parcel Consultants* ") ("Proof of prejudice is a necessary element of a due process claim."); *Cedar Bluff Broad., Inc. v. Rasnake*, 940

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 86 of 126

Page 60

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

F.2d 651 (Table), 1991 WL 141035, at *2
(4th Cir. Aug. 1, 1991) (unpublished) ( "
*Cedar Bluff Broadcasting* ") (creditor com-
plaining of notice deficiency failed to show,
among other things, "that it was prejudiced
by the lack of notice to general creditors").

The Plaintiffs cite one case at the Circuit
level which they argue would lead to a
different conclusion, *Lane Hollow Coal
Co. v. Director, Office of Workers' Com-
pensation Programs,* 137 F.3d 799 (4th
Cir.1998) (" *Lane Hollow Coal* "). They
quote a line from the opinion that the
claimant is not obligated to demonstrate a
"reasonable likelihood that the result of
this claim would have been different ab-
sent the violation," *id.* at 807, though this is
not the same as holding that there is no
requirement to show prejudice, as the *Lane
Hollow Coal* court itself seemed to recog-
nize. There the Fourth Circuit vacated, in
part, an administrative law judge deter-
mination granting benefits to a coal miner's
widow when there was a 17-year delay in
notifying the coal mine operator of the
claim, by which time evidence was no
longer available and the coal mine operator
was thus deprived of the opportunity to
mount a meaningful defense. *Id.* at 807.
The *Lane Hollow Coal* court did not cite or
criticize its earlier holding in *Cedar Bluff
Broadcasting* that had denied relief based
on a failure to show a lack of prejudice,
and in fact stated that *"[t]o be sure, there
are 'due process' cases in which we re-
quire a showing that the error complained
of actually prejudiced the result on the
merits ...."* *Id.* at 808 (emphasis added).
Though the other cases were not named or
otherwise substantively addressed, the
*Lane Hollow Coal* court continued "but
these cases are of a much different ilk." *Id.*

And it declined to authorize "speculation
about the would-have-been and
could-have-been" if notice had not been
denied for those 17 years. *Id.* at 807. *Lane
Hollow Coal* is insufficient, in this Court's
view, to trump the holdings of the ten cases
expressly holding that prejudice is an el-
ement of any due process claim. Rather, it
is better read as merely assuming that there
was in fact prejudice, and holding that a
finding of an absence of prejudice when
evidence was unavailable after a 17 year
delay would necessarily have been based
on unacceptable speculation. A later (and
very similar) Fourth Circuit holding upon
which the Plaintiffs likewise rely, *Con-
solidation Coal Co. v. Borda,* 171 F.3d 175
(4th Cir.1999), supports this Court's view.
*See id.* at 183 ("It is not the mere fact of the
government's delay that violates due pro-
cess, but *rather the prejudice resulting
from such delay.*") (emphasis added).

FN163. *See Caldor–District,* 266 B.R. at 583
("even if notice was inadequate, the object-
ing party must demonstrate prejudice as a
result thereof") (citing, *inter alia, Rapp* );
*Affirmance Opinion # 2,* 430 B.R. at 99 (re-
jecting appellant Parker's contentions that he
was denied due process as a result of the
expedited hearing on the 363 Sale in this
case, as "Parker was in no way prejudiced by
the expedited schedule").

FN164. *See Caldor Bankruptcy,* 240 B.R. at
188 ("Thus, in addition to establishing that
the means of notification employed by Cal-
dor was inadequate, Pearl must demonstrate
that it was prejudiced because it did not re-
ceive adequate notice.") (citing, *inter alia,
Rapp, Brock,* and *Savina Home Industries* ).

FN165. *In re Gen. Dev. Corp.,* 165 B.R. 685,

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July
6   2015 Letter from King & Spaling LLP   Pg 87 of 126

Page 61

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

688 (S.D.Fla.1994) (Aronovitz, J.) (" *General Development* ") ("A creditor's due process rights are not violated where the creditor has suffered no prejudice.").

FN166. *See Cedar Bluff Broadcasting*, n. 162 *supra* (bankruptcy court order converting case to chapter 7); *Caldor District* and *Caldor Bankruptcy*, nn. 163 and 164 *supra* (bankruptcy court wind-down order); *General Development*, n. 165 *supra* (bankruptcy court approval of settlement); *Affirmance Opinion # 2*, n. 163 *supra* (the Sale Order in this case).

*562 Neither the Plaintiffs, nor the GUC Trust (which is allied with the Plaintiffs on this issue), cite any case that contradicts that authority. [FN167] Rather, they variously argue that "the Due Process Clause protects ... the right to be heard, not the right to win; [FN168] that all of the above cases are distinguishable on their facts; [FN169] and that imposition of a prejudice requirement would require the Court to speculate as to the outcome if appropriate notice had been provided. [FN170] The first contention is overly *563 simplistic, the second misses the point; and the third fails based on a mistaken assumption.

FN167. *See* Pl. Br. at 36–39; GUC Trust Opp. at 27–32 & nn.9 and 10. The GUC Trust does, however, cite and quote at length a Bankruptcy Court decision, *White v. Chance Indus., Inc. (In re Chance Indus., Inc.)*, 367 B.R. 689 (Bankr.D.Kan.2006) (Nugent, C.J.) (" *Chance Industries* "), in which Judge Nugent addressed a situation in which a child was injured on a debtor-manufactured amusement ride after the confirmation of a reorganization plan, allegedly as a result of the reorganized debtor's wrongful prepetition conduct. *See id.* at 692. Judge Nugent ruled, correctly in this Court's view, that because the child was injured after confirmation, and

had no prepetition (or even pre-confirmation) relationship with the debtor, *see id.* at 701, the child did not have a claim capable of being discharged, see *id.* at 703–04, and could not be bound by a confirmation order as to which, for obvious reasons, he was not given notice. (Of course that situation is not present here, because New GM expressly assumed liability for death or injuries taking place after the 363 Sale, even if involving vehicles made by Old GM.)

The GUC Trust relies on language that came after that holding in which Judge Nugent declined to agree with an argument that the failure to provide notice to the child was "harmless error," based on the argument before him that the plan—which provided for no future claims representative, but nevertheless sought to bar future claims—would not have changed after an objection and would have been confirmed anyway. *See id.* at 709. But the GUC Trust takes Judge Nugent's comments out of context. Judge Nugent made his "harmless error" observations in the context of his discussion, see *id.* at 709–10 & n. 81, of the reorganized debtor's invocation of Fed.R.Bankr.P. 9005, and Fed.R.Civ.P. 61, which together provide that in bankruptcy, as elsewhere, courts should "disregard all errors and defects that do not affect any party's substantial rights." Understandably, Judge Nugent considered that the matter before him affected substantive rights. Though the word "prejudice" never was used in his opinion (which of course undercuts the GUC Trust's argument), he effectively ruled that the child would be substantively prejudiced—by "the extinguishing of an unknown claim that has yet to accrue," *id.* at 709—thus making Rule 61 harmless error analysis inappropriate.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 88 of 126

Page 62

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

The Plaintiffs also cite *Chance Industries*, *see* Pl. Br. at 37, but only for further support for their contention (with which, as noted above, the Court agrees) that in defective notice cases, speculation as to what the outcome would have been with proper notice is inappropriate. They read Judge Nugent's ruling as having rejected the *Chance Industries* debtor's arguments "notwithstanding [the] debtor's speculation that the tort claimant's participation in confirmation process would not have changed the result." *Id.* This Court agrees with that reading, and would even go farther; it reads Judge Nugent's *Chance Industries* opinion as suggesting that if the objection had been raised, he would have denied confirmation of the plan on those terms.

*Chance Industries* represents an excellent example of what courts do when they think parties are prejudiced; it does not stand for the notion that prejudice doesn't matter. *Chance Industries* did not, and could not, contradict the decisions of its own Tenth Circuit, *see Rapp* and *Savina Home Industries*, n. 162, *supra,* that are among those expressly imposing a requirement for showing prejudice.

FN168. Pl. Br. at 4.

FN169. *See id.* at 37–39; GUC Trust Opp. at 27 n.9 and 29 n.10.

FN170. *See* Pl. Br. at 36–37; GUC Trust Opp. at 27.

As to the first, the issue is not, as Plaintiffs, argue, whether the Due Process clause guarantees "a right to

win." Of course it is true that there is no constitutional right to win—though ironically, under the Plaintiffs' argument (that inadequate notice automatically gives them the win), they effectively seek exactly that. The real issue is rather whether, assuming that there has been a denial of the right to be heard, more is necessary to establish a *judicially cognizable* due process violation—*i.e.,* a right to the desired curative relief. The caselaw answers that; it requires the arguably injured party to show prejudice from the denial.

The Plaintiffs' and GUC Trust's second argument is that "the cases [New GM] cites do not support its contention." [FN171] But of course they do. Because due process cases are heavily fact-driven, it is hardly surprising that the Plaintiffs can point out factual distinctions between the ten cases discussed above [FN172] and this one. But the Court does not rely upon those cases for their factual similarity to this one; it relies on them for the *legal principles* that each enunciates, in very clear terms—as stated by the First Circuit in *Perry,* for example, "a party who claims to be aggrieved by a violation of procedural due process *must show prejudice.*" [FN173]

FN171. Pl. Br. at 37; *accord* GUC Trust Opp. at 27 n.9, 29 n.10.

FN172. *See* n.162 *supra*.

FN173. 629 F.3d at 17 (emphasis added).

The third contention does not go to the existence of the requirement for showing prejudice. It goes to *how* the Court should examine possible prejudice—and in particular, whether courts should speculate as to resulting harm once they have been presented with a showing of insufficient notice.

In that third contention, the Plaintiffs cite *Fuentes v. Shevin,* [FN174] in which the Supreme Court reversed the judgments of three-judge District Courts that had

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July
6   2015 Letter from King & Spaling LLP   Pg 89 of 126

Page 63

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

upheld the constitutionality of Florida and Pennsylvania replevin statutes that denied a prior opportunity to be heard before chattels were taken from consumers' possession, in several instances without a lawsuit. [FN175] The Plaintiffs do not argue that *Fuentes,* or any principles it articulated, trumped any of the holdings to which this Court has just referred – that a showing of prejudice must be made before court orders entered with insufficient notice are undone. Nor could they, as *Fuentes* involved facts nothing like this case, and instead involved a facial attack on the constitutionality of statutes that authorized the seizure of property without any notice, and, in many cases, any earlier judicial action at all. The different, later, possible judicial outcomes to which *Fuentes* referred (and upon which the Plaintiffs rely) [FN176] related to judicial proceedings that never took place, and (for good reasons) needed to take place.

> FN174. 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) ( " *Fuentes* ").

> FN175. *See id.* at 71 72 and n.4, 92 S.Ct. 1983.

> FN176. *See* 407 U.S. at 87, 92 S.Ct. 1983 ("To one who protests against the taking of his property without due process of law, it is no answer to say that in his particular case due process of law would have led to the same result because he had no adequate defense upon the merit."), quoted at Pl. Br. at 36.

[18]The Plaintiffs then argue a different proposition, on which they are on *564 stronger ground; they say that courts should reject "speculation" that the litigant would have lost anyway. And in this respect, the Court agrees with them. In determining prejudice, courts should not speculate as to outcome if an aggrieved party was denied the notice to which it was entitled. If there is a non-speculative reason to doubt

the reliability of the outcome, the Court agrees that it should take action – though the opposite is also true. For that reason, the Court believes that it here should neither deny, nor grant, relief to the Plaintiffs here based on a request by either side that the Court engage in speculation. [FN177] The Court will refrain from doing so.

> FN177. But that view, once again, does not go to the requirement that prejudice must be shown; it goes only to how the required prejudice should or should not be found.

> To avoid the need for such speculation, it is very possible that in a case where it made a difference, the Court would not require, incident to ascertaining the existence of prejudice, that the result *would* have been different; the Court might well hold that it should suffice that there is a reasonable likelihood that the result *could* have been different. But the Court does not need to decide that here. In this case, there are no matters argued by either side where the distinction would matter.

Finally, and apart from the caselaw previously noted, the Plaintiffs' contention that prejudice need not be shown in cases like this one runs contrary not just to existing law, but also fairness and sound policy. Bankruptcy sale due process cases, much more than in plenary litigation, involve competing interests – including those of parties who have acquired property rights as buyers of estate assets, and have a justifiable expectation that when they acquire assets pursuant to a bankruptcy court order, they can rely on what the order says. That was an important element of the Seventh Circuit's opinion in *Edwards,* [FN178] in which that court held that a bona fide purchaser of property in a free and clear sale acquired good title to it, even though a second mortgagee had not received notice of the sale until more than a year later.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 90 of 126

Page 64

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

FN178. *See* n. 69 *supra.* The Plaintiffs argue
that *Edwards,* which was written by Judge
Posner, was wrongly decided. *See* Pl. Br. at
34. But the Court believes *Edwards* was
correct in its result, and in most of its analy-
sis – especially insofar as it focuses on the
prejudice (or lack of prejudice) to the party
that received inadequate notice, and speaks
of others' property rights that likewise need
to be taken into account.

The *Edwards* court noted that "[i]f purchasers at
judicially approved sales of property of a bankrupt
estate, and their lenders, cannot rely on the deed that
they receive at the sale, it will be difficult to liquidate
bankrupt estates at positive prices," [FN179] and that "the
liquidation of bankrupt estates will be impeded if the
bona fide purchaser cannot obtain a good title, and
creditors will suffer." [FN180] That does not mean, at
least in this Court's view, that the purchasers of assets
automatically should win, but it does mean that their
needs and concerns – and the protection of their own
property rights – cannot be disregarded either.

FN179. 962 F.2d at 643.

FN180. *Id.* at 645.

The *Edwards* court twice addressed the compet-
ing interests on matters of this character:

We are left with the practical question, in what
circumstances can a civil judgment be set aside
without limit of time and without regard to the harm
to innocent third parties? The answer requires a
consideration of competing interests *565 rather
than a formula.[FN181]

And again:
To take away a person's property – and a lien is
property – without compensation or even notice is

pretty shocking, but we have property rights *on both
sides of the equation here,* since [the second mort-
gagee] wants to take away property that [the pur-
chaser] bought and [the purchaser's lender] fi-
nanced, without compensating them for their
loss.[FN182]

FN181. *Id.* at 644 (citation omitted).

FN182. *Id.* at 645 (emphasis added).

The Court is mindful of concerns articulated by
Chief Judge Jacobs dissenting in *Petrie Retail* [FN183]
(even though they were not embraced by the *Petrie
Retail* majority) that the requirements of law in
bankruptcy cases should not be trumped by concerns
as to whether they might have a chilling effect on sales
in bankruptcy cases, on the one hand, or "promote[ ]
the sale of the assets marketed by bankrupt estates,"
on the other. And for reasons discussed below, the
Court believes that in the Second Circuit, the re-
quirements of due process would trump the interests of
finality and maximizing creditor recovery. But in
bankruptcy, the interests inherent in the enforceability
of 363 orders (on which the buyers of assets should
justifiably be able to rely, and the interests of creditors
depending on the maximization of estate value like-
wise rest) are hugely important. And to the extent that
courts can respect and enforce sale orders as written
unless there is genuine prejudice, they should do so.
Since parties' competing needs and concerns "are on
both sides of the equation here," [FN184] that means that
in instances in which prejudice has not been shown,
there is no good reason for depriving asset purchasers
of their own property rights – and of the benefits for
which they provided value to a chapter 11 estate.

FN183. *See Luan Inv. S.E. v. Franklin 145
Corp. (In re Petrie Retail, Inc.),* 304 F.3d
223, 233 (2d Cir.2002) (" *Petrie Retail* ")
(Jacobs, C.J., dissenting).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 91 of 126

Page 65

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

FN184. *Edwards*, 962 F.2d at 645.

