# Exhibit B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
In re                                          :            Chapter 11
                                               :
MOTORS LIQUIDATION COMPANY, *et al.*,          :            Case No.: 09-50026 (REG)
          f/k/a General Motors Corp., *et al.* :
                                               :            (Jointly Administered)
                    Debtors.                   :
------------------------------------------------------------x

## DECISION ON MOTION TO ENFORCE SALE ORDER

APPEARANCES:

KING & SPALDING LLP
*Counsel for General Motors LLC (New GM)*
1185 Avenue of the Americas
New York, New York 10036
By:     Arthur J. Steinberg, Esq. (argued)
        Scott I. Davidson, Esq.

KIRKLAND & ELLIS LLP
*Counsel for General Motors LLC (New GM)*
300 North LaSalle
Chicago, Illinois 60654
By:     Richard C. Godfrey, Esq.
        Andrew B. Bloomer, Esq.

BROWN RUDNICK
*Designated Counsel and Counsel for Economic Loss Plaintiffs*
Seven Times Square
New York, New York 10036
By:     Edward S. Weisfelner, Esq. (argued)
        David J. Molton, Esq.
        May Orenstein, Esq.
        Howard S. Steel, Esq.
        Rebecca L. Fordon, Esq.

STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.
*Designated Counsel and Counsel for Economic Loss Plaintiffs*
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
By:     Sander L. Esserman, Esq. (argued)

**GOODWIN PROCTER, LLP**
*Designated Counsel and Counsel for Pre-Sale Accident Victim Plaintiffs*
The New York Times Building
620 Eighth Avenue
New York, New York 10018
By:    William P. Weintraub, Esq. (argued)
        Eamonn O'Hagan, Esq.
        Gregory W. Fox, Esq.

**GOLENBOCK, EISEMAN, ASSOR, BELL & PESKOE, LLP**
*Counsel for Groman Plaintiffs*
437 Madison Avenue
New York, New York 10022
BY:    Jonathan L. Flaxer, Esq. (argued)
        S. Preston Ricardo, Esq.

**GIBSON, DUNN & CRUTCHER, LLP**
*Counsel for Wilmington Trust Company as*
*GUC Trust Administrator*
200 Park Avenue
New York, New York 10166
BY:    Lisa H. Rubin, Esq. (argued)
        Keith R. Martorana, Esq.
        Matthew Williams, Esq.
        Adam H. Offenhartz, Esq.
        Aric H. Wu, Esq.

**AKIN, GUMP, STRAUSS, HAUER & FELD, LLP**
*Counsel for Participating GUC Trust Unit Trust Holders*
One Bryant Park
New York, New York 10036
By:    Daniel Golden, Esq.
        Deborah J. Newman, Esq. (argued)
        Jamison A. Diehl, Esq.
        Naomi Moss, Esq.

Introduction ...................................................................................................... 1
Summary of Conclusions .................................................................................. 5
   1.   Due Process .............................................................................................. 6
     (a) Notice Before Entry of Sale Order ............................................... 7
     (b) Notice Before Expungement of Claims ....................................... 9
     (c) Requirement for Prejudice ......................................................... 10
   2.   Remedies ............................................................................................... 12
   3.   Assumed Liabilities ............................................................................. 14
   4.   Equitable Mootness .............................................................................. 15
   5.   Fraud on the Court ............................................................................... 16
   6.   Certification to the Circuit .................................................................. 17
Facts ............................................................................................................... 17
   1.   Background ........................................................................................... 17
   2.   Chapter 11 Filing ................................................................................. 18
   3.   The Sale Motion and Notice Order ..................................................... 19
   4.   Notice of the Sale ................................................................................ 20
   5.   Objections to Free and Clear Provisions ............................................ 20
   6.   Sale Agreement—Relevant Provisions ............................................... 23
   7.   The Sale Order ..................................................................................... 26
   8.   Matters After the Sale ......................................................................... 27
   9.   The GUC Trust and its Operation ....................................................... 28
   10.   Knowledge of the Ignition Switch Defect ......................................... 32
   11.   The Motion to Enforce ........................................................................ 33
   12.   The Threshold Issues .......................................................................... 34
Discussion ...................................................................................................... 35
I. Due Process ................................................................................................ 35
A. Underlying Principles ............................................................................... 36
   1.   Mullane ................................................................................................ 36
   2.   Second Circuit Guidance ..................................................................... 41
   3.   Guidance from Lower Courts .............................................................. 45
   4.   The "Known"-"Unknown" Creditor Distinction ............................... 46
B. The Particular Issues Here ........................................................................ 52
   1.   Do Due Process Requirements Apply? ............................................... 52
   2.   Notice by Publication .......................................................................... 61
   3.   Known Claim Analysis ........................................................................ 62
   4.   The Requirement for Prejudice ........................................................... 69
   5.   Application of Those Principles  to Economic Loss Plaintiffs ............ 77
     (a)   Successor Liability .................................................................. 77
     (b)   New GM's Own Wrongful Acts .............................................. 82
     (c) The Used Car Purchasers ........................................................... 85
   6.   Application of Those Principles to Pre-Closing Accident Plaintiffs ... 89
   7.   Application to Filing of Claims ........................................................... 90
II. Remedies ................................................................................................... 92
A. The Sale Order ........................................................................................... 92
   1.   Prejudice As Affecting Remedy .......................................................... 93
   2.   Attaching Claims to Sale Proceeds ..................................................... 94

|   |   |   |
|---|---|---|
| 3. | Protection of Purchasers of Estate Assets | 95 |
| 4. | Effect of Constitutional Violations | 97 |
| 5. | Remedies Conclusion | 106 |

B.  Claims .......................................................................................... 107

III.  Assumed Liabilities ........................................................................ 107

IV. Equitable Mootness ......................................................................... 108

A.  Underlying Principles ...................................................................... 108

B.  Applying Those Principles Here ...................................................... 111

| 1. | Ability to Fashion Effective Relief | 112 |
| 2. | Effect on Re-emergence of Debtor as Revitalized Corporate Entity; | 114 |
| 3. | Unraveling Intricate Transactions | 114 |
| 4. | Adversely Affected Parties | 118 |
| 5. | Pursuit of Stay Remedies | 119 |

V.  Fraud on the Court ........................................................................... 122

| 1. | Effect on Process of Adjudication | 125 |
| 2. | Victim of the Fraud | 129 |
| 3. | Particular Standards to Apply | 130 |

VI.  Certification to Circuit ................................................................... 131

Conclusion ........................................................................................... 133

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

<u>Introduction</u>

In this contested matter in the chapter 11 case of Debtor Motors Liquidation
Company, previously known as General Motors Corporation ("**Old GM**"), General
Motors LLC ("**New GM**")—the acquirer of most of Old GM's assets in a section 363
sale back in July 2009—moves for an order enforcing provisions of the July 5, 2009
order (the "**Sale Order**") by which this Court approved New GM's purchase of Old
GM's assets.[1]

The Sale Order, filed in proposed form on the first day of Old GM's chapter 11
case with Old GM's motion for the sale's approval, was entered, in a slightly modified
form, within a few hours after this Court issued its opinion approving the sale.[2]  There
were approximately 850 objections to the 363 Sale, the proposed Sale Order, or both.
But the most serious were those relating to elements of the Sale Order ("**Free and Clear
Provisions**"), discussed in more detail below, that provided that New GM would
purchase Old GM's assets "free and clear" of successor liability claims.  After lengthy
analysis,[3] the Court overruled those objections.

In March 2014, New GM announced to the public, for the first time, serious
defects in ignition switches that had been installed in Chevy Cobalts and HHRs, Pontiac

---

[1]       ECF No. 12620.  New GM's motion has been referred to by New GM, the other parties, and the
Court as the "**Motion to Enforce**."

[2]       *See In re General Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009) (Gerber, J.) (the "*Sale
Opinion* "), *stay pending appeal denied,* 2009 WL 2033079 (S.D.N.Y. Jul. 9, 2009) (Kaplan, J.)
(the "*Stay Opinion*"), *appeal dismissed and aff'd sub nom Campbell v. General Motors Corp.*,
428 B.R. 43 (S.D.N.Y. 2010) (Buchwald, J.) ("*Affirmance Opinion #1*) and *Parker v. General
Motors Corp.*, 430 B.R. 65 (S.D.N.Y. 2010) (Sweet, J.) ("*Affirmance Opinion #2*), *appeal
dismissed*, No. 10–4882–bk (2d Cir. July 28, 2011) (*per curiam*, Jacobs, CJ, and Hall and Carney,
JJ.), *cert. denied*, 132 S.Ct. 1023 (2012).

[3]       *See Sale Opinion*, 407 B.R. at 499-506.

09-50026-reg   Doc 13109   Filed 04/19/15   Entered 04/19/15 15:58:42   Main Document
Pg 7 of 139

G5s and Solstices, and Saturn Ions and Skys (the "**Ignition Switch Defect**"), going back to the 2005 model year.  In the Spring of 2014 (though many have queried why Old GM and/or New GM failed to do so much sooner), New GM then issued a recall of the affected vehicles, under which New GM would replace the defective switches, and bear the costs for doing so.

New GM previously had agreed to assume responsibility for any accident claims involving post-sale deaths, personal injury, and property damage—which would include any that might have resulted from the Ignition Switch Defect.  But New GM's announcement was almost immediately followed by the filing of about 60 class actions in courts around the United States, seeking compensatory damages, punitive damages, RICO damages and attorneys fees for *other* kinds of losses to consumers—"**Economic Loss**"—alleged to have resulted from the Ignition Switch Defect.  The claims for Economic Loss include claims for alleged reduction in the resale value of affected cars, other economic loss (such as unpaid time off from work when getting an ignition switch replaced), and inconvenience.  The Court has been informed that the number of class actions now pending against New GM—the great bulk of which were brought by or on behalf of individuals claiming Economic Loss ("**Economic Loss Plaintiffs**")—now exceeds 140.  Though the amount sought by Economic Loss Plaintiffs is for the most part unliquidated, it has been described as from $7 to $10 billion.  Most of those actions ("**Ignition Switch Actions**") are now being jointly administered, for pretrial purposes, in a multi-district proceeding before the Hon. Jesse Furman, U.S.D.J., in the Southern District of New York (the "**MDL Court**").

New GM here seeks to enforce the Sale Order's provisions, quoted below, blocking economic loss lawsuits against New GM on claims involving vehicles and parts manufactured by Old GM.[4]  New GM argues that while it had voluntarily undertaken, under the Sale Order, to take on an array of Old GM liabilities (for the post-sale accidents involving both Old GM and New GM vehicles just described; under the express warranty on the sale of any Old GM or New GM vehicle (the "**Glove Box Warranty**"); to satisfy statutory recall obligations with respect to Old GM and New GM vehicles alike; and under Lemon Laws, again with respect to Old GM and New GM vehicles alike), the Sale Order blocked any others—including those in these suits for Economic Loss.

The Sale Order, as discussed below, plainly so provides.  But as to 70 million Old GM cars whose owners had not been in accidents of which they'd advised Old GM, the Sale Order was entered with notice only by publication.  And those owning cars with Ignition Switch Defects (again, those who had not been in accidents known to Old GM)—an estimated 27 million in number—were given neither individual mailed notice of the 363 Sale, nor mailed notice of the opportunity to file claims for any losses they allegedly suffered.  And more importantly, from the perspective of these car owners, they were not given *recall notices* which (in addition to facilitating switch replacement before accidents took place), they contend were essential to enabling them to respond to the published notices to object to the 363 Sale or to file claims.

---

[4]     There may be misunderstandings as to the matters now before the Court.  New GM has already undertaken to satisfy claims for death, personal injury, and property damage in accidents occurring after the 363 Sale—involving vehicles manufactured by New GM and Old GM alike.  Except for the *pre*-Sale accidents that are the subject of the Pre-Closing Accident Plaintiffs' contentions, addressed below (where those plaintiffs wish to sue New GM in lieu of Old GM), this controversy does not involve death, personal injury, or property damage arising in accidents.  Instead it involves only *economic losses* allegedly sustained with respect to Old GM vehicles or parts.

Then, after New GM filed the Motion to Enforce, two other categories of

Plaintiffs came into the picture. One was another group of Ignition Switch Defect

plaintiffs (the "**Pre-Closing Accident Plaintiffs**") who (unlike the Economic Loss

Plaintiffs) are suing with respect to actual accidents. But because those accidents

involved Old GM and took place *before* the 363 Sale Closing—and taking on pre-closing

accident liability was not commercially necessary to New GM's future success—they

were not among the accidents involving Old GM vehicles for which New GM agreed to

assume responsibility. The Pre-Closing Accident Plaintiffs have (or at least had) the right

to assert claims against Old GM (the only entity that was in existence at the time their

accidents took place), but they nevertheless wish to proceed against New GM. New GM

brought a second motion to enforce the Sale Order[5] with respect to the Pre-Closing

Accident Plaintiffs, and issues with respect to this Plaintiff group were heard in tandem

with the Motion to Enforce.

The other category of Plaintiffs later coming into the picture ("**Non-Ignition**

**Switch Plaintiffs**") brought actions asserting Economic Loss claims as to GM branded

cars that *did not have* Ignition Switch Defects, including cars made by New GM and Old

GM alike. In fact, most of their cars did not have defects, and/or were not the subject of

recalls, at all. But they contend, in substance, that the Ignition Switch Defect caused

damage to "the brand,"[6] resulting in Economic Loss to them. New GM brought still

---

[5]    ECF No. 12807.

[6]    *See* Day 1 Arg. Tr. at 137:4-138:16, Feb. 17, 2015 ("[PL. COUNSEL]:  The revelation of New
      GM's extensive deceptions tarnished the brand further . . .They allege that new GM concealed and
      suppressed material facts about the quality of its vehicle and the GM brand."); Day 2 Arg. Tr. at
      61:16-62:5, Feb. 18. 2015 ("THE COURT: I thought I heard arguments from either you or Mr.
      Esserman or both, that the contention being made on the Plaintiffs' side is that the failure to deal
      with the ignition switches damaged the GM brand, and is some Court of competent jurisdiction
      then going to hear an argument that there are 70 million vehicles that lost value and not just the 27
      million that are the subject of the recalls, or the lesser 13 million to which you just made

another motion[7] to enforce the Sale Order with respect to them, though this third motion

has been deferred pending the determination of the issues here.

    In this Court, the first two groups of Plaintiffs, whose issues the Court could

consider on a common set of stipulated facts and is in major respects considering

together,[8] contend that by reason of Old GM's failure to send out recall notices, they

never learned of the Ignition Switch Defect, and that the Sale Order is unenforceable

against them.

<u>Summary of Conclusions</u>

    New GM is right when it says that most of the claims now asserted against it are

proscribed under the Sale Order. But that is only the start, and not the end, of the

relevant inquiry. And assuming, as the Plaintiffs argue, that Old GM's and then New

GM's delay in announcing the Ignition Switch Defect to the driving public was

unforgiveable, that too is only the start, and not the end of the relevant inquiry.

    The real issues before the Court involve questions of procedural due process, and

what to do about it if due process is denied: (1) what notice was sufficient; (2) to what

extent an assertedly aggrieved individual's lack of prejudice from insufficient notice

---

reference? [PL. COUNSEL]: I'm not counsel of record there, but I guess I would be surprised if
the Plaintiffs in those actions aren't likewise looking for recompense for the people without
ignition switch defects in their car, on the theory, which may or may not be upheld by Judge
Furman . . . as giving rise to cognizable claims and causes of action.") Though not mentioned by
Plaintiffs' counsel then, those claims were made with respect to cars made by Old GM, *see, e.g.,*
Consolidated Amended Complaint for Post-Sale Vehicles ¶¶ 820-825, and thus were violative of
the Sale Order, to the extent it remains enforceable.

[7]    ECF No. 12808.

[8]    When they can be referred to together, they are collectively referred to as the "**Plaintiffs**." Their
bankruptcy counsel, retained and then designated to act for the large number of plaintiffs whose
counsel at least generally litigate tort matters, rather than bankruptcy issues, have been referred to
as "**Designated Counsel**." As the two groups of Plaintiffs' circumstances overlap in part and
diverge in part, one brief was filed by Designated Counsel for Economic Loss Plaintiffs, and
another by Designated Counsel for Pre-Closing Accident Plaintiffs—with the latter relying on the
former's brief with respect to overlapping themes. References to "Pl. Br." are thus to the main
brief filed by the Economic Loss Plaintiffs' Designated Counsel.

matters; (3) what remedies are appropriate for any due process denial; and (4) to what extent sale orders can be modified after the fact at the expense of those who purchased assets from an estate on the expectation that the sale orders would be enforced in accordance with their terms. They also involve the needs and concerns of Old GM creditors whose claims are pending, and of holders of units of the Old GM General Unsecured Creditors Trust ("**GUC Trust**"), formed for the benefit of unsecured creditors when Old GM confirmed its liquidating plan of reorganization (the "**Plan**")—all of whom would be prejudiced if Old GM's remaining assets were tapped to satisfy an additional $7 to $10 billion in claims.

For the reasons discussed at length below, the Court concludes:

*1. Due Process*

Notice must be provided in bankruptcy cases, as in plenary litigation, that is "reasonably calculated, under all the circumstances" to apprise people of the pendency of any proceeding that may result in their being deprived of any property, and to "afford them an opportunity to present their objections."[9] The Second Circuit, like many other courts, has held that "the Due Process Clause requires the best notice practical under the circumstances."[10] But "actual" (*i.e.*, personalized) notice is required for "known" creditors—those whose names and addresses are "reasonably ascertainable."[11] "Constructive" notice (typically provided by publication) can be used when it is the best

---

[9] *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("***Mullane***") (citations omitted).

[10] *In re Drexel Burnham Lambert Grp.*, 995 F.2d 1138, 1144 (2d Cir. 1993) ("***Drexel Burnham***"). The *Drexel Burnham* chapter 11 case generated several opinions relevant to this controversy. The Court has given another of them a different shorthand name to help tell it apart. *See* n.105 below.

[11] *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 800 (1983) ("***Mennonite Board***").

notice practical under the circumstances.  But publication notice, as a substitute for actual
notice, at least normally is insufficient for "known" creditors.

In the bankruptcy context, those general principles apply to both the notice
required incident to sale approval motions, on the one hand, and to claims allowance, on
the other.  And in this case, the Court ultimately reaches largely the same conclusions
with respect to each.  But the different circumstances applicable to the sale process (to be
completed before a grievously bleeding Old GM ran out of money) and the claims
process (which lacked comparable urgency) cause the Court to reach those conclusions in
different ways.

*(a) Notice Before Entry of Sale Order*

The Court disagrees with New GM's contention that imposing free and clear
provisions doesn't result in a potential deprivation of property, and thus concludes that
due process requirements apply.  But the caselaw—in plenary litigation and in
bankruptcy cases alike—permits, and indeed requires, consideration of practicality.

There was extraordinary urgency in connection with the 363 Sale.  In June 2009,
Old GM was bleeding cash at an extraordinary rate.  And U.S. and Canadian
governmental authorities, who had agreed to provide cash to keep Old GM alive until the
closing of a 363 sale, had conditioned their willingness to continue the necessary funding
on the approval of the 363 Sale by July 10, 2009, only 40 days after the chapter 11 filing.

Given that urgency, with the sale hearing to commence 29 days after the Petition
Date; objections due 18 days after the Petition Date; and 70 million Old GM vehicles on
the road, notice by publication to vehicle owners was obviously proper.  Indeed, it was
essential.  It would be wholly unreasonable to expect actual notice of the 363 Sale
hearing then to have been mailed to the owners of the 70 million GM cars on the road at

-7-

the time, or even the 27 million whose cars were then (or later became) the subject of pending recalls.  Though notice by publication would at least normally also be acceptable in instances involving considerably smaller bodies of creditors, this is exactly the kind of situation for which notice by publication is the norm.  Under normal circumstances, notice by publication would easily be sufficient under *Mullane, Drexel Burnham,* and their respective progeny.

But the Court must also determine whether the knowledge of many Old GM personnel of the Ignition Switch Defect removes this case from the general rule.  While there is no indication on this record, if there ever will be, that Old GM's bankruptcy counsel knew of the need to focus on notice to owners of cars with Ignition Switch Defects, at least 24 business and in-house legal personnel at Old GM were aware of the problem.  As of June 2009, when entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required, under the National Traffic and Motor Vehicle Safety Act (the "**Safety Act**"), to send out mailed recall notices to owners of affected Old GM vehicles.  And Old GM knew to whom it had to mail the recall notices, and had addresses for them.

The adequacy of notice issue is nevertheless close, however, because while Old GM had a known recall obligation, and knew the names and addresses of those owning the vehicles that were affected, Old GM gave *actual* notice of the 363 Sale to anyone who had previously asserted a claim against it for injury or death—by  reason of Ignition Switch Defects or otherwise.  And only a subset (and, possibly a small subset) of the others who were entitled to Ignition Switch Defect recall notices would later turn out to have been injured, killed, or economically damaged as a result of the circumstances that

led to the recall, or want to object to the 363 Sale or any of its terms.  That *some* of them would be killed or injured was known; *who they would be* was not.

But on balance the Court believes that the distinction is insufficient to be meaningful.  The known safety hazard that engendered the unsatisfied recall obligations gave rise to claims associated with the repair (and assertedly, though this is yet to be decided, decreases in value) of the cars and would give rise to more claims if car occupants were killed or injured as a result.  Old GM knew—even if it knew the particular identities of only *some* cars that had been in Ignition Switch Defect accidents— that the defect had caused accidents; that is exactly why this particular recall was required.  And Old GM also knew, from the same facts that caused it to be on notice of the need for the recall, that *others*, in the future, would be in accidents as well.

The publication notice here given, which otherwise would have been perfectly satisfactory (especially given the time exigencies), was not by itself enough for those whose cars had Ignition Switch Defects—because from Old GM's perspective, the facts that gave rise to its recall obligation resulted in "known" claims, as that expression is used in due process jurisprudence.  Because owners of cars with Ignition Switch Defects received neither the notice required under the Safety Act nor any reasonable substitute (either of which, if given before Old GM's chapter 11 filing, could have been followed by the otherwise satisfactory post-filing notice by publication), they were denied the notice that due process requires.

### (b) Notice Before Expungement of Claims

By contrast to the 363 Sale, there was no particular urgency with respect to the allowance of claims.  Claims could be (and ultimately were) considered in a less hurried fashion.  And while notice only by publication to 70 million (or even 27 million) vehicle

09-50026-reg   Doc 13109   Filed 04/15/15   Entered 04/15/15 15:58:22   Main Document
Pg 15 of 138

owners not known by Old GM to have been in accidents would be the norm for the

claims process as well (and notice by publication, applicable in this respect and others, is

what this Court then approved), the fact is that even at the later times set as deadlines for

the filing of claims, Old GM still had not sent out notice of the recall, and Old GM car

owners were still unaware of any resulting potential claims.

In the claims allowance respect too, the Court concludes that Old GM's

knowledge of facts sufficient to justify notice of a recall, and its failure to provide the

recall notice, effectively resulted in a denial of the notice due process requires.

### *(c) Requirement for Prejudice*

Though the Court has found failures, insofar as the Plaintiffs are concerned, to

provide the notice that due process requires, that does not by itself mean that they have

established a due process violation. The Court categorically rejects the Plaintiffs'

contention that prejudice is irrelevant. Rather, in order to establish a due process

violation, they must demonstrate that they have sustained prejudice as a result of the

allegedly insufficient notice.[12]

In some instances, a lack of notice plainly results in prejudice, as in instances in

which the earlier judicial action cannot be undone. In others, it does not—and it can be

cured by providing the opportunity to be heard at a later time, and, where the law permits

and requires, vacating or modifying the earlier order, or exempting parties from the

order's effect. In every case, however, a denial of notice need not result in an automatic

win for the party that failed to get appropriate notice the first time around. Instead that

party should get the full and fair hearing it was initially denied, with the Court then

---

[12] *Perry v. Blum*, 629 F.3d 1, 17 (1st Cir. 2010); *accord* all of the other cases cited in nn.162 through
164 *infra*.

09-50026-reg    Doc 13109    Filed 04/15/15    Entered 04/15/15 15:58:22    Main Document
Pg 16 of 38

focusing on the extent to which prejudice actually resulted—and, of course, on achieving

the right outcome on the merits, which in a perfect world would have been reached the

first time.[13]

Both groups of Plaintiffs were plainly prejudiced with respect to the bar date for

filing claims.  But the Pre-Closing Accident Plaintiffs were not prejudiced at all, and the

Economic Loss Plaintiffs were prejudiced only in part, by the failure to give them the

requisite notice in connection with the 363 Sale.  Neither the Economic Loss Plaintiffs

nor the Pre-Closing Sale Plaintiffs were prejudiced with respect to the Sale Order's Free

and Clear Provisions.  Back in 2009, the Court heard many others make the same

arguments, and rejected them.  The Court now has heard from both the Economic Loss

Plaintiffs and Pre-Closing Accident Plaintiffs with respect to the Free and Clear

Provisions and successor liability, with full and fair opportunity to be heard.  And neither

Plaintiff group has advanced any arguments on successor liability that were not

previously made, and made exceedingly well before.  Their principal contention—that

they would have won by reason of public outrage, political pressure, or the U.S.

Treasury's anger with Old GM, when they would not have won in the courtroom—is the

very speculation that they rightfully criticize.  Thus insofar as successor liability is

concerned, while the Plaintiffs established a failure to provide them with the notice due

---

[13]    That was referred to in oral argument here, initially by the Court, as a "do-over."  In many, if not
most, instances, that will be required, but in many, if not most, cases that will also be sufficient.
What is critical, however it is accomplished, is that the Court gauge in a non-speculative fashion
whether (and how) the outcome might have been different if the requisite notice had been
provided.

process requires, they did not establish a due process violation. The Free and Clear Provisions stand.[14]

But the Economic Loss Plaintiffs were prejudiced in one respect. Nobody else had argued a point that they argue now: that the proposed Sale Order was overly broad, and that it should have allowed them to assert claims involving Old GM vehicles and parts so long as they were basing their claims *solely on New GM conduct*, and not based on any kind of successor liability or any other act by Old GM. If the Economic Loss Plaintiffs had made that argument back in 2009, the Court would have agreed with them. And by contrast to their predictions as to possible results of public outrage, this is not at all speculative, since the Court had ruled on closely similar issues before, seven years earlier, and, indeed, again in that very same *Sale Opinion*. Here, by contrast, the failure to provide the notice that due process requires was coupled with resulting prejudice. The Economic Loss Plaintiffs were not furnished the opportunity to make the overbreadth argument back in 2009, and in that respect they were prejudiced. The failure to be heard on this latter argument necessarily must be viewed as having affected the earlier result.

Thus, with respect to Sale Order overbreadth, the Economic Loss Plaintiffs suffered a denial of due process, requiring the Court to then turn to the appropriate remedy.

### 2. *Remedies*

As noted above, the Court has rejected the Plaintiffs' contention that prejudice is irrelevant to a claim for denial of due process. And it has likewise rejected the notion

---

[14] They also stand with respect to a subset of Economic Loss Plaintiffs (the "**Used Car Purchasers**") who acquired cars manufactured by Old GM in the aftermarket after the 363 Sale (*e.g.*, from their original owners, or used car dealers). They too were not prejudiced by the inability to make successor liability arguments that others made, and, in addition, they can have no greater rights than the original owners of their cars had.

that the denial of the notice that due process requires means that the Plaintiffs should automatically win. But to the extent they were prejudiced (and the Court has determined that the Economic Loss Plaintiffs *were* prejudiced with respect to Sale Order overbreadth), they deserve a remedy tailored to the prejudice they suffered, to the extent the law permits.

The Court rejects, for reasons discussed below, New GM's contention that the principles under which property is sold free and clear of liens, with the liens to attach instead to sale proceeds, apply universally to interests other than liens—as relevant here, interests permitting the assertion of successor liability. But New GM's next several points—that purchasers of assets acquire property rights too, and that taking away purchasers' contractually bargained-for rights strikes at the heart of understandings critically important to the bankruptcy system—have great merit. They have so much merit, in fact, that were it not for the fact that the Plaintiffs' claim is a constitutional one, the Court would not deny enforcement of the Sale Order, in whole or in part. There is no good reason to give creditors asserting successor liability claims recovery rights greater than those of other creditors. And as importantly or more so, the interests inherent in the enforceability of 363 orders (on which the buyers of assets should justifiably be able to rely, and on which the interests of creditors, keenly interested in the maximization of estate value, likewise rest) are hugely important.

But the Court concludes that remedying a constitutional violation must trump those concerns. Decisions of the Second Circuit and other courts hold, or suggest (with little in the way of countervailing authority), that with or without reliance on Fed.R.Civ.P. 60(b), lower courts may—and should—deny enforcement, against those

-13-

who were prejudiced thereby, of even cherry-picked components of sale orders that have

been entered with denials of due process. Those cases make clear that it is not necessary

for a court to invalidate the sale order in full. That is so whether or not the Court declares

the order, or part of it, to be "void." And if the order can be declared to be void (or if it

can be selectively enforced, to avoid enforcing it against one denied due process),

provisions in the order providing that it is nonseverable fall as well.

In the absence of a constitutional violation, the Court suspects that the power to

deny full enforcement of a sale order (assuming that such is even permissible) will rarely,

if ever, be invoked. The principles underlying the finality of 363 sale orders are much

too important. But in cases where a sale order can be declared to be void (and orders

entered without due process are subject to such a consequence), sale orders may be

modified, or selectively enforced, as well.

### 3. Assumed Liabilities

In light of the Court's conclusions, summarized above, New GM's concerns as to

the limited liabilities that New GM assumed are not as significant as they might

otherwise have been. New GM is right that it expressly declined to assume any liabilities

based on Old GM's wrongful conduct, and that these were "retained liabilities" to be

satisfied by Old GM. But the Court's ruling that it will continue to enforce prohibitions

against successor liability makes New GM's concerns as to that academic. And to the

extent, if any, that New GM might be liable on claims based solely on any wrongful

conduct on its own part (and in no way relying on wrongful conduct by Old GM), New

GM would have such liability not because it had assumed any Old GM liabilities, or was

responsible for anything wrong that Old GM did, but only because it had engaged in

independently wrongful, and otherwise actionable, conduct on its own.

But it is plain that to the extent the Plaintiffs seek to impose successor liability, or to rely, in suits against New GM, on any wrongful conduct by Old GM, these are actually claims against Old GM, and not New GM.  It also is plain that any court analyzing claims that are supposedly against New GM only must be extraordinarily careful to ensure that they are not in substance successor liability claims, "dressed up to look like something else."[15]  Claims premised in any way on Old GM conduct are properly proscribed under the Sale Agreement and the Sale Order, and by reason of the Court's other rulings, the prohibitions against the assertion of such claims stand.

4. *Equitable Mootness*

Because the successor liability claims start by being claims against Old GM, the Court also must consider the GUC Trust's concerns as to Equitable Mootness.  The Court recognizes that mootness concerns will materially, if not entirely, impair the Plaintiffs' ability to collect on any allowed claims against Old GM (or more precisely, the GUC Trust) that they otherwise might have.  But nevertheless, the Court concludes, contrary to its original instincts at the outset of this controversy, that the GUC Trust is right in its mootness contentions, and that the rights of GUC Trust beneficiaries cannot be impaired at this late time.

