# Exhibit 3

This is a preliminary transcript of a
Committee hearing. It has not yet been
subject to a review process to ensure
that the statements within are
appropriately attributed to the witness
or member of Congress who made them,
to determine whether there are any
inconsistencies between the statement
within and what was actually said at the
proceeding, or to make any other
corrections to ensure the accuracy of the
record.

RPTS KERR

DCMN SECKMAN

THE GM IGNITION SWITCH RECALL:

WHY DID IT TAKE SO LONG?

TUESDAY, APRIL 1, 2014

House of Representatives,

Subcommittee on Oversight

and Investigations,

Committee on Energy and Commerce,

Washington, D.C.

The subcommittee met, pursuant to call, at 2:00 p.m., in Room
2123, Rayburn House Office Building, Hon. Tim Murphy [chairman of
the subcommittee] presiding.

Present:  Representatives Murphy, Burgess, Blackburn,
Gingrey, Scalise, Harper, Olson, Griffith, Long, Barton, Upton (ex
officio), DeGette, Braley, Schakowsky, Castor, Welch, Tonko,
Yarmuth, Green, Dingell (ex officio-nonvoting), and Waxman (ex
officio).

Staff Present:  Carl Anderson, Counsel, Oversight; Gary Andres, Staff Director, Charlotte Baker, Deputy Communications Director; Mike Bloomquist, General Counsel; Sean Bonyun, Communications Director; Matt Bravo, Professional Staff Member; Leighton Brown, Press Assistant; Karen Christian, Chief Counsel, Oversight; Brad Grantz, Policy Coordinator, O&I; Brittany Havens, Legislative Clerk; Sean Hayes, Deputy Chief Counsel, O&I; Kirby Howard, Legislative Clerk; Peter Kielty, Deputy General Counsel; Alexa Marrero, Deputy Staff Director; Brian McCullough, Senior Professional Staff Member, CMT; Brandon Mooney, Professional Staff Member; Paul Nagle, Chief Counsel, CMT; John Ohly, Professional Staff, O&I; Krista Rosenthall, Counsel to Chairman Emeritus; Peter Spencer, Professional Staff Member, Oversight; Shannon Weinberg Taylor, Counsel, CMT; Tom Wilbur, Digital Media Advisor; Jessica Wilkerson, Legislative Clerk; Michele Ash, Minority Chief Counsel, CMT; Phil Barnett, Minority Staff Director; Brian Cohen, Minority Staff Director, O&I, and Senior Policy Advisor; Elizabeth Ertel, Minority Deputy Clerk; Kiren Gopal, Minority Counsel; Hannah Green, Minority Staff Assistant; Elizabeth Letter, Minority Press Secretary; Karen Lightfoot, Minority Communications Director and Senior Policy Advisor; and Stephen Salsbury, Minority Investigator.

Mr. Murphy.  I now convene this hearing of the Oversight and Investigation Subcommittee, entitled the "GM Ignition Switch Recall:  Why Did It Take So Long?"

Ms. Barra, if you would like to take a seat, please.  Thank you.

This question is the focus of our investigation.  As soon as the Chevy Cobalt rolled off the production line in 2004, customers began filing complaints about the ignition switch.  These customers told General Motors that just by bumping the key with their knee while driving the Cobalt, it would shut off.  In 2004 and 2005, GM engineers twice considered the problem and even developed potential solutions to fix it, but GM decided the, quote, "tooling cost and piece prices are too high," unquote, and that, quote, "none of the solutions represent an acceptable business case," end quote.

The solution GM ultimately settled for was to tell their dealers to ask Cobalt drivers to remove heavy objects from their key chains, and yet just a year later, GM decided to fix the ignition switch.  In 2005, GM told their supplier, Delphi, to increase the torque in the ignition switch so the key wouldn't move out of the run position and into accessory mode.

GM was not alone in examining problems with the Cobalt.  The lead government safety regulator, the National Highway Traffic Safety Administration, known as NHTSA, was also evaluating concerns with the Cobalt.  But NHTSA didn't look at the ignition

switch problem, just air bag nondeployment.  In 2007, 3 years
after the Cobalt's release, the chief of NHTSA's Defects
Assessment Division proposed that the agency investigate the
Cobalt because he spotted a, quote, "pattern of nondeployments,"
unquote, in Cobalt air bags that didn't exist with similar sedans.

An internal NHTSA presentation noted a spike in warranty
claims for Cobalt air bags, a total of 29 crashes causing 25
injuries, 4 deaths, and 14 field reports.  Yet NHTSA ultimately
decided not to investigate.  Even when the issue was again raised
3 years later in 2010, NHTSA again passed on investigating.

GM was also looking into the air bag nondeployments.  As
early as 2007, GM started tracking incidents where Cobalt air bags
did not deploy in car crashes.

In 2011 and 2012, GM assigned at least two groups of
engineers to examine the problem.  According to GM's public
statements, it wasn't until December 2013 the company finally put
the pieces together and linked the problems with the air bags with
the faulty ignition switch, almost 10 years after customers first
told GM the Cobalt ignition switch didn't work.

We know this.  The red flags were there for GM and NHTSA to
take action, but for some reason, it did not happen.  Why didn't
GM and NHTSA put the pieces together for 10 years?  Why didn't
anyone ask the critical important questions?  Why did GM accept
parts below their own company standards and specs?  When GM
decided to get a new ignition switch for the Cobalt in 2006, did

GM do so because they recognized that the faulty switch posed a
safety problem?  Why did GM keep the old part number which led to
confusion?  When GM replaced the ignition switch, did engineers
also consider how the faulty ignition impacted other systems in
the car like air bags?  Why did GM the replace the ignition switch
in new cars but not the older models?  Why did GM think a memo
about the size of key chains was enough to solve the problems?
Why did NHTSA twice decide not to investigate the Cobalt?  And why
didn't NHTSA make the link between the keys being in the accessory
position and air bags not deploying?  Did anyone ask why?

And for both GM and NHTSA, are people talking to one another?
Do GM and NHTSA have a culture where people don't pass information
up and down the chain of command?  To borrow a phrase, what we
have here is a failure to communicate, and the results were
deadly, a failure to communicate both between and within GM and
NHTSA.  Today we will ask GM and NHTSA what they are doing to not
just fix the car but to fix the culture within a business and a
government regulator that led to these problems.  This is about
restoring public trust and giving the families and crash victims
the truth about whether this tragedy could have been prevented and
if future ones will be prevented.  It is my hope and expectation
that today we will not hear a blame game or finger pointing.  All
the brilliant engineers and workers in the world won't matter if
the people don't really care, and as the old saying goes, people
don't care that you know until they know that you care.

This investigation is only 3 weeks old, and we are determined to find the facts and identify the problem so a tragedy like this won't ever happen again.  This investigation is bipartisan, is a priority of all the members of this committee.  I want to thank Mary Barra for being here and also the head of NHTSA, David Friedman, ranking members Waxman, DeGette, and Dingell for working with us, and I now yield the remaining amount of my time to Dr. Michael Burgess.

[The prepared statement of Mr. Murphy follows:]


******** COMMITTEE INSERT ********

Dr. Burgess. I thank the chairman for yielding.

I thank our witnesses for being here. I thank our witnesses for being so responsive to the committee staff request. We are here to examine a very important matter. The hearing is appropriately named. We do have questions for General Motors.

We have questions for the National Highway Traffic Safety Administration. Two chances to open up formal investigations into the recalled General Motors cars: Both in 2007 and 2010, NHTSA initially examined problems with the vehicles and both times -- both times -- decided that no investigation was needed.

We need to hear from NHTSA today how you intend to improve the process going forward, and we were just here 5 years ago with the Toyota investigation. We heard a lot of things out of NHTSA on those hearings. I would like to know how they have improved the process and how we can expect to have confidence in their ability going forward.

I yield back.

[The prepared statement of Dr. Burgess follows:]


******** COMMITTEE INSERT ********

Mr. Murphy.  Now recognize the ranking member of the committee, Ms. DeGette, of Colorado.

Ms. DeGette.  Thank you very much, Mr. Chairman.

Like all of us, I am deeply troubled about what our investigation has revealed about GM's business practices and its commitment to safety.

Here is what we know.  We know that GM has recalled over 2.5 million vehicles because of defective ignition switches.  We know they should have done it much, much earlier.  We know that GM failed to provide Federal regulators with key information, and sadly, we know that at least 13 people are dead.  And there have been dozens of crashes because GM produced cars that had a deadly effect.

Mr. Chairman, I have a copy of the ignition switch assembly for one of these vehicles, and this is it.  A spring inside the switch, a piece that cost pennies, failed to provide enough force causing the switch to turn off when the car went over a bump.

GM knew about this problem in 2001.  They were warned again and again over the next decade, but they did nothing.  And I just want to show how easy it is to turn this key in this switch.  If you had a heavy key chain, like my long key chain, or if you had -- if you were short and you bumped up against the ignition with your knee, it could cause this key to switch right off.

Mr. Chairman, we now know that these switches were defective from the start.  In February of 2002, GM's ignition switch

supplier, Delphi, informed the company that the switch did not

meet GM's minimum specifications, but GM approved it anyway.

Now, yesterday, we sent Ms. Barra a letter about this

decision.  I would like unanimous consent to make that letter a

part of the hearing record.

Mr. Murphy.  Without objection.

[The information follows:]


******** COMMITTEE INSERT ********

Ms. <u>DeGette.</u>  Soon after this approval, the defective cars were on the road, and it didn't take long for problems to appear. In 2003, June 2003, the owner of a Saturn Ion with 3,474 miles on the odometer made a warranty report that he or she, quote, "bumped the key and the car shut off."  GM would receive more than 130 similar warranty claims from owners about this problem over the next decade, but it never informed the public or reported the problem to Federal safety regulators.

The minority staff conducted this warranty analysis, and again, we prepared a memo about these claims.  I would also ask unanimous consent to put that in the record, Mr. Chairman.

Mr. <u>Murphy.</u>  Without objection.

[The information follows:]


******** COMMITTEE INSERT ********

Ms. DeGette.  Initially, GM opened multiple investigations into the ignition switch issue, each which concluded the switch was bad; it didn't meet the minimums.  In 2005, GM identified solutions to the problem but concluded that, quote, "the tooling cost and piece price are too high... thus none of the solutions represents an acceptable business case."

Documents provided by GM show that this unacceptable cost increase was only 57 cents.

And Mr. Chairman, we have this document that we got from GM. Somehow it is not in the binder.  I would ask unanimous consent to put this in the record as well.

Mr. Murphy.  Without objection, so ordered.

[The information follows:]


******** COMMITTEE INSERT ********

Ms. <u>DeGette.</u>  Another technical investigation completed in 2005 led GM to issue a technical service bulletin advising dealers to distribute key inserts to help reduce the problem.  This was a simple fix to reduce the force on the switch.

And Mr. Chairman, these are the keys of one of my staff members who actually owns one of these cars, and as you can see, there is a long, long insert.  What the key inserts were supposed to do is go in the middle and just create a little hole so the key and the keys wouldn't go back and forth.  Unfortunately, GM never made this bulletin public.  More than 500 people out of the thousands of drivers who had cars with faulty switches got the key insert, and GM knew it.

Soon after this decision, company officials quietly redesigned the switch, but they never changed the part number, and astonishingly, this committee has learned that when GM approved a new switch in 2006, they did it with still not -- still knowing that the new switch didn't meet specifications.  The company even put more cars with bad switches on the road from 2008 until 2011, and we still don't know all the information about this.

Between 2003 and 2014, GM learned hundreds of reports of ignition switch problems through customer complaints, warranty claims, lawsuits, press coverage, field reports and even more internal investigations, but time and time again, GM did nothing. The company continued to sell cars, knowing they were unsafe.

I know we have a lot of family members here, Mr. Chairman,

and I know -- and I want to express my deepest sympathies to them,
but I want to tell them something more.  We are going to get to
the bottom of this.  We are going to figure out what happened, and
we are going to make sure it doesn't happen again.

Now, Mr. Chairman, I want to thank Ms. Barra for coming.  She
is brand new at the company.  I believe she is committed to fixing
this situation.  We have a lot of questions to ask today, though,
and I know every member of this committee is concerned about this.
Thank you very much.

Mr. Murphy.  And the gentlelady's time expired.

[The prepared statement of Ms. DeGette follows:]


******** COMMITTEE INSERT ********

Mr. Murphy.  Now recognize the chairman of the full committee, Mr. Upton, for 5 minutes.

The Chairman.  Well, thank you, Mr. Chairman.

We know that with a 2-ton piece of high velocity machinery, there is in fact a zero margin for error.  Product safety is indeed a life or death issue, but sadly, vehicle safety has fallen short, and it is not the first time.

During the late summer of 2000, in this very room, I led the oversight hearings that examined the Ford-Firestone recalls, a tire malfunction was causing violent crashes, and Americans did not feel safe behind the wheel.  We gathered testimony from the company and agency officials and reviewed thousands and thousands of pages of documents, and we found that the system indeed had failed.  Information about the defective tires had been shared with the companies and with NHTSA, the parties failed to protect the public safety, and over 100 people died.

After that investigation, I introduced the TREAD Act to correct many of the problems that contributed to the Ford-Firestone tragedy.  That bill was meant to ensure data about safety is reported so that defects can be quickly identified and fixed and lives ultimately saved.  The TREAD Act has now been law since November of 2000, but yet here we are investigating another safety failure.  It is deja vu all over again.

One month ago, GM issued a recall for an ignition switch defect in six vehicles, totalling 1.6 million cars.  And last

Friday, they called another 900,000 vehicles.  GM acknowledges
that a dozen people have died in automobile crashes associated
with that defect.  Two were teenagers from my own community.

Testifying today are GM CEO Mary Barra and NHTSA Acting
Administrator David Friedman, a first step in our quest to find
out what went wrong.

The committee's purpose is the same as it was in 2000, making
sure that drivers and families are protected and cars are safe.
And I will repeat what I said at the first oversight hearings on
Firestone tires in 2000.  Today's hearing is very personal to me
because I come from Michigan, the auto State, the auto capital of
the world.  That is no less true today.  Michigan is proud of its
auto industry, and while Michigan citizens build cars, obviously,
we drive them, too.

Documents produced to the committee show that both NHTSA and
GM received complaints about and data about problems with ignition
switches and air bags.  These complaints go back at least a
decade.  NHTSA engineers did crash investigations as early as 2005
and twice examined whether complaints with air bags constituted a
trend.  GM submitted early warning reports to NHTSA, including
data about crashes in the recalled cars.  With all that
information available, why did it take so long to issue the
recall?

In this case, just as it was with Ford-Firestone, it was news
reports that brought the attention to the Nation's

attention -- brought the problem to the Nation's attention.  This
investigation of the recall is indeed bipartisan, as it should be.
We will follow the facts wherever they lead us, and we are going
to work until we have the answers and can assure the public that
indeed they are safe.  I would like to note that the chairman of
our CMT Subcommittee, Mr. Terry, will be joining us for questions
this afternoon.  With his subcommittee's record on motor vehicle
safety issues, he will be watching closely as this investigation
unfolds so that he can take our findings and determine whether and
what changes may be needed to the laws designed to keep drivers
safe on the road.  After all, our goal on every issue follows the
Dingell model:  Identify the problem or abuse fully, and where
needed, fix it with legislation so that it won't happen again.

I yield to the vice chair of the committee, Mrs. Blackburn.

[The prepared statement of The Chairman follows:]


******** COMMITTEE INSERT ********

Mrs. <u>Blackburn.</u>  Thank you, Mr. Chairman.

And Ms. Barra, thank you very much for being here today.  We really owe this hearing to the American people, to GM customers, and to the relatives of the 12 individuals that have lost their lives.  And it is important that we get to the bottom of this and to see what the roles of GM and NHTSA were in this, figure out who is at fault, and we want to know who knew what when.

And Ms. Barra, that includes you.  We are going to want to know what your exposure was to this issue as you took the helm at GM as the CEO.

You know, in my district, we have the GM plant.  The Saturn Ion has been recalled.  That was made at that plant there in Spring Hill, so this is something that is important to my constituents.  Those that have worked with GM, I thank you for being here, and we look forward to the answers.

I yield back.

Mr. <u>Murphy.</u>  Thank you.  The gentlelady yields back.

[The prepared statement of Mrs. Blackburn follows:]


******** COMMITTEE INSERT ********

Mr. Murphy.  I now recognize the ranking member of the full committee, Mr. Waxman, for 5 minutes.

Mr. Waxman.  Thank you very much, Mr. Chairman.  I have a sad sense of deja vu as I sit here today.  I was part of this committee when we held our Ford-Firestone hearing in 2000.  I led the committee's hearing on Toyota's problems with unintended acceleration in 2010.  Each time, we heard about how auto manufacturers knew about potential defects and about how Federal safety officials at the National Highway Traffic Safety Administration missed signals that should have alerted them to defective cars on the road, and here we are today under similar circumstances.

Over the last month, the full dimensions of another auto safety disaster have unfolded.  General Motors has recalled 2.5 million vehicles due to a defective ignition switch, and the company has acknowledged that these cars have caused dozens of crashes and 13 fatalities.

Mr. Chairman, I know the families of some of these victims are in the audience for today's hearing.  I want to acknowledge them, thank them for coming.  We owe it to them to find out what happened.

The facts that we already know are hard to believe.  GM has known for years about this safety defect and has failed to take appropriate action to fix the problem.  The company installed an ignition switch it knew did not meet its own specifications.

Numerous internal investigations resulted in nothing but a nonpublic technical service bulletin that partially fixed the problem for fewer than 500 drivers.

A new analysis I released this morning revealed that over the last decade, GM received over 130 warranty claims from drivers and GM technicians who experienced and identified the defect.  Drivers reported that their car shut off after hitting bumps or potholes at highway speeds when they did something as simple as brushing the ignition switch with their knee.  One GM technician even identified the exact part causing the problem, a spring that would have caused at most as much as a few postage stamps, a couple of dollars.

Because GM didn't implement this simple fix when it learned about the problem, at least a dozen people have died in defective GM vehicles.  What is more, new information the committee received last week suggests that GM still has failed to fully own up to potential problems.  GM finally modified the ignition switch for later model cars, but Delphi, the manufacturer of the ignition switch, told the committee that the switches installed in model year 2008 to 2011 vehicles still did not meet GM's own specifications.  GM finally announced a recall of these vehicles last Friday but told the public that it was because of bad parts installed during repairs, not because of defective parts originally installed in the vehicles.

There are legitimate questions we need to ask about whether

NHTSA did enough to identify and uncover this problem.  In

retrospect, it is clear that the agency missed some red flags, but

NHTSA was also laboring under a handicap.  There appears to have

been a lot of information that GM knew but they didn't share with

the National Highway Traffic Safety Administration.  We need to

make sure that NHTSA and the public have access to the same

information about safety as auto executives.

That is why today I am introducing the Motor Vehicle Safety

Act of 2014.  This bill is modeled on the legislation that the

committee passed in 2010 but was never enacted into law.  It will

make more information on defects available to the public, and it

will increase NHTSA's funding and increase civil penalties for

manufacturers when companies like GM fail to comply with the law.

Mr. Chairman, we should learn as much as we can from this

investigation.  Then we should improve the law to make sure we are

not here again after another auto safety tragedy in the near

future.  I want to yield back my time.  Thank you.

Mr. Murphy.  The gentleman yields back.

[The prepared statement of Mr. Waxman follows:]


******** COMMITTEE INSERT ********

Mr. Murphy.  I would now like to introduce the witness on the first panel for today's hearing.  Ms. Mary Barra is the chief executive officer of General Motors Company and has been in this role since January 15th, 2014, when she also became a member of its board of directors.

She has held a number of positions in this company.  From 2008 to 2009, Ms. Barra served as vice president of global manufacturing engineering, and from 2005 to 2008, she was executive director of vehicle manufacturing engineering.  She has also served as a plant manager and director of competitive operations engineering as well as numerous other positions.

I will now swear in the witness.

Ms. Barra, you are aware that the committee is holding an investigative hearing and, when doing so, has a practice of taking testimony under oath.  Do you have any objections to testifying under oath?

Ms. Barra.  No.

Mr. Murphy.  The chair then advises you that under the Rules of the House and under the rules of the committee, you are entitled to be advised by counsel.  Do you desire to be advised by counsel during today's hearing?

Ms. Barra.  No.

Mr. Murphy.  In that case, if you would please rise and raise your right hand, I will swear you in.

[Witness sworn.]

Mr. <u>Murphy.</u>  Thank you.  Ms. Barra, you are now under oath and subject to the penalties set forth in Title 18, Section 1001 of the United States Code.  You may now give a 5-minute summary of your written statement.

**STATEMENT OF MARY T. BARRA, CHIEF EXECUTIVE OFFICER, THE GENERAL**

**MOTORS COMPANY**

Ms. Barra.  Thank you, Mr. Chairman and committee members.

Mr. Murphy.  Please pull your microphone close to your mouth
and make sure it is on.  Thank you.

Ms. Barra.  Can you hear me?  Okay.

Thank you, Mr. Chairman and committee members.  My name is
Mary Barra, and I am the chief executive officer of General Motors.
I appreciate the opportunity to be here today.  More than a decade
ago, GM embarked on a small-car program.  Sitting here today, I
cannot tell you why it took so long for a safety defect to be
announced for this program, but I can tell you we will find out.

This is an extraordinary situation.  It involves vehicles we
no longer make, but it came to light on my watch, so I am
responsible for resolving it.

When we have answers, we will be fully transparent with you,
with our regulators, and with our customers.

While I cannot turn back the clock, as soon as I learned about
the problem, we acted without hesitation.  We told the world we had
a problem that needed to be fixed.  We did so because whatever
mistakes were made in the past, we will not shirk from our
responsibilities now or in the future.

Today's GM will do the right thing.  That begins with my

sincere apologies to everyone who has been affected by this recall, especially the families and friends who lost their lives or were injured.  I am deeply sorry.

I have asked former U.S. Attorney Anton Valukas to conduct a thorough and unimpeded investigation of the actions of General Motors.  I have received updates from him, and he tells me he is well along with his work.  He has free rein to go where the facts take him, regardless of outcome.  The facts will be the facts.  Once they are in, my leadership team and I will do what is needed to help assure this does not happen again.  We will hold ourselves fully accountable.

However, I want to stress I am not waiting for his results to make changes.  I have named a new vice president of global vehicle safety, a first for General Motors.  Jeff Boyer's top priority is to quickly identify and resolve any and all product safety issues.  He is not taking on this task alone.  I stand with him, and my senior leadership team stands with him as well, and we will welcome input from outside of GM, from you, from NHTSA, from our customers, our dealers, and current and former employees.

The latest round of recalls demonstrates just how serious we are about the way we want to do things at today's GM.  We've identified these issues, and we brought them forward and we're fixing them.  I have asked our team to keep stressing the system at GM and work with one thing in mind, the customer and their safety are at the center of everything we do.  Our customers who have been

affected by this recall are getting our full and undivided
attention.  We are talking directly to them through a dedicated Web
site with constantly updated information and through social media
platforms.  We have trained and assigned more people, over 100, to
our customer call centers, and wait times are down to seconds.  And
of course, we are sending customers written information through the
mail.

We have empowered our dealers to take extraordinary measures
to treat each case specifically.  If people do not want to drive a
recalled vehicle before it is repaired, dealers can provide them
with a loaner or a rental car free of charge.  Today, we provided
nearly 13,000 loaner vehicles.  If a customer is already looking
for another car, dealers are allowed to provide additional cash
allowances for the purchase of a lease or new vehicle.

Our supplier is manufacturing new replacement parts for the
vehicles that are no longer in production.  We have commissioned
two lines and have asked for a third production line.  And those
parts will start being delivered to dealers next week.  These
measures are only the first in making things right and rebuilding
trust with our customers.  And as I have reminded our employees,
getting the cars repaired is only the first step.  Giving customers
the best support possible throughout this process is how we will be
judged.

I would like this committee to know that all of our GM
employees and I are determined to set a new standard.  I am

encouraged to say that everyone at GM, up to and including our
board of directors, supports this.  I am a second generation GM
employee, and I am here as our CEO.  But I am also here
representing the men and women who are part of today's GM and are
dedicated to putting the highest quality, safest vehicles on the
road.

I recently held a town hall meeting to formally introduce our
new VP of safety.  We met at our technical center in Michigan.
This is one of the places where the men and women who engineer our
vehicles work.  They are the brains behind our cars, but they are
also the heart of General Motors.  It was a tough meeting.  Like
me, they are disappointed and upset.  I could see it in their
faces.  I could hear it in their voices.  They had many of the same
questions that I suspect are on your mind.  They want to make
things better for our customers and, in that process, make GM
better.  They particularly wanted to know what we plan to do for
those who have suffered the most from this tragedy.

