# Exhibit 2

09-50026-reg   Doc 13299-2   Filed 07/14/15   Entered 07/14/15 17:22:53   Exhibit 2
Pg 2 of 212

                                                        Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 09-50026-reg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    MOTORS LIQUIDATION COMPANY, et al.,

7    f/k/a General Motors Corp., et al.

8

9             Debtors.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12

13                 U.S. Bankruptcy Court

14                 One Bowling Green

15                 New York, New York 10004

16

17

18                 February 17, 2015

19                 9:02 AM

20

21   B E F O R E :

22   HON ROBERT E. GERBER

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  K. HARRIS



Page 2

1    Hearing re:    Oral Argument on Motion to Enforce.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 3

```
 1   A P P E A R A N C E S :

 2

 3   KING & SPALDING, LLP

           Attorneys for General Motors, LLC

 4

           1185 Avenue of the Americas

 5

           New York, New York 10036

 6

 7

     BY:  ARTHUR J. STEINBERG, ESQ.

 8

           SCOTT DAVIDSON, ESQ.

 9

10

     GOODWIN PROCTER, LLP

11

           Attorneys for South Texas Plaintiffs

12

           The New York Times Building

13

           620 Eighth Avenue

14

           New York, New York 10018

15

16   BY:  WILLIAM P. WEINTRAUB, ESQ.

17

18   BROWN RUDNICK

19        Attorneys for Certain Plaintiffs

20        Seven Times Square

21        New York, New York 10036

22

23   BY:  EDWARD WEISFELNER, ESQ.

24

25   GOLENBOCK. EISEMAN, ASSOR, BELL & PESKOE, LLP
```

Page 4

1        Attorneys for Groman Plaintiffs

2        437 Madison Avenue

3        New York, New York 10022

4

5   BY:  JONATHAN L. FLAXER, ESQ.

6

7   GIBSON, DUNN & CRUTCHER, LLP

8        Attorneys for Wilmington Trust Company as

9        GUC Trust Administrator

10       200 Park Avenue

11       New York, New York 10166

12

13  BY:  LISA H. RUBIN, ESQ.

14       KEITH R. MARTORANA, ESQ.

15       MATTHEW WILLIAMS, ESQ

16

17  AKIN, GUMP, STRAUSS, HAUER & FELD, LLP

18       Attorneys for GUC Trust Unit Trust Holders

19       One Bryant Park

20       New York, New York 10036

21

22  BY:  DEBORAH NEWMAN, ESQ.

23       DANNY GOLDIN

24

25  STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

Page 5

1          Attorneys for Barron & Budd & Grant

2          2323 Bryan Street, Suite 2200

3          Dallas, Texas 75201

4

5    BY:  SANDER L. ESSERMAN, ESQ.

6

7    KIRKLAND & ELLIS, LLP

8          Attorneys for General Motors, LLC

9          300 North LaSalle

10         Chicago, Illinois 60654

11

12   BY:  RICHARD C. GODFRY, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

```
 1                    P R O C E E D I N G S
```

 2          THE COURT:  Good morning.  Have seats, please.

 3   Well, I know everybody who's likely to speak.  So, let me

 4   just get appearances of those who will be heard for the

 5   transcript.  And then I want you all to sit down, because

 6   I'm going to have some preliminary comments.

 7          MR. STEINBERG:  Arthur Steinberg, from King &

 8   Spalding, on behalf of New General Motors.

 9          THE COURT:  All right, Mr. Steinberg.  Could

10   everybody hear me?  I'm not sure if I have the same volume

11   in my mic that I normally do.  Can you hear me, Mr. Flaxer?

12          MR. FLAXER:  (indiscernible)

13          THE COURT:  Okay.  Thank you.

14          MR. WEISFELNER:  Good morning, Judge.  Edward

15   Weisfelner, Brown Rudnick, on behalf of the designated

16   counsel.

17          THE COURT:  Thank you, Mr. Weisfelner.

18          MR. WEINTRAUB:  So, good morning, your Honor.

19   William Weintraub with Goodwin Procter, also designated

20   counsel.

21          THE COURT:  Right, Mr. Weintraub.

22          MS. RUBIN:  Morning, your Honor.  I'm Lisa Rubin

23   with Gibbs & Dunn on behalf of the GUC Trust.

24          THE COURT:  Okay.  She was kind of far from the

25   mic; that was Ms. Rubin introducing herself for the GUC

 1    Trust.  I got it this time, Ms. Rubin.

 2            MS. NEWMAN:  Good morning, your Honor.  Deborah

 3    Newman from Akin Gump on behalf of the participating note

 4    holders.

 5            THE COURT:  All right, Ms. Newman.

 6            MR. ESSERMAN:  Good morning, your Honor.  Sander

 7    Esserman, Stutzman, Bromberg, Esserman & Plifka on behalf of

 8    designated counsel.

 9            THE COURT:  All right.  And I see Mr. Flaxer right

10    next to you, Mr. Esserman.

11            MR. FLAXER:  Yes, your Honor, only to the extent

12    that we feel that it's necessary to speak for -- it could be

13    a minute or two would be it.

14            THE COURT:  All right, very good.  Thank you.  All

15    right, folks.  With one exception, I want you to make your

16    presentations as you see fit.  But before you're done, I'd

17    like you to address a fair number of questions that had

18    occurred to me when I was reading the briefs.  These

19    questions (indiscernible) one or another of you, or, in many

20    cases, both.

21            But first, the exception, mainly Mr. Weisfelner

22    and Mr. Weintraub:  you folks spend many, many pages in your

23    briefs talking about the underlying failures of Old GM and

24    New GM to institute the necessary recalls on the cars and

25    the 24 or 25 people at Old GM who knew enough to justify

Page 8

```
 1   much, much larger recalls.  I get it.  But that's not what's
 2   before me now.
 3           I'm prepared to assume, for the purposes of this
 4   controversy, unless Mr. Steinberg really wants to dispute
 5   it, that there was enough to require a recall well before
 6   June 2009, and that each of Old GM and New GM acted very
 7   badly in connection with the delay.  But I want to focus on
 8   the legal issues.  So, let's turn to them.
 9           Starting with due process, Mr. Steinberg, one
10   would assume, I think, that a company's books and records,
11   if they're to determine whether a claim is known or unknown,
12   have to be much more broadly construed than in the financial
13   statement sense.  And I take it that you're not arguing that
14   whether or not a creditor is known or unknown turns on
15   whether the company has booked the liability.
16           So, before you're done, I'd like you to tell me:
17   how would you articulate the standard?  I wonder whether the
18   standard should be more than foreseeable but less than
19   probable.  But I would like you to put forward your view as
20   to how I should construe that.  It's debatable whether
21   potential liabilities associated with the ignition switches
22   were wholly (indiscernible) claims, even if Fritz Henderson
23   and Mary Barra didn't know about them.
24           But I take it you'll agree that Old GM knew enough
25   to send out recall notices back in 2009.  Their people would
```

Page 9

1   have known that there was something potentially wrong with

2   their cars.  And those who weren't in wrecks could have

3   filed claims or objected, as they're doing now, at the time

4   of the 363 sale.  If recall notices had been issued,

5   wouldn't the publication notice that was given then be more

6   justifiable?

7          Number two:  by the same token, Mr. Weisfelner,

8   would you clarify your position on what notice should have

9   been given?  I gather the parties have stipulated that there

10  were 70 million GM cars then on the road.  I gather also

11  that there were approximately 27 million whose cars, we're

12  learning, later became the subject of pending recalls.

13          It'd be helpful if you would tell me how many of

14  those 27 million cars were then subject to announced recalls

15  and how many would have been subject to recalls if GM, which

16  was then Old GM, of course, had announced them as it should

17  have.  Seemingly, the number would be very, very large.

18          Now, again, Mr. Weisfelner, is it your argument

19  that mailings should have gone out to each owner, each of

20  those 70 million, in the period between the June 1st, 2009,

21  filing of the bankruptcy and the June 30, 2009, date for the

22  start of the sale lien?  Or, for that matter, the June 19

23  date, which was the deadline for objections in the 363 sale?

24  Or are you saying it should have gone out by mail only to

25  cars with the poorly designed ignition switches?

1          Both sides:  what information do I have in the

2     record on how much it would cost to send out mailing notices

3     to all 70 million of the GM cars on the road at the time, or

4     even 27 million cars?  And what information do I have in the

5     record on how much time it would take to send out 27 or 70

6     million notices?

7          Mr. Weisfelner, I made a factual finding back at

8     the hearing on the same issue, that the continued

9     availability of the financing Old GM was using to survive at

10    the time was conditioned on approval of the 363 sale motion

11    by July 10.  And I also rejected an argument that was made

12    by bondholders at the time that the government's July 10

13    deadline was just posturing and that I should have argued --

14    I should have found back then, or assumed back then, that

15    the U.S. government cared so much about GM's survival that

16    the U.S. government would never let GM die.

17          Well, that seems to have a lot of similarities to

18    (indiscernible) you make now.  On that, I know your clients

19    weren't present back then to argue to the contrary, but to

20    challenge -- or to challenge those findings.  But others

21    did.  Are you challenging those findings now?  Do you think

22    there are some facts now to suggest that I should now find

23    that the government was posturing, while you'd rejected that

24    contention back in 2009?

25          I don't know if I'm going to hear from the GUC

1    Trust in the first phase of the arguments.  But, at some

2    point, Ms. Rubin, when you do get the chance to be heard,

3    which you will sooner or later, I'd like you to help me with

4    this:  the cost of administration of the Chapter 11 case,

5    which would at least seemingly include the cost of mailing,

6    would come directly out of the pockets of your folks, the

7    unsecured creditor constituency.

8         How do you think a judge should decide what's

9    reasonable in sending out notice of a 363 sale to a universe

10   of potential creditors when it comes out of the pockets of

11   those who you know are creditors for absolutely, positively

12   sure, like your bondholders, like your vendors in the supply

13   chain, and victims of car wrecks, people who were actually

14   in accidents who got injured or killed when cars didn't

15   perform the way they were supposed to?

16        Back to you, Mr. Weisfelner:  what would the

17   notice have said, if GM were to do it right, and you say

18   that GM didn't do it right?  As I think it was Judge

19   Bernstein said in Chrysler -- I think by then it had been

20   named New Car Co., or maybe Old Car Co., "Things can go

21   wrong with cars all the time.  And, while design defects

22   that can cause a loss in cars' value don't happen all the

23   time, or all that often, I don't know if anybody could

24   really say they're infrequent."  So, what do you think would

25   have been reasonable under the circumstances?

1            Both sides:  is it appropriate to be making

2     distinctions, when we're talking about honoring claims --

3     and I'm offering you a view now as to whether there are --

4     these are unknown claims as a (indiscernible) or not --

5     between liquidating 11s and 11s where there is a surviving

6     entity, we all know that there's no discharge in a

7     liquidating 11.  There is, of course, a discharge in the 11

8     where a company survives.

9            A lot, and maybe most, of the case law

10    (indiscernible) you rely on is in the context of expunging

11    claims, either because they're late or because they've been

12    discharged.  But it's a lot easier to say that a claim isn't

13    discharged when we have a debtor that's surviving and you

14    can still go after that debtor by ignoring or blowing away

15    the order that protected the debtor upon the confirmation of

16    the case or otherwise.

17           Both sides:  shouldn't we focus on the

18    distinctions between the notice that's appropriate in a 363

19    sale on the one hand and the notice that's required to give

20    parties a chance to file claims on the other?  Or, to the

21    extent that it's different, the notice that needs to be

22    given before a judge discharges a creditor's claim?  And

23    isn't it necessary or appropriate to take into account the

24    time exigencies inherent in many, perhaps most, 363 sales,

25    especially those, like most of them, where the debtor only

1    has the cash to survive for only days or weeks?

2         If reasonableness depends on the facts and

3    circumstances, as the Supreme Court said in (indiscernible),

4    wouldn't it be appropriate to take into account that, in the

5    363 context, you have to hold a hearing on a sale in four

6    weeks, because you're bleeding so badly that you can't

7    survive any longer?

8         Mr. Steinberg:  you point out that New GM didn't

9    yet exist when notice was given, and that it was Old GM that

10   was responsible for the failure to give the creditor

11   community a notice.  But does that matter?  Or should a

12   judge simply focus on whether or not the creditor was given

13   appropriate notice, no matter who's responsible for it or

14   for the failure to provide it, and then the extent to which

15   the outcome would have been different if appropriate notice

16   had been given?

17        Both Mr. Steinberg and Ms. Rubin, back to you.  I

18   haven't forgotten about you, Ms. Rubin.  Let's assume that I

19   agree with Mr. Steinberg that it wasn't practical to send

20   out mailed notice to the 70 million or even 27 million car

21   owners for the 19 days that they'd have to object to the 363

22   sale.  But isn't it inexcusable for Old GM to have denied

23   people whose cars were subject to recalls notice of the bar

24   date for filing claims?

25        And even if Old GM thereto -- that is, in the bar

1    date context as in the 363 context -- wasn't going to give

2    the 70 million or 27 million people mailed notice, I have

3    some trouble seeing how they could have responded to the bar

4    date notice and filed claims when Old GM still hadn't sent

5    out the recall notices as of the bar date, when at least

6    seemingly, if not apparently, there wasn't the same degree

7    of urgency.

8          Now, both sides -- and here I mean Mr. Weisfelner

9    and Mr. Steinberg -- on remedy, assuming I find violations

10   of due process, I have problems with aspects of each of your

11   positions.  Mr. Weisfelner, let's turn first to what you're

12   asking for.  I gather -- and I think you said it expressly -

13   - that you're not asking me to vacate the entire sale order.

14   In fact, I gather that you aren't even asking me to vacate

15   it, even in part.

16          It seems to me that you're saying, "Fine, enforce

17   it against everyone else.  Just don't enforce it against me,

18   or me and my guys."  Is that an unfair characterization of

19   your position?

20          Both sides:  finding a due process violation may

21   not by itself require a showing of prejudice.  But isn't the

22   prejudice critical to determining whether there's a remedy

23   for it?  I'm inclined to agree with Mr. Weisfelner that

24   finding a due process violation does not by itself turn on

25   prejudice, but it seems to me that the remedy for it

1    necessarily must.  The issue, it seems to me, is:  what

2    should a Court do about the situation when it finds that

3    there's been a violation of due process?

4              And here, I'm going to ask you guys to address

5    when the standards are the same when you have a bipolar

6    dispute, or a modestly polar dispute, which is typical in a

7    (indiscernible) litigation, and when you have a case where

8    hundreds, thousands, or millions of creditors are affected

9    by an order, and a very small subset of the universe of

10   people who were affected by the order want that order blown

11   away or ignored.

12             Mr. Weisfelner, you said in your brief that due

13   process involves the right to be heard, not the right to

14   win.  And because you were denied the right to be heard, it

15   seems to me that you're saying you (indiscernible) the right

16   to win.  Let's go with that for a minute.

17             If you (indiscernible) the right to be heard,

18   wouldn't the appropriate remedy be a do-over, to give you a

19   chance to make the arguments that you didn't get to make the

20   first time, and then to look at the matter ab initio to see

21   whether the result should be the same or should be

22   different?  Because it seems to me that what you're asking

23   for, assuming that you're (indiscernible) due process and

24   you've heard my questions that suggest that -- and I have

25   concerns as to whether you guys were denied due process --

 1    you're asking to simply win.

 2            Is it speculation or is it totally obvious for me

 3    to say now that I wouldn't have denied permission for GM to

 4    survive and to conduct its 363 sale so that one group of

 5    litigants could get a leg up over another group of

 6    litigants?  Or I guess I should say one group of creditors

 7    should -- could get a leg up on other creditors.

 8            And why in the world would I decide the

 9    successive liability issue differently today than I did

10    after talking about it for five or 10 or 15 pages in my

11    first opinion, when I considered the arguments made by

12    people like Mr. Jack (indiscernible), who argued the exact

13    same things that you're arguing now after they had

14    (indiscernible) given the appropriate notice?

15            So, what I need you to do, Mr. Weisfelner, is tell

16    me that, if you had been given notice and an opportunity to

17    be heard back in 2009, how would things be different?  Are

18    you arguing to me that I would have denied permission for

19    the sale, or that I would have granted a free-and-clear

20    order generally but I would have denied it for your favored

21    group?

22            Or do I properly read from your brief that you

23    would have wanted me to give the sale some kind of

24    conditional approval for your benefit, saying I'd approve it

25    if, but only if, New GM were required to assume your claims?

1    And then, if that's your position, would you please tell me

2    whether there would be some reason for me to grant that

3    protection for people who were claiming that their cars were

4    worthless or that they were inconvenienced, when I denied

5    that relief for people who were injured or killed in actual

6    wrecks?

7              Also, Mr. Weisfelner, let's talk about the exact

8    context of 363 sales, and recognize, as I think we need to,

9    that 363 sales are an extraordinarily important part of the

10   bankruptcy (indiscernible), not just in this case but

11   winning in the other 11s, and that whatever I do, for better

12   or worse, is likely to have precedential effect.

13             How can a judge force a buyer of assets in a 363

14   sale to assume liabilities that it doesn't want to assume?

15   Isn't the only real remedy to deny authority for the sale

16   totally, or to say, were I the judge back in 2009, that,

17   "Yeah, the sale can take place, but I, the judge, won't

18   grant a free-and-clear order at all"?

19             And, if that is the choice that's provided to the

20   judge, how helpful is that to the remainder of the creditor

21   community, the thousands of people that Ms. Rubin

22   represents?  And do we want to impose a principle of law

23   that requires judges to frag everyone else with the same

24   grenade?

25             Mr. Steinberg, despite the reservations that I

Page 18

1   just had expressed, I have some in your direction as well.

2   Before I read the briefs and the underlying cases, I'd

3   started with (indiscernible) stint in bankruptcy, orders and

4   agreements rise and fall as a whole, and that you can't

5   enforce them in part and disregard them in part, or cherry-

6   pick the parts that you like and those that you don't, or,

7   as here, say they're enforceable against most of the world

8   but not against this or that favored class.

9        But your opponents have cited five cases that seem

10   to do exactly that.  Three, while they come out of lower

11   courts, one Bankruptcy, two District, involve 363 sales.

12   The other two don't involve 363 sales, but they come from

13   the Second Circuit.  And, while one of the Second Circuit

14   cases is only a summary order, which therefore isn't a

15   binding precedent, it's still a Circuit -- Second Circuit

16   opinion.  And, frankly, I don't like to disregard anything

17   that comes out of the Second Circuit, that the Second

18   Circuit tells me.

19        So, Mr. Steinberg, I need you to talk about

20   Metzger, the 2006 decision by Arthur Weissbrodt, a

21   bankruptcy judge in San Jose; (indiscernible), the 2007

22   decision by District Judge Mary Cooper in Trenton; and

23   (indiscernible), the 2009 decision by Senior District Judge

24   John Grady in Chicago.

25        And I need you to talk about the Circuit's 2010

 1    decision in Johns Manville, Travelers v. Chubb, which I

 2    think is sometimes referred to -- I believe this is Manville

 3    4; and its 2014 decision in Koepp, K-O-E-P-P, the summary

 4    order from a panel that included Judge -- Chief Judge

 5    Katzmann and Judges Livingston and Hall.

 6         Finally, while it may be trumped by the holdings

 7    of those five cases that I talked about, I still need some

 8    help on whether I should be looking at this in

 9    (indiscernible) of 9024 and 60(b) terms, or whether I should

10    just bypass what those rules say and get to the "You're

11    excused from the order or not" kind of (indiscernible) those

12    other decisions did.

13         But I still want both sides to address whether a

14    judge has to look at it in traditional 60(b) terms and

15    either knock it out or live with it, or the third option,

16    which may or may not be permissible under 60(b) doctrine, of

17    living with it in part and validating it in part.

18         Mr. Weisfelner, you can help me by confirming, if

19    it's true, that you're saying I shouldn't be thinking about

20    invalidating the (indiscernible) or validating the rule but

21    simply refusing to enforce it.  But, if that is in fact your

22    position, then help me understand how I can be deciding this

23    without regard to a (indiscernible) bankruptcy procedure in

24    lieu of federal civil procedure.  And that would at least

25    seemingly be telling me how I'm supposed to do my job.

1          Finally, folks, in many ways this is the most

2     important of all the things that I want you to talk about,

3     because I think it's the closest question, in an environment

4     where there are already a bunch of close questions.  If we

5     had a do-over, and it's my instinct that, when somebody is

6     denied due process, he or she is entitled to a do-over, the

7     result of part of what you guys are arguing would be pretty

8     clear.  But part would be highly debatable. And, in each of

9     those two sides, or prongs, one side would have the stronger

10    side and one would have the weaker.

11         If we had a do-over, I think it's quite clear that

12    I'd still grant a free-and-clear order, especially since I

13    heard the same arguments before and I rejected them.  And I

14    gave them a lot of thought before I did.  But if we had a

15    do-over, I'd likely have to consider whether a free-and-

16    clear order in the form that I just issued it was over-

17    broad.  And, in this respect, the economic loss plaintiffs,

18    though not Mr. Weintraub's guys, would have the upper hand.

19         This order, as I read it, not only blocks

20    successor liability, but also blocks claims based on wholly

21    post-sale events that involved Old GM or Old GM parts.  This

22    is one of the issues, if not the issue, that bothers me the

23    most.  And the issue is whether what I should have done, or

24    would have done if the argument had been made to me then,

25    was to add a new order that was narrower and said that

```
 1    people couldn't sue based on anything Old GM had done, but

 2    they could sue if it was based on what New GM had done, so

 3    long as Old -- as New GM wasn't blamed for Old GM's acts.

 4             And if, as I'm inclined to rule, I find that, if

 5    there was a due process violation, the economic loss

 6    plaintiffs would be entitled to a do-over, and if I also

 7    concluded, as I'm inclined to do, that, if they got a do-

 8    over on successor liability, the result would be the same,

 9    the issue or the conclusion I'd reach would have been

10    different, given New GM protection for events that it did

11    that were not premised on anything old GM had done. And I

12    need both sides to address that scenario.

13             I have only one real question in (indiscernible),

14    so, even though we may not get to it this afternoon, I'm

15    going to get it out anyway.  Mr. Weisfelner, is there a

16    reason that you didn't ask me to stay further distributions

17    to Ms. Rubin's guys, the Old GM creditors, until the issues

18    before me now were sorted out?  Am I right in assuming,

19    since you're a pretty competent lawyer, that you didn't

20    overlook that possibility?

21             And can I properly assume that you did it for

22    tactical reasons, because you'd rather get $100 in a

23    recovery against New GM, as contrasted to the $0.25 or so

24    that you'd get on the dollar if you had to go against Old GM

25    (indiscernible)?
```

 1              Now, with all of that, let's get to work.  And

 2      (indiscernible) we hear first from you, Mr. Steinberg?

 3              MR. STEINBERG:  Yes, your Honor.

 4              THE COURT:  Come up to the main lectern, please.

 5              MR. STEINBERG:  Your Honor, good morning.  I'm

 6      Arthur Steinberg, for the record.  I'm here with my

 7      colleague, Scott Davidson, and my co-counsel from Kirkland &

 8      Ellis, Richard Godfrey and Andrew Bloomer.  I want to thank

 9      your Honor first of all for accommodating all the lawyers

10      for the rescheduling of this conference.

11              And I'm sure, like my other counsel who will be

12      addressing you today, they're all -- they have a lot of

13      thoughts swirling in their mind as they try to address the

14      multitude of questions that your Honor just went through.

15      But I think I will be able to do it, and I will do it in the

16      order where it was presented itself in the outline.

17              About a year ago, New GM announced a recall with

18      respect to ignition switches in Old GM vehicles.  And

19      shortly thereafter, that started a wave of lawsuits that

20      were commenced against New General Motors, seeking purported

21      economic losses regarding vehicles that were subject to the

22      recall.

23              In the early complaints that were filed, which

24      sought primarily monetary compensation for the alleged

25      decrease in value of the vehicles based on the ignition

1   switch that was being repaired, these complaints referred to

2   Old GM and New GM interchangeably.  They used the words

3   "successor liability," and they pled causes of action which,

4   under the sale agreement, were specifically identified as

5   retained liabilities.

6          And once we filed a motion to enforce, the later

7   filed complaints tried to sidestep the sale order by, among

8   other things, avoiding phrases such as "successor

9   liability."  But even these more carefully crafted

10  complaints could not alter the underlying act that their

11  claims related to Old GM vehicles and parts sold and old GM

12  conduct.  And their pled causes of action were the same

13  retained liabilities of Old GM.

14         And during the summer of 2014, there were other

15  recalls that New GM announced that were unrelated to the

16  ignition switch recall, and that led to additional economic

17  loss complaints being filed against New General Motors,

18  which caused New GM to file a separate motion to enforce for

19  these actions.

20         And eventually, most of these causes of actions

21  relating to economic loss, and even the accident cases, were

22  consolidated before in an MDL before Judge Furman.  And lead

23  counsel was selected in the MDL, and they filed two

24  complaints, which were intended to subsume the economic loss

25  complaints that had been filed against New General Motors.

1    And the parties referred to that as the presale consolidated

2    complaint and the post-sale consolidated complaint.

3           And while these events were taking place, certain

4    presale accident plaintiffs also brought lawsuits against

5    New GM. And New GM retained Ken Feinberg to develop a

6    program to compensate, on a voluntary basis, both the

7    presale and the post-sale action and plaintiffs who had the

8    recalled ignition switch in their vehicle and had met the

9    eligibility criteria of the Feinberg program.

10          And, for those who could not or chose not to

11   participate in the Feinberg program, New GM believed that

12   the actions violated the sale order, since claims based on

13   presale accidents were retained liabilities under Section

14   2.3(b)9 of the sale agreement.  So, a separate motion to

15   enforce was brought to bar those claims as well.

16          And, in response to these motions to enforce, your

17   Honor held periodic status conferences where the plaintiffs

18   raised, among other thing, the Rule 60 due -- 60(b) due

19   process issues relating to the notice of the sale motion.

20          Then, in an effort to efficiently try to resolve

21   these issues, the parties, at the Court's urgings, agreed to

22   factual stipulations.  And then they identified certain

23   threshold issues that the Court might summarily decide.  And

24   substantially all of the plaintiffs entered into stay

25   stipulations so that your Honor could decide those threshold

1    issues.

2              And so, in the first phase of the oral argument,

3    I'll deal with the three threshold issues that we've

4    identified, which are the due process issues, the remedies

5    issue, and the Old GM claim threshold issue.  And then the

6    other threshold issue that had been identified, the

7    equitable mootness issue, will be discussed at a later point

8    this afternoon.

9              Now, the central event that underlies all of these

10   motions to enforce is the 2009 purchase by New General

11   Motors of substantially all the assets of Old General Motors

12   in a bankruptcy-approved 363 sale.  And the sale was

13   structured so that New GM, at the time a U.S. government-

14   sponsored entity, would not be liable for most of Old GM's

15   liabilities, except for specifically defined assumed

16   liabilities.

17             Importantly, the liabilities that are the subject

18   of the motions to enforce are not assumed liabilities.

19   They're all retained liabilities of Old General Motors.  The

20   three -- and the assumed liabilities are the glove box

21   warranty, the lemon law claim, and the post-sale accident

22   (indiscernible) claims.

23             THE COURT:  Pause, please, Mr. Steinberg, because

24   I'll let you talk about that if you want.  But maybe I

25   should have said this more explicitly:  I'm quite

Page 26

1   comfortable with the fact that all or substantially all of

2   the claims that had been brought against New GM were not

3   assumed liabilities and are blocked or proscribed by the

4   sale order.

5        But it seems to me that your opponent's position

6   is more like what we called in Freshman Civil Procedure

7   "confession and avoidance."  They say, "Yeah, we know that

8   they're blocked by the sale order.  But you should be

9   ignoring the sale order."

10        So, if you want to -- I also think this is largely

11   relevant to the third of the threshold issues, because I

12   think -- I'll hear from Mr. Weisfelner if he feels

13   differently -- they've conceded that they're covered by the

14   civil letter, but they say I shouldn't be enforcing it.  So,

15   if you want to keep talking about what the sale order and

16   the underlying sale agreements say, go ahead and do that.

17   But I think we're probably beyond that at this point.

18        MR. STEINBERG:  Appreciate that, your Honor.  And

19   I agree that we are beyond it.  I just wanted to make the

20   general point that we are now talking about what is defined

21   as the assumed liabilities under the sale agreement.  I

22   recognize that they have an issue with what we call the used

23   car purchases, which are in their post-sale consolidated

24   complaint.  And I'll talk about that when I talk about the

25   Old GM claim threshold issue.

1          And, as your Honor had said, and obviously that

2      you know, the 363 sale was approved after extensive notice

3      was given, pursuant to the Court-approved procedures. A

4      multitude of objections were filed based on the sale notice

5      given and the widespread media coverage that related to the

6      sale.  And then your Honor conducted a three-day trial.  And

7      the Court then rendered a very extensive sale decision and a

8      lengthy and fully-vetted sale order.

9          Now, your -- as one of your questions that your

10     Honor answered, which was, "How do you sort of calculate the

11     direct mail notice given?  Where is the thing in the record

12     that says that?" the Garden City Company filed a fee

13     application -- a retention application.  The retention

14     application actually described what it would cost for each

15     mail notice that it would send out, the cost of the

16     assembling of the package and the cost of the postage.

17         So, when we extrapolated as to what the cost was

18     for sending out four million notices by direct mail, which

19     we said was $3 million, we then extrapolated, using the same

20     formula in the Garden City Company application, and said

21     that, if you had to send out direct mail notice for 70

22     million people, it would cost $43 million.  So, that's the

23     point in the record that talks about that.

24         In the sale order, among other things, New GM was

25     --

1          THE COURT:  Pause, please.  Is that 43 million

2    bucks for all GM car owners? Or is that for the lower --

3    somewhat lower number subject to the ignition switches, the

4    27 million or thereabouts?

5          MR. STEINBERG:  The $43 million number is

6    predicated off of 70 million domestic cars in the United

7    States.

8          In the sale order, your Honor found that New GM

9    was a good-faith purchaser for value, and it would not have

10   any successor liability for Old GM's debt.  And,

11   importantly, the no-successor-liability finding that your

12   Honor gave reserved condition for the sale going forward,

13   that New General Motors would not have gone forward without

14   the successor liability finding.  And that's in, I think,

15   paragraph DD of the -- of sale order.

16         The primary purpose of the 363 sale hearing -- and

17   I think a lot of your Honor's questions were directed at

18   this -- it was not to quantify the amount of the retained

19   liabilities.  It was to determine what was the highest and

20   best bid for the assets.

21         That issue, the allocation of the sale proceeds

22   and the quantification of the liabilities, were for later

23   phases of the bankruptcy case:  the filing of the schedules,

24   the setting of the bar date, the filing of a disclosure

25   statement, the filing of a plan.  All of those actions were

Page 29

1    post-sale.  They were done by Old General Motors.  And they

2    had nothing to do with New General Motors and they had

3    nothing to do with the Section 363 sale.

4              The -- and I think that that's significant because

5    so much of the briefing that was done in this case by my

6    opponents is directed on the fact -- and the cases that they

7    rely on are bar date cases, where you have the

8    extinguishment of a claim if you don't timely file it.  And

9    therefore, a lot of the cases there talk about sort of the

10   "all or nothing" proposition.

11             Also, the person who is giving the bar date notice

12   is the person suffering the consequences if they didn't give

13   the notice properly, so that, if the Old GM estate should

14   have given a broader notice than they did, then someone who

15   comes in and says, "I should have gotten broader notice, and

16   therefore I should be able to participate in the estate,"

17   well, the person who created the problem by not giving the

18   proper notice is the person who has to incur the remedy.

19   That's a totally different situation than a Section 363

20   transaction, especially because you're dealing with the

21   third party here, the third party being the good faith

22   purchaser for value.

23             And, in the Edwards case, which we cite in our

24   papers, it is --

25             THE COURT:  That's the Posner opinion, then, of

1        the Second Circuit?

2                MR. STEINBERG:  That's correct.  The -- and I know

3        it engendered some criticism on certain facts from my

4        opponents as they try to distinguish it.  But the central

5        issue there that I think is critical for your Honor to

6        consider, and underlies some of your questions that you

7        asked, was that they said that due process issues need to

8        dovetail with the concepts of a bona fide purchaser for

9        value, that there are times when there could have been a due

10       process issue that was involved.  But when you're dealing

11       with a bona fide purchaser for value, the question is

12       whether that remedy should be asserted against that party.

13               And the same issue is involved when Courts look at

14       Rule 60(b) and upsetting a sale order by virtue of the fact

15       that there wasn't due process given.  The test that they

16       offer is a three-prong test:  exceptional circumstances that

17       the party has to show; timeliness, timeliness of the

18       application; and undue prejudice to -- whether there was

19       undue prejudice to the -- any party.  If there was an undue

20       prejudice to a party, then you would not be able to get Rule

21       60(b) relief.  That is an essential element to be able to

22       try to get it in order to establish a basis to vacate an

23       order on due process.

24               And when you're dealing with a sale agreement, and

25       the party -- one of the parties is a bona fide purchaser for

1    value who would not have closed the transaction without a

2    finding that there was no successor liability, you can't

3    vacate that order.  You can't partially revoke the order;

4    you can't ignore the order without ignore -- without

5    finding, at the same time, that there was an undue prejudice

6    to the party, an undue prejudice to be exposed to

7    potentially what they've asserted to be billions of dollars

8    of claims.

9              So, all of that ties in together as to why a 363

10   order is much different than a bar date circumstance.  And

11   I'll get to dealing with the cases that your Honor asked for

12   me to comment about relating to sale agreements, because

13   there the situation was that the sale agreement itself was

14   either overly broad because the debtor could not have sold

15   the asset or didn't provide for selling of the asset, and

16   that's why the Court was carving out the sale remedy.  It

17   wasn't because of a due process concern where they're trying

18   to allow one person to avoid what was a foundational element

19   of the sale order itself.

20             So, when your Honor had your finding and dealt

21   with the sale order issues, you were looking at things that

22   related to whether this was -- whether the assets should

23   have been sold and whether this was the best price under the

24   circumstances.

25             And your Honor's questions were exactly correct

1    about the differences between a sale agreement and a claims

2    bar order position, in that, when you're moving for a 363

3    sale, many times you're dealing with a melting ice cube

4    situation.  You're dealing with a circumstance where the

5    assets are eroding.  Delays are potentially destroying

6    value.  And, in this particular case, your Honor had to deal

7    with deadlines that had been set by the purchaser, New

8    General Motors, as to when the sale order had to be issued.

9    And, if the sale order wasn't issued --

10            THE COURT:  But back at that time, were we really

11   talking about the order to enforce?

12            MR. STEINBERG:  That was correct, your Honor.

13            THE COURT:  And Auto Task Force, at some point

14   before the closing, caused New GM to be formed, if I'm not

15   mistaken.

16            MR. STEINBERG:  That's correct, your Honor.

17            THE COURT:  Yeah.

18            MR. STEINBERG:  This is the -- when we talk about

19   New General Motors at the time you're dealing with the sale,

20   we're dealing with the -- essentially the Auto Task Force,

21   the people from the U.S. Treasury.  Those were the people

22   making those type of decisions.  Those were the people who

23   testified before your Honor at the sale hearing.

24            Those were the people who said, when asked at the

25   sale hearing, "Why don't you just do assume the presale

 1    accident claims; they're not that much; it won't destroy the

 2    enterprise if you do that," and they drew their line in the

 3    sand.  They said, "I'm only going to take what's

 4    commercially necessary.  I'm not taking this."  And that was

 5    it.  That was it.  That was the choice that your Honor had

 6    to make:  either accept this deal based on how the purchaser

 7    had formulated it, or reject the deal.

 8            And your Honor recognized that in the sale

 9    decision, when you said that it was for the purchaser to

10    decide which of the prepetition liabilities it was prepared

11    to assume.  It was their business judgment of what they

12    wanted to do or not do.  And you would either accept the

13    deal or not accept the deal.  But you couldn't tell the

14    purchaser, "You have to take these liabilities in addition."

15            So, with regard to the presale accident claims,

16    they actually tried to show at the sale hearing that they

17    weren't that much.  They went through Aon report to try to

18    show that, if you back out the post-sale accident claims

19    that are part of the reserves, then it may be not that much.

20            And I think Mr. Miller, on behalf of Old GM, when

21    he was the proponent, started to say, "A little here, a

22    little here, a little here, a little here, and all of a

23    sudden you have a purchaser saddled with the same type of

24    issues that Old GM had and that the government wasn't

25    prepared to, in effect, start an enterprise with those --

1    that kind of burden."

2            So, you have a situation when you have a bar date

3    where you have a melting ice cube.  You clearly have more

4    time to deal with the claim issue.  And you have the

5    additional circumstances that, if the person who is moving

6    for the bar date blew it, then that's the party who should

7    suffer the consequences.  It's different than when you have

8    a 363 sale.

9            And I will talk shortly about why that I don't

10   think there was a due process violation at all --

11           THE COURT:  Pause, please.  That's the second time

12   you can say that.  But can you understand, from a judge's

13   point of view, that he or she, if somebody blew it, as you

14   put it, cares more about that which is necessary to fix the

15   problem than who was responsible for the problem in the

16   first place?

17           MR. STEINBERG:  I understand that, your Honor.

18   But if I was to -- if you had taken my comments to say that

19   I thought that they blew it, I don't think that they did

20   blow it.  I think that the publication notice was

21   appropriate.

22           THE COURT:  Of the bar date as well?

23           MR. STEINBERG:  Yes, your Honor.  But that's not

24   my fight.  That's someone else's fight.  I do think that

25   that was the situation.  And I think that's consistent with

Page 35

1   the case law.  And I'll talk about that.

2          But I do think that the issue of who is impacted

3   on the remedy is relevant if there's a due process

4   violation.  And your Honor has the Edwards situation that

5   they talked abut, which is that -- assume for the moment

6   that you had two innocents here, you had the person who

7   should have gotten notice who didn't get notice, and you

8   have the bona fide purchaser for value who actually closed

9   the transaction predicated on the facts that your Honor

10  approved.

11         In the battle between a bona fide purchaser and

12  that person who claims not to have had -- gotten proper

13  notice, the Edwards case said that you side on behalf of the

14  bona fide purchaser.  That is the person who wins.  And then

15  you're circumscribed as to what the remedy might be, but the

16  remedy will be based on that circumstance, because of the

17  bankruptcy policy objectives of a 363 sale of achieving

18  finality, of achieving certainty, and achieving the best

19  price for the estate. And those items don't override due

20  process, but they help shape due process.

21         And those objectives, those things that you're

22  talking about now, about those bankruptcy policy objectives,

23  they're actually the elements of Rule 60(b) test, and

24  they're actually the elements of the 363(m) test. In a

25  Section 363(m) test, they say that, if you're dealing with a

```
 1    good faith purchaser for value, and there's no stay of the

 2    sale order, then the purchaser takes free of that

 3    circumstance.  And you --

 4              THE COURT:  Pause, please, here, Mr. Steinberg,

 5    because, on this one, I wonder whether you're on weaker

 6    ground.  Mr. Weisfelner, in his brief -- maybe other people

 7    said it too -- said 363(m) applies to appeals.  We live in

 8    an environment where the Supreme Court believes sometimes,

 9    or in the view of some, even to an extreme -- you know, we

10    live in a world of plain meaning and textual analysis.  Do I

11    have the right to apply 363(m) to a situation other than an

12    appeal?

13              MR. STEINBERG:  No.  No, but I don't think you --

14    I think the point that I was trying to make is that the

15    policy objectives of Section 363(m), what they're trying to

16    accomplish, the policy objectives of the Rule 60(b) test,

17    about an undue prejudice to a third party, they're all

18    relevant of those policy objectives as to how your Honor

19    should approach the problem.

20              All I was trying to do was saying that the

21    rationale for 363(m) is consistent with what I'm saying

22    before, not that you should be applying a 363(m) test.  The

23    rationale of 363(m) is the bona fide purchaser concept,

24    which I that, if you close the transaction and you were a

25    good faith purchaser, and you were not otherwise stayed,
```

1   then you take, free and clear, whatever comes up after that.

2   You're protected.

3          Rule 60(b), on the -- vacating a Rule 60(b) order

4   on due process grounds has the same thing.  It's done not in

5   the language of 363(m).  It's done in the context of that

6   third prong, undue prejudice to a third party.  When you

7   have an undue prejudice to a third party, by taking away the

8   asset after you've just paid for the asset, or undermining

9   the fundamental aspect of the deal, the Court is saying you

10  can't do that.  You should be able to address due process

11  grounds, but there are constraints of what you should be

12  able to do and not be able to do.

13         And that takes me back to the Edwards case, which

14  is where Judge Posner was actually saying the same thing

15  again in different words, which is that, when dealing with a

16  sale and dealing with the fact that you have someone raising

17  issues, when you have a bona fide purchaser, the bona fide

18  purchasers are, in effect -- are the thing that you need to

19  focus on.  And they actually win in a battle of that type of

20  dispute because of those bankruptcy policy objectives.

21         The Court -- all of these issues are sort of tied

22  together on the same concept, which is that a 363 sale has

23  certain fundamental objectives, and that, once a sale closes

24  to a good faith purchaser, then we're going to protect the

25  purchaser.  And whether you do it under 363(m), whether

 1    you're doing it under 60(b), whether you're doing it just as

 2    straight as Judge Posner had done it in the Edwards case,

 3    it's the same concept.

 4             And I think that affects the remedies issue and it

 5    actually affects whether there was a due process violation.

 6    And I do want to talk a little about why I believe that

 7    there was no due process violation, not because of the

 8    notice circumstance, but because I don't think that there

 9    was a property right that was extinguished by the sale.  And

10    there's five reasons why that's the case.

11             The first one is endemic to a 363 sale.  363 sales

12    do not, in most cases, extinguish rights.  They say, "I'm

13    selling, free and clear, liens, encumbrances, and interest,"

14    which the case law includes claims, and say that it attaches

15    to the proceeds of sale.  So, there's no extinguishment of a

16    claim.

17             Now, there are cases where there actually is an

18    extinguished, where, if I'm selling it free and clear of a

19    covenant that runs with the land, then there's not a great

20    remedy that you can have by saying you should attach to the

21    proceeds of sale.  And that's some of the cases that the

22    designated counsel cites in their papers.

23             But when the lawsuit is monetary damages, which is

24    what their lawsuits are, then, whatever their claims are, it

25    attaches to the proceeds of sale.  There is no

 1   extinguishment.  It's another fundamental reason why this is

 2   different than the bar date, because of that.

 3          So, the first thing you have is that there's no

 4   extinguishment in a 363 sale, whatever rights they have,

 5   whatever they think they had, that attach to the proceeds of

 6   sale.  And they had the right, right after the sale, to

 7   assert whatever claim they had in the case.  The bar date

 8   hadn't been set; the schedules hadn't been set.  Whatever it

 9   was, they had the ability to do that.

10          And the Macarthur v. Manville case, which we cite

11   in our paper, says that the underlying principle of

12   preserving a debtor's estate for the creditors and funneling

13   claims into one proceeding in the Bankruptcy Court is a

14   fundamental part of the bankruptcy law.

15          They actually have the same concept in the

16   adequate protection sections of the Bankruptcy Code, which

17   is you're selling free and clear of someone's property

18   interest, but you're giving them replacement collateral;

19   you're giving them the proceeds of the collateral; you're

20   not destroying a property interest.  You're shifting it.

21   And that's fundamentally what happens in a 363(f) sale.

22          And this point was made at the sale hearing.  It

23   was made by Old GM's counsel at the closing argument.  It

24   was actually made by Wilmington Trust counsel as well, at

25   the closing argument, as well, too.  And your Honor actually

1    had echoed this theme in your decision, when you said, "The

2    sale agreement does not dictate the terms of a plan of

3    reorganization, and it does not attempt to dictate or

4    restructure the rights of the creditors of the estate.  It

5    merely brings in value.  Creditors will thereafter share in

6    that value pursuant to a Chapter 11 plan of reorganization."

7              And that same point was made by Judge Gonzalez in

8    the Wolff case.  I think it was Judge Gonzalez.  And we cite

9    that in our papers as well, too, the Wolff opinion, which is

10   a contested matter that came up after the Chrysler decision

11   and sale order was entered.  And there, Judge said, "The

12   purpose of the sale was not to effect a plan of

13   reorganization and set distributions to classes of

14   claimants, but to maximize the value of the estate and

15   support the best possible recoveries under a separately

16   confirmed plan."

17             So, the first fundamental point is that there was

18   no property right that was extinguished.  It's not like a

19   bar date case where, if you don't file your claim timely.

20   It's not like a plan case where you have a discharge.  In a

21   sale, the claim shifts to the proceeds of sale.

22             Second point is to why there was no property right

23   that was extinguished as part of it.  And this really

24   relates to the Third Circuit decision in Emoral.  And --

25             THE COURT:  Which Third Circuit decision?

1           MR. STEINBERG:  The Third Circuit decision in

2      Emoral, E-M-O-R-A-L.  There, the Bankruptcy Court said that,

3      in the context of the successor liability claim -- and here

4      we are talking about they claimed that the sale was free and

5      clear of their successor liability rights.  There's no other

6      property right that they were asserting, other than the

7      right that they think they have under successor liability.

8           Court says that, once a bankruptcy occurs, the

9      ability to assert a successful liability claim is an estate

10     cause of action under Section 544 of the Bankruptcy Code.

11     It's the same right that every creditor could have asserted,

12     and therefore the estate fiduciary is the one who could

13     bring that claim, not any individual.

14           THE COURT:  I have a little problem with that, Mr.

15     Steinberg, because, when we give the estate rights that are

16     owned by creditors before the bankruptcy, we do it by

17     express statutory means such as Section 544 of the Code.

18     The ability to assert a successor liability claim, when it's

19     permissible, is to add a class of defendants that the

20     creditor can sue beyond the original assignor of the

21     property.  It gives the creditor a second target, if you

22     will.  Isn't that a benefit of the creditor rather than the

23     original target?

24           MR. STEINBERG:  I don't think so, your Honor, for

25     the following reasons.  One is that the creditors didn't

1   have a successor liability claim until the sale actually

2   consummated.  There was no claim they had against New

3   General Motors.  They had no claim if the 363 sale didn't go

4   through.  As of the time of the bankruptcy case, they had no

5   successor liability claim against anybody.  They had no

6   property right as against anybody.

7           I mean, successor liability is not the same thing

8   as a property right.  It's a claim that someone acquires as

9   a sort of an equitable remedy because there's nobody that

10  you -- because either of the structure of the transaction or

11  because there's nobody else that you could sue.  Neither of

12  those circumstances apply in these circumstances.  The --

13          THE COURT:  Stick with me for a second, because

14  there is something related to what I just said but that's

15  slightly different as well.  Creditor wants to assert a

16  successor liability claim.  It wants to go after an entity

17  with the potential to go after 100-cent dollars instead of

18  baby bankruptcy dollars.

19          That has the effect, for that subclass of the

20  creditor community who can sue for 100-cent dollars, of

21  giving that creditor group a leg up over the poor suckers in

22  the creditor community who can only get baby bankruptcy

23  dollars.  Once again, that seems to me a benefit for a

24  favored creditor rather than a right of the estate.

25          MR. STEINBERG:  Yes, but I think, your Honor --

1    and I think I understand what is troubling you about that,

2    and I think I could isolate it for you.  The general

3    concepts of successor liability are generally

4    (indiscernible).  There's legal successor, which is a claim

5    that everybody shares.  Transaction is structured

6    (indiscernible), and so that the purchaser is the new legal

7    successor of the seller.

8         De facto merger, continuation of business, or

9    fraudulent purpose in connection with doing the transaction

10   altogether:  those are the four general prongs or successor

11   liability.  In the product area, in certain states, there's

12   a product line exception.  And I think your Honor is

13   thinking a little about the product line exception.  And

14   I'll separately address the product line exception.

15        But, with respect to the four prongs, de facto

16   merger, legal successor, continuation of business, and

17   fraudulent purpose, all of those things are something that

18   every creditor has, not one creditor, every creditor.  The

19   plaintiffs here are in no better position than the

20   bondholder or anybody else to have been able to assert those

21   claims.

22        And that is why Emoral, I think, was correctly

23   decided.  And that is why Emoral relied on the Keene

24   Corporation case, which was 164 B.R. 844, a Bankruptcy Court

25   case in the Southern District of New York.  And it basically

1    said that successor liability claims are estate causes of

2    action.

3           And that is why Judge Lifland's decision in Alper

4    Holdings, which is 386 B.R. 441, said the same thing.  Those

5    type of successor liability claims, based on the structure

6    of the transaction, those are things that are estate causes

7    of action.  The estate representative is the one in charge

8    to bring it.  And, in the context of the 363 sale, the

9    estate representative is the one who could release it.

10          Third reason why I don't think there was a

11   property interest -- and this is actually in your Honor's

12   decision, and it doesn't say it explicitly, and I don't want

13   to put words that says that you tried to say something

14   explicitly, but you clearly had the concept in your mind.

15   In Footnote 99 of your decision, you said that, in

16   discussing successor liability, you said, "The Court notes

17   that, as a matter of federal bankruptcy law, Section 363(f)

18   of the Bankruptcy Code trumps state law and requires a

19   different result."

20          And so, it would have been nicer if you'd said

21   federal preemption.  You didn't use those words, and I don't

22   mean to try to say that that's exactly what you tried to

23   say.  But those are -- that is the concept, which is that,

24   when you're -- because of the bankruptcy policy objectives,

25   and the federal bankruptcy law, of trying to achieve returns

1    on assets, that that has a tendency to trump state law.

2                And, in the White Motor case, the Bankruptcy Court

3    for the Northern District of Ohio, they said that effects of

4    successor liability in the context of a corporate

5    reorganization preclude its imposition.  The negative effect

6    on sales would only benefit product liability claimants,

7    thereby subverting the specific statutory priorities

8    established by the Bankruptcy Code.

9                So, there, he was more -- the judge was more

10   specific in saying that there was a federal preemption

11   concept.  But even if you don't want to go that far, your

12   Honor was recognizing in your sale decision, in trying to

13   justify why you were making your ruling on successor

14   liability, that there were concepts about the Bankruptcy

15   Code, Section 363 sales, that trump state law in connection

16   with successor liability.  And I think that that is true.

17   And I think that the case law recognizes that.  And some

18   judges have said it more explicitly than what your Honor was

19   alluding to.

20               The fourth reason why I don't think that there was

21   a property right that was extinguished here is that your

22   Honor decided, as a matter of fact and law, that there was

23   no successor liability claim.  The four-prong test, the most

24   important factor on the four-prong test -- and this is

25   undisputed -- is that there was no continuity of ownership

1    between the purchaser and the seller.  New General Motors

2    was going to be owned primarily by the government.  The

3    shareholders of the seller were going to be wiped out.

4    There's no continuity of ownership.

5            If you don't have continuity of ownership, you

6    don't have de facto merger as a matter of law, you don't

7    have legal successor.  Your Honor found, as a matter of law,

8    that this sale was not of a fraudulent purpose.  That wipes

9    out the other element.

10           And, on the continuity of the business section, in

11   the Second Circuit decision of Douglas v. Stamco, which is a

12   2010 Second Circuit opinion, they actually talked about that

13   provision.  And they said, if the seller survives, even in

14   the context of a liquidating trust, if it survives, then you

15   -- then the continuity of ownership factor is not

16   established.  You don't have successor liability on that

17   basis.

18           And that's what happened here.  I mean, Old GM

19   survived.  Old GM is still -- well, we argue; GUC Trust can

20   disagree -- its successor is the GUC Trust.  But certainly

21   it survived until almost -- until two years after the

22   transaction.  So, there is no of those four elements, as a

23   matter of fact, that would have established successor

24   liability, which then takes me to the fifth point, which is

25   the product line exception, which is true in only certain

1   states.

2           And, if it wasn't federally preempted, and if it

3   wasn't in an estate cause of action, and if you were

4   concerned about the claim was going to be extinguished

5   because of the 363(f) concept, even though I don't think

6   that that's true, then you have to see -- do an economic

7   loss plaintiff, do they have any claim under the product

8   line exception?  And the answer is no.  We have not been

9   able to find a case; they have not cited a case.  The

10   product line exception doesn't apply to them.

11           Whatever the state law was, whatever rights these

12   state laws are trying to protect, it's not protecting

13   economic loss plaintiffs.  It's also not protecting presale

14   accident plaintiffs.  The purpose of the product line

15   exception is that, after you have a sale, and you've had an

16   accident, and there's nobody to go after, the Court is

17   saying, "I'm going to make the successor potentially

18   liable," in certain states, not a lot of states, a minority

19   of states.

20           That's not what happened here.  Because the post-

21   sale accident paradigm was actually assumed by New General

22   Motors, it took away the successor liability issue on the

23   product line exception.

24           And that is why, when someone asks me, "Why did

25   your Honor carve out in your decision about successor

1    liability to the extent Constitutionally permissible for the

2    asbestos plaintiffs -- why weren't you broader?  Why did you

3    limit to the asbestos plaintiffs only?" and I wasn't sure

4    what the answer was.  But I did know that, vis-à-vis the

5    product people, that exception didn't apply anymore.  That

6    concern of future creditors didn't apply anymore, because

7    the sale agreement had that as an assumed liability of New

8    General Motors.

9            So, the threshold issue of the threshold issue of

10   due process was:  was there a property right extinguished?

11   And I've told you why, your Honor, there were the five

12   separate reasons why there was no property right

13   extinguished, and therefore you don't have to get to all the

14   other issues that are embedded here.

15           The next thing I'd like to talk about is the

16   burden of proof.  I think, when this case started, I kept on

17   hearing Rule 60(b).  And, when you read the briefs that were

18   filed in this case in response to our brief, there's no real

19   mention of Rule 60(b) anymore.  They want to make -- they

20   want to say that I'm entitled to this relief but I'm not

21   working under Rule 60(b).

22           And I think the reason why is what I articulated

23   before, which is that they don't have a case under Rule

24   60(b), because Rule 60(b) requires them to show that there

25   would not be an undue hardship on a party.  And you can't do

1    that with a bona fide purchaser for value.

2            And that concept of how 363 sales, burden of

3    proof, bankruptcy policy objectives -- I think Judge Peck

4    was trying to deal with that in the Lehman case, when he

5    said that there was something about it that he thought that

6    the burden of proof, in connection with 363 sales, is even

7    higher than in other circumstances, because of that.

8            And in the Lehman case, he was looking at whether

9    the actual fundamental aspect of the sale -- whether an

10   asset had been properly disclosed to him was appropriate.

11   And even there, he said that he was not going to upset the

12   sale, even if he thought there should have been better

13   disclosure on the actual assets that were being transferred.

14           That's a much harder case than what's been

15   presented to your Honor, where there's no issue about what

16   the assets were that were being sold.  The issue is whether

17   there was a proper description of retained liabilities in

18   the context of a sale which was not trying to extinguish

19   retained liabilities.  A hearing where the purpose was not

20   to deal with retained liabilities; those issues were for

21   another day.  And therefore, I think that's what the judge

22   was trying to deal with Lehman.

23           The issue that your Honor had raised in one of

24   your questions, which is, "Can I just carve them out of the

25   sale order, and leave the sale order in place, but just

Page 50

1    carve them out?" I know your Honor has written and spoken

2    many times, and sometimes I'm on the right end of this and

3    sometimes I'm on the wrong end of this, but your Honor talks

4    about stare decisis, the ability -- the need to follow the

5    law of the circuit, and that that guides how you render

6    these decisions.

7              And I would just point out to your Honor that the

8    argument about "carve me out of the sale order" was actually

9    made on appeal of your Honor's decision.  It was in the

10   Campbell case.  And it was actually the presale --

11             THE COURT:  That's the one before Judge Buchwald.

12             MR. STEINBERG:  Yes.  It was actually the presale

13   plaintiffs.  They said, basically, to the judge, "I want you

14   to apply the sale order to everyone but me.  And then you

15   could approve the order."  And then the judge used terms

16   like "elective surgery," "knock the props out from the

17   transaction," and said, "I can't do that.  And even the

18   Bankruptcy Court couldn't do that.  The bankruptcy order

19   talked about this was an integrated transaction.  Every term

20   is dependent on every other term.  I can't blue-line the

21   order."

22             And even if there was a peripheral thing that you

23   could blue-line and ignore the provision of the order,

24   successor liability was not a small item here.  That was a

25   fundamental, foundational point that you just can't ignore.

 1          THE COURT:  Pause, please, Mr. Steinberg.  You're

 2    ahead on successor liability.  But your opponents' stronger

 3    position is on matters that were not raised by Campbell.

 4    Campbell is Mr. Jakubowski's guys, if I recall.

 5          MR. STEINBERG:  Right.

 6          THE COURT:  There were 12 litigants who were in

 7    real, genuine car wrecks who wanted to sue New GM, along

 8    with Old GM.  Judge Buchwald, like me, didn't address the

 9    more debatable aspect of the sale order, which was

10    protecting New GM from its own wrongful conduct. Now, should

11    I regard her principles as a pawn to an argument that was

12    never made before either her or to me?

13          MR. STEINBERG:  No, but, your Honor, I think --

14    I'm glad that you raised that point again, because I will

15    try to now answer your question, because, fundamentally,

16    underlying your question is something that I disagree with.

17          Let me start with the proposition that I agree

18    with you.  I think, if New GM had an independent duty in

19    conduct vis-à-vis anything -- and clearly it assumed

20    liabilities, right?  So, it assumed the glove box warranty;

21    it assumed the lemon law; it assumed the obligation to

22    conform with federal law on the recall; it assumed the

23    obligation on the post-sale accidents.  I think, if those

24    things are involved, then that's New GM's obligation.

25          And the New GM obligation actually related to Old

1    GM vehicles.  Why?  Old GM -- New GM assumed the glove box

2    warranty with regard to Old GM vehicles.  New GM assumed the

3    lemon law responsibility as defined in the sale agreement

4    with regard to Old GM vehicles.  New GM agreed to assume

5    post-sale accidents with regard to Old GM vehicles.  And New

6    GM agreed that, if there was going to be a recall that was

7    necessary on an Old GM vehicle, it will do the necessary

8    repair for an Old GM vehicle.  So, New GM did have

9    independent conduct that your Honor was not insulating as

10   part of a sale order relating to Old GM vehicles.

11          But that was it.  If there was nothing that New GM

12   specifically assumed relating to an Old GM vehicle other

13   than those things, then everything else relating to an Old

14   GM vehicle was a retained liability.  And it had no

15   independent duty for anything related to that.  That was the

16   purpose of the no-successor-liability finding.

17          THE COURT:  Yeah, I understand that.  But if Mr.

18   Weisfelner had shown up back in 2009 and made the same

19   arguments he's making now, he would have said, in words or

20   substance, that you can't protect New GM from its own

21   wrongful conduct so long as it's independent of the Old GM

22   conduct, whether or not it involved Old GM or New GM parts

23   or cars.

24          MR. STEINBERG:  If it doesn't involve an Old GM

25   vehicle, or an Old GM part sold by Old GM, or Old GM

1    conduct, he would be right.

2          THE COURT:  Well, let me tell you an example.

3    Suppose I don't think New GM actually fixed its cars.  And I

4    don't know whether it ships the parts to mechanics that do.

5    But suppose New GM knowingly -- and I understand this is a

6    wholly fictitious hypothetical.  But suppose New GM

7    knowingly put a defective Old GM ignition switch into either

8    a New GM or Old GM vehicle.

9          If it knew that the switch was crummy, it wouldn't

10   be liable for having designed the switch wrong, but it would

11   -- arguably, I'm not going to get into stuff that's Judge

12   (indiscernible)'s issues -- but it could arguably be liable

13   for knowingly putting the crummy part into an Old GM

14   vehicle.

15         MR. STEINBERG:  I agree.

16         THE COURT:  Or New GM vehicle.  And, as I read the

17   sale order, it gets a "get out of jail free" card in that

18   kind of conduct.  The sale order and the sale agreement.

19         MR. STEINBERG:  I don't think so.

20         THE COURT:  Okay.  Then if you're contending that

21   that wouldn't be an issue, maybe that issue would go away.

22   But that is a matter of concern to me because of the breadth

23   of the documents in which you've read so much.

24         MR. STEINBERG:  No, no. But, your Honor, I think

25   that, if it relates to an Old GM vehicle, and somehow, when

1    it was sold, New GM took on a contractual obligation

2    independently, took on a contractual obligation to warranty

3    some aspect of that vehicle going forward, I think New GM

4    has that contractual obligation.  I wasn't looking a-- and I

5    know it's a catchy phrase to say, "get out of jail free"; I

6    don't think that's --

7              THE COURT:  I tend to get a little colloquial, but

8    you know where I'm coming from.

9              MR. STEINBERG:  I do.  I do, your Honor.  I just

10   feel that there's probably people at the company listening

11   to what I have to say, so I wanted to at least say something

12   in response to that, because I don't think "get out of jail

13   free" is the right way of doing it.

14             But no one was looking to absolve New General

15   Motors for independent duties that it voluntarily took on

16   after the sale.  But it purposefully did not take on

17   responsibilities with regard to Old GM vehicles that were

18   not assumed liabilities.  And what they've articulated --

19   and this is dealing with the Old GM claim threshold issue --

20   what they've articulated is something that has nothing to do

21   with New General Motors.

22             And I'll give you an example.  There was -- and I

23   think we gave a couple of these in the -- in our briefing.

24   There is a plaintiff named Rafael Lewis who brought -- who's

25   in the post-sale consolidated complaint.  They recognize

Page 55

1    that the presale consolidated complaint, if you're not going

2    to upset successor liability, the presale consolidated

3    complaint falls.  The presale accident plaintiffs also

4    recognize the same thing, that, if you -- successor

5    liability is going to be upheld, they lose.

6              The reason why the lead counsel broke up the

7    complaints between the presale and the post-sale was they

8    were trying to isolate those issues that they think survive

9    even if your Honor upheld the successor liability.  So, this

10   is in the post-sale complaint, not the pre-sale, the post-

11   sale.

12             Rafael Lewis bought a 2006 Chevrolet Cobalt after

13   the 363 sale at an auction for $2800 with no warranty.  His

14   claim is that, years after he made his $2800 auction

15   purchase, the value of his now eight-year-old vehicle had

16   gone down, because a recall was announced that was going to

17   fix the ignition switch problem in his car that he was

18   otherwise not aware of.

19             New GM did not manufacture that car in 2006.  New

20   GM did not sell him the car in -- after 2009.  Yet somehow,

21   according to the economic loss plaintiffs, New GM is

22   required to protect the value of that car purchased by

23   Plaintiff Lewis with no warranties from unrelated third

24   party.  You don't get there unless you have successor

25   liability.  That claim is predicated on successor liability.

Page 56

1   There's no independent duty that they had on a transaction

2   that they weren't involved with.  And the GUC Trust jumps on

3   the misguided bandwagon and says that, and they're equally

4   wrong as well.

5            We pointed out Plaintiff Barbara Hill.  She bought

6   a 2007 Chevrolet Cobalt after the 363 sale from a Nissan

7   dealer.  New GM did not manufacture her car in 2007 and they

8   didn't sell her a used car after the 363 sale.  Yet,

9   according to the economic loss plaintiffs, on their post-

10  sale consolidated complaint, New GM is liable for the

11  alleged loss in the value of her seven-year-old car after

12  the 363 sale by a Nissan dealer.

13           You don't get there unless you're asserting

14  successor liability.  There is no independent duty.  And you

15  can clearly see that by understanding what their post-sale

16  consolidated complaint tries to do.

17           It says that the people who are -- that New GM is

18  liable to is not the people who just are -- had vehicles

19  that were recalled in 2014.  That's the 27 million people.

20  It's not just them.  It's everybody that New GM sold a car

21  to since 2009, even if they had no subject to a recall.

22  Why?  Because the magnitude of the quantum of the recalls

23  tarnished the GM brand as a whole. And, by New GM profited

24  from selling all of those vehicles.  And that's why they

25  should be liable for the tarnishing of the brand.

1           Well, how does that theory make any sense at all

2    when you're dealing with a used car sale?  New GM didn't

3    sell that car.  New GM didn't profit from that car.  New GM

4    didn't make any representations about that car.  That's the

5    -- that's a critical element of their post-sale consolidated

6    complaint; it has nothing to do with an independent duty

7    that New General Motors assumed or not.  That's the

8    successor liability claim, nothing more than that.

9           When the complaint deals with what is in essence

10   successor liability, that is what we say should be

11   proscribed.  We're not looking to try to take an independent

12   duty.  The reality is, though, they have asserted an

13   independent duty.

14          The -- Judge Bernstein had this issue in the

15   Burton case.  There, they talked about the duty --

16          THE COURT:  Burton being one of the Chrysler

17   cases?

18          MR. STEINBERG:  Yes.  There, they talked about a

19   duty to warn.  And that was a case brought by economic loss

20   plaintiffs.  And Judge Bernstein said, "Duty to warn deals

21   with accidents.  You're not asserting an accident claim.

22   There is no duty to warn.  It's not an independent duty."

23   He said, "What you're doing is nothing more than a successor

24   liability claim, and I'm going to deny your ability to

25   assert that."

1           That's the essence of what we're talking about

2      here.  And you also get to the concept that these are really

3      successor liability claims when you look at the sale

4      agreement and the sale order.  The sale agreement talks

5      about what are assumed liabilities and what are retained

6      liabilities.  If you're not an assumed liability in the

7      carefully defined provisions of Section 2.3, then by

8      definition everything else is a retained liability.

9           Liability is defined in the sale agreement as any

10     liability that occurs or accrues even after the closing

11     date.  So, people understood --

12           THE COURT:  Can you -- were you quoting or

13     paraphrasing from the sale order, from the sale agreement,

14     or --

15           MR. STEINBERG:  I'm quoting from the definition of

16     liability under the sale agreement.

17           THE COURT:  Can you give me the cite to that,

18     please?

19           MR. STEINBERG:  It's Section -- it's in the

20     definitions section.

21           THE COURT:  In the definitions of the sale

22     agreement?

23           MR. STEINBERG:  Right.

24           THE COURT:  And that's of retained liability?

25           MR. STEINBERG:  The definition --

1              THE COURT:  Or assumed liability?

2              MR. STEINBERG:  No, the definition of liabilities

3      is in the sale agreement, and that's what I was referring

4      to.  Assumed liability versus retained liability is in

5      Section 2.3 of the agreement.

6              THE COURT:  The matter being 2.4?

7              MR. STEINBERG:  2.3, I believe.

8              THE COURT:  2.3?

9              MR. STEINBERG:  2.3.  The sale order provision is

10     in Paragraph 46.  Paragraph 46 confirms the point, when

11     you're dealing with Old GM vehicles.  It provides that,

12     except for assumed liabilities -- again, we're not talking

13     about assumed liabilities -- New GM shall not have any

14     liability for any claim that, A, relates to the production

15     of vehicles prior to the closing date, or, B, is otherwise

16     assertable against Old GM.

17              Every one of their claims, the economic loss

18     plaintiffs' claims, is a claim that's assertable against Old

19     GM as it relates to an Old GM vehicle.  The sale order

20     proscribed that from being asserted against New GM.

21              And that's why we say in our brief that, if you're

22     dealing with an Old GM vehicle, there wasn't anything that

23     was left to chance.  It was a binary choice.  We assumed

24     certain specific things -- glove box, lemon law, accidents.

25     We didn't assume anything else.  Anything else, they were on

1    their own.

2            And it's not like this argument wasn't raised at

3    the sale hearing. It was raised by the -- at the sale

4    hearing. This was raised not only by the consumer advocacy

5    groups, it was raised by the states' attorney generals and

6    they actually said things like you know, your Honor, there

7    are people here who may not even know they have a claim and

8    you're in effect eliminating their claim. And the answer is

9    yes. The answer is yes.

10           And that makes perfect sense as well too because

11   it wasn't like Old GM had stopped manufacturing cars two

12   years before the sale. They were manufacturing cars

13   throughout. There was going to be a circumstance where a car

14   that was manufactured two months before the sale or sold six

15   weeks before the sale that there may be an issue that

16   related to that car and that is going to come up post-sale.

17   And if it wasn't covered by the expressed warranty and if it

18   wasn't an accident and if it wasn't something by the Lemon

19   Law that person was not going to have a claim against new

20   General Motors unless New General motors decided to

21   voluntarily take that claim on. That was the firm cutoff.

22           But when you look at the sale, the sale order

23   specifically contemplated that these claims, claims relating

24   to latent design defects, that they could be asserted post-

25   bankruptcy and that if they do it is not going to be

1    something that switches the dichotomy between what new GM

2    agreed to and what Old GM agreed to do.

3            I'm trying to think. I still have a half hour I

4    think. Your Honor --

5            THE COURT:  I know I asked a lot of questions.

6    I'll cut you a little bit of slack on my taking up so much

7    of your time and of course I'll do my --

8            MR. STEINBERG:  Your Honor, I appreciate that. It

9    so happens that I'm so far off my outline about where I am

10   now I probably will need the rebuttal time to figure out how

11   to get back to where I need to be.

12           I want to talk about five cases that you raised as

13   to why they're not the situation here. The first is --

14           THE COURT:  Before you're done I also want you to

15   help me with the similarities and the differences between

16   Judge Bernstein's opinions that come to opposite results,

17   Grumman Olson on the one hand and Chrysler, I think it may

18   be Burton on the other.

19           MR. STEINBERG:  Well, let me take that because I

20   think Grumman Olson is actually an easy case.

21           Grumman Olson was a case where there was a post-

22   sale accident and the person who was the plaintiff here had

23   no connection, no relationship at all with Chrysler. It was

24   a person that was driving a car that had a manufactured part

25   that was defective, but wouldn't have known that at all.

Page 62

1          Judge, in the Burton case, the argument was that

2     they're a future creditor and you can't cut off their right

3     because they had no connection at all with the debtor.

4          That's not in any why the situation here.

5          THE COURT:  First, to what extent was either

6     related to whether a claim could be asserted notwithstanding

7     a seeming discharge on the one hand or a 363 free and clear

8     provision on the other.

9          MR. STEINBERG:  I think in Burton, I'm sorry, in

10    Grumman Olson, the judge said this issue wouldn't have come

11    up in like the GM situation because that claim, the post-

12    sale accident claim, is assumed by new General Motors. So,

13    we're not going to have this due process issue. We're not

14    going to have this future creditor issue and Judge Bernstein

15    in Burton said economic loss plaintiffs are different from

16    the Grumman plaintiff. The Grumman plaintiff is at minimum a

17    future type creditor and that's not what the Burton

18    plaintiffs were. They were economic loss plaintiffs. They

19    held contingent claims. They were unknown creditors. They

20    would be bound by the sale order.

21          So, in one circumstance here you have claims that

22    are assertable against Old GM that they are economic loss

23    claims. They are at worst unknown creditors. I know your

24    Honor wants me to address unknown versus known, but they're

25    clearly not future creditors and plaintiffs don't argue that

1    they're future creditors.

2           They may like the words of Grumman, but they know

3    that they're not Grumman. They're not the Grumman

4    plaintiffs. They specifically said that they're the opposite

5    of Grumman.

6           Grumman they said there is no way you could have

7    notified us because we had no connection with the estate.

8    These plaintiffs said you should have notified us and they

9    obviously know their connection with the Old GM estate, they

10   bought a car from Old GM. So, Grumman is not in any way

11   related to the issues that your Honor has to tackle.

12          If new GM hadn't amended the sale agreement to

13   account for post-sale accidents you would have had to face

14   the Grumman issue in this case now. But that changed.

15          The Burton case is actually on point -- latent

16   defect discovered after the sale, economic loss claim. The

17   judge recognized that what they were really asserting a

18   successful liability, uses the quote, "Anybody who owns a

19   car now is not going to have a problem with the car."

20          This case is Burton. To that matter, your Honor,

21   although it doesn't come up in the same exact context, this

22   case is very similar to I think your Morgenstein decision as

23   well too. In Morgenstein the issue that was raised was by a

24   product person claiming that in effect that that there was a

25   fraud on the Court, not a due process violation. They went

Page 64

 1    even further. They went to the fraud on a court section and

 2    they said when Old GM presented its plan, when Old GM

 3    presented its bar date they didn't send us the notice that

 4    they should have. They knew that there was a defect in the

 5    product that we bought. There are 400,000 cars that are

 6    affected. We should have had notice. We shouldn't be subject

 7    to the bar date. We shouldn't be subject to the injunction

 8    under the plan.

 9          The remedies that they asked for were a little

10    unusual. They asked for a partial revocation of the plan

11    which there are specific sections in the Bankruptcy Code

12    which talk about revocation of the plan and your Honor did a

13    strict statutory analysis, but it is in my view similar to

14    the partial revocation remedy that the plaintiffs are trying

15    to assert here. And then your Honor said that they didn't

16    plead fraud with the particularity, Rule 9B in the

17    Morgenstein decision.

18          But fundamentally what they were arguing about was

19    I should have gotten notice, I didn't get notice and now I'm

20    barred because you knew, you Old GM, knew that there was a

21    defect in my car and you didn't tell me. And their ultimate

22    remedy was you don't have a remedy and that I think is

23    similar to the circumstance that you Honor has here.

24          The five decisions, let me see if I can get this

25    right, the Metzger decision. There was -- the county had a

1    covenant to the land development and they were a known

2    creditor. People knew that they had a covenant with the

3    land, it was a public record, and you couldn't then sell the

4    land and then try to preserve the covenant. So, the court

5    had to deal with that singular circumstance and the

6    purchaser was arguing that the covenant was wiped out by the

7    sale and that there was no way that the sale proceeds could

8    satisfy that. So there you were dealing with a circumstance

9    where there wasn't a monetary damage claim and the 363 sale

10   actually reflected an extinguishment of a known property

11   right. That's not I think what you have here.

12          THE COURT:  But one of the reasons that I was

13   troubled or at least, not troubled, but was worried or of

14   the view, perhaps is the best of all the words, that those

15   five cases could be very significant here, is that I think

16   if that's -- you're talking Metzger by Arthur Weissbrodt?

17          MR. STEINBERG:  Mm hmm.

18          THE COURT:  He declined to blow away the free and

19   clear nature of that covenant without invoking 60(b), didn't

20   he? Was he just wrong when he did that? And I'm going to ask

21   the same question with respect to the other four. If I think

22   the bankruptcy judge or a district judge gets it wrong I'm

23   free to say that. I'm much less free to say that -- I can't

24   say that if it's a decision by the Second Circuit.

25          MR. STEINBERG:  Well, your Honor, I think that

Page 66

1   you've asked a very interesting broad question and I think

2   you obviously can decide it on the narrow grounds which is

3   the facts presented to you are not the Metzger type

4   circumstance and therefore however the judge approached the

5   problem in Metzger is not the same as you.

6           But if you're asking me on the most broad concept,

7   which is that are there cases where you don't need to get

8   the 60(b) in order to deal with a circumstance, there

9   probably are, but they probably have unique circumstances as

10  well that are not here. For example, Fuentes v. Shevin. It's

11  whether you could --

12          THE COURT:  (indiscernible) detachment?

13          MR. STEINBERG:  You can have a (indiscernible)

14  without notice to somebody. There the Supreme Court was

15  arguing about the Constitutionality of a statute and in that

16  circumstance the Court said that I'm going to invalidate the

17  statute as violating the due process clause. It's not a

18  matter of moving to Rule 60(b) because no due process was

19  given in effect of the procedural due process, it's a sort

20  of a substantive due process which was that the statute

21  itself was improper.

22          I would say there are five cases that plaintiff's

23  counsel have cited that fit within that paradigm which is

24  that what actually was being done was the Constitutionality

25  of the statute itself and a court was saying I'm not

1    enforcing the statute. The statute doesn't give people their

2    elementary due process rights, that if you have a

3    circumstance where the statute says I give publication

4    notice for the potential extinguishment of a lien when it's

5    a lien of public record, the Court is saying in those

6    circumstances you'd better give direct mail notice. It's

7    easy to give that individual lienholder credit notice and

8    there's something wrong with the statute altogether. I'm

9    invalidating the sale and I'm invalidating -- I'm saying

10   they didn't get their due process rights. And they're not

11   doing it on Rule 60(b) grounds, they're doing it based on

12   the fundamental element of the statute itself.

13           So, if you're asking me whether I think in this

14   particular case Judge Metzger got it right when he said that

15   a covenant with the land was a situation where you're

16   dealing with a known creditor and the direct mail notice was

17   not provided, I think Metzger was a situation where courts

18   have to struggle with the notion that if you're a known

19   creditor and you didn't get notice you'd better have a good

20   reason why and that if you knew -- if it's the type of

21   covenant -- if it's the type of thing that's a matter of

22   public record then there's an element that the purchaser

23   kind of knew that as well too and therefore it's not as

24   clean as a circumstance that we have here. So that's

25   Metzger.

1       Polycel, there I think there's an easy answer to

2    that question. In Polycel, I think you called it Polycal so

3    either I have a typo in my outline or I got it wrong, but I

4    think I'm talking about The 2006 WL 4452982 bankruptcy New

5    Jersey case in 2006.

6       THE COURT:  It's from a district judge out of

7    Trenton if I'm not mistaken.

8       MR. STEINBERG:  Yes. I don't know if it was the

9    District Court or a bankruptcy court, but I have it as a New

10    Jersey case. There the issue was can you sell molds that

11    were used by the objector to the sale and there the Court

12    said that the debtor didn't own the molds. So this was an

13    issue that as a matter of Section 363 the debtor had no

14    right to sell, that the molds were not owned by the debtor,

15    therefore a sale of a right, title and interest where the

16    debtor doesn't own anything didn't transfer anything.

17       Important to know that also in Polycel that the

18    purchaser agreed to take the assets subject to whatever the

19    debtor's interest was. So they took a quit claim on the

20    molds. So when the Court carved out the situation, they

21    weren't carving it out on due process grounds, they were

22    simply saying that the objector is entitled to its property

23    interest because the debtor had no right to sell it and the

24    debtor didn't actually sell it.

25       That's -- then court said you couldn't say take

1    the sale proceeds to compensate you for the loss of your

2    molds because the guy needed the molds for his business.

3    They were essential to the integration of his business, that

4    it was an irreplaceable items. That's how Polycel is a

5    different circumstance from your Honor.

6            Compak. Compak was a case where a creditor did not

7    receive the notice and he held a license to a patent owned

8    by the debtor and the argument was that the sale order

9    extinguished the license itself and the Court said the

10   creditor had no remedy because of the loss of its license.

11   It was critical for its business and that the Bankruptcy

12   Code had special protections for patent licensees and

13   therefore the Court wasn't going to enforce that order vis-

14   à-vis the licensee.

15           And the Court also said, I think it was this case,

16   that license didn't seem to be so critical for the --

17           THE COURT:  I beg your pardon?

18           MR. STEINBERG:  The license didn't seem to be so

19   critical to the purchaser, but there was a specific property

20   right and that the debtor had no right to sell it free and

21   clear and was a known contractual right and therefore they

22   were a known creditor.

23           We think first it starts off that they were

24   unknown creditors and therefore the notice was proper. But

25   in the known creditor situation when dealing with a license,

1    the Court said there are special protections for licensees

2    and you can't compensate that person monetarily by saying

3    your lien attaches to the proceeds of sale, how to deal with

4    it in different circumstance.

5         So, I keep on going back to the same point, when

6    someone sues for monetary damages then not a license, not

7    molds used for their business, the remedy that you can

8    afford to use is something other than -- attaching to the

9    sales proceeds doesn't protect the objector who was deprived

10   of due process.

11        Different circumstance here. When you're suing for

12   monetary damages clearly sale proceeds can accomplish that

13   goal.

14        Koepp, that's not a Bankruptcy Code case. That's a

15   railroad reorganization case under Section 77 of the

16   Bankruptcy Act. The creditor held an easement of the record,

17   but got no notice of a plan which attempted to extinguish

18   the easement.

19        In that railroad reorganization case they entered

20   something called the consummation order. Under the

21   consummation order it said you could not extinguish this

22   encumbrance because it runs with the land and it was only

23   going to extinguish rights if you were a claimant or a

24   stockholder and the consummation would only apply to those

25   people and the person who held the easement was neither a

Page 71

1    creditor nor a stockholder.

2         So the Court said that the consummation order

3    didn't govern what -- it didn't cut off this person's rights

4    anyway because you're an easement holder, you weren't the

5    creditor or stockholder and the only thing I was covering in

6    my consummation order were the rights of the creditors and

7    the stockholders.

8         So again, it was interpreting its order to say it

9    didn't apply, not that they were carving out something that

10   clearly applied for due process reasons.

11        THE COURT:  Didn't the circuit in that case say

12   that they found a violation of due process and didn't they

13   blow away the extinguishment of the complaining creditor's

14   interest without every talking about 60(b)?

15        Now summary opinions are called summary for a

16   reason because they're not drafted with the precision that

17   plenary opinions are. With that said, and I don't want to be

18   critical of the circuit, but seemingly the circuit didn't

19   think 60(b) was that important.

20        MR. STEINBERG:  Well, your Honor, I think to

21   defend the circuit, if I'm presented with an order --

22        THE COURT:  If the circuit didn't think 60(b) is

23   important, that tells guys like me we're not supposed to

24   think that 60(b) is that important. I'm not allowed to think

25   that the circuit was wrong.

1          MR. STEINBERG:  No, no. I actually think that

2    60(b) is important, but I think Koepp is a case where the

3    Court was interpreting the order that was entered and saying

4    the order didn't apply to the objective. The order was the

5    consummation order. The consummation order only affected

6    rights of creditors and stockholders and they were saying

7    that an easement person, any person who held an easement,

8    was not a creditor nor a stockholder and therefore its

9    rights were not extinguished and therefore I didn't have to

10   deal with 60(b), I was interpreting the order and saying it

11   didn't apply to them.

12          It was the same thing as the -- I'm sorry, which

13   talked about the molds. You know, you cn only sell what you

14   own. You didn't own the molds and therefore I'm interpreting

15   the order to say that those rights in the molds weren't

16   extinguished. It doesn't involve 60(b), it involves an

17   interpretation of the actual order itself. And so I do think

18   60(b) is important except you didn't need to reach it in

19   that case because you were interpreting the order and you

20   were trying to decide whether the order covered the

21   circumstance that was being complained about.

22          And then I think the last one is Manville IV and

23   there I think Manville IV fits within the same paradigm.

24   Manville IV was a circumstance where there was an injunction

25   that was entered as part of the Manville case and the focus

1    of that injunction was that entities like Travelers would be

2    protected from lawsuits and that they would be protected

3    from lawsuits because if they didn't that would erode the

4    insurance that otherwise was being given to the Manville

5    estate.

6            So, the insurance agreement was the res that was

7    part of the bankruptcy estate. In Manville IV the litigation

8    was between Chubb and the insurance company and it didn't

9    relate to the insurance. It related to whether the insurance

10   industry had defrauded as a whole the asbestos industry and

11   that they should have been protecting the industry as a

12   whole and the claim that was being asserted was a

13   contribution claim which was a prepetition direct claim that

14   one insurance company had to another insurance company. And

15   there the Court was saying that wasn't what this injunction

16   was dealing with. That wasn't what the court had

17   jurisdiction to issue an injunction. It wasn't going to

18   prevent a direct claim against another direct claim that was

19   unrelated to the insurance res which was what the Bankruptcy

20   Court had to deal with and therefore it carved out and said

21   that this didn't apply.

22           And then in Manville V it said that there wasn't a

23   failure to meet a condition precedent because the injunction

24   didn't apply to it in the first place.

25           Now, Manville has gone through lots of litigation.

Page 74

1      It has gone through up and down the circuit a number of

2      different times. That is what was involved in Manville IV.

3      The most telling distinction between Manville IV and the

4      case at bar is that Manville IV was a future creditor case

5      or not even a claim at all case. They're arguing that, the

6      Chubb is arguing it never could have been contemplated at

7      the time of the channeling injunction under the plan that

8      you would have this type of claim -- someone claiming that

9      the insurance industry as a whole was defrauding the

10     asbestos industry and therefore it wasn't contemplated, no

11     one could have expected that type of claim and therefore it

12     shouldn't be barred by any kind of channeling injunction.

13          That's not their situation, right? Their situation

14     is that they're a known creditor, that they should have

15     gotten notice as to the time of the sale and we cite in our

16     papers a case which talks about, while there are

17     similarities between a channeling injunction and a 363 sale

18     where there's an injunction to protect the purchaser, in the

19     Campbell case the court says while there are similarities

20     and there are similar rationales for the protection, it's

21     not the same and there are bankruptcy policy objectives

22     relating to a 363 sale which are independent of the

23     channeling injunction that's part of the plan.

24          So, I think, your Honor, those are the five cases

25     that you've asked me to address. I'd like to talk a little

1    about the claim-specific notice issue.

2            The 363 notice approved by the court did not

3    identify any specific liabilities retained by Old GM because

4    it wasn't the purpose of the sale hearing and it actually

5    didn't have to. The sale notice itself said it was free and

6    clear of all liabilities and it was other than assumed

7    liabilities. And when you say all, there's no need to break

8    down that further into its component parts.

9            Importantly, the creditors committee, the states'

10   attorneys generals, the consumer advocates and the vehicle

11   owner attorneys never challenged the sale procedure order

12   and the specificity of the sale notice and that was never

13   appealed at all by any of them.

14           And as noted, the sale notice told parties what

15   they needed. They told them that the sale would be free and

16   clear liens and it gave access to the sale agreement and the

17   sale agreement said that -- defined what were retained

18   liabilities and said it's going to be free of successor

19   liability claims. And this picks up on one of the questions

20   that your Honor had asked. A more detailed claim notice

21   would've been extremely costly and it would have delayed the

22   sale and the value --

23           THE COURT:  They're not really attacking the

24   specificity of the sale notice to my understanding. They're

25   saying that if mailed notice of the type that was sent with

1    -- I think they said first class mail, but maybe by

2    hyperbole they said by registered mail, that by not having

3    sent out the recall notices Old GM was hiding the cards. And

4    maybe it's Mr. Weintraub's brief, maybe it's Mr.

5    Weisfelner's or both, but one of them says even if you had

6    mailed us the notice it wouldn't have been good enough

7    because the recall notices haven't gone out. Could you

8    address that contention?

9              MR. STEINBERG:  I think --

10             THE COURT:  Or am I imagining that they said that?

11             MR. STEINBERG:  I don't think that they say it

12   like that. I think they say it slightly differently. I think

13   they say that the notice had to specifically say there was a

14   defect and that you may have rights that are extinguished if

15   you don't file a claim. So, they were putting the burden on

16   the proponent in the sale context to identify all the

17   liabilities that would be potentially extinguished by a no

18   successful liability finding and to have it said with

19   explicitness. That's what I think they said. I don't think

20   they tied at all to the recall notice.

21             And by the way, if the recall was done in 2008,

22   then what? If the recall was done six months before --

23             THE COURT:  Well, if the recall had been done in

24   2008 I'm not quite of a mind to say you would win this in a

25   heartbeat, but if the recall had been sent out in 2008 I

1   think that that coupled with the publication notice would

2   put you in a very strong position.

3           MR. STEINBERG:  The recall -- the element of a

4   recall, this -- to put it in context, is that there was a

5   defect of a safety nature that needed to be remedied. Old GM

6   had been sued by lots of people prior to its bankruptcy

7   based on failures to design the car properly, breaches of

8   implied warranty of merchantability, fraudulent concealment

9   in the context of selling the car. Those claims existed

10  throughout.

11          Your Honor had to deal with those circumstances in

12  Castillo. Your Honor, approved the settlement in

13  (indiscernible) and (indiscernible). All of those were in

14  effect economic loss claims. They were breach of warranty

15  actions where there had been class actions that had been

16  certified, but not approved as of the time of the

17  settlement. All of those claims are Old GM claims. All of

18  them had been paid as Old GM claims.

19          The recall of when you send out a notice or not is

20  -- I don't want to minimize it, but it is not relevant to

21  the issue that I think your Honor, has to address. The issue

22  is whether warranty claims, design defect claims will retain

23  liabilities and if they were then the issue is whether the

24  sale notice was proper.

25          And your Honor has asked the question well, what

1    is the objective, what is the test that I should look at?

2    You know, they use language like reasonably, reasonably

3    ascertainable, but that's not reasonably foreseeable. What

4    does it mean by looking at the books and records? Is it the

5    same as a financial statement?

6              THE COURT:  I take it -- that's easy. You agree

7    that it's not the financial statements.

8              MR. STEINBERG:  I agree it's not the financial

9    statements. And I think that the Drexel case actually

10   illustrated that because there you had a contractual

11   guarantee. Guarantees don't necessarily have to be on a

12   financial statement. It didn't mean that if you had

13   contractual guarantee you shouldn't be noticing that

14   creditor if it was in the context of a bar date situation.

15   Not a sale, but a bar date. So I agree that the financial

16   statement is not the end all be all.

17             But when we say books and records we're not

18   talking about, you know, we're not talking about the

19   financial statement. We're talking about the general ledger

20   of the enterprise, what is listed as the creditors of the

21   company on the company's books and records. We're looking at

22   what the litigation calendar is. People who had sued the

23   company. People who have made a claim against the company

24   and that's the issue that I think your Honor has to tackle

25   which is that if it's not a contractual claim, if it's not,

1    you know, the cases they cited if there's an easement, if

2    there's a mortgage you should give notice to the mortgagee.

3    If I have a contractual claim that I know about I should be

4    giving notice as if I'm trying to sell or if I'm going to

5    try to do a bar date. Those are known creditors.

6              But what is the objective test when you have an

7    unasserted tort claim where the tort claimant has never made

8    a claim for that at all? In this particular case, look at

9    the circumstance here, you have, you know, the ignition

10   switch recall went back as far as 2004-2005. So you have

11   people who drove their car for five years. One of the

12   arguments on the claim-specific notice is that they didn't

13   know they had a problem. So they drove their car for five

14   years. They didn't know they have a problem. It's only the

15   announcement that we're going to cure the problem that you

16   weren't aware of that they say creates the economic loss

17   claim.

18             But if they haven't unasserted a claim and it's a

19   stipulated fact that none of the named plaintiffs in the

20   ignition switch action actually asserted a claim against Old

21   GM as of the sale. So none of them asserted a claim and Old

22   GM didn't have it on their books and records and didn't have

23   a claim that's being asserted.

24             One of the things that I think this is clear also

25   is that you can get caught up in this due process argument,

1    and I don't mean to minimize the importance of due process,

2    but the reality was is that they generally knew that there

3    was a sale hearing anyway. They've never argued, they've

4    never put in one affidavit to your Honor that they weren't

5    aware of the sale hearing. Whether they got the direct mail

6    notice, the publication notice or they read one of the 1,250

7    newspaper articles or they watch television, you know, this

8    was what Judge Kaplan said. No sentient American was unaware

9    of the travails of Old GM.

10            And the cases that they cited which talk about Old

11   GM's awareness of the bankruptcy filing is not the same as

12   the awareness of the particular bankruptcy event. Well those

13   are cases which deal with the bar date. Every case that they

14   cite dealt with the bar date and there the courts were

15   saying I may know that there's a sale, I'm sorry, I may know

16   there's a bankruptcy, but I don't know in a Chapter 11 when

17   the bar date was set. I could have my rights extinguished if

18   the bar date is entered and I don't know about it and it's a

19   matter of who has the burden of telling somebody about the

20   setting of the bar date when it's not set in Chapter 11 by

21   statute, but it's set by court order. And there those cases

22   are saying the burden is on the proponent asking for the bar

23   date to send out the notice and merely the knowledge of the

24   bankruptcy filing will not obviate the necessity of giving

25   the notice of the bar date where their claim would otherwise

1   be extinguished. That's not the circumstance here. But the

2   reality is that they know. The named plaintiffs. The people

3   that they control. The people they could talk to on a daily

4   basis, they know if they were aware of a sale hearing or not

5   and there's not one piece of paper that they've issued that

6   says they were unaware of the sale hearing and the magnitude

7   of what happened in 2009 was that everybody was aware that

8   this was happening. This was not something that happened

9   just on June 1. The foreshadowing of the potential

10  bankruptcy of Old General Motors and the fact that the

11  government was going to be the sponsor to buy the assets of

12  the enterprise and whether that was a legitimate use of

13  government funds was widely debated, widely publicized and

14  widely known by everybody that was involved.

15          So, the issue of notice here is to some extent

16  irrelevant and your Honor, asked the issue about prejudice

17  and prejudice is also the same thing because it's not should

18  I have been able to argue my issue about proving my warranty

19  claim. That's not the issue. The real issue is would I have

20  been able to come into court and argue successor liability

21  any differently than anybody else argued successor

22  liability?

23          THE COURT:  That's the easy half. The sale order

24  had been circulated in proposed form June 1st or June 2nd

25  substantially immediately the proposed sale order after the

1    363 motion was filed. But a reasonable tort litigant may

2    have said I'll never in a thousand years win on successor

3    liability, but I can argue vis-à-vis the form of the order

4    and (indiscernible).

5              Your problem is (indiscernible) enough to convince

6    me that I would have not issued a free and clear. Your

7    problem is to convince me that I would have issued a sale

8    order with the exact (indiscernible) and language that the

9    one that was entered ultimately turned out to be.

10             MR. STEINBERG:  Well, your Honor, they have not

11   articulated what it is in your sale order that they would

12   have been able to argue was overbroad. I mean, that's a

13   question that you legitimately have asked.

14             THE COURT:  I thought they did. I'll certainly

15   hear from Mr. Weisfelner and you'll have a chance to reply.

16             MR. STEINBERG:  All right. But again, just to be

17   clear, if there was an independent duty that New GM had

18   after the sale, then I don't think your sale order protects

19   them of that independent duty that Old GM had. But vis-à-vis

20   old GM vehicles, that duty had already been parsed out and

21   that -- nothing was going to change by that and that the

22   timing of when you're raising the issue is irrelevant.

23             That issue relating to Old GM vehicles had been

24   parsed out and there were only certain things that New GM

25   was going to do and everything else it wasn't going to do.

1          The bar date toxic tort cases cited by the

2     plaintiffs are readily distinguishable for exactly the

3     reasons why I think your Honor highlighted in your questions

4     and which I tried to argue before and it relates to the

5     differences between the 363 sale and a bar date notice. The

6     timing of when something is issued and what is accomplished

7     by the extinguishment of a claim and that in a toxic tort

8     situation the person actually doesn't know that they have a

9     claim. They have to be told they have a claim. While in a

10    sale situation here the plaintiffs knew they had a car, they

11    knew their relevant with General Motors.

12          I know that I'm past my time. I just want to be

13    able to briefly say in five minutes something about the

14    prejudice point and then I'll say whatever else that your

15    Honor has for my rebuttal.

16          The no prejudice point we've articulated as saying

17    that when you're dealing with a bona fide purchaser the

18    remedy can't be asserted against that entity and we also

19    said that the sale notice attracted many objectors who

20    argued the exact same position that plaintiffs are trying to

21    argue now. They argued that the sale agreement should be

22    broader to protect warranty claims, all consumer claims.

23          Your Honor heard the argument that if the bond

24    exchange had been approved, everybody else would've written

25    through the bankruptcy case other than the bondholders. They

Page 84

1    would have converted. But now we have a sale where other

2    people are more broadly affected including the car loans and

3    that's why you had a number of the agencies there. You had

4    over 40 states' attorney generals and you had the creditor's

5    committee, the fiduciary for all creditors raising the issue

6    about successor liability and whether these claimants should

7    have realized that their rights were being cut off.

8          And the answer was that the argument was raised

9    and their rights were being cut off. And the importance to

10   be heard in a bankruptcy case is true, but that doesn't mean

11   anything if you otherwise got notice of it in another way

12   and it doesn't mean anything that if you stood up in court

13   you wouldn't have anything new to say on the successor

14   liability issue at all.

15         So, your Honor, I know we have a hard deadline and

16   so I'm going to stop at this point in time and I'll address

17   whatever else I need to on my rebuttal time. Thank you.

18         THE COURT:  Okay. We'll take a 10 minute recess.

19   I'll hear next from you Mr. Weisfelner. What is hard is the

20   approximately 3:15 time that I need to get out of here. The

21   rest we have some flexibility on. Refresh my recollection on

22   what was agreed on when we return Mr. Weisfelner. Can we get

23   you done before lunch?

24         MR. WEISFELNER:  Your Honor, I think --

25         THE COURT:  If we do lunch late enough?

1        MR. WEISFELNER:  I think you can. I think between

2    the three designated counsel in the last letter submitted to

3    your Honor we had asked for an hour and 35 minutes. We're

4    going to keep to the hour and 35 minutes, although as

5    between Mr. Esserman and Mr. Weintraub I think we're going

6    to switch their order because it makes more sense in terms

7    of keeping the due process arguments in the same vein. But

8    we will keep to the same timeframe that we had originally

9    contemplated. Your Honor, we can start. You can break us for

10   lunch or keep us here before lunch. It's really up to your

11   Honor.

12        THE COURT:  Well, if you can do it in an hour and

13   a half what I think I'd like to do is give you guys to do

14   your thing and break after that.

15        MR. WEISFELNER:  I think that's fine.

16        THE COURT:  There was a request by somebody for a

17   caucus room. I said I would approve it assuming that

18   everybody had the same ability. I mean all three of the main

19   constituencies. I think that has been done. That will be

20   clarified perhaps during the break. All right, we're in

21   recess, 10 minutes.

22        MR. WEISFELNER:  Thank you, judge.

23        CLERK:  All rise.

24        THE COURT:  Have seats please. Okay Mr.

25   Weisfelner, whenever you're ready.

1          MR. WEISFELNER:  Thank you, judge. Your Honor, by

2     my count you had asked about eight or nine questions that

3     were directed to me or other designated counsel and I intend

4     during the course of my presentation to respond to each and

5     every one of them. But I do want as a highlight and before I

6     get into my prepared outline, I basically think that your

7     questions were all of one variety or another of the same

8     theme.

9          First, was there indeed a due process violation in

10    this case? I think a subset of that question, what was the

11    nature of that due process violation because your Honor also

12    asked a number of questions that went to the question of how

13    might that due process violation have been avoided back in

14    2009. And then you also asked a number of questions about

15    what's the appropriate remedy were the Court to determine

16    ultimately that there was a due process violation.

17         And one of the things that your Honor indicated

18    that frankly troubled me and I want to address it right up

19    front, your Honor, seemed to suggest that the appropriate

20    remedy for a due process violation would be some semblance

21    of a do over. I think that was the phrase that your Honor

22    used, the do over. I must tell your Honor from the outset

23    that I am concerned about how one would effectuate a do

24    over.

25         In 2009 the ignition switch defect that we contend

1    GM knew about but failed to disclose, your Honor's phrase

2    failed to do a recall, but I think it goes deeper than that

3    and I'll get to that, was again something that had been

4    pending for seven full years. And if we're going to do a do

5    over how do we deal with the fact that in 2009 our new

6    purchaser, New GM, was going to maintain that silence, was

7    going to keep the ignition switch defect, which now we know

8    is a pervasive safety defect, was going to keep that secret

9    for another five full years? How in the context of a do over

10   do we deal with that 12-year history, seven years before the

11   sale, five years after the sale where there was a known

12   safety defect that GM failed to disclose? I don't know how

13   you'd do a do over in that context. If you did a do over,

14   would it impact your Honor's ability to give them a 363(m)

15   finding?

16          We also heard a lot about remedy and in the

17   context of remedy we heard a whole long discussion about

18   successor liability and does it apply and does it apply in

19   the general context and does it apply in the context of, and

20   this is critical, a car manufacturer. You didn't hear very

21   much about the fact that GM is a car manufacturer and how to

22   affects the law that ought to be applied in the case, but

23   I'll get to it.

24          Your Honor, if the order isn't enforceable, and

25   that's what we're here on, New GM's motion to enforce your

1    Honor's 2009 sale order, well if the order is not

2    enforceable for reasons I'll explain, then your Honor'

3    determination with regard to successor liability is likewise

4    not enforceable and it will be up to, not this court with

5    all due respect, but Judge Furman in the MDL or other courts

6    that have jurisdiction throughout the country to determine

7    what if any remedy is available to the plaintiffs if GM's

8    motion to stop them from prosecuting those complaints is

9    unsuccessful.

10          It'll be Judge Furman who decides if successor

11    liability applies. It'll be Judge Furman who decides that

12    that's between economic loss plaintiffs and people who were

13    involved in fatalities or serious in injuries there's a

14    difference qualitatively or quantitatively in terms of what

15    they're entitlements are.

16          And your Honor, I've got to start with one of the

17    last quotes that Mr. Steinberg gave you or statements that

18    he gave you here at the lectern because quite frankly I

19    found it astonishing.

20          In trying to convince your Honor that this is much

21    ado about nothing, these are economic loss plaintiffs, what

22    are we concerned about and it goes back to the whole notion

23    of a due process violation and what was known when, he said

24    that people drove for five years without filing a complaint.

25    People drove for five years without filing a complaint and

1    it brought to mind the Powledge case. I don't know if your

2    Honor remembers Powledge. That's the individual who with his

3    five children died in a car accident and GM's defense in

4    that lawsuit was the man committed murder/suicide.

5           Well that 2005 accident we now know was a

6    consequence of an ignition switch defect and a resulting

7    airbag non-deployment. Yeah, the family of the

8    murder/suicide victims didn't' appreciate that they had a

9    claim against GM.

10          THE COURT:  Mr. Weisfelner, this is exactly the

11   argument that I told you at the outset was inappropriate and

12   it's particularly inappropriate because this is a personal

13   injury or death case for which if it happened post-petition

14   New GM is already on the hook for it and if it happened pre-

15   petition I have said, unless you're going to tune me in

16   wrong, that the courts have allowed the claims that could

17   have been filed then to do it.

18          I want to hear arguments on the law. Forgive me, I

19   don't want to hear theatrics.

20          MR. WEISFELNER:  Alright. Your Honor, let's start

21   then with the first and most important issue for due process

22   purposes and that's that GM contends throughout its papers

23   and throughout its argument that all of the plaintiffs were

24   unknown creditors.

25          Now the second point is as a consequence of being

1    an unknown creditor, the publication notice that was

2    affected in this matter was sufficient. The third point they

3    raise is even if there was a failure of a notice and

4    deprivation of the right to be heard there was no prejudice

5    hence no due process violation or no appropriate remedy.

6    Their fourth point is if the asserted liability isn't

7    assumed within the terms of the sale agreement its

8    (indiscernible) retained and therefore enjoined and finally

9    New GM argues a default and therefore the remedy lies

10   against Old GM's residual estate and not against it.

11          Your Honor, we've had 160 pages of briefing and we

12   had the oral argument and aside from conclusory denials I'd

13   ask your Honor to ask yourself the question what record

14   evidence does New GM point to to support its contention that

15   the pre-sale plaintiffs were indeed unknown? There's

16   precious little in their pleadings I think that go to the

17   record.

18          In their opening brief they say that plaintiffs

19   point to the fact that a certain number of Old GM personnel

20   were aware that there were some reported incidents prior to

21   the 363 sale where the ignition switch malfunctioned. But

22   then they go on to argue that the mere possibility of

23   purported claims based on engineering issues being

24   investigated prior to the 363 sale does not make such

25   purported claims known.

1            In their reply brief they argue that Old GM had

2    not determined that there was a pervasive ignition switch

3    safety problem and that claims would inevitably be brought

4    against it. Now again, your Honor, I'm not going to go

5    through the numbers because I don't want to incur your

6    Honor's wrath again in terms of the number of fatalities and

7    serious injuries in the presale context which are all a

8    matter of record in the Feinberg protocol and reported on

9    the victim website. But we know today as New GM has

10   acknowledged that the ignition switch defect was indeed a

11   safety defect which necessitated a massive recall and an

12   admission by the head of New GM that some 15 as yet

13   unidentified employees were being fired for misconduct

14   because they, and this is a quote, "Simply didn't do enough.

15   They didn't take responsibility. They didn't act with a

16   sense of urgency. Something went wrong with our process and

17   terrible things happened." And still GM contends that the

18   plaintiffs were unknown.

19           What again GM has studiously avoided throughout

20   the course of these proceedings is the record evidence and

21   the applicable law that mandates a much different conclusion

22   as to what Old GM knew or as a matter of law what Old GM is

23   charged with having known about the ignition switch defect

24   at the time of the 363 sale. And I want to put all this into

25   context because there's one critical point that has to be

1   made and, your Honor, it serves in our view to distinguish

2   every single case relied on by New GM on the issue of what

3   they knew for purposes of due process.

4           In trying to determine what GM knew or is charged

5   with knowing as a matter of law it's critically important to

6   remember we're talking here about a car manufacturer, not a

7   financial services firm like Drexel or the department stores

8   like Caldor or an oil company like Enron or whatever

9   business in Virodyne or Agway or New Century was in.

10          Car companies, unlike all of those other

11  businesses, are mandated under federal law and a very

12  comprehensive regulatory scheme under the Safety Act and the

13  Tread Act to maintain certain books and records regarding

14  safety or potential safety issues. And it's those federal

15  mandated records that GM was required to consult.

16          Your Honor, asked a bunch of questions of Mr.

17  Steinberg. Are we just talking about the ledger? Are we

18  talking about the balance sheet? And Mr. Steinberg wasn't

19  prepared to go beyond the ledger, the balance sheet or a

20  listing of lawsuits that were filed. Your Honor, I want to

21  paraphrase Drexel because we're talking about a car company

22  and in a car company case arguments about all I need to do

23  is look at my ledger, my balance sheet, my list of lawsuits,

24  well that's even worse than pennies on the floor not worth

25  picking up, the quote from Drexel.

1          With that distinction in mind I think it's

2     important to catalog some of the evidence that constitutes

3     the record for these proceedings and since your Honor

4     started at the outset by telling us that in effect you think

5     that there was enough to require a recall by 2009, I'm not

6     going to go through all of it, but I do want instead to turn

7     to the conclusion. Not even the conclusion, I'm sorry, the

8     introduction of the Valukas Report. And just so the record

9     is crystal clear, your Honor knows we didn't get to take any

10    discovery in this action and as the Berman affidavit that

11    was submitted as part of our papers tells you discovery in

12    front of Judge Furman on the MDL, while it's been laid out

13    in connection with bellwether trials, that discovery doesn't

14    in effect even begin until some time in the future, isn't

15    schedule to reach any kind of conclusions until I think

16    phase one discovery runs through May. Phase two discovery

17    runs through October and depositions of former and current

18    employees, including those that were terminated because of

19    misconduct and because they didn't do enough and didn't act

20    with a sense of urgency, those depositions don't even begin

21    until after the phase one discovery is over.

22          So, what record do you have? Well, as your Honor

23    indicated in your prior order, the record in this matter

24    would include such information as would otherwise be

25    available in a Rule 7056 context. You got Mr. Berman's

1     affidavit. You got my affidavit and there are only two

2     things in my affidavit I want to highlight today. One is

3     Exhibit C, which was an August 2005 email from Laura

4     Andress, a GM engineer, to James Zito, another GM engineer.

5     And again, I'll paraphrase. She was talking about one of the

6     subject cars and the design of the ignition switch and what

7     she wrote in that email is, and I'm quoting, "I think this

8     is a serious safety problem, especially if the switch is on

9     multiple programs which this switch was. I'm thinking big

10    recall. I was driving 45 miles an hour when I hit a pothole

11    and the car shut off and a car driving behind me that

12    swerved around me. I don't like to imagine the customer

13    driving with their kids in the backseat on I-75 and hitting

14    a pothole in rush hour traffic. I think you should seriously

15    consider changing this part to a switch with a stronger

16    detent."

17          Now, your Honor, I'm going to turn to Exhibit B,

18    the May 29, 2014 report of Anton Valukas and what Valukas

19    tells us is that as a car manufacturer there were several

20    processes used by GM consistent with its obligations under

21    federal law to identify safety issues including what's

22    referred to as the TREAD Database and the PRTS or Problem

23    Resolution Tracking System database. And those databases are

24    supposed to contain all sorts of different information

25    including without limitation customer service requests,

1    repair orders from dealers, internal and external surveys,

2    field reports from employees who bought to test drove GM

3    vehicles and then captured information on what's referred to

4    as the CTF or Captured Test Fleet reports, complaints from

5    their OnStar center, which by the way had 365 cases of air

6    bag non-deployment reported in the 2005-2006 timeframe, and

7    a database maintained by GM's legal department to track

8    complaints in court or out of court.

9              What does a review of those databases tell us? And

10   again, I'm not going to go through the report in detail.

11   Your Honor has it as part of the record.

12             THE COURT:  Yes and apropos to that, is your point

13   that Old GM should have issued recall notices before June of

14   2009, which as you properly observed, I already agree with

15   or is it a different point?

16             MR. WEISFELNER:  It's a different point. It'

17   related, but it's different and I'll get to the point and

18   then I'll move on.

19             THE COURT:  Get to the point and then put the meat

20   on it so I know the relevance of this other than to again

21   show me that New GM was bad, which you're already ahead on.

22             MR. WEISFELNER:  Okay. Your Honor, my point is

23   this, that as a matter of bankruptcy law and as a matter of

24   due process concerns, what the cases tell us is that what

25   you're entitled to by way of due process is a function of

Page 96

1    whether or not you are a known creditor or an unknown

2    creditor. My opponents take the position in trying to

3    enforce the 2009 order that due process wasn't violated

4    because the plaintiffs were all of them are unknown

5    creditors and for bankruptcy purposes and in terms of

6    asserting or determining whether or not you had a claim and

7    you were entitled to a certain level of due process, our

8    contention is that we were known creditors and it's not a

9    test of being forced to demonstrate what GM knew, rather

10   it's a matter of law in terms of what GM is charged with

11   knowing.

12          And GM as a car manufacturer is charged with

13   constructive notice the cases tell us -- constructive notice

14   of what's in their databases, what's in the TREAD database,

15   what's in the PRTS database. And your Honor I will tell you

16   that I think that there is a terribly important series of

17   cases that are cited in the Valukas report and they were

18   referred to in our papers and they are the report -- they

19   are the cases that are listed in Appendix A to the Valukas

20   Report.

21          And what those cases stand for is the proposition

22   that if there's a known safety defect a car manufacturer has

23   to report that to NHTSA and notify the owners. And by

24   statute we know that a defect is one that creates

25   unreasonable risk of an accident or a risk of injury or

1    death as a result of an accident. And we have a string of

2    cases there are cited to us in the Valukas Report starting

3    with U.S. v. General Motors, a district of DC case in '97,

4    and I can give you they cite. It's 565 F.2d 754, the jump

5    page is 760.

6            And in that case the court rejected the argument

7    that very few incidents were likely to occur in the future.

8    Like GM tells us that the ignition switch defect operated

9    properly for a majority of the owners. That argument was

10   rejected by the Court. It required GM to do a recall and its

11   argument was that from the beginning the part at issue there

12   didn't meet manufacturer's own standards for proper assembly

13   and absent notification will in the future cause at least

14   some operators and passengers to be confronted with a clear

15   danger. To the same effect as Dole v. Ford, the Porsche case

16   and the two other GM cases that are cited by Valukas.

17           But then we have to go on to look at two other

18   cases and in particular U.S. v. General Motors, an '83 case

19   which stands for the proposition that a car manufacturer

20   incurs a reporting obligation when it actually determined or

21   should have determined that a safety-related defect exists.

22   That's 574 F. Supp. 1047, the jump site is 1050.

23           THE COURT:  Incurs an obligation to undertake a

24   recall.

25           MR. WEISFELNER:  Yeah, whether it actually

 1     determined or should have determined that there was a safety

 2     defect and to the same effect is U.S. v. General Motors 656

 3     F. Supp. 1555 out of the same court, a manufacturer can't

 4     avoid its reporting requirements by intentionally failing to

 5     reach a determination that a defect is a safety-related

 6     defect.

 7              THE COURT:  So are you repeating all of this

 8     because you're asking me to retreat from my tentatives that

 9     I already agree with you?

10              MR. WEISFELNER:  No, your Honor, again it's

11     because I'm trying to underscore the fact that if there were

12     a due process violation, and we contend there was because we

13     were known creditors, it gets us to the next issue and the

14     next issue is what manner of notice would have been required

15     as a consequence in order to avoid the due process issue?

16     And our point is if GM knew it had a safety defect then it

17     was required to give notice and since it and only it knew

18     it, it had to give notice of a type sufficient to advise the

19     claimant, not only that there's a bankruptcy proceeding and

20     a bankruptcy hearing at which your rights are going to be

21     affected, but here's the nature of your claim. Absent

22     telling people that there was a defective ignition switch in

23     their cars that was a safety defect by definition and could

24     cause the air bag non-deployment, making any accident you

25     were in even that much more severe, they could have visited

Page 99

1   every single plaintiff and told them in person there's

2   bankruptcy hearing, there's a sale hearing going on and that

3   sale hearing may affect your rights.

4          Well, if I don't know what my claim is, how do I

5   know what my rights are that I need to protect? No form of

6   notice, either mailed, in person or by publication, is

7   sufficient to advise a creditor, who all these people were

8   at the time, and known creditors from GM's perspective, but

9   unknown from their own perspective that they had a claim

10  that was worthy of protection.

11         Nowhere does GM even attempt to address our

12  imputation cases. You didn't hear any of that in connection

13  with today's dissertation. Our imputation cases stand for

14  the proposition that imputation is proper, even if knowledge

15  was never communicated to senior management. Employees'

16  position within the corporate hierarchy is irrelevant for

17  imputation purposes as long as they obtained their knowledge

18  while acting within the scope of their employment and Old Gm

19  is charged with the collective knowledge of all of its

20  employees even if no single employee possessed all the

21  relevant knowledge or was individually responsible for

22  acting on it.

23         Now the best that can be said for the failure to

24  disclose what was a known safety defect and the fact that it

25  was a known safety defect is imputed to GM as a matter of

 1    automobile law and general due process law in the bankruptcy

 2    context, the best that can be said is that it was related to

 3    the tremendous pressure that GM was under. And your Honor

 4    asked the question about whether or not due process concerns

 5    can change given the exigencies of the situation, the

 6    melting ice cube, the need to conduct the sale before money

 7    runs out.

 8            Well, I think the cost issues infected GM's

 9    decision. As the record reflects they were cutting costs

10    dramatically. That is part of the reason why the TREAD

11    database personnel were cut. The group charged with running

12    that database was paired down in the timeframe leading up to

13    the petition. But we think more insidious than the cost

14    issues was the cultural issues at play here. The record is

15    clear that personnel who tried to raise safety concerns

16    regarding the ignition switch defect got push back. There

17    was a fear of retaliation. You don't write reports using the

18    word stall, safety or defect and that comes from the quality

19    brand manager for the Cobalt cases themselves, cars

20    themselves.

21            Were these owners reasonably ascertainable? Based

22    on the record and based on the law the answer is yes. There

23    was no semblance of a diligent examination of GM's records

24    and database which they were required under federal law to

25    maintain which would have readily disclosed these creditors

1    and the nature of their claim. And there can't be any

2    question about GM's ability to identify the owners. Their

3    own stipulation of fact number 18 acknowledges that its

4    contract with R.L. Polk provided it with the ability to

5    obtain the names and addresses of vehicle owners.

6         And, your Honor, I couldn't do the math as quickly

7    as (indiscernible) could, but in their papers they told you

8    that direct mail notice would have cost $42 million, but

9    that's for the 70 million cars. I don't know what direct

10   mail notice would have cost to 27 million people that may

11   have been impacted by the ignition switch, but the point is

12   they could've gotten away with and they could have cured the

13   due process violation whether it was direct mail or

14   publication by letting people know what the nature of their

15   claims were, by telling people that were involved in

16   accidents or stall situations that we know why your car was

17   involved in those situations. We have a known safety defect

18   associated with out ignition switch. But they didn't.

19        There are two leading cases on the question of

20   whether or not these were known creditors don't help them.

21   Morganstern wasn't a due process case at all. The plaintiff

22   contended there was an undisclosed design defect that gave

23   rise to a fraud on the court and your Honor concluded that

24   the pleading requirements of Rule 9(b) had not been met.

25   Allegations that GM knew of the design defect were

 1    conclusory, not supported by the evidence. Quite different

 2    from our case.

 3              Burton again is not really a due process case. The

 4    Court didn't deal with our question, were claimants known or

 5    unknown. The Court assumed the successor liability shield

 6    was in place and the decision therefore is one of contract

 7    interpretation -- what claims were assumed versus retained.

 8              Your Honor, quite frankly, the content of your

 9    Honor's sale order is irrelevant to parties to whom due

10    process was denied -- all of it including whatever your

11    Honor may have said or found or determined with regard to

12    successor liability. That's ultimately, if your Honor agrees

13    that our rights were impacted such that the order should not

14    be a bar to our pursuit of claims, are to be determined by a

15    court of competent jurisdiction.

16              Your Honor, Drexel tells us --

17              THE COURT:  Which you're saying I'm not.

18              MR. WEISFELNER:  Your Honor is not with regard to

19    the remedy that the plaintiffs seek in either of their two

20    consolidated complaints. Your Honor's role, I would suggest,

21    is to determine whether or not your Honor's sale order in

22    2009 serves as a bar to the prosecution of those litigations

23    which is obviously a core function of your Honor. It's your

24    order. It's yours to interpret. But I do think that because

25    there was a violation of due process, these were known

1    creditors who weren't given any semblance of notice that

2    would satisfy due process, those orders cannot be used to

3    bar prosecution of their claims.

4           Now, Mr. Esserman and Mr. Weintraub will talk

5    about something other than the presale plaintiffs and

6    especially those involved in the economic loss scenario.

7    Even those plaintiffs involved in the economic loss scenario

8    do have direct claims against New GM that, I respectfully

9    submit, were not intended to be and could not have been in

10    effect precluded by virtue of the sale order. This is an

11    effort by New GM to get a get out of jail free card. There

12    were direct obligations.

13           THE COURT:  Well, forgive me Mr. Weisfelner, but

14    aren't both sides looking for a get out of jail free card?

15    You're looking for a get of jail free card on successful

16    liability provisions that were argued by different guys and

17    the GUC Trust says there are eight people in Mr.

18    Weintraub's. I don't know if it's that limited or not. But

19    all of the other people who were in car wrecks have

20    prepetition claims and the folks in Mr. Weintraub's group

21    who are asserting the same prepetition claims are saying

22    that they get a get of jail free card from a ruling that I

23    issued on exactly the same arguments were made back in 2009.

24    That's (indiscernible) and (indiscernible) Philadelphia

25    (indiscernible) and a bunch of others.

1             MR. WEISFELNER:  And --

2             THE COURT:  So let's try to be fully attentive to

3     the fact that it may be both sides in this case that are

4     overreaching.

5             MR. WEISFELNER:  Well, your Honor, let me try my

6     best to address that because I understand your Honor's issue

7     with regard to the arguments that were made on successor

8     liability and, your Honor, all I'm suggesting is that were

9     your Honor to determine that the 2009 order does not bar

10    these plaintiffs from pursuing claims in courts of competent

11    jurisdiction on whatever theory they may ultimately espouse

12    it will be up to Judge Furman to decide whether or not

13    successor liability standards are met.

14            For all of the reasons Mr. Steinberg indicated, he

15    may very well conclude that the plaintiffs don't meet or

16    exceed the threshold pleading standards on successor

17    liability. I think they do. But beyond successor liability

18    theories, the plaintiffs in the presale cases have

19    recognizable claims that run directly against New GM.

20            Let's not forget, and this sort of goes back to my

21    thesis that you can't do a do over, for five years following

22    the sale, New GM failed to disclose what it knew, what it's

23    charged by law of knowing and that is that the ignition

24    switch defect in the presale cars was dangerous. That

25    failure to disclose is separately and independently

1    actionable and your Honor's sale order could not have,

2    should not have, and in our view did not as a matter of law

3    extend to provide New GM with a cleansing of liability for

4    whatever theory the plaintiffs may be able to assert that a

5    court of competent jurisdiction will ultimately determine is

6    valid or invalid.

7         And it's not just successor liability type claims

8    that the pre-sale plaintiffs would rely on. But because

9    there was a due process violation here the only effective

10   remedy, the only remedy that the case law tells us is

11   applicable, is that the order can't be enforced against

12   them. And the notion that we'd have to prove that we would

13   have a different result is first of all, not what the case

14   law provides. It's not what Fuentes provides and it's not

15   what the other cases we cited in our brief provides. There's

16   no such thing as a no harm no foul due process violation.

17        Beyond that, and the cases are legion that talk

18   about the impropriety of using hindsight or speculation to

19   determine what would have happened had we rolled back the

20   clock. What would have happened had treasury determined that

21   there was a five-year long cover up of a dangerous situation

22   involving a line of cars that had caused fatalities, that

23   have caused serious injuries, and I know your Honor doesn't

24   like to hear it, but it had an individual convicted of

25   manslaughter for killing her fiancé and other egregious

1    situations, had treasury that that was the fact and had

2    treasury been aware that the cover up would go on for

3    another five years, do I know whether or not playing chicken

4    with treasury at that point to get him to change their line

5    in the sand on what was commercially necessary for New GM to

6    survive, what sort of public firestorm, congressional

7    inquiries, attorney general investigations would we all have

8    been treated to in 2009 that we were treated to in 2014 that

9    may have impacted whether or not treasury, who again is a

10   functionality of taxpayer base and its taxpayers implicated

11   and affected by this cover up, what they would've done to

12   preserve GM and to avoid a liquidation.

13           It's just as reasonable to expect that they would

14   have changed the line in the sand they drew to include the

15   claims and only those claims that were impacted by the five

16   year known ignition switch defect safety defect that was

17   undisclosed by GM in violation of their obligations under

18   federal law.

19           I don't know what would have happened had those

20   facts been raised. With all due respect, I don't know what

21   your Honor knows for a fact what would have happened. That's

22   why the case that tells us don't speculate. Don't take a

23   hindsight view. It's enough if due process was violated.

24   We're not going to go through the process of attempting to

25   do a do over, especially in this case because I think a do

1    over would require us to in effect go back to the future

2    again to figure out whether or not they'd be entitled to a

3    363(m) order if we know in advance they're going to maintain

4    the cover up for another five years.

5            Your Honor again, I don't need to remind your

6    Honor what the briefs say on whether a creditor who is

7    notified of the bankruptcy or is aware of the bankruptcy is

8    in the same position with regard to their claim if they're

9    never told about the claim as a creditor who has notice of

10   the claim, but not of the bankruptcy. That's Waterman,

11   that's Tillman and they haven't told you any cases that

12   stand for any different proposition.

13           Again, as the Second Circuit in Chateaugay

14   teaches, to expect claims to be filed by those who have not

15   yet had any contact whatsoever, what the tort fees are, has

16   been characterized as absurd. Mr. Steinberg argued that

17   well, but you did have contact with GM -- you bought the

18   car. Well, but no one told me that the car I bought had a

19   hidden, known but undisclosed safety defect so how did I

20   know I was supposed to file a claim?

21           And your Honor, I will tell you that I don't think

22   it's necessary to spend a lot of time on the contention

23   asserted by GM that somehow 363 sales provide some sort of

24   due process exception. A proposition of claims is supported

25   by the Edwards case. I think Mr. Steinberg made reference to

1   Edwards by my count seven times during his oral argument out

2   of the Seventh Circuit and his brief they also cite to the

3   Paris case out of the District Court of I think it was

4   Maine.

5           Well, your Honor, obviously neither Edwards nor

6   Paris is controlling. Both have been criticized if not

7   overruled in the case of Paris, and Edwards was criticized

8   in a number of cases including Excel Concrete, Savage

9   Industries and the Second Circuit has only recently

10   reconfirmed the applicability of due process concerns in

11   bankruptcy proceedings in the Colt case.

12           And your Honor, our brief had a laundry list of

13   due process cases in the 363 context, five of which your

14   Honor pointed out. But in addition to those five, you have

15   National Type, Folger, Excel, Savage Industry, Reiner in

16   addition to the Metzger case that your Honor pointed out,

17   Compak and the others. There's also Schwinn Cycling and

18   Ninth Avenue v. Remedial Group -- all of which stand for the

19   proposition that due process pertains in a 363 sale

20   notwithstanding the need for finality, notwithstanding the

21   circumstances that generally surround the 363 sale. And of

22   course, your Honor, you then have Grumman. And lest there be

23   any confusion, we collectively represent not only plaintiffs

24   in the presale complaint, but plaintiffs in the post-sale

25   complaint and the point that was made in our papers and in

1   particular in the GUC Trust papers that at least as to

2   people that didn't buy a car until after the 2009 order was

3   entered, no way to give those people notice. They weren't

4   contingent creditors. They were the future creditors that

5   Grumman spoke to and they couldn't have gotten adequate

6   notice and as a consequence as a matter of due process the

7   2009 were cannot be read against them.

8        What remedies they may ultimately have for the

9   injuries they complain of will be determined by a court of

10  competent jurisdiction. And, your Honor, you did cite the

11  Lane Hollow in your opening questions. We think Lane Hollow

12  and Fuentes are the cases on you don't look for prejudice.

13  There's a, in effect to ask a question about whether or not

14  in that particular case due process would have led to a

15  different result is not the issue that we're supposed to be

16  focusing on. We're supposed to avoid hindsight and pure

17  speculation.

18       Your Honor, as I think about it the prejudice, if

19  one wants to focus on it, in this particular case is very

20  acute. Not only didn't we have the opportunity in effect to

21  convince treasury that under the egregious and special

22  circumstances of this case their line should have been

23  moved, but so much has been written about and so much talked

24  about cases in 363 where listen, understand that what we're

25  doing is we're converting your claims against the debtor

1    into a pot of proceeds that came to use from the sale and

2    when you think about it, if your claims get to attach to the

3    proceeds and otherwise in the absence of the sale there

4    would have been a liquidation and proceeds to realize, how

5    you really prejudice.

6              Well, the amazing thing about this case that no

7    one seems to focus on, or at least New GM doesn't in its

8    papers, is the bar date followed the sale by a period of

9    time. By the time the bar date showed up no one at Old GM

10   and nobody at New GM who is now in possession of all of the

11   books and records, the same books and records that is the

12   matter of federal law, mandated the conclusion that they

13   knew there was a safety defect with regard to the ignition

14   switch defect, told any of the plaintiffs listen, now we're

15   down to the bar date, this is real serious stuff. 363 we

16   could, your Honor, not pay that much attention to because

17   there are exigencies and we've got melting ice cubes and

18   we've got to sell fast, but here's the bar date. So now

19   we're really going to make sure that you know about your

20   claims so that you have the right to attach yourself to the

21   proceeds. That didn't happen in this case, judge. And if

22   we're going to do a do over, I would assume part of the do

23   over is we get a record that would make sure that claimants

24   knew the nature of the defect, knew what their claims were,

25   had an opportunity to assert a claim.

1          The barn door has been open for an awfully long

2     time. The amount of value in the GUC Trust has been

3     substantially dissipated. Our opportunity to get back into

4     the fold and realize the same pro rata distribution as other

5     affected general unsecured creditors doesn't exist through

6     no fault of our own.

7          THE COURT:  Well, when you say no fault of your

8     own, this is a good time for you to answer the question I

9     asked at the outset which is that when Ms. Rubin and her

10    clients made it pretty clear that there was going to be an

11    upcoming distribution you didn't act.

12          First of all, I assume that you're not disclaiming

13    notice or of the fact that there's court where you could

14    have made an application to me to block that distribution

15    and most likely gotten it in a heartbeat.

16          MR. WEISFELNER: And most likely have --

17          THE COURT:  Got me to tell Ms. Rubin to wait

18    before making further distributions in a heartbeat.

19          MR. WEISFELNER:  It wasn't an easy decision and

20    not one that was decided by me or my office. In point of

21    fact the fact of the impending distribution was first

22    brought to us, if I recall, by New GM's counsel and New GM's

23    counsel suggested that we may want to seek to hold up that

24    distribution and our reaction was well don't you have an

25    obligation as well since you're saying that the remedy that

1    the Court ought to fashion is against New GUC Trust, why

2    isn't it your obligation to seek the Court's intervention to

3    hold it up and in fact there was correspondence that was

4    crafted and sent to Ms. Rubin and her clients which

5    suggested that it would be inappropriate for her to make

6    that distribution.

7              And, your Honor, there was a consideration of what

8    the standards were for injunctive relief and I appreciate

9    after-the-fact your Honor telling us that we would got it in

10   a heartbeat, but there was concern about the cost and

11   expense associated with meeting the preliminary injunction

12   standards.

13             Now, I will also tell your Honor, lest you

14   continue to look at me like I have two heads, yes there was

15   a strategic element to the decision that was taken on our

16   side. That's my point of view. It's kind of disingenuous,

17   one would have argued within the confines of the attorney

18   client privilege, but you can assume that the argument went

19   something like we're taking the position that we're not

20   required, to pursue to the exclusion of every other remedy,

21   our claims against the GUC Trust. So now to prevent the GUC

22   Trust to making what amounts to a diminimous distribution in

23   light of the totality of the consideration that they ever

24   had and we had a very short window of time after they told

25   us that they weren't going to voluntarily stop, yes your

1    Honor, the decision was made not to pursue it.

2            THE COURT:  You're not seriously suggesting to me

3    that in your fairly illustrious career you've never been

4    able to get out a TRO request in this kind of time.

5            MR. WEISFELNER:  Your Honor, again, it wasn't a

6    function of whether we could get out a TRO request, it was a

7    function of whether or not we'd prevail. And, your Honor

8    again, hindsight is 20/20 and there were many people on our

9    side of the table that thought that a TRO was appropriate.

10   There were people at New GM that at one point thought a TRO

11   was appropriate and for better or for worse for strategic

12   reasons or otherwise the fact of the matter is that we did

13   not attempt to prevent the GUC Trust from making a

14   distribution.

15           That doesn't change the fact that by the time of

16   the recalls, by the time the plaintiffs got organized and

17   began their litigation, by the time we were retained in this

18   case, a substantial majority of the funds originally in the

19   GUC Trust had been dispersed to GUC Trust beneficiaries and

20   it would have been impossible or very close to impossible to

21   put the ignition switch defect plaintiffs back in the same

22   position they would have been in had they been given enough

23   information to file a claim before the bar date.

24           And, your Honor, all of that says nothing about

25   the contention, with which we disagree, that the GUC Trust

1    has raised with regard to equitable movements. Your Honor,

2    again, we are not seeking a reversal or a modification of

3    your Honor's order or the 363(m) finding, although once

4    again if we were doing a do over and we were to know in 2009

5    everything we know today, I don't know how you'd take into

6    account the fact that New GM would for a period of another

7    five years fail to disclose what by law it was charged with

8    knowing constructively or actually about the ignition switch

9    defect and how that may have impacted your Honor's

10   determination.

11          The lack of notice and an opportunity to be heard

12   is what makes the plaintiffs not bound by the sale order and

13   free to pursue their state law claims against New GM. Now, I

14   also have to point out that the claims regarding cars

15   manufactured and sold by new GM, I think new GM concedes are

16   not subject to this sale order, and claims regarding cars --

17          THE COURT:  Say that slower, because it's a matter

18   of considerable importance.

19          MR. WEISFELNER:  All right.

20          THE COURT:  Which claims are not subject to the

21   sale order?

22          MR. WEISFELNER:  Claims regarding cars that were

23   manufactured and sold by new GM.

24          THE COURT:  Oh.  I think that's right.  Mr.

25   Steinberg can confirm that, but I thought that has never

1    been an issue.

2             MR. WEISFELNER:  Well, I think I heard him say

3    that, to the extent that new GM sold a car, but it contained

4    a part designed or manufactured by old GM --

5             THE COURT:  That's a different issue because the

6    order said cars or parts, and that is what I was asking both

7    sides to focus on.

8             MR. WEISFELNER:  Yeah, and again, Your Honor,

9    again, by way of demonstration of prejudice, I think, that

10   had the Plaintiffs known about the ignition switch defect,

11   known it had been around for five years, known that it was a

12   safety defect, known that it caused airbag non-deployment,

13   known that the part may be continued to be installed in cars

14   that were going to be sold by new GM, we would have pressed

15   for an appropriate carve out in the sale order to insure

16   that a known safety defect not be replicated and continue to

17   be incorporated into cars that are about to be sold.  Using

18   a switch with a known safety defect was new GM's choice, and

19   new GM bears liability for that decision.

20            THE COURT:  To what extent to I have evidence in

21   record telling me the extent to which old GM ignition

22   switches were stuck in new GM cars, or installed in new GM

23   cars?  That was one of the things I was trying to grope at

24   in my earlier questions.

25            MR. WEISFELNER:  Your Honor, to be frank with you,

1    I don't know what the record is about new GM cars that had

2    old GM ignition switches, which is either purposefully or

3    accidentally installed in them.  They were switched out at a

4    third-party repair place.  And frankly, I would think that

5    that sort of inquiry, that kind of discovery, would take

6    place at the MDL and would ultimately be determined as a

7    matter of fact by Judge Furman.  But sitting here today, I'm

8    afraid I can't tell you because I don't know any part of the

9    record that tells us how many new GM vehicles had old GM

10   parts.  The other point to make, I think, Your Honor, is

11   that these Plaintiffs hold the claims under state --

12            THE COURT:  Which Plaintiffs?

13            MR. WEISFELNER:  Primarily, the Plaintiffs in the

14   post-sale complaint, hold claims under state consumer

15   protection laws, arising out of new GM's failure to comply

16   with its obligations under the Safety Act.  Doesn't require

17   us to be private Attorney Generals under the Tread Act or

18   the Safety Act.  Rather, as is contended in the complaint,

19   and in some of the complaints filed, for example, in Arizona

20   and California by various Attorneys General, it is the

21   violation of Federal law, which is a predicate for the

22   contention that there has been a violation of State consumer

23   laws, and I don't think that new GM got, saw to get or, Your

24   Honor, intended to give them a pass on their post-sale

25   alleged violations of consumer protection laws in the

1        various states.

2               Your Honor, my bottom line point is, and I think,

3        again, this sort of gets down to a policy question, and Your

4        Honor, I agree that we need to be concerned about what gets

5        said and done about 363 sales, especially 363 sales that are

6        done in emergent situations, for Debtors that are on the

7        verge of dissolution in the absence of the only deal that's

8        being made available to them.  But I do think that this is a

9        very, very narrow carve out.  We are looking for a situation

10       where we have a Debtor, a car manufacturer, who knows and is

11       charged with constructive knowledge, that it has put into

12       the marketplace, and on the highways and byways of this

13       country, cars with a known safety defect.  And in that

14       context, in order to have the 363 sale happen, with parties

15       being able to protect their rights, they've got to give

16       adequate notice of the existence of the claims that arose as

17       a consequence of having sold those cars with a known safety

18       defect, and the failure to give that notice, whether it be

19       by publication or direct mail, is an unremedial violation of

20       due process.  The notion that you have to show prejudice,

21       it's not in the case law.  Talk about being bound by Second

22       Circuit authority, it's not in the Supreme Court authority.

23       You don't have to show prejudice.  The prejudice cases they

24       talk to you about are all cases that say, "You can glom onto

25       the proceeds of the sale."

1           That's chutzpah in this case, Judge, with all due

2    respect, because roll forward to the bar date.  These

3    Plaintiffs were in no better position to file a claim based

4    on what GM knew and failed to disclose.  So how can you say,

5    "No harm, no foul, you just attach to the proceeds" when I

6    couldn't attach to the proceeds because I didn't know I had

7    a claim.  And the same can be said, by the way, for the

8    discharge of the case, or the discharge of the company, when

9    the case confirmed.

10           THE COURT:  Well, time out.  I take it we agree

11    that there's no discharge in a liquidating 11.

12           MR. WEISFELNER:  We agree that there's no

13    discharge on a liquidating 11.

14           THE COURT:  So what discharge are you making

15    reference to?

16           MR. WEISFELNER:  Your Honor, I'm just talking

17    about from a policy perspective, to have a Debtor who sells

18    assets and continues on in business, not our -- not this

19    case.  So I won't focus on it.  I'll just focus on the fact

20    that the prejudice that befell our clients was multifold,

21    and can't be remedied.  First of all, to the extent that you

22    followed the cases, and I think you have to, that says that

23    a due process violation doesn't require a demonstration of

24    prejudice.  You don't have to show that you would have won.

25    Couple that with the fact that it's our position that, had

1    the firestorm that we saw happen in 2014, because of the 12-

2    year non-disclosure of the safety defect, been on the record

3    as of the time of the sale hearing, I believe it's just as

4    reasonable to suspect that the line drawn in the sand by the

5    Treasury would have changed.  And the last form of

6    prejudice, I think, that we can't overlook is the fact that,

7    come the bar date, new GM or old GM continued to fail to

8    give us any indication that we had claims based on a known

9    safety defect that existed in all of the cars, that they

10   refused to give anybody notice of, and they were charged

11   with knowing it as a matter of law.  Your Honor, I want to

12   reserve enough time for both rebuttal and for my co-counsel.

13              THE COURT:  Well, let me hear from Mr. Esserman

14   and Mr. Weintraub next.

15              MR. WEINTRAUB:  Good morning, Your Honor.  Between

16   Your Honor's questions and Mr. Weisfelner's presentation,

17   I've been taken way off of my outline, so I'm going to try

18   to address some of the things that Mr. Weisfelner --

19              THE COURT:  All right, let me interrupt you for a

20   second --

21              MR. WEINTRAUB:  Sure.

22              THE COURT:  -- Mr. Weintraub, and to help guide

23   you. I would like you to help me understand what are the

24   things you're talking about, also what categories they're

25   in.  Are they people who never got to get any kind of claims

1    in against old GM, or were they those, like, a separate

2    pleading that I got after most of all of the briefing was

3    done, are looking for the opportunity to re-negotiate

4    settlements because their cases may have been stronger than

5    they thought they were, or are they in some further

6    category?  I think you're ahead, subject to Ms. Rubin's

7    ability to be heard on the fact that you might be entitled

8    to some kind of (indiscernible) style relief, and the

9    opportunity to file claims if you didn't get to do that, but

10   you're still behind on your ability to go after new GM

11   because other people very similarly situated made these same

12   arguments you're making about successor liability and they

13   lost.  So, argue accordingly.

14          MR. WEINTRAUB:  Sure.  Well, let me start with

15   what I think was the first question, Your Honor.  We think

16   the number is at least 150 people.  I don't know where they

17   four or eight people came from.  One of the actions filed in

18   front of Judge Furman is an action that was filed by Robert

19   Hilliard that covers 140 people and that's just --

20          THE COURT:  Okay.  And those are 140 people joined

21   rather than a class action?

22          MR. WEINTRAUB:  I think that was filed as a class

23   action, actually, Your Honor.

24          THE COURT:  Okay, a class action to get into

25   adjudication on the common issues, and then to deal with

1    their individual specific ones thereafter?

2          MR. WEINTRAUB:  That's what I think, Your Honor.

3    There's an exhibit to that complaint.  The complaint alleges

4    they're all pre-sale accident victims.  Some of them are

5    fatalities, some of them are injuries, all of them, as I

6    said, occurred before the sale hearing.

7          THE COURT:  And pause once again, my apologies.

8          MR. WEINTRAUB:  I'm sorry?

9          THE COURT:  I assume that under Reading Vs. Brown,

10   a narrow subset of your group, if any are in that category,

11   if they were hurt after the filing on June 1st, 2009, but

12   before the sale, they'd have admin claims against old GM,

13   but they'd still be claims against old GM.

14         MR. WEINTRAUB:  Your Honor, our position is that

15   we don't think we should be barred by the successful

16   liability shield, with respect to the legal point you're

17   making, that may be correct.  I don't represent any of those

18   parties, so I don't have the particulars of those cases to

19   know whether or not anybody fell within that, that --

20         THE COURT:  That window, so to speak.

21         MR. WEINTRAUB:  Right.  But, Your Honor, with

22   respect to what Mr. -- if I'm pronouncing his name

23   incorrectly, I apologize - Jakubowski argued, Mr. Jakubowski

24   argued lack of subject matter jurisdiction, and he argued

25   that, as an academic issue, not as a -- based upon what was

1     actually going on, or the undisclosed issues in the case.

2     So what Mr. Jakubowski was arguing was, this Court did not

3     have subject matter jurisdiction.  You had ruled, in your

4     sale order, that you did have subject matter jurisdiction

5     because you could sell free and clear of in personam claims

6     under Section 363(f), you relied on Chrysler, which in turn

7     relied on TWA, and the District Court on appeal, even though

8     that appeal was dismissed as being moot because Mr.

9     Jakubowski did not try to get a stay pending appeal, did go

10    to the merits and say, "We've looked at this issue, and we

11    think that there was subject matter jurisdiction."  We are

12    not questioning subject matter jurisdiction.  That ship has

13    sailed.

14          Our issue is completely and solely the due process

15    issue of whether or not we should be bound by the successor

16    liability shield, and the reason that we don't think we

17    should be bound by the successor liability shield is because

18    we were unaware of the ignition switch defect that had a

19    seven-year history within old General Motors.  And I won't

20    repeat everything that Mr. Weisfelner said, but there are

21    internal reports, there was as we noted in our brief, the

22    Wisconsin State Trooper report which actually figured out

23    the connection between the airbags not deploying and the low

24    torque in the ignition switch, and that was all in old GM's

25    files.  We think that everyone who had that -- the affected

1    vehicle, had an ignition switch defect, because that defect

2    was in the DNA of every one of those manufactured vehicles.

3            So, as Mr. Weisfelner said, you've got this group

4    of potential Plaintiffs that all had that ignition switch

5    defect, and they all had a right to have that car repaired.

6    We're in a special subgroup of that.  Not only did we have

7    that defect, but that defect manifested itself in the form

8    of an accident.  And clearly, because we had an accident, we

9    were aware that we had a claim.  What we were not aware of,

10   Your Honor, was that causation was due to the ignition

11   switch defect, that the ignition switch defect was the fault

12   of General Motors.  Causation and fault --

13           THE COURT:  Pause, please.  In substance, you're

14   saying you knew you had a claim, but you didn't know how

15   strong your claim was.

16           MR. WEINTRAUB:  I knew -- let me amend that.  I

17   knew I had an accident.  I didn't know why I had it.  It

18   could have been my fault, it could have been an act of God.

19   What GM knew, what we contend GM knew, was it was the result

20   of the ignition switch defect, which it knew was in the

21   vehicle, and which it knew was in the vehicle before I had

22   the accident.  Not only did they not tell me about the

23   ignition switch defect before I had the accident, they

24   didn't tell me about that defect after I had the accident.

25   Had I known about that ignition switch defect, that sale

 1   hearing would have been a very different hearing, and as Mr.

 2   Weisfelner said, you can't get in your time machine and see

 3   what would have happened and that's why the Court shouldn't

 4   speculate.

 5          We had a different analogy in our complaint, and

 6   we said imagine the firestorm that would have occurred had a

 7   whistleblower on the eve of the sale hearing come forth with

 8   all of the information in the DeLuca report.  And that's why

 9   we contend that it's unknowable what would have happened at

10   the sale hearing, it's unknowable what the Federal

11   government would have done.  Would the Federal government

12   have continued to try to ram through a sale free and clear

13   of successor liability, knowing that this ignition switch

14   defect had been withheld from the public and from vehicle

15   owners for seven years?  That's speculative, but I think we

16   should get the benefit of the doubt on that, and the

17   inference on that.

18          Why?  It's very clear, Your Honor, that any sale,

19   notices are a very important issue for the due process

20   reasons.  Notice was that, the timing of the sale, the form

21   of the sale motion, the form and content of the notice, were

22   all controlled by both new GM and old GM.  This case

23   wouldn't have filed when it filed unless the government

24   said, "We're ready to file."  This sale motion was set on

25   the government's timetable.  In any sale, notice is

1    important, not just to the seller because the seller has the

2    information, but because the notice is critical to the

3    buyer.  It's the buyer that wants to bind people with the

4    results of the sale hearings, and either new GM or Treasury

5    or whoever was lackadaisical, lazy, negligent or didn't

6    care, but they should have been, just like any other

7    commercial buyer is, in any other sale that I've ever been

8    involved in, very involved in making sure that that form of

9    notice and the scope of the notice is adequate.

10           What should have the notice said here?  The notice

11   should have said, there's an ignition switch defect in these

12   vehicles.  This ignition switch defect causes unexpected

13   stalling, which would result in loss of power to the

14   steering, loss of power brakes and the inability of the

15   airbags to deploy.  With that information, people would have

16   been able to come to Court and make an effective argument

17   against successor liability.  What kind of arguments would

18   people have made against successor liability?  Clearly,

19   unclean hands would have been an issue.  Clearly, whether or

20   not it would be equitable to sell free and clear of

21   successor liability claims in circumstances like this one,

22   where the buyer had -- I'm sorry, the seller had withheld

23   the information for seven years before the sale.  This would

24   have been a maelstrom of a hearing, even much more

25   contentious than the hearing that we actually had.  And by

1     saying that new GM gets to hide behind the sale order, let's

2     think who was involved in putting together the notice in the

3     first place.  The notice was put together by old GM.  What

4     old GM knew was a nanosecond after the sale closed, it was

5     going to be come new GM.  It wanted nothing more than to

6     leave these liabilities behind, so it didn't disclose.  Not

7     only did it not disclose, it wasn't disclosed for another

8     five years after that.

9          So you would be rewarding the conduct of old GM as

10    it morphed into new GM by saying that new GM is not subject

11    to these successor liability claims.  You've got the very

12    same people that populated old GM and were investigating the

13    ignition switch defect, are now populating new GM.  It's

14    efficient to say that they're separate companies and that

15    there's no connection between old and new GM.  There's a

16    very close connection between old and new GM, and to reward

17    new GM, which is just old GM in a new bottle, for the lack

18    of disclosure, would be inappropriate, in our view.  Which

19    again, is one of the reasons why, if you're going to go and

20    look at prejudice, which, as Mr. Weisfelner says, and we

21    agree, is not something that the Court weighs when you're

22    looking at a due process violation, I think the due process

23    violation is just being deprived of the opportunity to be

24    heard in a meaningful way when it matters.  That was the

25    violation.  Not that we would have won anyway or we would

1    have lost anyway.  We were deprived of the opportunity to

2    make our best arguments when they really mattered.  But the

3    reason that it's not prejudicial to new GM is, like I said,

4    new GM could have been more involved in the notice and it

5    wasn't, and new GM is populated by the same people as old

6    GM.  So, when you weigh the equities here, we think the

7    equities weigh in our favor.  In terms of the Manville

8    remedy, this is not a Rule 60(b) proceeding.  My clients

9    didn't make a motion.  I didn't file a motion.  Mr.

10   Weisfelner didn't file a motion.  GM filed a motion to

11   enforce --

12            THE COURT:  Yeah, pause, please, Mr. Weintraub.

13   If we were looking only at the face of the order that Mr. --

14            MR. WEINTRAUB:  Steinberg?

15            THE COURT:  No -- but I was thinking of somebody

16   else, but it is Mr. Steinberg.

17            MR. WEINTRAUB:  That's (indiscernible), Your

18   Honor.

19            THE COURT:  But Mr. Steinberg is trying to

20   enforce.  Mr. Steinberg wins.  Your point and Mr.

21   Weisfelner's point, and I suspect it will be Mr. Esserman's

22   point, is that I can't limit the analysis to what the sale

23   order says, that it may be the start, but it's not the end

24   of the discussion.  So then, I have to see, at least focus

25   on the extent to which Mr. Steinberg should lose not the

1    standing -- what his sale order says, and then the issue is,

2    not so much a matter of constitutional law, but Federal

3    civil procedure and its bankruptcy procedure counterpart, as

4    to whether the second phase of that enquiry, blowing away

5    the order, requires attention to 60(b), and its bankruptcy

6    cousin, 9024.  So, I'm not persuaded that your failure to

7    invoke 60(b), or Mr. Weisfelner's or Mr. Esserman's, is

8    conclusive.  What Mr. Steinberg is saying in substance is,

9    "Hey, you guys, once you're asking me to look at the pha --

10   asking the Judge to look at the phase II part of the

11   inquiry, you've got to turn to 60(b) doctrine."  Help me

12   with that.

13            MR. WEINTRAUB:  Sure.  Let me start with the first

14   thing you said, which, if you apply the terms of the sale

15   order, we lose.  The sale order was based on an incomplete,

16   deficient record.  You can't look at the sale order, you

17   can't look at the findings that were made in July of 2009

18   and ignore what was going on and not disclosed to the Court

19   from 2002 to 2009.  You just can't.  The DeLuca report tells

20   you that there was a whole lot of stuff that you didn't

21   know, that may have changed your mind in July of 2009.  So,

22   saying that the order should be applied in accordance with

23   its terms without regard to all of the undisclosed

24   information really, to me, Your Honor, doesn't make sense

25   and it's not equitable.  And in terms of Rule 60(b), we are

1    not required to pursue a particular remedy.  The remedy that

2    we have pursued is the remedy that the Second Circuit has

3    given to us in Manville, and the remedy in Manville, didn't

4    require Rule 60(b).  It didn't require a Rule 60(b)

5    analysis, it didn't require a showing of prejudice.  It just

6    said, "If you didn't get constitutionally sufficient notice

7    of the order.  You're not bound by the order."

8              THE COURT:  Well, let's talk about that --

9              MR. WEINTRAUB:  If I could just --

10             THE COURT:  Pause for a second.  It didn't say

11   whether or not you had prejudice, but Chubb in that

12   situation was plainly prejudiced.  That was a no-brainer,

13   wasn't it?

14             MR. WEINTRAUB:  And Your Honor, I know you're

15   going to disagree with me, I was plainly prejudiced too,

16   because but for that successor liability shield, I had a

17   successor liability claim that I could have asserted against

18   new GM.  Maybe I would win, maybe I would lose.  Mr.

19   Steinberg says there is no merit to those claims because

20   he's focusing on mere continuation.  There are other

21   theories of successor liability, including product line

22   cases which would apply to my clients because they were

23   injured, and there is a fraud exemption, and there are all

24   kinds of penumbras to fraud, and one of the penumbras may be

25   the non-disclosure of the ignition switch defect for seven

1    years, so it's putting the cart before the horse to say I'd

2    lose on successor liability.  My point is that I was never

3    given the chance to, number one, oppose the successor

4    liability shield at a time when my opposition would have

5    mattered, before the transaction closed, and I was -- and

6    because of the sale order, I am now precluded from ever

7    bringing that successor liability claim.  So what I lost, as

8    you said earlier, was a collateral source.  And we were

9    talking about the successor liability cases being -- and

10   Amaro in particular, which I can get to in a minute.  When

11   you were talking about Amaro, you said you disagreed with

12   the underlying premise that those claims belong to the

13   Debtor, and in fact, probably did belong to the individual

14   claimants.  When this sale closed, I would have had a

15   successor liability claim, but for that shield.  And another

16   important point, because this is kind of stream-of-

17   consciousness at this point, when you get to Section 363(m),

18   what Section 363(m) -- and I know this is not appeal, but

19   Mr. Steinberg argued the policy of 363(m).  When you get to

20   Section 363(m), Section 363(m) does not bar appeals.  What

21   Section 363(m) says is, reversal or modification on appeal

22   does not affect the validity of a sale.  What happened in

23   this sale was much more than the mere transfer of title.

24   This sale had another very shiny Christmas tree ornament

25   sitting on it, and that Christmas tree ornament was the

1    successor liability shield.  So, even if this was an appeal

2    and a Section 363(m) situation, I don't think anybody is

3    arguing that no matter what you throw into a sale order, it

4    can't be reversed on appeal.  The language of 363(m) itself

5    anticipates a reversal or modification on appeal, because it

6    says a reversal or modification on appeal does not upset the

7    validity of the sale.  So, my point is, Your Honor, that

8    there are lots of things that happen in a sale that are not

9    part of the transfer of title.  I don't disagree that it was

10   not a condition set up by the Treasury that it be free and -

11   - that the sale be free and clear of successor liability,

12   but you can't trump someone's due process rights by putting

13   conditions into a contract by making the agreement

14   convoluted, by saying that it's too expensive to give 70

15   million people first class mail notice.  From our

16   perspective, they could have done a lot of things to give us

17   notice.  Even though we were known Creditors and entitled to

18   first class mail notice, publication notice, which

19   identified the nature of the defect and the effect of the

20   successor liability shield on injured people would have been

21   sufficient, we think, and that's the difference between what

22   happened in the Waterman case, because in Waterman, what the

23   Court held was that people who had not yet exhibited

24   symptoms could not be bound by a sale -- published sale

25   notice that didn't even mention asbestos.  What this Court

 1   did in Chemtura in order to bind people who had not yet

 2   developed symptoms but had been exposed to the chemical was,

 3   this Court required very targeted notice that was explicit -

 4   -

 5           THE COURT:  Yeah, but as you know, when you're

 6   talking about this Court, Mr. Weintraub, that wasn't just

 7   the Southern District of New York, that was Gerber.

 8           MR. WEINTRAUB:  Well, that's what I meant by this

 9   Court, Your Honor.

10           THE COURT:  And if a Judge tries to implement what

11   some, in other environs, call best practices, that doesn't

12   necessarily provide the yardstick by which constitutional

13   due process is measured.

14           MR. WEINTRAUB:  Your Honor --

15           THE COURT:  Now, Chemtura was a reorganized Debtor

16   case and was also an objection to claim case, and I wonder,

17   for those reasons, whether what I thought was a good idea in

18   Chemtura, and I later learned that my good idea was good

19   enough to measure what was satisfactory due process provides

20   the yard stick.

21           MR. WEINTRAUB:  So did Judge Furman, Your Honor.

22           THE COURT:  I'm sorry?

23           MR. WEINTRAUB:  So did Judge Furman.

24           THE COURT:  Yeah, I think he was the guy who

25   referred me on it.

1         MR. WEINTRAUB:  He did.  He liked what you did.

2         THE COURT:  Okay.  But how much does that help us

3    here?

4         MR. WEINTRAUB:  I think it helps us here, Your

5    Honor, because it informs a kind of notice that we think

6    should have been given, either by first class mail or by

7    publication notice, and you know, we're knocking ourselves

8    out with hypotheticals.  Let me give you a hypothetical.

9    What if --

10        THE COURT:  Time out.  You can ask yourself the

11   hypothetical, but part of the rules that we go under is that

12   you can't give me a hypothetical.

13        MR. WEINTRAUB:  Okay.  I'll give myself a

14   hypothetical.

15        THE COURT:  Okay.

16        MR. WEINTRAUB:  If I were the Judge in the General

17   Motors case and GM had filed a notice of sale with me, and a

18   motion to approve the form and content of notice and said,

19   "Oh, by the way, we've got this little ignition defect --

20   switch defect problem.  We've been working on it for seven

21   years.  30, 40 people have been killed, been a bunch of

22   accidents, we want to sell free and clear of that and we

23   want to bar successor liability claims.  We don't want to

24   say in our sale notice there's an ignition switch defect

25   that causes unexpected stalling and loss of power steering

 1   and power breaks and airbag disengagement.  That's just too

 2   much information.  You know, those four or five sentences,

 3   that could add maybe $1000 dollars to our mailing.  So Your

 4   Honor, Mr. Weintraub, Judge Weintraub, would you approve

 5   this form of notice as being good and sufficient, even

 6   though we don't mention the ignition switch defect?"  I

 7   don't think I would have done that, Your Honor.  But

 8   unfortunately, I think that's the equivalent of what

 9   happened here.  We think that's a violation of due process,

10   and we think it's unfair.  Can I address Amaro for a moment?

11             THE COURT:  Oh, sure.

12             MR. WEINTRAUB:  Unless you have other questions

13   for me.  I was thrown off by --

14             THE COURT:  No, that -- I -- I think, based on

15   what I said before, if we're talking about the same case,

16   you may be ahead on it, but if you want to talk about it, go

17   ahead.

18             MR. WEINTRAUB:  Well, the only point I want to

19   make on Amaro, because if I'm ahead, I should quit, but the

20   only point I want to make on Amaro is Amaro and the other

21   two cases cited in particular, I think it was the -- in the

22   Alper case, which was Judge Lifland and Judge Bernstein's

23   case, which was --

24             MAN:  Keene.

25             MR. WEINTRAUB:  Keene.  In all three of those

1    cases, the activity that was being complained of in Keene

2    and in Alper, was really inappropriate transactions between

3    corporate -- related corporate companies that related to

4    looting and in Amaro, it was a pre-bankruptcy sale that was

5    going to be challenged as a fraudulent transfer for

6    inadequate price.  All three of those Courts said, on the

7    filing date, those claims already existed, and therefore,

8    they became property of the Estate.  I don't agree that

9    those claims should have become property of the Estate, but

10   the rationale of those cases were, the cause of action

11   existed on the filing date, and therefore, they became

12   property of the Estate.  That's not what happened here, as

13   Mr. Steinberg pointed out, because the sale happened -- it

14   was a sale done by the Debtor in possession post-bankruptcy.

15   So, you don't have these claims ever becoming property of

16   the Estate.  The other very important point to make is,

17   Judge Bernstein was the Judge in Keene, and he was also the

18   Judge in Grumman/Olsen.  And in Grumman/Olsen --

19            THE COURT:  And in Burton.

20            MR. WEINTRAUB:  And in Burton, which Mr.

21   Weisfelner handled, ably so, I won't go back to that.  When

22   confronted with the successor liability issue in

23   Grumman/Olsen, Judge Bernstein did not say, "Oh, remember

24   what I did in the Keene case?  That was property of the

25   Estate, so that was released when I did the sale."  He

1    didn't do that.  What he did was the same analysis that Your

2    Honor did in this case.  He relied on Chrysler and he relied

3    on TWA, and said that these claims are in personam claims

4    and they can be solved free and clear of, in Section 363(f).

5    I know this Court is probably not going to go there, but

6    there's nothing in the record that said back in July of 2009

7    that there was a 9019 motion to settle a successful

8    liability claim.  That was not something that was stated on

9    the record, which would, of course, be another potential due

10   process violation if the result was going to be, "Oh, those

11   were released back in 2009 because they belong to the

12   Debtor."  Unless you've got questions for me, Your Honor, I

13   think I have about exhausted what was in my outline when I

14   left the house this morning.

15            THE COURT:  Okay, very good.  Mr. Esserman?

16            MR. WEINTRAUB:  Thank you.

17            MR. ESSERMAN:  Sandy Esserman.  Your Honor, I

18   realize that time is running short, so I'm just going to hit

19   a couple of hot points, if that's okay.

20            THE COURT:  Sure.

21            MR. ESSERMAN:  One thing that we have to be

22   cognizant of here is that we're not just looking at retained

23   liabilities versus assumed liabilities.  We also have to

24   remember that we're also talking about new liabilities, and

25   new liabilities of new GM, and why is that important?

1              THE COURT:  I understand instantly why that's

2     important.  I think it would be helpful if you would explain

3     to me what kinds of claims you think are in that category.

4              MR. ESSERMAN:  Well, we think a lot of the

5     complaints talk about new GM's liability as new GM, not as

6     an ignition switch.  Let me give you some examples and some

7     counts, and how the factual allegations are weaved into

8     those complaints, because the complaints definitely talk

9     about, in substantial portion, new GM's post-sale conduct.

10    That is, the claims that would arise, for which people could

11    not file proof of claim, for which they had no liability,

12    old GM may have no liability.  For instance there is a --

13    assertion of a violation of Deceptive Trade and Consumer

14    Protection statutes.  Some examples of the conduct forming

15    the basis of these claims include the fact that new GM

16    touted its commitment to safety, product quality, putting

17    customers first, purporting to be a company that was focused

18    on the consumer and pushing accountability deeper into the

19    organization.  The factual allegations go further that GM

20    knew about the defects plaguing the GM-branded vehicles.

21    They failed to take action, thereby causing consumers to

22    associate the GM brand with safety and reliability, and

23    causing Plaintiffs to overpay for or retain unsafe GM-

24    branded vehicles.  The relevation of new GM's extensive

25    deceptions tarnished the brand further.  There have been

1    complaints brought by the Orange County DA, the Arizona

2    Attorney General, which are a similar basis to these

3    complaints.  There's also complaints for fraudulent

4    concealment, which talks about independent, new GM violation

5    of its independent duties, not old GM.  Not those facts at

6    all.  They allege that new GM concealed and suppressed

7    material facts about the quality of its vehicle and the GM

8    brand.  The company's systematic devaluation of safety

9    issues, the ignition switch defect, many other defects

10   plaguing GM-branded vehicles.  The consolidated complaints

11   also allege that new GM's duty to disclose orders from new

12   GM's superior, if not exclusive knowledge of the many

13   serious defects, and that it valued cost-cutting over

14   safety, took steps to insure its employees did not reveal

15   known safety defects to regulators or customers, and it goes

16   on from there.

17           There's one other count to highlight, and that's

18   sort of the unjust enrichment claim, also all based on new

19   GM's conduct, not conduct that occurred in 2009, before the

20   sale order or whatever, and how new GM benefitted from its

21   failure to make timely disclosure of the initial switch

22   defect in old GM cars as it is required to do.  Plaintiffs

23   therefore overpaid, they suffered increased insurance

24   premiums, cost for alternative transportation, a few more

25   facts.  New GM benefit was unjustly retained in light of the

1    fact that new GM was only able to reap this through a

2    campaign of deception, et cetera, et cetera.  So, all of

3    this conduct occurred post-sale, and that is what is being

4    sought in the complaints, and that is what Your Honor is

5    sort of being asked --

6              THE COURT:  Occurred post-sale, but dealing with

7    the value of vehicles manufactured by old GM.

8              MR. ESSERMAN:  In part yes, in part no.  There's

9    some of the -- there is a portion of the complaint that

10   deals with new GM vehicles, so --

11             THE COURT:  Well, that, of course, is the much

12   easier part, Mr. Esserman.

13             MR. ESSERMAN:  Of course.

14             THE COURT:  Now, in the complaint, and I must say

15   that I've read everybody's briefs and cases more carefully

16   than I looked at that complaint.  Does it slice and dice?

17   Does it set forth in different claims which involve old GM

18   vehicles and which involve new, or is that a task that's

19   imposed on me or Judge Furman or somebody, once I lay out

20   the rules to try to figure out whether it's prescribed by

21   such portions of the sale order that I'm prepared to keep

22   enforcing?

23             MR. ESSERMAN:  I think it lays it out, and I think

24   you'll be able to imprint your order onto the complaint and

25   see.  Of course, we think all of it will survive, but if you

1       --

2              THE COURT:  Yeah, well, don't rule out the

3       possibility that any final opinion might not agree with both

4       sides in full.

5              MR. ESSERMAN:  Well, and I understand that.  You

6       know, which sort of also brings me to the order, and I know

7       what Your Honor -- well, I don't know anything, but what I

8       perceive is, to use Mr. Weintraub's analogy, if it was Judge

9       Esserman, I'd be struggling with how to reconcile some of

10      these provisions, how to reconcile the order, how to

11      reconcile the rights of people.  And one section of the

12      order that has been overlooked, and I'm just going to

13      suggest it's worth some thought anyway, is that in the sale

14      decision on page 17 --

15             THE COURT:  Of the slip opinion or -- but not in

16      the published opinion?

17             MR. ESSERMAN:  Yeah, it's --

18             THE COURT:  Well, I mean by published, I mean the

19      way it appears in the BR?

20             MR. ESSERMAN:  You know, I don't have the BR site

21      here.  It's the decision on Debtor's motion for approval of

22      its sale of assets to Vehicle Acquisition Holdings, LLC,

23      assumption and assignment of related executory contracts,

24      and entry into the UAW retiree settlement.

25             THE COURT:  Yeah, we're talking about the same

```
 1     opinion.

 2               MR. ESSERMAN:  Yeah, it's --

 3               THE COURT:  All I'm talking about is the way it

 4     appears on ECF, you're saying, rather than in the BR.

 5               MR. ESSERMAN:  Yes.

 6               THE COURT:  Okay.

 7               MR. ESSERMAN:  And these are the findings of fact

 8     in your decisions, which I'm going to quote to you, and

 9     they're adopted in the sale order, which, of course, takes

10     precedence, but there's one statement in there, and when

11     you're wrestling with this, you can wrestle with this, what

12     you meant by this, that "Old GM will retain all liabilities,

13     except those defined in the MPA as assumed liabilities."

14     The assumed liabilities, that is, what new GM's going to

15     take, include, and I'm quoting, "product liability claims

16     arising out of products delivered at, or after the sale

17     transaction closes, paren the closing, close paren, and two,

18     the warranty and recall obligations of both old GM and new

19     GM."  And I just sort of throw that out for something to be

20     massaged, I guess, but perhaps the sale order isn't all so

21     one-sided as new GM might have you believe, and perhaps it -

22     - I'm not sure what exactly was meant by that because there

23     are other, more specific issues dealing with those findings,

24     but that is a finding of this Court, which was adopted in

25     the sale order, which takes precedence.  So, there may be
```

1    some room in there to manipulate something, should Your

2    Honor decide to do so, on the basis of the order --

3             THE COURT:  Well, you don't exactly mean

4    manipulate it, as much as you mean, as to draw conclusions

5    from.

6             MR. ESSERMAN:  Exactly.  I withdraw that word.

7             THE COURT:  Okay.

8             MR. ESSERMAN:  And I probably already exceeded my

9    time, thank you.

10            THE COURT:  All right, thank you very much.  All

11   right, folks.  Can you get in and out?  Oh, Mr. Flaxer?

12            MR. FLAXER:  Hi, Judge.

13            THE COURT:  Okay, come on up, please.  I thought

14   your principal concern was on (indiscernible) on the Court,

15   though.

16            MR. FLAXER:  Yes, Your Honor, but your order

17   stated that that issue would not be addressed, which was

18   fine, but if we wanted to address, I would dispute it.  I

19   will dispute the --

20            THE COURT:  Okay, I'll just rely on your good

21   faith.  Go ahead.

22            MR. FLAXER:  Yes, Your Honor.  I just wanted to,

23   very briefly, focusing particularly on the remedy issues.

24   We continue to believe that some discovery, as highlighted

25   by our disputed facts and our prior pleadings before the

1   Court may still be appropriate.  We think that Your Honor's

2   determination on a remedy issue is inherently an equitable

3   decision.  We also think, in this respect, that it's likely

4   that discovery would reveal, and I'll mention two primary

5   factual areas: one is actual knowledge of the ignition

6   switch defect at very high levels of GM's management, the

7   other is that GM deceived NHTSA in connection with its

8   responses to the so-called "death inquiries".  We think that

9   if the Court had that factual record developed, as opposed

10  to, and what I still agree with designated counsel is a very

11  strong factual record based primarily on the DeLuca report,

12  but, as we've highlighted, the DeLuca report only goes so

13  far, and it seems to us, consciously avoids going after the

14  next level of senior level management knowledge.  We think

15  if you had those facts before you, it would weigh very

16  heavily in favor of granting a remedy sought by designated

17  counsel for reasons including deterrence of future

18  concealments in connection with 363 sales.

19          THE COURT:  And by that knowledge that you talked

20  about in the last sentence, you're talking about knowledge

21  by old GM management more senior than the 24 or 25 people

22  who were the subject of this (indiscernible)?

23          MR. FLAXER:  Yes, Your Honor.

24          THE COURT:  Okay.

25          MR. FLAXER:  For example, we think it's likely --

 1   we think it's very likely that the knowledge would go up to

 2   the level of general counsel of North America and perhaps

 3   higher, but you know, obviously that would take some

 4   discovery to establish that, and we understand the concern

 5   about delay, but in our estimation, in balancing the -- how

 6   crucial it is that the remedy sought by designated counsel

 7   be granted, that perhaps what Your Honor could do is rule in

 8   favor of our side of the table on the due process issue and

 9   authorize some discovery so Your Honor has a full, factual

10   record in order to make a fully informed decision, bearing

11   in mind that this is an equitable determination about

12   remedy, that Your Honor have a fully developed factual

13   record.

14           THE COURT:  All right, thank you.

15           MR. FLAXER:  Thank you, Your Honor.

16           THE COURT:  Okay.  By yelling out from the

17   audience, I guess, can you guys get back in an hour, or do

18   you need more time?

19           MAN:  An hour would work.

20           MAN 2:  An hour is fine with us, Your Honor.

21           THE COURT:  Okay, then I show five after one on my

22   watch, it's a minute or two after that on that big clock on

23   the wall, see you guys back here in an hour.

24           MR. STEINBERG:  Your Honor, I assume that when we

25   come back, it's the GUC Trust that will start?

Page 145

 1                THE COURT:  I assume you're going to reply next,

 2    or --

 3                MR. STEINBERG:  The GUC Trust hasn't spoken yet.

 4    I'm not --

 5                THE COURT:  Oh, yeah.  Is GUC Trust going to be --

 6    Ms. Rubin, are you going to be weighing in on what I've

 7    heard this morning?

 8                MS. RUBIN: I fully expect to, Your Honor.

 9                THE COURT:  Okay.  Then Ms. Rubin next, and then

10    you can reply after that, Mr. Steinberg.  Now, especially

11    with the extent to which I've interrupted you guys, I'm not

12    going to prevent you from arguing anything, even if it's

13    beyond the original time limits, assuming you're not

14    filibustering or otherwise taxing my patience, but we still

15    have to quit at 3:15 today.  If we're not done at that point

16    -- and of course, the resumption is going to be at 2:05, if

17    we're not done, then we're going to have to pick up tomorrow

18    morning.  We're in recess.

19                MR. STEINBERG:  Thanks.

20                (Court in recess at 1:05 PM)

21                THE CLERK:  All rise.

22                THE COURT:  Have seats, please.  Okay, are we up

23    to Ms. Rubin?

24                MS. RUBIN:  We are, Your Honor, and if I can help

25    it, I don't intend to take the full balance of my time

Page 146

1    today.

2              THE COURT:  Okay.

3              MS. RUBIN:  But I do want to address a number of

4    the issues that you talked about with others today, and hope

5    that I can address some of the questions that you posed to

6    all of us as a group, as well.

7              THE COURT:  Okay.

8              MS. RUBIN:  Your Honor, I want to start from the

9    proposition that you started from this morning, which is

10   that you have been convinced, or at least you assume, where

11   we are right now, that there was enough knowledge at old GM

12   to have warranted a recall in 2009, prior to the sale.  Your

13   Honor is clearly aware that the briefing that my client and

14   the participating unit holder submitted, took a different

15   tack, and the reason that we did that is because we wanted

16   to illustrate that even if everything that Mr. Steinberg and

17   his colleagues said was true, there was still a due process

18   violation here, or would be a due process violation here,

19   with respect to the groups of Plaintiffs that Mr.

20   Weisfelner, Mr. Esserman and Mr. Weintraub represent.

21              That having been said, let's start from the

22   proposition that Your Honor began with this morning and move

23   from there.  The first, and most important reason we believe

24   that that the Plaintiff should be able to proceed against

25   new GM is because, as Mr. Weisfelner and others capably told

1     you, they have independent claims in both the pre-sale and

2     the post-sale complaint against new GM, that are predicated

3     on conduct of new GM, and for some reason, in their reply,

4     new GM seems to suggest that that's not true of the pre-sale

5     complaint, and I just want to illustrate one example of why

6     that is, in fact, the case.  In paragraphs 1063 to 1079 of

7     the pre-sale complaint, the pre-sale Plaintiffs make a claim

8     under California's Unfair Competition law, and that claim is

9     predicated, in part but not in full, on the violation of GM,

10    sorry, new GM, on their violation to comply with the Safety

11    Act, and Your Honor, I want to underscore that that was a

12    knowing violation, by consenting to the order with NITSA.

13    What new GM essentially acknowledged is that they didn't

14    comply with that law, they did not provide NITSA with

15    knowledge within five days of determining there needed to be

16    a recall.

17            And from what I understand, Mr. Weisfelner's

18    clients' claim, for violation of the Unfair Competition law,

19    could be predicated on that in and of itself alone.  Now,

20    there's another reason that these claims -- we discussed

21    whether or not these independent claims against new GM are

22    subject to the sale order, and Mr. Esserman pointed out to

23    you this morning a reason why they are not, based on the

24    findings of fact in the sale decision, and their

25    incorporation in full into the sale order.

```
 1            Let me suggest to you another reason why, that I
 2    think has eluded our discussion so far, and I'll refer Your
 3    Honor to Section 2.3(b) of the Master Sale and Purchase
 4    Agreement.  That is the definition of retained liabilities,
 5    and I'll just read it, in part.  The definition of retained
 6    liabilities starts with, "each seller acknowledges and
 7    agrees that, pursuant to the terms and provisions of this
 8    agreement, Purchaser shall not assume or become liable to
 9    pay, perform or discharge, any liability of any Seller," and
10    let me pause there, Your Honor, because when we're talking
11    about retained liabilities, it pertains to the liability of
12    a Seller.  Now, Mr. Steinberg wants to suggest that any
13    liabilities that have to do with private rights of action
14    for failures, for example, to comply with recall
15    obligations, are not assumed liabilities, and therefore, by
16    definition, must be retained.  Respectfully, I'll disagree,
17    and agree with the Plaintiffs that it's not a binary
18    universe of assumed, retained and nothing else.  New GM
19    covenanted, under Section 6.15(a), that it would comply with
20    all of the Federal recall-related laws and regulations
21    applicable to old GM-manufactured, designed or sold
22    vehicles.
23            THE COURT:  That's in the sale agreement?
24            MS. RUBIN:  That is in the sale agreement, Your
25    Honor.
```

1              THE COURT:  What section is that, by the way?

2              MS. RUBIN:  It's 6.15(a) and it's addressed in our

3      briefing as well, Your Honor.

4              THE COURT:  I'm well aware of the point, I would

5      just -- wanted to see the citation, too.

6              MS. RUBIN:  So, Your Honor, it would be our

7      position that, having undertaken that covenant, that is the

8      independent duty that Mr. Steinberg insists that his client

9      does not have, irrespective of the wording of the sale

10     order, they agreed to comply with those recall laws in

11     respect of old vehicles.  Whether or not the sale order goes

12     beyond that in other respects, and maybe goes too far, is

13     another issue entirely, but at least in terms of the sale

14     agreement itself, the retained liabilities are liabilities

15     of any Seller.  I don't hear anybody suggesting, or they

16     shouldn't suggest, that old GM, or the old GM bankrupt

17     estate through the GUC Trust, should somehow be liable for

18     the knowingness conduct of new GM and its failure to

19     disclose to NITSA, disclose to the driving public, to

20     disclose to this Court, and to disclose to anyone at all,

21     that these cars were subject to a safety defect that rose to

22     the level that it warranted a recall.

23             The other thing that -- one other thing that we

24     would say, Your Honor, is, in terms of why the Plaintiff's

25     claims should be allowed to go forward, let me identify

1    another group of the Plaintiffs.  I believe Mr. Weisfelner

2    is the one who spoke to you at length about the used car

3    purchasers here, and whether or not their claims are subject

4    to the sale order.  It's hard for us to see, under the

5    Grumman case, which as Your Honor knows, interprets

6    Chateaugay, how the used car purchasers here could ever have

7    been subject to the sale order and injunction.  None of

8    those people had any pre-sale relationship or contact with

9    old GM.  Suddenly, they were not aware at the point in time

10   of their sale that their cars were subject to the serious

11   safety defect of which we're all now aware, and it's hard

12   for us to see how the analysis in the Grumman case is any

13   different than that which should be applied to used car

14   purchasers, who are a class of Plaintiffs implicated by the

15   post-sale consolidated complaint.

16          Now, there was some discussion this morning about

17   the Burton decision, which Your Honor referred to as the

18   Chrysler decision by Judge Bernstein, and to the extent that

19   Your Honor has questions about why these used car purchasers

20   in this situation should be treated any differently than the

21   Burton Plaintiffs, let me try to address that, if I may.

22          First and foremost, the Burton case involved a

23   recurring fuel spit-back problem that had already resulted

24   in two to three recalls prior to Plaintiffs bringing forth

25   claims in that instance.  Here, we have a warranty in the

1    sale agreement by old GM, that there had been no material

2    recalls since 2007.  We're not dealing with a factual

3    situation in which anybody who drove one of the vehicles,

4    we'll call them the subject vehicles, that are the subject

5    of this proceeding, nobody is suggesting that drivers should

6    have been on notice of the ignition switch defect by virtue

7    of anything that happened before, as was the case in Burton.

8           Now, new GM is very fond of quoting to Your Honor

9    a particular sentence from the Burton decision in which

10   Judge Bernstein, and I'm sure I'll mangle this somehow, says

11   that anyone who drives a car should reasonably contemplate

12   that their car will need to be repaired.  Again, the end of

13   that sentence, which new GM doesn't quote for you is,

14   "especially whereas here there have already been two to

15   three recalls involving the same problem, and involving some

16   of the same vehicles," but be that as it may, there's

17   another distinction here that I think is a more fundamental

18   and important one.

19          The claims at issue here are not fundamentally

20   about repairs.  The Burton case is one in which the

21   Plaintiffs, who characterized themselves as future claimants

22   and with which Judge Bernstein disagreed, their claims were

23   Duty to Warn claims and failures to honor warranties.

24   Fundamentally, they were upset that their cars weren't being

25   repaired.  That's not really the gravamen of the Plaintiff's

1     complaints and the consolidated complaints here.  What are

2     they really talking about, Your Honor?  They're saying,

3     there has been such a widespread erosion of GM's reputation

4     for quality, such that all of their vehicles have suffered

5     economic loss, and to the extent that they are also alleging

6     damages for economic losses associated with repairs, again,

7     I would submit that those are not the sort of repair-related

8     claims that a driver of these vehicles could have or should

9     have anticipated.  They are claims for things like childcare

10    expenses associated with all of the time necessary to get

11    their cars repaired, their lost wages, their rental car

12    expenses.  Your Honor is well aware that there are a number

13    of people who said, "Until GM is able to repair my car

14    consistent with the ignition switch recall, I'm not driving

15    that car, because I know, based on the information that's

16    come out through Feinberg Compensation Fund, that GM has at

17    least admitted that 50+ people died, and has awarded awards

18    under the Feinberg Compensation protocol, to at least 128

19    people."  That being the case, there are people that Mr.

20    Weisfelner and Mr. Esserman represent who say, "I'm not

21    going to drive my car and GM should be liable for the cost

22    of my rental car expenses during that period of time, until

23    my car is 100 percent safe to drive."

24            Now, Your Honor, putting aside the question of

25    whether these Plaintiffs have independent claims against new

1    GM, or whether there are future claims on behalf of the used

2    car purchasers that are more akin to the claims in the

3    Grumman/Olsen case, the biggest issue here is obviously

4    whether or not the pre-sale economic loss Plaintiffs

5    suffered a due process violation.  And you see in the

6    briefing that there are starkly different visions of the

7    notice that should have been afforded to those claimants.

8             Let me submit this.  If Your Honor can accept that

9    old GM knew enough that they should have recalled the

10   subject vehicles, the notice that was given was never

11   enough, even for the folks that Mr. Weintraub represents,

12   and here's why.  Last year, in the DPWN case that went up to

13   the Second Circuit, the Court set forth the standard for

14   evaluating the claims of those who otherwise would be barred

15   by a bankruptcy order.  And the Court essentially said, it's

16   a two-part test.  The first thing you have to do is look at

17   what the claimants knew or should have known with reasonable

18   diligence, and if the claimant gets across that threshold,

19   the second part of the inquiry is to ask what "the Debtor

20   knew or should have known of the potential liability, such

21   that it should have provided the claimant with notice of his

22   or her potential claim."

23            Whether or not the folks that Mr. Weisfelner and

24   Mr. Esserman and Mr. Weintraub represent are known

25   Creditors, it is indisputable that old GM knew enough that

1    it should have afforded them more notice under the DPWN

2    test.  And Your Honor shouldn't take my word for the fact

3    that the DPWN test now guides evaluations of due process not

4    just in a post-discharge context, but across all bankruptcy

5    contexts, Your Honor may be aware that Judge Gropper issued

6    an opinion in the Direct Access bankruptcy last month on

7    January 6th, the Westlaw site is 2015 WL 94556, and in doing

8    so, Judge Gropper was asked to pass on whether or not a

9    claimant could file a late Proof of Claim after a

10   confirmation order.  Judge Gropper writes as follows, Your

11   Honor: "In DPWN holdings, the Second Circuit recently set

12   forth the showing that a party must make, in order to obtain

13   the right to pursue a claim that otherwise would be barred

14   by virtue of a Debtor's bankruptcy"  It wasn't conditioned

15   on what kind of case we were talking about or what stage in

16   the bankruptcy we were at.  Judge Gropper interpreted the

17   DPWN case to be the guiding analysis for any time someone

18   comes before this Court or a District Court and says, "I

19   have a claim," and the Defendant says, "No, no, no, you're

20   barred by a sale order and an injunction," or, "You're

21   barred by some other order in bankruptcy."

22          So under that analysis, Your Honor, the DPWN

23   analysis, we would respectfully submit that old GM knew or

24   should have known of the potential claims that folks like

25   Mr. Weisfelner's clients would have had, even if they didn't

1    have a bunch of lawsuits before them, even if they didn't

2    make the list of Creditors, even if they didn't appear on

3    the general ledger.  The had sufficient knowledge within the

4    company, based on their books and records, construed more

5    broadly, that they should have provided notice of the

6    potential liability before the sale.

7              Now, Your Honor asked an inform question earlier

8    today, which was, "What should that notice have looked

9    like?"  And I think you've heard from Mr. Weintraub and

10   others about what that might have looked like.  Let me

11   underscore Mr. Weintraub's presentation and say, we believe

12   that the right notice here would have looked like the

13   Chemtura situation, and respectfully, while Your Honor

14   identifies that as a situation in which Your Honor approved

15   best practices, and certainly, I'll agree that Judge Furman

16   in affirming that, agreed that maybe that wasn't what was

17   constitutionally mandated under the facts of that case, I

18   think the type of notice provided there is constitutionally

19   mandated in this case.  You have a situation where on the

20   factual record, Mr. Weisfelner has already convinced Your

21   Honor that old GM knew enough that it should have issued a

22   recall in respect of the subject vehicles.  On those facts,

23   why it's not the case that the publication notice should

24   have said, "There is a safety defect of a serious dimension

25   in these makes and models of vehicles, and if you believe

1    you have been injured by that, now is the time to come

2    forward.  There will be a hearing about the sale."  That is

3    essentially what was provided in the Chemtura case where the

4    manufacturer understood that a chemical that it produced --

5              THE COURT:  Chemtura was a claims case, that the

6    people worked in factories where diacetyl was used.

7              MS. RUBIN:  Yes, Your Honor.

8              THE COURT:  It wasn't a 363 case.

9              MS. RUBIN:  Well, that's true, Your Honor, it

10   wasn't a 363 case, but respectfully, Your Honor, courts in

11   this District and Circuit and others, borrow, with respect

12   to what notice is constitutionally mandated, from context to

13   context all the time.

14             THE COURT:  Yes, but you would agree, I take it

15   that, Mullaney talks baby talk about the need to look at the

16   facts and circumstances.

17             MS. RUBIN:  Sure, and Your Honor, I'd also agree

18   that the facts --

19             THE COURT:  As do the other cases, the Second

20   Circuit cases such as Drexel Burnham implementing the

21   Mullaney.

22             MS. RUBIN:  Sure, but Your Honor, I would also

23   say, that in talking about 363 cases or otherwise, the

24   fundamentals of notice, the cornerstones of notice, or not

25   only notice of one's claim, but the opportunity to be heard,

1    and that doesn't change from context to context, and if we

2    are going to follow the dictates of Mullaney and talk about

3    the facts and circumstances of this case, I think if Your

4    Honor is willing to find that old GM knew enough that it

5    should have recalled the vehicles, certainly it knew enough

6    in those circumstances that it should have incorporated in a

7    publication notice, enough information to put people like

8    Mr. Weisfelner's clients, that if they believed they had a

9    claim, now was the time to come forward.  They didn't have

10   to necessarily say, "If you believe you've suffered an

11   economic loss or diminution of value in your car or lost

12   wages," or any of that, that's not the claim-specific notice

13   that we're talking about.  But they should have apprised

14   people in the Plaintiffs' position of the facts and

15   circumstances that underlie their case, that there was a

16   serious ignition switch defect that ran throughout the

17   subject vehicles, that was serious enough to warrant a

18   recall, and therefore, anyone who believes that they have

19   been injured thereby, should come forth and file a claim.

20          Now, Your Honor, there has been a lot made out of

21   the fact that 363 is sort of a separate situation, and I

22   think Your Honor just alluded to it, that in discharge cases

23   or confirmation cases, maybe notice doesn't mean what it

24   should mean in a 363 case.  But I'll have your -- I'll say

25   for Your Honor's sake, DPWN, at the District Court level,

1   which was a known Creditor case, right, DHL didn't know that

2   it has an antitrust claim against United Airlines.  They

3   certainly knew that they were a Creditor, they were

4   certainly apprised of the bankruptcy, and deciding what

5   notice is due to DHL, what did the Eastern District -- how

6   did the Eastern District make that decision?  Well, they

7   borrowed from the Grumman case, which is, in fact, a 363

8   case.

9            Similarly, in the Schwinn case in the Northern

10  District of Illinois, a 363 case involving a purchaser of an

11  exercise bike in 1979, whose grandson is not injured until

12  well after the bankruptcy in the 90s, what does that case

13  do?  It borrows from the Chemtron case in the Third Circuit,

14  which again, is a discharge case.  So, I would submit to

15  Your Honor that what is fundamentally required for notice

16  before depriving someone of a property interest, the facts

17  and circumstances of the cases might change in terms of

18  dictating what form of notice is required, but the content

19  has to be informed by a larger body of case law that is

20  transferrable from one context to the other.

21           It's also true that the idea that none of the

22  Plaintiff's property interests here were affected is sort of

23  a preposterous one, right?  And to the extent that new GM

24  tries to distinguish some of the 363 cases outside this

25  Circuit by saying, "Well, those cases involve property

1    interests that were unique and couldn't have been reduced to

2    money," that's actually not true.  First of all, those cases

3    were all decided on grounds other than the type of interest

4    invoked, and Rule 60(b) was considered in all of them.

5              I'll talk about the poly --

6              THE COURT:  Wait, time out.  You said 60(b) was

7    considered?

8              MS. RUBIN:  It was considered, and in each of

9    those cases, Polycel, Metzger, and Compak, after referring

10   to Rule 60(b), each of the courts nonetheless held that the

11   claimant before it should be exempt from the sale order, on

12   the basis that the due process rights were violated.  I'll

13   quote to you, Your Honor from the Metzger case, where, after

14   considering Rule 60(b), for example, the Court said, "The

15   Court has some flexibility in creating a remedy here, and

16   need not and will not find the entire sale void."  But

17   nonetheless, the Court held that it would find that the sale

18   was void as to the claimant before it.

19             THE COURT:  Well, there was no question that

20   Arthur Weissbrodt said that, but I don't have a memory of

21   him discussing the criteria for granting 60(b) relief, and

22   if you say that he mentioned it, and I'm not (indiscernible)

23   to Ms. Rubin, but there was not a material discussion of

24   60(b), was there?

25             MS. RUBIN:  Your Honor, I don't have the case

1    right in front of me and I'm unable to answer that question

2    directly, but my recollection is that in at least two of

3    these three cases, there is a discussion by the Defendant

4    that 60(b) only allows for voiding the entire sale order or

5    providing no relief, and in each of those cases, there's a

6    rejection, either implicitly or explicitly, of that theory.

7    So, for example, in the Compaq case -- you know, the other

8    thing I would say, Your Honor, is that certain of these

9    Courts say that notwithstanding Rule 60(b), Rule 60(b) is

10   only one way of getting there.  So, for example, in the

11   Compaq case, the Court says, "There's not a Rule 60(b)

12   motion before me, but sua sponte, I can characterize the

13   relief that this claimant is asking for as a 60(b) motion,

14   or alternatively, I can see this as a motion for relief from

15   the sale order."  That's an implicit recognition that 60(b)

16   is not the only vehicle by which you can remediate a due

17   process violation.  So, respectfully, GM's assertion that

18   the Plaintiffs here have to conform and shoehorn their

19   arguments into a 60(b) analysis in order to prevail is

20   simply not the case.  You have an implicit recognition in

21   the Compaq case that that's true, and more importantly, in

22   this District, let me refer Your Honor to the Lehman

23   Brothers decision that new GM cites in its brief at 2014 WL

24   7229473.  Now, Judge Buchwald in that situation determined

25   that the Creditor, who was making arguments before her, in

1    fact didn't qualify as a Creditor at all, but in clarifying

2    the narrowness of her holdings, she said as follows, Your

3    Honor: "We do not decide to question whether a person with a

4    cognizable property interest may attack a final free and

5    clear sale order in the absence of notice," and then,

6    following that immediately with this sentence: "Nor do we

7    decide whether the lack of notice could be grounds…" there

8    is an ellipses here, "for relief from a sale order under

9    Rule 60(b)."  So, you have a District Court Judge in this

10   District, implicitly recognizing that a due process claim,

11   meaning, I didn't get notice of the way in which my property

12   interests would be affected here, could be different from a

13   Rule 60(b) motion.

14           THE COURT:  I'm not sure if I heard you right.  I

15   thought you preceded each of those two sentences by "We do

16   not decide that."

17           MS. RUBIN:  And I did, Your Honor, but I still see

18   the case as standing for a recognition, as a District Court

19   Judge in this District, recognizing that these are two

20   alternative ways of getting to the same place.  I'll

21   recognize that that's dicta.  Judge Buchwald didn't reach

22   those issues in her decision, and she's very clear about

23   that, but notwithstanding that, in clarifying to the larger

24   community reading her decision what she is and is not

25   deciding, she is saying expressly, "I see these things as

1    possibly two different avenues for relief," and I think it

2    just underscores the fact that in the Compaq decision, for

3    example, the Court says the same thing.  "I don't have a

4    Rule 60(b) motion before me.  I can sua sponte interpret the

5    arguments that are being made before me as a 60(b) motion,

6    or alternatively, I can grant relief from the sale order."

7    That doesn't sound to me like the musings of a Judge who

8    believes that 60(b) is the only vehicle by which someone who

9    has a due process argument can seek relief from the sale

10   order.

11           Your Honor, I'll move on to talk about remedy, and

12   I'll note that the primary cases on which new GM depends are

13   the Edwards case, and they also place a lot of emphasis on

14   the Paris case, which hasn't been discussed directly by

15   name, but the general principle has been alluded to a lot

16   here, that's the case --

17           THE COURT:  Paris?

18           MS. RUBIN:  Yes.

19           THE COURT:  Mr. Weisfelner had mentioned Paris.

20           MS. RUBIN:  Well, I apologize to Mr. Weisfelner

21   for not hearing that.  To the extent that the Court in Paris

22   is saying, "Your interests are not affected here because you

23   have a bunch of assets that can be converted and all

24   Creditors will have access to that." Your Honor, that may be

25   fine and well if we were here four years ago, or five years

1    ago, but that's not where we are now, and I think to not

2    appreciate the realities of where the GUC Trust finds itself

3    would be a disservice to everyone, right?  We have a

4    situation here where the GUC Trust has distributed 90 plus

5    percent of distributable assets.  We are three plus years

6    post-confirmation.  All of the remaining resources of the

7    GUC Trust have been reserved for express purposes as Your

8    Honor knows, we filed a quarterly GUC Trust report last

9    week.  There is literally nothing left right now for the

10   Plaintiffs here, and so to not -- if we're going to consider

11   who would be prejudiced by a remedy here or consider a

12   larger context of prejudice with respect to the remedy, I

13   think that has to be considered, too.

14          The final thing that I'll say, Your Honor, is the

15   notion that prejudice is somehow a required element of a due

16   process violation is creative, but not sustained by the case

17   law.  To the extent that old GM siphoned numbers --

18          THE COURT:  Time out.  Before you go too far, Ms.

19   Rubin --

20          MS. RUBIN:  Sure.

21          THE COURT:  -- I need to dust off with you the

22   colloquy I had with Mr. Weisfelner, because I would agree in

23   a heartbeat that you didn't make the supplemental

24   distribution to your constituency last year in the dead of

25   night, but you're saying -- you're talking about hardship,

 1    presumably to the economic loss Plaintiffs, or maybe Mr.

 2    Weintraub's people or both.  At the same time that your

 3    folks were the beneficiaries of Mr. Weisfelner's guys

 4    decision for admitted strategic reasons, not to try to tap

 5    those funds.  So you're trying to exploit the very situation

 6    for which your guys were the beneficiary.

 7           MS. RUBIN:  I don't believe that it's an attempted

 8    exploitation at all, Your Honor.

 9           THE COURT:  Well, I'm not accusing you of evil --

10           MS. RUBIN:  I respectfully disagree, if I can.

11           THE COURT:  I'm accusing you of representing a

12    client --

13           MS. RUBIN:  No.

14           THE COURT:  -- but isn't that the bottom line?

15           MS. RUBIN:  No, Your Honor, it's not, and here's

16    why.  Your Honor engaged in a colloquy earlier with Mr.

17    Weisfelner, well first of all, to the extent that you

18    engaged in the colloquy earlier with Mr. Weisfelner also

19    about the efficacy of the bar date notice, correct?  It may

20    be that the bar date notice was not effective as to certain

21    of these Plaintiffs, but the sale notice wasn't effective as

22    to them either, and they had a choice to make at the outset.

23    It's undisputed that they didn't know about the defect in

24    the subject vehicles until around February of 2014, but at

25    that point in time, they made a choice, and they made a

Page 165

1    choice to go after new GM.  They never once filed a claim or

2    sought to file a late proof of claim against the GUC Trust.

3         When there were the initial motions to enforce a

4    few months later, and we came before this Court, the

5    Plaintiffs filed an objection, they filed an adversary

6    proceeding complaint, those issues were not raised there

7    either, and when we first came before Your Honor, let's

8    rehash how the GUC Trust came to be a party here.  It wasn't

9    on motion or any suggestion by the Plaintiffs.  It was on

10   suggestion by new GM, who said the Plaintiffs should be

11   forced and shoehorned into going after the GUC Trust.  But

12   we don't believe that the Plaintiffs should have to do that.

13   We believe that the Plaintiffs' due process rights were

14   violated, and so in making that distribution, I wouldn't

15   characterize it as an exploitation at all.  I would say that

16   my client was well within its rights to distribute assets to

17   its existing beneficiaries, consistent with its fiduciary

18   duties and the documents that govern it.

19        Your Honor, if I can return to prejudice?

20        THE COURT:  Yeah, go ahead.

21        MS. RUBIN:  The notion that prejudice is a

22   required element of a due process violation here, I think,

23   is a fiction, and in advancing that argument, new GM relies

24   on two different strands of cases: one are cases in which,

25   despite a notice defect, the claimants still have an

 1   opportunity to be heard, and that's particularly true of the

 2   cases that they cite within this District.  The Parker case,

 3   I think, is a paradigmatic example of that.  The Plaintiff

 4   in that case came forward and said they were deprived of

 5   their due process rights, but Your Honor found that,

 6   notwithstanding that, the guy cross-examined two of the

 7   three witnesses during the sale hearing, received ample

 8   discovery.  There was no due process violation because he

 9   had an opportunity to be heard.  That certainly was not the

10   case with respect to any of the Plaintiffs here, against

11   whom the notice couldn't have possibly been effective,

12   because to just get the notice without notice of their claim

13   is, as Mr. Weisfelner recognized in the Waterman case, no

14   different than being apprised of your claim and not being

15   apprised of the bankruptcy.

16          The other cases that they cite are entirely far of

17   field from bankruptcy altogether.  Most of them involve

18   procedural irregularities, like failure to enter a

19   substitution of counsel order, and notwithstanding that, the

20   new counsel still gets to be heard, or listing the wrong

21   statute in an administrative proceeding on the cover, where

22   everybody knows what's really at issue.  That's certainly

23   not the case in which we found ourselves, so it takes a lot

24   of creativity to cleave onto the due process standard in

25   this Circuit, some prejudice standard.  The Manville case

1    and the Cope case that Your Honor referred to earlier, we

2    understand and appreciate those aren't 363 cases.  But to

3    conclude, Your Honor, we would suggest that those should be

4    your guiding principles.  Those are recognitions by the

5    Second Circuit that in a bankruptcy situation, no party can

6    be deprived of a property interest without adequate notice

7    of their claim.

8              Everybody understands, here, that that's not what

9    happened, and to the extent that Your Honor is willing to

10   find on this stipulated factual record, that old GM had

11   sufficient knowledge that it should have recalled the

12   vehicles, it should also be the case that they had

13   sufficient knowledge to put into a publication notice, if

14   not actual mailed notice to all of the people that Mr.

15   Weisfelner and Mr. Esserman and Mr. Weintraub represent.  It

16   should have put into that notice greater content to afford

17   people a better and more complete, and consistent with due

18   process, a constitutional understanding of what their claims

19   are.  And with that, Your Honor, I'll rest.

20             THE COURT:  All right, thank you.  Okay, Mr.

21   Steinberg?

22             MR. STEINBERG:  Your Honor, do we have a stop at a

23   quarter after three today?

24             THE COURT:  Yes.

25             MR. STEINBERG:  I'm not sure if I'll finish with

1    my reply, but I've spoken to the other counsel and I think

2    they all want to reply as well too, and I'm wondering

3    whether we should do all of our replies tomorrow morning.

4    We could potentially do equitable mootness today, if you

5    wanted to take it out of order if everybody else was

6    prepared to do that, but I'm not sure whether I'll finish,

7    and I don't necessarily think it's fair that they will have

8    overnight to prepare for my replies.

9            THE COURT:  Well, I certainly see the merit of

10   your suggestion of having the remainder, this topic, done at

11   the start tomorrow.  How much equitable mootness is mainly

12   between Ms. Rubin and you?

13           MR. STEINBERG:  No, Your Honor, I think the entire

14   equitable mootness argument is a half hour and I think I

15   have five minutes, I think Mr. Weisfelner has five minutes -

16   -

17           THE COURT:  Yeah, of course, it's mainly Ms.

18   Rubin's issue.

19           MR. STEINBERG:  Oh.

20           MS. NEWMAN:  Actually, Your Honor, it's not, it's

21   --

22           MR. STEINBERG:  It's the unit holder.

23           THE COURT:  Yes, but with Akin Gump.

24           MS. NEWMAN:  Yes.

25           THE COURT:  You're her ally.

1                MS. NEWMAN:  I am. I (indiscernible).

2                THE COURT:  Okay, you're playing the role of Mr.

3       Golden?

4                MS. NEWMAN:  Yes, Your Honor.

5                THE COURT:  All right.  Can we really, really get

6       this done in 35 minutes?

7                MS. NEWMAN:  Your Honor, I think we would prefer

8       to start that tomorrow, keep the order that's contemplated

9       in the schedule and start that tomorrow because we're

10      concerned that, to the extent that Your Honor has questions,

11      we may need more time.

12               THE COURT:  Are you guys available early tomorrow

13      as you were today?

14               MR. STEINBERG:  Yes.

15               MS. NEWMAN:  Yes.

16               THE COURT:  All right, let's do this starting at

17      9:00am tomorrow.

18               MR. STEINBERG:  Thank you.

19               MS. NEWMAN:  Thank you, Your Honor.

20               THE COURT:  But therefore, what I want to do is

21      back to the principle arguments, which is what you

22      (indiscernible), Mr. Steinberg, and Mr. Weisfelner, you're

23      looking for a brief (indiscernible)?

24               MR. WEISFELNER:  Correct, Your Honor.

25               MS. RUBIN:  And Your Honor, I have also reserved

Page 170

1   five minutes if Your Honor can (indiscernible) reserve

2   (indiscernible).

3              THE COURT:  Okay.  In which case, the

4   (indiscernible) Plaintiffs, of course, have to be limited to

5   new stuff that Mr. Steinberg says tomorrow morning, but with

6   that said, we'll pick up at 9:00 tomorrow. Let's notify the

7   marshals accordingly.  And CourtCall if you are listening

8   in, get yourself down there before 9:00.  Okay, we'll recess

9   until 9:00.

10             MR. WEISFELNER:  Your Honor, do you know whether

11  or not it would be safe to leave our binders and --

12             THE COURT:  I'll tell you what I always tell

13  people in these circumstances, Mr. Weisfelner.  You've got

14  my permission to --

15             (Whereupon these proceedings were concluded at

16  2:44 PM)

17

18

19

20

21

22

23

24

25

Page 171

1                 C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  February 19, 2015

| & | | |
|---|---|---|
| **&**  3:3,25 4:7,17,25 5:1,1,7 6:7,23 7:7 22:7 | | |

| 0 | | |
|---|---|---|
| **0.25**  21:23 | | |
| **09-50026**  1:3 | | |

| 1 | | |
|---|---|---|
| **1**  81:9 | | |
| **1,250**  80:6 | | |
| **10**  10:11,12 16:10 84:18 85:21 | | |
| **100**  21:22 42:17,20 152:23 | | |
| **1000**  134:3 | | |
| **10004**  1:15 | | |
| **10018**  3:14 | | |
| **10022**  4:3 | | |
| **10036**  3:5,21 4:20 | | |
| **10166**  4:11 | | |
| **1047**  97:22 | | |
| **1050**  97:22 | | |
| **1063**  147:6 | | |
| **1079**  147:6 | | |
| **11**  11:4 12:7,7 40:6 80:16,20 118:11,13 | | |
| **11501**  171:23 | | |
| **1185**  3:4 | | |
| **11s**  12:5,5 17:11 | | |
| **12**  51:6 87:10 119:1 | | |
| **128**  152:18 | | |
| **140**  120:19,20 | | |
| **15**  16:10 91:12 | | |
| **150**  120:16 | | |
| **1555**  98:3 | | |
| **160**  90:11 | | |
| **164**  43:24 | | |
| **17**  1:18 140:14 | | |
| **18**  101:3 | | |
| **19**  9:22 13:21 171:25 | | |
| **1979**  158:11 | | |
| **1:05**  145:20 | | |
| **1st**  9:20 81:24 121:11 | | |

| 2 | | |
|---|---|---|
| **2**  144:20 | | |
| **2.3**  24:14 58:7 59:5 59:7,8 148:3 | | |
| **2.3.**  59:9 | | |
| **2.4**  59:6 | | |
| **20/20**  113:8 | | |
| **200**  4:10 | | |
| **2002**  128:19 | | |
| **2004-2005**  79:10 | | |
| **2005**  89:5 94:3 | | |
| **2005-2006**  95:6 | | |
| **2006**  18:20 55:12,19 68:4,5 | | |
| **2007**  18:21 56:6,7 151:2 | | |
| **2008**  76:21,24,25 | | |
| **2009**  8:6,25 9:20,21 10:24 16:17 17:16 18:23 25:10 52:18 55:20 56:21 81:7 86:14,25 87:5 88:1 93:5 95:14 96:3 102:22 103:23 104:9 106:8 109:2,7 114:4 121:11 128:17,19,21 136:6 136:11 138:19 146:12 | | |
| **2010**  18:25 46:12 | | |
| **2014**  19:3 23:14 56:19 94:18 106:8 119:1 160:23 164:24 | | |
| **2015**  1:18 154:7 171:25 | | |
| **2200**  5:2 | | |
| **2323**  5:2 | | |
| **24**  7:25 143:21 | | |
| **25**  7:25 143:21 | | |
| **27**  9:11,14 10:4,5 13:20 14:2 28:4 56:19 101:10 | | |
| **2800**  55:13,14 | | |
| **29**  94:18 | | |
| **2:05**  145:16 | | |

| 2:44 | 170:16 | |
|---|---|---|
| **2nd**  81:24 | | |

| 3 | | |
|---|---|---|
| **3**  27:19 | | |
| **30**  9:21 133:21 | | |
| **300**  5:9 171:22 | | |
| **330**  171:21 | | |
| **35**  85:3,4 169:6 | | |
| **363**  9:4,23 10:10 11:9 12:18,24 13:5 13:21 14:1 16:4 17:8,9,13 18:11,12 25:12 27:2 28:16 29:3,19 31:9 32:2 34:8 35:17,24,25 36:7,11,15,21,22,23 37:5,22,25 38:11,11 39:4,21 42:3 44:8 44:17 45:15 47:5 49:2,6 55:13 56:6,8 56:12 62:7 65:9 68:13 74:17,22 75:2 82:1 83:5 87:14 90:21,24 91:24 107:3,23 108:13,19 108:21 109:24 110:15 114:3 117:5 117:5,14 122:6 130:17,18,19,20,20 130:21 131:2,4 136:4 143:18 156:8 156:10,23 157:21 157:24 158:7,10,24 167:2 | | |
| **365**  95:5 | | |
| **386**  44:4 | | |
| **3:15**  84:20 145:15 | | |

| 4 | | |
|---|---|---|
| **4**  19:3 | | |
| **40**  84:4 133:21 | | |
| **400,000**  64:5 | | |
| **42**  101:8 | | |
| **43**  27:22 28:1,5 | | |
| **437**  4:2 | | |
| **441**  44:4 | | |

| 4452982 | 68:4 | |
|---|---|---|
| **45**  94:10 | | |
| **46**  59:10,10 | | |

| 5 | | |
|---|---|---|
| **50**  152:17 | | |
| **544**  41:10,17 | | |
| **565**  97:4 | | |
| **574**  97:22 | | |

| 6 | | |
|---|---|---|
| **6.15**  148:19 149:2 | | |
| **60**  19:9,14,16 24:18 24:18 30:14,21 35:23 36:16 37:3,3 38:1 48:17,19,21,24 48:24 65:19 66:8,18 67:11 71:14,19,22 71:24 72:2,10,16,18 127:8 128:5,7,11,25 129:4,4 159:4,6,10 159:14,21,24 160:4 160:9,9,11,13,15,19 161:9,13 162:4,5,8 | | |
| **60654**  5:10 | | |
| **620**  3:13 | | |
| **656**  98:2 | | |
| **6th**  154:7 | | |

| 7 | | |
|---|---|---|
| **70**  9:10,20 10:3,5 13:20 14:2 27:21 28:6 101:9 131:14 | | |
| **7056**  93:25 | | |
| **7229473**  160:24 | | |
| **75**  94:13 | | |
| **75201**  5:3 | | |
| **754**  97:4 | | |
| **760**  97:5 | | |
| **77**  70:15 | | |

| 8 | | |
|---|---|---|
| **83**  97:18 | | |
| **844**  43:24 | | |

| 9 | | |
|---|---|---|
| **9**  24:14 101:24 | | |
| **90**  163:4 | | |
| **9019**  136:7 | | |

**9024** 19:9 128:6
**90s** 158:12
**94556** 154:7
**97** 97:3
**99** 44:15
**9:00** 170:6,8,9
**9:00am** 169:17
**9:02** 1:19
**9b** 64:16

**a**

**ab** 15:20
**ability** 39:9 41:9,18
  50:4 57:24 85:18
  87:14 101:2,4 120:7
  120:10
**able** 22:15 29:16
  30:20,21 37:10,12
  37:12 43:20 47:9
  81:18,20 82:12
  83:13 105:4 113:4
  117:15 125:16
  139:1,24 146:24
  152:13
**ably** 135:21
**absence** 110:3
  117:7 161:5
**absent** 97:13 98:21
**absolutely** 11:11
**absolve** 54:14
**absurd** 107:16
**abut** 35:5
**academic** 121:25
**accept** 33:6,12,13
  153:8
**access** 75:16 154:6
  162:24
**accident** 23:21 24:4
  25:21 33:1,15,18
  47:14,16,21 55:3
  57:21 60:18 61:22
  62:12 89:3,5 96:25
  97:1 98:24 121:4
  123:8,8,17,22,23,24
**accidentally** 116:3
**accidents** 11:14
  24:13 51:23 52:5
  57:21 59:24 63:13

101:16 133:22
**accommodating**
  22:9
**accomplish** 36:16
  70:12
**accomplished** 83:6
**account** 12:23 13:4
  63:13 114:6
**accountability**
  137:18
**accrues** 58:10
**accurate** 171:4
**accusing** 164:9,11
**achieve** 44:25
**achieving** 35:17,18
  35:18
**acknowledged**
  91:10 147:13
**acknowledges**
  101:3 148:6
**acquires** 42:8
**acquisition** 140:22
**act** 23:10 70:16
  91:15 92:12,13
  93:19 111:11
  116:16,17,18
  123:18 147:11
**acted** 8:6
**acting** 99:18,22
**action** 23:3,12 24:7
  41:10 44:2,7 47:3
  79:20 93:10 120:18
  120:21,23,24
  135:10 137:21
  148:13
**actionable** 105:1
**actions** 23:19,20
  24:12 28:25 77:15
  77:15 120:17
**activity** 135:1
**acts** 21:3
**actual** 17:5 49:9,13
  72:17 143:5 167:14
**acute** 109:20
**add** 20:25 41:19
  134:3

**addition** 33:14
  108:14,16
**additional** 23:16
  34:5
**address** 7:17 15:4
  19:13 21:12 22:13
  37:10 43:14 51:8
  62:24 74:25 76:8
  77:21 84:16 86:18
  99:11 104:6 119:18
  134:10 142:18
  146:3,5 150:21
**addressed** 142:17
  149:2
**addresses** 101:5
**addressing** 22:12
**adequate** 39:16
  109:5 117:16 125:9
  167:6
**adjudication**
  120:25
**admin** 121:12
**administration**
  11:4
**administrative**
  166:21
**administrator** 4:9
**admission** 91:12
**admitted** 152:17
  164:4
**ado** 88:21
**adopted** 141:9,24
**advance** 107:3
**advancing** 165:23
**adversary** 165:5
**advise** 98:18 99:7
**advocacy** 60:4
**advocates** 75:10
**affect** 99:3 130:22
**affidavit** 80:4 93:10
  94:1,1,2
**affirming** 155:16
**afford** 70:8 167:16
**afforded** 153:7
  154:1
**afraid** 116:8

**afternoon** 21:14
  25:8
**agencies** 84:3
**ago** 22:17 162:25
  163:1
**agree** 8:24 13:19
  14:23 26:19 51:17
  53:15 78:6,8,15
  95:14 98:9 117:4
  118:10,12 126:21
  135:8 140:3 143:10
  148:17 155:15
  156:14,17 163:22
**agreed** 24:21 52:4,6
  61:2,2 68:18 84:22
  149:10 155:16
**agreement** 23:4
  24:14 26:21 30:24
  31:13 32:1 40:2
  48:7 52:3 53:18
  58:4,4,9,13,16,22
  59:3,5 63:12 73:6
  75:16,17 83:21 90:7
  131:13 148:4,8,23
  148:24 149:14
  151:1
**agreements** 18:4
  26:16 31:12
**agrees** 102:12 148:7
**agway** 92:9
**ahead** 26:16 51:2
  95:21 120:6 134:16
  134:17,19 142:21
  165:20
**air** 95:5 98:24
**airbag** 89:7 115:12
  134:1
**airbags** 122:23
  125:15
**airlines** 158:2
**akin** 4:17 7:3 153:2
  168:23
**al** 1:6,7
**allegations** 101:25
  137:7,19
**allege** 138:6,11

**alleged** 22:24 56:11
116:25
**alleges** 121:3
**alleging** 152:5
**allocation** 28:21
**allow** 31:18
**allowed** 71:24 89:16
149:25
**allows** 160:4
**alluded** 157:22
162:15
**alluding** 45:19
**ally** 168:25
**alper** 44:3 134:22
135:2
**alright** 89:20
**alter** 23:10
**alternative** 138:24
161:20
**alternatively**
160:14 162:6
**altogether** 43:10
67:8 166:17
**amaro** 130:10,11
134:10,19,20,20
135:4
**amazing** 110:6
**amend** 123:16
**amended** 63:12
**america** 144:2
**american** 80:8
**americas** 3:4
**amount** 28:18 111:2
**amounts** 112:22
**ample** 166:7
**analogy** 124:5
140:8
**analysis** 36:10
64:13 127:22 129:5
136:1 150:12
154:17,22,23
160:19
**andress** 94:4
**andrew** 22:8
**announced** 9:14,16
22:17 23:15 55:16

**announcement**
79:15
**answer** 47:8 48:4
51:15 60:8,9 68:1
84:8 100:22 111:8
160:1
**answered** 27:10
**anticipated** 152:9
**anticipates** 131:5
**antitrust** 158:2
**anton** 94:18
**anybody** 11:23 42:5
42:6 43:20 63:18
81:21 119:10
121:19 131:2
149:15 151:3
**anymore** 48:5,6,19
**anyway** 21:15 71:4
80:3 126:25 127:1
140:13
**aon** 33:17
**apologies** 121:7
**apologize** 121:23
162:20
**apparently** 14:6
**appeal** 36:12 50:9
122:7,8,9 130:18,21
131:1,4,5,6
**appealed** 75:13
**appeals** 36:7 130:20
**appear** 155:2
**appearances** 6:4
**appears** 140:19
141:4
**appendix** 96:19
**applicability**
108:10
**applicable** 91:21
105:11 148:21
**application** 27:13
27:13,14,20 30:18
111:14
**applied** 71:10 87:22
128:22 150:13
**applies** 36:7 88:11
**apply** 36:11 42:12
47:10 48:5,6 50:14

70:24 71:9 72:4,11
73:21,24 87:18,18
87:19 128:14
129:22
**applying** 36:22
**appreciate** 26:18
61:8 89:8 112:8
163:2 167:2
**apprised** 157:13
158:4 166:14,15
**approach** 36:19
**approached** 66:4
**appropriate** 12:1
12:18,23 13:4,13,15
15:18 16:14 34:21
49:10 86:15,19 90:5
113:9,11 115:15
143:1
**approval** 10:10
16:24 140:21
**approve** 16:24
50:15 85:17 133:18
134:4
**approved** 25:12
27:2,3 35:10 75:2
77:12,16 83:24
155:14
**approximately** 9:11
84:20
**apropos** 95:12
**area** 43:11
**areas** 143:5
**aren't** 167:2
**arguably** 53:11,12
**argue** 10:19 46:19
62:25 81:18,20 82:3
82:12 83:4,21 90:22
91:1 120:13
**argued** 10:13 16:12
80:3 81:21 83:20,21
103:16 107:16
112:17 121:23,24
121:24 130:19
**argues** 90:9
**arguing** 8:13 16:13
16:18 20:7 64:18
65:6 66:15 74:5,6

122:2 131:3 145:12
**argument** 2:1 9:18
10:11 20:24 25:2
39:23,25 50:8 51:11
60:2 62:1 69:8
79:25 83:23 84:8
89:11,23 90:12 97:6
97:9,11 108:1
112:18 125:16
162:9 165:23
168:14
**arguments** 11:1
15:19 16:11 20:13
52:19 79:12 85:7
89:18 92:22 103:23
104:7 120:12
125:17 127:2
160:19,25 162:5
169:21
**arising** 116:15
141:16
**arizona** 116:19
138:1
**arose** 117:16
**arthur** 3:7 6:7
18:20 22:6 65:16
159:20
**articles** 80:7
**articulate** 8:17
**articulated** 48:22
54:18,20 82:11
83:16
**asbestos** 48:2,3
73:10 74:10 131:25
**ascertainable** 78:3
100:21
**aside** 90:12 152:24
**asked** 30:7 31:11
32:24 61:5 64:9,10
66:1 74:25 75:20
77:25 81:16 82:13
85:3 86:2,12,14
92:16 100:4 111:9
139:5 154:8 155:7
**asking** 14:12,13,14
15:22 16:1 66:6
67:13 80:22 98:8

**115**:6 **128**:9,10
**160**:13
**asks** 47:24
**aspect** 37:9 49:9
51:9 54:3
**aspects** 14:10
**assembling** 27:16
**assembly** 97:12
**assert** 39:7 41:9,18
42:15 43:20 57:25
64:15 105:4 110:25
**assertable** 59:16,18
62:22
**asserted** 30:12 31:7
41:11 57:12 59:20
60:24 62:6 73:12
79:20,21,23 83:18
90:6 107:23 129:17
**asserting** 41:6
56:13 57:21 63:17
96:6 103:21
**assertion** 137:13
160:17
**asset** 31:15,15 37:8
37:8 49:10
**assets** 17:13 25:11
28:20 31:22 32:5
45:1 49:13,16 68:18
81:11 118:18
140:22 162:23
163:5 165:16
**assignment** 140:23
**assignor** 41:20
**associate** 137:22
**associated** 8:21
101:18 112:11
152:6,10
**assor** 3:25
**assume** 8:3,10
13:18 16:25 17:14
17:14 21:21 32:25
33:11 35:5 52:4
59:25 110:22
111:12 112:18
121:9 144:24 145:1
146:10 148:8

**assumed** 10:14
25:15,18,20 26:3,21
47:21 48:7 51:19,20
51:21,21,22 52:1,2
52:12 54:18 57:7
58:5,6 59:1,4,12,13
59:23 62:12 75:6
90:7 102:5,7 136:23
141:13,14 148:15
148:18
**assuming** 14:9
15:23 21:18 85:17
145:13
**assumption** 140:23
**astonishing** 88:19
**attach** 38:20 39:5
110:2,20 118:5,6
**attaches** 38:14,25
70:3
**attaching** 70:8
**attack** 161:4
**attacking** 75:23
**attempt** 40:3 99:11
113:13
**attempted** 70:17
164:7
**attempting** 106:24
**attention** 110:16
128:5
**attentive** 104:2
**attorney** 60:5 84:4
106:7 112:17
116:17 138:2
**attorneys** 3:3,11,19
4:1,8,18 5:1,8 75:10
75:11 116:20
**attracted** 83:19
**auction** 55:13,14
**audience** 144:17
**august** 94:3
**authority** 17:15
117:22,22
**authorize** 144:9
**auto** 32:13,20
**automobile** 100:1
**availability** 10:9

**available** 88:7
93:25 117:8 169:12
**avenue** 3:4,13 4:2
4:10 108:18
**avenues** 162:1
**avoid** 31:18 98:4,15
106:12 109:16
**avoidance** 26:7
**avoided** 86:13
91:19
**avoiding** 23:8
**avoids** 143:13
**awarded** 152:17
**awards** 152:17
**aware** 55:18 79:16
80:5 81:4,7 90:20
106:2 107:7 123:9,9
146:13 149:4 150:9
150:11 152:12
154:5
**awareness** 80:11,12
**awfully** 111:1

**b**

**b** 1:21 19:9,14,16
24:14,18 30:14,21
35:23 36:16 37:3,3
38:1 48:17,19,21,24
48:24 59:15 65:19
66:8,18 67:11 71:14
71:19,22,24 72:2,10
72:16,18 94:17
101:24 127:8 128:5
128:7,11,25 129:4,4
148:3 159:4,6,10,14
159:21,24 160:4,9,9
160:11,13,15,19
161:9,13 162:4,5,8
**b.r.** 43:24 44:4
**baby** 42:18,22
156:15
**back** 8:25 10:7,14
10:14,19,24 11:16
13:17 16:17 17:16
32:10 33:18 37:13
52:18 61:11 70:5
79:10 86:13 88:22
100:16 103:23

**104**:20 **105**:19
**107**:1 **111**:3 **113**:21
**135**:21 **136**:6,11
**144**:17,23,25
**150**:23 **169**:21
**backseat** 94:13
**bad** 95:21
**badly** 8:7 13:6
**bag** 95:6 98:24
**balance** 92:18,19,23
145:25
**balancing** 144:5
**bandwagon** 56:3
**bankrupt** 149:16
**bankruptcy** 1:1,13
1:23 9:21 17:10
18:3,11,21 19:23
25:12 28:23 35:17
35:22 37:20 39:13
39:14,16 41:2,8,10
41:16 42:4,18,22
43:24 44:17,18,24
44:25 45:2,8,14
49:3 50:18,18 60:25
64:11 65:22 68:4,9
69:11 70:14,16 73:7
73:19 74:21 77:6
80:11,12,16,24
81:10 83:25 84:10
95:23 96:5 98:19,20
99:2 100:1 107:7,7
107:10 108:11
128:3,5 135:4,14
153:15 154:4,6,14
154:16,21 158:4,12
166:15,17 167:5
**bar** 13:23,25 14:3,5
24:15 28:24 29:7,11
31:10 32:2 34:2,6
34:22 39:2,7 40:19
64:3,7 74:4 78:14
78:15 79:5 80:13,14
80:17,18,20,22,25
83:1,5 102:14,22
103:3 104:9 110:8,9
110:15,18 113:23
118:2 119:7 130:20

**133:**23 164:19,20
**barbara** 56:5
**barn** 111:1
**barra** 8:23
**barred** 64:20 74:12
  121:15 153:14
  154:13,20,21
**barron** 5:1
**base** 106:10
**based** 20:20 21:1,2
  22:25 24:12 27:4
  33:6 35:16 44:5
  67:11 77:7 90:23
  100:21,22 118:3
  119:8 121:25
  128:15 134:14
  138:18 143:11
  147:23 152:15
  155:4
**basically** 43:25
  50:13 86:6
**basis** 24:6 30:22
  46:17 81:4 137:15
  138:2 142:2 159:12
**battle** 35:11 37:19
**bearing** 144:10
**bears** 115:19
**becoming** 135:15
**befell** 118:20
**beg** 69:17
**began** 113:17
  146:22
**beginning** 97:11
**behalf** 6:8,15,23 7:3
  7:7 33:20 35:13
  153:1
**believe** 19:2 38:6
  59:7 119:3 141:21
  142:24 146:23
  150:1 155:11,25
  157:10 164:7
  165:12,13
**believed** 24:11
  157:8
**believes** 36:8
  157:18 162:8

**bell** 3:25
**bellwether** 93:13
**belong** 130:12,13
  136:11
**beneficiaries**
  113:19 164:3
  165:17
**beneficiary** 164:6
**benefit** 16:24 41:22
  42:23 45:6 124:16
  138:25
**benefitted** 138:20
**berman** 93:10
**berman's** 93:25
**bernstein** 11:19
  57:14,20 62:14
  135:17,23 150:18
  151:10,22
**bernstein's** 61:16
**bernstein's** 134:22
**best** 28:20 31:23
  35:18 40:15 65:14
  99:23 100:2 104:6
  127:2 132:11
  155:15
**better** 17:11 43:19
  49:12 67:6,19
  113:11 118:3
  167:17
**beyond** 26:17,19
  41:20 92:19 104:17
  105:17 145:13
  149:12
**bid** 28:20
**big** 94:9 144:22
**biggest** 153:3
**bike** 158:11
**billions** 31:7
**binary** 59:23
  148:17
**bind** 125:3 132:1
**binders** 170:11
**binding** 18:15
**bipolar** 15:5
**bit** 61:6
**blamed** 21:3

**bleeding** 13:6
**blew** 34:6,13,19
**block** 111:14
**blocked** 26:3,8
**blocks** 20:19,20
**bloomer** 22:8
**blow** 34:20 65:18
  71:13
**blowing** 12:14
  128:4
**blown** 15:10
**blue** 50:20,23
**body** 158:19
**bona** 30:8,11,25
  35:8,11,14 36:23
  37:17,17 49:1 83:17
**bond** 83:23
**bondholder** 43:20
**bondholders** 10:12
  11:12 83:25
**booked** 8:15
**books** 8:10 78:4,17
  78:21 79:22 92:13
  110:11,11 155:4
**borrow** 156:11
**borrowed** 158:7
**borrows** 158:13
**bothers** 20:22
**bottle** 126:17
**bottom** 117:2
  164:14
**bought** 55:12 56:5
  63:10 64:5 95:2
  107:17,18
**bound** 62:20 114:12
  117:21 122:15,17
  129:7 131:24
**bowling** 1:14
**box** 25:20 51:20
  52:1 59:24
**br** 140:19,20 141:4
**brainer** 129:12
**brakes** 125:14
**brand** 56:23,25
  100:19 137:22,25
  138:8

**branded** 137:20,24
  138:10
**breach** 77:14
**breaches** 77:7
**breadth** 53:22
**break** 75:7 85:9,14
  85:20
**breaks** 134:1
**brief** 15:12 16:22
  36:6 48:18 59:21
  76:4 90:18 91:1
  105:15 108:2,12
  122:21 160:23
  169:23
**briefing** 29:5 54:23
  90:11 120:2 146:13
  149:3 153:6
**briefly** 83:13
  142:23
**briefs** 7:18,23 18:2
  48:17 107:6 139:15
**bring** 41:13 44:8
**bringing** 130:7
  150:24
**brings** 40:5 140:6
**broad** 20:17 31:14
  66:1,6
**broader** 29:14,15
  48:2 83:22
**broadly** 8:12 84:2
  155:5
**broke** 55:6
**bromberg** 4:25 7:7
**brothers** 160:23
**brought** 24:4,15
  26:2 54:24 57:19
  89:1 91:3 111:22
  138:1
**brown** 3:18 6:15
  121:9
**bryan** 5:2
**bryant** 4:19
**buchwald** 50:11
  51:8 160:24 161:21
**bucks** 28:2
**budd** 5:1

**building** 3:12
**bunch** 20:4 92:16 103:25 133:21 155:1 162:23
**burden** 34:1 48:16 49:2,6 76:15 80:19 80:22
**burnham** 156:20
**burton** 57:15,16 61:18 62:1,9,15,17 63:15,20 102:3 135:19,20 150:17 150:21,22 151:7,9 151:20
**business** 33:11 43:8 43:16 46:10 69:2,3 69:11 70:7 92:9 118:18
**businesses** 92:11
**buy** 81:11 109:2
**buyer** 17:13 125:3,3 125:7,22
**bypass** 19:10
**byways** 117:12

**c**

**c** 3:1 5:12 6:1 94:3 171:1,1
**calculate** 27:10
**caldor** 92:8
**calendar** 78:22
**california** 116:20
**california's** 147:8
**call** 26:22 132:11 151:4
**called** 26:6 68:2 70:20 71:15 143:8
**campaign** 139:2
**campbell** 50:10 51:3,4 74:19
**can't** 116:8 118:21 119:6 124:2 127:22 128:16,17,19 131:4 131:12 133:12
**capably** 146:25
**captured** 95:3,4
**car** 11:13,20,20 13:20 26:23 28:2

51:7 55:17,19,20,22 56:7,8,11,20 57:2,3 57:3,4 60:13,16 61:24 63:10,19,19 64:21 77:7,9 79:11 79:13 83:10 84:2 87:20,21 89:3 92:6 92:10,21,22 94:11 94:11,19 96:12,22 97:19 101:16 103:19 107:18,18 109:2 115:3 117:10 123:5 150:2,6,13,19 151:11,12 152:11 152:13,15,21,22,23 153:2 157:11
**card** 53:17 103:11 103:14,15,22
**cards** 76:3
**care** 125:6
**cared** 10:15
**career** 113:3
**carefully** 23:9 58:7 139:15
**cares** 34:14
**cars** 7:24 9:2,10,11 9:14,25 10:3,4 11:14,21,22 13:23 17:3 28:6 52:23 53:5 60:11,12 64:5 94:6 98:23 100:19 101:9 104:24 105:22 114:14,16 114:22 115:6,13,17 115:22,23 116:1 117:13,17 119:9 138:22 149:21 150:10 151:24 152:11
**cart** 130:1
**carve** 47:25 49:24 50:1,8 115:15 117:9
**carved** 68:20 73:20
**carving** 31:16 68:21 71:9
**case** 1:3 11:4 12:9 12:16 15:7 17:10

28:23 29:5,23 32:6 35:1,13 37:13 38:2 38:10,14 39:7,10 40:8,19,20 42:4 43:24,25 45:2,17 47:9,9 48:16,18,23 49:4,8,14 50:10 57:15,19 61:20,21 62:1 63:14,15,20,22 67:14 68:5,10 69:6 69:15 70:14,15,19 71:11 72:2,19,25 74:4,4,5,16,19 78:9 79:8 80:13 83:25 84:10 86:10 87:22 89:1,13 92:2,22 97:3,6,15,18 101:21 102:2,3 104:3 105:10,13 106:22 106:25 107:25 108:3,7,11,16 109:14,19,22 110:6 110:21 113:18 117:21 118:1,8,9,19 122:1 124:22 131:22 132:16,16 133:17 134:15,22 134:23 135:24 136:2 147:6 150:5 150:12,22 151:7,20 152:19 153:3,12 154:15,17 155:17 155:19,23 156:3,5,8 156:10 157:3,15,24 158:1,7,8,9,10,12 158:13,14,19 159:13,25 160:7,11 160:20,21 161:18 162:13,14,16 163:16 166:2,4,10 166:13,23,25 167:1 167:12 170:3
**cases** 7:20 18:2,9,14 19:7 23:21 29:6,7,9 31:11 38:12,17,21 57:17 61:12 65:15 66:7,22 74:24 79:1

80:10,13,21 83:1 95:5,24 96:13,17,19 96:21 97:2,16,18 99:12,13 100:19 101:19 104:18 105:15,17 107:11 108:8,13 109:12,24 117:23,24 118:22 120:4 121:18 129:22 130:9 134:21 135:1,10 139:15 156:19,20 156:23 157:22,23 158:17,24,25 159:2 159:9 160:3,5 162:12 165:24,24 166:2,16 167:2
**cash** 13:1
**castillo** 77:12
**catalog** 93:2
**catchy** 54:5
**categories** 119:24
**category** 120:6 121:10 137:3
**caucus** 85:17
**caught** 79:25
**causation** 123:10,12
**cause** 11:22 41:10 47:3 97:13 98:24 135:10
**caused** 23:18 32:14 105:22,23 115:12
**causes** 23:3,12,20 44:1,6 125:12 133:25
**causing** 137:21,23
**cent** 42:17,20
**center** 95:5
**central** 25:9 30:4
**century** 92:9
**certain** 3:19 24:3,22 30:3 37:23 43:11 46:25 47:18 59:24 82:24 90:19 92:13 96:7 160:8 164:20
**certainly** 46:20 82:14 155:15 157:2

158:3,4 166:9,22
168:9
**certainty** 35:18
**certified** 77:16
171:3
**cetera** 139:2,2
**chain** 11:13
**challenge** 10:20,20
**challenged** 75:11
135:5
**challenging** 10:21
**chance** 11:2 12:20
15:19 59:23 82:15
130:3
**change** 82:21 100:5
106:4 113:15 157:1
158:17
**changed** 63:14
106:14 119:5
128:21
**changing** 94:15
**channeling** 74:7,12
74:17,23
**chapter** 11:4 40:6
80:16,20
**characterization**
14:18
**characterize** 160:12
165:15
**characterized**
107:16 151:21
**charge** 44:7
**charged** 91:23 92:4
96:10,12 99:19
100:11 104:23
114:7 117:11
119:10
**chateaugay** 107:13
150:6
**chemical** 132:2
156:4
**chemtron** 158:13
**chemtura** 132:1,15
132:18 155:13
156:3,5
**cherry** 18:5

**chevrolet** 55:12
56:6
**chicago** 5:10 18:24
**chicken** 106:3
**chief** 19:4
**childcare** 152:9
**children** 89:3
**choice** 17:19 33:5
59:23 115:18
164:22,25 165:1
**chose** 24:10
**christmas** 130:24
130:25
**chrysler** 11:19
40:10 57:16 61:17
61:23 122:6 136:2
150:18
**chubb** 19:1 73:8
74:6 129:11
**chutzpah** 118:1
**circuit** 18:13,13,15
18:15,17,18 30:1
40:24,25 41:1 46:11
46:12 50:5 65:24
71:11,18,18,21,22
71:25 74:1 107:13
108:2,9 117:22
129:2 153:13
154:11 156:11,20
158:13,25 166:25
167:5
**circuit's** 18:25
**circulated** 81:24
**circumscribed**
35:15
**circumstance** 31:10
32:4 35:16 36:3
38:8 60:13 62:21
64:23 65:5,8 66:4,8
66:16 67:3,24 69:5
70:4,11 72:21,24
79:9 81:1
**circumstances**
11:25 13:3 30:16
31:24 34:5 42:12,12
49:7 66:9 67:6
77:11 108:21

109:22 125:21
156:16 157:3,6,15
158:17 170:13
**citation** 149:5
**cite** 29:23 39:10
40:8 58:17 74:15
80:14 97:4 108:2
109:10 166:2,16
**cited** 18:9 47:9
66:23 79:1 80:10
83:1 96:17 97:2,16
105:15 134:21
**cites** 38:22 160:23
**city** 27:12,20
**civil** 19:24 26:6,14
128:3
**claim** 8:11 12:12,22
25:5,21 26:25 29:8
34:4 38:16 39:7
40:19,21 41:3,9,13
41:18 42:1,2,3,5,8
42:16 43:4 45:23
47:4,7 54:19 55:14
55:25 57:8,21,24
59:14,18 60:7,8,19
60:21 62:6,11,12
63:16 65:9 68:19
73:12,13,13,18,18
74:5,8,11 75:1,20
76:15 78:23,25 79:3
79:7,8,12,17,18,20
79:21,23 80:25
81:19 83:7,9,9 89:9
96:6 98:21 99:4,9
101:1 107:8,9,10,20
110:25 113:23
118:3,7 123:9,14,15
129:17 130:7,15
132:16 136:8
137:11 138:18
147:7,8,18 153:22
154:9,13,19 156:25
157:9,12,19 158:2
161:10 165:1,2
166:12,14 167:7
**claimant** 70:23 79:7
98:19 153:18,21

154:9 159:11,18
160:13
**claimants** 40:14
45:6 84:6 102:4
110:23 130:14
151:21 153:7,17
165:25
**claimed** 41:4
**claiming** 17:3 63:24
74:8
**claims** 8:22 9:3 12:2
12:4,11,20 13:24
14:4 16:25 20:20
23:11 24:12,15
25:22 26:2 31:8
32:1 33:1,15,18
35:12 38:14,24
39:13 43:21 44:1,5
58:3 59:17,18 60:23
60:23 62:19,21,23
75:19 77:9,14,17,17
77:18,22,22 83:22
83:22 89:16 90:23
90:25 91:3 101:15
102:7,14 103:3,8,20
103:21 104:10,19
105:7 106:15,15
107:14,24 109:25
110:2,20,24 112:21
114:13,14,16,20,22
116:11,14 117:16
119:8,25 120:9
121:12,13 122:5
125:21 126:11
129:19 130:12
133:23 135:7,9,15
136:3,3 137:3,10,15
139:17 141:15
147:1,20,21 149:25
150:3,25 151:19,22
151:23 152:8,9,25
153:1,2,14 154:24
156:5 167:18
**clarified** 85:20
**clarify** 9:8
**clarifying** 161:1,23

**class** 18:8 41:19
76:1 77:15 120:21
120:22,24 131:15
131:18 133:6
150:14
**classes** 40:13
**clause** 66:17
**clean** 67:24
**cleansing** 105:3
**clear** 16:19 17:18
20:8,11,12,16 37:1
38:13,18 39:17 41:5
62:7 65:19 69:21
75:6,16 79:24 82:6
82:17 93:9 97:14
100:15 111:10
122:5 124:12,18
125:20 131:11
133:22 136:4 161:5
161:22
**clearly** 34:3 44:14
51:19 56:15 62:25
70:12 71:10 123:8
125:18,19 146:13
**cleave** 166:24
**clerk** 85:23 145:21
**client** 112:18
146:13 149:8
164:12 165:16
**clients** 10:18 111:10
112:4 118:20 127:8
129:22 154:25
157:8
**clients'** 147:18
**clock** 105:20 144:22
**close** 20:4 36:24
113:20 126:16
141:17
**closed** 31:1 35:8
126:4 130:5,14
**closes** 37:23 141:17
**closest** 20:3
**closing** 32:14 39:23
39:25 58:10 59:15
141:17
**cn** 72:13

**cobalt** 55:12 56:6
100:19
**code** 39:16 41:10,17
44:18 45:8,15 64:11
69:12 70:14
**cognizable** 161:4
**cognizant** 136:22
**collateral** 39:18,19
130:8
**colleague** 22:7
**colleagues** 146:17
**collective** 99:19
**collectively** 108:23
**colloquial** 54:7
**colloquy** 163:22
164:16,18
**colt** 108:11
**come** 11:6 18:10,12
22:4 60:16 61:16
62:10 63:21 81:20
119:7 124:7 125:16
126:5 142:13
144:25 152:16
156:1 157:9,19
**comes** 11:10 18:17
29:15 37:1 100:18
154:18
**comfortable** 26:1
**coming** 54:8
**commenced** 22:20
**comment** 31:12
**comments** 6:6
34:18
**commercial** 125:7
**commercially** 33:4
106:5
**commitment**
137:16
**committed** 89:4
**committee** 75:9
84:5
**common** 120:25
**communicated**
99:15
**community** 13:11
17:21 42:20,22
161:24

**compak** 69:6,6
108:17 159:9
**companies** 92:10
126:14 135:3
**company** 1:6 4:8
8:15 12:8 27:12,20
54:10 73:8,14,14
78:21,23,23 92:8,21
92:22 118:8 137:17
155:4
**company's** 8:10
78:21
**company's** 138:8
**compaq** 160:7,11
160:21 162:2
**compensate** 24:6
69:1 70:2
**compensation**
22:24 152:16,18
**competent** 21:19
102:15 104:10
105:5 109:10
**competition** 147:8
147:18
**complain** 109:9
**complained** 72:21
135:1
**complaining** 71:13
**complaint** 24:2,2
26:24 54:25 55:1,3
55:10 56:10,16 57:6
57:9 88:24,25
108:24,25 116:14
116:18 121:3,3
124:5 139:9,14,16
139:24 147:2,5,7
150:15 165:6
**complaints** 22:23
23:1,7,10,17,24,25
55:7 88:8 95:4,8
102:20 116:19
137:5,8,8 138:1,3,3
138:10 139:4 152:1
152:1
**complete** 167:17
**completely** 122:14

**comply** 116:15
147:10,14 148:14
148:19 149:10
**component** 75:8
**comprehensive**
92:12
**concealed** 138:6
**concealment** 77:8
138:4
**concealments**
143:18
**conceded** 26:13
**concedes** 114:15
**concept** 36:23 37:22
38:3 39:15 44:14,23
45:11 47:5 49:2
58:2 66:6
**concepts** 30:8 43:3
45:14
**concern** 31:17 48:6
53:22 112:10
142:14 144:4
**concerned** 47:4
86:23 88:22 117:4
169:10
**concerns** 15:25
95:24 100:4,15
108:10
**conclude** 104:15
167:3
**concluded** 21:7
101:23 170:15
**conclusion** 21:9
91:21 93:7,7 110:12
**conclusions** 93:15
142:4
**conclusive** 128:8
**conclusory** 90:12
102:1
**concrete** 108:8
**condition** 28:12
73:23 131:10
**conditional** 16:24
**conditioned** 10:10
154:14
**conditions** 131:13

**conduct** 16:4 23:12
51:10,19 52:9,21,22
53:1,18 100:6 126:9
137:9,14 138:19,19
139:3 147:3 149:18
**conducted** 27:6
**conference** 22:10
**conferences** 24:17
**confession** 26:7
**confines** 112:17
**confirm** 114:25
**confirmation** 12:15
154:10 157:23
163:6
**confirmed** 40:16
118:9
**confirming** 19:18
**confirms** 59:10
**conform** 51:22
160:18
**confronted** 97:14
135:22
**confusion** 108:23
**congressional** 106:6
**connection** 8:7 43:9
45:15 49:6 61:23
62:3 63:7,9 93:13
99:12 122:23
126:15,16 143:7,18
**consciously** 143:13
**consciousness**
130:17
**consenting** 147:12
**consequence** 89:6
89:25 98:15 109:6
117:17
**consequences** 29:12
34:7
**consider** 20:15 30:6
94:15 163:10,11
**considerable**
114:18
**consideration** 112:7
112:23
**considered** 16:11
159:4,7,8 163:13

**considering** 159:14
**consistent** 34:25
36:21 94:20 152:14
165:17 167:17
**consolidated** 23:22
24:1,2 26:23 54:25
55:1,2 56:10,16
57:5 102:20 138:10
150:15 152:1
**constituencies**
85:19
**constituency** 11:7
163:24
**constitutes** 93:2
**constitutional**
128:2 132:12
167:18
**constitutionality**
66:15,24
**constitutionally**
48:1 129:6 155:17
155:18 156:12
**constraints** 37:11
**constructive** 96:13
96:13 117:11
**constructively**
114:8
**construe** 8:20
**construed** 8:12
155:4
**consult** 92:15
**consumer** 60:4
75:10 83:22 116:14
116:22,25 137:13
137:18
**consumers** 137:21
**consummated** 42:2
**consummation**
70:20,21,24 71:2,6
72:5,5
**contact** 107:15,17
150:8
**contain** 94:24
**contained** 115:3
**contemplate** 151:11
**contemplated** 60:23
74:6,10 85:9 169:8

**contend** 86:25
98:12 123:19 124:9
**contended** 101:22
116:18
**contending** 53:20
**contends** 89:22
91:17
**content** 102:8
124:21 133:18
158:18 167:16
**contention** 10:24
76:8 90:14 96:8
107:22 113:25
116:22
**contentious** 125:25
**contested** 40:10
**context** 12:10 13:5
14:1,1 17:8 37:5
41:3 44:8 45:4
46:14 49:18 63:21
76:16 77:4,9 78:14
87:9,13,17,19,19
91:7,25 93:25 100:2
108:13 117:14
154:4 156:12,13
157:1,1 158:20
163:12
**contexts** 154:5
**contingent** 62:19
109:4
**continuation** 43:8
43:16 129:20
**continue** 112:14
115:16 142:24
**continued** 10:8
115:13 119:7
124:12
**continues** 118:18
**continuity** 45:25
46:4,5,10,15
**contract** 101:4
102:6 131:13
**contracts** 140:23
**contractual** 54:1,2
54:4 69:21 78:10,13
78:25 79:3

**contrary** 10:19
**contrasted** 21:23
**contribution** 73:13
**control** 81:3
**controlled** 124:22
**controlling** 108:6
**controversy** 8:4
**converted** 84:1
162:23
**converting** 109:25
**convicted** 105:24
**convince** 82:5,7
88:20 109:21
**convinced** 146:10
155:20
**convoluted** 131:14
**cooper** 18:22
**cope** 167:1
**core** 102:23
**cornerstones**
156:24
**corp** 1:7
**corporate** 45:4
99:16 135:3,3
**corporation** 43:24
**correct** 30:2 31:25
32:12,16 121:17
164:19 169:24
**correctly** 43:22
**correspondence**
112:3
**cost** 10:2 11:4,5
27:14,15,16,17,22
100:8,13 101:8,10
112:10 138:13,24
152:21
**costly** 75:21
**costs** 100:9
**could've** 101:12
**couldn't** 109:5
118:6 159:1 166:11
**counsel** 6:16,20 7:8
22:7,11 23:23 38:22
39:23,24 55:6 66:23
85:2 86:3 111:22,23
119:12 143:10,17
144:2,6 166:19,20

[counsel - date]                                                                                   Page 10

168:1

**count** 86:2 108:1
138:17

**counterpart** 128:3

**country** 88:6
117:13 171:21

**counts** 137:7

**county** 64:25 138:1

**couple** 54:23 118:25
136:19

**coupled** 77:1

**course** 9:16 12:7
61:7 86:4 91:20
108:22 136:9
139:11,13,25 141:9
145:16 168:17
170:4

**court** 1:1,13 6:2,9
6:13,17,21,24 7:5,9
7:14 13:3 15:2 22:4
24:23 25:23 27:3,7
28:1 29:25 31:16
32:10,13,17 34:11
34:22 36:4,8 37:9
37:21 39:13 40:25
41:2,8,14 42:13
43:24 44:16 45:2
47:16 50:11,18 51:1
51:6 52:17 53:2,16
53:20 54:7 57:16
58:12,17,21,24 59:1
59:6,8 61:5,14 62:5
63:25 64:1 65:4,12
65:18 66:12,14,16
66:25 67:5 68:6,9,9
68:11,20,25 69:9,13
69:15,17 70:1 71:2
71:11,22 72:3 73:15
73:16,20 74:19 75:2
75:23 76:10,23 78:6
80:21 81:20,23
82:14 84:12,18,25
85:12,16,24 86:15
88:4 89:10 95:8,8
95:12,19 97:6,10,23
98:3,7 101:23 102:4
102:5,15,17 103:13

104:2 105:5 108:3
109:9 111:7,13,17
112:1 113:2 114:17
114:20,24 115:5,20
116:12 117:22
118:10,14 119:13
119:19,22 120:20
120:24 121:7,9,20
122:2,7 123:13
124:3 125:16
126:21 127:12,15
127:19 128:18
129:8,10 131:23,25
132:3,5,6,9,10,15
132:22,24 133:2,10
133:15 134:11,14
135:19 136:5,15,20
137:1 139:6,11,14
140:2,15,18,25
141:3,6,24 142:3,7
142:10,13,14,20
143:1,9,19,24
144:14,16,21 145:1
145:5,9,20,22 146:2
146:7 148:23 149:1
149:4,20 153:13,15
154:18,18 156:5,8
156:14,19 157:25
159:6,14,15,17,19
160:11 161:9,14,18
162:3,17,19,21
163:18,21 164:9,11
164:14 165:4,20
167:20,24 168:9,17
168:23,25 169:2,5
169:12,16,20 170:3
170:12

**court's** 24:21 112:2

**courtcall** 170:7

**courts** 18:11 30:13
67:17 80:14 88:5
89:16 104:10 135:6
156:10 159:10
160:9

**cousin** 128:6

**covenant** 38:19
65:1,2,4,6,19 67:15

67:21 149:7

**covenanted** 148:19

**cover** 105:21 106:2
106:11 107:4
166:21

**coverage** 27:5

**covered** 26:13
60:17 72:20

**covering** 71:5

**covers** 120:19

**crafted** 23:9 112:4

**created** 29:17

**creates** 79:16 96:24

**creating** 159:15

**creative** 163:16

**creativity** 166:24

**credit** 67:7

**creditor** 8:14 11:7
13:10,12 17:20
41:11,20,21,22
42:15,20,21,22,24
43:18,18,18 62:2,14
62:17 65:2 67:16,19
69:6,10,22,25 70:16
71:1,5 72:8 74:4,14
78:14 90:1 96:1,2
99:7 107:6,9 158:1
158:3 160:25 161:1

**creditor's** 12:22
71:13 84:4

**creditors** 11:10,11
15:8 16:6,7 21:17
39:12 40:4,5 41:16
41:25 48:6 62:19,23
62:25 63:1 69:24
71:6 72:6 75:9
78:20 79:5 84:5
89:24 96:5,8 98:13
99:8 100:25 101:20
103:1 109:4,4 111:5
131:17 153:25
155:2 162:24

**criteria** 24:9 159:21

**critical** 14:22 30:5
57:5 69:11,16,19
71:18 87:20 91:25
125:2

**critically** 92:5

**criticism** 30:3

**criticized** 108:6,7

**cross** 166:6

**crucial** 144:6

**crummy** 53:9,13

**crutcher** 4:7

**crystal** 93:9

**ctf** 95:4

**cube** 32:3 34:3
100:6

**cubes** 110:17

**cultural** 100:14

**cure** 79:15

**cured** 101:12

**current** 93:17

**customer** 94:12,25

**customers** 137:17
138:15

**cut** 61:6 62:2 71:3
84:7,9 100:11

**cutoff** 60:21

**cutting** 100:9
138:13

**cycling** 108:17

---

**d**

**d** 6:1

**da** 138:1

**daily** 81:3

**dallas** 5:3

**damage** 65:9

**damages** 38:23 70:6
70:12 152:6

**danger** 97:15

**dangerous** 104:24
105:21

**danny** 4:23

**database** 94:22,23
95:7 96:14,15
100:11,12,24

**databases** 94:23
95:9 96:14

**date** 9:21,23 13:24
14:1,4,5 28:24 29:7
29:11 31:10 34:2,6
34:22 39:2,7 40:19
58:11 59:15 64:3,7

78:14,15 79:5 80:13
80:14,17,18,20,23
80:25 83:1,5 110:8
110:9,15,18 113:23
118:2 119:7 135:7
135:11 164:19,20
171:25
**davidson** 3:8 22:7
**day** 27:6 49:21
**days** 13:1,21 147:15
**dc** 97:3
**dd** 28:15
**de** 43:8,15 46:6
**dead** 163:24
**deadline** 9:23 10:13
84:15
**deadlines** 32:7
**deal** 25:3 32:6 33:6
33:7,13,13 34:4
37:9 49:4,20,22
65:5 66:8 70:3
72:10 73:20 77:11
80:13 87:5,10 102:4
117:7 120:25
**dealer** 56:7,12
**dealers** 95:1
**dealing** 29:20 30:10
30:24 31:11 32:3,4
32:19,20 35:25
37:15,16 54:19 57:2
59:11,22 65:8 67:16
69:25 73:16 83:17
139:6 141:23 151:2
**deals** 57:9,20
139:10
**dealt** 31:20 80:14
**death** 89:13 97:1
143:8
**debatable** 8:20 20:8
51:9
**debated** 81:13
**deborah** 4:22 7:2
**debt** 28:10
**debtor** 12:13,14,15
12:25 31:14 62:3
68:12,13,14,16,23
68:24 69:8,20

109:25 117:10
118:17 130:13
132:15 135:14
136:12 153:19
**debtor's** 39:12
68:19
**debtors** 1:9 117:6
**debtor's** 140:21
154:14
**deceived** 143:7
**deception** 139:2
**deceptions** 137:25
**deceptive** 137:13
**decide** 11:8 16:8
24:23,25 33:10 66:2
72:20 104:12 142:2
161:3,7,16
**decided** 43:23 45:22
60:20 111:20 159:3
**decides** 88:10,11
**deciding** 19:22
158:4 161:25
**decision** 18:20,22
18:23 19:1,3 27:7
33:9 40:1,10,24,25
41:1 44:3,12,15
45:12 46:11 47:25
50:9 63:22 64:17,25
65:24 100:9 102:6
111:19 112:15
113:1 115:19
140:14,21 143:3
144:10 147:24
150:17,18 151:9
158:6 160:23
161:22,24 162:2
164:4
**decisions** 19:12
32:22 50:6 64:24
141:8
**decisis** 50:4
**declined** 65:18
**decrease** 22:25
**deeper** 87:2 137:18
**default** 90:9
**defect** 63:16 64:4
64:21 76:14 77:5,22

86:25 87:7,8,12
89:6 91:10,11,23
96:22,24 97:8,21
98:2,5,6,16,23
99:24,25 100:16,18
101:17,22,25
104:24 106:16,16
107:19 110:13,14
110:24 113:21
114:9 115:10,12,16
115:18 117:13,18
119:2,9 122:18
123:1,1,5,7,7,11,11
123:20,23,24,25
124:14 125:11,12
126:13 129:25
131:19 133:19,20
133:24 134:6 138:9
138:22 143:6
149:21 150:11
151:6 155:24
157:16 164:23
165:25
**defective** 53:7 61:25
98:22
**defects** 11:21 60:24
137:20 138:9,13,15
**defend** 71:21
**defendant** 154:19
160:3
**defendants** 41:19
**defense** 89:3
**deficient** 128:16
**defined** 25:15 26:20
52:3 58:7,9 75:17
141:13
**definitely** 137:8
**definition** 58:8,15
58:25 59:2 98:23
148:4,5,16
**definitions** 58:20,21
**defrauded** 73:10
**defrauding** 74:9
**degree** 14:6
**delay** 8:7 144:5
**delayed** 75:21

**delays** 32:5
**delivered** 141:16
**deluca** 124:8 128:19
143:11,12
**demonstrate** 96:9
**demonstration**
115:9 118:23
**denials** 90:12
**denied** 13:22 15:14
15:25 16:3,18,20
17:4 20:6 102:10
**deny** 17:15 57:24
**department** 92:7
95:7
**dependent** 50:20
**depends** 13:2
162:12
**deploy** 125:15
**deploying** 122:23
**deployment** 89:7
95:6 98:24 115:12
**depositions** 93:17
93:20
**deprivation** 90:4
**deprived** 70:9
126:23 127:1 166:4
167:6
**depriving** 158:16
**described** 27:14
**description** 49:17
**design** 11:21 60:24
77:7,22 94:6 101:22
101:25
**designated** 6:15,19
7:8 38:22 85:2 86:3
143:10,16 144:6
**designed** 9:25 53:10
115:4 148:21
**despite** 17:25
165:25
**destroy** 33:1
**destroying** 32:5
39:20
**detachment** 66:12
**detail** 95:10
**detailed** 75:20

detent 94:16
determination 88:3
98:5 114:10 143:2
144:11
determine 8:11
28:19 86:15 88:6
92:4 102:21 104:9
105:5,19
determined 91:2
97:20,21 98:1,1
102:11,14 105:20
109:9 116:6 160:24
determining 14:22
96:6 147:15
deterrence 143:17
devaluation 138:8
develop 24:5
developed 132:2
143:9 144:12
development 65:1
dhl 158:1,5
diacetyl 156:6
dice 139:16
dichotomy 61:1
dicta 161:21
dictate 40:2,3
dictates 157:2
dictating 158:18
didn't 118:6 120:9
123:14,17,24 125:5
126:6 127:9,9,10
128:20 129:3,4,5,6
129:10 131:25
136:1 147:13
154:25 155:1,2
157:9 158:1 161:1
161:11,21 163:23
164:23
die 10:16
died 89:3 152:17
difference 88:14
131:21
differences 32:1
61:15 83:5
different 12:21
13:15 15:22 16:17
21:10 29:19 31:10

34:7 37:15 39:2
42:15 44:19 62:15
69:5 70:4,11 74:2
91:21 94:24 95:15
95:16,17 102:1
103:16 105:13
107:12 109:15
115:5 124:1,5
139:17 146:14
150:13 153:6
161:12 162:1
165:24 166:14
differently 16:9
26:13 76:12 81:21
150:20
diligence 153:18
diligent 100:23
dimension 155:24
diminimous 112:22
diminution 157:11
direct 27:11,18,21
67:6,16 73:13,18,18
80:5 101:8,9,13
103:8,12 117:19
154:6
directed 28:17 29:6
86:3
direction 18:1
directly 11:6 104:19
160:2 162:14
disagree 46:20
51:16 113:25
129:15 131:9
148:16 164:10
disagreed 130:11
151:22
discharge 12:6,7
40:20 62:7 118:8,8
118:11,13,14 148:9
154:4 157:22
158:14
discharged 12:12
12:13
discharges 12:22
disclaiming 111:12
disclose 87:1,12
99:24 104:22,25

114:7 118:4 126:6,7
138:11 149:19,19
149:20,20
disclosed 49:10
100:25 126:7
128:18
disclosure 28:24
49:13 119:2 126:18
129:25 138:21
discovered 63:16
discovery 93:10,11
93:13,16,16,21
116:5 142:24 143:4
144:4,9 166:8
discussed 25:7
147:20 162:14
discussing 44:16
159:21
discussion 87:17
127:24 148:2
150:16 159:23
160:3
disengagement
134:1
disingenuous
112:16
dismissed 122:8
dispersed 113:19
dispute 8:4 15:6,6
37:20 142:18,19
disputed 142:25
disregard 18:5,16
dissertation 99:13
disservice 163:3
dissipated 111:3
dissolution 117:7
distinction 74:3
93:1 151:17
distinctions 12:2,18
distinguish 30:4
92:1 158:24
distinguishable
83:2
distributable 163:5
distribute 165:16
distributed 163:4

distribution 111:4
111:11,14,21,24
112:6,22 113:14
163:24 165:14
distributions 21:16
40:13 111:18
district 1:2 18:11
18:22,23 43:25 45:3
65:22 68:6,9 97:3
108:3 122:7 132:7
154:18 156:11
157:25 158:5,6,10
160:22 161:9,10,18
161:19 166:2
dna 123:2
doctrine 19:16
128:11
documents 53:23
165:18
doesn't 70:9 116:16
118:23 128:24
132:11 151:13
157:1,23 162:7
doing 9:3 38:1,1
43:9 54:13 57:23
67:11,11 109:25
114:4 154:7
dole 97:15
dollar 21:24
dollars 31:7 42:17
42:18,20,23 134:3
domestic 28:6
don't 116:1,8,23
117:23 118:24
120:16 121:15,17
121:18 122:16
131:2,9 133:23
134:6,7 135:8,15
140:2,7,20 142:3
145:25 149:15
159:20,25 162:3
164:7 165:12 168:7
door 111:1
doubt 124:16
douglas 46:11
dovetail 30:8

**dpwn** 153:12 154:1
154:3,11,17,22
157:25
**drafted** 71:16
**dramatically**
100:10
**draw** 142:4
**drawn** 119:4
**drew** 33:2 106:14
**drexel** 78:9 92:7,21
92:25 102:16
156:20
**drive** 152:21,23
**driver** 152:8
**drivers** 151:5
**drives** 151:11
**driving** 61:24 94:10
94:11,13 149:19
152:14
**drove** 79:11,13
88:24,25 95:2 151:3
**due** 8:9 14:10,20,24
15:3,12,23,25 20:6
21:5 24:18,18 25:4
30:7,9,15,23 31:17
34:10 35:3,19,20
37:4,10 38:5,7
48:10 62:13 63:25
66:17,18,19,20 67:2
67:10 68:21 70:10
71:10,12 79:25 80:1
85:7 86:9,11,13,16
86:20 88:5,23 89:21
90:5 92:3 95:24,25
96:3,7 98:12,15
100:1,4 101:13,21
102:3,9,25 103:2
105:9,16 106:20,23
107:24 108:10,13
108:19 109:6,14
117:20 118:1,23
122:14 123:10
124:19 126:22,22
131:12 132:13,19
134:9 136:9 144:8
146:17,18 153:5
154:3 158:5 159:12

160:16 161:10
162:9 163:15
165:13,22 166:5,8
166:24 167:17
**dunn** 4:7 6:23
**dust** 163:21
**duties** 54:15 138:5
165:18
**duty** 51:18 52:15
56:1,14 57:6,12,13
57:15,19,20,22,22
82:17,19,20 138:11
149:8 151:23

**e**

**e** 1:21,21,22 3:1,1
6:1,1 19:3 41:2
171:1
**earlier** 115:24
130:8 155:7 164:16
164:18 167:1
**early** 22:23 169:12
**easement** 70:16,18
70:25 71:4 72:7,7
79:1
**easier** 12:12 139:12
**eastern** 158:5,6
**easy** 61:20 67:7
68:1 78:6 81:23
111:19
**ecf** 141:4
**echoed** 40:1
**economic** 20:17
21:5 22:21 23:16,21
23:24 47:6,13 55:21
56:9 57:19 59:17
62:15,18,22 63:16
77:14 79:16 88:12
88:21 103:6,7 152:5
152:6 153:4 157:11
164:1
**ecro** 1:25
**edward** 3:23 6:14
**edwards** 29:23 35:4
35:13 37:13 38:2
107:25 108:1,5,7
162:13

**effect** 17:12 33:25
37:18 40:12 42:19
45:5 60:8 63:24
66:19 77:14 93:4,14
97:15 98:2 103:10
107:1 109:13,20
131:19
**effective** 105:9
125:16 164:20,21
166:11
**effects** 45:3
**effectuate** 86:23
**efficacy** 164:19
**efficient** 126:14
**efficiently** 24:20
**effort** 24:20 103:11
**egregious** 105:25
109:21
**eight** 55:15 86:2
103:17 120:17
**eighth** 3:13
**eiseman** 3:25
**either** 12:11 19:15
31:14 33:6,12 42:10
51:12 53:7 62:5
68:3 99:6 102:19
116:2 125:4 133:6
160:6 164:22 165:7
**elective** 50:16
**element** 30:21
31:18 46:9 57:5
67:12,22 77:3
112:15 163:15
165:22
**elementary** 67:2
**elements** 35:23,24
46:22
**eligibility** 24:9
**eliminating** 60:8
**ellipses** 161:8
**ellis** 5:7 22:8
**else's** 34:24
**eluded** 148:2
**email** 94:3,7
**embedded** 48:14
**emergent** 117:6

**emoral** 40:24 41:2
43:22,23
**emphasis** 162:13
**employee** 99:20
**employees** 91:13
93:18 95:2 99:15,20
138:14
**employment** 99:18
**encumbrance** 70:22
**encumbrances**
38:13
**endemic** 38:11
**enforce** 2:1 14:16
14:17 18:5 19:21
23:6,18 24:15,16
25:10,18 32:11
69:13 87:25 96:3
127:11,20 165:3
**enforceable** 18:7
87:24 88:2,4
**enforced** 105:11
**enforcing** 26:14
67:1 139:22
**engaged** 164:16,18
**engendered** 30:3
**engineer** 94:4,4
**engineering** 90:23
**enjoined** 90:8
**enquiry** 128:4
**enrichment** 138:18
**enron** 92:8
**enter** 166:18
**entered** 24:24 40:11
70:19 72:3,25 80:18
82:9 109:3
**enterprise** 33:2,25
78:20 81:12
**entire** 14:13 159:16
160:4 168:13
**entirely** 149:13
166:16
**entities** 73:1
**entitled** 20:6 21:6
48:20 68:22 95:25
96:7 107:2 120:7
131:17

entitlements 88:15
entity 12:6 25:14
  42:16 83:18
entry 140:24
environment 20:3
  36:8
environs 132:11
equally 56:3
equitable 25:7 42:9
  114:1 125:20
  128:25 143:2
  144:11 168:4,11,14
equities 127:6,7
equivalent 134:8
erode 73:3
eroding 32:5
erosion 152:3
especially 12:25
  20:12 29:20 94:8
  103:6 106:25 117:5
  145:10 151:14
espouse 104:11
esq 3:7,8,16,23 4:5
  4:13,14,15,22 5:5
  5:12
essence 57:9 58:1
essential 30:21 69:3
essentially 32:20
  147:13 153:15
  156:3
esserman 4:25 5:5
  7:6,7,7,10 85:5
  103:4 119:13
  136:15,17,17,21
  137:4 139:8,12,13
  139:23 140:5,9,17
  140:20 141:2,5,7
  142:6,8 146:20
  147:22 152:20
  153:24 167:15
esserman's 127:21
  128:7
establish 30:22
  144:4
established 45:8
  46:16,23

estate 29:13,16
  35:19 39:12 40:4,14
  41:9,12,15 42:24
  44:1,6,7,9 47:3 63:7
  63:9 73:5,7 90:10
  135:8,9,12,16,25
  149:17
estimation 144:5
et 1:6,7 139:2,2
evaluating 153:14
evaluations 154:3
eve 124:7
event 25:9 80:12
events 20:21 21:10
  24:3
eventually 23:20
everybody 6:3,10
  43:5 56:20 81:7,14
  83:24 85:18 166:22
  167:8 168:5
everybody's 139:15
evidence 90:14
  91:20 93:2 102:1
  115:20
evil 164:9
exact 16:12 17:7
  63:21 82:8 83:20
exactly 18:10 31:25
  44:22 83:2 89:10
  103:23 141:22
  142:3,6
examination 100:23
examined 166:6
example 53:2 54:22
  66:10 116:19
  143:25 147:5
  148:14 159:14
  160:7,10 162:3
  166:3
examples 137:6,14
exceed 104:16
exceeded 142:8
excel 108:8,15
exception 7:15,21
  43:12,13,14 46:25
  47:8,10,15,23 48:5
  107:24

exceptional 30:16
exchange 83:24
exclusion 112:20
exclusive 138:12
excused 19:11
executory 140:23
exempt 159:11
exemption 129:23
exercise 158:11
exhausted 136:13
exhibit 94:3,17
  121:3
exhibited 131:23
exigencies 12:24
  100:5 110:17
exist 13:9 111:5
existed 77:9 119:9
  135:7,11
existence 117:16
existing 165:17
exists 97:21
expect 106:13
  107:14 145:8
expected 74:11
expense 112:11
expenses 152:10,12
  152:22
expensive 131:14
explain 88:2 137:2
explicit 132:3
explicitly 25:25
  44:12,14 45:18
  160:6
explicitness 76:19
exploit 164:5
exploitation 164:8
  165:15
exposed 31:6 132:2
express 41:17 163:7
expressed 18:1
  60:17
expressly 14:12
  161:25
expunging 12:10
extend 105:3
extensive 27:2,7
  137:24

extent 7:11 12:21
  13:14 48:1 62:5
  81:15 115:3,20,21
  118:21 127:25
  145:11 150:18
  152:5 158:23
  162:21 163:17
  164:17 167:9
  169:10
external 95:1
extinguish 38:12
  49:18 70:17,21,23
extinguished 38:9
  38:18 40:18,23
  45:21 47:4 48:10,13
  69:9 72:9,16 76:14
  76:17 80:17 81:1
extinguishment
  29:8 36:15 39:1,4
  65:10 67:4 71:13
  83:7
extraordinarily
  17:9
extrapolated 27:17
  27:19
extreme 36:9
extremely 75:21

**f**

f 1:7,21 39:21 44:17
  47:5 97:22 98:3
  122:6 136:4 171:1
f.2d 97:4
face 63:13 127:13
fact 14:14 19:21
  26:1 29:6 30:14
  37:16 45:22 46:23
  79:19 81:10 87:5,21
  90:19 98:11 99:24
  101:3 104:3 106:1
  106:21 111:13,21
  111:21 112:3,9
  113:12,15 114:6
  116:7 118:19,25
  119:6 120:7 130:13
  137:15 139:1 141:7
  147:6,24 154:2
  157:21 158:7 161:1

162:2

**facto** 43:8,15 46:6

**factor** 45:24 46:15

**factories** 156:6

**facts** 10:22 13:2
30:3 35:9 66:3
106:20 138:5,7,25
142:25 143:15
155:17,22 156:16
156:18 157:3,14
158:16

**factual** 10:7 24:22
137:7,19 143:5,9,11
144:9,12 151:2
155:20 167:10

**fail** 114:7 119:7

**failed** 87:1,2,12
104:22 118:4
137:21

**failing** 98:4

**failure** 13:10,14
73:23 90:3 99:23
104:25 116:15
117:18 128:6
138:21 149:18
166:18

**failures** 7:23 77:7
148:14 151:23

**fair** 7:17 168:7

**fairly** 113:3

**faith** 28:9 29:21
36:1,25 37:24
142:21

**fall** 18:4

**falls** 55:3

**family** 89:7

**far** 6:24 45:11 61:9
79:10 143:13 148:2
149:12 163:18
166:16

**fashion** 112:1

**fast** 110:18

**fatalities** 88:13 91:6
105:22 121:5

**fault** 111:6,7 123:11
123:12,18

**favor** 127:7 143:16
144:8

**favored** 16:20 18:8
42:24

**fear** 100:17

**february** 1:18
164:24 171:25

**federal** 19:24 44:17
44:21,25 45:10
51:22 92:11,14
94:21 100:24
106:18 110:12
116:21 124:10,11
128:2 148:20

**federally** 47:2

**fee** 27:12

**feel** 7:12 54:10

**feels** 26:12

**fees** 107:15

**feinberg** 24:5,9,11
91:8 152:16,18

**feld** 4:17

**fell** 121:19

**fiancé** 105:25

**fiction** 165:23

**fictitious** 53:6

**fide** 30:8,11,25 35:8
35:11,14 36:23
37:17,17 49:1 83:17

**fiduciary** 41:12
84:5 165:17

**field** 95:2 166:17

**fifth** 46:24

**fight** 34:24,24

**figure** 61:10 107:2
139:20

**figured** 122:22

**file** 12:20 23:18
29:8 40:19 76:15
107:20 113:23
118:3 120:9 124:24
127:9,10 137:11
154:9 157:19 165:2

**filed** 9:3 14:4 22:23
23:6,7,17,23,25
27:4,12 48:18 82:1
89:17 92:20 107:14

116:19 120:17,18
120:22 124:23,23
127:10 133:17
163:8 165:1,5,5

**files** 122:25

**filibustering** 145:14

**filing** 9:21 13:24
28:23,24,25 80:11
80:24 88:24,25
121:11 135:7,11

**final** 140:3 161:4
163:14

**finality** 35:18
108:20

**finally** 19:6 20:1
90:8

**financial** 8:12 78:5
78:7,8,12,15,19
92:7

**financing** 10:9

**find** 10:22 14:9 21:4
47:9 157:4 159:16
159:17 167:10

**finding** 10:7 14:20
14:24 28:11,14 31:2
31:5,20 52:16 76:18
87:15 114:3 141:24

**findings** 10:20,21
128:17 141:7,23
147:24

**finds** 15:2 163:2

**fine** 14:16 85:15
142:18 144:20
162:25

**finish** 167:25 168:6

**fired** 91:13

**firestorm** 106:6
119:1 124:6

**firm** 60:21 92:7

**first** 7:21 11:1
14:11 15:20 16:11
22:2,9 25:2 34:16
38:11 39:3 40:17
61:13 62:5 69:23
73:24 76:1 86:9
89:21 105:13
111:12,21 118:21

120:15 126:3
128:13 131:15,18
133:6 137:17
146:23 150:22
153:16 159:2
164:17 165:7

**fit** 7:16 66:23

**fits** 72:23

**five** 16:10 18:9 19:7
38:10 48:11 61:12
64:24 65:15 66:22
74:24 79:11,13
83:13 87:9,11 88:24
88:25 89:3 104:21
105:21 106:3,15
107:4 108:13,14
114:7 115:11 126:8
134:2 144:21
147:15 162:25
168:15,15 170:1

**fix** 34:14 55:17

**fixed** 53:3

**flaxer** 4:5 6:11,12
7:9,11 142:11,12,16
142:22 143:23,25
144:15

**fleet** 95:4

**flexibility** 84:21
159:15

**floor** 92:24

**focus** 8:7 12:17
13:12 37:19 72:25
109:19 110:7 115:7
118:19,19 127:24

**focused** 137:17

**focusing** 109:16
129:20 142:23

**fold** 111:4

**folger** 108:15

**folks** 7:15,22 11:6
20:1 103:20 142:11
153:11,23 154:24
164:3

**follow** 50:4 157:2

**followed** 110:8
118:22

**following** 41:25
104:21 161:6
**follows** 154:10
161:2
**fond** 151:8
**footnote** 44:15
**force** 17:13 32:13
32:20
**forced** 96:9 165:11
**ford** 97:15
**foregoing** 171:3
**foremost** 150:22
**foreseeable** 8:18
78:3
**foreshadowing** 81:9
**forget** 104:20
**forgive** 89:18
103:13
**forgotten** 13:18
**form** 20:16 81:24
82:3 99:5 119:5
123:7 124:20,21
125:8 133:18 134:5
158:18
**formed** 32:14
**former** 93:17
**forming** 137:14
**formula** 27:20
**formulated** 33:7
**forth** 124:7 139:17
150:24 153:13
154:12 157:19
**forward** 8:19 28:12
28:13 54:3 118:2
149:25 156:2 157:9
166:4
**foul** 105:16 118:5
**found** 10:14 28:8
46:7 71:12 88:19
102:11 166:5,23
**foundational** 31:18
50:25
**four** 13:5 27:18
43:10,15 45:23,24
46:22 65:21 120:17
134:2 162:25

**fourth** 45:20 90:6
**frag** 17:23
**frank** 115:25
**frankly** 18:16 86:18
88:18 102:8 116:4
**fraud** 63:25 64:1,16
101:23 129:23,24
**fraudulent** 43:9,17
46:8 77:8 135:5
138:3
**free** 16:19 17:18
20:12,15 36:2 37:1
38:13,18 39:17 41:4
53:17 54:5,13 62:7
65:18,23,23 69:20
75:5,15,18 82:6
103:11,14,15,22
114:13 122:5
124:12 125:20
131:10,11 133:22
136:4 161:4
**freshman** 26:6
**fritz** 8:22
**front** 86:19 93:12
120:18 160:1
**fuel** 150:23
**fuentes** 66:10
105:14 109:12
**full** 87:4,9 140:4
144:9 145:25 147:9
147:25
**fully** 27:8 104:2
144:10,12 145:8
**function** 95:25
102:23 113:6,7
**functionality**
106:10
**fund** 152:16
**fundamental** 37:9
37:23 39:1,14 40:17
49:9 50:25 67:12
151:17
**fundamentally**
39:21 51:15 64:18
151:19,24 158:15
**fundamentals**
156:24

**funds** 81:13 113:18
164:5
**funneling** 39:12
**furman** 23:22 88:5
88:10,11 93:12
104:12 116:7
120:18 132:21,23
139:19 155:15
**further** 21:16 64:1
75:8 111:18 120:5
137:19,25
**future** 48:6 62:2,14
62:17,25 63:1 74:4
93:14 97:7,13 107:1
109:4 143:17
151:21 153:1

**g**

**g** 6:1
**garden** 27:12,20
**gather** 9:9,10 14:12
14:14
**general** 1:7 3:3 5:8
6:8 22:20 23:17,25
25:10,11,19 26:20
28:13 29:1,2 32:8
32:19 42:3 43:2,10
46:1 47:21 48:8
54:14,21 57:7 60:20
60:20 62:12 78:19
81:10 83:11 87:19
97:3,18 98:2 100:1
106:7 111:5 116:20
122:19 123:12
133:16 138:2 144:2
155:3 162:15
**generally** 16:20
43:3 80:2 108:21
**generals** 60:5 75:10
84:4 116:17
**genuine** 51:7
**gerber** 1:22 132:7
**getting** 160:10
161:20
**gibbs** 6:23
**gibson** 4:7
**give** 12:19 13:10
14:1 15:18 16:23

29:12 41:15 54:22
58:17 67:1,3,6,7
79:2 85:13 87:14
97:4 98:17,18 109:3
116:24 117:15,18
119:8,10 131:14,16
133:8,12,13 137:6
**given** 9:5,9 12:22
13:9,12,16 16:14,16
21:10 27:3,5,11
29:14 30:15 66:19
73:4 100:5 103:1
113:22 129:3 130:3
133:6 153:10
**gives** 41:21
**giving** 29:11,17
39:18,19 42:21 79:4
80:24
**glad** 51:14
**glom** 117:24
**glove** 25:20 51:20
52:1 59:24
**gm** 7:23,24,25 8:6,6
8:24 9:10,15,16
10:3,9,16 11:17,18
13:8,9,22,25 14:4
16:3,25 20:21,21
21:1,2,3,10,11,17
21:23,24 22:17,18
23:2,2,11,11,13,15
23:18 24:5,5,11
25:5,13 26:2,25
27:24 28:2,8 29:13
32:14 33:20,24
46:18,19 51:7,8,10
51:18,25 52:1,1,1,2
52:2,4,4,5,6,7,8,8
52:10,11,12,14,20
52:21,22,22,24,25
52:25,25 53:3,5,6,7
53:8,8,13,16,25
54:1,3,17,19 55:19
55:20,21 56:7,10,17
56:20,23,23 57:2,3
57:3 59:11,13,16,19
59:19,20,22 60:11
61:1,2 62:11,22

63:9,10,12 64:2,2
64:20 75:3 76:3
77:5,17,18 79:21,22
80:9 82:17,19,20,23
101:2 111:22,22
82:24 87:1,6,12,21
89:9,14,22 90:9,14
90:19 91:1,9,12,17
91:19,22,22 92:2,4
92:15 94:4,4,20
95:2,13,21 96:9,10
96:12 97:8,10,16
98:16 99:11,18,25
100:3 101:25 103:8
103:11 104:19,22
105:3 106:5,12,17
107:17,23 110:7,9
110:10 113:10
114:6,13,15,15,23
115:3,4,14,19,21,22
115:22 116:1,2,9,9
116:23 118:4 119:7
119:7 120:1,10
121:12,13 123:19
123:19 124:22,22
125:4 126:1,3,4,5,9
126:10,10,12,13,15
126:16,17,17 127:3
127:4,5,6,10 129:18
133:17 136:25
137:5,12,15,19,20
137:22,23 138:4,5,6
138:7,10,20,22,25
139:1,7,10,17
141:12,18,19,21
143:7,21 146:11,25
147:2,3,4,9,10,13
147:21 148:18,21
149:16,16,18 150:9
151:1,8,13 152:13
152:16,21 153:1,9
153:25 154:23
155:21 157:4
158:23 160:23
162:12 163:17
165:1,10,23 167:10
**gm's**   10:15 21:3
25:14 28:10 39:23

51:24 80:11 87:25
88:7 89:3 90:10
95:7 99:8 100:8,23
101:2 111:22,22
**gm's**   115:18 116:15
122:24 137:5,9,24
138:11,12,19
141:14 143:6 152:3
160:17
**go**   11:20 12:14
15:16 21:24 26:16
42:3,16,17 45:11
47:16 53:21 90:16
90:22 91:4 92:19
93:6 95:10 97:17
106:2,24 107:1
120:10 122:9
126:19 133:11
134:16 135:21
136:5 137:19
142:21 144:1
149:25 163:18
165:1,20
**goal**   70:13
**god**   123:18
**godfrey**   22:8
**godfry**   5:12
**goes**   87:2 88:22
104:20 138:15
143:12 149:11,12
**going**   6:6 10:25
14:1 15:4 21:15
28:12 33:3 37:24
46:2,3 47:4,17
49:11 52:6 53:11
54:3 55:1,5,16
57:24 60:13,16,19
60:25 62:13,14
63:19 65:20 66:16
69:13 70:5,23 73:17
75:18 79:4,15 81:11
82:21,25,25 84:16
85:4,5 87:4,6,7,8
89:15 91:4 93:6
94:17 95:10 98:20
99:2 106:24 107:3
110:19,22 111:10

112:25 115:14
119:17 122:1 126:5
126:19 128:18
129:15 135:5 136:5
136:10,18 140:12
141:8,14 143:13
145:1,5,6,12,16,17
152:21 157:2
163:10 165:11
**golden**   169:3
**goldin**   4:23
**golenbock**   3:25
**gonzalez**   40:7,8
**good**   6:2,14,18 7:2
7:6,14 22:5 28:9
29:21 36:1,25 37:24
67:19 76:6 111:8
119:15 132:17,18
132:18 134:5
136:15 142:20
**goodwin**   3:10 6:19
**gotten**   29:15 35:7
35:12 64:19 74:15
101:12 109:5
111:15
**govern**   71:3 165:18
**government**   10:15
10:16,23 25:13
33:24 46:2 81:11,13
124:11,11,23
**government's**   10:12
**government's**
124:25
**grady**   18:24
**grandson**   158:11
**grant**   5:1 17:2,18
20:12 162:6
**granted**   16:19
144:7
**granting**   143:16
159:21
**gravamen**   151:25
**great**   38:19
**greater**   167:16
**green**   1:14
**grenade**   17:24

**groman**   4:1
**grope**   115:23
**gropper**   154:5,8,10
154:16
**ground**   36:6
**grounds**   37:4,11
66:2 67:11 68:21
159:3 161:7
**group**   16:4,5,6,21
42:21 100:11
103:20 108:18
121:10 123:3 146:6
150:1
**groups**   60:5 146:19
**grumman**   61:17,20
61:21 62:10,16,16
63:2,3,3,5,6,10,14
108:22 109:5
135:18,18,23 150:5
150:12 153:3 158:7
**guarantee**   78:11,13
**guarantees**   78:11
**guc**   4:9,18 6:23,25
10:25 46:19,20 56:2
103:17 109:1 111:2
112:1,21,21 113:13
113:19,19,25
144:25 145:3,5
149:17 163:2,4,7,8
165:2,8,11
**guess**   16:6 141:20
144:17
**guide**   119:22
**guides**   50:5 154:3
**guiding**   154:17
167:4
**gump**   4:17 7:3
168:23
**guy**   69:2 132:24
166:6
**guys**   14:18 15:4,25
20:7,18 21:17 51:4
71:23 85:13 103:16
128:9 144:17,23
145:11 164:3,6
169:12

**h**

**h** 4:13
**half** 61:3 81:23
  85:13 168:14
**hall** 19:5
**hand** 12:19 20:18
  61:17 62:7
**handled** 135:21
**hands** 125:19
**happen** 11:22
  110:21 117:14
  119:1 131:8
**happened** 46:18
  47:20 81:7,8 89:13
  89:14 91:17 105:19
  105:20 106:19,21
  124:3,9 130:22
  131:22 134:9
  135:12,13 151:7
  167:9
**happening** 81:8
**happens** 39:21 61:9
**hard** 84:15,19
  150:4,11
**harder** 49:14
**hardship** 48:25
  163:25
**harm** 105:16 118:5
**harris** 1:25
**hasn't** 145:3 162:14
**hauer** 4:17
**head** 91:12
**heads** 112:14
**hear** 6:10,11 10:25
  22:2 26:12 82:15
  84:19 87:20 89:18
  89:19 99:12 105:24
  119:13 149:15
**heard** 6:4 11:2
  15:13,14,17,24
  16:17 20:13 83:23
  84:10 87:16,17 90:4
  114:11 115:2 120:7
  126:24 145:7 155:9
  156:25 161:14
  166:1,9,20

**hearing** 2:1 10:8
  13:5 28:16 32:23,25
  33:16 39:22 48:17
  49:19 60:3,4 75:4
  80:3,5 81:4,6 98:20
  99:2,2,3 119:3
  121:6 124:1,1,7,10
  125:24,25 156:2
  162:21 166:7
**hearings** 125:4
**heartbeat** 76:25
  111:15,18 112:10
  163:23
**heavily** 143:16
**held** 24:17 62:19
  69:7 70:16,25 72:7
  131:23 159:10,17
**help** 11:3 19:8,18
  19:22 35:20 61:15
  101:20 119:22,23
  128:11 133:2
  145:24
**helpful** 9:13 17:20
  137:2
**helps** 133:4
**henderson** 8:22
**here's** 153:12
  164:15
**hey** 128:9
**he's** 129:20
**hi** 142:12
**hidden** 107:19
**hide** 126:1
**hiding** 76:3
**hierarchy** 99:16
**high** 143:6
**higher** 49:7 144:3
**highest** 28:19
**highlight** 86:5 94:2
  138:17
**highlighted** 83:3
  142:24 143:12
**highly** 20:8
**highways** 117:12
**hill** 56:5
**hilliard** 120:19

**hindsight** 105:18
  106:23 109:16
  113:8
**history** 87:10
  122:19
**hit** 94:10 136:18
**hitting** 94:13
**hmm** 65:17
**hold** 13:5 111:23
  112:3 116:11,14
**holder** 71:4 146:14
  168:22
**holders** 4:18 7:4
**holdings** 19:6 44:4
  140:22 154:11
  161:2
**hollow** 109:11,11
**hon** 1:22
**honor** 6:18,22 7:2,6
  7:11 22:3,5,9,14
  24:17,25 26:18 27:1
  27:6,10 28:8,12
  30:5 31:11,20 32:6
  32:12,16,23 33:5,8
  34:17,23 35:4,9
  36:18 39:25 41:24
  42:25 43:12 45:12
  45:18,22 46:7 47:25
  48:11 49:15,23 50:1
  50:3,7 51:13 52:9
  53:24 54:9 55:9
  60:6 61:4,8 62:24
  63:11,20 64:12,15
  64:23 65:25 69:5
  71:20 74:24 75:20
  77:11,12,21,25
  78:24 80:4 81:16
  82:10 83:3,15,23
  84:15,24 85:3,9,11
  86:1,11,17,19,21,22
  87:24 88:2,16,20
  89:2,20 90:11,13
  91:4 92:1,16,20
  93:3,9,22 94:17
  95:11,22 96:15
  98:10 100:3 101:6
  101:23 102:8,11,12

102:16,18,23 104:5
  104:8,9 105:23
  106:21 107:5,6,21
  108:5,12,14,16,22
  109:10,18 110:16
  112:7,9,13 113:1,5
  113:7,24 114:1
  115:8,25 116:10,24
  117:2,4 118:16
  119:11,15 120:15
  120:23 121:2,14,21
  123:10 124:18
  127:18 128:24
  129:14 131:17 132:9
  132:14,21 133:5
  134:4,7 136:2,12,17
  139:4 140:7 142:2
  142:16,22 143:23
  144:7,9,12,15,20,24
  145:8,24 146:8,13
  146:22 147:11
  148:3,10,25 149:3,6
  149:24 150:5,17,19
  151:8,23 152:2,12
  152:24 153:8 154:2
  154:5,11,22 155:7
  155:13,14,21 156:7
  156:9,10,17,22
  157:4,20,22 158:13
  159:13,25 160:8,22
  161:3,17 162:11,24
  163:8,14 164:8,15
  164:16 165:7,19
  166:5 167:1,3,9,19
  167:22 168:13,20
  169:4,7,10,19,24,25
  170:1,10
**honor's** 28:17 31:25
  44:11 50:9 87:1,14
  88:1 91:6 102:9,20
  102:21 104:6 105:1
  114:3,9
**honoring** 12:2
**honor's** 119:16
  143:1 157:25
**hook** 89:14

**hope** 146:4
**horse** 130:1
**hot** 136:19
**hour** 61:3 85:3,4,12
  94:10,14 144:17,19
  144:20,23 168:14
**house** 136:14
**hundreds** 15:8
**hurt** 121:11
**hyde** 2:25 171:3,8
**hyperbole** 76:2
**hypothetical** 53:6
  133:8,11,12,14
**hypotheticals** 133:8

## i

**ice** 32:3 34:3 100:6
  110:17
**idea** 132:17,18
  158:21
**identified** 23:4
  24:22 25:4,6 131:19
**identifies** 155:14
**identify** 75:3 76:16
  94:21 101:2 149:25
**ignition** 8:21 9:25
  22:18,25 23:16 24:8
  28:3 53:7 55:17
  79:9,20 86:25 87:7
  89:6 90:21 91:2,10
  91:23 94:6 97:8
  98:22 100:16
  101:11,18 104:23
  106:16 110:13
  113:21 114:8
  115:10,21 116:2
  122:18,24 123:1,4
  123:10,11,20,23,25
  124:13 125:11,12
  126:13 129:25
  133:19,24 134:6
  137:6 138:9 143:5
  151:6 152:14
  157:16
**ignore** 31:4,4 50:23
  50:25 128:18
**ignored** 15:11

**ignoring** 12:14 26:9
**ii** 128:10
**illinois** 5:10 158:10
**illustrate** 146:16
  147:5
**illustrated** 78:10
**illustrious** 113:3
**imagine** 94:12
  124:6
**imagining** 76:10
**immediately** 81:25
  161:6
**impact** 87:14
**impacted** 35:2
  101:11 102:13
  106:9,15 114:9
**impending** 111:21
**implement** 132:10
**implementing**
  156:20
**implicated** 106:10
  150:14
**implicit** 160:15,20
**implicitly** 160:6
  161:10
**implied** 77:8
**importance** 80:1
  84:9 114:18
**important** 17:9
  20:2 45:24 68:17
  71:19,23,24 72:2,18
  89:21 92:5 93:2
  96:16 124:19 125:1
  130:16 135:16
  136:25 137:2
  146:23 151:18
**importantly** 25:17
  28:11 75:9 160:21
**impose** 17:22
**imposed** 139:19
**imposition** 45:5
**impossible** 113:20
  113:20
**imprint** 139:24
**improper** 66:21
**impropriety** 105:18

**imputation** 99:12
  99:13,14,17
**imputed** 99:25
**inability** 125:14
**inadequate** 135:6
**inappropriate**
  89:11,12 112:5
  126:18 135:2
**incidents** 90:20
  97:7
**inclined** 14:23 21:4
  21:7
**include** 11:5 93:24
  106:14 137:15
  141:15
**included** 19:4
**includes** 38:14
**including** 84:2
  93:18 94:21,25
  102:10 108:8
  129:21 143:17
**incomplete** 128:15
**inconvenienced**
  17:4
**incorporated**
  115:17 157:6
**incorporation**
  147:25
**incorrectly** 121:23
**increased** 138:23
**incur** 29:18 91:5
**incurs** 97:20,23
**independent** 51:18
  52:9,15,21 54:15
  56:1,14 57:6,11,13
  57:22 74:22 82:17
  82:19 138:4,5 147:1
  147:21 149:8
  152:25
**independently** 54:2
  104:25
**indicated** 86:17
  93:23 104:14
**indication** 119:8
**indiscernible** 6:12
  7:19 8:22 10:18
  12:4,10 13:3 15:7

15:15,17,23 16:12
  16:14 17:10 18:3,21
  18:23 19:9,11,20,23
  21:13,25 22:2 25:22
  43:4,6 53:12 66:12
  66:13 77:13,13 82:4
  82:5,8 90:8 101:7
  103:24,24,25 120:8
  127:17 142:14
  143:22 159:22
  169:1,22,23 170:1,2
  170:4
**indisputable** 153:25
**individual** 41:13
  67:7 89:2 105:24
  121:1 130:13
**individually** 99:21
**industries** 108:9
**industry** 73:10,10
  73:11 74:9,10
  108:15
**inevitably** 91:3
**inexcusable** 13:22
**infected** 100:8
**inference** 124:17
**inform** 155:7
**information** 10:1,4
  93:24 94:24 95:3
  113:23 124:8 125:2
  125:15,23 128:24
  134:2 152:15 157:7
**informed** 144:10
  158:19
**informs** 133:5
**infrequent** 11:24
**inherent** 12:24
**inherently** 143:2
**initial** 138:21 165:3
**initio** 15:20
**injunction** 64:7
  72:24 73:1,15,17,23
  74:7,12,17,18,23
  112:11 150:7
  154:20
**injunctive** 112:8
**injured** 11:14 17:5
  129:23 131:20

156:1 157:19
158:11
**injuries** 88:13 91:7
105:23 109:9 121:5
**injury** 89:13 96:25
**innocents** 35:6
**inquiries** 106:7
143:8
**inquiry** 116:5
128:11 153:19
**insidious** 100:13
**insists** 149:8
**installed** 115:13,22
116:3
**instance** 137:12
150:25
**instantly** 137:1
**instinct** 20:5
**institute** 7:24
**insulating** 52:9
**insurance** 73:4,6,8
73:9,9,14,14,19
74:9 138:23
**insure** 115:15
138:14
**integrated** 50:19
**integration** 69:3
**intend** 86:3 145:25
**intended** 23:24
103:9 116:24
**intentionally** 98:4
**interchangeably**
23:2
**interest** 38:13 39:18
39:20 44:11 68:15
68:19,23 71:14
158:16 159:3 161:4
167:6
**interesting** 66:1
**interests** 158:22
159:1 161:12
162:22
**internal** 95:1
122:21
**interpret** 102:24
162:4

**interpretation**
72:17 102:7
**interpreted** 154:16
**interpreting** 71:8
72:3,10,14,19
**interprets** 150:5
**interrupt** 119:19
**interrupted** 145:11
**intervention** 112:2
**introducing** 6:25
**introduction** 93:8
**invalid** 105:6
**invalidate** 66:16
**invalidating** 19:20
67:9,9
**investigated** 90:24
**investigating**
126:12
**investigations**
106:7
**invoke** 128:7
**invoked** 159:4
**invoking** 65:19
**involve** 18:11,12
52:24 72:16 139:17
139:18 158:25
166:17
**involved** 20:21
30:10,13 51:24
52:22 56:2 74:2
81:14 88:13 101:15
101:17 103:6,7
125:8,8 126:2 127:4
150:22
**involves** 15:13
72:16
**involving** 105:22
151:15,15 158:10
**irregularities**
166:18
**irrelevant** 81:16
82:22 99:16 102:9
**irreplaceable** 69:4
**irrespective** 149:9
**isn't** 141:20 164:14
**isolate** 43:2 55:8

**issue** 10:8 15:1 16:9
20:22,23 21:9 25:5
25:5,6,7 26:22,25
28:21 30:5,10,13
34:4 35:2 38:4
47:22 48:9,9 49:15
49:16,23 53:21,21
54:19 57:14 60:15
62:10,13,14 63:14
63:23 68:10,13
73:17 75:1 77:21,21
77:23 78:24 81:15
81:16,18,19,19
82:22,23 84:5,14
89:21 92:2 97:11
98:13,14,15 104:6
109:15 115:1,5
121:25 122:10,14
122:15 124:19
125:19 128:1
135:22 142:17
143:2 144:8 149:13
151:19 153:3
166:22 168:18
**issued** 9:4 20:16
32:8,9 81:5 82:6,7
83:6 95:13 103:23
154:5 155:21
**issues** 8:8 20:22
21:17 24:19,21,23
25:1,3,4 26:11 30:7
31:21 33:24 37:17
37:21 48:14 49:20
53:12 55:8 63:11
90:23 92:14 94:21
100:8,14,14 120:25
122:1 138:9 141:23
142:23 146:4
161:22 165:6
**it'd** 9:13
**it'll** 88:10,11
**item** 50:24
**items** 35:19 69:4
**it's** 114:17 117:21
117:22 118:25
119:3 124:9,10,18
125:3 126:13 127:3

127:23 128:25
130:1 131:14
134:10 139:20
140:13,17,21 141:2
143:3,25 144:1,22
144:25 145:12
148:17 149:2,2
150:4,11 153:15
155:23 158:21
164:7,15,23 168:7
168:17,20,20,22
**iv** 72:22,23,24 73:7
74:2,3,4
**i'd** 130:1 140:9
156:17
**i'll** 118:19 133:13
142:20 143:4 148:2
148:5,16 151:10
155:15 157:24,24
159:5,12 161:20
162:11,12 163:14
167:19,25 168:6
170:12
**i'm** 116:7 118:16
119:17 121:8,22
125:22 128:6
132:22 134:19
136:18 139:21
140:12 141:3,8,15
141:22 145:11
149:4 151:10
152:14,20 159:22
160:1 161:14 164:9
164:11 167:25
168:2,6
**i've** 119:17 125:7
139:15 145:6,11
168:1

**j**

**j** 3:7
**jack** 16:12
**jail** 53:17 54:5,12
103:11,14,15,22
**jakubowski** 121:23
121:23 122:2,9
**jakubowski's** 51:4

**james** 94:4
**january** 154:7
**jersey** 68:5,10
**job** 19:25
**john** 18:24
**johns** 19:1
**joined** 120:20
**jonathan** 4:5
**jose** 18:21
**judge** 1:23 6:14
11:8,18 12:22 13:12
17:13,16,17,20
18:21,22,23 19:4,4
19:14 23:22 37:14
38:2 40:7,8,11 44:3
45:9 49:3,21 50:11
50:13,15 51:8 53:11
57:14,20 61:16 62:1
62:10,14 63:17
65:22,22 66:4 67:14
68:6 80:8 85:22
86:1 88:5,10,11
93:12 104:12
110:21 116:7 118:1
120:18 128:10
132:10,21,23
133:16 134:4,22,22
135:17,17,18,23
139:19 140:8
142:12 150:18
151:10,22 154:5,8
154:10,16 155:15
160:24 161:9,19,21
162:7
**judge's** 34:12
**judges** 17:23 19:5
45:18
**judgment** 33:11
**july** 10:11,12
128:17,21 136:6
**jump** 97:4,22
**jumps** 56:2
**june** 8:6 9:20,21,22
81:9,24,24 95:13
121:11
**jurisdiction** 73:17
88:6 102:15 104:11

105:5 109:10
121:24 122:3,4,11
122:12
**justifiable** 9:6
**justify** 7:25 45:13

**k**

**k** 1:7,25 19:3
**kaplan** 80:8
**katzmann** 19:5
**keene** 43:23 134:24
134:25 135:1,17,24
**keep** 26:15 70:5
85:4,8,10 87:7,8
139:21 169:8
**keeping** 85:7
**keith** 4:14
**ken** 24:5
**kept** 48:16
**kids** 94:13
**killed** 11:14 17:5
133:21
**killing** 105:25
**kind** 6:24 16:23
19:11 34:1 53:18
67:23 74:12 93:15
112:16 113:4 116:5
119:25 120:8
125:17 130:16
133:5 154:15
**kinds** 129:24 137:3
**king** 3:3 6:7
**kirkland** 5:7 22:7
**knew** 7:25 8:24
53:9 64:4,20,20
65:2 67:20,23 80:2
83:10,11 87:1 91:22
92:3,4 96:9 98:16
98:17 101:25
104:22 110:13,24
110:24 118:4
123:14,16,17,19,19
123:20,21 126:4
137:20 153:9,17,20
153:25 154:23
155:21 157:4,5
158:3

**knock** 19:15 50:16
**knocking** 133:7
**know** 6:3 8:23
10:18,25 11:11,23
12:6 26:7 27:2 30:2
36:9 48:4 50:1 53:4
54:5,8 60:6,7 61:5
62:23 63:2,9 68:8
68:17 72:13 78:2,18
79:1,3,9,13,14 80:7
80:15,15,16,18 81:2
81:4 83:8,12 84:15
87:7,12 89:1,5 91:9
95:20 96:24 99:4,5
101:9,14,16 103:18
105:23 106:3,19,20
107:3,20 110:19
114:4,5,5 116:1,8
118:6 120:16
121:19 123:14,17
128:21 129:14
130:18 132:5 133:7
134:2 136:5 140:6,6
140:7,20 144:3
152:15 158:1 160:7
164:23 170:10
**knowing** 92:5 96:11
104:23 114:8
119:11 124:13
147:12
**knowingly** 53:5,7
53:13
**knowingness**
149:18
**knowledge** 80:23
99:14,17,19,21
117:11 138:12
143:5,14,19,20
144:1 146:11
147:15 155:3
167:11,13
**known** 8:11,14 9:1
61:25 62:24 65:1,10
67:16,18 69:21,22
69:25 74:14 79:5
81:14 87:11 88:23
90:25 91:23 96:1,8

96:22 98:13 99:8,24
99:25 101:17,20
102:4,25 106:16
107:19 115:10,11
115:11,12,13,16,18
117:13,17 119:8
123:25 131:17
138:15 153:17,20
153:24 154:24
158:1
**knows** 93:9 106:21
117:10 150:5 163:8
166:22
**koepp** 19:3 70:14
72:2

**l**

**l** 4:5 5:5 41:2
**lack** 114:11 121:24
126:17 161:7
**lackadaisical** 125:5
**laid** 93:12
**land** 38:19 65:1,3,4
67:15 70:22
**lane** 109:11,11
**language** 37:5 78:2
82:8 131:4
**large** 9:17
**largely** 26:10
**larger** 8:1 158:19
161:23 163:12
**lasalle** 5:9
**late** 12:11 84:25
154:9 165:2
**latent** 60:24 63:15
**laundry** 108:12
**laura** 94:3
**law** 12:9 17:22
25:21 35:1 38:14
39:14 44:17,18,25
45:1,15,17,22 46:6
46:7 47:11 50:5
51:21,22 52:3 59:24
60:19 87:22 89:18
91:21,22 92:5,11
94:21 95:23 96:10
100:1,1,22,24
104:23 105:2,10,14

106:18 110:12
114:7,13 116:21
117:21 119:11
128:2 147:8,14,18
158:19 163:17
**laws**  47:12 116:15
116:23,25 148:20
149:10
**lawsuit**  38:23 89:4
**lawsuits**  22:19 24:4
38:24 73:2,3 92:20
92:23 155:1
**lawyer**  21:19
**lawyers**  22:9
**lay**  139:19
**lays**  139:23
**lazy**  125:5
**lead**  23:22 55:6
**leading**  100:12
101:19
**learned**  132:18
**learning**  9:12
**leave**  49:25 126:6
170:11
**lectern**  22:4 88:18
**led**  23:16 109:14
**ledanski**  2:25 171:3
171:8
**ledger**  78:19 92:17
92:19,23 155:3
**left**  59:23 136:14
163:9
**leg**  16:5,7 42:21
**legal**  8:8 43:4,6,16
46:7 95:7 121:16
171:20
**legion**  105:17
**legitimate**  81:12
**legitimately**  82:13
**lehman**  49:4,8,22
160:22
**lemon**  25:21 51:21
52:3 59:24 60:18
**length**  150:2
**lengthy**  27:8
**lest**  108:22 112:13

**letter**  26:14 85:2
**letting**  101:14
**let's**  126:1 129:8
146:21 165:7
169:16 170:6
**level**  96:7 143:14,14
144:2 149:22
157:25
**levels**  143:6
**lewis**  54:24 55:12
55:23
**liabilities**  8:21
17:14 23:5,13 24:13
25:15,16,17,18,19
25:20 26:3,21 28:19
28:22 33:10,14
49:17,19,20 51:20
54:18 58:5,6 59:2
59:12,13 75:3,6,7
75:18 76:17 77:23
126:6 136:23,23,24
136:25 141:12,13
141:14 148:4,6,11
148:13,15 149:14
149:14
**liability**  8:15 16:9
20:20 21:8 23:3,9
28:10,11,14 31:2
41:3,5,7,9,18 42:1,5
42:7,16 43:3,11
44:1,5,16 45:4,6,14
45:16,23 46:16,24
47:22 48:1,7 50:24
51:2 52:14,16 55:2
55:5,9,25,25 56:14
57:8,10,24 58:3,6,8
58:9,10,16,24 59:1
59:4,4,14 63:18
75:19 76:18 81:20
81:22 82:3 84:6,14
87:18 88:3,11 90:6
102:5,12 103:16
104:8,13,17,17
105:3,7 115:19
120:12 121:16
122:16,17 124:13
125:17,18,21

126:11 129:16,17
129:21 130:2,4,7,9
130:15 131:1,11,20
133:23 135:22
136:8 137:5,11,12
141:15 148:9,11
153:20 155:6
**liable**  25:14 47:18
53:10,12 56:10,18
56:25 148:8 149:17
152:21
**license**  69:7,9,10,16
69:18,25 70:6
**licensee**  69:14
**licensees**  69:12 70:1
**lien**  9:22 67:4,5
70:3
**lienholder**  67:7
**liens**  38:13 75:16
**lies**  90:9
**lieu**  19:24
**lifland**  134:22
**lifland's**  44:3
**light**  112:23 138:25
**liked**  133:1
**likewise**  88:3
**limit**  48:3 127:22
**limitation**  94:25
**limited**  103:18
170:4
**limits**  145:13
**line**  33:2 43:12,13
43:14 46:25 47:8,10
47:14,23 50:20,23
105:22 106:4,14
109:22 117:2 119:4
129:21 164:14
**liquidating**  12:5,7
46:14 118:11,13
**liquidation**  1:6
106:12 110:4
**lisa**  4:13 6:22
**list**  92:23 108:12
155:2
**listed**  78:20 96:19
**listen**  109:24 110:14

**listening**  54:10
170:7
**listing**  92:20 166:20
**literally**  163:9
**litigant**  82:1
**litigants**  16:5,6 51:6
**litigation**  15:7 73:7
73:25 78:22 113:17
**litigations**  102:22
**little**  33:21,22,22,22
38:6 41:14 43:13
54:7 61:6 64:9
74:25 90:16 133:19
**live**  19:15 36:7,10
**living**  19:17
**livingston**  19:5
**llc**  3:3 5:8 140:22
**llp**  3:3,10,25 4:7,17
5:7
**loans**  84:2
**long**  21:3 52:21
87:17 99:17 105:21
111:1
**longer**  13:7
**look**  15:20 19:14
30:13 58:3 60:22
78:1 79:8 92:23
97:17 109:12
112:14 126:20
128:9,10,16,17
153:16 156:15
**looked**  122:10
139:16 155:8,10,12
**looking**  19:8 31:21
49:8 54:4,14 57:11
78:4,21 103:14,15
117:9 120:3 126:22
127:13 136:22
169:23
**looting**  135:4
**lose**  55:5 127:25
128:15 129:18
130:2
**loss**  11:22 20:17
21:5 23:17,21,24
47:7,13 55:21 56:9
56:11 57:19 59:17

[loss - minimize]                                                                 Page 23

62:15,18,22 63:16
69:1,10 77:14 79:16
88:12,21 103:6,7
125:13,14 133:25
152:5 153:4 157:11
164:1
**losses** 22:21 152:6
**lost** 120:13 127:1
130:7 152:11
157:11
**lot** 10:17 12:9,12
20:14 22:12 28:17
29:9 47:18 61:5
87:16 107:22
128:20 131:16
137:4 157:20
162:13,15 166:23
**lots** 73:25 77:6
131:8
**low** 122:23
**lower** 18:10 28:2,3
**lunch** 84:23,25
85:10,10

**m**

**m** 35:24,25 36:7,11
36:15,21,22,23 37:5
37:25 41:2 87:14
107:3 114:3 130:17
130:18,19,20,20,21
131:2,4
**macarthur** 39:10
**machine** 124:2
**madison** 4:2
**maelstrom** 125:24
**magnitude** 56:22
81:6
**mail** 9:24 27:11,15
27:18,21 67:6,16
76:1,2 80:5 101:8
101:10,13 117:19
131:15,18 133:6
**mailed** 13:20 14:2
75:25 76:6 99:6
167:14
**mailing** 10:2 11:5
134:3

**mailings** 9:19
**main** 22:4 85:18
**maine** 108:4
**maintain** 87:6
92:13 100:25 107:3
**maintained** 95:7
**majority** 97:9
113:18
**making** 12:1 32:22
45:13 52:19 98:24
111:18 112:22
113:13 118:14
120:12 121:17
125:8 131:13
160:25 165:14
**malfunctioned**
90:21
**man** 89:4 134:24
144:19,20
**management** 99:15
143:6,14,21
**manager** 100:19
**mandated** 92:11,15
110:12 155:17,19
156:12
**mandates** 91:21
**mangle** 151:10
**manifested** 123:7
**manipulate** 142:1,4
**manner** 98:14
**manslaughter**
105:25
**manufacture** 55:19
56:7
**manufactured**
60:14 61:24 114:15
114:23 115:4 123:2
139:7 148:21
**manufacturer**
87:20,21 92:6 94:19
96:12,22 97:19 98:3
117:10 156:4
**manufacturer's**
97:12
**manufacturing**
60:11,12

**manville** 19:1,2
39:10 72:22,23,24
72:25 73:4,7,22,25
74:2,3,4 127:7
129:3,3 166:25
**marketplace** 117:12
**marshals** 170:7
**martorana** 4:14
**mary** 8:23 18:22
**massaged** 141:20
**massive** 91:11
**master** 148:3
**material** 138:7
151:1 159:23
**math** 101:6
**matter** 1:5 9:22
13:11,13 15:20
40:10 44:17 45:22
46:6,7,23 53:22
59:6 63:20 66:18
67:21 68:13 80:19
90:2 91:8,22 92:5
93:23 95:23,23
96:10 99:25 105:2
109:6 110:12
113:12 114:17
116:7 119:11
121:24 122:3,4,11
122:12 128:2 131:3
**mattered** 127:2
130:5
**matters** 51:3 126:24
**matthew** 4:15
**maximize** 40:14
**mdl** 23:22,23 88:5
93:12 116:6
**mean** 14:8 42:7
44:22 46:18 78:4,12
80:1 82:12 84:10,12
85:18 140:18,18
142:3,4 157:23,24
**meaning** 36:10
161:11
**meaningful** 126:24
**means** 41:17
**meant** 132:8 141:12
141:22

**measure** 132:19
**measured** 132:13
**meat** 95:19
**mechanics** 53:4
**media** 27:5
**meet** 73:23 97:12
104:15
**meeting** 112:11
**melting** 32:3 34:3
100:6 110:17
**memory** 159:20
**mention** 48:19
131:25 134:6 143:4
**mentioned** 159:22
162:19
**merchantability**
77:8
**mere** 90:22 129:20
130:23
**merely** 40:5 80:23
**merger** 43:8,16
46:6
**merit** 129:19 168:9
**merits** 122:10
**met** 24:8 101:24
104:13
**metzger** 18:20
64:25 65:16 66:3,5
67:14,17,25 108:16
159:9,13
**mic** 6:11,25
**miles** 94:10
**miller** 33:20
**million** 9:10,11,14
9:20 10:3,4,6 13:20
13:20 14:2,2 27:18
27:19,22,22 28:1,4
28:5,6 56:19 101:8
101:9,10 131:15
**millions** 15:8
**mind** 22:13 44:14
76:24 89:1 93:1
128:21 144:11
**mineola** 171:23
**minimize** 77:20
80:1

**minimum** 62:16
**minority** 47:18
**minute** 7:13 15:16
84:18 130:10
144:22
**minutes** 83:13 85:3
85:4,21 168:15,15
169:6 170:1
**misconduct** 91:13
93:19
**misguided** 56:3
**mistaken** 32:15
68:7
**mm** 65:17
**models** 155:25
**modestly** 15:6
**modification** 114:2
130:21 131:5,6
**molds** 68:10,12,14
68:20 69:2,2 70:7
72:13,14,15
**moment** 35:5
134:10
**monetarily** 70:2
**monetary** 22:24
38:23 65:9 70:6,12
**money** 100:6 159:2
**month** 154:6
**months** 60:14 76:22
165:4
**moot** 122:8
**mootness** 25:7
168:4,11,14
**morganstern**
101:21
**morgenstein** 63:22
63:23 64:17
**morning** 6:2,14,18
6:22 7:2,6 22:5
119:15 136:14
145:7,18 146:9,22
147:23 150:16
168:3 170:5
**morphed** 126:10
**mortgage** 79:2
**mortgagee** 79:2

**motion** 2:1 10:10
23:6,18 24:14,19
82:1 87:25 88:8
124:21,24 127:9,9
127:10,10 133:18
136:7 140:21
160:12,13,14
161:13 162:4,5
165:9
**motions** 24:16
25:10,18 165:3
**motor** 45:2
**motors** 1:6,7 3:3 5:8
6:8 22:20 23:17,25
25:11,11,19 28:13
29:1,2 32:8,19 42:3
46:1 47:22 48:8
54:15,21 57:7 60:20
60:20 62:12 81:10
83:11 97:3,18 98:2
122:19 123:12
133:17
**move** 95:18 146:22
162:11
**moved** 109:23
**movements** 114:1
**moving** 32:2 34:5
66:18
**mpa** 141:13
**mullaney** 156:15,21
157:2
**multifold** 118:20
**multiple** 94:9
**multitude** 22:14
27:4
**murder** 89:4,8
**musings** 162:7

**n**

**n** 3:1 6:1 171:1
**name** 121:22
162:15
**named** 11:20 54:24
79:19 81:2
**names** 101:5
**nanosecond** 126:4
**narrow** 66:2 117:9
121:10

**narrower** 20:25
**narrowness** 161:2
**national** 108:15
**nature** 65:19 77:5
86:11 98:21 101:1
101:14 110:24
131:19
**necessarily** 15:1
78:11 132:12
157:10 168:7
**necessary** 7:12,24
12:23 33:4 34:14
52:7,7 106:5 107:22
152:10
**necessitated** 91:11
**necessity** 80:24
**need** 16:15 17:8
18:19,25 19:7 21:12
30:7 37:18 50:4
61:10,11 66:7 72:18
75:7 84:17,20 92:22
99:5 100:6 107:5
108:20 117:4
144:18 151:12
156:15 159:16
163:21 169:11
**needed** 69:2 75:15
77:5 147:15
**needs** 12:21
**negative** 45:5
**negligent** 125:5
**negotiate** 120:3
**neither** 42:11 70:25
108:5
**never** 10:16 51:12
74:6 75:11,12 79:7
80:3,4 82:2 99:15
107:9 113:3 114:25
119:25 130:2
153:10 165:1
**new** 1:2,15,15 3:5,5
3:12,14,14,21,21
4:3,3,11,11,20,20
6:8 7:24 8:6 11:20
13:8 16:25 20:25
21:2,3,10,23 22:17
22:20 23:2,15,17,18

23:25 24:5,5,11
25:10,13 26:2 27:24
28:8,13 29:2 32:7
32:14,19 42:2 43:6
43:25 46:1 47:21
48:7 51:7,10,18,24
51:25 52:1,2,4,5,8
52:11,20,22 53:3,5
53:6,8,16 54:1,3,14
54:21 55:19,19,21
56:7,10,17,20,23
57:2,3,3,7 59:13,20
60:19,20 61:1 62:12
63:12 68:4,9 82:17
82:24 84:13 87:5,6
87:25 89:14 90:9,14
91:9,12 92:2,9
95:21 103:8,11
104:19,22 105:3
106:5 110:7,10
111:22,22 112:1
113:10 114:6,13,15
114:15,23 115:3,14
115:18,19,22,22
116:1,9,15,23 119:7
120:10 124:22
125:4 126:1,5,10,10
126:13,15,16,17,17
127:3,4,5 129:18
132:7 136:24,25,25
137:5,5,9,15,24
138:4,6,11,11,18,20
138:25 139:1,10,18
141:14,18,21
146:25 147:2,3,4,10
147:13,21 148:18
149:18 151:8,13
152:25 158:23
160:23 162:12
165:1,10,23 166:20
170:5
**newman** 4:22 7:2,3
7:5 168:20,24 169:1
169:4,7,15,19
**newspaper** 80:7
**nhtsa** 96:23 143:7

nicer 44:20
night 163:25
nine 86:2
ninth 108:18
nissan 56:6,12
nitsa 147:12,14
  149:19
non 89:7 95:6 98:24
  115:12 119:2
  129:25
normally 6:11
north 5:9 144:2
northern 45:3
  158:9
note 7:3 162:12
noted 75:14 122:21
notes 44:16
notice 9:5,8 11:9,17
  12:18,19,21 13:9,11
  13:13,15,20,23 14:2
  14:4 16:14,16 24:19
  27:2,4,11,15,21
  29:11,13,14,15,18
  34:20 35:7,7,13
  38:8 64:3,6,19,19
  66:14 67:4,6,7,16
  67:19 69:7,24 70:17
  74:15 75:1,2,5,12
  75:14,20,24,25 76:6
  76:13,20 77:1,19,24
  79:2,4,12 80:6,6,23
  80:25 81:15 83:5,19
  84:11 90:1,3 96:13
  96:13 98:14,17,18
  99:6 101:8,10 103:1
  107:9 109:3,6
  111:13 114:11
  117:16,18 119:10
  124:20,21,25 125:2
  125:9,9,10,10 126:2
  126:3 127:4 129:6
  131:15,17,18,18,25
  132:3 133:5,7,17,18
  133:24 134:5 151:6
  153:7,10,21 154:1
  155:5,8,12,18,23
  156:12,24,24,25

157:7,12,23 158:5
158:15,18 161:5,7
161:11 164:19,20
164:21 165:25
166:11,12,12 167:6
167:13,14,16
notices 8:25 9:4
  10:2,6 14:5 27:18
  76:3,7 95:13 124:19
noticing 78:13
notification 97:13
notified 63:7,8
  107:7
notify 96:23 170:6
notion 67:18 88:22
  105:12 117:20
  163:15 165:21
notwithstanding
  62:6 108:20,20
  160:9 161:23 166:6
  166:19
number 7:17 9:7,17
  28:3,5 74:1 84:3
  86:12,14 90:19 91:6
  101:3 108:8 120:16
  130:3 146:3 152:12
numbers 91:5
  163:17
ny 171:23

o
o 1:21 6:1 19:3 41:2
  171:1
object 13:21
objected 9:3
objection 132:16
  165:5
objections 9:23
  27:4
objective 72:4 78:1
  79:6
objectives 35:17,21
  35:22 36:15,16,18
  37:20,23 44:24 49:3
  74:21
objector 68:11,22
  70:9

objectors 83:19
obligation 51:21,23
  51:24,25 54:1,2,4
  97:20,23 111:25
  112:2
obligations 94:20
  103:12 106:17
  116:16 141:18
  148:15
observed 95:14
obtain 101:5 154:12
obtained 99:17
obviate 80:24
obvious 16:2
obviously 27:1 63:9
  66:2 102:23 108:5
  144:3 153:3
occur 97:7
occurred 7:18
  121:6 124:6 138:19
  139:3,6
occurs 41:8 58:10
october 93:17
offer 30:16
offering 12:3
office 111:20
oh 114:24 133:19
  134:11 135:23
  136:10 142:11
  145:5 168:19
ohio 45:3
oil 92:8
okay 6:13,24 53:20
  84:18 85:24 95:22
  120:20,24 133:2,13
  133:15 136:15,19
  141:6 142:7,13,20
  143:24 144:16,21
  145:9,22 146:2,7
  167:20 169:2 170:3
  170:8
old 7:23,25 8:6,24
  9:16 10:9 11:20
  13:9,22,25 14:4
  20:21,21 21:1,3,3
  21:11,17,24 22:18
  23:2,11,11,13 25:5

25:11,14,19 26:25
28:10 29:1,13 33:20
33:24 39:23 46:18
46:19 51:8,25 52:1
52:2,4,5,7,8,10,12
52:13,21,22,24,25
52:25,25 53:7,8,13
53:25 54:17,19
55:15 56:11 59:11
59:16,18,19,22
60:11 61:2 62:22
63:9,10 64:2,2,20
75:3 76:3 77:5,17
77:18 79:20,21 80:9
80:10 81:10 82:19
82:20,23 90:10,19
91:1,22,22 95:13
99:18 110:9 115:4
115:21 116:2,9
119:7 120:1 121:12
121:13 122:19,24
124:22 126:3,4,9,12
126:15,16,17 127:5
137:12 138:5,22
139:7,17 141:12,18
143:21 146:11
148:21 149:11,16
149:16 150:9 151:1
153:9,25 154:23
155:21 157:4
163:17 167:10
171:21
olsen 135:18,18,23
  153:3
olson 61:17,20,21
  62:10
once 23:6 37:23
  41:8 42:23 114:3
  121:7 128:9 139:19
  165:1
ones 121:1
one's 156:25
onstar 95:5
open 111:1
opening 90:18
  109:11

operated 97:8
operators 97:14
opinion 16:11 18:16
  29:25 40:9 46:12
  140:3,15,16 141:1
  154:6
opinions 61:16
  71:15,17
opponent's 26:5
opponents 18:9
  29:6 30:4 51:2 96:2
opportunity 16:16
  109:20 110:25
  111:3 114:11 120:3
  120:9 126:23 127:1
  156:25 166:1,9
oppose 130:3
opposed 143:9
opposite 61:16 63:4
opposition 130:4
option 19:15
oral 2:1 25:2 90:12
  108:1
orange 138:1
order 12:15 14:13
  15:9,10,10 16:20
  17:18 18:14 19:4,11
  20:12,16,19,25
  22:16 23:7 24:12
  26:4,8,9,15 27:8,24
  28:8,15 30:14,22,23
  31:3,3,4,10,19,21
  32:2,8,9,11 36:2
  37:3 40:11 49:25,25
  50:8,14,15,18,21,23
  51:9 52:10 53:17,18
  58:4,13 59:9,19
  60:22 62:20 66:8
  69:8,13 70:20,21
  71:2,6,8,21 72:3,4,4
  72:5,5,10,15,17,19
  72:20 75:11 80:21
  81:23,25 82:3,8,11
  82:18 85:6 87:24
  88:1,1 93:23 96:3
  98:15 102:9,13,21
  102:24 103:10

104:9 105:1,11
  107:3 109:2 114:3
  114:12,16,21 115:6
  115:15 117:14
  122:4 126:1 127:13
  127:23 128:1,5,15
  128:15,16,22 129:7
  129:7 130:6 131:3
  132:1 138:20
  139:21,24 140:6,10
  140:12 141:9,20,25
  142:2,16 144:10
  147:12,22,25
  149:10,11 150:4,7
  153:15 154:10,12
  154:20,21 159:11
  160:4,15,19 161:5,8
  162:6,10 166:19
  168:5 169:8
orders 18:3 95:1
  103:2 138:11
organization
  137:19
organized 113:16
original 41:20,23
  145:13
originally 85:8
  113:18
ornament 130:24
  130:25
ought 87:22 112:1
outcome 13:15
outline 22:16 61:9
  68:3 86:6 119:17
  136:13
outset 86:22 89:11
  93:4 111:9 164:22
outside 158:24
overbroad 82:12
overlook 21:20
  119:6
overlooked 140:12
overly 31:14
overnight 168:8
overpaid 138:23
overpay 137:23

overreaching 104:4
override 35:19
overruled 108:7
owned 41:16 46:2
  68:14 69:7
owner 9:19 75:11
owners 13:21 28:2
  96:23 97:9 100:21
  101:2,5 124:15
ownership 45:25
  46:4,5,15
owns 63:18

**p**

p 3:1,1,16 6:1 19:3
  19:3
p.c. 4:25
package 27:16
page 97:5 140:14
pages 7:22 16:10
  90:11
paid 37:8 77:18
paired 100:12
panel 19:4
paper 39:11 81:5
papers 29:24 38:22
  40:9 74:16 89:22
  93:11 96:18 101:7
  108:25 109:1 110:8
paradigm 47:21
  66:23 72:23
paradigmatic 166:3
paragraph 28:15
  59:10,10
paragraphs 147:6
paraphrase 92:21
  94:5
paraphrasing 58:13
pardon 69:17
paren 141:17,17
paris 108:3,6,7
  162:14,17,19,21
park 4:10,19
parker 166:2
parsed 82:20,24
part 14:15 17:9
  18:5,5 19:17,17
  20:7,8 33:19 39:14

40:23 52:10,25
  53:13 61:24 72:25
  73:7 74:23 93:11
  94:15 95:11 97:11
  100:10 110:22
  115:4,13 116:8
  128:10 131:9
  133:11 139:8,8,12
  147:9 148:5 153:16
  153:19
partial 64:10,14
partially 31:3
participate 24:11
  29:16
participating 7:3
  146:14
particular 32:6
  67:14 79:8 80:12
  97:18 109:1,14,19
  129:1 130:10
  134:21 151:9
particularity 64:16
particularly 89:12
  142:23 166:1
particulars 121:18
parties 9:9 12:20
  24:1,21 30:25 75:14
  102:9 117:14
  121:18
parts 18:6 20:21
  23:11 52:22 53:4
  75:8 115:6 116:10
party 29:21,21
  30:12,17,19,20,25
  31:6 34:6 36:17
  37:6,7 48:25 55:24
  116:4 154:12 165:8
  167:5
pass 116:24 154:8
passengers 97:14
patent 69:7,12
patience 145:14
pause 25:23 28:1
  34:11 36:4 51:1
  121:7 123:13
  127:12 129:10
  148:10

**pawn** 51:11
**pay** 110:16 148:9
**peck** 49:3
**pending** 9:12 87:4
  122:9
**pennies** 92:24
**penumbras** 129:24
  129:24
**people** 7:25 8:25
  11:13 13:23 14:2
  15:10 16:12 17:3,5
  17:21 21:1 27:22
  32:21,21,22,24 36:6
  48:5 54:10 56:17,18
  56:19 58:11 60:7
  65:2 67:1 70:25
  77:6 78:22,23 79:11
  81:2,3 84:2 88:12
  88:24,25 98:22 99:7
  101:10,14,15
  103:17,19 109:2,3
  113:8,10 119:25
  120:11,16,17,19,20
  125:3,15,18 126:12
  127:5 131:15,20,23
  132:1 133:21
  137:10 140:11
  143:21 150:8
  152:13,17,19,19
  156:6 157:7,14
  164:2 167:14,17
  170:13
**perceive** 140:8
**percent** 152:23
  163:5
**perfect** 60:10
**perform** 11:15
  148:9
**period** 9:20 110:8
  114:6 152:22
**periodic** 24:17
**peripheral** 50:22
**permissible** 19:16
  41:19 48:1
**permission** 16:3,18
  170:14

**person** 29:11,12,17
  29:18 31:18 34:5
  35:6,12,14 60:19
  61:22,24 63:24 70:2
  70:25 72:7,7 83:8
  99:1,6 161:3
**person's** 71:3
**personal** 89:12
**personam** 122:5
  136:3
**personnel** 90:19
  100:11,15
**perspective** 99:8,9
  118:17 131:16
**persuaded** 128:6
**pertains** 108:19
  148:11
**pervasive** 87:8 91:2
**peskoe** 3:25
**petition** 89:13,15
  100:13
**pha** 128:9
**phase** 11:1 25:2
  93:16,16,21 128:4
  128:10
**phases** 28:23
**philadelphia**
  103:24
**phrase** 54:5 86:21
  87:1
**phrases** 23:8
**pick** 18:6 145:17
  170:6
**picking** 92:25
**picks** 75:19
**piece** 81:5
**place** 17:17 24:3
  34:16 49:25 73:24
  102:6 116:4,6 126:3
  161:20 162:13
**plaguing** 137:20
  138:10
**plain** 36:10
**plainly** 129:12,15
**plaintiff** 47:7 54:24
  55:23 56:5 61:22
  62:16,16 99:1

101:21 146:24
  166:3
**plaintiff's** 66:22
**plaintiffs** 3:11,19
  4:1 20:17 21:6 24:4
  24:7,17,24 43:19
  47:13,14 48:2,3
  50:13 55:3,21 56:9
  57:20 59:18 62:15
  62:18,18,25 63:4,8
  64:14 79:19 81:2
  83:2,10,20 88:7,12
  88:21 89:23 90:15
  90:18 91:18 96:4
  102:19 103:5,7
  104:10,15,18 105:4
  105:8 108:23,24
  110:14 113:16,21
  114:12 115:10
  116:11,12,13 118:3
  123:4 137:23
  138:22 146:19
  147:7 148:17 150:1
  150:14,21,24
  151:21 152:25
  153:4 160:18
  163:10 164:1,21
  165:5,9,10,12
  166:10 170:4
**plaintiffs'** 157:14
  165:13
**plaintiff's** 149:24
  151:25 158:22
**plan** 28:25 40:2,6
  40:12,16,20 64:2,8
  64:10,12 70:17 74:7
  74:23
**play** 100:14
**playing** 106:3 169:2
**plead** 64:16
**pleading** 101:24
  104:16 120:2
**pleadings** 90:16
  142:25
**please** 6:2 17:1 22:4
  25:23 28:1 34:11
  36:4 51:1 58:18

85:24 123:13
  127:12 142:13
  145:22
**pled** 23:3,12
**plenary** 71:17
**plifka** 4:25 7:7
**plus** 163:4,5
**pm** 145:20 170:16
**pockets** 11:6,10
**point** 11:2 13:8 25:7
  26:17,20 27:23
  32:13 34:13 36:14
  39:22 40:7,17,22
  46:24 50:7,25 51:14
  59:10 63:15 70:5
  83:14,16 84:16
  89:25 90:2,6,14,19
  91:25 95:12,15,16
  95:17,19,22 98:16
  101:11 106:4
  108:25 111:20
  112:16 113:10
  114:14 116:10
  117:2 121:16
  127:20,21,22 130:2
  130:16,17 131:7
  134:18,20 135:16
  145:15 149:4 150:9
  164:25
**pointed** 56:5 108:14
  108:16 135:13
  147:22
**points** 136:19
**polar** 15:6
**policy** 35:17,22
  36:15,16,18 37:20
  44:24 49:3 74:21
  117:3 118:17
  130:19
**polk** 101:4
**poly** 159:5
**polycal** 68:2
**polycel** 68:1,2,17
  69:4 159:9
**poor** 42:21
**poorly** 9:25

**populated** 126:12
127:5
**populating** 126:13
**porsche** 97:15
**portion** 137:9 139:9
**portions** 139:21
**posed** 146:5
**position** 9:8 14:19
17:1 19:22 26:5
32:2 43:19 51:3
77:2 83:20 96:2
99:16 107:8 112:19
113:22 118:3,25
121:14 149:7
157:14
**positions** 14:11
**positively** 11:11
**posner** 29:25 37:14
38:2
**possessed** 99:20
**possession** 110:10
135:14
**possibility** 21:20
90:22 140:3
**possible** 40:15
**possibly** 162:1
166:11
**post** 20:21 24:2,7
25:21 26:23 29:1
33:18 47:20 51:23
52:5 54:25 55:7,10
55:10 56:9,15 57:5
60:16,24 61:21
62:11 63:13 89:13
108:24 116:14,24
135:14 137:9 139:3
139:6 147:2 150:15
154:4 163:6
**postage** 27:16
**posturing** 10:13,23
**pot** 110:1
**potential** 8:21 11:10
42:17 67:4 81:9
92:14 123:4 136:9
153:20,22 154:24
155:6

**potentially** 9:1 31:7
32:5 47:17 76:17
168:4
**pothole** 94:10,14
**power** 125:13,14
133:25 134:1
**powledge** 89:1,2
**practical** 13:19
**practices** 132:11
155:15
**pre** 55:10 89:14
90:15 105:8 121:4
135:4 147:1,4,7,7
150:8 153:4
**preceded** 161:15
**precedence** 141:10
141:25
**precedent** 18:15
73:23
**precedential** 17:12
**precious** 90:16
**precision** 71:16
**preclude** 45:5
**precluded** 103:10
130:6
**predicate** 116:21
**predicated** 28:6
35:9 55:25 147:2,9
147:19
**preempted** 47:2
**preemption** 44:21
45:10
**prefer** 169:7
**prejudice** 14:21,22
14:25 30:18,19,20
31:5,6 36:17 37:6,7
81:16,17 83:14,16
90:4 109:12,18
110:5 115:9 117:20
117:23,23 118:20
118:24 119:6
126:20 129:5,11
163:12,15 165:19
165:21 166:25
**prejudiced** 129:12
129:15 163:11

**prejudicial** 127:3
**preliminary** 6:6
112:11
**premise** 130:12
**premised** 21:11
**premiums** 138:24
**prepare** 168:8
**prepared** 8:3 33:10
33:25 86:6 92:19
139:21 168:6
**prepetition** 33:10
73:13 103:20,21
**preposterous**
158:23
**presale** 24:1,4,7,13
32:25 33:15 47:13
50:10,12 55:1,2,3,7
91:7 103:5 104:18
104:24 108:24
**prescribed** 139:20
**present** 10:19
**presentation** 86:4
119:16 155:11
**presentations** 7:16
**presented** 22:16
49:15 64:2,3 66:3
71:21
**preserve** 65:4
106:12
**preserving** 39:12
**pressed** 115:14
**pressure** 100:3
**presumably** 164:1
**pretty** 20:7 21:19
111:10
**prevail** 113:7
160:19
**prevent** 73:18
112:21 113:13
145:12
**price** 31:23 35:19
135:6
**primarily** 22:24
46:2 116:13 143:11
**primary** 28:16
143:4 162:12

**principal** 142:14
**principle** 17:22
39:11 162:15
169:21
**principles** 51:11
167:4
**prior** 59:15 77:6
90:20,24 93:23
142:25 146:12
150:24
**priorities** 45:7
**private** 116:17
148:13
**privilege** 112:18
**pro** 111:4
**probable** 8:19
**probably** 26:17
54:10 61:10 66:9,9
130:13 136:5 142:8
**problem** 29:17
34:15,15 36:19
41:14 55:17 63:19
66:5 79:13,14,15
82:5,7 91:3 94:8,22
133:20 150:23
151:15
**problems** 14:10
**procedural** 66:19
166:18
**procedure** 19:23,24
26:6 75:11 128:3,3
**procedures** 27:3
**proceed** 146:24
**proceeding** 39:13
98:19 127:8 151:5
165:6 166:21
**proceedings** 91:20
93:3 108:11 170:15
171:4
**proceeds** 28:21
38:15,21,25 39:5,19
40:21 65:7 69:1
70:3,9,12 110:1,3,4
110:21 117:25
118:5,6
**process** 8:9 14:10
14:20,24 15:3,13,23

15:25 20:6 21:5
24:19 25:4 30:7,10
30:15,23 31:17
34:10 35:3,20,20
37:4,10 38:5,7
48:10 62:13 63:25
66:17,18,19,20 67:2
67:10 68:21 70:10
71:10,12 79:25 80:1
85:7 86:9,11,13,16
86:20 88:23 89:21
90:5 91:16 92:3
95:24,25 96:3,7
98:12,15 100:1,4
101:13,21 102:3,10
102:25 103:2 105:9
105:16 106:23,24
107:24 108:10,13
108:19 109:6,14
117:20 118:23
122:14 124:19
126:22,22 131:12
132:13,19 134:9
136:10 144:8
146:17,18 153:5
154:3 159:12
160:17 161:10
162:9 163:16
165:13,22 166:5,8
166:24 167:18
**processes** 94:20
**procter** 3:10 6:19
**produced** 156:4
**product** 43:11,12
43:13,14 45:6 46:25
47:7,10,14,23 48:5
63:24 64:5 129:21
137:16 141:15
**production** 59:14
**products** 141:16
**profit** 57:3
**profited** 56:23
**program** 24:6,9,11
**programs** 94:9
**prong** 30:16 37:6
45:23,24

**prongs** 20:9 43:10
43:15
**pronouncing**
121:22
**proof** 48:16 49:3,6
137:11 154:9 165:2
**proper** 29:18 35:12
49:17 69:24 77:24
97:12 99:14
**properly** 16:22
21:21 29:13 49:10
77:7 95:14 97:9
**property** 38:9 39:17
39:20 40:18,22 41:6
41:21 42:6,8 44:11
45:21 48:10,12
65:10 68:22 69:19
135:8,9,12,15,24
158:16,22,25 161:4
161:11 167:6
**proponent** 33:21
76:16 80:22
**proposed** 81:24,25
**proposition** 29:10
51:17 96:21 97:19
99:14 107:12,24
108:19 146:9,22
**props** 50:16
**proscribed** 26:3
57:11 59:20
**prosecuting** 88:8
**prosecution** 102:22
103:3
**protect** 37:24 47:12
52:20 55:22 70:9
74:18 83:22 99:5
117:15
**protected** 12:15
37:2 73:2,2
**protecting** 47:12,13
51:10 73:11
**protection** 17:3
21:10 39:16 74:20
99:10 116:15,25
137:14
**protections** 69:12
70:1

**protects** 82:18
**protocol** 91:8
152:18
**prove** 105:12
**provide** 13:14 31:15
105:3 107:23
132:12 147:14
**provided** 17:19
67:17 101:4 153:21
155:5,18 156:3
**provides** 59:11
105:14,14,15
132:19
**providing** 160:5
**proving** 81:18
**provision** 46:13
50:23 59:9 62:8
**provisions** 58:7
103:16 140:10
148:7
**prts** 94:22 96:15
**public** 65:3 67:5,22
106:6 124:14
149:19
**publication** 9:5
34:20 67:3 77:1
80:6 90:1 99:6
101:14 117:19
131:18 133:7
155:23 157:7
167:13
**publicized** 81:13
**published** 131:24
140:16,18
**purchase** 25:10
55:15 148:3
**purchased** 55:22
**purchaser** 28:9
29:22 30:8,11,25
32:7 33:6,9,14,23
35:8,11,14 36:1,2
36:23,25 37:17,24
37:25 43:6 46:1
49:1 65:6 67:22
68:18 69:19 74:18
83:17 87:6 148:8
158:10

**purchasers** 37:18
150:3,6,14,19 153:2
**purchases** 26:23
**pure** 109:16
**purported** 22:20
90:23,25
**purporting** 137:17
**purpose** 28:16
40:12 43:9,17 46:8
47:14 49:19 52:16
75:4
**purposefully** 54:16
116:2
**purposes** 8:3 89:22
92:3 96:5 99:17
163:7
**pursuant** 27:3 40:6
148:7
**pursue** 112:20
113:1 114:13 129:1
154:13
**pursued** 129:2
**pursuing** 104:10
**pursuit** 102:14
**push** 100:16
**pushing** 137:18
**put** 8:19 34:14
44:13 53:7 77:2,3
80:4 91:24 95:19
113:21 117:11
126:3 157:7 167:13
167:16
**putting** 53:13 76:15
126:2 130:1 131:12
137:16 152:24

### q

**qualify** 161:1
**qualitatively** 88:14
**quality** 100:18
137:16 138:7 152:4
**quantification**
28:22
**quantify** 28:18
**quantitatively**
88:14
**quantum** 56:22

**quarter** 167:23
**quarterly** 163:8
**question** 20:3 21:13
30:11 51:15,16
65:21 66:1 68:2
77:25 82:13 86:10
86:12 90:13 100:4
101:2,19 102:4
109:13 111:8 117:3
120:15 152:24
155:7 159:19 160:1
161:3
**questioning** 122:12
**questions** 7:17,19
15:24 20:4 22:14
27:9 28:17 30:6
31:25 49:24 61:5
75:19 83:3 86:2,7
86:12,14 92:16
109:11 115:24
119:16 134:12
136:12 146:5
150:19 169:10
**quickly** 101:6
**quit** 68:19 134:19
145:15
**quite** 20:11 25:25
76:24 88:18 102:1,8
**quote** 63:18 91:14
92:25 141:8 151:13
159:13
**quotes** 88:17
**quoting** 58:12,15
94:7 141:15 151:8

**r**

**r** 1:21 3:1 4:14 6:1
41:2 171:1
**r.l.** 101:4
**rafael** 54:24 55:12
**railroad** 70:15,19
**raise** 90:3 100:15
**raised** 24:18 49:23
51:3,14 60:2,3,4,5
61:12 63:23 84:8
106:20 114:1 165:6
**raising** 37:16 82:22
84:5

**ram** 124:12
**ran** 157:16
**rata** 111:4
**rationale** 36:21,23
135:10
**rationales** 74:20
**reach** 21:9 72:18
93:15 98:5 161:21
**reaction** 111:24
**read** 16:22 18:2
20:19 48:17 53:16
53:23 80:6 109:7
139:15 148:5
**readily** 83:2 100:25
**reading** 7:18 121:9
161:24
**ready** 85:25 124:24
**real** 17:15 21:13
48:18 51:7 81:19
110:15
**realities** 163:2
**reality** 57:12 80:2
81:2
**realize** 110:4 111:4
136:18
**realized** 84:7
**really** 8:4 11:24
32:10 40:23 58:2
63:17 75:23 85:10
102:3 110:5,19
127:2 128:24 135:2
151:25 152:2
166:22 169:5,5
**reap** 139:1
**reason** 17:2 21:16
39:1 44:10 45:20
48:22 55:6 67:20
71:16 100:10
122:16 127:3
146:15,23 147:3,20
147:23 148:1
**reasonable** 11:9,25
82:1 106:13 119:4
153:17
**reasonableness**
13:2

**reasonably** 78:2,2,3
100:21 151:11
**reasons** 21:22 38:10
41:25 48:12 65:12
71:10 83:3 88:2
104:14 113:12
124:20 126:19
132:17 143:17
164:4
**rebuttal** 61:10
83:15 84:17 119:12
**recall** 8:5,25 9:4
14:5 22:17,22 23:16
51:4,22 52:6 55:16
56:21 76:3,7,20,21
76:22,23,25 77:3,4
77:19 79:10 87:2
91:11 93:5 94:10
95:13 97:10,24
111:22 141:18
146:12 147:16
148:14,20 149:10
149:22 152:14
155:22 157:18
**recalled** 24:8 56:19
153:9 157:5 167:11
**recalls** 7:24 8:1
9:12,14,15 13:23
23:15 56:22 113:16
150:24 151:2,15
**receive** 69:7
**received** 166:7
**recess** 84:18 85:21
145:18,20 170:8
**recognition** 160:15
160:20 161:18
**recognitions** 167:4
**recognizable**
104:19
**recognize** 17:8
26:22 54:25 55:4
161:21
**recognized** 33:8
63:17 166:13
**recognizes** 45:17
**recognizing** 45:12
161:10,19

**recollection** 84:21
160:2
**reconcile** 140:9,10
140:11
**reconfirmed** 108:10
**record** 10:2,5 22:6
27:11,23 65:3 67:5
67:22 70:16 90:13
90:17 91:8,20 93:3
93:8,22,23 95:11
100:9,14,22 110:23
115:21 116:1,9
119:2 128:16 136:6
136:9 143:9,11
144:10,13 155:20
167:10 171:4
**records** 8:10 78:4
78:17,21 79:22
92:13,15 100:23
110:11,11 155:4
**recoveries** 40:15
**recovery** 21:23
**recurring** 150:23
**reduced** 159:1
**refer** 148:2 160:22
**reference** 107:25
118:15
**referred** 19:2 23:1
24:1 94:22 95:3
96:18 132:25
150:17 167:1
**referring** 59:3
159:9
**reflected** 65:10
**reflects** 100:9
**refresh** 84:21
**refused** 119:10
**refusing** 19:21
**reg** 1:3
**regard** 19:23 33:15
51:11 52:2,4,5
54:17 88:3 102:11
102:18 104:7 107:8
110:13 114:1
128:23
**regarding** 22:21
92:13 100:16

114:14,16,22
**registered** 76:2
**regulations** 148:20
**regulators** 138:15
**regulatory** 92:12
**rehash** 165:8
**reiner** 108:15
**reject** 33:7
**rejected** 10:11,23
20:13 97:6,10
**rejection** 160:6
**relate** 73:9
**related** 23:11 27:5
31:22 42:14 51:25
52:15 60:16 62:6
63:11 73:9 95:17
97:21 98:5 100:2
135:3,3 140:23
148:20 152:7
**relates** 40:24 53:25
59:14,19 83:4
**relating** 23:21
24:19 31:12 52:10
52:12,13 60:23
74:22 82:23
**relationship** 61:23
150:8
**release** 44:9
**released** 135:25
136:11
**relevance** 95:20
**relevant** 26:11 35:3
36:18 77:20 83:11
99:21
**relevation** 137:24
**reliability** 137:22
**relied** 43:23 92:2
122:6,7 136:2,2
**relief** 17:5 30:21
48:20 112:8 120:8
159:21 160:5,13,14
161:8 162:1,6,9
**relies** 165:23
**rely** 12:10 29:7
105:8 142:20
**remainder** 17:20
168:10

**remaining** 163:6
**remedial** 108:18
**remediate** 160:16
**remedied** 77:5
118:21
**remedies** 25:4 38:4
64:9 109:8
**remedy** 14:9,22,25
15:18 17:15 29:18
30:12 31:16 35:3,15
35:16 38:20 42:9
64:14,22,22 69:10
70:7 83:18 86:15,20
87:16,17 88:7 90:5
90:9 102:19 105:10
105:10 111:25
112:20 127:8 129:1
129:1,2,3 142:23
143:2,16 144:6,12
159:15 162:11
163:11,12
**remember** 92:6
135:23 136:24
**remembers** 89:2
**remind** 107:5
**render** 50:5
**rendered** 27:7
**rental** 152:11,22
**reorganization** 40:3
40:6,13 45:5 70:15
70:19
**reorganized** 132:15
**repair** 52:8 95:1
116:4 152:7,13
**repaired** 23:1 123:5
151:12,25 152:11
**repairs** 151:20
152:6
**repeat** 122:20
**repeating** 98:7
**replacement** 39:18
**replicated** 115:16
**replies** 168:3,8
**reply** 82:15 91:1
145:1,10 147:3
168:1,2

**report** 33:17 93:8
94:18 95:10 96:17
96:18,20,23 97:2
122:22 124:8
128:19 143:11,12
163:8
**reported** 90:20 91:8
95:6
**reporting** 97:20
98:4
**reports** 95:2,4
100:17 122:21
**represent** 108:23
121:17 146:20
152:20 153:24
167:15
**representations**
57:4
**representative** 44:7
44:9
**representing**
164:11
**represents** 17:22
153:11
**reputation** 152:3
**request** 85:16 113:4
113:6
**requests** 94:25
**require** 8:5 14:21
93:5 107:1 116:16
118:23 129:4,4,5
**required** 12:19
16:25 55:22 92:15
97:10 98:14,17
100:24 112:20
129:1 132:3 138:22
158:15,18 163:15
165:22
**requirements** 98:4
101:24
**requires** 17:23
44:18 48:24 128:5
**res** 73:6,19
**rescheduling** 22:10
**reservations** 17:25
**reserve** 119:12
170:1

**reserved** 28:12
163:7 169:25
**reserves** 33:19
**residual** 90:10
**resolution** 94:23
**resolve** 24:20
**resources** 163:6
**respect** 20:17 22:18
43:15 65:21 88:5
106:20 118:2
121:16,22 143:3
146:19 149:11
155:22 156:11
163:12 166:10
**respectfully** 103:8
148:16 154:23
155:13 156:10
160:17 164:10
**respects** 149:12
**respond** 86:4
**responded** 14:3
**response** 24:16
48:18 54:12
**responses** 143:8
**responsibilities**
54:17
**responsibility** 52:3
91:15
**responsible** 13:10
13:13 34:15 99:21
**rest** 84:21 167:19
**restructure** 40:4
**result** 15:21 20:7
21:8 44:19 97:1
105:13 109:15
123:19 125:13
136:10
**resulted** 150:23
**resulting** 89:6
**results** 61:16 125:4
**resumption** 145:16
**retain** 77:22 137:23
141:12
**retained** 23:5,13
24:5,13 25:19 28:18
49:17,19,20 52:14
58:5,8,24 59:4 75:3

75:17 90:8 102:7
113:17 136:22
138:25 148:4,5,11
148:16,18 149:14
**retaliation** 100:17
**retention** 27:13,13
**retiree** 140:24
**retreat** 98:8
**return** 84:22 165:19
**returns** 44:25
**reveal** 138:14 143:4
**reversal** 114:2
130:21 131:5,6
**reversed** 131:4
**review** 95:9
**revocation** 64:10,12
64:14
**revoke** 31:3
**reward** 126:16
**rewarding** 126:9
**richard** 5:12 22:8
**right** 6:9,21 7:5,9,9
7:14,15 11:17,18
15:13,13,14,15,17
21:18 36:11 38:9
39:6,6 40:18,22
41:6,7,11 42:6,8,24
45:21 48:10,12 50:2
51:5,20 53:1 54:13
58:23 62:2 64:25
65:11 67:14 68:14
68:15,23 69:20,20
69:21 74:13 82:16
85:20 86:18 90:4
110:20 114:19,24
119:19 121:21
123:5 142:10,11
144:14 146:11
154:13 155:12
158:1,23 160:1
161:14 163:3,9
167:20 169:5,16
**rights** 38:12 39:4
40:4 41:5,15 47:11
67:2,10 70:23 71:3
71:6 72:6,9,15
76:14 80:17 84:7,9

98:20 99:3,5 102:13
117:15 131:12
140:11 148:13
159:12 165:13,16
166:5
**rise** 18:4 85:23
101:23 145:21
**risk** 96:25,25
**road** 9:10 10:3
171:21
**robert** 1:22 120:18
**role** 102:20 169:2
**roll** 118:2
**rolled** 105:19
**room** 85:17 142:1
**rose** 149:21
**rubin** 4:13 6:22,22
6:25 7:1 11:2 13:17
13:18 17:21 111:9
111:17 112:4 145:6
145:8,9,23,24 146:3
146:8 148:24 149:2
149:6 156:7,9,17,22
159:8,23,25 161:17
162:18,20 163:19
163:20 164:7,10,13
164:15 165:21
168:12 169:25
**rubin's** 21:17
**rubin's** 120:6
168:18
**rudnick** 3:18 6:15
**rule** 19:20 21:4
24:18 30:14,20
35:23 36:16 37:3,3
48:17,19,21,23,24
64:16 66:18 67:11
93:25 101:24 127:8
128:25 129:4,4
140:2 144:7 159:4
159:10,14 160:9,9
160:11 161:9,13
162:4
**ruled** 122:3
**rules** 19:10 133:11
139:20

**ruling** 45:13 103:22
**run** 104:19
**running** 100:11
136:18
**runs** 38:19 70:22
93:16,17 100:7
**rush** 94:14

**s**

**s** 3:1 6:1 53:12
**saddled** 33:23
**safe** 152:23 170:11
**safety** 77:5 87:8,12
91:3,11 92:12,14,14
94:8,21 96:22 97:21
98:1,5,16,23 99:24
99:25 100:15,18
101:17 106:16
107:19 110:13
115:12,16,18
116:16,18 117:13
117:17 119:2,9
137:16,22 138:8,14
138:15 147:10
149:21 150:11
155:24
**sailed** 122:13
**sake** 157:25
**sale** 9:4,22,23 10:10
11:9 12:19 13:5,22
14:13 16:4,19,23
17:14,15,17 20:21
23:4,7 24:2,7,12,14
24:19 25:12,12,21
26:4,8,9,15,16,21
26:23 27:2,4,6,7,8
27:24 28:8,12,15,16
28:21 29:1,3 30:14
30:24 31:12,13,16
31:19,21 32:1,3,8,9
32:19,23,25 33:8,16
33:18 34:8 35:17
36:2 37:16,22,23
38:9,11,15,21,25
39:4,6,6,21,22 40:2
40:11,12,21,21 41:4
42:1,3 44:8 45:12
46:8 47:15,21 48:7

49:9,12,18,25,25
50:8,14 51:9,23
52:3,5,10 53:17,18
53:18 54:16,25 55:7
55:10,10,11,13 56:6
56:8,10,12,15 57:2
57:5 58:3,4,4,9,13
58:13,16,21 59:3,9
59:19 60:3,3,12,14
60:15,16,22,22
61:22 62:12,20
63:12,13,16 65:7,7
65:9 67:9 68:11,15
69:1,8 70:3,12
74:15,17,22 75:4,5
75:11,12,14,15,16
75:17,22,24 76:16
77:24 78:15 79:21
80:3,5,15 81:4,6,23
81:25 82:7,11,18,18
83:5,10,19,21 84:1
87:11,11 88:1 90:7
90:15,21,24 91:24
99:2,3 100:6 102:9
102:21 103:10
104:22 105:1,8
108:19,21,24 110:1
110:3,8 114:12,16
114:21 115:15
116:14,24 117:14
117:25 119:3 121:4
121:6,12 122:4
123:25 124:7,10,12
124:18,20,21,24,25
125:4,7,23 126:1,4
127:22 128:1,14,15
128:16 130:6,14,22
130:23,24 131:3,7,8
131:11,24,24
133:17,24 135:4,13
135:14,25 137:9
138:20 139:3,6,21
140:13,22 141:9,16
141:20,25 146:12
147:1,2,4,7,7,22,24
147:25 148:3,23,24
149:9,11,13 150:4,7

150:8,10,15 151:1
153:4 154:20 155:6
156:2 159:11,16,17
160:4,15 161:5,8
162:6,9 164:21
166:7
**sales**  12:24 17:8,9
18:11,12 38:11 45:6
45:15 49:2,6 70:9
107:23 117:5,5
143:18
**san**  18:21
**sand**  33:3 106:5,14
119:4
**sander**  5:5 7:6
**sandy**  136:17
**satisfactory**  132:19
**satisfy**  65:8 103:2
**savage**  108:8,15
**saw**  116:23 119:1
**saying**  9:24 14:16
15:15 16:24 19:19
36:20,21 37:9,14
38:20 45:10 47:17
66:25 67:5,9 68:22
70:2 72:3,6,10
73:15 75:25 80:15
80:22 83:16 102:17
103:21 111:25
123:14 126:1,10
128:8,22 131:14
141:4 152:2 158:25
161:25 162:22
163:25
**says**  27:12 29:15
39:11 41:8 44:13
56:3,17 67:3 74:19
76:5 81:6 103:17
113:24 118:22
126:20 127:23
128:1 129:19
130:21 131:6
151:10 154:18,19
160:11 162:3 170:5
**scenario**  21:12
103:6,7

**schedule**  93:15
169:9
**schedules**  28:23
39:8
**scheme**  92:12
**schwinn**  108:17
158:9
**scope**  99:18 125:9
**scott**  3:8 22:7
**seats**  6:2 85:24
145:22
**second**  18:13,13,15
18:17,17 30:1 34:11
40:22 41:21 42:13
46:11,12 65:24
89:25 107:13 108:9
117:21 119:20
128:4 129:2,10
153:13,19 154:11
156:19 167:5
**secret**  87:8
**section**  24:13 29:3
29:19 35:25 36:15
41:10,17 44:17
45:15 46:10 58:7,19
58:20 59:5 64:1
68:13 70:15 122:6
130:17,18,20,20,21
131:2 136:4 140:11
148:3,19 149:1
**sections**  39:16
64:11
**see**  7:9,16 15:20
47:6 56:15 64:24
124:2 127:24
139:25 144:23
149:5 150:4,12
153:5 160:14
161:17,25 168:9
**seeing**  14:3
**seek**  102:19 111:23
112:2 162:9
**seeking**  22:20 114:2
**seemingly**  9:17 11:5
14:6 19:25 71:18
**selected**  23:23

**sell**  55:20 56:8 57:3
65:3 68:10,14,23,24
69:20 72:13 79:4
110:18 122:5
125:20 133:22
**seller**  43:7 46:1,3,13
125:1,1,22 148:6,9
148:12 149:15
**selling**  31:15 38:13
38:18 39:17 56:24
77:9
**sells**  118:17
**semblance**  86:20
100:23 103:1
**send**  8:25 10:2,5
13:19 27:15,21 64:3
77:19 80:23
**sending**  11:9 27:18
**senior**  18:23 99:15
143:14,21
**sense**  8:13 57:1
60:10 85:6 91:16
93:20 128:24
**sent**  14:4 75:25 76:3
76:25 112:4
**sentence**  143:20
151:9,13 161:6
**sentences**  134:2
161:15
**sentient**  80:8
**separate**  23:18
24:14 48:12 120:1
126:14 157:21
**separately**  40:15
43:14 104:25
**series**  96:16
**serious**  88:13 91:7
94:8 105:23 110:15
138:13 150:10
155:24 157:16,17
**seriously**  94:14
113:2
**serves**  92:1 102:22
**service**  94:25
**services**  92:7
**set**  32:7 39:8,8
40:13 80:17,20,21

124:24 131:10
139:17 153:13
154:11
**setting**  28:24 80:20
**settle**  136:7
**settlement**  77:12,17
140:24
**settlements**  120:4
**seven**  3:20 56:11
87:4,10 108:1
122:19 124:15
125:23 129:25
133:20
**seventh**  108:2
**severe**  98:25
**shape**  35:20
**share**  40:5
**shareholders**  46:3
**shares**  43:5
**sheet**  92:18,19,23
**shevin**  66:10
**she's**  161:22
**shield**  102:5 121:16
122:16,17 129:16
130:4,15 131:1,20
**shifting**  39:20
**shifts**  40:21
**shiny**  130:24
**ship**  122:12
**ships**  53:4
**shoehorn**  160:18
**shoehorned**  165:11
**short**  112:24 136:18
**shortly**  22:19 34:9
**shouldn't**  64:6
124:3 149:16 154:2
**show**  30:17 33:16
33:18 48:24 95:21
117:20,23 118:24
144:21
**showed**  110:9
**showing**  14:21
129:5 154:12
**shown**  52:18
**shut**  94:11
**side**  20:9,10 35:13
112:16 113:9 144:8

[sided - steinberg]                                                                Page 34

**sided** 141:21
**sides** 10:1 12:1,17
  14:8,20 19:13 20:9
  21:12 103:14 104:3
  115:7 140:4
**sidestep** 23:7
**significant** 29:4
  65:15
**silence** 87:6
**similar** 63:22 64:13
  64:23 74:20 138:2
**similarities** 10:17
  61:15 74:17,19
**similarly** 120:11
  158:9
**simply** 13:12 16:1
  19:21 68:22 91:14
  160:20
**single** 92:2 99:1,20
**singular** 65:5
**siphoned** 163:17
**sit** 6:5
**site** 97:22 140:20
  154:7
**sitting** 116:7 130:25
**situated** 120:11
**situation** 15:2 29:19
  31:13 32:4 34:2,25
  35:4 36:11 61:13
  62:4,11 67:15,17
  68:20 69:25 74:13
  74:13 78:14 83:8,10
  100:5 105:21 117:9
  129:12 131:2
  150:20 151:3
  155:13,14,19
  157:21 160:24
  163:4 164:5 167:5
**situations** 101:16
  101:17 106:1 117:6
**six** 60:14 76:22
**slack** 61:6
**slice** 139:16
**slightly** 42:15 76:12
**slip** 140:15
**slower** 114:17

**small** 15:9 50:24
**sold** 23:11 31:14,23
  49:16 52:25 54:1
  56:20 60:14 114:15
  114:23 115:3,14,17
  117:17 148:21
**solely** 122:14
**solutions** 171:20
**solved** 136:4
**somebody** 20:5
  34:13 66:14 80:19
  85:16 127:15
  139:19
**someone's** 39:17
**someone's** 131:12
**somewhat** 28:3
**sonya** 2:25 171:3,8
**sooner** 11:3
**sorry** 62:9 72:12
  80:15 93:7 121:8
  125:22 132:22
  147:10
**sort** 27:10 29:9
  37:21 42:9 66:19
  104:20 106:6
  107:23 116:5 117:3
  138:18 139:5 140:6
  141:19 152:7
  157:21 158:22
**sorted** 21:18
**sorts** 94:24
**sought** 22:24 139:4
  143:16 144:6 165:2
**sound** 162:7
**source** 130:8
**south** 3:11
**southern** 1:2 43:25
  132:7
**spalding** 3:3 6:8
**speak** 6:3 7:12
  121:20
**special** 69:12 70:1
  109:21 123:6
**specific** 45:7,10
  59:24 64:11 69:19
  75:1,3 79:12 121:1
  141:23 157:12

**specifically** 23:4
  25:15 52:12 60:23
  63:4 76:13
**specificity** 75:12,24
  124:4
**speculate** 106:22
  124:4
**speculation** 16:2
  105:18 109:17
**speculative** 124:15
**spend** 7:22 107:22
**spit** 150:23
**spoke** 109:5 150:2
**spoken** 50:1 145:3
  168:1
**sponsor** 81:11
**sponsored** 25:14
**sponte** 160:12 162:4
**square** 3:20
**stage** 154:15
**stall** 100:18 101:16
**stalling** 125:13
  133:25
**stamco** 46:11
**stand** 96:21 99:13
  107:12 108:18
**standard** 8:17,18
  153:13 166:24,25
**standards** 15:5
  97:12 104:13,16
  112:8,12
**standing** 128:1
  161:18
**stands** 97:19
**stare** 50:4
**starkly** 153:6
**start** 9:22 33:25
  51:17 85:9 88:16
  89:20 120:14
  127:23 128:13
  144:25 146:8,21
  168:11 169:8,9
**started** 18:3 22:19
  33:21 48:16 93:4
  146:9
**starting** 8:9 97:2
  169:16

**starts** 69:23 148:6
**state** 44:18 45:1,15
  47:11,12 114:13
  116:11,14,22
  122:22
**stated** 136:8 142:17
**statement** 8:13
  28:25 78:5,12,16,19
  141:10
**statements** 78:7,9
  88:17
**states** 1:1 28:7
  43:11 47:1,18,18,19
  60:5 75:9 84:4
  117:1
**status** 24:17
**statute** 66:15,17,20
  66:25 67:1,1,3,8,12
  80:21 96:24 166:21
**statutes** 137:14
**statutory** 41:17
  45:7 64:13
**stay** 21:16 24:24
  36:1 122:9
**stayed** 36:25
**steering** 125:14
  133:25
**steinberg** 3:7 6:7,7
  6:9 8:4,9 13:8,17,19
  14:9 17:25 18:19
  22:2,3,5,6 25:23
  26:18 28:5 30:2
  32:12,16,18 34:17
  34:23 36:4,13 41:1
  41:15,24 42:25
  50:12 51:1,5,13
  52:24 53:15,19,24
  54:9 57:18 58:15,19
  58:23,25 59:2,7,9
  61:8,19 62:9 65:17
  65:25 66:13 68:8
  69:18 71:20 72:1
  76:9,11 77:3 78:8
  82:10,16 88:17
  92:17,18 104:14
  107:16,25 114:25
  127:14,16,19,20,25

128:8 129:19
130:19 135:13
144:24 145:3,10,19
146:16 148:12
149:8 167:21,22,25
168:13,19,22
169:14,18,22 170:5
**steps** 138:14
**stick** 42:13 132:20
**stint** 18:3
**stipulated** 9:9 79:19
167:10
**stipulation** 101:3
**stipulations** 24:22
24:25
**stockholder** 70:24
71:1,5 72:8
**stockholders** 71:7
72:6
**stood** 84:12
**stop** 84:16 88:8
112:25 167:22
**stopped** 60:11
**stores** 92:7
**straight** 38:2
**strands** 165:24
**strategic** 112:15
113:11 164:4
**strauss** 4:17
**stream** 130:16
**street** 5:2
**strict** 64:13
**string** 97:1
**strong** 77:2 123:15
143:11
**stronger** 20:9 51:2
94:15 120:4
**structure** 42:10
44:5
**structured** 25:13
43:5
**struggle** 67:18
**struggling** 140:9
**stuck** 115:22
**studiously** 91:19
**stuff** 53:11 110:15
128:20 170:5

**stutzman** 4:25 7:7
**style** 120:8
**sua** 160:12 162:4
**subclass** 42:19
**subgroup** 123:6
**subject** 9:12,14,15
13:23 22:21 25:17
28:3 56:21 64:6,7
68:18 94:6 114:16
114:20 120:6
121:24 122:3,4,11
122:12 126:10
143:22 147:22
149:21 150:3,7,10
151:4,4 153:10
155:22 157:17
164:24
**submit** 103:9 152:7
153:8 154:23
158:14
**submitted** 85:2
93:11 146:14
**subset** 15:9 86:10
121:10
**substance** 52:20
123:13 128:8
**substantial** 113:18
137:9
**substantially** 24:24
25:11 26:1 81:25
111:3
**substantive** 66:20
**substitution** 166:19
**subsume** 23:24
**subverting** 45:7
**successful** 41:9
63:18 76:18 103:15
121:15 136:7
**successive** 16:9
**successor** 20:20
21:8 23:3,8 28:10
28:11,14 31:2 41:3
41:5,7,18 42:1,5,7
42:16 43:3,4,7,10
43:16 44:1,5,16
45:4,13,16,23 46:7
46:16,20,23 47:17

47:22,25 50:24 51:2
52:16 55:2,4,9,24
55:25 56:14 57:8,10
57:23 58:3 75:18
81:20,21 82:2 84:6
84:13 87:18 88:3,10
102:5,12 104:7,13
104:16,17 105:7
120:12 122:15,17
124:13 125:17,18
125:21 126:11
129:16,17,21 130:2
130:3,7,9,15 131:1
131:11,20 133:23
135:22
**suckers** 42:21
**sudden** 33:23
**suddenly** 150:9
**sue** 21:1,2 41:20
42:11,20 51:7
**sued** 77:6 78:22
**sues** 70:6
**suffer** 34:7
**suffered** 138:23
152:4 153:5 157:10
**suffering** 29:12
**sufficient** 90:2
98:18 99:7 129:6
131:21 134:5 155:3
167:11,13
**suggest** 10:22 15:24
86:19 102:20
140:13 147:4 148:1
148:12 149:16
167:3
**suggested** 111:23
112:5
**suggesting** 104:8
113:2 149:15 151:5
**suggestion** 165:9,10
168:10
**suicide** 89:4,8
**suing** 70:11
**suite** 5:2 171:22
**summarily** 24:23
**summary** 18:14
19:3 71:15,15

**summer** 23:14
**superior** 138:12
**supp** 97:22 98:3
**supplemental**
163:23
**supply** 11:12
**support** 40:15
90:14
**supported** 102:1
107:24
**suppose** 53:3,5,6
**supposed** 11:15
19:25 71:23 94:24
107:20 109:15,16
**suppressed** 138:6
**supreme** 13:3 36:8
66:14 117:22
**sure** 6:10 11:12
22:11 48:3 110:19
110:23 119:21
120:14 125:8
128:13 134:11
136:20 141:22
151:10 156:17,22
161:14 163:20
167:25 168:6
**surgery** 50:16
**surround** 108:21
**surveys** 95:1
**survival** 10:15
**survive** 10:9 13:1,7
16:4 55:8 106:6
139:25
**survived** 46:19,21
**survives** 12:8 46:13
46:14
**surviving** 12:5,13
**suspect** 119:4
127:21
**sustained** 163:16
**swerved** 94:12
**swirling** 22:13
**switch** 23:1,16 24:8
53:7,9,10 55:17
79:10,20 85:6 86:25
87:7 89:6 90:21
91:2,10,23 94:6,8,9

94:15 97:8 98:22
100:16 101:11,18
104:24 106:16
110:14 113:21
114:8 115:10,18
122:18,24 123:1,4
123:11,11,20,23,25
124:13 125:11,12
126:13 129:25
133:20,24 134:6
137:6 138:9,21
143:6 151:6 152:14
157:16
**switched** 116:3
**switches** 8:21 9:25
22:18 28:3 61:1
115:22 116:2
**symptoms** 131:24
132:2
**system** 94:23
**systematic** 138:8

**t**

**t** 171:1,1
**table** 113:9 144:8
**tack** 146:15
**tackle** 63:11 78:24
**tactical** 21:22
**take** 8:13,24 10:5
12:23 13:4 17:17
33:3,14 37:1 54:16
57:11 60:21 61:19
68:18,25 78:6 84:18
91:15 93:9 96:2
106:22 114:5 116:5
118:10 137:21
141:15 144:3
145:25 154:2
156:14 168:5
**taken** 34:18 112:15
119:17
**takes** 36:2 37:13
46:24 141:9,25
166:23
**talk** 17:7 18:19,25
20:2 25:24 26:24,24
29:9 32:18 34:9
35:1 38:6 48:15

61:12 64:12 74:25
80:10 81:3 103:4
105:17 117:21,24
129:8 134:16 137:5
137:8 156:15 157:2
159:5 162:11
**talked** 19:7 35:5
46:12 50:19 57:15
57:18 72:13 109:23
143:19 146:4
**talking** 7:23 12:2
16:10 26:15,20
32:11 35:22 41:4
58:1 59:12 65:16
68:4 71:14 78:18,18
78:19 92:6,17,18,21
94:5 118:16 119:24
130:9,11 132:6
134:15 136:24
140:25 141:3
143:20 148:10
152:2 154:15
156:23 157:13
163:25
**talks** 27:23 50:3
58:4 74:16 138:4
156:15
**tap** 164:4
**target** 41:21,23
**targeted** 132:3
**tarnished** 56:23
137:25
**tarnishing** 56:25
**task** 32:13,20
139:18
**taxing** 145:14
**taxpayer** 106:10
**taxpayers** 106:10
**teaches** 107:14
**television** 80:7
**tell** 8:16 9:13 16:15
17:1 33:13 53:2
64:21 86:22 95:9,24
96:13,15 107:21
111:17 112:13
116:8 123:22,24
170:12,12

**telling** 19:25 74:3
80:19 93:4 98:22
101:15 112:9
115:21
**tells** 18:18 71:23
93:11 94:19 97:8
102:16 105:10
106:22 116:9
128:19
**tend** 54:7
**tendency** 45:1
**tentatives** 98:8
**term** 50:19,25
**terminated** 93:18
**terms** 19:9,14 40:2
50:15 85:6 88:14
90:7 91:6 96:5,10
127:7 128:14,23,25
148:7 149:13,24
158:17
**terrible** 91:17
**terribly** 96:16
**test** 30:15,16 35:23
35:24,25 36:16,22
45:23,24 78:1 79:6
95:2,4 96:9 153:16
154:2,3
**testified** 32:23
**texas** 3:11 5:3
**textual** 36:10
**thank** 6:13,17 7:14
22:8 84:17 85:22
86:1 136:16 142:9
142:10 144:14,15
167:20 169:18,19
**thanks** 145:19
**that's** 114:24 115:5
117:7 118:1 120:19
121:2 124:3,8,15
127:17 131:21
132:8 134:1,8,9
135:12 136:19
137:1 138:17
139:18 147:4
148:23 151:25
152:15 156:9
157:12 159:2

160:15,21 161:21
162:16 163:1 166:1
166:22 167:8 169:8
**theatrics** 89:19
**theme** 40:1 86:8
**theories** 104:18
129:21
**theory** 57:1 104:11
105:4 160:6
**thereabouts** 28:2
**thereto** 13:25
**there's** 118:11,12
121:3 125:11
126:15,15 133:24
136:6 138:3,17
139:8 141:10
147:20 151:16
160:5,11
**thesis** 104:21
**they'd** 121:12,13
**they're** 119:24
121:4 126:14 141:9
152:2
**they've** 117:15
**thing** 24:18 27:11
37:4,14,18 39:3
42:7 44:4 48:15
50:22 55:4 67:21
71:5 72:12 81:17
85:14 105:16 110:6
128:14 136:21
149:23,23 153:16
160:8 162:3 163:14
**things** 11:20 16:13
16:17 20:2 23:8
27:24 31:21 35:24
43:17 44:6 51:24
52:13 59:24 60:6
79:24 82:24 86:17
91:17 94:2 115:23
119:18,24 131:8,16
152:9 161:25
**think** 8:10 10:21
11:8,18,19,24 14:12
17:8 19:2 20:3,11
22:15 26:10,12,17
28:14,17 29:4 30:5

33:20 34:10,19,20
34:24,25 35:2 36:13
36:14 38:4,8 39:5
40:8 41:7,24 42:25
43:1,2,12,22 44:10
45:16,17,20 47:5
48:16,22 49:3,21
51:13,18,23 53:3,19
53:24 54:3,6,12,23
55:8 61:3,4,17,20
62:9 63:22 64:22
65:11,15,21,25 66:1
67:13,17 68:1,2,4
69:15,23 71:19,20
71:22,24,24 72:1,2
72:17,22,23 74:24
76:1,9,11,12,12,19
76:19 77:1,21 78:9
78:24 79:24 82:18
83:3 84:24 85:1,1,5
85:13,15,19 86:6,10
86:21 87:2 90:16
93:1,4,15 94:7,14
96:16 100:8,13
102:24 104:17
106:25 107:21,25
108:3 109:11,18
110:2 114:15,24
115:2,9 116:4,10,23
117:2,8 118:22
119:6 120:6,15,15
120:22 121:2,15
122:11,16,25
124:15 126:2,22
127:6 131:2,21
132:24 133:4,5
134:7,8,9,10,14,21
136:13 137:2,3,4
139:23,23,25 143:1
143:3,8,14,25 144:1
148:2 151:17 155:9
155:18 157:3,22
162:1 163:1,13
165:22 166:3 168:1
168:7,13,14,15
169:7

**thinking**  19:19
43:13 94:9 127:15
**third**  19:15 26:11
29:21,21 36:17 37:6
37:6,7 40:24,25
41:1 44:10 55:23
90:2 116:4 158:13
**thought**  20:14
34:19 49:5,12 82:14
113:9,10 114:25
120:5 132:17
140:13 142:13
161:15
**thoughts**  22:13
**thousand**  82:2
**thousands**  15:8
17:21
**three**  18:10 25:3,20
27:6 30:16 85:2,18
134:25 135:6
150:24 151:15
160:3 163:5 166:7
167:23
**threshold**  24:23,25
25:3,5,6 26:11,25
48:9,9 54:19 104:16
153:18
**throw**  131:3 141:19
**thrown**  134:13
**tied**  37:21 76:20
**ties**  31:9
**tillman**  107:11
**time**  7:1 9:3 10:3,5
10:10,12 11:21,23
12:24 15:20 25:13
31:5 32:10,19 34:4
34:11 42:4 61:7,10
74:7,15 77:16 83:12
84:16,17,20 91:24
93:14 99:8 107:22
110:9,9 111:2,8
112:24 113:4,15,16
113:17 118:10
119:3,12 124:2
130:4 133:10
136:18 142:9
144:18 145:13,25

150:9 152:10,22
154:17 156:1,13
157:9 159:6 163:18
164:2,25 169:11
**timeframe**  85:8
95:6 100:12
**timeliness**  30:17,17
**timely**  29:8 40:19
138:21
**times**  3:12,20 30:9
32:3 50:2 74:2
108:1
**timetable**  124:25
**timing**  82:22 83:6
124:20
**title**  68:15 130:23
131:9
**today**  16:9 22:12
91:9 94:2 114:5
116:7 145:15 146:1
146:4 155:8 167:23
168:4 169:13
**today's**  99:13
**token**  9:7
**told**  48:11 75:14,15
83:9 89:11 99:1
101:7 107:9,11,18
110:14 112:24
146:25
**tomorrow**  145:17
168:3,11 169:8,9,12
169:17 170:5,6
**topic**  168:10
**torque**  122:24
**tort**  79:7,7 82:1
83:1,7 107:15
**totality**  112:23
**totally**  16:2 17:16
29:19
**touted**  137:16
**toxic**  83:1,7
**track**  95:7
**tracking**  94:23
**trade**  137:13
**traditional**  19:14
**traffic**  94:14

**transaction**  29:20
31:1 35:9 36:24
42:10 43:5,9 44:6
46:22 50:17,19 56:1
130:5 141:17
**transactions**  135:2
**transcribed**  2:25
**transcript**  6:5 171:4
**transfer**  68:16
130:23 131:9 135:5
**transferrable**
158:20
**transferred**  49:13
**transportation**
138:24
**travails**  80:9
**travelers**  19:1 73:1
**tread**  92:13 94:22
96:14 100:10
116:17
**treasury**  32:21
105:20 106:1,2,4,9
109:21 119:5 125:4
131:10
**treated**  106:8,8
150:20
**tree**  130:24,25
**tremendous**  100:3
**trenton**  18:22 68:7
**trial**  27:6
**trials**  93:13
**tried**  23:7 33:16
44:13,22 83:4
100:15
**tries**  56:16 132:10
158:24
**tro**  113:4,6,9,10
**trooper**  122:22
**trouble**  14:3
**troubled**  65:13,13
86:18
**troubling**  43:1
**true**  19:19 45:16
46:25 47:6 84:10
146:17 147:4 156:9
158:21 159:2
160:21 166:1 171:4

**trump** 45:1,15 131:12
**trumped** 19:6
**trumps** 44:18
**trust** 4:8,9,18,18 6:23 7:1 11:1 39:24 46:14,19,20 56:2 103:17 109:1 111:2 112:1,21,22 113:13 113:19,19,25 144:25 145:3,5 149:17 163:2,4,7,8 165:2,8,11
**try** 22:13 24:20 30:4,22 33:17 44:22 51:15 57:11 65:4 79:5 104:2,5 119:17 122:9 124:12 139:20 150:21 164:4
**trying** 31:17 36:14 36:15,20 44:25 45:12 47:12 49:4,18 49:22 55:8 61:3 64:14 72:20 79:4 83:20 88:20 92:4 96:2 98:11 115:23 127:19 164:5
**tune** 89:15
**turn** 8:8 14:11,24 93:6 94:17 122:6 128:11
**turned** 82:9
**turns** 8:14
**twa** 122:7 136:3
**two** 7:13 9:7 18:11 18:12 20:9 23:23 35:6 46:21 60:11,14 93:16 94:1 97:16,17 101:19 102:19 112:14 134:21 141:17 143:4 144:22 150:24 151:14 153:16 160:2 161:15,19 162:1 165:24 166:6

**type** 32:22 33:23 37:19 44:5 62:17 66:3 67:20,21 74:8 74:11 75:25 98:18 105:7 108:15 155:18 159:3
**typical** 15:6
**typo** 68:3

**u**

**u.s.** 1:13,23 10:15 10:16 25:13 32:21 97:3,18 98:2
**uaw** 140:24
**ultimate** 64:21
**ultimately** 82:9 86:16 102:12 104:11 105:5 109:8 116:6
**unable** 160:1
**unasserted** 79:7,18
**unaware** 80:8 81:6 122:18
**unclean** 125:19
**underlie** 157:15
**underlies** 25:9 30:6
**underlying** 7:23 18:2 23:10 26:16 39:11 51:16 130:12
**undermining** 37:8
**underscore** 98:11 147:11 155:11
**underscores** 162:2
**understand** 19:22 34:12,17 43:1 52:17 53:5 104:6 109:24 119:23 137:1 140:5 144:4 147:17 167:2
**understanding** 56:15 75:24 167:18
**understands** 167:8
**understood** 58:11 156:4
**undertake** 97:23
**undertaken** 149:7
**undisclosed** 101:22 106:17 107:19 122:1 128:23

**undisputed** 45:25 164:23
**undue** 30:18,19,19 31:5,6 36:17 37:6,7 48:25
**unexpected** 125:12 133:25
**unfair** 14:18 134:10 147:8,18
**unfortunately** 134:8
**unidentified** 91:13
**unique** 66:9 159:1
**unit** 4:18 146:14 168:22
**united** 1:1 28:6 158:2
**universe** 11:9 15:9 148:18
**unjust** 138:18
**unjustly** 138:25
**unknowable** 124:9 124:10
**unknown** 8:11,14 12:4 62:19,23,24 69:24 89:24 90:1,15 91:18 96:1,4 99:9 102:5
**unreasonable** 96:25
**unrelated** 23:15 55:23 73:19
**unremedial** 117:19
**unsafe** 137:23
**unsecured** 11:7 111:5
**unsuccessful** 88:9
**unusual** 64:10
**upcoming** 111:11
**upheld** 55:5,9
**upper** 20:18
**upset** 49:11 55:2 131:6 151:24
**upsetting** 30:14
**urgency** 14:7 91:16 93:20
**urgings** 24:21

**use** 44:21 70:8 78:2 81:12 110:1 140:8
**uses** 63:18

**v**

**v** 19:1 39:10 46:11 66:10 73:22 97:3,15 97:18 98:2 108:18
**vacate** 14:13,14 30:22 31:3
**vacating** 37:3
**valid** 105:6
**validating** 19:17,20
**validity** 130:22 131:7
**value** 11:22 22:25 28:9 29:22 30:9,11 31:1 32:6 35:8 36:1 40:5,6,14 49:1 55:15,22 56:11 75:22 111:2 139:7 157:11
**valued** 138:13
**valukas** 93:8 94:18 94:18 96:17,19 97:2 97:16
**variety** 86:7
**various** 116:20 117:1
**vehicle** 24:8 52:7,8 52:12,14,25 53:8,14 53:16,25 54:3 55:15 59:19,22 75:10 101:5 123:1,21,21 124:14 138:7 140:22 160:16 162:8
**vehicles** 22:18,21 22:25 23:11 52:1,2 52:4,5,10 54:17 56:18,24 59:11,15 82:20,23 95:3 116:9 123:2 125:12 137:20,24 138:10 139:7,10,18 148:22 149:11 151:3,4,16 152:4,8 153:10 155:22,25 157:5,17

164:24 167:12
**vein** 85:7
**vendors** 11:12
**verge** 117:7
**veritext** 171:20
**versus** 59:4 62:24
102:7 136:23
**vetted** 27:8
**victim** 91:9
**victims** 11:13 89:8
121:4
**view** 8:19 12:3
34:13 36:9 64:13
65:14 92:1 105:2
106:23 112:16
126:18
**violated** 24:12 96:3
106:23 159:12
165:14
**violating** 66:17
**violation** 14:20,24
15:3 21:5 34:10
35:4 38:5,7 63:25
71:12 86:9,11,13,16
86:20 88:23 90:5
98:12 101:13
102:25 105:9,16
106:17 116:21,22
117:19 118:23
126:22,23,25 134:9
136:10 137:13
138:4 146:18,18
147:9,10,12,18
153:5 160:17
163:16 165:22
166:8
**violations** 14:9
116:25
**virodyne** 92:9
**virtue** 30:14 103:10
151:6 154:14
**vis** 48:4,4 51:19,19
69:13,14 82:3,3,19
82:19
**visions** 153:6
**visited** 98:25

**void** 159:16,18
**voiding** 160:4
**volume** 6:10
**voluntarily** 54:15
60:21 112:25
**voluntary** 24:6
**vs** 121:9

| w |
|---|

**wages** 152:11
157:12
**wait** 111:17 159:6
**wall** 144:23
**want** 6:5 7:15 8:7
15:10 17:14,22
19:13 20:2 22:8
25:24 26:10,15 38:6
44:12 45:11 48:19
48:20 50:13 61:12
61:14 71:17 77:20
83:12 86:5,18 89:18
89:19 91:5,24 92:20
93:6 94:2 111:23
119:11 133:22,23
133:23 134:16,18
134:20 146:3,8
147:5,11 168:2
169:20
**wanted** 16:23 26:19
33:12 51:7 54:11
126:5 142:18,22
146:15 149:5 168:5
**wants** 8:4 42:15,16
62:24 109:19 125:3
148:12
**warn** 57:19,20,22
151:23
**warrant** 157:17
**warranted** 146:12
149:22
**warranties** 55:23
151:23
**warranty** 25:21
51:20 52:2 54:2
55:13 60:17 77:8,14
77:22 81:18 83:22
141:18 150:25

**wasn't** 96:3 126:7
127:5 129:13 132:6
154:14 155:16
156:8,10 164:21
165:8
**watch** 80:7 144:22
**waterman** 107:10
131:22,22 166:13
**wave** 22:19
**way** 11:15 54:13
63:6,10 65:7 76:21
84:11 95:5,25 109:3
115:9 118:7 119:17
126:24 133:19
140:19 141:3 149:1
160:10 161:11
**ways** 20:1 161:20
**we've** 25:3 83:16
90:11 110:17,18
**weaker** 20:10 36:5
**weaved** 137:7
**website** 91:9
**week** 163:9
**weeks** 13:1,6 60:15
**weigh** 127:6,7
143:15
**weighing** 145:6
**weighs** 126:21
**weintraub** 3:16
6:18,19,21 7:22
85:5 103:4 119:14
119:15,21,22
120:14,22 121:2,8
121:14,21 123:16
127:12,14,17
128:13 129:9,14
132:6,8,14,21,23
133:1,4,13,16 134:4
134:4,12,18,25
135:20 136:16
146:20 153:11,24
155:9 167:15
**weintraub's** 20:18
76:4 103:18,20
**weintraub's** 140:8
155:11 164:2

**weisfelner** 3:23
6:14,15,17 7:21 9:7
9:18 10:7 11:16
14:8,11,23 15:12
16:15 17:7 19:18
21:15 26:12 36:6
52:18 82:15 84:19
84:22,24 85:1,15,22
85:25 86:1 89:10,20
95:16,22 97:25
98:10 102:18
103:13 104:1,5
111:16,19 113:5
114:19,22 115:2,8
115:25 116:13
118:12,16 119:18
122:20 123:3 124:2
126:20 127:10
135:21 146:20,25
150:1 152:20
153:23 155:20
162:19,20 163:22
164:17,18 166:13
167:15 168:15
169:22,24 170:10
170:13
**weisfelner's** 76:5
**weisfelner's** 119:16
127:21 128:7
147:17 154:25
157:8 164:3
**weissbrodt** 18:20
65:16 159:20
**went** 22:14 33:17
63:25 64:1 79:10
86:12 91:16 112:18
153:12
**weren't** 151:24
**westlaw** 154:7
**we'll** 151:4 170:6,8
**we're** 123:6 124:24
133:7 134:15
136:22,24 140:25
145:15,17,17,18
148:10 150:11
151:2 157:13
163:10 169:9

**we've**  122:10
133:19,20 143:12
**whatsoever**  107:15
**what's**  166:22
**whistleblower**
124:7
**white**  45:2
**wholly**  8:22 20:20
53:6
**widely**  81:13,13,14
**widespread**  27:5
152:3
**william**  3:16 6:19
**williams**  4:15
**willing**  157:4 167:9
**wilmington**  4:8
39:24
**win**  15:14,16 16:1
37:19 76:24 82:2
129:18
**window**  112:24
121:20
**winning**  17:11
**wins**  35:14 127:20
**wiped**  46:3 65:6
**wipes**  46:8
**wisconsin**  122:22
**withdraw**  142:6
**withheld**  124:14
125:22
**witnesses**  166:7
**wl**  68:4 154:7
160:23
**wolff**  40:8,9
**won**  118:24 126:25
**wonder**  8:17 36:5
132:16
**wondering**  168:2
**won't**  118:19
122:19 135:21
**word**  100:18 142:6
154:2
**wording**  149:9
**words**  23:2 37:15
44:13,21 52:19 63:2
65:14

**work**  22:1 144:19
**worked**  156:6
**working**  48:21
133:20
**world**  16:8 18:7
36:10
**worried**  65:13
**worse**  17:12 92:24
113:11
**worst**  62:23
**worth**  92:24 140:13
**worthless**  17:4
**worthy**  99:10
**would've**  75:21
83:24 106:11
**wouldn't**  124:23
165:14
**wrath**  91:6
**wrecks**  9:2 11:13
17:6 51:7 103:19
**wrestle**  141:11
**wrestling**  141:11
**write**  100:17
**writes**  154:10
**written**  50:1 83:24
109:23
**wrong**  9:1 11:21
50:3 53:10 56:4
65:20,22 67:8 68:3
71:25 89:16 91:16
166:20
**wrongful**  51:10
52:21
**wrote**  94:7

**x**

**x**  1:4,10

**y**

**yard**  132:20
**yardstick**  132:12
**yeah**  17:17 26:7
32:17 52:17 89:7
97:25 115:8 127:12
132:5,24 140:2,17
140:25 141:2 145:5
165:20 168:17

**year**  22:17 55:15
56:11 87:10 105:21
106:16 119:2
122:19 153:12
163:24
**years**  46:21 55:14
60:12 79:11,14 82:2
87:4,9,10,11 88:24
88:25 104:21 106:3
107:4 114:7 115:11
124:15 125:23
126:8 130:1 133:21
162:25,25 163:5
**yelling**  144:16
**york**  1:2,15,15 3:5,5
3:12,14,14,21,21
4:3,3,11,11,20,20
43:25 132:7
**you'll**  139:24
**you're**  119:24 120:6
120:10,12 121:16
123:13 126:19,21
128:9 129:7,14
132:5 141:4,11
143:20 145:1,13
154:19,20 163:25
163:25 164:5
168:25 169:2,22
**you've**  123:3
126:11 128:11
136:12 155:9
157:10 170:13

**z**

**zito**  94:4

**à**

**à**  48:4 51:19 69:14
82:3,19