1992 WL 121726
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

NIAGARA MOHAWK POWER CORPORATION;
Long Island Lighting Company; New York
State Electric & Gas Corporation; Rochester
Gas and Electric Corporation; and Central
Hudson Gas & Electric Corporation, Plaintiffs,

v.

STONE & WEBSTER ENGINEERING
CORPORATION, ITT Fluid Products Corporation,
and ITT Fluid Technology Corporation, Defendants.

No. 88–CV–819.   |   May 23, 1992.

**Attorneys and Law Firms**

Hiscock & Barclay, Syracuse, N.Y. (Richard K. Hughes, of counsel), Swidler & Berlin, Washington, D.C. (John R. Ferguson, of counsel), for plaintiff Niagara Mohawk Power.

Kirkland & Ellis, Chicago, Ill. (James C. Munson, of counsel), Hancock & Estabrook, Syracuse, N.Y. (William Allen, of counsel), for plaintiffs Long Island Lighting, New York State Electric & Gas, Rochester Gas & Electric and Central Hudson Gas & Electric.

McNamee Lochner Titus & Williams, Albany, N.Y. (Scott A. Barbour, of counsel), Hale & Dorr, Washington, D.C. (James Quarles III, of counsel), for defendants ITT Fluid Products & ITT Fluid Technology.

## MEMORANDUM–DECISION AND ORDER

McCURN, Chief Judge.

**\*1** On April 30, 1991, the court heard oral argument with respect to the summary judgment motion by defendants, ITT Fluid Products Corporation and ITT Fluid Technology Corporation ("ITT" or "the ITT defendants"), and the cross-motion for summary judgment by plaintiffs. Due to the lengthy memoranda of law, volumes of exhibits and appendices, as well as the numerous legal issues (some quite complex) raised by those motions, the court reserved decision. Then, on January 3, 1992, the court heard oral argument on a second set of summary judgment motions by ITT.[1] As it did on April 30, 1991, and for the same

reasons, the court reserved decision. The first set of motions focuses entirely on liability, whereas the second set of motions is framed both in terms of liability and damages. This memorandum-decision and order will address all of the outstanding motions.

### INTRODUCTION

This lawsuit arises out of the construction of the Nine Mile Point 2 nuclear power plant ("NMP2" or "the project"). In 1988, plaintiffs, five New York utilities that own and operate NMP2[2], commenced the present lawsuit against defendant Stone and Webster Engineering Corporation ("SWEC"), the company which designed and engineered NMP2 and served as the project construction manager. Also named as defendants are ITT Fluid Corporation and ITT Fluid Technology, as successors to ITT Grinnell Industrial Piping, Inc., the company which actually had the contract with plaintiffs for the piping work on NMP2. In the spring of 1991, NiMo and SWEC entered into an undisclosed settlement agreement, leaving the ITT defendants as the only remaining defendants in this action.[3]

The amended complaint contains three causes of action against ITT: breach of contract; negligence; and gross negligence.[4] By NiMo's calculations, the alleged resulting damages total approximately $88 million.[5] Over the past three and one-half years, the parties have conducted exhaustive discovery; and it is the fruits of that discovery which, in large part, form the basis for these motions.

### BACKGROUND

Basically, this controversy centers around the interpretation of four documents—the contract between NiMo and ITT for "Field Fabrication and Erection of Piping for Nine Mile Point Nuclear Station—Unit 2" ("contract P301C") and three Contract Changes thereto, Contract Changes 26, 32 and 34. In their various memoranda of law, the parties have detailed a great many facts, including extrinsic evidence, which they deem relevant to these motions. To simplify matters, in this section the court will limit its recitation of the facts to the provisions of those four documents which the parties maintain govern the outcome of the motions. Other relevant facts will be referred to subsequently as necessary to resolve the legal issues raised herein.

PLAINTIFF'S
EXHIBIT
16

09-50026-mg    Doc 13397-17    Filed 08/27/15    Entered 08/27/15 12:33:20    Exhibit
Exhibit 16 - Niagara Mohawk Power Corp. v. Stone & Webster Engineering C    Pg 2 of 37
Niagara Mohawk Power Corp. v. Stone & Webster..., Not Reported in...
1992 WL 121726

## A. Contract P301C

The long and contentious relationship between NiMo and ITT began almost twenty years ago in August, 1974, when NiMo and ITT entered into contract P301C.[6] As originally negotiated, contract P301C was a "Cost Plus Fixed Fee Contract." Put simply, instead of being paid one "lump sum" for its work on the project, ITT was to be paid a fixed fee. ITT was also entitled to reimbursement for all costs it incurred in connection with the piping work. The ostensible reason for structuring the contract in that way was that as of 1974, a nuclear power plant of this size had not previously been designed, making it impossible to know with certainty at the time of contracting how much the piping would eventually cost.

**\*2** Not surprisingly, contract P301C is lengthy and extremely detailed. The court need not be concerned at this point, however, with the many nuances of that contract. In response to ITT's second motion for summary judgment on liability, two provisions of contract P301C are particularly relevant, at least in NiMo's view. The first such provision is the "Alterations and Amendments" clause, which states in relevant part:

No waiver of any provision of the Contract, and no consent to departure therefrom, by either party, shall be effective *unless in writing and signed by the waiving or consenting party, and no such waiver or consent shall extend beyond the particular case and purpose involved.*

Contract P301C, "Supplementary Conditions of Contract" at ¶ 16 (Plaintiffs' Exhs., Vol. I at 18 (emphasis added)). Although numerous contract changes were entered into between NiMo and ITT, as NiMo is quick to point out, that clause was never changed in any way or deleted from the original contract.

NiMo also relies upon article four of the contract's "Supplementary Conditions", the "Release of Claims" provision. That provision also was not altered in any way or deleted from contract P301C by any of the subsequent contract changes. Article four states in its entirety:

The Engineers, in its sole discretion, may withhold final approval of the work until the Contractor shall furnish to it an affidavit setting forth the extent to which final payment or settlement has been made of all bids and claims of whatever kind or nature in any manner arising out of the Contract, including full details as to any such bills and claims remaining unpaid or unsettled; and the Purchaser shall have the right to retain from any payment then due to the Contractor, so long as any of said bills or claims remain unpaid or unsettled and outstanding, a sum sufficient (or if insufficient, then all of any such payment due to the Contractor) in the opinion of the Engineers to provide for the payment of the same and the Purchaser may pay any such bills or claims pro tanto in full satisfaction and discharge of any like amount due to the Contractor. Prior to final payment and as a condition thereto the Contractor shall furnish a release, in form and substance satisfactory to the Engineers, of all claims of Contractor against the Purchaser and the Engineers arising under and by virtue of the Contract.

If any breach or breaches by the Contractor of any provision of the Contract shall occur at any time prior to the completion of the Contract and the acceptance of the work by the Purchaser, and any part of the amounts due or to become due to the Contractor hereunder (including payments for additional work) shall be unpaid to the Contractor, the Purchaser may retain therefrom a sum sufficient, in the opinion of the Engineers to indemnify the Purchaser against all damages which have resulted or may result from such breach or breaches, but, if no such amount shall be retained, or if the amount of such damages shall exceed the amount so retained, the Contractor shall pay to the Purchaser on demand the amount of such damages or such excess as the case may be.

**\*3** Contract P301C, "Supplementary Conditions of Contract" at ¶ 4 (Plaintiffs' Exhs., Vol. I at 13).

## B. Contract Change 26

In 1976, ITT began to work on the project. As a result of numerous delays, the original Commercial Operation Date was extended four years from 1981 to 1986, thus requiring ITT to work on the project for five years longer than it had planned originally. Naturally, the delays also resulted in cost escalation. Based upon the increased amount of time it would be expected to work on the project, and the estimated cost increases, ITT requested a fee adjustment in June, 1980.

Following over a year of negotiations, on December 21, 1981, NiMo and ITT executed Contract Change 26. ITT vigorously contends that that Contract Change settled all claims existing as of December 21, 1981. One change included therein was the method by which ITT was to be

Niagara Mohawk Power Corp. v. Stone & Webster..., Not Reported in...
1992 WL 121726

paid, which, at least in part, was a response to the New York Public Service Commission's suggestion that reimbursable contracts (such as contract P301C) be converted to a type of contract containing greater incentives and penalties. Contract Change 26 converted the original "Cost Plus Fixed Fee" contract to a "Cost Reimbursable Incentive Fee Contract." ITT's fee was ultimately increased to $10,390,000.00. As part of the incentive compensation, ITT agreed to put $2,000,000.00 of that fee into a pool which NiMo would then unilaterally award based upon certain performance criteria. NiMo contributed $1,000,000.00 to that fund. The remainder of ITT's $10,390,000.00 fee (or $8,390,000.00) was the "base" fee.

With respect to this base fee, Contract Change 26 specifically provided:

It is agreed that the total fee compensation to which Contractor [ITT] is entitled for all work performed and any and all things done pursuant to performance of this Contract through 7:59 am EST, December 21, 1981, is *Two Million, Four Hundred Forty Nine Thousand, Seven Hundred Forty Five Dollars ($2,449,745).*

Contract Change 26, Article VI at ¶ 2 (Plaintiffs' Exhs., Vol. I at 56) (emphasis in original)). Other changes incorporated in Contract Change 26 were a change in the completion date of the piping work to October 1, 1986, and an increase in the estimated cost of ITT's work from $49 million to $206 million.

Relevant also is the provision of Contract Change 26 requiring ITT to pay $135,000.00 to NiMo "in consideration of full and final settlement of charges levied against Contractor [ITT] for tool loss and alleged defective or deficient work occurring through 7:59 a.m. EST December 21, 1981...." Contract Change 26, Article VI at ¶ 5 ("the settlement clause") (Plaintiffs' Exhs., Vol. I at 56). Insofar as future disputes over liability for defective work were concerned, Contract Change 26 provided that ITT would be reimbursed for all costs of rework:

If at any time before final completion and acceptance of the work, the Engineers shall certify to the Purchaser that any part of the work is found to be deficient or in any way fails to conform to the specifications, plans and drawings, then the Engineer is hereby expressly authorized and empowered to reject such defective or deficient work and to require the Contractor to redo and make good all

such defective or deficient work at no cost to the Purchaser; *provided, however, that such defective work occurs as a result of gross negligence, willful misconduct or willful failure of Contractor's [ITT] supervisory employees to follow the directions of the Purchaser and/or Engineer.* If, however, the Contractor [ITT] is required to redo or make good deficient or defective work *for any other reason,* the Contractor [ITT] shall re-perform this work and will be reimbursed for costs incurred therefor, without additional fee.

 *4  Contract Change 26, Article XVI at ¶ 3(10) (emphasis added) (Plaintiffs' Exhs., Vol. I at 76–77)). ITT's second summary judgment motion on liability is premised upon this apparent limitation of liability.

Finally, in conjunction with Contract Change 26, ITT executed an "Intermediate Corporation Release," which provided in relevant part:

[I]TT ..., for good and valuable consideration, as determined through negotiations stipulated in Change Order No 26 to Contract No. PC–NMP2–P301C and all amendments thereto, agrees that, except for amounts retained under Contract No. PC–NMP2–P301C through 7:59 EST A.M., December 21, 1981, in the total amount of $190,432, *said Change represents full and final settlement of any and all costs, claims, and outstanding changes and charges whether or not recognized, claimed and purported, incurred from contract inception through 7:59 EST, A.M., December 21, 1981.*

ITT's Appendix, Vol. II at 268 (emphasis added). No reciprocal release was ever executed by NiMo. Indeed, ITT's efforts to obtain a mutual release in connection with this Contract Change were rebuffed by NiMo. According to NiMo's Manager of Contract Administration at the time, NiMo informed ITT that it would not execute a mutual release because it had a policy of not granting such releases to contractors. Affidavit of James T. Niezabytowski (February 21, 1991) at ¶ 5 (Plaintiffs' Exhs., Vol. II thereto at 248). Furthermore, NiMo's Manager of Contract Administration did not think a mutual release was justified because the only claim being settled was ITT's fee claim against NiMo and not any outstanding claims which NiMo might have had against ITT. *Id.*

### C. Contract Change 32

Out of a growing concern over the "major change in scope in terms of size and speed" on the project, in approximately March, 1984, ITT began asserting that it was entitled to an

09-50026-mg   Doc 13397-17   Filed 08/27/15   Entered 08/27/15 12:33:20   Exhibit
Exhibit 16 - Niagara Mohawk Power Corp. v. Stone & Webster Engineering C   Pg 4 of 37

Niagara Mohawk Power Corp. v. Stone & Webster..., Not Reported in...
1992 WL 121726

increase in compensation. ITT's Appendix, Vol. III at 614. At the same time, ITT also expressed concern over various "backcharges" NiMo apparently unilaterally deducted from ITT invoices. More than one year later, on May 28, 1985, NiMo and ITT executed Contract Change 32.

From ITT's standpoint, by acquiescing in that Contract Change, it relinquished a claim for $9.6 million—the fee to which ITT believed it was entitled as of March, 1985. In exchange for relinquishing that fee, according to ITT, it received the following. First, contract P301C was changed from a "base fee" to a $14.6 million dollar "fixed fee," representing ITT's total entitlement on a base cost of $309,450,000.00. *See* Contract Change 32 at ¶ IV(1) (ITT's Appendix, Vol. III at 783). Notably, that fee was "not subject to adjustment for any reason," except as specifically provided by Contract Change 32. *Id.* at ¶ III (ITT's Appendix, Vol. III at 782). Second, Contract Change 32 provided, that "the total value of all fees earned ... through April 12, 1985, which amount reflects consideration for the value of the work accomplished ... is agreed and established at ... $12,207,704.36." *Id.* at ¶ IV(2)(a) (ITT's Appendix, Vol. III at 783). With respect to ITT's fee, that Change also explicitly stated that the "remaining amount of fixed fee payable to the Contractor [ITT] is ... agreed and established at ... $2,392,295.64." *Id.* at ¶ IV(2)(b) (ITT's Appendix, Vol. III at 783). The penultimate paragraph of Contract Change 32 clearly stated:

*5  The compensation stipulated for performance of this change represents *total and complete compensation for such performance including costs associated with the impact, if any, on the unchanged work.*

*Id.* at 7 (emphasis added) (ITT's Appendix, Vol. III at 788).

As it did with Contract Change 26, as part of Contract Change 32, ITT executed an "Intermediate Corporation Release" which stated:

[I]TT ..., for good and valuable consideration, as determined through negotiations stipulated in Change Order No. 32 to Contract No. NMP2–PC–P301C and all amendments thereto, agrees that *said Change Order represents full and final settlement of any and all extra costs, claims, and outstanding changes and charges whether or not recognized, claimed or purported, incurred from contract inception through May 8, 1985.* In consideration of Change Order No. 32, this release hereby remises, releases and forever discharges

Niagara Mohawk Power Corporation and Stone & Webster Engineering Corporation, Agent, from all claims, demands and rights thereto arising in connection with work performed or any contractual, statutory or common law basis pursuant to said Contract for Nine Mile Point Nuclear Power Station — ... through said date.

ITT's Appendix, Vol. III at 789 (emphasis added). Once again, no reciprocal release was executed by NiMo. From ITT's standpoint, the effect of this Contract Change was to settle all other claims (those not settled by Contract Change 26), including those set forth in the amended complaint.

### D. Contract Change 34

Contract Change 34 was the final contract change to contract P301C. It established a final cost of $296,785,801.24 for all work performed by ITT under the contract; and it set the total fee at $14,600,000.00. Contract Change 34 at 1 (ITT's Appendix, Vol. III at 852). In comparison to contract P301C and Contract Changes 26 and 32, Contract Change 34 is a short document (only two pages), over which there was evidently little negotiation or dispute.

As with the prior contract changes, ITT executed a release to accompany Contract Change 34. That release, while varying some from those executed in connection with Contract Changes 26 and 32, still had the common feature of, at least by its terms, releasing only NiMo, and not ITT, from claims arising out of contract P310C. *See* "For Corporate Release" (ITT's Appendix, Vol. III at 854). Again, NiMo did not execute a reciprocal release.

ITT contends that summary judgment should be granted on its first motion based upon any one of four affirmative defenses: (1) accord and satisfaction; (2) estoppel; (3) release; and (4) waiver.[7] NiMo takes the position that summary judgment is appropriate, but in favor of plaintiffs, dismissing each of those affirmative defenses as a matter of law. Alternatively, NiMo declares that the record is replete with genuine issues of material fact, rendering entirely improper ITT's motion for summary judgment on the affirmative defenses.

### DISCUSSION

*6  There is little upon which these parties agree. There is one small but important undisputed point, however, and that is the applicable law. In this diversity action New York law applies,

*Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *PSI Metals, Inc. v. Firemen's Ins. Co.,* 839 F.2d 42, 43–44 (2d Cir.1988); and the parties realize that. *Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp.,* 725 F.Supp. 656, 659 (N.D.N.Y.1989) ("*NiMoI* "); *see also* Transcript of December 31, 1988 Hearing ("Tr. I") at 5. Moreover, any doubt here as to the applicability of New York law is removed by the parties' choice of law clause, unequivocally stating that contract P301C should "take effect and ... be construed in accordance with the laws of the State of New York." Contract P301C, Supplementary Conditions at 10, ¶ 22 (Plaintiffs' Exhs., Vol. I at 20). *See Bank of America Nat. Trust & Sav. Assn. v. Envases Venezolanos, S.A.,* 740 F.Supp. 260, 264–65 (S.D.N.Y.), *aff'd sub nom. without pub. opinion, First Nat'l Bank of Maryland v. Envases Venezolanos,* 923 F.2d 843 (2d Cir.1990).

There is one other minor point upon which the parties are now in agreement. In light of NiMo's concession that it is not seeking damages from ITT on account of "costs associated with investigative and corrective action taken in response to falsification of weld radiographic film committed by two ITT employees," [8] NiMo does not appear to be contesting that part of ITT's motion seeking summary judgment on the enhanced radiograph claim. Thus, insofar as the amended complaint can be read as seeking damages based upon the radiograph falsification incident, summary judgment is granted in favor of ITT on such claim.

By now the legal standards for granting summary judgment in this Circuit are well settled and familiar to all. Some of those principles are worth repeating though, particularly as they relate to contract actions. Such a review is also useful where, as here, those principles have a tendency to become somewhat obscured by the necessarily zealous legal representation by counsel.

Summary judgment is an extraordinary remedy available only when it is clear that no genuine issue of material fact remains to be resolved at trial and that the movant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The initial burden of demonstrating the absence of a genuine issue of material fact is on the moving party. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). That burden may be discharged if the movant demonstrates to the court that there is an absence of evidence to support the non-moving party's case on which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553,

91 L.Ed.2d 265 (1986). In deciding whether the moving party has met this burden, all ambiguities must be resolved against the movant. *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1187 (2d Cir.1987) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

**\*7** The burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). That burden is not met where the non-movant simply shows that there is some "metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). To avoid summary judgment then, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986) (interpreting the "genuineness" requirement).

In *Seiden Associates, Inc. v. ANC Holdings, Inc.,* No. 91–7770 (2d Cir. March 23, 1992), the Second Circuit just recently reiterated several well known rules of contract construction, and the effect of such rules upon a summary judgment motion:

In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use.... When the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity..... Where the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become an issue of fact and summary judgment is inappropriate, ..., since it is only when there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law.....

*Id.,* slip op. at 2452–53 (citations omitted). [9] Stated more succinctly, the Second Circuit has held that where the issue to be decided concerns the parties' interpretation of a contract, " 'summary judgment is perforce improper unless the terms of the agreement are *'wholly unambiguous, '* and no material facts are in dispute." *Leberman v. John Blair & Co.,* 880 F.2d 1555, 1559 (2d Cir.1989) (emphasis added) (citing *Wards Co. v. Stamford Ridgeway Associates,* 761 F.2d 117, 120 (2d Cir.1985) (quoting in turn *Heyman v. Commerce & Industry Insurance Co.,* 524 F.2d 1317, 1320 (2d Cir.1975)). [10]

Therefore, "where one party opposes summary judgment by propounding a reasonable interpretation of a disputed matter, it may be sufficient to defeat the motion." *Schering*, 712 F.2d at 10. Finally, if there is conflicting evidence regarding the parties' intent, the court may only identify the issues at the summary judgment stage, not resolve them. *Id.* at 9–10.

