# Exhibit A

F8S6GMLC1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

GM IGNITION SWITCH MDL
PLAINTIFFS,

                    Plaintiffs,

           v.                          14 MD 2543 (JMF)

GM IGNITION SWITCH MDL
DEFENDANTS,

                    Defendants.

------------------------------x

                                    New York, N.Y.
                                    December 15, 2014
                                    9:30 a.m.

Before:

                    HON. JESSE M. FURMAN,

                                    District Judge

                         APPEARANCES

HAGGENS BERMAN SOBOL SHAPIRO LLP
     Attorneys for Plaintiffs
BY:  STEVE W. BERMAN

LIEFF CABRASER HEIMANN & BERNSTEIN LLP
     Attorneys for Plaintiffs
BY:  ELIZABETH JOAN CABRASER

HILLIARD MUNOZ GONZALES LLP
     Attorneys for Plaintiffs
BY:  ROBERT HILLIARD

SIDLEY AUSTIN LLP
     Attorneys for Defendants
BY:  EUGENE A. SCHOON

F8S6GMLC1

1

2                          APPEARANCES (Continued)

3

4    KIRKLAND & ELLIS, LLP
          Attorneys for Defendants
5    BY:   ANDREW B. BLOOMER
          RICHARD C. GODFREY
6          ROBERT C. BROCK

7    DELPHI AUTOMOTIVE SYSTEMS
     BY:   JOSEPH PAPELIAN
8
     KING & SPALDING, LLP
9    ATTORNEYS FOR DEFENDANTS
     BY:   ARTHUR STEINBURG
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F8S6GMLC1

1              (In open court; case called)

2              THE DEPUTY CLERK:  In re:  General Motors, LLC,

3     Ignition Switch Litigation.

4              Counsel, please state your name for the record.

5              MS. CABRASER:  Good morning.  Elizabeth Cabraser for

6     plaintiffs, your Honor.

7              MR. BERMAN:  Good morning.  Steve Berman for

8     plaintiffs.

9              MR. HILLIARD:  Good morning, Judge.  Bob Hilliard for

10    plaintiffs.

11             MR. PAPELIAN:  Joseph Papelian for Delphi.

12             MR. SCHOON:  Eugene Schoon for Delphi.

13             MR. GODFREY:  Good morning, your Honor.  Richard

14    Godfrey on behalf GM, along with Mr. Bloomer, Mr. Brock and

15    Mr. Steinburg.

16             THE COURT:  Good morning to all of you.  Welcome back.

17    It's been a little longer than usual, but it is nice to see you

18    all are having a good summer.  I think you have been a little

19    too busy to have a great summer and we'll leave it at that.

20             Just a couple housekeeping matters.  Just a reminder

21    to please speak loudly and clearly and slowly into the

22    microphone so that not only everybody in the courtroom can hear

23    you but also those listening in by telephone can.  Second, I

24    think you know that my law-clerk Ms. Adkins sadly moved on to

25    other places, namely, another chambers.  I think you have all

F8S6GMLC1

1    met, at least by e-mail, her replacement on this case, Beatrice

2    Franklin, but I wanted to make sure to introduce her.  I am

3    confident that she will equal Ms. Atkins in her ability to

4    assist me in this matter.  I look forward to working with her.

5    I also want to welcome a special guest, Justice Marl Weinberg,

6    who is joining us from the Court of Appeal of the State of

7    Victoria in Australia just to watch today.  I want to welcome

8    him.

9            With that let's get to the actual business of the day.

10    As you know I will follow the agenda letter that I endorsed

11    earlier this week and have a few other matters just here and

12    there.  With that let's get to Item No. 1, which is the

13    bankruptcy proceedings.  I did receive the letters that were

14    submitted to Judge Gerber in response to his order, and I

15    understand there is some disagreement with respect to the

16    issues that he should decide versus issues that some argue I

17    should decide and so forth.  I know that he has called a

18    conference for Monday.  I gather the bottom line is that I

19    think those are issues for him to address at least in the first

20    instance, though, obviously some things may come to me.  We

21    will see.  I will pay close attention to the progress of that

22    litigation and trust that between my communications with Judge

23    Gerber and you that I will be kept sufficiently up to date,

24    especially to the extent that it has a bearing on the

25    Bellwether trial, which obviously is my biggest concern.  I am

1    also concerned about the impact of whatever rulings on the

2    economic loss cases but the Bellwether trials are on a slightly

3    more expedited schedule that everybody is certainly aware of.

4    That is my biggest priority and concern.  The bottom line is,

5    as you have, make sure you up date me on any material

6    developments in that litigation and suffice it to say I am also

7    in communication with Judge Gerber directly.

8         I understand from your submission that the Second

9    Circuit has calendared the motion for direct appeal for

10   September 8th and that it is on submission, which I take to be

11   a reasonably good sign.  That is a good sign that they are

12   likely to grant the motion, which is now unopposed, but that is

13   obviously not up to me.  Assuming the motion is granted and the

14   Circuit accepts the direct appeal, I have no authority I am

15   sorry to say over the Circuit itself and I cannot tell it how

16   quickly to proceed.  However, I do have authority over you

17   since you are appearing in front of me and I would like you to

18   make a motion to the Circuit requesting that the appeal be done

19   on an expedited basis.  That is to say, it is not up to me

20   ultimately whether to grant that motion; but I am directing you

21   to make the motion and to make clear my view that so long as

22   bankruptcy issues are unresolved obviously I think hinders the

23   ultimate resolution of the MDL and the proceedings before me

24   and I think it would be in everybody's interests and my

25   interests and the case management over the MDL for the

1    bankruptcy proceedings to run their course as quickly as

2    possible.  So you are welcome to make my views known, not just

3    welcome, in fact you are directed to make my views know by

4    making a motion for expedited appeal.  Obviously it up to the

5    Circuit whether to grant that motion and ultimately up to the

6    Circuit whether to grant that motion and then ultimately up to

7    the Circuit in the first instance to take whatever time it

8    needs to decide the appeals themselves.

9            Aside from that I don't think there is anything else

10   that needs to be discussed on the bankruptcy front, but

11   anything that I have missed or that we need to discuss,

12   Mr. Hilliard?

13           MR. HILLIARD:  Your Honor, Bob Hilliard.  The

14   microphone has been moved up and I have made use of the

15   Criminal Code of Rules so you can hear me.

16           I need one clarification, your Honor, on the issue

17   that you spoke of initially in regards to discussing Judge

18   Gerber.  The paramount hot topic right now is whether or not

19   the post-accident complaints containing punitive damage and

20   gross negligence language will go in front of Judge Gerber.  Is

21   that what the Court was acknowledging?  If so, I can sit down.

22   I just wanted to be sure.

23           THE COURT:  I read your letters -- well, not your

24   letter but I think it was Brown Rudnick.  I read the letters

25   that were submitted to Judge Gerber and copied to me.  I have

F8S6GMLC1

1    talked to Judge Gerber about this.  I think there are three

2    issues that I can think of that sort of directly implicate and

3    relate to the Bellwether trials that I think everybody has an

4    interest in resolving sooner rather than later.  Who resolves

5    those is a separate question.  One is I think the elephant in

6    the room, namely, the punitive damages question.  The second is

7    whether and to what extent the conduct of old GM employees can

8    be imputed to new GM.  That is, employees who worked for old GM

9    and were hired by new GM.  The third is essentially what

10   effective, if any, his rulings have on the pleadings that are

11   filed with respect to the complaints filed with respect to the

12   early trial cases.  Those are the three that struck me as most

13   obviously relevant and necessary to resolve sooner rather than

14   later for the Bellwethers.  I think he is on the same page with

15   respect to that.  I know that there is a conference on Monday.

16   I think he plans to address those.  Again, I am going to leave

17   it to him, at least in the first instance, to essentially

18   decide sort of a process for resolving whether he is to be the

19   person to decide those or I am.  In any event, we'll sort of

20   take it one step at a time.

21        MR. HILLIARD:  I just wanted to be sure about the

22   elephant in the room because that is the big one.

23        THE COURT:  Yes.  I think everybody is aware of that.

24   Certainly I am and Judge Gerber is.

25        MR. HILLIARD:  Thank you, Judge.

F8S6GMLC1

1          THE COURT:  Anything else on the bankruptcy front?

2          Very good.  The second item on the agenda is

3   coordination of related actions.  I received new GM's most

4   recent submission yesterday and I will say that I have a call

5   into Judge Lopinot in Illinois, who has a hearing I gather

6   scheduled for next week.  It is an Austin matter.  I don't

7   think there is anything else that needs to be discussed on

8   that, but is there anything?  I can't imagine mush has happened

9   since yesterday.  Does anybody need to be heard there?

