**Reply Deadline: September 22, 2015 at 12:00 noon (ET)**
**Hearing Date and Time: October 14, 2015 at 9:45 a.m. (ET)**

William P. Weintraub
Gregory W. Fox
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
T: 212-813-8800
E: wweintraub@goodwinprocter.com
E: gfox@goodwinprocter.com

*Counsel for Post-Closing Ignition*
*Switch Accident Plaintiffs*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                              :

| In re: | : | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, et al., | : | Case No.: 09-50026 (REG) |
|      f/k/a General Motors Corp., et al., | : | |
| | : | |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------------X

**POST-CLOSING IGNITION SWITCH ACCIDENT PLAINTIFFS'**
**MEMORANDUM OF LAW WITH RESPECT TO PUNITIVE DAMAGES ISSUE**

# TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** ........................................................... 1

**ARGUMENT** ................................................................................... 3

I.    PUNITIVE DAMAGES FOR POST-SALE PERSONAL INJURIES AND
      WRONGFUL DEATHS ARE LIABILITIES NEW GM ASSUMED
      UNDER THE SALE AGREEMENT................................................... 3

A.    Governing Principles of Contract Interpretation................................ 3

B.    The Sale Agreement Unambiguously Provides that New GM Assumed All
      Liabilities for Post-Sale Accidents Without Carving Out Punitive Damages .... 5

C.    New GM's Flawed Attempts to Create a Carveout for Punitive Damages
      Where One Does Not Exist ............................................................ 10

      1.    The Word "Directly" Does Not Bifurcate Punitive Damages and
            Compensatory Damages ....................................................... 11

      2.    A Professed Goal of Only Assuming "Commercially Necessary"
            Liabilities Does Not Override the Clear and Unambiguous
            Language of the Sale Agreement............................................. 15

      3.    The Subordination of Punitive Damages In Bankruptcy Has No
            Bearing on the Fact That New GM Assumed Them as a Liability....... 18

D.    Post-Closing Ignition Switch Accident Plaintiffs Are Permitted to Rely on
      Old GM Acts in Their Complaints.................................................. 19

II.   NEW GM CAN BE HELD INDEPENDENTLY LIABLE FOR
      PUNITIVE DAMAGES FOR ITS OWN POST-SALE ACTIONS AND
      INACTIONS WITHOUT REGARD TO NEW GM'S ASSUMPTION OF
      OLD GM'S LIABILITY................................................................. 20

A.    New GM Can Be Held Liable for Punitive Damages Based On the
      Knowledge of the Ignition Switch Defect it Acquired From Old GM on the
      Closing Date............................................................................. 21

B.    New GM Can Be Held Liable for Punitive Damages Solely Based On
      Knowledge of the Ignition Switch Defect Accumulated By New GM Post-
      Sale........................................................................................ 22

III.  IMPOSITION OF A SHIELD AGAINST PUNITIVE DAMAGES
      WOULD VIOLATE THE POST-CLOSING IGNITION SWITCH
      ACCIDENT PLAINTIFFS' DUE PROCESS RIGHTS ................................ 23

**CONCLUSION** ............................................................................. 25

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Home Prods. Corp. v. CAMBR Co.*,
   2001 U.S. Dist. LEXIS 716 (S.D.N.Y. Jan. 29, 2001)............................................................11

*Bethlehem Steel Co. v. Turner Constr. Co.*,
   2 NY2d 456 (1957) ...........................................................................................................4

*BMW of N. Am. v. Gore*,
   517 U.S. 559 (1996)........................................................................................................13

*Castillo v. General Motors Co. (In re Motors Liquidation Co.)*,
   2012 WL 1339496 (Bankr. S.D.N.Y. Apr. 17, 2012)................................................9, 15, 16

*Coca-Cola Bottling Co. v. Soft Drink & Brewery Workers*,
   242 F.3d 52 (2d Cir. 2001)..................................................................................................8

*Goldberg & Connolly v. New York Cmty. Bancorp, Inc.*,
   565 F.3d 66 (2d Cir. 2009)..................................................................................................7

*Greenfield v. Philles Records, Inc.*,
   98 N.Y.2d 562 (2002) ........................................................................................................5

*Holland v. FCA US LLC*,
   2015 U.S. Dist. LEXIS 117643 (N.D. Ohio Sept. 3, 2015)....................................................23

*Hunt Ltd. v. Lifschultz Fast Freight, Inc.*,
   889 F.2d 1274 (2d Cir. 1989)..............................................................................................4

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,
   309 F.3d 76 (2d Cir. 2002)..................................................................................................4

*Jacobson v. Sassower*,
   66 N.Y.2d 991 (1985) ........................................................................................................4

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
   595 F.3d 458 (2d Cir. 2010)........................................................................................ *passim*

*Molzof v. U.S.*,
   502 U.S. 301 (1992)........................................................................................................14

*Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus., Inc.)*,
   445 B.R. 243 (Bankr. S.D.N.Y. 2011), *aff'd* 467 B.R. 694 (S.D.N.Y. 2012) ........................25

*Morgan Stanley High Yield Sec., Inc. v. Seven Circle Gaming Corp.*,
 269 F. Supp. 2d 206 (S.D.N.Y. 2003) ...................................................................16

*In re Motors Liquidation Co.*,
 2015 Bankr. LEXIS 2406 (Bankr. S.D.N.Y. July 22, 2015) ...........................................21, 22

*In re Motors Liquidation Co.*,
 529 B.R. 510 (Bankr. S.D.N.Y. 2015) .......................................................... *passim*

*Pathmark Stores, Inc. v. United Food & Commercial Workers Local 342-50, AFL-CIO*,
 204 F. Supp. 2d 500 (E.D.N.Y. 2002) .....................................................................8

*Phillip Morris USA v. Williams*,
 549 U.S. 346 (2007) ...................................................................................13

*Quadrant Structured Prods. Co.*,
 23 N.Y.3d 549 (2014) ..................................................................................7

*Rocanova v. Equitable Life Assurance Soc'y of U.S.*,
 83 N.Y.2d 603 (1961) .................................................................................12

*Seiden Assocs. v. ANC Holdings, Inc.*,
 959 F.2d 425 (2d Cir. 1992)............................................................................4

*Soroof Trading Dev. Co. v. GE Fuel Cell Sys. LLC*,
 842 F. Supp. 2d 502 (S.D.N.Y. 2012)...................................................................16

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
 538 U.S. 408 (2003)................................................................................12, 13

*Trusky v. General Motors Co. (In re Motors Liquidation Co.)*,
 2013 WL 620281 (Bankr. S.D.N.Y. Feb. 19, 2013) .......................................................15, 16

*Virgillo v. City of N.Y.*,
 407 F.3d 105 (2d Cir. 2005)........................................................................12, 13

*Vysyaraju v. Mgmt. Health Solutions, Inc.*,
 2013 U.S. Dist. LEXIS 118056 (S.D.N.Y. Aug. 10, 2013) ...................................................8

*W.W.W. Assocs., Inc. v. Giancontieri*,
 77 N.Y.2d 157 (1990) ..................................................................................5

