# <u>Exhibit A</u>

**ORIGINAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

IN RE:

**15 CV 977**

GENERAL MOTORS LLC IGNITION SWITCH LITIGATION    :    14-MD-2543 (JMF)

-------------------------------------------------------------

ARNOLD KESSENGER,                              :    Case No.

                    Plaintiff,            :

-v-                                            :    Complaint

                              :    Jury Trial Demanded

GENERAL MOTORS LLC,                            :

                  Defendant,            :

-------------------------------------------------------------X

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

COMES NOW Plaintiff, ARNOLD KESSENGER, by and through counsel, and files this

Complaint for Damages and Demand for Jury Trial, and states as follows:

**I.    INTRODUCTION**

1.     This action arises out of a motor vehicle accident that occurred on September 3,

2013. On that date, Plaintiff ARNOLD KESSENGER was driving his 2010 Cadillac CTS east on

US Highway 258 in Jacksonville, North Carolina. Plaintiff was stopped facing east at the light in

the correct travel lane for vehicles turning left onto US Highway 258. Plaintiff proceeded into the

intersection to make a left hand turn onto US 258 when another vehicle traveling south on US

258 failed to stop for the red light and struck Plaintiff in the intersection on the left side. After

impact, Plaintiff came to an uncontrolled stop facing east in the intersection. Plaintiff's airbags

failed to deploy causing severe injuries and damages.

1

2.      Upon information and belief, Plaintiff's 2010 Cadillac CTS's airbags failed to deploy due to a design defect in the vehicle's ignition switch, as described more fully below.

3.      As a result of the September 3, 2013 motor vehicle accident, Plaintiff ARNOLD KESSENGER suffered significant and long-lasting injuries that continue to this day.

4.      Prior to the accident on September 3, 2013, Defendant General Motors LLC knew of the design defect in the 2010 Cadillac CTS, yet failed to disclose the design defect or warn users of its existence. Rather, Defendant intentionally, purposely, fraudulently, and systematically concealed the defect from Plaintiff, the federal government, and the public at large.

5.      Accordingly, Plaintiff ARNOLD KESSENGER brings this action against Defendant General Motors LLC for negligence, strict liability, fraudulent concealment, and product liability under applicable law. Further, Plaintiff ARNOLD KESSENGER asserts claims against Defendant General Motors LLC for liability as a successor and mere continuation of General Motors Corporation.

6.      Further, and as set forth in more detail below, Plaintiff is compelled to file this Complaint because the Ignition Compensation Claims Resolution Facility established by Defendant General Motors LLC has unreasonably excluded accidents involving the 2010 Cadillac CTS from eligibility for compensation. The defect in vehicles eligible for compensation through the Facility is identical to the defect present in the 2010 Cadillac CTS. The 2010 Cadillac CTS was recalled for an ignition switch defect at or around the same time that Defendant General Motors LLC recalled the Cadillac SRX, Chevrolet Malibu, Oldsmobile Intrigue, Oldsmobile Alero, Pontiac Grand Am, Chevrolet Impala, Chevrolet Monte Carlo, Pontiac Grand Prix, and other vehicles for the exact same ignition switch defect. Defendant's

engineers developed and have knowledge of evidence that the ignition switch in the 2010

Cadillac CTS performs below Defendant's design specifications for the ignition switch. And

Defendant General Motors LLC has instituted a repair protocol under the direction of the

National Highway Traffic Safety Administration (NHTSA) requiring that the 2010 Cadillac CTS

and earlier model year defective vehicles receive precisely the same repairs. Defendant General

Motors LLC has, in other words, treated the recall and government-regulated repair of the 2010

Cadillac CTS in precisely the same manner as each of the other 2.1 million vehicles recalled for

defective ignition switches. Yet, Defendant General Motors LLC has, for the most part, restricted

eligibility in its Claims Resolution Facility to model year 2007 vehicles and earlier. This is

unreasonable. Consequently, Plaintiff, and others similarly situated, is left with no other recourse

but to seek compensation for his injuries through lawsuits such as the instant action.

## II.    PARTIES

7.    Plaintiff ARNOLD KESSENGER is an adult resident of Pensacola, Escambia

County, Florida. During the time in which the accident occurred, Plaintiff was an adult resident

of Jacksonville, Onslow County, North Carolina. Plaintiff ARNOLD KESSENGER was

seriously injured as a result of the automobile accident described below.

