jj.    Further, Old GM's above-referenced statement was demonstrably false and misleading because Old GM knew that safety incidents related to the ignition switches were the result of the safety-related defects identified in the November 2004 PRTS.

kk.    The negative media coverage, however, was becoming concerning. As a result, Old GM tasked its Product Investigations unit to examine the ignition switch defect. The Product Investigations unit typically was charged with solving significant engineering problems, both of customer satisfaction and product safety. Product Investigations Manager Doug Wachtel and his team examined early data from the field and found 14 incidents related to the ignition switch. Wachtel and company also tried to recreate moving stalls themselves. In this vein, Wachtel and Gay Kent drove a Cobalt around Old GM's property in Warren, Michigan. Ms. Kent had a long and heavy key chain, and was able to knock the ignition from "run" to "accessory" simply by moving her leg so that her jeans caused friction against the fob.

ll.    The Product Investigations unit, in spite of its findings, concluded that the ignition switch problem was not of sufficient seriousness to warrant a recall. At this time, Old GM knew that a defect existed in its vehicles, but it downplayed and denied the magnitude of the problem, and did nothing to disclose the issue to its customers.

mm.    The failure to act did not end here. Around June 7, 2005, DeGiorgio was asked to propose a change to the ignition switch that would double the torque required to turn the switch. DeGiorgio identified two possibilities. First, he proposed using a switch under development for the Saturn Vue and the Chevrolet Equinox (the "GMT 191"). Because the GMT 191 switch was superior to the current ignition switch both electrically

and mechanically, DeGiorgio referred to it as the "gold standard of ignition switches." Second, DeGiorgio proposed redesigning the ignition switch already in use. Part of DeGiorgio's plan for this latter option included adding a second detent plunger.

nn.      On June 14, 2005, Old GM's Vehicle and Process Integration Review (VAPIR) team for the Cobalt met to discuss potential solutions to the moving stall issue. Proposed solutions were categorized as either "short-term" or "long-term." As a proposed short-term solution, Old GM engineers proposed using a smaller key ring and replacing the slotted key head with one that contained a hole. (This was the same solution proposed by David Thrush during the November 2004 PRTS.) Old GM's long-term solution centered on DeGiorgio's proposal to replace the ignition switch with the GMT 191, or "gold standard" switch. The GMT 191 would allegedly double the torque required to turn the ignition. Old GM engineers proposed to implement the new switch beginning with model year 2007 or 2008 vehicles at a cost of just $1.00 per vehicle, plus tooling costs.

oo.      Shortly after its June 14, 2005 meeting, the Cobalt VAPIR team approved a "fix" for existing customers that would address the slotted key heads: a plug capable of insertion into the key head to eliminate the slot along the head of the key. The VAPIR team also approved a redesign of keys for future model year vehicles to eliminate the slot design (a change that was not implemented). Old GM then issued a Preliminary Information to its dealers, explaining that the key insert was available for 2005 Chevrolet Cobalt vehicles. The key insert solution did not, however, address the core problem of low torque and the low placement of the ignition switch on the steering cylinder. Indeed, Old GM's engineers regarded the key head design change as only a temporary solution—

21

or, as one Old GM engineer described it, a "band-aid." Old GM's failure to take decisive action to address the defect would soon prove fatal.

pp.    On June 29, 2005, an Old GM customer filed the following complaint (and succinctly identified the safety risk) regarding a 2005 Cobalt and its tendency to lose power during ordinary driving scenarios:

Dear Customer Service:

This is a safety recall issue if ever there was one. . . . The problem is the ignition turn switch is poorly installed. Even with the slightest touch, the car will shut off while in motion. I don't have to list to you the safety problems that may happen, besides an accident or death, a car turning off while doing a high speed . . . .

