Altman, were intimately involved in the development—and concealment—of the defective ignition switches, and both were longtime employees of Old GM and New GM.

98.     In the months that followed the initial ignition switch recalls, GM finally began to acknowledge that it has been ignoring safety concerns in its vehicles for years. To date, GM has announced over 35 recalls since February 2014, and it has recalled over 26.6 million vehicles in the past eight months. This number is staggering; indeed, no car manufacturer has ever recalled as many vehicles in a single year.

### D.     GM Creates an Inadequate Settlement Fund

99.     GM has acknowledged that the ignition switch defect has caused at least thirteen deaths and over 50 accidents. Independent safety groups put this number far higher: the Center for Auto Safety, for example, estimates that there have been 303 deaths associated with the Saturn Ion and Chevrolet Cobalt vehicles alone. The actual number of deaths and accidents for all Subject Vehicle models is expected to be significantly higher than GM's estimate.[4]

100.    In April 2014, under intense scrutiny from Congress and the Department of Justice, Mary Barra announced that GM would retain attorney Kenneth Feinberg to implement a claims facility to amicably resolve personal injury and wrongful death claims associated with the ignition switch defect. Ms. Barra's announcement was greeted with much fanfare on Capitol Hill and in the press.

---

[4] Indeed, GM's own Claims Resolution Facility has been accepting claims for little over ten weeks and has already determined that the ignition switch is responsible for 27 deaths and 25 injuries. By current estimate, the Facility has yet to review over 1,000 filed claims, and additional claims may be filed for another ten weeks. *See* M Ignition Compensation Claims Resolution Facility Overall Program Statistics, http://www.gmignitioncompensation.com/docs/ProgramStatistics.pdf

101. On June 30, 2014, Mr. Feinberg unveiled the GM Ignition Compensation Claims Resolution Facility (hereinafter the "GM Claims Facility" or "Facility"). The GM Claims Facility offers compensation to three categories of victims:

- Those who were killed in an accident involving certain Subject Vehicles;

- Those who suffered a "Category One" injury in an accident involving certain Subject Vehicles. A Category One injury is defined as a "quadriplegic injury, paraplegic injury, double amputation, permanent brain damage requiring continuous home medical assistance, or pervasive burns encompassing a substantial part of the body"; and

- Those who suffered a "Category Two" injury in an accident involving certain Subject Vehicles. A Category Two injury is generally defined as an injury requiring one or more nights of hospitalization within 48 hours of the accident.

102. In addition to these injury thresholds, the GM Claims Facility does not treat all Subject Vehicles equally. Rather, individual claimants injured or killed in accidents involving any Subject Vehicle of model year 2007 or earlier are eligible for compensation. Claimants in Subject Vehicles whose model year is 2008 or later, however, are eligible only upon proof that (i) the original ignition switch was replaced prior to the accident in question, and (ii) the replacement switch was one bearing Part Number 10392423.

103. According to the GM Claims Facility FAQ, this distinction makes sense because Subject Vehicles of model year 2007 and earlier "had defective ignition switches installed at the time of manufacture." Subject Vehicles whose model year is 2008 or later, however, allegedly "did not have defective ignition switches installed during manufacture." GM has thus taken the position (and excluded from eligibility) those Subject Vehicles that were manufactured with the

41

ignition switches as redesigned by Ray DeGiorgio in 2006. In other words, GM (and the Facility it implemented) denies that the ignition switches were still defective following DeGiorgio's redesign.

104. Thus, GM refuses to acknowledge what GM's engineers have long known—the defect in the ignition switches is not limited to inadequate torque performance, but also includes the low placement of the ignition on the steering cylinder as well as the airbag system that is disabled when the ignition is in the "accessory" or "off" position. GM's FPE team recognized these essential aspects of the safety defect as recently as 2012 when they proposed placing a shroud over the ignition and/or moving the ignition higher on the steering column.

105. Even if the ignition switch defect were purely an issue of inadequate torque performance, however, the evidence shows that the ignition switches were defective even after DeGiorgio's 2006 redesign. In May of 2012, GM's FPE team tested the ignition switches in dozens of Subject Vehicles, many of them model years 2008 and 2009. In these tests, GM engineers found that the ignition switches for these 2008 and 2009 model year Subject Vehicles by and large failed to meet GM's torque specifications for the ignition switch.

