and fraudulent concealment of a known defect with the specific intent to dissuade or prevent claims against Defendants as set forth more specifically below.

44. Plaintiffs could not have been on notice or had reason to know of the defects alleged in this complaint until they had actual knowledge of Defendants' recall of these vehicles. All of these claims are timely filed within the applicable limits after gaining said knowledge.

45. Plaintiffs' claims are not removable to federal court on the basis of diversity jurisdiction, federal question jurisdiction, or any other jurisdictional basis, any attempt to remove this matter would be improper and would provide grounds for sanctions. Plaintiffs include two Michigan citizens, and Defendant GM is a Michigan citizen with its principal place of business in Detroit, Michigan.

### III.  GENERAL ALLEGATIONS

**A.  BACKGROUND**

46. As used in this petition, the "Subject Vehicles" refers to the GM vehicles sold in the United States equipped at the time of sale with ignition switches ("Ignition Switches") sharing a common, uniform, and defective design or manufacture, including but not limited to the following makes and model years.

- 2005-2010 Chevrolet Cobalt
- 2006-2011 Chevrolet HHR
- 2006-2010 Pontiac Solstice
- 2003-2007 Saturn Ion
- 2007-2010 Saturn Sky
- 2005-2010 Pontiac G5
- 2004-2008 Pontiac Grand Prix
- 2003-2014 Cadillac CTS
- 2000-2005 Cadillac Deville
- 2004-2006 Cadillac SRX
- 2006-2011 Cadillac DTS
- 2005-2009 Buick Lacrosse
- 2006-2011 Buick Lucerne
- 2010-2014 Chevrolet Camaro

- 2000-2014 Chevrolet Impala
- 1997-2005 Chevrolet Malibu
- 2000-2007 Chevrolet Monte Carlo
- 1999-2004 Oldsmobile Alero
- 1998-2002 Oldsmobile Intrigue
- 1999-2005 Pontiac Grand Am

47. Millions of vehicles were sold in the United States equipped with the Ignition Switches.

48. The Ignition Switches in the Subject Vehicles turn on the vehicle's motor engine and main electrical systems when the key is turned to the "run" or "on" position. The Ignition Switches have several common switch points, including "RUN" (or "ON"), "OFF," and "ACC" ("accessory"). At the "run" position, the vehicle's motor engine is running and the electrical systems have been activated; at the "accessories" position the motor is turned off, and the electrical power is generally only supplied to the vehicle's entertainment system; and at the "off" position, both the vehicle's engine and electrical systems are turned off. In most vehicles, a driver must intentionally turn the key in the ignition to move to these various positions.

49. GM installed the Ignition Switches in certain vehicle models, including Plaintiffs' vehicles. Upon information and belief, Defendants knew the Ignition Switches were defectively designed, but nonetheless continued to manufacture and sell the Ignition Switches with the knowledge that they would be used in GM vehicles, including the Subject Vehicles.

50. Because of defects in their design, the Ignition Switches installed in the Subject Vehicles are, by their nature, loose and improperly positioned, and require too little force to move, and are susceptible to failure during normal and expected conditions. The ignition module is located in a position in the vehicle that allows a driver to contact the key ring, and inadvertently switch the ignition position. Further, even a road bump or jarring can switch the ignition position. Due to faulty design and improper positioning, the Ignition Switches can unexpectedly and suddenly move from the "on" or "run" position while the vehicle is in operation to the "Off" or "Acc" position ("Ignition Switch Defect"). When this ignition switch failure occurs, the motor engine and certain electrical components such as power-assisted steering and anti-lock brakes are turned off, thereby endangering the vehicle occupants and compromising the safety airbag system.

51. The Ignition Switch Defect can occur at any time during normal and proper operation of the Subject Vehicles, meaning the ignition can suddenly switch off while it is moving at 70 mph on the freeway, leaving the driver unable to control the vehicle and vulnerable to a nonfunctioning safety airbag system.

52. GM has acknowledged that the Ignition Switch Defect has caused at least thirteen deaths. GM has refused, however, to disclose the identities of those it counts among these thirteen deaths. Independent safety regulators have recorded 303 deaths associated with only the Saturn Ion, and Chevrolet Cobalt Subject Vehicle models. The actual number of deaths for all Subject Vehicle models is expected to be much higher.

53. The Ignition Switch Defect precludes drivers and owners of the Subject Vehicles, such as Plaintiffs from proper and safe use of their vehicles, reduces vehicle occupant protection, and endangers them and other vehicle occupants. However, no driver or owner of the Subject Vehicles, including Plaintiffs, knew, or could reasonably have discovered, the Ignition Switch Defect, prior to it manifesting in a sudden and dangerous failure during their auto accidents.

