UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
|  | . | Case No. 09-50026-reg |
| IN RE: | . | Chapter 11 |
|  | . |  |
| MOTORS LIQUIDATION COMPANY, | . | (Jointly administered) |
| et al., f/k/a GENERAL | . |  |
| MOTORS CORP., et al, | . | One Bowling Green |
|  | . | New York, NY 10004 |
| Debtors. | . |  |
|  | . | Monday, August 31, 2015 |
| . . . . . . . . . . . . . . . . . | . | 9:48 a.m. |

TRANSCRIPT OF NOTICE OF HEARING/NOTICE OF STATUS CONFERENCE TO
BE HELD IN CONNECTION WITH THE COURT'S CASE MANAGEMENT ORDER,
DATED AUGUST 19, 2015 [Dkt. No. 13383], AND THE LETTERS FILED
IN RESPONSE THERETO (RELATED DOCUMENT(S) 13383) [13396]
**BEFORE THE HONORABLE ROBERT E. GERBER**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:

For the Debtor:            King & Spalding LLP
                           By:  ARTHUR STEINBERG, ESQ.
                                SCOTT DAVIDSON, ESQ.
                           1185 Avenue of the Americas
                           New York, New York 10036-4003
                           (212) 556-2158

For General Motors on
behalf of participating
unit holders:              Akin Gump Strauss Hauer & Feld LLP
                           By:  NAOMI MOSS, ESQ.
                           One Bryant Park
                           New York, NY 10036-6745
                           (212) 872-1000

APPEARANCES CONTINUED.


Audio Operator:            Frances Ferguson, ECR


Transcription Company:     Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46038
                           (855) 873-2223
                           www.accesstranscripts.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

APPEARANCES (Continued):

For the Ignition Switch
plaintiffs and certain
non-Ignition Switch
plaintiffs:                    Brown Rudnick LLP
                              By:  EDWARD S. WEISFELNER, ESQ.
                                   HOWARD S. STEEL, ESQ.
                              7 Times Square
                              New York, New York 10036
                              (212) 209-4917

For the GUC Trust
Administrator:                Gibson, Dunn & Crutcher LLP
                              By:  LISA RUBIN, ESQ.
                                   MATTHEW J. WILLIAMS, ESQ.
                              200 Park Avenue
                              New York, New York 10166-0193
                              (212) 351-4000

For Sesay, Bledsoe
and Elliott:                  GARY PELLER, ESQ.
                              600 New Jersey Ave., NW
                              Washington, DC 20001
                              (202) 662-9122

For Personal Injury
Accident Plaintiffs:          Goodwin Procter LLP
                              By:  WILLIAM P. WEINTRAUB, ESQ.
                              The New York Times Building
                              620 Eighth Avenue
                              New York, NY 10018-1405
                              (212) 813-8839

For Interested Party
Watershed Asset
Management:                   Watershed Asset Management, LLC
                              By:  MICHELE F. KYROUZ
                              1 Maritime Plaza, #1525
                              San Francisco, CA  94111
                              (415) 391-8900

For Interested Party
Amer Tiwana:                  CRT Capital Group, LLC
                              By:  AMER TIWANA
                              262 Harbor Drive, #101
                              Stamford, CT  06902
                              (203) 569-6400



3

```
TELEPHONIC APPEARANCES:

For the Ignition Switch
Plaintiffs:                    Hagens Berman Sobol Shapiro LLP
                               By:  STEVE W. BERMAN, ESQ.
                               1918 Eighth Avenue, Suite 3300
                               Seattle, WA 98101
                               (206) 623-7292

                               Lieff, Cabraser, Heimann & Bernstein
                               By:  ELIZABETH J. CABRASER, ESQ.
                               275 Battery Street, 29th Floor
                               San Francisco, CA 94111-3339
                               (415) 956-1000

For Participating
Unit Holders:                  Akin Gump Strauss Hauer & Feld LLP
                               By:  NAOMI MOSS, ESQ.
                                    DANIEL H. GOLDEN, ESQ.
                               One Bryant Park
                               New York, NY 10036-6745
                               (212) 827-8010

For the Debtor:                Hanson Bolkcom Law Group, LTD.
                               By:  MARY E. BOLKCOM, ESQ.
                               527 Marquette Avenue, Suite 2300
                               Minneapolis, MN  55402
                               (612) 342-2880

For The Bavlsik
Plaintiffs:                    The Simon Law Firm, P.C.
                               By:  KEVIN M. CARNIE, ESQ.
                               800 Market Street, Suite 1700
                               St. Louis, MO  63101
                               (314) 241-2029

For Designated Counsel:        Stutzman, Bromberg, Esserman & Plifka
                               By:  BRIANA L. CIONI, ESQ.
                                    DAVID J. PARSONS, ESQ.
                               2323 Bryan Street, Suite 2200
                               Dallas, TX  75201
                               (214) 969-4986

For Interested Party
Reorg Research, Inc.:          Reorg Research, Inc.
                               By:  KENT COLLIER
                               1140 Broadway
                               New York, NY  10001
                               (212) 257-4383
```



4

```
TELEPHONIC APPEARANCES:    (Continued)

For Doris Phillips:        Josh Davis Law Firm
                           By:  JOSHUA P. DAVIS, ESQ.
                           101 Lamar, Suite 200
                           Houston, TX  77002
                           (713) 337-4100

For Law Debenture
Trust Company of
New York:                  Kelley Drye & Warren LLP
                           By:  BENJAMIN D. FEDER, ESQ.
                           101 Park Avenue
                           New York, NY  10178
                           (212) 808-7974

For MDL Plaintiffs:        Hilliard Munoz & Gonzales LLP
                           By:  ROBERT C. HILLIARD, ESQ.
                           719 Shoreline Blvd., #500
                           Corpus Christi, TX  78401
                           (361) 882-1612
```

5

1          (Proceedings commence at 9:48 a.m.)

2          THE COURT:  I think I know all of you.  There's no

3  need for you to make appearances in advance, but when you come

4  up to the mike, the main lectern to speak, please identify

5  yourselves for the record.

6          I've read all of your letters and the attachments to

7  the extent that I haven't read them previously.  I have

8  problems with both sides' positions, especially vis-a-vis

9  proposals on timing, but also vis-a-vis matters of substance.

10  It seems to me that neither side acknowledges -- and I'm

11  pushing the GUC Trust and the indentured trustee off to the

12  side for the time being.  It seems to me that neither side

13  acknowledges that it is subject to the jurisdiction and rulings

14  of two separate judges and that anything Jesse Furman says

15  counts, as far as I'm concerned, and I would have thought that

16  anything that I say counts insofar as proceedings in the

17  district court is concerned.  And what I need from each of you

18  is realistic proposals in terms of prioritization of matters so

19  that I can get Jesse Furman the rulings he needs so that the

20  bellwether trial or trials are not delayed.

21          It seems to me, subject to your rights to be heard,

22  that by far the most important of the matters that we need to

23  address are the matter of punitives.  And I will also decide

24  preliminarily, to the extent that it's necessary, the matter of

25  imputation, but I thought I had already made my views on

6

1  imputation quite clear and that that was a matter that was

2  something that I had already addressed in at least one, if not

3  more than one, of the three opinions I've issued in 2015 on the

4  subject.

5       Reading your various letters, it seems to me that one

6  or both sides don't get it.  I think the plaintiffs justifiably

7  criticize New GM for wanting to re-litigate matters upon which

8  I've already ruled.  Conversely, I have problems with stuff

9  from designated counsel, including from Mr. Weintraub, on

10 things like an unwillingness to accept rulings that I've

11 already made.

12      And I think that both sides are insufficiently

13 nuanced in their analysis.  There's some shtuss about my

14 findings of fact.  I didn't make findings of fact.  You guys

15 stipulated to facts, and I took all of the facts as undisputed.

16 Your stipulations that you made are binding before me.

17 Stipulations you made in my court are binding on me.  It's

18 Jesse Furman's right to decide whether he considers those

19 stipulations binding upon him, but I made no findings of fact

20 on my own.  Based on undisputed facts, I guess some of the

21 stuff that I decided can be regarded as a mixed question of

22 fact and law, but it was principally a conclusion of law.

23      On matters that I decided, it is too late to reargue.

24 It's too late by reason of the passage of time and it's too

25 late by reason of the fact that jurisdiction over matters that

7

1  I decided has gone up to the court of appeals.

2          Conversely, I've read Jesse Furman's opinion going

3  along with his order, and I think he was pretty clear in his

4  reasoning, as well.  And a lot of what I saw, especially from

5  Mr. Weintraub, perhaps to a lesser extent from Mr. Weisfelner,

6  seems to be looking to reargue that stuff, as well.  And if

7  there is to be reargument on anything where Jesse Furman

8  expressed a view, that's got to be taken to him, either by a

9  motion for reargument or, as was threatened by still another,

10  motion to withdraw the reference.  But until and unless Jesse

11  Furman expresses any different views, I think we know where

12  we're headed.

13          Now, it seems to me that we have three things that

14  Jesse Furman identified as important to him, and then we have

15  one or two more that I have to worry about as well.  Seems to

16  me that highest on the list is determining the issues,

17  vis-a-vis punitive damages.  It also seems to be raised in this

18  -- I don't think I can pronounce it properly -- Bablisik

19  (phonetic) case.  You can tell me how it's pronounced, if

20  that's not the way.  We'll also need to determine the extent to

21  which knowledge of New GM personnel is imputed to New GM.  I

22  thought I had expressed views on that and always had an

23  understanding on that, which I fleshed out in the Peller

24  reargument  decision -- or Bledsoe, rather, reargument

25  decision.  But if there was something upon which I have not

8

1  ruled, as contrasted to wanting to reargue something which I

2  have, then you can identify that for me.

3         And third is getting the bankruptcy work done that is

4  necessary for the bellwether trial or trials beyond those two

5  issues.  And if there is such, I need you to identify that for

6  me.  I don't know whether that's just the markup of the second

7  amended consolidated complaint or something else.  Again, I

8  need your help on it.

9         Now, I see Ms. Rubin there.  Yes, you said in your

10 letter, and I agree with you, that your issues are independent

11 and they can be done first, but I also wonder whether they're

12 the least urgent of what we need to get done over the next

13 several months.  So I want discussion as to whether, even

14 though the GUC Trust stuff may be easier, whether we have the

15 ability, if we need to, to push it back pending more urgent

16 stuff, most significantly punitives.

17        I want a clarification as to what exactly we're

18 talking about on bellwether trials -- well, trial or trials in

19 the district court.  At first, I thought the bellwether trial

20 was going to be on economic loss claims, but now there's a hint

21 that it could be on personal injury claims, and I need a

22 clarification on that.

23        In a way, personal injury claims could be easier,

24 from my perspective, especially if they're on post-sale

25 accident cases, in which case the only thing I would need to

9

1  resolve is punitives.  But I need your help on that issue.

2          I also wonder whether punitives is more nuanced than

3  either side has argued in the papers that I've seen so far,

4  which mainly are Mr. Steinberg's brief against a non-designated

5  counsel, on the one hand, Mr. Weintraub's letter on the other.

6  It may be -- and I'll expect you guys to brief it when we talk

7  about briefing -- that the extent to which punitives are

8  permitted on the one hand or prohibited on the other, once you

9  get past assumptions of various claims of liabilities, could,

10 by analogy or otherwise to the remainder of the April 15th

11 decision, turn what is being relied upon as the predicate for

12 the punitive damages.

13         So if, by way of example, the predicate is as in one

14 complaint I read, stuff that took place prior to July 2009, one

15 might come to one view, and if the predicate fit the punitives

16 to something that took place after July 2009, the conclusion

17 might be different.  In any event, that's not a today issue,

18 but that's why I think that punitives is the one that is

19 probably going to need to go to the top of the list.

20         All right.  Just one or two other things.  One might

21 think that a schedule that doesn't even have any oral argument

22 until something after November 2nd is way too leisurely, and

23 we're going to have to do much better in terms of disciplining

24 ourselves to get the work done that Jesse Furman needs.  What

25 I'm going to need from each of you is a sensible triaging

10

1  approach to get the most important stuff done first under

2  schedules that will appropriately utilize the fact that each

3  side has mountains of resources, two, three, four law firms on

4  each side, and that people are going to have to work through

5  the fall, actually through the weeks before the fall, before

6  September 21st.  So I want to hear on that.

7        And then one last thing.  I don't know how to say it

8  delicately, but the notion of giving me 120 pages of briefs on

9  marked-up complaints made me go ballistic.  When I see the

10 marked-up pleadings, I know what I need to do.  Subject to your

11 rights to be heard, I'll let each of you give me a letter of

12 fives pages, no more than that, on commentary on your marked-up

13 complaints if you want to.  And the presumption is going to be

14 simultaneous submissions on everything I get going forward with

15 a brief time for simultaneous replies.  And we don't have the

16 luxury of going seriatim as we would if this were an ordinary

17 breach of fiduciary duty case or busted fraudulent campaigns

18 case.  We've got to get work done so that work that needs to be

19 done in district court isn't delayed.

20        All right.  Who am I going to hear from first?

21        MR. WEINTRAUB:  Your Honor, I've heard my name

22 mentioned more than once, so --

23        THE COURT:  Well, you're all going to get a chance to

24 be heard before we're done.  All right.  I'll hear from you

25 first, Mr. Weintraub.

1       MR. WEINTRAUB:  I want to make sure that I do address

2  everything that the Court asked me to address.  I am here

3  representing the plaintiffs represented by Mr. Hilliard in

4  personal injury cases.

5       The first thing that I heard the Court ask is, is it

6  correct that the bellwether trials concerned post-sale personal

7  injury accident cases, and that is correct.  There are six of

8  them that are scheduled to begin on a rolling basis.  The first

9  one is in January of next year, and a letter that we submitted

10 to the Court did identify the bellwether case.

11      THE COURT:  You named them by name.

12      MR. WEINTRAUB:  Yes.

13      THE COURT:  And those are injury, death or both?

14      MR. WEINTRAUB:  They -- I believe they are both.

15      THE COURT:  Okay.  And to what extent do they still

16 have any economic loss components besides injury or death?

17      MR. WEINTRAUB:  My understanding, Your Honor, is that

18 none of them will have economic loss claims.  Only two of them,

19 based upon my reading and my consultation with counsel, contain

20 what could be considered to be economic loss claims, and those

21 are -- can be amended out.

22      THE COURT:  Okay.

23      MR. WEINTRAUB:  As Your Honor knows, the post-sale

24 cases were not part of the motion to stay and they were not

25 part of the briefing on the threshold issues.  I agree with

1   Your Honor that the issue of punitive damages should be front

2   and center, and we're prepared to deal with them on an

3   expedited basis to accommodate this Court and the district

4   court.   I also agree with Your Honor that the punitive damages

5   issues are more nuanced than are suggested in some of the

6   pleadings filed by others in the case.

7           There are really three paths to punitive damages in

8   this case.   One is, as we contend, it's an assumed liability.

9   If you look at the asset purchase agreement, we think it's

10  clear that it's an assumed liability.   As an assumed liability,

11  everything having to do with Old General Motors is front and

12  center and fair play.

13          Even if it is not an assumed liability, there are

14  still two paths to punitive damages.   One would be based upon

15  what we were calling imputation is the fact that New GM

16  inherited the books, the records, the reports, the databases,

17  the files of Old GM, and then it inherited the employees and

18  the knowledge and the memory and the brains of those employees.

19  And to the extent that any of that inherited knowledge is an

20  element of punitive damages, we think it's fair play.

21          The third path to punitive damages would be assuming,

22  for purposes of argument, that there is no such thing as

23  inherited knowledge and that the files were all destroyed as of

24  right before the closing and the employees all were brainwashed

25  right before the closing.   Based upon what was accumulated

13

1  knowledge beginning from and after the closing and the failure

2  to recall, the failure to warn, the information about repeated

3  accidents within New GM without regard to old information and

4  old knowledge would be a path to punitive damages.  So there

5  are three ways to get to punitive damages.

6      We think that you don't need to mark up the

7  complaints to address that because either the parties [sic] are

8  entitled -- the plaintiffs are entitled to punitive damages or

9  they're not, based upon a yes/no answer.  I think that through

10 either motions in limine or restrictions on what can be

11 permissibly proven at trial or based upon post-verdict motions,

12 there could be a determination as to whether there can be

13 punitive damages or not.

14     THE COURT:  It was your reference to yes/no without

15 being as nuanced as you were today, Mr. Weintraub, that had

16 caused me to be as critical of what you said in your letter.  I

17 take it what you're saying is on the lack of need for more

18 pleadings, that it is, in essence, a conceptual inquiry based

19 on the valuation of the three things you articulated, after

20 which I would then say yes/no based upon parsing those three

21 considerations.

22     MR. WEINTRAUB:  Yes, Your Honor.  Either this court

23 or -- we do believe that Judge Furman, through motions in

24 limine, could make the same determination.

25     THE COURT:  Well, that was the other thing that got

1   me so upset, Mr. Weintraub.  It seems to me -- and this was

2   something that became more relevant in the difference in views

3   between Mr. Steinberg and Mr. Weisfelner -- it seems to me that

4   my role in life is as kind of a gatekeeper on pleadings, to

5   ascertain the extent to which certain kinds of claims are or

6   are not permissible under the judgment and under bankruptcy

7   law, after which Jesse Furman would decide whether whatever

8   passes the gatekeeper is or is not actionable as a matter of

9   non-bankruptcy law.  Do you agree or disagree with that

10  preliminary way or thinking of it?

11          MR. WEINTRAUB:  Your Honor, the reason we took the

12  position that we took was many-fold.  First, we were not

13  involved in the recent spate of motions to withdraw the

14  reference.  We were not part of that.  Part of the reason we

15  were not part of that is because we were dealing with wholesale

16  accident cases, which we viewed as an assumed liability and

17  therefore not directly within the purview of this Court.

18          It's pretty clear what's a pre-sale accident and

19  what's a post-sale accident is driven by the date of the

20  accident.  Because there were post-sale accidents and because

21  we viewed them as essentially assumed liabilities, we didn't

22  see the close connection to this Court that the pre-sale cases

23  have and the economic damages cases have.  That said,

24  obviously, we will abide by whatever this Court rules.

25          THE COURT:  All right.  Well, at least you didn't

1  say, with due respect.

2            MR. WEINTRAUB:  I did not, Your Honor.  I never say

3  that.

4            In addition, you mentioned that my presentation here

5  was more nuanced than it was in the letter.  I viewed the

6  letter as for purposes of scheduling.  People are laying out

7  dates and people are laying out briefing schedules and whether

8  or not they wanted a hearing, and I didn't view that letter as

9  a letter brief to the Court.  And that's why we handled the

10 substance rather more lightly than we would have had it been a

11 substantive submission.

12           I don't know if, among all of those other questions

13 at the beginning, there are any more for me.

14           THE COURT:  Let me just get your bottom line then.

15 You would agree that we should put punitives to the top of the

16 queue, so to speak, and you would suggest that the briefing on

17 the punitives focus, in particular, on the three things you

18 mentioned, whether they were contractually assumed, whether --

19 or the extent to which New GM employees' post-sale knowledge

20 should be imputed to New GM and the extent to which they

21 accumulated knowledge after the sale should be relevant to

22 punitives.

