**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
: 
In re :
: **Chapter 11 Case No.**
: 
**MOTORS LIQUIDATION COMPANY,** *et al.*, :
f/k/a General Motors Corp., *et al.* : **09-50026 (REG)**
: 
: **(Jointly Administered)**
Debtors. :
: 
---------------------------------------------------------------x

### DECLARATION OF ANDREW SCRUTON IN SUPPORT OF THE GUC TRUST ADMINISTRATOR AND TRUSTEE'S OPPOSITION TO THE PLAINTIFFS' STAY REQUEST PENDING THE THRESHOLD ISSUES APPEAL

I, Andrew Scruton, declare as follows:

1.  I am a Senior Managing Director of FTI Consulting, Inc. ("**FTI**"), at which I specialize in Corporate Finance and Restructuring. I have held that position for approximately nine years. Before joining FTI, I was a founding Managing Director of Giuliani Capital Advisors and a Managing Director at Ernst & Young. I hold an M.A. in Mathematics and Management Studies from Cambridge University in England, and I am a Chartered Accountant.

2.  I have had extensive experience with restructuring and reorganization matters. During my twenty-plus years in the restructuring and reorganization sectors, I have worked on a broad range of restructuring and reorganization matters for companies, creditor committees, ad hoc groups and liquidating trusts both in the United States and Europe. Attached as Exhibit A hereto is a true and correct copy of my current CV, which details the dozens of restructurings and reorganizations in which I have been involved. I also have significant experience in acting as a fiduciary or advisor to a fiduciary in connection with liquidations or bankrupt estates. During my career in the U.K., I qualified as a Licensed Insolvency Practitioner and acted in that capacity in numerous situations. Since moving to the U.S. in 1996, I have served as a financial

advisor to liquidating trusts and liquidating trustees in the U.S., including in the following cases: Capital Bancorp, Advanta Corp, TerreStar, Fabrikant and Bermuda Fire & Marine.

3. I submit this declaration (the "**Declaration**") on behalf of Motors Liquidation Company GUC Trust (the "**GUC Trust**") in support of the GUC Trust Administrator and Trustee's opposition to *The Ignition Switch Plaintiffs' and Certain Non-Ignition Switch Plaintiffs' Request for a Stay of Distributions of GUC Trust Assets*, dated June 24, 2015 (the "**Plaintiffs' Stay Request**"). I have reviewed the Plaintiffs' Stay Request and the *Omnibus Reply of Wilmington Trust Company, as GUC Trust Administrator and Trustee, to Responses Received in Respect of the GUC Trust Administrator's Motion for an Order Granting Authority (a) to Exercise New GM Warrants and Liquidate New GM Common Stock and (b) to Make Corresponding Amendments to the GUC Trust Agreement*, dated June 26, 2015. I am also familiar with the parties' *Stipulations of Fact Regarding Request for Stay*, as filed with the Court today (the "**Stipulated Facts**").

4. All matters set forth herein are based upon: (a) my personal knowledge, (b) my review of relevant documents, (c) information supplied to me by counsel for the GUC Trust, including, but not limited to, the Stipulated Facts, (d) analysis prepared by FTI in support of this Declaration, or (e) as to matters of United States bankruptcy law or rules or the projected duration of the Threshold Issues Appeal, my reliance on GUC Trust Counsel.[1]

5. FTI currently serves as the court-approved Monitor of the GUC Trust (the "**GUC Trust Monitor**"). Prior to the formation of the GUC Trust, FTI served as the financial advisor to the Official Committee of Unsecured Creditors of General Motors Corporation. I have not been involved in FTI's provision of services in connection with these roles other than in connection with the work performed in connection with the preparation of this Declaration.

---

[1] Capitalized terms used and not otherwise defined shall have the meaning ascribed to them in the Stipulated Facts.

