**Reply Deadline:  September 30, 2015**

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:    (212) 556-2100
Facsimile:    (212) 556-2222
Arthur Steinberg
Scott Davidson

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Richard C. Godfrey, P.C. (admitted *pro hac vice*)
Andrew B. Bloomer, P.C. (admitted *pro hac vice*)

*Attorneys for General Motors LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re                                                    :        Chapter 11
                                                         :
MOTORS LIQUIDATION COMPANY, *et al.*,                    :        Case No.:  09-50026 (REG)
        f/k/a General Motors Corp., *et al.*             :
                                                         :
                            Debtors.                     :        (Jointly Administered)
                                                         :
------------------------------------------------------------x

**OPENING BRIEF BY GENERAL MOTORS LLC WITH RESPECT
TO WHETHER PLAINTIFFS CAN AUTOMATICALLY IMPUTE TO
NEW GM KNOWLEDGE OF THE EVENTS THAT TOOK PLACE AT
OLD GM AND/OR AS REFLECTED IN OLD GM'S BOOKS AND RECORDS**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ......................................................................................................1

RELEVANT BACKGROUND .......................................................................................................4

    A.  The Sale Agreement and Assumed Liabilities....................................................................4

    B.  The Sale Order, and Claims Based on Old GM Conduct ...................................................6

    C.  The Motions to Enforce, and the Bankruptcy Court's Decision and Judgment..........8

    D.  The Bellwether Cases in MDL 2543 ..................................................................................8

    E.  The MDL Complaint, the States Actions, and Complaints in Other Lawsuits..........10

ARGUMENT..................................................................................................................................11

    PLAINTIFFS CANNOT ASSERT RETAINED LIABILITIES AGAINST NEW GM
    UNDER THE GUISE OF IMPUTATION .......................................................................11

    A.  Plaintiffs Cannot Impute Knowledge of Events That Took Place At Old GM
        or Information in Old GM's Books And Records To Support Claims that are
        Otherwise Retained Liabilities .......................................................................................12

    B.  The Imputation Issue and Specific Claims in Complaints ...........................................15

        1.  Consumer Protection Statutes .................................................................................16

        2.  Breach of the Recall Covenant.................................................................................17

        3.  Fraud-Based Claims .................................................................................................18

    C.  The Court's Bledsoe Decision Did Not Decide the Imputation Issue..........................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ayres v. GMC*,
234 F.3d 514 (11th Cir. 2000) .................................................................................18

*Burton v. Chrysler Group (In re Old Carco LLC)*,
492 B.R. 392 (Bankr. S.D.N.Y. 2013).........................................................3, 14, 15

*Chamberlain Group, Inc. v.. Nassimi*,
2010 WL 1875923 (W.D. Wash. 2010)...................................................................13

*Conmar Prods. Corp. v. Universal Studio Fastener Co.*,
172 F.2d 150 (2d Cir. 1949).....................................................................................13

*Forest Labs., Inc. v. The Pillsbury Co.*,
452 F.2d 621 (7th Cir. 1971) ...................................................................................13

*Handy v. Gen. Motors Corp.*,
518 F.2d 786 (9th Cir. 1975) (*per curiam*) .............................................................18

*Interstate Power Co. v. Kansas City Power & Light Co.*,
909 F. Supp. 1241 (N.D. Iowa 1993).......................................................................13

*In re Motors Liquidation Co.*,
529 B.R. 510 (Bankr. S.D.N.Y. 2015)..........................................4, 8, 13, 14, 15, 19

*In re Motors Liquidation Co.*,
531 B.R. 354 (Bankr. S.D.N.Y. 2015).........................................................4, 11, 16

*In re Motors Liquidation Co.*,
533 B.R. 46 (Bankr. S.D.N.Y. 2015) .........................................................................4

*Smith v. LG Elecs. U.S.A., Inc.*,
2014 U.S. Dist. LEXIS 31577 (N.D. Cal. 2014) ....................................................16

*Trusky v. Gen. Motors LLC (In re Motors Liquidation Co.)*,
Adv. Proc. No. 12-09803, 2013 WL 620281 (Bankr. S.D.N.Y. Feb. 19, 2013)..................6, 11

*Weisfelner v. Fund 1* (*In re Lyondell Chem. Co.*),
503 B.R. 348 (Bankr. S.D.N.Y. 2014) (Gerber, J.).................................................13

*Wilson v. Hewlett-Packard Co.*,
668 F.3d 1136 (9th Cir. 2012) .................................................................................16

**Statutes**

Cal. Bus. & Prof. Code § 17200 ...............................................................................................16

National Traffic and Motor Vehicle Safety Act, 49 U.S.C. § 30101, *et seq.* ...............................18

This opening brief demonstrates that plaintiffs in lawsuits filed against General Motors LLC ("**New GM**") cannot automatically impute to New GM (i) knowledge of events that took place at Motors Liquidation Co. (f/k/a General Motors Corporation) ("**Old GM**"), and/or (ii) information reflected in Old GM's books and records that were transferred to New GM as part of the 363 Sale ("**Imputation Issue**").  To allow them to do so automatically, on a wholesale basis, and without any analysis of the specific knowledge at issue, or the specific claims impacted, would eviscerate the "free and clear" provisions of the 363 Sale.

## PRELIMINARY STATEMENT

Plaintiffs argue New GM was aware of everything Old GM did as of New GM's inception, and that knowledge should automatically be imputed to New GM.  In the personal injury Bellwether Complaints, the economic loss Second Amended Consolidated Complaint ("**MDL Complaint**") and the States Actions complaints, plaintiffs essentially assert hundreds of Old GM conduct allegations, copied and pasted verbatim from the Pre-Sale Consolidated Complaint that this Court held is barred by the Sale Order, and assert them as support for their purported Independent Claims relating to Old GM and New GM vehicles.  Plaintiffs transparent technique is to transpose hundreds of Old GM conduct allegations, by preceding them with the catchall, "New GM knew that Old GM . . . ."  There is no attempt to specify which Old GM employees' knowledge should be imputed to New GM, or how it is relevant to any specific claim.[1]

Thus, Plaintiffs attempt to assert:

(a)     Retained Liabilities for Old GM vehicles as to which New GM has no responsibility; and

---

[1]   The Decision held that only Ignition Switch Plaintiffs can assert Independent Claims that would otherwise be barred by the Sale Order.  Lumping all plaintiffs together blurs the limited modification to the Sale Order made by the Court in the Decision.

