**Reply Deadline:  September 30, 2015**
**Hearing Date and Time:  October 14, 2015 at 9:45 a.m. (ET)**

Steve W. Berman
steve@hbsslaw.com
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone:  206-623-7292

*Co-Lead Counsel in the MDL Proceeding for the
Ignition Switch Plaintiffs and Certain Non-
Ignition Switch Plaintiffs; and Counsel for the
People of the State of California, acting by and
through Orange County District Attorney Tony
Rackauckas and the State of Arizona*

Edward S. Weisfelner
eweisfelner@brownrudnick.com
Howard S. Steel
hsteel@brownrudnick.com
**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
Telephone: 212-209-4800

*Designated Counsel in the Bankruptcy
Proceeding for the Ignition Switch Plaintiffs and
Certain Non-Ignition Switch Plaintiffs*

*[Additional Counsel on Signature Page]*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, *et al*., | : | No. 09-50026 (REG) |
| f/k/a GENERAL MOTORS CORP., *et al*., | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OPENING BRIEF ON IMPUTATION ISSUE ON BEHALF OF THE IGNITION
SWITCH PLAINTIFFS, THE NON-IGNITION SWITCH PLAINTIFFS, THE STATE OF
ARIZONA, THE PEOPLE OF THE STATE OF CALIFORNIA, THE POST-CLOSING
IGNITION SWITCH ACCIDENT PLAINTIFFS AND THE ADAMS PLAINTIFFS**

**REDACTED VERSION**

# TABLE OF CONTENTS

<u>Page</u>

I.     INTRODUCTION .................................................................................................1

II.     FACTUAL BACKGROUND ..............................................................................5

      A.     No provisions in the Sale Order bar charging New GM with
           knowledge of pre-363 Sale facts.......................................................................5

      B.     New GM has always had the same TREAD Act duties with respect
           to the same Old GM vehicles as did Old GM. ..................................................5

      C.     The same critical mass of employees worked at New
           GM in the same capacity with the same authority and the same
           knowledge they had while working at Old GM.....................................................7

III.     ARGUMENT .....................................................................................................12

      A.     New GM can be sued for its own acts and omissions in light of its
           knowledge without violating the Sale Order, *regardless* of how
           New GM obtained that knowledge. ...................................................................12

      B.     Because large numbers of Old GM employees brought knowledge
           of pre-363 Sale events with them to New GM and/or learned
           about pre-363 Sale events from reviewing relevant records,
           New GM may be charged with knowledge of those pre-363 Sale events. ............13

      C.     New GM's arguments against charging it with knowledge of
           pre-Sale events are misplaced. .........................................................................16

           1.     New GM's argument against imputing the knowledge
                its employees obtained while working at Old GM is
                irrelevant and incorrect. ...........................................................16

           2.     The language of the Sale Agreement does not bar
                allegations that New GM had knowledge of pre-Sale facts.......................19

IV.     CONCLUSION..................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allard v. Arthur Andersen & Co. (USA)*,
924 F. Supp. 488 (S.D.N.Y. 1996)........................................................................................14

*Chamberlain Group, Inc. v. Nassimi*,
2010 WL 1875923 (W.D. Wash. May 10, 2010)...............................................................17, 18

*Columbia Pictures Corp. v. De Toth*,
87 Cal. App. 2d 620 (1948) ...................................................................................................18

*Conmar Prods. Corp. v. Universal Slide Fastener Co.*,
172 F.2d 150 (2d Cir. 1949)...................................................................................................17

*Forest Labs., Inc. v. The Pillsbury Co.*,
452 F. 2d 621 (7th Cir. 1971) ................................................................................................18

*First Ala. Bank of Montgomery, N.A. v. First State Ins. Co.*,
899 F.2d 1045 (11th Cir. 1990) ..............................................................................................15

*Fridena v. Evans*,
622 P.2d 463 (Ariz. 1980)..........................................................................................14, 15, 18

*Goodman v. Boeing Co.*,
75 Wash. App. 60 (1994).......................................................................................................18

*Interstate Power Co. v. Kansas City Power & Light Co.*,
909 F. Supp. 1241 (N.D. Iowa 1993).....................................................................................19

*In re Motors Liquidation Co.*,
2015 Bankr. LEXIS 2406 (Bankr. S.D.N.Y. July 22, 2015) ....................................................2

*In re Motors Liquidation Corp.*,
529 B.R. 510 (Bankr. S.D.N.Y. 2015)........................................................... *passim*

*O'Riordan v. Federal Kemper Life Assurance Co.*,
114 P.3d 753 (Cal. 2005) ......................................................................................................14

*Weisfelner v. Fund 1 (In re Lyondell Chemical Co.)*,
503 B.R. 348 (Bankr. S.D.N.Y. 2014) (Gerber, J.)................................................................14

## Statutes

49 U.S.C. § 30118(c) ................................................................................................................5

49 U.S.C. § 30166(m)(3) ..........................................................................................................6

Cal. Civ. Code § 2332...............................................................................................................14

## Other Authorities

49 C.F.R. §§ 576.5-576.6...........................................................................................................6

49 C.F.R. § 579.21 ....................................................................................................................6

The Ignition Switch Plaintiffs,[1] certain Non-Ignition Switch Plaintiffs,[2] the State of

Arizona *ex. rel.* Mark Brnovich, the Attorney General, the People of the State of California, by

and through Orange County District Attorney Tony Rackauckas, the Post-Closing Ignition

Switch Accident Plaintiffs,[3] and the Adams Plaintiffs[4] (collectively, "Plaintiffs") hereby submit

their Opening Brief on the "Imputation Issue" pursuant to the *Scheduling Order Regarding Case*

*Management Order re: No-Strike, No Stay, Objection, and GUC Trust Asset Pleading*, dated

September 3, 2015 [ECF No. 13416].

