# **Exhibit D**

CAUSE NO. 2014CCV-6078802

| | | |
|---|---|---|
| DIDRA DE LOS SANTOS,<br>*Plaintiff* | § § § § | IN THE COUNTY COURT |
| vs. | § § § | AT LAW NO. 2 |
| MELINA GABRIELLE ORTEGA<br>GENERAL MOTORS, LLC, and<br>RAYMOND DEGIORGIO, GARY<br>ALTMAN, LORI QUEEN, JIM<br>QUEEN, MARK LANEVE,<br>*Defendants* | § § § § § § § | NUECES COUNTY, TEXAS |

## PLAINTIFF'S FIRST AMENDED PETITION

COMES NOW Plaintiff Didra De Los Santos (hereinafter, "Didra" or "Plaintiff") and files her Original Petition and Application for Temporary Restraining Order and Injunction complaining of Melina Gabrielle Ortega, General Motors, LLC, Raymond DeGiorgio, Gary Altman, Lori Queen, Jim Queen, Mark LaNeve (together, "Defendants") and in support of this petition would show the Court as follows:

### I.
### DISCOVERY LEVEL

1.  Discovery shall be conducted in this case according to a Level III discovery control plan.

### II.
### PARTIES

2.  Plaintiff Didra De Los Santos is an individual residing in Corpus Christi, Nueces County, Texas.

Plaintiff's First Amended Petition

1.

2014 MAY 19 PM 7:59
FILED-PATSY PEREZ
CLERK OF COUNTY &
DISTRICT COURTS
NUECES COUNTY, TEXAS
BY _____ DPTY

3.   Defendant Melina Gabrielle Ortega ("Defendant Ortega") is an individual who resides in Nueces County, Texas. Defendant Ortega has been served at her residence, 8201 Azimuth Ct., Corpus Christi, Nueces County, Texas 78414.

4.   Defendant General Motors, LLC ("New GM") is a Delaware limited liability company. With respect to the facts alleged and claims asserted in this Petition, New GM is the corporate successor of General Motors Corporation ("Old GM"), which filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code on June 1, 2009. On July 10, 2009, New GM acquired substantially all of the assets and assumed certain liabilities of Old GM by way of a Section 363 sale under Chapter 11 of the Bankruptcy Code. Plaintiff's causes of action in this lawsuit are brought against New GM, and Plaintiff does not assert any causes of action against Old GM. Although this Petition references facts against Old GM, it is for background and reference purposes only. At all times relevant to the claims in this lawsuit, New GM has been in the business of developing, manufacturing, and marketing cars throughout the State of Texas. New GM has a network of authorized retailers that sells New GM vehicles and parts throughout Texas. General Motors, LLC has been served with process through its registered agent for service of process in the State of Texas, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-4234, and has appeared and answered in this case.

5.   Defendant Raymond DeGiorgio ("Defendant DeGiorgio") was the lead design engineer on Chevrolet Cobalt ignition switches. In 2006, DeGiorgio approved a design change to the faulty ignition switch that is the subject of GM's recent recall, and which caused Plaintiff's vehicle to stall immediately before the collision which is the subject of this lawsuit. Defendant DeGiorgio designed an improvement for the ignition switch in 2007, although he later denied,

Plaintiff's First Amended Petition

2.

under oath, that he had done so. He did this in what can only be described as an attempt to conceal a defective condition that GM knew about in the 2006 Chevrolet Cobalt, the vehicle owned by Plaintiff. Defendant DeGiorgio has recently been suspended, with pay, by the New GM for his role in the cover up at GM of the ignition switch defect. In fact, he was accused by at least one United States Senator of being actively involved in participation of a cover up by the New GM of the defective condition of the Chevrolet Cobalt and the extent of New GM's knowledge of the defective condition and the dangers such condition presented to Plaintiff and others. Defendant DeGiorgio has been served through the Texas Secretary of State in accordance with the Texas Long-Arm Statute, by service on him at his residence, 4085 Wildwood Court, Commerce, Michigan 48382.