FN185. *See* Pl. Br. at 58–60.

And the facts here (which may present a relatively uncommon situation)—where while insufficient notice was given, others duly given notice made the same, and indeed better, arguments against successor liability, and lost—raise an additional common sense and fairness concern. It defies common sense—and also is manifestly unfair—to give those who have not been prejudiced the bonanza of exemption from a ruling as to which other creditors, with no lesser equities in their favor, were heard on the merits, lost, and now have to live with the result.

For all of these reasons, the Court holds—consistent with the ten other cases that have held likewise—that even where inadequate notice has been given, prejudice is an essential element for vacating or modifying an order implementing a 363 sale.

5. *Application of Those Principles to Economic Loss Plaintiffs*

Having concluded that the Economic Loss Plaintiffs were denied the notice due process requires, but that establishing a claim for a denial of due process requires a showing of prejudice, the Court must then consider the extent to which they were prejudiced as a result. The Court finds that they were not at all prejudiced with respect to successor liability, but that they were prejudiced with respect to overbreadth of the Sale Order.

**\*566** *(a) Successor Liability*

[19]After arguing that prejudice need not be shown, and that they should win without any prejudice at all (contentions that the Court has rejected), the Plaintiffs go on to argue that even if prejudice must be established, it was shown.[FN185] They argue that if they had the opportunity to be heard, the result would have been different. Insofar as successor liability is concerned, the Court easily rejects that contention.

It is undisputed that although the Plaintiffs did not get adequate notice of the 363 Sale hearing, over 4 million others did, including a very large number who vigorously argued against the Free and Clear Provisions, but ultimately failed. While the Plaintiffs quote from *Mullane* repeatedly, and rely on *Mullane* principles even more often, they overlook the language in *Mullane* that expressly addressed situations where many would be similarly affected—and where all, because of incomplete notice, might not be able to be heard, but many could.

*Mullane* recognizes that where notice is imperfect, the ability of others to argue the point would preclude the prejudice that might result if *none* could. It even suggests that in such instances, there is no persuasive claim that even notice was defective. In language that the Plaintiffs fail to address, the *Mullane* court stated:

This type of trust presupposes a large number of small interests. *The individual interest does not stand alone but is identical with that of a class.* The rights of each in the integrity of the fund and the fidelity of the trustee are shared by many other beneficiaries. *Therefore notice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all, since any objections sustained would inure to the benefit of all.* We think that under such circumstances reasonable risks that notice might not actually reach every beneficiary are justifiable. 'Now and then an extraordinary case may turn up, but constitutional law, like other mortal contrivances, has to take some chances, and in the great majority of instances, no doubt, justice will be done.'[FN186]

Here, as in the situation addressed in *Mullane*, the notice that was sufficient to trigger many objections to the Free and Clear Provisions was "likely to safeguard

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 92 of 126

Page 66

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

the interests of all." [187] If those who got notice and made those objections had been successful, the "objections sustained would inure to the benefit of all.[188] These observations by the Supreme Court bolster the conclusion that there was no prejudice here. In fact, just as the *Mullane* court declared that "under such circumstances, reasonable risks that notice might not actually reach every beneficiary [were] justifiable," that element of the *Mullane* holding strongly suggests that notice that did not reach the subset of vehicle owners with Ignition Switch Defects was not constitutionally deficient in the first place.[189]

> FN186. *Mullane,* 339 U.S. at 318–19, 70 S.Ct. 652 (emphasis added).

> FN187. *Id.*

> FN188. *Id.*

> FN189. However, while that conclusion follows from what the Supreme Court said in the quoted language, the Court prefers to analyze the matter in terms of the massive caselaw requiring a showing of prejudice. The distinction doesn't matter with respect to the Free and Clear Provisions, because so many people argued against them. But it could matter with respect to overbreadth, discussed below, where those with notice didn't make an overbreadth argument. The Court is more comfortable in denying relief in instances where people made the same argument and lost than it is in instances where those with notice failed to make the argument at all.

**\*567** But even if *Mullane* does not by itself dispose of the question, the Plaintiffs' failure to show any reason why the Free and Clear Provisions were improperly imposed does. That failure underscores the

lack of prejudice here.[190] Notably, the Plaintiffs do not argue that when the Court barred successor liability back in 2009, it got it wrong.[191] They do not bring to the Court's attention any cases that other objectors missed, or any statutory or other authority suggesting a different outcome on the successor liability merits. In fact, they offer no legally based arguments as to why they would have, or even *could* have, succeeded on the successor liability legal argument when all of the other objectors failed.[192]

> FN190. *See Paris Industries,* 132 B.R. at 510 ("I conclude that [objectors] were in no way prejudiced by the lack of notice and their inability to appear and argue their position on the sale. They have made no showing that, if they had been notified and had appeared, they could have made any arguments to dissuade the bankruptcy court from issuing its order that the assets be sold free and clear of all claims."); *Austin v. BFW Liquidation, LLC (In re BFW Liquidation, LLC),* 471 B.R. 652, 672–73 (Bankr.N.D.Ala.2012) (Cohen, J.) (declining to set aside bankruptcy sale even though a creditor was not given notice of it where creditors' committee and many creditors participated in the process and court could conclude that all creditors' interests in the sale were adequately represented by that committee and those creditors, and the creditor "did not allege in her complaint that she possessed any grounds for opposing the sale which she could have raised had she been notified of the sale before it was authorized").

> FN191. *See* Pl. Br. at 58–60. The closest they come is an accusation that it is New GM that is engaging in speculation, and a suggestion that the Court would not have written "exactly the same opinion." *See* Pl. Br. at 58–59 ("New GM's argument speculatively presumes that this Court would have written

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 93 of 126

Page 67

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

exactly the same opinion in July of 2009 *even
if* it had been aware of the ISD, the now
well-documented campaign to cover it up,
and Old GM's abdication of its legal duties to
owners and lessees of Defective Vehicles.")
(emphasis in original). In light of the Plain-
tiffs' failure to put forward any new successor
liability arguments or caselaw authority, the
Facts section of any opinion might have
added a paragraph or two, but the legal dis-
cussion would not at all have changed—nor,
more importantly, would the outcome.

The Plaintiffs also argue, though only in a
footnote, that if they had an opportunity to
be heard, they would have objected to a
finding in the Sale Order that New GM was
a "good faith purchaser" (relevant under
Bankruptcy Code section 363(m)), and that
the Court likely would have agreed with
them. *See* Pl. Br. at 59 n.67. That conten-
tion does not help them. Their prediction of
the Court's ruling if they had made such an
argument is speculative, but even if such a
ruling might have come to pass, it would
not have an effect on the inclusion of pro-
visions imposing successor liability.
"Good faith purchaser" findings provide
safe harbors for buyers *on appeal;* they do
not go to whether or not a sale should be
approved, or the nature or extent of any
provisions barring successor liability. *See*
section 363(m).

FN192. The Court would have fully and
fairly considered any such argument now if it
had been made, but (presumably because of
the absence of supporting authority) that is
not the Plaintiffs' argument here.

Rather, while the Plaintiffs recognize that the
Court would not have let GM go into the liquidation
that would have resulted if the Court denied approval

of the 363 Sale, they argue that they could have de-
feated the successor liability injunction for reasons
unrelated to its propriety as a matter of bankruptcy
law. While criticizing New GM for improper specu-
lation,[FN193] **568** they ask the Court to rely on the
speculation they prefer; [FN194] they ask the Court to
accept the likelihood that by reason of public outrage
or public pressure, they could have required Old GM
or Treasury to rewrite the deal to accede to their de-
sires.[FN195] And they know, or should, the fundamental
principle of bankruptcy law that a buyer of assets
cannot be required to take on liabilities it doesn't want.

FN193. *See* Pl. Br. at 4 ("New GM's
self-serving speculation regarding possible
outcomes had the ISD been disclosed and
notice to the Pre Sale Class been given are
not even plausible."); *id.* at 58 ("New GM's
argument speculatively presumes that this
Court would have written exactly the same
opinion in July of 2009 ...."); *id.* at 59 ("New
GM cannot support its speculation as to the
potential outcome had Old GM disclosed, on
the eve of filing for bankruptcy, that it had
put millions of cars on the road with a known
but hidden life-threatening defect while
failing to disclose that fact to those most af-
fected by it.").

FN194. *See* Pl. Br. at 59 ("[I]t is equally or
even more likely that Old GM and Treas-
ury—who, New GM acknowledges, was the
one to draw 'the line in the sand'—would
have chosen to deal with objections from
Plaintiffs in the same way it chose to deal
with objections from consumer safety
groups, by adding Plaintiffs' claims to as-
sumed liabilities."); *id.* at 4 ("[T]here is no
way to determine, some five years later, what
the outcome would have been had the
bombshell of Old GM's concealment of this
massive safety defect been made known to
the Court, the Treasury, Congress, the public,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 94 of 126

Page 68

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

the press and the various objectors.").

FN195. *See id.* at 4–5 ("[H]ad the Court and
governmental authorities known that Old
GM had knowingly placed millions of cars
on the road with a life-threatening safety
defect (and that New GM intended to con-
tinue to allow such cars to remain on the road
with those known defects), it is not reasona-
ble to assume (as New GM does) that such a
revelation could only have resulted in a dis-
astrous liquidation and the end of GM as a
functioning company. Instead, it is likely that
such an outcome would have still been
avoided (for numerous reasons, political, na-
tional economic and otherwise, that were still
significant, compelling and extant), *and that
the entry of the Sale Order would have been
conditioned on New GM's assumption of all
related liabilities so as to ensure the com-
mercial success of the purchasing entity.*")
(emphasis added).

So it requires no speculation for the Court to rule
that given Old GM's circumstances at the time, the
Court would not have disapproved the 363 Sale or
conditioned its approval on modifications to the
carefully negotiated restructuring to favor one or more
groups seeking special treatment.

As noted above, the Court agrees with the Plain-
tiffs and the GUC Trust that speculation is inappro-
priate on an inquiry of this nature. But gauging the
outcome on the bar of successor liability if Plaintiffs
had been heard does not at all involve speculation,
especially since they offered no authority beyond what
the other objectors offered in 2009. Rather, it is the
Plaintiffs' alternative argument—that they could have
succeeded by reason of public outrage, political
pressure, or Treasury's anger with Old GM, when they
could not prevail in the courtroom—that asks the
Court to speculate. For the very reason the Plaintiffs
themselves advance, the Court should not, and will

not, do so.

Insofar as the Free and Clear Provisions' prohibi-
tion of successor liability claims are concerned, while
the Plaintiffs failed to receive the notice due process
requires, they were not prejudiced as a result. Thus
they have failed to establish a claim for a denial of due
process. The Free and Clear Provisions must stand.

*(b) New GM's Own Wrongful Acts*
[20]What the Court would have done in the face
of a Sale Order overbreadth objection is likewise not
subject to speculation. The Court follows its own
precedent. If the Plaintiffs had been heard to make the
argument back in 2009 that they are making
now—that they should have the right to allege claims
based on wrongful conduct by New GM alone, with-
out any reliance on anything that Old GM might *569
have done—the Court would have entered a narrower
order, as it did in similar situations. In this respect, the
Economic Loss Plaintiffs were prejudiced.

The Court has twice dealt with what is effectively
the same issue before. In another chapter 11 case on
the Court's watch, quite a number of years before the
363 Sale in this case, Magnesium Corporation of
America ("MagCorp"), one of the two debtors in that
case,[FN196] had massive bond debt, environmental, and
other liabilities, leading to a chapter 11 filing in Au-
gust 2001. In May 2002, lacking an ability to reor-
ganize, MagCorp sought approval of a 363 sale to U.S.
Magnesium, an affiliate, of substantially all of its
assets, with free and clear provisions that would pro-
tect the purchaser from successor liability on the
debtors' legacy claims—including, most significantly,
MagCorp's environmental liabilities to the EPA and
other U.S. Government entities. Understandably upset
that it would have to recover its very substantial
claims from a shell that at the time seemed largely
worthless, the Government objected to the free and
clear provisions.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 95 of 126

Page 69

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

FN196. *In re Magnesium Corp. of Am.* ("*MagCorp*").

Consistent with the law at the time (which was even clearer by 2009), the Court nevertheless granted the requested free and clear provisions. But it further ruled that *while successor liability would be proscribed*, U.S. Magnesium would not be protected with respect to any future matters *that were its own liability*. As part of its dictated rulings, the Court stated:

When you are talking about free and clear of liens, it means you don't take it subject to claims which, in essence, carry with the property. It doesn't absolve you from compliance with the law going forward.[FN197]

And though it later rejected an effort by the Government to reargue the free and clear provisions there, the Court then said:

I've made it clear that the new owners will have to comply with the law and will be subject to any and all obligations that the EPA or other regulatory authorities can impose with respect to the new owners of the land, including requiring that they do whatever they have to do with cleaning up their land if it's messed up.[FN198]

FN197. Tr. of Hr'g, Jun 4, 2002, No. 01 14312 ECF No. 290, at 129:21 25.

FN198. *Id.* at 132:22 133:5 (transcription errors corrected).

The Court's sale order in *MagCorp* therefore included, after its free and clear provisions, a key proviso:

*provided, however, that nothing contained herein shall*(a) release U.S. Magnesium LLC or any affiliate or insider thereof from any claim of the United States against U.S. Magnesium or such affiliate or insider which existed immediately prior to the Closing (but not as a successor in interest to the Seller) and (b) *excuse U.S. Magnesium LLC from any obligations under applicable law* (including, without limitation, RCRA or other environmental laws) *as the owner and operator of the Assets (but not as successor in interest to Seller).*[FN199]

FN199. Order, No. 01 14312 ECF No. 283 (Jun. 5, 2002) ¶ 13 (underlining in original but emphasis by italics added).

Similarly, at the 2009 sale hearing in this case, certain objectors voiced concerns that any approval order would too broadly release either Old GM or New GM from their respective duties to comply with environmental laws and cleanup obligations. After they did so, the Court noted that it **\*570** had originally shared their concerns, but that their concerns were addressed by amendments to the proposed order that were made after objections were filed.[FN200] The Sale Order in this case was amended to say:

Nothing in this Order or the [Sale Agreement] releases, nullifies, or enjoins the enforcement of any Liability to a governmental unit under Environmental Laws or regulations (or any associated Liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, or operator of property after the date of entry of this Order. Notwithstanding the foregoing sentence, nothing in this Order shall be interpreted to deem the Purchaser as the successor to the Debtors under any state law successor liability doctrine with respect to any Liabilities under Environmental Laws or regulations for penalties for days of violation prior to entry of this Order. Nothing in this paragraph should be construed to create for any governmental unit any substantive right that does not already exist under law.[FN201]

FN200. *See Sale Opinion,* 407 B.R. at

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July
6   2015 Letter from King & Spaling LLP   Pg 96 of 126

Page 70

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

507 08.

> FN201. *Id.* at 507. Another provision provided similarly: "Nothing contained in this Order or in the [Sale Agreement] shall in any way (i) diminish the obligation of the Purchaser to comply with Environmental Laws...." *Id.* at 507 08.

Here the Sale Order, in addition to barring successor liability (which for reasons discussed above, remains fully appropriate), also proscribed any claims involving vehicles and parts manufactured by Old GM, even if the claims might rely solely on wrongful conduct by New GM alone. By not having the opportunity to argue that such was inappropriate here (and to seek a proviso similar to the ones granted in *MagCorp* and for the environmental objectors here), the Economic Loss Plaintiffs were prejudiced. They thus established an actionable denial of due process with respect to Sale Order overbreadth.