Mootness doctrine already made a return of past distributions from all of Old GM's many thousands of creditors unthinkable.  But the Court, being mindful of the Second Circuit's holdings that mootness doctrine does not foreclose relief where *some* meaningful relief can be fashioned, originally thought that mootness concerns would not foreclose at least some relief—such as permitting the late filing of claims, and thereby

---

[15]     *Burton v. Chrysler Grp., LLC* (*In re Old Carco*), 492 B.R. 392, 405 (Bankr. S.D.N.Y. 2013) (Bernstein, C.J.) ("***Old Carco***").

permitting Economic Loss Plaintiffs to share in assets remaining in the GUC Trust. In

the course of subsequent briefing, however, the GUC Trust and its unit holders (the

"**Unitholders**") pointed out (along with other reasons for denial of relief) that granting

relief now to the Plaintiffs would require not just the allowance of late claims (which by

itself would be acceptable), but also *the modification of the confirmation order*—and

with it, impairment of the rights of the Unitholders, especially those who acquired those

units in post-confirmation trading. Though late claims filed by the Plaintiffs might still

be allowed, assets transferred to the GUC Trust under the Plan could not now be tapped

to pay them. Under the mootness standards laid down by the Second Circuit in its

leading decisions in the area,[16] GUC Trust Unitholders must be protected from a

modification of the Plan.

###### 5. *Fraud on the Court*

Believing that rulings now might expedite or moot further litigation down the

road, the Court also undertook to rule on the legal standards applicable to litigation over

whether, in connection with the entry of the Sale Order, there might have been a fraud on

the Court. Though they become less important for reasons discussed below, the Court

provides them in Section V.

Of the standards for establishing fraud on the Court, discussed below, three are

particularly relevant here. One is that fraud on the court requires action that does or

attempts to defile the *court itself*. Another, related to the first, is that establishing a fraud

on the Court requires defrauding the *court*, as contrasted to a non-judicial victim (such as

---

[16]   *See Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co.* (*In re Chateaugay Corp.*), 988 F.2d 322 (2d Cir. 1993) ("**Chateaugay I**"); *Frito-Lay, Inc. v. LTV Steel Co.* (*In re Chateaugay Corp.*), 10 F.3d 944 (2d Cir. 1993) ("**Chateaugay II**"); *Beeman v. BGI Creditors' Liquidating Trust (In re BGI, Inc.)*, 772 F.3d 102 (2d Cir. 2014) ("**BGI**").

a vehicle owner). A third is because it involves an effect on the Court (as contrasted to any injured third parties), it turns on the knowledge and intent of *those actually interfacing with the Court*. In each of those respects, and its application otherwise, establishing a fraud on the Court requires a knowing and purposeful effort to subvert the judicial process.

### 6. Certification to the Circuit

The issues here are important, difficult, and involve the application of often conflicting authority. Their prompt determination will affect further proceedings not just in this Court, but also the MDL Court. The Court believes that it should certify its judgment for direct review by the Circuit.

<u>Facts</u>[17]

### 1. Background

In late 2008 and the first half of 2009, Old GM—then the only "GM"—was in extremis. As the Court found in the *Sale Opinion*, Old GM had suffered a steep erosion in revenues, significant operating losses, and a dramatic loss of liquidity, putting its future in grave jeopardy. It was bleeding cash at an extraordinary rate.

Old GM was assisted in December 2008 by an emergency infusion of cash by the Bush administration, and then again, in January and February 2009, by two more emergency infusions of cash by the Obama administration. But the latter declared that its financial support would last for only a limited period of time, and that Old GM would have to address its problems as a matter of great urgency.

---

[17]     The Court asked the parties to agree on stipulated facts, and they did so. By analogy to motions for summary judgment, the Court has relied only on undisputed facts. To avoid lengthening this Decision further, the Court has limited its citations to quotations and the most important matters.

In March 2009, the U.S. Treasury ("**Treasury**"), whose Presidential Task Force on the Auto Industry ("**Auto Task Force**") was quarterbacking the rescue effort, gave Old GM 60 days to submit a viable restructuring plan.  Failure to accomplish that would force Old GM to liquidate.  But Old GM was unable to achieve an out-of-court restructuring.  It quickly became obvious that Old GM's only viable option was to file a chapter 11 case and to sell its assets through a 363 Sale, shed of the great bulk of its prepetition liabilities.  The acquirer ultimately became New GM.

The urgency at the time is apparent.  The cash bleeding was brutal; Old GM suffered negative cash flow of $9.4 billion in the first quarter of 2009 alone.[18]  Without a very quick end to the bleeding, Old GM would plunge into liquidation.  Apart from the loss to Old GM's creditors, Old GM's liquidation would result in the loss of over 200,000 jobs at Old GM alone, and grievous loss to the approximately 11,500 vendors, with more than 500,000 workers, in the Supplier Chain.[19]  Liquidation would also result in virtually no recovery for any of Old GM's prepetition creditors—including Pre-Closing Accident Plaintiffs and Economic Loss Plaintiffs before the Court now.

2. *Chapter 11 Filing*

On June 1, 2009 (the "**Petition Date**")—40 days prior to the deadline imposed under the critical DIP Financing—Old GM and three affiliates commenced these now jointly administered chapter 11 cases before this Court.  That same day, Old GM filed the motion (the "**Sale Motion**") for authority to engage in the required 363 Sale.

---

[18]     *Sale Opinion*, 407 B.R. at 476, 479.

[19]     *Id.* at 476, 477 n.6.  The Supplier Chain is the body of vendors that supply parts and subassemblies that go into the vehicles that are manufactured by the U.S. Big Three—GM, Chrysler, and Ford— and many of their foreign counterparts, at least those that manufacture vehicles in the U.S.  The Court learned, in connection with the 363 Sale Hearing back in 2009, that the majority of the value that would go into a GM vehicle would in fact have come from the Supplier Chain.

3. *The Sale Motion and Notice Order*

In its Sale Motion, GM asked the Court to authorize the 363 Sale "free and clear of all other 'liens, claims, encumbrances and other interests,' including, specifically, 'all successor liability claims.'"

Specifically, GM submitted a proposed order to the Court (the "**Proposed Sale Order**") containing provisions directed at cutting off successor liability except in the respects where successor liability was contractually assumed.  As the Court noted in 2009, the Proposed Sale Order would effectuate a free and clear sale through a double-barreled approach:

> First, the Proposed Sale Order contains a finding— and a decretal provision to similar effect—that the Debtors may sell the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability.

> Second, the Proposed Sale Order would enjoin all persons (including "litigation claimants") holding liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability, from asserting them against New GM or the Purchased Assets.[20]

Along with its submission of the Proposed Sale Order, GM moved for court approval of the sale procedures, and for an order fixing and approving the form and manner of notice.  After hearing argument on the motion, the Court approved the sale procedures, and the next day entered an order laying out the procedures for the upcoming 363 Sale (the "**Sale Procedures Order**").

---

[20]  *Sale Opinion*, 407 B.R. at 483 (internal citations omitted).

### 4.  *Notice of the Sale*

As relevant here, the Sale Procedures Order provided for *actual* notice to
25 categories of persons and entities, including, among many others, all parties who were
known to have asserted any lien, claim, encumbrance, or interest in or on the Purchased
Assets; all vehicle owners involved in actual litigation with Old GM (or, who though not
yet involved in actual litigation, had asserted claims or otherwise threatened to sue); and
all other known creditors.[21]

And the Sale Procedures Order additionally provided for constructive notice, by
publication, in the *Wall Street Journal* (global edition); *New York Times* (national
edition); *Financial Times* (global edition); *USA Today* (national edition); *Detroit Free
Press*; *Detroit News*; in the Canadian *Le Journal de Montreal*, *Montreal Gazette*, *The
Globe and Mail,* and *The National Post*; and on the website of Old GM's noticing agent,
The Garden City Group.[22]

The notice of hearing on the proposed 363 Sale ("**Sale Notice**") provided the
general terms of the sale, including the date and location at which the sale was to occur,
and instructions for those wishing to object or otherwise respond.  The Sale Notice did
not, however, attempt to describe the claims any recipient might have against Old GM, or
any bases for objections to the sale or Proposed Sale Order that any notice recipient
might wish to assert.

### 5.  *Objections to Free and Clear Provisions*

Many of the 850 parties objecting to the Sale Motion made limited objections—
not opposing the 363 Sale or its timing as such, but objecting instead to provisions in the

---

[21]     *See* Sale Procedures Order ¶¶ 9(a)(i) through (xxv), 9(b)(i) through (ii) (ECF No. 274).

[22]     *See id.* ¶ 9(e); *see also* New GM Stipulations of Fact ¶¶ 22-23 (ECF No. 12826-2).

Proposed Sale Order. They argued that New GM should assume certain kinds of claims; that the Free and Clear Provisions limiting successor liability were improper; or both. More specifically:

(a) Many of the states' Attorneys General ("**AGs**"), assisted in significant part by an attorney with the National Association of Attorneys' General well known for her expertise in the interplay between bankruptcy law and states' regulatory needs and concerns, argued that New GM should assume consumer claims for implied, express, and statutory warranties.[23]

(b) Old GM's Official Committee of Unsecured Creditors (the "**Creditors' Committee**"), representing unsecured creditors of all types (including tort plaintiffs and other vehicle owners), objected to the Proposed Sale Order because (as the Creditors' Committee well understood) it would cut off state law successor liability and limit any current or future claimants to recovery from the assets "left behind in the old company."[24]

(c) The Ad Hoc Committee of Consumer Victims (the "**Consumer Victims Committee**"); attorneys for individual accident litigants (the "**Individual Accident Litigants**"); attorneys for asbestos victim litigants (the "**Asbestos Litigants**"); and the Center for Auto Safety, Consumer Action, Consumers for Auto Reliability and Safety, National Association of Consumer Advocates, and Public Citizen (collectively, the "**Consumer**

---

[23]    *See* AGs Objections, ECF Nos. 1926 and 2043.

[24]    Creditors' Committee Objection at 3 (ECF No. 2362).

**Organizations,**" and, together with the others, the "**Successor Liability Objectors**") likewise argued that Old GM could not sell its assets free and clear of any rights or claims based on successor or transferee liability.[25]

The Successor Liability Objectors argued that shedding potential successor liability was not permitted under Bankruptcy Code section 363(f). They further argued that section 363(f) "authorize[d] the sale of property free and clear only of 'interests in' property to be sold, not *in personam* claims against the Purchaser under theories of successor liability."[26] They further argued that the Court "lack[ed] jurisdiction to enjoin actions between non-debtor product liability claimants and the Purchaser post-closing since resolution of these claims [would] not affect the Debtors' estates."[27] And they argued that the Free and Clear Provisions would violate due process—asserting that individuals who might have future claims for injuries "cannot have received meaningful notice that the bankruptcy proceeding was resolving their rights or a meaningful opportunity to protect those rights, which otherwise might allow a state law cause of action for their injuries."[28]

In the *Sale Opinion*, the Court considered, but ultimately rejected, those contentions and similar ones. Relying on, among other things, the then recent opinions by the Bankruptcy Court in *Chrysler*[29] (which had recently issued its own sale order with

---

[25]   *See* Successor Liability Objectors' Limited Obj. (ECF No. 2041).

[26]   Successor Liability Objectors' Mem. of Law at 2 (ECF No. 2050).

[27]   *Id.*

[28]   *Id.*

[29]   *See In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009) (" *Chrysler* "), (Gonzalez, CJ.), *aff'd for substantially the reasons stated in the opinions below*, No. 09–2311–bk (2d Cir. Jun. 5, 2009) ("*Chrysler Circuit Order* "), *temporary stay vacated and further stay denied*, 556 U.S. 960 (June 9, 2009), *Circuit written opinion issued*, 576 F.3d 108 (2d Cir. Aug. 5, 2009) ("*Chrysler Circuit*

free and clear provisions); of the Second Circuit (which, three weeks before the Old GM

363 Sale hearing, affirmed the *Chrysler* decision for "substantially the same reasons

articulated by the bankruptcy court"[30]); and earlier authority,[31] this Court overruled the

objections to the Free and Clear Provisions—determining, after lengthy analysis, that

New GM should be protected against successor liability claims.[32]

   6.   *Sale Agreement—Relevant Provisions*

       The agreement under which the 363 Sale would take place, which had the formal

name of "Amended and Restated Master Sale and Purchase Agreement," dated June 26,

2009 (often referred to by the parties as the "**ARMSPA**" but by this Court as the "**Sale**

**Agreement**"), was originally filed with the Sale Motion on June 1, 2009.  It was

thereafter amended—in respects relevant here (1) to incorporate an agreement with the

AGs under which New GM would assume liabilities under state Lemon Laws, and (2) to

provide that New GM would assume responsibility for any and all accidents or incidents

---

*Opinion"), judgment vacated and case remanded with instructions to dismiss appeal as moot*, 558 U.S. 1087 (Dec. 14, 2009).

[30]   *See Chrysler Circuit Order.*  The Circuit first issued a short written order, affirming for "substantially the reasons articulated by the Bankruptcy Court," *id.*, and advising that its order would be followed by a written order more fully explaining the Circuit's ruling.  The Circuit thereafter issued a lengthy opinion explaining its earlier ruling in great detail.  *See Chrysler Circuit Opinion.*  But about four months later, the Circuit's "judgment" was vacated by the United States Supreme Court with directions to dismiss the appeal as moot.  What the Supreme Court meant by "judgment" in that context was not explained, but one can infer (though the Supreme Court did not explain this either) that the appeal was moot at the time the Circuit's written opinion was issued, since Chrysler's 363 sale had already closed.  But even assuming that the controversy was moot by the time the Circuit issued the *Chrysler Circuit* written opinion), the controversy was not moot when the Circuit issued its initial affirmance order—the *Chrysler Circuit Order*— preceding the Chrysler 363 sale closing, upon which this Court also relied.  And assuming, *arguendo*, that, by reason of these matters of timing, the Circuit's written *Chrysler Circuit Opinion* can no longer be regarded as binding on the lower courts in the Second Circuit (a matter this Court has no need to decide), the Court thinks the Circuit's written thinking on the subject should continue to be respected.

[31]   *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 288–90 (3d Cir. 2003); *United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 581–82 (4th Cir.1996).

[32]   *See Sale Opinion*, 407 B.R. at 499-506.

giving rise to death, personal injury, or property damage after the date of closing of the 363 Sale, irrespective of whether the vehicle was manufactured by Old GM or New GM.

The Sale Agreement, in its Section 2.3, listed liabilities that New GM would assume ("**Assumed Liabilities**"), on the one hand, and that Old GM would retain ("**Retained Liabilities**"), on the other.  Those that would be assumed by agreement were listed in subsection (a); those that would be retained (which would cover everything else) were listed in subsection (b).  As provided in subsection (a), Assumed Liabilities included:

> (a) Claims for "**Product Liabilities**" (a term defined in the Sale Agreement), with respect to which New GM would assume (but assume only) those that arose out of "accidents or incidents"[33] occurring on or after the Closing Date;[34]

---

[33]  The Court addressed the meaning of "incidents" in its decisions in *In re Motors Liquidation Co.*, 447 B.R. 142, 149 (Bankr. S.D.N.Y. 2011) (Gerber, J.) (" **GM–Deutsch**"), and *In re Motors Liquidation Co.*, 513 B.R. 467 (Bankr. S.D.N.Y. 2014) (Gerber, J.) ("**GM-Phaneuf**").  In *GM-Deutsch*, the Court accepted the explanation proffered by New GM counsel in which he stated that the language was drafted to cover situations similar to accidents that might not be said to be accidents, such as a car catching on fire, blowing up, or running off the road—in each case where it could cause a physical injury to someone.  447 B.R. at 148 n.20.  In *GM-Phaneuf*, the Court made reference to its earlier *GM-Deutsch* ruling, describing it, in a parenthetical following the citation, as "construing the 'incidents' portion of the '"accidents or incidents' language (in the context of claims against New GM by the estate of a consumer who had been in an accident before the 363 Sale, but died thereafter) as covering more than just "accidents," but covering things that were similar, such as fires, explosions, or other definite events that caused injuries and resulted in the right to sue").  513 B.R. at 472 n.17.

[34]  Sale Agreement § 2.3(a)(ix) (as amended) (ECF No. 2968-2).  As a practical matter the great bulk of covered occurrences would be accidents.  For brevity, except where quoting language that did not do likewise, the Court uses "**Accidents**" to cover anything within that category.

The "**Closing Date**"—the date the 363 Sale closed, under the authority of the Sale Order—turned out to be July 10, 2009.

09-50026-reg   Doc 13109   Filed 04/19/15   Entered 04/19/15 13:58:22   Main Document
Pg 30 of 139

   (b) Repairs or the replacement of parts provided for under the

Glove Box Warranty;[35] and

   (c) Lemon Law claims.[36]

And as noted in the Sale Decision, "an important change [] was made in the [Sale

Agreement] after the filing of the motion" which broadened the Assumed Liabilities to

include "*all* product liability claims arising from accidents or other discrete incidents

arising from operation of GM vehicles occurring subsequent to the closing of the

363 Transaction, *regardless of when the product was purchased.*"[37]

   But by contrast, the liabilities retained by Old GM—and not assumed by New

GM—expressly included:  (a) Product Liabilities arising in whole or in part from any

Accidents, that happened *prior to* the Closing Date;[38] and (b) Liabilities to third parties

for prepetition claims based on contract, tort, or any other basis.[39]

   The Sale Agreement also required New GM to comply with recall obligations

imposed by federal and state law, even for cars or parts manufactured by Old GM.[40]

---

[35]   Sale Agreement § 2.3(a)(vii).  This is a duty to make, or cause to be made, the necessary repairs.
It is not a monetary obligation.  *See Trusky v. General Motors Co. (In re Motors Liquidation Co.),*
2013 Bankr. LEXIS 620, at *26, 2013 WL 620281, at *9 (Bankr. S.D.N.Y. Feb. 19, 2013)
(Gerber, J.) ("**GM-Trusky**") ("Performance of repairs and needed adjustments is the exclusive
remedy under this written warranty.  What is recoverable, in substance, is specific performance of
the repair or replacement obligation for otherwise qualifying defects.").

[36]   *See* Sale Agreement §2.3(a)(vii).  Lemon Law claims were added as an assumed liability during
the course of the 363 Sale hearing after negotiation with the AGs**.**  Additionally, and importantly
here, New GM undertook to comply with its statutory recall obligations, even with respect to Old
GM manufactured vehicles.  Though to the extent these related to Old GM manufactured vehicles,
these might be thought of as Old GM liabilities to be assumed, they were not characterized as
such.  But the characterization doesn't matter; what is clear is that New GM agreed that it would
be responsible for them.

[37]   407 B.R. at 481–82 (emphasis in original).

[38]   Sale Agreement § 2.3(b)(ix).  The Pre-Closing Accident Plaintiffs' claims are in this category.

[39]   Sale Agreement § 2.3(b)(xi).  The Economic Loss Plaintiffs' Claims are in this category.

[40]   *See* Sale Agreement § 6.15(a) ("From and after the Closing, Purchaser shall comply with the
certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety

7.  *The Sale Order*

As previously discussed, the Court overruled objections to Free and Clear

Provisions, and the Sale Order thus had five (somewhat duplicative) provisions, including

injunctive provisions, protecting New GM from successor liability.

One provided, for example, that except for Assumed Liabilities, Old GM's assets

were acquired "free and clear of all liens, claims, encumbrances, and other interests of

any kind or nature whatsoever [other than permitted liens], *including rights or claims*

*based on any successor or transferee liability,*" with "all such liens, claims,

encumbrances, and other interests, *including rights or claims based on any successor or*

*transferee liability,* [to] attach to the net proceeds" of the Sale.[41]

Three others provided that "*no claims, other than Assumed Liabilities, will be*

*assertable against the Purchaser* [New GM];"[42] that New GM would have no liability

"*for any claim that arose prior to the Closing Date, relates to the production of vehicles*

*prior to the Closing Date, or otherwise is assertable against the Debtors or is related to*

*the Purchased Assets prior to the Closing Date*";[43] and that "*the Purchaser shall have no*

*successor, transferee, or vicarious liabilities of any kind or character.*"[44]  And another

included injunctive provisions barring assertion of successor liability claims.[45]

---

Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean
Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent
applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.").

[41]    Sale Order ¶ 7 (ECF No. 2968) (emphasis added).

[42]    *Id.* at ¶ 9(a) (reformatted for readability, emphasis added).

[43]    *Id.* at ¶ 46 (reformatted for readability, emphasis added).

[44]    *Id.* at ¶ 48 (reformatted for readability, emphasis added).

[45]    *Id.* at ¶ 8 (the "**Injunctive Provision**").

09-50026-reg Doc 13109 Filed 04/19/15 Entered 04/19/15 15:58:22 Main Document Pg 32 of 138

But tracking the language of the Sale Agreement, almost verbatim, the Sale Order imposed certain recall and other obligations on New GM in accordance with federal and state law, even with respect to parts and vehicles manufactured by Old GM:

> From and after the Closing, the Purchaser shall comply with the certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety Act, as amended and recodified, including by the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar Laws, in each case, to the extent applicable in respect of motor vehicles, vehicles, motor vehicle equipment, and vehicle parts manufactured or distributed by the Sellers prior to the Closing.[46]

And the Sale Order also addressed severability: "The provisions of this Order are nonseverable and mutually dependent on each other."[47]

8. *Matters After the Sale*

Upon the closing of the 363 Sale, New GM provided Old GM, as provided in the Sale Agreement, shares of New GM common stock and warrants (the "**New GM Securities**"), to be later distributed to Old GM creditors pursuant to a future plan.

In September 2009, about two months after the Sale was completed, the Court entered an order (the "**Bar Date Order**") establishing November 30, 2009, as the deadline (the "**Bar Date**") for proofs of claim to be filed against Old GM, and approved the form and manner of notice of the Bar Date. The Bar Date Order allowed for publication notice to holders of unknown claims. The Plaintiffs here are among those who received publication notice only as to any claims they might have against Old GM.

---

[46] *Id.* at ¶ 17.

[47] *Id.* at ¶ 69.

In March 2011, Old GM filed the Plan, and without opposition anything like the opposition that the 363 Sale had engendered (though the opposition was sufficient to warrant a written opinion),[48] the Plan was confirmed. On March 29, 2011, the Court entered an order (the "**Confirmation Order**") confirming the Plan.

The Plan became effective on March 31, 2011 (the "**Effective Date**"), and the Plan provided that it would be deemed substantially consummated as of the Effective Date. The parties have stipulated that the Plan has been substantially consummated.[49]

   *9. The GUC Trust and its Operation*

Among many other things, the Confirmation Order authorized the creation of the GUC Trust. Under the agreement by which the GUC Trust was formed (the "**GUC Trust Agreement**"), only certain categories of persons or entities were made beneficiaries. The GUC Trust Agreements limited GUC Trust Beneficiaries to:

   (i) the holders of *allowed* general unsecured claims against Old GM that existed as of the Effective Date;

   (ii) the holders of claims asserted against Old GM that *were disputed* as of the Effective Date ("**Disputed Claims**") and *subsequently allowed* (collectively with claims that were allowed as of the Effective Date, "**Allowed Claims**"),

   (iii) the holders of potential general unsecured claims ("**JPMorgan Claims**") that might arise in connection with the GUC Trust's lien

---

[48]   *See In re Motors Liquidation Co.*, 447 B.R. 198 (Bankr. S.D.N.Y. 2011) (Gerber, J.) (the "***Confirmation Decision***").

[49]   Equitable Mootness Stipulated Facts ¶ 18 (ECF No. 12826-4); s*ee also Morgenstein v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 462 B.R. 494, 501 n. 36 (Bankr. S.D.N.Y. 2012) (Gerber, J.) ("***Morgenstein***") ("[T]he Plan already has been substantially consummated."), *aff'd* 12-cv-01746-AJN, ECF No. 21 (S.D.N.Y. Aug. 9, 2012) (Nathan, J.).

avoidance action relating to a mistakenly released financing statement;[50]
and

(iv) the holders of units of beneficial interest (each, a "**GUC Trust
Unit**")[51] in the GUC Trust.

The GUC Trust Agreement also set forth provisions governing the GUC Trust's
ability to distribute the New GM Securities and their proceeds (collectively, the "**GUC
Trust Assets**"), which were intended to ensure that the Unitholders would receive, as
promptly as practicable, any GUC Trust Assets that were not necessary to fund the
Allowed Claims (or potential Allowed Claims); any additional JPMorgan Claims; or
projected liquidation and administrative costs of the GUC Trust (collectively, the "**GUC

---

[50]    Before Old GM's Plan was confirmed, the Creditors' Committee brought an adversary proceeding
seeking a determination that the principal lien securing a syndicated $1.5 billion term loan (the
"**Term Loan**") that had been made to GM in November 2006 was terminated in October 2008,
before the filing of GM's chapter 11 case—thereby making most of the $1.5 billion in
indebtedness under the Term Loan unsecured.  The defendants were the syndicate members who
together made the Term Loan and JPMorgan Chase Bank, N.A. ("**JPMorgan**"), the agent under
the facility. On cross-motions for summary judgment in that adversary proceeding, this Court
ruled in favor of JPMorgan, but that decision, after an intermediate certification to the Delaware
Supreme Court, was thereafter reversed by the Second Circuit and remanded to this Court.  *See
Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JP Morgan Chase Bank, N.A*
(*In re Motors Liquidation Co.*), 486 B.R. 596 (Bankr. S.D.N.Y. 2013) ("**GM-UCC-3 Opinion**"),
*question certified for determination by Delaware Supreme Court*, 755 F.3d 78 (2d Cir. 2014),
*question answered*, 103 A.3d 1010 (Del. 2014), *rev'd and remanded*, 777 F.3d 100 (2d Cir. 2015),
*rehearing en banc denied*, No.13-2187 ECF No. 179 (2d Cir. Apr. 13, 2015).

When Old GM's Plan was confirmed, after that adversary proceeding was commenced, the
Creditors' Committee's right to pursue that litigation devolved to another trust created under the
Plan—the "Avoidance Action Trust."  Depending on the outcome of further litigation in this
Court, it is possible that a portion (and perhaps a major portion) of the Term Loan Debt would
have to be paid to the Avoidance Action Trust and then result in additional unsecured claims
against the GUC Trust. *See* 486 B.R. at 615 n.54 ("To the extent that the Committee might be
successful in this adversary proceeding, the amount paid to JPMorgan and the Lenders would be
subject to recapture, as provided in the final DIP Financing Order when the payoff of the Term
Loan was authorized.  In that event, after the return of the amount previously paid on what was
thought to be a duly secured claim, the Lenders would still have a claim for the Term Loan debt,
but would have only an unsecured claim, sharing *pari passu* with the many billions of dollars of
other unsecured claims in GM's chapter 11 case.").

[51]    The GUC Trust Units are freely tradable.  As reported by Bloomberg Finance, as of October 21,
2014, approximately 100 million GUC Trust Units had been bought and sold since June 14, 2012,
and the aggregate value of those GUC Trust Units (based on daily closing prices) totaled
approximately $2.1 billion.

**Trust Liabilities**"), and that the GUC Trust would retain sufficient assets to fund those liabilities.

By January 2012, more than two years after the original Bar Date, many claims continued to be filed against Old GM. On January 1, 2012 (nearly a year after the Effective Date), the GUC Trust filed a motion (the "**Late Filed Claims Motion**") seeking an order disallowing late filed claims.[52] Under the requested order, any future late filed claims would be disallowed unless, among other things, the claimant filed a motion with the Court seeking permission to file a late proof of claim.

The Court granted the GUC Trust's Late Filed Claims Motion, and in February 2012, entered its order (the "**Late Filed Claims Order**") implementing that ruling.

The Late Filed Claims Order explicitly stated that "nothing in [the Late Filed Claims Order] shall prevent any claimant submitting a Late Claim from filing a motion with the Court seeking to have its Late Claim deemed timely filed."[53] Likewise, none of the Plan, Confirmation Order, and GUC Trust Agreement prohibited late filed claims. In two known instances, late filed claims have been allowed in the Old GM bankruptcy case both before and after the Effective Date. Under the Plan, a late filed proof of claim may be subsequently adjudicated as an Allowed General Unsecured Claim.

In April and May 2011, initial distributions—consisting of 75% of the New GM Securities, along with nearly 30 million GUC Trust Units—were made to those who had Allowed Claims as of the Effective Date. The only New GM Securities that were not distributed were those that could be necessary to fund GUC Trust Liabilities[54]—

---

[52]     ECF No. 11351.

[53]     Late Filed Claims Order at 2 (ECF No. 11394).

[54]     Equitable Mootness Stipulated Facts ¶ 35 (ECF No. 12826-4).

09-50026-reg  Doc 13109  Filed 04/16/15  Entered 04/16/15 13:58:22  Main Document
Pg 36 of 138

principally claims that as of that time had been neither allowed or disallowed, and administrative costs.

Between May 2011 and the end of September 2014, the GUC Trust made distributions on formerly Disputed Claims that had thereafter been resolved.  Similarly, in July and October 2011, and December 2013, the GUC Trust made additional distributions of New GM Securities—to the end that by September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities and nearly 32 million GUC Trust Units.

On October 24, 2014, the GUC Trust Administrator disclosed that it was planning on making still another distribution, scheduled for November 12, 2014.  Shortly thereafter, certain Plaintiffs' counsel wrote the GUC Trust's counsel advising that Plaintiffs were "known potential contingent beneficiaries of the GUC Trust and the GUC Trust should not make any further distributions unless and until it demonstrates that adequate reserves ha[d] been established with respect to Plaintiffs' potential claims against Old GM and/or the GUC Trust that could be in the multiple billions of dollars."[55] The next day, counsel for the GUC Trust Administrator replied that it would *not* establish reserves for the Plaintiffs' claims, and that it was going forward with the planned November 2014 GUC Trust Distribution.  Plaintiffs chose, for admitted strategic reasons,[56] not to seek a stay of the GUC Trust's distributions.

The GUC Trust Administrator then made that distribution, without establishing any reserves for the Plaintiffs' claims.

---

[55]  *See* ECF No. 13029, Exhibit A, at 3.

[56]  *See* Day 1 Arg. Tr. at 112:13-16 ("yes, there was a strategic element to the decision that was taken on our side").

09-50026-reg Doc 13109 Filed 04/19/19 Entered 04/19/19 15:58:22 Main Document
Pg 30 of 138

As of December 16, 2014, the GUC Trust had total assets of approximately $773.7 million, comprised principally of New GM Securities, though with approximately $64 million in commercial paper, demand notes, and cash equivalents.[57]

The GUC Trust Assets stand to be augmented upon allowance of any Plaintiffs' claims against Old GM and/or the GUC Trust through an "accordion feature"[58] in the Sale Agreement and any order by the Court requiring New GM to contribute more money or New GM Common Stock to the GUC Trust.[59]

### 10. Knowledge of the Ignition Switch Defect

In February and March of 2014, New GM informed the Safety Administration of the Ignition Switch Defect, and that a recall would be conducted to address it. New GM does not contend, and there is no evidence in the record from which the Court now could find, that any Plaintiff knew of the Ignition Switch Defect before New GM's announcement in the Spring of 2014. But more than a few at Old GM knew of it as of the time of Old GM's chapter 11 filing. The parties stipulated that at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers, and attorneys, were informed or otherwise aware of the Ignition Switch Defect prior to the Sale Motion, as early as 2003.[60]

---

[57]    *See* GUC Trust Q3 2014 Form 10-Q at 1, 12.

[58]    Under the Sale Agreement, New GM agreed to provide additional consideration to Old GM if the aggregate amount of Allowed General Unsecured Claims against Old GM exceeded $35 billion. *See* Equitable Mootness Stipulated Facts ¶ 5. In such case, New GM is required to issue additional shares of New GM Common Stock to the GUC Trust. *Id.*

[59]    *See id.* ¶ 32.

[60]    *See* Pl. Stipulated Facts ¶ 14 (ECF No. 12826-2).