That is why I am pleased to announce that we have retained
Kenneth Feinberg as a consultant to help us evaluate the situation
and recommend the best path forward.  I am sure this committee
knows Mr. Feinberg is highly qualified and is very experienced in
handling matters such as this.  Having led the compensation efforts
involved with 9/11, the BP oil spill, and the Boston marathon
bombing, Mr. Feinberg brings expertise and objectivity to this
effort.

      As I have said, I consider this to be an extraordinary event, and we are responding to it in an extraordinary way.  As I see it, GM has civil responsibilities and legal responsibilities.  We are thinking through exactly what those responsibilities are and how to balance them in an appropriate manner.  Bringing in Mr. Feinberg is the first step.

      I would now be happy to answer your questions.  Thank you.

      Mr. <u>Murphy.</u>  Thank you, Ms. Barra.

      [The prepared statement of Ms. Barra follows:]

******** INSERT 1-1 ********

Mr. Murphy.  I also want to acknowledge all the families that are here today and know that we are aware and have sympathies of all the committee here.  One Kelly Erin Ruddy of Scranton, Pennsylvania, is one of those who we offer sympathy to the family, but we have all of your in our hearts.

Ms. Barra, our committee reviewed more than 200,000 pages of documents.  What we found is that as soon as the Cobalt hit the road in 2004, drivers began to immediately complain to General Motors that the car's ignition systems didn't work properly.  You can imagine how frightening it is to drive a car that suddenly you lose your power steering and power brakes.  When the switch for the Cobalt was being built back in 2002, GM knew the switch did not meet its specification for torque.  Am I correct?

Ms. Barra.  Yes.

Mr. Murphy.  GM engineers began to look at the problem and try to figure out how to address it.  GM understood the torque and the switch as measured below its own specifications.  Is that right?

Ms. Barra.  Yes.

Mr. Murphy.  Is it common practice for GM to accept a part that does not meet GM specifications?

Ms. Barra.  No, but there is a difference between a part meeting or not meting specifications and a part being defective.

Mr. Murphy.  So under what scenario is accepting parts that don't meet GM specs allowable?

Ms. Barra.  An example would that be when you are purchasing steel.  You will set a specification for steel, but then because of the different suppliers and availability of steel to make products, you will assess the performance, the functionality, the durability, you know, the aspects of the part, or in this case, steel, that is necessary to live up to what the performance and the durability the safety needs to be.

Mr. Murphy.  Well, let's --

Ms. Barra.  So that is an example of when you would have a part or have material that doesn't meet the spec that was set out but is acceptable from a safety, from a functionality perspective, performance as well.

Mr. Murphy.  Is that switch acceptable?

Ms. Barra.  The switch -- I am sorry, the switch.

Mr. Murphy.  Is the switch acceptable?

Ms. Barra.  At what timeframe, I am sorry?

Mr. Murphy.  Well, at the beginning.  It didn't meet the specs for GM, so is that what you would consider acceptable?

Ms. Barra.  As we -- as we clearly know today, it is not.

Mr. Murphy.  So, in 2006, GM changed its ignition switch, and GM's switch supplier Delphi put in a new spring to increase the torque.  Am I correct?

Ms. Barra.  I didn't hear the last part.  I am sorry.

Mr. Murphy.  GM switch supplier Delphi put a new spring in to increase the torque.  Is that correct?

Ms. <u>Barra.</u>  There was a new part.

Mr. <u>Murphy.</u>  Thank you.  Now, in that binder next to you, if you would turn to tab 25.  This is an email exchange between Delphi employees in 2005 discussing the changes to the ignition switch.  The email notes that a GM engineer is asking for information about the ignition switch because, quote, "Cobalt is blowing up in their face in regards to turning the car off with the driver's knee," unquote.

If this was such a big problem, why didn't GM replace the ignition switch in the cars already on the road, the cars where the torque fell well below GM's specifications, instead of just the new cars, why?

Ms. <u>Barra.</u>  What you just said does not match under tab 25.

Mr. <u>Murphy.</u>  It is the bottom of the page; there should be something there.  Well, just note that what I have said -- I apologize for that.

Ms. <u>Barra.</u>  Okay.

Mr. <u>Murphy.</u>  But there was a statement made, that Cobalt is blowing up in their face just by a bump of the driver's knee.

Ms. <u>Barra.</u>  Clearly, there were a lot of things that happened.  There has been a lot of statements made as it relates.  That is why we have answered Anton Valukas to do a complete investigation of this process.  We are spanning over a decade of time.

Mr. <u>Murphy.</u>  But you don't know why they didn't just replace

the switch on the old cars as well as the new cars?

Ms. Barra.  I do not know the answer to that, and that is why we are doing this investigation.

Mr. Murphy.  Well, given the number of complaints about ignitions turning off while driving, why wasn't this identified as a safety issue?

Ms. Barra.  Again, I can't answer specific questions at that point in time.  That is why we are doing a full and complete investigation.

Mr. Murphy.  Well, then, another one, in the chronology GM submitted to NHTSA, GM states it didn't make the connection between the ignition switch problems and the air bag nondeployment problems until late 2013.  So my question is, when GM decided to switch the ignition in 2006, did the company ever examine how a faulty ignition switch could affect other vehicle systems like the air bags?

Ms. Barra.  Again, that is part of the investigation.

Mr. Murphy.  Should they?

Ms. Barra.  Should we understand?

Mr. Murphy.  Should they look at how it affects other vehicle systems?

Ms. Barra.  Yes.

Mr. Murphy.  Let me ask another question then.  So when GM concluded, and you heard from my opening statement, that the tooling cost and price pieces are too high, what does that mean?

Ms. Barra.  I find that statement to be very disturbing.  As we do this investigation and understand it in the context of the whole timeline, if that was the reason the decision was made, that is unacceptable.  That is not the way we do business in today's GM.

Mr. Murphy.  Well, how does GM balance cost and safety?

Ms. Barra.  We don't.  Today, if there is a safety issue, we take action.  If we know there is a defect in our vehicles, we do not look at the cost associated with it.  We look at the speed in which we can fix the issue.

Mr. Murphy.  Was there a culture in GM at that time that they would have put cost over safety?

Ms. Barra.  Again, we are doing a complete investigation, but I would say, in general, we have moved from a cost culture after the bankruptcy to a customer culture.  We have trained thousands of people on putting the customer first.  We have actually gone with outside training.  It is a part of our core values, and it is one of the most important cultural changes we are driving in General Motors today.

Mr. Murphy.  I understand today.  We are asking about then. I am out of time.

Ms. DeGette, you are recognized for 5 minutes.

Ms. DeGette.  Thank you very much, Mr. Chairman.

Ms. Barra, GM knew about the defect in the ignition switches as far back as 2001, 13 years before the recall.  Correct?  Yes or

no will work.

Ms. Barra.  The investigation will tell us that.

Ms. DeGette.  You don't know when GM knew about the defect?

Ms. Barra.  I will -- I would like --

Ms. DeGette.  Take a look at tab 7 in your notebook, Ms. Barra.  This is a GM document, and what this GM document talks about is this switch.  It says, Tear down evaluation on the switch revealed two causes of failure, low contact force and low detent plunger force.

Do you recognize that document, ma'am?

Ms. Barra.  This is the first I have seen this document.

Ms. DeGette.  Okay.  Well, so you don't know how long GM knew about this, right?

Ms. Barra.  And that is why -- and that is why I am doing an investigation.

Ms. DeGette.  Okay.  In fact, Delphi, the manufacturer of the ignition switch, informed GM in 2002 that the switch was supposed to be 15 minimum torque specification, but in fact, these switches were between 4 and 10, didn't it?

Ms. Barra.  The specification is correct that it was supposed to be 20, plus or minus 5.

Ms. DeGette.  And these switches were between 4 and 10, correct?  Yes or no will work.

Ms. Barra.  We know that now.

Ms. DeGette.  And -- and GM was notified by Delphi of this

correct, yes or no?

    Ms. Barra.  I am not aware of being notified.

    Ms. DeGette.  Okay.  Then --

    Ms. Barra.  Can I also correct I was not aware that --

    Ms. DeGette.  I need a yes or no.  I only have 5 minutes.  I am sorry.

    So, as far back as 2004, 10 years ago, GM conducted a problem resolution tracking system inquiry after it learned of an incident where the key moved out of the run condition in a 2005 Chevrolet Cobalt.  Is this correct?

    Ms. Barra.  Again, you are relating specific incidents that happened --

    Ms. DeGette.  You don't know?

    Ms. Barra.  -- in our entire investigation.

    Ms. DeGette.  You don't know about that?  Take a look at tab 8, please.  And by the way, ma'am, I am getting this information from the chronology that GM provided to NHTSA.

    Ms. Barra.  Right.  And they are --

    Ms. DeGette.  So, let me ask you again, as far back as 2004, GM conducted a problem resolution tracking system inquiry after it learned of an incident where the key moved out of the run condition.  Is that correct?

    Ms. Barra.  Yes.

    Ms. DeGette.  Thank you.

    Now, after the PRTS inquiry, one engineer advised against

further action because there was, quote, "no acceptable business case to provide a resolution and the PRTS was closed."  Is that correct?

    Ms. <u>Barra.</u>  If that is true, that is a very disturbing fact.

    Ms. <u>DeGette.</u>  Yes, it is.

    Ms. <u>Barra.</u>  That is not the way we make decisions.

    Ms. <u>DeGette.</u>  Okay.  Again in 2005, GM received more reports of engines stopping when the keys were jerked out of the run condition.  Further investigations were conducted, and engineers proposed changes to the keys.  Is that correct?

    Ms. <u>Barra.</u>  It is part of our investigation to get that complete timeline.

    Ms. <u>DeGette.</u>  Much of this I am taking from the timeline GM has already done.

    Ms. <u>Barra.</u>  Which was a summary.

    Ms. <u>DeGette.</u>  Okay.  So, as a result of the investigation, a technical service bulletin was issued to dealers that if car owners complained, they should be warned of this risk and advised to take unessential items from the key chain, but this recommendation was not made to the public.  No public statements were issued.  No recall sent.  Is that correct?

    Ms. <u>Barra.</u>  To my understanding, yes.

    Ms. <u>DeGette.</u>  Thank you.

In 2006, GM contracted with Delphi to redesign the ignition switch to use a new detent plunger and spring that would increase

torque force in the switch.  Is that correct?

Ms. Barra.  Yes.

Ms. DeGette.  And for some reason, though, the new switch was
not given a part number and instead shared a number with the
original defective switch.  Is that correct?

Ms. Barra.  Yes.

Ms. DeGette.  Now, this new switch also did not meet GM's
minimum torque specifications either.  This one, Delphi said, was
in the range of 10 to 15, and it really should have been 15 at a
minimum.  Is that correct?

Ms. Barra.  I have not seen the test results from that.

Ms. DeGette.  You don't know that.  Okay.

Now, despite these facts, GM continued to manufacture its car
with these same ignition switches for the model years 2008 to
2011.  Is that correct?

Ms. Barra.  Yes.

Ms. DeGette.  And between 2004 and 2014, no public notices
were issued as a result of GM's knowledge of these facts and no
recalls were issued for the over 2.5 million vehicles manufactured
with these defective ignition switches.  Is that correct?

Ms. Barra.  Yes.

Ms. DeGette.  And finally, three recalls were made this year,
2014, two in February, and one just last Friday.  Is that right?

Ms. Barra.  Related to this ignition switch?

Ms. DeGette.  Now, I have -- I have just a couple of more

questions.

The first question I have, Ms. Barra, GM is intending to replace all the switches for those cars beginning on April 7th. Is that right?

Ms. <u>Barra.</u>  We will begin shipping material or new parts this week.

Ms. <u>DeGette.</u>  Now, are you going to put a completely redesigned switch, or are you going to put the old switches from 2006 into those cars?

Ms. <u>Barra.</u>  It is going to be a switch that meets the --

Ms. <u>DeGette.</u>  Is it going to be a newly designed switch or is it going to be the old switch from 2006?

Ms. <u>Barra.</u>  It is the old design that meets the performance that is required to act -- to operate safely.

Ms. <u>DeGette.</u>  Okay.  I have more questions, Mr. Chairman. Perhaps we can do another round.  Thank you.

Mr. <u>Murphy.</u>  But an important part, a follow up of several members being concerned about this, too.  You are saying that there is an ongoing investigation; you cannot comment on these yet.  Are you getting updates on a regular basis as this is going on?

Ms. <u>Barra.</u>  From Mr. Valukas?

Mr. <u>Murphy.</u>  From anybody in the company regarding these proceedings, are you getting updates?

Ms. <u>Barra.</u>  Yes, I am.

Mr. Murphy.  Thank you.

Now go to the chairman of the full committee, Mr. Upton for 5 minutes.

The Chairman.  Thanks, again, Ms. Barra, for being here this afternoon.  I want to make sure that we ask similar questions of both you and of NHTSA.  We want to learn about the documents that were submitted on a timely and appropriate basis to NHTSA, and in fact, what did they do with that information.

The documents that we have looked at as produced show that GM received complaints about its Cobalt ignition switches for about 2 years that ultimately resulted in a redesigned ignition switch in 2006.  Who within GM would have known about those specific complaints?  What was the process back then?

Ms. Barra.  I was not a part of that organization at the time.  That is why I am doing the investigation to understand that.

The Chairman.  So you don't know the folks that it would have been reported to at this point.  Is that right?

Ms. Barra.  I don't know the people who would have been handling this issue at that point.

The Chairman.  But you are getting updates, and what is -- what is supposed to happen?  Looking back, what should have happened when these reports came in?

Ms. Barra.  In general, when you have an issue, a product issue, a safety issue, a field incident, any type of issue that

comes in, you have a team of engineers that are the most knowledgeable that work on that.  If they see there is an issue, they elevate it to a cross-functional team that looks at it, and then it goes to a group for decision.

The Chairman.  Now, we know that the ignition switch was in fact redesigned because it didn't meet the specs that were there.  Is that right?

Ms. Barra.  Yes.

The Chairman.  Now, I would guess engineering 101 would normally require that when you assign a new part or replace a new part or replace a part with a new part, that that newly redesigned part, in fact, should have a different number on it.  Is that right?

Ms. Barra.  That is correct.

The Chairman.  So, and that didn't happen, right, did not happen?

Ms. Barra.  That is correct.

The Chairman.  Who within GM made the decision to move forward with that redesigned switch without a new part number?  Do you know who that is?

Ms. Barra.  I do not know the name of the individual.

The Chairman.  Are you going to be able to find that out for us?

Ms. Barra.  Yes, I will.

The Chairman.  And will you give that name to our committee?

Ms. Barra.  And provide that.

The Chairman.  Who -- is it -- would it -- is it likely that that same person was the one that decided not to recall the defective version?  Where in the timeline is that?

Ms. Barra.  I don't know, but that is part of the investigation that we are doing.

The Chairman.  Do you know when it was that it was discovered, what year, you know, where in the timeline that it was discovered that in fact a new part number was not assigned?

Ms. Barra.  I became aware of that after we did the recall and the timeline was put together.

The Chairman.  So that was just in the last month or so.  Is that right?

Ms. Barra.  That is when I became aware.

The Chairman.  But when -- when did GM realize that no new part number had been assigned?

Ms. Barra.  Again, that is part of our investigation.  I am -- I want to know that just as much as you because that is an unacceptable practice.  It is not the way we do business.

The Chairman.  So, you stated publicly that something went wrong with our process.  How is the process supposed to work?  How is this -- how are you redesigning the process to ensure that in fact it should work the way that it needs to work?

Ms. Barra.  Well, one of things we are doing is the investigation by Mr. Valukas.  I have some early findings from Mr.

Valukas.  As we look across the company, it appears at this time
there was information in one part of the company, and another part
of the company didn't have access to that.  At times, they didn't
share information just by course of process or they didn't
recognize that the information would be valuable to another area
of the company.  We have fixed that.  We have announced a new
position.  Jeff Boyer who is the vice president of Global Vehicle
Safety, all of this we will report to him.  He will have
additional staff and will have the ability to cut across the
organization and will also have the right functional leadership
that understands what is going on in the different areas, so that
is a fix we have already made, and he is operating that way today.

     The Chairman.  So, when GM received complaints about the
ignition switches for a number of years and ended up resulting in
the redesigned ignition switch in 2006, when was it that anyone
linked up the ignition switch problems to look at the Cobalt's air
bags not deploying?  Was that at about the same time?  Was that
later?  What is the timeline on that?

     Ms. Barra.  That is something I very much want to understand
and know, but I again, this is -- we are doing an investigation
that spans over a decade, and it is very important, because
designing a vehicle is a very complex process, that we get a
detailed understanding of exactly what happened because that is
the only way we can know that we can fix processes and make sure
it never happens again.

The Chairman.  When was it that GM informed NHTSA that in
fact a redesigned -- did in fact GM inform NHTSA that the ignition
switch had been redesigned?

Ms. Barra.  I don't know that.

The Chairman.  I yield back.

Mr. Murphy.  The gentleman yields back.

I now recognize the ranking member of the full committee, Mr.
Waxman, for 5 minutes.

Mr. Waxman.  Thank you, Mr. Chairman.

Ms. Barra, we heard about how in 2002, GM approved the use of
faulty ignition switches in Cobalts, Ions and other cars.  That is
what caused many of the problems that led to the recall of the
cars from model years 2003 to 2007.  So new ignition switches were
designed and approved by General Motors.  These were switches that
were used -- were in use in the model years 2008 to 2010.  Does
that all sound right to you?  Am I correct in what I am saying?

Ms. Barra.  There is a couple of statements you made at the
beginning that I don't know to be true.

Mr. Waxman.  Well, in 2002, GM approved the use of what
turned out to be faulty ignition switches in several of these
cars.

Ms. Barra.  They were actually in -- they were parts that
went into a 2003 was the earliest model.

Mr. Waxman.  Well, the tests were done in 2002, but the cars
were 2003 to 2007, so we had a recall of those cars.

Ms. Barra.   Right.

Mr. Waxman.   And then there was a new switch, new ignition switch designed and approved by GM, and these new switches were in use in the model years 2008 to 2010 Cobalts and Ions.   Is that --

Ms. Barra.   To the best of my knowledge, that's correct.

Mr. Waxman.   Okay.   But in a briefing last week, Delphi told committee staff that these new switches also did not meet GM specifications.   They told us the force required to turn these switches was about two-thirds of what GM said it should be, and documents that were provided to the committee also confirmed that top GM officials were aware of the out-of-spec switches in 2008 to 2002 vehicles in December 2013.

So, there's a document, if you want to look it up, it's tab 39, page 6 of your binder.   There was a December presentation for GM's high level executive field action decision committee, and that meeting -- at that meeting they show that the performance measurement for almost half of the 2008, so you go to 2008-2010 model year vehicles, ignition switches were below the minimum GM required specifications.   My question to you is, are you concerned that many 2008 to 2010 model year cars have switches that do not meet the company specifications?

Ms. Barra.   As we assess the situation, my understanding that there was work going on to look at the switches again, looking at just because a switch, or a part, any generic part doesn't meet specifications does not necessarily mean it is a defective part.

As that analysis was going on, at the same time we were doing the look across to make sure we could get all of the spare parts, and when we recognized that spare parts might be -- have been sold through third parties that have no tracking to know which vend, we made the decision to recall all of those vehicles.

Mr. Waxman.  Well, your own executives were informed that a lot of these cars, that those model years had switches that were just as defective as the 2003 to 2007 cars, that -- those cars were recalled, but you didn't recall the model year 2008 to 2011 vehicles until a month later on March 28th.  Why did the company delay in recalling these newer vehicles?

Ms. Barra.  The company was looking -- my understanding is the company was assessing those switches, but again, at the same time, in parallel, they were looking at the spare parts issue, and the spare parts issue became very clear we needed to go and get all of those vehicles because we couldn't identify which vehicles may have had a spare part put in them, and we then recalled the entire population.

Mr. Waxman.  But you recalled those vehicles.  You recalled them later.

Ms. Barra.  Yes, we did.

Mr. Waxman.  But not when you knew there was a problem.

Ms. Barra.  Well, we recall them --

Mr. Waxman.  Your recall of these later vehicles did not mention the faulty switches that were originally installed in the

cars.  They mention only, quote, faulty switches may have been used to repair the vehicles.

Why did the company not announce that subpar switches may have been installed in those vehicles in the first place?

Ms. Barra.  Again, there was an assessment going on to understand if the specification -- the parts performance was adequate.

Mr. Waxman.  Well, wasn't it misleading to say that that company didn't tell them sub par switches may have been installed in the first place?  What if I owned a later model car with its original ignition switch, your recall implies that I don't have to do anything, but my car might still, still have a sub par switch.  Will your company conduct a detailed analysis of these late model vehicles to determine if they are safe and will you provide the committee with warranty reports and other information so we can do our own analysis?

Ms. Barra.  I believe we're recalling all of those parts.  All of those vehicles are being recalled.

Mr. Waxman.  They are all being recalled.

Well, I must say, in conclusion, Mr. Chairman, I am concerned.  I know you have taken this job in an auspicious time; you are trying to clean up a mess that was left behind for you by your predecessors, but I have one last question.  How can GM assure its customers that new switches being installed beginning April 7 will finally meet GM's requirements?

Mr. Murphy.  Thank you.

Ms. Barra.  We have done -- we are working very closely with our supplier.  Our executive director responsible for switches is personally looking at the performance of the new switches.  We will do 100 percent end-of-line testing to make sure that the performance, the safety, the functionality of these switches are safe.

Mr. Murphy.  Thank you.  Gentleman's time expired.

Ms. Barra, you are being asked a number of questions.  I just want to be clear.  Did you review the documents that GM submitted to the committee?

Ms. Barra.  No, I did not.  There was over 200,000 pages, my understanding.

Mr. Murphy.  How about the document Mr. Waxman was talking about?  Did you review that?

Ms. Barra.  This page right here?

Mr. Murphy.  Yes.

Ms. Barra.  I actually saw this for the first time I think a day ago.

Mr. Murphy.  Thank you.

I now recognize Mrs. Blackburn for 5 minutes.

Mrs. Blackburn.  Thank you, Mr. Chairman.

Ms. Barra, you mentioned several times in your comments "today's GM," so my assumption is that you are going to run GM in a different manner than it has been run in the past.

Ms. Barra.  That is correct.

Mrs. Blackburn.  And that you are making some changes.

I want to ask you just a little bit about timeline, helping us to get our hands around this because this is the first investigation we are going to do.  We are going to have others and continue to look at this to get answers and figure out what has happened here between you all and NHTSA and also within what happened at GM.

So you mentioned in your testimony that this came to light on your watch, so I am assuming that there was no widespread knowledge in GM about this issue until you became CEO.  Am I correct on that?

Ms. Barra.  At the senior level of the company, we learned of this after the recall decision was made on January 31st.  I was aware in late December there was analysis going on on the Cobalt issue, but I had no more information than that.  But I can assure you, as soon as we understood, the senior leadership understood this issue and that a recall decision had been made, we acted without hesitation.

RPTS BAKER

DCMN WILTSIE

[2:58 p.m.]

Ms. Blackburn.  Okay.  Then, how did you find out about it?
Was it through someone bringing the issue to you to say, "Ms.
Barra, we have a real problem here" or, in doing your due
diligence, did you find out about it?

Ms. Barra.  The leadership committee responsible for making
recall decisions made a decision on January 31.  They notified
Mark Royse, who immediately picked up the phone and called me.

Ms. Blackburn.  Okay.  And could you submit to us the members
of that leadership committee that makes those recommendations.

Ms. Barra.  Yes.

Ms. Blackburn.  Thank you.

And then was your predecessor -- Mr. Akerson, your
predecessor, was he aware of this issue?

Ms. Barra.  Not to my knowledge.

Ms. Blackburn.  He was not.

Are any of the members of the leadership committee
also -- were they a part of his leadership committee?

Ms. Barra.  There are members of today's team that were also
members of Mr. Akerson's leadership team.  And, to my knowledge,
they were not aware.

Ms. Blackburn.  Do you think there was a coverup or it was

sloppy work?

Ms. <u>Barra.</u>  That is the question I have asked Mr. Valukus to uncover, and I am anxiously awaiting the results from his study.

Ms. <u>Blackburn.</u>  Okay.  Do you think it had anything to do with the auto bailout?

Ms. <u>Barra.</u>  I am sorry?

Ms. <u>Blackburn.</u>  With the auto bailout.  Do you think it had any --

Ms. <u>Barra.</u>  Again, I need to get the results of the study to make all determinations.

Ms. <u>Blackburn.</u>  And going back to what Mr. Upton said, you are going to be sharing that information with us?

Ms. <u>Barra.</u>  Yes.  We will be transparent.