To prevail on a motion for summary judgment on a breach of contract cause of action, a movant faces difficult although not insurmountable hurdles. Nonetheless, the summary judgment mechanism is a valuable litigation tool, and not a "disfavored procedural shortcut,...." *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555. As the Supreme Court reminded lower courts in *Celotex:*

   **\*8** Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* Consistent with that view of Rule 56, in a case decided prior to *Celotex,* the Second Circuit cautioned district courts that "[j]ustice requires careful consideration of the entire posture of the case so the 'drastic device' of summary judgment, .., is not precipitously imposed." *Schering,* 712 F.2d at 6 (quoting *Heyman,* 524 F.2d at 1320). To avoid "precipitously" granting summary judgment, the court has reviewed the seemingly endless record on these motions, and has carefully considered the parties' extensive memoranda of law, all the while keeping in mind the foregoing standards governing summary judgment.

## *I. BREACH of CONTRACT*

### *A. Accord and Satisfaction*

The first affirmative defense offered by ITT as a possible basis for summary judgment is that of accord and satisfaction. The Second Circuit has defined that defense as follows:

Accord and satisfaction is a legal rule of repose. Available as a defense in appropriate circumstances, its policy is to bar further litigation if the parties agreed to satisfy all existing claims by means of a substituted performance.

*Geisco, Inc. v. Honeywell, Inc.,* 682 F.2d 54, 57 (2nd Cir.1982). The Court in *Geisco* then outlined and discussed the elements of accord and satisfaction:

To establish the defense, 'the Court must find (i) the parties agreed that the transactions in question were to constitute an accord and satisfaction, and (ii) the performance rendered by defendant was sufficient consideration for a discharge.' ...The requisite agreement is not foreclosed by the plaintiff's unexpressed, subjective understanding; agreement *in law* arises if 'what was done by the defendant ..; made it unreasonable for plaintiff not to understand" that defendant's performance 'was offered to him as full satisfaction of any claim he might have' against defendant ... As to the sufficiency of the consideration, an accord and satisfaction is supported if 'the payments tendered by the (defendant) were in excess of any amount *then owing* to plaintiff,'... Where these factors appear, plaintiff may not accept the defendant's substituted performance and then sue on his original claims.

*Id.* at 57 (citations omitted) (emphasis in original). In other words, "[i]n appropriate instances, the acceptance by one party of benefits offered in settlement by the other will give rise to an inference that the differences have been settled by the proffered agreement." *Pepper's Steel & Alloys, Inc. v. Lissner Minerals & Metals, Inc.,* 494 F.Supp. 487, 496–97 (S.D.N.Y.1979) (citation omitted). Determining whether there was a meeting of the minds necessary to create an accord "requires the court to examine the circumstances surrounding the putative contract, including the parties' expressions of intent." *Id.* at 497 (citations omitted). It thus stands to reason that, as ITT admits, [11] "[w]hether there is an accord and satisfaction ordinarily involves a pure question of intention, which is, as a rule, a question of fact." *Moers v. Moers,* 229 N.Y. 294, 300 (1920) (citation omitted). Of course, "[i]f the evidence directly or through reasonable inference creates no conflict concerning the intention it is a question of law." *Id.*

   **\*9** ITT claims that the evidence is not in conflict here, and so the court can find as a matter of law that the parties intended Contract Changes 26 and 32 to be "settlements;" and as such, those Contract Changes constitute an accord and satisfaction which operates to bar NiMo's pending claims against ITT. Even though the conventional wisdom is that summary judgment is seldom appropriate on an intent issue, ITT strongly urges that summary judgment be granted in its favor on this defense. Regardless of the inherently factual nature of an intent inquiry, ITT argues that it had reason to believe that Contract Changes 26 and 32 worked an accord

09-50026-mg    Doc 13397-17    Filed 08/27/15    Entered 08/27/15 12:33:20    Exhibit
Exhibit 16 - Niagara Mohawk Power Corp. v. Stone & Webster Engineering C    Pg 7 of 37

Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp., Not Reported in...
1992 WL 121726

and satisfaction of NiMo's pending claims because "[t]he language of the Contract Changes and the undisputed facts concerning the circumstances of their negotiation would have led any reasonable person to understand that a settlement of *both* parties' claims had been reached." ITT's Memorandum at 48 (emphasis in original). NiMo responds that those contract changes were merely "modifications" of the parties' ongoing contractual relationship,...." Plaintiffs' Memorandum at 59. According to NiMo, the purpose of those Contract Changes was to "change payment terms for future performance, *not* to discharge ITT from liability for all past substandard performance." *Id.* (emphasis added).

Whether, as ITT contends, there was a complete accord and satisfaction by Contract Changes 26 and 32, or, whether, as NiMo contends, those Contract Changes were simply modifications cannot be decided as a matter of law on these motions. Obviously, to ascertain whether the parties reached an accord necessitates an inquiry into the parties' intent. To discern the parties' intent, the court must first look to Contract Changes 26 and 32.

At first glance it appears, as NiMo maintains, that those documents are unambiguous. Closer examination reveals, however, that when read as a whole, Contract Changes 26 and 32 are susceptible of at least two fairly reasonable meanings, insofar as whether the parties intended to effect an accord and satisfaction by executing those documents and accompanying releases. In particular, when the settlement clause of Contract Change 26 is read in conjunction with the release accompanying that Change, and with the provision setting ITT's fee at $2,449,745.00, it is reasonable to infer that ITT thought it had at least settled some, if not all, of the claims which are the subject of this litigation. That is the meaning which ITT attributes to Contract Change 26. It is equally plausible, however, to read Contract Changes 26 and 32, as does NiMo, as a very limited release, having little, if any, bearing on the claims herein. That interpretation is supported by the settlement clause of Contract Change 26.[12] Therefore, the court cannot say that the relevant documents are wholly unambiguous on the issue of accord and satisfaction. Consequently, because the parties' intent as to accord and satisfaction cannot readily be ascertained from the documentary evidence, extrinsic evidence should be considered.

**\*10** Even a cursory examination of the extrinsic evidence offered on these motions readily shows that there is a conflict as to what the parties intended when they entered into

Contract Changes 26 and 32. To illustrate, with respect to Contract Change 26, relying in large part upon the deposition testimony of two key players in the negotiations of that Contract Change (Louis Stoltenberg, SWEC's contract administrator, chief negotiator and draftsperson for Contract Change 26, and Lee Foster Henry, ITT's chief negotiator on Contract Change 26), ITT argues that Contract Change 26 settled all claims existing as of December, 1981. Messrs. Stoltenberg and Henry essentially so testified. *See* Deposition of Louis H. Stoltenberg (September 27, 1990) (ITT's Appendix, Vol. IV at 1158); Deposition of Lee Henry Foster (July 17, 1990) at 81–82 (ITT's Appendix, Vol. IV at 1016–17).

Not only does NiMo offer a widely varying interpretation of Contract Change 26 based on the language thereof, but it relies upon the deposition of James Niezabytowski, Manager of Contract Administration during the relevant time frame and one of the chief negotiators of Contract Change 26, whose testimony directly controverts that of Messrs. Stoltenberg and Henry. Mr. Niezabytowski testified that the settlement clause was limited; it was meant to confine the settlement to identified tool losses and formally processed back charges for defective or deficient work. Deposition Testimony of James T. Niezabytowski (July 12, 1990) at 228–32 (Plaintiffs' Exhs., Vol. III at 523–27). That testimony is corroborated by the affidavit of Dominick T. Scafidi, a Senior Contract Administrator for NiMo, who avers:

The only performance deficiencies addressed in Contract Change 26 were those performance deficiencies previously identified by SWEC and formally processed as 'back charges.' Niagara Mohawk and ITT did reach an agreement on the total amount ITT was to pay with respect to these specific back charges.

Affidavit of Dominick T. Scafidi (February 20, 1991) at ¶ 10 (Plaintiffs' Exhs., Vol. II at 238).

The parties also offer divergent views as to what was intended by Contract Change 32. According to ITT, that claim settled all claims currently pending in this action, other than those already settled by Contract Change 26. ITT maintains that because in Contract Change 32 it agreed to a $14.6 million fixed fee "not subject to adjustment for any reason,"[13] "[p]ermitting Niagara Mohawk to pursue this claim would permit it to attempt to take back from Grinnell [ITT] the very consideration for which Grinnell [ITT] agreed to settle its fee claim." ITT's Memorandum at 53.

Niagara Mohawk Power Corp. v. Stone & Webster, Not Reported in...
1992 WL 121726

ITT portrays the events leading up to Contract Change 32 as a series of negotiations extending over nearly a year, due to the mutual dissatisfaction of both parties over their respective obligations under contract P301C. Calling ITT's view "grossly inaccurate," NiMo implies that ITT is conveniently overlooking the fact that during that same time, ITT was asserting "everescalating claims against the project." Plaintiffs' Memorandum at 41. Against that background, NiMo contends that any claims which it had against ITT were simply not part of the negotiations for Contract Change 32, explaining that "[t]he project decided *not* to perform an assessment of ITT's performance deficiencies at the time of Contract Change 32, because it would drain too many resources from the project and disrupt the work." Deposition of Gary C. Hoyt at 194–96, 210–11, and 367–69 (August 28 and 29, 1990) (Plaintiffs' Exhs., Vol. III at 575–77, 579–80, and 666–68).

**\*11** That conflicting evidence as to what was meant by Contract Changes 26 and 32 makes summary judgment "perforce improper" [14]. At this stage of the litigation, the court cannot hold as a matter of law that those Contract Changes constitute an accord and satisfaction. Nor can the court hold (as NiMo urges) that as a matter of law Contract Changes 26 and 32 do not constitute an accord and satisfaction. Moreover, even assuming *arguendo* that the court could somehow determine at this juncture that an accord and satisfaction had been reached, the scope of such an accord cannot be resolved as a matter of law. Thus, due to the existence of genuine issues of material fact as to whether the parties intended Contract Changes 26 and 32 to operate as an accord and satisfaction; and, if so, the scope of such accord, summary judgment must be denied on that defense—both as to ITT and as to NiMo.

**B. Release**

Another affirmative defense advanced by ITT is that of release, or, more appropriately, implied release. Specifically, ITT asserts that NiMo's "acceptance of a release [from ITT] without an express reservation of rights bars all claims inconsistent with the claims released by" ITT. [15] Based upon the express language of the alterations and amendments clause in P301C, [16] it is NiMo's position that any releases or waivers thereunder must be in writing and narrowly construed. Thus, NiMo asserts that because the only releases here were unilateral releases executed by ITT discharging NiMo, and not the other way around (that is, NiMo did

not execute any reciprocal releases discharging ITT), those releases cannot operate as a bar to this action.

ITT's implied release argument is derived solely from law outside this jurisdiction. *See* ITT's Memorandum at 62–66. In reliance upon that case law, ITT asks this court to apply a legal presumption that because it executed a unilateral release in favor of NiMo, the court should find, as a matter of law, a reciprocal release in favor of ITT. The court will not invoke such a presumption. Indeed, to do so would be in direct contravention of New York law which requires "an 'explicit, unequivocal statement of a present promise to release defendant from liability.' " *Bank of America Nat. Trust & Sav. Asso. v. Gillaizeau*, 766 F.2d 709, 713 (2d Cir.1985) (quoting *Carpenter v. Machold*, 86 A.D.2d 727, 727, 447 N.Y.S.2d 46, 47 (3rd Dep't 1982)). [17] The court will not disregard that settled law and will adhere to the traditional rules governing releases, as articulated by New York courts.

Contract principles apply to the interpretation of releases. *Id.* at 715 (citations omitted). "The scope and meaning of a release will be determined by the manifested intent of the parties—in Corbin's words, 'by the process of interpretation, just as in the case of determining the meaning of an executory contract.' " *In re Thomson McKinnon Secur. Inc.*, 132 B.R. 9, 13 (Bankr.S.D.N.Y.1991) (quoting *Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261, 263 (2d Cir.1965) (quoting in turn 5A Corbin on Contracts § 1238 at 560 (1964)). [18] An additional rule which is of particular significance here is that "[i]f ambiguities in the document prevent a firm conclusion that it is a release, additional evidence may be considered to resolve the issue." *Marvel Entertainment Group, Inc. v. Young Astronaut Council*, 747 F.Supp. 945, 948 (S.D.N.Y.1990) (citing *Gillaizeau*, 766 F.2d at 714). Thus, under those circumstances, "[w]hether a document is a release is a factual question and therefore extrinsic evidence and oral testimony may be considered." *Id.*

**\*12** Application of those rules to the present case mandates the conclusion that, as with the accord and satisfaction defense, there is a factual issue as to intent, rendering summary judgment wholly improper. Admittedly, when read in isolation, Contract Changes 26 and 32 appear to be clear and unambiguous. To effectuate a release thereunder, a writing is required and NiMo did not do that. When read together to give effect to each part, however, it is plausible to construe those documents as meaning that NiMo intended to release ITT from any liability for the claims which are

Niagara Mohawk Power Corp. v. Stone & Webster... Not Reported in...
1992 WL 121726

the subject of this suit, even in the absence of a document executed by NiMo expressly designated as a release.

For instance, the release ITT executed in connection with Contract Change 32 contains arguably broad language; it is not limited to particular claims or claims by only certain parties. *See supra*, p. 12 (particularly the highlighted language thereon). In addition, Contract Change 32 itself describes the release thereto as having been given "[i]n consideration of the agreements and understandings between the parties which form the complete basis of this Contract Change 32...." ITT's Appendix, Vol. III at 788. This apparent ambiguity prohibits the court from reaching a "firm conclusion" [19] that the parties intended Contract Changes 26 and 32 to operate as a release barring this lawsuit. Extrinsic evidence on this issue will thus be permitted. Moreover, the court cannot find as a matter of law (as would be necessary to grant ITT's motion) the requisite "explicit unequivocal statement of a present promise to release" [20] by NiMo. Thus, ITT's summary judgment motion on this defense must be denied. Likewise, the existence of a factual dispute as to intent also precludes summary judgment on NiMo's cross-motion.

*C. Waiver*

ITT makes two waiver arguments. The first is a general waiver argument that by agreeing to an "equitable fee arrangement" [21] in Contract Changes 26 and 32, NiMo waived any rights it may have had to pursue the pending claims against ITT in this action. ITT's second waiver argument is commonly referred to as waiver-by-acceptance and usually arises in the area of construction contracts. In particular, according to ITT, when NiMo executed Contract Change 34—the final Contract Change; accepted ITT's work without reservation or qualification; released all the retainage; paid all monies due ITT and requested and received ITT's release, NiMo accepted ITT's work. By that purported acceptance, ITT contends that NiMo waived the right to recover for patent, as opposed to latent, defects. [22]

ITT's perfunctory treatment of the general waiver argument makes it practically impossible for the court to respond in any meaningful way. *See* ITT's Memorandum at 68. So the court is forced to resort to the settled rule that because "[i]t is often not clear that a party has waived its legal right(s), the waiver issue frequently involves questions of fact, and cannot be decided on a summary judgment motion." *Topps Chewing Gum, Inc. v. Imperial Toy Corp.*, 686 F.Supp. 402, 408 (E.D.N.Y.1988) (citing *Alsens A.P.C. Works v. Degnon Cont. Co.*, 222 N.Y.

34, 37 (1917)), *aff'd without pub. opinion*, 895 F.2d 1410 (2d Cir.1989). Contrary to what ITT thinks, this is not a situation such as that presented in *Topps* where the court found a waiver as a matter of law. Unlike *Topps*, in the present case there is an "opportunity for a reasonable inference" [23] to be drawn that NiMo did not waive its right to sue. Thus, the court must return to a by now familiar refrain: the existence of a material issue of fact precludes granting summary judgment in favor of either party on a general waiver theory.

**\*13** ITT fares no better with its waiver-by-acceptance argument. Application of the waiver-by-acceptance doctrine to the present case is problematic for several reasons. The first is that courts have not applied that doctrine in the broad manner ITT implies. In *Philip Zweig & Sons, Inc. v. Tuscarora Constr. Co.*, 50 A.D.2d 1069, 376 N.Y.S.2d 761 (1975), for example, the court differentiated between waiver of the right to terminate a contract for breach, which may result due to acceptance of later performance, and the waiver of the right to recover damages caused by that breach. In so doing the court repeated the general proposition that, " 'Failure to enforce the right to terminate the contract promptly constitutes to that extent a waiver of the default, but we have repeatedly held that it constituted no waiver of the claim for damages.' " *Id.* at 1069, 376 N.Y.S.2d at 762–63 (quoting *General Supply & Constr. Co. v. Goelet*, 241 N.Y. 28, 36 (1925) and citing *Deeves & Son v. Manhattan Life Ins. Co.*, 195 N.Y. 324, 330 (1909)). *See also Parke v. Franco–American Trading Co.*, 120 N.Y. 51, 56–57 (1890) (holding, *inter alia*, that "defective performance [may] be waived, subject to the right of the party damnified to recover or recoup damages for the loss he has sustained by reason of it"). As a result, even if waiver-by-acceptance is appropriate here, such waiver is potentially more limited than ITT would have this court believe.

Application of the waiver-by-acceptance rule is also questionable because of an obvious factual distinction between the cases in which it has been discussed and this case. In those cases, the plaintiffs were seeking to recover for physically defective work, [24] not, as NiMo, for excessive costs incurred as a result of ITT's alleged failure to properly and efficiently manage the piping work at NMP2, and for its alleged failure to develop and monitor adequate quality assurance programs. *See* Plaintiffs' Memorandum at 67. Third, even assuming for the sake of argument that the waiver-by-acceptance doctrine should be invoked in the present case, it would be premature for the court to do so today

Niagara Mohawk Power Corp. v. Stone & Webster... Not Reported in...
1992 WL 121726

because the court cannot find as a matter of law an intent to waive by NiMo.

Competing inferences may be drawn from the present record on the waiver issue. NiMo reasons that the inference of waiver-by acceptance which ITT urges this court to find as a matter of law is impermissible in light of the "Release of Retainage" provision contained in Contract Change 26. That provision specifies, "Final payment, ..., shall not relieve the Contractor [ITT] from responsibility under the Contract and guarantee." Contract Change 26, Article XI(3) (Plaintiffs' Exhs., Vol. I at 67). ITT responds that that "language merely memorializes the rule that liability for latent defects survives final payment, ..." ITT's Memorandum at 73, n. 30. Any other interpretation of the release of retainage provision would, in the opinion of ITT, "lead to absurd results." *Id.* As NiMo mentions, however, that restrictive reading of the release of retainage provision "is at odds with the plain meaning of ... [that] provision." Plaintiffs' Memorandum at 68. Hence, another ambiguity.

 **\*14** Moreover, the release of retainage provision does not, as NiMo states, "[d]ispose[ ] once and for all of any contention that final payment by NMPC could be construed to bar any claims that it might have against ITT for breach of the contract." Plaintiffs' Memorandum at 47–48. But, the existence of that provision is highly relevant to the parties' intent with respect to waiver—a factual issue, resolution of which must await trial. *Accord In re Family Showtime Theatres, Inc.,* 67 B.R. 542, 550 (Bankr.E.D.N.Y.1986)*aff'd,*72 B.R. 38 (Bankr.E.D.N.Y.), *aff'd without pub. opinion,*819 F.2d 1130 (2d Cir.1987) (citing *In re Delta Hotel of Syracuse,* 10 B.R. 585, 597 (Bankr.N.D.N.Y.1981)) ("Waiver is matter of intent which depends on the factual circumstances of each particular case."). In light of the foregoing, neither ITT nor NiMo is entitled to summary judgment insofar as waiver-by-acceptance is concerned.

## D. Estoppel

Resorting to vague notions of fairness, ITT contends that NiMo should be equitably estopped from pursuing its claims in this lawsuit against ITT. More specifically ITT states, "Niagara Mohawk's settlement of Grinnell's [ITT's] fee claim and the 'taking of a release may be regarded as an express or implied admission' that any problems with Grinnell's [ITT's] performance were, as Grinnell [ITT] claimed, either the plaintiffs' [NiMo's] fault or caused by events beyond Grinnell's [ITT's] control." ITT's Memorandum at 67 (quoting

*Lugena v. Hanna,* 420 S.W.2d 335, 341 (Mo.1967)). ITT argues, although not wholeheartedly, that "[s]uch an admission now estops the plaintiffs from claiming it was Grinnell's [ITT's] wrongful conduct which was responsible for its allegedly inefficient performance." *Id.* at 67–68. This estoppel argument, while somewhat novel, is not persuasive. At this point, the court will not find such a purported admission.