10          Third is new GM's document production.  I appreciate

11  your update on that front.  I assume that there is nothing we

12  need to discuss there as well.

13          Excellent.

14          No. 4, fact witness deposition update.  Let me address

15  here the dispute over the scope of the deposition of

16  Mr. Valukas.  One question is:  Can somebody remind me what the

17  date of that deposition is?  I just want to make sure I have it

18  on my calendar.

19          MR. BERMAN:  September 24th.

20          THE COURT:  September 24th?

21          MR. BERMAN:  Yes.

22          THE COURT:  So first and foremost I do want to say

23  that I wasn't thrilled with the plaintiffs' response to my

24  August 11th order, namely, the communication that was sent to

25  new GM with respect to the topics to be covered in the

F8S6GMLC1

1    deposition.  Certainly I don't think it complied with the

2    spirit of my order.  Whether it complied with the letter is a

3    different matter.  But a single sentence at that level of

4    generality doesn't strike me as advancing the ball meaningfully

5    here, but that obviously I think moots beyond that afterwards.

6         As far as I can tell I have reviewed your respective

7    letter briefs and the exhibits to them, including the more

8    detailed list of subject matters to be covered or proposed to

9    be covered.  I think they sort of fall into four categories.

10   Let me just address them kind of at that level and I am hoping

11   that this will more less resolve the matter and put most of

12   these issues to rest but we'll see.  I am not a big fan of

13   hiding the ball so I will say that I am largely in agreement

14   with the new GM on these issues, but I am not entirely.  So let

15   me specify.

16        Now, the first category is questions about the content

17   of the report, for example, about the accuracy of facts

18   disclosed in the report, recommendations made by the Valukas

19   team disclosed in the report and conclusions drawn in the

20   report.  My view is that questions that touch on those do

21   implicate the privilege and either would be a waste of time to

22   the extent that they would ask or call upon Mr. Valukas to read

23   what he stated in the report or would unjustifiably intrude

24   upon the privilege or work product to the extent that it would

25   call upon him to explain and justify his conclusions or his

F8S6GMLC1

1    thought processes and the like.  To the extent that the

2    plaintiffs seek to question Mr. Valukas about the facts

3    contained in the report, for example the cultural issues that

4    contributed to the delayed recall of the design and development

5    of the ignition switch, the knowledge or lack thereof of the

6    various officers and executives.  I just don't understand

7    Mr. Valukas to have any personal knowledge of those facts and I

8    think whatever knowledge he has of them he derived from his

9    investigation and from the interviews.  As you know from my

10   prior rulings in this case, many of you believe that the

11   interviews themselves are protected and therefore I think

12   questions of that sort would intrude upon the privilege and

13   work-product protection.

14          The second category is statements made by others with

15   respect to the report, namely, about the accuracy of the report

16   and the like.  Again, I agree with new GM that that line of

17   questioning is likely, if not inevitably, to intrude upon the

18   privilege and work-product protection insofar as it would

19   effectively force Mr. Valukas to disclose his opinions and

20   thought processes.  I don't know what the questions would be

21   intended to do other than basically confront Mr. Valukas with

22   the contrary opinions about facts set forth in his report and

23   ask him if it changes his mind or the like, which I think

24   essentially calls upon him to disclose his opinions and thought

25   processes and/or the content of the particular witnesses'

F8S6GMLC1

1    interviews, which again I have previously ruled are protected.

2    So that line of questioning I think is also impermissible.

3            Third is a question with respect to Mr. Valukas's own

4    public statements about the report, including his own written

5    and congressional testimony.  To the extent that it calls upon

6    Mr. Valukas simply to essentially read what is in those public

7    statements, I think that would indeed be a waste of time.  To

8    the extent it goes beyond that and develops into his thought

9    processes and opinions and the like, I think again it would

10   intrude upon the protections and privilege that I have already

11   ruled about.

12           That being said, I don't entirely understand or know

13   what the plaintiffs' intentions would be, what kinds of

14   questions they are looking for.  So I guess I am a little less

15   inclined to rule on a blanket basis that those sorts of

16   questions will be impermissible and I think I will just leave

17   you with that general view and we can either follow up in a way

18   that I will describe in a moment or deal with specific

19   questions as they arise at the deposition in the event that

20   there is an objection.

21           The last category that I see, which is what I

22   described as process questions, namely, questions about how the

23   report was created, that is, the attorneys who participated and

24   Mr. Valukas's own role and the extent of that role and the role

25   of King & Spalding as well as questions regarding Jenner &

F8S6GMLC1

1   Block's representation of new GM more broadly with respect to

2   the MDL with respect to other matters and the like.  I do not

3   think that those sorts of questions -- well, for the most part

4   I don't think that those sorts of questions would intrude on

5   privilege.  New GM does argue that some of the questions might

6   to the extent that they involve the disclosing of

7   representation of other matters might conceivably implicate

8   privilege with respect to those matters, but obviously as a

9   general proposition the fact that a lawyer is representing a

10  client in the matter that they are working on and the like

11  doesn't necessarily intrude upon privilege.  All of which is to

12  say I think we will have to take those questions as they come

13  and I am not going to sustain a blanket objection to that line

14  of questioning.

15          Having said that I am not entirely certain what the

16  relevance or purpose of those questions is or are.  Some of

17  this does go to my idea as how the plaintiffs propose and plan

18  to use the Valukas report at trial.  I suppose these sorts of

19  questions could be used, for example, to explore the bias or

20  impartiality of Mr. Valukas and maybe that would figure into

21  some sort of argument at trial with respect to the report.

22  Obviously to the extent that new GM has repeated represented

23  that it does not intend to offensively use the report and to

24  introduce it itself, I guess I am trying to figure out in my

25  mind how exactly this would be relevant.

F8S6GMLC1

1          Obviously one is always allowed to impeach one's own

2    witness and in that regard I suppose even if the plaintiffs are

3    the ones to offer the report and portions thereof I suppose the

4    same principle would seem to apply there and maybe they can

5    impeach the report even if ultimately this trial is not about

6    the report but about the defects in the particular accidents or

7    incidents involved.  That is where I stand at the moment.

8          Here is what I am going to do:  In light of those

9    rulings and in light of my sense that the plaintiffs really

10   have not articulated a particularly long list of subjects or

11   questions that do not intrude upon the privilege, I am going to

12   grant GM's request to limit the length of the deposition.  I am

13   going to grant plaintiffs three hours for the deposition unless

14   a showing can be made, and it can be made on an ex parte basis,

15   if doing so would require revealing deposition or trial

16   strategy.  That is a detailed showing of need for more time,

17   and by "detailed" I mean a showing with specificity that there

18   are questions or subjects that would not implicate the

19   privilege and would require time beyond the three hours that I

20   just set.

21         In light of fact that the deposition is scheduled for

22   September 24th, I am inclined to say I will give you, let's

23   say, two weeks, until September 11th to file that application.

24   Again, if it does reveal deposition or trial strategy if you

25   want for spell out the reasons and things like bias, etc., are

F8S6GMLC1

1    relevant for you to explore, then you are welcome to do so on

2    an ex parte basis.  Obviously to the extent that you can share

3    it with new GM or the public, which has an interest here, then

4    I would ask you to do that and limit what needs to be filed on

5    an ex parte basis.  That is how we will proceed and then to the

6    extent that we don't resolve things in advance of the

7    deposition, I will certainly make sure that I am generally

8    available on September 24th in the event that disputes arise as

9    to particular questions.

10           One last thing.  By prior order I indicated that any

11   party that believed I had temporarily granted the request to

12   file on a redacted basis, the submission order under seal of

13   submissions that were made in connection with this dispute and

14   I think my prior order I gave one week to any party that

15   believes that that should be maintained to support that and

16   argue and explain why that is consistent with the presumption

17   in favor of public access.  So obviously I will not rule on

18   that.  I remind you that you have a week from today in order to

19   make whatever showing you deem is appropriate on that.

20           Any questions?  Anything to discuss?

21           MR. GODFREY:  Your Honor, assuming that there is a

22   public filing or a redacted public filing, we might want a

23   chance to respond.  We can do it in five days if it is

24   acceptable to your Honor.  So we can do it by the 16th.

25           THE COURT:  That seems only fair.  So I will grant you

F8S6GMLC1

1   that.  Obviously if there is no public filing and it is only on

2   an ex parte basis, then you will have nothing to respond to.

3           MR. GODFREY:  Yes, your Honor.  That part I figured

4   out.

5           The second point is I think I should put a marker down

6   so that our position is clear.  We are going to get together

7   later today to discuss some motion *in limine* issues.