## STATUTES

28 U.S.C. § 2674.......................................................................................14

11 U.S.C. § 726(a) ....................................................................................18

iii

**OTHER AUTHORITIES**

PROSSER AND KEETON ON THE LAW OF TORTS
    (W. Page Keeton et al. eds., 5th ed. 1984)..............................................................................12

The plaintiffs in the "Bellwether Cases"[1] and in the post-closing personal injury and

wrongful death actions listed on Exhibit A (collectively, the "Post-Closing Ignition Switch

Accident Plaintiffs"), by and through the undersigned counsel, hereby submit this Memorandum

of Law pursuant to paragraph 1 of this Court's September 3, 2013 Scheduling Order.[2]

## Preliminary Statement

Under the Sale Agreement[3] that effectuated the July 10, 2009 sale of substantially all of

the assets of Old GM to New GM (the "Sale"), New GM expressly assumed certain liabilities of

Old GM.  Among the "Assumed Liabilities" were liabilities of Old GM for personal injury,

wrongful death, and property damage resulting from post-closing accidents or incidents

involving vehicles manufactured by Old GM.  Put simply, New GM contracted to be responsible

for Old GM's actions and inactions when it assumed liability for post-closing accidents or

incidents involving vehicles manufactured by Old GM.

After New GM revealed the existence of the Ignition Switch Defect in 2014 – a safety

defect this Court found was sufficiently known to Old GM at the time of the Sale to require Old

GM to conduct a recall under applicable federal law – many victims of post-closing accidents

involving vehicles with the Ignition Switch Defect filed lawsuits against New GM.

---

[1] The following actions constitute the Bellwether Cases, for which trials are scheduled to commence on a rolling basis beginning in January 2016:  (i) *Cockram v. General Motors, LLC* (Case No. 14-cv-08176) (S.D.N.Y.); (ii) *Scheuer v. General Motors, LLC* (Case No. 14-cv-08176) (S.D.N.Y.); (iii) *Norville v. General Motors, LLC* (Case No. 14-cv-08176) (S.D.N.Y.); (iv) *Barthelemy v. General Motors, LLC* (Case No. 14-cv-05810) (S.D.N.Y.); (v) *Reid v. General Motors, LLC* (Case No. 14-cv-05810) (S.D.N.Y.); and (vi) *Yingling v. General Motors, L.L.C.* (Case No. 14-cv-05336) (S.D.N.Y.).  *See* Memo Endorsed Letter Request Regarding Proposed Bellwether Trial Sequence and Replacement Protocol, entered July 28, 2015, *In re General Motors LLC Ignition Switch Litigation*, Case No. 1:14-md-02543 (JMF) (the "MDL") [MDL ECF No. 1217].

[2] *See* Scheduling Order Regarding Case Management Order Re: No-Strike, No Stay, Objection, and GUC Trust Asset Pleadings, entered September 3, 2015 [ECF No. 13416] (the "September 3 Scheduling Order").

[3] Capitalized terms not otherwise defined herein shall have the meanings assigned to them in this Court's (i) Judgment, entered on June 1, 2015 [ECF No. 13177] (the "Judgment") and (ii) Decision on Motion to Enforce Sale Order, entered on April 15, 2015 [ECF No. 13109], *In re Motors Liquidation Co.*, 529 B.R. 510 (Bankr. S.D.N.Y. 2015) (the "Decision").

In addition to seeking damages from New GM to compensate for the deaths, injuries, and property damage they suffered, many of these plaintiffs also seek punitive damages. These punitive damages requests seek to hold New GM responsible for the reprehensible and illegal act of allowing these preventable deaths and injuries to occur by failing to conduct a timely recall despite having ample knowledge of the Ignition Switch Defect and its deadly implications. As will be demonstrated below, the Post-Closing Ignition Switch Accident Plaintiffs have at least three pathways to recover punitive damages from New GM.

First, under the plain and unambiguous language of the Sale Agreement, punitive damages for post-closing accidents are "Assumed Liabilities" for which New GM is liable. New GM contractually bound itself to be responsible for <u>all</u> liabilities for wrongful death or personal injury for which Old GM would have been liable <u>without limiting such liabilities to compensatory damages</u>.

Second, the moment the Sale closed, New GM inherited the books, records, files, databases (including the TREAD database Old GM used to monitor safety matters as required under the Safety Act), reports, and analyses of Old GM. Moreover, once the Sale closed, the knowledge of transferred Old GM employees regarding the Ignition Switch Defect became the knowledge of New GM regarding the Ignition Switch Defect. Regardless of when it came into existence or its source, that knowledge was known to New GM and is an element of New GM's post-closing conduct that can be considered as part of a punitive damages case against New GM. Under this second path, the Post-Closing Ignition Switch Accident Plaintiffs are not attempting to hold New GM liable for Old GM acts; they seek only to hold New GM liable for its own independent actions and inactions, which were undertaken with the knowledge of the Ignition Switch Defect that New GM acquired at the moment the Sale closed and thereafter.

Third, even if all of Old GM's files and records were metaphorically destroyed and the

brains of all transferred employees wiped clean of any memory of Old GM at the time of the

closing of the Sale, New GM nevertheless has independent liability for punitive damages for its

own post-Sale conduct based on the knowledge of the Ignition Switch Defect that New GM

continuously accumulated and ignored <u>after</u> the Closing Date.

New GM's attempt to sidestep liability for the tragic and preventable deaths and injuries

inflicted on the Post-Closing Ignition Switch Accident Plaintiffs should fail and these plaintiffs

should be permitted to try all aspects of their cases, including punitive damages.

## **ARGUMENT**

### I.    **Punitive Damages for Post-Sale Personal Injuries and Wrongful Deaths Are Liabilities New GM Assumed Under the Sale Agreement**

New GM expressly assumed <u>all</u> liabilities and obligations of Old GM for post-closing

injuries and wrongful death claims involving vehicles manufactured by Old GM.  The Sale

Agreement does not carve out punitive damages from "Product Liabilities" and no amount of

linguistic legerdemain can rewrite the plain language of the operative definitions that describe

the scope of the "Product Liabilities" assumed by New GM.  Specifically, because the

unambiguous language of section 2.3(a)(ix) (as amended) and the defined terms used therein do

not exclude punitive damages from the assumed "Product Liabilities," New GM has assumed

any and all liability for punitive damages that could have been asserted against Old GM for these

types of injuries.  Accordingly, punitive damages may be imposed against New GM after trial

based on both Old GM's pre-Sale conduct and New GM's post-Sale conduct.

### A.    *Governing Principles of Contract Interpretation*

To determine whether the punitive damages are "Assumed Liabilities," the threshold

question is "whether the contract is unambiguous with respect to the question disputed by the

parties." *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) ("*Maverick Tube*") (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)).  A contract is only ambiguous if it "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* at 466 (quoting *Int'l Multifoods*, 309 F.3d at 83).  However, "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation, unless each is a 'reasonable' interpretation." *Id.* at 467.  Moreover, a "court should not find [a] contract ambiguous where the interpretation urged by one party would 'strain[] the contract language beyond its reasonable and ordinary meaning,'" *id.* (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 NY2d 456, 459 (1957)), and any doubt about whether the contract provision at issue is unambiguous should be construed strongly against the drafters. *Jacobson v. Sassower*, 66 N.Y.2d 991, 993 (1985) ("In cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language").