8.    Defendant General Motors LLC is a citizen of Delaware and Michigan, and does

business in all fifty states, including the States of Florida and North Carolina. General Motors

LLC's principal place of business is in Detroit, Michigan.

9.    Defendant General Motors LLC does business in the State of New York with its

principal domestic address located at Corporation Service Company, 80 State Street, Albany,

New York 12207.

10. General Motors LLC is a limited liability corporation with one member: General Motors Holding, LLC. General Motors Holding, LLC is a citizen of Delaware and Michigan, and is a holding company and direct parent of General Motors LLC. General Motors Holding, LLC is a limited liability corporation with one member: General Motors Company. General Motors Company is a citizen of Delaware and Michigan and is publicly traded.

11. General Motors Corporation was a Delaware corporation with its headquarters in Detroit, Michigan. General Motors Corporation, through its various entities, designed, manufactured, marketed, distributed, and sold Chevrolet, Pontiac, Saturn, and other brand automobiles in North Carolina, elsewhere in the United States, and worldwide.

12. In June of 2009, General Motors Corporation ("Old GM") filed for bankruptcy. On July 9, 2009, the United States Bankruptcy Court approved the sale of substantially all of Old GM's assets pursuant to a Master Sales and Purchase Agreement ("Agreement"). The Agreement became effective on July 10, 2009. The Agreement approved the sale of Old GM to Defendant General Motors LLC (hereinafter "Defendant," "GM," or "New GM").

13. The Agreement defines Defendant's "Purchased Assets" as:

(xiv) all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials (in whatever form or medium), including Tax books and records and Tax Returns used or held for use in connection with the ownership or operation of the Purchased Assets or Assumed Liabilities, including the Purchased Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers, legal records and information and other data;

(xv) all goodwill and other intangible personal property arising in connection with the ownership, license, use or operation of the Purchased Assets or Assumed Liabilities; . . . .

AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT at Section 2.2.

4

14.      Along with the Purchased Assets, GM also expressly took on a range of liabilities.

"Liabilities" is defined in the Agreement as "any and all liabilities and obligations of every kind

and description whatsoever, whether such liabilities or obligations are known or unknown,

disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined

or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including

Indebtedness and those arising under any Law, Claim, Order, Contract or otherwise."

15.      Among many others, the Liabilities assumed by GM under the Agreement

include:

> (vii) (A) all Liabilities arising under express written warranties of Sellers [i.e., old GM]
> that are specifically identified as warranties and delivered in connection with sale of new,
> certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and
> equipment (including service parts, accessories, engines and transmissions) manufactured
> or sold by Sellers or Purchaser [i.e., new GM] prior to or after the Closing and (B) all
> obligations under Lemon Laws; . . .

> (ix) all Liabilities to third parties for death, personal injury, or other injury to Persons or
> damage to property caused by motor vehicles designed for operation on public roadways
> or by the component parts of such motor vehicles and, in each case, manufactured, sold
> or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of
> accidents, incidents, or other distinct and discreet occurrences that happen on or after the
> Closing Date and arise from such motor vehicles' operation or performance;[1] . . .

> (xi) all Liabilities arising out of, relating to, in respect of, or in connection with the use,
> ownership or sale of the Purchased Assets after the Closing; . . .

16.      GM also assumed responsibility for compliance with a wide range of laws and

other regulations, including:

> (a) From and after the Closing, Purchaser [Defendant GM] shall comply with the
> certification, reporting, and recall requirements of the National Traffic and Motor
> Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and
> Documentation Act, the Clean Air Act, the California Health and Safety Code and
> similar Laws, in each case, to the extent applicable in respect of vehicles and
> vehicle parts manufactured or distributed by Seller [Old GM].

---

[1] Pursuant to an order of the bankruptcy court, this particular category of assumed
liabilities is "regardless of when the product was purchased."

5

(b) From and after the Closing, Purchaser [Defendant GM] shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [Old GM] . . . (ii) Lemon Laws.

17.    Moreover, the Bankruptcy Court order approving the Agreement made clear that Defendant GM assumed "the warranty and recall obligations of both Old GM and [Defendant GM]."