qq.    Just weeks later, in July of 2005, Old GM received notice that Amber Marie Rose, a 16 year old resident of Clinton, Maryland, was killed in an accident after her 2005 Chevrolet Cobalt drove off the road and struck a tree head-on. The airbags in Ms. Rose's Cobalt did not deploy during this frontal collision. NHTSA opened an investigation and hired Calspan Crash Data Research to conduct a Special Crash Investigation (SCI). The SCI determined that the ignition switch in Ms. Rose's Cobalt was in the "accessory" position at the time of collision. Upon information and belief, Old GM subsequently entered into a confidential settlement agreement with Ms. Rose's mother.

rr.    In December 2005, Old GM issued a Technical Service Bulletin (05-02-35-007) (the "TSB"). The TSB applied to 2005-2006 Chevrolet Cobalts, 2006 Cadillac CTSs, 2005-2006 Pontiac Pursuits, 2006 Pontiac Solstices, and 2003-2006 Saturn Ions, all of which contained uniformly designed defective ignition switches. The TSB, which was issued only to Old GM dealers, was captioned, "Information on inadvertent Turning

22

of Key Cylinder, Loss of Electrical System and no DTCs." The TSB stated:

> There is potential for the driver to inadvertently turn off the
> ignition due to low ignition key cylinder torque/effort.
>
> The concern is more likely to occur if the driver is short and has a
> large and/or heavy key chain. In these cases, this condition was
> documented and the driver's knee would contact the key chain
> while the vehicle was turning and the steering column was
> adjusted all the way down. This is more likely to happen to a person
> who is short, as they have the seat positioned closer to the steering column.
>
> In cases that fit this profile, question the customer thoroughly to
> determine if this may be the cause. The customer should be advised
> of this potential and should take steps to prevent it—such as removing
> unessential items from their key chain. . . .

ss.      As with its prior bulletin regarding the Subject Vehicles, the information

Old GM provided in the TSB was false and misleading.

tt.      For example, the TSB intentionally omitted use of the word "stall," which

was language Old GM knew was a red flag to regulators. Old GM Quality Service

Manager Steven Oakley, who drafted the December 2005 TSB, stated that the term

"stall" is a "hot" word that Old GM did not use in TSBs because it may raise a concern

about vehicle safety and thereby suggest that a recall, not a TSB, is appropriate. Old GM

personnel also stated that "there was concern about the use of 'stall' in a TSB because

such language might draw the attention of NHTSA."[3] Rather than describe the defective

condition accurately, Old GM used language to obfuscate the problem at hand.

uu.      Further, the TSB fails to mention that an ignition switch that turns to the

"accessory" or "off" position will disable the airbags, cut the engine, and disable power

steering and brakes.

---

[3] Valukas Report at 93 & n.392.

vv.    At the time it issued the TSB, Old GM knew that power failure incidents were happening to drivers of all heights and sizes, and to drivers with no extra items on their key chains.

ww.    Between November 2005 and March 2006, Old GM learned of at least three incidents in which operators of Chevrolet Cobalt vehicles lost control of the vehicle and experienced front-end collisions in which the airbags of the vehicle failed to deploy. In two of these incidents, data obtained from the vehicle's Sensory Diagnostic Module (SDM) showed that the vehicle was in the "accessory" position just before impact. Old GM opened internal investigations into each of these three incidents but generally did nothing.

xx.    On April 24, 2006, Ray DeGiorgio approved plans to redesign the ignition switch in order to improve the switch's torque performance. The redesign plan, *inter alia*, included a new detent plunger and spring in the detent plunger.

yy.    In spite of this redesign, Old GM did not issue a corresponding change of the ignition switch's part number. Upon information and belief, Old GM neglected to change the part number in an effort to conceal its redesign of the ignition switch. Government regulators would later explain that this action—concealing the part change by applying the same part number to the redesigned ignition switches—prevented NHTSA from discovering the ignition switch defect for years.

zz.    Indeed, New GM CEO Mary Barra acknowledged in April 2014 that the failure to change the part number for the ignition switches was inappropriate and did not meet industry standard behavior.