106. Further, GM's own investigation into airbag non-deployment events in Chevrolet Cobalt vehicles identified over 250 non-deploy crashes involving 2008-2010 Cobalts. Upon information and belief, GM has knowledge of numerous non-deploy incidents in Subject Vehicles of model year 2008 and later in which the ignition switch was not replaced prior to the relevant incident. Although these vehicles have thus exhibited evidence of the ignition switch defect, they are not eligible for compensation from the Claims Facility.

107. What is more, until GM recalled 2008 and later model year Subject Vehicles, it had never notified the owners of those vehicles that they should remove all items from their key

chains and/or avoid jarring road conditions or contacting the ignition key with one's knee. GM knew that any of these scenarios could cause the ignition switches in later model year Subject Vehicles to fail, but it did nothing to notify its customers of these facts.

108.   In truth, the problems in earlier model year Subject Vehicles and later model year Subject Vehicles are the same. The ignitions are placed dangerously low on the steering column, and the torque required to hold the ignition key in place under normal driving conditions is insufficient.

109.   This was certainly the case in Plaintiff ARNOLD KESSENGER's Cadillac CTS. On September 3, 2013, at the time of the accident, Plaintiff's key chain contained numerous keys in addition to his CTS ignition key. At this time, however, GM had not recalled the 2010 and later-year model CTSs, nor had it advised owners to remove extra items from the key chain and/or avoid driving across bumpy or jarring roadways.

110.   The ignition switch in ARNOLD KESSENGER's 2010 Cadillac CTS is defective. It is incapable of withstanding ordinary and normal movement and/or pressure. And when Plaintiff's ignition switch inadvertently turned to the "accessory" or "off" position on September 3, 2013, it was because his switch was unable to hold the "run" position, either because the torque performance was inadequate or because the switch inadvertently and unexpectedly moved while the vehicle traveled over rough or uneven roadway. The GM-created Claims Facility is therefore wrong to exclude later model years of Subject Vehicles on the theory that the ignition switches, following DeGiorgio's redesign, are not defective. These ignition switches are demonstrably defective.

111. GM's arbitrary exclusion of these vehicles is simply an attempt to contain its liability—a tactic that contradicts GM CEO Mary Barra's public statements. In her April 1, 2014 testimony before Congress, Ms. Barra assured legislators and the public that

> General Motors want[s] to do the right thing for our customers, and that's why we feel this is an extraordinary situation. . . . [W]e will make the best decisions for our customers, recognizing that we have legal obligations and responsibilities as well as moral obligations. We are committed to our customers, and we are going to work very hard to do the right thing for our customers.

Ten weeks later, Ms. Barra continued with her public assurances, telling Congress that GM "want[s] to capture [in the Facility] every single person who has suffered serious physical injury or lost a loved one" as a result of the defective ignition switches.

112. GM's assurances are cold comfort for individuals such as ARNOLD KESSENGER. Instead of fulfilling its assurances, GM waited until June 30, 2014, after congressional and public pressure had significantly subsided, to announce an artificial distinction between vehicles that are recalled for precisely the same defect with precisely the same disastrous safety risks. GM's exclusion of Plaintiff's vehicle and others like it is highly suspect and calls into question the commitment of GM to its victims and shows that the Claims Facility is not a viable remedy for many victims of GM's defective vehicles.

113. The ignition switch in ARNOLD KESSENGER's 2010 Cadillac CTS is defective. On September 3, 2013 this defect proved costly. Plaintiff should have the option to seek fair and expeditious compensation through the GM-created Claims Facility, but its protocols arbitrarily and unreasonably exclude his vehicle from eligibility. Once again, GM has offered half-measures where it should fully and completely rectify its past mistakes.

V.  **Tolling of the Statute of Limitation**

114. Old GM sold the Cadillac CTS at issue in this case over four years prior to the filing of this action. Any statutes of repose or limitation are tolled, however, because of New GM's fraudulent concealment of the ignition switch defect, and conduct equivalent to that required for a finding of willful and wanton conduct against GM.

115. Further, GM was under a continuous duty to disclose to Plaintiff the true character, quality, and nature of the Subject Vehicles. GM actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles. Plaintiff reasonably relied upon GM's knowing and affirmative representations that its vehicles—including the Subject Vehicles—were safe. Based on the foregoing, GM is estopped from relying on any statutes of limitations in defense of this action.