54. Upon information and belief, prior to the sale of the Subject Vehicles, GM knew of the Ignition Switch Defect through sources such as pre-release design, manufacturing, and field testing data; in-warranty repair data; early consumer complaints made directly to GM, collected by the National Highway Transportation Safety Administration's Office of Defect Investigation ("NHTSA ODI") and/or posted on public online vehicle owner forums; field testing done in response to those complaints; aggregate data from GM dealers; and accident data. Despite this knowledge, GM failed to disclose and actively concealed the Ignition Switch Defect from Plaintiffs and the public, and continued to market and advertise the Subject Vehicles as reliable, and safe vehicles, which they are not. Much of this knowledge was obtained as early as 2001.

55. As a result of GM's alleged misconduct, Plaintiffs were harmed and suffered actual damages and personal injuries, in that the Subject Vehicles are unsafe, unfit for their ordinary and intended use, and have manifested, or are at unreasonable risk of manifesting, the Ignition Switch Defect by way of a sudden and dangerous failure that puts them and others at serious risk of injury or death. Drivers and owners of the Subject Vehicles, including Plaintiffs, did not receive the benefit of their bargain as purchasers and/or lessees because the vehicles were of a lesser standard, grade, and quality than represented. Plaintiffs also did not receive vehicles that met ordinary and reasonable consumer expectations. Drivers and owners of the Subject Vehicles, including

Plaintiffs, did not receive vehicles that would reliably operate with reasonable safety, and that would not place drivers and occupants in danger of encountering an ongoing and undisclosed risk of harm, which could have been avoided, as GM knew but did not disclose, through the use of non-defective ignition parts.

### i. Lack of Knowledge by Plaintiffs

56. Upon information and belief, GM promoted the Subject Vehicles listed in Paragraph 46 as safe and reliable in numerous marketing and advertising materials.

57. No reasonable consumer expects that the vehicle that he or she purchases or leases contains a known but undisclosed design defect that poses a safety risk at the time or purchase or lease or use.

### ii. GM Field Reports and Internal Testing Reveal a Problem

58. In 2001, during pre-production of the 2003 Saturn Ion, GM engineers learned that the Ignition Switch could unintentionally move from the "run" position to the "accessory" or "off" position. In an internal report generated at the time, GM identified the cause of the problem as "low detent plunger force." The "detent" is part of the ignition switch's inner workings that keeps the switch from rotating from one setting to another unless the driver turns the key. The report stated that than an "ignition switch design change" was believed to have resolved the problem.

59. In 2003, a second report documented an incident with a Saturn Ion where "a service technician observed a stall while driving." There the technician noted that the owner had several keys on the key ring and surmised that the "weight of the keys had worn out the ignition switch" and replaced the switch and closed the matter.

60. GM engineers encountered the problem again in 2004 just prior to the launch of the 2005 Chevrolet Cobalt. GM learned of an incident in which a Cobalt vehicle suddenly switched out of the "run" position and lost engine power. GM engineers were able to replicate this problem during test drives of the Cobalt. According to GM, an engineering inquiry known as a Problem Resolution Tracking System ("PRTS") was able to pinpoint the problem and evaluate a number of solutions; however, after considering "lead time required, cost, and effectiveness," GM decided to do nothing.

61. After the Chevrolet Cobalt entered the market in 2004, GM began receiving complaints about incidents of sudden loss of engine power. GM engineers determined that the low

torque in the ignition switch could cause the key to move from the "run" to the "accessory" or "off" position under ordinary driving conditions with normal key chains because "detent efforts on ignition switch are too low, allowing key to be cycled to off position inadvertently." Specifically, in February 2005, GM engineers concluded that "there are two main reasons that we believe can cause a lower effort in turning the key: a lower torque detent in the ignition switch . . . [and a] low position of the lock module [on] the [steering] column."

62. Additional PRTS's were opened to investigate the problem, and in May 2005, GM engineers proposed redesigning the key head from a "slotted" to a "hole" configuration to prevent inadvertent shifting of the key in the ignition. Although GM initially approved the design, the company once again declined to act.

63. GM CEO Mary Barra explained in her April 1, 2014 testimony before the House Committee on Energy and Commerce that the proposed "fix" for the Ignition Switch Defect was rejected in 2005 because it would have taken too long and cost too much. Ms. Barra testified that GM's decision making was the product of a "cost culture" versus a "culture that focuses on safety and quality."

64. In April 2006, GM approved a design change for the Chevrolet Cobalt's ignition switch, as proposed by the supplier, Delphi. According to GM, the changes included a new detent plunger and spring, but there was no corresponding change in the ignition switch part number. GM estimates that Delphi began producing the redesigned ignition switch for all Subject Vehicles during the 2007 model year.