23           MR. WEINTRAUB:  Yes, Your Honor.  And not to play

24 hide the ball, and it's something we've been thinking about, we

25 think there may be latent due process issues here, as well,

1  because of the timing of the purchase of the vehicles that were

2  involved in the accidents.  And not to get too deeply into the

3  weeds, there is an argument that people who purchased their

4  vehicles pre-sale but had the accident post-sale were known

5  creditors entitled to constitutional sufficient notice and they

6  didn't get that notice and they were prejudiced because but for

7  that notice, they may not have had an accident at all because

8  they might not have been driving the vehicle.

9      With respect to post-sale purchasers, we think that

10  they would fall under the category of future claimants and

11  there would be no amount of notice that could have been given

12  to those claimants.  They fell into the -- what I call the

13  Grumman Olson category of future claim.  And I think that those

14  due process issues may have an impact on if the Court doesn't

15  believe that this is an assumed liability, whether or not the

16  successor liability shield would be appropriate for the pre-

17  sale purchasers who are injured post sale and the post-sale

18  purchasers that were injured post-sale.

19      THE COURT:  I understood the legal references you

20  were making, Mr. Weintraub, but not the factual predicate.  If

21  they were injured post-sale, I thought New GM was bellying up

22  to the bar to assume potential liability for those either way.

23      MR. WEINTRAUB:  That's correct, Your Honor.  But

24  remember that we're talking about punitive damages and three

25  paths to punitive damages.  The first path is we contend it's

1  an assumed liability.  If we're not successful in convincing

2  the Court that it's an assume liability, the question becomes

3  whether or not there's another path to successor -- I'm sorry,

4  to punitive damages.

5          THE COURT:  You're focusing purely on punitives at

6  this point.

7          MR. WEINTRAUB:  Yes.

8          THE COURT:  Okay.

9          MR. WEINTRAUB:  There's no question on the

10 compensatory.

11         THE COURT:  Okay.  All right.  Anything else before I

12 let other people be heard?  I think at this point, then, I

13 should probably hear from Mr. Weisfelner after you and then

14 from Mr. Steinberg.

15         MR. WEINTRAUB:  Unless you have any further questions

16 from me, Your Honor.

17         THE COURT:  No, thank you.

18         MR. WEINTRAUB:  Thank you.

19         MR. WEISFELNER:  Good morning, Judge.

20         THE COURT:  Good morning.

21         MR. WEISFELNER:  For the record, Edward Weisfelner,

22 together with my partner, Howard Steel, from (indiscernible) as

23 designated counsel for the economic loss plaintiffs.  Also on

24 the phone is Steve Berman, Elizabeth Cabraser, the co-leads for

25 what we commonly refer to as the "economic loss plaintiffs."

18

1          Your Honor, let me begin by stating our view that the

2   question of punitive damages is one that is time-sensitive with

3   regard to the bellwether trials, and as Your Honor has heard,

4   those are for personal injury/wrongful death cases as opposed

5   to the cases that are our collective responsibility.  So in

6   terms of prioritizing for the Court and the parties, I think

7   it's more critical that Your Honor deal with the interest of

8   Mr. Weintraub and the interest of New GM and consider our

9   issues on a secondary basis.

10          I say that because -- and again, I'm sensitive to

11  Your Honor's concern that our arguments sort of lacked nuance,

12  but it seemed to me that what Your Honor has determined,

13  obviously subject to appeal, is that the sale order and related

14  injunction are to remain in place but for independent claims.

15  And the question, I guess, for all of us is what constitutes an

16  independent claim.  And, Your Honor, there are those that would

17  argue that your decision had some language that could be

18  construed in different ways depending on whether you were

19  looking at it from the perspective of New GM or looking at it

20  from the perspective of the plaintiffs.  We took some comfort,

21  frankly, in some of the things that Your Honor said in

22  connection with the -- I guess it was the Bledsoe reargument,

23  and in particular, footnote --

24          THE COURT:  Where I fleshed out what I was thinking

25  when I was talking about the knowledge of New GM personnel?

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

19

1          MR. WEISFELNER:  In part, but it went beyond that.

2    What we took, both from your original decision, the judgment,

3    and ultimately the Bledsoe reargument was that you can state an

4    independent claim, even if you make a reference to Old GM.  You

5    can state an independent claim even if it's based on an Old GM

6    part or vehicle.  What you can't do is take a successor

7    liability claim and attempt to dress it up as an independent

8    claim.  In other words, the way we read it, New GM cannot be

9    held liable for Old GM acts.  Conversely, New GM can and should

10   be held liable, subject to courts where complaints are pending,

11   for their own independent, actionable conduct or failure to

12   act, which, in our view, requires -- putting aside the whole

13   issue of clearing the underbrush so that Judge Furman can get

14   to his bellwether trials as originally anticipated, for us, it

15   seems to us that the predominant issue is a determination once

16   and for all from this Court as to whether or not either the

17   second amended consolidated complaint or, for that matter, the

18   State of Arizona's complaint or the State of California's

19   complaint does or does not set forth independent claims.

20   Because it seems to us that -- and then we could then go

21   through the laundry list of the so-called, quote, "other

22   matters" that GM has identified.

23          Once Your Honor makes the determination as to whether

24   or not there is or is not independent claims, it seems to us

25   the rest of the other matters sort of fall into place.  So

1   that, for example, if we have not set forth independent claims,

2   then, frankly, the question of punitive damages is moot.  There

3   are no damages.  There's no claim.  You're not going forward.

4   You can't prove up compensatory damages, let alone, special or

5   punitive damages, if you haven't set forth an independent

6   claim.

7          Conversely, if you do have an independent claim,

8   which by definition is a claim against New GM that is not a

9   disguised successor liability claim, then your entitlement to

10  damages has nothing to do with the bankruptcy proceeding or

11  anything else that Your Honor has previously determined.

12  Either you've got compensatory damages that a jury or a court

13  is going to acknowledge as the predicate for punitive damages

14  or you don't.  But there's nothing about the bankruptcy that

15  relates to whether or not an independent claim against New GM

16  is entitled to punitive damages or not.

17         To us, it's a fairly simple and non-nuanced issue.

18  Independent claims can proceed, subject to a court and a jury,

19  on compensatory and, if appropriate, punitive damages so long

20  as the punitive damage component or the compensatory damage

21  component, for that matter, does not rely on conduct of Old GM

22  or otherwise disguised as a successor liability issue.

23         Your Honor, in terms of triaging for our particular

24  issues, we would think that, first and foremost, we get marked

25  pleadings from GM where they tell us where in the second

21

1  amended consolidated complaint, or for that matter, in Arizona

2  or California, the plaintiffs have somehow impermissibly

3  crossed the line and are asserting something other than

4  independent claims or attempting to disguise their complaints

5  as successor liability complaints.  Once we've done that -- and

6  again, Your Honor, in terms of triage, we don't see it as that

7  long of a process -- the second amended consolidated complaint

8  was a matter of public record going back to June 12th.

9      There were allegations made by New GM with respect to

10 the second amended consolidated complaint and impermissible

11 crossing of the line into something other than independent

12 claims a long time ago.  One would think that it wouldn't be

13 all that much of an effort requiring all that much time to mark

14 those pleadings.

15     Now, Your Honor, again, we have a tendency to merge,

16 in our own minds, the issue between marking up pleadings and

17 then providing commentary on the marked-up pleadings and then

18 briefing.  And I agree with Your Honor that if someone shows

19 you a set of marked-up pleadings and are able to give you a

20 commentary with regard to those allegations that New GM

21 believes crosses the line and renders them no longer

22 independent claims but something else, then subject to our

23 right to comment on those markups and tell you why they don't

24 cross the line, I don't see that as being legal briefing.  I

25 see it as being a debate over whether or not specific

22

1  allegations or causes of action or background facts constitute

2  an impermissible attempt to hold New GM liable on the successor

3  liability theory as opposed to an attempt to hold GM liable for

4  its own independent conduct or failure to act.

5        And in terms of triage, I would suspect that the

6  right way to go is start with the marked-up pleadings and their

7  annotations, which I view as being difficult to do in a

8  simultaneous fashion as Your Honor's preliminary seemed to

9  indicate because we don't know what portions of the complaint

10  or complaints New GM contends with specificity --

11        THE COURT:  Pause, please, Mr. Weisfelner, because I

12  was bouncing back and forth.  I was thinking of a simultaneous

13  on punitives, but I understand why you would need to see the

14  marked pleadings before you responded to them.

15        MR. WEISFELNER:  Okay.  And again, Your Honor, I

16  don't want to interfere, as Mr. Weintraub correctly stated, the

17  bellwether trials that are pending before Judge Furman are the

18  bellwether trials that relate to personal injury or wrongful

19  death, and my commentary doesn't relate to that.  I agree that

20  because those trials are coming up, the parties and Judge

21  Furman need to know whether or not requests for punitive

22  damages are violative of Your Honor's prior directives.

23        So I don't want to take away from the need to

24  prioritize that issue, but for all of our issues -- and they

25  include punitive damages but don't have the same timing concern

23

1  because we don't have bellwether trails that are scheduled -- I

2  believe that the right way to proceed, and I'll explain in a

3  little bit more detail, you go through the laundry list of

4  other matters that GM identified.  I think it's in Paragraph 6

5  of their letter to you.  I think you don't get into those

6  issues, get into the legal briefing of those issues, unless and

7  until you've had a determination by this Court that what we're

8  talking about are independent claims or aren't independent

9  claims.

10        And not to repeat myself, but to go quickly and then

11  get into the next issue, on punitive damages, if it's not an

12  independent claim, then by definition, you can't pursue

13  punitive damages.  You can't pursue any damages.  Conversely,

14  if it is an independent claim, there is nothing in Your Honor's

15  decision or judgment, or for that matter, the original sale

16  order injunction, that, in our view, could potentially prohibit

17  someone on an independent claim from pursuing both compensatory

18  and, if a court determines appropriate or a jury determines

19  appropriate, ultimately punitive damages.

20        THE COURT:  Is that another way of saying it's your

21  side's position that if it is an independent claim, that pre-

22  petition -- excuse me, pre-sale conduct by Old GM would be

23  relevant to such a otherwise independent claim?

24        MR. WEISFELNER:  Marginally.  Again, I'm not a trial

25  counsel nor can I possibly predict how that trial would ensue,

1   but it seems to me that the starting predicate is you need to

2   convince this Court that what you've alleged and what you

3   intend to prove is an independent claim as Your Honor has

4   defined it.  And if the plaintiffs are successful in convincing

5   Your Honor that these are independent claims, frankly, I think

6   the inquiry on the permissibility of punitive damages comes to

7   a stop.

8           All Judge Furman would need to know whether or not

9   punitive damages are an element of the claim is for Your

10  Honor's gatekeeping role to be satisfied to say, Judge Furman,

11  these are independent claims, having determined these are

12  independent claims, it's now up to you whether or not they can

13  ultimately prove the predicate compensatory damages against New

14  GM and are entitled under non-bankruptcy law to punitive

15  damages from New GM based on New GM conduct, not Old GM acts.

16          Now, Your Honor, again, I think many of us have

17  struggled with the dividing line between New GM's failures or

18  New GM's actionable conduct and Old GM since much of what the

19  economic loss plaintiffs complain about have to do with what

20  New GM did or didn't do with respect to Old GM vehicles or

21  parts.  As Your Honor laid out in Footnote 16 in the Bledsoe

22  action, the mere fact that we're talking about an old part or

23  an old vehicle doesn't get New GM off the hook with regard to

24  its own independent obligations, whether by common law or by

25  statute, be they state or federal.

1          But again, as a gating matter, we think that Your

2   Honor's role, again at least as it relates to the economic loss

3   claims, is to, first and foremost, determine has the second

4   amended complaint, has the State of California and the State of

5   Arizona asserted independent claims, yes or no.  And if they

6   have, then at least as to the punitive damages, we think the

7   issue is resolved.

8          And if I can go through the rest of the list of what

9   New GM has asserted are the other issues that the Court has to

10  consider --

11         THE COURT:  From Mr. Steinberg's August 26 letter?

12         MR. WEISFELNER:  Yes.  You've heard Mr. Weintraub

13  deal with economic losses on the post-sale accidents and

14  incidents, and I don't need to elaborate on that.  It's not

15  part of my bailiwick.

16         The proof of claim issue, this is a common cause of

17  action, as I understand, the bulk in the Adams complaint and in

18  the second amended consolidated complaint.  In other words, the

19  gravamen of the claim is that New GM's independent failure to

20  provide a recall when it knew a recall was required and its

21  other conduct amounting to fraudulent concealment was

22  responsible for plaintiff's failure to file timely proofs of

23  claim.

24         As a consequence, the complaints allege, in one way,

25  shape, form or another, that in light of Your Honor's equitable

26

1  mootness finding, which, subject to appeal, basically tells all

2  of us that we will not be able to go back and claw back, for

3  lack of a better term, against the existing GUC Trust

4  beneficiaries.  So what the complaints say is, your failure to

5  give us the information that was in your exclusive possession,

6  causing us not to file proofs of claim, damaged us to the

7  extent that we were not lined up with every other plaintiff as

8  part of -- or every other claimant as part of the proof of

9  claim universe, that we were denied the opportunity to

10 participate from dollar one in the GUC Trust.

11          Now, that's a claim that Your Honor is, I guess,

12 being asked to determine, and we think it's a failure

13 straightforward question.  Is that a claim against Old GM or is

14 it a claim against New GM?  We assert that it's a claim against

15 New GM.  We're saying that New GM's failure -- from the time it

16 became New GM up through and including the bar date is the

17 focus of our attention -- is a claim solely against New GM.

18 The beginning and the end of the allegations is New GM knew on

19 the date it came into existence that there was an ignition

20 switch defect, what its potential was, that it needed to be

21 recalled as a matter of federal law, that it failed to do so

22 and it failed to do so purposefully, thus preventing the

23 plaintiffs from filing proofs of claim.  And a court can

24 determine whether or not that's a cognizable claim, and if it

25 is, what the element of damages ought to be.

27

1           THE COURT:  Now, pause again.  When you said the

2    court in that last context, you were talking about Judge Furman

3    after I have done my gatekeeping.

4           MR. WEISFELNER:  Correct.  Or in the case of the

5    state claims, the relevant courts that those state claims are

6    currently pending in.

7           THE COURT:  And how would a state have standing to

8    assert a claim of that character?

9           MR. WEISFELNER:  Well, again, to the extent that --

10   and I guess I've misspoke.  To my knowledge, neither the State

11   of California nor the State of Arizona had that allegation

12   within their complaint.  It's only a second amended

13   consolidated complaint.

14          THE COURT:  Okay.  But you're talking about in your

15   constituency, your vehicle owners, and their contention is that

16   if the recall had taken place in the gap period between the

17   sale and the bar date, your guys could have filed claims and

18   then they would have gotten the 25 or 30 cents, whatever

19   unsecureds got in the case.

20          MR. WEISFELNER:  Precisely.  That's exactly right.

21          THE COURT:  All right.

22          MR. WEISFELNER:  And again, Your Honor, to the extent

23   that New GM contends that somehow that claim isn't an

24   independent claim, is instead a disguised successor liability

25   claim, to the extent Your Honor needs briefing on that topic, I

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

 1    guess we'll brief it.  We'll comply with whatever Your Honor's
 2    desires are in that regard.  But it seems to me, again, a
 3    gating issue is what part of the second amended consolidated
 4    complaint, including this particular cause of action, do you
 5    believe fails to satisfy independent claim status and why.
 6            Next issue in Mr. Steinberg's letter was the
 7    contention that state law consumer protection statutes related
 8    to Old GM vehicles and parts are somehow improper.  And Your
 9    Honor, it's our contention that, again, as a gatekeeper, if you
10    determine that the claims, based on state law consumer
11    protection statutes or otherwise, relate to New GM and what New
12    GM did or failed to do as opposed to what Old GM did or failed
13    to do, that depending on the particular state consumer
14    protection statutes, they either give rise to a claim or cause
15    of action to be determined by the trial court or they don't.
16    And the role of the gatekeeper, Your Honor, is to determine
17    whether or not those particular allegations relying on state
18    consumer protection laws do or do not constitute independent
19    claims versus disguised successor liability claims.
20            Likewise, the next issue, failure to warn and duty to
21    recall an Old GM vehicle.  It is New GM's position, which we
22    believe is a blatant attempt to re-litigate what Your Honor has
23    already decided, but it's New GM's apparent position now that
24    an allegation against New GM sounding in the nature of a
25    failure to warn or a breached duty to recall, if it involves an

1  Old GM vehicle, it's somehow prohibited.  And, Your Honor, we

2  believe that New GM had an independent duty to warn and an

3  independent duty to recall, which it violated and did so in a

4  reprehensible fashion, giving rise to liability constituting an

5  independent claim against New GM.  And if we need Your Honor as

6  the gatekeeper to once again tell us that's true,

7  notwithstanding what you said in April and then in June and

8  then at <u>Bledsoe</u>, so be it.  We'll ask Your Honor to say it

9  again.  An independent act or failure by New GM is actionable.

10      The next issue on the list is can you state a claim

11  based on Old GM conduct.  I guess that's a lot more nuanced.

12  We don't believe that the definition of independent claim

13  permits one to seek relief predicated solely on Old GM conduct.

14  That would seem to us to be on the wrong side of the definition

15  of independent claim and instead constitute a disguised

16  successor liability action.  But we firmly believe that the

17  second amended consolidated complaint is based on New GM

18  conduct, New GM independent failures and independent conduct.

19      The issue of knowledge imputation is next on the

20  list, and I, Your Honor, think I agreed with Your Honor's

21  tentatives that Your Honor has already spoken on that issue.

22  And I'm not sure I fully understand the question as it's been

23  posed by New GM, whether or not the knowledge gained by New GM

24  on the day it was born, or by its employees rather, can be

25  imputed to the corporate entity.  Again, we would have thought

1   that not much more, if anything, needed to be said by this

2   Court on that issue, but if somehow New GM believes outside of

3   the context of reargument or outside of the context of issues

4   that are up on appeal, that it has something specific and new

5   to say with regard to knowledge imputation, we're willing to

6   hear it and, if necessary, brief it.  I think what Your Honor

7   said with regard to findings of fact, because New GM alleged

8   that we were misusing the Court's findings, are not to be

9   applicable, and Your Honor, I did say that, that nothing in

10  your decision was to be applicable in any other court,

11  including the MDL.

12          But, Your Honor, I think we all know the difference

13  between stipulations, the effect of stare decisis versus res

14  judicata, and I think it's easy for a court trying a specific

15  complaint to determine the extent to which the stipulations

16  will be binding on the parties or the extent to which it will

17  have to engage in its own independent fact finding as to

18  knowledge and imputation.  So again, in terms of triage, we're

19  hard pressed to understand why that's an issue that, as a

20  gatekeeper, Your Honor necessarily needs to be involved in.

21          I'm coming down to the last two issues before I get

22  to some more general issues that GM raised.  GM continues to

23  make the argument that the second amended consolidated

24  complaint contains allegations on behalf of plaintiffs that

25  were plaintiffs in the amended complaints.  And somehow, they

31

1    argue that having been plaintiffs in the --

2            THE COURT:  You used the word "amended complaint."

3    Do you mean pre-petition accidents or pre-petition purchasers

4    who are claiming -- I keep saying "prepetition," I mean pre-

5    sale, who are complaining of alleged post-sale injury?

6            MR. WEISFELNER:  The latter, Your Honor.  It's GM's

7    contention that if we have named the same plaintiffs in the

8    second amended consolidated complaint as were named plaintiffs

9    in the now amended economic loss category of pre-sale

10   plaintiffs that somehow they ought to automatically be

11   dismissed.  And again, we don't know where that contention

12   comes from.