2

6. I have been asked by GUC Trust Counsel to consider two related issues that I understand are relevant to the Court's determination of Plaintiffs' Stay Request: (i) the likely harm to holders of GUC Trust Units (the "**Unitholders**") if Plaintiffs' Stay Request is granted and (ii) the amount of a supersedeas bond that would be necessary to protect Unitholders in that circumstance. I have been advised by GUC Trust Counsel that the purpose of a bond is to provide protection against the maximum potential harm that Unitholders could incur as a result of the imposition of a stay pending the Threshold Issues Appeal. As detailed herein, it is my opinion that although the actual harm to Unitholders from the imposition of a twelve-month stay could be significantly greater, a conservative estimate of the maximum potential harm is $18.4 million. Therefore, in the event that a stay is granted, I conclude that Plaintiffs would need to post a supersedeas bond in at least the amount of $18.4 million.

*Understandings and Assumptions*

7. The analysis and conclusions set forth in this Declaration are based on my understanding of several facts and assumptions that I have been asked to make by GUC Trust Counsel.

8. I understand that the GUC Trust is limited in its investment choices under the terms of the GUC Trust Agreement and may only invest cash in Permitted Investments, as described in the GUC Trust Agreement and the Stipulated Facts. I further understand that since liquidating its GM securities holdings in July and August 2015 through the Stock Sale, the GUC Trust has invested the proceeds of that sale in a mix of short-term (*e.g.*, 3-month and 6-month) U.S. Treasuries. In the event a stay is imposed pending appeal, I have been instructed to assume that (i) the GUC Trust would continue to invest in a mix of short-term U.S. Treasuries and (ii) that the projected rate of return on those investments between the Stock Sale and year's end is approximately 0.12%.

3

9. I also understand that absent a stay, and in the ordinary course of its business, the GUC Trust would distribute $135 million to Unitholders in mid-November 2015 and another $109 million in November 2016. I understand that the GUC Trust could seek IRS permission to shorten its taxable year, and as a result, it is possible that the second of these distributions could be made at an earlier juncture. However, my analysis conservatively assumes that the second distribution will not be made prior to November 2016.

10. Based on information provided by GUC Trust Counsel, I assume that any stay would be imposed for approximately twelve months. Specifically, I have reviewed statistics collected by the Administrative Office for the United States Courts for the year ending March 31, 2015 that demonstrate that the median time in the Second Circuit Court of Appeals between the filing of a notice on appeal and a final decision on the merits is 10 months. GUC Trust Counsel has represented to me that civil appeals historically take longer than criminal appeals. Given that the median time to decision data covers all appeals, civil and criminal, and that there are multiple parties involved in the Threshold Issues Appeal, I assume a twelve-month stay period. However, I also understand from GUC Trust Counsel that the parties have been directed by the district court judge overseeing related claims against New GM to seek expedited treatment of the Threshold Issues Appeal. Therefore, at the GUC Trust Counsel's request, I have also provided sensitivity analyses demonstrating the likely and potential harm to Unitholders for a stay ranging in duration from 6 to 18 months.

11. I understand that the Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs have asserted that any harm to Unitholders from the imposition of a stay would be minimal, and that those Plaintiffs may even suggest that there would be *no* harm, because they believe certain Unitholders have received negative returns on their recent investments. I believe that this assertion fails to appropriately consider the potential harm that would arise from a stay. Based on my experience, the harm to Unitholders from any stay should be

4

measured by comparing the GUC Trust's projected returns on the Permitted Investments in which it expects to hold its cash (*e.g.*, a mix of short-term U.S. Treasuries) against the rate of return that Unitholders could reasonably earn if they were able to invest the anticipated GUC Trust distributions at their discretion during the life of any stay. A reliable estimate of the rate of return, moreover, should be calculated based on a robust universe of data respecting the potential return that Unitholders could reasonably obtain. The difference between such a rate of return and the GUC Trust's projected returns reflects Unitholders' lost opportunity costs, and I use the phrase "lost opportunity costs" throughout this Declaration and the exhibits thereto to mean the harm to Unitholders associated with the imposition of a stay pending appeal.