(b)     claims relating to New GM vehicles based on Old GM conduct.

In both situations, plaintiffs actions are contrary to the Court's recent rulings and would nullify the "free and clear" aspects of the 363 Sale.

With respect to Old GM vehicles, plaintiffs' imputation argument for non-assumed Product Liability Claims is premised on the assertion of Independent Claims—not Assumed Liabilities or Retained Liabilities.  Tellingly, plaintiffs believe it is necessary to rely on Old GM conduct to allege "Independent Claims" which are supposed to be based on "independent" New GM conduct.  In fact, plaintiffs' Independent Claims are Retained Liabilities, and the Sale Order is clear that New GM did not have ongoing obligations with respect to such Liabilities.  Thus, the Imputation Issue has no relevance for such meritless claims.

By way of illustration, New GM did not assume liabilities for misrepresentations made by Old GM in connection with vehicles sold by Old GM.[2]  Those were Retained Liabilities, and New GM bought Old GM's assets free and clear of such Liabilities.  New GM also was not responsible for Old GM's conduct relating to Retained Liabilities, nor was it liable for successor liability claims for Retained Liabilities.  Plaintiffs' so-called Independent Claims against New GM relating to the sale of Old GM vehicles, such as post-sale failure to warn, failure to recall, concealing a defect, or violations of state law consumer protection statutes, are all Retained Liabilities.  Plaintiffs effectively concede this fact in their formulation of the Imputation Issue. By arguing the relevance of the Old GM employees' knowledge, and the need to impute such knowledge as of the 363 Sale to establish their Independent Claims, plaintiffs have admitted that Old GM is liable for such Claims. That makes their Independent Claims also Retained Liabilities.  New GM cannot be simultaneously liable with Old GM for Retained Liabilities.  The

---

2    *See* Sale Order, ¶ 56; Sale Agreement, § 2.3(b)(xvi).

2

purpose of obtaining a "free and clear" Sale Order was to have a bright line demarcation that New GM would *not* be liable or have any ongoing obligations for Retained Liabilities. The provision in the Sale Agreement that state New GM would not be liable *to third parties* for claims based on contract, tort or otherwise, was specifically drafted to exclude what plaintiffs are trying to do here.

The Sale Agreement contemplated that New GM would hire most of Old GM's employees. That was an important benefit of the 363 Sale—saving jobs during the country's economic crisis.  The hiring of Old GM employees, however, did not change the fundamental structure of the "free and clear" 363 Sale. Claims for Old GM vehicles based on "implied obligation under statutory or common law" and successor liability, remained with Old GM.

Judge Bernstein's *Burton* Case is on point.[3]  There, the Bankruptcy Court rejected a "duty to warn" claim in an economic loss case for Old Chrysler vehicles, holding that the claim was a "successor liability claim dressed up to look like something else." New Chrysler's obligation (like New GM's) to comply with the Safety Act for Old Chrysler cars did not impose on New Chrysler a separate obligation to the vehicle owner. Importantly, the pre-sale knowledge of Old Chrysler's employees that went to work for New Chrysler about the defect in the Old Chrysler vehicles did not change this result.  Plaintiffs' purported Independent Claims, like in *Burton*, are dressed-up successor liability claims.  The Imputation Issue raised by plaintiffs should be viewed in the same manner as *Burton*.

The analysis with regard to claims arising for New GM vehicles is even clearer.  As this Court already held, "[c]laims premised in any way on Old GM conduct are properly proscribed under the Sale Agreement and the Sale Order, and by reason of the Court's other rulings, the

---

[3]   *Burton v. Chrysler Group (In re Old Carco LLC)*, 492 B.R. 392 (Bankr. S.D.N.Y. 2013) ("***Burton***").

prohibitions against the assertion of such claims stand." *In re Motors Liquidation Co.*, 529 B.R.

510, 528 (Bankr. S.D.N.Y. 2015); *see also* Judgment ¶ 9.[4]  So too, in its May 27, 2015 Decision

re Form of Judgment, the Court rejected an identical attempt in the States Actions to plead

wholesale the conduct of Old GM:

> On their face, the State Plaintiffs, like many Ignition Switch Plaintiffs, intermix claims involving pre- and post-sale conduct. The California complaint includes at least 18 paragraphs alleging events that took place prior to the 363 Sale, and the Arizona complaint includes at least 60 paragraphs alleging pre-363 Sale conduct. ***Reliance on allegations of that character was expressly prohibited under the Court's decision***.

*In re Motors Liquidation Co.*, 531 B.R. 354, 358 (Bankr. S.D.N.Y. 2015) (emphasis added).

Plaintiffs cannot circumvent the Court's prior orders by adding—without any supporting facts—

a four-word preface to Old GM conduct allegations, nor can the alleged conduct of Old GM be

imputed wholesale into a complaint brought against New GM.

In sum, the knowledge of Old GM employees, their actions and inactions, the information

in Old GM's books and records, were all types of Old GM conduct that could not form the basis

of claims against New GM.  As set forth herein and in the marked-up complaints to follow, this

Court should hold that the wholesale imputation of allegations based on Old GM conduct is

barred, and direct plaintiffs to strike such allegations from their complaints.