## I.    INTRODUCTION

The issue before this Court is whether Plaintiffs' Complaints violate the Sale Order's ban

on claims based on the actions of Old GM by alleging that New GM had knowledge of pre-363

Sale events (whether through imputation or otherwise).  The answer is, simply, no:  whenever

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Decision on Motion to Enforce Sale Order, In re Motors Liquidation Co.*, 529 B.R. 510 (Bankr. S.D.N.Y. 2015).  Except where otherwise indicated, references to "ECF No. _" are to docket entries in the Bankruptcy Court proceedings: *In re Motors Liquidation Co.*, Bankr. Case No. 09-50026 (REF).

[2] The term "Non-Ignition Switch Plaintiffs" shall mean all plaintiffs that have commenced a lawsuit against New GM asserting economic losses based on or arising from an alleged defect, other than the Ignition Switch in the vehicles subject to Recall No. 14-V-047, or based on or arising from economic losses and diminution in value of their GM-branded vehicles based on the Ignition Switch Defect or other alleged defects in Old and New GM vehicles.

[3] As defined in the Post-Closing Ignition Switch Accident Plaintiffs' Memorandum of Law With Respect to Punitive Damages Issue, filed on September 13, 2015 [ECF No. 13434], the Post-Closing Ignition Switch Accident Plaintiffs are the plaintiffs in the "Bellwether Cases" and certain additional plaintiffs with personal injury, wrongful death, and property damage claims arising from post-Closing Date accidents and incidents in vehicles manufactured by Old GM.

[4] As defined in the Adams Plaintiffs' No Dismissal Pleading, filed on August 11, 2015 [ECF No. 13359], the Adams Plaintiffs are individuals with personal injury and wrongful death claims arising from pre-Closing Date accidents and incidents in vehicles manufactured by Old GM. Their complaint alleges a single count of liability against New GM for negligence, gross negligence, recklessness and/or fraud by concealment of the right to file a claim against Old GM in bankruptcy.

- 1 -

New GM's knowledge is part of the basis for a claim against New GM for its own misconduct, neither the source nor content of that knowledge can convert the claim into one based on the conduct of Old GM. As this Court recognized at the August 31 Status Conference, it has already resolved the issue.[5] As this Court has stated, "knowledge New GM personnel had when acting for New GM (even if those personnel acquired that knowledge while acting for Old GM) would be fair game" in litigation against New GM.[6] That statement is itself unassailable. So long as Plaintiffs seek to hold New GM liable solely for its own acts (and failures to act) in light of the knowledge that it had, the source of that knowledge does not change the claim into a "dressed-up" claim based on the actions of Old GM on a successorship or any other impermissible theory.

Indeed, New GM has just **conclusively admitted** its knowledge of the Ignition Switch Defect and its deadly consequences in a detailed Statement of Facts in a Deferred Prosecution Agreement with the United States Department of Justice ("DOJ").[7] As New GM has admitted for *all* litigation purposes,[8] it "failed to disclose a deadly safety defect to its U.S. regulator," and "falsely represented to consumers that vehicles containing the defect posed no safety concern."[9] Regardless of the source of New GM's knowledge, the Deferred Prosecution Agreement stands

---

[5] *In re Motors Liquidation Co.*, Bankr. Case No. 09-50026 (REF), *Transcript of Notice of Hearing/Notice of Status Conference to be Held in Connection with the Court's Case Management Order,* dated August 19, 2015 [Dkt. No. 13383], and the *Letters Filed in Response Thereto (Related Document(s) 13383)* [Dkt. No. 13396] (Aug. 31, 2015) (misdated Apr. 29, 2015), at 5:23-6:2.

[6] *In re Motors Liquidation Co.*, 2015 Bankr. LEXIS 2406, at *9 n.16 (Bankr. S.D.N.Y. July 22, 2015).

[7] A copy of the Deferred Prosecution Agreement and related documents is attached hereto as Exhibit 1.

[8] *See* Ex. A to the Deferred Prosecution Agreement at p. 6, ¶ 13.

[9] *See* Ex. C to Deferred Prosecution Agreement at ¶ 3.

- 2 -

as conclusive proof that New GM *itself* had knowledge of the Ignition Switch Defect and

breached its clear legal obligations to disclose and remedy the defect, and to refrain from false

and misleading statements to consumers.

Similar to the DOJ's claims that gave rise to the Deferred Prosecution Agreement, many

of the claims Plaintiffs bring against New GM rely on New GM's knowledge of the Ignition

Switch Defect (and the myriad other safety defects plaguing many models and years of GM-

branded vehicles.)  So, for example, Plaintiffs claim that New GM violated state consumer

protection laws by, among other things, concealing and failing to disclose its knowledge of the

Ignition Switch Defect and other safety defects in GM-branded vehicles in derogation of New

GM's clear obligation under the Sale Agreement in which it voluntarily agreed to abide by the

manufacturer's obligations under the Safety Act with respect to Old GM vehicles and parts.[10]

The States assert that conduct by New GM subjects New GM to liability for civil penalties in

connection with the sale of New GM vehicles,[11] and the Plaintiffs in the Second Amended

Consolidated Complaint assert that the conduct subjects New GM to liability both in connection

with the sale of New GM vehicles and by causing the value of *all* GM vehicles to diminish.[12]

Plaintiffs claim that New GM can be held liable for its own actions in concealing that

---

[10] The "Safety Act" refers to the National Traffic Vehicle and Motor Vehicle Safety Act, 49 U.S.C. §§ 30101 *et seq.*, as amended by the Transportation Recall, Enhancement, Accountability and Documentation Act (the "TREAD Act").  In § 6.15 of the Sales Agreement, New GM agreed to abide by all Safety Act obligations with respect to vehicles and parts manufactured by Old GM.