6.  Defendant Gary Altman ("Defendant Altman") was Chief Development Engineer at GM from 2000 to 2005, and programming engineering manager for the Chevrolet Cobalt. In 2013, Defendant Altman admitted that in 2005 GM made a conscious decision not to fix the Chevrolet Cobalt. Defendant Altman has recently been suspended, with pay, by the New GM for his role in the cover up at GM of the ignition switch defect. Defendant Altman was involved in the cover up at GM concerning the extent of New GM's knowledge of the defective switch and the dangers it posed to Plaintiff and others. Defendant Altman has been served through the Texas Secretary of State in accordance with the Texas Long-Arm Statute, by service on him at his residence, 62935 Tournament Drive, Washington, Michigan 48094.

7.  Defendant James E. Queen ("Defendant J. Queen") served as Group Vice President of Global Engineering of Motors Liquidation Company (formerly known as General Motors Corporation) from 2007 to July 2009. Mr. Queen served as Vice President of vehicle systems of GM North America Car Group since January 2001, and also served as its Vice

**Plaintiff's First Amended Petition**

3.

President and Group Director since 1999. He served as Group Director of engineering of the GM Small Car Group since 1997. Mr. Queen was one of the engineers at GM that was responsible for the design of the Chevrolet Cobalt. Defendant J. Queen was involved in the cover up at GM concerning the extent of General Motor's knowledge of the defective switch and the dangers it posed to Plaintiff and others. Defendant J. Queen resides at 59 Wicklow Dr., Hilton Head Island, SC 29928, and may be served through the Secretary of State.

8.      Defendant Lori Queen ("Defendant L. Queen") was GM's vehicle line executive for small cars, including the Chevrolet Cobalt, including from 2005 to 2009. E-mail communications have been discovered that demonstrate that Defendant L. Queen and GM had personal knowledge of the existence of a defective switch in the Chevrolet Cobalt since at September 2005. Defendant L. Queen was involved in the cover up at GM concerning the extent of GM's knowledge of the defective switch and the dangers it posed to Plaintiff and others. Defendant L. Queen has been served through the Texas Secretary of State in accordance with the Texas Long-Arm Statute, by service on her at his residence, 59 Wicklow Dr., Hilton Head Island, SC 29928.

9.      Defendant Mark LaNeve ("Defendant LaNeve") was the head of GM Sales, Service, and Marketing from 2004 to 2009. Defendant LaNeve was involved in the cover up at GM concerning the extent of GM's knowledge of the defective switch and the dangers it posed to Plaintiff and others. Defendant LaNeve's has been served through the Texas Secretary of State in accordance with the Texas Long-Arm Statute, by service on him at his residence, 47610 Bellagio Drive, Northville, Michigan 48167.

## III.
## VENUE AND JURISDICTION

10.     Venue is proper in Nueces County because all or a substantial part of the events giving rise to the claims brought by this lawsuit occurred in Nueces County, Texas, and Defendant Ortega resides in Nueces County, Texas.[1]

11.     The Court has jurisdiction over Defendant Ortega because she is domiciled in this State.

12.     The Court has jurisdiction over New GM, Raymond DeGiorgio, Gary Altman, Lori Queen, James E. Queen, Mark LaNeve (together, "GM Defendants") under the long-arm statute of the State of Texas.[2]

## IV.
## FACTS

### A.     This Lawsuit Arises Out Of A Collision In Nueces County, Texas

13.     Didra owns a 2006 Chevrolet Cobalt, which she purchased from Oasis Motor Company in Nueces County, Texas. Didra purchased the 2006 Cobalt because of the vehicle's quality, reliability, and safety features.

14.     During the early morning hours on September 4, 2013, Didra was traveling southbound on Weber Road on her way to work as a care provider to special needs children within Corpus Christi Independent School District. As she traveled through the intersection of

---

1.      *See* TEX. CIV. PRAC. & REM. CODE §§ 15.002 (a)(1)-(a)(2).

2.      *See* TEX. CIV. PRAC. & REM. CODE §17.042.

Plaintiff's First Amended Petition
                                            5.

Weber Road and Tiger Lane, a vehicle driven by Defendant Ortega, traveling in the opposite direction on Weber Road, made an illegal left-hand turn in front of Didra.

15. When Didra saw Defendant Ortega's vehicle turning in front of her she immediately applied her brakes. As she applied her brakes, her vehicle stalled, and she collided with Defendant Ortega's vehicle. The force of the impact was significant. The entire front end of Didra's 2006 Chevrolet Cobalt was crushed, which included significant damage to her bumper, hood, and both front quarter panels.