### (c) The Used Car Purchasers

[21]A subset of the Economic Loss Plaintiffs, the Used Car Purchasers (whom the Plaintiffs refer to as the "Post Sale Class"), assert that they have special rights to assert claims for successor liability when nobody else can because they had not yet purchased their cars at the time of the 363 Sale. The Court cannot agree. Aside from the illogic and unfairness of the contention, it is erroneous as a matter of law, for at least two reasons.

First, when the Court issued the Sale Order, approving the disposition of Old GM assets a matter over which the Court had unquestionable subject matter jurisdiction, derived from its statutory subject matter jurisdiction under 28 U.S.C. § 1334 and, more importantly for these purposes, the *in rem* jurisdiction the Court had over estate assets then being sold those assets were sold free and clear of successor liability claims. The substance of the Sale Or-

der was to proscribe claims based on the transferor Old GM's conduct that could be argued to travel with the assets transferred.[FN202] The bar against successor liability claims premised on continued ownership of the property traveled with the property. The Used Car Plaintiffs would *571 thus be bound by the *in rem* nature of that order except to the extent that its enforcement, by reason of due process concerns, would be improper as to them.

> FN202. *See Sale Opinion,* 407 B.R. at 501 (as part of Court's analysis that successor liability claims were "interests" properly subject to a free and clear order, recognizing that "we know that an 'interest' is something that may accompany the transfer of the underlying property, and where bankruptcy policy, as implemented by the drafters of the Code, requires specific provisions to ensure that it *will not* follow the transfer.") (emphasis in original).

Because they were unknown at the time, and were not even creditors (not having yet acquired the cars they now assert have decreased value), mailed notice was impossible, and publication notice (or for that matter, actual notice) would not have been meaningful to them, even if Old GM had previously sent out recall notices. Thus the Used Car Purchasers were denied the notice due process requires to bind them to the Free and Clear Provisions,[FN203] just as the remainder of the Plaintiffs were.

> FN203. *See Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus., Inc.),* 445 B.R. 243 (Bankr.S.D.N.Y.2011) (Bernstein, C.J.) (" *Grumman Olson Bankruptcy* "), *aff'd* 467 B.R. 694, 706 07 (S.D.N.Y.2012) (Oetkin, J.) (" *Grumman Olson District* ") (finding due process concerns made bar of successor liability unenforceable against claimants who were unknown, future, claimants at the time

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July
6   2015 Letter from King & Spaling LLP   Pg 97 of 126

Page 71

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

of the sale) (collectively, the "*Grumman Olson Decisions* ").

But like the other Plaintiffs, the Used Car Purchasers were not prejudiced, because others made the same arguments that Used Car Plaintiffs might have made, and the Court rejected those contentions. Especially since purchasers of estate property under sale orders have property rights too, the methodology for correcting a denial of an opportunity to be heard under such circumstances (if not others as well) should be (1) at least temporarily relieving an adversely affected litigant of the effect of the order, and then (2) giving the adversely affected litigant the opportunity to be heard that was previously denied – referred to colloquially by this Court, in oral argument, as a "do-over" [FN204] – fixing any damage that might have resulted from an incorrect or incomplete ruling the first time. Granting any more than that would favor the Plaintiffs with an outcome that the Court has already determined is contrary to existing law, and would grant them a wholly inappropriate windfall.

FN204. *See* Day 1 Arg. Tr. at 15, 20, 21.

Like the other Economic Loss Plaintiffs (and for that matter, the Pre-Closing Accident Plaintiffs), if the Used Car Purchasers made arguments at this time that were not previously raised, the Court believes that it would be obligated to consider those arguments now, and effectively give Used Car Plaintiffs a do-over. But once again like the other Plaintiffs, the Used Car Plaintiffs have identified no arguments they might have made that others did not. As with the other Plaintiffs, the denial of notice gave them the chance to be heard on the merits at a later time, but not to an automatic win.

[22]Second (assuming *arguendo* that they were injured), the Used Car Owners were injured as the successors in ownership to individuals or entities who had been the prior owners of their Old GM cars. And

for each of them, an earlier owner was in the body of owners of Old GM vehicles who were bound by the Free and Clear Provisions. With exceptions not applicable here (such as holders in due course of negotiable instruments), the successor in interest to a person or entity cannot acquire greater rights than his, her, or its transferor. [FN205] That is the principle *572 underlying the *Wagoner* Rule, [FN206] which, while an amalgam of state and federal law, is firmly embedded in the law in the Second Circuit.[FN207] And that principle has likewise been applied to creditors seeking better treatment than the assignors of their claims.[FN208] Thus it is not at all surprising to this Court that in *Old Carco*,[FN209] Judge Bernstein blocked the suits by those who bought *used* 2005 and 2006 Dodge Durangos or Jeep Wranglers,[FN210] distinguishing *Grumman Olson Bankruptcy* on the ground that those plaintiffs "*or their predecessors (the previous owners of the vehicles)* had a pre-petition relationship with Old Carco, and the design flaws that they now point to existed pre-petition." [FN211]

FN205. *See Tital Real Estate Ventures, LLC v. MJCC Realty L.P. (In re Flanagan),* 415 B.R. 29, 42 (D.Conn.2009) (Underhill, J.) ("In acquiring the estate's rights and interests ... Titan [the acquiror from a trustee] acquired no more and no less than whatever rights and interests to MJCC and its properties the estate possessed at the time of the assignment ... Titan can only prevail on its claims if, and to the extent that, the Trustee would have prevailed on those claims at the time of the assignment.").

FN206. *See Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114 (2d Cir.1991) ("*Wagoner* ").

FN207. *See, e.g., Buchwald v. The Renco Group, Inc. (In re Magnesium Corp. of America),* 399 B.R. 722, 757 nn. 113 & 114 (Bankr.S.D.N.Y.2009) (Gerber, J.) (applying

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 98 of 126

Page 72

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

*Wagoner* Rule to hold chapter 7 trustee to *in pari delicto* defenses applicable to the corporation and its management whom the trustee replaced).

FN208. *See In re KB Toys, Inc.,* 736 F.3d 247, 252 54 (3rd Cir.2013) (" *KB Toys* ") (a trade claim that was subject to disallowance in the hands of the original claimant as a preferential transfer was similarly disallowable in the hands of a subsequent transferee). Like the Third Circuit in *KB Toys, see id* at 254 n. 11, the Court has considered, but declined to follow, the contrary holding in *Enron Corp. v. Springfield Assocs. (In re Enron Corp.),* 379 B.R. 425 (S.D.N.Y.2007) (*Enron District* "), (Scheindlin, J.) (" *Enron District* "), which had held that susceptibility for equitable subordination and claims disallowance would continue if a transfer was by way of an "assignment," but not by "sale." The Third Circuit in *KB Toys* court found this distinction to be "problematic," *id.* and for that reason and others, it followed the contrary decisions in *Enron Corp. v. Avenue Special Situations Fund II, LP (In re Enron Corp.),* 340 B.R. 180 (Bankr.S.D.N.Y.2006) (Gonzalez, J.) (" *Enron Bankruptcy* ") (which the *Enron District* court had reversed), and in *In re Metiom, Inc.,* 301 B.R. 634 (Bankr.S.D.N.Y.2003) (Drain, J.), with which this Court, like the Third Circuit, agrees.

FN209. *See* n. 157 *supra.*

FN210. *See Old Carco,* 492 B.R. at 399.

FN211. 492 B.R. at 403 (emphasis added).

Thus the caselaw requires that New GM receive the same protection from Used Car Owners' successor liability claims that it had from their assignors'.

[23]The Used Car Purchasers' contention that they deserve better treatment than other GM vehicle owners is also illogical and unfair. As New GM argues, with considerable force, "an owner of an Old GM vehicle should not be able to 'end-run' the applicability of the Sale Order and Injunction by merely selling that vehicle after the closing of the 363 Sale ... if the Sale Order and Injunction would have applied to the original owner who purchased the vehicle prior to the 363 Sale, it equally applies to the current owner who purchased the vehicle after the 363 Sale." [FN212] There is no basis in logic or fairness for a different result.

FN212. *See* New GM Opening Br. at 66.

For all of these reasons, the Court concludes, after what is effectively *de novo* review (focused on the non-showing by Used Car Purchasers of anything they might have argued to defeat the Free and Clear Provisions beyond anything previously argued), that Used Car Purchasers have likewise failed to make a showing of prejudice, and the Free and Clear Provisions stand for them as well.

*6. Application of Those Principles to Pre-Closing Accident Plaintiffs*

[24]Like the Economic Loss Plaintiffs whose claims the Court just addressed, the Pre-Closing Accident Plaintiffs seek to impose*573 successor liability on New GM. But though the Court has found that they did not get the notice due process requires, they were not prejudiced by the failure.

Preliminarily, the Court's determination that the Economic Loss Plaintiffs were not prejudiced by the Free and Clear Provisions applies equally to the Pre-Closing Accident Plaintiffs. The Pre-Closing Accident Plaintiffs likewise have offered no arguments here as to why the Court's earlier order pro-

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 99 of 126

Page 73

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

scribing successor liability was wrong. And it requires
no speculation here for the Court again to find no basis
for a different legal result. In fact, many of the ob-
jectors whose contentions the Court rejected back in
2009 were asserting the exact same types of claims the
Pre Closing Accident Plaintiffs have—claims for
injury or death from pre-closing accidents, involving
vehicles or parts manufactured by Old GM. While the
Pre Closing Accident Plaintiffs' claims (premised
upon actual injury or death, and, at least allegedly,
from the safety risk of which Old GM was aware),
might be regarded by many as more sympathetic than
those of Economic Loss Plaintiffs, they nevertheless
are efforts to impose successor liability. And conten-
tions that the Pre Closing Accident Plaintiffs would
successfully impose successor liability by reason of
political concerns are once again speculative, just as
the similar arguments of the Economic Loss Plaintiffs
were.

The arguments as to Sale Order breadth that the
Economic Loss Plaintiffs might have asserted would
not be relevant to the Pre Closing Accident Plaintiffs.
To the extent the Sale Order was overbroad, it was so
as to any claims that might arise *solely by reason of
New GM's conduct*. The Pre Closing Accident Plain-
tiffs suffered the injury or death underlying their
claims in Old GM cars, and with Old GM parts. Any
actionable conduct causing that injury or death took
place before the 363 Sale—and necessarily was by
Old GM, not New GM, and indeed before New GM
could have done anything wrong.

If the overbreadth objection were sustained and
the Sale Order could be, and were, fixed (a matter
addressed in Section II below, dealing with Reme-
dies), the Pre Closing Accident Plaintiffs still could
not assert claims against New GM.

The Pre Closing Accident Plaintiffs did not suf-
fer the prejudice that is an element to a denial of due
process claim.

*7. Application to Filing of Claims*

[25]Much of the analysis above applies equally to
the allowance of claims. But due process analysis in
the claims allowance context must take into account
two differences. First, here there was not the same
degree of urgency with respect to the deadline for
filing claims. And second, while prejudice is required
in the claims context as well, the denial of the oppor-
tunity to file a timely proof of claim—and with it, the
likely or certain expungement of one's claim—is at
least generally, if not always, classic prejudice.

As noted above, due process analysis requires the
consideration of the surrounding circumstances.
While the need for urgency in a judicial process is the
paradigmatic example of a relevant circumstance, the
converse is also true. When the urgency is lacking, the
hugely important factor of impracticality by reason of
time constraints drops out of the picture. In contrast to
the 363 sale process, claims could be (and ultimately
were) considered in a less hurried fashion.

Nevertheless, were it not for the fact that Ignition
Switch Defects were known claims (for reasons dis-
cussed in Section I(A)(5) above), service of notice of
the Bar Date by the publication that here was uti-
lized*574 [FN213] would still be adequate. Old GM was
careful to send out notice of the Bar Date to any who
had brought suit against Old GM or expressed to Old
GM their belief that they might have claims, and the
Court approved Old GM's proposals for notice by
publication to those not known by Old GM to have
potential claims against the Old GM estate.

> FN213. The Plaintiffs seek to compare and
> contrast the highly detailed and carefully
> structured publication notice that this Court
> authorized with respect to worker claims that
> might have arisen by reason of their exposure
> to the chemical diacetyl, in another case on
> the Court's watch, *Chemtura* (No. 09–11233

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 100 of 126

Page 74

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

(reg)), where a challenge to the adequacy of the notice was rejected by this Court and later affirmed on appeal. *See Gabauer v. Chemtura Corp. (In re Chemtura Corp.),* 505 B.R. 427 (S.D.N.Y.2014) (Furman, J.). The comparison is not an apt one. There, as a result of a shared desire of the debtor and the Court to provide the best notice possible to workers who might have been exposed to diacetyl (and because Chemtura wanted to lean over backwards to get a discharge of such claims on which it could rely), the Court established special measures, such as notices with an unusually detailed discussion of the possibility of illness, postings of notices in each potentially affected plant, notices in local community newspapers, and publication in both English and Spanish. But these measures are properly thought of as "best practices," or at least an excess of caution, which would not establish a minimum standard for the quality of notice that is constitutionally required.

But with respect to the allowance of claims, the failure to send out Ignition Switch Defect recall notices, much more clearly than with respect to notice of the 363 Sale, resulted in the denial of the notice that due process requires. And though a showing of prejudice here too is required, the Court finds that the denial of timely notice of the Old GM Bar Date prejudiced the Plaintiffs with respect to any claims they might have filed against Old GM.

By reason of its failure to provide the Plaintiffs with either the notice required under the Safety Act or any other form of written notice, Old GM failed to provide the Plaintiffs with the notice that due process requires. [FN211] And because that failure prejudiced them in filing timely claims, the Plaintiffs were prejudiced as a result. The failure to give the Plaintiffs the notice that due process requires, coupled with the prejudice to them that resulted, denied the Plaintiffs

the requisite due process.

FN214. The Court does not need to decide, and does not decide (in either this context or in the context of the adequacy of notice of the 363 Sale), a matter also debated by the parties—the extent to which a detailed notice describing the types of claims Plaintiffs might assert (or, by analogy, of how they might be adversely affected by the Free and Clear Provisions) was required as a matter of due process law. Because Old GM failed to send out *any* recall notices, or provide *any* alternative form of notice to those with Ignition Switch Defects, whatever, the degree of detail that might otherwise be required is academic.

*II.*
*Remedies*

The second threshold issue requires the Court to determine the appropriate remedies for any denials of due process that the Court may have found. Once again, the Court focuses on the Sale Order and claims allowance process separately.

*A.*
*The Sale Order*

The Plaintiffs argue that the Court should simply deny New GM enforcement of the Sale Order "as to the objecting claimant[s] who did not receive due process," [FN215] (*i.e.,* as to *them*), even with respect to the same successor liability as to *575 which the Court ruled against others who got notice and argued against it. They argue, in substance, that they should be permanently absolved from the Sale Order's Free and Clear Provisions irrespective of whether those provisions were right or wrong. Not surprisingly, the Court rejects this contention.

FN215. Pl. Br. at 62.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 101 of 126

Page 75

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

By the same token, New GM argues that the Plaintiffs' remedy, if any, is to enforce their claims against the proceeds of the 363 Sale, and that the unitary nature of the Sale Order requires that the Court either enforce it as a whole or vacate it as a whole – while also reminding the Court (though the Court need hardly be reminded) that unwinding the sale at this point is unthinkable. Though these contentions are not as offensive as the Plaintiffs', these too are flawed.

Like the Due Process issue, the Court analyzes the Remedies issue in ways materially different than the parties here do – in accordance with the discussion that follows.

*1. Prejudice As Affecting Remedy*

For reasons discussed above,[FN216] the Court has already rejected the Plaintiffs' contention that prejudice is irrelevant to the existence of a due process violation resulting from a denial of the requisite notice. That limits, though it does not eliminate, the matters for which a remedy must be crafted.