New GM does not dispute that Old GM personnel knew enough as of the time of Old GM's June 2009 bankruptcy filing for Old GM then to have been obligated, under the Safety Act, to conduct a recall of the affected vehicles.[61]

*11. The Motion to Enforce*

Very nearly immediately after New GM's Spring 2014 announcement, a large number of class actions—the earliest Ignition Switch Actions—were commenced against New GM, asserting, among other things, successor liability.  In April 2014, New GM filed the Motion to Enforce, contending that most of the claims in the Ignition Switch Actions related to vehicles or parts manufactured and sold by Old GM, and that the Sale Order's Free and Clear Provisions, and injunctions against successor liability, proscribed such claims. In August 2014, New GM filed similar motions to enforce the Sale Order against the Pre-Closing Accident Plaintiffs and the Non-Ignition Switch Plaintiffs, though the latter is on hold pending the rulings here.

In June 2014, the Judicial Panel on Multidistrict Litigation established MDL 2543 and designated the United States District Court for the Southern District of New York as the MDL court, assigning Judge Furman to oversee coordinated proceedings for the actions assigned to the MDL.  New GM has stated in its Reply that "[t]here are over 140 class action lawsuits currently pending against [it], with more being filed."[62]  The Court understands the great bulk of these to involve economic loss claims.

At an August 11, 2014 case management conference in MDL 2543, it was determined that certain plaintiffs' counsel who had been designated to take the lead in MDL 2543 ("**Lead Counsel**") would file a consolidated master complaint for all

---

[61]     *See id.*; *see also* Pl. Br. at 47; Day 1 Arg. Tr. at 91:1-18; Day 2 Arg. Tr. at 7:11-19, 13:5-10.

[62]     New GM Reply at 45.

09-50026-reg Doc 13109 Filed 04/15/15 Entered 04/15/15 13:54:22 Main Document
Pg 39 of 188

economic loss actions. This Court then adjusted the briefing and argument of the issues

here to take into consideration any claims added or dropped in MDL 2543. In October

2014, Lead Counsel filed two Consolidated Complaints, each seeking class action

treatment. The first—referred to by many as the "Pre-Sale Consolidated Complaint"—

seeks damages from New GM on behalf of class members who purchased vehicles with

an Ignition Switch Defect (which necessarily would have been manufactured by Old GM)

*before* the closing of the 363 Sale.[63]

The second—referred to by some as the "Post-Sale Consolidated Complaint"—

seeks relief on behalf of class members who had purchased vehicles *after* the closing of

the 363 Sale.[64]

*12. The Threshold Issues*

After this Court held conferences with the parties to establish means to most

efficiently litigate the issues here, the parties identified, at the Court's request, four

threshold issues for judicial determination. They were:

> Whether Plaintiffs' procedural due process rights
> were violated in connection with the Sale Motion
> and the Sale Order and Injunction, or alternatively,
> whether Plaintiffs' procedural due process rights
> would be violated if the Sale Order and Injunction
> is enforced against them (the "**Due Process
> Threshold Issue**");

> If procedural due process was violated as described
> in (a) above, whether a remedy can or should be
> fashioned as a result of such violation and, if so,
> against whom (the "**Remedies Threshold Issue**");

---

[63] These would all be barred under the Sale Order, to the extent it is enforceable.

[64] Some of these would be barred under the Sale Order and some would not, depending on whether
the vehicle acquired after the 363 Sale had been previously manufactured by Old GM, or had Old
GM parts.

> Whether any or all of the claims asserted in the Ignition Switch Actions are claims against the Old GM bankruptcy estate (and/or the GUC Trust) (the "**Old GM Claim Threshold Issue**");[65] and
>
> If any or all of the claims asserted in the Ignition Switch Actions are or could be claims against the Old GM bankruptcy estate (and/or the GUC Trust), should such claims or the actions asserting such claims nevertheless be disallowed/dismissed on grounds of equitable mootness (the "**Equitable Mootness Threshold Issue**").[66]

The Court also asked for briefing on the legal standards that would apply to any claims asserting Fraud on the Court, and announced that it would rule on those as well.[67]

The Court addresses those issues, in some instances breaking them down further and restating them slightly to conform to a more appropriate framework, in the discussion to follow.

### Discussion

### I.

### Due Process

The Due Process Threshold Issue requires the Court to decide, with respect to the Sale Order, whether

> (1) as New GM contends and the Plaintiffs dispute, insufficient notice of the 363 Sale hearing could not result in a deprivation of due process (principally because any successor liability claims would belong

---

[65]   They agreed, however, that the issue of whether a claim asserted in the Ignition Switch Actions would be timely and/or meritorious against the Old GM bankruptcy estate (and/or the GUC Trust) is not a Threshold Issue.

[66]   *See* Supplemental Scheduling Order, dated Jul. 11, 2014, ECF No. 12770. Though the Threshold Issues were first identified before the Consolidated Complaints were filed, nobody has suggested that what has been pleaded in the Consolidated Complaint requires any change in the Threshold Issues.

[67]   *Id.*

to the Old GM estate, and not to the Plaintiffs, and because the Plaintiffs'

rights would attach to the sale proceeds), as there would not be the

requisite potential deprivation of property;

(2) as the Plaintiffs contend and New GM disputes, the Plaintiffs

failed to get the notice due process requires (and related to that, whether

the Plaintiffs had "known claims" as that expression is used in the due

process jurisprudence); and

(3) as New GM contends and the Plaintiffs dispute, prejudice is an

essential element of any claim for a denial of due process, and the

Plaintiffs failed to show the requisite prejudice here, with respect to all or

some of their claims.

After the Court does so, it then must decide the extent to which the Sale Order

remains subject to attack, and any areas as to which the Plaintiffs, or some of them, may

potentially qualify for a remedy.  The Court also believes that it should address these

same issues with respect to the allowance of Plaintiff claims against Old GM, from which

their successor liability contentions emanate, and which cannot appropriately be divorced

from any due process analysis.  Discussion of these matters follows.

## A.

### Underlying Principles

*1.  Mullane*

All parties, appropriately, begin with the Supreme Court's decision in *Mullane*—

which Plaintiffs describe as "the seminal Supreme Court case establishing due process

requirements for creditors in a bankruptcy proceeding."[68]  They are right to start with

*Mullane*; it is the seminal Supreme Court opinion clarifying what due process requires in

litigation.  But it was not a bankruptcy case.[69]  In *Mullane,* the Supreme Court held that a

statute authorizing notice by publication of a proposed judicial settlement of a "common

trust," holding the assets of 113 smaller trusts, failed to satisfy due process requirements

for the trust's known beneficiaries.[70]  The common trust had "many" beneficiaries.[71]  But

---

[68]    Pl. Br. at 27.

[69]    Nevertheless, considerable authority, by the Second Circuit and other circuit courts, holds, not surprisingly, that due process requirements apply in bankruptcy cases, just as they do in plenary litigation.  *See, e.g.*, *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 150 (2d Cir. 2014) (Newman, Pooler, and Livingston, JJ) ("**DPWN**") ("[A] claim cannot be discharged if the claimant is denied due process because of lack of adequate notice."); *In re Johns–Manville Corp.*, 600 F.3d 135, 153–54 (2d Cir. 2010) (*per curiam*) ("**Manville-2010,**"sometimes also referred to as "**Manville IV**") (Calabresi and Wesley, JJ) (ruling that due process was denied in dispute over whether an earlier bankruptcy court order in a chapter 11 case properly enjoined not only claims directed at Travelers insurance policies in the *res* of the Manville estate, but also non-derivative claims by Chubb that sought to impose liability on Travelers separately); *Koepp v. Holland*, 593 Fed. Appx. 20 (2d Cir. 2014) (Summary Order, Katzmann, CJ, and Hall and Livingston, JJ) ("**Koepp**") (ruling that due process was denied in dispute over easements on land previously owned by a debtor reorganized under § 77 of the now-superseded Bankruptcy Act); *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 n.1 (3d Cir. 1995) ("**Chemetron**") ("Although *Mullane* involved the notice due beneficiaries on judicial settlement of accounts by the trustee of a common trust fund, subsequent courts have interpreted the case to set the standard for notice required under the Due Process Clause in Chapter 11 bar date cases."); *In re Edwards*, 962 F.2d 641 (7th Cir. 1992) ("**Edwards**") (considering due process contentions by a secured creditor whose interest was extinguished in a free and clear section 363 sale without notice, though ultimately ruling in favor of a bona fide purchaser).

[70]    *See Mullane*, 339 U.S. at 320 ("We hold the notice of judicial settlement of accounts required by the New York Banking Law § 100-c(12) is incompatible with the requirements of the Fourteenth Amendment as a basis for adjudication depriving known persons whose whereabouts are also known of substantial property rights.").

[71]    *Id.* at 309.  But the Plaintiffs exaggerate, however, when they assert that the *Mullane* court ruled as it did notwithstanding the "very large" number of beneficiaries involved. Pl. Br. at 27.  Actually, the *Mullane* court said that "the record [did] not show the number or residence of the beneficiaries," 339 U.S. at 309, though it also said that there were 113 contributing trusts, with aggregate assets of about $3 million.  *Id.*  A $3 million trust corpus was a bigger number in 1950 than it is now, but the likely number of individuals having interests in the 113 contributing trusts whose collective assets led to that $3 million corpus would at least seemingly be many orders of magnitude smaller than the huge number of vehicle owners here—of 27 million cars with Ignition Switch Defects and of 70 million on the road.  That and the fact later mentioned by the *Mullane* court that mailed notices had been sent to ascertainable beneficiaries in the past, which was "persuasive" as to the Trust Company's ability to mail notice there, *see* 339 U.S. at 319, suggests that the number to be given mailed notice there, while relatively large, was much less than huge, most likely in the thousands (and perhaps low thousands), rather than tens of millions.

despite that (and even though the statute authorized service by publication), the Court found that because the trustee, Central Hanover Bank & Trust Company (the "**Trust Company**"), seeking the judicial settlement of the trust for which it was responsible, could with due diligence ascertain their names and addresses, they were entitled to mailed notice of the settlement.

In reaching that result, the *Mullane* court started with the recognition that while "[a] construction of the Due Process Clause which would place impossible or impractical obstacles in the way could not be justified," the Court would have to "balance" against that interest an individual's right to be heard.[72]  It continued by observing that while it "ha[d] not committed itself to any formula" in achieving that balance, "a few general principles stand out in the books."[73]  One was that:

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.[74]

Others were that "[t]he notice must be of such nature as reasonably to convey the required information . . . and it must afford a reasonable time for those interested to make their appearance."[75]

The *Mullane* court qualified its statement of those general requirements, however, by including an element of practicality:

> But if with due regard for the practicalities and peculiarities of the case these conditions are

---

[72]  *Id.* at 313-14.

[73]  *Id.* at 314.

[74]  *Id.*

[75]  *Id.*

reasonably met the constitutional requirements are
satisfied. The criterion is not the possibility of
conceivable injury, but the just and reasonable
character of the requirements, having reference to
the subject with which the statute deals.[76]

And once again recognizing the need for practicality, it stated that

[t]he reasonableness and hence the constitutional
validity of any chosen method may be defended on
the ground that it is in itself reasonably certain to
inform those affected, or, *where conditions do not
reasonably permit such notice*, that the form chosen
is not substantially less likely to bring home notice
than other of the *feasible* and customary
substitutes.[77]

The *Mullane* court expressly endorsed the use of publication when it would not be

practical to provide better notice:

This Court has not hesitated to approve of resort to
publication as a customary substitute in another
class of cases where it is not reasonably possible or
practicable to give more adequate warning. Thus it
has been recognized that, in the case of persons
missing or unknown, employment of an indirect and
even a probably futile means of notification is all
that the situation permits and creates no
constitutional bar to a final decree foreclosing their
rights.

Those beneficiaries represented by appellant whose
interests or whereabouts could not with due
diligence be ascertained come clearly within this
category. As to them the statutory notice [*i.e.*,
notice by publication] is sufficient. However great
the odds that publication will never reach the eyes
of such unknown parties, it is not in the typical case
much more likely to fail than any of the choices
open to legislators endeavoring to prescribe the best
notice practicable.[78]

---

[76]   *Id.* at 314-15 (internal quotation marks deleted).

[77]   *Id.* at 315 (emphasis added) (citations omitted).

[78]   *Id.* at 317 (citations omitted).

In a later post-*Mullane* decision,[79] the Supreme Court reiterated this.

> In the years since *Mullane* the Court has adhered to
> these principles, balancing the "interest of the State"
> and "the individual interest sought to be protected
> by the Fourteenth Amendment."  The focus is on
> the reasonableness of the balance, and, as *Mullane*
> itself made clear, whether a particular method of
> notice is reasonable depends on the particular
> circumstances.[80]

Thus it is hardly surprising that the Supreme Court has also stated, albeit in a

different context (there, deciding the extent of the hearing required before a revocation of

a former inmate's parole), that "[i]t has been said so often by this Court and others as not

to require citation of authority that due process is flexible and calls for such procedural

protections as the particular situation demands."[81]

Finally, the *Mullane* court made one other point—one which is frequently

overlooked—of considerable relevance here.  It recognized that notice to *others* with an

interest in objecting could ameliorate prejudice (and impliedly, if not expressly, even the

existence of constitutionally deficient notice in the first place) to those who did not get

notice.  It observed:

> This type of trust presupposes a large number of
> small interests.  *The individual interest does not
> stand alone but is identical with that of a class.*  The
> rights of each in the integrity of the fund and the
> fidelity of the trustee are shared by many other
> beneficiaries.  *Therefore notice reasonably certain
> to reach most of those interested in objecting is
> likely to safeguard the interests of all, since any
> objections sustained would inure to the benefit of
> all.*  We think that under such circumstances
> reasonable risks that notice might not actually reach

---

[79]    *Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478 (1988) ("***Tulsa Collection Services***").

[80]    *Id.* at 484.

[81]    *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("***Morrissey***").

> every beneficiary are justifiable. 'Now and then an
> extraordinary case may turn up, but constitutional
> law, like other mortal contrivances, has to take
> some chances, and in the great majority of
> instances, no doubt, justice will be done.'[82]

### 2.  Second Circuit Guidance

The Second Circuit has given the lower courts in this Circuit more specific

guidance, in several key cases. In its 1989 decision in *Weigner v. City of New York,*[83] the

Circuit held that "[t]he proper inquiry [on a due process contention] is whether the

[noticing party] *acted reasonably in selecting means likely to inform persons affected*, not

whether each property owner actually received notice."[84]

Then, in its 1993 decision in *Drexel Burnham*, first mentioned above,[85] the

Circuit put forward its understanding of *Mullane's* principles by stating that "no person

may be deprived of life, liberty or property by an adjudicatory process without first being

afforded notice and a full opportunity to appear and be heard, *appropriate to the nature of*

*a given case.*"[86]

There, the "given case," a proceeding in the *Drexel Burnham* chapter 11 case,

involved the approval of a settlement under which, among other things, Drexel Burnham

and a sub-class of its securities claimants pooled their recoveries from lawsuits Drexel

Burnham had brought against its former officers and directors, and the settling parties

granted a release to former officer Michael Milken. As here, the *Drexel Burnham*

objectors were apparently troubled that the settlement would impair their recoveries

---

[82]    *Mullane*, 339 U.S. at 319 (emphasis added).

[83]    852 F.2d 646 (2d Cir. 1988) ("*Weigner*"), *cert. denied,* 488 U.S. 1005 (1989).

[84]    *Id.* at 649 (emphasis added).

[85]    *See* n.10 *supra*.

[86]    995 F.2d at 1144 (emphasis added).

09-50026-reg   Doc 13109   Filed 04/19/15   Entered 04/19/15 15:58:22   Main Document
Pg 46 of 138

against parties other than the debtor itself.  The objectors raised both due process and
substantive objections to the settlement—contending, in the due process prong of their
objection, that the notice of the proposed settlement that had been mailed to 7,700 Drexel
bankruptcy claimants was insufficiently descriptive of the proposed settlement.

In that context, as part of its due process analysis, the Circuit observed in *Drexel
Burnham* that "[n]o rigid constitutionally mandated standard governs the contents of
notice in a case like the one before us.  Rather, the Due Process Clause requires *the best
notice practical under the circumstances*."[87]  And once again citing *Mullane*, the Circuit
continued that "the Supreme Court has warned against interpreting this notice
requirement so inflexibly as to make it an 'impractical or impossible obstacle[].'"[88]

Similarly, in its 2014 decision in *DPWN*,[89] the Second Circuit reiterated that
"whether notice comports with due process requirements turns on the *reasonableness* of
the notice, a *flexible* standard that often turns on what the debtor or the claimant knew
about the claim or, with reasonable diligence, should have known."[90]

Like *Weigner* before it (where the notice had also been mailed), *Drexel Burnham*
was a *quality* of notice case, rather than a *means* of notice case.[91]  Nevertheless, its

---

[87]  *Drexel Burnham*, 995 F.2d at 1144 (citing *Mullane*) (emphasis added).

[88]  *Id.* (once again citing *Mullane*).  With a *cf.*, the Circuit also cited, and quoted, a considerably older
Supreme Court decision, *Grannis v. Ordean*, 234 U.S. 385, 395 (1914), quoting the earlier
opinion's observation that the Due Process Clause "does not impose an unattainable standard of
accuracy."

[89]  747 F.3d 145.

[90]  *Id*. at 150 (citing *Mullane* and *Chemetron*) (emphasis added).

[91]  It considered whether the duly mailed notice was still insufficient, because it didn't tell creditors
enough.  In that respect, *Drexel Burnham* considered  a contention like the Pre-Closing Accident
Plaintiffs' assertions here that "Old GM did not disclose the existence of the Ignition Switch
defect in the Sale Motion or in the Sale Notice mailed to Pre-Closing Accident Plaintiffs that had
already sued Old GM" (Pre-Closing Accident Pl. Br. at 9) and "[t]he notice that Old GM provided
with respect to the 363 Sale was constitutionally deficient … regardless of whether the notice was
mailed directly to the Plaintiff or published in the newspaper." (*Id.* at 26; accord *id.* at 29).

direction that notice must be "*appropriate to the nature of a given case*"[92] was not

limited to cases of the first type.  And *Mullane*, the opinion on which the *Drexel

Burnham* court relied, was a case of the second type.  For each of those reasons, along

with common sense, the Court reads the Circuit's *Drexel Burnham* directions that "the

Due Process Clause requires the best notice practical under the circumstances,"[93] and that

the notice requirement should not be interpreted "so inflexibly as to make it an

'impractical or impossible obstacle'"[94]—each of which was derived by citing *Mullane*—

as applicable to cases involving either the *means* or the *quality* of any notice whose

adequacy is questioned.

Then, though it involves a materially different factual situation, the Circuit's

decision in *DPWN* is nevertheless significant in several respects.  *DPWN* was an antitrust

case, but with a bankruptcy discharge defense.  The plaintiff there, the well-known

courier DHL, which used United Airlines for cargo delivery services, sued United under

the Sherman Act, alleging price-fixing.  United had been reorganized in a chapter 11 case

in Chicago, at the conclusion of which it received a discharge of its debts, and moved to

dismiss the antitrust action under Rule 12(b)(6), relying on its earlier discharge.[95]

DHL (which had earlier received mailed notice in the bankruptcy of the

opportunity to file claims, but without particularized mention of United's susceptibility to

antitrust claims) had anticipated the discharge defense, and proactively pleaded a

potential basis for avoiding it—that it lacked sufficient notice of the availability of its

---

[92]       995 F.2d at 1144**.**

[93]       *Id.*

[94]       *Id.*

[95]       *See* 747 F.3d at 147.

antitrust claim to satisfy due process requirements for rendering that claim discharged. The District Court, taking that allegation as true, declined to dismiss at that state of the proceedings. But the Circuit remanded, considering the allegation to be too conclusory to pass *Iqbal*[96] scrutiny, and directed the District Court to conduct further inquiry as to whether it was supportable. More specifically, the Circuit remanded for District Court inquiry as to *DHL's* knowledge of its potential antitrust claim during United's chapter 11 case, and *United's* knowledge with respect to a DHL claim.[97]

*DPWN* also suggests two other concerns that turn out not to be determinative in this case, but that may well be important in others. First, it suggests (if it does not also require) a two-step methodology that should be used, to the extent applicable, in examining contentions that the notice that due process requires was denied. The first step calls for inquiry as to whether the *claimant* knew of the claim it might assert.[98] The second step calls for the lower court to determine whether the claim was, from the perspective of the *notice-giver* (often a debtor in a bankruptcy case), a "known" claim, obligating the notice-giver to provide actual, and possibly more detailed, notice.[99]

The second is a hint that in some cases, it may be the *quality*—as contrasted to the *means*—of notice that matters. That might suggest that even if the means of notice were entirely satisfactory (as it obviously was when DHL received *mailed* notice of the bankruptcy and of the deadline to file claims), notice lacking the requisite quality might

---

[96]   *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

[97]   *See* 747 F.3d at 153.

[98]   This Court said "to the extent applicable," however, because here New GM does not contend that any of the Plaintiffs knew of the Ignition Switch Defect, or had the means to ascertain it. Thus all parties here, and the Court, go straight to the second step.

[99]   That "known claim" second step, of course, is one of the most important elements of this Court's inquiry here.

nevertheless warrant relief. And this suggests that *notice of the bankruptcy* is not enough, or even the *deadline for the filing of claims*—and that assuming that the debtor has knowledge of the existence of the claim (which debtors will typically have in the case of contractual obligations but typically won't have with respect to non-contractual ones), something more detailed in the way of notice might have to be provided.[100]

### 3. Guidance from Lower Courts

Courts below the Circuit level likewise have been sensitive to the need for practicality and flexibility in due process analysis. In *Affirmance Opinion #2*, referred to by several parties in their briefs as "*Parker*," on one of the appeals from the *Sale Decision*, Judge Sweet considered a number of objections by appellant Oliver Parker, a bondholder, claiming that the 363 Sale violated his due process rights. Before rejecting Parker's contentions, Judge Sweet synthesized the underlying law, making reference to *Mullane* and *Morrissey* in the Supreme Court, and *Drexel Burnham* in the Circuit:

> The U.S. Supreme Court has repeatedly emphasized the flexibility of the due process requirement, which simply "calls for such procedural protections as the particular situation demands." An "elementary and fundamental requirement of due process . . . is notice reasonably calculated, under all the

---

[100] Importantly, however, the *DPWN* court did not do away with the "known" claim requirement. And that is understandable. Unless the debtor knew of the claim or could reasonably ascertain its existence (a task that is particularly challenging for noncontractual obligations), the debtor could not provide sufficiently detailed notice, and the bankruptcy system could not operate. Debtors (with resulting prejudice to their genuinely known creditors) would be subject to extraordinary expense and uncertainty in trying to think up, and explain in sufficient detail, claims that potential creditors might assert. They would be uncertain whether all of their claims could actually be discharged. And the process would be particularly fraught with peril under the rushed circumstances that typify section 363 sales. Though the *DPWN* court did not lay it down as a legal principle, it made another very important observation as to claims that are known and those that are not. It observed that "a debtor will normally be less likely to be charged with knowledge that it has violated the law than that it owes money unrelated to a law violation." 747 F.3d at 151. That is equally true with respect to many types of tort liabilities, especially product liability claims. Both violations of law and tort liabilities present challenges in knowing of the existence of the claim that are quite different from those in knowing of contractual obligations or transactions (such as the granting of liens or easements) involving earlier grants of property interests.

circumstances, to apprise interested parties of the
pendency of the action and afford them an
opportunity to present their objections."  In short,
the constitutional requirements of due process are
satisfied if notice is given with "due regard for the
practicalities and peculiarities of the case."[101]

Thus New GM is right when, quoting *Mullane* and *Affirmance Opinion #2*, it

argues that "[d]ue process is a flexible standard."  In fact, New GM's point that due

process is "flexible" comes verbatim from the Supreme Court's opinion in *Morrissey*,[102]

and also appears in so many words in *DPWN*.[103]  But as *Morrissey* also at least implies,

the caselaw does not support a wholly standardless flexibility.[104]  Other authority—

especially authority addressing the "known"-"unknown" claim distinction discussed in

the subsection that follows—rather suggests a standard requiring a fairly thoughtful, and

sometimes nuanced, consideration of the circumstances, to ascertain whether any failure

to provide better notice (either more direct or more detailed) can appropriately be

excused.

4.  *The "Known"-"Unknown" Creditor Distinction*

Apart from focusing on the practicality of requiring notice by one means or

another, and of one argued level of detail or another, a court also has to focus on whether

providing notice to one particular person or entity, or group of such, is required in the

first place.  As an abstract matter, that latter issue turns on whether those to be noticed

---

[101]   *Affirmance Opinion #2*, 430 B.R. at 97 (citations omitted).

[102]   *See* 408 U.S. at 481 ("It has been said so often by this Court and others as not to require citation of
authority that due process is flexible and calls for such procedural protections as the particular
situation demands.").

[103]   *See* 747 F.3d at 150.

[104]   *See* 408 U.S. at 481 ("To say that the concept of due process is flexible does not mean that judges
are at large to apply it to any and all relationships.  Its flexibility is in its scope once it has been
determined that some process is due; it is a recognition that not all situations calling for procedural
safeguards call for the same kind of procedure.").

-46-

(which in bankruptcy most commonly are creditors and those with ownership or security interests in estate property) are "known," on the one hand, or "unknown," on the other.[105] Stating the distinction is easy; applying it is much more difficult.

In many cases, whether the notice recipient would want the right to file a claim or to be heard—and hence is "known"—is obvious. In others, as here, it is much less so. Caselaw, at the Supreme Court and, especially, in the lower courts, has provided some guidance in this area. But it has been less than totally helpful.

*Mullane,* which was decided 65 years ago, did not yet make a "known"-"unknown" distinction, nor did it yet use the expression "reasonably ascertainable," which later became the standard, as discussed below. But *Mullane* did say—apart from saying that actual notice wasn't required for those whose interests were "conjectural"[106]—that actual notice was not required for those who, "although they could be discovered upon investigation, do not in due course of business come to knowledge of the common trustee."[107] That is plainly a rejection of a duty of investigation. But it is

---

[105]    *See, e.g., Chemetron,* 72 F.3d at 347 ("As characterized by the Supreme Court, a 'known' creditor is one whose identity is either known or 'reasonably ascertainable by the debtor.' An 'unknown' creditor is one whose 'interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor].'") (citations omitted); *In re Drexel Burnham Lambert Grp.,* 151 B.R. 674, 680 (Bankr. S.D.N.Y. 1993) (Conrad, J) ("**Drexel Burnham-Bankruptcy**") ("For purposes of determining constitutionally acceptable notice of an impending bar date, bankruptcy law divides creditors into two groups: known and unknown. According to well-established case law, due process requires that a debtor's known creditors be afforded actual notice of the bar date . . . For obvious reasons, debtors need not provide actual notice to unknown creditors. It is widely held that unknown creditors are entitled to no more than constructive notice (i.e., notice by publication) of the bar date.") (citations omitted).

[106]    339 U.S. at 317. "Conjectural" has since been joined by "conceivable" and "speculative." *See In re Thomson McKinnon Sec., Inc.,* 130 B.R. 717, 720 (Bankr. S.D.N.Y. 1991) (Schwartzberg, J.) ("**Thomson McKinnon**"); *In re XO Commc'ns, Inc.,* 301 B.R. 782, 793 (Bankr. S.D.N.Y. 2003) (Gonzalez, C.J.) ("**XO Communications**") (quoting *Thomson McKinnon*). With each of those three words, the idea is the same; many claims are *possible,* but to be known they must be much more than that.

[107]    339 U.S. at 317.

09-50026-mg   Doc 13109   Filed 04/19/15   Entered 04/19/15 15:58:42   Main Document
Pg 32 of 88

less helpful when the notice-giver has considerable knowledge, but lacks knowledge of every detail.

The standard was clarified somewhat thereafter.  In its 1983 decision in *Mennonite Board*, a post-*Mullane* opinion (though once again in a non-bankruptcy context), the Supreme Court held that notice by mail or by other means "as certain to ensure actual notice" was required if the name and address of the entity to be notified was "*reasonably ascertainable*."[108]  But the *Mennonite Board* court did not flesh out the standards in determining what the "reasonably ascertainable" standard required—concluding only that when the name of the mortgagee and its county in Ohio were shown on the underlying mortgage, but the mortgagee's full mailing address was not,[109] the "reasonably ascertainable" requirement was satisfied, and actual notice was required.[110]

Likewise, in *Tulsa Collection Services*,[111] another nonbankruptcy post-*Mullane* decision about five years after *Mennonite Board*, the Supreme Court repeated that if a claimant's identity was "known or reasonably ascertainable," actual notice was required.[112]  But once again, the Court did not flesh out the standards for "reasonably

---

[108]     462 U.S. at 800.  In a dissent in which Justices Powell and Rehnquist joined, Justice O'Connor argued for a more flexible standard (and hence a greater willingness to accept notice by publication), considering it a departure from the "balancing required by *Mullane*."  *Id.* at 806.  But this view secured only three votes.

[109]     *See id.* at 798 n.4; *id.* at 805 (dissent).

[110]     Without stating in so many words that it would embody the standard, the *Mennonite Board* court said in a footnote that "[w]e assume that the mortgagee's address could have been ascertained by reasonably diligent efforts."  462 U.S. at 798 n.4.  But it did not say whether, in determining whether a claimant's interest or address was "reasonably ascertainable," how much in the way of "diligent efforts" was required, or what would happen if efforts were insufficiently diligent.

[111]     *See* n.79 *supra*.

[112]     485 U.S. at 490.  Conversely, the Court made clear that actual notice need not be provided to claimants who are *not* actually known or "reasonably ascertainable."  In fact, speaking of the other extreme, it stated:

> Nor is everyone who may conceivably have a claim properly considered a creditor entitled to actual notice.  Here, as in

ascertainable," and on the record there presented, simply remanded for a factual determination as to that issue.[113]

However lower courts have addressed the applicable standards more extensively than the Supreme Court did.  In its 1995 decision in *Chemetron*, the Third Circuit provided more guidance, focusing in particular on the opposite extreme.  After reading the language in the *Mennonite Board* footnote quoted above to say that a creditor's identity is "reasonably ascertainable" if that creditor can be identified through "reasonably diligent efforts," the *Chemetron* court went on to say that "[r]easonable diligence does not require 'impracticable and extended searches . . . in the name of due process.'"[114]  And it stated further that:

> The requisite search instead focuses on the debtor's own books and records.  Efforts beyond a careful examination of these documents are generally not required.  Only those claimants who are identifiable through a diligent search are "reasonably ascertainable" and hence "known" creditors.[115]

Importantly, the *Chemetron* court declined to apply a "reasonably foreseeable" standard that had appeared in dictum in an earlier case in this District[116]—finding

---

*Mullane,* it is reasonable to dispense with actual notice to those with mere "conjectural" claims.  *Id.*

[113]    *Id.* at 491 ("Appellee of course was aware that her husband endured a long stay at St. John Medical Center, but it is not clear that this awareness translates into a knowledge of appellant's claim.  We therefore must remand the case for further proceedings to determine whether 'reasonably diligent efforts,' would have identified appellant and uncovered its claim.") (citation omitted).

[114]    72 F.3d at 346.

[115]    *Id.* at 347.  The *Chemetron* court emphasized, however, that while some courts had held, regardless of the circumstances, that the "reasonably ascertainable" standard would require only an examination of the debtor's books and records, without an analysis of the specific facts of each case, it did not construe the standard that narrowly.  It pointed out that situations could arise when creditors are "reasonably ascertainable" although not identifiable through the debtor's books and records.  *Id.* at n.2.