Ms. <u>Blackburn.</u>  Okay.  The engineers that were responsible for this, have you brought them into the process?  I know this is something that the part was actually created by Delphi.  Correct?

Ms. <u>Barra.</u>  Correct.

Ms. <u>Blackburn.</u>  And they have an engineering team that was working on that; so, they have a shared responsibility and liability in this entire issue.

Have you met with them and with the engineering team that was responsible for this switch?

Ms. <u>Barra.</u>  I have not met with the specific engineering team that is responsible, but I am speaking to leadership.  And those individuals are being interviewed as part of the investigation

conducted by Mr. Valukus.

Ms. Blackburn.  Okay.  Now, going back, did you say that this was a defective part when you talked about it earlier?

Ms. Barra.  We have learned when we knew -- when the recall decision was made and we later went back and looked at the chronology, there is points that suggest, and that is why we are doing the investigation.

Ms. Blackburn.  Okay.  All right.  Now, I think that you are going to hear from more than one of us about not having a new part number assigned.

Who made that decision?  Was that strictly a Delphi decision or did that come into the GM supply chain for that decision to be made as to how that part number would be coded?

Ms. Barra.  At a general level, General Motors is responsible for General Motors' parts numbers.  But, again, that is part of the investigation, to understand how that happened.

Ms. Blackburn.  Okay.  Does that seem inconceivable to you?

Ms. Barra.  Yes.  It is inconceivable.  It is not our process, and it is not acceptable.

Ms. Blackburn.  Okay.  I would think that it probably is not.

Have you asked Delphi if you can have access to their documentation and their email chain dealing with this issue?

Ms. Barra.  I have not.  And, again, Mr. Valukus will go -- as the investigation takes him to get the information he needs to make a complete and accurate accounting of what happened.

Ms. Blackburn.  My time has expired.

Thank you, Mr. Chairman.  I yield back.

Mr. Murphy.  Just for clarification, Ms. Blackburn, we have asked for that email chain from Delphi and we will let you know when we get that.

Now recognize Chairman Emeritus of the committee, Mr. Dingell, for 5 minutes.

Mr. Dingell.  Mr. Chairman, I thank you for your courtesy.

I begin by telling the families of those who were injured or killed by the defective General Motors' vehicles they have our sympathy, and we believe the events here are tragic, indeed.  And I join everyone in expressing my condolences to the families who were killed or injured in those crashes.

Now it is incumbent upon the Congress, Federal regulators, and General Motors to determine how these deaths could have happened and to take reasonable steps to ensure that the safety of American motorists and their families are moving forward.  I expect that this investigation will be thorough.  And I counsel all the stakeholders to be unabashedly forthright.

Now, Ms. Barra, I would like to build on Chairman Murphy's line of questioning.  And all of my questions will require "yes" or "no" answers.  If you cannot answer some of my questions, I expect that you will submit responses for the record and all available relevant supporting materials.

Now, Ms. Barra, is it correct that GM has now recalled

approximately 2.5 million small cars in the United States due to defective ignition switches?  Yes or no?

    Ms. Barra.  Yes.

    Mr. Dingell.  Now, Ms. Barra, is it correct that GM recently expanded its recall of small cars because it was possible that defective ignition switches may have been installed as replacement parts?  Yes or no?

    Ms. Barra.  Yes.

    Mr. Dingell.  Ms. Barra, is it correct that the ignition switch in question was originally developed in the late 1990s and approved by General Motors in February of 2002?  Yes or no?

    Ms. Barra.  Yes.

    Mr. Dingell.  Ms. Barra, is it correct that General Motors' own design specifications for such ignition switch required 20 plus or minus 5 newton centimeters of torque to move the switch from the accessory position to the run position?  Yes or no?

    Ms. Barra.  Yes.

    Mr. Dingell.  Ms. Barra, is it correct that General Motors approved production of such ignition switch despite test results by Delphi during the production part approval process, or PPAP, showing that the switch did not meet GM's torque requirement?  Yes or no?

    Ms. Barra.  It is not clear to me.

    Mr. Dingell.  Now, Ms. Barra, is it correct that General Motors approved a redesign of the ignition switch used in the

presently recalled vehicles in April of 2006?

Ms. Barra.  Yes.

Mr. Dingell.  Ms. Barra, is it correct that GM's torque requirement for the redesigned switch remained the same as for the original ignition switch?  Yes or no?

Ms. Barra.  It is not clear to me.  And that is why we are focusing the investigation on that area specifically.

Mr. Dingell.  When that information becomes available, would you submit it to the committee, please?

Ms. Barra.  Yes, I will.

Mr. Dingell.  Ms. Barra, to your knowledge, did the redesigned ignition switch meet GM's torque requirements?  Yes or no?

Ms. Barra.  I --

Mr. Dingell.  Want me to say it again?

To your knowledge, did the redesigned ignition switch meet GM's torque requirement?  Yes or no?

Ms. Barra.  It is part of the investigation.

Mr. Dingell.  Ms. Barra, will you please submit for the record an explanation of the factors that GM takes into consideration when approving a part for production.  Are there circumstances where GM may approve parts for production when such parts do not make such design specifications?  Yes or no?

Ms. Barra.  Yes.

Mr. Dingell.  If so, could you please submit materials for

the record explaining when and why that might occur.

Ms. Barra.  Yes.

Mr. Dingell.  Ms. Barra, I appreciate the lengths to which
GM, under your leadership, is going to recall the vehicles and
ensure that they are safe to drive.

GM's cooperation with the committee is necessary in order to
understand the process by which -- and the reasons decisions were
made leading up to the 2014 recall.  You may have so far done so,
and I expect that you will continue to do so.

Thank you for your courtesy, Mr. Chairman.

Thank you, Ms. Barra.

I yield back the balance of my time.

Mr. Murphy.  The gentleman yields back.

I now recognize the Chairman Emeritus of the majority, Mr.
Barton of Texas, for 5 minutes.

Mr. Barton.  Thank you, Mr. Chairman.

Before I ask my questions, I want to make just a general
observation.  This is probably the last major investigation that
this subcommittee and full committee is going to conduct where we
have the services of Mr. Dingell and Mr. Waxman.

We have had a history on this committee and this subcommittee
going back at least 40 to 50 years that, when we have major
issues, we try to approach them on behalf of the American people
in a non-partisan, very open way.  And it certainly appears that
we are going to continue that tradition today.

So I hope that we can show the best to the American people,
that the Congress at its best gets the facts, presents the facts,
and does so in a way that in the future we protect the public
health and safety for the American people.

Now, with that caveat, I do have a few questions.

A number of Congressmen so far have made the point that these
ignition switches didn't appear to meet specifications.

And my assumption is that you have agreed that they did not
meet specifications.  Is that correct?

Ms. Barra.  We have learned that as we did the recall.

Mr. Barton.  Now, I am an industrial engineer.  I used to be
a registered professional engineer.  I am not currently
registered, but I have been in the past.

Why in the world would a company with the stellar reputation
of General Motors purchase a part that did not meet its own
specifications?

Ms. Barra.  I want to know that as much as you do.  It is not
the way we do business today.  It is not the way we want to design
and engineer vehicles for our customers.

Mr. Barton.  I mean, I just don't understand that.  I have
never worked in an auto assembly environment.  I have worked in a
defense plant, an aircraft plant.  I was plant manager of a
printing plant.

I have done very limited consulting in the oil and gas
industry, but I have never been a part of an organization that

said, "We set the specs.  When a part doesn't meet the specs, we go ahead and buy it anyway."

You know, you are currently the CEO, but at one time, I think, before you became CEO, you were the vice president for Global Product Development, purchasing and supply chain.

Is it your position now that General Motors will not accept parts that don't meet specifications?

Ms. Barra.  We will not accept parts that don't meet our performance, safety, functionality, durability requirements.  As I mentioned before in the steel example, there will be times where there will be a material or a part that doesn't meet the exact specification, but after analysis and looking at the performance, the safety, the durability, the reliability, the functionality, it will be okayed.  That happens very often as we buy steel to make the bodies of the vehicles.

Mr. Barton.  Well, then, you don't need specifications -- with all respect --

Ms. Barra.  No.  But --

Mr. Barton.  -- what you just answered is gobbledygook.  It is your own specification.  It is your company's specification.

If a part doesn't meet the specification, why in the world would you not refuse it and only accept a part that meets the specification?

Ms. Barra.  There needs to be a well-documented process if you accept a part that doesn't meet the original specifications.

Ms. DeGette.  Would the gentleman yield?

Mr. Barton.  Briefly, yes.

Ms. DeGette.  Do you have that information?

Ms. Barra.  On steel?

Ms. DeGette.  No.  On starters.

Ms. Barra.  On the ignition switch --

Ms. DeGette.  Yeah.

If it didn't meet specifications, do you have the information on these starters that it met all those other criteria?

Ms. Barra.  That is part of the investigation.  But, clearly, by the fact that we made a recall, it did not meet the performance specifications.

Mr. Barton.  We have the advantage, as a subcommittee, that we know now what happened in the past.  We know now that there is a real problem.  We know now that a number of young people have lost their lives apparently because of this defect.

So we have the advantage of hindsight.  So I understand that. But as Ms. DeGette just said and a number of others, there is no reason to have specifications if you don't enforce them.

This next question is not a trick question, but it is an important question.  Right now, how many parts are being used in General Motors' products that don't meet your own company's specifications?

Ms. Barra.  I don't have that exact number.  But I can tell you the parts that we are using today meet the performance and the

reliability, the safety, that they need to.  If we find we have a part that is defective, that doesn't meet the requirements, we then do a recall.

Mr. Barton.  Well, again, with due -- that is not an acceptable answer, I think, to the American people.

We are not telling you the specifications to set.  Now, there are some safety specifications that -- by law and NHTSA, by regulation, sets, but there shouldn't be a part used in any GM product or, for that matter, any other automobile product that is sold in the United States that doesn't meet the specifications.

At what level was the decision made to override and to use this part even though it didn't meet specification?  Was that made at the manufacturing level, at the executive level, or even at some subcomponent purchasing level?  Do you know that right now?

Ms. Barra.  That is part of our investigation to answer that question.

Mr. Barton.  All right.  Thank you.

Thank you, Mr. Chairman.

Mr. Murphy.  Thank you.

I now recognize Mr. Braley for 5 minutes.

Mr. Braley.  Thank you, Mr. Chairman.

Ms. Barra, we have had different perspectives during this hearing.  You have been appropriately focusing your attention on the members of this committee and answering our questions.

I have been staring at these photographs on the back wall.

And I see young women the same age as my daughter.  I see young men the same age as my two sons.  My son Paul owns one of your Cobalts.

I see a young Marine in his dress blues, and I am reminded of the photograph I have in my office upstairs of my father at the age of 18 in his dress blues at Camp Pendleton.

And the focus of this hearing so far has been on GM's commitment to safety, which I think we all agree on is an important topic for this hearing.

You testified in your opening -- and I think I am quoting -- "Our customers and their safety are at the center of everything we do."

And you responded to a question from Ms. Blackburn and told us that you were going to run GM differently than it has been run in the past.

And I have a copy of GM's March 18 press release announcing Jeff Boyer as your new vice president of Global Vehicle Safety.

And in this press release he is quoted as saying, "Nothing is more important than the safety of our customers and the vehicles they drive.  Today's GM is committed to this, and I am ready to take on this assignment."

20 years before this hearing an Iowa family harmed by another defective GM vehicle gave me this promotional screwdriver set that they got from their local GM dealer.  And if you look at it, on the outside it has a slogan, "Safety comes first at GM."

So my question for you and I think the question that these families back here want to know is:  What has changed at GM? Isn't it true that, throughout its corporate history, GM has represented to the driving public that safety has always been their number one priority?

Ms. <u>Barra.</u>  I can't speak to the statements that were made in the past.  All I can tell you is the way we are working now, the training that we have done, we have changed our core values, the decisionmaking we are leading, we are leading by example.

One of the process changes that we have also made is, in addition to when the technical community makes their decision about a safety recall or a recall, we are going to be reviewing it, Mark Royce, the head of Global Product Development, and myself, to see if there is more than we want to do.

Mr. <u>Braley.</u>  Hasn't the core values of General Motors always been that safety comes first?

Ms. <u>Barra.</u>  I have never seen that part before.

Mr. <u>Braley.</u>  Isn't it true that, throughout the history of the company, it has made representations like this to the driving public as a way of inducing them to buy your vehicles?

Ms. <u>Barra.</u>  Today's General Motors -- all I can tell you is today's General Motors, we are focused or safety.  We have over 18 vehicles that have a five-star crash rating.  Our entire Buick lineup meets that requirement.  We take it very seriously.

Mr. <u>Braley.</u>  But we are talking about these vehicles and what

has changed.

Have you had a chance to read this article in the Saturday

New York Times:  A Florida Engineer's Eureka Moment With a Deadly

G.M. Flaw?

Ms. Barra.  I believe I read a portion of that article.

Mr. Braley.  This is an article by a writer named Bill

Vlasic.  And he wrote in here about an engineer named Mark Hood

who is "at a loss to explain why the engine in Brooke Melton's

Cobalt had suddenly shut off, causing her fatal accident in 2010

in Georgia.

"Then he bought a replacement for $30 from a local G.M.

dealership, and the mystery quickly unraveled.  For the first

time, someone outside G.M., even by the company's own account, had

figured out a problem that it had known about for a decade, and is

now linked to 12 deaths.

"Even though the new switch had the same identification

number, Mr. Hood found big differences."

And then the article continues, "So began the discovery that

would set in motion G.M.'s worldwide recall of 2.6 million Cobalts

and other cars, and one of the gravest safety crises in the

company's history."

Do you agree with the author that this is a grave safety

crisis in the history of General Motors?

Ms. Barra.  I have said that this incident took way too long,

it is not acceptable, and that is why we are making a radical

change to the entire process, adding more resources, naming a vice

president of Global Vehicle Safety who is tremendously experienced

and of the highest integrity, and we will continue to make process

changes and people changes as we get the results of the Mr.

Valukus investigation, and we will take all of those

recommendations and we will make changes.

Mr. <u>Braley.</u>  Before I yield back, Mr. Chairman, I would like

to ask unanimous consent to have this article added to the record

for the hearing, if it is not already a part of the record.

Mr. <u>Murphy.</u>  Without objection.

[The information follows:]


******** COMMITTEE INSERT ********

Ms. Blackburn.  If the gentleman would yield his remaining second, Ms. Barra said they had changed their core values.  I think it would be great if she could submit to us what those new core values for GM are so we would have those for the record.

Mr. Murphy.  We will ask that for the record.

Mr. Braley.  I would also like to have any prior statement of core values for General Motors over the last 20 years so that we can see what has changed, Mr. Chairman.

Mr. Murphy.  We will be asking members for several questions to submit to GM for the record.

Now recognize the vice chair of the subcommittee, Dr. Burgess, for 5 minutes.

Dr. Burgess.  Thank the chairman.

And thank the witness for spending so much time with us this afternoon.

You mentioned, Ms. Barra, at the start of your written testimony that, over a decade ago, General Motors embarked upon a small car program.

Do you recall why that was?

Ms. Barra.  I am sorry?

Dr. Burgess.  Why did GM embark upon a small car program 10 years ago, over a decade ago?

Ms. Barra.  To have a complete portfolio, I believe.

Dr. Burgess.  But the mission -- or the type of car that was manufactured by GM previously had not fit that model; so, this was

an entirely new business line that GM was undertaking?

Ms. Barra.  The Cobalt -- and there are several products.
But if you are speaking specifically about the Cobalt, it was
following a previous small car, but it was an all-new program
architecture, et cetera.

Dr. Burgess.  Was any part of this done because of the CAFE
standards that were changing?  Was any of this done because of
congressional action that had occurred previously?

Ms. Barra.  I cannot answer that question.  I wasn't in on
decisionmaking at that point.

Dr. Burgess.  Let me ask you this.  When Mr. Waxman was
giving his opening statement, he said it was a shame that the
National Highway Traffic Safety Administration did not have access
to the same information that General Motors had.

Do you think that was a fair statement for him to have made?

Ms. Barra.  As part of the investigation we are doing, I am
looking at what information was provided and when.

Dr. Burgess.  And that becomes, then, the troubling part of
all of this.

I think Ranking Member DeGette had you look at tab 8 in the
information binder, and this was talking about the ignition key
cylinder assembly.  And the date of the PDF that I have is January
1 of 2005.  Again, you will find that under tab 8.

But later on in the same document it says, "We are closing
this with no action.  The main reasons are all possible solutions

were presented.  The lead time for solutions is too long.  The tooling costs and piece price are too high, and none of the solution seems to fully countermeasure the possibility of the key being turned off."

So that was all in January of 2005.  And then, you know, as part of our document evaluation for getting ready for this hearing, there were several accident reports that were supplied to us.  And one of those occurred not too far away in Maryland in the middle of the summer of 2005.

And in that accident sequence, a Cobalt hit a series of trees at the end of a cul-de-sac.  The driver was fatally injured during that.  She wasn't wearing a seatbelt.  She wasn't a terribly large individual.  She weighed about 100 pounds.

Because the air bag did not deploy, though -- or it would be my -- well, you just have to wonder.  Had the air bag deployed, would her small frame have been protected?

I mean, she broke the rim off the steering wheel because of the impact of the collision, her body with the steering wheel and steering column.

Of course, the steering wheel, being somewhat indented toward the driver -- the lower part of the driver's body, hit her under the ribcage, apparently resulting in a liver laceration, which resulted in the exsanguination and the time sequence to get her out of the crash and get her to the hospital.

You can't help but wonder -- because the other injuries that

were reported with that crash are really fairly mild.  You have

got to believe the air bag would have made a difference there.

I just can't help but think that the people evaluating this

must have asked themselves why no air bag went off with this type

of crash.  She was going 70 miles an hour and hit an oak tree.

Wouldn't that be a logical place for an air bag to deploy?

Ms. Barra.  First of all, it is a very tragic situation.

Some of the fatalities in these vehicles, again, we see as a

tragedy, and we have apologized.

As I read the document that you asked me, I find that

unacceptable, that any engineer would stop at that point if there

was an issue that they felt was a safety defect.

That is why we are doing the investigation, again, to put a

complete timeline together.  And I commit to you, we will take

action.  We have made process changes.  We will fix the process.

Our goal is to have a world-class safety process.

Dr. Burgess.  And I respect you for being here and answering

that way.

One of the other accidents that is recorded in our binder

under tab 20 was a head-on collision that occurred, I believe, in

Pennsylvania where the Cobalt was not at fault.

Another car went over the center line, and there was a

head-on impact.  Again the Cobalt air bags did not deploy.  The

driver of the other vehicle -- the air bag did deploy.

I mean, it seems to me this should be a red flag to the

people who investigate air bag non-deployments as an occurrence or
as an issue.

In fairness, let me just state that all of the front-seat
occupants of both vehicles were deceased as a result of that
accident; so, the deployment of the air bag in that situation did
not protect, preserve the life of the driver.

But, still, you would have to ask the question.  You have a
Cobalt and a Hyundai meeting head on.  Why did the Cobalt's air
bags not deploy?

It was the exact same force for both vehicles.  There was no
intercedent jarring of the vehicle.  They didn't run off the curb.
They didn't run over another tree first.  So the air bag did not
deploy.

Why would that have been the case in that particular
accident?

Ms. <u>Barra.</u>  Again, it is a tragic situation anytime there is
a loss of life in a traffic situation.  Again, this is not an
investigation that was done by GM.  I can't answer your questions
because it is usually very complex as they look at that.  So I
can't comment on this particular study.

Dr. <u>Burgess.</u>  If that is part of your internal investigation,
though, I would like for you to make that information available to
the committee staff and to the committee.

Ms. <u>Barra.</u>  We will make whatever information we have
available.

Dr. Burgess.  Thank you.  And thanks for being here.

Mr. Murphy.  The gentleman's time is expired.

I will now recognize Ms. Schakowsky for 5 minutes.

Ms. Schakowsky.  Thank you, Mr. Chairman.

Mr. Braley talked about the pictures in the back, and I think that what must make it even more painful is that these deaths were needless.

So I want to ask you about something a little bit more than an apology.  One of the many questions raised about GM is how -- GM today -- is how you will handle accidents that happened prior to the company's bankruptcy.

GM filed for bankruptcy in 2009, emerging as new GM about 6 weeks later.  So that means that new GM, the company as it exists today, I have been told, may not be liable for accidents that occurred prior to July 2009.

Is that your understanding, Ms. Barra?

Ms. Barra.  We at General Motors want to do the right thing for our customers, and that is why we feel this is an extraordinary situation, as I have said.

It took too long to get to the answers and the understandings about this part.  That is why we have hired Mr. Feinberg.

We feel Mr. Feinberg has had extensive experience and he will bring his experience and objectivity to assess what are the appropriate next steps, because we do understand that we have civic responsibilities as well as legal responsibilities.

Ms. Schakowsky.  Are you saying that the hiring of
Mr. Feinberg indicates that GM will give some kind of settlement
with those individuals whose -- the families whose loved ones lost
their lives?

Ms. Barra.  We have just begun to work with Mr. Feinberg.  In
fact, our first meeting will be on Friday.  It will take probably
30 to 60 days to evaluate the situation.  So we have not made any
decisions.  We have just started this process with Mr. Feinberg.

Ms. Schakowsky.  And that might include people who have been
injured as well?

Ms. Barra.  Again, we have not made any decisions.

Ms. Schakowsky.  Let me ask you this:  During GM's
restructuring, did the company disclose what it knew about this
ignition switch defect?  By 2009, there is no doubt that officials
in GM were aware of this problem.

Ms. Barra.  I was not aware of this issue.  I can't speak to
what was disclosed.  So, again, our investigation will cover if
there was any information.  But, to my knowledge, it was not known
at the senior leadership of the company.

Ms. Schakowsky.  So does GM accept responsibility for the
accidents caused by the company's defective vehicles?

Ms. Barra.  First of all, I again want to reiterate we think
the situation is tragic and we apologize for what has happened and
we are doing a full investigation to understand --

Ms. Schakowsky.  I am talking about responsibility and even

liability.

Ms. Barra.  Responsibility -- I am sorry.  I don't understand your question.

Ms. Schakowsky.  And even liability.

Do you take responsibility?  Is the company responsible?  The new GM, is it responsible?

Ms. Barra.  We will make the best decisions for our customers, recognizing that we have legal obligations and responsibilities as well as moral obligations.  We are committed to our customers, and we are going to work very hard to do the right thing for our customers.

Ms. Schakowsky.  I hope that you do do the right thing.

Let me ask you about some of the people who potentially knew about this.

So you have appointed for the first time a president of Global Vehicle Safety.  I have to tell you I am underwhelmed by that, thinking that it is such an obvious thing to have someone high up that would, in fact, be able to connect the departments so everybody knew.  I guess it is a good thing, however, that it is finally done.

So we know that Ray DeGiorgio was the GM engineer who approved the ignition switch redesign in 2006.  Is he still an employee of your company?

Ms. Barra.  I believe he is.

Ms. Schakowsky.  Do you know who signed off on the initial

faulty ignition switch that did not meet your specifications?

Ms. Barra.  I don't.  But that is what I will learn with the investigation.  And after we have a complete investigation from a very complex process, we will take action.

We will change process, and we will deal with any people issues.  I think we demonstrated in the issues we learned in India with the Tavera about a year ago, we will take serious steps and hold people accountable.

Ms. Schakowsky.  So no one right now has lost their job as a result of this knowledge about this defective part?

Ms. Barra.  We are just a few weeks into the investigation by Mr. Valukus.  We have already made process changes.

And as I return to the office after this, we will begin to look at the implications, now that we have more data coming from the investigation, and take the appropriate steps.

Ms. Schakowsky.  Thank you.

I yield back.

Mr. Murphy.  Gentlelady yields back.

Now recognize the gentleman from Georgia, Dr. Gingrey, for 5 minutes.

Dr. Gingrey.  Mr. Chairman, thank you very much.

This hearing is much appreciated, pretty poignant to me, since Brooke Melton lived in my congressional district at the time.

And had it not been for an outstanding plaintiff's attorney

in the Cobb Judicial District of Georgia in bringing this
case -- I am sure it was against a local dealership -- resulted in
a settlement, but it brought to light what is going on now and the
purpose.  And, hopefully, some good can come from this hearing.

And I want to thank Chairman Murphy for holding it and
investigating the root cause of the General Motors recall of over
2.6 million vehicles linked to these ignition defects.
Unfortunately, Ms. Barra, I heard just yesterday that the recall
now includes 6.3 million vehicles.

And I do want to speak a little about this young lady named
Brooke Melton, a nurse in Paulding County, Georgia, which, at the
time, was in the district I represent.

And she was, as you know, tragically killed March the 10th,
2010, on her 29th birthday in a horrific side-impact accident on
Highway 92, and the ignition switch in the accessory position.