More important is that ITT has not met its burden of proof with respect to this defense. The New York Court of Appeals has explained that "[t]he doctrine of equitable estoppel 'is imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct has been misled into acting upon the belief that such enforcement would not be sought.' " *Walther v. Bank of New York,* 772 F.Supp. 754, 768 (S.D.N.Y.1991) (quoting *Nassau Trust Co. v. Montrose Concrete Products Corp.,* 56 N.Y.2d 175, 184, 451 N.Y.S.2d 663, 667 (1982)). ITT has pointed to no evidence of "misleading" words or conduct by NiMo. Thus, because ITT has not met its burden of proof as to the estoppel defense, summary judgment will not be granted in its favor on this issue. However, because NiMo did not expressly address estoppel in its cross-motion, summary judgment striking that defense will not be granted in NiMo's favor either. The parties should be aware, though, that the court has serious reservations, at least on the current state of the record, as to the viability of the estoppel defense.

## E. Contractual Limitation for Gross Negligence

 **\*15** ITT's second motion for summary judgment on liability, is grounded on § 10 of Contract Change 26. ITT claims that that provision limits its potential liability to acts of gross negligence or willful misconduct. [25] ITT further claims that the work for which NiMo is seeking recovery was not done in a grossly negligent manner, and thus summary judgment is warranted. NiMo counters that irrespective of the exclusion in § 10, article four of contract P301C's supplementary conditions gave NiMo the right to seek damages in the event of a breach, and nothing has happened subsequent to the execution of that contract altering or constraining that right in any way. Moreover, even if the gross negligence standard of article 10 applies here, NiMo argues that there are genuine issues of material fact precluding summary judgment.

Here again the issue is one of contract construction—what is meant by § 10 of Contract Change 26. Section 10 is susceptible of more than one fairly reasonable interpretation, neither of which " 'strain[s] the contract language beyond its reasonable and ordinary meaning.' *Seiden Associates, supra,* slip op. at 2453 (quoting *Bethlehem Steel Co. v. Turner Constr. Co.,* 2 N.Y.2d 456, 459 (1957)). The first possible meaning is that ascribed to § 10 by ITT; that is that the parties intended that ITT "not be responsible for the cost of redoing or repairing defective or deficient work unless that work was caused by gross negligence or willful misconduct...." Memorandum (Liability Issues) in Support of the ITT Defendants' Second Motion for Summary Judgment ("ITT's Damages Memorandum") at 18. According to NiMo, such an interpretation would impermissibly render other contract provisions unreasonable or of no effect. *See* Plaintiffs' Memorandum Opposing ITT's Second Motion for Summary Judgment (Liability Issues) ("Plaintiffs' Liability Memorandum") at 31 (and discussion therein).

It is a close call, but after careful consideration of the memoranda of law, the applicable case law, the relevant portions of the record and the Transcript of the January 3, 1992 hearing ("Tr. II"), the court is left with the distinct impression that there is an ambiguity. Section 10 is sufficiently unclear to warrant consideration of parole evidence. And, at the risk of sounding repetitive, when the parole evidence is surveyed here, there is no doubt that genuine issues of material fact remain. There is a serious factual dispute as to what the parties intended by § 10 of Contract Change 26. NiMo's president during the relevant time frame testified as follows at his deposition:

Q. And the resolution [of the parties' dispute over Grinnell's liability for defective or deficient work] was that unless it was gross negligence, willful misconduct or failure to follow the engineer's specific instructions by a management person at ITT, then ITT couldn't be backcharged?

A. That is as you—what you just described is in this document that I just reviewed?

**\*16** Q. And your understanding?

A. Yes.

Deposition Testimony of William J. Donlon at 82 (June 19, 1991) (ITT's Appendix, Vol. VII at 1896). Mr. Donlon's testimony is compatible with that of Ronald Wagner, SWEC's construction manager who attended the negotiating sessions for Contract Change. Mr. Wagner emphatically testified: "Let me say for the record one more time, for errors in work of a normal event, human fallibility, without any semblance of any evidence that there was fraud or malintent, I thought those types of backcharges were frivolous." Deposition Testimony of Ronald Wagner at 677 (June 24, 1991) (ITT's Appendix, Vol. VII at 2129). Conversely, NiMo has come forth with documentary evidence, and deposition testimony tending to show that the purpose of article 10 was not to limit NiMo's right to seek damages from ITT in an action such as the present one. *See* Plaintiffs' Liability Memorandum at 8–14, and 33 (outlining relevant proof). On the basis of that contradictory evidence, the court must deny ITT's second motion for summary judgment to the extent that it is seeking dismissal premised on the theory that § 10 of Contract Change 26 is a bar to this action.

The parties are forewarned that even if it is ultimately decided that the gross negligence standard of § 10 applies, then, in all probability, there will be an additional factual determination for the jury—whether ITT's conduct was grossly negligent. *Food Pageant, Inc. v. Consolidated Edison Co.,* 54 N.Y.2d 167, 173, 445 N.Y.S.2d 60, 62 (1981) ("Where the inquiry is to the existence or nonexistence of gross negligence, ..., ... the question ... remains a matter for jury determination."). A critical part of that determination will be whether, as ITT has labeled it, NiMo's "aggregate" theory of gross negligence will suffice to establish gross negligence in the minds of the jury. Apparently NiMo is not claiming that any specific items or categories of work by ITT were grossly negligent, but rather that ITT's work on the project as a whole was grossly negligent. ITT strongly argues that NiMo should not be allowed to proceed on that theory because inherent in such theory is that ITT's conduct did not rise to the level of gross negligence. While the aggregate theory of gross negligence propounded by NiMo undoubtedly makes NiMo's burden of proof more difficult, that does not necessarily mean, as a matter of law, that NiMo cannot succeed on such theory. Providing the issue of gross negligence gets that far, it will be up to the jury to give such weight to NiMo's evidence on the issue of gross negligence as it deems appropriate.

What should be abundantly clear by now is that summary judgment is not proper insofar as liability is concerned (with the one inconsequential exception of the enhanced radiograph claim), because at the heart of each of ITT's defenses is the issue of intent—a factual issue in all but the most unusual of cases. That is not to say, however, that the court does not

09-50026-mg    Doc 13397-17    Filed 08/27/15    Entered 08/27/15 12:33:20    Exhibit
Exhibit 16 - Niagara Mohawk Power Corp. v. Stone & Webster Engineering C    Pg 12 of 37
Niagara Mohawk Power Corp. v. Stone & Webster... Not Reported in...
1992 WL 121726

find quite convincing ITT's version of events on these motions (as well might a jury). The court's task at this stage of the proceedings is not to resolve factual disputes, however, but only to identify them.[26] As set forth above, a number of triable issues exist as to the interpretation of Contract P301C and the relevant supplemental documents. Consequently, insofar as the first set of motions is concerned, ITT's motion for summary judgment on the enhanced radiograph claim is granted. ITT's motion is in all other respects denied. NiMo's cross-motion is denied in all respects as well.

## II. Negligence Claim

*17  In addition to the contract based cause of action, NiMo is seeking to recover on negligence and gross negligence theories. ITT is also moving for summary judgment on both of those claims. NiMo's tort claims are not completely unfamiliar to this court. In *NiMoI, supra,* 725 F.Supp. 656, this court considered those claims in the context of ITT's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). At that time, NiMo proffered two separate theories of tort liability. NiMo first maintained that it should be able to recover against ITT on a claim of negligent performance of a contract. Secondly, NiMo asserted that ITT could be liable in tort because of a special relationship of trust and confidence which arose out of, among other things, NiMo's long standing contractual relationship with ITT.

For a number of reasons, the court did not agree with NiMo that New York always recognizes a cause of action for negligent performance of services under a contract. *Id.* at 661–66. The court therefore dismissed NiMo's tort claims to the extent that they were based upon such legal theory, concluding "the mere fact that the alleged breach involved a contract that encompassed the performance of services does not suffice as special additional allegations of wrongdoing which amount to 'a breach of a duty distinct from, or in addition to, the breach of a contract.' " *Id.* at 666 (quoting *North Shore Bottling Co., Inc. v. C. Schmidt and Sons, Inc.,* 22 N.Y.2d 171, 179, 292 N.Y.S.2d 86, 92 (1968)).

NiMo's tort claims were allowed to stand, however, insofar as they were premised upon the second theory of liability—the existence of a special relationship of trust and confidence. *Id.* at 668–69. Specifically, the court found that the allegations pertaining to the long-standing contractual relationship between NiMo and ITT, as well as other allegations, could, if ultimately proven, perhaps support an independent tort duty of care. *Id.* The court reminded the NiMo, though, that to

establish an independent duty of care based on tort law, they would have a "heavy burden." *Id.* at 669.

Before considering NiMo's second theory of tort liability, which is before the court again on these (ITT's second motion for summary judgment) motions, the court is obliged to discuss a Second Circuit case, decided just four days after *NiMoI.* In *William Wrigley Jr. Co. v. Waters,* 890 F.2d 594 (2d Cir.1989), the Second Circuit reaffirmed its view that "[i]t is well settled under New York law that negligent performance of a contract *may* give rise to a claim sounding in tort as well as one for breach of contract,...." *Id.* at 602 (citations omitted) (emphasis added). Although at first glance that statement appears to be at odds with *NiMoI* (rejecting NiMo's negligent performance of a contract claim), closer scrutiny of *Wrigley* demonstrates that it and *NiMoI* are factually distinguishable in two significant respects. As will be more fully explained herein, *NiMo* and *Wrigley* differ in terms of the basis asserted for the independent tort duty of care, and with respect to the nature of the damages sought.

*18  The uncontradicted proof at trial in *Wrigley* demonstrated that defendants held themselves out as experts in trademark law; and in that capacity, they undertook to protect approximately 3,500 trademarks held worldwide by Wrigley, the well-known vendor of candy and chewing gum. For a number of years, defendants were responsible for renewing Wrigley's numerous trademark registrations. Then, for economic reasons, Wrigley decided to discontinue hiring outside trademark agents, and instead decided to manage its trademarks inhouse. The inhouse trademark agent hired by Wrigley to replace defendants soon discovered that defendants had been extremely derelict in to renewing Wrigley's trademarks. Many trademarks had lapsed, for example, and others, which were about to lapse, were only salvaged because of the frantic and costly last minute efforts of Wrigley's then newly hired inhouse trademark agent. As a result, Wrigley incurred substantial damages, which it characterized as "clean-up" costs. Essentially those damages were the expenses Wrigley incurred in getting the trademark aspect of its business back in order.

Following a non-jury trial, the district court found that defendants were liable to Wrigley for both negligent performance of a contract and for breach of contract. The damages awarded included a sum for clean-up costs. On appeal, although a portion of the judgment was reversed, those particular aspects of the judgment were undisturbed. *See id.* at 604.

Emphasizing, as did the district court, that defendants had held themselves out as experts in trademark law, the Second Circuit agreed that defendants were liable for negligent performance of a contract because they breached a duty of care which arose out of their expertise. *Id.* at 602; *see also William Wrigley Jr. Co. v. Waters*, 1987 WL 123988, 1987 U.S. Dist. LEXIS 13663 at *10–*11 (S.D.N.Y. December 16, 1987). As experts, the Second Circuit held defendants to a duty of care and "caution proper to [their] calling.' " *Id.* (quoting *Ultrameres Corp. v. Touche, Niven & Co.,* 255 N.Y. 170, 179, (1931) (other citations omitted)). Referring to the defendants as "specialized service personnel," the *Wrigley* Court found persuasive "[t]he uncontradicted testimony establish[ing] that the trademark registration renewal business necessitates precision, careful attention and strict adherence to the legal requirements of numerous foreign jurisdictions." *Id.* The Court further explained:

Running afoul of such standards means risking a defective or untimely registration which translates into potentially disastrous consequences. Thus, there is an obligation on behalf of experts such as defendants to maintain files that are scrupulously accurate, up to date and complete.

*Id.* at 602–03.

In contrast, in the present case, NiMo did not expressly allege that ITT owed an independent duty of care to it based upon some expertise held by ITT. NiMo's tort claims now, as they were at the time of *NiMoI*, are couched strictly in terms of ordinary negligence and gross negligence, with no specific mention in the amended complaint as to a duty of care arising out of ITT's expertise. NiMo seeks only to hold ITT liable for falling "below the standard of care exercised by piping contractors" generally. *See* Amended Complaint at ¶¶ 154 and 157. Now, well into this litigation and nearly two years after the filing of the amended complaint, NiMo seems to be implying that ITT should be considered an expert in the area of nuclear power plant construction (specifically with respect to the piping therein), based primarily upon ITT's status as a holder of the "N stamp."[27] Initially that was not the stated basis for the negligent performance of a contract claim, and thus not expressly considered by the court in *NiMoI*. Furthermore, NiMo did not, and has not, explicitly asserted that an extra-contractual duty of care arose based upon the purported expertise of ITT.

**\*19** The other notable factual distinction between *NiMoI* and *Wrigley* is that in the latter, the damages awarded, particularly those for clean-up costs, were not contemplated under the contract. To illustrate, Wrigely was allowed to recover as part of its damages, under a negligence theory, costs incurred in connection with organizing all of the case files for which defendants were responsible. *Wrigley*, 890 F.2d at 604, n. 4. Whereas in this case, NiMo is seeking damages in its negligence causes of action which were contemplated under the contract, as is evidenced by the fact that those damages are identical to the damages sought in the breach of contract action. Indeed, in the amended complaint NiMo includes a separate subsection entitled damages, amended complaint at ¶ 135; and then incorporates that paragraph by reference in all three causes of action relating to ITT. *See id.* at ¶¶ 150, 153 and 156.

Interestingly, none of the parties moved for reconsideration of *NiMoI* based upon *Wrigley* or, for that matter, upon any other ground. However, because *Wrigley* was decided after *NiMoI*, and because arguably *Wrigley* mandates a different result than that reached in *NiMoI*, the court is compelled to examine the law of the case doctrine and its possible bearing on the present litigation.[28] The Second Circuit in *In Re PCH Associates*, 949 F.2d 585 (2d Cir.1991), explained that "[u]nder the law of the case doctrine, a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation." *Id.* at 592 (citing 1B J. Moore, J. Lucas, & T. Currier, *Moore's Federal Practice* ¶ 0.404[1], at 117 (1991)). This doctrine is discretionary, however, and generally "does not limit a court's power to reconsider its own decisions prior to final judgment."[29] *Virgin Atlantic Airways, Ltd. v. Nat'l. Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir.1992) (citations omitted).

There are three well recognized circumstances which may justify a court in departing from the law of the case. Those circumstances are "[1] an intervening change in controlling law, [2] the availability of new evidence, or [3] the need to correct a clear error or to prevent manifest injustice." *Id.* (citing 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4478 at 790). With respect to the first circumstance, it is not enough that the party seeking reconsideration could now make a "more persuasive" argument based upon intervening law. *Fogel v. Chestnutt*, 668 F.2d 100, 109 (2d Cir.1981), *cert. denied*,459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982). Rather, "The law of the case will be disregarded only when the court has 'a

clear conviction of error' with respect to a point of law on which its previous decision was predicated,...." *Id.*(quoting *Zdanok v. Glidden,* 327 F.2d 944, 953 (2d Cir.1964) (citing in turn *Johnson v. Cadillac Motor Car Co.,* 241 F.2d 878, 886 (2d Cir.1919)). This court has held that to warrant a change in a prior decision based upon a change in the law, the change " 'must truly be significant and controlling.' " *Wilson v. Great American Industries, Inc.,* 770 F.Supp. 85, 89 (N.D.N.Y.1991) (McCurn, C.J.) (quoting *Sango v. City of New York,* 1989 WESTLAW 86995 (E.D.N.Y.1989) (citing in turn *Fogel,* 668 F.2d at 109)). The Second Circuit has stressed that "mere doubt" on the part of the court is insufficient to open the point for full reconsideration. *Fogel,* 668 F.2d at 109 (quoting *White v. Higgins,* 116 F.2d 312, 317 (1st Cir.1940)).

**\*20** Courts ordinarily have not defined precisely what constitutes clearly erroneous or manifest injustice for reconsideration purposes. At least one court has held though that reconsideration is not warranted unless the prior decision is "dead wrong." *Parts & Electric Motors, Inc. v. Sterling Electric, Inc.,* 866 F.2d 228, 233 (7th Cir.1988), *cert. denied,*493 U.S. 847, 110 S.Ct. 141, 107 L.Ed.2d 100 (1989). [30] Finally, regardless of what the basis for reconsideration is, while acknowledging a court's power to revisit its own decision, the Supreme Court has cautioned that "as a rule courts should be loathe to do so in the absence of *extraordinary circumstances* ...." *Christianson v. Colt Industries Operating Corp.,* 486 U.S. 800, 817, 108 S.Ct. 2166, 2178, 100 L.Ed.2d 811 (1988) (emphasis added).

With those principles firmly in mind, the court sees no reason to revisit the issue of whether New York always recognizes a cause of action for negligent performance under a contract. Assuming *arguendo* that *Wrigley* represents a "change" in the law, the court still is not left with the clear conviction that it erred in dismissing NiMo's negligent performance of a contract claim. Given the previously discussed factual distinctions between *NiMoI* and *Wrigley,* the court does not believe that *Wrigley* is controlling here. And while, based upon *Wrigley,* perhaps NiMo could make a more persuasive argument as to the viability of a negligent performance of a contract claim, that simply is not enough. Nor, even after *Wrigley,* does the court believe that its *NiMoI* decision is "dead wrong." [31] Thus, the court will stand by its prior holding that, under the particular facts of this case, to the extent that NiMo's tort claims are based upon negligent performance of a contract, such claims cannot be allowed to stand.

The court is now free to consider the various arguments on these motions as to NiMo's remaining tort claims. After having the benefit of extensive discovery, ITT advances two reasons as to why summary judgment should be granted on these claims. First, ITT contends that NiMo cannot meet its burden of proving an independent tort duty of care, because no special relationship existed between ITT and NiMo. Second, ITT asserts that the economic loss doctrine bars NiMo's tort claims (both for negligence and for gross negligence). Basically that doctrine provides that recovery for purely economic loss is limited to a contract action, and therefore such losses are not recoverable in a negligence cause of action.

Insofar as the first argument is concerned, NiMo vigorously responds that the facts do establish that it and ITT had the requisite "special relationship." Alternatively, NiMo argues that, at the very least, there are genuine issues of material fact regarding the existence of a special relationship and so summary judgment on these claims is not appropriate. With respect to the economic loss doctrine, NiMo simply asserts that that doctrine does not bar their tort claims, which are indisputably for economic damages only. [32]

### A. Independent Legal Duty of Care

#### 1. Special Relationship

**\*21** The court will first consider ITT's contention that, as a matter of law, no special relationship existed between it and NiMo. NiMo contends, as it did previously, [33] that a special relationship of trust and confidence, such as that described in *Apple Records, Inc. v. Capitol Records, Inc.,* 137 A.D.2d 50, 529 N.Y.S.2d 279 (1st Dep't 1988), existed between it and ITT. NiMo believes that ITT can be held liable for negligence and gross negligence based upon such a relationship. NiMo also suggests a somewhat related but arguably distinct basis for the finding of a special relationship; that is ITT's alleged status as project manager. NiMo specifically contends that ITT "functioned as the project manager for piping erection, ... [;]" and in that capacity ITT owed an independent duty of care to NiMo. Plaintiffs' Liability Memorandum at 44.

The parties did not separately analyze the existence of a special relationship based upon trust and confidence, and one arising out of ITT's purported status as project manager. To clarify, the court will differentiate between the two. First,

Niagara Mohawk Power Corp. v. Stone & Webster..., Not Reported in...
1992 WL 121726

the court will consider the existence of a special relationship based upon the trust and confidence which NiMo allegedly reposed in ITT. Secondly, the court will consider the related issue of whether a special relationship existed arising out of ITT's alleged status as project manager for piping.