8           THE COURT:  Keep your voice up.

9           MR. GODFREY:  One of the motions *in limine* we intend

10  to file is the inadmissibility of the Valukas report.  One of

11  the challenges that we face, and I think one of the challenges

12  that your Honor has faced in trying to define what the purpose

13  of the Valukas deposition is from the plaintiffs' perspective

14  is on the one hand much of the papers -- the statements made in

15  the papers they have filed attack the validity of the report on

16  the basis that it is bias and it is unreliable, etc.  On the

17  other hand, they seem to be saying they want to use it.  Those

18  are fundamentally inconsistent positions that we disagree with,

19  that the report is bias.  We don't think it is admissible under

20  any exceptions of the hearsay rule.  In terms of deciding what

21  ultimately what questions can be asked, there ought to be a

22  purpose for those questions.  It seems to me it cannot be on

23  the one hand they argue that it is bias, that it's got hearsay,

24  that it's got all these problems; but on the other hand they

25  want to argue it is admissible.  Those are fundamentally

F8S6GMLC1

1    inconsistent positions and we should not waste time in a

2    deposition allowing them to pursue easily exclusively

3    fundamental inconsistent positions.  I put that down now

4    because it will be part of the briefing we have on the motions

5    *in limine* with respect to the Valukas report.

6            THE COURT:  Well, I am not going to rule on that issue

7    at this point.  It sounds like it is coming down the pike.  I

8    think it is more properly raised by motions *in limine* and

9    adequate briefing and the like.  Obviously for the most part

10   objections as to relevance and those sorts of objections are

11   objections you can preserve at the deposition, but there are

12   things that I necessarily need to rule on in the context of the

13   deposition itself.  Privilege, as you know, is a different

14   animal and beast altogether.  I appreciate the heads up on that

15   issue.  Though, I think I could have anticipated it myself.

16           Your letter indicated that you would be prepared to

17   propose a briefing schedule regarding a dispute with respect to

18   Category One, the deposition plaintiffs have requested.  Can

19   somebody elaborate and explain what that is?  And if you have a

20   proposed briefing schedule, I am all ears.

21           MR. GODFREY:  Your Honor, we made progress on this.

22   We don't have this issue quite resolved.  I hope that we could

23   have it resolved in the next four or five days.  If not, then I

24   would propose a brief -- one week from, I guess, Labor Day.  So

25   one week from next Tuesday I think simultaneous briefs on the

F8S6GMLC1

1   issue, but we have made progress on this.  Like many things

2   once you put it in the status agenda letter and we are going to

3   see you, we seem to have concentrated meet and confers.  It is

4   not quite done yet, but I am hopeful we can moot this issue.  A

5   week from this Tuesday simultaneous letter briefs of

6   three-pages should be sufficient I think.

7          THE COURT:  Given what you just said I am inclined to

8   make you come see me more often.  That's fine with me.  I am

9   not necessarily interested in ruining anyone's Labor Day

10  weekend.  So I am really happy to make the deadline the 8th if

11  that makes sense given the schedule.  You guys have a better

12  idea of whether and to what extent there is urgency here and

13  whether it will ruin your weekend.

14         Any objections to my making the deadline the 8th?

15         MR. GODFREY:  No, your Honor.

16         THE COURT:  The deadline for simultaneous letters not

17  to exceed three pages if there is any dispute.  If there is no

18  dispute -- it doesn't sound like the sort of thing that I need

19  to so order, but if there is anything that you need from me,

20  you can and know where to find me.

21         No. 5 is Bellwether expert discovery update.  I did

22  receive your letter of August 26th and I so ordered it this

23  morning.  It should be docketed later today.  That letter

24  indicated that there was a dispute or that the parties were

25  continuing to confer with respect to the two expert witnesses

F8S6GMLC1

1    and suggested that you might reach agreement before today's

2    conference, but I haven't heard anything or at least I don't

3    think I have heard anything on that.

4              So does anyone want to update me on that front?

5              MR. HILLIARD:  Judge, in reference to what Mr. Godfrey

6    said once the status conference is set, it looks like we have

7    begun to reach out again to our experts and give GM what they

8    are requesting.  I would be surprised if the dispute will

9    continue running much past today.  It is simply a scheduling

10   issue and not length of time but consecutive-day issue.  We

11   understand it is our responsibility to try to convince our

12   experts that given the truncated schedule that we're on, we

13   have to make some concessions and we're working with basically

14   Mr. Bloomer to be sure that they have a chance to take these

15   depositions timely.  Unless GM has a different position, I

16   believe we have it at the front of our burner so to speak and

17   we're working hard on it.

18             THE COURT:  All right.

19             MR. GODFREY:  I think that is an accurate statement,

20   your Honor.  I think we're down to one expert date and I have

21   no doubt we'll be able to resolve this.

22             THE COURT:  First, I appreciate your confidence and it

23   does sound like the thing you don't need to bother me with; but

24   why don't you put that in whatever letters are submitted on

25   September 8th if you can't reach agreement before then.  If you

F8S6GMLC1

1    need an extra page to do that, I am happy to give you up to

2    four pages for both those issues.  I will hope and trust that

3    you will be able to work that out.

4         I think Categories 6 and 7 can be and should be

5    addressed together, namely, the Bellwether complaint, motion

6    practice and then the Bellwether trial motions *in limine,*

7    *Daubert* motions and a pretrial order.  Actually, I should

8    mention maybe I will cover Item No. 8, deadlines and scheduling

9    for remaining Bellwether related trial cases as well and reveal

10   to you that I have finally managed to go through my schedule

11   and outline -- well, it is more than a proposed schedule for

12   the earlier trial cases.  It is a schedule unless and until I

13   order otherwise.  An order to that effect will be docketed

14   today as well.  I will give you that schedule now just so you

15   have it, but they will be an order on the docket as I just

16   mentioned.

17        Trial No. 1 is as we all know begins on January 11th

18   and I think you have said that I should plan to lay out four

19   weeks for that trial and three weeks for others.  That seems

20   fine by me.  Obviously, it is not an exact science as we all

21   know.  The other trials will be scheduled as follows:  Trial

22   No. 2, beginning on March 14th through April 1st.  Trial No. 3,

23   May 2nd to May 20th.  Trial No. 4 July 25th to August 12th.

24   Trial No. 5 September 12th to September 30th.  And Trial No. 6,

25   November 4th to December 2nd.  I know you requested not to

F8S6GMLC1

1    schedule anything in July.  I tried to honor that, but for

2    various reasons I had to sort of eat into the last few days of

3    July.  As the order will state or does state that is the

4    schedule unless and until I order otherwise.  Obviously there

5    may be conflicts or there may be other reasons that will

6    justify moving things around so I want you to let me know

7    promptly if there are such things.  You should confer with one

8    other and to the extent that you can make proposals for

9    revisions if that is necessary.  You should do that, but let's

10   try to sort that out sooner rather than later.

11       We also do need to -- this relates to Item No. 7 --

12   set pretrial deadlines for each of those trials and per the

13   order I would like you to confer with one another and submit a

14   hopefully agreed upon proposed order.  I think it would make

15   sense to set standard deadlines for each of the trials.  In

16   other words, X number of days or weeks prior to trial would be

17   the deadline for a joint pretrial order, for motions *in limine*,

18   for *Daubert* motions and the like.  I didn't put this in the

19   order but it does make sense, I assume that whatever rulings I

20   make, for example, in connection with the first Bellwether

21   trial -- I am thinking out loud here and it is a little

22   dangerous -- I wouldn't think there is res judicata with

23   respect to the subsequent trials since they involve different

24   parties; but I do want to figure out some process to ensure

25   that we don't have to relitigate the same issues over and over

F8S6GMLC1

 1    again.  So maybe some sort of process where the losing party

 2    can show cause or the party that would be on the losing end of

 3    the subsequent trial involving the same issue could show cause

 4    why the ruling would not apply.  Something of that sort would

 5    maybe make sense to spell that out in advance so that we can

 6    streamline this to the extent possible.

 7          One further word on the early trials.  I will tell you

 8    now that I am not committing myself to trying all of them

 9    myself.  I may.  Maybe I will decide that this is my lot in

10    life.  This case is not my only case as you probably know.  I

11    do have other trials and cases that I need to tend to and with

12    all due respect I imagine that I might be both sick of these

13    issues and sick of you by the time we get to the sixth trial.

14    Maybe not.  Maybe not.  In any event, I may ultimately try to

15    draft some of my colleagues to step in and try one or more of

16    the cases.  First of all, I am not doing that just yet.  My

17    plan is to try the first few so we can work most of the issues

18    and kinks out as much as possible.  I just want to give you

19    fair warning it is possible that some of these cases may end up

20    with other judges.