When the terms of a contract are unambiguous – as they are here – "the obligations it imposes are to be determined without reference to extrinsic evidence." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) ("*Hunt*").  *See also Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (same).  "[T]he objective of contract interpretation is to give effect to the expressed intentions of the parties." *Maverick Tube*, 595 F.3d at 467 (quoting *Hunt*, 889 F.2d at 1277) (emphasis in original).  "[T]he best evidence of what parties to a written agreement intend is what they say in their writing" and "[e]vidence

4

outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." *Id.* at 466, 467 (quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) and *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)).  Finally, "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing."  *Id.* at 468.

As shown below, the language of section 2.3(a)(ix) of the Sale Agreement unambiguously provides that New GM expressly assumed <u>all</u> direct[4] liability for post-Sale accidents in Old GM vehicles without any exclusion for punitive damages.  Nothing in the operative language limits the "Assumed Liabilities" to compensatory damages.  Rather, the operative definitions are broad and all-inclusive.  Guided by the above-quoted principles of contract interpretation, the Court should reject New GM's attempts to manufacture ambiguity where none exists by referencing defined terms not used the operative section of the agreement and on matters outside the contract's four corners.

**B.    *The Sale Agreement Unambiguously Provides that New GM Assumed All Liabilities for Post-Sale Accidents Without Carving Out Punitive Damages***

Under the plain language of section 2.3(a)(ix) of the Sale Agreement, included among the "Assumed Liabilities" (*i.e.*, Old GM liabilities for which New GM would be held responsible after the Closing Date) were:

> (ix)    all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by [Old GM] ("Product Liabilities"), which arise directly out of death, personal injury or other injury to Persons or damage to property caused by accidents or incidents first

---

[4] Section I.C.1 below addresses New GM's incorrect argument that punitive damages are not "directly" related to the Post-Closing Ignition Switch Accident Plaintiff's accidents.

> occurring on or after the Closing Date and arising from such motor
> vehicles' operation or performance ….

First Amendment to Sale Agreement, dated as of June 30, 2009 (the "<u>First Amendment</u>") at

§ 2.3(a)(ix) (emphasis added).  In order to know what was included in the assumed "Product

Liabilities," one must look to the definition of "Liabilities," which broadly reads as follows:

> "<u>Liabilities</u>" means <u>any and all liabilities and obligations of every
> kind and description whatsoever</u>, whether such liabilities or
> obligations are known or unknown, disclosed or undisclosed, matured
> or unmatured, accrued, fixed, absolute, contingent, determined or
> undeterminable, on or off-balance sheet or otherwise, or due or to
> become due, including Indebtedness and those <u>arising under any Law,
> Claim, Order, Contract or otherwise</u>.

Sale Agreement at § 1.1 (Defined Terms) (emphasis added).  Punitive damages are not excluded

from the definition of Liabilities and, thus, are not excluded from the "Product Liabilities" that

New GM assumed pursuant to section 2.3(a)(ix).  Accordingly, the plain language of the Sale

Agreement provides that New GM has expressly assumed liability for punitive damages that

were recoverable against Old GM based upon Old GM's conduct.

There can be no question that the authors of the Sale Agreement knew how to carve out

punitive damages from "Assumed Liabilities."  In fact, they explicitly carved punitive damages

out of the definition of "Damages."  However, although the defined term "Damages" is used

<u>elsewhere</u> in the Sale Agreement, <u>it does not appear anywhere in section 2.3 or in the defined

terms "Liabilities" or "Product Liabilities" used therein</u>.[5]  This is fatal to New GM's argument

and should be the end of the inquiry.

New GM attempts a shell game by arguing that liabilities to post-Sale accident plaintiffs

relate to "Losses" and the defined term "Losses" includes "damages" (with a lower case "d")

---

[5] Specifically, "Damages" is used in section 2.4(c) of the Sale Agreement in connection with New GM's
indemnification obligations towards Old GM for liabilities relating to "Non-Assignable Assets."  *See* Sale
Agreement at § 2.4(c).  The word "damage" (with a lower case "d") appears in the definition of "Product
Liabilities," however, it is clearly limited to "property damage" and the context makes clear there was no intent to
use the defined term "Damages."

and, in turn, the defined term "Damages" (which is <u>not</u> used in "Losses" or "Liabilities")

excludes punitive damages.  *See* Application By General Motors LLC, Pursuant to the Judgment

Dated June 1, 2015, In Support of an Order Directing Plaintiffs In the Bavlsik Lawsuit to

Withdraw Their Punitive Damages Request In Their Complaint, filed August 28, 2015 [ECF No.

13407-1] (the "<u>Bavlsik Pleading</u>") at ¶¶ 3-4, 25.  This argument is wishful thinking and must fail

because the only relevant operative definitions that appear in section 2.3(a)(ix) are ''Assumed

Liabilities," "Product Liabilities," and "Liabilities"; none of these definitions use the defined

terms "Loss," "Losses," or "Damages."  New GM's attempt to rely on definitions not used in

section 2.3(a)(ix) is, at its core, an unabashed request for this Court to insert terms into the plain

and unambiguous language of that section.  Guided by the above-quoted authorities, the Court

should refuse to rewrite clear and unambiguous language.

    As New GM points out in its Bavlsik Pleading, "[i]f parties to a contract omit terms –

particularly, terms that are readily found in other, similar contracts – <u>the inescapable conclusion</u>

<u>is that the parties intended the omission</u>.  The maxim *expression unis est exclusion alterius*, as

used in the interpretation of contracts, supports precisely this conclusion."  *See* Bavlsik Pleading

at ¶ 36 (quoting *Quadrant Structured Prods. Co.*, 23 N.Y.3d 549, 560 (2014)).  *See also*

*Goldberg & Connolly v. N.Y. Cmty. Bancorp, Inc.*, 565 F.3d 66, 72 (2d Cir. 2009) (in ruling that

a security agreement conveyed an interest in monies recovered from a legal dispute and did not

constitute an assignment of particular judgment, the Second Circuit held that by specifically

referencing the judgment in a related agreement but omitting reference to the judgment from the

operative security agreement language, the parties evidenced the intent not to assign the

judgment).  Here one does not even need to look to another similar contract.  The Sale

Agreement <u>itself</u> reflects the drafter's intent not to use the term "Damages" (and its embedded

carveout for punitive damages) in connection with New GM's assumption of Product Liabilities

for post-closing accidents.

Another clear indication that punitive damages were not meant to be excluded from

Assumed Liabilities is that section 2.3(a)(ix) itself expressly excludes certain liabilities (but not

punitive damages) from the Product Liabilities being assumed. Specifically, the parenthetical in

that section states:

> (for the avoidance of doubt, Purchaser shall not assume , or become
> liable to pay, perform or discharge, any Liability arising or contended
> to arise by reason of exposure to materials utilized in the assembly or
> fabrication of motor vehicles manufactured by Sellers and delivered
> prior to the Closing Date, including asbestos, silicates or fluids,
> regardless of when such alleged exposure occurs).