18.    Pursuant to the Agreement and other orders of the Bankruptcy Court, Defendant GM emerged out of bankruptcy and continued the business of Old GM with many, if not most, of Old GM's employees and, on information and belief, with most of the same senior-level management, officers, and directors.

19.    The allegations pertaining to Old GM above are included for purposes of background and context, and to set forth the scope of Defendant GM's liabilities and responsibilities under the Agreement. This Complaint does not assert any causes of action against Old GM; all causes of action and attributions of liability are directed solely against Defendant General Motors LLC.

## III.    JURISDICTION

20.    Jurisdiction is proper in this Court pursuant to Case Management Order No. 8 in *In re General Motors LLC Ignition Switch Litigation*, [14-MC-2543, Dkt. No. 36]. By filing this Complaint in this district, however, Plaintiff does not waive his right to transfer this case to the district where the cause of action arose or in which he resides at the conclusion of pretrial proceedings.

21.    This Court also has jurisdiction over this matter under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff is a citizen of a different state

than Defendant.

## IV.   STATEMENT OF FACTS

### A.   The September 3, 2013 Accident

22.   On or about the evening of September 3, 2013, Plaintiff ARNOLD KESSENGER was driving his 2010 Cadillac CTS east on US Highway 258 in Jacksonville, North Carolina.

23.   At approximately 7:44 p.m., Plaintiff was stopped facing east at the light in the correct travel lane for vehicles turning left onto US Highway 258. Plaintiff proceeded into the intersection to make a left hand turn onto US 258 when another vehicle traveling south on US 258 failed to stop for the red light and struck Plaintiff in the intersection on the left side. After impact, Plaintiff came to an uncontrolled stop facing east in the intersection. The airbags in Plaintiff's Cadillac CTS did not deploy during the collision.

24.   The resulting collision caused injuries to Plaintiff's left hand, which was jammed against the steering wheel, injuries to his left elbow, and a torn rotator cup in his left shoulder which was jerked forward during the collision.

25.   At the time of the accident, the road was dry and Plaintiff was slowly proceeding into the intersection to make his left turn. Plaintiff was wearing his seat belt.

26.   Plaintiff suffered significant and life-altering personal injuries as a result of the September 3, 2013 accident.

27.   The September 3, 2013 accident has caused injury, pain, and suffering that continues to this day. Plaintiff's ability to use his left hand, elbow and shoulder has been significantly reduced. Plaintiff has undergone 2 surgeries: (1) his left elbow on October 2, 2014; and (2) his left shoulder rotator cuff and ligaments on December 29, 2014, with all concurrent pain and suffering. He experiences excruciating recurrent pain in his hand and shoulder. He

7

experiences constant numbness in his left elbow that will continue for the rest of his life. He further continues to need physical rehabilitation to re-learn how to use his injured hand, elbow, and shoulder. These conditions were not present prior to the September 3, 2013 accident.

28.     To Plaintiff's knowledge and understanding, the Cadillac CTS involved in the September 3, 2013 accident had not been substantially modified or changed in any material way from its initial condition as designed, manufactured, marketed, and sold by Old GM.

29.     Upon information and belief, Plaintiff's Cadillac CTS's airbags failed to deploy on September 3, 2013 because of a defective ignition switch, described more fully below. That ignition switch, which is the subject of NHTSA Campaign Number 14V-047, can inadvertently and unexpectedly move out of the "run" position when, *inter alia*, an affected vehicle "experiences rough road conditions or other jarring."

30.     Plaintiff's accident occurred approximately 10 months before GM notified NHTSA that it was recalling Plaintiff's 2010 Cadillac CTS. GM knew, however, years prior to September 3, 2013, that the ignition switch in Plaintiff's vehicle may fail if the vehicle experienced a jarring condition, or if the key chain was carrying added weight. GM notified some GM dealers of this defect, but it did not notify consumers such as Plaintiff. Instead, GM concealed and obfuscated the fact of the ignition switch's defect—a fraud that resulted in Plaintiff's serious and long-term injuries on September 3, 2013.

**B.     GM Fraudulently Concealed the Ignition Switch Defect**

*1.     The Defective Vehicles Manufactured by Old and New GM*

31.     As used in this Complaint, the "Subject Vehicles" refers to GM vehicles sold in the United States equipped at the time of sale with an ignition switch sharing a common, uniform, and defective design.