24

aaa.    Furthermore, and in spite of the redesign, the ignition switches continued to fall short of Old GM's design specifications for torque performance. The redesigned ignition switches therefore continued to be defective as designed and manufactured.

bbb.    In October 2006, Old GM again updated the TSB (05-02-35-007) to include additional model years: the 2007 Saturn Ion and Sky, 2007 Cadillac CTS, 2007 Chevrolet Cobalt, and 2007 Pontiac Solstice and G5. These model year vehicles possessed the same safety-related defects as the vehicles included in the original TSB.

ccc.    In August 2007, Old GM met with Continental to review the SDM data from a crash of a 2005 Chevrolet Cobalt where the airbags failed to deploy, resulting in a fatal injury. By this time, Continental had knowledge of the safety-related defects discussed in this Complaint. Neither Old GM nor Continental shared the results of this meeting with relevant regulatory authorities or the public.

ddd.    The next month, the Chief of the Defect Assessment Division within the Office of Defects Investigation of NHTSA proposed that the agency investigate "frontal airbag non-deployment in 2003-2006 Chevrolet Cobalt/Saturn Ion." The proposal was prompted by a "pattern of reported non-deployments" that were "first observed in early 2005." According to the Chief of the Defect Assessment Division, and in response to inquiries from NHTSA, GM "indicat[ed] that they see no specific pattern."

eee.    At this time, Old GM knew of the problems related to airbag non-deployment in the Chevrolet Cobalt vehicles and, according to this email, was deliberately misleading NHTSA about its knowledge of these problems. Old GM knew, for example, that its airbag systems would become disabled when the ignition switch to a vehicle moved from the "run" position to the "accessory" or "off" position during normal

25

operation of the vehicle. All the while, however, Old GM also knew that NHTSA believed that in most, if not all vehicles, the airbag systems were operable for several seconds following a power loss. Thus, Old GM knew that NHTSA was mistaken and did nothing to correct NHTSA's mistaken belief.

     fff.    What is more, between December 2006 and October 2007, Old GM learned of at least five fatal accidents involving frontal collisions in Subject Vehicles wherein the airbags failed to deploy.

     ggg.    The Acting Administrator of NHTSA, David Friedman, testified in 2014 that Old GM withheld data from NHTSA regarding the likelihood of airbag non-deployment in the Subject Vehicles during this time period. Old GM withheld this data in an effort to thwart any investigation by NHTSA and to avoid a recall of the Subject Vehicles.

     hhh.    Old GM's concealment and obfuscation was not limited to its dealing with NHTSA. In a 2008 internal presentation, Old GM instructed its employees to avoid using the following "judgment" words:

| | | |
|---|---|---|
| always | detonate | maniacal |
| annihilate | disemboweling | mutilating |
| apocalyptic | enfeebling | never |
| asphyxiating | evil | potentially-disfiguring |
| bad | evicscerated [sic] | power [sic] keg |
| Band-Aid | explode | problem |
| big time | failed | safety |
| brakes like an "X" car | flawed | safety related |
| cataclysmic | genocide | serious |
| catastrophic | ghastly | spontaneous combustion |
| Challenger | grenadelike | startling |
| chaotic | grisly | suffocating |
| Cobain | gruesome | suicidal |
| condemns | Hindenburg | terrifying |
| Corvair-like | hobbling | Titanic |
| crippling | horrific | tomblike |

26

| | | |
|---|---|---|
| critical | impaling | unstable |
| dangerous | inferno | |
| deathtrap | widow-maker rolling sarcophagus (tomb or coffin) | |
| Kevorkianesque | words or phrases with biblical connotation | |
| debilitating | lacerating | |
| decapitating | life-threatening | |
| defect | maiming | |
| defective | mangling | |

iii.    Instead of using commonsense language, Old GM employees were advised in Orwellian fashion to use specific words to avoid disclosure of the material safety risks associated with Old GM products, and in so doing furthered the cover-up and fraud through intentional (and misleading) word substitutions, such as:

- "Issue, Condition [or] Matter" instead of "**Problem**"

- "Has Potential Safety Implications" instead of "**Safety**"

- "Does not perform to design" instead of "**Defect/Defective**"

jjj.    Old GM knew its defective vehicles were killing and/or maiming its customers, but it nonetheless instructed its employees to avoid words like "defect" or "safety"—words that accurately described the issues. Instead of publicly admitting the dangerous safety defects in its vehicles, Old GM repeatedly blamed accidents on driver error.

kkk.    Upon information and belief, Old GM's policy against "judgment" words, and linguistic obfuscation in general, was adopted and continued on by New GM after the bankruptcy sale.