116. Further, Plaintiff had no realistic ability to discern that his 2010 Cadillac CTS was defective until—at the earliest—the ignition switch defect caused a sudden unintended power failure. Even then, Plaintiff had no reason to know the sudden loss of power was caused by a defect in the ignition switch because of GM's active concealment of the ignition switch defect.

VI.  **Claims for Relief**

*Claim I: Negligence*

117. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

118. This Claim is brought under New York law.

119. GM was negligent in designing, inspecting, testing, manufacturing, assembling, marketing, selling, and providing warnings for the Cadillac CTS, as set forth in the paragraphs

45

above. To the extent that Old GM designed, inspected, tested, manufactured, assembled, marketed, sold, and provided warnings for the Cadillac CTS, GM assumed liability for Old GM's negligence and therefore stands in Old GM's shoes for purposes of negligence liability.

120.    GM had a duty to ensure that its vehicles, and those for which it had assumed liability, were reasonably safe to operate and did not contain defective components. When GM learned that the 2010 Cadillac CTS contained a defective component, it had a duty to warn Plaintiff of the existence of the defect.

121.    GM's negligence proximately caused the damages sustained by ARNOLD KESSENGER, as set forth herein, thus rendering GM liable for compensatory and punitive damages. GM is further liable for fair and reasonable damages for pain and suffering, medical expenses, and/or damages as may be determined by the Court or the jury, as well as costs, expenses, and reasonable attorneys' fees.

*Claim II: Strict Liability*

122.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

123.    This Claim is brought under New York law.

124.    GM designed, inspected, selected, tested, manufactured, assembled, equipped, marketed, distributed, and sold the Cadillac CTS, and its components. To the extent Old GM designed, inspected, selected, tested, manufactured, assembled, equipped, marketed, distributed, and sold the Cadillac CTS, however, GM assumed liability for Old GM's conduct and therefore stands in Old GM's shoes for purposes of strict liability.

125.    GM designed, inspected, selected, tested, manufactured, assembled, equipped, marketed, distributed, and sold the ignition switch system that was selected and installed in the

Cadillac CTS. To the extent Old GM designed, inspected, selected, tested, manufactured, assembled, equipped, marketed, distributed, and sold the ignition switch system that was selected and installed in the Cadillac CTS, GM assumed liability for Old GM's conduct and therefore stands in Old GM's shoes for purposes of strict liability.

126. GM had a legal duty to design, inspect, test, manufacture, and assemble the Cadillac CTS so that it would be reasonably crashworthy and provide a reasonable degree of occupant safety in foreseeable collisions occurring in the highway environment of its expected use. To the extent Old GM had a legal duty to design, inspect, test, manufacture, and assemble the Cadillac CTS so that it would be reasonably crashworthy and provide a reasonable degree of occupant safety in foreseeable collisions occurring in the highway environment of its expected use, GM assumed liability for Old GM's conduct and therefore stands in Old GM's shoes for purposes of strict liability.

127. Among other things, the 2010 Cadillac CTS is not crashworthy, is defective, and is unreasonably dangerous and unsafe for foreseeable users and occupants in each of the following particulars:

>  (a)   it has an ignition switch that allows the CTS to stall or lose engine power, power steering, and/or power braking while in normal and foreseeable operation;
>
>  (b) it has an ignition that is placed in a position so that it is common and foreseeable for a driver to impact the ignition with his or her knee, thereby moving the ignition switch from the "run" to the "accessory" or "off" position; and
>
>  (c) it has front airbags that do not deploy when the ignition is in the "accessory" or "off" position.

128. The defective nature of the Cadillac CTS was the proximate cause of ARNOLD KESSENGER's damages, as set forth herein, thus rendering GM strictly liable for compensatory and punitive damages, fair and reasonable damages, and damages as may be determined by the Court or jury, as well as for costs, expenses, and reasonable attorneys' fees.

*Claim III: Fraud and Fraudulent Concealment*

129. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

130. This Claim is brought under New York law.

131. GM intentionally concealed material facts from the Plaintiff, NHTSA, and the public in general, and it continues to do so today. GM knew that the Subject Vehicles, including the Cadillac CTS, were designed and manufactured with ignition switch defects, but GM concealed those material facts. Although the Subject Vehicles contain safety-related defects about which GM knew, or should have known, GM recklessly concealed that information from consumers in the United States. Those consumers, including the Plaintiff, had no knowledge of the safety-related defects.