65. Delphi assigned its newly designed switch the same part number assigned to the faulty ignition switch.

66. After another PRTS in 2009, GM redesigned the Chevrolet Cobalt key, changing the top of the key from a "slot" design to a "hole" design—as had been suggested in 2005. GM instituted the change after finding that consumers "with substantially weighted key chains/additional keys hanging from ignition key have experienced accidental ignition shut-off" and the design change was intended to "significantly reduce downward force and the likelihood of this occurrence." The new key design was produced for 2010 model year.

67. According to Delphi, the component required to fix the Ignition Switch Defect costs approximately $2 to $5. GM management estimated that replacement components would cost an additional 90 cents per vehicle, but would only save 10 to 15 cents in warranty costs.

COMPLAINT AND DEMAND FOR JURY TRIAL
- 11 -

68. GM also now acknowledges that Field Product Reports and PRTS reports related to the Subject Vehicles from 2003 and 2006 concerned engine stalling in the Saturn Ion and may be related to the Ignition Switch Defect.

69. The information learned about the Cobalt and Ion involve the same ignition switch as in all of the Subject Vehicles including the vehicles used by Plaintiffs.

### iii. GM Issues Information Service Bulletins

70. In 2005, as a result of internal investigation, GM issued an Information Service Bulletin entitled the "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35-007) to GM dealers warning about a stalling problem related to inadvertent shifting of the ignition switch. The bulletin applied to the 2005 and 2006 Chevrolet Cobalt; 2006 Chevrolet HHR; 2005 and 2006 Pontiac Pursuit (Canada only); 2006 Pontiac Solstice; and, 2003 to 2006 Saturn Ion, which all had the same ignition switch.

71. The bulletin advised that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort," noting that risk was greater "if the driver is short and has a large and/or heavy key chain" such that "the driver's knee would contact the key chain while the vehicle was turning." GM dealers were told to inform consumers of this risk, and recommend "removing unessential items from their key chain." The bulletin also informed dealers that GM had developed an insert for the key ring so that "the key ring cannot move up and down in the slot any longer – it can only rotate on the hole" and that the key ring has been replaced by a smaller design such that "the keys [will not hang] as low as in the past."

72. On July 19, 2005, the New York Times reported that Chevrolet dealers were telling Cobalt owners to remove extra items from their key rings to prevent accidental stalling of their vehicles. Alan Adler, GM's Manager for Safety Communications, stated that the problem manifested in only "rare cases when a combination of factors is present." Adler advised that consumers "can virtually eliminate this possibility by taking several steps, including removing nonessential material from their key rings."

73. The Times reporter noted that his wife had already encountered the problem with the Chevrolet Cobalt she was driving on a freeway, accidentally bumped the steering column with her knee, and found the engine "just went dead." She was able to safely coast to the side of the road. When the vehicle was brought back to the Chevrolet dealer for an inspection, nothing was found wrong and they were advised of the service bulletin. The reporter stated that the key chain

being used at the time of the stalling incident was provided by GM, and included only the key fob and a tag.

74. GM, in a statement at the time through Adler, insisted that this problem was not a safety issue because "[w]hen this happens, the Cobalt is still controllable" and the "engine can be restarted after shifting to neutral." Adler also claimed that this ignition issue was widespread because "practically any vehicle can have power to a running engine cut off by inadvertently bumping the ignition . . ."

75. In October 2006, GM updated the Information Service Bulletin, "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35-007A) to include additional vehicles and model years. Specifically, GM included the 2007 Chevrolet Cobalt; the 2007 Chevrolet HHR; the 2007 Pontiac G5; the 2007 Pontiac Solstice; the 2007 Saturn Ion, and; the 2007 Saturn Sky. The updated bulletin included the same service advisories to GM dealers as the earlier version.

76. According to GM, the service bulletin was the appropriate response "given that the car's steering and braking systems remained operational even after a loss of engine power." GM reports that GM dealers provided 474 key inserts to GM vehicle owners who brought their vehicles in for servicing.

### iv. Reports of Unintended Engine Shut Down

77. A number of reports from warranty and technical assistance data beginning in 2003, "addressed complaints of stalling Ion vehicles." Despite these reports, the Saturn Ion remained in production until 2007.

78. On May 26, 2005, a reporter for The Daily Item in Sunbury, Pennsylvania reviewed the Chevrolet Cobalt and found that during his test drives of the vehicle there were "[u]nplanned engine shutdowns [that] happened four times during a hard-driving test week" with the vehicle.

### v. Crash Reports and Data

79. The Defendants knew of the Ignition Switch Defect and its deadly consequences for consumers, but concealed that information from safety regulators and the public.

80. National Highway Traffic Safety Administration (NHTSA) data shows that there were three fatal car crashes involving Saturn Ions due to a failure of the airbag to deploy prior to July 2005.