13           Again, we get back to the basic either the

14   plaintiffs, each and every one of them or any of them have or

15   have not succeeded in pleading independent claims, in which

16   case they can go forward, or they failed to plead independent

17   claims in any way, shape or form, in which case they're not

18   going forward.  And to the extent that Your Honor's prior

19   decisions weren't, to GM's satisfaction, clear enough, then

20   you're being asked, I guess, to look at the specific

21   allegation, the specific complaint, and determine whether or

22   not we've crossed the line into a disguised successor liability

23   action or whether or not we've complied with Your Honor's prior

24   determination and have, instead, set forth actionable

25   independent claims.

1            Last and finally before I get to some of the larger

2    issues, when New GM lists other matters it now wants the Court

3    to consider and, in our view, reconsider, they want you to

4    determine that any allegations relating to brand diminution

5    based on New GM actions -- they're saying anything that you've

6    complained about that sounded in the nature of brand diminution

7    have to be a disguised successor liability claim.

8            And again, we think when Your Honor goes through the

9    complaint, the second amended consolidated complaint, with the

10   benefit of New GM's markups and annotations and with the

11   benefit of our responses to their markup and annotations, you

12   will be able to determine quite readily that our complaint

13   regarding brand diminution is a complaint based on New GM's

14   actions and New GM's failures to act.  And our allegations

15   regarding brand diminution do not rely on, are not predicated

16   on, Old GM conduct.

17           Now, Your Honor, there are other -- or at least two

18   other overriding concerns, and they relate in no small measure

19   to non-ignition switch defect plaintiffs.  I'll take them one

20   at a time.

21           Your Honor made its ruling -- made his ruling

22   regarding equitable mootness, and that decision is up on appeal

23   before the Second Circuit, and as Your Honor knows, Judge

24   Furman has directed the parties to seek an expedited appeal.

25   Your Honor's determination with regard to equitable mootness

1  was, by definition, applicable to folks other than the

2  non-ignition switch plaintiffs.  Nevertheless, it seems to us

3  that the GUC Trust is probably correct that the rationale

4  underlying Your Honor's equitable mootness decision would apply

5  with equal force to the non-ignition switch plaintiffs.  And in

6  fact, your procedures under the judgment, the 17-day business

7  about filing procedure, would have given the non-ignition

8  switch plaintiffs all of the due process that could reasonably

9  be afforded them on the issue of applicability of Your Honor's

10  equitable mootness ruling as to them.

11       THE COURT:  Pause, please.  I don't remember whether

12  it was in this context -- I think it was -- but I talked about

13  it's not res judicata, but it's stare decisis, and this would

14  convert it from being stare decisis to res judicata if, after

15  an opportunity to be heard, I came to the same view.

16       MR. WEISFELNER:  I think that's right.  And, Your

17  Honor, it seems to me that the only thing that needs to be

18  preserved -- and I think it's already preserved, but just to

19  draw upon line under it -- in this court and in any other court

20  is it is our position that with regard to ignition switch

21  plaintiffs and non-ignition switch plaintiffs, the problem we

22  had with Your Honor's equitable mootness decision is the

23  failure to take into account the remedy that could be crafted

24  or created that would, on the one hand, provide a remedy to the

25  plaintiffs, and on the other hand, wouldn't provide a detriment

34

1  or an impermissible detriment to the GUC Trust beneficiaries.

2  And I'm referring to two things.  One is the accordion feature.

3  And by the accordion feature, I mean that part of the plan

4  going back to '09 that provided that if claims against the GUC

5  Trust were to exceed a certain threshold -- I think it's $35

6  billion -- then and in that event, New GM would be required to

7  contribute I think by now, it's 30 million shares of New GM

8  stock.

9       I think it's crystal clear from the review of the GUC

10 Trust disclosures that there is no reasonable chance, there's

11 no chance, that the claims against the GUC Trust, as currently

12 constituted, can possibly reach the $35 billion threshold.  And

13 as a consequence, there is no opportunity to trigger the

14 accordion feature.

15      In our view, where the claims of the parties whose

16 due process rights were violated with regard to the bar date,

17 to be allowed to assert late claims, Your Honor's already

18 determined you can't claw back old value, but what we don't

19 think Your Honor determined or what Your Honor failed to take

20 into consideration was the availability of the accordion

21 feature.  And if our claims count toward the threshold, we

22 believe we'll exceed 35 billion and may very well get to the

23 maximum amount of claims that would trigger the maximum number

24 of New GM shares.  And in that regard, we believe that the

25 equitable mootness decision ought not apply to the accordion.

1  That's a subject for the appeal, we understand, but converting

2  stare decisis into res judicata, again, I don't think we're

3  going to contest any of that so long as everyone's rights with

4  regard to the accordion are preserved.

5        Likewise, as Your Honor knows, we have a hearing,

6  unless you've prevailed upon the GUC Trust beneficiaries to

7  change the date of September 22nd, wherein the parties were

8  going to present to Your Honor reasons for why the remaining

9  cash in the GUC Trust coffers, if you will, some seven or $800

10  million, should or should not be distributed to the

11  beneficiaries before the appeal is resolved.

12        In the plaintiff's point of view, there is a huge

13  difference between going back to the beneficiaries, the GUC

14  Trust unit holders, and saying, you got your money and you got

15  it a long time ago and you've done whatever it is that you've

16  done with that money and you've engaged in whatever

17  transactions you've engaged in, too bad, you got 30 cents on

18  the dollar, you should have only gotten 15 cents on the dollar

19  if you included our claims, kick back half of what you've

20  already received.  We think there's a big different between

21  doing that, which was the -- we believe, the subject of your

22  equitable mootness decision, as opposed to saying, you know,

23  there's another seven or $800 million that's yet to be

24  distributed.

25        We don't want you distributing it unless and until we

ACCESS TRANSCRIPTS, LLC        ⚖        1-855-USE-ACCESS (873-2223)

36

1  work out a formula that says, we're going to make up for the

2  fact that the amount that you've already distributed didn't

3  include us, and now we're going to get a priority on this next

4  700 million in an effort to get us caught up.

5          And we think so long as that contention is reserved,

6  both for the ignition switch plaintiffs that were part of the

7  threshold issues and the non-ignition switch plaintiffs that

8  weren't part of the threshold issues, then we agree with the

9  GUC Trust beneficiaries that there is no need to embroil them

10  in the rest of the issues and that their concerns are separate.

11  And whether we go forward with the trial currently scheduled

12  for the 22nd or not, Your Honor, we're ready -- will be ready

13  to proceed in that regard.

14          Last issue, and then I will turn the mic over subject

15  to whatever questions Your Honor may have, and that relates

16  again to the non-ignition switch plaintiffs.  And it focuses

17  back, Your Honor, on your determination that independent claims

18  can and should proceed against New GM notwithstanding the '09

19  sale order and injunction.

20          Our position is that the rationale that Your Honor

21  employed in determining that independent claims can proceed is

22  a rationale that ought to be applicable to non-ignition switch

23  plaintiffs as well, because it calls into question the

24  following proposition.  May a buyer in a 363 sale -- putting

25  aside good faith or bad faith in connection with the sale

1  itself because we believe that New GM, in fact, engaged in bad

2  faith.  It's one of the issues we will pursue on appeal.  It's

3  one of the reasons why we think the bar against successor

4  liability ought not be enforced.

5       But putting aside good faith or bad faith, the

6  question is if you have a purchaser in a 363 sale, may the

7  bankruptcy court that approves that sale and gives the buyer

8  free and clear protections, including successor liability,

9  nevertheless afford the buyer prospective protection for its

10  own independent tortious conduct?  And we think that the clear

11  answer to that proposition is no.

12       So again, if a non-ignition switch defect claimant,

13  whether would start an independent claim against New GM, would

14  that non-ignition switch plaintiff be successful, vis-a-vis

15  Your Honor as a gatekeeper.  New GM's contention is that, aha,

16  wait a second, the non-ignition switch plaintiff cannot assert

17  an independent claim against New GM unless and until that

18  non-ignition switch plaintiff demonstrates that back in '09,

19  its due process rights were violated.  Because Your Honor only

20  determined that independent claims were permissible having

21  first determined that the ignition switch plaintiffs' due

22  process rights were violated with prejudice because they didn't

23  have an opportunity to argue over breadth of the injunction.

24       So that's the last issue I can think of where we have

25  a marked disagreement between Mr. Steinberg and I.  It's my

38

1   belief that Your Honor's determination that the law in the

2   Second Circuit, that the law across this country is uniform,

3   and that is that a buyer in a 363 sale, putting aside whether

4   or not it's acting in good faith, does not obtain a

5   get-out-of-jail-free card for its own post-sale tortious

6   conduct, bad actions, fraudulent concealment.

7        THE COURT:  I understand the issue.  Pause.  If you

8   said this before in baby talk, I don't remember it.  Are you

9   now going to be kind of a designated counsel for non-ignition

10  switch plaintiffs, as well --

11       MR. WEISFELNER:  Your Honor --

12       THE COURT:  -- or did they have separate counsel?

13       MR. WEISFELNER:  They do not have separate counsel,

14  and to the extent that their rights need to be preserved, since

15  co-lead counsel in the MDL does have actions pending on their

16  behalf, subject, of course, to subsequent certification of

17  classes and that sort of thing, yes, we perceive ourselves as

18  having taken on the mantel of preserving and protecting the

19  rights of non-ignition switch plaintiffs in this court.

20       THE COURT:  So I don't have to worry about them not

21  having been heard if I listen to you.

22       MR. WEISFELNER:  I think that's a correct conclusion,

23  especially in light of Your Honor's procedures in the judgment

24  itself.

25       THE COURT:  Okay.  Continue or were you done now?

39

1          MR. WEISFELNER:  Your Honor, subject to whatever

2     questions or concerns you have, I'd be done.  I just want to

3     make sure that neither of my overseers, Mr. Berman or Ms.

4     Cabraser, have any further comments that they'd like to make.

5          THE COURT:  Is Mr. Berman on the phone?

6          MR. WEISFELNER:  I believe so.

7          MR. BERMAN:  (Telephonically)  Yes, Your Honor.  I'm

8     on the phone.  I think that he did a great job covering our

9     interests here.

10         THE COURT:  I'm sorry, you're not very audible.  Can

11    you say it slower and louder, please?

12         MR. BERMAN:  I think that he's covered everything

13    well and I have nothing to add.

14         THE COURT:  Okay.  Mr. Stein --

15         MS. CABRASER:  (Telephonically)  Your Honor,

16    Elizabeth Cabraser.

17         THE COURT:  Wait, I'm sorry.  Before you come up,

18    Mr. Steinberg, I thought I heard something on the phone after

19    Mr. Berman said he had nothing to add.

20         MS. CABRASER:  Your Honor, Elizabeth Cabraser,

21    co-lead for the economic loss plaintiffs.  You heard me.  I

22    apologize for not speaking more slowly.  I'm simply concurring,

23    as is Mr. Berman, subject to Your Honor's (indiscernible).  I

24    have nothing to add at this point.

25         THE COURT:  Okay.  I asked my questions as we went

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

40

1   along.

2          Mr. Steinberg.

3          MR. STEINBERG:  Your Honor, on behalf of New General

4   Motors, we have no problem with triaging the cases -- the

5   issues that arise in connection with the bellwether cases.  And

6   I think Your Honor and Judge Furman, on Friday, at the MDL

7   hearing, put his finger on the three issues that he needed most

8   to deal with.  One of them is the punitive damage issue.  The

9   second is what we've been calling here the imputation issue.

10  And the third is not necessarily marking up a complaint for

11  purposes of something that is ready to go to a trial, but are

12  the causes of action pled in those complaint that are otherwise

13  proscribed by Your Honor's 2009 sale order and your April

14  decision and your judgment.  And we think we can address all of

15  those things and have those pleadings done in the month of

16  September.

17         We had set forth in our letter an accelerated

18  briefing schedule on the punitive damage issue.  And to some

19  extent, based on Your Honor's comments today, I think we need

20  to deal, as the professionals, to try to figure out how to

21  address issues like number of pages to brief, how to present

22  something to give Your Honor something better than what we gave

23  to you last Wednesday.  But vis-a-vis, the punitive damage

24  brief, in the context of the Bavlsik pleading, which we filed

25  on Friday, we essentially wrote the punitive damage brief that

41

1  we would have as our opening brief, tailored to the <u>Bavlsik</u>

2  case, but the generic issue as to whether the punitive damage

3  issue was an assumed liability for post-sale accidents for

4  pre-sale cars, and we think we've already briefed.  So we could

5  be on an accelerated basis.

6       THE COURT:  The assumed liability is potentially

7  capable of being dealt with in a way similar to the one you

8  did, but isn't that complaint that you were commenting on the

9  easier end of the spectrum because so much of the alleged bad

10 things that New GM did -- excuse me, that were done by the GM

11 without either an Old or New before it, were at least

12 seemingly, if not plainly, pre-sale actions?

13      MR. STEINBERG:  Yes, Your Honor, but I think it's

14 actually the same with regard to all the bellwether cases.  The

15 Shoyer (phonetic) complaint is over 112 pages.  I think

16 probably 75 pages are cribbed from the second amended complaint

17 dealing with Old GM conduct.  And I think a large part of what

18 you heard today was preliminary oral argument on the issues

19 that we're supposed to brief substantively, and while I'm

20 perfectly capable and willing if Your Honor is prepared to

21 entertain, I took today's hearing to be more procedural.

22      But I will point out that punitive damages versus

23 compensatory damages are two different things, and punitive

24 damages are directed for things unrelated necessarily to the

25 specific accident at issue, but more broadly to punish the

42

1  wrongdoer for bad conduct.  You could have a circumstance where

2  Your Honor has determined punitive damages, as a general

3  matter, was not an assumed liability, but to the extent that

4  you're still seeking it based on Old GM conduct, that that was

5  proscribed by the sale order.

6        And so we believe that we can do the marked

7  pleadings.  There's only six of them, and while one of them is

8  over 100 pages, they're not all 100 pages.  What would actually

9  be helpful for us to deal with this is that they've already

10 admitted that they've pleaded beyond the sale order.  They've

11 already included, as part of those bellwether complaints, in

12 effect, economic loss claims that are otherwise barred by the

13 sale order.  And they've said in one of the footnotes to Your

14 Honor's letter that in at least two of the cases that they're

15 going to amend the complaint.

16       Well, they should have amended the complaint before

17 to not do what was proscribed by the sale order, but in order

18 to save time and to save Your Honor reviewing something, they

19 should get rid of the underbrush of what they're prepared to

20 concede right now is proscribed by the sale order, and then we

21 can comment on the amended complaint, and they should be able

22 to do that forthwith.

23       We will say that even though they've made the

24 concession for two of the complaints, that all six of the

25 complaints are violative of Your Honor's sale order.  And

43

1  things like fraud in connection with the sale of a vehicle,

2  fraudulent concealment in connection with the sale of a

3  vehicle, consumer protection statutes under Oklahoma law,

4  Nevada law, all of which are barred by the sale order and they

5  should never have been included in the first place.  And what

6  you have here is, I think, a side that is sort of tone deaf of

7  what Your Honor rules.  Your Honor rules that something

8  shouldn't happen, they just do it anyway, and then they hope on

9  the second time, they get a better shot at doing it.

10       So vis-a-vis the bellwether complaints, they amend

11  whatever they think they know they did wrong.  We'll take it on

12  face value and we'll go from there.  We already have

13  essentially briefed the opening brief, and we could do whatever

14  we need to do on punitive damages on the reply brief.

15       I do agree to some extent with what Mr. Weisfelner

16  said, that is to the extent that it is a retained liability,

17  that punitive damages is not going to be relevant because

18  they're not going to be able to assert it.  But beyond that, it

19  is more nuanced than on this issue, and I think the nuance will

20  be reflected by the marking up of the pleading, so that on

21  these bellwether cases, we'll be able to show that what they're

22  seeking for, for purposes of punitive damages unrelated to the

23  accident, designed to punish the wrongdoer, is based on Old GM

24  conduct and therefore should be eliminated from the pleading.

25       THE COURT:  Pause, please, Mr. Steinberg.  Sooner or

1   later, one of your hundreds of opponents is going to have a

2   claim, more likely an economic loss claim, I suspect, but

3   either way, where the bad things that are charged are going to

4   be things that New GM allegedly did bad after the sale, unlike

5   that one that you gave me in your recent notice of presentment.

6   Have you briefed that potential possibility to your

7   satisfaction or do you need to supplement your earlier brief to

8   do that?

9           MR. STEINBERG:  I think, Your Honor, we're talking

10  about economic loss complaints.  I do think, Your Honor, that

11  the issue that they have as their linchpin is the imputation

12  doctrine, and what we've said in our briefing, which, Your

13  Honor, I don't believe has ruled on at all, is that the devil

14  is in the detail on these imputation issues.  There's not an

15  automatic imputation, and you have to look at the underlying

16  cause of action that is actually being pled to see whether it's

17  really -- not a disguised successor liability -- it could very

18  well be a disguised successor liability, but really whether

19  it's a retained liability unrelated to any independent conduct,

20  and this is all dressed up to be something else.  And you need

21  to be able to see when they want to impute the knowledges,

22  whose knowledge for what purposes to establish what claim that

23  they assert as an independent claim.  And that, they've never

24  done.  They just paint this with a broad brush of general

25  phraseology.

45

1        And Your Honor, in your <u>Bledsoe</u> decision, you picked

2  out two examples that you said would clearly be something that

3  may be imputation.  I actually don't think we disagree with

4  either of the two examples that you had in your Footnote 16.

5  One of them related to if we knowingly installed a part

6  post-sale that we knew that was defective.  I think that that

7  probably is not something that we would bring before Your Honor

8  if that was the case.

9        And likewise, with refusing to repair something that

10  we knew that was -- that should have been repaired, which is, a

11  sense, a glove box warranty issue that we have in <u>Castillo</u>

12  where someone came in, should have been repaired, wasn't

13  repaired, and now they're looking for the repair remedy.

14  They're not looking for repair remedies, which is the glove box

15  warranty.  They're looking for economic loss and economic

16  damage.  That's something that's totally different.

17        So on the imputation doctrine, for example, when they

18  talk about a failure to recall, failure to warn, in the <u>Burton</u>

19  case, the judge -- Judge Bernstein decided on failure to warn.

20  He said that cause of action doesn't exist for economic loss

21  plaintiffs at all, and therefore he knocked it out in the

22  context of that case.  One of the things that we will be

23  briefing on the imputation as it relates to the economic loss

24  plaintiffs is that cause of action doesn't exist.

25        So when you are asserting it against us, you don't

46

1 get the ability to assert a retained liability against us,

2 claim as an independent claim and ask another court to

3 determine maybe you're right.   If it was a retained liability,

4 never should have been asserted against us in the first place.

5 That was the purpose of the injunction.

6 So we can brief the imputation doctrine quickly.   To

7 some extent, Your Honor, you've seen the imputation briefing

8 already because -- I want to know why no one's mentioned it --

9 there was fully briefed the no strike pleading with regard to

10 the second amended complaint.   There was that in the context of

11 that briefing.   There was sections on the imputation doctrine

12 as to whether it should apply or not apply.