12. Any analysis of Unitholders' lost opportunity costs involves myriad variables. Those variables include, for instance, any number of potential investment strategies that the Unitholders could pursue, and most significantly, the difficulty of accurately predicting market performance on a going-forward basis. Given these issues, it is my opinion that no amount of bond could provide 100% guaranteed protection for Unitholders in the event that a stay is granted. However, as set forth herein and in the attached Exhibits B through F, one certainly can make reasonable assumptions to calculate a rate of return for Unitholders that approximates their lost opportunity costs associated with a stay (the "**Protection Return Rate**") and to estimate the size of a supersedeas bond that would be necessary to ensure that Unitholders are fully protected from the potential harm to them that would result from a stay.

*<u>Approach and Calculation Methodology</u>*

13. In calculating the Protection Return Rate, as reflected in Exhibits B, D and E, I have looked to indicators of the market's past performance. Although past performance does not guarantee future performance, it can be indicative and predictive of future investment

5

performance, especially when multiple data sets spanning across the same time period intervals can be reviewed and compared. In particular, based on statistical principles and my experience in the investment community, it is my view that the most reasonable way to estimate future market performance for the assumed twelve-month stay period involves looking at annual rates of return for appropriate indices across several years and preferably at least ten years. This approach allows for the consideration of quantities of data that are more statistically significant and, with the removal of outlier years, provide a representative sample to use in building a picture of what may lie ahead.

14. Conversely, the performance of markets over the very recent past (*e.g.*, three months or six months) is not a reliable predictor of future performance in my opinion. Even over a long period of time, for the majority of asset classes, historical return rates show significant volatility as evidenced by the standard deviation in ten-year performance data. This volatility is magnified in performance periods of less than one year, where results are subject to even greater volatility and can be skewed by short-term events and public announcements that can create wild swings in the market as a whole.

15. In addition to considering ten years of annualized returns for certain indices, as further discussed below, my approach to calculating the Protection Return Rate relies on certain assumptions about the population of Unitholders. I understand that the Participating Unitholders, which are event-driven, multi-strategy hedge funds, have represented to the Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs that they hold approximately 47 percent of GUC Trust Units. I have been advised, however, that the GUC Trust is not permitted to track trading in GUC Trust Units and does not have information available to it with respect to the remaining Unitholders' identities. Therefore, the GUC Trust does not know the identity of the holders of the remaining 53 percent of GUC Trust Units, much less know their risk/return profiles.

6

16. For the purpose of this analysis, I assume that at least approximately 47 percent of GUC Trust Units are held by event-driven, multi-strategy hedge funds, using the Credit Suisse Event-Driven Multi-Strategy Hedge Fund Index as a reasonable proxy for their investment returns, and that the remaining 53 percent of Unitholders are divided into three groups of equal numbers with different risk/return profiles and who have invested solely in either large cap equities, investment grade fixed income securities, and money market funds. I then selected the returns of the following indices as representative of those asset classes: S&P 500 Index (Large Cap Equity), Bank of America Merrill Lynch U.S. High Grade Master Index (High Grade Fixed Income), and 10-Year U.S. Treasury Bonds (Money Market). These assumptions are reflected in "Scenario 2," as it appears in Exhibits B and D.

17. Although I understand that approximately 47 percent of GUC Trust Units are held by the Participating Unitholders, I believe that the universe of Unitholders likely consists of many other hedge funds. Indeed, based on my experience in the restructuring and reorganization sector, I understand that investments like the GUC Trust Units are typically purchased by event-driven, multi-strategy hedge funds and other similar investors. To the extent that more than fifty percent of Unitholders are hedge funds or invest primarily in other, similar high-risk/high reward investments, the Protection Return Rate derived through my analysis—and my calculation of lost opportunity costs in the event of a stay—is conservative. Given the historical rates of return for hedge funds over the last ten years, increasing the percentage of hedge funds among the Unitholders would only increase my calculation of the lost opportunity costs for all Unitholders.