## RELEVANT BACKGROUND

### A.      The Sale Agreement and Assumed Liabilities

Pursuant to the Amended and Restated Master Sale and Purchase Agreement (as

amended, "**Sale Agreement**"), approved by Order dated July 5, 2009 ("**Sale Order**"), New GM

purchased assets ("**363 Sale**") of Old GM, and agreed to assume only three categories of

---

[4]    *See also In re Motors Liquidation Co.*, 533 B.R. 46, 51 n. 10 (Bankr. S.D.N.Y. 2015) ("Presumably her counsel envisioned a theory based on a species of successor liability or other theory under which New GM would be responsible for Old GM's acts.  But theories of this character cannot be asserted under the Court's recent opinions . . . .").

liabilities for vehicles/parts manufactured/sold by Old GM: (a) post-363 Sale accidents/incidents involving Old GM vehicles causing personal injury, loss of life or property damage ("**Product Liability Claims**"); (b) repairs provided for under the "glove box" warranty (*i.e.*, a specific written warranty, of limited duration, that only covers repairs and replacement of parts and not monetary damages); and (c) Lemon Law claims (as defined in the Sale Agreement) essentially tied to the failure to honor the glove box warranty.  All other liabilities relating to vehicles/parts manufactured/sold by Old GM were "Retained Liabilities" of Old GM.  *See* Sale Agreement § 2.3(b).  That was a fundamental principle of New GM's contractual agreement to purchase Old GM's assets. The Imputation Issue arises in connection with claims that do not fall within Product Liability Claims, glove box warranty claims or Lemon Law claims.  Thus, claims that implicate the Imputation Issue are not Assumed Liabilities of New GM.[5]

Section 2.3(b) of the Sale Agreement sets forth a non-exclusive list of Retained Liabilities of Old GM.  They included, among others, (a) "all Liabilities to third parties for Claims based upon Contract, tort or any other basis" (*id.*, § 2.3(b)(xi)); and (b) "all Liabilities arising out of, related to or in connection with any (A) implied warranty or other implied obligation arising under statutory or common law without the necessity of an express warranty or (B) allegation, statement or writing by or attributable to Sellers" (*id.*, § 2.3(b)(xvi)).  The claims that raise the Imputation Issue for an Old GM vehicle are these types of Retained Liabilities.

Section 2.2(b)(viii) of the Sale Agreement defines Excluded Assets to include "all books, records, . . . advertising and promotional materials … relating exclusively to . . . Retained Liabilities, and any books and records and other materials that any Seller is required by Law to

---

[5]   To the extent a liability is a valid Assumed Liability as contemplated by the Sale Agreement, the knowledge of Old GM employees and the books and records of Old GM could be relevant in connection with such claims. But this is not an imputation issue; it is merely what goes along with an Assumed Liability.

retain." Thus, contrary to allegations made in various complaints, Old GM's books and records

relating to Retained Liabilities were never purchased by New GM.

The 363 Sale contemplated that New GM would offer employment to substantially all of

Old GM's employees,[6] and the books and records of Old GM (except those concerning Excluded

Assets) would be transferred to New GM.  These facts did not undermine the "free and clear"

aspect of the 363 Sale, nor could they be contorted to create a new and otherwise unexpressed

category of Assumed Liabilities. New GM never agreed to be liable for Old GM conduct except

to the extent of specified Assumed Liabilities.  Imputing knowledge by Old GM employees who

were later hired by New GM, or imputing information that may be contained in Old GM's books

and records to New GM for the purpose of plaintiffs' claims, is tantamount to holding New GM

liable for Old GM conduct in contravention of the Sale Order.

**B.**     <u>**The Sale Order, and Claims Based on Old GM Conduct**</u>

The Sale Order provides that, except for Assumed Liabilities, New GM shall not be liable

for Old GM's conduct (including acts and failures to act).[7]  Specifically, Paragraph AA of the

Sale Order provides, in relevant part:

> The transfer of the Purchased Assets to the Purchaser will be a legal, valid, and
> effective transfer of the Purchased Assets and, except for the Assumed Liabilities,
> will vest the Purchaser with all right, title, and interest of the Sellers to the
> Purchased Assets free and clear of liens, claims, encumbrances, and other
> interests (other than Permitted Encumbrances), including rights or claims (for
> purposes of this Order, the term "claim" shall have the meaning ascribed to such
> term in section 101(5) of the Bankruptcy Code) based on any successor or
> transferee liability, including, but not limited to … ***all claims arising in any way***
> ***in connection with any agreements, acts, or failures to act, of any of the Sellers***

---

6    *See* Sale Agreement, § 6.17(a) ("Effective as of the Closing Date, Purchaser or one of its Affiliates shall make an offer of employment to each Applicable Employee.").  "Applicable Employee" is defined as "all (i) current salaried employees of Parent and (ii) current hourly employees of any Seller or any of its Affiliates (excluding Purchased Subsidiaries and any dealership) represented by the UAW . . . ."  *Id.*, at 3.

7    *See Trusky v. Gen. Motors LLC (In re Motors Liquidation Co.)*, Adv. Proc. No. 12-09803, 2013 WL 620281, at *2 (Bankr. S.D.N.Y. Feb. 19, 2013) ("New GM is not liable for Old GM's conduct or alleged breaches of warranty.").

*or any of the Sellers' predecessors or affiliates*, . . . including, but not limited to, claims otherwise arising under doctrines of successor or transferee liability. (emphasis added).