[11] For the Court's convenience, the claims from the Arizona Action (¶¶ 494-511) and the California Action (¶¶ 253-273) are attached as Exhibits 2 and 3.

[12] By way of illustrative example, a copy Plaintiffs' claim for violations of the California Consumer Legal Remedies Act (¶¶ 1466-1492) is attached as Exhibit 4.

knowledge.[13]  Once again, the source of that knowledge is simply irrelevant to the issues before this Court.

New GM can cite no language in the Sale Agreement or Sale Order that poses any bar to (or even mentions) charging New GM with knowledge of pre-363 Sale facts.  Instead, New GM makes the circular argument that Plaintiffs cannot salvage a barred claim based on the ***conduct*** of Old GM by imputing ***knowledge*** of pre-Sale facts to New GM.  New GM does not explain why basing a claim, in part, on knowledge of pre-Sale facts means that the claim is based on pre-Sale ***conduct***.  Again, Plaintiffs' claims are based on New GM's acts in light of New GM's knowledge (including knowledge of pre-363 Sale events), and are not based on pre-Sale conduct.

New GM also makes two additional arguments that are simply not relevant to any of the issues before this Court.  First, New GM argues that Plaintiffs may not be able to prove New GM's knowledge of certain pre-Sale events (whether through imputation by agency, or otherwise).[14]  Similarly, New GM argues, even if Plaintiffs prove its knowledge of pre-Sale events, Plaintiffs still might not make out claims under governing state or federal law.[15]  If New GM's arguments are correct on the merits, it might prevail on at least some of the claims in the courts in which Plaintiffs' complaints will be adjudicated.  However, the issue before this Court

---

[13] New GM's argument that consumer protection statutes in certain states may not provide a claim with respect to cars sold pre-Sale is an argument on the merits for resolution by Judge Furman in the MDL litigation and other courts where the claims are pending, and is irrelevant to this Court's gatekeeper determination as to whether the claims are barred by the Sale Order.

[14] *See Omnibus Response by General Motors LLC to the No Strike Pleadings Filed by the States of Arizona and California* [ECF No. 13286 (July 10, 2015)] ("GM Omnibus Resp.") at 21-22; *Response by General Motors LLC to the Ignition Switch Plaintiffs' No Strike Pleading with Regard to the Second Amended Consolidated Complaint; and the Non-Ignition Switch Plaintiffs' Objection Pleading with Regard to the Second Amended Consolidated Complaint* [ECF No. 13316 (July 23, 2015)] ("GM Response re: MDL Complaint").

[15] GM Omnibus Resp. at 22 n.12.

- 4 -

is not whether Plaintiffs will ultimately prevail on their claims, but rather whether the Sale Order prevents them from asserting the claims in the first place. New GM's merits-based attacks pose no bankruptcy bar to claims charging New GM with knowledge of pre-363 Sale facts.

In resolving the Plaintiffs' "No Strike" and related Pleadings, this Court should find that alleging New GM's knowledge of pre-363 Sale facts does not violate the Sale Order.

## II.  FACTUAL BACKGROUND

### A.  No provisions in the Sale Order bar charging New GM with knowledge of pre-363 Sale facts.

Because New GM asserts that alleging its knowledge of pre-Sale facts somehow violates the Sale Order, it is incumbent on New GM to identify precisely which language in the Sale Order bars such allegations. New GM cannot do so, as no provisions in either the Sale Order or the Sale Agreement even mention charging New GM with pre-Sale knowledge, whether through imputation or otherwise.

### B.  New GM has always had the same TREAD Act duties with respect to the same Old GM vehicles as did Old GM.

New GM had ongoing obligations under the TREAD Act (as well as under various state consumer protection statutes) to monitor GM-branded vehicles on the road, to make quarterly reports to NHTSA, and to maintain all relevant records for five years. New GM explicitly assumed this duty in § 6.15 of the Sale Agreement, and hence stood in the role of "manufacturer,"[16] with respect to Old GM cars and parts.

As the Court is aware, the TREAD Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including incidents involving death or

---

[16] The TREAD Act on its face imposes recall and reporting obligations only on the "manufacturer" of a vehicle. 49 U.S.C. § 30118(c).

- 5 -

injury, claims relating to property damage received by the manufacturer, warranty claims paid by

the manufacturer, consumer complaints, and field reports prepared by the manufacturer's

employees or representatives concerning failure, malfunction, lack of durability, or other

performance issues.  49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.  Manufacturers must retain

for five years all underlying records on which the early warning reports are based and all records

containing information on malfunctions that may be related to motor vehicle safety.  49 C.F.R.

§§ 576.5-576.6.