16. As shown in the picture taken of Didra's 2006 Cobalt after the collision, the airbags on Plaintiff's 2006 Cobalt did not deploy. The airbags should have deployed because this was a "deployable event," meaning a collision in which the airbags should have opened given the change in velocity of the vehicle caused by the collision.

17. As a result of the failed airbags, there was nothing to stop Didra's forward momentum except her steering wheel and her seat belt, neither of which adequately prevented injury to Didra's spine. As Didra was thrown around in her vehicle, she suffered severe and permanent spinal injuries, as more fully described below.

**B.    The Airbags On Plaintiff's Vehicle Did Not Deploy Because Of A Defective Condition That GM Knew Existed**

1.    **Plaintiff's vehicle was one of the vehicles subject to a recent recall.**

Plaintiff's First Amended Petition

6.

18.     The problem with Plaintiff's vehicle was not unique. To the contrary, it is a problem that resulted in a recall notice being issued by New GM for certain of its vehicles, including Plaintiff's 2006 Chevrolet Cobalt. Initially, on February 7, 2014, New GM filed a Defect Notice to recall 2005-2007 Model Year Chevrolet Cobalt and 2007 Pontiac G5 vehicles. The Defect Notice stated that the ignition switch torque performance in these vehicles might not meet specifications, resulting in the nondeployment of airbags in crash events. The notice called for the recall of approximately six hundred thousand vehicles.

19.     Seventeen days later, on February 24, 2014, New GM issued a notice to the National Highway Traffic Safety Administration ("NHTSA"), expanding the recall to include 2003-2007 Saturn Ions, 2006-2007 Chevrolet HHRs, 2006-2007 Pontiac Solstices, and 2007 Saturn Skys, bringing the number of vehicles affected by the recall to 1,367,146. This NHTSA notice furnished information dating back 10 years, and dealt directly with New GM's recall obligations and product warranties, which have been known to New GM since July 2009. The notice dated February 24, 2014, provided a chronology that, at a minimum, demonstrates GM's knowledge and actions related to the ignition switch.

20.     On March 28, 2014, the recall was expanded to include the following vehicles: 2008-2010 Pontiac Solstices; 2008-2010 Pontiac G5s; 2008-2010 Saturn Skys; 2008-2010 Chevrolet Cobalts; and 2008-2011 Chevrolet HHRs (collectively, the "defective vehicles").

21.     Throughout 2005, Old GM received similar field reports of vehicles losing engine power when the key moved out of the "run" position. A proposal was approved to redesign the key head, but later cancelled. Instead of recalling the vehicles to replace the defective ignition switches, Old GM issued a Service Bulletin (the "Bulletin"). The Bulletin recognized that there

**Plaintiff's First Amended Petition**

was a potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort.

22. Although Old GM developed an insert for the key ring that changed it from a slot design to a hole design, to prevent the key from easily jogging the ignition switch out of the run position, the redesigned ignition switch was not installed in vehicles until the 2007 model year.

23. The defective ignition switch has been linked to numerous crashes and fatalities.

24. Given the vast number of instances of sudden engine power loss and nondeployment of airbags related to the defective ignition switch and New GM's discovery or knowledge of many or all of the instances beginning with its inception in July 2009, New GM should have aggressively taken remedial measures to address these defects. New GM failed to do so. In fact, this first recall was not implemented until 2014 – nearly ten years after the first instances of engine power loss.

25. The ignition switch defect in GM vehicles has adversely affected the company's reputation as a manufacturer of safe, reliable vehicles with high resale value, as compared to vehicles made by its competitors. In the wake of the news reports about this serious problem, GM customers and consumers generally are – as they should be – skeptical about the quality and safety of GM vehicles.

26. In the wake of the news about the ignition defects, consumers have also become rightfully skeptical about whether New GM is coming forth with truthful information about the sudden loss of power defect. Likewise, GM customers, including Plaintiff, and the general public are left to wonder whether safety concerns about GM vehicles are limited to this particular problem.

**Plaintiff's First Amended Petition**

**2.   The recall notice is inaccurate because Plaintiff only had one key in the ignition switch at the time of the collision, and her vehicle still stalled.**

27.   In late March 2014, Plaintiff received a letter from New GM advising her that her vehicle was being recalled. In that letter, New GM advised Plaintiff that she should take all the weight off of her key chain and, by so doing, her car would not stall.