> FN216. *See* page 71 & nn.162 through 165 *supra*.

Here the Plaintiffs failed to receive notice they might have used to join others likewise arguing against the Free and Clear Provisions. But the others made those points, and made them well. And while the prejudice analysis might be different if the Plaintiffs now identified successor liability points others failed to make, here no such points have been identified. On the Free and Clear Provisions barring successor liability, there is no prejudice; thus no due process claim; and thus nothing to remedy.[FN217]

> FN217. Even if prejudice did not need to be found as an element of a claim of denial of due process in the first place, prejudice would nevertheless be a critical element in

determining the proper remedy. As noted above, the Court believes that the methodology for the correction of a denial of an opportunity to be heard in a sale order context should be (1) at least temporarily relieving an adversely affected litigant of the effect of the order, and then (2) giving the adversely affected litigant the opportunity to be heard that was previously denied – repairing any damage that might have resulted from an incorrect or incomplete ruling the first time. Apart from the unfairness of treating the Plaintiffs better than others similarly situated, granting them any more than that would favor the Plaintiffs with an outcome that the Court has already determined is contrary to existing law, and grant them a wholly inappropriate windfall.

But on the Plaintiffs' second principal matter of concern – the overbreadth of the Sale Order – the situation is different. There is a flaw in the order, protecting New GM from liability on claims that, while they involve Old GM vehicles or Old GM parts, do not rest on successor liability, and instead rely on New GM's alleged wrongful conduct alone. The Plaintiffs could have made overbreadth arguments if given appropriate notice before the 363 Sale hearing, and to that extent they were prejudiced. And for that the Plaintiffs should be entitled to remedial relief to the extent the law otherwise permits.

*2. Attaching Claims to Sale Proceeds*

So it is necessary then to turn to New GM's points. In several respects, New GM is right, but in material respects New GM extends existing law too far, or fails to recognize the holdings or implications of existing precedent.

**\*576** Over-extension of existing law is the problem with respect to New GM's first point: its contention that the Plaintiffs' claims should attach to the 363 Sale Proceeds. That often works fine; courts routinely

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 102 of 126

Page 76

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

provide that upon sales of estate property subject to a
lien, the rights of parties with liens on the collateral
that was sold attach to the proceeds instead.[FN218] And
since the secured component of a claim protected by a
lien cannot exceed the value of the collateral, that will
typically eliminate any prejudice to the lien creditor.
That was the situation in *Edwards*, which (because it
involved a lien) reached the right bottom line. But as
this Court noted above, [FN219] the claims and interests
proscribed by a sale order can go beyond mere liens,
and New GM's analysis can work only for liens – or,
perhaps, any similar interests whose value is capped
by the value of collateral being sold. If another kind of
interest was impacted—as it has been here—a dif-
ferent remedy must be considered.

> FN218. In fact, the Court did exactly that at
> the time of the 363 Sale, with respect to
> lenders (the "**TPC Lenders**") who had liens
> on a transmission manufacturing plant in
> Maryland, and a service parts distribution
> center in Tennessee, that went over to New
> GM in the Sale. *See In re Motors Liquidation
> Co.,* 482 B.R. 485, 487
> (Bankr.S.D.N.Y.2012) (Gerber, J). After a
> series of negotiations, the TPC Lenders and
> Old GM agreed to protective provisions un-
> der which the proposed sale could go through
> while protecting the TPC Lenders' lien rights.
> The two properties were sold free and clear
> of liens; cash proceeds were put into an es-
> crow account, to which the TPC Lenders'
> liens would attach; and the Court later ruled
> on valuation issues that would determine the
> TPC Lenders' monetary entitlement.

> FN219. *See* page 54 et seq. & n.123, *supra.*

New GM's second point (that the Sale Order
cannot be vacated or modified at this late point in
time) breaks down into several distinct, but related,
points—raising issues of bankruptcy policy and the
finality of judicial sales; of due process law; and of

respect for the nonseverability provisions in orders
upon which many rely. Each raises matters of legiti-
mate concern from New GM's perspective. But they
can be taken only so far.

*3. Protection of Purchasers of Estate Assets*

New GM points out that the buyers of assets from
chapter 11 estates acquire property interests too – as
recognized by the Seventh Circuit in *Edwards*
[FN220] and that taking away those purchasers' con-
tractually bargained-for rights strikes at the heart of
understandings critically important to the bankruptcy
system. In this respect, New GM is right. The Second
Circuit has repeatedly recognized the importance to
the bankruptcy system of concerns before the Court
here. In one instance, the Circuit observed that "[w]e
have long recognized the value of finality in judicial
sales." [FN221] In another, the Circuit affirmed a District
Court judgment dismissing successor liability claims
after a bankruptcy sale, observing that:

> Allowing the plaintiff to proceed with his tort claim
> directly against [the asset purchaser] would be in-
> consistent with the Bankruptcy Code's priority
> scheme because plaintiff's claim is otherwise a
> low-priority, unsecured claim. Moreover, to the
> extent that the "free and clear" nature of the sale (as
> provided for in the Asset Purchase Agreement
> ("APA") and § 363(f)) was a crucial inducement in
> the sale's successful transaction*577 ... it is evident
> that the potential chilling effect of allowing a tort
> claim subsequent to the sale would run counter to a
> core aim of the Bankruptcy Code, which is to
> maximize the value of the assets and thereby
> maximize potential recovery to the creditors.[FN222]

> FN220. *See* nn.69 & 123 *supra.*

> FN221. *Licensing by Paolo, Inc. v. Sinatra
> (In re Gucci),* 126 F.3d 380, 387 (2d
> Cir.1997) (" *Gucci* ").

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 103 of 126

Page 77

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

FN222. *Douglas v. Stamco,* 363 Fed.Appx.
100, 102 (2d Cir.2010) (summary opinion,
Katzmann, Walker, and Feinberg, C.JJ.)
(quoting *In re Trans World Airlines, Inc.,* 322
F.3d 283, 292 (3d Cir.2003) ("To allow the
[plaintiff] to assert successor liability claims
against [the purchaser] while limiting other
creditors' recourse to the proceeds of the as-
set sale would be inconsistent with the
Bankruptcy Code's priority scheme.")) (cita-
tion, and footnote reference explaining why
"free and clear" nature of the sale was an
inducement there, omitted).

For all of these reasons, if it were not for the fact
that the Plaintiffs' claim is a constitutional one, the
Court would decline to deny enforcement of the Sale
Order, in whole or in part. There is no good reason to
give creditors asserting successor liability claims
recovery rights greater than those of other creditors.
And as importantly or more so, the interests inherent
in the enforceability of 363 orders (on which the
buyers of assets should justifiably be able to rely,[FN223]
and on which the interests of creditors, keenly inter-
ested in the maximization of estate value, likewise
rest) are hugely important.[FN224]

FN223. *See, e.g., In re Lehman Bros. Hold-
ings Inc.,* 445 B.R. 143
(Bankr.S.D.N.Y.2011) (Peck, J.) (" *Lehman*
"), *aff'd in part and rev'd in part on other
grounds,* 478 B.R. 570 (S.D.N.Y.2012),
*aff'd,* 761 F.3d 303 (2d Cir.2014). As Judge
Peck observed in *Lehman,* declining to grant
Rule 60(b) relief as to a sale order even
though significant information was not pro-
vided to him (and even while recognizing
that sale orders are not exempt from Rule
60(b) relief when cause is shown):

This tension relating to finality naturally
exists to some extent in every motion un-
der Rule 60(b) but the Court views final

sale orders as falling within a select cate-
gory of court order that may be worthy of
greater protection from being upset by later
motion practice. Sale orders ordinarily
should not be disturbed or subjected to
challenges under Rule 60(b) unless there
are truly special circumstances that war-
rant judicial intervention and the granting
of relief from the binding effect of such
orders.

*Id.* at 149.

FN224. There is also a policy concern,
though the Court does not suggest that a
policy concern could trump the requirements
of law, or, especially, parties' constitutional
rights. But those in the bankruptcy commu-
nity would instantly understand it. As the
court noted in *In re White Motor Credit
Corp.,* 75 B.R. 944, 951 (N.D.Ohio 1987):

The effects of successor liability in the
context of a corporate reorganization pre-
clude its imposition. The successor liabil-
ity specter would chill and deleteriously
affect sales of corporate assets, forcing
debtors to accept less on sales to compen-
sate for this potential liability. This nega-
tive effect on sales would only benefit
product liability claimants, thereby sub-
verting specific statutory priorities estab-
lished by the Bankruptcy Code. This result
precludes successor liability imposition.

### 4. Effect of Constitutional Violations

[26] But we here have a constitutional viola-
tion—a denial of due process. In such an instance, the
Court must then determine whether doctrine that
would justify modification of the Sale Order under less
extreme circumstances has to give way to constitu-
tional concerns. The Court concludes that it must.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July 6    2015 Letter from King & Spaling LLP    Pg 104 of 126

Page 78

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

New GM has called the Court's attention to two decisions in which courts declined to grant relief from sale orders where those seeking the relief received inadequate notice.[FN225] But in each case the party seeking the relief was found not to have been materially prejudiced or prejudiced at all. New GM has not called the Court's attention*578 to any case in which an order was found to have been entered with a prejudicial denial of due process and the court nevertheless denied relief.[FN226] By contrast, the Plaintiffs have called the Court's attention, and/or the Court has found, six decisions—including two by the Second Circuit—modifying, or declining to enforce as against adversely affected parties, earlier orders in instances where those parties were denied due process and also prejudiced thereby.[FN227]

> FN225. *See Edwards,* n. 69, and *Paris Industries,* n. 123 *supra.*

> FN226. In its reply, New GM calls the Court's attention to the Supreme Court's decision in *Factors' & Traders' Ins. Co. v. Murphy,* 111 U.S. 738, 4 S.Ct. 679, 28 L.Ed. 582 (1884) (" *Factors'* "), a case in which one of the several noteholders of four notes secured by a common mortgage failed to get notice of a free and clear sale, and the Court determined that the choices there were to either uphold a free and clear sale order in full or wholly invalidate it. *See* New GM Reply Br. at 46. It is true that the Court there saw those two options as the only fair alternatives. But the Court's ruling was to that effect not because of a holding that courts lack the power to more selectively enforce orders where a person is denied notice, but because doing so under the facts there (where the party not given notice would get a leg up over her fellow noteholders) would be unfair to the other noteholders, invalidating their liens while upholding only hers. *Factors'*

thus does not support New GM's position in the respect for which it was cited. It does, however, support New GM in a different, and ultimately more important, respect—New GM's point that the Plaintiffs cannot secure relief based on a lack of notice alone, without showing prejudice. *Factors'*evidences courts' reluctance to grant windfalls to those who claim to have received deficient notice, and their concern instead with a fair result.

> FN227. *See Manville 2010,* n. 69 *supra,* 600 F.3d at 153–54 (after ruling that due process was denied, ruling that an adversely affected insurer was not bound by an earlier bankruptcy court order); *Koepp,* n.69 *supra,* 593 Fed.Appx. 20 (ruling that easement holder was not deprived of her interest when her predecessor was not given notice of a railroad reorganization consummation order that extinguished the predecessor's interest); *Doolittle v. Cnty. of Santa Cruz (In re Metzger),* 346 B.R. 806, 819 (Bankr.N.D.Cal.2006) (Weisbrodt, J.) (" *Metzger* ") (finding sale order void to the extent (but only the extent) it affected the rights of an entity with an interest in the sold property that did not receive due process); *In re Polycel Liquidation, Inc.,* 2006 Bankr.LEXIS 4545, at *25–26, 31–34, 2006 WL 4452982, at *9, 11–12 (Bankr.D.N.J. Apr. 18, 2006) (" *Polycel Bankruptcy* ") (Lyons, J.) (after ruling that due process to an entity was denied by reason of failure to provide notice, voiding sale to extent, but only the extent, that it conveyed that entity's property), *aff'd,* 2007 U.S. Dist. LEXIS 955, 2007 WL 77336 (D.N.J. Jan. 8, 2007) (" *Polycel District* ") (Cooper, J.) (holding, *inter alia,* that Bankruptcy Court was not bound to either void the sale or let the sale stand); *Compak Cos., LLC v. Johnson,* 415 B.R. 334, 342 (N.D.Ill.2009) ( " *Compak* ")

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July 6    2015 Letter from King & Spaling LLP    Pg 105 of 126

Page 79

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: **529 B.R. 510**)

(holding that patent licensors' interests could not be extinguished by a sale order without due process, notwithstanding *Edwards*, given that the lienholder in *Edwards* had suffered only a trivial loss of interest); *Grumman Olson Bankruptcy*, 445 B.R. 243, *aff'd* 467 B.R. 694, 706‑07 (finding due process concerns made bar of successor liability unenforceable against claimants who were unknown, future, claimants at the time of the sale).

The latter decisions reached those results by varied means (and some with reference to Fed. R. Civ. P. 60(b) and some without it), but they all came to the same bottom line. They relieved the adversely affected party of the effects of the order insofar as it prejudiced that party. New GM insufficiently recognizes the significance of those decisions.

The decision most closely on point is *Metzger*. There the debtor in a chapter 11 case owned land to be later developed for the construction of townhouses that was subject to a deed restriction entered into with the county under which four of the units later to be constructed had to be sold at below market rates. The debtor sold the property under a free and clear order in 1992, but without notice to the county. In 2006, 14 years after the court issued the *579 sale order, the purchaser's successor found itself in a dispute with the county over the continuing validity of the restriction, and sought to enforce the free and clear provisions. As here, the county contended that it could not be bound by the free and clear provisions, because it was not given notice of the hearing at which the sale was approved.[FN228]

FN228. *See* 346 B.R. at 809‑10.

On those facts, the *Metzger* court ruled, under Fed. R. Civ.P. 60(b),[FN229] that the order was "void as to the County's interest."[FN230] It continued:

The Court has some flexibility in creating a remedy here and need not and will not find the entire sale void on these facts. The Court need only find, and does find, that the County's interest in the Property survived the sale to [the purchaser]. The 1992 Sale Order is to that limited extent void because the County's due process rights were violated.[FN231]

FN229. With exceptions not applicable here, Rule 60(b) applies in cases under the Bankruptcy Code under Fed. R. Bankr.P. 9024.

FN230. *Id* at 819.

FN231. *Id* (citations omitted).

Addressing remedy in the same fashion are the Bankruptcy Court and District Court decisions in *Polycel*. There the debtor sold its property (or what it said was its property) free and clear, in a 363 sale. The property assertedly conveyed to the buyer included commercial molds used in the manufacture of prefabricated panels used to form the interior surface of inground swimming pools. But a third party, Pool Builders Supply of the Carolinas ("**Pool Builders Supply**"), which without dispute was not given notice of the sale, and which contended that it was the true owner of the molds, sought relief from the sale order asserting that its property was taken without due process.

The Bankruptcy Court granted relief under Rule 60(b), voiding the sale order as to Pool Builders Supply alone (keeping the remainder of the sale order intact), and the Bankruptcy Court's determination was affirmed on appeal. The *Polycel Bankruptcy* court balanced the competing concerns of bankruptcy court finality and due process requirements, and concluded that the latter should prevail. Disagreeing with so much of *Edwards* that considered that the interests of finality to outweigh the due process concerns, the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 106 of 126

Page 80

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

*Polycel Bankruptcy* court stated:

This court is inclined to disagree with the reasoning
of the Seventh Circuit, and instead follows the more
persuasive line of cases that recognize the im-
portance of affording parties their due process rights
over the interest of finality in bankruptcy sales.