[116]    *See In re Brooks Fashion Stores, Inc.,* 124 B.R. 436 (Bankr. S.D.N.Y. 1991) (Blackshear, J.) ("***Brooks Fashion Stores***")

-49-

insufficient a contention that "Chemetron knew or should have known that it was

reasonably foreseeable" that it could suffer claims from individuals living near the

debtor's waste dump.[117]   The *Chemetron* court explained:

> In the instant case, the bankruptcy court failed to
> apply the "reasonably ascertainable" standard.  It
> instead crafted a "reasonably foreseeable" test from
> dictum in *In re Brooks Fashion Stores, Inc.*,
> 124 B.R. 436 (Bankr. S.D.N.Y. 1991).  In applying
> this test, the bankruptcy court found that
> "Chemetron knew or should have known that it was
> reasonably foreseeable that it could suffer claims
> from individuals living near the Bert Avenue
> Dump...."  It therefore found that claimants were
> known creditors.
>
> We hold that in substituting a broad "reasonably
> foreseeable" test for the "reasonably ascertainable"
> standard, the bankruptcy court applied an incorrect
> rule of law.  This constitutes clear error.  The
> bankruptcy court's expansive test departed from
> established rules of law and produced a result in
> conflict with other decisions.  Even if we were
> writing on a blank slate, we would reject the
> bankruptcy court's expansive standard.  Put simply,
> such a test would place an impossible burden on
> debtors.[118]

To the contrary, the *Chemetron* court held that "[a] debtor does not have a 'duty

to search out each conceivable or possible creditor and urge that person or entity to make

a claim against it," and that what is required "is not a vast, open-ended investigation."[119]

Applying these standards, the Third Circuit rejected the contention that though the debtor

could reasonably *foresee* that parties present in the immediate vicinity of its toxic waste

---

[117]   72 F.3d at 347.

[118]   *Id.* (citations omitted).

[119]   *Id.* at 346.

dump would have toxic tort claims against it, their claims would thereby become

"known." As a result, it ruled, publication notice was sufficient.

Since then, *Chemetron*, rather than *Brooks Fashion Stores*, has been followed in

this District[120] and elsewhere.[121] In his 2003 decision in *XO Communications*, Chief

Judge Gonzalez cited *Brooks Fashion Stores* for a different proposition, but relied on

*Chemetron* for the latter's rejection of the "reasonably foreseeable" standard. And

fleshing out the standards further, Judge Gonzalez quoted another decision in the *Drexel*

*Burnham* chapter 11 case:

> Reasonable diligence in ferreting out known
> creditors will, of course, vary in different contexts
> and may depend on the nature of the property
> interest held by the debtor. Applying *Mullane's*
> "reasonable under the circumstances" standard, due
> process requires a reasonable search for contingent
> or unmatured claims so that ascertainable creditors
> can receive adequate notice of the bar date. What is
> reasonable depends on the particular facts of each
> case. A debtor need not be omnipotent or
> clairvoyant. A debtor is obligated, however, to

---

[120]  *See XO Communications*, 301 B.R. at 793 (citing *Chemetron* as "emphasizing that claimants must be reasonably ascertainable, not reasonably foreseeable").

[121]  *See Louisiana Dep't of Envtl. Quality v. Crystal Oil Co. (In re Crystal Oil Co.)*, 158 F.3d 291, 297 (5th Cir. 1998) ("***Crystal Oil***"). In *Crystal Oil*, the Fifth Circuit affirmed a bankruptcy court's order declining to allow an environmental agency's late filing of a claim, even though the environmental agency had received notice only by publication. Though the "evidence could go either way," *see id.* at 298, the bankruptcy court's determination that the environmental claim was not "reasonably ascertainable" was held not to be clearly erroneous. Though Crystal Oil had dealt with environmental agencies in the past, including this one, the Fifth Circuit held that there could be "no basis for concluding that a debtor is required to send notices to any government agency that possibly may have a claim against it." *Id.* at 297. And it further held that even though the Louisiana Department of Environmental Quality had a telephone call with an individual at Crystal Oil discussing the particular polluted site with which it later would assert a claim, and Crystal looked up its records and erroneously concluded that it had no relationship with the property (because the records that would confirm ownership were "ancient ones in long-term storage"), the environmental agency was not a "reasonably ascertainable," and hence "known," creditor. *See id.* at 297-98. In articulating the standard, the Fifth Circuit stated that "[a]s we read these cases, in order for a claim to be reasonably ascertainable, the debtor must have in his possession, at the very least, some specific information that reasonably suggests both the claim for which the debtor may be liable and the entity to whom he would be liable." *Id.* at 297.

undertake more than a cursory review of its records
and files to ascertain its known creditors.[122]

The takeaway from the cases discussing the general principles helping courts

decide what are "known" and "unknown" claims is that the debtor must make effective

use of the information already available, but the fact that additional claims may be

"foreseeable" does not make them "known."  Then, in each case, the Court must

determine on which side of the line the facts before it fall.

## B.

### The Particular Issues Here

*1.  Do Due Process Requirements Apply?*

New GM argues preliminarily that due process requirements did not apply to the

363 Sale at all, because this Court's earlier bar to successor liability did not result in a

deprivation of property.  The Court cannot agree.

New GM premises that argument on five separate contentions:

(1) that in most 363 sales (including this one), claims or interests

would attach to the sale proceeds, and thus that there is no extinguishment

of a property right;

(2) that there was no extinguishment of a property right, because

any successor liability claims really belonged to the Old GM estate;

(3) that section 363(f) of the Bankruptcy Code preempts—*i.e.,*

trumps—state laws imposing successor liability;

---

[122]        301 B.R. at 793-94 (*quoting Drexel Burnham-Bankruptcy*, 151 B.R at 681).

(4) that the Court already ruled that there was no continuity of

ownership between purchaser and seller, and thus no basis for successor

liability; and

(5) that there could be no successor liability anyway for Economic

Loss Plaintiffs, because, unlike accident victims, they would not get the

benefit of the "product line exception."

The Court finds these preliminary contentions unpersuasive.

New GM is right when it says that in bankruptcy sales—either from the start or by

agreement to resolve objections—creditors with *security interests or other liens* regularly

get substitute liens on sale proceeds when estate property subject to their liens is sold to a

third party, and that the bankruptcy community regularly regards that as a fair substitute.

But comparable protection often cannot be provided for claims or interests other than

liens.  And here that comparable protection could not effectively be obtained.[123]  Neither

---

[123]    Thus Judge Posner, speaking for the Seventh Circuit in *Edwards*, *see* n.69 *supra*, was correct
when he observed that the failure to give a lien creditor notice of a section 363 sale resulted in no
more than a *de minimis* deprivation of property, since the value of the secured creditor's interest in
the property (*i.e.*, the value of its lien) was no more than the value of the property, and the sale
proceeds were the best measure of that.  *See* 962 F.2d at 645 ("[secured creditor] Guernsey does
not suggest that the property was worth more than the $85,000 that the bankrupt estate received
for selling it—and if it was worth no more Guernsey suffered only a trivial loss of interest (the
interest on $7,000 during the period it was in the hands of the trustee) as a result of the failure to
notify it of the sale.").  But as this Court explained in the *Sale Opinion*, see 407 B.R. at 501, "we
know that 'interest' includes more than just a lien."  Because estate property can be sold free and
clear of many types of claims and interests apart from liens, it would at least generally be
inappropriate to apply *Edwards*-style analysis to claims and interests other than liens whose value
is capped at the value of the property sold (and hence the available sale proceeds).

For that reason, although the Court agrees with nearly all of the analysis in *In re Paris Indus.
Corp.*, 132 B.R. 504 (D. Me. 1991) (Hornby, J.) ("***Paris Industries***") (a non-lien case in which
plaintiffs were enjoined from asserting successor liability in a tort action against an estate's assets'
purchaser, and where the court concluded that "the liquidation of the assets and their replacement
with cash (which was then apparently distributed to a secured creditor) has not affected [the
plaintiffs'] ability to recover on their claim," *id.* at 510), the Court agrees with the portion it has
just quoted only in part.  The *Paris Industries* plaintiffs might have recovered more from the
purchaser if their successor liability theory survived and prevailed.  But this Court agrees with the
next observation made by the *Paris Industries* court, pointing to a different kind of lack of
prejudice—"[t]he irony of [the plaintiffs'] argument is that they would not even be able to make

-53-

back in 2009, nor in 2011 when Old GM's plan was confirmed, did anyone suggest that Old GM's product liability creditors became secured creditors—the natural corollary of New GM's position. They were ordinary members of the unsecured creditor class, sharing in the proceeds of the 363 Sale in accordance with the usual bankruptcy priorities waterfall.[124]  That would not, of course, make a sale free and clear of successor liability claims improper.  But it likewise does not make it true that the Economic Loss Plaintiffs asserting successor liability claims would have "no property interest that was extinguished," as argued by New GM,[125] and thus no interests at stake and no interest in being heard.  Rather, the Economic Loss Plaintiffs would have the same interest in being heard as the accident victims who likewise wanted to (and did) oppose successor liability. The Court ultimately overruled the latter's objections on the merits, but there never was any doubt that they had a right to be heard.

The Court also cannot agree with New GM's second contention in this regard— that successor liability claims did not really belong to the Economic Loss Plaintiffs and Pre-Closing Accident Plaintiffs who might wish to assert them, but were actually claims owned by Old GM.  Though New GM offers caselaw support that at first blush supports its position, New GM's contention sidesteps the basic fact that a prepetition right that the Plaintiffs had to at least try to sue a successor was taken away from them, without giving them a chance to be heard as to whether or not that was proper.

---

their claim against [the purchaser] were it not for the sale, for it is only by the sale of assets and the doctrine of successor liability that they can even assert such a claim."  *Id.*  There, as here, the plaintiffs would have received no more in a liquidation.

[124]  *See* Plan at §§ 1.79, 4.3 (ECF No. 9941-1).

[125]  *See* New GM Reply at 36.

New GM relies on three cases in support of its contention:  *In re Keene Corp.*,[126] *In re Emoral, Inc.*,[127] (which heavily relied on *Keene*), and *In re Alper Holdings USA*.[128] Each of *Keene* and *Alper Holdings*, in this Court's view, was properly decided; *Emoral,* a 2-1 decision with a cogently articulated dissent by Judge Cowen, probably was not.  But whether or not all were properly decided, none supports the conclusion, which New GM asks the Court to reach, that tort litigants' interest in pursuing successor liability was so minimal that they didn't even have a right to be heard.

*Keene*, the first of the three, involved approximately 1,600 lawsuits by asbestos plaintiffs who at least arguably had claims against the debtor Keene.  But their rights to recover against the debtor were impaired when Keene transferred over $200 million of its assets to its then affiliates during the 1980s and then spun off the affiliates.[129]  Not surprisingly, the transfer and spin-off triggered fraudulent conveyance claims, initially brought prepetition.  In those same prepetition actions, asbestos plaintiffs also brought claims against the transferees, asserting successor liability and tort liability based on piercing the corporate veil.[130]

Thereafter, Keene filed a chapter 11 case.  Judge Bernstein granted the Keene estate's motion for an injunction blocking the continued prosecution of those actions, concluding that they were violative of section 362(a)(1) of the Code, which bars, among other things, the continuation of suits to recover on claims against the debtor that arose

---

[126]   *Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844 (Bankr. S.D.N.Y. 1994) (Bernstein, C.J.) ("***Keene***").

[127]   740 F.3d 875 (3d Cir. 2014), *cert. denied,* 135 S. Ct. 436 (2014) ("***Emoral***").

[128]   386 B.R. 441 (Bankr. S.D.N.Y. 2008) (Lifland, C.J.) ("***Alper Holdings***").

[129]   *See* 164 B.R. at 846.

[130]   *See id.* at 847-48.

before the filing of the bankruptcy case.[131] He noted that the fraudulent conveyance claims became the estate's claims to prosecute under section 544 of the Code, and reasoned, properly, that "the Wrongful Transfer Claims should be asserted, in the first instance, by Keene or any other estate representative designated for that purpose."[132] He likewise blocked the asbestos plaintiffs' efforts to go after the defendants on corporate veil piercing and successor tort liability theories, noting that the thrust of those actions would be to "subject all of the assets of these non-debtor defendants to the claims of Keene's creditors."[133] Even with respect to the successor liability claims, he read them as a species of fraudulent transfer claim,[134] with the purpose of increasing the assets of the estate as a whole to satisfy the claims of the creditor community as a whole.[135]

Given the asbestos plaintiffs' effort in *Keene* to recover assets that should have been recovered for the benefit of all (and, notably, the transfer of their litigation rights to the estate under section 544), Judge Bernstein's ruling in *Keene* was plainly correct. But in *Emoral*, which followed and heavily relied on *Keene*, the distinction between a benefit to all and a benefit to individual creditors seeking to impose successor liability was blurred—and it was this blurring that triggered Judge Cowen's dissent, and, in this Court's view, the greater persuasiveness of Judge Cowen's view.

---

[131]     *See id.* at 848-49; *accord id.* at 850.

[132]     *Id.* at 849.

[133]     *Id.* at 850.

[134]     *Id.* at 853.

[135]     *Id.* ("In any event, the remedy against a successor corporation for the tort liability of the predecessor is, like the piercing remedy, an equitable means of expanding the assets available to satisfy creditor claims. The class action plaintiffs that invoke it allege a *general* injury, their standing depends on their status as creditors of Keene, and their success would have the effect of *increasing the assets available for distribution to all creditors*. For the same reasons stated with respect to the piercing claims, claims based upon successor liability should be asserted by the trustee on behalf of all creditors.") (emphasis added).

Emoral involved a prepetition sale of assets from a company (known most commonly as Palorome International, but later renamed Emoral) that manufactured diacetyl, a chemical used in the food flavoring industry that was the subject of many toxic tort suits. Emoral later filed for bankruptcy protection, and disputes arose between the Emoral estate's trustee and the buyer of the assets, a company called Aaroma—including, most significantly, claims by the trustee that the prepetition asset sale had been a fraudulent transfer. The trustee and Aaroma settled those disputes; as part of the settlement, the trustee agreed to release Aaroma from any causes of action that were property of the Emoral estate. But at the bankruptcy court hearing considering the propriety of the settlement, the trustee's representative stated that any successor liability claims against Aaroma didn't belong to the Emoral estate, and that the trustee therefore couldn't release them.[136] Aaroma's counsel argued that whether or not the diacetyl plaintiffs' causes of action were property of the estate (and therefore covered by the release) was not an issue before the bankruptcy court at that time, and the approval order was modified to provide, in substance, that nothing in the approval order or the underlying sale agreement would operate as a bar to prosecution of any claims that weren't property of the Emoral estate.[137]

Thereafter, plaintiffs asserting diacetyl injury claims sued Aaroma, arguing for successor liability and citing the trustee's remarks that their claims didn't belong to the estate, and that the estate couldn't release them. In a 2-1 decision (and disagreeing with the Bankruptcy Court, which had held to the contrary), the Emoral majority held, relying heavily on Keene, that the claims did in fact belong to the estate, and that Aaroma was

---

[136]   740 F.3d at 877.

[137]   Id.

thus protected.  The two judges in the majority did so based on their view that as a legal matter, the claim for successor liability was for the benefit of all of the estate's creditors.  But they did not, so far as this Court can discern, parse the plaintiffs' complaint to focus on what the plaintiffs were actually asking for, to see if that was actually true.  Judge Cowen, dissenting (who agreed with the conclusion of the Bankruptcy Court), found the majority's mechanical approach troublesome for several reasons, most significantly because the majority failed to consider, as a factual matter, what he considered to be critical—whether  plaintiffs bringing the diacetyl claims would be suing for themselves or for the benefit of all.[138]

The third case, *Alper Holdings*, offered by New GM with a "*See also*," involved an objection to claims.  Somewhat like *Emoral* (though *Emoral* involved successor liability claims, rather than alter ego claims) *Alper Holdings,* decided by Chief Judge Lifland, involved an issue as to whether alter ego claims had been previously released by the estate.[139]  As in all of these cases, the focus was on whether the injury was to creditors as whole or only to particular ones.  And as Judge Bernstein had done in *Keene*, and as Judge Cowen dissenting in *Emoral* did (and as his colleagues should have done), Judge Lifland looked, as a factual matter, to the nature of the successor liability claims, to see if they were asserted for the benefit of all of the estate's creditors or only to particular ones.[140]

---

[138]     *See id.* at 885-86 & n.1.

[139]     *See* 386 B.R. at 446.

[140]     *See id.* ("[I]t was clear based upon the conduct alleged by the Holt Plaintiffs that such alter ego claims were of a generalized nature and did not allege a 'particularized injury' specific only to the Holt Plaintiffs.  Accordingly, this Court held that such alter ego claims were in fact property of Saltire's bankruptcy estate and were, therefore, released under section 13.1 of the Saltire Plan.").

Importantly, none of *Keene*, *Emoral*, or *Alper Holdings* involved a 363 sale, nor

considered the rights of plaintiffs to be heard before a free and clear order was entered.

And for that reason, they are not as important as they might otherwise appear at first

blush. But on the principle for which they are cited—that taking away the right to sue on

a successor liability theory isn't a deprivation of property from the person who might

wish to sue—they are at best irrelevant to New GM's position and at worst harmful to it.

Each of *Keene*, *Alper Holdings* and Judge Cowen in *Emoral* focused on whether the

particular successor liability action sought to recover for the benefit of all, on the one

hand, or to secure a private benefit, on the other.[141]  If it is the latter, a party at risk of

losing that private benefit deserves the opportunity to be heard.

As the Court noted in oral argument,[142] theories of successor liability, when

permissible, permit a claimant to assert claims not just against the transferor of the assets,

but also against the transferee; they provide a second target for recovery.  Here the

Plaintiffs have not purported to sue for the benefit of Old GM creditors generally; they

have instead sued to advance their own, personal, interests.  They have not asked New

GM to make a payment to Old GM; they want New GM's money for themselves.  Taking

away the right to recover from that additional defendant (where such a right otherwise

---

[141]  In that connection, the Plaintiffs point to a 2013 decision of the Second Circuit, *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54 (2d Cir. 2013) ("**Madoff**").  *Madoff* is not as closely on point as the Plaintiffs suggest, as it was a *Wagoner* Rule *in pari delicto* case; it involved neither a 363 sale nor claims of successor liability.  Nevertheless, the Plaintiffs properly observe (Pl. Br. at 36 n.44) that *Madoff* focused, as a factual matter, on whether the underlying creditor claims, in the *in pari delicto* context, were personal to the creditor or really belonged to the debtor corporation, and it tends to undercut New GM's position in that regard.  *See* 721 F.3d at 70 (rejecting the trustee's contention that he could bring claims against third party financial institutions because his "claim [was] a general one, with no particularized injury arising from it," and that the claims against the financial institutions were "common to all customers because all customers were similarly injured by Madoff's fraud and the Defendants' facilitation").

[142]  *See* Day 1 Arg. Tr. at 41.

exists under the law of those states that permit such) may easily be understood as a matter of bankruptcy policy, and the supremacy clause, but it nevertheless represents a taking of rights from the perspective of the tort plaintiff who loses the right to sue the successor.

New GM's last three reasons for why Plaintiffs would not have any due process rights at all require considerably less discussion. As the third of its five reasons, New GM argues that section 363(f) of the Bankruptcy Code prevails over state laws imposing successor liability. That is true, but that is why New GM should *win on the merits*. It does not justify denying those who might wish to argue otherwise the opportunity to be heard.

As the fourth of its five reasons, New GM argues that the Court already ruled that there was no continuity of ownership between purchaser and seller, and thus no basis for successor liability. Once again that is true, but it was done before the Plaintiffs had appeared in the case. The Court cannot rely on conclusions it reached in a hearing to which the Plaintiffs were not invited as a basis for retroactively blessing the failure to invite them.

As the fifth of its five reasons, New GM argues that there could be no successor liability anyway for Economic Loss Plaintiffs, because, unlike accident victims, they would not get the benefit of the "product line exception." That too might be true (though it could vary depending on the particular state whose law would apply), but it once again goes to the merits—not the Plaintiffs' rights to be heard before successor liability claims were barred.

For these reasons, the Court concludes that the Plaintiffs were entitled to due
process in the context of each of the sale and claims processes—requiring the Court then
to consider whether they received it.

### 2. Notice by Publication

Having determined that the Plaintiffs did have due process rights, the Court must
determine whether those rights were violated. The first (though not last) issue in that
inquiry is whether notice by publication to owners of Old GM vehicles not known by Old
GM to have been in accidents was, as a general matter, constitutionally sufficient. It
plainly was.

As noted above, the Second Circuit has held that the proper inquiry on a due
process contention is whether the noticing party (here Old GM)[143] "acted reasonably in
selecting means likely to inform persons affected . . . ."[144] The notice required is that
"appropriate to the nature of a given case,"[145] and "*the best notice practical under the
circumstances*."[146] The very reason why property is sold under section 363, and not
under a reorganization plan, is because time and liquidity constraints do not permit a
more leisurely process.[147]

---

[143]  The Court is not persuaded by New GM's contention that because it was Old GM and not New
GM that may have provided insufficient notice, New GM should not be penalized for that. It is
the possible failure to provide requisite notice—and not who was responsible for it—that results in
the need for the Court to take judicial action. The potential constitutional violation must trump
determinations of fault and New GM's contractual rights.

[144]  *Weigner*, 852 F.2d at 649.

[145]  *Drexel Burnham*, 995 F.2d at 1144.

[146]  *Id.* at 1144 (citing *Mullane*) (emphasis added).

[147]  It should go without saying that the urgency of the situation is a hugely important factor in
determining what is the best notice practical under the circumstances. Exemplifying this is *Pearl-
Phil GMT (Far East) Ltd. v. Caldor Corp. (In re Caldor Corp.),* 266 B.R. 575 (S.D.N.Y. 2001)
(Casey, J.) ("**Caldor-District**" ), *aff'g In re Caldor Corp.,* 240 B.R. 180 (Bankr. S.D.N.Y. 1999)
(Garrity, J.) ("**Caldor-Bankruptcy**"). There Judge Casey of the District Court, affirming an order
of Judge Garrity of this Court, rejected contentions by the appellant that it had been denied due

-61-

Actual notice to those in the 27 categories above resulted in mailed notice of the
363 Sale to over 4 million people and entities[148]—including any known by Old GM to
have been in accidents.  But given the urgency of GM's circumstances, it would be
wholly unreasonable to expect individual mailed notice of the 363 Sale hearing to go to
the owners of the approximately 70 million GM cars then on the road, or even the
approximately 27 million whose cars were then (or later became) the subject of pending
recalls.

This is exactly the kind of situation for which notice by publication would be the
norm.  Old GM's counsel could hardly be faulted for availing itself of that approach.
Under normal circumstances, notice by publication to Old GM vehicle owners—
describing the upcoming sale and the fact that New GM would be assuming only very
limited types of Old GM liabilities—would be the only kind of notice that would be
practical under circumstances like these, and would easily meet the Supreme Court's and
the Second Circuit's requirements.

*3.  Known Claim Analysis*

But Old GM's ability to provide notice by publication, rather than actual notice,
rests on the premise that those who received publication notice only did not have
"known" claims.  For that reason, both sides debate at length whether owners of cars with

---

process when it failed to get notice in advance of Judge Garrity's order (in the face of Caldor's
inability to continue in business during the course of its chapter 11 case) authorizing the prompt
wind-down of Caldor's business operations and restraining payment on anything more than a pro-
rata basis, of administrative claims that had accrued before the time of that order.  *See* 266 B.R. at
579, 583.  Judge Casey applied the Second Circuit's *Weigner* test of whether the noticing party
"acted reasonably," as contrasted to whether there was actual receipt of notice.  And recognizing
that Caldor was faced "with the formidable task of providing notice to approximately 35,000
entities," *id.* at 583, and that the record was "replete with evidence as to Caldor's dire financial
circumstances," *id.* at n.5, he found Caldor's actions "reasonable given the circumstances under
which it was operating."  *Id.* at 583.

[148]    *See* Davidson Decl. ¶ 5, New GM Appx. of Exh. 1 (ECF No. 12982-1).

Ignition Switch Defects—but who had neither been in accidents of which Old GM was aware, nor sued Old GM or manifested any intent to sue—were "reasonably ascertainable (and thus "known") creditors, on the one hand, or no more than "foreseeable" (and thus "unknown") creditors on the other.

That question is close. It is true, as New GM argues, that Old GM sent out actual notice of the 363 sale (and later, of the Bar Date) to anyone who had sued it or manifested a possible intention to sue, and that all or nearly all of those with Ignition Switch Defects were not yet in that category. It also is true that sending out notice of a recall is not the same as expecting to be sued; that not all recalls are the same in terms of the risk of resulting death or injury; and indeed that many (and perhaps most) recalls might not result from the risk of death or injury at all.

But it is also true that at least 24 Old GM engineers, senior managers and attorneys knew of the Ignition Switch Defect and the need to send out recall notices—and of the reasons why recall notices had to go out, here. And it is uncontroverted that Old GM had enough knowledge of the Ignition Switch Defect to be required, under the Safety Act, to send out mailed recall notices to owners of affected Old GM vehicles, and knew the names and addresses to whom it had to send them. On balance the Court concludes that by reason of the knowledge of those 24 individuals, the owners of cars with Ignition Switch Defects had "known" claims, from Old GM's perspective, as that expression is used in the due process jurisprudence.

The caselaw does not require actual notice to those whose claims are merely "foreseeable." But the caselaw requires actual notice to claimants whose identity is

"reasonably ascertainable."[149]  So the Court must consider how this case fits in that spectrum when 24 Old GM personnel knew of the need to conduct a recall (and with that, of the need to fix the cars); and, in addition, a critical safety situation; and, in addition, the exact names and addresses of the owners of the cars that were at risk.

Preliminarily, there can be no doubt that the names and addresses of the car owners whose cars Old GM's personnel knew to be subject to the recall obligation—and here, to have safety defects as well—were "reasonably ascertainable" and, in fact, actually known.  Old GM (like New GM later) was subject to the Safety Act, which requires vehicle manufacturers to keep records of vehicle ownership, including vehicle owners' names and addresses.  Once Old GM knew which cars had the Ignition Switch Defect, Old GM knew exactly to whom, and where, it had to send the statutorily required recall notice.

But not all of those with Ignition Switch Defects would be killed, injured, or want to sue Old GM on economic claims.  Those 24 Old GM personnel did not have knowledge of *which particular* car owners with Ignition Switch Defects would later be killed or injured in accidents, but they knew that some would—which is why Old GM needed to conduct the recall.  Those Old GM personnel also knew that all of those vehicle owners had a statutory right to get their cars fixed at Old GM's (and later New GM's) expense.

Taking the easier element first, the duty to fix the cars with Ignition Switch Defects was owed to every one of those whose cars were subject to the known recall

---

[149]     *See* pages 49 et seq. *supra.*

obligation.  That aspect of Old GM's obligations was not subject to the uncertainty of whether or not there would be a subsequent accident or lawsuit.

The other element is plainly harder, but the Court comes out the same way.  Old GM faced the recall obligation and known claims here not by reason of any kind of actuarial foreseeability (or the reality that in any line of endeavor, people can make mistakes and others can be hurt as a result), but by reason of the *known safety risk* that required the recall—*i.e.*, that here there was known death or injury in the making to someone (or many) in the body of people whose names and addresses were known, with the only uncertainty being who, exactly, those killed or injured might be.  It is not a satisfactory answer, in this Court's view, to say that because the particular individuals in a known group who would turn out to be accident victims were unknown, all of them were unknown.  Rather than concluding that because of that uncertainty, *none* were entitled to notice, the Court concludes that *all* of them were.

New GM understandably points to a considerable body of caselaw holding, in substance, that creditors are not "known" unless their status as such is reflected in the debtor's "books and records."  That is true, but what "books and records" means in this context is all important.  At oral argument on its motion, New GM understandably did not press its earlier position[150] that its financial accounting (and in particular, liabilities on its balance sheet) would be determinative of whether claims were known.[151]  And for good reason:  such a view would fail to comport with the caselaw or common sense.  The "books and records" standard does not rest on whether the notice-giver has booked a liability or created a reserve on its balance sheet; on the treatment of the loss contingency

---

[150]     *See* New GM Opening Br. at 27-29.

[151]     *See* Day 1 Arg. Tr. at 78 ("I agree it's not the financial statements.").

09-50026-reg   Doc 13109   Filed 04/19/15   Entered 04/19/15 15:54:22   Main Document
Pg 71 of 88

under FASB 5 standards; or on whether the debtor has acknowledged its responsibility for the claim;[152] it merely requires having the requisite knowledge in one way or another that can be relatively easily ascertained and thereafter used incident to the noticing process.  In the Court's view, the standard requires much more than the fact that somewhere, buried in a company's books, is information from which the liability could be ascertained,[153] and the Court doubts (though under the facts here it does not need to decide) that the knowledge of one or very few people in a large enterprise would be enough to meet the standard.[154]  But "books and records" must be construed in a fashion consistent with the Supreme Court's requirements that "known" liabilities include those that are not just actually known, but also "reasonably ascertainable."

New GM points out that it maintained a "litigation calendar," showing people who had sued it, threatened to do so, or even made claims against it, and that Old GM

---

[152]   *See, e.g., Drexel-Burnham-Bankruptcy*, n.105 *supra*, 151 B.R. at 681-82 (in late proof of claim context, holding that a guaranty liability not booked on the balance sheet was still a known claim, reflected on the debtor's "books and records," and that accounting practices were not determinative).

[153]   *See*, *e.g., XO Communications*, 301 B.R. at 793-94 (in late proof of claim context, noting that "[w]hat is reasonable depends on the particular facts of each case.  A debtor need not be omnipotent or clairvoyant.  A debtor is obligated, however, to undertake more than a cursory review of its records and files to ascertain its known creditors.").

[154]   The Court has based its conclusion that the Plaintiffs were known creditors here on the fact that at least 24 Old GM engineers, senior managers, and attorneys knew of the Ignition Switch Defect—a group large in size and relatively senior in position.  The Court has drawn this conclusion based not (as the Plaintiffs argue) on any kind of automatic or mechanical imputation drawn from agency doctrine (which the Court would find to be of doubtful wisdom), but rather on its view that a group of this size is sufficient for the Court to conclude that a "critical mass" of Old GM personnel had the requisite knowledge—*i.e.*, were in a position to influence the noticing process.  *Cf. Weisfelner v. Fund 1 (In re Lyondell Chemical Co.)*, 503 B.R. 348, 389 (Bankr. S.D.N.Y. 2014) (Gerber, J.) (in a case alleging an intentional fraudulent conveyance in an LBO, rejecting arguments based on automatic imputation of a CEO's alleged intent under ordinary agency rules, and ruling that if a creditor litigation trust pressing those claims could not plead facts supporting intent to hinder, delay or defraud on the part of a "critical mass of the *directors* who made the decisions in question," it would then have to allege facts plausibly suggesting that the CEO, who was only one member of a multi-member Board, could nevertheless control the disposition of Lyondell's property) (emphasis in original).

was careful to provide all of them with actual notice.[155]  That of course was the right

thing to do, and under other circumstances, it would do the job.[156]  But here we have the

unique fact that Old GM knew enough to send out recall notices (to meet a statutory

obligation to car owners, and, more importantly, to forestall the injury or death which,

without corrective action, would result), whose mailing, coupled with the publication

notice it could appropriately send, would have been more than sufficient.  But Old GM

did not do so.

New GM calls the Court's attention to its earlier decision in *Morgenstein,* in

which this Court held that the plaintiffs there were "unknown" creditors, who could not

use lack of actual notice to vacate the confirmation order in this case—though admittedly

they received notice only by publication.  There the plaintiffs (on their own behalf and a

class they wished to represent) sought to bring an untimely class proof of claim after the

bar date and after Old GM's liquidation plan went effective.  But they failed to plausibly

allege any evidentiary facts supporting their contention that Old GM *knew* that the

alleged design defect affected the vehicles they owned.  Nor were their vehicles subject

to a recall.  Old GM's knowledge of the Ignition Switch Defect here, and of its need to

effect a recall of the Plaintiffs' cars here, makes *Morgenstein* a different case.