Just the day before, just the day before, her death, she took
her 2005 Chevy Cobalt into the dealership for service, and the
service report stated, "Customer states engine shut off while
driving.  Please check."

Despite the fact that a service bulletin was issued from
General Motors for faulty ignition switches back in 2005 for that
make and that model, the on-site mechanic cleaned the fuel line,
cleaned the fuel injection, told her to come pick up her car,
which she did.

Brooke Melton's tragic death is not acknowledged as part of

this recall because it involved a side impact instead of a front
impact.  Ms. Melton's parents, Ken and Beth -- they are not here
today, I don't think, but they deserve answers.

Ms. Barra, is Brooke Melton included in General Motors' death
count?  Yes or no?

Ms. Barra.  To my knowledge, no.

Dr. Gingrey.  No?

Ms. Barra.  Because it was a side impact and we --

Dr. Gingrey.  Right.

Why did General Motors not include the non-deployment of air
bags from side-impact accidents resulting in loss of life or
injury in this recall?

Ms. Barra.  As you look at a frontal collision and the way
the air bag is to operate, I believe the assessment -- the
assessment was made that would potentially be related to the
switch.

Dr. Gingrey.  Yeah.  But, Ms. Barra, if you connect the
dots -- I mean, the ignition gets knocked over to the accessory
position.  There was a problem using faulty, even by your own
standards, equipment.

And so maybe what happened was that all of a sudden the car
stalls.  She is driving perfectly, trying to control without any
power steering, without any power brakes, and may very well
have -- and I don't know the details of that accident -- but may
very well have run through a four-way or a red light and was

slammed into from the side.

Whether it was a head-on collision or a side collision, it was for the same reason, and she is dead.  And that was almost four years ago.

I don't understand why General Motors does not include the non-deployment of air bags from side-impact accidents resulting in loss of life or injury in this recall.  Can you explain that to us.

Ms. Barra.  Well, first of all, all of the accidents and fatalities are very tragic, as you have indicated, and we are deeply sorry for those.

We have been very clear of the number that we put forward. There has been a lot of analysis that has gone on to look at potential incidents and --

Dr. Gingrey.  Well, did General Motors investigate or do you plan to investigate whether this condition relates to the non-deployment of air bags in side-impact crashes?

Ms. Barra.  We have individuals that are looking at the available information from accidents --

Mr. Dingell.  You told us about your recent hire, and I hope -- well, lastly, Ms. Barra, to what extent did GM regularly inform dealerships, like the dealership, obviously, in Cobb County, of its 2005 technical service bulletin on faulty ignition switches so that these service technicians, the young guys, you know, maybe working there 6 months to a year, that they could

properly address a customer complaint like Brooke had the day
before her death?

Ms. Barra. I am sorry. Was your question how do we
communicate service bulletins?

Dr. Gingrey. How do you make sure that these dealerships all
across the country and their service departments are making sure
that their technicians are getting and receiving the instruction?

Ms. Barra. We can provide details on exactly how we
communicate service bulletins and how that is rolled out to each
of our dealerships across the country.

Dr. Gingrey. I hope you will. Thank you, Ms. Barra.

And, Mr. Chairman, I yield back.

Mr. Murphy. Ms. Barra, related to his questions, with all
these calls in recall and waiting for parts, what are drivers
supposed to do in the meantime while their cars sit in the
driveway?

Ms. Barra. We have communicated and we have done extensive
testing that, if you have just the ignition key with the ring or
just the ignition key, the vehicle is safe to drive.

If people are not comfortable with that, we are making
loaners or rentals available. They can go to their dealer. We
have over 13,000 customers that have these vehicles in rentals or
loaners right now.

Mr. Murphy. And you are assuring people that it is safe to
drive if they just take the other things off the key?

Ms. Barra.  There has been extensive testing done by the engineering team.  And with just the key and the ring or just the key, we believe it is safe based on our testing.

Mr. Murphy.  Recognize Mr. --

Ms. DeGette.  Excuse me, Mr. Chairman.

Is that true of the earlier ignitions as well as the 2006, all of them?  All these cars, that's true?

Ms. Barra.  Yes.

Ms. DeGette.  Thank you.

Mr. Murphy.  Mr. Tonko, you are recognized for 5 minutes.

Mr. Tonko.  Thank you, Mr. Chair.

Ms. Barra, thank you for appearing before the committee.

And I have to believe, for the family members and friends of the victims of this tragic outcome, it must be a very painful process to sit here and listen to the exchange.

Just a comment at first.  We are hearing a lot about information that will come post the investigation or the review.

However, I hold in my hands a February report and a March report to NHTSA on behalf of GM under your watch that provides detailed timelines with a whole bit of knowledge exchanged.

And I am confused somewhat about that fair amount of knowledge that has been formally exchanged to NHTSA and, at the same time, we are hearing, "Well, we don't know until the investigation is complete."

So there is a conflict that I think is brought to bear here

in terms of an exchange that has been detailed in the last few
weeks under the watch of the new General Motors, today's GM.

And at the same time, when I was listening to our
representative from Illinois ask about the corporate chart and the
changes, no changes have been made.  We are waiting for that
pending the investigation.  But at the same time, we have
characterized -- or relabeled it as today's General Motors.

So while we are all products of the environment that produces
us, the cultural impact of GM seems to still be in play with a
number of people who have perhaps shifted positions, but are all
part of that organization.

So comfort me by telling me that there is a new thinking,
there is a new culture, that has beset GM while all the players
are still there in the corporate chart.  Tell me how the company
has restructured and reorganized so as to bring comfort to the
consumer.

Ms. Barra.  First, there are many new people in the company
as well as people who have experience across the company.  There
is a new structure.  For instance, in Global Product Development,
we have streamlined, eliminated bureaucracy.

We took out an entire layer of management in the product
development.  We have completely redone the quality processes over
the last -- it started in the 2011-2012 time frame.

We have changed our test procedure.  We have added additional
validation.  So there has been a complete remake of the way we

drive quality.  We test to failure instead of testing to a standard.  That is just one example.

And we have looked across the entire organization.  We have rebuilt our supplier quality organization, adding over 100 resources just in this country alone.

So systematically we have gone across the company and we are making changes, even in the chronologies which I think you held up.

Those are the most detailed chronologies that we have ever provided, sharing, again, in a summary fashion, the information we have now, but then we are conducting an investigation with Mr. Valukus.

We have also rolled out new values with the customer as our compass, relationships matter and individual excellence.  We have trained thousands of people.

But, most importantly, it is leadership at the top.  It is the leadership of how we behave, of how we demonstrate when we make decisions, and that we make decisions that focus on the customer, focus on safety, focus on quality.  And I can tell you, from my leadership team and the next layer, we continue to drive that every day.

We recognize culture change doesn't happen in a year or two, but we are well on that journey, and we are dedicated to it and we very clearly want to have the safest vehicles on the road.

Mr. Tonko.  And will you make that list public from the

report that you are anticipating?

Ms. Barra.  I am sorry?

Mr. Tonko.  Will you make the list that will be coming
forth public?  Will you share it?

Ms. Barra.  That's the list of?  I am sorry.

Mr. Tonko.  The full report coming from Mr. Valukus.

Ms. Barra.  Mr. Valukus will give us findings and we will
make the appropriate findings available to this body, to our
customers, and to our employees.

Mr. Tonko.  The appropriate findings.

What about the full report?

Ms. Barra.  I don't know if he will give a report or if he
will share findings.

Mr. Tonko.  If he does, will you share the full report?

Ms. Barra.  We will share the appropriate information.

Mr. Tonko.  Not the full report?

Ms. Barra.  Again, I don't know if there will be a full
report.  But we will share --

Mr. Tonko.  If there will be a full report, will you share
it?

Ms. Barra.  I commit that we will be very transparent and we
will share what's appropriate.

Mr. Tonko.  So, in other words, there is no commitment to
share the full report?

Ms. Barra.  I am saying I will share what is appropriate.

Mr. <u>Tonko.</u>  I hear the answer.

Mr. Chair, I yield back.

Mr. <u>Murphy.</u>  Gentleman yields back.

Recognize the gentleman from Louisiana, Mr. Scalise, for 5 minutes.

Mr. <u>Scalise.</u>  Thank you, Mr. Chairman.  I appreciate you having this hearing.

Ms. Barra, I thank you for being here.

Let me say first my prayers are with all the families of those who lost their lives and others who have been impacted by this.  I want to thank you all for being here in this room as well.

Obviously, the questions we have are even more pertinent to the families that are here, and that is why it is important that we ask the questions and get answers.

And if we are going to make sure that we can prevent something like this from happening again, we have got to get into the real details of what went on during those period of years, unfortunately, years, where it seemed somewhere inside of General Motors there was knowledge that this was a problem before it got to the level of recall.

I want to first take you, Ms. Barra, to the tab you have got there, Number 38.  Tab 38 is the signoff.  This is what is called a General Motors commodity validation signoff.  This is the actual sheet that the engineer signed off on that approved the design

change in the faulty ignition switch.

Have you seen that document before?

Ms. Barra.  This is the first time I have seen this document
that is labeled "Delphi."

Mr. Scalise.  Now, what we are talking about here -- I mean,
how long have you been aware of the problem with these faulty
ignition switches?

Ms. Barra.  I was aware that there was a faulty ignition
switch on January 31.

Mr. Scalise.  Of this year?

Ms. Barra.  Of this year.

Mr. Scalise.  Okay.  So as you are going through -- I'm sure
some of the questions you have and are asking and maybe some of
the ones we are having -- the first question you would want to ask
is:  What did we know about it?  When did we know?  Did we know
well in advance?  And why didn't we prevent it from happening?

The first thing we all are talking about is when was this
found out within GM to the point where they actually made a
change.  I mean, you all made a design change.

The letter I have got here, this form, is dated April 25 of
2006.  So 2006 is when your engineers -- and there is a name on
this sheet.  There is an actual engineer who you just said under
oath earlier is still employed with GM.

There is an engineer that actually signed this document
requesting -- not requesting -- approving a change in this

ignition switch, in fact, with the part number.  The part number is on here.

To your knowledge, has anyone in GM taken this -- he is an employee of yours.  You can just pull him aside right now and ask him, "When you signed off on this in 2006, number one, why didn't you change the part number?  And, number two, why did you approve a change in the ignition switch and not bring it to the level of recall?"

In 2006 -- clearly people lost their lives after this was signed off on.  So do you know right now -- and you are under oath -- do you know of anyone that has asked the person that signed this -- that signed off on this -- have any of you all asked him those basic questions?

Ms. Barra.  I know this is part of the Anton Valukus investigation.  And I want to know the answers to the questions you are asking as well as you.

Mr. Scalise.  Do you know of anyone that's asked him that question?  I mean, he's an employee of yours right now.  You can pull him aside right when you leave here today and ask him these questions.

Ms. Barra.  I think it is very important as we do an independent investigation that we let Mr. Valukus go do a thorough investigation, talk to people, that there is not a lot of side investigations going on.  He is the one standard that we are going to use in this investigation.  He brings the objectivity to it.

Mr. Scalise.  Clearly, you know, there -- I mean, you talk about a new culture.

Has anyone been held accountable as of now for what's happened?

Ms. Barra.  Again, we learned of this on January 31.

Mr. Scalise.  Well, again, you have a design change in 2006 related to what we are talking about.  This is not a 2014 issue.

The recall was issued in 2014, but the product, the faulty ignition switch we are talking about, was redesigned in 2006 by one of your engineers who's still an employee of General Motors.

If you can't get me that information -- and if you do find that information out, by the way, would you get that to the committee?

Ms. Barra.  It will be part of the investigation and we will share that.

Mr. Scalise.  The other question I want to ask you -- because later on we are going to have the acting administrator of the National Highway Traffic Safety Administration.

Some of the things he says in his testimony -- before you leave, I would like to get at least some responses.  He says, number one, "We are pursuing an investigation of whether GM met its timeliness responsibilities to report and address this defect under Federal law."

Are you aware of whether or not GM has met its obligations of timeliness?

Ms. Barra.  That will be part of the investigation that we
are doing.

Mr. Scalise.  But you are not aware at this time, though.  I
mean, if you are aware of something, that would be a violation of
Federal law.

If you are aware of that already, can you share that with us?

Ms. Barra.  I am aware of the findings that I have already
shared from Mr. Valukus today.

Mr. Scalise.  And another question he asks -- in the brief
time I have left, he says, "GM had critical information that would
have helped identify this defect."

That's the gentleman that's testifying right after you.  You
don't have the opportunity to come behind him and respond.  He is
going to be saying this.  He is writing this in his testimony.

What would you say in response to his statement that GM had
critical information that would have helped identify this defect?

Ms. Barra.  As I have already said, we have already learned
through Mr. Valukus's investigation that there were points in time
where one part of the organization had information that wasn't
shared across to the other side of the organization.  You can call
it a silo.

At some point, they didn't understand that the information
would be valuable to another party.  So I have already shared that
we have found that to be true and we have already made changes to
the structure and to the responsibilities of people.  So that

won't happen again.

Mr. Scalise. We appreciate getting the full range of answers to all these questions.

And, with that, I yield back the balance of my time. Thank you, Mr. Chairman.

Mr. Murphy. Time is expired.

I now recognize Mr. Green for 5 minutes, of Texas.

Mr. Green. Thank you, Mr. Chairman.

Ms. Barra, first of all, congratulations on being the CEO of General Motors. Like a lot of my constituents, I have been a customer of GM. In fact, I can't list the number of vehicles I think I have owned. Although my wife drives a Tahoe, I lease a Malibu. I have a Blazer. And, you know, we keep them for a long time. So I appreciate GM products.

And you have heard the questioning today, and it seems like on a bipartisan basis we are trying to find out what is happening, although -- Mr. Chairman, I know you heard it -- I was surprised because Dr. Gingrey is a good friend of mine and a physician and, to say he thanked a plaintiff's lawyer for something, you have at least gotten Republicans and Democrats on the same side on something. Phil's not here now, but there is a reason we have a civil bar.

You have gone down the litany with the other questions of the problems that were happening. In 2002, the switch was acknowledged it was below specs. In 2005, the dealers were

notified of a problem, but it was because of heavier key rings.

And I thought about my wife's key ring that she uses.  It has everything in the world on that key ring.  So I couldn't imagine that would be an issue.

But, I guess, getting down to the concern I have -- and in 2007 you modified the switch ignition for future models, but -- though the switch ignition still fell below the initial torque standards by GM.

Let me give you an example of what this has caused.  I have a constituent who I talked to yesterday before I left Houston whose mother, Lois, owns a 2003 Regal, which is 10 years old.  And she has owned GM products, like I guess I have, for many years.

But the Regal began stalling and turning off in February of 2013 and even the car had less than 50,000 miles.  Since she's owned the car, it's gone to the GM dealer six times.

The battery has been replaced, and each time the dealer did not fix the problem.  She ended up finding -- and I quote Mrs. Knutson who told it to me -- she finally found a shade tree mechanic who actually fixed it.

And I guess what bothers me, if you go back to the dealer this many times -- and I hold the dealers -- you know, repair shops to a higher level simply because they know the product -- that what has happened -- can you confidently say that these stalling issues are limited only to the Cobalt, the HHR, the Pontiac G5, the Solstice and Saturn Ion, and the Sky models of

vehicles or is it other ones like the Regal or maybe like the Malibu I drive?

Ms. Barra.  Again, I am not aware of any other stalling issues.  If we have an issue, we put it into our recall process and make decisions.  So if there is a defect that you are aware of, I would appreciate the information, and I will definitely look into it.

Mr. Green.  Well, we will get you that information.

I have a couple minutes left.  But I represent a very industrial area.  We have refineries and chemical plants.  What we do is inherently dangerous.  And so you have to take extra concern about it.

It looks like in the last 10 years GM has not -- somewhere along that line, the culture of the company is not there to deal with that.  And, as the new CEO, I would hope you would make sure it happens.

And I have said this many times.  When I have a chemical plant or a refinery that has an accident and somebody dies and -- we have been able to pinpoint sometimes with civil justice, but sometimes through Chemical Safety Board, on what decision was made that they didn't do that caused people to die.

That is what happened here.  And General Motors is a much greater company than to do that, and I would hope the culture of your corporation would be better so it would continue to earn the respect that both this lady and I have.

But that is your job now as CEO, but you need to fix it and fix it as quick as you can because it is going to cause problems, obviously.

Ms. Barra.  I agree with you.  It is completely my responsibility, and I will work day and night.  We have already made tremendous change at General Motors.  We will continue to do that, and I recognize it is my responsibility.

Mr. Green.  The last thing in my 30 seconds is:  Should my constituent -- should she have her mother in Phoenix take that Regal back and have it checked by a dealer now and see what happened?

Ms. Barra.  Yes.  And I wish you would send a note to me, and I will --

Mr. Green.  I will get you that information.

Ms. Barra.  Thank you.

Mr. Green.  Thank you, Mr. Chairman.

Mr. Murphy.  I now recognize Mr. Griffith for 5 minutes.

Mr. Griffith.  Thank you, Mr. Chairman.

Ms. Barra, you have indicated that not having a new part number when the part was changed in 2006 is not acceptable.  Is that correct?

Ms. Barra.  That is correct.  Yes.

Mr. Griffith.  And I guess it is hard to figure that somebody would have just done that by accident and that there had to be a reason.

Because that was a breach of protocol, wasn't it?

Ms. Barra.  I don't think there is an acceptable reason to do that.

Mr. Griffith.  And while there may not be an acceptable reason, you would have to acknowledge that a reason in somebody's mind, while not acceptable, might be that it is actually harder to track the problem with the old part when you have an improved new part that is put in its place.  Isn't that correct?  Yes or no?

Ms. Barra.  Yes.

Mr. Griffith.  And while you have indicated that you did not know the individual name of the person who made that decision, do you know whose job title it was or in whose chain of command it was to make the decision not to create a new part number for that part?

Ms. Barra.  I don't.  It would be within the engineering organization, but I will learn that from the investigation and we will take appropriate action.

Mr. Griffith.  And would that engineering department have been under your chain of command at some point in your tenure with GM?

Ms. Barra.  Since February of 2011.

Mr. Griffith.  But it never got to you?  Nobody ever brought this to your attention?

Ms. Barra.  No, it did not.

Mr. Griffith.  I appreciate that.

I do have this question, and I think that the answer probably is that your investigation will reveal this.

But it is somewhat concerning that, while the trial lawyer that uncovered this may be very savvy and his expert might be pretty sharp, you all have sharp people working at GM as well; do you not?

Ms. Barra.  I believe we do.

Mr. Griffith.  It is one of those questions that I am sure your investigation will uncover.  But why didn't your team of engineers connect the dots and figure out that, when the ignition slips into that auxiliary position, the air bags won't function properly?

Ms. Barra.  Congressman, those are the questions I want to answer and, as I have said, it has taken way too long.  And we will learn from this and we will make changes and we will hold people accountable.

Mr. Griffith.  And not only holding people accountable, but you were asked earlier -- and I know you are in a tough spot on that -- as to what kind of liability GM will end up accepting because there is legal liability and moral liability.  And you have said that.

One of the questions that I would have -- it would have been a whole lot easier just to have actually listed these liabilities in the bankruptcy; would it not?  It would have been easier to do it in the bankruptcy instead of having to come out now, wouldn't

it?

Ms. <u>Barra.</u>  The best thing in the world would be, as soon as
we find a problem, we fix it and it doesn't exist in the
marketplace and doesn't affect our customers and doesn't create
tragedies.

RPTS JANSEN

DCMN HUMKE

[3:47 p.m.]

Mr. Griffith.  And here is one of the things that concerns
me.  Have you been given any estimates yet by Mr. Feinberg or
others as to what a best-case or worst-case scenario is on your
civil liabilities?

Ms. Barra.  We have just been in initial conversations with
Mr. Feinberg.  I believe we will work through him to evaluate the
situation over the next 30 to 60 days.

Mr. Griffith.  Has anybody else given you a best-case or
worst-case scenario over liability issues related to this problem?

Ms. Barra.  There has been a lot of estimates done in the
public, but none given specifically to me.

Mr. Griffith.  Okay.  Would those liability issues have
negatively impacted the prospects of either a bailout by the
Federal government, or prior to the bailout, the people who were
lending you money to keep GM afloat with its heavy liabilities
already existing, would not the additional liabilities that would
have come forward by this problem have had the potential to
dissuade private investors or the Federal government from giving
cash to GM?

Ms. Barra.  As I look at it, as soon as we identify an issue
and fix it, then there aren't liabilities or the liabilities are

contained.  As we look at problems as we go forward, we want to fix them as soon as we can.  If there is a safety issue, we are going to make the change, make the right investment, and accept that.

Mr. <u>Griffith.</u>  But in the real world of business, if there is a new set of liabilities that come onto the page that weren't there before, it is harder to get money from both public and private sources; isn't that true?

Ms. <u>Barra.</u>  I think it depends on the situation.  So it is a general question.  I don't feel appropriate commenting.

Mr. <u>Griffith.</u>  I appreciate that.

Let me ask this last question.  When this issue first came up, the corresponding Problem Resolution Tracking System report document identified the issue of severity 3.  What does that mean?

Ms. <u>Barra.</u>  I am sorry, I didn't hear you.

Mr. <u>Griffith.</u>  Severity 3.  I am referencing back to some of the documents that you have given and your folks have given us.  And it is initial assessment in 2004, 2005 when your Problem Resolution Tracking System report came out, it related this problem as being severity 3.  What does that mean?

Ms. <u>Barra.</u>  I don't have a specific definition for that. I --

Mr. <u>Griffith.</u>  Can you get one for us?

Ms. <u>Barra.</u>  I can.

Mr. <u>Griffith.</u>  I appreciate that.

And I yield back.

Mr. Murphy.  Can I ask a clarifying question to what Mr. Griffith was saying.

Did GM purposely, willfully negotiate, during the bankruptcy issues or in the process of obtaining the loans, did they purposely withhold any information that they may have known about pending lawsuits or things that would be emerging in the future about the Cobalt or other cars?

Ms. Barra.  I am not aware.  I personally did not withhold any information.  I am not aware, but I can't speak to every single person.

Mr. Murphy.  Thank you.

Mr. Welsh, you are recognized for 5 minutes.

Mr. Welsh.  Thank you.

I have to congratulate General Motors for doing the impossible:  You have got Republicans and Democrats working together.  And I thank my colleagues for their focus on this hearing.

Couple of things.  How many cars have been recalled as of this date?

Ms. Barra.  Related to the ignition switch?

Mr. Welsh.  Right.

Ms. Barra.  Over 2.5 million.

Mr. Welsh.  Now, this ignition switch issue, was first -- it came to light in 2006; is that correct?

Ms. <u>Barra.</u>  Through our investigation, we will know when it came to light.  It came to light to me on January 31st, 2014.

Mr. <u>Welch.</u>  That is totally irrelevant to the people who lost their lives.

Ms. <u>Barra.</u>  I understand.

Mr. <u>Welch.</u>  I mean, you are the current CEO, but that is not relevant to the question I asked.

Ms. <u>Barra.</u>  You asked when I became aware of it.

Mr. <u>Welch.</u>  No.  GM.

Ms. <u>Barra.</u>  Again, that is what we will learn in our investigation.

Mr. <u>Welsh.</u>  Well, you changed the switch after 2006.  You began in 2007 changing the switch; right?

Ms. <u>Barra.</u>  Yes, there were changes made.

Mr. <u>Welsh.</u>  So would it be a logical inference that somebody thought there was a reason to change the switch that had been in use in 2006 to 2007?

Ms. <u>Barra.</u>  As we do our internal investigation, I hope get those answers.

Mr. <u>Welch.</u>  Wouldn't that be a starting point?  Somebody for some reason decided to change the very critical part in the car, between 2006, 2007; correct?

Ms. <u>Barra.</u>  Correct.

Mr. <u>Welsh.</u>  So let me ask you this:  If you had recalled cars and acted on this aggressively in 2006, when you were making the

decision that you had to change this -- you, GM, not you.

Ms. Barra.  I am sorry.

Mr. Welsh.  GM the changed the switch, how many cars would you have had to recall had you acted in 2007 when you made the decision to change the switch?

Ms. Barra.  I can get you the exact number.  But it would have been significantly less.  I don't know.

Mr. Welsh.  Give me an estimate.  You can talk to your back row there if you want.

Ms. Barra.  Again, I will confirm with an answer, but I would assume it is something around more 1.2 million.

Mr. Welsh.  Just from 2000 -- so you would have cut it down at least in half, and maybe more --

Ms. Barra.  Because, again, we are starting with vehicles that the Saturn ION was in production in 2003.

Mr. Welsh.  Let me just get a business-type question here. What do you estimate would have been the cost to GM of this recall had they done it in 2007?