### a. Trust and Confidence

At the outset the court observes that it finds somewhat surprising, given the voluminous record on these motions, that the proof relied upon by the parties in connection with this issue is quite scant. For example, in asserting that no special relationship existed between it and NiMo, ITT relies exclusively upon the deposition testimony of NMP2 project manager and NiMo vice president, Gerald K. Rhode. Mr. Rhode flatly responded "No," to the question "Were you aware of any relationship between ITT Grinnell and Niagara Mohawk Power Company other than that of owner and contractor?" Deposition of Gerald K. Rhode (July 16, 1991) at 19 (ITT's Appendix, Vol. VII at 2014.) ITT interprets that emphatic denial as meaning that no special relationship of trust and confidence existed between it and NiMo.

NiMo counters by relying primarily upon the affidavits of Mr. Rhode and Mr. Stanley Seiken. Mr. Seiken is one of several prospective expert witnesses retained by NiMo. In seeming contrast to his just quoted testimony, Mr. Rhode avers in his affidavit that "[I]TT was in effect a fiduciary for NMPC,...." Affidavit of Gerald K. Rhode (Nov. 27, 1991) at ¶ 13 (Plaintiffs' Exhs., Vol. IV thereto at 746). Both Messrs. Rhode and Seiken assert, but for different reasons, that NiMo placed trust and confidence in ITT, and hence in ITT's abilities. Mr. Rhode explains that "[b]ecause the precise scope of ITT's piping work could not be known at the time that ITT was hired to do the piping work, NMPC [NiMo] had no choice but to enter into a 'cost-plus' contract." *Id.* He further explains, "This forced NMP [NiMo] to repose great trust and confidence in ITT's integrity, technical ability, organizational and management ability, and ability to select qualified personnel." *Id.* Along a similar vein, Mr. Seiken avers that NiMo's trust and confidence in ITT was based upon "[t]he delegation of portions of the NMP2 quality assurance program associated with piping construction/erection to ITT through the NMP2 Preliminary Safety Analysis Report,...." Affidavit of Stanley J. Seiken (Dec. 14, 1991) at ¶ 17 (Plaintiffs' Exh., Vol IV Ex. 2 thereto at 790).

New York state courts, as well as others,[34] have recognized that whether a fiduciary relationship[35] exists is a question of fact. *Pavone v. Aetna Cas. & Sur. Co.,* 91 Misc.2d 658, ――, 398 N.Y.S.2d 630, 636 (N.Y.Sup.Ct.1977); *Levine v. Chussid,* 221 N.Y.S.2d 311, 314 (N.Y.Sup.Ct.1961) (question of fact presented regarding existence of "confidential relationship" for purposes of imposing a constructive trust, thus precluding summary judgment); *cf. Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb Inc.,* 767 F.Supp. 1220, 1232–33 (S.D.N.Y.1991) (applying New York law, summary judgment denied where a general question of fact existed regarding whether an investment banker owed a fiduciary duty to a tender offeror based upon the latter's disclosure of confidential information). Thus, given the conflicting evidence set forth above, the issue of whether there was a special relationship of trust and confidence between ITT and NiMo, which could form the basis for an independent tort duty of care, is, in all likelihood, a factual issue for the jury.[36]

### b. Project Manager

**\*22** ITT's argument (albeit not explicit) that summary judgment is proper because, as a matter of law, it was not the project manager for NMP2 is equally unavailing, although for a different reason. Specifically ITT, as the party seeking summary judgment on these tort claims, did not satisfy its "initial responsibility of informing the district court of the basis for its motion and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(c)). The only proof referenced by ITT in the massive record[37] is the previously mentioned deposition of Gerald Rhode, wherein he testified that he was not aware of any relationship between ITT and NiMo other than that of owner-contractor. Rhode Deposition at 19 (ITT's Appendix, Vol. VII at 2014). That proof is not directly responsive to the issue of whether ITT was the project manager on the NMP2 project, and is an insufficient basis for the granting of summary judgment on that issue.

The court notes in passing that even if ITT had met its initial burden of proof here, NiMo was also remiss in satisfying its burden as the nonmoving party. More particularly, NiMo did not designate "specific facts showing that there is a

Niagara Mohawk Power Corp. v. Stone & Webster..., Not Reported in...
1992 WL 121726

genuine issue for trial[,]" as required by Fed.R.Civ.P. 56(e). Instead of refuting with specific references to the record ITT's contention that it was not the project manager, in apparent reliance upon the affidavit of Mr. Rhode, [38] NiMo simply asserts that "[t]he record shows that ITT functioned as the project manager for piping erection, a task that exceeded the scope of many entire construction projects." Plaintiffs' Liability Memorandum at 44. Providing that ITT had met its initial burden of proof on the project manager issue, on the basis of the meager proof just recounted, the court assumes, without deciding, that NiMo would not have been able to survive ITT's motion for summary judgment on this issue. That is so because serving as a project manager for piping erection alone is nearly identical to the situation presented in *Morse/Diesel, Inc. v. Trinity Industries, Inc.,* 859 F.2d 242 (2d Cir.1988), wherein the Second Circuit held that a steel contractor and erector could not assert direct negligence claims against subcontractors with "discrete, circumscribed roles in [an] overall construction project," and who had no general supervisory duties concerning such project. *Id.* at 248. Thus, even though the court is extremely doubtful as to whether NiMo can proceed under a theory that an independent tort duty of care arose because of ITT's status as a project manager, it will not grant summary judgment against ITT on that narrow issue. Consequently, ITT's motion for summary judgment on NiMo's tort claims is denied insofar as that motion is premised upon the nonexistence of a special relationship, regardless of the basis for such relationship (trust and confidence and/or project manager status).

### B. Economic Loss Doctrine

**\*23** At oral argument on January 3, 1992, the court expressed some concern as to the viability of NiMo's tort causes of action in light of the economic loss doctrine. NiMo immediately sought and was granted permission to file a supplemental memorandum of law more fully detailing its position on this issue. In that memorandum of law NiMo narrowed the focus of its argument, asserting that the economic loss doctrine is inapplicable where a special relationship of trust and confidence has been shown. After much reflection, the court disagrees.

The general rule in New York, previously alluded to, is that "[a] simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated. *Macmillan, Inc. v. Federal Ins. Co.,* 764 F.Supp. 38, 41 (S.D.N.Y.1991) (citing *Clark–Fitzpatrick, Inc. v. Long Island Rail Rd. Co.,* 70 N.Y.2d 382, 521 N.Y.S.2d

653 (1987)). As one court astutely observed, however, "[t]he *Clark–Fitzpatrick* rule, ..., is only *one* of the dikes that New York courts have erected in their inevitable attempt to keep contract law 'from drown[ing] in a sea of tort.' " *Carmania Corp., N.V. v. Hambrecht Terrell Int'l,* 705 F.Supp. 936, 938 (S.D.N.Y.1988) (emphasis added) (*quoting East River S.S. Corp. v. Transamerica Delaval Inc.,* 476 U.S. 858, 866, 106 S.Ct. 2295, 2300 (1986)). The second dike which New York courts have erected is that "[i]f the damages suffered are of the type remediable in contract, a plaintiff may not recover in tort." [39] *Id.* (and cases cited therein). Or, as the Second Circuit has more narrowly stated, "New York law holds that a *negligence* action seeking recovery for economic loss will not lie." *County of Suffolk v. Long Island Lighting Co.,* 728 F.2d 52, 62 (2d Cir.1984) (emphasis added) (citing *Price Brothers Co. v. Olin Construction Co.,* 528 F.Supp. 716, 721 (W.D.N.Y.1981); *Martin v. Julius Dierck Equipment Co.,* 43 N.Y.2d 583, 403 N.Y.S.2d 185 (1978)); *see also Alloy Briquetting Corp. v. Niagara Vest. Inc.,* 756 F.Supp. 713, 722 (W.D.N.Y.1991) (plaintiff not allowed to recover under negligence and strict liability where only economic loss damages sought).

There are a few recognized exceptions to that rule. The first exception, broadly stated, is that a party may recover purely economic loss damages in a tort malpractice action when the underlying contract is for the rendering of professional services. [40] For example, the New York of Appeals has allowed causes of action to stand against architects sued by clients for negligence in design, construction, or choice of materials, even where the only injury claimed is economic. [41] The second exception is where a party is seeking to recover economic loss damages on a theory of negligent performance of a contract for services. This exception is illustrated by the often cited case of *Consol. Edison Co. v. Westinghouse Elec. Corp.,* 567 F.Supp. 358 (S.D.N.Y.1983). The *Westinghouse* court plainly held that "a suit for negligent performance of contractual duties is clearly available where only economic injury is alleged." *Id.* at 364. Obviously, after *NiMoI,* which dismissed NiMo's tort claims insofar as they were based upon negligent performance of a contract, NiMo cannot avail itself of this exception to the economic loss doctrine. See *NiMoI,* 725 F.Supp. at 666.

**\*24** The foregoing makes clear that in New York, unless a party falls within one of the exceptions, there are two significant limitations to recovery in tort where the allegations essentially mirror those of the breach of contract cause of action. The first limitation is that the plaintiff "[m]ust

establish that the defendant violated a legal duty separate from its contractual obligations,....” *Robehr Films, Inc. v. American Airlines, Inc.*, No. 85 Civ. 1072, 1989 WL 111079, at *2, 1989 U.S.Dist. LEXIS 10998, at *5 (S.D.N.Y. September 19, 1989) (citing *Carmania*, 705 F.Supp. 936),*aff'd without pub. opinion,*902 F.2d 1556 (2d Cir.1990). The second limitation is that the plaintiff “[ ]must demonstrate that the damages it suffered do not constitute mere ‘economic loss.’ ” *Id.* Assuming for the moment that NiMo can overcome that first limitation, the court is not convinced that it can overcome the second, at least insofar as the negligence claim is concerned.

The economic loss doctrine was the subject of some discussion in *NiMoI.* [42] NiMo implies from that discussion that the court has taken the position that economic loss damages are recoverable in tort where there is a finding of a special relationship of trust and confidence. The court did not so hold in *NiMoI;* and it declines to do so now. Discussion of the economic loss doctrine in *NiMoI* was limited to the negligent performance of a contract claim. [43] The possible applicability of the economic loss doctrine in the context of a tort claim, based upon the existence of a special relationship, was not expressly considered by the court in *NiMoI.* Therefore, even though the economic loss doctrine was discussed in *NiMoI,* because that doctrine was not considered in the context of the special relationship issue, that earlier decision does not preclude the court from now finding, as it must, that the economic loss doctrine bars NiMo's negligence claim.

Published decisions on the narrow issue of whether economic loss damages are recoverable in a tort action where only simple negligence is alleged are seemingly non-existent. *Robehr,* a case heavily relied upon by ITT is instructive though. The court in *Robehr* denied plaintiff's motion to amend its complaint to include a cause of action for negligence, finding that such an amendment would be futile because the plaintiff alleged only economic loss in its proposed negligence claims. *Robehr,* 1989 WL 111079, at *4–5, 1989 U.S.Dist. LEXIS 10998, at *13. In so holding, the *Robehr* court relied upon Judge Silverman's dissent in *Schiavone Constr. Co. v. Elgood May Corp.,* 81 A.D.2d 221, 439 N.Y.S.2d 933 (1st Dep't 1981), which the New York Court of Appeals subsequently adopted with approval. [44] In particular, the *Robehr* court reasoned:

[w]here there is no accident, and no physical damage, and the only loss is a pecuniary one, through loss of the value or use of the thing sold, or the cost of repairing it, the courts have

adhered to the rule ... that purely economic interests are not entitled to protection against *mere negligence,* and so have denied the recovery.

*\*25 Robehr,* 1989 WL 111079, at *5, 1989 U.S.Dist. LEXIS 10998, at *14 (emphasis added) (quoting *Schiavone,* 439 N.Y.S.2d at 939 (quoting in turn *Jones & Laughlin Steel Corp. v. Johns–Manville Sales Corp.,* 626 F.2d 280, 287–89 (3rd Cir.1980)). Importantly, neither the fact that a contract is for services, rather than goods, nor the fact that the parties are in contractual privity diminishes the force of the economic loss rule. 1989 WL 111079, at *8, n. 7, 1989 U.S.Dist. LEXIS 10998, at *13, n. 7 (citations omitted).

In their amended complaint, with respect to damages incurred as a result of ITT's allegedly tortious conduct, NiMo asserts the following:

As a result of the foregoing, the Owners [plaintiffs] have incurred and continue to incur damages including, but not limited to, the following:

a. the cost of redesign and reconstruction of systems and component of the NMP2 project;

b. the cost of excess manhours;

c. additional overhead expense resulting from redesign, reconstruction an excess manhours;

d. the cost of financing these Owner expenditures;

e. the cost of delay in the NMP2 project.

Amended Complaint at 38, ¶ 135(a)–(e). [45] Clearly then the amended complaint does not allege that NiMo ever sustained personal or property injury, as is required to recover in tort. Indeed, consistent with the voluminous damage reports NiMo *Id.* submitted in opposition to ITT's second summary judgment motion, [46] at oral argument, as mentioned earlier, NiMo conceded that it is only seeking economic loss damages in this action. Tr. II at 57. Furthermore, that has been NiMo's position since the early stages of this litigation. Therefore, as in *Robehr,* because NiMo is not seeking to recover for any injury apart from economic loss, summary judgment dismissing NiMo's negligence claim is mandated.

NiMo tries to circumvent the general rule prohibiting negligence actions for purely economic loss by arguing

that once a special relationship is shown, such damages are recoverable in tort. Thus, in essence, NiMo is urging this court to adopt yet another exception to the general prohibition against the recovery of strictly economic losses in negligence actions. The court is reluctant to do that for several reasons. First, NiMo has not pointed to any cases, and the court is aware of none, allowing recovery for strictly economic loss damages where mere negligence is the only tort claim. Second, NiMo's assertion, while somewhat forceful at first glance, does not withstand closer analysis because, without exception, the cases NiMo relies upon are readily distinguishable. Some of the cases, such as *Paver* and *Sears,* involved professional malpractice claims. NiMo has already conceded, however, that it is not seeking to recover against ITT on a professional malpractice theory. *NiMoI,* 725 F.Supp. at 666. Therefore, the fact that economic loss damages are generally recoverable in malpractice cases is of no consequence here.

**\*26** In addition to the malpractice line of cases, NiMo places much credence in *Apple Records.* The plaintiffs in *Apple Records* were the world renowned recording group, the Beatles. They sued Capitol Records alleging fraud, breach of fiduciary duties, tortious conduct, and conversion. The Supreme Court, among other things, dismissed the fraud and conversion causes of action, as well as a catch-all cause of action designated as a claim for "tortious conduct." *See Apple Records,* 137 A.D.2d at ——, 529 N.Y.S.2d at 284. On appeal, the Appellate Division reversed and reinstated the fraud and conversion causes of action. *Id.* Significantly, the Appellate Division's affirmance included that part of the lower court's decision dismissing the tortious conduct cause of action. *Id.* Although the Appellate Division did not give any reason for affirming dismissal of the tortious conduct cause of action, it can be inferred that the court did so because if allowed to stand, that claim would have violated the economic loss doctrine.

It is true, however, as NiMo has repeatedly reminded the court, that in *Apple Records* the Beatles were allowed to proceed with their tort claims, in part under a special relationship theory, even though the only damages sought were economic. NiMo is ignoring two critical distinctions between *Apple Records* and the present case, though. The first is that the remaining viable tort claims in *Apple Records* were intentional torts—claims which NiMo has already freely admitted are absent from this case. *NiMoI,* 725 F.Supp. at 666. Any arguably negligence based theory of recovery was dismissed in *Apple Records* when the court dismissed the

"tortious conduct" cause of action. Thus, because in *Apple Records* the tort claims arose from a duty wholly independent of the contract, there was no danger of tort law encroaching upon contract law. The Beatles were seeking redress for separate harms—breach of contract and the commission of intentional torts. Thus, it stands to reason that the economic loss doctrine was not an issue, and indeed was not even mentioned in *Apple Records.* The second vital distinction between *Apple Records* and the instant case is that in the former the special relationship theory was used to sustain the claim for breach of fiduciary duties, another claim which NiMo is not alleging in this litigation. Because of those important distinctions, the court is unwilling to apply the rationale of *Apple Records* to the present case.

Additionally, NiMo's assertion that, "Breach of such a societally imposed duty [an independent duty based on a special relationship] permits the recovery of economic damages even if a contract between the plaintiff and defendant exists," is not persuasive. Plaintiffs' Liability Memorandum at 42. In the court's view, that assertion is not supported by the case law set forth above; and neither of the cases relied upon by NiMo persuades the court otherwise. In neither *Int'l Ore & Fertilizer Corp. v. SGS Control Services, Inc.,* 743 F.Supp. 250, 258–60 (S.D.N.Y.1990), nor *Apple Records,* did the courts suggest that recovery for economic damages would be permitted based upon a theory that an independent duty of care arose because of a special relationship between the parties. Moreover, the tort claims alleged in those two cases were not mere negligence claims; but in the case of *Int'l Ore,* a claim for negligent misrepresentation, and, in the case of *Apple Records,* claims for intentional torts and breach of a fiduciary duty. Thus, because the plaintiffs in those two cases sought recovery for breach of a duty extraneous to the contract, the intentional tort and negligent misrepresentation claims therein could stand regardless of the vitality of the contract claims. [47]

**\*27** Finally it is true, as NiMo contends, that a contract action can be grounded in negligence or gross negligence standards, or both. [48] The availability of alternative theories of recovery in a contract action does not mean, as NiMo insinuates, [49] that courts should, or must, allow separate independent tort claims for negligence where only economic damages are alleged. Indeed, as previously discussed, such a holding would be contrary to well settled New York case law. Consequently, ITT is entitled to summary judgment on NiMo's tort based negligence claim because NiMo has not

shown any injury apart from economic loss, which clearly is not recoverable under a negligence theory.

### III. Gross Negligence

Up to this point, the court has purposely omitted from its discussion NiMo's separate cause of action for gross negligence in tort. That omission is deliberate. By definition,[50] gross negligence is more closely analogous to an intentional tort than it is to negligence. Thus, the court believes that, notwithstanding the economic loss doctrine, NiMo's cause of action for gross negligence in tort is still viable, provided, of course, that NiMo can establish the requisite independent duty of care, which would arise here, if at all, out of the alleged special relationship (based upon trust and confidence and/or project manager status) between NiMo and ITT.

To summarize, as to liability, NiMo is entitled to proceed for the time being on its breach of contract cause of action under theories of both negligence and gross negligence. NiMo's negligence cause of action sounding in tort cannot, however, survive ITT's motion for summary judgment because that cause of action is barred by the economic loss doctrine. NiMo is permitted to go forth, however, on its gross negligence tort cause of action. To ultimately prevail on such cause of action, however, NiMo must establish, *inter alia,* a special relationship between it and ITT. Otherwise there would be no independent duty of care—a necessary prerequisite to any finding of tort liability. Allowing NiMo to proceed on a gross negligence theory under both contractual and tort theories might at first appear redundant in that the damages sought thereunder are identical. The scope of recovery under those two theories is potentially different though. Due to the qualifying language of § 10 of Contract Change 26 (i.e., recovery for grossly negligent defective or deficient work), any recovery for gross negligence under the contract is arguably more restrictive than the scope of recovery for gross negligence in tort. Thus, for now, NiMo is entitled to proceed on a theory of gross negligence predicated upon both contractual and tort theories.

### IV. DAMAGES[51]

In a nutshell, ITT contends that plaintiffs' damages claims, totaling approximately $88,000,000.00, are ripe for summary judgment because the damages are either consequential and therefore barred under the contract, or speculative, or both. NiMo responds: (1) the damages are direct, and thus not

barred by the contract; (2) if there is a dispute as to whether any of the damages are direct or consequential, that dispute must be resolved by a jury; and (3) New York law does not permit a contractual limitation on liability for gross negligence. NiMo further responds that their damages are not speculative because the damage analyses furnished by its experts are all acceptable under New York law.

**\*28** To facilitate analysis of the damage claims, the court has divided the damages into twelve separate categories,[52] each of which will be addressed herein. Before turning to the arguments particular to each separate category of damages, there are two issues common to several categories of damages which must be considered: (1) whether certain damages are direct or consequential and (2) whether certain damages are speculative as a matter of law.