21          One last thing on that.  Per Order No. 60, that is the

22    order after the June pretrial conference, you were supposed to

23    let me know whether entry of a supplemental Bellwether order

24    for actions subject to recalls, other than the Cobalt and Ion

25    ignition switch recalls, should be entered but your agenda

1    letter was silent on that.  I assume in light of that it is not

2    time to do that, but I just want to make sure that that didn't

3    fall altogether off the radar screen.

4         MR. HILLIARD:  A little of both.  I think we have

5    addressed that.  I think you are probably right.  I would like

6    a chance to focus on it with Elizabeth and Steve.  I think your

7    views are probably true and that is not going to need them, but

8    quite frankly I just forgot about that one Judge.  We can meet

9    after this and let the Court and GM know quickly whether or not

10   your inclination is right.

11        THE COURT:  I think I have done what I need to do,

12   namely, just putting it back on the radar screen so you can

13   give it thought and make sure it is not forgotten.  If anything

14   is appropriate, you can let me know.  I will assume if I don't

15   hear back either before the next conference or in connection

16   with the next conference that it is a nonissue for the time

17   being.  I will leave that up to you.

18        Going back to Item No. 6 and 7 and beyond what I just

19   said.  The complaints were due to be filed and I think were

20   filed on August 7th.  Answers are due by September 4th.  Order

21   No. 25 set deadline for motion practice with respect to the

22   first Bellwether trial.  That is I think the Shower case.  The

23   question I have with respect to Items 6 and 7 on the agenda

24   list is just what else do you anticipate, and I think there was

25   a suggestion that you might want to change some of the schedule

F8S6GMLC1

1    that was set by Order No. 25, and so what are your thoughts?

2            MR. GODFREY:  I will break them into two categories.

3    As to the motion practice on the first Bellwether trial, our

4    answer to the pleading is due the 4th.  We agreed that if we

5    file motions, and if it is agreeable to the Court of course,

6    plaintiffs would ask three weeks to respond.  We will take 10

7    days to reply.

8            THE COURT:  Do you anticipate at this time that you

9    are filing a motion?

10           MR. GODFREY:  I do.  Although, some of it may be

11   resolved.  There is a choice of law issue that I think we have

12   reached a resolution on this morning.  We need to have a

13   further question on that.  If we resolve the choice of law

14   issue then that will resolve certainly part of the motion.

15   Right now I would say yes pending further discussions.

16           THE COURT:  Why would the choice of law issue be--

17           MR. GODFREY:  Well, if the plaintiffs agree that the

18   law of the individual state applies to some of the laws they

19   have pled, then those counts will have to be dropped or repled.

20   In other words, for example, a person who has asserted choice

21   of law in Michigan, we think Michigan law does not apply

22   because we think the place of the accident applies.  So if they

23   agree with us -- I think Mr. Hilliard have an agreement in

24   principle -- we need to look at the actual pleadings.  Then I

25   think that probably drops off.  Otherwise, we'll brief the

F8S6GMLC1

1    choice of law issue on each of the complaints.  Each of these

2    six complaints raises that issue for example.

3            THE COURT:  Fair enough.

4            MR. GODFREY:  The second category is Mr. Hilliard and

5    I and Mr. Brock have worked out a proposed amendment.  We

6    didn't quite get it in time to circulate it before the hearing,

7    but we would like to file later today.  Basically it reasonably

8    and aggressively moves some dates up and some dates back.  Some

9    of the dates that are under the Court's current order were

10   things due December 4 or December 5, we have moved up into

11   mid-November.  Other dates, particularly the motions *in limine*

12   and the *Daubert* motions, we have sequenced.  So we have four

13   different dates for motions *in limine* with the last date being

14   December 4.  The second to last date being November 10th, the

15   current date.  The two earlier dates and with stress provision

16   in the proposed order that says, You cannot file anymore than

17   one-quarter of your motions *in limine* on the last day.  We're

18   trying to sequence them because some of these are more

19   challenging, if you will, in terms of the issues.  So we want

20   to file motions *in limine*, for example, on a consent decree.

21   It should be admissible.  We want to file a motion with respect

22   to the admissibility of the Valukas report.  So we've got a

23   schedule worked out and the design is to be consistent with

24   your Honor's front end loading as much as possible, but it is

25   something that we think the parties both agree on.  I am

F8S6GMLC1

1    prepared to tender up a copy, but I think I would rather file

2    it and have everyone look at it for your Honor's consideration.

3    The plaintiffs have agreed with us.  We've work this out.  We

4    finished it late yesterday.  I think your Honor will see what

5    we're trying to accomplish in terms of making it liveable for

6    the Court but also on a rational schedule sequence.

7              THE COURT:  Why don't I reserve judgment until I see

8    your submission later today.  I guess the only question I have

9    with respect to the motion practice with respect to the

10   complaint, I don't think in principle I will have an objection

11   to the three weeks and 10 days for any opposition and reply but

12   I do need a little bit of time to decide some of these motions

13   and I don't want to run into trouble with the rest of our

14   schedule or give myself unreasonable deadlines to decide

15   things.  To the extent you need decisions on certain things

16   before you get to other things, I want you to keep that in mind

17   and I would rather shorten briefing schedules accordingly if

18   there is a need for rulings on certain things is what I am

19   trying to say.

20             MR. GODFREY:  Let me do this, let me go back.  If we

21   believe that one of the elements of the motion matures, a

22   motion *in limine or Daubert* motion or something like that, in

23   other words presenting problems for later sequence motions,

24   we'll alert the plaintiffs and we will alert the Court and then

25   we can discuss adjusting the briefing schedule accordingly.  I

1    don't anticipate that, but I need to go back and look at that

2    because I think there is a fair point we need to consider.

3         THE COURT:  The other thing I would be interested in

4    knowing is if anyone anticipates the need for a *Daubert*

5    hearing.  It is one thing if there is just a motion that can be

6    decided on the papers.  If there is a need for a hearing and I

7    don't know how substantial the issues are here or even what the

8    issues are, then that is something that needs to be factored

9    into the schedule and alike.

10        MR. GODFREY:  It's a bit premature but we think there

11   is a distinct possibility of that.  As soon as we would believe

12   that, we'll let the Court know.  I had understood the request.

13   It is an appropriate request from our perspective.  We'll let

14   the Court know as soon as possible.

15        I would like to raise two other issues.  I think

16   Mr. Hilliard and Mr. Brock -- Mr. Brock is leading the trial

17   teams in products for us.  I would like them to discuss with

18   the Court two issues that are in the draft order.  One is voir

19   dire and the other is the jury questionnaire.  I think you

20   should hear our views on that as part of that.  So you don't

21   just get the draft order and say, Why do they have this in

22   here.

23        THE COURT:  Before you do that, Mr. Hilliard, anything

24   you want to say with respect to the matters we just discussed?

25        MR. HILLIARD:  There is.  I think as the Court is

F8S6GMLC1

1    probably aware the heavy judicial lifting in these Bellwethers

2    is going to occur in this first trial.  The general motion *in*

3    *limine* that you are going to need to schedule and make time for

4    between the *Daubert* motions as well as the general causation

5    motions will not be reheard later.  It will be specific

6    causation motions.  Just to advise the Court the time necessary

7    as you've kind of caught onto is going to be significant as to

8    very important issues.  So since it is September already and we

9    start our first trial in January, I think both sides need to be

10   prepared to have the time necessary and give the Court the time

11   necessary to make the general causation and first wave of *in*

12   *limine* motions.

13           THE COURT:  I agree.  Also keep in mind the last days

14   of December are probably not days that you should assume

15   general availability on my part.  Whether you guys are working

16   or not is not my concern.

17           Mr. Brock.

18           MR. BROCK:  Briefly, your Honor.  The issues of the

19   voir dire and jury questionnaire are linked, your Honor, and

20   what we would like to propose to the Court is that the parties

21   would jointly work out a questionnaire, a written questionnaire

22   to be utilized with the jury panel.  Our suggestion would be

23   that once you know the panel that we will be picking from that

24   we would let them fill out the questionnaire.  It would have

25   questions that we're interested in as well as the plaintiffs.

F8S6GMLC1

1   It would be agreed upon.  It would agreed upon what the

2   questions should be.  In the midafternoon or potentially even

3   the morning of the second day if there are other things that we

4   can be doing on day one, we would bring the jury back in after

5   having a chance to review those questionaries and we would ask

6   that the Court permit some limited voir dire of the jury based

7   on what we learn from those questionnaires.  It is a process

8   that has worked very well in other cases, especially cases that

9   are prominent and where you have a lot of publicity as a way to

10  get information from jurors.  It is helpful to both sides.  It

11  is a pretty efficient way of doing it.  I don't think it slows

12  the process down significantly.  I know it has been very

13  helpful to both sides in other cases.  That was the proposal

14  that we would like the Court to think about at least.