Sale Agreement at § 2.3(a)(ix). Had the parties to the Sale Agreement wished to exclude

punitive damages from the universe of assumed Product Liabilities, a logical way to do so would

have been to include a reference to punitive damages in this parenthetical. Their failure to do so

speaks volumes. *See Pathmark Stores, Inc. v. United Food & Commercial Workers Local 342-*

*50, AFL-CIO*, 204 F. Supp. 2d 500, 505-06 (E.D.N.Y. 2002) ("[T]he CBA does not expressly

exempt employer-initiated disputes from arbitration. In contrast, there is one specific category of

exclusion in the arbitration article, demonstrating that the parties knew how to expressly exclude

certain disputes from arbitration when they so intended…. '[I]f the parties had wished to limit

the arbitration clause to employee-initiated grievances, they could have done so explicitly' as

they did elsewhere in the arbitration provision.") (quoting *Coca-Cola Bottling Co. v. Soft Drink*

*& Brewery Workers*, 242 F.3d 52, 57 (2d Cir. 2001)). *See also Vysyaraju v. Mgmt. Health*

*Solutions, Inc.*, 2013 U.S. Dist. LEXIS 118056, *21-22 (S.D.N.Y. Aug. 10, 2013) (where explicit

contract language contained a "consistent with past practices" exception to strict GAAP

compliance for calculation of "Net Working Capital" but not for the definition of "Qualifying

Revenue," court held that "[w]here the parties wanted revenue calculated through procedures other than those provided by GAAP they knew how to do that, and that is precisely what they did in Schedule G of the Agreement.  It is therefore an unreasonable interpretation of the contract to add the qualification that GAAP be applied "consistent with past practice" where that has not been specified.").[6]

In addition, not only are punitive damages not excluded from Assumed Liabilities, it is equally clear that they are not a "Retained Liability."  First, as set forth above, punitive damages are included under the definition of "Assumed Liabilities" and "Assumed Liabilities" are expressly excluded from the definition of "Retained Liabilities."  *See* Sale Agreement at § 2.3(b).  Second, the illustrative list of sixteen categories of liabilities retained by Old GM contained in the definition of "Retained Liabilities" does not include punitive damages.  Listing punitive damages as a seventeenth category of Retained Liability would have been another easy and logical manner of excluding punitive damages from the Assumed Liabilities.  *Castillo v. General Motors Co. (In re Motors Liquidation Co.)*, 2012 WL 1339496, *10 (Bankr. S.D.N.Y. Apr. 17, 2012) ("*Castillo*") ("[T]he matters for which New GM took on liability under the Sale Agreement are stated with great specificity – in several lines of text following the words 'arising under.'  Additionally, while strictly speaking, 'Retained Liabilities,' the subject of the next relevant section, are Old GM's problem, and not New GM's concern, they shed light on the liabilities that former GM and the Auto Task Force determined that New GM would not assume.").  And, third, in the context of evaluating liability for post-closing accidents, it would make no sense to bifurcate liability for post-Sale accidents into two claims, one for compensatory damages that are assumed and the other for punitive damages that are retained.

---

[6] Also of note is that section 2.3(a)(ix) was amended after the Sale Agreement was first executed.  *See* First Amendment at § 2(b).  This shows that section 2.3(a)(ix) was not ignored by the parties, but rather was under some amount of scrutiny.  Yet, the assumption of punitive damages remained untouched.

The retention of liability for punitive damages by Old GM for post-Sale accidents would be a nonsensical dead-end, especially for punitive damages that are wholly independent claims for purely New GM conduct.  Regardless, the Sale Agreement contains no such bifurcation for "Product Liabilities."

It is not relevant if the assumption of punitive damages in the Sale Agreement was not the result New GM intended or desired.  The parties to a contract have the responsibility to ensure their lawyers are doing their jobs.  *See* Order Regarding Benjamin Pillar's No Stay Pleading and Related Pleadings, entered July 29, 2015 [ECF No. 13328] at Corrected Tr. 27:2-5 (New GM held responsible for what its lawyer wrote in a pleading even though it did not accurately reflect provision of the Sale Agreement at issue; "Obviously GM has the ability to ensure that its counsel do their jobs, and it's not too much to hold GM [sic] for the consequences of what its counsel, who is plainly an agent, did.").[7]  New GM was represented by experienced lawyers in connection with the Sale.  Assuming for argument's sake that those lawyers failed to carve out punitive damages from the Product Liabilities being assumed, that is an issue between those lawyers and New GM.  It is not a reason for this Court to rewrite the contract to read the way New GM would like it to read over six years after the Closing Date.

## C.     *New GM's Flawed Attempts to Create a Carveout for Punitive Damages Where One Does Not Exist*

New GM makes several specious arguments in an effort to create an exception for the assumption of punitive damages that does not exist.  These arguments fall well short of the mark.

---

[7] In the *Pillar* matter, New GM's attorney cited the incorrect version of the Sale Agreement.  Here there is no question that all of the parties are looking at the correct version of the Sale Agreement.

1.      **The Word "Directly" Does Not Bifurcate Punitive Damages and Compensatory Damages**

New GM focuses on the word "directly" in section 2.3(a)(ix) and tries to argue that punitive damages are not "direct" damages because of the broader societal implication of deterrence associated with punitive damages.  Thus, New GM argues that punitive damages are independent of the particular incident at the core of a compensatory award.  *See* Bavlsik Pleading at ¶¶ 6-7, 23-24, 28.  As a threshold matter, there is no textual or contextual basis to elevate a single word – "directly" – to the status advanced by New GM.  If punitive damage claims against New GM were to be barred or excluded from Assumed Liabilities, the contract must say so in clear and unambiguous language.  It does not.  To the contrary, what was assumed was "<u>any and all</u> liabilities and obligations of every kind and description whatsoever."

As the District Court for the Southern District of New York has recognized, using the term "all" without further limiting language is about as certain an indication of total conveyance as you can get.  Specifically, in a litigation over whether the assets sold pursuant to an asset purchase agreement included certain antitrust litigation claims of the seller, that court stated:

> "All," of course, means "every", "the whole amount or quantity of."
> It is "one of the least ambiguous [words] in the English language,"
> and one that leaves "no room for uncertainty."  The word "all" cannot
> be read to exclude certain large, unforeseen causes of action -- like the
> pending antitrust suit -- in one provision yet stand for its plain
> meaning in every other.  …  [Seller] could have negotiated a clause
> that would protect its right to unforeseen, complex causes of action
> like antitrust suits, or at least excluded certain general types of actions
> from being transferred to [buyer].  Instead, [seller] excluded one
> specific cause of action and unambiguously conveyed all of its other
> stakes to litigation, known and unknown, including the Claims at
> issue here, to [buyer].

*Am. Home Prods. Corp. v. CAMBR Co.*, 2001 U.S. Dist. LEXIS 716, *7-9 (S.D.N.Y. Jan. 29, 2001).  Just as the seller in the *American Home Products* case developed "seller's remorse" after selling potentially valuable causes of action, New GM appears to have "buyer's remorse."

11

Buyer's remorse, however, is no reason for this Court to rewrite the Sale Agreement for New

GM; New GM must live with the contract to which it agreed to be bound.