8

32.    Plaintiff ARNOLD KESSENGER's 2010 Cadillac CTS falls within this group of Subject Vehicles.

33.    The ignition switches in the Subject Vehicles contain several common switch points, including "run" (or "on"), "off," and "accessory." At the "run" position, the vehicle's motor engine is running and electrical systems have been activated; at the "accessory" position the motor is off, and electrical power is generally only supplied to the vehicle's entertainment system; and at the "off" position, both the vehicle's engine and electrical systems are turned off. In most vehicles, a driver must intentionally and manually turn the key in the ignition to move to these various positions.

34.    In the Subject Vehicles, a detent plunger in the ignition switch does not generate sufficient torque to keep the detent plunger component in position. Thus, when the vehicle and/or ignition is jarred or any additional weight is added to the key ring, the detent plunger can move, switching the ignition from the "run" position to the "accessory" or "off" position.

35.    In addition, the Subject Vehicles contain a uniformly designed ignition cylinder, with the key position of the lock module on the steering column and an ignition key with a slot for a key ring at the top. By design, the ignition switch was placed low on the steering column, making it easy for a driver of regular height to inadvertently impact the ignition switch with his or her knee while operating the vehicle. Such an impact may jar the ignition switch and cause it to move from the "run" to the "accessory" or "off" position.

36.    The ignition switch on the Subject Vehicles is prone to fail during ordinary and foreseeable driving situations (such as traveling across bumpy or uneven roadways). When the ignition switch "fails," and the ignition switch moves from the "run" to the "accessory" or "off" position during ordinary operation of the vehicle, the power to the vehicle is terminated (even at

9

highway speeds), and the vehicle loses power steering and power brakes, among other things, including disabling airbags.

37.     Each of the Subject Vehicles also contains a uniformly designed airbag system that is disabled when the ignition switch on the vehicles fails during ordinary and foreseeable driving situations. Thus, as a result of the defective design of the Subject Vehicles, a driver whose ignition switch fails may suddenly and without warning experience a vehicular power failure that also disables the vehicle's airbags, steering, and brakes. Such a failure may occur unexpectedly and during normal operation of the vehicle.

38.     The 2010 Cadillac CTS purchased by ARNOLD KESSENGER contained the defective ignition switch and airbag system described in this Complaint.

39.     The ignition switch defect precludes drivers and owners of the Subject Vehicles, such as ARNOLD KESSENGER, from proper and safe use of their vehicles, reduces vehicle occupant protection, and endangers Subject Vehicle occupants as well as those in vehicles around them. Further, because GM concealed the existence of the ignition switch defect, no driver or owner of the Subject Vehicles, including ARNOLD KESSENGER, knew, or could reasonably have discovered, the ignition switch defect.

> 2.     *GM Learned of the Ignition Switch Defect Shortly After the Bankruptcy Sale, but Concealed the Defect for Years*

40.     In 2009, Old GM declared bankruptcy in the United States Bankruptcy Court in the Southern District of New York.

41.     On July 9, 2009, the United States Bankruptcy Court approved the sale of Old GM, which was converted into Defendant New GM. From its inception, New GM, which retained the vast majority of Old GM's senior and management level executives and engineers, knew that its predecessor had manufactured and sold millions of vehicles afflicted with the

10

ignition switch defect. Some of the Old GM employees retained by New GM include current

CEO Mary T. Barra; designer of the ignition switch and engineer Ray DeGiorgio; director of

product investigations Carmen Benavides; engineer Gary Altman; engineer Jim Federico; vice

presidents for product safety John Calabrese and Alicia Boler-Davis; vice president of regulatory

affairs Michael Robinson; director of product investigations Gay Kent; general counsel and vice

president Michael P. Milliken; and in-house product liability lawyer William Kemp.

42.    On or around the day of its formation as an entity, New GM also acquired, *inter
alia*, the knowledge of the contents of Old GM's "files" and company "documents." To that end,

New GM acquired notice of the safety-related defects contained in Old GM's files, including

numerous engineering reports, investigative reports, failure analyses, technical service bulletins,

and other documentation concerning the defective ignition switch and airbag system described

herein.