        *b.     New GM Continues to Fraudulently Conceal the Ignition Switch Defect After the Bankruptcy Sale*

44.    New GM continued its business with full knowledge of Old GM's awareness and concealment of the defects with the ignition switch and airbag system, and with knowledge of

Old GM's failure to disclose those defects to the public—or, for that matter, to the Bankruptcy Court. Had New GM acted when it acquired knowledge of the ignition switch defect, ARNOLD KESSENGER would likely not have been involved in an accident on September 3, 2013—almost five years after New GM emerged from bankruptcy.

45.    Rather than promptly recalling the Subject Vehicles, however, New GM fraudulently concealed the existence of the safety defects in the Subject Vehicles. Moreover, New GM continued to manufacture vehicles with the ignition switch defect after it emerged from bankruptcy. Indeed, hundreds of thousands of the vehicles manufactured by New GM have since been recalled for defective ignition switches.

46.    In March 2010, GM recalled nearly 1.1 million Cobalt and Pontiac G5 models for faulty power steering issues. In recalling these vehicles, GM recognized that loss of power steering, standing alone, was grounds for a safety recall. Yet, incredibly, GM claims it did not view the ignition switch defect (which disables power steering as well as other functions) as a "safety issue," but only a "customer convenience issue." Despite its knowledge of the ignition switch defect, GM did not include the ignition switch defect in this recall.

47.    Just days after the power steering recall, GM's deadly ignition switch took another life. On March 10, 2010, Brooke Melton was driving her 2005 Chevrolet Cobalt on a two-lane highway in Paulding County, Georgia. While she was driving, her key turned from the "run" to the "accessory/off" position causing her engine to shut off. After her engine shut off, she lost control of her Cobalt, which traveled into an oncoming traffic lane, where it collided with an oncoming car. Ms. Melton was killed in the crash. And the deaths did not stop here.

48.    On December 31, 2010, in Rutherford County, Tennessee, a 2006 Cobalt traveled off the road and struck a tree. Although there was a frontal impact in this incident, the front

28

airbags failed to deploy. The download of the SDM later showed the key was in the "accessory/off" position at the time of the crash. GM received notice of this incident, opened a file, and referred to it as the "Chansuthus" incident.

49.    Also on December 31, 2010, in Harlingen, Texas, a 2006 Cobalt traveled off the road and struck a curb. Although there was a frontal impact, the front airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "Najera" incident.

50.    On March 22, 2011, Ryan Jahr, a GM engineer, downloaded the SDM from Brooke Melton's Cobalt. The information from the SDM download showed that the key in the Cobalt turned from the "run" to the "accessory/off" position 3-4 seconds before the crash. On June 24, 2011, Brooke Melton's parents filed a lawsuit against GM.

51.    In August 2011, GM assigned Engineering Group Manager Brian Stouffer to assist with a Field Performance Evaluation (FPE) that it had opened to investigate frontal airbag non-deployment incidents in Chevrolet Cobalts and Pontiac G5s.

52.    On December 18, 2011, in Parksville, South Carolina, a 2007 Cobalt traveled off the road and struck a tree. Although the vehicle sustained a frontal impact, the front airbags did not deploy. A subsequent download of the SDM showed that the ignition key was in the "accessory/off" position at the time of impact. GM received notice of this incident, opened a file, and referred to it as the "Sullivan" incident.