132. GM had a duty to disclose the facts to Plaintiff, the public who owned defective GM vehicles, and NHTSA, but failed to do so.

133. GM knew that ARNOLD KESSENGER had no knowledge of the concealed facts, and that he did not have an equal opportunity to discover the concealed facts. GM was in a position of superiority over Plaintiff. Indeed, Plaintiff trusted GM not to allow defective vehicles for which it was responsible to remain in the marketplace. Plaintiff further trusted GM to warn of defects and to recall defective vehicles.

134. By failing to disclose these material facts, GM intended to hide information regarding the defect, mislead, avoid suspicion, or prevent further inquiry into the matter by NHTSA, Plaintiff, and the public in general. GM further intended to induce NHTSA not to recall Plaintiff's Cadillac CTS, as well as other Subject Vehicles, in order to reduce its eventual financial exposure.

135. Plaintiff reasonably relied on GM's nondisclosure, and reasonably but unknowingly continued to use the Cadillac CTS until the date of the accident.

136. Plaintiff would not have purchased the Cadillac CTS had he known of the ignition switch defect.

137. GM reaped the benefit of the sales and leases from the Subject Vehicles because it did not disclose the defects to the public and to NHTSA. Additionally, in not disclosing the Subject Vehicles' defects, GM prevented any meaningful investigation of numerous accidents that were likely the result of those defects. Further, because GM had not placed this matter before NHTSA or the public, cars and components in those other similar accidents were disposed of without the appropriate and adequate investigation.

138. As a direct and proximate result of GM's wrongful conduct and fraudulent concealment, ARNOLD KESSENGER suffered damages described herein.

139. GM's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff, such that punitive damages are appropriate.

*Claim IV: Violation of the Consumer Protection Statute*

140.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

141.     This Claim is brought under New York law. *See* N.Y. GBS. LAW § 349

142.     New York General Business Law § 349 ("NY GBS § 349") provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce…are hereby declared unlawful." N.Y. GBS. § 349

143.     Plaintiff ARNOLD KESSENGER, a "person who has been injured by reason of any violation of [§ 349] may bring an action…to recover his actual damages." *See* N.Y. GBS. LAW § 349 (h).

144.     Plaintiff ARNOLD KESSENGER purchased his 2010 Cadillac CTS new in 2010. At this time, GM was well aware of the ignition switch defect that plagued this vehicle. Rather than disclosing this defect, however, GM concealed it, misrepresented facts, and otherwise suppressed information to which Plaintiff was entitled.

145.     GM knew or should have known that its acts of concealment, obfuscation, suppression, and misrepresentation regarding the ignition switch defect violated the NY GBS § 349.

146.     Had Plaintiff known of the ignition switch defect in the 2010 Cadillac CTS, and GM's callous disregard for safety, Plaintiff either would have paid less for the vehicle or would not have purchased it at all. Thus, Plaintiff did not receive the benefit of his bargain as a result of GM's misconduct, and has suffered ascertainable loss because of GM's misrepresentations.

147.     Plaintiff seeks monetary relief against GM in an amount to be determined at trial. Plaintiff also seeks punitive damages because GM engaged in aggravated and outrageous

50

conduct with an evil mind. Plaintiff further seeks costs, expenses, attorneys' fees, and any other just and proper relief available under the NY GBS § 349.

### VII.    Damages

148.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

149.    Plaintiff's bodily injuries were proximately caused by Defendant's conduct. Accordingly, Plaintiff is entitled to reasonable and proper compensation for the following legal damages:

>   a. Past and future medical expenses;
>
>   b. Past and future pain and suffering;
>
>   c. Past and future loss and impairment of earnings;
>
>   d. Loss of enjoyment of life; and
>
>   e. Loss of function.

150.    Plaintiff seeks actual and punitive damages to be awarded by the jury in an amount in excess of the minimum jurisdictional limits of this Court.