81. In July 2005, a sixteen-year old was killed when her 2005 Chevrolet Cobalt crashed with the ignition switch in the accessory mode, which disabled the airbag.

82. In 2006, there were at least two fatalities associated with a Chevy Cobalt crash. Information from the car's data recorder indicated that the ignition switch was in "accessory" instead of run, and the front airbags failed to deploy.

83. In 2007, GM reviewed available sensor data from nine front-impact Cobalt crashes where the airbags did not deploy. GM discovered that in four of the crashes, the ignition was in the "accessory position." Crash information for the other Subject Vehicles was not reviewed.

84. In 2007, NHTSA's early warning division reviewed available data provided by GM on airbag non-deployments in Chevrolet Cobalt vehicles. This review identified 43 incidents in which airbags may not have deployed in a crash. The early warning division referred the case to NHTSA's data analysis division for further screening. A defects panel was convened, but after reviewing the data and consulting with GM, the panel ultimately concluded that "[t]he data available at the time of this evaluation did not indicate a safety defect or defect trend that would warrant the agency opening a formal investigation." In prepared remarks delivered April 1, 2014, to the Committee on Energy and Commerce, NHTSA Acting Administrator David Friedman stated, "At the time of these reviews, NHTSA did not have the information that GM has since provided—for instance, new evidence linking airbag non-deployment to faulty ignition switches."

85. GM has identified 23 frontal-impact crashes in the United States involving 2005 to 2007 Chevrolet Cobalts, and 2007 Pontiac G5s in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy.

86. GM has identified 8 frontal-impact crashes in the United States involving 2003 to 2007 Saturn Ion vehicles in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy. These crashes resulted in four fatalities and six injuries to occupants.

87. GM has identified 3 frontal-impact crashes in the United States involving 2006 and 2007 model year Chevrolet HHR vehicles in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy. These crashes resulted in three injuries to occupants.

### vi. GM's Belated Repair Recall of Some Vehicles

88. On February 7, 2014, GM filed a Part 573 Defect Notice with the NHTSA to recall 2005 to 2007 model year Chevrolet Cobalt and 2007 Pontiac G5 vehicles. The notice stated that the "ignition switch torque performance may not meet General Motors' specifications," explaining that if "the key ring is carrying weight or the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the 'run' position" and may result in deactivating the airbags. The notice did not acknowledge that the Ignition Switch Defect could occur under normal driving conditions, even when the key ring is not carrying added weight.

89. The notice also did not identify all the vehicles affected by the Ignition Switch Defect.

90. The notice failed to indicate the full extent to which GM has been aware of the Defect. The notice suggests that GM's knowledge of the defect is recent, stating that "[t]he issue was presented to the Field Performance Evaluation Review Committee and on January 31, 2014, the Executive Field Action Decision Committee decided to conduct a safety recall."

91. In a February 24, 2014 letter to the NHTSA, GM amended the Part 573 Report to include a more detailed chronology. The chronology indicated that GM first learned of the Ignition Switch Defect during the launch of the 2005 Chevrolet Cobalt from field tests by its engineers.

92. On February 25, 2014, GM amended its Part 573 Report to cover additional models and model years due to the same Ignition Switch Defect. Specifically, GM identified the 2003 to 2007 model years of the Saturn Ion; 2006 and 2007 model years of the Chevrolet HHR; 2007 model year of the Pontiac Solstice; and, 2007 model year of Saturn Sky vehicles.

93. According to the NHTSA Acting Administrator David Friedman, the chronology information provided by GM on February 24, 2014 "raise[d] serious questions as to the timeliness of GM's recall." Therefore, the NHTSA opened a "timeliness query" on February 26, 2014.

94. On March 4, 2014, the NHTSA issued GM a Special Order demanding that it provide additional information by April 3, 2014, on 107 specific requests, including information to "evaluate the timing of GM's defect decision making and reporting of the safety defect to NHTSA."

95. On March 11, 2014, GM filed a new Part 573 report superseding its February 25 filing. The new chronology provided with the report indicated that GM was aware of the Ignition Switch Defect in 2001—significantly earlier than its previous 2004 disclosure. GM now indicated

1  that it had a report from 2001 that revealed a problem with the ignition switch during pre-
2  production of the Saturn Ion.

3  96. On March 28, 2014, GM filed a new Part 573 report, which expanded the recall set
4  forth in its February 25, 2014 filing. GM's March 28 report indicated that several additional model
5  year vehicles may be affected by the Ignition Switch Defect. GM identified those vehicles as the
6  2008-2010 Chevrolet Cobalt; 2008-2011 Chevrolet HHR; 2008-2010 Pontiac Solstice; 2008-2010
7  Pontiac G5; and, 2008-2010 Saturn Sky. The March 28 report added over one million vehicles to
   the total affected by the Ignition Switch Defect.