13 In the most recent thing that we filed on Friday on

14 the post-sale accident for Old GM vehicle, there's briefing on

15 the imputation doctrine, as well, too.   And we cite maybe ten

16 cases that say there's not an automatic imputation, and we also

17 cite to Your Honor's opinion where you say you don't do it on a

18 whole-cloth basis.

19 The real problem is, is they've never articulated

20 what it is that stands up as an independent claim.

21 Mr. Weisfelner will talk about that New GM had a duty to recall

22 on the day that it came into existence, which meant that Old GM

23 had that duty to recall under his theory on the day before the

24 sale.   And Old GM was in charge of a bar order and the issue of

25 getting a bar order and getting the notice approved.   That was

47

1  not a New GM issue, and we'd claim that all of that is not

2  something that we assumed as part of the sale process, that

3  with regard to Old GM vehicles, the claims process that would

4  take place after the sale, that was something that we didn't

5  have a duty or responsibility for and no ongoing obligation at

6  all.  That, we believe, was a retained liability, and that is

7  what we brief to you in connection with the economic loss

8  no-strike pleading and that is what we will brief to you on

9  September 3 in connection with the <u>Adams</u> lawsuit.

10         What I struggled with in writing the letter on August

11  26th is how to deal with a circumstance where I, in a sense,

12  briefed a lot of these issues to you already.  They've briefed

13  a lot of these issues already to you.  And when Your Honor

14  says, you don't need to give me another 50 pages, we could do

15  it much shorter by referencing that this subject is found in

16  the following pages in connection with pleadings already filed

17  and, for Your Honor's convenience, put it in an appendix so you

18  don't have to struggle and look for it, but you have a context

19  of the briefing.  And anybody who wants to supplement beyond

20  with a greater thought process that they had when they briefed

21  these things can do it in a relatively short basis.  And so we

22  don't have to do 50 pages.

23         But as Your Honor could see, when we did these

24  letters -- and as we said, we had two meet-and-confers and

25  there were particular agendas as to why one side wanted to put

48

1  it one way and one side put in the other way.  And so while we

2  generally agreed to a briefing schedule and potentially page

3  limits, we didn't do it with the benefit of Your Honor's

4  comments today, and frankly, I didn't have the benefit of what

5  they put in.  They had the benefit, essentially, of my opening

6  draft of what I was going to put in.  And so I wasn't able to

7  really address that.

8        With regard to some of the other things, I frankly --

9  I could not follow what Mr. Weisfelner said about the GUC Trust

10  asset pleading other than an attempt to try to say where the --

11  I don't know -- multiple time, the same type of argument he's

12  making about equitable mootness in an effort to try to convince

13  Your Honor to rethink the issue.  But they actually filed a GUC

14  Trust asset pleading.  They opposed the relief that they now

15  are saying that they're potentially prepared to concede.  So I

16  couldn't quite figure out did he make the concession or didn't

17  he make the concession.

18        I will bet you Ms. Rubin has no idea whether he made

19  the concession or not because if he was prepared to concede the

20  non-ignition switch plaintiffs should be treated the same for

21  purposes of Your Honor's equitable mootness finding, then that

22  was what they asked to have briefed on the GUC Trust asset

23  pleading.  That is what they asked to have removed, to have

24  Judge Furman to do in their motion to withdraw the reference,

25  and that is what they said in their own letter Your Honor

49

1  should decide and there's no need for further briefing.  So did

2  they go further and basically take the issue off the table so

3  that Your Honor doesn't have to deal with it or not?  I

4  actually don't know.

5      The other thing that I actually don't know is that --

6  well, Your Honor asked the question, are you speaking on behalf

7  today of the non-ignition switch plaintiffs?  Mr. Weisfelner's

8  been designated counsel for that group for purposes of briefing

9  the four threshold issues and for purposes of the oral

10 argument.  That has never changed.  That has always been his

11 role in this case.  The --

12     THE COURT:  I thought that Mr. Weisfelner had said in

13 some footnote to one of his briefs that because the

14 non-ignition switch guys hadn't gotten the same level of

15 discovery and stipulation crafting that the ignition switch

16 guys had, that he didn't understand that non-ignition switch

17 guys would be dealt with in the four threshold issues.

18     MR. STEINBERG:  No, Your Honor.  I think what --

19 where the confusion is, is that we had stipulated facts with

20 regard to their earliest recalls, which only dealt with the

21 ignition switches, and that they said that there was no

22 discovery that was needed further with respect to anything

23 else.  And therefore, they were asking Your Honor to decide the

24 four threshold issues with regard to that stipulated factual

25 record.

50

1          There was no stipulated factual record that had been

2    developed for the non-ignition switch plaintiffs.  So he was

3    saying that, to the extent that I need more discovery, I need,

4    on behalf of that group, more discovery on -- for the

5    non-ignition switch plaintiffs to show the same level that

6    there was a due process violation with respect to the sale

7    order as it applies to that group of people.

8          So he always represented the group.  He was just

9    saying, I didn't have the level of discovery, which is why Your

10   Honor's judgment said that that non-ignition switch group is

11   bound on a stare decisis basis.  They have the ability to file

12   a no strike pleading if they want to show that they shouldn't

13   be bound on a collateral estoppel basis.  And the fact of the

14   matter is, they did do that.  They filed whatever it is that

15   they wanted to file.  And our argument was, is that they have

16   the same problem that the ignition switch plaintiffs have, that

17   even if there was a due process violation, there was no

18   prejudice to them because those arguments were made already in

19   the context of the sale hearing.  So there was no due process

20   violation and they otherwise should be bound.

21         And, Your Honor, we briefed that issue to you, as

22   well, in the context of the no strike pleading.  If he's

23   prepared to withdraw that, that's fine.  But Your Honor's order

24   asking us to write something in the letter with regard to the

25   non-ignition switch plaintiffs was to address the issue as to

51

1   how do we deal with the fact that we don't have a stipulated

2   factual record for the non-ignition switch plaintiffs, and

3   therefore, how do they show that they have a due process

4   violation.  Because otherwise, the sale order is clear -- I'm

5   sorry, the decision was clear, the sale order was not amended

6   to them.  The sale order was only amended for purposes of

7   asserting independent claims that would otherwise be proscribed

8   by the sale order and injunction for the economic loss ignition

9   switch plaintiffs and no one else.

10          So how did they get to that -- to have the same

11   level?  They had to do something more, they hadn't done it.

12   Our letter says, tell the Court what it is that you want to do

13   because otherwise, you're bound.  Mr. Weisfelner basically said

14   today, I'd rather not do anything and just get the same

15   benefit, and they're not allowed to do that.  They need to show

16   that there was a due process violation, that there was, I

17   guess, sufficient knowledge of Old GM so that they would have

18   been deemed to have been a known creditor for purposes of doing

19   something more with respect to those particular issues, not the

20   ignition switch issue.  And he hasn't done that or said what

21   he's prepared to do on that.

22          The issue on what we had put in our letter -- and I

23   think Your Honor has the benefit of the letter -- we were

24   flagging the issues, Your Honor, that had already been raised

25   and partially briefed to Your Honor were ready.  So we weren't

52

1 trying to raise anything new or to do something.  We were

2 saying to Your Honor, here are those issues, if we wanted to

3 argue that vis-a-vis an economic loss plaintiff, that there was

4 no duty to warn because we didn't take the warranty liability

5 at all.  We left behind everything related to an Old GM vehicle

6 other than the glove box warranty, the lemon law

7 responsibility, or if that car had gotten into an accident.

8 Everything else was left behind.  We weren't going to deal with

9 it anymore.

10        That's our construct.  Your Honor had said that if

11 there's an independent claim that would otherwise be proscribed

12 by the sale order, that I'm going to allow that to be heard.

13 Now, to some extent, if there's an independent claim that

14 exists whether the sale order said something or not, I don't

15 think that is a quarrel that New GM has, provided that there's

16 an agreement as to what that is.  And I think the concept of

17 the marked pleadings will develop that.

18        What Mr. Weisfelner cavalierly says that we've had

19 the benefit of the second amended complaint since June and

20 therefore it should be easy to mark it up, I don't know if Your

21 Honor realizes that the second amended complaint is over 1,200

22 pages.

23        THE COURT:  I'm aware of that.  I'll tell you I

24 haven't read 1,200 pages.  I am not even sure if anybody's

25 tried to lift that for me and stick it on my desk.

53

1          MR. STEINBERG:  So the --

2          THE COURT:  But I have heard that it's 1,200 pages.

3          MR. STEINBERG:  So --

4          THE COURT:  I assume that there are not 1,200

5    paragraphs that I need to focus on.

6          MR. STEINBERG:  No, but if -- Your Honor, if I told

7    you there's probably 60, 70 pages that all deal with Old GM

8    conduct and Old GM allegations, I don't think you would be

9    surprised.  You know, I'm not going to.  I will resist the

10   temptation, only to say that we flagged the issue in our

11   letter, that we think that when you entered the judgment and

12   you said that the pre-sale consolidated complaint would be

13   stayed and they took all the pre-sale consolidated plaintiffs

14   and they put it into their post-sale complaint, and then they

15   essentially try to dress up how they were going to allege the

16   same thing over again, that that was violative of Your Honor's

17   judgment.

18         We will brief -- we briefed that issue in the context

19   of the second amended complaint.  We briefed the issue on the

20   damage issue and the second amended complaint.  To the extent

21   that we think that they're saying something more that we need

22   to brief, we'll try to do --

23         THE COURT:  When you said the damage issue, did you

24   mean punitive damages or something different?

25         MR. STEINBERG:  Something different.  Their second

54

1  amended complaint basically tries to get a recovery for every

2  vehicle owner that owned an Old GM car or a New GM car as of

3  2009 whether that Old GM vehicle owner actually ever had their

4  car recalled.  Their complaint in their addendum is for 70

5  million vehicle owners based on a theory.  We believe that the

6  theory -- and it's not to be phrased as only if you're a

7  successor liability.  We actually had that argument in the

8  context of the form of the judgment.  If your claim is based on

9  something that would be proscribed by the sale order because it

10 relies on Old GM conduct, it's barred.

11         And we believe that that damage theory, as it relates

12 to Old GM vehicle owners, is barred.  You can't sue New GM

13 under whatever theory you could dream of for an Old GM vehicle

14 that you say value diminished from the time that Old GM sold

15 the car to that vehicle owner in 2004 and 2005.  No matter what

16 they're alleging, that's a retained liability.

17         And that's what we're asking Your Honor to do, that

18 they studied Your Honor's ruling very hard.  They studied how

19 to try to circumvent Your Honor's 2009 order very hard.  And

20 we're saying we want to expose the bright light on what they're

21 doing and they should be told to stop it as they have done

22 throughout, not just in the MDL court, but in various other

23 state courts, as well.  We need to put a stop to it, and that's

24 what this -- we took Your Honor's letter to say, give me

25 everything I need to do to finish this, what are the issues

55

1   that I need to tackle, and that's what we're trying to do.

2        The -- so we're prepared to -- I will say one other

3   things on the states.  The states didn't file separate briefs

4   for the four threshold issues, but if you actually review the

5   briefing that was done in connection with the four threshold

6   issues and the oral argument, you will see that designated

7   counsel picked up some of the (indiscernible) for the states

8   and tried to present their argument.  Mr. Esserman, at the oral

9   argument, tried to put forth the state's position, and in

10  footnotes that they try to argue the California Consumer

11  Protection Statute, which underlies the state causes of action.

12       Your Honor should realize -- and I'm not quarreling

13  that we shouldn't be flexible enough to change course, but Your

14  Honor should realize that the states flouted what Your Honor

15  said should be done.  Your Honor had already said in the

16  context of the form of judgment decision that they should amend

17  their complaint, otherwise they're going to be stayed.  Now, in

18  the context of this letter, you're saying, let's start over

19  again, tell them specifically why they should be stayed and

20  I'll rule.

21       Your Honor had already ruled that what they had done

22  was wrong.  They tried to go to Judge Furman to get around

23  that.  Judge Furman said, you've got to come back before Your

24  Honor.  One easy way to deal with the states so you don't have

25  the briefing is saying, you lost your opportunity, you didn't

1   amend when you were supposed to amend, you're stayed until the

2   four threshold issues are determined by the Second Circuit.

3   What they're getting here is the benefit of a redo because they

4   didn't do what they were supposed to do before.

5           If Your Honor wants to streamline something easy, you

6   should streamline the states and say there's no reason to

7   bother to deal with them at all because they lost their

8   opportunity to do a no strike pleading, they did -- whatever

9   they did on the no strike pleading, I have in front of me, but

10  they didn't amend and they were supposed to amend.  And

11  therefore, you knew what you were doing when you didn't amend,

12  you now -- you took your shot at Judge Furman, you lost, and

13  now you might as well understand that you're stayed until the

14  Second Circuit rules, and I don't have to deal with this again.

15          I will say, though, that even if you took that tact,

16  some of the things that we are briefing that we will need to

17  brief are the hybrid lawsuits, right, because there's some

18  aspects of the states' lawsuits that should go forward.  It's a

19  hybrid lawsuit.  It deals with not just Old GM vehicles, it's

20  New GM vehicles, too.  They just didn't plead it right and they

21  didn't care when you told them, you didn't plead it right.  And

22  so they have to -- we have to deal with the hybrid lawsuits

23  anyway on the consumer protection statutes.

24          We briefed that a little in connection with the

25  second amended complaint.  We actually briefed that issue to

1  some extent, both sides did, in context of the Old GM threshold

2  issue as part of the four threshold issues.  We had to write

3  briefs as to whether what was pled, not in the second amended

4  complaint, but the first amended complaint, whether that was

5  violative of the sale order.  We had sections of our brief

6  dealing with fraud, fraudulent concealment, misrepresentation,

7  California statute.  They tried to put in whatever they wanted

8  to do.  We actually briefed more of it than they did.  And now

9  we're doing it again because Your Honor ruled they it in a

10  general fashion, but really the proof is in the pudding.  That

11  proof is in the pudding when you put in 1,200 pages.  We have

12  to tell you, and we have to do it in a way, Your Honor, that

13  makes sense.

14         One of our exhibits showed that we tried to deal with

15  the stare decisis collateral estoppel.  We have 80 separate

16  actions, all have accidents in the state court, not bellwether

17  cases, not in the MDL, <u>Bavlsik</u> is one of them where there's the

18  punitive damage issue.  Frankly, Your Honor had the punitive

19  damage issue in front of you six weeks ago.  The <u>Walton</u> no

20  strike pleading actually had the -- that whole no strike

21  pleading was the punitive damage issue.  The fact of the matter

22  was is that Your Honor lost that opportunity and New GM lost

23  that opportunity to get clarity on that issue because Walton

24  decided to withdraw its request for punitive damages.

25         THE COURT:  That was a post-petition accident with

58

1    bases for punitives premised on pre-sale conduct?

2            MR. STEINBERG:  Yes, Your Honor, and it was a pre-

3    sale vehicle.  It's the same issue as what's in the bellwethers

4    right now.

5            THE COURT:  Uh-huh.

6            MR. STEINBERG:  It was a -- I mean, the brief that we

7    filed on Friday has many similarities to the Walton brief that

8    we filed.  So, Your Honor, I could go on, but I think today's

9    not the day for a tit-for-tat for me to try to refute

10   everything that everybody else said.  Your Honor's looking for

11   a procedure how to go forward.  I think we can deal with all

12   the bellwether issues in September.  We could do the marked

13   complaints for the bellwether issues, but I do think that they

14   should mark up -- they should eliminate that which they know is

15   violative of the order so that we're not having to mark up

16   something further than that.

17           And then, I think we can agree on a briefing

18   schedule.  We had asked for an accelerated briefing schedule.

19   I think in our context, we had said that we can do opening

20   brief by this Friday.  I think, frankly, if Your Honor wanted

21   to deem my Bavlsik pleading to be the opening brief and give me

22   a --

23           THE COURT:  Opening brief on --

24           MR. STEINBERG:  Punitives.

25           THE COURT:  -- on punitives by next Friday?

59

1          MR. STEINBERG:  Well, I had it -- in my briefing

2    schedule, I had it for this Friday, September 4th.  We're

3    already into September as of tomorrow.  And then I had given

4    them to, I think, September 16th or something like that, and --

5          THE COURT:  Well, September 16th is a little elusory,

6    not just for the most religious people in the New York

7    community, but for --

8          MR. STEINBERG:  Yeah.

9          THE COURT:  -- a lot of people --

10         MR. STEINBERG:  I think September 18th.

11         THE COURT:  -- because it covers two days of holiday

12   for a lot of people.

13         MR. STEINBERG:  Your Honor, I didn't care.  If they

14   thought they needed a few extra days, I didn't care about any

15   of that.  I wanted to do something that reflected two things.

16   One is I didn't even know -- I knew that there was a bellwether

17   issue out there and Judge Furman would give us clarity on that,

18   but when I wrote this letter, I didn't have the benefit of his

19   remarks on Friday.

20         THE COURT:  From this past Friday.

21         MR. STEINBERG:  From this past Friday.  But I knew I

22   had to deal with this issue on an expedited basis because of

23   cases like Bavlsik.  Right?  I have Bavlsik scheduled to go to

24   trial in Missouri, in a Missouri court, in middle of September.

25   And so on Friday, when we filed our no strike pleading with

60

1  Your Honor, my counsel in Missouri filed a pleading asking for

2  an extension of time so that Your Honor could deal with the --

3           THE COURT:  Where do we stand on that?  Because no

4  matter how much I accelerate, I can't get it done by September

5  4th.

6           MR. STEINBERG:  I agree with that, so we recognized

7  that it would be hard to try to force this issue into today's

8  status conference.  And so the return date on the request for

9  an extension from the Missouri court is this coming Friday,

10  September 4th.  If we don't get the relief that we need by

11  September 4th, we may very well try to tee up something before

12  Your Honor to try to preserve the status quo so that Your Honor

13  has the benefit of all the briefing.

14           THE COURT:  In the nature of a TRO?

15           MR. STEINBERG:  In the nature of a TRO.  This has

16  been done -- Judge Furman has had to tackle this type of issue

17  in connection with coordinating the state cases, and many a

18  times, he's able to speak to the state court judge there and

19  say, this is what I need, and the papers that we filed on

20  Friday basically said that we expect the punitive damage issue

21  to be resolved in two to three months and that we're asking for

22  an extension of the trial date so that it goes forward in that

23  period of time.

24           So we were guided by cases like Bavlsik, and there

25  may be other cases like that, whether it's not September 15th,

1    but it's October 10th, October 30th.  We were guided by that.

2    Frankly, we thought Walton might have given us the clarity that

3    we needed to go forward, but you don't go forward on an action

4    when the other side says, I capitulate.  You tell the judge

5    that they capitulated so he doesn't have to write a decision on

6    it.

7            And we know that could be fair to the other side,

8    that they will wanna weigh in on this issue, as well.  To the

9    extent that they didn't weigh in on Walton, they didn't weigh

10   in on Walton, but we know now that they want to weigh in on the

11   other -- for the other cases.  So we try to set up this

12   accelerated briefing schedule, and we did believe that if

13   everything is done in September, Your Honor will be able to

14   tackle the issue quickly and give Judge Furman and the other

15   judges the guidance that they need so they know how to go

16   forward in their cases.

17           So on the bellwethers, we're committing to do the

18   markup of the six complaints and we're prepared to do the

19   briefing, whatever works, on the punitive damage issue.  And if

20   they want to have oral argument, I'm not shy to have an oral

21   argument if Your Honor believes an oral argument is required.