18. In order to estimate the Protection Return Rate, I did calculations for each of the indices I selected to estimate potential returns that would be sufficient to protect the Unitholders in the event of a stay pending the Threshold Issues Appeal. Specifically, I ranked the last ten years of annual investment returns for each asset class (as indicated by the

7

applicable index) from best to worst, and calculated the Protection Return Rate based on a weighted average of the third-best year for each asset class (disregarding the best and second-best annual performance returns as potential outliers). The indicated returns from the third-best years are within one standard deviation from the mean or average return over the 10-year period for each index. As a result, this methodology results in a conservative estimate of the lost opportunity costs.

### *Lost Opportunity Costs From Delays in GUC Trust Distributions*

19. Based upon my analysis, the lost opportunity costs for the Unitholders from a stay of GUC Trust distributions pending the Threshold Issues Appeal would be significant. For example, as reflected in Exhibit B, if a stay were granted for twelve months, then Unitholders would potentially suffer lost returns of at least $18.4 million, based upon a Protection Return Rate of 12.96%, a reasonable—but conservative—estimation of the potential harm that the Unitholders would suffer as a result of the stay. To arrive at my $18.4 million estimate of the lost opportunity costs, I multiplied the Protection Return Rate by the $135 million anticipated November 2015 Distribution and then subtracted from that calculation the Trust's expected returns on its investments in short-term U.S. Treasuries for a twelve-month period. Those calculations reflect that the Unitholders would earn $18.6 million if permitted to reinvest the $135 million in anticipated distributions without any restrictions as compared with the $0.2 million that the Trust is projected to earn.

20. In addition to the analysis that led to my calculation of the Protection Return Rate and the estimated lost opportunity costs to Unitholders of $18.4 million, I considered alternative scenarios that rely upon different assumptions about the population of Unitholders and their investment strategies (*e.g.*, the investments of Unitholders equally divided among the four asset classes and the investments of Unitholders concentrated 60 percent in hedge funds

8

versus 13 percent in each of the three remaining asset classes). I also considered an alternative methodology that calculates the estimated rate of return based upon a ten-year adjusted mean of each index on which I rely, excluding the highest and lowest years for each index (the "Trimmed Mean Approach"). Exhibits C and D reflect these alternative considerations. The rates of return obtained from both the alternative assumptions about the population of Unitholders and the application of the Trimmed Mean Approach reflect more conservative rate of returns than the Protection Return Rate. In my opinion, the rates of return yielded from these analyses do not fully capture the potential harm that Unitholders would suffer as the result of a stay pending appeal.

21.     Exhibits E and F also reflect sensitivity analyses requested by GUC Trust Counsel, showing how the calculation of lost opportunity costs would change if the stay were granted for periods ranging between 6 and 18 months and under different return rate assumptions. Although I have been advised that an expedited appeal is possible, I also understand that another appeal to the Second Circuit during the course of the General Motors bankruptcy matter lasted approximately 18 months, excluding the time spent certifying a question to the Delaware Supreme Court and obtaining its response.

22.     As stated above, I understand that the Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs may seek to rely on short-term returns from certain high-yield bond indices to attempt to demonstrate that the Unitholders would not suffer any harm as a result of the stay. I do not believe *any* short-term returns reflect a reasonable approach to estimating Unitholders' lost opportunity costs from the imposition of a stay pending appeal for the reasons outlined above. I have, however, applied the methodology I adopted in calculating the Protection Return Rate using one high-yield bond index favored by the Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs and the only index on which they intend to rely for which ten years of historical data is available: the Bank of America Merrill Lynch U.S. High

9

Yield Master II Index. This analysis produces a return rate of approximately 15%, representing the third-highest annual return in the last 10 years, and the lost opportunity costs, or potential harm to Unitholders, from a twelve-month stay would be $21.8 million. Additionally, even the yield to worst—a forward-looking metric that represents the lowest yield that a bondholder could achieve, accounting for prepayment risks but excluding potential defaults—for that index results in a calculation of the harm to Unitholders from a twelve-month stay of $9.8 million.

23. I reserve the right to amend and/or supplement this Declaration based on any additional information as it becomes known to me.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of September, 2015 at New York, New York.

_____
Andrew Scruton