With respect to Retained Liabilities, New GM was not liable for any claims, whether known, contingent, or *arising in the past or the future*. For example, paragraph DD of the Sale Order provides that New GM would not have consummated the 363 Sale if it "would, *or in the future* could, be liable for . . . Retained Liabilities" (emphasis added), and that New GM would have no liability whatsoever with respect to Retained Liabilities. *See also id.* ¶ 47 (prohibiting all actions against New GM with respect to any claims against the Debtors (other than Assumed Liabilities)); *id.*, ¶ 48 ("except for Assumed Liabilities, New GM shall have "no liability or responsibility for any liability or other obligation of Sellers arising under or related to the Purchased Assets . . . [T]he Purchaser shall not be liable for any claims against the Seller…whether known or unknown as of the Closing, now existing or hereafter arising . . . with respect to the Sellers or any obligations of the Sellers arising prior to the Closing."). As set forth in the Sale Order, New GM was "not assuming responsibility for Liabilities contended to arise by virtue of other alleged warranties, including implied warranties and statements in materials such as, without limitation, individual customer communications, owner's manuals, advertisements, and other promotional materials, catalogs, and point of purchase materials." Sale Order, ¶ 56. Various other provisions of the Sale Order provide that New GM would have no responsibility for any liabilities (other than Assumed Liabilities) predicated on Old GM's conduct, relating to the operation of Old GM's business, or the production of vehicles/parts before the closing of the 363 Sale, and that creditors and other parties in interest were barred from asserting such liabilities, including successor liability claims, against New GM. *See*, *e.g.*, Sale Order ¶¶ 8, 9, 46. The Imputation Issue is a transparent attempt by plaintiffs to circumvent these provisions of the Sale Order.

C.    **The Motions to Enforce, and the Bankruptcy Court's Decision and Judgment**

The Court rendered its *Decision on Motion to Enforce Sale Order* on April 15, 2015

("**Decision**")[8] and specifically held that it will continue to enforce the prohibitions against

successor liability and that New GM is not liable for Old GM conduct.  The Court issued the

Judgment on June 1, 2015 ("**Judgment**"), memorializing its rulings from the Decision.  Pursuant

to the Judgment and Decision, the Court found that Ignition Switch Plaintiffs asserting non-

Product Liability Claims could assert "otherwise viable claims against New GM for any causes

of action that might exist *arising solely out of New GM's own, independent, post-Closing acts,*

*so long as those Plaintiffs' claims do not in any way rely on any acts or conduct by Old GM*."

*Motors Liquidation Co.*, 529 B.R. at 598 (emphasis added).

D.    **The Bellwether Cases in MDL 2543**

Each of the Bellwether Cases[9] concerns an accident that took place after the closing of

the 363 Sale that involved a vehicle sold by Old GM.  The Bellwether Plaintiffs assert claims

that fall within the definition of Product Liability Claims assumed by New GM.[10]  Significantly,

however, they also assert claims that do not fall within the definition of Product Liability Claims

and are instead Retained Liabilities (*e.g.*, claims for fraud, fraudulent concealment, fraudulent

misrepresentation, violations of consumer protection statutes).

Every cause of action in the Bellwether Cases is based on Old GM conduct.  While this is

appropriate for assumed Product Liability Claims, it is not permissible with regard to non-

---

[8]    *In re Motors Liquidation Co.*, 529 B.R. 510 (Bankr. S.D.N.Y. 2015).

[9]    In connection with the multidistrict litigation pending in the United States District Court for the Southern District of New York ("**District Court**"), captioned *In re General Motors LLC Ignition Switch Litigation*, Case No. 14-MD 2543 ("**MDL 2543**"), the following six cases have been designated as Bellwether Cases, with their trials scheduled to go first in MDL 2543: (i) *Yingling v. General Motors LLC*, (ii) *Barthelemy v. General Motors LLC*; (iii) *Reid v. General Motors LLC*; (iv) *Norville v. General Motors LLC*; (v) *Cockram v. General Motors LLC*; and (vi) *Scheuer v. General Motors LLC* (collectively, the "**Bellwether Cases**").

[10]    New GM disputes liability for the Product Liability Claims alleged in the Bellwether Cases, and ultimately the merits dispute will be decided in the District Court.

Product Liability Claims.  For example, the *Yingling* complaint contains causes of action based on fraud and fraudulent concealment.  As a basis for these claims, Plaintiffs assert that: "GM has known, and its internal documents reveal that, since at least 2005, that replacement of the ignition switches alone on the defective vehicles is not a complete solution to the risk of inadvertent key transfers from the run to the accessory/off position in the defective vehicles." *Yingling* Complaint, ¶ 139.  These non-Product Liability causes of action rely on at least 77 paragraphs detailing events that took place prior to the 363 Sale.  *See Yingling* Complaint, ¶¶ 21-98 and 148, 164, 167, 173, 176, 180, 183, 202, 205, 219 (incorporating by reference every prior paragraph "as if fully set forth herein").  Thus, the *Yingling* plaintiff seeks to impute the knowledge of Old GM employees, and information contained in Old GM's books and records, to New GM to support these non-Product Liability Claims.

The complaints in the other five Bellwether Cases are substantially similar. They rely on dozens of paragraphs detailing events that took place prior to the closing of the 363 Sale in support of their purported independent non-Product Liability Claims.[11]  For example, in *Scheuer*, plaintiffs assert without reference to any specific claim that:

(i)     "Pursuant to the [Sale] Agreement and other orders of the Bankruptcy Court, Defendant New GM emerged out of bankruptcy and continued the business of Old GM with many, if not most, of Old GM's employees and, on information and belief, with most of the same senior-level management, officers, and directors" (*Scheuer* Complaint, ¶ 17);

(ii)    "Defendant New GM knew and was fully aware of the now infamous ignition switch defect (and many other serious defects in numerous models of GM-branded vehicles) ***from the very date of its inception on July 11, 2009***. For example, at least two dozen GM employees, many high-level or in positions of influence, knew of the defects as of that date. Defendant New GM was not born

---

[11]   *See, e.g., Scheuer* Complaint, ¶¶ 142-188. Most, if not all of these allegations are also contained in the complaints in the four other Bellwether Cases.  *See Barthelemy* Complaint (*see* ¶¶ 138-184 thereof); *Cockram* Complaint (*see* ¶ 133-179 thereof); *Reid* Complaint (*see* ¶¶ 138-184 thereof); *Norville* Complaint (*see* ¶¶ 140-186 thereof).