Old and New GM used several processes to identify safety issues, including the TREAD

database and Problem Resolution Tracking System ("PRTS").  *See* Valukas Report at 282-313

(available at http://www.nhtsa.gov/staticfiles/nvs/pdf/Valukas-report-on-gm-redacted.pdf).  The

TREAD database, used to store the data required for the quarterly NHTSA early warning reports,

was the principal database used by Old and New GM to track incidents related to GM-branded

vehicles.  *Id.* at 306.  The database included information from (i) customer service requests; (ii)

repair orders from dealers; (iii) internal and external surveys; (iv) field reports from employees

who bought GM-branded vehicles and from Captured Test Fleet reports;[17] (v) complaints from

the OnStar call center; and (vi) a database maintained by GM legal staff to track data concerning

complaints filed in court.  *Id.*  A TREAD reporting team, headed up for both Old and New GM

by Dwayne F. Davidson, conducted monthly database searches and prepared scatter graphs to

identify spikes in the number of accidents or complaints related to various GM-branded vehicles.

*Id.* at 307.  Because the same employees carried out the TREAD Act obligations at Old and New

---

[17] Captured Test Fleet reports were submitted by employees who were given vehicles and asked to document any problems that arose while driving.  Valukas Report at 300.  The Quality Group would review, summarize, and group these reports into categories.  *Id.*

GM, *see infra* at 8, they not only had knowledge of pre-Sale events—they were required to act on that knowledge under the Sale Agreement in which New GM undertook to monitor Old GM vehicles for safety defects and promptly disclose and remedy any such defects.[18]

### C.    The same critical mass of employees worked at New GM in the same capacity with the same authority and the same knowledge they had while working at Old GM.

New GM essentially continued the operations of Old GM—building the same makes of cars in the same factories with essentially the same personnel.  New GM has conceded that "substantially all of Old GM's employees" were hired by New GM. [19]  New GM had TREAD Act responsibilities with respect to all vehicles and parts manufactured by Old GM,[20] as well as those made by New GM.  And discovery in the MDL to date has confirmed that—apart from the name of the company—precious little changed after the 363 Sale when Old GM became New GM.[21] ███████████████████████████████████████████████

███████████████████████████████████████ [22]

---

[18] New GM admitted that it violated these duties with respect to the Ignition Switch Defect. *See* Consent Order, *available at* http://www.nhtsa.gov/staticfiles/communications/pdf/May-16-2014-TQ14-001-Consent-Order.pdf, at 4.  While New GM may repeat its specious assertion that certain Plaintiffs improperly assert private causes of action under the TREAD Act, not a single count in any of the Plaintiffs' Complaints does so.  In any event, such an argument is merely another merits-based attack to be heard by the court adjudicating Plaintiffs' Complaints, and can have no bearing on any issue properly before this Court in performing its gate-keeping role.

[19] GM Omnibus Resp. at 20.

[20] Sales Agreement, § 6.15.

[21] *See, e.g.,* May 7, 2015 Deposition of Mark Beauregard at 18:10-19:14 (Exhibit 5); May 15, 2015 Deposition of Dwayne Davidson at 204:21-207:24 ("Davidson Dep.") (Exhibit 6); June 1, 2015 Deposition of Vipul Modi at 20:18-21:12 (Exhibit 7); June 8, 2015 Deposition of Steven Oakley at 274:1-20 (Exhibit 8); July 15, 2015 Deposition of Deborah Nowak-Vanderhoef at 90:21-92:5 (Exhibit 9); August 26, 2015 Deposition of Douglas Parks at 174:15-175:6 (Exhibit 10); August 26, 2015 Deposition of Peter Judis at 16:6-17:6 (Exhibit 11).

[22] *See id.*



Typical is the testimony of Mr. Davidson, who ███████████████████

████████████    Mr. Davidson testified that ████████████████

███████████[23]  According to Mr. Davidson, ███████████████

████████████████[4]  ██████████████████

██████████████████████ ███.[25] ███████

████████████████████████

███████████████[26] █████████████████

██████████████████████████

████████████████████████

██.[27] ███████████████████

███████████████[28] ████████████

██████████████████████████

███████████████████████ █

████████████████,,[30] █████████████████

█████████████████[31]

---

[23] Davidson Dep. at 205:4-10.

[24] *Id.* at 205:17-25.

[25] *Id.* at 206:2-12.

[26] *Id.* at 206:13-23.

[27] *Id.* at 207:10-22.

[28] *Id.* at 210:16-211:2.

[29] *Id.* at 209:1-23.

[30] *Id.* at 209:24-210:5.

[31] *Id.* at 210:9-11.

- 8 -

New GM's legal department was also comprised of the same personnel as in the days of

Old GM. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

████████ [32]  Jaclyn C. Palmer, Michael Gruskin and Doug Brown were among those who were

in-house attorneys at both Old and New GM, and attended the Roundtable meetings during

which the company discussed whether (and for how much) cases against GM should be settled—

including cases involving the Ignition Switch Defect.[33]  Although the main function of the

Roundtable was to evaluate claims and generate settlement forecasts, the Roundtable "had a

second function as well: to spot trends indicating safety issues."[34]  Palmer has stated that

"attorneys discussed potential safety or accident trends at Roundtable on occasion, and the

Roundtable Committee referred issues to GM engineers for a follow-up investigation."[35]  The

Ignition Switch Defect was discussed at Roundtables both before and after the 363 Sale.[36]  At

Old GM, lawyers were told that "if you as an attorney are aware of any threatened, on-going or

past violation of a federal, state or local law or regulation . . . it is your responsibility to respond

appropriately." [37]  At New GM, the same lawyers had the same responsibility.  Indeed, General

Counsel for GM North America, Lucy Clark-Dougherty, recently testified ██████████████

---

[32] *See, e.g.*, May 19, 2015 Deposition of Jaclyn Palmer at 231:15-19, 247:12-248:5, 267:14-20 (Exhibit 12).

[33] Valukas Report, 106-07.

[34] Valukas Report, 108.

[35] Valukas Report, 108.