28.   New GM's statements in the recall notice are not accurate. At the time of her collision, Plaintiff only had one key, her ignition key – with no key fob, a small security hardware device used to unlock vehicles and set a vehicle's alarm – in the ignition switch of her 2006 Chevrolet Cobalt.

**3.   The damage done....**

29.   As a direct and proximate result of the collision and the negligent conduct of Defendants, Plaintiff suffered severe bodily injuries to her cervical spine. The injuries are permanent in nature. The injuries have had a serious effect on the Plaintiff's health and well-being. Some of the effects are permanent and will abide with the Plaintiff for a long time into the future, if not for her entire life. These specific injuries and their ill effects have, in turn, caused the Plaintiff physical and mental condition to deteriorate generally and the specific injuries and ill effects alleged have caused and will, in all reasonable probability, cause the Plaintiff to suffer consequences and ill effects of this deterioration throughout her body for a long time in the future, if not for the balance of her natural life. As a further result of the nature and consequences of her injuries, the Plaintiff suffered great physical and mental pain, suffering and mental anguish and in all reasonable probability, will continue to suffer in this manner for a long time into the future, if not for the balance of her natural life.

30.   Additionally, as a direct and proximate result of the occurrence made the basis of

**Plaintiff's First Amended Petition**

9.

this lawsuit, Plaintiff was caused to incur the following damages:

a. Reasonable medical care and expenses in the past. Plaintiff incurred these expenses for the necessary care and treatment of the injuries resulting from the accident complained of herein and such charges are reasonable and were usual and customary charges for such services in which county they were incurred;

b. Reasonable and necessary medical care and expenses, which will, in all reasonable probability be incurred in the future;

c. Physical pain and suffering in the past;

d. Physical pain and suffering, which will, in all reasonable probability be suffered in the future;

e. Physical impairment in the past;

f. Physical impairment, which will, in all reasonable probability, be suffered in the future;

g. Lost wages in the past, present and future;

h. Loss of earning capacity, which will, in all reasonable probability, be incurred in the future;

i. Mental anguish in the past;

j. Mental anguish which will, in all reasonable probability be suffered in the future;

k. Disfigurement; and

l. Other special damages.

## V.
## CLAIMS AGAINST DEFENDANT ORTEGA

31. Plaintiff hereby incorporates each of the foregoing paragraphs herein as if set forth in full in this section.

32. Defendant Ortega had a duty to exercise the degree of care that a reasonably careful person would use to avoid harm to others under circumstances similar to those described herein.

**Plaintiff's First Amended Petition**

10.

33. Plaintiff's injuries were proximately caused by Defendant Ortega's negligent, careless and reckless disregard of said duty.

34. The negligent, careless and reckless disregard of duty of Defendant Ortega consisted of, but is not limited to, the following acts and omissions:

  a. Defendant Ortega failed to keep a proper lookout for Plaintiff's safety that would have been maintained by a person of ordinary prudence under the same or similar circumstances;

  b. Defendant Ortega failed to yield the right-of-way to Plaintiff's vehicle;

  c. Defendant Ortega failed to timely apply the brakes of the vehicle in order to avoid the collision in question;

  d. Defendant Ortega failed to turn her motor vehicle to the right or the left in an effort to avoid the collision complained of; and

  e. Defendant Ortega failed to blow her horn to warn of imminent collision.

35. Each of these acts and/or omissions, whether taken singularly or in any combination constitute negligence, negligence per se and gross negligence, which proximately caused the collision and injuries and other losses as specifically set forth herein, all of which Plaintiff suffered and which Plaintiff will continue to suffer in the future, if not for the remainder of her natural life, and the damage and other losses to Plaintiff.

## VI.
## CLAIMS AGAINST GM DEFENDANTS

**A.** **Negligence And Gross Negligence**

36. Plaintiff re-alleges as if fully set forth, each and every allegation set forth herein.

Plaintiff's First Amended Petition

11.

37. Plaintiff hereby asserts a cause of action for negligence strictly and solely against "New GM" and the GM Defendants, as defined above to include Defendant J. Queen, Defendant L Queen, Defendant DeGiorgio, Defendant Altman, and Defendant LaNeve.