Although this court agrees that the interest of final-
ity is an important part of ensuring participation in
bankruptcy sales, this cannot trump constitutionally
mandated due process requirements for notice and
an opportunity to be heard.[FN232]

> FN232. 2006 Bankr.LEXIS 4545, at *30,
> 2006 WL 4452982, at *10 11 (citations
> omitted).

Addressing the Remedies issue in the same
fashion is *Compak*. There, a suit over patent in-
fringement and the entitlement to patent royalties
turned on whether a patent license could be extin-
guished in a 363 sale of all of the debtor's assets. A
sublicensee of the patent rights was not given notice of
a 363 sale that would extinguish the sublicensee's
claims.[FN233] After discussion of the prejudice the sub-
licensee *580 suffered, and distinguishing *Edwards*
because of the much greater "interests at stake," the
*Compak* court concluded that "the Sale Order is 'void'
insofar as it purports to extinguish the defendants'
license."[FN234]

> FN233. *See* 415 B.R. at 337.

> FN234. *See id.* at 342 43.

In the *Grumman Olson Opinions*, Judges Bern-
stein and Oetkin dealt with a factual variant of the 363
sale order cases discussed above. Those decisions,
unlike those previously discussed, did not involve
individuals who were supposed to get notice but didn't
get it, but rather people who the debtor *could not have*

*given notice to*, because they did not have claims or
interests yet.

There certain of the assets of the debtor Grumman
Olson, a manufacturer of truck bodies that were in-
stalled in complete vehicles, had been sold in a 363
sale with protection against successor liability claims.
Prior to its bankruptcy, Grumman Olson sold a truck
body that was incorporated into a vehicle sold to
Federal Express; years later (long after the sale), a
FedEx employee was injured when the FedEx truck
she was driving hit a telephone pole, and she and her
husband (who joined in the lawsuit) sued the asset
purchaser under successor liability doctrine. For ob-
vious reasons (as they had no contact with the debtor
prior to the sale), the woman and her husband were not
known to the debtor at the time of the sale and re-
ceived no notice of the sale hearing. Judge Bernstein
ruled that they did not have claims (as they had not yet
suffered injuries before the sale, and had no earlier
contact with the debtor), but his more important con-
clusion for our purposes was that they could not be
bound by the sale order. He concluded that "the Sale
Order does not affect their rights to sue [the purchas-
er]."[FN235] He did so without resort to Rule 60(b), and
without invalidating the sale order as to anyone else or
in any other respect.

> FN235. 445 B.R. at 254.

The Second Circuit has twice addressed these
issues in ways relevant here, though in situations not
quite as similar to those addressed above. In *Man-
ville 2010*, the Circuit considered the effect of a de-
nial of due process in connection with a bankruptcy
court order though not in connection with a sale
order, or, of course, one with free and clear provisions.
Though most of the details of that fairly complex
controversy need not be discussed here, *Man-
ville 2010* is important for the Circuit's conclusion as
to the appropriate remedy after it found a due process
violation.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 107 of 126

Page 81

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

There the debtor Manville, which had been subject to massive liabilities resulting from its manufacture of asbestos (and whose insurance policies, notwithstanding coverage disputes, were its most valuable asset), entered into a series of settlements and settlement clarifications in the 1980s with a group of its insurers, including Travelers, its primary insurer, which were approved by Bankruptcy Court orders.[236] Under the settlement documents, in exchange for sizable contributions to a settlement fund, the insurers were relieved of all obligations related to the disputed policies, and the insurers would be protected from claims based on such obligations by bankruptcy court injunctive orders. By bankruptcy court orders entered in 1986, claims related to the policies were channeled to a trust created for addressing Manville's liabilities, and injunctive orders implemented broad releases protecting the settling insurers on "Policy Claims"– defined as "any and all claims ... by any Person ... based upon, arising out of or *581 related to any or all of the Policies" at issue in the settlement.[237]

FN236. *See* 600 F.3d at 138 39.

FN237. *Id.* at 139.

But another insurer, Chubb, was not a party to the settlements approved in the 1980s,[238] and had not received notice then that its own claims would be (or at least could be) enjoined too. Chubb thus argued that it could not, as a matter of due process, be bound by the 1986 Orders' terms.[239]

FN238. *Id.* at 143.

FN239. *See id.* at 148.

For reasons unnecessary to discuss here, the Circuit agreed that Chubb had been denied due process. But it did not vacate the 1986 Orders in their entirety. It held simply that "[u]nder the unique circumstances of this case, there can be little doubt that the publication notice employed by the bankruptcy court in 1984 was insufficient to bind Chubb to the 2004 interpretation of the 1986 Orders."[240]

FN240. *Id.* at 157; accord *id.* at 158 ("Chubb is therefore not bound by the terms of the 1986 Orders. Consequently, it may attack the Orders collaterally as jurisdictionally void. And, as we held in *Manville III,* that attack is meritorious.").

The *Manville 2010* court did not invoke Rule 60(b) in support of its decision, or even mention it. Nor did it expressly discuss whether orders could be invalidated only in part by reason of a denial of due process. But *Manville 2010* necessarily must be read as having concluded that after a denial of due process prejudicing only a single party (even if the order affects other parties, and affecting those other parties is unthinkable), the partial denial of enforcement of that order, insofar as it binds that party alone, is permissible.

To the same effect is the Circuit's decision in *Koepp,*[241] which, while a Summary Order not binding on the lower courts in the Second Circuit, further evidences the Circuit's thinking on whether orders can be less than fully enforced without wholly vacating them. *Koepp,* unlike *Manville 2010,* involved a free and clear order. As relevant here, the Circuit considered a party's claim to easements on land conveyed to a reorganized company (in a § 77 railroad reorganization under the now superseded Bankruptcy Act) under a reorganization plan with free and clear provisions not materially different than those in the Free and Clear order here. Notice had not been given to the easement owner's predecessor when the reorganization plan had been approved, and for that reason, the Circuit concluded that the District Court correctly ruled that the railroad reorganization consummation order (analogous to a confirmation order

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 108 of 126

Page 82

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

under present law) did not extinguish the easements.
Once again, the Circuit did not invoke Rule 60(b), nor
did it invalidate the consummation order. It simply
declined to find the free and clear provisions en-
forceable against the adversely affected party.

FN241. 593 Fed.Appx. 20.

New GM points out, in this connection, that Rule
60(b) provides that a court "may relieve a party ...
from a final judgment, order or proceeding" for the
reason, among others, that "the *judgment* is void,"
[FN242] and does not speak of relieving parties from
*provisions within* judgments or orders—*i.e.,* a partial
invalidation. And New GM further points out that the
Sale Order expressly provided that it was not sever-
able, and that this was a material element of the un-
derstanding under which it acquired Old GM's assets,
and took on many, but not all, of Old GM's liabilities.
For that reason, New GM argues that the *582 Court
can only void the Sale Order in its entirety (which
obviously is not an option here) or enforce the sale
order as written. In an ordinary situation—one not
involving a denial of due process—the Court would
agree with New GM; the Court well understands how
363 sale agreements and sale orders are carefully
drafted, and how the buyers of assets contemplate
taking on certain identified liabilities, but no more.
But here failures of notice gave rise, in part,[FN243] to
denials of due process, and that distorts the balancing
under which concerns of predictability and finality
otherwise prevail.

FN242. Fed. R. Civ. P. 60(b) and 60(b)(4).

FN243. It will be remembered that the
Plaintiffs were denied due process only with
respect to the Sale Order's overbreadth. They
were not prejudiced with respect to the Free
and Clear Provisions, and cannot claim a
denial of due process, or, of course a remedy,
with respect to those.

[27]In each of *Manville 2010, Koepp, Metzger,
Polycel District, Polycell Bankruptcy, Compak,* and
the two *Grumman Olson Opinions,* after they found
what they determined to be denials of due process, the
courts granted what in substance was a partial denial
of enforcement of the order in question—either by
invocation of Rule 60(b) in some fashion (finding the
order void only to a certain extent, or as to an identi-
fied party) [FN244] or without mentioning Rule 60(b) at
all.[FN245] In *Polycel Bankruptcy,* for instance, the
Bankruptcy Court concluded, after its 60(b) analysis,
"*[t]o that extent,* the Sale Order is void...." [FN246] In
*Manville 2010,* the Circuit found the earlier order
unenforceable against Chubb without mention of Rule
60(b) at all. Though they reached their bottom lines by
different paths, the takeaway from those cas-
es—especially in the aggregate—is effectively as
stated by the Bankruptcy Court in *Metzger* — that
"[t]he Court has some flexibility in creating a remedy
here and need not ... find the entire sale void on these
facts," and that the sale order was "to that limited
extent void." [FN247]

FN244. *See Metzger,* 346 B.R. at 816; *Pol-
ycel District,* 2007 WL 77336, at *9, 2007
U.S. Dist. LEXIS 955, at *28; *Poly-
cel Bankruptcy,* 2006 WL 4452982, at *1,
6–8, 11, 2006 Bankr.LEXIS 4545, at *1–2,
17–26, 31–34; *Compak,* 415 B.R. at 341.

FN245. *See Manville 2010,* 600 F.3d at
153–54; *Koepp,* 593 Fed.Appx. at 23;
*Grumman Olson Bankruptcy,* 445 B.R. at
245. 254–55 (considering ability of pur-
chaser's successor after a 363 sale to enforce
sale order against one injured after the sale,
without reference to Rule 60(b)); *Grumman
Olson District,* 467 B.R. at 696, 699–700
(affirming *Grumman Olson Bankruptcy,* and
likewise not relying on Rule 60(b)).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July 6    2015 Letter from King & Spaling LLP    Pg 109 of 126

Page 83

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

FN246. 2006 WL 4452982, at *12, 2006 Bankr.LEXIS 4545, at *34 (emphasis added).

FN247. 346 B.R. at 819.

For that reason, New GM's point that the Sale Order provided that it was a unitary document, and that the Free and Clear Provisions could not be carved out of it, cannot be found to be controlling once a court finds that there has been a due process violation. If a court applies Rule 60(b) analysis, and determines, as in *Metzger* and *Polycel Bankruptcy*, that a sale order can be declared void to a "limited extent," the provisions providing for the sale order's unitary nature fall along with any other objectionable provisions. And if a court considers it unnecessary even to rely on Rule 60(b) at all (as in *Manville 2010* and *Koepp* ), it can selectively decline enforceability as the Circuit did in those cases.

### 5. Remedies Conclusion

[28]For these reasons, the Court concludes that as in *Manville 2010, Koepp,* and the lower court cases it can excuse **\*583** the Economic Loss Plaintiffs [FN248] from compliance with elements of the Sale Order without voiding the Sale Order in its entirety. And the Court further concludes that on the narrow facts here where the reason for relief is of constitutional dimension the nonseverability provisions of the Sale Order do not bar such relief.

FN248. It will be recalled that this applies only to the overbreadth objection, and thus does not benefit the Pre Closing Accident Plaintiffs. For lack of prejudice and any showing that either group of Plaintiffs would have successfully made any successor liability arguments that others did not make the Free and Clear Provisions stand.

*B.*

### Claims

[29]The remedy with respect to the denial of notice sufficient to enable the filing of claims before the Bar Date is obvious. That is leave to file late claims. And the Court may grant leave from the deadline imposed by the Court's Bar Date Order, just as the Circuit relieved Chubb and the easements owner from enforcement of the earlier orders in *Manville 2010* and *Koepp.*

There is of course a separate issue as to whether the Plaintiffs should have the ability to tap GUC Trust assets that are being held for other creditors and claimants, even if later claims were allowed. But that separate issue is discussed in Section IV below.

### III.
### Assumed Liabilities

Although once regarded as important enough to be a threshold issue, determination of what liabilities New GM agreed to assume (and conversely declined to assume) is now of very little importance. The Plaintiffs have not disputed what the Sale Agreement and Sale Order say.[FN249] Earlier potential disputes over what they say have now been overtaken by the issues as to whether any Sale Order protections are unenforceable.

FN249. The GUC Trust, however, raises an issue of that character, contending, somewhat surprisingly, that New GM voluntarily assumed economic loss claims taking on liability (beyond for death and personal injury) for "other injury to Persons" with respect to "incidents first occurring on or after the Closing Date...." GUC Trust Br. at 40, citing Sale Agreement § 2.3(a)(ix). But the GUC Trust misunderstands the Sale Agreement. The language to which the GUC Trust referred did not relate to economic loss claims, but rather to death, personal injury, or property damage caused by "accidents or incidents" occurring after the Closing

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 110 of 126

Page 84

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

Date   which included, in addition to accidents, things that were similar, such as fires, explosions or a car running off the road. *See GM Deutsch* and *GM Phaneuf,* n.33 *supra.*

New GM is right that it expressly declined to assume any liabilities based on Old GM's wrongful conduct. But the Court's ruling that it will continue to enforce prohibitions against successor liability makes New GM's concerns as to that academic. And to the extent, if any, that New GM might be liable on claims based solely on any wrongful conduct on its own part (and in no way relying on wrongful by Old GM), New GM would be liable not because it had assumed any Old GM liabilities (or was responsible for anything that Old GM might have done wrong), but only because New GM had engaged in independently wrongful, and otherwise actionable, conduct on its own.

Under the circumstances, the Court need not say any more about what liabilities New GM assumed.

## IV.
### Equitable Mootness
Understandably concerned that the successor liability claims that the Economic *584 Loss and Pre Closing Accident Plaintiffs seek to saddle New GM with are still prepetition claims—and that the Court could reason that to the extent those claims have merit and New GM is not liable for them, *somebody* is likely to be  the GUC Trust and its Participating Unitholders argue that tapping the recoveries of GUC Trust Unitholders would be barred by the doctrine of Equitable Mootness. Though the Court's original instinct was to the contrary (and it once thought that at least partial relief might be available), the Court has been persuaded that they are right.

### A.
### Underlying Principles
The parties do not dispute the underlying princi-

ples, nor that three holdings of the Second Circuit largely determine the mootness issues here—the Circuit's two 1993 *Chateaugay* decisions, involving appeals by the Creditors' Committee of LTV Aerospace [FN250] and creditor Frito–Lay [FN251] in the *LTV* chapter 11 cases, and the Circuit's 2014 *BGI* decision, involving an appeal by creditors seeking to file untimely class proofs of claim against debtor Borders Books in the *BGI* chapter 11 cases.[FN252]

FN250. *See Chateaugay I,* n. 16 *supra.*

FN251. *See Chateaugay II,* n. 16 *supra.*

FN252. *See BGI,* n. 16 *supra.*

[30]The mootness cases start with the proposition that while the Constitution requires the dismissal of cases as moot whenever effective relief cannot be fashioned, the related, prudential, doctrine of equitable mootness requires dismissal where relief *can* be fashioned, but implementation of such relief would be inequitable.[FN253] The doctrine of equitable mootness reflects the "pragmatic principle" that "with the passage of time after a judgment in equity and implementation of that judgment, effective relief ... becomes impractical, imprudent, and therefore inequitable." [FN254] This principle is "especially pertinent" in proceedings in bankruptcy cases, "where the ability to achieve finality is essential to the fashioning of effective remedies." [FN255]

FN253. *See Church of Scientology v. United States,* 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992); *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.),* 416 F.3d 136, 143 (2d Cir.2005).

FN254. *Id.* at 144 (quotations and citations omitted); *see also Alsohaibi v. Arcapita Bank B.S.C.(c) (In re Arcapita Bank B.S.C.(c)),*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

2014 U.S. Dist. LEXIS 1053, at \*14-15,
2014 WL 46552, at \*5, (S.D.N.Y. Jan. 6,
2014) (Scheindlin, J.) (" *Arcapita Bank* ").