New GM also calls this Court's attention to Judge Bernstein's decision in *Old

Carco*[157]—the *Chrysler* chapter 11 case—which in many respects is closely on point, and

---

[155]     *See* Day 1 Arg. Tr. at 78-79.

[156]     New GM also points out that it is much easier for a debtor to recognize contractual obligations
than those that may arise in tort, for alleged violations of law, or in other instances where the
debtor and possible claimants have not had personal dealings.  That is true, and it underscores why
publication notice for claimants in the latter categories is normally sufficient.  But here, once
again, Old GM personnel knew of the need to send out recall notices, where to send them, and
why they needed to go out.  This changes everything.

[157]     *See* n.15, *supra.*

09-50026-reg    Doc 13109    Filed 04/19/13    Entered 04/19/13 15:58:22    Main Document
Pg 72 of 138

with which this Court fully agrees.  There, after Old Carco's[158] own 363 sale, owners of Jeep Wranglers and Dodge Durangos manufactured by Old Carco brought a class action for economic loss against New Chrysler in the District Court in Delaware, alleging that their cars suffered from a design flaw known as "fuel spit back."  As here, the affected car owners in *Old Carco* had received notice only by publication.  With the same issue as to whether the *Old Carco* sale order's free and clear provisions barred the economic loss claims there, the Delaware District Court referred that question to the *Old Carco* bankruptcy court.  Judge Bernstein concluded that Old Carco's Sale Order did indeed bar those economic loss claims, and found no due process impediment to enforcing the *Old Carco* sale order against those asserting the economic loss claims there—even against those who bought their cars in the used car market[159]—finding that their claims had arisen when their cars had been manufactured, which was before Old Carco's 363 sale.

But while *Old Carco* plainly was correctly decided, it is distinguishable from this case, in a highly significant respect.  Old Carco had *already* issued at least three recall notices for the "fuel spit back" problem for certain Durango and other Old Carco vehicles before the original purchasers bought their vehicles from Old Carco,[160] avoiding the exact problem this Court has identified here.

The publication notice here given, which otherwise would have been perfectly satisfactory (especially given the time exigencies), was insufficient, because from Old GM's perspective, owners of cars with Ignition Switch Defects had "known" claims.

---

[158]    Just as Old GM came to be officially known as "Motors Liquidation Co." after the 363 Sale here, the former Chrysler came to be officially known as "Old Carco" after its 363 sale.

[159]    *See* 492 B.R. at 403.

[160]    *Id.* at 395 (Old Carco issued a "safety defect recall in 2002";  "a second safety recall … in 2005"; and a "further safety recall" in January 2009).

Because Old GM failed to provide the notice required under the Safety Act (which, if

given before Old GM's chapter 11 filing, could have been followed by the otherwise

satisfactory post-filing notice by publication), the Plaintiffs were denied the notice due

process requires.

### 4.   *The Requirement for Prejudice*

But the Court's determination that Plaintiffs were denied the notice due process

requires does not necessarily mean that they were "denied due process."  The latter turns

on the extent to which a denial of due process also requires a showing of resulting

prejudice.

Plaintiffs argue that once they have shown the denial of the notice that due

process requires, any resulting prejudice is simply irrelevant.  In their view, the denial of

the notice that due process requires means that they need not show anything more, and

that the Court need not, and should not, think about how things might have been different

if they had received the notice that was denied.

The Court disagrees.  The contention runs contrary to massive caselaw, and

common sense.

Though the Second Circuit, so far as the parties' briefing has revealed and this

Court is aware, has not ruled on this issue,[161] no less than six other Circuits have.  They

have repeatedly, and very explicitly, identified prejudice as an essential element of a

denial of due process claim—saying, in exactly these words or words that are very close,

---

[161]    In the recent cases in which the Circuit granted relief for denials of due process, the prejudice to
the party that had received inadequate notice was obvious, and no other party in the case had made
the exact same argument that the party failing to get notice might have made.  *See Manville-2010*,
600 F.3d at 154-58 (injunction against insurer's non-derivative claims that had no relation to
bankruptcy); *DPWN*, 747 F.3d at 151 (discharge of claim); *Koepp*, 593 Fed. Appx. at 23
(extinguishment of easement).

that "a party who claims to be aggrieved by a violation of procedural due process must

show prejudice."[162]  So have lower courts in this District (at both the District Court[163]

---

[162]  *Perry*, 629 F.3d at 17.  *See also Rapp v. U.S. Dep't of Treasury, Office of Thrift Supervision*, 52 F.3d 1510, 1520 (10th Cir. 1995) ("***Rapp***") ("In order to establish a due process violation, petitioners must demonstrate that they have sustained prejudice as a result of the allegedly insufficient notice."); *Brock v. Dow Chemical U.S.A.*, 801 F.2d 926, 930-31 (7th Cir. 1986) ("***Brock***") (in context of review of administrative order affecting an employer where improper notice was alleged, "it must be noted that, unless the employer demonstrates that the lack of formal notice was prejudicial, we will not order that the charges be dismissed"); *Savina Home Indus., Inc. v. Sec'y of Labor*, 594 F.2d 1358, 1365 (10th Cir. 1979) ("***Savina Home Industries***") (in considering due process claim, fact that "no prejudice has been alleged" was identified as one of two factors supporting conclusion that "no due process violation has been established"); *In re New Concept Housing, Inc.*, 951 F.2d 932, 939 (8th Cir. 1991) ("***New Concept Housing***") (ruling that failure to give the debtor notice of a hearing on the approval of a settlement violated two of the Federal Rules of Bankruptcy Procedure, but (rejecting the views of the dissenter that the failure to provide notice of the hearing resulted in a denial of due process that could not be subject to harmless error analysis) that "the violation of these rules constituted harmless error, because the Debtor's presence at the hearing would not have changed its outcome.  The Debtor had neither a legal nor factual basis for establishing that the settlement was unreasonable.").  *See also In re Parcel Consultants, Inc.*, 58 Fed. Appx. 946, 951 (3d Cir. 2003) (unpublished) ("***Parcel Consultants***") ("Proof of prejudice is a necessary element of a due process claim."); *Cedar Bluff Broad., Inc. v. Rasnake*, 940 F.2d 651 (Table), 1991 U.S. App. LEXIS 17220, at *7, 1991 WL 141035, at *2 (4th Cir. Aug. 1, 1991) (unpublished) ("***Cedar Bluff Broadcasting***") (creditor complaining of notice deficiency failed to show, among other things, "that it was prejudiced by the lack of notice to general creditors").

The Plaintiffs cite one case at the Circuit level which they argue would lead to a different conclusion, *Lane Hollow Coal Co. v. Director, Office of Workers' Compensation Programs*, 137 F.3d 799 (4th Cir. 1998) ("**Lane Hollow Coal**").  They quote a line from the opinion that the claimant is not obligated to demonstrate a "reasonable likelihood that the result of this claim would have been different absent the violation," *id.* at 807, though this is not the same as holding that there is no requirement to show prejudice, as the *Lane Hollow Coal* court itself seemed to recognize.  There the Fourth Circuit vacated, in part, an administrative law judge determination granting benefits to a coal miner's widow when there was a 17-year delay in notifying the coal mine operator of the claim, by which time evidence was no longer available and the coal mine operator was thus deprived of the opportunity to mount a meaningful defense.  *Id.* at 807.  The *Lane Hollow Coal* court did not cite or criticize its earlier holding in *Cedar Bluff Broadcasting* that had denied relief based on a failure to show a lack of prejudice, and in fact stated that *"[t]o be sure, there are 'due process' cases in which we require a showing that the error complained of actually prejudiced the result on the merits…."  Id.* at 808 (emphasis added).  Though the other cases were not named or otherwise substantively addressed, the *Lane Hollow Coal* court continued "but these cases are of a much different ilk."  *Id.*  And it declined to authorize "speculation about the would-have-been and could-have-been" if notice had not been denied for those 17 years.  *Id.* at 807.  *Lane Hollow Coal* is insufficient, in this Court's view, to trump the holdings of the ten cases expressly holding that prejudice is an element of any due process claim.  Rather, it is better read as merely assuming that there was in fact prejudice, and holding that a finding of an absence of prejudice when evidence was unavailable after a 17 year delay would necessarily have been based on unacceptable speculation.  A later (and very similar) Fourth Circuit holding upon which the Plaintiffs likewise rely, *Consolidation Coal Co. v. Borda*, 171 F.3d 175 (4th Cir. 1999), supports this Court's view.  *See id.* at 183 ("It is not the mere fact of the government's delay that violates due process, but *rather the prejudice resulting from such delay*.") (emphasis added).

and Bankruptcy Court[164] levels), and elsewhere.[165]  Several of the above were bankruptcy

cases, in which litigants sought to be relieved of bankruptcy court orders based on

contentions of denial of due process.[166]

Neither the Plaintiffs, nor the GUC Trust (which is allied with the Plaintiffs on

this issue), cite any case that contradicts that authority.[167]  Rather, they variously argue

---

[163]    *See Caldor-District*, 266 B.R. at 583 ("even if notice was inadequate, the objecting party must demonstrate prejudice as a result thereof") (citing, *inter alia, Rapp*); *Affirmance Opinion #2*, 430 B.R. at 99 (rejecting appellant Parker's contentions that he was denied due process as a result of the expedited hearing on the 363 Sale in this case, as "Parker was in no way prejudiced by the expedited schedule").

[164]    *See Caldor-Bankruptcy*, 240 B.R. at 188 ("Thus, in addition to establishing that the means of notification employed by Caldor was inadequate, Pearl must demonstrate that it was prejudiced because it did not receive adequate notice.") (citing, *inter alia, Rapp, Brock*, and *Savina Home Industries*).

[165]    *In re Gen. Dev. Corp.*, 165 B.R. 685, 688 (S.D. Fla. 1994) (Aronovitz, J.) ("**General Development**") ("A creditor's due process rights are not violated where the creditor has suffered no prejudice.").

[166]    *See Cedar Bluff Broadcasting*, n.162 *supra* (bankruptcy court order converting case to chapter 7); *Caldor-District* and *Caldor-Bankruptcy,* nn. 163 and 164 *supra* (bankruptcy court wind-down order); *General Development,* n.165 *supra* (bankruptcy court approval of settlement); *Affirmance Opinion #2*, n. 163 *supra* (the Sale Order in this case).

[167]    *See* Pl. Br. at 36-39; GUC Trust Opp. at 27-32 & nn.9 and 10.  The GUC Trust does, however, cite and quote at length a Bankruptcy Court decision, *White v. Chance Indus., Inc. (In re Chance Indus., Inc.)*, 367 B.R. 689 (Bankr. D. Kan. 2006) (Nugent, C.J.) ("**Chance Industries**"), in which Judge Nugent addressed a situation in which a child was injured on a debtor-manufactured amusement ride after the confirmation of a reorganization plan, allegedly as a result of the reorganized debtor's wrongful prepetition conduct.  *See id.* at 692.  Judge Nugent ruled, correctly in this Court's view, that because the child was injured after confirmation, and had no prepetition (or even pre-confirmation) relationship with the debtor, *see id.* at 701, the child did not have a claim capable of being discharged, *see id.* at 703-04, and could not be bound by a confirmation order as to which, for obvious reasons, he was not given notice.  (Of course that situation is not present here, because New GM expressly assumed liability for death or injuries taking place after the 363 Sale, even if involving vehicles made by Old GM.)

The GUC Trust relies on language that came after that holding in which Judge Nugent declined to agree with an argument that the failure to provide notice to the child was "harmless error," based on the argument before him that the plan—which provided for no future claims representative, but nevertheless sought to bar future claims—would not have changed after an objection and would have been confirmed anyway.  *See id.* at 709.  But the GUC Trust takes Judge Nugent's comments out of context.  Judge Nugent made his "harmless error" observations in the context of his discussion, see *id.* at 709-10 & n.81, of the reorganized debtor's invocation of Fed.R.Bankr.P. 9005, and Fed.R.Civ.P. 61, which together provide that in bankruptcy, as elsewhere, courts should "disregard all errors and defects that do not affect any party's substantial rights."  Understandably, Judge Nugent considered that the matter before him affected substantive rights.  Though the word "prejudice" never was used in his opinion (which of course undercuts the GUC Trust's argument), he effectively ruled that the child would be substantively prejudiced—by "the extinguishing of an

---

-71-

that "the Due Process Clause protects . . . the right to be heard, not the right to win;[168] that all of the above cases are distinguishable on their facts;[169] and that imposition of a prejudice requirement would require the Court to speculate as to the outcome if appropriate notice had been provided.[170]  The first contention is overly simplistic, the second misses the point; and the third fails based on a mistaken assumption.

As to the first, the issue is not, as Plaintiffs, argue, whether the Due Process clause guarantees "a right to win."  Of course it is true that there is no constitutional right to win—though ironically, under the Plaintiffs' argument (that inadequate notice automatically gives them the win), they effectively seek exactly that.  The real issue is rather whether, assuming that there has been a denial of the right to be heard, more is necessary to establish a *judicially cognizable* due process violation—*i.e.*, a right to the desired curative relief.  The caselaw answers that; it requires the arguably injured party to show prejudice from the denial.

---

unknown claim that has yet to accrue," *id.* at 709—thus making Rule 61 harmless error analysis inappropriate.

The Plaintiffs also cite *Chance Industries, see* Pl. Br. at 37, but only for further support for their contention (with which, as noted above, the Court agrees) that in defective notice cases, speculation as to what the outcome would have been with proper notice is inappropriate.  They read Judge Nugent's ruling has having rejected the *Chance Industries* debtor's arguments "notwithstanding [the] debtor's speculation that the tort claimant's participation in confirmation process would not have changed the result."  *Id.*  This Court agrees with that reading, and would even go farther; it reads Judge Nugent's *Chance Industries* opinion as suggesting that if the objection had been raised, he would have denied confirmation of the plan on those terms.

*Chance Industries* represents an excellent example of what courts do when they think parties are prejudiced; it does not stand for the notion that prejudice doesn't matter.  *Chance Industries* did not, and could not, contradict the decisions of its own Tenth Circuit, *see Rapp* and *Savina Home Industries*, n.162, *supra*, that are among those expressly imposing a requirement for showing prejudice.

[168]   Pl. Br. at 4.

[169]   *See id.* at 37-39; GUC Trust Opp. at 27 n.9 and 29 n.10.

[170]   *See* Pl. Br. at 36-37; GUC Trust Opp. at 27.

The Plaintiffs' and GUC Trust's second argument is that "the cases [New GM]
cites do not support its contention."[171]  But of course they do.  Because due process cases
are heavily fact-driven, it is hardly surprising that the Plaintiffs can point out factual
distinctions between the ten cases discussed above[172] and this one.  But the Court does
not rely upon those cases for their factual similarity to this one; it relies on them for the
*legal principles* that each enunciates, in very clear terms—as stated by the First Circuit in
*Perry*, for example, "a party who claims to be aggrieved by a violation of procedural due
process *must show prejudice*."[173]

The third contention does not go to the existence of the requirement for showing
prejudice.  It goes to *how* the Court should examine possible prejudice—and in particular,
whether courts should speculate as to resulting harm once they have been presented with
a showing of insufficient notice.

In that third contention, the Plaintiffs cite *Fuentes v. Shevin*,[174] in which the
Supreme Court reversed the judgments of three-judge District Courts that had upheld the
constitutionality of Florida and Pennsylvania replevin statutes that denied a prior
opportunity to be heard before chattels were taken from consumers' possession, in
several instances without a lawsuit.[175]  The Plaintiffs do not argue that *Fuentes*, or any
principles it articulated, trumped any of the holdings to which this Court has just
referred—that a showing of prejudice must be made before court orders entered with
insufficient notice are undone.  Nor could they, as *Fuentes* involved facts nothing like

---

[171]      Pl. Br. at 37; *accord* GUC Trust Opp. at 27 n.9, 29 n.10.

[172]      *See* n.162 *supra*.

[173]      629 F.3d at 17 (emphasis added).

[174]      407 U.S. 67 (1972) ("***Fuentes***").

[175]      *See id.* at 71-72 and n.4.

this case, and instead involved a facial attack on the constitutionality of statutes that

authorized the seizure of property without any notice, and, in many cases, any earlier

judicial action at all.  The different, later, possible judicial outcomes to which *Fuentes*

referred (and upon which the Plaintiffs rely)[176] related to judicial proceedings that never

took place, and (for good reasons) needed to take place.

The Plaintiffs then argue a different proposition, on which they are on stronger

ground; they say that courts should reject "speculation" that the litigant would have lost

anyway.  And in this respect, the Court agrees with them.  In determining prejudice,

courts should not speculate as to outcome if an aggrieved party was denied the notice to

which it was entitled.  If there is a non-speculative reason to doubt the reliability of the

outcome, the Court agrees that it should take action—though the opposite is also true.

For that reason, the Court believes that it here should neither deny, nor grant, relief to the

Plaintiffs here based on a request by either side that the Court engage in speculation.[177]

The Court will refrain from doing so.

Finally, and apart from the caselaw previously noted, the Plaintiffs' contention

that prejudice need not be shown in cases like this one runs contrary not just to existing

law, but also fairness and sound policy.  Bankruptcy sale due process cases, much more

than in plenary litigation, involve competing interests—including those of parties who

---

[176]     *See* 407 U.S. at 87 ("To one who protests against the taking of his property without due process of law, it is no answer to say that in his particular case due process of law would have led to the same result because he had no adequate defense upon the merit."), quoted at Pl. Br. at 36.

[177]     But that view, once again, does not go to the requirement that prejudice must be shown; it goes only to how the required prejudice should or should not be found.

To avoid the need for such speculation, it is very possible that in a case where it made a difference, the Court would not require, incident to ascertaining the existence of prejudice, that the result *would* have been different; the Court might well hold that it should suffice that there is a reasonable likelihood that the result *could* have been different.  But the Court does not need to decide that here.  In this case, there are no matters argued by either side where the distinction would matter.

have acquired property rights as buyers of estate assets, and have a justifiable expectation
that when they acquire assets pursuant to a bankruptcy court order, they can rely on what
the order says. That was an important element of the Seventh Circuit's opinion in
*Edwards*,[178] in which that court held that a bona fide purchaser of property in a free and
clear sale acquired good title to it, even though a second mortgagee had not received
notice of the sale until more than a year later.

The *Edwards* court noted that "[i]f purchasers at judicially approved sales of
property of a bankrupt estate, and their lenders, cannot rely on the deed that they receive
at the sale, it will be difficult to liquidate bankrupt estates at positive prices,"[179] and that
"the liquidation of bankrupt estates will be impeded if the bona fide purchaser cannot
obtain a good title, and creditors will suffer."[180] That does not mean, at least in this
Court's view, that the purchasers of assets automatically should win, but it does mean
that their needs and concerns—and the protection of their own property rights—cannot be
disregarded either.

The *Edwards* court twice addressed the competing interests on matters of this
character:

> We are left with the practical question, in what
> circumstances can a civil judgment be set aside
> without limit of time and without regard to the harm
> to innocent third parties? The answer requires a

---

[178]    *See* n.69 *supra*. The Plaintiffs argue that *Edwards*, which was written by Judge Posner, was
wrongly decided. *See* Pl. Br. at 34. But the Court believes *Edwards* was correct in its result, and
in most of its analysis—especially insofar as it focuses on the prejudice (or lack of prejudice) to
the party that received inadequate notice, and speaks of others' property rights that likewise need
to be taken into account.

[179]    962 F.2d at 643.

[180]    *Id.* at 645.

> consideration of competing interests rather than a
> formula.[181]

And again:

> To take away a person's property—and a lien is
> property—without compensation or even notice is
> pretty shocking, but we have property rights *on both
> sides of the equation here,* since [the second
> mortgagee] wants to take away property that [the
> purchaser] bought and [the purchaser's lender]
> financed, without compensating them for their
> loss.[182]

The Court is mindful of concerns articulated by Chief Judge Jacobs dissenting in

*Petrie Retail*[183] (even though they were not embraced by the *Petrie Retail* majority) that

the requirements of law in bankruptcy cases should not be trumped by concerns as to

whether they might have a chilling effect on sales in bankruptcy cases, on the one hand,

or "promote[] the sale of the assets marketed by bankrupt estates," on the other.  And for

reasons discussed below, the Court believes that in the Second Circuit, the requirements

of due process would trump the interests of finality and maximizing creditor recovery.

But in bankruptcy, the interests inherent in the enforceability of 363 orders (on which the

buyers of assets should justifiably be able to rely, and the interests of creditors depending

on the maximization of estate value likewise rest) are hugely important.  And to the

extent that courts can respect and enforce sale orders as written unless there is genuine

prejudice, they should do so.  Since parties' competing needs and concerns "are on both

sides of the equation here,"[184] that means that in instances in which prejudice has not

---

[181]     *Id.* at 644 (citation omitted).

[182]     *Id.* at 645 (emphasis added).

[183]     *See Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223, 233 (2d Cir. 2002) ("**Petrie Retail**") (Jacobs, C.J., dissenting).

[184]     *Edwards*, 962 F.2d at 645.

09-50026-reg    Doc 13109    Filed 04/19/15    Entered 04/19/15 15:58:22    Main Document
Pg 83 of 138

been shown, there is no good reason for depriving asset purchasers of their own property rights—and of the benefits for which they provided value to a chapter 11 estate.

And the facts here (which may present a relatively uncommon situation)—where while insufficient notice was given, others duly given notice made the same, and indeed better, arguments against successor liability, and lost—raise an additional common sense and fairness concern. It defies common sense—and also is manifestly unfair—to give those who have not been prejudiced the bonanza of exemption from a ruling as to which other creditors, with no lesser equities in their favor, were heard on the merits, lost, and now have to live with the result.

For all of these reasons, the Court holds—consistent with the ten other cases that have held likewise—that even where inadequate notice has been given, prejudice is an essential element for vacating or modifying an order implementing a 363 sale.

### 5. *Application of Those Principles to Economic Loss Plaintiffs*

Having concluded that the Economic Loss Plaintiffs were denied the notice due process requires, but that establishing a claim for a denial of due process requires a showing of prejudice, the Court must then consider the extent to which they were prejudiced as a result. The Court finds that they were not at all prejudiced with respect to successor liability, but that they were prejudiced with respect to overbreadth of the Sale Order.

### (a)    *Successor Liability*

After arguing that prejudice need not be shown, and that they should win without any prejudice at all (contentions that the Court has rejected), the Plaintiffs go on to argue

09-50026-reg   Doc 13109   Filed 04/19/15   Entered 04/19/15 15:58:22   Main Document
Pg 82 of 138

that even if prejudice must be established, it was shown.[185]  They argue that if they had

the opportunity to be heard, the result would have been different.  Insofar as successor

liability is concerned, the Court easily rejects that contention.

It is undisputed that although the Plaintiffs did not get adequate notice of the

363 Sale hearing, over 4 million others did, including a very large number who

vigorously argued against the Free and Clear Provisions, but ultimately failed.  While the

Plaintiffs quote from *Mullane* repeatedly, and rely on *Mullane* principles even more

often, they overlook the language in *Mullane* that expressly addressed situations where

many would be similarly affected—and where all, because of incomplete notice, might

not be able to be heard, but many could.

*Mullane* recognizes that where notice is imperfect, the ability of others to argue

the point would preclude the prejudice that might result if *none* could.  It even suggests

that in such instances, there is no persuasive claim that even notice was defective.  In

language that the Plaintiffs fail to address, the *Mullane* court stated:

> This type of trust presupposes a large number of
> small interests.  *The individual interest does not
> stand alone but is identical with that of a class.*  The
> rights of each in the integrity of the fund and the
> fidelity of the trustee are shared by many other
> beneficiaries.  *Therefore notice reasonably certain
> to reach most of those interested in objecting is
> likely to safeguard the interests of all, since any
> objections sustained would inure to the benefit of
> all.*  We think that under such circumstances
> reasonable risks that notice might not actually reach
> every beneficiary are justifiable.  'Now and then an
> extraordinary case may turn up, but constitutional
> law, like other mortal contrivances, has to take

---

[185]   *See* Pl. Br. at 58-60.

some chances, and in the great majority of
instances, no doubt, justice will be done.'[186]

Here, as in the situation addressed in *Mullane*, the notice that was sufficient to trigger

many objections to the Free and Clear Provisions was "likely to safeguard the interests of

all."[187]  If those who got notice and made those objections had been successful, the

"objections sustained would inure to the benefit of all.[188]  These observations by the

Supreme Court bolster the conclusion that there was no prejudice here.  In fact, just as the

*Mullane* court declared that "under such circumstances, reasonable risks that notice might

not actually reach every beneficiary [were] justifiable," that element of the *Mullane*

holding strongly suggests that notice that did not reach the subset of vehicle owners with

Ignition Switch Defects was not constitutionally deficient in the first place.[189]

But even if *Mullane* does not by itself dispose of the question, the Plaintiffs'

failure to show any reason why the Free and Clear Provisions were improperly imposed

does.  That failure underscores the lack of prejudice here.[190]  Notably, the Plaintiffs do

---

[186]      *Mullane*, 339 U.S. at 318-19 (emphasis added).

[187]      *Id.*

[188]      *Id.*

[189]      However, while that conclusion follows from what the Supreme Court said in the quoted
           language, the Court prefers to analyze the matter in terms of the massive caselaw requiring a
           showing of prejudice.  The distinction doesn't matter with respect to the Free and Clear
           Provisions, because so many people argued against them.  But it could matter with respect to
           overbreadth, discussed below, where those with notice didn't make an overbreadth argument.  The
           Court is more comfortable in denying relief in instances where people made the same argument
           and lost than it is in instances where those with notice failed to make the argument at all.

[190]      *See Paris Industries, supra* n.123, 132 B.R. at 510 ("I conclude that [objectors] were in no way
           prejudiced by the lack of notice and their inability to appear and argue their position on the sale.
           They have made no showing that, if they had been notified and had appeared, they could have
           made any arguments to dissuade the bankruptcy court from issuing its order that the assets be sold
           free and clear of all claims."); *Austin v. BFW Liquidation, LLC (In re BFW Liquidation, LLC)*,
           471 B.R. 652, 672-73 (Bankr. N.D. Ala. 2012) (Cohen, J.) (declining to set aside bankruptcy sale
           even though a creditor was not given notice of it where creditors' committee and many creditors
           participated in the process and court could conclude that all creditors' interests in the sale were
           adequately represented by that committee and those creditors, and the creditor "did not allege in

not argue that when the Court barred successor liability back in 2009, it got it wrong.[191]

They do not bring to the Court's attention any cases that other objectors missed, or any

statutory or other authority suggesting a different outcome on the successor liability

merits.  In fact, they offer no legally based arguments as to why they would have, or even

*could* have, succeeded on the successor liability legal argument when all of the other

objectors failed.[192]

Rather, while the Plaintiffs recognize that the Court would not have let GM go

into the liquidation that would have resulted if the Court denied approval of the 363 Sale,

they argue that they could have defeated the successor liability injunction for reasons

unrelated to its propriety as a matter of bankruptcy law.  While criticizing New GM for

improper speculation,[193] they ask the Court to rely on the speculation they prefer;[194] they

---

her complaint that she possessed any grounds for opposing the sale which she could have raised had she been notified of the sale before it was authorized").

[191]   *See* Pl. Br. at 58-60.  The closest they come is an accusation that it is New GM that is engaging in speculation, and a suggestion that the Court would not have written "exactly the same opinion."  *See* Pl. Br. at 58-59 ("New GM's argument speculatively presumes that this Court would have written exactly the same opinion in July of 2009 *even if* it had been aware of the ISD, the now well-documented campaign to cover it up, and Old GM's abdication of its legal duties to owners and lessees of Defective Vehicles.") (emphasis in original).  In light of the Plaintiffs' failure to put forward any new successor liability arguments or caselaw authority, the Facts section of any opinion might have added a paragraph or two, but the legal discussion would not at all have changed—nor, more importantly, would the outcome.

The Plaintiffs also argue, though only in a footnote, that if they had an opportunity to be heard, they would have objected to a finding in the Sale Order that New GM was a "good faith purchaser" (relevant under Bankruptcy Code section 363(m)), and that the Court likely would have agreed with them.  *See* Pl. Br. at 59 n.67.  That contention does not help them.  Their prediction of the Court's ruling if they had made such an argument is speculative, but even if such a ruling might have come to pass, it would not have an effect on the inclusion of provisions imposing successor liability.  "Good faith purchaser" findings provide safe harbors for buyers *on appeal*; they do not go to whether or not a sale should be approved, or the nature or extent of any provisions barring successor liability.  *See* section 363(m).

[192]   The Court would have fully and fairly considered any such argument now if it had been made, but (presumably because of the absence of supporting authority) that is not the Plaintiffs' argument here.

[193]   *See* Pl. Br. at 4 ("New GM's self-serving speculation regarding possible outcomes had the ISD been disclosed and notice to the Pre-Sale Class been given are not even plausible."); *id.* at 58 ("New GM's argument speculatively presumes that this Court would have written exactly the

---

ask the Court to accept the likelihood that by reason of public outrage or public pressure,

they could have required Old GM or Treasury to rewrite the deal to accede to their

desires.[195]  And they know, or should, the fundamental principle of bankruptcy law that a

buyer of assets cannot be required to take on liabilities it doesn't want.

So it requires no speculation for the Court to rule that given Old GM's

circumstances at the time, the Court would not have disapproved the 363 Sale or

conditioned its approval on modifications to the carefully negotiated restructuring to

favor one or more groups seeking special treatment.

As noted above, the Court agrees with the Plaintiffs and the GUC Trust that

speculation is inappropriate on an inquiry of this nature.  But gauging the outcome on the

bar of successor liability if Plaintiffs had been heard does not at all involve speculation,

especially since they offered no authority beyond what the other objectors offered in

2009.  Rather, it is the Plaintiffs' alternative argument—that they could have succeeded

by reason of public outrage, political pressure, or Treasury's anger with Old GM, when

---

same opinion in July of 2009 . . . ."); *id.* at 59 ("New GM cannot support its speculation as to the potential outcome had Old GM disclosed, on the eve of filing for bankruptcy, that it had put millions of cars on the road with a known but hidden life-threatening defect while failing to disclose that fact to those most affected by it.").

[194]  *See* Pl. Br. at 59 ("[I]t is equally or even more likely that Old GM and Treasury—who, New GM acknowledges, was the one to draw 'the line in the sand'—would have chosen to deal with objections from Plaintiffs in the same way it chose to deal with objections from consumer safety groups, by adding Plaintiffs' claims to assumed liabilities."); *id.* at 4 ("[T]here is no way to determine, some five years later, what the outcome would have been had the bombshell of Old GM's concealment of this massive safety defect been made known to the Court, the Treasury, Congress, the public, the press and the various objectors.").

[195]  *See id.* at 4-5 ("[H]ad the Court and governmental authorities known that Old GM had knowingly placed millions of cars on the road with a life-threatening safety defect (and that New GM intended to continue to allow such cars to remain on the road with those known defects), it is not reasonable to assume (as New GM does) that such a revelation could only have resulted in a disastrous liquidation and the end of GM as a functioning company.  Instead, it is likely that such an outcome would have still been avoided (for numerous reasons, political, national economic and otherwise, that were still significant, compelling and extant), *and that the entry of the Sale Order would have been conditioned on New GM's assumption of all related liabilities so as to ensure the commercial success of the purchasing entity.*") (emphasis added).

they could not prevail in the courtroom—that asks the Court to speculate. For the very reason the Plaintiffs themselves advance, the Court should not, and will not, do so.

Insofar as the Free and Clear Provisions' prohibition of successor liability claims are concerned, while the Plaintiffs failed to receive the notice due process requires, they were not prejudiced as a result. Thus they have failed to establish a claim for a denial of due process. The Free and Clear Provisions must stand.