Ms. Barra.  When we looked at the population from 2003 to 2007, actually, if I look at all of the vehicles that had this, it would have been a higher number, I believe it was 1.8.  And that would have probably -- the estimated costs for those two pieces is something less than a hundred million.

Mr. Welch.  Okay.  And what do you estimate will be the cost of the recall now that it is being done 8 years later?

Ms. Barra.  Well, there is a larger population.  We can provide the information.

Mr. Welsh.  I want an estimate.  I want people to be able to hear this.  A decision delayed is money and lives at risk.  So I am trying to get an opinion from you, and it is ballpark so it can be adjusted, as to what the costs would have been had you acted 8 years ago versus acting now.  You, GM.

Ms. Barra.  Well, if we would have acted at that point we would have had a smaller population, as we talked about.

Mr. Welsh.  I know that.  That is obvious.

Ms. Barra.  I am sorry, I am not trying to be difficult.  I don't understand your question.

Mr. Welch.  You know what?  If I were on the board of directors and I had an obligation to shareholders, and I had a company that could have acted 8 years ago, to deal with a problem but by not acting let that problem increase in magnitude, do more damage to shareholders, do more damage to the bottom line, do enormous damage to the reputation of this company, and cause we don't know how much harm to citizens, I would want an answer to the question.

Ms. Barra.  I agree.  It would have been substantially less at that time frame had we done it than what it will be now.

Mr. Welsh.  GM was involved in litigation concerning allegations that this switch was defective and caused problems; correct?

Ms. <u>Barra.</u>  Yes.

Mr. <u>Welsh.</u>  And GM settled some of these litigation matters; correct?

Ms. <u>Barra.</u>  Correct.

Mr. <u>Welch.</u>  After very aggressive defense.  Those settlements were secret?

Ms. <u>Barra.</u>  They are confidential by both parties.

Mr. <u>Welsh.</u>  By both parties -- I am -- you know, some of us have been in court.  By "both parties" usually means by the request of the party that is paying the damages.

Ms. <u>Barra.</u>  I wasn't involved in those settlements.  All I know is confidential was by both parties.

Mr. <u>Welsh.</u>  Okay.  This is not good.  You are the company right now.  All right?

Ms. <u>Barra.</u>  I am.

Mr. <u>Welsh.</u>  Let me ask this question.  Do you believe that when a company that has been sued about a matter involving product safety, where a person has been seriously injured or has died, that the company that settles as a matter of policy, should be entitled to keep secret what that settlement was about?

Ms. <u>Barra.</u>  I am not -- I think that there are issues associated with that that every settlement is unique and it is a decision that is agreed to by both parties.  And I don't have any comment beyond that.  Each one is unique.

Mr. <u>Welsh.</u>  Let me ask you this:  If a company, GM or any

company, settles litigation and pays a substantial amount of money pertaining to an allegation about serious bodily injury or death, should that company be permitted to keep secret that settlement from the governmental agency whose responsibility it is to protect the public safety?

Ms. Barra.  If that is information required by that government agency, then we would provide it if the two parties involved in the settlement agree to it, that is their agreement.

Mr. Welsh.  So if you don't have to do it, you won't do it?

Ms. Barra.  If both parties want that.  I am making the assumption that both parties agreed to it, which what is I have been told.

Mr. Welsh.  I yield back.

Thank you.

Mr. Murphy.  Gentleman's time has expired.

Now recognize the gentleman from Mississippi for 5 minutes, Mr. Long.

Mr. Long.  Thank you, Mr. Chairman.

And thank you for being here, Ms. Barra.

And I want to thank the families that you here today for keeping safety in the forefront of America's and Congress's consciousness when it comes to automobile safety.  And we have heard about the same subcommittee in the past, dealing with the issue before I came to Congress, the Ford Explorer/ Firestone tire situation.  We have heard about the Toyota accelerating car issue.

And, like I say, I wasn't here, but I can imagine that the
questions were similar:  Who knew what when?  Who was responsible?
Did you know this person?  Have you done anything about it?

I want to take a little different tack with my line of
questioning, as I normally do.  And that is that, people ask me
all the time, Do you think you make a difference?  When you go to
Congress, you are up here a few years, do you think you are making
a difference?  And that is hard to quantify, to explain to
somebody whether you are making a difference or not.  But today
this is a day I want to look back on and say, you know, I think I
made a difference.  I think that we got some answers to questions
in the future to prevent -- I don't want to be here again and I
don't want to have them say Ford Explorer/Firestone tire, Toyota
accelerating, and you remember the GM faulty ignition switch.  So
that is what I would like to say, yeah, we made a difference.

And with that, like I say, I thank the families for being
here and keeping it in the forefront of safety so there is not
other people sitting in those same seats next time we approach an
issue like this.  Because hopefully there won't be a next time.
And the finger pointing, the old analogy, when you are pointing
your finger, you got three fingers pointing at yourself.  There is
going to be a lot of finger pointing in this.

But I would really like to drill down on and get answers to
is how the NHTSA, or whatever they are calling it, the National
Transportation -- National Highway Transportation -- or excuse me,

National Highway Traffic Safety Administration and you all, as an
automobile manufacturer, if you can work to see that this doesn't
happen again so that the two organizations can work together and
drill down on these problems when we first learn them, whatever
the next problem may be, that would be my goal for here today.

In answer to one of Chairman Upton's, the Chairman of full
committee's questions awhile ago, and I don't even know what he
was asking about exactly.  But you said "I was not part of that
organization at the time."

I am sure that was something within General Motors.  Because
you, like I, have a history that goes back I think to when you
were 18 years old with General Motors.  So you were there at the
time as far as the overall organization but not whatever part he
had -- your father, I believe, worked 39 years for Pontiac.  So
you indeed go way back.

I go back to 18 years old with General Motors too.  When I
was 18, my folks bought me a 1973 GM Jimmy.  If you think of a big
Suburban today, cut off two doors, and that was a Jimmy, or a
Blazer; Chevrolet called theirs a Blazer.  I was in the real
estate and auction business for years, from 1973 to about 2005, I
drove nothing but General Motors Suburbans.  I remember times when
the key would be in there and you would go to put your key in and
it wouldn't work.  Why wouldn't it work?  Because I had a big key
chain a big key ring.  And it would vibrate.  And it would tear
the teeth off the keys to where the key no longer functioned.

But never once did I have that shut off, never once did I
have that fail to act or shut off in the middle of driving.  So,
to me, from 1973 to 2005, with my experience, they made pretty
good ignition switches.

Can you tell me how many models GM makes today?

Ms. Barra.  Oh, around the globe, over a hundred.

Mr. Long.  Hundred different models.  Can you tell me how
many ignition switches they make?

Ms. Barra.  Well, we sell over 8 million vehicles.

Mr. Long.  No, I mean how many per -- if you have a hundred
models, how many different ignition switches would there be?

Ms. Barra.  I can't answer that question.  I don't know.

Mr. Long.  To me, GM has proven in the past, and other
companies have, that you can -- I just don't understand this
reinventing the wheel, that every car has to have a different
ignition switch with different set of circumstances made by
somebody down in Mexico to make sure that it meets the
qualifications.

So I would recommend two things:  That you work hard with us.
Our next witness from the National Highway Traffic Safety
Administration says that a car, when it shuts off that the airbag
will still deploy for 60 seconds.  I can't imagine being in a cash
that a car shut off and you continue for more and 60 seconds.  So
that is a question that I am going to have for him.

But I would ask that you reach out and work not only with

your engineers, saying, hey, we have got some pretty good -- why
do we reinvent the wheel every time we go to invent a new ignition
switch for all these different models?  And also hope that you
will reach out and work with the National Highway Traffic Safety
Administration so.

Ms. Barra.  I would welcome the opportunity to have our
technical experts look at how we can improve the way the system
works.  Because airbag deployment is part of the system, and I
would welcome the opportunity if there are improvements that can
be made, we would want to be in the forefront of making them.

Mr. Long.  In communication with NHTSA.

Ms. Barra.  And work closely with NHTSA --

Mr. Long.  I appreciate it.  I thank the families.

Mr. Chairman, I yield back.

Mr. Murphy.  Now recognize Mr. Yarmuth for 5 minutes.

Mr. Yarmuth.  Thank you, Mr. Chairman.

I, at the outset, want to express my condolences to the
family of the victims of this tragedy.  And I know it must be
frustrating to you to listen to this testimony.  And you are
looking for answers and so are we and so is GM right now.  And I
hope we do get answers because I was frustrated by the same
questions that my colleague had just mentioned.  I have been
driving a long time, and this is a pretty well established
technology, sticking a key into an ignition and turning it.  Are
you aware of any other ignition problems that have been discovered

or -- in GM or any other vehicle over the history of key ignition systems?

Ms. Barra.  I have not reviewed every incident we have ever had.  By I -- you know, we do, as we find issues, we document them and take them through our process.  And in particular case it took way too long.

Mr. Yarmuth.  And there is a new technology.  I have been driving a car for four and a half years.  I confess it is a Ford product, not a GM product, that has a push-button ignition.  I was in a GM car last week, very nice one, by the way, which has a push-button ignition system.

How do you make the judgment as to whether a car has a push-button ignition system and/or a key ignition system and what are the differences?

First of all, in terms of safety, we know that this particular situation wouldn't occur with a push-button ignition system.  But how do you make that decision as to what goes into which car.

Ms. Barra.  We evaluate.  And actually the push-button start is something that we are evaluating putting across the portfolio.  As you look at the specifics of a push-button start versus the traditional ignition, I would like our experts to provide that information.  Because again.  The ignition switch and how it is a component that operates as part of a system of the vehicle especially as it relates from a safety perspective.  I think we

would be better served to have our experts cover that.

Mr. <u>Yarmuth.</u>  But you are doing an analysis of whether a push-button ignition system is safer than a key ignition system?

Ms. <u>Barra.</u>  We can definitely do that.  I think, you know, there has been work done that both can be designed to be safe. But we are looking because of the customer, you know, it is a function, it is a delighter, usually when the vehicle has a push-button start, we have them on some of our vehicles.  We continue to roll those out across our entire portfolio, and we are looking at doing it across the board.

Mr. <u>Yarmuth.</u>  I have no idea if there is a difference in the safety.  There may be done.  But it would be worth doing that analysis.

One of my staff members has a 2005 Malibu that was recalled because of a power steering issue, and she called the dealership, and the dealership said that they didn't know how to fix it.  So my question to you is, are you confident that GM knows how to fix the vehicles it recalls for the variety of problems that have --

Ms. <u>Barra.</u>  Well, first of all, if we find a situation that is not safe and we don't know how to fix it, we are still going to recall the vehicles and we will take those actions.  In this case, there may be a communication lag, because there is a fix, whether it is a check or a replacement of the product.  So that does exist for that specific vehicle.

Mr. <u>Yarmuth.</u>  So she is getting bad information from here

dealership or they haven't been told yet.

Ms. <u>Barra.</u>  I would assume.  I can follow up if you would
like.

Mr. <u>Yarmuth.</u>  I mean, I think the public be would want to
know that --

Ms. <u>Barra.</u>  Right.

Mr. <u>Yarmuth.</u>  Because you now have --

Ms. <u>Barra.</u>  Right.  That there is --

Mr. <u>Yarmuth.</u>  -- millions of vehicles out there under recall.
And she was told to go ahead and drive the vehicle if she felt
safe.  And I am not sure that every driver would know whether they
should feel safe or not.

I mean, that -- some people, if the power steering goes out
are strong people and maybe it is happened to them before and they
know that it is going to take a little more effort to steer, other
people might not.  So, I mean, I don't even know how the average
consumer is supposed to know whether they feel safe or not after a
vehicle has been recalled.

Doesn't the company have some disclosure responsibility to
say these things, at least these things could happen?

Ms. <u>Barra.</u>  Yes, and we have done that, and that is a part of
the letter that we send to the customer with we notify them of
this issue, and then we provide information to the dealers as
well.

Mr. <u>Yarmuth.</u>  Okay.  One final question.

We talk about and we are going to have the NHTSA
representative here earlier.  One of the things that you are not
required to do is to provide warranty data proactively to the
National Highway Traffic Safety Administration.  Do you think that
that is something that ought to be considered, that might be
helpful?  In this case, maybe dots could have been connected
sooner if all that data had been --

Ms. Barra.  I welcome the opportunity to look at what
information that NHTSA would feel of value to submit.

Mr. Yarmuth.  Thank you.  I yield back.

Mr. Murphy.  Thank the gentleman yields back.

I will now recognize Mr. Harper for 5 minutes.

Mr. Harper.  Thank you, Mr. Chairman.

And to the family members that are here, our hearts indeed go
out to you.  And we will continue to get to the bottom of this.

And Ms. Barra, I know this is not the most enjoyable
experience to go through this.  But we are in a situation that,
you know, we don't trust the company right now.  And we have to
get to the bottom of this.  And so we want to continue to ask some
questions.

If I can get you to refer to tab 28 in your binder.  And I
want to direct your attention to that email that is found at tab
28.  In September of 2005, a few months after General Motors
decided that there was not an acceptable business case to
implement changes to the ignition switch, an engineering group

manager emailed Lori Queen and other GM personnel including

Raymond DeGiorgio about proposed changes for model year 2008

ignition switch.

So this engineer obviously explains that a more robust

ignition switch will not be implemented in model year 2008

vehicles because it appears that piece cost could not be offset

with warranty savings.  In his email he references "piece cost."

Is that just the ignition switch?

Ms. Barra.  Generally, when people refer to piece cost, they

refer to the part.

Mr. Harper.  So he is just referring to that ignition switch.

That is a yes?

Ms. Barra.  Again, I didn't write this note.  But I am just

telling you generally when people use the term "piece cost," that

is what it means.

Mr. Harper.  As he notes in that email, an increase of 90

cents; is that correct?

Ms. Barra.  I am sorry?

Mr. Harper.  Does the email say there would be an increase of

90 cents?

Ms. Barra.  Yes, I see that?

Mr. Harper.  And since the warranty offset was only 10 cents

to 15 cents, GM didn't make the change.

Ms. Barra.  And that is not something that I find acceptable.

If there is a safety defect, there is not a business case, this

analysis is inappropriate.

Mr. Harper.  And I appreciate that you don't find that acceptable.  But that indeed is what happened here.  Correct?

Ms. Barra.  And that is -- exactly.  And that is one piece of data as we go through the investigation as we put the pieces together we will take action.  Because this is not the type of behavior that we want in our company today with our engineers today.

Mr. Harper.  And understand, we are trying to go back and figure out what happened and understand that so we can indeed make sure as you do that this never happens to anyone else again.

Now Lori Queen, what was her position at the time?

Ms. Barra.  2005, I believe she was a vehicle line executive.  But you can go back and confirm that.

Mr. Harper.  If you would let us know, please.

How does cost factor into decisions about safety?

Ms. Barra.  They don't.

Mr. Harper.  Has --

Ms. Barra.  But they --

Mr. Harper.  Go ahead.

Ms. Barra.  Again, I can only speak to the way that we are running the company.  And if there is a safety issue, if there is a defect identified, we go fix the vehicle, fix the part, fix the system.  It is not acceptable to have a cost put on a safety issue.

Mr. Harper.  And that is obviously your position and your
goal and the way you want it to be now, but that is not the case
of what we are going back and looking at.

So you are telling us that General Motors has changed its
position of how it handles costs and is safety issues.  It hasn't
been this way before, but this is how you want it now.  Am I
correct?

Ms. Barra.  This is how it is, I think we in the past had
more of a cost culture, and we are going to a customer culture
that focuses on safety and quality.

Mr. Harper.  When we go back and look at who first, who first
authorized the use of an ignition switch that did not meet
specifications.

Ms. Barra.  And that is something we will learn in our
investigation.

Mr. Harper.  Now, one of the things that concerns us, of
course, is when General Motors filed bankruptcy in 2009, it wasn't
an overnight problem with money or with the loss of profits or
losing money each year.  In 2005, I know General Motors lost 10.6
billion; jump to 2007, lost 38.7 billion, 2008, lost 30.9 billion,
and then filed for bankruptcy in 2009.

The fact that General Motors was going through many years of
financial issues, did that impact how this was categorized and was
not dealt with at that time as it should have been?

Ms. Barra.  I can't answer that question.  I want to know the

answer to that question, and when I do, I will take action.

Mr. Harper.  You indicated earlier that a specific traffic
death was not included in the count of fatalities that may have
been associated with this issue, I would like to see other traffic
deaths or serious injuries that were looked at but the
determination was made that it was not part of this total.  Can
you get us that information?

Ms. Barra.  Through our TREAD information, yes.

Mr. Harper.  Will you get that for us?

Ms. Barra.  Yes.

Mr. Harper.  Thank you very much.  I yield back.

Mr. Murphy.  Gentleman yields back.

Now recognize Ms. Castor for 5 minutes.

Ms. Castor.  Thank you.

Natasha Weigel, age 18, was killed October 24th, 2006 while
riding in a 2005 Chevy Cobalt.  Sarah Troutwine, age, 19 was
killed on June 12th, 2009, after losing control of her 2005 Chevy
Cobalt, and Allen Ray Floyd, age 26, was killed on July 3rd, 2009
after losing control of his 2006 Chevy Cobalt.

I understand that Ms. Weigel's parents and Ms. Troutwine's
family are in attendance at the hearing today.  Others have been
killed because of GM's defective ignition switch.  The fact is, we
do not know yet the full extent of the fatalities, injuries, and
accidents.  But evidence is growing through this investigation and
that in the press and hopefully your own investigation, that the

deaths could have been avoided if GM had addressed this issue long ago.

We know that GM knew about this problem as far back as 2001. The committee learned last week that the supplier of the faulty switch, Delphi, conducted tests, that year, 2001 which showed that the switch didn't meet GM's specifications.  But GM used this switch in Cobalts and IONs and other vehicles anyway.

Ms. Barra, the committee sent you a letter about this issue. And documents were received yesterday that show that these inadequate switches were approved by GM in May 2002.  I have a document here and it has been placed before you and it is at tab 54 in the binder as well.  This document shows that the force required to turn the ignition switch was too low.  That specification is clearly marked "not okay."  Ms. Barra, does this document show that GM officials were aware that the ignition switch did not meet company standards in 2002?

Ms. <u>Barra.</u>  If this document was provided to the engineers, again, that is something I will learn in our investigation.

Ms. <u>Castor.</u>  Internally, GM knew there were problems.  By 2004, they are considering ways to fix the problem by redesigning the faulty switch.

This document, which is also placed before you, this is at tab 8 in that notebook as well.  From 2004, shows that GM did reject alternative designs.  It mentions 1-year lead times and says, quote, the tooling costs and piece prices are too high.  It

concludes, "Thus none of the solutions represents an acceptable business case."

Other documents present the piece-cost increase for a potential solution as 57 cents per unit.  Ms. Barra, do you know who at GM would have made the decision about whether to make this change in 2004?

Ms. Barra.  Well, first of all, I find that decision unacceptable, as I have stated.  If there is a safety defect, the cost is not the issue that we look at.  We look at what is going to take the fix the problem and make the vehicle safe.  As we go through our investigation, we will put all the pieces together of incidents and actions that were taken or not taken over a more than and decade period and make the appropriate process changes.

Ms. Castor.  So, in retrospect, do you think that a repair cost of 57 cents was too costly for GM to undertake?

Ms. Barra.  Again, if we are making a decision on safety, we don't even look at costs.  We make the change.

Ms. Castor.  But there was a major disconnect between what GM told the public and what it knew in private.  In private, GM approved the switch that it knew it was defective, and then the company appeared to reject other changes because of cost of 57 cents per fix was too high a price to pay.

Now also in 2005, the New York Times ran a review in which the author wrote about his wife encountering a problem account Chevy Cobalt.  He, quote, said, "She was driving on a freeway when

the car just went dead.  The only other thing besides a key on the
ring was a remote control fob provided by GM.  The GM spokesman at
that time, Allen Adler, issued a statement saying, In rare cases,
when a combination of factors is present, a Chevrolet Cobalt
driver can cut power to the engine by inadvertently bumping the
ignition key to the accessory or off position while the car is
running.  When this happens, the Cobalt is still controllable."

So I find it baffling that not only did GM know about this
serious problem over a decade ago but that it was discussed on the
pages of the New York Times.  And when GM responded publicly, it
essentially told drivers, no big deal.  Engines cut off all the
time.

When your engine suddenly cuts off when you are driving on
the highway, would you consider this a safety issue?

Ms. Barra.  Yes.

Ms. Castor.  And you have indicated that you were not even
aware that GM was investigating the Cobalts until December 2013;
is that correct?

Ms. Barra.  I was aware that there was analysis going on
related to a Cobalt.

Ms. Castor.  But at the time the New York Times wrote their
report in 2005, what was your position?

Ms. Barra.  In 2005, I believe I was in the manufacturing
engineering organization of the company.

Ms. Castor.  So you were a high-level executive at GM

responsible for vehicle manufacturing?

Ms. Barra.  The equipment that we use to build vehicles.

Ms. Castor.  And one of the Nation's largest newspapers raised the issue in this important new vehicle launch for GM and you did not know about it at the time?

Ms. Barra.  I don't have a recollection of that article.

Ms. Castor.  Do you recall it being a concern for GM?

Ms. Barra.  I was not aware that this was this issue until the recall was introduced on January 31st.  I only knew at the end of December that there was an issue with the Cobalt.  I did not know it was an ignition switch issue.

Ms. Castor.  Thank you, Mr. Chairman.

Mr. Murphy.  Thank you.

That concludes our members, but I would like to see if Mr. Terry of Nebraska, who is the subcommittee chairman of Commerce, Manufacturing, and Trade would have an opportunity for 5 minutes.  Is there any objection.

Mr. Terry.  Thank you.

Mr. Murphy.  Without objection, you may proceed Mr. Terry.

Mr. Terry.  Thank you.

I appreciate this.  And I am sorry for being late, but my plane was canceled for mechanical reasons, probably an ignition switch.  USAir.

So, getting back to NHTSA.  And I chair the subcommittee over jurisdiction with NHTSA and the TREAD Act.  And the TREAD Act

clearly requires in the act manufacturers to inform NHTSA within 5 days of any, quote, "noncompliance or defects that create an unreasonable risk of safety."

Did GM at any time contact or notice NHTSA of any noncompliance or defects regarding the ignition switch?

Ms. Barra.  That is something I hope to learn as we go through our investigation.

Mr. Terry.  Okay.  What is the difference between noncompliance and a defect?

Ms. Barra.  It is a very broad question.

Mr. Terry.  No.  It is a very specific question.

Ms. Barra.  I think it depends on the specific situation that you are talking about.

Mr. Terry.  Regarding an ignition switch.

Ms. Barra.  So your question is what is a noncompliant --

Mr. Terry.  Yeah, a noncompliant ignition switch.

Ms. Barra.  My understanding of when there is a noncompliance it is a very specific term used by NHTSA to standards.

Mr. Terry.  Right.

Mr. Barra.  But I can get you the specific definition of that, versus when we feel we have found a defect with one of our parts.  That is my understanding.

Mr. Terry.  And that is why it is "or."  So when an ignition switch is substandard, it is noncompliant.  And a defect, then, is a higher level.  And I think that is what we are looking for here

today, is to determine if there was, quote, unquote, a "defect."

Ms. Barra. Congressman, I think in the language that we use with NHTSA there is very specific definitions. And I would like to provide those to you as opposed too --

Mr. Terry. I can get the definitions from NHTSA. I am not asking you to do that.

Ms. Barra. You are asking a very specific question related to this, and I am trying to be truthful.

Mr. Terry. Okay. But just all right, I am not trying to beat up on you here, but just repeating back NHTSA's definition, I am asking specifically how it applies to the ignition switch. And NHTSA's going to testify there was no notice.

Ms. Barra. I am sorry, I didn't hear. NHTSA is going --

Mr. Terry. My understanding is that NHTSA said that GM did not contact them of noncompliance.

Ms. Barra. If I find through our investigation that we did not provide the appropriate information to NHTSA, that will be a very serious issue and we will take --

Mr. Terry. Okay.

Ms. Barra. -- appropriate action with the individuals involved.

Mr. Terry. All right, thank you.

I yield back.

Mr. Murphy. The gentleman yields back.

I think there are no further questions.

Although, Ms. DeGette, you had a clarifying question?

Ms. DeGette.  I just had two questions, Mr. Chairman.  Thank you.

The first one is, I have been sitting here thinking about these new ignition switches that you are putting into the recalled cars.  They are based on the 2006 specs.  But what you are saying, Ms. Barra, is that they are going to meet the highest safety standards when they are manufactured; is that right?

Ms. Barra.  Our engineering team is going through extensive validation testing to make sure that they meet the requirements.