### A. Direct versus Consequential Damages

ITT contends that four of the damage categories are barred because those damages are, as a matter of law, consequential, and the contract expressly bars the recovery of consequential damages.[53] In particular, ITT contends that the costs for financing, CAT/SALP (generally), engineering oversight and overhead[54] are all consequential. NiMo does not dispute that the contract bars the recovery of consequential damages.[55] NiMo strongly contests ITT's characterization of the damages as consequential, however. Rather, NiMo contends that the contractual limitation does not apply here because the damages plaintiffs are seeking to recover are direct—*not* consequential.[56]

In *American List Corp. v. U.S. News & World Report, Inc.,* 75 N.Y.2d 38, 550 N.Y.S.2d 590 (1989), the New York Court of Appeals explained the difference between general (or direct) and consequential (or special) damages:

General damages are those which are the natural and probable consequences of the breach ..., while special damages are extraordinary in that they do not so directly flow from the breach.

*Id.* at 42–43, 550 N.Y.S.2d at 593 (citations omitted).[57] Consequential damages are recoverable only when they were both foreseeable and within the contemplation of the parties at the time the contract was made. *Id.* at 43, 550 N.Y.S.2d at 593 (citations omitted). Generally, whether damages are direct or consequential is an issue of fact which

Niagara Mohawk Power Corp. v. Stone & Webster..., Not Reported in...
1992 WL 121726

must be reserved for trial. *See Long Island Lighting Co. v. Transamerica Delaval, Inc.,* 646 F.Supp. 1442, 1459 n. 30 (S.D.N.Y.1986) ("We reserve for trial the question of whether the plaintiff's claimed damages should be characterized as direct, incidental, or consequential.") *American Electric Power Co. v. Westinghouse Elec. Corp.,* 418 F.Supp. 435, 459 (S.D.N.Y.1976) ("[t]he precise demarcation between direct and consequential damages is a question of fact,....."); *but see Starmakers Pub. Corp. v. Acme Fast Freight, Inc.,* 646 F.Supp. 780, 782 (S.D.N.Y.1986) (special damages for three-week delay in delivery not recoverable as a matter of law where shipper could not establish that defendant freight forwarders had notice that shipped matter was time-sensitive); *and Sweazey v. Merchants Mutual Insurance Co.,* 169 A.D.2d 43, 571 N.Y.S.2d 131, 132 (3rd Dep't 1991) (reversing denial of motion to dismiss consequential damages claim based upon the absence of a showing that such damages were foreseeable and within the contemplation of the parties at the time the contract was made or prior thereto).

*\*29* Disregarding that general rule, ITT and NiMo cite a number of cases which they contend stand for the proposition that the four categories of damages listed above are, as a matter of law, either consequential or direct. [58] Significantly, in none of those cases did the court hold, as a matter of law on a summary judgment motion, that certain types of damages were either direct or consequential. Without exception, all of the cited cases were tried (although most were non-jury), and the determination as to whether the damages therein were direct or consequential was made by the court after it had an opportunity to review the fully developed trial record. [59] Stated somewhat differently, it was the insufficiency of the proof which led to the conclusion that the sought damages in those cases were consequential and thus not recoverable.

Turning to the present case, ITT cannot prevail on its motion for summary judgment on the damage claims insofar as that motion is premised on the argument that certain of NiMo's damages are consequential, and thus barred by the contract. The issue of whether those particular damages (financing[60], engineering oversight, engineering overhead costs and CAT/SALP damages (generally) are consequential is, most likely, one of fact and thus cannot be decided until trial. [61] *See Charles E.S. McLeod, Inc. v. R.B. Hamilton Moving & Storage,* 89 A.D.2d 863, 453 N.Y.S.2d 251 (2d Dep't 1982) (summary judgment thwarted where fact issue as to whether lessee knew that lessor was in the business of renting heavy equipment, and therefore should have foreseen that if it

breached the lease, lessor might sustain loss by reason of inability to relet the equipment until it was repaired). [62]

## I. Financing Costs

As part of its damages, NiMo is seeking approximately $27 million in financing costs. That figure was derived from an accounting concept commonly used in the public utilities industry, known as "Allowance for Funds Used During Construction" ("AFUDC"). The regulations governing public utilities subject to the provisions of the Federal Power Act, such as NiMo, defines AFUDC, in relevant part, as:

"Allowance of funds used during construction" (Major and Non-major utilities) includes the net cost for the period of construction of borrowed funds used for construction purposes and a reasonable rate on other funds when so used, not to exceed, without prior approval of the Commission, allowances computed in accordance with the formula prescribed in paragraph (a) of this subparagraph.

18 C.F.R. part 101, Electric Plant Instructions § 3(17) (1990). *See generally, Greenapple v. Detroit Edison Co.,* 618 F.2d 198, 200–202 (2d Cir.1980).

ITT offers three reasons as to why it is entitled to summary judgment with respect to financing cost damages. First, according to ITT, such damages are prohibited under New York law unless it is shown that the plaintiff is seeking to recover for a loan obtained *solely* to finance the underlying damages. In other words, ITT maintains that because NiMo cannot trace any actual financing expenditures to ITT's wrongdoing, it should not be allowed to recover any such costs. Second, ITT contends that by seeking a damage award for financing costs NiMo is seeking, in effect, a "double recovery"[63] because they are seeking to be compensated for an award of financing costs using AFUDC calculations, as well as seeking an award of statutory interest on the base damages. [64] Third, ITT contends that the financing costs are consequential, and thus barred under the contract.

*\*30* Simply stated, NiMo counters that ITT is attempting to impose an impermissible tracing requirement on the recovery of financing costs under New York law. NiMo further counter that CPLR § 5001 is not a bar to the recovery of financing costs. In light of the previous discussion regarding consequential damages, the court will assume, for purposes of

Niagara Mohawk Power Corp. v. Stone & Webster... Not Reported in...
1992 WL 121726

these motions only, that financing costs are not consequential damages, and therefore the contractual limitation on the same is inapplicable. Operating from that basic assumption, the court will consider ITT's remaining arguments regarding tracing and § 5001.

### a. CPLR § 5001—Prejudgment Interest

ITT contends that NiMo should not be allowed to recover its financing costs because such costs are, in reality, a claim for prejudgment interest, governed exclusively by § 5001 of the CPLR. ITT further maintains that NiMo "[s]eek [s] to be compensated not once but twice for the lost time-value of money, first in the award of 'financing costs' based on the AFUDC data and then with the award of statutory interest on both the base damages and the 'financing costs.' " ITT's Damages Memorandum at 14. This argument need not detain the court for long. ITT's position is not well taken after *Long Island Lighting Co. v. IMO Industries, Inc.*, No. 85 Civ. 6892, 1990 WL 64588, 1990 U.S.Dist. LEXIS 5,351 (S.D.N.Y. May 3, 1990) ("*LILCO* "), wherein Judge Owen plainly stated, "[a] party to a contract may recover financing costs as incidental damages, *apart* from prejudgment interest allowable under New York State law." 1990 WL 64588, at *4–5, 1990 U.S.Dist. LEXIS 5,351, at *16 (emphasis added) (citing *Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co.*, 697 F.2d 481 (2d Cir.1983) and *Intermeat, Inc. v. American Poultry, Inc.*, 575 F.2d 1017 (2d Cir.1978)); *see also Minpeco, S.A. v. Hunt*, 686 F.Supp. 420, 425–27 (S.D.N.Y.1988) (denying motion to preclude claim for cost of borrowing money necessitated by defendants' alleged manipulation of the silver market).[65] There are obvious factual and legal distinctions between the cited cases and the present case: the cited cases deal predominately with the issue of the recovery of incidental damages under the U.C.C. and, for the most part, pertain to contracts for goods, as opposed to services. Nonetheless, the court finds the cited authority applicable here given the Second Circuit's express determination in *Bulk Oil* that the plaintiff there was entitled to be made whole for its interest payments. *See Bulk Oil*, 697 F.2d at 485.

Of equal if not more import is the fact that NiMo is not, as ITT implies, trying to seek a double recovery for financing damages. Instead, NiMo is merely seeking to prove its actual financing costs, which have been computed only through NMP2's commercial operation ("C.O.") date of April, 1988. Cotenants' Memorandum in Opposition to ITT's Motion for Summary Judgment on Damages Issues ("Plaintiff's Damages

Memorandum") at 50; *see also* Tr. II at 76. NiMo is then seeking statutory prejudgment interest from that date to the present. *Id.* at 50. Indeed, NiMo states with candor:

**\*31** [I]f the [plaintiffs] recover all of their pre-commercial operation financing costs at trial, they will *not* seek an award of prejudgment interest for the time period *prior* to C.O. On the other hand, if the [plaintiffs] do not recover some or all of their pre-commercial operation financing cost damages at trial, the Court can then determine, in light of the jury's damage award, whether or to what extent an award of statutory prejudgment interest is appropriate for that period.

*Id.* (emphasis in original). Given those candid statements by NiMo, there is absolutely no basis for ITT's assertion that NiMo is seeking a double recovery here. Moreover, the case law set forth above provides ample support for NiMo's financing cost claim as part of the damages arising from ITT's alleged breach of contract and alleged tortious conduct. Consequently, § 5001 of the CPLR does not prevent NiMo from attempting to prove at trial so much of its damages as relates to financing costs.

### b. Traceability

ITT vigorously contends that *LILCO*, 1990 WL 64588, 1990 U.S.Dist. LEXIS 5351, is dispositive of NiMo's damage claim for financing costs. In *LILCO*, Judge Owen held that a financing cost award was not proper because the plaintiff was "[u]nable to point to a particular loan necessitated by [defendant's] conduct, ...."[66] 1990 WL 64588, at *4–5, 1990 U.S.Dist. LEXIS 5351, at *16 (emphasis added) (citation omitted). The *LILCO* court also noted that "[a]n award of interest would be appropriate if LILCO had rightfully and properly rejected the diesels as non-conforming goods, *and had secured a loan in order to purchase replacement diesels from Colt.*" *Id.* (emphasis added).

NiMo, on the other hand, heavily relies on two cases outside this jurisdiction: *The Cincinnati Gas & Electric Co v. General Electric Co.*, No. C–1–84–988, (S.D.Ohio 19—)[67] ("*Zimmer* ") (applying Ohio law); and *Washington Public Power Supply System v. General Electric Co.*, No. 85–098–AA, 1989 WL 306200, 1989 U.S.Dist. LEXIS 18,279 (E.D.Wash. Nov. 8, 1989) ("*WPPSS* ") (applying Washington law). The courts in both of those cases allowed the plaintiff utilities to submit financing cost proof to the jury. The issue arose in *Zimmer* against the backdrop of defendants' motion to

Niagara Mohawk Power Corp. v. Stone & Webster ... Not Reported in ...
1992 WL 121726

exclude evidence relevant to plaintiffs' financing costs claim. The *Zimmer* court held that the plaintiffs were entitled to present such evidence for purposes of a summary jury trial. [68] *Zimmer*, slip op. at 12–13. [69] The *Zimmer* court warned plaintiffs, however, "[t]hat they must be prepared to make the requisite showing of casuation [sic] and, to the extent that the injury was foreseeable, a showing of a nexus between the damages alleged and the alleged wrongdoing of defendant, i.e., that the costs are attributable to the wrongdoing." *Id.* at 11–12. In other words, the *Zimmer* court equated causation with traceability: "[t]o require plaintiffs to establish this nexus [attributing the costs of the loan to the breach] serves the same purposes as the concept of traceability." *Id.* at 12. The court in *Zimmer* further explained:

*32 [t]hat the requirements of causation and certainty of damages [sic] provide an adequate means for defendants to present their argument to the jury on such matters as whether some or all of plaintiffs' alleged 'financing costs' were due to plaintiffs' alleged mismanagement of its affairs or whether costs incurred (e.g. costs of dividends) were the result of business decisions..... Similarly, while we are not barring plaintiffs from offering testimony on the general methods of accounting in the utilities industry or presenting a formula for assessing the amount of damages, we note that the jury will be instructed on plaintiffs' burden of establishing causation, ..., and certainty of the amount of damages.

*Id.* at 12 (citation omitted). It is critical to note that the *Zimmer* court did not place an additional burden on plaintiffs of demonstrating traceability to a specific loan.

In an analogous situation, the court in *WPPSS* denied defendant's summary judgment motion on plaintiff's claim for interest, basically finding that the defendant had failed to satisfy its burden of presenting evidence negating either causation or accountability. *WPPSS*, 1989 WL 306200, 1989 U.S.Dist. LEXIS 18279, at *16. The relevance of *WPPSS* to the present case is arguably limited somewhat by the fact that traceability, although offered as a possible basis for summary judgment, was not actually an issue therein. In *WPPSS* the defendant, as does ITT, asserted that the plaintiff should not be allowed to recover "cost of capital" "where it cannot trace specific interest expense to the claimed injury." *Id.* at 20 (citations omitted). However, because in *WPPSS* the bonds issued to finance the subject construction were spent only on that particular project, it was not critical that the court define the parameters of the asserted traceability requirement. *See id.* at *21. Nevertheless, the court implicitly rejected

defendant's tracing argument, observing that in another case (upon which defendants had relied), "[t]he plaintiff's claim for actual interest was denied because 'its books were not set up to show the amount of interest paid on a particular job,'..., *not* because the plaintiff could not trace a particular expense within one job to the proceeds of a specific loan.") *Id.* (emphasis added) (quoting *Wyoming v. Brasel & Sims Constr. Co.*, 688 P.2d 871, 881 (Wyo.1984)). The court concurs with NiMo's reading of *WPPSS;* that is *WPPSS* does not impose a stringent tracing requirement on the recovery of financing costs. Instead, *WPPSS* only confirms the view that there be a "legally sufficient casual link" between a plaintiff's direct damage and the loan in question. *Id.* at *19.

Ordinarily would the court be reluctant to follow *Zimmer* and *WPPSS* because they construe case law outside this jurisdiction. However, because the definition of causation (in the context of a financing cost claim) in those cases is remarkably similar, indeed, virtually identical to the definition under New York law, [70] *Zimmer* and *WPPSS* are certainly instructive on the tracing argument. In addition, a careful reading of *Zimmer* and *WPPSS*, as well as *LILCO* and the cases cited therein, convinces the court that NiMo should, at a minimum, be permitted to proffer evidence at trial relating to its purported financing cost damages. [71] Not only is that the more sound practice given the current posture of this case, [72] but, importantly, such a practice is also in accordance with New York law. In *Ernst Steel*, a case referred to in *LILCO*, the Appellate Division started with the generally accepted proposition that "[i]n an appropriate case a seller is entitled to recover commercially reasonable finance and interest charges incurred as a result of a buyer's breach as a proper item of incidental damages...." 104 A.D.2d at ——, 481 N.Y.S.2d at 839 (citations omitted). [73] Then, even though the Appellate Division reversed the trial court's award of interest damages, it reasoned:

*33 [w]hile there is no requirement in the code [U.C.C.] that interest expenses must be identified to indebtedness specifically covering the contact [sic] goods, where a seller cannot link the claimed damages to the contract it clearly has a more difficult burden of proof. In our view, [plaintiff] has not substantiated its claim that the entire amount of increased costs due to the delay was paid for with borrowed funds ... and it has failed to link any portion of its indebtedness to the delay in payment resulting from [defendant's] breach. [Plaintiff] has not met its burden of proof that its claim for financing

Niagara Mohawk Power Corp. v. Stone & Webster..., Not Reported in...
1992 WL 121726

costs was attributable to [defendant's] breach and the award of interest expenses must be reversed *due to a failure of proof.*

*Id.* (citation omitted) (emphasis added). The basis for the reversal in *Ernst Steel* was thus not due to a failure to trace to a specific loan, but rather due to a failure of proof on causation. [74]

Based upon the foregoing (particularly the highlighted language), unlike the *LILCO* court, this court does not construe *Ernst Steel* as mandating traceability to prevail on a claim for financing costs damages. All that is required is that a plaintiff's proof of financing cost damages be "commercially reasonable and foreseeable under the circumstances." *See LILCO,* 1990 WL 64588, at *4–5, 1990 U.S.Dist. LEXIS 5351 at *16 (citation omitted). [75] NiMo thus is entitled to offer evidence that its claimed financing costs are attributable to ITT's alleged breach. NiMo should, of course, be mindful of its burden of proof on this issue, especially with respect to causation. As did the plaintiff in *Ernst Steel,* in the absence of proof relating a specific loan to ITT's alleged breach, NiMo will undoubtedly have a more difficult burden of proof. That does not mean, however, that NiMo should be prohibited from offering at trial proof of its supposed financing cost damages.

### B. Claimed Speculative Nature of Damages

ITT's other argument, common to several different categories of damages, is that those damages are speculative as a matter of law. ITT makes that argument as to the following categories of damages: large bore piping; QA/QC; MAC review; QPMP; civil penalty; engineering oversight; and overhead. Naturally NiMo disagrees, asserting that the damages calculations by its own experts are "manifestly reasonable" and an "accurate assessment" of the damages sustained by plaintiffs. [76] Thus, from NiMo's perspective, there is absolutely no reason that the jury should not hear its proof on the categories of damages just listed.

"It is well-settled that a plaintiff in a contract action must demonstrate *both* that his damages were caused by the alleged breach and that the alleged loss is capable of proof with reasonable certainty." *Ullman-Briggs, Inc. v. Salton, Inc.,* 754 F.Supp. 1003, 1008 (S.D.N.Y.1991) (emphasis added) (citing *Lexington Products, Ltd. v. B.D. Communications, Inc.,* 677 F.2d 251, 253 (2d Cir.1982); *Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 132 (1986)). On this aspect of its motion, ITT centered almost exclusively on whether the amount of NiMo's asserted damages can

be proven with reasonable certainty; it did not focus on causation. [77] So at this point, the court will limit its discussion to whether the amount of NiMo's damage estimates, as calculated by its experts, is based upon speculation or conjecture, and as such should not be allowed to be presented to a jury.

**\*34**  In appraising the sufficiency of damage evidence, several well established principles have evolved. In *Wolff & Munier, Inc. v. Whiting–Turner Contracting Co.,* 946 F.2d 1003 (2d Cir.1991), the Second Circuit reiterated a couple of those principles. First, "[a]lthough the amount of recoverable damages is a question of fact, the measure of damages upon which the factual computation is based is a question of law.' " *Id.* at 1009 (quoting *United States ex rel. Juno Constr. Corp.,* 759 F.2d 253, 255 (2d Cir.1985)). Second, "[a] party is not to be denied damages when they are necessarily uncertain, ..., New York law does not countenance damage awards based on '[s]peculation or conjecture.' " *Id.* at 1010 (quoting *Berley Indus., Inc. v. City of New York,* 45 N.Y.2d 683, 687, 412 N.Y.S.2d 589, 591 (1978)). "In other words, 'the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes.' " *Care Travel Co. v. Pan American World Airways, Inc.,* 944 F.2d 983 (2d Cir.1991) (quoting *Kenford Co.,* 67 N.Y.2d at 261, 502 N.Y.S.2d at 132 (citing in turn *Wakeman v. Wheeler & Wilson Manuf'g Co.,* 101 N.Y. 205 (1886)). "[T]he burden of uncertainty as to the amount of damages is upon the wrongdoer,.... [78] *Lamborn v. Dittmer,* 873 F.2d 522, 532–33 (2d Cir.1989) (quoting *Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918, 926 (2d Cir.1977)) (citations omitted). Lastly, the principle having perhaps the most impact upon ITT's motion pertaining to damages is that "[t]he test for admissibility of evidence concerning prospective damages is whether the evidence has *any tendency* to show their probable amount. [79] *Id.* (emphasis added).

Those same principles were expounded upon by the New York Court of Appeals in *Berley Industries:*

Particularly in actions *ex contractu,...,* when it is clear that some injury has been occasioned, recovery will not necessarily be denied a plaintiff when it is apparent that the quantum of damages is unavoidably uncertain, beset by complexity or difficult to ascertain.... The law is realistic enough to bend to necessity in such cases. A jury then may draw reasonable inferences from the other, though lesser,

Niagara Mohawk Power Corp. v. Stone & Webster... Not Reported in...
1992 WL 121726

proofs actually presented in order to arrive at an estimate of
the amount of extra costs which are the natural and probable
result of the delay.... Even then there must be a definite and
logical connection between what is proved and the damages
a jury is asked to find....