15          THE COURT:  This is something I also anticipated.  I

16  need to give it some thought.  The question I have is I don't

17  know what the proposed order says with respect to this, and

18  before I commit to doing this I think I would want to know what

19  the proposed questionnaire actually looks like.  I will tell

20  you that I am inherently skeptical of using questionnaires as

21  part of voir dire notwithstanding what you just said.  My view

22  is it does tend to be inefficient and take a lot of time.

23  Having said that I think it is appropriate in certain kinds of

24  cases and given the nature of this case, it may will be

25  appropriate here.  I also want to give some thought if we are

F8S6GMLC1

1   going to use it as to how it is done.  I have never done it as

2   a judge; but on cases I was involved in in my prior life

3   involving a questionnaire, I think the general practice the way

4   it was done, and maybe this is a general practice in this

5   court, is to actually have the jury panel in on one day and

6   fill out the questionnaire and then essentially come back a

7   week or so later after the parties have had an opportunity to

8   go through them and make challenges for cause and discuss with

9   the Court issues that need to be followed up upon and so forth.

10  That might make more sense than doing it on day two and expect

11  that you all or I would have been able to process it.  So I

12  guess that is a long way of saying I think I want to know what

13  the proposed questionnaire would look like, give it some

14  thought and give thought to what impact that has and how it

15  should be implemented with respect to the schedule.  One option

16  is to essentially move the beginning of one year for

17  questionnaire purposes at least to the prior week, the week of

18  January 4th, bring the jury in and have them fill out the

19  questionnaire with the anticipation we will continue with voir

20  dire on the 11th.  I don't want to lose a week on the other

21  side.

22       MR. BROCK:  We've done it both ways.  We have also

23  done it in scenarios where the questionnaires have been mailed

24  out to jurors and they bring it in with them.  I think a week's

25  lag where they are doing it sort of under the supervision of

F8S6GMLC1

1    the Court after they have been in and they have been given the

2    instructions not to investigate the case, that type of thing,

3    in that week between the time they do the questionnaire,

4    because they will know the general subject matter of the case,

5    and when they return, it is very workable.  I have found that I

6    don't feel so good about it if we mail them out a month ahead

7    of time.  There is too much opportunity there for searching

8    minds to think about what they might be doing when they get to

9    court.

10            THE COURT:  I will tell you I am not inclined to mail

11    it out.

12            MR. BROCK:  We don't think so either.

13            THE COURT:  I think it will be important for me to

14    have folks in here and give them general instructions and

15    emphasize the need for discretion and what they can and cannot

16    do.

17            I will look at your proposed order.  I will speak to

18    some of my colleagues who have done this in other cases and get

19    a sense of what the most appropriate course would be.  I don't

20    know if the proposed order has anything in it with respect to

21    when you would submit a proposed questionnaire, but again I

22    think I would probably want to see it to figure out whether the

23    questionnaire is appropriate.  If it is not in the proposed

24    order today, why don't you talk with one another and figure out

25    when and how you could submit that to me.

F8S6GMLC1

1           One another thing that you should just think about --

2    again, thinking out loud which is dangerous -- but I know in

3    other cases where questionaries have been used, needless to say

4    it is often in high profile cases and this is certainly one of

5    those, the issue that arises is public access and press access

6    to those questionnaires and you want to give some thought to

7    that and think about it with respect to the questions you put

8    on it.

9           MR. BROCK:  So the process we have used in other

10   matters, your Honor, is that we would be responsible for

11   helping the Court with having the appropriate number of copies

12   available for use by the Court for the jurors to fill out and

13   then we would certify to either the destruction of those

14   materials or a return of them to the Court after we have

15   completed our use of the materials.  Those questionaries in our

16   view would not be available for public view.

17          THE COURT:  Well, the press may have a different view

18   on that.

19          MR. BROCK:  That would be up to you of course, yes,

20   your Honor.

21          THE COURT:  As with most things.

22          MR. BROCK:  I just want to say I think there are

23   things that we can do, whatever you decide, to have the

24   appropriate protections for that if that is what you feel is

25   the right thing to do.

F8S6GMLC1

1          THE COURT:  Obviously there are various interests

2     including privacy interests of prospective jurors and I

3     recognize that.

4          Mr. Hilliard, anything you want to add on this?

5          MR. HILLIARD:  To weigh in from the plaintiffs' side,

6     Judge, is in a case like this I think the questionnaire will do

7     a number of things.  It will save I think extraordinary time if

8     the Court allows a pretty detailed questionnaire, which we used

9     in the past, as has GM, and it will also allow the Court to

10    consider strikes for cause.  And there will be quick answers

11    based on my experiences where you will be able to say, No

12    question about it, and we can move through this process quickly

13    without a potential answer from a potential problem issue

14    coming up generally.  Mr. Brock is right that the need to

15    really be in tune I think on a case like this to jurors being

16    straight up and clearly informed as to what their obligation is

17    is paramount to both sides.  Once the questionnaire is filled

18    out -- well, I need one clarification.  Is the Court

19    considering giving the non-answered questionnaire out?  I mean,

20    the non-answered questionnaire would seem to be -- if the press

21    wants to get it, I would assume that is an issue of not giving

22    it.  I agree with the Court's belief, you cannot give

23    questionnaires out.

24          I am not sure it is so clear cut.  Certainly the

25    unanswered questionnaire I don't see any issues with and I

F8S6GMLC1

1    think the press would be entitled to and the public would be

2    entitled to it.  I don't think it is so clear cut that they

3    wouldn't be entitled to some portions of the answers.  One,

4    simply because my decisions as to who to strike for cause and

5    alike are obviously based upon judicial documents.  If there

6    are privacy interests that would justify redacting and sealing,

7    that is one thing.  This came up.  I was involved in the

8    Ghailani prosecution where Judge Kaplan used a questionnaire

9    and ultimately redacted versions of the jury's completed

10    questionnaires were provided to the press sort of on that

11    theory.  I don't remember sitting here whether it was litigated

12    or that was just sort of done by agreement.  I am just flagging

13    this as an issue that you might want to give some thought to.

14    It might make sense to give some thought to it in connection

15    with the design of the questionnaire so more private

16    information can be more easily redacted if that is the

17    direction that I ultimately go.  I just wanted to flag it.  I

18    think you all know that public access is something that I do

19    take pretty seriously and give a lot of thought to.  Also,

20    anticipate that the press when it comes to trial may make their

21    voices heard if I don't do what they think I should be doing.

22    Just flagging it as an issue.

23        MR. HILLIARD:  Some clarification from the Court.  In

24    regards to numbers of jurors, I came in and watched your Heyman

25    voir dire and I am very interested in how that ended.

F8S6GMLC1

1          THE COURT:  Defense verdict.  I am assuming you want a

2    different one here.

3          MR. HILLIARD:  I watched how the voir dire was

4    conducted in the questionnaire.  I think maybe right now is not

5    the time, but sooner rather than later maybe some discussion

6    between the Court and the parties where we can start it and

7    provide a view as to how we would foresee and propose the first

8    number of potential venire that would come in and then how the

9    actual inquiry would occur between the Court and the potential

10   jurors.

11         The other question that is still on the table is:  Do

12   the parties get a chance for limited voir dire based on any

13   answers to the questionnaires.  We would join GM and like the

14   Court to consider giving us permission for some limited

15   opportunity to inquire of potential jurors on specific

16   questions.

17         THE COURT:  I will look for your proposed order later

18   today and then this is obviously something we should discuss at

19   greater length and nail down as much as possible.  So to the

20   extent that we don't do that before the October 9th conference,

21   let's certainly make sure we discuss it then and continue to

22   discuss it as much as needed.

23         I don't think I need to give you the answers on those

24   issues now, but I would be curious to know, for example, how

25   many people you think should be impanelled for voir dire.  I

1    will check with my colleagues and the jury folks to see if they

2    have any thoughts but obviously that too is not an exact

3    science.  If you have thoughts, certainly I am open to hear

4    them.

5             MR. HILLIARD:  Do you seat eight with any alternates?

6             THE COURT:  My typical practice in standard civil

7    cases is to seat eight.  In this case I would at least consider

8    seating more than eight just on the theory that, number one,

9    the trial is likely to be a little bit longer, on the longer

10   end of things; and, number two, given the subject matter and

11   the high profile nature of it and the fact that there is likely

12   to be press coverage, I can imagine circumstances arising where

13   jurors end up being excused during the trial and I certainly

14   don't want to retry a case if we can avoid it.