Moreover, there _is_ a direct connection between these plaintiffs' claims for post-Sale

incidents and the punitive damages sought.  Contrary to the picture New GM wishes to paint,

punitive damages arise directly from the injury suffered by a plaintiff notwithstanding that one

aspect of punitive damages is their societal purpose of deterrence.  Punitive damages are also a

well-recognized form of retribution to the victim for the defendant's reprehensible conduct

toward the plaintiff.  _See State Farm Mut. Auto. Ins. Co. v. Campbell_, 538 U.S. 408, 416 (2003)

("_State Farm_") (collecting cases and stating "punitive damages serve a broader function; they are

aimed at deterrence and retribution").  Indeed, the Supreme Court has recognized in the context

of punitive damages, that "[a] defendant should be punished for the conduct that harmed the

plaintiff, not for being an unsavory individual or business."  _Id._ at 423 (emphasis added).

In nearly all states, there cannot be an award of punitive damages without a threshold

award of compensatory damages.  _See_ PROSSER AND KEETON ON THE LAW OF TORTS § 2, at 14

(W. Page Keeton et al. eds., 5th ed. 1984); _Virgillo v. City of N.Y._, 407 F.3d 105,117 (2d Cir.

2005) ("A demand or request for punitive damages is parasitic and possesses no viability absent

its attachment to a substantive cause of action") (quoting _Rocanova v. Equitable Life Assurance

Soc'y of U.S._, 83 N.Y.2d 603, 616 (1961)).[8]  This "parasitic" string connects the award of

---

[8] It is odd that New GM cites _Virgillo_ in support of its arguments.  _See_ Bavlsik Pleading at ¶ 23.  In _Virgillo_, the
Second Circuit ruled that under a federal statute, plaintiffs who filed claims with the 9/11 Victim Compensation
Fund waived the right to sue to certain defendants for compensatory and punitive damages.  Victims that made
claims to the fund tried to argue they could still sue for punitive damages because the waiver only applied to
"damages sustained," which they argued only covered compensatory damages.  Acknowledging that punitive
damages serve a different purpose from compensatory damages, the Second Circuit ruled that the plain language of
the statute barred plaintiffs from suing for _both_ punitive and compensatory damages because the phrase "damages
sustained" includes both compensatory and punitive damages.  The latter is impossible without the former.  _Virgillo_,
407 F.3d at 115-18.  Thus, _Virgillo_ supports the Post-Closing Ignition Switch Accident Plaintiffs' argument that
punitive and compensatory damages are linked and that absent a specific reference to punitive damages, an
assumption of all "Liabilities" for a particular injury constitutes an assumption of both punitive and compensatory

punitive damages to the victim.  Moreover, the plaintiff must be the target or subject of the
misconduct that underlies or supports the award of punitive damages, forging yet another direct
connection.  *See Phillip Morris USA v. Williams*, 549 U.S. 346 (2007) (prohibiting juries from
awarding punitive damages based on harm defendant inflicted on parties other than the plaintiff).
Here, each Post-Closing Ignition Switch Accident Plaintiff was <u>directly</u> harmed by the
reprehensible conduct of both Old and New GM:  failing to recall vehicles that they each knew
contained a deadly safety defect, which resulted in these plaintiffs or their loved ones to
unknowingly continue to drive unsafe vehicles until those vehicles failed and they were injured,
maimed, or killed.  Thus, the punitive damages at issue do arise <u>directly</u> from the incidents.

New GM puts the cart before the horse.  It is well-established that there must be a
proportional relationship between the severity of the harm suffered by the plaintiff (as reflected
in the compensatory damages) and the amount of punitive damages awarded.  *See BMW of N.
Am. v. Gore*, 517 U.S. 559, 575 (1996) (overturning punitive damages award as grossly
excessive and instructing that punitive damages awards must be proportional to the degree of
reprehensibility of the defendant's conduct).  *See also State Farm*, 538 U.S. at 419 (applying
*Gore*  and overturning punitive damage award that "bore no relation" to the harm suffered by the
plaintiffs).  This is yet another direct connection between the incident, compensatory damages,
and punitive damages.  Although there has been no award here yet to challenge, if there is an
award that lacks sufficient nexus to these plaintiffs' injuries, New GM would have the post-
verdict litigation rights available to all defendants to overturn a grossly excessive punitive
damages award (the same rights successfully employed by defendants in *Gore* and *State Farm*).

---

damages. If the statutory language at issue in *Virgillo* was construed to implicitly bar punitive damages because
compensatory damages were barred, the converse should also be true:  if compensatory damages are not barred,
there should be a presumption that punitive damages are not barred unless the bar is explicit and clear.

The *Molzof* case on which New GM relies is especially instructive.  *See* Bavlsik Pleading at ¶ 24 (quoting *Molzof v. U.S.*, 502 U.S. 301, 307 (1992)).  *Molzof* involved a dispute over whether a damages award against the U.S. Government contained "punitive damages," which are explicitly prohibited by the Federal Tort Claims Act ("FTCA").  The FTCA provides:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under the circumstances, <u>but shall not be liable</u> for interest prior to judgment or <u>for punitive damages</u>.

*Molzof*, 502 U.S. at 305 (quoting 28 U.S.C. § 2674) (emphasis in original).  Unlike section 2.3(a)(ix) of the Sale Agreement, which has no exclusion for punitive damages, the FTCA specifically excluded punitive damages (which is implicit recognition that punitive damages would be included among the liabilities of the United States absent the exclusion).  The Supreme Court in *Molzof* also <u>rejected</u> the Government's argument that "punitive damages" included damages for future medical expenses and loss of enjoyment of life.  The Court stated:

> the Government's interpretation of § 2674 appears to be premised on the assumption that the statute provides that the United States "shall be liable only for compensatory damages."  But the first clause of § 2674, the provision we are interpreting, does not say that.  What it clearly states is that the United States "shall not be liable . . . for punitive damages."  The difference is important.  The statutory language suggests that to the extent a plaintiff may be entitled to damages that are not legally considered "punitive damages," but which are for some reason above and beyond ordinary notions of compensation, the United States is liable "in the same manner and to the same extent as a private individual."

*Id.* at 308.  Just as the Government unsuccessfully argued in *Molzof*, New GM argues that the language of section 2.3(a)(ix) contains an unwritten limitation to compensatory damages beyond the contract's plain language.  It does not, and that argument should be similarly rejected here.

## 2. A Professed Goal of Only Assuming "Commercially Necessary" Liabilities Does Not Override the Clear and Unambiguous Language of the Sale Agreement

Also unavailing is New GM's focus on statements in prior decisions of the Court that one of the goals of the Sale was that New GM would "take on only those liabilities that would be necessary for the commercial success of New GM." Those cases involved plaintiffs seeking damages from New GM for claims against Old GM relating to warranties that did not fall under the limited "Glove Box Warranty" claims New GM expressly assumed in the Sale Agreement. See *Castillo*, 2012 WL 1339496, at *9-10; *Trusky v. General Motors Co. (In re Motors Liquidation Co.)*, 2013 WL 620281, *7-8 (Bankr. S.D.N.Y. Feb. 19, 2013).

Those cases are inapposite for several reasons. First, general statements about the goal of the Sale expressed by the parties and understood by the Court at the time of the Sale which make no mention of punitive damages cannot trump the plain language of the contract which clearly provides that New GM assumed <u>all Liabilities</u> for these post-closing accidents.