    *a.    New GM Learns of the Ignition Switch Defect*

43.    From the day of its formation as a corporate entity, New GM acquired notice and

full knowledge of the following:

    a.    In 2001, during pre-production testing of the 2003 Saturn Ion, Old GM

engineers learned that the vehicle's ignition switch could unintentionally move from the

"run" to the "accessory" or "off" position. Old GM further learned that where the ignition

switch moved from "run" to the "accessory" or "off" position, the vehicle's engine would

stall and/or lose power. In a section of an internal report titled, "Root Cause Summary,"

Old GM engineers identified two "causes of failure," namely: "[l]ow contact force and

low detent plunger force."

    b.    Delphi Automotive PLC ("Delphi"), the manufacturer of the ignition

switches,[2] informed Old GM that the ignition switch did not meet Old GM's torque specifications. The Design Release Engineer for the Ion ignition switch, Ray DeGiorgio, specifically discussed with Delphi the fact that the switches did not meet the torque required by Old GM's specifications.

      c.      DeGiorgio also corresponded with representatives of Koyo, the supplier of the Ion steering column into which the ignition switch was to be installed. In his correspondence, DeGiorgio stated that ten of twelve prototype ignition switches recently provided by Delphi "[f]ailed to meet engineering requirements," and remarked that the "failure is significant."

      d.      Nonetheless, rather than delay production of the Saturn Ion, and redesign the ignition switch in order to ensure that it met Old GM's specifications, Mr. DeGiorgio went ahead and approved use of ignition switches he knew did not meet Old GM's design specifications.

      e.      Old GM contracted with Continental Automotive Systems US, Inc. ("Continental") to manufacture the airbag system, including the sensing system, in the Subject Vehicles, including the 2003 Saturn Ion.

      f.      The airbag system in the Subject Vehicles was defectively designed so that it would shut off and the airbags would not deploy when the key in the ignition

---

[2] The ignition switch "was developed as a 'corporate common' part, meaning that it was designed to be used in multiple vehicle platforms." REPORT TO BOARD OF DIRECTORS OF GENERAL MOTORS COMPANY REGARDING IGNITION SWITCH RECALLS at 19 (May 29, 2014) (hereinafter, "Valukas Report"). The defective ignition switches were installed in, inter alia, the Chevrolet HHR, Chevrolet Cobalt, Saturn Ion, Saturn Sky, Pontiac G5, and Pontiac Solstice. Id. at 18-19. The use of common ignition switches across vehicle makes was a method to reduce costs. *Id.*

12

turned from the "run" to the "accessory/off" position during foreseeable driving operation.

g.      In 2002, Old GM began manufacturing and selling 2003 Saturn Ions with the defective ignition switches and defective airbag systems.

h.      In 2004, Old GM engineers reported that the ignition switch on the Saturn Ion was so weak and placed so low on the steering column that the driver's knee could easily bump the key and turn off the vehicle.

i.      This defect was sufficiently serious that an Old GM engineer, Gerald A. Young, reported in January 2004 that "[t]he ignition switch is too low. All other keys and the key fob hit on the driver's right knee. The switch should be raised at least one inch toward the wiper stalk." Young then concluded that "[t]his is a basic design flaw and should be corrected if we want repeat sales."

j.      Mr. Young was not alone in his observations. In a February 19, 2004 report concerning his model year 2004 Saturn Ion, Old GM employee Onassis Matthews stated, "The location of the ignition key was in the general location where my knee would rest (I am 6' 3" tall, not many places to put my knee). On several occasions, I inadvertently turn [sic] the ignition key off while *driving down the road*. For a tall person, the location of the ignition key should be moved to a place that will not be inadvertently switched to the off position."

k.      Two months later, in an April 15, 2004 report concerning his model year 2004 Saturn Ion, Old GM employee Raymond P. Smith described a moving stall: "I thought that my knee had inadvertently turned the key to the off position."

l.        Meanwhile, a July 1, 2004 report by Siemens VDO Automotive analyzed the relationship between the ignition switch in Old GM-branded vehicles and the airbag system. The Siemens report concluded that when an Old GM-branded vehicle experienced a power failure, the airbag sensors were disabled. The Siemens report was distributed to at least five Old GM engineers.

m.       The Chevrolet Cobalt was in pre-production at this time. In spite of the problems reported with the Saturn Ion's switch, Old GM installed the same ignition switch and airbag system in the 2005 Cobalt as it had in the Ion.