53.    In early 2012, Brian Stouffer asked Jim Federico (who reported directly to Mary Barra at the time) to oversee the FPE investigation into frontal airbag non-deployment incidents. Federico was named the "executive champion" for the investigation to help coordinate resources.

54.    In May 2012, GM engineers tested the torque on numerous ignition switches of 2005-2009 Cobalt, 2007-2009 Pontiac G5, 2006-2009 HHR, and 2003-2007 Ion vehicles that

were parked in a junkyard. The results of these tests showed that the torque required to turn the ignition switches from the "run" to the "accessory/off" position in most of these vehicles did not meet GM's minimum torque specification requirements. Even vehicles from model years 2008-2009, after Ray DeGiorgio approved the redesign of the ignition switch, by and large failed to meet GM's torque specifications. These results were reported to Stouffer and other members of the FPE.

55.    In September 2012, Stouffer requested assistance from a "Red X Team" as part of the FPE investigation. The Red X Team was a group of engineers within GM assigned to find the root cause of the airbag non-deployments in front-end accidents involving Chevrolet Cobalts and Pontiac G5s. By that time, however, it was clear that the root cause of the airbag non-deployments in a majority of the front-end accidents was the defective ignition system.

56.    Indeed, Mr. Stouffer acknowledged in his request for assistance that the Chevrolet Cobalt could experience a power failure during an off road event, or if the driver's knee contacted the key and turned off the ignition. Mr. Stouffer further acknowledged that such a loss of power could cause the airbags not to deploy. In other words, Mr. Stouffer knew full well the reasons for the airbag non-deployments, yet he requested additional assistance in order to stall and/or ignore the problem.

57.    At this time, GM did not provide the information that it had developed during the FPE to NHTSA or the public.

58.    Under 49 C.F.R. § 573.6, GM had a duty in 2012, when it clearly was aware of the ignition switch defect, to disclose the defect in the Subject Vehicles. Rather than comply with its legal obligations, GM continued to fraudulently conceal this defects from the public and the US government.

59.     Had GM complied with its obligations under § 573.6, a recall may have been implemented in 2012, and ARNOLD KESSENGER's Cadillac CTS may have been repaired prior to September 3, 2013.

60.     Acting NHTSA Administrator David Friedman recently stated, "at least by 2012, GM staff was very explicit about an unreasonable risk to safety" from the ignition switches in the Subject Vehicles.

61.     Mr. Friedman continued: "GM engineers knew about the defect. GM lawyers knew about the defect. But GM did not act to protect Americans from the defect."

62.     There is significant evidence that multiple in-house attorneys knew of and understood the ignition switch defect in and around 2012 and 2013. These attorneys, including in-house lawyer Michael Milliken, negotiated settlement agreements with families whose loved ones had been killed and/or injured while operating a Subject Vehicle under circumstances that implicated the ignition switch defect.  In spite of their knowledge of the ignition switch defect, GM's attorneys concealed what they knew and neglected to question whether the Subject Vehicles should be recalled. This quest to keep the ignition switch defect secret prolonged its ultimate discovery and contributed to added death and injury.

63.     During the FPE inquiry, GM determined that, although increasing the detent in the ignition switch would reduce the chance that the key would inadvertently move from the "run" to the "accessory/off" position, it would not be a total solution to the problem.

64.     Indeed, GM engineers identified several additional ways to actually fix the problem. Unsurprisingly, these solutions echoed solutions that Old GM engineers had proposed years before, but had decided not to implement because of cost concerns. GM engineers proposed adding a shroud to prevent a driver's knee from contacting the key, modifying the key

31

and lock cylinder to orient the key in an upward facing orientation when in the "run" position, and adding a push button to the lock cylinder to prevent it from slipping out of run. GM rejected each of these ideas.