### VII. Punitive Damages

151.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

152.    Plaintiff would further show that the clear and convincing evidence in this case will show that GM consciously or deliberately engaged in oppression, fraud, wantonness, and/or malice in concealing the defect in the Subject Vehicle and failing to recall the vehicle in a timely manner. GM had actual, subjective awareness of the risk involved but nevertheless proceeded

with indifference to the rights, safety, or welfare of others, including Plaintiff. Therefore, punitive damages are sought and should be assessed against the Defendant.

**WHEREFORE**, Plaintiff, ARNOLD KESSENGER, respectfully demands as follows:

1. For judgment against Defendant General Motors LLC.

2. For compensatory damages against Defendant in such amounts as the trier of fact shall deem just, fair and equitable, including, but not limited to:

   a. Past and future medical expenses;

   b. Past and future loss and impairment of earnings;

   c. Loss of enjoyment of life;

   d. Past and prospective pain and suffering;

   e. Loss of function; and

   f. Prospective medical care and medication costs.

3. For punitive damages against Defendants for willful and wanton conduct, gross negligence, and fraudulent concealment of the ignition switch defect for a period of five years' time.

4. For pre-judgment and post-judgment interest;

5. For his costs expended herein, including reasonable attorneys' fees;

6. Leave to amend this Complaint to conform to the evidence produced at trial; and

7. Any and all other relief to which Plaintiff may appear entitled.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:    February 6, 2015

Respectfully submitted,

SIMON GREENSTONE PANATIER BARTLETT, PC

_____
AMY M. CARTER
Texas State Bar No. 24004580
3232 McKinney Avenue, Suite 610
Dallas, Texas 75204
214-276-7680
214-276-7699 fax
acarter@sgpb.com

**ATTORNEYS FOR PLAINTIFF**

COPY

THE POTTS LAW FIRM, LLP
Saima Khan, CA State Bar No. 288376
100 Waugh Drive, Suite 350
Houston, Texas 77007
Telephone: 713-963-8881
Facsimile: 713-583-5388
Email: skhan@potts-law.com
*Attorney for Plaintiffs*

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

DEC 31 2014

Sherri R. Carter, Executive Officer/Clerk
By: Moses Soto, Deputy

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES
(UNLIMITED JURISDICTION)

| | |
|---|---|
| JOHN MULLIN, individually;<br>EILEEN MULLIN, individually;<br>LYNETTA BRAY, individually;<br>JOYCE MARKER, individually;<br>DARLENE HINES, individually;<br>JAMES SIZEMORE, individually, and;<br>ELIZABETH SIZEMORE, individually.<br><br>*Plaintiffs*,<br><br>vs.<br><br>GENERAL MOTORS LLC, a Delaware corporation, and Does 1 through 50 inclusive.<br><br>*Defendants.* | CASE NO.: BC568381<br>COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL<br><br>1. STRICT LIABILITY FOR FAILURE TO WARN AND DESIGN DEFECT<br>2. NEGLIGENCE<br>3. BREACH OF WARRANTY |

Plaintiffs, as identified in further detail below, bring this action for damages against Defendants, as identified in further detail below, and would show the Court as follows:

## I.    PARTIES

### A.    PLAINTIFFS

1. At all relevant times, Plaintiffs resided in the United States of America or its territories. There are a total of seven Plaintiffs bringing claims in this action.

2. As a result of Defendants' intentional and coordinated conduct, Plaintiffs were injured by Defendants' defective and dangerous subject vehicles and/or ignition switches. As pled with additional particularity herein, Defendants' subject vehicles and/or ignition switches were defectively and negligently designed, unreasonably dangerous and defective, inadequately tested,

COMPLAINT AND DEMAND FOR JURY TRIAL
-1-

made with manufacturing defect, dangerous to human health and safety, and lacked proper and adequate warnings as to the known dangers associated with their use.

3. The ignition switch and related parts at issue are a component of all of the vehicles operated by the Plaintiffs.

4. Plaintiff JOHN MULLIN is a resident and citizen of the State of Nevada. Mr. Mullin was the husband of Juanita Mullin at the time of her death on May 7, 2012. He brings this action for his wife's wrongful death. Juanita Mullin died in an auto accident near Baker, California on May 7, 2012 while traveling on Interstate I-15.

5. Plaintiff EILEEN MULLIN is a resident and citizen of the State of Virginia. Ms. Mullin is the only surviving daughter of Juanita Mullin. She brings this action for her mother's wrongful death.