8  97. GM notified dealers of the Subject Vehicles of the recall in February and March
9  2014. GM also notified owners of the Subject Vehicles by letter of the recall. The letter minimized
10 the risk of the defect, indicating that the Ignition Switch Defect would occur only "under certain
11 conditions" and emphasized that the risk increased if the "key ring is carrying added weight . . . or
12 your vehicle experiences rough road conditions."

13 98. GM prior to the recalls listed above, did not inform the public of the known defect
14 with its ignition switch.

**B.   The Subject Incidents.**

15 99. Plaintiffs JOHN MULLIN and EILEEN MULLIN bring an action for the wrongful
16 death of Juanita Mullin.

17 100. Juanita Mullin was operating a Subject Vehicle, a 2012 Chevrolet Impala,
18 manufactured and sold by Defendants, on May 7, 2012. On that date, Plaintiff Mullin was traveling
19 on Interstate I-15 near Baker, California. The vehicle's VIN Number is: 2G1WF5E35C12135
20 Plaintiff Mullin's Impala stalled while she was traveling on the interstate and the motor stopped
21 working due to the Ignition Switch Defect.

22 101. As a result of the motor stopping and subsequent loss of power to the engine, steering
23 wheel and brakes, Plaintiff Mullin was left no choice but to try and restart the vehicle while in a
24 lane of Interstate 15. While she was trying to restart the Impala, Plaintiff Mullin was rear ended
25 by another vehicle, killing her. Defendants' defects as alleged herein were the direct and proximate
   cause of her death.

26 102. Plaintiff JOYCE MARKER was a passenger in a Subject Vehicle, a 2010 Chevrolet
27 HHR manufactured and sold by Defendants, on October 4, 2013. On that date, Plaintiff Marker
28 was travelling in Covina, California at the time of her auto accident. The vehicle's VIN is:

COMPLAINT AND DEMAND FOR JURY TRIAL
- 16 -

3GNBAADB2AS613469. The HHR stalled due to the Ignition Switch Defect and the motor, steering and brakes stopped working. While the vehicle was stalled, the HHR was rear ended by another vehicle. Plaintiff MARKER suffered personal injuries to her body as a result of this auto accident. Defendants' defects as alleged herein were the direct and proximate cause of her injuries.

103. Plaintiff LYNETTA BRAY was the driver of a Subject Vehicle, a 2006 Cadillac CTS, manufactured and sold by Defendants, on July 23, 2010. On that date, Plaintiff Bray was travelling in Los Angeles County, California on Interstate 5. The vehicle's VIN is 1G6DP577260107401. Plaintiff Bray braked hard and swerved to avoid a wheelbarrow in the road when the steering and braking of the vehicle was affected by the Ignition Switch Defect. This maneuver resulted in a frontal collision with another car but the front airbags did not deploy in Plaintiff Bray's vehicle. If such airbags had deployed, Plaintiff Bray would either not have suffered injuries or suffered greatly reduced injuries. Defendants' defects as alleged herein were the direct and proximate cause of her injuries.

104. Plaintiff DARLENE HINES was operating a Subject Vehicle, a 2004 Pontiac Grand Prix, manufactured and sold by Defendants, on August 20, 2009. On that date, Plaintiff Hines was travelling on Middleground Road in Burke County, Georgia. The vehicle's VIN is 2G2WR524941133352. Due to the Ignition Switch Defect, Plaintiff Hines lost power to the engine while steering her car. She then lost control of her vehicle and hit several trees in a frontal crash. Despite a significant frontal impact, the frontal air bags did not deploy in the crash. If such airbags had deployed, Plaintiff Hines's would either not have suffered injuries or suffered greatly reduced injuries. Defendants' defects as alleged herein were the direct and proximate cause of her injuries.

105. Plaintiffs ELIZABETH SIZEMORE and JAMES SIZEMORE were in a Subject Vehicle, a 2006 Chevrolet HHR, manufactured and sold by Defendants, on June 13, 2014. On that date, Plaintiffs were travelling near Shelby Township, Michigan. The vehicle's VIN is 3GNDA13D76S676036. The vehicle lost power due to the defective ignition switch causing the wheel to have reduced steering and braking capabilities. Plaintiffs then endured a frontal crash into a tree. Despite a significant impact, the frontal air bags did not deploy during the crash. If such airbags had deployed, Plaintiffs' would either not have suffered injuries or would suffered greatly reduced injuries.

106. To Plaintiffs' knowledge and understanding, the vehicles listed in Paragraphs 99-106 had not been substantially modified or changed in any material way from its initial condition as designed, manufactured, marketed, and sold by the Defendants, and Plaintiffs were unaware of any defect with the vehicle or its components prior to the incident described herein.