22   If it does, then I'm happy to do the oral argument whenever

23   Your Honor wants to do it.  And that will address Judge

24   Furman's concerns on the bellwethers.

25           The rest of what's involved here, marking up of the

62

1  pleadings and how to deal with the economic loss cases, I

2  almost think, Your Honor, that we need the benefit of perhaps

3  another discussion amongst the group to see what kind of

4  schedule we should put forward and how to present it to you

5  with the benefit of your comments.  If the people think that we

6  should just do it all now, I guess we could do it now and I

7  could give you my thoughts on the fly, but I do think that

8  everybody heard you say the briefing was too long and the

9  timing is too long and you need to have that done quicker.

10       We have to deal with the fact that we're being asked

11 to mark up a 1,200-page complaint.  We're being asked to mark

12 up complaints that otherwise are stayed right now, we believe,

13 but to try to get greater clarity.  And to some extent we're

14 interested in greater clarity, as well, too, at some point in

15 time.  We're not dilatory.  We actually want Your Honor's

16 ruling so that it can then set the table for what should happen

17 next.  A large part of the delay has been a fight over whether

18 you should be the gatekeeper that you were intended to be in

19 2009.

20       So I hope that is responsive enough to what was said

21 before I took the podium.  I obviously have other responses to

22 other things, but I disagree with when people tried to argue

23 substance because I just don't think Your Honor has the desire

24 to hear substantive arguments as to why we think our legitimate

25 -- these are legitimate things to raise to you.  You'll get the

63

1  benefit of our briefing, and there will come a day when I'll be

2  able to give the oral substance response to that.  Thank you.

3          THE COURT:  All right.  Thank you.

4          Ms. Rubin.

5          MS. RUBIN:  Thank you, Your Honor.  I'm Lisa Rubin of

6  Gibson, Dunn & Crutcher for the record.  I represent the GUC

7  Trust, and I'm here this morning on behalf of the GUC Trust and

8  the unitholders.  Mr. Golden of the Akin Gump firm is also on

9  the phone, and I expect that if he has anything to add at the

10 conclusion of my presentation, Your Honor, he will ask for an

11 opportunity to address the Court briefly.

12         Your Honor, you said at the outset of your comments

13 that you wondered whether it made sense to push off what you

14 recognized were the independent issues facing the GUC Trust.

15 And respectfully, Your Honor, I would say no, and here's why.

16         All of the parties before you agree that the issues

17 presented by the GUC Trust asset pleadings are very limited

18 ones.  They're issues that the judgment asked the parties to

19 put before your Court, and specifically Paragraph 13(d) of the

20 judgment required that if any party who was not affected by the

21 judgment, specifically the two categories, non-ignition switch

22 plaintiffs, if they had a good-faith basis as to why Your

23 Honor's equitable mootness holding and the April 1st decision

24 should not apply to them, they should set that forth in a GUC

25 Trust asset pleading.

                                                                    64

1              THE COURT:  This goes for the purpose of converting

2   what is now stare decisis into res judicata.  Am I correct?

3              MS. RUBIN:  Yes.  Yes.  And, Your Honor, you

4   recognized in a May 27th decision to explain some of the

5   decisions you made about the judgment where there were

6   disagreements before the parties.  You said specifically as

7   follows -- and if you'll excuse me, Your Honor, I'm reading

8   from my Blackberry from your decision -- at Page 8 of that

9   decision, you said:

10             "The decision will be stare decisis for the non-

11             ignition switch plaintiffs subject to the usual right

12             of any litigant to show that a judicial opinion is

13             distinguishable, but it will not be res judicata."

14             Your Honor then continued:

15             "The Court agrees with New GM, the GUC Trust, and the

16             unitholders that it is time to come to closure on

17             whether there is any basis to excuse the non-ignition

18             switch plaintiffs."

19             And by that, I believe Your Honor meant two

20  categories of non-ignition switch plaintiffs, the non-ignition

21  switch plaintiffs with economic loss claims represented by

22  Mr. Weisfelner and the non-ignition switch plaintiffs with

23  personal injury claims represented, as I understand, by

24  Mr. Weintraub, from the provision of the sale order, that's not

25  something that I'm here to discuss, and the Court's mootness

65

1  conclusions.  That's the thing I am here to discuss.

2            And that's what Paragraph (d) of the judgment was

3  designed to do.  It gave the parties 17 business days after the

4  entry of the judgment to come forward and say what their

5  good-faith basis was for why that equitable mootness holding

6  should not apply to those two categories of non-ignition switch

7  plaintiffs.

8            And then you had two pleadings come in, Your Honor.

9  You had designated counsels' omnibus motion, which included

10 their GUC Trust asset pleading, and then you had what

11 Mr. Weintraub captioned a reservation of rights on behalf of

12 his clients.  Now, for the reasons the GUC Trust and the

13 unitholders set forth in a brief before Your Honor, we would

14 respectfully submit that they didn't give you those reasons.

15 And, in fact, Mr. Weisfelner this morning has stated to you

16 that we are probably correct that -- I'm not sure why probably

17 as opposed to just correct; maybe it's just a difficult

18 concession for Mr. Weisfelner to make -- that having not

19 provided to you a good-faith basis other than the existence of

20 the appeal itself, these two categories of non-ignition switch

21 plaintiffs didn't tell Your Honor why the equitable mootness

22 holding shouldn't be applicable to them.

23            So, Your Honor, everyone has come before you today,

24 and you'll see in our letter, the GUC Trust asset pleading is

25 ripe for Your Honor's decision.  It was a limited issue.  No

66

1  party is suggesting that there be any more briefing.  No party

2  has suggested that there be oral argument.  And it's a very

3  limited pleadings at issue.  It's Mr. Weisfelner's omnibus

4  motion to the extent that it has a GUC Trust asset pleading at

5  the end, and the reservation of rights submitted by

6  Mr. Weintraub.

7       Mr. Weintraub will tell you that that's not intended

8  to be a GUC Trust asset pleading, but the date of its

9  submission and the issues that he discusses in it make it very

10  difficult for me to understand why it's not intended to be that

11  GUC Trust asset pleading.  In any event, if it's solely

12  intended as a reservation of rights, he hasn't complied with

13  Paragraph 13(d) of the judgment, which required the parties to

14  set forth their good-faith basis why the equitable mootness

15  holding shouldn't pertain to them.

16       Now, why does this matter?  Your Honor said in your

17  May 27th decision that it was time to come to closure for the

18  liquidating trust and its beneficiaries, and we couldn't agree

19  more.  None of the issues that I've raised here today, Your

20  Honor, impair or impede the resolution of what I think the

21  parties to both sides of me would agree are maybe more pressing

22  issues, but the liquidating trust has a desire to get on with

23  its business, to move on and to stop spending money

24  unnecessarily on things that we don't think concern us.

25       One of the things that's so, I guess, baffling to me

67

1   is that Mr. Weisfelner came up this morning and he said that he

2   wants to reserve -- in addition to his umpteenth attempt at

3   trying to reargue the equitable mootness holding, he says it's

4   okay with him if you decide the GUC Trust asset pleading so

5   long as you cordon off some sort of attempt for his parties to

6   tell you why the accordion feature should be reserved for them

7   and why they should have a preserved right to brief the

8   accordion feature.  Respectfully, Your Honor, that's a

9   distortion of your April 1st decision, that's a distortion of

10  your May 27th opinion, and that's a distortion of the judgment

11  itself, all of which make amply clear that Your Honor decided

12  the issues before Your Honor with ample consideration of the

13  accordion feature.

14          And let me go through why that is.  Paragraph 6, Your

15  Honor, of the judgment makes clear that the equitable mootness

16  holding as it applied to the ignition switch plaintiffs applied

17  to the GUC Trust assets past, present and future.  That was

18  language about which the parties disagreed heartily during the

19  negotiation of the judgment.  Your Honor was asked to pass on

20  that issue, and Your Honor took up that issue and passing on

21  the judgment.

22          And, Your Honor, in your May 27th decision, which was

23  meant to amplify certain of the decisions you made in coming to

24  the judgment, you discussed the --

25          THE COURT:  May 27th is the form of judgment

68

1  decision?

2          MS. RUBIN:  No.  That -- it's the form of judgment

3  decision, Your Honor, that's correct.  And on Page 9 of that

4  decision -- and again I'm reading from the decision -- Your

5  Honor says as follows.  Your Honor was trying to describe why

6  there was certain language about the GUC Trust assets in

7  respect to Section 502(j), and you said:

8              "It was necessary in the Court's view to include

9              different provisions in the judgment with respect to

10             new claims as opposed to the reconsideration of old

11             ones."  And I quote, "When Old GM creditors receive

12             distributions under the plan and when unitholders,

13             even if as after-market acquirers of GUC Trust units,

14             acquire their units, they had a reasonable

15             expectation that the total universe of claims filed

16             against Old GM would not increase, and while they

17             knew there was an accordion feature" -- these are

18             Your Honor's words -- "they also knew that claims

19             exposure would result with exceptions exceedingly

20             difficult to show only from previously filed claims."

21         And that's Pages 9 to 10 of the May 27th decision on

22  form of judgment.  That to me indicates that contrary to

23  Mr. Weisfelner's very impassioned presentation, Your Honor knew

24  full well there was an accordion feature when you made your

25  decision on April 1st, you knew full well that accordion

69

1  feature was part of what remained in dispute between the

2  parties and negotiating in the form of judgment, and Your Honor

3  took that all into consideration.

4         What Mr. Weisfelner is trying to do now is no less

5  tactical than what he tried to do here in February, what he

6  tried to do last November in not seeking to enjoin the

7  distribution that my client made.  Mr. Weisfelner has been

8  presented at various points in this proceeding with decision

9  points about who he wants to pursue his claims from, where he

10  wants -- whose pocket he wants to pick, and his highest

11  priority pocket is Mr. Steinberg's, it's not mine.  But that's

12  Mr. Weisfelner's decision.

13         And again he has not filed the motion for reargument

14  of the April 1st decision.  He has not even filed the claim,

15  nor has Mr. Weintraub.  So even though Your Honor's April 1st

16  decision invites them to file late-filed claims, arguably so

17  Your Honor could resolve whether those claims are allowed

18  pending appeal so that if they win on their appeal to the

19  Second Circuit, there wouldn't be delays in compensating them,

20  they still haven't filed the proof of claim.  Not a class

21  claim, not an individual claim, no claim at all.

22         And nonetheless they stand here before you this

23  morning and say that it's okay with them if you decide the GUC

24  Trust asset pleading so long as they have a right to argue that

25  the accordion feature somehow applies to them.  They're putting

70

1 the cart before the horse, Your Honor.  They are still playing

2 tactical games with the Trust, and they are pushing for a stay

3 of distributions pending appeal for a category of people that

4 don't even have claims, let alone a decision affecting them,

5 let alone an appeal that involves them.

6      So what I'm here before you, Your Honor, to ask for

7 is that you narrow the issues before you to the extent that you

8 can.  Again, no oral argument is required.  No further briefing

9 is required.  Let's resolve as much as can be resolved as

10 possible for the liquidating trust and its existing

11 beneficiaries.

12      And further, Your Honor, I believe that resolving the

13 GUC Trust asset pleadings will also facilitate ongoing

14 settlement discussions.  Your Honor knows that the GUC Trust

15 has reporting obligations, and therefore I'm not at liberty to

16 say anything further about those settlement conversations other

17 than to say to the extent that Your Honor can resolve

18 outstanding issues affecting the GUC Trust, I believe they

19 would and could go a long way to forwarding conversations among

20 the parties.

21      Your Honor, I'll rest now and I'll take any questions

22 if you have them.

23      THE COURT:  All right.  Thank you.

24      Mr. Golden, do you need to supplement what Ms. Rubin

25 said?

1  *T        MR. GOLDEN:  I don't, Your Honor.  Thank you for

2  letting me participate by phone.  I think she thoroughly

3  covered the points I would have covered.

4          THE COURT:  Okay.  Mr. Weisfelner?

5          MR. WEISFELNER:  Just quickly in terms of a reply,

6  and I'm going to get to the GUC Trust in a bit, but I do

7  believe that, with no insult intended to Ms. Rubin or her

8  clients, they are the tail wagging the dog.

9          Your Honor, I'm not a trial lawyer by trade, but as I

10  was listening to Mr. Steinberg's presentation to the Court, it

11  occurred to me that -- or I started imagining how GM, New GM,

12  would otherwise go about protecting their interests absent

13  asking Your Honor, in our view, to re-litigate a lot of the

14  issues that they lost on, and in particular the whole issue of

15  independent claims.

16          So you've got a jury in the jury box, you've got a

17  judge, and there's litigation over punitive damages.  And it

18  seems to me that the fastest way to resolve the issue -- not,

19  again, being a trial lawyer -- is for New GM to contend that

20  there needs to be an instruction to the jury, and the Court

21  ultimately resolves the instruction to the jury that sounds

22  something like, you may not find punitive damages against New

23  GM, even if you found compensatory damages against New GM

24  because, by the way, if you didn't find compensatory damages,

25  there's no predicate for punitive damages.

1          But having found compensatory damages, you're now

2   being asked to consider punitive damages.  Here's my

3   instruction to you, jury, you may not find punitive damages

4   against New GM that are predicated on things Old GM did.

5   That's for the economic loss plaintiffs.

6          For the personal injury plaintiffs, depending on the

7   outcome of their argument with regard to whether or not

8   punitive damages on post-sale accidents were part of their

9   assumed liabilities -- and I've read the language and I think

10  Weintraub is right, but assuming that he somehow loses on that

11  issue, again, why isn't it resolved by virtue of a jury

12  instruction where instead of going through this whole

13  rigamarole, this whole retrial, this whole effort to delay and

14  prevent Judge Furman or the courts in California or the courts

15  in Arizona from dealing with their actions?

16         We see New GM once again saying, whoa, slow down, I

17  don't want to get anywhere near a trial, anywhere near a jury

18  where these issues could be easily resolved by virtue of a jury

19  instruction or a court instruction.  They instead want to slow

20  the whole train down and take one more bite at the apple.

21         Judge, can you please tell us that when you defined

22  independent claim, you really need to go back and figure out

23  whether or not your definition of independent claim somehow

24  violates the contractual clause of retained liabilities.

25  Because if it's a retained liability, it can't be an

73

1  independent claim.  What?  We did this already.

2         The thing that amazes me about New GM's position is

3  -- and, Your Honor, I thought said it at the end of my prior

4  remarks.  Is it possible for a bankruptcy court to approve a

5  sale in the 363 context where whether or not the buyer engaged

6  in bad faith, the buyer is entitled to what I refer to as a get

7  out of jail free card?

8         Listen, you can independently start polluting the

9  environment all over again.  You can independently do whatever

10  it is that the old debtor, the seller, was once upon a time

11  accused of.  You can do it on your own dime, your own time.

12  You can do it knowingly and you've got a get out of jail free

13  card.  That's not the law.

14         And when Mr. Steinberg got up to address the Court,

15  he never got close to that issue.  He only said that, well, you

16  know, the non-ignition switch plaintiffs can't take the

17  position that they've got independent claims.  They have no

18  claims because the sale order is still binding on them until

19  they can show a due process violation.  Why?

20         So until and unless I show a due process violation,

21  the buyer, New GM, can do whatever it wants to do and it can't

22  be sued by anybody, anywhere, anytime.  He's never addressed

23  that.

24         We're here for procedural purposes.  It seems to me

25  crystal clear that what Your Honor needs to do for Judge Furman

74

1  is Your Honor needs to be the gatekeeper as to whether or not

2  the bellwether trials properly assert punitive damages.  That's

3  issue number one.  And I think I will adopt a page from

4  Mr. Steinberg's suggestion that you send all of us back to the

5  drawing board on what's going to get filed, when and how many

6  pages, understanding as we now do, and we didn't when we wrote

7  our respective letters, where Judge Furman's focus of attention

8  is.  And I think we all need to do our best to try and get that

9  stuff out of the way.

10        And I thought we were going down the right track

11 procedurally when we focused on punitive damages, but then we

12 got diverted again when Mr. Steinberg said, we've got to focus

13 on punitive damages, we've got to focus on imputation.  Well,

14 Your Honor, did you or did you not say today that you thought

15 you were crystal clear on imputation?  What else needs to be

16 determined on imputation?

17        I think, but I don't know -- I think that what Judge

18 Furman may have been struggling with was Your Honor's

19 commentary in your decision that nothing about imputation is to

20 be used outside the context of the four threshold issues, and

21 in particular doesn't apply to the MDL.  Well, Your Honor, I

22 don't think we're supposed to be re-litigating imputation as a

23 matter of fact or as a matter of law.  I think the only thing

24 Judge Furman needs, unless GM can convince you otherwise, is

25 that to the extent that imputation of bad knowledge to New GM,

1  which is the bad actor in the complaints that are alive, the

2  law of imputation of the knowledge of New GM employees is not a

3  matter that Judge Furman, with all -- that Judge Furman needs

4  your help with, and that's not what he was asking.

5        I think he was asking for clarification of the

6  language that said, you can't use the imputation for part of

7  the MDL.  But he can use his own brain.  He can allow the

8  parties to rebrief imputation.  It's a different imputation.

9  It's the question of knowledge of New GM employees, knowledge

10 that New GM garners from books and records that it adopts, the

11 extent to which all of that gets imputed to New GM for purposes

12 of independent claims against New GM.

13        So I don't know why we're briefing that on a triage

14 basis.  That's an issue that ought to be determined by the

15 trial courts when they trial their cases with proper jury

16 instructions.

17        THE COURT:  Mr. Weisfelner, where is the statement

18 that has caused the ambiguity about imputation being capable of

19 being used or not being capable of being used in the MDL?

20        MR. WEISFELNER:  I'll find it for you in a second,

21 Judge.  I think it was part of the judgment itself.

22        MR. STEINBERG:  Your Honor, it is part of a June 1

23 judgment.

24        THE COURT:  And the judgment is contrasted to either

25 of the two opinions that preceded it.

76

1          MR. STEINBERG:  That's correct because the parties

2   had to deal with the fact that there was a stipulated factual

3   record, and they wanted to make sure that the stipulated

4   factual record was limited -- it was only done for purposes of

5   the four threshold issues, so we wanted to have clarity on that

6   issue.  And this particular point which was raised in my letter

7   was because notwithstanding that specific provision in the

8   judgment, not just in the MDL, but more the other proceedings

9   outside the MDL in the state court, they're citing the findings

10  of the judgment in prohibition to that.  So this was not done

11  really for Judge Furman.  This was done for the other courts to

12  make sure those plaintiffs don't abuse the judgment.  And I

13  don't know what Mr. Weisfelner is intuiting what was in Judge

14  Furman's head.

15          MR. WEISFELNER:  Your Honor, again, I think we're all

16  in agreement that the language comes from the judgment.  I

17  can't lay my hands on it that quickly, but here's the problem.

18  Your Honor determined that --

19          UNIDENTIFIED:  Here's the language, 15(d).

20          MR. WEISFELNER:  Thank you.  For these reasons and

21  others, the findings of fact --

22          THE COURT:  What paragraph are you reading from,

23  please?