innocent, and its public commitment to culture and process change remain entirely hollow." (*id.*, ¶ 54) (emphasis in original); and

(iii)    "In addition, all the documents discussed herein that were generated prior to the inception of New GM remained in Defendant New GM's files. Given Defendant New GM's knowledge of these documents, and its continuing and ongoing monitoring and reporting duties under the Safety Act, Defendant New GM is also charged with knowledge of each such document." (*id.*, ¶ 133).[12]

And, contrary to express rulings by this Court, the *Scheuer* plaintiff asserts that "New GM is and was the successor corporation to General Motors Corporation and/or General Motors Company . . . ."[13]

## E.    The MDL Complaint, the States Actions, and Complaints in Other Lawsuits

In addition to the complaints in the Bellwether Cases, the MDL Complaint also seeks to impute to New GM knowledge of events that took place occurred prior to the 363 Sale.  The MDL Complaint asserts claims on behalf of, among others, 63 plaintiffs who purchased vehicles manufactured by Old GM prior to the 363 Sale, as well as 40 additional plaintiffs who purchased used Old GM vehicles after the 363 Sale from third parties who had no connection to New GM.[14]  As with the complaints in the Bellwether Cases, the MDL Complaint is replete with allegations of Old GM conduct. S*ee, e.g.*, *id.*, ¶¶ 251-297.   And, all but one of the counts in the MDL Complaint "reallege and incorporate by reference all paragraphs as though fully set forth herein."  *See, e.g.*, *id.*, ¶ 2969.  Thus, the MDL Complaint seeks to hold New GM liable with regard to Old GM vehicles, in the absence of any viable Independent Claim. In addition, the MDL Complaint seeks to hold New GM liable with regard to New GM vehicles on the basis of

---

[12]   Substantially similar allegations are made in the complaints in the four other Bellwether Cases.

[13]   *Scheuer* Complaint, ¶ 37; *see also Barthelemy* Complaint, ¶ 33; *Cockram* Complaint, ¶ 28; *Reid* Complaint, ¶ 33; *Norville* Complaint, ¶ 35.

[14]   The MDL Complaint contains numerous non-Product Liability Claims that concern both Old GM vehicles and New GM vehicles.  The causes of action include (i) violations of state consumer protection statutes, (ii) fraud by concealment, (iii) fraudulent concealment of the right to file a claim against the Old GM bankruptcy estate: (iv) a third party beneficiary claim; (v) breach of implied warranty, and (vi) unjust enrichment.  In addition, the MDL Complaint seeks damages on behalf of ***all*** owners of Old GM and New GM vehicles, whether or not they were recalled by New GM.

Old GM conduct. The same is true in the States Actions.  As this Court previously found, the complaints in the States Actions are replete with references to Old GM conduct in support of their claims against New GM.[15]  That is the essence of a successor liability claim.

New GM has also been named as a defendant in other personal injury and economic loss suits that concern both Old GM and New GM vehicles.  Many of these lawsuits, either explicitly or implicitly, seek to impute to New GM knowledge from events that took place at Old GM in connection with causes of action that are not Assumed Liabilities under the Sale Agreement.

## ARGUMENT

### PLAINTIFFS CANNOT ASSERT RETAINED LIABILITIES AGAINST NEW GM UNDER THE GUISE OF IMPUTATION

This Court already concluded that (except for Assumed Liabilities) New GM cannot be liable to plaintiffs on claims that depend on Old GM conduct.[16]  This Court also concluded that, other than Independent Claims propounded by Ignition Switch Plaintiffs based *exclusively* on New GM conduct, New GM did not acquire any *new* liabilities for Old GM vehicles in connection with the 363 Sale.  Whether in the guise of purported Independent Claims related to personal injury claims (as in the Bellwether complaints), or economic loss claims related to used Old GM and New GM vehicles (as in the MDL Complaint and States Actions), the assertion of a "new liability" claim against New GM based on claimed imputation is, in reality, a successor liability claim that is barred by the Sale Order.

---

[15]  *See Motors Liquidation Co.*, 531 B.R. at 358 ("The California complaint includes at least 18 paragraphs alleging events that took place prior to the 363 Sale, and the Arizona complaint includes at least 60 paragraphs alleging pre–363 Sale conduct. Reliance on allegations of that character was expressly prohibited under the Court's decision.").

[16]  *See* Sale Order, ¶ AA; *Trusky*, 2013 WL 620281, at *2.

**A.      Plaintiffs Cannot Impute Knowledge of Events That Took Place At Old GM
or Information in Old GM's Books And Records To Support Claims that are
Otherwise Retained Liabilities**

Although this Court has plainly held that Old GM conduct allegations and dressed-up

successor liability claims are barred, plaintiffs nevertheless seek to make an end-run around this

holding by imputing the knowledge of events that took place at Old GM to New GM.  In doing

so, plaintiffs fail to explain (i) what particular knowledge is imputed to (ii) what specific

employee for purposes of (iii) which discrete claim, and then demonstrate (iv) why that

allegation meets the standard for imputed knowledge.  That New GM hired Old GM's employees

who may have knowledge of something that occurred years ago does not change the fact that the

underlying claims are based on Old GM's conduct.  New GM did not assume such claims under

the Sale Agreement, and New GM acquired Old GM's assets free and clear of such claims.

Plaintiffs argue that New GM's knowledge is the same regardless of its origin.  Under

this view, because New GM *chose* to hire Old GM employees, it somehow had an obligation to

disclose or act on information after the 363 Sale based on information learned by those

employees while working at Old GM.  Among other problems, the claims premised upon New

GM's "knowledge" ignore that the Sale Agreement expressly contemplated that (a) substantially

all of Old GM's employees would be hired by New GM, and (b) the hiring of such employees

would nevertheless not transform Retained Liabilities into, essentially, a new and unexpressed

category of Assumed Liabilities of New GM.  *See* Sale Agreement ¶ 2.3(b).  Indeed, if plaintiffs'

theory about imputed knowledge is correct, the protections afforded by 363 sales would be

illusory because it would be impossible to construct a sale free and clear of liability unless the

new entity refused to hire any of the seller's employees and took none of its records.