[36] *See* Valukas Report at 110-112 (2006 Roundtable discussions of accidents caused by Ignition Switch Defect); *id.* at 130 (2008 Roundtable discussion of accident caused by Ignition Switch Defect); *id.* at 148 (2011 Roundtable discussion of accident caused by Ignition Switch Defect); *id.* at 163 (2012 Roundtable discussion of accident caused by Ignition Switch Defect).

[37] Valukas Report, 109.

- 9 -

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ [38]

Likewise, the same engineering personnel who were involved with investigating the Ignition Switch Defect performed the same functions at both Old and New GM.  For example, both Old and New GM used Field Performance Assessment ("FPA") engineers to assist in defending product claims.[39]  "FPA engineers are assigned to gather information and assess technical issues in lawsuits and [not-in-suit matters.]"[40]  Their assessments "are the lawyers' primary source of technical information for the early case evaluations…."[41]  While at Old GM, FPA engineer Kathy Anderson was assigned to fatal crashes involving the Ignition Switch Defect and airbag nondeployment.[42]  Anderson was then involved in the investigation of other fatal airbag nondeployment cases in 2010 and 2011.[43]  John Sprague was another FPA engineer at Old and New GM; while at Old GM, he investigated at least one crash involving the Ignition Switch Defect.[44]  In 2007, Sprague was tasked with compiling information on Cobalt and Ion not-in-suit matters and lawsuits.[45]  After a meeting with airbag manufacturer Continental in May

---

[38] Aug. 13, 2015 Deposition of Lucy Clark-Dougherty at 31:11-33:1, 34:24-35:11, 80:12-23, 121:10-22, 123:1-21 (Exhibit 13).

[39] Valukas Report, 105.

[40] Valukas Report, 106.

[41] Valukas Report, 106.

[42] Pltfs' Stip. Facts, ¶ 14(C); Valukas Report, 112.

[43] Valukas Report, 140, 148.

[44] Pltfs' Stip. Facts, ¶ 14(X).

[45] *Id.*

of 2009, Sprague collected information regarding power mode status, added it to his spreadsheet

of airbag nondeployment not-in-suit matters and lawsuits, and discovered that the power mode

was recorded as Off or Accessory in a number of accidents.[46]  Sprague continued adding to his

spreadsheet, and continued his involvement in investigating the Ignition Switch Defect, after he

began working for New GM.[47]  In fact, Sprague was involved in the 2011 meeting that "kicked-

off" the Field Performance Evaluation process in connection with Cobalt airbag

nondeployments, at which he expressed "a theory that the airbag non-deployments were

connected to [the sensing diagnostic module] receiving a message that the vehicle power mode

was in Accessory or Off," and that "these power-mode messages might be connected to the

Ignition Switch."[48]

As this Court has ruled based on the stipulated factual record:

> [A]t least 24 Old GM engineers, senior managers and attorneys
> knew of the Ignition Switch Defect and the need to send out recall
> notices—and of the reasons why recall notices had to go out, here.
> And it is uncontroverted that Old GM had enough knowledge of
> the Ignition Switch Defect to be required, under the Safety Act, to
> send out mailed recall notices to owners of affected Old GM
> vehicles ….
>
> …24 Old GM personnel knew of the need to conduct a recall (and
> with that, of the need to fix the cars); and, in addition, a critical
> safety situation….[49]

---

[46] Valukas Report, 135.

[47] *See, e.g.,* Valukas Report, 148 (Sprague involved in investigating post-Sale crashes involving Ignition Switch Defect).

[48] Valukas Report, 150-154.

[49] *In re Motors Liquidation Corp.*, 529 B.R. at 557.

- 11 -

Based on this "critical mass" of personnel with knowledge of the Ignition Switch Defect, this

Court found that the Ignition Switch Defect was known to Old GM such that owners of the

vehicles with the Ignition Switch Defect were "known creditors" to Old GM for the purposes of

Due Process.[50]  As this Court also found, all of these personnel transferred to New GM.[51]  There

is nothing to suggest they left their knowledge of pre-363 Sale events behind—and it is

undisputed that they (and New GM) had the responsibility to act on *all* relevant knowledge,

including knowledge of pre-363 Sale events.

## III.    ARGUMENT

### A.    New GM can be sued for its own acts and omissions in light of its knowledge without violating the Sale Order, *regardless* of how New GM obtained that knowledge.

Many of the causes of action pled in the Plaintiffs' Complaints depend, at least in part, on

New GM's knowledge of pre-363 Sale facts—including knowledge of the Ignition Switch Defect

and a host of other pre-Sale defects.  In general terms, the Plaintiffs allege that, rather than

disclose and remedy those defects, New GM knowingly concealed them from regulators,

consumers and the public at large.[52]  To the extent that it is necessary for Plaintiffs to prove New

GM's knowledge of pre-363 Sale facts, Plaintiffs will have to do so in order to prevail in the

---

[50] *Id.* at 558 n.154.

[51] *Id.* at 537.

[52]  *See The Ignition Switch Plaintiffs' No Strike Pleading with Regard to the Second Amended Consolidated Complaint; and the Non-Ignition Switch Plaintiffs' (I) Objection Pleading with Regard to the Second Amended Consolidated Complaint and (II) GUC Trust Asset Pleading* [ECF No. 13247 (June 24, 2015)] at 9-12, 23-28 (summarizing claims in the Second Amended Consolidated Complaint); *State of Arizona's "No Strike" Pleading* [ECF No. 13211 (June 16, 2015) (Arizona No Strike Pleading")] at 4-7 (summarizing claims in State of Arizona's Complaint); *People of the State of California's "No Strike" Pleading* [ECF No. 13210 (June 16, 2015) ("California No Strike Pleading)] at 4-7 (summarizing claims in California's First Amended Complaint).