38. Each and every act of negligence asserted herein by the Plaintiff is asserted against the New GM and the GM Defendants, only, and not the Old GM.

39. The GM Defendants owed Plaintiff a duty to detect known safety defects in GM vehicles.

40. The GM Defendants owed Plaintiff a duty, once it discovered the safety defects, such as the ignition switch defect, to provide thorough notice of the defect, including a warning that the defective vehicles should not be driven until an appropriate repair procedure is developed and performed.

41. The GM Defendants owed Plaintiff a duty, once it discovered the ignition switch defect, to ensure that an appropriate repair procedure was developed and made available to drivers.

42. The GM Defendants knew that their customers, such as Plaintiff, expect that the company will employ all reasonable efforts to detect safety defects, warn drivers of their existence, and develop and make available an appropriate repair procedure.

43. The GM Defendants efforts to discover, provide notice of, and provide repair procedures for safety related defects exist for the benefit of Plaintiff and other drivers of GM vehicles. New GM was aware that by providing maintenance and repair information and assistance, including through its authorized dealerships, GM had a responsibility to Plaintiff and other drivers to take the reasonable measures listed above.

44. Between July 10, 2009, and March 2014, the GM Defendants breached their

Plaintiff's First Amended Petition

12.

duties to Plaintiff by failing to provide appropriate notice of and repair procedures for the ignition switch defect in Plaintiff's vehicle. In doing so, New GM departed from the reasonable standard of care required of it.

45.   It was foreseeable that if the GM Defendants did not provide appropriate notice and repair procedure for the defect, that Plaintiff and other drivers would be endangered, and that when news of the defect became widespread, that the value of Plaintiff's vehicle and other defective vehicles would be diminished.

46.   Plaintiff has suffered injury by, among other things, being stuck with a defective vehicle with no known appropriate fix, and with a diminished value. Plaintiff is thus deprived of the use and enjoyment of her vehicle as well as the ability to sell her vehicle for the value it would have had if New GM had not concealed and failed to develop a repair procedure for the defect. In addition, Plaintiff and other drivers have been and continue to be endangered by New GM's refusal to state unequivocally that the vehicles should not be driven in their current state. New GM's failure to provide an appropriate notice and repair was the direct and proximate cause of Plaintiff's injuries, and led directly and predictably to the harm suffered.

47.   Plaintiff's injuries were reasonably foreseeable to New GM.

48.   Plaintiff could not through the exercise of reasonable diligence have prevented the injuries caused by New GM's negligence.

49.   Plaintiff seeks an order enjoining New GM from its continued negligence; including to require New GM to provide appropriate notice to drivers (including instructions to drivers to park the vehicle); to pay for a rental car while the necessary repairs are conducted; and to extend warranty coverage covering components of the ignition system.

**B.   Civil Conspiracy Against The GM Defendants**

Plaintiff's First Amended Petition

13.

50. Plaintiff re-alleges as if fully set forth each and every allegation set forth above.

51. The GM Defendants and the New GM were involved in a civil conspiracy, as two or more persons whose goal was to accomplish a cover up of the defective ignition switch at the New GM. The cover up was for the purpose of an unlawful act, to wit, the defective condition which proximately caused damage to Plaintiff.

C. **Fraud by Non Disclosure**

52. Plaintiff re-alleges as if fully set forth, each and every allegation set forth herein.

53. The Plaintiff hereby asserts a cause of action for fraud by non-disclosure strictly and solely against New GM. That is, each and every act constituting fraud by non-disclosure asserted herein by the Plaintiff are asserted against the New GM only and not the Old GM.

54. As set forth above, from July 2009 to the present, New GM intentionally concealed or failed to disclose material facts from the Plaintiff, the public, and NHTSA.

55. As early as 2001, during pre-production development of the Ion, Old GM became aware of issues relating to ignition switch "passlock" system. The 2001 report stated the problem included a "low detent plunger force" in the ignition switch.

56. In 2003, before the launch of the 2005 Cobalt, Old GM became aware of incidents wherein the vehicle engine would suddenly lose power in the event the key moved out of the "run" position when the driver inadvertently contacted the key or steering column. An investigation was opened and, after consideration of lead-time required and the cost and effectiveness of potential solutions, the investigation was closed with no action taken.