FN255. *Chateaugay I,* 988 F.2d at 325; *see
also Compania Internacional Financiera
S.A. (In re Calpine Corp.),* 390 B.R. 508, 517
(S.D.N.Y.2008) (Marrero, J.) (" *Cal-
pine District* "), *aff'd by summary order,* 354
Fed.Appx. 479 (2d Cir.2009) (" *Cal-
pine Circuit* ").

[31]In *BGI,* the Circuit explained that:

Equitable mootness is a prudential doctrine under
which a district court [and by extension, any ap-
pellate court] may in its discretion dismiss a bank-
ruptcy appeal "when, even though effective relief
could conceivably be fashioned, implementation of
that relief would be inequitable." The doctrine
"requires the district court to carefully balance the
importance of finality in bankruptcy proceedings
against the appellant's right to review and relief."
FN256

\*585 And the Circuit there made clear that the
doctrine of equitable mootness applies to chapter 11
liquidations as well as reorganizations. FN257

FN256. 772 F.3d at 107 (quoting *In re
Charter Commc'ns, Inc.,* 691 F.3d 476, 481
(2d Cir.2012) (" *Charter Communications*
")) (internal quotation marks omitted).

FN257. 772 F.3d at 109. *See also Schaefer v.
Superior Offshore Int'l, Inc. (In re Superior
Offshore Int'l, Inc.),* 591 F.3d 350, 353-54
(5th Cir.2009) (applying equitable mootness
analysis to liquidation plan).

[32]But while mootness doctrine has been applied
most frequently in bankruptcy appeals, it has broader

application, including other instances likewise pre-
senting situations where a court has to balance the
importance of finality against a party's desire for re-
lief. "[T]he doctrine is not limited to appeals from
confirmation orders, and has been applied in a variety
of contexts, including ... injunctive relief, leave to file
untimely proofs of claim, class certification, property
rights, asset sales, and payment of prepetition wages."
FN258

FN258. *Arcapita Bank,* 2014 Bankr.LEXIS
1053, at \*19, 2014 WL 46552, at \*5. *See also
BGI,* 772 F.3d at 109 (stating that earlier
cases "suggest that the doctrine of equitable
mootness has already been accorded broad
reach, without apparent ill effect," and citing
*Arcapita Bank* approvingly for the latter's
statement that the "doctrine of equitable
mootness 'has been applied in a variety of
contexts' ").

[33]In *Chateaugay II,* the Circuit held that sub-
stantial consummation of a reorganization plan is a
"momentous event," but it does not necessarily make
it impossible or inequitable for an appellate court to
grant effective relief in all cases.FN259 The Circuit
synthesized earlier law to say that substantial con-
summation will not moot an appeal if all of the fol-
lowing circumstances exist:

(a) the court can still order some effective relief;

(b) such relief will not affect "the re-emergence of
the debtor as a revitalized corporate entity";

(c) such relief will not unravel intricate transac-
tions so as to "knock the props out from under the
authorization for every transaction that has taken
place" and "create an unmanageable, uncontrollable
situation for the Bankruptcy Court";

(d) the "parties who would be adversely affected

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 112 of 126

Page 86

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

by the modification have notice of the appeal and an
opportunity to participate in the proceedings," and

(e) the appellant "pursue[d] with diligence all
available remedies to obtain a stay of execution of
the objectionable order ... if the failure to do so
creates a situation rendering it inequitable to reverse
the orders appealed from." [FN260]

> FN259. See 10 F.3d at 952.

> FN260. Id. at 952 53.

Those five factors are typically referred to as the
Chateaugay factors. "Only if all five Chateaugay
factors are met, and if the appellant prevails on the
merits of its legal claims, will relief be granted." [FN261]

> FN261. Charter Communications, 691 F.3d
> at 482; accord BGI, 772 F.3d at 110.

### B.
### Applying Those Principles Here

[34][35]Here, the parties have stipulated, and the
Court has previously found, that the Plan has been
substantially consummated.[FN262] That, coupled with
the requirement *586 that all of the Chateaugay factors
must be shown to avoid mootness, effectively gives
rise to a presumption of mootness. The Court can find
that some of the Chateaugay factors necessary to
trump that presumption have been satisfied. But the
Court cannot find that they all have been.

> FN262. Equitable Mootness Stipulated Facts
> ¶ 18. This Court found likewise in an earlier
> proceeding in Old GM's chapter 11 case,
> Morgenstein, 462 B.R. at 501 n. 36 ("[T]he
> Plan already has been substantially con-
> summated"). Neither New GM nor the
> Plaintiffs here were parties to Morgenstein,
> and they thus are not bound by res judicata or
> collateral estoppel as to that finding. But their

stipulation to substantial consummation
makes those doctrines academic.

### 1. Ability to Fashion Effective Relief

The first factor that must be established in order to
overcome the presumption of equitable mootness is
that the Court can fashion effective relief. Fashioning
effective relief here would require two steps:

(1) allowing the Plaintiffs to file late claims, after
the Bar Date; and

(2) allowing the GUC Trust's limited assets to be
tapped for satisfying those claims.

The first step would not be particularly difficult.
But the second could not be achieved. There would be
two problems foreclosing the Court's ability to fashion
effective relief.

First, the initial step would be effective relief for
the Plaintiffs only if the second step could likewise be
achieved. And the initial step would be of value (and
the second step could be achieved) only if there were
assets in the GUC Trust not already allocated for other
purposes (such as other creditors' not-yet-liquidated
claims, or expenses of the GUC Trust), or if value
reserved for others were taken away. It is undisputed
that there are no such available assets, and taking
away value previously reserved for those whose
claims have not yet been either allowed nor disallowed
would be inequitable wholly apart from unfairness to
GUC Trust investors.[FN263]

> FN263. Plaintiffs' counsel acknowledged as
> much. See Day 1 Arg. Tr. at 113:15 23 ("by
> the time of the recalls, by the time the plain-
> tiffs got organized and began their litigation,
> by the time we were retained in this case, a
> substantial majority of the funds originally in
> the GUC Trust had been dispersed to GUC
> Trust beneficiaries and it would have been

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 113 of 126

Page 87

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

impossible or very close to impossible to put the ignition switch defect plaintiffs back in the same position they would have been in had they been given enough information to file a claim before the bar date.").

Old GM's plan of reorganization (which as noted was a liquidating plan), made no distributions on claims for as long as they were disputed   not even partial distributions with respect to any undisputed portions. That was not unusually harsh; it is "a regular feature of reorganization plans approved in this Court." [FN264] But to ameliorate the unfairness that would otherwise result, Old GM was required to, and did, establish reserves sufficient to satisfy the disputed claims.

FN264. *Confirmation Decision,* 447 B.R. at 213 & n. 34.

Those reserves were a point of controversy at the time of confirmation; creditors whose claims then were disputed contended that the reserves had to be segregated.[FN265] The Court overruled their objection to the extent they demanded *segregated* reserves, but agreed that reserves had to be established, and in the full amount of their disputed claims.[FN266] *587 Removing that protection now would be grossly unfair to holders of disputed claims, who would have understandably expected at least the more modest protection that they did receive.

FN265. *See id.* at 216  17.

FN266. *See id.* at 217 ("While, as noted above, caselaw requires that reserves be established for holders of disputed claims, it does not impose any additional requirement that such reserves be *segregated* for each holder of a disputed claim."); *id* at n. 50 ("[W]ithout creating reserves of some kind, I have some difficulty seeing how one could

provide the statutorily required equal treatment when dealing with the need to make later distributions on disputed claims that ultimately turn out to be allowed, especially in cases, like this one, with a liquidating plan.").

Additionally, the terms of the Plan that provided for the reserves were binding contractual commitments. They could not be altered without revoking the entirety of the Plan and Confirmation Order.[FN267] But revocation of the Confirmation Order would be impermissible under the Bankruptcy Code, which provides for such revocation only in limited circumstances that are not present here.[FN268] For that reason or others, no party requests it.

FN267. *See Morgenstein,* 462 B.R. at 504 ("A confirmed plan takes on the attributes of a contract ... modification of a contract only in part, without revoking it in whole, raises grave risks of upsetting the expectations of those who provided the necessary assents.") (quotations omitted).

FN268. *See* 11 U.S.C. § 1144.

*2  Effect on Re-emergence of Debtor as Revitalized Corporate Entity*

The second factor that needs to be satisfied is that granting relief would not affect the "reemergence of the debtor as a revitalized corporate entity."

Old GM became the subject of a liquidation. It will not be revitalized. To the extent (which the Court believes is minimal) that any effect on New GM by reason of tapping the GUC Trust's assets would be relevant, the Court can see no adverse effect on New GM.

This factor can be deemed to be either inapplicable or to have been satisfied. [FN269] Either way, it is not an impediment to relief.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 114 of 126

Page 88

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

FN269. *See Beeman v. BGI Creditors' Liq-
uidating Trust (In re BGI, Inc.)*, 2013 U.S.
Dist. LEXIS 77740, at *24-25 (S.D.N.Y.
May 22, 2013) (Andrew Carter, J.)
("*BGI District* ") ("All parties agree the
second Chateaugay factor is inapplicable
because the Debtor has liquidated its assets
and will not re-emerge as a new corporate
entity."); *cf. BGI*, 772 F.3d at 110 n. 15 ("All
parties agreed that the second *Chateaugay*
factor—whether such relief will "affect the
re-emergence of the debtor as a revitalized
corporate entity"—was inapplicable because
Borders liquidated its assets and would not
emerge as a new corporate entity.").

*3. Unraveling Intricate Transactions*

The third factor is that "such relief will not un-
ravel intricate transactions so as to 'knock the props
out from under the authorization for every transaction
that has taken place' and 'create an unmanageable,
uncontrollable situation for the Bankruptcy Court.' "

The manageability problems would not neces-
sarily be matters of great concern, but the Unitholders
are right in their contention that granting relief here
would "knock the props out" from the transactions
under which they acquired their units.

Allowing a potential $7 to $10 billion in claims
against the GUC Trust now would be extraordinarily
unjust for the purchasers of GUC Trust units after
confirmation. With the Bar Date having already come
and gone, they would have made their purchases based
on the claims mix at the time—a then-known universe
of claims that, by reason of then-pending and future
objections to disputed and unliquidated claims, *could
only go down.* Of course, the extent to which the ag-
gregate claims would go down was uncertain; that was
the economic bet that buyers of GUC Trust units
made. But they could not be expected to foresee that

the amount of claims would actually go *up*. They also
could not foresee that future distributions would be
delayed while additional claims *588 were filed and
litigated. Allowing the aggregate claims against the
GUC Trust now to go up (and by $7 to $10 billion, no
less) would indeed "knock the props" out of their
justifiable reliance on the claims mix that was in place
when GUC Trust Units were acquired.

In *Morgenstein*, certain creditors sought, after the
Bar Date and Effective Date, to file and recover on a
class proof of claim in an estimated amount of $180
million, "whose assertion ... would [have been] barred
under the Debtor's reorganization plan ... and confir-
mation order." [FN270] The Court denied the relief sought
on other grounds. But it noted that even though the
creditors were not seeking to recoup distributions that
had already been made, permitting them to proceed
even against the assets remaining in the GUC Trust
raised "fairness concerns." [FN271] And on the record
then before it, the Court added that "mootness con-
cerns may very well still exist." [FN272] It continued that
it suspected, but was not yet in a position to find, that:

hundreds of thousands (or more) of shares and
warrants, with a value of many millions (or more) of
dollars, traded since the Plan became effective,
having been bought and sold based on estimates of
Plan recoveries *premised on the claims mix at the
time the Plan was confirmed.* [FN273]

When the Court made those observations, it
lacked the evidentiary record it has now. But the rec-
ord now before the Court confirms the Court's earlier
suspicions.

FN270. *Morgenstein*, 462 B.R. at 496-97.

FN271. *Id.* at 509.

FN272. *Id.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 115 of 126

Page 89

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

FN273. *Id.* (emphasis added).

When a large number of transactions have taken
place in the context of then-existing states of facts,
changing the terrain upon which they foreseeably
would have relied makes changing that terrain ineq-
uitable. Thus, understandably, the caselaw has evi-
denced a strong reluctance to modify that terrain.

*BGI* is particularly relevant, since there, as here,
the issues before the court involved the allowance of
late claims and contentions of inadequate notice. In
*BGI,* the bankruptcy court, following confirmation of
Borders' plan of liquidation, had denied the appellants
leave to assert late priority claims, and refused to
certify a class of creditors holding unused gift cards
issued by the debtor Borders Books.[FN274] The appel-
lants argued that they had not received adequate notice
of the bar date, and thus that the bankruptcy court had
erred when it denied them that relief.

FN274. *See BGI,* n. 16 *supra,* 772 F.3d at
106; *BGI District,* 2013 U.S. Dist. LEXIS
77740, at *2.

But the BGI liquidating trust had already distrib-
uted more than $80 million, and there was an addi-
tional approximately $61 million remaining for dis-
tribution.[FN275] In holding that those appeals were eq-
uitably moot, Judge Carter in the District Court ap-
provingly quoted Judge Glenn's finding in the Bank-
ruptcy Court that allowing appellants to file late
claims "would result in massive prejudice to the estate
because the distributions to general unsecured credi-
tors who filed timely proofs of claim would be se-
verely impacted."[FN276] The Circuit, in affirming Judge
Carter's District Court ruling, approved this find-
ing.*589 [FN277] Other cases too, though not as closely
on point as *BGI,* have held similarly.[FN278]

FN275. *BGI District,* 2013 U.S. Dist.
LEXIS 77740, at *16.

FN276. *Id.* at *25–26.

FN277. *See BGI,* 772 F.3d at 110 n. 15
("Observing that the transactions in a liqui-
dation proceeding may not be as complex as
those in a reorganization proceeding, the
court nonetheless predicted, *persuasively,*
that allowing Appellants to file late claims
and certifying a class of gift card holders
would have 'a disastrous effect' on the re-
mainder of the liquidated estate and the dis-
tributions under the Plan.") (emphasis add-
ed).

FN278. *See Calpine District,* 390 B.R. at
520 (finding that appellant had failed to sat-
isfy the first *Chateaugay* factor based, in
part, on the court's view that "modifying the
TEV in a consummated plan of reorganiza-
tion that so many parties have relied upon in
making at least some potentially irrevocable
decisions would be inequitable."); *In re En-
ron Corp.,* 326 B.R. 497, 504
(S.D.N.Y.2005) (Marrero, J.) (holding that it
would be "manifestly inequitable" to modify
even a single provision of a substantially
consummated plan "that so many parties
have relied upon in making various, poten-
tially irrevocable, decisions.").

Finally, although most courts have held that
Bankruptcy Courts have the discretion to allow the
filing of class proofs of claim,[FN279] and this Court,
consistent with the authority in this district, has ad-
hered to the majority view,[FN280] courts recognize that
"[t]he costs and delay associated with class actions are
not compatible with liquidation cases where the need
for expeditious administration of assets is para-
mount" and that "[c]reditors who are not involved in
the class litigation should not have to wait for payment
of their distributive liquidated share while the class

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 116 of 126

Page 90

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

action grinds on." [FN281] Thus Unitholders would be prejudiced even if Plaintiffs' claims were ultimately disallowed.

> FN279. *See, e.g., Thomson McKinnon,* 133 B.R. 39, 40 (Bankr.S.D.N.Y.1991).

> FN280. *See In re Motors Liquidation Co.,* 447 B.R. 150, 156–57 (Bankr.S.D.N.Y.2011) (Gerber, J.) ("*GM–Apartheid* ").

> FN281. *Thomson McKinnon,* 133 B.R. at 41.

The Court cannot find this third *Chateaugay* factor to have been satisfied.