*(b)    New GM's Own Wrongful Acts*

What the Court would have done in the face of a Sale Order overbreadth objection is likewise not subject to speculation. The Court follows its own precedent. If the Plaintiffs had been heard to make the argument back in 2009 that they are making now— that they should have the right to allege claims based on wrongful conduct by New GM alone, without any reliance on anything that Old GM might have done—the Court would have entered a narrower order, as it did in similar situations. In this respect, the Economic Loss Plaintiffs were prejudiced.

The Court has twice dealt with what is effectively the same issue before. In another chapter 11 case on the Court's watch, quite a number of years before the 363 Sale in this case, Magnesium Corporation of America ("**MagCorp**"), one of the two debtors in that case,[196] had massive bond debt, environmental, and other liabilities, leading to a chapter 11 filing in August 2001. In May 2002, lacking an ability to reorganize, MagCorp sought approval of a 363 sale to US Magnesium, an affiliate, of substantially all of its assets, with free and clear provisions that would protect the purchaser from successor liability on the debtors' legacy claims—including, most significantly,

---

[196]    *In re Magnesium Corp. of Am.*, No. 01-14312-reg ("***MagCorp***).

09-50026-reg   Doc 13109   Filed 04/19/13   Entered 04/19/13 15:58:22   Main Document
Pg 88 of 138

MagCorp's environmental liabilities to the EPA and other U.S. Government entities. Understandably upset that it would have to recover its very substantial claims from a shell that at the time seemed largely worthless, the Government objected to the free and clear provisions.

Consistent with the law at the time (which was even clearer by 2009), the Court nevertheless granted the requested free and clear provisions. But it further ruled that *while successor liability would be proscribed,* US Magnesium would not be protected with respect to any future matters *that were its own liability.* As part of its dictated rulings, the Court stated:

> When you are talking about free and clear of liens, it means you don't take it subject to claims which, in essence, carry with the property. It doesn't absolve you from compliance with the law going forward.[197]

And though it later rejected an effort by the Government to reargue the free and clear provisions there, the Court then said:

> I've made it clear that the new owners will have to comply with the law and will be subject to any and all obligations that the EPA or other regulatory authorities can impose with respect to the new owners of the land, including requiring that they do whatever they have to do with cleaning up their land if it's messed up.[198]

The Court's sale order in *MagCorp* therefore included, after its free and clear provisions, a key proviso:

> provided, however, that *nothing contained herein shall* (a) release US Magnesium LLC or any affiliate or insider thereof from any claim of the

---

[197]   Tr. of Hr'g, Jun 4, 2002, No. 01-14312 ECF No. 290, at 129:21-25.

[198]   *Id.* at 132:22-133:5 (transcription errors corrected).

United States against US Magnesium or such
affiliate or insider which existed immediately prior
to the Closing (but not as a successor in interest to
the Seller) and (b) *excuse US Magnesium LLC from
any obligations under applicable law* (including,
without limitation, RCRA or other environmental
laws) *as the owner and operator of the Assets (but
not as successor in interest to Seller).*[199]

Similarly, at the 2009 sale hearing in this case, certain objectors voiced concerns

that any approval order would too broadly release either Old GM or New GM from their

respective duties to comply with environmental laws and cleanup obligations. After they

did so, the Court noted that it had originally shared their concerns, but that their concerns

were addressed by amendments to the proposed order that were made after objections

were filed.[200]   The Sale Order in this case was amended to say:

Nothing in this Order or the [Sale Agreement]
releases, nullifies, or enjoins the enforcement of any
Liability to a governmental unit under
Environmental Laws or regulations (or any
associated Liabilities for penalties, damages, cost
recovery, or injunctive relief) that any entity would
be subject to as the owner, lessor, or operator of
property after the date of entry of this Order.
Notwithstanding the foregoing sentence, nothing in
this Order shall be interpreted to deem the
Purchaser as the successor to the Debtors under any
state law successor liability doctrine with respect to
any Liabilities under Environmental Laws or
regulations for penalties for days of violation prior
to entry of this Order.  Nothing in this paragraph
should be construed to create for any governmental
unit any substantive right that does not already exist
under law.[201]

---

[199]   Order, No. 01-14312 ECF No. 283 (Jun. 5, 2002) ¶ 13 (underlining in original but emphasis by italics added).

[200]   *See Sale Opinion*, 407 B.R. at 507-08.

[201]   *Id.* at 507.  Another provision provided similarly:  "Nothing contained in this Order or in the [Sale Agreement] shall in any way (i) diminish the obligation of the Purchaser to comply with Environmental Laws…."  *Id.* at 507-08.

Here the Sale Order, in addition to barring successor liability (which for reasons discussed above, remains fully appropriate), also proscribed any claims involving vehicles and parts manufactured by Old GM, even if the claims might rely solely on wrongful conduct by New GM alone. By not having the opportunity to argue that such was inappropriate here (and to seek a proviso similar to the ones granted in *MagCorp* and for the environmental objectors here), the Economic Loss Plaintiffs were prejudiced. They thus established an actionable denial of due process with respect to Sale Order overbreadth.

### (c) The Used Car Purchasers

A subset of the Economic Loss Plaintiffs, the Used Car Purchasers (whom the Plaintiffs refer to as the "Post-Sale Class"), assert that they have special rights—to assert claims for successor liability when nobody else can—because they had not yet purchased their cars at the time of the 363 Sale. The Court cannot agree. Aside from the illogic and unfairness of the contention, it is erroneous as a matter of law, for at least two reasons.

First, when the Court issued the Sale Order, approving the disposition of Old GM assets—a matter over which the Court had unquestionable subject matter jurisdiction, derived from its statutory subject matter jurisdiction under 28 U.S.C. § 1334 and, more importantly for these purposes, the *in rem* jurisdiction the Court had over estate assets then being sold—those assets were sold free and clear of successor liability claims. The substance of the Sale Order was to proscribe claims based on the transferor Old GM's conduct that could be argued to travel with the assets transferred.[202] The bar against

---

[202]     *See Sale Opinion*, 407 B.R. at 501 (as part of Court's analysis that successor liability claims were "interests" properly subject to a free and clear order, recognizing that "we know that an 'interest' is something that may accompany the transfer of the underlying property, and where bankruptcy

09-50026-reg   Doc 13109   Filed 04/19/15   Entered 04/19/15 15:58:22   Main Document
Pg 90 of 188

successor liability claims premised on continued ownership of the property traveled with

the property. The Used Car Plaintiffs would thus be bound by the *in rem* nature of that

order except to the extent that its enforcement, by reason of due process concerns, would

be improper as to them.

Because they were unknown at the time, and were not even creditors (not having

yet acquired the cars they now assert have decreased value), mailed notice was

impossible, and publication notice (or for that matter, actual notice) would not have been

meaningful to them, even if Old GM had previously sent out recall notices. Thus the

Used Car Purchasers were denied the notice due process requires to bind them to the Free

and Clear Provisions,[203] just as the remainder of the Plaintiffs were.

But like the other Plaintiffs, the Used Car Purchasers were not prejudiced,

because others made the same arguments that Used Car Plaintiffs might have made, and

the Court rejected those contentions. Especially since purchasers of estate property under

sale orders have property rights too, the methodology for correcting a denial of an

opportunity to be heard under such circumstances (if not others as well) should be (1) at

least temporarily relieving an adversely affected litigant of the effect of the order, and

then (2) giving the adversely affected litigant the opportunity to be heard that was

previously denied—referred to colloquially by this Court, in oral argument, as a "do-

over"[204]—fixing any damage that might have resulted from an incorrect or incomplete

---

policy, as implemented by the drafters of the Code, requires specific provisions to ensure that it *will not* follow the transfer.") (emphasis in original).

[203]   *See Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus., Inc.)*, 445 B.R. 243 (Bankr. S.D.N.Y. 2011) (Bernstein, C.J.) ("**Grumman Olson-Bankruptcy**"), *aff'd* 467 B.R. 694, 706-07 (S.D.N.Y. 2012) (Oetkin, J.) ("**Grumman Olson-District**") (finding due process concerns made bar of successor liability unenforceable against claimants who were unknown, future, claimants at the time of the sale) (collectively, the "**Grumman Olson Decisions**").

[204]   *See* Day 1 Arg. Tr. at 15, 20, 21.

ruling the first time.  Granting any more than that would favor the Plaintiffs with an

outcome that the Court has already determined is contrary to existing law, and would

grant them a wholly inappropriate windfall.

Like the other Economic Loss Plaintiffs (and for that matter, the Pre-Closing

Accident Plaintiffs), if the Used Car Purchasers made arguments at this time that were

not previously raised, the Court believes that it would be obligated to consider those

arguments now, and effectively give Used Car Plaintiffs a do-over.  But once again like

the other Plaintiffs, the Used Car Plaintiffs have identified no arguments they might have

made that others did not.  As with the other Plaintiffs, the denial of notice gave them the

chance to be heard on the merits at a later time, but not to an automatic win.

Second (assuming *arguendo* that they were injured), the Used Car Owners were

injured as the successors in ownership to individuals or entities who had been the prior

owners of their Old GM cars.  And for each of them, an earlier owner was in the body of

owners of Old GM vehicles who were bound by the Free and Clear Provisions.  With

exceptions not applicable here (such as holders in due course of negotiable instruments),

the successor in interest to a person or entity cannot acquire greater rights than his, her, or

its transferor.[205]  That is the principle underlying the *Wagoner* Rule,[206] which, while an

amalgam of state and federal law, is firmly embedded in the law in the Second Circuit.[207]

---

[205]   *See Tital Real Estate Ventures, LLC v. MJCC Realty L.P. (In re Flanagan)*, 415 B.R. 29, 42 (D.
Conn. 2009) (Underhill, J.) ("In acquiring the estate's rights and interests . . . Titan [the acquiror
from a trustee] acquired no more and no less than whatever rights and interests to MJCC and its
properties the estate possessed at the time of the assignment . . . Titan can only prevail on its
claims if, and to the extent that, the Trustee would have prevailed on those claims at the time of
the assignment.").

[206]   *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991) ("**Wagoner**").

[207]   *See, e.g., Buchwald v. The Renco Group, Inc. (In re Magnesium Corp. of America)*, 399 B.R. 722,
757 nn. 113 & 114 (Bankr. S.D.N.Y. 2009) (Gerber, J.) (applying *Wagoner* Rule to hold chapter 7

And that principle has likewise been applied to creditors seeking better treatment than the assignors of their claims.[208] Thus it is not at all surprising to this Court that in *Old Carco*,[209] Judge Bernstein blocked the suits by those who bought *used* 2005 and 2006 Dodge Durangos or Jeep Wranglers,[210] distinguishing *Grumman Olson-Bankruptcy* on the ground that those plaintiffs "*or their predecessors (the previous owners of the vehicles)* had a pre-petition relationship with Old Carco, and the design flaws that they now point to existed pre-petition."[211]

Thus the caselaw requires that New GM receive the same protection from Used Car Owners' successor liability claims that it had from their assignors'.

The Used Car Purchasers' contention that they deserve better treatment than other GM vehicle owners is also illogical and unfair. As New GM argues, with considerable force, "an owner of an Old GM vehicle should not be able to 'end-run' the applicability of the Sale Order and Injunction by merely selling that vehicle after the closing of the 363 Sale . . . if the Sale Order and Injunction would have applied to the original owner who purchased the vehicle prior to the 363 Sale, it equally applies to the current owner

---

trustee to *in pari delicto* defenses applicable to the corporation and its management whom the trustee replaced).

[208] *See In re KB Toys, Inc.*, 736 F.3d 247, 252-54 (3rd Cir. 2013) ("**KB Toys**") (a trade claim that was subject to disallowance in the hands of the original claimant as a preferential transfer was similarly disallowable in the hands of a subsequent transferee). Like the Third Circuit in *KB Toys, see id.* at 254 n.11, the Court has considered, but declined to follow, the contrary holding in *Enron Corp. v. Springfield Assocs. (In re Enron Corp.)*, 379 B.R. 425 (S.D.N.Y. 2007) (Scheindlin, J.) ("**Enron-District**"), which had held that susceptibility for equitable subordination and claims disallowance would continue if a transfer was by way of an "assignment," but not by "sale." The Third Circuit in *KB Toys* court found this distinction to be "problematic," *id.*, and for that reason and others, it followed the contrary decisions in *Enron Corp. v. Avenue Special Situations Fund II, LP (In re Enron Corp.)*, 340 B.R. 180 (Bankr. S.D.N.Y. 2006) (Gonzalez, J.) ("**Enron-Bankruptcy**") (which the *Enron-District* court had reversed), and in *In re Metiom, Inc.*, 301 B.R. 634 (Bankr. S.D.N.Y. 2003) (Drain, J.), with which this Court, like the Third Circuit, agrees.

[209] *See* n.157 *supra.*

[210] *See Old Carco*, 492 B.R. at 399.

[211] 492 B.R. at 403 (emphasis added).

-88-

who purchased the vehicle after the 363 Sale."[212]  There is no basis in logic or fairness

for a different result.

For all of these reasons, the Court concludes, after what is effectively *de novo*

review (focused on the non-showing by Used Car Purchasers of anything they might have

argued to defeat the Free and Clear Provisions beyond anything previously argued), that

Used Car Purchasers have likewise failed to make a showing of prejudice, and the Free

and Clear Provisions stand for them as well.

6.  *Application of Those Principles
to Pre-Closing Accident Plaintiffs*

Like the Economic Loss Plaintiffs whose claims the Court just addressed, the Pre-

Closing Accident Plaintiffs seek to impose successor liability on New GM.  But though

the Court has found that they did not get the notice due process requires, they were not

prejudiced by the failure.

Preliminarily, the Court's determination that the Economic Loss Plaintiffs were

not prejudiced by the Free and Clear Provisions applies equally to the Pre-Closing

Accident Plaintiffs.  The Pre-Closing Accident Plaintiffs likewise have offered no

arguments here as to why the Court's earlier order proscribing successor liability was

wrong.  And it requires no speculation here for the Court again to find no basis for a

different legal result.  In fact, many of the objectors whose contentions the Court rejected

back in 2009 were asserting the exact same types of claims the Pre-Closing Accident

Plaintiffs have—claims for injury or death from pre-closing accidents, involving vehicles

or parts manufactured by Old GM.  While the Pre-Closing Accident Plaintiffs' claims

(premised upon actual injury or death, and, at least allegedly, from the safety risk of

---

[212]      *See* New GM Opening Br. at 66.

09-50026-reg   Doc 13109   Filed 04/19/15   Entered 04/19/15 15:54:22   Main Document
Pg 94 of 138

which Old GM was aware), might be regarded by many as more sympathetic than those of Economic Loss Plaintiffs, they nevertheless are efforts to impose successor liability. And contentions that the Pre-Closing Accident Plaintiffs would successfully impose successor liability by reason of political concerns are once again speculative, just as the similar arguments of the Economic Loss Plaintiffs were.

The arguments as to Sale Order breadth that the Economic Loss Plaintiffs might have asserted would not be relevant to the Pre-Closing Accident Plaintiffs.  To the extent the Sale Order was overbroad, it was so as to any claims that might arise *solely by reason of New GM's conduct*.  The Pre-Closing Accident Plaintiffs suffered the injury or death underlying their claims in Old GM cars, and with Old GM parts.  Any actionable conduct causing that injury or death took place before the 363 Sale—and necessarily was by Old GM, not New GM, and indeed before New GM could have done anything wrong.

If the overbreadth objection were sustained and the Sale Order could be, and were, fixed (a matter addressed in Section II below, dealing with Remedies), the Pre-Closing Accident Plaintiffs still could not assert claims against New GM.

The Pre-Closing Accident Plaintiffs did not suffer the prejudice that is an element to a denial of due process claim.

### 7.  *Application to Filing of Claims*

Much of the analysis above applies equally to the allowance of claims.  But due process analysis in the claims allowance context must take into account two differences.  First, here there was not the same degree of urgency with respect to the deadline for filing claims.  And second, while prejudice is required in the claims context as well, the denial of the opportunity to file a timely proof of claim—and with it, the likely or certain expungement of one's claim—is at least generally, if not always, classic prejudice.

As noted above, due process analysis requires the consideration of the surrounding circumstances. While the need for urgency in a judicial process is the paradigmatic example of a relevant circumstance, the converse is also true. When the urgency is lacking, the hugely important factor of impracticality by reason of time constraints drops out of the picture. In contrast to the 363 sale process, claims could be (and ultimately were) considered in a less hurried fashion.

Nevertheless, were it not for the fact that Ignition Switch Defects were known claims (for reasons discussed in Section I(A)(5) above), service of notice of the Bar Date by the publication that here was utilized[213] would still be adequate. Old GM was careful to send out notice of the Bar Date to any who had brought suit against Old GM or expressed to Old GM their belief that they might have claims, and the Court approved Old GM's proposals for notice by publication to those not known by Old GM to have potential claims against the Old GM estate.

But with respect to the allowance of claims, the failure to send out Ignition Switch Defect recall notices, much more clearly than with respect to notice of the 363 Sale, resulted in the denial of the notice that due process requires. And though a showing of prejudice here too is required, the Court finds that the denial of timely notice of the Old

---

[213]    The Plaintiffs seek to compare and contrast the highly detailed and carefully structured publication notice that this Court authorized with respect to worker claims that might have arisen by reason of their exposure to the chemical diacetyl, in another case on the Court's watch, *Chemtura* (No. 09–11233 (reg)), where a challenge to the adequacy of the notice was rejected by this Court and later affirmed on appeal. *See Gabauer v. Chemtura Corp. (In re Chemtura Corp.),* 505 B.R. 427 (S.D.N.Y. 2014) (Furman, J.). The comparison is not an apt one. There, as a result of a shared desire of the debtor and the Court to provide the best notice possible to workers who might have been exposed to diacetyl (and because Chemtura wanted to lean over backwards to get a discharge of such claims on which it could rely), the Court established special measures, such as notices with an unusually detailed discussion of the possibility of illness, postings of notices in each potentially affected plant, notices in local community newspapers, and publication in both English and Spanish. But these measures are properly thought of as "best practices," or at least an excess of caution, which would not establish a minimum standard for the quality of notice that is constitutionally required.

GM Bar Date prejudiced the Plaintiffs with respect to any claims they might have filed against Old GM.

By reason of its failure to provide the Plaintiffs with either the notice required under the Safety Act or any other form of written notice, Old GM failed to provide the Plaintiffs with the notice that due process requires.[214]  And because that failure prejudiced them in filing timely claims, the Plaintiffs were prejudiced as a result.  The failure to give the Plaintiffs the notice that due process requires, coupled with the prejudice to them that resulted, denied the Plaintiffs the requisite due process.

## II.

## Remedies

The second threshold issue requires the Court to determine the appropriate remedies for any denials of due process that the Court may have found.  Once again, the Court focuses on the Sale Order and claims allowance process separately.

## A.

## The Sale Order

The Plaintiffs argue that the Court should simply deny New GM enforcement of the Sale Order "as to the objecting claimant[s] who did not receive due process,"[215] (*i.e.*, as to *them*), even with respect to the same successor liability as to which the Court ruled against others who got notice and argued against it.  They argue, in substance, that they

---

[214]    The Court does not need to decide, and does not decide (in either this context or in the context of the adequacy of notice of the 363 Sale), a matter also debated by the parties—the extent to which a detailed notice describing the types of claims Plaintiffs might assert (or, by analogy, of how they might be adversely affected by the Free and Clear Provisions) was required as a matter of due process law.  Because Old GM failed to send out *any* recall notices, or provide *any* alternative form of notice to those with Ignition Switch Defects, whatever, the degree of detail that might otherwise be required is academic.

[215]    Pl. Br. at 62.

should be permanently absolved from the Sale Order's Free and Clear Provisions irrespective of whether those provisions were right or wrong. Not surprisingly, the Court rejects this contention.

By the same token, New GM argues that the Plaintiffs' remedy, if any, is to enforce their claims against the proceeds of the 363 Sale, and that the unitary nature of the Sale Order requires that the Court either enforce it as a whole or vacate it as a whole—while also reminding the Court (though the Court need hardly be reminded) that unwinding the sale at this point is unthinkable. Though these contentions are not as offensive as the Plaintiffs', these too are flawed.

Like the Due Process issue, the Court analyzes the Remedies issue in ways materially different than the parties here do—in accordance with the discussion that follows.

### 1. *Prejudice As Affecting Remedy*

For reasons discussed above,[216] the Court has already rejected the Plaintiffs' contention that prejudice is irrelevant to the existence of a due process violation resulting from a denial of the requisite notice. That limits, though it does not eliminate, the matters for which a remedy must be crafted.

Here the Plaintiffs failed to receive notice they might have used to join others likewise arguing against the Free and Clear Provisions. But the others made those points, and made them well. And while the prejudice analysis might be different if the Plaintiffs now identified successor liability points others failed to make, here no such points have

---

[216]     *See* page 71 & nn.162 through 165 *supra*.

been identified.  On the Free and Clear Provisions barring successor liability, there is no

prejudice; thus no due process claim; and thus nothing to remedy.[217]

But on the Plaintiffs' second principal matter of concern—the overbreadth of the

Sale Order—the situation is different.  There is a flaw in the order, protecting New GM

from liability on claims that, while they involve Old GM vehicles or Old GM parts, do

not rest on successor liability, and instead rely on New GM's alleged wrongful conduct

alone.  The Plaintiffs could have made overbreadth arguments if given appropriate notice

before the 363 Sale hearing, and to that extent they were prejudiced.  And for that the

Plaintiffs should be entitled to remedial relief to the extent the law otherwise permits.

### 2. *Attaching Claims to Sale Proceeds*

So it is necessary then to turn to New GM's points.  In several respects, New GM

is right, but in material respects New GM extends existing law too far, or fails to

recognize the holdings or implications of existing precedent.

Over-extension of existing law is the problem with respect to New GM's first

point: its contention that the Plaintiffs' claims should attach to the 363 Sale Proceeds.

That often works fine; courts routinely provide that upon sales of estate property subject

to a lien, the rights of parties with liens on the collateral that was sold attach to the

---

[217]    Even if prejudice did not need to be found as an element of a claim of denial of due process in the first place, prejudice would nevertheless be a critical element in determining the proper remedy. As noted above, the Court believes that the methodology for the correction of a denial of an opportunity to be heard in a sale order context should be (1) at least temporarily relieving an adversely affected litigant of the effect of the order, and then (2) giving the adversely affected litigant the opportunity to be heard that was previously denied—repairing any damage that might have resulted from an incorrect or incomplete ruling the first time.  Apart from the unfairness of treating the Plaintiffs better than others similarly situated, granting them any more than that would favor the Plaintiffs with an outcome that the Court has already determined is contrary to existing law, and grant them a wholly inappropriate windfall.

proceeds instead.[218]  And since the secured component of a claim protected by a lien

cannot exceed the value of the collateral, that will typically eliminate any prejudice to the

lien creditor.  That was the situation in *Edwards*, which (because it involved a lien)

reached the right bottom line.  But as this Court noted above,[219] the claims and interests

proscribed by a sale order can go beyond mere liens, and New GM's analysis can work

only for liens—or, perhaps, any similar interests whose value is capped by the value of

collateral being sold.  If another kind of interest was impacted—as it has been here—a

different remedy must be considered.

New GM's second point (that the Sale Order cannot be vacated or modified at this

late point in time) breaks down into several distinct, but related, points—raising issues of

bankruptcy policy and the finality of judicial sales; of due process law; and of respect for

the nonseverability provisions in orders upon which many rely.  Each raises matters of

legitimate concern from New GM's perspective.  But they can be taken only so far.

### 3. *Protection of Purchasers of Estate Assets*

New GM points out that the buyers of assets from chapter 11 estates acquire

property interests too—as recognized by the Seventh Circuit in *Edwards*[220]—and that

taking away those purchasers' contractually bargained-for rights strikes at the heart of

understandings critically important to the bankruptcy system.  In this respect, New GM is

---

[218]  In fact, the Court did exactly that at the time of the 363 Sale, with respect to lenders (the "**TPC Lenders**") who had liens on a transmission manufacturing plant in Maryland, and a service parts distribution center in Tennessee, that went over to New GM in the Sale.  *See In re Motors Liquidation Co.,* 482 B.R. 485, 487 (Bankr. S.D.N.Y. 2012) (Gerber, J).  After a series of negotiations, the TPC Lenders and Old GM agreed to protective provisions under which the proposed sale could go through while protecting the TPC Lenders' lien rights.  The two properties were sold free and clear of liens; cash proceeds were put into an escrow account, to which the TPC Lenders' liens would attach; and the Court later ruled on valuation issues that would determine the TPC Lenders' monetary entitlement.

[219]  *See* page 54 et seq. & n.123, *supra*.

[220]  *See* nn.69 & 123 *supra*.

right.  The Second Circuit has repeatedly recognized the importance to the bankruptcy

system of concerns before the Court here.  In one instance, the Circuit observed that

"[w]e have long recognized the value of finality in judicial sales."[221]  In another, the

Circuit affirmed a District Court judgment dismissing successor liability claims after a

bankruptcy sale, observing that:

> Allowing the plaintiff to proceed with his tort claim
> directly against [the asset purchaser] would be
> inconsistent with the Bankruptcy Code's priority
> scheme because plaintiff's claim is otherwise a low-
> priority, unsecured claim.  Moreover, to the extent
> that the "free and clear" nature of the sale (as
> provided for in the Asset Purchase Agreement
> ("APA") and § 363(f)) was a crucial inducement in
> the sale's successful transaction…it is evident that
> the potential chilling effect of allowing a tort claim
> subsequent to the sale would run counter to a core
> aim of the Bankruptcy Code, which is to maximize
> the value of the assets and thereby maximize
> potential recovery to the creditors.[222]

For all of these reasons, if it were not for the fact that the Plaintiffs' claim is a

constitutional one, the Court would decline to deny enforcement of the Sale Order, in

whole or in part.  There is no good reason to give creditors asserting successor liability

claims recovery rights greater than those of other creditors.  And as importantly or more

so, the interests inherent in the enforceability of 363 orders (on which the buyers of assets

---

[221]    *Licensing by Paolo, Inc. v. Sinatra (In re Gucci),* 126 F.3d 380, 387 (2d Cir. 1997) ("**Gucci**").

[222]    *Douglas v. Stamco,* 363 Fed. Appx. 100, 102 (2d Cir. 2010) (summary opinion, Katzmann,
Walker, and Feinberg, C.JJ.) (quoting *In re Trans World Airlines, Inc.,* 322 F.3d 283, 292 (3d Cir.
2003) ("To allow the [plaintiff] to assert successor liability claims against [the purchaser] while
limiting other creditors' recourse to the proceeds of the asset sale would be inconsistent with the
Bankruptcy Code's priority scheme.")) (citation, and footnote reference explaining why "free and
clear" nature of the sale was an inducement there, omitted).

should justifiably be able to rely,[223] and on which the interests of creditors, keenly

interested in the maximization of estate value, likewise rest) are hugely important.[224]

  4.   *Effect of Constitutional Violations*

But we here have a constitutional violation—a denial of due process.  In such an

instance, the Court must then determine whether doctrine that would bar modification of

the Sale Order under less extreme circumstances has to give way to constitutional

concerns.  The Court concludes that it must.

New GM has called the Court's attention to two decisions in which courts

declined to grant relief from sale orders where those seeking the relief received

---

[223]   *See, e.g.*, *In re Lehman Bros. Holdings Inc.*, 445 B.R. 143 (Bankr. S.D.N.Y. 2011) (Peck, J.) ("**Lehman**"), *aff'd in part and rev'd in part on other grounds*, 478 B.R. 570 (S.D.N.Y. 2012), *aff'd*, 761 F.3d 303 (2d Cir. 2014).  As Judge Peck observed in *Lehman*, declining to grant Rule 60(b) relief as to a sale order even though significant information was not provided to him (and even while recognizing that sale orders are not exempt from Rule 60(b) relief when cause is shown):

> This tension relating to finality naturally exists to some extent in every motion under Rule 60(b) but the Court views final sale orders as falling within a select category of court order that may be worthy of greater protection from being upset by later motion practice.  Sale orders ordinarily should not be disturbed or subjected to challenges under Rule 60(b) unless there are truly special circumstances that warrant judicial intervention and the granting of relief from the binding effect of such orders.

*Id.* at 149.

[224]   There is also a policy concern, though the Court does not suggest that a policy concern could trump the requirements of law, or, especially, parties' constitutional rights.  But those in the bankruptcy community would instantly understand it.  As the court noted in *In re White Motor Credit Corp.*, 75 B.R. 944, 951 (N.D. Ohio 1987):

> The effects of successor liability in the context of a corporate reorganization preclude its imposition.  The successor liability specter would chill and deleteriously affect sales of corporate assets, forcing debtors to accept less on sales to compensate for this potential liability.  This negative effect on sales would only benefit product liability claimants, thereby subverting specific statutory priorities established by the Bankruptcy Code.  This result precludes successor liability imposition.

inadequate notice. [225]  But in each case the party seeking the relief was found not to have

been materially prejudiced or prejudiced at all.  New GM has not called the Court's

attention to any case in which an order was found to have been entered with a prejudicial

denial of due process and the court nevertheless denied relief. [226]  By contrast, the

Plaintiffs have called the Court's attention, and/or the Court has found, six decisions—

including two by the Second Circuit—modifying, or declining to enforce as against

adversely affected parties, earlier orders in instances where those parties were denied due

process and also prejudiced thereby.[227]

---

[225]     *See Edwards*, n.69, and *Paris Industries*, n.123 *supra*.

[226]     In its reply, New GM calls the Court's attention to the Supreme Court's decision in *Factors' & Traders Ins. Co. v. Murphy*, 111 U.S. 738 (1884) ("***Factors'***"), a case in which one of the several noteholders of four notes secured by a common mortgage failed to get notice of a free and clear sale, and the Court determined that the choices there were to either uphold a free and clear sale order in full or wholly invalidate it.  *See* New GM Reply Br. at 46.  It is true that the Court there saw those two options as the only fair alternatives.  But the Court's ruling was to that effect not because of a holding that courts lack the power to more selectively enforce orders where a person is denied notice, but because doing so under the facts there (where the party not given notice would get a leg up over her fellow noteholders) would be unfair to the other noteholders, invalidating their liens while upholding only hers.  *Factors'* thus does not support New GM's position in the respect for which it was cited.  It does, however, support New GM in a different, and ultimately more important, respect—New GM's point that the Plaintiffs cannot secure relief based on a lack of notice alone, without showing prejudice.  *Factors'* evidences courts' reluctance to grant windfalls to those who claim to have received deficient notice, and their concern instead with a fair result.

[227]     *See Manville-2010*, n.69 *supra*, 600 F.3d at 153-54 (after ruling that due process was denied, ruling that an adversely affected insurer was not bound by an earlier bankruptcy court order); *Koepp*, n.69 *supra*, 593 Fed. Appx. 20 (ruling that easement holder was not deprived of her interest when her predecessor was not given notice of a railroad reorganization consummation order that extinguished the predecessor's interest); *Doolittle v. Cnty. of Santa Cruz (In re Metzger)*, 346 B.R. 806, 819 (Bankr. N.D. Cal. 2006) (Weisbrodt, J.) ("***Metzger***") (finding sale order void to the extent (but only the extent) it affected the rights of an entity with an interest in the sold property that did not receive due process); *In re Polycel Liquidation, Inc.*, 2006 Bankr. LEXIS 4545, at *25-26, 31-34, 2006 WL 4452982, at *9, 11-12 (Bankr. D.N.J. Apr. 18, 2006) ("***Polycel-Bankruptcy***") (Lyons, J.) (after ruling that due process to an entity was denied by reason of failure to provide notice, voiding sale to extent, but only the extent, that it conveyed that entity's property), *aff'd*, 2007 U.S. Dist. LEXIS 955, 2007 WL 77336 (D.N.J. Jan. 8, 2007) ("***Polycel-District***") (Cooper, J.) (holding, *inter alia*, that Bankruptcy Court was not bound to either void the sale or let the sale stand); *Compak Cos., LLC v. Johnson*, 415 B.R. 334, 342 (N.D. Ill. 2009) ("***Compak***") (holding that patent licensors' interests could not be extinguished by a sale order without due process, notwithstanding *Edwards*, given that the lienholder in *Edwards* had suffered only a trivial loss of interest); *Grumman Olson-Bankruptcy*, 445 B.R. 243, *aff'd* 467 B.R.