Ms. DeGette.  And, on the component technical specification, it is tab 53 of your notebook, which was December 6, 2012, it says, The minimum torque required by the switch on the return side of the ignition switch, from crank to the run position must be 15 N-CM.  So would that be the standard, then, since it says it must be that?

Ms. Barra.  From the position of run to accessory?

Ms. DeGette.  Yes.

Ms. Barra.  Fifteen is the minimum.  The spec is 20 plus --

Ms. GeGette.  Right.

Ms. Barra.  -- or minus five.

Ms. DeGette.  But yeah okay.

And my final question is, I am impressed, this committee has had experience with Kenneth Feinberg before.  Because he was appointed to help administer the fund that was set up by BP after

Deepwater Horizon, which was this committee's investigation.  He was also appointed to administer the fund after the Boston Marathon terrorist attacks.

But I want to make sure that what you are doing when you hire him is you are really doing something.  Because he is usually hired to sort out the value of people's claims.  And then assign money.  And I am assuming GM's hiring him to help identify the size of claims and then help compensate the victims; is that right?  Is GM willing to put together some kind of a compensation fund for these victims that Mr. Feinberg will then administer?  Is that why you have hired him?

Ms. <u>Barra.</u>  We have hired Mr. Feinberg to help us assess the situation.  We understand --

Ms. <u>DeGette.</u>  So really there is no money involved in this at this point?

Ms. <u>Barra.</u>  We have just hired him and will begin work with him on Friday.

Ms. <u>DeGette.</u>  So really you hired him, you announced it today.  But so far he has not being given any ability to compensate victims; is that what you are saying?

Ms. <u>Barra.</u>  We are going to work with him to determine what the right course of action is.

Ms. <u>DeGette.</u>  And might that include victim compensation here?

Ms. <u>Barra.</u>  We haven't made any decisions on that yet.

Ms. DeGette.  Okay.

Thank you so much, Mr. Chairman.

Mr. Murphy.  Thank you, Ms. Barra.  We thank you for your
time today.  GM has cooperated with this investigation, and we
expect your company will continue to cooperate.  Let me make a
couple requests.  One is, members will have other questions for
you, and we hope that you respond to those within a timely manner.
We also plan to conduct interviews, further interviews with
General Motors officials and employees involved in the recalled
part and maybe requesting more records.  Will you make sure you
make those available to us?

Ms. Barra.  We will absolutely cooperate.

Mr. Murphy.  Thank you.

And also on behalf of Chairman Upton and I, we would also
like to be notified when you get your internal report and would
like to discuss with you a chance to review that report as well.

Ms. Barra.  We will notify you.

Mr. Murphy.  Thank you very much.

I thank you, Ms. Barra.  You will be dismissed.

But while this is taking place and waiting for Mr. Friedman
to sit down, we are going to take a 5-minute break to allow Mr.
Friedman to take his seat, and we will reconvene this hearing in 5
minutes.  Thank you.

[Recess.]

Mr. Murphy.  Thank you.  This hearing of the Oversight and

Investigation Subcommittee on Energy and Commerce will now
continue with our second witness.

Mr. David Friedman has served as an acting administrator of
the National Highway Traffic Safety Administration since January
18th, 2014.  He was sworn in as deputy administrator on May 15th,
2013.  Before becoming NHTSA's, which is the National Highway
Traffic Administration's, deputy administrator, Mr. Friedman
worked for 12 years at the Union of Concerned Scientists as a
Senior Engineer, Research Director, and as the Deputy Director of
the Clean Vehicles Program.

I'll now swear in the witness.

Mr. Friedman, you are aware that the committee is holding an
investigative hearing, and when doing so, has a practice of taking
testimony under oath.  Do you have any objections to testifying
under oath?

Mr. Friedman.  I do not.

Mr. Murphy.  Thank you.

The chair then advises you under that under the rules of the
House and the rules of the committee, you are entitled to be
advised by counsel.  Do you desire to be advised by counsel during
your testimony today?

Mr. Friedman.  I do not.

Mr. Murphy.  In that case, would you please rise and raise
your right hand.

[Witness sworn.]

09-50026-reg   Doc 13297-3   Filed 07/14/15   Entered 07/14/15 17:22:56   Exhibit 3
Pg 123 of 189

Mr. <u>Murphy.</u>  Let the record show the witness is now under oath and subject to the penalties set forth on Title 18, Section 1001 of the United States Code.

Mr. Friedman, you may now give a 5-minute summary of your written statement.

TESTIMONY OF DAVID FRIEDMAN, ACTING ADMINISTRATOR, NATIONAL
HIGHWAY TRAFFIC SAFETY ADMINISTRATION

Mr. Friedman.  Chairman Murphy, Ranking Member DeGette, and
members of the committee, thank you for the opportunity to testify
before you today.

To begin, I would like to say that on behalf of everyone at
NHTSA, we are deeply saddened by the lives lost in crashes
involving the General Motors' ignition switch defect.  The
victims' families and friends some of whom I believe are here
today, have suffered greatly, and I am deeply sorry for their
loss.

Safety is NHTSA's top priority, and our employees go to work
every day trying to prevent tragedies like these.  Our work
reducing dangerous behaviors behind the wheel, improving the
safety of vehicles, and addressing safety defects has helped
reduce highway fatalities to historic lows not seen since 1950.

In the case of the recently recalled General Motors vehicles,
we are first, focused on ensuring that General Motors identifies
all vehicles with a defective ignition switch, fixes the vehicles
quickly, and is doing all it can to inform consumers on how to
keep themselves safe.

We are also investigating whether General Motors met its
responsibilities to report and address this defect as required

under federal law.  If it failed to do so, we will hold General
Motors accountable, as we have in other cases over the last 5
years, which have led to record fines on automakers.

Internally at NHTSA and the department, we have already begun
a review of our actions and assumptions in this case to further
our ability to address potential defects.  Today I will share what
I have learned so far.

NHTSA used consumer complaints and early warning data, three
special crash investigations on the Cobalt, industry websites, and
agency expertise on airbag technology.  Some of that information
did raise concerns about airbag non-deployments.  So in 2007, we
convened an expert panel to review the data.  Our consumer
complaint data on injury crashes with airbag non-deployments
showed that neither the Cobalt nor the ION stood out when compared
to other vehicles.

The two special crash investigation reports we reviewed at
the time were inconclusive on the cause of non-deployment.  The
reports noted that the airbags did not deploy and the power mode
was in accessory.  But these crashes involved unbelted occupants
and off-road conditions that began with relatively small
collisions where, by design, airbags are less likely to deploy in
order to avoid doing more harm than good.  Further, power loss is
not uncommon in crashes where airbags deploy and did not stand out
as a reason for non-deployment.  In light of these factors, NHTSA
did not launch a formal investigation.

We continued monitoring the data and in 2010 found that the
related consumer complaint rate for the Cobalt had decreased by
nearly half since the 2007 review.  Based on our engineering
expertise and our process, the data available to NHTSA at the time
was not sufficient to warrant a formal investigation.

So what does all this mean?  It means that NHTSA was
concerned and engaged on this issue.  This was a difficult case
where we used tools and expertise that over the last decade have
successfully resulted in 1,299 recalls, including 35 recalls on
airbag non-deployments.  These tools and expertise have served us
well, and we will continue to rely on and improve them.  For
example, we have already invested in advanced computer tools to
improve our ability to spot defects and trends, and we are
planning to expand that effort.  But what we know now, also means
that we need to challenge our assumptions, we need to look at how
we handle difficult cases like this going forward.

So we are looking to better understand how manufacturers deal
with power loss and airbags.  We are also considering ways to
improve the use of crash investigations in identifying defects.
We are reviewing ways to address what appear to be remote defect
possibilities.  And we are evaluating our approach to engaging
manufacturers in all stages of our defects process.  Between these
efforts and those of the department's inspector general, I know
that we will continue to improve our ability to identify vehicle
defects and ensure that they are fixed.

But I want to close on one important note.  Our ability to find defects also requires automakers to act in good faith and to provide information on time.  General Motors has now provided new information definitively linking airbag non-deployment to faulty ignition switches.  Identifying the parts change and indicating potentially critical supplier conversations on airbags.  Had this information been available earlier, it would have likely changed NHTSA's approach to this issue.  But let me be clear, both NHTSA and the auto industry as a whole must look to improve.

Mr. Chairman, Ranking Member DeGette, I greatly appreciate the opportunity to testify before you today.  Thank you.

[The prepared statement of Mr. Friedman follows:]


******** INSERT 3-1 ********

Mr. Murphy.  Thank you.

Now recognize myself for 5 minutes.

Now Mr. Friedman, with the understanding you just got in this position of acting administrator just a couple months ago.  And for the last 12 years, you were involved in other groups that focused on green energy and fuel cell technology.  We understand if you are unable or uncomfortable asking specific questions about automobile engineering and safety, you are more than welcome to ask someone else, some of your support staff behind you.

So, I wanted to find out how NHTSA is communicating to the public about this recall.  And I believe I have a slide available, or I have a poster here.  I went to your website to see what I could learn.

And do we have that image available about this?  And what it shows -- this is all.  This is all I could find on your website about the recall notice.  No information about the broader recalls, about parts replacement, investigation, or anything.  I can't even click on this.  It simply says, get rid of your car key fobs.  But there is nothing else a person could do.

Can you fix the website so people could use to it get more useful information, please?

Mr. Friedman.  Congressman, if there is added information that should be on there to make sure that people can get to the information available on our website, we will take those steps.  Right now, consumers can go to our website and get all of the

details associated with this recall.  If they go to that "search"
button and select the 2005 Cobalt.

Mr. Murphy.  Just to make it easier, because no one trusts
government websites --

Mr. Friedman.  -- links right there, sir, absolutely.

Mr. Murphy.  In 2007, the chief of NHTSA's Defect Assessment
Division proposed opening an investigation of airbag
non-deployment to the Chevy Cobalts.  Am I correct about that
date?

Mr. Friedman.  Yes.

Mr. Murphy.  Now, if you turn to tab 19 in your binder, it is
labeled as the DAD Panel for November 15, 2007.

This is the PowerPoint presentation made to the Defect
Assessment Panel on November 15th.  At Bates stamp 4474, those
little numbers at the bottom of the page, the presentation states
that there have been 29 complaints about the Cobalt airbags, four
fatal crashes, and 14 field reports; is that correct?

Mr. Friedman.  That sounds correct.

Mr. Murphy.  At Bates stamp 4480, there is a chart of airbag
warranty claims for Cobalt airbags as compared to other comparable
vehicles.  Do you agree that the number of warranty claims for
Cobalt airbags is much higher than other cars?

Mr. Friedman.  Congressman, Mr. Chairman, that is one of the
issues that did raise concerns on our part.  What that chart shows
is warranty claims, some of which are likely associated with

airbag non-deployments, some of which may also and are very likely
to be associated with warning lights on airbags or other potential
problems.

This is a gross look at the data, and important look at the
data that is provided by our early warning data system that we use
to decide whether or not we need to look further into one of these
issues, which is what we did do in this case.

Mr. Murphy.  But still NHTSA panel decided there was not a
trend here and decided not to investigate, despite the number of
complaints, the fatal crashes, and the warranty claims.  Why was
NHTSA convinced that an investigation was not warranted?  I
believe this happened on two occasions.

NHTSA decided twice, don't move forward with an
investigation.  What specific information did you have that said
don't go forward?

Mr. Friedman.  Mr. Chairman, when we look at these cases and
when they looked at this case at the time, they look at the whole
body of information.  You can't just rely necessarily on one piece
of information.  The core pieces of information that they relied
on in the determination there wasn't sufficient enough
information.

First was an analysis of the complaints, the injury crash
complaints associated with airbag non-deployment and the exposure,
the number of those divided by the number of vehicles that were on
the road and the number of years they were on the road.  That

gives you a sense of how large the problem is in comparison to other vehicles.

When the team did that comparison, the Cobalt did not stand out.  It was a little bit above average, but there were several vehicles that were significantly higher, there were some vehicles that --

Mr. Murphy.  I understand.  But twice, employees of NHTSA, raised a red flag on this.  It wasn't just once.  A second time too they said something is not right here.

So I am wondering if you did something different when that occurred the second time in reviewing it.

And such as, did anybody ask questions of why an airbag doesn't deploy?  I mean, I looked at the statements there and had a number of things about power losses or how much longer battery power would be involved on an airbag deployment in case of an accident.

But did anybody ask a question, was there anything else, any other reason why an airbag wouldn't deploy, within NHTSA?  Did anybody ask those questions.

Mr. Friedman.  Mr. Chairman, my understanding is folks were trying to understand why the airbags did not deploy.  When they looked at the special crash investigations in 2007, as well as the data available, those special crash investigations were inconclusive.  Why?  Because they indicated that these crashes were happening in off-road conditions with unbelted occupants.

Mr. Murphy.  I understand.  I am looking at reasons why airbags wouldn't deploy.  And so you were talking among yourselves, according to what we understand, the PowerPoints.

What specifically did NHTSA ask GM?  For example, and this is very important:  Did NHTSA raise a question with GM, tell us the reasons why an airbag would not deploy in one of your cars?  Did you ask GM that question?

Mr. Friedman.  I don't have a record of that.  I know our team did bring up concerns over this case to General Motors in a meeting, but I don't have records of us asking that specific question.

Mr. Murphy.  I mean, it is important, because you are saying GM didn't provide you information.  But you are also saying you don't know if you asked them for the information.  I mean, it is important for the families to know what happened and if this key government agency which is tasked with protecting the safety of the public.  I just want to know if those kinds of questions get asked?

Mr. Friedman.  Mr. Chairman, those kind of questions typically do get asked of the car companies when we move into the investigation phase.

What this phase and where this was, was a phase where concerns are raised and it is discussed whether or not there is sufficient information to move to the point of asking those questions of automakers.  Roughly in these defects panels, roughly

half of the cases that are brought up are brought into
investigations, roughly half are not.

One of the things that we are looking at relative to this
process going forward is, do we need to make any changes when it
comes to how we present this information and when we present our
concerns to automakers.  I do believe that there are some changes
that we can make to engage automakers earlier in the process to
put them in the position of letting us know if our concerns are
shared by them and if they --

Mr. Murphy.  Certainly I know the family members would want
to know in retrospect what would you change in this whole process.
But I am out of time.

I now recognize Ms. DeGette for 5 minutes.

Ms. DeGette.  Thank you, Mr. Chairman.

Mr. Friedman, NHTSA investigated airbag non-deployment.  But
as you talked about, it was never able to connect the dots between
that problem and the defective ignition switch.

So what I want to know is, if NHTSA had the relevant
information it needed to make a fully informed determination and
what the agency believed about the connection between the ignition
switch position and airbag non-deployment during the time of its
special crash investigations?

In your written testimony, you know that when NHTSA was
investigating the airbag non-deployment issue, the agency
mistakenly believed based on GM's service literature that the

airbags would function up to 60 seconds after the power cut off.

Why did NHTSA think that?

Mr. Friedman.  Thank you, Ranking Member.

That knowledge was actually based on years of experience and previous experience with earlier airbags where there was actually a problem, where airbags would go off long after the vehicle was turned off.

Ms. DeGette.  And --

Mr. Friedman.  Airbag systems have capacitors in them, and those capacitors are designed to store energy, so that if power is lost, the airbag can still deploy.  Because power is often lost some of these kinds of crashes.

Ms. DeGette.  But that is based on the GM service literature or the agency's experience or both?

Mr. Friedman.  That is a very important question.

Ms. DeGette.  Right.

Mr. Friedman.  My understanding is that was based on the agency's experience.  My understanding is -- and I apologize if I was not clear enough in my testimony.  We have since, after General Motors made this recall, found that service information that confirmed our understanding at the time, which was that airbags are designed to be powered when the power is lost.  So a power loss would not typically stand out --

Ms. DeGette.  So okay.  So you were base -- so NHTSA was base -- you weren't there -- but NHTSA was basing its

determination on its experience.  How is that, then, that it failed to connect the dots between the airbag non-deployment problem and it ignition switch problem?

Mr. Friedman.  I believe there is two situations here.

First of all, the information we had at the time indicated that, you know, there were two possibilities put in front us in one of the special crash investigation reports.  One of them was that the ignition being off could have been a cause.  Another one was that the circumstances of the crash could have been the cause.

In those two cases, the more likely scenario was that the circumstances of the crash were more likely to yield to the airbags not deploying.

Ms. DeGette.  So you also said that GM had critical information that would have helped identify this defect that NHTSA didn't have.  What information could GM have given you that the agency -- that would have helped identify the real problem?

Mr. Friedman.  Well, I made that statement based on looking at the chronology that General Motors provided with this recall.

Ms. DeGette.  Okay.

Mr. Friedman.  And there were at least a few things, in that chronology that raised serious concerns for me.

Ms. DeGette.  And what were those things?

Mr. Friedman.  The first was that there was a change in part number relative to the ignition switch, and we were never informed of that change.

The second is that there were some conversations with suppliers about their control algorithm, the control systems for airbags.  We were never informed of that conversation, to my knowledge.  And we did not have the details on how those algorithms worked.

Third, and most importantly, General Motors created a direct connection in their recall between the airbag non-deployment and the ignition switch.  If we had any of those pieces of information, I truly believe it would have changed the way NHTSA would have approached this.

Ms. DeGette.  Now, if GM is changing a part, are they legally required to inform NHTSA of that change?

Mr. Friedman.  It is not clear to me that that is a legal requirement.  But I can get back to you to make sure.

Ms. DeGette.  I would appreciate it.  Because it seems to me that is critical.

Now, in your opening statement, you said that in order for NHTSA to be able to make a correct determination, you need all of the information, as you just said.  And you need it company to be acting in good faith.

Based on what you know now, do you think that at the time that all of this was happening GM was acting in good faith towards the agency?

Mr. Friedman.  Congresswoman, we have an open investigation to answer that exact question.  And if we find out that they were

not, we will hold them accountable.

Ms. DeGette.  And I would hope that you would inform this committee, irrespective of your determination, whether they did or didn't.

Mr. Friedman.  Absolutely.

Ms. DeGette.  When do you expect to finish that investigation?

Mr. Friedman.  I can't put an exact timeline on it.  We are getting hundreds of thousands of documents from General Motors.  The deadline is April 3rd for them to provide those documents.  It is not clear that they will be able to provide all the documents at the time.

But we have been making sure that they are continuously producing documents so that we can understand.  As soon as my team is able to find information in those documents that indicate that General Motors had information that they should have acted on sooner, we will determine how to move forward to hold General Motors accountable; or, if we don't find that information, then we will also let you know.

Ms. DeGette.  Thank you.

Mr. Murphy.  Gentlelady yields back.

With regard to Ms. DeGette's question about if there is a change in a part, do they need to notify you.  Will you also let us know if they make a change in a part, do they also have to have a different part number?  I don't know what NHTSA's requirements

are on that.  That is an issue.  Just you can submit that for the
record.

Mr. Friedman.  I will go back to you to be clear.

Mr. Murphy.  We also need to know what information you were
reviewing with regard to these airbags, GM cars or specific to the
Cobalt.  And would you please provide that information to the
committee.

Mr. Friedman.  Mr. Chairman, I believe we provided a
significant amount of documentation, but we will continue to do
so.

Mr. Murphy.  On this, we would like to know what you are
viewing.

RPTS KERR

DCMN SECKMAN

[5:05 p.m.]

Mr. Murphy.  Unless -- we would like to know what you are
reviewing.

Now recognize the chairman of the full committee, Mr. Upton,
5 minutes.

The Chairman.  Well, thank you, Mr. Chairman, and I just want
to -- I know you are, as well as our committee, is literally, we
are looking through boxes of information, thousands and thousands
of pages.  And that continues and looks like we will be getting
some more down the road.

Well, as you know, I wrote the TREAD Act, which passed
unanimously in the Congress.  President Clinton signed it into
law, and the whole point or a major point of that law was that
NHTSA would in fact get the information that it needed to detect a
trend as quickly as they could.  So when NHTSA considered whether
to investigate the Cobalt for an air bag defect back in 2007, the
early warning data was one of the factors that was cited in the
Defect Assessment Division's recommendation to investigate it,
correct?

Mr. Friedman.  That is correct.

The Chairman.  So what was -- looking back, what is -- what
is the problem?  Did GM not report the information that the law

required?  Or was NHTSA unable to sort through the information
that it had to find the problem or both?

   Mr. Friedman.  Congressman, we have an open investigation to
determine whether or not General Motors failed in their
responsibility to provide information, and we will definitely
report to this committee the results of that effort.

   In terms of what our team did.  Our team looked at all the
available information using the approach that we have used
successfully to lead to over 1,299 recalls influenced by NHTSA
over the last 10 years.  We use that process to look into the
early warning data, to look at the consumer complaint data, to
look at special crash investigations, and a variety of other
information.

   We dug into that data.  We analyzed it.  We tried to see if
there was a defect trend that stood out.  The data didn't support
that.  It showed that the Cobalt did not stand out when it came to
air bag nondeployments.

   We looked at the special crash investigations.  Those
available at the time were inconclusive.  This was a case where
the team worked very hard to try to understand what was happening
and wasn't able to see a significant enough trend or a clear
enough defect.

   What I am learning from this and where we have to go in the
future is we need to look more carefully at remote defect
possibilities.  We need to reconsider the way we are using special

crash investigations. We need to continue to invest in tools. We are already investing in computer tools basically grown out of the Watson IBM software to be able to more effectively, more efficiently use our resources to spot trends. We've got to put all these tools forward, and we've got to look for opportunities to make changes, look in better spots that --

The <u>Chairman.</u> So, as you look to embark on an investigation, do you consider the number of deaths? I mean, is there some trigger that you use to warn further exploration, whether it is 1 death, 4 deaths, 10 deaths, 20, 100, I mean, is there some type of standard equation that you put into place?

Mr. <u>Friedman.</u> Congressman, there is not. Our goal, what I would love to be able to do is to find each and every one of these defects before there's a single death. It is the manufacturer's responsibility to be reporting all of these defects and getting them fixed. When they do not, it is our job to try to find them. We don't have a simple rule-of-thumb because each case is different. In some cases, we have opened investigations after one incident where it was clear that it was a defect. In other cases, we have had to rely on the trend data that indicates that this stands out. I can't give you a specific --

The <u>Chairman.</u> So let's play Monday morning quarterback. So, today is April 1st, 2014. These problems arose over the last 10 years. What would you have liked to have had on your platter from GM specifically in terms of information today that you didn't

have in the last 8 or 10 years?

Mr. Friedman.  Well, at a minimum, what I can tell you, based on their chronology, I would have liked to have had information that they had changed the parts on the ignition switch.  I would have liked to have had information that they were talking to their suppliers, because they appear to have had concerns about the algorithm associated with air bag nondeployments.  I would have certainly liked to have any information they had directly linking the ignition switch defect to air bag nondeployments.  As we go through our investigation, I should be able to come back to you and let you know if there is additional information they should have had --

The Chairman.  And are you pretty certain that today that they did not provide that information to you?

Mr. Friedman.  It is my understanding that none of that information was available.  We are continuing our efforts to try to make sure that we understand what happened, so I can't say that I can give you a comprehensive and definitive answer, but my understanding at this point is that, no, we did not have that information.

The Chairman.  I know Mr. Long wanted my last 15 seconds, so I -- that is now gone.

I yield back.

Mr. Long.  Thank you, Mr. Chairman.

I will have my friend Mr. Terry here assist me, and the

chairman of the committee here -- subcommittee showed you this
picture awhile ago and said he couldn't navigate past this page,
and you said that if any new information became available to you,
that you would get that on the Web site.

Something we learned in the first hearing that I think is
very germane is that if you will take your car to General Motors,
they will give you a loaner at no cost or a rental car at no cost.
I would call that very germane.  I would call it critical, and if
somebody has got an 2005, 2006, 2007, I think it would be enticing
to drive a 2014 for a little while they repair your car, so that
would be a suggestion to put on there.

I yield back.

Mr. Murphy.  Thank you.

I might note to the gentleman, I received a call from one of
my constituents who said he has tried to get a loaner car, and the
dealer told him he couldn't have one, too.

Ms. DeGette.  One more thing, too, you could put on there is
take all your keys off the key ring except for the ignition key.
That is the other thing Ms. Barra said.  Is that on there?

Mr. Friedman.  I believe that is very clearly on there.  In
fact, just to be clear, the reason why we did that is because
safety is our top priority.  We are all focused on investigating
this case, but safety, safety is our top priority, which is why
the first thing I wanted people to see when they came to that Web
site was how to keep themselves safe.  So I do just want to be

clear, that is why we have that limited information there because I didn't want anyone out there who came to our Web site not to understand the steps how to keep themselves safe.  I agree it is a good idea to put on there -- I will have to see if we can fit it in the space we've got, or if there is another way to point people to it, but I agree it is a good idea to let them know that --

Mr. Murphy.  People need to know if it is safe to drive their current cars.