*Id.* at ——, 412 N.Y.S.2d at 591; *see also Borne Chemical
Co. v. Dictrow,* 85 A.D.2d 646, ——, 445 N.Y.S.2d 406,
413–14 (2d Dep't 1981). It cannot be overlooked, however,
that "[t]he amount of damages need not be calculated with
absolute certainty or mathematical precision." *Trans World
Airlines, Inc. v. 47th Street Photo, Inc.,* 751 F.Supp. 439,
440 (S.D.N.Y.1990) (citing *Story Parchment Co. v. Paterson
Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248,
250–251, 75 L.Ed. 544 (1931), and other cases). Similarly,
"[e]vidence that, as a matter of just and reasonable inference,
shows the existence of damages and the extent thereof will
suffice, even though the result is only an approximation."
*Id.* at 441 (citing *Story Parchment,* 282 U.S. at 563, 51
S.Ct. at 250 and other cases). The court will now examine
the evidence submitted in connection with ITT's summary
judgment motion on damages in light of the standards just
recited.

### 2. Large Bore Piping

**\*35** ITT claims that the damages NiMo seeks to recover
for erection, repair and rework of large bore piping and pipe
supports are speculative because the sampling methodology
employed by NiMo's experts is "inherently speculative," and
the determination of a "reasonable" [80] amount of rework is
also speculative. The court will separately address those two
contentions.

### a. Sampling

Preliminarily, it should be noted that according to ITT there
would be no need for statistical sampling if one of two events
had occurred at Contract Change 34—the final contract
change. Either NiMo should have kept the contemporaneous
time records, which it had a right to do under Contract
Change 26; [81] or, NiMo should not have agreed to final
acceptance of ITT's work by signing Contract Change 34.
As discussed in section one, ITT adheres to the view that
when NiMo approved final payment to ITT under Contract
Change 34, [82] ITT had settled all claims (past and future)

with NiMo. In reliance upon NiMo's final acceptance of ITT's
work (in Contract Change 34), ITT also did not retain the
contemporaneous time records.

ITT makes much of the fact that NiMo did not exercise
its right to retain the contemporaneous time records. While
in hindsight it obviously would have been preferable to
have those documents; the fact remains that they are
not available. [83] Nothing in the record suggests that the
unavailability of those documents is due to wrongdoing by
any party to this litigation. [84] Thus, the court will not prevent
NiMo from relying upon statistical sampling evidence just
because at one point there were contemporaneous time
records, which purportedly would have established what
NiMo is endeavoring to show by way of sampling.

To fully understand ITT's objections to the sampling
methodology devised and applied by NiMo's experts, an
overview of that methodology is helpful. The starting
point for NiMo's sampling methodology is the document
packages ("planners"), which were retrieved from NMP2
plant records. The information contained in those planners,
while incomplete, contains such items as isometric drawings
for a certain section of piping; weld data reports; and
sign-off forms from the superintendent, foreperson or field
engineer. ITT's Appendix, Vol. V at 1411. Out of 17,735 pipe
support planners, the sampling population consisted of 401
planners selected by NiMo's statistical expert. *Id.* at 1259 and
1411; ITT's Appendix, Vol. VII at 1945–48. The sampling
population was smaller for piping sections; 41 out of 421
planners were reviewed. *Id.* at 1251; *id.* at 1972.

Using the sample planners, one of NiMo's experts, Alan D.
Nance, tried to ascertain whether repair and rework was done,
and the cause for such repair or rework, i.e. craft error or other
causes, such as SWEC mandated design changes. *Id.* at 1409,
1412. When he determined that the rework or repair was due
to craft error, Mr. Nance then estimated the hours spent on
such repair or rework. *Id.* at 1213, 1242, 1409, 1412. Those
figures were totaled and extrapolated to the entire number of
pipe supports and pipes. A reasonable amount of rework was
then credited by the expert, and the hours were translated into
a dollar amount by using average wage costs for the years in
question. *Id.* at 1251, 1256.

**\*36** The methodology just described, albeit in far less detail
than that contained in the damage reports of NiMo's experts,
is objectionable to ITT. According to ITT, "[b]ecause of the
small number of documentation packages actually reviewed

and the multiplier effect of overhead and interest, the smallest error in Mr. Nance's judgment as to whether a piece of rework occurred, was [ITT's] fault, or the time necessary to accomplish it is enormously magnified in the final damages calculation." ITT's Damages Memorandum at 20. To illustrate, ITT states that "[i]n the pipe support claim, ..., an incorrect assumption that a single incident of rework required scaffolding in 1983 would add approximately $51,000 to the damages sought by the plaintiffs." Id. (citing ITT's Appendix Vol. V, at 1255–1268).

Due to the time and expense allegedly involved in reviewing every planner,[85] NiMo hired several experts, including a statistician, Dr. Charles Mann, and Alan Nance, a mechanical engineer specializing in piping. In conducting his review of the sample planners, Nance's job was to apply the sampling method devised by Dr. Mann. Mr. Nance avers that his review exposed that "there were systemic, recurring, ongoing and serious failures on the part of ITT in the pipe support and piping erection process," including improper installation sequence, incorrect installation, lost documentation, carelessly performed work, welding defects, loose hardware, delayed inspections, lost material and incorrect repairs. Nance Affidavit at ¶ 33 (Plaintiffs' Appendix Vol. I, Ex. C thereto). Based on Nance's results, Dr. Mann then determined the cost of excessive work in the total population of pipe and pipe supports. Affidavit of Charles Mann (December 3, 1991) ("Mann Affidavit") at ¶ 6 (Plaintiffs' Appendix Vol. I, Ex. E thereto).

Not unexpectedly, Dr. Mann avers that "[t]he statistical methodology used to make the calculations and inferences ... is widely accepted and used in the statistical community." Id. at ¶ 8 (Plaintiffs' Appendix, Vol. I, Ex. E thereto). NiMo has provided the court with additional information regarding the methods used and conclusions drawn by its damages experts. Although the court did review that information, it need not concern itself with those details to resolve this motion.

The threshold issue here is the propriety of statistical sampling in the context of this rather unique litigation (the construction of a nuclear power plant). After reviewing NiMo's proof as to damages, which is part of the record on this motion, the court cannot accept ITT's assertion that NiMo's sampling evidence is inherently speculative. It is true, as ITT points out, that sampling has generally been allowed in factual settings vastly different than the present one. See, e.g., Royal Business School, Inc. v. New York State Dept. of Education, 141 A.D.2d 170, 534 N.Y.S.2d

489 (3rd Dep't 1988) (allowing statistical sampling to determine the accuracy of a business school's certification of students for state tuition assistance awards, and to compute the total amount disallowed for improper certification); and People v. Chesler, 91 Misc.2d 551, 398 N.Y.S.2d 320 (N.Y.Sup.Ct.1977) (expert testimony permissible based upon sampling in a case challenging the representation of minorities in a jury pool). It is equally true, however, that the evidence before the court, primarily in the form of damage reports and experts' affidavits, undeniably has a "tendency" to show the amount of damages allegedly sustained by NiMo. Estimates based on "sound sampling techniques" will, in some circumstances, suffice as the best evidence of proving damages. Martin Motor Sales, Inc. v. Saab-Scania of America, Inc., 452 F.Supp. 1047, 1053 (S.D.N.Y.1978), aff'd without pub. opinion, 595 F.2d 1209 (2d Cir.1979) (citation omitted).[86] Thus, even though the present case might not fall into the group of cases where statistical sampling evidence has typically been permitted, without a more fully developed record, there can be no determination as to whether NiMo's sampling techniques are sound.

**\*37** NiMo's experts need to be cross-examined and defense experts also need to render their opinion—both as to the propriety of the sampling methodology employed, and as to the conclusions which can be drawn from that methodology. Presumably, cross-examination of experts on both sides of this litigation will allow the respective opposing counsel to show, for example, the fallacy, if any, in the reasoning of a given expert; whether that expert's calculations are based upon faulty underlying assumptions, and whether the methodology used is a reasonable basis for ascertaining damages.[87] Only then will the court be in a position to determine whether certain damage claims are truly speculative.[88]

This is not a situation, as ITT contends, where it can be safely said at this point that NiMo's damages calculations as to large bore piping are so "grossly inflated and exaggerated as to render them meaningless." D.S. Magazines, Inc. v. Warner Publisher Services, 640 F.Supp. 1194, 1209 (S.D.N.Y.1986) (damages claims "derived from unwarranted bases and speculative assumptions ... [were] so conjectural that they could not serve as a proper basis for calculating plaintiff's alleged damages"). Nor is this a situation such as that presented in Herman Schwabe where the testimony of plaintiff's economist was properly excluded because it was based on assumptions that ranged from "demonstrably false to unreasonable and contrary to common sense." Autowest,

09-50026-mg    Doc 13397-17    Filed 08/27/15    Entered 08/27/15 12:33:20    Exhibit
Exhibit 16 - Niagara Mohawk Power Corp. v. Stone & Webster Engineering C    Pg 26 of 37
Niagara Mohawk Power Corp. v. Stone & Webster..., Not Reported in...
1992 WL 121726

*Inc. v. Peugeot, Inc.*, 434 F.2d 556, 566 (2d Cir.1970) (citing *Herman Schwabe*, 297 F.2d at 910–12). Looking at NiMo's damage proof in a vacuum (that is without the advantage of experts offering contrary opinions), as the court necessarily must on this motion, it cannot say that the assumptions of NiMo's experts are demonstrably false and/or contrary to common sense. Such a finding would be premature given the current state of the record. The present case is more akin to *Trans World Airlines, supra*, 251 F.Supp. 439, where the court, quoting from a Ninth Circuit decision, observed that when evidence tends to support a theory of damages, a party has the right to put that evidence before a jury and ask them to believe it. 751 F.Supp. at 441 (quoting *Transworld Airlines Inc. v. American Coupon Exchange, Inc.*, 913 F.2d 676, 692–693 (9th Cir.1990). To conclude, the court denies ITT's summary judgment motion insofar as that motion is seeking a determination that NiMo's large bore piping claims are speculative as a matter of law because they are based upon statistical sampling.

### b. Rework Determination

The second aspect of ITT's motion as to the large bore piping damage claim is that the attempt by NiMo's expert to ascertain a reasonable amount of rework is wholly speculative. As ITT describes it, there are essentially three steps in the methodology used by NiMo's expert to make that determination. First, the expert used a 73.4 manhour rate derived from the negotiation of unit rates in 1981. Deposition of Alan D. Nance (May 8, 1991) at 298 (ITT's Appendix, Vol. VII at 1954). Those rates supposedly reported as a projection as to how long it would take to erect a given commodity. Mr. Nance (NiMo's engineering expert) then rounded up the unit rate to 100 manhours to justify "things we could not quantify." *Id.* at 309. (ITT's Appendix, Vol. VII at 1963). The resulting calculation represents the time Mr. Nance posits that ITT *should have* spent on each large bore pipe support. *Id.* at 293 (ITT's Appendix, Vol. VII at 1949). (emphasis added). Lastly, to arrive at a final reasonable rework figure, Mr. Nance relied upon a 1981 report suggesting that rework for all crafts on a nuclear power plant, not just large bore piping and pipe supports, could "represent 15 to 20 percent of total manhours in certain areas." ITT's Appendix Vol., VI at 1490. He also relied upon a 1981 estimate by SWEC that rework due to design changes might equal 12%. Mr. Nance thus computed that rework due to craft error (put more bluntly, ITT's "fault") should have been no more than ten percent. ITT's Appendix, Vol. VII at 1950. The end result of those calculations is

an allocation of ten manhours (that is, ten percent of 100 manhours) as a reasonable rework rate for each large bore pipe support. ITT's Appendix, Vol. V at 1256.

**\*38** These calculations result in "no more than a guess" in ITT's opinion. ITT's Damages Memorandum at 31. ITT disputes these calculations claiming that "plaintiffs are attempting to unilaterally impose a contractual obligation on Grinnell [ITT] that was never discussed in negotiations." *Id.* More particularly, according to ITT, "[t]he final result of the plaintiffs' methodology is an attempt to hold Grinnell [ITT] liable for hours devoted to rework in excess of ten percent of the time Grinnell [ITT] 'should' have taken to erect the pipe supports and piping." *Id.*

NiMo does not challenge ITT's description of the methodology used by Mr. Nance to determine a reasonable rework amount. Instead, as it did with most of the damage claims, NiMo responds by reiterating the general rules of law as to proof of damages, and by outlining the extensive work done by its experts to quantify the damages. Basically for the same reasons set forth in section III(B)(2)(a), the court is unable to hold that the reasonable amount of rework calculated by NiMo's experts in connection with large bore piping is speculative as a matter of law. NiMo is apprised, however, that on the record as it is presently constituted, on a spectrum, the rework element of the large bore piping claims seems to fall far closer to impermissible, speculative evidence than it does to admissible evidence.

### 3. CAT/SALP

The only ground asserted by ITT for granting summary judgment on NiMo's claim regarding CAT/SALP costs generally is that those damages are consequential. In ITT's view, these damages are consequential and thus excluded under the contract because they are not a "direct" or "natural" result of ITT's alleged breach of contract. ITT's Damages Memorandum at 34. As previously discussed, whether damages are consequential or not is usually a fact issue.[89] Therefore, ITT's assertion that these damages are consequential does not form an adequate basis for the granting of summary judgment.

### 4. Increased QA/QC Costs

Niagara Mohawk Power Corp. v. Stone & Webster..., Not Reported in...
1992 WL 121726

As part of their CAT/SALP claim, NiMo is seeking to recover $10,522,576.00 (excluding overhead and financing costs) of the total project QA/QC costs. ITT's Appendix, Vol. V at 1310. This calculation is based on the assumption that as a result of failures (at least some, if not all, of which NiMo is attributing to ITT) revealed by the CAT and SALP audits conducted by the NRC, there were "substantial increases in *project* QA/QC manpower" which otherwise would not have been needed. *Id.* (emphasis added). ITT presents the court with compelling reasons as to why this particular claim is speculative as a matter of law. *See* ITT's Damages Memorandum at 36–40. NiMo does not refute that reasoning; instead, as before, it simply makes generalizations regarding the merits of its proof. NiMo cannot survive ITT's motion for summary judgment on this claim on the basis of those generalizations.

The court agrees with ITT—the mathematical formula used by NiMo to quantify this claim is fraught with uncertainty. The most glaring and perhaps most significant uncertainty is that one of NiMo's experts "estimated," with no readily apparent foundation, that 25% of the QA/QC costs which he deemed as "excessive" are attributable to ITT. ITT's Appendix, Vol. V at 1384. Plainly then this claim is far too speculative and as such does not meet the standards established in the case law discussed herein. Thus, for substantially the reasons set forth in ITT's Damages Memorandum, the court grants summary judgment to ITT as to the damage claim for increased QA/QC costs.

### 5. MAC Review Costs

**\*39**  Another part of the CAT/SALP claim is the $3,690,604.00, which supposedly represents ITT's share of the MAC review. The MAC review refers to the consulting work done by an outside firm (MAC) assessing NMP2 quality programs. NiMo divides the MAC review cost into two parts: the amount charged by MAC and the estimated costs of all personnel on the NMP2 project, including ITT employees, who assisted or otherwise interacted with MAC. ITT's Appendix, Vol. V at 1230–32; 1304–05. Once again, NiMo did not respond in any specific or meaningful way to ITT's cogent argument that this element of damages is speculative because it is based upon no more than a series of estimates connected by unfounded assumptions. So, for the reasons set forth in ITT's Damages Memorandum, ITT is also entitled to summary judgment on that portion of the CAT/SALP claim pertaining to the cost of the MAC review.

### 6. QPMP Costs

Supposedly as a result of mismanagement by ITT, the NRC ordered the NMP2 project to establish a program to monitor construction quality activities. ITT's Appendix, Vol. V at 1232–33. NiMo is seeking to recover $113,682.00 of the estimated cost of that program. This claim too cannot withstand ITT's summary judgment motion. NiMo has come forth with absolutely nothing to convince the court that these calculations are based upon anything other than educated guesswork. The court agrees with ITT, given the guesswork and unsupported assumptions which form the basis for this damage estimate, summary judgment on the QPMP claim is mandated. *See* ITT's Damages Memorandum at 42–44; and ITT's Reply Memorandum at 13.

### 7. Civil Penalty

In a letter dated March 20, 1984, the NRC included a Notice of Violation imposing a $100,000.00 civil penalty on NMP2. ITT's Appendix, Vol. V at 1309; *see also id.* at 1373–82. One of NiMo's experts determined that 19% of that penalty or $19,000.00 was attributable to ITT. NiMo is seeking to recover that sum. The $19,000.00 figure was arrived at through a relatively simple computation. The total number of NRC violations cited was divided by the violations (or portions of violations) which NiMo contends were the "fault" of ITT. *Id.* at 1309, 1373–83. The court concurs with ITT that because "[t]he plaintiffs did not consider the severity of the violations, nor take into consideration the NRC's overwhelming concern with Niagara Mohawk's management deficiencies," this particular damage calculation "does not bear the 'definite and logical connection' between Grinnell's alleged deficiencies and the claimed damages required by *Berley Industries,....*" ITT's Damages Memorandum at 44–45. That, combined with the fact that NiMo offered nothing to convince the court otherwise, requires that summary judgment be granted in favor of ITT on this claim.

### 8. Engineering Oversight

As previously mentioned, engineering oversight costs are not a separate category of damages, but are a portion of the damage claims for planner preparation, large bore pipe

Niagara Mohawk Power Corp. v. Stone & Webster... Not Reported in...
1992 WL 121726

support and large bore piping. [90] ITT contends that these oversight damages are both consequential and speculative. The court can find no reason in this instance to deviate from its initial conclusion that generally whether damages are consequential is a fact issue. (ITT itself seems to place little credence in the argument that oversight damages are consequential, as it devotes only one sentence of its lengthy damages memorandum to that argument. See ITT Damages Memorandum at 48.) Thus, summary judgment is denied on the engineering oversight portion of NiMo's damages insofar as said motion is based upon the assumption that those damages are consequential.

*40    Nor does the court agree with ITT that these damages are speculative as a matter of law. ITT insists (mistakenly) that NiMo's formula is based on two unsupported assumptions. Specifically, according to ITT the assumptions that NiMo's engineering costs increased and that they did so on a proportional basis are both unsupported. Those assumptions are not completely unsupported, however. In fact, the contrary is true: both assumptions are amply supported by proof in the record. For example, two NiMo employees unequivocally averred that NiMo incurred increased oversight costs due to ITT failures. Affidavit of Yatish C. Goyal (Dec. 3, 1991) at ¶ 9 (Plaintiffs' Exhs. Vol. V, Tab T thereto); Affidavit of Gerald K. Rhode (Nov. 27, 1991) at ¶ 12 (Plaintiffs' Exhs. Vol. VI, Tab U thereto); see also Huston Affidavit at ¶ 17 (Plaintiffs' Exhs., Vol. IV at 770). Insofar as the assumption that increases were on a proportional basis is concerned, based upon the averments and deposition testimony of Charles Huston, one of NiMo's experts, the court is also satisfied that that is not a completely unsupported assumption. See Huston Affidavit at ¶ 17 (and citations therein) (Plaintiffs' Exhs., Vol. IV at 770).

ITT tries to depict the oversight formula as being the same or worse than the mathematical formula rejected by the Court of Appeals in Berley Industries, where there was no attempt "to prove that the formula was logically calculated to produce a fair estimate of actual damages." Berley Industries, 45 N.Y.2d at 688, 412 N.Y.S.2d at 591. In the present case, NiMo made such an attempt. Therefore, the court will allow NiMo's damage claim for oversight to remain in the case—at least for now.

### 9. Overhead

NiMo's claim for overhead costs, totaling $3,573,744.00, (also a portion of other damage claims rather than an actual category of damages unto itself), is in almost the exact same position as the oversight claim. ITT contends that summary judgment on this claim is also mandated because such costs are speculative, and barred as consequential damages. Again, the court will not retreat from its determination that the issue of whether damages are consequential is ordinarily one of fact. Therefore, the resolution of that issue will have to await another day. Further, because there is no discernable difference between the method used to calculate oversight costs and that used to calculate overhead costs, there is also no basis for granting summary judgment in ITT's favor on the overhead claim.

### 10. Liquid Penetrant Inspection

During the course of the CAT inspection, the NRC found that five welds that had been liquid penetrant inspected [91] and accepted by ITT had, in fact, unacceptable "linear indications." As part of the damages, NiMo is seeking $9,633,506.00, [92] which it attributes to the fact that for a period of time, ITT's union pipefitters accompanied liquid penetrant inspectors. ITT's Appendix Vol. V, at 1286.