15            MR. HILLIARD:  The other thing that is brewing is as a

16   practical matter there is a ton of documents that can be pretty

17   sophisticated.  IT folks from both sides the sooner we know

18   which courtroom we are going to be in and what internal

19   information or technology is available, they are asking from

20   both teams and my hope is that we can share a lot of the IT

21   between the parties.  As soon as we know where we're going and

22   what is available, the better.

23            THE COURT:  That's a fair point.  It is something I

24   will think about sooner rather than later myself.  So I will

25   let you know.  Again, I don't know we need to get into the

F8S6GMLC1

1   other voir dire issues raised.  I will tell you right now that

2   I do not typically allow lawyers to conduct voir dire

3   themselves.  That is not generally the practice in this

4   district.  I think that is for all sorts of good reasons.

5         MR. HILLIARD:  The process where he had a week between

6   the preparation of the questionnaires and the selection or even

7   just a few days, it would give us adequate time just to

8   consultant a few questions that we might have and we would ask

9   if that might be something the Court would consider?

10        On the issue of technology if we were to be in this

11  courtroom or another courtroom, what we would probably like to

12  do is have our tech people as well as the plaintiffs' tech

13  folks actually come in.  They don't need the lawyers for that.

14  Just to see what the rules of process would be in terms of

15  where tables can be, what your preference would be on

16  electrical outlets and that type of thing.  They can work most

17  of that out.  I am sure you have done that in other cases.

18        (Continued on next page)

19

20

21

22

23

24

25

F8s4GML2

1          THE COURT:  Yes, I have.  In most cases, just the week

2     before.  Here, I think it probably does make sense for me to

3     figure out what courtroom we will be in, to give you an

4     opportunity to come in even before that.

5          My inclination is -- just, again, thinking out loud --

6     not to try it in this courtroom, number one, because I would

7     anticipate there might be a lot of folks who want to attend,

8     and we have larger courtrooms; number two, as we all know, the

9     acoustics in here are challenging.  As beautiful as it is, as

10    much as I love my own courtroom, I think my inclination would

11    be to find a bigger courtroom, either downstairs in this

12    building or even one of the ones across the street, where the

13    acoustics are probably the best.

14         I don't know if you have any view on the size of the

15    courtroom.

16         MR. HILLIARD:  Again, as a practical matter, I

17    envision there will be either introduced pieces of evidence or

18    demonstrative evidence, given this is a car ignition cases,

19    which would be fairly large.  On wheels, it will need to be

20    moved around fairly freely for the expert to look at it, the

21    expert comes down and talks to the jury about it.  So the more

22    freedom around counsel table for bigger exhibits, given the

23    type of case, probably the easier it goes.

24         THE COURT:  You're not planning to bring a car into

25    the courtroom; are you?

F8s4GML2

1              MR. HILLIARD:  Is that work product?

2              THE COURT:  You don't need to answer that now.

3              I will start to think about this and talk to the

4    relevant folks in the court about it.

5              Anything else we need to address on that front?

6              Okay.  I appreciate your thinking these things through

7    well in advance of the trial.  Obviously, I really do want to

8    sort as much out both legally and practically in advance of

9    trial as we can.  It is in everyone's interests.  I want to

10   ensure that when the trial actually starts and we have a jury

11   in the box, we don't have to delay for any sorts of things like

12   that.  I really do appreciate your thinking these things

13   through and bringing them to my attention well in advance and

14   teeing them up for resolution.

15             Item number 9 is the motion to compel.  I don't think

16   there is anything we need to discuss on that.  I granted the

17   application for New GM and King & Spalding to file sur-replies.

18   They are due by September 4th.  I will do my best to decide the

19   motion as quickly as possible.

20             Item 10 phase three discovery plan, I'm not sure there

21   is anything for us to discuss there.  My question is:  Should I

22   give you a deadline for any submissions on that?

23             MR. BERMAN:  Perhaps the deadline should be five days

24   before the next status conference.

25             THE COURT:  Mr. Godfrey?

F8s4GML2

```
 1          MR. GODFREY:  October the 4th would be fine with us,

 2   your Honor.

 3          THE COURT:  October 4th is a Sunday.  Let's make it

 4   October 2nd, to avoid the Sunday, and that Monday and Tuesday

 5   are Jewish holidays.

 6          Item number 11, privilege challenges.  I would be

 7   curious to know what may be coming down the pike; that is to

 8   say, what kind of issues we're talking about, how many, and if

 9   you're in a position to make a proposal now about how I should

10   resolve any disputes.

11          MR. GODFREY:  I think there are two buckets of issues.

12   All of the parties have made progress on the meet-and-confers,

13   not surprisingly.

14          One bucket relates to the privileged clawbacks.  We

15   have narrowed the issues of the dispute.  We may be able to

16   resolve that without the need of court assistance.  I think we

17   would know that within a week.  If you say within a week we

18   will know if we have a dispute that is worth fighting about,

19   then maybe a week later, letter briefs on it.  That would work

20   from our perspective if that works from the Court's

21   perspective.

22          THE COURT:  I should alert you -- I assume you have

23   systems in place to read everything that I write -- I'm

24   kidding, you don't actually need to read everything I write --

25   but a couple of days ago I issued an opinion in a case United
```

F8s4GML2

1    States versus Wells Fargo -- if I remember correctly, the

2    docket number is 12-7527 -- addressing an application in that

3    case to clawback or for reproduction of documents that were

4    clawed back by the plaintiff, by the government in that case,

5    and I did rule on that.  It may inform your discussions on the

6    meet-and-confer on that issue.  I would advise you to look at

7    that.

8         MR. GODFREY:  We are familiar with that matter.

9         As I say, we have narrowed the area of disagreement.

10    I think it is going to end up by agreement, but we may want to

11    amend current order 10.  There's a dispute about

12    interpretation.  So the current discussions are centering on is

13    a better way to solve this just to amend order 10 in a way that

14    is mutually agreeable to the parties.  That is one bucket.

15         The second bucket I'm less certain about the status.

16    At various points in time, the plaintiffs have suggested that

17    they would like to have what we would describe -- I don't mean

18    to be pejorative about this -- categorical challenges.  We

19    think privileged documents need to be challenged

20    document-by-document.  They have raised the issue of

21    categorical challenges.  I'm not sure I fully understand.  I'm

22    not sure where this ends up.  We're in the fairly early stage

23    of discussion about this.  Again, I would hope that we could

24    either narrow it or resolve it.  That is under discussion.

25    That is a recent issue.  That may be coming in a couple of

F8s4GML2

1    weeks.  We're working through that issue.

2              THE COURT:  It sounds like you should continue to meet

3    and confer on both issues, and it is in your interests to tee

4    it up for me to resolve sooner rather than later if there are

5    things that you can't work out.

6              With respect to the first thing, I already mentioned

7    my opinion in Wells Fargo.  With respect to the latter, I will

8    just say, to me, it depends on how many documents we're talking

9    about.  If we're talking about 2,000 documents, I can assure

10   you that I'm not going to go document-by-document for 2,000

11   documents and make separate rulings.  You need to figure out

12   some process where you can pick some representative sample of

13   the universe of documents, and I will give you rulings on

14   those, and then you can apply those rulings to the rest of the

15   documents.  Or I expect you to organize them into categories

16   that I can rule on them in a more categoric basis.  If there

17   are only 15 documents, it's a different story, I'm open to

18   doing it on a document by document basis.  It really comes down

19   to the devil is in the details.

20             MR. GODFREY:  In the past, we have done the former

21   suggestion of your Honor, where we try to pick representative

22   samples that would provide guidance that would be more broadly

23   applied.  That is both an efficient and I think instructive way

24   to proceed.  As I say, we're in the beginning stages of

25   discussion; and hopefully, we will either resolve this issue

1   centrally or have a proposal as to how the Court resolves it.

2            THE COURT:  That's fine.  There, too, you may want to

3   look at the Wells Fargo case, where I have resolved a number of

4   privileged disputes, and you may take some guidance there.  I

5   don't think there is a categorical approach to these things

6   that should be applied in every case.  It does depend on the

7   particulars and the like.  Be charitable to me.

8            All right.  Anything folks at the front table need to

9   say on that score?

10            I'm not going to set a deadline there.  I think you

11   should continue to meet and confer with the understanding that

12   if you can't resolve something, it is in everybody's interests

13   to raise it with me sooner rather than later.

14            Item 12 is settlement.  I'm content to know that it's

15   on the radar and that you are talking about.  As I have said

16   before, if there is any way that I can assist those discussions

17   or whatever in this context, you should obviously let me know

18   in whatever way would be appropriate.

19            All right.  Other issues.  I think it gets to the

20   stuff in my endorsement.  First, the dispute over

21   Mr. Robinson's deposition.  Having reviewed your briefs and the

22   transcripts, I sustained GM's objections and instructions to

23   Mr. Robinson not to answer the questions at issue,

24   substantially for the reasons stated in New GM's letter.