Second, reliance on parol evidence is inappropriate in the face of unambiguous contractual language in conjunction with an explicit integration clause barring reliance on evidence outside the four corners of the agreement. Indeed, the Sale Agreement contains an integration clause at section 9.17, which provides that:

> This Agreement (together with the Ancillary Agreements, the Sellers' Disclosure Schedule and the Exhibits) contains the final, exclusive and entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersedes all prior and contemporaneous agreements and understandings, whether written or oral, among the Parties with respect to the subject matter hereof and thereof. Neither this Agreement nor any Ancillary Agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

15

Sale Agreement at § 9.17.  By including this provision, the parties to the Sale Agreement

(including New GM) instructed the world that the explicit language of the contract should

control, not arguments or evidence about the parties' understandings or goals that were not

included in the written document.  *Soroof Trading Dev. Co. v. GE Fuel Cell Sys. LLC*, 842 F.

Supp. 2d 502, 512 (S.D.N.Y. 2012) ("Parol evidence is properly excluded where, as here, a

contract is clear, unambiguous, complete on its face and, moreover, contains an explicit

integration clause.") (citing *Morgan Stanley High Yield Sec., Inc. v. Seven Circle Gaming Corp.*,

269 F. Supp. 2d 206, 214-15 (S.D.N.Y. 2003)).

And third, the Court's prior decisions in *Castillo* and *Trusky* arose in much different

contexts.  The plaintiffs in those actions were trying to expand the meaning of the words "arising

under express written warranties" in section 2.3(a)(vii)(A) of the Sale Agreement to include

settlement and other monetary obligations of Old GM that fell outside of the performance-only

obligations assumed by New GM under the Glove Box Warranties.  There, the Court was

correctly unwilling to expand and strain the contractual language and common usage of the

English language to force New GM to assume obligations it clearly did not assume.  To the

contrary, here it is New GM that is asking the Court to strain the contractual language and the

English language to create a carveout to Assumed Liabilities that does not exist.

The Second Circuit's decision in *Maverick Tube Corp.* is directly on point.  In that case,

certain notes issued by an obligor ("Maverick") were convertible to cash or stock upon

acquisition of Maverick by a "Public Acquirer," which was defined as an acquiring entity that

"has a class of common stock traded on a United States national securities exchange."  *Maverick

Tube*, 595 F.3d at 463.  A dispute arose as to whether a foreign acquirer, whose ordinary shares

did not trade on a United States exchange, fell within the definition of "Public Acquirer."  *Id.* at

16

462-63.  Judge Sullivan of the Southern District of New York and the Second Circuit Court of

Appeals agreed that, although certain depository shares ("ADS" shares) of the acquirer have

similar characteristics to common shares, they are not the same thing, and, therefore the

acquiring entity was not a "Public Acquirer."  Under the unambiguous terms of the indenture,

because the acquirer's depository shares traded on a U.S. exchange but its ordinary shares did

not, the noteholders' Public Acquirer conversion rights were not triggered.  *Id.* at 464 and 472.

The Second Circuit stated as follows:

> The parties could easily have included in the Indenture a definition of
> common stock in general with a parenthetical phrase expressly
> including ADSs, such as the parenthetical in the definition of "Capital
> Stock"; or they could have included such a parenthetical after
> "common stock" in the "a class of common stock traded on a United
> States national securities exchange" clause of the Public Acquirer
> definition.  They did neither.  Given that the parties defined more than
> 100 terms in the Indenture and made explicit reference to ADSs in the
> "Capital Stock" definition that informs the rights of noteholders to
> require Maverick to purchase their notes, the Indenture as a whole
> does not suggest that the undefined term "common stock," in the
> Public Acquirer definition that informs noteholders' conversion
> rights, includes ADSs implicitly.

*Id.* at 469.  The Court also rejected the invitation to include the depository shares in the

undefined term "common stock" because to not do so would not be "commercially reasonable."

Specifically, the Second Circuit wrote:

> Any suggestion that the Indenture should be read to accomplish what
> the Trustee views as "commercial[ly]" "reasonable" essentially asks
> us to rewrite the Indenture's Public Acquirer definition.  Instead, we
> are required to give effect to the intentions expressed in the
> agreement's own language.  Given the pains taken by the parties to
> have the Indenture set out detailed definitions of numerous terms and
> to have its definition of Capital Stock make explicit reference to
> ADSs--a reference we are not entitled to regard as superfluous--we
> conclude that the district court properly declined to read ADSs into
> the undefined term "common stock," as used in the clause "common
> stock traded on a United States national securities exchange" without
> elaboration.

*Id.* at 472 (internal citations omitted). New GM is requesting this Court do exactly what the Second Circuit refused to do in *Maverick Tube*: read or imply a term into a section of a contract that is not present in that section (but is present elsewhere in the contract) because to not do so would be "commercially unreasonable." New GM and the other parties to the Sale Agreement are sophisticated commercial parties who knew full well how to place a carveout for punitive damages in the section of the Sale Agreement in which New GM assumed Product Liabilities. In fact the drafters of the Sale Agreement did create such a carveout in the definition of "Damages" and used that definition in section 2.4(c) of the Sale Agreement but not in section 2.3(a)(ix). It would be improper for this Court to read the defined term "Damages" into section 2.3(a)(ix). Regardless of New-GM's hindsight assertions that assuming punitive damages for post-Sale accidents was not "commercially necessary" at the time of the Sale, the reality is that they assumed liability for punitive damages under the contract and this Court should not rewrite that contract to enable New GM to renege on that commitment.[9]

### 3. The Subordination of Punitive Damages In Bankruptcy Has No Bearing on the Fact That New GM Assumed Them as a Liability

New GM also argues that because punitive damages are subordinated to general unsecured claims under section 726(a) of the Bankruptcy Code, New GM only assumed liability to pay claims in the amounts that were actually payable by Old GM. *See* Bavlsik Pleading at ¶¶ 30-35. According to New GM, because Old GM was insolvent, punitive damages claims would not have received any distribution in the chapter 11 case. Therefore, New GM assumed the obligation to pay nothing. This argument is nonsensical and equates assumption of liability

---

[9] It has also not been established that New GM's assumption of punitive damage claims against Old GM for post-Sale accidents was not "commercially necessary." It is irrelevant – and now susceptible to convenient revisionism or gamesmanship – whether parties to the Sale Agreement and the Auto Task Force may have viewed it as a commercial necessity for New GM to fully (rather than partially) stand behind damages for accidents involving Old GM-manufactured vehicles. This is not a point that should be litigated, however, because the plain language of the Sale Agreement provides that New GM <u>did</u> assume punitive damages and that language is what controls, not what New GM, years after the fact, now argues was "commercially necessary."

with distributions on claims.  Not getting a distribution on a claim due to insolvency or subordination does not mean the debtor is not liable.  The liability still exists but, due to the debtor's bankruptcy, the Bankruptcy Code treats the priority and payment of the claim <u>against the debtor</u> in a limiting manner.  This has no impact on the level of the assuming party's obligation.  Assumed liabilities are not limited to the amount distributed on allowed claims.