n.        Unsurprisingly, reports of moving stalls surfaced almost immediately around the time of the Cobalt's production launch in 2004. At a press event in the summer or fall of 2004, a journalist informed Doug Parks, the Cobalt Chief Engineer, that while adjusting his seat in the Cobalt he was test driving, the journalist had inadvertently turned off the car by hitting his knee against the key fob or chain. Parks asked Gary Altman, the Program Engineering Manager, to follow up on the complaint by trying to replicate the incident and to determine a fix. Altman thereafter replicated the incident at an Old GM testing facility.

o.        Mr. DeGiorgio learned about the moving stall at the press event in 2004 and was approached by an Old GM engineer who suggested that Old GM should "beef up" the ignition switch detents. DeGiorgio rejected this idea.

p.        Around this same time, Old GM opened an engineering inquiry known as a Problem Resolution Tracking System (PRTS) to address the complaint from the press event that a Cobalt could be "keyed off with knee while driving." At this time, PRTS issues were analyzed by a Current Production Improvement Team (CPIT). The CPIT that

14

examined the Cobalt issue beginning in November 2004 included a cross-section of business people and engineers, including Gary Altman and Lori Queen, Vehicle Line Executive on the case.

q.    Old GM considered a number of potential solutions to the problem during the PRTS, including changes to the key position on the lock module and measures to increase the torque in the ignition switch. Indeed, the CPIT characterized a suggestion to change the location of the ignition switch on the steering column from a low-mount to a higher mount as a "sure solution," but rejected it because it was too expensive. Old GM also considered changing the key from a slot to a hole configuration.

r.    Changing the key from a slot to a hole configuration would reduce the lever arm of the key and key chain. With the slot design, the key hangs lower on the key, which increases the torque force on the ignition switch when the chain is contacted or moved in any way. Old GM engineers determined that changing the key to a hole configuration would lessen the consequences of impacts on the key and significantly reduce the chance that the key would inadvertently move from the "run" to the "accessory/off" position during ordinary driving maneuvers.

s.    Old GM engineer David Trush determined that redesigning the key to a hole design would have cost less than one dollar per vehicle.

t.    In the end, however, Old GM engineers and executives decided to do nothing. In March of 2005, Mr. Altman, who was the Cobalt Program Engineering Manager, issued a directive to close the November 2004 PRTS with no action. The rationale of Old GM's decision makers was that the "lead-time for all solutions is too long" and the "tooling cost and piece price are too high." Thus, "none of the solutions

15

represents an acceptable business case"—a standard phrase used by Old GM when closing a PRTS without action due to cost. David Thrush, the Design Release Engineer for the Cobalt ignition cylinder, explained that an "acceptable business case" is one whose solution should solve the issue, be cost effective, and have an acceptable lead time to implement the change. But one of the very solutions proposed by Thrush—changing the ignition key from a slot to a hole configuration—would have cost less than one dollar per vehicle.

u.      Not only did Old GM close the PRTS with no action, it also downplayed the severity of the safety threat posed, rating the specter of a moving stall (even at highway speeds) with a severity level of 3—on a scale of 1 (most severe) to 4 (least severe).

v.      On February 28, 2005, Old GM issued a bulletin to its dealers regarding engine-stalling incidents in 2005 Chevrolet Cobalts and 2005 Pontiac Pursuits (the Canadian version of the Pontiac G5).

w.      In the February 28, 2005 bulletin, Old GM provided the following recommendations and/or instructions to its dealers—*but did not provide this information to the public in general*:

> There is potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effort. The concern is more likely to occur if the driver is short and has a large heavy key chain.

> In the cases this condition was documented, the driver's knee would contact the key chain while the vehicle was turning. The steering column was adjusted all the way down. This is more likely to happen to a person that is short as they will have the seat positioned closer to the steering column.

> In cases that fit this profile, question the customer thoroughly to determine if this may be the cause. The customer should be advised of this potential and to take steps, such as removing unessential items from their key chains, to prevent it.