65.     The photographs below depict a GM engineer in the driver's seat of a Cobalt during the investigation of Cobalt stalling incidents. Note the proximity of the driver's knee to the ignition key:



66.     These photographs show the dangerous position of the key in the lock module on the steering column, as well as the key with the slotted head, which allows the key fob to hang too low off the steering column. GM engineers understood that the key fob can be impacted and pinched between the driver's knee and the steering column, and that this may cause the key to inadvertently turn from the "run" to the "accessory" or "off" position. The photographs show why GM engineers understood that increasing the detent in the ignition switch would not be a total solution to the problem, for such a step would not alleviate the possibility of impacting the key with a driver's knee. The photographs also show why GM engineers believed that additional changes (such as the shroud) were necessary to fully fix the defects with the ignition switch.

67.     On October 4, 2012, there was a meeting of the Red X Team during which Jim Federico gave an update of the Cobalt airbag non-deploy investigation. According to an email

from Stouffer on the same date, the "primary discussion was on what it would take to keep the SDM active if the ignition key was turned to the accessory mode." Again, GM engineers recognized that the SDM should remain active if the key is turned to the "accessory/off" mode, but GM took no action at this time to remedy the ignition switch defect or notify customers that the defect existed.

68.   During the October 4, 2012 meeting, Stouffer and the other members of the Red X Team also discussed "revising the ignition switch to increase the effort to turn the key from Run to Accessory."

69.   On October 4, 2012, Mr. Stouffer emailed Ray DeGiorgio and asked him to "develop a high level proposal on what it would take to create a new switch for service with higher efforts." On October 5, 2012, DeGiorgio responded:

> Brian,
>
> In order to provide you with a HIGH level proposal, I need to understand what my requirements are. [w]hat is the TORQUE that you desire?
>
> Without this information [sic] I cannot develop a proposal.

70.   On October 5, Stouffer responded to DeGiorgio's email, stating:

> Ray,
>
> As I said in my original statement, I currently don't know what the torque value needs to be. Significant work is required to determine the torque. What is requested is a high level understanding of what it would take to create a new switch.

71.   DeGiorgio replied to Stouffer the following morning:

> Brian,
>
> Not knowing what my requirements are I will take a SWAG at the

33

Torque required for a new switch. Here is my level proposal

**Assumption is 100 N cm Torque.**

- New switch design = Engineering Cost Estimate approx. $300,000

- Lead Time = 18 – 24 months from issuance of GM Purchase Order and supplier selection.

Let me know if you have any additional questions.

72.    Stouffer later admitted in a deposition that DeGiorgio's reference to "SWAG" was an acronym for "Silly Wild-Ass Guess."

73.    DeGiorgio's cavalier attitude exemplifies GM's approach to the safety-related defects that existed in the ignition switch and airbag system in the Subject Vehicles. Rather than seriously addressing the safety-related defects, DeGiorgio's emails show he understood the ignition switches were contributing to the crashes and fatalities, and he could not care less.

74.    It is also obvious from this email exchange that Stouffer, who was a leader of the Red X Team, had no problem with DeGiorgio's cavalier and condescending response to the request that he evaluate the redesign of the ignition switches.

75.    On April 29, 2013, Ray DeGiorgio was deposed in Detroit, Michigan as part of the lawsuit brought by Brooke Melton's parents. At his deposition, Mr. DeGiorgio was shown photographs of the differences between the ignition switch in Brooke's Cobalt and the ignition switch in the 2008 Cobalt (which DeGiorgio had redesigned without changing the part number).

76.    Mr. DeGiorgio was questioned about his knowledge of any differences in the ignition switches:

Q. And I'll ask the same question. You were not aware before today that GM had changed the spring – the spring on the ignition switch had been changed from '05 to the replacement switch?

34

MR. HOLLADAY: Object to the form. Lack of predicate and foundation. You can answer.

THE WITNESS: I was not aware of a detent plunger switch change. We certainly did not approve a detent plunger design change.

Q. Well, suppliers aren't supposed to make changes such as this without GM's approval, correct?

A. That is correct.

Q. And you are saying that no one at GM, as far as you know, was aware of this before today?

MR. HOLLADAY: Object. Lack of predicate and foundation. You can answer.