6. Plaintiff LYNETTA BRAY is a resident and citizen of the State of California, and resides in Los Angeles County, California. She brings this action for her own personal injuries.

7. Plaintiff JOYCE MARKER is a resident and citizen of the State of Nevada, and was injured in Covina, California due to Defendants' conduct. She brings this action for her own personal injuries.

8. Plaintiff DARLENE HINES is a resident and citizen of the State of Georgia. Ms. Hines brings this action for her own personal injuries.

9. Plaintiff ELIZABETH SIZEMORE is a resident and citizen of the State of Michigan. Ms. Sizemore brings this action for her own personal injuries.

10. Plaintiff JAMES SIZEMORE is a resident and citizen of the State of Michigan. Mr. Sizemore brings this action for his own personal injuries.

**B.    DEFENDANTS**

11. Defendant GENERAL MOTORS LLC is a Delaware corporation with its headquarters and principal place of business in Detroit, Michigan. GENERAL MOTORS LLC does business in the State of California and can be served via its Registered Agent for service, or on the person designated by law to accept such service, as follows: Corporation Service Company 2710 Gateway Oaks Dr., Suite 150N, Sacramento, California 95833. GENERAL MOTORS LLC is the successor in interest to General Motors Corporation.

12. General Motors Corporation was a Delaware corporation with its headquarters and principal place of business in Detroit, Michigan. The Corporation, through its various entities,

designed, manufactured, marketed, distributed, and sold Pontiac, Saturn, Chevrolet and other brand automobiles in California and multiple other locations in the United States and worldwide.

13. In 2009, General Motors Corporation filed for bankruptcy, and substantially all of its assets were sold pursuant to a Master Sales and Purchase Agreement ("Agreement") to Defendant GENERAL MOTORS LLC ("GM").

14. Under the Agreement, Defendant GM also expressly assumed certain liabilities of General Motors Corporation, including certain statutory requirements:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.

Moreover, under the Agreement, GM agreed that it would "assume and thereafter pay or perform as and when due, or otherwise discharge, all of the Assumed Liabilities." The "Assumed Liabilities" were defined to include:

> (vii) (A) all Liabilities arising under express written warranties of [General Motors Corporation] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by [General Motors Corporation] or [General Motors LLC] prior to or after the Closing and (B) all obligations under Lemon Laws;

***

> (ix) all liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by [General Motors Corporation] (collectively, "Product Liabilities"), which arise directly out of accidents, incidents or other distinct and discreet occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance...

15. At all times relevant herein, General Motors Corporation and its successor in interest, GM were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Subject Vehicles, as described in this Complaint, and other motor vehicles and motor vehicle components throughout the United States.

16. Plaintiffs are ignorant of the true names and capacities of Defendants herein sued as DOES 1 through 50 inclusive, and therefore sues said Defendants by such fictitious names. PLAINTIFFS will seek leave of Court to amend this Complaint and allege their true names and capacities when ascertained. PLAINTIFFS are informed and believe and thereon allege that each of said fictitiously named Defendants are negligently responsible in some manner for the occurrences herein alleged, and that PLAINTIFFS' injuries as herein alleged were proximately caused by such negligence.

## II. VENUE AND JURISDICTION

17. Jurisdiction in this Court is proper as Defendants conduct "business in the state of" California and committed torts in whole or in part against Plaintiffs in California.

18. Venue is proper in this Court pursuant to Cal. Civ. Proc. Code § 395 because one or more of the named Defendants resides or does business in Los Angeles County, maintained their principal place of business in Los Angeles County, and maintain their registered agent for service in Los Angeles County. Plaintiff JOYCE MARKER was injured in Covina, Los Angeles County, California due to Defendants' conduct. Plaintiff LYNETTA BRAY resides in Los Angeles County, California, and was injured in Los Angeles County, California due to Defendants' conduct.

19. At all times material to this action, Defendants and/or their predecessors in interest and/or its subsidiaries, regularly engaged in business in California and Los Angeles County, including advertising, analyzing, assembling, designing, developing, distributing, inspecting, labeling, manufacturing, marketing, packaging, producing, processing, promoting, researching, selling, testing, and/or training in the use of the subject vehicles and/or ignition switches.

20. Defendants regularly solicit and transact business in, receive substantial revenues from, and/or distribute products in California and Los Angeles County.