107. Plaintiffs herein all have almost identical auto accidents that involve the Ignition Switch Defects of Defendants' recalled vehicles. All of these accidents involve either/or: 1) engine, braking and steering failure from the ignition defect; or 2) frontal collisions with no air bag deployment; or 3) both.

### IV. PLAINTIFFS' USE OF THE SUBJECT VEHICLES AND/OR IGNITION SWITCH AND RESULTING INJURY

108. Plaintiffs incorporate by reference all the above paragraphs as if set forth in full herein.

109 Plaintiffs bring this action to recover damages resulting from injuries suffered as a direct and proximate result of their use of the Subject Vehicles and/or ignition switches.

110. Plaintiffs' use of the Subject Vehicles and/or ignition switches caused Plaintiffs' injuries and resulting damages. During Plaintiffs' operation of the Subject Vehicles and/or ignition switches, the Subject Vehicles and/or ignition switches were used in a manner reasonably foreseeable to Defendants. The Subject Vehicles and/or ignition switches were defectively designed, unreasonably dangerous, inadequately tested, dangerous to human health, untimely and belatedly recalled, and lacked proper warnings as to the dangers associated with their use by Plaintiffs.

111. Plaintiffs have suffered serious physical injuries and damages as a direct and proximate result of the Subject Vehicles and/or ignition switches. Plaintiffs' injuries necessitate continued medical treatment for the foreseeable future.

112. Prior to Plaintiffs' use of the Subject Vehicles and/or ignition switches, Defendants knew or should have known of the risks associated with the operation of the Subject Vehicles and/or ignition switches and possessed the means to provide adequate warning regarding the risks associated with the Subject Vehicles and/or ignition switches. Had Plaintiffs been adequately warned that the Subject Vehicles and/or ignition switches could cause serious injury and/or death, they would have not have used the Subject Vehicles and/or ignition switches.

COMPLAINT AND DEMAND FOR JURY TRIAL
- 18 -

113. As a direct and proximate result of Defendants' conduct, Plaintiffs were unaware and could not reasonably know, or through the exercise of reasonable diligence could not have known, that the Subject Vehicles and/or ignition switches exposed Plaintiffs to the risks and injuries alleged herein.

114. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered physical injuries and damages. Further, the Plaintiffs have sustained in the past, and will sustain in the future, physical pain and suffering, disfigurement, physical impairment, a reasonable and traumatic fear of an increased risk of additional injuries, progression and aggravation of existing physical conditions, and other serious injury and loss.

115. Plaintiffs also have suffered and will sustain past and future general and special damages, including past and future medical care and treatment, lost wages, and lost earning capacity.

116. As a direct and proximate result of Defendants' conduct and/or the Subject Vehicles and/or ignition switches, Plaintiffs have incurred, and will continue to incur for the foreseeable future, medical, nursing, diagnostic, hospital, pharmaceutical, rehabilitative, and other related costs and expenses for Plaintiffs' treatment and care, along with lost wages, lost earning capacity, and other damages for which they are entitled to compensation. Said amounts are above the jurisdiction amount for this Court, but the exact amounts are unknown at this time.

117. Plaintiffs are entitled to punitive damages because Defendants' conduct was reckless, intentional, with evil and malice, and without regard for the Plaintiffs' and the public's safety and welfare. Defendants misled both the automotive community and the public at large, including the Plaintiffs, by making false representations about the safety of the Subject Vehicles and/or ignition switches and concealing known defects. Defendants downplayed, understated, concealed and/or disregarded its knowledge of the serious risks and unreasonable dangers associated with the Subject Vehicles and/or ignition switches. Nevertheless, Defendants continued to market the Subject Vehicles and/or ignition switches by providing false and misleading information with regard to their safety and efficacy. Defendants' conduct constitutes a willful, despicable, fraudulent, malicious, oppressive, reckless, and conscious disregard for the rights of Plaintiffs and the public.

118. Defendants are liable both jointly and severally to the Plaintiffs for all damages, punitive damages, and all other relief to which Plaintiffs are entitled to by law or equity.

## V. CAUSES OF ACTION (AGAINST ALL DEFENDANTS)

### A. STRICT LIABILITY FOR FAILURE TO WARN AND DESIGN DEFECT

119. Plaintiffs hereby incorporate by reference each and every paragraph set forth in this Petition as if fully copied and set forth at length herein.

120. Defendants designed, manufactured, distributed and/or sold the Subject Vehicles, including Plaintiffs' vehicles with design, manufacturing, and/or marketing defects, more particularly set forth herein.