24          MR. WEISFELNER:  I'm reading from Paragraph 15(d).

25          THE COURT:  Fifteen delta?

77

1           MR. WEISFELNER:   Fifteen delta.   That's right, Your

2   Honor.   Page 14 of the 21-page judgment.   And what it provides

3   in substantive part is the findings of fact in the decision

4   shall apply only for the purposes of this Court's resolution of

5   the four threshold issues and shall have no force or

6   applicability in any other legal proceeding or matter,

7   including, without limitation, MDL 2543.   Notwithstanding the

8   foregoing and all events, however, the decision and judgment

9   shall apply with respect to the Court's interpretation of the

10  enforceability of the sale order and the actions of the

11  affected parties that are authorized and proscribed by the

12  decision and judgment.

13           And again, just so that I'm crystal clear on this,

14  the question of whether or not the 24 Old GM employees that

15  became New GM employees as of the effective date of this sale,

16  whether their collective knowledge can be imputed to New GM, if

17  that's an issue in any other case as it is in the second

18  amended consolidated complaint, as I believe it is in the

19  California and Arizona actions, then it seems to us that those

20  courts can take a look at those allegations and take a look at

21  the proof that's made by those parties, following whatever

22  additional discovery those parties are ultimately pursuing, and

23  those courts can determine, based on that evidence, whether or

24  not imputation of that knowledge, or for that matter any other

25  knowledge, to New GM is appropriate as a matter of fact and as

1  a matter of law.

2         If we are, all of us, focused on something that's

3  efficient, that affords other courts the opportunity to get on

4  with their cases and calendars.  Why in the world do we need to

5  come back to the gatekeeper who's already made a determination

6  with regard to imputation with regard to stipulations between

7  the parties and now ask you all over again to make an

8  imputation decision that's bereft of the kinds of facts and

9  evidence and argument that are ultimately going to be made in

10 those cases?  I don't think that's what Judge Furman, with all

11 due respect to him, was asking you to do.  I think what he was

12 asking was for some clarity about how the decision, to the

13 extent it relied on stipulated facts, was not to apply in the

14 MDL.

15         And I think what Your Honor had in mind -- once upon

16 a time, you asked me whether or not you could utilize your

17 knowledge of the background facts of this case in order to

18 render ultimate decisions, and I said unless you were prepared

19 to have a lobotomy, I didn't think we could avoid it.  Your

20 Honor, my point here is that the ultimate determination of

21 whether or not employee knowledge or books and records, facts

22 that are contained in those books and records, can be imputed

23 to New GM is not a determination that I think the Bankruptcy

24 Court could or should be making without the benefit of

25 discovery and trial on the merits.

1          And courts of competent jurisdiction are amply able

2   to ultimately determine whether or not imputation, under the

3   law of whatever jurisdiction will govern -- I presume there may

4   be some differences on imputation.  It's not necessarily

5   federal common law, I don't know, but it's not something that I

6   think the Bankruptcy Court rightfully ought to be focused on,

7   and I don't think it's what Judge Furman had in mind in terms

8   of triaging issues.

9          Now, the other thing that Mr. Steinberg then slipped

10  in when he talked about what he wants to triage, he talked

11  about punitives because you can't get away from what Judge

12  Furman said about that.  He talked about imputation, and I

13  think, quite frankly, he's banging his head against the wall,

14  but he wants to see what happens.  Maybe Your Honor will bite

15  on it.

16         The third thing he talked about is other causes of

17  action proscribed by the sale order and original injunction and

18  causes of action that are still proscribed based on Your

19  Honor's sale order and injunction.  Well, that's a whole

20  another reargument again.  I went through carefully a list of

21  the issues in his letter, and I think I made it clear that in

22  terms of the way we should be going forward by way of a

23  schedule and what we ought to be triaging, and in an effort to

24  make our next meet and confer reasonable, Judge, we need some

25  direction beyond the triage that Judge Furman says he needs --

80

1          THE COURT:  Well, I can give you a little more

2   direction that may help your meet and confer, and it ties into

3   one of the very few -- well, perhaps very few is an

4   overstatement -- what I consider to be one of the closer

5   questions that you guys were arguing about, which is that when

6   people have not shown a due process violation yet, that being

7   the subset of your larger constituency with non-ignition switch

8   issues, where they have not shown that 24 people or even one

9   person at New GM had enough knowledge to make them knowing

10  plaintiffs -- or knowing claimants, excuse me -- whether they

11  should get benefits that the remainder of your constituency won

12  in the last go-around.  And Mr. Steinberg's position, as I

13  understand it, is that even if it is so, that if I were ruling

14  on a clean slate with the ability to be heard back in 2009,

15  that what I ultimately ruled with respect to environmental

16  claimants and narrow view of economic loss claimants, vis-à-vis

17  ignition switches, whether they should or should not be

18  beneficiaries of that ruling, then they haven't established a

19  due process violation.  That was the context in which I said

20  what I was saying.

21          Now, hopefully that's not too cryptic, but the

22  non-ignition switch plaintiffs' inability or inaction to have

23  yet established a due process violation to give them the

24  benefits that the remainder of your constituency got is, in my

25  view, a big issue.

81

1          MR. WEISFELNER:  Okay.  I mean, again, just as a

2    matter of fact, discovery with regard to the non-ignition

3    switch defects that are at issue are ongoing.  And while --

4          THE COURT:  I understood that, and it certainly was

5    ongoing back on April 15th --

6          MR. WEISFELNER:  Right.

7          THE COURT: -- which is why the opinion didn't cover

8    them.

9          MR. WEISFELNER:  Right.  But, Your Honor, look, it

10   still seems to me that, you know, one could argue that whether

11   or not you're the beneficiary of a due process violation

12   because you were a known creditor, nevertheless, Your Honor's

13   sale order could not as a matter of constitutional law, Second

14   Circuit law, have provided New GM with a get out of jail free

15   card with regard to its post-sale independent acts and conduct.

16   I just don't think that the --

17         THE COURT:  I understand that's the argument you're

18   going to make.  You had telegraphed that before.  My guess is

19   that Mr. Steinberg is going to have a different view, and

20   that's why I called it an issue rather than something that I've

21   decided.

22         MR. WEISFELNER:  Okay.  To the extent that that

23   remains an issue, then in terms of triaging things, it seems to

24   me that we need to get that issue teed up quickly because to

25   the extent that people, either New GM or us, depending on who

82

1  loses, needs to appeal that decision, they ought to get

2  started.  But again, in terms of triaging the remaining issue,

3  what frustrates us on the plaintiffs' side is every opportunity

4  that New GM can take, it does take in an effort to try and

5  reinterpret, redefine, cut down on, narrow the scope of the

6  definition of independent claims.

7          And they're not all, as Mr. Steinberg indicated,

8  briefed in the no strike/no stay pleading because we didn't see

9  any of these issues emanating from New GM, frankly, until after

10  Judge Furman denied the motions to withdraw the reference.  And

11  I think that emboldened New GM to try and take another bite at

12  the apple.

13          And, Your Honor, I think maybe the right thing to do

14  is, with your guidance, send us back to the drawing board.  We

15  will try desperately hard again to come up with an appropriate

16  scheduling order with the right issues.  But again, to the

17  extent that New GM insists on having Your Honor act as a

18  gatekeeper on issues that we believe are more properly resolved

19  in the context of trial because we don't think it impacts Your

20  Honor's role as a gatekeeper -- we think the gatekeeper role is

21  tell us if this is an independent claim or not an independent

22  claim.  And Mr. Steinberg can tell you there are 60 pages of

23  allegations with regard to Old GM, and our point is you can

24  have 600 pages of allegations with regard to Old GM.  Focus on

25  the claim and cause of action.  Focus on what it is that you

83

1  want recovery for.  Focus in on what it is you're asking the

2  jury to decide based on instructions from the judge.

3       And you will see that the liability we assert is New

4  GM's liability, that the allegations regarding Old GM are of

5  necessity background information.  You don't start a story, if

6  you will, about New GM -- I'm sorry, GM manufacturing cars with

7  known defective components beginning in '03 and '04, going

8  through all sorts of evaluations, tests, and accumulation of

9  information that the ignition switch defect, in fact, presented

10  a known safety defect that was killing people throughout the

11  country, that it chooses not to bring to the attention of the

12  Court during its bankruptcy proceeding, that New GM remains

13  completely well aware of from the date it's born and maintains

14  that cone of silence throughout the period from 2009 through

15  2014.

16       And I'm here today to assess liability -- I'm talking

17  to a prospective jury -- against New GM because Old GM's gone

18  and Old GM isn't here and Old GM can't pay for this, and New GM

19  shouldn't be made to pay for something that was an Old GM bad

20  act or bad conduct.  Now, I'm going to argue to the jury the

21  facts.  I don't want to start the case by saying as of some

22  date in 2009, New GM was born.

23       THE COURT:  I know that you don't want to start your

24  case that way, but you are going to start the case within the

25  constraints of what the law requires.

84

1          MR. WEISFELNER:  Absolutely.

2          THE COURT:  And whether it's done by a curative

3   instruction, which anybody who's ever been a litigator has to

4   kind of laugh at, or a motion in limine, and then whether that

5   motion in limine comes from the trial judge or is required by

6   the gatekeeper judge is a matter to be determined under the law

7   rather than your tactical preferences.  I used to be a trial

8   lawyer.  I know what I like to do.  I don't always get what I

9   want.

10          MR. WEISFELNER:  And, Your Honor, again, all I'm

11  suggesting is that the practical reality of this Court being

12  asked to be the gatekeeper not once, not twice, not three

13  times, but multiple times in situations where you've got a

14  lawsuit pending before the District Court, you've got two

15  lawsuits pending, one in Arizona, one in California, you've got

16  bellwether cases, you've got a case on presentment that the New

17  GM wants to get you out of, I forgot, Minnesota, Minneapolis,

18  some other place.

19          THE COURT:  Missouri.

20          MR. WEISFELNER:  Missouri, and God knows how many

21  other complaints they're going to want to bring to your

22  attention.  It seems to me that as a matter of judicial

23  economy, if nothing else, how many times can they knock on your

24  door when the issue is just as well resolved in the trial

25  court?  And frankly, you know, we believe that Your Honor has

85

1  done yeoman's work with regard to your gatekeeping function.

2         Your Honor, unless you have any questions, I should

3  get back to Ms. Rubin's commentary with regard to the GUC

4  Trust.  Your Honor, it's their call.  As I said before, if they

5  want to move forward with their September 22nd trial on whether

6  there's any basis to prevent them from making the last

7  distribution, so be it.  Our argument is and has always been,

8  and I can read Your Honor's decisions as well as Ms. Rubin can,

9  our view is whether Your Honor intended it or not as a matter

10 of appeal and the likelihood of prevailing on appeal.  Any

11 decision on equitable mootness has to be predicated on the

12 inability to unscramble the egg and afford a party an effective

13 remedy without doing damage to the damaged party.

14        And Your Honor we understood to say in your equitable

15 mootness decision that it would be unreasonable for any number

16 of reasons, including tactical decisions that I've been blamed

17 for, to ask the unitholders to give back what they've already

18 gotten or to be disappointed in their reasonable expectations

19 going forward.

20        And, Your Honor, it's my belief, and this is what the

21 appeal is all about, that that determination as it relates to

22 the accordion feature was inappropriate because if there is an

23 effective remedy that can be crafted for us, that doesn't

24 disappoint their reasonable expectations, i.e. the accordion,

25 then whether Your Honor thought about it or didn't think about

1  it, and I guess in particular if Your Honor thought about it

2  and said, I'm not going to accordion that at all together,

3  forget it, you can never attach the -- attack the accordion

4  feature, that that was an inappropriate decision on Your

5  Honor's part in the law of equitable mootness and we'll leave

6  it to the Second Circuit.

7           I didn't ever ask Your Honor to reconsider or rewrite

8  it or rethink it.  It is what it is.  And as to the money

9  that's in the bank, we'll deal with it as a matter of a trial

10  on the 22nd, unless Your Honor determines that you've got

11  better things to do.  But it's Your Honor's courtroom.  Your

12  Honor controls it.  We'll be here when Your Honor tells us to

13  be here.  Thank you.

14           MR. STEINBERG:  Your Honor, my turn, please?

15           THE COURT:  All right.  We'll go through one more

16  cycle.  First Mr. Weintraub, then Mr. Steinberg, then

17  Ms. Rubin.

18           MR. WEINTRAUB:  Thank you, Your Honor.  I will be

19  brief.

20           First point is that contrary to what was said during

21  argument, I did not admit and my clients have not admitted that

22  anything in the bellwether pleadings were pled beyond the sale

23  order.  Our position is that the sale order does not bar the

24  punitive damages claims.  And what we argue -- or restate what

25  we said before, there are three paths there -- to get there,

87

 1  and we think that all three paths are pled in the bellwether

 2  complaints.

 3        With respect to whether the plaintiffs should now

 4  amend the bellwether complaints in advance of getting marked

 5  pleadings from New GM, I don't think that makes any sense, Your

 6  Honor.  We believe --

 7        THE COURT:  You say you don't think that makes any

 8  sense?

 9        MR. WEINTRAUB:  Yes.  That we should amend before we

10  get marked pleadings.  Without the benefit of this Court's

11  ruling, we'd be amending in the dark, and probably end up

12  perhaps having to amend yet a second or third time.  I think

13  that the pleadings, to the extent we need marked pleadings on

14  them, which is something I addressed earlier and said I didn't

15  think we did, because once we know which of the three paths, or

16  all three paths, or two of the three paths is what is the

17  appropriate path for these lawsuit, then I think the pleadings

18  can be dealt with.  Or proof at trial could be circumscribed

19  based upon what the plaintiff is permitted to prove.

20        Second point, Your Honor, and I won't belabor this

21  because believe it or not I know when to shut up, and I'm going

22  to try to adhere to that this morning.  With respect to the GUC

23  Trust and the reservation of rights that I filed, it was not

24  filed for all non-ISD personal injury claimants.  It was filed

25  for a very limited group represented by Mr. Hilliard.  That is

88

1 now a moot point.  It was not a GUC Trust asset pleading.  It
2 was a reservation of rights.

3          My understanding is Mr. Hilliard is not going forward
4 with representation of non-ISD pre-sale plaintiffs, so that the
5 reservation of rights, whatever it meant, and it still means
6 because I'm not going to un-reserve my rights, it was a
7 statement, rights are reserved, whatever that means, it may be
8 a moot point.

9          THE COURT:  Did you say may be a moot point
10 because --

11          MR. WEINTRAUB:  Because I --

12          THE COURT:  -- I've got a lot of work to do here.  If
13 there's something that's moot, I'm not going to reach out to
14 decide something I don't need to decide.

15          MR. WEINTRAUB:  I believe it's moot.  And
16 Mr. Hilliard is on the phone, and if it's not moot he'll
17 correct me, but I have spoken with him about this, and subject
18 to him telling me I misinterpreted what he told me, I believe
19 it's a moot point.
20 With respect --

21          MR. HILLIARD:  Your Honor, good morning.  This is Bob
22 Hilliard and I can speak to that issue briefly.

23          THE COURT:  Do you want to interrupt Mr. Weintraub
24 for it or do you want to wait until he's done?

25          MR. WEINTRAUB:  I would give Mr. Hilliard permission,

1  whenever he wants to interrupt me.

2          THE COURT:  All right.  Mr. Hilliard, why don't you

3  button it up now, please.

4          MR. HILLIARD:  Thank you, Judge.  I'll be brief.

5          Mr. Weintraub is correct in that the bellwether

6  complaints will only address and be tried based on the personal

7  injury and deaths and not on the economic loss.

8          MR. WEINTRAUB:  I was speaking about something --

9          THE COURT:  I thought you were --

10          MR. WEINTRAUB:  -- different than that.

11          THE COURT:  -- speaking about different -- yes.

12          MR. WEINTRAUB:  Yeah.

13          THE COURT:  All right.  I thought you were talking

14  about --

15          MR. WEINTRAUB:  I'm talking about the ability to

16  assert proofs of claim for pre-sale accident victims.

17          THE COURT:  Yeah, so --

18          MR. WEINTRAUB:  For non-ISD plaintiffs.

19          THE COURT:  For non-ignition switch guys, and this is

20  on proofs of claim for non-ignition switch people, which if I'm

21  not mistaken increases the ante, if you will, for Ms. Rubin and

22  Mr. Golden from 22 million cars' worth to 70 million cars'

23  worth.  That might get my attention if I were one of them.

24          MR. WEINTRAUB:  And just to be clear, Your Honor,

25  what we filed was only for the people listed on the exhibit to

90

1   our reservation of rights.  And Mr. Hilliard, my understanding

2   is he is no longer pursuing for those people on that exhibit

3   the ability to file a late proof of claim for the pre-sale

4   non-ISD plaintiffs on that list.

5           THE COURT:  Okay.  Now stand by, Mr. Weintraub.

6           Mr. Hilliard, did he properly understand your intent

7   and position or is there a breakdown in communication?  I'm not

8   of a mind to estop anybody.  I just want to know what's on the

9   table.

10          MR. HILLIARD:  He is right, Your Honor.

11          THE COURT:  Okay.  Now go ahead, Mr. Weintraub.

12          MR. WEINTRAUB:  So it's a moot point, so I won't

13  refute several of the misstatements that were made.  And I'll

14  stop and shut up, take my own advice.

15          Your Honor, with respect to briefing on the

16  punitives, I thought we were talking about simultaneous

17  briefing -- that's what Your Honor said earlier -- and then I

18  thought it may have morphed into opening brief and reply brief.

19  I would prefer simultaneous briefing.

20          Also, just as a point of clarification, if we are

21  doing the briefing in this court on the bellwether complaints,

22  I would assume that supersedes the 17 business day requirement

23  of responding to Mr. Steinberg's letter that was sent pursuant

24  to the terms of the judgment.

25          THE COURT:  Are you talking about on punitives or

1  something different?

2          MR. WEINTRAUB:  Punitives.

3          THE COURT:  I understand -- I had understood that it

4  would be a briefing schedule that I would set today, which

5  would inevitably trump 17 days.  Is that what you're saying?

6          MR. WEINTRAUB:  That's what I'm asking for

7  clarification on, Your Honor.  Yes.

8          THE COURT:  All right.  I'll clarify it by the time

9  we're done.  I think I have a tentative on that, but I'll let

10 Mr. Steinberg and Ms. Rubin be heard, too, although I don't

11 think she has a dog in the fight on punitives.

12         MR. WEINTRAUB:  And I'll stop there, Your Honor.

13         THE COURT:  Okay.

14         MR. WEINTRAUB:  Thank you.

15         THE COURT:  Mr. Weintraub -- forgive me,

16 Mr. Steinberg.  At this point I really know who each of you

17 guys are.