In general, the knowledge of a seller (*i.e.*, Old GM) cannot be automatically imputed to

the buyer (*i.e.*, New GM) simply because the seller's employees went to work for the buyer after

the closing of the 363 Sale.  *See, e.g., Conmar Prods. Corp. v. Universal Studio Fastener Co.*, 172 F.2d 150, 157 (2d Cir. 1949) (buyer not liable for trade secret violation despite knowledge of employee hired from seller who was aware of the trade secret violation); *Chamberlain Group, Inc. v. Nassimi*, No. C09-5438BHS, 2010 WL 1875923 (W.D. Wash. 2010) (employee's knowledge of a fraud while working for the seller, who is then hired by the buyer, cannot be imputed to the buyer who was unaware of the fraud); *Interstate Power Co. v. Kansas City Power & Light Co.*, 909 F. Supp. 1241, 1272 (N.D. Iowa 1993) (knowledge held by KCPL employees who stayed on as IPC employees could not be imputed to IPC); *Forest Labs., Inc. v. The Pillsbury Co.*, 452 F.2d 621, 626 (7th Cir. 1971)("finding that "the knowledge of the [seller's] employees cannot properly be imputed to [the purchaser] just because they went to work for [the purchaser]").  In the bankruptcy context of a "free and clear" sale, this would be tantamount to holding New GM liable for Old GM conduct, and allowing successor liability claims.  As the Court recognized in the Decision, "it is plain that to the extent the Plaintiffs seek to impose successor liability, or to rely, in suits against New GM, on any wrongful conduct by Old GM, these are actually claims against Old GM, and not New GM."  529 B.R. at 528.  Thus, allowing Old GM conduct to be pled whole cloth under the guise of imputed New GM knowledge would eviscerate the restrictions imposed by the Sale Order and the Judgment.

Indeed, the Decision specifically addressed imputed knowledge by finding that its conclusion that certain plaintiffs were known creditors was "based not on any kind of automatic or mechanical imputation drawn from agency doctrine (which the Court would find to be of doubtful wisdom)."  *Id.*  In support, the Court cited *Weisfelner v. Fund 1* (*In re Lyondell Chem. Co.*), 503 B.R. 348, 389 (Bankr. S.D.N.Y. 2014) (Gerber, J.), in which the Court previously rejected arguments of automatic imputation of a CEO's alleged intent under ordinary agency

rules.  Decision, 529 B.R. at 558 n.154.  So too, here, plaintiffs cannot simply rely on allegations of imputed knowledge from Old GM employees to end-run the Sale Order's bar on successor liability claims and reliance on Old GM conduct.

Moreover, a case squarely addressing these precise issues is *Burton*.  There, the bankruptcy court reviewed whether New Chrysler assumed Old Chrysler's duty to warn its customers of a "fuel spit back" defect.  *Burton*, 492 B.R. at 405.  Just like the situation here, New Chrysler hired many of the Old Chrysler's employees and had generally acquired its books and records.  While a recall was not initiated, New Chrysler did issue Technical Services Bulletins to its dealers alerting them to the defect in certain model vehicles. *Id.* at 406. A class action lawsuit was filed by customers who owned vehicles subject to the defect.  In holding that the sale order in *Old Carco* barred the customers' claims, the bankruptcy court first found that plaintiffs could not assert a "duty to warn" case against New Chrysler even though Old Chrysler was aware of the "fuel spit back" problem since before the sale to New Chrysler.  *Id.* at 395.  The plaintiffs' basic complaint, as Judge Bernstein recognized, was that they purchased defective vehicles manufactured by Old Chrysler that required more servicing and were allegedly worth less money. *Burton*, 492 B.R. at 405.  Such claims were inextricably tied to Old Chrysler's conduct and thus barred by the sale order.  *Id.*  The court also found that New Chrysler's conduct did not proximately cause the loss to the plaintiffs; rather, any loss occurred when the vehicle was sold by Old Chrysler.  Judge Bernstein concluded that the alleged failure to disclose "is a typical successor liability case dressed up to look like something else, and is prohibited by the plain language of the bankruptcy court's Order." *Id.* (internal citations omitted).  Just as in  *Burton*, plaintiffs here should not be permitted to avoid the Sale Order by re-casting Retained Liabilities through the Imputation Issue as claims arising from New GM duties that do not exist.

14

B.    **The Imputation Issue and Specific Claims in Complaints**

The Imputation Issue cannot be presented in the abstract.  There are specific claims in plaintiffs' complaints.  Thus, the seminal question is whether valid claims have been asserted against New GM?  If so, the next question is how does the Imputation Issue satisfy the elements of those claims?  Answering these questions reveal that the claims plaintiffs are asserting are successor liability claims; they relate to and depend on pre-363 Sale conduct that is otherwise barred by the Sale Order.  Specifically, the MDL Complaint alleges generically that New GM was "not born innocent" and New GM knew of the ignition switch defects "from the very date of its inception on July 11, 2009 . . . ."  MDL Complaint, ¶ 15.  In the States Actions, the same type of allegations are made.[17]   Likewise, most of the complaints in the Bellwether Cases allege wrongful conduct by New GM "[f]rom the inception."[18]   Significantly, these claims fail to identify what particular knowledge is imputed to what specific New GM employee, in support of which claim.  Relying on numerous allegations of Old GM conduct and New GM's supposed knowledge of that conduct purportedly acquired at the time of the 363 Sale does nothing to elucidate the relevance of the Imputation Issue for any particular claim.  *See Motors Liquidation Co.*, 529 B.R. at 528 ("to the extent the Plaintiffs seek . . . to rely, in suits against New GM, on any wrongful conduct by Old GM, these are actually claims against Old GM, and not New GM."); *see also Burton*, 492 B.R. at 405.  In other words, alleging wholesale imputed knowledge acquired by employees of Old GM is no different from "alleging events that took place prior to

---

17    *See Arizona* Complaint, ¶ 19 ("Given the continuity of engineers, corporate counsel, and other key personnel from Old GM to New GM, New GM knew and was fully aware of the now infamous ignition switch defects (and many other serious defects in numerous models of GM-branded vehicles) *from the very date of its inception on July 11, 2009*. New GM was not born innocent." (emphasis in original)); *California* Complaint, ¶ 22 ("From its inception in 2009, GM has known that many defects exist in millions of GM-branded vehicles sold in the United States.").