- 12 -

Courts in which their Complaints are pending—whether by showing that a "critical mass" of New GM employees were aware of the defect, or through imputation by agency, or otherwise.  If Plaintiffs cannot prove knowledge of certain facts, and that knowledge is necessary to prevail on their claims, they will not prevail.  ***But the simple fact that Plaintiffs allege that New GM had knowledge of pre-Sale facts does not convert their claims to impermissible claims based on the conduct of Old GM.***

**B.     Because large numbers of Old GM employees brought knowledge of pre-363 Sale events with them to New GM and/or learned about pre-363 Sale events from reviewing relevant records, New GM may be charged with knowledge of those pre-363 Sale events.**

This Court found based on the stipulated factual record that the Ignition Switch Plaintiffs were known creditors to Old GM because a "'critical mass' of Old GM personnel had the requisite knowledge" of the defect.  529 B.R. at 558 n.154.  Under the logic of this Court's ruling, the pre-Sale knowledge of employees who worked first at Old GM and then at New GM is charged to New GM.  This Court based its conclusion that Old GM had knowledge of the Ignition Switch Defect in part on the fact that Old GM—and later New GM—engineers, senior managers, and attorneys who knew of the Ignition Switch Defect were part of "a group large in size and relatively senior in position."  *Id.*  In this Court's opinion, "a group of this size is sufficient for the Court to conclude that a 'critical mass' of Old GM personnel had the requisite knowledge—*i.e.*, were in a position to influence the noticing process."  *Id.* (citing *cf. Weisfelner v. Fund 1 (In re Lyondell Chemical Co.),* 503 B.R. 348, 389 (Bankr. S.D.N.Y. 2014) (Gerber,

- 13 -

J.)).[53] Necessarily, given the presence of this same "critical mass" at New GM, 529 B.R. at 537,

New GM had knowledge of the Ignition Switch Defect.

Alternatively, under the law of agency in California, Arizona, Michigan, New York and

elsewhere, Plaintiffs believe they will be able to show that the knowledge that New GM

employees obtained while working at Old GM is attributable to New GM—even if there was not

a "critical mass" of personnel with knowledge.  Indeed, the law in Arizona, California and across

the country broadly imputes an employee's knowledge to its corporate employer where, as here,

the employees are acting in the scope of their employment and that knowledge is germane to

their responsibilities.  *See, e.g., Fridena v. Evans*, 622 P.2d 463, 466 (Ariz. 1980); Cal. Civ.

Code § 2332 ("As against a principal, both principal and agent are deemed to have notice of

whatever either has notice of, and ought, in good faith and the exercise of ordinary care and

diligence, to communicate to the other."); *O'Riordan v. Federal Kemper Life Assurance Co.*,

114 P.3d 753, 757 (Cal. 2005);  *Allard v. Arthur Andersen & Co. (USA)*, 924 F. Supp. 488, 494-

95 (S.D.N.Y. 1996) (applying New York and Michigan law).  Again, each of the 24 Old GM

employees that this Court found to be aware of the Ignition Switch Defect remained at New GM

in the same or similar roles because New GM chose to keep them there.  To impute the

knowledge of those employees to New GM does not somehow convert Plaintiffs' claims into

successor liability claims (or any other barred claims based on the acts of Old GM).  If New GM

or those employees had acted appropriately upon their hiring by New GM to address (rather than

---

[53] Plaintiffs note that, unlike this case, *Weisfelner* was an adversary proceeding in which this
Court was adjudicating whether or not a claim was stated on the merits.  No party in *Weisfelner*
argued that imputing knowledge was in violation of any "free and clear" provisions in a sale
order.

conceal) the known problems, Plaintiffs would not be seeking to hold New GM liable for its own misconduct.

Contrary to New GM's argument, under agency principles, the knowledge of these employees and counsel may be imputed to New GM.[54] So, for example, under Arizona law, "a corporation is bound by the knowledge acquired by, or notice given to, its agents ... which is within the scope of their authority and which is in reference to a matter to which their authority extends."[55] And employees' knowledge within the scope of their employment is imputed to the corporation even if it is never communicated because Courts impose a conclusive presumption that the agent has discharged his duty to impart to the principal all the knowledge which is necessary for the principal's protection or guidance.[56] Here, it is undisputed that New GM assumed ongoing obligations under the TREAD Act to monitor Old GM vehicles, disclose known defects and order recalls if dictated by safety concerns.  Plaintiffs allege that many GM attorneys, engineers, managers, and other personnel who worked at both Old and New GM acquired knowledge of the Ignition Switch Defect and other defects while performing their duties, using systems and procedures that Old and then New GM maintained to comply with Safety Act obligations.  *See supra* at 5-12.  These facts distinguish this case from the cases cited by New GM declining to find "automatic imputation."  *See infra* at 17-19.  Hence, while the issue of whether or not Plaintiffs can meet the standards for imputation under agency principles

---

[54] *See* Arizona No Strike Pleading at 14-17; California No Strike Pleading at 16-18 (discussing imputation under the law of Arizona, California, New York, and Michigan).

[55] *Fridena v. Evans,* 622 P.2d at 466.

[56] *See, e.g., First Ala. Bank of Montgomery, N.A. v. First State Ins. Co.*, 899 F.2d 1045, 1061 n.8 (11th Cir. 1990).

is not before this Court, Plaintiffs believe they will be able to do so when the issue is properly

joined in the courts adjudicating their Complaints.