57. New GM had a duty to disclose the facts to the Plaintiff and New GM knew: (1) the Plaintiff was ignorant of the material facts that New GM did not disclose and/or intentionally

Plaintiff's First Amended Petition
14.

concealed; and (2) the plaintiff did not have an equal opportunity to discover the material facts that GM did not disclose and/or intentionally concealed.

58.  By failing to disclose these material facts, New GM intended to induce Plaintiff to take some action or refrain from acting.

59.  Plaintiff relied on New GM's non-disclosure and the Plaintiff was injured as a result of acting without knowledge of the undisclosed facts.

### D.  Intentional Infliction of Emotional Distress

60.  Plaintiff re-alleges as if fully set forth, each and every allegation set forth herein.

61.  The Plaintiff hereby asserts a cause of action for intentional infliction of emotional distress strictly and solely against New GM. That is, each and every act constituting the intentional infliction of emotional distress asserted herein by the Plaintiff is asserted against the New GM only and not the Old GM.

62.  New GM's intentional and/or reckless conduct, outlined above, was both extreme and outrageous, causing Plaintiff to suffer severe emotional distress. Specifically, New GM's conduct, as described above, was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community, and the emotional distress suffered by Plaintiff was so severe that no reasonable person could be expected to endure it.

### VII.
### PREJUDGMENT AND POST-JUDGMENT INTEREST

65.  Plaintiff seeks prejudgment and post-judgment interest at the maximum rate permitted by law.

Plaintiff's First Amended Petition

## VIII.
## JURY DEMAND

66. In accordance with Rule 216 of the Texas Rules of Civil Procedure, Plaintiff hereby makes application for a jury trial and request that this cause be set on the Court's Jury Docket. In support of his application, the appropriate jury fee has been paid to the Clerk at least thirty (30) days in advance of the trial setting.

## XIII.
## PRAYER

For the foregoing reasons, Plaintiff Didra De Los Santos prays that the Defendants be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendants for actual damages, as alleged, and exemplary damages, in an amount within the jurisdictional limits of this Court; together with pre-judgment interest (from the date of injury through the date of judgment) at the maximum rate allowed by law; post-judgment interest at the legal rate, costs of court; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

Respectfully submitted,

HILLIARD MUÑOZ GONZALES LLP

By: _____
Robert C. Hilliard
State Bar No. 09677700
bobh@hmglawfirm.com
Rudy Gonzales, Jr.
State Bar No. 08121700
rudyg@hmglawfirm.com
Catherine D. Tobin
State Bar No. 24013642
catherine@hmglawfirm.com

**Plaintiff's First Amended Petition**
16.

John B. Martinez
State Bar No. 24010212
john@hmglawfirm.com
T. Christopher Pinedo
State Bar No. 00788935
cpinedo@hmglawfirm.com
Kimberly Wilson
State Bar No. 24066035
kimberly@hmglawfirm.com
Marion Reilly
State Bar No. 24079195
marion@hmglawfirm.com
Neely Balko
State Bar No. 24082652
neely@hmglawfirm.com
Todd A. Hunter, Jr.
State Bar No. 24087774
todd@hmglawfirm.com

719 S. Shoreline Boulevard,
Suite 500
Corpus Christi, TX 78401
Telephone No.: (361) 882-1612
Facsimile No.: (361) 882-3015

THE LAW OFFICE OF THOMAS J. HENRY
521 Starr St.
Corpus Christi, Texas 78401
Tel. (361) 985-0600
Fax. (361) 985-0601

Thomas J. Henry
State Bar No. 09484210
Greggory A. Teeter
State Bar No. 24033264
David A. Tijerina
State Bar No. 00791796
Bianca Martinez
State Bar No. 24076208
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned attorney does hereby certify that a true and correct copy of the foregoing instrument was forwarded to all counsel of record, listed below, pursuant to the Texas Rules of Civil Procedure on this the 19th day of May 2014.

Darrell L. Barger
HARTLINE DACUS BARGER DREYER LLP
800 North Shoreline Blvd.
Suite 2000, North Tower
Corpus Christi, Texas 78401
361.866.8039 fax

Kyle H. Dreyer
HARTLINE DACUS BARGER DREYER LLP
6688 N. Central Expressway, Suite 1000
Dallas, Texas 75206
214.267.4214 fax

_____
Robert C. Hilliard

Plaintiff's First Amended Petition

18.