*4. Adversely Affected Parties*

The fourth *Chateaugay* factor requires a showing that the third parties affected by the relief sought have had notice of and an opportunity to participate in the proceedings.[FN282] It requires individual notice, and cannot be satisfied by an "assertion ... that [affected parties] may have constructive or actual notice." [FN283] But here there has been no material resulting prejudice *590 from the failure to provide the notice, and this slightly complicates the analysis.

> FN282. *See BGI,* 772 F.3d at 110 (" Here, we agree with the District Court that Appellants failed to satisfy at least the fourth ... *Chateaugay* factor[ ]: i.e., ensuring adequate process for parties who would be adversely affected ... As to the fourth factor, Appellants did not establish that the general unsecured creditors who could be stripped of their entire recovery if the proposed class was certified" received notice of their appeal to the District Court.") (citations, internal quotation marks, and brackets deleted); *Arcapita Bank,* 2014 U.S. Dist. LEXIS 1053, at *21, 2014 WL 46552, at *7 ("Appellant does not contend that the numerous third parties who

have participated in and relied on the trans-actions completed pursuant to the Plan have been notified. Accordingly, Appellant fails to satisfy the fourth *Chateaugay* factor."); *O'Connor v. Pan Am Corp. (In re Pan Am Corp.),* 2000 U.S. Dist. LEXIS 2562, at *15, 2000 WL 254010, at *4 (S.D.N.Y. Mar. 7, 2000) (Casey, J) (" *Pan Am* ") (the fact that the appellant "did not notify any of the holders of administrative claims of her intent to challenge the distribution order" weighed in favor of a finding of equitable mootness).

> FN283. *See Calpine District,* 390 B.R. at 522 ("An assertion by Appellants that pur-chasers of New Calpine Common Stock may have constructive or actual notice is not suf-ficient to satisfy their burden of establishing that such purchasers had notice of the Ap-peals and an opportunity to participate in the proceedings.").

Many who would be adversely affected by tap-ping GUC Trust assets did not get the requisite notice. They would include the current holders of Disputed Claims; the syndicate members in JPMorgan Chase's Term Loan; the holders of Allowed Claims who have not yet received a distribution, and third-party Uni-tholders that have purchased or held GUC Trust Units based on the publicly disclosed amounts of potential GUC Trust Liabilities.

But the briefing by the GUC Trust and so-called "Participating Unitholders" (a subset of the larger Unitholder constituency), and the oral argument by one of the Participating Unitholders' counsel, very effectively articulated the objections that all, or sub-stantially all, of the absent parties would share. The Court doubts that any of those adversely affected parties could make the mootness arguments any better. Those who did not file their own briefs, or make the same oral argument, were not prejudiced.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July
6   2015 Letter from King & Spaling LLP   Pg 117 of 126

Page 91

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

Because the other mootness factors are so lop-
sided, the Court does not need to decide whether
prejudice is a requirement here, as it is in the due
process analysis discussed above. The Court assumes,
in an excess of caution, that this factor is not an im-
pediment to granting relief.

*5. Pursuit of Stay Remedies*

Finally, the Court agrees in part with the conten-
tion by the GUC Trust and the Participating Uni-
tholders that the Plaintiffs have not "pursued with
diligence all available remedies to obtain a stay of
execution of the objectionable order," and "the failure
to do so creates a situation rendering it inequitable to
reverse the orders" [FN284] enough to find that this
factor has not been satisfied.

> FN284. GUC Trust Opening Br. at 31
> (quoting *Affirmance Opinion # 2*, 430 B.R. at
> 80, which in turn quoted *Chateaugay II*, 10
> F.3d at 952–53).

Of course the Plaintiffs could not be expected to
have sought a stay of the Confirmation Order when
they were then unaware of Ignition Switch claims.
Nor, for the same reason, could the Plaintiffs be
faulted for not having filed claims with Old GM or the
GUC Trust before the Ignition Switch Defect came to
light. So the Court cannot find this factor to be satis-
fied based on any inaction before the Spring of 2014,
at which time New GM issued the recall notices and
alerted the Plaintiffs to the possibility that they might
have legal rights of which they were previously una-
ware.

Rather, this factor has to be analyzed in different
terms—focusing instead on the Plaintiffs' failure to
seek a stay of *additional* distributions to Old GM
creditors and Unitholders after it learned, on October
24, 2014, that the GUC Trust announced that it was
planning on making another distribution. By this time,

of course, the Ignition Switch Defect was well known
(and most of the 140 class actions had already been
filed), and the Court had identified, as an issue it
wanted briefed, whether the Plaintiffs' claims were
more properly asserted against Old GM. As the Court
noted at oral argument, at that stage in the litigation
process—when the Court considered it entirely pos-
sible that it would rule that it would be the GUC Trust
that is responsible for the Plaintiffs' otherwise viable
claims—the Court would have made the GUC Trust
wait before making additional distributions "in a
heartbeat." [FN285]

> FN285. *See* Day 1 Arg. Tr. at 111:7–15.

**\*591** Without dispute, the failure to block the
November distribution did not result from a lack of
diligence. It resulted, as the Plaintiffs candidly ad-
mitted, from tactical choice.[FN286] Their reason for that
tactical choice would be obvious to any litigator,[FN287]
but it was still a tactical choice.

> FN286. *See* Day 1 Arg. Tr. at 112:13–113:1
> ("Now, I will also tell Your Honor ... yes
> there was a strategic element to the decision
> that was taken on our side ... Yes Your
> Honor, the decision was made not to pursue
> it.") (transcription errors corrected; further
> explanation for reasons underlying the stra-
> tegic element deleted).

> FN287. Any litigators in the Plaintiffs' law-
> yers shoes would understandably prefer to
> proceed against a solvent entity (New GM)
> rather than one with much more limited as-
> sets (the GUC Trust)—especially since so
> much of the GUC Trust's assets had already
> been distributed. And doing anything to
> suggest that Old GM or the GUC Trust was
> the appropriate entity against whom to pro-
> ceed could undercut their position that they
> should be allowed to proceed against New

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 118 of 126

Page 92

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

GM.

And it is inappropriate to disregard that tactical choice in light of the Plaintiffs' decision to allow further distributions to be made. In November 2014, additional GUC Trust assets went out the door. And while tapping the assets distributed in November 2014 might have been as inequitable as tapping those that now remain, it makes the challenges of granting even some relief more difficult. Here too circumstances of this character have been regarded as significant in considering the fifth *Chateaugay* factor. [FN288]

> FN288. *See Pan Am*, 2000 WL 254010, at *4, 2000 U.S. Dist. LEXIS 2562, at *15 (finding that appellant failed to satisfy the fifth *Chateaugay* factor where she "never sought a stay of execution of the distribution order" and "did not notify any of the holders of administrative claims of her intent to challenge the distribution order."). *See also Affirmance Opinion # 1*, 428 B.R. at 62, and n. 30 ("Appellants' deliberate failure to 'pursue with diligence all available remedies to obtain a stay of execution of the objectionable order' has indeed 'created a situation rendering it inequitable to reverse the orders appealed from' "; "the Second Circuit has made it clear that an appellant is obligated to protect its litigation position by seeking a stay....").

*BGI* is relevant in this respect too. The court in *BGI District*, later affirmed by the Circuit, held that the appellants "did not pursue their claims with all diligence," noting that the "[a]ppellants' counsel began reviewing the case in early December and was retained by the end of December," but that the appellants "did not appear at the confirmation hearing or file any objections to the Plan," and "did not seek reconsideration of or appeal the confirmation order or seek a stay of the Effective Date." [FN289] It concluded, and the Circuit agreed, that "[t]he fact that no stay of

distributions was sought by Appellants until almost a year after they entered the bankruptcy litigation and the Plan was confirmed indicates the lack of diligence with which Appellants moved." [FN290]

> FN289. 2013 U.S. Dist. LEXIS 77740, at *32–33.

> FN290. *BGI–District*, 2013 U.S. Dist. LEXIS 77740, at *33; *accord BGI*, 772 F.3d at 110–11 (quoting *BGI–District* ).

The circumstances here are similar. The Plaintiffs began filing their actions as early as February 2014. Yet the Plaintiffs have taken no steps to seek a stay from the Court preventing the GUC Trust from making further distributions, or, except by one letter, to put affected third parties on notice of an intention to assert claims over the GUC Trust Assets. They have been frank in explaining why: they prefer to pursue claims against New GM first, and resort to the GUC Trust only if necessary. But even though their tactical reasoning is understandable, the underlying fact remains; their failure to diligently pursue *592 claims against the GUC Trust precludes them from doing so now.

\* \* \*

Thus at least three of the five *Chateaugay* factors *cut against* overcoming the presumption in favor of mootness, when all must favor overcoming that presumption. And shifting from individual factors to the big picture, we can see the overriding problem. We here don't have a reorganized debtor continuing in business that would continue to make money and that, by denial of discharge, could absorb additional claims. We have a GUC Trust, funded by discrete bundles of assets—that had been reserved for identified claims under Old GM's reorganization plan—with no unallocated assets left for additional claims. Entities in the marketplace have bought units of the GUC Trust as an investment based upon the GUC Trust's ability to *reduce* the once huge universe of claims against New

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 119 of 126

Page 93

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

GM, in a context where the universe of claims could not increase. Allowing $7 to $10 billion (or even much lower amounts) of additional claims against the GUC Trust would wholly frustrate those investors' legitimate expectations, and, indeed, "knock the props" out from the trading in GUC Trust Units that was an important component of the plan.

Granting relief to the Plaintiffs here would simply replace hardship to the Plaintiffs with hardship to others.

## V.
### Fraud on the Court

[36]After receipt of the various parties' briefs, it now appears that the standards for establishing fraud on the court (one of the bases for relief under Fed. R. Civ. P. 60(b))  though once regarded as important enough to be a Threshold Issue  are not as important as they were originally perceived to be. That is so because fraud on the court issues bear on the time by which a motion for 60(b) relief can be brought  but (as discussed in Section II above), several courts, including the Second Circuit, when faced with denials of due process, have invalidated particular provisions in orders *without addressing* Rule 60(b), and because, even under Rule 60(b), an order entered without due process can be declared to be void, and without regard to the time limitations that are applicable to relief for fraud, among other things. But for the sake of completeness, the Court nevertheless decides them.

With exceptions not relevant here, Fed. R. Civ. P. 60, captioned "Relief from a Judgment or Order," applies in bankruptcy cases under Fed. R. Bankr. P. 9024. Its subsection (b) provides, in relevant part:

(b) GROUNDS FOR RELIEF FROM A FINAL JUDGMENT, ORDER, OR PROCEEDING. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

...

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

...or

(6) any other reason that justifies relief.[FN291]

Then, Rule 60's subsection (c), captioned "Timing and Effect of the Motion," provides, in relevant part:

**\*593** (1) *Timing.* A motion under Rule 60(b) must be made within a reasonable time  and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.

And its subsection (d), captioned "Other Powers to Grant Relief," provides, in relevant part:

(d) Other Powers to Grant Relief. This rule does not limit a court's power to:

...

(3) set aside a judgment for fraud on the court.[FN292]

FN291. *Id.* (portions that are not even arguably applicable omitted).

FN292. This last provision, now in a separate subsection (d), was once part of Rule 60(b). It has been described by the Circuit as a "sav-

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 120 of 126

Page 94

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

ings clause." *See Hadges v. Yonkers Racing
Corp.*, 48 F.3d 1320, 1325 (2d Cir.1995) ("
*Hadges* ").

[37]As explained by the Supreme Court in *Ha-
zel Atlas Glass,*[FN293] an early decision considering
Rule 60(b), the federal courts have had a
long-standing aversion to altering or setting aside final
judgments at times long after their entry [FN294]
"spring[ing] from the belief that in most instances
society is best served by putting an end to litigation
after a case has been tried and judgment entered." [FN295]
But there likewise has been a rule of equity to the
effect that under certain circumstances—one of which
is after-discovered fraud relief could be granted
against judgments regardless of the term of their en-
try.[FN296] That equitable rule was fashioned "to fulfill a
universally recognized need for correcting injustices
which, in certain instances, are deemed sufficiently
gross to demand a departure from rigid adherence to
the term rule." [FN297]

FN293. *Hazel Atlas Glass Co. v. Hart-
ford Empire Co.*, 322 U.S. 238, 64 S.Ct. 997,
88 L.Ed. 1250 (1944) (" *Hazel Atlas Glass*
").

FN294. The original rule looked to "the *term*
at which the judgments were finally entered."
*See id.* at 244, 64 S.Ct. 997 (emphasis add-
ed). The one year time-limit under Rule 60(b)
approximates that.

FN295. *Id.*

FN296. *Id.*

FN297. *Id.*

As explained by the Second Circuit in its fre-
quently cited 1985 decision in *Leber Krebs,*[FN298]
*Hazel Atlas* deliberately did not define the metes and

bounds of this "fraud on the court" doctrine, but it did
make clear that it has always been "characterized by
flexibility which enables it to meet new situations
which demand equitable intervention, and to accord
all the relief necessary to correct the particular injus-
tices involved in these situations." [FN299]

FN298. *Leber Krebs, Inc. v. Capitol Rec-
ords,* 779 F.2d 895 (2d Cir.1985) ("
*Leber Krebs* ").

FN299. *Id.* at 899.

"Out of deference to the deep rooted policy in
favor of the repose of judgments entered during past
terms, courts of equity have been cautious in exer-
cising their power over such judgments. But where the
occasion has demanded, where enforcement of the
judgment is 'manifestly unconscionable', they have
wielded the power without hesitation." [FN300]

FN300. *Hazel Atlas Glass,* 322 U.S. at
244-45, 64 S.Ct. 997 (*quoting Pickford v.
Talbott,* 225 U.S. 651, 657, 32 S.Ct. 687, 56
L.Ed. 1240 (1912)).

[38]It is in that context—where the injustices are
"sufficiently gross," and where enforcement of the
judgment would be "manifestly unconsciona-
ble"—that federal courts may consider requests to
modify long-standing judgments for fraud on the
court.

**\*594** *1. Effect on Process of Adjudication*

[39]Consistent with that, the Second Circuit has
repeatedly stated that a "fraud on the court" under Fed.
R. Civ. P. 60(d)(3) embraces:

only that species of fraud which does or attempts to,
defile the court itself, or is a fraud perpetrated by
officers of the court so that the judicial machinery
cannot perform in the usual manner its impartial

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg   Doc 13330-1   Filed 07/29/15   Entered 07/29/15 17:13:50   Exhibit July
6   2015 Letter from King & Spaling LLP   Pg 121 of 126

Page 95

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

task of adjudging cases.... [FN301]

> FN301. *Kupferman v. Consol. Research and Mfg. Corp.,* 459 F.2d 1072, 1078 (2d Cir.1972) ( *Kupferman* ") (quotation marks omitted); *accord Hadges,* 48 F.3d at 1325 (*quoting Kupferman* ); *Transaero, Inc. v. La Fuerza Area Boliviana,* 24 F.3d 457, 460 (2d Cir.1994) ( " *Transaero* ") *on reh'g in part sub nom.* 38 F.3d 648 (2d Cir.1994); *Gleason v. Jandrucko,* 860 F.2d 556, 558 59 (2d Cir.1988) ( " *Gleason* "); *Serzysko v. Chase Manhattan Bank,* 461 F.2d 699, 702 (2d Cir.1972). *See also Grubin v. Rattet (In re Food Mgmt. Grp., LLC'),* 380 B.R. 677, 714 (Bankr.S.D.N.Y.2008) (Glenn, J.) (" *Food Management Group* ") (*quoting Kupferman* ).

In *Hadges* (one the several Second Circuit decisions making the distinction between fraud of a more generalized nature and defrauding the Court), the Circuit explained that fraud is a basis for relief under both Rule 60(b)(3) and Rule 60's savings clause.[FN302] But "the type of fraud necessary to sustain an independent action attacking the finality of a judgment is narrower in scope than that which is sufficient for relief by timely motion." [FN303]

> FN302. *Hadges,* 48 F.3d at 1325.