The latter decisions reached those results by varied means (and some with reference to Fed.R.Civ.P. 60(b) and some without it), but they all came to the same bottom line. They relieved the adversely affected party of the effects of the order insofar as it prejudiced that party. New GM insufficiently recognizes the significance of those decisions.

The decision most closely on point is *Metzger*. There the debtor in a chapter 11 case owned land to be later developed for the construction of townhouses that was subject to a deed restriction entered into with the county under which four of the units later to be constructed had to be sold at below market rates. The debtor sold the property under a free and clear order in 1992, but without notice to the county. In 2006, 14 years after the court issued the sale order, the purchaser's successor found itself in a dispute with the county over the continuing validity of the restriction, and sought to enforce the free and clear provisions. As here, the county contended that it could not be bound by the free and clear provisions, because it was not given notice of the hearing at which the sale was approved.[228]

On those facts, the *Metzger* court ruled, under Fed. R. Civ. P. 60(b),[229] that the order was "void as to the County's interest."[230] It continued:

> The Court has some flexibility in creating a remedy here and need not and will not find the entire sale void on these facts. The Court need only find, and does find, that the County's interest in the Property survived the sale to [the purchaser]. The 1992 Sale

---

694, 706-07 (finding due process concerns made bar of successor liability unenforceable against claimants who were unknown, future, claimants at the time of the sale).

[228] *See* 346 B.R. at 809-10.

[229] With exceptions not applicable here, Rule 60(b) applies in cases under the Bankruptcy Code under Fed. R. Bankr. P. 9024.

[230] *Id.* at 819.

-99-

Order is to that limited extent void because the
County's due process rights were violated.[231]

Addressing remedy in the same fashion are the Bankruptcy Court and District

Court decisions in *Polycel*.  There the debtor sold its property (or what it said was its

property) free and clear, in a 363 sale.  The property assertedly conveyed to the buyer

included commercial molds used in the manufacture of prefabricated panels used to form

the interior surface of inground swimming pools.  But a third party, Pool Builders Supply

of the Carolinas ("**Pool Builders Supply**"), which without dispute was not given notice

of the sale, and which contended that it was the true owner of the molds, sought relief

from the sale order asserting that its property was taken without due process.

The Bankruptcy Court granted relief under Rule 60(b), voiding the sale order as to

Pool Builders Supply alone (keeping the remainder of the sale order intact), and the

Bankruptcy Court's determination was affirmed on appeal.  The *Polycel-Bankruptcy*

court balanced the competing concerns of bankruptcy court finality and due process

requirements, and concluded that the latter should prevail.  Disagreeing with so much of

*Edwards* that considered that the interests of finality to outweigh the due process

concerns, the *Polycel-Bankruptcy* court stated:

> This court is inclined to disagree with the reasoning
> of the Seventh Circuit, and instead follows the more
> persuasive line of cases that recognize the
> importance of affording parties their due process
> rights over the interest of finality in bankruptcy
> sales.
>
> Although this court agrees that the interest of
> finality is an important part of ensuring
> participation in bankruptcy sales, this cannot trump

---

[231]     *Id.* (citations omitted).

09-50026-reg   Doc 13109   Filed 04/19/13   Entered 04/19/13 15:58:22   Main Document
Pg 106 of 138

> constitutionally mandated due process requirements
> for notice and an opportunity to be heard.[232]

Addressing the Remedies issue in the same fashion is *Compak.* There, a suit over patent infringement and the entitlement to patent royalties turned on whether a patent license could be extinguished in a 363 sale of all of the debtor's assets. A sublicensee of the patent rights was not given notice of a 363 sale that would extinguish the sublicensee's claims.[233] After discussion of the prejudice the sublicensee suffered, and distinguishing *Edwards* because of the much greater "interests at stake," the *Compak* court concluded that "the Sale Order is 'void' insofar as it purports to extinguish the defendants' license." [234]

In the *Grumman Olson Opinions,* Judges Bernstein and Oetkin dealt with a factual variant of the 363 sale order cases discussed above. Those decisions, unlike those previously discussed, did not involve individuals who were supposed to get notice but didn't get it, but rather people who the debtor *could not have given notice to*, because they did not have claims or interests yet.

There certain of the assets of the debtor Grumman Olson, a manufacturer of truck bodies that were installed in complete vehicles, had been sold in a 363 sale with protection against successor liability claims. Prior to its bankruptcy, Grumman Olson sold a truck body that was incorporated into a vehicle sold to Federal Express; years later (long after the sale), a FedEx employee was injured when the FedEx truck she was driving hit a telephone pole, and she and her husband (who joined in the lawsuit) sued the asset purchaser under successor liability doctrine. For obvious reasons (as they had no

---

[232]    2006 Bankr. LEXIS 4545, at *30, 2006 WL 4452982, at *10-11 (citations omitted).

[233]    *See* 415 B.R. at 337.

[234]    *See id.* at 342-43.

contact with the debtor prior to the sale), the woman and her husband were not known to the debtor at the time of the sale and received no notice of the sale hearing.  Judge Bernstein ruled that they did not have claims (as they had not yet suffered injuries before the sale, and had no earlier contact with the debtor), but his more important conclusion for our purposes was that they could not be bound by the sale order.  He concluded that "the Sale Order does not affect their rights to sue [the purchaser]."[235]  He did so without resort to Rule 60(b), and without invalidating the sale order as to anyone else or in any other respect.

The Second Circuit has twice addressed these issues in ways relevant here, though in situations not quite as similar to those addressed above.  In *Manville-2010*, the Circuit considered the effect of a denial of due process in connection with a bankruptcy court order—though not in connection with a sale order, or, of course, one with free and clear provisions.  Though most of the details of that fairly complex controversy need not be discussed here, *Manville-2010* is important for the Circuit's conclusion as to the appropriate remedy after it found a due process violation.

There the debtor Manville, which had been subject to massive liabilities resulting from its manufacture of asbestos (and whose insurance policies, notwithstanding coverage disputes, were its most valuable asset), entered into a series of settlements and settlement clarifications in the 1980s with a group of its insurers, including Travelers, its primary insurer, which were approved by Bankruptcy Court orders.[236]  Under the settlement documents, in exchange for sizable contributions to a settlement fund, the insurers were relieved of all obligations related to the disputed policies, and the insurers

---

[235]     445 B.R. at 254.

[236]     *See* 600 F.3d at 138-39.

would be protected from claims based on such obligations by bankruptcy court injunctive orders. By bankruptcy court orders entered in 1986, claims related to the policies were channeled to a trust created for addressing Manville's liabilities, and injunctive orders implemented broad releases protecting the settling insurers on "Policy Claims"—defined as "any and all claims . . . by any Person . . . based upon, arising out of or related to any or all of the Policies" at issue in the settlement.[237]

But another insurer, Chubb, was not a party to the settlements approved in the 1980s,[238] and had not received notice then that its own claims would be (or at least could be) enjoined too. Chubb thus argued that it could not, as a matter of due process, be bound by the 1986 Orders' terms.[239]

For reasons unnecessary to discuss here, the Circuit agreed that Chubb had been denied due process. But it did not vacate the 1986 Orders in their entirety. It held simply that "[u]nder the unique circumstances of this case, there can be little doubt that the publication notice employed by the bankruptcy court in 1984 was insufficient to bind Chubb to the 2004 interpretation of the 1986 Orders."[240]

The *Manville-2010* court did not invoke Rule 60(b) in support of its decision, or even mention it. Nor did it expressly discuss whether orders could be invalidated only in part by reason of a denial of due process. But *Manville-2010* necessarily must be read as having concluded that after a denial of due process prejudicing only a single party (even if the order affects other parties, and affecting those other parties is unthinkable), the

---

[237]    *Id.* at 139.

[238]    *Id.* at 143.

[239]    *See id.* at 148.

[240]    *Id.* at 157; accord *id.* at 158 ("Chubb is therefore not bound by the terms of the 1986 Orders. Consequently, it may attack the Orders collaterally as jurisdictionally void. And, as we held in *Manville III,* that attack is meritorious.").

partial denial of enforcement of that order, insofar as it binds that party alone, is permissible.

To the same effect is the Circuit's decision in *Koepp*,[241] which, while a Summary Order not binding on the lower courts in the Second Circuit, further evidences the Circuit's thinking on whether orders can be less than fully enforced without wholly vacating them. *Koepp*, unlike *Manville-2010*, involved a free and clear order. As relevant here, the Circuit considered a party's claim to easements on land conveyed to a reorganized company (in a § 77 railroad reorganization under the now superseded Bankruptcy Act) under a reorganization plan with free and clear provisions not materially different than those in the Free and Clear order here. Notice had not been given to the easement owner's predecessor when the reorganization plan had been approved, and for that reason, the Circuit concluded that the District Court correctly ruled that the railroad reorganization consummation order (analogous to a confirmation order under present law) did not extinguish the easements. Once again, the Circuit did not invoke Rule 60(b), nor did it invalidate the consummation order. It simply declined to find the free and clear provisions enforceable against the adversely affected party.

New GM points out, in this connection, that Rule 60(b) provides that a court "may relieve a party … from a final judgment, order or proceeding" for the reason, among others, that "the *judgment* is void,"[242] and does not speak of relieving parties from *provisions within* judgments or orders—*i.e.*, a partial invalidation. And New GM further points out that the Sale Order expressly provided that it was not severable, and that this was a material element of the understanding under which it acquired Old GM's assets,

---

[241]     593 Fed. Appx. 20.

[242]     Fed. R. Civ. P. 60(b) and 60(b)(4).

and took on many, but not all, of Old GM's liabilities.  For that reason, New GM argues
that the Court can only void the Sale Order in its entirety (which obviously is not an
option here) or enforce the sale order as written.  In an ordinary situation—one not
involving a denial of due process—the Court would agree with New GM; the Court well
understands how 363 sale agreements and sale orders are carefully drafted, and how the
buyers of assets contemplate taking on certain identified liabilities, but no more.  But here
failures of notice gave rise, in part,[243] to denials of due process, and that distorts the
balancing under which concerns of predictability and finality otherwise prevail.

In each of *Manville-2010, Koepp, Metzger, Polycel-District, Polycell-Bankruptcy,
Compak,* and the two *Grumman Olson Opinions,* after they found what they determined
to be denials of due process, the courts granted what in substance was a partial denial of
enforcement of the order in question—either by invocation of Rule 60(b) in some fashion
(finding the order void only to a certain extent, or as to an identified party)[244] or without
mentioning Rule 60(b) at all.[245]  In *Polycel-Bankruptcy,* for instance, the Bankruptcy
Court concluded, after its 60(b) analysis, "*[t]o that extent,* the Sale Order is void…."[246]
In *Manville-2010*, the Circuit found the earlier order unenforceable against Chubb
without mention of Rule 60(b) at all.  Though they reached their bottom lines by different

---

[243]     It will be remembered that the Plaintiffs were denied due process only with respect to the Sale
          Order's overbreadth.  They were not prejudiced with respect to the Free and Clear Provisions, and
          cannot claim a denial of due process, or, of course a remedy, with respect to those.

[244]     *See Metzger*, 346 B.R. at 816; *Polycel-District*, 2007 WL 77336, at *9, 2007 U.S. Dist. LEXIS
          955, at *28; *Polycel-Bankruptcy*, 2006 WL 4452982, at *1, 6-8, 11, 2006 Bankr. LEXIS 4545, at
          *1-2, 17-26, 31-34; *Compak*, 415 B.R. at 341.

[245]     *See Manville-2010*, 600 F.3d at 153-54; *Koepp*, 593 Fed. Appx. at 23; *Grumman Olson-
          Bankruptcy*, 445 B.R. at 245, 254-55 (considering ability of purchaser's successor after a 363 sale
          to enforce sale order against one injured after the sale, without reference to Rule 60(b)); *Grumman
          Olson-District*, 467 B.R. at 696, 699-700 (affirming *Grumman Olson-Bankruptcy*, and likewise
          not relying on Rule 60(b)).

[246]     2006 WL 4452982, at *12, 2006 Bankr. LEXIS 4545, at *34 (emphasis added).

paths, the takeaway from those cases—especially in the aggregate—is effectively as stated by the Bankruptcy Court in *Metzger*—that "[t]he Court has some flexibility in creating a remedy here and need not . . . find the entire sale void on these facts," and that the sale order was "to that limited extent void."[247]

For that reason, New GM's point that the Sale Order provided that it was a unitary document, and that the Free and Clear Provisions could not be carved out of it, cannot be found to be controlling once a court finds that there has been a due process violation. If a court applies Rule 60(b) analysis, and determines, as in *Metzger* and *Polycel-Bankruptcy*, that a sale order can be declared void to a "limited extent," the provisions providing for the sale order's unitary nature fall along with any other objectionable provisions. And if a court considers it unnecessary even to rely on Rule 60(b) at all (as in *Manville-2010* and *Koepp*), it can selectively decline enforceability as the Circuit did in those cases.

## 5. Remedies Conclusion

For these reasons, the Court concludes that—as in *Manville-2010*, *Koepp*, and the lower court cases—it can excuse the Economic Loss Plaintiffs[248] from compliance with elements of the Sale Order without voiding the Sale Order in its entirety. And the Court further concludes that on the narrow facts here—where the reason for relief is of constitutional dimension—the nonseverability provisions of the Sale Order do not bar such relief.

---

[247]    346 B.R. at 819.

[248]    It will be recalled that this applies only to the overbreadth objection, and thus does not benefit the Pre-Closing Accident Plaintiffs. For lack of prejudice—and any showing that either group of Plaintiffs would have successfully made any successor liability arguments that others did not make—the Free and Clear Provisions stand.

## B.

## Claims

The remedy with respect to the denial of notice sufficient to enable the filing of claims before the Bar Date is obvious. That is leave to file late claims. And the Court may grant leave from the deadline imposed by the Court's Bar Date Order, just as the Circuit relieved Chubb and the easements owner from enforcement of the earlier orders in *Manville-2010* and *Koepp*.

There is of course a separate issue as to whether the Plaintiffs should have the ability to tap GUC Trust assets that are being held for other creditors and claimants, even if later claims were allowed. But that separate issue is discussed in Section IV below.

## III.

## Assumed Liabilities

Although once regarded as important enough to be a threshold issue, determination of what liabilities New GM agreed to assume (and conversely declined to assume) is now of very little importance. The Plaintiffs have not disputed what the Sale Agreement and Sale Order say.[249] Earlier potential disputes over what they say have now been overtaken by the issues as to whether any Sale Order protections are unenforceable.

New GM is right that it expressly declined to assume any liabilities based on Old GM's wrongful conduct. But the Court's ruling that it will continue to enforce

---

[249] The GUC Trust, however, raises an issue of that character, contending, somewhat surprisingly, that New GM voluntarily assumed economic loss claims—taking on liability (beyond for death and personal injury) for "other injury to Persons" with respect to "incidents first occurring on or after the Closing Date . . . ." GUC Trust Br. at 40, citing Sale Agreement § 2.3(a)(ix). But the GUC Trust misunderstands the Sale Agreement. The language to which the GUC Trust referred did not relate to economic loss claims, but rather to death, personal injury, or property damage caused by "accidents or incidents" occurring after the Closing Date—which included, in addition to accidents, things that were similar, such as fires, explosions or a car running off the road. *See GM-Deutsch* and *GM-Phaneuf*, n.33 *supra*.

prohibitions against successor liability makes New GM's concerns as to that academic.

And to the extent, if any, that New GM might be liable on claims based solely on any

wrongful conduct on its own part (and in no way relying on wrongful by Old GM), New

GM would be liable not because it had assumed any Old GM liabilities (or was

responsible for anything that Old GM might have done wrong), but only because New

GM had engaged in independently wrongful, and otherwise actionable, conduct on its

own.

Under the circumstances, the Court need not say any more about what liabilities

New GM assumed.

## IV.
## Equitable Mootness

Understandably concerned that the successor liability claims that the Economic

Loss and Pre-Closing Accident Plaintiffs seek to saddle New GM with are still

prepetition claims—and that the Court could reason that to the extent those claims have

merit and New GM is not liable for them, *somebody* is likely to be—the GUC Trust and

its Participating Unitholders argue that tapping the recoveries of GUC Trust Unitholders

would be barred by the doctrine of Equitable Mootness.  Though the Court's original

instinct was to the contrary (and it once thought that at least partial relief might be

available), the Court has been persuaded that they are right.

## A.

## Underlying Principles

The parties do not dispute the underlying principles, nor that three holdings of the

Second Circuit largely determine the mootness issues here—the Circuit's two 1993

*Chateaugay* decisions, involving appeals by the Creditors' Committee of LTV

-108-

Aerospace[250] and creditor Frito-Lay[251] in the *LTV* chapter 11 cases, and the Circuit's

2014 *BGI* decision, involving an appeal by creditors seeking to file untimely class proofs

of claim against debtor Borders Books in the *BGI* chapter 11 cases.[252]

The mootness cases start with the proposition that while the Constitution requires

the dismissal of cases as moot whenever effective relief cannot be fashioned, the related,

prudential, doctrine of equitable mootness requires dismissal where relief *can* be

fashioned, but implementation of such relief would be inequitable.[253] The doctrine of

equitable mootness reflects the "pragmatic principle" that "with the passage of time after

a judgment in equity and implementation of that judgment, effective relief . . . becomes

impractical, imprudent, and therefore inequitable."[254] This principle is "especially

pertinent" in proceedings in bankruptcy cases, "where the ability to achieve finality is

essential to the fashioning of effective remedies."[255]

In *BGI*, the Circuit explained that:

> Equitable mootness is a prudential doctrine under
> which a district court [and by extension, any
> appellate court] may in its discretion dismiss a
> bankruptcy appeal "when, even though effective
> relief could conceivably be fashioned,
> implementation of that relief would be inequitable."
> The doctrine "requires the district court to carefully

---

[250]  *See Chateaugay I,* n.16 *supra.*

[251]  *See Chateaugay II,* n.16 *supra.*

[252]  *See BGI,* n.16 *supra.*

[253]  *See Church of Scientology v. United States*, 506 U.S. 9, 12 (1992); *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 143 (2d Cir. 2005).

[254]  *Id*. at 144 (quotations and citations omitted); *see also Alsohaibi v. Arcapita Bank B.S.C.(c) (In re Arcapita Bank B.S.C.(c))*, 2014 U.S. Dist. LEXIS 1053, at *14-15, 2014 WL 46552, at *5, (S.D.N.Y. Jan. 6, 2014) (Scheindlin, J.) ("**Arcapita Bank**").

[255]  *Chateaugay I*, 988 F.2d at 325; *see also Compania Internacional Financiera S.A. (In re Calpine Corp.)*, 390 B.R. 508, 517 (S.D.N.Y. 2008) (Marrero, J.) ("**Calpine-District**"), *aff'd by summary order*, 354 Fed. Appx. 479 (2d Cir. 2009) ("**Calpine-Circuit**").

> balance the importance of finality in bankruptcy
> proceedings against the appellant's right to review
> and relief."[256]

And the Circuit there made clear that the doctrine of equitable mootness applies to

chapter 11 liquidations as well as reorganizations.[257]

But while mootness doctrine has been applied most frequently in bankruptcy

appeals, it has broader application, including other instances likewise presenting

situations where a court has to balance the importance of finality against a party's desire

for relief. "[T]he doctrine is not limited to appeals from confirmation orders, and has

been applied in a variety of contexts, including . . . injunctive relief, leave to file untimely

proofs of claim, class certification, property rights, asset sales, and payment of prepetition

wages."[258]

In *Chateaugay II*, the Circuit held that substantial consummation of a

reorganization plan is a "momentous event," but it does not necessarily make it

impossible or inequitable for an appellate court to grant effective relief in all cases.[259]

The Circuit synthesized earlier law to say that substantial consummation will not moot an

appeal if all of the following circumstances exist:

> (a) the court can still order some effective relief;

---

[256]  772 F.3d at 107 (quoting *In re Charter Commc'ns, Inc.,* 691 F.3d 476, 481 (2d Cir. 2012) ("***Charter Communications***")) (internal quotation marks omitted).

[257]  772 F.3d at 109. *See also Schaefer v. Superior Offshore Int'l, Inc. (In re Superior Offshore Int'l, Inc.),* 591 F.3d 350, 353–54 (5th Cir. 2009) (applying equitable mootness analysis to liquidation plan).

[258]  *Arcapita Bank*, 2014 Bankr. LEXIS 1053, at *19, 2014 WL 46552, at *5.  *See also BGI*, 772 F.3d at 109 (stating that earlier cases "suggest that the doctrine of equitable mootness has already been accorded broad reach, without apparent ill effect," and citing *Arcapita Bank* approvingly for the latter's statement that the "doctrine of equitable mootness 'has been applied in a variety of contexts'").

[259]  See 10 F.3d at 952.

(b) such relief will not affect "the re-emergence of the debtor as a revitalized corporate entity";

(c) such relief will not unravel intricate transactions so as to "knock the props out from under the authorization for every transaction that has taken place" and "create an unmanageable, uncontrollable situation for the Bankruptcy Court";

(d) the "parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings," and

(e) the appellant "pursue[d] with diligence all available remedies to obtain a stay of execution of the objectionable order . . . if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from."[260]

Those five factors are typically referred to as the *Chateaugay* factors. "Only if all five *Chateaugay* factors are met, and if the appellant prevails on the merits of its legal claims, will relief be granted."[261]

## B.

## Applying Those Principles Here

Here, the parties have stipulated, and the Court has previously found, that the Plan has been substantially consummated.[262] That, coupled with the requirement that all of the *Chateaugay* factors must be shown to avoid mootness, effectively gives rise to a presumption of mootness. The Court can find that some of the *Chateaugay* factors necessary to trump that presumption have been satisfied. But the Court cannot find that they all have been.

---

[260]   *Id.* at 952-53.

[261]   *Charter Communications,* 691 F.3d at 482; *accord BGI*, 772 F.3d at 110.

[262]   Equitable Mootness Stipulated Facts ¶ 18. This Court found likewise in an earlier proceeding in Old GM's chapter 11 case, *Morgenstein)*, 462 B.R. at 501 n.36 ("[T]he Plan already has been substantially consummated"). Neither New GM nor the Plaintiffs here were parties to *Morgenstein*, and they thus are not bound by *res judicata* or collateral estoppel as to that finding. But their stipulation to substantial consummation makes those doctrines academic.

### 1. Ability to Fashion Effective Relief

The first factor that must be established in order to overcome the presumption of equitable mootness is that the Court can fashion effective relief.  Fashioning effective relief here would require two steps:

(1) allowing the Plaintiffs to file late claims, after the Bar Date; and

(2) allowing the GUC Trust's limited assets to be tapped for satisfying those claims.

The first step would not be particularly difficult.  But the second could not be achieved.  There would be two problems foreclosing the Court's ability to fashion effective relief.

First, the initial step would be effective relief for the Plaintiffs only if the second step could likewise be achieved.  And the initial step would be of value (and the second step could be achieved) only if there were assets in the GUC Trust not already allocated for other purposes (such as other creditors' not-yet-liquidated claims, or expenses of the GUC Trust), or if value reserved for others were taken away.  It is undisputed that there are no such available assets, and taking away value previously reserved for those whose claims have not yet been either allowed nor disallowed would be inequitable wholly apart from unfairness to GUC Trust investors.[263]

---

[263]     Plaintiffs' counsel acknowledged as much.  *See* Day 1 Arg. Tr. at 113:15-23 ("by the time of the recalls, by the time the plaintiffs got organized and began their litigation, by the time we were retained in this case, a substantial majority of the funds originally in the GUC Trust had been dispersed to GUC Trust beneficiaries and it would have been impossible or very close to impossible to put the ignition switch defect plaintiffs back in the same position they would have been in had they been given enough information to file a claim before the bar date.").

Old GM's plan of reorganization (which as noted was a liquidating plan), made

no distributions on claims for as long as they were disputed—not even partial

distributions with respect to any undisputed portions.  That was not unusually harsh; it is

"a regular feature of reorganization plans approved in this Court."[264]  But to ameliorate

the unfairness that would otherwise result, Old GM was required to, and did, establish

reserves sufficient to satisfy the disputed claims.

Those reserves were a point of controversy at the time of confirmation; creditors

whose claims then were disputed contended that the reserves had to be segregated.[265]

The Court overruled their objection to the extent they demanded *segregated* reserves, but

agreed that reserves had to be established, and in the full amount of their disputed

claims.[266]  Removing that protection now would be grossly unfair to holders of disputed

claims, who would have understandably expected at least the more modest protection that

they did receive.

Additionally, the terms of the Plan that provided for the reserves were binding

contractual commitments.  They could not be altered without revoking the entirety of the

Plan and Confirmation Order.[267]  But revocation of the Confirmation Order would be

impermissible under the Bankruptcy Code, which provides for such revocation only in

---

[264]    *Confirmation Decision*, 447 B.R. at 213 & n.34.

[265]    *See id.* at 216-17.

[266]    *See id.* at 217 ("While, as noted above, caselaw requires that reserves be established for holders of
disputed claims, it does not impose any additional requirement that such reserves be *segregated*
for each holder of a disputed claim."); *id.* at 50 ("[W]ithout creating reserves of some kind, I
have some difficulty seeing how one could provide the statutorily required equal treatment when
dealing with the need to make later distributions on disputed claims that ultimately turn out to be
allowed, especially in cases, like this one, with a liquidating plan.").

[267]    *See Morgenstein*, 462 B.R. at 504 ("A confirmed plan takes on the attributes of a contract . . .
modification of a contract only in part, without revoking it in whole, raises grave risks of upsetting
the expectations of those who provided the necessary assents.") (quotations omitted).

-113-

limited circumstances that are not present here.[268] For that reason or others, no party requests it.

## 2. *Effect on Re-emergence of Debtor as Revitalized Corporate Entity*

The second factor that needs to be satisfied is that granting relief would not affect the "reemergence of the debtor as a revitalized corporate entity."

Old GM became the subject of a liquidation. It will not be revitalized. To the extent (which the Court believes is minimal) that any effect on New GM by reason of tapping the GUC Trust's assets would be relevant, the Court can see no adverse effect on New GM.

This factor can be deemed to be either inapplicable or to have been satisfied.[269] Either way, it is not an impediment to relief.

## 3. *Unraveling Intricate Transactions*

The third factor is that "such relief will not unravel intricate transactions so as to 'knock the props out from under the authorization for every transaction that has taken place' and 'create an unmanageable, uncontrollable situation for the Bankruptcy Court.'"

The manageability problems would not necessarily be matters of great concern, but the Unitholders are right in their contention that granting relief here would "knock the props out" from the transactions under which they acquired their units.

---

[268]    *See* 11 U.S.C. § 1144.

[269]    *See Beeman v. BGI Creditors' Liquidating Trust (In re BGI, Inc.)*, 2013 U.S. Dist. LEXIS 77740, at *24-25 (S.D.N.Y. May 22, 2013) (Andrew Carter, J.) ("***BGI-District***") ("All parties agree the second Chateaugay factor is inapplicable because the Debtor has liquidated its assets and will not re-emerge as a new corporate entity."); *cf. BGI*, 772 F.3d at 110 n.15 ("All parties agreed that the second *Chateaugay* factor—whether such relief will "affect the re-emergence of the debtor as a revitalized corporate entity"—was inapplicable because Borders liquidated its assets and would not emerge as a new corporate entity.").

Allowing a potential $7 to $10 billion in claims against the GUC Trust now would be extraordinarily unjust for the purchasers of GUC Trust units after confirmation. With the Bar Date having already come and gone, they would have made their purchases based on the claims mix at the time—a then-known universe of claims that, by reason of then-pending and future objections to disputed and unliquidated claims, *could only go down*. Of course, the extent to which the aggregate claims would go down was uncertain; that was the economic bet that buyers of GUC Trust units made. But they could not be expected to foresee that the amount of claims would actually go *up*. They also could not foresee that future distributions would be delayed while additional claims were filed and litigated. Allowing the aggregate claims against the GUC Trust now to go up (and by $7 to $10 billion, no less) would indeed "knock the props" out of their justifiable reliance on the claims mix that was in place when GUC Trust Units were acquired.

In *Morgenstein*, certain creditors sought, after the Bar Date and Effective Date, to file and recover on a class proof of claim in an estimated amount of $180 million, "whose assertion . . . would [have been] barred under the Debtor's reorganization plan . . . and confirmation order."[270] The Court denied the relief sought on other grounds. But it noted that even though the creditors were not seeking to recoup distributions that had already been made, permitting them to proceed even against the assets remaining in the GUC Trust raised "fairness concerns."[271] And on the record then before it, the Court added that "mootness concerns may very well still exist."[272] It continued that it suspected, but was not yet in a position to find, that:

---

[270]    *Morgenstein*, 462 B.R. at 496-97.

[271]    *Id.* at 509.

[272]    *Id.*

-115-

> hundreds of thousands (or more) of shares and
> warrants, with a value of many millions (or more)
> of dollars, traded since the Plan became effective,
> having been bought and sold based on estimates of
> Plan recoveries *premised on the claims mix at the
> time the Plan was confirmed.*[273]

When the Court made those observations, it lacked the evidentiary record it has now. But the record now before the Court confirms the Court's earlier suspicions.

When a large number of transactions have taken place in the context of then-existing states of facts, changing the terrain upon which they foreseeably would have relied makes changing that terrain inequitable. Thus, understandably, the caselaw has evidenced a strong reluctance to modify that terrain.

*BGI* is particularly relevant, since there, as here, the issues before the court involved the allowance of late claims and contentions of inadequate notice. In *BGI*, the bankruptcy court, following confirmation of Borders' plan of liquidation, had denied the appellants leave to assert late priority claims, and refused to certify a class of creditors holding unused gift cards issued by the debtor Borders Books.[274] The appellants argued that they had not received adequate notice of the bar date, and thus that the bankruptcy court had erred when it denied them that relief.

But the BGI liquidating trust had already distributed more than $80 million, and there was an additional approximately $61 million remaining for distribution.[275] In holding that those appeals were equitably moot, Judge Carter in the District Court approvingly quoted Judge Glenn's finding in the Bankruptcy Court that allowing appellants to file late claims "would result in massive prejudice to the estate because the

---

[273]      *Id.* (emphasis added).

[274]      *See BGI*, n.16 *supra*, 772 F.3d at 106; *BGI-District,* 2013 U.S. Dist. LEXIS 77740, at *2.

[275]      *BGI-District*, 2013 U.S. Dist. LEXIS 77740, at *16.

-116-

distributions to general unsecured creditors who filed timely proofs of claim would be severely impacted."[276] The Circuit, in affirming Judge Carter's District Court ruling, approved this finding.[277] Other cases too, though not as closely on point as *BGI*, have held similarly.[278]

Finally, although most courts have held that Bankruptcy Courts have the discretion to allow the filing of class proofs of claim,[279] and this Court, consistent with the authority in this district, has adhered to the majority view,[280] courts recognize that "[t]he costs and delay associated with class actions are not compatible with liquidation cases where the need for expeditious administration of assets is paramount"—and that "[c]reditors who are not involved in the class litigation should not have to wait for payment of their distributive liquidated share while the class action grinds on."[281] Thus Unitholders would be prejudiced even if Plaintiffs' claims were ultimately disallowed.