Mr. Dingell, you are now recognized for 5 minutes.

Mr. Dingell.  Mr. Chairman, I thank you.

Mr. Friedman, let's look at NHTSA's internal decisionmaking processes.  These questions will require a yes or no answer.

Is it correct that contractors for NHTSA's special crash investigations program conducted three separate investigations of Chevy Cobalt in 2005, 2006, and 2009 related to air bag nondeployment?

Mr. Friedman.  Yes, that is correct

Mr. Dingell.  Now, is it correct that NHTSA's Office of Defects Investigation reviews early warning reporting data and consumer complaints in deciding whether to open a formal defect investigation?

Mr. Friedman.  Yes, those are parts of the process.

Mr. Dingell.  Now, is it correct that GM submitted EWR data to NHTSA concerning Chevrolet Cobalts, subject to NHTSA's 2005 and 2006 special crash investigation?  Yes, or no.

Mr. Friedman.  I'm sorry, sir.  Could you repeat that,

please?

Mr. Dingell.  I'll give it to you again.  Is it correct that

GM submitted EWR data to NHTSA concerning Chevrolet Cobalt,

subject to NHTSA's 2005 and 2006 special crash investigation?

Mr. Friedman.  Yes, that's correct.  Those are important bits

of our investigation.

Mr. Dingell.  Now, is it correct that the Office of Defects

Investigation, ODI, follows a multistep process in order to

determine whether a defect exists in the vehicle?  Yes or no.

Mr. Friedman.  Yes

Mr. Dingell.  Now, and that process includes an initial

evaluation, a preliminary evaluation, and an engineering analysis.

Is that correct?

Mr. Friedman.  Yes, that is the standard process, but we will

act earlier in that stage if we have compelling information that

there's a defect.  We do not wait necessarily to go through that

whole process if we have sufficient information to act on.

Mr. Dingell.  All right.  Now, let's clarify something.

NHTSA's Special Crash Investigation program is something separate

and distinct from the formal ODI investigations process.  Is that

correct?

Mr. Friedman.  That is correct

Mr. Dingell.  Now, is it correct that the Office of Defects

Investigation convened an initial evaluation panel in 2007 to

investigate the nondeployment of air bags in the 2003, 2006 Chevy Cobalts and Ions, yes or no?

Mr. Friedman.  That is correct

Mr. Dingell.  Now, is it correct that the review was prompted by 29 consumer complaints, 4 fatal crashes, and 14 field reports?

Mr. Friedman.  That was one of the reasons for the review. The additional --

Mr. Dingell.  What were the other reasons?

Mr. Friedman.  In addition, we were looking at consumer complaints.  Those complaints raised concerns as well, and I can get back to you on the record with each of the pieces of information that were involved, but we do have a memo that was provided when this -- when it was proposed to potentially move this to a defect that lays out early warning data, consumer complaint data concern on the record, special crash investigation --

Mr. Dingell.  Would you submit that for the record, please?

Mr. Friedman.  Yes.

Mr. Dingell.  Now, were there other things that triggered this review?

Mr. Friedman.  My understanding is it was all the items in that memo was the information that triggered this review.

Mr. Dingell.  So there weren't other things.

Now, is it correct that ODI decided not to elevate that review to a more formal investigation because there was a lack of

discernible trend, yes or no?

Mr. Friedman.  Yes, that was one of the reasons.

Mr. Dingell.  What were the other reasons?

Mr. Friedman.  The other reason is that the crash investigation information we had was inconclusive and did not -- was not able to point to a specific defect.

Mr. Dingell.  All right.  Now, to be clear, at the time of the 2000 initial evaluation, NHTSA had concluded that the Chevy Cobalt was not over representative compared to other peer vehicles with respect to injury crash incident rates.  Is that correct?

Mr. Friedman.  That's correct.

Mr. Dingell.  Is there any other reason?

Mr. Friedman.  Was there any -- the other --

Mr. Dingell.  Was there any other reason that you came to that conclusion?

Mr. Friedman.  In 2007.

Mr. Dingell.  Now, also to be clear, NHTSA did not have information at the time of the 2007 investigation that, for example, linked air bag nondeployment to ignition switch position.  Is that correct?

Mr. Friedman.  We do not have any specific information that provided a direct link.

Mr. Dingell.  So you are agreeing?

Mr. Friedman.  I believe so.

Mr. Dingell.  Okay.  Now, Mr. Chairman, I am troubled here.

It appears that we have a flaw in NHTSA's decisionmaking process which is related to defects and their inquiries into defects. I fully recognize, and I am like most of the members of this committee, I think, critical of the fact that NHTSA is short staffed and underfunded. At the same time, I am compelled to agree with Acting Administrator Friedman that Congress may need to examine the usual -- use of special crash investigations in the defect screening process, how best to get NHTSA the information it needs for that process, and how best to engage manufacturers around issue evaluations. In so doing, I think we will help to better ensure the safety of American motorists and their families.

And I yield back the balance of my time.

Mr. Murphy. The gentleman yields back.

Now recognize Dr. Gingrey from Georgia for 5 minutes.

Dr. Gingrey. Mr. Chairman, thank you.

Mr. Friedman, in your written testimony, you suggested that NHTSA, your agency, did not pursue investigations into the issues with Cobalts and Ions because they were unaware of information developed by General Motors. In the years leading up to this recall, has NHTSA had any concerns with General Motors' responsiveness or lack thereof to safety defects and concerns?

Mr. Friedman. Congressman, I would like to get back to you on the record with that just to defer.

Dr. Gingrey. Let me do this. You may not have to do that. Just look at tab 34. It is right there in front of you. In

July 2013, the head of ODI emailed General Motors with a number of concerns.  It is the second page, bottom of the second page, sent to Carmen.  You see you where I am -- you with me?

Mr. <u>Friedman.</u>  I have not seen this before, but yes, I see it.

Dr. <u>Gingrey.</u>  Okay.  You want to read that first paragraph and then look -- look up and I will know that you have read it?

Mr. <u>Friedman.</u>  Yes

Dr. <u>Gingrey.</u>  He stated, The general perception is that General Motors is slow to communicate, slow to act and, at times, requires additional efforts of ODI that we do not feel is necessary with some of your peers.  You read that, didn't you?

Mr. <u>Friedman.</u>  Yes

Dr. <u>Gingrey.</u>  Were you aware of the concerns raised by ODI, and I guess that was July 2013?

Mr. <u>Friedman.</u>  I was not aware of this specific email, but I have been in at least one meeting where we sat down with General Motors and made clear to them that they needed to make sure that they were following an effective process when it came to their recalls.

Dr. <u>Gingrey.</u>  So there was definitely some concern.

Mr. <u>Friedman.</u>  Well, we -- with each and every automaker, we need to make sure that they have a good and effective process to quickly deal with this.  This email clearly indicates some very specific concerns.

Dr. <u>Gingrey.</u>  Did the agency have similar concerns in 2007, 2010, when it declined to advance any investigations into nondeployment of air bags in these GM vehicles?

Mr. <u>Friedman.</u>  I don't know

Dr. <u>Gingrey.</u>  You weren't with NHTSA at the time?

Mr. <u>Friedman.</u>  No.  I joined NHTSA back last year, I have been there for almost a year now.

Dr. <u>Gingrey.</u>  Do you think NHTSA did enough to get the information that it needed?

Mr. <u>Friedman.</u>  I believe in this case that the team looked very clearly and very carefully at the data.  I believe that the reason why we didn't move forward was because the data indicated that the Cobalts didn't stand out and that we didn't have conclusive -- we didn't have conclusive information as to a very specific intent.

Dr. <u>Gingrey.</u>  Well, you know, in 2005, GM issued this technical services bulletin -- and that's tab 12, if you want to flip quickly to tab 12 of your document binder -- this technical service bulletin to its dealers, and it recommended a solution for complaints of this inadvertent key turn due to the low torque, particularly by these Chevrolet Cobalts.  The technical services bulletin instructed the dealers exactly what to do to provide an insert that converted a key from a slot design to a hold design. I don't know exactly what that means, but they do.  General Motors believed that this would help reduce the force exerted on the

ignition while driving from maybe shaking of the keys or bumping it with your knee.

In 2006, the technical services bulletin was expanded to include additional make and model years.  Unfortunately, in the case of this young girl, 29-year old Brooke Melton, a nurse from my congressional district that was killed the day after she took her car in, saying, Hey, this engine is cutting off for no reason. And, you know, I know they must have gotten the technical service bulletin about this issue, but all they did was clean out a fuel line, gave her the car the next day, and led her to her death.

Administrator Friedman, yes or no, was NHTSA aware of General Motors' 2005, 2006 technical services bulletins related to low ignition key cylinder torque effect?

Mr. Friedman.  Mr. Gingrey, first, if I may, Brooke's death was a tragedy.  And it's a tragedy that we work each and every day to avoid.  I do believe we were aware, as part of our efforts and as part of the special crash investigation, that we were aware of that technical service bulletin.  At the time, that technical service bulletin would not have been seen as being associated with air bag nondeployment.

Dr. Gingrey.  Yeah.  Listen, I believe you, Mr. Friedman, I believe you, and you know, obviously, when people are driving impaired or texting or emailing or whatever, and you know, they don't change the oil when they should and their tires are low and the brakes are worn out, you know, there's some responsibility,

some personal responsibility.  But when they're doing everything the right way and they take their car in, and you know, they think that -- they trust the service department of the local dealership and they get a situation like this, I mean, you can understand why -- she's gone, but her parents, obviously -- and all these parents, these families are just irate because the expectation, if they're doing the right thing, they ought to be safe.

Mr. Friedman.  Congressman, I completely understand, and I would actually argue that consumers should expect that their cars should function as they're designed no matter the cause of the crash.

Dr. Gingrey.  Absolutely.  Thank you, Mr. Friedman.

I yield back.

Mr. Murphy.  I venture to say that they would assume the car keys don't have to be monitored --

Mr. Friedman.  Correct.

Mr. Murphy.  -- and checked.

Mr. Murphy.  Mr. Green, you are recognized for 5 minutes.

Mr. Green.  Thank you, Mr. Chairman.

Mr. Friedman, thank you for appearing today.  NHTSA has a central role for consumer safety, and I would like to understand better how long it took for NHTSA to identify this fault.  In your opinion, how did NHTSA not identify the deadly trend.

Mr. Friedman.  Congressman, when our team looked at the data, the trend did not -- there was not a trend that stuck out.  In

fact, when it came to air bag nondeployments, the Cobalt was not an outlier.

Mr. Green.  Was it -- was GM forthcoming with their data?

Mr. Friedman.  Well, that's the exact question and that's the exact reason why we have an open investigation to them.  I do have concerns about the parts change, about conversations they had with suppliers, and any of their information they may have had, which is exactly why we opened up an investigation to them, and if they did not follow the law in their requirements to get information to us and to respond quickly, we're going to hold them accountable as we have with many other automakers.

Mr. Green.  Okay.  Earlier this month, the New York Times reported on NHTSA's response to the consumer complaints over the years about ignition switch issues used for the recalled vehicles. According to the Times, many of the complaints detailed frightening scenes which moving cars suddenly stalled at high speeds on highways, in the middle of city traffic and while crossing railroad tracks.  A number of the complaints warned of catastrophic consequences if something was not done.  NHTSA received more than 260 of these consumer complaints over the past 11 years about GM vehicles suddenly turning off while driving, but it never once opened an effective investigation with the ignition issue -- switch issue.  If consumers submitted these complaints to NHTSA, many were met with a quote of just silence.

Mr. Friedman, Mary Ruddy's daughter died in a crash involving

a 2005 Cobalt.  Ms. Ruddy has repeatedly tried to contact NHTSA
for information but has only received form letters.  She told the
New York Times that, quote, I just want to hear -- someone to hear
from me.  We've had no closure.  We still have no answers.  Ms.
Ruddy was -- I don't know if she's still here today, but she was
in the audience.  Has NHTSA been in contact with Ms. Ruddy?

    Mr. Friedman.  Mr. Congressman, my understanding of what
happened with Ms. Ruddy -- well, first of all, Ms. Ruddy deserves
answers, and that is exactly why we are looking into what GM did.
That is exactly why we are making sure we understand what
happened.  What she has been through, it is a tragedy, and we've
got to work to make sure that those don't happen again.

    In terms of my understanding of Ms. Ruddy's contacts with
NHTSA, those contacts were made through our complaint system.  In
those complaint systems, as we do note on the Web site, we do not
necessarily respond to all of those complaints because what we are
doing with those complaints is we are looking for potential
problems, and if those complaints don't contain sufficient
information, if we have questions about them, we do follow up with
consumers.  But if they have the information we need, we do not,
because the goal of those complaint databases is to try to find
problems.

    In this case, my understanding is Ms. Ruddy provided those
complaints after being notified of a recall that NHTSA did
influence.  We got the Cobalt recalled.

Mr. <u>Green.</u>  I only have 5 minutes, but do you -- did NHTSA

really receive 260 consumer complaints over 11 years about this

automatic shutdown of your engines?

Mr. <u>Friedman.</u>  I don't have that exact number, but what I do

know is that at NHTSA, we -- human eyes look at every single one

of these complaints to try to find out if there is something that

stands out.  My understanding of the complaints you are

referencing are that they were for stalls and that only a very

small number of them were related to air bag nondeployments.  What

we were looking for --

Mr. <u>Green.</u>  I know but 260 complaints on the car stopping.

Mr. <u>Friedman.</u>  Right.

Mr. <u>Green.</u>  On the freeway or wherever it's at.  I don't know

if that is a high number or a low number over, you know, 11 years,

but you might need to have somebody or who actually looks at

complaints, and I assume they come from different parts of the

country, so somebody identifies and said, Hey, we need to focus on

these 260 complaints.

Mr. <u>Friedman.</u>  Congressman, in this case, a human eye looked

at each and every one of those, and whether that's a large or a

small number based on the analysis that I've seen relative to the

number of Cobalts that were out on the road, that was not a very

large number compared to a lot of the other stall complaints that

do happen for a variety of other vehicles that are out there.

Mr. <u>Green.</u>  Well, you told me about how NHTSA responds to

consumer complaints, but it seems like in this case, NHTSA might look at how they respond to consumer complaints much better because I know as a Member of Congress, believe me, if we don't respond to emails and letters, we will hear about it, and if I get a number of emails on a certain subject, you know, we obviously respond to it.

So, Mr. Chairman, I know I'm almost out of time, and thank you for your courtesy.

Mr. Murphy.  The gentleman yields back.

I now recognize the gentleman from Louisiana, Mr. Scalise, for 5 minutes

Mr. Scalise.  Thank you, Mr. Chairman.

And Mr. Friedman, thank you for being with us and participating in this investigative hearing as well.  I know earlier you had talked about the decision back in 2007 when the chief of Defect Assessment Division at your agency had suggested opening an investigation and then ultimately, some time after, it was decided not to open that investigation.  When was the decision made not to open the investigation?

Mr. Friedman.  That was also made in 2007, and basically what the chief of the defect investment -- sorry, Defects Assessment Division was doing was exactly what his job requires him to do. He is supposed to look for potential defect cases and bring those up to a panel where those are considered, where a broad set of evidence is considered.

Mr. Scalise.  Is that the trends in relation to peers, i

that's the language that you all were using when you're looking

at, I guess, similar cars that were having similar problems with

air bags?

Mr. Friedman.  That's one of the pieces of information that's

used as well as crash investigations and other EWR data that is

involved.  About half of those that are brought up do not end up

going to investigation, but we have designed our system to make

sure that we have at least two teams always looking for potential

problems.  The Defects Assessment Division is always looking for

potential problems and raising that question.  That's what --

Mr. Scalise.  And then I'd be curious to get the information

that you got within NHTSA that helped make that decision not to

move forward with the investigation between September 2007, when

the Defect Assessment Division decided -- that suggested to go

forward, and then when you subsequently, your agency subsequently

decide not to because when you look at this chart we got from

2007, the Cobalt versus Peer crash rate, there is a chart, and

you've got the other peers and you've got some fairly static

numbers and then you've got the spike here in what's called

exposure rate per population that seems to spike with the Cobalt,

and so if -- if the internal decisionmaking was that they were

similar to their peers, it doesn't seem to mesh from this chart

from 2007.  So if you can get me or get the committee whatever

information you have on what decisionmaking went into NHTSA's

final call to reject what was a warning or so from internal -- the
Defect Assessment Division, and can you get us that information?

Mr. Friedman.  Well, I believe we provided that information
to the committee already, but if there is additional information,
I'll make sure committee has --

Mr. Scalise.  And were you all --

Mr. Friedman.  I'm sorry, sir

Mr. Scalise.  You had something else you wanted to add to
that?

Mr. Friedman.  Thank you, yes, I apologize.  I just wanted to
make clear about what the data shows.  I believe you're referring
to this chart.  The bars here represent the defect, the potential
defect, or really the complaint rate, and what you'll see with
these bars is they're not spiking, they're not standing out in
comparison to these others.  The average is here, and they're just
above average

Mr. Scalise.  The blue line there on your chart

Mr. Friedman.  Right.  And that's what I was wondering if you
were pointing to.  The blue line is the volume of -- I believe
that's the volume of reports.  No, that's the volume of sales, so
that indicates how many vehicles were sold, but the complaint rate
that's the important data that we're looking at are the bars.

Mr. Scalise.  Okay.  Did you take action on any of those
other cars that are identified in that chart?

Mr. Friedman.  In some cases, we took action.  In some cases,

we did not.

Mr. <u>Scalise.</u>  So in some, you did.  If you can get
us -- again, if you can get the committee the list of those cars
where you did take action because clearly you made the choice not
to take action in the case of the Cobalt, so we appreciate if you
can get us that.

I do want to ask a few other questions because in your
testimony, you'd made a few, I don't know if you'd call them
accusations, but I guess you could call them that.  I mean, here
you're saying we're pursuing an investigation of whether GM met
its timeliness responsibilities to report and address this defect
under Federal law.  I know you addressed this a little bit
earlier, but if you've got any specifics that you're referring to
when you make that statement, can you get that to the committee?

Mr. <u>Friedman.</u>  Yeah.  Well, the specifics, I believe, are in
my testimony that there are three things that I am concerned about
based on their chronology.  First and foremost is that they have
identified that there's a link between the ignition switch and air
bag nondeployment.  Second is that they changed the part.  And
third is they appear to have had conversations with their
suppliers about the air bag algorithm in relationship to the
key --

Mr. <u>Scalise.</u>  Final question, and I know I am out time, GM
had -- this is your statement:  GM had critical information that
would have helped identify this defect.  Have you gotten our staff

that critical information already that you feel GM had that would

have helped identify this defect?

Mr. Friedman.  So that information is the information that

was referred to in General Motors' chronology.  I believe the

committee has asked for all that information.

Mr. Scalise.  So we don't yet have that, as far as you know?

Mr. Friedman.  I am not aware of exactly what documents you

do or don't have, but if you don't have that information --

Mr. Scalise.  If you can make sure we get that information if

you have it.

Mr. Friedman.  I also just wanted to clarify.  We don't only

look for trends.  If there is a clear defect, we move forward into

the investigation as well, so on -- I don't know the answer but on

some of these cases, there may have not been as large of a trend,

but if there was a clear defect, we would have investigated

this --

Mr. Scalise.  Thanks for your testimony.

And I yield back the balance of my time, Mr. Chairman.

Mr. Murphy.  I just want to make sure, so we're very clear on

this, when he's referring to the information given this committee,

if you could highlight very specifically the information you did

not have that GM later gave you that would have changed your

decision, you make sure the committee has that.  I mean, I know

you said it was a parts switch, and that's what we have.

Mr. Friedman.  Well, so, what I'm referring to, and I can

highlight it in GM's chronology, is I'm referring to specific
items that are identified in General Motors' chronology that
brought concerns.  We are getting that information from General
Motors.

Mr. Murphy.  Thank you.

I now recognize the gentlewoman from Florida, Ms. Castor, for
5 minutes.

Ms. Castor.  Thank you, Mr. Chairman.

Administrator Friedman, GM has confirmed that it knew as
early as 2001 that its ignition switches contained defects.  And
by 2004, GM had a body of consumer complaints that raised enough
questions for them to open an internal engineering inquiry of the
switches.  Meanwhile, the National Highway Traffic Safety
Administration, your agency, was beginning to receive its own body
of consumer complaints of cars stalling and ignition switch
failures, and in 2005, as your agency was monitoring air bag
nondeployment issues, its special crash investigation of a 2005
Cobalt found that the ignition switch was in the accessory
position when the air bags did not deploy.  You said, At this
point, it was not clear to the Highway Traffic Safety
Administration what was happening.

But then information came out subsequently that you can tell
us, should this have pointed NHTSA in the right direction, in 2007
agency investigated a second crash of a 2005 Cobalt where the air
bags did not deploy, I think you said, At this point, it still, it

did not stick out.  And you've testified that you didn't see
trends.

The crash report found that the nondeployment could be the
result of, quote, "power loss due to movement of the ignition
switch just prior to impact."  But at this point, GM was also
providing your agency with early warning reports in the third
quarter of 2005, the fourth quarter of 2006, in addition to the
crash -- special crash investigation, so we're all trying to
figure out how it took so long for these defective ignition
switches to trigger a recall at GM and then raise red flags at
NHTSA and how the Highway Traffic Safety Administration could have
noticed this issue sooner if GM had been more forthcoming.

So the committee's investigation has revealed that GM
approved switches for these cars that did not meet the company
specifications in 2002 and again in 2006.  Did GM ever inform the
Highway Traffic Safety Administration of this fact?

Mr. Friedman.  Of which specific fact?  I apologize.

Ms. Castor.  That they -- that the ignition switches did not
meet the company specifications?

Mr. Friedman.  It's my understanding that we did not have
that information.

Ms. Castor.  Okay.  The supplemental memo released this
morning by the committee staff also revealed that GM had over 130
warranty claims on the recalled vehicles that specifically
referred to problems with the ignition switch turning

off -- turning the car off when going over bumps or when drivers accidentally hit the key with their knee or leg.  Is it true that GM provides -- provided early -- in their early warning reports aggregate data of the warranty information but not the specific warranty claims listed by -- one by one in the comments from consumers?

Mr. Friedman.  What all car companies provide are aggregate numbers associated with warranties, and so we don't know when we get those counts what the reason for those warranties could be. For example, on the air bag side, I believe I mentioned before, you know, the complaints could be because the air bag light was going off when they thought it shouldn't or because the passenger sensor was not working.  So, we don't -- when we have that count, we do not have the information as to the detail of exactly what each and every one of those warranty claims is.

Ms. Castor.  So if GM had shared the specific warranty claims, would that have been helpful to your agency?

Mr. Friedman.  The specific warranty claims I believe you're speaking of are related to the ignition switch itself?

Ms. Castor.  Yes, the 130 that have now come out due to the committee investigation.

Mr. Friedman.  And my honest answer is I don't know, and that is in part because what -- at the time, we did not have the information we now have for General Motors directly connecting the ignition switch to the air bag recalls.

Ms. Castor.  So the state of the law currently is that in early warning reports on any type of vehicle problem, the car companies do not have to provide you the specific warranty claims?

Mr. Friedman.  I believe that's the case.

Ms. Castor.  They can give you a summary in general?

Mr. Friedman.  Yes, I believe that's the case.

Ms. Castor.  And that's true whether it is a warranty problem with the radio or a warranty problem that could be a serious safety defect?

Mr. Friedman.  I believe that's correct

Ms. Castor.  Is that -- do you think it's time to look at the law if the -- if they're -- if a car company has so many -- you know, here, 130 warranty claims that are specific and they relate to a serious safety defect, do you think that would be helpful to your agency, maybe change the law and say when a car company becomes aware that they have so many of these serious safety defects, they have to provide you the specific warranty complaints from the consumer?

Mr. Friedman.  Congresswoman, I have to look at the exact data before I would be able to tell you whether or not it would be valuable, but what I will --

Ms. Castor.  But certainly if a company had gathered a critical mass of serious safety defect complaints, that would be helpful --

Mr. Friedman.  Well --

Ms. Castor.  -- correct?

Mr. Friedman.  -- if they have information regarding a defect, I believe that information they would, without a doubt, have to provide to us.  I believe the information --

Ms. Castor.  But the law does not require that currently?

Mr. Friedman.  Well, if they have information about a defect, I believe the law does.  I believe what you're referring to are warranty claims, which may or may not be associated with a defect.

Ms. Castor.  Okay.  Well, I think this is an important issue for the committee to look at.  There might be some new line drawing or directions on what these early warning reports and if there is serious safety information that they've -- a car company has -- has gleaned through their own internal investigation, it really needs to be provided to the agency.

Mr. Murphy.  Thank you.