*41    ITT vigorously argues that it is "inconceivable" that NiMo is entitled to recover any amount for these alleged damages because the arrangement to have ITT union pipefitters accompany inspectors was approved with the piping union management by SWEC's resident manager, Ronald Wagner. And relying upon contract P301C, ITT states that it was obligated to abide by SWEC's directions, and, by the same token, was entitled to reimbursement for such resulting labor costs.

NiMo alleges that ITT misapprehends the nature of this claim. NiMo, through the affidavit of Charles Huston, contends that it is not an issue of who supplied or requested the union pipefitters who accompanied the liquid penetrant inspectors. Huston Affidavit at 15 ¶ 29 (Plaintiffs' Exhs., Vol. IV at 777). Rather, in NiMo's view, the reason the pipefitters had to accompany the inspectors was essentially due to ITT's alleged breach of contract. That is, "[i]f ITT had planned and scheduled its work so that the welds were tested within a reasonable time, before dirt and rust had a chance to build up," then presumably there would have bee no need for the accompanying pipefitters. Id. (citation omitted). Because the outcome here appears to depend upon whether ITT properly performed under the contract, and because that is one of the

definitive issues for trial, ITT's summary judgment motion on this claim is denied.

This category of damages is also consequential according to ITT. The basis for ITT's argument this time is slightly different than it was for the other categories of damages. This time around, ITT is asserting that the use of additional ITT union pipefitters constitutes a "special" or "unusual" circumstance; and thus any damages arising therefrom are consequential. Even though the argument is different, the result is the same. Whether these damages are consequential and thus excluded under the contract cannot be decided on this summary judgment motion.

### 11. Planner Preparation

The last specified category of damages is for costs incurred due to SWEC's preparation of planner packages. Following an NRC inspection in April, 1982, SWEC personnel began to prepare some of the planners. ITT's Appendix, Vol. V at 1292, 1299. They did that because the NRC resident inspector found that the welding procedure for a certain category of welds had not specified that the welds be qualified for impact testing. *Id.* at 1292. According to ITT, those planners would have had to have been prepared by someone in any event, so the cost of SWEC personnel who eventually performed that task is not recoverable. ITT bluntly states, "[t]here is no legal theory or contractual obligation to support such a recovery." ITT's Damages Memorandum at 51.

NiMo argues, on the other hand, that the damages it is seeking under this claim are for costs incurred as a result of "[t]he fact that SWEC personnel had to take over work that ITT personnel had performed improperly." Huston Affidavit at 16, ¶ 31 (Plaintiffs' Exhs., Vol. IV at 778) (citation omitted). Thus, as with the liquid penetrant inspection claim, this claim too seems to turn on NiMo's success in proving a breach of the underlying contract; and that issue cannot and has not been decided by these motions. NiMo's claim for planner preparation will thus remain in the case for now.

### 12. Other Damages

*42    Finally, ITT is arguing that a catch-all category of damages, which it simply refers to as "other," are consequential damages and thus barred under the contract. *See* ITT's Damages Memorandum at 52 and chart attached

thereto. It should come as no surprise that the court is hesitant to conclude that these damages are consequential, and therefore prohibited by the contract, when ITT has not even specified what those damages are, except in a cursory manner. Moreover, such a finding would be wholly inconsistent with the court's prior determination that whether damages (of any kind) are consequential is a fact issue.

To summarize, with the exception of the damage claims for QA/QC costs; MAC review; QPMP costs; and the civil penalty, [93] the court is not prepared to hold at this point in the litigation that any of NiMo's other damage claims are speculative (or otherwise barred) as a matter of law. Furthermore, the court on these motions will not, and cannot, determine that any of NiMo's purported damages are consequential and thus barred under contract P301C. The possibility always remains, however, that the court will be in a position to make such determinations (both as to the speculative nature of given damage claims and/or whether any damages are consequential as a matter of law) after hearing the proof at trial. [94]

Accordingly, for the reasons set forth herein, it is hereby ORDERED:

(1) that the first motion for summary judgment by the ITT defendants is GRANTED with respect to the enhanced radiograph claims; and in all other respects it is DENIED;

(2) that plaintiffs' cross-motion for summary judgment is in all respects DENIED;

(3) that the motion for summary judgment by the ITT defendants seeking to dismiss Count V (Breach of Contract) of the Amended Complaint on the grounds that that cause of action is contractually barred is DENIED;

(4) that the motion for summary judgment by the ITT defendants seeking to dismiss Count VI (Negligence) of the Amended Complaint on the grounds that that cause of action is barred by the economic loss doctrine is GRANTED;

(5) that the motion for summary judgment by the ITT defendants seeking to dismiss Count VII (Gross Negligence) of the Amended Complaint on the grounds that the ITT defendants did not owe the plaintiffs any independent tort duty and/or that such cause of action is barred by the economic loss doctrine is DENIED;

Niagara Mohawk Power Corp. v. Stone & Webster... Not Reported in...
1992 WL 121726

(6) that the motion for summary judgment by the ITT defendants seeking to dismiss plaintiffs' claim for financing costs on the grounds that those damages are barred by law and are consequential damages barred by the parties' contract is DENIED;

(7) that the motion for summary judgment by the ITT defendants seeking to dismiss plaintiffs' claim for increased QA/QC costs, MAC review costs, QPMP costs and a portion of the civil penalty on the grounds that they are speculative is GRANTED;

(8) that the motion for summary judgment by the ITT defendants seeking to dismiss plaintiffs' claim for CAT/SALP damages on the grounds that those damages are consequential damages barred by the parties' contract is DENIED;

**\*43** (9) that the motion for summary judgment by the ITT defendants seeking to dismiss plaintiffs' claims for engineering oversight costs on the grounds that those damages are speculative and are consequential damages barred by the parties' contract is DENIED;

(10) that the motion for summary judgment by the ITT defendants seeking to dismiss plaintiffs' claim for overhead on the grounds that those costs are speculative is DENIED;

(11) that the motion for summary judgment by the ITT defendants seeking to dismiss plaintiffs' claim for the costs of pipefitters accompanying liquid penetrant inspectors is DENIED;

(12) that the motion for summary judgment by the ITT defendants seeking to dismiss plaintiffs' claim for the costs of SWEC's preparation of planners is DENIED; and

(13) that the motion for summary judgment by the ITT defendants to dismiss all claims for consequential damages identified on the chart attached to ITT's Damages Memorandum on the grounds that they are barred by the parties' contract is DENIED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1992 WL 121726

## Footnotes

1    The various memoranda of law submitted in connection with these two sets of motions total over 300 pages in length, excluding exhibits thereto and Statements of Material Facts pursuant to Local Rule 10(J). The combined exhibits total approximately 3,818 pages. In addition, in response to ITT's second summary judgment motions, plaintiffs submitted six volumes of appendices which are not numbered sequentially, but which measure nearly nine inches in height. Some of the exhibits are duplicative, but not many.

2    The plaintiffs are Niagara Mohawk Power Corporation ("NiMo"), Long Island Lighting Company, New York Gas and Electric Corporation, Rochester Gas and Electric Corporation, and Central Hudson Gas & Electric Corporation. Because NiMo is the owner of the largest share of NMP2 and because it is the first named plaintiff, NiMo and plaintiffs will be used interchangeably throughout this decision.

3    When ITT filed its original summary judgment motion in December, 1990, it included a motion for summary judgment on SWEC's cross-claim for contribution and indemnification. However, based upon the SWEC settlement agreement, SWEC has agreed to drop this cross-claim against ITT; thus rendering moot that portion of ITT's first summary judgment motion.

4    Amended Complaint at ¶¶ 150–157.

5    The damage figures cited herein are all taken from NiMo's damage reports—part of the record on these motions. The court is cognizant of the fact that due to additional recent calculations by NiMo's experts (some as recent as early this month), these figures may not correspond exactly to the damages NiMo will be seeking to prove at trial. The court will use the figures contained in those damage reports simply as a point of reference. Those figures are not binding on the parties in any way.

6    In addition to P301C, ITT and NiMo entered into two other contracts for the project. One was a contract to fabricate the pipe ("the piping contract" or "301B" contract) and the other was a contract to fabricate the pipe supports. Contract P301C is at the heart of this litigation, but there is one allegation pertaining to the 301B piping contract and that is the so-called radiograph enhancement claim, which will be briefly addressed later.

7    *See* Answer to Amended Complaint, Counterclaim and Jury Demand of ITT Fluid Products Corporation and ITT Fluid Technology Corporation at 16–17.

In its answer, ITT specifically asserts an affirmative defense based upon the "settlement agreements" (i.e. the pertinent Contract Changes). *Id.* at 17. That is not truly a discrete aspect of ITT's first summary judgment motion, however. Therefore, even though ITT separately asserted in its answer a defense based upon the "settlement agreements," the court will not consider that as a possible independent basis for ITT's first summary judgment motion. The settlement agreement defense will only be considered insofar as the same is encompassed in the other affirmative defenses which form the basis for ITT's motions herein.

8   Plaintiffs' Memorandum in Support of their Cross–Motion for Summary Judgment and in Opposition to Motion for Summary Judgment of Defendants ITT Fluid Products Corporation and ITT Fluid Technology Corporation ("Plaintiffs' Memorandum") at 4, n. 4.

9   *See also Ginett v. Computer Task Group, Inc.,* No. 91–7768, 91–7792, slip op. 3169, 3195–3196 (2d Cir. April 21, 1992) ("If an ambiguity in the contract exists, then summary judgment is generally improper, because the principles governing summary judgment 'require that where contract language is susceptible of at least two fairly reasonable meanings, the parties have a right to present extrinsic evidence of their intent at the time of contract.' " (quoting *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 9 (2d Cir.1983)); *see also Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.,* 930 F.2d 1021, 1025–1026 (2d Cir.1991) ("Where contract language is ambiguous, interpretation of the language's meaning, and hence determination of the parties' intent, is a question of fact for the jury.") (citations omitted); *Enercomp, Inc. v. McCorhill Pub., Inc.,* 873 F.2d 536, 546 (2d Cir.1989) ("Where parties' intent cannot be conclusively determined as a matter of law from the terms of the agreement at issue, a factual question arises that must be resolved by a jury.")

10   And that is so even where, as here, both parties move for summary judgment. *Long Island Airports Limousine Service Corp. v. Playboy–Elsinore Associates,* 739 F.2d 101, 103 (2d Cir.1984) (citations omitted); *see also Home Ins. Co. v. Aetna Cas. & Sur. Co.,* 528 F.2d 1388, 1390 (2d Cir.1976) (citing *American Manuf. Mutual Ins. Co. v. American Broadcasting–Paramount Theatres, Inc.,* 388 F.2d 272, 279 (2d Cir.1967)) (fact that both sides move for summary judgment does not make it more readily available).

11   Memorandum in Support of Motion for Summary Judgment of Defendants ITT Fluid Products Corporation and ITT Fluid Technology Corporation ("ITT's Memorandum") at 46.

12   *See supra,* p. 9.

13   Contract Change 32 at 1, ¶ III (ITT's Appendix, Vol. III at 782).

14   *See Leberman, supra,* 880 F.2d at 1559.

15   ITT's Memorandum at 62.

16   *See supra,* p. 6.

17   ITT endeavors to distinguish this case, among others, on the ground that it involved a gratuitous, as opposed to a bargained for release. That is a distinction without a difference, at least for purposes of analyzing the issues raised by ITT's motions. ITT has not pointed to any case authority, and the court is aware of none, in which a New York court has employed different standards governing releases based upon whether they are gratuitous or not.

18   *Accord Gillaizeau,* 766 F.2d at 713 (citing *Gordon,* 358 F.2d at 263) ("The parties' intent will determine the scope of a release.")

19   *See Marvel Entertain.,* 747 F.Supp. at 948.

20   *See Gillaizeau,* 766 F.2d at 713.

21   ITT's Memorandum at 68.

22   Patent defects are those defects "known or discernible by reasonable inspection." *Yeshiva Univ. v. Fidelity & Deposit Co.,* 116 A.D.2d 49, ——, 500 N.Y.S.2d 241, 244 (1st Dep't 1986) (citing *Town of Tonawanda v. Stapell, Mumm & Beals Corp.,* 240 A.D. 472, 270 N.Y.S. 377 (4th Dep't), *aff'd,* 265 N.Y. 630 (1934)).

23   *See id.* at 408 (citation omitted).

24   *See, e.g., Cawley v. Weiner,* 236 N.Y. 357 (1923); *John W. Cowper Co. v. Buffalo Hotel Dev. Venture,* 115 A.D.2d 346, 496 N.Y.S.2d 127 (1985), *appeal of third-party plaintiff dismissed,* 68 N.Y.2d 660, 505 N.Y.S.2d 75 (1986), *aff'd,* 72 N.Y.2d 890, 532 N.Y.S.2d 742 (1988).

25   *See supra,* p. 9.

26   *See Schering, supra,* 712 F.2d at 9–10.

27   The "N" stamp refers to the "NA/NPT" stamp held by ITT. According to ITT, "[a]n N stamp represents authorization by the American Society of Mechanical Engineers ... to install safety related piping on a nuclear power plant. Memorandum (Liability Issues) in Support of the ITT Defendants Second Motion for Summary Judgment ("ITT's Liability Memorandum") at 42.

28    A court may, *sua sponte,* deviate from the law of the case doctrine for, among other reasons, the purpose of avoiding the perpetration of error. When that is done, certain notice requirements must be met. For example, in *United States v. Uccio,* 940 F.2d 753 (2d Cir.1991), the Second Circuit held that the district court properly exercised its discretion to revisit one of its prior rulings where the district court believed such ruling was "incorrect." *Id.* at 758–59. The Second Circuit explicitly held that "[h]aving given Uccio [the defendant] sufficient notice and an opportunity to be heard, it was well within the court's discretion to decline to deem itself bound by a ruling that it had come to view as wrong." *Id.* at 759. *See also United States v. Lorusso,* 695 F.2d 45, 53 (2d Cir.1982) (" whether the case *sub judice* be civil or criminal[,] so long as the district court has jurisdiction over the case, it possesses inherent power over interlocutory orders, and can reconsider them when it is consonant with justice to do so' ") (quoting *United States v. Jerry,* 487 F.2d 600, 605 (2d Cir.1973)), *cert. denied,*460 U.S. 1070, 103 S.Ct. 1525, 75 L.Ed.2d 948 (1983)). Thus, in the present case, even though none of the parties moved for reconsideration after *NiMol,* if the court were, in its discretion, to revisit the issues decided therein, the law of the case doctrine would not be violated, assuming the existence of a valid legal basis justifying such reconsideration.

29    Although part of NiMo's tort claims were dismissed in *NiMol,* the parties did not enter a partial or final judgment with respect to those claims, as provided for in Fed.R.Civ.P. 54(b). That rule allows a court to "direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Fed.R.Civ.P. 54(b). That was not done here. Rule 54(b) further states, in straightforward language:

In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision *is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.*

*Id.* (emphasis added); *see also In Re United States,* 733 F.2d 10, 13 (2d Cir.1984) ("It is well established that the interlocutory orders and rulings made pretrial by a district judge are subject to modification by the district judge at any time prior to final judgment,....") (citations omitted). Therefore, because a partial final judgment under Rule 54(b) was not issued in connection with *NiMol,* the court could conceivably reconsider its prior decision therein, providing no other obstacles to reconsideration are present.

30    In a more picturesque statement, the Court in *Sterling* stated, "to be clearly erroneous, a decision must ... strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." 886 F.2d at 233.

31    Indeed, the court observes that after both *NiMol* and *Wrigley* were decided, at least one New York state court plainly held, albeit with no analysis, that a cause of action for negligent performance of a contract "simply does *not* exist...." *Megaris Furs, Inc. v. Gimbel Bros., Inc.,* 172 A.D.2d 209, ——, 568 N.Y.S.2d 581, 583 (1st Dep't 1991) (emphasis added) (citing *Hamilton v. Hertz Corp.,* 130 Misc.2d 1034, 1037, 498 N.Y.S.2d 706). Cf. *Westminster Const. Co. v. Sherman,* 160 A.D.2d 867, ——, 554 N.Y.S.2d 300, 301 (2d Dep't 1990) (citations omitted) (allegations that work was performed under a contract in a "less than skillful and workmanlike manner" stated a cause of action for breach of contract, and not for negligence).

32    NiMo does not attempt to characterize its damages as anything other than economic in nature. *See Tr.* II at 57 (plaintiffs' counsel admitting that all damages sought here under negligence theories are economic loss damages). In fact, as early as December 13, 1988, when ITT's motion to dismiss the tort claims was argued, ITT described NiMo's damages as solely for economic loss. *See Tr.* I at 5. NiMo did not challenge that.

33    *NiMol,* 725 F.Supp. at 667–68.

34    *See Richardson Greenshields Securities v. Mui–Hin Lau,* 693 F.Supp. 1445, 1456 (S.D.N.Y.1988) (applying New York law, court denied summary judgment on breach of fiduciary duty claim because of conflicting evidence regarding whether brokerage firm employee had a fiduciary relationship with customer); *see also Carter Equipment Co. v. John Deere Industrial Equipment Co.,* 681 F.2d 386, 390 (5th Cir.1982) ("The existence or nonexistence of a fiduciary relationship between parties is a question of fact for the jury."); *Roberts v. Sears, Roebuck & Co.,* 573 F.2d 976, 983 (7th Cir.), *cert. denied,*439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 168 (1978), (To establish the existence of a confidential relationship in the context of a fraud claim, the Court stated, "The trier of fact must examine all of the circumstances surrounding the relationship between the parties and determine whether 'one person reposes trust and confidence in another who thereby gains a resulting influence and superiority over the first.' ") (quoting *Kester v. Crilly,* 405 Ill. 425, 91 N.E.2d 419, 423 (1950)).

35    The court is cognizant of the fact that, for the most part, the cases referenced herein included separate and distinct claims for breach of a fiduciary duty. *NiMol,* 725 F.Supp. at 666. NiMo is making no such claim. The court is of the view, though,

09-50026-mg    Doc 13397-17    Filed 08/27/15    Entered 08/27/15 12:33:20    Exhibit
Exhibit 16 - Niagara Mohawk Power Corp. v. Stone & Webster Engineering C    Pg 33 of 37
Niagara Mohawk Power Corp. v. Stone & Webster ... Not Reported in...
1992 WL 121726

that the rules governing whether a fiduciary relationship exists, be it formal or informal, apply with equal force even where no claim for breach of a fiduciary duty is alleged.

36    Judge Sweet's decision in *Don King Productions, Inc. v. Douglas,* 742 F.Supp. 741 (S.D.N.Y.1990), does not require a different conclusion. Although the court in *Don King* held, as a matter of law, that there was no special relationship of trust and confidence arising out of a promotional contract between a boxer and a promoter, there was persuasive evidence in that case that the boxer, as well as his manager, believed that the promoter had not been doing a satisfactory job, thus destroying any alleged trust relationship. *See id.* at 766–67.

There is a marked contrast between the evidence presently before this court and the evidence in *Don King.* Unlike *Don King,* ITT has not pointed to any evidence showing that the alleged relationship of trust between it and NiMo was destroyed. Perhaps more importantly, however, at least at this stage in the court's analysis, is the fact that NiMo has highlighted evidence which, if found credible by a jury, could support a finding of a special relationship of trust and confidence.

37    The court readily admits that, in an effort to find evidence which would support ITT's position, it did not scrupulously review the entire record submitted in connection with motions presently before it. That is not the court's obligation; it is the obligation of the parties.

38    Without any evident foundation, Mr. Rhode avered that ITT was "functioning as the project manager for piping erection [at NMP2]...." Rhode Affidavit at ¶ 13 (Plaintiffs' Exhs., Vol. IV thereto at 746).

39    Such a rule is necessary because of the divergent goals of tort and contract law, which the court can in *Carmania* thoughtfully explained as follows:

The law of contracts is meant to facilitate voluntary economic exchange. Plaintiffs who sue successfully for breach of contract are entitled to damages providing them with the benefit of the bargains they and the defendants chose to strike—i.e., to be placed in the positions they would have enjoyed had the parties' expectations panned out. The law of torts, in contrast, has different goals: to deter people from inflicting harm when they behave unreasonably, and to compensate those injured by restoring them to the state they occupied before they suffered harm.
*Carmania,* 705 F.Supp. at 938.