25   Although conversations between Mr. Robinson and his

F8s4GML2

1    supervisor-to-be did not involve a lawyer, Mr. Robinson was and

2    is not authorized to waive New GM'S privilege.  And the

3    questions asked ultimately, in my judgment, do call for him to

4    divulge privileged and otherwise protected communications;

5    namely, what he was asked by the Valukas team and what he said

6    in the context of his interviews.

7           I did get requests to seal or redact some of those

8    submissions.  I think I'm in a position to rule on those.  New

9    GM's motion is granted in its entirety.  Plaintiffs' motion is

10   also granted, except that I don't see any reason or basis to

11   redact the substance of footnote 1 on page 2 of plaintiffs'

12   submission.

13          I don't know if anyone wants to be heard on that or

14   explain to me why you think that that ought to be redacted if

15   you have it in front of you.

16          MR. BERMAN:  We're fine with the ruling, your Honor.

17          THE COURT:  Very good.  If you could refile by the end

18   of Monday without that redaction, that would be great.  If both

19   sides can submit the sealed records by the end of Tuesday,

20   copies of the unredacted memoranda and any exhibits that are to

21   be filed under seal, that would be great.

22          All right.  Next item is there are various motions to

23   vacate or reinstate and motions to dismiss that are pending,

24   and let me run through those and resolve those that I think can

25   be resolved.

F8s4GML2

1          First, there is a motion to vacate the dismissal in

2     the Dowling case, that is 15 CV 2033, docket number 1230 in the

3     MDL docket.

4          I take it, that is unopposed by New GM?

5          MR. BLOOMER:  That's correct.

6          THE COURT:  That motion is granted.

7          Second is a motion to vacate the dismissal with

8     respect to Lisa Marino, in 14 CV 8385, that is docket number

9     114 in the member case docket.

10         I take it that is also unopposed; is that correct?

11         MR. BLOOMER:  I believe so, your Honor.  That is not a

12    name I had.  I had three names.  I'm guessing you're right, but

13    if we could inform the Court later this afternoon whether there

14    is any opposition, if that is acceptable to the Court, I would

15    like to do that.  I would like to check with our staff.

16         THE COURT:  Sure.  Let me know by letter later today,

17    and I will defer decision until I hear from you.

18         All right.  Next is New GM'S motion to dismiss with

19    prejudice, at docket 1248.  That is a motion to dismiss a few

20    Plaintiffs' claims.  One of those is the same Lisa Marino,

21    actually, and she is the one plaintiff who has opposed that

22    motion.

23         Now, I assume your letter today will speak to that

24    issue, as well, obviously.  If her motion to reinstate and

25    vacate prior dismissal is granted, I would assume it moots the

F8s4GML2

1  motion to dismiss with prejudice, but I will wait until I get

2  your letter to figure out what the story is there.

3          MR. BLOOMER:  We will address it in our letter.

4          THE COURT:  A second plaintiff on that list, John

5  Cameron, is the subject of a pending motion to withdraw by

6  counsel that will be fully briefed on September 4th, docket

7  1245.

8          My inclination and plan is to defer deciding the

9  motion to dismiss with respect to him, out of an abundance of

10  caution, until the time passes to brief the motion to withdraw,

11  to make sure that he is given every opportunity and notice of

12  the potential dismissal.  I will defer that at least until

13  September 4th, and then we can take it from there.  If he does

14  not appear in connection with either motion, then I assume the

15  motion to dismiss will be granted, and that would moot the

16  motion to withdraw, I think, but again, I will wait until

17  September 4th.

18          That leaves a few other plaintiffs:  Joseph Hamilton,

19  Stephanie Hamilton, Galisha Hayes, and Darlene Robinett.

20          Mr. Hilliard, I don't know if you have any information

21  concerning those plaintiffs or made any efforts to communicate,

22  successful or otherwise.  I guess I'm asking you that now.

23          MR. HILLIARD:  As the Court knows from the letter we

24  filed yesterday, we're in the process of reaching out to some

25  of the clients.  I apologize, your Honor.  I can't give you

F8s4GML2

1   specifics as to the names that you just mentioned.  I am

2   prepared to tell the Court that I will provide you specifics as

3   soon as I can send an email or text right after this hearing.

4   I simply don't have the information at hand with regards to

5   those plaintiffs.

6            THE COURT:  Why don't you let me know ideally by

7   letter today but certainly no later than Monday, and I will

8   defer decision on that motion until you make that submission.

9            I think Ms. Robinett is, actually, technically pro se.

10  She is one of the plaintiffs who appeared pro se and was the

11  subject of orders related to that.

12           In any event, I just advise you of that.  If you look

13  at New GM's motion, 1248, the exhibit to that motion should

14  have the relevant list.  And Ms. Marino and Mr. Cameron are in

15  a separate bucket, but it is the other ones that you should let

16  me know about.

17           MR. HILLIARD:  I will, Judge.  Thank you.

18           THE COURT:  All right.  The next motion is the motion

19  to dismiss I think it is B. Sommerville -- I don't have the

20  first name here -- without prejudice.  That is docket number

21  14 CV 691, and it appears at 1247 on the MDL docket.

22           She did file a certification that she had submitted a

23  substantially complete plaintiff fact sheet, docket 1280.

24           Technically, New GM has until some time next week,

25  until September 2nd, I think, to reply to that.  But I guess,

F8s4GML2

1   Mr. Bloom, if you're in a position now to indicate your views

2   on that, we can perhaps resolve it, or I can give you until

3   then.

4           MR. BLOOMER:  We can check.  How about if we just

5   address it in the letter we submit this afternoon.

6           THE COURT:  Great.

7           I think that that leaves only two motions:  The motion

8   to dismiss pursuant order number 50, at docket 1253, as to

9   which any opposition is due today, and the motion to dismiss

10  without prejudice at docket number 1234, which was opposed by

11  several plaintiffs and as to which New GM is scheduled to file

12  a reply, I think, also by today.  So I will, obviously, await

13  whatever submissions are made in connection with those motions.

14  To the extent that in your submission later today you can

15  address those, that would be great.

16          Two housekeeping things.

17          MR. BLOOMER:  Your Honor, if I may.  I mentioned there

18  were three individuals that were, I think, mentioned in

19  Exhibit A to Order 68, and you mentioned -- who had moved, that

20  our records show had moved to vacate their dismissals in a

21  timely manner.  You mentioned Jamie Lee Dowling, and we agree

22  that she has submitted a certification.  There was also James

23  Boyd and Debra O'Neill that our records indicate submitted

24  timely certifications.  And so to the extent that they have

25  moved -- and I believe they have -- to vacate the dismissals,

F8s4GML2

1    we have no oppositions to those.

2              THE COURT:  Can you repeat those names?

3              MR. BLOOMER:  Boyd, B-O-Y-D; Debra, D-E-B-R-A O'Neill,

4    O-'-N-E-I-L-L.

5              THE COURT:  Okay.  I will take a look for that.  What

6    I think I will do is I will wait until I get your letters, but

7    I will issue an order ruling on the various motions myself,

8    which is to say you don't need to put that into the

9    post-conference order.  I will plan to do that, but I will

10   await your letters, to make sure that everybody is on the same

11   page.

12             Speaking of which, two housekeeping matters going

13   forward with respect to these kinds of motions; namely, the

14   motions to dismiss and motions to vacate or reinstate.  First,

15   just a reminder, it would be really great if everybody

16   remembered to docket their submissions on both the MD docket,

17   14 MD 2543, and whatever member case is implicated by the

18   motion.  At least one filing was docketed only in the member

19   case, and it definitely makes it easier on our end if things

20   are also docketed on the MD docket.

21             Second, because there are so many moving parts here

22   and I want to make sure that, to the extent that these motions

23   do, obviously, implicate the rights of litigants, I want to

24   make sure the rulings are correct and we're keeping proper

25   track and the like.  I think it would be super helpful if both

F8s4GML2

1    sides, with respect to any motions, if you're not going to

2    oppose a motion, that you file something to that effect.  If

3    any plaintiff files a motion to reinstate or to vacate a

4    dismissal and New GM agrees that is appropriate or is not

5    opposing it, you should file a statement or something to that

6    effect.  Similarly, if New GM files a motion to dismiss, either

7    without prejudice or with, I think it would be helpful if lead

8    counsel, as it did back in June -- I think docket 1054, as an

9    example -- if lead counsel could submit something indicating

10   its lack of opposition and what efforts, if any, counsel has

11   made to reach the relevant plaintiffs, that would be very

12   helpful in just keeping track of these things.