Under New GM's "no distribution" logic, New GM's liability for compensatory damages would be capped at $0.30 (or zero if this was a zero recovery case).  Indeed, "assumption of liability" would vary from case to case depending on the degree of the debtor's insolvency and every guaranty would become a guaranty of bankruptcy dollars.  Nothing in the Sale Agreement, the Sale Order, applicable law, or the rules of common sense allow New GM to limit its liability for Assumed Liabilities to the amount such creditors would have received in the chapter 11 case.

### D.    *Post-Closing Ignition Switch Accident Plaintiffs Are* <u>*Permitted to Rely on Old GM Acts in Their Complaints*</u>

References to Old GM in the Post-Closing Ignition Switch Accident Plaintiffs' complaints are entirely appropriate.  Putting aside punitive damages for the moment, New GM <u>assumed</u> the liability of Old GM for Product Liabilities for post-closing accidents involving vehicles manufactured by Old GM, which means New GM has agreed that it is liable for whatever Old GM is or would have been liable for.  Unlike the successor liability claims addressed in the Decision, there is no issue with the Post-Closing Ignition Switch Accident Plaintiffs seeking to hold New GM responsible for Old GM acts; New GM expressly assumed that responsibility.  Indeed, how else could the Post-Closing Ignition Switch Accident Plaintiffs show that Old GM was liable to accident victims for the liabilities of Old GM that New GM has undeniably assumed?  The way to hold New GM liable for the liabilities that it assumed in section 2.3(a)(ix) of the Sale Agreement is to demonstrate at trial that Old GM designed a

19

defective car and then failed or refused to disclose the defect or recall the vehicle.  This led the

Post-Closing Ignition Switch Accident Plaintiffs to unknowingly purchase defective vehicles and

unknowingly drive those vehicles until the incident occurred.  Old GM is or should be liable for

such pre-Sale conduct, and New GM has assumed that liability.  Therefore, while the Post-

Closing Ignition Switch Accident Plaintiffs will review and respond to the marked complaints

that New GM is preparing in accordance with this Court's September 3 Scheduling Order, they

continue to wonder what New GM can credibly argue was improperly pled.

## II.    New GM Can Be Held Independently Liable for
Punitive Damages for its Own Post-Sale Actions and Inactions
Without Regard to New GM's Assumption of Old GM's Liability

The Post-Closing Ignition Switch Plaintiffs also seek to hold New GM liable for its own

independent, post-closing misconduct with respect to the delayed recall, not as the party that

assumed Old GM's liability but purely as "Independent Claims."  As the relevant complaints

allege, following the Sale, New GM continued the concealment of the Ignition Switch Defect

begun by Old GM, even though New GM inherited Old GM's knowledge of the defect and hired

its employees and (subsequent to the Closing Date) developed its own information about the

Ignition Switch Defect.  By delaying the recall for so many years, New GM may have caused a

plaintiff to purchase a used vehicle that he or she never would have purchased if he or she had

known it contained a life-threatening safety defect.  Even if the defective vehicle was purchased

pre-Sale, the delayed recall by New GM caused the plaintiff to unknowingly continue to drive

that defective vehicle until the occurrence of the incident.  New GM's failure or refusal to

perform a recall when it had knowledge of the Ignition Switch Defect was wanton and reckless,

regardless of whether New GM's knowledge was inherited from Old GM's books and records, or

from the minds of Old GM's employees, or was separately developed by New GM.

### A.      *New GM Can Be Held Liable for Punitive Damages Based On the Knowledge of the Ignition Switch Defect it Acquired From Old GM on the Closing Date*

The second path to punitive damages is to hold New GM liable for punitive damages for its own independent, post-closing breaches, actions and inactions, which were done with the knowledge of the Ignition Switch Defect that it acquired from Old GM on the Closing Date.  As this Court knows, at the moment the Sale closed, New GM inherited the books, records, files, databases (including the TREAD database Old GM used to monitor safety matters as required under the Safety Act), reports, and analyses of Old GM,[10] and the minds of the employees that were transferred from Old GM to New GM (and all of the pre-Sale knowledge in those minds).  Regardless of when it came into existence, that knowledge is an element of New GM's post-closing conduct that can be considered as part of a punitive damages case against New GM.

As will be more fully briefed in connection with the "Imputation Issue," this Court has already held that New GM is responsible for its own independent, tortious, and illegal conduct following the Closing Date.  *See* Decision, 529 B.R. at 583 ("And to the extent, if any, that New GM might be liable on claims based solely on any wrongful conduct on its own part (and in no way relying on wrongful conduct by Old GM), New GM would be liable not because it had assumed any Old GM liabilities (or was responsible for anything that Old GM might have done wrong), but only because New GM had engaged in independently wrongful, and otherwise actionable, conduct on its own."); *id.* at 598.  Moreover, this Court has instructed the parties to this litigation that the knowledge New GM personnel had post-closing regarding the Ignition Switch Defect would be "fair game" "even if those personnel acquired that knowledge while acting for Old GM."  *In re Motors Liquidation Co.*, 2015 Bankr. LEXIS 2406, *8 n.16 (Bankr. S.D.N.Y. July 22, 2015) ("*Bledsoe*").  Thus, the allegations in the Post-Closing Ignition Switch

---

[10] *See* Sale Agreement at § 2.2(a)(xiv).

Accident Plaintiffs' complaints regarding the knowledge of the Ignition Switch Defect that was

already possessed by New GM employees at the Closing Date do not violate this Court's prior

rulings (even though that knowledge came into being prior to the Closing Date).

> This Court also held in its Decision that:

>> [t]he Court has based its conclusion that the Plaintiffs were known
>> creditors here on the fact that at least 24 Old GM engineers, senior
>> managers, and attorneys knew of the Ignition Switch Defect--a group
>> large in size and relatively senior in position.  The Court has drawn
>> this conclusion based not (as the Plaintiffs argue) on any kind of
>> automatic or mechanical imputation drawn from agency doctrine
>> (which the Court would find to be of doubtful wisdom), but rather on
>> its view that a group of this size is sufficient for the Court to conclude
>> that a 'critical mass' of Old GM personnel had the requisite
>> knowledge--i.e., were in a position to influence the noticing process.

Decision, 529 B.R. at 558 n.154.  Whether a court will ultimately reach the same conclusion for

New GM as this Court did regarding Old GM's knowledge of the Ignition Switch Defect and

resulting responsibilities, is a determination for another day.  Here, the question is <u>not</u> whether

New GM had the same awareness of the Ignition Switch Defect as Old GM.  Rather, the issue is

whether these plaintiffs <u>can seek to prove New GM had sufficient awareness</u> by making

reference to knowledge and information that was indisputably transferred (or available) to New

GM.  Indeed, if <u>zero</u> information was inherited by New GM, it would not even be capable of

manufacturing an automobile.  Raising this issue as part of the prosecution of an Independent

Claim for punitive damages is not barred by the Sale Order, Decision, or Judgment.