16

Please follow this diagnosis process thoroughly and complete each step. If the condition exhibited is resolved without completing every step, the remaining steps do not need to be performed.

x.     At this time, Old GM knew that drivers were inadvertently turning off the vehicles due to design defects in the ignition switches installed in those vehicles, and not only because "short" drivers were impacting the steering column or because drivers' key chains were "heavy."

y.     Old GM failed to disclose and, in fact, concealed the February 28, 2005 bulletin, as well as the information contained therein, to Cobalt and Pursuit owners/lessees, and sent affirmative representations to dealers that did not accurately describe the nature of the problem, the multiple design steps needed for a solution to the problem, and Old GM's knowledge of the problem.

z.     Indeed, rather than disclosing this serious safety problem that uniformly affected all Chevrolet Cobalts, Old GM instead concealed and obscured the defect-related problems, electing to wait until customers brought their cars to a dealership *after* an engine-stalling incident had occurred. Further, Old GM offered even its own dealers an incomplete, incorrect, and insufficient description of the defects and the manner in which to actually remedy them.

aa.     As of February 2005, Old GM engineers knew that the Chevrolet Cobalt ignition switches were defectively designed as discussed in this Complaint.

bb.     Pursuant to 49 C.F.R. § 573.6, which requires an automobile manufacturer to "furnish a report to the NHTSA for each defect . . . related to motor vehicle safety," Old GM had a duty to disclose the safety-related defects in the Chevrolet Cobalt and all other Subject Vehicles as soon as it knew of them.

cc.    Instead of complying with its legal obligations, however, Old GM fraudulently concealed the ignition switch defect from the public and continued to manufacture and sell the Subject Vehicles with known safety defects.

dd.    Between February 2005 and December 2005, Old GM continued to receive reports of moving stalls and/or power failures in the Subject Vehicles. Indeed, Old GM opened multiple PRTS inquiries during this time period regarding reports of power failure and/or engine shutdown in Subject Vehicles.

ee.    As part of one such PRTS, Quality Brand Manager Steven Oakley asked William Chase, an Old GM warranty engineer, to estimate the warranty impact of the ignition switch defect in the Cobalt vehicles. Chase estimated that for Cobalt vehicles on the road for 26 months, 12.40 out of every 1,000 vehicles would experience inadvertent power failure while driving. Old GM did not provide this information to its dealers, to regulators, or to the general public.

ff.    In May 2005, a customer demanded that Old GM repurchase his Cobalt. The complainant stated that the ignition switch shut off during normal driving conditions with no apparent contact between the driver's knee and key chain or fob. Steven Oakley forwarded this information internally, stating that the ignition switch "goes to the off position too easily[,] shutting the car off." Oakley's email was forwarded to DeGiorgio.

gg.    The problem with moving stalls began to receive increased press attention in May and June of 2005. On May 26, 2005, a writer for the *Sunbury Daily Item* in Pennsylvania reviewed the Cobalt and reported that "[u]nplanned engine shutdowns happened four times during a hard-driving test last week. . . . I never encountered anything like this in 37 years of driving and I hope I never do again." Similarly, a writer

18

for the *New York Times* reported that his wife experienced a moving power failure while driving a Cobalt.

hh.    At or around the late spring of 2005, Old GM, through Product Safety Communications Manager Alan Adler (who now works for New GM), issued the following statement regarding customer-reported engine-stalling events in the Chevrolet Cobalt:

> In rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the ignition key to the accessory or off position while the car is running.
>
> When this happens the Cobalt is still controllable. The engine can be restarted after shifting to neutral.
>
> GM has analyzed this condition and believes it may occur when a driver overloads a key ring, or when the driver's leg moves amid factors such as steering column position, seat height and placement. Depending on these factors, a driver can unintentionally turn the vehicle off.
>
> Service advisers are telling customers they can virtually eliminate this possibility by taking several steps, including removing non-essential material from their key rings.
>
> Ignition systems are designed to have "on" and "off" positions, and practically any vehicle can have power to a running engine cut off by inadvertently bumping the ignition from the run to the accessory or off position.

Old GM's statement was demonstrably misleading and false.

ii.    For example, contrary to the above-referenced statement, Old GM's internal testing documents showed that these incidents occurred when drivers were using keys with the standard key fob. Old GM knew that these incidents were not only caused by drivers with heavy key chains or as a result of a driver's seating position. Old GM knew that removing non-essential items from a key chain would not "virtually eliminate" the possibility of power failure.