THE WITNESS: I am not aware about this change.

(DeGiorgio Deposition, pp. 151-152).

77.     Mr. DeGiorgio's testimony left no doubt that he unequivocally disclaimed any knowledge of any change in the ignition switch in the 2005-2010 Cobalts. Mr. DeGiorgio, however, authorized the redesign to the ignition switches in 2006. Thus, the testimony provided in 2013 was knowingly false and intended to mislead.

78.     Mr. DeGiorgio also provided the following testimony about the ignition switch supplier, Delphi:

Q. And there weren't any changes made – or were there changes made to the switch between '05 and 2010 that would have affected the torque values to move the key from the various positions in the cylinder?

A. There was one change made to the resistor in '08, but that should not have affected the torque or the displacement of the switch.

I can restate this way: There was an electrical change made in '08, but not a mechanical change – at least there were no official changes, mechanical changes, made to the switch that I know of.

Q. When you say no official, could there be unofficial changes made?

35

A. I'm not saying that there was, I'm just saying if there was something changed at the
supplier side, we were not aware of it and we did not approve it, okay?

(DeGiorgio Deposition, pp. 57-58).

79.    Mr. DeGiorgio's testimony left no doubt that he had spoken with Delphi
employees and that they confirmed that there were no changes made to the ignition switch in
2005-2010 Cobalts. This testimony, like the testimony set forth above, was knowingly false and
intended to mislead.

80.    GM's years-long internal "investigation" into the Subject Vehicles—as well as all
of the GM documents that were included in the "Purchased Assets" from the bankruptcy sale—
provided GM with actual knowledge, long before ARNOLD KESSENGER's September 2013
injury, of the ignition switch defects in the Subject Vehicles. Notwithstanding these facts, GM
continued to fraudulently conceal the nature and extent of the defects from the public, inducing
customers, including ARNOLD KESSENGER, to purchase Subject Vehicles with no knowledge
of the existence of these serious and uniform defects, and no provision to avoid the safety risks
of operating the Subject Vehicle. Mr. DeGiorgio's deposition testimony in 2013, while appalling,
is simply emblematic of the cover-up that was long-running and company-wide.

81.    Moreover, throughout the entirety of its corporate existence, GM received
numerous and repeated complaints of moving engine stalls and/or power failures in the Subject
Vehicles. These complaints are yet more evidence that GM was fully aware of the ignition
switch defect and should have timely announced a recall much sooner than it did.

82.    GM was aware of these problems year after year and nationwide, as reflected not
only by the internal documents reflecting knowledge and cover-up at high levels, but also in
thousands of customer complaints recorded in GM's internal complaint logs and documents. GM
received and reviewed complaints of safety issues from customers with Subject Vehicles in

36

nearly every state nationwide. Documents produced by GM pursuant to Order No. 12 in *In re*
*General Motors LLC Ignition Switch Litigation* (14-MC-2543, Dkt. No. 46) show that GM was
aware of customer complaints of stalling Subject Vehicles in many of these states and ultimately
did nothing about them. These complaints, of course, are in addition to the multiple non-deploy
fatalities of which GM became aware and even investigated from July 2009 to the present.

### C.   GM Issues a Recall—Ten Years Too Late

83.   As pressure from the Melton litigation mounted, GM executives finally felt
compelled to act. On January 31, 2014, GM's Field Performance Review Committee and
Executive Field Action Decision Committee ("EFADC") finally ordered a recall of *some* Subject
Vehicles.

84.   On February 7, 2014, GM, in a letter from Director of Product Investigations and
Safety Regulations Carmen Benavides, informed NHTSA that it was conducting a recall of
2005-2007 model year Chevrolet Cobalt and 2007 model year Pontiac G5 vehicles.

85.   GM knew that this recall was insufficient in scope. Indeed, GM knew that the
same defective ignition switches installed in the Cobalt and G5 vehicles were installed in
Cadillac CTS, Pontiac Solstice, Saturn Ion, and Saturn Sky vehicles. But GM did not recall these
vehicles on February 7.