21. It was reasonably foreseeable to Defendants that the subject vehicles and/or ignition switches would be used by persons such as Plaintiffs and in the State of California and Los Angeles County.

22. At all relevant times, Defendants transacted business in the State of California and Los Angeles County.

23. At all relevant times, Defendants committed tortious conduct within the State of California and Los Angeles County including the auto accidents occurring in Los Angeles County due to Defendants' conduct.

24. At all relevant times, Defendants used or possessed property situated in the State of California and Los Angeles County.

25. At all relevant times, Defendants marketed, promoted, and sold the subject vehicles and/or ignition switches throughout the State of California and Los Angeles County.

26. Defendants' contacts with the State of California and Los Angeles County were at all relevant times systematic and continuous such that the exercise of jurisdiction comports with the notions fair play and substantial justice.

27. Additionally, some Plaintiffs named herein suffered injury as a direct and proximate result of Defendants' subject vehicles and/or ignition switches and/or Defendants' acts and/or omissions in the State of California and Los Angeles County.

28. Plaintiffs do not assert claims or rights arising under the Constitution, treaties, or laws of the United States; thus, there is no federal question at issue pursuant to 28 U.S.C. §1441(b) and 28 U.S.C. §1331.

29. Complete diversity of citizenship is lacking pursuant to 28 U.S.C. §1441(b) and 28 U.S.C. § 1332(c) as certain Plaintiffs and Defendants are citizens of the same State, Michigan.

30. Plaintiffs' claims are brought pursuant to state law. As such, there is no federal subject matter jurisdiction because no federal question is raised and complete diversity does not exist.

31. Plaintiffs' claims present common and virtually identical questions of fact and law concerning, as alleged herein, what information Defendants possessed concerning the defects and dangers of the subject vehicles and/or ignition switches, what information Defendants chose to disclose, and what information Defendants were required by law to disclose about those dangers.

32. All of the subject vehicles used by Plaintiffs have identical or substantially similar defective ignition switches, and or defective airbag deployment systems.

33. All of the subject vehicles used by the Plaintiffs are subject to the same negligent and untimely recall by Defendants.

34. All of the subject vehicles used by the Plaintiffs are identical or substantially similar in design, manufacture, production, sale, and operation.

35. All of the defects alleged by Plaintiffs arise out of identical or substantially similar accidents including frontal collisions with no air bag deployment, engine shut offs during operation, braking difficulty or failure due to engine shut off, and steering difficulty or failure due to engine shut off.

36. Plaintiffs' claims are logically related because all Plaintiffs allege the same claims related to their operation of a subject vehicle and/or vehicle with a defective ignition switch. Further, these subject vehicles and/or ignition switches were defectively designed, manufactured, marketed and sold by Defendants, and Defendants failed to provide appropriate warnings and instructions regarding the dangers posed by these subject vehicles and/or ignition switches.

37. Defendants' conduct in designing, developing, marketing, selling, distributing, and failing to timely recall or warn of the subject vehicles and/or ignition switches relates to all Plaintiffs and provides a common universe of facts underlying Plaintiffs' claims, such that Plaintiffs' claims against Defendants arise from the same transaction or occurrence or the same series of transactions or occurrences.

38. Plaintiffs suffered injuries and damages following as a result of Defendants' subject vehicles and/or ignition switches, and common liability facts will be presented to demonstrate that Defendants' knew or should have known that these vehicles caused such serious injuries and death.

39. Discovery will be identical for all Plaintiffs' claims with respect to Defendants' conduct and regulatory violations, as all claims arise out of the same acts and/or omissions of Defendants and involve common questions of law and/or fact.

40. Joinder of Plaintiffs' claims is proper because Plaintiffs' claims arise out of the same acts and/or omissions of Defendants and involve common questions of law and/or fact, including vehicles that have all been recalled by Defendants. Further, joinder supports judicial efficiency, conserves the parties and court's resources, prevents duplicative discovery, and serves the interests of justice.

41. This is an action for damages that exceed the minimum jurisdictional limits of this Court.

42. Plaintiffs have timely filed this lawsuit within the applicable statutory limitations period.

43. Further, any applicable statute of limitation or statute of repose should be equitably tolled or the Defendants estopped from asserting any such limitation due to Defendants purposeful