121. Marketing Defect and Failure to Warn – Defendants designed, manufactured, and/or sold the Subject Vehicles, with one or more marketing defects:

   a. There was an unreasonable risk in the intended or reasonably foreseeable use of such automobile in that the above defect prevents the vehicle's airbag from being deployed or causes the vehicle to have dangerous loss of engine power, steering power or braking power, causing physical injury and death;
   b. Defendants knew, foresaw, or should have known and foreseen the above risk;
   c. Defendants failed to adequately warn plaintiffs of the above risks, failed to adequately instruct plaintiffs how to avoid the above danger, or both;
   d. Plaintiffs would not have used the vehicles if such risks and dangers had been disclosed or known to them.

122. Design Defect – Defendants designed, manufactured, and/or sold the Subject Vehicles, with one or more design defects, more particularly set forth in the preceding paragraphs in this Petition, including an Ignition Switch Defect that prevented the vehicles' airbags from deploying in the event of an impact, loss of engine power, loss of steering power, loss of braking power, and a lack of Electronic Stability Control ("ESC"). Defendants designed the Subject Vehicles and knew of safer alternative designs that existed at the time of production or later that would have prevented or significantly reduced the above risks without substantially impairing the vehicles' utility, and was economically and technologically feasible at the time that the Subject Vehicles left Defendants' control by the application of existing or reasonably achievable scientific knowledge.

123. Manufacturing Defect – Defendants designed, manufactured, and/or sold the Subject Vehicles, with one or more manufacturing defects, more particularly set forth above. The Subject Vehicles manufactured by Defendants deviate, in their construction or quality, from the

specifications or planned output in a manner that renders the automobiles unreasonably dangerous, including but not limited to faulty electrical circuitry, power supply or too low of torque.

124. Unreasonably Dangerous – The manufacturing defects, marketing defects, or both, rendered the Subject Vehicles unreasonably dangerous by making the automobiles dangerous to an extent beyond that which would be contemplated by the ordinary consumer with the knowledge common to the community as to its characteristics.

125. The design defects, or any of them, rendered the Subject Vehicles unreasonably dangerous as designed, considering the utility of the automobile and the risks involved in its use.

126. The design, manufacturing, and/or marketing defects, or any of them, were producing causes of Plaintiffs' injuries and damages, as more particularly set forth above. Defendants' actions caused or contributed to cause each Plaintiff's damages. Defendants' actions or omissions were the legal and proximate cause of each Plaintiff's damages.

127. It was entirely foreseeable to, and well-known by, Defendants that accidents involving its automobiles, such as occurred herein, would on occasion take place during the normal and ordinary use of said automobiles, including but not limited to frontal impact crashes.

128. The Subject Vehicles were defective and unreasonably dangerous in that they contained the Ignition Switch Defect that prevented the vehicles' airbags from deploying upon an impact, or caused a loss of power to the engine, steering or brakes, and were designed without Electronic Stability Control.

129. The Subject Vehicles were in this defective condition at the time they left the possession or control of Defendants.

130. The Subject Vehicles reached the consumers without substantial change to the condition of the Ignition Switch.

131. Defendants designed, manufactured, marketed, distributed, and sold the Subject Vehicles to be unreasonably dangerous and defective within the meaning of Section 402A Restatement (Second) Torts in that the Subject Vehicle were unreasonably dangerous as designed, marketed, manufactured, or any of them. Specifically, the Subject Vehicles contained an Ignition Switch that was defective, inferior and inadequately designed, marketed and manufactured, and the Subject Vehicles also lacked Electronic Stability Control.

132. The foregoing acts and/or omissions of Defendants were a producing and/or proximate cause of the Plaintiffs' damages. Defendants' conduct caused or contributed to cause Plaintiffs' injuries and damages.

B. **NEGLIGENCE**

133. Plaintiffs hereby incorporates by reference each and every paragraph set forth in this Petition as if fully copied and set forth at length herein.

134. Defendants were negligent in designing, manufacturing, and/or selling the Subject Vehicles, with one or more design defects, more particularly set forth above, including the Ignition Switch Defect that prevented the vehicle's airbag from deploying in the event of an impact, loss of engine power, loss of steering power, loss of braking power, and the lack of Electronic Stability Control ("ESC") that would reduce the risk of loss of vehicle control.

135. Defendants owed Plaintiffs a duty to exercise ordinary care in designing, manufacturing, marketing, testing, selling and distributing the automobiles in question; and to discover dangerous propensities of its product. Defendants failed to exercise ordinary care in designing, manufacturing, marketing, testing, selling, distributing and recalling the Subject Vehicles in question.

136. Defendants breached their duties to Plaintiffs by designing, manufacturing, marketing, testing, selling, distributing, and recalling the Subject Vehicles with a latent dangerous defect in the Ignition Switch and lack of Electronic Stability Control and/or by failing to warn of the defects and/or by failing to adopt a safer, practical, feasible or otherwise reasonable alternative design that could have then been reasonably adopted to prevent or substantially reduce the risk of harm without substantially impairing the usefulness, practicality, or desirability of the Subject Vehicles.