18         MR. STEINBERG:  Your Honor, I'd like to address

19 Mr. Weintraub's comments first, and then I'll go to

20 Mr. Weisfelner.  And I'll try to be brief.

21         On Footnote 4 on Page 3 of Mr. Weintraub's letter to

22 the Court, he writes:

23              "It is our understanding that only two of the

24              bellwether actions, the Norville and the Cochran

25              actions, seek economic loss damages.  We had been

1                  informed that counsel for the plaintiffs in these two
2                  bellwether actions will not pursue claims against New
3                  GM for economic loss damages and are willing to amend
4                  their complaints to limit the damage sought to
5                  compensatory and punitive damages stemming from the
6                  post-363 sale incidents at issue."
7              So in his own letter to Your Honor he said he was
8     going to amend the complaints because they had gone beyond what
9     they were supposed to do.  Our suggestion was --
10             THE COURT:  I -- pause, please, because I think we've
11    got a double entendre here which is causing the confusion.
12    You're saying that you understand Mr. Weintraub to be intending
13    to drop economic loss claims and to go strictly with the PI
14    type claim array.  And I think what Mr. Weintraub was saying
15    troubled him was asking him to amend, not vis-à-vis, that
16    aspect, but rather reliance on pre-sale old GM activity.  I'm
17    not sure if you and he disagree or not.
18             MR. WEISFELNER:  Well --
19             THE COURT:  I think I'd actually like you to pause
20    for a second, whisper to Mr. Weintraub whether the distinction
21    I'm making is the distinction, because if it's what I think
22    you're saying, you could agree in eight seconds and his needs
23    and concerns could be addressed and so could yours.
24             MR. STEINBERG:  Right.  Just to -- let me just say
25    what my position is and then ask Mr. Weintraub if they will

93

1  confirm it.  My position was you amend whatever you think

2  you're supposed to amend.  I will then submit a marked pleading

3  if I think you hadn't gone further.  But I'm not asking you to

4  do anything more than what you presently indicated you were

5  prepared to do in your letter to the Court.

6        MR. WEINTRAUB:  Your Honor, I think the way you

7  described it was exactly what I intended.  If we need to have

8  it deemed dropped, that's fine, economic damages.  If we need

9  to physically amend the complaint, I think that's a waste of

10 time, Your Honor, and I'd prefer not to do that.

11       THE COURT:  Either physically amend or give me a

12 statement now, if you're authorized to do it, that says your

13 client's complaint would be deemed amended to drop economic

14 loss, but to have reserved your existing allegations vis-à-vis

15 punitives.

16       MR. WEINTRAUB:  That's correct, Your Honor.  I adopt

17 what you just said.

18       THE COURT:  Is that enough to skin the cat,

19 Mr. Steinberg?

20       MR. STEINBERG:  Almost.  All I ask, Your Honor, is

21 not for him to go through formal amendments but to tell me the

22 paragraph numbers of the complaints that he is formally

23 withdrawing so that I know they're not something I have to deal

24 with.

25       THE COURT:  Can you guys prepare a stip or consent

94

1   order to do that so we don't have to do it on the fly with all

2   these people in the courtroom?

3          MR. WEINTRAUB:  We're talking about six complaints,

4   five of which are at least 120 pages each.  I think it would be

5   a waste of time, Your Honor.  What I've said stands.  None of

6   those plaintiffs are pursuing economic damages and the claim

7   for relief should be deemed withdrawn.  I don't want to put

8   everyone through --

9          THE COURT:  All right.  Mr. Steinberg, Mr. Weintraub

10  is as honorable as you are.  Both of you guys have long track

11  records in this court.  Isn't that -- can I rely on that?

12         MR. STEINBERG:  No.  No, Your Honor, because I don't

13  know what he's talking about.  I -- it's not --

14         THE COURT:  I can tell the difference between an

15  economic loss claim and a PI claim pretty easily.

16         MR. STEINBERG:  Well, in the -- in those cases is it

17  -- does -- is it the cause of action on the Consumer Protection

18  Statute?  Is that what you're dropping?  I just need -- it's

19  not that hard for him to say Paragraphs 12 through 32.  I'm not

20  even asking to the -- anything with the underlying facts.  All

21  I want to know is when he gets to the cause of action one, two,

22  three, and four, which ones are the ones that are -- remain.

23  That's all I'm asking for him to say.  That's easy to do.

24         MR. WEINTRAUB:  We can look at the causes of action

25  as opposed to the underlying factual allegations and point out

95

1  which ones are deemed withdrawn.

2         MR. STEINBERG:  That would be acceptable to us.

3         MR. WEINTRAUB:  I would just add, Your Honor, that we

4  don't believe that we went beyond whatever restrictions there

5  are --

6         THE COURT:  I'm not looking to assign blame.  What I

7  am looking for is to make this issue go away.  One way or

8  another I want you guys to make this issue go away.  You've got

9  too many substantive things to be arguing about, when you're on

10 the one yard line, to be arguing about this.  It's not a good

11 use of anybody's time.

12        MR. WEINTRAUB:  I agree, Your Honor.  We will do what

13 I just said we would do.

14        MR. STEINBERG:  All right.  The second thing is, Your

15 Honor, that in our letter to Your Honor we had indicated that

16 we believed that the briefing schedule you set on the punitive

17 damage issue, and broader than that, all the other issues, to

18 the extent that we have an outstanding demand letter which

19 includes the six bellwether complaints, that the 17 business

20 days would be overridden by the briefing schedule that Your

21 Honor set.

22        THE COURT:  Right.

23        MR. STEINBERG:  So we had made that suggestion in our

24 letter to you.

25        THE COURT:  Okay.

1          MR. STEINBERG:  So I think that's all I'm going to

2     say about what Mr. Weintraub had remarked.

3          I will say that with regard to Mr. Weisfelner's

4     remarks that vis-à-vis the GUC Trust asset pleading, we should

5     know before the end of the day are they withdrawing their GUC

6     Trust asset pleading or not.  Are they asking Your Honor to

7     decide it based on the papers, or has he now made the

8     concession that Your Honor's ruling applies to the non-ignition

9     switch plaintiffs as well as the ignition switch plaintiffs

10    with regard to the equitable mootness cause of action?  That's

11    pretty simple to decide, whether I've withdrawn it or I

12    haven't.  He's come close to the finish line, but he hasn't --

13         THE COURT:  Well, are we talking about a reservation

14    of rights or something different?

15         MR. STEINBERG:  People could reserve whatever rights

16    they want, but at the end of the day there's something --

17         THE COURT:  Well, Ms. Rubin made the point that there

18    was no GUC Trust asset pleading, or at least I understood that

19    to be her point, aside from the reservation of rights.

20         MS. RUBIN:  No.  Can I clarify, Your Honor, please?

21         THE COURT:  Yeah, but come to a mike so it gets

22    picked up in the recording transcript.

23         MS. RUBIN:  I think I can clarify this pretty easily,

24    if I could.  Mr. Steinberg?

25         There are two pleadings and I'm sure that

1  Mr. Steinberg and Mr. Davidson would agree with this.

2  Mr. Weisfelner, on behalf of his clients, he represents non-

3  ignition switch plaintiffs with economic loss claims, they

4  filed an omnibus brief at the end of which had a section called

5  GUC Trust asset pleading.  Separately, Mr. Weintraub filed a

6  reservation of rights on behalf of, as he has clarified,

7  certain non-ignition switch pre-sale accident plaintiffs.  It's

8  Mr. Weintraub who is now saying he is willing to either

9  withdraw or concede that it's moot.

10         Separately, I believe that what Mr. Steinberg is

11  saying is that Mr. Weisfelner has said we are probably correct

12  that the reasoning in Your Honor's April 1st decision, and the

13  judgment itself as entered by Your Honor on June 1st, that we

14  are probably correct that that reasoning should apply equally

15  to non-ignition switch plaintiffs of both varieties, but

16  probably he is saying that in connection with the economic loss

17  plaintiffs.

18         So there are two pleadings that we consider GUC Trust

19  asset pleadings.  I understand Mr. Weintraub to say one of them

20  is moot.  What Mr. Steinberg is asking is will Mr. Weisfelner

21  tell us once and for all whether he's willing to say the

22  rationale should apply equally and Your Honor can rule on that

23  and we can move on.

24         THE COURT:  All right.  Now I'm with you.

25         All right.  Back to you, Mr. Stein --

ACCESS TRANSCRIPTS, LLC       ⚖       1-855-USE-ACCESS (873-2223)

98

1          MR. STEINBERG:  I think he -- I think Ms. Rubin said

2   Mr. Weintraub when she meant Mr. Weisfelner there,

3   Mr. Weintraub's reservation of rights.  I agree with the

4   argument that -- I think we made the argument was non-

5   responsive to having to file an affirmative pleading.

6          But all I'm trying to say, Your Honor, on this

7   particular point is that there's something called the GUC Trust

8   asset pleading.  All sides in their letters to Your Honor have

9   said you could rule on the papers and there's no need for oral

10  argument.  But based on what transpired today, it may be that

11  there's nothing to rule on because they've withdrawn the

12  request.  Somewhere before the end of the day they should tell

13  you whether they've withdrawn the request, what it is that

14  they've withdrawn, and so that Your Honor will know what's left

15  to rule upon.  That's all I'm trying to say on that point.

16         THE COURT:  Okay.

17         MR. STEINBERG:  The other comments that I wanted to

18  address was Mr. Weisfelner trying to argue what a trial lawyer

19  might do in front of a jury and what Judge Furman may have

20  intended to say notwithstanding what the transcript says what

21  he intends to say.

22         So, Your Honor, we gave you the transcript.  I don't

23  want to burden the record necessarily by reading it.  On Page 8

24  out of 57, the judge, Judge Furman, gives three things that he

25  would like to have resolved, and those three things are

1  punitive damages, imputation, and the effect of Your Honor's

2  rulings on the pleadings that were filed in connection with the

3  bellwether.

4        So those are the things that I had said that we

5  should try to address in the next 30 days, work out a schedule,

6  get it to Your Honor to be able to do it.  I don't have to do

7  more than that about whether -- what Judge Furman thought he --

8  what Mr. Weisfelner hoped he had said about imputation or not.

9  We'll brief it.  Your Honor will then decide what you want to

10 do based on that, and that will give Judge Furman everything he

11 needs on the bellwether.

12       Everything else after which, which deals with the

13 economic loss plaintiffs and the appropriate schedule and the

14 level of the briefing, I obviously have a response.  I will be

15 somewhat if I try to do it now repetitive of what I had said

16 earlier.  I don't want to burden Your Honor since

17 Mr. Weisfelner has picked up on my suggestion that we should

18 try to do it on a consensual basis and give you some -- give

19 Your Honor something that we have.

20       So I'm prepared to rest on all of it, but not because

21 I'm reticent to engage in a toe-to-toe argument and to -- and

22 refute each of the points, only because I think when both sides

23 agree we can try to work it out to make it more presentable to

24 Your Honor, that's where we should put the period and move on.

25       THE COURT:  Okay.  Ms. Rubin, do you have other stuff

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1  beyond what you already said?

2          MS. RUBIN:  Just very briefly, Your Honor.

3          THE COURT:  Okay.

4          MS. RUBIN:  I'll try to make this the briefest

5  wagging of the tail ever.  Your Honor, I just want to clarify

6  we are going to go forward on September 22nd.  And that's a

7  hearing, as Your Honor knows, on whether Mr. Weisfelner's

8  clients are entitled to a stay of future distributions from the

9  GUC Trust.

10         THE COURT:  I understand that to be separate and

11 apart from the remainder of the issues.

12         MS. RUBIN:  I -- and that was going to be my point,

13 Your Honor.  It has nothing to do with the GUC Trust asset

14 pleading.  It has nothing to do with the accordion feature.

15 It's a day on which Mr. Weisfelner's clients are going to have

16 to show their entitlement to a stay by meeting criteria,

17 including the likelihood of success on the merits of their

18 appeal.

19         THE COURT:  I assume you guys are both going to be

20 making your usual objection to their arguments.  Maybe I'm

21 showing my age, the usual standards for a preliminary

22 injunction in the Second Circuit.

23         MS. RUBIN:  Yes, Your Honor.  And in addition to

24 that, we're going to have to talk about whether or not

25 Mr. Weisfelner's clients should post a bond, as our argument is

1  that they should.

2        Now, the only reason I raise this, Your Honor, is to

3  say to the extent that there's any connection at all between

4  some of the issues I've been discussing today and that hearing,

5  it was to say Mr. Weisfelner is seeking a stay of distributions

6  on behalf of a number of groups of people, the ignition switch

7  plaintiffs but also the non-ignition switch plaintiffs that he

8  represents with economic loss claims.  And my only point was to

9  say those folks aren't really before Your Honor.  They haven't

10 filed a claim.  There is not decision affecting them until Your

11 Honor rules on the GUC Trust asset pleading.

12       I was only meaning to suggest the bulk of the people

13 that are driving this motion for a stay of distributions, the

14 millions and millions of them that Your Honor was referring to,

15 those are non-ignition switch plaintiffs.  And so the time has

16 come to resolve whether or not the equitable mootness holding

17 should even apply to them before they ask Your Honor -- put the

18 cart before the horse and ask Your Honor to stay my client's

19 distributions and ones that affect the GUC Trust beneficiaries.

20       THE COURT:  Well, you're giving a preview of your

21 September 22nd arguments?

22       MS. RUBIN:  I'm not sure that I am, Your Honor.  My

23 September 22nd arguments I think are much more geared toward

24 the merits and why I think Mr. Weisfelner is going to lose on

25 his appeal.

1          THE COURT:  Again, but then what are you arguing now?

2          MS. RUBIN:  I'm only meaning to say that the two are

3    not connected other than those on which he has moved -- those

4    on whose behalf on which he has moved.  Those are people who

5    are affected by this GUC Trust asset pleading.  It's time to

6    resolve whether they are even affected by the judgment that

7    they are claiming they want a stay in support of.

8          THE COURT:  All right.

9          MS. RUBIN:  Thank you, Your Honor.

10          THE COURT:  Okay.  Sir, I'm sorry, I don't know you.

11          MR. PELLER: Gary Peller, Your Honor.

12          THE COURT:  Oh, Mr. Peller.  Yes, I do know you.

13          MR. PELLER: Gary Peller for the Bledsoe, Sesay and

14    Elliott plaintiffs.  Your Honor, my plaintiffs include a post-

15    sale personal injury plaintiff as far as ignition switch and

16    non-ignition switch economic loss plaintiffs.  They are -- none

17    of them are plaintiffs in the bellwether trials and so there's

18    no triage necessary for briefing on any of their issues.  But

19    they would like an opportunity, since they're not represented

20    by designated counsel, to submit papers and to respond to any

21    marked-up pleadings that GM might submit with respect to their

22    complaints.  They're not named in the second amended MDL

23    complaint.  Their complaints are separate.

24          THE COURT:  You can submit any papers you want.

25    Vis-à-vis the timing of the papers, they're going to have to be

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

1  timed vis-à-vis the issue of -- that is then before me.  If you

2  don't have a dog in the fight on punitives, then you can be

3  heard in the timetable dealing with the other stuff.  If you

4  have a dog in the fight on punitives, and I sense that you

5  might, then you'll meet the deadlines with the -- imposed upon

6  whoever has the most comparable interest, which I assume is

7  going to be Mr. Weisfelner and Mr. Weintraub.

8            MR. PELLER:  Yes.  And we're happy to join in --

9            THE COURT:  Okay.

10            MR. PELLER:  -- whatever deadlines are agreed to.

11            THE COURT:  Okay.

12            MR. PELLER:  Thank you, Your Honor.

13            THE COURT:  All right.  All right.  Has everybody had

14  a chance to speak their peace?  All right.

15            MR. CARNIE:  Your Honor, this is Kevin Carnie, I

16  represent the Bavlsik plaintiffs.

17            THE COURT:  Okay.  That's the name I had trouble

18  pronouncing.  Is it Bavlsik?

19            MR. CARNIE:  Yes, Your Honor.

20            THE COURT:  Yeah, go ahead.

21            MR. CARNIE:  I just had one procedural issue that I

22  think that you have addressed.  I just wanted to make sure you

23  had the notice of presentment that's been filed.  It was filed

24  last Friday.  I assume that in addition to the outstanding

25  demand letters that New GM has sent out, that your scheduling

1  order for the briefing on the punitives will also take

2  precedent over that notice of presentment.

3          THE COURT:  Okay.  Now, under the notice of

4  presentment, you would have been required to respond on what

5  date?

6          MR. CARNIE:  Well, Your Honor, that would require us

7  to respond this Friday.  And as a preliminary matter, I would

8  let you know that the initial letter was served on us on

9  August 21st.  We did not -- we were not given 17 business days

10  to respond.  That would have brought it to September 15th.

11  Instead on Friday this notice of presentment was filed.

12          THE COURT:  Well, there was a letter that was

13  attached to one of the documents that I saw that I gather you

14  wrote where you kind of telegraph to me the potential for

15  wanting to object to Mr. Steinberg's notice of presentment.

16          MR. CARNIE:  Yes.  We will, of course, be objecting

17  to the notice of presentment.

18          THE COURT:  All right.  I want you first and then

19  Mr. Steinberg to tell me your views as to whether you would

20  want -- it would be appropriate for your response on the

21  punitives to either supplement or be submitted at the same time

22  as Mr. Weintraub, Mr. Weisfelner, on their punitives and

23  whether that's agreeable to you, Mr. Steinberg.

24          MR. STEINBERG:  Do you want him to go first?

25          THE COURT:  Well, first, I'm sorry, I didn't get your

1  name other than the fact that I know you represent Bavlsik.

2          MR. CARNIE:  Oh, I'm sorry, Your Honor.  My name is

3  Kevin Carnie.

4          THE COURT:  Carney, C-A-R-N-E-Y?

5          MR. CARNIE:  N-I-E.

6          THE COURT:  N-I-E.  Okay, Mr. Carnie.  Is what you're

7  looking for the opportunity to put in your punitives response

8  at the same time as the other two guys?

9          MR. CARNIE:  Yes.  I was just making sure, Your

10 Honor, that everyone was in agreement that we would not be

11 responding by this Friday on the punitive damages issue.

12         THE COURT:  Uh-huh, okay.  Mr. Steinberg?

13         MR. STEINBERG:  Your Honor, I would say yes with a

14 caveat, which is that we have always suggested that Mr. Carnie,

15 if he wants to respond, would respond as the same time as

16 everyone else and Your Honor will tackle this at the same time.

17 There is a hearing in the Missouri court next -- this coming

18 Friday.  Mr. Carnie will have to give his position as to

19 whether he will oppose an adjournment of a trial to allow Your

20 Honor to rule on that or not.

21         If he's going to oppose the adjournment to allow Your

22 Honor to rule, that is fine.  He can file his substantive

23 response to the punitives with everybody else, but we will be

24 filing pleadings before Your Honor to stay the trial on the

25 merits to allow Your Honor to reach the rule -- the merits.

1              So my answer is the merits briefing should happen at

2    the same time, but I'm here telegraphing that if there's not

3    going to be an understanding to allow Your Honor's ruling to

4    apply to the Bavlsik case, we may be able -- we may be coming

5    to Your Honor to address the issue.

6              THE COURT:  Mr. Carnie, giving you the extra time and

7    the ability to run along with the other guys makes a lot of

8    sense, but Mr. Steinberg makes a pretty good point to me.  Are

9    you going to oppose him on the adjournment?

10             MR. CARNIE:  Yes, Your Honor.  We have what we

11   believe is a significant waiver issue in our case.  This issue

12   of punitive damages, this issue of the sale agreement, the sale

13   order was not raised as an affirmative defense in our case.  It

14   was not mentioned until August 21st, and we believe that's a

15   significant waiver issue, and on that basis we are opposing the

16   motion to continue the trial.

17             THE COURT:  Mr. Carnie, until and unless I give you

18   the relief from the punitives, you're in contempt of my earlier

19   orders.  Are you going to be -- you know, everybody else who's

20   been arguing before me has been up front on this and nobody's

21   trying to get cute.  If you insist on going forward without me

22   deciding the threshold issue of punitives, you're going to be,

23   A, in potential risk of getting TRO'd by me on the commencement

24   of that trial, and B, at potential risk of contempt.