18    *See Scheuer* Complaint, ¶¶ 54, 133, 337; *Cockram* Complaint, ¶¶ 45, 124, 381; *Barthelemy* Complaint, ¶¶ 50, 129, 336, *Reid* Complaint, ¶¶ 50, 129; *Norville* Complaint, ¶¶ 52, 131.

the 363 Sale" and thus basing claims on allegations that the Court has already "expressly prohibited." *Motors Liquidation Co.*, 531 B.R. at 358.

With respect to non-Product Liability Claims related to Old GM vehicles, like those contained in the Bellwether Cases (*i.e.*, claims for violations of consumer protection statutes, fraud, unjust enrichment,[19] *etc.*), New GM had only certain discrete ongoing obligations with respect to Old GM vehicles, which are not at issue here. New GM did not assume any other duty or obligation in connection with such vehicles, and plaintiffs' assertion of such claims is directly contrary to the Sale Agreement. The imputation of knowledge or information cannot create a duty that otherwise does not exist. These claims are Retained Liabilities, and plaintiffs cannot convert them into Independent Claims through the guise of imputation. The same is true for used Old GM and New GM vehicles alleged in the MDL Complaint and the States Actions where the claim is based on Old GM conduct.

### 1.    Consumer Protection Statutes

The MDL Complaint, States Actions, and the Bellwether Cases, as well as other lawsuits, assert claims against New GM based on consumer protection statutes which generally arise at a vehicle's point of sale. For example, in the MDL Complaint, plaintiffs assert a cause of action against New GM based on CAL. BUS. & PROF. CODE § 17200 ("**California Statute**") (*see* MDL Complaint, ¶¶ 1493-1515), that prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Liability under the California Statute is tied to the manufacturer/seller and generally refers to *point of sale* conduct.[20]  Thus,

---

[19] New GM could not have been unjustly enriched by the sale of an Old GM vehicle; it was Old GM that received the benefit of that sale, not New GM. This is just another species of a successor liability claim that is barred.

[20] *See Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1146 (9th Cir. 2012) (to recover under the California Statute, a plaintiff must show that the defendant "was aware of the alleged defect *at the time the [products] were sold*." (emphasis added)); *Smith v. LG Elecs. U.S.A., Inc.*, No. C 13-4361 PJH, 2014 U.S. Dist. LEXIS 31577, at *36 (N.D. Cal. 2014) ("[P]laintiff has alleged no facts—as opposed to mere conclusory assertions—

the relevant party with regard to an Old GM vehicle for a claimed violation of the California Statute is necessarily Old GM as the manufacturer/seller, and the relevant conduct is that of Old GM—not New GM.  Clearly, knowledge at the point of sale could never be the conduct of New GM, which did not exist at such time.  Such a claim is a Retained Liability, not an Independent Claim.  The relevance of the Imputation Issue falls when the claim against New GM is negated.

In the *Scheuer* Complaint, plaintiff asserts a claim based on the Oklahoma Consumer Protection Act, and alleges that "GM engaged in the unfair and deceptive trade practices set forth above, including knowingly designing and selling defective ignition switches, which caused airbags not to deploy, hiding those defects from consumers and regulators, and refusing to fix the defects and adequately warn about them, all the while promoting the safety of its vehicles." *Scheuer* Complaint, ¶ 402.  In the *Cockram* Complaint, plaintiff lumps New GM and Old GM together in numerous allegations in its count under the Virginia Consumer Protection Act (*see Cockram* Complaint, ¶¶ 405-410), and then asserts: "[f]rom its inception in 2009, New GM has known of the ignition switch defects that exist [in] Plaintiff's vehicle and in millions of Defective Vehicles sold in the United States" and concealed this information. *Id*., ¶ 411.  But New GM had no obligation to disclose and, in general, no duty to Old GM vehicle owners other than what was specifically assumed under the Sale Agreement.

## 2.    <u>Breach of the Recall Covenant</u>

Plaintiffs also contend that Section 6.15 of the Sale Agreement—the recall covenant—is another basis for their alleged Independent Claims.  However, this provision was purposefully not included in the section dealing with Assumed Liabilities, and is thus *not* an exception to the general rule set forth in the Sale Order that New GM acquired assets *free and clear* of all Old

---

that defendants were aware of or had any reason to know of the excessive noise and/or vibration ***at the time of sale***, which is a requirement under the [California Statute]" (emphasis added)).