**C.    New GM's arguments against charging it with knowledge of pre-Sale events are misplaced.**

**1.    New GM's argument against imputing the knowledge its employees obtained while working at Old GM is irrelevant and incorrect.**

New GM argues that "allegations regarding the knowledge of Old GM employees who

became New GM employees" should be stricken from Plaintiffs' Complaints because Plaintiffs

cannot meet the requirements for imputation under governing state or federal law.[57]  But that

argument misses the mark, since the issue before this Court is ***not*** whether Plaintiffs will be

successful in charging New GM with the knowledge of its employees (whether by imputation or

otherwise), but whether Plaintiffs are allowed to make the attempt.[58]

The issues of what knowledge New GM had, and whether New GM's conduct in light of

that knowledge subjects it to liability, are ultimately for the courts adjudicating Plaintiffs' claims

on the merits.  Plaintiffs will nonetheless address New GM's argument that "the knowledge of

Old GM's employees cannot be automatically imputed to New GM simply because they went to

work for New GM after the closing of the 363 Sale."[59]  Whether or not New GM's "automatic

imputation" argument is correct under the law of any relevant jurisdiction, Plaintiffs do ***not*** seek

---

[57] *See Response by General Motors LLC to Adams Plaintiffs' No Dismissal Pleading* [ECF No. 13422 (Sept. 3. 2015) ("*Adams* Resp.")] at 14-16.

[58] New GM puts the cart before the horse when it states: "That New GM hired many of Old GM's employees who may have knowledge of something does not change the fact that … the underlying claim is based on Old GM's conduct…."  *Adams* Resp. at 15.   New GM's argument—that a barred claim cannot be saved by imputation—does not logically advance its claim that imputation is automatically barred.

[59] *Adams* Resp. at 15.

- 16 -

to attribute knowledge of the Ignition Switch Defect to New GM *merely because* Old GM employees continued on at New GM.  In fact a "critical mass" of high level Old GM employees with knowledge of the defects stayed on at New GM.  Moreover, they worked in the same capacities for a company with the same TREAD Act responsibilities for monitoring and remedying safety defects in GM-branded vehicles, and with access to the same information which they necessarily used to perform the same job functions with respect to those same vehicles.  None of New GM's authorities involve remotely similar facts.

New GM's leading case, *Conmar Prods. Corp. v. Universal Slide Fastener Co.*, 172 F.2d 150 (2d Cir. 1949),[60] is wholly inapposite.  In order to prevail on its trade secrets claim in *Conmar*, the plaintiff was required to prove that the defendants knew that plaintiff's former employees had executed contracts promising not to divulge plaintiff's methods, and that defendants "induced the men to divulge the secrets they had learned."  *Id.* at 154.  In other words, "the [alleged] wrong consist[ed] in inducing [the employee] to break his contract" by disclosing the secret. *Id.* at 155.  Because the Second Circuit affirmed the district court's finding that defendants "had no knowledge of the secrecy contract," *id.* at 154, it ruled in favor of the defendants: "[h]aving acquired the secrets innocently, they were entitled to exploit them."  *Id.* at 157.  Because it was undisputed that the defendants *did* acquire the knowledge its employees obtained in their former employ, *Conmar* provides no support for New GM here.

*Chamberlain Group, Inc. v. Nassimi,* 2010 WL 1875923 (W.D. Wash. May 10, 2010), is also readily distinguishable.  There, the plaintiff Chamberlain sought rescission of the purchase of defendant Nassimi's company based on a claim of fraudulent inducement.  Nassimi defended

---

[60] Cited in *Adams* Resp. at 15.

- 17 -

on the grounds that one of his prior employees, Crider, was aware of the alleged fraud before he became an employee of Chamberlain.  *Id.* at *2.  Under governing Washington agency law, "knowledge may be imputed if it relates to the subject matter of the agency, and the agent acquired it while acting within the scope of his or her authority."  *Goodman v. Boeing Co.*, 75 Wash. App. 60, 86 (1994).  Hence, the *Chamberlain* court found, "Crider's knowledge … cannot be imputed … because Crider … acquired knowledge of the alleged fraud before being hired by Chamberlain."  *Nassimi*, 2010 WL 1875923, at *6.  Here, in stark contrast, the same "critical mass" of Old GM employees continued on in their same roles with New GM—hence, they had and used knowledge of pre-Sale events while acting within the scope of their authority at New GM.[61]  Moreover, to the extent *Nassimi* accurately describes Washington law as disallowing imputation of knowledge acquired prior to the agency relationship, Plaintiffs note that the law in other jurisdictions differs.  So, for example, in California, the principal is "charged with knowledge which his agent acquires before the commencement of the relationship when that knowledge can reasonably be said to be present in the mind of the agent while acting for the principal,"[62] and in Arizona a corporation is bound by the knowledge of its agents so long as the knowledge is "within the scope of their authority and … is in reference to a matter to which their authority extends."[63]

---

[61] *Forest Labs., Inc. v. The Pillsbury Co.*, 452 F. 2d 621, 626 (7th Cir. 1971), likewise holds merely that "the knowledge of the [seller's] employees cannot properly be imputed to [the purchaser] just because they went to work for the [the purchaser]."  Once again, the critical mass of employees with knowledge here necessarily had, and were required to act on, that knowledge given their duties and New GM's ongoing TREAD Act obligations.

[62] *Columbia Pictures Corp. v. De Toth,* 87 Cal. App. 2d 620, 631 (1948).

[63] *Fridena,* 622 P.2d at 466.