> FN303. *Id. See also Gleason,* 860 F.2d at 559; *Transaero,* 24 F.3d at 460.

[40]In its repeatedly cited 1972 decision in *Kupferman,* the Circuit, speaking through Judge Friendly, emphasized the additional requirements for any showing of fraud on the court. "Obviously it cannot be read to embrace any conduct of an adverse party of which the court disapproves; to do so would render meaningless the one-year limitation on motions under F. R. Civ.P. 60(b)(3)." [FN304] Rather, "[f]raud upon the court as distinguished from fraud on an adverse party *is limited to fraud which seriously affects the integrity of the normal process of adjudication.*" [FN305]

> FN304. *Kupferman,* 459 F.2d at 1078.

> FN305. *Gleason,* 860 F.2d at 559 (internal quote marks deleted).

Bankruptcy courts in this district, deciding particular cases under the Circuit's pronouncements, have permitted claims of fraud on the court to proceed in cases with a sufficiently egregious effect on the integrity of the litigation process, but have rejected them in cases lacking such an effect. In his well known decision in *Clinton Street Foods,*[FN306] Judge Bernstein found *Leber Krebs* to be instructive,[FN307] and denied a 12(b)(6) motion insofar as it sought to dismiss a trustee's claims of a fraud on the court. [FN308] But that was in the context ***595** of a case involving bid-rigging in a bankruptcy court auction. There the complaint alleged that the defendants—the assets' purchaser and three potential competing bidders—lied when the bankruptcy court inquired about any bidding agreements. The defendants' lies contributed to the acceptance of the winning bid and the approval of the Sale Order; the trustee lacked the opportunity to discover the fraud in light of the summary nature of the sale proceeding and the relatively short time frame (only three weeks between the filing of the sale application and the auction); and the defendants benefited from the lie to the Court. [FN309]

> FN306. *Gazes v. DelPrete, (In re Clinton Street Food Corp.),* 254 B.R. 523 (Bankr.S.D.N.Y.2000) (Bernstein, C.J.) (" *Clinton Street Foods* ").

> FN307. *Id.* at 533. He synthesized the bases for the *Leber Krebs* finding of fraud on the court based on an attachment garnishee's false denials of ownership of debtor property

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 122 of 126

Page 96

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

as based on (1) the defendant's misrepresentation to the court, (2) the denial of the motion to confirm the attachment based on the misrepresentation, (3) the lack of an opportunity to discover the misrepresentation and either bring it to the court's attention or bring a timely turnover proceeding against the garnishee, and (4) the benefit the defendant derived by inducing the erroneous decision. *Id.* After *Clinton Street Foods,* these factors, referred to as the *Leber Krebs* factors, have repeatedly been applied in fraud on the court decisions.

FN308. *Id.*

FN309. *Id.* at 533.

In *Food Management,* Judge Glenn of this Court, analyzing *Clinton Street Foods* and *Leber Krebs,* likewise denied a motion to dismiss a fraud on the court claim, where there was once again alleged manipulation of an auction, by reason of a failure to disclose the participation of insiders in an ostensible third party bid for estate assets.[FN310]

FN310. *See* 380 B.R. at 715.

But in *Ticketplanet,*[FN311] four years earlier, Judge Gropper of this Court, also analyzing *Clinton Street Foods* and *Leber Krebs,* found the allegations of fraud on the court to be insufficient. He explained that fraud on the court encompasses only that conduct that "seriously affects the integrity of the normal process of adjudication," and it is available "only to prevent a grave miscarriage of justice." [FN312] There the trustee charged that the defendants' actions (both before and after the chapter 11 filing) were taken to protect themselves and benefit a secured lender that thereafter obtained relief from the stay to foreclose on estate assets. The alleged wrongful actions included a failure to adequately disclose the competing interest of the

debtor's largest shareholder; the appointment of a straw-man at the helm of the debtor; a direction to the debtor's counsel not to fight the lift stay motion; and efforts to engineer a dismissal of the initial chapter 11 case rather than a conversion once the lender had taken control of the debtor's assets. But the basic facts with respect to a relation between the corporate principals, the debtor and its lender were known,[FN313] and the alleged nondisclosure "did not substantially impact the Court's ruling at the Lift Stay hearing." [FN314] Relief was not necessary "to prevent a grave miscarriage of justice." [FN315]

FN311. *Tese Milner v. TPAC, LLC (In re Ticketplanet.com* ), 313 B.R. 46, 64 (Bankr.S.D.N.Y.2004)    (Gropper,    J.)    ( *Ticketplanet* ").

FN312. *Id.*

FN313. *Id.* at 65.

FN314. *Id.*

FN315. *Id.*

[41]The takeaway from these cases is that relief can be granted only where there has been not just an impact on the *accuracy of outcome* of the Court's adjudicative process, but also on the *integrity of the judicial process* itself, and then only where a denial of relief would be "manifestly unconscionable."

*2. Victim of the Fraud*

[42]Thus the failure to disclose pertinent facts relating to a controversy before the court, or even perjury regarding such facts, whether to an adverse party or to the court, does not without more constitute "fraud upon the court" and does not merit relief under Fed. R. Civ.P. 60(d)(3). [FN316]

FN316. *See, e.g., Gleason,* 860 F.2d at

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 123 of 126

Page 97

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

559 60; *Hoti Enters., L.P. v. GECMC 2007 C 1 Burnett Street, LLC (In reHoti Enters., L.P.),* 2012 U.S. Dist. LEXIS 182395, at *12 13, 2012 WL 6720378, at * 3 4 (S.D.N.Y. Dec. 27, 2012) (Seibel, J.).

**\*596** In *Hoti Enterprises,* Judge Seibel affirmed the bankruptcy court's denial of reconsideration of a cash collateral order based on alleged fraud by a lender in its representation that it had a secured claim. She held that "neither perjury nor non-disclosure by itself amounts to anything more than fraud involving injury to a single litigant" covered by Fed. R. Civ. P. 60(b)(3), and therefore, is not the type of egregious misconduct necessary for relief under Fed. R. Civ.P. 60(d).[FN317] That rule also means that assuming, arguendo, Old GM had attempted to defraud car owners, that would not be enough. It would need to have defrauded *the Court.*

FN317. *Hoti Enters.,* 2012 U.S. Dist. LEXIS 182395, at *12 13, 2012 WL 6720378, at *3 4. Courts from other jurisdictions have reached the same conclusion. *See In re Tevis,* 2014 Bankr.LEXIS 406, at *12, 2014 WL 345207, at *4 (B.A.P. 9th Cir. Jan. 30, 2014) ("Mere nondisclosure of evidence is typically not enough to constitute fraud on the court, and 'perjury by a party or witness, by itself, is not normally fraud on the court."); *In re Andrada Fin., LLC,* 2011 Bankr.LEXIS 1779, at *21, 2011 WL 3300983, at *7 (B.A.P. 9th Cir. Apr. 7, 2011); *In re Levander,* 180 F.3d 1114, 1119 (9th Cir.1999); *Simon v. Navon,* 116 F.3d 1, 6 (1st Cir.1997); *Wilson v. Johns Manville Sales Corp.,* 873 F.2d 869, 872 (5th Cir.1989); *In re Mucci,* 488 B.R. 186, 193 94 & n.8 (Bankr.D.N.M.2013) (Jacobvitz, J.); *In re Galanis,* 71 B.R. 953, 960 (Bankr.D.Conn.1987) (Shiff, J.) ("It is well established that the failure to disclose allegedly pertinent facts relating to a controversy before the court, whether to an ad-

verse party or to the court, does not constitute "fraud upon the court" for purposes of setting aside a judgment....").

*3. Particular Standards to Apply*

[43]In each of *Ticketplanet* and *Food Management,* after discussion of *Leber Krebs* and *Clinton Street Foods,* the courts listed matters to be considered in analyzing a fraud on the court claim for sufficiency, as extracted from *Leber Krebs* and *Clinton Street Foods.* They were:

(1) the defendant's misrepresentation to the court;

(2) the impact on the motion as a consequence of that misrepresentation;

(3) the lack of an opportunity to discover the misrepresentation and either bring it to the court's attention or bring an appropriate corrective proceeding; and

(4) the benefit the defendants derived by inducing the erroneous decision.[FN318]

With the courts in *Clinton Street Foods, Ticketplanet, and Food Management* having looked to those factors to supplement the Supreme Court and Circuit holdings discussed above, this Court will too.

FN318. 313 B.R. at 64.

[44]Together, the above cases thus suggest a methodology to apply in determining whether any fraud rises to the level of fraud on the court. First, as *Kupferman, Hadges* and the other Circuit cases make clear, the Court must ascertain whether the alleged fraud is of a type that defiles the court itself; is perpetrated by officers of the court; or seriously affects the *integrity* of the normal process of adjudication. Then the Court must analyze the alleged fraud in the context of the *Leber Krebs* factors, as applied in

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 124 of 126

Page 98

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

*Clinton Street Foods, Ticketplanet,* and *Food Management.* The *Leber Krebs* factors bring into the analysis, among other things, requirements of an interface with the court; [FN319] an injury to the court or the *597 judicial system (as contrasted to an injury to one or more individuals); [FN320] impact by the fraud on the workings of the judicial system; a nexus between the fraud and injury to the judicial system; and one or more benefits to the wrongful actor(s) by reason of the fraud on the court.

> FN319. Thus, if the fraud is not linked to either a communication to the court, or a nondisclosure to the court under circumstances where there is a duty to speak with the matter that was not disclosed, that requirement is not satisfied.

> FN320. *See SEC v. ESM Grp., Inc.,* 835 F.2d 270, 273 (11th Cir.1988) (holding that fraud on the court is the type of fraud which prevents or impedes the proper functioning of the judicial process, and it must threaten public injury, as distinguished from injury to a particular litigant), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2822, 100 L.Ed.2d 923 (1988).

[45][46] The takeaway from these cases is also that there can be no fraud on the court by accident. Those engaging in the fraud must be attempting to subvert the legal process in connection with whatever the court is deciding. There likewise cannot be a fraud on the court by imputation alone. There must be a direct nexus between the knowledge and intent of any wrongdoer and communications to the court. If the fraud has taken place elsewhere (and is unknown to those actually communicating with the court), the requisite attempt to defile the Court itself and subvert the legal process is difficult, if not impossible, to show.

## VI.
### Certification to Circuit

[47] As the Court did with respect to one other (but much less than all) of its earlier decisions in Old GM's chapter 11 case,[FN321] the Court certifies its judgment here for direct review by the Second Circuit. Here too, in this Court's view, this is one of those rare occasions where the Circuit might wish to consider immediate review as an option.

> FN321. *See GM UCC 3 Opinion,* n. 50 *supra,* 486 B.R. at 646-47.

In that connection, 28 U.S.C. § 158 grants a court of appeals jurisdiction to hear appeals from final judgments of the bankruptcy court under limited circumstances. First the bankruptcy court (acting on its own motion or on the request of a party to the judgment), or all the appellants and appellees acting jointly, must certify that

> (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;

> (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or

> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken.... [FN322]

Then the Court of Appeals decides whether it wishes to hear the direct appeal.[FN323]

> FN322. 28 U.S.C. § 158(d).

> FN323. *Id.; see also In re General Motors*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 125 of 126

Page 99

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
(Cite as: 529 B.R. 510)

*Corp.*, 409 B.R. 24, 27
(Bankr.S.D.N.Y.2009) (Gerber, J.) ("
***GM–Sale Appeal Certification Decision*** ")
("The Circuit does not have to take the ap-
peal, however, and can decide whether or not
to do so in the exercise of its discretion.").

In this case, the Court considers each of the three
bases for a certification to be present. With respect to
the first prong, the decision here is one of law based on
undisputed facts. There are no controlling decisions of
the Second Circuit on the issues here beyond the most
basic fundamentals. And this is a matter of consider-
able public importance. Additionally, though the $7 to
$10 billion in controversy here may be regarded as
personal to the *598 Plaintiffs and New GM, the un-
derlying legal issues are important as well, as are their
potential effect, going forward, on due process in
chapter 11 cases, and on 363 sales and the claims
allowance process in particular.

With respect to the second prong, available au-
thorities, while helpful to a point, came nowhere close
to addressing a factual situation of this nature. The
issues were complicated by broad language in the
caselaw, and conflicting decisions.[FN324]

FN324. In one of its earlier decisions in the
*GM* case, *see GM Sale Appeal Certification
Decision,* 409 B.R. at 27–29, the Court de-
nied certification to the Circuit of the appeals
from the Sale Order following the *Sale
Opinion,* even though, as the subsequent
history of the *Sale Opinion* indicates, *see* n.2
*supra,* one of them ultimately did go up to the
Circuit. This Court denied certification there
because while GM's well-being and that of its
suppliers, as a business matter, had substan-
tial public importance, the legal issues were
not particularly debatable. Here they are
plainly so.

With respect to the third prong, the Court believes
that an immediate appeal from the judgment in this
matter is likely to advance proceedings in both this
case (if the Court is called upon to do anything further)
and the MDL case. Plainly a second level of appeal
(which would otherwise be almost certain, given the
stakes and importance of the controversy) would have
a foreseeable adverse effect on the ability of the MDL
Court to proceed with the matters on its watch.

*Conclusion*

The Court's conclusions as to the Threshold Is-
sues were set forth at the outset of this Decision, and
need not be repeated here. Based on its conclusions as
to the Threshold Issues as discussed above, the Court
will not allow either the Economic Loss Plaintiffs
(including the Used Car Purchasers subset of Eco-
nomic Loss Plaintiffs) or the Pre–Closing Sale Plain-
tiffs to be exempted from the Sale Order's Free and
Clear Provisions barring the assertion of claims for
successor liability. The Economic Loss Plaintiffs (but
not the Pre–Closing Sale Claimants) may, however,
assert otherwise viable claims against New GM for
any causes of action that might exist arising solely out
of New GM's own, independent, post-Closing acts, so
long as those Plaintiffs' claims do not in any way rely
on any acts or conduct by Old GM. The Plaintiffs may
file late claims, and to the extent otherwise appropriate
such late claims may hereafter be allowed – but the
assets of the GUC Trust may not be tapped to satisfy
them, nor will Old GM's Plan be modified in this or
any other respect.

The Court will not lengthen this decision further
by specifically addressing any more of the contentions
that were raised in the more than 300 pages of briefing
on the Motion to Enforce and its sister motions. The
Court has canvassed those contentions and satisfied
itself that no material points other than those it has
specifically addressed were raised and have merit.

The parties are to caucus among themselves to see
if there is agreement that no further issues need be

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 13330-1    Filed 07/29/15    Entered 07/29/15 17:13:50    Exhibit July
6    2015 Letter from King & Spaling LLP    Pg 126 of 126

Page 100

529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P 82,789
**(Cite as: 529 B.R. 510)**

determined at the Bankruptcy Court level. If they
agree (as the Court is inclined to believe) that there are
none, they are to attempt to agree on the form of a
judgment (without prejudice, of course, to their re-
spective rights to appeal) consistent with the Court's
rulings here. If they cannot agree (after good faith
efforts to try to agree), any party may settle a judgment
(or, if deemed preferable, an order), with a time for
response agreed upon in advance by the parties. After
the Court has been presented with one or more pro-
posed judgments or orders, the Court will enter a
judgment or order in the form it regards as most ap-
propriate,**\*599** and a separate order providing the
necessary certification for review under § 158(d).

Bkrtcy.S.D.N.Y., 2015
In re Motors Liquidation Company
529 B.R. 510, 60 Bankr.Ct.Dec. 253, Bankr. L. Rep. P
82,789

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.