The Court cannot find this third *Chateaugay* factor to have been satisfied.

---

[276]  *Id.* at *25-26.

[277]  *See BGI*, 772 F.3d at 110 n.15 ("Observing that the transactions in a liquidation proceeding may not be as complex as those in a reorganization proceeding, the court nonetheless predicted, *persuasively*, that allowing Appellants to file late claims and certifying a class of gift card holders would have 'a disastrous effect' on the remainder of the liquidated estate and the distributions under the Plan.") (emphasis added).

[278]  *See Calpine-District*, 390 B.R. at 520 (finding that appellant had failed to satisfy the first *Chateaugay* factor based, in part, on the court's view that "modifying the TEV in a consummated plan of reorganization that so many parties have relied upon in making at least some potentially irrevocable decisions would be inequitable."); *In re Enron Corp.*, 326 B.R. 497, 504 (S.D.N.Y. 2005) (Marrero, J.) (holding that it would be "manifestly inequitable" to modify even a single provision of a substantially consummated plan "that so many parties have relied upon in making various, potentially irrevocable, decisions.").

[279]  *See, e.g., Thomson McKinnon*, 133 B.R. at 40.

[280]  *See In re Motors Liquidation Co.*, 447 B.R. 150, 156-57 (Bankr. S.D.N.Y. 2011) (Gerber, J.) ("**GM-Apartheid**").

[281]  *Thomson McKinnon,* 133 B.R. at 41.

-117-

4. *Adversely Affected Parties*

The fourth *Chateaugay* factor requires a showing that the third parties affected by the relief sought have had notice of and an opportunity to participate in the proceedings.[282] It requires individual notice, and cannot be satisfied by an "assertion . . . that [affected parties] may have constructive or actual notice."[283] But here there has been no material resulting prejudice from the failure to provide the notice, and this slightly complicates the analysis.

Many who would be adversely affected by tapping GUC Trust assets did not get the requisite notice. They would include the current holders of Disputed Claims; the syndicate members in JPMorgan Chase's Term Loan; the holders of Allowed Claims who have not yet received a distribution, and third-party Unitholders that have purchased or held GUC Trust Units based on the publicly disclosed amounts of potential GUC Trust Liabilities.

But the briefing by the GUC Trust and so-called "Participating Unitholders" (a subset of the larger Unitholder constituency), and the oral argument by one of the Participating Unitholders' counsel, very effectively articulated the objections that all, or

---

[282]  *See BGI,* 772 F.3d at 110 (*"Here, we agree with the District Court that Appellants failed to satisfy at least the fourth … Chateaugay* factor[]: i.e., ensuring adequate process for parties who would be adversely affected . . . As to the fourth factor, Appellants did not establish that the general unsecured creditors—who could be stripped of their entire recovery if the proposed class was certified"—received notice of their appeal to the District Court.") (citations, internal quotation marks, and brackets deleted); *Arcapita Bank,* 2014 U.S. Dist. LEXIS 1053, at *21, 2014 WL 46552, at *7 ("Appellant does not contend that the numerous third parties who have participated in and relied on the transactions completed pursuant to the Plan have been notified. Accordingly, Appellant fails to satisfy the fourth *Chateaugay* factor."); *O'Connor v. Pan Am Corp. (In re Pan Am Corp.),* 2000 U.S. Dist. LEXIS 2562, at *15, 2000 WL 254010, at *4 (S.D.N.Y. Mar. 7, 2000) (Casey, J) (*"Pan Am"*) (the fact that the appellant "did not notify any of the holders of administrative claims of her intent to challenge the distribution order" weighed in favor of a finding of equitable mootness).

[283]  *See Calpine-District,* 390 B.R. at 522 ("An assertion by Appellants that purchasers of New Calpine Common Stock may have constructive or actual notice is not sufficient to satisfy their burden of establishing that such purchasers had notice of the Appeals and an opportunity to participate in the proceedings.").

substantially all, of the absent parties would share.  The Court doubts that any of those

adversely affected parties could make the mootness arguments any better.  Those who did

not file their own briefs, or make the same oral argument, were not prejudiced.

Because the other mootness factors are so lopsided, the Court does not need to

decide whether prejudice is a requirement here, as it is in the due process analysis

discussed above.  The Court assumes, in an excess of caution, that this factor is not an

impediment to granting relief.

### 5. *Pursuit of Stay Remedies*

Finally, the Court agrees in part with the contention by the GUC Trust and the

Participating Unitholders that the Plaintiffs have not "pursued with diligence all available

remedies to obtain a stay of execution of the objectionable order," and "the failure to do

so creates a situation rendering it inequitable to reverse the orders"[284]—enough to find

that this factor has not been satisfied.

Of course the Plaintiffs could not be expected to have sought a stay of the

Confirmation Order when they were then unaware of Ignition Switch claims.  Nor, for the

same reason, could the Plaintiffs be faulted for not having filed claims with Old GM or

the GUC Trust before the Ignition Switch Defect came to light.  So the Court cannot find

this factor to be satisfied based on any inaction before the Spring of 2014, at which time

New GM issued the recall notices and alerted the Plaintiffs to the possibility that they

might have legal rights of which they were previously unaware.

Rather, this factor has to be analyzed in different terms—focusing instead on the

Plaintiffs' failure to seek a stay of *additional* distributions to Old GM creditors and

---

[284]    GUC Trust Opening Br. at 31 (quoting *Affirmance Opinion #2*, 430 B.R. at 80, which in turn
quoted *Chateaugay II*, 10 F.3d at 952-53).

Unitholders after it learned, on October 24, 2014, that the GUC Trust announced that it
was planning on making another distribution. By this time, of course, the Ignition Switch
Defect was well known (and most of the 140 class actions had already been filed), and
the Court had identified, as an issue it wanted briefed, whether the Plaintiffs' claims were
more properly asserted against Old GM. As the Court noted at oral argument, at that
stage in the litigation process—when the Court considered it entirely possible that it
would rule that it would be the GUC Trust that is responsible for the Plaintiffs' otherwise
viable claims—the Court would have made the GUC Trust wait before making additional
distributions "in a heartbeat."[285]

Without dispute, the failure to block the November distribution did not result
from a lack of diligence. It resulted, as the Plaintiffs candidly admitted, from tactical
choice.[286] Their reason for that tactical choice would be obvious to any litigator,[287] but it
was still a tactical choice.

And it is inappropriate to disregard that tactical choice in light of the Plaintiffs'
decision to allow further distributions to be made. In November 2014, additional GUC
Trust assets went out the door. And while tapping the assets distributed in November
2014 might have been as inequitable as tapping those that now remain, it makes the

---

[285]   *See* Day 1 Arg. Tr. at 111:7-15.

[286]   *See* Day 1 Arg. Tr. at 112:13-113:1 ("Now, I will also tell Your Honor . . . yes there was a
strategic element to the decision that was taken on our side . . . Yes Your Honor, the decision was
made not to pursue it.") (transcription errors corrected; further explanation for reasons underlying
the strategic element deleted).

[287]   Any litigators in the Plaintiffs' lawyers shoes would understandably prefer to proceed against a
solvent entity (New GM) rather than one with much more limited assets (the GUC Trust)—
especially since so much of the GUC Trust's assets had already been distributed. And doing
anything to suggest that Old GM or the GUC Trust was the appropriate entity against whom to
proceed could undercut their position that they should be allowed to proceed against New GM.

-120-

challenges of granting even some relief more difficult.  Here too circumstances of this

character have been regarded as significant in considering the fifth *Chateaugay* factor.[288]

   *BGI* is relevant in this respect too.  The court in *BGI-District,* later affirmed by

the Circuit, held that the appellants "did not pursue their claims with all diligence,"

noting that the "[a]ppellants' counsel began reviewing the case in early December and

was retained by the end of December," but that the appellants "did not appear at the

confirmation hearing or file any objections to the Plan," and "did not seek reconsideration

of or appeal the confirmation order or seek a stay of the Effective Date."[289]  It concluded,

and the Circuit agreed, that "[t]he fact that no stay of distributions was sought by

Appellants until almost a year after they entered the bankruptcy litigation and the Plan

was confirmed indicates the lack of diligence with which Appellants moved."[290]

   The circumstances here are similar.  The Plaintiffs began filing their actions as

early as February 2014.  Yet the Plaintiffs have taken no steps to seek a stay from the

Court preventing the GUC Trust from making further distributions, or, except by one

letter, to put affected third parties on notice of an intention to assert claims over the GUC

Trust Assets.  They have been frank in explaining why: they prefer to pursue claims

against New GM first, and resort to the GUC Trust only if necessary.  But even though

---

[288]   *See Pan Am*, 2000 WL 254010, at *4, 2000 U.S. Dist. LEXIS 2562, at *15 (finding that appellant
failed to satisfy the fifth *Chateaugay* factor where she "never sought a stay of execution of the
distribution order" and "did not notify any of the holders of administrative claims of her intent to
challenge the distribution order.").  *See also Affirmance Opinion #1,* 428 B.R. at 62, and n.30
("Appellants' deliberate failure to 'pursue with diligence all available remedies to obtain a stay of
execution of the objectionable order' has indeed 'created a situation rendering it inequitable to
reverse the orders appealed from'"; "the Second Circuit has made it clear that an appellant is
obligated to protect its litigation position by seeking a stay . . . .").

[289]   2013 U.S. Dist. LEXIS 77740, at *32-33.

[290]   *BGI-District*, 2013 U.S. Dist. LEXIS 77740, at *33; *accord BGI*, 772 F.3d at 110-11 (quoting
*BGI-District*).

their tactical reasoning is understandable, the underlying fact remains; their failure to

diligently pursue claims against the GUC Trust precludes them from doing so now.

*   *   *

Thus at least three of the five *Chateaugay* factors *cut against* overcoming the

presumption in favor of mootness, when all must favor overcoming that presumption.

And shifting from individual factors to the big picture, we can see the overriding

problem. We here don't have a reorganized debtor continuing in business that would

continue to make money and that, by denial of discharge, could absorb additional claims.

We have a GUC Trust, funded by discrete bundles of assets—that had been reserved for

identified claims under Old GM's reorganization plan—with no unallocated assets left

for additional claims. Entities in the marketplace have bought units of the GUC Trust as

an investment based upon the GUC Trust's ability to *reduce* the once huge universe of

claims against New GM, in a context where the universe of claims could not increase.

Allowing $7 to $10 billion (or even much lower amounts) of additional claims against the

GUC Trust would wholly frustrate those investors' legitimate expectations, and, indeed,

"knock the props" out from the trading in GUC Trust Units that was an important

component of the plan.

Granting relief to the Plaintiffs here would simply replace hardship to the

Plaintiffs with hardship to others.

### V.

### Fraud on the Court

After receipt of the various parties' briefs, it now appears that the standards for

establishing fraud on the court (one of the bases for relief under Fed.R.Civ.P. 60(b))—

though once regarded as important enough to be a Threshold Issue—are not as important

-122-

as they were originally perceived to be.  That is so because fraud on the court issues bear

on the time by which a motion for 60(b) relief can be brought—but (as discussed in

Section II above), several courts, including the Second Circuit, when faced with denials

of due process, have invalidated particular provisions in orders *without addressing* Rule

60(b), and because, even under Rule 60(b), an order entered without due process can be

declared to be void, and without regard to the time limitations that are applicable to relief

for fraud, among other things.  But for the sake of completeness, the Court nevertheless

decides them.

     With exceptions not relevant here, Fed. R. Civ. P. 60, captioned "Relief from a

Judgment or Order," applies in bankruptcy cases under Fed.R.Bankr.P. 9024.  Its

subsection (b) provides, in relevant part:

> (b) GROUNDS FOR RELIEF FROM A FINAL
> JUDGMENT, ORDER, OR PROCEEDING.  On motion
> and just terms, the court may relieve a party or its
> legal representative from a final judgment, order, or
> proceeding for the following reasons:
>
> > (1) mistake, inadvertence, surprise, or
> > excusable neglect;
> >
> > …
> >
> > (3) fraud (whether previously called
> > intrinsic or extrinsic), misrepresentation, or
> > misconduct by an opposing party;
> >
> > (4) the judgment is void;
> >
> > … or
> >
> > (6) any other reason that justifies relief.[291]

---

[291]    *Id.* (portions that are not even arguably applicable omitted).

Then, Rule 60's subsection (c), captioned "Timing and Effect of the Motion," provides,

in relevant part:

> (1) *Timing.* A motion under Rule 60(b) must be
> made within a reasonable time—and for reasons (1),
> (2), and (3) no more than a year after the entry of
> the judgment or order or the date of the proceeding.

And its subsection (d), captioned "Other Powers to Grant Relief," provides, in relevant

part:

> (d) Other Powers to Grant Relief.  This rule does
> not limit a court's power to:
>
> …
>
> (3) set aside a judgment for fraud on the
> court.[292]

As explained by the Supreme Court in *Hazel-Atlas Glass*,[293] an early decision

considering Rule 60(b), the federal courts have had a long-standing aversion to altering or

setting aside final judgments at times long after their entry[294] "spring[ing] from the belief

that in most instances society is best served by putting an end to litigation after a case has

been tried and judgment entered."[295]  But there likewise has been a rule of equity to the

effect that under certain circumstances—one of which is after-discovered fraud—relief

could be granted against judgments regardless of the term of their entry.[296]  That

equitable rule was fashioned "to fulfill a universally recognized need for correcting

---

[292]  This last provision, now in a separate subsection (d), was once part of Rule 60(b).  It has been
described by the Circuit as a "savings clause."  *See Hadges v. Yonkers Racing Corp.*, 48 F.3d
1320, 1325 (2d Cir. 1995) ("***Hadges***").

[293]  *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) ("***Hazel-Atlas Glass***").

[294]  The original rule looked to "the *term* at which the judgments were finally entered."  *See id.* at 244
(emphasis added).  The one year time-limit under Rule 60(b) approximates that.

[295]  *Id.*

[296]  *Id.*

injustices which, in certain instances, are deemed sufficiently gross to demand a departure from rigid adherence to the term rule." [297]

As explained by the Second Circuit in its frequently cited 1985 decision in *Leber-Krebs*,[298] *Hazel-Atlas* deliberately did not define the metes and bounds of this "fraud on the court" doctrine, but it did make clear that it has always been "characterized by flexibility which enables it to meet new situations which demand equitable intervention, and to accord all the relief necessary to correct the particular injustices involved in these situations." [299]

"Out of deference to the deep rooted policy in favor of the repose of judgments entered during past terms, courts of equity have been cautious in exercising their power over such judgments. But where the occasion has demanded, where enforcement of the judgment is 'manifestly unconscionable', they have wielded the power without hesitation."[300]

It is in that context—where the injustices are "sufficiently gross," and where enforcement of the judgment would be "manifestly unconscionable"—that federal courts may consider requests to modify long-standing judgments for fraud on the court.

### 1. *Effect on Process of Adjudication*

Consistent with that, the Second Circuit has repeatedly stated that a "fraud on the court" under Fed. R. Civ. P. 60(d)(3) embraces:

> only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery

---

[297]   *Id.*

[298]   *Leber–Krebs, Inc. v. Capitol Records,* 779 F.2d 895 (2d Cir.1985) ("***Leber-Krebs***").

[299]   *Id.* at 899.

[300]   *Hazel-Atlas Glass,* 322 U.S. at 244-45 (*quoting Pickford v. Talbott,* 225 U.S. 651, 657 (1912)).

cannot perform in the usual manner its impartial
task of adjudging cases . . . .[301]

In *Hadges* (one the several Second Circuit decisions making the distinction

between fraud of a more generalized nature and defrauding the Court), the Circuit

explained that fraud is a basis for relief under both Rule 60(b)(3) and Rule 60's savings

clause.[302]  But "the type of fraud necessary to sustain an independent action attacking the

finality of a judgment is narrower in scope than that which is sufficient for relief by

timely motion."[303]

In its repeatedly cited 1972 decision in *Kupferman*, the Circuit, speaking through

Judge Friendly, emphasized the additional requirements for any showing of fraud on the

court.  "Obviously it cannot be read to embrace any conduct of an adverse party of which

the court disapproves; to do so would render meaningless the one-year limitation on

motions under F.R.Civ.P. 60(b)(3)."[304]  Rather, "[f]raud upon the court as distinguished

from fraud on an adverse party *is limited to fraud which seriously affects the integrity of

the normal process of adjudication*."[305]

Bankruptcy courts in this district, deciding particular cases under the Circuit's

pronouncements, have permitted claims of fraud on the court to proceed in cases with a

sufficiently egregious effect on the integrity of the litigation process, but have rejected

---

[301]  *Kupferman v. Consol. Research and Mfg. Corp.*, 459 F.2d 1072, 1078 (2d Cir. 1972)
("**Kupferman**") (quotation marks omitted); *accord Hadges*, 48 F.3d at 1325 (*quoting Kupferman*);
*Transaero, Inc. v. La Fuerza Area Boliviana*, 24 F.3d 457, 460 (2d Cir. 1994) ("**Transaero**") *on
reh'g in part sub nom.* 38 F.3d 648 (2d Cir. 1994); *Gleason v. Jandrucko*, 860 F.2d 556, 558-59
(2d Cir. 1988) ("**Gleason**"); *Serzysko v. Chase Manhattan Bank*, 461 F.2d 699, 702 (2d Cir. 1972).
*See also Grubin v. Rattet (In re Food Mgmt. Grp., LLC)*, 380 B.R. 677, 714 (Bankr. S.D.N.Y.
2008) (Glenn, J.) ("**Food Management Group**") (*quoting Kupferman*).

[302]  *Hadges*, 48 F.3d at 1325.

[303]  *Id.  See also Gleason*, 860 F.2d at 559; *Transaero*, 24 F.3d at 460.

[304]  *Kupferman*, 459 F.2d at 1078.

[305]  *Gleason*, 860 F.2d at 559 (internal quote marks deleted).

them in cases lacking such an effect.  In his well known decision in *Clinton Street Foods*,[306] Judge Bernstein found *Leber-Krebs* to be instructive,[307] and denied a 12(b)(6) motion insofar as it sought to dismiss a trustee's claims of a fraud on the court.[308]  But that was in the context of a case involving bid-rigging in a bankruptcy court auction. There the complaint alleged that the defendants—the assets' purchaser and three potential competing bidders—lied when the bankruptcy court inquired about any bidding agreements.  The defendants' lies contributed to the acceptance of the winning bid and the approval of the Sale Order; the trustee lacked the opportunity to discover the fraud in light of the summary nature of the sale proceeding and the relatively short time frame (only three weeks between the filing of the sale application and the auction); and defendants benefited from the lie to the Court.[309]

In *Food Management*, Judge Glenn of this Court, analyzing *Clinton Street Foods* and *Leber–Krebs,* likewise denied a motion to dismiss a fraud on the court claim, where there was once again alleged manipulation of an auction, by reason of a failure to disclose the participation of insiders in an ostensible third party bid for estate assets.[310]

---

[306]    *Gazes v. DelPrete*, (*In re Clinton Street Food Corp.),* 254 B.R. 523 (Bankr. S.D.N.Y. 2000) (Bernstein, C.J.) ("**Clinton Street Foods**").

[307]    *Id.* at 533.  He synthesized the bases for the *Leber-Krebs* finding of fraud on the court based on an attachment garnishee's false denials of ownership of debtor property as based on (1) the defendant's misrepresentation to the court, (2) the denial of the motion to confirm the attachment based on the misrepresentation, (3) the lack of an opportunity to discover the misrepresentation and either bring it to the court's attention or bring a timely turnover proceeding against the garnishee, and (4) the benefit the defendant derived by inducing the erroneous decision.  *Id.*  After *Clinton Street Foods*, these factors, referred to as the *Leber-Krebs* factors, have repeatedly been applied in fraud on the court decisions.

[308]    *Id.*

[309]    *Id.* at 533.

[310]    *See* 380 B.R. at 715.

But in *Ticketplanet*, [311] four years earlier, Judge Gropper of this Court, also

analyzing *Clinton Street Foods* and *Leber–Krebs*, found the allegations of fraud on the

court to be insufficient.  He explained that fraud on the court encompasses only that

conduct that "seriously affects the integrity of the normal process of adjudication," and it

is available "only to prevent a grave miscarriage of justice." [312]  There the trustee charged

that the defendants' actions (both before and after the chapter 11 filing) were taken to

protect themselves and benefit a secured lender that thereafter obtained relief from the

stay to foreclose on estate assets.  The alleged wrongful actions included a failure to

adequately disclose the competing interest of the debtor's largest shareholder; the

appointment of a straw-man at the helm of the debtor; a direction to the debtor's counsel

not to fight the lift stay motion; and efforts to engineer a dismissal of the initial chapter

11 case rather than a conversion once the lender had taken control of the debtor's assets.

But the basic facts with respect to a relation between the corporate principals, the debtor

and its lender were known, [313] and the alleged nondisclosure "did not substantially impact

the Court's ruling at the Lift Stay hearing." [314]  Relief was not necessary "to prevent a

grave miscarriage of justice." [315]

The takeaway from these cases is that relief can be granted only where there has

been not just an impact on the *accuracy of outcome* of the Court's adjudicative process,

---

[311]    *Tese-Milner v. TPAC, LLC* (*In re Ticketplanet.com*)*, 313 B.R. 46, 64 (Bankr. S.D.N.Y. 2004)
(Gropper, J.) (***Ticketplanet***").

[312]    *Id.*

[313]    *Id.* at 65.

[314]    *Id.*

[315]    *Id.*

09-50026-reg   Doc 13109   Filed 04/19/15   Entered 04/19/15 15:58:22   Main Document
Pg 134 of 139

but also on the *integrity of the judicial process* itself, and then only where a denial of

relief would be "manifestly unconscionable."

### 2.  *Victim of the Fraud*

Thus the failure to disclose pertinent facts relating to a controversy before the

court, or even perjury regarding such facts, whether to an adverse party or to the court,

does not without more constitute "fraud upon the court" and does not merit relief under

Fed. R. Civ. P. 60(d)(3).[316]

In *Hoti Enterprises*, Judge Seibel affirmed the bankruptcy court's denial of

reconsideration of a cash collateral order based on alleged fraud by a lender in its

representation that it had a secured claim.  She held that "neither perjury nor non-

disclosure by itself amounts to anything more than fraud involving injury to a single

litigant" covered by Fed. R. Civ. P. 60(b)(3), and therefore, is not the type of egregious

misconduct necessary for relief under Fed. R. Civ. P. 60(d).[317]  That rule also means that

assuming, arguendo, Old GM had attempted to defraud car owners, that would not be

enough.  It would need to have defrauded *the Court.*

---

[316]  *See, e.g., Gleason*, 860 F.2d at 559-60; *Hoti Enters., L.P. v. GECMC 2007 C-1 Burnett Street,
LLC ( In re Hoti Enters., L.P. )*, 2012 U.S. Dist. LEXIS 182395, at *12-13, 2012 WL 6720378, at
* 3-4 (S.D.N.Y. Dec. 27, 2012) (Seibel, J.).

[317]  *Hoti Enters.*, 2012 U.S. Dist. LEXIS 182395, at *12-13, 2012 WL 6720378, at *3-4.  Courts from
other jurisdictions have reached the same conclusion.  *See In re Tevis*, 2014 Bankr. LEXIS 406, at
*12, 2014 WL 345207, at *4 (B.A.P. 9th Cir. Jan. 30, 2014) ("Mere nondisclosure of evidence is
typically not enough to constitute fraud on the court, and 'perjury by a party or witness, by itself,
is not normally fraud on the court."); *In re Andrada Fin., LLC*, 2011 Bankr. LEXIS 1779, at *21,
2011 WL 3300983, at *7 (B.A.P. 9th Cir. Apr. 7, 2011); *In re Levander*, 180 F.3d 1114, 1119 (9th
Cir. 1999); *Simon v. Navon*, 116 F.3d 1, 6 (1st Cir. 1997); *Wilson v. Johns-Manville Sales Corp.*,
873 F.2d 869, 872 (5th Cir. 1989); *In re Mucci*, 488 BR 186, 193-94 & n.8 (Bankr. D. N.M. 2013)
(Jacobvitz, J.); *In re Galanis*, 71 B.R. 953, 960 (Bankr. D. Conn. 1987) (Shiff, J.) ("It is well
established that the failure to disclose allegedly pertinent facts relating to a controversy before the
court, whether to an adverse party or to the court, does not constitute "fraud upon the court" for
purposes of setting aside a judgment . . . .").

### 3. Particular Standards to Apply

In each of *Ticketplanet* and *Food Management*, after discussion of *Leber-Krebs* and *Clinton Street Foods*, the courts listed matters to be considered in analyzing a fraud on the court claim for sufficiency, as extracted from *Leber-Krebs* and *Clinton Street Foods*. They were:

> (1) the defendant's misrepresentation to the court;
>
> (2) the impact on the motion as a consequence of that misrepresentation;
>
> (3) the lack of an opportunity to discover the misrepresentation and either bring it to the court's attention or bring an appropriate corrective proceeding; and
>
> (4) the benefit the defendants derived by inducing the erroneous decision.[318]

With the courts in *Clinton Street Foods, Ticketplanet, and Food Management* having looked to those factors to supplement the Supreme Court and Circuit holdings discussed above, this Court will too.

Together, the above cases thus suggest a methodology to apply in determining whether any fraud rises to the level of fraud on the court. First, as *Kupferman*, *Hadges* and the other Circuit cases make clear, the Court must ascertain whether the alleged fraud is of a type that defiles the court itself; is perpetrated by officers of the court; or seriously affects the *integrity* of the normal process of adjudication. Then the Court must analyze the alleged fraud in the context of the *Leber–Krebs* factors, as applied in *Clinton Street Foods*, *Ticketplanet*, and *Food Management*. The *Leber-Krebs* factors bring into the

---

[318]     313 B.R. at 64.

-130-

analysis, among other things, requirements of an interface with the court;[319] an injury to the court or the judicial system (as contrasted to an injury to one or more individuals);[320] impact by the fraud on the workings of the judicial system; a nexus between the fraud and injury to the judicial system; and one or more benefits to the wrongful actor(s) by reason of the fraud on the court.

The takeaway from these cases is also that there can be no fraud on the court by accident. Those engaging in the fraud must be attempting to subvert the legal process in connection with whatever the court is deciding. There likewise cannot be a fraud on the court by imputation alone. There must be a direct nexus between the knowledge and intent of any wrongdoer and communications to the court. If the fraud has taken place elsewhere (and is unknown to those actually communicating with the court), the requisite attempt to defile the Court itself and subvert the legal process is difficult, if not impossible, to show.

## VI.

### Certification to Circuit

As the Court did with respect to one other (but much less than all) of its earlier decisions in Old GM's chapter 11 case,[321] the Court certifies its judgment here for direct review by the Second Circuit. Here too, in this Court's view, this is one of those rare occasions where the Circuit might wish to consider immediate review as an option.

---

[319]    Thus, if the fraud is not linked to either a communication to the court, or a nondisclosure to the court under circumstances where there is a duty to speak with the matter that was not disclosed, that requirement is not satisfied.

[320]    *See SEC v. ESM Grp., Inc.,* 835 F.2d 270, 273 (11th Cir. 1988) (holding that fraud on the court is the type of fraud which prevents or impedes the proper functioning of the judicial process, and it must threaten public injury, as distinguished from injury to a particular litigant), *cert denied,* 486 U.S. 1055 (1988).

[321]    *See GM-UCC-3 Opinion,* n.50 *supra,* 486 B.R. at 646-47.

In that connection, 28 U.S.C. § 158 grants a court of appeals jurisdiction to hear

appeals from final judgments of the bankruptcy court under limited circumstances.  First

the bankruptcy court (acting on its own motion or on the request of a party to the

judgment), or all the appellants and appellees acting jointly, must certify that—

> (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;

> (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or

> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken….[322]

Then the Court of Appeals decides whether it wishes to hear the direct appeal.[323]

In this case, the Court considers each of the three bases for a certification to be

present.  With respect to the first prong, the decision here is one of law based on

undisputed facts.  There are no controlling decisions of the Second Circuit on the issues

here beyond the most basic fundamentals.  And this is a matter of considerable public

importance.  Additionally, though the $7 to $10 billion in controversy here may be

regarded as personal to the Plaintiffs and New GM, the underlying legal issues are

important as well, as are their potential effect, going forward, on due process in chapter

11 cases, and on 363 sales and the claims allowance process in particular.

---

[322]    28 U.S.C. § 158(d).

[323]    *Id.; see also In re General Motors Corp.*, 409 B.R. 24, 27 (Bankr. S.D.N.Y. 2009) (Gerber, J.) ("***GM-Sale Appeal Certification Decision***") ("The Circuit does not have to take the appeal, however, and can decide whether or not to do so in the exercise of its discretion.").

-132-

With respect to the second prong, available authorities, while helpful to a point, came nowhere close to addressing a factual situation of this nature.  The issues were complicated by broad language in the caselaw, and conflicting decisions.[324]

With respect to the third prong, the Court believes that an immediate appeal from the judgment in this matter is likely to advance proceedings in both this case (if the Court is called upon to do anything further) and the MDL case.  Plainly a second level of appeal (which would otherwise be almost certain, given the stakes and importance of the controversy) would have a foreseeable adverse effect on the ability of the MDL Court to proceed with the matters on its watch.

## Conclusion

The Court's conclusions as to the Threshold Issues were set forth at the outset of this Decision, and need not be repeated here.  Based on its conclusions as to the Threshold Issues as discussed above, the Court will not allow either the Economic Loss Plaintiffs (including the Used Car Purchasers subset of Economic Loss Plaintiffs) or the Pre-Closing Sale Plaintiffs to be exempted from the Sale Order's Free and Clear Provisions barring the assertion of claims for successor liability.  The Economic Loss Plaintiffs (but not the Pre-Closing Sale Claimants) may, however, assert otherwise viable claims against New GM for any causes of action that might exist arising solely out of New GM's own, independent, post-Closing acts, so long as those Plaintiffs' claims do not in any way rely on any acts or conduct by Old GM.  The Plaintiffs may file late claims,

---

[324]    In one of its earlier decisions in the *GM* case, *see GM-Sale Appeal Certification Decision*, 409 B.R. at 27-29, the Court denied certification to the Circuit of the appeals from the Sale Order following the *Sale Opinion*, even though, as the subsequent history of the *Sale Opinion* indicates, *see* n.2 *supra*, one of them ultimately did go up to the Circuit.  This Court denied certification there because while GM's well-being and that of its suppliers, as a business matter, had substantial public importance, the legal issues were not particularly debatable.  Here they are plainly so.

and to the extent otherwise appropriate such late claims may hereafter be allowed—but the assets of the GUC Trust may not be tapped to satisfy them, nor will Old GM's Plan be modified in this or any other respect.

The Court will not lengthen this decision further by specifically addressing any more of the contentions that were raised in the more than 300 pages of briefing on the Motion to Enforce and its sister motions. The Court has canvassed those contentions and satisfied itself that no material points other than those it has specifically addressed were raised and have merit.

The parties are to caucus among themselves to see if there is agreement that no further issues need be determined at the Bankruptcy Court level. If they agree (as the Court is inclined to believe) that there are none, they are to attempt to agree on the form of a judgment (without prejudice, of course, to their respective rights to appeal) consistent with the Court's rulings here. If they cannot agree (after good faith efforts to try to agree), any party may settle a judgment (or, if deemed preferable, an order), with a time for response agreed upon in advance by the parties. After the Court has been presented with one or more proposed judgments or orders, the Court will enter a judgment or order in the form it regards as most appropriate, and a separate order providing the necessary certification for review under § 158(d).

Dated: New York, New York  
     April 15, 2015

    *s/Robert E. Gerber*  
United States Bankruptcy Judge