Mr. Friedman.  And Congressman -- Chairman --

Mr. Murphy.  Now recognize Dr. Burgess for 5 minutes.  Thank you.

Dr. Burgess.  Thank you, Mr. Chairman.

Thank you, Mr. Friedman, for being here with us.  It's been a long afternoon.  Now, your testimony, I think you stated that, in 2007 and 2010, there was not enough evidence to conduct a formal investigation into General Motors' Chevrolet Cobalt, despite the number of complaints and four fatal crashes that had already shown up, but in 2012, your agency, the National Highway Traffic Safety

Administration opened an investigation into an air bag problem
that some Hyundai models -- my understanding is this was based on
a single complaint, and that is okay.  I think the air bag
nondeployment is a serious issue, but why wasn't it a serious
issue when the complaints were coming in about the Cobalt?  Given
the fact that you initiated the investigation with much less
evidence in the case of Hyundai, how can you -- how can you assert
that there was not enough evidence to proceed with General Motors'
case?

     Mr. Friedman.  Congressman, safety is our priority, and air
bag nondeployments is a serious issue and we treat them very, very
seriously.  I would have to get back to you on specifics of the
Hyundai case, but it goes back to one of the points I made before,
which is we are looking for two potential things.  The best thing
and the easiest ability -- the best thing to be able to find and
the clearest thing to be able find is when there's an obvious
indication of a defect.  All it takes is one if that's clear.

     Dr. Burgess.  Yeah.  And I agree completely, and I don't
know -- I mean, you were not here when the CEO testified when we
posed questions.  One of questions I posed was for the accident
that occurred in Maryland in July of 2005 where a Chevy Cobalt
went down a street that ended in a cul-de-sac, maybe was driving
too fast, a lot of problems that night, but the air bag didn't
deploy when the car impacted some trees.  And it was a pretty
serious impact.  In fact, it was so serious that the driver was

then pushed up, compressed against the steering wheel with such
force, I mean, she only weighed 106 pounds, and she broke the rim
off the steering wheel, and that's a massive amount of force for a
little 106-pound body to exhibit.  So the air bag didn't deploy,
and you know, I got your report here that it was in fact
investigated in December of 2006, but that's a big deal that that
air bag didn't deploy.

Different from all of the other accidents that we were given
information about, because of the nature of this person's
injuries, because of the cause of her demise, I can't tell you
that the air bag would have saved her life, but I know, without
the air bag, there was no chance at all, and of course, that was
proven that night.  But an air bag might have made a difference
because the steering wheel that she broke off actually compressed
against the upper dome, just below the diaphragm, below the rib
cage, and lacerated the liver, and over the course of the next
hour and 45 minutes, small woman, small blood volume, she bled
out.  I mean, an air bag might have made a big difference that
night.

Now, contrasting that with another accident that occurred in
Pennsylvania in 2009, where there was a head-on collision between
a Hyundai and a Cobalt, and as I pointed out to the GM CEO, the
Cobalt was not at fault, and that is, the driver of the Cobalt was
not at fault.  The Hyundai came over the center line, and there
was a head-on collision.  Closing speed was probably close to 100

miles an hour when you add the two speeds of the automobiles
together.  Everyone who was in the front seat of those vehicles
died, but the Cobalt air bag did not deploy.  The Hyundai did.
Now, unfortunately, it didn't make any difference as to the
overall fatality of that accident, but here you've got a
side-by-side, identical speeds with which the impact occurred, the
deceleration forces were identical in both automobiles.  Hyundai
deploys, Cobalt doesn't, this is a problem.  Don't you agree?

    Mr. Friedman.  Congressman, when air bags don't deploy,
that's a serious issue.  There's also a serious issue sometimes
when air bags do deploy.  Over 200 people died because air bags,
earlier air bags, deployed when they shouldn't have or deployed
too strongly when they shouldn't have.  Part of the challenge with
all this, part of the reason why this information ended up not
being conclusive for us is because air bags are designed, even in
some difficult crashes, to not go off because that's the safest
thing, that's the best way to avoid potential harm.

    Dr. Burgess.  Sir, in all due respect, I cannot
imagine -- and I'm not an engineer, and I'm not lawyer, but I
cannot imagine any circumstance where impacting an oak tree at
70 miles an hour or a head-on collision at 45 miles per hour per
vehicle would not be a situation where you did not want the
deployment of the air bag.  I can't think of a single reason why
the air bag deploying would add to the lethality of that accident
sequence.

Mr. Friedman.  Congressman, I completely understand
why -- why you have -- why you feel that and why you have that
impression.  In the case of the 2005 crash and in general with
these air bags, if you have an unbelted occupant and a small
strike first, the risk at play here is that the occupant may be
moving forward during that crash.  If you're moving forward during
that crash and the air bag is opening, yes, it actually could
cause more harm than good.  When the air bag is -- system is
trying to decide whether or not to deploy --

Dr. Burgess.  It couldn't have possibly done more harm that
night.  I would just submit that first impact was with a 5-inch
pine tree, and although the pine tree yielded to the Cobalt, it
was still a pretty significant impact when that happened.

Thank you, Mr. Chairman.  I will yield back.

Mr. Murphy.  The gentleman's time is expired.

I will now recognize Mr. Barton for 5 minutes.

Mr. Barton.  Thank you.  And I want to apologize to the other
recall members that are still here.  I have been watching the
hearing as I've been doing meetings, but I apologize for not being
here physically to go ahead of some of you folks, and having said
that, I'm going to go ahead.

I have listened to most of what you said today on the
television, and I think it's obvious that GM has some real
questions that they've not done a very good answering today, but I
also think, as the Federal regulator on the block, there are some

valid questions for your agency to answer.  My first question is, at what level of accidents or deaths or incidents of malfunction triggers more than normal NHTSA review, not necessarily a full fledged investigation, but in this case, we, in hindsight, have got 13 deaths that we feel are attributable to this ignition problem over a 10-year period.  I don't know how many accidents, how many injuries, but you know, when would NHTSA really start looking at something and say, you know, there's an anomaly here, we need to check it out?

Mr. Friedman.  Congressman, first, I appreciate your question, and you know, part of what you started with is there are important questions that NHTSA has to answer in addition to General Motors, and I think this is an incredibly important process because we have questions, you have questions.  What we need -- what my focus is in addition to the recall is making sure NHTSA does everything we can to improve the way we deal with these cases.

When it comes to your question about, is there a specific level?  Each case ends up being different.  Ideally, what I would like to have happen, is that we find any -- first, that automakers find and fix these defects right away.  If they don't, ideally, I want to find and fix these defects --

Mr. Barton.  But there is some internal reporting system or monitoring system and like if a specific model started showing up, 100 accidents a month that were unexplainable, that would be a big

enough blip that somebody at NHTSA would say, Well, what's going
on there.  I mean, if you had a steering problem, if you had a
brake problem, if you had a gasoline tank problem that kept
exploding over and over again, not once every decade, but I mean,
you know, enough that you could see in your reporting, somebody at
NHTSA would say, Hey, we need to check that out.

Now, I am told that at the staff level, there were some
internal NHTSA employees, some employees at NHTSA said, you know,
before GM admitted that there was a problem, there were some NHTSA
midlevel people that said we need to look at it and a decision was
made within NHTSA that it wasn't at a level that was worthy of
further investigation.  Is that true?

Mr. Friedman.  Congressman, we have a process to do exactly
what you just said.  We have people who are reading every single
one of the more than 45,000 complaints that come in.  We have a
team dedicated to do that.  We have a team dedicated to looking at
all the early warning data that comes in.  In this case, red flags
were raised.  Concerns were raised, and it was proposed, because
of that exact process, the exact process that you're talking about
that we do have, concerns were raised.  And this was brought to a
panel.  The job of that panel is to consider all of the evidence,
the initial evidence as well as more detailed look at the data,
whether or not there's a clear trend, whether or not there's
a -- enough information to have concern over a specific defect.
The panel did that in this case.  What I'm learning, what I'm

seeing from all this is that we need to reconsider and look at,
how do we deal with cases where there may be something that's
considered a remote explanation?  Should we change the way we
follow up on it?  Should we change the way we follow up on that
with the car company?  These are things that I think we're
learning, lessons that --

Mr. Barton.  My time is just about out.  I want to make one
general comment and then one final question.  You know, we pointed
out to the GM executive that was here that their part didn't meet
their own specifications, and it didn't just almost not meet them;
it didn't meet them by a long way.  I mean, like a third, it was
like two-thirds off.  It was way below, not just a little bit, and
that's not NHTSA's problem, and you're not expected to -- the
NHTSA people aren't expected to know things at that level.  But on
the general point that Dr. Burgess was asking about, you know,
when the air bag doesn't deploy when it runs into a tree at 40 or
50 miles an hour and the general response from NHTSA is that we
didn't know how that particular air bag system was supposed to
work, I don't think that's a very good answer.  Isn't NHTSA
supposed to know how the air bag systems work, and if they are
not, if NHTSA doesn't know, aren't you, in your agency, supposed
to find out?

Mr. Friedman.  Congressman, the circumstances of these
crashes were much more complicated than that.  We applied
expertise, we applied our understanding, we applied a process that

has worked to generate over 1,299 recalls over the last decade.

Are there improvements that we need to make to that process based

on what we've learned today?  Yes, absolutely.

     Mr. Barton.  Okay.

     Mr. Friedman.  and I'm committed to making sure that that

happens, but these -- I wish these crashes were as simple as they

appear to be.  I wish the connection was as direct as we now know

it is.  At the time and with the information that we had --

     Mr. Barton.  Hindsight is always easier than current sight.

     Mr. Friedman.  As before, hindsight is 20/20, and ideally,

we --

     Mr. Barton.  Thank you, Mr. Chairman.

     Mr. Murphy.  The gentleman yields back.

     I'll recognize Mr. Griffith of Virginia for 5 minutes.

     Mr. Griffith.  Thank you very much.  I appreciate it.  I

would ask -- I appreciate you being here today, and I would ask

several questions following up, you know, on why didn't NHTSA

know, and it is true that hindsight is 20/20, but it appears that

some of your folks were at least sent enough warning signals.

     I am looking at what I believe is tab 18, and the DAD, which

is the Defects Assessment Division, and I know you know that, but

not everybody watching on TV knows that, and so I want to make

sure they know because I had to look it up, sent out and said in

one of their emails in 2007, said, Notwithstanding GM's

indications that they see no specific problem pattern, DAD

perceives a pattern of nondeployments in these vehicles that does
not exist in their peers and that their circumstances are such
that in our engineering judgment merited a deployment and that
such a deployment would have reduced injury level or saved lives.

When you combine that flag with the flag I think you
mentioned earlier in your testimony that you were getting a
number, if I remember correctly, was about 200-and-some complaints
on this particular Cobalt vehicle, that they were stalling out in
the road or the engine was cutting off, and you start adding those
together along with the fact that I believe you all knew that
there were at least, I think it was three where the air bag didn't
deploy and the ignition was in the accessory mode, it would seem
that somebody ought to start an investigation that those
coincidences might have been more than coincidences.  And I would
ask, I know you're trying to do things better, but apparently, the
person who put all this together was an investigator for a one-man
law firm.  He did have somebody of counsel, but basically you've
got a one man law firm with an engineering investigator who
figures this out.  So I would say to you, you know, what can you
do better and have you called on that investigator to come in and
maybe train some of your folks that -- to look at some of these
coincidences because when you start seeing a series of negative
things happen, that might be where you ought to be looking.

Mr. Friedman.  Congressman, our team was looking at this
issue.  The Defects Assessment Division was doing exactly their

job.  We have a system that is designed to raise those red flags.
About half of the time, the recommendations of those Defects
Assessment Division end up moving on to investigations.
This -- what I see in this case is one of the things I mentioned
before, which is one of the things we need to look at is, how do
we make connections between remote defect possibilities?

     In this case, you had one theory that was put forth, which
was that the accessory -- the key being the accessory position
could have caused air bag nondeployments.  In the crashes that we
looked at, the circumstances of those crashes led the
investigators to believe that it was more -- much more likely that
the air bags didn't go off because of the circumstances of that
crash.  I understand -- completely understand why it looks like --

     Mr. Griffith.  Well, but let me --

     Mr. Friedman.  It should have been clear, but it's clear now
in part because we have that clear connection from General Motors.

     Mr. Griffith.  Well, but let me raise this concern.  This
memo indicates that there's a reliance, and I'm implying this from
the wording, notwithstanding GM's indication that they see no
specific pattern problem.  It shows -- that statement shows a
reliance on GM.  Likewise, in your testimony, you state that this
understanding was verified -- talking about the power loss
situation -- This understanding was verified by GM service
literature during our due diligence effort.

     Now, if you've got a company that's got a car that is not

functioning the way it is supposed to, I would like to think that with 51 employees versus that one-man law firm out of Georgia, that you would look at something other than the service literature and not necessarily that rely on GM indications that they see no specific pattern or problem pattern.  So, I am concerned that there may have been too much reliance on the information from GM, including their service -- let me make sure I get the wording right -- their service literature and what they saw as problem patterns when in fact I think that you all are supposed to be finding the problem patterns.

Now, I understand it is easy, in hindsight, sitting up here to say that, but these are warning signs that go off to me as a legislator that maybe you all need to take a look at that, and you know, when you see problems, maybe the service literature of the company that you're looking at is not the best place to get your information.

Mr. Friedman.  Congressman, just to be clear, we did not rely on General Motors when it came to defects, whether or not there was a defect trend.  We did our own analysis of the data, and our own analysis indicated that the Cobalt did stand out.  I also wonder if I haven't been clear enough relative to that service bulletin.  We did not rely on that service bulletin at the time.  We did not rely on that information from General Motors.  We relied on our expert's understanding of air bag systems.

Mr. Griffith.  But their understanding of the air bag system

in the Cobalt was based on the service literature for the Cobalt,
according to your written testimony.  Am I not correct?  Is that
not what you said?

Mr. Friedman.  My testimony sounds like it was not clear
enough.  What happened was once we found out about this defect, we
looked into the service literature to confirm our understanding at
the time, and the service literature that we looked at this year
for that vehicle confirmed our understanding at the time, which
was that --

Mr. Griffith.  Your understanding at the time and the service
literature were both wrong.  Isn't that correct, yes or no?

Mr. Friedman.  Yes, that's correct.

Mr. Griffith.  Thank you.

I yield back.

Mr. Murphy.  The gentleman yields back.

Now recognize Mr. Long for 5 minutes.

Mr. Long.  Thank you, Mr. Chairman.

I want to thank the chairman and the ranking member and all
of the members on both sides that have been here today.  We
originally weren't scheduled to be in this soon, and so a lot of
us had to change our travel plans to get in today, and a lot of us
have been sitting here through the entire both hearings today
because it is a very, very important issue, of course, that we're
discussing.

And thank you, Mr. Friedman, for being here with us today

with your testimony.  You know, when I think of NHTSA, I think of
Number 66 for the Green Bay Packer's linebacker Ray Nitschke, and
all day we've been talking about NHTSA, NHTSA.  Tell me what NHTSA
is.

       Mr. Friedman.  NHTSA is the National Highway Traffic Safety
Administration.  It's an organization of nearly 600 people, whose
mission is to save lives and reduce injuries by addressing issues
like drunk driving, unbelted occupants, vehicle safety, and the
subject we're talking about today, which is finding vehicle
defects when automakers don't find them themselves, which is their
first and foremost responsibility.

       Mr. Long.  I just wanted to get that out there on the record.
I, of course, know what it is, but I think a lot of people when
they hear that NHTSA, NHTSA, NHTSA all day, they're thinking, what
exactly is this?  So the next question I would have would be do
you have any way to track consumer complaints to auto dealers
short of waiting for them to reach out to you, not the dealers,
but the consumers that are having a problem?  Do you have any way
to track people coming in and my car stopped, it died, it did
this, it did that, do you have any way to track that, or do you
have to wait for someone to contact you all?

       Mr. Friedman.  We have early warning data which tracks the
cases where warranty services are provided on vehicles

       Mr. Long.  So anytime a warranty service is provided, you
will be notified of that?

Mr. Friedman.  We're notified of a count.  We have a total
number -- a count of the number of those and the part that that's
associated with.

Mr. Long.  And how often --

Mr. Friedman.  Not the reason for the complaint.

Mr. Long.  Do you get that annually, semi-annually,
quarterly, how often?

Mr. Friedman.  Once a quarter --

Mr. Long.  Once a quarter.

Mr. Friedman.  -- have the information we need, it's required
once a quarter.

Mr. Long.  How would a -- what kind of marketing do you do?
How would a consumer know -- learn about the National Highway
Traffic Safety Administration?  What kind of market do you do?  If
I took my car in, had a problem, it wouldn't pop into my head to
call you, so how do you market yourself?  How can we let the
American public know if they do have an issue and they're not
satisfied with their dealer, how can they contact you or what can
we do to better augment that, I guess?

Mr. Friedman.  Well, some of the things that we're already
looking at doing and we're already making sure that happens is on
every single recall letter that goes out, both NHTSA's name is on
that letter, even though it's sent from the automaker, and it's in
clear red letters that this is an important safety recall
information.  We also have apps that are available online that we

try to make sure the consumers download.  These apps allow people
to lodge complaints directly to us.  They allow them to track
their recalls.  We're also moving forward later on this year with
a tool that will allow all consumers to come to our Web site, put
in their VIN number to find out if there is a recall associated
with their very specific vehicle that has yet to be addressed.

    We have additional efforts where we try to make sure that
people are aware of who NHTSA is, but yes, I have seen the same
data, and one of the things I've talked to any staff about is that
I'm concerned that we are not at the top of the list when people
have complaints, and we've been talking about ways to make sure
that we have campaigns to make people aware that if you've got a
complaint, if you've got a concern, come to NHTSA.  We need that
information.  Consumer complaint data is one of the vital tools
that we have to try to find these defects, and I would appreciate
any help anyone can provide to make sure that people are aware,
that people go to SaferCar.gov to report these defects.

    Mr. Long.  Where tomorrow you're going to be able to see on
there that you could take your car in and get a free loaner or a
free rental, right?

    Mr. Friedman.  Absolutely.

    Mr. Long.  Very good.  My last question.  At what point is a
consumer supposed to reach out to you?

    Mr. Friedman.  At any point they have a concern.  I mean, you
know --

Mr. Long.  At what point is that, though?  If I get a -- go home this evening, in the mail I get a recall on my vehicle, and they want me to bring it in and fix this switch or that doodad there or whatever, do I run to the phone or call you and say, Hey, I've got a recall?  Or do I wait until I'm not satisfied with the dealer?  At what point do consumers -- should consumers reach out to you?

Mr. Friedman.  Well, in that case, if you get a recall letter, the first thing you should do, without a doubt, is contact your dealer and get your vehicle fixed as soon as possible.  These are --

Mr. Long.  Yeah, but I'm talking about contacting you.  At what point do I -- if it's just a standard thing, I don't need to contact you on that?

Mr. Friedman.  If it's a standard recall and you're concerned and you want to reach out to us, absolutely, but typically, when we want people to contact us is well before there's a recall.  We rely on and look at over 45,000 consumer complaints every single year to try to spot these trends, so I want someone to reach out to NHTSA the instant they have a serious concern about their vehicle and they feel that their safety is at risk so that we can have that information.  Right now, we've got 45,000 complaints. I'd like to see that number get up to 50,000; 60,000; 75,000 complaints relative to safety issues so that we can have more information to be able to track down these problems.

Mr. Long. Okay. Mr. Chairman, I don't have any time left, but if I did, I'd sure yield back.

Mr. Griffith. [Presiding.] Thank you.

I thank the gentleman.

The gentleman from Nebraska, Mr. Terry, 5 minutes.

Mr. Terry. Thank you, Acting Chair.

You had testified, Mr. Friedman, or in your testimony, you showed or testified that there were two SCI reports that showed indications of power loss and identified the vehicle power mode as accessory. And I think one of these has been highlighted in several newspaper articles that the SCI noted during air bag investigation a problem with the accessory.

So the question I have is, did these reports merely report the vehicle power mode as a fact, or did it report this and identify it as a potential contributing factor?

Mr. Friedman. Well, the two reports handled the case differently. My understanding and my memory is that in one of the reports, it simply had an entry in the EDR data, in the event data recorder data, that indicated that the vehicle power mode was accessory. That's typically not reported. In other case, in the other -- it was included in the special crash investigation that there were two possible reasons why the air bag did not deploy. One possible reason was because of the ignition switch. The other possible reason was because the yielding nature of the trees wasn't sufficient.

Mr. Terry.   You mean, they're hard when they're hit?

Mr. Friedman.   I'm sorry?

Mr. Terry.   I'm being sarcastic.   You said the yielding nature of the tree is kind of -- they're hard and objects hit them and --

Mr. Friedman.   Well, different trees have different sizes. In this case --

Mr. Terry.   Well anyway, I don't want to get bogged down into the force of the impact of a tree, but the point is that they were noted in two SCI reports but not acted upon, so what is the communication process between the SCI and the ODI?   Someone has got to take that up and say, Gee, there's a problem with an ignition switch that's been noted; maybe we should follow up on that.   What's the process?

RPTS BAKER

DCMN SECKMAN

[6:02 p.m.]

Mr. Friedman.  So the process, it depends on the circumstance.  In some cases, our Office of Defects Investigation will actually ask the special crash investigators to go out and look at a crash so that they can seek new information.  In other cases, when the special crash investigators follow up on a crash, they will bring it to the attention of the Office of Defects Investigation.  So we try to make sure that both teams are talking to each other and sharing critical information.

Mr. Terry.  Okay.  So in these two SCI reports that were filed, did the SCI, the special crash investigator, communicate that there was a problem, other than noting it in those reports on those two occasions to the ODI?

Mr. Friedman.  I don't know if SCI specifically communicated the accessory issue, but when the team did look at especially the investigation that indicated that there were two possible reasons for that.

Mr. Terry.  Yeah.  So the ODI knew that there may have been, that the switch may have been part of the problem, let's say?

Mr. Friedman.  ODI would have been aware of exactly?

Mr. Terry.  So ODI was aware?

Mr. Friedman.  I believe so because my understanding is

that --

Mr. Terry.  Because it looks like you have one group of people that's not talking to another group of people.

Mr. Friedman.  Our teams do talk to each other, but as you'll notice in my testimony, one of the things I do think we need to discuss is, are there ways that we can change the way these crash investigations are used in our defective products?

But in this case, I do want to note that the draft version of this report that the team had at the time, at that moment, indicated that the crash investigators thought the more likely reason that the air bags did not go off was because of the circumstances.

Mr. Terry.  I would think if you note that there was a problem with the switch automatically turning to accessory, that that would be significant enough to just follow up on, whether or not it was deemed to be a contributing factor or the sole factor. I need to ask, though, on the early warning reports, you were receiving early warning, the reports from GM.  Correct?

Mr. Friedman.  That's correct.

Mr. Terry.  In my question to the chair -- I'm sorry, the president of GM, she said that they were submitting those.  Were they required when they know or feel that there is a problem with a specific item in that car like the ignition switch, to report that?  Or is that just one of the many items to be submitted within the EWR?

Mr. Friedman.  Well, my understanding is that if they're aware of a problem that relates to a safety defect, that that actually is not reported within EWR.  That needs to be directly reported --

Mr. Terry.  Under the TREAD Act, they have to support that separately.

Mr. Friedman.  Well, under the TREAD Act, they're required to report warranty claims and a variety of other pieces of information to us.  But if they saw a defect, then they needed to report that to us completely separate from, you know -- that's simply --

Mr. Terry.  What's noncompliance?  I'm over my time, but I do need to get on the record, what is noncompliance versus defect?  And you have 2 seconds.

Mr. Friedman.  Sure.  Really quickly, noncompliance means you did not meet the standards that we have.  A safety defect means that you may have met the standards, but there's something wrong with the vehicle that poses an unreasonable risk to safety.

Mr. Griffith.  I thank the gentleman.

I would ask for unanimous consent that the members' written opening statements be introduced into the record.

Without objection, the documents will be entered into the record.  Hearing none.

[The information follows:]

******** COMMITTEE INSERT ********

Mr. <u>Griffith.</u>  I will ask unanimous consent that the contents of the document binder be introduced into the record and to authorize staff to make appropriate redaction.

Without objection, the documents will be entered into the record with any redactions that staff determines are appropriate. Hearing no objections.

[The information follows:]


******** COMMITTEE INSERT ********

Mr. Griffith.  In conclusion, I would like to thank all the witnesses.

Thank you, Mr. Friedman, and members that participated in today's hearing.  I remind members that they have 10 business days to submit questions for the record, and I ask that the witnesses all agree to respond promptly to the questions.

Anything else?  Thank you very much.  This hearing is adjourned.

[Whereupon, at 6:07 p.m., the subcommittee was adjourned.]