40    Insofar as NiMo's liability memorandum can be read as intimating that the economic loss doctrine is not a bar to the tort claims because ITT rendered professional services, the court declines to so find. Even assuming that the erection of large bore piping and pipe supports by ITT amounted to the rendering of professional services, the court is not prepared to expand the professional services exception to include construction project subcontractors such as ITT. Including subcontractors within the limited professional services exception to the economic loss doctrine would significantly undermine that doctrine; because then any subcontractor on a construction project, even those in contractual privity, could be held liable for strictly economic loss damages. The court is not prepared to take so expansive a view of the professional services exception to the economic loss doctrine.

41    *See, e.g., Sears, Roebuck & Co. v. Enco Assocs., Inc.,* 43 N.Y.2d 389, 401 N.Y.S.2d 767 (1977); *Paver & Wildfoerster v. Catholic High School Association,* 38 N.Y.2d 669, 382 N.Y.S.2d 22 (1976); *but see Robinson Redevelopment Co. v. Anderson,* 155 A.D.2d 755, 547 N.Y.S.2d 458 (3rd Dep't 1989) (developer not entitled to bring professional malpractice claim for economic loss against architectural firm).

42    *See NiMol,* 725 F.Supp. at 665.

43    *See id.*

44    *See Schiavone,* 56 N.Y.2d 667, 451 N.Y.S.2d 720 (1981).

45    Although this paragraph is designated as a separate subsection of the amended complaint entitled, "damages," it is incorporated by reference in the tort causes of action alleged against ITT. *See* Amended Complaint at 41–42, ¶¶ 153 and 156. And no other damages are referred to in the tort claims. Thus, it is clear that NiMo is seeking to recover for these damages based upon a tort theory.

46    *See* Plaintiffs' Appendices Vols. II, III, IV, and V, Tabs I–P thereto.

47    Although there was a plain negligence claim asserted in *Int'l Ore,* the district court refused to allow that claim to stand because it found no independent tort liability in that the claimed failure to perform arose only by virtue of the contract. *Int'l Ore,* 743 F.Supp. at 258.

48    *See, e.g., Kalisch–Jarcho, Inc. v. New York,* 58 N.Y.2d 377, 381–85, 461 N.Y.S.2d 746, 747–50 (1983).

49    *See* Plaintiffs' Liability Memorandum at 42, n. 12.

50    The accepted definition of gross negligence actually combines two definitions. *See Federal Ins. Co. v. Honeywell, Inc.,* 631 F.Supp. 1560, 1563 (S.D.N.Y.1986). " 'Gross negligence means a failure to use even slight care, or conduct that is

Niagara Mohawk Power Corp. v. Stone & Webster... Not Reported in...
1992 WL 121726

so careless as to show complete disregard for the rights and safety of others.' " *Id.* (quoting *N.Y. Pattern Jury Instructions* 2:10A (Supp.1986)).

51    On April 27, 1992, the court received, via facsimile, a copy of Plaintiffs' Supplemental Memorandum in Opposition to ITT's Second Motion for Summary Judgment ("supplemental memorandum"). Accompanying that memorandum was a letter from plaintiffs' counsel, John Ferguson, indicating that the memorandum would be filed with the court on April 28, 1992. The court did not consider that memorandum in connection with the present motions, and denied ITT's telephone request for permission to file a reply to the supplemental memorandum.

Plaintiffs did not seek permission from the court for the filing of such memorandum, as required by Local Rule 10(E). Furthermore, of at least equal significance is the fact that when the court received that supplemental memorandum, it was in the throes of drafting this decision. The court understands all too well that this is a technically complex case, and that at least one expert was not deposed until April 15, 1992. (Plaintiffs' supplemental memorandum did focus primarily on that testimony.) Those factors do not justify plaintiffs' unsolicited submission. As previously mentioned, the record on these motions is voluminous, and the combined memoranda of law extremely lengthy. This case is scheduled to be tried in less than three weeks—at some point submissions to the court must stop. The court has reached that point.

52    Those categories are:
(1) financing costs;
(2) erection, repair, and rework of large bore piping and pipe supports ("large bore piping");
(3) costs allegedly incurred by NiMo as a result of inspections conducted as part of the Nuclear Regulatory Commission's ("NRC") "Construction Appraisal Team" ("CAT") and three "Systematic Assessment of Licensee Performance" ("SALP") inspections—generally referred to by the parties (and hence the court) as the CAT/SALP claim;
(4) increased quality assurance/quality control ("QA/QC");
(5) retaining Management Analysis Company ("MAC") to assess NMP2's quality programs and assist with corrective actions supposedly necessitated by ITT's alleged mismanagement of quality programs;
(6) the quality performance management program ("QPMP") instituted at the behest of the NRC;
(7) civil penalty;
(8) engineering oversight;
(9) overhead;
(10) liquid penetrant inspection;
(11) planner preparation; and
(12) a final category designated by ITT only as "other damages". ITT's Damages Memorandum at 52.
The costs for QA/QC, MAC review, civil penalty and QPMP are part and parcel of the so-called CAT/SALP claim; but for the sake of clarity, the court, as did ITT, will separately address each of those elements of the CAT/SALP claim. Additionally, overhead costs and financing costs are not actually separate and distinct categories of damages, but have been added to various other categories of damages. They too will be separately addressed, because there are some legal arguments pertaining only to them.

53    The contract specifically provides, "In no event shall the Contractor [ITT] be liable for consequential damages arising out of the performance of erection work to the project." Contract P301C, Supplementary Conditions, at 6, ¶ 8 (Plaintiffs' Exhs., Vol. I at 16). Interestingly, despite a total of 34 contract changes, that particular provision remained unchanged throughout the duration of contract P301C.

54    In its analysis, NiMo combines the last two categories of damages, but to avoid possible confusion, the court will separately address the engineering oversight costs and the overhead costs.

55    Tr. II at 52.

56    *Id.*

57    This rule has its origins in the often cited case of *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng.Rep. 145 (1854), wherein it states:

Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it. Now, if the special circumstances under which the contract was actually made were communicated by the plaintiffs to the defendants, and thus known to both parties, the damages resulting from the breach of such a contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated. But, on the other hand, if

09-50026-mg    Doc 13397-17    Filed 08/27/15    Entered 08/27/15 12:33:20    Exhibit
Exhibit 16 - Niagara Mohawk Power Corp. v. Stone & Webster Engineering C    Pg 35 of 37

Niagara Mohawk Power Corp. v. Stone & Webster..., Not Reported in...
1992 WL 121726

these special circumstances were wholly unknown to the party breaching the contract, he, at the most, could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases not affected by any special circumstances, from such a breach of contract.

9 Exch. at ———, 156 Eng.Rep. at 151.

58    Such a contention by NiMo is slightly curious given the fact that it did not cross-move for summary judgment in response to ITT's summary judgment motion on the damage issues. Perhaps NiMo intends for the court, on its own volition, to grant summary judgment to plaintiffs on this narrow issue. *See Coach Leatherware Co. v. Anntaylor, Inc.,* 933 F.2d 162, 167 (2d Cir.1991) (citations omitted) (recognizing that although not expressly authorized by Rule 56, the practice of a district court independently granting summary judgment in favor of a nonmoving party has become "an accepted method of expediting litigation"). The court will not grant summary judgment in favor of NiMo, declaring that some or all of their damages are direct damages as a matter of law because, as will be seen, summary judgment on the issue of whether certain damages are direct or consequential is not appropriate.

59    *See Record Club of America, Inc. v. United Artists Records, Inc.,* 696 F.Supp. 940, 947 (S.D.N.Y.1988) (following non-jury trial, court dismissed claims for lost customer-list rental fees and advertising-insert income as consequential where there was no evidence submitted that such damages were within the contemplation of the parties when they entered into the agreement); *Havens Steel Co. v. Randolph Engineering Co.,* 613 F.Supp. 514, 541 (W.D.Mo.1985), *aff'd,* 813 F.2d 186 (8th Cir.1987) (documentary evidence supported finding under Missouri law that "costs of capital" were recoverable as "direct" damages); *Burgess Constr. Co. v. M. Morrin & Son Co.,* 526 F.2d 108, 117 (10th Cir.1975), *cert denied,* 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976) (citation omitted) ("Overhead is a proper element of cost of completion damages,...."); and *437 Madison Ave. Associates v. A.T. Kearney, Inc.,* 127 Misc.2d 37, 488 N.Y.S.2d 950 (Sup.Ct., 1st Dep't 1985) (losses due to non-breaching party's dealings with third party were consequential); *Certain-Teed Products Corp. v. Goslee Roofing & Sheet Metal, Inc.,* 26 Md.App. 452, 339 A.2d 302 (1975) (jury award of interest upheld on appeal because, among other reasons, "the interest paid was in fact a normal and thus foreseeable incident to [defendant's] breach of warranty"); and *Roanoke Hospital Ass'n v. Doyle & Russell, Inc.,* 215 Va. 796, 214 S.E.2d 155 (1975) (consequential damages denied where jury made factual determination that such damages were not within contemplation of the parties).

60    With respect to financing costs, ITT emphasizes that one scholar has written, albeit within the framework of the Uniform Commercial Code ("U.C.C."), "[b]ecause recovery of such interest or finance charges is a recovery of consequential damage, such recovery must be denied where consequential damages have been properly disclaimed or excluded by the buyer's contract of sale." Roy R. Anderson, *Incidental and Consequential Damages,* 7 Journal of Law and Commerce 327, 435 (1987). The court cannot accept that view, however, in light of the relevant case law set forth above. Moreover, the author's view is not especially persuasive because in that same article, as NiMo notes, the author references cases holding to the contrary. *See id.* at 435–36, 439. Thus, the court is unwilling, based upon the Anderson article, to hold as a matter of law that financing costs are consequential damages.

61    The court does not intend by this statement to foreclose the possibility of granting a directed verdict on this issue in the event NiMo does not come forth with sufficient proof at trial that the enumerated categories of damages were foreseeable and within the contemplation of the parties at the time they contracted.

62    *Accord Barker v. Underwriters at Lloyd's, London,* 564 F.Supp. 352, 358 (E.D.Mich.1983) (under Michigan law, applying *Hadley* rule, court stated, "[t]he issue of whether plaintiff can recover the alleged consequential damages is a question of fact that will be determined by evidence showing whether these damages were within the contemplation of the parties at the time the contract was made.")

63    ITT's Damages Memorandum at 14.

64    New York Civil Practice Law and Rules ("CPLR") § 5001 provides, in relevant part:

Interest *shall* be recovered upon a *sum awarded* because of a breach of performance of a contract, ..., ... and the rate and date from which it shall be computed shall be in the court's discretion.

N.Y.Civ.Prac.L. & R. § 5001 (McKinney 1963) (emphasis added).

65    *Accord Havens, supra,* 613 F.Supp. 514 (W.D.Mo.1985), *aff'd,* 813 F.2d 186, 188 (8th Cir.1987) ("In Missouri, a claim for the cost of money used to pay expenses necessitated by a breach of contract is a claim for damages, not for prejudgment interest.")

66    In denying plaintiff's claim for financing costs, the *LILCO* court plainly relied upon the traceability factor as defined therein, as well as upon the fact that the plaintiff did not meet " '[i]ts burden of proof that its claim for financing costs was attributable to [lmo's] [defendant's] breach,'...." *LILCO* 1990 WL 64588, at *5, 1990 U.S.Dist. LEXIS 5351, at *17 (quoting *Ernst Steel Corp. v. Horn Const. Div.,* 104 A.D.2d 55, 481 N.Y.S.2d 833, 839, n. 16 (4th Dep't 1984), *mod'd,* 486 N.Y.S.2d 1022 (4th

Dep't 1985)). Therefore, the just quoted statement is not, as NiMo suggests, mere *dicta* (and thus implicitly not worthy of serious consideration).

67   The date of this decision is illegible on the copy provided to the court.

68   A summary jury trial is a proceeding used to facilitate settlement by allowing parties to try a case before a jury, which will then render an advisory verdict. *See* Fed.R.Civ.P. 39(c).

69   Because the decision itself did not contain page numbers, the court took the liberty of inserting page numbers so as to avoid confusion.

70   *Compare Zimmer,* slip op. at 7 ("[C]ausation requires a showing that the damages claimed were reasonably foreseeable and in the contemplation of the parties."); and *WPPSS,* 1989 WL 306200, 1989 U.S.Dist. LEXIS 18279 at *19, n. 11 (citations omitted) ("In a contract action, the need to borrow the funds must be shown to have been 'a normal and foreseeable incident arising from' the breach of contract.") *with LILCO,* 1990 WL 64588, 1990 U.S.Dist. LEXIS 5351 at *16 (citation omitted) ("[C]ourts award such relief [financing costs] where the injured party can point to costs associated with a particular loan that was 'commercially reasonable and foreseeable' under the circumstances.")

71   As with other issues in this litigation, whether that proof will be legally sufficient to withstand the inevitable motion for a directed verdict by ITT remains to be seen.

72   In response to ITT's summary judgment motion on damages, NiMo has identified Ronald Ungerer, NiMo's Chief Financial Officer as someone who will testify regarding NiMo's capital raising efforts purportedly necessitated by ITT's alleged breach of contract. Specifically, NiMo states that Mr. Ungerer "will testify at trial that NMPC raised money to pay for the costs attributable to ITT's wrongdoing from various sources—including selling preferred stock and common stock, issuing long-term and short-term securities and making substantial borrowings—and incurred a finance cost on each source." Plaintiffs' Damages Memorandum at 42 (citing Ungerer Affidavit at ¶¶ 4–5; and NMPC's Response to ITT Interrogatories on Damages). The other plaintiffs will also present similar testimony. *Id.* (citing Cotentant Responses to ITT Interrogatories on Damages). That contemplated testimony, in conjunction with the fact that, at least at this juncture, ITT is not disputing that plaintiffs borrowed money and hence incurred financing costs due to ITT's alleged wrongdoing, renders summary judgment inappropriate.

73   As are many of the cases cited in this subsection, *Ernst Steel* involved a breach of a contract for goods under the U.C.C. Clearly the present case does not involve a contract for goods under the U.C.C.; but, in the absence of case authority directly on point, these U.C.C. cases at least provide some guidance.

74   The court does not read the selective language quoted by ITT from *Ernst Steel, see* ITT's Damages Memorandum at 12, as establishing a traceability requirement. When read in context, that language simply refers to causation. The plaintiff therein did not show that it borrowed funds to perform the subject contract.

75   *See also Zimmer,* slip op. at 8–9 (" [R]andolph's [plaintiff] ability to recover its 'cost of capital' expense is [not] limited by its ability to 'trace' its actual 'borrowing' costs.... The only thing necessary is that the court have some reasonable way of determining Randolph's [plaintiff] borrowing cost *or* the cost associated with a use of its own capital....' ") (quoting *Havens, supra,* 613 F.Supp. at 542).

76   Plaintiffs' Damages Memorandum at 26.

77   ITT did mention (almost as an afterthought) that summary judgment could be granted dismissing the CAT/SALP claim on causation grounds. *See* ITT's Damages Memorandum at 45, n. 28. ITT also made that argument by inference with respect to the large bore piping claim. *See* Defendants' Reply Memorandum in Support of their Second Motion for Summary Judgment ("ITT's Reply Memorandum") at 10–11. However, because the parties did not undertake a thorough legal analysis of the fact of injury issue, but only briefly touched upon that issue, the court will not address it at this time. For the same reason (lack of briefing), the court will not hypothesize as to whether lack of causation is a viable alternate basis for granting summary judgment on any of the other damage claims.

78   In support of this statement, the Second Circuit here cited to *Perma Research & Dev. Co. v. Singer Co.,* 542 F.2d 111 (2d Cir.), *cert. denied,* 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976). After *Kenford Co., supra,* the continuing validity of *Perma Research* is "seriously in doubt," but not insofar as it stands for the particular rule quoted above. *See Penthouse International, Ltd. v. Dominion Federal Sav. & Loan Asso.,* 855 F.2d 963, 983 (2d Cir.1988), *cert. denied,* 490 U.S. 1005, 109 S.Ct. 1639, 104 L.Ed.2d 154 (1989) (acknowledging that Court of Appeals in *Kenford* specifically rejected the "rational basis" test enunciated in *Perma Research* as a basis by which to assess future lost profits damages).

79   In a number of the cited cases, including *Lamborn,* the courts discussed the standard for assessing damages proof as it relates to future damages, such as future lost profits. Even though NiMo is not seeking recovery of lost future profits, or any other type of prospective damages, that difference in the type of damages sought does not, in the court's view, render the cited cases involving prospective relief inapplicable here.

09-50026-mg    Doc 13397-17    Filed 08/27/15    Entered 08/27/15 12:33:20    Exhibit
Exhibit 16 - Niagara Mohawk Power Corp. v. Stone & Webster Engineering C    Pg 37 of 37

Niagara Mohawk Power Corp. v. Stone & Webster... Not Reported in...
1992 WL 121726

80    "Reasonable" is the characterization of NiMo's expert, Mr. Nance. Thus, any further references to a reasonable rework rate shall mean in the opinion of Alan Nance—not necessarily in the opinion of the court.

81    *See* Contract Change 26 at ¶ 27 (ITT's Appendix, Vol. VI at 1530).

82    *See* Contract Change 34, ITT's Appendix, Vol. III at 852–54.

83    ITT now regrets its failure to return those records because they would be helpful in showing "the grossly excessive nature of the plaintiffs' time estimates" regarding large bore piping. ITT's Reply Memorandum at 11.

84    NiMo insinuates that there was something improper about ITT destroying those records, whereas it appears that those records were simply destroyed "in the normal course of [ITT's] business many years ago." Affidavit of Charles L. Huston (December 4, 1991) ("Huston Affidavit"), Ex. 8 thereto at 2 (Plaintiffs' Appendix, Vol. I, Exh. H thereto).

85    Without deciding whether NiMo will ultimately be allowed to present their statistical sampling evidence at trial, the court notes that if, as NiMo suggests, it would take one person working 2,000 hours per year 54 years to perform a comprehensive review of each of the nearly 16,000 planners, the use of statistical sampling seems justifiable. *See* Plaintiffs' Damages Memorandum at 7 (citing Affidavit of Alan D. Nance (December 3, 1991) ("Nance Affidavit") at ¶ 23).

86    *Accord Tenants' Union of West Side, Inc. v. Beame,* 40 N.Y.2d 133, 138, 386 N.Y.S.2d 83, 85 (1976) ("[f]or the statistical methods ... to be acceptable, they need[ ] to be sound, fair, representative and, in general designed to produce an accurate result,....") (citations omitted).

87    *See William H. Rankin Co. v. Assoc. Bill Posters of U.S.,* 42 F.2d 152, 155 (2d Cir.1930) (citing *Eastman Kodak Co. v. Southern Photo Material Co.,* 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1926)).

88    Without prejudging any of the evidence which may be proffered at trial, the court reminds counsel, and defense counsel in particular, that:

    There is no bright line that divides evidence worthy of consideration by a jury, although subject to heavy counter-attack, from evidence that is not. Especially because of the guaranty of the Seventh Amendment, a federal court must be exceedingly careful not to set the threshold to the jury room too high.

    *Brink's Inc. v. City of New York,* 717 F.2d 70, 711 (2d Cir.1983) (quoting *Herman Schwabe, Inc. v. United Shoe Machinery Corp.,* 297 F.2d 906, 912 (2d Cir.), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962)). Heeding that admonition in the present case may mean that when all is said and done, it will be a matter of weight and credibility as opposed to admissibility.

89    *See supra,* § IV(A).

90    In its damages memorandum, ITT states that this claim is in the amount of $120,561. ITT's Damages Memorandum at 45. That number is transposed; it should be $120,651.00.

91    A liquid penetrant inspection is a type of nondestructible test used to measure the acceptability of a given weld.

92    Plaintiffs' Appendix Vol. IV, Tab M at 1. This figure is inclusive of the $846,609.00 in overhead costs and the $2,401,874.00 in associated financing costs.

93    These four categories of damages total roughly $14.3 million.

94    The standard for granting a motion for summary judgment and the standard for granting a motion for a directed verdict under Fed.R.Civ.P. 50(a) are essentially the same. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Given the highly technical and complex nature of this litigation, combined with the fact that at trial there will undoubtedly be widely divergent opinions offered by the parties' respective experts, the advantage to the court (and to the parties) of a fully developed record is obvious.

---

End of Document                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.