13            Any questions on that?

14            Great.

15            Another housekeeping type issue similar to that is

16   just a brief comment on applications to seal or redact

17   submissions.  As you have seen, I think we have more or less

18   adopted a standard protocol for these sorts of applications,

19   where a party moves to file something under seal or in redacted

20   form, in light of the protective orders in place.  My general

21   approach has been to grant those applications at least on a

22   temporary basis and then require any party who wishes for

23   something to remain under seal or in redacted form to file a

24   letter justifying doing so within a week of my ruling on the

25   substantive issue.

F8s4GML2

1          Now, I'm inclined to think it makes sense to just

2     formalize that in an order.  It can be in the post-conference

3     order, as far as I am concerned, or in a separate order, but I

4     think it would be helpful to me if I can, in granting those

5     motions, say something to the effect of granted in accordance

6     with order number whatever, and everybody would understand what

7     that means, and follow a standard protocol for dealing with

8     these things.  I am inclined to formalize it in an order, and I

9     think I would indicate that anyone who wishes to be heard with

10    respect to an application to file something under seal should

11    make themselves heard, I would say, within a week of my ruling

12    on the issue.  And by anyone, I mean if you support or oppose

13    the application, that submission should be made in that week,

14    and no replies unless I grant leave or order a reply.

15         To be clear, it will still be up to me whether things

16    are actually filed under seal.  I'm not granting you blanket

17    approval to file anything under seal.  Still do what you have

18    done; namely, file those motions.  But I think it would make

19    things easier if I could reference sort of a standing order

20    with respect to that process.

21         If you have any suggestions for how the process could

22    be improved, I'm certainly open to those.  Why don't you confer

23    with one another, and if you're okay with the process that

24    we've largely been following, you can submit a proposed order

25    memorializing it.  If you have any suggestions, you can make

F8s4GML2

1   them by way of proposed order, as well.

2             Any questions there?

3             All right.  Great.

4             Another housekeeping matter with respect to directly

5   filed cases, I think that the process has worked reasonably

6   well.  As you probably know, counsel generally designates

7   directly filed cases related to the MDL, assuming I agree, it

8   is assigned to me, and I have been issuing the consolidation

9   orders, essentially formally making it part of the MDL.

10            I do just want to say, there is always the possibility

11  of a case falling through the cracks.  I guess what I'm trying

12  to say, if you learn of a case that is filed in this district

13  and either is not acted upon, remains unassigned, and/or is

14  assigned to a different judge or has not, for some reason,

15  consolidated with the MDL, I would appreciate your letting my

16  chambers know and directing our attention to it.  It may be

17  that something falls through the cracks, either in the Clerk's

18  Office or -- I hesitate to say -- even in my chambers.  So if

19  you could just give us a heads-up, that would be great.  I

20  don't think that has happened, but better to say it anyway.

21            All right.  That, I think, exhausts the things I have

22  to talk about.

23            Our next conference is scheduled for October 9th, same

24  time, same place, 9:30, and then we have a conference on

25  November 20th.  I guess my question is:  Should we put a

F8s4GML2

1   conference on the calendar for some time in December,

2   recognizing, number one, we're getting closer and closer to the

3   first Bellwether and, number two, schedules in December can

4   become complicated?

5          MR. HILLIARD:  Yes.  Circling back, Judge, before we

6   adjourn, regarding practical matters at trial, the need for

7   daily copy.  Some courts prefer that the court reporter be

8   responsible, solely responsible, for daily copy.  I don't know

9   what your practice is.  If it is not, we sometimes bring in

10  independent court reporters to do daily copy.

11         I see head shaking.  I don't want to step on anyone's

12  toes.  I am happy to do either one.

13         THE COURT:  You should contact the Southern District

14  of New York Court Reporters.  They are superb at their jobs.

15  They will provide daily copy.  You just need to pay them.  Talk

16  to them.  You can get things on a realtime basis, as well.  You

17  can sort it out with them.

18         MR. HILLIARD:  We will.

19         THE COURT:  I don't see any reason for you to bring in

20  anyone else.  Contact them, and I am sure they will answer all

21  of your questions.

22         Before we talk about a December date, any other issues

23  that we need to discuss?

24         MR. GODFREY:  Two quickly, your Honor.  I really

25  appreciate your Honor's endorsement this morning on the expert

F8s4GML2

1    change in schedule.  Apparently, as we were having the

2    conference, the parties agreed to have the last expert

3    deposition three days later than the date proposed, on

4    October the 2nd.  If we could have the Court's permission to

5    amend that endorsement to allow the last expert deposition to

6    be taken on October 2nd, we would appreciate it.

7            Secondly, I neglected to mention this before -- it is

8    not for decision today -- but I did think something the Court

9    needs to be aware of, that I think at some point in a future

10   status as we get nearer to trial Mr. Brock and Mr. Hilliard

11   will probably need a discussion with the Court about how to

12   handle privilege issues during the course of the trial.  I'm

13   not certain it is a motion in limine.  Certainly, by that time,

14   the Court already has issued a number of privileged rulings,

15   the Court will probably issue a few more.  So the parties will

16   have guidance.  I think you will see the issue in terms of when

17   the witness is on the stand.  I think that is an issue that the

18   trial counsel, the lead trial counsel on each side, is going to

19   have to work out with the Court so we don't have constant

20   interference at side bars.  I wanted to alert the Court to

21   that.  I wanted to raise that on the privilege issues.  We have

22   not had discussions about that yet.

23           Your Honor's rulings this morning are very helpful,

24   will help fill in the gaps on some of this, but I do think this

25   is a trial issue that at some future status conference or

F8s4GML2

1    pretrial conference that will be subject to the parties

2    discussing with the Court.

3              THE COURT:  I appreciate that.  I don't want to

4    interrupt the flow of trial.  I don't want counsel up sitting

5    with the witness.  I don't want repeated interruptions.  And my

6    goal, in any case, is to limit the number of side bars as close

7    to zero as possible.

8              I do rely on counsel to spot issues before they arise

9    and work as many of those kinds of issues out in advance as

10   possible.  I appreciate that.  It is now on my radar.  You

11   should discuss it, and I agree we should try and resolve as

12   much of that as possible in advance.

13             Anything else before we wrap up?

14             All right.  So October 9th.  Let's talk about a

15   December date, and I will let you go.

16             Have you discussed potential December dates?

17             MR. HILLIARD:  We acknowledge that giving the trial

18   coming up, we needed probably the Court's time and attention in

19   December, but we haven't checked each other's calendars or

20   schedules.

21             THE COURT:  All right.  I think you're going to get

22   more of my time and attention than you probably deserve.  But

23   how about Friday, December 18th?

24             MR. HILLIARD:  No objection.

25             MR. GODFREY:  Fine with us.

F8s4GML2

1           THE COURT:  Again, October 9th, November 20th, and

2    December 18th are on our calendars.

3           Yes, Mr. Godfrey.

4           MR. GODFREY:  That is the one status that I can

5    envision taking longer than three hours.  I don't know that,

6    but in thinking about it, that is probably the last status

7    before start of trial.  I can see a whole host of issues that

8    we want to raise.  I can see that being more than three hours.

9           THE COURT:  My guess is we would have a final pretrial

10   conference with respect to the Bellwether specifically in early

11   January, just so you know.  That being said, I agree with you

12   that there are likely to be more issues.  Again, to the extent

13   we can resolve things sooner than later, I'm a big fan of that.

14   I will block out the whole day for you.  To the extent you let

15   me know how much time you think will be necessary, that would

16   be helpful.  We will go from there.

17           I told you, you should meet and confer with respect to

18   a proposed order about pretrial deadlines for all the early

19   trial cases.  I would urge you -- in fact direct you -- to look

20   at my individual rules and practices.  I think paragraph 5

21   concerns pretrial submissions, what I generally look for in a

22   joint pretrial order, and other submissions.  And I'm not

23   saying you need to follow that precisely, but it will probably

24   give you a good sense of what I look for and require in most

25   cases.  To the extent you can peg your proposed order off of

F8s4GML2

1    that, that would be helpful.

2           I think you should think about deadlines that we might

3    not have set yet for the first Bellwether, if there are any.

4    When you look at that, you should propose those, as well.

5           All right.  You know the drill with respect to the

6    post-conference order.  Again, I will issue an order.  An order

7    will go up later today with respect to the early trial

8    schedule, so you don't need to include that.  I will deal with

9    the motions to vacate and the motions to dismiss by separate

10   order, as well.  Everything else should go in the

11   post-conference order, as usual.

12          Anything else?

13          Great.  Thank you, guys, as always for helping make

14   this efficient and productive.

15          We are adjourned.

16          (Adjourned)

17

18

19

20

21

22

23

24

25