### B.    *New GM Can Be Held Liable for Punitive Damages Solely Based On Knowledge of the Ignition Switch Defect Accumulated By New GM Post-Sale*

Even if this Court were to attempt to distinguish the punitive damages issue from the

above-quoted statements from the Decision and from *Bledsoe* and hold that the triers of fact for

the Bellwether Cases must assume that New GM did not inherit any knowledge of the Ignition

Switch Defect from Old GM, New GM could <u>still</u> be held liable for punitive damages.  This is

true even if the jury is instructed to pretend that immediately prior to the Sale, all Old GM

employees with knowledge of the Ignition Switch Defect (including the "at least 24 Old GM

engineers, senior managers and attorneys" this Court referenced in its Decision) were

brainwashed of any knowledge of the Ignition Switch Defect and all books and records reflecting

the Ignition Switch Defect were destroyed.  Because the complaints at issue have ample

allegations that (i) after the Closing Date, New GM continuously acquired and developed

knowledge of the deadly crashes involving the Subject Vehicles and the cause of those crashes

and (ii) that New GM failed or refused for years to recall these vehicles, New GM can be held

liable for compensatory and punitive damages as "Independent Claims," based solely upon its

own post-closing conduct.  *Cf. Holland v. FCA US LLC*, 2015 U.S. Dist. LEXIS 117643, *13-14

(N.D. Ohio Sept. 3, 2015) (denying purchaser of Chrysler's assets' request to transfer litigation

to the bankruptcy court because the complaints at issue – even though they used the phrase

"successor liability" – only alleged liability against the purchaser for knowledge acquired and

acts taken post-sale).  Simply put, the fact that New GM acquired its business through a 363 sale

does not place it above the law or absolve it from liability (including punitive damages) for its

own reprehensible conduct.

### III.    Imposition of a Shield Against Punitive Damages Would Violate the Post-Closing Ignition Switch Accident Plaintiffs' Due Process Rights

In addition to the foregoing, there are due process issues that drive whether punitive

damages can be sought from New GM that are distinct from the question of whether punitive

damages are an "Assumed Liability" or can be asserted against New GM as an Independent

Claim.  Although the result is the same for the assertion of punitive damages claims against New

GM, the analysis is slightly different depending upon whether the subject vehicle was acquired

by personal injury plaintiff before or after the date of the closing of the Sale.

For vehicles acquired before the closing of the Sale, each plaintiff in this category was a known creditor of Old GM because each of these plaintiffs (i) owned a vehicle that was known to Old GM to contain a safety defect, and (ii) was capable of being identified and notified by Old GM.  As this Court has held, all of these vehicles should have been recalled by Old GM prior to the Sale, but were not.  *See* Decision, 529 B.R. at 524-25.  Plaintiffs in this category were denied the notice required by due process and were subsequently prejudiced when, unaware of the safety defect or their potential future claims, they (i) may have lost their full panoply of claims (*i.e.*, the right to recover punitive damages) if the Sale Order is now enforced against them, and (ii) unknowingly continued to operate their vehicles and such vehicles failed causing death, injury, and/or property damage.  But for the failure to initiate a recall or otherwise alert these plaintiffs to the dangerous condition in their vehicles, the incidents that injured (or killed) these plaintiffs would not have occurred.  Consistent with this Court's Decision, the successor liability shield in the Sale Order cannot be applied against these plaintiffs to impose any supposed limit on the assertion of claims for punitive damages against New GM.

For vehicles acquired after the closing of the Sale, each plaintiff in this category lacked any connection to Old GM at the time of the Sale.[11]  Apart from Old GM's inability to predict who might acquire one of its defective vehicles after the closing of the Sale, and despite the fact that had the vehicle been recalled before the Sale, the harm caused by the defect in the vehicle would have been avoided, the publication notice given by Old GM was ineffective to bar punitive damages claims by future creditors such as these plaintiffs.  It is indisputable that actual notice could not have been given to persons that did not yet own a Subject Vehicle.  It is also indisputable that publication notice could never be sufficient notice to persons with no

---

[11] Of the six Bellwether Cases, four involve situations where the plaintiff acquired the subject vehicle after the Closing Date:  the *Yingling*, *Norville*, *Reid*, and *Barthelemy* actions.

connection to Old GM and no reason to read the notice or ability to comprehend its import.  This is especially true here because the generic form of notice given did not mention the Ignition Switch Defect.  Under these circumstances, these plaintiffs are no different than the plaintiffs in *Grumman Olson*.  *See* Decision, 529 B.R. at 572 n.203 (citing *Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus., Inc.)*, 445 B.R. 243 (Bankr. S.D.N.Y. 2011), *aff'd* 467 B.R. 694, 706-07 (S.D.N.Y. 2012) (finding due process concerns made bar of successor liability unenforceable against claimants who were unknown, future, claimants at the time of the sale).  These plaintiffs are true future creditors and cannot be bound by any limiting aspects of the Sale Order, which includes any supposed limit on the assertion of punitive damages.

## <u>Conclusion</u>

For the foregoing reasons, the Post-Closing Ignition Switch Accident Plaintiffs respectfully request entry an order (i) deeming their requests for punitive damages against New GM permissible under this Court's Sale Order, Decision, and Judgment and (ii) permitting them to pursue such punitive damages against New GM in the MDL or other trial courts with jurisdiction over their respective lawsuits.

Dated: September 13, 2015                    Respectfully submitted,

                                             /s/ *William P. Weintraub*
                                             William P. Weintraub
                                             Gregory W. Fox
                                             GOODWIN PROCTER LLP
                                             The New York Times Building
                                             620 Eighth Avenue
                                             New York, NY 10018
                                             Tel.: 212.813.8800
                                             Fax:  212.355.3333
                                             wweintraub@goodwinprocter.com
                                             gfox@goodwinprocter.com

                                             *Counsel for Post-Closing Ignition
                                             Switch Accident Plaintiffs*

## **Exhibit A**

### Bellwether Cases

1. *Cockram v. General Motors, LLC* (Case No. 14-cv-08176) (S.D.N.Y.)
2. *Scheuer v. General Motors, LLC* (Case No. 14-cv-08176) (S.D.N.Y.)
3. *Norville v. General Motors, LLC* (Case No. 14-cv-08176) (S.D.N.Y.)
4. *Barthelemy v. General Motors, LLC* (Case No. 14-cv-05810) (S.D.N.Y.)
5. *Reid v. General Motors, LLC* (Case No. 14-cv-05810) (S.D.N.Y.)
6. *Yingling v. General Motors, L.L.C.* (Case No. 14-cv-05336) (S.D.N.Y.)

### Non-Bellwether Post-Sale Ignition Switch Accident Cases[12]

1. *Altebaumer v. General Motors, LLC* (Case No. 14-cv-04142) (S.D.N.Y.)
2. *Bendermon v. General Motors, LLC* (Case No. 15-cv-01354) (S.D.N.Y.)
3. *Fleck v. General Motors, LLC* (Case No. 14-cv-08176) (S.D.N.Y.)
4. *Hayes v. General Motors, LLC* (Case No. 14-cv-10023) (S.D.N.Y.)
5. *Stevens v. General Motors, LLC* (Case No. 2015-04442) (Dist. Ct. of Harris County, Tx.)

---

[12] The actions listed under the category of "Non-Bellwether Post-Sale Accident Cases" are personal injury and wrongful death actions against New GM arising from post-Sale incidents other than the Bellwether Cases in which the plaintiffs are represented by law firms Goodwin Procter, LLP represents in these chapter 11 cases and for which New GM has served demand letters referencing the punitive damages issue pursuant to the Judgment.