86.   On February 19, 2014, a request for timeliness query of GM's recall was sent to
NHTSA by the Center for Auto Safety, a non-profit auto safety group. The timeliness query
pointed out that GM had failed to recall all of the vehicles with the defective ignition switches.

87.   The February 19, 2014 timeliness query also asked NHTSA to investigate GM's
failure to fulfill its legal obligation to report the safety defects in the Subject Vehicles within five
days of discovering the defect—a requirement of applicable federal law.

88.    On February 24, 2014, GM informed NHTSA it was expanding the recall to include 2006-2007 model year Cadillac CTS and Pontiac Solstice, 2003-2007 model year Saturn Ion, and 2007 model year Saturn Sky vehicles.

89.    GM included an Attachment to the February 24, 2014 letter. In the Attachment, GM, for the first time, admitted that it authorized a change in the ignition switch in 2006. Specifically, GM stated:

> On April 26, 2006, the GM design engineer responsible for the
> Cobalt's ignition switch signed a document approving changes to
> the ignition switch proposed by the supplier, Delphi Mechatronics. The approved
> changes included, among other things, the use of a
> new detent plunger and spring that increased torque force in the
> ignition switch. This change to the ignition switch was not reflected
> in a corresponding change in the part number for the ignition switch.
> GM believes that the supplier began providing the re-designed ignition
> switch to GM at some point during the 2007 model year.

90.    Public criticism in the wake of GM's piecemeal recalls was withering. On March 17, 2014, Mary Barra issued an internal video, which was broadcast to employees. In the video, Ms. Barra acknowledged:

> Scrutiny of the recall has expanded beyond the review by the
> federal regulators at NHTSA, the National Highway Traffic Safety
> Administration. As of now, two congressional committees have
> announced that they will examine the issue. And it's been reported
> that the Department of Justice is looking into this matter. . . . These
> are serious developments that shouldn't surprise anyone. After all,
> something went wrong with our process in this instance and
> terrible things happened.

91.    The public backlash continued and intensified. On March 28, 2014, GM again expanded the ignition switch recall to cover all model years of the Chevrolet Cobalt and HHR, the Pontiac G5 and Solstice, and the Saturn Ion and Sky in the United States. This third expansion of the ignition switch recall covered an additional 824,000 vehicles in the United States and raised the number of recalled vehicles to 2,191,146.

38

92.     Unfortunately for Plaintiff ARNOLD KESSENGER, his 2010 Cadillac CTS's ignition switch failed prior to GM's recall of the 2010 model year CTS.

93.     GM's recalls of the Subject Vehicles were not only untimely, they are completely insufficient to correct the safety-related defects in the Subject Vehicles.

94.     To address the safety defect, GM is replacing the defective ignition switches in the Subject Vehicles with a new ignition switch, and providing new keys without slotted key heads. These repairs fail to address the design defect that causes the key fob/chain to hang too low on the steering column, and fails to address the defective airbag system, which disables the airbag immediately when the engine shuts down. Thus, even when the ignition switches and keys are replaced, a defective condition will still exist in the Subject Vehicles and the potential will continue to persist for a driver to contact the key chain and inadvertently turn the key from the "run" to the "accessory/off" position.

95.     GM notified owners and lessees of the Subject Vehicles by letter beginning in late February of 2014. GM's recall letter minimizes the risk of the ignition switch defect, indicating that ignition problems would occur only "under certain conditions" and emphasizing that the risk increases if the "key ring is carrying added weight . . . or your vehicle experiences rough road conditions."

96.     On May 16, 2014, GM agreed to a civil penalty of $35 million—the maximum permitted by law—for its failure to timely notify NHTSA of the ignition switch defect. As part of its agreement, GM agreed to implement numerous internal reforms to improve its response to product defect issues in the future.

97.     GM later terminated fifteen employees for their participation in the ignition switch cover-up. Two of those employees, Design Release Engineer Ray DeGiorgio and Gary