C. **BREACH OF WARRANTY**

137. Plaintiffs hereby incorporate by reference each and every paragraph set forth in this Petition as if fully copied and set forth at length herein.

138. When Defendants placed the Subject Vehicles into the stream of commerce, Defendants knew or should have known of the use for which they were intended and expressly and impliedly warranted to Plaintiffs that the use of the Subject Vehicles were safe and acceptable.

139. Plaintiffs reasonably relied upon the expertise, skill, judgment and knowledge of Defendants and upon the express and/or implied warranty that the Subject Vehicles were of merchantable quality and fit for use as intended.

140. The Subject Vehicles were not of merchantable quality and were not safe or fit for their intended use because it was unreasonably dangerous and unfit for the ordinary purpose for which they are used in that it caused injury to Plaintiffs. Defendants breached the warranty because the Subject Vehicles were unduly dangerous in expected use and did indeed cause undue injury to Plaintiffs.

141. As a direct and proximate result of Defendant's breach of warranty of merchantability, Plaintiffs were seriously and permanently injured, and or killed.

## VI.    DAMAGES

142. Plaintiffs hereby incorporate by reference each and every paragraph set forth in this Petition as if fully copied and set forth at length herein.

143. Because of Plaintiffs' bodily injuries or death proximately caused by Defendants' conduct, Plaintiffs are entitled to reasonable and proper compensation for the following legal damages:

    a.    past and future medical expenses and charges;

    b.    past and future physical pain and anguish;

    c.    past and future physical impairment;

    d.    past and future disfigurement;

    e.    past lost wages and future lost wage-earning capacity;

    f.    loss of guidance, love and companionship for wrongful death;

    g.    loss of household contributions for wrongful death; and,

    h.    all other economic and non-economic damages allowed for wrongful death.

144. Plaintiffs seeks actual and punitive damages to be awarded by the jury in an amount in excess of the minimum jurisdictional limits of this Court.

## VII.    GROSS NEGLIGENCE/PUNITIVE DAMAGES

145. Plaintiffs hereby incorporate by reference each and every paragraph set forth in this Petition as if fully copied and set forth at length herein.

146. Plaintiffs would further allege that the clear and convincing evidence in this case will show that Defendants acted with gross negligence and/or actual malice with evil intent in that

when viewed objectively from the standpoint of these Defendants at the time of the occurrence, there was an extreme danger of risk considering the probability and magnitude of potential harm to others, and of which each Defendants had actual, subjective awareness of the risk involved, but nevertheless proceeded with indifference to the rights, safety, or welfare of others, including the Plaintiffs. Therefore, punitive damages are sought and should be assessed against each Defendant to the maximum amount allowed by applicable law.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs respectfully pray that Plaintiffs have upon final trial, among other things:

a. Judgment against Defendants for compensatory damages in excess of the minimum jurisdictional limits of the Court;

b. Judgment for punitive damages in excess of the minimum jurisdictional limits of the Court;

c. Pre-judgment and post-judgment interests as authorized by law on the judgments which enter on Plaintiffs' behalf;

d. Costs of suit; and,

e. Such other and further relief as this Court may deem proper and just.

DATED: December 31, 2014                THE POTTS LAW FIRM, LLP

By: _____
Saima Khan
*Attorney for Plaintiffs*

## DEMAND FOR JURY TRIAL

Plaintiffs specifically demand a trial by jury of all claims asserted in this complaint.

Dated: December 31, 2014

                      THE POTTS LAW FIRM, LLP

By: _____
Saima Khan
*Attorney for Plaintiffs*

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## NOTICE OF CASE ASSIGNMENT - UNLIMITED CIVIL PERSONAL INJURY CASE

Case Number _____

THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT    **BC 568381**

Your case is assigned for all purposes to the judicial officer indicated below (Local Rule 3.3(c)).

| ASSIGNED JUDGE | DEPT | ROOM | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|
| Hon. Gregory Keosian | 91 | 635 | | | |
| ☒ Hon. Elia Weinbach | 92 | 633 | | | |
| Hon. Howard L Halm | 93 | 631 | | | |
| Hon. Teresa Beaudet | 97 | 630 | | | |

FSC: 06/15/2016    TRIAL: 06/30/2016    OSC: 01/01/2018

Given to the Plaintiff/Cross-Complainant/Attorney of Record on _____    SHERRI R. CARTER, Executive Officer/Clerk

LACIV PI 190 (Rev09/13)    **SHERRI R. CARTER**
LASC Approved 05-06                                    By _____**M. Soto**_____, Deputy Clerk
For Optical Use

**NOTICE OF CASE ASSIGNMENT –
UNLIMITED CIVIL CASE**