25             Now, everybody else has gone by the rules.  And

1  forgive me, I'm getting a little angrier than I was earlier on,

2  although hopefully I'm not screaming, but your trying to have

3  it both ways really bugs me.  And do you really want to go that

4  route?

5          MR. CARNIE:  Your Honor, if I may respond?

6          THE COURT:  Of course.

7          MR. CARNIE:  Okay.  Number one, I do not believe that

8  we are violating your earlier ruling.  We were not given 17

9  days to respond and file a no dismissal pleading.  The notice

10 of presentment was filed way too soon and the procedures used

11 were not the procedures that Your Honor outlined in the

12 judgment.

13         THE COURT:  All right.  Here is my ruling on that.

14 You have the later of the time of the 17 days provided under

15 the order and the time that's been agreed upon by other

16 counsel.  And if you're going to go this way, we better set the

17 hearing on the TRO right now.

18         And then you can have the hearing on contempt,

19 Mr. Steinberg, either on the same day or thereafter.

20         And, Mr. Carnie, I would sincerely invite you to

21 consider whether you want to go along this route.  When people

22 work cooperatively I'm willing to listen to them for hours, as

23 I've been willing to do now today for I guess what's close to

24 four hours, in fact without a bathroom break for any of the

25 poor people in the courtroom.  But when you decide to play this

1  kind of hard ball, it's not the way we litigate in this court.

2  Think about that between now and the time of the TRO and/or

3  contempt hearings.

4          MR. CARNIE:  Your Honor, I would apologize.  It is

5  not my intention at all to play hard ball.  This is something

6  that we've been brought in at the last minute in our trial.

7  It's coming up in just a few days here.  We have been working

8  diligently to try to understand what is going on in the

9  Bankruptcy Court and what your rulings mean, and we are not

10 trying to disrupt anything.  We are not trying to play hard

11 ball.  We certainly -- we'd never do anything that violates

12 your order and we do not believe that we have done so.  If we

13 have, we will correct that and will apologize.

14         We were under the impression that we had 17 business

15 days to respond to the letter from General Motors, and I think

16 that is where the problem lies.

17         THE COURT:  All right.  Mr. Carnie, I would invite

18 you, not now but maybe after we're adjourned today, to call one

19 of the very skilled bankruptcy litigators who are representing

20 people who have interests similar to yours.  And I'm not

21 telling you what to do, but I'm telling you that I will hear an

22 application on a TRO if this thing isn't satisfactorily

23 resolved.  I'm not going to prejudice all of the other parties

24 in this case who have very serious needs and concerns to meet

25 your particular agenda time-wise.

1          MR. CARNIE:  Yes, Your Honor, we understand.  The one

2    issue I wish clarification on is whether as the gatekeeper your

3    function is to decide the waiver of this or not or whether that

4    is something that belongs in the federal district court here.

5          THE COURT:  The waiver argument can be made, but only

6    if you're otherwise allowed to proceed.

7          MR. CARNIE:  I'm sorry, Your Honor, I --

8          THE COURT:  And I'm not going to decide an issue of

9    that character in a status conference today.  All right.

10          MR. STEINBERG:  Your Honor?

11          THE COURT:  Yes, Mr. Steinberg.

12          MR. STEINBERG:  Just on that point.  When Your Honor

13    said "if you're allowed to proceed," I assume you meant proceed

14    by Your Honor, not by another Court?

15          THE COURT:  You bet your bippy.

16          MR. STEINBERG:  All right.  Thank you.

17          THE COURT:  All right.  We're going to take a ten

18    minute recess.  You all can go to the men's and ladies' rooms.

19    And then I'll come back to you with some thoughts.

20      (Recess taken at 12:36 p.m.)

21      (Proceedings resume at 12:55 p.m.)

22          THE COURT:  All right.  Ladies and gentleman, here's

23    what we're going to do.  We are going to be triaging the

24    matters as we all discussed, with particular focus on what

25    needs to be done on the bellwether trials.

1              And on the punitives issue, which I regard as most

2    important and most urgent, we're going to have simultaneous

3    opening briefs and simultaneous replies, but we're not going to

4    do it seriatim.  Openings for both sides are going to be due no

5    later than Sunday, September 13 at noon.

6              I note for those of you who don't have calendars that

7    a holiday begins that night, which is why I'm setting it for

8    noon that day.  The courtesy copies that are normally delivered

9    to chambers may be delivered the next day by non-religious

10   messengers.  Replies by each side will be due on noon, Tuesday,

11   September 22nd, for the same reason.  And once again delivery

12   to chambers can be done the next day.

13             Vis-à-vis anything anybody still wants to say about

14   imputation, we're going to do a slight variant of that.  I want

15   simultaneous openings and simultaneous replies, the replies to

16   be coming in on September 30.  I want you to meet and confer on

17   a stip or consent order for a mutually agreed upon date for the

18   openings.

19             On marked pleadings, on the bellwether cases that are

20   going to need to be tried first, I think if I heard you right,

21   Mr. Steinberg, I said you could have -- I think you said you

22   could have your marked pleadings completed by September 21st.

23   Did I hear you right?

24             MR. STEINBERG:  That's correct.

25             THE COURT:  Okay.  With the marked pleading, you can

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

1    give me, if you choose to, a three-page, single-spaced letter
2    filed on ECF explaining your reasons for your positions on your
3    marked pleadings.  The plaintiffs' side can give me a three-
4    page, single-spaced commentary one week thereafter.

5           I want, however, only one responsive commentary,
6    unless there's some showing of cause why one is insufficient.
7    I don't want to get 18 of them.  I don't want to get two of
8    them, unless there's something that reflects a material
9    difference in position.

10          The second amended consolidated complaint, though, I
11   don't understand to be a bellwether issue and to both justify
12   and require a slightly longer time.  I want you to meet and
13   confer on the mechanism for the marked pleading on the second
14   amended consolidated complaint, but I don't want it to trail
15   the marked pleadings by much later.  I'm thinking roughly a
16   week.  And on that the commentary by New GM can be five pages,
17   single spaced.  And the response, which I assume will come from
18   Mr. Weisfelner, can likewise be five pages, single spaced.  In
19   each case, single spaced.

20          On GUC Trust, upon review of my earlier opinion, I
21   think Ms. Rubin did accurately say what I -- what she said I
22   said on Page 9 of the formal judgment opinion, that it is time
23   to come to fully -- to come to closure.  It does appear that
24   the matter is fully submitted, and she also convinced me that
25   there was no need to -- or that it would be inappropriate to

1    delay on it.  However, I still don't know if this is an issue

2    or not.  So I'd like to know by the end of the day what, if

3    anything, is still going to have to be done on GUC Trust.

4    Maybe I can take this one off my plate.

5            Now, and not by the way of -- oh, lastly, Mr. Carnie,

6    your time frame will be as I described it before.  You can take

7    the later of 17 days or the time that your allies are going to

8    be submitting their punitive damages things in.  But I am not

9    ordering you, but I am strongly encouraging you, to talk to

10   those with like interests on punitives.  And let first

11   Mr. Steinberg and then my chambers know -- well, let all the

12   other parties because they're impacted, too, by your strategy,

13   and then my chambers as to whether I need to reserve time for a

14   TRO hearing on that.

15           All right.  Not by way of reargument, is there

16   anything I failed to address?  Mr. Steinberg?

17           MR. STEINBERG:  Yes, Your Honor.  On the briefing for

18   the size of the number of pages of briefing, you haven't

19   addressed that with regard to the punitive or the imputation.

20   And I know that our letter had suggested a 20-page limit on the

21   punitive, but -- and then I think 10 pages on the reply.  But

22   Your Honor may want to set different limits, but I'd just note

23   that that's a hole in the schedule which either Your Honor will

24   want to fill or not.

25           THE COURT:  Yeah.  No, that is a hole.  I didn't

1  address that.

2         Mr. Weintraub, you may be the point guy on this;

3  otherwise, Mr. Weisfelner, both of you.  Does 20 and 10 work

4  for you guys?

5         MR. WEINTRAUB:  I'd prefer 25 to open, Your Honor.

6  I'd be fine with 10 for the reply.

7         THE COURT:  All right.  You can have 25.  Anything

8  else?

9         MR. WEISFELNER:  Your Honor --

10         MR. STEINBERG:  Same thing for imputation, Your

11  Honor?

12         THE COURT:  Actually, imputation seems simpler than

13  punitives.  I'd like to stick with 20 and 10 on that.

14         MR. STEINBERG:  That's fine.

15         THE COURT:  Mr. Weisfelner?

16         MR. WEISFELNER:  Your Honor, while I don't represent

17  them, I didn't want there to be a hole in the schedule of the

18  states.  I presume that there could be a meet and confer with

19  regard to the states.  They're not on the same time frame as

20  the bellwether trials, but perhaps the parties can meet and

21  confer as to how long New GM should take on a commentary and

22  how many pages of commentary and response the Court needs.

23         THE COURT:  Yes, but I want it all done by

24  September 30.

25         MR. WEISFELNER:  Yes, sir.

114

1          THE COURT:  Mr. Weintraub?

2          MR. WEINTRAUB:  Just two housekeeping things, Your

3    Honor.  You didn't indicate -- or I might have missed it -- a

4    time for the marked pleading letters on the 21st and the 28th

5    of September.

6          THE COURT:  Marked pleadings on the bellwethers or

7    something --

8          MR. WEINTRAUB:  Yes, on the bellwether.  There are

9    three-page letters that you're looking for on the 22nd.

10         THE COURT:  I'm sorry.  I thought I said one week

11   thereafter.

12         MR. WEINTRAUB:  No, no --

13         MR. STEINBERG:  No, he's asking whether it's --

14         MR. WEINTRAUB:  -- no, what time --

15         MR. STEINBERG:  -- 5:00 p.m. or a different time or

16   before midnight.  That's what he's asking.

17         THE COURT:  If it doesn't run up on the night before

18   a holiday, you can have until the close of business.  For that

19   matter, you can have midnight if that's your idea of how you

20   like to spend your evenings.

21         MR. WEINTRAUB:  It's not, Your Honor.  Just one other

22   thing on the bellwethers and the three-page letter that the

23   plaintiffs would be doing.  I'm the attorney representing the

24   plaintiffs in all six of those cases.  And you mentioned

25   something about just one letter and sharing letters.  I'm not

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

1  sure who I might be sharing letters with on the bellwethers if

2  it's just me.

3          THE COURT:  Well, if you're the only guy then I think

4  the issue drops out.

5          MR. WEINTRAUB:  I think so.

6          THE COURT:  Am I correct in my assumption that,

7  especially if you're the guy, your position is going to be

8  pretty uniform across all of your clients?

9          MR. WEINTRAUB:  I think so, Your Honor.  Yes.

10          THE COURT:  Okay.

11          MR. STEINBERG:  Your Honor, while I don't disagree

12  with what Mr. Weintraub said, there are other state court

13  plaintiffs that are not in the MDL and therefore are not

14  bellwethers which have these types of issues.  I do think that

15  that will be a stare decisis collateral estoppel type issue

16  unless we pull them into the process.

17          THE COURT:  Well, I've got mixed feelings about that,

18  Mr. Steinberg, because on the one hand I don't want to go

19  through this over and over again.  I don't want me or my

20  successor to have to go through this over and over again.  But

21  on the other hand, the notion of getting all these people from

22  all over the country popping in and making the same arguments,

23  albeit perhaps not as well as Mr. Weintraub's going to do it,

24  bothers me.

25          So what's your thought?  To do it like we did the GUC

116

1  Trust thing, which is to have this go forward as a prototype

2  with other people having the ability to show why it should be

3  something beyond stare decisis, or I guess it's the other way

4  around.  It's going to be stare decisis, but giving the chance

5  to be heard before it's res judicata?

6         MR. WEINTRAUB:  Your Honor, I think -- if I could

7  just be heard.  What I'm talking about --

8         THE COURT:  If you're going to be heard for more than

9  one or two, take Mr. Steinberg's place at the main mike here.

10         MR. WEINTRAUB:  What I was referring to specifically

11  were the letters in response to the marked pleadings.  I'm the

12  only attorney with respect to those marked pleadings.  There

13  may be other people throughout the country that have a similar

14  issue, but those people are not involved with those specific

15  complaints.  And so we'd be responding to what is marked in

16  specific pleadings.

17         THE COURT:  I take your point.  Now, the concepts are

18  going to be the same, Mr. Weintraub.

19         MR. WEINTRAUB:  That's in --

20         THE COURT:  But the devil will be in the details, I

21  gather.

22         MR. WEINTRAUB:  But I think the concepts will be

23  addressed in briefing.  And I thought the Court said that

24  anyone who wants to be heard on the briefing can file their own

25  brief.

1          THE COURT:  And I told that to Mr. Peller, and it

2    would apply to the other guys, too.  Just see if you can talk

3    to them to see if they can minimize the duplication.

4          MR. WEINTRAUB:  I will, Your Honor.

5          THE COURT:  But I cannot and will not deny anybody

6    the right to file a brief.

7          MR. WEINTRAUB:  No, I understand, Your Honor.  I just

8    don't want to be constrained in a three-page letter if I'm

9    sharing it with 87 people.

10          THE COURT:  Oh, you're concerned about security of

11   circulating your draft or something?

12          MR. WEINTRAUB:  No, constrained in terms of space.

13   If I'm sharing three pages --

14          THE COURT:  I don't expect you to make 87 guys -- I

15   assume you're mainly going to be talking concepts with some

16   discussion of how it applies to your six guys.

17          MR. WEINTRAUB:  That's right, Your Honor, but I'd be

18   -- I presume I'd be responding specifically to what was marked

19   in the six specific pleadings.

20          THE COURT:  You don't have a duty to anybody other

21   than your own constituency.

22          MR. WEINTRAUB:  That's right, Your Honor.

23          THE COURT:  I understand that.  Okay.

24          Mr. Steinberg?

25          MR. STEINBERG:  Your Honor, I think that perhaps the

1   most efficient way is to deal with it as we dealt with it in

2   the GUC Trust asset pleading.  I would ask that we try to

3   capture that in a proposed order which would be the scheduling

4   order because I -- these people have gotten demand letters.  So

5   I'd like to be able to write them a note saying that you don't

6   have to respond in 17 business days, these issues are teed up

7   in the context of the bellwether cases and will be presented

8   there.

9        This is the briefing schedule and if you believe that

10  you're entitled to or would like to, you know, file a brief,

11  you should indicate so to the Court or something to that so

12  then Your Honor could then decide, but --

13       THE COURT:  What you said sounds sensible, and I'm

14  not sure if the people in the room would disagree with you.

15  What about due process for the people who aren't in the room in

16  terms of me endorsing your idea?

17       MR. STEINBERG:  I think, Your Honor, I will settle

18  the order on those people.  The goal is to draft an order today

19  which would be acceptable to the people in the room.  And I

20  guess, Your Honor, we can then ask Your Honor to sign it, and

21  if anybody has an issue with regard to that, we can give them a

22  short window to object to it as it pertains to them.  And then

23  Your Honor could see how many of them emerge from that process,

24  but they will have then had the due process to have a further

25  argument because they were not in the room right now.

119

1           THE COURT:  Anybody in this room object to that idea?

2    Okay.  That seems to make sense.  Did I not give you enough

3    time to respond?

4           MR. WEINTRAUB:  I'm sorry, Your Honor.  I didn't hear

5    the question.  I was asking --

6           THE COURT:  Mr. Steinberg was talking about working

7    out something consensual with the people in this room and then

8    settling it on the much larger universe.  And then giving them

9    also a couple of days to file something in case they don't like

10   what the procedures order says.

11          MR. WEINTRAUB:  I think that's fine, Your Honor.  I

12   thought we did work out that anyone who wanted to file their

13   own brief could.  And with respect to the marked pleadings and

14   the bellwethers, I don't have to share three pages with anybody

15   else.

16          THE COURT:  I think I did say that, but I didn't see

17   those as inconsistent.

18          MR. WEINTRAUB:  No, I don't --

19          THE COURT:  Don't be diplomatic.  If you think I am

20   inconsistent, tell me that.

21          MR. WEINTRAUB:  No.  I said I thought we agreed to

22   that.  I'm not sure what else I'm supposed to agree with --

23          MR. STEINBERG:  Well, let me see --

24          THE COURT:  Well, I think the main problem is

25   Mr. Steinberg thinks that if he puts in -- or I'm guessing you

120

 1  think that if you put in something else, then maybe three other

 2  people don't have to file them even though they have the right

 3  to do that.

 4        MR. STEINBERG:  Right.  I think they need to know --

 5  they need to have a deadline upon which they indicate to Your

 6  Honor that they'd want to participate in their own pleading and

 7  to deal with it.  And we'll see what those notices are and how

 8  many them are -- there are.  And then we could have a -- maybe

 9  a telephonic conference so that Your Honor could regulate the

10  flow of papers and still conform with your process.  The whole

11  goal is to include those who aren't in the room, to give them a

12  chance to agree to what the people in the room have agreed to

13  vis-à-vis the bellwether complaints.

14        THE COURT:  I think we left it that you were going to

15  put your form of order past the other guys anyway.

16        MR. STEINBERG:  That's correct.

17        THE COURT:  See if you can work out these details on

18  a consensual basis, at least amongst you guys.

19        MR. STEINBERG:  Thank you.

20        MR. WEINTRAUB:  That's fine, Your Honor.

21        MR. WEISFELNER:  Your Honor, I apologize.  I thought

22  I was unconfused until I just heard the last dialogue between

23  the parties.  Your Honor's request with regard to the punitive

24  damage issue for briefs and replies, I thought I understood and

25  I thought that they were inclusive of our issues, even though

1  we're not bellwether, and now I'm a little bit confused.  I

2  thought Your Honor wanted to triage and deal with bellwether

3  first.  Do you really need to hear from us on the punitive

4  damage issue?  And for that matter, do you need to hear from

5  everyone who's not a bellwether participant on the issue of

6  punitive damages at the same time?

7       THE COURT:  Well, I don't want to decide the issue a

8  second -- have to decide the issue a second time.  If you have

9  something different to say than Mr. Weintraub, I think you

10 should pile on when he does his.

11      MR. WEISFELNER:  Okay.

12      THE COURT:  And I'm not sure if the concepts are

13 going to be different or not, but I definitely don't want to

14 decide punitives a second time.

15      MR. WEISFELNER:  Yes.

16      THE COURT:  Okay.

17      MR. WEISFELNER:  The only -- that's fine.  I

18 understand.

19      THE COURT:  Okay.  Anything else?  Okay.  We're

20 adjourned.  Thank you.

21      MR. WEISFELNER:  Thank you.

22      (Proceedings concluded at 1:13 p.m.)

23                        *  *  *  *  *

24

122

1                      **C E R T I F I C A T I O N**

2

3           I, Lisa Luciano, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter, and to the best of my ability.

7

8

9    _____

10   LISA LUCIANO, AAERT NO. 327       DATE:   September 1, 2015

11   ACCESS TRANSCRIPTS, LLC

12

13

14

15                     **C E R T I F I C A T I O N**

16

17          I, Ilene Watson, court-approved transcriber, hereby

18   certify that the foregoing is a correct transcript from the

19   official electronic sound recording of the proceedings in the

20   above-entitled matter, and to the best of my ability.

21

22

23   _____

24   ILENE WATSON, AAERT NO. 447       DATE:   September 1, 2015

25   ACCESS TRANSCRIPTS, LLC


ACCESS TRANSCRIPTS, LLC              1-855-USE-ACCESS (873-2223)