GM liabilities and Old GM conduct. New GM's separate covenant to comply with the National

Traffic and Motor Vehicle Safety Act, 49 U.S.C. § 30101, *et seq.* ("**Safety Act**"), does not create

an independent obligation or duty to any third party like plaintiffs.  Indeed, a claimed breach of

the Safety Act does not provide for an individual consumer cause of action.[21]  Thus, plaintiffs

cannot base a claim on New GM's failure to comply with the Safety Act, and the Imputation

Issue has no relevance for this meritless claim.[22]

### 3.    **Fraud-Based Claims**

An example of a fraud-based claim is contained in the *Scheuer* Complaint, which has a

count for deceit (fraudulent concealment).  Specific allegations include, among others: (i) "[a]t

all relevant times herein, New GM had a legal duty to design, inspect, test, manufacture, and

assemble automobiles which it places into the stream of commerce to provide a reasonable

degree of occupant safety during the intended and foreseeable use of those automobiles"

(*Scheuer* Complaint, ¶ 374); (ii) "[a]t all relevant times herein, New GM actively concealed

and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff to

purchase an unsafe and defective vehicle" (*id.* at ¶ 379); and (iii) "[a]s a proximate result of the

Defendant's deceit and suppression of facts, the Plaintiff was induced to purchase and use the

2003 Saturn Ion and suffer damages" (*id.* at 380).  The *Scheuer* vehicle was purchased prior to

the 363 Sale.  *Scheuer* Complaint, ¶¶ 1-2.  It was Old GM that manufactured, marketed and

placed the *Scheuer* vehicle into the stream of commerce.  Therefore, New GM could not be liable

for fraudulent concealment since it had no ongoing obligations with respect to that vehicle.

---

[21]  *See Handy v. Gen. Motors Corp.*, 518 F.2d 786, 788 (9th Cir. 1975) (*per curiam*); *see also Ayres v. GMC*, 234 F.3d 514, 522 (11th Cir. 2000) (stating that the Safety Act confers no private right of action).

[22]  While the MDL Complaint asserts a third party beneficiary claim in connection with the recall covenant, the Sale Agreement expressly provides that, other than exceptions not applicable here, "nothing express or implied in this Agreement is intended or shall be construed to confer upon or give to any Person, other than the Parties, their Affiliates and their respective permitted successors or assigns, any legal or equitable Claims, benefits, rights or remedies of any nature whatsoever under or by reason of this Agreement."  Sale Agreement, § 9.11.  Thus, no plaintiff is a third-party beneficiary under the Sale Agreement.

Plaintiffs' attempt to saddle New GM with this liability through imputation is akin to holding New GM liable for Old GM conduct.

Misrepresentation and other fraud-based claims suffer the same fate. The vehicle at issue in the *Barthelemy* Bellwether Case is a 2007 Saturn Sky manufactured by Old GM and sold used to the plaintiffs by a third party.[23] In their fraudulent misrepresentation count, the *Barthelemy* plaintiffs, like other plaintiffs, assert that New GM had a "legal duty to design, inspect, test, manufacture, and assemble automobiles which it places into the stream of commerce to provide a reasonable degree of occupant safety during the intended and foreseeable use of those automobiles." *Barthelemy* Complaint, ¶ 372. They also allege "New GM actively concealed and/or suppressed these material facts, in whole or in part, with the intent to deceive and induce Plaintiffs to purchase unsafe and defective vehicles." *Id.*, ¶ 377. Again, New GM had no part in designing, manufacturing or placing the vehicle into the stream of commerce.

## C.     **The Court's Bledsoe Decision Did Not Decide the Imputation Issue**

In the *Decision And Order On Bledsoe Plaintiffs' Reargument And Other Post-Judgment Motions*, dated July 22, 2015 [Dkt. No. 13313] ("**_Bledsoe_ Decision**"), the Court, in a footnote discussed aspects of the Imputation Issue, stating as follows:

> This Court assumed that things New GM did, or knowledge New GM personnel had when acting for New GM (even if those personnel acquired that knowledge while acting for Old GM) would be fair game. (For example, if such acts were actionable under applicable nonbankruptcy law, New GM could still be held liable, consistent with this Court's ruling, for knowingly installing a part it knew to be defective even if the part had been made by Old GM—just as New GM might be liable for doing that if the part had been manufactured by another manufacturer in the Supplier Chain—and likewise could be held liable for refusing to make a repair that New GM knew had to be made, no matter when its personnel acquired the requisite knowledge.)

---

[23]   The fact that the plaintiff purchased the vehicle used after the closing of the 363 Sale does not change the analysis. *See Motors Liquidation Co.*, 529 B.R. at 526 n.14 (Used Car Purchasers "were not prejudiced by the inability to make successor liability arguments that others made, and, in addition, they can have no greater rights than the original owners of their cars had.").

*Id.*, at 6 n.16.  The discrete examples set forth in the *Bledsoe* Decision are not equivalent to what plaintiffs are asserting against New GM.  What the Court described in the *Bledsoe* Decision are affirmative acts, that necessarily would have occurred after the closing of the 363 Sale.  While it is possible that discrete instances of a particular employee's Old GM knowledge might be relevant to his or her actions as a New GM employee, that is not what plaintiffs have pled. Instead, they transpose numerous pages of purported Old GM conduct without any explanation of the connection between the alleged Old GM conduct and the specific claims against New GM.

Significantly, the Court went on to say in the *Bledsoe* Decision as follows:

> But this Court further believed that New GM could not be held liable for ***anything Old GM did, and that claims for either compensatory or punitive damages would have to be premised solely on New GM's knowledge and conduct***. While mention (without anything materially more) of Old GM and of the 363 Sale would be proper, and New GM would have to live with the knowledge its personnel had from the earliest days they began to serve New GM, ***this Court assumed that in light of its rulings, courts thereafter implementing them would be wary of reliance on facts ostensibly introduced as "background" when they were in fact attempts to paint New GM with Old GM acts***.

*Id.*  Plaintiffs are doing what this Court said they should not do—they are attempting to "paint New GM with Old GM acts."  This is the quintessential successor liability claim that is barred.

WHEREFORE, New GM respectfully requests that this Court hold that wholesale imputation of allegations based on Old GM conduct are barred and direct plaintiffs to strike such allegations from their complaints.

Dated: New York, New York
September 18, 2015

Respectfully submitted,


_____/s/ Arthur Steinberg_____
Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:     (212) 556-2100
Facsimile:     (212) 556-2222

Richard C. Godfrey, P.C. (admitted *pro hac vice*)
Andrew B. Bloomer, P.C. (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Attorneys for General Motors LLC*