Finally, New GM can draw no support from its citation to *Interstate Power Co. v. Kansas City Power & Light Co.*, 909 F. Supp. 1241, 1272 (N.D. Iowa 1993). While that decision indeed rejected the argument that "the knowledge of [the seller's] employees … should be imputed to [the purchaser]," the court did so because "[a]t best the evidence shows that a handful of [the seller's] employees had knowledge [of the relevant issue] and none of them had any reason to raise the issue after becoming employees of [the buyer.]" *Id.* Here, in stark contrast, a "critical mass" of New GM employees had knowledge of the Ignition Switch Defect and, acting within the scope of their authority in carrying out New GM's TREAD Act obligations, they had every reason and obligation to raise the issues after they became employees of New GM.

In sum, under the facts of this case, Plaintiffs will be able to satisfy the requirements for imputation under the agency law of most or all relevant jurisdictions.

### 2.    The language of the Sale Agreement does not bar allegations that New GM had knowledge of pre-Sale facts.

New GM argues that imputation of pre-bankruptcy facts is somehow barred because "the Sale Agreement contemplated that (a) substantially all of Old GM's employees would be hired by New GM … (*see* Sale Agreement § 6.17(a)), and (b) the hiring of such employees would not transform Retained Liabilities based on Old GM's knowledge and conduct into, essentially, a new and unexpressed category of Assumed Liabilities of New GM."[64] But New GM's argument here is circular at best.

New GM simply assumes (without explaining why) claims based in part on New GM's knowledge of pre-Sale events are "Retained Liabilities based on Old GM's knowledge and conduct…." But claims based on New GM's knowledge (and its actions and failures to act in

---

[64] GM Omnibus Resp. at 20.

- 19 -

light of that knowledge) cannot be converted into Retained Liabilities merely because New

GM's knowledge relates to facts that occurred prior to the 363 Sale.  Instead, as this Court held,

it is claims based on "wrongful **conduct** by Old GM" that are "actually claims against Old GM"

and therefore generally proscribed by the Sale Agreement, the Sale Order and the Decision.  *See*

529 B.R. at 528.

Differently put, suppose that New GM had chosen to terminate each of the 24 employees

with knowledge of the Ignition Switch Defect, and assume (contrary to reality) that those were

the only 24 employees with knowledge of the Ignition Switch Defect.  Further suppose that,

shortly after New GM came into existence, its new TREAD team reviewed all the relevant

records of Old GM and became fully aware of the Ignition Switch Defect.  In that scenario, not

even New GM could claim that attempts to hold it liable for its subsequent actions and inactions

in connection with the Ignition Switch Defect were barred by the Sale Order.  And New GM has

offered no reason why the result should be different simply because it kept those 24 employees

(and their knowledge) through the changeover to New GM.

## IV.    CONCLUSION

For the reasons stated above, Plaintiffs respectfully submit that the knowledge of New

GM employees can be charged to New GM without violating the Sale Order, regardless of

whether that knowledge was gained while working for Old GM, reviewing Old GM records

while working at New GM, or independently acquired at New GM.

Dated:  September 18, 2015

- 20 -

**HAGENS BERMAN SOBOL SHAPIRO LLP**

*/s/ Steve W. Berman*
Steve W. Berman
steve@hbsslaw.com
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone:  206-623-7292

*Co-Lead Counsel in the MDL Proceeding
for the Ignition Switch Plaintiffs and Certain Non-
Ignition Switch Plaintiffs; and Counsel for the
People of the State of California, acting by and
through Orange County District Attorney Tony
Rackauckas and the State of Arizona*

-and-

Elizabeth J. Cabraser
ecabraser@lchb.com
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, California 94111
Telephone: 414-956-1000

*Co-Lead Counsel in the MDL Proceeding for the
Ignition Switch Plaintiffs and Certain Non-Ignition
Switch Plaintiffs*

-and-

Mark P. Robinson Jr.
mrobinson@rcrlaw.net
**ROBINSON CALCAGNIE ROBINSON
SHAPIRO DAVIS, INC.**
19 Corporate Plaza Drive
Newport Beach, California 92660
Telephone: 949-720-1288

*Counsel for the People of the State of California,
acting by and through Orange County District
Attorney Tony Rackauckas*

- 21 -

-and-

Edward S. Weisfelner
eweisfelner@brownrudnick.com
Howard S. Steel
hsteel@brownrudnick.com
**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
Telephone: 212-209-4800

-and-

Sander L. Esserman
esserman@sbep-law.com
**STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA, A PROFESSIONAL CORPORATION**
2323 Bryan Street, Ste 2200
Dallas, Texas 75201
Telephone: 214-969-4900

*Designated Counsel in the Bankruptcy Proceeding
for the Ignition Switch Plaintiffs and Certain Non-
Ignition Switch Plaintiffs*

-and-

William P. Weintraub
wweintraub@goodwinprocter.com
**GOODWIN PROCTER LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Telephone: 212-813-8800

*Counsel for Post-Closing Accident Switch Plaintiffs
and the Adams Plaintiffs*

- 22 -

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 18, 2015, I caused the foregoing to be filed and served

upon all parties receiving notice via the Court's ECF system.

Dated:  September 18, 2015              /s/ Steve W. Berman
                                       Steve W. Berman (*pro hac vice*)
                                       HAGENS BERMAN SOBOL SHAPIRO LLP
                                       1918 Eighth Avenue, Suite 3300
                                       Seattle, Washington  98101
                                       Tel.:  206-623-7292
                                       steve@hbsslaw.com

010440-11  809504 V1